IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x
In re:                                                  :    Chapter 11
                                                        :
AMERICAN HOME MORTGAGE                                  :    Case No. 07-11047 (___)
HOLDINGS, INC., et al.,                                 :
                                                        :    Joint Administration Pending
         Debtors.                                       :
------------------------------------------------------- x

### DECLARATION OF MICHAEL STRAUSS IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Michael Strauss, hereby declare:

1.     I am Chairman, Chief Executive Officer and President of American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation and the parent company of American Home Mortgage Holdings, Inc., a Delaware corporation ("AHM Holdings," and together with AHM Investment and their various direct and indirect subsidiaries, as described below, "AHM" or the "Debtors").[1] I have been employed by the Debtors since 1988.

2.     AHM Investment is a mortgage real estate investment trust ("REIT") that earns net interest income from its investment in mortgage loans and securities and, through its taxable subsidiaries, earns fee income from originating, servicing and selling mortgage loans. Until the Debtors were forced to discontinue operations, as further described below, mortgages

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

were originated by certain of the Debtors through a network of loan origination offices (the "Retail Origination Business"). In addition, the Debtors originated loans obtained from mortgage brokers and purchased loans from correspondents (the "Wholesale Origination Business"). Some of the loans originated by the Debtors, whether retail or wholesale, were – and continue to be – serviced by AHM Servicing, another Debtor.

3. I submit this Declaration in connection with the voluntary chapter 11 petitions, first-day applications and motions listed on Exhibit A (collectively, the "First Day Papers"). Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant first-day motion or application. All facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by people who report to me or are senior officers or employees with the Debtors, upon information supplied to me by the Debtors' professionals and consultants, or upon my opinion based on my experience and knowledge with respect to the Debtors' operations, financial condition and related business issues. If I were called upon to testify, I could and would testify competently to the facts set forth herein, and I am authorized to submit this Declaration on behalf of the Debtors.

## I. NATURE OF DEBTORS' BUSINESSES AND STATEMENT OF CIRCUMSTANCES LEADING TO THE DEBTORS' CHAPTER 11 FILINGS

### A. The Debtors

4. Prior to the date of filing these bankruptcy cases (the "Petition Date"), the Debtors' business primarily entailed the origination, servicing and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitization of residential mortgage loans. The Debtors primarily originated or purchased loans to prime credits and originated or purchased so-called "Alt-A" loans. Prior to the reduction

in workforce on August 3, 2007, the Debtors employed approximately 7500 people and constituted the tenth largest mortgage originator in the United States, according to the *National Mortgage News*. Debtors now only employ approximately 1,000 persons, and that number is expected to decline over the coming days and months.

**B.    The Corporate Structure**

### AHM Holdings and its Direct Subsidiaries

5.    AHM Holdings, a Delaware corporation, is a direct, wholly owned subsidiary of AHM Investment, a Maryland corporation. AHM Holdings is a holding company for certain of its Debtor and non-debtor subsidiaries. AHM Holdings guarantees certain obligations of other Debtors and non-debtors, and is the direct obligor with respect to certain other transactions. AHM Holdings wholly owns AHM Servicing, a Maryland corporation, AHM Corp., a New York corporation, and AHM Ventures, a Delaware limited liability company. AHM Holdings also wholly owns non-debtor entities including American Home Securities, LLC, a Delaware limited liability company, American Home Bank, a United States federally chartered thrift, and several Delaware business trusts.[2]

### AHM Investment and its Direct Subsidiaries

6.    AHM Investment, a Maryland corporation, is organized and operates as a REIT for federal income tax purposes, and its common stock is publicly traded on the New York Stock Exchange under the symbol "AHM."[3] AHM Investment is the ultimate parent of each of the other Debtors. AHM Investment directly wholly owns AHM Holdings, a Delaware

---

[2] These business trusts include Baylis Trust II, Baylis Trust III, Baylis Trust IV, Baylis Trust V, Baylis Trust VI, Baylis Trust VII and Baylis Trust VIII.

[3] AHM Investment's 9.75% Series A Cumulative Redeemable Preferred Stock ("Series A Preferred Stock") and 9.25% Series B Cumulative Redeemable Preferred Stock ("Series B Preferred Stock") are also traded on the NYSE under the symbols "AHM PrA" and "AHM PrB," respectively.

corporation, and AHM Acceptance, a Maryland corporation, as well as four non-debtor entities: Baylis Trust I, a Delaware business trust; AHM Capital Trust I, a Delaware business trust; American Home Mortgage Securities LLC, a Delaware limited liability company; and AHM SPV III, LLC, a Delaware limited liability company.

### AHM Acceptance and its Direct Subsidiaries

7.  AHM Acceptance, a Maryland corporation, is a direct, wholly owned subsidiary of AHM Investment, a Maryland corporation, that originates loans for AHM. AHM Acceptance also wholly owns two non-debtor entities: Melville Funding, LLC, a Delaware limited liability company, and AHM LF, LLC, a Delaware limited liability company.

### AHM Servicing and its Direct Subsidiaries

8.  AHM Servicing, a Maryland corporation, is a direct, wholly owned subsidiary of AHM Holdings, a Delaware corporation, that services the Debtors' loans as well as loans for third parties. AHM Servicing also wholly owns three non-debtor entities: CNI Reinsurance, Ltd., a company established under the laws of Turks & Caicos Islands; NAP Financial Services, LLC, a Maryland limited liability company; and CNI Title Services, LLC, a Maryland limited liability company.

### AHM Corp. and its Direct Subsidiaries

9.  AHM Corp., a New York corporation, is a direct, wholly owned subsidiary of AHM Holdings, a Delaware corporation, and together with AHM Acceptance, a Maryland corporation, primarily originated loans for the Debtors. AHM Corp. wholly owns Homegate, a New York corporation and Great Oak, a New York corporation, as well as several

non-debtor entities.[4] AHM Corp. is also a participant in the following joint ventures: Mortgage First Limited, LLC; Array Mortgage, LLC; and American Midwest Title Agency, LLC.

### AHM Ventures

10. AHM Ventures, a Delaware limited liability company, is a wholly owned subsidiary of AHM Holdings, a Delaware corporation, that provides residential mortgage brokerage services. AHM Ventures also participates in several joint ventures.[5]

### Homegate

11. Homegate, a New York corporation, is a wholly owned subsidiary of AHM Corp., a New York corporation, that provides vendor management services to the Debtors' loan origination affiliates.

### Great Oak

12. Great Oak, a New York corporation, is a wholly owned subsidiary of AHM Corp., a New York corporation, that provides title search and related services in New York State to certain of the Debtors' affiliates.

### C. The Debtors' Businesses

#### Overview of the Debtor's Business

13. As noted above, the Debtors engaged in the origination of residential mortgage loans through their retail business and their indirect business. The Debtors' intention was to sell many of the loans they originated, either by transfer into securitization transactions or through whole loan sales to institutional purchasers.

---

[4] These wholly owned non-debtor entities include: Broadhollow Funding, LLC, a Delaware limited liability company; AHM SPV I, LLC, a Delaware limited liability company; AHM SPV II, LLC, a Delaware limited liability company; American Home Mortgage Assets LLC, a Delaware limited liability company; Melville Reinsurance Corp., a Vermont corporation; and American Home Escrow, LLC, a Delaware limited liability company.

[5] These joint ventures include: HSS Mortgage, LLC; All Pro Mortgage, LLC; Silicon Mortgage, LLC; TDG Equities, LLC; Elite Lending Partners, LLC; Peak Experience Mortgage, LLC; U.S. Lending Company, LLC; American Home Mortgage V, LLC; and Private Mortgage Group, LLC.

14. In order to maintain adequate liquidity pending the ultimate sale of their loans, the Debtors entered into several warehouse financing arrangements (the "Warehouse Facilities"). Most of the arrangements are documented under committed Master Repurchase Agreement facilities. Pursuant to these facilities, the loans are sold to an institution for a purchase price that is generally thought to be less than the fair market value of the loans. The sale is subject to an obligation of the Debtors to repurchase the loans at a price equal to the original purchase price, plus a differential representing the time value of money and is subject to an obligation on the part of the purchaser to resell the loan to the Debtors at that price. The Master Repurchase Agreements generally permit the purchaser to periodically mark the purchased loans to market and, if the value of the loans has declined, to demand additional margin payments. If the Debtors fail to meet a margin call, the purchasers are entitled to declare an event of default and accelerate the Debtors' obligation to repurchase, thus extinguishing that right.

15. Debtors also warehouse loans under secured lending facilities and a commercial paper program. These facilities also generally permit the lenders or credit support providers to mark the collateral to market and to demand additional margin payments.

16. In addition to owning loans pending sale, the Debtors purchased mortgage backed securities.

17. As of December 31, 2006, the Debtors held a leveraged portfolio of mortgage loans and mortgage-backed securities in the amount of approximately $15.6 billion.

18. The Debtors' originations were sourced through a sales force of approximately 2,450 loan officers and account executives, as well as mortgage brokers and loan correspondents staffed in over 550 retail and wholesale production offices located in 47 states

and the District of Columbia. During 2006, the Debtors made loans to approximately 196,000 borrowers with total originations of approximately $58.9 billion.

**Loan Sales and Securitizations**

19.   As noted above, the Debtors sold a portion of the mortgage loans that they originated in the secondary mortgage market through whole loan sales or in the form of securitizations. With respect to mortgage loans that the Debtors originated but did not securitize, the Debtors typically sold those loans in the secondary mortgage market to securities dealers, large national banks, Fannie Mae, Freddie Mac, thrifts and smaller banks, real estate investment trusts and other institutional loan buyers. Typically, the Debtors sold loans on a limited recourse basis in order to reduce exposure to default risk, except that pursuant to the underlying purchase agreements, the Debtors generally committed to repurchase or substitute a loan if (i) a payment default occurred early in the life of the loan (an "Early Payment Default" or "EPD claim"), (ii) the selling entity breached its representations and warranties or (iii) the loan did not comply with the underwriting standards or other requirements of the ultimate investor.

20.   The Debtors sold most of the loans they originated through whole loan sales. Other loans were sold into securitization trusts, out of which all of the ownership interests were sold to investors. For the loans the Debtors retained, since the third quarter of 2005, the Debtors sold securities against those loans and retained a residual interest. The securitization trusts are distinct legal entities not included in the Debtors' chapter 11 filing.

**Loan Servicing**

21.   An active part of the Debtors' business is its servicing platform, which is conducted through AHM Servicing. Loans are serviced primarily for the trusts of the Debtors' securitizations and for Fannie Mae, Ginnie Mae and other third-party purchasers of the loans originated by the Debtors. Loan servicing activities are designed and implemented to ensure that

the borrowers repay each loan in a mortgage servicing portfolio in accordance with its terms. The Debtors' servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries and enables the Debtors to maintain control over the collection and default mitigation processes. The loan servicing business also provides the Debtors with a stable cash flow.

22.  As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. The weighted-average servicing fee on the Debtors' servicing portfolio as of December 31, 2006, was 0.347% of the principal amount of each loan serviced. These servicing fees are typically collected from the monthly payments made by the borrowers on the loans. In addition, the Debtors receive other remuneration for loan servicing including float benefits representing interest earned on collection accounts where mortgage payments are held pending remittance to investors, as well as mortgagor-contracted fees such as late fees and, in some cases, prepayment penalties.[6]

**D.    Principal Indebtedness**

23.  As noted above, to finance mortgage loan production, the Debtors used credit facilities generally in the form of master repurchase agreements (the "Master Repurchase Agreements") with lenders under the Warehouse Facilities (the "Warehouse Lenders"). Pursuant to the Master Repurchase Agreements, each Warehouse Lender provided borrowing ability, either committed or uncommitted, to the applicable Debtor(s). In the ordinary course of their business, the Debtors used each Warehouse Lender's credit facility, together with their own

---

[6] Certain of the Debtors and their non-debtor subsidiaries engage in other businesses that are ancillary to the Debtors' mortgage loan origination, servicing and sales activities, including two mortgage reinsurance subsidiaries, a title abstract subsidiary and a vendor management company. In addition, American Home Bank, a non-debtor subsidiary of AHM Holdings conducts certain banking services.

capital, to fund the production of mortgage loans. Pursuant to the terms of the various Master Repurchase Agreements, the underlying Warehouse Lenders have the right to require, each time funds are advanced to fund a mortgage loan, that the Debtors use a portion of their own capital to cushion that Warehouse Lender against nonperforming mortgage loans. These funds paid by the Debtors as a portion of the proceeds of the mortgage loans are referred to in the industry as the "haircut."

24.    As described, the Debtors typically sold a mortgage loan for a profit shortly after originating it, generally within one to three months. When a mortgage loan is sold, the portion of the line of credit used to fund the mortgage loan is repaid to the Warehouse Lender and the haircut is returned to the Debtors.

25.    Prior to repayment, the Debtors' obligation to repay the Warehouse Lender is secured by a security interest in the mortgage loan originated with the funds from that Warehouse Lender's line of credit. The Master Repurchase Agreements require the Debtors' subsidiaries to maintain a collateral balance under the Master Repurchase Agreements such that the total value of the collateral securing the obligations under the Master Repurchase Agreements is at least equal to the value of the obligations under the mortgage loans minus the haircut. If the value of the collateral drops below that amount, the Warehouse Lender is entitled to make a margin call requiring the Debtors to post additional cash as collateral.

26.    As noted above, under the Master Repurchase Agreements, each of the Warehouse Lenders has a right to accelerate the Debtors' repayment obligation (referred to as an obligation to repurchase the mortgage loans financed under the respective agreement) in the event of a default under the Repurchase Agreement. The Warehouse Lenders also have the right to cease providing financing to the Debtors in the event of default. All of the Debtors'

Warehouse Lenders have discontinued providing financing as a result of alleged defaults by the Debtors under the Master Repurchase Agreements.

### E. Events Leading to the Debtors' Chapter 11 Filings

27. The Debtors have fallen victim to a confluence of environmental factors that are unprecedented in the company's experience. The devaluation of the company's mortgage-backed securities and mortgage loan holdings was caused by, among other factors, falling real estate prices and a spike in consumer defaults on mortgage obligations. The downward pressure on loan and security values accelerated as more and more borrowers were forced to sell securities and loans in an effort to meet margin calls, such that for the last two weeks the markets for these assets has been disrupted to the point of dysfunction. The disruption in the credit markets in the past few weeks was unprecedented in the company's experience and caused major write-downs of its loan and security portfolios.

28. These events have adversely impacted many mortgage originators and mortgage investors. In the last two weeks, originators including Countrywide Financial Corp., Accredited Home Lenders Holding and IndyMac BancCorp, as well as mortgage investors, C-Bass and certain Bear, Stearns funds, have issued press releases concerning lowered earnings and credit stress.

29. In the case of the Debtors, these write downs led to significant margin calls with respect to the Debtors' credit facilities. As of late July, the Debtors became unable to meet these margin calls.

30. As a consequence, most or all Warehouse Lenders have provided the Debtors notices of purported defaults and have notified the Debtors that they intend to exercise certain rights, including the right to sell the mortgage loans financed under the credit facilities and offset the proceeds from such a sale against amounts owed by the Debtors. Other

Warehouse Lenders have informed the Debtors that they intend to retain the mortgage loans and will determine the value of the loans for the purpose of determining an offset against amounts owed by the Debtors. These Warehouse Lenders have also notified the Debtors that they reserve their purported rights to seek recovery of any shortfall after that offset. The Debtors have notified these Warehouse Lenders that the Debtors dispute certain alleged events of default and reserve their rights with respect to these actions and that the Warehouse Lenders are obligated to proceed in a commercially reasonable manner in connection with any sale of assets subject to the Warehouse Facilities.

31. In addition, the Debtors received various notices of purported defaults from parties to the Debtors' master servicing agreements. Certain of these parties have also notified the Debtors that such alleged defaults serve as the basis for disqualifying AHM Servicing from continuing to act as servicer for their loans.[7] The Debtors have also disputed these allegations, as the Debtors' servicing business continues to efficiently and effectively service loans, as required by the governing agreements.

32. On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

33. During this same period, the Debtors retained a cadre of experienced advisors and made an all-out effort to preserve the Debtors' operations. Between July 27 and August 2, at least four entities with serious interest in purchasing the Debtors' retail and

---

[7] On August 3, 2007, Federal Home Loan Mortgage Corp. ("Freddie Mac") obtained a temporary restraining order ("TRO") from the United States District Court for the Northern District of Texas, requiring AHM Corp. to, inter alia, immediately turn over certain loan origination and servicing files to Freddie Mac.

wholesale origination businesses, or some combination thereof, arrived at the Debtors' offices and engaged in active, around-the-clock negotiations. However, none of these transactions was able to gel and, having been unable to fund loans for three days, the Debtors were forced to shut down their origination business.

34. On August 3, 2007, the Debtors implemented a reduction in force, resulting in the termination of approximately 6,500 employees. The Debtors retained approximately 1,000 employees (450 servicing employees, 250 to close the retail branch offices and 300 other employees company-wide), who are absolutely essential to the Debtors' continued operations. It is anticipated that the employee headcount will reduce further as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

## II.  **FIRST DAY MOTIONS AND APPLICATIONS**

35. As a result of my first-hand experience, and through my review of various materials and information, discussions with other of the Debtors' executives, and discussions with the Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in their First Day Papers listed on Exhibit A, (b) the need for the Debtors to continue to operate effectively, and (c) the deleterious effects upon the Debtors of not obtaining such relief.

36. I have reviewed each of the First Day Papers (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct. Such representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I

could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Papers.

37.     Accordingly, for the reasons stated herein and in each of the First Day Papers filed concurrently or in connection with the commencement of these cases, I respectfully request that each of the First Day Papers be granted in its entirety, together with such other and further relief as this Court deems just and proper.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Executed this 6th day of August at Melville, New York.

_____
Michael Strauss
Chairman, Chief Executive Officer and President
American Home Investment Corporation

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Executed this 6th day of August at Melville, New York.

_____
Michael Strauss
Chairman, Chief Executive Officer and President
American Home Investment Corporation

# EXHIBIT A

## List of First Day Motions and Applications

# FIRST DAY MOTIONS AND APPLICATIONS

A. **Administrative and Procedural Matters**

1. Motion for Order Authorizing Joint Administration Pursuant to Bankruptcy Code Section 302, as Supplemented by Bankruptcy Rule 1015 and Local Rule 1015-1

2. Application for Order Approving Debtors' Retention of EPIQ Bankruptcy Solutions, LLC as Claims, Notice and Balloting Agent Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f) and Local Rule 2002-1(f)

B. **Stabilization of Business Operations of the Debtors**

3. Motion for an Order Pursuant to Sections 105(a), 345, and 503(b)(1) of the Bankruptcy Code (I) Authorizing Debtors to Maintain and Use Existing Bank Accounts and Business Forms, (II) Authorizing the Debtors to Maintain and Use Existing Cash Management System, (III) Extending the Debtors' Time to Comply with Section 345 of the Bankruptcy Code; and (IV) Granting Administrative Expense Status to Postpetition Intercompany Claims

4. Motion for Interim and Final Orders Pursuant to Section 366 of the Bankruptcy Code (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment

5. Motion for Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Taxes, Including Trust Fund and Personal Liability Taxes, Pursuant to Sections 105(a), 363 and 507(a) of the Bankruptcy Code

6. Motion for an Order Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code Authorizing the Debtors to (I) Continue All Insurance Policies and Agreements Relating Thereto and (II) Honor Certain Obligations in Respect Thereof

7. Motion for Entry of Order Authorizing Debtors to Pay Prepetition Obligations of Certain Critical Vendors and Service Providers

8. Motion for an Order (A) Authorizing, but not Directing, the Debtors to (I) Pay Certain Pre-Petition Wages, Compensation and Employee Benefits; and (II) Continue Payment of Wages, Compensation and Employee Benefits in the Ordinary Course of Business; and (B) Authorizing and Directing Applicable Banks and Other Financial Institutions to Process and Pay all Checks Presented for Payment and to Honor all Transfer Requests Made by the Debtors Relating to the Foregoing

9. Motion for Interim and Final Orders Authorizing Debtors to Implement Non-Insider Employee Retention Plan Pursuant to Sections 105, 363, 503 of the Bankruptcy Code

10. Motion of the Debtors Pursuant to Sections 105(a), 361, 362, 363, 364 and 552 of the Bankruptcy Code and Bankruptcy Rule 4001(b) for Entry of Interim and Final Orders (A) Authorizing Limited Use of Cash Collateral in Connection with Operating the Servicing Business; (B) Granting Adequate Protection; and (C) Scheduling a Final Hearing on the Motion

11. Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364(c); (II) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001(c); and (III) Granting Related Relief

12. Emergency Motion of the Debtors for Orders: (A)(I) Approving Sale Procedures; (II) Scheduling a Hearing to Consider Sale of Certain Assets Used in the Debtors' Loan Servicing Business; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief; and (B)(I) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Purchase Agreement Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief

13. Emergency Motion of Debtors for: (I) an Order (A) Scheduling a Hearing to Consider the Proposed Sale of Loan Assets and Approving the Form and Manner of Notice Thereof, (B) Establishing Procedures Relating to the Sale and the Sale, Assumption and Assignment of Certain Executory Contracts, License Agreements, and Unexpired Leases, Including Notice of Proposed Cure Amounts, and (C) Granting Certain Related Relief; and (II) an Order (A) Approving the Sale, (B) Authorizing the Sale, Assumption, and Assignment of Certain Executory Contracts, License Agreements, and Unexpired Leases, and (C) Granting Certain Related Relief