IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------------ x
In re:                                              :    Chapter 11
                                                    :
AMERICAN HOME MORTGAGE                              :    Case No. 07-11047 (_____)
HOLDINGS, INC., a Delaware corporation, et al.,    :
                                                    :    Joint Administration Pending
                Debtors.                            :
------------------------------------------------------------------------ x

## APPLICATION FOR ORDER APPROVING
## DEBTORS' RETENTION OF EPIQ BANKRUPTCY SOLUTIONS, LLC AS CLAIMS,
## NOTICE AND BALLOTING AGENT PURSUANT TO 28 U.S.C. § 156(c),
## BANKRUPTCY RULE 2002(f) AND LOCAL RULE 2002-1(f)

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and

debtors in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] by and

through their undersigned proposed attorneys, hereby submit this application, for entry of an

order, pursuant to section 28 U.S.C. § 156(c), Rule 2002(f) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and Rule 2002-1(f) of the Local Rules of Bankruptcy

Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the

"Local Rules"), approving the Debtors' retention of Epiq Bankruptcy Solutions, LLC ("Epiq") as

claims, notice and balloting agent of the Court (the "Application"). In support of this

Application, the Debtors respectfully represent:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

## JURISDICTION

1.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief requested herein is 28 U.S.C. § 156(c), as supplemented by Bankruptcy Rule 2002(f), and Local Rule 2002-1(f).

## BACKGROUND

2.     On the date hereof (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     Simultaneous with the filing of this pleading, the Debtors have filed a motion with this Court pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure seeking joint administration of the Debtors' estates.

4.     No creditors' committee has yet been appointed in these cases.  No trustee or examiner has been appointed.

## THE DEBTORS' BUSINESS[2]

5.     Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans.  AHM also invested in securitized mortgage loans originated by others and originated and

---

[2] The facts set forth herein are derived from the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief, filed concurrently herewith (the "First Day Declaration"), which is incorporated by reference as if fully set forth herein at length.

2

sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

6.      As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

7.      A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

## EVENTS LEADING TO THE CHAPTER 11 FILING

8.      Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing

3

default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

9.     The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

10.    In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders -- the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

11.    On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

12.    The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors now employ approximately 1000 persons who are

4

absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

13.     In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

14.     Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

### RELIEF REQUESTED

15.     By this Application, the Debtors seek authorization to retain Epiq as the notice, claims, and balloting agent in connection with the Debtors' chapter 11 cases pursuant to the terms and conditions of the agreement between the Debtors and Epiq dated August 1, 2007 (the "Agreement"), attached hereto as Exhibit A.

16.     The Debtors have over one-hundred thousand creditors and other parties in interest, many of whom are expected to file proofs of claim. It appears that the noticing and receiving, docketing and maintaining proofs of claim would impose heavy administrative and other burdens upon the Court and the Office of the Clerk of the United States Bankruptcy Court for the District of Delaware (the "Clerk's Office"). Upon information and belief, preparing and serving the notices on all such creditors and parties in interest and docketing and maintaining the

5

large number of proofs of claim that may be filed in these cases would strain the resources of the Clerk's Office.

17.     The sheer number of the Debtors' creditors and equity security holders makes it impracticable for the Clerk's Office to undertake such tasks. The Debtors respectfully submit that the Debtors' engagement of an independent third party to act as agent for the Court and to perform such services is the most effective and efficient manner by which to perform, among others, the following tasks: (i) transmit certain notices to creditors and parties in interest in these cases; (ii) receiving, docketing, maintaining, photocopying and transmitting proofs of claim in these cases; (iii) overseeing the distribution of solicitation material; (iv) receiving, reviewing and tabulating ballots; and (v) performing other administrative tasks such as maintaining creditor lists and mailing notices.

18.     Accordingly, the Debtors propose to engage Epiq as a noticing, claims processing, and balloting agent (the "Agent") in these chapter 11 cases.

## A.     Scope of Epiq's Services

19.     The Debtors seek to engage Epiq to, among other things: (i) transmit certain notices (including the notice of commencement of these cases, and the bar date notice with proof of claim forms); (ii) receive, docket, scan, maintain and photocopy claims filed against the Debtors; (iii) assist the Debtors in the distribution of solicitation materials; (iv) receive, review and tabulate ballots cast in accordance with voting procedures approved by this Court; and (v) assist the Debtors with certain administrative functions relating to their chapter 11 plan. The Debtors submit that if Epiq is not engaged, then the Debtors may have to divert substantial manpower to, among other tasks, managing the claims process and implementing the plan solicitation process.

6

20.     Under the Agreement, it is anticipated that Epiq will perform the following services as Agent at the request of the Debtors or the Clerk's Office:

- assist the Debtors with all required notices in these cases including, among others:

- provide notice of commencement of these chapter 11 cases and the initial meeting of creditors under section 341(a) of the Bankruptcy Code

- notice of claims bar dates;

- notice of objections to claims;

- notices of any hearings on the Debtors' disclosure statement and confirmation of the Debtors' chapter 11 plan; and

- such other miscellaneous notices as the Debtors or the Court may deem necessary or appropriate for the orderly administration of these chapter 11 cases;

- within five (5) days of the service of a particular notice, file with the Clerk's Office a certificate or affidavit of service that includes: (i) a copy of the notice served; (ii) a list of persons upon whom the notice was served along with their addresses; and (iii) the date and manner of service;

- receive, examine and maintain copies of all proofs of claim and proofs of interest filed in the case;

- maintain official claims registers in each of the Debtors' cases by docketing all proofs of claim and proofs of interest in the applicable claims database that includes the following information for each such claim or interest asserted:

- the name and address of the claimant or interest holder and any agent thereof, if the proof of claim or proof of interest was filed by an agent;

- the date the proof of claim or proof of interest was received by Epiq and/or the Court;

- the claim number assigned to the proof of claim or proof of interest;

- the asserted amount and classification of the claim; and

7

- the applicable Debtor against which the claim or interest is asserted;

- implement necessary security measures to ensure the completeness and integrity of the claims registers;

- transmit to the Clerk's Office a copy of the claims registers on a weekly basis, unless requested by the Clerk's Office on a more or less frequent basis;

- maintain an up-to-date mailing list for all entities that have filed proofs of claim or proofs of interest and make the list available upon request to the Clerk's Office or any party in interest;

- provide access to the public for examination of copies of the proofs of claim or proofs of interest filed in the case without charge during regular business hours;

- record all transfers of claims pursuant to Bankruptcy Rule 3001(e) and provide notice of the transfers as required by Bankruptcy Rule 3001(e);

- comply with applicable federal, state, municipal and local statutes, ordinances, rules, regulations, orders and other requirements;

- promptly comply with such further conditions and requirements as the Clerk's Office or the Court may at any time prescribe;

- provide such other claims processing, noticing and related administrative services as may be requested from time to time by the Debtors;

- oversee the distribution of the applicable solicitation material to each holder of a claim against or interest in the Debtors;

- respond to mechanical and technical distribution and solicitation inquiries;

- receive, review and tabulate the ballots cast, and make determinations with respect to each ballot as to its timeliness, compliance with the Bankruptcy Code, Bankruptcy Rules and procedures ordered by this Court subject, if necessary, to review and ultimate determination by the Court;

- certify the results of the balloting to the Court; and

8

- perform such other related plan-solicitation services as may be requested by the Debtors.

**B.    Epiq's Qualifications**

21.    The Debtors believe Epiq is well-suited for this retention because Epiq is a data-processing firm whose principals and senior staff have more than 10 years of in-depth chapter 11 experience in performing noticing, claims processing, claims reconciliation and other administrative tasks for chapter 11 debtors.  Epiq is also experienced in performing plan voting and distribution services, and other services relating to its role as Agent.  Epiq has been retained to act as Agent in many districts throughout the United States.

**C.    Compensation and Indemnification of Epiq**

22.    The Debtors propose to retain Epiq at the rates set forth in the Agreement. The Debtors and Epiq have agreed (subject to the Court's authorization hereof) that Epiq shall invoice the Debtors monthly for services rendered to the Debtors during the preceding month. Under the Agreement, the Debtors will pay Epiq, upon the approval of Agreement by the Court, a retainer of $25,000 to be applied against the final invoice submitted to the Debtors.[3]

23.    The Debtors believe the proposed rates to be charged by Epiq for the services to be performed are reasonable and appropriate for services of this nature.  Pursuant to section 503(b)(1)(A) of the Bankruptcy Code, the Debtors hereby request that the fees to be charged by Epiq together with its necessary actual expenses be allowed as administrative expenses of the Debtors' estates.

24.    Epiq acknowledges that it will perform its duties if it is retained in the Debtors' chapter 11 cases regardless of payment and, to the extent that Epiq requires redress, it will seek appropriate relief from the Court.

---

[3] The description of certain terms of the Agreement as summarized by the Motion is for the convenience of the Court. The Agreement, and not any descriptions in the Motion, is the governing document.

9

25.     Epiq will continue to perform the services contemplated by the Agreement in the event the Debtors' chapter 11 cases are converted to chapter 7 cases.

26.     If Epiq's services are terminated, Epiq shall perform its duties until a complete transition with the Clerk's Office or any successor claims/noticing/balloting agent occurs.

## **INDEMNIFICATION**

27.     As part of the overall compensation payable to Epiq under the terms of the Agreement, the Debtors have agreed to certain indemnification obligations. The Agreement provides that Debtors will indemnify and hold harmless Epiq, its officers, employees, and agents under certain circumstances specified in the Agreement; however, such indemnification will not extend to acts of gross negligence or willful misconduct by Epiq. Both the Debtors and Epiq believe that such provisions are customary and reasonable for notice, claims, and balloting agents retained in a chapter 11 case.

## **EPIQ'S CONNECTIONS WITH PARTIES IN INTEREST AND POSSIBLE CONFLICTS OF INTEREST**

28.     To the best of the Debtors' knowledge, information and belief, other than as set forth herein or in the Declaration of Daniel C. McElhinney, Esq. (the "McElhinney Declaration") attached hereto as Exhibit B, Epiq has not represented and has no relationship with: (i) the Debtors; (ii) its creditors or equity security holders; (iii) any other parties in interest in these cases; (iv) the respective attorneys and accountants of any of the foregoing; or (v) the United States Trustee or any person employed in the Office of the United States Trustee for the District of Delaware, in any matter relating to these cases.

29.     As set forth in the McElhinney Declaration, Epiq believes it:  (a) neither holds nor represents any interest adverse to the Debtors or the Debtors' estates on matters for

10

which it is to be retained; (b) has no prior connection with the Debtors, their creditors or any

other party in interest; and (c) is a "disinterested" person as such term is defined in section

101(14) of the Bankruptcy Code.

## BASIS FOR RELIEF REQUESTED

30.     Bankruptcy Rule 2002 generally regulates what notices must be provided

to creditors and other parties in interest in bankruptcy cases.  Under Bankruptcy Rule 2002(f),

the Court may direct that some person, other than the Clerk of the Court, give notice of the

various matters described above.  Pursuant to Local Rule 2002-1(f), in cases with more than 200

creditors, a debtor is required to file with the court a motion to retain a notice and/or claims clerk

pursuant to 28 U.S.C. § 156(c).

31.     In addition, 28 U.S.C. § 156(c) expressly authorizes the use of non-court

services for noticing.  It provides, in relevant part, as follows:

> Any court may utilize . . . services, either on or off the court's
> premises, which pertain to the provision of notices, dockets . . . and
> other administrative information . . . to parties in cases filed under
> the provisions of title 11 . . . , where the costs of such . . . services
> are paid for out of the assets of the estate and are not charged to the
> United States. . . . The utilization of such . . . services shall be
> subject to such conditions and limitations as the pertinent circuit
> council may prescribe.

28 U.S.C. § 156(c).

32.     For the foregoing reasons, the Debtors believe the retention of Epiq as

Agent is appropriate and in the best interest of the Debtors and their estates, creditors, equity

security holders and other parties in interest.

## NOTICE

33.     Notice of this Motion has been given by facsimile or overnight delivery to

the following parties, or in lieu thereof, to their counsel:  (i) the United States Trustee for the

11

District of Delaware; (ii) the parties included on the Debtors' list of forty (40) creditors holding the largest unsecured claims; (iii) counsel to Bank of America, N.A; and (iv) the proposed debtor in possession lender and its counsel.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## **NO PRIOR APPLICATION**

34.    No previous application for the relief sought herein has been made to this or to any other court.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form annexed hereto, approving the Agreement with Epiq, retaining Epiq as Agent of the Court in these chapter 11 cases, and granting such other and further relief as is just or proper.

Dated: Wilmington, Delaware
       August ⎾6⏌, 2007

_____
Michael Strauss
Chief Executive Officer
American Home Mortgage Holdings, Inc.

## **EXHIBIT A**

## **AGREEMENT**

P 646.282.2500  F 646.282.2501
757 THIRD AVENUE, NEW YORK, NY 10017
WWW.EPIQSYSTEMS.COM

SYSTEMS

## EPIQ BANKRUPTCY SOLUTIONS, LLC

### STANDARD BANKRUPTCY SERVICES AGREEMENT

Between Epiq Bankruptcy Solutions, LLC (formerly known as Bankruptcy Services LLC), a New York limited liability company ("Epiq"), and American Home Mortgage Corp. and related debtors (the "Customer" or "Debtor") dated as of August 1, 2007.

In consideration of the premises herein contained and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**General Terms and Conditions**

1. Services.

In accordance with the charges, terms and conditions contained in this Agreement and in the schedule attached hereto (the "Agreement"), Epiq agrees to furnish Customer with computerized bankruptcy support services and bankruptcy administrative services according to the pricing schedule annexed hereto.

2. Term.

This Agreement shall become effective on the later of (i) the date of its acceptance by Epiq and (ii) the date of entry of an order by the Bankruptcy Court approving this Agreement (or such earlier date set by the Bankruptcy Court). **The Agreement shall remain in effect until terminated by the Customer on one (1) month's prior written notice received by Epiq and entry of an order of the Court discharging Epiq as claims agent or by Epiq upon three (3) month's prior written notice received by the Customer and entry of an order of the Court discharging Epiq as claims agent.**

3. Charges.

3.1 For services and materials furnished by Epiq under this Agreement, Customer shall pay the charges set forth in the schedule annexed hereto attached hereto and made a part of this Agreement. Epiq will bill Customer monthly. All invoices shall be due and payable upon receipt.

3.2 Epiq reserves the right to reasonably increase its prices, charges and rates annually on January 2nd of each year. However, if such increases exceed 10%, Epiq will be required to give sixty (60) days prior written notice to Customer.

3.3 Customer agrees to pay Epiq for all materials necessary for Epiq's performance under this Agreement, other than computer hardware and software, and any reasonable out of pocket expenses including, without limitation, transportation, long distance communications, printing, postage and related items.

3.4 In addition to all charges for services and materials hereunder, Customer shall pay to Epiq all taxes, however designated, levied or based that are applicable to this Agreement or are measured directly by payments made under this Agreement and are required to be collected by Epiq or paid by Epiq to taxing authorities. This provision, includes but is not limited to, sales, use and excise taxes, but does not include personal property taxes or taxes based on net income.

SYSTEMS

3.5  In addition to all other charges for services and materials hereunder, Customer shall pay to Epiq any actual charges related to, arising out of or as a result of any Customer error or omission, as mutually agreed by Epiq and Customer. Such charges shall include but not be limited to re-runs and any additional clerical work billed at the Epiq then prevailing standard rates, supplies, long distance phone calls, travel expenses and overtime expenses for work chargeable at the rates set forth on the schedule annexed hereto.

3.6  Where the Customer requires measures that are unusual and beyond normal business practice of Epiq such as but not limited to CPA audit, errors and omissions insurance, or off premises storage of data, the cost of such measures, if provided by Epiq, shall be charged to the Customer at a competitive rate.

3.7  In the event of termination due to Customer's default, Customer shall be liable for all amounts then owing.

3.8  Upon the Court's approval of the Agreement, Customer shall pay Epiq a retainer in the amount of $25,000 to be applied against Epiq's final invoice for the services provided herein.

4. Confidentiality.

All of Customer's data given to Epiq will be safeguarded by Epiq to the same extent that Epiq safeguards data relating to its own business; provided, however, that if data is publicly available, was already in Epiq's possession or known to it, or was rightfully obtained by Epiq from a third party, Epiq shall bear no responsibility for disclosure. Customer agrees that Epiq shall not be liable beyond the limits provided in Section 7.1 herein for damages or losses of any nature whatsoever arising out of the unauthorized acquisition or use of any material supplied by Customer to Epiq in the performance of this Agreement.

5. Title to Property.

Epiq reserves all property rights in and to all materials, concepts, know-how, techniques, programs, systems and other information, including, without limitation, data processing programs, specifications, applications, routines, sub-routines, procedural manuals and documentation furnished or developed by Epiq for itself or for use by the Customer ("Property"). Charges paid by Customer do not vest in Customer any rights to the Property, it being expressly understood that the Property is made available to Customer under this Agreement solely for Customer's use during and in connection with each use of the Epiq equipment and services. Customer agrees not to copy or permit others to copy any of the Property.

6. Disposition of Data.

Any data, programs, storage media or other materials furnished by the Customer to Epiq in connection with this Agreement may be retained by Epiq until the services provided herein are paid for, or until this Agreement is terminated with the services provided herein having been paid for in full. Customer shall remain liable for all charges imposed under this Agreement as a result of data or physical media maintained by Epiq. Epiq shall dispose of the data and media in the manner requested by Customer. Customer agrees to pay Epiq for reasonable expenses incurred as a result of the disposition of the data or media. After giving Customer thirty (30) days advance notice, Epiq reserves the right to dispose of data or media maintained by Epiq for Customer if Customer has not utilized the services provided herein for a period of at least ninety (90) days or if Customer has not paid all charges due to Epiq.

7. Limitation of Liability, Warranty and Indemnity.

7.1  In no event shall Epiq be liable to Customer for any special or consequential damages (including loss of anticipated profits) incurred by Customer in connection with or arising out of the services provided for in this Agreement.

7.2  Customer is responsible for the accuracy of the programs and data it submits for processing to Epiq and for the output. Customer agrees to initiate and maintain backup files that would allow Customer to regenerate or duplicate all programs and data submitted by Customer to Epiq.

7.3  Customer agrees that except as set forth in the paragraph 7.1 above, Epiq makes no representations or warranties, express or implied, including but not limited to, any implied or express warranty of merchantability, fitness or adequacy for a particular purpose or use, quality, productiveness or capacity.

7.4  The Customer shall indemnify and hold Epiq, its affiliates and each of their respective officers, members, directors, agents, consultants and employees (each an "Indemnified Person") harmless, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, costs of preparation and attorneys' fees) and expenses as incurred (collectively, "Losses"), to which any Indemnified Person may become subject or involved in any capacity arising out of or relating to this Agreement or Epiq's rendering of services pursuant hereto, regardless of whether any of such Indemnified Persons is a party thereto, other than Losses resulting from Epiq's gross negligence or willful misconduct.  Without limiting the generality of the foregoing, "Losses" includes any liabilities resulting from claims by third persons against any Indemnified Person.  The Customer shall notify Epiq in writing promptly of the commencement, institution, threat, or assertion of any claim, action or proceeding of which the Customer is aware with respect to the services provided by Epiq under this Agreement.  Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of the Customer and shall survive the termination of this Agreement until the expiration of all applicable statutes of limitation with respect to Epiq's liabilities.

8. Bank Accounts

At the Customer's request, Epiq shall be authorized to establish accounts with financial institutions in the name of and as agent for the Customer.  To the extent certain financial products are provided to the Customer pursuant to Epiq's agreement with certain financial institutions, Epiq may receive compensation from such financial institutions for the services Epiq provides pursuant to such agreement.

9. General

9.1  No waiver, alteration, amendment or modification of any of the provisions of this Agreement shall be binding upon either party unless signed in writing by a duly authorized representative of both parties.

9.2  This Agreement may not be assigned by Customer without the express written consent of Epiq, which consent shall not be unreasonably withheld.  The services provided under this Agreement are for the sole benefit and use of Customer, and shall not be made available to any other persons.

9.3  This Agreement shall be governed by the laws of the State of New York, without regard to that state's provisions for choice of law.

9.4  The parties agree that this Agreement is the complete and exclusive statement of the agreement between the parties which supersedes all proposals or prior agreements, oral or written, and all other communications between the parties relating to the subject matter of this Agreement.

9.5 Notices to be given or submitted by either party to the other, pursuant to this Agreement, shall be sufficiently given or made if given or made in writing and sent by certified mail, postage prepaid, and addressed as follows:

If to Epiq:

Epiq Bankruptcy Solutions, LLC
757 Third Avenue, Third Floor
New York, New York 10017
Attn: Ron Jacobs

If to Customer:

American Home Mortgage Corp.
538 Broadhollow Road
Melville, NY 11747
Attn: Michael Strauss

With a copy to:

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Attn: Pauline K. Morgan, Esq.

SYSTEMS

9.6  This Agreement shall be subject to approval of the United States Bankruptcy Court for the District of Delaware.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

EPIQ BANKRUPTCY SOLUTIONS, LLC

Name:   Daniel C. McElhinney
Title:     Sr. Vice President, Director of Operations

AMERICAN HOME MORTGAGE CORP.
AND RELATED DEBTORS

By:

Name:   Abn Horn

Title:    EVP



# Pricing

Consulting Services:

| | |
|---|---|
| Senior Bankruptcy Consultant | $225 - $295 per hour |
| Bankruptcy Consultant | $185 - $225 per hour |
| IT Programming Consultant | $140 - $190 per hour |
| Case Managers | $125 - $175 per hour |
| Clerical | $40 - $60 per hour |

Please note that any additional professional services not covered by this proposal will be charged at hourly rates including any outsourced data input services performed under our supervision and control. Outside vendors may charge a premium for weekend and overtime work.

Claims Management Services:

| | |
|---|---|
| Database and System Access (No restriction on number of users) | $ .10 per record per month |
| Data Transfer | $ .15 per creditor |
| Manual Claims Input | $ .95 per claim plus hourly rates |
| Document Storage | $1.50 per box per month |



# Pricing

Printing, Mailing and Noticing:

| | |
|---|---|
| Set up | Waived |
| Printing | $ .10 per image and/or page including the envelope face) |
| Collate, fold and/or insert | $ .10 each piece |
| Postage and overnight delivery | At cost |
| Electronic noticing | $ .02 per page |
| Legal notice publishing | Quote prior to publishing |
| Claim acknowledgement card | $ .25 per notice |
| Fax | $ .20 per page |

Document Management/Imaging:

| | |
|---|---|
| Electronic imaging (scanning/bar coding) | $ .30 per image |
| Additional OCR capture | $ .10 per image |
| CD burning (mass document storage) | Varies upon requirements |
| Stand Alone Case Website Construction | $150.00 per hour |
| Hosting Case Specific Site | $ .75 per megabyte per month ($200 minimum and $2,000 maximum) |
| Case Data Web Traffic | $1.50 per megabyte per month ($200 minimum and $2,000 maximum) |

Confidential Document Management:

| | |
|---|---|
| Confidential on-line workspace | Varies upon requirements |

Voting Tabulation and Reports:

| | |
|---|---|
| Set-up, tabulation and vote verification | Applicable consulting fees only |
| Printing and mailing of ballots | Subject to unit pricing for mailing and noticing above |
| Solicitation and Notification of Public Securities Holders | Varies upon requirements |



# Pricing

Please note that Epiq will coordinate outside services for notice publication, printing and scanning upon request. Reimbursable expenses including travel, envelopes and courier services are billed at cost. Postage is payable in advance of any mailings.

Disbursements:

Transaction fees:

| | |
|---|---|
| Per check or Form 1099 | $1.50 each |
| Per record to transfer agent | $ .25 each |

# EXHIBIT B

## MCELHINNEY DECLARATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------------- x
|  | : | Chapter 11 |
In re: | : |  |
 | : | Case No. 07-[_____] (_____) |
AMERICAN HOME MORTGAGE | : |  |
HOLDINGS, INC., a Delaware corporation, et al.,[1] | : |  |
 | : | Joint Administration Pending |
Debtors. | : |  |
---------------------------------------------------------------------- x

### DECLARATION OF DANIEL C. MCELHINNEY, ESQ IN SUPPORT OF APPLICATION FOR ORDER APPROVING DEBTORS' RETENTION OF EPIQ BANKRUPTCY SOLUTIONS, LLC AS CLAIMS, NOTICE AND BALLOTING AGENT PURSUANT TO 28 U.S.C. § 156(c), BANKRUPTCY RULE 2002(f) AND LOCAL RULE 2002-1(f)

I, Daniel C. McElhinney, Esq., pursuant to 28 U.S.C. § 1746, declare:

1.     I am Senior Vice President and Director of Operations of Epiq Bankruptcy Solutions, LLC ("Epiq") which is engaged in the business of chapter 11 administration and claims management, consulting and analysis. I submit this declaration in support of the application (the "Application") of the above-captioned debtors and debtors-in-possession (each a "Debtor" and collectively, the "Debtors"), for entry of an order approving Debtors' retention of Epiq as claims, notice and balloting agent of the Bankruptcy Court in these cases (the "Agent").

2.     The services Epiq proposes to render as Agent are described in the Application and the agreement (the "Agreement"), attached to the Application and are incorporated herein by reference.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

3.      Epiq specializes in providing consulting and data processing services to chapter 11 debtors in connection with the administration, reconciliation and negotiation of claims and solicitation of votes to accept or reject plans of reorganization. Epiq also specializes and has expertise in serving as outside claims agent to the United States Bankruptcy Court with respect to all aspects of claims administration, including docketing and storage of claims, maintenance of claims registers, and related noticing services. Epiq has provided identical or substantially similar services to other chapter 11 debtors in other cases. Accordingly, I believe Epiq is well-qualified to act as Agent in these cases.

4.      To the best of my knowledge, and based solely upon information provided to me by the Debtors, neither Epiq, nor any employee thereof, has any connection with the Debtors, their creditors or any other party in interest herein. To the best of my knowledge, neither Epiq, nor any employee thereof, represents any interest adverse to the Debtors' estate with respect to any matter upon which Epiq is to be engaged.

5.      As compensation for its services, Epiq will charge the rates set forth in the Agreement. These rates are at least as favorable as those charged by Epiq to other chapter 11 debtors for similar services.

6.      Epiq will comply with all requests of the Clerk of the Court and follow the guidelines promulgated by the Judicial Conference of the United States for the implementation of section 156(c) of title 28 of the United States Code, 28 U.S.C. § 156(c).

7.      If appointed as Agent of the Bankruptcy Court, Epiq will not (1) cease providing services to the Debtors for any reason, including non-payment, and (2) undertake any legal representation of the Debtors, nor provide any advice of a legal nature, outside the scope of

2

the duties outlined in the Application without prior order from this Court authorizing Epiq to do so.

## **CONCLUSION**

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Dated: August 6, 2007

/s/ Daniel C. McElhinney
Daniel C. McElhinney, Esq.
Sr. Vice President, Director of Operations

3

## **EXHIBIT C**

## **PROPOSED ORDER**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
---------------------------------------------------------- x
In re:                                                     :   Chapter 11
                                                           :
AMERICAN HOME MORTGAGE                                      :   Case No. 07-[_____] (_____)
HOLDINGS, INC., a Delaware corporation, et al.,¹           :
                                                           :   Jointly Administered
          Debtors.                                         :
                                                           :   Ref. Docket No. _____
---------------------------------------------------------- x
```

### ORDER APPROVING THE DEBTORS' RETENTION OF EPIQ BANKRUPTCY SOLUTIONS, LLC AS CLAIMS, NOTICING AND BALLOTING AGENT PURSUANT TO PURSUANT TO 28 U.S.C. § 156(c), BANKRUPTCY RULE 2002(f), AND LOCAL RULE 2002-1(f)

Upon consideration of the application (the "Application")² of the above-captioned

debtors and debtors-in-possession (each a "Debtor" and collectively, the "Debtors") for an order

pursuant to 28 U.S.C. § 156(c), Rule 2002(f) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rule 2002-1(f) of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules"), approving the Debtors' retention of Epiq Bankruptcy Solutions, LLC ("Epiq") as

claims, noticing and balloting agent and as Agent of the Court in these chapter 11 cases; and

upon the declaration of Daniel C. McElhinney, Esq. (the "McElhinney Declaration"), attached to

the Application as Exhibit B; and due and adequate notice of the Application having been given;

---

¹ The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

² Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Application.

and it appearing that no further or other notice is required; and the Court being satisfied that Epiq

is a "disinterested person" as such term is defined under section 101(14), as modified by section

1107(b), of the Bankruptcy Code, and that the retention of Epiq is necessary and in the best

interests of the Debtors and their estates, creditors and equity security holders; and after due

deliberation and sufficient cause appearing therefor; it is hereby

ORDERED that the Application is granted; and it is further

ORDERED that the Debtors' retention of Epiq as Agent under the terms of the

Agreement is approved; and it is further

ORDERED that the Debtors are authorized to retain Epiq effective as of the

Petition Date to perform the noticing, claims processing, balloting and other services described

in the Application, including, but not limited to, receiving, maintaining, recording and otherwise

administering proofs of claim filed in the chapter 11 case; and it is further

ORDERED that pursuant to Section 503(b)(1)(A) of the Bankruptcy Code, the

fees and expenses of Epiq incurred pursuant to the Agreement are to be treated as an

administrative expense of the Debtors' chapter 11 estates, and shall be paid by the Debtors in the

ordinary course of business after the submission of an invoice in reasonable detail describing the

basis for the fees and expenses requested to be paid thereto; and it is further

ORDERED that the Debtors are authorized to indemnify Epiq in accordance

with the Agreement, but not for any claim arising from, related to, or in connection with Epiq's

postpetition performance of any services other than the services described in the Agreement

unless such services and indemnification therefor are approved by the Court. Notwithstanding

any provision of the Application or the Agreement to the contrary, the Debtors have no

obligation to indemnify Epiq, or provide contribution or reimbursement to Epiq for any claim or

2

expense that is either (i) judicially determined (the determination having become final) to have arisen from Epiq's gross negligence or willful misconduct, or (ii) settled prior to a judicial determination as to Epiq's gross negligence or willful misconduct, but determined by this Court, after notice and a hearing, to be a claim or expense for which Epiq should not receive indemnity, contribution, or reimbursement under the terms of the Application and the Agreement, as modified by this Order; and it is further

ORDERED that if these cases are converted to cases under chapter 7 of the Bankruptcy Code, Epiq will continue to be paid for its services until all claims in these cases have been processed; and if claims agent representation is necessary in the converted chapter 7 cases, Epiq will continue to be paid in accordance with 28 U.S.C. § 156(c) upon the terms of the Agreement and hereof; and it is further

ORDERED that if Epiq is unable to provide the services set forth in the Agreement, Epiq will immediately notify the Clerk's Office, the Debtors and Debtors' counsel and cause all original proofs of claim and computer information turned over to another claims agent with the advice and consent of the Clerk, the Debtors and Debtors' counsel; and it is further

ORDERED that Epiq shall not cease providing services for any reason including nonpayment, without prior order of this Court authorizing Epiq to do so; and it is further

3

ORDERED that this Court shall retain jurisdiction with respect to all matters

arising from or related to the implementation or interpretation of this Order.

Dated: Wilmington, Delaware
      August _____, 2007

 

                                  _____

                                  UNITED STATES BANKRUPTCY JUDGE

4