IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------------- x
In re:                                                                 :   Chapter 11
                                                                       :
AMERICAN HOME MORTGAGE                                                 :   Case No. 07-11047 (_____)
HOLDINGS, INC., a Delaware corporation, et al.,                        :
                                                                       :   Joint Administration Pending
                      Debtors.                                         :
---------------------------------------------------------------------- x

**MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO
SECTION 366 OF THE BANKRUPTCY CODE (I) PROHIBITING UTILITY
COMPANIES FROM ALTERING, REFUSING, OR DISCONTINUING UTILITY
SERVICES, (II) DEEMING UTILITY COMPANIES ADEQUATELY ASSURED OF
FUTURE PERFORMANCE, AND (III) ESTABLISHING PROCEDURES FOR
DETERMINING ADEQUATE ASSURANCE OF PAYMENT**

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] respectfully represent as follows:

**SUMMARY OF RELIEF REQUESTED[2]**

1. By this motion (the "Motion"), the Debtors request that this Court enter an interim order (the "Interim Order") and a final order (the "Final Order") pursuant to section

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

[2] Capitalized terms in this Summary shall have the meanings ascribed to them below in this Motion.

366(b) of the Bankruptcy Code (a) prohibiting the Utility Companies from altering, refusing, or discontinuing Utility Services on account of pre-petition invoices; (b) deeming the Debtors' utility service providers adequately assured of future performance, and (c) establishing procedures for determining additional adequate assurance of future payment and authorizing the Debtors to provide adequate assurance of future payment to the Debtors' utility service providers. As more fully set forth in the Motion, the Debtors will establish a segregated account containing an amount equal to 50% of the Debtors' estimated monthly cost of utility service in order to provide the Utility Companies adequate assurance of the Debtors' future payment of their utility bills.

2. Uninterrupted utility service is vital to the continued operation of the Debtors' businesses and, consequently, to the success of their chapter 11 cases. Termination of Utility Services provided to the Debtors (even temporarily) could result in the disruption of the Debtors' business, and affect the ability of the Debtors to preserve and maximize the value of their estates. Thus, the relief requested herein is necessary and in the best interests of the Debtors' estates and their creditors.

## JURISDICTION

3. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

4. On the date hereof (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11, title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"). Each Debtor is continuing to operate its business and

manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. Simultaneous with the filing of this pleading, the Debtors have filed a motion with this Court pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure seeking joint administration of the Debtors' estates.

6. No creditors' committee has yet been appointed in these cases. No trustee or examiner has been appointed.

### THE DEBTORS' BUSINESS[3]

7. Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

8. As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans

---

[3] The facts set forth herein are derived from the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief, filed concurrently herewith (the "First Day Declaration"), which is incorporated by reference as if fully set forth herein at length.

from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

9.  A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

## EVENTS LEADING TO THE CHAPTER 11 FILING

10.  Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

11.  The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

12.  In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the

-4-

Debtors' loans. During this time, certain of the Debtors' warehouse lenders -- the financial institutions that provide short term credit facilities needed to originate and purchase loans -- began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

13.     On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

14.     The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors now employ approximately 1000 persons who are absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

15.     In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

16.     Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity

crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## THE DEBTORS' UTILITY COMPANIES

17.     In connection with the operation of their businesses, the Debtors obtain electricity, water, telephone, and/or other similar services (collectively, the "Utility Services"), from over 1,900 different utility companies (the "Utility Companies").[4] Annexed hereto as Exhibit A is a list of Utility Companies providing services to the Debtors as of the Petition Date. The relief requested herein is requested with respect to all Utility Companies and is not limited to those listed on Exhibit A.[5]

18.     In general, the Debtors have established a good payment history with virtually all of their Utility Companies, consistently making payments on a regular and timely basis. To the best of the Debtors' knowledge, there are no defaults or arrearages of any significance with respect to the Debtors' undisputed Utility Services invoices, other than the payment interruptions that may be caused by the commencement of these chapter 11 cases.

## RELIEF REQUESTED

19.     The Debtors request that the Court enter the Interim Order, annexed hereto as Exhibit B, and the Final Order, annexed hereto as Exhibit C, (a) prohibiting the Utility Companies from altering, refusing, or discontinuing Utility Services on account of pre-petition

---

[4] Many of the Utility Companies provide utility services to locations used by the Debtors in connection with the loan origination business. As detailed more fully in the First Day Declaration, the Debtors have determined to cease originating loans and, therefore, the number of Utility Companies that will continue to provide the Debtors with utility service will decrease.

[5] Although the Debtors believe that the list of Utility Companies attached hereto as Exhibit A is a complete list, they reserve the right to supplement the list if it is determined that any Utility Company has been omitted. Moreover, the Debtors reserve the right to assert that any of the entities listed on Exhibit A are not utilities within the scope of section 366(a).

invoices, including the making of demands for security deposits or accelerated payment terms; (b) providing that the Utility Companies have "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, based, inter alia, on the Debtors' establishment of a segregated account containing an amount equal to 50% of the Debtors' estimated monthly cost of utility service, which may be adjusted by the Debtors to account for the termination of utility services by the Debtors; and (c) establishing procedures for determining additional adequate assurance of future payment and authorizing the Debtors to provide adequate assurance of future payment to the Debtors' utility service providers.

## BASIS FOR RELIEF REQUESTED

20.     If the Utility Companies are permitted to terminate Utility Services, the Debtors could be forced to cease operations at their headquarters and other business locations. Thus, termination of utility services will result in substantial (and potentially irreparable) disruption to the Debtors' business, as well as loss of revenue and profits. Any interruption of Utility Services would substantially diminish or impair the Debtors' efforts to preserve and maximize the value of their estates. It is therefore critical that Utility Services continue uninterrupted.

21.     Section 366 of the Bankruptcy Code provides that, in a chapter 11 case, during the initial thirty days after the commencement of a bankruptcy case, utilities may not alter, refuse or discontinue service to, or discriminate against, a debtor solely on the basis of the commencement of its case or the existence of pre-petition debts owed by the debtor. In a chapter 11 case, following the thirty-day period under section 366(c) of the Bankruptcy Code, utilities may discontinue service to the debtor if the debtor does not provide adequate assurance of future

performance of its post-petition obligations in a form that is satisfactory to the utility, subject to the Court's ability to modify the amount of adequate assurance.

22.     While the form of adequate assurance of payment may be limited to the types of security enumerated in subsection 366(c)(1)(A),[6] the determination of the amount of the adequate assurance is within the discretion of the Court. It is well established that the requirement that a utility receive adequate assurance of payment does not require a guarantee of payment. Instead, the protection granted to a utility is intended to avoid exposing the utility to an unreasonable risk of nonpayment.

23.     To provide adequate assurance of payment for future services to the Utility Companies, the Debtors propose to deposit a sum equal to 50% of the Debtors' estimated monthly cost of utility service into an interest-bearing, newly created segregated account within ten (10) business days of entry of the Final Order (the "Utility Deposit").

24.     The Debtors submit that the Utility Deposit constitutes sufficient adequate assurance to the Utility Companies. If any Utility Company believes additional assurance is required, they may request such additional assurance pursuant to the procedures set forth herein. The Debtors propose the establishment of procedures (the "Procedures") under which a Utility Company may request additional adequate assurance of payment in the event that it can demonstrate that additional adequate assurance is warranted. The Procedures provide the following:

> (a)     If a Utility Company is not satisfied with the assurance of future payment provided by the Debtors, the Utility Company must serve a written request (a "Request") upon the Debtors setting forth the location(s) for which Utility Services are provided, the account

---

[6] Section 366(c)(1)(A) provides that "assurance of payment" may be in the form of a cash deposit, letter of credit, certificate of deposit, surety bond, prepayment of utility consumption, or another form of security that is mutually agreed on between the utility and the debtor. 11 U.S.C. § 366(c)(1)(A).

number(s) for such location(s), the outstanding balance for each account, a summary of the Debtors' payment history on each account, and an explanation of why the Utility Deposit is not adequate assurance of payment.

(b) The Request must be actually received by Debtors' counsel, within twenty (20) days of the date of the Final Order granting this Motion (the "Request Deadline").

(c) Without further order of the Court, the Debtors may enter into agreements granting additional adequate assurance to a Utility Company serving a timely Request, if the Debtors, in their discretion, determine that the request is reasonable.

(d) If the Debtors believe that a Request is unreasonable, then they shall, within thirty (30) days after the Request Deadline date, file a motion (the "Determination Motion") pursuant to section 366(c)(3) of the Bankruptcy Code seeking a determination from the Court that the Utility Deposit, plus any additional consideration offered by the Debtors, constitutes adequate assurance of payment. Pending notice and a hearing on the Determination Motion, the Utility Company that is the subject of the unresolved Request may not alter, refuse, or discontinue services to the Debtors.

(e) The Utility Deposit shall be deemed adequate assurance of payment for any Utility Company that fails to make a timely Request.

25. The Debtors request a final hearing on this Motion to be held within twenty-five (25) days of the Petition Date to ensure that, if a Utility Company argues it can unilaterally refuse service to the Debtors on the 31st day after the Petition Date, the Debtors will have the opportunity, to the extent necessary, to request that the Court make such modifications to the Procedures in time to avoid any potential termination of utility service.

### THE UTILITY COMPANIES WILL NOT BE PREJUDICED BY THE REQUESTED RELIEF

26. The Debtors have in excess of 1,900 Utility Companies, with which the Debtors may have multiple utility accounts. On a monthly basis, the Debtors receive hundreds of individual invoices for Utility Services. To the best of the Debtors' knowledge, there are no

material defaults or arrearages with respect to undisputed Utility Service invoices, other than payment interruptions that may be caused by commencement of these chapter 11 cases.

27.     The Debtors' proposed method of furnishing adequate assurance of payment for post-petition Utility Service is not prejudicial to the rights of any Utility Company, and is in the best interest of the Debtors' estates. This Court has granted similar relief to that requested herein following the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. See, e.g., In re New Century TRS Holdings, Inc., No. 07-10416 (KJC) (Bankr. D. Del. Apr. 24, 2007) (deeming utilities adequately assured where debtor provided two-weeks deposit for utilities); In re Global Home Products LLC, No. 06-10340 (KG) (Bankr. D. Del. May 4, 2006) (deeming utilities adequately assured where the debtors established segregated account containing an amount equal 50% of the debtors' estimated monthly cost of utility service); In re Pliant, No. 06-10001 (MFW) (Bankr. D. Del. Jan. 5, 2006); In re Nobex Corp., No. 05-20050 (MFW) (Bankr. D. Del. Dec. 21, 2005); In re FLYi, Inc., No. 05-20011 (MFW) (Bankr. D. Del. Dec. 2, 2005).

28.     Because uninterrupted utility service is vital to the continued operation of the Debtors' businesses and, consequently, to the success of their chapter 11 cases, the relief requested herein is necessary and in the best interests of the Debtors' estates and their creditors. Such relief ensures that the Debtors' business operations will not be disrupted, as well as providing Utility Companies and the Debtors with an orderly, fair procedure for determining "adequate assurance."

29.     Based upon the foregoing, the Debtors submit that the Motion should be granted.

## NOTICE

30. Notice of this Motion has been given by facsimile or overnight delivery to the following parties, or in lieu thereof, to their counsel: (i) the United States Trustee for the District of Delaware; (ii) the parties included on the Debtors' list of forty (40) creditors holding the largest unsecured claims; (iii) counsel to Bank of America, N.A; and (iv) the proposed debtor in possession lender and its counsel. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PRIOR APPLICATION

31. No previous application for the relief sought herein has been made to this or to any other court.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

WHEREFORE, the Debtors request entry of the attached Interim Order and the Final Order granting the relief requested herein and such other and further relief as is just.

Dated:   Wilmington, Delaware
         August 6, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ _____

James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Kara Hammond Coyle (No. 4410)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
