IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x
In re:                                                           :    Chapter 11
                                                                 :
AMERICAN HOME MORTGAGE                                            :    Case No. 07-11047 (_____)
HOLDINGS, INC., a Delaware corporation, et al.,                  :
                                                                 :    Joint Administration Pending
                                                                 :
                                  Debtors.                        :
                                                                 x
---------------------------------------------------------------- x

## MOTION FOR ENTRY OF ORDER AUTHORIZING
## DEBTORS TO PAY PREPETITION OBLIGATIONS
## OF CERTAIN CRITICAL VENDORS AND SERVICE PROVIDERS

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and

debtors in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] hereby move

for entry of an order, pursuant to sections 105(a), 363(b), 364, 1107(a), and 1108 of title 11 of

the United States Code (the "Bankruptcy Code"), authorizing, but not directing, the Debtors to

pay prepetition obligations to certain critical vendors and service providers, subject to the

conditions described herein (the "Motion"). In support of the Motion, the Debtors rely upon and

incorporate by reference the Declaration of Michael Strauss in Support of First Day Motions and

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

066585.1001

Applications, which was filed with the Court concurrently herewith. In further support of the

Motion, the Debtors respectfully represent:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of these

cases and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The

statutory predicates for the relief requested herein are sections 105(a), 363(b), 364, 1107(a), and

1108 of the Bankruptcy Code.

## BACKGROUND

2.      On the date hereof (the "Petition Date"), each of the Debtors filed with

this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Each Debtor

is continuing to operate its business and manage its properties as a debtor in possession pursuant

to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      Simultaneous with the filing of this pleading, the Debtors have filed a

motion with this Court pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure

seeking joint administration of the Debtors' estates.

4.      No creditors' committee has yet been appointed in these cases. No trustee

or examiner has been appointed.

## THE DEBTORS' BUSINESS

5.      Prior to the filing of these bankruptcy cases, AHM's business primarily

entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage

loans and mortgage-backed securities resulting from the securitizations of residential mortgage

loans. AHM also invested in securitized mortgage loans originated by others and originated and

2

sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

6.    As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

7.    A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

## EVENTS LEADING TO THE CHAPTER 11 FILING

8.    Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing

3

sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

6.       As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

7.       A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

## EVENTS LEADING TO THE CHAPTER 11 FILING

8.       Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing

3

default rates on such mortgages. These concerns became exacerbated by the failure of two major

hedge funds with concentrated investments in subprime loans.

9.     The concern in the credit markets has spread beyond the subprime market

and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury

issued securities and general corporate debt securities. The surge in mortgage delinquencies for

subprime home loans also generated anxiety in the market about borrowers with adjustable rate

mortgages scheduled to reset with higher rates in 2007 and 2008.

10.     In the weeks prior to the Petition Date, this unprecedented disruption in

the credit markets caused major write-downs of the Debtors' loan and security portfolios and

consequently resulted in margin calls for hundreds of millions of dollars with respect to the

Debtors' loans. During this time, certain of the Debtors' warehouse lenders -- the financial

institutions that provide short term credit facilities needed to originate and purchase loans –

began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to

originate loans and threatening the company's continued viability.

11.     On July 27, 2007, AHM Investment announced that its Board of Directors

had decided to delay payment of its quarterly cash dividend on the Company's common stock

and anticipated delaying payment of its quarterly cash dividends on its preferred stock to

preserve liquidity.

12.     The Debtors' inability to originate loans and the exercise of remedies by

certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the

Debtors to discontinue their retail and indirect loan origination business. As a result, on August

3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination

of over 6,500 employees. The Debtors now employ approximately 1000 persons who are

4

absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

13.     In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

14.     Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## CRITICAL VENDORS

15.     Prior to the Petition Date, AHM originated mortgage loans and invested in mortgage-backed securities and mortgage loans resulting from the securitization of residential mortgage loans that its various entities originate and service. Although the Debtors have not had sufficient resources or access to credit to originate loans, the Debtors continue to operate their mortgage loan servicing business (the "Loan Servicing Business") and, concurrently herewith, have filed a motion seeking approval to sell the Loan Servicing Business on an expedited basis in order to maximize the value of the Debtors' estates (the "Loan Servicing Sale").

16.     The Debtors' loan servicing customers (the "Servicing Customers") demand a high level of service. Loan servicing typically includes, among other things: (i) collecting and remitting loan payments received from the borrowers; (ii) making required

5

advances; (iii) accounting for principal and interest; (iv) customer service; (v) holding escrow or impound funds for payment of taxes and insurance; and, if applicable; (vi) contacting delinquent borrowers and supervising foreclosures and property dispositions in the event of unremedied defaults. Proper loan servicing requires diligence and sensitivity in order to maximize collections, particularly on delinquent loans, and at the same time compliance with applicable laws and regulations. The efficient functioning of the Loan Servicing Business depends on maintaining a stable vendor and service provider base, particularly since servicing loans, especially loans in default, requires sophistication concerning the legal and practical issues that affect proper loan servicing.

17.    The universe of potential replacements for the vendors and service providers with the necessary skill, size and expertise the Debtors require to operate the loan servicing business is limited. Thus, quickly and efficiently locating and transitioning to replacement vendors or service providers on reasonable terms would be extremely difficult, especially when the Debtors are engaged in the process of selling the Loan Servicing Business on an expedited basis. In the ordinary course of business the Debtors utilize several hundred vendors and service providers in connection with the Loan Servicing Business. The Debtors have identified approximately 30 vendors and service providers that are vital to the loan servicing business, cannot be effectively transitioned, are not legally bound to continue providing services and, without which, the value of the Loan Servicing Business could suffer (such vendors and service providers are hereinafter collectively referred to as the "Critical Vendors," and their prepetition claims are hereinafter identified as "Critical Vendor Claims").

18.    Each of the Critical Vendors is vital to the Debtors' Loan Servicing Business. The Critical Vendors include certain sole source providers. These sole source vendors

6

provide, among other things, services that are critical to the Debtors' collection functions, information services essential to AHM's timely action on loans where the borrowers have filed for bankruptcy, and interfacing functions with the credit bureaus for timely credit corrections and disputes. Other Critical Vendors can be categorized based on the essential automatic data transmissions and servicing system software that they provide. These Critical Vendors serve vital functions for the day-to-day operations of the Loan Servicing Business and cannot be transitioned without severe disruption. For instance, almost all of these Critical Vendors provide automatic data feeds built to the Debtors' operating system that could not be re-created in a short time period. The remaining Critical Vendors provide, among other things, disaster back-up and recovery services and specialized technical expertise that cannot be replicated or transitioned to any other vendor without business disruptions or the risk of irreparable harm to the Loan Servicing Business.

19.     The Debtors believe that replacing the Critical Vendors would be disruptive, cost-prohibitive and, in certain instances, impossible given the Debtors' efforts to maximize value for their estates through the Loan Servicing Sale. Moreover, the Debtors have developed relationships with these Critical Vendors that have allowed the Debtors to negotiate favorable pricing, credit terms, and priority scheduling. Failure to timely honor the prepetition obligations to these Critical Vendors would seriously jeopardize these relationships and thus, impair the Debtors' ability to preserve the value of the Loan Servicing Business.

20.     To ensure the Debtors identify only those vendors and service providers that are critical, certain of the Debtors' employees and professionals who have been responsible for maintaining, and have intimate knowledge of, the Debtors' vendors and service provider relationships have and will continue to conduct an extensive analysis and review of the Debtors'

7

immediate vendor and service needs. The Debtors have and will continue to use the following criteria to determine which of the Debtors' vendors and service providers are critical to the Debtors' business: (a) whether the vendor or service provider in question is a "sole-source" provider; (b) whether, even if the vendor or service provider in question is not a "sole-source" provider, quality requirements or other specifications prevent the Debtors from obtaining a vendor's products or services from alternative sources within a reasonable timeframe; and (c) whether a vendor meeting the standards of (a) or (b) is likely to refuse to provide products or services to the Debtors postpetition if its prepetition balances are not paid. The Debtors are confident that this process has appropriately identified only those vendors/service providers that meet the foregoing stringent guidelines.

<div align="center">**RELIEF REQUESTED**</div>

21.    By this Motion, the Debtors seek entry of an order, pursuant to sections 105(a), 363(b), 364, 1107(a), and 1108 of the Bankruptcy Code, authorizing, but not directing, the Debtors to pay Critical Vendor Claims in an aggregate amount not to exceed $520,000.00.

**A.    Payment of the Critical Vendor Claims Is Essential
for the Debtors' Efforts to Preserve and Maximize Value**

22.    The Debtors believe that payment of the Critical Vendor Claims is vital to the Debtors' effort to sell the Loan Servicing Business and, thus to preserve and maximize the value of the Debtors' estates. The Critical Vendors are the only source from which the Debtors can procure products and services within a timeframe that would permit the Debtors to avoid a shutdown, irreparable disruption and/or depletion of asset value of the Loan Servicing Business operations. The Debtors' inability to pay the Critical Vendor Claims would, in the Debtors' business judgment, result in the Critical Vendors refusing to provide products or services to the Debtors postpetition. Any refusal by Critical Vendors to provide products or perform key

<div align="center">8</div>

services would have immediate and severe adverse repercussions, including, but not limited to, jeopardizing or impairing the value of the Loan Servicing Business.

23.    In addition, the relief requested herein, if granted, would likely avert the filing of suits, liens and motions by the Critical Vendors seeking payment of or priority for their claims on a variety of grounds. Avoiding the time, distraction, and considerable expense of litigating the merits of such claims would benefit the Debtors, their estates, and creditors while facilitating the orderly administration of these cases.

**B.    Proposed Terms and Conditions of Payment of Critical Vendor Claims**

24.    The Debtors hereby request authorization, but not direction, to pay, in their sole discretion, those Critical Vendor Claims (or a portion thereof) that the Debtors determine must be paid to continue receiving the vital products and/or services provided by the Critical Vendors. Subject to the terms set forth below, the Debtors propose to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to continue supplying products and/or services to the Debtors on the trade terms that such Critical Vendors provided products and/or services to the Debtors on a historical basis prior to the Petition Date (the "Customary Trade Terms"), or pursuant to such other trade practices and programs that are favorable to the Debtors. The Debtors reserve the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim.

25.    To ensure that the Critical Vendors deal with the Debtors on Customary Trade Terms, the Debtors propose that a letter agreement (a "Trade Agreement"),[2] substantially in

---

[2]  The Debtors' entry into a Trade Agreement shall not change the nature or priority of the underlying Critical Vendor Claims and shall not constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement between the Debtors and a Critical Vendor.

066585.1001

the form attached hereto as Exhibit A, be sent to the Critical Vendors for execution, together with a

copy of the Order granting this Motion.

26.     The Debtors propose that each Trade Agreement include, without limitation:

(a)     the amount of the relevant Critical Vendor's estimated Critical Vendor Claims, accounting for any setoffs, other credits and discounts thereto; provided, however, such amount shall be used only for the purposes of determining such Critical Vendor's claim under the Order and shall not be deemed a claim allowed by the Court, and the rights of all interested persons to object to such claim shall be fully preserved until further order of this Court;

(b)     the Customary Trade Terms applicable to such Critical Vendor, or such other terms as the Critical Vendor and the Debtors may agree on, and the Critical Vendor's agreement to provide products and/or services to the Debtors pursuant to such terms for a period of at least six (6) months from the date of the Trade Agreement;

(c)     the Critical Vendor's agreement not to file or otherwise assert against the Debtors, their estates or any of their respective assets or property (real or personal) any lien (a "Lien") or claim for reclamation (the "Reclamation Claim"), regardless of the statute or other legal authority upon which such Lien or Reclamation Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date and, to the extent the Critical Vendor has already obtained or otherwise asserted such a Lien or Reclamation Claim, the Critical Vendor shall take (at such vendor's own expense) whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim;

(d)     the Critical Vendor's acknowledgment that it has reviewed the terms and provisions of the Order sought hereby and is bound thereby; and

(e)     the Critical Vendor's agreement that it will not separately seek payment for reclamation claims outside the terms of the Order sought hereby unless the Critical Vendor's participation in the program to pay Critical Vendor Claims pursuant to such Order is terminated.

27.     By this Motion, the Debtors seek only the authority, and not direction, to

enter into Trade Agreements when the Debtors determine, in their sole discretion, that payment

of such Critical Vendor Claims is necessary and that such agreements are advisable. The

10

Debtors also seek authority to make payments on account of Critical Vendor Claims in the

absence of a Trade Agreement if the Debtors determine, in their business judgment, that failure

to pay such Critical Vendor Claims is likely to result in irreparable harm or depletion of asset

value to the Debtors and there is no reasonable likelihood that the Debtors will negotiate an

acceptable Trade Agreement with the applicable vendors and/or service providers in a reasonable

timeframe.[3]

       28.    In the event a Critical Vendor refuses to supply products and/or services to

the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties)

following receipt of payment on its Critical Vendor Claim, or fails to comply with any Trade

Agreement entered into between such Critical Vendor and the Debtors, the Debtors hereby seek

authority, in their sole discretion and without further order of the Court: (a) to declare that any

Trade Agreement between the Debtors and such Critical Vendor is terminated; (b) to declare that

payments made to such Critical Vendor on account of its Critical Vendor Claims be deemed to

have been in payment of then-outstanding (or subsequently accruing) postpetition claims of such

Critical Vendor without further order of the Court or action by any person or entity; and (c) to

recover or seek disgorgement of any payment made to such Critical Vendor on account of its

Critical Vendor Claims to the extent that such payments exceeded the postpetition claims of such

Critical Vendor, without giving effect to any rights of setoff, claims, provision for payment of

reclamation or trust fund claims, or other defense. In sum, in the event a Trade Agreement is

terminated or a Critical Vendor refuses to supply products and/or services to the Debtors on Customary

Trade Terms (or such other terms as have been agreed by the parties) following receipt of payment

---

[3] Nothing in this Motion should be construed as a waiver by the Debtors of their rights to contest any claim of a
Critical Vendor under applicable non-bankruptcy law.

11

on its Critical Vendor Claim, the Debtors seek authority to return the parties to the positions they

held immediately prior to the entry of the Order approving this Motion with respect to all prepetition

claims. In addition, the Debtors reserve the right to seek damages, disgorgement or other appropriate

remedies against any breaching Critical Vendor.

      29.     The Debtors further propose that any Trade Agreement terminated as a

result of a Critical Vendor's refusal to comply with the terms thereof may be reinstated if:

> (a)    the underlying default under the Trade Agreement is fully cured by
> the Critical Vendor not later than five (5) business days following
> the Debtors' notification to the Critical Vendor of such a default;
> or
>
> (b)    the Debtors, in their discretion, reach a favorable alternative
> agreement with the Critical Vendor.

## BASIS FOR RELIEF REQUESTED

      30.     The relief requested in this Motion is supported by several provisions of

the Bankruptcy Code that authorize a debtor to honor prepetition obligations in certain

circumstances. Courts have recognized each of these statutory provisions as valid authority for

such payments. For instance, courts have found a basis for allowing debtors to make payments

to creditors under sections 363 and 364 of the Bankruptcy Code. See, e.g., In re UAL Corp.,

Case No. 02-48191 (Bankr. N.D. Ill. Dec. 11, 2002). Authority for such payments also may be

found in sections 1107(a) and 1108 of the Bankruptcy Code, which vest debtors in possession

with authority to continue operating their businesses. Sometimes this duty and the concomitant

fiduciary duty to maximize estate value may be fulfilled only through the pre-plan payment of

certain unsecured claims. See, e.g., In re Mirant Corp., 296 B.R. 427 (Bankr. N.D. Tex. 2003);

In re CoServ, L.L.C., 273 B.R. 487, 498 (Bankr. N.D. Tex. 2002). Finally, courts have similarly

authorized payment of prepetition obligations pursuant to section 105(a) of the Bankruptcy

Code, which allows a bankruptcy court to enter any order "necessary or appropriate" to carry out the provisions of the Bankruptcy Code. See, e.g., In re Just for Feet, Inc., 242 B.R. 821 (D. Del. 1999).

**A.**      **This Court May Authorize Payment of the Critical Vendor Claims**
        **Pursuant to Sections 363 and 364 of the Bankruptcy Code**

        31.    The relief requested in this Motion is authorized pursuant to sections 363 and 364 of the Bankruptcy Code. In re UAL Corp., Case No. 02-48191 (Bankr. N.D. Ill. Dec. 11, 2002) (essential trade motion relying upon section 363 is "completely consistent with the Bankruptcy Code;" payments to critical trade vendors have further support when debtor seeks "the extension of credit under section 364 on different than usual terms, terms that might include the payment of a prepetition obligation"); In re Conseco, Inc., Case No. 02-49672 (CAD) (Bankr. N.D. Ill. Jan. 14, 2003); Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.), 29 B.R. 391, 397 (S.D.N.Y. 1983) (under section 363 of the Bankruptcy Code, the court authorized a contractor to pay prepetition claims of some suppliers who were potential lien claimants, because payments were necessary for general contractors to release funds owed to debtors, thus benefiting estate).

        32.    The relief requested in this Motion contemplates payments to be made to Critical Vendors who agree to provide products or services on Customary Trade Terms. As a result, the payment of such Critical Vendor Claims is consistent with and appropriate under sections 363 and 364 of the Bankruptcy Code. As detailed above, the products and services provided by the Critical Vendors are vital to the Debtors' efforts to preserve and maximize the value of the Debtors' estates through the expedited sale of the Loan Servicing Business.

        33.    Courts in this jurisdiction have granted similar critical vendor relief in other cases. See, e.g., In re Werner Holding Co. (DE), Inc., Case No. 06-10578 (Carey, J.) (Bankr. D.

13

Del. June 13, 2006); In re Pliant Corp., Case No. 06-10001 (Walrath, J.) (Bankr. D. Del. Jan. 4,

2006); In re Glass Group, Inc., Case No. 05-10532 (Walsh, J.) (Bankr. D. Del. Mar. 2, 2005); In

re Maxide Acquisitions, Inc., Case No. 05-10429 (Walrath, J.) (Bankr. D. Del. Feb. 15, 2005) In

re Fleming Companies, Inc., Case No. 03-10945 (Walrath, J.) (Bankr. D. Del. May 6, 2003); In

re Maxxim Medical Group, Inc., Case No. 03-10438 (Walsh, J.) (Bankr. D. Del. Feb. 19, 2003).

**B.     The Court Should Authorize Payment of the Critical Vendor Claims
        as a Valid Exercise of the Debtors' Fiduciary Duties**

34.     The Debtors, operating their business as debtor in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy

estate and operating the business for the benefit of its creditors and (if the value justifies) equity

owners." In re CoServ, L.L.C., 273 B.R. at 497. Implicit in the duties of a chapter 11 debtor in

possession is the duty "to protect and preserve the estate, including an operating business's

going-concern value." Id.

35.     Courts have noted that there are instances in which a debtor in possession

can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." Id. The

CoServ court specifically noted that preplan satisfaction of prepetition claims would be a valid

exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial

enhancement of the estate" and also when the payment was to "sole suppliers of a given

product." Id. at 497-98. The court provided a three-pronged test for determining whether a

preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary

duty:

> First, it must be critical that the debtor deal with the
> claimant. Second, unless it deals with the claimant, the
> debtor risks the probability of harm, or, alternatively, loss
> of economic advantage to the estate or the debtor's going
> concern value, which is disproportionate to the amount of

14

> the claimant's prepetition claim. Third, there is no
> practical or legal alternative by which the debtor can deal
> with the claimant other than by payment of the claim.

Id. at 498.

36.     Payment of the Critical Vendor Claims meets each element of the CoServ

court's standard.  As described above, the Debtors have narrowly tailored the Critical Vendor

Claims to encompass only those suppliers and service providers that are the sole source of a

particular good without which the Debtors' Loan Servicing Business would be shut down or

those suppliers or service providers who are critical because the time and expense involved in

transitioning to a new supplier would be prohibitive and would significantly disrupt the Debtors'

efforts to maximize the value of the Loan Servicing Business.  The shutdown or disruption of the

Debtors' loan servicing operations would cost the Debtors' estates millions of dollars in lost

revenues and/or sale value.  The harm and economic disadvantage that would stem from the

failure of any of the Critical Vendors to provide necessary goods and services is grossly

disproportionate to the amount of the prepetition claim that would have to be paid.  Finally, with

respect to each Critical Vendor, the Debtors have examined other options short of payment of

Critical Vendor Claims and have determined that to avoid significant disruption of the Debtors'

business operations and expedited sale process there exists no practical or legal alternative to

payment of the Critical Vendor Claims.  Therefore, the Debtors can only meet their fiduciary

duties as debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code by

payment of the Critical Vendor Claims.

**C.      The Court May Rely on the "Necessity of Payment" Doctrine
          and its General Equitable Powers to Grant the Motion**

37.     The traditional source of authority for preplan payments of prepetition

debts is the "doctrine of necessity" or "necessity of payment" rule first recognized by the

15

Supreme Court more than 120 years ago in Miltenberger v. Logansport, C. & S. Ry. Co., 106

U.S. 286 (1882). In Miltenberger, the Supreme Court acknowledged the basic duty of an equity

receiver "to protect and preserve the trust funds in his hands." Id. at 310 (quoting Wallace v.

Loomis, 97 U.S. 146, 162-63 (1878)). More importantly, the Court held that, consistent with this

duty, "[m]any circumstances may exist which may make it necessary and indispensable to the

business . . . and the preservation of the property, for the receiver to pay pre-existing debts . . .

out of the earnings of the [debtor] . . . under the order of the court . . . ." Id. at 311-12.

38.    This doctrine "recognizes the existence of the judicial power to authorize a

debtor in a reorganization case to pay prepetition claims where such payment is essential to the

continued operation of the debtor." In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr.

S.D.N.Y. 1989); In re UNR Indus., Inc., 143 B.R. 506, 519-20 (Bankr. N.D. Ill 1992), rev'd on

other grounds, 173 B.R. 149, 158-59 (N.D. Ill. 1994); see also In re Lehigh & N.E. Ry. Co., 657

F.2d 570, 581 (3d Cir. 1981) (payment of creditors' claims authorized under "necessity of

payment" doctrine); In re CAF Bindery, Inc., 199 B.R. 828 (Bankr. S.D.N.Y. 1996) (payment of

pre-petition claims warranted when critical to debtor's reorganization). This doctrine is

consistent with the paramount goal of chapter 11 -- "facilitating the continued operation and

rehabilitation of the debtor." In re Ionosphere Clubs, 98 B.R. at 176; see also Dudley v. Mealey,

147 F.2d 268, 271 (2d Cir. 1945) ("Let it [(a hotel)] once be shut down, and it will lose much of

its value . . . Some priority [to the hotel's prepetition suppliers] may be essential to

preservation of the business").

39.    The court's general equitable powers are codified in section 105(a) of the

Bankruptcy Code. Section 105(a) of the Bankruptcy Code empowers the court to "issue any

order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. §

16

105(a). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." In re Ionosphere Clubs, Inc., 98 B.R. at 175 (citing NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984)). Under section 105(a), a court "can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor." In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992).

40.    Maintaining access to the products and services provided by the Critical Vendors is absolutely critical to preserving and maximizing the value of the Debtors' estates and thus, is in the best interests of the Debtors' estates and their creditors. Hence, giving the Debtors the authority to pay the Critical Vendor Claims is essential to assure that the Debtors continue to receive the products and services necessary to the uninterrupted operation of their Loan Servicing Business through the sale process. This Court should therefore exercise its equitable powers to grant the relief requested in this Motion.

## NOTICE

41.    Notice of this Motion has been given by facsimile or overnight delivery to the following parties, or in lieu thereof, to their counsel: (i) the United States Trustee for the District of Delaware; (ii) the parties included on the Debtors' list of forty (40) creditors holding the largest unsecured claims; (iii) counsel to Bank of America, N.A; and (iv) the proposed debtor in possession lender and its counsel. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

42.    No previous motion for the relief sought herein has been made to this or any other Court.

17

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form annexed hereto as Exhibit B, granting the relief requested in the Motion

and such other and further relief as may be just and proper.

Dated:  Wilmington, Delaware
         August 6, 2007

<div style="margin-left: 40%;">

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____

James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Kara Hammond Coyle (No. 4410)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Proposed Counsel for Debtors and
Debtors in Possession

</div>

DB02:6160142.3

066585.1001

# EXHIBIT A

## Form of Trade Agreement

066585.1001

_____, 2007

TO:    [Critical Vendor/Service Provider]
       [Name]
       [Address]

Dear Valued Supplier/Service Provider:

As you may be aware, on August _____, 2007 (the "Petition Date"), American Home Mortgage Holdings, Inc., and certain of its direct and indirect affiliates and subsidiaries, (collectively, the "Debtors"), filed voluntary petitions under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Case" and the "Bankruptcy Court," respectively).  On the Petition Date, the Debtors requested the Bankruptcy Court's authority to pay certain entities in recognition of the importance of our relationship with such suppliers and the Debtors' desire that the Bankruptcy Case has as little effect on it as possible.  On _____, 2007, the Bankruptcy Court entered an order (the "Order") authorizing the Debtors, under certain conditions, to pay pre-bankruptcy claims of certain trade creditors and service providers that agree to the terms set forth below and to be bound by the terms of the Order.  A copy of the Order is enclosed.

To receive payment on pre-bankruptcy claims, the Debtors require each selected trade creditor or service provider to agree to continue supplying products and services to the Debtors based on "Customary Trade Terms."  In the Order, Customary Trade Terms are defined as the normal and customary trade terms, practices, and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowance, rebates, coupon reconciliation, normal product mix and availability and other applicable terms and programs) in effect between such creditor and the Debtors on a historical basis prior to the Petition Date (the "Prepetition Trade Terms") or such other terms, practices, and programs that are favorable to the Debtors.

For purposes of administration of this program as authorized by the Bankruptcy Court, the Debtors and you agree as follows:

1.    The estimated balance of the prepetition claim (net of any setoffs, credits or discounts) (the "Claim") is $_____.  Your Claim does not constitute a claim allowed by the Court in the Bankruptcy Case, and signing this Trade Agreement does not constitute a proof of claim and therefore, does not excuse you from any requirement of filing a proof of claim in the Bankruptcy Case.

2.    The open balance or credit line that you will extend to the Debtors for shipment of postpetition products is $_____ (which shall not be less than the greater of the open balance outstanding: (a) on _____, 2007, or (b)

on normal and customary terms on a historical basis for the period prior to the Petition Date).

3.      In consideration for the payment described herein, you agree not to file or otherwise assert against any or all of the Debtors, their estate or any other person or entity or any of their respective assets or property (real or personal) any lien (a "Lien") or claim for reclamation ("Reclamation Claim"), regardless of the statute or other legal authority upon which such Lien or Reclamation Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date and, to the extent the Critical Vendor has already obtained or otherwise asserted such a Lien or Reclamation Claim, the Critical Vendor shall (at its own expense) take whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim.

4.      You will hereafter extend to the Debtors all Customary Trade Terms, which are:

[ADD INDIVIDUALIZED SET OF CUSTOMARY TRADE/SERVICE TERMS]

Payment of your Claim in the manner set forth in the Order may occur upon execution of this letter by a duly authorized representative of your company and the return of this letter to the Debtors. Your execution of this letter agreement and the return of the same to the Debtors constitutes an agreement by you and the Debtors:

(a)      to the Customary Trade Terms and, subject to the reservations contained in the Order, to the amount of the Trade Claim set forth above;

(b)      that, for a period of no less than six (6) months from the date hereof, you will continue to supply the Debtors with products and/or services pursuant to the terms hereof and that the Debtors will pay for such products and/or services in accordance with terms hereof;

(c)      that you have reviewed the terms and provisions of the Order and acknowledge that you are bound by such terms;

(d)      that you will not separately seek payment for reclamation or similar claims outside of the terms of the Order unless your participation in the trade payment program authorized by the Order (the "Trade Payment Program") is terminated; and

(e)      that if either the Trade Payment Program or your participation therein terminates as provided in the Order, any payments received by you on account of your Claim will be deemed to have been in payment of postpetition obligations owed to you and you will

2

immediately repay to the Debtors any payments made to you on account of your Claim to the extent that the aggregate amount of such payments exceed the postpetition obligations, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or other defense.

The Debtors and you also hereby agree that any dispute with respect to this agreement, the Order and/or your participation in the Trade Payment Program shall be determined by the Bankruptcy Court.

If you have any questions about this Agreement or the Debtors' financial restructuring, please do not hesitate to call [Name] at (____)_____ or [Name] (____)_____.

Sincerely,

[Debtors]

By:
Title:


Agreed and Accepted by:
[Name of Trade Vendor]

By:

     Its:

Dated:

3

## EXHIBIT B

**Proposed Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------------------- x
In re:                                                                :   Chapter 11
                                                                      :
AMERICAN HOME MORTGAGE                                                 :   Case No. 07-[_____] (_____)
HOLDINGS, INC., a Delaware corporation, et al.,                       :
                                                                      :   Jointly Administered
                                                                      :
                                    Debtors.                          :   **Ref. Docket No. _____**
                                                                      x
--------------------------------------------------------------------- x

## ORDER AUTHORIZING THE DEBTORS TO PAY PREPETITION OBLIGATIONS OF CERTAIN CRITICAL VENDORS AND SERVICE PROVIDERS

Upon consideration of the motion (the "Motion")[1] of American Home Mortgage

Holdings, Inc., a Delaware corporation, and certain of its direct and indirect affiliates and

subsidiaries, the debtors and debtors in possession in the above cases (collectively, the

"Debtors")[2], for an order, pursuant to sections 105(a), 363(b), 364, 1107(a), and 1108 of title 11

of the United States Code (the "Bankruptcy Code"), authorizing, but not directing, the Debtors to

pay certain prepetition obligations to certain critical vendors and service providers; and upon the

Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day

Relief; and due and sufficient notice of the Motion having been given; and it appearing that no

other or further notice need be provided; and it appearing that the relief requested by this Motion

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

[2] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

is in the best interests of the estates, their creditors, and other parties in interest; and after due

deliberation and sufficient cause appearing therefor, it is hereby

ORDERED that the Motion is granted; and it is further

ORDERED that the Debtors are authorized, but not directed, in their sole

discretion, to pay in the ordinary course the Critical Vendor Claims in an aggregate amount not

to exceed $520,000.00; and it is further.

ORDERED that the Debtors are authorized, but not directed, to undertake

appropriate efforts to cause Critical Vendors to enter into agreements with the Debtors,

substantially similar to that annexed as Exhibit A to the Motion, as a condition of payment of

each such Critical Vendor Claim; and it is further

ORDERED that the Debtors are authorized, but not directed, in their sole

discretion, to make payments on account of a Critical Vendor Claim, subject to the other limits

set forth herein, even in the absence of a Trade Agreement if the Debtors determine, in their

business judgment, that failure to pay such Critical Vendor Claim is likely to result in irreparable

harm or depletion of asset value to the Debtors' business operations; and it is further

ORDERED that if a Critical Vendor refuses to supply products and/or to provide

services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the

parties) following receipt of payment on its Critical Vendor Claim (regardless of whether such

Critical Vendor has entered into a Trade Agreement), or fails to comply with any Trade

Agreement entered into between such Critical Vendor and the Debtors, then the Debtors may, in

their discretion and without further order of the Court: (a) declare that any Trade Agreement

between the Debtors and such Critical Vendor is terminated; (b) declare that payments made to

such Critical Vendors on account of its Critical Vendor Claims shall be deemed to have been in

2

payment of then-outstanding or subsequently accruing postpetition claims of such vendor without further order of the Court or action by any person or entity; and (c) recover any payment made to such Critical Vendor on account of its Critical Vendor Claims, without giving effect to any rights of setoff, claims, provision of payment of reclamation on trust fund claims or other defense. Under any such circumstances, such Critical Vendor shall immediately repay to the Debtors any payment made to it on account of its Critical Vendor Claims to the extent that such payments exceed the postpetition claims of such vendors then outstanding, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims or other defense. Nothing herein shall constitute a waiver of the Debtors' rights to seek damages, disgorgement or other appropriate remedies against any breaching Critical Vendor; and it is further

ORDERED that notwithstanding the foregoing, the Debtors may, in their sole discretion, reinstate a Trade Agreement if:

    (a)    the underlying default under the Trade Agreement is fully cured by the Critical Vendor not later than five (5) business days following the Debtors' notification to the Critical Vendor that such default had occurred; or

    (b)    the Debtors, in their discretion, reaches a favorable alternative agreement with the Critical Vendor;

and it is further

ORDERED that nothing herein shall be construed to limit, or in any way affect, the Debtors' ability to dispute any Critical Vendor Claim; and it is further

ORDERED that nothing contained in this Order shall be deemed to constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement

between the Debtors and a Critical Vendor or to require the Debtors to make any of the payments authorized herein; and it is further

ORDERED that the authorization granted hereby to pay Critical Vendor Claims shall not create any obligation on the part of the Debtors or their officers, members, attorneys, or agents to pay the Critical Vendor Claims, none of the foregoing persons shall have any liability on account of any decision by the Debtors not to pay a Critical Vendor Claim and nothing contained in this order shall be deemed to increase, reclassify, or elevate to an administrative expense status or otherwise affect the Critical Vendor Claims to the extent they are not paid; and it is further

ORDERED that the amount of each Critical Vendor's Critical Vendor Claims set forth in connection with a Trade Agreement shall be used only for purposes of determining such Critical Vendor's claim under this Order and shall not be deemed a claim allowed by the Court, and the rights of all interested persons to object to such claim shall be fully preserved until further order of the Court. Further, signing a Trade Agreement containing a claim amount for purposes of this Order does not constitute a proof of claim and therefore, shall not excuse such Critical Vendor from filing a proof of claim in this case; and it is further

ORDERED that no claimant who receives payment on account of a Critical Vendor Claim (whether or not such claimant signs a Trade Agreement) is permitted to file or perfect a Lien on account of such claim, and any such claimant shall take all necessary action to remove any existing Lien relating to such claim, even if the Lien is against property of a non-Debtors; and it is further

4

ORDERED that notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall create, nor is it intended to create, any rights in favor of, or enhance the status of any claim held by, any person; and it is further

ORDERED that notwithstanding Bankruptcy Rule 6004(g), this Order shall be effective and enforceable immediately upon entry hereof; and it is further

ORDERED that this Court shall retain jurisdiction with respect to all matters relating to the interpretation or implementation of this Order.

Dated: Wilmington, Delaware
      August _____, 2007

_____
UNITED STATES BANKRUPTCY JUDGE

5