IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------  x
In re:                                                        :    Chapter 11
                                                              :
AMERICAN HOME MORTGAGE                                        :    Case No. 07-11047 (___)
HOLDINGS, INC., a Delaware corporation, et al.,               :
                                                              :    Joint Administration Pending
                          Debtors.                            :
------------------------------------------------------------  x
```

## MOTION FOR AN ORDER (A) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO (I) PAY CERTAIN PRE-PETITION WAGES, COMPENSATION AND EMPLOYEE BENEFITS; (II) CONTINUE PAYMENT OF WAGES, COMPENSATION AND EMPLOYEE BENEFITS IN THE ORDINARY COURSE OF BUSINESS; AND (III) PAY CERTAIN UNPAID COMPENSATION TO TERMINATED EMPLOYEES; AND (B) AUTHORIZING AND DIRECTING APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS TO PROCESS AND PAY ALL CHECKS PRESENTED FOR PAYMENT AND TO HONOR ALL TRANSFER REQUESTS MADE BY THE DEBTORS RELATING TO THE FOREGOING

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and

debtors in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] respectfully

represent as follows:

### SUMMARY OF RELIEF REQUESTED[2]

1.        By this motion (the "Motion"), the Debtors request that this Court enter an

order pursuant to sections 363 and 105(a) of the Bankruptcy Code (i) authorizing, but not

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

[2] Capitalized terms in this Summary shall have the meanings ascribed to them below in this Motion.

directing, the Debtors to pay certain pre-petition wages, compensation and employee benefits, including certain amounts owed to terminated employees; (ii) authorizing, but not directing, the Debtors to continue payment of wages, compensation and employee benefit programs in the ordinary course of business and to pay other costs and expenses relating to the foregoing as described more fully below; and (iii) authorizing and directing applicable banks and other financial institutions to process and pay all checks presented for payment and to honor all transfer requests made by the Debtors relating to the foregoing.

2.    The Debtors seek this authorization because the Employees are essential to the operation of the Debtors' business and, absent an order granting the relief requested by this Motion, the Employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable the Employees to meet their own personal financial obligations. Moreover, the Debtors believe that, without the requested relief, the stability of the Debtors' on-going business operations will be undermined, perhaps irreparably. The recent significant reduction in the Debtors' workforce as more fully described below, along with the commencement of these chapter 11 cases, has brought about intense employee anxiety, and the requested relief is critical to stabilizing these concerns.

### JURISDICTION

3.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### BACKGROUND

4.    On the date hereof (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11, title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

5.    Simultaneous with the filing of this pleading, the Debtors have filed a

motion with this Court pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure

seeking joint administration of the Debtors' estates.

6.    No creditors' committee has yet been appointed in these cases.  No trustee

or examiner has been appointed.

### THE DEBTORS' BUSINESS[3]

7.    Prior to the filing of these bankruptcy cases, AHM's business primarily

entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage

loans and mortgage-backed securities resulting from the securitizations of residential mortgage

loans.  AHM also invested in securitized mortgage loans originated by others and originated and

sold mortgage loans to institutional investors.  AHM offered an array of mortgage products and

primarily made loans to borrowers with good credit profiles.  Most of its portfolio consisted of

securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

8.    As of December 31, 2006, AHM held a leveraged portfolio of mortgage

loans held for investment and mortgage-backed securities in the amount of approximately $15.6

billion.  As of December 31, 2006, AHM operated more than 550 loan production offices located

in 47 states and the District of Columbia, and made loans throughout all 50 states and the District

of Columbia.  Certain of the Debtors originated mortgages through a network of loan origination

offices.  In addition, AHM originated loans obtained from mortgage brokers and purchased loans

from correspondents.  AHM originated approximately $58.9 billion in aggregate principal

amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest

residential mortgage lender, according to National Mortgage News.

---

[3] The facts set forth herein are derived from the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief (the "First Day Declaration"), filed concurrently herewith, which is incorporated by reference as if fully set forth herein at length.

9.    A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

## EVENTS LEADING TO THE CHAPTER 11 FILING

10.    Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

11.    The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated nervousness in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

12.    In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, the Debtors' warehouse lenders -- the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

13.     On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

14.     The Debtors' inability to originate loans and the exercise of remedies by the various warehouse lenders created a severe liquidity crisis and forced the Debtors to discontinue their wholesale and retail loan origination business.  As a result, on August 3, 2007, the Debtors implemented a massive reduction in force, resulting in the termination of approximately 6,500 employees.  The Debtors retained approximately 1,000 employees (450 servicing employees, 250 employees to close the branch offices and 300 other employees company-wide), who are absolutely essential to the Debtors' organized wind-down efforts and continued servicing operations.

15.     In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought additional funding sources and capital infusions.  Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

16.     Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to  preserve and maximize the value of their estates through orderly sales of their assets.

## THE DEBTORS' EMPLOYEES AND THE REDUCTION IN FORCE

17.     As set forth above, because of the Debtors' severe liquidity crisis, they were forced to shut down the loan origination aspects of their business and implement a massive

reduction in force on August 3, 2007, resulting in the termination of approximately 6,500

employees (the "Terminated Employees"). This leaves the Debtors with a current workforce of

approximately 1,000 employees (collectively, the "Employees"). This number will decrease to

approximately 750 employees on or about August 13, 2007 once the Debtors have closed their

branch offices.

       18.     Most of the Employees work for the Debtors' loan servicing business (the

"Servicing Business"), which constitutes a valuable asset of the Debtors' estates, and which the

Debtors intend to promptly seek approval to sell in this bankruptcy case pursuant to section 363

of the Bankruptcy Code. The Debtors believe that significant recoveries for their stakeholders in

these cases may derive from the sale of the Servicing Business. The strength of the Servicing

Business depends on maintaining a knowledgeable and experienced workforce, since servicing

loans requires sophistication concerning the legal and practical issues that affect that business.

Some of the Debtors' remaining Employees will be used to close the branch offices, while others

possess the institutional knowledge, experience and skills necessary to support the Debtors'

business operations during the chapter 11 process and to support successful sales of the Servicing

Business, as well as the Debtors' remaining assets.

       19.     Given the events of the past few weeks and the challenges facing the

Employees in the weeks and months ahead, the Debtors are especially cognizant of the need to

minimize any hardships to the Employees resulting from the commencement of the Debtors'

chapter 11 cases. Additionally, the remaining Employees who possess unique and critical skill

sets will be in demand. In this climate, clearly, the risk of Employee departures is real, and the

Debtors must take all necessary steps to retain their remaining Employees and bolster their

morale to preserve and maximize the value of their estates. Accordingly, by this Motion, the

Debtors seek authority to pay and honor their pre-petition obligations, pay wages, salaries, and other compensation to their Employees, pay federal and state withholding taxes, payroll taxes, and other payments under employee benefit plans, and honor and maintain certain Employee benefits that the Debtors have traditionally provided in the ordinary course of business (all such obligations to the employees collectively, the "Employee Obligations"). In addition, the Debtors seek authority to pay unpaid compensation to certain Terminated Employees, up to the $10,950 priority limit established in section 507(a)(4) of the Bankruptcy Code (the "Terminated Employee Obligations").

## THE DEBTORS' EMPLOYEE OBLIGATIONS

### A.    Unpaid Compensation

20.    In the ordinary course of business, the Debtors, through ADP, their payroll processor, issue payroll checks twice a month to both hourly and salaried employees. Once ADP receives payroll funds, it transmits the direct deposits via ACH transfers and issues checks to the Debtors' employees from the ADP account.

21.    The Debtors funded their last payroll with ADP on August 3, 2007 (the "August 3rd Funding"). The August 3rd Funding compensated the current remaining Employees only for services rendered through and including July 31, 2007. Accordingly, the Debtors' Employee Obligations for their remaining Employees for the period from August 1, 2007 through the Petition Date remain outstanding as pre-petition claims.

22.    Although most employees are paid by direct deposit, some of the Debtors' employees are paid by check issued by ADP, and it is highly likely that those checks (the "August Paychecks") were not received by the Employees prior to the commencement of the Debtors' chapter 11 cases. Accordingly, the Debtors seek authority to honor those August Paychecks that remain outstanding as of the Petition Date.

23.    The Debtors estimate that approximately $1 million in pre-petition wages, salaries and other compensation owed to Employees may remain unpaid as of the Petition Date (collectively, the "Unpaid Compensation"). The Debtors do not believe that any Employee is owed in excess of the $10,950 limit on priority claims under section 507(a)(4) of the Bankruptcy Code on account of Unpaid Compensation.

24.    Pursuant to this Motion, the Debtors seek to pay in the ordinary course of business the outstanding amounts owed to their Employees as of the Petition Date for accrued and unpaid wages and salaries.

**B.    Vacation, Sick and Other Paid Leave**

25.    The Debtors' Employees are eligible for paid vacation. Employees accrue a specified number of vacation hours based upon years of service set by company policy or other individual agreements. The average Employee earns two to three weeks of vacation per year. Employees may carry over a certain number of unused vacation days from one year to the next, subject to certain limitations.

26.    The Debtors' ordinary course policy is to pay an Employee, upon termination, all accrued unpaid vacation at his/her final rate of pay.[4] As of the Petition Date, Employees had accrued unpaid vacation valued at approximately $2,000,000 (the "Vacation Obligations"), which represents an average of approximately $2,000 per Employee.

27.    In addition, under company policy, Employees are entitled to certain sick leave benefits ("Sick Leave Obligations") -- for most Employees seven sick days per year. Although salaried Employees may not carry over Sick Leave Obligations from year to year (except in California, where state laws require that Employees have that option), hourly

---

[4] The payment of accrued vacation time upon termination is required under the laws of certain states.

Employees may carry forward their Sick Leave Obligations from year to year. If sick days are carried forward, Employees are paid in February for such unused Sick Leave Obligations accrued in the preceding calendar year.

28.    In addition to vacation and sick leave, full-time Employees are paid for eight holidays per year ("Holiday Obligations").

29.    Employees are also entitled to up to three days of paid bereavement leave per calendar year for use in the event of a death of an immediate family member ("Bereavement Obligations" and, together with Vacation Obligations, Sick Leave Obligations and Holiday Obligations, the "Leave Obligations").

30.    The Debtors request that, to the extent applicable, they be authorized as part of their ongoing business operations to allow Employees to use Leave Obligations accrued in respect of pre-petition periods and pay Employees for prepetition unpaid accrued vacation upon termination, in accordance with their prepetition policies.

C.    **Workers' Compensation Programs and Benefits**

31.    Under the laws of the various states in which the Debtors operate, the Debtors are required to maintain workers' compensation liability insurance and to provide employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors. The Debtors provide workers' compensation benefits (the "Private Workers' Compensation Obligations") to their Employees, except for those employed in jurisdictions (the "Publicly Insured States") that require workers compensation liability insurance to be maintained through the state, through a workers' compensation insurance policy issued by The Hartford (the "Private Workers' Compensation Policy"). The term of the Private Workers' Compensation Policy is from March 28, 2007 to March 28, 2008.

32.     The Debtors provide workers' compensation benefits (the "Public Workers' Compensation Obligations," and together with the Private Workers' Compensation Obligations, the "Workers' Compensation Obligations") to their Employees working in the Publicly Insured States through policies provided directly from those states (collectively, the "Public Workers' Compensation Policies," and together with the Private Workers' Compensation Policy, the "Workers' Compensation Policies").

33.     In the past, the Debtors paid annual premiums of approximately $375,000 for their Workers' Compensation Policies regardless of the number or amount of claims made under the policies.  Going forward, the Debtors expect the average monthly premiums for their Workers' Compensation Policies to be approximately $10,000.

34.     Failure to maintain workers' compensation insurance in the various states in which the Debtors conduct business could result in the institution of administrative or legal proceedings and material fines against the Debtors and their officers and directors.  The Debtors therefore seek authority to continue paying and/or contesting in good faith, as appropriate in the Debtors' business judgment, all outstanding amounts related to Workers Compensation Obligations that arose prior to the Petition Date, including, without limitation, any payments for workers compensation claims, premiums and fees owed for administrative costs and other amounts required in connection with the Debtors' workers compensation programs, as such amounts become due in the ordinary course of the Debtors' business.

**D.      Employee Benefits**

35.     The Debtors have established various plans and policies to provide the Employees with medical, dental, prescription drug, vision, life insurance, retirement savings and other benefits (collectively, the "Employee Benefits" and amounts owed under these plans, the

"Employee Benefit Obligations"). By this Motion, the Debtors seek the authority, but not the direction, to satisfy Employee Benefit Obligations relating to pre-petition periods. The Employee Benefits include, but are not limited to, the following:

### Medical Benefits

36.      The Debtors offer self-insured medical and prescription insurance coverage to their Employees under various PPO and EPO plans (the "Medical Plans"). All Employees, other than those employed in California, are covered under a plan administered by Blue Cross/Blue Shield. California Employees are covered by a medical and prescription plan administered by Kaiser Permanente. Most Employees participate in the Medical Plans, with a range of options with varying deductibles, coinsurance, co-pays, payroll premiums and coverages. Prior to the Petition Date the Medical Plans cost the Debtors approximately $3.85 million per month, which included approximately $900,000 per week for claim assessments[5] based on their current utilization rate and approximately $250,000 per month in administrative fees paid to the third party administrators. Although the Debtors have greatly reduced their employee ranks, the weekly assessment will remain at approximately $900,000 until their utilization rate is adjusted. Under normal circumstances, utilization rates are adjusted on a quarterly basis; however, based upon the Debtors' current circumstances, the Debtors are requesting their plan administrators to immediately readjust the utilization rates. Once the utilization rates are adjusted, the Debtors expect claim assessments to run approximately $150,000 per week. Additionally, going forward, the Debtors expect administrative fees to be approximately $50,000 per month.

---

[5] As the Debtors are self-insured, they make weekly payments to their plan administrators for anticipated claims that will be submitted by employees, which are periodically trued-up against actual claims. Claim assessments are based upon the actual cost of claims processed during the previous quarter.

### Life Insurance

37.    The Debtors offer term life insurance ($50,000 basic life insurance benefit and $50,000 accidental death benefit) to all salaried and hourly Employees pursuant to group policies issued by Highmark Life Insurance Company of New York, New York ("Highmark"). The Debtors estimate that, as of the Petition Date, the Debtors' obligations with respect to accrued but unpaid life insurance costs aggregated approximately $28,000. There is no Employee contribution for this life insurance coverage; however, Employees may elect to obtain additional coverage at their own expense. Going forward, the Debtors expect to expend approximately $7,000 per month on account of their life insurance program The Debtors hereby seek authority to maintain their life insurance programs, including paying, in their discretion, any amounts owed to Highmark in the ordinary course of their business, regardless of when the life insurance costs accrued.

### Retirement Savings

38.    The Debtors maintain a retirement savings plan (the "Savings Plan") that meets the requirements of Section 401(k) of the Internal Revenue Code of 1986. Employees can elect to make before-tax contributions to the Savings Plan through payroll deductions that are then paid to a trust shortly thereafter. The Debtors collect contributions from Employees from each payroll and transfer those contributions into the Savings Plan as directed by the Employees, typically on a monthly basis. Some of these amounts collected from Employees may not have been transferred into the Savings Plan prior to the Petition Date. Prior to the Petition Date, the Debtors made matching contributions of $.25 for every dollar contributed by an Employee through payroll deductions up to a maximum of 6% of such Employee's compensation or

$4,000, whichever is less.  However, as of the Petition Date, to preserve funds, the Debtors have discontinued their matching 401(k) contribution benefits.

39.    The Debtors seek authority (but not direction) to continue such Savings Plan, except for matching contributions, and to pay over all amounts payable to the Savings Plan as and when due.

### Flexible Spending

40.    The Debtors offer their Employees the ability to contribute a portion of their compensation into flexible spending accounts for health and dependent care (the "Flexible Spending Program").  Approximately 200 Employees participate in the Flexible Spending Program, which the Debtors expect will cost approximately $2,000 per month.

41.    The Debtors seek authority (but not direction) to continue making such payments on account of the Flexible Spending Program.

### E.    Employee Payroll Garnishments/Other Payroll Deductions

42.    The Debtors deduct from their Employees' paychecks certain taxes, such as payroll, social security and unemployment taxes, required to be withheld by certain federal, state and local taxing authorities (the "Payroll Deductions").  The Debtors forward these withheld amounts to the appropriate governmental authorities and, by this Motion, seek authority to continue to forward any Payroll Deductions not forwarded as of the Petition Date.

43.    Periodically, the Debtors also are presented with garnishment or child support orders requiring the withholding of Employee wages to satisfy such Employee obligations.  Additionally, certain Employees have voluntary deductions for items such as optional health coverage for dependents, or optional dental or vision care.  Payment of these

obligations are made from amounts otherwise payable to the Employees and are not an incremental cost obligation of the Debtors' estates.

44.    The Debtors seek authority to continue making such deductions and to pay over such amounts to third parties as requested or required.

**F.    Reimbursable Business Expenses**

45.    As is customary with most large businesses, the Debtors reimburse their Employees who incur and pay a variety of approved business-related expenses, in the ordinary course of performing their duties for the Debtors ("Employee Expense Obligations"). Most Employees initially incur and pay such expenses by using corporate or personal credit cards, but are subsequently reimbursed by the Debtors after submission and approval of expense reimbursement requests. Because a significant lag time may occur between the time such expenses are incurred and the time an expense reimbursement request is submitted, it is difficult to determine with precision the aggregate outstanding amount of such Employee Expense Obligations. It would be patently inequitable to require Employees to personally bear any expenses that they incurred in furtherance of their responsibilities to the Debtors. Accordingly, the Debtors request authority, in their discretion and in the exercise of their business judgment, to continue to honor all of their Employee Expense Obligations in the ordinary course of business, regardless of when such obligations arose.

**G.    Tuition Reimbursement**

46.    The Debtors also offer a tuition reimbursement program (the "Tuition Reimbursement Program") for certain of their Employees. Pursuant to the Tuition Reimbursement Program, the Debtors reimburse Employees who have been employed by the Debtors for at least a year for 80% to 100% of tuition costs for pre-approved courses. The

reimbursements are payable upon the Employee's satisfactory completion of the approved course work. As of the Petition Date, the Debtors estimate the aggregate amount of reimbursements due under the Tuition Reimbursement Program to be *de minimis*.

47.      By this Motion, the Debtors seek authority to continue the Tuition Reimbursement Program in the ordinary course of business, and to honor and pay all unpaid amounts as of the Petition Date.

**H.      Employee Assistance Program**

48.      The Debtors also offer Employees access to an employee assistance program (the "Employee Assistance Program"), which provides Employees access to six free counseling services of any type (such as legal assistance, marital counseling, personal therapy, drug counseling and diet counseling). The Debtors anticipate that the Employee Assistance Program will cost approximately $1,200 per month. This program provides important benefits to Employees and improves Employee morale at a relatively modest cost. The Debtors request authority to pay any costs related to, and to continue with such Employee Assistance Program in the ordinary course of business.

**THE DEBTORS' TERMINATED EMPLOYEE OBLIGATIONS**

49.      The August 3rd Funding compensated the Terminated Employees for services rendered through and including August 3, 2007. However, at that time, the Debtors could not determine with specificity amounts owed to certain of the Terminated Employees for commissions and similar compensation owed primarily to marketing and sales personnel. By this Motion, the Debtors request authority to pay such unpaid compensation to the Terminated

Employees up to the $10,950 limit established in section 507(a)(4) of the Bankruptcy Code. The

Debtors estimate the amounts outstanding to the Terminated Employees to be $1.5 million.[6]

## RELIEF REQUESTED AND REASONS THEREFOR

50.    To minimize the personal hardship the Employees will suffer in

connection with the filing of these cases, the Debtors request entry of an order (i) authorizing

(but not directing) the Debtors to pay, in their sole discretion, the Employee Obligations as

described in this Motion and all costs incident thereto; (ii) authorizing (but not directing) the

Debtors to continue to honor their practices, programs and policies with respect to the

Employees, as such practices, programs and policies were in effect as of the Petition Date, with

authorization (but not direction) to pay the Employee Obligations that become due and owing

during the pendency of these cases; and (iii) authorizing and directing Disbursement Banks to

receive, process and pay any and all checks drawn on the Debtors' payroll accounts, and

automatic payroll transfers to the extent that such checks or transfers relate to any of the

foregoing.

51.    Pursuant to section 507(a)(4) of the Bankruptcy Code, as amended by the

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, each Employee may be

granted a priority claim for:

> allowed unsecured claims, but only to the extent of $10,950 for each individual or
> corporation, as the case may be, earned within 180 days before the date of the
> filing of the petition or the date of the cessation of the debtor's business,
> whichever occurs first, for –
>
> (A)    wages, salaries, or commissions, including vacation, severance, and sick
>        leave pay earned by an individual; or

---

[6] The Debtors also seek authority to forward the appropriate prepetition payroll deductions arising from the
Terminated Employee Compensation to the applicable taxing authorities, and to remit the appropriate withheld
amounts arising as a result of the Terminated Employee Compensation to the appropriate third parties.

(B)    sales commissions earned by an individual or by a corporation with only 1 employee, acting as an independent contractor in the sale of goods or services, for the debtor in the ordinary course of the debtor's business if, and only if, during the 12 months preceding that date, at least 75 percent of the amount that the individual or corporation earned by acting as an independent contractor in the sale of goods or services was earned from the debtor...

11 U.S.C. § 507(a)(4).

52.    Likewise, under Section 507(a)(5) of the Bankruptcy Code, Employees may ultimately be granted a priority claim for:

allowed unsecured claims for contributions to an employee benefit plan –

(A)    arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

(B)    for each such plan, to the extent of –

(i)    the number of employees covered by each such plan multiplied by $10,950; less

(ii)    the aggregate amount paid to such employees under paragraph (3) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

11 U.S.C. § 507(a)(5).

53.    The Debtors believe that the Employee Obligations that they seek to pay are entitled to priority status under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code and individually do not exceed $10,950. The Debtors would therefore be required to pay these claims in full in order to confirm a plan of reorganization. See 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims for wages, salaries, and commissions, and certain allowed unsecured claims for contributions to an employee benefit plan). Thus, granting the relief requested herein would only affect the timing, and not the amount, of the payment of the Employee Obligations to the extent that they constitute priority claims.

54.    The vast majority of the Debtors' Employees rely exclusively on their full compensation, benefits and reimbursement of their expenses to continue to pay their daily living expenses, and these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to pay the unpaid Employee Obligations.  The Debtors believe that if they are unable to honor such obligations, Employee morale and loyalty will be jeopardized at a time when such support is critical.

55.    Courts in this District have approved the payment of prepetition claims of employees for wages, salaries, expenses, and benefits on the grounds that the payment of such claims was necessary to effectuate the chapter 11 process.  See, e.g., In re Pliant Corp., Case No. 06-10001 (Bankr. D. Del. Jan. 31, 2006) (Walrath, J.) (authorizing the payment of prepetition wages, salaries and other compensation); In re Foamex International Inc., Case No. 05-12685 (Bankr. D. Del. September 20, 2005) (Walsh, J.) (same); In re Pharmaceutical Formulations, Inc., Case No. 05-11910 (Bankr. D. Del. July 12, 2005) (Walrath, J.) (same); In re Meridian Automotive Systems – Composites Operations, Inc., et al., Case No. 05-11168 (Bankr. D. Del. May 27, 2005) (Walrath, J.) (same); In re Maxide Acquisitions, Inc., Case No. 05-10429 (Bankr. D. Del. Feb. 15, 2005) (Walrath, J.) (same); In re Ultimate Electronics, Inc., et al., Case No. 05-10104 (Bankr. D. Del. Jan. 13, 2005) (Walsh, J) (same); In re ETeam USA and ETeam of Philadelphia, Case No. 04-11302 (Bankr. D. Del. May 6, 2004) (Walsh, J.) (same); In re Garden Ridge Corp., Case No. 04-10324 (Bankr. D. Del. Feb. 3, 2004) (Kornreich, J.) (same); In re Factory 2-U Stores, Inc., Case No. 04-10111 (Bankr. D. Del. Jan. 14, 2004) (Walsh, J.) (same); In re KB Toys, Inc., Case No. 04-10120 (Bankr. D. Del. Jan. 16, 2004) (Rosenthal, J.) (same).

56.    Additionally, the failure to pay the Payroll Taxes could result in tax liabilities and penalties for both the Employees and the Debtors.  Likewise, the failure to transmit

garnishments and other similar deductions can cause hardship to certain Employees and an administrative burden for the Debtors. Indeed, the Debtors expect inquiries from garnishors regarding the Debtors' failure to submit, among other things, child support and alimony payments that are not the Debtors' property, but, rather, have been withheld from Employees' paychecks on such parties' behalf. Further, if the Debtors cannot remit these amounts, the Employees may face legal action due to the Debtors' failure to submit such payments.

57.    Moreover, maintaining the Workers' Compensation Program is indisputably justified because applicable state law mandates this coverage. Furthermore, with respect to the Workers' Compensation Claims, the risk that eligible claimants will not receive timely payments with respect to employment-related injuries could have a devastating effect on the financial well-being and morale of the Debtors' Employees and their willingness to remain in the Debtors' employ.

58.    Other than as described in this Motion, the Debtors do not by this Motion seek to alter their compensation, incentive, vacation, and other benefit policies at this time. This Motion is intended only to permit the Debtors, in their discretion, to make payments consistent with those pre-petition policies to the extent that, without the benefit of an order approving this Motion, such payments would be inconsistent with the Bankruptcy Code.

59.    As stated above, the Employees are essential to the success of the sale of the Debtors' Servicing Business and remaining assets. Preservation of the value of the estates depends upon a stable work force. Thus, any significant number of remaining Employee departures or deterioration in morale at this time will substantially and adversely impact the Debtors' business and result in immediate and irreparable harm to the estates and their creditors. Consequently, it is critical that the Debtors continue in their ordinary course personnel policies,

programs and procedures that were in effect prior to the Petition Date, except as otherwise set forth herein, for all of their remaining Employees.

60.     Payment of the Terminated Employee Obligations will provide assurances to the active Employees that they will receive equitable treatment if they lose their employment, thereby encouraging such Employees who would otherwise consider pursuit of alternative employment to remain with the Debtors at a time in which their continued employment is crucial to the success of the Debtors' bankruptcy cases. Otherwise, any remaining Employee morale could be destroyed, which could have a negative impact on the Debtors' ability to maximize value of their assets for their estates.

61.     Authorizing, but not directing, the Debtors to pay the Employee Obligations in accordance with, and the Terminated Employees as set forth herein, their pre-petition policies is in the best interest of the Debtors, the Debtors' creditors and all parties in interest and will enable the Debtors to continue to operate their business in an economic, efficient manner, without disruption.

62.     Authorization to pay all amounts under this Motion, including on account of the Employee Obligations and the Terminated Employee Obligations, shall not be deemed to constitute post-petition assumption or adoption of any contract, program or policy pursuant to section 365 of the Bankruptcy Code. The Debtors are in the process of reviewing these matters and reserve all their rights under the Bankruptcy Code with respect thereto. Moreover, authorization to pay all amounts under this Motion, including on account of Employee Obligations and the Terminated Employee Obligations shall not affect the Debtors' right to contest the amount or validity of any Employee Obligations, including without limitation the Payroll Tax Obligations that may be due to any taxing authority.

63.     Accordingly, as authorized by sections 363(b) and 105(a) of the
Bankruptcy Code, the Debtors seek authority to pay the Employee Obligations that become due
and owing during the pendency of these cases and to continue at this time their practices,
programs and policies with respect to the Employees, as such practices, programs and policies
were in effect as of the Petition Date. In addition, the Debtors seek authority to pay the
Terminated Employees, subject to the limitations of section 507(a)(4) of the Bankruptcy Code.
The Debtors submit that the relief requested herein is essential and critical to their ability to
maximize value for their creditors.

### APPLICABLE BANKS SHOULD BE AUTHORIZED TO HONOR AND PAY CHECKS ISSUED AND MAKE OTHER TRANSFERS TO PAY THE PRE-PETITION EMPLOYEE OBLIGATIONS

64.     The Debtors further request that the Court authorize and direct applicable
banks and other financial institutions (collectively, the "Disbursement Banks") to honor and pay
all pre-petition and post-petition checks issued or to be issued, and fund transfers requested or to
be requested, by the Debtors on account of the Employee Obligations and Terminated Employee
Obligations that were not honored or paid as of the Petition Date. The Debtors also seek
authority to issue new post-petition checks, or effect new fund transfers, on account of the
Employee Obligations to replace any pre-petition checks or fund transfer requests that may be
dishonored or rejected.

65.     As a result of the commencement of the Debtors' chapter 11 cases, and in
the absence of an order of the Court providing otherwise, the Debtors' checks, wire transfers and
direct deposit transfers on account of the Employee Obligations and Terminated Employee
Obligations may be dishonored or rejected by the Disbursement Banks.

66.     The Debtors represent that each of these checks or transfers is or will be
drawn on the Debtors' payroll accounts and can be identified as relating directly to payment of

the Employee and Terminated Employee Obligations. Accordingly, the Debtors believe that pre-petition checks and transfers other than those for Employee and Terminated Employee Obligations will not be honored inadvertently.

67. The Debtors hereby request that all Disbursement Banks be authorized and directed to receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors related to the Employee and Terminated Employee Obligations, whether such checks were presented or fund transfer requests were submitted prior to or after the Petition Date. The Debtors represent that they have sufficient cash or funding to promptly pay all of the Employee and Terminated Employee Obligations, to the extent described herein, on an ongoing basis and in the ordinary course of their businesses.

## NOTICE

68. Notice of this Motion has been given by facsimile or overnight delivery to the following parties, or in lieu thereof, to their counsel: (i) the United States Trustee for the District of Delaware; (ii) the parties included on the Debtors' list of forty (40) creditors holding the largest unsecured claims; (iii) counsel to Bank of America, N.A; and (iv) the proposed debtor in possession lender and its counsel. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PRIOR APPLICATION

69. No previous application for the relief sought herein has been made to this or to any other court.

WHEREFORE, the Debtors request entry of an order, in the form attached hereto

as Exhibit A, granting the interim relief requested herein and such other and further relief as is

just.

Dated:  Wilmington, Delaware
        August 6, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Pauline K. Morgan (No. 3650)
Edward J. Kosmowski (No. 3849)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Kara Hammond Coyle (No. 4410)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Proposed Counsel for Debtors and
Debtors in Possession

# EXHIBIT A

## PROPOSED ORDER

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------- x
In re:                                                  :   Chapter 11
                                                        :
AMERICAN HOME MORTGAGE                                   :   Case No. 07-[_____] (___)
HOLDINGS, INC., a Delaware corporation, et al.,         :
                                                        :   Jointly Administered
                          Debtors.                      :
                                                        :   Ref. Docket No. _____
------------------------------------------------------- x
```

**ORDER (A) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO
(I) PAY CERTAIN PRE-PETITION WAGES, COMPENSATION AND
EMPLOYEE BENEFITS; AND (II) CONTINUE PAYMENT OF WAGES,
COMPENSATION AND EMPLOYEE BENEFITS IN THE ORDINARY
COURSE OF BUSINESS; AND (III) PAY CERTAIN UNPAID
COMPENSATION TO TERMINATED EMPLOYEES; AND (B)
AUTHORIZING AND DIRECTING APPLICABLE BANKS AND OTHER
FINANCIAL INSTITUTIONS TO PROCESS, AND PAY ALL CHECKS
PRESENTED FOR PAYMENT AND TO HONOR ALL FUNDS TRANSFER
REQUESTS MADE BY THE DEBTORS RELATING TO THE FOREGOING**

Upon consideration of the motion (the "Motion")[1] of American Home Mortgage

Holdings, Inc. ("AHM Holdings"), a Delaware corporation, and certain of its direct and indirect

affiliates and subsidiaries, the debtors and debtors in possession in the above cases (collectively,

"AHM" or the "Debtors"),[2] seeking entry of an order (i) authorizing, but not directing, the

Debtors to pay certain pre-petition wages, compensation and employee benefits; (ii) authorizing,

but not directing, the Debtors to continue payment of wages, compensation and employee benefit

programs in the ordinary course of business and to pay other costs and expenses relating to the

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

[2] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation
(3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979);
American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home
Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC
("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc.
("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York
corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except
for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

foregoing as described more fully below; (iii) authorizing, but not directing, the Debtors to pay

unpaid compensation to Terminated Employees; and (iv) authorizing and directing applicable

Disbursement Banks to process and pay all checks presented for payment and to honor all funds

transfer requests made by the Debtors relating to the foregoing, all as described more fully in the

Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein

in accordance with 28 U.S.C. §§ 157 and 1334; and due notice of the Motion having been

provided; and it appearing that no other or further notice of the Motion need be provided; and the

Court having determined that the relief sought in the Motion is in the best interests of the

Debtors, their estates and all parties in interest; and upon the Motion, and the Declaration of

Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief; and all of

the proceedings had before the Court; and after due deliberation and sufficient cause appearing

therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that the Debtors are authorized, pursuant to sections 105(a) and

363(b) of the Bankruptcy Code, but not obligated or directed, in the reasonable exercise of their

business judgment, to pay and honor the Employee Obligations that become due and owing; and

it is further

ORDERED that the Debtors are authorized, pursuant to sections 105(a) and

363(b) of the Bankruptcy Code, but not obligated or directed, in the reasonable exercise of their

business judgment, to pay and honor the Terminated Employee Obligations, up to the $10,950

priority limit established in section 507(a)(4) of the Bankruptcy Code; and it is further

ORDERED that all applicable Disbursement Banks are authorized and directed,

when requested by the Debtors and in the Debtors' sole discretion, to receive, process, honor,

and pay any and all checks drawn on the Debtors' accounts to the Employees and Terminated

Employees whether those checks were presented prior to or after the Petition Date, and make other transfers, provided that sufficient funds are available in the applicable accounts to make the payments; and it is further

ORDERED that authorization to pay all amounts on account of Employee and Terminated Employee Obligations shall not affect the Debtors' right to contest the amount or validity of any Employee or Terminated Employee Obligations, including without limitation, the Payroll Tax Obligations that may be due to any taxing authority; and it is further

ORDERED that nothing contained in this Order or the Motion shall constitute a rejection or assumption by the Debtors, as debtors in possession, of any executory contract or unexpired lease by virtue of reference to any such contract or lease in the Motion; and it is further

ORDERED that this Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the implementation of this Order.

Dated:    Wilmington, Delaware
          August _____, 2007


_____
UNITED STATES BANKRUPTCY JUDGE