IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------------- x
In re:                                              :
                                                    :    Chapter 11
AMERICAN HOME MORTGAGE HOLDINGS, INC.,              :
a Delaware corporation, et al.,                     :    Case No. 07-11047 (___)
                                                    :
        Debtors.                                    :    Joint Administration Pending
---------------------------------------------------------------------- x

**MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTORS
TO IMPLEMENT NON-INSIDER EMPLOYEE RETENTION PLAN PURSUANT
TO SECTIONS 105, 363 AND 503 OF THE BANKRUPTCY CODE**

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and

debtors in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] hereby

submit this motion (the "Motion") for entry of interim and final orders, pursuant to sections

105(a), 363(b) and 503(c)(3) of the Bankruptcy Code, authorizing the Debtors to implement a

retention plan for all of their remaining non-insider employees. In support of this Motion, the

Debtors rely on the Declaration of Michael Strauss in Support of the Debtors' Chapter 11

Petitions and First Day Relief (the "Strauss Declaration"). In further support of this Motion,

the Debtors respectfully represent as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland
corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation
(1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American
Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures
LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc.
("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York
corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747,
except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

## PRELIMINARY STATEMENT[2]

1.    Last Friday, August 3, 2007, the Debtors were forced to drastically reduce their workforce from approximately 7,500 employees to only those approximately 1,000 employees determined to be essential to (a) wind-down the loan origination business, (approximately 250 employees); (b) maintain the valuable loan servicing business until a sale of such business can occur (approximately 450 employees); and (c) administer, manage and wind-down the Debtors' remaining businesses in chapter 11 and maximize the value of the Debtors' assets. As a result of this workforce reduction and paradigm shift, most employees will now be forced to perform in addition to their prepetition duties, the duties previously performed by persons no longer employed by the Debtors along with the additional tasks associated with the chapter 11 cases. To say the least, this will be a very trying time for all of the Debtors' remaining employees.

2.    To retain and motivate essential non-insider employees and avoid severe disruption to the Debtors' businesses, the Debtors have developed a retention plan which permits non-insider employees to earn a modest bonus in an amount up to forty (40) percent of such employees' regular compensation, earned during the chapter 11 cases. The Debtors estimate that the proposed retention plan will cost approximately $600,000 in the next two weeks and $8.5 million in aggregate. The Debtors submit that this modest amount (on average, $8,500 per employee) pales in comparison to the potential for drastic dissipation in value, without these necessary employees.

---

[2] Capitalized terms in this Summary shall have the meanings ascribed to them below in this Motion.

## JURISDICTION

3.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is

proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.     General Background

4.     On the date hereof (the "Petition Date"), each of the Debtors filed with

this Court a voluntary petition for relief under chapter 11, title 11, United States Code,

11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code").  Each Debtor is continuing to operate its

business and manage its properties as a debtor in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

5.     Simultaneous with the filing of this pleading, the Debtors have filed a

motion with this Court pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") seeking joint administration of the Debtors' estates.

6.     No creditors' committee has yet been appointed in these cases.  No

trustee or examiner has been appointed.

### B.     Relevant Background

7.     Prior to the Petition Date, AHM originated mortgage loans and invested

in mortgage-backed securities and mortgage loans resulting from the securitization of

residential mortgage loans that its various entities originate and service.  Although the Debtors

have not had sufficient resources or access to credit to originate loans, the Debtors continue to

operate their mortgage loan servicing business and, concurrently herewith, have filed a motion

seeking approval to sell the loan servicing business on an expedited basis in order to maximize

the value of the Debtors' estates (the "Loan Servicing Sale Motion").

8.  Loan servicing typically includes: (i) collecting and remitting loan payments received from the borrowers; (ii) making required advances; (iii) accounting for principal and interest; (iv) customer service; (v) holding escrow or impound funds for payment of taxes and insurance; and, if applicable; (vi) contacting delinquent borrowers and supervising foreclosures and property dispositions in the event of unremedied defaults. Proper loan servicing requires diligence and sensitivity in order to maximize collections, particularly on delinquent loans, and at the same time compliance with applicable laws and regulations.

9.  In the days leading up to the Petition Date, the Debtors were forced to cease their loan originating business and to reduce their 7,500-strong workforce to only essential personnel. The Debtors conducted an extensive analysis of their infrastructure and personnel to determine which employees are critical (i) to maintaining the Debtors' loan servicing business during the sale process, and (ii) to effectuating an orderly liquidation of the Debtors' assets. These employees, which are currently approximately 1000 in number, fall into the following three (3) categories: (i) 250 employees devoted to the shutdown of the retail and wholesale business; (ii) 450 employees dedicated to operating the loan servicing business; and (iii) 300 employees necessary for an orderly wind down. During the pendency of these chapter 11 cases, the Debtors will continue to balance the necessity of each remaining employee and the economic realities imposed by a chapter 11 filing and accordingly reduce their workforce.

10.  The remaining employees not only have the necessary skill and expertise in the Debtors' industry, but are intimately familiar with the Debtors' operations and business practices. Such expertise and intimate familiarity are vital to maintain the Debtors' operations, and particularly their loan servicing business. Moreover, the remaining employees have the

requisite sophistication concerning the legal and practical issues that affect proper loan servicing.

11.     Absent an extraordinary effort from these remaining employees, the Debtors will likely be unable to maintain the loan servicing business as a going concern long enough to complete an expedited sale and will potentially lose their ability to preserve one of their most valuable assets.  Accordingly, the Debtors believe that it is imperative to implement a non-insider employee retention plan (the "Non-Insider Employee Retention Plan") as soon as possible.  The Non-Insider Employee Plan proposes to pay eligible employees (the "Non-Insider Employees") retention payments up to an amount equal to forty (40) percent of their total annual compensation.  To be eligible for payments under the Non-Insider Employee Retention Plan, the employees must not be members of senior management or insiders of the Debtors, as such term is defined in the Bankruptcy Code.

12.     The Debtors estimate that the aggregate cost of the Non-Insider Employee Retention Plan will not exceed $8.5 million.

## THE NON-INSIDER EMPLOYEES

13.     To manage the bankruptcy and liquidation process, the Debtors have focused their attention into three main areas: (1) effectuating an orderly disposition of the Debtors' loan origination assets; (2) maintaining and selling as a going concern the loan servicing business; and (3) meeting the day-to-day challenges of operating and winding-down the Debtors' complex businesses in chapter 11.  To that end, the Debtors have drastically downsized the number of employees to those Non-Insider Employees essential to accomplishing these objectives.

**A.     Disposition of the Loan Origination Assets**

14.     Prior to filing these bankruptcy cases, AHM originated mortgage loans

through more than 550 loan production offices (the "Production Offices") located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

15.    The Debtors must now manage the disposition of the nearly 600 Production Offices which will require the 250 remaining employees to: (i) dispose of loan origination documentation in compliance with applicable consumer privacy laws; (ii) assist in any potential transitions of the Production Offices to other industry-related entities interested in obtaining offices with the necessary infrastructure to originate loans; and (iii) coordinate the turnover of any Production Offices to their respective landlords. A failure to dispose of nonpublic personally identifiable consumer information could result in a Federal Trade Commission investigation which would, in turn, cause a significant diversion of the Debtors' resources. Additionally, without sufficient Production Office employees, the Debtors run the risk of incurring increased rejection damages claims from their landlords and reducing the value of the assets related to the Production Offices.

16.    The Debtors anticipate completing the disposition of the loan origination assets within the first several weeks of theses cases. Thus, the Debtors submit that the cost of the 250 Production Office employees will likely pay for itself through decreased claims and increased value for the assets associated with the Production Offices.

B.    **Maintenance of the Loan Servicing Business**

17.    As noted above, the Debtors seek to sell their loan servicing business as a going concern as more fully set forth in the Loan Servicing Sale Motion. To operate the loan servicing business in the interim, the Debtors only currently employ approximately 450

employees. The Debtors determined that these employees have the requisite sophistication concerning the business, including legal and operational issues, to effectively maintain the loan servicing business until the business can be transitioned to a buyer. Finding replacements for similarly skilled personnel on the Debtors' time constraints would be extremely difficult, if not impossible. Accordingly, if these employees were to leave the Debtors' employ prematurely, the Debtors would be vulnerable to immediate and severe adverse repercussions, thus jeopardizing the value of the loan servicing business.

18.     As set forth more fully in the Loan Servicing Sale Motion, the Debtors anticipate selling the loan servicing business in approximately sixty (60) days.

C.     **Meeting the Day-to-Day Challenges of Chapter 11**

19.     The remaining 300 employees have been designated vital to the successful completion of the Debtors' chapter 11 cases. These employees have the industry expertise and institutional knowledge to navigate the Debtors' highly regulated business and utilize their resources in the most efficient and cost-effective manner to maximize the value of the assets. These employees will be required to handle a myriad of additional duties required of a chapter 11 debtor in possession and deal with the attendant challenges faced by chapter 11 debtors, in addition to managing the liquidation, sale and wind-down process. Failure to retain these employees will undoubtedly cause substantial delays in the chapter 11 process and, consequently, an increase in the Debtors' administrative expenses to the detriment of the Debtors' creditors.

20.     The Debtors anticipate that a substantial portion of these employees will be vital throughout the liquidation process, which the Debtors estimate to be approximately six (6) months.

7

## THE NON-INSIDER EMPLOYEE RETENTION PLAN

21.     Pursuant to the Non-Insider Employee Retention Plan, a copy of which is annexed hereto as Exhibit A,[3] the Non-Insider Employees shall earn retention bonuses based upon the length of time employed with the Debtors.

22.     Non-Insider Employees who work for one week or less (i.e., during the week of August 6-10, 2007) will be entitled to double time for hours worked (the "Double Time Bonus"). The Debtors estimate that approximately 250 employees will be entitled to the Double Time Bonus.

23.     Non-Insider Employees who work for more than one week shall be eligible to earn retention payments payable in an amount equal to forty (40) percent of the employees' total compensation[4] earned during such time interval (each, a "Retention Payment" and, collectively, the "Retention Payments"). The Debtors estimate that approximately 750 employees will be eligible for Retention Payments.

24.     Retention Payments shall be earned daily and payable as follows: (i) twenty (20) percent of the Retention Payment (or eight (8) percent of the employee's regular bi-monthly compensation) shall be payable on the pay date following the bi-monthly period earned (the "Bi-Monthly Payments"); and (ii) for those employees retained less than three (3) months, eighty (80) percent of the Retention Payment (or thirty-two (32) percent of the employee's regular compensation earned during the chapter 11 cases) will be paid when the

---

[3] The descriptions herein are qualified in their entirety by reference to the Non-Insider Employee Incentive Plan. To the extent there is a discrepancy between the terms of the Non-Insider Employee Incentive Plan and the descriptions contained herein, the terms of the Non-Insider Employee Incentive Plan control.

[4] Total compensation is deemed to consist of the employee's current base salary equivalent plus the portion of any annual bonus compensation paid to the employee in 2007 (2006 incentive compensation) related to this specific period.

employee's assignment is complete (the "Deferred Payments"). If, however, an employee is retained for three (3) months or more, partial distributions of the Deferred Payment will be paid monthly to the employee beginning on the last pay date of November (the "Post-Quarter Monthly Payments"). Regardless of whether an employee is entitled to any Post-Quarter Monthly Payments, no less than twenty-five (25) percent of the Retention Payment (or ten (10) percent of the employee's regular compensation) earned during the chapter 11 cases will be held until the involuntary dismissal of such employee (the "Final Payment"). Non-Insider Employees who resign or are dismissed for cause prior to the end of the quarter shall not be eligible to receive any unpaid Post-Quarter Monthly Payments or the Final Payment. An summary of how the Non-Insider Employee Retention Program would work under different scenarios is attached hereto as Exhibit B.

**RELIEF REQUESTED**

25.     By this Motion, the Debtors seek entry of interim and final orders, pursuant to sections 105(a), 363(b) and 503(c) of the Bankruptcy Code, authorizing the Debtors to implement the Non-Insider Employee Retention Plan. The Non-Insider Employee Retention Plan is designed to incentivize the Non-Insider Employees who have the ability to directly impact the Debtors' performance and business initiatives to remain employed by the Debtors.

**BASIS FOR RELIEF REQUESTED**

**A.      Applicable Legal Standards**

26.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Several courts have held that transactions should be approved under section 363(b)(1) when they are supported by the sound business judgment of management. See, e.g., Dai-Ichi Kangyo Bank,

Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999). A debtor's showing of a sound business justification need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not sufficient business reasons exist to justify a transaction depends upon the facts and circumstances of each case. See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Montgomery Ward, 242 B.R. at 155 (approving funding of employee incentive and severance program and finding that business purpose requirement was fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

27.     The debtor bears the burden of establishing a valid business purpose for the use of estate property in a manner that is not in the ordinary course of business. See Lionel Corp., 722 F.2d at 1071. Once the debtor has articulated a valid business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company. See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res. Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992). Courts are cautious not to subject their own business judgment for the debtor's judgment. See, e.g., Chaney v. Official Comm. of Unsecured Creditors (In re Crystal Apparel), 207 B.R. 406, 410 (S.D.N.Y. 1997) ("[C]ourts must exercise great deference in reviewing a corporation's decision to pay its employees.").

28.     Further, under section 105(a) of the Bankruptcy Code, a bankruptcy court has authority to approve incentive payments if such payments will serve to preserve or protect the value of a debtor's assets. Specifically, section 105(a) provides that "[t]he court

may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of [title 11]." 11 U.S.C. § 105(a).  Pursuant to section 105(a), a court may fashion

an order or decree that helps preserve or protect the value of a debtor's assets.  See, e.g.,

Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section

105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the

purposes of the Bankruptcy Code.").

      29.     As recently amended by the Bankruptcy Abuse Prevention and

Consumer Protection Act of 2005, Pub. L. No. 109-8, § 331, 119 Stat. 23, 102-03 (April 20,

2005) ("BAPCPA"), section 503(c) of the Bankruptcy Code sets forth certain limitations on

transfers or payments by debtors to the extent that such payments are: (i) payments to an insider

for the purpose of inducing such person to remain with the debtor's business; (ii) a severance

payment to an insider; or (iii) a transfer or obligation outside of the ordinary course of business.

See 11 U.S.C. § 503(c).

      30.     Section 503(c)(3) of the Bankruptcy Code precludes payment as an

administrative expense of "other transfers or obligations that are outside the ordinary course of

business and *not justified by the facts and circumstances of the case*...." See 11 U.S.C. §

503(c)(3) (emphasis added).  The standard for approval under that section—justified by the

facts and circumstances of the case—is essentially the same as the standard for similar

transactions under section 363(b)(1) of the Bankruptcy Code.  As Judge Walrath remarked

recently, "[I] find [the 503(c) standard] quite frankly nothing more than a reiteration of the

standard under section 363." See Transcript from In re Nobex Corp., Case No. 05-20050

(Bankr. Del. Jan. 12, 2006) (Judge Walrath), the relevant portions of which are annexed hereto

as Exhibit E.  Thus, if the Court finds that section 503(c)(3) is applicable, the Court may apply

the business judgment standard used previously when reviewing incentive plans under section

363(b) of the Bankruptcy Code.

B.     **The Non-Insider Employee Retention Plan Should Be
       Approved Because the Non-Insider Employees are
       Essential to Maximize the Value of the Debtors' Estates**

        31.     The Debtors believe that adoption and implementation of the Non-

Insider Employee Retention Plan is supported by sound business judgment and is justified by

the facts and circumstances of these cases.  The ability of the Debtors to maintain the stability

of their business and the value of their estates is dependent upon the continued employment and

dedication of these Non-Insider Employees who possess the industry and institutional

knowledge, experience and skills that are absolutely necessary to support the Debtors' business

operations during these challenging times.

        32.     The Debtors, like many large companies, benchmark their employee

compensation levels against the competition based on total compensation, which includes

performance-based incentive compensation.  Payment of base salary alone would

undercompensate the Debtors' employees relative to the marketplace and does not provide the

necessary motivation.  Accordingly, such incentive compensation constitutes an essential part

of employee compensation.  In light of the circumstances, the Debtors seek to pay, and in prior

years have paid such additional compensation, in the ordinary course of business to compensate

fairly and incentivize employees.

        33.     Providing their employees with proper incentives has always been a

priority for the Debtors, but it is critically important at this time.  During these cases, the

Debtors' employees will be required to handle the difficult task of winding-up the Debtors'

business and in some cases transitioning to a new owner in addition to the myriad of additional

duties unique to a chapter 11 debtor in possession.  The changes and the challenges the Debtors

and their employees are facing during this period are unparalleled in the Debtors' long history. To complete this liquidation successfully, the Debtors must encourage employees to focus on the Debtors' objectives, and the only way to do so is to provide proper incentives.

34.    Without being able to provide incentives to rank and file employees, the Debtors will almost certainly find that their most talented, experienced and motivated employees will find it necessary to consider employment options elsewhere. These are the very employees who will permit the Debtors to achieve their goals, yet the harsh reality is that these exceptional employees are also the most likely to find many other, more attractive employment opportunities elsewhere.

35.    The concern that employees will leave, which the Debtors recognize is articulated in almost every major chapter 11 case, goes well beyond mere rhetoric for the Debtors; the risk of employee departures is very real. Within the past week, the Debtors reduced their workforce from approximately 7,500 to approximately 1,000. Without the certainty of the benefits to be provided by the Non-Insider Employee Retention Plan, these resignations could very well turn out to be only the beginning of a much larger exodus that could severely hamper the Debtors' opportunity to maximize value for their estates. The Debtors submit that the consequent potential decrease in the value of their assets exceeds the costs of the Non-Insider Employee Retention Program.

36.    Notwithstanding the gravity of the situation with respect to their employees, the Debtors also recognize the economic realities imposed by a chapter 11 filing. As a result, they have taken painstaking efforts to design a program that is targeted specifically at maximizing the value of the Debtors' estates while operating in bankruptcy. Given the *bona fide* risk of losing valuable employees, coupled with the high cost of attracting talented and

13

capable employees to join a company operating in chapter 11, the Debtors submit that the Non-Insider Employee Incentive Plan provides the most cost-effective method to help the Debtors retain important employees and to motivate those employees to remain committed to a successful outcome in these chapter 11 cases.

37.    Because the Non-Insider Employee Retention Plan does not include any insiders (as defined in the Bankruptcy Code), neither section 503(c)(1) nor 503(c)(2) of the Bankruptcy Code are applicable.

38.    Recognizing the needs of a chapter 11 debtor to provide proper incentives to employees during a reorganization, courts in this District have approved various forms of retention plans under section 363(b)(1) of the Bankruptcy Code as a proper exercise of a debtor's business judgment. See, e.g., In re Sea Containers Ltd., Case No. 06-11156 (KJC) (Bankr. D. Del. May 8, 2007) (authorizing implementation of a non-insider retention plan); In re Premium Papers Holdco, LLC, Case No. 06-10269 (CSS) (Bankr. D. Del. June 23, 2006) (approving a "Retention/Incentive Plan" to provide employees who had been determined crucial to the Debtor's operations and sale efforts with a retention bonus); In re Pliant, Case No. 06-10001 (MFW) (Bankr. D. Del. March 14, 2006) (authorizing incentive pay based on individual and corporate performance goals); In re FLYi, Inc., Case No. 05-20011 (MFW) (Bankr. D. Del. Jan. 5, 2006 and Feb. 3, 2006) (approving incentive payments to certain employees and termination benefits to thousands of union and non-union employees).

39.    For the foregoing reasons, the Debtors submit that a sound business purpose exists to approve, and the facts and circumstances of these cases justify approval of, the Non-Insider Employee Incentive Plan.

**C.**    <u>Interim and Final Approval Should Be Granted on an Expedited Basis</u>

40.    Generally, Bankruptcy Rule 2002(a)(2) requires that a minimum of twenty days' notice of proposed sales of property outside the ordinary course of business be provided by mail to "the debtor, the trustee, all creditors and indenture trustees" and any committee appointed under section 1102 of the Bankruptcy Code. <u>See</u> <u>also</u> 11 U.S.C. § 363(b)(1) (permitting the use, sell or lease of property of the estate outside of the ordinary course of business upon notice and a hearing). However, shorter notice may be appropriate given the circumstances. 11 U.S.C. § 102(1)(A) (defining "after notice and a hearing" to mean such notice and an opportunity for hearing "as [are] appropriate in the particular circumstances").

41.    Courts are authorized to shorten the twenty-day notice period, or direct another method of giving notice, upon a showing of "cause." <u>See</u> Bankruptcy Rule 2002(a)(2). The Debtors respectfully submit that cause for a shortened notice exists, due to the immediate need to incentivize their Non-Insider Employees. As noted above, these Non-Insider Employees are crucial to the Debtors' ability to maximize value for the estates in the upcoming few weeks. Given that certain of these employees are necessary for a short period of time – indeed, some for only one week – the Debtors believe that failure to provide immediate incentives will likely result in the Non-Insider Employees refusing to return to work and seeking employment elsewhere.

42.    Accordingly, the process of providing the full twenty-day notice before obtaining Court approval of the Non-Insider Employee Retention Plan may severely hinder the Debtors' ability to take advantage of their assets and minimize their liabilities. The Debtors submit that, if the Non-Insider Employees do not complete their individual tasks, the value of

the Debtors' loan servicing business and other assets will deteriorate. Moreover, the Debtors could potentially face (i) an investigation by the Federal Trade Commission for consumer privacy violations; (ii) increased liabilities related to rejection damages for failure to maintain the Production Offices; (iii) increased administrative costs due to the delays in facilitating the bankruptcy process; and (iv) increased liabilities relating to defaults under various loan servicing arrangements.

43.    The Debtors submit that the potential decrease in the value of their estates, should the Non-Insider Employees leave, exceeds the costs of maintaining the Non-Insider Employee Retention Plan. Moreover, to balance the exigencies of the situation with the need to provide parties in interest with an opportunity to be heard with respect to the relief requested herein, the Debtors request that this Court approve the relief requested herein on an interim basis initially and, after a shortened objection period, on a final basis.

## NOTICE

44.    Notice of this Motion has been given by facsimile or overnight delivery to the following parties, or in lieu thereof, to their counsel: (i) the United States Trustee for the District of Delaware; (ii) the parties included on the Debtors' list of forty (40) creditors holding the largest unsecured claims; (iii) counsel to Bank of America, N.A; and (iv) the proposed debtor in possession lender and its counsel.

## NO PRIOR APPLICATION

45.    No previous application for the relief sought herein has been made to this or to any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the orders, substantially in the form annexed hereto, granting the relief requested in the Motion on an interim and final basis and such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
    August 6, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Pauline K. Morgan (No. 3650)
M. Blake Cleary (No. 3614)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Kara Hammond Coyle (No. 4410)
Margaret B. Whiteman (No. 4652)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Proposed Counsel for Debtors and
Debtors in Possession

## EXHIBIT A

## NON-INSIDER EMPLOYEE INCENTIVE PLAN

RETAINED EMPLOYEES
COMPENSATION PLAN
August 3, 2007

All non-executive employees retained by American Home Mortgage will be entitled to enhanced compensation during the retention period.

Employees who work for one week or less during the period August 6 – 10, 2007 will be entitled to double time for hours worked.

Employees retained for more than one week will be entitled to an amount equal to 140% of their total annual compensation, during the period of time they are retained by American Home Mortgage.

Total annual compensation is deemed to consist of the employee's current annual base salary equivalent plus any bonus compensation paid to the employee in 2007 (2006 incentive compensation).

The employee will receive the additional 40% of compensation in increments as follows:

- 20% of the additional 40% of compensation will be paid in on each regularly scheduled semi-monthly pay date.
- The remaining 80% of the additional 40% will be set aside in a "bank" for the benefit of employees to be paid when the employee's assignment is complete.
- If the employee is retained for three months or more, a partial distribution will be paid to the employee on the first semi-monthly pay date of each month.

The attached example illustrates the retention pay plan for employees who continue with the company after August 3, 2007. As the attachment indicates, employees will be paid the equivalent of 1/24th of their annual total compensation amount, plus 20% of the 40% additional compensation beginning on the August 25' 2007 pay date.

Employees who elect to leave the company prior to completing their assignments will forfeit unpaid "banked" amounts.

Individual letter agreements will be prepared for retained employees next week.

## **EXHIBIT B**

### NON-INSIDER EMPLOYEE INCENTIVE PLAN SCENARIOS

### EXAMPLE 1
### EMPLOYEE RETAINED FOR TWO MONTHS

| Base | $ 45,000 |
|---|---|
| Bonus | 5,000 |
| Total Comp | $ 50,000 |

| Month | August | | September | | Total Payments |
|---|---|---|---|---|---|
| Pay Period | 8/15 | 8/31 | 9/15 | 9/30 | |
| Bi-Monthly Compensation | $ 2,083 | $ 2,083 | $ 2,083 | $ 2,083 | $ 8,333 |
| Retention Payments | | | | | |
| Bi-Monthly Payments | $ 167 | $ 167 | $ 167 | $ 167 | $ 667 |
| Post-Quarter Monthly Payments | | | | | |
| Final Payments | | | | 2,667 | 2,667 |
| Retention Total | $ 167 | $ 167 | $ 167 | $ 2,834 | $ 3,334 |
| Total Compensation Paid | $ 2,250 | $ 2,250 | $ 2,250 | $ 4,917 | $ 11,667 |

### EXAMPLE 2
### EMPLOYEE VOLUNTARILY LEAVES AT TWO MONTHS

| Base | $ 45,000 |
|---|---|
| Bonus | 5,000 |
| Total Comp | $ 50,000 |

| Month | August | | September | | Total Payments |
|---|---|---|---|---|---|
| Pay Period | 8/15 | 8/31 | 9/15 | 9/30 | |
| Bi-Monthly Compensation | $ 2,083 | $ 2,083 | $ 2,083 | $ 2,083 | $ 8,333 |
| Retention Payments | | | | | |
| Bi-Monthly Payments | $ 167 | $ 167 | $ 167 | $ 167 | $ 667 |
| Post-Quarter Monthly Payments | | | | | |
| Final Payments | | | | Not Paid | - |
| Retention Total | $ 167 | $ 167 | $ 167 | $ 167 | $ 667 |
| Total Compensation Paid | $ 2,250 | $ 2,250 | $ 2,250 | $ 2,250 | $ 9,000 |

### EXAMPLE 3
### EMPLOYEE RETAINED FOR FIVE MONTHS

| Base | $ 45,000 |
|---|---|
| Bonus | 5,000 |
| Total Comp | $ 50,000 |

| Month | August | | September | | October | | November | | December | | Total Payments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pay Period | 8/15 | 8/31 | 9/15 | 9/30 | 10/15 | 10/31 | 11/15 | 11/30 | 12/15 | 12/31 | |
| Bi-Monthly Compensation | $ 2,083 | $ 2,083 | $ 2,083 | $ 2,083 | $ 2,083 | $ 2,083 | $ 2,083 | $ 2,083 | $ 2,083 | $ 2,083 | $ 20,833 |
| Retention Payments | | | | | | | | | | | |
| Bi-Monthly Payments | $ 167 | $ 167 | $ 167 | $ 167 | $ 167 | $ 167 | $ 167 | $ 167 | $ 167 | $ 167 | $ 1,667 |
| Post-Quarter Monthly Payments | | | | | | | | 917 | | 917 | 1,833 |
| Final Payments | | | | | | | | | | 4,833 | 4,833 |
| Retention Total | $ 167 | $ 167 | $ 167 | $ 167 | $ 167 | $ 167 | $ 167 | $ 1,083 | $ 167 | $ 5,917 | $ 8,333 |
| Total Compensation Paid | $ 2,250 | $ 2,250 | $ 2,250 | $ 2,250 | $ 2,250 | $ 2,250 | $ 2,250 | $ 3,167 | $ 2,250 | $ 8,000 | $ 29,167 |

### EXAMPLE 4
### EMPLOYEE VOLUNTARILY LEAVES AT FIVE MONTHS

| Base | $ 45,000 |
|---|---|
| Bonus | 5,000 |
| Total Comp | $ 50,000 |

| Month | August | | September | | October | | November | | December | | Total Payments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pay Period | 8/15 | 8/31 | 9/15 | 9/30 | 10/15 | 10/31 | 11/15 | 11/30 | 12/15 | 12/31 | |
| Bi-Monthly Compensation | $ 2,083 | $ 2,083 | $ 2,083 | $ 2,083 | $ 2,083 | $ 2,083 | $ 2,083 | $ 2,083 | $ 2,083 | $ 2,083 | $ 20,833 |
| Retention Payments | | | | | | | | | | | |
| Bi-Monthly Payments | $ 167 | $ 167 | $ 167 | $ 167 | $ 167 | $ 167 | $ 167 | $ 167 | $ 167 | $ 167 | $ 1,667 |
| Post-Quarter Monthly Payments | | | | | | | | 917 | | 917 | 1,833 |
| Final Payments | | | | | | | | | | | - |
| Retention Total | $ 167 | $ 167 | $ 167 | $ 167 | $ 167 | $ 167 | $ 167 | $ 1,083 | $ 167 | $ 1,083 | $ 3,500 |
| Total Compensation Paid | $ 2,250 | $ 2,250 | $ 2,250 | $ 2,250 | $ 2,250 | $ 2,250 | $ 2,250 | $ 3,167 | $ 2,250 | $ 3,167 | $ 24,333 |

## EXHIBIT C

### PROPOSED FORM OF INTERIM ORDER

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------------ x
In re:                                                    :
                                                          :   Chapter 11
AMERICAN HOME MORTGAGE HOLDINGS, INC.,                    :
a Delaware corporation, et al.,                           :   Case No. 07-[_____] (___)
                                                          :
     Debtors.                                             :   Jointly Administered
------------------------------------------------------------------------ x   Doc. Ref. No. _____

**INTERIM ORDER PURSUANT TO SECTIONS 105, 363 AND 503
OF THE BANKRUPTCY CODE AUTHORIZING DEBTORS TO
IMPLEMENT NON-INSIDER EMPLOYEE RETENTION PLAN**

Upon consideration of the motion (the "Motion") of the debtors and debtors in

possession in the above-captioned cases (collectively, the "Debtors") for entry of interim and

final orders, pursuant to sections 105(a), 363(b) and 503(c) of title 11 of the United States Code

(the "Bankruptcy Code"), authorizing the Debtors to implement a retention plan (the "Non-

Insider Employee Incentive Plan") for the Debtors' non-insider employees; and due and

sufficient notice of the Motion having been given under the circumstances; and it appearing that

the relief requested by this Motion is in the best interest of the Debtors, their estates and

creditors, and other parties in interest; and after due deliberation and sufficient cause appearing

therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED that:**

1.      The Motion is granted on an interim basis.

2.      Capitalized terms not otherwise defined herein shall have the meanings

ascribed to such terms in the Motion.

3.      Pursuant to sections 105(a), 363(b) and 503(c)(3) of the Bankruptcy Code,

the Debtors are authorized, but not required, (a) to adopt and implement the Non-Insider

066585.1001

Employee Retention Plan, (b) to make the Retention Payments thereunder to eligible Non-Insider

Employees, and (c) to take such other actions as may be necessary to implement the Non-Insider

Employee Retention Plan, including, without limitation, designing and/or altering the Non-

Insider Employee Retention Plan in any manner necessary to comply with applicable law;

provided, however, that the Retention Payments shall not exceed $600,000 in the aggregate.

4.     The authorization granted hereby to make the Retention Payments under

the Non-Insider Employee Retention Plan shall not create any obligation on the part of the

Debtors or their officers, directors, attorneys or agents to make payments under the Non-Insider

Employee Retention Plan and none of the foregoing persons shall have any liability on account

of any decision by the Debtors not to honor the Non-Insider Employee Retention Plan.

5.     Neither this Order nor any payment or performance by the Debtors

authorized hereunder shall be deemed an assumption of any executory contract or otherwise

affect the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any

executory contract.

6.     The deadline by which objections to the Motion and the Final Order must

be filed is _____, 2007 at 4:00 p.m. (ET).  A final hearing on the Motion will be held

on _____, 2007 at _____ ____.m. (ET).  If no objections to the Motion are filed,

the Court may enter the Final Order without further notice or hearing.

7.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective

and enforceable immediately upon entry hereof.

8.    This Court shall retain jurisdiction with respect to all matters relating to

the interpretation or implementation of this Order.

Dated: Wilmington, Delaware
_____, 2007


_____
UNITED STATES BANKRUPTCY JUDGE

3

## **EXHIBIT D**

### **PROPOSED FORM OF FINAL ORDER**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------------ x
In re:                                                          :
                                                                :   Chapter 11
AMERICAN HOME MORTGAGE HOLDINGS, INC.,                           :
a Delaware corporation, et al.,                                 :   Case No. 07-[_____] (_____)
                                                                :
        Debtors.                                                :   Jointly Administered
                                                                :
------------------------------------------------------------------------ x   Doc. Ref. No. _____

**FINAL ORDER PURSUANT TO SECTIONS 105, 363 AND 503
OF THE BANKRUPTCY CODE AUTHORIZING DEBTORS TO
IMPLEMENT NON-INSIDER EMPLOYEE RETENTION PLAN**

Upon consideration of the motion (the "Motion") of the debtors and debtors in

possession in the above-captioned cases (collectively, the "Debtors") for entry of interim and

final orders, pursuant to sections 105(a), 363(b) and 503(c) of title 11 of the United States Code

(the "Bankruptcy Code"), authorizing the Debtors to implement a retention plan (the "Non-

Insider Employee Incentive Plan") for the Debtors' non-insider employees; and due and

sufficient notice of the Motion having been given; and it appearing that no other or further notice

need be provided; and it appearing that the relief requested by this Motion is in the best interest

of the Debtors, their estates and creditors, and other parties in interest; and after due deliberation

and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED that:**

1.      The Motion is granted on a final basis.

2.      Capitalized terms not otherwise defined herein shall have the meanings

ascribed to such terms in the Motion.

3.      Pursuant to sections 105(a), 363(b) and 503(c)(3) of the Bankruptcy Code,

the Debtors are authorized, but not required, (a) to adopt and implement the Non-Insider

5

Employee Retention Plan, (b) to make the Retention Payments thereunder to eligible Non-Insider

Employees, and (c) to take such other actions as may be necessary to implement the Non-Insider

Employee Retention Plan, including, without limitation, designing and/or altering the Non-

Insider Employee Retention Plan in any manner necessary to comply with applicable law;

provided, however, that the Retention Payments shall not exceed $8.5 million in the aggregate.

4.    The authorization granted hereby to make the Retention Payments under

the Non-Insider Employee Retention Plan shall not create any obligation on the part of the

Debtors or their officers, directors, attorneys or agents to make payments under the Non-Insider

Employee Retention Plan and none of the foregoing persons shall have any liability on account

of any decision by the Debtors not to honor the Non-Insider Employee Retention Plan.

5.    Neither this Order nor any payment or performance by the Debtors

authorized hereunder shall be deemed an assumption of any executory contract or otherwise

affect the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any

executory contract.

6.    Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective

and enforceable immediately upon entry hereof.

7.    This Court shall retain jurisdiction with respect to all matters relating to

the interpretation or implementation of this Order.

Dated: Wilmington, Delaware
           _____, 2007


_____
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT E

### RELEVANT PORTIONS OF NOBEX TRANSCRIPT

1  program that's proposed.  That's the program that was approved

2  by the board and negotiated with the committee.

3          Your Honor, I don't understand how the fact that

4  folks have agreed to something doesn't -- let me back up, Your

5  Honor.  We believe we have met our burden.  There's evidence

6  that the compensation committee considered it.  There's

7  evidence that it was negotiated with another body, a second

8  body, that has fiduciary duty to the creditors and agreed to by

9  them.  I think that's adequate evidence, Your Honor.

10          THE COURT:  All right, thank you.

11          MR. CARICKHOFF:  Good evening, Your Honor.  David

12  Carickhoff of Blank Rome on behalf of the creditors committee.

13          Your Honor, we think that in the context where we

14  find ourselves with this platform and that platform being a

15  sale process driven by a Biocon stalking horse bid, we think it

16  is necessary to have the employees, especially Mr. Dimmler,

17  incentivized to drive this process to get the maximum value for

18  the creditors in this estate.  We think that he will be and is

19  complimentary with respect to SSG, who the debtor is seeking or

20  will seek to retain as its investment banker to shop its

21  assets.

22          So, we did think that in a context of this case with

23  -- in this platform, it did make sense to incentivize them by

24  giving them a piece of the upside in the event that they can

25  move beyond the stalking horse bid that's on the table.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  And you are satisfied with the structure?

2          MR. CARICKHOFF:  Yes, we are, Your Honor.

3          THE COURT:  Thank you.

4          Well, let me first deal with the legal issue raised

5     by the United States Trustee's objection.  I guess I can agree

6     with everybody that the language is not that clear, but this is

7     my take on it.

8          I agree with the debtor that (c)(1) was meant to

9     impose specific standards and criteria for a retention program.

10    (c)(2) was meant to provide similar guidance with respect to a

11    severance program.  And (c)(3) was meant to provide a standard,

12    albeit not as clear, for any other transfers or obligations

13    outside the ordinary course of business.

14         I agree that the including transfers made to

15    officers, managers or consultants hired after the petition date

16    is not exclusive.  That's clear from other provisions in the

17    Bankruptcy Code.

18         So I do read (c)(3) to be the catch-all and the

19    standard under (c)(3) for any transfers or obligations made

20    outside the ordinary course of business are those that are

21    justified by the facts and circumstances of the case.  Nothing

22    more -- no further guidance being provided to the Court by

23    Congress, I find it quite frankly nothing more than a

24    reiteration of the standard under 363 and -- well, 363 under

25    which courts had previously authorized transfers outside the

87

1 ordinary course of business and that is, based on the business
2 judgement of the debtor, the court always considered the facts
3 and circumstances of the case to determine whether it was
4 justified. And I'll do the same in this case.

5      I think in this case it is clear that from structure
6 of the plan that this is not a retention plan. It is not
7 providing payment to the employees or senior management solely
8 for being retained, staying on the job. In fact, they can stay
9 on the job all they want if the criteria are not meant. That
10 is, the sale does not produce sufficient funds, they will not
11 get anything.

12      Similarly, they can leave the day after the sale and
13 get the incentive if in fact the sale produces more than the
14 minimums required under this. So I see it as not a retention
15 plan and therefore not subject to the (c)(1) strictures.

16      The question is whether or not, based on the evidence
17 that was presented, whether this incentive plan or the
18 transfers contemplated by it are justified by the facts and
19 circumstances of the case. And I think that burden has been
20 met here.

21      I do place great weight in the fact that the plan has
22 been presented and negotiated with the creditors committee,
23 who, as well as the debtor, has a fiduciary duty to all
24 creditors, but has a particular interest in assuring that
25 general unsecured creditors get some recovery.

**J&J COURT TRANSCRIBERS, INC.**