UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------  x
In re:                                             :    Chapter 11
                                                   :
AMERICAN HOME MORTGAGE                             :    Case No. 07-11047 (_____)
HOLDINGS, INC., a Delaware corporation, et al.,   :
                                                   :    Joint Administration Pending
                    Debtors.                       :
------------------------------------------------  x
```

**EMERGENCY MOTION OF THE DEBTORS FOR ORDERS:  (A)(I) APPROVING SALE PROCEDURES; (II) SCHEDULING A HEARING TO CONSIDER SALE OF CERTAIN ASSETS USED IN THE DEBTORS' LOAN SERVICING BUSINESS; (III) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (IV) GRANTING RELATED RELIEF; AND (B)(I) AUTHORIZING THE SALE OF SUCH ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) AUTHORIZING AND APPROVING PURCHASE AGREEMENT THERETO; (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (IV) GRANTING RELATED RELIEF**

American Home Mortgage Holdings, Inc.  ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors

in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] hereby submit this

emergency motion (the "Motion"), pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of

the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rules 2002, 6004,

6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry

of two orders:  (A) one, substantially in the form annexed hereto as Exhibit A (the "Sale

Procedures Order"), (i) approving procedures (the "Sale Procedures") with respect to the proposed

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp.  ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc.  ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc.  ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp.  ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc.  ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp.  ("Great Oak"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

sale (the "Sale") of the Debtors' mortgage loan servicing business (the "Servicing Business"), as more specifically described in the form Purchase and Sale Agreement (the "Purchase Agreement"), annexed hereto as Exhibit D; (ii) scheduling a hearing (the "Sale Hearing") on the Sale and setting objection and bidding deadlines with respect to the Sale, (iii) approving the form and manner of notice of an auction for the relevant assets (the "Auction") and the Sale Hearing, and (iv) granting related relief; and (B) the other, substantially in the form annexed hereto as Exhibit E (the "Sale Order"),[2] (i) authorizing the Sale free and clear of liens, claims, encumbrances, and interests, pursuant to the Purchase Agreement(s), (ii) authorizing and approving the Purchase Agreement related thereto, (iii) approving the assumption and assignment of executory contracts and unexpired leases, as necessary in connection with the Sale, and (iv) granting related relief. In support of this Motion, the Debtors rely on the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief (the "Strauss Declaration"). In further support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## STATUS OF CASE AND JURISDICTION

1.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On the Petition Date, the Debtors also jointly filed motions or applications seeking certain typical "first day" relief, including entry an order to have these cases jointly administered.

2.      The Debtors have continued in possession of their respective properties and have continued to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[2] If the terms of any agreement respecting the Sale require modification of the proposed Sale Order, the Debtors will provide notice of the modified proposed Sale Order to the Court and interested parties in advance of the Sale Hearing.

DB02:6153729.6                                                    066585.1001

3.    No request has been made for the appointment of a trustee or examiner, and no official committee has yet been established in these cases.

4.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363, 365, 503 and 507, as complemented by Bankruptcy Rules 2002, 6004, 6006 and 9014.

### GENERAL BACKGROUND[3]

The Debtors' Business

5.    Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

6.    As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination

---

[3] A detailed description of the Debtors' businesses and related business information is set forth in the Strauss Declaration and is incorporated herein by reference.

offices.  In addition, AHM originated loans obtained from mortgage brokers and purchased loans

from correspondents.  AHM originated approximately $58.9 billion in aggregate principal amount

of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential

mortgage lender, according to National Mortgage News

7.    A large component of AHM's business is the servicing of loans, which is

conducted through AHM Servicing.  The servicing business collects mortgage payments,

administers tax and insurance escrows, responds to borrower inquiries, and maintains control over

collection and default mitigation processes.  As of December 31, 2006, AHM Servicing serviced

approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion.

AHM continues to conduct its servicing business, which constitutes a valuable asset of the

Debtors' estates.

Events Leading to the Chapter 11 Filing

8.    Beginning in late 2006, and continuing through 2007, the credit markets

became concerned over the quality of subprime mortgages and, specifically, the increasing default

rates on such mortgages.  These concerns became exacerbated by the failure of two major hedge

funds with concentrated investments in subprime loans.

9.    The concern in the credit markets has spread beyond the subprime market

and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury

issued securities and general corporate debt securities.  The surge in mortgage delinquencies for

subprime home loans also generated anxiety in the market about borrowers with adjustable rate

mortgages scheduled to reset with higher rates in 2007 and 2008.

10.    In the weeks prior to the Petition Date, this unprecedented disruption in the

credit markets caused major write-downs of the Debtors' loan and security portfolios and

066585.1001

consequently resulted in margin calls for hundreds of millions of dollars with respect to the

Debtors' loans. During this time, certain of the Debtors' warehouse lenders -- the financial

institutions that provide short term credit facilities needed to originate and purchase loans – began

to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans

and threatening the company's continued viability.

11.    On July 27, 2007, AHM Investment announced that its Board of Directors

had decided to delay payment of its quarterly cash dividend on the Company's common stock and

anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve

liquidity.

12.    The Debtors' inability to originate loans and the exercise of remedies by

certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the

Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3,

2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of

over 6,500 employees. The Debtors now employ approximately 1000 persons who are absolutely

essential to the Debtors' continued operations, although that number is expected to decline as

various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining

assets are sold.

13.    In the wake of these events, the Debtors, assisted by counsel and

professional advisors, sought alternative funding sources and capital infusions. Additionally, the

Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans

owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to

financial and strategic investors.

5

14.     Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to  preserve and maximize the value of their estates through orderly sales of their assets.

## RELEVANT BACKGROUND

15.     Although the Debtors have not had sufficient resources or access to credit to originate loans, the Debtors continue to operate their mortgage loan servicing business in accordance with their historically high standards and comply with their obligations under their agreements with indenture trustees and other parties to provide servicing for mortgage loans.

16.     During the days leading up to the Petition Date, the Debtors, aided by their professional advisors, sought sources of additional financing, infusions of debt and/or equity capital, or a sale of their businesses to a strategic or financial investor.

17.     The Debtors' inability to originate loans and the exercise of remedies by the Warehouse Lenders have left the Debtors in a severe liquidity crisis.  Without a prompt sale of the Debtors' Servicing Business, its value will be significantly impaired.  Accordingly, the Debtors have commenced these chapter 11 cases to pursue an expedited sale of the Servicing Business and the Debtors' other assets for the benefit of the Debtors' stakeholders.

18.     The Debtors have the necessary resources from the use of their cash collateral to maintain and operate their Servicing Business through an expedited sale.

19.     Pursuant to a Purchase Agreement or such other agreement as the Debtors may enter into with respect to the Sale (a "Sale Agreement"), the Debtors propose to sell, assign and transfer the Servicing Business to the Successful Bidder (defined below), free and clear of all liens, claims, encumbrances and other interests other than those expressly assumed by the Successful Bidder.  Any such interests against or in the Servicing Business will attach to the

proceeds of the Sale, in the order of priority and with the same validity, force and effect that such

interest may now have against the Servicing Business.  The Sale is subject to the Court's approval

and the Auction process proposed herein.  The Debtors believe that the Sale of the Servicing

Business contemplated by the Sale Procedures on an expedited basis, will maximize the value of

their estates for the benefit of their creditors and other interested parties.

**NEED FOR IMMEDIATE SALE**

20.     The Debtors have commenced these bankruptcy cases in order to maintain

and preserve their assets and to promptly market their businesses and consummate sales of assets,

as soon as practicable, to maximize recoveries for their stakeholders.  Prior to commencing these

cases, the Debtors, aggressively marketed their whole loan and origination businesses.  This

resulted in many expressions of interest for various assets and components of their businesses.

However, due to their liquidity constraints, the Debtors were unable to consummate any

transaction with respect to Servicing Business prior to the Petition Date.

21.     The Debtors' Servicing Business is among the most substantial of the

Debtors' operations being offered for sale, as loan servicing has been and remains a very active

and important part of the Debtors' businesses.  Loans are serviced primarily for the trusts of the

Debtors' securitizations and for Fannie Mae, Freddie Mac, Ginnie Mae large national banks, and

other third party purchasers of the loans originated by the Debtors.  As of December 31, 2006, the

Debtors serviced approximately 197,000 loans with an aggregate principal amount of

approximately $46.3 billion.  The Debtors' mortgage servicing rights ("MSRs") are generally

established in servicing contracts with securitization trusts or third party whole loan purchasers.

The average servicing fee on the Debtors' servicing portfolio as of December 31, 2006 was

0.347% of the principal amount of each loan serviced.  These servicing fees are typically collected

7

from the monthly payments made by the borrowers on the loans. In addition, the Debtors receive

other remuneration for loan servicing, including, but not limited to, float benefits representing

interest earned on collection accounts where mortgage payments are held pending remittance to

investors, as well as mortgagor-contracted fees such as late fees and, in some cases, prepayment

penalties.

22.    For the fiscal year ended December 31, 2006, the Debtors estimate that they

collected approximately $145 million of servicing fees, yielding approximately $37 million of

servicing income after amortization of MSRs, realization of cash flows and changes in valuation

assumptions (net of hedge gains). In addition, in many instances, the Debtors own residual or

other interests in such mortgage-backed securities, thus giving the estates an additional significant

economic interest in the proper servicing of the securitized mortgage loans.

23.    Loan servicing typically includes: (i) collecting and remitting loan

payments received from the borrowers; (ii) making required advances; (iii) accounting for principal

and interest; (iv) customer service; (v) holding escrow or impound funds for payment of taxes and

insurance; and, if applicable; (vi) contacting delinquent borrowers and supervising foreclosures and

property dispositions in the event of unremedied defaults. Proper servicing requires diligence and

sensitivity to maximize collections, particularly on delinquent loans, while at the same time

complying with applicable laws and regulations. Servicing contracts also generally require the

servicer to advance principal, interest, and certain "property protection" costs such as taxes and

insurance (collectively, the "Advances") with respect to delinquent mortgage loans, unless such

amounts are determined to be unrecoverable from the related loans. These Advances receive a

priority of payment in the securitization trust documents, but they also require the servicer to have

substantial working capital in order to finance them.

8

066585.1001

24.    As more fully set forth in the Strauss Declaration, certain parties to the Debtors' master servicing agreements have threatened to terminate their servicing arrangements with AHM Servicing, based largely on the financial condition of the Debtors as a whole and not the quality of the Debtors' servicing. The Debtors submit that the implementation of a prompt sale process combined with the continued operation of the Servicing Business in the ordinary course, is necessary to allay the concerns of these parties.

25.    Moreover, this is a licensed and regulated industry. The Debtors have had regular dialogue with their regulators. Providing a clear answer to how the Servicing Business will continue to operate and how Debtors will transfer operations quickly to a new operator should provide additional comfort to the various government agencies with which the Debtors work.

26.    In light of the foregoing, much of the effort expended by the Debtors at the outset of these cases has been designed to maintain the Servicing Business and to continue to service loans pursuant to the Debtors' historic high standards, while subjecting such assets to the market to attract potential bidders prior to any significant deterioration in the value of the Servicing Business.

27.    The cornerstone of the Debtors' efforts to realize value for their stakeholders from their Servicing Business is the proposed Sale pursuant to bidding procedures established by this Court. The Debtors' ability to obtain approval of, and consummate, a sale of the Servicing Business early in these cases is essential to maintaining the confidence of the Debtors' Servicing Business employees, the securitization trusts that utilize the Debtors for loan servicing and the regulators who govern this industry.

066585.1001

**RELIEF REQUESTED**

28.     By this Motion, the Debtors seek entry of two orders of this Court: (A) the

Sale Procedures Order (i) approving the Sale Procedures; (ii) scheduling the Sale Hearing; (iii)

approving the form and manner of notice of the Sale Procedures, including the Auction and Sale

Hearing; and (iv) granting such other and further relief as is just and proper; and (B) the Sale Order

(i) authorizing the Sale free and clear of liens, claims, encumbrances, and interests, pursuant to the

Sale Agreement; (ii) authorizing and approving the Sale Agreement; (iii) approving the assumption

and assignment of various executory contracts and unexpired leases related thereto, if necessary;

and (iv) granting related relief.  The Debtors reserve the right to seek approval of the Sale of

portions of the Servicing Business through separate Purchase Agreements with different purchasers

in the event that the combination of such Sales is determined by the Debtors, in their sole

discretion, to obtain the highest value for the assets associated with the Servicing Business.

A.     Sale Procedures

29.     The Debtors are proposing the Sale Procedures in an attempt to maximize

the realizable value of the Servicing Business for the benefit of the Debtors' estates, creditors and

other interested parties.  The Sale Procedures contemplate an Auction process pursuant to which

bids for the Servicing Business will be subject to higher or better offers.  As described below, and

more fully in the Sale Procedures, only Qualified Bidders[4] who timely submit Qualified Bids may

---

[4] The Sales Procedures define a Qualified Bidder as a potential bidder whose financial or other information
demonstrates the financial capability to consummate a Sale transaction and which the Debtors determine, in their
discretion, is reasonably likely to make a bona fide offer that would result in value being received for the benefit of the
Debtors' estates.

066585.1001

be eligible to participate in the Auction. Specifically, the Sale Procedures provide, in relevant part, as follows:[5]

(a) Notice: The Debtors, in consultation with their financial advisors, have developed a list of parties (each, individually, a "Contact Party", and collectively, the "Contact Parties") whom the Debtors believe may potentially be interested in and whom the Debtors reasonably believe would have the financial resources to consummate a purchase of the Assets.

Within five days of the entry of the Procedures Order, the Debtors and their advisors will send notice of the proposed Sale, the process for obtaining diligence materials, the process for qualifying as a bidder, the due date for bids and the proposed time and date of the Auction (as defined below) to Contact Parties and other parties in interest and prospects that have or may be identified as potential bidders for the Assets. The Debtors will also publish notice of the proposed sale and bidding procedures in the Wall Street Journal (National Edition).

(b) Access to Information: Information relevant to the Assets for evaluation by interested parties, including certain books and records, material contracts, and other financial information for due diligence investigation, will be made available to bidders who have executed a valid nondisclosure agreement. To obtain a copy of a non-disclosure agreement, contact Milestone Advisors, LLC 1775 Eye Street, NW, Suite 800, Washington, DC 20006 (Attn: Jeffrey M. Levine) (Tel. (202) 367-3000) or Phoenix Capital, Inc., 600 Seventeenth Street, Suite 1650 South, Denver, CO 80202 (Attn: Brett Schaffer) (Tel. (303) 892-7070). Specific information for accessing the information will be provided after execution of such agreements. The Debtors will coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders.

(c) Qualified Bid. A "Qualified Bid" is a bid which the Debtors believe, in their discretion, would be consummated if selected as the Successful Bid and which is a written irrevocable offer from a Qualified Bidder (i) stating that the Qualified Bidder offers to consummate the Sale pursuant to a signed purchase agreement that has been marked to show amendments and modifications to the

---

[5] The following description of the Sale Procedures is a summary of the terms set forth in the Sale Procedures annexed hereto as Exhibit B. Capitalized terms used but not defined in this paragraph have the meanings ascribed to them in such Exhibit. To the extent that this summary differs in any way from the terms set forth in such Exhibit, the terms of such Exhibit shall control.

066585.1001

Purchase Agreement, including price and terms, that are being proposed by the Qualified Bidder, which amendments and modifications shall not materially alter the terms of the Purchase Agreement, the Minimum Bid Agreement, or the Debtors' form purchase agreement, as applicable (the "Marked Purchase Agreement"); (ii) confirming that the offer shall remain open until the closing of the Sale to the Successful Bidder or to Next Highest Bidder; (iii) enclosing a copy of the proposed Marked Purchase Agreement; and (iv) accompanied with a certified or bank check, wire transfer, or letter of credit reasonably acceptable to the Debtors of at least $5,000,000, as a minimum deposit (the "Minimum Deposit"). In addition, a Qualified Bid must:

(i) be on terms that are not materially more burdensome or conditional than the terms of the Purchase Agreement;

(ii) not be conditioned on obtaining financing, permits or approvals or the outcome of any due diligence by the bidder;

(iii) not request or entitle the bidder to any break-up fee, expense reimbursement or similar type of payment;

(iv) contain a list of the Debtors' executory contracts and unexpired leases related to the Servicing Business with respect to which the bidder seeks assignment from the Debtors, if any; and

(v) fully disclose the identity of each entity that will be bidding for the Servicing Business or otherwise participating in connection with such bid, and the complete terms of any such participation.

(d) Bid Deadline. The deadline for submitting bids by a Qualified Bidder shall be September 6, 2007 at 4:00 p.m. (prevailing Eastern Time) (the "Bid Deadline"). Prior to the Bid Deadline, a Qualified Bidder that desires to make a bid shall deliver written copies of its bid to: (i) American Home Mortgage Holdings, Inc., 538 Broadhollow Road, Melville, New York 11747 (Attn.: Alan Horn, General Counsel); (ii) Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391 (Attn.: James L. Patton, Jr.), counsel to the Debtors; (iii) Milestone Advisors, LLC 1775 Eye Street, NW, Suite 800, Washington, DC 20006 (Attn: Jeffrey M. Levine); (iv) counsel to the Official Committee of Unsecured Creditors, when appointed (the "Committee"); (v) counsel to Bank of America, N.A., as Administrative Agent for the lenders under that certain Credit Agreement dated August 30, 2004; and (vi) counsel to the Debtors' post-petition lenders (the "DIP Lender").

12

(e)   Auction. If a Qualified Bid by a Qualified Bidder is received by the Bid Deadline, the Auction will take place on September 10, 2007 at 10:00 a.m. (prevailing Eastern Time) at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19899, or such other place and time as the Debtors shall notify all Qualified Bidders, the Committee, the Prepetition Lenders, the DIP Lender and other invitees.

(f)   Sale Procedures. At the Auction, Qualified Bidders will be permitted to increase their bids. The bidding at the Auction shall start at the purchase price stated in the highest or otherwise best Qualified Bid (the "Starting Qualified Bid") as disclosed to all Qualified Bidders prior to the commencement of the Auction and continue in bidding increments of at least $1,000,000. The Starting Qualified Bid and subsequent highest or otherwise best Qualified Bid shall be determined by the Debtors. Unless otherwise agreed by the Debtors, in their discretion, no Qualified Bidder will be permitted more than one-half hour to respond to the previous bid at the Auction and, at the expiration of such time (unless extended), the Auction shall conclude. Immediately prior to concluding the Auction, the Debtors shall (i) review each Qualified Bid on the basis of its financial and contractual terms and the factors relevant to the sale process and the best interests of the Debtors' estates and creditors; (ii) determine and identify the highest or otherwise best Qualified Bid (the "Successful Bid") and the next highest or otherwise best offer after the Successful Bid (the "Next Highest Bid"); and (iii) have the right to reject any and all bids. Immediately upon selection of the Successful Bid, if the Minimum Deposit does not equal 10% of the purchase price of the Successful Bid, the Successful Bidder shall provide the Debtors with immediately available funds so that the Minimum Deposit is equal to 10% of the purchase price of the Successful Bid. The Auction may be adjourned as the Debtors deem appropriate. Reasonable notice of the time and place for the resumption of the Auction will be given to all Qualified Bidders, the Committee and other invited parties. The Debtors reserve the right to waive Sale Procedures, in their discretion, to the extent such waiver is in the best interest of the Debtors' estates.

(g)   Sale Hearing. At the Sale Hearing, the Debtors shall present to this Court for approval both the Successful Bid and the Next Highest Bid. Subject to Court approval, the Debtors shall effect the Sale with the entity that submitted the Successful Bid. If, for any reason, the Successful Bidder fails to close the Sale contemplated by its Successful Bid, then, without notice to any other party or further Court order, the Debtors shall be authorized to close with the Qualified Bidder that submitted the Next Highest Bid.

(h)    <u>Acceptance of the Sale</u>: The Debtors shall have accepted a Qualified Bid only when (i) the Bid is declared the Successful Bid, (ii) the Bankruptcy Court has approved the Successful Bid and an order approving such Bid has been docketed, (iii) definitive documentation has been executed in respect thereof; and (iv) the Sale closes.

(i)    <u>Reservation of Rights</u>:  The Debtors reserve the right, as they may determine to be in the best interests of their estates, to:  (i) determine which bidders are Qualified Bidders; (ii) determine which Bids are Qualified Bids; (iii) determine which Qualified Bid is the highest and/or best proposal and which is the next highest and/or best proposal, (iv) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Procedures Order or the requirements of the Bankruptcy Code or (c) contrary to the best interests of the Debtors and their estates; (v) waive terms and conditions set forth herein with respect to any or all potential bidders, (vi) impose additional terms and conditions with respect to any or all potential bidders, (vii) extend the deadlines set forth herein, (vii) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice; (ix) remove some or all of the Assets from the Auction, and (x) modify the Sale Procedures as they may determine to be in the best interests of their estates or to withdraw the Sale Motion at any time with or without prejudice.  Without limiting the generality of the foregoing, the Debtors may determine to (i) distribute or not distribute copies of other Qualified Bids to other Qualified Bidders prior to or during the Auction or (ii) proceed with sealed bidding.

(j)    <u>Return of Minimum Deposit</u>.  The Minimum Deposits of all Qualified Bidders (other than the Successful Bidder and the Next Highest Bidder) shall be returned upon or within one (1) business day after Closing of the Sale.  The Minimum Deposit of the Successful Bidder shall be held until the closing of the Sale and applied in accordance with the Successful Bid.  The Minimum Deposit of the Next Highest Bidder shall be returned upon or within one (1) business day after closing of the Sale to the Successful Bidder.  In the event the Debtors proceed to closing with the Next Highest Bidder, the Minimum Deposit of the Next Highest Bidder shall be held until the closing of the Sale with the Next Highest Bidder and applied in accordance with the Next Highest Bid.  If a closing does not occur by September 28, 2007, the disposition of Minimum Deposits shall be as provided in the relevant bids.

B.    Notice of Auction and Sale Hearing

30.    Subject to the Court's calendar, the Debtors seek to have the Sale Hearing scheduled for a date during the week of September 17, 2007, with an objection deadline of five (5) business days prior to the Sale Hearing.  Additional objections related to the identity of a Successful Bidder will be permitted following identification of such party.

31.    Not later than five days after the entry of the Sale Procedures Order, the Debtors will serve copies of the Notice of Auction and Sale Hearing, substantially in the form attached hereto as Exhibit C, the Purchase Agreement, substantially in the form annexed hereto as Exhibit D, the Sale Procedures, and the Sale Procedures Order (a) by mail, postage prepaid to: (i) all entities known to have expressed a *bona fide* interest in acquiring the Servicing Business; (ii) counsel to Bank of America, N.A., as Administrative Agent for the lenders under that certain Credit Agreement dated August 30, 2004; (iii) counsel to the DIP Lender, (iv) counsel to the Official Committee of Unsecured Creditors, when appointed; and (v) the Office of the United States Trustee for the District of Delaware; and (b) by first-class mail, postage prepaid, to all parties that have requested notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Sale Procedures Order.

32.    Not later than ten days after entry of the Sale Procedures Order, the Debtors will publish the Notice of Auction and Sale Hearing, substantially in the form attached hereto as Exhibit C in the national edition of *The Wall Street Journal*.

## **AUTHORITY FOR REQUESTED RELIEF**

A.    The Sale is Within the Sound Business
      Judgment of the Debtors and Should be Approved

33.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary

066585.1001

course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Section 363 of the Bankruptcy

Code does not set forth a standard for determining when it is appropriate for a court to authorize

the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts in this

Circuit and others have required that the decision to sell assets outside the ordinary course of

business be based upon the sound business judgment of the debtors.  See In re Abbotts Dairies of

Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d

389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722

F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp.,

(In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware &

Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991).

      34.    The "sound business judgment" test requires a debtor to establish four

elements in order to justify the sale or lease of property outside the ordinary course of business,

namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course

of business, (b) that adequate and reasonable notice has been provided to interested persons, (c)

that the debtors have obtained a fair and reasonable price, and (d) good faith.  Abbotts Dairies, 788

F.2d 143; Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399

(Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).

In this case, the Debtors submit that the decision to proceed with the Sale of the Servicing

Agreement and the Sale Procedures related thereto are based upon their sound business judgment

and should be approved.  A debtor's showing of a sound business purpose need not be unduly

exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound

business reasons."  In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

Whether or not there are sufficient business reasons to justify a transaction depends upon the facts

066585.1001

and circumstances of each case. Lionel, 722 F.2d at 1071; Montgomery Ward, 242 B.R. at 155

(approving funding of employee incentive and severance program; business purpose requirement

fulfilled because stabilizing turnover rate and increasing morale were necessary to successful

reorganization).

35.    Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy

court with broad powers in the administration of a case under the Bankruptcy Code. Section

105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided

that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated

by the Bankruptcy Code, the exercise of its section 105(a) power is proper. In re Fesco Plastics

Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R.

303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or

decree that helps preserve or protect the value of a debtor's assets. See, e.g., Chinichian v.

Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the

power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the

Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D.

Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect

whatever equities a debtor may have in property for the benefit of its creditors as long as that

protection is implemented in a manner consistent with the bankruptcy laws.").

36.    The Debtors submit that more than ample business justification exists to sell

the Servicing Business to the Successful Bidder (or Next Highest Bidder) pursuant to the Sale

Procedures. For the reasons identified more fully above, the Debtors believe that it is essential to

sell the Servicing Business on an expedited basis. The Debtors moreover believe that a targeted

066585.1001

sale process involving potential end users of the Servicing Business is most likely to achieve the highest and best price for the Servicing Business. Simply put, given the situation that the Debtors face generally, and particularly the facts specific to the Servicing Business, the Debtors believe that the relief sought by this Motion is not only reasonable, but necessary, to maximize the value of their estates for the benefit of their stakeholders.

37.    The notice described herein and the Sale Procedures are designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Debtors' assets. Accordingly, the proposed Sale satisfies the second prong of the Abbotts Dairies standard.

38.    Moreover, the Sale Procedures are designed to maximize the value received for the Servicing Business. The process proposed by the Debtors allows for a timely auction process, given the circumstances currently facing the Debtors, while providing bidders and consultants with ample time and information to submit a timely bid. The Sale Procedures are designed to ensure that the Servicing Business will be sold for the highest or otherwise best possible purchase price. The Debtors are subjecting the value of the Servicing Business to market testing and permitting prospective purchasers to bid on the Servicing Business. The proposed Sale will be further subject to a market check through the solicitation of competing bids in a court-supervised Auction process as set forth in the Sale Procedures. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Servicing Business will be fair and reasonable, and the third prong of the Abbotts Dairies standard is satisfied. As discussed below, the "good faith" prong of the Abbotts Dairies standard is also satisfied here.

18

B.    The Sale is Proposed in "Good Faith"
      Under Section 363(m) of the Bankruptcy Code

      39.    The Debtors request that the Court find that the Successful Bidder (or Next Highest Bidder) is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.

      40.    Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

      41.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Servicing Business. Additionally, the United States Court of Appeals for the Third Circuit (the "Third Circuit") has indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under Bankruptcy Code section 365. Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 497-98 (3d. Cir. 1998). In Krebs, the Court considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)." Id. at 497. Despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the Court in Krebs concluded that section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale. Like

the franchise agreements protected in <u>Krebs</u>, the Assumed Contracts and Leases (as defined below) are executory contracts that may be assumed and assigned pursuant to section 365 of the Bankruptcy Code. In light of <u>Krebs</u>, the Debtors respectfully submit that section 363(m) applies to protect the Successful Bidder (or Next Highest Bidder) with respect to both the Assumed Contracts and Leases (as defined and described more fully below) and the Servicing Business.

42.      As required by section 363(m) of the Bankruptcy Code, the Sale Procedures have been proposed in good faith and provide for both the Debtors and the potential purchaser to act in good faith in negotiating the Sale and the assignment of the Assumed Contracts and Leases (as defined below). Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." <u>Abbotts Dairies</u>, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." <u>Id.</u> (citing <u>In re Rock Indus. Mach. Corp.</u>, 572 F.2d 1195, 1198 (7th Cir. 1978)). <u>See also</u> <u>In re Bedford Springs Hotel, Inc.</u>, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); <u>In re Perona Bros., Inc.</u>, 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." <u>In re Pisces Leasing Corp.</u>, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting <u>In re Rock Indus. Mach. Corp.</u>, 572 F.2d 1195, 1998 (7th Cir. 1978)).

43.      Here, the sale of the Servicing Business and the assignment of the Assumed Contracts and Leases (as defined below) is in good faith. There is no evidence of fraud or collusion in the terms of the Sale and the assignment of the Assumed Contracts and Leases. To the

contrary, as discussed throughout this Motion, and as will be further demonstrated at the Sale

Hearing, the Sale Agreement will be the culmination of a solicitation and negotiation process in

which all parties will be represented by sophisticated counsel and financial advisors. No known

potential bidder is an insider of the Debtors, as that term is defined in section 101(31) of the

Bankruptcy Code, and all negotiations have been and will continue to be conducted on an arms

length, good faith basis. With respect to the potential bidders, the Sale Procedures are designed to

ensure that no party is able to exert undue influence over the process. Under the circumstances, the

Successful Bidder (or Next Highest Bidder) should be afforded the protections that section 363(m)

of the Bankruptcy Code provides to a good faith purchaser. Furthermore, the Sale Procedures are

designed to prevent the Debtors or the Successful Bidder (or Next Highest Bidder) from engaging

in any conduct that would cause or permit the Sale Agreement, or the Sale of the Servicing

Business to the Successful Bidder (or Next Highest Bidder) pursuant thereto and hereto, to be

avoided under section 363(n) of the Bankruptcy Code.

44.    All creditors and parties in interest will receive notice of the Sale and will be

provided with an opportunity to be heard. Additionally, all counterparties to Assumed Contracts

and Assumed Leases will be provided notice of assumption and assignment and an opportunity to

be heard. The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies

the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

C.    The Sale Satisfies the Requirements
       of Section 363(f) of the Bankruptcy Code

45.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may

sell all or any part of its property free and clear of any and all liens, claims or interests in such

property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party

asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the

066585.1001

purchase price for the property is greater than the aggregate amount of all liens on the property;

(iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim or

interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for

such interest. 11 U.S.C. § 363(f); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R.

343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the

disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the

subsections is met). Because the Debtors expect that they will satisfy the second and fifth of these

requirements, if not others as well, approving the sale of the Servicing Business free and clear of

all adverse interests is warranted. Furthermore, courts have held that they have the equitable

power to authorize sales free and clear of interests that are not specifically covered by section

363(f). See, e.g., In re Trans World Airlines, Inc., 2001 WL 1820325 at *3, 6 (Bankr. D. Del.

March 27, 2001); Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor

Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

D.     Assumption and Assignment
       of Executory Contracts and Unexpired Leases Should be Approved

       46.     To facilitate and effect the sale of the Servicing Business, the Debtors seek

authority to assume and assign various executory contracts and unexpired leases related to the

Servicing Business (as may be identified by separate notice prior to the Sale Hearing, the

"Assumed Contracts and Leases") to the Successful Bidder (or the Next Highest Bidder) to the

extent required by such Successful Bidder (or Next Highest Bidder). Section 365 of the

Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and

unexpired leases, subject to the approval of the Bankruptcy Court, provided that the defaults under

such contracts and leases are cured and adequate assurance of future performance is provided. A

debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the

066585.1001

"business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. <u>Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.</u>, 318 U.S. 523 (1943) (applying Bankr. Act section 77 subsection (b), the predecessor to Bankruptcy Code Section 365) (rejecting the test of whether the executory contract was burdensome in favor of whether rejection is within the debtor's business judgment); <u>Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.</u>, 756 F.2d 1043, 1046-47 (4th Cir. 1985).

47.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." <u>See</u> <u>Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.)</u>, 103 B.R. 524, 538 (Bankr. D.N.J. 1989). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. <u>In re Bygaph, Inc.</u>, 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

48.    The Successful Bidder (or the Next Highest Bidder) may desire to take assignment of certain executory contracts and unexpired leases related to the Servicing Business. To the extent Assumed Contracts and Leases are identified, the Debtors believe that they can and will demonstrate that all requirements for assumption and/or assignment of the Assumed Contracts and Leases will be satisfied at the Sale Hearing. The Debtors, as required by the Sale Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Servicing Business. Further, for the reasons stated throughout this Motion, the Debtors, in

23

066585.1001

exercising their sound business judgment, believe that selling the Servicing Business and assuming and assigning to the Successful Bidder (or the Next Highest Bidder) the Assumed Contracts and Leases would be in the best interests of their estates.  Moreover, the Debtors will provide all parties to the Assumed Contracts and Leases an opportunity to be heard.  Specifically, a notice identifying any Assumed Contracts and Leases will be provided to each non-Debtor party to an Assumed Contract and Lease no later than August 31, 2007.  Such notice will, among other things, list the Debtors' proposed cure amount.  Each non-Debtor party to an Assumed Contract and Lease will receive notice as soon as reasonably practicable to object to such assignment and/or cure amount.  If no such objection is received on or before September 10, 2007, the assignment of the applicable Assumed Contract and Lease, and the Debtors' proposed cure amount, would be approved.

49.    Thus, the Debtors respectfully submit that by the conclusion of the Sale Hearing, assumption and assignment of the Assumed Contracts and Leases should be approved.

E.    Relief from the Ten Day Waiting Periods
      Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

50.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Sale Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

51.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h)

066585.1001

and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order

otherwise" and eliminate or reduce the ten (10) day stay period, Collier on Bankruptcy suggests

that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close

immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th

Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988).  Furthermore, Collier's provides that if an

objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the

stay may be reduced to the amount of time actually necessary to file such appeal.  Id.

52.    The Debtors hereby request that the Court waive the ten-day stay period

under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

53.    No trustee, examiner or creditors' committee has been appointed in these

chapter 11 cases.  Notice of this Motion has been provided to: (i) the Office of the United States

Trustee for the District of Delaware; (ii) the 40 largest unsecured creditors for the Debtors on a

consolidated basis as identified in the Debtors' chapter 11 petitions; (iii) counsel to Bank of

America, N.A., as Administrative Agent for the lenders under that certain Credit Agreement dated

August 30, 2004; (iv) counsel to the DIP Lender; (v) all parties who are known to possess or assert

a secured claim against the Servicing Business; (vi) the Internal Revenue Service; (vii) the U.S.

Securities and Exchange Commission; and (viii) all parties entitled to notice under Local Rule

2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or

further notice is required.

## CONCLUSION

WHEREFORE, the Debtors respectfully request (A) entry of the proposed Sale Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>, (B) entry of the proposed Sale Order, substantially in the form attached hereto as <u>Exhibit E</u>, and (C) such other and further relief as the Court deems just and proper.

Dated: August 6, 2007
      Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Kara Hammond Coyle (No. 4410)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

Proposed Counsel for the Debtors and
Debtors in Possession

DB02:6153729.6

066585.1001