## EXHIBIT D

**Purchase and Sale Agreement**

**ASSET PURCHASE AGREEMENT**

**by and among**

**[PURCHASER],**

**[AHM PARENT]**

**and**

**[AMERICAN HOME MORTGAGE SERVICING INC.]**

**dated as of**

**_____, 2007**

# TABLE OF CONTENTS

Page

## ARTICLE I

### DEFINITIONS AND INTERPRETATION

Section 1.1    Definitions.................................................................................................1
Section 1.2    Interpretation...........................................................................................12

## ARTICLE II

### PURCHASE AND SALE OF ASSETS

Section 2.1    Purchase and Sale of Assets....................................................................13
Section 2.2    Excluded Assets ......................................................................................14
Section 2.3    Post-Closing Asset Deliveries.................................................................15
Section 2.4    Non-Assignable Permits and Contracts; Servicing Licenses..............................15
Section 2.5    Assumption of Certain Liabilities............................................................16
Section 2.6    Retained Liabilities .................................................................................16
Section 2.7    Closing .....................................................................................................16
Section 2.8    Ancillary Agreements .............................................................................16
Section 2.9    Deliveries by Purchaser ..........................................................................16
Section 2.10   Deliveries by Sellers ...............................................................................17
Section 2.11   "As Is Where Is" Transaction .................................................................17

## ARTICLE III

### TRANSFERRED EMPLOYEES

Section 3.1    Transferred Employees ............................................................................18
Section 3.2    Employee Benefit Plans...........................................................................18
Section 3.3    COBRA.....................................................................................................19
Section 3.4    WARN .......................................................................................................19
Section 3.5    Cooperation...............................................................................................19
Section 3.6    No Third Party Rights ..............................................................................19

## ARTICLE IV

### PURCHASE PRICE; ADJUSTMENT; ALLOCATION

Section 4.1    Purchase Price..........................................................................................19
Section 4.2    Allocation of the Purchase Price..............................................................20

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Section 5.1    Authorization; Validity of Agreement; Seller Action.........................................21
Section 5.2    Organization and Good Standing...........................................................................21
Section 5.3    Consents and Approvals; No Violations...............................................................22
Section 5.4    Title to Assets and Properties; Liens ...................................................................22
Section 5.5    Mortgage Servicing Portfolio; Servicing Agreements; Mortgage Loans ...........22
Section 5.6    Brokers...................................................................................................................23

## ARTICLE VI

## COVENANTS

Section 6.1    Interim Operations of Seller..................................................................................23
Section 6.2    Access ....................................................................................................................25
Section 6.3    Cooperation; Efforts and Actions to Cause Closing .............................................25
Section 6.4    Confidentiality .......................................................................................................26
Section 6.5    Subsequent Actions................................................................................................27
Section 6.6    Procedures for Transfer of Servicing.....................................................................27
Section 6.7    Bankruptcy Actions ...............................................................................................28
Section 6.8    Maintenance of Insurance ......................................................................................28
Section 6.9    Orders.....................................................................................................................29

## ARTICLE VII

## [RESERVED]

## ARTICLE VIII

## CONDITIONS

Section 8.1    Conditions to Obligations of Purchaser and Sellers .............................................29
Section 8.2    Conditions to Obligations of Sellers......................................................................29
Section 8.3    Conditions to Obligations of Purchaser .................................................................30

## ARTICLE IX

## TERMINATION

Section 9.1    Termination.............................................................................................................30
Section 9.2    Reserved.................................................................................................................32
Section 9.3    Procedure and Effect of Termination.....................................................................32

## ARTICLE X

### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Section 10.1    Legal Power; Organization; Qualification of Purchaser ....................................32
Section 10.2    Binding Agreement .........................................................................................33
Section 10.3    No Conflict or Default .....................................................................................33
Section 10.4    Funding ............................................................................................................33
Section 10.5    Brokers .............................................................................................................33

## ARTICLE XI

### MISCELLANEOUS

Section 11.1    Transfer Taxes .................................................................................................33
Section 11.2    Fees and Expenses ...........................................................................................33
Section 11.3    Amendment; Waiver ........................................................................................34
Section 11.4    Publicity ...........................................................................................................34
Section 11.5    Notices ..............................................................................................................34
Section 11.6    Counterparts .....................................................................................................35
Section 11.7    Entire Agreement; No Third Party Beneficiaries .............................................35
Section 11.8    Severability ......................................................................................................35
Section 11.9    GOVERNING LAW .........................................................................................35
Section 11.10   Venue and Retention of Jurisdiction ...............................................................35
Section 11.11   Time of Essence ...............................................................................................35
Section 11.12   No Consequential Damages .............................................................................35
Section 11.13   Assignment ......................................................................................................36
Section 11.14   Fulfillment of Obligations ...............................................................................36
Section 11.15   Specific Performance .......................................................................................36
Section 11.16   Waiver of Bulk Transfer Laws ........................................................................36
Section 11.17   Personal Liability .............................................................................................36

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of [          ], 2007, is entered into by and among [          ] ("Purchaser"), American Home Mortgage Investment Corporation, a Maryland corporation, as a debtor and debtor-in-possession ("Parent"), and American Home Mortgage Servicing Inc., a [          ] corporation, as a debtor and debtor-in-possession (the "Company" and together with Parent, the "Sellers").

WHEREAS, Sellers are engaged in the Business (as hereinafter defined).

WHEREAS, on August, [   ], 2007 (the "Petition Date"), the Filing Subsidiaries (as hereinafter defined) filed voluntary petitions ("Petitions") for relief (the "Bankruptcy Cases") under Chapter 11 of Title 11, U.S.C. §§101 et seq. (as amended) (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (together with any court having proper jurisdiction under the Bankruptcy Code, the "Bankruptcy Court").

WHEREAS, upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 363 and 365 of the Bankruptcy Code, Sellers wish to sell to Purchaser, and Purchaser wishes to purchase from Sellers, all of the Purchased Assets (as hereinafter defined), and Purchaser is willing to assume all of the Assumed Liabilities (as hereinafter defined), relating to or used in connection with the Business (as hereinafter defined).

WHEREAS, Sellers, as debtors and debtors-in-possession, have continued in the possession of their respective assets and in the management of the Business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 1.1    Definitions. As used in this Agreement, the following terms have the meanings set forth below:

"Advances" means, with respect to each Servicing Agreement, the aggregate outstanding amount that as of any date of determination has been advanced directly by Sellers from their own funds or funds borrowed by Sellers from a third party (but not with funds borrowed from any custodial or other accounts under a Servicing Agreement) in connection with servicing the Mortgage Loans in accordance with the terms of such Servicing Agreement,

including with respect to principal, interest, Taxes, insurance premiums and other advances made pursuant to the applicable Servicing Agreement.

"Advances Amount" means, as of the Business Day immediately prior to the Closing Date, the amount of outstanding Advances which have been paid out by Sellers and not yet collected from third parties

"Affiliate" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified. For purposes of this definition, the term "control" of a Person means the possession, direct or indirect, of the power to (i) vote 50% or more of the voting securities of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise, and the terms and phrases "controlling," "controlled by" and "under common control with" have correlative meanings.

"Agreement" or "this Agreement" means this Asset Purchase Agreement, together with the schedules and exhibits hereto.

"Allocation Schedule" has the meaning specified in Section 4.5(a) hereof.

"Ancillary Agreement" has the meaning specified in Section 2.8 hereof.

"Ancillary Income" means any and all income, revenue, fees, expenses, charges or other moneys that Sellers are entitled to receive, collect or retain as servicer pursuant to the Servicing Agreements (other than servicing fees).

"Applicable Requirements" means, with respect to each Seller all applicable requirements of Law relating to servicing, insuring or filing of claims in connection with Mortgage Loans, and all contractual obligations of Sellers.

"Assigned Leases" means those Leases used or leased by the Business listed on Schedule 1.1(b).

"Assignment and Assumption Agreement" means the assignment and assumption agreement to be executed by Sellers in favor of Purchaser in respect of the Assumed Liabilities, in form and substance reasonably satisfactory to Sellers and Purchaser.

"Assignment and Assumption of Lease Agreements" means the assignment and assumption of lease agreements to be executed by Sellers in favor of Purchaser in respect of the Real Property Leases, in form and substance reasonably satisfactory to Sellers and Purchaser.

"Assumed Contracts" has the meaning set forth in Section 2.1(b).

"Assumed Liabilities" means the obligations arising under any Servicing Agreement, Assigned Lease or Assumed Contract after the assignment to Purchaser of the Liabilities of Sellers set forth on Schedule 1.1(c).

"Assumed Rights and Claims" has the meaning specified in Section 2.1(j) hereof.

"Auction" has the meaning specified in the Bidding Procedures Order.

"Bankruptcy Cases" has the meaning specified in the Recitals.

"Bankruptcy Code" has the meaning specified in the Recitals.

"Bankruptcy Court" has the meaning specified in the Recitals.

"Bidding Procedures" has the meaning specified in the Bidding Procedures Order.

"Bidding Procedures Order" means the Order of the Bankruptcy Court (including all schedules thereto), in the form set forth in Exhibit A hereto, approving the bidding procedures relating to the Sale, including those procedures granting Purchaser the protections and benefits set forth in such Order (including the Break-Up Fee and the Expense Reimbursement).

"Bills of Sale" means the bills of sale to be executed by Sellers in favor of Purchaser in respect of the Purchased Assets, in form and substance reasonably satisfactory to Sellers and Purchaser.

"Books and Records" means all books, ledgers, files, reports, plans, records, manuals and other materials (in any form or medium) Related to the Business.

"Business" means the business (whether existing now or existing at or before the Closing, direct or indirect) of providing servicing for residential real estate Mortgage Loans, including the servicing of the Servicing Agreements.

"Business Day" means a day other than Saturday, Sunday or any day on which banks located in the State of New York or Delaware are authorized or obligated to close.

"Business Employee" means each employee of Sellers whose sole responsibility is to provide services Related to the Business and each other employee of Sellers identified by Sellers as having significant responsibility Related to the Business, including as set forth on Schedule 3.1.

"Claims" means, with respect to the period prior to the Closing Date, any right to payment from Sellers, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, known or unknown; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from Seller, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"Closing" has the meaning specified in Section 2.7 hereof.

"Closing Date" means the date upon which the Closing occurs.

"Closing Date Mortgage Loan Schedule" has the meaning specified in Section 5.5 hereof.

"Closing Servicing Amount" means an amount equal to the product of (i) the scheduled principal balance of the Mortgage Loans under the Servicing Agreements as of the close of business on the day prior to the Closing Date, after application of all scheduled payments received on such date, multiplied by (ii) [  ]%.

"COBRA" means the U.S. Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, or any similar State or Local Law.

"Code" means the Internal Revenue Code of 1986, as amended.

"Computer Equipment" means all equipment and devices (including data processing hardware and related telecommunications equipment, media, and tools) used by Sellers in the conduct of the Business, including Sellers' rights under all related warranties. As of the date hereof, the Computer Equipment consists of all items listed in Schedule 1.1(g).

"Confidentiality Agreement" has the meaning specified in Section 9.3 hereof.

"Consent" means any consent, approval, license, waiver or authorization.

"Contracts" means all agreements, contracts, leases and subleases, purchase orders, arrangements, commitments and licenses (other than this Agreement and the Ancillary Agreements) that are Related to the Business as of the Closing, or to which any of the Purchased Assets are subject, whether written or oral, including the Servicing Agreements and the Software Contracts, except to the extent included in Excluded Assets.

"Copyright Assignments" means the copyright assignments to be executed by Sellers in favor of Purchaser in respect of the Copyrights, in form and substance reasonably satisfactory to Sellers and Purchaser.

"Copyrights" has the meaning specified in the "Intellectual Property" definition.

"Cut-Off Date" means [          ], 2007, or such other date as shall be agreed by Purchaser.

"Cut-Off Date Mortgage Loan Schedule" has the meaning specified in Section 5.5 hereof.

"DIP Financing Agreement" means the _____.

"Disclosure Schedules" means the disclosure schedules delivered by Sellers to Purchaser in connection with this Agreement.

"Enforceability Exceptions" has the meaning specified in Section 5.1 hereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business, whether or not incorporated, that together with Seller would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA or Section 414 of the Code.

"Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Assets" has the meaning specified in Section 2.2 hereof.

"Filing Subsidiaries" means Parent and the Company and the Affiliates of the Company set forth on Schedule 1.1(f).

"Final Order" means an order or judgment: (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, the order or judgment has been affirmed by the highest court to which such order or judgment was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired; provided, that the theoretical possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not prevent such order or judgment from being considered a Final Order.

"Fixtures and Equipment" means all furniture, furnishings, vehicles, equipment, Computer Equipment, tools and other tangible personal property Related to the Business, wherever located, including any of the foregoing purchased subject to any conditional sales or title retention agreement in favor of any other Person.

"GAAP" means United States generally accepted accounting principles, applied on a consistent basis.

"Governmental Authorizations" means all licenses, permits, certificates and other authorizations and approvals related to the Business and issued by or obtained from a Government Entity.

"Government Entity" means any federal, state or local court, administrative body or other governmental or quasi-governmental entity with competent jurisdiction, including the Department of Housing and Urban Development, the Federal National Mortgage Association, the Government National Mortgage Association, the Federal Home Loan Mortgage Corporation and the Federal Trade Commission.

"Government Requirements" has the meaning specified in Section 5.3 hereof.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended.

"Intellectual Property" means (i) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names and other indicia of origin, all applications and registrations for the foregoing, including all renewals of same (collectively, "Trademarks"); (ii) inventions and discoveries, whether patentable or not, and all patents, registrations, invention disclosures and applications therefor, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, extensions and reissues (collectively, "Patents"); (iii) trade secrets, confidential information and know-how, including processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists and supplier lists (collectively, "Trade Secrets"); (iv) published and unpublished works of authorship, whether copyrightable or not (including without limitation databases and other compilations of information), including mask rights, copyrights therein and thereto, registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof (collectively, "Copyrights"); and (v) any other intellectual property or proprietary rights.

"IRS" means the Internal Revenue Service.

"IT Assets" means IT Inventories, Technical Documentation, Software Contracts and Computer Equipment, in each case Related to the Business.

"Knowledge of Sellers" concerning a particular subject, area or aspect of the Business or the affairs of Seller, means the actual (and not constructive or imputed) knowledge of any individual listed on Schedule 1.1(a) after making a reasonable inquiry as to the accuracy of the representation and warranty in question.

"Law" means any Law, statute, ordinance, rule, regulation, code, order, judgment, writ, injunction, decree, enacted, issued, promulgated, enforced, or entered by a Government Entity.

"Lease" means each lease or other Contract pursuant to which Seller leases any Real Property or personal property, either as lessor or lessee.

"Leased Real Property" means all real property, including leasehold improvements, that are the subject of the Assigned Leases, as set forth on Schedule 1.1(d).

"Liabilities" means any and all debts, liabilities, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including whether arising out of any contract or tort based on negligence or strict Liability) and whether or not the same would be required by GAAP to be reflected in financial statements or disclosed in the notes thereto.

"Lien" means any lien, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"Loss" or "Losses" means any and all losses, liabilities, costs, claims, damages, penalties and expenses (including reasonable attorneys' fees and expenses and costs of investigation, enforcement and litigation). In the event any of the foregoing are determined to be indemnifiable hereunder, the terms "Loss" and "Losses" shall include any and all attorneys' fees and expenses and costs of investigation and litigation incurred by the Indemnitee in enforcing such indemnity.

"Material Adverse Effect" means any change, effect, event or circumstance, that, individually or in the aggregate, is materially adverse to the Purchased Assets, the Business or the ability of Sellers to perform their obligations under this Agreement, except for any change, effect, event, or circumstance relating to (i) the economy or the financial markets in general, (ii) the industry in which the Business operate in general and not specifically relating to the Business, (iii) the announcement of this Agreement or the transaction contemplated hereby or the identity of Purchaser, (iv) changes in applicable Laws after the date hereof, (v) the fact that Sellers will be operating as a debtors-in-possession under the Bankruptcy Code, (vi) changes in GAAP or regulatory accounting principles after the date hereof, or (vii) changes in the value of the Mortgage Loans or the Servicing Rights.

"Mortgage Loans" means (i) any residential mortgage loan or other extension of credit secured by a Lien on real property of a borrower originated or purchased by Sellers or any of their Affiliates and (ii) any REO Property.

"Mortgage Loan Documents" means, for each Mortgage Loan, all documents pertaining to such Mortgage Loan, including the Mortgage Note, the mortgage or deed of trust and all assignments of the mortgage or deed of trust, all endorsements and allonges to the Mortgage Note, the title insurance policy with all endorsements thereto, any security agreement and financing statements, any account agreements, and any assignments, assumptions, modifications, continuations or amendments to any of the foregoing.

"Mortgage Loan Schedule" has the meaning specified in Section 5.13(a) hereof.

"Mortgage Note" means, with respect to a Mortgage Loan, a promissory note or notes, or other evidence of indebtedness, with respect to such Mortgage Loan secured by a mortgage or mortgages, together with any assignment, reinstatement, extension, endorsement or modification thereof.

"Mortgaged Property" means a fee simple property (or such other estate in real property as is commonly accepted as collateral for Mortgage Loans that are subject to secondary mortgage sales or securitizations) that secures a Mortgage Note and that is subject to a mortgage.

"Multiemployer Plan" means any plan that is a "multiemployer plan," as defined in Section 3(37) or Section 4001(a)(3) of ERISA, which is maintained or contributed to for employees of Seller or any ERISA Affiliate or with respect to which Sellers or any ERISA Affiliate has any Liability or reasonable expectation of Liability.

"Non-Governmental Authorizations" means all licenses, permits, certificates and other authorizations and approvals other than Governmental Authorizations that are (i) held by Seller or any of their Affiliates and (ii) related to the Business.

"Non-Transferred Asset" has the meaning specified in Section 2.4(a) hereof.

"Order" means, with respect to any Person, any award, decision, injunction, judgment, stipulation, order, ruling, subpoena, writ, decree, consent decree or verdict entered, issued, made or rendered by any Government Entity affecting such Person or any of its properties.

"Ordinary Course of Business" means the ordinary course of business of the Business, consistent with past custom and practice of the Business.

"Organizational Documents" means, with respect to a limited partnership, the certificate of limited partnership, limited partnership agreement and subscription agreements with such partnership's partners then in effect; with respect to a limited liability company, the certificate of formation, limited liability company agreement and subscription agreements with such company's members then in effect; with respect to a corporation, the articles or certificate of incorporation and by-laws of such corporation then in effect; and, with respect to any other entity, comparable organizational documents of such entity, in each case, as then in effect.

"Parent" has the meaning specified in the preamble.

"Permits" means permits, concessions, grants, franchises, licenses and other authorizations and approvals required or issued by any Government Entity and primarily used or held for use in connection with the Business.

"Permitted Lien" means (i) Liens for Taxes not yet due; (ii) inchoate mechanics' and materialmen's Liens for construction in progress; (iii) inchoate workmen's, repairmen's, warehousemen's and carriers' Liens arising in the ordinary course of the Business; and (iv) Liens securing payments under capital lease arrangements.

"Person" means a natural person, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Government Entity or other entity or organization.

"Petition" has the meaning specified in the Recitals.

"Petition Date" has the meaning specified in the Recitals.

"Plan" means each deferred compensation and each bonus, retention, incentive compensation, stock purchase, stock option, restricted stock, phantom stock and other equity compensation plan, program, agreement or arrangement; each severance or termination pay, medical, surgical, hospitalization, life insurance and other "welfare" plan, fund or program (within the meaning of Section 3(1) of ERISA); each profit-sharing, stock bonus or other "pension" plan, fund or program (within the meaning of Section 3(2) of ERISA); each employment, consulting, retention, change in control, termination or severance agreement; and each other employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by Seller or by any ERISA Affiliate, or to which Seller or an ERISA Affiliate is party, whether written or oral, for the benefit of any director, employee or former employee of Seller or any Seller Subsidiary, or

with respect to which Sellers or any ERISA Affiliate otherwise has Liability or reasonable expectation of Liability.

"Purchased Asset" has the meaning specified in Section 2.1 hereof.

"Purchase Price" has the meaning specified in Section 4.1(a) hereof.

"Purchaser" has the meaning specified in the preamble.

"Real Property" means all real property that is leased or owned by Sellers or that is reflected as an asset of the Company on the Balance Sheet and used in connection with the Business, other than REO Property.

"Real Property Leases" means the leases described in Schedule 1.1(b) pursuant to which a Seller occupies the Leased Real Property.

"Regulatory Approvals" means any and all certificates, permits, licenses, franchises, concessions, grants, consents, approvals, orders, registrations, authorizations, waivers, variances or clearances from, or filings or registrations with, a Government Entity.

"Related to the Business" means required for, or primarily used in connection with, the Business as conducted by Sellers prior to the Closing.

"REO Property" means a Mortgaged Property acquired by a Seller as servicer under a Servicing Agreement through foreclosure, acceptance of a deed in lieu of foreclosure or otherwise in connection with the default or imminent default of a Mortgage Loan.

"Representatives" means, with respect to any Person, the directors, officers, employees, accountants, agents, counsel, insurance brokers, insurance companies, lenders and other financing sources and other representatives of such Person.

"Retained Liabilities" means any and all Claims and Liabilities of any kind or nature whatsoever of a Seller or any of its Affiliates other than the Assumed Liabilities, including, without limitation any Claims and Liabilities (i) arising from any early payment default claims with respect to any Mortgage Loans or from any deficiency with respect to any existing loan facilities or Sellers, (ii) relating to any and all Plans, Multiemployer Plans or Title IV Plans, or (iii) relating to any action, event, circumstance or condition occurring or existing on or prior to the Closing Date, including (a) any Claims and Liabilities arising under WARN, COBRA or any other Law pertaining to current and former employees (or their beneficiaries) generally, (b) any employee severance Claims or Liabilities relating to the employment or termination of employment by Sellers of any employees of Sellers not hired by Purchaser, and (c) any and all Claims and Liabilities for or resulting from any and all lawsuits or governmental examinations, audits or investigations commenced and claims made or pertaining to the period prior to the Closing Date.

"Sale" means the sale of the Purchased Assets in accordance with the Bidding Procedures Order.

USActive 9716589.5
DB02:6163584.1

066585.1001

"Sale Approval Order" means an Order or Orders of the Bankruptcy Court issued pursuant to Sections 363 and 365 of the Bankruptcy Code, authorizing and approving, among other things, (i) the sale, transfer and assignment of the Purchased Assets and the Assumed Liabilities to Purchaser in accordance with the terms and conditions of this Agreement, free and clear of all Liens and (ii) the assumption and assignment of the Assumed Contracts in connection therewith and as a part thereof.

"Sale Hearing" has the meaning specified in the Bidding Procedures Order.

"Sale Motion" means the motion filed by Parent with the Bankruptcy Court for the approval of the Sale Approval Order in the form of a Final Order.

"SEC" means the U.S. Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended.

"Seller Indemnified Parties" means Sellers and each of their Affiliates.

"Sellers" has the meaning specified in the preamble.

"Servicing Agreements" means the servicing agreements, pooling and servicing agreements, subservicing agreements, master servicing agreements, interim servicing agreements and related agreements which are identified on Schedule 5.5(b), including all documents attached as an exhibit or schedule to or incorporated by reference into any Servicing Agreement.

"Servicing Fees" means the sum of (i) the servicing fees (excluding any Ancillary Income) paid to a Seller as set forth in a Servicing Agreement and (ii) any Ancillary Income.

"Servicing File" means, for each Mortgage Loan, copies of the Mortgage Loan Documents and all other documents, files and other items related thereto required to be maintained by the servicer pursuant to the applicable Servicing Agreement, and, if not specifically set forth in the applicable Servicing Agreement, pursuant to the applicable servicing standard.

"Servicing Licenses" means the licenses required by Law or a Government Entity in order to engage in the Business, including the licenses listed on Schedule 1.1(e).

"Servicing Rights" means all right, title and interest of Sellers in and to: (i) the right to service the Mortgage Loans under the Servicing Agreements, including the right to receive the Servicing Fees and Ancillary Income; (ii) the related master servicing and/or servicing obligations as specified in each Servicing Agreement, including the obligations to administer and collect the payments of or relating to the Mortgage Loans, and to remit all amounts and provide information reporting to others in accordance with the Servicing Agreements; (iii) the right of ownership, possession, control and use of any and all Servicing Files and Mortgage Loan Documents pertaining to the servicing of the Mortgage Loans as provided in the Servicing Agreements; (iv) the rights with respect to, and obligations to make, any advances required pursuant to any Servicing Agreement, including obligations to reimburse funds borrowed from any custodial or other accounts under a Servicing Agreement; (v) the

"clean-up call" right, if any, to purchase the related Mortgage Loans upon the aggregate principal balance thereof being reduced below a specified amount to the extent provided for in the Servicing Agreement; and (vi) all other rights, powers and privileges of Sellers as the master servicer, servicers or subservicer under the Servicing Agreements as expressly set forth therein; provided, that all indemnification rights and obligations of Sellers arising prior to the Closing Date, shall not be transferred to Purchaser (other than Purchased Assets and Assumed Liabilities).

"Software Contracts" means all Contracts, agreements, licenses, and other commitments and arrangements, with the exception of generally available or off-the-shelf shrink wrap licenses acquired for under $10,000, with any person or entity respecting the ownership, license, acquisition, design, development, distribution, marketing, development, use, outsourcing or maintenance of computer program code, related technical or user documentation, and databases, in each case relating to or arising out of the Business, other than such of the foregoing as are identified in the Excluded Assets. As of the date hereof, the Software Contracts consist of the items set forth on Schedule 1.1(h) as (i) licenses from third parties (development and/or marketing); (ii) licenses from third parties (internal use only); (iii) development contracts, work-for-hire agreements, information technology outsourcing agreements, and consulting and employment agreements; (iv) licenses and sublicenses to others; and (v) maintenance, support, or enhancement agreements.

"Subsidiary" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, of which (i) at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person and/or by any one or more of its Subsidiaries, or (ii) such Person or any other Subsidiary of such Person is a general partner (excluding any such partnership where such Person or any Subsidiary of such Person does not have a majority of the voting interest in such partnership).

"Tax" or "Taxes" means all taxes, charges, fees, duties, levies, penalties or other assessments imposed by any federal, state, local or foreign governmental authority, including income, gross receipts, excise, property, sales, gain, use, license, custom duty, unemployment, capital stock, transfer, franchise, payroll, withholding, social security, minimum estimated, profit, gift, severance, value added, disability, premium, recapture, credit, occupation, service, leasing, employment, stamp and other taxes, any amounts attributable thereto or attributable to any failure to comply with any requirement regarding Tax Returns and any transferee or secondary Liability in respect of taxes, including, in each case, any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any such document prepared on a consolidated, combined or unitary basis and also including any schedule or attachment thereto, and including any amendment thereof.

"Technical Documentation" means all technical and descriptive materials (other than Inventory) relating to the acquisition, design, development, use, or maintenance of computer code, program documentation, Computer Equipment and materials in Seller's Business.

"Trademark Assignments" means the trademark assignments to be executed by Sellers in favor of Purchaser in respect of the Trademarks, in form and substance reasonably satisfactory to Sellers and Purchaser.

"Trademarks" has the meaning specified in the "Intellectual Property" definition.

"Trade Secrets" has the meaning specified in the "Intellectual Property" definition.

"Transfer Instructions" means the transfer instructions agreed to by Sellers and Purchaser set forth on Exhibit B.

"Transfer Taxes" means any federal, state, county, local, foreign and other sales, use, transfer, conveyance, documentary transfer, recording or other similar Tax, fee or charge imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto.

"Transferred Employee" has the meaning specified in Section 3.1(b) hereof.

"Transferred Intellectual Property" means all the Intellectual Property Related to the Business owned by, or licensed to, Sellers or their Affiliates, including all invoices, shipping documents, purchase orders and other preprinted business forms that have any Trademark thereon, used in connection with the Business, including those set forth on Schedule 1.1(i).

["Transition Services Agreement" means the transition services agreement to be entered into by and between Purchaser, Parent and the Company, in form and substance acceptable to Sellers and Purchaser.]

"WARN" means the U.S. Worker Adjustment and Retraining Notification Act of 1988, as amended or any similar state or local (including, for the avoidance of doubt, the California Worker Adjustment and Retraining Notification Act, as amended).

Section 1.2    Interpretation.   When a reference is made in this Agreement to a section or article, such reference shall be to a section or article of this Agreement unless otherwise clearly indicated to the contrary.

(a)    Whenever the words "include" "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)    The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.

(c)     The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(d)     A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(e)     A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(f)     Capitalized terms used in this Agreement and not defined herein have the meaning set forth in the **[Loan Agreement]**.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

Section 2.1    Purchase and Sale of Assets.   On the terms and subject to the conditions set forth herein, at the Closing, Sellers shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase from Sellers, free and clear of all "claims" (as defined in the Bankruptcy Code) and Liens, other than Permitted Liens, all of the right, title and interest of all Sellers in and to the following assets, whether tangible or intangible, real, personal or mixed, except for the Excluded Assets (collectively, the "Purchased Assets"):

(a)     all of Sellers' Servicing Rights and rights to receive Servicing Fees;

(b)     except for Contracts included in the Excluded Assets, all (i) Contracts set forth in Schedule 2.1(b), (ii) Real Property Leases, (iii) Intellectual Property Licenses, (iv) Transferred Shared Contracts, (v) the Assigned Leases and (vi) Contracts entered into or made by any Seller in the conduct of the Business after the date hereof and before the Closing; provided that, in the case of any such Contract referred to in this clause (vi), Sellers shall have furnished Purchaser a true, correct and complete copy of such Contract (collectively, the "Assumed Contracts");

(c)     all Transferred Intellectual Property;

(d)     all Books and Records that are not Excluded Assets;

(e)     all Fixtures and Equipment;

(f)     all IT Assets;

(g)     the Leased Real Property, including all easements and other rights and interests appurtenant thereto;

(h)    the right to be reimbursed for Advances pursuant to each applicable Servicing Agreement (subject to the corresponding obligation to make payments thereunder);

(i)    all credits, prepaid expenses, deferred charges, security deposits, prepaid items and duties to the extent primarily related to a Servicing Agreement or a Purchased Asset;

(j)    all causes of action, lawsuits, judgments, claims, refunds, choses in action, rights of recovery, rights of set-off, rights of recoupment, demands and any other rights or Claims of any nature available to or being pursued by Sellers or any of its Affiliates to the extent related to the Purchased Assets within subsections (a) through (i) and (k) through (l) of this Section 2.1 and arising or accruing from and after the Closing or to the extent related to the Assumed Liabilities, whether arising by way of counterclaim or otherwise ("Assumed Rights and Claims");

(k)    all guaranties, warranties, indemnities and similar rights in favor of Sellers or any of its Affiliates to the extent related to any Servicing Agreement or any Purchased Asset within subsections (a) through (j) and (l) of this Section 2.1; and

(l)    all Permits held by Sellers necessary for the operation or ownership of the Business or any of the Purchased Assets within subsections (a) through (k) of this Section 2.1, to the extent transferrable, including those listed on Schedule 2.1(l).

Section 2.2    Excluded Assets.  Notwithstanding anything herein to the contrary, from and after the Closing, Sellers shall retain all of its existing right, title and interest in and to any and all assets that are not Purchased Assets, and there shall be excluded from the sale, conveyance, assignment or transfer to Purchaser hereunder, and the Purchased Assets shall not include, the following (collectively, the "Excluded Assets"):

(a)    any asset or class of assets excluded from the defined terms set forth in Sections 2.1(a) through (n) by virtue of the limitations expressed or implied therein;

(b)    all cash and cash equivalents, including Sellers' bank accounts, but excluding cash flows under any Servicing Agreements or any net profits generated by operation of the Business on or after the Cut-Off Date;

(c)    all Tax Returns of Sellers or any of its Affiliates and all Books and Records (including working papers) related thereto, other than any such Tax documents related to the Purchased Assets, and any Books and Records which Seller is required by Law to retain;

(d)    all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, rights of recoupment, demands and any other rights or Claims of any nature other than the Assumed Rights and Claims, including to any claims of any nature relating to early payment default claimants;

(e)    all rights or Liabilities in connection with and assets of the Plans;

(f)    any rights, demands, claims, actions and causes of action constituting avoidance actions of Sellers' estate under Chapter 5 of the Bankruptcy Code;

(g)     all of Sellers' rights and causes of action arising under Section 502 and 503 of the Bankruptcy Code and Rule 3007 thereunder;

(h)     all of the rights and claims of the Filing Subsidiaries available to Filing Subsidiaries under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, and any other applicable provisions of the Bankruptcy Code, and any related claims and actions arising under such sections by operation of Law or otherwise, including any and all proceeds of the foregoing;

(i)     any of the rights of Sellers under this Agreement (or any agreements between either Seller, on the one hand, and Purchaser or any of its Affiliates, on the other hand, entered into on or after the date of this Agreement);

(j)     all insurance proceeds that Sellers or any of its Affiliates have a right to receive as of the Closing or that relate to events, circumstances or occurrences prior to the Closing;

(k)     Tax refunds related to any taxable period (or portion thereof) ending on or prior to the Closing Date;

(l)     the Purchase Price; and

(m)     all rights, claims and causes of action relating to any Excluded Asset within subsections (a) through (l) of this Section 2.2 or any Retained Liability.

Section 2.3    Post-Closing Asset Deliveries.  If either Seller, in its reasonable discretion, determine after the Closing that books, records or other materials constituting Purchased Assets are still in the possession of such Seller or any of its Affiliates, such Seller shall, or shall cause such Affiliates to, promptly deliver them to the Purchaser.  If any Seller or Purchaser, in its reasonable discretion, determines after the Closing that books, records or other materials constituting Excluded Assets were delivered to Purchaser, Purchaser shall promptly return them to the applicable Seller.

Section 2.4    Non-Assignable Permits and Contracts; Servicing Licenses.

(a)     Non-Assignability.  Notwithstanding anything to the contrary contained in this Agreement or in any Ancillary Agreement, to the extent that any Contract or Permit included in the Purchased Assets is not capable of being assigned to Purchaser at the Closing without the Consent of the other party or parties thereto or the issuer thereof or any other third party (including a Government Entity), or if such assignment or attempted assignment without such Consent would constitute a breach thereof or a violation of any Law, this Agreement shall not constitute an assignment or transfer of any claim, right, benefit or obligation thereunder, or any such attempted assignment, unless any such Consent is obtained at or prior to the Closing (any such Contract or Permit that is not capable of being assigned to Purchaser at the Closing as contemplated by this Section 2.4(a), a "Non-Transferred Asset").

(b)     Efforts to Obtain Consents and Waivers.  At Purchaser's request, and at its cost and expense, each Seller shall use commercially reasonable efforts, and Purchaser shall

provide reasonable cooperation to each Seller, to obtain the Consents referred to in Section 2.4(a) with respect to any Non-Transferred Asset after the Closing.

Section 2.5    Assumption of Certain Liabilities.  On the terms and subject to the conditions set forth herein, at the Closing, Purchaser shall assume and discharge or perform when due the Assumed Liabilities.  Purchaser shall not assume or have any Liability or responsibility with respect to any Liability of any nature or kind whatsoever relating to the Business or the Purchased Assets that exists, or arises out of the operation or ownership of the Purchased Assets or the Business, prior to the Closing and that, at or after the Closing is not an Assumed Liability.  Other than the Assumed Liabilities, Purchaser shall not assume any Liability of any nature or kind whatsoever of Sellers.

Section 2.6    Retained Liabilities.  Sellers shall retain and be liable and responsible for all Retained Liabilities.

Section 2.7    Closing.  Subject to the terms and conditions of this Agreement, the closing (the "Closing") of the transactions contemplated hereby shall take place at the offices of _____, on the second Business Day following the date on which the conditions set forth in Article VIII (other than those conditions that by their nature can be satisfied only at the Closing but subject to the fulfillment or waiver of those conditions) have been satisfied or waived or at such other time and place as the parties hereto may mutually agree.  At the Closing, the appropriate parties shall take all actions required under Sections 2.9 and 2.10 and all other actions not previously taken but required to be taken hereunder at or prior to the Closing.

Section 2.8    Ancillary Agreements.  At the Closing, Sellers shall duly execute and deliver to Purchaser, and Purchaser shall duly execute and deliver to Sellers, each of the following agreements to which they are to be a party (the "Ancillary Agreements"):

    (a)    [Copyright Assignments];

    (b)    Trademark Assignments;

    (c)    [the Transition Services Agreement;]

    (d)    the Bills of Sale;

    (e)    the Assignment and Assumption Agreement; and

    (f)    the Assignment and Assumption of Lease Agreements.

Section 2.9    Deliveries by Purchaser.

    (a)    At the Closing, Purchaser shall deliver to Sellers the following:

    (i)    the Purchase Price, in accordance with Section 4.1, in immediately available funds by wire transfer to an account or accounts which have been designated by Sellers at least two Business Days prior to the Closing Date;

(ii)     the certificate to be delivered pursuant to <u>Section 8.2(c)</u>;

(iii)     such instruments of assumption and other instruments or documents, in form and substance reasonably acceptable to Sellers, as may be necessary to effect Purchaser's assumption of the Assumed Liabilities and the effective assignment of any Assumed Contracts, Assigned Leases or other Purchased Assets; and

(iv)     such other customary instruments of transfer, assumptions, filings or documents, in form and substance reasonably satisfactory to Sellers, as may be required to give effect to this Agreement or any Ancillary Agreement.

Section 2.10     <u>Deliveries by Sellers</u>.

(a)     At the Closing, Sellers shall deliver, or cause to be delivered, to Purchaser the following:

(i)     certified copies of (A) the Bidding Procedures Order and the Sale Approval Order, each of which shall not have been materially modified or amended in any manner that has not been agreed to in writing by Purchaser and shall have become a Final Order, and (B) all other Orders of the Bankruptcy Court pertaining to the transactions contemplated by this Agreement and the Ancillary Agreements;

(ii)     the certificates to be delivered pursuant to <u>Section 8.3(c)</u>;

(iii)     a master copy of each software program Related to the Business (in both object code, and to the extent available, source code form); and

(iv)     such other customary instruments of transfer, assumptions, filings or documents, in form and substance reasonably satisfactory to Purchaser, as may be required to give effect to this Agreement or any Ancillary Agreement.

Section 2.11     <u>"As Is Where Is" Transaction</u>.  Purchaser hereby acknowledges and agrees that, notwithstanding anything to the contrary contained herein, except as expressly set forth in this Agreement, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets.  Without in any way limiting the foregoing, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets. Purchaser further acknowledges that the Purchaser has conducted an independent inspection and investigation of the physical condition of all portions of the Purchased Assets and all such other matters relating to or affecting the Purchased Assets as Purchaser deemed necessary or appropriate and that in proceeding with its acquisition of the Purchased Assets, Purchaser is doing so based solely upon such independent inspections and investigations.  Accordingly, Purchaser will accept the Purchased Assets at the Closing "AS IS" and "WHERE IS".

**ARTICLE III**

**TRANSFERRED EMPLOYEES**

Section 3.1    <u>Transferred Employees</u>. With respect to each Business Employee, <u>Schedule 3.1</u> lists, to the extent such information is permitted to be disclosed under applicable Law: (i) each such person's title or job/position; (ii) each such person's job designation (i.e., salaried or hourly); (iii) each such person's location of employment; (iv) each such person's employment status (i.e., actively employed or not actively at work (due to, e.g., illness, short-term disability, sick leave, authorized leave or absence, etc.)); (v) each such person's annual base rate of compensation and target bonus amount for the current fiscal year to which they are entitled and any amounts which they have received prior to the date hereof; and (vi) if applicable, any material, individual specific provisions relating to such person's employment (e.g., golden parachute, etc.).

(a)    Not later than 10 days prior to the Closing Date, Sellers will provide Purchaser with an updated <u>Schedule 3.1</u>.

(b)    Not later than 7 days prior to the Closing Date, and effective as of the Closing Date, Purchaser shall offer employment to substantially all Business Employees identified on <u>Schedule 3.1</u> (as updated in accordance with <u>clause (a)</u> of this <u>Section 3.1</u>); <u>provided</u>, that each such offer shall provide that it shall not become effective with respect to a Business Employee unless the applicable Business Employee is actively at work as of the Closing Date. Each such offer of employment shall comply with the requirements of this <u>Section 3.1</u>. The new employment of each Business Employee who accepts Purchaser's offer of employment shall commence with effect from the later of the Closing or the date of acceptance. Each Business Employee who accepts Purchaser's offer of employment and who becomes an employee of Purchaser as of the Closing shall be a "<u>Transferred Employee</u>."

(c)    Purchaser's offer of employment will be at a level of base compensation substantially similar to the level of base compensation as applied to such Person immediately prior to the Closing and with benefits that are substantially similar in the aggregate to those provided by Sellers immediately prior to the Closing Date. Purchaser shall give service credit for pre-Closing service with Sellers for purposes of the eligibility and vesting provisions of the plans and programs in which such employees participate and give appropriate credit for unused vacation time and co-pays and deductibles under welfare plans.

Section 3.2    <u>Employee Benefit Plans</u>. <u>Schedule 3.2</u> sets forth a true, complete and correct list of each Plan that covers any Business Employee. Purchaser and its Affiliates shall not assume any Plans or any Liabilities under or with respect to the Plans (except, in Purchaser's sole discretion, as to any permitted "rollover" accepted by the applicable plan of Purchaser or one of its Affiliates that is elected by a Transferred Employee under a Plan intended to be qualified under Section 401(a) of the Code). Effective as of the Closing, each Business Employee shall be 100% fully vested in his benefits under each of the Plans that provides for vesting. Sellers shall take all such actions as are necessary to provide for such full vesting of benefits.

Section 3.3    COBRA. Sellers shall retain all obligations relating to compliance with the continuation health care coverage requirements of COBRA under the Plans with respect to all current and former Business Employees (and their dependents) for qualifying event occurring on or prior to the Closing Date. This Agreement shall not, however, limit the ability of the Sellers to amend or terminate any Plan at any time.

Section 3.4    WARN. Sellers agree to provide any required notice under and to otherwise retain all Liabilities relating to WARN, or any similar Laws, with respect to any event affecting Business Employees on or prior to the Closing Date. Purchaser agree to provide any required notice under and to otherwise assume all Liabilities relating to WARN, or any similar Laws, with respect to any event affecting Transferred Employees after the Closing Date.

Section 3.5    Cooperation. Sellers and Purchasers shall provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this Article III.

Section 3.6    No Third Party Rights. No provision of this Agreement confers rights or remedies upon any Person, including any Business Employee or any Transferred Employee, other than the Parties.

## ARTICLE IV

## PURCHASE PRICE; ADJUSTMENT; ALLOCATION

Section 4.1    Purchase Price. (a) The aggregate consideration for the Purchased Assets (the "Closing Date Purchase Price") on the Closing Date shall, subject to the terms and conditions of this Article IV, equal (i) the sum of (A) $_____, (B) the Closing Servicing Amount and (C) the Advances Amount.

(b)    Sellers shall prepare prior to the Closing Date the calculation, as of the Cut-Off Date (the "Cut-Off Date Report") and as of the Closing Date (the "Closing Date Report" and, together with the Pre-Closing Report and the Cut-Off Date Report, the "Reports"), of (i) the outstanding stated principal balance of all Mortgage Loans under the Servicing Agreements in the Cut-off Date Mortgage Loan Schedule and the Closing Date Mortgage Loan Schedule and (ii) the Advances Amount, in each case including the calculation of collections and distributions pursuant to the Servicing Agreements used in calculating such amounts. Sellers shall provide Purchaser with each of the Reports as promptly as possible after the applicable Cut-Off Date and Closing Date, and Purchaser shall have the right to dispute all matters included in each Report. Purchaser and Sellers shall negotiate in good faith to resolve all disputed matters with respect to each Report as promptly as possible. If Purchaser or Sellers do not dispute the Closing Date Report, such Closing Date Report shall be deemed final by Sellers and Purchaser, and used to calculate the Purchase Price on the Closing Date pursuant to Section 4.1(a).

(c)    If Purchaser disputes any of the Reports (or any item included therein) set forth in Section 4.1(b) above, such dispute shall be resolved in the following manner: (i) Purchaser shall notify Sellers within 10 days after Purchaser's receipt of the Report, which notice shall specify in reasonable detail the nature of the dispute; (ii) during the 15-day period

following Purchaser's receipt of such notice, Sellers and Purchaser shall use their commercially reasonable efforts to resolve such dispute in good faith; and (iii) if at the end of such 15-day period Sellers and Purchaser shall have failed to resolve such dispute in writing, Sellers and Purchaser shall submit the item(s) in dispute as promptly as practicable to a national accounting or consulting firm (the "Arbitrating Accountants") with experience in the mortgage loan servicing business and that is independent of Sellers and Purchaser and their respective Affiliates to be selected by mutual agreement between Sellers and Purchaser. The Arbitrating Accountants shall act as an arbitrator and shall resolve the dispute as to the Audit Report within 15 days after such dispute is referred to it. Each of the parties hereto shall bear all costs and expenses incurred by it in connection with such arbitration, except that the cost of the Arbitrating Accountants hereunder shall be borne equally by Sellers and Purchaser. This provision for arbitration shall be specifically enforceable by the parties hereto. The decision of the Arbitrating Accounts in accordance with the provisions hereof shall be final and binding (absent manifest error), and there shall be no right of appeal therefrom.

Section 4.2    Allocation of the Purchase Price.    (a) The Purchase Price and the value of any Assumed Liabilities shall be allocated among the Business, the Purchased Assets and the agreements provided herein for transfer of the Business to Purchaser in a manner consistent with the allocation schedule set forth in Schedule 4.2(a) (the "Allocation Schedule"), which Allocation Schedule shall be mutually agreed upon by Purchaser and Sellers within 120 days after the Closing Date to the extent reasonably possible, in compliance with Section 1060 of the Code and the regulations promulgated thereunder. If the Allocation Schedule is not mutually agreed upon within such period, the parties shall submit such dispute to a nationally recognized independent accounting firm mutually chosen by the parties (the "Independent Accounting Firm") for a decision that shall be rendered in a timely manner in order to permit the timely filing of all applicable forms with the IRS and other Tax authorities. The Independent Accounting Firm's review shall be final and binding on all parties. The fees and expenses of the Independent Accounting Firm shall be borne 50% by Sellers, on the one hand, and 50% by Purchaser, on the other hand.

(b)    Each of Sellers and Purchaser shall (i) timely file any forms (including IRS Form 8594) and Tax Returns required to be filed in connection with the Allocation Schedule, (ii) be bound by such allocation for purposes of determining Taxes, (iii) prepare and file, and cause its Affiliates to prepare and file, its Tax Returns on a basis consistent with such allocation and (iv) take no position, and cause its Affiliates to take no position, inconsistent with such allocation on any applicable Tax Return. Each of Purchaser, on the one hand, and Sellers, on the other hand, will provide the other with copies of IRS Form 8594 and any required exhibits thereto, consistent with the allocation determined pursuant to this Section 4.2 upon request. In the event that the allocation set forth on the Allocation Schedule is disputed by any taxing authority, the party receiving notice of such dispute shall promptly notify the other party hereto concerning the existence of, material developments regarding, and resolution of such dispute.

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF THE SELLER**

Except as set forth in the Disclosure Schedules, Sellers represent and warrant to Purchaser that the statements contained in this Article V are true and correct as of the date of this Agreement (or, if made as of a specified date, as of such date), and shall be true and correct as of the Closing Date as though made on the Closing Date.

Section 5.1    Authorization; Validity of Agreement; Seller Action. Each Seller has the corporate or other organizational power and authority (a) to execute and deliver this Agreement and each Ancillary Agreement to which such Seller is or will be a party, (b) to perform its obligations hereunder and thereunder (subject to entry and effectiveness of the Bidding Procedures Order), and (c) to consummate the transactions contemplated hereby and thereby (subject to entry and effectiveness of the Sale Approval Order). The execution, delivery and performance of this Agreement by each Seller and of each Ancillary Agreement by each Seller that is or will be a party thereto, and the consummation by each Seller of the transactions contemplated hereby and thereby, have been duly authorized by all necessary corporate action on the part of each Seller and no other corporate actions or proceedings on the part of such Seller are necessary to authorize this Agreement, any Ancillary Agreement or any of the transactions contemplated hereby and thereby. This Agreement has been duly and validly executed and delivered by or on behalf of each Seller and (assuming this Agreement constitutes a valid and binding obligation of each Purchaser) constitutes the legal, valid and binding obligation of each Seller, enforceable against such Seller in accordance with its terms, except (i) as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability (the "Enforceability Exceptions"), (ii) that enforceability of the provisions hereof requiring consummation of the transactions contemplated hereby is subject to entry and effectiveness of the Sale Approval Order or any other action by the Bankruptcy Court and (iii) that enforceability of all other provisions hereof is subject to entry and approval of the Bidding Procedures Order or any other action by the Bankruptcy Court. Each Ancillary Agreement will be duly and validly executed and delivered by each Seller that will be a party thereto at or prior to the Closing, and upon such execution and delivery (assuming such Ancillary Agreement constitutes a valid and binding obligation of each other party thereto) will constitute the legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its respective terms, subject to the Enforceability Exceptions.

Section 5.2    Organization and Good Standing. Except as a result of the commencement of the Bankruptcy Cases, each Seller (i) is a legal entity duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and (ii) has all requisite corporate or other organizational power and, subject to any required Bankruptcy Court approval, authority to own, lease, hold and operate its properties and assets and to carry on the Business as presently conducted, except as would not reasonably be expected to have a Material Adverse Effect. Except as a result of the commencement of the Bankruptcy Cases, each Seller is qualified to do business and is in good standing in all jurisdictions where it owns or leases real property in connection with the Business or otherwise conducts the Business,

except where the failure to so qualify or to so be in good standing has not had and would not reasonably be expected to have a Material Adverse Effect.

Section 5.3    Consents and Approvals; No Violations.  Subject to the approval of the Bankruptcy Court, no Consent of, or declaration, filing or registration with, any Government Entity is required to be obtained or made, as applicable, by either Seller in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreement, or the consummation of the transactions contemplated by this Agreement or by any Ancillary Agreement, except for: (a) Consents of, and declarations, filings and registrations with, the Bankruptcy Court; (b) the filing of a notification and report form under the HSR Act and the expiration or earlier termination of the applicable waiting period thereunder and (c) Consents, declarations, filings and registrations the failure to have which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  The items referred to in clauses (a) and (b) of this Section 5.3 are hereinafter referred to as the "Governmental Requirements."

Section 5.4    Title to Assets and Properties; Liens.  At the Closing, Sellers shall transfer to Purchaser good title to, or a valid lease or license interest in, all of the Purchased Assets, free and clear of all Liens, other than Permitted Liens.  Except as set forth on Schedule 5.4, no Affiliate of Seller has any right, title or interest in or to the Purchased Assets, other than as a stockholder of the Company.

Section 5.5    Mortgage Servicing Portfolio; Servicing Agreements; Mortgage Loans.

(a)    Mortgage Servicing Portfolio. Sellers have delivered to Purchaser in a spreadsheet attached as Schedule 5.5(a) a schedule dated as of [      ], 2007 that provides information with respect to the Mortgage Loans and all REO Properties underlying the serviced loans (the "Mortgage Loan Schedule," which term includes, except where the context requires otherwise, an updated schedule (the "Cut-Off Date Mortgage Loan Schedule") to be prepared as of the Cut-Off Date and delivered two Business Days after the Cut-Off Date and an updated schedule (the "Closing Date Mortgage Loan Schedule" to be prepared as of the close of business on the day preceding the Closing Date and delivered on the Closing Date).  The Mortgage Loan Schedules contain the information included in, and be prepared in accordance with, the Mortgage Loan Schedules as defined in the Servicing Agreements.

(b)    Servicing Agreements. Except as set forth on Schedule 5.5(b), the Servicing Agreements set forth all of the provisions with respect to fees and other income and set forth in all material respects all of the other terms and conditions of Sellers' rights and obligations relating to the servicing of the Mortgage Loans, and there are no other agreements, written or oral, that modify or affect the Servicing Agreements or the Servicing Fees and the Servicing Rights thereunder.  The Company and Parent, as applicable, own the entire right, title and interest in and to the Servicing Rights and the sole right to service the Mortgage Loans, subject to the Servicing Agreements but free and clear of all Liens, except for the rights of subservicers disclosed on Schedule 5.5(b).  Except as set forth on Schedule 5.5(b): (i) the transfer, assignment and delivery of the Servicing Rights in accordance with the terms and conditions of this Agreement shall, upon execution and delivery of the applicable Assignment

and Assumption Agreements by the parties thereto, grant to Purchaser all of Sellers' Servicing Rights; (ii) each Servicing Agreement is in full force and effect, is the valid, binding and enforceable agreement of Sellers, except for the Enforceability Exceptions, and, upon the assignment of each such Servicing Agreement to Purchaser in accordance with this Agreement, will be enforceable by Purchaser, except for the Enforceability Exceptions; (iii) except as disclosed in <u>Schedule 5.5(b)</u>, none of the other parties to any of the Servicing Agreements or certificate holders have provided written notice to any of Sellers that such party will be terminating, modifying or amending any of the Servicing Agreements (or otherwise seeking to terminate, modify or amend, or reduce Seller's benefits or the Servicing Rights under, any of the Servicing Agreements); (iv) no written claim has been made against a Seller for indemnification pursuant to any Servicing Agreement; and (v) except as set forth on <u>Schedule 5.5(b)</u>, Sellers have not engaged any subservicers, subcontractors or other agents to perform any of Sellers' duties pursuant to the Servicing Agreements, which engagements are pursuant to agreements permitted by, and in compliance in all material respects with the requirements of, the applicable Servicing Agreements and have not been terminated, and all fees and expenses in connection therewith have been paid when due, except in each of <u>clauses (i)</u> through <u>(v)</u> as would not reasonably be expected to have a Material Adverse Effect.

(c)    <u>Compliance with Applicable Servicing Agreements and Law</u>.  Except as set forth on the 1122 Servicer's Assessments of Compliance provided pursuant to Regulation AB, from and after the time a Mortgage Loan became subject to the applicable Servicing Agreements, the servicing of the Mortgage Loans has been performed by the applicable Seller in compliance in all material respects with all provisions of the related Mortgage Loan Documents, the applicable Servicing Agreements and Law.

(d)    <u>Advances</u>. Except as set forth on <u>Schedule 5.5(d)</u> (which schedule shall be updated as of the Cut-Off Date and the Closing Date), (i) all Advances made by Sellers prior to and through and including the date set forth on <u>Schedule 5.5(d)</u>, the Cut-Off Date and the Closing Date have been made in compliance in all material respects with the terms of the applicable Servicing Agreement; (ii) the amount of each Advance, in each case in accordance with the applicable Servicing Agreement, are set forth on <u>Schedule 5.5(d)</u> as of the date set forth on such schedule, the Cut-Off Date and the Closing Date, and (iii) all Advances are valid and subsisting amounts owing to Sellers, payable at the times and in accordance with the provisions of the applicable Servicing Agreement, free and clear of all Liens other than Liens arising under any servicing advance facility which shall be satisfied as of the Closing.

Section 5.6    <u>Brokers</u>.  Other than Milestone Advisors, LLC whose fee shall be paid by Sellers, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers.

## ARTICLE VI

## COVENANTS

Section 6.1    <u>Interim Operations of Seller</u>.  Subject to any obligations as debtors or debtors-in-possession under the Bankruptcy Code, or any order of the Bankruptcy Court,

Sellers covenant and agree that, after the date hereof and prior to the Closing Date, except as expressly provided in this Agreement or as may be agreed in writing by Purchaser:

(a)    the Business shall be conducted substantially in the same manner as heretofore conducted, and Sellers shall use commercially reasonable best efforts to preserve the business organization of the Business intact, keep available the services of the current officers and employees of the Business and maintain the existing relations with customers, suppliers, creditors, business partners and others having business dealings with the Business;

(b)    prior to the Closing, Sellers or their Affiliates shall not modify, amend or terminate any of the Assumed Contracts, except in the Ordinary Course of Business or as necessary to assume and assign the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code;

(c)    Sellers or their Affiliates shall not terminate or permit to lapse any material Permits or other Government Authorizations of any Government Entities that are necessary for the operation of the Business; and the failure to have which would cause a Material Adverse Effect, except when such termination or lapse results from any Order or other proceeding instituted by any Government Entity;

(d)    Sellers or their Affiliates shall not lease, license, mortgage, pledge or encumber any Purchased Assets other than in the Ordinary Course of Business and under the DIP Financing Agreement (provided that any DIP Financing Agreement shall provide for the transfer of the Purchased Assets to Purchaser free and clear of all such liens and claims upon the Closing) or purchase, transfer, sell or dispose of any assets other than in the Ordinary Course of Business or dispose of or permit to lapse any rights to any material Intellectual Property other than in the Ordinary Course of Business;

(e)    Sellers or their Affiliates shall not make any change to increase the rate of base compensation or bonus opportunity of any Business Employee;

(f)    Sellers or their Affiliates shall not take, or agree to or commit to take, any action that would or is reasonably likely to result in any of the conditions to the Closing, as applicable, set forth in Article VIII, not being satisfied, or would make any representation or warranty of Sellers contained herein inaccurate in any material respect at, or as of any time prior to, the Closing Date or that would materially impair the ability of Sellers or Purchaser to consummate the Closing in accordance with the terms hereof or materially delay such consummation;

(g)    Sellers shall conduct the Business in accordance with applicable Law and Applicable Requirements in all material respects and shall maintain in full force and effect all material Permits and other Government Authorizations; and

(h)    no Seller nor any Affiliate of a Seller shall enter into any agreement, Contract, commitment or arrangement to do any of the foregoing, or authorize, recommend, propose or announce an intention to do, any of the foregoing.

Section 6.2    Access.  (a) Between the date of this Agreement and the Closing, Sellers shall (i) afford Purchaser and its authorized representatives reasonable access to all Books and Records, offices and other facilities Related to the Business, as well as management and other employees Related to the Business, of Sellers, (ii) permit Purchaser to make reasonable inspections and to make copies of such Books and Records as it may require and (iii) furnish Purchaser with such financial and operating data Related to the Business and other information which is Related to the Business as Purchaser may from time to time reasonably request; provided, however, that such access shall not unreasonably disrupt the business of Sellers.  For the avoidance of doubt, it is agreed that the provision of access under this Section 6.2 shall be solely for the purposes of transition planning and closing-related matters, and Sellers may limit such access to such matters.

(b)    Purchaser shall preserve for a period of six years after the Closing Date all Books and Records relating to the Business prior to the Closing Date.  After the Closing Date, where there is a legitimate purpose, Purchaser shall provide Sellers with access, upon prior reasonable written request specifying the need therefor, during regular business hours, to the books of account and records of Purchaser, but, in each case, only to the extent relating to the conduct of the Business prior to the Closing Date, and Sellers and their representatives shall have the right to make copies of such books and records; provided, however, that the foregoing right of access shall not be exercisable in such a manner as to interfere unreasonably with the normal operations and business of Purchaser; and provided, further, that such information shall be held by Purchaser in confidence to the extent required by, and in accordance with, the Confidentiality Agreement.  Such records may nevertheless be destroyed by Purchaser if Purchaser sends to Sellers written notice of its intent to destroy records, specifying with particularity the contents of the records to be destroyed.  Such records may then be destroyed after the 10th day after such notice is given unless Sellers object to the destruction, in which case Purchaser shall deliver such records to Sellers.

Section 6.3    Cooperation; Efforts and Actions to Cause Closing.  (a) Following the date hereof and until the Closing, upon the terms and subject to the conditions of this Agreement, Purchaser and Sellers shall cooperate in good faith and use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done and cooperate with each other in order to do, all things necessary, proper or advisable (subject to any applicable Laws) to satisfy the conditions to the Closing, as applicable, set forth in Article VIII and to consummate the Closing and the transactions contemplated hereby as promptly as practicable, including the preparation and filing of all forms, registrations and notices required to be filed to consummate the Closing and the transactions contemplated hereby and the taking of such actions as are necessary to obtain all requisite approvals, authorizations, consents, orders, licenses, Permits, qualifications, exemptions or waivers by any third party or Government Entity, including the Sale Approval Order.  [Sellers and Purchaser shall each file their Notification and Report Form under the HSR Act within [  ] Business Days after the date hereof.]

(b)    Following the date hereof and until the Closing, each party shall promptly consult with the other parties hereto with respect to, provide any necessary information with respect to, and provide the other parties (or their respective counsel) with copies of, all filings made by such party with any Government Entity or any other information supplied by such party

to a Government Entity in connection with this Agreement and the transactions contemplated hereby. Each party hereto shall promptly provide the other parties with copies of any communication (including any written objection, litigation or administrative proceeding that challenges the transactions contemplated hereby or the entry of the Sale Approval Order) received by such party from any Government Entity or any other Person regarding the transactions contemplated hereby. If any party hereto or Affiliate thereof receives a request for additional information or documentary material from any such Government Entity with respect to the transactions contemplated hereby, then such party shall endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after consultation with the other parties, an appropriate response in compliance with such request. To the extent that transfers, amendments or modifications of Permits are required as a result of the execution of this Agreement or consummation of the transactions contemplated hereby, Sellers shall use their commercially reasonable efforts to effect such transfers, amendments or modifications.

(c)    Sellers shall use their commercially reasonable efforts to obtain, prior to the Closing, all requisite approvals, including (i) the unconditional Consent to the Closing and the transactions contemplated hereby of each lessor of Leased Real Property or material personal property leased by Sellers and Related to the Business; and (ii) the Consent to the Closing and the transactions contemplated hereby of each other party to each Contract to which it is a party or to which the Purchased Assets or Assumed Liabilities are subject with a Seller or any Affiliate of a Seller (including under any Contract relating to the Transferred Intellectual Property and the IT Assets), in each case if required by the terms of such loan, mortgage, lease, insurance policy or contract. All costs associated with obtaining such Consents and approvals (whether before or after the Closing), including costs of counsel incurred in connection with obtaining any legal opinions required for consents or approvals, shall be borne by Purchaser.

(d)    Sellers shall use their commercially reasonable best efforts to obtain, prior to the Closing Date, all approvals and consents necessary under all Servicing Agreements in order to consummate the transactions contemplated hereby, including executing all such documents as required by the Servicing Agreements and reasonably required by any trustee, rating agency, insurer or other third party to evidence the assignment of the Servicing Rights by Sellers to Purchaser and assumption of the servicing responsibilities by Purchaser related to such Servicing Rights; provided, that such agreements and documents do not materially increase the duties or obligations of the servicer under the related Servicing Agreements or materially decrease the benefits associated with the Servicing Rights under the related Servicing Agreements and do not materially decrease the Servicing Rights thereunder. All costs associated with obtaining such consents and approvals (whether before or after the Closing), including costs of counsel incurred in connection with obtaining any legal opinions required for consents or approvals, shall be borne by Purchaser. Sellers and Purchaser agree to cooperate with each other in executing and delivering promptly such other documents, certificates, agreements and other writings, and in taking such other actions, as are necessary or desirable in order to consummate the transfer of Servicing Rights and the other transactions contemplated hereby.

Section 6.4    Confidentiality.    Except as otherwise required by Law or regulation as advised by counsel or as may be necessary or appropriate in connection with the Bankruptcy Case, Sellers shall treat as confidential and shall safeguard any and all information, knowledge and data included in the Purchased Assets and Assumed Liabilities, in each case by

using the same degree of care, but no less than a reasonable standard of care, to prevent the unauthorized use, dissemination or disclosure of such information, knowledge and data as Sellers used with respect thereto prior to the execution of this Agreement. The confidentiality obligations set forth herein shall not extend to information, knowledge and data that is publicly available or becomes publicly available through no act or omission of Sellers.

Section 6.5    Subsequent Actions. Each of the parties shall use commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the transactions contemplated by this Agreement as promptly as practicable. If at any time before or after the Closing, Purchaser shall consider or be advised that any deeds, bills of sale, instruments of conveyance, assignments, assurances or any other actions or things are necessary or desirable (i) to vest, perfect or confirm ownership (of record or otherwise) in Purchaser, its right, title or interest in, to or under any or all of the Purchased Assets, (ii) to vest, perfect or confirm ownership (of record or otherwise) in a Seller, any of its rights, properties or assets or (iii) otherwise to carry out this Agreement, Sellers shall use reasonable efforts to execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments and assurances and take and do all such other actions and things as may be reasonably requested by Purchaser in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Purchaser or Sellers, in each case at Purchaser's cost and expense.

Section 6.6    Procedures for Transfer of Servicing.

(a)    Transfer. Without limiting any other provision of this Agreement, on the Closing Date, Sellers shall, in accordance with the Transfer Instructions, take all steps, and execute and deliver all such agreements, letters or other documents, as are reasonably requested by Purchaser to effect the transfer of the Servicing Agreements (and the related Purchased Assets) from Sellers to Purchaser such that, after the Closing Date, Purchaser has all of the Servicing Rights, the Servicing Files and any and all assets and rights necessary to perform its obligations under such Servicing Agreements.

(b)    Name Changes. As soon as practicable after the Closing Date, each of Sellers and Purchaser agree to take all such actions as are required, in accordance with the Transfer Instructions, to change the named party to Purchaser on documents related the Servicing Agreements that are currently in the name of Sellers, in their capacity as Servicer, including on all financing statements and insurance policies.

(c)    Invoices. All invoices (including legal, tax and insurance invoices) pertaining to the servicing of the Mortgage Loans that Sellers receive after the Closing Date shall be promptly forwarded by Sellers to Purchaser by reputable overnight courier for a period of not less than 90 days after the Closing Date and thereafter by regular mail within a reasonable time after receipt for a period of not less than 180 days. Purchaser agrees to pay each such invoice promptly upon the receipt of such invoice from Sellers together with an officer's certificate from Sellers stating that Seller has received no benefit under such invoice and that such invoices should be paid by Purchaser and constitute expenses of the applicable trust pursuant to the applicable Servicing Agreements.

(d)    <u>Existing Litigation and Indemnities</u>.  As promptly as possible after the date hereof, Sellers and Purchaser shall agree upon mechanics and procedures to identify and schedule all litigation presently being handled by Sellers as servicer under the Servicing Agreements and transfer responsibility for such litigation to Purchaser.

(e)    <u>Compliance Costs; Reporting Obligations</u>. Sellers shall be responsible for all costs of compliance related to the operation of the Business and the Purchased Assets prior to the Closing Date.  After the Closing Date, Sellers shall be responsible for completing any requested compliance and/or servicer certificate related to the operation of the Business and the Purchased Assets prior to the Closing Date, including but not limited to pursuant to Regulation AB under the Exchange Act and Form 1098 tax reporting.  If requested by Sellers, Purchaser shall be of reasonable assistance to Sellers in connection with the foregoing so long as (i) Sellers pay to Purchaser a mutually agreeable nominal fee in connection with such assistance and (ii) Sellers provide to Purchaser all information needed by Purchaser in connection with such assistance.

Section 6.7    <u>Bankruptcy Actions</u>.  (a) Sellers hereby agree that they shall, and Sellers shall cause all of their Affiliates to, comply with all of the obligations of Sellers under (i) the Bidding Procedures Order (after the entry of such Order by the Bankruptcy Court) and (ii) the Sale Approval Order (after the entry of such Order by the Bankruptcy Court).

(b)    Sellers shall use reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the sale of the Purchased Assets under this Agreement, including serving on all required Persons in the Bankruptcy Cases (including (i) all Persons who are known to possess or assert a Lien against any of the Purchased Assets, (ii) the Internal Revenue Service, (iii) all applicable state attorneys general, local realty enforcement agencies and local Government Entities, (iv) all applicable state and local Government Entities with taxing authority and (v) all other Persons required by any order of the Bankruptcy Court notice of the Sale Motion, the Sale Hearing and the objection deadline in accordance with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure, the Bidding Procedures Order or other orders of the Bankruptcy Court, and any applicable local rules of the Bankruptcy Court.

(c)    As provided in the Sale Motion, move to assume and assign to Purchaser the Pre-Petition Contracts with a Filing Subsidiary set forth in <u>Schedule 6.7(d)</u> (collectively, the "<u>Assumed Pre-Petition Contracts</u>") and shall provide notice thereof in accordance with all applicable Bankruptcy Rules as modified by orders of the Bankruptcy Court.  Sellers shall pay Cure Amounts required to effect assumption and assignment of the Assumed Pre-Petition Contracts as agreed to by the applicable Seller and each party to a Assumed Pre-Petition Contract or, absent such agreement, by order of the Bankruptcy Court in the time and manner specified by the Sale Approval Order.

Section 6.8    <u>Maintenance of Insurance</u>. From the date of this Agreement until the Closing Date, Sellers shall, in connection with the Business, (a) continue to carry its existing insurance through the Closing Date, and (b) shall use reasonable efforts to not allow any breach, default, termination or cancellation of such insurance policies or agreements to occur or exist.

Section 6.9    Orders. From the date of this Agreement until the Closing Date, Sellers shall promptly notify Purchaser concerning the existence of any new Law, decree, judgment, injunction or other Order which restricts, prevents, prohibits, makes illegal, enjoins or otherwise affects the Business.

## ARTICLE VII

## [RESERVED]

## ARTICLE VIII

## CONDITIONS

Section 8.1    Conditions to Obligations of Purchaser and Sellers. The respective obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, or waiver by Purchaser and Sellers, on or prior to the Closing Date, of all of the following conditions precedent:

(a)    Sale Approval Order. The Sale Approval Order (A) shall have been entered by the Bankruptcy Court, (B) shall not have been modified or amended in any manner unless agreed to in writing by Purchaser in its sole discretion, and (C) shall have become a Final Order.

(b)    No Law, Judgments, Etc.    No Government Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or any decree, judgment, injunction or other Order which is in effect and which restricts, prevents, prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement.

(c)    Hart-Scott-Rodino; Competition Approvals.    The applicable waiting period under the HSR Act shall have expired or been earlier terminated without action by the Department of Justice or the Federal Trade Commission to prevent consummation of the transactions contemplated by this Agreement.

Section 8.2    Conditions to Obligations of Sellers. The obligations of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver, at or prior to the Closing Date, of the following conditions:

(a)    Representations and Warranties. The representations and warranties of Purchaser contained in this Agreement shall be true and correct (without regard to any materiality or Material Adverse Effect qualifier contained therein) on the date of this Agreement (except to the extent cured prior to the Closing Date) and on the Closing Date as though made on the Closing Date, except to the extent such representations and warranties speak as of an earlier date, and except to the extent that any such failure of a representation or warranty to be true and correct, individually or in the aggregate, would not have a Material Adverse Effect.

(b)    <u>Covenants</u>. Each of the covenants and agreements of Purchaser to be performed on or prior to the Closing Date shall have been duly performed in all material respects.

(c)    <u>Certificate</u>. Sellers shall have received a certificate, signed by a duly authorized officer of the sole member of Purchaser and dated the Closing Date, to the effect that the conditions set forth in <u>Sections 8.2(a)</u> and <u>8.2(b)</u> have been satisfied.

Section 8.3    <u>Conditions to Obligations of Purchaser</u>. The obligations of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions:

(a)    <u>Representations and Warranties</u>. The representations and warranties of Sellers contained in this Agreement shall be true and correct (without regard to any materiality or Material Adverse Effect qualifier contained therein) on the date of this Agreement (except to the extent cured prior to the Closing Date) and on the Closing Date as though made on the Closing Date, except to the extent such representations and warranties speak as of an earlier date, and except to the extent that any such failure of a representation or warranty to be true and correct, individually or in the aggregate, would not have a Material Adverse Effect.

(b)    <u>Covenants</u>. Each of the covenants and agreements of Sellers to be performed on or prior to the Closing Date shall have been duly performed in all material respects.

(c)    <u>Certificate</u>. Purchaser shall have received certificates, signed by duly authorized officers of Sellers and dated the Closing Date, to the effect that the conditions set forth in <u>Sections 8.3(a)</u> and <u>8.3(b)</u> have been satisfied.

(d)    <u>Sale Approval Order</u>. Sellers shall have complied with all of their obligations under, and Purchaser shall have received the benefits of, the Sale Approval Order.

(e)    <u>Actions or Proceedings</u>. No Proceeding or investigation by any Government Entity or other Person shall have been instituted that restricts, prevents, prohibits, makes illegal, enjoins the consummation of the transactions contemplated by this Agreement or any Ancillary Agreement.

## ARTICLE IX

## TERMINATION

Section 9.1    <u>Termination</u>. Notwithstanding anything to the contrary contained in this Agreement, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time on or prior to the Closing Date:

(a)    by the mutual written consent of Sellers and Purchaser;

(b)    by either Sellers or Purchaser, upon written notice to the other:

(i)      if the closing condition set forth in <u>Section 8.1(a)</u> shall not have been satisfied on or before [      ], 2007 (unless such deadline is extended with the written consent of Purchaser); <u>provided</u>, <u>however</u>, that the party proposing to terminate (and its Affiliates) shall not have breached in any material respect any of their respective representations, warranties, covenants or agreements contained in this Agreement in any manner that shall have proximately contributed to such failure (such breaching party, (a "<u>Proximate Cause Party</u>");

(ii)      if the Closing Date shall not have occurred on or before [      ], 2007 (unless such deadline is extended with the consent of Purchaser); <u>provided</u>, <u>however</u>, that neither the party proposing to terminate nor any of its Affiliates is a Proximate Cause Party; or

(iii)      if a Government Entity shall have issued a Final Order or taken any other action permanently restricting, preventing, prohibiting, making illegal or enjoining the transactions contemplated by this Agreement, unless such Final Order or action was issued or taken at the request or with the support of the party seeking to terminate this Agreement (or any of its Affiliates); or

(c)      by Purchaser, upon written notice to Sellers:

(i)      if either Seller shall have failed to comply in any material respect with any of its covenants or agreements in this Agreement required to be complied with prior to the date of such termination, which failure to comply has not been cured within 30 days following receipt by Sellers of written notice from Purchaser of such failure to comply and such failure has caused a Material Adverse Effect; <u>provided</u>, <u>however</u>, that neither Purchaser nor any of its Affiliates is a Proximate Cause Party;

(ii)      if there has been (A) a breach by or inaccuracy of either Seller of any representation or warranty in this Agreement that is not qualified as to materiality which has the effect of making such representation or warranty not accurate, true and correct in all material respects or (B) a breach by or inaccuracy of any Seller of any representation or warranty in this Agreement that is qualified as to materiality, in each case which breach or inaccuracy has not been cured within 30 days following receipt by Sellers from Purchaser of such breach or inaccuracy and such breach or inaccuracy has caused a Material Adverse Effect; <u>provided</u>, <u>however</u>, that neither Purchaser nor any of its Affiliates is a Proximate Cause Party; or

(iii)      following approval by the Bankruptcy Court at the Sale Hearing of an alternative transaction including the sale of the Purchased Assets to a bidder other than Purchaser.

(d)      by Sellers, upon written notice to Purchaser:

(i)      if Purchaser shall have failed to comply in any material respect with any of its covenants or agreements in this Agreement required to be complied with prior to the date of such termination, which failure to comply has not been cured within 30 days following receipt by Purchaser of written notice from Sellers of such failure to comply

USActive 9716589.5
DB02:6163584.1

066585.1001

and such failure has caused a Material Adverse Effect; provided, however, that neither Sellers nor any of their Affiliates is a Proximate Cause Party; or

(ii)     if there has been (A) a breach by or inaccuracy of Purchaser of any representation or warranty in this Agreement that is not qualified as to materiality which has the effect of making such representation or warranty not accurate, true and correct in all material respects or (B) a breach by or inaccuracy of any Purchaser of any representation or warranty in this Agreement that is qualified as to materiality, in each case which breach or inaccuracy has not been cured within 30 days following receipt by Purchaser from Sellers of such breach or inaccuracy and such breach or inaccuracy has caused a Material Adverse Effect; provided, however, that neither Sellers nor any of their Affiliates is a Proximate Cause Party.

Section 9.2     Reserved.

Section 9.3     Procedure and Effect of Termination. If this Agreement is terminated in accordance with Section 9.1, this Agreement shall become void and of no further force and effect (subject to the provisions of this Article IX) and the transactions contemplated by this Agreement shall be abandoned, without further action by any party, and no party shall have any Liability or further obligation to any other party resulting from such termination (a) except for the provisions of: (i) the parties' obligations under that certain Confidentiality Agreement, dated [     ], between Parent and Purchaser (the "Confidentiality Agreement"), (ii) Article IX (Termination); and (iii) Sections 11.2 (Fees and Expenses), 11.3 (Amendment; Waiver), 11.4 (Publicity), 11.5 (Notices), 11.7 (Entire Agreement; No Third Party Beneficiaries), 11.9 (Governing Law), 11.10 (Venue and Retention of Jurisdiction), and 11.13 (Assignment), all of which shall remain in full force and effect; and (b) except that no such termination shall relieve any party from any Liability (other than for special, incidental, punitive, exemplary or consequential damages and lost profits) which such party may have to another party for Losses arising out of any breach of this Agreement by such party which occurs upon or prior to the termination of this Agreement.

## ARTICLE X

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers that all of the statements contained in this Article X, are true and correct as of the date of this Agreement (or, if made as of a specified date, as of such date) and will be true and correct as of the Closing Date as though made on the Closing Date.

Section 10.1     Legal Power; Organization; Qualification of Purchaser. Purchaser has been duly incorporated, and is validly existing and in good standing under the Laws of its jurisdiction of incorporation, has all requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements and to consummate the transactions contemplated hereby, and has taken all necessary corporate or other action to authorize the execution, delivery and performance of this Agreement.

Section 10.2    Binding Agreement. This Agreement has been duly executed and delivered by Purchaser and, assuming due and valid authorization, execution and delivery by Sellers, this Agreement constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar Laws of general application affecting enforcement of creditors' rights generally and (ii) the availability of the remedy of specific performance or injunctive or other forms of equitable relief may be subject to equitable defenses and would be subject to the discretion of the court before which any proceeding therefor may be brought.

Section 10.3    No Conflict or Default. Neither the execution and delivery of this Agreement nor the consummation by Purchaser of the transactions contemplated hereby will result in a violation of, or a default under, or conflict with, or require any consent, approval or notice under, any material contract, trust, commitment, agreement, obligation, understanding, arrangement or restriction of any kind to which Purchaser is a party or by which Purchaser is bound or to which any properties or assets owned by Purchaser are subject. Consummation by Purchaser of the transactions contemplated hereby will not violate, or require any consent, approval or notice under, any provision of any material judgment, order, decree, statute, Law, rule or regulation applicable to such Purchaser.

Section 10.4    Funding. The Purchaser has all funds necessary to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

Section 10.5    Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Purchaser.

## ARTICLE XI

## MISCELLANEOUS

Section 11.1    Transfer Taxes. Unless Sellers have obtained an order of the Bankruptcy Court exempting the transactions contemplated by this Agreement from all Transfer Taxes, all Transfer Taxes attributable to the transfer of the Purchased Assets and any Transfer Taxes required to effect any recording or filing with respect thereto shall be borne by Purchaser, and Purchaser shall indemnify Sellers for any such Taxes imposed on Sellers. All such Transfer Taxes shall be paid by Purchaser no later than the earlier of (i) the due date for paying such Taxes and (ii) the Business Day prior to the Closing Date. Sellers and Purchaser shall cooperate to timely prepare, and Purchaser shall file or cause to be filed any returns or other filings relating to such Transfer Taxes (unless Seller is required by applicable Law to file the return), including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes.

Section 11.2    Fees and Expenses. All costs and expenses incurred in connection with this Agreement and the consummation of the Transaction shall be paid by the party incurring such expenses.

USActive 9716589.5
DB02:6163584.1                                                                              066585.1001

Section 11.3    <u>Amendment; Waiver</u>. This Agreement may be amended, modified and supplemented only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Agreement. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

Section 11.4    <u>Publicity</u>. The initial press release with respect to the execution of this Agreement shall be a joint press release reasonably acceptable to Purchaser and Sellers. Thereafter, until the Closing, or the date the transactions contemplated hereby are terminated or abandoned pursuant to <u>Article IX</u>, none of Sellers, Purchaser nor any of their respective Affiliates shall issue or cause the publication of any press release or other public announcement with respect to this Agreement or the transactions contemplated hereby without prior consultation with the other party, except as may be required by Law or by any listing agreement with a national securities exchange or trading market.

Section 11.5    <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be delivered personally by hand, by facsimile (which is confirmed) or sent by an overnight courier service to the parties at the following addresses (or at such other address for a party as shall be specified by such party by like notice):

if to Purchaser, to:

with copies to (which copies shall not constitute notice):

if to Seller, to:

with copies to (which copies shall not constitute notice):

All notices given pursuant to this <u>Section 13.4</u> shall be deemed to have been given (i) if delivered personally on the date of delivery or on the date delivery was refused by the addressee, (ii) if delivered by facsimile transmission, when transmitted to the applicable number so specified in (or pursuant to) this <u>Section 13.4</u> and an appropriate answerback is received or (iii) if delivered by overnight courier, on the date of delivery as established by the return receipt or courier service confirmation (or the date on which the courier service confirms that acceptance of delivery was refused by the addressee).

Section 11.6  <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other parties. Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of such counterparts is confirmed.

Section 11.7  <u>Entire Agreement; No Third Party Beneficiaries</u>. This Agreement and the Sale Approval Order (a) constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof, except for the Confidentiality Agreement, which shall remain in full force and effect until the Closing, and (b) is not intended to confer any rights or remedies upon any Person other than the parties hereto and thereto.

Section 11.8  <u>Severability</u>. Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

Section 11.9  <u>GOVERNING LAW</u>. THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT GIVING EFFECT TO RULES GOVERNING THE CONFLICT OF LAWS AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

Section 11.10  <u>Venue and Retention of Jurisdiction</u>. All actions brought, arising out of or related to the transactions contemplated in this Agreement shall be brought in the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction to determine any and all such actions

Section 11.11  <u>Time of Essence</u>. Each of the parties hereto hereby agrees that, with regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Section 11.12  <u>No Consequential Damages</u>. In no event will any party to this Agreement be liable to any other party for any punitive, exemplary, indirect, special, incidental or consequential damages, including lost profits or savings, damage to business reputation or loss of opportunity.

Section 11.13 <u>Assignment</u>. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of Law or otherwise) without the prior written consent of the other parties. Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns.

Section 11.14 <u>Fulfillment of Obligations</u>. Any obligation of any party to any other party under this Agreement, which obligation is performed, satisfied or fulfilled completely by an Affiliate of such party, shall be deemed to have been performed, satisfied or fulfilled by such party.

Section 11.15 <u>Specific Performance</u>. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that Purchaser and Sellers shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court of the United States located in the State of Delaware or in Delaware state court, this being in addition to any other remedy to which they are entitled at Law or in equity.

Section 11.16 <u>Waiver of Bulk Transfer Laws</u>. Seller and Purchaser agree to waive compliance with Article 6 of the Uniform Commercial Code as adopted in each of the jurisdictions in which any of the Purchased Assets are located to the extent that such Article is applicable to the transactions contemplated hereby.

Section 11.17 <u>Personal Liability</u>. This Agreement shall not create or be deemed to create or permit any personal liability or obligation on the part of any officer, director, employee, Representative or investor of any party hereto.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**[PURCHASER]**

By:_____
    Name:
    Title:

**[PARENT]**
    as Seller and Debtor and Debtor-in-
    Possession

By:_____
    Name:
    Title:

**[THE COMPANY]**
    as Seller and Debtor and Debtor-in-
    Possession

By:_____
    Name:
    Title:

USActive 9716589.5
DB02:6163584.1

066585.1001