IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x
In re:                                                           :   Chapter 11
                                                                 :
AMERICAN HOME MORTGAGE                                           :   Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,                  :
                                                                 :   Joint Administration Pending
                         Debtors.                                :
---------------------------------------------------------------- x

**MOTION FOR AN ORDER PURSUANT TO SECTIONS 105(a), 345, AND 503(b)(1) OF THE BANKRUPTCY CODE (I) AUTHORIZING DEBTORS TO MAINTAIN AND USE EXISTING BANK ACCOUNTS AND BUSINESS FORMS, (II) AUTHORIZING THE DEBTORS TO MAINTAIN AND USE EXISTING CASH MANAGEMENT SYSTEM, (III) EXTENDING THE DEBTORS' TIME TO COMPLY WITH SECTION 345 OF THE BANKRUPTCY CODE; AND (IV) GRANTING ADMINISTRATIVE EXPENSE STATUS TO POSTPETITION INTERCOMPANY CLAIMS**

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] respectfully represent as follows:

## SUMMARY OF RELIEF REQUESTED

1. By this motion (the "Motion"), the Debtors request that this Court enter an order pursuant to sections 105(a), 345, and 503(b)(1) of title 11 of the United States Code (the "Bankruptcy Code") (i) authorizing the continued use of existing Bank Accounts and business

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

forms; (ii) authorizing the continued use of their existing cash management system; (iii) extending their time to comply with the requirements of section 345 of the Bankruptcy Code; and (iv) granting administrative expense priority status to postpetition intercompany claims held by a Debtor against one or more of the other Debtors.

2. Requiring the Debtors to change their bank accounts, cash management systems and business forms would be costly and disruptive, and would not be beneficial to the Debtors' estates. The requested relief would allow the Debtors to use their existing bank accounts, cash management systems and business forms, and would allow the Debtors sufficient time to comply with their obligations under section 345 of the Bankruptcy Code. Such relief will help to ensure the Debtors' orderly entry into chapter 11 and will avoid many of the possible disruptions and distractions that could divert the Debtors' attention from more pressing matters during the initial days of these chapter 11 cases.

## JURISDICTION

3. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a), 345, and 503(b)(1) of the Bankruptcy Code.

## BACKGROUND

4. On the date hereof (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. Simultaneous with the filing of this pleading, the Debtors have filed a motion with this Court pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure seeking joint administration of the Debtors' estates.

6. No creditors' committee has yet been appointed in these cases. No trustee or examiner has been appointed.

## THE DEBTORS' BUSINESS[2]

7. Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

8. As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal

---

[2] The facts set forth herein are derived from the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief, filed concurrently herewith (the "First Day Declaration"), which is incorporated by reference as if fully set forth herein at length. The First Day Declaration is available on PACER, the Court's electronic docket system. Any party unable to retrieve these documents from PACER may contact the Debtors' counsel for a copy.

amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to *National Mortgage News*.

9.  A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

## EVENTS LEADING TO THE CHAPTER 11 FILING

10.  Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

11.  The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

12.  In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders -- the financial

institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

13. On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

14. The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors now employ approximately 1000 persons who are absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

15. In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

16. Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity

crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM

17. The Debtors maintain a complex system of deposit, accounts payable, payroll, operating, trust and custodial accounts. As of the Petition Date, the Debtors maintained approximately 450 bank accounts in the United States (collectively, the "Bank Accounts"). A schedule of the Bank Accounts is attached hereto as Exhibit A.

18. The cash management system enables the Debtors to maximize the investment income available from cash resources they generate. It allows cash receipts to be efficiently invested and, through concentration, managed to yield the highest returns consistent with the investment policy objectives of safety and liquidity. The Debtors' cash management system is comparable to those used by other companies of similar size and complexity in the mortgage lending industry. Under the cash management system, the Debtors are able to track the amounts paid to and from each affiliated participant in the system. In addition, the cash management system enables the Debtors to track receipts related to their mortgage loan servicing platform with respect to moneys which are paid to the Debtors as servicer for mortgage loans which the Debtors do not own.

19. While the Debtors' cash management system is complex, it can generally be described by organizing the Debtors' main cash flow into the following categories.[3]

---

[3] In addition to the categories described below, until shortly before the Petition Date, the Debtors also utilized certain Bank Accounts in connection with their wholesale and retail loan origination business. Since the Debtors are no longer originating loans or investing in loans, some of those bank accounts may no longer be necessary. To avoid the payment of unnecessary bank fees and costs, in the coming days and weeks, the Debtors intend to review these bank accounts and close all accounts which are no longer necessary for their streamlined operations.

-7-

A.  **Business Operations Funds**

(i)  Funding Accounts and Disbursement Accounts

20.  The Debtors maintain five (5) funding accounts and five (5) controlled disbursement accounts, primarily with JPMorgan Chase, to facilitate the payment of the Debtors' ordinary course of business accounts payable and other expenses. The disbursement accounts are zero balance accounts, funded daily by the funding accounts. Checks are presented daily on the disbursement accounts, and the Debtors ensure that at least the aggregate amount of the checks presented will be placed in the funding accounts. The funding accounts are funded by the Debtors' operating accounts. The Debtors maintain their primary operating accounts at JPMorgan Chase Bank and Deutsche Bank.

(ii)  Payroll Accounts

21.  The Debtors' payroll accounts are maintained at JPMorgan Chase Bank and Bank of America. The payroll accounts are funded from the operating accounts two days in advance for payroll and one day in advance for employment related taxes.

(iii)  Licensing Accounts

22.  The Debtors are required by the various state regulations to maintain trust accounts in those states, to obtain and maintain the necessary business licenses. As a result, the Debtors maintain certain licensing accounts at various banks for this purpose.

B.  **Loan Servicing**

23.  As stated above, a significant portion of the Debtors' business relates to the servicing of loans through AHM Servicing, and the vast majority of the Debtors' bank accounts are necessary for this aspect of their business. Loan servicing functions typically include: all aspects of servicing mortgage loans, including payment processing (the collecting and remitting of mortgage loan payments), customer service communications and activities,

collection communications, making required advances, accounting for principal and interest, and holding escrow or impound funds for payment of taxes and insurance.

(i) <u>Servicing Securitized Loans</u>

24. Servicing loans for securitization trusts and purchasers of loans acquired in whole loan sales is an important and profitable portion of the Debtors' business. The Debtors' mortgage servicing rights ("<u>MSR's</u>") are generally established in servicing contracts with the securitization trusts, special purpose issuers or third party whole loan purchasers. For performing the loan servicing functions, the Debtors receive a servicing fee, which is based upon a percentage of the unpaid principal balance of the loans, certain ancillary fees (e.g., late fees, fees associated with payments by phone) and interest. These fees are typically collected from the monthly payments made by the borrowers on the loans. Preserving these MSR's and the Debtors' loan servicing platform is critical to maximizing and maintaining the value of the Debtors' estates.

25. The Debtors perform loan servicing on behalf of a number of securitization trusts under the terms and conditions of a series of servicing agreements, pooling and servicing agreements, mortgage loan purchase and servicing agreements, indentures and related documents (collectively, the "<u>Securitization Documents</u>"). As of July 31, 2007, the Debtors serviced approximately $41 billion in principal amount of mortgage loans under the securitizations for the benefit of the holders of the related mortgaged backed securities, asset backed securities and commercial paper.

26. Under the Securitization Documents, the Debtors (a) service mortgage loans held by the trusts in accordance with the terms and conditions thereof, including receiving and posting to such investors the principal and interest receipts thereon, (b) advance principal, interest and certain "property protection" costs (taxes and insurance) with respect to delinquent

mortgage loans, unless such amounts are determined to be unrecoverable from the related loans, (c) perform securities related computational, reporting and compliance tasks, and (d) pay certain fees and expenses and to the trustee and certain other parties to the securitization documents (collectively, the "Securitization Servicing Functions").

27.     The timely performance of the Securitization Servicing Functions is essential to prevent material economic damage to all parties with an interest in the securitization trusts, including the Debtors' estates. The Securitization Servicing Functions are important to the Debtors' servicing business, and the Debtors' MSR's constitute important assets of the Debtors' estates. In addition, the Debtors' continued performance under the Securitization Documents will maintain the value of the MSR, as well as limit the obligations and damages incurred by the Debtors under various Securitization Documents.

(ii)    Servicing Loans Subject to Whole Loan Sales

28.     When the Debtors sell loans in whole loan sales, the purchaser often contracts with the Debtors to provide loan servicing, sometimes on an interim basis and sometimes on a longer term basis (typically when the purchaser does not have the capacity to service loans). These servicing agreements are typically documented in a servicing agreement that has many of the same features of the servicing agreements with the securitization trusts. Like servicing loans held by securitization trusts, performing these functions is a integral part of the Debtors' businesses.

(iii)   Loan Servicing Cash Management

29.     Amounts collected by the Debtors in connection with performing the loan servicing functions are deposited into a central lockbox account.[4] Within two days of receipt of

---

[4] The Debtors maintain an additional lockbox account in connection with construction loans.

a borrower's mortgage payments, the funds are transferred by an Automatic Clearing House ("ACH") file to the Debtors' payment clearing accounts. From the payment clearing accounts, the Debtors direct the funds, by ACH files, to a series of custodial accounts established for principal and interest (the "P&I Custodial Accounts"), taxes, assessments, maintenance fees, and insurance with respect to the mortgage property (the "T&I Custodial Accounts" and together with the P&I Custodial Accounts, the "Custodial Accounts"). For each securitization trust, there are separate Custodial Accounts. In accordance with the respective securitization trust and servicing documents, funds are periodically remitted from the P&I Custodial Account to the trustee of the securitization trusts for payment to the respective bondholders or noteholders of the securitization trust.

30. Prior to the periodic remittance of funds from the Custodial Accounts to the trustees of the securitization trusts, the Debtors deduct fees earned in connection with the servicing of the corresponding loans. The Debtors additionally deduct any amounts previously advanced by the Debtors for principal and interest, taxes and insurance, and, in accordance with the Securitization Documents, certain servicing and related advances (e.g., attorneys' fees and costs incurred in connection with foreclosures) in circumstances where the borrower has failed to satisfy its obligations under the respective mortgage documents (collectively, the "Loan Servicing Advances").

31. The Debtors additionally advance amounts from their operating accounts on account of draws by borrowers under home equity lines of credit ("HELOCs"). The checks that are drawn under a HELOC are initially presented to Bank of New York. The Debtors are then required to remit funds necessary to cover the checks presented under the HELOCs. As a result, the Debtors periodically deduct amounts from the P&I Custodial Accounts to repay

themselves for advancements made on account of draws made under the HELOCs (the "<u>HELOC Advances</u>").

32.     In the ordinary course of business, the Debtors open and close Custodial Accounts to make payments for principal and interest, taxes, assessments and maintenance fees, insurance and similar costs with respect to the mortgaged properties. The other parties to these transactions may assert that the Custodial Accounts are not property of the Debtors' estates. It is critical to the Debtors' operations that they be allowed to continue to maintain the operations of these Custodial Accounts in the ordinary course of business. Thus, out of an abundance of caution, the Debtors request the authority to continue operating as servicer in the ordinary course of business, including, but not limited to, maintaining, opening and closing the Custodial Accounts. In addition, the Debtors request that the parties to these transactions be authorized to continue any prepetition customary loan servicing practices.

33.     Additionally, the Debtors request that the Court authorize the Debtors' banks to process and pay all prepetition checks and transfers relating to funds from the P&I Custodial Accounts (the "<u>P&I Funds</u>") and the T&I Custodial Accounts (the "<u>T&I Funds</u>"). Authorizing and directing the Debtors' banks to process, honor and pay all prepetition checks and transfers from Custodial Accounts related to P&I Funds and T&I Funds will not prejudice creditors or other parties in interest. Accordingly, the Debtors' banks should be authorized and directed to process, reverse and debit deposits which are returned by payor banks in the ordinary course of business, honor any and all prepetition checks or other transfers related to the P&I Funds and T&I Funds including, without limitation, checks or other transfers drawn from P&I and T&I Custodial Accounts or otherwise made in the ordinary course of the Debtors' loan servicing business operations.

## RELIEF REQUESTED

34. By this Motion, the Debtors request entry of an Order, pursuant to sections 105(a), 345, and 503(b)(1) of the Bankruptcy Code, (i) authorizing the continued use of existing Bank Accounts and business forms; (ii) authorizing the continued use of their existing cash management system; (iii) extending their time to comply with the requirements of section 345 of the Bankruptcy Code; and (iv) granting administrative expense priority status to postpetition intercompany claims held by a Debtor against one or more of the other Debtors.

## BASIS FOR RELIEF REQUESTED

### A. Existing Bank Accounts Should be Continued

35. The Operating Guidelines and Reporting Requirements promulgated by the Office of the United States Trustee require that a chapter 11 debtor close its pre-petition bank accounts and open new accounts. This requirement is designed to (a) provide a clear line of demarcation between pre-petition and post-petition transactions and operations and (b) block the inadvertent payment of pre-petition claims through the payment of checks drawn prior to the commencement of a debtor's case.

36. The Debtors can achieve the goals of the Operating Guidelines without closing their existing accounts and opening new ones. The Debtors will identify all pre-petition checks and other forms of payment outstanding on the Petition Date and notify the appropriate bank not to pay such checks or obligations. The systems employed by the Debtors and their banks should ensure that pre-petition obligations are not paid.

37. Requiring the Debtors to close all existing accounts and open new debtor in possession accounts would not be in the best interests of the estates. The exercise would (1) be costly, (2) disrupt the Debtors' ability to satisfy post-petition payables in a timely manner, potentially causing a loss of credit and creditor confidence, (3) interfere with the efficient

management of the Debtors' cash resources, and (4) distract Debtors' managers at a time when the business and the planned sales of the Debtors' assets require their full attention.

38. In other cases of similar size and complexity, courts have recognized that the strict enforcement of the bank account closing requirement does not serve the rehabilitative purposes of chapter 11. Accordingly, courts in this district have regularly entered orders authorizing debtors to maintain their pre-petition bank accounts. See, e.g., In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. Apr. 3, 2007) (permitting debtors to maintain existing bank accounts and cash management system); In re Werner Holding Co. (DE), Inc., Case No. 06-10578 (KJC) (Bankr. D. Del. June 13, 2006) (same); In re Pliant Corp., Case No. 06-10001 (MFW) (Bankr. D. Del. Jan. 4, 2006) (same); In re FLYi, Inc., Case No. 05-20011 (MFW) (Bankr. D. Del. Nov. 7, 2005) (same).

39. A similar waiver of the bank account closing requirement in the Debtors' cases is necessary. Specifically, the Debtors request that the existing Bank Accounts be deemed debtor in possession accounts and that their maintenance and continued use, in the same manner and with the same account numbers, styles and document forms (including checks) as during the pre-petition period, be authorized, subject only to (a) designation of such accounts in the books and records of the Debtors and by the affected financial institution as debtor in possession accounts (other than P&I Funds and T&I Funds) and (b) a prohibition against honoring pre-petition checks without specific authorization from this Court. The Debtors will advise all banks with whom they have disbursement accounts not to honor checks issued prior to the commencement of these cases, except as authorized by this Court. By so advising the banks, the Debtors will achieve the goals of the bank account closing requirement — (a) establishing a clear demarcation between pre-petition and post-petition checks and (b) blocking the inadvertent payment of pre-petition checks — without disrupting the Debtors' ongoing operations.

### B.     Existing Business Forms Should be Continued

40.     In the ordinary course of their businesses, the Debtors use a variety of checks and other business forms (collectively, the "Business Forms"). By virtue of the nature and scope of the businesses in which the Debtors are engaged, and the numerous other parties with whom the Debtors deal, it is imperative that the Debtors be permitted to continue to use the Business Forms without alteration or change. To avoid breaching the requirement of the United States Trustee that the Debtors' post-petition checks and business forms contain the legend "Debtor in Possession" or a so-called "debtor in possession number," the Debtors request that this Court order that the Debtors' checks and business forms do not require such legends.

41.     Parties doing business with the Debtors undoubtedly will be aware, as a result of the size of these cases, of the Debtors' status as chapter 11 debtors in possession. Changing correspondence and business forms would be unnecessary and burdensome to the estates, as well as expensive and disruptive to the Debtors' business operations. Courts have allowed debtors to use their pre-petition checks and other forms without the "debtors in possession" label. See, e.g., In re Young, 205 B.R. 894, 897 (Bankr. W.D. Tenn. 1997) (finding that the United States Trustee had no authority to require the "debtor in possession" imprint on debtor's checks); In re Gold-Standard Banking, Inc., 179 B.R. 98, 105-06 (Bankr. N.D. Ill. 1995) (holding United States Trustee's requirements prohibiting issuance of checks without "debtor in possession" designation to be unenforceable); see also In re Harnischfeger Indus., Inc., et al., Case No. 99-02171 (Bankr. D. Del. June 8, 1999) (waiving U.S. Trustee's requirement for debtors to issue only checks containing "debtor in possession" label). Similar relief has also been granted by this Court in In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. Apr. 3, 2007).

### C. The Cash Management System Should be Continued

42.     As described above, in the ordinary course of business, the Debtors used a centralized cash management system similar to those utilized by other mortgage lenders and major corporate enterprises. The cash management system is designed to efficiently collect, transfer and disburse funds generated through the Debtors' operations and to accurately record such collections, transfers and disbursements as they are made.

43.     The Debtors' cash management system, or a variation thereof, has been employed for a number of years and constitutes an ordinary course, essential business practice. The Debtors' centralized cash management system is beneficial and critical to the Debtors, their estates and creditors because it enables the Debtors to reduce the administrative expenses involved in moving funds, to maintain accurate information regarding receipts, account balances and disbursements with respect to their servicing operations, to maintain an efficient process for the investment of cash, and to ensure compliance with the Debtors' accounting and disbursement control procedures as well as their obligations under the Securitization Documents.

44.     As noted above, the cash management system is similar to those employed by comparable corporate enterprises in the industry. Moreover, the relief requested herein to maintain the Debtors' cash management system has been routinely granted in complex chapter 11 cases in this district. See, e.g., In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. Apr. 3, 2007); In re ResMae Mortgage Corp., Case No. 07-10177 (Bankr. D. Del. Feb. 13, 2007); In re Werner Holding Co. (DE), Inc., Case No. 06-10578 (KJC) (Bankr. D. Del. June 13, 2006); In re Pliant Corporation, Case No. 06-10001 (MFW) (Bankr. D. Del. Jan. 4, 2006) (same); In re FLYi, Inc., Case No. 05-20011 (MFW) (Bankr. D. Del. Nov. 7, 2005).

45.     The Debtors request that the Court authorize the Debtors to continue to utilize their existing cash management system and authorize the payment of any costs or expenses associated with the maintenance of the cash management system. The Debtors further request the authority to implement ordinary course changes to their cash management system. The Debtors may conclude that changes in the cash management system are beneficial to their business and therefore seek authority to make such changes without further order of the Court. In addition, the Debtors request authority to open and close bank accounts as may be appropriate to avoid unnecessary fees and costs or to better facilitate the operation of their business.

**D.     Extension of Time to Comply with Section 345 of the Bankruptcy Code**

46.     Section 345(a) of the Bankruptcy Code authorizes deposits or investments of estate funds, such as the Debtors' cash, only in a manner that will yield the maximum reasonable net return on such funds, taking into account the safety of each deposit or investment. If deposits or investments are not insured or guaranteed by the United States or backed by the full faith and credit of the United States, section 345(b) provides that, unless the court for cause orders otherwise, the estate must require the entity with which the money is deposited or invested to obtain a bond in favor of the United States that is secured by the undertaking of an adequate corporate surety.

47.     It is within the Court's discretion to extend or waive the investment guidelines requirement of section 345(b) of the Bankruptcy Code "for cause." 11 U.S.C. § 345(b). The Debtors request a sixty (60) day extension within which to comply with section 345 of the Bankruptcy Code. Such an extension is warranted by the size and complexity of these chapter 11 cases.

E. **Administrative Expense Status to Postpetition Intercompany Claims**

48. The Debtors respectfully request that, pursuant to section 503(b)(1) of the Bankruptcy Code, all intercompany claims against a Debtor by another Debtor arising after the Petition Date as a result of intercompany transactions through the cash management system (collectively, "Intercompany Claims") be accorded administrative expense priority status. Transfers among the Debtors represent extensions of intercompany credit. According administrative expense status to Intercompany Claims will ensure that each individual Debtor utilizing funds flowing through the cash management system will continue to bear ultimate repayment responsibility for such borrowings. See In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. Apr. 3, 2007); In re FLYi, Inc., Case No. 05-20011 (MFW) (Bankr. D. Del. Nov. 7, 2005); In re Globalstar Capital Corp., et al., Case No. 02-10499 (Bankr. D. Del. Feb. 21, 2002) (Walsh, J.); In re Kaiser Aluminum Corp., et al., Case No. 02-10429 (Bankr. D. Del. Feb. 13, 2002) (Katz, J.) (authorizing the debtor to continue intercompany transactions so long as strict records are maintained).

## NOTICE

49. Notice of this Motion has been given by facsimile or overnight delivery to the following parties, or in lieu thereof, to their counsel: (i) the United States Trustee for the District of Delaware; (ii) the parties included on the Debtors' list of forty (40) creditors holding the largest unsecured claims; (iii) counsel to Bank of America, N.A; and (iv) the proposed debtor in possession lender and its counsel. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PRIOR APPLICATION

50. No previous application for the relief sought herein has been made to this or to any other court.

WHEREFORE, the Debtors request entry of an order, in the form attached hereto as <u>Exhibit B</u>, and such other and further relief as is just.

Dated: Wilmington, Delaware
       August 6, 2007

                                    YOUNG CONAWAY STARGATT & TAYLOR, LLP

                                    _____
                                    James L. Patton, Jr. (No. 2202)
                                    Joel A. Waite (No. 2925)
                                    Pauline K. Morgan (No. 3650)
                                    Sean M. Beach (No. 4070)
                                    Matthew B. Lunn (No. 4119)
                                    Kara Hammond Coyle (No. 4410)
                                    Kenneth J. Enos (No. 4544)
                                    The Brandywine Building
                                    1000 West Street, 17th Floor
                                    Wilmington, Delaware 19801
                                    Telephone: (302) 571-6600
                                    Facsimile: (302) 571-1253

                                    Proposed Counsel for Debtors and
                                    Debtors in Possession