## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------ x

In re:                                                           :   Chapter 11
                                                                 :
AMERICAN HOME MORTGAGE                                            :   Case No.  07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,[1]               :
                                                                 :   Joint Administration Pending
                                        Debtors.                 :

------------------------------------------------------------------ x

## EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS
## (I) AUTHORIZING CERTAIN DEBTORS TO OBTAIN POSTPETITION
## FINANCING AND GRANT SECURITY INTERESTS AND SUPERPRIORITY
## ADMINISTRATIVE EXPENSE PURSUANT TO 11 U.S.C. §§ 105, 362, 363,
## AND 364(c); (II) SCHEDULING FINAL HEARING PURSUANT TO
## BANKRUPTCY RULE 4001(c); AND (III) GRANTING RELATED RELIEF

American Home Mortgage Investment Corp. American Home Mortgage

Holdings, Inc., American Home Mortgage Corp., American Home Mortgage Acceptance, Inc.,

American Home Mortgage Ventures LLC, Homegate Settlement Services, Inc., and Great Oak

Abstract Corp., each a debtor and debtor in possession (collectively, the "Borrowers"),[2] hereby

submit this emergency motion (the "Motion") for entry of interim and final orders, pursuant to

chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy

Code") (I) authorizing the Borrowers to obtain postpetition financing pursuant to Bankruptcy

---

[1]    The Debtors (as defined below) in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. (6303) ("AHM Holding"); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580) (collectively, "AHM" or the "Debtors").  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

[2]    AHM Servicing is not one of the Borrowers.  As set forth more fully herein, the Debtors filed a separate motion seeking authority to use the cash collateral derived from operating the loan servicing business, which is operated through AHM Servicing.  This cash collateral is only proposed to be used to pay for expenses that are related to operating the loan servicing business.

Code sections 105, 362, 363, 364(c)(1), 364(c)(2), and 364(c)(3); (II) scheduling a final hearing on the Motion pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (III) granting related relief.  In support of this Motion, the Borrowers rely on the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief (the "Strauss Declaration").  In further support of this Motion, the Borrowers respectfully represent as follows:

## JURISDICTION

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105, 362, 363, 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014.

## BACKGROUND

2.    On the date hereof (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.    Simultaneous with the filing of this pleading, the Debtors have filed a motion with this Court pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure seeking joint administration of the Debtors' estates.

4.    No creditors' committee has yet been appointed in these cases.  No trustee or examiner has been appointed.

## THE DEBTORS' BUSINESS

5.    Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

6.    As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

7.    A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately

$46.3 billion.  AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

## EVENTS LEADING TO THE CHAPTER 11 FILING

8.      Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages.  These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

9.      The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities.  The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

10.     In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans.  During this time, certain of the Debtors' warehouse lenders -- the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

11.     On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

066585.1001

12.     The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors now employ approximately 1000 persons who are absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

13.     In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

14.     Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## PREPETITION INDEBTEDNESS

15.     As more fully set forth in the Strauss Declaration, prior to the discontinuing their wholesale and retail loan origination business shortly before the Petition Date, the Debtors used credit facilities in the form of master repurchase agreements (the "Master Repurchase Agreements") with Bank of America, NA., Barclays Bank PLC, Credit Suisse First Boston Mortgage Capital LLC, IXIS Real Estate Capital, Inc., Bear Stearns, and UBS Real

Estate Securities (each a "Warehouse Lender"). The Debtors used each Warehouse Lender's credit facility, together with their own capital, to fund the production of a mortgage loan.

16.    In addition to Master Repurchase Agreements with the Warehouse Lenders, the Debtors were parties to a credit facility with Bank of America, N.A. (the "Prepetition Agent"), as administrative agent, swing line lender and a lender and other lenders (collectively, the "Prepetition Lenders"). Pursuant to a credit agreement dated August 10, 2006 (as amended and restated and together with all agreements, documents, notes and instruments delivered pursuant thereto or in connection therewith, the "BofA Loan Agreement") by and between certain of the Debtors[3] and the Prepetition Lenders, the Prepetition Lenders made various loans, advances and extensions of credit to or for the benefit of the Debtors. The BofA Loan Agreement includes a warehouse credit facility (the "Warehouse Facility"), a swing line credit facility (the "Swing Line Facility"), a working capital credit facility (the "Working Capital Facility"), and a servicing rights credit facility (the "Servicing Facility").

17.    The Prepetition Lenders have asserted that the obligations under the Loan Agreement (the "BofA Loan Agreement Obligations")[4] are secured by security interests and liens in certain of the Debtors' assets, as set forth in the security and collateral agency agreement, dated August 30, 2004 by and between the Borrowers and the Lenders (the "Prepetition Security Agreement"), which include all Mortgage Loans; all Warehouse-Related Mortgage Backed Securities; all rights of any of the Borrowers under all Take-Out Commitments, Hedging Arrangements and all rights to deliver Mortgage Loans and/or Warehouse-Related Mortgage

---

[3]    The borrowers under the BofA Loan Agreement are American Home Mortgage Investment Corp., American Home Mortgage Acceptance, Inc., American Home Mortgage Servicing, Inc. and American Home Mortgage Corp. Additionally, American Home Mortgage Holdings Inc. is a guarantor under the Loan Agreement.

[4]    All capitalized terms not defined in this paragraph shall have the meaning ascribed to them in the Prepetition Security Agreement (as defined in this paragraph).

DB02:6162914.5                                                                                            066585.1001

Backed Securities; all accounts maintained with broker-dealers by any Borrower for the purpose of carrying out transactions under Take-Out Commitments and hedge contracts and other futures and futures options transactions involving Mortgage Loans and/or Warehouse-Related Mortgage Backed Securities; all rights to service, administer and/or collect Mortgage Loans; all Servicing Rights; all Servicing Receivables; all accounts, escrow accounts, contract rights and general intangibles constituting or relating to any of the foregoing; all files, documents, instruments, surveys, certificates, correspondence, appraisals, computer programs, tapes, discs, cards, accounting records and other books, records, information and data of the Borrowers relating to the foregoing; the Funding Account, the Settlement Account, the Mortgage Backed Securities Safekeeping Account, and any and all Custodian Settlement Accounts and any and all funds at any time held in any such accounts (collectively, the "Prepetition Collateral"), and all proceeds and products derived from the Prepetition Collateral.

18.     As of the Petition Date, the approximate outstanding balances of the facilities were: Warehouse Facility - $608,300,000; Swing Line Facility – no outstanding balance; Working Capital Facility - $50,000,000; and Servicing Facility - $446,250,000.

19.     The Debtors, through a motion filed contemporaneously herewith (the "Cash Collateral Motion"), are seeking authority to use the cash derived from operating the loan servicing business, which is claimed as collateral by the Prepetition Lenders (the "Cash Collateral"). The Cash Collateral is only proposed to be used to pay for expenses that are set forth in the Cash Collateral Budget (as defined in the Cash Collateral Motion), which are related to operating the Servicing Business through a sale of those assets and not for other expenses related to the wind-down of the Debtors' operation.

DB02:6162914.5                                                                                          066585.1001

## **RELIEF REQUESTED**

20.    By this Motion, the Borrowers request entry of interim and final orders

authorizing the Borrowers to:

(a)    obtain postpetition financing pursuant to the terms set forth in the credit facility (the "DIP Credit Facility"),[5] substantially in the form annexed hereto as Exhibit A, in the principal amount of $50,000,000 million from WLR Recovery Fund III, L.P. and other financial institutions acceptable to the Administrative Agent (the "Postpetition Lender").

(b)    All Loans and all other amounts owing by the Borrower under the DIP Credit Facility will, at all times:

(i)    have the status of allowed superpriority administrative expense claims, in accordance with section 364(c)(1) of the Bankruptcy Code, and shall have priority over all administrative expense claims and unsecured claims against the Borrowers, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, any adequate protection-related claims and any administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, to the extent permitted by applicable law, subject only to the Carve Out. Notwithstanding the foregoing, the Secured Parties shall not seek to enforce, directly or indirectly, an administrative priority claim in respect of any asset which constitutes the BofA Collateral;

(ii)    have, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, and enforceable perfected first priority security interest in and lien on all the property and assets of each of the Borrowers and their estates of every kind or type whatsoever, tangible, intangible, real, personal and mixed, whether now owned or existing or hereafter acquired or arising and regardless of where located, whether within the United States or in other locations (including, without limitation, all property of the estates of each of the Borrowers within the meaning of section 541 of

---

[5]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Credit Facility or the Interim Order (as defined herein).

066585.1001

the Bankruptcy Code) that is not otherwise encumbered by valid, perfected, enforceable, and nonavoidable liens and security interests existing on or in the Collateral on the Commencement Date (collectively, the "Pre-Existing Liens"), subject only to the Carve-Out; and

(iii)     have, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, and enforceable perfected second priority security interest in and lien on all the property and assets of each of the Borrowers and their estates of every kind or type whatsoever, tangible, intangible, real, personal and mixed, whether now owned or existing or hereafter acquired or arising and regardless of where located, whether within the United States or in other locations (including, without limitation, all property of the estates of each of the Borrowers within the meaning of section 541 of the Bankruptcy Code) that is encumbered by the Pre-Existing Liens, *provided*, should any such Pre-Existing Lien be voided, extinguished or determined not be valid, the Liens granted to the Administrative Agent hereunder shall, notwithstanding anything to the contrary in Section 551 of the Bankruptcy Code, be deemed perfected first priority liens without any further action by the Secured Parties or the Court, subject only to the Carve-Out.

Notwithstanding anything to the contrary in (b)(i)-(iii), nothing therein shall be deemed to grant the Postpetition Lender a security interest in or lien on the BofA Collateral or any Avoidance Actions.

(c)     entry of an interim order (the "Interim Order"), annexed to this Motion as Exhibit B, authorizing the Debtors, on an interim basis, to forthwith borrow not less than $12,000,000 from the Postpetition Lender under the DIP Credit Facility; and

(d)     schedule, pursuant to Bankruptcy Rule 4001, within 30 days of the entry of the Interim Order, a final hearing (the "Final Hearing") for this Court to consider entry of a final order (the "Final Order") authorizing the balance of the DIP Credit Facility on a final basis, as set forth in this Motion and the DIP Credit Facility attached to this Motion.

### BASIS FOR RELIEF REQUESTED

21.     The Borrowers do not have sufficient available sources of working capital and financing to operate their businesses without the DIP Credit Facility. The Borrowers have

an immediate need to obtain financing, in addition to the use Cash Collateral as requested

through the Cash Collateral Motion, to facilitate, among other things, the Borrowers' efforts to

effectuate an orderly liquidation and wind-down of their business and sale of their assets.  In the

absence of immediate authorization of the DIP Credit Facility, the Borrowers would not have

sufficient working capital to continue to operate their businesses through the various anticipated

sale of assets designed to maximize the value of the Borrowers' estates.  Put differently, serious

and irreparable harm to the Borrowers and their estates would occur without approval of the DIP

Credit Facility.

    22.    The ability of the Borrowers to obtain sufficient working capital and

liquidity through the incurrence of new indebtedness for borrowed money and other financial

accommodations is vital to the Borrowers.  The preservation and maintenance of the going

concern value of the Borrowers is integral to the Borrowers' efforts to maximize the value of

their estates through the orderly liquidation of their assets.

    23.    For these reasons, the Borrowers have an immediate need for adequate

postpetition financing.  The Borrowers were unable to obtain adequate unsecured credit

allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.

Therefore, the Borrowers sought proposals for debtor-in-possession financing, and determined in

their sound business judgment, that the proposal for debtor-in-possession financing provided by

the Postpetition Lender was the most favorable under the circumstances, and addressed the

Borrowers' reasonably foreseeable capital needs.

    24.    The DIP Credit Facility has been negotiated in good faith and at arm's

length between the Borrowers and the Postpetition Lender.  The Borrowers believe that the terms

of the DIP Credit Facility are fair and reasonable, reflect the Borrowers' exercise of prudent

DB02:6162914.5                                                                                      066585.1001

business judgment consistent with their fiduciary duties, and are supported by reasonably

equivalent value and fair consideration.

A.    Terms of the DIP Credit Facility

25.    The terms of the DIP Credit Facility are more specifically set forth in the

DIP Credit Facility attached hereto as Exhibit A.[6] The key provisions of the DIP Credit Facility

are as follows:[7]

    (a)    Borrower:  American Home Mortgage Investment Corp., American Home Mortgage Holdings, Inc., American Home Mortgage Corp., American Home Mortgage Acceptance, Inc., American Home Mortgage Ventures LLC, Homegate Settlement Services, Inc., and Great Oak Abstract Corp.

    (b)    Facility Amount:  $50,000,000.

    (c)    Type of Facility:  Senior secured superpriority debtor-in-possession credit facility, comprised of a $50,000,000 revolving credit facility.

    (d)    Purpose:  To finance working capital and other general corporate purposes while under Chapter 11 protection, including the payment of expenses associated with the Bankruptcy Cases; provided, however, that (i) an amount equal to 12 months of interest (assuming all of the Loans are borrowed on the Closing Date and the interest rate applicable to the Loans is at a rate per annum equal to the LIBOR rate on the Closing Date plus the Applicable Margin) of the proceeds of the Loans shall be deposited in an account subject to the exclusive control of the Administrative Agent and shall be used to pay interest on the Loans (the "Interest Escrow"), (ii) $10,000,000 of the available Loans under the DIP Credit Facility may not be borrowed without the prior consent of the Administrative Agent, and (iii) $1,000,000 of the Loans shall be held as a fee and expense deposit against which fees and expenses (including legal fees and expenses) shall be paid. The

---

[6]    The form of DIP Credit Facility attached hereto as Exhibit A is in substantially final form, but is still being reviewed and edited by the Debtors and the Postpetition Lender. Any material modifications will be identified for the Court at or prior to the hearing on the Motion.

[7]    To the extent that the terms set forth herein differ from the terms in the attached proposed Interim Order and the DIP Credit Facility, the Interim Order and the DIP Credit Facility shall govern.

DB02:6162914.5                                                                066585.1001

amount held in the Interest Escrow will be reduced and released on a pro rata basis for any repayment of the Loans that is accompanied by a corresponding reduction in the amount of the commitment.

(e)     Administrative Agent:  WLR Recovery Fund III, L.P.

(f)     Lenders:  WLR Recovery Fund III, L.P. and other financial institutions acceptable to the Administrative Agent.

(g)     Maturity Date:  The earlier of (i) 12 months after the Closing Date and (ii) the effective date of a plan of reorganization or liquidation in the Bankruptcy Cases.

(h)     Interest Rates and Interest Periods:  Advances under the DIP Credit Facility ("Loans") will bear interest at the Eurodollar Rate plus the Applicable Margin and will be available at the rates and for the Interest Periods stated below.  The Eurodollar Rate shall be a periodic fixed rate equal to LIBOR plus the Applicable Margin, which is 3%.  The Eurodollar Rate will be fixed for Interest Periods of 1 month.

(i)     Default Rate:  Upon the occurrence and during the continuance of any Event of Default, the Applicable Margin will increase by 2.00% per annum.

(j)     Facility Fee:  From and after the Closing Date, a non-refundable facility fee at the rate of 0.50% per annum will accrue on a portion of the DIP Credit Facility equal to $35,000,000 (whether or not then available), based upon actual days in a 360-day year, and will be payable monthly in arrears and on the Maturity Date.

(k)     Loans:  Loans will be in minimum principal amounts of $1,000,000 and integral multiples of $100,000 in excess thereof. Loans will be available on same day notice.

(l)     Availability:  Subject to the terms and conditions of the Interim Order and the Final Order, Loans will be available from the Closing Date to the Maturity Date and the Borrowers may borrow, repay and reborrow Loans during such period.  The aggregate principal amount of all Loans will not exceed at any time the Facility Amount.

(m)    Interim Availability:  Until the Final Order has been entered, availability will be limited to an amount equal to the maximum amount of Loans approved by the Bankruptcy Court pursuant to the Interim Order, provided that the Interim Order must provide for

not less than $10,000,000 of Loans to be available on the date of entry of the Interim Order.

(n)    Priority and Security:  As is customary for financings of this nature, all Loans and all other amounts owing by the Borrower under the DIP Credit Facility, at all times:  (i) shall have the status of allowed superpriority administrative expense claims, in accordance with section 364(c)(1) of the Bankruptcy Code, and shall have priority over all administrative expense claims and unsecured claims against the Borrowers, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, any adequate protection-related claims and any administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, to the extent permitted by applicable law, subject only to the Carve Out.  Notwithstanding the foregoing, the Secured Parties shall not seek to enforce, directly or indirectly, an administrative priority claim in respect of any asset which constitutes the BofA Collateral; (ii) shall have, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, and enforceable perfected first priority security interest in and lien on all the property and assets of each of the Borrowers and their estates of every kind or type whatsoever, tangible, intangible, real, personal and mixed, whether now owned or existing or hereafter acquired or arising and regardless of where located, whether within the United States or in other locations (including, without limitation, all property of the estates of each of the Borrowers within the meaning of section 541 of the Bankruptcy Code) that is not otherwise encumbered by valid, perfected, enforceable, and nonavoidable liens and security interests existing on or in the Collateral on the Commencement Date (collectively, the "Pre-Existing Liens"), subject only to the Carve-Out; and (iii) shall have, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, and enforceable perfected second priority security interest in and lien on all the property and assets of each of the Borrowers and their estates of every kind or type whatsoever, tangible, intangible, real, personal and mixed, whether now owned or existing or hereafter acquired or arising and regardless of where located, whether within the United States or in other locations (including, without limitation, all property of the estates of each of the Borrowers within the meaning of section 541 of the Bankruptcy Code) that is encumbered by the Pre-Existing Liens, *provided*, should any such Pre-Existing Lien be voided, extinguished or determined not be valid, the Liens granted to the Administrative Agent hereunder shall, notwithstanding anything to the contrary in Section 551 of the Bankruptcy Code, be deemed perfected first priority liens without any further action by the

- 13 -

Secured Parties or the Court, subject only to the Carve-Out. Notwithstanding anything to the contrary in (i)-(iii) above, nothing therein shall be deemed to grant the Postpetition Lender a security interest in or lien on the BofA Collateral or any Avoidance Actions.

(o)     Carve-Out:  Following the occurrence of an Event of Default, an amount sufficient for payment of (i) allowed professional fees and disbursements incurred by professionals retained by the Borrowers and a statutory committee of unsecured creditors in an aggregate amount not to exceed $5,000,000 and (ii) fees pursuant to 28 U.S.C. § 1930 and any fees payable to the clerk of the Bankruptcy Court, provided that, so long as an Event of Default has not occurred, the Borrowers shall be permitted to pay fees and expenses allowed and payable under 11 U.S.C. § 330 and § 331, as the same may become due and payable, and the same shall not reduce the Carve-Out.

(p)     Use of Cash Collateral:  The DIP Credit Facility shall not be available for use by the Borrowers unless the Bankruptcy Court shall have authorized the use by the Borrowers of cash collateral on terms acceptable to the Administrative Agent.

(q)     Conditions Precedent to All Loans:  Customary for facilities of this nature, as set forth in the DIP Credit Agreement attached hereto.

(r)     Covenants:  The DIP Credit Facility contains affirmative, negative and financial reporting covenants customary for facilities of this nature and otherwise satisfactory to the Administrative Agent.

(s)     Events of Default:  The DIP Credit Facility and the Financing Orders contain certain customary events of default. By way of example, and as more fully set forth in section 8 of the DIP Credit Facility, the following constitute "Events of Default":  (a) failure to pay principal or interest; (b) a default under other Loan Documents that remains unremedied for five (5) days; (c) false or misleading representations, warrantees, or certifications; (d) termination of other Loan Documents; (e) the occurrence of a Material Adverse Change or Material Adverse Effect; (f) there is a Change in Control; (g) the Final Order shall not be entered by September 7, 2007; (h) the Borrowers file a motion seeking appointment of a chapter 11 trustee (or an examiner with enlarged powers) or an order appointing a chapter 11 trustee (or an examiner with enlarged powers) is entered by the Court; (i) any of the Bankruptcy Cases is converted to chapter 7; and (j) any of the Bankruptcy Cases is dismissed and the order dismissing such

066585.1001

case(s) does not provide for termination of the Postpetition Commitments.

(t)    Commitment Fee:  1% of the Facility Amount.

(u)    Administrative Agent Fee:  $50,000 per annum.

B.    Provisions that Potentially Implicate Local Rule 4001-2

26.    Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") requires that certain provisions contained in the DIP Credit Facility documents be highlighted, and that the Debtors must provide justification for the inclusion of such highlighted provision(s).

27.    The Borrowers do not believe that the proposed Interim Order contains any provisions requiring special disclosure under Local Rule 4001-2(a)(i).  However, in paragraph 18 of the Interim Order, the Postpetition Lender has requested a waiver of any rights under section 506(c) of the Bankruptcy Code be granted as part of the Final Order.  Other than this provision, there are no additional provisions of the Final Order that would require disclosure pursuant to Local Rule 4001-2(a)(i).

C.    The DIP Credit Facility Should Be Approved

28.    Bankruptcy Code section 364(c) provides:

(c)    If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —

(1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)    secured by a junior lien on property of the estate that is subject to a lien.

- 15 -

066585.1001

29.    The Borrowers were unable to procure adequate postpetition financing in the form of unsecured credit or unsecured debt with an administrative priority because substantially all of the Borrowers' assets are encumbered.  The circumstances of these cases require the Borrowers to obtain financing under Bankruptcy Code section 364(c).  Therefore, the Borrowers believe that this Court should authorize the Borrowers to obtain the postpetition financing to the extent and pursuant to the terms contained herein, in the DIP Credit Facility, the proposed Interim Order attached hereto as <u>Exhibit B</u>, and the proposed Final Order.[8]

30.    The proposed DIP Credit Facility is required to preserve and maximize the value of the Borrowers' estates.  The availability of credit under the DIP Credit Facility is necessary to allow the Borrowers to effectuate an orderly liquidation and wind-down of their business and sale of their assets.  Moreover, the available credit will give the Borrowers' vendors and suppliers the necessary confidence to continue relationships with the Borrowers during the sales of assets and also will be viewed favorably by the Borrowers' remaining employees and customers, and thereby enhance the Borrowers' efforts to maximize the value of their assets for the benefit of creditors.

31.    The Borrowers contacted several potential lenders.  Certain of those lenders executed confidentiality agreements and of those, only the Postpetition Lender and one other submitted a proposal to provide postpetition financing to the Borrowers.  The Borrowers ultimately determined that postpetition financing being provided by the Postpetition Lenders presented the best financing available under the circumstances.  After determining that postpetition financing was available only under Bankruptcy Code section 364(c), the Borrowers

---

[8] The proposed form of Final Order will be filed separately.

DB02:6162914.5                                                                                      066585.1001

negotiated the DIP Credit Facility at arm's length and pursuant to its business judgment, which is to be accorded deference so long as it does not run afoul of the provisions of and policies underlying the Bankruptcy Code.  See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (approving debtor-in-possession financing necessary to sustain seasonal business); In re Ames Dept. Stores, Inc., 115 B.R. 34, 40 (S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest").

32.    The terms and conditions of the DIP Credit Facility are fair and reasonable and were negotiated by the parties in good faith and at arm's length.  Accordingly, the Postpetition Lender should be accorded the benefits of Bankruptcy Code section 364(e) with respect to the postpetition financing.

33.    The Borrowers further request that the automatic stay provisions of section 362 of the Bankruptcy Code be vacated and modified to the extent necessary so as to permit the Postpetition Lender to exercise, upon the occurrence of an Event of Default (as defined in the DIP Credit Facility and the proposed Interim Order) and the giving of five (5) business days' written notice to the Borrowers, all rights and remedies provided for in the DIP Credit Facility and the proposed Interim Order as entered by the Court.

D.    The Interim Approval Should Be Granted

34.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, the Court is

empowered to conduct a preliminary expedited hearing on the motion and authorize obtaining of

credit to the extent necessary to avoid immediate and irreparable harm to the Borrowers' estates.

35.    The Borrowers request that the Court hold and conduct an interim hearing

immediately to consider entry of the proposed Interim Order authorizing the Borrowers from and

after the entry of the Interim Order until the Final Hearing to borrow under the DIP Credit

Facility in an amount not less than $12,000,000 of Loans.  This relief will enable the Borrowers

to operate their businesses in a manner that will enable them to preserve and maximize value and

therefore avoid immediate and irreparable harm and prejudice to its estate and all parties in

interest, pending the Final Hearing.

## NOTICE

36.    Notice of this Motion has been given by facsimile or overnight delivery to

the following parties, or in lieu thereof, to their counsel:  (i) the United States Trustee for the

District of Delaware; (ii) the parties included on the Debtors' list of forty (40) creditors holding

the largest unsecured claims; (iii) counsel to Bank of America, N.A; and (iv) the proposed debtor

in possession lender and its counsel.  The Borrowers submit that, under the circumstances, no

further notice of the hearing on the interim financing is necessary and request that any further

notice be dispensed with and waived.

37.    The Borrowers further respectfully request that the Court schedule the

Final Hearing and authorize it to serve a copy of the signed Interim Order, which fixes the time

and date for the filing of objections, by first-class mail upon (i) the United States Trustee for the

District of Delaware; (ii) the parties included on the Debtors' list of forty (40) creditors holding

the largest unsecured claims; (iii) counsel to Bank of America, N.A; (iv) the Postpetition Lender

and its counsel; (v) any party who filed a request for notices in these chapter 11 cases pursuant to

Bankruptcy Rule 2002 prior to the date set forth in the Interim Order for service of notice of the

Final Hearing, and (vi) any known lienholders of the Borrowers.  The Borrowers request that the

Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule

4001 and Local Rule 2002-1.[9]

38.    No previous request for the relief sought herein has been made to this

Court or any other court.

WHEREFORE, the Borrowers respectfully requests that the Court enter an order

(i) granting the relief requested herein and (ii) granting such other relief as is just and proper.

Dated: Wilmington, Delaware
       August  6 , 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Pauline K. Morgan (No. 3650)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Proposed Counsel for Debtors and
Debtors in Possession

---

[9]    Local Rule 2002-1(b) provides that "[i]n cases under chapter 11, all motions . . . shall be served only upon counsel for the debtor, the United States Trustee, counsel for all official committees, all parties who file a request for service of notices pursuant to Fed. R. Bankr. P. 2002(i), and on any party whose rights are affected by the motion.  If an official unsecured creditors' committee has not been appointed, service shall be made on the 20 largest unsecured creditors in the case in lieu of the committee."

DB02:6162914.5                                                                              066585.1001