# DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

## Dated as of August 6, 2007

### by and among

### AMERICAN HOME MORTGAGE INVESTMENT CORP.
#### as debtor and debtor-in-possession,

### CERTAIN OF ITS AFFILIATES,
#### as debtors and debtors-in-possession,

### THE LENDERS PARTY HERETO,

#### and

### WLR RECOVERY FUND III, L.P.
#### as Administrative Agent

NYI-4012525v8
DIP Credit Agreement -- AHM
JP011771
000000 - 000000

## TABLE OF CONTENTS

| | | |
|---|---|---|
| Section 1. | Definitions and Accounting Matters | 1 |
| 1.01 | Certain Defined Terms | 1 |
| 1.02 | Accounting Terms and Determinations | 20 |
| 1.03 | Uniform Commercial Code | 20 |
| 1.04 | Construction | 20 |
| Section 2. | Loans, Evidence of Debt and Prepayments | 21 |
| 2.01 | Loans | 21 |
| 2.02 | Evidence of Debt | 21 |
| 2.03 | Procedure for Borrowing | 22 |
| 2.04 | Limitation on Types of Loans; Illegality | 24 |
| 2.05 | Repayment of Loans; Interest | 24 |
| 2.06 | Mandatory Prepayment | 25 |
| 2.07 | Optional Prepayments | 26 |
| 2.08 | Requirements of Law | 26 |
| 2.09 | Purpose of Loans | 27 |
| Section 3. | Payments; Computations; Taxes; Fees | 27 |
| 3.01 | Payments | 27 |
| 3.02 | Sharing of Payments Etc | 28 |
| 3.03 | Apportionment of Payments | 28 |
| 3.04 | Computations | 29 |
| 3.05 | Joint and Several Liability of Borrowers | 29 |
| 3.06 | U.S. Taxes | 30 |
| 3.07 | Fees | 31 |
| Section 4. | Collateral Security and Administrative Priority | 31 |
| 4.01 | Collateral; Security Interest | 31 |
| 4.02 | Perfection of Security Interests | 32 |
| 4.03 | Rights of Lender; Limitations on Lenders' Obligations | 33 |
| 4.04 | Covenants of the Borrowers with Respect to Collateral | 34 |
| 4.05 | Performance by Agent of the Borrowers' Obligations | 38 |
| 4.06 | Limitation on Agent's Duty in Respect of Collateral | 39 |

# TABLE OF CONTENTS
(continued)

| | | | |
|---|---|---|---|
| | 4.07 | Remedies, Rights Upon Default | 39 |
| | 4.08 | Appointment as Attorney-in-Fact | 41 |
| | 4.09 | Secured, Superpriority Obligations | 43 |
| Section 5. | | Conditions Precedent | 44 |
| | 5.01 | Conditions Precedent to Initial Loan | 44 |
| | 5.02 | Conditions Precedent to Initial and Subsequent Loans | 46 |
| Section 6. | | Borrowers Representations and Warranties | 47 |
| | 6.01 | Existence; Compliance with Law | 47 |
| | 6.02 | Financial Condition | 48 |
| | 6.03 | Litigation | 48 |
| | 6.04 | No Breach | 48 |
| | 6.05 | Action | 49 |
| | 6.06 | Approvals | 49 |
| | 6.07 | Margin Regulations | 49 |
| | 6.08 | Taxes | 49 |
| | 6.09 | Intellectual Property | 49 |
| | 6.10 | Environmental Matters | 49 |
| | 6.11 | Investment Company Act | 50 |
| | 6.12 | No Legal Bar | 50 |
| | 6.13 | No Default | 50 |
| | 6.14 | Collateral; Collateral Security; Administrative Priority | 50 |
| | 6.15 | Location of Books and Records | 51 |
| | 6.16 | True and Complete Disclosure | 51 |
| | 6.17 | ERISA | 51 |
| | 6.18 | Use of Proceeds | 52 |
| | 6.19 | Insurance | 52 |
| | 6.20 | No Agent or Lender Licenses | 52 |
| | 6.21 | Subsidiaries | 52 |
| | 6.22 | Origination of Unencumbered Whole Loans | 52 |
| | 6.23 | Orders | 52 |

NYI-4012525v8
DIP Credit Agreement -- AHM
JP011771
000000 - 000000

**TABLE OF CONTENTS**
(continued)

| | | | |
|---|---|---|---|
| 6.24 | REIT Status | | 52 |
| 6.25 | MERS Membership | | 53 |
| 6.26 | Collection Accounts and Escrow Accounts | | 53 |
| 6.27 | Anti-Terrorism Law Compliance | | 53 |
| Section 7. | Covenants of the Borrowers | | 53 |
| 7.01 | Financial Statements and Other Information | | 53 |
| 7.02 | Litigation | | 54 |
| 7.03 | Existence, Etc | | 55 |
| 7.04 | Prohibition of Fundamental Changes | | 55 |
| 7.05 | [Reserved] | | 55 |
| 7.06 | Satisfaction of Conditions Precedent for the Final Order | | 55 |
| 7.07 | Notices | | 55 |
| 7.08 | Servicing | | 56 |
| 7.09 | Lines of Business | | 56 |
| 7.10 | Transactions with Affiliates | | 56 |
| 7.11 | Use of Proceeds | | 56 |
| 7.12 | Limitation on Liens | | 56 |
| 7.13 | Limitation on Sale of Assets | | 57 |
| 7.14 | Limitation on Distributions | | 57 |
| 7.15 | Restricted Payments | | 57 |
| 7.16 | Loans, Loans, Investments, Etc | | 57 |
| 7.17 | Orders, Administrative Priority; Lien Priority; Payment of Claims | | 57 |
| 7.18 | No Amendment or Waiver | | 58 |
| 7.19 | Maintenance of Property; Insurance | | 58 |
| 7.20 | ERISA | | 58 |
| 7.21 | Other Indebtedness | | 58 |
| 7.22 | Prepetition Payments | | 58 |
| 7.23 | MERS | | 59 |
| 7.24 | REIT Status and Seller/Servicer Status | | 60 |
| 7.25 | Retention of CRO | | 60 |

NYI-4012525v8
DIP Credit Agreement – AHM
JP011771
000000 - 000000

# TABLE OF CONTENTS
(continued)

Section 8.    Events of Default ............................................................................................ 60

Section 9.    Remedies Upon Default ................................................................................... 64

Section 10.    Administrative Agent ....................................................................................... 64

    10.01  Appointment ........................................................................................................ 64

    10.02  Nature of Duties .................................................................................................. 65

    10.03  Rights, Exculpation, Etc ..................................................................................... 65

    10.04  Reliance ............................................................................................................... 66

    10.05  Indemnification .................................................................................................... 66

    10.06  Agent Individually .............................................................................................. 67

    10.07  Successor Agent ................................................................................................... 67

    10.08  Collateral Matters ............................................................................................... 67

Section 11.    Miscellaneous ................................................................................................. 69

    11.01  Amendments, Etc ................................................................................................ 69

    11.02  Waiver ................................................................................................................. 69

    11.03  Notices ................................................................................................................ 69

    11.04  Indemnification and Expenses ............................................................................ 70

    11.05  Amendments ........................................................................................................ 72

    11.06  Successors and Assigns ....................................................................................... 72

    11.07  Survival ............................................................................................................... 72

    11.08  Captions .............................................................................................................. 72

    11.09  Counterparts; Telefacsimile Execution ............................................................... 72

    11.10  LOAN AGREEMENT CONSTITUTES SECURITY AGREEMENT;
GOVERNING LAW ............................................................................................ 73

    11.11  CERTAIN, WAIVERS; WAIVER OF JURY TRIAL ....................................... 73

    11.12  Acknowledgments ............................................................................................... 73

    11.13  No Party Deemed Drafter ................................................................................... 73

    11.14  Parent as Agent for Borrowers ............................................................................ 73

    11.15  Assignments; Participations ................................................................................ 74

    11.16  Set-Off ................................................................................................................ 77

    11.17  Entire Agreement ................................................................................................ 77

# TABLE OF CONTENTS
### (continued)

11.18  Records .................................................................................................... 78

11.19  Confidentiality ......................................................................................... 78

11.20  Public Announcements ............................................................................ 78

11.21  USA Patriot Act ....................................................................................... 78

NYI-4012525v8
DIP Credit Agreement -- AHM
JP011771
000000 - 000000

## TABLE OF CONTENTS

**SCHEDULES**

Schedule A          Affiliates

Schedule B          Lenders and Commitment

Schedule C          Budget

Schedule D          First Lien Collateral

Schedule E          Unencumbered Whole Loans

Schedule F      Residuals

Schedule G          Authorized Officer

Schedule 6.01(a)   Jurisdictions of Organization

Schedule 6.01(b)   Consents

Schedule 6.03      Litigation

Schedule 6.21      Subsidiaries of the Borrowers

Schedule 7.16      Permitted Investments

**EXHIBITS**

Exhibit A      Interim Order

Exhibit B      Borrowing Notice

NYI-4012525v8
DIP Credit Agreement -- AHM
JP011771
000000 - 000000

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

THIS DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT (as amended, restated or otherwise modified from time to time, this "Agreement" or this "Loan Agreement"), dated as of August 6, 2007, by and among American Home Mortgage Investment Corp., as a debtor and a debtor-in-possession, a Maryland corporation (the "Parent"), the affiliates of the Parent listed on Schedule A hereto, each as a debtor and a debtor-in-possession (together with the Parent, individually a "Borrower" and, collectively, the "Borrowers"), the Lenders from time to time party hereto, including the initial lenders party hereto as set forth on Schedule B hereto (each individually a "Lender" and, collectively, the "Lenders") and WLR Recovery Fund III, L.P., a Delaware limited partnership, as administrative agent for the Lenders (in such capacity, the "Administrative Agent").

### RECITALS

On August 6, 2007 (the "Filing Date"), the Borrowers commenced cases (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and the Borrowers have retained possession of their assets and are authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession.

The Bankruptcy Court has authorized the joint administration of the bankruptcy estate of each Borrower.

Subject to the approval of the Bankruptcy Court, the Borrowers, the Lenders and the Administrative Agent wish to enter into an agreement to provide to the Borrowers a senior, secured, superpriority debtor-in-possession revolving credit facility of up to $50,000,000 (the "Facility") to finance working capital and for general corporate purposes to the extent permitted pursuant to this Loan Agreement.

The Lenders have agreed, upon the terms and subject to the conditions of this Loan Agreement, to provide such financing to the Borrowers.

Accordingly, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

### Section 1.  Definitions and Accounting Matters

1.01      Certain Defined Terms.  As used herein, the following terms have the following meanings:

"Administrative Agent" has the meaning set forth in the preamble hereto.

- 1 -

"Administrative Borrower" has the meaning set forth in Section 11.14 hereof.

"Affiliate" has the meaning provided in the Bankruptcy Code.

"Agency Guide" means the FHLMC Guide, the FNMA Guide or the GNMA Guide, as applicable.

"Agreement" has the meaning set forth in the preamble hereto.

"AHMA" means American Home Mortgage Acceptance, Inc., a Maryland corporation.

"AHMC" means American Home Mortgage Corp., a New York corporation.

"AHMH" means American Home Mortgage Holdings, Inc., a Delaware corporation.

"AHMS" means American Home Mortgage Servicing, Inc., a Maryland corporation.

"AHMV" means American Home Mortgage Ventures LLC, a Delaware limited liability company.

"Applicable Margin" means 3.00% per annum.

"Approved Fund" means, with respect to any Lender that is a fund that invests in bank loans and similar commercial extensions of credit, any other fund that invests in bank loans and similar commercial extensions of credit and is managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Asset Sale" means any Disposition of Property or series of related Dispositions of Property (excluding any such Disposition permitted by Section 7.13) that yields gross proceeds to any Borrower or any of their Subsidiaries (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) in excess of $50,000.

"Authorized Officer" means any of the officers listed on Schedule G hereto, as the same may be amended from time to time by the Borrowers' delivery of an updated Schedule G.

"Availability" means, as of any date of determination, the amount that the Borrowers are entitled to borrow as Loans hereunder (after giving effect to all then outstanding Loans, interest thereon, fees, and expenses and all sublimits and reserves then applicable hereunder).

"Avoidance Actions" means actions available to the bankruptcy estate of the Borrowers in the Chapter 11 Cases pursuant to Sections 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code and the proceeds thereof.

- 2 -

"B of A" means Bank of America, N.A.

"B of A Collateral" shall mean all "Pre-Petition Collateral" and "Collateral" as defined in that certain Interim Order (I) Authorizing Debtors' Limited Use Of Cash Collateral, (II) Granting Replacement Liens And Adequate Protection To Certain Pre-Petition Secured Parties And (III) Scheduling Final Hearing Pursuant To Bankruptcy Rule 4001 entered by the Bankruptcy Court in the Chapter 11 Cases, and any final orders entered in respect thereto.

"B of A Credit Agreement" means that certain Second Amended and Restated Credit Agreement, dated as of August 10, 2006, by and among the Parent, American Home Mortgage Servicing, Inc., American Home Mortgage Corp, American Home Mortgage Acceptance, Inc., the lenders from time to time party thereto and B of A, as administrative agent for such lenders, as amended from time to time.

"Bankruptcy Code" has the meaning set forth in the recitals hereto.

"Bankruptcy Court" has the meaning set forth in the recitals hereto.

"Borrower" has the meaning set forth in the preamble hereto.

"Borrowing Notice" means the certificate prepared by the Administrative Borrower substantially in the form of Exhibit B attached hereto.

"Budget" means the Borrowers' budget attached as Schedule C hereto[1], as updated from time to time pursuant to Section 7.01 (a).

"Business Day" means any day other than (i) a Saturday or Sunday, (ii) a day on which the New York Stock Exchange, the Federal Reserve Bank of New York or banking and savings and loan institutions in New York, New York are authorized or obligated to close their regular banking business, or (iii) a day on which trading in securities on the New York Stock Exchange or any other major securities exchange in the United States is not conducted.

"Capital Lease Obligations" means, for any Person, all obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) Property to the extent such obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP, and, for purposes of this Loan Agreement, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP.

"Carve-Out" has the meaning set forth in the applicable Order.

"Carve-Out Amount" has the meaning set forth in the applicable Order.

---

[1] It is anticipated that the Budget, as set forth on Exhibit C, will be a cumulative projected expenses Budget and will be subject to variances of not more than 20%

- 3 -

"Cash Equivalents" means (a) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (b) certificates of deposit and eurodollar time deposits with maturities of 90 days or less from the date of acquisition and overnight bank deposits of any commercial bank having capital and surplus in excess of $500,000,000, (c) repurchase obligations of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than seven days with respect to securities issued or fully guaranteed or insured by the United States Government, (d) commercial paper of a domestic issuer rated at least A-1 or the equivalent thereof by Standard and Poor's Ratings Group ("S&P") or P-1 or the equivalent thereof by Moody's Investors Service, Inc. ("Moody's") and in either case maturing within 90 days after the day of acquisition, (e) securities with maturities of 90 days or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the requirements of clause (b) of this definition, or (f) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (e) of this definition.

"Change of Control" means the Parent fails to own, directly or indirectly, 100% of the outstanding Equity Interests of the other Borrowers except as a result of a Permitted Disposition.

"Chapter 11 Cases" has the meaning set forth in the recitals hereto.

"Closing Date" means the date on which the Administrative Agent sends the Administrative Borrower a written notice that each of the conditions precedent set forth in Section 5.01 either has been satisfied or has been waived, which notice shall not be unreasonably withheld or delayed.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all property and assets of each Borrower and its estate of every kind or type whatsoever (other than Avoidance Actions), tangible, intangible, real, personal and mixed, whether now owned or existing or hereafter acquired or arising and regardless of where located, whether within the United States or in other locations, and including all of each Borrower's now owned or hereafter acquired right, title and interest in and to each of the following:

(a) all Accounts, including any account holding cash in respect of a Deferred Compensation Plan;

(b) all Accounts Receivable and Accounts Receivable Records;

(c) all Books and Records pertaining to the property described in this definition of "Collateral";

(d) all Chattel Paper (whether tangible or electronic);

- 4 -

(e) all Commercial Tort Claims;

(f) all Deposit Accounts (including the Facility Collection Account, the Escrow Account, the Interest Escrow Subaccount, the Lender Expenses Escrow Subaccount and the other Control Accounts);

(g) all Documents;

(h) all Equipment;

(i) all Fixtures;

(j) all General Intangibles and Payment Intangibles;

(k) all Goods;

(l) all Instruments;

(m) all Interest Rate Protection Agreements;

(n) all Intellectual Property;

(o) all Inventory;

(p) all Investment Property, including the Equity Interests of the Specified Banking Subsidiary, the Specified Captive Insurance Subsidiary and the Specified Real Property Subsidiary and all Investment Property held in Control Accounts and that portion of the Pledged Collateral constituting Investment Property;

(q) all Letter-of-Credit Rights, including all rights of payment or performance under letters of credit, and any secondary obligation that supports the payment or performance of an Account, Chattel Paper, a Document, a General Intangible, a Payment Intangible, an Instrument, Investment Property, or any other Collateral;

(r) all mortgage loans, including all Unencumbered Whole Loans;

(s) all mortgage loan documents, including without limitation all promissory notes or other instruments or agreements evidencing the indebtedness of obligors thereon and any other collateral pledged or otherwise relating to such mortgage loans, together with all files, material documents, instruments, surveys (if available), certificates, correspondence, appraisals, computer records, computer storage media, mortgage loan accounting records and other books and records relating thereto;

(t) all mortgage guaranties and insurance (issued by governmental agencies or otherwise) and any mortgage insurance certificate or other document evidencing such mortgage guaranties or insurance relating to any mortgage loans and all claims and payments thereunder;

- 5 -

(u) all Insurance and all other insurance policies and Insurance Proceeds relating to any mortgage loans or the related mortgaged property;

(v) all Negotiable Collateral;

(w) all Payment Intangibles;

(x) all Residuals;

(y) all Supporting Obligations and Collateral Support, including with respect to any other item of Collateral;

(z)     all Tax Refund Receivables;

(aa)    all Vehicles;

(bb)    all money or other assets of each such Borrower that now or hereafter come into the possession, custody, or control of any Lender;

(cc)    all of each Borrower's interests in Real Property owned by such Borrower (including the Illinois Property) or its interest (if any) in the Real Property collateralizing any mortgage loan;

(dd)    all property of the estate of each Borrower (within the meaning of the Bankruptcy Code) and all other Personal Property of the Borrowers, wherever located and whether now or hereafter existing, and whether now owned or hereafter acquired, of every kind and description, whether tangible or intangible, including money and all property of any Borrower held by the Administrative Agent or any Secured Party, including all property of every description, in the possession or custody of or in transit to the Administrative Agent or such Secured Party for any purpose, including safekeeping, collection or pledge, for the account of such Borrower, or as to which such Borrower may have any right or power;

(ee)    to the extent not otherwise included, all monies and other property of any kind which is, after the Petition Date, received by such Borrower in connection with refunds with respect to taxes, assessments and governmental charges imposed on such Borrower or any of its property or income;

(ff) to the extent not otherwise included, all causes of action (other than Avoidance Actions) and all monies and other property of any kind received therefrom, and all monies and other property of any kind recovered by any Borrower; and

(gg)    all Proceeds, products, rents and profits, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any and all tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the Proceeds thereof; provided, however, that notwithstanding the foregoing, "Collateral" shall not include any of the B of A Collateral.

- 6 -

"Collateral Support" means all property (real or personal) assigned, hypothecated or otherwise securing any of the items set forth as (a) through (gg) in the definition of Collateral in this Section 1.01 and includes any security agreement or other agreement granting a Lien or security interest in such real or personal property.

"Commitment" means the commitment of a Lender to make Loans hereunder in the amount set forth opposite its name on Schedule B hereto or as may subsequently be set forth in the Register from time to time, as the case may be.

"Committee" means an Official Committee of Unsecured Creditors for the Borrowers appointed pursuant to Section 1102(a) of the Bankruptcy Code by the United States Trustee, as the membership of such committee may from time to time be constituted and reconstituted.

"Contractual Obligation" means as to any Person, any material provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound or any material provision of any security issued by such Person.

"Contaminant" means any material, substance or waste that is classified or regulated under any Environmental Law as hazardous, toxic, a contaminant or a pollutant or by other words of similar meaning, including any petroleum or petroleum-derived substance or waste, asbestos and polychlorinated biphenyls.

"Control Account" means an account subject to a Control Agreement.

"Control Account Party" means the applicable securities intermediary with respect to a securities account or bank with respect to a deposit account.

"Control Agreements" means, as applicable, the Facility Collection Account Control Agreement, the Escrow Account Control Agreement and any other control agreement, in form and substance reasonably satisfactory to the Administrative Agent, executed and delivered by a Borrower, the Administrative Agent and the Control Account Party in accordance with the terms hereof.

"Custodian Category" means the category of the same name on the MERS System that reflects the custodial party that is in possession of the mortgage loans pledged by Borrowers to mortgage warehouse lenders.

"Default" means an Event of Default or an event that with notice or lapse of time or both would become an Event of Default.

"Deferred Compensation Plan" means the American Home Mortgage Holding, Inc. Amended and Restated Deferred Compensation Plan effective January 1, 2005.

"Disposition" means any transaction, or series of related transactions, pursuant to which any Borrower or any of its Subsidiaries sells, assigns, transfers or otherwise disposes of any Property or assets (whether now owned or hereafter acquired) to any other Person, in each

- 7 -

case whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person.

"Dollars" and "$" means lawful money of the United States of America.

"Entry Date" means the date of the entry of the Final Order.

"Environmental Laws" means all applicable Requirements of Law now or hereafter in effect, as amended or supplemented from time to time, relating to pollution or the regulation and protection of human health, safety, the environment or natural resources, including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. § 9601 *et seq.*); the Hazardous Material Transportation Act, as amended (49 U.S.C. § 180 *et seq.*); the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. § 136 *et seq.*); the Resource Conservation and Recovery Act, as amended (42 U.S.C. § 6901 *et seq.*); the Toxic Substance Control Act, as amended (42 U.S.C. § 7401 *et seq.*); the Clean Air Act, as amended (42 U.S.C. § 740 *et seq.*); the Federal Water Pollution Control Act, as amended (33 U.S.C. § 1251 *et seq.*); the Occupational Safety and Health Act, as amended (29 U.S.C. § 651 *et seq.*); the Safe Drinking Water Act, as amended (42 U.S.C. § 300f *et seq.*); and their state and local counterparts or equivalents and any transfer of ownership notification or approval statute.

"Environmental Liabilities and Costs" means, with respect to any Person, all liabilities, obligations, responsibilities, Remedial Actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all fees, disbursements and expenses of counsel, experts and consultants and costs of investigation and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any other Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute, including any thereof arising under any Environmental Law, Permit, order or agreement with any Governmental Authority or other Person, which relate to any environmental, health or safety condition or a Release or threatened Release, and result from the past, present or future operations of, or ownership of property by, such Person or any of its Subsidiaries.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

"Equity Interests" means, with respect to any Person, any and all shares, securities, interests, participations or other equivalents, including membership interests (however designated, whether or not voting) of equity of such Person, including, if such Person is a partnership (whether general or limited), limited liability company membership interests or any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, such entity, but in no event will Equity Interest include any debt securities convertible or exchangeable into equity unless and until actually converted or exchanged.

- 8 -

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any corporation or trade or business that is a member of any group of organizations (i) described in Section 414(b) or (c) of the Code of which any Borrower is a member and (ii) solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the Lien created under Section 302(f) of ERISA and Section 412(n) of the Code, described in Section 414(m) or (o) of the Code of which any Borrower is a member.

"Escrow Account" means that certain account number _____ named "_____" of the Borrowers maintained with _____.

"Escrow Account Control Agreement" means that certain control agreement with respect to the Escrow Account, the Interest Escrow Subaccount and the Lender Expenses Escrow Subaccount, in form and substance reasonably satisfactory to the Administrative Agent, executed and delivered by the Borrowers, the Administrative Agent and _____.

"Event of Default" has the meaning set forth in Section 8 hereof.

"Event of Loss" means, with respect to any property constituting Collateral, (i) the actual or constructive total loss of such property or the use thereof, resulting from destruction, damage beyond repair, or the rendition of such property permanently unfit for normal use from any casualty or similar occurrence whatsoever, (ii) the destruction or damage of a portion of such property from any casualty or similar occurrence whatsoever under circumstances in which such damage cannot reasonably be expected to be repaired, or such property cannot reasonably be expected to be restored to its condition immediately prior to such destruction or damage, within 90 days after the occurrence of such destruction or damage, (iii) the condemnation, confiscation or seizure of, or requisition of title to or use of, any property, or (iv) in the case of any property located upon a leasehold, the termination or expiration of such leasehold.

"Exchange Act" means the United States Securities and Exchange Act of 1934, as amended from time to time.

"Excluded Taxes" means, with respect to the Administrative Agent, a Lender, a Participant and its Tax Related Persons, only the following Taxes: (a) income, franchise Taxes (imposed in lieu of net income Taxes) or similar Taxes imposed on (or measured by) the net income of such Person by the jurisdiction under the laws of which such Person is organized, in which its principal or applicable lending office is located or in which it is otherwise doing business (other than a jurisdiction in which such Person is treated as doing business as a result of its execution, delivery of any Loan Document or its exercise of its rights or performance of its obligations thereunder or otherwise as a result of its participation (or the participation of an entity in which it owns a beneficial interest) in the transactions contemplated by this Loan Agreement); (b) withholding Taxes imposed by the United States of America on payments to such Person, other than as a result of a change in applicable law occurring after (i) the date that

- 9 -

such Person became a party to this Agreement, or (ii) with respect to an assignment, participation, acquisition, designation of a new applicable lending office or the appointment of a successor Administrative Agent, the effective date of such assignment, participation, acquisition, designation or appointment, except, in each case, to the extent and at the rate that such Person's predecessor was entitled to such amounts (or in the case of a designation of a new applicable lending office, to the extent such Person was entitled to such amounts with respect to its prior applicable lending office); and (c) Taxes that would not have been imposed but for and solely as a result of the failure of such Person to comply with its obligations under Section 3.06(e).

"Extraordinary Receipts" means any cash received by any Borrower outside of the ordinary course of business, including, without limitation, (i) pension plan reversions, (ii) proceeds of insurance (including business interruption insurance), (iii) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (iv) condemnation awards (and payments in lieu thereof), (v) indemnity payments, (vi) any purchase price adjustment received in connection with any purchase agreement and (vii) any Tax Refund Receivables.

"Facility" has the meaning set forth in the recitals hereto.

"Facility Collection Account" means that certain account number _____ named "_____" of the Borrowers maintained with _____.

"Facility Collection Account Control Agreement" means that certain control agreement with respect to the Facility Collection Account, in form and substance reasonably satisfactory to the Administrative Agent, executed and delivered by the Borrowers, the Administrative Agent and _____.

"Facility Fee" has the meaning set forth in Section 3.07(a).

"Federal Funds Rate" means, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three primary dealers (other than an affiliate of the Administrative Agent).

"Federal Tax Refund Receivable" means all prepayments, credits, refunds, causes of action, rights of recovery, rights of set off, and rights of recoupment with respect to the federal or foreign Taxes of the Borrowers and their Subsidiaries, including refundable and non-refundable research and development tax credits, in each case arising as a result of, or in connection with, the ownership or operation of the business.

"FHA" means the Federal Housing Authority and any successor agency.

- 10 -

"FHLMC" means the Federal Home Loan Mortgage Corporation and any successor agency.

"Filing Date" has the meaning set forth in the recitals hereto.

"Final Order" means the order of the Bankruptcy Court in substantially the form of the Interim Order (with only such modifications thereto as are satisfactory in form and substance to the Administrative Agent), as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Administrative Agent, the Lenders and the Borrowers, approving the Loans made and to be made to the Borrowers in accordance with this Loan Agreement and granting the Liens contemplated hereby.

"First Lien Collateral" means the Collateral on which the Administrative Agent, for the benefit of the Secured Parties, is granted or is purported to be granted a first priority Lien pursuant to the Loan Documents, including the Collateral set forth on Schedule D.

"FNMA" means the Federal National Mortgage Association and any successor agency.

"Funding Date" means the date on which a Loan is made hereunder.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States of America.

"Governmental Authority" means any nation or government, any state or other political subdivision, agency or instrumentality thereof, any entity exercising executive, legislative, judicial, regulatory, taxing or administrative functions of or pertaining to government and any court or arbitrator having jurisdiction over any Borrower or any of its Subsidiaries or properties.

"Guarantee" means, as to any Person, any obligation of such Person directly or indirectly guaranteeing any Indebtedness of any other Person or in any manner providing for the payment of any Indebtedness of any other Person or otherwise protecting the holder of such Indebtedness against loss (whether by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, or to take-or-pay or otherwise), provided that the term "Guarantee" shall not include (i) endorsements for collection or deposit in the ordinary course of business, or (ii) obligations to make servicing advances in respect of any mortgaged property. The amount of any Guarantee of a Person shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith. The terms "Guarantee" and "Guaranteed" used as verbs have correlative meanings.

"HUD" means the Department of Housing and Urban Development and any successor thereto.

- 11 -

"Illinois Property" means the Property of the applicable Borrower or Subsidiary thereof located in Mt. Prospect, Illinois.

"Indebtedness" means, for any Person: (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, the issuance and sale of debt securities or the sale of Property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services, other than trade accounts payable (other than for borrowed money) arising, and accrued expenses incurred, in the ordinary course of business so long as such trade accounts payable are payable within 90 days of the date the respective goods are delivered or the respective services are rendered; (c) indebtedness of others secured by a Lien on the Property of such Person, whether or not the respective indebtedness so secured has been assumed by such Person; (d) obligations (contingent or otherwise) of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for the account of such Person; (e) Capital Lease Obligations of such Person; (f) obligations of such Person under repurchase agreements or like arrangements; (g) indebtedness of others Guaranteed by such Person; (h) all obligations of such Person incurred in connection with the acquisition or carrying of fixed assets by such Person; (i) indebtedness of general partnerships of which such Person is a general partner; and (j) any other indebtedness of such Person evidenced by a note, bond, debenture or similar instrument.

"Indemnified Liabilities" has the meaning set forth in Section 11.04.

"Indemnified Party" has the meaning set forth in Section 11.04.

"Indemnified Taxes" means all Taxes other than Excluded Taxes.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Insurance Proceeds" means with respect to each mortgage loan, proceeds of insurance policies insuring the mortgage loan or the related mortgaged property.

"Intellectual Property" means, with respect to any Person, any copyrights, patents, trademarks or other intellectual property and all registrations, licenses agreements and other rights relating thereto.

"Interest Escrow Subaccount" means that certain subaccount of the Escrow Account named "_____".

"Interest Period" means, with respect to any Loan, (i) initially, the period commencing on the Funding Date with respect to such Loan and ending on the calendar day prior to the next succeeding Monthly Payment Date, and (ii) thereafter, each period commencing

- 12 -

on the Monthly Payment Date of a month and ending on the calendar day prior to the Monthly Payment Date of the next succeeding month. Notwithstanding the foregoing, no Interest Period may end after the Maturity Date.

"Interim Amount" has the meaning set forth in Section 5.01(n).

"Interim Funder Category" means the category of the same name on the MERS System that reflects the custodial party that is in possession of the mortgage loans pledged by Borrowers to mortgage warehouse lenders.

"Interim Interest Escrow Deposit" has the meaning set forth in Section 5.01(t).

"Interim Order" means the order of the Bankruptcy Court, in the form of Exhibit A, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Administrative Agent, the Lenders and the Borrowers, approving the Loans made and to be made to the Borrowers in accordance with this Loan Agreement and granting the Liens contemplated hereby.

"Lender" has the meaning set forth in the preamble hereto.

"Lender Expenses" means all (a) costs or expenses (including taxes, and insurance premiums) required to be paid by any Borrower under any of the Loan Documents that are paid, advanced, or incurred by the Administrative Agent, any Lender or any Lender-Related Party, (b) reasonable fees or charges paid or incurred by any Lender-Related Party in connection with the Administrative Agent's or any Lender's transactions with the Borrowers under the Loan Documents, including, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and Uniform Commercial Code searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal (including periodic collateral appraisals or business valuations to the extent of the fees and charges (and up to the amount of any limitation) contained in this Loan Agreement), real estate surveys, real estate title policies and endorsements, and environmental audits, (c) reasonable out-of-pocket costs and expenses incurred by the Administrative Agent or any Lender in the disbursement of funds to the Borrowers (by wire transfer or otherwise), (d) out-of-pocket charges paid or incurred by any Lender-Related Party resulting from the dishonor of checks payable by or to any Borrower, (e) reasonable out-of-pocket costs and expenses paid or incurred by any Lender-Related Party to correct any default or enforce any provision of the Loan Documents, or in monitoring, gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (f) reasonable audit fees and expenses of Lender-Related Parties related to audit examinations of the Collateral, (g) costs and expenses of third party claims or any other suit paid or incurred by any Lender-Related Party in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or the Administrative Agent or any Lender's relationship with any Borrower or any of its Affiliates, and (h) reasonable out-of-pocket costs and expenses (including attorneys fees and expenses) incurred by the Lender-Related Parties in advising, structuring, drafting,

- 13 -

documenting, executing, reviewing, administering, syndicating, or amending the Loan Documents.

"Lender Expenses Escrow Subaccount" means that certain subaccount of the Escrow Account named "_____".

"Lender-Related Party" means the Administrative Agent, the Lenders and each of the Administrative Agent's or any Lender's, members, Affiliates, sponsors, managing directors, directors, together with their respective officers, employees, agents, advisors, attorneys and other representatives.

"LIBO Base Rate" means with respect to each day a Loan is outstanding (or if such day is not a Business Day, the next succeeding Business Day), the rate per annum equal to the rate published by Bloomberg or if such rate is not available, the rate appearing at Reuters Screen LIBOR01 Page as one-month LIBOR on such date and, if such rate shall not be so quoted, the rate per annum at which the Administrative Agent is offered Dollar deposits at or about 11:00 AM, eastern time, on such date by prime banks in the interbank eurodollar market where the eurodollar and foreign currency and exchange operations in respect of the Administrative Agent's Loans are then being conducted for delivery on such day for a period of one month and in an amount comparable to the amount of the Loans to be outstanding on such day.

"LIBO Rate" means with respect to each Interest Period pertaining to a Loan, a rate per annum (reset on a monthly basis) determined by the Administrative Agent in its sole discretion in accordance with the following formula (rounded upwards to the nearest 1/100th of one percent), which rate as determined by the Administrative Agent shall be conclusive absent manifest error by the Administrative Agent:

$$\frac{\text{LIBO Base Rate}}{1.00 - \text{LIBO Reserve Requirements}}$$

The LIBO Rate shall be calculated on each Funding Date and Monthly Payment Date commencing with the first Funding Date.

"LIBO Reserve Requirements" means for any Interest Period for any Loan, the aggregate (without duplication) of the rates (expressed as a decimal fraction) of any reserve requirements applicable to any Lender or any Lender-Related Party in effect on such day (including, without limitation, basic, supplemental, marginal and emergency reserves under any regulations of the Board of Governors of the Federal Reserve System or other Governmental Authority having jurisdiction with respect thereto), dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of such Board) maintained by a member bank of such Governmental Authority as of the Closing Date, the LIBO Reserve Requirements shall be deemed to be zero.

"Lien" means any mortgage, lien, pledge, charge, security interest or similar encumbrance.

- 14 -

"Loan" has the meaning set forth in Section 2.01 hereto.

"Loan Agreement" has the meaning set forth in the preamble hereto.

"Loan Account" means that certain account number _____ of the Parent maintained with _____.

"Loan Documents" means, collectively, the Control Agreements, this Loan Agreement, the Orders, any note or notes executed by the Borrowers in connection with this Loan Agreement and payable to any Lender, and any other agreement entered into, now or in the future, by any Borrower and the Administrative Agent or any Lender in connection with this Loan Agreement.

"Majority Lenders" means Lenders whose Pro Rata Shares, taken in the aggregate, represent at least 51% of the Total Commitment.

"Material Adverse Change" means an event, fact, circumstance, change in, or effect on the business of any Borrower or any Subsidiary that individually or in the aggregate or on a cumulative basis with any other events, facts, circumstances, changes in, or effects on, the Borrowers, taken as a whole, or any Borrower or any Subsidiary could reasonably be expected to have a Material Adverse Effect.

"Material Adverse Effect" means a material adverse effect which either occurs after the date hereof or with respect to which any Lender obtains knowledge after the date hereof on (a) the business, property, operations, condition (financial, legal or otherwise) or prospects of any Borrower or any of the their Subsidiaries, (b) the ability of any Borrower to perform any of its respective obligations under any of the Loan Documents to which it is a party, (c) the validity or enforceability of any of the Loan Documents, (d) the rights and remedies of the Administrative Agent or any Lender under any of the Loan Documents or (e) the Collateral; provided, however, that the commencement of the Chapter 11 Cases, events customarily resulting from the filing of a case under Chapter 11 of the Bankruptcy Code and the Borrowers' efforts to market and sell substantially all of their businesses and assets shall not constitute a Material Adverse Effect.

"Material Contract" means all agreements and contracts evidencing the Residuals and the mortgage loans.

"Maturity Date" means the date which is the earliest of (a) the effective date of a plan of reorganization in the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court, (b) the first anniversary of the Closing Date, (c) the sale of all or substantially all of the Borrowers' assets, whether under Section 363 of the Bankruptcy Code, a confirmed plan of reorganization or otherwise; (d) the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (e) the dismissal of any of the Chapter 11 Cases; (f) September 7, 2007, if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, and (g) such earlier date on which either (A) all Loans shall become due and payable, in whole, in accordance with the terms of this Loan Agreement and the other Loan

- 15 -

Documents or (B) all Loans and all other Obligations for the payment of money shall be paid in full and the Commitments and this Loan Agreement are terminated.

"Maximum Credit" has the meaning specified in Section 2.01.

"MERS" means Mortgage Electronic Registration System, Inc.

"MERSCORP" means MERSCORP, Inc.

"MERS Member" means any entity that is a member of MERS, in good standing and in compliance with all rules, regulations, procedures and requirements set forth by MERS, including, but not limited to the payment of membership dues.

"MERS Mortgage" means any deed of trust or mortgage registered to any of the Borrowers on the MERS System.

"MERS System" means the Mortgage Electronic Registration System.

"Monthly Payment Date" means the last Business Day of each month.

"Multiemployer Plan" means a multiemployer plan defined as such in Section 3(37) of ERISA to which contributions have been or are required to be made by any Borrower or any ERISA Affiliate and that is covered by Title IV of ERISA.

"Negotiable Collateral" means letters of credit, letter of credit rights, instruments, promissory notes, drafts, documents, and chattel paper (including electronic chattel paper and tangible chattel paper), and any and all supporting obligations in respect thereof.

"Net Cash Proceeds" means, with respect to (i) any Disposition (including any Repo Disposition) by any Person, the amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Person or any of its Subsidiaries, in connection therewith after deducting therefrom only (A) the principal amount of any Indebtedness secured by any senior Permitted Lien on any asset (other than Indebtedness assumed by the purchaser of such asset) and interest, fees and expenses in respect thereof which is (x) required to be, and is, repaid in connection with such Disposition (other than Indebtedness under this Loan Agreement) or (y) in escrow in connection with such Person contesting such Indebtedness or the Lien securing such Indebtedness in connection with such Disposition, (B) reasonable costs, fees and expenses related to such Disposition reasonably incurred by such Person in connection therewith and paid in cash, and (C) Taxes paid by such Person in connection therewith, to the extent approved (to the extent such approval is required) by the Bankruptcy Court and (ii) any Event of Loss with respect to the assets or property of any Person, the amount of cash received (directly or indirectly) from time to time by or on behalf of such Person or any of its Subsidiaries, in connection therewith after deducting therefrom only (A) the principal amount of any Indebtedness secured by any senior Permitted Lien on any asset (other than Indebtedness assumed by the purchaser of such asset) and interest, fees and expenses in respect thereof which is (x) required to be, and is,

- 16 -

repaid in connection with such Event of Loss (other than Indebtedness under this Loan Agreement) or (y) in escrow in connection with such Person contesting such Indebtedness or the Lien securing such Indebtedness in connection with such Event of Loss, (B) reasonable costs, fees and expenses related to such Event of Loss reasonably incurred by such Person in connection therewith and paid in cash and (C) Taxes paid (or reasonably estimated to be payable) by such Person in connection therewith, to the extent approved (to the extent such approval is required) by the Bankruptcy Court.

"Non-Stayed Order" means an order of the Bankruptcy Court that is in full force and effect, as to which no stay has been entered and which has not been reversed, amended, modified, reversed, vacated or overturned in any respect without the prior written consent of the Administrative Agent, the Required Lenders and the Borrowers.

"Note" means each promissory note executed by the Borrowers in favor of a Lender evidencing such Lender's Loans.

"Obligations" means all Loans, advances, debts, principal, interest, contingent reimbursement obligations with respect to any of the Loan Documents, premiums, liabilities (including all amounts charged to the Loan Account pursuant hereto), obligations (including indemnification obligations), fees (including the fees provided for in Section 3.07 hereof), charges, costs, Lender Expenses, guaranties, covenants, and duties of any kind and description owing by any Borrower or any of its Subsidiaries to the Administrative Agent, any Lender or any Lender-Related Party pursuant to or evidenced by the Loan Documents, in each case irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising. Any reference in this Loan Agreement or in the Loan Documents to the Obligations shall include all extensions, modifications, renewals or alterations thereof.

"Orders" means the Interim Order and the Final Order.

"Other Taxes" means any and all present or future stamp, registration, transfer or documentary Taxes or any excise or property Taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to or in connection with, the Loan Documents.

"Parent" has the meaning set forth in the recitals hereto.

"Participant" has the meaning set forth in Section 11.15(c).

"Payment Date" means the first Business Day of each week.

"PBGC" means the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"Permit" means any permit, approval, authorization, license, variance or permission required from a Governmental Authority under an applicable Requirement of Law.

- 17 -

"Permitted Disposition" means (i) any Disposition on terms and conditions reasonably satisfactory to the Administrative Agent (so long as such Disposition does not create a Default or Event of Default); or (ii) any Repo Disposition.

"Permitted Liens" has the meaning set forth in Section 7.12.

"Person" means any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, unincorporated association or Governmental Authority.

"Plan" means an employee benefit or other plan established or maintained by any Borrower or any ERISA Affiliate and that is covered by Title IV of ERISA, other than a Multiemployer Plan.

"Pledged Collateral" means collectively, the Pledged Notes, the Pledged Stock, the Pledged Partnership Interests, the Pledged LLC Interests, any other Investment Property of any Borrower, all certificates or other instruments representing any of the foregoing, all Security Entitlements of any Borrower in respect of any of the foregoing, all dividends, interest distributions, cash, warrants, rights, instruments and other property or Proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing. Pledged Collateral may be General Intangibles or Investment Property.

"Pledged LLC Interests" means all of any Borrower's right, title and interest as a member of any limited liability companies and all of such Borrower's right, title and interest in, to and under any limited liability company agreement (or analogous constituent document) to which it is a party.

"Pledged Notes" means all right, title, title and interest of any Borrower, in the Instruments evidencing all Indebtedness owed to such Borrower issued by the obligors named therein, and all interest, cash, Instruments and other property or Proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Indebtedness.

"Pledged Partnership Interests" means all of any Borrower's right, title and interest as a limited and/or general partner in all partnerships and all of such Borrower's right, title and interest in, to and under any partnership agreements to which it is a party.

"Pledged Securities" means all securities owned each Borrower.

"Pledged Stock" means the Equity Interests owned by each Borrower.

"Post-Default Rate" means, in respect of any principal of any Loan or any other amount under this Loan Agreement or any other Loan Document, a rate per annum equal to (a) 2.00% per annum plus (b)(i) the interest rate otherwise applicable to such Loan or other amount, or (ii) if no interest rate is otherwise applicable, the LIBO Rate plus the Applicable Margin.

"Pre-Petition Credit Facilities" means the B of A Credit Agreement. [others].

- 18 -

"Pre-Petition Payment" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness (including with respect to any of the Pre-Petition Credit Facilities) or trade payables or other pre-petition claims against any Borrower.

"Property" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Pro Rata Share" means, with respect to any Lender, the percentage obtained by dividing (i) such Lender's Commitment by (ii) the Total Commitment, provided, that, if the Total Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's Loans and the denominator shall be the aggregate unpaid principal amount of all of the applicable Loans.

"Reference Rate" means the rate of interest specified in the Wall Street Journal as the prime rate. The prime rate is determined from time to time by such bank as a means of pricing some loans to its borrowers and neither is tied to any external rate of interest or index nor necessarily reflects the lowest rate of interest actually charged by such bank to any particular class or category of customers. Each change in the Reference Rate shall be effective from and including the date such change is publicly announced as being effective.

"Register" has the meaning set forth in the Section 11.15(b)(ii).

"Registered Loan" means any loan recorded on the Register pursuant to Section 11.15(b)(ii).

"Regulations T, U and X" means Regulations T, U and X of the Board of Governors of the Federal Reserve System (or any successor), as the same may be modified and supplemented and in effect from time to time.

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration, in each case, of any Contaminant into the indoor or outdoor environment or into or out of any property, including the movement of Contaminants through or in the air, soil, surface water, ground water or property.

"Remedial Action" means all actions required pursuant to Environmental Law to (a) clean up, remove, treat or in any other way remediate any Contaminant in the indoor or outdoor environment, (b) reasonably prevent the Release or reasonably minimize the further Release so that a Contaminant does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or (c) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"Repo Disposition" means any Disposition pursuant to or in connection with the terms of any repurchase agreement, mortgage loan purchase and sale agreement, master repurchase agreement or similar agreement or arrangement that constitutes a "securities contract" within the meaning of Section 741(7) of the Bankruptcy Code.

- 19 -

"Required Lenders" means (a) for so long as the Pro Rata Share of WLR represents at least 51% of the Commitments, WLR, and (b) in all other cases, Lenders whose Pro Rata Shares, taken in the aggregate, represent at least 51% of the Commitments.

"Requirement of Law" means as to any Person, (a) the certificate of incorporation and by-laws or other organizational or governing documents of such Person, (b) all laws (including consumer regulatory laws), treaties, rules or regulations, and (c) all determinations of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Residuals" means any unencumbered securitization residual interests, including as listed on Schedule F hereto and all rights and interests related thereto.

"Responsible Officer" means, as to any Person, the chief executive officer or, with respect to financial matters, the chief financial officer, the chief restructuring officer of such Person; provided, that in the event any such officer is unavailable at any time he or she is required to take any action hereunder, Responsible Officer means any officer authorized to act on such officer's behalf as demonstrated by a certificate of corporate resolution.

"Restricted Payments" means with respect to any Person, collectively, all dividends or other distributions of any nature (cash, securities, assets or otherwise), and all payments, by virtue of redemption or otherwise, on any class of equity securities (including, without limitation, warrants, options or rights therefor) issued by such Person, whether such securities are now or may hereafter be authorized or outstanding and any distribution in respect of any of the foregoing, whether directly or indirectly.

"Rule 15c3-1" means Rule 15c3-1, including the appendices thereto, promulgated by the SEC under the Exchange Act, as such rule may be amended from time to time, or any rule or regulation of the SEC that replaces Rule 15c3-1.

"SEC" means the United States Securities and Exchange Commission, or any other regulatory body that succeeds to the functions of the United States Securities and Exchange Commission.

"Secured Parties" means the Administrative Agent and the Lenders.

"Senior Claims" means all valid, perfected, non-avoidable secured claims existing on the Filing Date.

"Servicing Rights" means all rights of the Borrowers or any of their Subsidiaries relating to the servicing of loans.

"Specified Banking Subsidiary" means American Home Bank.

"Specified Captive Insurance Subsidiary" means [ ].

"Specified Real Property Subsidiary" means AHM SPV II LLC.

- 20 -

"State Tax Refund Receivables" means all prepayments, credits, refunds, causes of action, rights of recovery, rights of set off, and rights of recoupment with respect to the state or local Taxes of the Borrowers and their Subsidiaries, including refundable and non-refundable research and development tax credits, in each case arising as a result of, or in connection with, the ownership or operation of the business.

"Subsidiary" means, with respect to any Person, (a) any corporation, partnership or other entity of which at least a majority of the securities or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other persons performing similar functions of such corporation, partnership or other entity (irrespective of whether or not at the time securities or other ownership interests of any other class or classes of such corporation, partnership or other entity shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person, or (b) if such Person is a trust, the depositor of such trust.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority, and shall include all interest, penalties and additions to Tax related thereto.

"Tax Refund Receivables" means any Federal Tax Refund Receivable and any State Tax Refund Receivables.

"Tax Related Person" means any Person (including, without limitation, a beneficial owner of an interest in a pass-through entity) whose income is realized through or determined by reference to the Administrative Agent, a Lender or Participant or any Tax Related Person of any of the foregoing.

"Tax Return" means any report, filing, return, information return, document, election, including amendments to any of the foregoing, filed or furnished or required to be filed or furnished with respect to Taxes.

"Total Commitment" means, at any time, the sum of the Commitments.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect on the date hereof in the State of New York; provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection or the priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or priority.

"Unencumbered Whole Loan" means a mortgage loan owned by a Borrower, including as set forth on Schedule E.

- 21 -

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"VA" means the Veterans Administration or any successor agency.

"WLR" means WLR Recovery Fund III, L.P.

1.02    Accounting Terms and Determinations. Except as otherwise expressly provided herein, all accounting terms used herein shall be interpreted, and all financial statements and certificates and reports as to financial matters required to be delivered to the Lender hereunder shall be prepared, in accordance with GAAP.

1.03    Uniform Commercial Code. Any capitalized terms used in this Agreement that are defined in the Uniform Commercial Code shall be construed and defined as set forth in the Uniform Commercial Code unless otherwise defined herein.

1.04    Construction. Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references in the plural include the singular, references to the singular include the plural, the term "including" is not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in the other Loan Documents to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in the other Loan Documents shall be satisfied by the transmission of a record and any record transmitted shall constitute a representation and warranty as to the accuracy and completeness of the information contained therein.

## Section 2. Loans, Evidence of Debt and Prepayments.

2.01    Loans. Subject to fulfillment of the conditions precedent set forth in Sections 5.01 and 5.02 hereof, and provided that no Default or Event of Default shall have occurred and be continuing hereunder, each Lender hereby severally agrees, from time to time, on the terms and conditions of this Loan Agreement and the other Loan Documents, to make loans (individually, a "Loan"; collectively, the "Loans") to the Borrowers in Dollars, on any Business Day (but the Borrowers will endeavor to limit requests for Loans to not more frequently than once weekly) from and including the Closing Date to but excluding the Maturity Date in an aggregate principal amount at any one time outstanding not to exceed such Lender's Pro Rata Share of the Total Commitment as in effect from time to time. Subject to the terms and

- 22 -

conditions of this Loan Agreement, during such period the Borrowers may borrow, repay and reborrow Loans hereunder. In no event shall the Lenders be obligated to make a Loan when any Default or Event of Default has occurred and is continuing, and in no event shall the aggregate principal amount of all Loans outstanding at any time exceed $50,000,000, as reduced from time to time in accordance with Section 2.06 (the amount maximum amount available to be borrowed pursuant to this Section 2.01 shall be referred to herein as the "Maximum Credit"); provided that any request for any Loans in excess of the aggregate principal amount of $40,000,000 shall only be made in the sole discretion of the Lenders; provided, further, that at all times prior to the Final Order, the Maximum Credit shall equal the Interim Amount.

2.02    Evidence of Debt.

(a)    The Administrative Agent shall maintain an account or accounts evidencing the indebtedness of the Borrowers to each Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.

(b)    In the absence of manifest error, the entries made in the accounts maintained pursuant to paragraph (a) of this Section shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein; provided that the failure of the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Loans in accordance with the terms of this Loan Agreement.

(c)    Any Lender may request that the Loans be evidenced by a Note or Notes. In such event, the Borrowers shall prepare, execute and deliver to such Lender a Note or Notes payable to the order of such Lender (or, if requested by such Lender, to such Lender and its assigns) and in a form approved by such Lender. Thereafter, the Loans evidenced by such Note and interest thereon shall at all times be represented by one or more Notes in such form payable to the payee named therein or its registered assigns.

2.03    Procedure for Borrowing.

(a)    Borrowing Procedure for Requesting a Loan.    The Administrative Borrower may request a borrowing, on any Business Day during the period from and including the Closing Date to the Maturity Date to the extent set forth above for any Loan, by delivering to the Administrative Agent, with a copy to the Lenders, an irrevocable Borrowing Notice, appropriately completed and with all required supporting documentation, which Borrowing Notice must be received no later than [12:00 noon] (eastern time) on the requested Funding Date. Such Borrowing Notice shall be irrevocable and shall specify (i) the principal amount of the proposed Loans, (ii) the use of the proceeds of such proposed Loans and (iii) the proposed borrowing date, which must be a Business Day. The Administrative Agent and the Lenders may act without liability upon the basis of written, telecopied or telephonic notice believed by the Administrative Agent in good faith to be from the Administrative Borrower (or from any Authorized Officer thereof designated in writing purportedly from the Administrative Borrower to the Administrative Agent). The Administrative Agent and each Lender shall be entitled to

- 23 -

rely conclusively on any Authorized Officer's authority to request Loans on behalf of the Borrowers until the Administrative Agent receives written notice to the contrary. The Administrative Agent and the Lenders shall have no duty to verify the authenticity of the signature appearing on any Borrowing Notice. Except as otherwise provided in this Section 2.03, Loans shall be made ratably in accordance with each Lender's Pro Rata Share.

(b)     Each Borrowing Notice pursuant to this Section 2.03 shall be irrevocable and the Borrowers shall be bound to make a borrowing in accordance therewith. Each Loan shall be made in a minimum amount of $1,000,000 and shall be in an integral multiple of $100,000.

(c)     Mechanics of Loans.

(i)     Except as otherwise provided in this Section 2.03(c), all Loans under this Agreement shall be made by the Lenders simultaneously and proportionately to their Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligations to make a Loan requested hereunder, nor shall the Commitment of any Lender be increased or decreased as a result of the default by any other Lender in that other Lender's obligation to make a Loan requested hereunder, and each Lender shall be obligated to make the Loans required to be made by it by the terms of this Loan Agreement regardless of the failure of any other Lender to do so.

(ii)     Notwithstanding any other provision of this Loan Agreement, and in order to reduce the number of fund transfers among the parties hereto, the Borrowers, the Administrative Agent and the Lenders agree that the Administrative Agent may (but shall not be obligated to), and the Borrowers and the Lenders hereby irrevocably authorize the Administrative Agent to, fund, on behalf of the Lenders, Loans pursuant to Section 2.01; provided, however, that the Administrative Agent shall in no event fund such Loans if the Administrative Agent shall have received written notice from the Required Lenders prior to the funding of the proposed Loan that one or more of the conditions precedent contained in Section 5.01 or Section 5.02, will not be satisfied on the day of the proposed Loan. If the Administrative Borrower gives a Borrowing Notice requesting a Loan and the Administrative Agent elects not to fund such Loan on behalf of the Lenders, then promptly after receipt of the Borrowing Notice requesting such Loan, the Administrative Agent shall notify each applicable Lender of the specifics of the requested Loan and that it will not fund the requested Loan on behalf of the Lenders. If the Administrative Agent notifies the Lenders that it will not fund a requested Loan on behalf of the Lenders, each applicable Lender shall make its Pro Rata Share of the Loan available to the Administrative Agent, in immediately available funds, no later than 2:00 p.m. (eastern time) (provided that, except with respect to any Loan to be made on the Closing Date, the Administrative Agent requests payment from such Lender not later than 5:00 p.m. (eastern time) on the prior Business Day) on the date of the proposed Loan. The Administrative Agent will make the proceeds of such Loans available to the Borrowers on the day of the proposed Loan by causing an amount, in immediately available funds, equal to the proceeds of all such Loans received by the Administrative Agent or the

- 24 -

amount funded by the Administrative Agent on behalf of the Lenders to be deposited in the Loan Account.

(iii)     If the Administrative Agent has notified the Lenders that the Administrative Agent, on behalf of the Lenders, will fund a particular Loan pursuant to Section 2.03(c)(ii), the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such day and the Administrative Agent, in its sole discretion, may, but shall not be obligated to, cause a corresponding amount to be made available to the Borrowers on such day. If the Administrative Agent makes such corresponding amount available to the Borrowers and such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from the date such payment was due until the date such amount is paid to the Administrative Agent, at the Federal Funds Rate for three Business Days and thereafter at the Reference Rate plus the Applicable Margin. During the period in which such Lender has not paid such corresponding amount to the Administrative Agent, notwithstanding anything to the contrary contained in this Loan Agreement or any other Loan Document, the amount so advanced by the Administrative Agent to the Borrowers shall, for all purposes hereof, be a Loan made by the Administrative Agent for its own account Upon any such failure by a Lender to pay the Administrative Agent, the Administrative Agent shall promptly thereafter notify the Administrative Borrower of such failure and the Borrowers shall immediately pay such corresponding amount to the Administrative Agent for its own account.

(iv)     Nothing in this Section 2.03(c) shall be deemed to relieve any Lender from its obligations to fulfill its Commitment hereunder or to prejudice any rights that the Administrative Agent or the Borrowers may have against any Lender as a result of any default by such Lender hereunder.

(d)     Upon the Borrowers' request for a borrowing pursuant to Section 2.03(a) above and subject to Section 2.03(c) above, each Lender shall, assuming all conditions precedent set forth in this Section 2.03 and in Sections 5.01 and 5.02 have been met, and provided no Default shall have occurred and be continuing (in accordance with Section 2.01), not later than 3:00 p.m. (eastern time) on the requested Funding Date, make a Loan (determined by the Administrative Agent) in an amount equal to such Lender's Pro Rata Share and which would not cause the aggregate amount of Loans then outstanding to exceed the Maximum Credit. Subject to the foregoing, such borrowing will be made available to the Borrowers in accordance with Section 2.03(c) via wire transfer to the applicable Loan Account in funds immediately available to the Borrowers.

2.04     Limitation on Types of Loans; Illegality.   Anything herein to the contrary notwithstanding, if, on or prior to the determination of any LIBO Base Rate:

(a)     any Lender determines, which determination shall be conclusive, that quotations of interest rates for the relevant deposits referred to in the definition of "LIBO Base

- 25 -

Rate" in Section 1.01 hereof are not being provided in the relevant amounts or for the relevant maturities for purposes of determining rates of interest for Loans as provided herein; or

(b)    any Lender determines, which determination shall be conclusive, that the Applicable Margin plus the relevant rate of interest referred to in the definition of "LIBO Base Rate" in Section 1.0.1 hereof upon the basis of which the rate of interest for Loans is to be determined is not likely adequately to cover the cost to such Lender of making or maintaining Loans; or

(c)    it becomes unlawful for such Lender to make or maintain Loans hereunder using a LIBO Rate;

then such Lender shall give the Administrative Agent and the Administrative Borrower prompt notice thereof and, so long as such condition remains in effect, the Lenders shall not make additional Loans, and the Borrowers shall, at their option, either prepay such Loans or pay interest on such Loans at a rate per annum as determined by such Lender taking into account the increased cost to such Lender of making and maintaining the Loans.

2.05    Repayment of Loans; Interest.

(a)    Each Borrower hereby unconditionally promises to pay in full on the Maturity Date the then aggregate outstanding principal amount of the Loans and all other Obligations due under this Loan Agreement and the other Loan Documents.

(b)    The Borrowers shall pay to the Administrative Agent for the account of the Lenders interest on the unpaid principal amount of each Loan for the period from and including the date of such Loan to but excluding the date such Loan shall be paid in full, at a rate per annum equal to the LIBO Rate plus the Applicable Margin. Notwithstanding the foregoing, upon the occurrence and during the continuance of any Event of Default, the Borrowers shall pay to the Administrative Agent for the account of the Lenders interest at the applicable Post-Default Rate on any principal of any Loan and on any other amount payable by the Borrowers hereunder, for the period from and including the date of occurrence of such Event of Default to but excluding the date such Event of Default is waived or such amount is paid in full.

(c)    Accrued interest on each Loan as calculated in Section 2.05(b) above shall be payable in arrears on each Monthly Payment Date and on the Maturity Date, except that interest payable at the Post-Default Rate shall accrue daily and shall be payable promptly upon receipt of invoice; provided, that, so long as the interest payable does not exceed the amount on deposit in the Interest Escrow Subaccount, the Administrative Agent shall pay on the Borrowers' behalf all then-outstanding interest with amounts on deposit in the Interest Escrow Subaccount. Promptly after the determination of any interest rate provided for herein or any change therein, the Lender shall give written notice thereof to the Administrative Borrower.

(d)    The amount held in the Interest Escrow Subaccount will be reduced and released to the Borrowers on a pro rata basis for any repayment or prepayment of the Loans

- 26 -

under Sections 2.06 or 2.07 that is accompanied by a corresponding reduction in the amount of the Commitment.

        2.06      Mandatory Prepayment.

        (a)      Deficiency. If at any time the aggregate outstanding principal amount of Loans exceeds the Maximum Credit (a "Deficiency"), as determined by the Administrative Agent and notified to the Administrative Borrower on any Business Day, the Borrowers shall immediately upon receipt of such written notice by the Administrative Borrower, prepay the Loans in part or in whole, such that after giving effect to such prepayment a Deficiency no longer exists. To the extent that there are Deficiencies with respect to more than one Loan, funds on deposit in the Control Accounts shall be applied pro rata to the Loans.

        (b)      Asset Dispositions. Upon receipt by any Borrower of any Net Cash Proceeds from (i) any Asset Sale, the Borrower shall immediately prepay the Loans in an amount equal to 100% of such Net Cash Proceeds; and (ii) any Repo Disposition, such Borrower shall immediately prepay the Loans in an amount equal to 50% of such Net Cash Proceeds.

        (c)      Certain Proceeds of Indebtedness. Upon receipt by any Borrower of the cash proceeds (net of underwriting discounts and commissions, placement agent fees and other customary fees and costs associated therewith) from any issuance or incurrence of any Indebtedness that is not permitted to be incurred hereunder the Borrowers will make a prepayment of the Loans in an amount equal to 100% of such net proceeds.

        (d)      Certain Proceeds of an Event of Loss. Upon receipt by any Borrower of any Net Cash Proceeds from any Event of Loss in excess of $50,000, in the aggregate during any fiscal year, the Borrowers will make a prepayment of the Loans in an amount equal to 100% of the Net Cash Proceeds then received from such Event of Loss to the extent in excess of $50,000.

        (e)      Extraordinary Receipts. Not later than the tenth Business Day following the date of the receipt by the Borrowers or any of their Subsidiaries of Extraordinary Receipts, the Borrowers will make a prepayment of the Loans in an amount equal to 100% of such Extraordinary Receipts (net of any reasonable expenses incurred in collecting such Extraordinary Receipts).

        (f)      Subject to Section 3.03(b), any prepayments made by the Borrower pursuant to Section 2.06 (b), (c), (d) or (e) shall be applied to repay the outstanding principal balance of the Loans until such Loans shall have been paid in full. All repayments of Loans required to be made pursuant to such paragraphs shall, at the election of the Lenders, result in a permanent reduction of the Commitments.

        2.07      Optional Prepayments

        (a)      The Loans are prepayable without premium or penalty, in whole or in part on each Payment Date. The Loans are prepayable at any other time, in whole or in part, in accordance herewith and subject to clause (b) below. Amounts repaid may be reborrowed in

- 27 -

accordance with the terms of this Loan Agreement to the extent permitted under Section 2.01. If the Borrowers intend to prepay a Loan in whole or in part from any source other than as required under Section 2.06, the Administrative Borrower shall give two (2) Business Days' prior written notice thereof to the Lenders. If such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid. Partial prepayments shall be in a minimum principal amount of $1,000,000 and shall be in an integral multiple of $100,000.

(b)    If the Borrowers make a prepayment of the Loans on any day which is not a Payment Date, the Borrowers shall indemnify the Administrative Agent and the Lenders and hold the Administrative Agent and the Lenders harmless from any actual loss or expense which the Administrative Agent or such Lender may sustain or incur arising from (a) the re-employment of funds obtained by the Administrative Agent or any Lender to maintain the Loans hereunder or from (b) fees payable to terminate the deposits from which such funds were obtained, in either case, which actual loss or expense shall be equal to an amount equal to the excess, as reasonably determined by the Administrative Agent or such Lender, of (i) its cost of obtaining funds for such Loans for the period from the date of such payment through the following Payment Date over (ii) the amount of interest likely to be realized by such Lender in redeploying the funds not utilized by reason of such payment for such period. This Section 2.07 shall survive termination of this Loan Agreement and payment of the Loans.

(c)    This Loan Agreement may be terminated by the Borrowers at any time upon payment in full in cash of all Obligations, including all payments required to be made under Sections 2.05, 3.06 and 3.07 of this Loan Agreement.

2.08    Requirements of Law.

(a)    If any Requirement of Law (other than with respect to any amendment made after the Closing Date to the Administrative Agent's or any Lender's certificate of incorporation and by-laws or other organizational or governing documents) or any change in the interpretation or application thereof or compliance by the Administrative Agent or any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(i)    shall subject any Lender-Related Party to any tax of any kind whatsoever with respect to this Loan Agreement or any Loan made by it other than Excluded Taxes or change the basis of taxation of payments to any Lender-Related Party in respect thereof;

(ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory advance or similar requirement against assets held by deposits or other liabilities in or for the account of Loans or other extensions of credit by, or any other acquisition of funds by any office of any Lender-Related Party which is not otherwise included in the determination of the LIBO Base Rate hereunder; or

(iii)    shall impose on any Lender-Related Party any other condition;

- 28 -

and the result of any of the foregoing is to increase the cost to the Administrative Agent or any Lender, by an amount which the Administrative Agent or such Lender deems to be material, of making, continuing or maintaining any Loan or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrowers shall promptly pay the Administrative Agent or such Lender such additional amount or amounts as will compensate the Administrative Agent or such Lender, on an after-Tax basis, for such increased cost or reduced amount receivable thereafter incurred.

(b)     If the Administrative Agent or any Lender shall have determined that the adoption of or any change in any Requirement of Law (other than with respect to any amendment made after the Closing Date to the Administrative Agent's or any Lender's certificate of incorporation and by-laws or other organizational or governing documents) regarding capital adequacy or in the interpretation or application thereof or compliance by any Lender-Related Party or any corporation controlling any Lender-Related Party with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on such corporation's or any Lender- Related Party's capital as a consequence of any obligations hereunder to a level below that which such corporation or any Lender-Related Party (taking into consideration such corporation's or any Lender-Related Party's policies with respect to capital adequacy) by an amount reasonably deemed by the Administrative Agent or such Lender to be material, then from time to time, the Borrowers shall promptly pay to the Administrative Agent or such Lender such additional amount or amounts as will thereafter compensate the Administrative Agent or such Lender for such reduction.

(c)     If the Administrative Agent or any Lender becomes entitled to claim any additional amounts pursuant to this subsection, it shall promptly notify the Administrative Borrower of the event by reason of which it has become so entitled. A certificate as to any additional amounts payable pursuant to this subsection submitted by the Administrative Agent or such Lender to the Administrative Borrower shall be conclusive in the absence of manifest error.

2.09     Purpose of Loans.    Each Loan shall be used in accordance with Section 7.11.

### Section 3. Payments; Computations; Taxes; Fees.

3.01     Payments.    Except to the extent otherwise provided herein, all payments of principal, interest and other amounts to be made by the Borrowers under this Loan Agreement, shall be made in Dollars, in immediately available funds, without deduction, set-off or counterclaim, to the Facility Collection Account not later than 12:00 noon, eastern time, on the date on which such payment shall become due (each such payment made after such time on such due date to be deemed to have been made on the next succeeding Business Day). Each Borrower acknowledges that it has no rights of any kind with respect to the foregoing account (including, without limitation, any right of withdrawal therefrom); provided, that, absent a Default or Event of Default, the Administrative Agent shall release to the Borrowers all funds not otherwise required to be applied to the Obligations.

- 29 -

    3.02  Sharing of Payments Etc. Except as provided in Section 2.08 hereof, if any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of any Obligation in excess of its Pro Rata Share on account of similar obligations obtained by all the Lenders, such Lender shall forthwith purchase from the other Lenders such participations in such similar obligations held by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided, however, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and such Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender of any interest or other amount paid by the purchasing Lender in respect of the total amount so recovered). The Borrowers agree that any Lender so purchasing a participation from another Lender pursuant to this Section 3.02 may, to the fullest extent permitted by law, exercise all its rights (including the Lender's right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrowers in the amount of such participation.

    3.03  Apportionment of Payments.

    (a)  All payments of principal and interest in respect of outstanding Loans, all payments of fees and all other payments in respect of any other Obligations, shall be allocated by the Administrative Agent among such of the Lenders as are entitled thereto, in proportion to their respective Pro Rata Shares or otherwise as provided herein or, in respect of payments not made on account of the Loans as designated by the Person making payment when the payment is made. The Administrative Agent will promptly distribute any such payment to each Lender, as appropriate, within one (1) Business Day of receipt. So long as no Event of Default shall have occurred and be continuing, the Administrative Agent shall, subject to the provisions of this Agreement, apply all payments in respect of any Obligations and all proceeds of the Collateral as set forth in Section 2.06.

    (b)  After the occurrence and during the continuance of an Event of Default or on the Maturity Date, the Administrative Agent may, and upon the direction of the Required Lenders shall, apply all payments in respect of any Obligations and all proceeds of the Collateral, subject to the provisions of this Agreement (i) first, to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due to the Administrative Agent, as administrative agent, until paid in full; (ii) second, to pay the Obligations in respect of any fees, expense reimbursements and indemnities then due to the Lenders until paid in full; (iii) third to pay interest due in respect of the Loans, as determined by the Administrative Agent, until paid in full; (iv) fourth to pay principal of the Loans, as determined by the Administrative Agent, until paid in full; (v) fifth, to the ratable payment of all other Obligations then due and payable, (vi) sixth, to the extent that there has been asserted any claim to which the Administrative Agent and/or the Lender-Related Parties may be entitled to indemnification pursuant to the terms of this Loan Agreement, to establish a reserve in an amount determined by the Administrative Agent in good faith, and (vii) seventh, to the

- 30 -

Administrative Borrower for distribution to the Borrowers or to whomever is legally entitled to such proceeds as ordered by the Bankruptcy Court.

        3.04      Computations. Interest on the Loans shall be computed based on a 360-day year for the actual days elapsed (including the first day but excluding the last day) occurring in the period for which payable.

        3.05      Joint and Several Liability of Borrowers.

        (a)      Notwithstanding anything in this Loan Agreement or any other Loan Document to the contrary, each of the Borrowers hereby accepts joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Administrative Agent and the Lenders under this Loan Agreement and the other Loan Documents, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations. Each of the Borrowers, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 3.05), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each of the Borrowers without preferences or distinction among them. If and to the extent that any of the Borrowers shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation. Subject to the terms and conditions hereof, the Obligations of each of the Borrowers under the provisions of this Section 3.05 constitute the absolute and unconditional, full recourse Obligations of each of the Borrowers enforceable against each such Person to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement, the other Loan Documents or any other circumstances whatsoever.

        (b)      The provisions of this Section 3.05 are made for the benefit of the Administrative Agent on behalf of the Lenders and their successors and assigns, and may be enforced by the Administrative Agent from time to time against any or all of the Borrowers as often as occasion therefor may arise and without requirement on the part of the Administrative Agent, the Lenders or such successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any of the other Borrowers or to exhaust any remedies available to it or them against any of the other Borrowers or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this Section 3.05 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.

        (c)      Each of the Borrowers hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Borrowers with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Administrative Agent or the Lenders with respect to any of the Obligations or any Collateral

- 31 -

until such time as all of the Obligations have been paid in full in cash. Any claim which any Borrower may have against any other Borrower with respect to any payments to the Administrative Agent or the Lenders hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations.

        3.06     U.S. Taxes.

(a)      Except as required by applicable law, any and all payments by or on account of any Obligation of the Borrowers hereunder shall be made free and clear of and without deduction for any Taxes; provided, however, that if any deduction of Indemnified Taxes shall be required, then (i) the Borrowers shall increase the sum payable so that after all required deductions (including deductions applicable to additional sums payable under this Section 3.06) the Administrative Agent, the Lenders and each of their respective Tax Related Persons receives and retains (after withholding and payment of all Taxes, including income Taxes) an amount equal to the sum it would have received and retained had no such deductions been made, (ii) the Borrowers or the Administrative Agent shall make such deductions and (iii) the Borrowers or the Administrative Agent shall pay the full amount deducted to the relevant Governmental Authorities in accordance with applicable law.

(b)      In addition, each Borrower shall pay all Other Taxes to the relevant Governmental Authorities in accordance with applicable law.

(c)      Each Borrower shall indemnify the Administrative Agent and each Lender (including for these purposes a Participant), within ten days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid or incurred by the Administrative Agent or such Lender or their respective Tax Related Persons, as the case may be, relating to, arising out of, or in connection with, this Loan Agreement, any Note, any other Loan Document or any payment or transaction contemplated hereby or thereby, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. Such indemnification shall be made on an after-Tax basis, such that after all required deductions and payments of all Taxes (including deductions applicable to amounts payable under this Section 3.06; and income Taxes) and payment of all reasonable expenses, the Administrative Agent, the Lenders and each of their respective Tax Related Persons receives and retains an amount equal to the sum it would have received and retained had it not paid or incurred or been subject to such Indemnified Taxes or Other Taxes. The written demand shall include a certificate setting forth the amount of such Indemnified Taxes and/or Other Taxes. Such certificate shall be conclusive, absent manifest error. For purposes of this Section 3.06 and any provision of any Loan Document requiring payment by the Borrowers on an after-Tax basis, the indemnitee or recipient of such payment (or its Tax Related Persons, as applicable) shall be conclusively presumed to be subject to current income taxation at the highest marginal rate applicable to persons of the indemnitee's classification (e.g., individual, corporation or trust).

- 32 -

(d)      As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Borrower to a Governmental Authority, such Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt, if any, issued by such Governmental Authority evidencing such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)      To the extent legally entitled to do so, the Administrative Agent and each Lender shall furnish to the Administrative Borrower and the Administrative Agent (as applicable) Internal Revenue Service Forms W-8BEN, W-8ECI, W-8IMY or W-9 to the extent necessary to obtain a reduction of or exemption from withholding taxes imposed by the United States of America with respect to payments made by the Borrowers or the Administrative Agent under any Loan Document. Each Lender and the Administrative Agent shall provide such forms prior to the first interest payment date after becoming a party to this Agreement and when reasonably and timely requested by the Administrative Borrower or the Administrative Agent (as applicable). "United States persons" (within the meaning of Code Section 7701(a)(30)) that are "exempt recipients" (within the meaning of Treasury Regulations Section 1.6049-4(c)(i)(ii) (without regard to the second sentence thereof)) shall not be required to furnish an Internal Revenue Service Form W-9, except to the extent required under Treasury Regulations Section 1.1441-I(d)(4) (if applicable). None of the Administrative Agent, any Lender or any Tax Related Person shall be required to make available any information that it deems confidential to the Borrowers or to any other Person.

3.07      Fees. The Borrowers shall pay the following fees and charges, which fees and charges shall be non-refundable when paid (irrespective of whether this Agreement is terminated thereafter):

(a)      Facility Fee. To each Lender under the Facility, a facility fee on such Lender's Pro Rata Share of $35,000,000 (the "Facility Fee") from the date hereof until the Maturity Date or, if later, the date on which all the Loans shall have been fully and finally repaid, at a rate equal to 0.50% per annum, payable in arrears (i) on each Monthly Payment Date, commencing on the first Monthly Payment Date following the Closing Date, (ii) on the Maturity Date and (iii) if later than the Maturity Date, the date on which all the Loans shall have been fully and finally repaid.

(b)      Commitment Fees. To the Administrative Agent on the date of entry of the Initial Order, a commitment fee in an amount equal to 1.00% times $50,000,000.

## Section 4. Collateral Security and Administrative Priority.

4.01      Collateral; Security Interest.

(a)      Pursuant to and as provided in the Orders, as security for the full and timely payment and performance of all of the Obligations, each Borrower hereby as of the Closing Date assigns, pledges, transfers and grants to the Administrative Agent, for the benefit of the Secured Parties, pursuant to Section 364 of the Bankruptcy Code, a perfected security interest in and to and Lien on all of its right, title and interest in, to and under all the Collateral, whether

- 33 -

now owned or hereafter acquired, now existing or hereafter created and wherever located, to secure the payment of the Obligations. Each Borrower agrees to mark its computer records and tapes to evidence the security interests granted to the Administrative Agent, for the benefit of the Secured Parties, hereunder.

(b)        Each Borrower agrees to direct and to cause all Persons remitting funds that constitute part of the Collateral, to remit such funds to the Facility Collection Account. To the extent that any Borrower (or any of its agents or employees) receives any funds that would be remitted to Control Accounts pursuant to the immediately preceding sentence, such Borrower agrees to deposit immediately such funds into the applicable Control Account.

        4.02    Perfection of Security Interests.

        (a) Each Borrower shall, at its expense, promptly and duly execute and deliver, and have recorded, such agreements, instruments and documents and perform any and all actions reasonably requested by the Administrative Agent at any time and from time to time to perfect, maintain, protect, and enforce the Lenders' security interest in the Collateral of such Borrower, including, without limitation, (i) executing and filing financing or continuation statements, and amendments thereof, in form and substance satisfactory to the Administrative Agent, (ii) in the case of any Investment Property, Deposit Accounts, taking any actions required by the Administrative Agent to enable the Administrative Agent to obtain Control with respect thereto, (iii) executing and delivering such documents, agreements and instruments as may be required by the Administrative Agent to further evidence and perfect its security interests in all Intellectual Property, (iv) maintaining complete and accurate stock records, (v) using its best efforts in delivering to the Administrative Agent negotiable warehouse receipts, if any, and, upon the Administrative Agent's request therefor, non-negotiable warehouse receipts covering any portion of the Collateral located in warehouses and for which warehouse receipts are issued, (vi) placing notations on such Borrower's certificates of title or books of account to disclose the Administrative Agent's security interest therein, (vii) delivering to the Administrative Agent all documents, certificates and Instruments necessary or desirable to perfect the Administrative Agent's Lien in letters of credit on which such Borrower is named as beneficiary and all acceptances issued in connection therewith, (viii) after the occurrence and during the continuation of an Event of Default, transferring Inventory maintained in warehouses to other warehouses designated by the Administrative Agent and (ix) taking such other steps as are deemed necessary or desirable to maintain the Administrative Agent's security interest in the Collateral.

        (b) Each Borrower hereby authorizes the Administrative Agent at any time and from time to time to execute and file financing statements or continuation statements and amendments thereto and other filing or recording documents or instruments with respect to the Collateral without the signature of such Borrower in such form and in such offices as the Administrative Agent determines appropriate to perfect the security interests of the Administrative Agent under this Agreement. Each Borrower shall pay the costs of, or incidental to, any recording or filing of any financing statements concerning the Collateral. Each Borrower agrees that a carbon, photographic, photostatic, or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement. If any Collateral is at any time in the

- 34 -

possession or control of any warehouseman, bailee or such Borrower's agents or processors, such Borrower shall notify such warehouseman, bailee, agents or processors of the Administrative Agent's security interest, which notification shall specify that such Person shall hold all such Collateral for the benefit of the Administrative Agent and, upon the occurrence and during the continuance of an Event of Default, hold all such Collateral for the Administrative Agent's account subject to the Administrative Agent's instructions. From time to time, each Borrower shall, upon the Administrative Agent's request, execute and deliver written instruments pledging to the Administrative Agent the Collateral described in any such instruments or otherwise, but the failure of such Borrower to execute and deliver such confirmatory instruments shall not affect or limit the Administrative Agent's security interest or other rights in and to the Collateral. Until all Obligations have been fully satisfied and the Commitments shall have been terminated, the Administrative Agent's security interest in the Collateral, and all Proceeds and products thereof, shall continue in full force and effect.

(c) Notwithstanding subsections (a) and (b) of this Section 4.02, or any failure on the part of any Borrower or the Administrative Agent to take any of the actions set forth in such subsections, the Liens and security interests granted herein shall be deemed valid, enforceable and perfected by entry of the Interim Order and the Final Order, as applicable. No financing statement, notice of Lien, mortgage, deed of trust or similar instrument in any jurisdiction or filing office need be filed or any other action taken in order to validate and perfect the Liens and security interests granted by or pursuant to this Agreement or the Orders.

4.03    Rights of Lender; Limitations on Lenders' Obligations.

(a) Subject to each Borrower's rights and duties under the Bankruptcy Code (including Section 365 of the Bankruptcy Code), it is expressly agreed by each Borrower that, anything herein to the contrary notwithstanding, such Borrower shall remain liable under its Contracts to observe and perform all the conditions and obligations to be observed and performed by it thereunder. Neither the Administrative Agent nor any Secured Party shall have any obligation or liability under any Contract by reason of or arising out of this Agreement, the other Loan Documents or the Orders, or the granting to the Administrative Agent of a security interest therein or the receipt by the Administrative Agent or any Lender of any payment relating to any Contract pursuant hereto, nor shall the Administrative Agent be required or obligated in any manner to perform or fulfill any of the obligations of any Borrower under or pursuant to any Contract, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any Contract, or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b) Subject to Section 4.05, the Administrative Agent authorizes each Borrower to collect its Accounts, provided that such collection is performed in accordance with such Borrower's customary procedures, and the Administrative Agent may, upon the occurrence and during the continuation of any Event of Default and without notice, other than any requirement of notice provided in the Orders, limit or terminate said authority at any time.

- 35 -

(c) Subject to any requirement of notice provided in the Orders, the Administrative Agent may at any time, upon the occurrence and during the continuation of any Event of Default, notify Account Debtors, notify the other parties to the Contracts of the Borrowers, notify obligors of Instruments and Investment Property of the Borrowers and notify obligors in respect of Chattel Paper of the Borrowers that the right, title and interest of the Borrowers in and under such Accounts, such Contracts, such Instruments, such Investment Property and such Chattel Paper have been assigned to the Administrative Agent and that payments shall be made directly to the Administrative Agent. Subject to any requirement of notice provided in the Orders, upon the request of the Administrative Agent, the Borrowers will so notify such Account Debtors, such parties to Contracts, obligors of such Instruments and Investment Property and obligors in respect of such Chattel Paper. Subject to any requirement of notice provided in the Orders, upon the occurrence and during the continuation of an Event of Default, the Administrative Agent may in its own name, or in the name of others, communicate with such parties to such Accounts, Contracts, Instruments, Investment Property and Chattel Paper to verify with such Persons to the Administrative Agent's reasonable satisfaction the existence, amount and terms of any such Accounts, Contracts, Instruments, Investment Property or Chattel Paper.

4.04    Covenants of the Borrowers with Respect to Collateral. Each Borrower hereby covenants and agrees with the Administrative Agent that from and after the date of this Agreement and until the Obligations are fully satisfied:

(a) Such Borrower will not, (i) change its jurisdiction of organization or the location of its chief executive office or sole place of business, or (ii) change its name, identity, taxpayer identification number, organizational identification number, or organizational structure or form to such an extent that any financing statement filed by the Administrative Agent in connection with this Agreement would become incorrect or misleading.

(b) Such Borrower will keep and maintain, at its own cost and expense, satisfactory and complete records of the Collateral, in all material respects, including, without limitation, a record of all payments received and all credits granted with respect to the Collateral and all other dealings concerning the Collateral. For the Administrative Agent's further security, each Borrower agrees that the Administrative Agent shall have a property interest in all of such Borrower's books and Records pertaining to the Collateral and, upon the occurrence and during the continuation of an Event of Default, such Borrower shall deliver and turn over any such books and Records to the Administrative Agent or to their respect representatives at any time on demand of the Administrative Agent.

(c) In any suit, proceeding or action brought by the Administrative Agent relating to any Account, Chattel Paper, Contract, General Intangible, Investment Property, Instrument, Intellectual Property or other Collateral for any sum owing thereunder or to enforce any provision of any Account, Chattel Paper, Contract, General Intangible, Investment Property, Instrument, Intellectual Property or other Collateral, such Borrower will save, indemnify and keep the Secured Parties harmless from and against all expense, loss or damage suffered by the Secured Parties by reason of any defense, setoff, counterclaim, recoupment or reduction of liability whatsoever of the obligor thereunder, arising out of a breach by such Borrower of any

- 36 -

obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to, or in favor of, such obligor or its successors from such Borrower, and all such obligations of such Borrower shall be and remain enforceable against and only against such Borrower and shall not be enforceable against the Administrative Agent.

(d) Such Borrower will not create, permit or suffer to exist, and will defend the Collateral against and take such other action as is necessary to remove, any Lien on the Collateral except Permitted Liens and will defend the right, title and interest of the Administrative Agent in and to all of such Borrower's rights under the Collateral and in and to the Proceeds thereof against the claims and demands of all Persons whomsoever other than claims or demands arising out of Permitted Liens.

(e) Such Borrower will not, without the Administrative Agent's prior written consent, grant any extension of the time of payment of any of the Accounts, Accounts Receivable, Chattel Paper, Instruments, Payment Intangibles or Supporting Obligations, compromise, compound or settle the same for less than the full amount thereof, release, wholly or partly, any Person liable for the payment thereof, or allow any credit or discount whatsoever thereon other than any of the foregoing which are done in the ordinary course of business, consistent with past practices and trade discounts granted in the ordinary course of business of such Borrower.

(f) Such Borrower will advise the Lenders promptly, in reasonable detail, (i) of any Lien asserted against any of the Collateral other than Permitted Liens and (ii) of the occurrence of any other event which could have a Material Adverse Effect with respect to the aggregate value of the Collateral or on the security interests created hereunder.

(g) Such Borrower will keep and maintain the Equipment in good operating condition sufficient for the continuation of the business conducted by such Borrower on a basis consistent with past practices, ordinary wear and tear excepted.

(h) Pledged Collateral.

(i) Upon request of the Administrative Agent, such Borrower will (x) deliver to the Administrative Agent, all certificates or Instruments representing or evidencing any Pledged Collateral, whether now arising or hereafter acquired, in suitable form for transfer by delivery or, as applicable, accompanied by such Borrower's endorsement, where necessary, or duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Administrative Agent, together with a Pledge Amendment, duly executed by the Borrowers, in form and substance acceptable to the Administrative Agent (a "Pledge Amendment"), in respect of such Additional Pledged Collateral and authorizes the Administrative Agent to attach each Pledge Amendment to this Agreement and (y) maintain all other Pledged Collateral constituting Investment Property in a Control Account subject to a binding Control Account Letter. The Administrative Agent shall have the right, at any time in their discretion and without notice to the Borrowers, to transfer to or to register in its name or in the name of its nominees

- 37 -

any or all of the Pledged Collateral. The Administrative Agent shall have the right at any time to exchange certificates or instruments representing or evidencing any of the Pledged Collateral for certificates or instruments of smaller or larger denominations.

(ii) Except as provided in Section 4.07, such Borrower shall be entitled to receive all cash dividends paid in respect of the Pledged Collateral (other than liquidating or distributing dividends) with respect to the Pledged Collateral. Any sums paid upon or in respect of any of the Pledged Collateral upon the liquidation or dissolution of any issuer of any of the Pledged Collateral, any distribution of capital made on or in respect of any of the Pledged Collateral or any property distributed upon or with respect to any of the Pledged Collateral pursuant to the recapitalization or reclassification of the capital of any issuer of Pledged Collateral or pursuant to the reorganization thereof shall, unless otherwise subject to a perfected security interest in favor of the Administrative Agent, be delivered to the Administrative Agent to be held by it hereunder as additional collateral security for the Obligations. If any sums of money or property so paid or distributed in respect of any of the Pledged Collateral shall be received by such Borrower, such Borrower shall, until such money or property is paid or delivered to the Administrative Agent, hold such money or property in trust for the Administrative Agent, segregated from other funds of such Borrower, as additional security for the Obligations.

(iii) Except as provided in Section 4.07, such Borrower will be entitled to exercise all voting, consent and corporate rights with respect to the Pledged Collateral; provided, however, that no vote shall be cast, consent given or right exercised or other action taken by such Borrower which would impair the Collateral or which would be inconsistent with or result in any violation of any provision of this Agreement, the other Loan Documents or the Orders or, without prior notice to the Administrative Agent, to enable or take any other action to permit any issuer of Pledged Collateral to issue any stock or other equity securities of any nature or to issue any other securities convertible into or granting the right to purchase or exchange for any stock or other equity securities of any nature of any issuer of Pledged Collateral.

(iv) Such Borrower shall not grant control over any Investment Property to any Person other than the Administrative Agent.

(v) In the case of each Borrower which is an issuer of Pledged Collateral, such Borrower agrees to be bound by the terms of this Agreement relating to the Pledged Collateral issued by it and will comply with such terms insofar as such terms are applicable to it. In the case of each Borrower which is a partner in a partnership, such Borrower hereby consents to the extent required by the applicable partnership agreement to the pledge by each other Borrower, pursuant to the terms hereof, of the Pledged Partnership Interests in such partnership and to the transfer of such Pledged Partnership Interests to the

- 38 -

Administrative Agent or its nominee and to the substitution of the Administrative Agent or its nominee as a substituted partner in such partnership with all the rights, powers and duties of a general partner or a limited partner, as the case may be. In the case of each Borrower which is a member of a limited liability company, such Borrower hereby consents to the extent required by the applicable limited liability company agreement to the pledge by each other Borrower, pursuant to the terms hereof, of the Pledged LLC Interests in such limited liability company and to the transfer of such Pledged LLC Interests to the Administrative Agent or its nominee and to the substitution of the Administrative Agent or its nominee as a substituted member of the limited liability company with all the rights, powers and duties of a member of the limited liability company in question.

(vi) Such Borrower will not agree to any amendment of a limited liability company agreement or partnership agreement that in any way adversely affects the perfection of the security interest of the Administrative Agent in the Pledged Partnership Interests or Pledged LLC Interests pledged by such Borrower hereunder, including electing to treat the membership interest or partnership interest of such Borrower as a security under Section 8-103 of the UCC.

(i) <u>Intellectual Property</u>.

(i) Such Borrower (either itself or through licensees) will (i) continue to use each Trademark that is Intellectual Property in order to maintain such Trademark in full force and effect with respect to each class of goods for which such Trademark is currently used, free from any claim of abandonment for non-use, (ii) maintain as in the past the quality of products and services offered under such Trademark, (iii) use such Trademark with the appropriate notice of registration and all other notices and legends required by applicable Requirements of Law, (iv) not adopt or use any mark which is confusingly similar or a colorable imitation of such Trademark unless the Administrative Agent shall obtain a perfected security interest in such mark pursuant to this Agreement and (v) not (and not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby such Trademark may become invalidated or impaired in any way.

(ii) Such Borrower (either itself or through licensees) will not do any act, or omit to do any act, whereby any Patent which is Intellectual Property may become forfeited, abandoned or dedicated to the public.

(iii) Such Borrower (either itself or through licensees) (i) will not (and will not permit any licensee or sublicensee thereof to) do any act or omit to do any act whereby any portion of the Copyrights which is Intellectual Property may become invalidated or otherwise impaired and (ii) will not (either itself or through licensees) do any act whereby any portion of the Copyrights which is Intellectual Property may fall into the public domain.

- 39 -

(iv)  Such Borrower (either itself or through licensees) will not do any act, or omit to do any act, whereby any trade secret which is Intellectual Property may become publicly available or otherwise unprotectable.

(v)  Such Borrower (either itself or through licensees) will not do any act that knowingly uses any Intellectual Property to infringe the intellectual property rights of any other Person.

(vi)  Such Borrower will notify the Administrative Agent immediately if it knows, or has reason to know, that any application or registration relating to any Intellectual Property may become forfeited, abandoned or dedicated to the public, or of any adverse determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office or any court or tribunal in any country) regarding such Borrower's ownership of, right to use, interest in, or the validity of, any Intellectual Property or such Borrower's right to register the same or to own and maintain the same.

(vii)  Whenever such Borrower, either by itself or through any agent, licensee or designee, shall file an application for the registration of any Intellectual Property with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency within or outside the United States, such Borrower shall report such filing to the Administrative Agent within five Business Days after the last day of the fiscal quarter in which such filing occurs.  Upon request of the Administrative Agent, such Borrower shall execute and deliver, and have recorded, any and all agreements, instruments, documents, and papers as the Administrative Agent may request to evidence the Administrative Agent's security interest in any Copyright, Patent or Trademark and the goodwill and general intangibles of such Borrower relating thereto or represented thereby.

(viii)Such Borrower will take all reasonable actions necessary or requested by the Administrative Agent, including in any proceeding before the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of any Copyright, Trademark or Patent that is Intellectual Property, including filing of applications for renewal, affidavits of use, affidavits of incontestability and opposition and interference and cancellation proceedings.

(ix)  In the event that any Intellectual Property is infringed upon or misappropriated or diluted by a third party, such Borrower shall notify the Administrative Agent promptly after such Borrower learns thereof.  Such Borrower shall take appropriate action in response to such infringement, misappropriation or dilution, including promptly bringing suit for infringement, misappropriation or dilution and to recover any and all damages for such infringement, misappropriation or dilution, and shall take such other actions may be appropriate

- 40 -

in its reasonable judgment under the circumstances to protect such Intellectual Property.

4.05    Performance by Agent of the Borrowers' Obligations. If any Borrower fails to perform or comply with any of its agreements contained herein and the Administrative Agent, as provided for by the terms of this Agreement, shall perform or comply, or otherwise cause performance or compliance, with such agreement, the expenses of the Administrative Agent incurred in connection with such performance or compliance, together with interest thereon at the rate then in effect in respect of the Loans, shall be payable by such Borrower to the Administrative Agent on demand and shall constitute Obligations secured by the Collateral. Performance of such Borrower's obligations as permitted under this Section 4.05 shall in no way constitute a violation of the automatic stay provided by Section 362 of the Bankruptcy Code and each Borrower hereby waives applicability thereof. Moreover, neither the Administrative Agent nor the Lenders shall be responsible for the payment of any costs incurred in connection with preserving or disposing of Collateral pursuant to Section 506(c) of the Bankruptcy Code and the Collateral may not be charged for the incurrence of any such cost.

4.06    Limitation on Agent's Duty in Respect of Collateral. Neither the Administrative Agent nor any Lender shall have any duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of it or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto, except that the Administrative Agent shall, with respect to the Collateral in their possession or under their control, deal with such Collateral in the same manner as the Administrative Agent deal with similar property for its own account. Upon request of the Borrower, the Administrative Agent shall account for any moneys received by them in respect of any foreclosure on or disposition of the Collateral of any Borrower.

4.07    Remedies, Rights Upon Default.

(a) If any Event of Default shall occur and be continuing, the Administrative Agent may exercise in addition to all other rights and remedies granted to it in this Agreement, any other Loan Document and the Orders, all rights and remedies of a secured party under the UCC. Without limiting the generality of the foregoing, each Borrower expressly agrees that in any such event the Administrative Agent, without demand of performance or other demand, advertisement or notice of any kind (except the notice required by the Interim Order or Final Order or the notice specified below of time and place of public or private sale) to or upon such Borrower or any other Person (all and each of which demands, advertisements and/or notices are hereby expressly waived to the maximum extent permitted by the UCC and other applicable law), may forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give an option or options to purchase, or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, in one or more parcels at public or private sale or sales, at any exchange or broker's board or at any of the Administrative Agent's offices or elsewhere at such prices at it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. The Administrative Agent shall have the right upon any such public sale or sales to purchase the whole or any part of said Collateral so sold, free of any right or equity of redemption, which equity of redemption each

- 41 -

Borrower hereby releases. Each Borrower further agrees, at the Administrative Agent's request, to assemble the Collateral and make it available to the Administrative Agent at places which the Administrative Agent shall reasonably select, whether at such Borrower's premises or elsewhere. The Administrative Agent shall apply the proceeds of any such collection, recovery, receipt, appropriation, realization or sale (net of all expenses incurred by the Administrative Agent in connection therewith, including, without limitation, attorney's fees and expenses), to the Obligations in any order deemed appropriate by the Administrative Agent, such Borrower remaining liable for any deficiency remaining unpaid after such application, and only after so paying over such net proceeds and after the payment by the Administrative Agent of any other amount required by any provision of law, including, without limitation, the UCC, need the Administrative Agent account for the surplus, if any, to such Borrower. To the maximum extent permitted by applicable law, each Borrower waives all claims, damages, and demands against the Administrative Agent and the Lenders arising out of the repossession, retention or sale of the Collateral except such as arise out of the gross negligence or willful misconduct of the Administrative Agent. Each Borrower agrees that the Administrative Agent need not give more than seven (7) days' notice to the Borrowers (which notification shall be deemed given when mailed or delivered on an overnight basis, postage prepaid, addressed to the Borrowers at their address referred to in <u>Section 11.03</u>) of the time and place of any public sale of Collateral or of the time after which a private sale may take place and that such notice is reasonable notification of such matters. The Administrative Agent and their respective agents shall have the right to enter upon any real property owned or leased by any Borrower to exercise any of its rights or remedies under this Agreement. The Administrative Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Administrative Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and any such sale may, without further notice, be made at the time and place to which it was adjourned. Each Borrower shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay its Obligations and all other amounts to which the Administrative Agent are entitled, the Borrowers also being liable for the fees and expenses of any attorneys employed by the Administrative Agent to collect such deficiency.

(b) Each Borrower hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Agreement or any Collateral.

(c) <u>Pledged Collateral</u>.

(i) During the continuance of an Event of Default, if the Administrative Agent shall give notice of its intent to exercise such rights to the relevant Borrower or Borrowers, (i) the Administrative Agent shall have the right to receive any and all cash dividends, payments or other Proceeds paid in respect of the Pledged Collateral and make application thereof to the Obligations in the order set forth in Section 3.03(b), and (ii) the Administrative Agent or its nominee may exercise (A) all voting, consent, corporate and other rights pertaining to the Pledged Collateral at any meeting of shareholders, partners or members, as the case may be, of the relevant issuer or issuers of Pledged Collateral or otherwise and (B) any and all rights of conversion, exchange and subscription and any other rights,

- 42 -

privileges or options pertaining to the Pledged Collateral as if it were the absolute owner thereof (including the right to exchange at its discretion any and all of the Pledged Collateral upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate structure of any issuer of Pledged Securities, the right to deposit and deliver any and all of the Pledged Collateral with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Administrative Agent may determine), all without liability except to account for property actually received by it, but the Administrative Agent shall have no duty to any Borrower to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(ii)    In order to permit the Administrative Agent to exercise the voting and other consensual rights which it may be entitled to exercise pursuant hereto and to receive all dividends and other distributions which it may be entitled to receive hereunder, (i) each Borrower shall promptly execute and deliver (or cause to be executed and delivered) to the Administrative Agent all such proxies, dividend payment orders and other instruments as the Administrative Agent may from time to time reasonably request and (ii) without limiting the effect of <u>clause (i)</u> above, such Borrower hereby grants to the Administrative Agent an irrevocable proxy to vote all or any part of the Pledged Collateral and to exercise all other rights, powers, privileges and remedies to which a holder of the Pledged Collateral would be entitled (including giving or withholding written consents of shareholders, partners or members, as the case may be, calling special meetings of shareholders, partners or members, as the case may be, and voting at such meetings), which proxy shall be effective, automatically and without the necessity of any action (including any transfer of any Pledged Collateral on the record books of the issuer thereof) by any other person (including the issuer of such Pledged Collateral or any officer or agent thereof) during the continuance of an Event of Default and which proxy shall only terminate upon the payment in full of the Obligations.

(iii)    Each Borrower hereby expressly authorizes and instructs each issuer of any Pledged Collateral pledged hereunder by such Borrower to (i) comply with any instruction received by it from the Administrative Agent in writing that (A) states that an Event of Default has occurred and is continuing and (B) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Borrower, and each Borrower agrees that such issuer shall be fully protected in so complying and (ii) unless otherwise expressly permitted hereby, pay any dividends or other payments with respect to the Pledged Collateral directly to the Administrative Agent.

4.08    <u>Appointment as Attorney-in-Fact.</u>

(a) Each Borrower hereby irrevocably constitutes and appoints the Administrative Agent and any officer or agent thereof, with full power of substitution, as their and their

- 43 -

Subsidiaries' true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Borrower and in the name of such Borrower, or in its own name, from time to time in the Administrative Agent's discretion, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute and deliver any and all documents and instruments which may be necessary and desirable to accomplish the purposes of this Agreement and the transactions contemplated hereby, and, without limiting the generality of the foregoing, hereby give the Administrative Agent the power and right, on behalf of such Borrower, without notice to or assent by such Borrower to do the following:

(i) to ask, demand, collect, receive and give acquittances and receipts for any and all moneys due and to become due under any Collateral and, in the name of such Borrower, its own name or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other Instruments for the payment of moneys due under any Collateral and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Administrative Agent for the purpose of collecting any and all such moneys due under any Collateral whenever payable and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Administrative Agent for the purpose of collecting any and all such moneys due under any Collateral whenever payable;

(ii) to pay or discharge taxes, Liens, security interests or other encumbrances levied or placed on or threatened against the Collateral, to effect any repairs or any insurance called for by the terms of this Agreement and to pay all or any part of the premiums therefor and the costs thereof; and

(iii) (A) to direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due, and to become due thereunder, directly to the Administrative Agent or as the Administrative Agent shall direct; (B) to receive payment of and receipt for any and all moneys, claims and other amounts due, and to become due at any time, in respect of or arising out of any Collateral; (C) to sign and indorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with accounts and other documents constituting or relating to the Collateral; (D) to commence and prosecute any suits, actions or proceedings at law or equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; (E) to defend any suit, action or proceeding brought against any Borrower with respect to any Collateral of such Borrower; (F) to settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, to give such discharges or releases as the Administrative Agent may deem appropriate; (G) to license or, to the extent permitted by an applicable license, sublicense, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any trademarks, throughout the world for such term or terms, on such conditions, and in such manner, as the Administrative Agent shall in their sole discretion determine; and (H) generally to sell, transfer,

- 44 -

pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Administrative Agent were the absolute owner thereof for all purposes, and to do, at the Administrative Agent's option and such Borrower's expense, at any time, or from time to time, all acts and things which the Administrative Agent reasonably deem necessary to protect, preserve or realize upon the Collateral and the Administrative Agent's Lien therein, in order to effect the intent of this Agreement, all as fully and effectively as such Borrower might do.

(b) The Administrative Agent agrees that it will forbear from exercising the power of attorney or any rights granted to the Administrative Agent pursuant to this Section 4.08, except upon the occurrence or during the continuation of an Event of Default. The Borrowers hereby ratify, to the extent permitted by law, all that said attorneys shall lawfully do or cause to be done by virtue hereof. Exercise by the Administrative Agent of the powers granted hereunder is not a violation of the automatic stay provided by Section 362 of the Bankruptcy Code and each Borrower waives applicability thereof. The power of attorney granted pursuant to this Section 4.08 is a power coupled with an interest and shall be irrevocable until the Obligations are indefeasibly paid in full.

(c) The powers conferred on the Administrative Agent hereunder are solely to protect the Administrative Agent's and the Lenders' interests in the Collateral and shall not impose any duty upon them to exercise any such powers. The Administrative Agent shall be accountable only for amounts that it actually receive as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or agents shall be responsible to any Borrower for any act or failure to act, except for their own gross negligence or willful misconduct.

(d) Each Borrower also authorizes the Administrative Agent, at any time and from time to time upon the occurrence and during the continuation of any Event of Default or as otherwise expressly permitted by this Agreement, (i) to communicate in its own name or the name of its Subsidiaries with any party to any Contract with regard to the assignment of the right, title and interest of such Borrower in and under the Contracts hereunder and other matters relating thereto and (ii) to execute any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral.

4.09    Secured, Superpriority Obligations. Each Borrower covenants, represents, and warrants that, upon the entry of the Interim Order or the Final Order, as applicable, on and after the Closing Date:

(a) the provisions of the Loan Documents and the Orders are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and perfected Liens on and security interests (having the priority provided for herein and in the Orders) in all right, title and interest of each Borrower in the Collateral;

(b) all Obligations will:

- 45 -