IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x

In re:                                            :   Chapter 11
                                                  :
AMERICAN HOME MORTGAGE                            :   Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,   :
                                                  :   Jointly Administered
        Debtors.                                  :
                                                  :   **Objection Deadline: August 21, 2007 at 4:00 p.m.**
                                                  :   **Hearing Date: August 24, 2007 at 1:00 p.m.**

------------------------------------------------------------- x

## EMERGENCY MOTION FOR AN ORDER, PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE APPROVING DEBTORS' ENTRY INTO LICENSE AGREEMENT WITH INDYMAC BANK, F.S.B. IN CONNECTION WITH ITS BID FOR ASSIGNMENT OF CERTAIN OFFICE LEASES AND PURCHASE OF RELATED FURNITURE, FIXTURES AND EQUIPMENT *NUNC PRO TUNC* TO AUGUST 8, 2007

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and

debtors in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] hereby submit

this emergency motion (the "Motion") for entry of an order, pursuant to sections 105(a) and 363

of title 11 of the United States Code (the "Bankruptcy Code"), approving the Debtors' entry into

that certain license agreement annexed hereto as Exhibit A by and between the Debtors and

Indymac Bank F.S.B. ("IMB") in connection with IMB's bid for assignment of certain office

leases and purchase of the furniture, fixtures and equipment (collectively, the "FF&E") located

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

in such leaseholds *nunc pro tunc* to August 8, 2007 (the "License Agreement"). In support of

this Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## STATUS OF CASE AND JURISDICTION

1.      On August 6, 2007 (the "Petition Date"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code. On the Petition Date, the

Debtors also jointly filed motions or applications seeking certain typical "first day" relief,

including entry of an order to have these cases jointly administered.

2.      The Debtors have continued in possession of their respective properties

and have continued to operate their businesses as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.

3.      No request has been made for the appointment of a trustee or examiner,

and no official committee has yet been established in these cases.

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases

and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory

predicates for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code, as

complemented by Bankruptcy Rules 6004 and 9014.

## GENERAL BACKGROUND[2]

A.      The Debtors' Business

5.      Prior to the filing of these bankruptcy cases, AHM's business primarily

entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage

loans and mortgage-backed securities resulting from the securitizations of residential mortgage

---

[2] A detailed description of the Debtors' businesses and related business information is set forth in the Declaration of
Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief [Docket No. 2].

DB02:6169760.4                                                                          066585.1001

loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

6.      As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to *National Mortgage News*.

B.    Events Leading to the Chapter 11 Filing

7.      Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

8.      The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

9.      In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders -- the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

10.     On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

11.     The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors now employ approximately 1000 persons who are absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

12.     In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans

-4-

owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

13.     Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## RELEVANT BACKGROUND

14.     As stated above, the Debtors were in the business of originating mortgage loans and investing in mortgage-backed securities and mortgage loans resulting from the securitization of residential mortgage loans. In the weeks prior to the Petition Date, the Debtors operated hundreds of leased loan production offices locations in 47 states and the District of Columbia (collectively, the "Production Offices"). However, the Debtors discontinued their loan origination business in their Production Offices shortly prior to the Petition Date. On August 3, 2007, the Debtors implemented a massive reduction in workforce resulting in the termination of over 6,500 employees, many of whom were part of the Debtors' loan origination business employed at the various Production Offices. As such, the Production Offices, including the assets and related infrastructure for loan origination, are no longer necessary to the Debtors' operations.

15.     During the days leading up to the Petition Date, the Debtors, aided by their professional advisors, solicited interest from and were contacted by a number of parties, including IMB, regarding a potential purchase of the Debtors' loan origination business and/or certain select assets and leases relating to certain of the Production Offices. As a result of the negotiations with IMB, the Debtors and IMB have entered into the License Agreement and a letter agreement, subject to Bankruptcy Court approval, whereby IMB has agreed to bid for the

-5-

066585.1001

assignement of the office leases identified on Exhibit A to the License Agreement (collectively,

the "Office Leases" a list of the Office Leases is attached hereto as Exhibit B)[3] and the purchase

of the FF&E located in the Premises (as defined below) for an amount not less than $2.5 million

(the "Sale").[4]

### THE LICENSE AGREEMENT[5]

16.    Following arm's length negotiations, the Debtors and IMB entered into the

License Agreement.  A summary of the terms of the License Agreement are listed herein:

        (a)     License:  The Licensor grants to the Licensee a license to use the
office space, and all furniture, fixtures and equipment located
within such office space, including utilities, telephone and Internet
service supplied to such office space and all other items owned,
rented, leased or otherwise controlled by Licensor at the office
locations listed on Exhibit A attached to the License and such
additional locations as the Licensee and the Licensor may jointly
later designate (such office space and all furniture, fixtures,
equipment, utilities, telephone service and Internet service are
collectively referred to herein as the "Premises").

        (b)     Term:  The term of the License shall commence on the date the
Licensee obtains access to the Premise (the "Effective Date")[6] and
shall continue until terminated by either party upon not less than
fifteen (15) business days' notice.

        (c)     Monthly License Fee, Services:  During the Term, the Licensee
shall pay Licensor a fee (the "License Fee") equal to (i) the amount

---

[3] The list of Office Leases is subject to modification pursuant to the terms of the August Letter (as defined below).
Certain Office Leases have been removed from and others have been added to the original list of Office Leases
annexed to the License Agreement. Such changes may effect the ultimate purchase price of the Office Assets.

[4] IMB's bid is set forth in that certain letter dated August 7, 2007 (the "August Letter") attached hereto as Exhibit
C. The description contained herein is a summary only. To the extent there is any conflict between this summary
and the terms of the August Letter, the terms of the August Letter shall control. Contemporaneously herewith, the
Debtors have filed the Emergency Motion for an Order, Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy
Code, (I) Authorizing the Assumption and Assignment of Certain Real Property Leases and the Sale of Furniture,
Fixtures and Equipment Located Therein; (II) Approving the Terms of the Letter Agreement; and (III) Granting
Related Relief seeking approval of the Sale.

[5] The summary of the License Agreement provided herein is for the convenience of the Court only. To the extent
there is any conflict between this summary and the terms of the License Agreement, the terms of the License
Agreement shall control. Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to
them in the License Agreement.

[6] IMB was granted access to the Premises by the Debtors on August 8, 2007.

066585.1001

of the actual monthly rent and additional rent, including operating expenses, utilities, real estate taxes and insurance, payable by the Licensor with respect to the Premises pursuant to the applicable leases for the Premises for the period that the Licensee is provided access to and use of the Premises, plus (ii) the amount of the actual monthly charges payable by the Licensor to third parties for all facility and telecommunication service contracts servicing the Premises, plus (iii) $25,000 per month (prorated for any partial months) to cover the cost of four (4) Licensor employees (or contractors) providing bill processing/accounts payable services related to the Premises and telecommunications/data network/computer desktop/Internet support to the Premises and the Licensee's employees working at or remotely from the office locations constituting the Premises, until such time as the Licensee assumes responsibility for providing such services directly. The Licensor makes no representations or warranties with respect to any services so provided, including, without limitation, the quality or adequacy of any services provided to the Licensee under this License Agreement. To facilitate the calculation of the License Fee, the Licensor shall deliver to the Licensee (a) complete copies of each of the Licensor's leases with respect to the Premises within three (3) days after the Effective Date, and (b) copies of each of the invoices from the applicable third parties for the portion of the License Fee payable pursuant to subclause (ii) above. Prior to the approval of the License Agreement by the United States Bankruptcy Court in the Licensor's pending chapter 11 cases, the Licensor shall pay the License Fee weekly on each Friday, prorated for its actual days of occupancy based on the actual number of days in the applicable calendar month (with the first such payment to be paid on or before August 10, 2007). Upon approval of the License Agreement by the United States Bankruptcy Court in the Licensor's pending chapter 11 cases, the Licensee shall pay the remainder of the License Fee for the calendar month of August (or, if Bankruptcy Court approval is not obtained until September, then for the calendar month of September), 2007 in full. The License Fee shall be calculated based on a schedule provided by Licensor of landlords and other payees and amounts (setting forth the name, address and amount due for each landlord and other vendor for the month of August) to be paid solely with respect to the calendar month of August, 2007 with respect to the Premises (which payments shall be subject to reconciliation in subsequent months based upon landlord- and vendor-specific invoices). The License Fee for any partial month during the Term shall be prorated based on the actual number of days in the applicable calendar month that the Licensee has the use of and access to the Premises to the extent the Licensor is able to

receive a pro-rated refund under any lease or third party vendor service (unless such termination is caused by Licensor, in which event the Licensee shall be entitled to prorate regardless of whether the Licensor is entitled to receive a prorated refund under the lease or third party vendor service). Prior to any payment by Licensee to Licensor pursuant to this License Agreement, Licensor shall deliver to Licensee a completed and signed Form W-9.

(d)     Denial of Access to Premises:  Notwithstanding anything to the contrary in the License Agreement, the Licensee shall have no obligation to pay the Licensor for any period of time that the Licensee is denied physical access to the Premises or any portion thereof and, if the Licensee is denied physical access to any portion of the Premises for any period longer than 24 hours, the Licensee may, at its sole option, elect to terminate the license with respect to such portion of the Premises and, upon such termination, the Licensee shall have no further obligation for any portion of the License Fee accruing after such termination and with respect to such portion of the Premises.  In the event of such a termination, Licensor shall refund to the Licensee any payments of the License Fee made by the Licensee that are allocable to the period of time subsequent to such termination to the extent the Licensor is able to receive a pro-rated refund under any lease or third party vendor service (unless such termination is caused by the Licensor, in which event the Licensee shall be entitled to the refund regardless of whether the Licensor is entitled to receive a prorated refund under the lease or third party vendor service).  Except for the License Fee payable pursuant to this paragraph, in no event shall Licensee be liable or obligated to Licensor or any other party, for any other amounts whatsoever for the Licensor's grant of the license and the use of the Premises in accordance with the terms of the License Agreement..

(e)     Consumer Confidential Information:  The Licensor shall use its best efforts to remove, before the Effective Date, any and all consumer confidential information at any of the Premises, including, without limitation, any and all customer loan profiles ("Consumer Confidential Information").  The Licensee shall use its best efforts to package and deliver to the Licensor, at addresses to be provided to Licensee, any Consumer Confidential Information that Licensee discovers remaining at the Premises on or after the Effective Date.

(f)     Indemnification by the Licensee:  The Licensee shall indemnify, defend and hold the Licensor harmless from any and all claims, losses, costs (including, without limitation, reasonable attorneys' fees and costs), damages and liens (collectively, "Claims") which

-8-

the Licensor actually incurs as a direct result of the Licensee's or its employees' or invitees' use of or damage to, the Premises or failure to vacate the Premises upon termination of the License Agreement. Such rights of indemnity shall exclude (a) any and all Claims resulting from or related to the Licensor's gross negligence or willful misconduct, (b) any Claims or other liabilities resulting from any claims of breach or default by the landlords under the Licensor's leases for the Premises unless the same are as a direct result of activities conducted by the Licensee at the Premises that do not constitute a Permitted Use, and (c) normal wear and tear in connection with the Licensee's use of the Premises in accordance with the License Agreement.

(g)     Indemnification by the Licensor. The Licensor shall indemnify, defend and hold the Licensee harmless from any and all Claims which the Licensee actually incurs as a direct result of the Licensor's execution and delivery of the License Agreement, including any Claims resulting from the Licensor's failure to pay any amounts due to landlord's or third-party service providers from amounts remitted to the Licensor as part of the License Fee. Such rights of indemnity shall exclude (a) Claims of the Licensor's landlords in connection with any use of the Premises by the Licensee that is not a Permitted Use, and (b) all Claims resulting from or related to the Licensee's gross negligence or willful misconduct.

## RELIEF REQUESTED

17.     By this Motion, the Debtors request entry of an order, pursuant to sections 105(a) and 363 of the Bankruptcy Code, approving the Debtors' entry into the License Agreement with IMB, *nunc pro tunc* to August 8, 2007.

## BASIS FOR RELIEF REQUESTED

A.     The Entry Into the License Agreement is Within
the Sound Business Judgment of the Debtors and Should be Approved

18.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court

-9-

to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991).

19.    The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith. Abbotts Dairies, 788 F.2d 143; Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). In this case, the Debtors submit that the decision to enter into the License Agreement is based upon their sound business judgment and should be approved *nunc pro tunc* to August 8, 2007. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. Lionel, 722 F.2d at 1071; Montgomery Ward, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose

-10-

requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

20.    Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

21.    The Debtors submit that more than ample business justification exists for the approval of the License Agreement. The Debtors, through the chapter 11 cases, are attempting to preserve and maximize the value of their assets for the benefit of their stakeholders. In furtherance of those efforts, the Debtors have successfully negotiated the terms of the Sale to IMB that will result in (i) an infusion of capital in an amount of not less than $2.5

-11-

million, subject to adjustment as set forth in the August Letter, and (ii) the elimination of substantial administrative obligations associated with the Premises.

22.    The License Agreement was negotiated at arm's length, with the Debtors' current financial position and the proposed Sale to IMB in mind.  Through the terms of the License Agreement, the Debtors have agreed to allow IMB to enter the Premises and commence business operations in an effort to immediately curtail and defer the administrative expenses associated with the Premises.  In consideration for allowing IMB immediate access to the Premises, IMB is paying the Debtors a License Fee, which is designed to satisfy the Debtors' expenses associated with the Premises, including, but not limited to, rent, utilities, real estate taxes, insurance, telecommunication charges, and the administrative costs incurred by the Debtors in connection with the License Agreement.  IMB has also agreed to forgo any break-up fee or expense reimbursement in exchange for prompt access to the Premises.

23.    The Debtors, as stated above, have discontinued their mortgage origination business and implemented a massive reduction in force.  As a result, the Premises are unoccupied, yet the Debtors continue to incur obligations related thereto.  Put differently, the Premises and the carrying costs associated therewith are an administrative and expensive burden siphoning valuable assets and resources of the Debtors' estates.  Accordingly, the entry into the License Agreement is within the sound business judgment of the Debtors.  The Debtors believe that the approval of the entry into the License Agreement is not only reasonable and necessary, but it will also reduce administrative expenses, thus maximizing value of the Debtors' estates for the benefit of their stakeholders.

## NEED FOR IMMEDIATE AND *NUNC PRO TUNC RELIEF*

24.     The Debtors commenced these chapter 11 cases in order to maintain and preserve their assets and to promptly market their businesses and consummate sales of assets, as soon as practicable, to maximize recoveries for their stakeholders. The entry into the License Agreement and the Sale is consistent with those efforts. Prior to commencing these cases, the Debtors aggressively marketed their whole loan and origination businesses. This resulted in many expressions of interest for various assets and components of their businesses. However, due to their liquidity constraints, the Debtors were unable to consummate any transaction prior to the Petition Date. Because the Debtors have ceased to originate loans, the Premises are vacant. Nevertheless, the Debtors continue to incur obligations related thereto. The relief requested by this Motion will reduce, and in fact, eliminate the administrative costs of the Debtors associated with the Premises and facilitate the assumption and assignment of the Office Leases and sale of the FF&E located therein to IMB. Accordingly, for the foregoing reasons, the Debtors submit that approval of the Debtors' entry into the License Agreement *nunc pro tunc* to August 8, 2007 is necessary and in the best interests of the Debtors' estates.

## WAIVER OF STAY OF ORDER

25.     Pursuant to Bankruptcy Rule 6004(g), an order authorizing the sale, use or lease of property is stayed for ten days after the entry of the order unless the court orders otherwise. Due to the exigencies and circumstances surrounding the entry into the License Agreement and the associated Sale as more fully described above, the Debtors request that the Court order that such stay not apply with respect approval of the License Agreement.

## NOTICE

26.     No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion will be provided to: (i) the Office of the United States

-13-

Trustee for the District of Delaware; (ii) the 40 largest unsecured creditors for the Debtors on a

consolidated basis as identified in the Debtors' chapter 11 petitions; (iii) counsel to Bank of

America, N.A., as Administrative Agent for the lenders under that certain Credit Agreement

dated August 30, 2004; (iv) counsel to the Debtors' postpetition lender; (v) the landlords to the

Premises; (vi) counsel to IMB; and (vii) all parties entitled to notice under Del. Bankr. LR 2002-

1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or

further notice is required.

      WHEREFORE, the Debtors request entry of the Order attached hereto as <u>Exhibit</u>

<u>D</u> granting the relief requested herein and such other and further relief as is just.

Dated: Wilmington, Delaware
      August 10 , 2007

                        YOUNG CONAWAY STARGATT & TAYLOR, LLP

                        _____

                        James L. Patton, Jr. (No. 2202)
                        Joel A. Waite (No. 2925)
                        Pauline K. Morgan (No. 3650)
                        Sean M. Beach (No. 4070)
                        Matthew B. Lunn (No. 4119)
                        Kara Hammond Coyle (No. 4410)
                        Kenneth J. Enos (No. 4544)
                        The Brandywine Building
                        1000 West Street, 17th Floor
                        Wilmington, Delaware 19801
                        Telephone: (302) 571-6600
                        Facsimile: (302) 571-1253

                        Proposed Counsel for Debtors and
                        Debtors in Possession

-14-

                        

## **EXHIBIT A**

## **LICENSE AGREEMENT**

## LICENSE AGREEMENT

This **LICENSE AGREEMENT** ("License Agreement") is made and entered into as of the 7th day of August, 2007, between AMERICAN HOME MORTGAGE ("Licensor"), and INDYMAC BANK, F.S.B. ("Licensee") for the right to use the office space, and all furniture, fixtures and equipment located within such office space, including utilities, telephone and Internet service supplied to such office space and all other items owned, rented, leased or otherwise controlled by Licensor at the office locations listed on Exhibit "A" attached hereto (such office space and all furniture, fixtures, equipment, utilities, telephone service and Internet service are collectively referred to herein as the "Premises"), with reference to the following:

**LICENSE.** Licensor hereby grants to Licensee a license to use the Premises and Licensee hereby accepts such license to use the Premises from Licensor on the terms and conditions set forth in this License Agreement. From and after the Effective Date (defined below), to preserve the confidentiality of Licensee's documentation maintained at the Premises, Licensor shall not grant any other person or entity the right to use or access the Premises without Licensee's prior written consent. Notwithstanding the foregoing, Licensor shall have the right to enter the Premises upon reasonable prior notice to Licensee; provided, however, that during any such entry by Licensor, the parties shall implement reasonable procedures to protect the confidentiality of Licensee's documentation and other information within the Premises. The foregoing license shall include Licensee's right to use software applications on Licensor's computers and other intellectual property within the Premises, to the extent permitted by applicable law as reasonably determined by Licensee; provided, however, the license shall exclude any right to use Licensor's loan origination system, Licensor's point-of-sale system and any proprietary software developed by or especially for Licensor. Licensee shall have access to and may use the Premises seven days per week, twenty-four hours per day, three hundred sixty-five days per year. Licensee and its employees, agents and invitees shall have the right to use the parking spaces in the parking area allocated to the Premises in accordance with the applicable leases in common with other users of the buildings containing the Premises.

**TERM.** The term of this License Agreement ("Term") shall commence on the date Licensee obtains access to the Premises (the "Effective Date") and shall continue thereafter until terminated by either party upon not less than fifteen (15) business days notice. The Term shall expire at midnight on the date specified in the written notice from either party electing to terminate this License Agreement.

This License Agreement shall be of no force or effect unless the Effective Date occurs by August 8, 2007, unless that deadline is mutually extended by each of Licensor and Licensee in its sole and absolute discretion. Effective upon execution of this License Agreement, Licensor shall cause Licensee to have access to and use of all of the Premises.

**MONTHLY LICENSE FEE. SERVICES.** During the Term, Licensee shall pay Licensor a fee (the "License Fee") equal to (i) the amount of the actual monthly rent and additional rent, including operating expenses, utilities, real estate taxes and insurance, payable by Licensor with respect to the Premises pursuant to the applicable leases for the Premises for the period that Licensee is provided access to and use of the Premises, plus (ii) the amount of the actual monthly charges payable by Licensor to third parties for all facility and telecommunication service contracts servicing the Premises, plus (iii) $25,000 per month (the "Licensor Services Component") (prorated for any partial months) to cover the cost of four (4) Licensor employees (or contractors) providing bill processing/accounts payable services related to the Premises and telecommunications/data network/computer desktop/Internet support to the Premises and Licensee's employees working at or remotely from the office locations constituting the Premises, until such time as Licensee assumes responsibility for providing such services directly. Licensor makes no representations or warranties with respect to any services so provided, including, without limitation, the quality or adequacy of any services provided to Licensee under this License Agreement. To facilitate the calculation of the License Fee, Licensor shall deliver to Licensee (a) complete copies of each of Licensor's leases with respect to the Premises within three (3) days after the Effective Date, and (b) copies of each of the invoices from the applicable third parties for the portion of the License Fee payable pursuant to subclause (ii) above. Prior to the approval of this License Agreement by the United States Bankruptcy Court in the Licensor's pending Bankruptcy case, Licensor shall pay the License Fee weekly on each Friday, prorated for its actual days of occupancy based on the actual number of days in the applicable calendar

month (with the first such payment to be paid on or before August 10). Upon approval of this License Agreement by the United States Bankruptcy Court in the Licensor's pending Bankruptcy case, Licensee shall pay the remainder of the License Fee for the calendar month of August (or, if Bankruptcy Court approval is not obtained until September, then for the calendar month of September), 2007 in full. The License Fee shall be calculated based on a schedule provided by Licensor of landlords and other payees and amounts (setting forth the name, address and amount due for each landlord and other vendor for the month of August) to be paid solely with respect to the calendar month of August, 2007 with respect to the Premises (which payments shall be subject to reconciliation in subsequent months based upon landlord- and vendor-specific invoices). Thereafter, Licensee shall pay Licensor the License Fee on or before the date the applicable portion of the License Fee is due and payable in accordance with the terms of the applicable lease or other agreement with or invoice from the applicable third-party provider. The Licensor Services Component of the License Fee shall be paid by Licensee to Licensor on or before the ninth (9th) day of the applicable calendar month, provided, however, that until the Bankruptcy Court in the Licensor's Pending Bankruptcy case approves this License Agreement, the Licensor Services Component of the License Fee shall be prorated and paid concurrently with the License Fee. Licensee shall pay all of the License Fee to Licensor (at Licensor's address set forth below or at such other address as Licensor shall identify in writing to Licensee) and Licensor shall pay to the applicable landlord or other third party provider all amounts payable to such applicable landlord or third party provider. The License Fee for any partial month during the Term shall be prorated based on the actual number of days in the applicable calendar month that Licensee has the use of and access to the Premises to the extent Licensor is able to receive a pro-rated refund under any lease or third party vendor service (unless such termination is caused by Licensor, in which event Licensee shall be entitled to prorate regardless of whether Licensor is entitled to receive a prorated refund under the lease or third party vendor service). Prior to any payment by Licensee to Licensor pursuant to this License Agreement, Licensor shall deliver to Licensee a completed and signed Form W-9.

Notwithstanding anything to the contrary in this License Agreement, Licensee shall have no obligation to pay Licensor for any period of time that Licensee is denied physical access to the Premises or any portion thereof and, if Licensee is denied physical access to any portion of the Premises for any period longer than 24 hours, Licensee may, at its sole option, elect to terminate the license with respect to such portion of the Premises and, upon such termination, Licensee shall have no further obligation for any portion of the License Fee accruing after such termination and with respect to such portion of the Premises. In the event of such a termination, Licensor shall refund to Licensee any payments of the License Fee made by Licensee that are allocable to the period of time subsequent to such termination to the extent Licensor is able to receive a pro-rated refund under any lease or third party vendor service (unless such termination is caused by Licensor, in which event Licensee shall be entitled to the refund regardless of whether Licensor is entitled to receive a prorated refund under the lease or third party vendor service). Except for the License Fee payable pursuant to this paragraph, in no event shall Licensee be liable or obligated to Licensor or any other party, for any other amounts whatsoever for Licensor's grant of the license and the use of the Premises in accordance with the terms of this License Agreement.

The services provided to Licensee at the Premises shall include all utilities, including without limitation, electricity and heating, ventilation and air conditioning, and janitorial services. Such services will be provided in the same manner and to the extent that such services were provided to the Premises immediately prior to the Effective Date and Licensor makes no representation or warranty with respect to such services, including, without limitation, the quality or adequacy of such services.

Licensor shall allow Licensee access to the Internet via Licensor's telephone, cable modem, ISDN or DSL service and equipment within the Premises, whichever is available and selected by Licensee, provided that Licensor makes no representation and warranties with respect to the same and shall, in no event, be responsible for any loss or damages to Licensee arising out of such use. Licensee shall have the right to have mail delivered to Licensee at the Premises and to permit third-party courier services to deliver and retrieve packages at the Premises.

**CONDITION OF OFFICE SPACE.** Licensee shall accept the Premises in its "as-is" condition and "as-built" configuration existing on the Effective Date.

**PERMITTED USE.** Licensee shall use the Premises only for general office purposes and for purposes of conducting consumer retail lending services, including, without limitation, the origination, documentation, and administration of loans and mortgages. The foregoing permitted uses are collectively referred to in this License Agreement as the "Permitted Use".

**CARE, MAINTENANCE AND REPAIR.** Licensee shall, at its sole expense, keep the Premises in a clean, neat and orderly condition (ordinary wear and tear excepted), and in compliance with all applicable laws.

**INSURANCE.** During the Term, Licensee, at its sole expense, shall obtain and maintain policies of commercial general liability insurance, including personal injury, bodily injury, death and broad form property damage, in such limits as Licensee, with Licensor's consent (which consent shall not be unreasonably withheld) may determine are reasonably appropriate for the Premises and the operation of the Permitted Use. Licensee shall cause Licensor to be listed as an additional named insured on all policies of insurance obtained by Licensee with respect to the Premises and Licensee's use of the Premises.

**CONSUMER CONFIDENTIAL INFORMATION.** Licensor shall use its best effort to remove, before the Effective Date, any and all consumer confidential information at any of the Premises, including, without limitation, any and all customer loan profiles ("Consumer Confidential Information"). Licensee shall use its best efforts to package and deliver to the Licensor, at addresses to be provided to Licensee, any Consumer Confidential Information that Licensee discovers remaining at the Premises on or after the Effective Date.

**LICENSEE'S PROPERTY.** All of Licensee's equipment and supplies delivered to the Premises by Licensee, together with all other personal property owned by Licensee and located within the Premises after the Effective Date, shall remain the property of Licensee, shall not be subject to any lien or claim of ownership by Licensor and may be removed by Licensee from time to time during the Term or upon the termination of this License Agreement.

**NOTICES.** Notices between Licensor and Licensee shall be in writing, and shall be effectively served by personal delivery or Certified or Registered Mail as follows (in which case, the date of receipt or refusal shall be the date of notice):

**To Licensee:**

**IndyMac Bank, F.S.B.**
888 East Walnut Street
Pasadena, California 91101
**Attn: Corporate Real Estate**

**With a copy to:**

**CB Richard Ellis, Inc.**
355 South Grand Avenue
Los Angeles, CA 90071
**Attn: Mark Sprague**

**To Licensor:**

**American Home Mortgage**
538 Broad Hollow Road
Melville, NY 11747
**Attn: Mr. Kevin Nystrom**

**INDEMNIFICATION BY LICENSEE.** Licensee shall indemnify, defend and hold Licensor harmless from any and all claims, losses, costs (including, without limitation, reasonable attorneys' fees and costs), damages and

liens (collectively, "Claims") which Licensor actually incurs as a direct result of Licensee's or its employees' or invitees' use of or damage to, the Premises or failure to vacate the Premises upon termination of this License Agreement. Such rights of indemnity shall exclude (a) any and all Claims resulting from or related to Licensor's gross negligence or willful misconduct, (b) any Claims or other liabilities resulting from any claims of breach or default by the landlords under Licensor's leases for the Premises unless the same are as a direct result of activities conducted by Licensee at the Premises that do not constitute a Permitted Use, and (c) normal wear and tear in connection with Licensee's use of the Premises in accordance with this License Agreement.

**INDEMNIFICATION BY LICENSOR.** Licensor shall indemnify, defend and hold Licensee harmless from any and all Claims which Licensee actually incurs as a direct result of Licensor's execution and delivery of this License Agreement, including any Claims resulting from Licensor's failure to pay any amounts due to landlord's or third-party service providers from amounts remitted to Licensor as part of the License Fee. Such rights of indemnity shall exclude (a) Claims of Licensor's landlords in connection with any use of the Premises by Licensee that is not a Permitted Use, and (b) all Claims resulting from or related to Licensee's gross negligence or willful misconduct.

**MISCELLANEOUS.** No waiver by either party of any breach hereunder shall be implied from any omission by that party to take any action on account of such breach if such breach persists or be repeated, and no express written waiver shall affect any breach other than the breach specified in the express written waiver and only to the extent therein stated. This License Agreement, along with Exhibit "A" attached hereto, constitutes the entire and exclusive agreement between Licensor and Licensee with respect to the use of the Premises by Licensee. This License Agreement may be altered, amended or modified only by an instrument in writing signed by both Licensor and Licensee. This License Assignment shall be governed by and construed in accordance with the laws of the State of California, without regard to its conflicts of law principles. This License Agreement may be executed in counterparts, all of which shall constitute the same License Agreement, notwithstanding that all parties are not signatory to the same or original counterpart. Licensor and Licensee each represent and warrant to the other that (a) subject to United States Bankruptcy Court approval, each party has the full right, power and lawful authority to enter into this License Agreement and to consummate the transactions contemplated herein, and (b) this License Agreement has been duly authorized by all necessary corporate action.

(Signature Page Follows Immediately)

The parties have executed this License Agreement as of the date first set forth above.

**LICENSEE:**
INDYMAC BANK, F.S.B., a federally chartered savings bank

By: _____

**LICENSOR:**

AMERICAN HOME MORTGAGE

By: _____

## EXHIBIT A

## DESCRIPTION OF THE LOCATIONS OF THE PREMISES

Exhibit A

| BranchName | City | State | Address | Cost Center |
|---|---|---|---|---|
| Alameda CA 330 | Alameda | CA | 1516 Webster Street | 00230 |
| Albuquerque Uptown NM 2171 | Albuquerque | NM | 6900 Uptown Blvd. NB | 02171 |
| Anaheim CA 369 | Anaheim | CA | 2390 E. Orangewood | 00369 |
| Angels Camp CA 345 | Angels Camp | CA | 1239 S. Main St. | 00345 |
| Bellingham WA 2188 | Bellingham | WA | 1765 Iowa Street | 02188 |
| Big Sky 2363 | Big Sky | MT | 50 Meadow Village Suite 205 | #N/A |
| Bloomington WA 2039 | Bloomington | MN | 1000 West 82nd St | 02039 |
| Boise ID 2025 | Boise | ID | 8895 W Emerald | 02025 |
| Bozeman Main MT 2729 | Bozeman | MT | 2616 W. Main St. | 02729 |
| Campbell Campbell CA 340 | Campbell | CA | 51 E. Campbell Avenue | 00340 |
| Central Lafayette LA 3331 | Ladbyette | LA | 318 Guilloem Road | 03331 |
| Cerritos CA 377 | Cerritos | CA | 17771 Center Court Drive | 00877 |
| Chandler AZ 1312 | Chandler | AZ | 225 N Arizona Place | 01312 |
| Chaska MN 1313 | Chaska | MN | 1107 Hazeltine Blvd. Ste 500 | 01313 |
| Cheyenne WY 363 | Cheyenne | WA | 4515-F East Pershing | 00363 |
| Coeur d'Alene ID 2227 | Coeur D'Alene | ID | 1221 Ironwood Dr | 02227 |
| Concord Sutter Street CA 302 | Concord | CA | 1830 Sutter Street | 00302 |
| Del Rio Border FCU TX-2475 | Del Rio | TX | 609 B. Gibbs Street | 02475 |
| Eagle ID 2074 | Eagle | ID | 462 B. Shore Drive | 02074 |
| Edmonds | Edmonds | WA | 21900 76th Ave. West, Ste 110 | #N/A |
| Elk Grove CA 3115 | Elk Grove | CA | 9555 E Stockton Blvd | 03115 |
| Flowmound TX 2163 | Flower Mound | TX | 3305 Long Prairie Road | 02163 |
| Glendale AZ 3221 | Glendale | AZ | 5859 W Thrird Blvd | 03221 |
| Grand Junction 1st CO 422 | Grand Junction | CO | 2478 Patterson Road | 00422 |
| Greenwood Village CO 2004 | Greenwood Village | CO | 8101 East Prentice Avenue | 02004 |
| Gresham OR 2027 | Gresham | OR | 320 North Main | 02027 |
| Helena MT 3334 | Helena | MT | 825 Great Northern Boulevard | 03334 |
| Henderson NV 351 | Henderson | NV | 2170 Corporate Circle | 00351 |
| Honolulu HI 2401 | Honolulu | HI | 737 Bishop Street | 02401 |
| Houston Kingwood TX 3333 | Houston | TX | 720 N. Post Oak | 03333 |
| Indian Wells CA 314 | Indian Wells | CA | 74-859 Highway 111 | 00314 |
| Iowa Area IA 2095 | West Des Moines | IA | 2829 Westown Parkway | 02095 |
| Kapaa HI 2422 | Kapaa | HI | 4-361 Kuhio Highway | 02422 |
| Kapolei HI 2411 | Kapolei | HI | 1001 Kamokila Boulevard | 02411 |
| Kirkland WA 2170 | Kirkland | WA | 401 Parkplace | 02170 |
| La Jolla CA 311 | La Jolla | CA | 4225 Executive Square | 00311 |
| Lahaina HI 2942 | Lahaina | HI | 222 Papalaua Street | 02942 |
| Lakewood WA 2072 | Lakewood | WA | 5808 100th Street | 02072 |
| Las Vegas NV 353 | Las Vegas | NV | 7777 North Rainbow Blvd. | 00353 |
| Layton UT 3330 | Layton | UT | 920 West Heritage Park Blvd | 03330 |
| Littleton CO 2005 | Littleton | CO | 9200 W Cross Drive | 02005 |
| Long Beach Kilroy CA 307 | Long Beach | CA | 3780 Kilroy Airport Way | 00307 |
| Maple Grove MN 1309 | Maple Grove | MN | 7767 Elm Creek Blvd. | 01309 |
| Missoula MT 2045 | Missoula | MT | 1802 Dearborn Avenue | 02045 |
| Modesto CA 361 | Modesto | CA | 1159 Ninth Street | 00361 |
| Monterey CA 356 | Monterey | CA | 1659 Abrego Street | 00356 |
| Nampa ID 2075 | Nampa | ID | 724 12th Avenue South | 02075 |
| Peak Experience Mortgage | Colorado Springs | CO | 2630 Tenderfoot Hill Street | 02563 |
| Pomona CA 324 | Pomona | CA | 3191 Temple Avenue | 00324 |
| Portland OR 2058 | Portland | OR | 10220 SW Greenburg Road | 02058 |
| Portland OR 2231 | Portland | OR | 10220 SW Greenburg Rd | 02231 |
| Rancho Cucamonga, CA 309 | Rancho Cucamonga | CA | 9680 Haven Ave. #250 | 00369 |

| BranchName | City | State | Address | Cost Center |
|---|---|---|---|---|
| Riverside CA 310 | Riverside | CA | 3739 Adams Street | 00010 |
| Roseville CA 344 | Roseville | CA | 1508 Eureka Road | 00344 |
| Rowlett TX 3338 | Rowlett | TX | 4700 Rowlett Drive | 03338 |
| Sacramento CA 2402 | Sacramento | CA | 1610 Arden Way | 02402 |
| Salinas CA 1321 | Salinas | CA | 2 Salinas Street | 01521 |
| Salt Lake City UT 2144 | Salt Lake City | UT | 6415 South 3000 East | 02144 |
| Scottsdale Y AZ 1310 | Scottsdale | AZ | 8709 East Vista Bonita | 01310 |
| Scottsdale Venture 1 AZ 357 | Scottsdale | AZ | 8709 E. Via De Ventura | 00357 |
| Sherwood OR 2193 | Sherwood | OR | 20512 SW Roy Rogers Road | 02193 |
| Sioux Falls SD 343 | Sioux Falls | SD | 3409 West 47th Street | 00343 |
| Sonora CA 346 | Sonora | CA | 79 N. Washington Street | 00346 |
| Temecula CA 2409 | Temecula | CA | 27450 Ynez Road | 02409 |
| Tenlardont CO 3323 | Colombia Springs | CO | 2650 Tenderfoot Hill Street | 03323 |
| Torrance CA 313 | Torrance | CA | 2780 Skypark Drive | 00313 |
| Walnut Creek CA 338 | Walnut Creek | CA | 500 Ygnacio Valley Road | 00338 |
| West Linn OR 2201 | West Linn | OR | 1800 Blankenship Rd | 02201 |
| Yakima WA 2162 | Yakima | WA | 917 Triple Crown Way | 02162 |
| Yucca Valley CA 315 | Yucca Valley | CA | 56851 29 Palms Highway | 00315 |
| Total | 70 | | | |

BBV SH

## EXHIBIT B

**LIST OF OFFICE LEASES**
**(As of August 10, 2007)**

Exhibit A - August 9, 2008

| BranchName | Cost Center | City | State | Address |
|---|---|---|---|---|
| Scottsdale 3 AZ 1310 | 1310 | Scottsdale | AZ | 8700 East Vista Bonita |
| Chandler AZ 01312 | 1312 | Chandler | AZ | 25 S Arizona Place |
| Scottsdale Camelback AZ 2002 | 2002 | Scottsdale | AZ | 6991 East Camelback Road |
| Glendale AZ 3321 | 3321 | Glendale | AZ | 5859 W Talavi Blvd |
| Retail West Division Ops 298 | 298 | Irvine | CA | 111 Pacifica |
| Irvine CA 300 | 300 | IRVINE | CA | 111 Pacifica, Suite 305 |
| Concord Sutter Street CA 302 | 302 | Concord | CA | 1800 Sutter Street |
| Long Beach Kilroy CA 307 | 307 | Long Beach | CA | 3780 Kilroy Airport Way |
| Rancho Cucamonga CA 309 | 309 | Rancho Cucamonga | CA | 9227 Haven Avenue |
| La Jolla CA 311 | 311 | La Jolla | CA | 4275 Executive Square |
| Torrance CA 313 | 313 | Torrance | CA | 2780 Skypark Drive |
| Indian Wells CA 314 | 314 | Indian Wells | CA | 74-890 Highway 111 |
| Yucca Valley CA 315 | 315 | Yucca Valley | CA | 56351 29 Palms Highway |
| Pomona CA 324 | 324 | Pomona | CA | 3191 Temple Avenue |
| Alameda CA 330 | 330 | Alameda | CA | 1512 Webster Street |
| Walnut Creek CA 338 | 338 | Walnut Creek | CA | 500 Ygnacio Valley Road |
| Campbell Campbell CA 340 | 340 | Campbell | CA | 51 E. Campbell Avenue, Suite 170 |
| Roseville CA 344 | 344 | Roseville | CA | 1508 Eureka Road |
| Angels Camp CA 345 | 345 | Angels Camp | CA | 1239 S. Main St. |
| Sonora CA 346 | 346 | Sonora | CA | 79 N. Washington Street |
| Monterey CA 356 | 356 | Monterey | CA | 659 Abrego Street |
| Modesto CA 361 | 361 | Modesto | CA | 1150 Ninth Street |
| Anaheim CA 369 | 369 | Anaheim | CA | 2390 E. Orangewood |
| Cerritos CA 377 | 377 | Cerritos | CA | 17777 Center Court Drive |
| Retail West Division Executive 398 | 398 | Irvine | CA | 111 Pacifica, Suite 305 |
| Salinas CA 1321 | 1321 | Salinas | CA | 2 Salinas Street |
| Sacramento CA 2402 | 2402 | Sacramento | CA | 1610 Arden Way |
| Temecula CA 2409 | 2409 | Temecula | CA | 27450 Ynez Road |
| Riverside CA 3313 | 3313 | Riverside | CA | 5225 Canyon Crest Dr |
| Irvine CA 3314 | 3314 | Irvine | CA | 111 Pacifica |
| Elk Grove CA 3315 | 3315 | Elk Grove | CA | 9355 E Stockton Blvd |
| Grand Junction 1st CO 422 | 422 | Grand Junction | CO | 2478 Patterson Road |
| Colorado Springs CO 1364 | 1364 | Colorado Springs | CO | 1271 Kelly Johnson Blvd. Suite 111 |
| Greenwood Village CO 2004 | 2004 | Greenwood Village | CO | 8101 East Prentice Avenue |
| Littleton CO 2005 | 2005 | Littleton | CO | 9200 W Cross Drive |
| Westminster CO 2410 | 2410 | Westminster | CO | 1400 W. 122nd Avenue |
| Tenderfoot CO 3323 | 3323 | Colorado Springs | CO | 2630 Tenderfoot Hill Street |
| Honolulu HI 02401 | 2401 | Honolulu | HI | 737 Bishop Street |
| Kapolei HI 2411 | 2411 | Kapolei | HI | 1001 Kamokila Boulevard |
| Wailuku HI 2421 | 2421 | Wailuku | HI | 2200 Main Street |
| Kapaa HI 2422 | 2422 | Kapaa | HI | 4-361 Kuhio Highway |
| Lahaina HI 2942 | 2942 | Lahaina | HI | 222 Papalaua Street |
| Cedar Rapids IA 2017 | 2017 | Cedar Rapids | IA | 3053 Center Point Road NE |
| Des Moines University IA 2020 | 2020 | Des Moines | IA | 6600 University Ave. |
| Iowa Area IA 2095 | 2095 | West Des Moines | IA | 2829 Westown Parkway, Suite 220 |
| Boise ID 2025 | 2025 | Boise | ID | 8850 W Emerald |
| Eagle ID 2074 | 2074 | Eagle | ID | 462 E. Shore Drive |
| Nampa ID 2075 | 2075 | Nampa | ID | 724 12th Avenue South |
| Caldwell ID 2169 | 2169 | Caldwell | ID | 2805 Blaine Street |
| Coeur d'Alene ID 2227 | 2227 | Coeur d'Alene | ID | 1221 Ironwood Dr |
| Lafayette LA 3335 | 3335 | Lafayette | LA | 318A Guilbeau Road |
| Maple Grove MN 1309 | 1309 | Maple Grove | MN | 7767 Elm Creek Blvd. |
| Burnsville MN 1334 | 1334 | Burnsville | MN | 350 West Burnsville Parkway |
| Chaska MN 1313 | 1334 | Chaska | MN | 1107 Hazeltine Blvd. Ste 500 |
| Bloomington MN 2039 | 2039 | Bloomington | MN | 1600 West 82nd St |
| Woodbury MN 3311 | 3311 | Woodbury | MN | 6043 Hudson Road |
| Missoula MT 2045 | 2045 | Missoula | MT | 1802 Dearborn Avenue |
| Bozeman Main MT 2729 | 2729 | Bozeman | MT | 2616 W. Main St. |
| Big Sky 2883 | 2883 | Big Sky | MT | 50 Meadow Village Suite 205 |
| Helena MT 3334 | 3334 | Helena | MT | 825 Great Northern Boulevard |
| Albuquerque Uptown NM 2171 | 2171 | Albuquerque | NM | 6000 Uptown Blvd. NE |
| Henderson NV 351 | 351 | Henderson | NV | 2370 Corporate Circle |
| Las Vegas NV 353 | 353 | Las Vegas | NV | 777 North Rainbow Blvd. |
| Reno NV 367 | 367 | Reno | NV | 5470 Kietzke Lane, Suite 210 |
| Gresham OR 2057 | 2057 | Gresham | OR | 320 North Main |
| Portland OR 2058 | 2058 | Portland | OR | 10220 SW Greenburg Road Suite 245 |
| Sherwood OR 2193 | 2193 | Sherwood | OR | 20512 SW Roy Rogers Road |
| West Linn OR 2201 | 2201 | West Linn | OR | 1800 Blankenship Rd |
| Portland OR 2230 | 2230 | Portland | OR | 700 NE Multnomah Street Suite 450 |
| Sioux Falls SD 343 | 343 | Sioux Falls | SD | 3409 West 47th Street |
| The Woodlands TX 2130 | 2130 | The Woodlands | TX | 21 Waterway Ave |

| | | | | |
|---|---|---|---|---|
| Flowermound TX 2163 | 2163 | Flower Mound | TX | 3305 Long Prairie Road |
| North San Antonio TX 02190 | 2190 | San Antonio | TX | 8200 IH-10 West |
| Frisco TX 2205 | 2205 | Frisco | TX | 2595 Dallas Parkway |
| Del Rio Border FCU TX 2475 | 2475 | Del Rio | TX | 600 E. Gibbs Street |
| Houston Galleria TX 3332 | 3332 | Houston | TX | 730 N. Post Oak Road |
| Houston Kingwood TX 3333 | 3333 | Houston | TX | 20669 Lake Houston Parkway |
| Rowlett TX 3338 | 3338 | Rowlett | TX | 4700 Rowlett Drive |
| Salt Lake City UT 2144 | 2144 | Salt Lake City | UT | 6415 South 3000 East |
| Layton UT 3330 | 3330 | Layton | UT | 920 West Heritage Park Blvd |
| Yakima WA 2162 | 2162 | Yakima | WA | 917 Triple Crown Way |
| Kirkland WA 2170 | 2170 | Kirkland | WA | 401 Parkplace |
| Bellingham WA 2188 | 2188 | Bellingham | WA | 1756 Iowa Street |
| Vancouver WA 2215 | 2215 | Vancouver | WA | 700 Washington St |
| Spokane WA 2228 | 2228 | Spokane | WA | 818 W Riverside Ave |
| Monroe RE/MAX desk rental 2413 | 2413 | Monroe | WA | 14961 Chain Lake Rd. #159 |
| Edmonds WA 2415 | 2415 | Edmonds | WA | 21920 76th Ave. West, Ste 110 |
| Bellingham WA 3303 | 3303 | Bellingham | WA | 2211 Rimland Drive |
| Gig Harbor WA 3337 | 3337 | Lakewood / Tacoma | WA | 5808 100th Street Suite A |
| Total | 86 | | | |

Note that the Irvine locations are under one lease

# EXHIBIT C

## AUGUST LETTER

**INDYMAC BANK, F.S.B.**
**888 E. Walnut Street**
**Pasadena, CA  91101**

August 7, 2007

American Home Mortgage
538 Broad Hollow Road
Melville, NY  11747

Attention:  Mr. Michael Strauss

Dear Michael:

Per our discussions, attached is a License Agreement (the "License") for your execution on behalf of American Home Mortgage ("AHM") that will allow Indymac Bank F.S.B. ("IMB") to conduct operations out of the offices set forth on Exhibit "A" (collectively, the "Offices" and each, individually, an "Office").  The License Agreement is submitted in connection with IMB's bid to assume the leases (the "Office Leases") for the Offices and to purchase the furniture, fixtures, and equipment located in the Offices (the "FFE" and, together with the Office Leases, collectively, the "Office Assets").  The terms of IMB's offer to purchase are as subsequently set forth herein.  We understand, and you agree, that upon your acceptance of IMB's bid to acquire the Office Assets, AHM will submit a motion in AHM's pending bankruptcy case seeking (i) the Bankruptcy Court's approval of IMB's purchase of the Office Assets subject to any higher and better bids that AHM may receive for the Office Assets; (ii) bid procedures for purposes of conducting an auction of the Office Assets (the "Auction"); and (iii) approving IMB's occupation and use of the Offices in accordance with the License pending the Auction and IMB's purchase of the Office Assets, with the granting of the License to be in lieu of any break-up fee or other bid protections being provided to IMB.  AHM will seek to have such motion heard and approved by the Bankruptcy Court within two days after the date of this letter.

Subject to any extension IMB may grant, in writing, in its sole and absolute discretion, this letter and the commitments in it will be of no force or effect unless (1) IMB is granted by AHM access to and use of all of the Offices by August 8, 2007; (2) the License is signed this day (by midnight August 7, 2007 Pacific Daylight Time) by AHM; and (3) AHM shall have filed with the Bankruptcy Court by August 10, 2007 an emergency motion (or motions) for the approval of the License Agreement and the Auction procedures.

As consideration for the purchase of the Office Assets, IMB shall (i) pay AHM a cash payment of $2,500,000 (the "Cash Payment"); (ii) assume the following liabilities in connection with the Office Assets:  (a) phone company arrearages with respect to any of the Office Assets in an amount not to exceed $50,000; and (b) amounts necessary to satisfy any other arrearages, liens, or security interests with respect to the Offices Assets in an amount not to exceed $50,000 (collectively, the "Assumed Liabilities"); (iii) take assignment of and assume all liabilities under the Office Leases that are not Excluded Leases (hereinafter defined); and (iv) pay AHM an amount equal to the security deposits, if any, held by landlords in connection with the Office Leases that are not Excluded Leases, less (a) any charges made or claims retained by the landlords with regard to their security deposit relating to AHM's occupancy and (b) any amounts paid by IMB to the landlords to cure any of AHM's defaults or other obligations under the Office Leases.  If IMB designates any additional offices ("Additional Offices") to be included as Offices and as part of the Office Assets and as the result of such addition of the Additional Offices (net of any removed Offices ("Removed Offices") related to Excluded Leases (as defined below)), sixty percent (60%) of the book value of the FFE at the Offices plus Additional Offices minus the Removed Offices exceeds the Cash Payment, then the Cash Payment shall be increased by an amount equal to sixty percent (60%) of

American Home Mortgage
August 7, 2007
Page 2

AHM's book value of the FFE for FFE not paid for (at the 60% of book value rate) as part of the Cash Payment. Notwithstanding the foregoing, the Cash Payment shall be decreased by the amount, if any, that IMB pays for any cure costs in connection with the assumed Office Leases or any other costs attributable to the Office Assets that are collectively in excess of the Assumed Liabilities. Notwithstanding anything to the contrary in this letter, any payments by IMB to third parties to cure arrearages or pay claims secured by liens or security interests with respect to the Premises shall be deducted from the Cash Payment. Subject to the payment of any cure amounts and other claims with respect to the Office Leases from the Cash Payment, the Office Assets shall be transferred to IMB free and clear of any claims, arrearages, liens or encumbrances. IMB's obligation to make the Cash Payment shall be subject to AHM's certification and confirmation (as acknowledged pursuant to AHM's counter-signature below) that since August 1, 2007 it has not removed or authorized the removal, and from this day forward it will not remove or authorize the removal, of any of the FFE reflected on Exhibit "A" from the Offices, and that all such FFE will be included in the bill of sale to IMB.

Notwithstanding the foregoing, within 10 business days of the granting of the License, IMB may, by written notice to AHM, elect to exclude (i) up to ten percent (10%) of the Office Leases from the Office Assets to be acquired by IMB as listed on Exhibit "A" plus any Office Leases for Additional Offices (as identified in writing by IMB to AHM within 10 business days of the granting of the License), and (ii) any Office Leases that IMB reasonably determines to be ten percent (10%) or more over market in rent and other financial obligations. Any Office Leases so excluded are referred to herein as "Excluded Leases." IMB's offer to acquire the Office Assets is contingent upon approval by the Bankruptcy Court of a sale and assignment of the Office Assets that permits IMB to assume Office Leases for not less than seventy-five percent (75%) of the Offices, after exclusion of the Excluded Leases.

Pursuant to the License Agreement, IMB will gain the right to use the Offices, together with the FFE and various utilities and support services related to the operations of the Offices. Under the terms of the License, as set forth therein, IMB would be responsible for payment of all expenses, including rent, utility services, phone usage, security, janitorial, cleaning, and other costs, in connection with the use of the Offices and would reimburse AHM for the same together with a payment of $25,000 per month for any administrative costs incurred by AHM in connection with the License.

Please sign and fax (or scan and email) back to me a signed copy of this offer and the License at (626) 535 - 4180. Upon receipt, I will countersign the License Agreement and fax it back to you. Please provide a preferred fax number. To facilitate the payments contemplated by this letter, please also send me a completed and signed Form W-9.

Sincerely,

INDYMAC BANK, F.S.B.

Jules Vogel
Executive Vice President

American Home Mortgage
August 7, 2007
Page 3

## ACCEPTED, ACKNOWLEDGED AND AGREED

**American Home Mortgage**

By: _Stephen A. Hozie_ (signature)
Name: _Stephen A. Hozie_
Title: _EVP + CFO_

Date: **August 7, 2007**

Exhibit A

| Branch Name | City | State | Address | Cost Center |
|---|---|---|---|---|
| Alameda CA 330 | Alameda | CA | 1512 Webster Street | 02030 |
| Albuquerque Uptown NM 2171 | Albuquerque | NM | 6001 Uptown Blvd. NE | 02171 |
| Anaheim CA 369 | Anaheim | CA | 2390 E. Orangewood | 00369 |
| Angels Camp CA 345 | Angels Camp | CA | 1239 S. Main St. | 00345 |
| Bellingham WA 2188 | Bellingham | WA | 1756 Iowa Street | 02188 |
| Big Sky 2883 | Big Sky | MT | 50 Meadow Village Suite 205 | #N/A |
| Bloomington MN 2059 | Bloomington | MN | 1600 West 82nd St | 02059 |
| Boise ID 2025 | Boise | ID | 1850 W Emerald | 02025 |
| Bozeman Main MT 2729 | Bozeman | MT | 2616 W. Main St. | 02729 |
| Campbell Campbell CA 340 | Campbell | CA | 51 E. Campbell Avenue | 00340 |
| Central Lafayette LA 3331 | Lafayette | LA | 318 Guilbeau Road | 03331 |
| Cerritos CA 377 | Cerritos | CA | 17777 Center Court Drive | 00377 |
| Chandler AZ 01312 | Chandler | AZ | 275 S Arizona Place | 01312 |
| Chaska MN 1313 | Chaska | MN | 1107 Hazeltine Blvd. Ste 500 | 01313 |
| Cheyenne WY 563 | Cheyenne | WY | 4515-F East Pershing | 00563 |
| Coeur d'Alene ID 2227 | Coeur D Alene | ID | 1221 Ironwood Dr | 02227 |
| Concord Sutter Street CA 302 | Concord | CA | 1800 Sutter Street | 00302 |
| Del Rio Border FCU TX 2475 | Del Rio | TX | 609 E. Gibbs Street | 02475 |
| Eagle ID 2074 | Eagle | ID | 462 B. Shore Drive | 02074 |
| Edmonds | Edmonds | WA | 21929 76th Ave. West, Ste 110 | #N/A |
| Elk Grove CA 3115 | Elk Grove | CA | 9255 E Stockton Blvd | 03115 |
| Flowermound TX 2160 | Flower Mound | TX | 3305 Long Prairie Road | 02160 |
| Glendale AZ 3321 | Glendale | AZ | 5859 W Talavi Blvd | 03321 |
| Grand Junction 14 CO 422 | Grand Junction | CO | 2478 Patterson Road | 00422 |
| Greenwood Village CO 2004 | Greenwood Village | CO | 8101 East Prentice Avenue | 02004 |
| Gresham OR 2057 | Gresham | OR | 1520 North Main | 02057 |
| Helena MT 2734 | Helena | MT | 825 Great Northern Boulevard | 02734 |
| Henderson NV 2351 | Henderson | NV | 2270 Corporate Circle | 02351 |
| Honolulu HI 02401 | Honolulu | HI | 737 Bishop Street | 02401 |
| Houston Kingwood TX 3333 | Houston | TX | 709 N. Post Oak | 03333 |
| Indian Wells CA 314 | Indian Wells | CA | 74-490 Highway 111 | 00314 |
| Iowa Area IA 2095 | West Des Moines | IA | 3829 Westown Parkway | 02095 |
| Kapaa HI 2422 | Kapaa | HI | 4-361 Kuhlo Highway | 02422 |
| Kapolei HI 2411 | Kapolei | HI | 1001 Kamokila Boulevard | 02411 |
| Kirkland WA 2179 | Kirkland | WA | 401 Parkplace | 02179 |
| La Jolla CA 311 | La Jolla | CA | 4275 Executive Square | 00311 |
| Lahaina HI 2942 | Lahaina | HI | 222 Papalaua Street | 02942 |
| Lakewood WA 2072 | Lakewood | WA | 5808 100th Street | 02072 |
| Las Vegas NV 353 | Las Vegas | NV | 777 North Rainbow Blvd. | 00353 |
| Layton UT 3330 | Layton | UT | 920 West Heritage Park Blvd | 03330 |
| Littleton CO 2005 | Littleton | CO | 5920 W Cross Drive | 02005 |
| Long Beach Kilroy CA 307 | Long Beach | CA | 3780 Kilroy Airport Way | 00307 |
| Maple Grove MN 1309 | Maple Grove | MN | 7767 Elm Creek Blvd. | 01309 |
| Missoula MT 2045 | Missoula | MT | 1802 Dearborn Avenue | 02045 |
| Modesto CA 361 | Modesto | CA | 1150 Ninth Street | 00361 |
| Monterey CA 356 | Monterey | CA | 559 Abrego Street | 00356 |
| Nampa ID 2075 | Nampa | ID | 724 12th Avenue South | 02075 |
| Peak Experience Mortgage | Colorado Springs | CO | 2050 Tenderfoot Hill Street | 02503 |
| Pomona CA 324 | Pomona | CA | 3191 Temple Avenue | 00324 |
| Portland OR 2058 | Portland | OR | 10220 SW Greenburg Road | 02058 |
| Portland OR 2231 | Portland | OR | 10220 SW Greenburg Rd | 02231 |
| Rancho Cucamonga CA 369 | Rancho Cucamonga | CA | 9590 Haven Ave. #350 | 00369 |

| BranchName | City | State | Address | Cost Center |
|---|---|---|---|---|
| Riverside CA 310 | Riverside | CA | 3729 Adams Street | 00810 |
| Roseville CA 344 | Roseville | CA | 1508 Eureka Road | 00344 |
| Rowlett TX 3338 | Rowlett | TX | 4709 Rowlett Drive | 03338 |
| Sacramento CA 2402 | Sacramento | CA | 1610 Arden Way | 02402 |
| Salinas CA 1321 | Salinas | CA | 2 Salinas Street | 01521 |
| Salt Lake City UT 2144 | Salt Lake City | UT | 6415 South 3000 East | 02144 |
| Scottsdale 1 AZ 1310 | Scottsdale | AZ | 8700 Bent Vista Bonita | 01310 |
| Scottsdale Ventura 1 AZ 357 | Scottsdale | AZ | 8700 E. Via De Ventura | 00357 |
| Sherwood OR 2193 | Sherwood | OR | 20512 SW Roy Rogers Road | 02193 |
| Sioux Falls SD 343 | Sioux Falls | SD | 3409 West 47th Street | 00343 |
| Sonora CA 346 | Sonora | CA | 79 N. Washington Street | 00346 |
| Temecula CA 2409 | Temecula | CA | 27450 Ynez Road | 02409 |
| Teederbot CO 3323 | Colorado Springs | CO | 2850 Tenderbot Hill Street | 00323 |
| Torrance CA 113 | Torrance | CA | 21780 Skypark Drive | 00113 |
| Walnut Creek CA 338 | Walnut Creek | CA | 500 Ygnacio Valley Road | 00338 |
| West Linn OR 2201 | West Linn | OR | 11800 Blankenship Rd | 02201 |
| Yakima WA 2162 | Yakima | WA | 917 Triple Crown Way | 02162 |
| Yucca Valley CA 315 | Yucca Valley | CA | 56551 29 Palms Highway | 00215 |
| Total | | 70 | | |