UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| AMERICAN HOME MORTGAGE | . | Case No. 07-11047(CSS) |
| HOLDINGS., a Delaware | . | Jointly Administered |
| corporation, *et al.*, | . | |
| | . | Aug. 7, 2007 (3:08 p.m.) |
| Debtors. | . | (Wilmington) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

INDEX

DEBTORS' EVIDENCE

|  | Direct | Cross | Redirect | Recross |
|---|--------|-------|----------|---------|
| WITNESS: | | | | |
| Michael Strauss | | 74 | 80 | |
| | | 88 | 95 | |

1          THE CLERK: All rise.

2          THE COURT: Please be seated.  Good afternoon, Mr.

3   Patton.

4          MR. PATTON: Good afternoon, Your Honor.  Thank you

5   very much for giving us time this afternoon to appear before

6   you in connection with the American Home Mortgage matter.  We

7   very much appreciate it.  This is obviously both a traumatic

8   and a very important day in the life of this company.  Prior

9   to coming here today, Your Honor, we've provided notice of

10  today's hearing as well as copies of the applications that we

11  intend to present today to the various noticed parties, and

12  we've also received a number of formal and informal comments.

13  We've been working through many of those.  I believe we've

14  resolved many.  I suspect there will still be some - in fact

15  I'm sure there will still be some that we'll have to take up

16  as we work through these over the course of the afternoon.

17  Before I begin, let me take just a moment to introduce Your

18  Honor to Mike Strauss who's the chairman, the CEO, and the

19  president.  He's here in the courtroom with me today, Your

20  Honor.  He is also the signer of the declaration that

21  supports the first day applications.  A little bit of

22  background.  This company is organized at the parent level as

23  a real estate investment trust.  It's in the business of

24  originating, servicing, and selling home mortgage loans and

25  investing in home mortgage loans and mortgage backed

securities resulting from securitizations of residential home
mortgage loans.  At the end of 2006, the company was reported
to be the 10th largest in the industry, and it has conducted
its business primarily originating and purchasing prime
credit loans and loans called Alt-A loans, relatively few are
sub-prime loans.  We also are in the business of servicing
mortgage loans, and I'll talk a little bit about our
servicing business in a moment, but I want to take some time
to first focus on the loan origination aspect of our business
because that's where the problems have occurred that have led
to the filing of the bankruptcy petition today - or
yesterday, that brought us here today.  The American Home
Mortgage family of entities comprises a number of
subsidiaries, several are special purpose entities.  Some of
those are trusts that are set up to handle the
securitizations of home mortgages, and the debtors that we
have filed petitions for amount to eight, and they represent
the parent company and the various subsidiaries that are
integrally involved in the home mortgage orgination and
servicing business.  We have several subsidiaries and
affiliates that are not in bankruptcy.  Some of them are
special purpose entities that are not eligible for
bankruptcy, and one is a very valuable subsidiary that's a
thrift institution, a savings and loan that is operating on a
standalone basis, and as I'll mention a little bit later,

1   it's an asset ultimately that we will be selling through

2   these proceedings.  But as an institution, it's not affected

3   by the bankruptcy of the parent.  It's fully capitalized and

4   self-contained in terms of its operations.  The extreme

5   financial distress that confronts this company is a direct

6   result of the rapid devaluation of home mortgage loans that

7   we've all been reading about in the papers over the last

8   several months.  Just to give you some perspective, prior to

9   the end of last week, we had 7,500 employees.  Over the

10  course of the week, we let 6,000 of those employees go to

11  respond to the collapse of our mortgage origination business.

12  At the end of 2001, we had $15.6 billion in a leverage

13  mortgage and a mortgage backed securities portfolio.  I'm not

14  sure what the value is today, but it's lost a substantial

15  amount of its value over the course of the last several

16  months.  As the value and the market perception of value of

17  home mortgage loans has declined over the last several

18  months, and as that anxiety about the value of home mortgage

19  loans and mortgage backed securities has spread out of the

20  sub-prime market and into higher quality mortgage portfolios,

21  American Home Mortgage found its finances stretched and

22  ultimately stretched to the breaking point and, as I'll

23  explain in a moment, ultimately reached the breaking point.

24  The company's mortgage origination business, which is the

25  business which is the source of our problems, worked as

1  follows: The company would originate loans, both retail loans

2  through its own employees and what it called wholesale loans

3  through brokers, by raising capital, principally through

4  warehouse lines of credit, and it would use that capital to

5  fund the mortgages that the company originated.  The

6  warehouse lines were borrowings that were structured as

7  sales.  We would typically sell the underlying mortgage to

8  the warehouse lender at a price typically below market value.

9  We'd be obligated to repurchase that loan at the original

10  sale price with a differential increase, and we would

11  ultimately sell the underlying mortgage either in whole loan

12  sales or through securitizations and use the proceeds of that

13  sale to pay down our warehouse lender and capture our profit.

14  An important component of our warehouse lending facilities is

15  that most, if not all of them, included a power given to our

16  lenders to re-price or mark down the underlying home

17  mortgages that represented the underlying collateral, and

18  upon marking down the value, the lender could make a demand

19  for a margin payment from American Home Mortgage.  We also

20  used conventional secured lending facilities, and we also

21  raised capital through commercial paper programs, and in

22  general, with respect to those facilities, our counter-

23  parties also had the power to mark down the value of the

24  underlying home mortgage collateral and - or home mortgage

25  asset and make margin calls on the company.  Over the course

1    of the earlier part of this year, we received a number of

2    margin calls.  We were meeting those margin calls or

3    negotiating resolutions of the margin calls with our counter-

4    parties, and ultimately, however, we reached the point where

5    the company was unable to meet and satisfy all of the margin

6    calls that were being placed on us as a result of the

7    devaluation of the underlying home mortgage securities.  And

8    as you can see, as the marketplace for the home mortgage

9    security business begins to shrink our ability to satisfy

10   margin calls becomes more and more constrained.  In recent

11   weeks, the home mortgage marketplace reached a point of

12   dysfunctionality that made it almost impossible for us to

13   even sell to third parties our home mortgages at any

14   reasonable price.  So our ability to move our assets or to

15   otherwise liquidate our assets functionally ground to a halt.

16   During that same time period in our negotiations with our

17   warehouse lenders, we ultimately reached the point with them

18   where they no longer were willing to lend to us.  Not being

19   able to obtain financing through our warehouse lenders, we

20   were unable to continue to originate loans, and last week we

21   ceased originating loans through our loan origination

22   business.  I'm going to come back in a minute to talk a

23   little bit about the specific events that unfolded last week

24   and the consequence of our decision to terminate the

25   origination business or the necessity of terminating our

1    origination business and how we addressed that problem over

2    the course of the last week, but I want to focus for a moment

3    on the loan servicing side of the business.  As I said at the

4    outset, that part of the business has not been affected by

5    the problems that plague the home mortgage origination

6    business.  The servicing business represents an important and

7    stable part of our business.  It's a very valuable aspect of

8    our business.  It has been operating efficiently and

9    effectively throughout this time period, and it represents a

10   very important source of cashflow for the business.  The home

11   servicing - The home mortgage servicing business that we

12   operate is, in its simplest terms, is much more complex than

13   this, but an operation of where our job as a mortgage

14   servicer is to collect the payments from the home owners, to

15   allocate those payments into appropriate buckets of principal

16   and interest, to pay tax obligations, to pay insurance

17   obligations, and to manage the flow of funds with respect to

18   the loans that we're servicing to see that the incoming

19   payments by the homeowners are divvied up and allocated

20   appropriately to the various entities that have interest in

21   those payments or that we are obligated to receive payment in

22   connection with a portion of those payments, like taxing

23   authorities.  That process has been proceeding smoothly all

24   through this period of crisis for the company, and it's our

25   goal, through this bankruptcy, ultimately, to sell that

1    business and to get it in the hands of a third pary who's

2    viable, who's successful, and who's going to be able to run

3    that business smoothly and efficiently in the future, and

4    ultimately, for the benefit of the estate, through the sale

5    of that business, capture the value that the servicing

6    business represents in the hands of American Home Mortgage.

7    One of the things to pay attention to with respect to the

8    servicing business, however, is that fundamentally it's a

9    wasting assets.  Additionally, it's something of an expensive

10   asset to hang onto.  As a wasting asset, it represents an

11   asset that's diminishing in value over time.  We're not

12   originating loans, so we're not creating new loans for the

13   servicing business to service.  Loans are maturing and

14   rolling off of the servicing rolls every day.  So, this

15   business - this asset is shrinking as each day goes by.

16   Additionally, we have some 450 employees at the operating

17   level of the servicing business that are dedicated to keeping

18   the servicing business going, and they represent an overhead

19   obligation for this business that as each day goes by just

20   represents a further drain on the business.  As I'll address

21   in a little bit more detail in a moment and others will

22   address in even more detail, we have an arrangement with Bank

23   of America who has a lien on our servicing assets that allows

24   us to use the cash collateral generated from the servicing

25   business to keep that business running smoothly, but

1  nevertheless, as we run this business we are ultimately

2  cannibalizing the underlying mortgages that are being

3  serviced by the business and as time goes by, diminishing the

4  value.  So we'll be asking Your Honor to allow us to sell

5  that business in very short order.  Additionally, many of our

6  couter-parties for whom we are performing servicing work

7  prior to the bankruptcy had attempted to take action to

8  terminate our servicing rights.  One of the things that we

9  think is important in this bankruptcy case is that we

10  maintain a stable servicing business.  One of the things that

11  we believe is going to be critical to maintaining this stable

12  servicing business is that all of our counter-parties see

13  that we've got an effective, efficient, and very timely

14  process underway to move the serivcing business into the

15  hands of a purchaser, some third party that's healthy and

16  able to operate the business to their satisfaction.  Your

17  Honor, over the last - roughly the last week, the company

18  recognized that it has reached the point or had reached the

19  point where it was in significant crisis.  It began taking

20  steps to do two things:  One, prepare for a potential

21  bankruptcy, which ultimately came to pass.  It also began

22  taking steps to attempt to find purchasers for its principal

23  assets, the servicing business and the loan origination

24  business.  We focused our attention most intensively on the

25  loan origination business, since that is the business that

1   was in crisis, and over the last week we had very intense

2   neogitiatons with four potential purchasers for that

3   business.  Ultimately we failed in each case to bring the

4   potential purchaser to the alter, and as I indicated earlier,

5   the warehouse lenders last week ceased the lending and caused

6   us, forced us to cease originating loans.  Being unable to

7   find a purchaser for the loan origination business and being

8   unable to continue to originate loans, we were forced to

9   cease the origination operation.  That's what triggered the

10  termination of the 6,000 employees over the course of the

11  last week.  We, additionally, spent the last week taking a

12  variety of other steps to prepare for bankruptcy.  We spent a

13  fair amount of time looking for, finding, and negotiating a

14  successful DIP financing arrangement from a DIP lender.

15  We've also, as I alluded to, spent a fair amount of time

16  negotiating with Bank of America, the holder of liens on our

17  servicing rights to make sure that we would be able to use

18  cash collateral to insure that that operations continues

19  smoothly during the course of a bankrupty.  We also, in

20  addition to winnowing our workforce to reflect the reality of

21  the loss of our servicing business, we spent a great deal of

22  time looking hard at our workforce to determine who among our

23  7,500 employees were absolutely critical to the operation of

24  this company and to the management of its assets during the

25  course of bankruptcy.  And as a result of that process, we

1    identified what we consider the core, critical group of

2    employees, many of these are individuals with very

3    sophisticated knowledge of the particular aspect of this

4    business that they are responsible for, and all of them are

5    individuals with detailed information and understanding of

6    our business, and we concluded that we had winnowed our

7    workforce down to a group that was the smallest reasonable

8    group for us to maintain but also a group the we must

9    maintain.  We have in our package of applications a request

10   for both preliminary and ultimately final approval of a

11   retention program for our non-insider employees that is

12   designed to help us insure that those that we have asked to

13   stay with us will stay with us.  The goal of this bankruptcy

14   case, if it's not obvious from everything I've said so far,

15   is relatively simple.  We have three buckets of assets.  We

16   have our servicing business, that we consider quite valuable.

17   We have our bank subsidiary, that we consider quite valuable,

18   and we also have a variety of other financial assets,

19   mortgage and mortgage-backed securities that we own, some of

20   them free and clear and some of them not.  We have leases all

21   around the country associated with our retail operation.  We

22   have furniture, fixtures, and equipment at each of those

23   locations, and what we propose to do is, as quickly and as

24   efficiently as possible, liquidate our holdings in each of

25   those categories, sell our servicing business as quickly and

1   efficiently as possible, liquidate our miscellaneous assets,

2   our miscellaneous financial assets, and our assets associated

3   with our leaseholds, and sell our interest in our bank.  So

4   that simultaneously with that process, we can continue to

5   reduce our workforce and continue to curtail the accrual of

6   administrative expenses that this estate will face, and in

7   relatively short order, winnow this estate down to cash and

8   move to the point where we can prepare a plan and distribute

9   that cash to the unsecured creditors.  We have one enemy in

10  this case and that's time.  Our principal asset, the

11  servicing business, as well as our financial assets, are not

12  going to improve in value over time.  We believe they're

13  going to decline, and we have no ongoing business.  So every

14  day that we're in operation and every day that we're keeping

15  on our payroll employees needed to preserve these assets, we

16  are approving administrative expenses that are cannibalizing

17  the assets that we do have.  So we are going to be asking the

18  assistance of the Court to enable us to move as efficiently

19  as possible through this sale process so that we can manage

20  our enemy here, which is time.  Finally, I want to just take

21  a moment to reflect on what has been, for the company, a very

22  stunning and traumatic two weeks.  We have seen American Home

23  Mortgage lose millions in value, lose 6,000 employees, and

24  throughout that process the company and its employees have

25  managed to continue to operate its servicing business in an

1  uninterrupted and efficient way.  It's managed to control the

2  wind-down of its origination operations in a professional and

3  efficient way, and the employees and personnel of the company

4  have shown remarkable courage and dedication to American Home

5  Mortgage in the face of extreme personal hardship and

6  insecurity.  And as a result of their efforts, they've

7  responsibly and ably positioned the company for what I

8  believe will be a relatively efficient and effective chapter

9  reorganization process.  With that, Your Honor, I think it's

10  time to turn to the first days, unless you have questions for

11  me, and begin addressing the real business of today.

12        THE COURT: All right.

13        MR. PATTON: Your Honor, I'll turn the podium over

14  to Mr. Lunn for the presentation of the first few first day

15  motions.

16        THE COURT: All right.

17        MR. LUNN: Good afternoon, Your Honor.  May it

18  please the Court, Matthew Lunn from Young, Conaway on behalf

19  of the debtors.  Your Honor, I'll simply refer to the agenda

20  that was filed and run down the items that I am responsible

21  for.  The first item, Your Honor, is the debtors' motion for

22  joint administration.  This is the standard motion with the

23  idea that these cases are being jointly administrated for

24  procedural purposes only.  We had sent an advanced copy of

25  this motion over to the United States Trustee and had a

1    conversation with him last night.  He did not have any

2    comments to the proposed form of order.  Unless Your Honor

3    has any questions for me, I have a proposed form of order to

4    hand up.

5        THE COURT: Does anyone wish to be heard in

6    connection with the motion for joint administration?  All

7    right hearing none, this is a routine matter, the order is

8    fine.  So, if you'll approach, I'll sign it.

9        MR. LUNN: Thank you, Your Honor.

10        THE COURT: Let's sign them as we go so we don't

11    lose track.  Thank you.  No changes from the proposed order

12    in the binder?

13        MR. LUNN: No, Your Honor.

14        THE COURT: Okay.

15        MR. LUNN: The next item, Your Honor, is agenda item

16    number 3, and this is the debtors' application to employ EPIQ

17    Bankruptcy Solutions LLC as its noticing and claims agent.

18    Again, we had a conversation last night with the Office of

19    the United States Trustee and have agreed to the vast

20    majority of their suggested revisions.  I would note at the

21    outset, Your Honor, that there was indemnification provisions

22    that were included in the form of order.  Early this

23    afternoon, the United States Trustee had sent over a

24    different form from what was included in the binder.  I have

25    not yet gotten EPIQ to agree to the exact terms of the

1    indemnification, but nonetheless, we're going to work that

2    out with the United States Trustee and provided, with respect

3    to the rest of my presentation, Your Honor will approve the

4    order, we would submit it under certification of counsel

5    since we got agreement with the United States Trustee.

6            THE COURT: All right.

7            MR. LUNN: The other provisions, Your Honor, relate

8    to and that we've agreed to revise are section 7.1 of the

9    agreement which provided for a limitation of liability.  We

10   have agreed to strike that from the order, Your Honor.

11   Additionally, the United States Trustee has requested copies

12   of EPIQ's invoices to be provided to the Office of the United

13   States Trustee and counsel for the Committee when appointed,

14   and that both parties have 10 days to object to such invoice.

15   We've again agreed with that provision, Your Honor, and would

16   include it in the order with one caveat that the portions of

17   the invoices that are not objected to may be paid in the

18   ordinary course under the agreement after the expiration of

19   the 10 days.

20           THE COURT: Okay.

21           MR. LUNN: Section 8 of the agreement, Your Honor,

22   left open the ability for EPIQ to open a bank account for the

23   debtors.  This is really more in connection if they were to

24   serve as a distribution agent.  We've agreed to strike that

25   provision also from the agreement and will reflect it in the

1   order.  We obviously would reserve the right at a later time

2   to come back and to ask that EPIQ serve as the distribution

3   agent and have the authority to set such an account for

4   distribution purposes.  The additional comment, Your Honor,

5   that the Office of the United States Trustee had was with

6   respect to the modest $25,000 retainer.  We have not come to

7   an agreement on this fact, Your Honor, and as Your Honor is

8   well aware, under Insilco, this matter would require a full-

9   blown evidentiary hearing which the debtors at this time and

10  given that this is at the first day hearing do not believe

11  that this ripe for today.  Nonetheless, the Office of the

12  United States Trustee is pressing and saying that we cannot

13  even agree to adjourn over the hearing which the debtors want

14  to do solely with respect to the application of the $25,000

15  retainer.

16          THE COURT: Do they have the retainer?

17          MR. LUNN: They have the retainer now, Your Honor.

18          THE COURT: Well, then their position has got some

19  merit; don't you think?

20          MR. LUNN: EPIQ's position, yes, Your Honor.

21          THE COURT: No, no, the U.S. Trustee's position.

22          MR. LUNN: Well -

23          THE COURT: You caught me with my pronoun, but -

24  They've already got the retainer.

25          MR. LUNN: They're holding the retainer, yes, Your

1    Honor.

2         THE COURT: They've got the ultimate relief you're

3    seeking.  So continuing the matter indefinitely while you try

4    to work it out or set it up for an evidentiary hearing,

5    they've already got the relief the U.S. Trustee's objecting

6    to.

7         MR. LUNN: Your Honor, we're not asking that it be

8    adjourned indefinitely.  All we're asking that it be carried

9    over to a date to be determined, whatever Your Honor would

10   set up, so that we can have a full-blown evidentiary hearing.

11   EPIQ's rights in this matter are being addressed, Your Honor.

12        THE COURT: Are being what?

13        MR. LUNN: EPIQ's rights are being adversely

14   addressed, and they should have the opportunity to come down

15   and present their case as well as the debtors' case as to why

16   this meets the factors under Insilco.  What we're talking

17   about here, Your Honor, is a very large case with a very

18   large number of creditors.  EPIQ is going to be required to,

19   as Mr. Patton said, send out numbers of notices in connection

20   with the sale.  This is a $25,000 issue, Your Honor, and not

21   to have that cut against me, so to speak, to have the debtors

22   prepay for every single service that would potentially go out

23   and have EPIQ require that creates an administrative burden

24   on the debtors that given the timelines that we're talking

25   about here, just are not in the best interest of the estate,

1  Your Honor, and all we're asking is that this be carried over

2  to another hearing and not be heard on the first day hearing.

3         THE COURT: All right, let me hear from Mr. McMahon.

4         MR. McMAHON: Your Honor, good afternoon.  Joseph

5  McMahon for the United States Trustee.  To clarify the record

6  a bit, Your Honor, we're objecting to the Evergreen portion

7  of the request which is what's really at issue here.  I think

8  Mr. Lunn by his reference to Insilco bring that.  Frankly,

9  Your Honor, we're happy to address this issue in whichever

10  way the Court deems appropriate.  I don't know necessarily

11  that EPIQ is necessarily a party to the particular dispute

12  before the Court.  I don't think that they would have

13  standing to appeal from any adverse ruling that the Court may

14  issue in this regard, but putting that aside, as a courtesy

15  to EPIQ, if they wanted to appear at the hearing to assist

16  the debtors' efforts in presenting evidence, I guess that

17  would be possible and appropriate.  The practical point that

18  I think was - I guess, is getting lost here is if EPIQ has

19  to, I guess, put out advanced funds for costs and stuff,

20  they're going to be doing that irrespective of, I guess, how

21  this particular provision gets addressed, which is the

22  $25,000 retainer being in Evergreen, they're going to be

23  sitting on that and holding on to it on a month-to-month

24  basis until the termination and conclusion of these cases

25  such that this concern about laying out money for EPIQ I

1    don't think is necessarily before the Court.  In its present

2    posture, EPIQ would be advancing whatever costs it would have

3    itself to send out notices and then invoicing the debtors at

4    the end of the month.

5          THE COURT: All right, but by having a retainer in

6    the event the debtor doesn't pay, they have some means to

7    recover their potential loss.  Mr. Lunn's point is, if I

8    don't give them a retainer, without that backup, they may

9    require prepayment of expenses.  They have to serve 100,000

10   creditors with a notice which is a significant outlay in

11   paper, copy costs, and postage.

12         MR. McMAHON: And, Your Honor -

13         THE COURT: Even for a one-page notice.

14         MR. McMAHON: With respect to that point, Your

15   Honor, what I would suggest is that - I don't think that Mr.

16   Lunn accurately stated our position with respect to the

17   matter being heard today.  If the debtors want to continue it

18   to, I guess, the next hearing in the cases, we will discuss

19   this point with them, and if we can agree to some type of

20   acceptable resolution, we'll address it then.  We'll address

21   it under certification of counsel.  Otherewise, we'll address

22   it at that hearing.

23         THE COURT: Well, do you have an issue with the

24   Court approving the order in all elements other than the

25   retainer and simply holding the retainer out for a later day?

1   Or would you like the whole order put off until -

2          MR. McMAHON: Your Honor, I would prefer that the

3   whole order be put off, and I think that's kind of implicit

4   in the situation where we stand with respect to the

5   indemnification provision.  We're going to have to take a

6   look at that anyway.

7          THE COURT: All right, and that's where you disagree

8   with Mr. Lunn, I believe.  Is that correct, Mr. Lunn?

9          MR. LUNN: Correct, Your Honor.  I don't think

10  anyone's contesting them holding the retainer, Your Honor.

11  It's the application and all we're asking is that portion be

12  carried over to another hearing date.

13         THE COURT: They're going to bill you monthly?

14         MR. LUNN: I believe so, Your Honor, I -

15         THE COURT: So they're not going to bill you till

16  the end of August; right?

17         MR. LUNN: But they're still going to have to serve

18  out a number of notices.  The utility order, for instance, is

19  going to have to be served out.  They're going to outlay a

20  lot of cash between now and the next hearing.

21         THE COURT: Well, I understand, but the way their

22  agreement is structured, like any law firm, they do the

23  services, they bill you at the end of the month, you pay it,

24  and the issue you're going to have with Mr. McMahon is

25  whether the first $25,000 of that first bill gets paid out of

1   the retainer or whether they're able to hang onto the

2   retainer.  That's not going to happen until September.

3          MR. LUNN: That is correct, Your Honor.  It's about

4   the application of the retainer.  That is the issue.

5          THE COURT: All right.  What I'll do is, subject to

6   submitting an order under certification of counsel with the

7   agreed to indemnification language, I'll approve the order

8   other than the retainer and whether it will be an Evergreen

9   retainer, and we'll hear that at the next hearing in the

10  matter but certainly before the end of August.

11         MR. LUNN: Very well, Your Honor.  Thank you.  The

12  next agenda item, Your Honor, is -

13         THE COURT: But if - I'm sorry to interrupt you, but

14  if it turns out that my assumption is wrong and that you're

15  going to get a bill tomorrow, you need to inform the Court so

16  that I can adjust my ruling accordingly.

17         MR. LUNN: Very well, Your Honor.  The fourth item

18  on the agenda, Your Honor, is the cash management motion.

19  For now, I would request that we skip over that as Ms. Morgan

20  from our office will be handling that.

21         THE COURT: All right.

22         MR. LUNN: The next item is the motion to provide or

23  deem utility companies adequately assured of future

24  performance and establishing the related procedures.  We are

25  seeking interim relief at this time of the motion, Your

1    Honor, and I have a blackline as we've attempted to address

2    Your Honor's concerns from other hearings and other orders.

3    So, if I may approach?

4              THE COURT: Yes, you may.  Thank you.

5              MR. LUNN: As I stated, Your Honor, we have gone

6    back and have revised the interim order to be consistent with

7    other orders that Your Honor has entered.  Specifically, we

8    are making it clear that the deposit of funds into an escrow

9    account will occur within the 20 days prior to the petition

10   date, and we also have noted that Your Honor has concerns

11   about limiting the time by which the utility companies may

12   seek additional adequate assurance.  So what we have done is,

13   if Your Honor looks at the third ordered paragraph, we have

14   captured the 20-day aspect, and in the third ordered

15   paragraph on page 3, that provision that we receive requests

16   within a certain period of time has been stricken.

17             THE COURT: All right.

18             MR. LUNN: The Office of the United States Trustee

19   also had raised a concern regarding the adjustment of the

20   escrow account and what we've agreed to do is make the

21   following representation.  The debtors represent that in the

22   event the debtors reach an agreement with the utility

23   company, a deposit of two weeks or more, the debtors will

24   adjust the escrow accordingly.  That way to keep it so that

25   there's a minimum of the two weeks' deposit within the

1  escrow.

2          THE COURT: Okay.

3          MR. LUNN: Unless Your Honor has any questions, I do

4  have a form of order.

5          THE COURT: Does anyone wish to be heard in

6  connection with the utility motion?  All right.  You did

7  successfully address my two concerns.

8          MR. LUNN: I'm glad to hear it, Your Honor.

9          THE COURT: That's good.  I'm ready to sign it.  Do

10  you want to set the final hearing date or are we getting

11  ahead of ourselves?

12          MR. LUNN: One moment, Your Honor.

13          THE COURT: Sure.

14          MR. LUNN: Your Honor, I'm being told that we would

15  like a date the last week of August.

16          THE COURT: All right.  I'm going to have to check

17  something on my other computer.

18          MR. LUNN: Okay, Your Honor.

19          THE COURT: So, I've signed the order, but I'll hold

20  it.  I'm not sure I can give you something that week, so -

21          MR. LUNN: Okay.

22          THE COURT: That will also be the final DIP hearing,

23  et cetera, et cetera?

24          MR. LUNN: Yes, Your Honor, that's why we're trying

25  to coordinate.

1          THE COURT: How about the 24th of August, that's a

2   Friday; does that work?

3          MR. LUNN: Let me check, Your Honor.

4          THE COURT: Does the math work on the - Is that 20

5   days?

6          MR. PATTON: Your Honor, does the day after Labor

7   Day work . . . (microphone not recording).

8          THE COURT: I apologize.  I'm on vacation the last

9   week in August so I'm struggling with whether to risk

10  domestic - what's the opposite of tranquility?  I don't -

11         MR. PATTON: Your Honor, does the second - I'm

12  sorry, the Tuesday after -

13         THE COURT: The 4th is fine, yeah.

14         MR. PATTON: I think that works . . . (microphone

15  not recording).

16         THE COURT: You need to be at a microphone, Mr.

17  Patton, or we're not going to -

18         MR. PATTON: I'm sorry.

19         THE COURT: Do you want the 4th or do you want me to

20  check on -

21         MR. PATTON: I'll take the 4th, Your Honor.

22         THE COURT: All right.

23         MR. PATTON: I'll plead the 5th.

24         THE COURT:  Do you have a time?

25         MR. PATTON: Whatever is convenient for Your Honor.

1   We do have folks coming down from New York, so -

2          THE COURT: Eleven a.m.?

3          MR. PATTON: Eleven will be just fine, Your Honor.

4   Yeah, 11 is just fine.

5          THE COURT: All right.  September 4th at 11 a.m.

6          MR. PATTON: Yeah, thank you very much.

7          THE COURT: Mr. Lunn, I'll set an objection deadline

8   of the 27th, which is Monday -

9          MR. LUNN: Thank you, Your Honor.

10         THE COURT:  - because of the holiday.  It looks

11  like the DIP order just arrived.  All right, yes sir, how may

12  I help you?

13         MR. BEACH: Good afternoon, Your Honor.  May it

14  please the Court, Sean Beach on behalf of the debtors.  Your

15  Honor, I'm going to address items number 6, 7, and 8 on the

16  agenda beginning with the tax motion.  Your Honor, the

17  debtors have -

18         THE COURT: Hang on just a second.  Let's pause for

19  a moment so everybody can get what they need.

20         MR. BEACH: Sure.

21         THE COURT: And then we'll settle down.  All right,

22  you may proceed, Mr. Beach.

23         MR. BEACH: Thank you, Your Honor.  Item number 6 on

24  the agenda, Your Honor, is the request of the debtors to pay

25  pre-petition taxes, Your Honor.  There are two categories of

1   taxes that we're requesting this relief for.  One area is

2   trust fund taxes where the debtors collect from third parties

3   before remitting them to the appropriate taxing authorities.

4   The debtors on an annual basis estimate that the amount of

5   these types of trust fund taxes is approximately 156,000 and

6   that the pre-petition balance if approximately 76,000.  The

7   other area of taxes is certain business and occupation taxes,

8   which are akin to franchise taxes where there's some concern

9   that in at least certain jurisdictions there is personal

10  liability for officers and directors with respect to those

11  taxes, and the estimated pre-petition amount owed with

12  respect to these taxes is about 45,000.  Your Honor, we've

13  had a discussion with the Office of the United States Trustee

14  prior to this hearing.  The U.S. Trustee has requested that

15  we establish a cap for this motion, and we have established a

16  cap at $150,000, slightly higher than the two estimates I

17  gave you but built in a little flexibility for the debtors.

18          THE COURT: All right.  Does anyone wish to be heard

19  in connection with this motion?  All right, I'll approve it

20  as resolved.

21          MR. BEACH: Thank you, Your Honor.  May I approach

22  with a clean and a blackline?

23          THE COURT: Yes.  Thank you.  All right, I'll sign

24  the order.  Okay.

25          MR. BEACH: Your Honor, the next item on the agenda

1  is item number 7, the debtors' insurance motion.  On the

2  balance of the debtors' insurance policies, the debtors have

3  paid current pre-petition.  There is one area of insurance

4  that we're requesting relief on today, Your Honor, and that's

5  with respect to certain mortgage insurance policies that the

6  debtors are the insured under with respect to the servicing

7  unit.  In connection with the servicing functions, Your

8  Honor, the debtors are insured under these policies, and

9  they're critical to the debtors being able to comply with

10  their servicing functions.  The way these mortgage insurance

11  policies work, typically, is that there's an agreement with

12  the lender that certain amounts of the principal and interest

13  paid by homeowners will be essentially stripped off.  For

14  instance, if the homeowner has an interest rate of 7 percent,

15  they'll strip off, for instance, 50 basis points, allocate

16  that to a separate account for the payment of this mortgage

17  insurance to help secure the loan portfolio and certain

18  individual loans.  That money that's allocated into that

19  account is used once invoices come in to pay these mortgage

20  insurance premiums, and the debtors then remit those amounts.

21  Your Honor, I do need to make one clarification in the

22  motion.  We estimated that the pre-petition amount owed under

23  this motion was about 3.6 million.  The actual estimate is

24  about 5.3 million.  Five million dollars of this amount is

25  what I've just described to you.  It's these amounts that are

1  essentially advanced and stripped out of the principal and

2  interest that homeowners pay allocated to a separate account

3  solely for the payment of these mortgage insurance policies

4  and then paid in the ordinary course of business.  The other

5  300,000 of that amount, Your Honor, relates to certain pre-

6  paid policies where the debtors agreed to pay the whole

7  amount of the loan up front and then strip away the basis

8  points from principal and interest going forward.  Your

9  Honor, these insurance policies are critical to the

10 functioning of the debtors' servicing operation.  They're

11 required under a number of the servicing contracts, and the

12 debtors believe that there could be irreparable harm and

13 certainly devaluing of the loans and the loan portfolio if

14 this insurance wasn't paid and certain of the insurance

15 policies were terminated.  The debtors believe that the

16 insurance will not only make the overall loan portfolio more

17 marketable because, especially in this market where we have a

18 number of defaulting loans, purchasers are looking for loans

19 that are insured or better secured, and the debtors believe

20 that the payment of this additional $300,000 is in the

21 debtors' best interest.  With respect to the 5 million that I

22 discussed earlier, that is money that's stripped away and

23 allocated and not advanced by the debtor.  Your Honor, I've

24 had discussions with the Office of the United States Trustee.

25 Again, with the exception of setting cap, which we have done

1    and we've revised the order to do that, I believe the Office

2    of the U.S. Trustee doesn't have any objections to the relief

3    requested.

4              THE COURT: Are any of the insurance companies that

5    are being paid affiliated with the debtor?  I know the debtor

6    has one, Turf and Caicos Insurance Company (phonetical).  Is

7    it going to receive payments under this?

8              MR. BEACH: No, Your Honor, I don't believe so.

9              THE COURT: Why don't you check with your client.

10             MR. PATTON: Your Honor, Jim Patton for the debtors.

11   Just - and I apologize to Mr. Beach for jumping in here.

12   There is a way that a certain portion of these dollars will

13   ultimately find their way into one of our subsidiaries.  We

14   don't know the numbers, but it could be as much as $100,000,

15   but what happens is this: The insurance companies that we are

16   paying seek to reinsure some portion of their risk.  Our

17   insurance subsidiary provides - I assume among other, but

18   provides reinsurance.  If these entities choose to reinsure,

19   and it's their election, with one of our subsidiaries, we

20   could end up with some of those dollars through that

21   transaction, but the payment -

22             THE COURT: But that's a transaction between the

23   insurance company and your affiliate in a normal market

24   condition; correct?

25             MR. PATTON: That's exactly right.  So it - just so

1   the record is clear, it could siphon back into the estate

2   that way.

3           THE COURT: All right, that's fine.  I appreciate

4   the clarification.  I'm not troubled by that.  Mr. Beach, you

5   may approach with the order.  Does anyone else wish to be

6   heard in connection with this matter?  All right, hearing

7   none, I'll sign the order as modified.  What's the cap; 5.3

8   million?

9           MR. BEACH: 5.3.

10          THE COURT: I'll sign the order.

11          MR. BEACH: Thank you, Your Honor.  The next item on

12  the agenda is the critical vendor motion.  Your Honor, the

13  Office of the United States Trustee was provided with an

14  advanced copy of this motion.  I've had several discussions

15  with the Office of the U.S. Trustee.  We've provided them

16  with a list of the critical vendors and the proposed amount

17  for each vendor and have had discussions about the nature of

18  the work that that vendor proposes to continue to do for the

19  debtors and the reasons for why we believe that they are

20  critical vendors and need to be paid under this order.  If

21  it's acceptable to Your Honor, what I propose to do is

22  proceed by proffer of Mr. Robert Love, vice president of Loan

23  Sales and New Product Lines of American Home Mortgage.  Mr.

24  Love is in the courtroom today.

25          THE COURT: Any objection to the use of a proffer?

1   You may proceed.

2          MR. BEACH: Thank you, Your Honor.  Your Honor, if

3   called, Mr. Love would testify that he's the vice president

4   of Loan Sales, New Product Lines for American Home Mortgage

5   Servicing, Inc.  He has worked in the loan servicing industry

6   since September 2001.  Prior to that, working for Columbia

7   National Incorporated, which was acquired by AHM and has been

8   employed with AHM Servicing since June 2002.  In his capacity

9   as vice president, Mr. Love works with other senior managers

10  at AHM Servicing to insure compliance with respect to

11  servicing obligations for contracts which govern every aspect

12  of the servicing business.  Mr. Love would testify that the

13  debtors' mortgage and construction loan servicing customers

14  demand a high level of service.  That loan servicing

15  typically includes, among other things, collecting and

16  remitting loan payments received from the borrowers, making

17  required advances, accounting for principal and interest,

18  customer service, holding escrow or impound funds for payment

19  of taxes and insurance, and if applicable, contacting

20  delinquent borrowers and supervising foreclosures and

21  property dispositions in the event of unremedied defaults.

22  He would testify that proper loan servicing requires

23  diligence and sensitivity and that the efficient functioning

24  of the loan servicing business depends on maintaining a

25  stable vendor and service provider base, particularly since

servicing loans, especially loans in default, requires

sophistication concerning the legal and practical issues that

affect the loan servicing business.  Mr. Love would further

testify that the universe of potential replacements for these

vendors and service providers with the necessary skill, size,

and expertise the debtor is required to operate the loan

servicing business is limited.  That quickly and efficiently

locating and transitioning to replacement vendors as service

providers on reasonable terms would be extremely difficult

especially when the debtors are engaged in the process of

selling the loan servicing business on an expedited basis.

He would testify that in the ordinary course of business, the

debtors utilize several hundred vendors and service providers

in connection with the loan servicing business.  That the

debtors have carefully evaluated and pared down their list of

vendors and have identified only the approximately 30 most

critical vendors.  That these critical vendors are vital to

the loan servicing businesses, cannot be effectively

transitioned, are not legally bound to continue providing

services, and without which the value of the loan servicing

business could suffer irreparably.  That the critical vendors

include certain sole source providers that these sole source

vendors provide, among other things, services that are

essential to the debtors' collections, functions, information

services essential to AHM's timely action on loans where the

1  borrowers have filed for bankruptcy and interfacing functions

2  with the credit bureaus for timely credit corrections and

3  disputes.  He would further testify that other critical

4  vendors can be categorized based on essential automatic data

5  transmissions and servicing systems software that they

6  provide.  These critical vendors serve vital functions for

7  the day-to-day operations of the loan servicing business and

8  cannot be transitioned without severe disruption.  For

9  instance, almost all of the critical vendors in this category

10 provide automatic data feeds built into the debtors'

11 operating systems.  He would also testify that the remaining

12 critical vendors provide, among other things, possessed or

13 backup and recovery services and specialized technical

14 expertise that cannot be replicated or transitioned to any

15 other vendor without business disruptions or the risk of

16 irreparable harm to the loan servicing businesses.  Mr. Love

17 would testify that he believes that the critical vendors

18 would be unlikely to provide services pre-petition unless

19 outstanding pre-petition invoices were paid.  He believes

20 that replacing any of the critical vendors would be

21 disruptive, cost prohibitive, and in certain instances

22 impossible given the debtors' efforts to maximize value for

23 their estates through the loan servicing sale.  That the

24 debtors have developed relationships with these vendors that

25 would be hard to replicate in a short period of time.  That

1  failure to timely honor the pre-petition obligations to these

2  critical vendors would seriously jeopardize these

3  relationships.  Mr. Love would testify that the debtors have

4  and will continue to use strict type criteria to determine

5  who these critical vendors are.  Those criteria are whether

6  the vendors is a service provider or service in question is a

7  sole source provider, whether even if the vendor or service

8  provider in question is not a sole source provider, quality

9  requirements or other specifications prevent the debtors from

10  obtaining a vendor's products or services from alternative

11  sources within a reasonable time frame, and whether a vendor

12  meeting one of the other standards is likely to refuse to

13  provide products or services to the debtors post-petition if

14  its pre-petition balances are not paid.  Finally, he would

15  testify that he is confident that this process has

16  appropriately identified only those vendors, service

17  providers that meet the foregoing stringent guidelines.  Your

18  Honor, that concludes the proffer of Mr. Love.

19      THE COURT: Does anyone wish to cross-examine Mr.

20  Love?  All right.

21      MR. BEACH: Thank you, Your Honor.  Your Honor, by

22  this critical vendor motion, the debtors seek authority

23  pursuant to § 105 through 63 through 64, 1107 and/or 1108 of

24  the Bankruptcy Code authorizing -

25      THE COURT: Do you have anymore you want to throw

1  in?

2         MR. BEACH: I'm sure I could think of a few, Your

3  Honor - authorizing the debtors to make critical vendor

4  payments in the aggregate amount of $520,000.  The relief

5  requested in this motion is critical to the operations, as

6  you've heard in Mr. Love's testimony, to make sure that we

7  maintain a stable business throughout the course of the sale

8  that Mr. Patton spoke to earlier.  Your Honor, the debtors

9  have narrowed down this list from a list of several hundred

10  to thousands of servicing vendors, have figured out which

11  vendors are critical to the business, which vendors are

12  already under or bound by contracts and have excluded those

13  from the list, and have narrowed it down to who they think

14  are the most essential vendors, and we would ask Your Honor

15  to approve this motion today with the cap of $520,000.

16         THE COURT: Does anyone wish to be heard in

17  connection with this motion?  All right, hearing none, I'll

18  approve the order.

19         MR. BEACH: Thank you, Your Honor.  May I approach?

20         THE COURT: Yes.  You don't need to ask anymore.

21  Thank you.  There are no changes to the order?

22         MR. BEACH: No, Your Honor.  Your Honor, I'd like to

23  cede the podium to Pauline Morgan who will address the cash

24  management motion.

25         THE COURT: All right.

1          MS. MORGAN: Good afternoon, Your Honor.

2          THE COURT: Good afternoon.

3          MS. MORGAN: For the record, Pauline Morgan from

4    Young, Conaway, Stargatt & Taylor on behalf of the debtors.

5    Your Honor, if we may, we'd like to go backwards in the

6    binder to item 4.

7          THE COURT: Okay.

8          MS. MORGAN: And Your Honor, this is the debtors'

9    motion seeking an order authorizing them to continue to use

10   their existing cash management system, bank accounts,

11   business forms, and also seeking an interim waiver of the

12   deposit requirements of § 345.  Your Honor, based apparently

13   on lessons learned from other cases, we've received very

14   specific requests from our creditors as to how this order

15   should read, and many of those comments we actually received

16   before we filed it and are included in the form of order

17   attached to the motion, and many of these are either very

18   close to or exactly what was approved by Judge Carey in the

19   New Century case.  Apparently there's always room for

20   improvement because we also received many additional requests

21   for lenders and these provisions - this is an over-

22   generalization, but basically lenders are requesting that the

23   debtors confirm in this order that we are using cash but not

24   violating any of the substantive agreements between the

25   parties.  And also, many are reserving their rights to

1    confirm that we are not using their cash collateral.  So,

2    we've attempted again to collect, I believe, all the

3    comments.  I'm sure we will hear from someone if we've missed

4    some, but we have tried to collect all the comments and

5    incorporate them in the revised cash management order.  We've

6    also spoken to the U.S. Trustee, with Mr. McMahon, and we

7    have a few changes that we've agreed to with him as well.  If

8    acceptable to the Court, I think it might be easier if I

9    approach and we just go through a blackline?

10          THE COURT: That's fine.

11          MS. MORGAN: Thank you, Your Honor.

12          THE COURT: Thank you.

13          MS. MORGAN: Your Honor, minor change on page 2, as

14    you will see, and then beginning - I'm looking at the

15    blackline at paragraph (3), this is a request of the U.S.

16    Trustee that we just notify the office when we close or open

17    a new account.

18          THE COURT: All right.

19          MS. MORGAN: Which we've agreed to do.  Later on

20    that page, this is also at the request of the U.S. Trustee,

21    it's conforming the provision regarding business forms to

22    more closely conform with our Local Rules on this subject,

23    which we've done.

24          THE COURT: Okay.  The opening and closing of bank

25    accounts would also be reflected in your monthly operating

1    reports; wouldn't it?

2         MS. MORGAN: They should be, Your Honor, that's

3    correct.

4         THE COURT: Is that the notice - Is this an

5    additional notice?

6         MS. MORGAN: Your Honor, I think since Mr. McMahon

7    asked for it so nicely, we'll give him additional notice.

8         THE COURT: All right.

9         MS. MORGAN: Your Honor, on the next page, again

10   this, I believe, in large part is reflected in comments from

11   Barklays, and I apologize if I'm not giving the correct

12   attributions to the right lender.  At this point I'm confused

13   about who gave us which comment, but again, the comment is to

14   make sure we include in here mortgage loan purchasing and

15   servicing agreements and related documents for the sale of

16   whole loans to third parties.

17        THE COURT: All right.

18        MS. MORGAN: As one could read it prior to this

19   change it may not include whole loan documents.  We've made

20   it clear now that it does.  We've now also made clear at the

21   request of Bank of America, nothing in this order provides

22   that the debtors may transfer cash collateral as that term is

23   defined in the cash collateral order from any debtor to

24   another debtor or other party.

25        THE COURT: Other than is authorized under the cash

1  collateral order.

2          MS. MORGAN: Or the governing documents, Your Honor,

3  yes.

4          THE COURT: All right.

5          MS. MORGAN: Your Honor, later on that page, again

6  there's an inclusion of whole loan documents.

7          THE COURT: The definition of whole loan documents

8  is, "the mortgage loan purchasing and servicing agreements

9  and related documents for sales of whole loans to third

10 parties"; correct?

11         MS. MORGAN: Correct, Your Honor.  We have a typo on

12 page 6.  At the top of page 7, again, we are providing here

13 and this is, I believe, at the request of Bank of America,

14 that claims against one or more of the debtors arising from

15 post-petition performance of the securitization servicing

16 functions shall be either paid in accordance with the

17 documents or be afforded administrative priority.  Again,

18 whatever the documents may provide.

19         THE COURT: All right.

20         MS. MORGAN: On page 8, again we are modifying this

21 clause to make sure that what we are agreeing to do is only

22 what is in accordance with the securitization documents and

23 otherwise these expenses are afforded administrative expense

24 priority to the extent provided again in the relevant

25 securitization documents.  A little further down on that

1   page, again, Your Honor, I believe - I'm not sure who

2   requested this, but the securitization servicing functions in

3   someone's view did not perhaps include reporting

4   requirements, so we've made clear that those are also

5   covered.

6          THE COURT: Okay.

7          MS. MORGAN: Your Honor, at the next page,

8   previously the order did provide that nothing impaired our

9   rights to assume.  This makes clear that other parties may

10  assert their rights or defenses, that nothing constitutes a

11  finding by this Court under 365, and that non-debtor parties'

12  rights to a servicing agreement are not impaired, and they

13  may seek to have an earlier effective date of rejection.

14  Further below, Your Honor, the motion and the order provide

15  that intercompany claims would be entitled to administrative

16  priority treatment and Bank of America has asked that we add,

17  and we have added, that this order shall not affect the

18  rights of the pre-petition secured parties as provided in the

19  cash collateral order.  Top of the next page, Your Honor, we

20  have just included various other sections of the Bankruptcy

21  Code which -

22         THE COURT: All of which already say what this

23  paragraph says, but okay.

24         MS. MORGAN: Yes, yes, Your Honor, but it can't hurt

25  to say it again.

1          THE COURT: No comment.

2          MS. MORGAN: Your Honor, the next ordered paragraph,

3     I believe this is at the request of Deutsche Bank.  Again,

4     this paragraph related primarily to servicing functions,

5     again, with respect to the transactions of the kind listed in

6     the sections we've just mentioned above.  We've also added at

7     end this paragraph that it also applies to whole loan

8     documents or any other agreement with respect to which any of

9     the debtors hold mortgage servicing rights.

10          THE COURT: Wait a minute.  What does this paragraph

11    mean?  All right, you're just saying that everything - Oh, I

12    see.  All right.  Everything that we just went through with

13    servicing applies -

14          MS. MORGAN: To whole loans -

15          THE COURT: All right.

16          MS. MORGAN:  - and any other agreements that would

17    fall under these categories, Your Honor.

18          THE COURT: Okay.

19          MS. MORGAN: I believe the next ordered paragraph

20    was at the request of CSFB and just again is a reservation of

21    rights.  It indicates nothing in this order is intended to

22    limit, expand, or otherwise affect rights and obligations of

23    the debtors and other parties under repo agreements including

24    obligations, if any, to segregate funds and transfer

25    servicing rights.

1          THE COURT: All right.

2          MS. MORGAN: Your Honor, the last paragraph is also

3   at the request of Bank of America.  Your Honor, this relates

4   to a single seller commercial paper facility where the

5   parties have already commenced the liquidation process of

6   these mortgage loans in accordance with the respective

7   documents, and this provision says that the debtor shall

8   comply with the terms of the relevant documents to liquidate

9   the loans in a commercially reasonable manner, again, in

10  accordance with the documents, whatever they say.

11         THE COURT: Okay.

12         MS. MORGAN: Your Honor, I've also been asked to

13  state on the record that Barclays, which I believe Barclays'

14  counsel is on the phone, Mr. Robert Miller, that he has

15  provided us comments and that they are incorporated in this

16  cash management order, and, Your Honor, I believe that

17  concludes the changes.  For the record, the cash management

18  system is very important to the debtor and allows us to

19  manage our cash efficiently and invest and manage in

20  concentration accounts in order to yield the highest return.

21  We maintain accurate accounting records of our daily

22  transactions and the system enables us to do that.  The

23  debtors' procedures, we believe, are ordinary, usual, and

24  essential for a company of this type and size.  We are also

25  seeking to continue to use our business forms because we

1 believe any change in those forms would be disruptive and

2 burdensome and expensive to the estates. We also request, as

3 is provided in the order, that intercompany claims be

4 accorded administrative priority treatment which assures that

5 each debtor is bearing the burden it should bear for its own

6 borrowings. And finally, we are seeking an interim waiver of

7 the requirements of § 345. We do have, I believe, 450

8 accounts, so it will take us some time to come into

9 compliance. And with that, Your Honor, the debtors request

10 that the Court grant the order.

11      THE COURT: All right. Does anyone else wish to be

12 heard in connection with this motion? We'll start with the

13 people that are here. We'll get to the people on the phone

14 in a minute. Special perks for making the trip.

15      MS. FIFE: Thank you, Your Honor. Lori Fife from

16 Weil, Gotshal & Manges on behalf of Credit Suisse. I have

17 actually worked out some language with Ms. Morgan. She's

18 very cooperative, but I am still a little bit uncertain

19 regarding the paragraph on page 10 that Your Honor actually

20 pointed out, the second ordered paragraph. The language is a

21 little bit confusing, and if it is as Your Honor seemed to

22 suggest that all of the provisions in this order relate to

23 repurchase agreements then that's something that's not

24 acceptable to Credit Suisse. There are many provisions in

25 this order relating to the debtors taking over servicing

1  rights and having to comply with servicing rights, which as

2  you may have read in our papers, we do not agree is

3  appropriate in connection with our repurchase agreement, and

4  we also have requested that funds be put in separate

5  accounts.  So I don't think it's appropriate for all of the

6  provisions in this agreement to apply to repurchase

7  agreements, which is why -

8          THE COURT: Well, but don't they give it and they

9  immediately take it away in the next paragraph.

10          MS. FIFE: Right, that's right.

11          THE COURT: So, it doesn't matter, because that one

12  says - well, the one you don't like says, all provisions of

13  the order pertaining to servicing apply to your repo

14  transactions, then the next one says that nothing in the

15  order, including the paragraph you don't like, shall limit,

16  expand, or otherwise affect your rights.

17          MS. FIFE: I don't think it makes sense to have an

18  order with two conflicting paragraphs.

19          THE COURT: Well, I don't think they're necessarily

20  conflicting because I think this is - frankly, I think Ms.

21  Morgan was probably more focused on capturing the whole loan

22  documents' transactions, which aren't repo transactions, if I

23  recall correctly, so -

24          MS. FIFE: Okay.

25          THE COURT:  - they might be, frankly, a little

1   loose with the previous paragraph, but I think you're

2   protected, at least my understanding of what I'm going to

3   sign is that you're protected.

4         MS. FIFE: Okay, that's great.  Thank you, Your

5   Honor.

6         THE COURT: It doesn't get any better than that.

7   Anyone else present have any other comments?  I've got a few

8   here, Mr. Knight.  Oh, no, I'm sorry.

9         MS. RYLAND: Good afternoon, Your Honor.  Erica

10   Ryland from Jones Day representing the DIP lender.

11   Unfortunately, we were just handed this substantial markup 10

12   minutes ago.  So we would just ask for a little bit of time

13   to feed some, what I think are very minor, comments back to

14   the debtor prior to your agreeing to enter the order.

15         THE COURT: Very well.

16         MS. RYLAND: Thank you.

17         THE COURT: Mr. Knight?

18         MR. KNIGHT: Good afternoon, Your Honor.  John

19   Knight from Richards, Layton for ABN Amro Bank.  My co-

20   counsel, Gregory Bray from Milbank Tweed in Los Angeles would

21   like to address the Court.  I filed a *pro hac vice* motion and

22   I would ask the Court to hear him.

23         THE COURT: I think the order has already been

24   signed so that's not a problem.  Mr. Bray, yes.

25         MR. BRAY: Good afternoon, Your Honor.  ABN Amro

1    filed a limited objection covering the financing papers in

2    this.  I heard everything the Court said, and I guess I'm

3    piling on but I just want to be sure that my understanding is

4    that we have the documents which we've outlined for you which

5    are repurchase agreements that there's nothing in here - let

6    me back up.  The concern of course is that when the Court

7    signs the order later someone says we were ambushed and that

8    we somehow waived our rights under our documentation with

9    respect to transfer of funds, servicing, whatever the case

10   may be by virtue of the order.  That's what we're trying to

11   avoid.  We don't object to the order being entered, to the

12   debtor continuing to perform the servicing, to being paid for

13   the servicing, all the things that we'd normally do in the

14   ordinary course provided that if and when we seek to exercise

15   whatever rights and remedies we have under the Code, that

16   this order is not used to essentially say that we waived

17   those rights and remedies.  That's the concern, and I think

18   that that's what the paragraph that Your Honor focused on

19   says, but out of an abundance of caution I guess I wanted to

20   say it my way to make sure that I had it right with respect

21   to the debtors' understanding, that these orders are always

22   dangerous in that sense.

23          THE COURT: All right.  Well, I - I mean it says

24   what it says, of course, which may not be particularly

25   helpful to you, but if you have a repurchase agreement, I

1  don't know if you do or don't, if you have a repurchase

2  agreement, I think it's pretty clear.  Nothing in this order

3  shall limit, expand, or otherwise affect any rights and

4  obligations under any of the debtors' repurchase agreements.

5          MR. BRAY: Thank you, Your Honor.

6          THE COURT: I don't know if you have a repurchase

7  agreement.  I know you purport to have one.

8          MR. BRAY: We're not asking you to make that

9  decision today.

10         THE COURT: And I think that applies to anybody who

11  has a repurchase agreement or thinks they have a repurchase

12  agreement.  Mr. Dehney, good afternoon.

13         MR. DEHNEY: Good afternoon, Your Honor.  Robert

14  Dehney from Morris, Nichols, Arsht & Tunnell.  Among the

15  clients we represent in this case, Your Honor, is Federal

16  Guaranty Insurance Co., and at the end of last week, we

17  served by letter, by hand, by FedEx terminations under the

18  servicing agreements with instructions to transition the

19  servicing over to the backup servicer.  I've read this order,

20  and it's unclear to me under those circumstances what it is

21  the debtor's asking for approval of today.  They have a

22  provision in here that says they're going to continue

23  servicing until the earlier of rejection of the termination

24  under the applicable agreement.  We, of course, believe it

25  was terminated pre-petition, and we have those documents.  So

1    I would just like to understand what the debtor is proposing

2    in the context of parties who terminated or as Mr. Patton

3    might suggest purport to have terminated on a going forward.

4            THE COURT: Well, I think you're in the same boat as

5    Credit Suisse and several other parties, and I think their

6    position is - Well, what is your position?  I think I know

7    what it is.

8            MS. MORGAN: Documents are what they are, and we

9    will see what they say, and we will of course reserve our

10   right to have a different view, but if they are validly

11   terminated then my - I believe they will be terminated and

12   they will have all the rights that they have under their

13   agreements, whatever they may be.

14           THE COURT: In the interim you have the right to

15   service the agreements?

16           MS. MORGAN: That's right, Your Honor.

17           THE COURT: So, I think they're going to service

18   your agreements, Mr. Dehney, until they tell you they're not,

19   and you certainly have the right to seek whatever relief you

20   deem is appropriate.

21           MR. DEHNEY: Is Your Honor scheduling - I mean, I

22   know we're not the only one who's filing papers.  Are you

23   going to set a date for us all to come back?

24           THE COURT: We'll get to that.  Yes, sir.

25           MR. CLEMENTE: Good afternoon, Your Honor.  Matt

1    Clemente from Sidley Austin on behalf of Society Generale.

2    Unfortunately, Your Honor, my client has not yet retained

3    Delaware counsel, but I would ask that Your Honor indulge me

4    and hear me this afternoon.

5            THE COURT: That is unfortunate, but -

6            MR. CLEMENTE: Believe me, they have attempted it in

7    fact.

8            THE COURT: No, no, no, that's fine.

9            MR. CLEMENTE: Mr. Dehney may actually be the one

10   that just got the phone call, so -

11           THE COURT: I'm certainly happy to hear you and any

12   creditor has 30 days to retain local counsel.

13           MR. CLEMENTE: Yes, I understand, thank you, Your

14   Honor.  Your Honor, Society Generale, I think, is probably

15   characterized as having a whole loan document with respect to

16   American Home Mortgage.  Similar to what Mr. Dehney just

17   said, Society Generale has also terminated the mortgage loan

18   purchase and sale agreement which included the servicing

19   rights.  I think the comments in the cash management order go

20   a long way to satisfying the concerns we had about prejudice

21   regarding that termination, but I would ask for one

22   clarification.  I think this is the way the order works, this

23   gets back to this page 10, where now we have added language

24   that speaks to all the provisions of the order, et cetera, et

25   cetera, applied to home loan documents.  Just so that my

1  understanding and my client's understanding is clear, the way

2  that I think this cash management order works is that the

3  debtors are obligated to operate in accordance with the

4  underlying documents, whatever those documents may say.  If

5  those documents say you're obligated to turn collections over

6  within two business days, the way I read this order and the

7  way I think I understand this addition works, is that the

8  debtors are being ordered to do that, and I wanted to

9  understand whether that is in fact the intent of this order

10  in the language including the additions here.

11       MS. MORGAN: Your Honor, I hope all this says is

12  that we are ordered to comply with whatever the documents

13  say, and that's all we certainly intend to agree to today.

14       THE COURT: Without waiving your rights to take a

15  contract position.

16       MS. MORGAN: Absolutely.

17       THE COURT: I mean, it's not that complicated.

18  They're authorized to continue to operate, and if they think

19  they have defenses, they have them, and if they don't, they

20  don't, and they're going to comply with the order.

21       MR. CLEMENTE: Your Honor, I completely agree.  To

22  me though, there's a difference between "may" but "not

23  directed to" and "shall".  I just wanted to insure that

24  that's the intent here as opposed to - I mean, there's a lot

25  of cash that's sitting around in these various accounts, and

1 leaving it within the debtors' discretion obviously, the

2 documents speak for themselves, but the intent of the order,

3 as I understand it, is that the debtors are being ordered to

4 file the documents whatever they may say as opposed to

5 leaving it in their discretion, you know, not to file the

6 documents, not to make transfers, that's sort of the point of

7 clarity that I was trying to achieve.

8      THE COURT: Ms. Morgan.  Do you want to say it

9 again?

10      MS. MORGAN: Yes, Your Honor.  I think it bears

11 repeating.  Your Honor, we intend to comply with the

12 underlying documents reserving all of our rights to assert

13 that our interpretation of them might be different than our

14 lenders.  In the meantime, we will service, Your Honor.

15      MR. CLEMENTE: Thank you very much, Your Honor.

16      THE COURT: You're welcome.

17      MS. ENGLAND: Good afternoon, Your Honor.  Margaret

18 England with Eckert Seamans.  I'd like to introduce my co-

19 counsel, Benjamin Ackerly with Hunton & Williams out of

20 Richmond, Virginia.  We're representing Calyon Credit in this

21 matter, and I'd like him to be able to address the Court

22 today.

23      THE COURT: Yes, welcome, sir.

24      MR. ACKERLY: Good afternoon, Your Honor.  I would

25 like to pile on where Mr. Dehney was talking, going back to

1    paragraph - page 10, paragraph - that nothing in this order

2    affects repurchase agreements.  I would like to suggest a

3    revision to that paragraph, after repurchase agreements and

4    insert, "and related servicing agreements" since there might

5    be some question as to whether servicing agreements are

6    included within repurchase agreements.

7              THE COURT: Ms. Morgan.

8              MS. MORGAN: Your Honor, you know, I don't have an

9    objection to that in concept.  I have a feeling that it's in

10   here somewhere else, but I don't mind -

11             THE COURT: I won't make you negotiate at the

12   podium, you can think about it.

13             MS. MORGAN: Okay, thank you.

14             THE COURT: Mr. Bowden?

15             MR. BOWDEN: Good afternoon, Your Honor.  Bill

16   Bowden of Ashby & Geddes.  Your Honor, I wanted to take a

17   moment to introduce to Your Honor and move the admission *pro*

18   *hac vice* of Alex Rovira of Sidley Austin's New York office.

19   Your Honor, Mr. Rovira represents Morgan Stanley Mortgage

20   Capital in connection with this case.  I will be his co-

21   counsel, and, Your Honor, to avoid any confusion,

22   subsequently, I wanted to alert Your Honor now to the fact

23   that there are two other Morgan Stanley entities who Ashby &

24   Geddes has been asked to represent with another firm.  Those

25   are Morgan Stanley and Co., Incorporated, and Morgan Stanley

1   Capital Services.  So, if I stand up at some point in time to

2   appear on behalf of Morgan Stanley not accompanied by Mr.

3   Rovira, Your Honor, that's the reason why.  I will follow up

4   with a *pro hac* motion in short order.  Thank you.

5       THE COURT: Clear as always, Mr. Bowden.

6       MR. ROVIRA: Good afternoon, Your Honor.  Alex

7   Rovira from Sidley Austin on behalf of Morgan Stanley,

8   Mortgage Capital as well as Bear Stearns, EMC Mortgage Corp.,

9   and Liquid Funding.  Your Honor, on behalf of my clients, I'm

10  just coming up here to raise the same concerns and some of

11  the concerns that other parties had mentioned.  Just wanted

12  to make sure that we reserve our rights on all the underlying

13  documents we have.  Morgan Stanley has made certain

14  terminations under their loan agreements.  Just want to make

15  sure that we reiterate that those rights under those

16  underlying documents are seen through.

17      THE COURT: All right, thank you.  Ms. Slights.

18      MS. SLIGHTS: Good afternoon, Your Honor.  Ellen

19  Slights as local counsel for Ginnie Mae.  Your Honor, I hate

20  to repeat things that others have said at the podium, but

21  Ginnie Mae had asked me to appear today to also alert the

22  Court that Ginnie Mae has issued a default as of last Friday,

23  and we'll be seeking a turnover of its records, but, Your

24  Honor, Ginnie Mae did have concerns and wanted to make

25  absolutely clear that it had objections to any of its

1  servicing agreements or related collateral being sold or in

2  any way encumbered by these motions.

3        THE COURT: Thank you.

4        MS. SLIGHTS: Thank you.

5        THE COURT: Anyone - Oh, I have one more present

6  before we turn to the phone.  Mr. Falgowski.

7        MR. FALGOWSKI: Good afternoon, Your Honor.  Cory

8  Falgowski from Reed Smith on behalf of Federal Home Loan

9  Mortgage Corporation, Freddie Mac.  I just wanted to make the

10  same reservation of rights that the parties before me have.

11  Freddie Mac has terminated its servicing arrangements with

12  the debtor pre-petition, and I just wanted to make those same

13  reservations.

14        THE COURT: Understood.  Anyone on the phone wish to

15  be heard?

16        MR. MILLER (TELEPHONIC): Your Honor, if I may.

17  Richard Miller, K&L Gates on behalf of Barclays.  My personal

18  apologies for my inability to be in front of you this

19  afternoon.  Thank you for the phone attendance.  I just have

20  a point of clarification if I may.  In decretal paragraph

21  number (27) on page 10, at least our part of the phone

22  connection had a little bit of static at the time when the

23  language was being read, and I would like to know from

24  counsel if the second line still says, "The debtors'

25  performance or transfer of servicing functions with respect

1  to securitizations or with respect to transactions", et

2  cetera.

3          THE COURT: It does, sir.

4          MR. MILLER (TELEPHONIC): Is the word

5  "securitizations" still in that order?

6          THE COURT: It is, sir.

7          MR. MILLER (TELEPHONIC): Thank you very much.

8          THE COURT: Anyone else on the telephone wish to be

9  heard?

10          MR. TOP (TELEPHONIC): Your Honor, Frank Top from

11  Chapman & Cutler on behalf of Wells Fargo Bank in its

12  capacity as master of servicing and indenture trustee, and I

13  have what I hope is just a clarifying comment to the order

14  and that is, in various places, it references certain rights

15  of trustees under each securitization document would have,

16  and as we are the master servicer, we oversee a lot of the

17  servicing activities of the servicer, and it would be equally

18  important for us to have those identical rights, and so we

19  ask that the order include us as one of those parties with

20  those rights to access and things like that.

21          THE COURT: Ms. Morgan?

22          MS. MORGAN: I'm here, and I'm sorry, I didn't hear

23  who the gentleman represented, but I don't think this order

24  gives anyone access.  I think it just confirms, again, that

25  we will comply with whatever underlying documents are

1  applicable.

2          THE COURT: I think he said he represents Wells

3  Fargo as master servicer.  I don't know what that means, but

4  -

5          MS. MORGAN: We are honoring our service agreements,

6  and we will include Wells Fargo, but there is no specific

7  mention of any other bank in this order, and we're hoping to

8  try to keep it that way.

9          MR. TOP (TELEPHONIC): No, I apologize, I - And this

10  is the existing bank accounts motion; is that correct?  Am I

11  looking at the right thing?

12          THE COURT: Yes, sir.

13          MR. TOP (TELEPHONIC): Yeah, in there it doesn't

14  reference a bank in particular by name, but it gives rights

15  to trustees under securitization documents?

16          THE COURT: Can you point to a paragraph, sir?

17          MR. TOP (TELEPHONIC): Sure, on page 7, for example,

18  it says, "Ordered that the trustees under each securitization

19  document shall be afforded reasonable access through their

20  employees or designated agents."  And I just wanted to make

21  sure that would cover a master servicer as well who really is

22  there to oversee those servicing functions.  So where it

23  talked about trustees, that it also include master servicers,

24  which is an integral part of these securitization

25  transactions.

1          THE COURT: We're discussing it.

2          MS. MORGAN: Your Honor, we have no objection to

3     clarifying, I guess, that this applies to parties under

4     master service agreements.  I suppose maybe that's the

5     easiest way to -

6          THE COURT: Okay.  They'll incorporate your

7     comments, sir.

8          MR. TOP (TELEPHONIC): Thank you, Your Honor.

9          MS. MORGAN: Thank you, Your Honor.

10          THE COURT: Anyone else on the phone?  All right, so

11     -

12          MS. MORGAN: Your Honor, if I could go back to

13     Calyon - I'm sorry to interrupt.  Calyon came up and asked if

14     we also could add something -

15          THE COURT: Right, that you were thinking about.

16          MS. MORGAN: Yes, and we will do that, Your Honor.

17     So it will read, "under any repurchase agreements and related

18     servicing agreements".

19          THE COURT: Okay.

20          MS. MORGAN: We will add that.

21          THE COURT: And so we're just waiting to hear from

22     the DIP lender; are you still considering the changes?

23          MS. MORGAN: We need this order today.  Okay.  Your

24     Honor, I guess we'll pass over it for now, but I'm hoping

25     that we can address it before you leave the bench today

1 because we absolutely need this order entered.  So maybe I

2 can talk to Ms. Ryland while some of the other festivities

3 are going on.

4          THE COURT: All right.  Subject to her comments, her

5 client's comments, and any comments people might have in

6 response to her comments, I'll approve the order as modified.

7          MS. MORGAN: Thank you, Your Honor.  Your Honor, I

8 think that brings us to item 9 on the agenda, which is the

9 employee wage motion.

10          THE COURT: Okay.

11          MS. MORGAN: Your Honor, by this motion the debtors

12 seek to pay or honor pre-petition wages, salaries, and

13 benefits owed to their remaining employees and to continue to

14 pay those wages and honor those benefits in the ordinary

15 course of business post-petition.  The motion also seeks to

16 pay certain outstanding compensation owed to terminated

17 employees.  As Mr. Patton indicated in his opening, I think

18 it was actually closer to 6,500 employees who were terminated

19 on August 3rd.  It has been a trying time for the company, and

20 this motion is particularly important.  I do know that Mr.

21 McMahon has at least a partial objection to the relief

22 sought, so again, if it is acceptable to the Court, I would

23 like to proceed by proffer and proffer the testimony of Mr.

24 Mike Strauss who is in the courtroom today?

25          THE COURT: Any objection to the use of a proffer?

1    Hearing none, you may proceed.

2         MS. MORGAN: Your Honor, this motion is also

3    supported by the declaration of Mr. Strauss, which was filed

4    in support of the first day motions, but in addition to the

5    facts set forth therein, Mr. Strauss would testify to the

6    facts that I'm about to outline for the Court.  He would

7    testify that as set forth in the motion, the debtors

8    implemented a massive reduction in force on August 3rd, 2007,

9    cutting the size of their workforce from approximately 7,500

10   to approximately 1,000 employees, and this number is expected

11   to decrease further to approximately 750 employees on August

12   13, which is the anticipated date of the closing of the

13   debtors' branch offices which were used primarily for the

14   loan origination business.  Most of the remaining employees

15   work for the debtors' loan servicing business, which as you

16   also heard, is a valuable asset of the estate, and the

17   debtors will be later seeking approval to sell those assets

18   under § 363.  Mr. Strauss would testify that the employees

19   perform a variety of critical functions especially in

20   connection with the servicing business and that they have the

21   experience, skills, and knowledge of the debtor necessary to

22   maintain the business in an effective, efficient manner as a

23   going concern while the company attempts to attract bidders.

24   Although these employees retain their jobs on August 3rd, the

25   remaining employees, the 1,000 that are left, they did suffer

1     a tremendous blow.  They witnessed the loss basically of

2     their peers and colleagues sitting around them, and they also

3     learned that their own jobs would last only for a period of

4     months or in some cases days.  For some employees, they're

5     just remaining long enough to clean out the branch offices

6     for a week, and for others, they've basically been told that

7     they will be at the company long enough for the company to

8     sell the remaining assets if approved by the Bankruptcy

9     Court.  It's a situation in which, obviously, the morale of

10    the employees has suffered, understandably, and the debtors

11    are very concerned about that, and in order to be successful

12    in this case, Mr. Strauss would testify that the debtors

13    absolutely need the support and dedication of their remaining

14    employees, and that they must take all necessary steps to

15    restore their morale to the extent possible to insure that

16    they do not suffer any unnecessary negative impact as a

17    result of the filing of the cases.  Accordingly, the debtors

18    do seek authority to pay wages, honor pre-petition benefits

19    in the ordinary course, and to pay any outstanding amounts

20    due for services rendered pre-petition.  The current

21    employees were paid for services they rendered through July

22    31.  So it's the period from August 1 through the petition

23    date that would constitute pre-petition claims.  The debtors

24    estimate that unpaid compensation to employees for this

25    period to be $1.3 million, and Your Honor, this varies

1   slightly from the motion which estimated it at $1 million.

2   The difference is approximately $300,000 in commissions that

3   had not been submitted or approved as of the filing of the

4   motion.  Even with this adjustment, the debtors believe that

5   each employee's wage claim would be less than the $10,950

6   priority limit of § 507(a)(4).  In addition, Mr. Strauss

7   would testify that the debtors seek to honor the benefit

8   package they provide to their employees in the ordinary

9   course.  Employees get paid vacation and under company

10  policy, long-existing company policy, they're entitled to be

11  paid any accrued vacation upon departure.  Most employees

12  obtain two to three weeks vacation, and they are permitted to

13  carry over one week to the next year.  The debtors estimate

14  that the value of accrued unpaid vacation to remaining

15  employees is approximately $2 million.  On average, that's

16  2,000 per employee, but obviously there are some both below

17  and above the average.  This is the ordinary course for this

18  company and is in fact required by some state laws, that

19  earned and accrued vacation be paid upon termination.  Mr.

20  Strauss would testify that if the employees could not take

21  lump-sum vacation when they left the debtors' employ, what

22  would most likely happen is they would begin to take vacation

23  now, if they have accrued vacation, and this is not the time

24  where we would like to have our very, bare-bones staff take

25  vacation in order to preserve their right to take vacation.

1   So, we believe it's important, and Mr. Strauss would testify

2   that it is very important that the company honor its existing

3   policy and allow employees to receive their accrued vacation

4   upon termination even if it exceeds, Your Honor, the $10,950

5   limit provided in the statute.  Debtors also provide such

6   benefits as six days' holiday pay, bereavement pay, and we

7   would like to continue those policies post-petition.  The

8   debtors would like to pay continued Worker's Comp premiums.

9   We estimate that those will be about $10,000 per month.  In

10  the past that has been about $375,000 annually, but we expect

11  in light of the reduction in force that this amount will be

12  reduced drastically, perhaps not immediately, but we expect

13  that will happen in short order.  We also provide medical

14  benefits to the employees, and this is a self-funded medical

15  benefit plan.  Currently, we pay administrative fees for that

16  plan of approximately $250,000 per month.  Again, with the

17  adjustment in the workforce, we expect that amount to reduce

18  to approximately $50,000 per month.  The actual assessment

19  rate for the benefit, the premium amount for the benefit, has

20  in the past been $900,000 per week, again, based on a

21  workforce of 7,500.  Typically that amount is permitted to be

22  adjusted quarterly.  The debtors intend to go to their

23  insurer, which is Blue Cross/Blue Shield, and attempt to get

24  a more immediate reduction in light of the drastic reduction

25  in force, and the debtors' estimates are that that new rate

1   would be only about $150,000 per week.  We also seek

2   authority to pay withholding and related taxes and other

3   third-party funds that are withheld from payroll.  This

4   motion also seeks the authority to continue to reimburse

5   employees for business and travel expenses that they incurred

6   on the debtors behalf.  We estimate that the total amount of

7   those expenses to be reimbursed is approximately $400,000.

8   The debtors also provided tuition benefits program for their

9   employees whereby they pay 80 to 100 percent of tuition costs

10  for certain pre-approved courses, which may be beneficial to

11  the debtors' business.  This is a cost of about $15,000 that

12  we believe is outstanding on a pre-petition basis.  Finally,

13  the debtors employ - I'm sorry, the debtors provide an

14  assistance program to their employees where they may have up

15  to six counseling sessions of whatever type they feel they

16  need, and this costs the debtors a *de minimis* amount, $1,200

17  per month, but for the cost we believe it is a benefit that

18  is enjoyed by employees and would be lost and would not be

19  appreciated if it were lost.  We would like to continue that

20  benefit in the ordinary course.  With respect to the

21  terminated employees, Your Honor, Mr. Strauss would testify

22  that those employees were paid for services through August

23  3rd, but in many cases, we were not able to verify and

24  calculate unpaid commissions as of that time.

25          THE COURT: I'm sorry, they were paid through August

1    3rd?

2         MS. MORGAN: They were paid through August 3rd, which

3    was their last day.

4         THE COURT: All right.

5         MS. MORGAN: However, Your Honor, again, because of

6    the lag in time of submitting paperwork for commissions, we

7    do not believe we included commissions for many of the

8    terminated employees as stated in the motion.  The motion

9    states, actually, that we estimate the amount to be 1.5

10   million.  We now estimate that amount to be 1.7 million.

11   Payment of these amounts are priority claims, so we believe

12   authorization would only affect the timing of payment, and we

13   believe that we should honor these payments again to bolster

14   the morale of the current employees.

15        THE COURT: These are commissions for mortgage

16   originations that are currently in the debtors' portfolio?

17        MS. MORGAN: Correct, Your Honor, and other things,

18   but primarily, yes, mortgage originations.  Your Honor, we're

19   concerned, and Mr. Strauss would testify that if the existing

20   employees see that the terminated employees did not receive

21   their full compensation, it would affect their dedication and

22   loyalty to the company when we need them to maintain that

23   dedication in the next weeks and few months.  Mr. Strauss

24   would testify that employee morale in the past week or two

25   has been at an all-time low, and it would suffer further if

1  the employees were not assured of payment for their accrued

2  compensation and benefits.  These employees are essential to

3  facilitating the sales of the debtors' assets in a way which

4  would maximize value for the estates, and Mr. Strauss would

5  testify that he believes the authority to pay these amounts

6  as requested in the motion is absolutely necessary and

7  critical in his business judgment.  And that would conclude

8  the proffer, Your Honor.

9      THE COURT: Does anyone wish to cross-examine Mr.

10  Strauss?  I hear none.

11      MS. MORGAN: Thank you, Your Honor.  Your Honor, as

12  the motion indicates, the vast majority of these payments are

13  within the 507(a)(4) limit.  The aspect of it that I'm not

14  positive is within the 507(a)(4) limit, is the accrued

15  vacation time, which again, under company policy, may be paid

16  at termination.  We ask the Court to approve this motion.  We

17  believe it's authorized under the necessity of payment

18  doctrine, and again, we believe it's of critical importance

19  to the debtors.

20      THE COURT: Are the commissions for the terminated

21  employees under the limit?

22      MS. MORGAN: Yes, they are, Your Honor.

23      THE COURT: Okay.  Does anyone wish to be heard in

24  connection with this motion?  Mr. McMahon?

25      MR. McMAHON: Your Honor, good afternoon.  Joseph

 1    McMahon.  Your Honor, we expressed a concern with the debtors

 2    that the order reflect language consistent with 11 U.S.C.

 3    § 507(a)(4) and (a)(5) that to the extent there would be a

 4    true-up of benefits under 507(a)(5) that would reduce the cap

 5    that the amounts up to the aggregate cap of 10,950 consistent

 6    with both subsections of the Code, that that language, that

 7    that cap would be reflected in the order.  My understanding

 8    is that the debtors aren't in a position today to, I guess,

 9    confirm, you know, exactly what amounts are going to be paid

10    over and above the cap, and we do have, consistent with what

11    the debtors have represented in their papers and on the

12    record here today, a significant reduction force coming at

13    the end of this week such that the concern that we would have

14    is paying amounts in excess of the administrative claim

15    priority for both the current employees and the terminated

16    employees to be consistent is our concern, and we haven't

17    been able to obtain definitive information on this front, but

18    we would like the Court to reaffirm the fact that benefits

19    that are paid pursuant to this order should not exceed the

20    507(a)(4) cap subject to 507(a)(5).

21              THE COURT: Ms. Morgan.

22              MS. MORGAN: Your Honor, I did have a discussion

23    with Mr. McMahon about that provision, and I did add, in

24    fact, with respect to the terminated employees, that it was

25    subject to the limit in § 507(a)(4) and subject to any

1   reduction under 507(a)(5).  With respect to the existing

2   employees, I'm also willing to and have added that language

3   except I would like an exception with respect to accrued

4   vacation time, which again, we believe is critical that these

5   people know that they can take their vacation time or else

6   they will leave us now and take their vacation time when we

7   need them.  And again, Your Honor, although it is beyond the

8   cap, it is authorized under the necessity of payment

9   doctrine.  There is no one more necessary right now to this

10  business than these 1,000 remaining employs.

11          THE COURT: Are these 1,000 remaining employees, are

12  they scattered throughout the country or -

13          MS. MORGAN: Right now, they are, Your Honor.  The

14  employees who will be with us for only one week are actually

15  all over the country.  They'll be closing our production

16  offices, almost 600 offices in 47 states and the District of

17  Columbia.  There are many in Texas that will stay.  Those are

18  where most of the servicing functions are done.  Yes, we will

19  have operations in various states.

20          THE COURT: And what percentage of those are in

21  states where - if you know, in states where you're required

22  to pay accrued vacation time?

23          MS. MORGAN: I can't tell you the percentage.  I

24  know that California requires it.  I know we have employees

25  in California.  I can't state with specificity today what

1  other states may require it.

2       THE COURT: Mr. McMahon, do you have a response?

3       MR. McMAHON: Your Honor, just to clarify our

4  position, to the extent that state law requires the payment

5  of these - I guess the vacation benefits, our office would

6  not object to a provision that would so limit that relief.

7       THE COURT: Well, I'm glad to hear that.  All right,

8  so the dispute at this point is limited to whether - you want

9  to carve out, Ms. Morgan, for vacation time no matter what,

10 and Mr. McMahon is not agreeable.

11      MS. MORGAN: Yes, that's right, Your Honor.  We

12 can't calculate with specificity who may have carried over

13 and might be over.

14      THE COURT: What's the aggregate of the accrued

15 vacation time?

16      MS. MORGAN: Two million, Your Honor.  So on

17 average, that's $2,000 per employee.  Again, I don't know -

18 Some people -

19      THE COURT: It's up to one week from a previous year

20 and then whatever they've earned this year, that they haven't

21 taken; is that correct?

22      MS. MORGAN: Correct, Your Honor, but presumably

23 some have already taken some time.

24      THE COURT: I'm going to overrule Mr. McMahon's

25 objection on that point and authorize somewhat unusual but

1  given the circumstances in this case, which are unique in the

2  truly critical need for these employers' pleas in the near

3  future, authorize the payment of accrued but unused vacation

4  at termination even though it may have been accrued pre-

5  petition notwithstanding the cap under 507(a)(4) and (a)(5).

6          MS. MORGAN: Thank you, Your Honor.  May I approach

7  with an order?

8          THE COURT: Yes.  Thank you.

9          MS. MORGAN: Your Honor - I'm sorry, are you ready?

10         THE COURT: Yes.

11         MS. MORGAN: Moving to the next item on the agenda.

12  This is the debtors' motion for an interim order today and a

13  final order at a later date authorizing debtors to implement

14  a non-insider employee retention plan pursuant to §§ 105,

15  363, and 503.  Your Honor, because the debtors seek to

16  implement the plan immediately and because approximately 250

17  of the employees will be working for the debtors only through

18  August 13, the debtors are seeking interim approval of this

19  motion today, and again, I believe Mr. McMahon is objecting

20  on that basis.  So, if I may, one more time, I would like to

21  proceed by proffer if acceptable to the Court.

22         THE COURT: Mr. McMahon?

23         MR. McMAHON: Your Honor, by way of procedure, I

24  don't know if we want to, I guess, bifurcate the issues and

25  let me just address the concern that we have with respect to,

1    I'd say, truly extraordinary relief that's being requested by

2    the debtors in this vein on the first day of the case.  Our

3    objection is to the hearing going forward with respect to the

4    interim relief that the debtors are requesting pending the

5    formation of an Official Committee of Unsecured Creditors,

6    which will occur hopefully next week.  In that regard, Your

7    Honor, we believe that it's absolutely essential that the

8    Official Committee of Unsecured Creditors as the

9    representative of the creditor body get the opportunity to

10   weigh in on the entirety of the relief including the interim

11   relief which the debtors are requesting today.  At some point

12   after the Committee is formed, and, Your Honor, we do not at

13   this point have an objection to a hearing at a reasonable

14   time after the Committee is appointed for that purpose.  I

15   would also note, Your Honor, that as to just a logistical

16   matter, these types of motions raise, I guess, a host of

17   issues that it is - requires time to get your arms around

18   including issues as to whether or not it's been represented

19   to be a non-insider retention plan.  I can't specifically say

20   whether or not I necessarily agree with that contention prior

21   to a record being formed, but there's a host of issues like

22   that, that I think require more consideration than having a,

23   I guess, a exhibit with close to 700 names being emailed to

24   your office in the midst of dealing with the other issues

25   associated with the first day hearing, our office having to

1  come to some type of resolution with respect to an

2  extraordinary amount of information in that short period a

3  time.  So, just as a matter of procedure, we would prefer to

4  address the substantive relief that's requested by the

5  debtors at that subsequent hearing that we're proposing after

6  the Committee is formed, such that our office and also the

7  Committee can be heard on a reasonable basis.  Thank you.

8            THE COURT: Ms. Morgan?

9            MS. MORGAN: Yes, Your Honor.

10            THE COURT: Why don't you start by proffering

11  whatever testimony you think is appropriate to establish why

12  we should go forward today.

13            MS. MORGAN: Okay.

14            THE COURT: Focusing on that if you could before we

15  get into sort of the details of - I know that to a certain

16  extent that the issues are interwoven, but if you could focus

17  on why you need the relief today as opposed to say, two weeks

18  from today.

19            MS. MORGAN: Your Honor, yes, I would like to do

20  that.  Again, the debtors would proffer the testimony of Mr.

21  Strauss, Michael Strauss who is in the courtroom, and whose

22  declaration is in your binder in support of the first day

23  relief.  With respect to the timing of this request, the

24  request for interim approval of payments of up to $600,000 on

25  an interim basis, Mr. Strauss would testify that these

1  employees, all of the employees, since we've had a reduction

2  of force, are critical to the debtors' ongoing operations,

3  but he would specifically testify that approximately 250 of

4  those employees are slated to only remain in the debtors'

5  employ for one week.  Many of these individuals are managers

6  of the retail branches, what used to be the retail branches

7  of the debtors' origination business.  They are scattered

8  throughout the country in approximately 600 offices, and they

9  have been asked to work for one week and, as set forth in the

10  motion, the proposal with respect to these individuals get -

11  approximately 250 of them is that they be paid double time

12  for working for one week for the debtor.  The cost of the

13  program in the next two weeks would be approximately

14  $600,000.  Mr. Strauss would testify that the savings that

15  the debtors would entail in carefully dismantling their

16  branch offices by these employees who know the debtors'

17  business and who, we hope, would have some loyalty to the

18  debtors after being offered the retention plan bonus, would

19  be the best way to maximize value for the estates with

20  respect to these production offices.  Mr. Strauss would

21  further testify that if we do not come away today with an

22  order granting them the plan that they are now aware of, that

23  promises them double time for one week, that we do not have

24  any belief that many, many of them will stay with us.  So

25  they will leave the task to others at the company.  The

1    debtors will be forced to take their already bare-bones staff

2    and disburse them throughout the 600 production offices and

3    have the work done by someone else, probably at a cost that

4    exceeds the $600,000, not positive of that, but it will be a

5    costly enterprise, and again, Your Honor, we will also save

6    in that we believe we will be able with these experienced

7    employees who know the business, to preserve whatever is in

8    those offices so that landlord claims, for instance, will be

9    diminished if possible.  And that would conclude the proffer

10   on that portion of the relief, Your Honor.

11           THE COURT: Okay.  Mr. McMahon, do you wish to

12   cross-examine the witness on this issue?

13           MR. McMAHON: I do, Your Honor, briefly.

14           THE COURT: Please.  Mr. Strauss, please take the

15   stand.  Swear the witness, please.

16           THE CLERK: (Microphone not recording.)

17           THE WITNESS: My name is Michael Strauss, S-t-r-a-u-

18   s-s.

19                       MICHAEL STRAUSS

20   having been duly sworn testifies as follows:

21           THE CLERK: Please be seated.

22                     CROSS-EXAMINATION

23   BY MR. McMAHON:

24   Q.  Mr. Strauss, good evening.  With regard to the plan

25   that's being proposed, which individuals with the debtors

1  were involved in creating the blueprint for the plan?

2  A.  The company's senior officers.

3  Q.  That would include yourself, sir, and who else?

4  A.  I was not directly involved but our chief administrative

5  officer, our chief financial officer, and other senior

6  officers at that level.

7  Q.  Was the plan presented to the Board of Directors for

8  approval?

9  A.  I don't recall.

10  Q.  The employees that are, I guess, the subject of a plan,

11  they're represented to be branch managers.  I gather that the

12  250 employees that we're talking about that are proposed to

13  be paid for one week of service are primarily origination and

14  production employees; is that correct?

15  A.  I believe that most of the people that are to be paid for

16  one week of service were associated with the origination.

17  Q.  And what tasks over the next few days are they proposed

18  to serve?

19  A.  They are going to secure offices, return customer loan

20  files to a central repository, take charge of equipment that

21  are in those offices, those types of activities.

22  Q.  You indicated that you don't recall whether or not the

23  Board has approved this plan; correct?

24  A.  That is correct.

25  Q.  All right.  Now, do you have an understanding as to

1    whether the components of the plan had been communicated to

2    your remaining employees?

3    A.   The components of the plan have been communicated to the

4    employees.

5    Q.   When was that done?

6    A.   In the last week.

7    Q.   And the communication, I gather, just basically mirrored

8    the request for relief that the debtors have put before the

9    Court today?

10   A.   That is correct.

11   Q.   Now, this past week, the debtors laid off - what, 6,000

12   people; is that correct?

13   A.   In that order of magnitude.

14   Q.   And amongst those employees were personnel that

15   presumably to the extent that they were called on have

16   knowledge of the debtors' business and operations; is that

17   correct?

18   A.   I'm sorry, please repeat the question.

19   Q.   Sure.  You laid off a number of employees that presumably

20   were in good standing with the debtors at the time that they

21   were terminated; is that correct?

22   A.   That is correct.

23   Q.   And the relief that you're requesting to go forward with

24   today is premised upon the idea that these employees will

25   leave or go to another employer if the relief requested is

1  not approved; is that correct?

2  A.  That is one concern.  Another concern is that they will

3  be less dedicated to the work that remains in front of them.

4  Q.  Would it be fair to say, sir, that, I guess, the

5  employment prospects in the mortgage industry at this point

6  for the employees that you terminated as well as anyone that

7  would leave is less than certain; would that be a fair

8  statement?

9  A.  Well, the act of our stopping origination activities

10  caused our competitors to aggressively recruit those parts of

11  our origination business that they believed could help them,

12  and so, I would tell you that that is part of the equation.

13  Q.  The branch managers, typically what title do they have?

14      MS. MORGAN: Your Honor, may I object at this point.

15  I thought that we were -

16      THE COURT: Yeah, you asked to bifurcate, Mr.

17  McMahon.

18      MR. McMAHON: Your Honor, with respect - I'll

19  withdraw the question, and I have no further questions.

20      THE COURT: I know it's hard to do it on the fly.

21  When's the next payroll?

22      THE WITNESS: It is approximately one week and three

23  days from now.

24      THE COURT: What date?

25      THE WITNESS: I'm not sure of the exact date, Your

1    Honor.

2              THE COURT: Well, do you generally pay every other

3    week or -

4              THE WITNESS: We pay - twice a month, we pay, Your

5    Honor.

6              THE COURT: And you last paid on July 31st; right?

7              THE WITNESS: It was close to July 31st.

8              THE COURT: How many days before a payroll do you

9    have to fund payroll?  Two business days?

10             THE WITNESS: It is some number of days before

11   payroll, but I'm not sure of the exact number of days, but,

12   Your Honor, it is approximately two or three days.

13             THE COURT: Under your proposed plan, people who are

14   going to work, I think, through August - Well, less than two

15   weeks are going to get double pay.  People that stay longer

16   are going to get - coming out to 40 percent, but they only

17   get 20 percent in the interim; is that correct?  Twenty

18   percent of the 40 percent?

19             THE WITNESS: Twenty percent of the 40 percent.

20             THE COURT: So, 12 percent of salary, something like

21   that.  Maybe it's 8.

22             MS. MORGAN: It's 8, Your Honor.

23             THE COURT: But if I could do math, I wouldn't have

24   gone to law school; all right?  So what you're seeking is

25   double pay for the people who are going to be terminated,

1   about 250 employees - on an interim basis what you're seeking

2   is double pay for about 250 employees that will be terminated

3   basically before the next pay day and 8 percent for the

4   remaining employees.

5           THE WITNESS: That is correct, Your Honor.

6           THE COURT: And that equals how much, Ms. Morgan or

7   Mr. Strauss?

8           MS. MORGAN: Six hundred thousand, Your Honor, and

9   we have provided for that in the order.

10          THE COURT: And you don't know when the next payroll

11  is, specifically.  Is there anything you could refer to, Mr.

12  Strauss, that you have with you in the courtroom that might

13  refresh your recollection as to when the next payroll is?

14  Ms. Morgan, do you know the answer to the question?

15          MS. MORGAN: Your Honor, I believe it's on or about

16  August 12th.  I could be off a day or so.

17          THE COURT: That's a Sunday.

18          MS. MORGAN: Well, then it's not that day.

19          THE COURT: Is there anyone in the courtroom that

20  would know?

21          MS. MORGAN: Sorry, Your Honor, we don't have that

22  exact answer.

23          THE COURT: That's all right.  What I'm getting at

24  is rather obvious is whether we can schedule a hearing prior

25  to the next payroll but after a Committee is formed to deal

1    with the non-terminated employees.

2              MS. MORGAN: Those who will be here longer than a

3    week, Your Honor?

4              THE COURT: Yes, but it doesn't sound like we can do

5    that.  Mr. McMahon, have you set a Committee formation date?

6              MR. McMAHON: Your Honor, we have.  It's a week from

7    today at 10 o'clock a.m.

8              THE COURT: The 14th?

9              MR. McMAHON: Correct.

10             THE COURT: All right, thank you, Mr. Strauss.  Do

11   you have any further questions, Mr. McMahon?  Or any

12   redirect, Ms. Morgan.

13             MS. MORGAN: Your Honor, just a couple of redirect.

14             THE COURT: All right.

15                       REDIRECT EXAMINATION

16   BY MS. MORGAN:

17   Q.  Mr. Strauss, among the duties of the branch managers, do

18   you know what duties they will be performing while they're

19   closing up the production offices?

20   A.  Securing customer loan files, securing equipment, those

21   types of duties.

22   Q.  Will they be assisting the company in preserving

23   confidential information that may be subject to consumer

24   privacy laws?

25   A.  Yes.  If things go well, the GLB information, protected

1    information, the customer loan files will be secured by the

2    return of those filed to New York headquarters.

3    Q.  And that would be done primarily by those 250 so

4    employees who are working for one week.

5    A.  That is correct.

6         MS. MORGAN: No further questions, Your Honor.

7         THE COURT: All right.

8         MR. McMAHON: No further questions, Your Honor.

9         THE COURT: All right.  I'm going to overrule your

10   objection, Mr. McMahon, in connection with going forward

11   today.  I believe the debtors have laid a sufficient factual

12   basis given the exigencies of the case, the meltdown of the

13   entire industry, frankly, and the importance of motivating

14   the employees who are necessary to secure the privacy

15   information in the debtors' possession to go forward today.

16   So, I'll allow the debtors to go forward today in their

17   request for interim relief, and Ms. Morgan, if you want to

18   proffer evidence at this point in connection with the

19   substance of the relief you're requesting, I'll allow you to

20   do so.  Mr. Strauss, you can step down for the time being.

21   If we recall you, you'll still be under oath.

22        MS. MORGAN: Thank you, Your Honor.  Your Honor,

23   again, I would like to proffer the testimony of Mr. Michael

24   Strauss and also if it's acceptable to the Court, I would

25   like to incorporate some of the - in fact all of the

1    testimony just provided in connection with the wage motion,

2    which might save some time?

3         THE COURT: That's fine.

4         MS. MORGAN: In addition, Your Honor, in connection

5    with this motion, Mr. Strauss would testify that in the days

6    leading up to the reduction of force on August 3rd, they

7    recognize the need to provide some incentives to their

8    remaining approximately 1,000 employees to encourage them to

9    remain during the wind-down process.  Mr. Strauss would

10   testify that he met with his senior officers and certain of

11   the company's legal and financial advisors to develop a

12   retention plan.  He first asked the various department and

13   division leaders to carefully identify those employees to be

14   terminated and those to remain.  Based upon each such

15   employee's particular skills and qualifications and also

16   based on the understanding that the origination business

17   would be shuttered but the assets of the business would still

18   need to be disposed of in an orderly way, that many of the

19   employees would have increased duties because of the

20   requirements of operating a Chapter 11 and that the servicing

21   business would continue to need to operate at top performance

22   level to attract the highest and best bid for that business.

23   After considering several alternatives, based on the needs of

24   the company and a review of other incentive plans offered by

25   companies in Chapter 11, the debtors determined to implement

1    a plan which would essentially pay up to 40 percent of the

2    employee's compensation as incentive during their post-

3    bankruptcy tenure.  Because so many of the debtors' employees

4    earn a base salary and in addition performance based bonuses,

5    the debtors' senior officers determined that the starting

6    point for the incentive plan would be based on total

7    compensation rather than base salary.  Mr. Strauss would

8    testify that he and his senior officers also recognize the

9    need to provide additional incentives to the approximately

10   250 employees who were asked to stay on for one week to

11   assure appropriate disposition of the loan origination

12   assets.  Again, those employees are expected to remain only

13   until August 13 and will assist in among other things

14   preserving the confidential information at those locations

15   and preserving the assets that remain at those locations.  It

16   was ultimately determined that those employees would be paid

17   double time for their work as a proper incentive.  Of the

18   remaining 750 employees about 450 work in the loan servicing

19   business, and they are expected to remain until that business

20   is sold, which we hope to be mid-September.  Approximately

21   300 of the remaining employees have been designated by their

22   superiors as critical to the successful prosecution of these

23   cases and expect that they will remain anywhere from one to

24   six months with the debtors.  For those employees, the

25   incentive will be earned daily and payable as follows: 20

1  percent of the retention payment or 8 percent of their

2  regular compensation payable in their bi-monthly paychecks.

3  For those employees retained less than three months, the

4  remaining 80 percent, which is 32 percent of their regular

5  compensation, would be paid upon termination.  If the

6  employee remains for three months or more, partial

7  distributions of the deferred 80 percent, if you will, would

8  be paid in pieces.  Fifty-five percent would be paid monthly

9  to the employees beginning on the last pay date of November,

10  and the final 25 percent of the retention payment or 10

11  percent, again, of regular compensation would be paid upon

12  termination.  Mr. Strauss would testify that the plan

13  provides that if an employee leaves voluntarily or if he or

14  she is terminated for cause, they would forfeit any remaining

15  payments that might come due under the program.  Mr. Strauss

16  would testify that as with many financial institutions, the

17  debtors suffer a bit from title inflation.  Despite many

18  employees' titles of senior VP, VP, or assistant VP, these

19  officers, and many of these are included in this motion and

20  in this program, are not functional officers of the

21  corporation.  They do not have ability to bind the

22  corporation.  They do not have decision-making authority.

23  They serve instead in a managerial capacity, however, they

24  have the title of, again, assistant VP, VP, or senior VP.  By

25  rough estimate the retention plan includes approximately 9

1   senior VPs, 45 VPs, and 58 assistant VPs.  The remaining 238

2   employees all have designations lower than that.  Of the

3   senior VP titles, these are essentially department managers

4   in the following areas: Whole loan trading, loan shipping

5   delivery and imaging, network support, real estate

6   maintenance and leasing, construction lending, loan

7   purchasing, customer services, and systems integrity.

8   Despite their officer-styled titles, these employees cannot

9   exert any control over the company nor do they have signatory

10  authorization, nor do they participate in policy-making

11  functions of the company.  Again, the remaining titles all

12  fall beneath that and have even less management power and

13  authority.  The assistant VPs that are affected by this

14  motion are approximately 23 in number, and these are

15  primarily branch operations managers.  These are primarily

16  the employees that are being retained for this week only to

17  assist in the liquidation of the production offices.

18  Although they receive a title of assistant VP from the Human

19  Resources Department, none of these individuals was formerly

20  appointed as an officer of the company by corporate

21  resolution of the Board of Directors.  They do not have any

22  authority accorded to them in that capacity.  Mr. Strauss

23  would testify that in the company's business judgment the

24  retention program is reasonable, it's justified in light of

25  the facts and circumstances, and absolutely necessary to

1  achieve the debtors' Chapter 11 goals.  Without providing

2  incentives under this retention program, the employees are

3  likely to leave as soon as they find a new position, for some

4  of them, immediately.  These employees are exceptional.

5  They're likely to have little trouble finding attractive

6  employment and are certainly able to find more permanent

7  employment than what the debtors can provide.  A loss of

8  these valued and highly skilled employees would severely

9  impede the debtors' efforts to maximize value through these

10  Chapter 11 cases.  And that would conclude the proffer of Mr.

11  Strauss.

12        THE COURT: Mr. McMahon, cross-examination?

13        MR. McMAHON: May I have a moment, Your Honor?

14        THE COURT: Yes.

15        MS. MORGAN: Your Honor, may I reopen my direct for

16  a moment?

17        THE COURT: Yes.

18        MS. MORGAN: Your Honor, I would like to move into

19  evidence, but ask the Court to place under seal, a document

20  that lists every single employee that would be eligible for

21  the retention program along with their base salary and total

22  compensation and their title.

23        THE COURT: Can you proffer a basis for putting it

24  under seal, please.

25        MS. MORGAN: Your Honor, this obviously includes

1  confidential information regarding the employees.  It would

2  be embarrassing for the employees, to say the least, to have

3  to their salaries listed publicly.  It would be detrimental

4  to the other employees and the company to have this

5  information at their disposal, and we think it would be very

6  detrimental to the debtors' business to have this in the open

7  market, and we believe placing an item like this under seal

8  is appropriate under § 107(b).

9       THE COURT: All right.

10       MS. MORGAN: May I approach, Your Honor?

11       THE COURT: Yes, you may.  I'll accept the exhibit

12  under seal pursuant to 107(b) where the Court is required to

13  seal documents that meet the criteria set forth in the

14  statute.  However, the record, the hearing itself is open.

15       MS. MORGAN: I understand that, Your Honor.

16       THE COURT: This is D-1?

17       MS. MORGAN: Yes, Your Honor.

18       THE COURT: You're moving its submission?

19       MS. MORGAN: Yes, I am, Your Honor, and Mr. Strauss

20  would testify that this list represents the employees who are

21  eligible for the retention program that is the subject of

22  this motion.

23       THE COURT: Any objection to its admission?

24       MR. McMAHON: No, Your Honor.

25       THE COURT: All right.  It's admitted without

1    objection.  Any cross, Mr. McMahon?

2             MR. McMAHON: Your Honor, yes, briefly.

3             THE COURT: Mr. Strauss, would you retake the stand,

4    please, sir.  You're still under oath.  Ms. Morgan, I know

5    you mentioned - and I'm sorry to interrupt for a moment.  I

6    know you mentioned when you get certain orders you have until

7    6:30 to get them docketed today, otherwise they get docketed

8    tomorrow.  I don't know if that's important to you or not,

9    but I want to make you aware of that deadline.  You may

10   proceed, Mr. McMahon.

11            MS. MORGAN: Thank you, Your Honor.

12            MR. McMAHON: Your Honor, I'd like to mark a copy of

13   the exhibit as U.S. Trustee-1 and hand a copy to the witness

14   if it hasn't already been marked by -

15            THE COURT: It's marked as D-1.  You may approach

16   the witness and give him a copy.

17            MR. McMAHON: Thank you.

18                         CROSS-EXAMINATION

19   BY MR. McMAHON:

20   Q.  Mr. Strauss, good evening again.  With respect to the

21   list that's in front of you - First, have you seen this

22   particular list before?

23   A.  I have not.

24   Q.  You have not.  But you do understand that it lists the

25   proposed participants in the bonus program that's proposed by

1   the debtors; correct?

2   A.  I do.

3   Q.  Now, there's about, I would assume about 50 names per

4   page here.  I'm looking at the first page, the salary ranges

5   on the first page range from 180,000 to 526,000; correct?

6   A.  As I look at it, yes.

7   Q.  Right, and consistent with your proffer, my understanding

8   is that none of these persons have been by action of the

9   Board or an officer authorized pursuant to the bylaws of one

10  or more of the debtors been appointed as an officer of the

11  debtors; is that correct?

12  A.  None, I think I just referred to in my proffer and

13  mentioned that these people hold SVP, VP, or AVP titles.

14  They don't have broad decision-making authority if they have

15  not been - their salary is not set by the Board of Directors.

16  They are not affiliates of the company.  They have specific

17  roles based on managerial style duties.

18  Q.  Well, I'd like an answer to my question if you don't

19  mind.  I want to confirm that it's consistent with your

20  proffer, did you make inquiry with respect to whether or not

21  any of these individuals were the subject of a Board

22  resolution or were appointed by an authorized officer

23  pursuant to the corporate bylaws that as an officer of one or

24  more the debtors; that is your testimony?

25  A.  I'm sorry.  I think your question presupposes - it's

1   multiple questions.  If you'd please ask them one at a time,

2   I'll just answer.

3   Q.  Sure.  Under the bylaws of one or more of the debtors,

4   the debtors have the ability to appoint corporate officers;

5   correct?

6   A.  The bylaws, I believe, give different authorizations to

7   appoint different officers, but I'm not familiar with the

8   bylaws to say specifically what is authorized by them in

9   terms of appointing officers.

10  Q.  Okay. In some cases, that may be - that power may be

11  vested in the Board of Directors; correct?

12  A.  That's true.

13  Q.  And in some instances, that power may be vested in a

14  president or chief executive officer; is that correct?

15  A.  That is - I'm not familiar with the bylaws to be able to

16  answer that.

17  Q.  Okay.  Prior to you coming here today, sir, did you make

18  due inquiry as to whether or not there was action taken, a

19  Board resolution, a piece of paper issued by an authorized

20  officer which named one or more of these people as a

21  corporate officer?

22  A.  These people were appointed to their positions by

23  typically their senior, and their senior reported to

24  typically a further senior, and only further up the hierarchy

25  of our company would you reach what I would think of as our

1  corporate officers, those officers who have broad policy

2  making authority whose compensation is set by a Board of

3  Directors.

4  Q.  And, sir, I appreciate that, but I'm not interested in

5  what you think.  I'm asking as a matter of fact, whether or

6  not there was any action taken by an authorized Board or

7  officer pursuant to the bylaws wherein one or more of the

8  persons that are reflected on Exhibit D-1 were appointed as

9  corporate officers of the debtors.  And your answer is -

10 A.  I answered your question as to the Board.  The Board did

11 not appoint any of these people as officers.  Again, because

12 there's this hierarchy of reporting, you know, an officer

13 named an officer who named an AVP or a VP.

14 Q.  So, it's possible that an authorized officer may have

15 appointed an assistant vice president or vice president as an

16 officer of the corporation pursuant to the bylaws, you're

17 just not aware of it?

18 A.  I'm not sure what you mean by the term "officer of the

19 corporation".

20 Q.  I mean an officer pursuant to the bylaws.

21 A.  Again, I don't know what you mean by that.  If you're

22 speaking of a specific position that's required by the bylaws

23 such as chief financial officer, that would be one thing, but

24 if the bylaws broadly authorize the delegation of authority

25 to appoint AVPs that would be another, and I'm not sure of

1   what the bylaws say in that regard.

2   Q.  Okay.  Now, do you have an understanding as to how many

3   people on this list earn $200,000 or more in salary?

4              MS. MORGAN: Your Honor, objection.  The document

5   speaks for itself and salaries are set forth . . .

6   (microphone not recording).

7              MR. McMAHON: Understood.

8              THE COURT: Yes, sustained.

9              MR. McMAHON: Your Honor, with respect to - Excuse

10  me -

11  BY MR. McMAHON:

12  Q.  Mr. Strauss, with respect to the various functions of the

13  persons that are listed here, I'd like to focus on the first

14  page.  There's a series of branch managers listed there.  Are

15  these branch managers the persons that the debtors are

16  seeking to retain for a week or so in connection with the

17  relief that's being requested?

18  A.  As I read this document the first column, week or less,

19  why, would say that those are the people that would only be

20  there for one week.

21  Q.  And that's what that designates?

22  A.  I believe so, and to answer your question, if you look at

23  the branch manager persons on this list, they appear to be

24  all slated for a week or - well, generally slated for a week

25  or less.

1    Q.  Now, if you go to the job named description, for some

2    there is the acronym WHSL.  What does that stand for?

3    A.  Wholesale.

4    Q.  Okay.  And the acronym BM on the end of some of the ones

5    at the top there, what does that stand for?

6    A.  I believe it stands for branch manager.

7    Q.  In terms of the process that the debtors used to

8    construct this particular plan, was there a decision made to

9    basically include all the employees as part of their

10   retention plan?

11   A.  All employees except for the senior officers of the

12   corporation.

13   Q.  And you used the term "senior officers", are there other

14   officers that I'm not aware of?

15   A.  We've discussed this before.  This is the question of

16   whether AVP, VP, or SVP constitutes an officer.

17           THE COURT: Excuse me.  Who are the senior officers

18   that are not included on this list that are still employed by

19   the company?  Name them.  How many are there?

20           THE WITNESS: There are perhaps 10.

21           THE COURT: All right.  Thank you.  Go ahead, I'm

22   sorry, Mr. McMahon.

23   BY MR. McMAHON:

24   Q.  A branch manager, typically how many persons are employed

25   at a particular branch?

1   A.  It would vary from as few as five to as many as 50.

2   Q.  Okay.  And how is it that a - I guess a branch manager's

3   salary is referenced to an annual base column and then the

4   total compensation, I gather the difference between a branch

5   manager would be bonus compensation; is that correct?   The

6   commissions?

7   A.  Loosely spoken, yes.  It's different factors based on

8   what had been loan production and profitability.  But again,

9   these are one-week compensation people.

10  Q.  Now, the branch managers or, I guess - who does the

11  branch manager directly report to?

12  A.  Typically a district manager.

13  Q.  And for the persons that are listed on Exhibit D-1, do

14  you have an understanding as to how many of them are direct

15  reports to the senior officers as you've identified?

16  A.  No.

17  Q.  In the process of constructing the plan, did the debtors

18  employ a compensation consultant or other professional to

19  assist them in crafting or creating the plan?

20  A.  No.

21  Q.  Did the debtors employ any as professionals or make any

22  inquiries to assess whether the employment marketplace for

23  mortgage industry personnel was such that you would not - I'm

24  sorry.  You would need to implement such a plan to retain

25  employees?

1  A.  No.

2  Q.  I'm not going to go through the entire exhibit

3  functionally person by person.  It's late hour, but it would

4  be fair to say, sir, wouldn't it be correct that a number of

5  the persons that are listed here, especially on the first

6  couple of pages, perform key management roles for the

7  debtors; is that correct?

8  A.  Please repeat the question.

9  Q.  Sure.  A number of the persons that are listed on Exhibit

10  D-1 perform key management roles for the debtors; is that

11  correct?

12  A.  I'm not sure what you mean by "key management roles".

13  Their specific functions are set forth on the schedule.  A

14  majority of the highly compensated people were slated for one

15  week or less.  It appears to me that the compensation is

16  listing in extending order with the very mast majority of the

17  people in the top pages that represent the high compensation

18  people slated for one week or less of compensation.  Very few

19  of the highly compensated people are scheduled for more than

20  one week of compensation.

21  Q.  Do any of the persons on Exhibit D-1 have the, I guess,

22  given by the debtors, the authority to manage other

23  personnel?

24  A.  Yes.

25  Q.  Do any of the persons listed on Exhibit D-1 have the

1    ability to hire personnel?

2    A.  Yes.

3    Q.  Do any of the persons listed on Exhibit D-1 have the

4    ability to terminate the personnel of other employees?

5    A.  Yes.

6          MR. McMAHON: Your Honor, I'll suspend my

7    questioning.

8          THE COURT: All right.  Redirect, Ms. Morgan?

9          MS. MORGAN: Yes, Your Honor, very briefly.

10                    REDIRECT EXAMINATION

11   BY MS. MORGAN:

12   Q.  Mr. Strauss, I think Mr. McMahon asked by his questions,

13   suggested that maybe the mortgage industry would not have

14   many openings for these employees; do you recall that

15   question and your answer?

16   A.  I do recall the question.

17   Q.  If you lost these employees, could you replace them?

18   A.  Only after a period of time.

19   Q.  Are some of - If you lost them and replaced them, would

20   the replacements have any knowledge of the background of the

21   company in order to perform, for instance, the servicing

22   function in a very quick fashion?

23   A.  They would not.

24   Q.  Do you believe many of these employees would find

25   employment elsewhere whether or not it's in the mortgage

1  industry?

2  A.  I do.

3           MR. McMAHON: Objection, hypothetical.

4           MS. MORGAN: Your Honor, I think he can state based

5  on his knowledge of his workforce that he's been in charge of

6  that where they go when they leave the debtors' employ and

7  what kind of jobs they might be qualified to obtain.

8           THE COURT: Mr. McMahon, a response?

9           MR. McMAHON: I don't think there's been any

10  foundation laid as to Mr. Strauss' ability to know anything

11  beyond the four walls of the debtors' operations and

12  furthermore, I think the testimony previously was that there

13  was no consultation with any personnel, say professionals,

14  related professionals in that industry with respect to

15  creation of the plan, so -

16           THE COURT: Well, all right.  I think the way that

17  the question was phrased it was really along the lines of

18  what Mr. McMahon mentioned which was more of a hypothetical

19  than you might direct to an expert witness.  I think Ms.

20  Morgan, you'd probably rephrase and get there based on his

21  experience or opinion as a senior person at the company.

22           MS. MORGAN: Thank you, Your Honor.

23  BY MS. MORGAN:

24  Q.  Mr. Strauss, how long have you been at this company?

25  A.  Since 1988.

1  Q.  You founded the company, in fact; is that right?

2  A.  That is correct.

3  Q.  And the company has grown substantially since 1988?

4  A.  Yes, it has.

5  Q.  And during that time, are you familiar generally with the

6  workforce that you employ?

7  A.  Yes.

8  Q.  Are you familiar with their skill-set in general with

9  respect to the functions of your company and whether the

10  skill-sets are needed for your business?

11  A.  I am.

12  Q.  Does your company hire employees who possess the skills

13  that are necessary to work in this industry?

14  A.  It does.

15  Q.  Are any of these skills transferrable to other

16  industries?

17  A.  Yes, in particular if you consider the more highly paid

18  people in this packet, you'll notice that many of them are

19  involved in technology functions or accounting functions,

20  functions that are critical for us to fulfill our

21  responsibility going forward, and also, in my opinion,

22  functions that other people would find desirable, other

23  employers would find desirable.

24          MS. MORGAN: No further questions, Your Honor.

25          THE COURT: All right.  You may step down, sir.  Mr.

1    Strauss, you may step down.  Any further argument?

2         MS. MORGAN: Your Honor, based on the testimony

3    you've heard, the debtors would submit that there's a valid

4    and strong business purpose for instituting and maintaining

5    this retention program.  The program is supported by the

6    debtors' sound business judgment, is in the best interest of

7    the estate, and is authorized under both § 363 and 503©)(3)

8    and we ask that it be approved today on an interim basis.

9         THE COURT: Thank you.  Mr. McMahon.

10         MR. McMAHON: Your Honor, very briefly, what the

11    debtors are seeking to authorize today is a retention plan

12    with certain payments tied to benchmarks on the debtors going

13    forward liquidation calendar, and the issue is whether under

14    503©) all or part of these payments would be prohibited as an

15    initial issue and then we'll get to the other points under

16    that subsection.  The threshold question under 503©) would be

17    whether or not any of these individuals - ©)(1) would be

18    whether or not any of these individuals are in fact insiders

19    for purpose of the statute, and it's important to note that

20    the Bankruptcy Code does not limit the definition of the term

21    "insider" to officer.  It also includes the term with respect

22    to corporations, managing agent, or person in control, and I

23    think that what the testimony of Mr. Strauss underscored is

24    the fact that we do have an exhibit in evidence.  It does

25    reflect the fact that some of these individuals are

1    compensated very well.  They're compensated like officers.

2    They, in some instances hold titles of officers, and I would

3    note, Your Honor, that Mr. Strauss' testimony was non-

4    committal on the point that we raised with respect to whether

5    or not the bylaws - under the bylaws one or more of the

6    individuals with the vice president title were in fact

7    crowned or given the title of officer consistent with those

8    bylaws.  The testimony was, I guess, unclear on that point,

9    and I would suggest that to the extent that there's any doubt

10   on the record with respect to that point, it would have to be

11   resolved against granting the relief today, but as a broader

12   matter, Your Honor, a number of these people do perform

13   important functions for the debtors' operations.  They do

14   manage employees.  They do hire and fire people.  There's

15   that in combination - it's a combination of these factors

16   which, at least from our perspective, the record supports

17   some restraint in just simply approving on an interim basis

18   retention payments to these personnel.  And beyond that, Your

19   Honor, there is the substantive issue as to whether or not

20   it's actually appropriate to implement a retention plan.

21   Now, in my two-stage cross-examination, we've heard that Mr.

22   Strauss doesn't know whether or not the Board of Directors

23   has actually approved what is before Your Honor today.  They

24   did not retain, I guess, a professional to assist them in

25   crafting the particular proposal or consult with an

1  appropriate person within the industry, I guess, they could

2  call a - someone who's familiar with the marketplace for

3  employees to assess whether or not the plan will be even

4  necessary under the circumstances that the debtors are faced

5  with.  Given that Mr. Strauss was somewhat divorced from

6  what's called the key factors or concerns that were involved

7  with respect to the creation and implementation of the plan,

8  we had asked, I guess, basic questions, as to whether or not

9  all of the relief that's requested by the debtors is in fact

10  necessary.  Those are the two concerns that we have raised,

11  Your Honor, which is first, whether or not one or more of the

12  persons that are listed on Exhibit D-1 are in fact insiders

13  under the Bankruptcy Code, and I would note that Your Honor,

14  there is case law which suggests that even in the absence of

15  an actual corporate bylaw appointment with the title of

16  officer there's cases that say, with respect to § 327, you

17  hold yourself out as such, the company gives you a title even

18  if you are a titular officer, you are an officer for purposes

19  of the Bankruptcy Code, and that would be a concern that we

20  raise even in the absence of the Board resolution on that

21  point.  With respect to the necessity, it's a very limited

22  record, Your Honor.  This is a lot of money, and we could go

23  back to, I guess, the strong preference that the Office of

24  the United States Trustee has for the creditors to have an

25  opportunity to weigh in on the most relief that is possibly -

1  could possibly be better at a later date consistent with the

2  record, and because we don't think the debtors have put on a

3  compelling case for implementation of the retention plan, we

4  would request that the Court deny the relief that's

5  requested.

6  THE COURT: Ms. Morgan?

7  MS. MORGAN: Your Honor, with respect to Mr.

8  McMahon's seeming emphasis on the fact that a Board of

9  Directors has not approved this.  I don't think there's

10  anything in evidence that suggests that the Board of

11  Directors was required to approve this.  In fact, I think

12  that it is not necessarily required in many cases under the

13  jurisdiction of the Bankruptcy Court.  He also suggested that

14  they were compensated like officers, whatever that means. I

15  don't think compensation is relevant to whether someone holds

16  an officer position or constitutes an insider as that term is

17  defined in the Bankruptcy Code, and it's defined as a

18  director and officer, a person in control.  There may be

19  cases, as Mr. McMahon suggested.  There are also cases that

20  say quite the opposite, that an officer is someone with a

21  sufficiently close relationship with the debtor that is able

22  to conduct the operations and decision-making authority.

23  There is also a case, and it's <u>ABC Electric Services</u> in

24  Florida, that said, Whether or not the facts indicate an

25  opportunity to accept, deal, or exert more control over the

1    debtors' affairs is relevant to whether someone is an

2    officer.  In the <u>MNI</u> case, Your Honor, in the District of

3    Columbia in 1995, the Court held that a vice president sales

4    manager was not an officer because he did not set overall

5    corporate policy or perform other important executive duties.

6    Your Honor, in <u>New Century</u>, I believe, Judge Carey determined

7    that individuals holding the title of vice president and

8    assistant vice president were not, under the circumstances,

9    to be considered officers, and I believe Your Honor has made

10   a similar ruling in the Smart Papers case.  The title of VP

11   is not suggestive or is not determinative, I should say, of

12   whether these individuals are officers and insiders within

13   the meaning of the Code, and I would submit to Your Honor,

14   that they're not.  They're not insiders.  The testimony was

15   clear, Your Honor, that these individuals do not have control

16   over the company and are not insiders as that term is defined

17   in the Bankruptcy Code.  Your Honor, I guess, will decide

18   whether our case was compelling enough, but I think the

19   evidence shows that this is critical for this business,

20   especially under the circumstances in which we find ourselves

21   here, and I think Mr. Strauss' testimony shows that these

22   individuals are not officers and are entitled, if Your Honor

23   finds it appropriate, to relief under § 503©)(3).

24           THE COURT: Okay.

25           MR. McMAHON: Your Honor, just very briefly in

1    response.  The cases which debtors' counsel cited, deal with

2    the catchall provision of the insider relationship meaning

3    that the term "insider" as defined in the Bankruptcy Code is

4    defined as including defined categories, and courts have used

5    standards like the ones that debtors' counsel has identified

6    to assist them in determining whether or not a undefined

7    class, that is a person who is not a director, not an

8    officer, not an enumerated class under that definition, is in

9    fact an insider, but to the extent that Court were to find

10   that these persons were obviously members of the enumerated

11   class, we would suggest that that authority is inapposite.

12         THE COURT: Okay, thank you.  All right, we're going

13   to take a ten-minute recess while I think about it.  If you

14   have orders you want to work on or are ready to be signed,

15   you can hand them up to my clerk here and she'll take them

16   back and we'll get them docketed.  Mr. Waite?

17         MR. WAITE: Your Honor, if I could just briefly,

18   since we're going to take a recess, we were going to ask for

19   a short recess before going forward with DIP and cash

20   collateral in any event because we talked to Mr. McMahon

21   before the hearing and haven't had a chance to catch back up,

22   but if we're taking a break, I thought it might be helpful if

23   I handed up to the Court, the blackline cash collateral and

24   DIP orders, and a few modifications to the DIP credit

25   agreement so Your Honor may review them.

1          THE COURT: How long a break do you want then.

2     Shall we take more than ten minutes?  Let's break till 6:15.

3     There you go.  You didn't answer soon enough.

4          MS. MORGAN: Your Honor, I don't know if I should

5     read into the record the additional changes made to the cash

6     management order, so -

7          THE COURT: Hang on.  Don't leave.  Why don't you

8     read in the changes to the cash management order.

9          MS. MORGAN: I just want to make sure everyone knows

10    what was done.  I'm reading in the cash management order,

11    page 4.  I'm looking at the clean version, but it is

12    immediately after the definition of "whole loan documents".

13    The sentence will read, "The mortgage loan purchasing and

14    service agreement" -

15         THE COURT: Whoa, slow down, slow down.

16         MS. MORGAN: I'm sorry - "provided, however, such

17    transfers of funds by and among the debtors and their

18    affiliates do not violate or impair any party's rights under

19    the securitization documents, the mortgage loan purchasing

20    and servicing agreements, and related documents for sales of

21    whole loans to third parties (the whole loan documents)", and

22    here is the insert, "the DIP financing documents, as defined

23    in the interim order", I won't read the whole thing, but it's

24    the title of the DIP financing order, "with respect to the

25    DIP collateral as defined in the DIP order."  And it looks

1  like we have a change at page 7, at the paragraph that

2  begins, "ordered that the trustees under".  It will now read

3  "orders that the trustees under each securitization document

4  shall be afforded reasonable access through their employees

5  or designated agents", and this is the addition, "or parties

6  under master servicing agreements", I believe that was the

7  request of Calyon.

8            THE COURT: Right.

9            MS. MORGAN: At page 9, the last full ordered

10  paragraph that begins, "Ordered that the debtors are

11  authorized".  It says, "Provided, however, this order shall

12  not affect the rights of the pre-petition secured parties as

13  provided in the cash collateral order", and the addition

14  says, "or the rights of the secured parties as such term is

15  defined in the DIP order".  At the next page in the sections

16  in which we listed the applicable Code sections, we

17  apparently missed one, "556" has been added to both

18  paragraphs.  And in the second ordered paragraph, near the

19  end, "Claims or setoff rights, if any, arising thereunder

20  shall apply equally to the debtors' performance or transfer

21  of servicing functions with respect to repurchase agreements

22  and related servicing agreements."  And that would be it,

23  Your Honor.

24            THE COURT: All right, during the break, anyone who

25  needs to look at that and see it and make sure it's okay,

1   now's your chance, otherwise, when we start back at 6:15, I'm

2   going to sign it, and it's going to go downstairs and get

3   docketed.  All right?

4           MS. MORGAN: Thank you, Your Honor.

5           THE COURT: We'll recess till 6:15.

6           (Whereupon at 5:54 p.m., a recess was taken in the

7   hearing in this matter.)

8           (Whereupon at 6:26 p.m., the hearing in this matter

9   reconvened and the following proceedings were had:)

10          THE CLERK: All rise.

11          THE COURT: Please be seated.  You may be seated.

12  All right, I'm prepared to rule in connection with the Office

13  of the United States Trustee's objection to the retention

14  program, non-insider retention program, and I'm going to

15  sustain that objection in part and overrule it in part.

16  503©)(1) of the Bankruptcy Code, which is, I think everyone

17  here is well aware, is a recent amendment under BASIPA

18  (phonetical), basically, for all intents and purposes

19  prohibits retention plans to insiders.  The criteria to have

20  a retention plan approved for insiders is extremely high and

21  difficult, and in any event I don't think the debtors have

22  attempted to show that they've met it in this case.  The

23  debtors have an Exhibit D-1 which lists the employees that

24  are subject to the retention plan, and again, 503©)(1) only

25  applies to retention plans not incentive plans, and this is

1   described as, and I think fairly described as, a retention

2   plan.  There is no incentive-based criteria for the

3   employees.  It's clearly a retention plan.  The exhibit lists

4   a number of persons who have titles that I think are fairly

5   characterized as officer titles, vice president, senior vice

6   president, assistant vice president, et cetera, and I find

7   that for purposes of today's hearing at least that those

8   persons with those titles are insiders as defined in the

9   Bankruptcy Code because I believe they are officers by their

10  title.  I think the evidence on cross-examination indicated

11  that many of them have broad authority which could, absent

12  even a title of an officer, be construed as having the kind

13  of control over the debtors' business that an officer would

14  have.  I find it difficult, frankly, to believe that a 7,000

15  employee business would have had ten persons who could have

16  been considered officers for purposes of managing such a

17  complex and large enterprise.  This is consistent with

18  rulings that I've made in the past, most recently in the

19  Jones Fabric's case at a June 7 hearing.  Certainly the

20  debtors have the ability to present evidence which may

21  overcome the presumption that if you call somebody an officer

22  by giving them the title of an officer, he's an officer or

23  she's an officer until you sort of prove otherwise.  There

24  was some headway made by the debtors in this case, but I

25  don't think enough to overcome the presumption especially

1   given the fact that this relief is being sought on day one of

2   the case.  There's no committee in place.  I understand the

3   extraordinary and appreciate the extraordinary circumstances

4   that this debtor is operating under and the incredible, I

5   think, crisis, frankly, in the industry that led to this

6   debtors' demise and which will probably lead to the demise of

7   other similarly situated companies in the near future -

8   that's already led to the demise of literally dozens of

9   companies, some in bankruptcy, some not in bankruptcy.  But,

10  I don't think that I can ignore the statue, nor should I

11  ignore the statute.  So, I'm going to sustain the debtors'

12  objection - excuse me, the U.S. Trustee's objection to the

13  extent that I am not going to approve the retention plan for

14  anyone who has a title of vice president, assisted vice

15  president, or senior vice president.  I'm going to overrule

16  the objection as it pertains to the other employees because

17  they're not insiders, and thus, 503©)(1) is not applicable,

18  and we turn to the normal question of whether the debtors

19  have satisfied the criteria to have - the sound business

20  judgment test, and I'm referring specifically to the criteria

21  set out by Judge Lifland in the <u>Second Dana Corp.</u> decision on

22  this issue, which is 358 BR 567.  Judge Gross cites it in his

23  Global Home Products case, and I cited to it as well, in a

24  recent case.  There's a six-part test, a holistic approach as

25  he puts it, but a six-part test that is generally used in

 1   determining whether a program like this meets the sound

 2   business judgment test, and I think the debtors have

 3   satisfied certainly the most important criteria in connection

 4   with the non-insiders.  There's a reasonable relationship

 5   between the plan and the results to be obtained, the cost of

 6   the plan is reasonable, the context of the debtors' assets,

 7   liabilities, and the scope of the plan if fair and reasonable

 8   and it does not - it applies basically to everyone and does

 9   not discriminate unfairly.  Some of the other criteria may

10   not have been met such as what were the due diligence

11   efforts, you know, did you shop around and see what other

12   plans were out there?  Did the debtor receive independent

13   counsel from some sort of expert?  Frankly, I don't consider

14   those overly significant, and certainly understandable that

15   they weren't done in the context of what was an extremely

16   quick meltdown at the debtors' business.  So, I will approve

17   the program on an interim basis for those employees who are

18   not officers.  This is without prejudice for you to come back

19   with this motion after the Committee is formed and clearly -

20   and many other judges have said this, the Committee has a

21   look at this and has comments or you can have an opportunity

22   to present a fuller record on what these people actually do

23   and whether they may or may not be truly insiders for

24   purposes of the Code, the Court will listen to that with a

25   blank slate.

1          MS. MORGAN: Thank you, Your Honor, I appreciate

2     that.  We will revise the order and submit it tomorrow under

3     certificate of counsel?

4          THE COURT: All right.

5          MS. MORGAN: And, Your Honor, before I cede the

6     podium I just want to make a brief remark again on item 4,

7     which is the cash management order, and we did hand it back

8     there to be entered and appreciate that, but I was asked by

9     Wells Fargo to make representation on the record that where

10    the document refers to trustee, that term includes Wells

11    Fargo as a master servicer.

12         THE COURT: All right.  I have signed the order and

13    it's being docketed.

14         MS. MORGAN: Thank you, Your Honor, and I will cede

15    the podium to my partner, Mr. Waite.

16         MR. WAITE: Good afternoon, Your Honor.  Joel Waite

17    on behalf of the debtors.  Your Honor, the next two items on

18    the calendar are the two financing motions we have today.

19    One is the consensual order for use of cash collateral of

20    Bank of America, as administrative agent for a group of

21    lenders, and we also have a post-petition financing facility

22    with W.L.R. Recovery Fund III LP.  Your Honor, I think it's

23    important, I think, up front to talk about the two of these

24    together for just a minute.  We worked very hard over the

25    last couple of days, literally around the clock, to negotiate

1   the consensual use of cash collateral with Bank of America,

2   to negotiate a DIP facility with W.L. Ross, and to negotiate

3   between the three of us to make the two documents work

4   together, and I think we've achieved that goal.  The cash

5   collateral, Your Honor, is to be used with respect to the

6   servicing business.  Bank of America asserts a lien in the

7   servicing business assets as well as certain other assets,

8   and that is the ongoing business, and so we, in our

9   negotiations with Bank of America, determined that the

10  appropriate thing to do for this estate was to basically

11  ring-fence that business and have that business operated from

12  the cash that's generated from the ongoing operations which

13  is servicing fees, and advancement - servicing advanced

14  refunds, and based upon the budget that the company's put

15  together and the current servicing revenues, we believe that

16  if the operations continue in normal course that the cash

17  collateral generated from that business will be sufficient to

18  operate it through a sale process.  With respect to the DIP

19  financing, Your Honor, we have a $50 million facility.  We're

20  seeking interim approval today of approximately $12 million

21  which after reserves would enable the debtor to borrow up to

22  $10 million depending on final hearing.  The funds from that

23  facility are to be used in connection with the remaining part

24  of the business to cover the cost and expenses of winding

25  down the remaining part of the business to fund the process

1    to sell these assets to maximize the recovery for the

2    unsecured creditors, and that will be funded both from cash

3    on hand, other unencumbered assets, and this DIP facility.

4    Your Honor, I think I'll start with the cash collateral and

5    let me at the outset make a statement I think which hopefully

6    will resolve some of the questions we received from a number

7    of the lenders that the company has.  By this order we are

8    only seeking and the Court is only being asked to grant the

9    authority for the debtors to use the cash collateral of Bank

10   of America.  We are not asking nor does the order provide for

11   the debtors to use the cash collateral of any other party.

12   We've had questions raised by certain of the lenders

13   regarding funds which we have that we collect on their behalf

14   as their servicer.  I think that was dealt with in the cash

15   management order.  Those funds when they are received are

16   deposited into the appropriate custodial accounts, and I

17   think in connection with the cash management order we've

18   addressed those issue as to how those funds will be handled

19   in the ordinary course.  So, hopefully, we can shortcut some

20   of the objections and reservations of rights that I would

21   have anticipated would otherwise be made.  Your Honor, let me

22   - we've attached the budget to the order and pursuant to the

23   agreement, the debtors are permitted to use the cash

24   collateral in accordance with that budget.  Any deviations,

25   except those which are permitted by the order and there are

1   certain variances permitted with respect to the servicing

2   advance line, but other than that, any deviations will have

3   to be approved by the administrative agent.

4         THE COURT: You went to the blackline, I'm sorry.

5         MR. WAITE: Pardon me?

6         THE COURT: Are you going through the blackline?

7         MR. WAITE: Not quite yet, Your Honor.  I'll get to

8   that in a minute.

9         THE COURT: All right.

10        MR. WAITE: Your Honor, it's critical to the

11  maintenance of this business that we have the authority to

12  use cash collateral, and the Bankruptcy Code permits use of

13  cash collateral either by order of the Court or by consent.

14  Here we have a consensual order.  Your Honor, in exchange for

15  these attached collateral we negotiated what we believe was

16  appropriate adequate protection for Bank of America, and this

17  is not your standard cash collateral order, and it's not your

18  standard adequate protection.  What we have not done is we

19  have not granted Bank of America -

20        THE COURT: No, Mr. Waite - Are we having a problem?

21  Hang on for just a second.  Do you need a minute?  Okay, why

22  don't you go back a sentence or two.  You remember exactly

23  where you were.

24        MR. WAITE: I remember exactly where I was.  I was

25  saying, Your Honor, that this is not your typical cash

collateral stipulation. We are not using cash collateral to
fund the entire operation. We are using it for a specific
purpose, and in light of that, we negotiated adequate
protection which we thought was appropriate, and I was
saying, we had not, as part of this cash collateral order,
granted to Bank of America a new lien in any unencumbered
assets or any assets in which they did not have a lien pre-
petition. We've granted a replacement lien in the same
assets in which they had a pre-petition lien. We have also
not, by this order, granted them a super-priority
administrative claim. What we have granted them, as I said,
was a replacement lien in the same assets. We've also agreed
that we will not permit any junior liens to be placed on
their collateral. We've also agreed to provide for certain
payments of their attorney's fees and other fees that they're
entitled to under their loan documents, and there's an
appropriate notice period or objection period provided for in
the stipulation. We've also provided that certain proceeds
from the sale of their collateral will be paid over to them
in reduction of their loan as well as when we collect
principal and interest, and other amounts on account of their
loans which we service. Those will payed over in accordance
with the underlying agreements. Your Honor, we've also
provided that there would not be any administrative claim or
priority claim that would be able to seek to come against the

1   BofA collateral prior to their being paid in full, and we

2   have a counter-provision like that in the DIP order and that

3   was a negotiation between the two parties to make sure that

4   the super-priority claim that we're giving to the DIP lender

5   and the DIP order would not give them the right to come in

6   and obtain recoveries from BofA's collateral prior to their

7   being paid in full, and that was a negotiated provision.

8   Your Honor, we have negotiated a period of time for this

9   initial cash collateral usage through September 7th.  I

10  suspect that prior to that date, we will be back before the

11  Court asking for a further extension to get us through the

12  sale process, but in light of the circumstances in which we

13  found ourselves in the short period of time we had, we

14  determined that to make progress here we would do a 30-day

15  budget which gets us well on the way of getting these assets

16  to sale.  The stipulation also contains other standard

17  termination provisions.  I won't go through them unless the

18  Court would like me to.  We've also in the stipulation made

19  certain standard stipulations and agreement with the lenders

20  regarding their claims, the extent and validity of their

21  liens, but we've also included in paragraph (20) the normal

22  and customary call-back rights of a committee or other party

23  in interest, and we've provided the appropriate period of

24  time as provided by the Local Rules.  Your Honor, the order,

25  I don't believe has any provisions which violate Local Rule

1   4001-2 or that require special disclosure.  We have included

2   in paragraph (13), there's a 506©) waiver request that they

3   will make at a final hearing, but that is not operative as

4   part of the interim order.  Your Honor, we have made some

5   changes to the order.  I don't know if Your Honor has had a

6   chance to look at them when we handed them up during the

7   break?

8           THE COURT: I didn't.  I was busy thinking about the

9   retention plan issue.

10          MR. WAITE: Would you like me to walk through them

11  individually?  I can proceed however Your Honor would like.

12          THE COURT: Well, let ask preliminarily.  You say

13  "consensual" I know it's consensual with BofA.  Are there - I

14  don't need to hear from people as to what they are yet, but

15  are there any remaining objections by any parties in interest

16  to the form of order?

17          MR. WAITE: Your Honor, I'm not sure.  The U.S.

18  Trustee had raised a number of issues.  We spoke to him.  I'm

19  not sure if he has any remaining issues on this order.  A

20  number of the lenders had raised issues.  I think the

21  representations regarding whose cash collateral we're using

22  by this order and also we've included as a new paragraph at

23  the end of the order the same language that you'll see in the

24  DIP order with respect to repo rights.  It refers to §§ 559,

25  560, and 561 of the Bankruptcy Code and just recognizes that

1    nothing in this order is intended to affect those rights,

2    whatever they are.  We're not saying what rights people have

3    today or what rights they don't have, but we're not affecting

4    those rights by this order.  I think with that, I think we

5    resolved most of the concerns.  There may be one or two

6    lenders who have some individual concerns.  I'm not sure

7    what's left out at this point, Your Honor.

8         THE COURT: All right.  Does anyone - And again, I

9    don't want to hear what it is right now, but if there's any

10   one present who still has issues with the cash collateral

11   order, please identify yourselves so we can - other than you,

12   Mr. McMahon; okay?  Oh, we have a few, all right, okay.

13   Well, let's do this, let's turn the order and I'll give you -

14   you can give me the redline changes and I'll give you any

15   comments I have.

16        MR. WAITE: Okay, Your Honor.  On page 1 we simply

17   updated the caption and we struck from the title

18   "administrative expense priority", because we did not provide

19   that as adequate protection.  Your Honor, on paragraph - on

20   page 7, paragraph (1), which is reflected at the beginning

21   that the motion is granted, that any objections are

22   overruled.  Page 8, we've added a provision.  I believe this

23   is in part a request of the U.S. Trustee's Office to provide

24   that if there any permitted deviations from the budget agreed

25   to by the administrative agent, that the debtors will provide

1    notice of that to counsel to the Committee and the

2    administrative agent.  Your Honor, on page 9, we've added a

3    provision to make it clear that - and this is partly related

4    to the fact that we're kind of circling off this part of the

5    business, that we won't transfer any of BofA's cash

6    collateral from any debtor to any other debtor or other party

7    absent their consent.

8            THE COURT: I have a question for the last clause in

9    that at paragraph (3).

10           MR. WAITE: Is that on page - okay.  Bottom of page

11   9?

12           THE COURT: It will be the top of your new page 10.

13           MR. WAITE: Okay.

14           THE COURT: It says that you're - I'm sorry.  All

15   right, You're granting the administrative agent for the

16   ratable benefit of the pre-petition secured parties security

17   interest and lien on pre-petition collateral and proceeds, et

18   cetera, et cetera, senior to any other security interest or

19   lien subject only to valid perfection and enforceable pre-

20   petition liens if any.  That's normal; right?

21           MR. WAITE: Yes.

22           THE COURT: But then you add, Which are senior to

23   the pre-petition party's security liens or security interest

24   as of the petition date.

25           MR. WAITE: I think what that means - is meant to

1    do, Your Honor, is to provide that the new liens granted as

2    their adequate protection are senior to their pre-petition

3    liens but not anyone else's pre-petition liens.

4            THE COURT: Is that correct - okay.

5            MR. WAITE: I'm told I got that right.

6            THE COURT: I was afraid there you were in effect

7    doing a priming adequate protection lien.

8            MR. WAITE: Yeah, when I read the language, I

9    thought that's what your concern was, but we are not priming

10   anyone by this order or by the DIP order.

11           THE COURT: Say that on the record, and we'll be

12   fine.

13           MS. SCHONHOLTZ: Your Honor, Margo Schonholtz for

14   Bank of America as the administrative agent.  We are not

15   doing a priming adequate protection.

16           THE COURT: Thank you.  Okay, go ahead, Mr. Waite.

17           MR. WAITE: Following page 10, I think that's just a

18   clarifying change.

19           THE COURT: All right.  That paragraph, paragraph

20   (5) -

21           MR. WAITE: This is the paragraph, Your Honor, that

22   provides that -

23           THE COURT: The gross proceeds go directly to them.

24           MR. WAITE: That's correct, but it's subject to the

25   rights of paragraph (20).

1          THE COURT: All right.

2          MR. WAITE: If the liens are challenged

3     successfully.  Your Honor, there's a change on page 12 where

4     the period of time to object to any of the administrative

5     agent's fees has been changed to ten days from five business

6     days, at the request of the U.S. Trustee's Office, and

7     there's also a provision providing that the U.S. Trustee and

8     the Committee will be provided copies of those.

9          THE COURT: Right, good.

10         MR. WAITE: Page 14, paragraph (11) -

11         THE COURT: May I have - I'm sorry, I'm sorry.  We

12    preserve their right to dispute the payment of any portion of

13    the invoiced fees if within the review period the debtors pay

14    in full the invoiced fees including - So they get the money

15    even though there's a dispute?

16         MR. WAITE: Yes, Your Honor, that's where we

17    negotiated this is they sort of -

18         THE COURT: But it's subject to disgorgement, you

19    meant, it's not approved.

20         MR. WAITE: Exactly, Your Honor.

21         THE COURT: Right.

22         MR. WAITE: Under the loan document, that is how it

23    normally works.

24         THE COURT: I always know how to find lawyers,

25    that's not a problem - all right.

1          MR. WAITE: We figured BofA was good for money, Your

2     Honor.  Your Honor, on page 14, paragraph (11), we just

3     removed the brackets around September 7th to make clear that

4     that is the current termination date.

5          THE COURT: All right, let me ask you - Paragraphs

6     (7) and (8) -

7          MR. WAITE: I'm sorry, Your Honor.

8          THE COURT: That's okay.  Except as provided in

9     paragraph (3)IX and I don't know what -

10          MR. WAITE: That's the provision that gives them a

11     priming lien over their own lien, Your Honor.

12          THE COURT: All right.

13          MR. WAITE: It's just (3).  It's not (3)IX.  We need

14     to correct that.  Your Honor, it's just paragraph (3).  We'll

15     get rid of the -

16          THE COURT: IX?

17          MR. WAITE:  - rest of that reference.

18          THE COURT: All right.  The security interest in

19     liens granted to the agent shall not be subordinated to or

20     made *pari passu* with any lien or security interest -

21          MR. WAITE: That's right.  We've agreed that in

22     connection -

23          THE COURT: Well, I know you've agreed.

24          MR. WAITE: I understand, Your Honor.

25          THE COURT: I haven't agreed.

1      MR. WAITE: I understand, that what we're asking

2  Your Honor to approve.  Your Honor, this was a part of our

3  negotiation for adequate protection because of the way this

4  business is structured in the servicing business and our need

5  to kind of rope it off and operate it from the cash generated

6  -

7      THE COURT: I'll approve it on an interim basis but

8  without prejudice to reconsider at the final order.

9      MR. WAITE: Understood, Your Honor.

10      THE COURT: And just let me look at (8) again here.

11      MR. WAITE: I'm sorry.

12      THE COURT: And the same with this provision in

13  paragraph (8) about not granting any junior liens.

14      MR. WAITE: Again, I understand the Court's question

15  in connection with our negotiations.  It was important to

16  them in agreeing to this that someone else not be able to

17  come in and disrupt their efforts to protect and proceed with

18  their collateral and that's why it was carved out of the DIP

19  facility.

20      THE COURT: Right, and I see that - I mean, I

21  understand that the 328, 330, 331 obligations get paid under

22  the DIP, not the cash collateral.  I'm not as troubled by

23  that as I am this concept of not granting any junior liens at

24  any time, but I'll approve it on an interim basis, but I have

25  concerns about it for the final order.

1          MR. WAITE: Understood, Your Honor.

2          THE COURT: All right.  I'm sorry, you were in

3   paragraph (11)?

4          MR. WAITE: Paragraph (11) was just taking out some

5   brackets to make it clear that September 7th is the date.

6          THE COURT: Okay.

7          MR. WAITE: And then on page 16, paragraph (12), it

8   just adds to the bank's reservation of rights with respect to

9   whatever other actions they may decide to take under their

10  documents in this case, and obviously the debtor reserves all

11  of its right to oppose any such actions.  Your Honor, in

12  paragraph (15), we made some modifications based upon

13  discussions with the U.S. Trustee's Office to strike the

14  reference to a superceding case and make it clear that the

15  provisions of this order are binding, notwithstanding,

16  conversion or dismissal of the cases.

17         THE COURT: Okay.

18         MR. WAITE: Paragraph (16) was struck at the request

19  of the U.S. Trustee's Office, and page 19, at the top, we

20  added the word "amount" after "challenging".

21         THE COURT: Okay.

22         MR. WAITE: At the U.S. Trustee's Office's request.

23  And at the very end, we've added just the reference to this

24  order becoming immediately effective which is now new

25  paragraph (23), and in paragraph (24) is where we added the

1  language that it's in the DIP order to make it clear that

2  nothing that's being approved as part of this order is

3  intended to or will affect repo rights, whatever they are.

4         THE COURT: Do you need to add 556 here as well?

5         MR. WAITE: I think we do.  We'll handwrite that in.

6  We have a few other hand corrections, I think some of the

7  paragraph numbering got off when we made the last round of

8  changes.

9         THE COURT: All right.  Let me hear any remaining

10  objections.

11         MR. WAITE: Thank you, Your Honor.

12         THE COURT: Or - Yeah, let me hear any remaining

13  objections.

14         MR. ACKERLY: May it please the Court, Ben Ackerly

15  on behalf of Calyon, New York branch.  Your Honor, Calyon is

16  the administrative agent under a repurchase agreement and

17  under a custodial agreement, a servicing agreement, that were

18  dated in November of 2006.  They were a purchaser under a

19  warehouse financing arrangement similar to those described in

20  Mr. Strauss' declaration at paragraph (14), originally

21  covered it by $1.5 billion of mortgages which were purchased

22  under the repurchase agreement, and the custodial agreement

23  provided for servicing.  As a result of a default, a pre-

24  petition default, the repurchase agreement and the servicing

25  agreement were terminated August 1st with instructions that

1   turned servicing over to the replacement servicer which had

2   been appointed by Calyon.  The debtor has not wholly

3   cooperated in turning this servicing over, and from what I

4   glean from what's being said in court today, does not intend

5   to voluntarily accept the pre-petition termination of

6   servicing, and it intends, I expect, to continue to service

7   our loans contrary to pre-petition instructions.  My concern

8   with respect to this cash collateral is the debtor has stated

9   that it's only seeking permission to use cash collateral

10  which I would describe as the Bank of America's cash

11  collateral, not any cash collateral which might belong to my

12  client or any other party to a repurchasing agreement.  Now,

13  we take the position that because we terminated the

14  repurchase agreement and the servicing agreement

15  pre-petition, they're not property of the estate, but the

16  debtor's taking the position, apparently, that it has an

17  interest in the cash that it generates from servicing our

18  loans, contrary to our consent.  Therefore, I think an

19  argument could be made that that is cash collateral under

20  363(a) because we clearly have an interest in it and they are

21  asserting an interest in it as well.  So, I would like to

22  state on the record that we do not consent to their use of

23  our cash collateral in any respect, including paying

24  themselves a servicing fee from the cash collateral, and we

25  would ask that they be required to take our cash collateral

1    and segregate it from any other cash collateral and that they

2    provide us with an accounting of cash collateral that they

3    collect for us until they're prepared to turn it over to us,

4    and that they forward to us all documents and loans which are

5    not yet finalized.  And that's our position with respect to

6    their cash collateral.  We just want to it clear on the

7    record that we do not consent to their using cash collateral.

8    They haven't apparently sought permission to use it, but

9    we're not consenting to the use of it, and we're asking that

10   our cash be segregated until they will turn it over to us or

11   until we can have a hearing with the Court to determine that

12   issue.

13          THE COURT: All right.  Your reservation is noted.

14          MR. WAITE: And, Your Honor, I would note that this

15   was one of the specific reasons we've included the new

16   language in the last paragraph of this order.  The servicing

17   fees that we earn are the cash collateral Bank of America.  I

18   understand that his client has taken the position that they

19   terminated the servicing rights.  That issue is not before

20   the Court today.  It's not to be decided today.

21          THE COURT: Well, he's taking the position that it's

22   his cash collateral, you can't even pay yourself your normal

23   servicing fee without court approval to use cash collateral,

24   and you're not asking for that today, so you act at your

25   risk, and it's his position.  He just wants to make it clear

1   on the record that the debtor is acting at its own risk.

2           MR. WAITE: I understand, Your Honor, I -

3           THE COURT: But his reservation is noted.

4           MR. WAITE: And the last paragraph is meant to

5   preserve for the Court the ability to fashion an appropriate

6   remedy if those issues get -

7           THE COURT: Well, again, I don't think it's related

8   to the bank - I didn't hear an objection to you using Bank of

9   America's cash collateral.

10          MR. WAITE: And that's what we're asking to do, Your

11  Honor.

12          THE COURT: Mr. Dehney.

13          MR. DEHNEY: Not surprising since FGIC is similarly

14  situated.  We join in Mr. Ackerly's objection, and we also do

15  not consent.  The other point I wanted to raise, Your Honor,

16  is I heard Mr. Waite say that the debtor is effectively

17  agreeing not to transfer to third parties cash collateral,

18  cash collateral accounts, and I thought I heard them say,

19  rights under servicing agreements and fees they consider

20  collateral.  So, we believe we terminated.  They don't have

21  the right to service, and therefore, it's not property of the

22  estate.  I just want to make sure they're not building in a

23  trip wire that it would be a consent requirement of BofA for

24  that and actually comply with the agreement.

25          THE COURT: I'm not sure I understand the comment,

1    frankly.

2         MR. WAITE: I didn't either, Your Honor, and it's

3    either the property of the estate or it's not.

4         THE COURT: Let me Dehney clarify.

5         MR. DEHNEY: I'm sorry, Your Honor.  Page 9 -

6         THE COURT: Okay.

7         MR. DEHNEY:  - of my blackline, the debtors agree

8    they will not, without the agent's prior consent, transfer

9    cash collateral from any debtor to another debtor or any

10   other party, and I argue, obviously, as it's been terminated

11   -

12        THE COURT: Well, the cash collateral is defined in

13   the order as the cash collateral of Bank of America.

14        MR. DEHNEY: Okay.

15        THE COURT: Not your cash collateral, if it is cash

16   collateral.

17        MR. DEHNEY: Understood.

18        THE COURT: Okay.

19        MR. DEHNEY: That was it.  Thank you, Your Honor.

20        THE COURT: Okay.  Nice try, Mr. Waite.  Mr.

21   Falgowski.

22        MR. FALGOWSKI: Your Honor, Cory Falgowski again

23   this time for ZC Real Estate Tax Solutions.  With me is Mr.

24   Rich Norton.  We submitted a *pro hac* application for Mr.

25   Norton, and if, Your Honor, it's acceptable to you, I'll turn

1    the podium over to Mr. Norton.

2           THE COURT: Very well, welcome, Mr. Norton.

3           MR. NORTON: Thank you, Your Honor, good evening.

4    I'll just take up a minute.  ZC, my client here, tracks and

5    monitors realty, real estate taxes for the debtors' servicing

6    business.  I just wanted a clarification on the record from

7    the debtors' attorneys that ZC's being included in the budget

8    submitted in connection with the cash collateral motion.

9           MR. WAITE: Your Honor, I believe Mr. Beach from my

10   office was able to confirm that.  We have included what we

11   typically would have paid them in the ordinary course as part

12   of our budget, and so, it is provided for on a going forward

13   basis.

14          THE COURT: Okay.

15          MR. NORTON: Thank you, Your Honor.

16          THE COURT: Ms. Slights.

17          MS. SLIGHTS: Good evening, Your Honor.

18          THE COURT: Good evening.

19          MS. SLIGHTS: Ellen Slights for Ginnie Mae.  Your

20   Honor, I would just like to join in the reservation of rights

21   put on the record by Mr. Dehney for his clients, Federal

22   Guaranty Agency, and Calyon - I probably am mispronouncing

23   that, but Ginnie May also believes that it has terminated all

24   of its property - or all of the rights of the debtor in any

25   Ginnie May property, and that none of its property is the

1   property of the estate, and so, it also would not consent to

2   the use of any cash collateral even though it doesn't believe

3   there is any.

4           THE COURT: Okay, thank you.

5           MS. SLIGHTS: Thank you, Your Honor.

6           MR. CLEMENTE: Your Honor, Matt Clemente, I'm next

7   in line on the reservation of rights here.  Just for the

8   record, Sidley Austin represents Society Generale.  We are

9   slightly different because we're not party to a repo

10  agreement.  It's a whole loan where Society Generale buys the

11  loans and actually owns them, and then the cash that's

12  collected through servicing is owned by them as well.  I

13  think Mr. Dehney in the Calyon objection hit on a key issue.

14  We also terminated servicing on August 1.  Once that happens,

15  the servicing fee is no longer - I don't know if I should say

16  this, the servicer is no longer entitled to the servicing fee

17  until perhaps other things may happen.  Therefore, to the

18  extent that the BofA facility purports to use that as their

19  cash collateral, our position is that none of that is in fact

20  cash collateral, it's all our property, and therefore, we do

21  not consent to its use, and we don't believe the debtors are

22  seeking to use it pursuant to the motion that's before the

23  Court.

24          THE COURT: All right, thank you.

25          MR. CLEMENTE: Thank you, Your Honor.

1          MR. ROVIRA: Good evening, Your Honor.  Alex Rovira

2     again from Sidley Austin, represent several clients, Bear

3     Stearns, Liquid Funding, Morgan Stanley Mortgage Corporation

4     - Capital, I'm sorry.  Again, I'm just - on reservation of

5     rights.  Some of our clients have terminated some of the

6     servicing agreements on August 3rd.  There is a trust account.

7     That money was supposed to be swept over and transferred

8     over.  It has not been done yet.  We have no confirmation of

9     that being done.  I want to make sure that those accounts and

10    any other accounts that has cash collateral of our clients

11    are not used, and we do not consent to it.

12         THE COURT: All right, thank you.  Mr. Bowden?

13         MR. BOWDEN: Good evening, Your Honor.  Again, Bill

14    Bowden of Ashby & Geddes for Morgan Stanley Co. and Morgan

15    Stanley Capital Services.  Slight push here, Your Honor.  I

16    understand full well the import of Mr. Waite's statements,

17    and I appreciate them and the additional language added to

18    the order.  I've been asked to make a statement of

19    reservation for the record in any event.  Your Honor, these

20    Morgan Stanley entities are parties to a swap agreement and a

21    repo agreement protected in our view by the safe harbor

22    provisions of the Code for which the debtors posted margin in

23    the form of cash and/or securities.  Upon the filing of the

24    bankruptcy, we exercised our rights under those contracts.

25    Our concern with this motion was that the debtor might be

1  purporting to use the cash collateral that we are currently

2  holding in the form of the cash or securities and/or grant a

3  lien on it.  I understand Mr. Waite's statements and the

4  addition of this new paragraph to confirm that is not being

5  the case.  That's all I wanted to say, Your Honor.  Thank

6  you.

7        THE COURT: Thank you, Mr. Bowden.

8        MR. BOWDEN: I have a similar comment, Your Honor,

9  with respect to the proposed interim DIP order.

10        THE COURT: Okay, Mr. Bowden.

11        MR. BOWDEN: Thank you.

12        THE COURT: Thank you.

13        MR. WAITE: I think I responded to the same

14  reservation of rights before, so I don't think I need to put

15  it on the record again.

16        THE COURT: No, the reservation is noted.  Mr.

17  McMahon?

18        MR. McMAHON: Your Honor, good evening.  I've raised

19  a number of, well, language issues and whatever with the

20  debtors and the lenders, and I'm going to exercise some

21  discretion and reserve some of them for the final hearing

22  with respect to the matter, but two, I guess, large concerns.

23  One, Your Honor addressed with respect to the junior

24  encumbrance provision, and I'm comfortable with the Court's

25  resolution of that.  The other point was, on the

1    investigation period, I believe, but I don't know whether

2    it's 19 or 20 now. The last sentence of that, I guess,

3    purports and indicates that the interim order shall not be

4    deemed a grandstanding to the Committee or any other party to

5    commence the adversary proceeding to test the matter

6    challenging the liens or bringing an action under that.  I

7    will note that there's a broad category of potential

8    challenges that are encompassed within that paragraph.

9    Certainly, my understanding is that any party in interest in

10   the bankruptcy case could object to a proof of claim, and I'm

11   a bit concerned about - well, first, the fact that parties in

12   interest rights may be affected by that sentence, and

13   furthermore, it's my understanding that with respect to

14   challenges under the paragraph, I don't know if necessarily

15   they're so restricted, meaning a committee, certainly a

16   Committee of Unsecured Creditors would be perfectly entitled

17   to bring an adversary proceeding based upon this paragraph

18   without having to come back to this Court and obtain some

19   type of authority authorizing them to bring such an action on

20   behalf of the debtors' estate.  So, I don't know precisely

21   what the point is of an additional hurdle given the debtors

22   have already made the representations with respect to where

23   they stand.  Certainly, there is some additional work to be

24   done with respect to that particular sentence, but that's our

25   concern, Your Honor.

1        MS. SCHONHOLTZ: Your Honor, Margo Schonholtz, Kaye

2    Scholar for BofA.  I'll be very brief.  The loans outstanding

3    under this facility exceed a billion one.  We've agreed to a

4    consensual use of cash collateral in a very difficult case.

5    We are not getting the usual forms of adequate protection and

6    in exchange for doing this and foregoing the usual forms of

7    adequate protection, it is critical that our assets be ring-

8    fenced for sale in accordance with the business

9    understanding.  I understand Your Honor has reservations

10   about - and we do appreciate your approving on an interim

11   basis, the junior lien provision.  We hope to convince you on

12   the final that that's appropriate, but at this juncture, I'd

13   just like to disagree respectfully with Mr. McMahon.  The

14   order as it stands, does require any party in interest,

15   including a committee, to obtain standing to file an

16   adversary.  That, of course, is something that I'm sure

17   somebody will request us to change in the final, but it is an

18   interim order, and that's what we understand it means.  Thank

19   you.

20        THE COURT: Okay, well, I read it as not expanding,

21   making it clear that nothing in the paragraph expanded what

22   someone otherwise would have a right to do, and -

23        MS. SCHONHOLTZ: I agree, Your Honor.  Our

24   understanding is that a party in interest, including a

25   committee, has to seek standing.  That obviously can be

1  changed on a consensual basis.

2          THE COURT: All right.

3          MS. SCHONHOLTZ: But we're not doing any thing other

4  than what the law provides.

5          THE COURT: My only concern on saying something

6  like, all right, I'm going to approve in the interim order

7  and I'll reserve rights for the final, is when you have a

8  deadline in here and we get to day 75 and we're still

9  operating under an interim order, I reserve the right to

10 reconsider my position about whether I'm reserving it for the

11 final order.  I don't want the interim order to become a

12 final order just by being out there for 75 days.  I cannot

13 imagine your client allowing this company to continue to

14 operate on an interim basis for 75 days, so I don't think it

15 will be an issue, but with that, with my reservation, I'll

16 approve it for current purposes.

17         MS. SCHONHOLTZ: Understood, thank you.

18         THE COURT: Yes, sir.

19         MR. CLEMENTE: Your Honor, if I may briefly.  I'll

20 take the daggers for this one, I have no doubt.  Matt

21 Clemente for Society Generale.  Your Honor, on page 7 of the

22 blackline order you've heard a variety of reservation of

23 rights, but the new language here says the motion is granted

24 in accordance with the terms.  Any objections that have not

25 be withdrawn and all reservation of rights included therein

1  are hereby denied and overruled.

2  　　　　THE COURT: Well, we're going to have to strike

3  that.

4  　　　　MR. CLEMENTE: Thank you very much, Your Honor.

5  　　　　THE COURT: How about, all reservations - yeah, just

6  strike that.  You don't need that.  So it should simply read,

7  "Any objections to the motion with respect to entry of this

8  interim order that have not been withdrawn, waived, or

9  settled are hereby denied and overruled".

10  　　　　MR. WAITE: Your Honor, just for the record, we made

11  a couple of other minor handwritten changes.  In paragraph

12  (7) we struck the reference to that paragraph (3)XI, and -

13  　　　　THE COURT: Are you going to fill in the date for

14  the final hearing for September 4 at 11 a.m.?

15  　　　　MR. WAITE: Apparently our paragraph numbering got

16  off a little bit, so we have a - include a reference to a

17  deleted paragraph (16) and then renumbered the remaining

18  paragraphs.  So the final hearing, Your Honor, will be on

19  September 4.

20  　　　　THE COURT: At 11 a.m., with objections due August

21  27th at 4.

22  　　　　MR. WAITE: August 27th -

23  　　　　THE COURT: That's 8 calendar days, but it's 5

24  business days because of the holiday.

25  　　　　MR. WAITE: And then on paragraph (25), the final

1  paragraph, we've included the reference to § 556.

2          THE COURT: Okay.

3          MR. WAITE: And one other clarifying change.  If I

4  may approach?

5          THE COURT: Yes.  Thank you.  They don't let you

6  handwrite much, do they?

7          MR. WAITE: No.  No, I failed penmanship and I've

8  often said that when my assistant retires, I'm retiring too

9  because there's nobody else who can read my writing.

10         THE COURT: All right, I'm going to - All right,

11  I'll sign the order as amended.

12         MR. WAITE: Thank you, Your Honor.

13         THE COURT: It will get docketed tomorrow.

14         MR. WAITE: Thank you.  Moving on to the DIP

15  financing, I'll try to move forward quickly in light of the

16  late hour.  As I indicated, we've obtained a post-petition

17  financing facility, a total amount of $50 million.  We're

18  seeking approval of 12 million on an interim basis after

19  certain reserves that we're required to post that we would

20  have borrowing ability of approximately 10 million pending a

21  final hearing.  As collateral for the post-petition

22  financing, we are granting the DIP lender the first priority

23  lien on all of the estate's unencumbered assets, a second

24  priority lien on the estate's other encumbered assets other

25  than the Bank of America collateral, and granting them a

1    super-priority administrative claim, and we've also excluded

2    any lien on avoidance actions.  Your Honor, the debtors -

3    actually the borrowers, because one of the debtors, the

4    servicing business, is not a borrower.  The borrowers need

5    the financing provided by this DIP facility to provide

6    sufficient available resources and working capital to fund

7    the wind-down of their business and the orderly liquidation

8    of their assets for the benefit of their creditors.  As I

9    indicated before, the funds from this borrowing are not being

10   used in connection with the servicing business.  Your Honor,

11   as Mr. Patton alluded to early in this hearing, to say the

12   debtors have been through a turbulent couple of weeks would

13   be an understatement and having the DIP facility in place to

14   assure our employees, vendors, and creditors with whom we're

15   dealing and the various lenders who have liens on our assets

16   as we move forward through this liquidation process, that

17   we're going to have the ability to fund this process in an

18   orderly fashion.  We believe it's critical that we have the

19   DIP facility in place to provide that stability and that

20   financing.  This facility along with certain unencumbered

21   assets of the debtor will be used to fund this wind-down.

22   Your Honor, the debtors, obviously, were unable to obtain

23   unsecured credit or unsecured credit with only an

24   administrative priority claim.  This DIP facility was

25   negotiated over the last several days.  Upon the company's

1    financial crisis exacerbating in the last week, the debtors

2    reached out to a number of potential lenders.  I believe

3    approximately 13 lenders were contacted about providing

4    possible debtor-in-possession financing.  It's my

5    understanding that approximately nine of those parties

6    executed confidentiality agreements, and that two parties

7    proposed term sheets.  However, this was the only proposal

8    that did not contain due diligence and other contingencies

9    that provided the necessary financing that could be closed on

10   an appropriate basis.  The other proposal had a number of

11   conditions and due diligence requirements that we were

12   concerned would not be able to be satisfied in a timely

13   manner.  Accordingly, Your Honor, this is the best facility

14   that's available to the debtors under the circumstances.

15   Your Honor, this facility was negotiated in good faith over

16   the last couple of days, and represents a bargain for

17   exchange between the parties.  As I indicated before, these

18   negotiations included negotiations between the debtors and

19   the lender, as well as between the debtors, the lender, and

20   Bank of America to make sure that the relief that was being

21   granted to the DIP lender did not interfere with the

22   arrangement we were reaching with Bank of America.  And I

23   believe we have struck that balance, and we've made a few

24   additional changes to the order to clarify the rights between

25   the two parties.  Your Honor, the lender under the facility

 1    will be W.L. Ross - or W.L.R. Recovery Fund III LP.  This

 2    entity is not affiliated with the debtors.

 3            THE COURT: Is there any affiliation with Bank of

 4    America?

 5            MR. WAITE: To my knowledge, there's no affiliation

 6    with Bank of America.  Your Honor, the facility will run for

 7    a period of 12 months after the closing date or would

 8    terminate earlier if certain default events occurred or a

 9    plan of reorganization is confirmed.  The facility provides

10    for the establishment of certain reserves, including 12

11    months of interest and a one million reserve for certain

12    legal fees and expenses of the lender.  The non-default

13    interest rate is the liber plus three percent, Euro dollar

14    rate, which I understand is approximately 8 percent - just a

15    little higher than 8 percent, Your Honor.  And, Your Honor,

16    the default rate would be in two additional percentage points

17    above that.  Your Honor, the facility enables the debtor to

18    use the capital or the funding for general corporate

19    purposes.  In accordance with the budget, we did file the

20    budget earlier today.  I apologize that that was not ready to

21    file with the original motion, and those budgeted items

22    consist primarily of employee expenses, operating costs,

23    rent, utilities, professional expenses, and other expenses

24    associated with the wind-down of the debtors' affairs.  Your

25    Honor, as security for the post-petition financing, we are

1  providing the DIP lender with a super-priority administrative

2  claim, pursuant to 364©)(1).  In connection with the Bank of

3  America issues there is language added to the order to make

4  it clear that notwithstanding the grant of the super-priority

5  administrative claim, the DIP lenders cannot take action to

6  recover on such claim against the BofA collateral, prior to

7  BofA being paid in full, and that was agreed to by the

8  parties.  We are also granting a first lien on all

9  unencumbered assets and a second lien on all other assets in

10  which there is a prior lien, again, except for the BofA

11  collateral.  The financing does not prime any existing liens.

12  As I indicated, we did not grant a lien on avoidance actions.

13  We did, however, grant the super-priority administrative

14  claim which would have the right to share in any avoidance

15  action recoveries.  Your Honor, there's a carve-out in the

16  facility for professional fees of $5 million and for payment

17  of the U.S. Trustee's fees.  There are certain fees

18  associated with the facility.  There is a half of a percent

19  per annum facility fee which is calculated based on $35

20  million and not the entire $50 million facility.  I think

21  that equates to approximately 175,000 a year, actually

22  exactly 175,000 a year.  There's a one percent commitment fee

23  on the $50 million facility, and there's a $50,000 per year

24  administrative agent fee.  Your Honor, the agreement and the

25  order contain certain, what I would view, as standard events

1  of default.  I won't go through them all, but includes

2  failure to pay principal and interest when due, failure to

3  provide certain reporting, otherwise complying with the

4  agreement.  If a final order is not entered by September 7th,

5  the cases are dismissed or converted, and a number of other

6  standard default provisions that are set forth in section 8

7  of the credit agreement.  Your Honor, the order also provides

8  that the automatic stay is modified and vacated so that in

9  the event of default, the DIP lender may be permitted to

10  proceed with its rights and its remedies under the agreement

11  upon giving five business days' notice to the borrowers and

12  there are limitations in the order on the issues that could

13  be raised and a challenge to a default notice.  Your Honor,

14  the debtors believe that the DIP facility is fair and

15  reasonable and in the exercise of their prudent business

16  judgment, believe that it is necessary for the debtors to

17  proceed with this facility to provide the liquidity it needs

18  to get through this process.  Your Honor, I would note, in

19  connection with Local Rule 4001-2, I don't believe any of the

20  provisions we've included require special disclosure.  Again,

21  there is a 506©) waiver provision to be included in a final

22  order, but I believe we have addressed all those issues

23  before we filed the pleadings.  Your Honor, I don't know if

24  you have any questions or whether you'd like to turn to the

25  changes in the order.  I did hand up some changes to the

1  credit agreement as well, and I don't want to belabor the

2  record if Your Honor doesn't want to hear them.

3      THE COURT: I didn't read the credit agreement.  I

4  didn't have time to read the credit agreement, I'm not

5  reading the credit agreement.

6      MR. WAITE: Okay.  Duly noted, Your Honor.

7      THE COURT: The order controls.

8      MR. WAITE: Thank you, Your Honor.

9      THE COURT: Although I was troubled that the events

10  of default weren't in the order, that they're in the credit

11  agreement; is that correct?

12      MR. WAITE: They are in the credit agreement, yes.

13      THE COURT: And they're not in the order, all right.

14  Well we are going to go through them then.  You'll have to

15  point those out to me at some point.  Do you want to turn to

16  the order first?

17      MR. WAITE: Yes, we can do that, Your Honor.

18      THE COURT: All right.

19      MR. WAITE: Your Honor, on page 2 there are just a

20  couple minor, I would call, clarifying changes.  Does Your

21  Honor have the blackline?

22      THE COURT: Yes.

23      MR. WAITE: Your Honor, on page 3, we've corrected a

24  date, a couple of dates, and a typographical error on the

25  bottom.  I think we had the wrong date for one of the loan

1    documents.  Your Honor, on page 4, we've modified the

2    definition - included definitions for DIP liens and DIP

3    collateral just to avoid confusion between that and the liens

4    and collateral of the pre-petition agent.  And you'll see the

5    references to the DIP collateral you'll see throughout the

6    document.  Page 6, just a typographical correction.  Page 7,

7    we've included at the beginning of that section, "subject to

8    the provisions of paragraph (9) hereof", that's to pick up

9    the limitations on exercising rights against BofA collateral

10   that are in paragraph (9) that had been negotiated between

11   the two lenders.  I think there's a couple of clarifying

12   changes on page 8.  And on page 9, there's substantial

13   changes.  I don't think it really changed the substance of

14   what was in the original order, but it was to clarify that in

15   connection with the negotiations between the lenders, there's

16   an agreement not only that there won't be an lien on the

17   collateral, BofA collateral, but with respect to pursuing any

18   administrative claim that the DIP lenders may have, that they

19   cannot proceed against the BofA collateral prior to them

20   being paid in full.  There's also an acknowledgment of the

21   liens granted and rights granted in the cash collateral order

22   to BofA.  Your Honor, the other changes on page 10 are just

23   definitional changes.  Same on page 11 -

24           THE COURT: Paragraphs (10) and (11), same issue I

25   had with the cash collateral order, and especially in a DIP

1  situation, these kind of provisions are fine as events of

2  default.  If someone tries to subject your collateral to a

3  junior lien or tries to do something to your collateral, I

4  don't have any issue with it being an event of default.  You

5  can declare an event of default.  The debtor gets two or

6  three business days to come in here and try to save the world

7  or save the case, and if they don't do it, you get it

8  foreclosed, but I have a problem with these types of

9  provisions that prevent the debtor from taking action or

10 purport to prevent the Court from taking action because I can

11 imagine a situation where the debtor may be required in

12 exercise of its fiduciary duties to try to do the types of

13 actions that the order purports to say they can't do or the

14 Court, upon application of a party in interest, may want to

15 grant this relief.  So, I'd rather have and I'm not going - I

16 think I'll approve it for purposes of the interim order

17 again, because I can't imagine much happening along these

18 lines between now and the final order status, but these types

19 of provisions should really be events of default.  They

20 shouldn't be prohibitions against the debtor or the Court

21 taking action.

22      MR. WAITE: I understand the Court's comments, and I

23 appreciate your approving it on an interim basis.  I will

24 note for the Court that this was part of our negotiation.  It

25 was part of the bargain for exchange, and we thought it was

1    appropriate in the context of this case where we have a new

2    lender coming in and lending into a liquidation process, and

3    they thought it was important to them lending into a process

4    where we are selling the company's assets and liquidating the

5    assets of the estate in the event they're creditors, that if

6    they're going to fund that that someone else not be able to

7    come in and upset those rights, and so that's why we agreed

8    to it, and we think it's appropriate, but I understand Your

9    Honor's comment, and I suspect we'll revisit it at the final

10   hearing.

11          THE COURT: I mean, I'm not saying that the lender

12   has any bad motive.  There's always a good reason to try to

13   do it, but it's not permitted.

14          MR. WAITE: Understood, Your Honor.

15          THE COURT: And I'll just point out a few more.

16   This should really be events of default.  Paragraphs (13),

17   (16), (17), and (18) -

18          MS. RYLAND: Your Honor, would you like to have

19   those go first and then have me respond, or -

20          THE COURT: You could -

21          MS. RYLAND: Just so that I could understand your -

22          THE COURT: Sure.  Let's finish turning the order

23   and then I'll hear anybody as long as they want to speak.

24   I've got nowhere to go.

25          MR. WAITE: Your Honor, then just focusing on the

1  changes and then we'll come back to those questions -

2         THE COURT: Yep.

3         MR. WAITE:  - the Court had.  On page 11, there's

4  just some definitional changes.  Page 12, again, definitional

5  changes and some clarification with respect to permitted

6  means.  Same on 13, definitional changes, and 14.  Page 15,

7  we've included counsel to BofA as a noticed party on the

8  events of default, and added the provision in to reflect that

9  the remedies granted to the DIP lender here are subject to

10  the provisions of paragraph (9), which are the agreements

11  reached between the two lenders.

12        THE COURT: All right.  There's a provision we're

13  going to have to - the proviso in the sentence immediately

14  prior to the sentence you've added has to be struck.  I'm not

15  approving that.

16        MS. RYLAND: I'm sorry, which -

17        MR. WAITE: This is in paragraph (23) at the top of

18  page 15 of the blackline.  You're referring to the -

19        THE COURT: Provided that in any hearing related to

20  the giving of any such notice, the only issues that may be

21  raised by any party, et cetera, et cetera - I'm not limiting

22  that.  Anybody can raise any issue at that hearing, not just

23  whether or not the event of default occurred or is

24  continuing.  I have no problem with obviously the new

25  language.

1         MR. WAITE: Your Honor, on page 7 - I'm just going

2    to go through the rest of the changes and then we can come

3    back to the comments.

4         THE COURT: And you have the right to, you know,

5    argue with me.

6         MR. WAITE: Your Honor, just clarifying changes on

7    (17) and (19), paragraph (20), we just basically made part of

8    that paragraph a separate subparagraph just for ease of

9    reference in another section.  The same in paragraph (32) -

10        THE COURT: Yeah, let me, while we're on (32), I

11   understand the notice is fine, but don't they need an

12   opportunity to object?  And by that I mean to the attorney's

13   fees.  Along the lines of the same issue we have with - the

14   way it was resolved with the cash collateral was acceptable.

15        MR. WAITE: Okay, Your Honor.  Your Honor, I think

16   that covers the changes in the order.

17        THE COURT: Show me your events of default in the

18   DIP agreement.

19        MR. WAITE: Your Honor, the DIP agreement is

20   attached to the motion -

21        THE COURT: I've got the blackline.

22        MR. WAITE:  - and the events of default of the

23   blackline - we just gave you the blackline changed pages,

24   Your Honor.

25        THE COURT: Oh, you didn't give me the whole thing?

1        MR. WAITE: We didn't want to kill anymore trees

2   than we had to, Your Honor.  I apologize for that.  Do you

3   have the original motion as filed?  I can direct you to the -

4        THE COURT: Yeah, I've got it.  What page?

5        MR. WAITE: It's page 61 of the credit agreement,

6   section 8, events of default.  They go A through W, Your

7   Honor, a couple of pages.

8        THE COURT: Okay.  Let me just look at them real

9   quick.

10       MR. WAITE: Very well, Your Honor.

11       THE COURT: All those provisions in section 7 deal

12  with the timetable for liquidation, I assume?

13       MR. WAITE: There are no milestone events of

14  default.

15       THE COURT: Oh, there are not, okay.  Oh, other

16  covenants - all right, I see.  Okay.

17       MR. WAITE: Your Honor, I will note on the blackline

18  that we handed up there was one change in one of the events

19  of default.  There was a one, I guess, code section

20  reference, but in item L, there's new language and that is

21  designed to make it clear that with respect to an event of

22  default under another indebtedness which would create a

23  cross-default, it's limited to those in excess of $100,000

24  and it carves out any defaults related to any of the repo

25  agreements.

1    THE COURT: All right.  Okay.

2    MR. WAITE:  Your Honor, with that, unless you have

3  any other questions for me, maybe we can check and see what

4  if any objections we have outstanding.

5    THE COURT: Yes.  Anyone wish to be heard?

6    MR. ACKERLY: Your Honor, Ben Ackerly on behalf of

7  Calyon.  I have two points.  In the term sheet which is

8  attached, on page 20 there's a new definition of repo

9  disposition, and then there's a provision that on any repo

10  disposition the lender gets 50 percent of the net cash for

11  repo disposition, as I read it.

12    MR. WAITE: Your Honor, maybe I can explain that.

13  We built into this the concept in connection with discussion

14  of various of the lenders, we were going to be disposing of

15  various assets, and it is possible, and we are hopeful that

16  we will reach agreements with certain of the repo lenders to

17  dispose of their assets in connection with the process we

18  were undertaking and what this is designed to do, that if we

19  undertake that type of sale process and there are net

20  proceeds above and beyond the amounts that are owed to the

21  repo lenders, which is a residual asset of the estate, that

22  would - 50 percent of that would be used to pay down the

23  facility, but we are not, by these definitions, affecting

24  whatever repo rights they have and that language in the order

25  will control.  So it was just a deal with a situation where

1  we might engage in a sale process that would include repo

2  rights, obviously that would involve some negotiation with

3  those parties.

4        THE COURT: All right.

5        MR. ACKERLY: Your Honor, on that point, if I could

6  suggest just a minor change to the definition of repo

7  disposition to make it clear that it only applies to post-

8  petition disposition by the debtors.  So there's no confusion

9  it would apply to any other disposition.

10        MS. RYLAND: Your Honor, that's not acceptable to

11  us.  The rights are what they are.  We're not here to have

12  him expand his rights.

13        MR. WAITE: Again, Your Honor, we're not trying by

14  this to change whatever rights the repo parties have.  We

15  have the provision in paragraph (37) of the order that does

16  that.  If we do sell repo rights and there's excess value,

17  and it only applies if there's excess value above and beyond

18  what they're entitled to, then we've reached agreement on how

19  that will be impacted under the DIP facility.  That's all

20  this does.

21        MR. ACKERLY: Your Honor, I'm more concerned than I

22  was when I got up here now because, I mean, this definition

23  could be meant to apply to a non-debtor party to a repo

24  agreement doing a repo disposition, and there's certainly no

25  way that that should be subject to the lien.

1          THE COURT: Where in the -

2          MR. WAITE: This is on page 20 of the blackline.

3          THE COURT: No, where - That's just the definition

4     of repo disposition.  Where is the provision of the loan

5     agreement that actually incorporates the definition.

6     Paragraph?

7          MS. RYLAND: Perhaps it would simplify things if I

8     point out in paragraph (37), we reserve all the rights of

9     repo participants.

10          THE COURT: Well, let me just read the provision.  I

11     told you I didn't want to read this.

12          MS. RYLAND: Well, the order governs anyway.

13          THE COURT: Yeah.  Has 206 changed or is it the

14     original language?

15          MS. RYLAND: That's the original language, Your

16     Honor.

17          THE COURT: The original, okay.

18          MR. WAITE: Your Honor, maybe it would help if I -

19     I'm sorry.

20          THE COURT: I don't see repo disposition in there.

21          MS. RYLAND: Your Honor, I've been told their

22     concern is that they don't want these provisions to affect

23     property that's not property of the estate.

24          THE COURT: I was reading the wrong provision, I'm

25     sorry.  Hang on just a moment.

1          MS. RYLAND: It may simplify -

2          THE COURT: I don't see anything in this DIP

3    agreement authorizing them to do a doggone thing with the

4    repo agreement.  You're not a party to the contract.  All it

5    says is if they do something what happens to the proceeds.

6    It doesn't authorize them to do the activity you're concerned

7    about.  And the order says they can't.

8          MR. ACKERLY: Your Honor, I think the concern can be

9    resolved simply by making it clear that the collateral only

10   is property of the estate.

11         THE COURT: They can't - If it's not property of the

12   estate it can't be collateral by definition.  I don't even

13   have jurisdiction over it if it's not property of the estate,

14   so even if I wanted it to be collateral, there's nothing I

15   can do about it.  It is - Let me just say this, this will

16   apply in any case I ever have.  If it's not property of the

17   estate, the debtor can't offer it as collateral.  I mean, I

18   don't know how to respond to that, sir.  I know your position

19   is it's not property of the estate.  They're position is it

20   isn't - it is, excuse me, but -

21         MR. ACKERLY: My concern in this, Your Honor, is

22   they're using a very broad definition of repo disposition.  I

23   understand your point, but I mean, we're dealing with a

24   document that it would be very simple to clarify that point.

25   I understand you don't have authority to approve a lien on

1  something that's not property of the estate, but this could

2  be read to include that.  That's all I'm saying.

3      MR. WAITE: Your Honor, the reason we added this

4  provision was to make it clear that if there was a

5  disposition or repo assets and there was a residual value in

6  that disposition, that residual value is property of the

7  estate and this specifies how we're going to deal with that.

8  There's another definition in the document regarding

9  permitted dispositions, and it requires lender consent to

10 certain dispositions, and we wanted to make sure we carved

11 out of that any repo dispositions so that we could proceed

12 with certain agreements with certain of the repo lenders if

13 we wanted to and the exchange for carving that out was a

14 provision that if we received net proceeds, which is estate

15 property, then we would use 50 percent of that to pay down

16 the DIP facility.  That's what these provisions were designed

17 to do.  I hope that clarifies things.

18      THE COURT: Well, let me see if I can clarify it.

19 My understanding what this agreement does is it says that in

20 the event that there is something called a repo disposition

21 that the debtor gets its hands on, it's going to be split

22 50/50 between the debtor and the DIP lender; right?  Have I

23 got it wrong?

24      MR. WAITE: Well, I wouldn't say split 50/50.  Fifty

25 percent is going to be used to pay down the DIP.  The other

1    50 percent the estate would be able to use.

2         THE COURT: All right, but there's nothing in this

3    agreement, there's nothing in this order that authorizes you

4    to do the repo disposition.  That's subject to further court

5    order or if you have the position that it would be within the

6    ordinary course of business and if you want to take that

7    position, you can proceed according.

8         MR. WAITE: That's correct, Your Honor, and that's

9    what paragraph (37) of the order is meant to deal with.

10   We're not affecting the repo rights to the extent they exist.

11        THE COURT: All right.  I overrule the objection.

12        MR. WAITE: Thank you, Your Honor.

13        THE COURT: Mr. Bray.

14        MR. BRAY: Your Honor, at the risk of . . .

15   (microphone not recording).

16        THE COURT: No, nobody gets their head chopped off.

17   I apologize if I was -

18        MR. BRAY: What I understand is that we may have a

19   disagreement about what is property of the estate and what is

20   not property of the estate.  If, for some reason, the debtor

21   is involved in a repo transaction but my interpretation of my

22   documents is that all the money is mine until I've been paid

23   in full.  There may be a dispute about whether there's any

24   excess value, call it residual value or whatever you want to

25   call it after the fact, and who owns that, but for the sake

1    of argument, just assume that all of the money, residual or

2    not, belongs under my facility to ABN.  If the debtor was for

3    some reason involved in a repo transaction, this document

4    would not permit the DIP lender to receive 50 percent of the

5    excess money because the money belonged to me.  I think what

6    I heard you say is if it's property of the estate and it's a

7    residual interest that belongs to the estate, that 50 percent

8    of the estate's interest would be paid to the DIP lender

9    under the DIP documents.  Is that right?

10          THE COURT: My understanding.  Mr. Waite?

11          MR. WAITE: Your Honor, this DIP agreement and this

12   DIP order don't authorize any asset dispositions, estate or

13   otherwise.  All this provision was meant to do was to provide

14   if there was an asset disposition and if it's not property of

15   the estate, we have no right to dispose of it, but if there

16   was an asset disposition involving a repo and there was

17   excess value, this provision sets forth how that excess value

18   which belongs to the estate is to be split in terms of paying

19   down the DIP and remaining in the estate for other purposes.

20          THE COURT: That's my understanding.  Mr. Bray, is

21   that -

22          MR. BRAY: Where we're parsing words is that in the

23   repo transaction, the debtor may be involved in the entire

24   transaction even though the money could end up belonging to -

25   in my case, to the purchaser or ABN - again, I'm just trying

1  to be clear that it's the debtors' interest in the property

2  that the DIP lender is entitled to not the counter-party or

3  the other party's interest in the property.

4          THE COURT: That's a tautology, of course.

5          MR. BRAY: Okay, I thought so too, but we seemed to

6  be -

7          THE COURT: I can only say it as clearly as I can

8  say it.  If it's not property of the estate, it's not

9  affected in any way by anything I do.

10          MR. BRAY: And that's all it takes, Your Honor.

11          THE COURT: I just can't, you know - and I

12  understand there are arguments about whether or not it's

13  property of the estate.  We'll deal with that at a different

14  time.

15          MS. FIFE: Now, you're going to chop my head off.

16          THE COURT: No, no.

17          MS. FIFE: Because I understand that there are

18  arguments as to whether this is property of the estate of

19  not, is why I'm coming up here.

20          THE COURT: Sure.

21          MS. FIFE: Because, to the extent that we all lose

22  the argument that repo is in fact property of the estate,

23  then what happens is, that the transaction gets re-

24  characterized as a secured loan, and in that event, we have a

25  first lien on the collateral which is mortgage loans.

1        THE COURT: Understood.

2        MS. FIFE: So, to the extent that the debtor sells

3   those loans, we get the proceeds in full.

4        THE COURT: Response?  I mean, my understanding is

5   that your DIP liens are junior preexisting valid liens, and

6   regardless of whether repo disposition is defined one way or

7   not, until the proceeds of that collateral go to, actually

8   has a senior interest, you don't have any interest in it.

9        MS. FIFE: That's fine.  Thank you, Your Honor.

10       THE COURT: You're welcome, and I don't know how

11  Judge Gross does it.  No one ever gets mad at him.  Anybody

12  else?

13       MR. FALGOWSKI: We have one more, Your Honor.  Cory

14  Falgowski for Freddie Mac.  Your Honor, as I had said

15  previously, Freddie Mac is, you know, taking the position

16  that the servicing agreement was terminated pre-petition, and

17  therefore, that the servicing rights related to those loans

18  are now property of the estate.  I just wanted to clarify

19  that Freddie Mac's joining each of the reservation of rights

20  that had been put on the record today for similarly situated

21  parties, and also just wanted to clarify that the Freddie Mac

22  servicing rights are not DIP collateral and also that the DIP

23  order is not a finding that the Freddie Mac servicing rights

24  are property of the estate.

25       THE COURT: Your reservation is noted.  That's fine.

1    I still need to talk to the DIP lender, I think.  Which

2    entity got the judgment in Texas?  Was that Freddie Mac?

3             MR. WAITE: Yes, Your Honor.

4             THE COURT: All right.  Mr. McMahon.

5             MR. McMAHON: Again, Your Honor, we raised a number

6    of language issues which I'll reserve and try to address

7    before the final hearing. I do want to note one issue.  In

8    paragraph (7) I believe that the lenders are getting a super-

9    priority claim with respect to the proceeds of avoidance

10   actions under that section and given that they're not taking

11   a lien with respect to avoidance actions becomes, I guess,

12   half a victory for purposes of this order.  We're happy to

13   address the concern today or at the final hearing, whichever

14   way the Court would like to proceed.

15            THE COURT: Well, it's, you now, it's six of one and

16   half a dozen of the other.  Whether they get a lien and don't

17   get the super-priority claim or they get the super-priority

18   claim and don't get the lien.  There are distinctions, but

19   frankly, they're lost on me.

20            MR. WAITE: Well, Your Honor, I don't think you get

21   a super-priority claim in anything.  You get a super-priority

22   claim which means you come -

23            THE COURT: Yeah, I understand.

24            MR. WAITE:  - I'm first in the order of the

25   unencumbered assets, which would include avoidance actions.

1      THE COURT: Right, but no one else has a lien,

2  unless it's you, on the avoidance actions, so it's - you

3  share *pari passu* with all other super-priority claimants, but

4  there are none.  So, it's the same thing.  The only

5  difference is, it's who gets control of the disposition of

6  the collateral which is, i.e., the actions.

7      MS. RYLAND: Well, I think, if this is what you're

8  saying, Your Honor, you're absolutely right.  The critical

9  difference is, if it's not your collateral, you don't control

10  it, you can't contain it, it's run by somebody else.

11      THE COURT: Right, and I think the general rule here

12  is, is you get one or the other, and, you know, I - for

13  purposes of the interim order, I'll overrule the objection,

14  and we'll take it up at the final order.  Did you have any

15  other comments, Mr. McMahon?

16      MR. McMAHON: No, Your Honor, we'll reserve them for

17  final.

18      THE COURT: All right.  I have one more reservation

19  of rights, I believe, and then we'll talk to the DIP lender.

20      MR. ROVIRA: Good evening, Your Honor.  Alex Rovira

21  again from Sidley Austin representing Bear Stearns, EMC

22  Mortgage Corp., Liquid Funding, and Morgan Stanley Mortgage

23  Capital.  Reserving my rights again in respect to the repo

24  disposition, the residuals that the repurchase agreements are

25  allowed to go under their terms if the residual is to be used

1    for expenses that they be allowed to be used for expenses and

2    it's after that term that they have whatever rights the

3    debtors may have and whatever split terms it may have.  In

4    addition, in terms of the servicing agreements, that those

5    are honored and the terminations are honored, and whatever

6    residuals of the trust assets and trust accounts that I hold

7    for my client belong to my client.

8            THE COURT: Okay, thank you.

9            MR. WAITE: I'll just say it again.  Paragraph (37)

10   I think we dealt with this several times.

11           THE COURT: All right.  Yes, sir.

12           MR. ROVIRA: I apologize one more time.  The

13   language about the reservation of rights being included

14   therein are denied and overruled on this motion as well, this

15   order?

16           THE COURT: Yes.  Thank you very much, yes.  That

17   should be stricken.  I think for present purposes I made some

18   comments about paragraph (10), (11), (16), and (17) being

19   somewhat troubling.  Forget about (18), that's an issue for

20   the final order by its own definition.  Again, I mean, I'll

21   approve them for the interim order, but I'd really rather see

22   provisions like this as events of default as opposed to broad

23   prohibitions.

24           MS. RYLAND: If I may, Your Honor, particularly with

25   respect to paragraphs (10) and (11) as events of default they

1  come too late to protect the DIP lender.

2        THE COURT: Well, they -

3        MS. RYLAND: For instance if a third junior lien

4  attaches, it's a matter of default, but we've already been

5  damaged by then.

6        THE COURT: But they would have to seek court

7  approval.

8        MS. RYLAND: Right.

9        THE COURT: So, I think you could make the event of

10  default the seeking of court approval to authorize those

11  liens.

12        MS. RYLAND: As you suggest, Your Honor -

13        THE COURT: I mean, you could certainly make it a

14  covenant that they not allow mechanics liens or any other -

15  and you probably already have, any other sort of type of lien

16  to -

17        MS. RYLAND: Well, we actually have permitted liens.

18  We do allow certain liens that are important, you know, for

19  the ongoing -

20        THE COURT: Well, you can talk me out of it at the

21  final hearing, maybe.

22        MS. RYLAND: Particularly the anti-layering

23  language, Your Honor, is absolutely critical to our client,

24  because just as Mr. Waite pointed out, we're brand-new money

25  coming in here.  We have no skin in the game, and unless we

1  can get comfortable with what our collateral is, we're

2  getting a first on all unencumbered assets, but from

3  everything we hear, virtually everything is encumbered.

4  We're not getting a second on the evasive collateral which

5  is, from what I understand, a big chunk of the collateral.

6  So, you know, it's going to be very difficult for my client

7  to live with any kind of layering language.

8      THE COURT: Well, let me just - Why?  Because I mean

9  I understand the *pari passu* but what about junior.  It has no

10  effect.

11     MS. RYLAND: I'm sorry?

12     THE COURT: I understand not wanting a *pari*

13  *passu* lien or a senior lien.

14     MS. RYLAND: Right.

15     THE COURT: But why would your client have a problem

16  with it.

17     MS. RYLAND: Only because of the difficulties with a

18  junior lienor behind you as a creditor, as a secured

19  creditor.

20     THE COURT: Well, maybe in a private sale or a state

21  court sale, but in Bankruptcy Court that's not going to be an

22  issue; is it?

23     MS. RYLAND: My clients are very concerned about it.

24     THE COURT: All right.  All right, I understand your

25  issue.  Did you have any other -

1          MS. RYLAND: Just wanted to walk you through

2    essentially clean up/typo changes.

3          THE COURT: All right.

4          MS. RYLAND: The first is on page 3.  We're going to

5    insert the hearing date of August 7.

6          THE COURT: September 7th.

7          MS. RYLAND: No, no, no.  This is today's hearing.

8          THE COURT: Oh, today's date, all right.

9          MS. RYLAND: Today's hearing.

10          THE COURT: Is today the 7th?  Yeah.  Sorry.

11          MS. RYLAND: Lucky 7.  On page 4, the blackline

12    language says "on the collateral as term", we're going to

13    insert the words "as such term is defined".  On page 5, at

14    the very bottom, we're going to strike the reservation of

15    rights as we've agreed.

16          THE COURT: Okay.

17          MS. RYLAND: On page 8, the language that is

18    stricken starting on the 4th line at the bottom, that was an

19    accidental deletion.  We're going to need to put that back

20    in.  As I say, we're getting a second lien on property that's

21    encumbered by preexisting liens.

22          THE COURT: All right.

23          MS. RYLAND: On page 9, just a syntax matter.  In

24    the blacklined language about ten lines down, there's

25    references to paragraphs (9), (34)(b) and it should read "or"

1  - (30)(b) or (34)(b).

2          THE COURT: Okay.

3          MS. RYLAND: And a few lines further than that,

4  immediately prior to the definition of the cash collateral

5  order, we're inserting "together with any final order entered

6  in respect thereof".  So the cash collateral order will be

7  used to reference any cash collateral order.  I misspoke on

8  the record.  The document refers to (32)(b) in paragraph (9),

9  and that's what was intended.  So it would read, "paragraphs

10 (9), (30)(b), or (32)(b)" of this interim order.  On page 22,

11 we're adding section 556 for the reservation of rights under

12 those special code provisions.

13         THE COURT: Okay.

14         MS. RYLAND: And then on page 23, we're just

15 inserting the date of the final - date and time of the final

16 hearing and the objections.

17         THE COURT: Okay.  August 27th and September 4.

18 Okay.  Anything else?

19         MR. WAITE: Your Honor, I think that's it on the

20 DIP.  We'll make those changes in a - mark those changes on a

21 clean copy of the order.  I promise I will not do the

22 writing, and while we move on with the next matter and if we

23 can hand the order up after that matter, Your Honor?

24         THE COURT: That's fine.  I'll approve it as

25 modified.

1          MR. PATTON: I'm the beginning and the end, Your

2     Honor.

3          THE COURT: The alpha and omega.

4          MR. PATTON: Your Honor, we have on the agenda two

5     remaining items with respect to the debtors' motions and then

6     we have one final item that I understand from Your Honor is

7     going to be a scheduling matter with respect a CSFB

8     application.  With respect to the debtors' items, these are

9     items 13 and 14 on the agenda.  They are both applications

10    relating to sale procedures we'd like to initiate.  With

11    respect to number 14, over the course of this morning and

12    afternoon, the company's professionals and officers have been

13    reevaluating through discussions with a variety of parties

14    what the best way to proceed is with the assets we sought to

15    sell.  Under item 14 these are miscellaneous loan assets, and

16    we're going to not present that motion today.  It appears

17    that there may be a better way to approach this particular

18    problem.  These are assets, however, that need to get sold

19    quickly, so we will be back shortly to address that

20    particular asset bundle.  So that means that with respect to

21    our presentation we're left with item number 13, and item

22    number 13, Your Honor, is an application for authority to

23    initiate a sale process and auction process with respect to

24    the company's servicing business.  We've heard a lot about

25    that today.  Obviously, I talked about it at some length in

1    my opening remarks, and we've just spent a fair amount of

2    time with respect to the cash collateral application and

3    talked about BofA's rights with respect to servicing, and

4    this is the bundle of assets that generate the cash

5    collateral that supports the BofA facility, and these

6    servicing assets are assets that we believe we need to sell

7    as quickly as possible.  What we're asking the Court to do

8    today is somewhat limited in a sense that we're not asking

9    for extraordinary relief in any way other than setting a

10   relatively aggressive timetable.  Let me explain why, if it's

11   not obvious from the facts we've presented so far.  This

12   asset, as I said in my opening remarks, is a wasting asset.

13   Each day that goes by represents a day that we're not

14   replenishing the mortgages that are being serviced by

15   servicing.  Over the course of a year, the servicing asset,

16   if it's not replenished, will dwindle by between 20 and 30

17   percent.  In rough terms, that means that we're losing a half

18   a percent of value every week.  That's what's spurring us on.

19   Additionally, as I outlined, as each week goes by, we're

20   supporting a staff and supporting intra-structure that's just

21   consuming assets of this estate.  We've concluded that this

22   needs to be sold quickly.  We've wrestled with what we think

23   is an appropriate timetable for getting it sold.  As I've

24   said, we've started the process of trying to find a buyer,

25   and what we're asking the Court to do today is to establish a

1    timetable that lets us conduct an auction in the first part

2    of September and then - which we specifically, on September

3    10th, which is a Monday and then in the week after that have a

4    hearing to approve a sale to whoever is the successful

5    winning bidder at that auction.  The motion asks the Court

6    also to set some additional deadlines and also to approve

7    some bid procedures.  We've been in discussion with a number

8    of parties about this application, and we've agreed to a few

9    changes.  For example, Bank of America asked us to make a

10   global change.  Everywhere where we say the debtor reserves

11   the right to modify the bid procedures at its sole discretion

12   or at its discretion, we're going to replace the phrase "sole

13   discretion" or "its discretion" with "after consultation with

14   BofA".  Additionally, we've added language to the order, and

15   perhaps I should hand it up and distribute it to reflect some

16   of the changes that we've seen in other orders to try to

17   protect parties' interest, and if I may approach, Your Honor?

18        THE COURT: Yes.  Hold on, let him finish.  Thank

19   you.

20        MR. PATTON: The change to the order is rather

21   simple.  If you'll turn to the last page, paragraph (16) was

22   a reservation of rights provision that we've deleted and

23   replaced with the language that we've been using that I think

24   now requires us to also add § 556, but it's the reservation

25   of rights language we've been using.

1          THE COURT: Where is that?

2          MR. PATTON: I'm sorry, it's the very last

3     paragraph, bottom of page 6, carryover to page 7 on the

4     blackline there.

5          THE COURT: All right.

6          MR. PATTON: Your Honor, apart from that change, and

7     pointing that out to Your Honor, let me just talk a little

8     bit more about what the application is seeking, what I think

9     the only real challenge to granting the application today

10    might be.  As I said, the application principally sets some

11    broad rules and some deadlines for the conducting of the

12    auction.  We're asking for an approval of a procedure that

13    sets a bid deadline of September 6th at 4 o'clock that

14    requires a minimum deposit of $5 million, that sets an

15    auction to be held on September 10th at 10 o'clock, and of

16    course leaves a blank for the hearing date on a date

17    thereafter.  Imbedded in the procedures also is a

18    requirement, for example, that the incremental bidding be one

19    million, and that a successful bidder has to come forward

20    with 10 percent of the purchase price, all of which is

21    relatively unremarkable.  The part that is at all

22    controversial with respect to this and is an issue that's

23    been raised by the U.S. Trustee is whether we should approve

24    it now or whether we should wait a week for the Committee to

25    be formed and then some period of time after the Committee is

1    formed for the Committee to evaluate the appropriate

2    timetable for selling these assets.  We've concluded that

3    that's not only imprudent but perhaps foolish given the

4    nature of the asset, and also given the nature of what we're

5    seeking today, which is to get the process started.  I think

6    we all know it takes deadlines to get things done, and it

7    takes schedules to get people focused, and we are simply

8    wasting the assets of this estate if we do not start down

9    this process, set some concrete procedures and deadlines to

10   focus the attention of potential bidders and the company on

11   disposing of these assets.  There's nothing that's going to

12   happen in the context of this procedure that couldn't be

13   altered if a Committee chose to alter it after coming to Your

14   Honor and asking this Court to make that alteration, but on

15   the other hand, if we don't set some deadlines and commit our

16   resources toward meeting those deadlines and commit people

17   who are interested in purchasing these assets to focusing on

18   these assets and pursuing these assets in the context of our

19   auction process, we believe we're simply wasting the estate's

20   money running up costs, and if two weeks go by, we'll have

21   lost a percentage of value just by the simple ineluctable

22   mathematics with the way this asset runs off.  So, the

23   request is, as I said, a fairly straightforward one for a

24   non-stalking horse auction process and we're asking Your

25   Honor to set some deadlines and to impose some structure on

1    this process so that we can get started.

2         THE COURT: And the bid procedures specifically

3    provide that there'll be no bid protections.

4         MR. PATTON: That's correct, there's no stalking

5    horse component to this at all.

6         THE COURT: All right.  Does anyone wish to be heard

7    in connection with this matter?  Mr. McMahon?

8         MR. McMAHON: Your Honor, good evening.  Debtors'

9    counsel correctly stated, I guess, our objection, same

10   objection as with regard to the KERP.  We don't believe that

11   the matter should be going forward prior to a committee being

12   formed, and with respect to the issue of prejudice or somehow

13   that we're wasting estate funds or wasting an opportunity are

14   the words being used a lot, I would suggest that if we get

15   the Committee formed that Tuesday, subject to the Court's

16   availability, of course, a hearing could be held later that

17   week where the motion would be put out on notice with the

18   same timetable the debtors presently have proposed, and the

19   Committee will be able to weigh in in a meaningful way with

20   respect to that particular issue, meaning what the

21   appropriate deadline is with respect to marketing the assets.

22   I don't know what the Committee's position is going to be,

23   whether or not September 5th provides them an adequate

24   opportunity to pound the pavement, so to speak, to drum up a

25   buyer for this.  Lord knows the myriad of issues that the

1    Committee could raise with respect to the bid procedures.  I

2    think that that's the critical point for right now, Your

3    Honor, is that despite, you know, the claim of a need for a

4    timetable today, the reality is that putting this motion out

5    on notice isn't going to change, really won't affect the

6    debtors' focus in any meaningful way.  They'll have a motion

7    teed up with the deadlines set as they are in the binder

8    before Your Honor, and the Committee will have an opportunity

9    to speak at the appropriate time.

10            THE COURT: All right, thank you, Mr. McMahon.

11            MR. McMAHON:  Thank you.

12            MS. SCHONHOLTZ: Your Honor, Margo Schonholtz for

13    BofA.  We support the debtors' motion to start the bid

14    procedures today.  There's nothing that's going to happen of

15    substance with respect to these assets before a Committee is

16    formed, and they are using our cash collateral and not

17    generating any new business, so it truly is a wasting asset,

18    and we would appreciate the approval of the bid procedures.

19    There's no stalking horse.  There's no anything that would

20    affect anyone's substantive right, it's just getting the

21    process moving.

22            THE COURT: Thank you.  I'm going to overrule the

23    objection.  I'll grant the motion, the -

24            MR. TOP (TELEPHONIC): Your Honor, may I be heard

25    real quick?

1         THE COURT: Yes, you may.

2         MR. TOP: This is Frank Top on behalf of Wells Fargo

3    Bank as master servicer, and again, we don't have any

4    objection to a sales process for any of these assets, but

5    just getting back to Mr. McMahon's point, I think a little

6    bit of time would help make the bidding procedures and

7    process a lot more efficient.  A lot of folks on our side of

8    the table, those who oversee the servicing and all the

9    securitization trusts are going to be equally interested in

10   who the identity of those particular purchasers are and

11   whether or not they're going to be adequately able to service

12   these assets going forward.  We're also going to be concerned

13   about the process in which those assets are transferred to a

14   third party, and there could be some provisions incorporated

15   into the bid procedures themselves that would help provide

16   the information and the commitments necessary to enable

17   someone to make a decision prior to a September 10th date when

18   the auction's going to be held and then objections having to

19   be filed on that date with respect to the same thing.  Again,

20   we don't necessarily have any objections to selling the

21   assets to the right person with the right abilities that meet

22   the right qualifications under the terms of each of these

23   servicing agreements, but the process ought to include some

24   recognition of some of these things having to - these are

25   billions and billions of dollars in loans, and again, if the

1   process isn't handled correctly, a lot of value could be lost

2   to all these investors.

3          THE COURT: Well, I understand your comments, sir,

4   but, I mean, you can't deny that this entire industry is

5   hemorrhaging, and if nothing, certainly the proper concern

6   that the various parties have expressed tonight about - today

7   and tonight about reserving their rights and making clear

8   that their rights under the repurchase agreement, the

9   servicing agreement are protected, are certainly appropriate

10  and reflect the seriousness of the issue, but as I was going

11  to rule, the Court would normally not approve bid procedures

12  on day one of a case.  It's extraordinary relief, but I think

13  this debtor is in an extraordinary position.  It's not just

14  this entity that's in crisis, it's many other entities that

15  are in crisis, and I don't think the situation is going to

16  improve over time.  I'm not approving the substance of the

17  transaction.  All I'm doing is approving procedures.  The

18  Committee and any other party in interest has 30 days under

19  our Local Rules to seek reconsideration of any first day

20  order, including this order, and it does not shift the burden

21  of proof.  We'll have a hearing on it.  If we need to have a

22  hearing next week, we'll have one, and if there are positive

23  comments as to - and I do take, I think your comment is true,

24  it's often true for instance in perhaps a more mundane

25  situation where you're dealing with landlords who want to

1    know who the retailer is going to put in their stores and the

2    sooner you can let them know that information, then the

3    sooner they get to know whether their interests are going to

4    be, there should be adequate assurance of payment for

5    interest, for instance, the more likely you ought to have a

6    successful auction and sale hearing.  So I think you have

7    some very positive comments that I'm sure the debtors or the

8    Committee would be happy to incorporate, but I'm very

9    concerned about putting off this hearing.  I think the

10   debtors are in an extraordinary position, and I'm prepared to

11   approve the sale procedures.  Yes, sir.

12          MR. SCHILTZ: Your Honor, Todd Schiltz.  I am Mr.

13   Top's local counsel.  I wanted to make clear what our

14   position is because I'm not sure that it was - it's late in

15   the day, and I'm not sure we were all clear on exactly what

16   we we're looking for.  We're not asking for the process to be

17   put off indefinitely or put off at all, but we're

18   particularly concerned that the auction is going to occur on

19   September 10th and our objections to the auction process and

20   the sale and the sale process are due the exact same day, and

21   obviously the hearing is going to occur a few days subsequent

22   to that.  So what we're at least interested in is having some

23   time between the closing of the auction and the date by which

24   objections to the auction process and the sale are going to

25   be due.  That would then give us the time to figure out who

1    is the winning bidder and raise objections.

2              THE COURT: Where do you see an objection deadline?

3              MR. SCHILTZ: It's in there, Your Honor.  I

4    apologize, I -

5              THE COURT: Oh, I see it.  Mr. Patton, do you want

6    to address that issue?

7              MR. PATTON: Yes.  Your Honor -

8              THE COURT: You're also going to have - I'm not sure

9    what you want for a sale hearing.

10             MR. PATTON: Yeah, well, we need to pick a date, but

11   the target would be, obviously, after the 10th and presumably

12   the week of the 17th would be -

13             THE COURT: Oh, okay, good.

14             MR. PATTON:  - the ideal week.  Your Honor, what

15   the -

16             THE COURT: You run into the Jewish holiday.

17             MR. PATTON: Right.  With respect to the objection

18   deadline, obviously, if the objection is to the winner of the

19   auction, any issues with respect to that get addressed after

20   the auction.  The notion that's embedded in this is if you've

21   got an objection to process, it should be filed in, you know,

22   far enough in advance so that we can deal with that in the

23   context of the auction process itself, but if the issue is

24   who the buyer is, then, obviously, you can't address that

25   until you know who the buyer is, and -

1    THE COURT: Yeah, what I do with lease auctions is,

2  you know, if you have a cure objection, you give your cure

3  objection.  If you have an adequate assurance objection,

4  you've got to know who your winner is before it can be - a

5  deadline is appropriate, and if you squeeze the auction and

6  the sale too close together, I let people raise it at the

7  sale hearing without having to file a written objection.  In

8  this case I think I'd really prefer a written objection

9  because I expect -

10    MR. PATTON: Well, why don't we work backwards from

11  a hearing date and there is one other scheduling change.

12  Someone has asked that we make our deadline for disclosing

13  our potential cure amounts with respect to any contracts that

14  are to be assumed and assigned August 27th, and we've agreed

15  to get our notice out with respect to potentially - contracts

16  that may potentially be assumed and assigned and our estimate

17  of cure amounts and have that circulated by August 27th.  But,

18  Your Honor, the timing of the objections is - whatever works

19  for the Court.

20    THE COURT: You can have the 17th, 19th, or 20th.

21    MR. PATTON: For the hearing date?

22    THE COURT: Yeah.

23    MR. PATTON: Why don't we do the 17th and have

24  objections be the Thursday before the weekend.

25    THE COURT: That's fine.  Twelve noon, the 17th.

1          MR. PATTON: Twelve noon on the 17th, and if we have

2     objections in on Thursday by 4, that gives parties all the

3     way to that objection deadline to address process issues, and

4     then several days to address issues that are purchaser

5     specific.

6          THE COURT: Right.

7          MR. PATTON: And us a little time to deal with the

8     content of the objections before the hearing.  Subject to

9     whatever anybody else has to say, what I propose to with this

10    particular application, Your Honor, is clean up the order and

11    get it over tomorrow.

12         THE COURT: All right.  Mr. McMahon - or, I'm sorry,

13    sir, I forget your name, I apologize.

14         MR. PATTON: I apologize, if I may.  Just one other

15    promise I made that I need to put forward and that is that we

16    agree that we'll let the Committee - We will consult with the

17    Committee regarding the auction process and any changes that

18    may be proposed.

19         THE COURT: Yeah.

20         MR. ROVIRA: Good evening, Your Honor.  Alex Rovira.

21    Very quickly.  I know this is mostly procedurally, but our

22    concern is just with what actually is being sold here.

23    They're asking for the servicing rights and the servicing

24    agreements as they're scheduled or not scheduled.  So we

25    don't know whether those rights for the servicing agreements

1    are terminated, whether they're trying to sell those as well,

2    and whether which our agreements that are still alive are

3    included in that, so -

4         THE COURT: I understand, and they're not going to

5    tell you, not tonight.  But obviously your position and all

6    the reservations as to what can and cannot be sold are fully

7    preserved.

8         MR. PATTON: We intend to sell all our assets, but

9    if other people want to add assets, we're happy to sell those

10   too.

11        THE COURT: All right.

12        MR. PATTON: Your Honor, what I propose is, we turn

13   to the scheduling matter that's at the end of the agenda with

14   respect to CSFB application, and we're finalizing the DIP

15   order, and then, from our point of view, we'll have completed

16   the day.

17        THE COURT: Hang on.

18        MR. BOWDEN: Your Honor, again, good evening.  Bill

19   Bowden, Your Honor.  I take a moment to introduce and move

20   the admission *pro hac vice* of Rick Antonoff from Pillsbury

21   Winthrop, who is here on behalf of UBS Real Estate

22   Securities.  Just with one housekeeping matter on item 14 on

23   the agenda.

24        THE COURT: All right.

25        MR. BOWDEN: Thank you.

1          THE COURT: Yes, sir.  Item 14?  That's the one

2     that's not going forward.

3          MR. ANTONOFF: That's right and that's why it's a

4     matter of housekeeping.  Thank you, Your Honor.  I won't be

5     long.  UBS did have a concern about item 14 which I won't

6     burden the Court with since it's not on the calendar.  We'll

7     deal with the debtors directly.  My only question is whether

8     the debtors' intent to re-notice that with an opportunity to

9     object or it will just appear on an agenda?

10          THE COURT: Yeah, I was actually going to ask you,

11     Mr. Patton, whether you wanted to continue item 14 to another

12     date or you're simply going to re-notice it?

13          MR. PATTON: I'm going to re-notice it, Your Honor.

14          THE COURT: All right.

15          MR. ANTONOFF: Thank you, Your Honor.

16          MS. FIFE: Good afternoon, again, Your Honor - or

17     good evening, I guess.  Lori Fife from Weil, Gotshal &

18     Manges.  My partner Howard Comet is here as well.  We

19     represent Credit Suisse First Boston Mortgage Capital LLC,

20     and as you know, we filed a motion seeking a TRO yesterday.

21     I understand that Your Honor just wants to discuss scheduling

22     issues today.  We're very anxious to have this TRO heard as

23     quickly as possible.  I think it's pretty clear that the

24     issues relating to this TRO are essential to this case.  It's

25     come up on numerous occasions today, and in addition to that,

1   we believe that the asset is going to decline in value every

2   day.  As Your Honor pointed out, the industry is hemorrhaging

3   and there's a meltdown in the entire industry, so we're

4   particularly concerned.

5        THE COURT: Have you discussed scheduling with the

6   debtor?

7        MS. FIFE: No, we have not.

8        THE COURT: Mr. Waite, who's handling this - Oh, Mr.

9   Dorsey, of course.  I knew there was a reason you were here.

10       MR. DORSEY: First day hearings aren't evidentiary.

11  Litigators don't show up.

12       THE COURT: Yeah, I know.  What's your position on

13  scheduling?

14       MR. DORSEY:  It sounds like, from what we've heard

15  today, Your Honor - or tonight, Your Honor, that there's

16  going to be a lot of these motions being filed.  I don't know

17  if we can consolidate them someway.  Given what the Court has

18  heard tonight about the fact that these loans are being

19  serviced, the debtor still has its servicing business up and

20  operating, which is one of the things CSFB was alleging was a

21  part of their irreparable harm.  And there's no question the

22  servicing is being done appropriately and efficiently, and

23  all of the -

24       THE COURT: Well, I don't have any evidence -

25       MR. DORSEY: We don't have any evidence of that.

1        THE COURT: - one way or the other. So there may

2   be a question.

3        MR. DORSEY: And the fact that part of the relief

4   that they were requesting was that these funds be segregated

5   and the debtor has set up some separate funds for all of the

6   loan servicing agreements that they have. So, we don't see

7   there's any need to do this tomorrow morning, and I'd like to

8   see how many other people are going to object or raise TROs,

9   so that we can address them in a consolidated fashion.

10       MR. COMET: Your Honor, Howard Comet from Weil,

11  Gotshal. I did not think we were going to argue the merits,

12  which seems to be what Mr. Dorsey is doing. There is no

13  evidence on these issues, and we have filed papers already.

14  It is, I think, clear this needs to be decided quickly. The

15  debtors themselves need to have this resolved if they're

16  going to figure out what they're going to sell, and we are

17  prepared to proceed quickly. It does not have to be tomorrow

18  morning, but we would like to proceed this week on this

19  application.

20       THE COURT: How do you - the TRO, I mean, basically

21  we're going to - I assume no live evidence. It's just going

22  to be the declaration and oral argument or do you - How long

23  do you anticipate you're going to need for the hearing?  And

24  I assume the debtor is going to want to file a response prior

25  to the hearing.

1          MR. COMET: I would - We would certainly not be more

2     than two hours, but probably less than that, Your Honor.

3          THE COURT: All right, so I'll double that.  So,

4     four hours.

5          MR. DORSEY: And we're happy to proceed by affidavit

6     on that, Your Honor, without having the need for live

7     testimony which should save some time.

8          THE COURT: All right.  When's the formation

9     meeting, Mr. McMahon?   Tuesday the 14th?

10          MR. McMAHON: Tuesday at 10 a.m., Your Honor.

11          THE COURT: Does that create an issue for you, Mr.

12     Dorsey, if - you having to be in two places at once?

13          MR. DORSEY: It does not create an issue for me in

14     terms of scheduling, Your Honor, but it does raise an issue

15     about whether or not the Committee would want to weigh in on

16     this issue.

17          THE COURT: I know that's a long time.  I'm fitting

18     you in where I can, I'm sorry.

19          MS. FIFE: I don't see why this would take four

20     hours, frankly.  There's not much more to say other than

21     what's in our pleadings already.

22          MR. DORSEY: There is a factual dispute, Your Honor.

23     We will be submitting affidavits.

24          MS. FIFE: Yeah, but that's an affidavit.

25          THE COURT: What's the factual dispute, Mr. Dorsey?

1          MR. DORSEY: A factual dispute about whether or not

2     the alleged pre-petition termination actually occurred

3     property, whether it was noticed properly, whether there

4     actually was in fact a default under the agreement.  There's

5     a lot of factual -

6          THE COURT: Well, there was a margin call though;

7     correct?

8          MR. DORSEY: Correct.  Whether the margin call was -

9     whether there actually was a need for one, et cetera.

10          THE COURT: Right.  I apologize.  I'm in a

11     conference Friday and Saturday, which is why it's difficult

12     for me to, and I wouldn't go except I'm speaking.  I'm sorry,

13     the best I can do for you is August 14th.  I'll give you -

14     We'll start at 10 a.m. on August 14th.

15          MR. COMET: Your Honor, in light of that and Mr.

16     Dorsey's statements about a factual dispute, could we get the

17     answering papers a few days before so that we might have a

18     chance to consider whatever dispute he's claiming and perhaps

19     -

20          THE COURT: Can you get your answer by the end of

21     business on the 10th, Mr. Dorsey, and then they can file a

22     reply if any by noon on the 13th?

23          MR. DORSEY: That's fine, Your Honor.

24          MS. FIFE: Can I ask for another request.  That's a

25     long time, and we have absolutely, you know, no way of

1    knowing that they are segregating our monies, that they are

2    keeping proper records, that they are servicing our loans

3    properly.  You know, they can dispute all they want, but

4    we're entitled to those records.  It's ours.  I mean, at a

5    minimum, they should give us copies of the records, they

6    should give us an accounting of what monies they're holding

7    for us, and they should agree that they'll segregate the

8    funds.

9           MR. DORSEY: I'm happy to sit down with them, Your

10   Honor, and discuss all these issues.

11          THE COURT: I'm not going to make a ruling on the

12   merits before you have a hearing.  I'm giving you a hearing

13   as quickly as I can.  I appreciate it's eight days, and

14   that's unusual for a TRO.  Frankly, I'm fitting you in the

15   best I can.  Do you want to make a preliminary injunction

16   hearing at that time as opposed to a TRO, you can discuss it

17   amongst yourselves, but -

18          MS. FIFE: Thank you.

19          THE COURT: Mr. Dorsey is not always reasonable, but

20   is sometimes reasonable.  So, hopefully, he'll accommodate

21   your demands.

22          MR. COMET: Your Honor, I just have one thing to add

23   one thing to what Ms. Fife said.  I mean the agreement

24   expressly provides, quite aside from termination and

25   everything else, that we are entitled upon request to have

1  access to all the record and copies of them if we want even

2  if they continue servicing.  We've been denied that access,

3  so the notion that everything is clear, that they're doing

4  things properly, is entirely inconsistent with the way

5  they've treated us, and we hope - We'll speak to Mr. Dorsey

6  and hope -

7          THE COURT: But for the second time, I can't give

8  you - I'm not giving you relief on the merits today.  The

9  best I'm doing is scheduling it.  I did review your papers

10  this afternoon, so, I understand your allegations and the

11  seriousness of them.

12          MS. FIFE: Okay, thank you, Your Honor.

13          THE COURT: And that's your hearing.  That's nobody

14  else's hearing.

15          MS. FIFE: Okay.

16          THE COURT: If anyone else wants to file appropriate

17  papers, Mr. Dehney or anyone else, you can contact my

18  chambers to get a date.

19          MS. FIFE: Thank you very much, Your Honor.

20          THE COURT: But I can tell you, nobody's going to

21  get heard prior to the 14th.

22          MR. DORSEY: Thank you, Your Honor.

23          MR. WAITE: Your Honor, I believe I have the DIP

24  order with the inter-lineations.

25          THE COURT: Does it have - The agreement need to be

1    attached; right?

2              MR. WAITE: I don't believe we had it listed as

3    being attached.  I believe -

4              THE COURT: Well, I think you have to attach the

5    agreement.

6              MR. WAITE: Oh, you're right.

7              THE COURT: The revised one.

8              MR. WAITE: Yeah, I have the blackline pages.  I can

9    have it sent over very shortly, and I'll just submit it to

10   chambers; is that acceptable?

11             THE COURT: Yes, send it over.

12             MR. WAITE: Tonight yet?

13             THE COURT: I mean, it's not getting docketed until

14   tomorrow.  Do you want it dated today, I take it?

15             MR. WAITE: Yes, yes, we do.

16             THE COURT: All right, send it over tonight.  I'll

17   give you - Well, send it over as soon as you can.

18             MR. WAITE: I'll call back and have the order

19   brought over, but I apologize, Your Honor.

20             THE COURT: No, that's all right.

21             MR. WAITE:  I've been told I'm not allowed to sleep

22   until this is entered, and I'm ready to go.

23             THE COURT: Very well.

24             MR. PATTON: Your Honor, I think there's - I'm told

25   there's an unscheduled, un-agenda item, and I won't take

1  credit for anything more than that, but some folks would like

2  to talk to you, but after that, I think we're done.

3       THE COURT: All right.

4       MR. LANDIS: Your Honor, I'm approaching with some

5  trepidation as we head up toward six hours of first day

6  hearings, and I appreciate your indulgence.  For the record,

7  Adam Landis from Landis, Rath & Cobb here on behalf of JP

8  Morgan Chase.  I see Mr. Brady approaching slowly behind me

9  as well, and we do have an unscheduled, un-agenda item, and

10 I'll take five minutes, maybe even less, Your Honor.  JP

11 Morgan Chase is a warehouse lender in this case with a $200

12 million facility.  Rather than file a lift stay motion

13 seeking emergency relief with respect to a certain aspect of

14 that facility, we've reached out to the debtors very soon

15 after the petition was filed and tried to work out a

16 stipulation in connection with a very small portion of that

17 facility.  Of that facility, Your Honor $24 million of it is

18 used for construction to permanent loans.  This collateral of

19 JP Morgan Chase is in various states of building.  Draws get

20 made periodically so that the collateral houses owned by moms

21 and pops all over the place, so those houses can be completed

22 in construction.  If those draws are not made, obviously the

23 collateral diminishes immediately and irreparably.  Reason

24 being that you often get mechanics liens slapped onto the

25 collateral, other problems with the collateral just not being

1  finished and people walking off the jobs.  The debtors have

2  no ability to fund these 15 construction loans, and JP Morgan

3  Chase has stepped in and wants to be able to fund those loans

4  to protect its collateral.

5          THE COURT: Fifteen loans?

6          MR. LANDIS: Fifteen loans in a -

7          THE COURT: Not loan packages?

8          MR. LANDIS: No.  Fifteen individual loans in the

9  context of a $200 million facility.  The problem is these are

10  hard dollars that need to go out the door.  They are

11  construction loans, very different from your typical mortgage

12  on a completed house.  Your Honor, the debtor has been very

13  accommodating during this maelstrom of other events going on

14  in working out a stipulation with us.  We have tried to get

15  it by various parties, the DIP lender, BofA, and the U.S.

16  Trustee, who for obvious reason and understandable reason,

17  haven't really had a chance to weigh in on it.  What we would

18  like to do is be able to get that stipulation in front of

19  BofA in particular.  The DIP lender has seen it at least -

20  and given a cursory nod to it, and hopefully get it submitted

21  by certification of counsel tomorrow.  The debtors have

22  agreed to the provisions of the stipulation, which

23  essentially just allow BofA to directly fund or fund through

24  the debtor amounts - Excuse me, excuse me, I'm sorry.  Sorry,

25  Your Honor, it's late, it's late and I got Ms. Schonholtz to

1 stand right up.  Let me back up.  It would allow JP Morgan

2 and I heard from the gallery back there, that I got that

3 wrong too, so thank you - Will allow JP Morgan to directly

4 fund those loans or fund those amounts through the debtors

5 with certain protections so that the debtor would only be

6 acting as a conduit on those funds.

7           THE COURT: Have you filed this yet?

8           MR. LANDIS: We haven't filed a motion.  We have the

9 stipulation that we were hoping to be able to hand up, but

10 based on not getting BofA even to be able to be in a position

11 to take a look at it this evening, we determined that what we

12 tried to do, based on BofA's kind indulgence to take a look

13 at it first thing in the morning, that we'd be able to submit

14 it on certification.  So, that's kind of where we're at, Your

15 Honor.  I wanted to at least alert the Court to it.  We are

16 at a late hour.  This is critical relief because -

17           THE COURT: Well, let me ask you.  A little bit of

18 what you're asking me to approve a procedure on something I

19 haven't seen.  You've described it as best you can, but I

20 have no idea what it says.  I have no idea whether many of

21 these people might have a problem with it.  So I'm not going

22 to let you submit it under certification of counsel.  I'll

23 give you a hearing for this and this issue alone.  I can give

24 you Thursday at noon.

25           MR. LANDIS: Your Honor, we'll take Thursday at

1    noon.

2            THE COURT: File it as soon as possible, notice it

3    out.  Objections can be raised at the hearing.  No written

4    objection will be required.

5            MR. LANDIS: Okay, thank you very much, Your Honor,

6    I appreciate it.

7            THE COURT: All right.

8            MR. PATTON: Your Honor, I think that was a ruse to

9    try to let people put together what they needed for the DIP

10   order, but it failed.  I don't think we have it quite done

11   yet.  In any event, we will send the DIP over with the

12   agreement attached just as soon as possible.  It should be

13   here in just a minute.

14           THE COURT: Who are you going to use?

15           MR. PATTON: Did you say who am I going to use?

16           THE COURT: What delivery service are you going to

17   use?

18           MR. PATTON: It's going to be Craig Greer, I think.

19           THE COURT: All right.

20           MR. PATTON: He's on his way.  High-powered

21   delivery.

22           THE COURT: If you use Parcels, it will get here

23   Friday.

24           MR. PATTON: Actually the question is, I'm not sure

25   how long it's been since Craig showed up in this courtroom,

1   so it might take awhile, but -

2           THE COURT: All right.

3           MR. PATTON:  - in any event, Your Honor, we, I

4   think -

5           THE COURT: Just bring it directly to chambers and

6   hit the buzzer, and I'll let you in.

7           MR. PATTON: Very well, Your Honor, but thank you

8   very much for your indulgence.  We really appreciate your

9   time and attention and your patience with our chaos on this

10  side of the bench, but this has been a very important day for

11  the company, and we very much appreciate the time you've

12  given us.

13          THE COURT: Not a problem at all.  Is there anything

14  further for today?  Any questions?  All right, the hearing is

15  adjourned.  I'll await those orders by certification of

16  counsel or directly, and we'll reconvene Thursday at 12 noon.

17          ALL: Thank you, Your Honor.

18          (Whereupon at 8:38 p.m., the hearing in this matter

19  was concluded for this date.)


            I, Elaine M. Ryan, approved transcriber for the
United States Courts, certify that the foregoing is a correct
transcript from the electronic sound recording of the
proceedings in the above-entitled matter.

/s/ Elaine M.  Ryan                        August 13, 2007
Elaine M. Ryan
2801 Faulkland Road
Wilmington, DE 19808
(302) 683-0221