IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------ x
In re:                                                             :   Chapter 11
                                                                   :
AMERICAN HOME MORTGAGE HOLDINGS, INC., :   Case No. 07-11047 (CSS)
a Delaware corporation, et al.,                                   :
                                                                   :   Jointly Administered
         Debtors.                                                  :
------------------------------------------------------------------ x   **Hearing Date:  August 24, 2007 at 1:00 p.m. (ET)**
                                                                       **Objection Deadline:  August 21, 2007 at 4:00 p.m. (ET)**

**MOTION FOR AN ORDER, PURSUANT TO SECTIONS 105, 363, 365 AND 554
OF THE BANKRUPTCY CODE, ESTABLISHING PROCEDURES FOR THE (I)
ASSUMPTION AND ASSIGNMENT OF REAL PROPERTY LEASES AND/OR
OTHER EXECUTORY CONTRACTS AND (II) SALE OR ABANDONMENT OF
FURNITURE, FIXTURES AND EQUIPMENT LOCATED THEREIN**

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and

debtors in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] respectfully

represent as follows:

**SUMMARY OF RELIEF REQUESTED**[2]

1.      The Debtors were in the business of originating mortgage loans and

investing in mortgage-backed securities and mortgage loans resulting from the securitization of

residential mortgage loans that its various entities originate and service.  In the weeks prior to the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation
(3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979);
American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home
Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC
("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc.
("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York
corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except
for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

[2] Capitalized terms in this Summary shall have the meaning ascribed to them below in this Motion.

Petition Date, the Debtors operated hundreds of loan production offices in leased locations in 47

states and the District of Columbia (collectively, the "Production Offices").  On or about August

2, 2007, the Debtors discontinued their retail loan origination business in their Production

Offices.  The Debtors' Production Offices are no longer necessary to the Debtors' operations.

   2. By this motion (the "Motion"), the Debtors request that this Court enter an

order (the "Order"), pursuant to sections 105, 363, 365 and 554 of the Bankruptcy Code,

authorizing the implementation of expedited procedures to effectuate the assumption and

assignment of real property leases and other executory contracts related to their Production

Offices (collectively, the "Office Leases," attached hereto as Exhibit A)[3] and sale or

abandonment of the furniture, fixtures and equipment located therein (collectively, the "FF&E"

and with the Office Leases, the "Office Assets") that are no longer necessary to the Debtors'

operations free and clear of all liens, claims, interests and encumbrances (collectively, the

"Liens") with such Liens attaching to the sale proceeds of any such Office Assets to the extent of

their validity and priority immediately prior to the sale.

   3. Requiring Court approval of each Office Asset disposition would be

administratively burdensome to the Court and costly for the Debtors' estates, especially in light

of the value of the Office Assets that will be transferred in one transaction or a series of

transactions (each a "Sale," and collectively, the "Sales").[4]  The value of the Office Leases

diminish as the length of time that they remain empty increases, given that prospective buyers

will most likely be interested in rehiring the Debtors' knowledgeable former employees and in

---

[3]  The Debtors believe that the list attached as Exhibit A includes all Office Leases; however, the term "Office Lease" shall include any such leases or executory contracts that have been inadvertently omitted from this list.

[4]  The Debtors submit that they have been and will continue to take steps to collect and preserve any personally identifiable information located in the Production Offices consistent with applicable consumer privacy laws prior to any assignment.  Accordingly, the Debtors believe that a consumer privacy ombudsman is not required for the relief requested in this Motion.

taking advantage of the community's familiarity with the location as a home loan office. Failure to expeditiously sell the Office Assets could also result in excessive administrative burdens as postpetition monthly rent becomes due. Accordingly, the costs and delays associated with seeking Court approval of each individual Sale could substantially undermine the economic benefits of the transactions.

4.      Thus, the relief requested herein is necessary and in the best interests of the Debtors' estates and their creditors.

## JURISDICTION

5.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105, 363, 365 and 554 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

## BACKGROUND

6.      On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases are being jointly administered pursuant to Rule 1005(b) of the Federal Rules of Bankruptcy Procedure. Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      On August 14, 2007, the United States Trustee for the District of Delaware appointed The Official Committee of Unsecured Creditors (the "Creditors Committee"). No trustee or examiner has been appointed.

## THE DEBTORS' BUSINESSES[5]

8.      Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

9.      As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

10.     A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately

---

[5] A detailed description of the Debtors' business and related business information is set forth in the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief [D.I. 2].

066585.1001

$46.3 billion. AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

## EVENTS LEADING TO THE CHAPTER 11 FILING

11.     Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

12.     The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

13.     In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders -- the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

14.     On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

15.    The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business.  As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees.  The Debtors now employ approximately 1000 persons who are absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

16.    In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions.  Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

17.    Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

### SALE PROCEDURES

18.    The Debtors have been in contact with certain entities and anticipate that additional entities in the mortgage industry will contact the Debtors and express interest in taking immediate control of certain of the Debtors' Production Offices.  For example, on August 10, 2007, the Debtors filed motions seeking approval of a license agreement and the assumption and assignment of approximately 87 Office Leases and sale of the FF&E located in such Production

Offices to Indymac Bank F.S.B.  The Debtors believe that there may be other potential

purchasers willing to acquire certain of the remaining Office Assets.  As such, the Debtors

believe that implementing a procedure to allow for the swift transfer is required to maximize the

value of the Debtors' interest in the Production Offices.

19.     If contacted by a prospective purchaser for a particular Production Office

or group of Production Offices, the Debtors propose to work with the landlord (i) to reconcile

any potential cure amounts under the Lease, and (ii) to obtain consent with respect to the

proposed assignee.  Upon landlord consent, the Debtors propose to adhere to the Sale Procedures

(as defined below) to effectuate an expeditious Sale.  If consent is not attained, the Sale

Procedures will provide the Debtors with the ability to seek an expedited Court hearing to

consider approval of the Sale over the landlord's objection.

20.     Accordingly, the Debtors request that the Court enter an order authorizing

the Debtors to sell any and all Office Assets with a Sale price per Production Office not to

exceed $100,000, excluding any liabilities assumed by the purchaser, based on substantially

similar terms to those set forth in the standard Assumption and Assignment Agreement and

Purchase Agreement and Bill of Sale (collectively, the "Sale Agreement," attached hereto as

Exhibit B), for the highest and best value, taking into consideration the exigencies and

circumstances, pursuant to the following procedures (the "Sale Procedures"):

> (i)     at least seven (7) days prior to the proposed closing of any such
> Sale, the Debtors shall give written notice (each, a "Sale Notice,"
> substantially in the form attached hereto as Exhibit C) of such a
> proposed Sale to the following parties (collectively, the "Sale
> Notice Parties") by overnight delivery: (i) the United States
> Trustee; (ii) counsel to the Creditors Committee; (iii) the landlord
> or non-Debtor party of the Office Lease(s) to be assigned; (iv)
> counsel to the Debtors' postpetition lenders, (v) counsel to Bank of
> America, (vi) the U.S. Securities and Exchange Commission; and

(vii) any party known by the Debtors to be asserting an interest or a Lien on any of the Office Assets to be sold;

(ii)    the content of the Sale Notice sent to the Sale Notice Parties for the sale of Office Assets shall in reasonable detail: (i) identify the Office Assets, including the location of the Office Leases and FF&E, being assumed and assigned, sold or abandoned; (ii) identify the purchaser of the Office Assets; (iii) provide proposed cure amounts (the "Cure Amounts"), if any; and (iv) provide the purchase price;

(iii)   a Sale Notice Party may object to a proposed Sale by making such objection in writing and serving the same on the other Sale Notice Parties and on the Debtors' counsel within five (5) days of the date of the Sale Notice;

(iv)    if no Sale Notice Party objects to a proposed Sale in accordance with the Sale Procedures within five (5) days of the date of the applicable Sale Notice, the Debtors, without further action or order of the Court, shall be authorized to consummate any such Sale, including the execution of any documents required and any such Sale shall be free and clear of all Liens with such Liens attaching only to the net proceeds of the Sale to the extent of their validity and priority immediately prior to the Sale;

(v)     if any of the Sale Notice Parties objects to a proposed Sale within five (5) days of the date of the Sale Notice, the Sale of the Office Asset(s) shall not proceed except upon (i) resolution of the objection by the parties in question, or (ii) further order of the Court after a hearing;

(vi)    in the event a hearing is required to resolve an objection or to attain approval of an assumption and assignment where landlord consent is not attained, the Debtors may notice such Sale and objection for the next scheduled omnibus hearing date that is at least five (5) business days from the date of the filing of such notice;

(vii)   on or before the 15th day of each calendar month the Debtors shall file a schedule of any Office Assets sold in the preceding calendar month, which schedule identifies: (i) the Office Assets, including the location of Office Leases and FF&E, assumed and assigned, sold or abandoned; (ii) the purchaser of the Office Assets; (iii) the location of the Office Assets sold; and (iv) the aggregate amount of the net proceeds of the Sale(s); and

      (viii)   in the event a prospective purchaser requests an order of the Court approving a Sale, the Debtors shall be permitted to obtain such order through the filing of a certification of counsel.

## BASIS FOR RELIEF REQUESTED

21.     The Bankruptcy Code permits debtors in possession, after notice and a hearing, "[to] use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); see also 11 U.S.C. § 365 (permitting assumption and assignment of executory contracts and unexpired leases of the debtor). Such sales of property outside of the ordinary course of business may be by private sale. See Fed. R. Bankr. P. 6004(f)(1). Whether a debtor's proposed use of assets should be approved in a particular case is a matter left to the Court's discretion, giving due consideration to the sound business judgment of the proponent of the sale. See, e.g., Stephens Industries, Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986); Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (court may approve the sale of property outside the ordinary course of business when it finds a good business reason for such sale); In re Delaware & Hudson Rv. Co., 124 B.R. 169 (D. Del 1991).

22.     The Debtors, as stated above, have discontinued their mortgage origination business and implemented a massive reduction in workforce. As a result, the Production Offices are unoccupied, yet the Debtors continue to incur obligations related thereto. The Office Assets must be sold swiftly or the administrative costs of maintaining the Office Leases will exceed any value that could be attained by the Debtors through a Sale. The Debtors believe that the relief requested herein will aid in the Debtors' efforts to immediately reduce and defer administrative expenses and maximize value

           

23.    The Sale Procedures are fair and reasonable under the circumstances and promote the efficient use of estate resources.  Parties in interest will be afforded adequate time and an appropriate mechanism to respond to any concerns with respect to any proposed Sale. The Sale Procedures also allow the Court sufficient oversight in connection with any objections by a party in interest, while not overburdening the Court with numerous Sale approval requests. Finally, without such Sale Procedures in place, the Office Assets will likely need to be rejected and abandoned.

## CURE AMOUNTS AND ADEQUATE ASSURANCE OF FUTURE PERFORMANCE

24.    Prior to or after serving any Sale Notice, the Debtors will attempt to work with the landlords to reconcile Cure Amounts and adequate assurance of future performance issues.  Accordingly, the Debtors request that payment of any Cure Amounts, as agreed-to by the Debtors and the landlord to the Office Lease(s) or approved by the Court, be deemed to compensate the appropriate party for all losses, if any, under the Office Lease(s).  Consequently, the Debtors request that, upon payment, the landlord be barred from asserting any additional cure or other amounts with respect to its Office Lease.

## ABANDONMENT OF UNNECESSARY AND BURDENSOME OFFICE ASSETS

25.    Section 554(a) provides that "[a]fter notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. § 554(a).  Additionally, 11 U.S.C. § 105(a) of the Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  The purpose of § 105(a) is "to assure the bankruptcy court's power to take whatever action is appropriate or

necessary in aid of the exercise of their jurisdiction." 2 Collier on Bankruptcy, ¶ 105.01 at 105-6 (15th ed. rev. 1999).

26.    Fed. R. Bankr. P. 6007 provides that a debtor may abandon property of the estate by giving notice of the proposed abandonment to various parties, and allowing those parties to file an objection. "[I]f a trustee feels an asset is of inconsequential value and benefit to the estate or that it is 'burdensome to the estate,' [the trustee] may abandon it." Reich v. Burke (In re Reich), 54 B.R. 995, 1003-04 (Bankr. E.D. Mich. 1985).

27.    In the instant case, the Debtors request authority to abandon any FF&E under the Sale Procedures that, in the Debtors' reasonable business judgment, is burdensome to these estates.  The proposed abandonment is primarily contemplated under circumstances where a proposed purchaser intends to purchase only a portion of the FF&E at a Production Office. However, the Debtors are also seeking the authority to abandon burdensome FF&E located at Production Offices where the Debtors are unable to locate a purchaser for the Office Assets.  In situations in which the Debtors are unable to locate a purchaser for the Office Assets, they shall seek to obtain a mutual release of claims with the landlord of the Production Office where the burdensome FF&E is located.  As outlined above, the Debtors have ceased operations at the Production Offices, and therefore should the request to abandon the FF&E be denied, in the near future, the Debtors may need to store the FF&E at an alternate location, which could require payment of transportation and storage fees in excess of the value of such assets.

28.    Accordingly, the relief requested herein is appropriate and in the best interest of creditors and the Debtors' estates and should be approved.

DB02:6157007.5                                                                    066585.1001

## PROPRIETY OF SHORTENED AND LIMITED NOTICE

29.    Generally, Bankruptcy Rule 2002(a)(2) requires that a minimum of twenty

days' notice of proposed sales of property outside the ordinary course of business be provided by

mail to "the debtor, the trustee, all creditors and indenture trustees" and any committee appointed

under section 1102 of the Bankruptcy Code.  See also 11 U.S.C. §363(b)(1) (permitting the use,

sell or lease of property of the estate outside of the ordinary course of business upon notice and a

hearing).  However, shorter notice may be appropriate given the circumstances.  11 U.S.C.

§102(1)(A) (defining "after notice and a hearing" to mean such notice and an opportunity for

hearing "as [are] appropriate in the particular circumstances").

30.    Courts are authorized to shorten the twenty-day notice period generally

applicable to asset sales, or direct another method of giving notice, upon a showing of "cause."

See Bankruptcy Rule 2002(a)(2).  The Debtors seek the approval of the proposed Sale

Procedures to maximize the net value to be realized from sales of Office Assets.  These

procedures will accommodate the smooth and timely consummation of such non-core asset sales.

31.    The Debtors believe that the process of providing the full twenty-day

notice and obtaining Court approval of each Sale will severely hinder the Debtors' ability to take

advantage of sale opportunities that are available only for a limited time.  Inherent in the

marketability and value of the Production Offices is a prospective purchaser's ability to

effectuate a nearly effortless opening of a new loan origination office within their existing

business.  For these reasons, the Debtors propose the Sale Procedures to streamline the process

and shorten the applicable notice periods as described herein.

32.    After careful analysis, and in the exercise of their business judgment, the

Debtors have determined, and respectfully submit, that for all of the foregoing reasons the relief

requested in this Motion is in the best interests of their estates and creditors. Thus, the Debtors respectfully request that the Court enter an order authorizing the Debtors to engage, without further order of the Court, in Sales of Office Assets in accordance with the Sale Procedures set forth herein.

      33.     Courts in this district and others have previously approved similar procedures in other large chapter 11 cases. See, e.g., In re Meridian Automotive Systems-Composite Operations Inc., et al., No. 05-11168 (Bankr. D. Del. Aug. 11, 2005) (Walrath, J.) (authorizing sale of assets with a value of no more than $1,000,000 on shortened notice); In re Directv Latin America, LLC, No. 03-10805 (Bankr. D. Del. Sep. 8, 2003) (Walsh, J.) (authorizing the sale of assets with a value of no more than $200,000 on limited notice); In re Exide Technologies, et al., No. 02-11125 (Bankr. D. Del. May 10, 2002) (Akard, J.) (authorizing sales or abandonment up to $50,000 with no advance notice, authorizing sales between $50,000 and $5,000,000 on ten (10) days limited advance notice, and authorizing abandonment between $50,000 and $1,000,000 on limited advance notice); In re W. R. Grace & Co., et. al., No. 01-1139 (D. Del. Aug. 2, 2001) (Farnan, J.) (authorizing sales of less than $250,000 without advance notice and authorizing sales between $250,000 and $5,000,000 on limited notice); see also In re Tower Automotive, Inc., No. 05-10578 (Bankr. S.D.N.Y. Mar. 16, 2005) (Gropper, J.) (authorizing sales of assets of less than $250,000 with no advance notice, authorizing sales from $250,000 to $1,000,000 on ten days' limited notice and authorizing abandonment of assets worth less than $250,000 on ten days' limited notice); In re WorldCom, Inc., No. 02-13533 (Bankr. S.D.N.Y. Oct. 22, 2002) (Gonzalez, J.) (authorizing sales of less than $1,000,000 with no advance notice, authorizing sales between $1,000,000 and $10,000,000 on ten days' limited advance notice and authorizing abandonment of any assets on limited notice).

                                                            

## WAIVER OF STAY OF ORDER

34.     Pursuant to Bankruptcy Rule 6004(g) and 6006(d), an order authorizing the sale of property or the assignment of an unexpired lease is stayed for ten days after the entry of the order unless the court orders otherwise.  Due to the exigencies and circumstances surrounding the sales of the Production Offices described above, the Debtor requests that the Court order that such stays not apply with respect to the sales and assignment of the Office Leases and the FF&E.

## NOTICE

35.     No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion will be provided to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Creditors Committee; (iii) counsel to Bank of America, N.A., as Administrative Agent for the lenders under that certain Credit Agreement dated August 30, 2004; (iv) counsel to the Debtors' postpetition lender; (v) the landlords to the Office Leases; (vi) the U.S. Securities and Exchange Commission; (vii) counsel to IMB; (viii) the Potential Bidders; and (ix) all parties entitled to notice under Local Rule 2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PRIOR APPLICATION

36.     No previous application for the relief sought herein has been made to this or to any other court.

066585.1001

WHEREFORE, the Debtors request entry of the attached Order granting the relief requested herein and such other and further relief as is just.

Dated:    Wilmington, Delaware
          August 15, 2007

                              YOUNG CONAWAY STARGATT & TAYLOR, LLP


                              _____
                              James L. Patton, Jr. (No. 2202)
                              Joel A. Waite (No. 2925)
                              Pauline K. Morgan (No. 3650)
                              Sean M. Beach (No. 4070)
                              Matthew B. Lunn (No. 4119)
                              Kara Hammond Coyle (No. 4410)
                              Kenneth J. Enos (No. 4544)
                              The Brandywine Building
                              1000 West Street, 17th Floor
                              Wilmington, Delaware 19801
                              Telephone: (302) 571-6600
                              Facsimile: (302) 571-1253

                              Proposed Counsel for Debtors and
                              Debtors in Possession

DB02:6157007.5                                            066585.1001