IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------------------- x   Chapter 11
In re:                                                               :
                                                                     :   Case No. 07-11047 (CSS)
AMERICAN HOME MORTGAGE                                               :
HOLDINGS, INC., a Delaware corporation, et al.,                      :   Jointly Administered
                                                                     :
                                        Debtors.                     :   Objection Deadline: August 27, 2007 at 4:00 p.m.
--------------------------------------------------------------------- x   Hearing Date: September 4, 2007 at 11:00 a.m.

### APPLICATION FOR AN ORDER AUTHORIZING THE DEBTORS TO EMPLOY AND RETAIN KEKST AND COMPANY INCORPORATED AS CORPORATE COMMUNICATIONS ADVISOR PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a), NUNC PRO TUNC TO THE PETITION DATE

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors in possession in the above-captioned cases (collectively, "AHM" or the "Debtors"),[1] respectfully represent as follows:

### SUMMARY OF RELIEF REQUESTED

1.      By this application (the "Application"), the Debtors request that this Court enter an order authorizing the Debtors to employ and retain Kekst and Company Incorporated ("Kekst"), as corporate communications advisor in these cases pursuant to sections 327(a) and 328(a) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), *nunc pro tunc* to the Petition Date. The facts and circumstances supporting this Application are set forth

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

in the Affidavit of Robert Siegfried in Support of the Application for an Order Authorizing the Debtors to Employ and Retain Kekst and Company Incorporated as Corporate Communications Advisor Pursuant to 11 U.S.C. §§ 327(a) and 328(a), *nunc pro tunc* to the Petition Date (the "Siegfried Affidavit"), attached hereto as Exhibit A

## JURISDICTION

2. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

3. On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

5. No creditors' committee has yet been appointed in these cases. No trustee or examiner has been appointed.

## THE DEBTORS' BUSINESS[2]

6. Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage

---

[2] The facts set forth herein are derived from the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief (the "First Day Declaration") [Docket No. 2], which is incorporated by reference as if fully set forth herein at length.

loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

7. As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

8. A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

## EVENTS LEADING TO THE CHAPTER 11 FILING

9. Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing

default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

10. The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

11. In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders -- the financial institutions that provide short term credit facilities needed to originate and purchase loans -- began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

12. On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

13. The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors now employ approximately 1000 persons who are

4

absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

14. In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

15. Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## RELIEF REQUESTED

16. By this Application, the Debtors seek entry of an order pursuant to sections 327(a) and 328(a) of the Bankruptcy Code authorizing the employment and retention of Kekst, as of the Petition Date, as corporate communications advisor in the course of the chapter 11 cases, which generally includes advising the Debtors on public relations and corporate communications issues and providing communications services, in accordance with the terms and conditions of the Siegfried Affidavit and the engagement letter annexed hereto as Exhibit B (and incorporated herein by reference) (the "Engagement Letter").

**BASIS FOR RELIEF**

17. In light of the size and complexity of these chapter 11 cases, the Debtors require the services of a seasoned and experienced corporate and crisis communications advisor who is familiar with the chapter 11 process.

18. Kekst is particularly well suited to serve as Debtors' corporate communications advisor in these chapter 11 cases. Founded in 1970, Kekst is a corporate communications consulting firm that has extensive experience in crisis communications involving matters such as transactions, bankruptcies, restructurings and reorganizations, and it has an excellent reputation for the services it has rendered in chapter 11 cases on behalf of debtors throughout the United States. Representative of Kekst's chapter 11 engagements are Delta Air Lines, Inc.; Allied Holdings, Inc.; Winn-Dixie Stores, Inc.; Pegasus Satellite Communications, Inc.; Loral Space & Communications; Fibermark, Inc.; Factory 2-U Stores, Inc.; Kmart Corporation; Polaroid Corporation; Pacific Gas & Electric; Owens Corning; and R.H. Macy & Co.

19. On July 31, 2007, the Debtors engaged Kekst to provide corporate and crisis communications services. In the short time in which they have been engaged, and in large part due to the emergent nature of these cases, Kekst's professionals have worked closely with the Debtors' management team and the Debtors' other professionals and have become well acquainted with the Debtors' operations and businesses.

20. The services of Kekst are necessary for the Debtors to effectively operate in, and to emerge from, these chapter 11 cases. Indeed, a plethora of constituency groups and stakeholders, including employees, customers, vendors, and creditors, counter-parties to executory contracts and leases, lenders, public debt holders, equity holders, financial markets,

potential investors, governmental entities, the media and the general public will be interested in the Debtors' bankruptcy. The cooperative participation of many of these persons and entities will be necessary for the Debtors to successfully operate in chapter 11 and manage their bankruptcy estates. Kekst will be able to assist the Debtors in protecting, retaining and developing the goodwill and confidence of these constituencies and stakeholders.

21. Additionally, the Debtors believe that by having a corporate communications advisor provide these services in these bankruptcy cases, other professionals in these cases -- and company officers who might otherwise handle corporate communications matters -- will be able to focus better on their respective competencies and their core tasks: to efficiently and effectively manage of the Debtors' businesses and operations and to facilitate a successful chapter 11 process.

22. The Debtors believe that Kekst is well qualified to provide its services to the Debtors in a cost-effective, efficient and timely manner. Kekst has indicated a willingness to act on behalf of the Debtors and subject itself to the jurisdiction and supervision of the Court.

## SERVICES TO BE RENDERED

23. The Debtors anticipate that Kekst will render corporate communications services as needed throughout the course of these chapter 11 cases. The Debtors have negotiated the terms of the Engagement Letter, which generally sets forth the scope of services Kekst will provide to the Debtors, as well as the manner in which Kekst will be compensated for its services. Subject to further order of the Court, Kekst will be engaged to render, among other things, professional services that may include the following:

- Provide general strategic public relations advice related to the reorganization to the Debtors' management;

- Prepare, distribute and follow-up on press releases and responsive statements relevant to the chapter 11 cases and its progress;

- Assist in answering questions from the media on the Debtors' behalf and proactively contacting and speaking with the media as necessary to convey information;

- Provide monitoring services related to the media's coverage of the Debtors' reorganization and professional evaluation of its importance, quality and tone;

- Prepare, including original writing and/or editing of, various correspondence, memoranda, letters, web sites and other communications related to the reorganization for the Debtors to use with its employees, customers, sales agents, vendors and other key business constituencies;

- Prepare and/or edit materials to anticipate the concerns of and likely questions from various constituencies affected by the reorganization and development of appropriate information for the Debtors to use in response;

- Attend meetings and participate in phone conferences with, among others, the Debtors' management and its attorneys and financial advisors as required;

- Attend court hearings and develop information about such hearings for the benefit of internal and external constituencies; and

- Consult and review drafts of all materials with all appropriate company officials and attorneys.

**DISINTERESTEDNESS OF PROFESSIONALS**

24.     As set forth in more detail in the Siegfried Affidavit and subject to the exceptions disclosed or described therein, Kekst has informed the Debtors that Kekst (a) does not hold or represent any interest adverse to the Debtors' estates, and (b) is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code.

25.     Kekst has informed the Debtors that it will periodically review its files during the pendency of the chapter 11 cases to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise,

Kekst will use reasonable efforts to identify such further developments and will promptly amend the Siegfried Affidavit to the extent that further disclosure is required.

## **PROFESSIONAL COMPENSATION**

26.  Section 328(a) of the Bankruptcy Code provides, in relevant part, that a debtor "with the court's approval, may employ or authorize the employment of a professional person under section 327 on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a).

27.  Subject to the Court's approval and pursuant to the terms of the Engagement Letter, Kekst intends to charge for its professional services on an hourly basis in accordance with its ordinary and customary hourly rates in effect on the date services are rendered. The current standard hourly rates of Kekst are:

| | |
|---|---|
| Senior Partners: | $600 to $875 |
| Partners: | $425 to $600 |
| Senior Associates: | $375 to $425 |
| Associates/Analysts: | $200 to $325 |

The hourly rates charged by Kekst's professionals differ based on, among other things, each professional's level of experience. Hourly rates are increased annually.

28.  In addition to the fees outlined above, Kekst will bill the Debtors for reasonable out-of-pocket expenses and other charges, which are likely to include airfare, meals and hotel accommodations, telephone and other communications charges, press release distribution, research, duplicating and printing, and reasonable professional fees and disbursements incurred by Kekst. Kekst will bill for such reasonable expenses in accordance with its standard practices, which may be periodically updated.

29.     As more fully set forth in the Siegfried Affidavit and the Engagement Letter, Kekst has received a non-refundable minimum fee in the amount of $50,000 (the "Kekst Fee") in connection with prepetition services rendered to the Debtors and for the proposed post-petition representation of the Debtors with respect to these cases. Kekst's charges for services will be applied against the Kekst Fee, with any charges in excess of the Kekst Fee billed separately.

30.     Notwithstanding any contrary provisions in the Engagement Letter, the Debtors understand that Kekst intends to apply to the Court for payment of compensation and reimbursement of expenses in accordance with applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), and orders of this Court.

## OTHER PROVISIONS

31.     Pursuant to the terms of the Engagement Letter, and as set forth in further detail therein, the Debtors will indemnify and hold harmless Kekst, its officers, directors, employees, and agents from and against any and all losses, claims, damages, liabilities, costs and expenses (including, but not limited to, reasonable attorney's fees and disbursements) which Kekst or any of the foregoing persons may be subject to or incur at any time (notwithstanding the termination of the Engagement Letter) in connection with the services rendered or to be rendered by Kekst in these cases (including, but not limited to, those arising from or out of its or their reliance upon or use of any information, documents, representations, reports or data furnished or

prepared by the Debtors and those arising from or out of any need to produce documents or give testimony at any time arising out of the services rendered or to be rendered by Kekst to the Debtors), unless such losses, claims, damages, liabilities, costs and expenses are (i) judicially determined (the determination having become final) to have arisen from Kekst's gross negligence or willful misconduct; (ii) for a contractual dispute in which the Debtors allege the breach of Kekst's contractual obligations unless the Court determines that indemnification, contribution or reimbursement would be permissible pursuant to In re United Artists Theatre Co., 315 F.3d 217 (3d Cir. 2003); or (iii) settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by the Court, after notice and a hearing to be a claim or expense for which Kekst should not receive indemnity, contribution or reimbursement under the terms of the Engagement Letter.

32.   The Debtors and Kekst believe this indemnification provision is customary and reasonable for the engagement set forth herein, both in out-of-court and in chapter 11 reorganizations, and is consistent with indemnification provisions approved in large chapter 11 proceedings.

## NOTICE

33.   Notice of this Application will be provided to (i) the United States Trustee for the District of Delaware; (ii) the parties included on the Debtors' list of forty (40) creditors holding the largest unsecured claims; (iii) counsel to Bank of America, N.A., as Administrative Agent for the lenders under that certain Credit Agreement dated August 30, 2004; (iv) Counsel to the Agent for the Debtors' Postpetition Lender; and (v) all parties entitled to notice under Del. Bankr. LR 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

**NO PREVIOUS RELIEF REQUESTED**

34. No previous application for the relief sought herein has been made by the Debtors to this or any other court.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

WHEREFORE, the Debtors respectfully request that the Court enter an order, in substantially the form attached hereto as <u>Exhibit C</u>, and grant such other and further relief as is just and proper.

Dated:   Wilmington, Delaware
         August 17, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Kara Hammond Coyle*
_____
James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Kara Hammond Coyle (No. 4410)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Proposed Counsel for Debtors and
Debtors in Possession