IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x

In re:

AMERICAN HOME MORTGAGE
HOLDINGS, INC., a Delaware corporation, et al.,[1]

Debtors.

---------------------------------------------------------------- x

:  Chapter 11
:
:  Case No. 07-11047 (CSS)
:
:  Jointly Administered
:
:
:  **Objection Deadline: August 27, 2007 at 4:00 p.m.**
:  **Hearing Date: September 4, 2007 at 11:00 a.m.**

**APPLICATION FOR ORDER PURSUANT TO SECTIONS 327
AND 328 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 2014
APPROVING RETENTION OF MILESTONE ADVISORS, LLC AS INVESTMENT
BANKERS AND FINANCIAL ADVISORS FOR THE DEBTORS
*NUNC PRO TUNC* TO PETITION DATE**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their undersigned proposed attorneys, hereby submit this application (the "Application") for an order pursuant to sections 327(a) and 328(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the employment and retention of Milestone Advisors, LLC ("Milestone"), as the Debtors' investment bankers and financial advisors effective, *nunc pro tunc* to the Petition Date (as defined below). In support of the Application, the Debtors rely upon and incorporate by reference the Declaration of John J. Nelligan (the "Nelligan Declaration"), a copy of which is attached hereto as Exhibit A. In further support of the Application, the Debtors respectfully represent as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

## JURISDICTION

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 327 and 328 of the Bankruptcy Code and Bankruptcy Rule 2014.

## STATUS OF THE CASE

2.    On the August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.    Each Debtor is continuing to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.    The Debtors' chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

5.    An official committee of unsecured creditors (the "Committee") was appointed on August 14, 2007. No trustee or examiner has been appointed.

## THE DEBTORS' BUSINESS[2]

6.    Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and

---

[2] The facts set forth herein are derived from the Michael Strauss Declaration, which is incorporated by reference as if fully set forth herein at length [Docket No. 2].

006072.1001

primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

7.      As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

8.      A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

### EVENTS LEADING TO THE CHAPTER 11 FILING

9.      Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

DB02:6159786.5                                                      006072.1001

10. The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

11. In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders -- the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

12. On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

13. The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors, as of the Petition Date, employed approximately 1000 absolutely essential employees to the Debtors' continued operations, although that number is

006072.1001

expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

14.    In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

15.    Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## RELIEF REQUESTED

16.    By this Application, the Debtors respectfully request that the Court enter an order, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, authorizing the Debtors to employ and retain Milestone as their investment bankers and financial advisors, effective *nunc pro tunc* to the Petition Date. The Debtors seek to retain and employ Milestone pursuant to the terms of the engagement set forth in the letter agreement, dated August 8, 2007, and attached hereto as Exhibit B (the "Engagement Letter") for the purposes of assisting the Debtors with the disposition of the (i) Mortgage Servicing Rights; (ii) Servicing Platform; and (iii) American Home Bank (as those terms are defined in the Engagement Letter, collectively, the "Core Asset Sale", as defined in the Engagement Letter).

## BASIS FOR RELIEF REQUESTED

17.    Bankruptcy Code section 327(a) provides, in relevant part, as follows:

5

> Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professionals persons, that do not hold or represent an interest adverse to the estates, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a).

18.    Bankruptcy Code section 328(a) provides, in relevant part, as follows:

> The trustee . . . with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . of this title . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis.  Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provide under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a).

19.    Bankruptcy Rule 2014 provides, in relevant part, as follows:

> An order approving the employment of financial advisors . . . or other professionals pursuant to § 327 . . . of the Code shall be made only on application of the trustee or committee.

Fed. R. Bankr. P. 2014.

## A.    Milestone's Qualifications

20.    The Debtors have selected Milestone based on its extensive experience in providing financial advisory and investment banking solutions to business leaders dealing with complex challenges or financial distress and based on Milestone's familiarity with the Debtors' business.  Milestone has become familiar with the Debtors' financial condition and business as a result of the professional services provided to the Debtors prior to the Petition Date.

6

21.    Milestone's core focus is providing investment banking services to institutions and companies within the financial services sector. Milestone's partners and professionals have particular expertise in working with: (i) banks and thrifts; (ii) commercial, consumer, and mortgage finance companies; (iii) accounts receivable management, business process outsourcing, and market research firms; (iv) insurance and re-insurance companies; and (v) asset managers. Milestone advises its clients on: (i) mergers and acquisitions; (ii) corporate finance solutions; (iii) restructuring services; (iv) merchant banking; and (v) other strategic alternatives.

22.    Milestone has had extensive experience in the mergers and acquisitions field involving mortgage lenders for several years. Over the last three years, Milestone has been one of the most active firms in the country for mergers and acquisitions involving specialty finance companies. Milestone has been the most active firm in the country in terms of the number of merger and acquisition transactions involving mortgage lenders and has conducted a significant number of transactions involving mortgage lenders. For example, in the past twelve months, Milestone has been involved in transactions involving Saxon Capital, First Franklin/Nationpoint, Encore Credit, and several other lenders. In these transactions, Milestone has represented both sellers and large financial institutions as buyers. Additionally, Milestone served as financial advisors and investment bankers to the Debtor in In re ResMae Mortgage Corporation, Case No. 07-10177 (Bankr. D. Del. Feb. 15, 2007) (KJC).

**B.    Services To Be Provided**[3]

23.    Generally, Milestone is being retained to provide general financial advice to assist the Debtors in their bankruptcy cases and to assist the Debtors with the Core Asset Sale

---

[3] This summary is presented for convenience purposes only. The terms set forth in the Engagement Letter are controlling in all respects. Capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to such terms in the Engagement Letter.

006072.1001

regardless of the form of the transaction. Specifically, as more fully set forth in the Engagement

Letter, the services that Milestone will provide to the Debtors include, but are not be limited to:

<u>Services related to Advisory Fees:</u>

a.  Review and analyze the Debtors' business, operations, properties, financial condition, and future prospects;

b.  Assist the Debtors' in negotiations with lenders and other parties;

c.  Assist the Debtors with the disposition of leased office space;

d.  Assist the Debtors' reinsurance subsidiary;

e.  Determine the range of values for the Debtors' assets on a liquidation basis;

f.  Advise and attend meetings of the Debtors' Board of Directors and its Committees and, if appropriate, its creditors;

g.  Participate in any hearings before any court with respect to the matters upon which Milestone has provided advice, including, as relevant, coordinating with the Debtors' counsel as to the necessary testimony relating thereto;

h.  Provide financial advice and assistance to the Debtors in the disposition of residual interests in certain securities, certain securities, and whole loans;

<u>Services related to Core Asset Sales:</u>

i.  With respect to the Core Asset Sale, advise and assist the Debtors' in structuring and effecting the financial aspect of such transactions, subject to the terms and conditions of the Engagement Letter;

j.  Provide financial advice and assistance to Debtors in connection with a Core Asset Sale, identify potential acquirers and, at the Debtors' request, contact such acquirers;

k.  Assist the Debtors in preparing a memorandum to be used in soliciting potential acquirers of their assets, subject to the limitations set forth in the Engagement Letter;

l.  Assist the Debtors and/or participate in negotiations with potential acquirers of its assets; and

DB02:6159786.5

006072.1001

m.      Render an opinion as to the fairness of the consideration to be received in connection with a Core Asset Sale.

24.      The Debtors require qualified professionals to render these essential professional services. As noted above, Milestone has substantial expertise in all of the areas for which it is proposed to be retained. Accordingly, the Debtors submit that Milestone is well qualified to perform these services and assist the Debtors in these chapter 11 cases.

25.      By separate application, the Debtors are seeking authority to retain as investment banker Phoenix Capital, Inc. ("Phoenix") to assist the Debtors in marketing the Debtors' Mortgage Servicing Rights and Servicing Platform. The Debtors are retaining Phoenix in addition to Milestone because of Phoenix's specialized experience brokering sales of mortgage servicing rights. Milestone and Phoenix have discussed a division of responsibility and will make every effort to avoid duplication. Further, as explained below and as set forth fully in the Engagement Letter, Milestone and Phoenix have agreed to split certain transaction "success" fees.

## C.    **Payment of Fees and Expenses**

26.      Subject to this Court's approval, in accordance with the provisions of section 328(a) of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors propose to pay Milestone according to the terms set forth in the Engagement Letter.

27.      Pursuant to the Engagement Letter, the Debtors paid Milestone a nonrefundable financial advisory fee of $500,000 upon execution of the Engagement Letter. In

006072.1001

addition, Milestone will be entitled to fees ("Advisory Fees")[4] related to its general financial advisory services provided to the Debtors. Pursuant to the Engagement Letter, in the event that the Debtors file for bankruptcy protection and/or pursue a liquidation of their assets and a settlement of their liabilities, additional Advisory Fees of $200,000 per month shall be payable to Milestone; the first installment of $200,000 shall be due and payable promptly upon approval of the Engagement Letter by the Bankruptcy Court and for each 30 day period thereafter.

28.    Regarding the Core Asset Sales, Milestone will work with Phoenix to effectuate the Core Asset Sale of the Debtors' Mortgage Servicing Rights. In the event of a Core Asset Sale of the Debtors' Mortgage Servicing Rights (whether alone or combined with the sale of the Debtors' Servicing Platform), the Debtors shall pay Milestone and Phoenix an aggregate success fee equal to (i) $1,000,000, plus (a) $1,000,000, pro rated for any proceeds received by the Debtors in excess $435 million and up to $460 million, plus (b) 6.25% of any proceeds received by the Debtors in excess of $460 million.

29.    The Engagement Letter provides that in the event of a sale of the Debtors' Servicing Platform that is separate and distinct from the sale of the Debtors' Mortgage Servicing Rights, the Debtors shall pay Milestone and Phoenix an aggregate success fee equal to (i) $500,000, plus (ii) 5.0% of any proceeds received by the Debtors in excess of $10 million.

30.    Milestone has agreed to split any fees payable by the Debtors for a sale of the Servicing Platform and/or the Mortgage Servicing Rights, 60% to Milestone and 40% to Phoenix.

31.    In the event of a Core Asset Sale of the Debtors' bank subsidiary, American Home Bank, FSB, the Debtors shall pay Milestone a success fee equal to (i) $500,000,

---

[4]    The defined term "Advisory Fees" does not include the $500,000 due upon execution of the Engagement Letter. As such, pargraph 32, providing in certain circumstances that Advisory Fees are to be credited against the fees due to Milestone related to a successful Core Asset Sale or Sales, does not apply to the $500,000.

plus (ii) 1.5% of any proceeds received by the Debtors in excess of $50 million and up to $65 million, plus (iii) 2.5% of any proceeds received by the Debtors in excess of $65 million.

32.     The first million of any Advisory Fee paid to Milestone shall not be credited against any fees paid to Milestone for one or more Core Assets Sales.  However, one hundred percent (100%) of any Advisory Fee paid to Milestone in excess of $1.0 million and up to $1.4 million, and fifty percent (50%) of any Advisory Fee paid to Milestone in excess of $1.4 million, shall be credited against the aggregate of any fees paid to Milestone for one or more Core Asset Sales.

33.     The Debtors propose to reimburse Milestone for all reasonable documented out-of-pocket expenses (including counsel fees) incurred by Milestone in connection with the services to be rendered by Milestone, whether or not a transaction is consummated.  Milestone has provided an expense deposit of $75,000 to cover initial out-of-pocket expenses.

34.     The Debtors submit that the proposed fee structure and fees and expense reimbursement provisions described above are consistent with normal and customary billing practices for cases of this size and complexity that require the level and scope of services outlined above.  Milestone and the Debtors also believe that the foregoing compensation arrangements are both reasonable and market-based.

35.     The Debtors propose that all compensation and expenses will be sought in accordance with section 328(a) of the Bankruptcy Code, as incorporated in sections 329 and 331 of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and orders of the Court, and will not be subject to the standard of review in section 330 of the Bankruptcy Code.

**D.      Indemnification and Limitation of Liability**

36.    The Debtors have also agreed to indemnify and hold Milestone harmless against any claims, liabilities and obligations arising out of its retention under the Engagement Letter as set forth more fully in Appendix I to the Engagement Letter.  However, notwithstanding anything to the contrary in the Engagement Letter or any agreements incorporated by reference in the Engagement Letter (including, without limitation Appendix I), the Debtors agree to indemnify and hold Milestone harmless (the "Indemnification Agreement") to the extent set forth below:

a.    Milestone shall not be entitled to indemnification, contribution or reimbursement pursuant to the Agreement for services other than those described in the Agreement, unless such services and indemnification therefore are approved by the Court;

b.    The Debtors shall have no obligation to indemnify Milestone, or provide contribution or reimbursement to Milestone, for any claim or expense that is either:  (i) judicially determined (the determination having become final) to have arisen from Milestone's gross negligence or willful misconduct; (ii) for a contractual dispute in which the Debtors allege the breach of Milestone's contractual obligations unless the Court determines that indemnification, contribution or reimbursement would be permissible pursuant to In re United Artists Theatre Co., 315 F.3d 217 (3d Cir. 2003); or (iii) settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by the Court, after notice and a hearing to be a claim or expense for which Milestone should not receive indemnity, contribution or reimbursement under the terms of the Agreement as modified by this Order; and

c.    If, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these cases (that order having become a final order no longer subject to appeal), and (ii) the entry of an order closing these chapter 11 cases, Milestone believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution and/or reimbursement obligations under the Agreement (as modified by this Order), including without limitation the advancement of defense costs, Milestone must file an application therefore in this Court, and the Debtors may not pay any such amounts to Milestone before the entry of an order by this Court approving the payment.  This subparagraph (c) is intended only to specify the period of time under which the Court shall have jurisdiction over any request for fees and expenses by Milestone for indemnification, contribution or reimbursement, and not a provision limiting the duration of the Debtors' obligation to indemnify Milestone.

12

> All parties in interest shall retain the right to object to any demand by Milestone for indemnification, contribution or reimbursement.

37.     The Debtors believe that the Indemnification Agreement is customary and reasonable for investment bankers and financial advisors, both out-of-court and in chapter 11 proceedings.  See e.g., In re United Artists Theatre Company, 315 F.3d 217 (3d Cir. 2003) (authorizing the indemnification of Houlihan Lokey by the debtors); In re Joan & David Halpern, Inc., 248 B.R. 43 (Bankr. S.D.N.Y. 2000).  The Indemnification Agreement is also similar to other indemnification provisions that have been approved by bankruptcy courts in the district. See e.g., In re Premium Papers Holdco, LLC, Ch. 11 Case No. 06-10269 (CSS) (Bankr. D. Del. May 3, 2006) (order authorizing retention of Giuliani Capital Advisors on similar terms); In re Burlington Industries, Inc., Ch. 11 Case No. 01-11282 (RJN) (Bankr. D. Del. May 21, 2003) (order authorizing retention of Hostmann on similar terms); In re Oakwood Homes Corporation, Ch. 11 Case No. 02-13396 (PJW) (Bankr. D. Del. July 21, 2003) (order authorizing retention of Hostmann on similar terms).

38.     Finally, notwithstanding the limitation of liability provision or provisions in the Engagement Letter or any agreements incorporated by reference therein (including, without limitation Appendix I), the Engagement Letter shall be modified to delete such provision or provisions from the Engagement Letter.

**D.     Milestone's Disinterestedness**

39.     To check and clear potential conflicts of interest in this case, Milestone researched its relationship with the following entities (collectively, the "Interested Parties"):

a.     The Debtors;

b.     The Debtors' officers and directors;

c.     Companies affiliated with the Debtors' officers and directors;

d.    The Debtors' top forty (40) unsecured creditors;

e.    Bank of America, N.A., as Administrative Agent for the lenders under that certain Credit Agreement dated August 30, 2004;

f.    Persons holding a large percentage of the Debtors' issued and outstanding voting securities; and

g.    The Debtors' professionals in these bankruptcy cases.

The identities of the Interested Parties were provided to Milestone by the Debtors.

40.    To the best of the Debtors' knowledge, information, and belief, other than in connection with this case, Milestone has no connection with the Debtors, their creditors, the United States Trustee, or any other party with an actual or potential interest in this chapter 11 case or their respective attorneys or accountants, except as set forth in the Nelligan Declaration.

41.    To the best of the Debtors' knowledge, information, and belief, Milestone neither holds nor represents any interest adverse to the Debtors or to their estates in the matters for which Milestone is proposed to be retained. Accordingly, the Debtors believe that Milestone is a "disinterested person," as defined in section 101(14) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code. The Debtors' knowledge, information, and belief regarding the matters set forth herein are based, and made in reliance, upon the Nelligan Declaration.

**E.    Engagement Under Section 328 is Reasonable and Appropriate Under the Circumstances**

42.    Section 328 of the Bankruptcy Code provides, in relevant part, that a debtor "with the court's approval, may employ or authorize the employment of a professional person under section 327 on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis." 11 U.S.C. § 328(a). For the reasons

14

set forth in the Application, section 328(a) therefore permits this Court to approve the terms of the proposed engagement of Milestone as set forth in the Engagement Letter.

43.    The Debtors respectfully submit that the terms of the proposed retention are reasonable and based on the customary compensation charged by Milestone and comparably skilled practitioners in matters outside and other than chapter 11 cases, as well as cases under chapter 11, and have been approved and implemented in not just this jurisdiction but also in chapter 11 cases elsewhere.  Indeed, the entire engagement as set forth in the Engagement Letter is common within the industry and reflects what is considered to be "market" both in and out of chapter 11 proceedings, in light of Milestone's experience in reorganizations and the scope of work to be performed pursuant to its engagement.  Accordingly, the Debtors respectfully submit that the terms of the proposed engagement of Milestone should be approved.

## NOTICE

44.    Notice of this Application will be provided to (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Bank of America, N.A., as Administrative Agent for the lenders under that certain Credit Agreement dated August 30, 2004; (iv) counsel to the Debtors' postpetition lender; (v) the Securities and Exchange Commission; and (vi) all parties entitled to notice under Del. Bankr. LR 2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

DB02:6159786.5                                                                                                    006072.1001

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order under sections 327(a) and 328(a) of the Bankruptcy Code and Rule 2014 of the Bankruptcy Rules, substantially in the form attached hereto as Exhibit C, approving the employment of Milestone pursuant to the terms of the Engagement Letter to perform the services described herein, and grant the Debtors such other and further relief as is just.

Wilmington, Delaware
August 17, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Travis Turner (No. 4926)

James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Kara Hammond Coyle (No. 4410)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Proposed Attorneys for the Debtors and
Debtors-in-Possession

006072.1001

## **EXHIBIT A**

## NELLIGAN DECLARATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x
                                                                 :
In re:                                                           :    Chapter 11
                                                                 :
AMERICAN HOME MORTGAGE                                           :    Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,[1]               :
                                                                 :    Jointly Administered
                          Debtors.                               :
---------------------------------------------------------------- x

**DECLARATION OF JOHN J. NELLIGAN IN SUPPORT OF APPLICATION FOR
ORDER PURSUANT TO SECTIONS 327 AND 328 OF THE BANKRUPTCY CODE
AND BANKRUPTCY RULE 2014 APPROVING RETENTION OF MILESTONE
ADVISORS, LLC AS INVESTMENT BANKERS AND FINANCIAL ADVISORS FOR
THE DEBTOR *NUNC PRO TUNC* TO THE PETITION DATE**

I, John J. Nelligan, pursuant to 28 U.S.C. §1746, declare:

1.     I am the Managing Director of Milestone Advisors, LLC ("Milestone"), at

1775 Eye Street, NW, Suite 800, Washington, DC 20006. Milestone is the financial advisory

division of Milestone Merchant Partners, LLC, and is a NASD licensed broker/dealer

headquartered at 1775 Eye Street, NW, Suite 800, Washington, DC 20006, with additional

offices in Miami, Florida. I am duly authorized to make this supplemental declaration (the

"Declaration") on behalf of Milestone. I submit this Declaration in accordance with sections 327

and 328 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") in connection with the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp.
("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM
Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a
Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558);
American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407);
Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp.
("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road,
Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving,
Texas 75063.

application (the "Application") of the above captioned debtors and debtors in possession

(collectively the "Debtors") for an order pursuant to sections 327 and 328 of the Bankruptcy

Code and Bankruptcy Rule 2014 authorizing the Debtors to retain and employ Milestone as its

investment bankers and financial advisors.

2.      Unless otherwise stated in this Declaration, I have personal knowledge of

the facts set forth herein and, if called as a witness, I would testify thereto.  Capitalized terms and

phrases not otherwise defined herein shall have the meanings ascribed to such terms in the

Application.

3.      Milestone has in the past performed prepetition investment banking and

financial advisory related services for the Debtors.  However, Milestone has no prepetition

claims related to such prepetition services.

4.      To check and clear potential conflicts of interest in this case, Milestone

researched its relationship with the following entities, the identities of which were provided by

the Debtors:

      a.    The Debtors;

      b.    The Debtors' officers and directors;

      c.    Companies affiliated with the Debtors' officers and directors;

      d.    The Debtors' top forty (40) unsecured creditors;

      e.    Bank of America, N.A., as Administrative Agent for the lenders under that certain Credit Agreement dated August 30, 2004;

      f.    Persons holding a large percentage of the Debtors' issued and outstanding voting securities;

      g.    The Debtors' professionals in these bankruptcy cases.

2

5.      Milestone has served or is currently serving as financial advisors and/or as investment bankers to the following entities, though Milestone is not currently aware of any direct conflicts.

| Current and Former Unrelated Clients |
| --- |
| Morgan Stanley |
| Impac Funding Corporation |
| Washington Mutual |
| IndyMac Bank |
| ABN AMRO |
| |
| |

6.      Milestone is continuing to review the Debtors' complete list of creditors. To the extent that I become aware of any additional connections or relationships that may be relevant to Milestone's assistance to the Debtors, I will file a supplemental affidavit.

7.      Milestone is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code in that said firm, its partners, counsel and associates:

      a.      are not creditors, equity security holders or insiders of the Debtors;

      b.      are not and were not, within two (2) years before the date of the filing of the Debtors' chapter 11 petitions, a director, officer, or employee of the Debtors; and

      c.      does not have an interest materially adverse the Debtors' estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in any of the Debtors, or for any other reason.

8.      The payments received by Milestone within the 90 days prior to the Petition Date are described as follows:  Milestone was engaged by the Debtors in April 2007 and completed two financings for the Company, both of which closed June 28, 2007: (i) $140 million residual interest repurchase facility and (ii) $125 million Convertible Trust Preferred Securities.  As part of its engagement, Milestone  received the following fees as compensation

3

006072.1001

for services provided to the Debtor: (i) a non-refundable financial advisory fee of $250,000 paid

by the Debtor on May 3, 2007, and additional aggregate non-refundable monthly financial

advisory fees of $100,000 ($50,000 for each month of May and June 2007); both being paid on

July 2, 2007); (ii) a success fee of $3,750,000 (calculated as 3.0% of $125,000,000) related to the

Debtors' issuance of $125,000,000 of Convertible Trust Preferred Securities; (iii) and a success

fee of $1,050,000 (calculated as 0.75% of $140,000,000) related to the Debtors securing a

$140,000,000 residual repurchase facility; and (iv) the Debtors reimbursed Milestone for its

travel and other out-of-pocket expenses incurred in connection with the two transactions.

9.      Milestone was retained pursuant to the terms of an engagement agreement

dated August 8, 2007 (the "Engagement Letter"), a copy of which is attached to the Application

as Exhibit B.  Pursuant to the Engagement Letter, the Debtors paid Milestone a nonrefundable

financial advisory fee of $500,000[2] upon execution of the Engagement Letter.

10.      In addition, Milestone will be entitled to fees ("Advisory Fees") related to

its general financial advisory services provided to the Debtors.  Pursuant to the Engagement

Letter, in the event that the Debtors file for bankruptcy protection and/or pursue a liquidation of

their assets and a settlement of their liabilities, additional Advisory Fees of $200,000 per month

shall be payable to Milestone; the first installment of $200,000 shall be due and payable

promptly upon approval of the Engagement Letter by the Bankruptcy Court and for each 30 day

period thereafter.

11.      Regarding the Core Asset Sales, Milestone will be working with Phoenix

(to be retained through a separation Application to this Court) to effectuate the Core Asset Sale.

In the event of a Core Asset Sale of the Debtors' Mortgage Servicing Rights (whether alone or

---

[2]  The $500,000 will not be credited against any fees due to Milestone related to a successful Core Asset Sale or
Sales.

4

combined with the sale of the Debtors' Servicing Platform), the Debtors shall pay Milestone and

Phoenix an aggregate success fee equal to (i) $1,000,000, plus (a) $1,000,000, pro rated for any

proceeds received by the Debtors in excess $435 million and up to $460 million, plus (b) 6.25%

of any proceeds received by the Debtors in excess of $460 million.

12.    The Engagement Letter provides that in the event of a sale of the Debtors'

Servicing Platform that is separate and distinct from the sale of the Debtors' Mortgage Servicing

Rights, the Debtors shall pay Milestone and Phoenix an aggregate success fee equal to (i)

$500,000, plus (ii) 5.0% of any proceeds received by the Debtors in excess of $10 million.

13.    Milestone has agreed to split any fees payable by the Debtors for a sale of

the Servicing Platform and/or the Mortgage Servicing Rights, 60% to Milestone and 40% to

Phoenix.

14.    In the event of a Core Asset Sale of the Debtors' bank subsidiary,

American Home Bank, FSB, the Debtors shall pay Milestone a success fee equal to (i) $500,000,

plus (ii) 1.5% of any proceeds received by the Debtors in excess of $50 million and up to $65

million, plus (iii) 2.5% of any proceeds received by the Debtors in excess of $65 million.

15.    The Engagement Letter provides that no fees paid to Milestone in

connection with a Core Asset Sale shall be credited against the Advisory Fee.  One hundred

percent (100%) of any Advisory Fee paid to Milestone in excess of $1.0 million and up to $1.4

million, and fifty percent (50%) of any Advisory Fee paid to Milestone in excess of $1.4 million,

shall be credited against the aggregate of any fees paid to Milestone for one or more Core Asset

Sales.

16.    The Debtors propose to reimburse Milestone for all reasonable

documented out-of-pocket expenses (including counsel fees) incurred by Milestone in

connection with the services to be rendered by Milestone, whether or not a transaction is consummated. Milestone has provided an expense deposit of $75,000 to cover initial out-of-pocket expenses.

## CONCLUSION

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Dated: August __17__, 2007

John J. Nelligan
Managing Director

# **EXHIBIT B**

## ENGAGEMENT LETTER

 **MILESTONE**

1775 Eye Street, NW
Suite 800
Washington, DC 20006
Tel 202.367.3000
Fax 202.367.3001

August 8, 2007

Mr. Michael Strauss
Chairman, Chief Executive Officer and President
American Home Mortgage Investment Corp.
538 Broadhollow Road
Melville, NY 11747

Dear Mr. Strauss:

This agreement ("Agreement") sets forth the terms of the engagement by American Home Mortgage Investment Corp. (the "Company") of Milestone Advisors, LLC ("Milestone") pursuant to which Milestone shall act as a financial advisor and investment banker to the Company in connection with its possible bankruptcy filing and related proceedings under chapter 11 of Title 11 U.S.C. §§101 et seq., (the "Bankruptcy Code") and possible Core Asset Sales (as defined below) and with respect to such other financial and investment banking matters as to which the Company and Milestone may agree in writing during the term of this engagement agreement (the "Agreement").

Scope of Services.  In connection with the analysis and pursuit of the above-mentioned financial advisory services and Core Asset Sales, Milestone will, as the Company's financial advisor and investment banker, work on one or more of the following activities, as requested from time to time by management of the Company (hereinafter referred to as the "Services"):

    (a) <u>General Financial Advisory Services.</u>  Milestone shall, in each case if requested by the Company:

        i.   to the extent it deems necessary, appropriate and feasible, review and analyze the business, operations, properties, financial condition and prospects of the Company;

        ii.   assist the Company in negotiations with its lenders and other parties;

        iii.   determine a range of values for the Company's assets on a liquidation basis;

        iv.   advise and attend meetings of the Company's Board of Directors and its Committees and, if appropriate, its creditors;



Mr. Michael Strauss
August 8, 2007
Page 2

    v.  participate in any hearings before any court with respect to the matters upon which Milestone has provided advice, including, as relevant, coordinating with the Company's counsel as to necessary testimony relating thereto; and

    vi.  with respect to Core Asset Sales (as defined below), advise and assist the Company in structuring and effecting the financial aspects of such transactions, subject to the terms and conditions of this Agreement.

(b)  <u>Core Asset Sale Services.</u>  If the Company pursues a Core Asset Sale (as defined below), Milestone shall, in each case, if requested by the Company:

    i.  provide financial advice and assistance to the Company in connection with a Core Asset Sale, identify potential acquirors and, at the Company's request, contact such potential acquirors (each a "Purchaser Entity");

    ii.  assist the Company in preparing a memorandum (with any amendments or supplements thereto, the "Sale Memorandum"), to be used in soliciting potential acquirors of its assets, provided that (A) the Sale Memorandum shall be based entirely upon information supplied by the Company (as it concerns the Company as opposed to competitors or the market generally), (B) the Company shall be solely responsible for the accuracy and completeness of the Sale Memorandum (as it concerns the Company as opposed to competitors or the market generally), and (C) other than as contemplated by this subparagraph (b)(ii), the Sale Memorandum shall not be used, reproduced, disseminated, quoted or referred to at any time in any way, except with Milestone's prior written consent which shall not be unreasonably withheld or delayed; and

    iii.  assist the Company and/or participate in negotiations with potential acquirors of its assets; and

    iv.  if requested, render an opinion as to the fairness of the consideration to be received in connection with a Core Asset Sale.

For purposes of this Agreement, the term "Core Asset Sale" shall mean the sale of one or more of the Company's following assets or divisions: (i) Mortgage Servicing Rights, (ii) Servicing Platform, and (iii) American Home Bank.

In rendering its services to the Company hereunder, Milestone is not assuming any responsibility for the Company's underlying business decision to pursue (or not to pursue) any business strategy or to effect (or not to effect) any Core Asset Sale or other transaction. The Company agrees that Milestone shall not have any obligation or responsibility to provide accounting, audit, "crisis management", or business consultant services for the Company and shall have no responsibility for designing or implementing operating, organization, administrative, cash management or liquidity improvements, or to provide any valuation opinions or any advice or opinions with respect to solvency in connection with any transaction. The Company confirms that it will rely on its own counsel, accountants and other similar expert advisors for legal, accounting, tax and other similar advice.


Mr. Michael Strauss
August 8, 2007
Page 3

The Company shall make available to Milestone all material information concerning the business, assets, operations, financial condition and prospects of the Company that Milestone reasonably requests in connection with the services to be performed for the Company hereunder and shall provide Milestone with reasonable access to the Company's officers, directors, employees, independent accountants, counsel and other advisors and agents as Milestone reasonably requests. In order to coordinate effectively the Company's and Milestone's activities to effect a Core Asset Sale, the Company will promptly inform Milestone of any discussions, negotiations or inquiries regarding a possible Core Asset Sale (including any such discussions, negotiations or inquiries that have occurred in the six month period prior to the date of this Agreement). The Company represents that, to the best of its knowledge, all information furnished by it or on its behalf to Milestone, at all times during Milestone's engagement, (including information contained in any Sale Memorandum) (i) will be accurate and complete in all material respects, and (ii) will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which such statements are made. The Company recognizes and confirms that in advising the Company and completing its engagement hereunder, Milestone will be using and relying on publicly available information and on data, material and other information furnished to Milestone by the Company and other parties. It is understood that in performing pursuant to this Agreement, Milestone may assume and rely upon the accuracy and completeness of, and is not assuming any responsibility for independent certification of, such publicly available information and other information so furnished.

2.  Compensation. Milestone's compensation for services to be performed under this Agreement will consist of the following cash fees:

  (a) Retainer Fee:

    i.  Advisory Fee:  a non refundable financial advisory fee of $500,000 paid by the Company upon execution of this Agreement ("Advisory Fee"); Milestone hereby acknowledges that such Advisory Fee has been paid in full.

    ii. Restructuring/Liquidation Advisory Fee:  In the event the Company files for bankruptcy protection and/or pursues a liquidation of its assets and settlement of its liabilities, an additional non-refundable fee of $200,000 per month shall be payable to Milestone; the first installment of $200,000 shall be due and payable promptly upon approval of this Agreement pursuant to the bankruptcy proceeding and for each 30 day period thereafter (the "Restructuring Advisory Fee"). The Restructuring Advisory Fee is being paid in consideration of Milestone assisting the Company in the sale of assets (other than Core Assets), including but not limited to furniture, fixtures and equipment located in the Company's origination and processing offices, securities, residential mortgage loans and reinsurance subsidiary assets, and the settlement of liabilities of the Company.

  (b) Core Asset Sale Fees:

    i.  Milestone acknowledges that the most successful sale of the Servicing Platform and Mortgage Servicing Rights will be accomplished through a joint effort of Milestone and Phoenix Capital, and therefore agrees to work with Phoenix Capital to effectuate the sale of the Servicing Platform and Mortgage Servicing Rights. In the event of a Core Asset Sale of the Company's Mortgage Servicing



Mr. Michael Strauss
August 8, 2007
Page 4

Rights (whether alone or if combined with the sale of the Company's Servicing Platform), the Company shall pay Milestone and Phoenix Capital an aggregate success fee equal to: (i) $1,000,000, plus (a) $1,000,000, pro rated for any proceeds received by the Company in excess of $435 million and up to $460 million, plus (b) 6.25% of any proceeds received by the Company in excess of $460 million.  In the event of a Core Asset Sale of the Company's Servicing Platform in a transaction that is separate and distinct from the sale of the Company's Mortgage Servicing Rights, the Company shall pay Milestone and Phoenix Capital an aggregate success fee equal to: (i) $500,000, plus (ii) 5.0% of any proceeds received by the Company in excess of $10 million.  Milestone and Phoenix Capital have agreed to split any fees payable by the Company for a sale of the Servicing Platform and/or a sale of the Mortgage Servicing Rights, 60% to Milestone and 40% to Phoenix Capital.  The Company shall enter into a separate agreement with Phoenix Capital reflecting such terms.

ii.  In the event of a Core Asset Sale of the Company's bank subsidiary, American Home Bank, FSB, the Company shall pay Milestone a success fee equal to: (i) $500,000, plus (ii) 1.5% of any proceeds received by the Company in excess of $50 million and up to $65 million, plus (iii) 2.5% of any proceeds received by the Company in excess of $65 million.

No fee paid to Milestone for a Core Asset Sale shall be credited against the Advisory Fee.  One hundred percent (100%) of any Restructuring Advisory Fees paid to Milestone in excess of $1.0 million and up to $1.4 million, and fifty percent (50%) of any Restructuring Advisory Fees paid to Milestone in excess of $1.4 million, shall be credited against the aggregate of any fees paid to Milestone for one or more Core Asset Sales.

3.  <u>Confidential Review.</u>  Milestone and its agents and counsel, if any, will be accorded access to and may examine documents, records and other materials and information of the Company and its subsidiaries as Milestone reasonably deems appropriate to perform its obligations hereunder.  Milestone shall keep all such information, to the extent confidential and proprietary to the Company, confidential except to the extent disclosure is required by any judicial, administrative or self-regulatory agency or organization.  The following information shall not be deemed confidential or proprietary:

(a)  Information that at the time of disclosure, or after disclosure, is or subsequently becomes generally available to the public or within the industries in which the Company or Milestone and its affiliates conduct business, other than as a result of a breach by Milestone or its agents or counsel of its obligations under this Agreement;

(b)  Information that prior to or at the time of disclosure by the Company, was already in the possession of Milestone or its affiliates (provided that Milestone or its affiliates, at the time of such disclosure was not subject to a non-disclosure obligation relating to such information including any non-disclosure obligation under applicable "Insider Trading" laws and regulations) or could have been developed by them from information then in their possession, by the application of other information or techniques in their possession



Mr. Michael Strauss
August 8, 2007
Page 5

or generally available to the public or available to them, other than from the Company or its agents;

(c) Information that at the time of disclosure or subsequent to disclosure, is obtained by Milestone or its affiliates from a third party who is lawfully in possession of the information and who is not in violation of any contractual, legal or fiduciary obligation to the Company with respect to that information; or

(d) Information that is or was independently developed by Milestone or its affiliates from information lawfully obtained by Milestone or its affiliates from parties lawfully in possession of such information and who are not in breach of any contractual, legal or fiduciary obligation to the Company with respect to the information.

The Company has furnished and will continue to furnish or cause to be furnished to Milestone such information as Milestone believes appropriate to its assignment (all information so furnished being the "Information"). The Company recognizes and confirms that Milestone: (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the Services without having independently verified the same; (b) does not assume responsibility for the accuracy or completeness of the Information and such other information; and (c) will not make an appraisal of any assets or liabilities of the Company or a Purchaser Entity or any of their market competitors.

Milestone shall have no right to make any representation which will be binding upon the Company without the prior written consent of the Company.

4.  Recognition of the Fee Structure: The Company and Milestone acknowledge and agree that (a) hours worked, the results achieved and the ultimate benefit to the Company of the work performed, in each case, in connection with this engagement maybe variable and (b) the Company and Milestone have taken this into account in setting the fees hereunder. No fee payable to any other person, by the company to any other party, shall affect the fee payable to Milestone hereunder.

5.  Out-of-Pocket Expenses: In addition to any fees payable by the Company to Milestone hereunder, the Company, shall whether or not any transaction contemplated by this Agreement shall be proposed or consummated, reimburse Milestone on a monthly basis for it's reasonable travel and other reasonable out of pocket expenses (including all fees, disbursements and other reasonable charges of one firm of counsel, if any, to be retained by Milestone, and of other consultants and advisors retained by Milestone with the Company's consent) incurred in connection with, or arising out of Milestone's activities under or contemplated by this Agreement. The Company shall also reimburse Milestone, at such times as Milestone shall request for any sale, use or similar taxes (including additions to such taxes, if any) arising in connection with any matter referred to or contemplated by this Agreement. All such reimbursements shall be made promptly upon submission by Milestone of statements for such expenses. Upon execution of this Agreement, the Company will provide Milestone with an expense deposit of $75,000 to cover initial out-of-pocket expenses ("Expense Deposit"); Milestone hereby acknowledges that such Expense Deposit has been received.



Mr. Michael Strauss
August 8, 2007
Page 6

9.  <u>Term:</u> This Agreement and the retention of Milestone hereunder shall remain in full force and effect for twelve (12) months from the date hereof unless terminated earlier (the "Engagement Period") and may be terminated by the Company or Milestone at any time, with or without cause, upon 30 days written notice to that effect to the other party, without further obligation to each other, except it is agreed that the provisions relating to indemnification, limitation of liabilities, contribution, settlement, the provisions relating to the payment of fees and expenses, confidentiality, the status of Milestone as an independent contractor, the limitation on to whom Milestone shall owe any duties, and the waiver of the right to trial by jury in this Agreement will survive any such termination. If this Agreement expires or is terminated by the Company, any agreement or other written arrangement entered into by the Company regarding a Core Asset Sale within a 12 month period following the termination or expiration of this Agreement shall be deemed to give rise to the Core Asset Sale Fee set forth in Paragraph 2, payable by the Company to Milestone.

10.  <u>Independent Contractor:</u> The Company acknowledges and agrees that it is a sophisticated business enterprise and that Milestone has been retained pursuant to this Agreement to provide services to the Company. In such capacity, Milestone shall act as an independent contractor, and any duties of Milestone arising out of its engagement pursuant to this Agreement shall be contractual in nature and shall be owed solely to the Company. Each party disclaims any intention to impose any fiduciary duty on the either.

11.  <u>Announcement:</u> If a Core Asset Sale is completed, the Company acknowledges and agrees that Milestone may, at its option and expense, place an announcement in such newspapers and periodicals as it may choose, subject to the Company's prior approval which shall not be unreasonably withheld, stating that Milestone has acted as a Financial Advisor to the Company in connection with the Core Asset Sale. Other than announcements consistent with the preceding sentence, neither party shall make any public announcement relating to the content of this Agreement or any proposed acquisition or transaction in the absence of mutual written agreements by the parties regarding the content and timing of such announcement.

12.  <u>Indemnification, Contribution, and Limitation of Liability:</u> The Company agrees, as of July 1, 2007, to indemnify Milestone and its controlling persons, representatives, and agents in accordance with the indemnification provisions set forth in Appendix I, and agrees to the other provisions of Appendix I, which is incorporated herein by this reference, with respect to financial advisory services provided by Milestone both prior to and following the Company's bankruptcy filing and regardless of whether a Core Asset Sale is consummated.

13.  <u>Beneficiaries:</u> This Agreement shall inure to the sole and exclusive benefit of Milestone and the Company and the persons referred to in Appendix I and their respective successors and representatives. The obligations and liabilities under this Agreement shall be binding upon Milestone and the Company.

14.  <u>Amendments:</u> This Agreement may be modified or amended, or its provisions waived, only in writing signed by the person or persons against whom enforcement of the modification, amendment or waiver is sought.


Mr. Michael Strauss
August 8, 2007
Page 7

15. <u>No Commitment:</u> This Agreement does not and will not constitute any agreement, commitment or undertaking, express or implied on the part of Milestone or any affiliate to purchase or to sell any securities or to provide any financing and does not ensure the successful arrangement or completion of a Core Asset Sale.

16. <u>Entire Agreement:</u> This Agreement constitutes the entire Agreement between the parties and supersedes and cancels any and all prior or contemporaneous arrangements, understandings and agreements, written or oral, between them relating to the subject matter hereof.

17. <u>Severability:</u> If any portion of this Agreement shall be held or made unenforceable or invalid by a statute, rule, regulation, decision of a tribunal or otherwise, the remainder of this Agreement shall not be affected thereby and shall remain in full force and effect, and, to the fullest extent, the provisions of the Agreement shall be severable.

18. <u>Governing Law; Waiver of Trial by Jury:</u> This Agreement, and the rights and obligations of the parties hereto, shall be governed by and construed in accordance with Delaware law (without regard to any rules or principles of conflicts of law that might look to any jurisdiction outside of the State of New York). Any dispute arising hereunder shall be brought before a court in the State of New York.

**EACH OF THE PARTIES HERETO (ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS STOCKHOLDERS AND INDEMNIFIED PARTIES) WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERACTION (WHETHER BASED UPON CONTRACT, OR OTHERWISE) RELATED TO OR ARISING OUT OF THE ENGAGEMENT PURSUANT TO, OR THE PERFORMANCE OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT.**

19. <u>Waiver, Amendment and Modification; Headings:</u> No waiver, amendment or other modification of this Agreement shall be effective unless signed in writing by each of the parties hereto. The headings used herein are for ease of reference only and shall not be used to construe the meaning of this Agreement.

20. <u>Authority:</u> The Company and Milestone represent and warrant that they have full power and authority to execute and deliver this Agreement and to assume the obligations set forth herein, and this Agreement has been duly authorized, executed and delivered by the Company and constitutes a valid, binding and legally enforceable obligation of the Company and Milestone (except (i) as may be limited by laws pertaining to bankruptcy, insolvency, reorganization, moratorium, receivership, conservatorship or other laws affecting creditors' rights generally, and (ii) as may be limited by laws governing specific performance, injunction relief and all other equitable remedies.

21. <u>Business Continuity Plan:</u> The Company acknowledges that it has been provided with a copy of the Business Continuity Plan ("BCP") of Milestone which addresses the possibility of future significant business disruption and how Milestone intends to respond to events of varying scope.

 Mr. Michael Strauss
August 8, 2007
Page 8

The Company further acknowledges that the current BCP is posted on the website of Milestone and will periodically be updated for material changes.

 Mr. Michael Strauss
August 8, 2007
Page 9

If the foregoing terms correctly set forth our agreement, please sign and return to us a duplicate copy of this Agreement.  We look forward to working with you toward the successful conclusion of this engagement and developing a long-term relationship with the Company.

 Mr. Michael Strauss
August 8, 2007
Page 10

Very truly yours,

**MILESTONE ADVISORS, LLC**

By: _____
     Eugene S. Weil
     Chief Executive Officer

Confirmed and accepted as of this 5th day of August 2007

**AMERICAN MORTGAGE INVESTMENT CORP.**

By _____
  Mr. Michael Strauss
  Chairman, Chief Executive Officer and
  President



Mr. Michael Strauss
August 8, 2007
Page 11

## APPENDIX I

The Company agrees to indemnify and hold harmless Milestone and its affiliates (as defined in Rule 405 under the Securities Act of 1933, as amended) and their respective directors, officers, employees, agents and controlling persons (Milestone and each such person being an "Indemnified Party") from and against all losses, claims, damages and liabilities (or actions, including shareholder actions, in respect thereof), joint or several, to which such Indemnified Party may become subject under any applicable federal or state law, or otherwise, which are related to or result from the performance by Milestone of the services contemplated by or the engagement of Milestone pursuant to, this Agreement and will promptly reimburse any Indemnified Party for all reasonable expenses (including reasonable counsel fees and expenses) as they are incurred in connection with the investigation of, preparation for or defense arising from any threatened or pending claim, whether or not such Indemnified Party is a party and whether or not such claim, action or proceeding is initiated or brought by the Company. The Company will not be liable to any Indemnified Party under the foregoing indemnification and reimbursement provisions, (i) for any settlement by an Indemnified Party effected without its prior written consent (not to be unreasonably withheld); or (ii) to the extent that any loss, claim, damage or liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted primarily from Milestone's willful misconduct or gross negligence. The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its security holders or creditors related to or arising out of the engagement of Milestone pursuant to, or the performance by Milestone of the services contemplated by, this Agreement except to the extent that any loss, claim, damage or liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted primarily from Milestone's, willful misconduct or gross negligence.

Promptly after receipt by an Indemnified Party of notice of any intention or threat to commence an action, suit or proceeding or notice of the commencement of any action, suit or proceeding, such Indemnified Party will, if a claim in respect thereof is to be made against the Company, pursuant hereto, promptly notify the Company, in writing of the same. In case any such action is brought against any Indemnified Party and such Indemnified Party notifies the Company of the commencement thereof, the Company, may elect to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Party, and an Indemnified Party may employ counsel to participate in the defense of any such action provided, that the employment of such counsel shall be at the Indemnified Party's own expense, unless (i) the employment of such counsel has been authorized in writing by the Company (ii) the Indemnified Party has reasonably concluded (based upon advice of counsel to the Indemnified Party) that there may be legal defenses available to it or other Indemnified Parties that are different from or in addition to those available to the Company, or that a conflict or potential conflict exists (based upon advice of counsel to the Indemnified Party) between the Indemnified Party and the Company that makes it impossible or inadvisable for counsel to the Indemnifying Party to conduct the defense of both the Company and the Indemnified Party (in which case the Company not have the right to direct the defense of such action on behalf of the Indemnified Party), or (iii) the Company has not in fact employed counsel reasonably satisfactory to the Indemnified Party to assume the defense of such action within a reasonable time after receiving notice of the action, suit or proceeding, in each of which cases the reasonable fees, disbursements and other charges of such counsel will be at the expense of the Company; provided, further, that in no event shall the Company be required to pay fees and expenses for more than one firm of attorneys representing Indemnified Parties unless the defense of one Indemnified Party is unique or separate from that of another Indemnified Party subject to the same claim or action. Any failure or delay



Mr. Michael Strauss
August 8, 2007
Page 12

by an Indemnified Party to give the notice referred to in this paragraph shall not affect such Indemnified Party's right to be indemnified hereunder, except to the extent that such failure or delay causes actual harm to the Company or prejudices its ability to defend such action, suit or proceeding on behalf of such Indemnified Party.

If the indemnification provided for in this Agreement is for any reason held unenforceable by an Indemnified Party, the Company agrees to contribute to the losses, claims, damages and liabilities for which such indemnification is held unenforceable (i) in such proportion as is appropriate to reflect the relative benefits to the Company on the one hand, and Milestone on the other hand, of the transaction contemplated by the Agreement whether or not the transaction is consummated or, (ii) if (but only if) the allocation provided for in clause (i) is for any reason unenforceable, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of the Company on the one hand and Milestone, on the other hand, as well as any other relevant equitable considerations. The Company agrees that for the purposes of this paragraph the relative benefits to the Company and Milestone of the transaction as contemplated shall be deemed to be in the same proportion that the total value received or contemplated to be received by the Company or its shareholders, as the case may be, as a result of or in connection with the transaction, bear to the fees paid or to be paid to Milestone under this Agreement. Notwithstanding the foregoing, the Company expressly agrees that Milestone shall not be required to contribute any amount in excess of the amount by which fees paid Milestone hereunder (excluding reimbursable expenses), exceeds the amount of any damages which Milestone has otherwise been required to pay.

The Company agrees that without Milestone's prior written consent, which shall not be unreasonably withheld, it will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which indemnification could be sought under the indemnification provisions of this Agreement (in which the Milestone or any other Indemnified Party is an actual or potential party to such claim, action or proceeding), unless such settlement, compromise or consent includes an unconditional release of each Indemnified Party from all liability arising out of such claim, action or proceeding.

In the event that an Indemnified Party is requested or required to appear as a witness in any action brought by or on behalf of or against the Company in which such Indemnified Party is not named as a defendant, the Company agrees to promptly reimburse Milestone on a monthly basis for all expenses incurred by it in connection with such Indemnified Party's appearing and preparing to appear as such a witness, including, without limitation, the reasonable fees and disbursements of its legal counsel. In addition to any reimbursed fees, expenses or costs outlined hereunder, Milestone shall also receive from the Company cash compensation of $2,000.00 per person, per day, plus reasonable out-of-pocket expenses and costs should Milestone be required to provide testimony in any formal or informal proceeding regarding the Company

If multiple claims are brought, with respect to at least one of which indemnification is permitted under applicable law, and provided for under this Agreement, the Company agrees that any judgment or arbitrate award shall be conclusively deemed to be based on claims as to which indemnification is permitted and provided for, except to the extent the judgment or arbitrate award expressly states that it, or any portion thereof, is based solely on a claim as to which indemnification is not available.