# EXHIBIT A

## List of Additional Leases

## Additional Leases

| BranchName | Division | City | State | Zip | Address | Cost Center |
|---|---|---|---|---|---|---|
| Columbia Gateway | Retail-East | Columbia | MD | 21046 | 6996 Columbia Gateway Drive, Suite 102 | |
| Coral Gables FL 2951 | Retail-East | Coral Gables | FL | 33134 | 4621 Ponce De Leon Blvd | 02951 |
| Cornelius NC 2732 | Retail-East | Cornelius | NC | 28031 | 19930 W. Catawba Ave., Suite 140 | 02732 |
| Gaithersburg MD 515 | Retail-East | Gaithersburg | MD | 20877 | 481 N. Fredrick Ave, Suite 420 | 00515 |
| Hilton Head Island SC 2773 | Retail-East | Hilton Head Island | SC | 29928 | 10 Executive Park Road, Suite 101 | 02773 |
| Miami Beach FL 2926 | Retail-East | Miami Beach | FL | | 1111 Lincoln Road, Suites 6 & 7 | 02926 |
| Charleston SC 2626 | Retail-East | N Charleston | SC | 29407 | 2000 Sam Rittenburg, Suite 3009 | 02626 |
| New City NY 7 | Retail-East | New City | NY | 10956 | 200B South Main Street | 00007 |
| Palm Beach Gardens FL 2950 | Retail-East | Palm Beach Gardens | FL | 33410 | 4100 RCA Boulevard, Suite 100 | 02950 |
| Plantation FL 2829 | Retail-East | Plantation | FL | 33324 | 801 S University Drive, Suite A139 | 02829 |
| Raleigh National NC 2050 | Retail-East | Raleigh | NC | 27519 | 3717 National Drive, Suite 106 | 02050 |

| Tampa FL 2218 | Retail-East | Tampa | FL | 33607 | 1511 West Shore Blvd, Suite 720 | 02218 |
|---|---|---|---|---|---|---|
| Miami FL 2940 | Retail-East | Miami | FL | | 200 S. Biscayne Blvd. | 02940 |
| Miami FL 2821 | Retail-East | Miami | FL | | 12751 South Dixie Highway | 02821 |
| Sarasota Tamiami FL 2828 | Retail-East | Sarasota | FL | | 950 South Tamiami Trail | 02828 |
| St. Louis MO 2199 | Retail-West | Saint Louis | MO | 63129 | 4409 Meramec Bottom Road | 2199 |
| Scottsdale Ventura 1 AZ 357 | Retail-West | Scottsdale | AZ | 85258 | 8700 E. Via De Ventura | 357 |

## EXHIBIT B

**Sale Motion**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
---------------------------------------------------------------- x
In re:                                                           :    Chapter 11
                                                                 :
AMERICAN HOME MORTGAGE                                            :    Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,                  :
                                                                 :    Jointly Administered
        Debtors.                                                 :
                                                                 :    Objection Deadline: August 21, 2007 at 4:00 p.m. (ET)
                                                                 :    Bid Deadline: August 21, 2007 at 4:00 p.m. (ET)
---------------------------------------------------------------- x    Auction (if any): August 23, 2007 at 10:00 a.m. (ET)
                                                                      Hearing Date:  August 24, 2007 at 1:00 p.m. (ET)
```

## <u>NOTICE OF MOTION</u>

TO:    (I) THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE DISTRICT OF
DELAWARE; (II) THE 40 LARGEST UNSECURED CREDITORS FOR THE
DEBTORS ON A CONSOLIDATED BASIS AS IDENTIFIED IN THE DEBTORS'
CHAPTER 11 PETITIONS; (III) COUNSEL TO BANK OF AMERICA, N.A., AS
ADMINISTRATIVE AGENT FOR THE LENDERS UNDER THAT CERTAIN
CREDIT AGREEMENT DATED AUGUST 30, 2004; (IV) COUNSEL TO THE
AGENT FOR THE DEBTORS' POSTPETITION LENDER; (V) THE LANDLORDS
TO THE OFFICE LEASES; (VI) THE U.S. SECURITIES AND EXCHANGE
COMMISSION; (VII) THE POTENTIAL BIDDERS; (VIII) COUNSEL TO IMB; AND
(IX) ALL PARTIES ENTITLED TO NOTICE UNDER LOCAL RULE 2002-1 (b)

        **PLEASE TAKE NOTICE** that the above-captioned debtors and debtors-in-
possession have filed the Emergency Motion for an Order, Pursuant to Sections 105(a), 363 And
365 of the Bankruptcy Code, (I) Authorizing the Assumption and Assignment of Certain Real
Property Leases and The Sale of Furniture, Fixtures and Equipment Located Therein; (II)
Approving the Terms of the Letter Agreement; and (III) Granting Related Relief (the "Motion").

        **PLEASE TAKE FURTHER NOTICE** that objections to the attached Motion
must be filed with the United States Bankruptcy Court for the District of Delaware, 824 N.
Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before **4:00 p.m. (ET) on August
21, 2007**.  At the same time, you must also serve a copy of the objection upon the undersigned
counsel.

        **PLEASE TAKE FURTHER NOTICE** that all bids for the Office Assets (as
defined in the Motion) must be received by the following on or before **4:00 p.m. (ET) on
August 21, 2007**:

(i) American Home Mortgage Holdings, Inc., 538 Broadhollow Road, Melville, New York 11747 (Attn.: Alan Horn, General Counsel);

(ii) Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391 (Attn.: James L. Patton, Jr.), counsel to the Debtors;

(iii) Milestone Advisors, LLC 1775 Eye Street, NW, Suite 800, Washington, DC 20006 (Attn.: Jeffrey M. Levine);

(iv) the Official Committee of Unsecured Creditors, if appointed;

(v) Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022 (Attn.: Margot B. Schonholtz and Scott D. Talmadge) and Potter Anderson & Corroon LLP, Hercules Plaza, 6th Floor, 1313 North Market Street, Wilmington, Delaware 19801 (Attn.: Laurie Selber Silverstein), counsel to Bank of America, N.A., as Administrative Agent for the lenders under that certain Credit Agreement dated August 30, 2004;

(vi) Jones Day, 222 East 41st Street, New York, New York 10017 (Attn.: Corinne Ball and Erica M. Ryland) and Greenberg Traurig LLP, 1007 North Orange Street, Suite 1200, Wilmington, Delaware 19801 (Attn.: Victoria Counihan), counsel to the agent for the Debtors' post-petition lenders; and

(vii) Pachulski Stang Ziehl Young Jones & Weintraub, 780 Third Avenue, 36th Floor, New York, NY 10017-2024 (Attn: William P. Weintraub) and Orrick, Herrington & Sutcliffe LLP, The Orrick Building, 405 Howard Street, San Francisco, CA 94105 (Attn: Frederick D. Holden, Jr.), counsel to IMB.

**PLEASE TAKE FURTHER NOTICE** that if any Qualified Bids (as defined in the Motion) are received, an auction for the Office Assets shall take place on **10:00 a.m. (ET) on August 23, 2007**, at offices of Young Conaway Stargatt & Taylor, LLP, The Brandywine Bldg., 17th Floor, 1000 West Street, Wilmington, DE 19801, or such later time or other place as the Debtors may decide.

A HEARING ON APPROVAL OF THE SALE OF THE OFFICE ASSETS WILL BE HELD ON **AUGUST 24, 2007 AT 1:00 P.M. (ET)** BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 N. MARKET STREET, 5TH FLOOR, COURTROOM #6, WILMINGTON, DELAWARE 19801.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OF HEARING.

Dated: Wilmington, Delaware
      August 10, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Kara Hammond Coyle (No. 4410)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Proposed Counsel for Debtors and
Debtors in Possession

066585.1001

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x
In re:                                                           :   Chapter 11
                                                                 :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,                            :   Case No. 07-11047 (CSS)
a Delaware corporation, et al.,                                  :
                                                                 :   Jointly Administered
        Debtors.                                                 :
                                                                 :   **Objection Deadline: August 21, 2007 at 4:00 p.m. (ET)**
                                                                 :   **Bid Deadline: August 21, 2007 at 4:00 p.m. (ET)**
---------------------------------------------------------------- x   **Auction (if any): August 23, 2007 at 10:00 a.m. (ET)**
                                                                     **Hearing Date:  August 24, 2007 at 1:00 p.m. (ET)**

**EMERGENCY MOTION FOR AN ORDER, PURSUANT TO SECTIONS
105(a), 363 AND 365 OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN REAL PROPERTY LEASES
AND THE SALE OF FURNITURE, FIXTURES AND EQUIPMENT LOCATED
THEREIN; (II) APPROVING THE TERMS OF THE LETTER AGREEMENT;
AND (III) GRANTING RELATED RELIEF**

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and

debtors in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] respectfully

represent as follows:

## SUMMARY OF RELIEF REQUESTED[2]

1.       By this emergency motion (the "Motion"), the Debtors seek entry of an

order, pursuant to sections 105(a), 363 and 365 of title 11 of the Bankruptcy Code, (i)

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

[2] Capitalized terms in this Summary shall have the meaning ascribed to them below in this Motion.

authorizing the assumption and assignment of certain real property leases (the "Office Leases")[3] and the sale of furniture, fixtures, and equipment contained therein (the "FFE," and together with the Office Leases, collectively, the "Office Assets") to Indymac Bank F.S.B. ("IMB") or other party submitting a higher or better offer; (ii) approving the terms of the letter agreement dated August 7, 2007, by and between the Debtors and IMB, attached hereto as Exhibit 1 (the "Letter Agreement"); and (iii) granting related relief.

## JURISDICTION

2.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief requested herein are sections 105(a), 363 and 365 of title 11, United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code").

## BACKGROUND

3.    On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.    The Debtors' chapter 11 cases are being jointly administered pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

5.    No creditors' committee has yet been appointed in these cases.  No trustee or examiner has been appointed.

---

[3] The term "Office Leases" shall include such Office Leases added to the list, and shall not include the Office Leases removed from the list, in accordance with the terms of the Letter Agreement.

## THE DEBTORS' BUSINESS[4]

6.      Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

7.      As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

8.      A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately

---

[4] The facts set forth herein are derived from the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief (the "First Day Declaration") [D.I. 2], which is incorporated by reference as if fully set forth herein at length.

066585.1001

$46.3 billion.  AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

## EVENTS LEADING TO THE CHAPTER 11 FILING

9.     Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages.  These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

10.     The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities.  The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

11.     In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans.  During this time, certain of the Debtors' warehouse lenders -- the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

12.     On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

13.    The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors now employ approximately 1000 persons who are absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

14.    In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

15.    Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets

**THE SALE PROCESS**

16.    As stated above, the Debtors were in the business of originating mortgage loans and investing in mortgage-backed securities and mortgage loans resulting from the securitization of residential mortgage loans. In the weeks prior to the Petition Date, the Debtors operated hundreds of leased loan production offices at locations in 47 states and the District of Columbia (the "Production Offices"). However, shortly prior to the Petition Date, the Debtors

discontinued their loan origination business (the "Origination Business") in their Production Offices. The vast majority of the Debtors' employees were part of the Origination Business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. Given the shutdown of the Origination Business and the extensive workforce reduction, Production Offices, including the assets necessary for loan origination, are no longer necessary to the Debtors' operations.

17.    The approximate aggregate monthly rental costs for the Production Offices amounts to approximately $3.4 million. Prior to the Petition Date, the Debtors remitted payment for the August rent applicable to the Production Offices.[5] The Debtors intend, in the near term, to file a motion to reject certain Production Office leases that the Debtors believe, in their reasonable business judgment, will result in the incurrence of administrative liability that cannot be recouped.

18.    During the days leading up to the Petition Date, the Debtors, aided by their professional advisors, were in contact with certain entities in the mortgage industry that expressed an interest in taking immediate control of the Debtors' Production Offices. In particular, IMB approached the Debtors inquiring as to the assumption and assignment of certain of the Debtors' Production Offices and the potential purchase of the FFE located therein. Shortly thereafter, the Debtors and IMB entered into negotiations concerning the potential sale. As a result of those negotiations, the Debtors agreed, pursuant to the terms of the Letter Agreement, to sell the Office Assets to IMB (the "Sale"), which Sale includes the assumption and assignment of

---

[5] Certain of the August lease payments may not have cleared prior to the Petition Date and may remain unpaid.

the Office Leases (a list of the Office Leases is attached hereto as <u>Exhibit 2</u>),[6] and the sale of the

FFE contained therein.[7]

## <u>SUMMARY OF THE LETTER AGREEMENT</u>[8]

19.    Following arm's length negotiations, the Debtors and IMB entered into the

Letter Agreement.  A summary of the terms of the Letter Agreement are listed herein:

- In consideration for the sale of the Office Assets, IMB shall (i) pay AHM a cash payment of $2,500,000 (the "<u>Cash Payment</u>"); (ii) assume the following liabilities in connection with the Office Assets:  (a) phone company arrearages with respect to any of the Office Assets in an amount not to exceed $50,000; and (b) amounts necessary to satisfy any other arrearages, liens, or security interests with respect to the Offices Assets in an amount not to exceed $50,000 (collectively, the "<u>Assumed Liabilities</u>"); (iii) take assignment of and assume all liabilities under the Office Leases that are not Excluded Leases (hereinafter defined); and (iv) pay the Debtors an amount equal to the security deposits, if any, held by landlords in connection with the Office Leases that are not Excluded Leases, less (a) any charges made or claims retained by the landlords with regard to their security deposit relating to the Debtors' occupancy and (b) any amounts paid by IMB to the landlords to cure any of the Debtors' defaults or other obligations under the Office Leases.

- If IMB designates any additional offices ("<u>Additional Offices</u>") to be included as Offices and as part of the Office Assets and as the result of such addition of the Additional Offices (net of any removed Offices ("<u>Removed Offices</u>") related to Excluded Leases (as defined below)),

---

[6] The list of Office Leases is subject to modification pursuant to the terms of the Letter Agreement.  Certain Office Leases have been removed from and others have been added to the original list of Office Leases annexed to the License Agreement (as defined below).  Such changes may effect the ultimate purchase price of the Office Assets.

[7] In connection with the proposed Sale, the Debtors entered into a license agreement (the "<u>License Agreement</u>") with IMB, pursuant to which IMB is granted a license to use the office space, and all furniture, fixtures and equipment located within such office space, including utilities, telephone and Internet service supplied to such office space and all other items owned, rented, leased or otherwise controlled by Debtors at the Leased Offices, until such time as the Sale proposed herein is approved.  A copy of the License Agreement is attached to the Letter Agreement. Contemporaneously herewith, the Debtors filed the Emergency Motion for an Order, Pursuant to Sections 105 and 363 of the Bankruptcy Code, Approving Debtors' Entry into License Agreement with Indymac Bank F.S.B. in Connection with Bid to Assume Certain Leases and Purchase Related Furniture, Fixtures and Equipment, *nunc pro tunc* to August 8, 2007, seeking approval of the License Agreement.

[8] The summary of the Letter Agreement is qualified in its entirety by the Letter Agreement.  If there are any inconsistencies between the summary contained herein and the Letter Agreement, the Letter Agreement shall control.  Any capitalized terms used in this summary and not defined therein shall have the meaning assigned to such terms in the Letter Agreement.

066585.1001

sixty percent (60%) of the book value of the FFE at the Offices plus Additional Offices minus the Removed Offices exceeds the Cash Payment, then the Cash Payment shall be increased by an amount equal to sixty percent (60%) of AHM's book value of the FFE for FFE not paid for (at the 60% of book value rate) as part of the Cash Payment.

- Notwithstanding the foregoing, the Cash Payment shall be decreased by the amount, if any, that IMB pays for any cure costs in connection with the assumed Office Leases or any other costs attributable to the Office Assets that are collectively in excess of the Assumed Liabilities.

- Notwithstanding anything to the contrary in this letter, any payments by IMB to third parties to cure arrearages or pay claims secured by liens or security interests with respect to the Premises shall be deducted from the Cash Payment.

- Subject to the payment of any cure amounts and other claims with respect to the Office Leases from the Cash Payment, the Office Assets shall be transferred to IMB free and clear of any claims, arrearages, liens or encumbrances.

- IMB's obligation to make the Cash Payment shall be subject to AHM's certification and confirmation (as acknowledged pursuant to AHM's counter-signature below) that since August 1, 2007 it has not removed or authorized the removal, and from this day forward it will not remove or authorize the removal, of any of the FFE reflected on Exhibit "A" to the Letter Agreement from the Offices, and that all such FFE will be included in the bill of sale to IMB.

- Notwithstanding the foregoing, within 10 business days of the granting of the License, IMB may, by written notice to AHM, elect to exclude (i) up to ten percent (10%) of the Office Leases from the Office Assets to be acquired by IMB as listed on Exhibit "A" to the Letter Agreement plus any Office Leases for Additional Offices (as identified in writing by IMB to AHM within 10 business days of the granting of the License), and (ii) any Office Leases that IMB reasonably determines to be ten percent (10%) or more over market in rent and other financial obligations. Any Office Leases so excluded are referred to herein and in the Letter Agreement as "Excluded Leases."

- IMB's offer to acquire the Office Assets is contingent upon approval by the Bankruptcy Court of a sale and assignment of the Office Assets that permits IMB to assume Office Leases for not less than seventy-five percent (75%) of the Offices, after exclusion of the Excluded Leases.

DB02:6173600.5                                                    066585.1001

## RELIEF REQUESTED

20.     By this Motion, the Debtors request entry of an order (i) authorizing

assumption and assignment of the Office Leases and the sale and assignment of Office Assets to

IMB or another party submitting a higher and better offer; (ii) approving the terms of the Letter

Agreement attached hereto as Exhibit 1; and (iii) granting related relief, pursuant to sections 105

and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

## BASIS FOR RELIEF REQUESTED

I.      **The Entry Into the Letter Agreement is Within the Sound**
        **Business Judgment of the Debtors and Should be Approved**

21.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee,

after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code provides

that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to

carry out the provisions of this title." 11 U.S.C. § 105(a). In pertinent part, Bankruptcy

Rule 6004 states that, "all sales not in the ordinary course of business may be by private sale or

by public auction." Fed.R.Bankr.P. 6004(f)(1). With respect to the notice required in connection

with a private sale, Bankruptcy Rule 2002(c)(1) states, in pertinent part, that,

> . . . the notice of a proposed use, sale or lease of property . . . shall
> include . . . the terms and conditions of any private sale and the
> deadline for filing objections. The notice of a proposed use, sale or
> lease of property, including real estate, is sufficient if it generally
> describes the property.

Fed.R.Bankr.P. 2002(c)(1).

22.     To approve the use, sale, or lease of property out of the ordinary course of

business under Bankruptcy Code section 363(b), this Court must find "some articulated business

justification" for the proposed action. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d

143, 145-47 (3d Cir. 1986) (implicitly adopting the "articulated business justification" and good

faith tests of Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d

1063, 1070 (2d Cir. 1983)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76

(D. Del. 1991) (concluding that the Third Circuit had adopted a "sound business purpose" test in

Abbotts Dairies); Titusville Country Club v. PennBank (In re Titusville Country Club), 128 B.R.

396, 399 (Bankr. W.D. Pa. 1991); In re Indus. Valley Refrigeration & Air Conditioning Supplies,

Inc., 77 B.R. 15, 19 (Bankr. E.D. Pa. 1987).

       23.     Generally, courts have applied four (4) factors in determining whether a

sale of a debtor's assets should be approved: (1) whether a sound business reason exists for the

proposed transaction; (2) whether fair and reasonable consideration is provided; (3) whether the

transaction has been proposed and negotiated in good faith; and (4) whether adequate and

reasonable notice is provided. See Lionel, 722 F.2d at 1071 (setting forth the "sound business

purpose" test); Abbotts Dairies, 788 F.2d at 145-57 (implicitly adopting the articulated business

justification test and adding the "good faith" requirement); Delaware & Hudson Ry., 124 B.R. at

176 ("Once a court is satisfied that there is a sound business reason or an emergency justifying

the pre-confirmation sale the court must also determine that the trustee has provided the

interested parties with adequate and reasonable notice, that the sale price is fair and reasonable

and that the purchaser is proceeding in good faith.").

       24.     This fundamental analysis does not change if the proposed sale is private,

rather than public. See, e.g., In re Ancor Exploration Co., 30 B.R. 802, 808 (Bankr. N.D. Okla.

1983) ("[T]he bankruptcy court should have wide latitude in approving even a private sale of all

or substantially all of the estate assets not in the ordinary course of business under § 363(b).").

The bankruptcy court "has ample discretion to administer the estate, including authority to

conduct public or private sales of estate property." In re WPRV-TV, Inc., 143 B.R. 315, 319 (D.P.R. 1991), vacated on other grounds, 165 B.R. 1 (D.P.R. 1992); accord, In re Canyon Partnership, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985). Here, the proposed sale of the Office Assets meets all of these requirements of a private sale, includes procedures for receiving and considering any higher and better offer, including conducting a public auction to the extent a higher and better offer is received, and thus, should be approved.

A.    The Sale Reflects an Exercise of the Debtors' Business Judgment

25.    There is a sound business justification for the Debtors' preference to proceed with a sale to IMB according to the terms of the Letter Agreement, rather than conducting a sale of the Office Assets piecemeal. The Debtors are no longer using the Office Assets contained therein, yet the Debtors continue to accrue obligations related thereto. The Debtors' Production Offices are located in 47 states and the District of Columbia, and even more remotely separated within each state. The enormous marketing effort and expense associated with the piecemeal sale of the Office Assets would subsume any value in these assets. This is particularly evident when considering that each day the Office Leases remain unoccupied is a further drain on the Debtors' assets.

26.    Pursuant to the terms of the Letter Agreement, IMB has agreed to relieve this burden on the Debtors' estates by purchasing the Office Assets, assuming certain liabilities related thereto, and licensing the Office Leases for a period of time until the proposed Sale is approved. Moreover, the bulk sale of the Office Assets will result in the Debtors' realization of value, both in cash and through the assumption of liabilities, instead of the rejection of the Office Leases and the abandonment of a substantial portion of the FFE. The proposed sale, coupled with the License Agreement, offers an expeditious and cost-saving alternative to selling the

Office Assets one-by-one, and is the only reasonable and cost effective alternative under the circumstances.

      27.    Moreover, the Debtors believe that a sale of the Office Assets to IMB under the terms of the Letter Agreement will be much more likely to close in a timely, efficient and cost-effective manner than individual sales of the Office Assets. The Letter Agreement demonstrates IMB's good faith intent to close the contemplated transaction, subject only to a minimum amount of conditions, as set forth in the Letter Agreement. In the Debtors' business judgment, the Letter Agreement provides them with strong assurances that IMB is motivated to close the contemplated transaction in a timely manner.

      B.    The Purchase Price is Fair and Reasonable

      28.    The Debtors further believe that the Purchase Price represents a fair and reasonable price for the Office Assets. IMB has offered to pay $2.5 million for the Office Assets, as well as to assume certain related liabilities.[9] The Debtors, as stated above, are no longer using the Office Assets, and, as a result, the carrying costs associated therewith may be an administrative expensive burden on the Debtors' estates. The sale of the Office Assets to IMB will result in an infusion of capital in the amount of $2.5 million and the elimination of substantial administrative obligations. The Debtors submit that the proposed purchase price represents fair and reasonable consideration pursuant to the terms of the Letter Agreement. See Mellon Bank, N.A., v. Metro Communications, Inc., 945 F.2d 635 (3d Cir. 1991) (price amounted to reasonably equivalent value under the Bankruptcy Code), cert. denied, 503 U.S. 937 (1992).

---

[9] The proposed purchase price of $2.5 million is subject to reduction for certain cure payments, as more particularly set forth in the Letter Agreement.

    

C.     The Sale is Proposed in Good Faith

29.     The sale transaction pursuant to the terms of the Letter Agreement has been proposed in good faith. The terms of the sale to IMB are the product of arm's length negotiations with IMB, there is no undisclosed consideration changing hands and there are no side or undisclosed arrangements. IMB is not an affiliate of any of the Debtors, nor does IMB have any common officers or directors with any of the Debtors. Moreover, this transaction is proposed for the sole purpose of maximizing the estates' return on the Office Assets and minimizing future administrative expenses.

D.     Adequate and Reasonable Notice of the Sale Has Been Provided

30.     The Debtors have provided adequate and reasonable notice of the proposed sale to all parties in interest, as required by the applicable procedural rules. See Fed. R. Bankr. P. 2002(c)(1) (notice must contain "the terms and conditions of any private sale and the time fixed for filing objections."); see also, Delaware & Hudson Ry., 124 B.R. at 180 (the disclosures necessary in such a sale notice need only include the terms of the sale and the reasons why such a sale is in the best interests of the estate and do not need to include the functional equivalent of a disclosure statement). Contemporaneous with the filing of this Motion, the Debtors will file a motion to shorten and approve the form and manner of notice (the "Motion To Shorten"). Under the circumstances, including, inter alia, the fact that the Debtors' have shut down their Origination Business and are pressed with a short timeframe to sell the Office Assets without incurring substantial administrative expenses, the Debtors believe that notice is adequate and sufficient.

31.     The deadline by which IMB is required to provide the Debtors, and their advisors, with a list of any and all Additional Offices, if any, shall be **August 16, 2007 at 4:00**

**p.m. (Eastern Time).** The Debtors shall serve notice, by expedited mail, to the non-Debtor

parties to the Additional Offices **on or before August 17, 2007.** The Debtors have sought

approval of these deadlines in the Motion To Shorten.

        32.     The Debtors will serve the Motion and the Letter Agreement on all parties

the Debtors believe may have an interest in purchasing the Office Assets. These parties will

have the opportunity to submit offers to purchase the Office Assets (the "Competing Bids")

through and **including 4:00 p.m. (Eastern Time), on August 21, 2007** (the "Competing Bid

Deadline"). All Competing Bids must be served on each of the following so as to be received by

the Competing Bid Deadline:

> (i) American Home Mortgage Holdings, Inc., 538 Broadhollow Road, Melville, New York 11747 (Attn.: Alan Horn, General Counsel);

> (ii) Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391 (Attn.: James L. Patton, Jr.), counsel to the Debtors;

> (iii) Milestone Advisors, LLC 1775 Eye Street, NW, Suite 800, Washington, DC 20006 (Attn.: Jeffrey M. Levine);

> (iv) the Official Committee of Unsecured Creditors, if appointed;

> (v) Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022 (Attn.: Margot B. Schonholtz and Scott D. Talmadge) and Potter Anderson & Corroon LLP, Hercules Plaza, 6th Floor, 1313 North Market Street, Wilmington, Delaware 19801 (Attn.: Laurie Selber Silverstein), counsel to Bank of America, N.A., as Administrative Agent for the lenders under that certain Credit Agreement dated August 30, 2004;

> (vi) Jones Day, 222 East 41st Street, New York, New York 10017 (Attn.: Corinne Ball and Erica M. Ryland) and Greenberg Traurig LLP, 1007 North Orange Street, Suite 1200, Wilmington, Delaware 19801 (Attn.: Victoria Counihan), counsel to the agent for the Debtors' post-petition lenders; and

> (vii) Pachulski Stang Ziehl Young Jones & Weintraub, 780 Third Avenue, 36th Floor, New York, NY 10017-2024 (Attn: William P. Weintraub) and Orrick, Herrington & Sutcliffe LLP, The Orrick Building, 405 Howard Street, San Francisco, CA 94105 (Attn: Frederick D. Holden, Jr.), counsel to IMB.

33.     Consistent with their fiduciary duties to their estates, the Debtors will consider all such Competing Bids and accept an offer, if any, that, in the Debtors' business judgment, is higher or better than IMB's offer.  If a higher and better offer for the Office Assets is received on or before the Competing Bid Deadline, the bidding procedures, attached hereto as Exhibit 3, will govern (the "Bidding Procedures").  The Bidding Procedures require, among other things, an overbid of $50,000.00 and bid increments of an equal amount.

34.     To summarize, in the Debtors' sound business judgment, very little if anything would be gained by conducting piecemeal sales of the Office Assets.  In light of the bulk bid submitted by IMB, the Debtors do not believe it is likely that a higher and better bid will come in when factoring the delay, uncertainty and added administrative expenses attendant to individual bids.  Notwithstanding the foregoing, the Debtors will carefully consider all bids received.  The Debtors submit that to preserve and maximize the value of their estates, the sale of the Office Assets to IMB or the highest and best bidder is an exercise of sound business judgment, is in the best interests of the Debtors and their estates, and should be approved in all respects.

**II.     The Sale Should Be Approved Under 11 U.S.C. § 363**

A.     The Sale is Proposed in Good Faith Within the Meaning of 11 U.S.C. § 363(m)

35.     As discussed above, the Letter Agreement was negotiated at arm's length and in good faith.  IMB is not affiliated with any of the Debtors or their representatives.  Accordingly, this Court should find that IMB has acted in good faith within the meaning of section 363(m) of the Bankruptcy Code.  See generally Marin v. Coated Sales, Inc. (In re Coated Sales, Inc.), No. 89 Civ. 3704 (KMW), 1990 WL 212899 (S.D.N.Y.) (holding that to show lack of good faith, a party must demonstrate "fraud, collusion, or an attempt to take grossly unfair

advantage of other bidders"); see also In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting In re Bel Air Assocs., Ltd., 706 F.2d 301, 305 (10th Cir. 1983)); In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings" (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978))).  Similarly, if another purchaser is approved by the Court after submitting a higher or better offer, such party should be found to have acted in good faith in accordance with section 363(m) of the Bankruptcy Code.

      B.     The Sale Transfer Should be Free and Clear of Liens, Claims, and Interests under 11 U.S.C. § 363(f)

      36.     In accordance with section 363(f) of the Bankruptcy Code, a debtor in possession may sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

     (i)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

     (ii)     such entity consents;

     (iii)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

     (iv)     such interest is in bona fide dispute; or

     (v)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); see In re Elliot, 94 B.R. 343, 354 (E.D. Pa. 1988) (sale "free and clear" may be approved provided the requirements of at least one subsection are met).

      37.     Considering that any objections to this Motion must be resolved by consent of the objecting party or by the Court, the Debtors expect that they can satisfy, at least, both the second and fifth subsections of Bankruptcy Code section 363(f).  Accordingly, the

Debtors request that the sale of the Office Assets be approved free and clear, with any liens, claims, encumbrances, and interests to attach to proceeds of the Sale.

**III.    Assumption and Assignment of the Office Leases Should be Approved**

        38.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts have uniformly deferred to the business judgment of a debtor to determine whether the assumption of an unexpired lease or contract would be beneficial to the estate and is therefore appropriate under section 365(a) of the Bankruptcy Code. See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993); In re Taylor, 913 F.2d 102 (3d Cir. 1990). "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

        39.    Pursuant to section 365(b)(1) of the Bankruptcy Code, a debtor must cure (or provide adequate assurance that they will promptly cure) all existing defaults (other than defaults described in section 365(b)(2) of the Bankruptcy Code) in connection with the assumption of such contract. IMB has agreed to assume certain liabilities in a strictly limited amount and to (i) cure, to the extent it can be effected by deduction from, and within the amount of, the Cash Payment, any default existing under any of the Office Leases prior to the date of assumption, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, (ii) provide compensation or adequate assurance of compensation, to the extent it can be effected by deduction from, and within the amount of, the Cash Payment, to any party for any actual of

Page 17

pecuniary loss to such party resulting from a default prior to the date hereof under any of the

Office Leases, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and (iii)

provide adequate assurance of their future performance of and under the Office Leases, within

the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.

          40.    The Debtors will provide a notice identifying the proposed cure amount

for each of the Office Leases to each non-Debtor party to an Office Lease no later than two (2)

business days following entry of an order approving this Motion. Such notice will, among other

things, list the Debtors' proposed cure amount (the "Proposed Cure Amount"). The Debtors

request that the Court establish **September 7, 2007 at 4:00 p.m. (prevailing Eastern time)** (the

"Cure Objection Deadline") as the deadline by which non-Debtor parties to the Office Leases

must file an objection (the "Cure Amount Objection") to their scheduled Proposed Cure Amount

and that such parties serve a copy of the Cure Amount Objection so as to be received no later

than the Cure Objection Deadline on the same day to:

> (i) American Home Mortgage Holdings, Inc., 538 Broadhollow Road, Melville, New York 11747 (Attn.: Alan Horn, General Counsel);
>
> (ii) Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391 (Attn.: James L. Patton, Jr.), counsel to the Debtors;
>
> (iii) Milestone Advisors, LLC 1775 Eye Street, NW, Suite 800, Washington, DC 20006 (Attn.: Jeffrey M. Levine); and
>
> (iv) Pachulski Stang Ziehl Young Jones & Weintraub, 780 Third Avenue, 36th Floor, New York, NY 10017-2024 (Attn: William P. Weintraub) and Orrick, Herrington & Sutcliffe LLP, The Orrick Building, 405 Howard Street, San Francisco, CA 94105 (Attn: Frederick D. Holden, Jr.), counsel to IMB.

Such non-debtor parties shall (i) be forever barred from objecting to the Proposed Cure Amount

and from asserting any additional cure or other amounts with respect to such Office Lease and

the Debtors shall be entitled to rely solely upon the Proposed Cure Amount; and (ii) be deemed

to have consented to the assumption and assignment of such Office Lease and shall be forever barred and estopped from asserting or claiming against the Debtors and IMB (or such other successful bidder or any other assignee of the Office Lease) that any additional amounts are due or defaults exist, or conditions to assumption and assignment must be satisfied under such Office Lease.

41.   For the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that selling the Office Assets, including the assumption and assignment of the Office Leases to IMB, would be in the best interests of their estates. Thus, the Debtors respectfully submit that the assumption and assignment of the Office Leases should be approved.

**IV.    Waiver of Ten-Day Stay Period Under Fed. R. Bankr. P. 6004(g) and 6006(d)**

42.    Bankruptcy Rule 6004(g) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Sale order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(g) and 6006(d) are waived.

43.    The purpose of Bankruptcy Rules 6004(g) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(g) and 6006(d). Although Bankruptcy Rules 6004(g) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, Collier on

Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

      44.     The Debtors hereby request that the Court waive the ten-day stay period under Bankruptcy Rules 6004(g) and 6006(d).

## NOTICE

      45.     No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the 40 largest unsecured creditors for the Debtors on a consolidated basis as identified in the Debtors' chapter 11 petitions; (iii) counsel to Bank of America, N.A., as Administrative Agent for the lenders under that certain Credit Agreement dated August 30, 2004; (iv) counsel to the Debtors' postpetition lender; (v) the landlords to the Office Leases; (vi) the U.S. Securities and Exchange Commission; (vii) counsel to IMB; (viii) the Potential Bidders; and (ix) all parties entitled to notice under Local Rule 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PRIOR MOTION

      46.     No previous motion for the relief sought herein has been made to this or any other Court.

             066585.1001

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit 4, and grant such other and further relief as is just and proper.

Dated:    Wilmington, Delaware
          August 10, 2007

                        YOUNG CONAWAY STARGATT & TAYLOR, LLP

                        James L. Patton, Jr. (No. 2202)
                        Joel A. Waite (No. 2925)
                        Pauline K. Morgan (No. 3650)
                        Sean M. Beach (No. 4070)
                        Matthew B. Lunn (No. 4119)
                        Kara Hammond Coyle (No. 4410)
                        Kenneth J. Enos (No. 4544)
                        The Brandywine Building
                        1000 West Street, 17th Floor
                        Wilmington, Delaware 19801
                        Telephone: (302) 571-6600
                        Facsimile: (302) 571-1253

                        Proposed Counsel for Debtors and
                        Debtors in Possession

DB02:6173600.5                                              066585.1001

# EXHIBIT 1

## Letter Agreement

AUG. 9. 2007  3:38PM    AMERICAN-HOME-MORTGAGE                    NO. 2477   P. 1

**INDYMAC BANK, F.S.B.**
**888 E. Walnut Street**
**Pasadena, CA 91101**

August 7, 2007

American Home Mortgage
538 Broad Hollow Road
Melville, NY 11747

Attention: Mr. Michael Strauss

Dear Michael:

Per our discussions, attached is a License Agreement (the "License") for your execution on behalf of American Home Mortgage ("AHM") that will allow Indymac Bank F.S.B. ("IMB") to conduct operations out of the offices set forth on Exhibit "A" (collectively, the "Offices" and each, individually, an "Office"). The License Agreement is submitted in connection with IMB's bid to assume the leases (the "Office Leases") for the Offices and to purchase the furniture, fixtures, and equipment located in the Offices (the "FFE" and, together with the Office Leases, collectively, the "Office Assets"). The terms of IMB's offer to purchase are as subsequently set forth herein. We understand, and you agree, that upon your acceptance of IMB's bid to acquire the Office Assets, AHM will submit a motion in AHM's pending bankruptcy case seeking (i) the Bankruptcy Court's approval of IMB's purchase of the Office Assets subject to any higher and better bids that AHM may receive for the Office Assets; (ii) bid procedures for purposes of conducting an auction of the Office Assets (the "Auction"); and (iii) approving IMB's occupation and use of the Offices in accordance with the License pending the Auction and IMB's purchase of the Office Assets, with the granting of the License to be in lieu of any break-up fee or other bid protections being provided to IMB. AHM will seek to have such motion heard and approved by the Bankruptcy Court within two days after the date of this letter.

Subject to any extension IMB may grant, in writing, in its sole and absolute discretion, this letter and the commitments in it will be of no force or effect unless (1) IMB is granted by AHM access to and use of all of the Offices by August 8, 2007; (2) the License is signed this day (by midnight August 7, 2007 Pacific Daylight Time) by AHM; and (3) AHM shall have filed with the Bankruptcy Court by August 10, 2007 an emergency motion (or motions) for the approval of the License Agreement and the Auction procedures.

As consideration for the purchase of the Office Assets, IMB shall (i) pay AHM a cash payment of $2,500,000 (the "Cash Payment"); (ii) assume the following liabilities in connection with the Office Assets: (a) phone company arrearages with respect to any of the Office Assets in an amount not to exceed $50,000; and (b) amounts necessary to satisfy any other arrearages, liens, or security interests with respect to the Offices Assets in an amount not to exceed $50,000 (collectively, the "Assumed Liabilities"); (iii) take assignment of and assume all liabilities under the Office Leases that are not Excluded Leases (hereinafter defined); and (iv) pay AHM an amount equal to the security deposits, if any, held by landlords in connection with the Office Leases that are not Excluded Leases, less (a) any charges made or claims retained by the landlords with regard to their security deposit relating to AHM's occupancy and (b) any amounts paid by IMB to the landlords to cure any of AHM's defaults or other obligations under the Office Leases. If IMB designates any additional offices ("Additional Offices") to be included as Offices and as part of the Office Assets and as the result of such addition of the Additional Offices (net of any removed Offices ("Removed Offices") related to Excluded Leases (as defined below)), sixty percent (60%) of the book value of the FFE at the Offices plus Additional Offices minus the Removed Offices exceeds the Cash Payment, then the Cash Payment shall be increased by an amount equal to sixty percent (60%) of

OHS West:260282165.3

American Home Mortgage
August 7, 2007
Page 2

AHM's book value of the FFE for FFE not paid for (at the 60% of book value rate) as part of the Cash Payment. Notwithstanding the foregoing, the Cash Payment shall be decreased by the amount, if any, that IMB pays for any cure costs in connection with the assumed Office Leases or any other costs attributable to the Office Assets that are collectively in excess of the Assumed Liabilities. Notwithstanding anything to the contrary in this letter, any payments by IMB to third parties to cure arrearages or pay claims secured by liens or security interests with respect to the Premises shall be deducted from the Cash Payment. Subject to the payment of any cure amounts and other claims with respect to the Office Leases from the Cash Payment, the Office Assets shall be transferred to IMB free and clear of any claims, arrearages, liens or encumbrances. IMB's obligation to make the Cash Payment shall be subject to AHM's certification and confirmation (as acknowledged pursuant to AHM's counter-signature below) that since August 1, 2007 it has not removed or authorized the removal, and from this day forward it will not remove or authorize the removal, of any of the FFE reflected on Exhibit "A" from the Offices, and that all such FFE will be included in the bill of sale to IMB.

Notwithstanding the foregoing, within 10 business days of the granting of the License, IMB may, by written notice to AHM, elect to exclude (i) up to ten percent (10%) of the Office Leases from the Office Assets to be acquired by IMB as listed on Exhibit "A" plus any Office Leases for Additional Offices (as identified in writing by IMB to AHM within 10 business days of the granting of the License), and (ii) any Office Leases that IMB reasonably determines to be ten percent (10%) or more over market in rent and other financial obligations. Any Office Leases so excluded are referred to herein as "Excluded Leases." IMB's offer to acquire the Office Assets is contingent upon approval by the Bankruptcy Court of a sale and assignment of the Office Assets that permits IMB to assume Office Leases for not less than seventy-five percent (75%) of the Offices, after exclusion of the Excluded Leases.

Pursuant to the License Agreement, IMB will gain the right to use the Offices, together with the FFE and various utilities and support services related to the operations of the Offices. Under the terms of the License, as set forth therein, IMB would be responsible for payment of all expenses, including rent, utility services, phone usage, security, janitorial, cleaning, and other costs, in connection with the use of the Offices and would reimburse AHM for the same together with a payment of $25,000 per month for any administrative costs incurred by AHM in connection with the License.

Please sign and fax (or scan and email) back to me a signed copy of this offer and the License at (626) 535 - 4180. Upon receipt, I will countersign the License Agreement and fax it back to you. Please provide a preferred fax number. To facilitate the payments contemplated by this letter, please also send me a completed and signed Form W-9.

Sincerely,

INDYMAC BANK, F.S.B.

Jules Vogel
Executive Vice President

American Home Mortgage
August 7, 2007
Page 3


**ACCEPTED, ACKNOWLEDGED AND AGREED**

**American Home Mortgage**

By: _____

Name: _Stephen A. Howe_

Title: _EVP + CFO_

Date: **August 7, 2007**

Exhibit A

| BranchName | City | State | Address | Cost Center |
|---|---|---|---|---|
| Alameda CA 390 | Alameda | CA | 1512 Webster Street | 00030 |
| Albuquerque Uptown NM 2171 | Albuquerque | NM | 6900 Uptown Blvd, NB | 02171 |
| Anaheim CA 369 | Anaheim | CA | 2270 La Crescenta | 00369 |
| Angela Chang CA 345 | Angela Chang | CA | 1239 S. Atlas St. | 00345 |
| Bellingham WA 2188 | Bellingham | WA | 1736 Iowa Street | 02188 |
| Big Sky 2883 | Big Sky | MT | 50 Meadow Village Suite 205 | #N/A |
| Bloomington MN 2039 | Bloomington | MN | 1600 West 82nd St. | 02039 |
| Boise ID 2025 | Boise | ID | 1850 W Emerald | 02025 |
| Bozeman Main MT 2729 | Bozeman | MT | 2616 W. Main St. | 02729 |
| Campbell Campbell CA 340 | Campbell | CA | 51 E. Campbell Avenue | 00340 |
| Central Lafayette LA 3331 | Lafayette | LA | 318 Guilbeau Road | 03331 |
| Cerritos CA 377 | Cerritos | CA | 17777 Center Court Drive | 00377 |
| Chandler AZ 01512 | Chandler | AZ | 725 S Arizona Place | 01512 |
| Chaska MN 1313 | Chaska | MN | 1107 Hazeltine Blvd, Ste 500 | 01313 |
| Cheyenne WY 365 | Cheyenne | WY | 4515-F East Pershing | 00365 |
| Coeur d'Alene ID 2227 | Coeur D'Alene | ID | 1221 Ironwood Dr. | 02227 |
| Concord Sutter Street CA 392 | Concord | CA | 1800 Sutter Street | 00392 |
| Del Rio Border FCU TX 2375 | Del Rio | TX | 6003 E. Gibbs Street | 02375 |
| Eagle ID 2074 | Eagle | ID | 463 E. Shore Drive | 02074 |
| Edmonds | Edmonds | WA | 21959 76th Ave. West, Ste 110 | #N/A |
| Elk Grove CA 3315 | Elk Grove | CA | 9355 E Stockton Blvd | 03315 |
| Flowermound TX 3163 | Flower Mound | TX | 3165 Long Prairie Road | A3163 |
| Glendale AZ 3321 | Glendale | AZ | 5855 W. Talavi Blvd | 03321 |
| Grand Junction 1st CO 422 | Grand Junction | CO | 2452 Patterson Road | 00422 |
| Greenwood Village CO 2004 | Greenwood Village | CO | 8101 East Pentdise Avenue | 02004 |
| Gresham OR 2657 | Gresham | OR | 1520 North Main | 02657 |
| Helena MT 2334 | Helena | MT | 825 Great Northern Boulevard | 02334 |
| Henderson NV 351 | Henderson | NV | 2270 Corporate Circle | 00351 |
| Honolulu HI 02401 | Honolulu | HI | 1357 Kapiolani Blvd. | 02401 |
| Houston Glenwood TX 3333 | Houston | TX | 720 N. Post Oak | 03333 |
| Indian Wells CA 314 | Indian Wells | CA | 76-699 Highway 111 | 00314 |
| Iowa Area IA 2095 | West Des Moines | IA | 3829 Westown Freeway | 02095 |
| Kapaa HI 2422 | Kapaa | HI | 4-361 Kuhio Highway | 02422 |
| Kapolei HI 01111 | Kapolei | HI | 1001 Kamokila Boulevard | 01111 |
| Gold Bar WA 2170 | Gold Bar | WA | 401 Petadium | 02170 |
| La Jolla CA 311 | La Jolla | CA | 4225 Executive Square | 00311 |
| Lahaina HI 2342 | Lahaina | HI | 222 Papalaua Street | 02342 |
| Lakewood WA 2072 | Lakewood | WA | 5808 100th Street | 02072 |
| Las Vegas NV 2353 | Las Vegas | NV | 7777 North Rainbow Blvd. | 02353 |
| Layton UT 3330 | Layton | UT | 920 West Heritage Park Blvd | 03330 |
| Littleton CO 2005 | Littleton | CO | 9200 W Cross Drive | 02005 |
| Long Beach Kilroy CA 307 | Long Beach | CA | 3780 Kilroy Airport Way | 00307 |
| Maple Grove MN 1209 | Maple Grove | MN | 7767 Elm Creek Blvd. | 01209 |
| Missoula MT 2505 | Missoula | MT | 1821 Stephens Avenue | 02505 |
| Modesto CA 361 | Modesto | CA | 1150 Ninth Street | 00361 |
| Monterey CA 356 | Monterey | CA | 659 Abrego Street | 00356 |
| Nampa ID 2075 | Nampa | ID | 724 12th Avenue South | 02075 |
| Peak Experience Mortgage | Colorado Springs | CO | 2639 Tenderfoot Hill Street | 02639 |
| Pomona CA 324 | Pomona | CA | 3191 Kettelle Avenue | 00324 |
| Portland CO 2035 | Portland | OR | 10220 SW Greenburg Road | 02035 |
| Portland OR 2231 | Portland | OR | 10220 SW Greenburg Rd | 02231 |
| Rancho Cucamonga CA 309 | Rancho Cucamonga | CA | 9650 Haven Ave. #250 | 00309 |

| BranchName | City | State | Address | Cost Center |
|---|---|---|---|---|
| Riverside CA 319 | Riverside | CA | 3759 Adams Street | 00510 |
| Roseville CA 394 | Roseville | CA | 1608 Eureka Road | 00344 |
| Rowlett TX 3339 | Rowlett | TX | 4709 Rowlett Drive | 00328 |
| Sacramento CA 2402 | Sacramento | CA | 1610 Arden Way | 02402 |
| Salinas CA 1321 | Salinas | CA | 2 Salinas Street | 01321 |
| Salt Lake City UT 2144 | Salt Lake City | UT | 6415 South 3000 East | 02144 |
| Scottsdale 1 AZ 1310 | Scottsdale | AZ | 16700 Hayden Vista Boulder | 01310 |
| Scottsdale Ventura 1 AZ 357 | Scottsdale | AZ | 8700 E. Via De Ventura | 00357 |
| Sherwood OR 2199 | Sherwood | OR | 20512 SW Roy Rogers Road | 02193 |
| Sioux Falls SD 343 | Sioux Falls | SD | 3409 West 47th Street | 00343 |
| Sonora CA 346 | Sonora | CA | 79 N. Washington Street | 00346 |
| Temecula CA 2409 | Temecula | CA | 27450 Ynez Road | 02409 |
| Tendlefoot CO 3323 | Colorado Springs | CO | 2650 Tenderfoot Hill Street | 00323 |
| Temecula CA 313 | Temecula | CA | 2780 Skymark Drive | 00313 |
| Walnut Creek CA 338 | Walnut Creek | CA | 590 Ygnacio Valley Road | 00338 |
| West Linn OR 2201 | West Linn | OR | 1800 Blankenship Rd | 02201 |
| Yakima WA 2162 | Yakima | WA | 5917 Tieph-Owen Way | 02162 |
| Yucca Valley CA 315 | Yucca Valley | CA | 55551 29 Palms Highway | 00315 |
| Total | 70 | | | |

## LICENSE AGREEMENT

This **LICENSE AGREEMENT** ("License Agreement") is made and entered into as of the 7th day of August, 2007, between AMERICAN HOME MORTGAGE ("Licensor"), and INDYMAC BANK, F.S.B. ("Licensee") for the right to use the office space, and all furniture, fixtures and equipment located within such office space, including utilities, telephone and Internet service supplied to such office space and all other items owned, rented, leased or otherwise controlled by Licensor at the office locations listed on Exhibit "A" attached hereto (such office space and all furniture, fixtures, equipment, utilities, telephone service and Internet service are collectively referred to herein as the "Premises"), with reference to the following:

**LICENSE.** Licensor hereby grants to Licensee a license to use the Premises and Licensee hereby accepts such license to use the Premises from Licensor on the terms and conditions set forth in this License Agreement. From and after the Effective Date (defined below), to preserve the confidentiality of Licensee's documentation maintained at the Premises, Licensor shall not grant any other person or entity the right to use or access the Premises without Licensee's prior written consent. Notwithstanding the foregoing, Licensor shall have the right to enter the Premises upon reasonable prior notice to Licensee; provided, however, that during any such entry by Licensor, the parties shall implement reasonable procedures to protect the confidentiality of Licensee's documentation and other information within the Premises. The foregoing license shall include Licensee's right to use software applications on Licensor's computers and other intellectual property within the Premises, to the extent permitted by applicable law as reasonably determined by Licensee; provided, however, the license shall exclude any right to use Licensor's loan origination system, Licensor's point-of-sale system and any proprietary software developed by or especially for Licensor. Licensee shall have access to and may use the Premises seven days per week, twenty-four hours per day, three hundred sixty-five days per year. Licensee and its employees, agents and invitees shall have the right to use the parking spaces in the parking area allocated to the Premises in accordance with the applicable leases in common with other users of the buildings containing the Premises.

**TERM.** The term of this License Agreement ("Term") shall commence on the date Licensee obtains access to the Premises (the "Effective Date") and shall continue thereafter until terminated by either party upon not less than fifteen (15) business days notice. The Term shall expire at midnight on the date specified in the written notice from either party electing to terminate this License Agreement.

This License Agreement shall be of no force or effect unless the Effective Date occurs by August 8, 2007, unless that deadline is mutually extended by each of Licensor and Licensee in its sole and absolute discretion. Effective upon execution of this License Agreement, Licensor shall cause Licensee to have access to and use of all of the Premises.

**MONTHLY LICENSE FEE. SERVICES.** During the Term, Licensee shall pay Licensor a fee (the "License Fee") equal to (i) the amount of the actual monthly rent and additional rent, including operating expenses, utilities, real estate taxes and insurance, payable by Licensor with respect to the Premises pursuant to the applicable leases for the Premises for the period that Licensee is provided access to and use of the Premises, plus (ii) the amount of the actual monthly charges payable by Licensor to third parties for all facility and telecommunication service contracts servicing the Premises, plus (iii) $25,000 per month (the "Licensor Services Component") (prorated for any partial months) to cover the cost of four (4) Licensor employees (or contractors) providing bill processing/accounts payable services related to the Premises and telecommunications/data network/computer desktop/Internet support to the Premises and Licensee's employees working at or remotely from the office locations constituting the Premises, until such time as Licensee assumes responsibility for providing such services directly. Licensor makes no representations or warranties with respect to any services so provided, including, without limitation, the quality or adequacy of any services provided to Licensee under this License Agreement. To facilitate the calculation of the License Fee, Licensor shall deliver to Licensee (a) complete copies of each of Licensor's leases with respect to the Premises within three (3) days after the Effective Date, and (b) copies of each of the invoices from the applicable third parties for the portion of the License Fee payable pursuant to subclause (ii) above. Prior to the approval of this License Agreement by the United States Bankruptcy Court in the Licensor's pending Bankruptcy case, Licensor shall pay the License Fee weekly on each Friday, prorated for its actual days of occupancy based on the actual number of days in the applicable calendar

month (with the first such payment to be paid on or before August 10). Upon approval of this License Agreement by the United States Bankruptcy Court in the Licensor's pending Bankruptcy case, Licensee shall pay the remainder of the License Fee for the calendar month of August (or, if Bankruptcy Court approval is not obtained until September, then for the calendar month of September), 2007 in full. The License Fee shall be calculated based on a schedule provided by Licensor of landlords and other payees and amounts (setting forth the name, address and amount due for each landlord and other vendor for the month of August) to be paid solely with respect to the calendar month of August, 2007 with respect to the Premises (which payments shall be subject to reconciliation in subsequent months based upon landlord- and vendor-specific invoices). Thereafter, Licensee shall pay Licensor the License Fee on or before the date the applicable portion of the License Fee is due and payable in accordance with the terms of the applicable lease or other agreement with or invoice from the applicable third-party provider. The License Services Component of the License Fee shall be paid by Licensee to Licensor on or before the ninth (9th) day of the applicable calendar month, provided, however, that until the Bankruptcy Court in the Licensor's Pending Bankruptcy case approves this License Agreement, the License Services Component of the License Fee shall be prorated and paid concurrently with the License Fee. Licensee shall pay all of the License Fee to Licensor (at Licensor's address set forth below or at such other address as Licensor shall identify in writing to Licensee) and Licensor shall pay to the applicable landlord or other third party provider all amounts payable to such applicable landlord or third party provider. The License Fee for any partial month during the Term shall be prorated based on the actual number of days in the applicable calendar month that Licensee has the use of and access to the Premises to the extent Licensor is able to receive a pro-rated refund under any lease or third party vendor service (unless such termination is caused by Licensor, in which event Licensee shall be entitled to prorate regardless of whether Licensor is entitled to receive a prorated refund under the lease or third party vendor service). Prior to any payment by Licensee to Licensor pursuant to this License Agreement, Licensor shall deliver to Licensee a completed and signed Form W-9.

Notwithstanding anything to the contrary in this License Agreement, Licensee shall have no obligation to pay Licensor for any period of time that Licensee is denied physical access to the Premises or any portion thereof and, if Licensee is denied physical access to any portion of the Premises for any period longer than 24 hours, Licensee may, at its sole option, elect to terminate the license with respect to such portion of the Premises and, upon such termination, Licensee shall have no further obligation for any portion of the License Fee accruing after such termination and with respect to such portion of the Premises. In the event of such a termination, Licensor shall refund to Licensee any payments of the License Fee made by Licensee that are allocable to the period of time subsequent to such termination to the extent Licensor is able to receive a pro-rated refund under any lease or third party vendor service (unless such termination is caused by Licensor, in which event Licensee shall be entitled to the refund regardless of whether Licensor is entitled to receive a prorated refund under the lease or third party vendor service). Except for the License Fee payable pursuant to this paragraph, in no event shall Licensee be liable or obligated to Licensor or any other party, for any other amounts whatsoever for Licensor's grant of the license and the use of the Premises in accordance with the terms of this License Agreement.

The services provided to Licensee at the Premises shall include all utilities, including without limitation, electricity and heating, ventilation and air conditioning, and janitorial services. Such services will be provided in the same manner and to the extent that such services were provided to the Premises immediately prior to the Effective Date and Licensor makes no representation or warranty with respect to such services, including, without limitation, the quality or adequacy of such services.

Licensor shall allow Licensee access to the Internet via Licensor's telephone, cable modem, ISDN or DSL service and equipment within the Premises, whichever is available and selected by Licensee, provided that Licensor makes no representation and warranties with respect to the same and shall, in no event, be responsible for any loss or damages to Licensee arising out of such use. Licensee shall have the right to have mail delivered to Licensee at the Premises and to permit third-party courier services to deliver and retrieve packages at the Premises.

**CONDITION OF OFFICE SPACE.** Licensee shall accept the Premises in its "as-is" condition and "as-built" configuration existing on the Effective Date.

**PERMITTED USE.** Licensee shall use the Premises only for general office purposes and for purposes of conducting consumer retail lending services, including, without limitation, the origination, documentation, and administration of loans and mortgages. The foregoing permitted uses are collectively referred to in this License Agreement as the "Permitted Use".

**CARE, MAINTENANCE AND REPAIR.** Licensee shall, at its sole expense, keep the Premises in a clean, neat and orderly condition (ordinary wear and tear excepted), and in compliance with all applicable laws.

**INSURANCE.** During the Term, Licensee, at its sole expense, shall obtain and maintain policies of commercial general liability insurance, including personal injury, bodily injury, death and broad form property damage, in such limits as Licensee, with Licensor's consent (which consent shall not be unreasonably withheld) may determine are reasonably appropriate for the Premises and the operation of the Permitted Use. Licensee shall cause Licensor to be listed as an additional named insured on all policies of insurance obtained by Licensee with respect to the Premises and Licensee's use of the Premises.

**CONSUMER CONFIDENTIAL INFORMATION.** Licensor shall use its best effort to remove, before the Effective Date, any and all consumer confidential information at any of the Premises, including, without limitation, any and all customer loan profiles ("Consumer Confidential Information"). Licensee shall use its best efforts to package and deliver to the Licensor, at addresses to be provided to Licensee, any Consumer Confidential Information that Licensee discovers remaining at the Premises on or after the Effective Date.

**LICENSEE'S PROPERTY.** All of Licensee's equipment and supplies delivered to the Premises by Licensee, together with all other personal property owned by Licensee and located within the Premises after the Effective Date, shall remain the property of Licensee, shall not be subject to any lien or claim of ownership by Licensor and may be removed by Licensee from time to time during the Term or upon the termination of this License Agreement.

**NOTICES.** Notices between Licensor and Licensee shall be in writing, and shall be effectively served by personal delivery or Certified or Registered Mail as follows (in which case, the date of receipt or refusal shall be the date of notice):

To Licensee:

> **IndyMac Bank, F.S.B.**
> 888 East Walnut Street
> Pasadena, California 91101
> **Attn: Corporate Real Estate**

With a copy to:

> **CB Richard Ellis, Inc.**
> 355 South Grand Avenue
> Los Angeles, CA 90071
> **Attn: Mark Sprague**

To Licensor:

> **American Home Mortgage**
> 538 Broad Hollow Road
> Melville, NY 11747
> **Attn: Mr. Kevin Nystrom**

**INDEMNIFICATION BY LICENSEE.** Licensee shall indemnify, defend and hold Licensor harmless from any and all claims, losses, costs (including, without limitation, reasonable attorneys' fees and costs), damages and

liens (collectively, "Claims") which Licensor actually incurs as a direct result of Licensee's or its employees' or invitees' use of or damage to, the Premises or failure to vacate the Premises upon termination of this License Agreement. Such rights of indemnity shall exclude (a) any and all Claims resulting from or related to Licensor's gross negligence or willful misconduct, (b) any Claims or other liabilities resulting from any claims of breach or default by the landlords under Licensor's leases for the Premises unless the same are as a direct result of activities conducted by Licensee at the Premises that do not constitute a Permitted Use, and (c) normal wear and tear in connection with Licensee's use of the Premises in accordance with this License Agreement.

**INDEMNIFICATION BY LICENSOR.**  Licensor shall indemnify, defend and hold Licensee harmless from any and all Claims which Licensee actually incurs as a direct result of Licensor's execution and delivery of this License Agreement, including any Claims resulting from Licensor's failure to pay any amounts due to landlord's or third-party service providers from amounts remitted to Licensor as part of the License Fee. Such rights of indemnity shall exclude (a) Claims of Licensor's landlords in connection with any use of the Premises by Licensee that is not a Permitted Use, and (b) all Claims resulting from or related to Licensee's gross negligence or willful misconduct.

**MISCELLANEOUS.** No waiver by either party of any breach hereunder shall be implied from any omission by that party to take any action on account of such breach if such breach persists or be repeated, and no express written waiver shall affect any breach other than the breach specified in the express written waiver and only to the extent therein stated. This License Agreement, along with Exhibit "A" attached hereto, constitutes the entire and exclusive agreement between Licensor and Licensee with respect to the use of the Premises by Licensee. This License Agreement may be altered, amended or modified only by an instrument in writing signed by both Licensor and Licensee. This License Assignment shall be governed by and construed in accordance with the laws of the State of California, without regard to its conflicts of law principles. This License Agreement may be executed in counterparts, all of which shall constitute the same License Agreement, notwithstanding that all parties are not signatory to the same or original counterpart. Licensor and Licensee each represent and warrant to the other that (a) subject to United States Bankruptcy Court approval, each party has the full right, power and lawful authority to enter into this License Agreement and to consummate the transactions contemplated herein, and (b) this License Agreement has been duly authorized by all necessary corporate action.

(Signature Page Follows Immediately)

The parties have executed this License Agreement as of the date first set forth above.

LICENSEE:
INDYMAC BANK, F.S.B., a federally chartered
savings bank

By: _____

LICENSOR:

AMERICAN HOME MORTGAGE

By: _____

## EXHIBIT A

## DESCRIPTION OF THE LOCATIONS OF THE PREMISES

Exhibit A

| BranchName | City | State | Address | Cost Center |
|---|---|---|---|---|
| Alameda CA 339 | Alameda | CA | 1512 Webster Street | 02930 |
| Albuquerque Uptown NM 2171 | Albuquerque | NM | 6900 Uptown Blvd, NB | 02171 |
| Anaheim CA 369 | Anaheim | CA | 2299 E. Orangewood | 00069 |
| Angola Camp CA 345 | Angola Camp | CA | 1339 S. Main St. | 02345 |
| Burlington WA 2188 | Burlington | WA | 1725 Iowa Street | 02188 |
| Big Sky 2893 | Big Sky | MT | 150 Meadow Village Suite 205 | 8NFA |
| Bloomington MN 2039 | Bloomington | MN | 1600 West 82nd St | 02039 |
| Boise ID 2025 | Boise | ID | 8850 W Emerald | 02925 |
| Bozeman Main MT 2729 | Bozeman | MT | 2616 W. Main St. | 02729 |
| Campbell Campbell CA 340 | Campbell | CA | 151 E. Campbell Avenue | 00340 |
| Central Lafayette LA 3331 | Lafayette | LA | 316 Guilbeau Road | 03331 |
| Cerritos CA 377 | Cerritos | CA | 17777 Center Court Drive | 00377 |
| Chandler AZ 01512 | Chandler | AZ | 225 S Arizona Place | 01512 |
| Chaska MN 1313 | Chaska | MN | 1107 Hazeltine Blvd, Ste 500 | 01313 |
| Cheyenne WY 0363 | Cheyenne | WY | 4354-F East Pershing | 00363 |
| Coeur d'Alene ID 2227 | Coeur d'Alene | ID | 1223 Ironwood Dr | 02227 |
| Concord Sutter Street CA 302 | Concord | CA | 1800 Sutter Street | 00302 |
| Del Rio Border TCU TX 2475 | Del Rio | TX | 600 E. Gibbs Street | 02475 |
| Emilt ID 2474 | Emilt | ID | 462 E. Shore Drive | 02474 |
| Edmonds | Edmonds | WA | 21909 76th Ave. West, Ste 110 | 8NFA |
| Elk Grove CA 1315 | Elk Grove | CA | 9555 Elk Grove Blvd | 02915 |
| Flower mound TX 2163 | Flower Mound | TX | 2313 Long Prairie Road | 02163 |
| Glendale AZ 2321 | Glendale | AZ | 5859 W Talavi Blvd | 02321 |
| Grand Junction 1st CO 0212 | Grand Junction | CO | 2478 Patterson Road | 00212 |
| Greenwood Village CO 2004 | Greenwood Village | CO | 8101 East Prentice Avenue | 02004 |
| Gresham OR 2057 | Gresham | OR | 320 North Main | 02057 |
| Helena MT 2304 | Helena | MT | 825 Great Northern Boulevard | 02304 |
| Henderson NV 2351 | Henderson | NV | 2370 Corporate Circle | 02351 |
| Honolulu HI 02401 | Honolulu | HI | 7317 Bishop Street | 02401 |
| Houston Kirkwood TX 3333 | Houston | TX | 720 N. Post Oak | 10333 |
| Indian Wells CA 316 | Indian Wells | CA | 74-399 Highway 111 | 00316 |
| Iowa Ave IA 2095 | West Des Moines | IA | 2323 Western Parkway | 02095 |
| Kapaa HI 2422 | Kapaa | HI | 4-361 Kuhio Highway | 02423 |
| Kapolei HI 2411 | Kapolei | HI | 1001 Kamokila Boulevard | 02411 |
| Kirkland WA 2179 | Kirkland | WA | 101 Parkplace | 02179 |
| La Jolla CA 311 | La Jolla | CA | 1222 Executive Square | 02011 |
| Labelles HI 2942 | Labelles | HI | 7319 Ekwhahwa Street | 02042 |
| Lakewood WA 2072 | Lakewood | WA | 5808 100th Street | 02072 |
| Las Vegas NV 253 | Las Vegas | NV | 7777 North Rainbow Blvd. | 00253 |
| Layton UT 3330 | Layton | UT | 920 West Heritage Park Blvd | 03330 |
| Littleton CO 2005 | Littleton | CO | 9200 W Cross Drive | 02005 |
| Long Beach Kilroy CA 307 | Long Beach | CA | 3760 Kilroy Airport Way | 00307 |
| Maple Grove MN 1309 | Maple Grove | MN | 7767 Elm Creek Blvd. | 01309 |
| Missoula MT 2045 | Missoula | MT | 1802 Dearborn Avenue | 02045 |
| Modesto CA 361 | Modesto | CA | 1150 Ninth Street | 00361 |
| Monterey CA 356 | Monterey | CA | 609 Abrego Street | 00356 |
| Nampa ID 2075 | Nampa | ID | 724 12th Avenue South | 02075 |
| Peak Experience Mortgage | Colorado Springs | CO | 2609 Tenderfoot Hill Street | 02603 |
| Pomona CA 324 | Pomona | CA | 3191 Temple Avenue | 00324 |
| Portland OR 2038 | Portland | OR | 10220 SW Greenburg Road | 02038 |
| Portland OR 2271 | Portland | OR | 10220 SW Greenburg Rd | 02271 |
| Rancho Cucamonga CA 309 | Rancho Cucamonga | CA | 9680 Haven Ave. #230 | 00309 |

AUG. 9. 2007 3:39PM    AMERICAN-HOME-MORTGAGE              NO. 2477   P. 5

| BranchName | City | State | Address | Cost Center |
|---|---|---|---|---|
| Riverside CA 310 | Riverside | CA | 3738 Adams Street | 00310 |
| Roseville CA 344 | Roseville | CA | 1509 Eureka Road | 00344 |
| Rowlett TX 2338 | Rowlett | TX | 4700 Rowlett Drive | 02338 |
| Sacramento CA 2402 | Sacramento | CA | 1610 Arden Way | 02402 |
| Salinas CA 1321 | Salinas | CA | 2 Salinas Street | 01321 |
| Salt Lake City UT 2164 | Salt Lake City | UT | 6415 South 3000 East | 02164 |
| Scottsdale AZ 1910 | Scottsdale | AZ | 8700 East Vista Bonita | 01910 |
| Scottsdale Ventura 1 AZ-257 | Scottsdale | AZ | 8700 E. Vin De Ventura | 00257 |
| Sherwood OR 2193 | Sherwood | OR | 20512 SW Roy Rogers Road | 02193 |
| Sioux Falls SD 343 | Sioux Falls | SD | 3409 West 47th Street | 00343 |
| Sonora CA 346 | Sonora | CA | 79 N. Washington Street | 00346 |
| Temecula CA 2409 | Temecula | CA | 27451 Ynez Road | 02409 |
| Tenderfoot CO 2323 | Colorado Springs | CO | 2650 Tenderfoot Hill Street | 02323 |
| Torrance CA 315 | Torrance | CA | 2789 Skypark Drive | 00315 |
| Walnut Creek CA 328 | Walnut Creek | CA | 500 Ygnacio Valley Road | 00328 |
| West Linn OR 2201 | West Linn | OR | 1900 Blankenship Rd | 02201 |
| Yakima WA 2162 | Yakima | WA | 9177 Tieton Crown Way | 02162 |
| Yucca Valley CA 315 | Yucca Valley | CA | 56551 29 Palms Highway | 00315 |
| Total | 70 | | | |

JBV  SH

**EXHIBIT 2**

**List of Office Leases**

Exhibit A - August 9, 2008

| BranchName | Cost Center | City | State | Address |
|---|---|---|---|---|
| Scottsdale 3 AZ 1310 | 1310 | Scottsdale | AZ | 8700 East Vista Bonita |
| Chandler AZ 01312 | 1312 | Chandler | AZ | 25 S Arizona Place |
| Scottsdale Camelback AZ 2002 | 2002 | Scottsdale | AZ | 6991 East Camelback Road |
| Glendale AZ 3321 | 3321 | Glendale | AZ | 5859 W Talavi Blvd |
| Retail West Division Ops 298 | 298 | Irvine | CA | 111 Pacifica |
| Irvine CA 300 | 300 | IRVINE | CA | 111 Pacifica, Suite 305 |
| Concord Sutter Street CA 302 | 302 | Concord | CA | 1800 Sutter Street |
| Long Beach Kilroy CA 307 | 307 | Long Beach | CA | 3780 Kilroy Airport Way |
| Rancho Cucamonga CA 309 | 309 | Rancho Cucamonga | CA | 9227 Haven Avenue |
| La Jolla CA 311 | 311 | La Jolla | CA | 4275 Executive Square |
| Torrance CA 313 | 313 | Torrance | CA | 2780 Skypark Drive |
| Indian Wells CA 314 | 314 | Indian Wells | CA | 74-890 Highway 111 |
| Yucca Valley CA 315 | 315 | Yucca Valley | CA | 56351 29 Palms Highway |
| Pomona CA 324 | 324 | Pomona | CA | 3191 Temple Avenue |
| Alameda CA 330 | 330 | Alameda | CA | 1512 Webster Street |
| Walnut Creek CA 338 | 338 | Walnut Creek | CA | 500 Ygnacio Valley Road |
| Campbell Campbell CA 340 | 340 | Campbell | CA | 51 E. Campbell Avenue, Suite 170 |
| Roseville CA 344 | 344 | Roseville | CA | 1508 Eureka Road |
| Angels Camp CA 345 | 345 | Angels Camp | CA | 1239 S. Main St. |
| Sonora CA 346 | 346 | Sonora | CA | 79 N. Washington Street |
| Monterey CA 356 | 356 | Monterey | CA | 659 Abrego Street |
| Modesto CA 361 | 361 | Modesto | CA | 1150 Ninth Street |
| Anaheim CA 369 | 369 | Anaheim | CA | 2390 E. Orangewood |
| Cerritos CA 377 | 377 | Cerritos | CA | 17777 Center Court Drive |
| Retail West Division Executive 398 | 398 | Irvine | CA | 111 Pacifica, Suite 305 |
| Salinas CA 1321 | 1321 | Salinas | CA | 2 Salinas Street |
| Sacramento CA 2402 | 2402 | Sacramento | CA | 1610 Arden Way |
| Temecula CA 2409 | 2409 | Temecula | CA | 27450 Ynez Road |
| Riverside CA 3313 | 3313 | Riverside | CA | 5225 Canyon Crest Dr |
| Irvine CA 3314 | 3314 | Irvine | CA | 111 Pacifica |
| Elk Grove CA 3315 | 3315 | Elk Grove | CA | 9355 E Stockton Blvd |
| Grand Junction 1st CO 422 | 422 | Grand Junction | CO | 2478 Patterson Road |
| Colorado Springs CO 1364 | 1364 | Colorado Springs | CO | 1271 Kelly Johnson Blvd. Suite 111 |
| Greenwood Village CO 2004 | 2004 | Greenwood Village | CO | 8101 East Prentice Avenue |
| Littleton CO 2005 | 2005 | Littleton | CO | 9200 W Cross Drive |
| Westminster CO 2410 | 2410 | Westminster | CO | 1400 W. 122nd Avenue |
| Tenderfoot CO 3323 | 3323 | Colorado Springs | CO | 2630 Tenderfoot Hill Street |
| Honolulu HI 02401 | 2401 | Honolulu | HI | 737 Bishop Street |
| Kapolei HI 2411 | 2411 | Kapolei | HI | 1001 Kamokila Boulevard |
| Wailuku HI 2421 | 2421 | Wailuku | HI | 2200 Main Street |
| Kapaa HI 2422 | 2422 | Kapaa | HI | 4-361 Kuhio Highway |
| Lahaina HI 2942 | 2942 | Lahaina | HI | 222 Papalaua Street |
| Cedar Rapids IA 2017 | 2017 | Cedar Rapids | IA | 3053 Center Point Road NE |
| Des Moines University IA 2020 | 2020 | Des Moines | IA | 6600 University Ave. |
| Iowa Area IA 2095 | 2095 | West Des Moines | IA | 2829 Westown Parkway, Suite 220 |
| Boise ID 2025 | 2025 | Boise | ID | 8850 W Emerald |
| Eagle ID 2074 | 2074 | Eagle | ID | 462 E. Shore Drive |
| Nampa ID 2075 | 2075 | Nampa | ID | 724 12th Avenue South |
| Caldwell ID 2169 | 2169 | Caldwell | ID | 2805 Blaine Street |
| Coeur d'Alene ID 2227 | 2227 | Coeur D Alene | ID | 1221 Ironwood Dr |
| Lafayette LA 3335 | 3335 | Lafayette | LA | 318A Guilbeau Road |
| Maple Grove MN 1309 | 1309 | Maple Grove | MN | 7767 Elm Creek Blvd. |
| Burnsville MN 1334 | 1334 | Burnsville | MN | 350 West Burnsville Parkway |
| Chaska MN 1313 | 1334 | Chaska | MN | 1107 Hazeltine Blvd. Ste 500 |
| Bloomington MN 2039 | 2039 | Bloomington | MN | 1600 West 82nd St |
| Woodbury MN 3311 | 3311 | Woodbury | MN | 6043 Hudson Road |
| Missoula MT 2045 | 2045 | Missoula | MT | 1802 Dearborn Avenue |
| Bozeman Main MT 2729 | 2729 | Bozeman | MT | 2616 W. Main St. |
| Big Sky 2883 | 2883 | Big Sky | MT | 50 Meadow Village Suite 205 |
| Helena MT 3334 | 3334 | Helena | MT | 825 Great Northern Boulevard |
| Albuquerque Uptown NM 2171 | 2171 | Albuquerque | NM | 6000 Uptown Blvd. NE |
| Henderson NV 351 | 351 | Henderson | NV | 2370 Corporate Circle |
| Las Vegas NV 353 | 353 | Las Vegas | NV | 777 North Rainbow Blvd. |
| Reno NV 367 | 367 | Reno | NV | 5470 Kietzke Lane, Suite 210 |
| Gresham OR 2057 | 2057 | Gresham | OR | 320 North Main |
| Portland OR 2058 | 2058 | Portland | OR | 10220 SW Greenburg Road Suite 245 |
| Sherwood OR 2193 | 2193 | Sherwood | OR | 20512 SW Roy Rogers Road |
| West Linn OR 2201 | 2201 | West Linn | OR | 1800 Blankenship Rd |
| Portland OR 2230 | 2230 | Portland | OR | 700 NE Multnomah Street Suite 450 |
| Sioux Falls SD 343 | 343 | Sioux Falls | SD | 3409 West 47th Street |
| The Woodlands TX 2130 | 2130 | The Woodlands | TX | 21 Waterway Ave |

| | | | | |
|---|---|---|---|---|
| Flowermound TX 2163 | 2163 | Flower Mound | TX | 3305 Long Prairie Road |
| North San Antonio TX 02190 | 2190 | San Antonio | TX | 8200 IH-10 West |
| Frisco TX 2205 | 2205 | Frisco | TX | 2595 Dallas Parkway |
| Del Rio Border FCU TX 2475 | 2475 | Del Rio | TX | 600 E. Gibbs Street |
| Houston Galleria TX 3332 | 3332 | Houston | TX | 730 N. Post Oak Road |
| Houston Kingwood TX 3333 | 3333 | Houston | TX | 20669 Lake Houston Parkway |
| Rowlett TX 3338 | 3338 | Rowlett | TX | 4700 Rowlett Drive |
| Salt-Lake City UT 2144 | 2144 | Salt Lake City | UT | 6415 South 3000 East |
| Layton UT 3330 | 3330 | Layton | UT | 920 West Heritage Park Blvd |
| Yakima WA 2162 | 2162 | Yakima | WA | 917 Triple Crown Way |
| Kirkland  WA 2170 | 2170 | Kirkland | WA | 401 Parkplace |
| Bellingham WA 2188 | 2188 | Bellingham | WA | 1756 Iowa Street |
| Vancouver WA 2215 | 2215 | Vancouver | WA | 700 Washington St |
| Spokane WA 2228 | 2228 | Spokane | WA | 818 W Riverside Ave |
| Monroe RE/MAX desk rental 2413 | 2413 | Monroe | WA | 14961 Chain Lake Rd. #159 |
| Edmonds WA 2415 | 2415 | Edmonds | WA | 21920 76th Ave. West, Ste 110 |
| Bellingham WA 3303 | 3303 | Bellingham | WA | 2211 Rimland Drive |
| Gig Harbor WA 3337 | 3337 | Lakewood / Tacoma | WA | 5808 100th Street Suite A |
| Total | | 86 | | |

Note that the Irvine locations are under one lease

## EXHIBIT 3

**Bidding Procedures**

## BIDDING PROCEDURES

By motion dated August 10, 2007 (the "Motion"), American Home Mortgage Holdings, Inc., *et al.*, Case No. 07-11047 (CSS) (the "Sellers"), the debtors and debtors-in-possession, sought, among other things, approval of the sale of the Office Assets (as defined in the Motion), including the assumption and assignment of certain real property leases and the sale of certain furniture, fixtures and equipment at the highest or otherwise best value (the "Assets"). The Debtors shall determine the highest or otherwise best value for the Assets through the process and procedures set forth below (the "Bidding Procedures").

On August 24, 2007 at 1:00 p.m. (prevailing Eastern Time), as further described below and in the Motion, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") shall conduct a hearing (the "Sale Hearing") at which Sellers shall seek entry of an order (the "Sale Order") authorizing and approving the sale of the Assets (a "Sale Transaction") pursuant to either (i) that certain Letter Agreement, dated August 7, 2007 (the "Original Agreement"), by and between Sellers and Indymac Bank F.S.B. ("Purchaser" or "IMD"), attached as Exhibit "1" to the Motion or (ii) a different Successful Bid (as defined below).

### Participation Requirements

In order to participate in the bidding process or otherwise be considered for any purpose hereunder, a person interested in the Assets (a "Potential Bidder"), other than IMB, must first deliver the following materials to counsel to the Sellers:

    (i)    An executed confidentiality agreement in form and substance satisfactory to Sellers and their counsel; and

    (ii)    The most current audited and latest unaudited financial statements (collectively, the "Financials") of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of a Sale Transaction, (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to Seller and its counsel and (y) the written commitment acceptable to Sellers and their counsel of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with a Sale Transaction.

A "Qualified Bidder" is a Potential Bidder whose Financials demonstrate the financial capability to consummate a Sale Transaction *and* that Sellers, in their discretion, determine is likely to consummate a Sale Transaction, if selected as the Successful Bidder, after taking into account all relevant financial, business, legal and regulatory considerations. Purchaser is a Qualified Bidder. All of the materials required by subparagraphs (i) and (ii) above must be received by Sellers by the Bid Deadline (as defined below).

Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access by Sellers or its advisors regarding such Qualified Bidder. Failure by the Qualified Bidder to comply with requests for additional information and due diligence access will be a basis for Seller to determine that a bid made by the Qualified Bidder is not a Qualified Bid.

Seller shall determine, in consultation with its advisors, and shall notify Purchaser and the Potential Bidder in writing, whether the Potential Bidder is a Qualified Bidder. Neither Sellers nor any of their affiliates (or any of its respective representatives) are obligated to furnish any information relating to Sellers, the Assets, and/or a Sale Transaction to any person except to Purchaser or another Qualified Bidder. Sellers shall give Purchaser access to all due diligence information provided to any other Qualified Bidder.

Sellers shall coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. No conditions relating to the completion of due diligence shall be permitted to exist after the Bid Deadline (as defined below).

### Bid Deadline

**The deadline for submitting bids by a Qualified Bidder shall be August 21, 2007, at 4:00 p.m. (Eastern Time) (the "<u>Bid Deadline</u>").**

Prior to the Bid Deadline, a Qualified Bidder that desires to make a bid shall deliver written copies of its bid to: (i) American Home Mortgage Holdings, Inc., 538 Broadhollow Road, Melville, New York 11747 (Attn.: Alan Horn, General Counsel); (ii) Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391 (Attn.: James L. Patton, Jr.), counsel to the Debtors; (iii) Milestone Advisors, LLC 1775 Eye Street, NW, Suite 800, Washington, DC 20006 (Attn.: Jeffrey M. Levine); (iv) the Official Committee of Unsecured Creditors, if appointed; (v) Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022 (Attn.: Margot B. Schonholtz and Scott D. Talmadge) and Potter Anderson & Corroon LLP, Hercules Plaza, 6th Floor, 1313 North Market Street, Wilmington, Delaware 19801 (Attn.: Laurie Selber Silverstein), counsel to Bank of America, N.A., as Administrative Agent for the lenders under that certain Credit Agreement dated August 30, 2004; and (vi) Jones Day, 222 East 41st Street, New York, New York 10017 (Attn.: Corinne Ball and Erica M. Ryland) and Greenberg Traurig LLP, 1007 North Orange Street, Suite 1200, Wilmington, Delaware 19801 (Attn.: Victoria Counihan), counsel to the agent for the Debtors' post-petition lenders; and (vii) Pachulski Stang Ziehl Young Jones & Weintraub, 780 Third Avenue, 36th Floor, New York, NY 10017-2024 (Attn: William P. Weintraub) and Orrick, Herrington & Sutcliffe LLP, The Orrick Building, 405 Howard Street, San Francisco, CA 94105 (Attn: Frederick D. Holden, Jr.), counsel to IMB.

### Bid Requirements

A bid must be a written irrevocable offer from a Qualified Bidder (i) stating that the Qualified Bidder offers to consummate a Sale Transaction pursuant to an agreement that has been marked to show amendments and modifications to the Original Agreement, including price and terms, that are being proposed by the Qualified Bidder (the "<u>Marked Agreement</u>"); (ii) confirming that the offer shall remain open until the closing of a Sale Transaction to the Successful Bidder (as defined below); (iii) stating that such Qualified Bidder is prepared to enter into and consummate the transaction after entry by the Bankruptcy Court of the Sale Order; and (iv) enclosing a copy of the proposed Marked Agreement.

066585.1001

In addition to the foregoing requirements, a bid or bids must:

    (i)    provide for a value, in the Debtor's sole and absolute discretion after consultation with the lenders and any committee, greater than or equal to the sum of (a) the IMB offer (as set forth in the Original Agreement), <u>plus</u> (b) $50,000 (in the aggregate, an "<u>Initial Overbid</u>");

    (ii)    be substantially on the same or better terms and conditions, as determined by the Debtors in their reasonable discretion, after consultation with the lenders, as those set forth in the Original Agreement;

    (iii)    be accompanied by satisfactory evidence of committed financing or other ability to perform;

    (iv)    not be conditioned on obtaining financing or the outcome of any due diligence by the bidder;

    (v)    not request or entitle the bidder to any breakup fee, expense reimbursement or similar type of payment; and

    (vi)    fully disclose the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation.

A bid received from a Qualified Bidder and that meets the requirements set forth in the preceding subparagraphs will be considered a "<u>Qualified Bid</u>" if Sellers believe, in their sole and absolute discretion, that such bid would be consummated if selected as the Successful Bid (as defined below). For all purposes hereof, Purchaser's offer to acquire the Assets pursuant to the Original Agreement shall constitute a Qualified Bid, without deposit or any other further action by Purchaser.

## Auction

If a Qualified Bid (other than Purchaser's) is received by the Bid Deadline, an auction (the "<u>Auction</u>") with respect to a Sale Transaction shall take place on **August 23, 2007, at 10:00 a.m. (prevailing Eastern Time)** at the offices of Young, Conaway, Stargatt & Taylor, LLP. If, however, no such Qualified Bid is received by the Bid Deadline, then the Auction will not be held, Purchaser will be the Successful Bidder, the Original Agreement will be the Successful Bid, and, at the August 24, 2007 Sale Hearing, Seller will seek approval of and authority to consummate the Sale Transaction contemplated by the Original Agreement.

Only a Qualified Bidder who has submitted a Qualified Bid will be eligible to participate at the Auction. Only the authorized representatives of each of the Qualified Bidders, the Committee, if appointed prior to the Auction, the Lenders, Purchaser, and Sellers shall be permitted to attend the Auction. At the Auction, Qualified Bidders will be permitted to increase their bids. The bidding at the Auction shall start at the purchase price stated in the highest or otherwise best Qualified Bid as disclosed to all Qualified Bidders at or prior to commencement of the Auction, and continue in increments of at least $50,000 or more. Purchaser shall be entitled, in its sole

                

and absolute discretion, to make a revised offer following such highest or otherwise best Qualified Bid. The highest or otherwise best Qualified Bid shall be determined by the Sellers in their reasonable discretion, after consultation with the Committee and the Lenders.

Sellers, in their sole and absolute discretion, in consultation with the lenders and any committee, may adopt rules for the Auction at or prior to the Auction that, in its discretion, will better promote the goals of the Auction. All such rules will provide that all bids shall be made and received in one room, on an open basis, and all other bidders shall be entitled to be present for all bidding with the understanding that the true identity of each bidder (i.e., the principals submitting each bid) shall be fully disclosed to all other bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction.

Unless otherwise agreed to by Sellers, in their discretion, no Qualified Bidder will be permitted more than thirty minutes to respond to the previous bid at the Auction and, at the expiration of such time (unless extended), the Auction shall conclude. Immediately prior to concluding the Auction, Sellers shall (i) review each Qualified Bid on the basis of its financial and contractual terms and the factors relevant to the sale process and the best interests of the Sellers' creditors, including, without limitation, those factors affecting the speed and certainty of consummating a Sale Transaction and (ii) determine and identify the highest or best Qualified Bid (the "Successful Bid") and the next highest or otherwise best offer after the Successful Bid (the "Next Highest Bid"). Any bid submitted after the conclusion of the Auction shall not be considered for any purpose.

### Acceptance of Qualified Bids

On August 24, 2007, at 1:00 p.m. (prevailing Eastern Time), Sellers shall present the results of the Auction together with the Successful Bid to the Bankruptcy Court at the Sale Hearing, at which certain findings will be sought by the Bankruptcy Court regarding the Auction, including, among other things, that (i) the Auction was conducted and the Successful Bidder was selected in accordance with these Bidding Procedures, (ii) the Auction was fair in substance and procedure, and (iii) consummation of the Sale Transaction contemplated by the Successful Bid will provide the highest or best value for the Assets and is in the best interests of the Seller and its estate.

In the event that, for any reason, the Successful Bidder fails to close the Sale Transaction contemplated by its Successful Bid, then, without notice to any other party or further court order, Sellers shall be authorized to close with the Qualified Bidder that submitted the Next Highest Bid.

066585.1001

## **EXHIBIT 4**

**Proposed Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------ x
In re:                                                             :    Chapter 11
                                                                   :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,                              :    Case No. 07-11047 (CSS)
a Delaware corporation, et al.,                                    :
                                                                   :    Jointly Administered
        Debtors.                                                   :
                                                                   :    Doc. Ref. No.
------------------------------------------------------------------ x

**ORDER, PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY
CODE, (I) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
REAL PROPERTY LEASES AND THE SALE OF FURNITURE, FIXTURES AND
EQUIPMENT LOCATED THEREIN; (II) APPROVING THE TERMS OF THE
LETTER AGREEMENT; AND (III) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion")[1] of American Home Mortgage

Holdings, Inc. ("AHM Holdings"), a Delaware corporation, and certain of its direct and indirect

affiliates and subsidiaries, the debtors and debtors in possession in the above cases (collectively,

"AHM" or the "Debtors"),[2] for entry of an order, pursuant to sections 105(a), 363 and 365 of title 11 of

the United States Code (the "Bankruptcy Code") (i) authorizing the sale of certain assets (the "Office

Assets"), including the assumption and assignment of certain real property leases (the "Office Leases")

and the sale of furniture, fixtures, and equipment contained therein (the "FFE"), to Indymac Bank

F.S.B. ("IMB") or other party submitting a higher or better offer; (ii) approving the terms of the letter

agreement dated August 7, 2007, by and between the Debtors and IMB, attached hereto as Exhibit 1

---

[1]  Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Motion.

[2]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation
(3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979);
American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home
Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC
("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc.
("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York
corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except
for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

(the "Letter Agreement"); and (iii) granting related relief; and the Court having reviewed the Letter Agreement, and upon the record of the hearing held on August 24, 2007; and after due deliberation and sufficient cause appearing therefor, the Court hereby makes the following:

FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]

A.    The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief requested in the Motion are sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

C.    For the reasons set forth in the Motion, due and adequate notice of the Motion, the Letter Agreement, the hearing, and the subject matter thereof has been provided to all parties in interest herein, and no other or further notice is necessary. A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

D.    The Sale is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the Sale. The Debtors are the owners of the FFE and have good and marketable title to the same and have the authority to sell, assign and transfer their right, title and interest thereto. There are no brokers involved in the transaction and the Sale is a legal and valid transfer of ownership to IMB.

E.    The Letter Agreement was negotiated and proposed, and has been entered into by the parties, in good faith, from arm's length bargaining positions, and without collusion.

---

[3] When appropriate, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact. See Fed. R. Bankr. P. 7052.

DB02:6173600.5                                                                                    066585.1001

IMB is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is entitled to the protection thereof. Neither the Debtors nor IMB have engaged in any conduct that would cause or permit the Letter Agreement, or the sale of the Office Assets to IMB pursuant thereto and hereto, to be avoided under Bankruptcy Code section 363(n).

G.    Under the circumstances, and due and adequate notice having been provided, it is the best interests of the Debtors, their creditors, and all other parties in interest herein that the Office Assets be sold to IMB in a sale under section 363(b) of the Bankruptcy Code and Bankruptcy Rules 2002(c)(1) and 6004(f)(1).

H.    Notwithstanding the opportunity to purchase the Office Assets being afforded to the Potential Bidders through, among other means, service of the Motion and the Letter Agreement, [IMB was the only party to submit an acceptable offer for the Office Assets.] The consideration provided by IMB for the Office Assets pursuant to the Letter Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Office Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

H.    The Debtors are authorized to sell the Office Assets free and clear of all interests of any kind or nature whatsoever because one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) have been satisfied. Those holders of interests who did not object to the Motion or the relief requested therein, or who imposed and then withdrew their objections, are deemed to have consented to the sale pursuant to Bankruptcy Code section 363(f)(2). Those holders of interests who did object fall within one or more of the other

subsections of Bankruptcy Code section 363(f) and are adequately protected by having their interests, if any, attach to the proceeds of the sale of the Office Assets.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.  The Motion is GRANTED.

2.  Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, the Debtors are hereby authorized and empowered (i) to enter into the Letter Agreement; (ii) to assume and assign the Office Leases to IMB; and (iii) to sell, transfer, and convey the Office Assets to IMB.

3.  The Letter Agreement and all of its terms are APPROVED, and this Order and the Letter Agreement shall be binding upon the Debtors, all creditors of the Debtors, and any trustees appointed in these proceedings or any trustees appointed in any subsequent proceedings under chapter 7 or chapter 11 of the Bankruptcy Code relating to the Debtors, and all other parties in interest herein.

4.  Upon the date of closing the sale of the Office Assets (the "Closing Date"), the Office Assets shall be transferred to IMB free and clear of all liens, claims, encumbrances, or other interests, except as set forth in the Motion and Letter Agreement, pursuant to Bankruptcy Code sections 105(a) and 363. All persons and entities (including, without limitation, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, and trade and other creditors) holding interests of any kind or nature whatsoever against or in the Debtors or the Office Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated) arising under or out of, in connection with, or in any way relating to the Debtors, the Office Assets, the operation of the Debtors' businesses prior to the Closing Date, or the

066585.1001

transfer of the Office Assets to IMB, hereby are forever barred, estopped, and permanently

enjoined from asserting against IMB, its successors or assigns, or the Office Assets, such

persons' or entities' interests.

      5.    Neither the execution nor performance of the License Agreement, nor the

assumption of the Office Leases by the Debtors, nor the assignment of the Office Leases to the

Purchaser, nor any of the conditions regarding the Debtors or this case described in Bankruptcy

Code section 365(b)(2) shall constitute a default under any of the Offices Leases, now or at an

time hereafter.

      6.    IMB is hereby granted and is entitled to all of the protections provided to a

good faith purchase of the Office Assets under Section 363(m) of the Bankruptcy Code.

      7.    Pursuant to Bankruptcy Code section 363(b), the Debtors and IMB, as

well as their officers, employees, and agents, shall be, and hereby are, authorized to take any and

all actions and/or execute any and all documents as may be necessary or desirable to

consummate the transactions contemplated by the Letter Agreement. Any actions taken by the

Debtors and IMB necessary or desirable to consummate such transactions prior to the entry of

this Order are hereby ratified.

      8.    The Letter Agreement and any related agreements, documents, or other

instruments may be modified, amended, or supplemented by the parties thereto, in a writing

signed by both parties, and in accordance with the terms thereof, without further order of this

Court; provided that any such modification, amendment or supplement does not have a material

adverse effect on the Debtors' estates.

      9.    The Debtors shall provide a notice identifying the proposed cure amount

for each of the Office Leases to each non-Debtor party to an Office Lease no later than two (2)

066585.1001

business days following entry of this Order. Such notice shall, among other things, list the

Debtors' proposed cure amount (the "Proposed Cure Amount"). The deadline by which non-

Debtor parties to the Office Leases must file an objection (the "Cure Amount Objection") to their

scheduled Proposed Cure Amount is **September 7, 2007 at 4:00 p.m. (prevailing Eastern time)**

(the "Cure Objection Deadline"). Such parties must also serve a copy of the Cure Amount

Objection so as to be received no later than the Cure Objection Deadline on the same day to: (i)

American Home Mortgage Holdings, Inc., 538 Broadhollow Road, Melville, New York 11747

(Attn.: Alan Horn, General Counsel); (ii) Young Conaway Stargatt & Taylor, LLP, 1000 West

Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391 (Attn.: James L. Patton,

Jr.), counsel to the Debtors; (iii) Milestone Advisors, LLC 1775 Eye Street, NW, Suite 800,

Washington, DC 20006 (Attn.: Jeffrey M. Levine); and (iv) Pachulski Stang Ziehl Young Jones

& Weintraub, 780 Third Avenue, 36th Floor, New York, NY 10017-2024 (Attn: William P.

Weintraub) and Orrick, Herrington & Sutcliffe LLP, The Orrick Building, 405 Howard Street,

San Francisco, CA 94105 (Attn: Frederick D. Holden, Jr.), counsel to IMB. Such non-debtor

parties shall (i) be forever barred from objecting to the Proposed Cure Amount and from

asserting any additional cure or other amounts with respect to such Office Lease and the Debtors

shall be entitled to rely solely upon the Proposed Cure Amount; and (ii) be deemed to have

consented to the assumption and assignment of such Office Lease and shall be forever barred and

estopped from asserting or claiming against the Debtors or such other successful bidder or any

other assignee of the Office Lease that any additional amounts are due or defaults exist, or

conditions to assumption and assignment must be satisfied under such Office Lease.

066585.1001

10.    The failure specifically to include any particular provisions of the Letter Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Letter Agreement be authorized and approved in its entirety.

11.    There is no assumption of liabilities by IMB other than as set forth in the Letter Agreement; IMB is not a successor to the Debtors, nor is the Purchaser a successor employer of any current or former employees of the Debtors who are hired by the Purchaser; upon the closing of the Sale approved hereunder and solely with respect to the Office Assets under the Sale, the creditors, employees and equity holders of the Debtors, are permanently and forever barred, restrained and enjoined from asserting any claims or enforcing any remedies, or commencing or continuing in any manner any action or proceeding of any kind against the Purchaser with respect to the Office Assets on account of any liens, claims or liabilities or asserting any claims or enforcing any remedies under any theory of successor liability, de facto merger, or substantial continuity; on the closing date, this Order shall be construed and shall constitute for all purposes a full and complete general assignment, conveyance and transfer of all of the Office Assets or a bill of sale transferring good and marketable title in such Office Assets to the Purchaser on the closing date; no bulk sales or similar laws are applicable to the sale; if, following entry of this Order approving the sale of the Office Assets free and clear of liens, any person or entity that held a lien on the Office Assets fails or refuses to deliver a release of lien or similar release to evidence such sale free and clear, the Purchaser is authorized to file or record such release in the name or on behalf of such person or entity; the order is binding upon and govern the acts of all persons and entities, including filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state or local

officials and all other persons who may be required by operation of law, the duties of their office,

or contract , to accept, file register or otherwise record or release any documents or instruments,

or who may be required to report or insure any title or state of title to any of the Office Assets,

and all such persons or entities are authorized and specifically directed to strike all recorded

liens, interests and encumbrances against the Office Assets from their records, official or

otherwise; and each and every federal, state and governmental agency or department, and any

other person or entity, is hereby directed to accept any and all documents and instruments

necessary or appropriate to consummate the transactions approved by this Order; and this Order

is binding in all respects, solely with respect to the Office Assets under the Sale, upon the

creditors and equity holders of the Debtors, all non-debtor parties to any assumed Office Leases

or other assumed contracts or leases, any official committees appointed in these cases, all

successors and assigns of the Debtors, any trustees, examiners or "responsible persons" or other

fiduciaries appointed in these cases or upon conversion to chapter 7 of the Bankruptcy Code; and

the sale of the FFE and the assignment of the Office Leases approved pursuant to this Order shall

not be avoidable under any circumstances. ·

        12.     Upon the closing of the Sale, and except as otherwise expressly provided

in the Letter Agreement, IMB shall not be liable for any claims against, and liabilities and

obligations of, the Debtors or any of the Debtors' predecessors or affiliates. Without limiting the

generality of the foregoing, (a) IMB shall have no liability or obligation to pay wages, bonuses,

severance pay, benefits (including, without limitation, contributions or payments on account of

any under-funding with respect to any pension plan) or make any other payment to employees or

former employees of the Debtors, (b) IMB shall have no liability or obligation in respect of any

collective bargaining agreement, employee pension plan, employee health plan, employee

retention program, employee incentive program or any other similar agreement, plan or program to which any Debtors are a party (including, without limitation, liabilities or obligations arising from or related to the rejection of termination of any such plan, program agreement or benefit), (c) IMB shall in no way be deemed a party or assignee of any such employee benefit, agreement, plan or program, (d) and all parties to any such employee benefit, agreement, plan or program are enjoined from asserting against IMB any claims arising from or relating to such employee benefit, agreement, plan or program.

13.     As provided by Bankruptcy Rule 6004(g) and 6006(d), this Order shall not be stayed for ten (10) days after entry thereof and shall be effective and enforceable immediately.

14.     This Court shall retain jurisdiction over any and all matters arising from or related to the implementation or interpretation of the Letter Agreement or this Order.

Dated: Wilmington, Delaware
      August \_\_\_, 2007

                              _____
                              Christopher S. Sontchi
                              United States Bankruptcy Judge