**<u>EXHIBIT 1</u>**

**Auction Procedures Agreement**

## AGREEMENT

This AGREEMENT (the **"Agreement"**), dated as of August 17, 2007, is entered into by and among: (i) BROADHOLLOW FUNDING, LLC, a Delaware limited liability company (**"Broadhollow"**) and MELVILLE FUNDING, LLC, a Delaware limited liability company (**"Melville"** and, together with Broadhollow, the **"Sellers"**); (ii) AMERICAN HOME MORTGAGE CORP. (**"American Home"**), AMERICAN HOME MORTGAGE INVESTMENT CORP. (**"American Home Investment"** and, together with American Home, **"AHM"**) and AMERICAN HOME MORTGAGE SERVICING, INC. (the **"Servicer"**), each a debtor and debtor-in-possession in the Cases (as defined below); and (iii) the entities listed as swap providers on the attached <u>Schedule IA</u> and <u>Schedule IB</u> (each, a **"Swap Provider"** and, collectively, the **"Swap Providers"**). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Broadhollow MLPSA (as defined below).

**WHEREAS**, Broadhollow, American Home, American Home Investment and the Servicer are parties to that certain Mortgage Loan Purchase and Servicing Agreement dated as of May 27, 2004 (the **"Broadhollow MLPSA"**) pursuant to which Broadhollow from time to time purchased Mortgage Loans from American Home;

**WHEREAS**, Melville, American Home, American Home Investment and the Servicer are parties to that certain Mortgage Loan Purchase and Servicing Agreement dated as of May 27, 2004 (the **"Melville MLPSA"** and, together with the Broadhollow MLPSA, the **"MLPSA"**) pursuant to which Melville from time to time purchased Mortgage Loans from American Home;

**WHEREAS**, each Swap Provider is a party to (or participants of a party to) an ISDA Master Agreement between such Swap Provider and Broadhollow and between such Swap Provider and Melville, in each case as more fully described on <u>Schedule IA</u> opposite to such Swap Provider's name (in each case, together with the Schedule thereto, a **"Front-end Swap Agreement"**), pursuant to which, among other things, each Swap Provider has exposure, severally and not jointly with any other Swap Provider, to certain fluctuations in the value of certain Mortgage Loans owned by Broadhollow and Melville (taken together, the **"Market Exposure"**);

**WHEREAS**, each Swap Provider is a party to (or participants of a party to) an ISDA Master Agreement between such Swap Provider and American Home Investment or a Debtor affiliate, in each case as more fully described on <u>Schedule IB</u> opposite to such Swap Provider's name (in each case, together with the Schedule and Credit Support Annex thereto, a **"Back-end Swap Agreement"**), pursuant to which, among other things, American Home Investment or a Debtor affiliate is obligated to pay to each Swap Provider such Swap Provider's Market Exposure to the extent funded by such Swap Provider;

**WHEREAS**, on August 6, 2007, AHM, together with certain of its subsidiaries and affiliates including those affiliates that are party to the Back-end Swap Agreement (collectively, the **"Debtors"**), commenced cases (collectively, the **"Cases"**) under Chapter 11 of the United States Bankruptcy Code (the **"Bankruptcy Code"**) in the Bankruptcy Court for the United States District Court for the District of Delaware (the **"Bankruptcy Court"**);

**WHEREAS**, prior to the commencement of the Cases, there occurred at least one Termination Event under clause 11.2(o) of the MLPSA;

**WHEREAS**, as a result of the occurrence of the Termination Event described above, all non-Deliquent Loans and non-Defaulted Loans owned by the Sellers are required to be sold or Securitized by the Servicer within thirty (30) days of the date of such Termination Event, with any such Loans unsold after such period being subject to a Termination Event Auction to be conducted by the Collateral Agent on the thirtieth (30th) day after the Termination Event;

**WHEREAS**, the Sellers own all right, title and interest in and to the Loans subject to the sale and the Debtors have certain rights and obligations, as specified in the Facility Documents, with respect to their activities as Servicer, Calculation Agent and any entitlement to the Broadhollow Reserve Fund; and

**WHEREAS**, the parties hereto agree, subject to the terms hereof, that the procedures described herein for the disposition of Loans required to be sold pursuant to the terms of the MLPSA, and the agreements among the parties hereto (including the sale procedures set forth on Schedule III hereto) with respect to such disposition, are consistent with the obligations of the Servicer under the MLPSA are commercially reasonable and intended to maximize the proceeds of sales of such Loans and related servicing rights and, among other things, minimize the claims on the Debtors' estates to the extent arising under the Back-end Swap Agreements;

**NOW THEREFORE**, in consideration of the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      Diligence Process.      Commencing on the date hereof, AHM, the Servicer and the Sellers shall provide, and they shall use their commercially reasonable efforts to cause the Collateral Agent to provide, the Swap Providers (and their agents) with reasonable access to all information (in electronic format or otherwise) relating to each Mortgage Loan owned by the Sellers (collectively, the **"Assets"**), including, without limitation, the data points listed on Schedule IV hereto. Simultaneously, AHM and the Servicer shall establish an electronic data room which shall be populated with the information made available by AHM, the Servicer, the Sellers and the Collateral Agent, to the Swap Providers (and their agents) and, subject to execution of a valid nondisclosure agreement, any other party (and such party's agents) expressing an interest in purchasing the Assets (each an **"Interested Bidder"**). AHM and the Servicer agree to provide reasonable cooperation to the Swap Providers and any Interested Bidder in connection with the Swap Providers' or any Interested Bidder's performance of due diligence and shall timely respond to all information requests received from the Swap Providers and any Interested Bidder.

2.      Bankruptcy Court Approval of Sale Procedures; Auction.      AHM shall use its commercially reasonable efforts to cause the Bankruptcy Court to enter an order as soon as practicable but no later then August 22, 2007, to be in form and substance reasonably satisfactory to the Swap Providers, (a) approving AHM's entry into this Agreement and authorizing AHM to comply with the terms hereof, (b) approving the form of asset purchase agreements in the form set forth as Schedule IIA and Schedule IIB hereto and (c) directing the

Debtors to conduct an auction in accordance with the bidding and auction procedures specified on Schedule III hereto, for the Assets on a "servicing-released" basis.

      3.     Reimbursement of Expenses. In the event that any Swap Provider, the Swap Providers, or an acquisition entity organized by one or more of the Swap Providers submits a Qualified Bid (in accordance with the procedures set forth in paragraph 4 of Schedule III hereto) which Qualified Bid is declared by the Servicer to be a "stalking horse" bid, the Debtors shall pay the Swap Providers the lesser of (1) $500,000 and (2) one-third of the documented reasonable costs and expenses (including but not limited to diligence and attorneys' fees) incurred in connection with the diligence process (referred to in clause 1, above) and in the negotiation and documentation of the asset purchase agreements submitted as part of such "stalking horse" bid (which amount shall be distributed as agreed by the Swap Providers). In addition to the amounts, if any, paid to the Swap Providers in connection with a "stalking horse" bid, in the event that any Swap Provider, the Swap Providers, or an acquisition entity organized by one or more of the Swap Providers is named the Successful Bidder for more than 51% of the Mortgage Loans (in accordance with the procedures set forth in paragraph 7 of Schedule III hereto) ,which shall be calculated based on the unpaid principal balance of the Mortgage Loans, the Debtors shall pay the Swap Providers the lesser of (1) $500,000 and (2) one-half of such entity or entities' then outstanding and unpaid documented reasonable costs and expenses (including but not limited to diligence and attorneys' fees) incurred in connection with the diligence process, in the negotiation and documentation of the asset purchase agreements submitted as part of such party's Qualified Bid, and incurred thereafter in connection with the Auction and in preparation of closing of the Sale (which amount shall be distributed as agreed by the Swap Providers).

      4.     Transfer of Servicing Rights. Consistent with the terms of the MLPSA, the sale of the Mortgage Loans to the Successful Bidder (as defined in Schedule III hereto) shall be on a "servicing-released" basis; provided, however, that the Servicer shall provide interim servicing for the Mortgage Loans and be entitled to receive customary fees for such servicing following the closing of the Sale until the Mortgage Loans can be transferred to a replacement servicer.

      5.     Preservation of Rights of Notcholders. The parties hereto agree that nothing herein affects or otherwise modifies the rights of any Swap Provider or Notcholder or in any way modifies the terms and conditions of any of the Facility Documents.

      6.     Certain Acknowledgments. The Sale Procedures with respect to the disposition of Mortgage Loans required to be sold pursuant to the terms of the MLPSA, and the agreements among the parties hereto with respect to such disposition are commercially reasonable and intended to maximize the proceeds of sales of such Mortgage Loans and related servicing rights in satisfaction of the terms of Section 11.2 of the MLPSA. The Servicer shall promptly advise the Collateral Agent of the sale process described  herein and of the agreements among the parties hereto.

      7.     Limitations and Termination. The parties acknowledge and agree that nothing herein creates an obligation or commitment on the part of any Swap Provider, the Swap Providers or an acquisition entity organized by one or more of the Swap Providers to submit a bid for any of the Assets. Upon failure by AHM to cause the Bankruptcy Court to enter the order

referred to in Section 2 of this Agreement by the dates set forth herein, this Agreement shall terminate and be of no further force or effect unless such dates shall be extended in writing by each of the Swap Providers party hereto.

8.      Governing Law; Submission to Jurisdiction. This Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrines and, to the extent applicable, the Bankruptcy Code. Each party hereto hereby irrevocably submits itself in any legal action or proceeding relating to this Agreement to the non-exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from exercising) jurisdiction, to the non-exclusive jurisdiction of any state or federal court of competent jurisdiction sitting in New York County, New York.

**IN WITNESS WHEREOF**, the duly authorized representatives of the parties have caused this Agreement to be executed and acknowledge that they have read and understood this Agreement.

**BROADHOLLOW FUNDING, LLC**

By: _____
Name:
Title:


**MELVILLE FUNDING, LLC**

By: _____
Name:

Title:


**AMERICAN HOME MORTGAGE CORP.**

By: _____
Name:
Title:


**AMERICAN HOME MORTGAGE INVESTMENT CORP.**

By: _____
Name:
Title:

DB02:6189775.1

**AMERICAN HOME MORTGAGE
SERVICING, INC.**

By: _____
Name:

Title:

**CITIBANK, N.A.**

By: _____
Name:
Title:

**BANK OF AMERICA, N.A.**

By: _____

Name:

Title:

**ABN AMRO BANK N.V.**

By: _____
Name:
Title:

By: _____
Name:
Title:

**CALYON NEW YORK BRANCH**

By: _____
Name:
Title:

By: _____
Name:
Title:

**SOVEREIGN BANK FSB**

By: _____
Name:
Title:

## SCHEDULE IA TO AGREEMENT

## FRONT-END SWAP AGREEMENT INFORMATION

| Swap Provider | Counterparty | Date |
|---|---|---|
| Citibank, N.A. | Broadhollow Funding, LLC | June 7, 2005 |
| Citibank, N.A. | Melville Funding, LLC | June 7, 2005 |
| | | |
| ABN Amro Bank N.V. | Broadhollow Funding, LLC | May 27, 2004 |
| ABN Amro Bank N.V. | Melville Funding, LLC | May 27, 2004 |
| | | |
| Calyon New York Branch (and its participant, Sovereign Bank FSB) | Broadhollow Funding, LLC | May 27, 2004 |
| Calyon New York Branch (and its participant, Sovereign Bank FSB) | Melville Funding, LLC | March 9, 2004[1] |
| | | |
| Bank of America, N.A. | Broadhollow Funding, LLC | May 27, 2004 |
| Bank of America, N.A. | Melville Funding, LLC | May 27, 2004 |

---

[1]  The ISDA Master Agreement between Calyon New York Branch and Melville Funding, LLC is dated March 9, 2004, however, the Schedule, Credit Support Annex and Confirmation thereto are each dated May 27, 2004.

## SCHEDULE IB TO AGREEMENT

## BACK-END SWAP AGREEMENT INFORMATION

| Swap Provider | Counterparty | Date |
|---|---|---|
| Citibank, N.A. | American Home Mortgage Servicing, Inc. (f/k/a Columbia National Incorporated) | June 7, 2005 |
| Citibank, N.A. | American Home Mortgage Investment Corp. | June 7, 2005 |
| | | |
| ABN Amro Bank N.V. | American Home Mortgage Servicing, Inc. (f/k/a Columbia National Incorporated) | May 27, 2004 |
| ABN Amro Bank N.V. | American Home Mortgage Investment Corp. | May 27, 2004 |
| | | |
| Calyon New York Branch | American Home Mortgage Servicing, Inc. (f/k/a Columbia National Incorporated) | May 27, 2004, as amended and extended |
| Calyon New York Branch | American Home Mortgage Investment Corp. | May 27, 2004 |
| | | |
| Sovereign Bank FSB | American Home Mortgage Servicing, Inc. (f/k/a Columbia National Incorporated) | June 7, 2005, as amended and extended |
| Sovereign Bank FSB | American Home Mortgage Investment Corp. | June 7, 2005, as amended and extended |
| | | |
| Bank of America, N.A. | American Home Mortgage Servicing, Inc. (f/k/a Columbia National Incorporated) | May 27, 2004 |
| Bank of America, N.A. | American Home Mortgage Investment Corp. | May 27, 2004 |

## SCHEDULE IIA TO AGREEMENT

## FORM OF BROADHOLLOW ASSET PURCHASE AGREEMENT

[_____]

**Purchaser**

**and**

**BROADHOLLOW FUNDING, LLC**

**Company**

**BULK SALE AND INTERIM SERVICING AGREEMENT**

**Dated as of [_____], 2007**

**Adjustable and Fixed-Rate Mortgage Loans**

**TABLE OF CONTENTS**

ARTICLE I
DEFINITIONS

Section 1.01.    Definitions.................................................................................................1

ARTICLE II
AGREEMENT TO PURCHASE; CONVEYANCE OF MORTGAGE LOANS; PURCHASE
PRICE; POSSESSION OF MORTGAGE FILES; MAINTENANCE OF SERVICING FILES;
BOOKS AND RECORDS; CUSTODIAL AGREEMENT; DELIVERY OF DOCUMENTS;
CLOSING CONDITIONS

Section 2.01.    Agreement to Purchase; Conveyance of Mortgage Loans; Purchase
                Price; Possession of Mortgage Files; Maintenance of Servicing Files............11
Section 2.02.    Books and Records; Transfers of Mortgage Loans...........................................13
Section 2.03.    Custodial Agreement; Delivery of Documents.................................................13
Section 2.04.    [Reserved]...................................................................................14
Section 2.05.    Closing Conditions. .........................................................................14
Section 2.06.    Costs.......................................................................................15

ARTICLE III
REPRESENTATIONS AND WARRANTIES REMEDIES AND BREACH

Section 3.01.    Company Representations, Warranties and Covenants. ...................................16

ARTICLE IV
ADMINISTRATION AND SERVICING OF MORTGAGE LOANS DURING THE INTERIM
SERVICING PERIOD

Section 4.01.    Company to Act as Servicer. ...............................................................16
Section 4.02.    Collection of Mortgage Loan Payments. ....................................................17
Section 4.03.    Maintenance of Fidelity Bond and Errors and Omissions Insurance. ..............17
Section 4.04.    Gramm Leach Bliley Act.....................................................................18
Section 4.05.    Disaster Recovery/Business Continuity Plan................................................18

ARTICLE V
Transfer of servicing

Section 5.01.    Assumption of Responsibilities at Transfer Date. ........................................18

ARTICLE VI
COMPANY TO COOPERATE

Section 6.01.    Provision of Information; Right to Examine Company Records....................21

ARTICLE VII
THE COMPANY

Section 7.01.    Indemnification; Third Party Claims. ......................................................22
Section 7.02.    [Reserved]...................................................................................22

i

Section 7.03.    [Reserved]..................................................................................................22
Section 7.04.    Limitation on Assignment by Company............................................................22

ARTICLE VIII
[RESERVED]

ARTICLE IX
MISCELLANEOUS PROVISIONS

Section 9.01.    Amendment...................................................................................................22
Section 9.02.    Governing Law. ...........................................................................................23
Section 9.03.    Notices. ......................................................................................................23
Section 9.04.    Severability of Provisions..............................................................................24
Section 9.05.    Relationship of Parties. .................................................................................24
Section 9.06.    Successors and Assigns; Assignment of Agreement. .......................................24
Section 9.07.    Solicitation of Mortgagor...............................................................................24
Section 9.08.    Further Agreements. ......................................................................................25
Section 9.09.    Confidential Information. ..............................................................................25
Section 9.10.    Information Security and Privacy. ..................................................................26
Section 9.11.    [Reserved]....................................................................................................27
Section 9.12.    Counterparts.................................................................................................27
Section 9.13.    Exhibits. ......................................................................................................27
Section 9.14.    General Interpretive Principles. .....................................................................27
Section 9.15.    Reproduction of Documents. .........................................................................28
Section 9.16.    Trade Confirmation.......................................................................................28

EXHIBITS

Exhibit A       Contents of Each Mortgage File
Exhibit B       Data Fields on Mortgage Loan Schedule
Exhibit C       Form of Trade Confirmation
Exhibit D       Form of Memorandum of Sale
Exhibit E       Form of Assignment, Assumption and Recognition Agreement
Exhibit F       Underwriting Guidelines
Exhibit G       Form of Opinion of Counsel
Exhibit H       Representations, Warranties and Covenants Regarding the Company
Exhibit I       Loan Sale and Delivery Requirements

## BULK SALE AND INTERIM SERVICING AGREEMENT

This is a Bulk Sale and Interim Servicing Agreement (the "Agreement") for adjustable and fixed rate residential first and second mortgage loans, dated and effective as of [_____], 2007, and is executed between [_____], as purchaser (the "Purchaser"), and Broadhollow Funding, LLC, as seller and interim servicer (the "Company").

## W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲

WHEREAS, the Purchaser has agreed to purchase from the Company and the Company has agreed to sell to the Purchaser first and second lien adjustable and fixed rate mortgage loans, together with the servicing rights associated with such Mortgage Loans; and

WHEREAS, the Mortgage Loans will be sold by the Company and purchased by the Purchaser as a pool of whole loans, servicing released (the "Mortgage Loan Package") on the Closing Date as provided herein; and

WHEREAS, each of the Mortgage Loans as of the Closing Date will be secured by a mortgage, deed of trust or other security instrument creating a first or second lien on a residential dwelling located in the jurisdiction indicated on the Mortgage Loan Schedule for the Mortgage Loan Package, which will be annexed to the Memorandum of Sale (defined herein) on the Closing Date; and

WHEREAS, the Purchaser and the Company wish to prescribe the manner of purchase of the Mortgage Loans and the conveyance, interim servicing and control of the Mortgage Loans.

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Purchaser and the Company agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01. _Definitions._ Whenever used herein, the following words and phrases, unless the content otherwise requires, shall have the following meanings:

_Accepted Practices:_ Procedures (including collection procedures) that comply with Applicable Laws and that the Company customarily employs and exercises in servicing and administering mortgage loans for its own account and which are in accordance with the Fannie Mae Guides and the accepted mortgage servicing practices of prudent mortgage lending institutions which service mortgage loans of the same type as the Mortgage Loans in the jurisdiction where the related Mortgaged Property is located and with respect to the Non-Conventional Mortgage Loans, FHA or VA regulations, as applicable.

_Adjustable Rate Mortgage Loan:_ A Mortgage Loan that contains a provision pursuant to which the Mortgage Interest Rate is adjusted periodically.

1

Adjustment Date: As to each Adjustable Rate Mortgage Loan, the date on which the Mortgage Interest Rate is adjusted in accordance with the terms of the related Mortgage Note and Mortgage.

Agreement: This Bulk Sale and Interim Servicing Agreement and all amendments hereof and supplements hereto.

ALTA: The American Land Title Association or any successor thereto.

Applicable Laws: All legal and regulatory requirements (including statues, rules, regulations and ordinances) of federal, state and local governmental agencies, boards, commissions, instrumentalities or other governmental bodies to which any Mortgage Loan or any previous or current party (including the servicer) to any Mortgage Loan is subject.

Appraisal: Either (i) written appraisal of a Mortgaged Property made by a Qualified Appraiser, which appraisal must be written, in form and substance to Fannie Mae and Freddie Mac standards, and satisfy the requirements of Title XI of the Financial Institution, Reform, Recovery and Enforcement Act of 1989 and the regulations promulgated thereunder, in effect as of the date of the appraisal or (ii) to the extent reflected on the Mortgage Loan Schedule, another form of valuation of the Mortgaged Property permitted under the related Underwriting Guidelines.

Appraised Value: With respect to any Mortgage Loan, the lesser of (i) the value set forth on the Appraisal made in connection with the origination of the related Mortgage Loan as the value of the related Mortgaged Property, or (ii) the purchase price paid for the Mortgaged Property, provided, however, that in the case of a refinanced Mortgage Loan, such value shall be based solely on the Appraisal made in connection with the origination of such Mortgage Loan.

Assignment, Assumption and Recognition Agreement: The agreement substantially in the form of Exhibit E attached hereto.

Assignment of Mortgage: An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the sale of the Mortgage to the Purchaser.

BPO: A broker's price opinion with respect to a Mortgaged Property.

Business Day: Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking or savings and loan institutions in the State of New York or the state in which the Company's servicing operations are located are authorized or obligated by law or executive order to be closed.

Closing Date: [ _____ ], 2007.

Code: The Internal Revenue Code of 1986, as it may be amended from time to time or any successor statute thereto, and applicable U.S. Department of the Treasury regulations issued pursuant thereto.

2

Commission: The United States Securities and Exchange Commission.

Company: Broadhollow Funding, LLC, or its successor in interest or assigns, or any successor to the Company under this Agreement appointed as herein provided.

Company Employees: As defined in Section 4.03.

Company Information: As defined in Section 8.05.

Conventional Mortgage Loan: Any Mortgage Loan that is not a FHA Mortgage Loan or VA Mortgage Loan.

Cooperative Corporation: The entity that holds title (fee or an acceptable leasehold estate) to the real property and improvements constituting the Cooperative Property and which governs the Cooperative Property, which Cooperative Corporation must qualify as a Cooperative Housing Corporation under Section 216 of the Code.

Cooperative Loan: Any Mortgage Loan secured by Cooperative Shares and a Proprietary Lease.

Cooperative Loan Documents: With respect to any Cooperative Loan, (i) the Cooperative Shares, together with a stock power in blank; (ii) the original executed Security Agreement (or a copy thereof certified by an authorized officer of the related Cooperative Corporation) and the assignment of the Security Agreement endorsed in blank; (iii) the original executed Proprietary Lease and the assignment of the Proprietary Lease endorsed in blank; (iv) the original executed Recognition Agreement and the assignment of the Recognition Agreement (or a blanket assignment of all Recognition Agreements) endorsed in blank; (v) the executed UCC-1 financing statement with evidence of recording thereon, which has been filed in all places required to perfect the security interest in the Cooperative Shares and the Proprietary Lease; and (vi) the Company's executed UCC-3 financing statements (or copies thereof) or other appropriate UCC financing statements required by state law, evidencing a complete and unbroken chain of title from the mortgagee to the Company with evidence of recording thereon (or in a form suitable for recordation).

Cooperative Property: The real property and improvements owned by the Cooperative Corporation, that includes the allocation of individual dwelling units to the holders of the Cooperative Shares of the Cooperative Corporation.

Cooperative Shares: Shares issued by a Cooperative Corporation.

Cooperative Unit: A single family dwelling located in a Cooperative Property.

Credit Score: The credit score of the Mortgagor provided by an organization providing credit scores at the time of the origination of a Mortgage Loan as reflected on the Mortgage Loan Schedule and determined in accordance with the related Underwriting Guidelines.

3

Custodial Agreement: The agreement between the Purchaser and the Custodian governing the retention of the originals of each Mortgage Note, Mortgage, Assignment of Mortgage and other Mortgage Loan Documents.

Custodian: The custodian under the Custodial Agreement, which shall initially be [_____], or its successor in interest or assigns, or any successor to the Custodian under the Custodial Agreement as provided therein.

Cut-off Date: With respect to each Mortgage Loan, the close of business on August 31, 2007.

Delivery Requirements: As defined in Section 5.01.

Due Date: The day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace, as specified in the related Mortgage Note.

Errors and Omissions Insurance Policy: An errors and omissions insurance policy to be maintained pursuant to Section 4.03.

Escrow Payments: With respect to any Mortgage Loan, the amounts constituting ground rents, taxes, assessments, water rates, sewer rents, municipal charges, mortgage insurance premiums, fire and hazard insurance premiums, condominium charges, and any other payments required to be escrowed by the Mortgagor with the mortgagee pursuant to the Mortgage or any other related document.

Fannie Mae: Federal National Mortgage Association (FNMA), or any successor thereto.

Fannie Mae Guides: The Fannie Mae Sellers' Guide and the Fannie Mae Servicers' Guide and all amendments or additions thereto.

FHA: The Federal Housing Administration, an agency within HUD, or any successor thereto and including the Federal Housing Commissioner and the Secretary of HUD where appropriate under the FHA regulations.

FHA Mortgage Loan: A Mortgage Loan that has a MIC issued by HUD/FHA.

Fidelity Bond: A fidelity bond to be maintained pursuant to Section 4.03.

First Lien: With respect to each Mortgaged Property, the lien of the mortgage, deed of trust or other instrument securing a Mortgage Note which creates a first lien on the Mortgaged Property.

Flood Zone Service Contract: A transferable contract maintained for the Mortgaged Property with a flood zone service provider acceptable to the Purchaser for the purpose of obtaining the current flood zone relating to such Mortgaged Property.

Freddie Mac: Federal Home Loan Mortgage Corporation (FHLMC), or any successor thereto.

4

Freddie Mac Guide: The Freddie Mac Single-Family Seller/Servicer Guide and all amendments or additions thereto.

GAAP: Generally accepted accounting principles, consistently applied.

Gross Margin: With respect to each Adjustable Rate Mortgage Loan, the fixed percentage amount set forth in the related Mortgage Note which is added to the Index in order to determine the related Mortgage Interest Rate, as set forth in the Mortgage Loan Schedule.

HUD: The United States Department of Housing and Urban Development or any federal agency or official thereof which may from time to time succeed to the functions thereof with regard to FHA mortgage insurance. The term "HUD," for purposes of this Agreement, is also deemed to include subdivisions thereof such as the FHA and Government National Mortgage Association.

Index: With respect to any Adjustable Rate Mortgage Loan, the index identified on the Mortgage Loan Schedule and set forth in the related Mortgage Note for the purpose of calculating the interest therein.

Interest-Only Mortgage Loan: A Mortgage Loan which only requires payments of interest for a period of time specified in the related Mortgage Note.

Interim Funder: With respect to each MERS Designated Mortgage Loan, the Person named on the MERS System as the interim funder pursuant to the MERS Procedures Manual.

Interim Servicing Period: With respect to each Mortgage Loan Package, the period of time from and including the Closing Date to but not including the Servicing Transfer Date.

Investor: With respect to each MERS Designated Mortgage Loan, the Person named on the MERS System as the investor pursuant to the MERS Procedures Manual.

LGC: A Loan Guaranty Certificate issued by the VA as a guarantee that the federal government will repay to the lender a specified percentage of the loan balance in the event of the borrower's default.

Loan-to-Value Ratio: With respect to any Mortgage Loan, the ratio of (i) the original loan amount of the Mortgage Loan at its origination (unless otherwise indicated) plus, in the case of Second Lien Mortgage Loans, the amount of any related First Lien as of the date of origination of the Mortgage Loan to (ii) the Appraised Value of the Mortgaged Property.

Market Change Event: (a) A suspension or material limitation in trading in securities generally on the New York Stock Exchange or on NASDAQ; (b) a general moratorium on commercial banking activities declared by either Federal or New York State authorities or a material disruption in commercial banking or securities settlement or clearance services in the United States; or (c) the outbreak or escalation of hostilities involving the United States or the declaration by the United States of a national emergency or war, if the effect of any such event specified in clause (c) in the judgment of the Purchaser makes it impracticable or inadvisable to

5

proceed with the transactions as contemplated in this Agreement on the terms and in the manner contemplated in this Agreement.

Material Adverse Change: (a) a material impairment of the ability of the Company to perform under this Agreement or any related agreements; or (b) a material adverse effect upon the legality, validity, binding effect or enforceability of this Agreement against the Company (unless such material adverse effect is directly caused by an action of the Purchaser which can be remedied by the Purchaser).

Memorandum of Sale: With respect to the Mortgage Loans and Mortgage Loan Package, the memorandum of sale, substantially in the form of Exhibit D attached hereto, confirming the sale by the Company and the purchase by the Purchaser of the Mortgage Loan Package on the Closing Date.

MERS: MERSCORP, Inc., its successors and assigns.

MERS Designated Mortgage Loan: A Mortgage Loan for which (a) the Company has designated or will designate MERS as, and has taken or will take such action as is necessary to cause MERS to be, the mortgagee of record, as nominee for the Company, in accordance with MERS Procedure Manual and (b) the Company has designated or will designate the Purchaser or its designee as the Investor on the MERS System.

MERS Procedures Manual: Collectively, the policies and procedures manuals published by MERS, including without limitation, the MERS Procedures Manual and the MERS Quality Assurance Procedures Manual, in each case, as it may be amended, supplemented or otherwise modified from time to time and as available from the MERS website.

MERS Report: The report from the MERS System listing MERS Designated Mortgage Loans and other information.

MERS System: MERS mortgage electronic registry system, as more particularly described in the MERS Procedure Manual.

MIC: A Mortgage Insurance Certificate issued by HUD/FHA as evidence that a mortgage has been insured and that a contract of mortgage insurance exists between HUD/FHA and the lender.

MOM Mortgage Loan: A Mortgage Loan that was registered on the MERS System at the time of origination thereof and for which MERS appears as the record mortgagee or beneficiary on the related Mortgage.

Monthly Payment: With respect to any Mortgage Loan (other than an Option ARM Mortgage Loan), the scheduled monthly payment of principal and/or interest on a Mortgage Loan. With respect to any Option ARM Mortgage Loan, the payment of interest and/or principal elected to be paid by a Mortgagor pursuant to the payment options under the related Mortgage Note on each Due Date which payment may change on any Due Date as provided in the related Mortgage Note.

6

Mortgage: With respect to any Mortgage Loan that is not a Cooperative Loan, the mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a first or second lien on the Mortgaged Property securing the Mortgage Note and, with respect to a Cooperative Loan, the related Security Agreement.

Mortgage File: The items pertaining to a particular Mortgage Loan referred to in Exhibit A annexed hereto, and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

Mortgage Interest Rate: The annual rate of interest borne on a Mortgage Note in accordance with the provisions of the Mortgage Note.

Mortgage Loan: Each Mortgage Loan originally sold and subject to this Agreement and identified on the Mortgage Loan Schedule annexed to the Memorandum of Sale, which Mortgage Loan includes without limitation the Mortgage File, the Monthly Payments, Principal Prepayments, servicing rights, liquidation proceeds, condemnation proceeds, insurance proceeds and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan.

Mortgage Loan Documents: The documents referred to in Exhibit A as items 1 through 11.

Mortgage Loan Package: The pool of whole loans purchased on the Closing Date, as described in the Mortgage Loan Schedule annexed to the Memorandum of Sale.

Mortgage Loan Schedule: With respect to the Mortgage Loan Package, the schedule of Mortgage Loans annexed to the Memorandum of Sale (and delivered in electronic format to the Purchaser), such schedule setting forth the information set forth on Exhibit B with respect to each Mortgage Loan in the Mortgage Loan Package.

Mortgage Note: The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

Mortgaged Property: With respect to each Mortgage Loan that is not a Cooperative Loan, the Mortgagor's real property or leasehold interest, including any improvements, securing repayment of the debt evidenced by a related Mortgage Note, consisting of an unsubordinated estate in fee simple or, with respect to real property located in jurisdictions in which the use of leasehold estates for residential properties is a widely-accepted practice, a leasehold estate, in a single parcel or multiple parcels of real property improved by a residential dwelling. With respect to each Cooperative Loan, the Cooperative Shares allocated to a Cooperative Unit in the related Cooperative Corporation that were pledged to secure such Cooperative Loan and the related Proprietary Lease.

Mortgagor: The obligor on a Mortgage Note.

Non-Conventional Mortgage Loans: The FHA Mortgage Loans and the VA Mortgage Loans.

7

OCC: The Office of the Comptroller of the Currency.

Officer's Certificate: A certificate signed by the Chairman of the Board, the Vice Chairman of the Board, the President, the Chief Financial Officer, a Senior Vice President, an Executive Vice President, a First Vice President, a Vice President or an Assistant Vice President and by the Treasurer or the Secretary or one of the Assistant Treasurers or Assistant Secretaries of the Company, and delivered to the Purchaser as required by this Agreement.

Opinion of Counsel: A written opinion of in-house counsel to the Company substantially in the form of Exhibit G attached hereto.

Option ARM Mortgage Loan: An Adjustable Rate Mortgage Loan with respect to which the related borrower may choose a flexible payment option each month pursuant to the terms of the related Mortgage Note.

Originator: With respect to any Mortgage Loan, the entity that (i) took the Mortgagor's loan application, (ii) processed the Mortgagor's loan application, or (iii) closed and/or funded such Mortgage Loan.

Periodic Interest Rate Cap: As to each Adjustable Rate Mortgage Loan, the maximum increase or decrease in the Mortgage Interest Rate on any Adjustment Date pursuant to the terms of the Mortgage Note.

Person: Any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof.

PMI Policy: A policy of primary mortgage guaranty insurance issued by a Qualified Insurer, as required by this Agreement with respect to certain Mortgage Loans.

Prepayment Premium: With respect to a Prepayment Premium Loan, the prepayment charge or penalty interest required to be paid by the Mortgagor in connection with a prepayment of the related Mortgage Loan, as provided in the related Mortgage Note or Mortgage, and as specified on the Mortgage Loan Schedule.

Prepayment Premium Loan: Each Mortgage Loan identified on the Mortgage Loan Schedule with respect to which the Mortgagor must pay a Prepayment Premium in connection with a Principal Prepayment of all or a specific portion of the Mortgage Loan.

Principal Prepayment: Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date, including any Prepayment Premium thereon and which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Proprietary Lease: With respect to any Cooperative Unit, a lease or occupancy agreement between a Cooperative Corporation and a holder of related Cooperative Shares.

8

Purchase Price: The price specified in the Memorandum of Sale and paid on the Closing Date by the Purchaser to the Company for the Mortgage Loans included in the Mortgage Loan Package, as calculated and adjusted as set forth in the Trade Confirmation.

Purchaser: [      ], or its successor in interest or any successor or assignee to the Purchaser under this Agreement as herein provided.

Qualified Appraiser: An appraiser, duly appointed by the Company, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof at the time at which the appraisal was made, and whose compensation was not affected by the approval or disapproval of the Mortgage Loan, and such appraiser and the appraisal made by such appraiser both satisfied the requirements of Title XI of the Financial Institution Reform, Recovery, and Enforcement Act and the regulations promulgated thereunder, all as in effect on the date of the appraisal.

Qualified Insurer: A mortgage guaranty insurance company duly authorized and licensed where required by law to transact mortgage guaranty insurance business and approved as an insurer by Fannie Mae or Freddie Mac.

Rating Agency: Each of Fitch, Inc., Moody's Investors Service, Inc., and/or Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or any successor thereto.

Recognition Agreement: With respect to any Cooperative Loan, an agreement between the related Cooperative Corporation and the originator of such Mortgage Loan to establish the rights of such originator in the related Cooperative Property.

RESPA: The Real Estate Settlement Procedures Act, as amended.

Second Lien: With respect to each Mortgaged Property, the lien of the mortgage, deed of trust or other instrument securing a Mortgage Note which creates a second lien on the Mortgaged Property.

Second Lien Mortgage Loan: A Mortgage Loan secured by the lien on the Mortgaged Property, subject to one prior lien on such Mortgaged Property securing financing obtained by the related Mortgagor.

Securities Act: The Securities Act of 1933, as amended.

Securitization Transaction: Any transaction involving either (1) a sale or other transfer of some or all of the Mortgage Loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or privately placed, rated or unrated mortgage-backed securities or (2) an issuance of publicly offered or privately placed, rated or unrated securities, the payments on which are determined primarily by reference to one or more portfolios of residential mortgage loans consisting, in whole or in part, of some or all of the Mortgage Loans.

Security Agreement: With respect to any Cooperative Loan, the agreement between the owner of the related Cooperative Shares and the originator of the related Mortgage Note that

9

defines the terms of the security interest in such Cooperative Shares and the related Proprietary Lease.

Servicing Advances: All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) incurred in the performance by the Company of its servicing obligations hereunder.

Servicing Fee: With respect to each Mortgage Loan, as set forth in the Subservicing Agreement.

Servicing File: With respect to each Mortgage Loan, the file retained by the Company, or the Subservicer on behalf of the Company, consisting of originals or copies, which may be imaged copies, of all documents in the Mortgage File which are not delivered to the Custodian and copies of the Mortgage Loan Documents listed in the Custodial Agreement, the originals of which are delivered to the Custodian pursuant to Section 2.03.

Servicing Transfer Date: The date on which the responsibility for the servicing of the Mortgage Loans included in the Mortgage Loan Package transfers from Company to the Successor Servicer, which date shall be the date which is, unless otherwise agreed by the Company and the Purchaser, fifteen (15) calendar days following the Closing Date (or if such date is not a Business Day, the Business Day immediately succeeding such date).

Stated Principal Balance: As to each Mortgage Loan, (i) the actual principal balance of the Mortgage Loan at the Cut-off Date, minus (ii) all amounts previously distributed to the Purchaser with respect to the related Mortgage Loan representing payments or recoveries of principal or advances in lieu thereof.

Subservicer: Any Person with which the Company has entered into a Subservicing Agreement, provided that such Person is a Fannie Mae or Freddie Mac approved seller/servicer in good standing and no event has occurred, including but not limited to a change in insurance coverage, that would make it unable to comply with the eligibility for seller/servicers imposed by Fannie Mae or Freddie Mac. Initially, the Subservicer shall be American Home Mortgage Servicing, Inc.

Subservicing Agreement: The Mortgage Loan Purchase and Servicing Agreement dated as of May 27, 2004, by and among the Company, as purchaser, American Home Mortgage Corp., a New York corporation, as seller, American Home Mortgage Servicing, Inc., as servicer, and American Home Mortgage Investment Corp., as performance guarantor.

Successor Servicer: [_____] and any successor servicer with respect to the Mortgage Loans.

Tax Service Contract: A transferable contract maintained for the Mortgaged Property with a tax service provider for the purpose of obtaining current information from local taxing authorities relating to such Mortgaged Property.

Trade Confirmation: With respect to any Mortgage Loan Package purchased and sold on the Closing Date, the letter agreement between the Purchaser and the Company, in the form

10

attached hereto as Exhibit C (including any exhibits, schedules and attachments thereto) or as shall be agreed upon by the parties, setting forth the terms and conditions of such transaction and describing the Mortgage Loans to be purchased by the Purchaser on the Closing Date.

Underwriting Guidelines: The underwriting guidelines of the Originator attached hereto as Exhibit F, as may be updated and incorporated into Exhibit F from time to time by providing such updates to the Purchaser.

VA: The Department of Veterans Affairs, an agency of the United States of America, or any successor thereto, including the Administrator of Veterans Affairs.

VA Mortgage Loan: A Mortgage Loan that has a LGC issued by the VA.

Whole Loan Transfer: Any sale or transfer of some or all of the Mortgage Loans by the Purchaser to a third party, which sale or transfer is not a Securitization Transaction.

## ARTICLE II

### AGREEMENT TO PURCHASE; CONVEYANCE OF MORTGAGE LOANS; PURCHASE PRICE; POSSESSION OF MORTGAGE FILES; MAINTENANCE OF SERVICING FILES; BOOKS AND RECORDS; CUSTODIAL AGREEMENT; DELIVERY OF DOCUMENTS; CLOSING CONDITIONS

Section 2.01.  Agreement to Purchase; Conveyance of Mortgage Loans; Purchase Price; Possession of Mortgage Files; Maintenance of Servicing Files.

(A)    *Agreement to Purchase; Conveyance of Mortgage Loans*

In exchange for the payment of the Purchase Price on the Closing Date, the Company agrees to sell and the Purchaser agrees to purchase, without recourse, but subject to the terms of this Agreement, on a servicing released basis, all of the right, title and interest of the Company in and to the Mortgage Loans in the Mortgage Loan Package having an aggregate Stated Principal Balance on the Cut-off Date in an amount as set forth in the Memorandum of Sale.   The Company shall deliver to the Purchaser a computer readable file in a format acceptable to the Purchaser containing all information necessary for the Purchaser to board the Mortgage Loans on its servicing system and the Mortgage File in accordance with the Delivery Requirements. Pursuant to Section 2.03, the Company will deliver the Mortgage Loan Documents to the Custodian.

(B)    *Purchase Price*

The Purchase Price for each Mortgage Loan listed on the Mortgage Loan Schedule shall be the percentage of par as stated in or otherwise calculated pursuant to the Trade Confirmation (subject to adjustment as provided therein), multiplied by its Stated Principal Balance as of the Cut-off Date.  If so provided in the Trade Confirmation, portions of the Mortgage Loans shall be priced separately.  In addition to the Purchase Price as described above, the Purchaser shall pay to the Company, at closing, accrued interest on the Stated Principal Balance of each Mortgage Loan as of the Cut-off Date at the Mortgage Interest Rate from the Cut-off Date through the day

11

prior to the Closing Date, both inclusive. With respect to each Mortgage Loan (other than Option ARM Mortgage Loans) purchased, the Purchaser shall own and be entitled to receive: (a) the principal portion of all Monthly Payments due (or received in the case of the Option ARM Mortgage Loans) after the Cut-off Date and (b) all other payments and/or recoveries of principal collected on or after the Cut-off Date (provided, however, that all scheduled payments of principal due on or before the Cut-off Date and collected by the Servicer after the Cut-off Date shall, except in the case of the Option ARM Mortgage Loans, belong to the Company) and (c) all payments of interest on the Mortgage Loans.

(C)    *Possession of Mortgage Files; Maintenance of Servicing Files*

The contents of each Servicing File are and shall be held in trust by the Company, or a Subservicer on behalf of the Company, for the benefit of the Purchaser as the owner thereof as of the Cut-off Date. The Company shall take, or shall cause a Subservicer to take, all necessary steps to ensure that the documents required to be included in the Servicing File are complete and shall maintain the Servicing File as required by this Agreement and Accepted Practices. Possession of each Servicing File by the Company, or a Subservicer on behalf of the Company, is at the will of the Purchaser for the sole purpose of servicing the related Mortgage Loan during the Interim Servicing Period, and such retention and possession by the Company, or a Subservicer on behalf of the Company, is in a custodial capacity only. Upon the sale of the Mortgage Loans, the ownership of each Mortgage Note, the related Mortgage and the related Mortgage File and Servicing File shall vest immediately in the Purchaser, and the ownership of all records and documents with respect to the related Mortgage Loan prepared by or which come into the possession of the Company shall vest immediately in the Purchaser and shall be retained and maintained by the Company, or a Subservicer on behalf of the Company, in trust, at the will of the Purchaser and only in such custodial capacity. The Company shall release, or shall cause its Subservicer to release, its custody of the contents of any Servicing File only in accordance with written instructions from the Purchaser or in connection with the transfer of servicing pursuant to Section 5.01. Servicing Files for the Mortgage Loans shall be delivered to the Successor Servicer on or before the Servicing Transfer Date.

(D)    *Fees*

With respect to each Mortgage Loan, the Seller shall (i) pay to the Purchaser on the Servicing Transfer Date $5.00 for the cost of acquiring a life of loan Flood Zone Service Contract or assign to the Purchaser an existing Flood Zone Service Contract with First American Corporation and (ii) either pay to the Purchaser on the Servicing Transfer Date $75.00 for the cost of acquiring a life of loan Tax Service Contract or assign to the Purchaser an existing life of loan Tax Service Contract entered into with First American Corporation.

(E)    *Home Mortgage Disclosure Act*

The Company shall provide to the Purchaser all data and information (in form and substance acceptable to the Purchaser) required to be collected by the Originator or owner of mortgage loans under the Home Mortgage Disclosure Act.

12

Section 2.02.  Books and Records; Transfers of Mortgage Loans.

The sale of each Mortgage Loan shall be reflected on the Company's balance sheet and other financial statements, tax returns and business records as a sale of assets by the Company. Until the Closing Date, the Company shall be responsible for maintaining, and shall maintain, a complete set of books and records for each Mortgage Loan which shall be marked clearly to reflect the ownership of each Mortgage Loan by the Purchaser from and after the Cut-off Date. In particular, the Company shall maintain in its possession, available for inspection by the Purchaser, or its designee, and shall deliver to the Purchaser upon demand, evidence of compliance with all Applicable Laws and requirements of Fannie Mae or Freddie Mac, if applicable, including but not limited to documentation as to the method used in determining the applicability of the provisions of the Flood Disaster Protection Act of 1973, as amended, to the Mortgaged Property and documentation evidencing insurance coverage and, with respect to conforming Mortgage Loans that are secured by condominium units, eligibility of any condominium project for approval by Fannie Mae or Freddie Mac.

For the purposes of this Agreement, the Company shall be under no obligation to deal with any person with respect to this Agreement or the Mortgage Loans unless the books and records show such person as the owner of the Mortgage Loan. The Purchaser may, subject to the terms of this Agreement, sell and transfer one or more of the Mortgage Loans. With respect to any transfer of a Mortgage Loan prior to the Servicing Transfer Date, the Purchaser also shall advise the Company of the transfer. Upon receipt of notice of the transfer, the Company shall mark its books and records to reflect the ownership of the Mortgage Loans of such assignee, and shall release the previous Purchaser from its obligations hereunder with respect to the Mortgage Loans sold or transferred.

Section 2.03.  Custodial Agreement; Delivery of Documents.

The Company will, with respect to each Mortgage Loan, deliver and release the Mortgage Loan Documents to the Custodian in accordance with the Delivery Requirements. In addition, in connection with the assignment of any MERS Designated Mortgage Loan, the Company agrees that on or prior to the Closing Date it will cause the MERS System to indicate that the related Mortgage Loans have been assigned by the Company to the Purchaser in accordance with the Delivery Requirements. The Company further agrees that it will not alter the information referenced in this paragraph with respect to any Mortgage Loan during the term of this Agreement.

The Custodian shall be required to certify its receipt of the Mortgage Loan Documents required to be delivered pursuant to the Custodial Agreement prior to the Closing Date, as evidenced by the initial certification of the Custodian in the form annexed to the Custodial Agreement.  The Company shall be responsible for recording, at its own expense, the Assignments of Mortgage, other than for MOM Mortgage Loans.  The Purchaser shall be responsible for the initial and on-going fees and expenses of the Custodian.

All recording fees and other costs associated with the recording of Assignments of Mortgage and other relevant documents to the Purchaser or its designee will be borne by the Company. The Company shall furnish the Custodian with a copy of each Assignment of

Mortgage submitted for recording. In the event that any such Assignment is lost or returned unrecorded because of a defect therein, the Company shall promptly have a substitute Assignment of Mortgage prepared or have such defect cured, as the case may be, and thereafter cause such Assignment of Mortgage to be duly recorded.

Except as otherwise provided in this Section 2.03, upon discovery or receipt of notice of any defective document required to be included in a Mortgage File, or that a document required to be in a Mortgage File is missing, the Company shall have ninety (90) calendar days to cure such defect or deliver such missing document to the Custodian. Any document required to be included in a Mortgage File that is not executed as required or does not strictly comply with all legal requirements shall be deemed to be defective.

In the event the public recording office is delayed in returning any original document, the Company shall deliver to the Custodian within one hundred eighty (180) calendar days following the Closing Date, a copy of such document and an Officer's Certificate, which shall (i) identify the recorded document; (ii) state that the recorded document has not been delivered to the Custodian due solely to a delay by the public recording office, (iii) state the amount of time generally required by the applicable recording office to record and return a document submitted for recordation, and (iv) specify the date the applicable recorded document will be delivered to the Custodian. The Company will be required to deliver the document to the Custodian by the date specified in (iv) above. An extension of the date specified in (iv) above may be requested from the Purchaser, which consent shall not be unreasonably withheld.

Section 2.04. [Reserved].

Section 2.05. Closing Conditions.

The closing for the purchase and sale of the Mortgage Loan Package shall take place on the Closing Date. The closing shall be either: by telephone, confirmed by letter or wire as the parties shall agree; or conducted in person, at such place as the parties may agree.

The closing for the Mortgage Loan Package shall be subject to the satisfaction of each of the following conditions:

(a)    with respect to the Purchaser's obligations to close:

(i)    the Company shall have delivered to the Purchaser and the Custodian the Mortgage Loan Schedule and an electronic data file containing information on a loan-level basis;

(ii)    all of the representations and warranties of the Company under this Agreement shall be true and correct as of the Closing Date (or such other date specified herein) in all material respects;

(iii)    the Purchaser shall have received the Opinion of Counsel;

14

(iv)    the Purchaser shall have received from the Custodian an initial certification with respect to its receipt of the Mortgage Loan Documents for the Mortgage Loans, which certification shall be in form and substance acceptable to the Purchaser;

(v)    the Purchaser shall have received copies (provided that original executed copies shall be delivered to the Purchaser within a reasonable time after the Closing Date) of the Memorandum of Sale, the Trade Confirmation and a funding memorandum setting forth the Purchase Price(s), and the accrued interest thereon, for the Mortgage Loan Package, in each case duly executed on behalf of the Company;

(vi)    no Material Adverse Change or Market Change Event shall have occurred since the date of the Trade Confirmation;

(vii)    all other terms and conditions of this Agreement, the Memorandum of Sale and the Trade Confirmation to be satisfied by the Company shall have been complied with in all material respects; and

(viii)    an order of the bankruptcy court approving the sale.

(b)    with respect to the Company's obligations to close:

(i)    the Company shall have received a copy of the initial certification of the Custodian with respect to its receipt of the Mortgage Loan Documents for the Mortgage Loans;

(ii)    the Company shall have received copies (provided that original executed copies shall be delivered to the Purchaser within a reasonable time after the Closing Date) of the Memorandum of Sale, the Trade Confirmation and a funding memorandum setting forth the Purchase Price(s), and accrued interest thereon, for the Mortgage Loan Package, in each case executed on behalf of the Purchaser; and

(iii)    all terms and conditions of this Agreement, the Memorandum of Sale and the Trade Confirmation to be satisfied by the Purchaser shall have been complied with in all material respects.

Upon satisfaction of the foregoing conditions, the Purchaser shall pay to the Company on the Closing Date the Purchase Price for the Mortgage Loan Package, including accrued interest pursuant to Section 2.01 of this Agreement.

Section 2.06.  Costs.

The Purchaser shall pay any commissions due its salesmen, the Custodian and the legal fees and expenses of its attorneys.  All other costs and expenses specified herein and incurred in connection with the transfer and delivery of the Mortgage Loans, including without limitation recording fees, fees for title policy endorsements and continuations, fees for recording Assignments of Mortgage, if any, and the Company's attorney's fees, shall be paid by the Company.

15

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES REMEDIES AND BREACH

Section 3.01.   Company Representations, Warranties and Covenants.

The Company hereby makes the representations, warranties and covenants set forth in Exhibit H hereto to the Purchaser as of the Closing Date.

## ARTICLE IV

## ADMINISTRATION AND SERVICING OF MORTGAGE LOANS DURING THE INTERIM SERVICING PERIOD

Section 4.01.   Company to Act as Servicer.

The Mortgage Loans are being sold by the Company to the Purchaser on a servicing released basis.  During the Interim Servicing Period, the Company, as an independent contractor, shall service and administer the Mortgage Loans on behalf of the Purchaser on an actual/actual basis and shall have full power and authority, acting through the Subservicer, to do any and all things in connection with such servicing and administration which the Company may deem necessary or desirable, consistent with the terms of this Agreement and with Accepted Practices; provided, however, that the servicing activities of the Company hereunder shall be restricted to such minimal servicing and collection activities as are necessary for preserving and collecting the Mortgage Loans on a temporary basis, it being agreed and understood that the servicing of the Mortgage Loans is intended to be transferred to the Purchaser or the Purchaser's designee on or before the Servicing Transfer Date.  The Subservicer shall be entitled to receive the Servicing Fee as compensation for subservicing the Mortgage Loans.  During the Interim Servicing Period, the Company shall at all times act through the Subservicer.  The Company shall service the Mortgage Loans on an actual/actual basis in accordance with Accepted Practices subject to the limitations set forth in this Section 4.01 and shall service (a) the FHA Mortgage Loans in accordance with the guidelines of FHA and (b) the VA Mortgage Loans in accordance with the guidelines of VA and, in each such case, shall comply with all the rules and regulations as set forth by each applicable agency.  The Company will advise Purchaser from time to time of such servicing actions, including, without limitation, filing of notices of default, that the Company believes should be taken with respect to the Mortgage Loans and will take such actions to the extent authorized to do so by the Purchaser.  The Purchaser shall have the ability, without any penalty, to terminate any Subservicing Agreement.  Notwithstanding any provision in this Agreement to the contrary, the Company shall not make any Servicing Advances in excess of $500 with respect to any Mortgage Loan without the consent of the Purchaser.  In the event that servicing of the Mortgage Loans is not transferred to the Purchaser or the Purchaser's designee within thirty (30) calendar days of the Closing Date, the Company and the Purchaser shall enter into a mutually agreeable servicing agreement to govern the servicing of the Mortgage Loans for the remainder of the Interim Servicing Period.

16

Section 4.02.  Collection of Mortgage Loan Payments.

Continuously from the date hereof until the Servicing Transfer Date, in accordance with this Agreement and Accepted Practices, the Company shall proceed diligently to collect all payments due under each of the Mortgage Loans when the same shall become due and payable and shall ascertain and estimate Escrow Payments (if applicable) and all other charges that will become due and payable with respect to the Mortgage Loan and the Mortgaged Property, to the end that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable.  The Company shall remit to the Purchaser on or before the fifth (5th) Business Day following the end of each month during the Interim Servicing Period any and all amounts received on account of the Mortgage Loans during the Interim Servicing Period, including, without limitation, payments of principal and interest and insurance proceeds, such remittance to be by wire transfer in the case of cash received and by overnight delivery service with respect to checks and other instruments.  Such remittance shall be accompanied by a report in form and detail reasonably satisfactory to Purchaser setting forth the source and application of all amounts received.

Section 4.03.  Maintenance of Fidelity Bond and Errors and Omissions Insurance.

From the date hereof until the termination of the Interim Servicing Period, the Company shall cause any Subservicer to maintain with responsible companies, at its own expense, a blanket Fidelity Bond and an Errors and Omissions Insurance Policy, with broad coverage on all officers, employees or other persons acting in any capacity requiring such persons to handle funds, money, documents or papers relating to the Mortgage Loans ("Company Employees").  Any such Fidelity Bond shall be in the form of the Mortgage Banker's Blanket Bond and the Fidelity Bond and Errors and Omissions Insurance Policy shall protect and insure the Company against losses, including forgery, theft, embezzlement, fraud, errors and omissions and negligent acts of such Company Employees.  Such Fidelity Bond and Errors and Omissions Insurance Policy also shall protect and insure the Company, or the Subservicer, as applicable, against losses in connection with the release or satisfaction of a Mortgage Loan without having obtained payment in full of the indebtedness secured thereby.  No provision of this Section 4.03 requiring such Fidelity Bond and Errors and Omissions Insurance Policy shall diminish or relieve the Company from its duties and obligations as set forth in this Agreement.  The minimum coverage under any such Fidelity Bond and Errors and Omissions Insurance Policy shall be at least equal to the amounts acceptable to Fannie Mae or Freddie Mac.  Upon the request of the Purchaser, the Company shall cause to be delivered to the Purchaser a certificate of insurance for such Fidelity Bond and Errors and Omissions Insurance Policy.

17

Section 4.04.  Gramm Leach Bliley Act.

The Company shall comply with Title V of the Gramm-Leach-Bliley Act of 1999, as amended, and all applicable regulations promulgated thereunder, relating to the Mortgage Loans and the related Mortgagors and shall provide all required notices thereunder required prior to the Servicing Transfer Date.

Section 4.05.  Disaster Recovery/Business Continuity Plan.

The Company shall cause the Subservicer to establish or maintain contingency plans, recovery plans and proper risk controls to ensure Company's continued performance under this Agreement.  The plans must be in place within thirty (30) calendar days after the Closing Date of this Agreement and shall include, but not be limited to, testing, control functions, accountability and corrective actions to be immediately implemented, if necessary.  The Company agrees to make copies or summaries of the plans available to the Purchaser or appropriate regulator upon request.

## ARTICLE V

## TRANSFER OF SERVICING

Section 5.01.  Assumption of Responsibilities at Transfer Date.

On the Servicing Transfer Date, the Purchaser, or its designee, shall assume all servicing responsibilities related to, and the Company will cease all servicing responsibilities (except as expressly set forth herein) related to, the Mortgage Loans. On or prior to the Servicing Transfer Date (or in the case of (c), (d) and (e) below, within three (3) Business Days from and after the Servicing Transfer Date or by such other date as may be specified in this Agreement or as may be otherwise agreed), the Company will take such steps, or shall cause its Subservicer to take such steps, as are provided for in the Loan Sale and Delivery Requirements, attached hereto as Exhibit I (as such exhibit may be amended from time to time, the "Delivery Requirements"), or as may otherwise be necessary or appropriate to effectuate and evidence the transfer of the servicing of the Mortgage Loans to the Purchaser, or its designee, including but not limited to the following (which shall not apply to the extent they are inconsistent with the Delivery Requirements):

(a)    Notice to the Mortgagors.  The Company shall mail to each Mortgagor a letter advising the Mortgagor of the transfer of the servicing of the related transferring Mortgage Loan to the Purchaser, or its designee, in accordance with RESPA, Regulation X and other applicable laws and regulations; provided, however, the content and format of the letter in a standard from shall have the prior approval of the Purchaser. The Company shall provide the Purchaser with copies of all such related notices no later than fifteen (15) calendar days from and after the Servicing Transfer Date.

(b)    Notice of Taxing Authorities and Insurance Companies.  The Company shall transmit to the applicable taxing authorities and insurance companies (including PMI Policy insurers, if applicable) and/or agents, notification of the transfer of the servicing to the Purchaser, or its designee, and instructions to deliver all notices, tax bills and insurance statements, as the

18

case may be, to the Purchaser, or its designee, from and after the Servicing Transfer Date, with an officer's certificate of a servicing officer of the Company, confirming that all such notices have been transmitted, together with a copy of the related standard form(s) of such notifications no later than the Servicing Transfer Date.

(c)     Delivery of Servicing Records.  The Company shall forward to the Purchaser, or its designee, all servicing records and the Servicing Files in the Company's possession relating to each transferring Mortgage Loan, and shall make available to the Purchaser, or its designee, during normal business hours, any such records.

(d)     Escrow Payments.  The Company shall provide the Purchaser, or its designee, with immediately available funds by wire transfers in the amount of the net Escrow Payments and suspense balances and all loss draft balances associated with the Mortgage Loans. The Company shall provide the Purchaser, or its designee, with an accounting statement of Escrow Payments and suspense balances and loss draft balances sufficient to enable the Purchaser, or its designee, to reconcile the amount of such payment with the accounts of the Mortgage Loans. Additionally, the Company shall wire transfer to the Purchaser the amount of any prepaid transferring Mortgage Loan payments and all other similar amounts held by the Company.

(e)     Mortgage Payments Received Prior to Servicing Transfer Date.  Prior to the Servicing Transfer Date, all payments received by the Company on each Mortgage Loan shall be properly applied by the Company to the account of the particular Mortgagor.

(f)     Mortgage Payments Received After the Servicing Transfer Date.  The amount of any Monthly Payments for the Mortgage Loans received by the Company after the Servicing Transfer Date shall be forwarded to the Purchaser by wire transfer or overnight mail within two (2) Business Days of receipt. The Company shall notify the Purchaser of the particulars of the payment, which notification requirement shall be satisfied if the Company forwards with its payment sufficient information to permit appropriate processing of the payment to the Purchaser. The Company shall assume full responsibility for the endorsement of such Monthly Payment to the Purchaser with the particulars of the payment such as the account number, dollar amount, date received and any special Mortgagor application instructions with respect to such Monthly Payments received by the Company after the Servicing Transfer Date with respect to any Mortgage Loans then in foreclosure or bankruptcy.

(g)     Misapplied Payments.  Misapplied payments (including without limitation payments returned for insufficient funds) on Mortgage Loans shall be processed as follows: (i) all parties shall cooperate in correcting misapplication errors; (ii) the party receiving notice of a misapplied payment occurring prior to the Servicing Transfer Date and discovered after the Servicing Transfer Date shall immediately notify the other party; (iii) if a misapplied payment occurred prior to the Servicing Transfer Date cannot be identified and said misapplied payment has resulted in a shortage in a custodial account or escrow account, the Company shall be liable for the amount of such shortage; the Company shall reimburse the Purchaser for the amount of such shortage within thirty (30) calendar days after the receipt of written demand thereof from the Purchaser; (iv) if a misapplied payment which occurred prior to the Servicing Transfer Date has created an improper Purchase Price as the result of an inaccurate outstanding principal balance, the party with notice of such misapplied payment shall promptly inform the other party

19

and a wire transfer or check shall be issued to the party shorted by the improper payment application within ten (10) Business Days after notice thereof by the other party; and (v) any wire transfer or check issued under the provisions of this paragraph shall be accompanied by a statement indicating the corresponding Company and/or the Purchaser Mortgage Loan identification number and an explanation of the allocation of any such payments or by fax.

(h)     Books and Records.  On the Servicing Transfer Date, the books, records and accounts of the Company with respect to the servicing of the Mortgage Loans shall be in accordance with the Accepted Practices.

(i)     Reconciliation.  The Company shall, on or before the Servicing Transfer Date, reconcile principal balances and make any monetary adjustments for the Mortgage Loans as agreed to by Company and Purchaser. Any such monetary adjustments will be transferred between the Company and the Purchaser as appropriate.

(j)     IRS Forms.  The Company shall file all IRS forms 1099, 1099A, 1098, or 1041 and K-1 which are required to be filed in relation to the servicing and ownership of the Mortgage Loans on or before the Servicing Transfer Date. The Company shall provide copies of such forms to the Purchaser upon reasonable request and shall reimburse the Purchaser for any penalties or reasonable costs incurred by the Purchaser due to the Company's failure to comply with this paragraph.

(k)     Insurance Premiums.  The Company shall pay all hazard and flood insurance premiums, PMI Policy premiums, due within thirty (30) calendar days after the Servicing Transfer Date, provided that the Company has received bills for insurance premiums at least fourteen (14) days prior to the Servicing Transfer Date.

(l)     Property Taxes.  The Company shall pay all tax bills (including interest, late charges and penalties in connection therewith) due, within thirty (30) calendar days after the Servicing Transfer Date, provided that the Company has received such bills at least fourteen (14) calendar days prior to the Servicing Transfer Date. For ninety (90) calendar days after the Servicing Transfer Date, the Company shall deliver such tax bills as it may receive with respect to the Mortgage Loans to Purchaser within two (2) Business Days of receipt of the same, thereafter Company shall exercise reasonable efforts to deliver such tax bills as it may receive with respect to the Mortgage Loans to Purchaser within a reasonable time of its receipt of same.

(m)     Insurance Policies.  For ninety (90) calendar days after the Servicing Transfer Date, the Company shall deliver such insurance policies or renewals and invoiced as it may receive with respect to the Mortgage Loans to Purchaser within ten (10) Business Days of its receipt of same, thereafter Company shall exercise reasonable efforts to deliver such insurance policies or renewals and invoices as it may receive with respect to the Mortgage Loans to Purchaser within a reasonable time of its receipt of same.

(n)     Escrow Analysis.  The Company has properly conducted escrow analysis with respect to such Mortgage Loan as may be required under Applicable Laws. With respect to any each applicable Mortgage Loan, any adjustment to the escrow payment due, refunds of escrow

20

overages and collections of escrow shortages have been made in accordance with Applicable Laws.

(o) <u>Transfer of Servicing</u>.  On the Servicing Transfer Date, the Company shall transfer servicing of the related Mortgage Loans to the Purchaser or its designee pursuant to the terms of this Agreement and the procedures reasonably agreed to by the Company, the Purchaser and the Purchaser's designee.  All information provided to the Purchaser or its designee shall be provided electronically.

(p) <u>Reimbursement for Servicing Advances</u>.  Following a Servicing Transfer Date, the Company shall be reimbursed for any unreimbursed and properly made Servicing Advances made with respect to any related Mortgage Loan.  Such reimbursement shall be paid by the Purchaser or its designee to the Company following the delivery of a reasonably detailed invoice or other evidence of such amounts to the Purchaser.  This Section 5.01(p) shall survive each Servicing Transfer Date.

## ARTICLE VI

## COMPANY TO COOPERATE

Section 6.01.  <u>Provision of Information; Right to Examine Company Records</u>

During the term of this Agreement, the Company shall furnish to the Purchaser such periodic, special, or other reports or information as the Purchaser may reasonably request, and copies or originals of any documents contained in the Servicing File for each Mortgage Loan provided for herein.  All other special reports or information not provided for herein as shall be necessary, reasonable, or appropriate with respect to the Purchaser or any regulatory agency will be provided at the Purchaser's expense.  All such reports, documents or information shall be provided by and in accordance with all reasonable instructions and directions which the Purchaser may give.  In addition, during the term of this Agreement, the Company shall provide to the OCC and to comparable regulatory authorities supervising the Purchaser or any of Purchaser's assigns (including beneficial owners of securities issued in Securitization Transactions backed by the Mortgage Loans) and the examiners and supervisory agents of the OCC and such other authorities, access to the documentation required by applicable regulations of the OCC and other authorities with respect to the Mortgage Loans.  Such access shall be afforded without charge, but only upon reasonable and prior written request and during normal business hours at the offices designated by the Company.

The Company shall execute and deliver all such instruments and take all such action as the Purchaser may reasonably request from time to time, in order to effectuate the purposes and to carry out the terms of this Agreement.

The Purchaser, or its designee, shall have the right to examine and audit any and all of the related books, records, or other information of the Company, whether held by the Company or by another on its behalf, with respect to or concerning this Agreement or the Mortgage Loans, during business hours or at such other times as may be reasonable under applicable

21

circumstances, upon reasonable advance notice. The Purchaser shall pay its own travel expenses associated with such examination.

## ARTICLE VII

## THE COMPANY

Section 7.01.  Limited Recourse.

The Purchaser agrees that the obligations of the Company to the Purchaser under this Agreement are limited recourse obligations of the Company payable solely from the assets of the Company and that, upon application of all assets of the Company, the Purchaser shall have no recourse to the Company for any obligations of the Company to the Purchaser to the extent such application does not provide for full satisfaction and payment of such obligation.

Section 7.02.  [Reserved].

Section 7.03.  [Reserved].

Section 7.04.  Limitation on Assignment by Company.

The Company shall neither assign this Agreement or the servicing hereunder or delegate its rights or duties hereunder or any portion hereof (other than the delegation of Servicing rights to a Subservicer) or sell or otherwise dispose of all of its property or assets without the prior written consent of the Purchaser, which consent shall not be unreasonably withheld.

Prior to the Servicing Transfer Date, the Company shall not resign from the obligations and duties hereby imposed on it except by mutual consent of the Company and the Purchaser or upon the determination that its duties hereunder are no longer permissible under Applicable Laws and such incapacity cannot be cured by the Company.

## ARTICLE VIII

## [RESERVED]

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

Section 9.01.  Amendment.

This Agreement may be amended from time to time by the Company and by written agreement signed by the Company and the Purchaser.

232966v.8

Section 9.02.  Governing Law.

This Agreement shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

EACH OF THE COMPANY AND THE PURCHASER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OR ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT, OR ANY OTHER DOCUMENTS AND INSTRUMENTS EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF THE COMPANY OR THE PURCHASER.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PURCHASER TO ENTER INTO THIS AGREEMENT.

Section 9.03.  Notices.

All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or delivered by overnight courier as follows:

(a)    if to the Company:

Broadhollow Funding, LLC
[_____]
[_____]
Attention: [_____]
Phone: [_____]

Fax: [_____]

or such other address as may hereafter be furnished to the Purchaser in writing by the Company;

(b)    if to the Purchaser:

[_____]
[_____]
[_____]
Attention: [_____]
Phone: [_____]

Fax: [_____]

or such other address as may hereafter be furnished to the Company in writing by the Purchaser.

23

232966v.8

Section 9.04.  Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be held invalid for any reason whatsoever, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

Section 9.05.  Relationship of Parties.

Nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties hereto and the services of the Company shall be rendered as an independent contractor and not as agent for the Purchaser.

Section 9.06.  Successors and Assigns; Assignment of Agreement.

This Agreement shall bind and inure to the benefit of and be enforceable by the Company and the Purchaser and the respective permitted successors and assigns of the Company and the successors and assigns of the Purchaser.  After the Closing Date, this Agreement shall not be assigned, pledged or hypothecated by the Company to a third party without the prior written consent of the Purchaser, which consent may be withheld by the Purchaser in its sole discretion. The Purchaser shall have the right, without the consent of the Company, to assign, in whole or in part, its interest under this Agreement with respect to some or all of the Mortgage Loans, and designate any person to exercise any rights of the Purchaser hereunder, by executing an Assignment, Assumption and Recognition Agreement, and the assignee or designee shall accede to the rights and obligations hereunder of the Purchaser with respect to such Mortgage Loans. All references to the Purchaser in this Agreement shall be deemed to include its assignee or designee.  The Successor Servicer, to the extent not a party to this Agreement, shall be an intended third party beneficiary of this Agreement to the same extent as if it were a party hereto, shall have the right to enforce the provisions of this Agreement.

Section 9.07.  Solicitation of Mortgagor.

The Company agrees that, from and after the Closing Date, it will not take any action or permit or cause any action to be taken by any of its agents or affiliates, or by any independent contractors on the Company's behalf, to personally, by telephone or mail, solicit the borrower under any Mortgage Loan for the purpose of refinancing, in whole or in part, or offering other loans or related financial products.  It is understood and agreed that all rights and benefits relating to the solicitation of any Mortgagors and the attendant rights, title and interest in and to the list of such Mortgagors and data relating to the Mortgages (including insurance renewal dates) shall be transferred to the Purchaser pursuant to this Agreement on the Closing Date and the Company shall take no action to undermine these rights and benefits.  For the avoidance of doubt, the Company agrees that the Purchaser has the express right to market, offer and sell any services and products to the Mortgagors.  Notwithstanding the foregoing, it is understood and agreed that promotions undertaken by Company or any affiliate of the Company which are directed to the general public at large, including, without limitation, mass mailings based on

24

commercially acquired mailing lists, and newspaper, radio and television advertisements shall not constitute solicitation under this Section.

Section 9.08.  Further Agreements.

The Purchaser and the Company each agree to execute and deliver to the other such additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

Section 9.09.  Confidential Information.

(a)    The Purchaser and the Company hereby acknowledge that certain information including, without limitation, the Mortgage Loans, exchanged by them pursuant to this Agreement is confidential, sensitive, or proprietary in nature.  Either the Purchaser or the Company may also designate information as "Confidential" by written notice to the other party at the time of initial disclosure of such information.  Each of the Purchaser and the Company agrees that such "Confidential" information shall be used solely for the purpose of fulfilling the terms and conditions of this Agreement and shall be disclosed only to employees, agents, and representatives of the other party as is necessary for the performance of that party's obligations under this Agreement.  Such employees, agents, and representatives shall use reasonable safeguards to maintain the confidentiality of such information and to prevent its disclosure to any person not authorized to receive such information.

(b)    The term "Confidential Information" shall mean this Agreement and all proprietary information, data, trade secrets, business information and other information of any kind whatsoever that: (a) a party hereto ("Discloser") discloses, in writing, orally or visually, to the other party ("Recipient") or to which Recipient obtains access in connection with the negotiation and performance of this Agreement, and which (b) relates to: (i) a party hereto or its customers or (ii) third-party vendors or licensors who have made confidential or proprietary information available to a party hereto.  Confidential Information shall include Customer Information (as defined below).

(c)    The Company acknowledges that the Purchaser has a responsibility to its customers to keep information about its customers and their accounts ("Customer Information") strictly confidential.  In addition to the other requirements set forth in this Section 9.09 regarding Confidential Information, Customer Information shall also be subject to the additional restrictions set forth in this Subsection.  The Company shall not disclose or use Customer Information other than to carry out the purposes for which such Customer Information has been disclosed to the Company.  The Company shall not disclose any Customer Information other than on a "need to know" basis and then only to: (a) affiliates of the Purchaser; (b) its employees or officers; (c) affiliates of the Company provided that such affiliates shall be restricted in use and redisclosure of the Customer Information to the same extent as the Company; (d) to subcontractors provided that such subcontractors shall have entered into a confidentiality agreement no less restrictive than the terms hereof; (e) to independent contractors, agents, experts and consultants hired or engaged by the Purchaser, provided that all such persons are subject to a confidentiality agreement which shall be no less restrictive than the provisions of this Section; or (f) pursuant to the exceptions set forth in 15 U.S.C. § 6802(e) and accompanying

25

regulations which disclosures are made in the ordinary course of business. In addition, each party further agrees that any Customer Information transmitted electronically by either party must be encrypted. The restrictions set forth herein shall apply during the term and after the termination of this Agreement.

(d)     Each of the Purchaser and the Company, as the Recipient, hereby agrees on behalf of itself and its employees, officers, affiliates and subcontractors that Confidential Information will not be disclosed or made available to any person for any reason whatsoever, other than on a "need to know basis" and then only to: (a) its employees and officers; (b) subcontractors and other third parties specifically permitted under this Agreement, provided that all such persons are subject to a confidentiality agreement which shall be no less restrictive than the provisions of this Section 9.09; (c) independent contractors, agents, experts and consultants hired or engaged by the Purchaser, provided that all such persons are subject to a confidentiality agreement which shall be no less restrictive than the provisions of this Section 9.09; and (d) as required by law or as otherwise permitted by this Agreement, either during the term of this Agreement or after the termination of this Agreement. Prior to any disclosure of Confidential Information as required by law, the Recipient shall use its reasonable best efforts to: (i) notify the Discloser of any, actual or threatened legal compulsion of disclosure, and any actual legal obligation of disclosure immediately upon becoming so obligated, and (ii) cooperate with the Discloser's reasonable, lawful efforts to resist, limit or delay disclosure.

(e)     Upon the termination or expiration of this Agreement, the Recipient shall destroy or return, in its sole discretion, all Confidential Information, including Customer Information, in the possession of the Recipient or in the possession of any third party over which Recipient has or may exercise control to the extent such Confidential Information is not required for audit or record keeping purposes; provided that Customer Information which is also Customer Information of the Recipient shall not be required to be returned or destroyed.

(f)     With the exception of the obligations related to Customer Information, the obligations of confidentiality in this Section 9.09 shall not apply to any information which either the Purchaser or the Company rightfully has in its possession when disclosed to it by the other party, information which either the Purchaser or the Company independently develops, information which is or becomes known to the public other than by breach of this Section 9.09 or information rightfully received by either the Purchaser or the Company from a third party without the obligation of confidentiality.

(g)     Neither the Purchaser nor the Company shall issue any media releases, public announcements and public disclosures, relating to this Agreement or use the name or logo of the other party, including, without limitation, promotional or marketing material, or customer lists, but not including any disclosure required by legal, accounting or regulatory requirements beyond the reasonable control of such party.

Section 9.10.    Information Security and Privacy.

(a)     The Company acknowledges that the Purchaser is required to comply with the information security standards required by the Gramm-Leach-Bliley Act (15 U.S.C. 6801, 6805(b)(1)), as amended, and the regulations issued thereunder (12 C.F.R. Part 40) (collectively,

26

232966v.8

the "GLB Act") and with other statutory and regulatory requirements (collectively, "Privacy Laws") as well as its internal information security program for information protection. If applicable, the Company shall make commercial best efforts to assist the Purchaser to so comply and to conform to its own policies for information protection with applicable Privacy Laws, as amended from time to time. At the Purchaser's request, the Company shall make commercially reasonable modifications to its information security program or to the procedures and practices thereunder to conform to the Purchaser's security requirements as they exist from time to time.

(b)    Within thirty (30) calendar days of the Purchaser's written request, the Company shall deliver to the Purchaser's information protection department a copy of its written information security program. The program shall be designed to:

(i)    Ensure the security, integrity and confidentiality of Confidential Information;

(ii)    Protect against any anticipated threats or hazards to the security or integrity of such Confidential Information;

(iii)    Protect against unauthorized access to or use of such Confidential Information that could result in substantial harm or inconvenience to the person that is the subject of such information; and

(iv)    Ensure the proper disposal of such Confidential Information.

Section 9.11.    [Reserved].

Section 9.12.    Counterparts.

This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

Section 9.13.    Exhibits.

The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 9.14.    General Interpretive Principles.

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)    accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP;

27

(c)     references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)     a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)     the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)     the term "include" or "including" shall mean without limitation by reason of enumeration.

Section 9.15.   Reproduction of Documents.

This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

Section 9.16.   Trade Confirmation.

The terms and conditions set forth in the Trade Confirmation between the Purchaser and the Company with respect to the Closing Date shall be incorporated herein. In the event of any conflict between the terms of this Agreement and the Trade Confirmation, this Agreement shall control.

*[Intentionally Blank - Next Page Signature Page]*

28

IN WITNESS WHEREOF, the Company and the Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

| [_____] | **BROADHOLLOW FUNDING, LLC** |
|---|---|
| Purchaser | Company |
| | |
| By: _____ | By: _____ |
| | |
| Name: _____ | Name: _____ |
| | |
| Title: _____ | Title: _____ |

## EXHIBIT A

### CONTENTS OF EACH MORTGAGE FILE

With respect to each Mortgage Loan, the Mortgage File shall include each of the following items, which shall be available for inspection by the Purchaser and any prospective Purchaser, and which shall be included in the Servicing File or delivered to the Purchaser or the Custodian pursuant to Sections 2.01, 2.02 and 2.03 of the Bulk Sale and Interim Servicing Agreement to which this Exhibit is attached (the "Agreement"):

1.    (a) The original Mortgage Note endorsed "Pay to the order of _____, without recourse" and signed in the name of the Company by an authorized officer (provided that, in the event that the Mortgage Loan was acquired by the Company in a merger, the signature must be substantially in the following form: "[Company], successor by merger to [name of predecessor]"; and in the event that the Mortgage Loan was acquired or originated by the Company while doing business under another name, the signature must be substantially in the following form: "[Company], formerly known as [previous name]"). The Mortgage Note must contain all necessary intervening endorsements showing a complete chain of endorsement from the Originator (each such endorsement being sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note); or

    (b) With respect to no more than 1% of the aggregate unpaid principal balance of the Mortgage Loans included in a Mortgage Loan Package as of the Cut-off Date, a certified copy of the Mortgage Note (endorsed as provided above) together with a lost note affidavit, providing indemnification to the holder thereof for any losses incurred due to the fact that the original Mortgage Note is missing.

2.    The original of any guarantee executed in connection with the Mortgage Note (if any).

3.    The original Mortgage, with evidence of recording thereon, except as follows: if in connection with any Mortgage Loan, the Company cannot deliver or cause to be delivered the original Mortgage with evidence of recording thereon on or prior to the Closing Date because of a delay caused by the public recording office where such Mortgage has been delivered for recordation or because such Mortgage has been lost or because such public recording office retains the original recorded Mortgage, the Company shall deliver or cause to be delivered to the Custodian, a photocopy of such Mortgage, together with (i) in the case of a delay caused by the public recording office, an Officer's Certificate of the Company stating that such Mortgage has been dispatched to the appropriate public recording office for recordation and that the original recorded Mortgage or a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage will be promptly delivered to the Custodian upon receipt thereof by the Company; or (ii) in the case of a Mortgage where a public recording office retains the original recorded Mortgage

or in the case where a Mortgage is lost after recordation in a public recording office, a copy of such Mortgage certified by such public recording office or by the title insurance company that issued the title policy to be a true and complete copy of the original recorded Mortgage.

4.    The originals or certified true copies of any document sent for recordation of all assumption, modification, consolidation or extension agreements, with evidence of recording thereon, or, if the original of any such agreement with evidence of recording thereon has not been returned by the public recording office where such agreement has been delivered for recordation or such agreement has been lost or such public recording office retains the original recorded agreement, a photocopy of such agreement, certified by the Company or its agent to be a true and correct copy of the agreement delivered to the appropriate public recording office for recordation. The original recorded agreement or, in the case of a agreement where a public recording office retains the original recorded agreement or in the case where an agreement is lost after recordation in a public recording office, a copy of such agreement certified by such public recording office to be a true and complete copy of the original recorded agreement, will be promptly delivered to the Custodian upon receipt thereof by the Company.

5.    The Assignment of Mortgage to MERS for each Mortgage Loan (other than MOM Mortgage Loans), originals or certified true copies thereof sent for recordation with evidence of recording thereon, or if any such Assignment of Mortgage has not been returned from the applicable recording office or has been lost or if such public recording office retains the original recorded assignments of mortgage, the Company shall deliver or cause to be delivered to the Custodian, a photocopy of such Assignment of Mortgage, together with (i) in the case of a delay caused by the public recording office, an Officer's Certificate of the Company stating that such Assignment of Mortgage has been dispatched to the appropriate public recording office for recordation and that such original recorded Assignment of Mortgage or a copy of such Assignment of Mortgage certified by the appropriate public recording office or by the title insurance company that issued the title policy to be a true and complete copy of the original recorded Assignment of Mortgage will be promptly delivered to the Custodian upon receipt thereof by the Company; or (ii) in the case of an Assignment of Mortgage where a public recording office retains the original recorded Assignment of Mortgage or in the case where an Assignment of Mortgage is lost after recordation in a public recording office, a copy of such Assignment of Mortgage certified by such public recording office to be a true and complete copy of the original recorded Assignment of Mortgage. If the Mortgage Loan was acquired by the Company in a merger, the Assignment of Mortgage must be made by "[Company], successor by merger to [name of predecessor]." If the Mortgage Loan was acquired or originated by the Company while doing business under another name, the Assignment of Mortgage must be made by "[Company], formerly know as [previous name]." Subject to the foregoing and where permitted under Applicable Laws of the jurisdiction wherein the Mortgaged Property is located, such Assignments of Mortgage may be made by blanket assignments for Mortgage

EXHIBIT A - Page 2

Loans secured by the Mortgaged Properties located in the same county. With respect to each Mortgage Loan (including MOM Mortgage Loans) the Company shall take all actions as are necessary to cause the Purchaser or its designee to be shown as the owner of the related Mortgage Loan on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS.

6. Originals or certified true copies of documents sent for recordation of all intervening assignments of the Mortgage, if any, with evidence of recording thereon, or if any such intervening assignment has not been returned from the applicable recording office or has been lost or if such public recording office retains the original recorded assignments of mortgage, the Company shall deliver or cause to be delivered to the Custodian, a photocopy of such intervening assignment, together with (i) in the case of a delay caused by the public recording office, an Officer's Certificate of the Company stating that such intervening Assignment of Mortgage has been dispatched to the appropriate public recording office for recordation and that such original recorded intervening Assignment of Mortgage or a copy of such intervening Assignment of Mortgage certified by the appropriate public recording office or by the title insurance company that issued the title policy to be a true and complete copy of the original recorded intervening Assignment of Mortgage will be promptly delivered to the Custodian upon receipt thereof by the Company; or (ii) in the case of an intervening assignment where a public recording office retains the original recorded intervening Assignment of Mortgage or in the case where an intervening Assignment of Mortgage is lost after recordation in a public recording office, a copy of such intervening Assignment of Mortgage certified by such public recording office to be a true and complete copy of the original recorded intervening Assignment of Mortgage.

7. The original mortgagee policy of title insurance in the form required by the Agreement or, if the original lender's title insurance policy has not been issued, the preliminary report or irrevocable binder or commitment to issue the same.

8. Any security agreement, chattel mortgage or equivalent executed in connection with the Mortgage.

9. For each Mortgage Loan which is secured by a residential long-term lease, if any, a copy of the lease with evidence of recording indicated thereon, or, if the lease is in the process of being recorded, a photocopy of the lease, certified by an officer of the respective prior owner of such Mortgage Loan or by the applicable title insurance company, closing/settlement/escrow agent or company or closing attorney to be a true and correct copy of the lease transmitted for recordation.

10. With respect to the Non-Conventional Mortgage Loans, the MIC or LGC, as applicable, or any other evidence of FHA insurance coverage or VA guaranty, as the case may be.

11.     With respect to any Cooperative Loan, the applicable Cooperative Loan Documents.

With respect to each Mortgage Loan, the Mortgage File shall include each of the following items to the extent required pursuant to the Underwriting Guidelines:

12.     The original PMI Policy or certificate of insurance, where required pursuant to the Agreement.

13.     The original hazard insurance policy and, if required by law, flood insurance policy.

14.     Fully executed residential loan application.

15.     Fully executed Mortgage Loan closing statement (Form HUD-1) and any other truth-in-lending or real estate settlement procedure forms required by law.

16.     Verification of employment and income (if required pursuant to the Underwriting Guidelines).

17.     Verification of acceptable evidence of source and amount of down payment.

18.     Credit report on the Mortgagor.

19.     Residential appraisal report.

20.     Photograph of the Mortgaged Property.

21.     Survey of the Mortgaged Property, if required by the title company or Applicable Law.

22.     Copy of each instrument necessary to complete identification of any exception set forth in the exception schedule in the title policy, i.e. map or plat, restrictions, easements, sewer agreements, home association declarations, etc.

23.     All fully executed required disclosure statements required by Applicable Laws.

24.     If applicable, termite report, structural engineer's report, water potability and septic certification.

25.     Sales contract, if applicable.

26.     Evidence of payment of taxes and insurance premiums, insurance claim files, correspondence, current and historical computerized data files, and all other processing, underwriting and closing papers and records which are customarily contained in a mortgage file and which are required to document the Mortgage Loan or to service the Mortgage Loan.

27.     Amortization schedule, if available.

EXHIBIT A - Page 4

28.    Payment history for any Mortgage Loan that has been closed for more than ninety (90) calendar days.

29.    Fully executed power of attorney, if applicable.

In the event of a delay by the public recording office in returning any recorded document, the Company shall deliver to the Custodian, within one hundred eighty (180) calendar days of the Closing Date, an Officer's Certificate which shall (i) identify the recorded document, (ii) state that the recorded document has not been delivered to the Custodian due solely to a delay caused by the public recording office, (iii) state the amount of time generally required by the applicable recording office to record and return a document submitted for recordation, and (iv) specify the date the applicable recorded document will be delivered to the Custodian. The Company shall be required to deliver to the Custodian the applicable recorded document by the date specified in (iv) above. An extension of the date specified in (iv) above may be requested form the Purchaser, which consent shall not be unreasonably withheld.

EXHIBIT A - Page 5

## EXHIBIT B

### MORTGAGE LOAN SCHEDULE

(1)    the Company's Mortgage Loan number;

(2)    Mortgagor's name (including any co-mortgagors);

(3)    the full street address, city, state and zip code of the Mortgaged Property and the mailing address if different than the street address;

(4)    a code indicating whether the loan was originated through a correspondent, retail, or wholesale channel;

(5)    the broker identification number;

(6)    the number of units for all Mortgaged Properties;

(7)    the number of bedrooms and rents by unit;

(8)    a code indicating whether the Mortgaged Property is a single family residence, two-family residence, three-family residence, four-family residence, an individual unit in a planned unit development or an individual condominium unit;

(9)    the current Mortgage Interest Rate as of the Cut-off Date;

(10)    the Mortgage Interest Rate as of the date of origination;

(11)    the current Monthly Payment;

(12)    the original term to maturity;

(13)    the scheduled maturity date;

(14)    the original principal amount of the Mortgage Loan and, with respect to Second Lien Mortgage Loans, the related First Lien;

(15)    the principal balance of the Mortgage Loan as of the Cut-off Date after deduction of payments of principal received on or before the Cut-off Date and with respect to Second Lien Mortgage Loans, the principal balance of the related First Lien as of the Cut-off Date, after deduction of payments received on or before the Cut-off Date;

(16)    the Loan-to-Value Ratio at origination;

(17)    a code indicating the Credit Scores of the Mortgagor at the time of origination and the source of such Credit Scores;

(18)    a code indicating the credit grade and specific loan/underwriting program of each Mortgage Loan as assigned by the Company;

EXHIBIT B - Page 1

(19)    a code indicating the name of the issuer of the PMI Policy, if any, and the certificate number and percentage coverage, if applicable;

(20)    the Appraised Value;

(21)    the Due Date, the Due Date on which the first Monthly Payment was due and the Due Date as of the Cut-off Date;

(22)    the last payment date on which a payment was applied;

(23)    a code indicating the documentation level (full, alternative, limited);

(24)    a code indicating loan purpose (i.e., purchase financing, rate/term refinancing, cash-out refinancing);

(25)    a code indicating whether the Mortgaged Property is owner-occupied or investor property;

(26)    a code indicating whether the Mortgagor is self-employed;

(27)    a code indicating the product type (e.g., 2/28, 3/27, 15-year fixed, 30-year fixed, 15/30 balloon, etc);

(28)    a code indicating whether the Mortgage Loan is subject to a Prepayment Premium;

(29)    the term of any Prepayment Premium;

(30)    the type and amount of any Prepayment Premium;

(31)    the Mortgagor's debt to income ratio;

(32)    a code indicating whether the Mortgage Loan is an Adjustable Rate Mortgage Loan;

(33)    with respect to each Adjustable Rate Mortgage Loan, the Gross Margin;

(34)    with respect to each Adjustable Rate Mortgage Loan, the next Adjustment Date and, if different, the date on which the Monthly Payment is changed;

(35)    with respect to each Adjustable Rate Mortgage Loan, the lifetime maximum Mortgage Interest Rate;

(36)    with respect to each Adjustable Rate Mortgage Loan, the lifetime minimum Mortgage Interest Rate;

(37)    with respect to each Adjustable Rate Mortgage Loan, the Periodic Interest Rate Cap;

EXHIBIT B - Page 2

(38)     with respect to each Adjustable Rate Mortgage Loan, the Index;

(39)     with respect to each Adjustable Rate Mortgage Loan, to the extent that such Mortgage Loan is an Interest-Only Mortgage Loan, the number of months/years whereby the scheduled payment payable by a Mortgagor under the related Mortgage Note on each Due Date includes only interest payments;

(40)     a code indicating whether the Mortgage Loan is an adjustable rate or fixed rate mortgage loan;

(41)     the name of the Originator or broker of the Mortgage Loan;

(42)     a code indicating whether such Mortgage is insured by the FHA or guaranteed by the VA;

(43)     with respect to any Non-Conventional Mortgage Loan, the related VA entitlement percentage or FHA case number, as applicable;

(44)     a code indicating whether the Mortgaged Property is subject to a First Lien or a Second Lien;

(45)     a code indicating whether the Mortgage Loan is a MERS Designated Mortgage Loan and the related MIN;

(46)     a code indicating the Appraisal type (e.g., Tax Assessment, BPO, Drive-By Form 704, URAR, Form 2065, Form 2055 (Exterior only), Form 2055 (Interior Inspection), or automated valuation model ("AVM"));

(47)     if the Appraisal Type in #46 above is an AVM, then a description of the AVM type;

(48)     a code indicating whether such Mortgage Loan is a Texas Refinance Loan;

(49)     the Mortgage type (Conventional, FHA, VA, FSA/RHS);

(50)     a code indicating the cash out purpose of the Mortgage Loan (purchase or refinance);

(51)     Mortgagor IRS data (ss#, certification date, 1098 exempt code);

(52)     the Cut-off Date with respect to the Mortgage Loan; and

(53)     a code indicating whether the Mortgage Loan is an Option ARM Mortgage Loan.

With respect to the Mortgage Loans in the aggregate in the related Mortgage Loan Package, the respective Mortgage Loan Schedule shall set forth the following information, as of the Cut-off Date:

(1)     the number of Mortgage Loans;

EXHIBIT B - Page 3

(2)    the current aggregate outstanding principal balance of the Mortgage Loans;

(3)    the current weighted average Mortgage Interest Rate of the Mortgage Loans; and

(4)    the weighted average months to maturity of the Mortgage Loans.

EXHIBIT C

FORM OF TRADE CONFIRMATION

[Date]

Broadhollow Funding, LLC
[_____]
[_____]

Ladies and Gentlemen:

[_____] ("Purchaser") hereby confirms its agreement to purchase, and Broadhollow Funding, LLC (the "Company") hereby confirms its agreement to sell, on a mandatory delivery basis, certain [adjustable and fixed rate] first [and second] lien mortgage loans, on a servicing released basis (the "Mortgage Loans"). The Mortgage Loans have an aggregate Stated Principal Balance as of [Cut-Off Date] (the "Cut-off Date") of approximately $[_____] (plus or minus 5%). The purchase and sale of the Mortgage Loans will occur on [Closing Date] or such other date as shall be mutually agreed to by the parties (the "Closing Date"). The terms and provisions of the agreement for the purchase and sale of the Mortgage Loans are as described below.

1.    **Terms of this Commitment:** The Mortgage Loans are to be sold in a whole loan format on a servicing released basis pursuant to the Bulk Sale and Interim and Servicing Agreement, dated as of [_____], 2007, by and between Purchaser and Company, as may be amended by mutual agreement of the parties (the "Sale and Servicing Agreement"). [In the event that the Mortgage Loans are sold to the Purchaser on a date subsequent to the originally scheduled Closing Date specified herein (the "Scheduled Closing Date"), provided the delay was caused by the Company, or a party in the direct control of the Company, then for the time period commencing on the Scheduled Closing Date until the actual closing date, the Company shall pay to the Purchaser an amount equal to the difference between the weighted average Mortgage Interest Rate on the Mortgage Loans and the Purchaser's internal cost of funds calculated in the good faith discretion of the Purchaser (such difference, the "Cost of Carry"), which Cost of Carry may be deducted by the Purchaser from the purchase proceeds paid to the Company on the Closing Date.]

2.    **Delivery of Mortgage Loan Documents:**    Unless otherwise agreed by the Purchaser, the Mortgage Loan Documents shall be delivered to [_____] (the "Custodian") prior to the Closing Date in accordance with the Loan Sale and Delivery Requirements. For Mortgage Loans not registered under the MERS System, the Company shall cause Assignments of Mortgage to be completed and to be recorded in the name of MERS. The Company shall be required to deliver such Assignments of Mortgage for recording, at its own expense, within thirty (30) days of the Closing Date. Upon receipt of certification from the Custodian, Purchaser shall remit the payment of the purchase price to Company on the Closing Date as determined in paragraph 7 below. The Custodian shall hold the

EXHIBIT C - Page 1

Mortgage Loan Documents for the benefit of the Purchaser, its assignees or designees.

3.  **Servicing of the Mortgage Loans:** The Mortgage Loans will be serviced by the Company from the Closing Date until the Servicing Transfer Date (the "Interim Servicing Period") in accordance with the terms of the Sale and Servicing Agreement. The Company shall remit to the Purchaser on or before the 5th Business Day following the end of each month during the Interim Servicing Period any and all amounts received on account of the Mortgage Loans during the Interim Servicing Period, including, without limitation, payments of principal and interest and insurance proceeds, such remittance to be by wire transfer in the case of cash received and by overnight delivery service with respect to checks and other instruments.

4.  **Servicing Transfer:** The Company shall cause the servicing of the Mortgage Loans to be transferred to the Purchaser or its designee on the 15th day following the Closing Date (or such other date mutually acceptable to the parties) pursuant to the terms of the Sale and Servicing Agreement. The expected Servicing Transfer Date for this referenced transaction shall be [Servicing Transfer Date].

5.  **No Solicitation:** The Company hereby agrees that it will not take any action, or cause any action to be taken by any of its agents, contractors, employees or affiliates, to target for solicitation the prepayment of any of the Mortgage Loans.

6.  **Representations and Warranties:** The Company and the Purchaser will close this transaction pursuant to the terms of the Sale and Servicing Agreement including the representations and warranties contained therein.

7.  **Purchase Price:** [Adjust as necessary] The purchase price for the Mortgage Loans shall be [____]% times the Stated Principal Balance of the Mortgage Loans as of the Cut-off Date from the Cut-off Date to, but not including, the Closing Date at the weighted average Mortgage Interest Rate of the Mortgage Loans. **[In the event the weighted average interest rate on the Closing date differs from the original weighted average interest rate of [___]%, by 10 basis points (0.10%) or less, the purchase price percentage shall be adjusted as follows: (i) for each basis point (0.01%) that the weighted average mortgage interest rate increases, the purchase price percentage shall increase by [____] basis points ([___]%): (ii) for each basis point (0.01%) that the weighted average mortgage interest rate decreases, the purchase price percentage shall decrease by [__] basis points ([__]%) In the event the weighted average mortgage interest rate changes by more than ten basis points (0.10%), the purchase price shall be subject to renegotiation.]**

8.  **Fees.** With respect to each Mortgage Loan, the Company (i) shall pay to the Purchaser on the Closing Date $[_____] for the cost of acquiring a life of loan Flood Zone Service Contract, (ii) either pay to the Purchaser on the Closing Date $[_____] for the cost of acquiring a life of loan Tax Service Contract or assign to

EXHIBIT C - Page 2

the Purchaser an existing life of loan Tax Service Contract entered into with First American Corporation (and pay any transfer fees associated with such assignment and (iii) pay a transfer administration fee of $[      ] per Mortgage Loan.

9.    **Fees and Expenses:** Except as provided herein or in any order of the bankruptcy court, each party shall be responsible for payment of its own fees and expenses including, without limitation, attorneys' fees incurred in connection with this transaction.

10.    **Additional Information:** The Company shall deliver to the Purchaser a complete data format file. Such data file shall be delivered no later than five business days following the date of this letter agreement.

11.    **Trade Stipulations:** Each Mortgage Loan shall comply with the trade stipulations attached hereto as Exhibit A.

12.    **OCC Guidelines:** Neither the origination of the Mortgage Loan, nor the purchase thereof by the Purchaser, will cause the Mortgage Loan or the Purchaser to fail to comply with the OCC Guidelines Establishing Standards for Residential Mortgage Lending Practices.

13.    **Consumer Personal Information:** The Purchaser and the Company agree that they shall comply with all applicable laws and regulations regarding the privacy or security of all personal information about the mortgagors that has been supplied in connection with the respective Mortgage Loans by or on behalf of the mortgagors.

This letter agreement contains the entire agreement relating to the subject matter hereof between us and supersedes any prior oral or written agreement between us. This letter agreement may only be amended by a written document signed by both the Purchaser and the Company. This letter agreement may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same agreement. Capitalized terms used herein but not otherwise defined herein shall have the meanings given them in the Sale and Servicing Agreement. This letter agreement shall be kept confidential unless otherwise agreed to in writing by the Purchaser and the Company or otherwise required by law.

[Signature Page Follows]

EXHIBIT C - Page 3

Please confirm by signing and returning via facsimile, no later than [Date], to [_____] at [_____].

Very truly yours,

[_____]

By: _____
Name: _____
Title: _____

Confirmed and agreed to:
[Company]

By:_____
Name:_____
Title:_____

EXHIBIT C - Page 4

232966v.8

EXHIBIT A

TRADE STIPULATIONS

[To be attached hereto]

EXHIBIT C - Page 5

## EXHIBIT D

### FORM OF MEMORANDUM OF SALE

CLOSING DATE:

This Memorandum of Sale (this "Memorandum"), dated as of the Closing Date referred to above, confirms the sale by Broadhollow Funding, LLC (the "Company") to [_____] (the "Purchaser"), and the purchase by the Purchaser from the Company, of the first [and second] lien adjustable and fixed rate residential mortgage loans on a servicing released basis described on the Mortgage Loan Schedule attached as Schedule I hereto (the "Mortgage Loans"), pursuant to the terms of the Bulk Sale and Interim Servicing Agreement (the "Agreement"), dated as of [_____], 2007, by and between the Purchaser and the Company.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company does hereby bargain, sell, convey, assign and transfer to Purchaser without recourse, except as provided in the Agreement, and on a servicing released basis, all right, title and interest of the Company in and to each of the Mortgage Loans, together with all documents maintained as part of the related Mortgage Files and Servicing Files, all Mortgaged Properties which secure any Mortgage Loan but are acquired by foreclosure, deed in lieu of foreclosure after the Cut-off Date or otherwise, all payments of principal and interest received on the Mortgage Loans after the Cut-off Date, all other unscheduled collections collected in respect of the Mortgage Loans after the Cut-off Date, and all proceeds of the foregoing, subject, however, to the rights of the Company under the Agreement.

The Company hereby acknowledges receipt of the Purchase Price with respect to the Mortgage Loans.

The Company has delivered to the Custodian prior to the date hereof the Mortgage Loan Documents with respect to each Mortgage Loan required to be delivered under the Agreement.

The Company hereby acknowledges its duties and obligations under the Agreement with respect to the Mortgage Loans.

Capitalized terms that are used herein but are not defined herein shall have the respective meanings set forth in the Agreement.

232966v.8

IN WITNESS WHEREOF, the parties hereto, by the hands of their duly authorize officers, execute this Memorandum as of the Closing Date referred to above.

[_____],
as Purchaser

**BROADHOLLOW FUNDING, LLC**
as Company

By: _____

By: _____

Name: _____

Name: _____

Its: _____

Its: _____

232966v.8

EXHIBIT E

FORM OF ASSIGNMENT, ASSUMPTION AND RECOGNITION AGREEMENT

[DATE OF ASSIGNMENT]

ASSIGNMENT, ASSUMPTION AND RECOGNITION AGREEMENT dated _____, among _____, ("Assignor"), _____, ("Assignee") and Broadhollow Funding, LLC (the "Company"):

For and in consideration of the sum of one dollar ($1.00) and other valuable consideration the receipt and sufficiency of which are hereby acknowledged, and of the mutual covenants herein contained, the parties hereto hereby agree as follows:

1.     With respect to the Mortgage Loans listed on Exhibit A hereto, the Assignor hereby grants, transfers and assigns to Assignee all of the right, title and interest of Assignor, as Purchaser, in, to and under that certain Bulk Sale and Interim Servicing Agreement (the "Bulk Sale and Interim Servicing Agreement"), dated as of [_____], 2007, and the Memorandum of Sale dated [INSERT DATE] (together with the Bulk Sale and Interim Servicing Agreement, the "Sale Agreement"), each by and between [_____] (the "Purchaser") and the Company, and the Mortgage Loans delivered thereunder by the Company to the Assignor.

2.     The Assignor warrants and represents to, and covenants with, the Assignee that:

a.     The Assignor is the lawful owner of the Mortgage Loans with the full right to transfer the Mortgage Loans free from any and all claims and encumbrances whatsoever;

b.     The Assignor has not received notice of, and has no knowledge of, any offsets, counterclaims or other defenses available to the Company with respect to the Sale Agreement or the Mortgage Loans;

c.     The Assignor has not waived or agreed to any waiver under, or agreed to any amendment or other modification of, the Sale Agreement or the Mortgage Loans. The Assignor has no knowledge of, and has not received notice of, any waivers under or amendments or other modifications of, or assignments of rights or obligations under, the Sale Agreement or the Mortgage Loans; and

d.     Neither the Assignor nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Mortgage Loans, any interest in the Mortgage Loans or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Mortgage Loans, any interest in the Mortgage Loans or any other similar security from, or otherwise approached or negotiated with respect to the Mortgage Loans, any interest in the Mortgage Loans or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action which would constitute a distribution of the Mortgage Loans under the Securities Act of 1933 (the "Securities Act") or which would render the disposition of the

EXHIBIT E - Page 1

232966v.8

Mortgage Loans a violation of Section 5 of the Securities Act or require registration pursuant thereto.

      3.      That Assignee warrants and represent to, and covenants with, the Assignor and the Company pursuant to Section 9.06 of the Sale Agreement that:

      a.      The Assignee agrees to be bound, as Purchaser, by all of the terms, covenants and conditions of the Sale Agreement and the Mortgage Loans, and from and after the date hereof, the Assignee assumes for the benefit of each of the Company and the Assignor all of the Assignor's obligations as purchaser thereunder;

      b.      The Assignee understands that the Mortgage Loans have not been registered under the Securities Act or the securities laws of any state;

      c.      The purchase price being paid by the Assignee for the Mortgage Loans is in excess of $250,000.00 and will be paid by cash remittance of the full purchase price within sixty (60) calendar days of the sale;

      d.      The Assignee is acquiring the Mortgage Loans for investment for its own account only and not for any other person. In this connection, neither the Assignee nor any person authorized to act therefor has offered to sell the Mortgage Loans by means of any general advertising or general solicitation within the meaning of Rule 502(c) Regulation D promulgated under the Securities Act;

      e.      The Assignee considers itself a substantial sophisticated institutional investor having such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Mortgage Loans;

      f.      The Assignee has been furnished with all information regarding the Mortgage Loans that it has requested from the Assignor or the Company;

      g.      Neither the Assignee nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Mortgage Loans, any interest in the Mortgage Loans or any other similar security to, or solicited any offer to buy or accepted a transfer, pledge or other disposition of the Mortgage Loans, any interest in the Mortgage Loans or any other similar security from, or otherwise approached or negotiated with respect to the Mortgage Loans, any interest in the Mortgage Loans or any other similar security with, any person in any manner which would constitute a distribution of the Mortgage Loans under the Securities Act or which would render the disposition of the Mortgage Loans a violation of Section 5 of the Securities Act or require registration pursuant thereto, nor will it act, nor has it authorized or will it authorize any person to act, in such manner with respect to the Mortgage Loans; and

      h.      Either (1) the Assignee is not an employee benefit plan ("Plan") within the meaning of section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or a plan ("Plan") within the meaning of section 4975(e)(1) of the Internal Revenue Code of 1986 ("Code"), and the Assignee is not directly or indirectly purchasing the Mortgage Loans on behalf of, investment manager of, as named fiduciary of, as trustee of, or with assets of,

a Plan; or (2) the Assignee's purchase of the Mortgage Loans will not result in a prohibited transaction under section 406 of ERISA or section 4975 of the Code.

       i.      The Assignee's address for purposes of all notices and correspondence related to the Mortgage Loans and the Sale Agreement is:

> [NAME AND ADDRESS OF ASSIGNEE]
> Attention:
> Telephone:
> Fax:

The Assignee's wire transfer instructions for purposes of all remittances and payments related to the Mortgage Loans and the Sale Agreement is:

> For the account of [NAME OF ASSIGNEE]
> A/C#:
> ABA#:
> Attn:
> Taxpayer ID#:

      4.      Accuracy of the Sale Agreement.

The Company and the Assignor represent and warrant to the Assignee that (i) attached hereto as Exhibit B are true, accurate and complete copies of the Sale Agreement and all amendments and modifications, if any, thereto and (ii) the Sale Agreement has not been amended or modified in any respect, except as set forth in this Agreement. The Company represents and warrants that as of the date hereof, the representations and warranties referenced in Section 3.01 are true and correct as of the date hereof.

      5.      Recognition of Assignee.

From and after the date hereof, the Company shall note the transfer of the Mortgage Loans to the Assignee in its books and records and the Company shall recognize the Assignee as the owner of the Mortgage Loans. It is the intention of the Assignor, the Company and the Assignee that the Sale Agreement shall be binding upon and inure to the benefit of the Company and the Assignee and their respective successors and assigns.

[Signatures Follow]

IN WITNESS WHEREOF, the parties have caused this Assignment, Assumption and Recognition Agreement be executed by their duly authorized officers as of the date first above written.

**[NAME OF ASSIGNOR]**
Assignor

By: _____

Name: _____

Its: _____

**[NAME OF ASSIGNEE]**
Assignee

By: _____

Name: _____

Its: _____


**BROADHOLLOW FUNDING, LLC**
Company

By: _____

Name: _____

Its: _____

232966v.8

EXHIBIT F

UNDERWRITING GUIDELINES

[To be attached hereto]

## EXHIBIT G

## FORM OF OPINION OF COUNSEL


[_____], [____]

[_____]
[_____]


Re:     [Name of Company]


Ladies and Gentlemen:

I am special counsel for Broadhollow Funding, LLC, a [_____] limited liability company (the "Company"), with respect to certain matters in connection with the sale of Mortgage Loans pursuant to that certain Bulk Sale and Interim Servicing Agreement by and between the Company and [_____], dated as of [_____], 2007 (the "Agreement"). Capitalized terms not otherwise defined herein have the meanings given them in the Agreement.

In rendering the opinions set forth below, I have examined and relied upon originals or copies, certified or otherwise identified to my satisfaction, of the certificate of incorporation and by-laws of the Company, the Agreement and such corporate records, agreements or other instruments of the Company, and such certificates, records and other documents, agreements and instruments, as I have deemed necessary and proper as the basis for my opinions. In connection with such examination, I have assumed the genuineness of all signatures, the authenticity of all documents, agreements and instruments submitted to me as originals, the conformity to original documents, agreements and instruments of all documents, agreements and instruments submitted to me as copies or specimens, the authenticity of the originals of such documents, agreements and instruments submitted to us as copies or specimens, the conformity to executed original documents of all documents submitted to me in draft and the accuracy of the matters set forth in the documents we reviewed.    I have also assumed that all documents, agreements and instruments have been duly authorized, executed and delivered by all parties thereto. As to any facts material to such opinions that I did not independently establish or verify, I have relied upon statements and representations of officers and other representatives of the Company as I have deemed necessary and proper as the basis for my opinions, including, among other things, the representations and warranties in the Agreement.

Based upon the foregoing, I am of the opinion that:

1.      The Company is a corporation duly organized, validly existing and in good standing under the laws of the state of [_____].

232966v.8

2.      The Company has the power to engage in the transactions contemplated by the Agreement and all requisite power, authority and legal right to execute and deliver the Agreement, and to perform and observe the terms and conditions of the Agreement.

3.      Each person who, as an officer of the Company, signed (a) the Agreement, and (b) any other document delivered prior hereto or on the date hereof in connection with the sale, servicing and securitization of the Mortgage Loans was, at the respective times of such signing and delivery, and is, as of the date hereof, duly elected or appointed, qualified and acting as such officer, and the signatures of such persons appearing on such documents are their genuine signatures.

4.      The Agreement has been duly authorized, executed and delivered by the Company and is a legal, valid and binding agreement, enforceable in accordance with its terms, subject to bankruptcy laws and other similar laws of general application affecting rights of creditors and subject to the application of the rules of equity, including those respecting the availability of specific performance.

5.      The Company has been duly authorized to allow its officers to execute any and all documents by original signature in order to complete the transactions contemplated by the Agreement, and by original or facsimile signature in order to execute the endorsements of the Mortgage Notes and the Assignments of Mortgages, and the original or facsimile signature of the officer of the Company executing the endorsements of the Mortgage Notes and the Assignments of Mortgages represents the legal and valid signature of said officer of the Company.

6.      Either (i) no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Company of or compliance by the Company with the Agreement, or the consummation of the transactions contemplated by the Agreement; or (ii) any required consent, approval, authorization or order has been obtained by the Company.

7.      Neither the consummation of the transactions contemplated by, nor the fulfillment of the terms of the Agreement, will conflict with or result in a breach of or constitute a default under the charter or by-laws of the Company, the terms of any indenture or other agreement or instrument to which the Company is a party or by which it is bound or to which it is subject, or violate any statute or order, rule, regulations, writ, injunction or decree of any court, governmental authority or regulatory body to which the Company is subject or by which it is bound.

8.      There is no action, suit, proceeding or investigation pending or, to the best of my knowledge, threatened against the Company which, in my opinion, either in any one instance or in the aggregate, would likely result in any material adverse change in the business, operations, financial condition, properties or assets of the Company or in any material impairment of the right or ability of the Company to carry on its business substantially as now conducted or in any material liability on the part of the Company or which would draw into question the validity of the Agreement, or of any action taken or to be taken in connection with the transactions contemplated thereby, or which would be likely to impair materially the ability of the Company to perform under the terms of the Agreement.

9.      The sale of each Mortgage Note and Mortgage as and in the manner contemplated by the Agreement is sufficient fully to transfer all right, title and interest of the Company thereto as noteholder and mortgagee, apart from the rights to service the Mortgage Loans pursuant to the Agreement.

10.     The form of endorsement that is to be used with respect to the Mortgage Loans is legally valid and sufficient to duly endorse the Mortgage Notes to the Purchaser.

        The Opinions expressed herein are limited to matters of federal and [_____] law and do not purport to cover any matters as to which laws of any other jurisdiction are applicable. Except as expressly provided herein, this opinion is being furnished to the addressees hereof solely for their benefit in connection with the transactions contemplated in the Agreement, and it is not to be used, circulated, quoted or otherwise referred to for any purpose without my express written consent.

                        Sincerely,


                        By:_____
                              [Name of Counsel]

                        Its:    [Special Counsel]

EXHIBIT G - Page 3

EXHIBIT H

REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE COMPANY

The Company hereby represents, warrants and covenants that, as of the Closing Date, or as of such date specifically provided herein:

(a)    Due Organization and Authority: The Company is duly organized, validly existing and in good standing under the laws of the jurisdiction and has all licenses necessary to carry on its business as now being conducted, except where the failure to be so licensed or qualified would not result in a Material Adverse Change to the Company or the Company's performance of its obligations under this Agreement, and is licensed, qualified and in good standing in each state where a Mortgaged Property is located if the laws of such state require licensing or qualification in order to conduct business of the type conducted by the Company, and in any event the Company is in compliance with the laws of any such state to the extent necessary to ensure the enforceability of the related Mortgage Loan and the servicing of such Mortgage Loan in accordance with the terms of this Agreement; the Company has the full corporate power and authority to execute and deliver this Agreement and to perform in accordance herewith; the execution, delivery and performance of this Agreement (including all instruments of transfer to be delivered pursuant to this Agreement) by the Company and the consummation of the transactions contemplated hereby have been duly and validly authorized; this Agreement evidences the valid, binding and enforceable obligation of the Company, subject to bankruptcy, insolvency, moratorium and other principles of equity affecting the rights of creditors generally, whether considered in a proceeding at law or in equity; and all requisite corporate action has been taken by the Company to make this Agreement valid and binding upon the Company in accordance with its terms;

(b)    No Conflicts: Neither the execution and delivery of this Agreement, the acquisition of the Mortgage Loans by the Company, the sale of the Mortgage Loans to the Purchaser or the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement will conflict with or result in a breach of any of the terms or provisions of (i) the organizational documents of the Company or (ii) any agreement or instrument to which the Company is now a party or by which it is bound, except for such conflicts, breaches or defaults in the case which, individually or the aggregate, would not result in a Material Adverse Change to the Company or the Company's performance of its obligations under this Agreement, or constitute a default or result in the violation of any law, rule, regulation, order, judgment or decree to which the Company or its property is subject, or impair the ability of the Purchaser to realize on the Mortgage Loans, or impair the value of the Mortgage Loans;

(c)    Fair Consideration: The consideration received by the Company upon the sale of the Mortgage Loans under this Agreement shall constitute fair consideration and reasonably equivalent value for the Mortgage Loans;

(d)    Ability to Perform: The Company does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement.

232966v.8

The sale of the Mortgage Loans is not undertaken to hinder, delay or defraud any of the Company's creditors;

(e)     No Litigation Pending: There is no action, suit, proceeding or investigation pending or to its knowledge threatened against the Company which, either in any one instance or in the aggregate, may result in any material adverse change in the business, operations, financial condition, properties or assets of the Company, or in any material impairment of the right or ability of the Company to carry on its business substantially as now conducted, or in any material liability on the part of the Company, or which would draw into question the validity of this Agreement or the Mortgage Loans or of any action taken or to be contemplated herein, or which would be likely to impair materially the ability of the Company to perform under the terms of this Agreement;

(f)     No Consent Required: Except for the bankruptcy court order referred to in the Agreement, no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Company of, or compliance by the Company with, this Agreement or the sale of the Mortgage Loans as evidenced by the consummation of the transactions contemplated by this Agreement, or if required, such consent, approval, authorization or order has been obtained prior to the Closing Date;

(g)     No Untrue Information: None of this Agreement, the information set forth in the Mortgage Loan Schedule attached to the Memorandum of Sale and the information contained in the related electronic data file delivered to the Purchaser by the Company, nor any statement, report or other document furnished or to be furnished by or on behalf of the Company pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they were made, not misleading;

(h)     Sale Treatment: The Company has determined that the disposition of the Mortgage Loans pursuant to this Agreement will be afforded sale treatment for accounting and tax purposes;

(i)     No Brokers' Fees: The Company has not dealt with any broker, investment banker, agent or other Person that may be entitled to any commission or compensation in the connection with the sale of the Mortgage Loans;

(j)     Anti-Money Laundering Law Compliance: The Company has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws"); the Company has established, or shall have caused its Subservicer to have established, an anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Mortgage Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Mortgagor and the origin of the assets used by the said Mortgagor to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable Mortgagor for purposes of the Anti-Money Laundering Laws;

(k)    <u>Securities Law Compliance</u>: Neither the Company nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of any Mortgage Loans, any interest in any Mortgage Loans or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of any Mortgage Loans, any interest in any Mortgage Loans or any other similar security from, or otherwise approached or negotiated with respect to any Mortgage Loans, any interest in any Mortgage Loans or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action which would constitute a distribution of the Mortgage Loans under the Securities Act or which would render the disposition of any Mortgage Loans a violation of Section 5 of the Securities Act or require registration pursuant thereto, nor will it act, nor has it authorized or will it authorize any person to act, in such manner with respect to the Mortgage Loans;

(l)    <u>Ownership</u>: As of the Closing Date, no Mortgage Note and related Mortgage has been assigned or pledged and immediately prior to the transfer and assignment herein contemplated, the Company held good, marketable and indefeasible title to, and was the sole owner and holder of, each Mortgage Loan subject to no liens; the Company has full right and authority under all governmental and regulatory bodies having jurisdiction over the Company, subject to no interest or participation of, or agreement with, any party, to sell and assign the same pursuant to the Bulk Sale and Interim Servicing Agreement; and immediately upon the transfer and assignment therein contemplated, the Company shall have transferred all of its right, title and interest in and to each Mortgage Loan to the Purchaser and the Purchaser will hold good, equitable, and when recorded marketable, title, to, and be the sole owner of, each Mortgage Loan subject to no liens.

232966v.8

EXHIBIT I

LOAN SALE AND DELIVERY REQUIREMENTS

[To be attached hereto]

232966v.8