UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
In re:                                                          : Chapter 11
                                                                :
AMERICAN HOME MORTGAGE                                          : Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,                 :
                                                                : Jointly Administered
                                                                :
                                                                : Proposed Objection Deadline: At the Hearing
                                                                : Proposed Hearing Date: August 24, 2007 at 1:00 P.M.
                         Debtors.                               :
---------------------------------------------------------------x

**MOTION OF THE DEBTORS FOR ORDER PURSUANT TO SECTIONS 105(a)
AND 363 OF THE BANKRUPTCY CODE (I) CONFIRMING THE DEBTORS' AUTHORITY
(a) TO SELL CERTAIN REAL ESTATE OWNED BY THE DEBTORS IN THE ORDINARY
COURSE FREE AND CLEAR OF ANY AND ALL LIENS AND ENCUMBRANCES, (b) TO
CONTINUE FUNDING SERVICING ADVANCES AND DEDUCTING SUCH SERVICING
ADVANCES FROM THE PROCEEDS OF THE SALE, (c) TO DISTRIBUTE
PROCEEDS OF THE SALE, AND (II) GRANTING RELATED RELIEF**

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors-in-possession in the above cases (collectively, "AHM" or the "Debtors"),[1] hereby submit this motion (the "Motion"), pursuant to sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") for entry of an order (I) confirming the Debtors' authority (a) to sell certain real estate owned by the Debtors in the ordinary course of

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

business free and clear of any and all liens and encumbrances, (b) to continue funding loan servicing advances related to the real estate owned by the Debtors and deducting such loan servicing advances from the proceeds of the sales, (c) to distribute the balance of the sale proceeds in accordance with the relevant loan servicing agreements, and (II) granting related relief. In support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

## PRELIMINARY STATEMENT

1. The Debtors and hundreds of homebuyers are unnecessarily facing an inability to close sales of real estate owned by the Debtors (collectively "REO") because of title insurance companies and escrow agents refusing to close, absent an order of the Court authorizing the sale of the REO. These unwarranted actions by insurance companies and escrow agents unfamiliar with bankruptcy law are significantly impairing the Debtors' ability to conduct business operations and creating additional unnecessary administrative expenses. Further, it is impeding homebuyers' ability to close on the purchase of their homes.

2. In the ordinary course of business, the Debtors commence foreclosure proceedings on delinquent mortgages and then attempt to sell the REO. The sale of REO to purchasers and the funding of loan servicing advances related to the REO and deducting such loan servicing advances from the proceeds of the sales is an ordinary course of business transaction. Accordingly, to avoid any refusals or delays in connection with the sale of REO, the Debtors request entry of an order confirming the Debtors' authority to sell REO and net the loan servicing advances in the ordinary course of business without further order of the Court.

## STATUS OF CASE AND JURISDICTION

3. On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. The Debtors' chapter 11 cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

5. No trustee or examiner has been appointed. The Official Committee of Unsecured Creditors (the "Committee") was appointed on August 14, 2007.

6. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004.

## GENERAL BACKGROUND[2]

A. The Debtors' Business

7. Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and

---

[2] A detailed description of the Debtors' businesses and related business information is set forth in the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief [Docket No. 2], which is incorporated herein by reference.

primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

8. As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News

9. A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

B.   Events Leading to the Chapter 11 Filing

10. Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

4

11. The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

12. In the weeks prior to the Petition Date, this anxiety within certain institutions led to such institutions quickly devaluing the Debtors' loan and security portfolios and, consequently, such institutions made margin calls for hundreds of millions of dollars with respect to the Debtors' loans. In addition, during this time, certain of the Debtors' warehouse lenders -- the financial institutions that provide short term credit facilities used by the Debtors to originate and purchase mortgage loans -- began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

13. On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

14. Margin calls and the exercise of remedies by the Debtors' warehouse lenders created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on Friday, August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors as of the Petition Date employed approximately 1,000 essential employees to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

15. In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

16. Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets, including the servicing business and mortgages held for sale.

## **RELEVANT BACKGROUND**

17. As stated above, a large component of the Debtors' business is the servicing of loans primarily for the trusts of the Debtors' securitizations and for Fannie Mae, Freddie Mac, Ginnie Mae, large national banks, and other third party purchasers of the loans originated by the Debtors. The loan servicing business is conducted through AHM Servicing and generally entails collecting mortgage payments, administering tax and insurance escrows, responding to borrower inquiries, and maintaining control over collection and default mitigation processes, such as the commencement of foreclosure proceedings. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion.

18. In the ordinary course of the Debtors' loan servicing business, the Debtors institute foreclosure procedures when mortgagors fail to remit the requisite payments pursuant to the terms of their mortgages. At the conclusion of the foreclosure process, assuming the Debtors are the successful bidder at the foreclosure auction, the foreclosed properties become owned by the Debtors and referred to as REO.

19. Pursuant to the loan servicing agreements, in the ordinary course of business, the Debtors market the REO for sale through various real estate brokers. Upon receipt of the proceeds of a sale of REO, the Debtors deduct the servicing advances and costs related to the foreclosure proceedings and property preservation (i.e., insurance and maintenance). The remaining proceeds are then distributed to the appropriate parties in accordance with the respective loan servicing agreements.

20. At the closing of a sale of REO, the Debtors are generally required to deliver marketable and insurable title to the purchaser of the REO. However, solely because the Debtors have commenced these chapter 11 cases, certain title insurance companies and escrow agents have refused to insure or pass clear title to the purchasers of the REO absent an order from the Court authorizing the Debtors to sell the REO.

**RELIEF REQUESTED**

21. By this Motion, the Debtors seek entry of an order (I) confirming the Debtors' authority (a) to sell certain real estate owned by the Debtors in the ordinary course of business free and clear of any and all liens and encumbrances, (b) to continue the funding of loan servicing advances related to the REO and deducting such loan servicing advances from the proceeds of the sale of REO, (c) to distribute the balance of the sale proceeds in accordance with the relevant loan servicing agreements, and (II) granting related relief. While the Debtors believe an order from the Court is not required because the relief requested is in the ordinary course of business, the Debtors request such relief out of an abundance of caution and in an attempt to provide comfort to various title insurance companies and escrow agents, who are impeding the Debtors' ability to conduct this important component of their business operations.

## BASIS FOR RELIEF REQUESTED

A.   Ordinary Course of Business

22.   Section 363(c) of the Bankruptcy Code authorizes a debtor in possession to use, sell or lease property of the estate in the ordinary course of its business. 11 U.S.C. § 363(c). Section 363(c) of the Bankruptcy Code, in relevant part, provides:

> (c)(1) If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204 or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1). The ordinary course standard was intended to allow the debtor in possession the flexibility required to run its business and respond quickly to changes in the business environment. In re James A. Phillips, Inc., 29 B.R. 391, 394 (S.D.N.Y. 1983); In re HMH Motor Service., 259 B.R. 440, 448-49 (Bankr. S.D. Ga. 2000). A debtor in possession thus may use, sell or lease property of the estate without need for prior court approval if the transaction is in the ordinary course. In re Johns Mansville, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (holding that ordinary course uses of estate property do not require a prior hearing); In re James A. Phillips, Inc., 29 B.R. at 394 (holding that where a debtor in possession is merely exercising the privileges of his status, there is no general right to notice and hearing concerning particular transactions conducted in the ordinary course of the business).

23.   Courts broadly interpret the term ordinary course. In re Berkley Multi-Units, Inc., 88 B.R. 394, 396 (Bankr. M.D. Fla. 1988). In determining whether a transaction is in the ordinary course of business under section 363 of the Bankruptcy Code, the courts generally engage in a two step test: (1) the objective horizontal test, and (2) the subjective vertical test. In re

8

Roth American, Inc., 975 F.2d 949, 952 (3d Cir. 1992); In re Vision Metals, Inc., 325 B.R. 138, 143 (Bankr. D. Del. 2005).

24. The horizontal test is a factual analysis as to whether the transaction in question is of the sort commonly undertaken by companies in that industry. In re Roth American, Inc., 975 F.2d at 952-53. That is, the horizontal test focuses on whether the transaction is usual or abnormal for the industry. In re Dant & Russell, Inc., 853 F.2d 700, 704 (9th Cir. 1988). The vertical test is an analysis conducted from the perspective of a hypothetical creditor and analyzes whether the transaction subjects the creditor to an economic risk of a nature different from those it accepted when it decided to extend credit. In re Roth American, Inc., 975 F.2d at 952-53; United States ex rel. Harrison v. Estate of Deutscher, 115 B.R. 592, 598 (M.D. Tenn. 1990) (holding that the vertical test focuses on debtor's internal operations, comparing the debtor's prepetition business with its postpetition conduct and considers factors such as the size, nature and type of business and the size and nature of the transaction in question in assessing whether the transaction has subjected the creditor to economic risks of nature different from those accepted when credit was extended).

25. Here, (i) selling the REO, (ii) funding the loan servicing advances related to the REO and deducting such loan servicing advances from the proceeds of the REO sales, and (iii) distributing the balance of the sale proceeds in accordance with the relevant loan servicing agreements satisfies the horizontal and vertical tests. As stated above, the Debtors are in the business of servicing mortgage loans pursuant to various loan servicing agreements. In connection with servicing loans, the Debtors are required, from time to time, to institute foreclosure proceedings on properties of delinquent mortgagors. It is without question that selling the REO

9

subsequent to a foreclosure proceeding is an essential element in the Debtors' loan servicing business. Therefore, the horizontal test is satisfied.

26. Similarly, a hypothetical creditor should expect that the Debtors, who are in the business of servicing loans, would be parties to various servicing agreements that require the Debtors to foreclose upon properties of delinquent mortgagors and to sell those properties to recoup or minimize losses. Granting the relief requested herein would not subject creditors to economic risks that would not have been contemplated by the creditor. Therefore, the vertical test is also satisfied. In re WRB West Associates Inc., 106 B.R. 215, 218-20 (Bankr. D. Mont. 1989) (holding that a land developer had the authority to sell developed lots of land in the ordinary course of the debtor's business pursuant to section 363 of the Bankruptcy Code); In re Stroud Ford, Inc., 205 B.R. 722, 725-26 (Bankr. M.D. Pa. 1996) (explaining that a debtor's sale of real estate would not require court approval if the debtor's business was residential real estate development).

27. Notwithstanding these facts, certain title insurance companies and escrow agents are refusing to close on the sale of REO, absent an order of the Court or confirmation that the Debtors are authorized to sell the REO. Their refusal to proceed with the closings is significantly impairing the Debtors' ability to conduct business operations. The Debtors estimate that (i) fifteen such sales are scheduled to the close on or before August 24, 2007, (ii) approximately eighty-five (85) are scheduled to close by the end of August 2007, and (iii) approximately three hundred (300) are to close in the next sixty (60) days. It is thus critical that the Debtors continue to sell the REO, including the funding of servicing advances related to the REO and deducting such servicing advances from the sale proceeds, in the ordinary course of business without the necessity of seeking court approval for each and every sale by separate motion.

28.    If the Debtors are unable to sell the REO because of the refusal of the title insurance companies and escrow agents to close (or conditionally close) without an order of the Court authorizing the sale of the REO, the Debtors will incur potentially unnecessary administrative costs in connection with preservation of the REO that would have otherwise been sold. Moreover, if the REO is not sold by the first of the month, the Debtors are responsible for that month's interest.

29.    The title insurance companies' and escrow agents' refusals to close on the sale of the REO not only impairs the Debtors' business operations, but also adversely affects the purchasers of the REO. Purchasers of the REO have presumably scheduled their respective closings to coincide with the sale of their existing home or some other event necessitating the purchase of the REO. By not closing on the scheduled date because of a requirement to obtain Court approval of such sale, the purchasers of the REO may be forced make other arrangements, including deciding not to proceed with the purchase of the REO.

30.    Accordingly, requiring the Debtors to seek Court approval for the sale of each REO will only increase administrative costs, delay closings, significantly disrupt the Debtors' business operations, and adversely affect the purchasers of the REO.

31.    Even if this Court finds that these sales are not in the ordinary course of the Debtors' business, the relief requested by this Motion is appropriate and within the Court's equitable powers under section 105(a) of the Bankruptcy Code and its authority to approve transactions under section 363(b) of the Bankruptcy Code.

32.    Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of [title 11]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. See In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

B.   Sales Free And Clear Are Appropriate Under The Circumstances

33.   Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if (a) applicable nonbankruptcy law permits such a free and clear sale, (b) the holder of the interest consents, (c) the interest is a lien and the sales price of the property exceeds the value of all liens on the property, (d) the interest is in bona fide dispute, or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. 11 U.S.C. § 365(f).

34.   At closings for the REO sales, the Debtors are required to deliver marketable and insurable title free and clear of encumbrances at closing. To convey marketable and insurable title to the prospective buyers at closing, the Debtors request authority to sell the REO free and clear of any claim or encumbrance. To the extent that any claim or encumbrance exists on the

REO, they shall attach to the proceeds realized from the sale of the REO. Accordingly, the Debtors request that the sale of REO in the ordinary course of business be free clear of all claims and encumbrances.

## NOTICE

35. Notice of this Motion has been provided, via overnight delivery, to: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Official Committee of Unsecured Creditors; (iii) counsel to Bank of America, N.A., as Administrative Agent for the lenders under that certain Credit Agreement dated August 30, 2004; (iv) counsel to the postpetition lender; and (v) all parties entitled to notice under Local Rule 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the proposed order, substantially in the form annexed hereto as <u>Exhibit A</u> and granting such further relief as the Court deems just and proper.

Dated: August 22, 2007  
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)  
Joel A. Waite (No. 2925)  
Pauline K. Morgan (No. 3650)  
Sean M. Beach (No. 4070)  
Matthew B. Lunn (No. 4119)  
Donald J. Bowman, Jr. (No. 4383)  
The Brandywine Building  
1000 West Street, 17th Floor  
Wilmington, Delaware 19801  
(302) 571-6600

Counsel for the Debtors and Debtors-in-Possession