## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re:                                                  : Chapter 11
                                                        :
AMERICAN HOME MORTGAGE                                   : Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,[1]      :
                                                        : Jointly Administered
        Debtors.                                        :
------------------------------------------------------------ x    Hearing Date: September 4, 2007 at 1:00 p.m. (ET)
                                                                 Objection Deadline: August 31, 2007 at 12:00 p.m. (ET)

**DEBTORS' EMERGENCY MOTION FOR ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363, AND 1146(c): (i) AUTHORIZING PRIVATE SALE OF CERTAIN SERVICING RIGHTS TO BARCLAYS BANK PLC FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND TRANSFER TAXES; (ii) APPROVING THE TERMS OF THE PURCHASE AND SALE AGREEMENT; AND (iii) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, "AHM" or

the "Debtors"), as debtors and debtors in possession in the above-captioned jointly administered

cases, hereby move this Court for entry of an order (i) authorizing the private sale of the

servicing rights (the "Barclays Servicing Rights") under that certain Servicing Agreement (the

"Barclays Servicing Agreement"), dated as of May 1, 2007, between Barclays Bank PLC (the

"Buyer" or "BBPLC") and AHM Servicing, such sale to be free and clear of liens, claims,

interests, and transfer taxes, except as set forth herein; (ii) approving the terms of the Purchase

and Sale Agreement (the "Sale Agreement," attached hereto as Exhibit "A"); and (iii) granting

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

ancillary relief (the "Motion"). In support of the Motion, the Debtors respectfully state as follows:

## STATUS OF THE CASE AND JURISDICTION

1.      On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases are being jointly administered pursuant to Rule 1005(b) of the Federal Rules of Bankruptcy Procedure. Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On August 14, 2007, the United States Trustee for the District of Delaware appointed The Official Committee of Unsecured Creditors (the "Committee"). No trustee or examiner has been appointed.

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief requested are sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9014, and 9019.

## GENERAL BACKGROUND

**A.      The Debtors' Business**

4.      Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and

sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

5.      As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

6.      A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes an important asset of the Debtors' estates.

**B.      Events Leading to the Chapter 11 Filing**

7.      Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing

default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

8.      The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

9.      In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders -- the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening AHM's continued viability.

10.     On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

11.     The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors now employ approximately 1000 persons who are

absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

12.     In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and "scratch and dent" loans, to financial and strategic investors.

13.     Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## RELIEF REQUESTED

14.     By this Motion, the Debtors respectfully request entry of an order, approving the private sale to the Buyer for the Barclays Servicing Rights owned by the Debtors as set forth herein.

### The BBPLC/AHM Servicing Transaction

15.     The Debtors have been servicing and administering a portfolio of first lien, adjustable-rate mortgage loans (the "Mortgage Loans") on a servicing retained basis, which Mortgage Loans AHM Corp. sold to BBPLC on May 1, 2007. The terms by which AHM Servicing serviced the Mortgage Loans on behalf of BBPLC are set forth in the Barclays Servicing Agreement. The Debtors estimate that, as of August 22, 2007, there are 1,777

Mortgage Loans serviced by the Barclays Servicing Agreement, with an aggregate principal balance of $745,793,399.

16.    On August 24, 2007, the Debtors and BBPLC agreed to the terms of the Sale Agreement, attached hereto as Exhibit A, which is contingent upon Court approval of the terms of the sale (the "BBPLC Sale").

## I.    The Debtors' Marketing Efforts for the BBPLC Sale

17.    As noted above, since the sudden and dramatic upheaval in the Debtors' business, the Debtors have sought to sell their businesses and assets to financial and strategic investors.  On August 6, 2007, the Debtors filed a motion for approval of procedures for the sale of certain assets used in the Debtors' loan servicing business, and ultimately the approval of a sale of such assets [Docket No. 11] (the "Servicing Sale Motion"), which was approved by order dated August 9, 2007 [Docket No. 113] (the "Servicing Sale Order").

18.    The Debtors anticipate that a buyer for the bulk of its loan servicing business will be found, and the Debtors will seek approval of a sale of the business to the party presenting the highest or otherwise best bid for such assets.  However, given (i) the Debtors' judgment that the consideration provided for the Barclays Servicing Rights exceeds the value that could be obtained by the estates if the Barclays Servicing Rights are sold as part of the larger sale under the Servicing Sale Motion; (ii) the Debtors' judgment that the private sale of the Barclays Servicing Rights will not interfere with the bulk of the loan servicing assets to be sold pursuant to the Servicing Sale Motion, but will simply carve out the Barclays Servicing Rights form the assets sold under the Servicing Sale Motion, and (iii) the resolution of certain claims and disputes between the Debtors and BBPLC that are embodied in the Sale Agreement, the

Debtors submit that the BBPLC Sale offers the Debtors the most reasonable terms and provides the most value to the Debtors' estates.

## II.     Summary of Proposed Terms of the Sale Agreement

19.     The Sale Agreement provides for the transfer of all of the Debtors' right, title and interest set forth under the Barclays Servicing Agreement, and confirms the termination of the Barclays Servicing Agreement itself.  In return, any liabilities that the Debtors incurred under the Barclays Servicing Agreement will be assumed by BBPLC, and the Debtors will receive a percentage of the remaining unpaid principal balance of the Mortgage Loans serviced under the Barclays Servicing Agreement as of September 1, 2007 as additional consideration under the Sale Agreement.  Further, in the Sale Agreement, the parties have set forth the terms by which the Debtors will transfer the Barclays Servicing Rights, record the assignment of the Mortgage Loans to BBPLC or its designee, transfer all escrowed funds related to the Mortgage Loans, provide notice to the borrowers under the Mortgage Loans of the transfers, and discharge its servicing obligations prior to the Transfer Date (as defined in the Sale Agreement).

## III.     The Sale of the Barclays Servicing Rights Should Proceed by Private Sale

20.     For the reasons explained below and throughout this Motion, the Debtors believe that the approval of a private sale of the Barclays Servicing Rights to BBPLC pursuant to the terms of the Sale Agreement is appropriate.

*A.  Sale of the Barclays Servicing Rights Substantially Pursuant to the Terms of the Sale Agreement Should be Approved.*

21.     Section 363(b)(1) of the Bankruptcy Code provides:  "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code provides: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry

out the provisions of this title." 11 U.S.C. § 105(a). In pertinent part, Bankruptcy Rule 6004

states that, "all sales not in the ordinary course of business may be by private sale or by public

auction." Fed.R.Bankr.P. 6004(f)(1). With respect to the notice required in connection with a

private sale, Bankruptcy Rule 2002(c)(1) states, in pertinent part, that,

> . . . the notice of a proposed use, sale or lease of property . . . shall
> include . . . the terms and conditions of any private sale and the
> deadline for filing objections. The notice of a proposed use, sale or
> lease of property, including real estate, is sufficient if it generally
> describes the property.

Fed.R.Bankr.P. 2002(c)(1).

22.     To approve the use, sale, or lease of property out of the ordinary course of

business, this Court must find "some articulated business justification" for the proposed action.

See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 145-47 (3d Cir. 1986) (implicitly

adopting the "articulated business justification" and good faith tests of Committee of Equity Sec.

Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983)); see also In re

Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third

Circuit had adopted a "sound business purpose" test in Abbotts Dairies); Titusville Country Club

v. PennBank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re

Indus. Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. 15, 19 (Bankr. E.D. Pa.

1987).

*B. Legal Standard for Approval of Private Sale.*

23.     Generally, courts have applied four (4) factors in determining whether a

sale of a debtor's assets should be approved: (a) whether a sound business reason exists for the

proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the

transaction has been proposed and negotiated in good faith; and (d) whether adequate and

reasonable notice is provided.  See Lionel, 722 F.2d at 1071 (setting forth the "sound business

purpose" test); Abbotts Dairies, 788 F.2d at 145-57 (implicitly adopting the articulated business

justification test and adding the "good faith" requirement); Delaware & Hudson Ry., 124 B.R. at

176 ("Once a court is satisfied that there is a sound business reason or an emergency justifying

the pre-confirmation sale the court must also determine that the trustee has provided the

interested parties with adequate and reasonable notice, that the sale price is fair and reasonable

and that the purchaser is proceeding in good faith.").

   24. This fundamental analysis does not change if the proposed sale is private,

rather than public.  See, e.g., In re Ancor Exploration Co., 30 B.R. 802, 808 (Bankr. N.D. Okla.

1983) ("[T]he bankruptcy court should have wide latitude in approving even a private sale of all

or substantially all of the estate assets not in the ordinary course of business under § 363(b).").

The bankruptcy court "has ample discretion to administer the estate, including authority to

conduct public or private sales of estate property."  In re WPRV-TV, Inc., 143 B.R. 315, 319

(D.P.R. 1991), vacated on other grounds, 165 B.R. 1 (D.P.R. 1992); accord, In re Canyon

Partnership, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985).  Here, the proposed private sale of the

Barclays Servicing Rights to the Buyer meets all of these requirements and should be approved.

*C.  Proceeding by Private Sale Reflects an Exercise of the Debtors' Business Judgment.*

   25. There is a sound business justification for the Debtors' preference to

proceed with a private sale to the Buyer, rather than conducting a public sale of the Barclays

Servicing Rights in the context of the Servicing Sale Motion.  The Debtors submit that an order

granting the relief requested herein is a matter within the discretion of the Court and would be

consistent with the provisions of the Bankruptcy Code.  See 11 U.S.C. §105(a).  BBPLC is the

owner of the Mortgage Loans subject to the Barclays Servicing Rights, and therefore has a more

vested interest in the ultimate fate of the Barclays Servicing Rights than other potential

purchasers. Accordingly, BBPLC has presented the Debtors with the Sale Agreement, the terms

of which are superior to what the Debtors anticipate would be obtained for the Barclays

Servicing Rights if simply sold in tandem with the bulk of the Debtors' servicing business to a

third-party buyer.

26.    As a result of BBPLC's unique interest in the Barclays Servicing Rights,

and BBPLC's willingness to provide significant consideration based on its unique interest in the

Barclays Servicing Rights, the Debtors believe that their estates and creditors would benefit from

the approval of the BBPLC Sale without the added costs associated with a public auction, at

which the Debtors are not guaranteed the commitment of BBPLC to purchase the Barclays

Servicing Rights at all, much less at the price to be provided through the Sale Agreement.

BBPLC has indicated that in the ordinary course of its business, its ability to market and sell the

Mortgage Loans in the immediate future will yield more value for BBPLC if it is able to sell the

Barclays Servicing Rights in tandem with the Mortgage Loans. Therefore, the value of the

BBPLC Servicing Rights are more value to BBPLC if they can be immediately and definitively

obtained.

27.    Furthermore, BBPLC has raised certain allegations regarding whether the

Debtors are entitled to retain any rights under the Barclays Servicing Agreement, and whether

BBPLC has the right to unilaterally terminate the Barclays Servicing Agreement. BBPLS has

advised the Debtors that the existing Barclays Servicing Agreement may have terminated by its

terms and in any event may be terminated by BBPLC without cause. The Debtors dispute that its

rights under the Barclays Servicing Agreement have been or could be terminated; however, a

prompt consummation of the BBPLC Sale will serve to resolve any claims or disputes of this

nature, and would prevent any dispute with BBPLC from clouding or delaying the sale process provided for under the Servicing Sale Order.  Any delay may result in losses for the Debtors' estates and increased administrative expenses.

28.    The Debtors believe that a private sale of the Barclays Servicing Rights to the Buyer under the terms of the Sale Agreement will be much more likely to close in a timely manner than an auction because, in the Debtors' business judgment, the Barclays Sale Agreement provides them with strong assurances that the Buyer is motivated to close the contemplated transaction in a timely manner.  Further, the Sale Agreement demonstrates the Buyer's good faith intent  to close the contemplated transaction, subject only to Court approval.

D.  *The Purchase Price is Fair and Reasonable.*

29.    The Purchase Price represents a fair and reasonable price for the Barclays Servicing Rights.  As explained above, the Debtors have been engaged in liquidating all the assets of its servicing business, including the Servicing Assets.  In the Debtors' view, the Sale Agreement represents substantial value to the Debtors' estates inasmuch as it provides favorable terms for the disposition of the Barclays Servicing Rights at a price that represents fair and reasonable consideration.  See Mellon Bank, N.A., v. Metro Communications, Inc., 945 F.2d 635 (3d Cir. 1991) (price amounted to reasonably equivalent value under the Bankruptcy Code), cert. denied, 503 U.S. 937 (1992).

E.  *The Sale is Proposed in Good Faith.*

30.    The transaction has been proposed in good faith.  In fact, the terms of the private sale to the Buyer are the product of extensive, intense arms-length negotiations with the Buyer. The Buyer is not an affiliate of any of the Debtors, nor does the Buyer have any common officers or directors with any of the Debtors.  This transaction is proposed for the sole purpose of

maximizing the estates' return on the Barclays Servicing Rights and minimizing future administrative expenses.

*F.  Adequate and Reasonable Notice of the Sale Has Been Provided.*

31.     The Debtors have provided adequate notice of the proposed sale to all parties-in-interest, as required by the applicable procedural rules.  See Fed.R.Bankr.P. 2002(c)(1) (notice must contain "the terms and conditions of any private sale and the time fixed for filing objections."); see also, Delaware & Hudson Ry., 124 B.R. at 180 (the disclosures necessary in such a sale notice need only include the terms of the sale and the reasons why such a sale is in the best interests of the estate and do not need to include the functional equivalent of a disclosure statement).

32.     The Debtors have also served the Motion and the Sale Agreement on all parties that have expressed interest or the Debtors believe may have an interest in purchasing the Barclays Servicing Rights.

33.     The notified parties will have the opportunity to submit other offers during the period prior to the objection deadline noted in the caption of this Motion.  Consistent with their fiduciary duties to their estates, the Debtors will consider all such offers.

34.     To summarize, in the Debtors' informed business judgment, there is very little, if anything, to be gained by conducting a formal auction of the Barclays Servicing Rights, and there is a great deal to lose.  Even if there were other entities willing and able to overbid the Buyer for the Barclays Servicing Rights, which the Debtors believe to be unlikely, the delay, uncertainty and added administrative expenses attendant to the auction process would be unfavorable to the Debtors, their estates and creditors.  Further, the value to be gained through a

private Sale of the Barclays Servicing Rights individually will yield more value to the estates

than the incremental decrease in value that would conceivably take place if the Barclays

Servicing Rights are not sold together with the bulk of the Debtors' Servicing Assets.  For these

reasons, the Court should not force the parties to conduct a public sale or to establish bidding

procedures contrary to the Sale Agreement and the Debtors' business judgment, but instead

should approve the private sale of the Barclays Servicing Rights to the Buyer.

**IV.    The Sale Should Be Approved Under 11 U.S.C. § 363(f)**

*A.  The Sale is Proposed in Good Faith Within the Meaning of 11 U.S.C. §363(m).*

35.    As discussed above, the Sale Agreement was negotiated at arms-length

and in good faith after other proposals for purchase of the Barclays Servicing Rights were

considered.  The Buyer is not affiliated to any of the Debtors or their representatives.

Accordingly, this Court should find that Buyer has acted in good faith within the meaning of

section 363(m) of the Bankruptcy Code.  See generally Marin v. Coated Sales, Inc. (In re Coated

Sales, Inc.), No. 89 Civ. 3704 (KMW), 1990 WL 212899 (S.D.N.Y.) (holding that to show lack

of good faith, a party must demonstrate "fraud, collusion, or an attempt to take grossly unfair

advantage of other bidders"); see also generally In re Sasson Jeans, Inc., 90 B.R. 608, 610

(S.D.N.Y. 1988) (quoting In re Bel Air Assocs., Ltd., 706 F.2d 301, 305 (10th Cir. 1983)); In re

Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining the facts of each case,

concentrating on the "integrity of [an actor's] conduct during the sale proceedings" (quoting In re

Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978))).

B.  *The Sale Transfer Should be Free and Clear of Liens, Claims, and Interests (Except as Set Forth Herein).*

36.     In accordance with section 363(f) of the Bankruptcy Code, a debtor in possession may sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

> (i)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (ii)    such entity consents;
>
> (iii)   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (iv)    such interest is in bona fide dispute; or
>
> (v)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); see In re Elliot, 94 B.R. 343, 354 (E.D. Pa. 1988) (sale "free and clear" may be approved provided the requirements of at least one subsection are met).

37.     Considering that any objections to this Motion must be resolved by consent of the objecting party or by the Court, the Debtors expect that they can satisfy at least the second and fifth subsections of Section 363(f).  The Debtors will seek to obtain the consent of the primary parties in interest to the Sale Agreement.  Accordingly, they request that the sale of the Barclays Servicing Rights be approved "free and clear", with any liens, claims, encumbrances, and interests to attach to proceeds of the sale.

C.  *The Sale Should Be Exempt From Transfer Taxes.*

38.     Section 1146(c) of the Bankruptcy Code provides that the making or delivery of an instrument of transfer under a confirmed Chapter 11 plan of reorganization may not be taxed under any law imposing a stamp or similar tax.  Courts in the Third Circuit have

construed this provision to include transfers outside of, but in furtherance of effectuating, a

Chapter 11 plan.  See Director of Revenue, State of Delaware v. CCA Partnership, 70 B.R. 696

(Bankr. D.Del. 1987), aff'd 833 F.2d 304 (3d Cir, 1987).  See also In re Jacoby Bender, Inc., 40

B.R. 10 (Bankr. E.D.N.Y. 1984), aff'd 758 F.2d 840 (2d Cir, 1985).

        39.      In the instant case, the sale of the Barclays Servicing Rights is essential to

the consummation of a plan, and therefore should be deemed as made "under a plan."  The

Debtors intend to use the net proceeds of the sale to satisfy the claims asserted against the

Debtors in accordance with the Bankruptcy Code and the orders of this Court.  For these reasons,

the Debtors submit that the sale of the Barclays Servicing Rights falls within the scope of the

exemption provided by Section 1146(c) of the Bankruptcy Code.  See In re Permar Provisions,

Inc., 79 B.R. 530, 534 (Bankr. E.D.N.Y. 1987) (sale of property one year prior to plan

confirmation was exempt under Section 1146(c), where sale proceeds were distributed to secured

and unsecured creditors).

## NOTICE

        40.      The Debtors will serve this Motion on (i) the Office of the United States

Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) Counsel to Bank of

America, N.A., as Administrative Agent for the lenders under that certain Credit Agreement

dated August 30, 2004 (the "Administrative Agent"); (iv) counsel to the DIP Lender; (v) counsel

to the Buyer; (vi) the U.S. Securities and Exchange Commission; (vii) any creditor known by the

Debtors to be asserting a Lien on the Barclays Servicing Rights; and (viii) all parties entitled to notice under Local Rule 2002-1(b).[2]

41.    The Debtors have filed a motion to shorten the time for notice of this Motion contemporaneously herewith (the "Motion to Shorten").  As noted herein and in the Motion to Shorten, the Debtors submit that based on the enhanced value available through an immediate private sale, the fact that the private sale will not interfere with the sale of the remainder of the Debtors' servicing assets, and the resolution of certain disputes with BBPLC that are embodied by the Sale Agreement, the Debtors submit that no other or further notice is appropriate or required.

---

[2] Contemporaneous with the filing of this Motion, the Debtors have filed the Debtors' Motion for Order Authorizing the Debtors to File Exhibit to the Servicing Rights Purchase Agreement Between the Debtors and EMC Mortgage Corporation, Which Exhibit Lists the Purchase Price, Under Seal Pursuant to Section 107(b) of the Bankruptcy Code (the "Motion to File Under Seal").  As described further in the Motion to File Under Seal, the Debtors seek entry of an order authorizing the Debtors to place the purchase price for the Sale under seal and directing that the purchase price shall remain under seal and shall not be made available to anyone other than: (i) the Court, (ii) the United States Trustee, (iii) counsel for the Committee; and (iv) counsel to the Administrative Agent.

WHEREFORE, the Debtors respectfully request that the Court enter an order (i) authorizing the Debtors to enter into the Sale Agreement and to sell the Barclays Servicing Rights free and clear of claims, liens, encumbrances, other interests and transfer taxes except as set forth herein; (ii) approving such transaction as a private sale; (iii) approving the Sale Agreement; (iv) finding the Buyer to be a good faith purchaser, (v) approving the notice procedures described herein, and (vi) granting such ancillary relief as is requested herein and such further relief as is just and proper.

Dated:    Wilmington, Delaware
          August 24, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

(#4484)

James L. Patton, Jr. (No. 2202)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Kara Hammond Coyle (No. 4410)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Proposed Counsel for Debtors and
Debtors in Possession

# EXHIBIT A

## SALE AGREEMENT

## SERVICING RIGHTS

## PURCHASE AND SALE AGREEMENT

**THIS SERVICING RIGHTS PURCHASE AND SALE AGREEMENT**, dated as of the _____ day of August 2007, is hereby mutually agreed upon and entered into by and between BARCLAYS BANK PLC, including its successors and assigns, (collectively, "BBPLC"), and AMERICAN HOME MORTGAGE SERVICING, INC. and certain of its affiliates as identified within this Agreement, each a debtor and debtor in possession ("Servicer") under Title 11 of the United States Code (11 USC Sec.101 et seq.), as amended (the "Bankruptcy Code").

### WITNESSETH:

**WHEREAS**, an affiliate of BBPLC and American Home Mortgage Corp., a New York corporation ("AHM"), entered into a Mortgage Loan Purchase Agreement dated as of May 1, 2007 pursuant to which BBPLC has purchased from AHM certain first lien, adjustable-rate residential mortgage loans (the "Mortgage Loans") on a servicing retained basis;

**WHEREAS**, the Servicer has serviced and administered the Mortgage Loans on behalf of BBPLC pursuant to a Servicing Agreement (the "Servicing Agreement") entered into as of May 1, 2007;

**WHEREAS**, on August 6, 2007 Servicer and certain of its affiliates filed for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, Case No.07-11047 (CSS) Jointly Administered (the "Bankruptcy Case"),and Servicer remains in possession and control of its assets as of the date hereof; and

**WHEREAS**, BBPLC and Servicer desire to set forth the terms and conditions pursuant to which Servicer will sell, transfer and assign to BBPLC all of Servicer's right, title and interest in and to the Servicing Rights, and BBPLC will purchase and assume all right, title and interest in and to the Servicing Rights.

**NOW, THEREFORE**, in consideration of the mutual premises, covenants and conditions and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and upon the terms and subject to the conditions set forth herein, the parties hereto agree as follows:

### ARTICLE I.

### DEFINITIONS

As used in this Agreement, the following terms shall have the meanings specified below.

"Accepted Servicing Practices" means, with respect to any Mortgage Loan, those mortgage servicing practices of prudent mortgage lending institutions which service mortgage loans of the same type as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located.

"Advances" means, with respect to the Mortgage Loans, all customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) incurred in the performance by the Servicer of its servicing obligations, including, but not limited to, the cost of (a) the preservation, restoration and protection of the Mortgaged Property, (b) any enforcement or judicial proceedings, including foreclosures, (c) the management and liquidation of the Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage and (d) compliance with the obligations under Section 2.08 of the Servicing Agreement (except with respect to any expenses incurred in connection with procuring or transferring Tax Service Contracts as provided therein).

"Agreement" means this Servicing Rights Purchase and Sale Agreement, including all amendments, supplements, and Exhibits hereto.

"Ancillary Income" means all late charges, assumption fees, reinstatement fees, and escrow account benefits or similar types of fees arising from or in connection with any Mortgage Loan, to the extent not otherwise payable to the Mortgagor under applicable law or pursuant to the terms of the related Mortgage Note.

"Applicable Requirements" means, as of the time of reference, (i) the Accepted Servicing Practices; (ii) all contractual obligations of Servicer with respect to the applicable Servicing Rights, including without limitation those contractual obligations contained herein, in the Servicing Agreement or in the Mortgage Loan Documents; (iii) all applicable federal, state and local laws, statutes, rules, regulations and ordinances applicable to Servicer or to the applicable Servicing Rights; and (iv) all other judicial and administrative judgments, orders, approvals, stipulations, awards, writs and injunctions applicable to Servicer, the applicable Servicing Rights or the related Mortgage Loans.

"Assignments of Mortgage Instruments" means an assignment of Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction where the related Mortgaged Property is located to reflect the transfer of the Mortgage to the party indicated therein or if the related Mortgage has been recorded in the name of MERS or its designee, such actions as are necessary to cause the designee to be shown as the owner of the related Mortgage on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS.

"Bankruptcy Code" has the meaning set forth in the introductory paragraph of this Agreement.

"Bankruptcy Loan" means a Mortgage Loan with respect to which, as of the Transfer Date, the Mortgagor thereof has sought relief under or has otherwise been subjected to the federal bankruptcy laws under the Bankruptcy Code or any other similar federal or state laws of general application for the relief of debtors, through the institution of appropriate proceedings, and such proceedings are continuing.

"BBPLC" has the meaning set forth in the introductory paragraph of this Agreement.

"Business Day" shall mean any day other than a Saturday, Sunday, or other day on which banking institutions in the State of New York are required or authorized by law or by executive order to be closed.

"Claim" has the meaning set for in Bankruptcy Code Section 101(5) including any third-party claim, demand or litigation.

"Custodial Accounts" means the accounts in which Custodial Funds are deposited and held by Servicer pursuant to the Servicing Agreement.

"Custodial Funds" means all funds held by Servicer with respect to the related Mortgage Loans including, but not limited to, all principal and interest funds and any other funds due Investors, maintained by Servicer relating to the Mortgage Loan.

"Custodian" means an entity acting as a mortgage loan document custodian under any custodial agreement or pursuant to Applicable Requirements.

"Encumbrance" means any security interest, pledge, hypothecation, mortgage, lien (including environmental and tax liens), violation, charge, lease, license, encumbrance, servient easement, adverse claim, reversion, reverter, preferential arrangement, restrictive covenant, condition or restriction of any kind, including any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of legal ownership.

"Escrow Account" means the accounts in which Escrow Funds are deposited and held by a Servicer pursuant to the Servicing Agreement.

"Escrow Funds" means funds held by a Servicer with respect to the related Mortgage Loans for the payment of taxes, assessments, insurance premiums, ground rents, funds from hazard insurance loss drafts, other mortgage escrow and impound items and similar charges (including interest accrued thereon for the benefit of the Mortgagors under the Mortgage Loans, if applicable), maintained by Servicer relating to the Mortgage Loans.

"Exhibit" means an exhibit attached hereto or delivered or to be delivered pursuant to this Agreement.

"HUD" means United States Department of Housing and Urban Development or any successor thereto.

"Insurer" or "Insurers" means any Person providing any standard hazard insurance policy, any federal flood insurance policy, any title insurance policy, any earthquake insurance policy, or any other insurance policy applicable to a Mortgage Loan or Pool and any successor thereto providing, including, without limitation, as applicable, an Agency, private mortgage insurer or other insurer or guarantor under such policies.

"Litigation Loan" means a Mortgage Loan with respect to which, as of the Transfer Date, any litigation is pending relating to the Mortgage Loan and materially and adversely affecting the value of the related Servicing Rights or subjecting the Servicer to potential

3

liability or cost (excluding class action lawsuits or loan level lawsuits that do not affect the value of the Servicing Rights).

"Loss" or "Losses" means any and all direct, actual and out-of-pocket losses, damages, deficiencies, claims, costs or expenses, including without limitation, reasonable attorneys' fees and disbursements.

"MERS" means the Mortgage Electronic Registration System that enables members to execute and deliver an Assignment of Mortgage Instrument with respect to a Mortgage Loan to MERS for recording in the office of the appropriate local jurisdiction.

"Mortgage Escrow Payments" means the portion, if any, of the Mortgage Loan Payment in connection with a Mortgage Loan that will, upon receipt by Servicer, become part of the Escrow Funds.

"Mortgage File" means the file containing copies in the form set forth in Section 2.07, and original documents to the extent required by the Applicable Requirements, of the Mortgage Loan Documents with respect to a Mortgage Loan, as well as the related credit and closing packages, disclosures, custodial documents, and all other files, books, records and documents necessary, as applicable, to (i) establish the eligibility of the Mortgage Loan for insurance by an Insurer, (ii) service the Mortgage Loan in accordance with Applicable Requirements, and (iii) comply with Applicable Requirements regarding the Mortgage Loan documentation to be maintained by the Servicer of the Mortgage Loan, or its document custodian.

"Mortgage Instrument" means any deed of trust, security deed, mortgage, security agreement or any other instrument which constitutes a first lien on real estate securing payment by a Mortgagor of a Mortgage Note.

"Mortgage Loan" means the one-to-four family residential mortgage loans as to which Servicer is the owner of the Servicing Rights for which the related Servicing Rights are the subject of this Agreement.

"Mortgage Loan Documents" means (a) with respect to any Mortgage Loan (i) the original Mortgage Note, (ii) the original Mortgage Instrument, (iii) a mortgagee title insurance policy (or other evidence of title acceptable under Applicable Requirements), (iv) any private mortgage insurance policy, and (v) the original, recorded Assignments of Mortgage Instrument(s), as required under Applicable Requirements, along with such other documents or instruments, or substitutes therefore, as are required to be retained by the Custodian pursuant to Applicable Requirements.

"Mortgage Loan Payment" means, with respect to a Mortgage Loan, the amount of each monthly installment on such Mortgage Loan, whether principal and interest or interest alone or escrow or other payment, required to be paid by the Mortgagor in accordance with the terms of the Mortgage Loan Documents.

4

"Mortgage Loan Schedule" means the schedule of the related Mortgage Loans to be attached hereto as Exhibit B or provided in electronic form by Servicer to BBPLC setting forth information with respect to such Mortgage Loans.

"Mortgage Note" means the promissory note executed by a Mortgagor and secured by a Mortgage Instrument evidencing the indebtedness of the Mortgagor under a Mortgage Loan.

"Mortgaged Property" means the fully constructed one-to-four family residential real property that is encumbered by a Mortgage Instrument, including all buildings and fixtures thereon and all accessions thereto including installations of mechanical, electrical, plumbing, heating and air conditioning systems located in or affixed to such buildings, and all alterations, additions and replacements.

"Mortgagor" means any obligor under a Mortgage Note or a Mortgage Instrument.

"Order" means any order or ruling issued by the United States Bankruptcy Court for the District of Delaware and such other Court having jurisdiction over Servicer's Bankruptcy Case that is applicable to the Agreement and the rights and obligations of the parties hereto.

"Parties" means Servicer and BBPLC.

"Payment Date" means the first Business Day after Servicer has delivered to BBPLC or BBPLC's sub-servicer or BBPLC's other designee all related Escrow Funds, Custodial Funds and Mortgage Files in conformity with the Servicing Transfer Instructions and this Agreement, which is anticipated to be approximately five (5) Business Days after the Transfer Date.

"Person" means an individual, a corporation, a partnership, a limited liability company, a joint venture, a trust, an unincorporated association or organization, or a government body, agency or instrumentality, rather than the meaning set forth in Bankruptcy Code Section 101(41).

"Prepayment Charge" means with respect to any Mortgage Loan, the charges or premiums, if any, due in connection with a Principal Prepayment of such Mortgage Loan, in accordance with the terms of the related Mortgage Note or Mortgage Instrument, and in accordance with applicable state and federal laws.

"Principal Prepayment" means any recovery of principal on a Mortgage Loan which is received in advance of its scheduled due date, and which is not accompanied by an amount of interest representing scheduled interest due on any date subsequent to the month of prepayment.

"Purchase Price" means, with respect to Servicing Rights to be sold to BBPLC hereunder, the total amount to be paid by BBPLC to Servicer pursuant to Article III to acquire the Servicing Rights.

"Purchase Price Percentage" means ▮▮▮▮

"Sale Date" means as of September 1, 2007.

"Servicer" has the meaning set forth in the introductory paragraph of this Agreement.

"Servicing Agreements" has the meaning set forth in the recitals of this Agreement.

"Servicing Fee" means the amount payable to Servicer under the Servicing Agreement related to a Mortgage Loan, as consideration for servicing the Mortgage Loan.

"Servicing Rights" means the rights and obligations of Servicer to administer, collect the payments for the reduction of principal and application of interest, collect payments on account of taxes and insurance, pay taxes and insurance, remit collected payments, provide foreclosure services, provide full escrow administration and any other obligations required for or in connection with the related Mortgage Loans pursuant to the Servicing Agreement, together with the right to receive the Servicing Fee, Prepayment Charges, if any, and any Ancillary Income arising from or connected to the Mortgage Loans, and all rights, powers, and privileges incident to any of the foregoing.

"Servicing Transfer Instructions" means the instructions detailing the procedures pursuant to which Servicer shall effect the transfer of Servicing Rights, Mortgage Files and Servicing Agreements to BBPLC, which instructions are attached hereto as Exhibit A.

"Tax Service Contract" means a paid in full, fully assignable, life of loan tax service contract with respect to a Mortgage Loan.

"Transfer Date" means September 4, 2007.

## ARTICLE II.

### TRANSFER OF SERVICING RIGHTS

Section 2.01.    Conveyance of Servicing Rights.

(a)    Upon the terms and subject to the conditions of this Agreement, and subject to the Applicable Requirements, Servicer shall, on the Transfer Date, transfer and assign to BBPLC, and BBPLC shall assume from Servicer, all right, title, interest and obligation of Servicer in and to: (i) the Servicing Rights to the Mortgage Loans, and all rights related thereto, (ii) the Advances, (iii) the Custodial Funds and Escrow Funds, (iv) the Mortgage Files, (v) the exclusive right to enter into arrangements that generate, or to otherwise receive, Ancillary Income with respect to the Mortgage Loans, (vi) the right to collect and retain Prepayment Charges; and (vii) the Tax Service contracts.

(b)    On the Transfer Date, the Servicer shall deliver to BBPLC such other instruments of assignment, transfer and conveyance, and do such other acts as are reasonably necessary to effectuate the transfer, assignment and delivery to BBPLC of the right, title and

066585.1001

interest of the Servicer in and to the Servicing Rights to be sold, transferred, assigned and delivered to BBPLC on such date pursuant to Article II free and clear of any Encumbrances.

(c)    This Agreement shall terminate the Servicing Agreement; provided that this termination of the Servicing Agreement shall not affect any claims that BBPLC or its affiliates may have against the Servicer and/or AHM under the Servicing Agreement with respect to servicing of the Mortgage Loans prior to the Transfer Date or any claims BBPLC or its affiliates may have against the Servicer and/or AHM not pertaining to the Servicing Agreement.

Section 2.02.    Assumption of Liabilities.

Upon the terms and subject to the conditions of this Agreement, and subject to the Applicable Requirements, BBPLC shall, on the Transfer Date, accept such appointment and become fully vested with all the rights, powers, duties, responsibilities, obligations and liabilities of the Servicer, with like effect as if originally named as a "Servicer" in the Servicing Agreement and the Custodial Agreement with respect to any Servicing Rights and related assets described in Section 2.01, pursuant to the Servicing Agreement, and any other liabilities as are expressly assumed by BBPLC under this Agreement, as may be limited in this Agreement.

Section 2.03.    Evidence of Transfer.

On the Transfer Date or within a reasonable period of time thereafter, BBPLC and Servicer shall execute and deliver the documents in connection with the transfer of the related Servicing Rights hereunder, in form and substance reasonably satisfactory to BBPLC and Servicer, and shall execute and deliver such other instruments or documents as BBPLC and Servicer shall reasonably determine are necessary to evidence the transactions contemplated hereby.

Section 2.04.    Servicing Transfer Instructions.

In connection with the transfer of Servicing Rights from Servicer to BBPLC or any sub-servicer designated by BBPLC pursuant to this Agreement, Servicer and BBPLC shall follow the Servicing Transfer Instructions.

Section 2.05.    Delivery of Mortgage Loan Data and Files.

(a)    Transfer Date Data Tapes.    No later than five (5) days before the Transfer Date hereunder, Servicer shall provide BBPLC with a preliminary tape(s) containing the information necessary to transfer the Servicing Rights to be sold on the Transfer Date.

(b)    Delivery of Mortgage Loan Files.    No later than two (2) Business Days prior to the Transfer Date, Servicer shall, at its sole expense and in accordance with the Servicing Transfer Instructions, provide BBPLC, its sub-servicer or its other designee with the data, information and materials reasonably necessary for BBPLC, BBPLC's sub-servicer or BBPLC's other designee to service the related Mortgage Loans, including, but not limited to, Mortgage Notes (including e-Notes), riders, loan modification documents, and servicing files, in accordance with the Applicable Requirements.    Servicer shall, at its sole expense and in

accordance with the Servicing Transfer Instructions, package and ship to BBPLC and/or BBPLC's sub-servicer or BBPLC's other designee for inside delivery, to be received by BBPLC and/or BBPLC's sub-servicer or BBPLC's other designee no later than five (5) days after the Transfer Date, all Mortgage Files pertaining to the related Mortgage Loans and the related servicing records in Servicer's possession. Servicer shall provide BBPLC with prior written notice of the carrier, shipping arrangements and insurance arrangements with respect to the delivery of the Mortgage Files.

Section 2.06.    Recordation of Assignments of Mortgage.

Servicer shall take all such actions as may be necessary to transfer of record all right, title and interest in the Mortgage Loans to BBPLC and the Servicing Rights with respect to the Mortgage Loans to BBPLC, consisting of: (i) assigning nominal title to the related Mortgage Loans to BBPLC; (ii) preparing or causing to be prepared all prior intervening Assignments, and recording such Assignments if required under Applicable Requirements; and (iii) endorsing or causing to be endorsed the related Mortgage Notes in accordance with Applicable Requirements. Servicer shall bear all costs associated with the preparation and recording of the Assignments described in (i) and (ii) above, and the preparation of the endorsements described in (iii) above. Servicer shall forward to the Custodian the original recorded Assignments upon return from the recording office on a weekly basis and forward to BBPLC a report of all original recorded Assignments delivered to Custodian. Servicer shall (X) provide and/or assist BBPLC in the procurement and/or execution of such affidavits, land court orders or other documents as it currently uses to evidence Servicer's ownership of such Servicing Rights, and (Y) prepare such endorsements and/or prepare and record such intervening Assignments as may be required to reflect of record Servicer's ownership of such Servicing Rights in any jurisdiction or recording office that refuses to accept the documents described in clause (X) as proof of Servicer's ownership of such Servicing Rights, and Servicer shall in each case bear all reasonable costs associated therewith.

Notwithstanding the foregoing provisions of this Section 2.06, if a Mortgage Loan already is registered with MERS, Servicer shall follow the requirement of MERS to reflect in the records of MERS the transfer of the Servicing Rights to the Mortgage Loan from Servicer to BBPLC. Servicer shall continue the transmission of recording information of the Mortgage Instruments to MERS after the Transfer Date, until all such recording information is received and transmitted to MERS and BBPLC, which in any event and under all circumstances shall be completed not later than three (3) days after the Transfer Date. Servicer shall bear all costs and all responsibility associated with the registration of a Mortgage Loan with MERS, to the extent done before the Transfer Date, including, without limitation, the related preparation and recordation of an Assignment of Mortgage Instrument, and all costs and responsibility associated with the reflection of the transfer of Servicing to the Mortgage Loan in the records of MERS. For each Mortgage Loan registered with MERS, Servicer shall provide BBPLC with the MERS mortgage loan identification number in an electronic format acceptable to the parties.

Section 2.07.    Transfer of Mortgage Loan Files.

Servicer shall be responsible for ensuring all required documents comprising the Mortgage File, related to the Mortgage Loans and that are not already held by the Custodian, are

8

transferred to BBPLC in a timely manner including, but not limited to, Mortgage Notes (including e-Notes), riders, loan modification documents and servicing files. In the event the required Mortgage Loan files and documents other than recorded mortgages, interim assignments and title policies are not received within ten (10) days following the Transfer Date, BBPLC may bill Servicer for reasonable costs associated with creating or obtaining any required missing Mortgage Loan Documents.

Section 2.08.    Transfer of Escrows Funds, Custodial Funds, Advances and Reconciliation.

Within five (5) days after the Transfer Date, the Servicer shall remit and deliver to BBPLC, or BBPLC's sub-servicer or BBPLC's other designee, Escrow Funds, Custodial Funds and all other funds and collections, the legal, right, title and interest to which were transferred to BBPLC on the Transfer Date and shall reconcile such amounts with BBPLC in accordance with the Servicing Transfer Instructions.

Section 2.09.    Costs of Transfer.

Except as otherwise provided herein (i) Servicer shall be responsible for all transfer and recording fees, costs and expenses with respect to the transfer of Servicing Rights, the delivery of Mortgage Loan Files and related documents, the remittance of Custodial Funds, and all other fees, costs and expenses incurred by Servicer in its performance of its obligations under this Agreement, including without limitation the fees of Servicer's document custodian, attorneys and accountants, and (ii) BBPLC shall be responsible for the fees, costs and expenses of BBPLC in its performance of its obligations under this Agreement, including without limitation the fees of BBPLC's attorneys and accountants.

Section 2.10.    Notice to Borrowers.

Not more than 30 days after the Transfer Date, Servicer and BBPLC shall deliver to each borrower under an applicable Mortgage Loan a joint letter advising the borrower of the transfer of Servicing Rights contemplated herein. Such joint letter shall be mutually agreeable to the parties and shall comply with all Applicable Requirements, including, without limitation, the federal Real Estate Settlement Procedures Act, as amended, and Regulation X, as amended. The Servicer shall pay 25% of the cost of such joint letter and BBPLC shall pay 75% of the cost of such joint letter.

Section 2.11.    Servicing Prior to Transfer Date

On and prior to the Transfer Date, the Servicer shall discharge such duties and responsibilities during the period from the date hereof until the Transfer Date with the same degree of diligence and prudence which Servicer is obligated to exercise under the Servicing Agreement.

Section 2.12.    Tax Contracts.

No later than the Transfer Date, Servicer shall assign to BBPLC the Tax Service Contracts. In addition, BBPLC shall deduct from the Purchase Price Sixty-Two Dollars and fifty cents ($62.50) per Mortgage Loan as to which there is no Tax Service Contract.

9

Section 2.13.   Forwarding Post-Transfer Date Items.

Servicer shall promptly forward to BBPLC, BBPLC's sub-servicer, or its other designee, all Mortgagor correspondence, insurance notices, tax bills or any other correspondence or documentation related to the transferred Servicing Rights and the Advances that is received by Servicer after the Transfer Date.  Without limiting the generality of the forgoing, for the first 60 days following the Transfer Date, any Mortgage Loan payments due BBPLC and received by Servicer shall be forwarded on the date of receipt to BBPLC, BBPLC's sub-servicer, or BBPLC's other designee, at Servicer's expense, by overnight mail.  After the expiration of the 60-day period following the Transfer Date, Servicer shall forward Mortgage Loan payments due BBPLC, and received by Servicer, by first class mail, within one (1) Business Day after the date on which such payments are received by Servicer.

### ARTICLE III.

### TRANSFER OF SERVICING RIGHTS

Section 3.01.   Purchase Price.

In full consideration for the transfer and sale of Servicing Rights as of a particular agreed upon Transfer Date, BBPLC shall pay to Servicer in the manner provided in Section 3.03, and subject to the adjustments provided for in this Agreement, an amount equal to (i) the Purchase Price Percentage multiplied by the aggregate unpaid principal balance of the related Mortgage Loans as of September 1, 2007, excluding the unpaid aggregate principal balances of Litigation Loans, Bankruptcy Loans and Mortgage Loans which are one or more payments past due as of September 1, 2007, plus (ii) all outstanding documented Advances funded by Servicer in accordance with the terms of the Servicing Agreement and which are determined to be reasonably recoverable.  For example, a Mortgage Loan is past due if a Mortgage Loan Payment due on July 1, 2007 is not paid by July 31, 2007.

Section 3.02.   Verification of Purchase Price Items.

Within five (5) Business Days prior to the Transfer Date, Servicer shall provide BBPLC with a preliminary Mortgage Loan Schedule that sets forth the Mortgage Loans relating to the Servicing Rights being purchased as of the Transfer Date, the aggregate actual unpaid principal balance of each such Mortgage Loan as of the Transfer Date and all other mortgage loan data reasonably required by the BBPLC at such time.  If BBPLC notifies Servicer that the preliminary Mortgage Loan Schedule is acceptable, then the Mortgage Loan Schedule shall become final.  If, however, after reviewing the preliminary Mortgage Loan Schedule, BBPLC reasonably believes that there is an error in the preliminary Mortgage Loan Schedule, BBPLC shall so notify Servicer and in such event the Parties shall cooperate in connection with resolving the matter.  Upon resolution of the matter, the Mortgage Loan Schedule shall be finalized, after any applicable revisions to the preliminary Mortgage Loan Schedule are made.

Section 3.03.  Payment of Purchase Price by BBPLC.

The Purchase Price for the Servicing Rights shall be paid by BBPLC to Servicer as follows:

(a)  Sale Date.  On the Sale Date, BBPLC shall pay to Servicer by wire transfer of immediately available funds (i) ninety percent (90%) of the estimated portion of the Purchase Price attributable to Section 3.01(i) hereof, and (ii) one hundred percent (100%) of the portion of the Purchase Price attributable to Sections 3.01(ii).  To the extent the Purchase Price Percentage, unpaid principal balance of the Mortgage Loans, or amount of Advances as of the Transfer Date cannot be definitively determined, the forgoing calculations shall be based on such figures and amounts most recently available, and the amount of the Purchase Price paid as a result adjusted to reflect the Transfer Date figures and amounts by an addition or subtraction to the amount paid pursuant to Section 3.03(b), as appropriate.

(b)  Payment Date.  Subject to the adjustments set forth in Section 3.03(a), on the Payment Date, BBPLC shall pay to Servicer by wire transfer of immediately available funds ten percent (10%) of the portion of the Purchase Price attributable to Section 3.01(i) hereof applicable to the Servicing Rights transferred on the Transfer Date.

(c)  Adjustments.  If within two hundred and ten (210) days after the payment of all or any portion of the Purchase Price, transfer of the Custodial Funds, payment for the Advances or the payment or transfer of any other amounts due under this Agreement to either Party, an error is discovered with respect to the calculation of the payment or amount transferred, within five (5) Business Days after the receipt of information sufficient to provide notice that payment is due, the Party benefiting from the error shall pay an amount sufficient to correct and reconcile the error and shall provide a reconciliation statement and such other documentation sufficient to satisfy the other Party (in such other Party's exercise of its reasonable discretion), concerning the accuracy of such reconciliation.

Section 3.04.  Form of Payment to be Made.

Unless otherwise agreed to by the Parties, all payments to be made by a Party to another Party, or such other Party's designee, shall be made by wiring immediately available funds to the accounts designated by the Party receiving the payment.

## ARTICLE IV.

### REPRESENTATIONS AND WARRANTIES; REMEDIES FOR BREACH

Section 4.01.  Representations and Warranties of the Servicer.

Servicer hereby makes the following representations and warranties as of the Sale Date and the Transfer Date:

(a)     <u>Due Organization and Authority</u>. The Servicer is a Maryland corporation, validly existing under the laws of its jurisdiction of incorporation or formation and is licensed to conduct business of the type conducted by the Servicer. Subject only to entry of an Order in the Bankruptcy Case approving this Agreement: the Servicer has the full corporate power and authority to execute and deliver this Agreement and to perform in accordance herewith; the execution, delivery and performance of this Agreement (including all instruments or transfer to be delivered pursuant to this Agreement) by the Servicer; the consummation of the transactions contemplated hereby have been duly and validly authorized; this Agreement evidences the valid, binding and enforceable obligation of the Servicer, subject to bankruptcy laws and other similar laws of general application affecting the rights of creditors; and all requisite corporate action has been taken by the Servicer to make this Agreement valid and binding upon the Servicer in accordance with its terms.

(b)     <u>No Conflicts</u>. Upon entry of an Order in the Bankruptcy Case approving this Agreement, neither the execution and delivery of this Agreement, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of the Servicer's charter, by laws or other organizational documents or any legal restriction or any material agreement or instrument to which the Servicer is now a party or by which it is bound, or constitute a default or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Servicer or its property is subject.

(c)     <u>No Litigation Pending</u>. Except for the pending Bankruptcy Case and the Servicer's request for entry of an Order approving this Agreement, there is no action, suit, proceeding or investigation pending or, to the best of Servicer's knowledge, threatened against the Servicer, before any court, administrative agency or other tribunal regarding the invalidity of this Agreement, which would draw into question the validity of this Agreement or the Mortgage Loans or of any action taken or to be taken in connection with the obligations of the Servicer contemplated herein.

(d)     <u>No Consent Required</u>. Other than entry of an Order in the Bankruptcy Case approving this Agreement, no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Servicer of or compliance by the Servicer with this Agreement as evidenced by the consummation of the transactions contemplated by this Agreement.

(e)     <u>Brokers Fees</u>. If Servicer has utilized a broker or other financial or other advisor(s) for which a fee or commission may be due, Servicer represents and warrants that such fee or commission shall be the sole responsibility of the Servicer;

(f)     <u>Tax Service Contracts</u>. All Mortgage Loans have Tax Service Contracts, except as set forth on the Mortgage Loan Schedule.

(g)     <u>Notice of Relief Requested Pursuant to the Servicemembers Civil Relief Act</u>. Servicer has not received notice from any Mortgagor or other party with respect to the Mortgage Loans of a request for relief pursuant to or invoking any of the provisions of the Servicemembers Civil Relief Act or any other federal or state law that would have the effect of

12

suspending or reducing the Mortgagor's payment obligations under a Mortgage Loan or that would prevent or restrict the ability of the Servicer to commence or continue with the foreclosure of the Mortgage Loan.

(h)    Mortgage Loans Schedule. The information set forth on the Mortgage Loan Schedule is true, accurate and complete in all material respects.

Section 4.02.    Representations and Warranties Of BBPLC

BBPLC hereby makes the following representations and warranties to the Servicer as of each of the Sale Date and the Transfer Date:

(a)    Authority and Capacity. The execution, delivery and performance by BBPLC of this Agreement has been duly and validly authorized by all necessary corporate action. Subject only to entry of an Order in the Bankruptcy Case approving Servicer's participation in and compliance with this Agreement, this Agreement constitutes a legal, valid and enforceable obligation of BBPLC and its affiliates to the extent necessary for BBPLC to perform hereunder.

(b)    No Conflicts. Upon entry of an Order in the Bankruptcy Case approving this Agreement, neither the execution and delivery of this Agreement, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of BBPLC's charter, by laws or other organizational documents or any legal restriction or any agreement or instrument to which BBPLC is now a party or by which it is bound, or constitute a default or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the BBPLC or its property is subject.

(c)    No Litigation Pending. Except for the pending Bankruptcy Case and the Servicer's request for entry of an Order approving this Agreement, there is no action, suit, proceeding or investigation pending or, to the best of BBPLC's knowledge, threatened against BBPLC, before any court, administrative agency or other tribunal regarding the invalidity of this Agreement, which would draw into question the validity of this Agreement or the Mortgage Loans or of any action taken or to be taken in connection with the obligations of BBPLC contemplated herein.

(d)    No Consent Required. Other than entry of an Order in the Bankruptcy Case approving this Agreement, no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by BBPLC of or compliance by BBPLC with this Agreement as evidenced by the consummation of the transactions contemplated by this Agreement.

(e)    Brokers Fees. If BBPLC has utilized a broker or other financial or other advisor(s) for which a fee or commission may be due, BBPLC represents and warrants that such fee or commission shall be the sole responsibility of BBPLC;

13

      (f)   <u>Financing</u>.  BBPLC has available sufficient funding to enable BBPLC to consummate the purchase of the Servicing Rights from Servicer and otherwise to perform all of BBPLC's obligations under this Agreement.

## ARTICLE V.

### CONDITIONS PRECEDENT

Section 5.01.  <u>Conditions Precedent to the Obligations of BBPLC and Servicer.</u>

      The obligations of each of BBPLC and Servicer under this Agreement are subject to the satisfaction in all material respects, at or prior to the Transfer Date, of each of the following conditions, any or all of which in subsections (a) and (b) below may be waived in writing by BBPLC and/or Servicer:

      (a)   <u>Correctness of Representations and Warranties</u>.  The representations and warranties made by each of BBPLC and Servicer in this Agreement are true and correct in all material respects as of each of the Sale Date and the Transfer Date;

      (b)   <u>Compliance with Conditions</u>.  All material terms, covenants and conditions of this Agreement required to be complied with and performed by each of BBPLC and Servicer at or prior to the Transfer Date shall have been duly complied with and performed by such party in all material respects; and

      (c)   <u>Bankruptcy Court Order.</u>  Entry of an Order in the Bankruptcy Case in form and substance reasonably acceptable to BBPLC approving this Agreement.

## ARTICLE VI.

### MISCELLANEOUS

Section 6.01.  <u>Supplementary Information.</u>

      From time to time prior to and after the Transfer Date, Servicer shall furnish to BBPLC such information supplementary to the information contained in the documents and schedules delivered pursuant hereto which is reasonably available to Servicer as BBPLC may reasonably request or which may be reasonably necessary to enable BBPLC to file any reports due to the Investors in connection with the related Mortgage Loans or Servicing Rights.

Section 6.02.  <u>Access to Information.</u>

      Servicer shall allow BBPLC and its counsel, accountants, and other representatives, reasonable access, during normal business hours, to all of Servicer's files, books and records directly relating to the Servicing Rights and the related Mortgage Loans, Custodial Accounts, and Advances.  BBPLC and its representatives and affiliates shall treat all information obtained in such investigation, not otherwise in the public domain, as confidential and shall not

14

use any such information for its own benefit, unless BBPLC acquires the related Servicing Rights hereunder.

Section 6.03.  Further Assurances.

Subject to Bankruptcy Court approval, BBPLC and the Servicer each agree to execute and deliver to the other such additional documents, instruments or agreements as may be necessary to effectuate the purposes of this Agreement.  BBPLC and Servicer shall cooperate in good faith to consummate the transactions contemplated by this Agreement.

Section 6.04.  Notices.

All demands, notices and communications hereunder shall be in writing and shall be given via e-mail, facsimile transmission or registered or certified mail to the person at the address set forth below:

        i.     if to the Servicer:

American Home Mortgage Servicing, Inc.
4600 Regent Blvd, Suite 200
Irving, Texas 75063
Attention:  David Friedman
Fax:  (866) 841-2568
E-mail:  David.Friedman@Americanhm.com

with a copy to the counsel at:

American Home Mortgage Servicing, Inc.
538 Broadhollow Road
Melville, NY 11747
Attention: Alan Horn, General Counsel
Fax:  (800) 209-7276
E-mail:  Alan.Horn@Americanhm.com

And

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Attention:  Sean M. Beach
Fax:  (302) 571-1253
E-mail:  sbeach@ycst.com

15

ii.    if to BBPLC:

Barclays Bank PLC
200 Park Avenue, 5th Floor
New York, New York 10166
Attention: Michael Dryden
Fax: (212) 412-3266
E-mail: michael.dryden@barcap.com

With a copy to counsel at:

Kirkpatrick & Lockhart Preston Gates Ellis LLP
599 Lexington Avenue
New York, New York 10022
Attention: Richard S. Miller
Fax: (212) 536-3901
Email: richard.miller@klgates.com

or such other address as may hereafter be furnished to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

Section 6.05.    Entire Agreement; Amendment.

This Agreement constitutes the entire agreement between the Parties with respect to the sale of the servicing rights of the Mortgage Loans. This Agreement may be amended and any provision hereof waived, but, only in writing signed by the Party against whom such enforcement is sought.

Section 6.06.    Execution; Binding Effect.

This Agreement may be executed in one or more counterparts and by the different Parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same agreement. This Agreement shall inure to the benefit of and be binding upon the Servicer and BBPLC and their respective successors and assigns.

Section 6.07.    Governing Law Jurisdiction; Consent to Service of Process.

THIS AGREEMENT SHALL BE DEEMED IN EFFECT WHEN A FULLY EXECUTED COUNTERPART THEREOF IS RECEIVED BY BBPLC IN THE STATE OF NEW YORK AND SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK. THIS AGREEMENT SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ITS CHOICE OF LAW RULES AND PRINCIPLES.

BBPLC AND SERVICER FURTHER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (A) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT.    BBPLC CONSENTS TO AND EXPRESSLY AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION; *PROVIDED, HOWEVER,* THAT IF THE BANKRUPTCY COURT REFUSES TO ACCEPT JURISDICTION OVER ANY SUCH DISPUTE, EACH OF BBPLC AND THE SERVICER IRREVOCABLY (I) SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK FOR THE PURPOSE OF ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT; (II) WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT; (III) AGREES THAT A FINAL JUDGMENT IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW; AND (IV) CONSENTS TO SERVICE OF PROCESS UPON IT BY MAILING A COPY THEREOF BY CERTIFIED MAIL ADDRESSED TO IT AS PROVIDED FOR NOTICES HEREUNDER.

Section 6.08.    Waiver of Trial by Jury.

THE SERVICER AND BBPLC EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 6.09.    Counterparts.

This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

Section 6.10.    Time of Essence.

Time is of the essence in occurrence of the Transfer Date and the performance of the obligations stated in this Agreement.

Section 6.11.    No Remedy Exclusive.

Except as otherwise set forth in this Agreement, no remedy under this Agreement is intended to be exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to any remedies given under this Agreement or existing at law or in equity.

Section 6.12.    Construction.

This Agreement shall be construed and interpreted fairly as to both Parties and not in favor or against either Party, regardless of which Party prepared this Agreement.

Section 6.13.    Waivers.

Except for the requirement of entry of an Order in the Bankruptcy Case in form and substance acceptable to BBPLC approving this Agreement, either the Servicer or BBPLC may upon consent of all parties, by written notice to the others:

      (a)    Waive compliance with any of the terms, conditions or covenants required to be complied with by the others hereunder; and

      (b)    Waive or modify performance of any of the obligations of the others hereunder.

The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other subsequent breach.

Section 6.14.    Announcements.

Neither Party shall issue press releases or announcements regarding, or otherwise disclose to the general public or mortgage servicing industry, the existence or terms of this Agreement without the prior written approval of the other Party, except to the extent required by any court, tribunal, regulatory authority or law.

Section 6.15.    No Solicitation.

From and after the related Closing Date, the Servicer agrees that it will not take any action or permit or cause any action to be taken by any of its agents or Affiliates, or by any independent contractors on the Servicer's behalf, to personally, by telephone or mail (via electronic means or otherwise), solicit a Mortgagor under any Mortgage Loan for the purpose of refinancing a Mortgage Loan, in whole or in part, without the prior written consent of BBPLC. Notwithstanding the foregoing, it is understood and agreed that promotions undertaken by the Servicer or by any Affiliate of the Servicer which are directed to the general public at large (including, without limitation, mass mailing based on commercially acquired mailing lists, newspaper, radio and television advertisements), shall not constitute solicitation under this Section.

Section 6.16.    Relationship of Parties.

Nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties. The duties and responsibilities of the Servicer shall be rendered by it as an independent contractor and not as an agent of BBPLC.

Section 6.17.    <u>Severability of Provisions.</u>

Any part, provision representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.  To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.

Section 6.18.    <u>Exhibits.</u>

The exhibits to this Agreement are hereby incorporated and made a part hereof and are integral parts of this Agreement.

Section 6.19.    <u>General Interpretive Principles.</u>

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    Terms used in this Agreement have the meanings assigned to them in this Agreement (as defined herein), and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender.

(b)    Accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles.

(c)    References herein to a "Section," shall be to the specified section(s) of this Agreement and shall include all subsections of such section(s).

(d)    The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provisions.

(e)    Headings of the Articles and Sections in this Agreement are for reference purposes only and shall not be deemed to have any substantive effect.

(f)    Each reference to any federal, state or local statute or law shall be deemed also to refer to all rules and regulations promulgated there under.

[Signatures Follow]

DB02:6201588.1                                        066585.1001

IN WITNESS WHEREOF, each of the undersigned parties to this Agreement has caused this Agreement to be duly executed in its name by one of its duly authorized officers, all as of the date first above written.

**BARCLAYS BANK PLC**

By: _____

Name: _____

Title: _____

**AMERICAN    HOME    MORTGAGE SERVICING,    INC.,    DEBTOR    AND DEBTOR IN POSSESSION**

By: _____

Name: _____

Title: _____

20

IN WITNESS WHEREOF, each of the undersigned parties to this Agreement has caused this Agreement to be duly executed in its name by one of its duly authorized officers, all as of the date first above written.

**BARCLAYS BANK PLC**

By: _____

Name: _____

Title: _____

**AMERICAN   HOME   MORTGAGE SERVICING,   INC.,   DEBTOR   AND DEBTOR IN POSSESSION**

By: _____

Name: _Craig S. Pino_____

Title: _EVP & Treasurer_____

20