IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
In re:                                              : Chapter 11
                                                    :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,              : Case No. 07-11047 (CSS)
a Delaware corporation, et al.,                     :
                                                    : Jointly Administered
    Debtors.                                        :
                                                    : Objection Deadline: August 31, 2007 at 12:00 p.m.
                                                    : Hearing Date: September 4, 2007 at 11:00 a.m.
---------------------------------------------------------------x

## DEBTORS' MOTION PURSUANT TO SECTION 105 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR AN ORDER APPROVING AND AUTHORIZING COMPROMISE AND SETTLEMENT AGREEMENT WITH FANNIE MAE

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] by this motion (the "Motion"), seek entry of an order pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and section 105(a) of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") approving a Compromise and Settlement Agreement (the "Stipulation"), a copy of which is attached as Exhibit A to the proposed form of Order annexed hereto, by and among the Debtors and Fannie Mae (collectively, the "Parties"). In support of the Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

## JURISDICTION

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2. On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

4. On August 14, 2007, the United States Trustee for the District of Delaware appointed The Official Committee of Unsecured Creditors (the "Committee"). No trustee or examiner has been appointed.

## THE DEBTORS' BUSINESS[2]

5. Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and

---

[2] The facts set forth herein are derived from the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief (the "First Day Declaration") [Docket No. 2], which is incorporated by reference as if fully set forth herein at length.

primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

6. As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

7. A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

### EVENTS LEADING TO THE CHAPTER 11 FILING

8. Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

9. The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

10. In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders – the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

11. On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

12. The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors now employ approximately 1000 persons who are absolutely essential to the Debtors' continued operations, although that number is expected to

decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

13.   In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

14.   Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## **RELEVANT BACKGROUND**

15.   Prior to the Petition Date and at least through July 31, 2007, the Debtors had been servicing (the "Servicing Rights") a portfolio of mortgages (the "Fannie Mae Portfolio") owned by Fannie Mae, pursuant to the Mortgage Selling and Servicing Contract (the "Selling and Servicing Contract") entered into between the Debtors and Fannie Mae, as supplemented by the Fannie Mae Selling and Servicing Guides (the "Guides", collectively, with the Selling and Servicing Contract, the "Contract").

16.   The Debtors estimate that the Fannie Mae Portfolio contains approximately 36,700 loans, with an aggregate unpaid principal balance of $5.2 billion. The Serving Rights represent approximately ten percent (10%) in unpaid principal balance, and fifteen percent (15%) in loan value, of the loans serviced by the Debtors' servicing business.

17. On July 31, 2007, Fannie Mae sent notice to the Debtors (the "Termination Notice") purporting to terminate the Servicing Rights for "cause". In the Termination Notice, Fannie Mae contended that cause existed to terminate the Servicing Rights based upon various breaches of the Contract allegedly committed by the Debtors related to their declining financial condition and alleged corresponding failure to comply with the provisions of the Guides.

18. The Debtors dispute whether Fannie Mae effectively terminated the Contract prior to the Petition Date.

19. Since the Petition Date, the Debtors have sought to sell their businesses and assets to financial and strategic investors. The Debtors' servicing business is one of the most valuable assets of these estates and, if the Debtors are to obtain the maximum return as a result of the planned sale of this business, it is desirable that they resolve any dispute with a counterparty to a servicing-related agreement without the need for litigation. The Debtors anticipate that a buyer for their servicing business will be found, and the Debtors will seek approval of a sale of the business to the party presenting the highest or otherwise best bid for such assets. However, in order to avoid a costly dispute that could disrupt the sale, the Parties wish to compromise and settle the controversy between them on the terms and conditions set forth in the Stipulation. The terms of the Stipulation are highly favorable to the Debtors, and among other things, include a hard-fought concession from Fannie that permits the Debtors to remain a Fannie Mae approved servicer on an interim basis during the term of the Stipulation.

## **STIPULATION**[3]

20. The effectiveness of the Stipulation is conditioned upon approval of the Bankruptcy Court. The principal terms of the Stipulation are set forth below:[4]

   a) Fannie Mae agrees to allow the Debtors to perform the duties of a loan servicer with respect to the Fannie Mae Portfolio on an interim basis, without prejudice to Fannie Mae's rights in connection with its Termination Notice, and the Debtors shall be deemed an approved Fannie Mae servicer on an interim basis during the term of the Stipulation. For performing such duties on an interim basis, the Debtors are authorized to collect the same fees as were payable in connection with the Servicing Rights under the Contract.

   b) Fannie Mae and the Debtors have agreed that the Debtors will continue to service the Fannie Mae Portfolio in order to allow the Debtors to market the Servicing Rights and to negotiate and close a sale of the Servicing Rights on or before October 31, 2007, subject to the Debtors' obligation to satisfy certain conditions. The result of the Debtors' failure to satisfy any of the conditions set forth herein shall constitute an event of default under the Stipulation:

   i. Debtors must engage, subject to Bankruptcy Court approval, a broker or investment banker to solicit bids for the Servicing Rights, with bids to be obtained on both a sale subject to full recourse and full representations and warranties from the purchaser and a sale without recourse and without representations and warranties being assumed by the purchaser, with solicitations for bids issued on or before August 20, 2007;[5]

   ii. Bids must be received on or before September 6, 2007, or such other date as is established by the Bankruptcy Court;

   iii. A binding agreement for the acquisition of the Servicing Rights by a Fannie Mae-approved servicer on terms which shall include the assumption by the purchaser of the responsibilities, duties, selling warranties, and loan-level

---

[3] All terms not otherwise defined herein shall have the meanings ascribed to them in the Stipulation.

[4] The terms of the Stipulation set forth herein are a summary only. To the extent of any inconsistency between the summary herein and the Stipulation, the terms of the Stipulation shall govern.

[5] The Debtors have already commenced the solicitation of bids for the Debtors' servicing business.

          recourse obligations set forth in the Contract and which are otherwise reasonably acceptable to Fannie Mae must be executed on or before September 17, 2007 or such other date as is established by the Bankruptcy Court, provided however, the Debtors shall have the right to elect, prior to the execution of the binding agreement with the purchaser, to pay Fannie Mae an additional $3.25 million at closing in exchange for Fannie Mae waiving the requirement that the purchaser assume the loan-level recourse obligations and selling warranties (the "<u>Recourse/Warranty Buy-Out Fee</u>") and Fannie Mae may waive the requirement that the purchaser be an approved Fannie Mae servicer when the agreement is executed; and

    iv.    The closing of the sale of the Servicing Rights (the "<u>Closing</u>") must occur on or before October 31, 2007, unless Fannie Mae waives such condition.

c)    If the Debtors close a sale of the Servicing Rights on or before October 31, 2007, provided the Debtors have fully complied with all obligations under the terms of the Stipulation, the proceeds from such sale shall be allocated and paid at Closing in the following order: first to Fannie Mae in payment for any and all amounts due from the Debtors; then to Bank of America to the extent of any amounts then owed by the Debtors to Bank of America in accordance with the terms of the Credit Agreement; then to any other party asserting a valid and perfected lien in any Company rights to the Servicing Rights; and finally to the Debtors.

d)    Because the Debtors will service the Fannie Mae Portfolio pursuant to the terms of the Stipulation, the Debtors and Fannie Mae agree on certain controls for borrower payments and access to funds and loan information.

e)    If an Event of Default occurs, Fannie Mae shall have certain rights and remedies as set forth in greater detail in the Stipulation.

## **RELIEF REQUESTED AND BASIS THEREFOR**

21.    By this Motion, the Debtors are seeking this Court's approval of the Stipulation pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019. The Debtors have weighed the costs, risks and disruption that would arise from potential litigation with Fannie Mae against the compromises contained within the Stipulation. In addition, in entering into the Stipulation, the Debtors have considered the importance of being designated as

a Fannie Mae approved servicer to the value of the servicing business. In the Debtors' judgment, the Stipulation is fair and reasonable and serves the best interests of the Debtors, their estates and creditors.

## STANDARDS FOR SETTLEMENTS

22. Rule 9019(a) of the Federal Rules of Bankruptcy Procedure provides that "on motion by the trustee and after a hearing, the Court may approve a compromise or settlement." The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged. In re Penn Central Transp. Co., 596 F.2d 1002 (3d Cir. 1979). The Supreme Court has recognized that "in administering a reorganization proceeding in an economical and practical manner, it will often be wise to arrange the settlement of claims in which there are substantial and reasonable doubts." In re Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. V. Anderson, 390 U.S. 414 (1986).

23. Approval of a proposed settlement is within the "sound discretion" of the Bankruptcy Court. In re Neshaminy Office Building Associates, 62 B.R. 798, 803 (Bankr. E.D. Pa. 1986). The court must determine whether the proposed settlement is in the "best interests of the estate." See In the Matter of Energy Cooperative, Inc., 886 F.2d 921, 927 (7th Cir. 1989). In determining whether to approve an motion to settle a controversy, a Bankruptcy Court must determine whether it is fair, reasonable and adequate by examining four factors:

> (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection: (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

Official Comm. of Unsec. Cred. Of Penn. Truck Lines, Inc., v. Penn Truck Lines, Inc. (In re Penn Truck Lines, Inc.), 150 B.R. 595, 598 (Bankr. E.D. Pa. 1992). The Court should not

.
.

substitute its judgment for that of a trustee. <u>Neshaminy Office Building Associates</u>, 62 B.R. at 803. The Court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to see whether the settlement falls below the lowest point in the range of reasonableness. <u>In re W.T. Grant and Co.</u>, 699 F.2d 599, 608 (2d Cir. 1983), <u>cert. denied</u>, 464 U.S. 22 (1983). In addition, "because the bankruptcy judge is unequally situated to consider the equities and reasonableness of a particular compromise, approval or denial of a compromise will not be disturbed on appeal absent a clear abuse of discretion." <u>Neshaminy Office Building Assoc.</u>, 62 B.R. at 803 (citing, <u>In re Patel</u>, 43 B.R. 500, 505 (Bankr. N.D. Ill. 1984).

24.     Initially, the Stipulation is in the best interest of the Debtors, their estates and creditors, because it not only clears an obstacle on their path to a successful sale of the servicing business, but also contains terms that should increase the servicing business's value. The Debtors will be able to achieve significantly more value for their servicing business if the sale occurs quickly and without disruption. Moreover, by entering into the Stipulation, the Debtors are permitted to maintain their status as a Fannie Mae approved servicer, status designation that is critical to the value of the Debtors' servicing business. In this regard, a number of the Debtors' servicing agreements with other parties mandate that the Debtors be a Fannie Mae approved servicer. The Stipulation is an important step in the servicing business sale process because it presents an opportunity to expeditiously resolve a dispute with a counterparty to a significant servicing agreement on favorable terms.

25.     Moreover, even if the Debtors come before this Court and successfully retain the ability to assume and assign the Contract pursuant to section 365 of the Bankruptcy Code, the outcome of an assumption of the Contract would result in the Debtors having to cure

all defaults under the Contract and applying any proceeds to the payment of secured debt owed to Bank of America, N.A., in its capacity as Administrative Agent for certain lenders under that certain Second Amended and Restated Credit Agreement dated as of August 10, 2006. This is essentially the same outcome obtained with the Stipulation.

26. Finally, by agreeing to the terms of the Stipulation, the Debtors are able to avoid the commencement of yet another costly and contentious dispute. Considering the many battles the Debtors are already being forced to wage to protect their servicing business, the resolution of this dispute with Fannie Mae, without the need for litigation, is a favorable outcome, because it will preserve and ultimately increase the value of the Debtors' servicing business.

## NOTICE

27. Notice of this Application will be provided to (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Bank of America; (iv) Counsel to the Agent for the Debtors' Postpetition Lender; (v) counsel to Fannie Mae; and (vi) all parties entitled to notice under Del. Bankr. LR 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PREVIOUS REQUEST

28. No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court issue and enter an order (i) pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, approving the Settlement and Release, and (ii) granting such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
August 24, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Kara Hammond Coyle (No. 4410)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Proposed Counsel for Debtors and
Debtors in Possession