```
                 UNITED STATES BANKRUPTCY COURT
                 FOR THE DISTRICT OF DELAWARE


     IN RE:                          )
                                     )  Chapter 11
     AMERICAN HOME MORTGAGE          )
     HOLDINGS, INC., a Delaware      )
     corporation, et al.,            )  Case No. 07-11047 (CSS)
                                     )
                      Debtors        )
     --------------------------------)  August 16, 2007
     CREDIT SUISSE FIRST BOSTON      )
     MORTGAGE CAPITAL, LLC,          )
                                     )
                      Plaintiff,)
                                     )
          vs.                        )
                                     )
     AMERICAN HOME MORTGAGE CORP., )
     AMERICAN HOME MORTGAGE          )
     ACCEPTANCE, INC., AMERICAN      )
     HOME MORTGAGE SERVICING, INC.,)
     AMERICAN HOME MORTGAGE          )
     INVESTMENT CORP., and AMERICAN)
     HOME MORTGAGE HOLDINGS, INC., )
                                     )
                 Debtor-Defendants)


             BEFORE THE HONORABLE CHRISTOPHER SONTCHI
              UNITED STATES BANKRUPTCY COURT JUDGE

     APPEARANCES:

     For the Debtors:          ROBERT S. BRADY, ESQUIRE
                               JOHN DORSEY, ESQUIRE
                               YOUNG, CONAWAY, STARGATT & TAYLOR
                               The Brandywine Building
                               1000 West Street, 17th Floor
                               Wilmington, DE  19801

     Audio Operator:           NICOLE SCHAEFER/NICKI BARKSDALE

     Transcribed by:           DIANA DOMAN TRANSCRIBING
                               P.O. Box 129
                               Gibbsboro, New Jersey  08026-129
                               (856) 435-7172
                               FAX:  (856) 435-7124
                               Email:  Dianadoman@comcast.net
```

Proceedings recorded by electronic sound recording; transcript produced by transcription service

(Appearances continued)

```
For the Debtors:              SUSHEEL KIRPALANI, ESQUIRE
                              QUINN, EMANUEL, URQUHART, OLIVER &
                                 HEDGES, LLP
                              51 Madison Avenue, 22nd Floor
                              New York, NY  10010

For the Defendant:            HOWARD B. COMET, ESQUIRE
Credit Suisse First           LORI FIFE, ESQUIRE
Boston Mortgage               WEIL, GOTSHAL & MANGES, LLP
Capital, LLC                  767 Fifth Avenue
                              New York, NY 10153

For the Committee:            BONNIE G. FATELL, ESQUIRE
                              BLANK ROME, LLP
                              Chase Manhattan Centre
                              1201 Market Street, Ste. 800
                              Wilmington, DE  19801

For the Committee:            MARK S. INDELICATO, ESQUIRE
                              HAHN & HESSEN, LLP
                              488 Madison Avenue
                              14th and 15th Floor
                              New York, NY  10022

For Morgan Stanley            DON A. BESKRONE, ESQUIRE
Mortgage Capital              ASHBY & GEDDES
                              500 Delaware Avenue
                              P.O. Box 1150
                              Wilmington, DE  19899

                              LEE S. ATTANASIO, ESQUIRE
                              SIDLEY, AUSTIN, LLP
                              787 Seventh Avenue
                              New York, NY  10019
```

.

3

<u>I N D E X</u>

| <u>Witnesses</u> | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> |
|---|---|---|---|---|
| <u>FOR THE PLAINTIFF:</u> | | | | |
| Bruce Kaiserman | 31 | 58 | | |
| <u>FOR THE DEBTOR:</u> | | | | |
| Robert Love | 79 | 92 | | |
|   BY:  The Court | 110 | 150 | | |
| Craig Pino | 113 | 194 | | |

<u>PAGE</u>

<u>OPENING STATEMENT:</u>

| | |
|---|---|
| BY:  Mr. Comet | 4 |
|     Reply | 21 |
| BY:  Mr. Brady | 9 |
| BY:  Mr. Indelicato | 19 |
| BY:  Mr. Kirpalani | 29 |

| <u>EXHIBITS</u>: | <u>Ident.</u> | <u>Evid.</u> |
|---|---|---|
| <u>FOR CREDIT SUISSE:</u> | | |
| P-1 through 7 | | 32 |
| <u>FOR THE DEBTOR:</u> | | |
| D-5  Email from Credit Suisse | | 197 |
| D-8  Website printout | 177 | |

**Transcriber's Notes:**

Lee S. Attanasio, Esquire appearing telephonically.

Some phonetic spellings.

Opening Statement - Comet                                    4

1          (Hearing in session)

2               THE CLERK:  All rise.

3               THE COURT:  Please be seated.  Good afternoon.  This

4     is the time set in the Credit Suisse matter.  So -- for --

5     well, temporary restraining order or preliminary injunction,

6     one or the other.  You may proceed.

7               MR. COMET:  Good afternoon, Your Honor.  Howard Comet

8     from Weil, Gotshal & Manges for Credit Suisse First Boston

9     Mortgage Capital.

10              I'm not sure exactly how Your Honor wants to proceed.

11    I thought what I would do is just briefly walk through the

12    issues that have come up in the parties' papers, because I

13    think if we do that, we'll see that there is very little in the

14    way of factual disputes here.  Most of the disputed matters

15    involve legal issues, and I'd like to briefly delineate that,

16    if I could, to identify the areas where there is a factual

17    question that evidence might be offered on and then proceed on

18    those limited factual areas to present evidence on the motion,

19    if that's acceptable.

20              THE COURT:  That's -- I'll take that in that

21    basically, you want to do an opening, which is fine, and I'll

22    allow the debtors to respond, and then we'll turn to the

23    evidence.

24              MR. COMET:  Fine, Your Honor.  Well, in that sense

25    then, Your Honor, this is a motion for preliminary relief by

1    Credit Suisse to require the debtors to turn over funds,

2    records, and materials related to loans, mortgage loans that

3    are owned by Credit Suisse that are currently in our

4    understanding being serviced by the debtors, and they hold all

5    the records and the funds that are being collected on.

6            Under the parties' agreement, all of those items, the

7    funds, the records, et cetera, are expressly agreed to be the

8    property of Credit Suisse, and without those funds and records,

9    Credit Suisse has been effectively blocked from realizing any

10   of the benefits or rights of ownership of the loans that it

11   owns.  Can't sell them.  It can't determine with any degree of

12   adequate assurance what is occurring regarding those loans.

13           Now, so as we will discuss, we think we're being

14   harmed every day by that, and would like the Court to order the

15   transfer of the funds and the records.

16           The -- as I said, Your Honor, I think there is very

17   little in the way of facts in dispute.  The -- I think there

18   have been five issues identified in the parties' briefing, and

19   I think maybe only one of them, actually, issue of harm,

20   involves a factual dispute.

21           The first issue I think that we've identified in a

22   sense is an overarching matter that the debtors really haven't

23   even acknowledged and much less given any position on, but it's

24   something we tried to highlight in our reply papers in

25   particular, and that question is why the debtors are even

1    resisting the turnover of the collections and servicing to

2    Credit Suisse, and the ostensible reason for their position,

3    the only reason we've heard is that they want to try to sell

4    some sort of servicing rights connected with these loans.  As I

5    understand it, the debtors plan to go out of business,

6    liquidate and selling whatever servicing rights they can sell,

7    and therefore, if they have nothing to sell, there seems to be

8    no point to this dispute, and there -- we don't believe there

9    is anything to sell here, even putting aside in a sense the

10   legal issues, just as a simple practical matter, there is no

11   agreement between these parties that the debtors could assume

12   and assign that provides for any payment for any servicing

13   work, and therefore, there is no conceivable reason why anyone

14   would bid to undertake the servicing for no compensation.

15         I think that has some pretty substantial legal

16   consequences, but also, simply as a practical matter, we don't

17   understand what this dispute is about unless it's perhaps to

18   use as a bargaining chip between the parties in some way, but

19   other -- otherwise, we don't know.  We've asked the debtors for

20   an explanation.  We've received none.  They said nothing about

21   it in their papers.

22         But in any event, we don't think there is any factual

23   dispute about that issue.  It's just -- it's plain on the face

24   of the contract.  There is simply no language, no provision in

25   there for any payment for servicing.

Opening Statement - Comet                              7

1          If we somehow get past that point, the second issue,

2    Your Honor, I think is a procedural one.  The debtors have

3    objected that Credit Suisse should have filed a proof of claim

4    rather than commence an adversary proceeding.  That's plainly a

5    legal issue, not a fact issue, and we think there is no

6    question that an adversary proceeding is proper, but again,

7    since that's a legal issue, we'll leave that, Your Honor, for

8    final argument, if we can.

9          The third issue that I see is one of two issues

10   regarding the termination of the repurchase agreement, and that

11   issue is whether the agreement was terminated prepetition.  I

12   don't think there is any dispute about the underlying facts

13   regarding that termination.  The -- the major dispute seems to

14   be whether the contract -- what the contract required in terms

15   of the termination, but I just received some exhibits that the

16   debts I guess intend to offer, and I haven't even had a chance

17   to review them.  So I can't say for sure that something won't

18   come up during the hearing, but as far as we're concerned, what

19   occurred was a prepetition margin call was made, properly made

20   under the contract.  The debtors declined to send funds in

21   response to the margin call, did not cure the margin deficit,

22   and -- and we gave notice of termination.

23         In that connection, we have as an exhibit all of the

24   e-mail communications that took place between Credit Suisse and

25   the debtors regarding the margin call as well as the default

Opening Statement - Comet                          8

1    notices and prior essentially identical types of margin calls

2    by e-mails that were responded to and funds provided.  I had

3    made that material available to the debtors before this, and I

4    don't believe there is any objection.

5         We have an exhibit binder, Your Honor, that has those

6    materials, the e-mails, the materials that accompanied them,

7    the default notices, and the repurchase agreement which we'd

8    like to offer into evidence at the appropriate point.  I don't

9    believe there should be any objection to any of those

10   materials.

11        The -- there is also a question, Your Honor, of

12   whether regardless of the prepetition termination, the contract

13   was terminated as a result of the debtor's bankruptcy filing,

14   which the contract expressly provides that's the case.  That

15   issue doesn't even have to be reached if the pre -- if the

16   Court finds the prepetition termination occurred, but if it is

17   reached, there is a dispute about whether this contract could

18   be separated into a repurchase agreement and a separate

19   servicing agreement.  We -- we don't believe it can, Your

20   Honor, under the plain terms of the contract, again, among

21   other things, because there is no consideration for servicing

22   in the contract, but that is also principally a legal dispute,

23   not a factual one.

24        So that brings us, Your Honor, I think to the

25   question of harm that's relevant, because this is an

1    application for preliminary relief, and as I said, we believe

2    the debtors are being harmed -- excuse me.  We believe Credit

3    Suisse is being harmed here every day by the debtor's conduct,

4    not only because we are forced to rely without real knowledge

5    of what's occurring on whether the debtors are adequately

6    servicing and collecting funds, but also because it's

7    impossible for us to exercise our ownership rights in these

8    circumstances.  We can't sell loans.  We don't have the

9    materials that we'd have to show to a bidder.  No one will buy

10   contracts that are being serviced by a company in bankruptcy,

11   and we have grave concerns even that the -- the underlying

12   mortgage borrowers will be so concerned about the bankruptcy

13   they will not making their payments.

14              And on that question, Your Honor, we have a witness

15   who's here, Bruce Kaiserman from Credit Suisse who filed a

16   declaration with our reply papers, and we'd like to call him to

17   testify.  We -- we believe, Your Honor, that that's the only

18   area, as I say, where there is a factual dispute and testimony

19   from -- from Credit Suisse is therefore needed.  I would like

20   to offer the exhibits that I mentioned.  They would deal with

21   the underlying facts on anything else regarding the margin

22   calls and so forth, and I guess I'll do that after the -- the

23   debtors make their opening.

24              THE COURT:  Thank you.  Hear from the debtor.

25              MR. BRADY:  Good afternoon, Your Honor.  Robert Brady

1    on behalf of the debtors.  Some context, Your Honor.  We're

2    about ten days into this case.  The committee was formed and

3    retained counsel two days ago.  Yesterday we received CSFB's

4    38-page reply and a new declaration some time shortly after

5    3:00 p.m. yesterday.

6            The CSFB adversary proceeding presents a number of

7    very significant issues not only to this particular proceeding

8    but to the case as a whole.  There are a number of significant

9    disputed facts that we believe preclude the entry of an

10   injunction.  I'd like to preview some of those issues as it

11   relates to their burden to establish likelihood of success on

12   the merits.

13           The first question we raise is is the filing of the

14   adversary proceeding a violation of the stay.  CSFB's claims

15   are really breach of contract claims.  They believe they

16   terminated.  They believe the debtors are breaching the

17   agreement to fulfill their obligations to transfer of

18   servicing.

19           Clearly, this is an action that could have been

20   commenced prepetition, because they believe they sent their

21   termination notice prepetition.  Couching this as injunctive

22   relief we do not believe provides a creditor an open invitation

23   to seek relief under 7001.

24           The automatic stay gives the debtor a breathing

25   spell.  We submit that CSFB needed to file a motion for relief

1    from stay where Your Honor must balance the harms to determine

2    if this issue should be decided at this early stage of the

3    case.  We think they failed to do that, and therefore, violated

4    the automatic stay.

5            Now, CSFB assumes, Your Honor, as a threshold matter

6    that the automatic stay doesn't apply, but to determine that,

7    we need to determine whether Section 559 applies, and that

8    question is is this master agreement a repo agreement under 559

9    and Section 10147.  We do not concede that point.

10           A determination needs to be made whether this is a

11   true sale or a secured financing.  Our witness today, one of

12   our witnesses will show that CSFB acted like a lender.  They

13   dealt with margins, collateral requirements.  They used

14   concepts like advances, transactions --

15           THE COURT:  Excuse me.  I'm sorry.  If you're on the

16   telephone and you're going to make noise, you need to mute or

17   I'm going to kick you off the phone.  Go ahead.

18           MR. BRADY:  Transactions like this in the past were

19   always structured as loans.  So to some extent, we're in new

20   territory here.

21           The provision of 10147 that added the term mortgage

22   loans was just added less than two years ago.  We believe the

23   Court needs to conduct a factual analysis of whether this

24   agreement falls under Section 559 and 10147.  If so, we still

25   believe the Court needs to decide whether the servicing

Opening Statement - Brady                                    12

1    agreement portion of it qualifies as a repo agreement under

2    10147.

3              That brings us to the question of whether the

4    servicing agreement is severable from the master agreement

5    under New York State law so as to create a separate and

6    distinct contract.  To do that, we think you have to look at

7    the intention of the parties, a factual inquiry.

8              We would just point to one element of the contract

9    that we think provides some basis for that, and that is section

10   16(D).  That provides if CSFB sells the loan with servicing

11   retained, CSFB has to provide the debtors with a credit for the

12   value of the servicing.  If there is no value to the servicing,

13   to the servicing that CSFB contends, why under certain

14   circumstances is the debtor entitled to a credit for the value

15   of that servicing?

16             CSFB has raised the question of the existence of

17   separate consideration for the servicing, another factual

18   question and a question of whether the contract is ambiguous on

19   that point, and if so, should the Court hear parole evidence.

20   If the servicing agreement is a separate executory contract,

21   was it terminated by the bankruptcy filing as a result of the

22   master agreements ipso facto clause?  That leads to the

23   question of whether the servicing agreement component is

24   governed by Section 365(E)(1).

25             There is also a question of whether a cross default

1   will prevent the debtors from seeking to assume and assign an

2   executory contract.  That was an issue that came up in the IT

3   Group case, and Judge Walrath has an opinion on that.

4              There are also policy considerations.  Does 559

5   require that repo agreements -- that the loans travel with the

6   servicing?  Is it really impossible to sell these loans without

7   the servicing rights as CSFB alleges?  That's a factual

8   dispute.

9              CSFB alleges that western civilization will come

10  crashing down if the Court rules against CSFB on this Section

11  559 issue.  I'm not sure that's relevant, but, Your Honor, each

12  of these agreements, and we've reviewed a lot of them in

13  connection with this case, are all at least a little different.

14  They all have been performed a little differently by the

15  parties.  So it requires a specific factual analysis of this

16  agreement and how it was performed before Your Honor can find

17  whether 559 applies.

18             There is a factual question whether the servicing

19  agreement is executory.  If it is, we believe their sole remedy

20  is to seek to compel the debtors to assume or reject that

21  agreement.  We don't believe relief from stay or an adversary

22  proceeding is proper.

23             We then get to whether there was a valid prepetition

24  termination.  That calls into question of whether there was an

25  event of default.  That question is whether there was a proper

Opening Statement - Brady                                    14

1    margin call under the agreement.  We dispute that there was a

2    proper margin call under agreement, that there was no margin

3    deficit when CSFB sent -- allegedly sent its notice.

4           You will learn today from the witnesses that CSFB

5    failed to credit a previous margin call payment of

6    approximately $2.4 million to the amount of the outstanding

7    loans.  This is a fact that we just learned over the last

8    couple of days and a fact that contradicts their original

9    motion in this case.

10          With that payment applied, Your Honor, the

11   $2.4 million payment, did a $933,000 deficit really exist?  We

12   don't believe so.  Does the fact that CSFB failed to properly

13   apply this prior margin call lead to a finding of unclean hands

14   that bars an award of equitable relief to them?  There is

15   bankruptcy case law that supports that argument.

16          Was the margin deficit validly noticed?  What notice

17   is required under the master agreement?  We submit written

18   notice is required, and it must go to Mr. Pino and Mr. Horn.

19   There is no dispute that CSFB did not provide written notice to

20   Mr. Pino and Mr. Horn.

21          So in their papers yesterday, they raised course of

22   dealings and they cite to New York law.  The agreement has a

23   no-waiver provision that course of dealings cannot waive the

24   requirements of the agreement.  So there is a question of

25   whether course of dealings is even admissible.

1          If Your Honor believes that course of dealings is

2     relevant, we've not had time to take discovery to understand

3     the complete course of dealings between the parties.  Indeed,

4     if we get into that today, we think we'll be able to show the

5     Court that the course of dealings between the parties is

6     favorable to the debtor's arguments, that Mr. Pino was

7     routinely notified of margin calls, that negotiations ensued

8     after a margin call.  Sometimes those took days if not weeks to

9     resolve, and there was no event of default declared while the

10    parties attempted to resolve disputes over margin calls.

11         Yesterday, CSFB said they think the notice provisions

12    are ambiguous.  The Court has to make a finding that they're

13    ambiguous, and if they are, then we get to parole evidence as

14    to what the terms mean.

15         We don't believe we'll have a record today that's

16    sufficient for Your Honor to make those findings.  We don't

17    believe a few hand-picked e-mails by CSFB are sufficient to

18    establish the course of dealings between the parties, again, if

19    Your Honor even finds that's relevant with the no-waiver

20    clause.

21         If the margin call was not properly noticed, is that

22    fatal to CSFB's claim of default?  We cited a case that says

23    yes.  They cite a case that says no.

24         CSFB has the burden on all of these issues today.

25    When you take all of these issues and the disputed facts, we

Opening Statement - Brady                          16

1    submit that there just will not be a sufficient record on which

2    the Court can make a finding that CSFB is entitled to judgment

3    as a matter of law.

4         So we now look at harm, Your Honor.  What is the harm

5    to CSFB as these issues get properly litigated before the

6    Court?  To obtain a preliminary injunction that effectively

7    grants them final relief in our opinion, CSFB must show

8    immediate and irreparable harm, and they cannot meet this very

9    high burden.

10        You will hear testimony today as you did throughout

11   the day at the first day hearing that the debtors are servicing

12   these loans and all of their loans.  The debtors have set up

13   segregated accounts.  The debtors have provided CSFB with

14   reports and information on these loans.  That was provided this

15   week.

16        The fact that the debtor cannot -- the fact that a

17   defendant being a debtor cannot in and of itself create

18   irreparable harm, as they suggest.  If that is the case,

19   Your Honor, then every plaintiff in a bankruptcy seeking

20   injunctive relief against a debtor would be entitled to a TRO.

21        We think the cases they cite to the -- that are Third

22   Circuit cases are not applicable, and we think they've been

23   overruled by the Supreme Court's decision in Groupo Mexicano.

24   There, the court founds that protecting one's ability to

25   satisfy a judgment cannot form the basis of a preliminary

1  injunction.  The fact that we're a debtor and they may have an

2  unsecured claim that may receive a percentage on the dollar

3  cannot justify in and of itself a preliminary injunction.

4        Most of the harms they've identified in their

5  affidavit yesterday are based on pure speculation, that they

6  can't sell the loans without this information.  Your Honor, we

7  offered to have these loans as well as the servicing rights be

8  sold as part of the bankruptcy process.  That way, we could

9  insure that the debtor's interests are protected.  CSFB refused

10  that.

11        They argue the value -- value is deteriorating daily.

12  Well, markets change, Your Honor, and maybe this isn't the

13  right time to sell these loans and maybe things will stabilize

14  by September, but it's speculation on their part that value is

15  deteriorating daily.  The raise that mortgagors may not pay

16  because we're in bankruptcy.  There will be no valid evidence

17  to that.  In any event, all of these alleged harms, Your Honor,

18  if they ever came to be, would be compensable and money

19  damages, and therefore, an injunction is not appropriate.

20        Now, what's the harm to the debtor if Your Honor

21  grants this relief?  If Your Honor grants this relief as a

22  preliminary injunction, we believe it effectively grants them

23  full and total relief, that they'll take this information,

24  they'll sell these loans, and they'll have no incentive

25  whatsoever to obtain one penny more than the value -- than

1    their loan balance.

2           On CSFB's own website -- and you'll hear this today

3    from our witness.  On August 1, the day they allegedly sent the

4    notice of default or the notice of margin call, they listed the

5    fair market value of these loans of over $35.0 million.  The

6    loan balance on that day was 27.0 million.  That's potential

7    value to this date of $8.0 million.

8           If they have the right to go sell these loans, we

9    won't see any of that value.  There will -- there will be no

10   assurances that they'll sell them in a commercially reasonable

11   manner, and the debtor's potential interest there will be lost.

12          Again, based on all of these legal and factual issues

13   raised by the pleadings, based on the fact that there is no

14   immediate and irreparable harm to CSFB, based on the -- the

15   fact that these are very early stage of these proceedings, the

16   committee was just formed on Tuesday, and based on the harm to

17   the debtors if the Court grants the preliminary injunction,

18   which we believe is effectively final relief, we don't believe

19   CSFB has met its burden and the Court must deny the preliminary

20   injunction motion.

21          THE COURT:  Thank you.  Ms. Fatell, do you want to be

22   heard?

23          MS. FATELL:  Thank you, Your Honor.  Bonnie Fatell,

24   proposed counsel -- co-counsel for the creditors committee.  I

25   wanted to introduce my proposed co-counsel, Mark Indelicato

1    from Hahn and Hessen, and we will be filing pro hoc vice

2    motions this afternoon.

3              THE COURT:  All right.

4              MS. FATELL:  Thank you.

5              MR. INDELICATO:  Thank you, Your Honor.  Very

6    briefly, Mark Indelicato from Hahn & Hessen, proposed counsel

7    for the committee.

8              Your Honor, as has been said several times, the

9    committee was just formed, and we have just been retained.  We

10   took a look at the papers as best we could in the ensuing

11   period of time, and while obviously, we don't know all of the

12   facts, it does appear to us that there are significant issues

13   of fact that need to be addressed, but, Your Honor, I think you

14   made the point at the first day hearing, and I think even CS

15   made the paper -- made the point in their -- in their reply

16   papers.  Some of the issues that need to be addressed here will

17   not only have ramifications in the industry but in this case.

18             Our concern, Your Honor, is the case is merely ten

19   days old.  They're asking this Court to make some very profound

20   decisions that are going to have great implications for the

21   case.  I think there should be -- we should work towards some

22   resolution where we can keep the status quo, where it could be

23   litigated on an even keel, where all the appropriate issues are

24   addressed with CS's concerns are addressed as best they can in

25   the context of this bankruptcy case.  They're not the only ones

1    that are alleging issues of whether or not servicing has been

2    terminated.  There are others, not only in this case, in other

3    cases that have been filed in this district and others.

4           Your Honor, I think it's imperative in this case that

5    these issues be addressed appropriately and in -- in a manner

6    in which not only are the issues of CS addressed but the issues

7    of the creditors and the debtors as well.  We're concerned that

8    -- that a precipitous trial and issues on this could not only

9    have a negative impact -- an impact on this -- the losing of

10   the $8.0 million of equity, but significantly could impact the

11   sale of the servicing business which ultimately hopefully will

12   bring significant value to this estate.

13          So for those reasons, Your Honor, we would be -- we

14   would make ourselves available to work with the parties to try

15   and arrange a situation where CS is protected as best we can

16   protect it in this case, deal with these issues in an

17   appropriate manner so that the estate and all its creditors as

18   well as CS are protected.  Thank you, Your Honor.

19          THE COURT:  You're welcome.  Reply in your opening or

20   do you want to move straight to evidence?

21          MR. COMET:  Well, I just want to briefly reply to

22   raise really a couple of objections, Your Honor.  I think, you

23   know, we have quite substantial points on many of the things

24   that Mr. Brady said, but I really take exception to a couple of

25   things.

1          He suggested that the debtors are going to present

2     evidence in dispute today whether this agreement between the

3     parties is at all a repurchase agreement within the meaning of

4     Section 559 of the Bankruptcy Code.  The debtors expressly

5     disclaimed in their papers that they filed earlier this week

6     that they were raising that issue for the purposes of this

7     hearing.

8          I'm looking at page 11 of their memorandum of law

9     which contains a footnote about this point.  They say --

10               "Whether or not the repurchase agreement portion of

11               the master agreement constitutes a repurchase

12               agreement within the meaning of Sections 559 and 362

13               of the Bankruptcy Code is irrelevant..."

14          THE COURT:  What note are you on?

15          MR. COMET:  Well, I'm on pages 10 and 11 now which

16     leads to footnote 4, Your Honor.

17               "...is irrelevant since all of the relief sought by

18               CSFB relates to the servicing agreement."

19          Then there is -- there is a footnote in connection

20     with that sentence that says --

21               "The debtors specifically reserve their right to

22               argue in subsequent proceedings that the master

23               agreement does not constitute a repurchase agreement

24               for purposes of Section 599 and 362(b)(7) of the

25               Bankruptcy Code."

1    So we're a bit --

2         THE COURT:  How is -- how is the reservation of right

3    to argue in a subsequent proceeding somehow a waiver of the

4    ability to make your argument in this proceeding?

5         MR. COMET:  Well, because we -- we had no notice that

6    that issue would be in dispute today, Your Honor, and

7    therefore, Mr. Brady suggested they're going to present

8    evidence about past nature of these kinds of agreements, that

9    they've been done as financing.  We had no notice that any type

10   of -- of evidence of that sort or issue of that sort would be

11   raised today and had no opportunity to prepare for it.

12        We understood from their papers that that issue was

13   not being raised for purposes of this motion but is being

14   reserved for subsequent proceedings, and therefore, it is -- it

15   prejudicial to us.  It denies us notice and a fair opportunity

16   to be heard on the matter, Your Honor.

17        THE COURT:  Well, I don't know if that's particularly

18   accurate.  I mean, frankly, you could take the position that

19   your reply brief is completely different in your approach than

20   your opening brief.  Opening brief and your reply brief have

21   quite a few differences in your focus.  I hear -- I see

22   repurchase agreement a lot in the reply brie, but I think it's

23   fair to say that the focus was on the servicing portion in your

24   opening brief.

25        MR. COMET:  Well --

1      THE COURT:  You think that's a fair statement?

2      MR. COMET:  Well, Your Honor, the focus has always

3  been on the servicing in the sense that we need to have the

4  matters connected with the servicing turned over to us, the

5  collection of funds, the files and so on.  That has always been

6  our focus.

7      The fact that we're entitled to that by virtue of

8  this being a repurchase agreement was raised both in our

9  opening papers and in our reply papers.  To the extent that

10 there is a difference in the focus of the papers, Your Honor,

11 it's because we were responding to the arguments as one would

12 normally do in a reply brief, responding to the arguments that

13 the debtors had made.

14     The other thing I take objection to, Your Honor, in

15 Mr. Brady's statement is he referred several times to matters

16 that were discussed only in settlement discussions between the

17 parties that were explicitly denominated particularly by the

18 debtors as being covered by Federal Rule of Evidence 408, and

19 we had understood that therefore, we were not going to offer

20 evidence about what transpired in those matters in this hearing

21 today, and now they are apparently intending to do that.

22     They apparently -- he referred to information that

23 was provided to us only under the rubric of a settlement

24 discussion, not to be used for business purposes, expressly

25 agreed.  He referred to offers of settlement that were made and

1   he said refused which he apparently wants to use as evidence on

2   the questions of liability here, which is directly contrary to

3   Rule 408, and I think that is -- is not appropriate,

4   Your Honor.

5           As far as the other issues, Your Honor, we will

6   address them, but just one factual point I'd like -- or semi-

7   factual point I'd like to respond in Mr. Brady's thing.  He

8   said -- he referred to a section of the -- the contract that I

9   don't believe is mentioned in their papers, in Section 16, the

10  remedies section.  It says that if CSFB sells these loans and

11  retains the servicing, it has to give the debtors a credit for

12  that, and he said well, if there is no value to the servicing

13  rights, why do they have to give a credit.

14          I think that argument sort of very much confuses the

15  issues here.  Nobody is claiming that there is no value in a

16  sense to servicing rights, Your Honor, when one has a

17  contractual right to servicing and to be paid for it.

18          The reason that the debtors get a credit under the

19  circumstances Mr. Brady described is the following.  If CSFB

20  takes the loans, takes control of the loans -- it already owns

21  them -- and sells them, it has to credit whatever it gets

22  against the unpaid balance that the debtors owe.  Now, if it

23  sells them with the servicing released, it credits obviously

24  the full sales price.  If it sells them with the servicing

25  retained, it has something that still exists that has to be

1     valued to be further credited so the debtors get full credit

2     for the matter involved.

3              That's entirely a separate question from whether this

4     agreement in the first instance allows the debtors to control

5     the servicing when it expressly says that the servicing belongs

6     to Credit Suisse, and second, it's a separate question from

7     whether the contract provides for the debtors to receive any

8     compensation for servicing.  There is no -- I still have not

9     heard any answer from the debtors as to where in the contract

10    there is any provision that says they get a set amount of

11    dollars per month, they get a percentage interest, they get

12    anything, any income whatsoever for servicing.

13             So if they put this -- if they put this contract up

14    for auction and someone is to look at it and say I -- whether

15    they want to buy the servicing rights, they would say I

16    believe, first of all, there is no servicing rights to be

17    bought here, but second, what am I going to get for the

18    servicing rights.  There is simply no provision for

19    compensation in the contract for it.

20             That doesn't mean that the rights aren't valuable.

21    It just means in the nature of this agreement, no right was

22    provided, because what was expected here -- and there will be

23    testimony about this, Your Honor -- was that the loans after

24    they were originated by American Home would be sold to Credit

25    Suisse so that they could get a quick infusion of capital for

1     their business including capital to make additional loans.

2     They would then repurchase them within a few weeks or perhaps

3     months at most, and when they repurchased them, they would

4     have, again, full control and could sell the servicing rights

5     or sell the loans, whatever, but they -- so in this very brief

6     interim, they were left with the responsibility for servicing

7     but without any compensation for that, and certainly, no

8     provision that upon default, you could sever the servicing for

9     the loans.  There is simply no -- no language in the contract

10    that suggests that.  It specifically says the servicing goes

11    with the loans.  The only reason they retained it was in the

12    logistics of it, this was a brief -- expected to be a brief

13    period, and they were going to buy the loans back and have full

14    control of them once again.  They defaulted.  They can't do

15    that, and therefore, there is no -- nothing here to assign to

16    anybody.

17            I still think the debtors need to answer the

18    question.  What are they going to tell a bidder as to the

19    amount of compensation it will receive for servicing here?

20    There is simply nothing in the contract that says anything

21    about that.  There is no provision for such compensation.  All

22    right.

23            THE COURT:  Mr. Kirpalani, do you want to respond to

24    the -- I took it you were going to respond to the Rule 408.

25            MR. KIRPALANI:  Just a couple of things, Your Honor,

Opening Statements - Kirpalani                          27

1    and it's a pleasure to -- to see you.  It's been quite a long

2    time.  Susheel Kirpalani of Quinn, Emanuel, co-counsel for the

3    debtors.

4              Just a couple if issues, because I was present for

5    some of the discussions that Mr. Comet was -- was referring to.

6    He was not present, but the first -- with respect to the

7    settlement offers and discussions, I don't believe anything

8    that Mr. Brady said implicates anything that was offered by

9    Credit Suisse, and it also doesn't implicate anything regarding

10   a claim that is made against Credit Suisse or made by Credit

11   Suisse.  In fact, I believe Credit Suisse has taken the

12   position that this is not about a claim, not about an amount

13   that is owed, and I think if you look through the rule, that's,

14   in fact, what it's supposed to deal with.

15             But more importantly, when I was sitting here

16   listening to Mr. Comet, I believe the phrase he used is I have

17   no idea why the debtors would want to even retain these

18   servicing rights other than -- and I wrote it down, because it

19   was important -- other than to use it as a, quote, bargaining

20   chip.  So to the extent that opening the door shows that a

21   person should not be accusatory when the other side raises

22   issues about their motives in connection with this, I don't

23   think that's really an appropriate position for them to take,

24   because they were the first ones that did open that door.

25             And then more fundamentally, and I really think more

1    importantly since we're not talking about the admissibility of

2    evidence in an opening statement, particularly when it's before

3    Your Honor and not a jury, but with respect to their burden and

4    whether or not the issue of the master agreement being a repo

5    at all is properly before the Court here today.  That issue is

6    always properly before the Court on a motion for preliminary

7    injunction.

8            Credit Suisse retains the burden on every single

9    element of their claim.  Their claim is that this is a repo.

10   It rides through because of 559 and the amendments in 2005 to

11   10147.

12           We, of course, make arguments to the contrary, but to

13   the extent that Mr. Comet does not believe it's appropriate to

14   go into that evidence today, frankly, we believe it deserves

15   much, much more careful evidence after an adequate amount of

16   time of discovery and a proper record to make that decision

17   anyway, but to the extent that Mr. Comet is abandoning the

18   argument for purposes of today, that the bankruptcy filing

19   allows him to terminate, then we don't have a problem with

20   that.

21           On the other hand, in our -- in our view, if the

22   issue today is whether or not the agreement was properly

23   terminated prepetition in accordance with the contract, we

24   would agree that the subject of it being a repo that rides

25   through under 559 is not necessary to be decided today, but to

Colloquy                                                    29

1      the extent that they're arguing that as a back -- as a fail

2      safe, even if we didn't do it right prepetition or we didn't

3      act in good faith prepetition, we still deserve to have the

4      servicing rights transferred to us, because they're integral to

5      a repo and the repo rides through under 559.

6              We think it's just implicit and fundamental to that

7      position that the Court makes a determination that it, in fact,

8      is a true repo, and we don't believe that it can be done on a

9      short -- on the record like this, but that's really up to the

10     movant, Your Honor.

11             THE COURT:  All right.  I understand.  Thank you,

12     Mr. Kirpalani.  You don't need to respond to that.  I assume

13     you're not waiving anything.  Let's get started.

14             MR. COMET:  Your Honor, as I said, I have exhibits.

15     I had discussed all of these with Mr. Dorsey prior to today,

16     and we'd like to offer them in evidence.  I notice there is a

17     typo on the cover of the exhibit binder.  It has a date of

18     August 17th instead of August 16th, but otherwise, it should be

19     okay.  May I approach?

20             THE COURT:  Yes, you may.  All right.  Thank you.

21             MR. DORSEY:  Your Honor, we agreed we would not

22     object to the introduction of these materials on hearsay or

23     authentication grounds.  However, to the extent the Court

24     decides it is not necessary to go into the course of dealings

25     argument raised by CSFB, we would argue that these are

1    irrelevant and would move to exclude them on those grounds, but

2    we'll just reserve that for now and allow them to be admitted

3    if that's permissible.

4              THE COURT:  That's fine.  I assume that's acceptable,

5    Mr. Comet?

6              MR. COMET:  Yes.  That is acceptable, Your Honor.

7              THE COURT:  All right.

8              MR. COMET:  Although if I can just add one thing in

9    that connection.  Mr. Brady seemed to say that the course of

10   dealing argument had only to do with a waiver point.  It does

11   not.  It has to do primarily necessary for the contract

12   interpretation.

13             THE COURT:  Well, we'll do this.  I'm going to --

14   I'll admit -- they're tabbed -- how are they marked?  They're

15   tabbed 1 through 7.  So I'll admit them as Credit Suisse First

16   Boston Mortgage Capital, LLC exhibits 1 through 7, reserving

17   the right to argue that they -- reserving -- excuse me -- the

18   debtor's right to argue that they are inadmissible on relevance

19   grounds.

20             MR. COMET:  Thank you.  Your Honor, the -- Credit

21   Suisse would like to call Bruce Kaiserman as a witness.

22             THE COURT:  Please take the stand, Mr. Kaiserman.

23   Swear the witness.

24             THE CLERK:  Please state your full name and spell

25   your last name for the record.

1          MR. KAISERMAN:  Bruce Kaiserman, K A I S E R M A N.

2      B R U C E   K A I S E R M A N, PLAINTIFF'S WITNESS, SWORN

3          THE CLERK:  Thank you.  You may be seated.

4          MR. KAISERMAN:  Thank you.

5          MR. COMET:  May I proceed, Your Honor?

6          THE COURT:  Yes.

7                      DIRECT EXAMINATION

8   BY MR. COMET:

9   Q    Mr. Kaiserman, what is your current employment position?

10  A    I'm a director with Credit Suisse Securities.  I'm a vice

11  president of Credit Suisse First Boston Mortgage Capital, and

12  I'm a vice president and board of director for DLJ Mortgage

13  Capital.

14  Q    Are all those entities affiliated entities in the Credit

15  Suisse group?

16  A    Yes, sir.  They're all wholly owned subsidiaries.

17  Q    And what -- what are your responsibilities in those

18  positions?

19  A    Certainly.  In my current capacity, I'm responsible for

20  all whole loan related activities.  That includes warehouse

21  financing, whole loan trading, servicing rights arrangements,

22  securitization transactions, and all related matters.

23  Q    Do you have responsibility for the servicing of mortgage

24  loans?

25  A    I do.  Credit Suisse acquired a servicing company in 2005

1   known as Select Portfolio Servicing.  I have primary

2   responsibility for the ongoing management of that entity as

3   well.

4   Q   And how long have you been working in these mortgage and

5   real estate related areas?

6   A   Certainly.  I joined Credit Suisse in 2000 and have been

7   involved in these activities since.  Prior to that, I was with

8   Donaldson, Lufkin & Jenrette, another investment bank, and in

9   that capacity, I was responsible for real estate and mortgage

10  related matters as well.

11          Prior to that, I was an attorney with Brown & Wood,

12  and in that capacity, was involved in all structured finance

13  related transactions.

14  Q   Are you familiar with the master repurchase agreement

15  between Credit Suisse First Boston Mortgage Capital and various

16  American Home Mortgage entities?

17  A   I am, sir.

18  Q   Can you briefly explain your understanding of what that

19  agreement provides for?

20  A   Certainly.  Under the master repurchase agreement,

21  American Home sells from time to time mortgage loans to Credit

22  Suisse with the understanding that they would be owned by

23  Credit Suisse for a period of time and then eventually

24  repurchased by American Home and disposed of by American Home

25  as it saw appropriate.

1           During the term of the agreement, it is my

2    understanding that in the event of an event of default, that

3    the parties would be given -- the parties, Credit Suisse, would

4    be given -- would continue to own the mortgage loans, and

5    American Home would no longer be required to repurchase those

6    loans.

7    Q    What type of loans has Credit Suisse purchased from

8    American Home under the master repurchase agreement?

9    A    Certainly.  The mortgage loans are what is known as

10   scratch and dent mortgage loans.  Scratch and dent mortgage

11   loans are mortgage loans that tend to fall in one of three

12   categories.  The first is there are credit-related issues with

13   the loans that rendered them ineligible for sale in ordinary

14   transactions that American Home may have engaged in.

15           In addition, the second category would be that they

16   are performance related defects, whether they've had or

17   currently have a delinquency in their history, and finally, a

18   third category would be document deficiencies, whether there

19   may be missing documents associated with the mortgage loans or

20   they were prepared incorrectly or something of that sort.  So

21   again, scratch and dent loans fall into three categories,

22   performance, credit, and documentation deficiencies.

23   Q    And have all the loans that Credit Suisse purchased from

24   American Home fallen into one or more of these scratch and dent

25   categories?

1   A    Indeed.  Since it was originally established and through

2   the event of default, at all times, the loans on the line were

3   deemed scratch and dent.

4   Q   What significance, if any, does the fact that these are

5   scratch and dent loans have for the servicing of the loans?

6   A    Certainly.  Given the fact that the loans are scratch and

7   dent, a servicer servicing these mortgage loans is required to

8   take particular care in the ongoing management of those assets,

9   and in particular, if a loan, for example, has had a prior

10  history or is currently in default, the servicer must conduct

11  its affairs in a more timely and accurate manner.  They must

12  call in the borrowers more regularly.  They must write the

13  borrowers more regularly, and of equal importance, they may be

14  called upon to foreclose and take action under the mortgage

15  should the borrower's delinquency continue.

16          Similarly, if there are credit-related events that

17  cause the -- the loan to be deemed scratch and dent, the

18  borrower may have had a prior event in their history that

19  suggests that they need to be called upon more regularly,

20  written more regularly, or again, if the need arises,

21  foreclosed upon, and as such, as scratch and dent loans, the

22  servicer must take unique care that an ordinary loan servicer

23  wouldn't necessarily have to take if it were servicing

24  nonscratch and dent loans.

25  Q   Let me come back to the particular loans involved here in

1    a moment, but let me ask you, does Credit Suisse have other

2    repurchase agreements similar to its agreement with American

3    Home with other companies?

4    A     Indeed, we do.  Today, we have about 31 other agreements,

5    all of which were prepared using forms substantially similar to

6    the master repurchase agreement with American Home.  The

7    outstanding amount available under those master repurchase

8    agreements is approximately $7.5 billion.

9    Q     And in your experience, are -- do other financial

10   institutions have similar arrangements with mortgage

11   originators like American Home?

12   A     Indeed, they do, and in my current capacity, I've reviewed

13   other agreements used by my competitors and other companies

14   similarly situated to Credit Suisse and believe that those

15   agreements are on form substantially similar to not only the

16   form used for American Home, but more generally across our

17   entire business.

18   Q     Now, who has been servicing the loans that Credit Suisse

19   purchased from American Home?

20   A     Certainly.  The agreement contemplated that the loans

21   would be serviced by American Home during the term of the

22   agreement.  As I mentioned earlier, the agreement contemplates

23   our purchase of the mortgage loans and the eventual repurchase

24   by American Home over a short period of time, in some cases, a

25   few weeks, perhaps one month.

1          During the pendency of that transaction, American

2    Home would service those loans, and they would do so largely

3    for convenience reasons.  If they were to transfer the

4    servicing to us part of the original purchase, it would be

5    disruptive to the borrowers.  They would be informed that

6    prospectively, please remit your payments to a new servicer,

7    and then in 30 days or two weeks, whatever the period of time

8    that our transaction lasted, they would again be advised to

9    remit the payments to presumably American Home or perhaps

10   whomever they sold the loans onto thereafter.

11         And so for convenience reasons during the term of the

12   master repurchase, the loans would be serviced by American Home

13   and then eventually when they repurchased the loan, they would

14   be transferred on, if appropriate, to the eventual purchaser.

15   So during the pendency, American Home serviced it.

16   Q    Well, do you have some understanding of what American Home

17   was doing with the loans when it repurchased them?

18   A    Indeed, I do.  During -- after the master repurchase

19   agreement was completed and the loans were repurchased by

20   American Home, as is often the case in the industry, the

21   company, in this case, American Home, would either sell the

22   homes and the servicing rights to a third party purchaser and

23   in doing so, would transfer the servicing rights to them, that

24   party having purchased them.

25         Alternatively, they might sell the loans servicing

1   retained, meaning they would sell the whole loan to an

2   investor, retain the servicing rights, and perform the ongoing

3   servicing and maintenance thereafter for the benefit of that

4   purchaser.  Finally, they might securitize those loans, and in

5   doing so, agree for the benefit of the trust, which is the

6   vehicle through which the securitization is created, would

7   service those loans for the benefit of the securitization

8   trust.

9   Q    And in your experience, would the arrangement for

10  servicing in those kind of resale situations by American Home

11  differ from the servicing arrangement under the master

12  repurchase agreement between Credit Suisse and American Home?

13  A    Indeed.  As I mentioned earlier, the servicing provision

14  under the master repurchase agreement is for convenience and

15  convenience only.  It's not a servicing agreement.  It's an

16  arrangement to facilitate the purchase and sale contemplated by

17  the master repurchase agreement.

18       On the other hand, if they were to sell the loans on

19  a servicing release basis, they would perform -- again, through

20  a third party, they would sell the loans on a servicing release

21  basis.  They would perform them for maybe 45 days for a nominal

22  fee and then transfer them off to that purchaser.

23       On the other hand, if they were to sell them on a

24  retained basis, meaning they continued to retain the ownership

25  rights of the servicing, they would enter into a lengthy

1    servicing agreement that would contemplate in great detail how

2    the loans would be serviced for the benefit of the purchaser,

3    and furthermore, the compensation would be established, and in

4    many cases, it's described in terms of a number of basis

5    points, also known as a strip.  It could range from as low as

6    25 basis points to as much as 37 1/2 basis points depending on

7    the type of loans.

8            As you see in our master repurchase agreement, there

9    is no consideration described.  There is no detail about how

10   the loans would be serviced, and arguably, no one would rely

11   upon that as a servicing arrangement if they were to buy for --

12   long term.  There is just no specificity.

13   Q    What is your understanding of what happens to the

14   servicing if a master repurchase agreement of that type is

15   terminated upon the default of the counter party to the

16   financial institution?

17   A    Certainly.  The agreement specifically contemplates that

18   upon the occurrence of an event to default, the loans,

19   including the servicing rights, would be the property of Credit

20   Suisse, and I believe Credit Suisse when it entered into this

21   arrangement did so on the basis that if there were an event of

22   default, it would have absolute control to dispose of the

23   loans, including the servicing, as it saw appropriate.

24           I'd go further and say that across our entire

25   business, not only American Home, but all of our customers who

1    have similar arrangements to the master repurchase agreement,

2    that we believe upon the occurrence of an event to default, the

3    mortgage loans and the related servicing rights could be sold

4    by us at our discretion.

5    Q    Have there been other instances for Credit Suisse besides

6    American Home where the counter party on a master repurchase

7    agreement became insolvent and the question arose of the

8    servicing?

9    A    Yes, sir.  There has.  In -- in connection with New

10   Century, a prior debtor in bankruptcy, we had a master

11   repurchase agreement with them, and we were successfully given

12   the right to sell the loan as well as the servicing rights and

13   did so in a commercially reasonable manner and disposed of the

14   loans in our ordinary course of business.

15          In addition to New Century, we are in the midst of

16   doing the same thing with Alliance Bancorp, another debtor in

17   bankruptcy.  Prior to that, we've done it with People's Choice,

18   and we're in the midst of doing it with Aegis Mortgage.

19   Q    So --

20   A    But we've had several instances within the last 90 days

21   where this same treatment has occurred.

22   Q    And all of those counter parties transferred the servicing

23   rights or the servicing files and materials to Credit Suisse,

24   is that correct?

25   A    Yes.

1    Q    Now, why -- why is it important for the collections and

2    the servicing materials to be transferred to Credit Suisse

3    under those circumstances?

4    A    Sure.  At the present time, as I mentioned, these are

5    scratch and dent loans, and scratch and dent loans are unique

6    in that the servicing responsibilities are enhanced.  These

7    borrowers need to be contacted more regularly, written more

8    regularly, and handled differently than other borrowers who are

9    not scratch and dent loans.

10          For us to sell them, we must be able to present to

11   the purchaser the servicing rights associated with the loans.

12   We simply cannot sell them if we don't have control of the

13   servicing rights.

14          In addition we have great concerns about American

15   Home's ability to appropriately segregate our funds, to

16   appropriately call upon these borrowers.  As is well known, the

17   company has filed for bankruptcy.  Its intent is to liquidate,

18   and the people who are calling upon these borrowers must be

19   concerned about their own jobs and their livelihood.

20          MR. DORSEY:  Object and move to strike.  Speculation,

21   Your Honor.  He has no idea what people calling in are saying.

22          THE COURT:  Response?

23          MR. COMET:  I don't think he was talking about people

24   calling in, Your Honor.  I think he was talking about people

25   working at a servicing company that's insolvent and on the

1    brink of going out of business, what the employees of the

2    company would --

3              THE COURT:  Why don't you lay a foundation as to why

4    he would have any idea as to those facts.

5              MR. COMET:  Okay.

6    BY MR. COMET:

7    Q    Have you had prior experience, Mr. Kaiserman, with a

8    servicer in financial distress and how it operated?

9    A    Certainly.  In addition to the companies that I previously

10   mentioned, New Century, Alliance, Aegis, People's Choice, as I

11   mentioned earlier, we own a servicing company called Select

12   Portfolio Servicing.  We acquired that company in 2005.  I had

13   the lead responsibility in that acquisition.

14             That company was under significant distress.  Indeed,

15   its business was hemorrhaging.  It had about -- at the time,

16   about 1,200 employees, and during the course of that

17   acquisition, I spent an inordinate amount of time talking to

18   the staff about their concerns, how they were most concerned

19   about their own jobs, their families, and their ability to earn

20   a living, and they were not concerned about whether or not

21   Credit Suisse was going to go forward with this acquisition.

22   They wanted to know where their jobs were, and they were

23   distracted.

24             And so as part of my role in that acquisition, we

25   tried to keep -- we tried to keep the company together and

Kaiserman - Direct                                    42

1    intact, and it was -- took great care.  The employees were

2    significantly distracted.

3    Q    And --

4         MR. DORSEY:  Objection, Your Honor.  Move to strike.

5    That was completely irrelevant to the issues here about what's

6    going on at the debtors, not what happened at some other entity

7    years ago.

8         THE COURT:  Response?

9         MR. COMET:  Your Honor, the witness began this by

10   explaining that Credit Suisse is concerned about the servicing.

11   He's offering I think the reasons why it's concerned and can't

12   be assured that there will be adequate performance under the

13   circumstances that exist for this debtor.  He has experience

14   with similar circumstances, and that explains why he's in a

15   position to state that that is a legitimate concern and a

16   problem in what is occurring and why Credit Suisse is

17   potentially being harmed in this situation.

18        THE COURT:  Mr. Dorsey?

19        MR. DORSEY:  Your Honor, the witness's belief about

20   whether or not CSFB might be harmed in the future is

21   irrelevant.  He can testify about facts that show that they

22   will be harmed immediately in the future, but he can't

23   speculate about what happened at a company years ago and try

24   and ipso facto apply that to what's happening with the debtors

25   in this case.

1          THE COURT:  All right.  I'm going to overrule the

2    objection.  I think he can testify -- he was testifying in

3    response to a question based on his experience in the business,

4    and I think it's relevant for purposes of issues that may or

5    may not be relevant as to whether the debtors are adequately

6    servicing the matter.

7          I think the fact that it's his personal belief goes

8    to weight, and I'll allow you to explore on cross-examination,

9    which I'm sure you will, what specific facts he has in

10   connection with this debtor that deal with -- that would

11   indicate whether or not they're performing properly the

12   servicing.  So I'll overrule the objection.

13         MR. DORSEY:  Thank you, Your Honor .

14   BY MR. COMET:

15   Q    I don't know whether you had completed your testimony,

16   Mr. Kaiserman, but let me try to move this along.  Your -- your

17   concern about the ability of American Home to -- to service, is

18   that affected in any way by the fact that these are scratch and

19   dent loans?

20   A    Indeed.  As I mentioned earlier, the borrowers require

21   additional attention.  If the people calling upon the borrowers

22   or writing the borrowers are distracted or otherwise focused on

23   matters unrelated to these borrowers, the servicing performance

24   will deteriorate.

25         In addition, as I mentioned earlier, a scratch and

1    dent buyer of mortgage loans will want the right to control the

2    servicing.  They simply will not accept the servicing to be

3    performed by a debtor in bankruptcy.  A company whose servicer

4    rating has been placed on negative watch or credit watch with

5    negative implications whose status as a Fannie and a Freddie

6    servicer is currently being removed, they will not allow the

7    loans to be serviced by this entity, and as such, until the

8    servicing is moved, I cannot sell them.

9    Q    You just referred to a servicer whose ratings as a

10   servicer have been put on credit watch with negative

11   implications.  Are you referring to American Home?

12   A    I am.

13   Q    And the same regarding the Freddie Mack and the Fannie Mae

14   matters.  Those are things in your understanding that are

15   problems American Home has, is that correct?

16   A    Yes, sir.  Beyond their status.  The current market

17   turmoil that we all are well aware of and the continued delay

18   will significantly affect Credit Suisse.  As these loans age,

19   their value goes down.  As these loans season, the

20   delinquencies will grow.  As time passes, the value of the

21   underlying real estate which secure the mortgages will go down,

22   and all of these factors will prevent Credit Suisse from

23   maximizing the proceeds upon selling these mortgage loans, and

24   for these reasons, we will be harmed if we're unable to sell

25   and dispose of these loans immediately.

Kaiserman - Direct                                    45

1   Q    Do you know if there has been any recent decrease in the

2   real estate valuations for the properties involved in the loans

3   that Credit Suisse purchased from American Home?

4   A    Indeed.  In early August, we were given by American Home

5   what is known as broker price opinions showing that the value,

6   the real estate value of some of the -- the properties securing

7   these loans has gone down in some cases by as much as ten

8   percent.  In addition, in my day-to-day activities, including

9   liquidating some of these earlier portfolios that we described,

10  most recently, Alliance, I've seen buyers of mortgage loans

11  adjust the prices they're willing to pay by as much as 20

12  percent on scratch and dent loans as a result of a decline in

13  the underlying value of the real estate.

14  Q    What -- what has happened recently in the market for

15  mortgages in terms of the supply of mortgages out there to be

16  sold?

17  A    Indeed.  At the present time, as a result of a lot of the

18  insolvencies and the lack of liquidity, there is a flood of

19  mortgages in the market, and it's expected that that flood will

20  continue to grow, and the longer we are forced to wait, the

21  more harm we will suffer as a result of this flood to the

22  market of these mortgages.

23          MR. DORSEY:  Objection, Your Honor.  Move to strike.

24  That's expert testimony.  This witness was not designated as an

25  expert.  No expert report was provided.  There's been no

1  opportunity for discovery.  It's improper for this witness to

2  be able to testify about his opinion about what -- what is

3  happening in the marketplace, and we would move to strike that

4  testimony.

5           THE COURT:  Mr. Comet?

6           MR. COMET:  Your Honor, I think this is clearly

7  admissible lay opinion testimony under Rule 701 of the Federal

8  Rules of Evidence.  This is Mr. Kaiserman's business.  He's out

9  there every day buying and selling mortgages.  A witness in the

10  business is allowed to testify about his understanding of the

11  way that the business works and the way the marketplace

12  operates.  In fact, he's allowed to even project the

13  possibility of damages and losses.

14           In the Advisory Committee notes to Rule 701 -- I can

15  quote it explicitly if Your Honor wants -- there is a specific

16  statement that courts allow witnesses to testify about what

17  will happen to their business in terms of losses of income or

18  damages, and the Advisory Committee cites for that a leading

19  Third Circuit case that stands for exactly that proposition.

20           The Advisory Committee notes that --

21           "Courts have permitted the owner or officer of a

22           business to testify to the value or projected profits

23           of the business without the necessity of qualifying

24           the witness as an accountant, appraiser, or similar

25           expert.  See, for example, Lighting Lube, Inc. v.

1          <u>Witco Corp.</u>, 4 F.3d 1153, Third Circuit (1993)."

2              So if a witness can testify about how his business is

3     going to do earnings or losseswise, as this clearly says, I

4     think Mr. Kaiserman can say based on what he does every day,

5     seeing what's going on in the market, which, frankly, I think

6     is rather overwhelming to any reader of the daily newspapers

7     what's occurring in this particular market, that there is a

8     great likelihood of decline in values.  I believe he's

9     competent to testify to that as lay opinion.

10             THE COURT:  Mr. Dorsey?

11             MR. DORSEY:  Clearly, it's not lay opinion,

12    Your Honor.  He's not testifying about the accounting at his

13    company.  He's talking about -- he's making predictions about

14    what the real estate market is going to do in the future.  He's

15    making predictions about what the value of the underlying real

16    estate that forms the basis for these mortgage loans is going

17    to do in the future.  That is clearly expert testimony.  It is

18    not lay testimony as --

19             THE COURT:  Well --

20             MR. DORSEY:  -- under the Third Circuit opinion.

21             THE COURT:  -- isn't a opinion or inference, A,

22    rationally based on the perception of the witness, B, helpful

23    to a clear understanding of the fact in issue, and C, not based

24    on scientific or specialized knowledge?

25             MR. DORSEY:  I think it is based on specialized

Kaiserman - Direct                                          48

1  knowledge, Your Honor.  You have to be an expert to be able to

2  testify about what's going to happen in the future and make

3  predictions about the future of the real estate industry.

4           THE COURT:  You have to be an oracle in order to

5  adequately predict the real estate market.  I'm going to

6  overrule the -- I'm going to overrule the objection and allow

7  the witness to offer his opinion as to the value that he thinks

8  he will be able to or Credit Suisse First Boston will be able

9  to achieve in the short term in connection with the sale of

10 these mortgages that are subject to I'll say the purported

11 repurchase agreement, so I don't get another objection.

12           MR. COMET:  I usually avoid objecting to the Court's

13 interim.

14 BY MR. COMET:

15 Q    One more point, Mr. Kaiserman, on the question of what --

16 what effects American Home's conduct is causing to -- to Credit

17 Suisse.  Do you have experience with prior situations in which

18 a -- a company like American Home that are going bankrupt

19 continued for some time to service the mortgages in terms of

20 whether the mortgage borrowers were making their payments as

21 fully as possible?

22 A    Yes, sir.

23 Q    What's your experience of that?

24 A    In connection with the liquidation of the New Century

25 portfolio, which was approximately $1.3 billion, we transferred

Kaiserman - Direct                                          49

1    the servicing from New Century to our wholly owned company,

2    Select Portfolio Servicing, and in doing so, boarded the loans

3    to our servicing system.

4            THE COURT:  I'm sorry.  I missed the verb.  You did

5    what?

6    A    Boarding.  We added them to our database as borrowers that

7    we were collecting the loans.

8            THE COURT:  All right.

9    A    Sorry.  And in doing so, we were receiving calls and

10   making outbound calls, and from time to time heard from

11   consumers that they were relieved that the loans had been

12   placed at a company that was not in bankruptcy, that they felt

13   more comfortable making payments to a company that was not in

14   bankruptcy, and as a result, I am of the opinion that if the

15   loans continue to be serviced by American Home, consumers may

16   delay or avoid entirely making payments to American Home on the

17   basis that they won't be given credit for those payments or

18   they may otherwise not be applied to their loan.

19           MR. DORSEY:  I think I know the ruling, Your Honor,

20   but I'm going to raise my objection for the record to preserve

21   it.  Objection and move to strike on the grounds that this

22   witness is not an expert and cannot testify about what mortgage

23   or what borrowers might do with regard to the payment of their

24   mortgages in the future.

25           THE COURT:  Mr. Comet?

1      MR. COMET:  Well, I think, again, this is

2   Mr. Kaiserman's business, Your Honor.  He has specific

3   experience with exactly this kind of situation within recent

4   times.  He has day-to-day responsibility for mortgage servicing

5   company and -- and for what happens in connection with mortgage

6   servicing and collections.

7      I think he's given the basis for why he has this

8   concern and opinion about what is likely to occur with American

9   Home based on actual experience with the same thing, and

10  therefore, I believe that it should be admissible, Your Honor.

11     THE COURT:  All right.  Mr. Dorsey, any further

12  reply?

13     MR. DORSEY:  Yes, Your Honor.  I think we haven't

14  been given the opportunity to examine the underlying factual

15  basis that he's using to formulate his opinion, which is

16  New Century and the materials that he reviewed in New Century,

17  and that's -- that's particularly why it's necessary to have a

18  report with an expert witness, so you can examine the

19  underlying facts that form the basis for their opinion.  We

20  haven't had the opportunity to do that.

21     THE COURT:  All right.  I'm going to overrule the

22  objection.  I think you'll be able to cross-examine here on a

23  variety of issues that will go to the weight of his opinion and

24  whether it's actually a valid opinion that the Court should

25  give weight to.  So I'll overrule the objection.

1          MR. COMET:  Your Honor, give me one second?

2                      (Pause)

3     BY MR. COMET:

4     Q    Now, in your -- based on your experience, Mr. Kaiserman,

5     if someone reviewed the repurchase agreement between Credit

6     Suisse and American Home at the current time in order to

7     determine whether they wanted to bid on the purchase of the

8     servicing rights from the debtors, do you think there would be

9     interest in bidding on that?

10    A    Sure.

11         MR. DORSEY:  Objection; speculation, lack of

12    foundation.

13         THE COURT:  Yeah.  Mr. Comet, what's your -- going a

14    bit far afield here.

15         MR. COMET:  Well --

16         THE COURT:  I don't recall any testimony that --

17    regarding the foundation for -- well, I'll let you respond.

18         MR. COMET:  Well, I can lay a further foundation,

19    Your Honor, if necessary.  I think the witness already

20    testified that he's familiar with the agreement, that he --

21    he's testified about the nature of the servicing arrangement

22    and what it provides for, and as someone who is in the industry

23    buying and selling mortgages, servicing rights in such matters,

24    which I think he's testified he is, I'm asking him, in effect,

25    if he were presented with the same type of agreement and the

1    inquiry was whether he was interested in bidding on acquiring

2    the servicing rights under this agreement from an insolvent --

3             THE COURT:  That's where I think you're missing the

4    foundation.  I don't recall any testimony that he's involved in

5    buying servicing rights --

6             MR. COMET:  Right.

7             THE COURT:  -- of distresses mortgages or scratch and

8    dent mortgages that he doesn't otherwise own.  So --

9             MR. COMET:  Is -- I'll lay a foundation on that,

10   Your Honor.

11   BY MR. COMET:

12   Q    Is it part of your responsibilities, Mr. Kaiserman, to --

13   to -- in the sale and purchase of servicing rights?

14   A    Yes, sir, and, in fact, as part of our acquisition of

15   Select Portfolio Servicing, the servicing rights previously

16   owned by that company were purchased by Credit Suisse, I think

17   the approximate principal balance of which was north of

18   30.0 billion at the time.  Forty percent of those loans were

19   delinquent loans which is one of the categories, as I mentioned

20   earlier, for scratch and dent loans, and as part of that

21   acquisition, my team was charged with reviewing the contracts

22   that we would ultimately be purchasing the servicing rights

23   under to determine whether or not we were interested in

24   purchasing those assets, and we went through contract by

25   contract evaluating what the nature of the right is that we

Kaiserman - Direct                        53

1    were ultimately purchasing and what we thought the impediments,

2    if any, to owning those servicing rights were and how we could

3    maximize our profitability by buying these loans -- excuse me

4    -- the servicing rights.

5    Q    When you referred in your last answer to a $30.0 billion

6    number, you were talking about the value of the loans rather

7    than the value of the servicing rights, is that correct?

8    A    Yes, sir.  And -- and in my day-to-day activities,

9    servicing rights trade as liquid as mortgage loans generally,

10   and so it's a regular occurrence that we will look at a

11   portfolio of servicing or offer for sale a portfolio of

12   servicing.  Indeed, most of what we purchase we sell with the

13   servicing rights released, meaning we're separately selling

14   them to a third party.  So I look at it every day.  Yes, sir.

15   Q    And -- okay.  Based on that experience, what -- if you

16   were asked to -- to buy the servicing rights under an agreement

17   of the sort that Credit Suisse has with American Home, the

18   situation where the mortgage originator like American Home was

19   insolvent, what would be your reaction?

20   A    Certainly.  My reaction would be that the agreement under

21   which I would be purchasing servicing rights is a master

22   repurchase agreement, but the company offering the servicing

23   rights for sale didn't own them.  Putting that aside, if I was

24   asked to evaluate a purchase of the servicing set forth in the

25   master repurchase agreement, I would say I wouldn't buy it.

1          There is no compensation established for the ongoing

2    servicing.  There are no terms that I'd have to adhere to.

3    It's very obvious from reading the provisions in the master

4    repurchase agreement that the servicing that is described

5    therein is for convenience and convenience only, that you would

6    not be the owner of the servicing nor stand to gain any benefit

7    in purchasing it.

8    Q    Has Credit Suisse entered into any repurchase agreements

9    in which it did not have the right to control the servicing if

10   an originator became bankrupt?

11   A    No, sir, we have not, and, in fact, if I were asked to

12   enter into an agreement the terms of which were as you've

13   described, I would not enter into that agreement.  The fact is

14   under these agreements, we expect to be given the right to sell

15   not only the mortgage loans but the servicing rights as well

16   upon the occurrence of an event of default, and if I were asked

17   to do so without that right, I, simply put, would not enter

18   into it.

19          Candidly, I don't think anyone in the marketplace

20   would.  The fact is these agreements are structured so that a

21   person in Credit Suisse's position upon the occurrence of an

22   event to default would have the right to sell not only the

23   loans but the servicing rights and move on.

24          As you may know, these agreements are throughout the

25   industry.  This is how the mortgage industry provides liquidity

1    to mortgage originators such as American Home, and without

2    these arrangements, originators such as American Home would not

3    have the capital to make the loans.

4    Q    What -- what impact on -- on that process do you think it

5    would have if the originators were able to retain the servicing

6    rights even though they became insolvent?

7    A    Credit Suisse would not be in the business of entering

8    into master repurchase agreements.  We would presumably

9    discontinue the current arrangements we have, and in all

10   likelihood, I would imagine the rest of the industry would

11   follow suit.  It's not -- it's not the basis upon which you

12   enter into these arrangements.

13   Q    What effect would that have on the mortgage market?

14   A    Certainly.  These master repurchase agreements provide

15   capital for mortgage originators such as American Home to run

16   their day-to-day business, to make mortgage loans

17   prospectively.  Without these arrangements, they would not have

18   the capital to make the loans.  Without the capital to make

19   these loans, they would not do what they do.  Without doing

20   what they do, individual borrowers would not have mortgage --

21   mortgages made available to them.

22   Q    I'd like to ask you about one subject that I had not

23   intended to, Mr. Kaiserman, but based on the statements by

24   American Home, are you familiar with the margin call provision

25   in the repurchase agreement between Credit Suisse and American

1    Home?

2    A     I am.

3    Q     And what -- what's your understanding of the way the

4    margin call process works in terms of whether margin calls are

5    based on deficiencies regarding particular loans or the overall

6    value of the portfolio?

7    A     Certainly.  Under the terms of the agreement, I am of the

8    opinion that Credit Suisse in its reasonable good faith

9    judgment could make the determination that a particular

10   transaction, meaning one individual mortgage loan, was no

11   longer valued appropriately, and as such, a margin call for

12   that one particular loan would be in order.

13          We could also do it on multiple assets, meaning

14   mortgage loans, that were, again, not appropriately valued and

15   issue a margin call, whether it's on that individual mortgage

16   loan or a group of mortgage loans, again, as determined by us

17   in our good faith, and that is the way all of our agreements

18   operate as well as the industry generally.

19   Q     And is that your actual practice?

20   A     Yes, sir.

21   Q     And does that practice include making margin calls on

22   individual loan deficiencies regardless of the valuation of the

23   overall portfolio?

24   A     Yes, sir.  Again, it's on an asset-by-asset basis.

25          MR. COMET:  I have no further questions at this time,

Kaiserman - Direct                                        57

1    Your Honor.

2              THE COURT:  Let's take a short recess before we

3    proceed with cross-examination.  So take five or ten-minute

4    recess.  Sir, you're still under oath, and you're subject to

5    cross-examination.  You may not discuss the subject of your

6    testimony with counsel or Credit Suisse during the break.

7              MR. KAISERMAN:  Certainly.

8              THE COURT:  All right.  We'll take a ten-minute

9    recess.

10                           (Pause)

11             THE CLERK:  All rise.

12             THE COURT:  Please be seated.  Please be seated.

13   This is Government equipment.  It can only stand so much use.

14   That's all there is to it. Mr. Dorsey.  Let's see, you need a

15   witness.

16             MR. DORSEY:  Yes, Judge.

17             THE COURT:  Please retake the stand, sir.  Is it --

18   it's Kaiserman, is that correct?

19             MR. KAISERMAN:  Yes.

20             THE COURT:  Please take the stand, Mr. Kaiserman.

21   You're still under oath.  Mr. Dorsey, you may proceed.

22             MR. DORSEY:  Thank you, Your Honor.  John Dorsey on

23   behalf of the debtors.

24                      CROSS-EXAMINATION

25   BY MR. DORSEY:

1    Q    Mr. Kaiserman, were you involved in the negotiation of the

2    agreement between CSFB and the debtors?

3    A    No, sir.  I was not.

4    Q    But you've testified you are familiar with the terms of

5    that agreement?

6    A    Yes, sir.

7    Q    And that's from your reading that agreement, correct?

8    A    Yes, sir, as well as the forms on which our arrangements

9    are based.

10   Q    And then you're familiar with the margin call provisions

11   of the agreement?  In fact, you testified about what the margin

12   call provisions are, correct?

13   A    Yes, sir.

14   Q    And you're familiar then with what the requirements are

15   for giving notice to the debt in the event of a margin call?

16   A    I'm familiar generally with the requirements regarding

17   notice.

18   Q    And Section 6 of the agreement requires that there is a

19   notice to the debtors of a margin call, correct?

20   A    I would need to look at the agreement.

21            MR. DORSEY:  Is there -- is there a binder?  Do you

22   have the binder in front of you there?

23   BY MR. DORSEY:

24   Q    I believe this is exhibit 1 in the binder.

25   A    Yes, sir.

1    Q    And if we could turn to Section 6.

2              THE COURT:  Let me ask a question.  Is there any

3    difference between exhibit 1 to the binder and what was

4    attached as -- as an exhibit to the complaint filed by the

5    plaintiff?

6              MR. COMET:  I don't believe so.

7              THE COURT:  All right.  I'm going to follow along

8    with my copy then if that's all right, which I've already read

9    and marked.

10   BY MR. DORSEY:

11   Q    Do you have that in front of you, sir?

12   A    I do.

13   Q    And Section 6A states that in the event that there is a

14   need to make a margin call, the buyer may notice to any seller

15   -- require sellers to transfer -- let me -- let me strike that

16   and start over again since I only read part of the sentence.

17              "If at any time the market value of any purchased

18              asset subject to a transaction is less than the

19              buyer's margin account for such transaction (a

20              "margin deficit"), then buyer may by notice to any

21              seller require seller to transfer to buyer cash in an

22              amount at least equal to the margin deficit (a

23              "margin call")."

24              Correct?

25   A    Yes, sir.

Kaiserman - Cross                                    60

1  Q    So if there is going to be a margin call, it has to be
2  made by notice to the debtor.  Otherwise, they wouldn't even
3  know there was a margin call, would they?
4  A    I didn't say that.  I think you said that.  It says the
5  buyer may.
6  Q    So is it your testimony that the buyer can declare a
7  margin call without letting the debtors know?
8  A    I didn't say that.  I'm telling you what this says.  It
9  says the buyer may.
10 Q    May make a margin call.
11 A    Yeah.
12 Q    And if it makes a margin call, it has to be by notice,
13 correct?
14 A    That's what it looks to say.  Yeah.
15 Q    Okay.  And it also says in section B that any notice must
16 be in writing, any -- any written means, correct?
17 A    It says may be given by any written means.  That's what it
18 says.
19 Q    Okay.  And if we turn to Section 20 please of the
20 agreement.  It's captioned notices and other communications.
21 Do you have that open, sir?
22 A    Not yet.  Which page is that?
23 Q    Page 58.
24 A    Okay, sir.
25 Q    It says there that --

1          "Any and all notices...[and then there is a paren

2          that gives certain exceptions...] statements,

3          demands, or other communications hereunder may be

4          given by a party to the other by [and it lists

5          several different ways] e-mail, facsimile, messenger,

6          or otherwise to the address specified below."

7          Do you see that?

8   A    I do.

9   Q    So if there is going to be a margin call, there has to be

10  a notice given, and according to Section 20, the notice has to

11  be sent to the person specified below, correct?

12          MR. COMET:  Objection, Your Honor.

13          THE COURT:  Basis?

14          MR. COMET:  He's misrepresenting the contents of the

15  agreement.

16          MR. DORSEY:  I'm reading it verbatim, Your Honor.  I

17  don't know how I'm representing -- misrepresenting anything.

18          THE COURT:  And how -- wait a minute.  Let's get to

19  what the objection is.

20          MR. COMET:  He --

21          MR. DORSEY:  Your Honor, I -- can we excuse the

22  witness, because I'm concerned that this objection is going to

23  be to try to instruct the witness on how to answer this

24  question.

25          THE COURT:  All right.  The witness will remove

1   himself to the hallway, please.  All right.  You may proceed.

2               MR. COMET:  All right.  Your Honor --

3               THE COURT:  You may be seated.  It's just as easy.

4   That way, the mic picks you up.

5               MR. COMET:  Your Honor, I mean, preliminarily, the

6   agreement I believe speaks for itself, but Mr. Dorsey is

7   phrasing a question as if he's asking the witness what this

8   specific section says when he's really combining two different

9   sections of the agreement, and that -- that  is the issue, as

10  he knows, it's raised in the papers, whether this section

11  applies to Section 6.  It doesn't apply to Section 6.

12              I also believe that this -- this is beyond the scope

13  of direct examination, Your Honor.  I did not ask Mr. Kaiserman

14  any questions about the method of notice of the agreement.  So

15  he's now -- he's asking him what the document says on a matter

16  that's beyond the scope of cross I think at some point in the

17  question, and I object on both grounds.

18              THE COURT:  Mr. Dorsey?

19              MR. DORSEY:  We'll take the second one first,

20  Your Honor.  This is a preliminary injunction hearing.  We're

21  working on the fly here.  There has been no discovery.  The

22  witness opened the door himself by talking about the provisions

23  of the agreement, and particularly, the provisions relating to

24  margin calls.  So I think it's completely fair game to ask him

25  about the notice.

1          THE COURT:  I agree.  That part of the objection is

2     overruled.

3          MR. DORSEY:  The second one, I asked him specifically

4     about Section 6 and the requirement that if there is a margin

5     call, the margin call has to be made by notice.  I then asked

6     him about Section 20 which says if there are notices, those

7     notices have to be provided to certain persons.  That's the

8     only question I asked him, Your Honor.

9          THE COURT:  Well, I'm going to overrule the

10    objection.  I think that, you know, Mr. Dorsey is permitted to

11    explore the possible ambiguity between the two sections.  The

12    witness is more than capable of parsing through the documents.

13    That's clear.  I believe he even has legal training, if I

14    remember correctly from his affidavit.

15         So I don't think there is any danger that the witness

16    will be unduly confused, and you'll certainly have the

17    opportunity to redirect if you believe that Mr. Dorsey has

18    misstated what the documents say.  So the objection is

19    overruled.

20         If I could ask someone -- maybe Mr. Riley, if you

21    could ask the witness to please return, I'd appreciate it.

22    Thank you, sir.

23                         (Pause)

24         THE COURT:  Thank you, sir.  You may be seated.

25    BY MR. DORSEY:

1    Q    Mr. Kaiserman, I believe my last question was if a notice

2    is required to be given under the terms of this agreement,

3    under Section 20, that notice has to be given to certain

4    parties, is that correct?

5    A    Just take me a minute to read it.

6    Q    Certainly.

7                              (Pause)

8    A    It appears as though it -- it says they may be given.  It

9    doesn't say they shall.  Now, I don't know if there is a

10   distinction, but it seems to say they may be given this way.

11   My reading would say they may, they may not.  Maybe another way

12   could be given.

13   BY MR. DORSEY:

14   Q    So your testimony is that if a notice has to be given for

15   a margin call under Section 6, that the CSFB was not required

16   to provide that notice to the persons listed in Section 20.

17   A    It says may.  I don't know what the word may means to you.

18   Q    Can you answer my question please, sir?

19   A    Yes.

20   Q    Are you a bankruptcy lawyer, Mr. Kaiserman?

21   A    No.

22   Q    Are you familiar with the provisions of the Bankruptcy

23   Code dealing with how executory contracts are dealt with in

24   bankruptcy?

25   A    No.

1    Q    Are you familiar with what happens to an executory

2    contract where there is no valid prepetition termination of a

3    contract?

4    A    No.

5    Q    I'd like to turn to your testimony about the harm that

6    CSFB is going to suffer if these servicing rights aren't turned

7    back over.  First you testified that you can't determine

8    whether or not the loans are being properly serviced, correct?

9    A    Yes.

10   Q    And what have you done to determine whether or not the

11   loans are being properly serviced at this time?

12   A    I personally have not done anything.  However, my opinion

13   is based upon how the company is currently managing its

14   affairs.

15            MR. DORSEY:  Move to strike, Your Honor.

16   Nonresponsive.  I asked him what he did, not what his opinion

17   is.

18            THE COURT:  Overruled.  He can explain.

19   A    My opinion is based on my belief that the company as a

20   debtor in bankruptcy and its employees are no longer

21   functioning in an orderly fashion, and as such, I have great

22   concerns and no way to verify absent doing it myself how the

23   loans are being serviced.  As I mentioned during my testimony,

24   what I said was we own a company that services about -- a

25   substantial number of mortgage loans similar to American Home,

1  and to actually go in and monitor it would require someone

2  actually to stand there and oversee it or do it themselves.

3  Q    How many American Home employees have you spoken to since

4  the filing of the bankruptcy petition?

5  A    None.

6  Q    And how many American Home employees have left employment

7  at American Home since the filing of the bankruptcy petition?

8  A    Well, according to the paper, I think 90 percent of the

9  staff was let go.

10 Q    How many of the servicing employees have left?

11 A    The paper did not specify, sir.

12 Q    So you don't know.

13 A    That's correct, sir.

14 Q    And are you aware that there was a employee retention

15 program that was approved by this Court on the first day of the

16 filing of the bankruptcy?

17 A    Yes.

18 Q    You mentioned -- you filed an affidavit in this case,

19 correct?

20 A    Yes.

21 Q    And in your affidavit, you make mention of your

22 involvement in the purchase of the Fairbanks Capital assets,

23 correct?

24 A    Yes.

25 Q    What is Fairbanks Capital?

1   A    Fairbanks Capital is a servicer of mortgage loans.  They

2   are now known as Select Portfolio Servicing.

3   Q    Isn't it true, sir, that they were actually known as

4   Select Servicing even before they were purchased by CSFB?

5   A    No, sir.

6   Q    It is not true?

7   A    That's not true.

8   Q    Okay.  When did Credit Suisse buy the assets of Fairbanks

9   Capital?

10  A    I believe we closed in October of 2005.

11           MR. DORSEY:  May I approach the witness,

12  Your Honor --

13           THE COURT:  Yes.

14           MR. DORSEY:  -- and the clerk, and Your Honor?

15           THE COURT:  Yes.  Thank you.

16           MR. KAISERMAN:  Thank you.

17           MR. DORSEY:  I'm not sure what document number this

18  is, Your Honor.

19           THE COURT:  Well, I have --

20           MR. DORSEY:  For purposes of referring to it for

21  identification purposes.

22           THE COURT:  You can call it whatever you like.  I

23  have -- the only documents so far were Credit Suisse exhibits 1

24  through 7.  So I don't know what you want to -- you want to

25  call it debtor 1?

1          MR. DORSEY:  Yes, Your Honor.

2          MR. KIRPALANI:  Don't do that.

3          THE COURT:  Don't do that Mr. Kirpalani says.

4          MR. DORSEY:  I -- I've been informed we already have

5    1 through 6, Your Honor.  So for purposes of now, I won't refer

6    to it as any exhibit number --

7          THE COURT:  All right.

8          MR. DORSEY:  -- and see if we're even going to admit

9    it into evidence or just use it for --

10         THE COURT:  Very well.

11         MR. DORSEY:  -- impeachment purposes.

12   BY MR. DORSEY:

13   Q    Do you have this document in front of you that is titled

14   "SPS For Immediate Release, Select Portfolio Servicing,

15   Fairbanks Capital, Changes to Select Portfolio Servicing,

16   Inc."?

17   A    I do, sir.

18   Q    And do you see the date of this press release as July 1,

19   2004?

20   A    Yes.

21   Q    And it says --

22              "Fairbanks Capital Corp today announced it has

23              officially changed its name to Select Portfolio

24              Servicing, Inc."

25              Correct?

1    A    Yes.

2    Q    And that was before the time that CSFB purchased SPS?

3    A    Yes.

4    Q    What kind of a servicing company was SPS at the time it

5    was purchased by CFB?

6    A    I don't understand the question.

7    Q    What kind of loans did it service?

8    A    Mortgage loans.

9    Q    What kind of mortgage loans?

10   A    Are you referring to the type of credit?

11   Q    Yes.

12   A    The type of credit of the loans that were serviced by

13   Select Portfolio varied.  Some of them were subprime loans.

14   Some of them were second lien loans.  Some of them were all day

15   loans, and a small portion were prime loans.

16   Q    So these were mostly subprime loans?

17   A    I didn't say that.  I said some of them were subprime.

18            MR. DORSEY:  May I approach again, Your Honor?

19            THE COURT:  Uh-huh.

20            MR. KAISERMAN:  Thank you.

21   BY MR. DORSEY:

22   Q    Do you have in front of you, sir, the document that I just

23   handed you which is a press release from Credit Suisse First

24   Boston dated August 12, 2005?

25   A    Yes, sir.

1    Q    And at the bottom of this press release -- or this is a

2    press release that describes the purchase of the SPS assets by

3    Credit Suisse, correct?

4    A    Yes.

5    Q    And if you turn to -- draw your attention to -- drawn your

6    attention to the last paragraph above the cautionary statement,

7    do you see that?

8    A    I do, sir.

9    Q    It says --

10            "SPS, a leading nonprime residential mortgage loan

11            servicers, is headquartered in Salt Lake City..."

12   A    Yes, sir.

13   Q    (Reading)

14            "...with facilities Jacksonville..."

15   A    Yes, sir.

16   Q    (Reading)

17            "...and SPS services approximately 270,000 nonprime

18            residential mortgage loans."

19            Correct?

20   A    Yes, sir.

21   Q    And that was a press release that CSFB put out when it

22   purchased those assets?

23   A    Yes, sir.  I think it's important to distinguish what is

24   meant by nonprime.  Nonprime means something other than prime,

25   and as such, could be construed to mean everything other than

1   prime loans.  So keep in mind when it says 270,000 nonprime

2   loans, it means loans other than prime loans.

3   Q    It also describes SPS as being a leading servicer --

4   service provider, correct?

5   A    It says nonprime, sir.

6   Q    A leading nonprime service provider?

7   A    Yes.

8   Q    Okay.  Is there anything in this press release that says

9   SPS was in financial crisis at the time of the purchase?

10  A    No, sir, but as is widely known, it was fined

11  $40.0 million by the Federal Trade Commission, and as such, was

12  under severe distress.  Furthermore, its servicer rating, much

13  like American Home, has been downgraded.  So yes, it was under

14  distress.

15  Q    Has American Home been fined for anything?

16  A    Not to my knowledge.

17  Q    You mentioned CSFB's involvement with the New Century

18  case.  Do you recall that?

19  A    Yes.

20  Q    And because of the involvement in the New Century case,

21  you believe that the mortgages in this -- in American Home's

22  portfolio will not be serviced properly, correct?

23  A    Yes.

24  Q    What kind of a mortgage company was New Century?  What

25  kind of mortgage loans did it service?

1    A    It serviced all day and nonprime subprime loans.

2    Q    And you mentioned that there were -- the default rate went

3    up at the time you were involved in the New Century bankruptcy,

4    correct?

5    A    What I said was the borrowers had indicated concern over

6    remitting payments to a company in bankruptcy.  I think I also

7    said my assumption, my belief is that a company in bankruptcy

8    and its employees will no longer be functioning as they were

9    outside of bankruptcy, and in particular, would be concerned

10   about their livelihood and their jobs.

11   Q    Well, I believe you testified also that collections

12   suffered during that period.

13   A    Yes.

14   Q    And collections would be the amount of money that the

15   servicer is collecting from the underlying borrowers on the

16   mortgages?

17   A    Yes.

18   Q    And are you aware of -- and that would be called a

19   delinquency, correct, if a mortgagee or mortgagor is not paying

20   promptly?

21   A    Yes.

22   Q    And are you aware of what the delinquency rate is for

23   American Home products since the filing of the bankruptcy

24   proceeding?

25   A    No.

1  Q    Do you know whether American Home Mortgage's delinquency

2  rate has gone up or down since the filing of the bankruptcy

3  proceeding?

4  A    No.

5  Q    You mentioned during your direct examination that a buyer

6  of scratch and loan dents wouldn't buy those loans without the

7  servicing as well, correct?

8  A    I think what I said was being able to select who services

9  them, whether they buy the servicing rights or appoint their

10  own servicer and sell the servicing rights to them.  That was

11  my intent.

12  Q    And under Section 16 of the master agreement, it states

13  that in the event of a default, CSFB can sell the underlying

14  mortgages with the servicing rights released or the servicing

15  rights retained, correct?

16  A    Yes, sir.

17  Q    And in the event the mortgages are sold with the servicing

18  rights retained, then CSFB has to give credit to American Home

19  for the fair market value of those servicing rights, correct?

20  A    Correct.

21  Q    And how would one go about determining what the fair

22  market value of those servicing rights are?

23  A    In the same way that they would determine the value of a

24  mortgage loan.  It's just a stream of funds that will be paid

25  over a period of time.  It's a discounted cash flow analysis.

1    Q    And I believe you also testified that nobody would buy

2    these loans without being able to -- well, you testified about

3    the -- about being able to select the servicer or service it

4    themselves, correct?

5    A    Correct.

6    Q    Okay.  Are you aware that Bear Sterns has already sold the

7    underlying mortgages in its portfolio without the servicing

8    rights attached?

9    A    No.

10   Q    When CSFB first purchased the mortgages that form the

11   portfolio that we're talking about today, what due diligence

12   did they do on those mortgages?

13   A    I'm sorry?

14   Q    What due diligence did CSFB do when they purchased

15   mortgages under the master agreement?

16   A    Nothing.

17   Q    They didn't look at the value of the underlying assets?

18   A    When you say underlying assets, what are you referring to?

19   Q    The real estate that forms the basis for the mortgage

20   loan.

21   A    We were given data about the value of the underlying real

22   estate, and we used it as part of the information furnished

23   from American Home.

24   Q    So CSFB didn't do any independent due diligence?

25   A    On the underlying real estate value?

Kaiserman - Cross                                        75

1    Q    Yes.

2    A    No, sir.

3    Q    Did it do any due diligence with regard to the assets that

4    it was purchasing?

5    A    As is common in the industry, parties entering into a

6    master repurchase agreement do not perform the type of

7    diligence that you're describing.  So we did not nor does

8    anyone in the industry.

9    Q    At the time of the purchase of these mortgages by CSFB,

10   how many of them were already aged out?

11   A    I don't recall, sir.

12   Q    All right.

13   A    I'd have to go back and --

14           THE COURT:  Already what, Mr. Dorsey?  I'm sorry.

15           MR. DORSEY:  Aged out, Your Honor.

16           THE COURT:  Aged out?

17           MR. DORSEY:  Yes.

18           THE COURT:  All right.

19   BY MR. DORSEY:

20   Q    Maybe you could explain to the Court what that means to

21   have a loan that's aged out.

22   A    It's your word, not mine.  You better explain.  I answered

23   it meaning the loan has -- has been paying or has been

24   outstanding for a period of time, aged from the date of the

25   origination.  I don't know how you're using it.

1    Q    That's what I meant too.  And when they reach a certain

2    age, then there is a --

3                   THE COURT:  Stop.

4    BY MR. DORSEY:

5         Q    -- discount.

6                   THE COURT:  Stop.  I'm glad you both agree.  I don't

7    understand.  Explain to me what aged out means.

8                   MR. KAISERMAN:  Sure.  If a loan was closed today, in

9    30 days time, it would be deemed aged out 30 days in 30 days

10   from now, and similarly, in 60 days, it would be 60 days aged

11   out.

12                  THE COURT:  Okay.  So all loans are aged out as soon

13   as they're one day past closing.

14                  MR. KAISERMAN:  Yes, sir.

15                  THE COURT:  All right.

16   BY MR. DORSEY:

17   Q    And when they reach a certain level of being aged out, a

18   certain number of days out after the closing, those loans are

19   discounted, correct?

20   A    Yes, sir.

21   Q    And -- but you're not aware at this point how many of

22   those loans in the portfolio at the time they were purchased by

23   CSFB were aged out to the point where the lowest discount had

24   already been applied?

25   A    I'm not personally aware of it.  No.

1  Q    Okay.  And how many of the loans in the portfolio that was

2  purchased by CSFB were already more than 90 days in default on

3  mortgage payments?  Do you know?

4  A    I don't, sir.

5  Q    When purchasing a mortgage portfolio, does CSFB take those

6  into -- those two things into account, whether the loans are

7  aged out to the lowest level and whether or not they're in

8  default?

9           MR. COMET:  I would object, Your Honor, only in that

10 I think the question is very unclear, because Mr. Dorsey isn't

11 saying purchased under what kind of arrangement.  There are

12 many ways to purchase a portfolio, and I think -- I don't want

13 to say any more because he'll accuse me of coaching the

14 witness, but I think he understands what I'm saying.

15           MR. DORSEY:  I'll rephrase the question, Your Honor.

16 BY MR. DORSEY:

17 Q    In purchasing the loans pursuant to the master agreement

18 in place between the parties in this case, did -- does CSFB

19 take into account the number of loans that already aged out to

20 the lowest point and the number of loans that are already in

21 default 90 days or more in determining how much they're going

22 to loan to American Home under those loans?

23 A    First of all, we didn't loan anything.  We purchased the

24 mortgages, but yes, sir, we would take into account how far

25 aged out they are as well as the related delinquencies in order

1    to come up with the amount of money we would purchase the

2    mortgage loans for.

3              MR. DORSEY:  Can I just have one moment, Your Honor?

4                         (Pause)

5              MR. DORSEY:  No further questions, Your Honor.

6              THE COURT:  Redirect?

7              MR. COMET:  Give me one moment, Your Honor.

8                         (Pause)

9              MR. COMET:  I have no further questions, Your Honor,

10   at this time.  I would like to reserve the right to possibly

11   recall Mr. Kaiserman on rebuttal depending on the testimony put

12   on by the --

13             THE COURT:  All right.  You may step down, sir.

14             MR. KAISERMAN:  Thank you.

15        (Witness excused)

16             THE COURT:  Any further witnesses, Mr. Comet?

17             MR. COMET:  No, Your Honor.  We have no further

18   witnesses at this time.  As I indicated, based on the issues

19   that were identified in the papers, I believe that between the

20   exhibits that we've introduced and Mr. Kaiserman's testimony,

21   we've addressed any areas of factual dispute or concern.  The

22   remaining issues are legal ones.

23             THE COURT:  All right.  So you rest your case.

24             MR. COMET:  Yes, for purposes of this hearing.

25             THE COURT:  Okay.  Reserving your right to present a

1    rebuttal case, of course.

2              MR. COMET:  Yes, Your Honor.

3              THE COURT:  All right.  Mr. Dorsey, evidence?

4              MR. DORSEY:  Thank you, Your Honor.  The debtors

5    would call Robert Love, Jr. to the stand.

6              THE COURT:  All right.

7              THE CLERK:  Please place your hand on the Bible.

8    Please state your full name and spell your last name for the

9    record.

10             MR. LOVE:  Robert L. Love, Jr.  The last name is

11   spelled L O V E.

12           R O B E R T   L O V E, DEFENDANT'S WITNESS, SWORN

13             THE CLERK:  Thank you.  You may be seated.

14                        DIRECT EXAMINATION

15   BY MR. DORSEY:

16   Q    Good afternoon, Mr. Love.

17   A    Good afternoon.

18   Q    Could you please tell the Court how you are currently

19   employed?

20   A    I am currently employed as the vice president at American

21   Home Mortgage Servicing.

22   Q    You might need to get a little bit closer to the

23   microphone and speak up so the Court can hear you.

24   A    Sure.  I'm currently employed as the vice president at

25   American Home Mortgage Servicing, Inc.

Love - Direct                                                    80

1    Q    What are your responsibilities in that position?

2    A    In that position, I'm a member of the senior management

3    team at American Home Mortgage Servicing.  The areas that I am

4    directly responsible for include loan sales and all service and

5    transfers either to -- to HM Servicing or away from HM

6    Servicing to other entities.  As a member of the senior

7    management team, I'm also involved in working with other

8    members of the senior management team on different projects or

9    new initiatives that come up, including -- at this point in

10   time would be things such as the -- the bankruptcy case and the

11   pending sale of American Home Servicing, Inc.

12   Q    How long have you been employed by American Home

13   Servicing?

14   A    I started with American Home Mortgage when they purchased

15   Columbia National, Inc. in June of 2002.

16   Q    And have you been employed with them continuously since

17   that time?

18   A    Yes, I have.

19   Q    Could you describe for the Court how American Home

20   Servicing operated on a day-to-day basis prior to the filing of

21   the bankruptcy petition in this case?

22   A    On a -- on a day-to-day basis prior to the filing of the

23   bankruptcy case, American Home Mortgage Servicing was engaged

24   in -- in the servicing business of mortgage loans which

25   includes everything from fielding customer questions through a

1    customer service call center, the administration of tax and

2    insurance, payments on behalf of the debtors out of their

3    escrowed accounts, collections of mortgage loans all the way

4    through the default process which could include bankruptcy,

5    foreclose, REO, a loss mitigation process prior to that.

6           The other pieces involved with the servicing business

7    in general have to do with applying -- you know, receiving and

8    applying the debtor's payments correctly to the system and

9    accounting for the payments in cash as they come in both on the

10   loan level and in an aggregate as they would roll up to have

11   those payments remitted out to the various investors that own

12   the underlying loans.

13   Q    Could you describe for the Court please how on an

14   individual loan basis, when a payment is received how that gets

15   handled at -- how it was handled prepetition at American

16   Home --

17   A    Sure.

18   Q    -- Servicing?

19   A    Prepetition, if -- if a customer were to send a payment to

20   us which would come to American Home Mortgage Servicing in a

21   number of different varieties, but to take the simplest

22   approach would be just say that you were a borrower and you

23   mailed your payment to us in the form of a check along with

24   your -- the coupon from your -- your monthly statement.  That

25   payment would come to our lockbox facility as it's called which

1    is run by J.P. Morgan Chase, which is located just a few miles

2    from our Irving, Texas facility.

3            When they would receive that check, they would

4    deposit the funds to our payment clearing account, which is

5    where all the payments received will come in.  They would enter

6    the information for that particular borrower, their loan

7    number, and the total amount of money that was received on that

8    payment.

9            When that information would come into the servicing

10   system, the payment application program would take the

11   information for that loan as well as every loan that day or in

12   that transmission and would apply the funds appropriately,

13   broken out into the buckets as it should be applied, and by the

14   buckets, what I mean is the portion of the payment that would

15   go to pay down principal, what portion goes to interest, and if

16   applicable, what portion would go to escrows or possibly

17   optional products.

18           When that happens, the loan servicing system knows

19   that that particular loan is assigned to an investor category

20   within the servicing system.  The servicing system then knows

21   that for that particular loan and that investor code that it's

22   associated with has individual bank accounts that are tied to

23   that investor code.  Each investor code is going to have two

24   separate bank accounts tied to it.  One will be for principal

25   and interest collections, and the other will be for taxes and

1    insurance.  It's usually referred to as a T and I account, and

2    that's for the escrow portion of the payments, as I explained,

3    how they're broken up into the -- the different buckets

4    according to the system.

5              During the overnight process then, the banking

6    program within the servicing system will know that however much

7    money was received on that particular loan broken into the

8    various buckets needs to be transferred from the payment

9    clearing account to the bank accounts tied to that particular

10   investor code.

11   Q    Prior to the filing of the bankruptcy, how then once the

12   money was collected into the accounts was that then distributed

13   to the various investors that you referred to?

14   A    The -- the investor reporting department at American Home

15   Mortgage Servicing has those responsibilities for -- for most

16   of the investors for which we would service.  They prepare

17   reports and remit payments out to the investors usually on a

18   monthly basis is usually the cycle typically that those fall

19   under.

20   Q    And when you say investors, what are you -- what are you

21   referring to?

22   A    The investors would be whoever owns the -- owns the loans

23   that are housed in that investor.  They could be a combination

24   of -- it could be securitization trusts that own the loans that

25   are grouped.  It could be private investors that own the loans.

1  It could also be investors that have bought loans that AHM is

2  just interim servicing until a predetermined or prescheduled

3  servicing transfer date.

4  Q    How were the funds coming in that were related

5  specifically to CSFB handled prior to the filing of the

6  bankruptcy?

7  A    Prior to the filing of the bankruptcy, and really, prior

8  to -- a few days prior to the filing of the bankruptcy, the

9  loans specifically owned by CSFB as well as the rest of the

10 warehouse lenders as we refer to them in servicing were grouped

11 in a series of what we would refer to as warehouse accounts.

12 They were not specifically segregated to line up exactly with

13 each warehouse lender.  The funds were swept back to a

14 corporate account each night.  Nightly warehouse collections

15 were swept back, and from there, the actual breakout of which

16 loans dynamically moved to and from which warehouse lines was a

17 function that's handled by the -- was handled by corporate

18 accounting and the treasury departments.

19 Q    And what happened a few days before the filing of the

20 bankruptcy with regard to the handling of the CSFB accounts?

21 A    A few days prior to the filing of the bankruptcy, American

22 Home Mortgage Servicing was requested to open up new bank

23 accounts specifically titled to the benefit of Credit Suisse

24 specifically for the loans that were on their facility at that

25 time.  We were also asked to open a new investor code within

1    the servicing system to move all those loans within the

2    servicing system and segregate them within that investor code.

3    Q    And when you say segregate within the investor code, what

4    do you mean by that?

5    A    What I mean is that we set up -- for this purpose, it was

6    investor code 6 is now -- now is where all the loans associated

7    with the CSFB line are located or tied to within the servicing

8    system.  So when we talk about transferring a loan within

9    investor codes in the servicing system, it's changing the --

10   the designation of where that loan is linked to which then

11   correspondingly ties to what bank accounts any collections that

12   come in on those loans are tied to.

13   Q    So if I understand your testimony then, there are now

14   separate accounts just for Credit Suisse?

15   A    That is correct.  For Credit Suisse with respect to the

16   loans that would fall under the agreement in the matter that

17   we're talking about today, there are two separate accounts that

18   have been set up and established at J.P. Morgan Chase.  One is

19   where all of the P and I collections that have posted onto the

20   loans from August 1st and forward would currently be deposited

21   and every day continue to be deposited through the routine that

22   I had mentioned before where payments come into the payment

23   clearing and then through the banking program would get moved

24   to that bank account, and the second bank account is a T and I

25   account which any of the funds that get posted that should

1    apply to taxes and insurance payments would move as well

2    through the same process.

3    Q    And what will happen to the money that's collected in the

4    P and I account?

5    A    The money in the P and I account will continue to collect

6    in the bank account that is titled to CSFB's benefit until a

7    point where, you know, American Home Mortgage Servicing, you

8    know, could be or would be directed to remit those funds from

9    -- from direction from our corporate office.

10   Q    Other than the setting up of the separate accounts for

11   CSFB and the way those funds now flow, has anything else

12   changed with how CSFB's loans are serviced on a day-to-day

13   basis?

14   A    No.  There has not been.

15   Q    How many employees were there at CSFB -- or excuse me --

16   at American Home Servicing prior to the filing of the

17   bankruptcy?

18   A    Prior to the filing of the bankruptcy, American Home

19   Mortgage Servicing consisted of somewhere approximately around

20   475 employees, an aggregate which also included somewhere in

21   the neighborhood of 50 employees that are not directly under

22   the American Home Mortgage Servicing umbrella but provide

23   support functions for American Home Mortgage Servicing.  The

24   support functions would include employees that would fall under

25   other departments such as, you know, information technology

Love - Direct                                                    87

1    departments, training and performance improvement departments.

2    We have on-site HRM. recruiters that were part of that number.

3    Q    And how many people have left American Home Servicing

4    since the filing of the bankruptcy petition?

5    A    From discussions that I've had with the other senior

6    management as well as just other employees in general, to the

7    best of my knowledge through yesterday, there have been two

8    employees that have left American Home Servicing since the

9    filing of the bankruptcy.

10   Q    Is that unusual compared to the number of employees who

11   left on a bi-weekly basis prior to the filing of the

12   bankruptcy?

13   A    Definitely not.

14   Q    Are the employees aware of the fact that American Home has

15   filed for bankruptcy?

16   A    Yes.  The -- the employees are very aware for a number of

17   reasons.  Obviously, the -- the fact that the information was

18   all over the -- the news and everything else that it meant for

19   American Home as a -- as a global company.

20            The other way that they're most directly involved in

21   knowing what's going on is that David Friedman, who is the

22   executive vice president in charge of American Home Mortgage

23   Servicing has met I believe three times over the past few weeks

24   with all the employees to go over and keep them informed as to

25   where things are in the process and, you know, what is

Love - Direct                                                    88

1    important for them to understand and to know.

2    Q    What steps, if anything, did American Home Servicing take

3    prior to the filing of the bankruptcy petition to try and

4    prepare for the fact that the company was going into

5    bankruptcy.

6    A    Prior to the filing of the bankruptcy, American Home

7    Mortgage Servicing worked very diligently to help prepare a

8    number of the day one motions that were presented before the

9    Court to insure that we would be able to continue to conduct

10   our business without interruption.

11   Q    What type of motions were you involved with?

12   A    I was involved with the critical vendor motion as well as

13   to some outside degree the -- the noninsider employer retention

14   policy just from -- just from the aspect of actually knowing

15   what was being presented, not actually working on anything that

16   had to do with preparing it.

17   Q    Why did American Home Servicing take those steps prior to

18   filing bankruptcy?

19   A    We felt that it would be critical to our business to be

20   able to continue with as little interruption as possible.  The

21   noninsider employee retention program was in large part

22   specifically designed to help retain the servicing employees so

23   that they would stay intact.  The critical vendor motion was

24   one so that we could continue services uninterrupted without

25   running into problems with vendors that provide critical

1   services for servicing on a day-to-day basis so we can continue

2   our operations.

3   Q    Does American Home Servicing have a way to track the

4   delinquency rate for the mortgages that it services?

5   A    Yes.  We have -- we have several different ways that we

6   track delinquency on a daily basis, most commonly through a

7   series of reports that our collections department publishes

8   internally at American Home Mortgage Servicing.

9   Q    And has American Home Servicing continued to track that

10  delinquency rate on a daily basis?

11  A    Yes, we have, in the same fashion that we have previous to

12  filing the bankruptcy.

13  Q    And what is the latest data that you're aware of with

14  regard to the delinquency rate on the loans?

15  A    As of discussions that I've had this morning with -- with

16  David Friedman as well as the -- the head of our collections

17  unit, we are trending ahead in all buckets in delinquency this

18  month compared to the same time last month as you would look at

19  it with the same number of business days remaining in the

20  month.

21  Q    When you say trending ahead, what do you mean?

22  A    That the delinquency rate in each of the buckets -- and

23  when I refer to buckets, what I mean is the number of loans

24  that are due for the current month, which would be loans that

25  are still due for their 8/1 payment, loans that are currently

1   30 days delinquent, 60, 90, or 120 plus, and the delinquency

2   rates in each of those buckets today as we began the work day

3   was lower that they were the previous month at the same time.

4   Q    Does American Home Servicing get paid for the work it does

5   to service the CSFB loans?

6   A    We have historically been paid 12 1/2 basis points from

7   AHM Corporate --

8   Q    How --

9   A    -- for servicing all the warehouse loans.

10  Q    And how does that work?

11  A    We are credited a basis point fee off of collections that

12  are brought in on loans in the warehouse to my understanding.

13  Q    Are you familiar with the New Century bankruptcy case?

14  A    I am -- no.  I'm not familiar with the case other than I

15  know that they filed bankruptcy and what type of company it

16  was, but aside from that, I do not have any other detailed

17  knowledge about the case.

18  Q    What -- what was your understanding about the type of

19  company that New Century was?

20  A    From my understanding of the type of company New Century

21  was is it was a -- it was mainly a subprime mortgage servicer.

22  Q    And what kind of company is American Home?

23  A    American Home Mortgage is a company that focuses on prime

24  and alt-A loan originations, which would end up trickling down

25  to be the type of loans which American Home Mortgage Servicing

1    then is servicing.

2    Q    And what's the difference between a subprime and what you

3    just described that American Home does?

4    A    The -- the main difference in -- you know, my estimation

5    has to do, one, with the -- the credit quality of the -- of the

6    borrower at the time of origination as well as the -- you know,

7    the sophistication of the borrowers from our interactions with

8    them on our side and the -- you know, their willingness or

9    understanding of -- of what it would -- of what the

10   requirements are, obligations are under the loans to pay.

11   Q    How many loans does American Home Servicing service at the

12   current time?

13   A    Today beginning of the day we serviced somewhere --

14   somewhere around 235,000 active accounts on our servicing

15   system.

16   Q    And how much in terms of dollar amount does -- did those

17   loans represent?

18   A    I believe it's -- it's somewhere in the order of magnitude

19   of $57.0 billion or so of outstandings.

20   Q    And how much of that portfolio or how much of the entire

21   portfolio of American Home Servicing does CSFB represent?

22   A    CSFB represents somewhere around -- it's somewhere in the

23   40 to $45.0 million size of outstanding balance as it relates

24   to the customers loans.

25              MR. DORSEY:  Can I have just one moment, Your Honor?

1    I have nothing further, Your Honor.  Thank you.

2              THE COURT:  Cross?

3              MR. COMET:  Yes.

4                      CROSS-EXAMINATION

5    BY MR. COMET:

6    Q    Hello, Mr. Love.

7    A    Hello.

8    Q    My name is Howard Comet.  As I'm sure you're aware, I

9    represent Credit Suisse here.  Do you have any responsibilities

10   in connection with the process that American Home is involved

11   in for putting up servicing rights for sale in the near future?

12   A    I am -- I am involved in working with the investment

13   bankers to some degree in helping to prepare due diligence

14   materials for the sale of the servicing platform but not

15   necessarily the servicing rights from -- from a data

16   perspective.

17   Q    From a what perspective?

18   A    Sorry.  A data perspective, helping to gather data that

19   they would need.

20   Q    I'm not sure I understand the distinction.  What do you

21   mean, you're involved in selling the servicing platform?

22   A    Well, the servicing platform is actually the -- what would

23   be considered the servicing business, which would be the -- the

24   infrastructure, the capabilities as well as the current

25   employees.

1   Q    And in terms of individual servicing contracts, do you

2   have any responsibility regarding assignment or transfer of

3   those contracts?

4   A    Not as it would refer to transferring them.  No.

5   Q    I thought you had indicated in your testimony that you

6   were involved in the transfer of servicing to or from American

7   Home Mortgage Servicing.  Is that correct?

8   A    Yes.  I have different departments that facilitate the

9   transferring of servicing either from other servicers to our

10  platform or from our platform to subsequent servicers as it

11  relates to loans that we either buy or sell.

12  Q    Are your responsibilities in that connection just

13  operational as opposed to being involved in the negotiation of

14  the terms on which the transfer will occur?

15  A    I guess maybe if you could elaborate on what you mean by

16  the terms of the transfer.

17  Q    Well, for example, has American Home sometimes sold the

18  rights to servicing?

19  A    The way that it worked from a process perspective on new

20  loans that we were selling, the capital markets group at AHM

21  corporate were the ones that would put the packages out for

22  bid, and they would accept bids on both servicing released or

23  servicing retained basis.  They would then send the terms of

24  the trade down to us, which if it was a servicing release

25  trade, it would include what the servicing transfer date that

1    was negotiated was.

2    Q    But you would not be involved in those negotiations

3    whether it would be servicing released or servicing retained,

4    is that correct?

5    A    That's correct.  Not in that decision making process.

6    Q    How much money is in the principal and interest account of

7    segregated funds for Credit Suisse?

8    A    I don't know that number today.  It changes by the minute.

9    Q    By the minute?

10   A    Potentially.

11   Q    You don't make deposits once a day to the account?

12   A    Deposits come in several times throughout the day.  There

13   are several transmissions that come from our lock box provider

14   each day as well as we have automated transmissions that come

15   in through Western Union and CheckFree, which is a large

16   national company that provides on-line banking services for

17   many banks throughout the country.

18   Q    Do you know the amount that was in the account at any time

19   in the past few days?

20   A    There was -- over the past week, we were requested to

21   provide what a balance was.  I don't recall the balance

22   exactly, but I believe that the collections, from my memory,

23   somewhere around $60,000 had been deposited from 8/1 through

24   now, but I don't know that that number is -- is an exact number

25   or where it would be today, but somewhere in that order of

Love - Cross                                                95

1    magnitude, I believe.

2    Q    Have you tracked the delinquency rate specific to the

3    Credit Suisse loans?

4    A    Specific to that, no.

5    Q    Have you tracked the delinquency rate specific to scratch

6    and dent loans that are serviced by American Home?

7    A    We do publish stats on a -- on a monthly basis that would

8    break out loans by investor codes and their delinquency

9    performance.  We do have several investor codes which are

10   specific to scratch and dent securitizations that we have done

11   over time that would produce numbers of that -- along those

12   lines.

13   Q    But you haven't been tracking those numbers on a --

14   recently, is that correct?

15   A    The -- the last published reports that would have come out

16   would have been as of July 31st.

17   Q    And that was pre-bankruptcy, is that right?

18   A    That's correct.

19   Q    Have you reviewed at any time the repurchase agreement

20   between Credit Suisse and American Home?

21   A    Only very briefly over the last few days.

22   Q    Are you familiar with Section 12 of the agreement?

23   A    Not from memory.  No.

24   Q    Well, did you review the servicing section of the

25   agreement?

1    A    I reviewed the sections which I thought pertained to

2    servicing which were very -- very limited.

3    Q    Did you see any provision in there for any rate of

4    compensation to American Home for servicing?

5    A    I do not recall reading anything in the agreement that

6    would specifically apply to that.

7    Q    Now, you said that American Home corporate provides some

8    kind of fee to American Home Servicing for its servicing of the

9    loans that are owned by CSFB, is that correct?

10   A    That's correct.  It was not an agreement specifically set

11   up to address only the loans owned by CSFB, but to my

12   understanding, it's all loans that are in warehouse -- what we

13   consider warehouse that we service.

14   Q    And the same rate is applied to all the loans in warehouse

15   accounts, is that right?

16   A    With the exception of the Lehman Commercial Paper facility

17   that we service for, which is 50 basis points instead of 12

18   1/2.

19   Q    Do you know why there is that difference?

20   A    I do not.

21   Q    But aside from the Lehman one, all the other warehouse

22   line loans all have this 12 1/2 basis point rate, is that

23   correct?

24   A    That's my understanding.

25   Q    And do you know if that's an internal accounting division

1   of funds by American Home?

2   A    I don't know how that piece is handled.  I just know what

3   we get credit for.

4   Q    So you don't know the basis, for lack of a better word, on

5   which that basis point rate is determined, is that correct?

6   A    That's correct.

7   Q    Now, you testified that American Home is segregating the

8   funds that are coming in on the Credit Suisse loans into two

9   accounts, is that correct?

10  A    That's correct.

11  Q    And is that all of the payments that are coming in from

12  the borrowers on those loans?

13  A    It would be any payments that have been received and

14  posted to the accounts from the date of 8/1 and forward.

15  Q    But it's every penny in payments that has come in on those

16  loans since 8/1, is that correct?

17  A    I'm trying to think if there would be any exceptions to

18  that.  Hang on.  The only exception that I'm not -- that I'm

19  not certain of as we sit, but generally speaking, exceptions to

20  that would include items that are generally not required to be

21  deposited into accounts which would -- which could include if

22  it was set up in the system servicing fees or LPMI premiums,

23  which would be stripped off to pay those respective pieces and

24  go to GL accounts, but I do not know how those would be set up

25  specifically on these loans since it was just done very

1   recently.

2   Q    Well, is American Home deducting servicing fees or any

3   other deductions from the amount coming in from the borrowers

4   under Credit Suisse's loans?

5   A    Again, without -- without knowing the specific -- without

6   knowing specifically the population if any of those loans would

7   have LPMI, for example, where those amounts are actually owed

8   to the insurance carriers, I cannot speak to that point.  As

9   far as the servicing fee, it would depend on whether or not the

10  servicing fee rate had been loaded to the loans on the system

11  and the loan level, and I do not know if that has happened or

12  not.

13  Q    So you can't testify as you sit here that all the money

14  coming in from the borrowers on the Credit Suisse loans is

15  being deposited into those accounts, is that correct?

16  A    With the potential exception of the two items that I

17  listed, every dollar that comes in would be deposited.

18  Q    You submitted a declaration in this case, is that correct?

19  A    That's correct.

20  Q    And in the last paragraph of that declaration, you said --

21       "All funds collected on the CSFB loans from August 1,

22       2007 forward have been deposited in either the CSFB

23       P and I custodial account or the CSFB T and I

24       custodial account."

25       Is that statement correct?

1   A    I believe it to be correct based on the way that the funds

2   flow, as we discussed, through the -- through the banking

3   program as to what comes in and what would be applied to the

4   accounts.  The only potential carve outs that I mentioned are

5   just specific to how the system works in general to what would

6   be treated by the system as funds that are not designated as

7   portions owed to -- owed to those custodial accounts.

8   Q    Well, do you know whether that system is -- is locking the

9   deposit of some funds to the CSFB accounts?

10  A    I guess -- what do you mean by locking?

11  Q    Well, I don't know what  the right word is.  You're saying

12  that you have some kind of system in place that directs people

13  who are depositing the funds in the accounts not to deposit a

14  certain percentage or some amount of the funds in certain

15  accounts, is that correct?

16  A    When the -- when the funds are deposited, and we talked

17  about the checks are received like at the -- at the lock box,

18  for example, the entire amount would go into that -- would go

19  into the bank account, and then based upon where those loans

20  were sitting, the funds are going to be redirected to the bank

21  accounts that are tied to the investor codes that the loans

22  reside in today.

23  Q    Well, when you say we directed, do you mean funds are

24  being withdrawn from the account or simply that the account

25  balance remains the same, but the funds are internally -- the

1    actual cash so to speak is internally allocated some other way?

2    A    The -- the way that it works is through an ACH

3    transaction.  So if a thousand dollars came in on loan number

4    123 for a payment, when that hits the loan and that loan is

5    tied to an investor code with the two specific bank accounts,

6    what's principal and what's interest, the system sets up an ACH

7    transaction through the banking system to say of that $1,000,

8    that 500 was principal and interest, and 500 was escrow to make

9    the math easy.  It would set up an ACH transaction to remove

10   the full thousand dollars from the payment clearing account and

11   reallocate that, actually physically transfer the cash so it

12   would be deposited into those bank accounts.

13   Q    And then might there be some withdraw in effect from the

14   account subsequently for the items you mentioned?

15   A    Typically, there can be withdraws from the accounts for

16   those items.  The way that -- the way that most agreements that

17   you'll see are set up when it talks about establishing accounts

18   or custodial accounts is there are permitted deposits to -- to

19   the accounts and permitted withdrawals.

20   Q    What -- what type of agreements are you talking about?

21   Agreements between who and who?

22   A    Just servicing agreements in general.

23   Q    Servicing agreements between American Home Servicing and

24   the owner of loans that it's doing the servicing for?

25   A    From whoever we're being contracted to do the servicing.

1    That's correct.

2    Q    So you are familiar with those types of agreements, is

3    that correct?

4    A    That's correct.

5    Q    And those type of agreements, do they provide some rate of

6    compensation for servicing to American Home?

7    A    Typically speaking, they will mention for compensation.

8    Compensation is sometimes determined in agreements that are

9    outside of the actual servicing agreement.  Sometimes

10   compensation is laid out in -- a trade confirmation would be an

11   example of -- of a type of document outside the servicing

12   agreement where servicing could be -- the servicing

13   compensation could be designated.

14   Q    But many of the servicing agreements have a rate of

15   compensation, is that correct?

16   A    Many do.

17   Q    And you didn't see any such rate of compensation between

18   the agreement -- excuse me -- in the agreement between Credit

19   Suisse and American Home, is that right?

20   A    I did not.  That's correct.

21   Q    And you're not aware of any other document that's an

22   agreement between Credit Suisse and American Home regarding

23   compensation for servicing, are you?

24   A    Not that I have seen in the last few days.  No.

25   Q    Is there any that you've seen at any time?

1   A    No related to this specific pool, but for other types of

2   agreements that we've had with them in the past for selling

3   loans, there would be.

4   Q    So you've had other agreements with Credit Suisse in which

5   there was a rate of compensation stated, is that correct?

6   A    Not for different types of -- different types of sales,

7   not the same type of arrangement that this would be.

8   Q    For an actual sale, purchase of the mortgages rather than

9   a repurchase agreement, is that correct?

10  A    That would be correct.

11  Q    Now, are you aware of whether there has been any change in

12  the servicer ratings of American Home Servicing since -- since

13  July of 2007?

14  A    Yes.  I am aware that -- that two of the rating agencies

15  that have rated the platform in the past have issued, you know,

16  ratings watch or statements regarding the servicer ratings and

17  what they referenced was due to the financial condition or

18  situation of the parent company but did not reference anything

19  specific to the deterioration of quality of servicing of the

20  loans.

21  Q    But they -- they issue ratings regarding the servicer

22  function of American Home, is that correct?

23  A    That's correct.

24  Q    And they -- those ratings have been negatively impacted,

25  is that correct?

1    A    That's correct.

2    Q    And the entire mortgage invested community is likely aware

3    of that change in the ratings, is that correct?

4    A    To the extent that they would have seen or read one of the

5    press releases put out by them.  That's something that they

6    would, and it would -- and it would state the reasons for that.

7    Q    Well, you don't believe that the reasons that were stated

8    for that are incorrect, do you?

9    A    No.  The reasons that are stated are due to the financial

10   condition of the parent.

11   Q    Do you track inbound calls from mortgage borrowers to

12   American Home?

13   A    Yes, we do.

14   Q    Has there been an increase in calls since the bankruptcy

15   filing?

16   A    I don't know the specific numbers of what's come in over

17   those times.  I have not -- I have not looked at reports.

18   Q    Do you know -- without knowing the specific numbers, do

19   you know whether the call -- the volume of calls has increased?

20   A    I don't know.

21   Q    Do you know if any of the employees at American Home are

22   looking for other jobs?

23   A    I do not know for a fact if any of them are.

24   Q    Do you know for a fact if anyone is?  Has anyone indicated

25   to you they're looking for another job?

1   A    They -- no one has indicated directly to me.  No.

2   Q    Have you previous to this ever been involved in management

3   of a company in significant financial distress?

4   A    No.

5   Q    Has there been any change in the relationship between

6   American Home and the Fannie Mae agency?

7   A    There has been some change in the relationship.  However,

8   you know, I would say that, you know, right now, the

9   relationship with them is -- you know, is -- is under positive

10  discussions and that we have, you know, reached some sort of

11  agreements with them, and they are onsite at our operations.

12  Q    They are onsite at your operations?

13  A    They do have some -- they do have some people that are --

14  they do have some folks that are there as part of an agreement

15  monitoring some pieces of -- of the cash business which they

16  are -- you know, which they are related in.

17  Q    Are there any other --

18            THE COURT:  Mr. Love, can you move that microphone

19  closer to you, please?  Speak up if you can.

20            MR. LOVE:  Sorry about that.

21            THE COURT:  It's all right.

22  BY MR. COMET:

23  Q    Do you have any other investors onsite monitoring what's

24  occurring?

25  A    We do not have any other investors onsite monitoring.

1    During this past week, we did have two of the master servicers

2    for large portions of our portfolio in -- the master servicers

3    have a servicer oversight responsibility for the

4    securitizations or deals in which we service where they are

5    master servicer, and we -- you know, they each came in for --

6    you know, for a day or part of a day to meet with the

7    management group, tour the facilities.  They had some other

8    pieces that they were looking at to try to come to an

9    understanding of where they -- you know, where they felt the

10   servicing was, and the outcome of both of those was -- was in

11   our estimation very positive.

12   Q    Did any of the master servicers advise American Home

13   Servicing that they were terminating their servicing

14   agreements?

15   A    No, they have not.

16   Q    None advised prepetition that they were terminating?

17   A    Not to my knowledge.

18   Q    Are you -- did you -- did you read the declaration that

19   Michael Strauss filed at the beginning of the bankruptcy case?

20   A    I did not read his declaration.

21   Q    Well, in that declaration, paragraph 31, Mr. Strauss --

22            MR. DORSEY:  Objection, Your Honor; hearsay.

23            MR. COMET:  I think Mr. Strauss's statements filed in

24   this Court, Your Honor, are an admission.

25            THE COURT:  Why isn't that -- yeah.  That's an

1   admission of a party opponent, isn't it, Mr. Dorsey?

2           MR. DORSEY:  Well, it depends on what he's -- he's

3   going to say, Your Honor, whether it's an admission or not.

4   I'd like to see it before he reads it into the record.

5           THE COURT:  What affidavit are we talking about?

6           MR. COMET:  It's the declaration of Michael Strauss

7   in support of the debtor's Chapter 11 petitions and first day

8   relief, Your Honor.

9           THE COURT:  Okay.  And you're going to read from

10   paragraph 31?

11           MR. COMET:  Yes.

12           THE COURT:  Just give Mr. Dorsey an opportunity to

13   review that.

14           MR. DORSEY:  I don't have a copy of it, Your Honor.

15           MR. COMET:  I'll show it to you.

16                    (Pause)

17           MR. DORSEY:  I withdraw the objection, Your Honor.

18           THE COURT:  Okay.  Thank you.

19   BY MR. COMET:

20   Q    In that declaration, paragraph 31, Mr. Strauss said --

21           "The debtors received various notices of purported

22           defaults from parties to the debtors' master

23           servicing agreements.  Certain of these parties have

24           also notified the debtors that such alleged defaults

25           serve as the basis for disqualifying AHM Servicing

1          from continuing to act as servicer for their loans."

2          Is that statement correct?

3    A    Yeah.  I don't -- I don't know that I can speak to whether

4    the -- the statement is correct or not.  I did not -- you know,

5    I did not have knowledge of any terminations that would -- that

6    were sent nor that we have transferred anything away as a

7    result of any terminations.  As of today, we continue to

8    service and report to all the master servicers that we have

9    prepetition.

10   Q    Well, you're continuing to service many loans and

11   situations where the owners or other parties regarding those

12   have -- have indicated they want to terminate the relationship,

13   is that correct?

14   A    That is correct.

15   Q    And Morgan Stanley has indicated it wanted to terminate

16   its servicing agreement with American Home Servicing, is that

17   correct?

18   A    I don't know that to be a fact.  They have not sent a

19   notification to me.  I don't know them to be a master servicer.

20   Q    I didn't mean to imply --

21   A    Okay.

22   Q    -- that they were a master servicer.  They -- they have a

23   servicing contract with American Home Servicing, is that

24   correct?

25   A    They would have servicing contracts with us.  Yes.

1    Q    And they -- Morgan Stanley has given notice they want to

2    terminate that contract, is that correct?

3    A    Again, not that -- not that I know of.

4    Q    Are there -- well, let me ask you this question.  Do you

5    believe you know of each and every instance in which someone

6    has given notice to American Home that it wants to terminate a

7    contract?

8    A    No, I do not.

9    Q    Have any of American Home's licenses been affected by its

10   financial distress and bankruptcy filing?

11   A    I don't know.

12   Q    Do you know what American Home Mortgage Servicing's status

13   is regarding Fidelity Insurance at present?

14   A    Are you referring to Fidelity bond errors and omissions

15   insurance or --

16   Q    For American Home Servicing.  Yes.

17   A    No, I'm not.

18   Q    Do you -- do you know if American Home Servicing has such

19   insurance at present?

20   A    I know that we always have.  I don't know -- I don't know

21   if -- if anything has changed with that materially recently.

22   Q    Now, what happens in servicing if J.P. Morgan Chase can't

23   match a check it receives to an account?

24   A    Could you elaborate a little more what you mean?

25   Q    Well, does it sometimes happen that a check comes into the

1    lock box you described and doesn't have the proper papers

2    accompanying it or otherwise isn't possible to figure out what

3    account it goes to?

4    A    Okay.   Sure.   If -- if J.P. Morgan Chase cannot -- cannot

5    identify the check based on the information that's sent in with

6    it, they do have a few employees there that have look-up

7    capability within our servicing system.   So they have the

8    ability to log in and do a search to try to match the

9    information that would be on the check.   Normally on a check,

10   you would have a borrower's name and address, for example.

11   They'll do a search to try to find the name and address on the

12   check and to match -- if the amount on the check exactly

13   matches the monthly payment, then they can deposit that check

14   and send the information electronic file.

15            If they are after those efforts unable to determine

16   the check, there is a courier service that runs several times a

17   day from the lock box facility to our -- to our cash management

18   facility a few miles away in our Irving office location where

19   they would perform those functions.

20   Q    So until that process is completed, you can't deposit

21   funds to the appropriate investment account, is that correct?

22   A    Are you asking if you don't know what loan a payment is

23   for, if you can apply is to the account?

24   Q    Correct.

25   A    That would be correct.

1          THE COURT:  You going to wind up pretty soon here --

2          MR. COMET:  Yes.

3          THE COURT:  -- Mr. Comet?

4          MR. COMET:  Yes, Your Honor.  One moment.  Just give

5     me one second, Your Honor.  No further questions, Your Honor.

6          THE COURT:  Before you do redirect, I had -- I have a

7     few questions, and if they -- if they generate any further

8     questions by you, Mr. Comet, you're welcome to ask them.

9     BY THE COURT:

10    Q    You testified, Mr. Love, that on all your warehouse loan

11    accounts other than a carve out for Lehman, you were credited

12    -- servicing was credited with 12 1/2 basis points by

13    corporate.

14    A    That's correct.

15    Q    Okay.  12 1/2 basis points of what?  Of the loan

16    origination amount?

17    A    It's of the current outstanding balance on an annualized

18    basis.

19    Q    Current outstanding.  And when do you get those credits?

20    On an annual basis or monthly or --

21    A    It would be as payments are collected.

22    Q    All right.  So every month, boom, boom, boom.  And what do

23    you mean, credit for?  That's -- this is what I'm struggling

24    with a little bit.

25    A    We sent a request -- we  sent a request before to

1  accounting to -- to our corporate accounting group to inquire

2  as to what the compensation to servicing was that would get

3  credit to -- that would get, you know, accounted to the P and L

4  for loans that we serviced that are in the warehouse accounts.

5  Q    All right.  So it gets accounted -- it gets credited to

6  your profit and loss statement.

7  A    That's correct.

8  Q    No funds are actually transferred.

9  A    I don't know.

10 Q    You don't know.  Okay.

11         THE COURT:  Okay.  Mr. Comet, I'm sorry.  Do you have

12 any questions following up on those?

13         MR. COMET:  No, Your Honor.

14         THE COURT:  All right.  Redirect.

15         MR. DORSEY:  No redirect, Your Honor.

16         THE COURT:  Okay.  Thank you.  You may step down,

17 sir.

18         MR. LOVE:  Thank you.

19     (Witness excused)

20         THE COURT:  Do we have another witness?

21         COUNSEL:  Yes, Your Honor.  The debtors would like to

22 call Craig Pino.

23         THE COURT:  All right.  We're going to take a five-

24 minute recess before we do that.  All right?

25         COUNSEL:  Thank you, Your Honor.

1           (Recess)

2                   THE CLERK:  All rise.

3                   THE COURT:  Please be seated.

4                   MR. DORSEY:  Your Honor, housekeeping matter.

5                   THE COURT:  All right.

6                   MR. DORSEY:  Before we go to the next witness, can

7      Mr. Love be dismissed?  He has a flight to catch back to

8      Dallas.

9                   THE COURT:  Mr. Comet?

10                  MR. COMET:  I have no objection.

11                  THE COURT:  Yes, he may.

12                  MR. DORSEY:  Thank you, Your Honor.

13                  THE COURT:  Okay.  Good luck getting -- well, get out

14     now, because if you're -- about three hours, it's going to be

15     thunderstorms.  So get out while you can.

16                  Speaking of housekeeping, I -- trying to get an idea

17     of how much more evidence we have.

18                  COUNSEL:  Your Honor, this is the debtor's last

19     witness.  It's hard to estimate how long his direct might go,

20     to be perfectly honest, but --

21                  THE COURT:  I wouldn't ask you to.  Just -- so this

22     is the last witness.

23                  COUNSEL:  Yes, Your Honor.

24                  THE COURT:  All right.  And I do want to address the

25     scheduling of the Morgan Stanley matter at some point before we

1    finish today.  All right.  You may proceed.

2              COUNSEL:  Your Honor, the debtors call Craig Pino.

3              THE CLERK:  Please place your hand on the Bible.

4    Please state your full name and spell your last name for the

5    record.

6              MR. PINO:  Craig Severan (phonetic) Pino.  Pino is

7    P I N O.

8         C R A I G   P I N O, DEFENDANT'S WITNESS, SWORN

9              THE CLERK:  Thank you.  You may be seated.

10                       DIRECT EXAMINATION

11   BY MR. KIRPALANI:

12   Q    Good afternoon, Mr. Pino.  Would you please state your

13   full name for the record again?

14   A    Craig Severan Pino.

15   Q    Mr. Pino, by whom are you employed?

16   A    American Home Mortgage.

17   Q    And what is your title with American Home?

18   A    I'm the chief investment officer, treasurer, and executive

19   vice president.

20   Q    How long have you been in the mortgage finance business?

21   A    Since early 1991.

22   Q    And what other companies have you worked for before

23   American Home?

24   A    Just previous to my employment at American Home, I worked

25   for Countrywide Home Loans as executive vice president and

1   assistant treasurer.  Prior to that, I worked for North

2   American Mortgage, Arbor National Mortgage, and Margaretten &

3   Company all in treasury related functions.

4   Q    And how long have you been with American Home now?

5   A    I started in February of 2004.

6   Q    Mr. Pino, as the treasurer, what are your day-to-day

7   responsibilities at American Home?

8   A    Primarily responsible for liquidity and cash management of

9   the company.  That includes all of our financing positions, the

10  operations and movement of funds, the management of the

11  warehouse facilities, structure and credit facilities, and some

12  short-term investment management functions as well.

13  Q    So Mr. Pino, I'm sorry.  Just to be clear, does that

14  include the front end negotiation of these agreements as well?

15  A    Yes, it does.

16  Q    Mr. Pino, are you knowledgeable about the company's

17  current cash position?

18  A    Fairly, yes.

19  Q    Can you tell the Court what is currently the debtor's cash

20  position with respect to unencumbered cash?

21  A    It would probably be approximately $23.0 million.

22  Q    And, Mr. Pino, do you know if the company has been granted

23  consensual use of Bank of America's cash collateral?

24  A    Yes, it has.  Yes, relating to our -- our servicing

25  operations.

1    Q    And is there also a DIP financing facility?

2    A    There is a $50.0 million DIP financing facility, I think

3    got approved for I believe $12.0 million initially.

4    Q    And how much of that has been drawn?

5    A    Nothing is drawn.

6    Q    Do you anticipate drawing any of it?

7    A    It's our -- our expectation at this point not to.

8    Q    And are you familiar at all with the company's efforts to

9    sell the servicing business as a going concern?

10    A    Generally, I am.  Yes.

11    Q    And how is that process going?  Have you received any

12    bids?

13    A    We I believe just sent out the -- the notices of the -- of

14    the bid.  I believe it was yesterday, approximately the day

15    before.  I know that we've received back some confidentiality

16    agreements from potential -- potential investors as well as I

17    believe some interest from at least one that I know of.

18    Q    Okay.  Without going into the specifics of any bids or the

19    names of any bidders, can you tell the Court what your belief

20    is with respect to whether or not a bid has actually been

21    received even before these bid packets went out?

22    A    You know, I believe that strong interest has been

23    submitted.

24    Q    And what is the company's current timetable for trying to

25    consummate a sale, to your knowledge?

1    A    The expectation would be to conclude the auction I believe

2    in the -- the third week of September.

3    Q    And do you believe you're going to be able to meet that

4    time table?

5    A    I believe so.

6    Q    And throughout that time, you would not even draw on your

7    DIP facility?  Is that your testimony?

8    A    It's our intention not to.  Or I shouldn't say intention

9    but expectation based on our cash forecasting.

10   Q    Mr. Pino, I want to ask you a few questions about your

11   general familiarity with this particular Credit Suisse

12   warehouse facility.  Okay?

13   A    Okay.

14   Q    Are you familiar with the so-called master repurchase

15   agreement that's at issue here?

16   A    Yes, I am.

17   Q    Did you, in fact, negotiate this contract with Credit

18   Suisse?

19   A    Yes, I did.

20   Q    And did you have any outside counsel assist you in

21   structuring this transaction?

22   A    We did not.

23   Q    Do you typically?

24        THE COURT:  Can't hear you.

25   A    I'm sorry.  We did not.

1    BY MR. KIRPALANI:

2    Q    Do you typically have outside counsel review these types

3    of financing transactions?

4    A    Many times we do.  Sometimes we haven't.

5    Q    This one you didn't.

6    A    We didn't.

7    Q    Can you tell the Court, because so much has been talked

8    about with this facility, I'm not sure that His Honor has been

9    living with it like we have for the last week.  Can you just

10   explain what exactly in your own words this facility is, what

11   it does, and how big it is?

12   A    It was a $350.0 million mortgage warehouse facility.  It

13   had $175.0 million committed portion.  It was primarily put in

14   place to finance the company's scratch and dent inventory so,

15   you know, impaired or delinquent loans.

16   Q    And what was the outstanding balance on the facility --

17   when you say warehouse facility, I'm sorry, can you just

18   explain what you mean by warehouse facility?

19   A    It's a contemporary financing facility that allows the

20   company to finance its mortgage loan inventory in preparation

21   for -- for a sale or securitization.

22   Q    And during that period, you heard some testimony from

23   Credit Suisse's witness that Credit Suisse purchased the

24   mortgages during that short term and didn't lend against it.

25   Did you hear that testimony?

1   A     Yes, I did.

2   Q     Is -- is that your understanding of the -- the economic

3   substance as well?

4   A     You know, generally, it felt like a financing, you know,

5   short term financing, revolving.

6   Q     But you're not a lawyer, right?

7   A     No.  No, I'm not.

8   Q     Okay.  Can I ask you, since you were the one -- of the

9   people who negotiated this transaction, why did you call it a

10  repurchase transaction?

11  A     Just the form of the document.

12  Q     Could this -- in your experience in the mortgage finance

13  industry since 1991, to your knowledge, could this warehouse

14  facility have been structured as a secured loan?

15  A     We have structured many as secured loans.

16  Q     Do you have any right now that are in substance similar to

17  this?

18  A     (No verbal response).

19  Q     You have to speak audibly.

20  A     Generally.  Generally similar.

21  Q     Which facility are you thinking of?

22  A     We've got a mortgage warehouse facility with J.P. Morgan

23  that is similar to a scratch and dent facility, $200.0 million,

24  and we also have a -- a facility that finances warehouse loans

25  that's led by Bank of America.  It's a syndicated facility led

1    by Bank of America.

2    Q    Uh-huh.  What is your understand with respect to the --

3    the prominence of mortgage loan repurchase transactions as

4    compared with mortgage loan warehouse facilities that were

5    secured loans before or after 2005?

6    A    I think after 2005, there was more of a push to

7    recharacterize mortgage loan warehouse facilities as mortgage

8    loan repurchase agreements, and my understanding is that had to

9    do with some changes to the bankruptcy laws.

10   Q    Okay.  Did you hear Credit Suisse testify that if this

11   wasn't a repurchase agreement and didn't have the benefits of

12   the repurchase agreement, the entire mortgage financing

13   industry is going to fall apart?  Did you hear something to

14   that effect?

15   A    Similar to that, yeah.

16   Q    Uh-huh.  And do you agree with that assessment?

17   A    You know, I was in the mortgage finance industry before

18   2005, and I think we had, you know, mortgage financing

19   agreements prior to that that weren't -- weren't repos.

20   Q    And you still do.

21   A    And got them now.

22   Q    Mr. Pino, I want you to direct your thoughts now to what

23   the disputes that you've been reading about in this case are.

24   Have you reviewed Credit Suisse's pleadings and briefs that

25   they filed?

1    A    Yes, I have.

2    Q    Are you aware that Credit Suisse's attorneys state that

3    the debtors are not challenging the repurchase agreement as a

4    true repo?

5    A    I believe that was in -- in their documents.

6    Q    Just for the record, is that true that you're not

7    challenging that?

8    A    I don't think that's true.

9    Q    Now, just to be clear, have you made -- have you made a

10   determination that you will be challenging it, or do you think

11   that's something that the debtor is considering during this

12   initial period?

13   A    I think it's something that hasn't been determined yet.

14   Q    And would -- would you like the opportunity to consider

15   that?

16   A    Yes.

17   Q    Mr. Pino, can you explain to the Court, because again,

18   we've heard these words thrown around, and I know I'm six days

19   into it and it's still confusing to me.  What is a margin

20   deficit with respect to this contract?  What does that mean, a

21   margin deficit?

22   A    The amount of the -- the market value of the loans, you

23   know, practically, the market value of the loans less the

24   advance rate applied to that particular bucket of loans is less

25   than the amount that's been advanced against those -- that

1   bucket of loans or against the loans.

2   Q    Okay.  And when you're referring to loans, you mean the

3   underlying mortgages?

4   A    Yeah.  The -- exactly.

5   Q    Okay.  And do you have an understanding as to how the

6   market value of those mortgage loans is to be determined under

7   the contract?

8   A    You know, I think it's at -- you know, it's determined by

9   Credit Suisse, you know, using their -- their good faith.

10  Q    Are you aware that Credit Suisse asserts that there was a

11  consistent course of dealing with respect to how to value the

12  collateral?

13  A    Yes, I am.

14  Q    Do you agree with their assertion first that there was a

15  consistent course of dealing?  We'll talk about what that

16  course of dealing was, but do you agree that there was a

17  consistent course of dealing between the parties as to how the

18  collateral under the master repurchase agreement should be

19  valued?

20  A    When you say consistent course of dealings, you mean it

21  was always dealt with a certain way?

22  Q    Yes.

23          MR. COMET:  Your Honor, I object to relevancy.  I'm

24  not aware of there being an issue raised in any pleading about

25  how the collateral was valued or that there is a dispute about

1    it.  I don't know what Mr. Kirpalani is referring to.

2            MR. KIRPALANI:  Your Honor, it has always been our --

3    our contention that the margin call --

4            THE COURT:  Was improper.

5            MR. KIRPALANI:  -- was improper.  That's exactly the

6    heart of the issue.

7            MR. COMET:  But I -- I have not seen any issue

8    raised, Your Honor, regarding valuation of collateral in

9    connection with the money, but I've seen -- the papers

10   previously raised two issues on it, the notice and whether the

11   margin call was supposed to be based on the overall value of

12   the portfolio as opposed to individual loans.

13           MR. KIRPALANI:  Perhaps if Mr. Comet would let me ask

14   my question, he'd withdraw his objection.

15           MR. COMET:  Perhaps.

16           THE COURT:  Well, I think it's relevant.  So the

17   objection is overruled.

18           MR. KIRPALANI:  Thank you, Your Honor.  But to be

19   clear, we are not proffering Mr. Pino as an expert on

20   valuation.  What we're trying to establish, Your Honor, is

21   whether there was a course of dealing and whether the company

22   had a certain position and Credit Suisse had another, but

23   that's what these questions are about.

24   BY MR. KIRPALANI:

25   Q    Was one of the -- well, what was one of the key issues?  I

1    mean, you know this issue, Mr. Pino.  What was one of the key

2    issues in terms of the course of dealing between Credit Suisse

3    and the company since you negotiated this agreement?

4    A    Whether when they looked at the value of the collateral

5    versus the amount outstanding on the line, the -- the overall

6    value of the collateral exceeded the amount that they had

7    advanced against us, and, you know, we had gone back and forth,

8    you know, multiple times on whether there actually was a margin

9    deficit or what the value of that margin deficit was based on,

10   the fact that if you took all of the loans on -- on their line

11   and you looked at the collateral value that they ascribed to

12   the -- all of the loans on the line, it typically exceeded the

13   amount of -- that they had advanced against those loans on the

14   line.

15          MR. KIRPALANI:  Your Honor, may I approach the bench?

16   I have our exhibits 1 through 6 organized here, not quite as

17   neatly, but I do have them.

18          THE COURT:  Okay.  Thank you.

19          MR. COMET:  One second.  W hat did you just --

20          MR. KIRPALANI:  It's the exhibits I gave you earlier,

21   the -- the 1 through 6.  Your Honor, may I approach the witness

22   with exhibit 1?

23          THE COURT:  Yes.

24   BY MR. KIRPALANI:

25   Q    Mr. Pino, we were just talking about your recollection

1    that there was this dispute for some period of time over

2    whether you value collateral on a loan-by-loan basis or in the

3    aggregate of a portfolio at any given time for purposes of

4    calculating margin, and I just want to show you a couple of

5    e-mails that actually, you showed me to help illustrate to the

6    Court exactly what you're talking about.  Can you just take a

7    look at this first exhibit, debtor's 1, which is an e-mail from

8    Denise Frank (phonetic) to Jody Rocco (phonetic).  Who is --

9    and then -- I'm sorry.  And then down below, from Haley

10   Lauretson (phonetic) to Bonnie Sing (phonetic).  Can you just

11   tell us who these people are?

12   A    Denise Frank was an analyst that worked in the treasury

13   operations group, and she was responsible on a day-to-day basis

14   reconciling warehouse facilities against -- against our records

15   and performing transactions that moved loans between one

16   warehouse facility and another.  Jody Rocco was her manager.

17   Jody is still with the company.  She manages the -- the entire

18   warehouse operations group as well as previous to the -- to

19   when we ceased funding mortgage originations, she was

20   responsible for the -- for the -- we called it the treasury

21   help desk, but really, the liaisons between all of our branch

22   and operations centers and -- and the treasury.

23   Q    Okay.  And let me just ask you there.  These are American

24   Home employees or they were?

25   A    Denise -- Denise was.  Jody still is.

1    Q    And they both report to you?

2    A    Yes.  Denise reported to Jody, and Jody reported to

3    Bonnie, who's down below, and Bonnie Sing was an assistant

4    treasurer, reported directly to me, and had overall management

5    of that group.

6    Q    Okay.  The -- the re: line in -- well, strike that.  In

7    the e-mail from Haley Lauretson from Credit Suisse to Bonnie

8    Sing and Denise Frank, people that work with you, in the second

9    paragraph, it states that the aggregate increase in the

10   shortfall.

11   A    Right.

12   Q    Do you see that line?

13   A    Yes, I do.

14   Q    What does that mean to you?

15   A    The increase in the aggregate, the total amount of the

16   increase.

17   Q    And is that referring to the portfolio of mortgages?

18   A    Yes.  I believe so.

19   Q    And is it referring to them on a -- on an individualized

20   basis or on a -- an -- or on a whole portfolio basis in your

21   mind?

22   A    I believe it was on a -- on an entire portfolio basis.

23            MR. COMET:  Your Honor, I would object, because I --

24   first of all, the witness is not a party to this e-mail.  So I

25   think this is hearsay.  He -- the e-mail refers to a

Pino - Direct                                                    126

1    spreadsheet that apparently accompanied this.  The spreadsheet

2    has not been provided.  I think the spreadsheet would show what

3    the aggregate increase is, and that's referred to here.  So I

4    think this is just speculation by a witness who -- who's not

5    involved in this document, and it's hearsay.

6              MR. KIRPALANI:  Well, may I respond, Your Honor?  I

7    don't think it's hearsay.  I think it's a statement by Credit

8    Suisse.  The statement doesn't need to be made to this witness.

9              MR. COMET:  Your Honor, I object.  The witness's

10   understanding of a communication he was not involved in, his

11   interpretation of what somebody from Credit Suisse was

12   referring to, his speculation about Ms. Lauretson's state of

13   mind, especially in the absence of the spreadsheet which she

14   was referring to is not admissible evidence.  He can't testify

15   to what Ms. Lauretson meant nor is it relevant for him to say

16   what he today thinks it meant, something in April.

17             THE COURT:  Mr. Kirpalani?

18             MR. KIRPALANI:  Your Honor, these are people that

19   report to Mr. Pino.  He's testified to that.  There is no

20   dispute about it.  He understands the way his staff and his

21   team does business with Credit Suisse as well as with various

22   other counter parties.

23             THE COURT:  Well, in connection with statements by

24   Credit Suisse that are included in this exhibit, to the extent

25   they're hearsay, I think they are arguably an admission from a

1   party opponent, and thus, admissible.  However, this witness --

2   regardless of whether or not these people report to him, if you

3   want to know what they thought, you need to get them in here.

4   I know some of them may no longer be with the company, but he

5   can't testify to what his employees thought or meant.

6           The document is what the document is.  Whether or not

7   it's admissible as a document for me to look at is one thing or

8   the other, but he can't speculate as to what these people

9   meant.

10          MR. KIRPALANI:  Yeah.  That's fine, Your Honor.

11  BY MR. KIRPALANI:

12  Q   Why don't you put the document down, Mr. Pino.  Let me ask

13  you a question.  Has this specific issue, whether or not to

14  value the loans in the aggregate or the loans line-by-line ever

15  been raised by you with Credit Suisse?

16  A   Yes, it has.

17  Q   When was that?

18  A   I don't remember the exact time frame, but I believe it

19  was late -- late in March.

20  Q   And who did you raise that issue with?

21  A   Initially, with Randy Shy (phonetic), who worked with or

22  for -- for Gary Timmerman, and then with Gary Timmerman and

23  Patty Robbins (phonetic).

24  Q   Okay.  All of these people --

25  A   All --

1   Q    -- Randy, Gary, Patty, they're Credit Suisse people?

2   A    Yeah.

3   Q    Can you tell the Court what the substance of your

4   discussions was and how it came about?

5   A    We had received a margin call from Credit Suisse.  The --

6   the number was fairly large.  When we looked into understanding

7   what was behind them causing a margin call, we went onto their

8   website and pulled down the data related to the -- the loans on

9   the facility.  We looked at the total collateral value against

10  the total amount that Credit Suisse had lent us against it and

11  was off widely from the amount that they were requesting as a

12  margin.

13          After, you know, a period of time of going back and

14  forth with them to get an understanding of how they had

15  calculated the number, it became apparent to me that they had

16  taken all of the loans that had collateral values that were

17  less than the amount advanced, summed those up, and that was

18  essentially the amount that they were asking for in the margin.

19  When I looked at the spreadsheet, and there were many more

20  loans on the line than there are today, but when I looked at

21  adding up all of the loans that had positive values where the

22  collateral value was, in fact, more than the amount that they

23  had indicated that they had advanced against, you know, we had

24  a fair amount of positive collateral value, and the net of the

25  two brought the margin down to a lot less than they had

1      initially called for.

2              I had a series of conversations with Randy.  It was

3      about the time that Randy was leaving Credit Suisse.  He then

4      brought in Patty, and I had a conversation with Patty and Gary,

5      and in that conversation, my recollection is that Gary had

6      said, you know, you're right, we need to re-advance on these

7      loans with positive values, and they then proceeded to

8      recalculate the margin based on our discussion.

9              I think we had a similar -- a similar situation in

10     the middle of April that was for a much smaller amount but that

11     when we had gotten a margin call, the people that worked for me

12     did essentially the same process, sorted -- looked at the

13     detail behind the loans, brought to me the fact that there were

14     a lot of loans that had positive collateral value, and we were

15     only being -- we were being margined on the -- the negative

16     collateral value.  I had some discussions with my staff who

17     talked to CSFB, and my understanding is that subsequent to

18     that, shortly after that, CSFB reduced the margin call, you

19     know, in part by -- there were a couple of other things

20     involved in the overall discussion, but in part, by the amount

21     of those loans with positive collateral value.

22     Q    Thank you, Mr. Pino.  Mr. Pino, would you turn -- well,

23     actually, I have to approach you.  You don't have them.

24              MR. KIRPALANI:  Can I approach the witness,

25     Your Honor?

1          THE COURT:  Yes.

2          MR. KIRPALANI:  I've shown the witness what was

3    previously marked as debtor's proposed exhibit 5, Your Honor.

4    This is an e-mail from Patricia Robbins of Credit Suisse to

5    Craig Pino.

6    BY MR. KIRPALANI:

7    Q    Mr. Pino, do you recall receiving this e-mail or do you

8    recall showing it to me?

9    A    I do.

10   Q    Can you tell the Court whether you think this speaks to

11   the issue of whether there was a course of dealing as to how to

12   value collateral, whether it was on a loan-by-loan basis or an

13   aggregate basis?

14   A    Well, I -- I mean, as I said, I do also think this was

15   talking about the overall market value of the collateral on the

16   line.

17   Q    Where are you specifically referring to?

18   A    In the second paragraph, the second sentence that says --

19              "The portfolio is currently marked at an overall

20              price of 75."

21   Q    Does that mean that -- well, what does that mean, overall

22   price of 75 percent?  I don't understand that.

23   A    That if you took the -- the net value of all the loans,

24   UPB's on the loan versus the net value of all -- all the market

25   or the sum of the market value of loans on the line.  There

1    would be about a 75 -- there would be a 75 percent market value

2    based on the UPB's of the loans on the line.

3    Q    UPB means?

4    A    Unpaid principal balance.

5    Q    So that's the unpaid principal balance on each of the

6    underlying mortgages, is that correct?

7    A    Yes.

8    Q    And so it's your testimony that your understanding of the

9    way Credit Suisse was valuing this collateral -- I'm just

10   asking for your understanding -- was essentially, it was about

11   75 percent of the total unpaid principal balance of all the

12   mortgages in the portfolio at one time.

13   A    Right.  Yes.

14   Q    Mr. Pino, did Credit Suisse make any margin calls to your

15   knowledge in July of 2007, the month preceding the bankruptcy?

16   A    Yes, they did.

17   Q    Do you remember how much they had requested?

18   A    I think they had a number of margin calls, at least -- at

19   least three that I can recall, three or four that I can recall.

20   Q    And that debtor's exhibit 5 that we were just looking at,

21   that's a July 18th e-mail.  Is that one -- is that referring to

22   one of the -- the margin calls?

23   A    Yes.

24   Q    And how much was this one for?

25   A    $2.0 million.

Pino - Direct                                                    132

1   Q    So Credit Suisse had requested that American Home give it

2   to $2.0 million on July 18th, is that correct?

3   A    Yes.

4   Q    Do you recall whether there was another margin call

5   between July 18th and the one that was made on August 1st

6   that's the subject of today's hearing?

7   A    Yes.  I believe there was one on July 27th as well.

8   Q    Do you remember how much that was for?

9   A    Roughly 300,000, slightly more than 300,000.

10  Q    389?

11  A    I think that could be right.

12  Q    So as of August 1st, how much of American Home's cash did

13  Credit Suisse have on margin?

14  A    Well, I believe they had on deposit about $2.4 million.

15  Q    When you say on deposit, do you view a deposit different

16  than margin?

17  A    I think in many instances, when we sent margin in, the

18  margin was used to pay down the advance on the line.  In this

19  case, I believe the margin was sitting in -- in a bank account

20  at Credit Suisse.

21  Q    Uh-huh.  Do you recall how much was the margin call that

22  Credit Suisse made against the company on August 1st?

23  A    About 933,000.

24  Q    Was notice of that margin call sent to you in accordance

25  with the master agreement?

1    A    No, it was not.

2    Q    When did you first focus on this margin call?

3    A    Probably on the 2nd when we saw the -- the event of

4    default notice.

5    Q    Did you have a view as to whether this $933,000 margin

6    call was proper?

7    A    Prior to seeing that, I didn't have a chance to look at

8    it.

9    Q    And once you got the event of default, what was your

10   reaction?

11   A    Yeah.  My -- my view was that, again, I think it was only

12   the -- the loans with the negative marks on the line without

13   regard to the loans with a positive net marks.  I think that

14   the overall collateral value was greater than the overall

15   advance amount, and I think also that Credit Suisse had about

16   $2.4 million set aside in -- in a -- what they term as the buy

17   down account for us and that --

18   Q    Okay.  But to be clear, did you focus on the $2.4 million

19   prebankruptcy?

20   A    No.

21   Q    Okay.  So you -- you still thought it was improper though,

22   is that your testimony, that just based on the aggregate

23   collateral value?

24   A    That's true.

25   Q    And did you -- did you look at anything to determine

1    whether that -- whether when they made that margin call, they

2    were taking a reasonable position with respect to the

3    collateral value?

4    A    Well, yeah.  Subsequent -- once I started to look at it, I

5    looked at the data that came off of their -- their internal

6    website.

7    Q    You've got to explain that to the Court, because this is

8    the first time we're hearing about internal website.

9    A    Credit Suisse had a -- a -- a website that they provided

10   their warehouse borrowers that allowed us to go in and view the

11   collateral that we had pledged on their lines and so we could

12   take a download of all of the loans at a pretty detailed loan

13   level, a pretty detailed loan level basis, and we could see the

14   UPB's of the loans, the unpaid principal balance, the -- the

15   market values that Credit Suisse was ascribing to the loans,

16   the collateral value, which would be the -- really, the market

17   value times the advance rate, and then the loan amount, which

18   would be the amount that they actually advanced us against the

19   -- against the loans.

20           When -- when I looked at that data, again, the

21   collateral value was greater than the total amount of the

22   advance.

23   Q    How much was it greater by?

24   A    60,000 roughly.

25   Q    So when you -- after you received the event of default

1   notice and you checked Credit Suisse's internal website, is it

2   your testimony that according to Credit Suisse's own documents

3   or own website, is this your testimony, that the loan amount

4   was less than the collateral value?

5   A    Yes.

6   Q    And it was by $60,000 roughly.

7   A    Roughly.

8   Q    So are we talking it's in the neighborhood of

9   $29.0 million?

10  A    I think that was 29.3 on the collateral and 29.2 on the

11  loan, I believe.

12  Q    Okay.  So your understanding was the amount they were

13  asserting was due on the loan was 29.0 million?

14  A    Yes.

15  Q    Do you have any reason to dispute that Credit Suisse acted

16  in good faith in making that determination that you owe another

17  $933,000?

18  A    Well, what I mentioned a second ago was that I didn't

19  realize at that time and we didn't realize just until a couple

20  days ago was that in addition to the fact that the collateral

21  value was greater than the loan amount, we had also had on

22  deposit at Credit Suisse related to this facility another

23  $2.4 million of cash.

24  Q    So if -- if they -- if Credit Suisse had applied the $2.4

25  million of cash that it was holding, what would the outstanding

1   loan amount have been?

2   A    Just under 26 or just under 27.0 million, I believe.

3   Q    Would there then have been a margin call?

4   A    Well, I didn't think there was even before they --

5   Q    Right, but assuming that their -- their valuation in the

6   margin notice was correct, if they had applied the

7   $2.4 million, would there have been a margin call against that

8   value?

9            MR. COMET:  Objection.

10  A    I don't believe so.

11           MR. COMET:  The witness can say whether he thinks

12  that a margin call would have been appropriate.  I don't see

13  how he can say whether Credit Suisse would have made a margin

14  call or not.

15  A    Yeah.  I --

16           THE COURT:  Whoa.  Whoa.  Whoa.

17  A    I think the question to be --

18           THE COURT:  Hold on, Mr. Pino.

19           MR. PINO:  I'm sorry.

20           THE COURT:  Mr. Kirpalani?

21           MR. KIRPALANI:  Thank you, Your Honor.  I'm just

22  asking an arithmetic question.  So perhaps I wasn't clear, but

23  that's all I'm asking.

24           THE COURT:  All right.  Well, I think we can all

25  agree that 2.4 million minus 900,000 is -- uh-oh --

1    $1.5 million?

2              MR. KIRPALANI:  You're better than me.

3              THE COURT:  That's more than zero, right?  Is that

4    all you're asking?

5              MR. KIRPALANI:  That's all I'm asking, Your Honor,

6    that based on the numbers -- I'll ask it again.

7    BY MR. KIRPALANI:

8    Q    Based on the numbers that you were given as to what Credit

9    Suisse's then believed collateral value was, there was a

10   $933,000 margin call.  Assuming those values were still going

11   to come out the same way, if they had applied $2.4 million,

12   would that margin call have been given?

13   A    I don't -- I don't believe it should have been.

14   Q    You don't believe it should have been anyway, right?

15   A    Right.

16   Q    Have you had a chance to engage in formal discovery with

17   Credit Suisse in this litigation?

18   A    No.

19   Q    Has there been any exchange of information between the

20   parties?

21   A    We did provide Credit Suisse with some information.

22   Q    Okay.  And in providing this information, is that how you

23   came to learn about this $2.4 million?

24   A    No.  It was actually -- the way that we came to learn

25   about the 2.4 million was when we were matching up all of the

1   margin calls that we had received as a company over the month

2   of July and trying to figure out where that -- where that money

3   went to, we realized we had sent them in $2.0 million on the

4   18th, and we didn't have that reflected as being applied to pay

5   down the loan.

6   Q    Can I ask you to turn to the binder that's before you?

7   These are not my documents, but I believe that Mr. Comet won't

8   have an objection if I ask you about his.  If you'd turn to tab

9   5.  This is a series of e-mails that according to the cover

10  page, it's e-mail transmissions of margin calls to the

11  defendants and the defendants' replies.  Can you just take a

12  few minutes and just flip through this, the first four or five

13  pages of this?  You have read these before, Mr. Pino.

14  A    Yes.

15           MR. COMET:  Your Honor, while Mr. Pino is doing that,

16  can I take it that the debtors are withdrawing their objection

17  to this exhibit, since they're using it for questioning?

18           MR. KIRPALANI:  I'm not -- I'm not going to admit it

19  into evidence, Your Honor.  I'm just asking the witness to

20  review it.

21           MR. COMET:  Well, I would ask Your Honor to deem the

22  objection overruled if Mr. Kirpalani is going to use it in

23  eliciting testimony from the witness.

24           MR. KIRPALANI:  I would just say, Your Honor, at this

25  point, we're still waiting for Your Honor to make a decision as

1   to whether course of dealings of the parties is relevant with

2   respect to the way margin calls were made or whether the notice

3   provisions of the contract are clear and unambiguous.  To the

4   extent that Mr. Comet is trying to use these documents to

5   establish a course of dealing on the way margin calls were

6   made, we would oppose that until Your Honor makes a decision

7   that it is, in fact, ambiguous at which time these documents, I

8   guess, will be up to Your Honor to review.

9           THE COURT:  So you want to -- this testimony --

10  you're sort of assuming arguendo that the document doesn't

11  control, you want to solicit his testimony.

12          MR. KIRPALANI:  That's right.

13  BY MR. KIRPALANI:

14  Q    Mr. Pino, away from the documents, is it your

15  understanding -- do you have an understanding as to a course of

16  dealing with Credit Suisse as to how amounts kept on deposit or

17  on margin, either way, with Credit Suisse would be applied to

18  an outstanding loan amount?

19  A    In very many instances when we had a -- a request for a

20  margin that came into my staff, my staff would instruct Credit

21  Suisse to debit this -- the buy down account to apply the funds

22  in the buy down account against the -- against the margin

23  deficit.

24  Q    And when you received the July 27th margin call for

25  $389,000, do you recall whether the company asked Credit Suisse

1   to apply the amount that was in the buy down account that was

2   just sitting there?

3   A    We did.

4   Q    And what was their initial -- initial statement to the

5   company?

6   A    Well, initially, they -- they had asked us did we want to

7   apply it, and we said yes, we did.  They -- they weren't clear

8   as to which of two accounts that we had at Credit Suisse we

9   wanted to debt.  They asked us do you want us to debit the buy

10  down account or the -- the other.  I think it's an operating

11  account, and we said the buy down account.

12  Q    And then -- and then what happened?  Did they -- did

13  Credit Suisse change their mind?

14  A    Then they came back and said that the money in the buy

15  down account was restricted.

16  Q    What did that mean to you, it was restricted?

17  A    I don't know.  I mean, that they wouldn't let us access it

18  is what it meant to me.

19  Q    Is that they wouldn't let you access your $2.4 million?

20  A    That's correct.

21  Q    Was that the first time you had heard that happening?

22  A    Yes.

23  Q    And then subsequent to July 27th, on August 1st, they made

24  another margin call for $933,000, right?

25  A    That's correct.

Pino - Direct                                                          141

1    Q    Had you gotten notice under the contract or if

2    Mr. Timmerman or one of your frequent colleagues that you speak

3    to at Credit Suisse called you about the $933,000, what would

4    you have done?

5    A    I think the first thing I would have done was take a look

6    at the website and figure out whether the collateral value was

7    greater than the -- than the advance amount.

8    Q    And what if it -- and, in fact, you did do that after the

9    fact.  So given your conclusion, what would you have done next?

10   A    I think I would have told him Gary, we don't have -- you

11   know, we've got more collateral than we've got advance.

12   Q    And -- and did you have a prior conversation with

13   Mr. Timmerman about that same subject?

14   A    Months earlier I did.  Yes.

15   Q    And which way did that issue get resolved?

16   A    They gave us the credit for the loans that had net

17   positive values as I was describing.

18   Q    But is your testimony you didn't even have an opportunity

19   to do that, to -- to challenge whether their margin call was

20   proper on August 1st?

21   A    No.

22   Q    You didn't have an opportunity to do that?

23   A    No.

24   Q    After you got an event of default notice on August 2nd,

25   what was the next thing that you remember Credit Suisse doing?

1    A    The next thing I heard was that they were in Dallas at our

2    servicing shop I believe on the morning of the 3rd or indicated

3    that they were in Dallas at our servicing shop on the morning

4    of the 3rd looking to get files and data.

5    Q    And had that ever happened before with Credit Suisse on

6    this contract?

7    A    No.

8    Q    Okay.  So let me just recap, make sure I understand the

9    facts.  August 1st, Credit Suisse sends an e-mail to the

10   company asserting a margin call, is that correct?

11   A    That's correct.

12   Q    August 2nd, there is an event of default notice sent to

13   the company, is that correct?

14   A    Yes.

15   Q    And so August 2nd, you start focusing on whether the

16   collateral values were done the same way they had been done in

17   the past, is that correct?

18   A    Right.  Well, the -- the event of default notice came in

19   relatively late on -- I think it was after 6:30 on the 2nd.

20   Q    Uh-huh.

21   A    I don't believe I started focusing on that until the 3rd.

22   Q    You were doing other things on that Thursday?

23   A    Doing other things.  Yes, I was.

24   Q    Okay.  Mr. Pino, you already testified that you were one

25   of the -- the parties negotiating this contract with Credit

1   Suisse.  Do you believe that the language in the contract is

2   ambiguous with whether you value the assets on an aggregate

3   basis?  I'm asking if you believe it's ambiguous.

4           MR. COMET:  If you're asking him about discussions in

5   the negotiations, that might be parole evidence, if parole

6   evidence is admissible here, but I don't understand,

7   Your Honor, how the witness can offer his opinion on whether

8   the language is ambiguous.  I think that's a legal opinion.

9           THE COURT:  Isn't that -- isn't that my job?

10          MR. KIRPALANI:  It is, Your Honor.  I'm just trying

11  to show the Court that his -- his belief that the course of

12  dealing was to value the collateral in the aggregate is

13  actually supported by some language that he relied on.  So I'm

14  really going to the reasonableness of his belief that the

15  course of dealing was proper.

16          THE COURT:  Well, why don't you ask him -- instead of

17  giving -- instead of -- my concern, and I think the focus of

18  the objection is you're asking his legal opinion on the import

19  of the document itself, and he's not qualified to do that.  So

20  I won't let him testify to that, but if you want to ask him

21  what I think you're trying to get at, which is, you know, what

22  is his basis for believing that that course of dealing meant

23  something, go ahead.

24          MR. KIRPALANI:  Okay.  Thank you, Your Honor.  My

25  mistake.

1    BY MR. KIRPALANI:

2    Q    Mr. Pino, is there anything in the contract that you

3    negotiated that leads you to believe that the course of dealing

4    to -- to aggregate the collateral value was actually the proper

5    way to do it?

6    A    I believe the -- yeah.  I believe the definition of the

7    buyer's margin amount and buyer's margin percentage are, you

8    know, related to the overall transaction or all of the assets

9    of the transaction.

10   Q    It's in tab 1, Mr. Pino.  If you want to just look at the

11   agreement and show the Court what it is that you focused on.  I

12   believe --

13            THE COURT:  Page 4.

14            MR. KIRPALANI:  Thank you.

15   A    I think in -- in the definition of buyer's margin amount,

16   it talks about the buyer's margin -- it being a product of the

17   buyer's margin percentage and the purchase price for the

18   transaction, and in buyer's margin percentage, buyer's margin

19   percentage is obtained by taking the percentage of the market

20   value of all of the purchased assets on the purchase date and

21   divide it by the purchase price on the purchase date for those

22   -- those assets or for the transaction.

23   BY MR. KIRPALANI:

24   Q    But doesn't it say such transaction, and isn't such

25   transaction singular?

1    A    Yeah, but I think the transaction was buying the pool of

2    mortgages.

3    Q    So your understanding is that transaction could refer to a

4    whole pool of mortgages, not just one by one?

5    A    I think it would.

6    Q    I have nothing further with the purchase agreement.  You

7    can put that exhibit away.  Mr. Pino, do you have a view as to

8    what caused the company to file for bankruptcy on August 6th?

9    A    I do.

10   Q    What is that view?

11   A    It was -- generally, it was having to meet large margin

12   calls.

13   Q    Was Credit Suisse one of those margin calls?

14   A    They were a margin call.

15   Q    Mr. Pino, we talked a minute ago about the buy down

16   account.  You remember, Mr. Comet was objecting that I was

17   calling it margin and then you corrected yourself and said it

18   may be -- or corrected me and said well, it was a deposit as

19   opposed to margin.  What's the difference between giving cash

20   to Credit Suisse as margin or as a deposit in your mind?

21   A    I didn't -- I didn't really view a difference.

22   Q    Okay.  And so historically, what was the buy down account

23   used for?

24   A    Generally, it was used to -- to satisfy margin calls.

25   Q    Do you believe that the -- the various margin calls that

1    the company received in the days preceding the bankruptcy

2    caused the company to cease as a going concern?

3              MR. COMET:  Your Honor, I haven't objected thus far,

4    but Mr. Kirpalani is testifying here.  Every question is a

5    leading question, and I would object to his continuing to lead,

6    especially repetitious questions like this.

7              THE COURT:  Mr. Kirpalani, it sounds leading to me.

8              MR. KIRPALANI:  Okay.  Sorry, Your Honor.

9              THE COURT:  I've been waiting for that objection.

10             MR. KIRPALANI:  Sorry, Your Honor.  That's what

11   happens on -- on matters where you haven't had time to really

12   discuss this.

13             THE COURT:  I understand.

14   BY MR. KIRPALANI:

15   Q    Mr. Pino, is the company continuing as a going concern

16   right now?

17   A    No, it's not.

18   Q    Well, what about the servicing business?

19   A    The servicing business is operating with the intention to

20   sell it as a separate portion of the -- of the business.

21   Q    And what about the origination business of the mortgage?

22   A    The origination business has stopped.

23   Q    Were you trying to sell the mortgage business either

24   before or after bankruptcy?

25   A    We were trying to sell it before bankruptcy.

1    Q    So what happened to that process?

2    A    When we got to the period of time where we couldn't fund

3    the mortgage originations, which I believe was the -- I think

4    it was July 26th or that Monday of that week, we really began

5    to lose the ability to -- to hold that business together, and I

6    think we went two or three days after we lost our ability to

7    fund mortgage loans, still attempting to sell the business, but

8    it became pretty apparent with about the third day that without

9    the ability to continue funding current originations, we

10   wouldn't have the ability to -- to hold the business together.

11   Q    Mr. Pino, Credit Suisse has asserted in their papers that

12   we have -- and here in the courtroom, we have -- the company

13   has no reason to keep the servicing because we're not

14   compensated for it by Credit Suisse.  Are you familiar with

15   that argument?

16   A    Yes, I am.

17   Q    Do you have a view on whether or not keeping the servicing

18   is a benefit to the company?

19   A    I do.

20   Q    What's your view?

21   A    My view is that it's -- that it is beneficial.

22   Q    Why is that?  How does it benefit the estate if you're not

23   getting cash for it?

24   A    Well, we -- we believe that the -- the value of the assets

25   above the amount that Credit Suisse had lent us on the assets

1  is really due back to us, and we don't believe that Credit

2  Suisse really has an incentive to try to achieve the full value

3  of those assets.  They really only have an incentive to achieve

4  the value up to the amount that they advanced us, which is

5  about $27.0 million.

6  Q    I'm sorry.  It's 27 or it's -- oh, it's 27 after you apply

7  the 2.4?

8  A    After you apply the 2.4, and, I mean, the day that they

9  gave us the margin call for the $900,000, they had the value of

10  the assets at $35.0 million, and, you know, our view is that

11  when we turn over the servicing to them for them to dispose of

12  the loans, in all likelihood, they're going to dispose of the

13  loans at, you know, as close to $27.0 million as they can

14  without any regard to really trying to get, you know, what we

15  think could be the full value.

16  Q    Do you have any -- what is the basis for your belief that

17  Credit Suisse would have no incentive to -- to try to get value

18  back to the debtor?

19  A    I think they really don't have any upside to working

20  harder to get that value back.  I think they have -- they have

21  an upside to get up to $27.0 million, which is the amount of

22  exposure that they have to those mortgages, and after that,

23  it's really not nearly as meaningful to them as it is to us.

24  Q    Well, does it have any meaning to them if -- if they

25  collect more money than what they are due?

1    A    Probably up through the legal fees and other, you know,

2    accrued expenses that they -- they have to bill us, but north

3    of that, I don't think so.

4    Q    Mr. Pino, did you listen to the testimony of Credit

5    Suisse's witness regarding the sharp decline in the real estate

6    market?  I'm paraphrasing, but that -- that general area?

7    A    I did.

8    Q    Do you have an opinion as to what the real estate decline

9    is, whether it's going up or down or sideways?

10   A    I don't know.  I mean, I've got an opinion, but I don't

11   really have a -- a firm view on it.

12   Q    Do you think you're qualified to give an opinion on the

13   values of where the real estate market is going?

14   A    No.

15   Q    Do you recall the testimony earlier from Credit Suisse

16   that no buyer will purchase the mortgages as long as the

17   servicing is controlled by the Chapter 11 debtors?

18   A    Yes.

19   Q    To your knowledge, has any counter party sold mortgages

20   that are serviced by American Home without selling the

21   servicing rights?

22   A    I am aware of mortgage loans being sold that we currently

23   control the servicing on.  Yes.

24   Q    That happened postbankruptcy?

25   A    Possibly within a day or two of -- of the filing.

1          MR. KIRPALANI:  I have nothing further for this

2     witness, Your Honor.

3          THE COURT:  Cross.

4          MR. COMET:  Yes, Your Honor.

5                      CROSS-EXAMINATION

6     BY MR. COMET:

7     Q    Mr. Pino, American Home has other repurchase agreements

8     with other financial institutions in addition to the one it has

9     with Credit Suisse, is that correct?

10    A    That is true.

11    Q    Were you involved in the negotiation of any of those

12    agreements?

13    A    Yes, I was.

14    Q    Did American Home have counsel in connection with any of

15    those agreements?

16    A    Yes, we did.

17    Q    And with the advice of counsel, you entered into

18    repurchase agreements with other financial institutions, is

19    that right?

20    A    Yes.  Always with the advice of counsel, but I think --

21    did you mean outside counsel?

22    Q    Oh, okay.  So in -- in your negotiations with Credit

23    Suisse, did you have any counsel, inside or outside?

24    A    Yes.

25    Q    Which counsel was that?

1   A    Inside.

2   Q    And who was that?

3   A    Jody Giagos (phonetic).

4   Q    Was Mr. Horn involved?

5   A    No, he wasn't.

6   Q    Okay.  And Jody Giagos -- what -- is that person still

7   with the company?

8   A    No, he's not.

9   Q    Did he have a background in these types of agreements?

10  A    You know, I really don't directly know.

11  Q    And some of your repurchase agreements, you also had

12  outside counsel in addition --

13  A    Yes.

14  Q    -- correct?  And those agreements which -- which you had

15  both inside and outside counsel were repurchase agreements as

16  distinguished from secured financings that Mr. Kirpalani

17  referred to, is that correct?

18  A    We had both.

19  Q    And you had --

20  A    We --

21  Q    You had both, but for some of them that were repurchase

22  agreements, you had outside counsel that advised you.

23  A    Yes.  Yes.

24  Q    Do you know who Credit Suisse's outside counsel was in

25  connection with this repurchase agreement with American Home?

1    A    Uh-huh.

2    Q    Who was it?

3    A    Yes.  I believe it's Cadwalader.

4    Q    Is that the same Cadwalader firm that the debtors have

5    recently filed an application to employ in connection with this

6    bankruptcy case?

7    A    I'm not familiar with the -- the application.  The

8    creditors or --

9    Q    No.  American Home.  Hasn't American Home filed --

10   A    Oh, I thought you said the creditors.  The debtors, yeah.

11   Yes.

12   Q    If I said the creditors, I apologize.  I misspoke.

13   A    Okay.

14   Q    The debtors have filed an application to employ Cadwalader

15   in connection with this bankruptcy case, is that correct?

16   A    Yes.

17   Q    And that's because Cadwalader has been outside counsel to

18   American Home on matters for many years, is that correct?

19   A    Yes.

20   Q    But in this particular transaction, they represented

21   Credit Suisse, is that right?

22   A    That's true.

23   Q    And American Home consented to that, is that right?

24   A    Yes.  I'm sure.

25   Q    And do you have an understanding what Cadwalader's view is

1    about the nature of this agreement?

2              MR. KIRPALANI:  Your Honor, I object.

3              THE COURT:  Basis?

4              MR. KIRPALANI:  Relevance.

5              THE COURT:  Why is this relevant, Mr. Comet?

6              MR. COMET:  I'll withdraw the question, Your Honor.

7              THE COURT:  Thank you.

8              MR. COMET:  Approach the matter a different way.  May

9    I show him an exhibit, Your Honor?

10             THE COURT:  Yes.

11             MR. PINO:  Thank you.

12             THE COURT:  Thank you.

13             MR. COMET:  Let me call this I guess Credit Suisse 8,

14   Your Honor.

15   BY MR. COMET:

16   Q    Credit Suisse 8, Mr. Pino, is a copy of the application to

17   employ the Cadwalader firm.  Have you seen this before?

18   A    I have not.

19   Q    And if you take a moment to look through the document, I

20   think you'll see there is an application followed by an

21   affidavit from an attorney at Cadwalader, which is part of the

22   application, and then finally, an exhibit at the end.  Have you

23   had a moment to look at it?

24   A    Yes.

25   Q    Okay.  If you look at the exhibit at the end, you'll see

1    that it indicates that Cadwalader -- in the first box,

2    Cadwalader represented Credit Suisse as the buyer of American

3    Home Mortgage, originated loans and repurchased transactions in

4    2006 and 2007.  Do you see that?

5    A    Yes.

6    Q    And do you have any reason to think that statement is

7    incorrect?

8    A    No.

9    Q    Thank you.  You read the agreement with Credit Suisse

10   before American Home entered into it, is that correct?

11   A    Yes.

12   Q    And you saw in the agreement that it provided that Credit

13   Suisse was purchasing the loans, is that correct?

14   A    Yes.

15   Q    And you didn't object to that, did you?

16   A    To the wording, no.

17   Q    Well, to the concept.  Did you object to it?

18   A    No.

19   Q    Did you say this should be a financing and not a purchase?

20   A    No.

21   Q    And you were aware that the agreement provided that if

22   American Home became insolvent, it would be required to

23   transfer all the funds and the records and files to Credit

24   Suisse if Credit Suisse asked for that, is that correct?

25   A    Yes.

1    Q    And you agreed to that, is that right?

2    A    Yes.

3    Q    If you could turn in the exhibit binder in front of you to

4    the first exhibit to page 25 in the repurchase agreement.  Do

5    you have that?

6    A    Yes, I do.

7    Q    Okay.  And on that page, there is section 6 headed margin

8    maintenance.  That's the section that applies to margin calls

9    under this contract, is that correct?

10   A    Yes.

11   Q    And that says in section A that if at any time the market

12   value of any purchased asset subject to a transaction is less

13   than buyer's margin amount for such transaction, that would be

14   a margin deficit, is that correct?

15   A    That's correct.

16   Q    Now, do you have an understanding of what a purchase asset

17   under the agreement is?

18   A    Yes.

19   Q    What's your understanding?

20   A    I believe it's a mortgage loan.

21   Q    It's an individual mortgage loan, correct?

22   A    I believe that's true.

23   Q    And so any time there is a margin deficit for an

24   individual mortgage loan under this contract, Credit Suisse

25   could by notice require American Home to transfer cash in an

1    amount equal to that margin deficit pursuant to a margin call,

2    is that correct?

3    A    Yes.

4    Q    So Credit Suisse could -- could say here is one individual

5    loan in this portfolio, the market value of that loan is less

6    than the buyer's margin amount, you should -- you need to

7    transfer that difference pursuant to a margin call, is that

8    correct?

9    A    Yes.

10   Q    Now, does American Home have rules or internal guidelines

11   regarding the credit authority of various employees or the cash

12   authority let's say of various employees?

13   A    Wire transfer authority?  Something like that?

14   Q    Well, is there a rule that, for example, a particular

15   employee can't send cash out of the company more than $100,000

16   or a million dollars or something of that sort?

17   A    Yes, there is.

18   Q    Okay.  And what is -- is there a limit to your authority?

19   A    Yes.

20   Q    What's that limit?

21   A    Honestly, I don't know off the top of my head.  It

22   depended on -- it was on a transactional basis as well as a

23   dollar basis.  So I think, you know, for instance, to pay an

24   accounts payable check, it could only be up to maybe $500,000,

25   but to, you know, repay a warehouse loan, it could be, you

1   know, up to $500.0 million.

2   Q    If it were a margin call in connection with a repurchase

3   agreement, did you have certain authority to approve payment of

4   that?

5   A    I did.

6   Q    What was the amount of that authority?

7   A    Umbrellaed under the -- the warehouse, and I believe it

8   would have been about $500.0 million, but I don't remember the

9   exact amounts.

10  Q    Up to $500.0 million for a margin call.  Is that what

11  you're saying?

12  A    Well, the -- yes.

13  Q    How about Jody Rocco?  Did she have some limit on her

14  authority?

15  A    She did.

16  Q    Does she still?

17  A    Does.

18  Q    What's that limit?

19  A    I don't know off the top of my head.

20  Q    Is it more than $100,000?

21  A    Yes.

22  Q    Is it more than $1.0 million?

23  A    Yes.

24  Q    More than $2.0 million?

25  A    That's where it's -- I'm not that certain around there.  I

1    would be guessing if I said, but maybe it's 5.0 million or

2    something like that.

3    Q    When she received margin call requests, were you normally

4    notified of that?

5    A    Not necessarily.

6    Q    So she could send out hundreds of thousands of dollars

7    without providing any notification to you that she had done

8    that?

9    A    Yes, she could.

10   Q    To be clear, I'm not only asking about ahead of time but

11   even after the fact, you would not receive any kind of

12   notification that a margin call payment of hundreds of

13   thousands of dollars had been made?

14   A    Not necessarily.  No.

15   Q    Well, did you normally receive that?

16   A    Probably not in -- in the hundreds of thousands amount.

17   Q    How about --

18   A    I mean, there are certain -- if I could --

19   Q    Go ahead.

20   A    -- clarify?  There are certain warehouse facilities that

21   were really based on, you know, a warehouse lender marking the

22   portfolio every single day, and the fluctuations of those

23   margin amounts were potentially relatively small -- small

24   dollar amounts.

25        I may be on the distribution of that margin notice.

1    Very often, I am on the distribution of that margin notice.  So

2    I would know that that was there, but in those instances, she

3    might have the authority to make that margin without coming

4    back or -- or telling me.

5    Q    So -- and was she operating in those instances under

6    contracts that did not require that you be notified about a

7    margin call?

8    A    I would have to guess about the contract.  I'm not

9    certain.

10   Q    Well, do you know of any contract -- let's put aside the

11   one in Credit Suisse and American Home.  Do you know of any

12   other contract that requires that you be notified of a margin

13   call?

14   A    Do I know of any that require me to?

15   Q    Yes.

16   A    Yes.

17   Q    Which ones?

18   A    I believe R. Barklay's agreement.

19   Q    Is that a repurchase agreement?

20   A    It's a repurchase agreement.

21   Q    How about are there any repurchase agreements that don't

22   require you to be notified about margin calls?

23   A    I'm not certain.

24   Q    Are there any financing agreements that provide for margin

25   calls and don't require you to be notified?

1    A    I'm not certain.

2    Q    So -- so you're saying then you don't know whether -- when

3    Ms. Rocco was doing all these margin payments, whether the

4    contract notice provisions were being complied with or not, is

5    that correct?

6    A    I'd have to think through all the margin calls and whether

7    I know the specific agreements, but it's possible what you're

8    saying.  Yes.

9    Q    Do you recall ever having a conversation with Jody Rocco

10   and telling her this contract says I'm supposed to be notified

11   about the margin call, you shouldn't be sending out margin call

12   payments without seeing that I've been notified about them?

13   A    I don't recall ever having that conversation with her.

14   Q    Okay.  You testified that you had a conversation around

15   March with people from Credit Suisse about how to calculate

16   margin call, is that correct?

17   A    That is true.

18   Q    Did you write any memo about that conversation?

19   A    Not -- not to my knowledge.  No.

20   Q    Did you confirm in -- in writing with Credit Suisse what

21   had occurred in that conversation?

22   A    No.

23   Q    Do you know of any document that shows that Credit Suisse

24   changed a margin call it had made as a result of that

25   conversation in order to base it on an overall loan portfolio

1    rather than individual loans?

2    A    I believe that there -- that their data would show that.

3    I mean, I think that at some point, they came to us and said

4    you owe us $40.0 million or $35.0 million, and at some point

5    two or three weeks later, they had data that said you don't owe

6    us $35.0 million, you owe us --

7    Q    Well, how did they say this?

8    A    -- something less than that.

9    Q    Did they -- was this in an oral conversation with you, or

10   was it in a written document?

11   A    Well, the -- what I was describing earlier were oral

12   conversations with Gary and Patty.

13   Q    Well, do you have written documents that show that on one

14   day they asked for 40.0 million or whatever the number was, and

15   the next day, they changed it to a lower amount because they

16   were now valuing the matter on an overall portfolio basis

17   rather than individual loans?

18   A    I don't know if I have those documents or not.

19   Q    Do you recall ever seeing any such document?

20   A    I don't recall.

21   Q    If you could turn in the exhibit binder to exhibit 5,

22   please.  Do you have that?

23   A    I do.  I'm there.

24   Q    Okay.  Okay.  Could you turn in exhibit 5 to page 16,

25   please?

1   A    I'm there.

2   Q    Okay.  You'll see at the bottom of that page there is an

3   e-mail from Haley Lauretson at Credit Suisse dated June 13th

4   that was sent to Bonnie Sing, Jody Rocco, and Denise Frank at

5   American Home.  Do you see that?

6   A    Yes.

7   Q    Okay.  And those three people at American Home, Bonnie

8   Sing, Jody Rocco, and Denise Frank, they all dealt with margin

9   call matters, is that correct?

10  A    Yes.

11  Q    And I think you said one of them was that Bonnie Sing

12  reported directly to you?

13  A    Yes.

14  Q    Now, that e-mail refers to a shortfall that's described in

15  an attached spreadsheet.  Do you see that?

16  A    Yes.

17  Q    Okay.  And that -- that e-mail, as I said, is dated

18  June 13th.  I think if you look in -- if you need to, if you

19  look in exhibit 7, there is a series of spreadsheets, and the

20  first -- first spreadsheet in there is dated June 13th.

21  A    Okay.

22  Q    And I believe it's the spreadsheet that accompanied this

23  e-mail.  Now, why don't you take a moment to read this e-mail

24  and look at the spreadsheet, and then I want to ask you whether

25  this e-mail involved a margin call based on individual loans in

1    a deficit position.

2    A    Yeah.  I think -- I think it did.

3    Q    Okay.  And this is well after March of 2007, right?

4    A    Yes.

5    Q    And what was American Home's response to this margin call?

6              MR. KIRPALANI:  Objection, Your Honor.  Is he asking

7    for this witness's recollection, or is he asking him to read an

8    e-mail that he's not copied on?  I just want to know.

9              MR. COMET:  I'll rephrase the question.

10   BY MR. COMET:

11   Q    Do you know -- do you have any reason to think, Mr. Pino,

12   that anyone at American Home objected to this margin call or

13   failed to honor it?

14   A    I don't know.  I don't have any reason to think one way.

15             THE COURT:  You don't have any what?

16             MR. PINO:  Any reason to think that way.  No.

17   BY MR. COMET:

18   Q    You would expect that if the margin call had been on it,

19   you would have heard about it from Credit Suisse, isn't that

20   correct?

21   A    You know, I -- I don't know that that's true.  I think

22   that there were times where there were ongoing conversations

23   about Credit Suisse sending us --

24             THE COURT:  I know that's not a cell phone.

25             MR. PINO:  It can't be mine.

1       A MALE SPEAKER:  I think it is yours, Gregg.

2       THE COURT:  Can you please give it to the clerk?

3   Actually, Mr. Brady, can you approach the witness and have him

4   turn it off?

5       MR. PINO:  Apologize, Your Honor.

6       THE COURT:  That's all right.  Is it off?

7       MR. PINO:  Yes, it is.

8       THE COURT:  All right.  Just give it to Nick.  You

9   can have it after the hearing.  I can't fine witnesses.  It's

10  so annoying.  Only -- only lawyers.  I'm sorry.  You -- I

11  interrupted the flow.  There was a pending question --

12      MR. COMET:  I think, Your Honor --

13      THE COURT:  -- that I don't recall.  So maybe --

14  maybe we could re-ask the question, if that's all right.

15      MR. COMET:  Okay.

16  BY MR. COMET:

17  Q    Prior to August 2, 2007, Credit Suisse had never contended

18  that American Home was in default for failing to honor a margin

19  call, is that correct?

20  A    That is true.

21  Q    And -- well, now, after you had your conversation in March

22  with the Credit Suisse people, did you instruct Bonnie Sing or

23  Jody Rocco or Denise Frank that any margin calls that came in

24  from Credit Suisse that weren't based on an overall portfolio

25  value shouldn't be honored or should be questioned?

1   A    I believe I had conversations with them regarding the

2   conversations that I had with Credit Suisse, and I think that

3   they shared my belief, but no, I didn't tell them not to -- not

4   to honor any margin call that Credit Suisse gave us, but I

5   think what you had asked earlier about whether I would know

6   about it if they dispute it or not I don't think is necessarily

7   true.  I think the one thing that I had been given before was

8   an email exchange where they were actually disputing it that I

9   wasn't on.

10  Q    That -- oh, a document you weren't on.  Okay.

11  A    I wasn't copied on that D-1.

12  Q    Well, you can see that the response to this margin call

13  request was, "We will review your file and get back to you on

14  how we would like to settle the shortfall."  Now, if you turn

15  to page 15 in exhibit 5, you'll see on that page there is

16  another e-mail from Haley Lauretson to Jody Rocco and Denise

17  Frank dated June 20, 2007.  Do you see that?

18  A    Yes, I do.

19  Q    And I think the second spreadsheet in exhibit 7 is dated

20  June 20, 2007.  So feel free to consult that if you need to.

21  Do you agree that this e-mail is another margin call request

22  based on individual loan values rather than an overall

23  portfolio value?

24  A    Which -- which exhibit referred to on tab 7?

25  Q    I think it's the second spreadsheet.  It's dated

1    June 20th.  The dates on the spreadsheets are --

2    A    Oh, I see.  Okay.

3    Q    -- are in the lower right-hand corner on the final page.

4    A    This is on June 20th.

5    Q    Correct.

6    A    I'm not -- the schedule I see in tab 7 shows a deficit of

7    2.7 million, 2,788,292.41.

8    Q    Correct.

9    A    And the shortfall is 3,025,000.  Is the difference that

10   237,000?  I'm going to assume -- I'm going to assume so, but I

11   couldn't add those up.

12   Q    Well, the -- the spreadsheet shows only loans in a deficit

13   position, is that correct?

14   A    That is true.

15   Q    Okay.  And again, you don't know of any document that

16   shows -- I'll withdraw that.  Why don't we look at exhibit

17   that's marked I think as D-5 that Mr. Kirpalani showed you.  Do

18   you still have that?

19   A    Yes, I do.

20   Q    Okay.  And that's an e-mail that you were on, right, dated

21   July 18th?

22   A    Yes.

23   Q    Now, that e-mail indicates that Credit Suisse was having

24   some lack of information in valuing the portfolio, is that

25   correct?

1    A    Yes.

2    Q    And that e-mail asks American Home to provide updated

3    BPO's, is that right?

4    A    Yes.

5    Q    And what are BPO's?

6    A    Broker price opinions.  That's where a real estate broker

7    will review a property and assess the current value of the

8    property.

9    Q    And under the agreement between Credit Suisse and American

10   Home, American Home was required to periodically supply Credit

11   Suisse with broker price opinions regarding the real estate

12   value of the -- in connection with the loans in the portfolio,

13   is that correct?

14   A    I think with some of the loans on the portfolio.

15   Q    And that's what Patricia Robbins is referring to in this

16   e-mail, is that right?

17   A    I don't recall specifically which loans she was asking

18   for.

19   Q    Well, she was asking for updated BPO's from American Home,

20   is that correct?

21   A    Yes.

22   Q    And presumably, she was asking for them in connection with

23   the loans for which she was entitled to BPO's in this

24   portfolio, is that right?  Is that your understanding?

25   A    I'm not sure without looking at the loan, without looking

1    at the list.  My understanding actually from recollection was

2    that we were required to provide BPO's for I thought delinquent

3    loans but that as the mortgage market began to suffer some

4    problems in the spring and summer, they began to ask for BPO's

5    on other products that maybe weren't required under the

6    document.

7    Q    And -- and Ms. Robbins said here that someone named

8    Walker, I guess Walker Kidd (phonetic) would send you and Jody

9    a list of the loans requiring updated BPO's.  Do you see that?

10   A    Yes.

11   Q    And you later received that list, is that right?

12   A    I believe so.  I know Jody did.  I think she provided some

13   BPO's.

14   Q    Right.  Some time after July 18th, towards the end of

15   July, some updated BPO's were provided to Credit Suisse, is

16   that correct?

17   A    Yes.

18   Q    And what Ms. Robbins was asking for in this e-mail was

19   some money to be advanced not specifically because of deficit

20   on any particular loans, but because she had a concern that

21   with outdated information, there could well be a need for a

22   substantial margin call, and she wanted to have money on

23   deposit for the day when these BPO's came in and she could see

24   what specific margin call might be needed, isn't that correct?

25   A    You know, it's unclear for me looking at this -- looking

1      at this e-mail and, you know, obviously, a lot has happened

2      between July 18th and now, whether she already discounted the

3      value of the loans by the ten points in the expectation that

4      these BPO's would come back with value, and so she was

5      therefore asking for margin.

6      Q    Well, she says in here she wants to be able to mark the

7      portfolio with accuracy, correct?

8      A    Right, and I think the way I read that or the way I

9      understood that was that the value of the -- the portfolio,

10     because she didn't have that accurate information, was reduced

11     by ten points, and I thought she was asking for the 2.0

12     million, because after the reduction -- because of the

13     reduction due to not having the data, she thought there was a

14     deficit.

15     Q    But you -- you don't have any reason to think, do you,

16     that -- well, let me rephrase that.  This e-mail is consistent

17     with the idea that Ms. Robbins wanted to have money on deposit

18     for the day when she got these updated BPO's and all the

19     accurate information so that the loan could be -- the loans

20     could be fully valued, although she obviously was expecting

21     they'd have to be -- there would have to be some reduction of

22     value, but she wanted to apply the 2.0 million when she got --

23     finally got the accurate information.  Is there anything in

24     here you think is inconsistent with that?

25     A    Only that I wasn't sure whether or not she had already

1    reduced the value on -- on the loans, but, you know, I think in

2    substance, yeah.

3    Q    Okay.  Now, if you look in exhibit 5, the Credit Suisse

4    exhibit 5, the binder at page 5, there is an e-mail there dated

5    July 26, 2007, and that's another margin request, is that

6    correct?

7    A    Yes.

8    Q    And that was based on the shortfall regarding individual

9    loans in the portfolio, is that correct?

10   A    Yes.

11   Q    And the amount of the shortfall was approximately

12   $389,000, right?

13   A    Yes.

14   Q    And now, that's the -- the margin call that Mr. Kirpalani

15   asked you about where initially, the response by American Home

16   was to debit the buy down account, is that correct?

17   A    That's correct.

18   Q    Now, did you have any knowledge about what was occurring

19   in connection with this margin call at the time?

20   A    No, I did not.

21   Q    Throughout the period from June and July and so on, were

22   you aware that Ms. Rocco or Ms. Sing were getting margin calls

23   from Credit Suisse and responding to them?  I mean, even as a

24   general matter, did you know that was happening?

25   A    Yes.  Uh-huh.

1   Q    And did you ever call anybody at Credit Suisse and say how

2   come you're sending margin calls to those people and not

3   copying me on them?

4   A    No.

5   Q    Now, after American Home said to use the funds in the buy

6   down account for this July 27th margin call, Credit Suisse

7   responded that -- or Ms. Lauretson responded that she had

8   learned that the funds in the buy down account were restricted

9   for a margin call, is that correct?

10  A    Yes.

11  Q    And did anybody at American Home object and say why are

12  they restricted, why can't you use those funds?

13  A    I'm not certain.

14  Q    Do you know of any such objection?

15  A    I don't.

16  Q    Actually, what the e-mails show is that Jody Rocco said

17  she would wire the funds in.  Is that how you read them?

18  A    Yes.

19  Q    And do you know whether as of July 27th, Credit Suisse was

20  still waiting to get the buyer price opinions in order to

21  accurately value the portfolio?

22  A    I believe they were.

23  Q    Okay.  Now, if you turn to exhibit 6 in the binder, it's

24  just two pages.  If you'll take a moment to look at those.

25  A    Okay.  I did.

1    Q    Okay.  Is it your understanding this is the exchange of

2    e-mails about the margin call on August 1st?

3    A    Yes.

4    Q    And this, again, was a margin call for individual loans,

5    is that right?

6    A    Yes.

7    Q    Now, Ms. Rocco responded to this margin call by saying we

8    will not be sending this wire today, is that correct?

9    A    Yes.

10   Q    Do you know if she discussed that with anyone at American

11   Home before sending that response?

12   A    I'm not certain.  I would assume so.

13   Q    Well, have you discussed with her what happened on this?

14   A    No, not on the 1st.

15   Q    Well, did you discuss it with her subsequently?

16   A    I would say I didn't discuss what happened on the 1st with

17   her.

18   Q    So you -- you never asked her why did she respond that way

19   to this margin call?

20   A    I -- no.  No.

21   Q    You have no -- no knowledge on that subject, do you?

22   A    Of why she responded to that?

23   Q    Why she responded the way she did.  Yes.

24   A    I mean, yeah, I've got a good -- good idea, but I don't

25   have a recollection of having a conversation with her about it.

1    Q    Well, did she -- you're not aware of her saying to anybody

2    at Credit Suisse this is not a legitimate margin call.

3    A    No, I'm not.  No.

4    Q    And you don't know of anyone at American Home saying to

5    Credit Suisse this margin call wasn't sent the right way, do

6    you?

7    A    No.

8    Q    Was Ms. Rocco under any kind of general instructions as of

9    August 1st about --

10              THE COURT:  Hold on for just a minute.  Sorry.

11                         (Pause)

12              THE COURT:  I apologize, but if it's get hot -- too

13    hot in here, I stop paying attention.

14              MR. COMET:  We don't want that.

15    BY MR. COMET:

16    Q    Was Ms. Rocco under any kind of general instructions as of

17    August 1st about caution or methods of dealing with wire --

18    margin calls?

19    A    Yes.

20    Q    What were those instructions?

21    A    She was not to pay them.

22    Q    And that was due to the general financial condition of the

23    company at the time?

24    A    Yes, it was.

25    Q    And that was not to pay them regardless of whether they

1    were legitimate margin calls or not, is that correct?

2    A    That was.  Yes.

3    Q    Now, on August 2nd, you got the notice of event of default

4    from Credit Suisse, is that correct?

5    A    Yes.

6    Q    When was the first time after that that you communicated

7    with anyone at Credit Suisse?

8    A    You know, I believe personally, I think I left Gary a

9    voicemail on the 6th.

10   Q    The day of --

11   A    I believe so.

12   Q    -- the bankruptcy filing?

13   A    I believe so.

14   Q    Okay.  And what -- what was the substance of that

15   voicemail?

16   A    Gary -- Gary had called somebody who works for me, Christy

17   Lugo (phonetic), I believe with a request to buy loans off the

18   line, and, you know, I think we had responded back to Gary to

19   say, you know, here is the market value of the loans on the

20   line based on your report on the 1st, what price, you know, are

21   you looking to buy them back at, and I think Gary had indicated

22   to the person who works for me he just wanted to -- to clear

23   the line and not send any money back, and I left him a

24   voicemail saying hey, Gary, I understand you talked to Christy,

25   can you give me a call to discuss, you know, buying the loans

1    back off the line.

2    Q    So you didn't say anything in that voicemail about the

3    margin call, did you?

4    A    No.

5    Q    Or the notice of default.

6    A    No.

7    Q    Do you know what the repurchase agreement provides about

8    Credit Suisse's rights to obtain access and review of the loan

9    servicing records once there has been an event of default?

10   A    Not intimately.  I've read it.  I know where it is in the

11   agreement.

12   Q    Where is it?

13   A    I believe it's in -- I think section 12, I think, or 13.

14   Actually, I'm sorry.  I think it's in 16 -- or it's in -- let's

15   see.

16             THE COURT:  We don't need to -- this isn't a quiz.

17             MR. COMET:  Okay.

18             THE COURT:  If you know where it is, tell him where

19   it is.

20             MR. COMET:  Well --

21   A    Yeah.  I think --

22             MR. COMET:  -- depends upon which --

23   A    Remedies upon default?

24   BY MR. COMET:

25   Q    Well, that's one section.  That provides that Credit

1   Suisse is entitled to have physical possession and have the

2   records and materials turned over if it wants upon default, is

3   that correct?

4   A    Right.

5   Q    Okay, but in terms of merely getting access to the

6   records, are you familiar with section 36 in the contract which

7   is on page 65?  Have you seen this section before?

8   A    I'm sure I have.  Yes.

9   Q    Okay.  And that section provides that upon a default,

10  Credit Suisse is entitled to access to the records on no

11  notice, is that correct?

12  A    Yes.

13  Q    So there was nothing improper about Credit Suisse after

14  giving notice of default asking to get access to the records in

15  Texas, was there?

16         MR. KIRPALANI:  Objection, Your Honor.  Calls for a

17  legal conclusion.

18         THE COURT:  Sustained.

19  BY MR. COMET:

20  Q    Now, you testified about some information you saw on a

21  Credit Suisse website about evaluation, is that correct?

22  A    Yes.

23  Q    Do you have what I think Mr. Kirpalani marked as exhibit

24  D-6?  No?

25  A    Yes.

1    Q    Now, I'm not sure what the last two pages of that are, but

2    the first page, does that show the information you were

3    referring to?

4    A    Yes.

5    Q    This is the information you store.

6    A    A summary -- a summary.  We did -- we took the data and a

7    download from the website and put it into a pivot table in

8    Excel.

9    Q    And do you know whether this information incorporated the

10   broker price opinions that Ms. Robbins had asked for back in

11   the middle of July?

12   A    I don't know if it did or didn't.

13   Q    Okay.  Have you looked since August 1st or -- to see what

14   the information is on the Credit Suisse website?

15   A    We don't have access to the website any longer.

16   Q    Did you look on August 2nd?

17   A    I believe the first time that I looked was August 6th, and

18   we didn't have access to the website.

19              MR. COMET:  I'd like to mark an exhibit, Your Honor.

20              THE COURT:  Yes.  Is this one exhibit or -- what are

21   you marking this as?  D-8, Credit Suisse 8, I think.

22              MR. COMET:  Yes.  Credit Suisse 8, Your Honor.  Thank

23   you.

24   BY MR. COMET:

25   Q    Now, this is a printout, Mr. Pino, of information from the

1   same website, continuous run of various dates.  It shows at the

2   top the -- the summary from August 1st with I believe the same

3   numbers that appear in debtor's exhibit 6.  Do you see that?

4          MR. KIRPALANI:  Objection, Your Honor.  Debtor's

5   exhibit 6 was never introduced into evidence, and this is rank

6   hearsay.  I don't know who prepared this.  I don't think there

7   is any testimony that Mr. Pino prepared it.

8          THE COURT:  Response.

9          MR. COMET:  Your Honor, this -- I don't necessarily

10  need to move this into evidence, but this is from the same

11  website that Mr. Pino was relying upon, and I -- I will ask him

12  if -- just a question about it.  I don't necessarily need to

13  move it into evidence.

14         THE COURT:  Mr. Kirpalani?

15         MR. KIRPALANI:  I'm continuing my objection,

16  Your Honor, but obviously, Your Honor can give it the weight

17  that it deserves.  I still don't understand how it's

18  authenticated by anybody, and he hasn't said he couldn't recall

19  something.  So I don't really know the purpose it's being used

20  for.  He hasn't been asked a question yet.

21         THE COURT:  Well, let's do this.  Ask the question.

22  We'll see how it -- I'll tentatively overrule the objection

23  subject to actually hearing what the question is in connection

24  with the document.

25  BY MR. COMET:

1    Q    If you look, Mr. Pino, at the --

2              THE COURT:  Let me warn you though.  If what you're

3    going to try to do is get what Credit Suisse's position as what

4    the collateral value was on August 2nd by asking him what this

5    says, that's not going to get you there.

6              MR. COMET:  I understand, Your Honor, and you know if

7    necessary, I can call a witness, but that wasn't quite what I

8    was going to ask him.

9              THE COURT:  Okay.

10   BY MR. COMET:

11   Q    You'll -- if you look at Credit Suisse's exhibit 8,

12   Mr. Pino, you'll see compilation numbers for August 2nd at the

13   bottom of the page.  Do you see that?

14   A    Yes, I do.

15   Q    Now, you -- you've been -- let me rephrase that.  In the

16   course of the relationship between Credit Suisse and American

17   Home under the repurchase agreement, Credit Suisse has been

18   calculating collateral values and market values as part of the

19   relationship, is that correct?

20   A    Yes.

21   Q    And you've relied in many instances on Credit Suisse's

22   calculations, is that right?

23   A    That's true.  Yes.

24   Q    And do you know what the broker price opinion reports that

25   were provided to Credit Suisse in late July or so showed about

1    the trend in the market values of the properties that covered?

2    A    I don't.

3    Q    So I believe you heard Mr. Kaiserman testify that they

4    showed a decline in the market values that led to approximately

5    ten percent reduction in the values that Credit Suisse is

6    placing on this portfolio.  Do you recall that?

7              MR. KIRPALANI:  Objection, Your Honor.  This question

8    was asked and answered.  He said he doesn't know.

9              MR. COMET:  No.  I'm asking him now if he heard

10   Mr. Kaiserman's testimony today on the subject.

11             MR. KIRPALANI:  I withdraw it for that question.

12             THE COURT:  All right.

13   BY MR. COMET:

14   Q    Did you hear Mr. Kaiserman's testimony?

15   A    Yes, I did.

16   Q    And do you have any reason to think that the Credit Suisse

17   reduction in value based on the broker price opinion reports

18   did not fairly reflect what those reports showed about the

19   movement of the market values?

20   A    I didn't understand.  When he said that the information

21   provided in the broker's price opinions, whether that said that

22   the property values went down for the whole portfolio ten

23   percent or whether because it went down some smaller number,

24   that brought the whole portfolio down by ten percent, and if it

25   was the latter, then I would have reason to disagree, I think.

1          So I don't know if he was saying that the -- that we

2    gave them BPO's and the home values underlying this collateral

3    all went down by ten percent.  I think what he said is the --

4    the broker price opinion showed a reduction in value that

5    caused Credit Suisse to mark the whole portfolio down by ten

6    percent.

7    Q    I think that's what he said also.

8    A    Yeah.  I think if I had heard that, I would have reason --

9    I would say that seems, you know, surprising to me.

10   Q    Do you know if -- do you have any reason to think Credit

11   Suisse followed -- I'll withdraw that.

12   A    I mean, I said earlier that I wasn't sure on the e-mail

13   from Patty Robbins if they hadn't already marked the portfolio

14   down because they thought the values were -- were in there.

15   Q    But you're not -- you don't know.

16   A    I'm not certain.  No.

17   Q    Okay.  Are you aware of any provision in the repurchase

18   agreement for compensation to American Home attributable to its

19   carrying out the servicing of the loans?

20   A    No.

21   Q    Are you involved in the proposed or upcoming sale of

22   servicing matters by American Home?

23   A    Yes.

24   Q    What's your role in connection with that?

25   A    I am one of the members of the liquidity committee that's

1    responsible for the -- the disposition decisions on the assets

2    of the company.

3    Q    And as a member of --

4    A    So --

5    Q    -- the committee doing that, what specifically are you

6    doing in connection with the -- the sale?

7    A    Specifically with the sale, it is more of a monitoring of

8    the financial advisors that we've hired to sell the business

9    and monitoring of the coordination of the -- of the servicing

10   facility.

11   Q    And one of the things -- well, what -- what assets are you

12   selling in connection with that sale?

13   A    We're selling the servicing platform, which is the

14   infrastructure, the systems, the people, and we're selling the

15   MSR's, the servicing rights.  I think we were selling the

16   servicing advances as well.

17   Q    So when you say you're selling servicing rights, do you

18   mean you're selling rights under servicing contracts?

19   A    Yes.

20   Q    And is this contract with Credit Suisse, is that one of

21   the assets you're seeking to sell in that sale?

22   A    I don't believe so.  No.  Did you ask me if the contract

23   -- the Credit Suisse contract --

24   Q    Is one of the assets you're planning to sell.

25   A    No.

1   Q    Assuming the sale takes place and is successful, what is

2   your plan for the American Home business, servicing business at

3   that point?

4   A    We transfer the ownership to the buyer.

5   Q    And what will happen at that point to the servicing of the

6   Credit Suisse loans?

7   A    My hope is that we continue until the final disposition of

8   those loans.

9   Q    What do you mean, the final disposition of those loans?

10  A    If those loans get sold to a third party on a servicing

11  release basis, it would go with them.  If the loans get

12  securitized, that the servicing would stay with the entity that

13  acquires the servicing business.  If the loans get sold,

14  servicing retained, the servicing would stay with the entity

15  that acquires the business.

16  Q    Well, it's up to Credit Suisse whether the loans get sold

17  or not, correct?

18  A    I mean, that I think is what -- what, you know my

19  attorneys were saying from the beginning.  We are -- you know,

20  we understand that the document reads -- it's a mortgage

21  repurchase agreement, but it's very similar to documents that,

22  you know, I had financing mortgages prior to the 2005 change in

23  the bankruptcy law, and so, you know, we wanted the opportunity

24  to at least think through before we -- if you all conceded that

25  point, and that's why when I think Mr. Kirpalani asked me what

1    the importance of the servicing was to us, was that at the

2    point that we transfer the servicing, they take the loans and

3    dispose of them.

4    Q    And your -- so your -- what you want to do is to keep

5    control of the servicing so that you can have some impact on

6    the sale of the loans, is that correct?

7    A    I think, you know, most importantly, so we could have time

8    to -- to get through the analysis of understanding -- of

9    understanding that.  Yes.

10   Q    Understanding what?

11   A    The impact of the sale of the loans.  For instance, what I

12   said, what I heard from -- from Credit Suisse was I know that

13   you've given me this spreadsheet, but the day earlier, I looked

14   at a spreadsheet that said the loans were worth 35.  Two days

15   later, I heard back from a direct report of mine that a

16   representative of Credit Suisse said, you know, they were worth

17   27, at best, and, you know, we've taken them and we're gone,

18   and that's really what we had said.  We just -- that -- you

19   know, in a course of we got a notice on Thursday.  They showed

20   up on Friday.  On Monday, they were in court saying these are

21   ours and it's decided and there is no gray area.

22   Q    Well, in -- in a secured financing arrangement --

23   A    Right.

24   Q    -- one you had before 2005 or have today, the financer has

25   a collateral interest in the loans, doesn't it?

1    A    I believe so.

2    Q    And even -- even under that kind of arrangement in

3    bankruptcy, the financing company is entitled to control the

4    disposition of the loans, isn't it -- in most instances.  Isn't

5    that your understanding?

6              MR. KIRPALANI:  Objection, Your Honor.

7    A    That's a little bit outside my --

8              THE COURT:  Sorry?

9              MR. KIRPALANI:  Objection that it's calling for his

10   bankruptcy expertise, and I don't think he has any.

11             MR. COMET:  I would only say, Your Honor, he's

12   previously testified about his understanding of differences

13   between repurchase agreements and financings and -- but if he

14   -- if he thinks he's not capable of explaining how -- what

15   difference that makes in actual practice in a bankruptcy case,

16   then that's fine, if the witness is not competent on that, but

17   if he has an understanding on it, that's what I'm asking for,

18   not a legal opinion.

19             THE COURT:  All right.  Do you understand -- do you

20   have an understanding --

21             MR. PINO:  Well --

22             THE COURT:  -- of the difference?

23             MR. PINO:  I can tell you what -- what my

24   understanding is or what it --

25             MR. KIRPALANI:  Excuse me, Your Honor.  Just to

1    caution the witness not to go into attorney/client

2    communications, but you can give your understanding away from

3    that.

4              MR. PINO:   Right.   Right.   Right.   Right.

5    A    Was that prior to 2005, my warehouse lender would have a

6    security interest in that collateral, and after the filing of a

7    bankruptcy, that the disposition of that collateral -- that I

8    would immediately hand over all, you know, rights, interest,

9    title, files, servicing, everything to that, that they could

10   take and do whatever they wanted to, that there would be a

11   process that would go through the court system to allow for the

12   disposition of the assets but that the -- after 2005, that the

13   view of mortgage lenders that changed their security -- secured

14   facilities to repo facilities would go right through that and

15   just take it and do whatever they wanted to.

16   BY MR. COMET:

17   Q    So you're saying that you want to keep control of the

18   servicing of the Credit Suisse loans here in order to make sure

19   that the -- the disposition of those loans is somehow

20   controlled through the court process, is that correct?

21   A    I think at least we wanted to control the servicing to

22   give us the time to understand whether -- whether we had that

23   right, I guess.

24   Q    Whether you had what right?

25   A    That right to have that process controlled by the court.

1    Q    Now, if Credit Suisse sells the loans in a manner that's

2    not commercially reasonable, it doesn't produce a fair value

3    for them, your understanding is you could assert a claim

4    against Credit Suisse, right?

5    A    Yes.

6    Q    And do you have any reason to think Credit Suisse would

7    not have sufficient assets to pay that claim if the Court

8    entered a judgment against Credit Suisse?

9    A    I don't have any reason to think that.

10   Q    In fact, you have a lot of reason to think that Credit

11   Suisse would have enough money, right?

12   A    I think that's true.

13   Q    Okay.  Now, on the other side, if Credit Suisse is

14   prevented from selling the loans and the value declines and

15   Credit Suisse puts in a claim in bankruptcy for that reduction

16   in value, they're not likely to get 100 cents on the dollar for

17   that, are they?

18   A    I mean, I think that's similar to a lot of people that

19   have secured financings with the company, but I think -- and I

20   think that's in my opinion why that bankruptcy protection was

21   afforded in those secured financings.  So I understand that.

22   You know, I have reason to believe that they'd have a less

23   likely -- less likelihood of getting 100 percent on the dollar

24   of their claim than I would on my claim against them.

25   Q    You would say that's a substantial greater likelihood,

1   isn't it?

2   A    Yeah.  Yes.

3   Q    Has American Home tried to find someone who would buy the

4   loans from Credit Suisse and pay the full loan balance value of

5   the loans?

6   A    We are really -- you know, the creditors committee just

7   got formed on Tuesday.  We were really just beginning the

8   process of coming up with a plan on asset disposition to -- so

9   no, I guess.

10  Q    Well, I'm not sure the question and answer connected, so

11  let me just try one more time.

12  A    Right.

13  Q    If Credit Suisse were to say to you you find me a buyer

14  who will pay the full amount of the unpaid balance to Credit

15  Suisse on the loans and if you do, I'll gladly sell the loans

16  to that person, have you considered that possibility and tried

17  to find a buyer who would do that?

18  A    We've considered the possibility.  We haven't gotten to

19  the point of trying to find a buyer.

20  Q    If you sell the servicing business of American Home and

21  the -- there has been no disposition of what happens to the

22  Credit Suisse loan to that point, your proposal is that

23  American Home is just going to keep servicing the loans

24  indefinitely until there is some kind of resolution with the

25  Court or between the parties?  Is that -- is that what you're

Pino - Cross                                                    189

1    saying?

2    A    I would expect that the transfer of the servicing would go

3    with the entity that acquired the servicing platform.

4    Q    But you told me a few minutes ago you're not planning to

5    sell that servicing, correct?

6    A    I misunderstood.  It's -- it's not in the valuation, you

7    know, proposal that we're giving to the -- to the servicer, but

8    yeah, the people that take the platform would understand that

9    they take the warehouse loans that they're servicing as well.

10   Q    You --

11   A    So I think -- so I answered that wrong.

12   Q    So you're going to ask those people to take the warehouse

13   loans and service them even though they receive no compensation

14   for them?

15            MR. KIRPALANI:  Objection, Your Honor.  I think that

16   mischaracterizes the record.  The individual employees receive

17   compensation for showing to work -- for showing up to work, not

18   for individual loans.

19            MR. COMET:  No.  No.  That was not my question.  I

20   apologize if maybe I misspoke.

21   BY MR. COMET:

22   Q    Your -- there is no provision in the repurchase agreement

23   between Credit Suisse and American Home for American Home to

24   receive compensation attributable to servicing the loans, is

25   that correct?

1    A    The way the agreement worked in practice, we really

2    received all of the interest payments on the loans and remitted

3    an interest bill to Credit Suisse for the amount that they had

4    advanced us, and so, you know, to the extent that that is

5    income that comes into the, you know, servicer of the loan,

6    that would be servicing income, I guess, but there is no

7    specific provision in the agreement that says American Home

8    will earn 25 basis points or 30 basis points or --

9    Q    And the agreement also says that upon default, all of the

10   income has to go to Credit Suisse, is that correct?

11   A    That's true.  Yeah.

12   Q    And American Home is not planning to assume and assign the

13   entire agreement, is that correct?

14   A    That is true.

15   Q    So what you're going to propose to purchasers at the

16   auction of the servicing is that they assume the servicing

17   rights under this agreement without the rest of the agreement

18   and take on the servicing obligation, is that correct?

19   A    Yes.

20   Q    And what are you going to tell them about what

21   compensation they'll receive for doing the servicing?

22   A    That hasn't been discussed.

23   Q    Well, based on the agreement, do you know of anything that

24   would identify what compensation they would obtain?

25   A    No.

1    Q    So is your -- your plan to ask them to take on the

2    servicing of all of the warehouse loans regardless of whether

3    they receive any compensation for it?

4    A    My -- my expectation is that the mortgage loans would be

5    disposed of prior to the transfer of servicing.  However, if

6    that were not the case, that would be my expectation.

7    Q    So you -- you think all the mortgage loans and all your

8    warehouse lines are going to be disposed of prior to the third

9    week in September?

10   A    Well, I believe if there is a purchase of the servicing

11   platform, that the actual transfer of the servicing platform

12   would probably take place at some point after that.

13   Q    When after that?

14   A    I would think licensing and things like that would

15   probably take 120 days, in that neighborhood.

16   Q    You're saying -- we're talking now five or six months from

17   now before American Home stops servicing?

18   A    Probably five months in a transfer of a -- of a servicing

19   platform.

20            THE COURT:  Mr. Comet --

21            MR. COMET:  Yes?

22            THE COURT:  -- how much longer do you think you have

23   with this witness?

24            MR. COMET:  I don't think too much longer,

25   Your Honor.

1          THE COURT:  You can take as long as you want.  I'm

2     just trying to get an idea.  Take as long as you need, but

3     maybe you can consult with your colleague and give me a

4     guesstimate.

5          MR. COMET:  Okay.

6                              (Pause)

7          MR. COMET:  Have you --

8          THE COURT:  Hold on.  How much longer?

9          MR. COMET:  Oh, I apologize, Your Honor.

10         THE COURT:  That's okay.

11         MR. COMET:  I think I just have a few more minutes.

12         THE COURT:  Few more minutes.  Mr. Kirpalani, you

13    going to have redirect?

14         MR. KIRPALANI:  Less than five minutes, Your Honor.

15         THE COURT:  All right.  All right.  We'll push

16    through then.  Okay.

17    BY MR. COMET:

18    Q    Have you prepared any materials for potential buyers for

19    the servicing platform?

20    A    Not me personally, but there have been prepared.

21    Q    Do you know if there is any reference to the Credit Suisse

22    contract in those materials?

23    A    I don't know.

24    Q    In general, is there reference to the warehouse repurchase

25    agreements in those materials?

1   A    I don't know.

2   Q    Your -- correct me if I'm wrong.  Your concern in holding

3   onto the servicing rights in this transaction is solely because

4   you think that Credit Suisse won't sell the loans in a

5   commercially reasonable manner to obtain the best value, is

6   that correct?

7   A    I think it's two parts.  I think that's one of them, and I

8   think the other one was just to give us a chance to understand

9   that as we transfer this over, were we doing something that we

10  should be doing inside of bankruptcy.

11  Q    Well, as far as an ultimate benefit or loss to the estate,

12  your concern is that the loans be sold for the best value, is

13  that correct?

14  A    That is true.  Yes.

15  Q    And if there were some way of assuring that would occur,

16  even though the servicing had been transferred to Credit

17  Suisse, would you see any reason there after why you wouldn't

18  want to transfer the servicing to Credit Suisse?

19          MR. KIRPALANI:  Objection, Your Honor.  Is he calling

20  for speculation or making a settlement offer?  I don't know

21  what's the question.

22          MR. COMET:  The question is designed to try to

23  identify exactly what -- where the controversy is between the

24  parties, Your Honor.  I'm trying to pinpoint that so -- I think

25  that would be helpful to the Court and the parties to figure

1    out what is going on here, because frankly, some of the

2    testimony we heard today is -- is surprising to us.  We didn't

3    realize exactly what the debtor's position was going to be.

4            THE COURT:  Objection is overruled.

5    A    Ask that again, please.

6    BY MR. COMET:

7    Q    Yes.  If there were some method to assure that Credit

8    Suisse -- that you believe would assure that Credit Suisse will

9    sell the loans in a commercially reasonable manner to obtain

10   fair value or the best possible value in the current market,

11   would there be any reason then why you would have a problem

12   with transferring the servicing rights?

13   A    I don't believe so.

14           MR. COMET:  I have no further questions, Your Honor.

15           THE COURT:  All right.  Thank you.  Redirect.

16           MR. KIRPALANI:  Very briefly, Your Honor.

17                    REDIRECT EXAMINATION

18   BY MR. PINO:

19   Q    Mr. Pino, you had a couple of questions on cross about the

20   law firm of Cadwalader.  Do you remember that?

21   A    Yes, I do.

22   Q    Have you ever reviewed a Cadwalader legal opinion relating

23   to a repurchase agreement?

24   A    Yes, I have.

25   Q    To your knowledge, do those legal opinions typically have

1    guarantees as to how the repurchase agreement would be treated

2    by a court like this?

3    A    No.

4            MR. COMET:  Your Honor, can we clarify whether Mr.

5    Kirpalani is talking about an internal legal opinion and waving

6    the attorney/client privilege or something else?

7            MR. KIRPALANI:  No.  I'm talking about a legal

8    opinion given by a law firm, Cadwalader, to a repurchase

9    agreement, to a repurchaser transaction.

10           MR. COMET:  Isn't Cadwalader representing the

11   American Home or representing the financial institution giving

12   an opinion to American Home?

13           THE COURT:  Doesn't matter.

14           MR. KIRPALANI:  Doesn't matter.

15           THE COURT:  What's the -- if he's waived

16   attorney/client privilege, he's waived it.

17           MR. COMET:  Well, I just want -- I just wanted to --

18           THE COURT:  Not your job to protect his

19   attorney/client privilege.

20           MR. COMET:  It's not, Your Honor.  I guess I can ask

21   further questions, but I'm entirely unclear about whose -- in

22   what capacity this opinion is being given, but that's fine.

23           THE COURT:  All right.  I'm not sure what the

24   objection is, but to the extent it's to preserve the debtor's

25   attorney/client privilege, I don't think you have standing.  To

1  the extent he looked at something Credit Suisse got, then

2  Credit -- that was attorney/client privilege, then Credit

3  Suisse waived the privilege.  So I don't think it's relevant

4  one way or the other.  So objection is overruled.

5  BY MR. KIRPALANI:

6  Q    Just generally speaking without respect to any particular

7  transaction in a legal opinion given in connection with a

8  repurchase agreement, even by the esteemed firm Cadwalader, is

9  it your understanding that there is any certainty as to the

10 issue as to what Judge Sontchi would rule on a particular day?

11 A    No, there is not.

12 Q    Is Cadwalader your bankruptcy counsel in this case?

13 A    They are not.

14 Q    Do you know why?

15 A    A conflict of interest with -- with many of our creditors.

16 Q    Mr. Comet asked you whether you typically relied on Credit

17 Suisse for valuation of the collateral.  Do you remember that

18 question?

19 A    Yes.

20 Q    Have you ever had a dispute with Credit Suisse?

21 A    Yes.

22 Q    Over the course of dealings with Credit Suisse since you

23 negotiated the contract, you testified earlier that there were

24 at times disputed margin calls, is that correct?

25 A    Yes.

1   Q    How long typically did it take to resolve a disputed

2   margin call?

3   A    It varied.  I mean, I recall at least one time being, you

4   know, more than a couple of weeks, maybe three weeks, and other

5   times it being a week or, you know, a couple of days.

6   Q    To your knowledge, did the company have any indication

7   that if they didn't respond to this margin call in one business

8   day, that there would be an event of default?

9   A    No.

10            MR. KIRPALANI:  The last -- I have no further

11   questions, Your Honor.  Just I wanted to move the debtor's

12   exhibit 5 into evidence.  That was the one e-mail that Mr. Pino

13   received himself from Credit Suisse on the $2.0 million.

14            THE COURT:  Any objection?

15            MR. COMET:  No objection.

16            THE COURT:  D-5 is admitted.

17            MR. KIRPALANI:  Thank you, Your Honor.  We have no

18   further witnesses.

19            THE COURT:  All right.  Do you have --

20            MR. COMET:  I just have two questions.

21            THE COURT:  I generally don't allow recross, but I

22   think you got into a new area there with Cadwalader.  So I'll

23   allow you to -- I assume that's what you're going to get into.

24            MR. COMET:  Well, on second thought --

25            THE COURT:  All right.

Colloquy                                                           198

1          MR. COMET:  -- I have no further questions.

2          THE COURT:  All right.  There you go.  You may step

3     down.

4          (Witness excused)

5          THE COURT:  No further witnesses and no further

6     admission of evidence, correct?  All right.  That will close

7     the debtor's case.  Do you wish to put on a rebuttal case for

8     Credit Suisse?

9          MR. COMET:  No, Your Honor.

10         THE COURT:  All right.  That will close the evidence.

11    We're going to need to have oral argument, I know.  I want oral

12    argument, and I know it's going to take a long time.  So we're

13    not going to have oral argument tonight.  We're going to have

14    oral argument tomorrow, because frankly, I'm not fresh enough

15    for -- to give you the attention you deserve on this important

16    matter.

17         So we'll -- we can -- and I apologize to those of you

18    who are from out of town, but -- so I have availability

19    tomorrow morning at say 9:00, or I can give you 11:30.  I don't

20    know if you're going home or staying and coming back.  However

21    you want to proceed.

22         MR. COMET:  We -- we had not planned on saying over,

23    Your Honor.  So if it could be possibly scheduled not first

24    thing in the morning.

25         THE COURT:  Is 11:30 okay?

1          MR. KIRPALANI:  I would have stayed if you didn't

2    mind seeing me in the same suit, but I'll come back tomorrow,

3    Your Honor.  11:30 --

4          THE COURT:  Well, see, it's a long way between where

5    I am and you are.  So it doesn't bother me.  It may bother your

6    colleagues.  Mr. Brady will put you up I'm sure.

7          All right.  Let's reconvene at 11:30 then.  I have a

8    call at 11:00 that I don't think will take too long, but if it

9    goes on, we may start a little late, but we'll reconvene at

10   11:30 for oral argument.

11         While I have everyone here, I know Mr. Beskrone

12   represents Morgan, Stanley, and I had -- he filed a TRO

13   application either yesterday or this morning -- I can't recall

14   which -- and I indicated to the parties that we would discuss

15   scheduling of that at the conclusion of the hearing.  So now

16   would be the time to do that.

17         MR. BESKRONE:  Good evening, Your Honor.  May I

18   please the Court.  Don Beskrone from Ashby & Geddes for Morgan

19   Stanley Mortgage Capital Holdings, LLC.  Your Honor, I believe

20   -- I hope she's available.  Appearing telephonically is my co-

21   counsel, Lee Attanasio from the Sidley, Austin firm.

22   Ms. Attanasio is admitted in good standing in the State of

23   New York.  I'd move her admission and ask that she be able to

24   be heard today.  I believe her pro hoc motion is in the

25   process.

1         THE COURT:  All right.  Thank you, Mr. Beskrone.  Ms.

2   -- is it Attanasio?

3         MS. ATTANASIO:  It's Attanasio, Your Honor, and I --

4   I am on the call.

5         THE COURT:  Okay.

6         MS. ATTANASIO:  I appreciate the opportunity to

7   participate telephonically, Your Honor, and to address the

8   scheduling on the motion that we filed.  I believe it fell in

9   under the wire last night.

10        We've had some discussions with Young, Conaway about

11  scheduling.  Obviously, this is a matter that Morgan, Stanley

12  feels needs to be heard at the earliest possible date.  I do

13  believe, without getting into the merits obviously, Your Honor,

14  that there are substantially fewer, really, if any, factual

15  issues that are going to be in dispute on this matter.  The

16  contracts are very --

17        THE COURT:  That's what Mr. Comet thought.

18        MS. ATTANASIO:  Excuse me, Your Honor?

19        THE COURT:  I said that's what Mr. Comet thought.

20        MS. ATTANASIO:  Oh.  Well, the contracts are very

21  different than the ones at issue here.

22        THE COURT:  Right.

23        MS. ATTANASIO:  And so we -- we believe that we could

24  do this at a very early date and would like to suggest, subject

25  obviously to the Court's calendar, as early as Monday or

Colloquy                                                    201

1    Tuesday of next week.

2             THE COURT:  Okay.  Mr. Brady or Mr. Dorsey, whoever.

3             MR. BRADY:  Your Honor, for the record, Robert Brady.

4    We believe we have an agreement in principal with Morgan,

5    Stanley on this issue.  It needs to be -- we need to run it by

6    Bank of America, and we -- as I sat here today, there has been

7    some documentation going back and forth about an interim step

8    to implement that agreement.

9             So we would propose that this get scheduled no

10   earlier than Wednesday to give the parties a legitimate period

11   of time to try to document and resolve this rather than turning

12   our attention to preparing papers and witnesses for a hearing.

13            MS. ATTANASIO:  And, Your Honor, we -- we do

14   absolutely acknowledge, and we are very hopeful that we can

15   document the agreement in principal.  The concern is simply

16   that if -- if that does not come to fruition, there are some

17   scheduling conflicts on Wednesday that we were hoping to avoid,

18   but we'll be prepared to go forward either consensually by

19   presentation of a stipulation or with a -- a full hearing, you

20   know, on any day that the Court can schedule us, but certainly,

21   at the earliest date available.

22            THE COURT:  Well, Wednesday is not great for me

23   either, and I'm tentatively scheduled.  I may know more

24   tomorrow, frankly, about Thursday, but Mr. Brady's client is --

25   doesn't want me to go forward on Thursday.  I'm supposed to

Colloquy                                                    202

1    have a sale -- all-day sale hearing in Nelson.

2            So let's do this.  I'll give you -- let's do the

3    afternoon of Tuesday, the 21st.  Obviously, if the parties

4    agree to move it, we'll work with you to -- to reschedule it,

5    but 2:00 p.m. on Tuesday.

6            MS. ATTANASIO:  I appreciate that very much,

7    Your Honor, and will obviously try and let the Court know as

8    soon as possible --

9            THE COURT:  Right.

10           MS. ATTANASIO:  -- if we won't need time for trial.

11           THE COURT:  Okay.  And I'll let you guys work out

12   amongst yourselves as professionals and colleagues a briefing

13   schedule that makes sense.

14           You know, if you can get me the briefs, if I get them

15   Tuesday morning, I'll be ready for the -- the hearing in the

16   afternoon.  So if you want to have until Monday night to file

17   your brief, reply -- or answering brief, I think that will

18   probably work.

19           MR. BRADY:  Thank you, Your Honor.

20           THE COURT:  Okay.  Anything further for today?

21         (No verbal response).

22           THE COURT:  All right.  Just so -- so we'll reconvene

23   on oral argument on the Credit Suisse matter at 11:30 tomorrow,

24   and then we've scheduled the TRO in the Morgan, Stanley matter

25   for August 21st at 2:00, and you're the first hearing tomorrow.

Colloquy                                    203

1   So if you want to leave your things, you can.  If not, you can

2   take them home.  All right?

3              MR. KIRPALANI:  Your Honor, if I can just ask a

4   question, please?

5              THE COURT:  Yes.

6              MR. KIRPALANI:  Mr. Pino doesn't have to come back

7   tomorrow, correct?

8              THE COURT:  No.  Evidence is closed --

9              MR. KIRPALANI:  Right.  Okay.  Thank you.

10             THE COURT:  -- for both sides.  So it's simply oral

11  argument at this point.  All right?  Thank you very much.  The

12  hearing is adjourned until tomorrow at 11:30 a.m.

13             ATTORNEY:  Thank you.

14             ATTORNEY:  Thank you, Your Honor.

15        (Case adjourned)

16                        * * * * *

17                  C E R T I F I C A T I O N

18        I, Maureen Emmons, court approved transcriber,

19  certify that the foregoing is a correct transcript from the

20  official electronic sound recording of the proceedings in the

21  above-entitled matter.

22

23  _____        Date:

24  MAUREEN EMMONS

25  DIANA DOMAN TRANSCRIBING