UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .    Chapter 11
                                .
AMERICAN HOME MORTGAGE          .    Case No. 07-11047(CSS)
HOLDINGS, INC., a Delaware      .    (Jointly Administered)
corporation, *et al.*,          .
                                .    Aug. 22, 2007 (9:12 a.m.)
            Debtors.            .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

INDEX

|            | Direct | Cross | Redirect | Recross |
|------------|--------|-------|----------|---------|
| WITNESS:   |        |       |          |         |
| Damian Vaulo |      | 22    | 28       | 30      |

1                    THE CLERK: All rise.

2                    THE COURT: Please be seated.  Good morning.

3                    MS. MORGAN: Good morning, Your Honor.  Pauline

4       Morgan from Young Conaway Stargatt & Taylor on behalf of the

5       debtors.  We only have one listed thing on the agenda today.

6                    THE COURT: Yeah.

7                    MS. MORGAN: Thank you.  But Mr. Brady is here to

8       hand up a stipulation, and I understand he has permission

9       from chambers to present briefly.

10                   THE COURT: Yes.

11                   MS. MORGAN: Thank you, Your Honor.

12                   THE COURT: Good morning, Mr. Brady.

13                   MR. BRADY: Good morning, Your Honor.  Robert Brady

14      on behalf of the debtors.  This is a stipulation with ABN

15      Amro that creates a procedure for ABN to make advances

16      required under certain construction loans.  This is

17      substantially similar to the stipulation we presented earlier

18      in the case with respect to JPM Morgan Chase.  This has been

19      thoroughly negotiated by the debtors, ABN Amro, the Creditors

20      Committee, Bank of America, and the DIP lender.  It's

21      slightly different because the structure of the facility was

22      different than JPMC.  Under the ABN agreements, the committed

23      amount of the facility was funded incrementally based upon a

24      draw request, which is generated by the borrower at the

25      achievement of a milestone.

1          THE COURT: Okay.

2          MR. BRADY:  Pre-petition AHM would fund the entire

3    advance and collect the bank's piece afterwards.  This

4    stipulation puts in place a procedure whereby ABN Amro will

5    fund the entire amount of the draw in advance.  Just some key

6    points to the stipulation: the debtors may make funding

7    requests to ABN up to $32 million, and ABN is authorized but

8    not obligated to fund those requests either through allowing

9    withdraws from a collection account that's been maintained or

10   through additional transfers.  The debtors are segregating

11   all collections that come in on these loans on and after the

12   petition date into a specified post-petition collections

13   account.  The stipulation as with JPMC makes it clear that

14   any money transferred for advances shall not become property

15   of the estate, shall not be deemed collateral for any of the

16   debtors' obligations, future or outstanding, other than ABN

17   does have a protective security interest in its favor under

18   the pre-petition agreements.  The advances may only be used

19   to pass along to the borrower to satisfy obligations.  If

20   they're not, they're to be returned to ABN.  As with the JPMC

21   stipulation, ABN has agreed it will not assert any

22   administrative or priority claim against the debtors with

23   respect to the transactions contemplated by this stipulation.

24   It will not assert a lien or security interest in any of the

25   property of the debtors' estate which constitutes, and these

1   are defined terms, pre-petition collateral or collateral

2   under the cash collateral order or any other lien or security

3   interest, again, other than the protective security interest

4   ABN is provided under the pre-petition agreements.  This

5   stipulation expressly provides for the continuation of

6   servicing fees to be paid to the debtors.  Paragraph (17)

7   outlines a budget for the remainder of 2007.  The debtors

8   will continue to report in the same manner as they did

9   pre-petition and the stipulation contains various other

10  reservations of rights by the parties.  With that, Your

11  Honor, unless you have any specific questions, the debtors

12  would ask that you -

13          THE COURT: Well, about this budget, these are funds

14  that will flow to the debtors for servicing the construction

15  loans?

16          MR. BRADY: The budget sets forth what we believe

17  are servicing expenses will be for those months under the

18  construction loan portfolio in total.  ABN Amro is obligated

19  then to pay their -

20          THE COURT: Pro rata.

21          MR. BRADY:  - pro rata share which would be

22  basically the number of ABN Amro loans divided by the total

23  loans in the pool.

24          THE COURT: What if the debtors underestimate the

25  budget and it, in fact, is higher?  Are they waiving the

1    right to seek additional funds from ABN?

2          MR. BRADY: No.  My understanding of the agreement,

3    Your Honor, is that this is meant to be an estimate of what

4    the servicing fees will be, but ABN Amro will be responsible

5    for whatever they are, its pro rata share.

6          THE COURT: Okay.  Does anyone wish to be heard in

7    connection with this matter?  Well, let me hear statements on

8    the record on behalf of the Committee and the DIP lender and

9    the cash collateral lender that they in fact have no

10   objection.

11         MR. INDELICATO: Good morning, Your Honor.  Mark

12   Indelicato from Hahn & Hessen, proposed counsel to the

13   Committee.  Your Honor, I can confirm that this was heavily

14   negotiated line by line.  The Committee was intimately

15   involved.  There were some issues that were addressed and

16   were corrected to the satisfaction of the Committee, so based

17   on that, we would support the entry of the stipulation.

18         THE COURT: Thank you.

19         MS. COUNIHAN: Good morning, Your Honor.  Victoria

20   Counihan from Greenberg Traurig on behalf of the DIP lender,

21   WLR Recovery Fund.  Your Honor, in addition, this was heavily

22   negotiated with my co-counsel from Jones Day, and I

23   understand the DIP lender consents to the entry of the order.

24         THE COURT: Thank you.  Bank of America?

25         MR. TALMODGE: Good morning, Your Honor.  Scott

1      Talmodge from Kaye Scholer representing Bank of America as

2      the administrative agent under the pre-petition facility

3      referenced in the cash collateral order.  As everyone has

4      just said, this was very heavily negotiated.  It mirrors in

5      many respects what the Court has already entered in respect

6      to the JP Morgan stip, and, therefore, we have no objection

7      to the entry of the stipulation.

8                  THE COURT: Thank you.

9                  MR. NEUFELD: Good morning, Your Honor.  Fred

10     Neufeld of Millbank Tweed and John Knight of Richards Layton

11     for ABN Amro bank and my colleague Bob Moore is on the phone.

12     I would just add to what Mr. Brady said that the commitment

13     of the bank to pay for the servicing fees is a benefit the

14     debtors did not have pre-bankruptcy.  It wasn't part of the

15     agreement for debtors to provide those services as part of

16     the price for the loans that were sold, so this is an

17     additional benefit that we're providing during the bankruptcy

18     case.

19                 THE COURT: All right, thank you, sir.  Does anyone

20     else wish to be heard in connection with this matter?  All

21     right, hearing none, I'll approve the stipulation.  Do you

22     have a signature copy, Mr. Brady?  I pulled it off the docket

23     this morning and read it, but I hope you have a clean copy.

24                 MR. BRADY: I do, Your Honor.

25                 THE COURT: Thank you.  I've signed the order.

1          MR. BRADY: Thank you, Your Honor.

2          MS. MORGAN: Your Honor, again for the record,

3     Pauline Morgan for the debtors.  Your Honor, the matter

4     scheduled for today's agenda is the debtors' motion

5     authorizing entry into an auction procedures agreement for

6     approval of sale procedures in connection with the proposed

7     sale of 5,700 mortgage loans owned by Broadhollow Funding LLC

8     or Melville Funding LLC approving form and manner of the

9     notice of that auction and approving a sale to a bidder.  As

10    was indicated at the first day hearing briefly in connection

11    with the cash management order, Broadhollow and Melville are

12    non-debtor special purpose entities established by AHM

13    Investment, one of the debtors, to fund a portion of its

14    prime mortgage origination.  Broadhollow and Melville issued

15    commercial paper in the form of secured liquidity notes,

16    which everyone refers to as SLNs, and they're secured by

17    mortgage loans that Broadhollow and Melville purchased

18    pursuant to certain mortgage loan purchase and servicing

19    agreements with certain of the debtors.  There are swap

20    parties which are identified as Exhibit B to the motion and

21    each of those swap parties entered into an agreement with

22    either Broadhollow or Melville, and pursuant to ISDA master

23    agreements, the swap providers have exposure with respect to

24    fluctuations in the value of the mortgage loans.  So they are

25    required to cover certain deficiencies between the market

1    value of the assets and the amount due under the SLNs.

2    Additionally, each of the swap providers is a party to a

3    back-to-back or a mirror swap agreement with certain of the

4    debtors, and pursuant to those back-to-back swap agreements,

5    certain of the debtors are obligated to the swap providers,

6    again intended to hedge their potential exposure with respect

7    to the agreements.  So, if the swap providers are forced to

8    cover, they may assert claims against the estate on account

9    of any amounts that they were required to pay.  Broadhollow

10    and Melville, as indicated on the assets, that we are

11    proposing to sell its 5,700 loans, and it has an aggregate

12    unpaid principal balance of 1.62 billion.  Although they are

13    owned by non-debtors and are, therefore, not property of the

14    estates, the debtors do have an interest in this asset

15    because we believe we may have residual value remaining after

16    the sale of the assets and payment in full of the notes.

17    Moreover, as I indicated, we have potential exposure under

18    the back-to-back swap agreements.  If the assets are sold at

19    a hundred percent of their value, Broadhollow would be able

20    to pay off all the outstanding notes, and the debtors would

21    be entitled to a cash reserve, which is sitting at

22    Broadhollow of $26 million, and that reserve fund serves as

23    further security of the notes.  So, the better we do on the

24    sale, the more prospect for the debtor to have that reserve

25    fund come back into the estate.  On August 3rd, just before

1    the filing, at least one termination event occurred under the

2    master loan purchase and servicing agreements when a swap

3    provider informed Broadhollow that the swap agreement would

4    not be extended within the period required by the agreement,

5    and as a result of this event, the documents themselves

6    require that the debtors either sell or securitize the assets

7    either within a 20- or 30-day period, depending on whether

8    it's Broadhollow or Melville, and if we don't sell within

9    that period, it goes to auction, which is run by Deutsche

10   Bank Trust Company Americas as collateral agent.  The

11   debtors, Broadhollow and Melville, each of the swap providers

12   - there's five swap providers, and each of them have separate

13   counsel, have worked closely together to develop sale

14   procedures for the assets in a way to maximize value that I

15   believe everyone thinks would exceed any value received by a

16   forced auction conducted by DB.  So the intent of all of this

17   is to maximize value to the estate rather than forcing DB to

18   conduct a quick auction, having the auction procedures

19   blessed by this Court and extended out a little bit past the

20   20- to 30-day period.  We've had delicate and, I would say at

21   times, excruciating negotiations over the past weekend and

22   the last couple of days, and I think we've been able to

23   satisfy Deutsche Bank.  Each of the swap parties, the

24   Creditors Committee, and the holder of the largest amount of

25   the subordinated notes, which we're calling subordinated note

1    representative, and they're represented by Paul Weiss, that

2    this procedure makes sense, and we have included all of their

3    comments in a proposed form of order that we hope to get to

4    shortly.   Before -

5              THE COURT: Who haven't you satisfied?

6              MS. MORGAN:   Pardon me?

7              THE COURT: Who haven't you satisfied?

8              MS. MORGAN: Mr. McMahon.  Generally, the auction

9    procedures require us to set up a data room, and I believe

10   it's set up right now.  Some of the swap parties are already

11   conducting due diligence, and we've agreed to obviously

12   cooperate with anyone who is a qualified bidder and signs a

13   non-disclosure agreement to give them due diligence

14   materials.  Again, we're asking the Court to approve the

15   procedures without the necessity of coming back to the Court,

16   for a sale hearing, and the reason for that, one, it's not

17   estate assets, but because of the type of asset that this is,

18   my understanding is no one will put on the table their best

19   bid or even close to their best bid because of the

20   fluctuations in the marketplace for this kind of asset if

21   there's any kind of meaningful delay in getting that loan

22   approved and going to close.  So, again, what we're proposing

23   is an open process with all of these parties, including the

24   Creditors Committee, intimately involved, having an auction

25   in one day, having that auction conclude by 2 o'clock so - or

1    thereabouts, so that the winning bidder can immediately hedge

2    their bid and then close the next day at 10 o'clock.  The

3    procedures would also require that a second bidder remain on

4    the hook and if there is no closing by 10 a.m. the next day

5    the second bidder would have to close the following day.  The

6    procedures also include an expense reimbursement feature.  If

7    the debtors choose a stalking horse among the swap parties,

8    and we're not required to, we've agreed by these procedures

9    to pay the lesser of $500,000 and one-third of the documented

10   reasonable expenses for the due diligence.  In addition, if

11   one of those swap providers or a group of swap providers

12   together or an entity that they form becomes the winning

13   bidder for at least 51 percent of the pool, then they would

14   be entitled to, again, the lesser of 500,000 or one-half of

15   the remaining unpaid documented expenses.  So the most it

16   could be is a million dollars.  And again, the pool size is

17   1.6 billion.  The diligence period is starting now.  It has

18   started already.

19           THE COURT: What does this stalking horse bid get

20   paid out of?

21           MS. MORGAN: The stalking horse would get paid from

22   the estate -

23           THE COURT: Okay.

24           MS. MORGAN: - because the estate sees a benefit to

25   having a potentially, and again, depending on the price, a

1    stalking horse there to set a floor, but if the price isn't

2    right, presumably the debtor wouldn't designate a stalking

3    horse.

4         THE COURT: And I'm not going to have any input into

5    who the stalking horse is or approve the stalking horse bid?

6         MS. MORGAN: The procedures do not contemplate that.

7    They contemplate that the debtor has the ability, if it

8    chooses, to designate a stalking horse in consultation with

9    the Committee.

10        THE COURT: All right.

11        MS. MORGAN:  Your Honor, I think I indicated the

12   bid deadline would be the 10th.   The auction would be the

13   11th, and the other feature I should tell you about is, we did

14   negotiate, and we have agreed and will agree to provide full

15   consultation rights to the Committee.  The order that you'll

16   see provides that if the Committee would object to our

17   selection at the auction of the highest bid or the second

18   best - I'm sorry, the best bid or the second best bid, it

19   would contemplate the ability of the parties to call Your

20   Honor on the 11th and hopefully get a telephonic hearing.  So,

21   again, part of the process is that we would hope that you

22   could pencil in on your calendar some time for a possible

23   call on the 11th, although we have every confidence that that

24   won't be necessary.  Again, the debtors and the Creditors

25   Committee are aligned in their interest in getting the

1   maximum value for the estate.  And, Your Honor, we would

2   contemplate, again, putting notice in the Wall Street

3   Journal, I believe within two days.  We would post the

4   auction procedures on interlinks.  We have solicited and

5   received, I believe, from the Creditors Committee some

6   potential interested parties.  We know of interested parties

7   ourselves, and we intend to also post this on the Blumberg

8   news wire service.  And, Your Honor, with that, I think I

9   indicated that Mr. McMahon has an objection to the expense

10  reimbursement portion, and I do have a witness, and if it's

11  acceptable to the Court, I'd like to proffer some brief

12  testimony on that aspect.

13        THE COURT: Well, before - Do you have a document

14  you can show me that indicates the current state of play.  I

15  assume there have been changes.

16        MS. MORGAN: Yes, yes.  May I approach, Your Honor?

17        THE COURT: Yes.  Thank you.  Is it blacklined?

18        MS. MORGAN: Yes.

19        THE COURT: Thank you.  Mr. McMahon, do you want an

20  opening statement before she puts a witness on - Ms. Morgan

21  puts her witness on?

22        MR. McMAHON: Your Honor, thank you.

23        THE COURT: You're welcome.

24        MR. McMAHON: Joe McMahon for the U.S. Trustee.

25  Given the fact that this was filed on an emergency basis, I

1    just want to outline what our concerns are for the Court.

2              THE COURT: Please.

3              MR. McMAHON: The first concern has to do with the

4    fact that we are talking about the dangling of the expense

5    reimbursement without a commitment today, meaning that we are

6    in a situation where we don't have a party signed up and

7    committed today, and the typical benefit that's provided by

8    the bid protections before the stalking horse purchaser is

9    that going forward with the bidding process they provide a

10   number of floor that other bidders can look at and rely upon

11   determining what it is that they may bid.  Essentially, the

12   estate doesn't get the benefit that we traditionally accord

13   to such bid protections if they're extended on the basis that

14   has been proposed to the Court.  Second, I want to note, I

15   guess, some general concerns under O'Brien.  First, O'Brien

16   talks about situations where if you have a party that has an

17   economic interest in bidding independent of the bid

18   protections, then O'Brien suggests that the breakup fee and

19   expense reimbursement, other types of bid protections may not

20   be appropriate in that situation.  Given the relationship of

21   the swappers to the non-debtor entities, it's hard to fathom

22   exactly what could be a more precise example of an entity

23   that has an independent economic interest such that they

24   would bid independent of any bid protections.  If they're on

25   the hook for whatever market value differential there is

1    between the face amount of the SLNs and the market value

2    that's ultimately accorded to these loans at auction, then

3    they're going to be at the table, and I think their interest

4    in the process to date is an acknowledgment of that point.

5    Second, the motion really doesn't lay out what the - I guess,

6    the interest of the estate is at this point in the process.

7    I understand that the debtors have sub-notes against the non-

8    debtor entities as well as some residual interest down the

9    food chain, but - and given the current state of the market,

10   I would understand that it may be difficult to predict where

11   exactly the chips fall with respect to the process, but

12   there's been, I guess, an incomplete record with respect to

13   what types of loans are at issue here and what we can

14   reasonable expect for this process to bring to the estates

15   before the debtors' estates lay out cash in the form of the

16   expense reimbursement.  The third point I want to make under

17   these - we'll call it generic O'Brien concerns is that, the

18   expense reimbursement is limited to the swap parties, and I

19   guess, using more of a procedural fairness issue here, could

20   that fact that, you know, the swap parties are getting it

21   and, again, going back to our first point, we can't think of

22   a party that would be more likely to bid in this situation,

23   it's essentially analogous to a secured lender credit

24   bidding, why the expense reimbursement is being limited to

25   swapping parties.  Again, we don't believe that absent a

1   commitment today it would be appropriate to approve it today,

2   but that's more or less a bid chilling point.  The third

3   category of concerns that we have relate to what we call the

4   tail-end expense reimbursement, it's essentially a winner's

5   fee, and we essentially don't understand what that's doing to

6   encourage competitive bidding, and then second, I guess

7   there's a more procedural point, how that interplays with the

8   auction rules.  It is an issue we have, meaning, Is it

9   essentially a credit?  How does this factor into the debtors'

10   ability to determine what's the highest and best bid for the

11   assets?  So those are our concerns, Your Honor.

12          THE COURT: Thank you, Mr. McMahon, that's helpful.

13   Do you want to proffer a witness?  Any objection to a

14   proffer?

15          MR. McMAHON: No, Your Honor.

16          THE COURT: Okay, Ms. Morgan.

17          MS. MORGAN: Thank you, Your Honor.  Your Honor, the

18   debtors would like to proffer the testimony of Damian Vaulo,

19   senior vice president of risk management in American Home and

20   Mr. Vaulo is present in the courtroom and is available for

21   cross-examination.  He has reviewed and is familiar with the

22   emergency motion before you today.

23          THE COURT: What's his position?

24          MS. MORGAN: He is senior vice president, risk

25   management.

1          THE COURT: Okay.

2          MS. MORGAN: If called to testify today, Mr. Vaulo

3     would testify that he has held the position of senior vice

4     president, risk management with American Home Mortgage since

5     2005.  In connection with his duties, he is familiar with and

6     is responsible for managing the trade desk, which entails

7     managing daily risk of loans including interest rate risks.

8     He is also responsible for selling loans in a secondary

9     market.  Mr. Vaulo would testify that Broadhollow Funding and

10    Melville Funding are non-debtor special purpose entities that

11    own 5,700 mortgage loans with an aggregate unpaid principal

12    balance of $1.62 billion.  These 5,700 loans in the debtors'

13    view are high quality, mostly performing loans.  On August

14    3rd, 2007, at least one termination event occurred under the

15    governing documents when a swap provider informed Broadhollow

16    and Melville that swap agreements would not be extended.  As

17    a result of this termination event, Broadhollow and Melville

18    are required to sell or securitize their loans within a very

19    short time period, 20 to 30 days, depending on the documents,

20    with any such loans unsold on the 30th day being subject to an

21    auction to be conducted by the collateral agent, Deutsche

22    Bank Trust Company Americas.  Mr. Vaulo would testify that

23    the debtors have consulted with the swap providers, Deutsche

24    Bank, the Creditors Committee, and other interested parties

25    and have developed sale procedures that they believe maximize

1   value for the debtors' estates.  The debtors believe that an

2   auction of the loan under these sale procedures will yield

3   greater interest and a higher price for the loan assets than

4   would be achieved in a forced Deutsche Bank auction.  One

5   component of the sale procedures is the request for approval

6   and expense reimbursement in the event the swap provider

7   submits a bid prior to the auction and is selected by the

8   debtors as a stalking horse.  Mr. Vaulo is familiar with the

9   proposed expense reimbursement provided for in these

10  procedures, and he would testify that it has two components.

11  One, if a swap provider submits a qualified bid declared by

12  the debtors to be a stalking horse, the debtors will pay the

13  swap providers the lesser of $500,000 and one-third of the

14  documented reasonable costs and expenses incurred in

15  connection with the due diligence process.  And secondly, in

16  the event any swap provider as swap providers as a group or

17  an acquisition entity organized by one or more of them is

18  named a successful bidder at the auction of more than 51

19  percent of the loans, the debtors will pay the swap providers

20  the lesser of $500,000 and one-half of such entities then

21  outstanding unpaid, documented, reasonable of cost and

22  expenses.  So the maximum expense reimbursement is $1 million

23  which constitutes less than one-half of one percent of the

24  total loan pool.  Mr. Vaulo would testify that this is a *de*

25  *minimis* amount in comparison to the benefit the estates

1    expect to receive.  He would testify that the expense

2    reimbursement is fair under the circumstances, would not

3    chill bidding, and in fact is designed to attract a bidder to

4    make a favorable bid for the loans.  In the ordinary course,

5    if we were not in the situation we are today, he would

6    testify that at the conclusion of a sale, an auction of

7    similar loans at prior to closing, the successful bidder

8    would engage an independent agency to review and underwrite a

9    cross-section of the loans to determine whether the data

10   provided in the loan files is accurate or otherwise complies

11   with the sellers' stated loan origination policies and

12   procedures.  He would testify that that review or

13   underwriting process generally takes four weeks, and that

14   depending on the results of that re-underwriting, there could

15   be a price adjustment for the buyer.  Depending on the number

16   of purchase loans, it can also be a very costly process.  And

17   in fact, the debtors estimate that the due diligence costs

18   for underwriting a loan pool of this size, based on estimates

19   they received, is $1.5 million.  Here, because the loans that

20   are subject to these procedures are being sold as is, the

21   diligence review and underwriting process all have to be

22   completed on an expedited basis prior to the auction, and the

23   debtors believe that the potential for the reimbursement of

24   expenses of a portion, not all of, but a portion of the

25   bidders' expenses is likely to attract a potential bidder to

1    engage in the auction process.  He would testify that this is

2    not the type of asset in which a bid is generally left on the

3    table for a long period of time in order, for instance, to

4    come back and seek a Bankruptcy Court approval because of the

5    fluctuations in the marketplace sometimes on an hourly basis.

6    If the diligence and underwriting process is completed by a

7    potential buyer prior to the auction, the bids will likely be

8    higher in the debtors' view than if the process was not

9    undertaken because the purchaser will have a better

10   understanding as to the quality of the loans.  In other

11   words, the approval of the expense reimbursement is necessary

12   to preserve and maximize value for the loans because the

13   debtors are concerned that without the potential for a

14   reimbursement, bidders may not undertake what is a very

15   expensive and in this case a very condensed in time frame

16   process that would require someone to make a reasoned bid for

17   these loans, again which the debtors believe to be of very

18   high quality.  Mr. Vaulo would further testify that the

19   proposed expense reimbursement was the result of extensive

20   arms length negotiations between the debtors on the one hand

21   and the swap providers on the other, and finally he would

22   testify that approval of the bid procedures, including the

23   expense reimbursement feature, will provide a material

24   benefit to the debtors and their estates by attracting

25   bidders who will have an incentive to conduct the process,

1    the underwriting process necessary to confirm the high

2    quality and high value of the loans.  And that would conclude

3    the proffer, Your Honor.

4              THE COURT: Cross-examination, Mr. McMahon?

5              MR. McMAHON: Briefly, Your Honor.

6              THE COURT: Mr. Vaulo, please take the stand.

7              MR. McMAHON: Sir, good morning -

8              THE COURT: Please, whoa, whoa - We've got to put

9    him under oath.  Stand up, put your hand on the Bible.

10                          DAMIAN VAULO

11   having been duly sworn testifies as follows:

12             THE CLERK: (Microphone not recording.)

13             THE WITNESS: Damian Vaulo, V, as in Victor, a-u-l-

14   o.

15             THE COURT: Thank you.  You may proceed, Mr.

16   McMahon.  We like our witnesses to be under oath.

17             MR. McMAHON: Sorry to jump the gun, Your Honor.

18             THE COURT: No, that's fine.

19                       CROSS-EXAMINATION

20   BY MR. McMAHON:

21   Q.  Good morning, sir.  With regard to the way the debtors

22   have set up the bid procedures, can you explain to the Court

23   why the debtors have extended the expense reimbursement

24   benefit to the swap providers alone as opposed to considering

25   the possibility of extending that benefit to non-swap

1   bidders?

2   A.   The benefit would provide the swap providers the

3   initiative to come in and look at collateral of the loans

4   before bid and to get comfortable with the borrowers, credit

5   worthiness of the borrowers, look at the property itself, the

6   collateral, to understand who the borrowers are and the

7   quality of the borrowers and the ability of the borrowers to

8   repay the loans.

9   Q.   Perhaps, I didn't phrase my question clearly, but I know

10  what the expense reimbursement is designed to do for them.

11  I'm asking, do you have an understanding as to why the

12  debtors, I guess, excluded non-swapping parties from the

13  expense reimbursement benefit?

14  A.   I do not.  I was not part of that.

15  Q.   You're not part of those discussions?

16  A.   I was not.

17  Q.   Okay.  Do you have an understanding of the swap

18  agreements in your position as risk management senior vice

19  president?

20  A.   I have a general understanding, yes.

21  Q.   Would it be correct to say that the swapping parties are

22  interested in the outcome of this auction to the extent that

23  they may be required to fund certain shortfalls pursuant to

24  the front end aspect of their swap agreements?

25  A.   Yes.

1   Q.  What can you tell the Court about the quality of the

2   loans that are proposed to be sold that will give the Court

3   some indication as to the likelihood that the debtors'

4   estates will get some economic benefit from the proposed

5   sale?

6   A.  Well, as stated by counsel, they are of high quality

7   loans, meaning A-paper loans, agency-eligible paper, Fannie,

8   Freddie, Ginnie Mae, which is the highest quality paper.

9   Jumbo Prime Loans, which is also A-paper of high quality, and

10  what makes high quality, you know, A-paper loans is higher

11  FICA scores, you know, lower loan devalued ratios, which

12  generally trade higher in the secondary market, tried at the

13  highest price and generally of the Broadhollow/Melville,

14  they're all the - a majority of the loans are of the higher

15  quality A-paper.

16  Q.  Right.  If I were to ask you to give me a percentage

17  breakdown describing such loans as prime or all-A loans,

18  could you give me a percentage?

19  A.  I wouldn't want to give a number but I would say, a

20  majority are A-paper prime loans.

21          MR. McMAHON: Your Honor, I have no further

22  questions.

23          THE COURT: I have a couple.  If I approve these

24  procedures, what funds flow to the debtor entities and what

25  are the trigger points?  Do you understand the question?

1          THE WITNESS: I think so.  Do you mind saying it

2     again?

3          THE COURT: Well, the servicing, American Home

4     Mortgage Servicing is going to receive something for doing

5     this transaction, is my understanding.  What are they going

6     to receive?

7          THE WITNESS: Well, what they're responsible for is

8     collecting the payments of, you know, doing the processing of

9     the mortgage loan, and that's - and they get fees for doing

10    that.  That's their business.  They collect the check to

11    process payments and a there's a whole other jobs they do -

12    the basic function of any servicing organization is the

13    mechanics behind collecting payments and processing payments

14    and making sure loans are current and tracking ones that

15    aren't and -

16         THE COURT: Okay, and they're going to receive that

17    regardless of whether I approve these procedures or not.

18    They're servicing these loans.

19         THE WITNESS: They are servicing the loans.

20         THE COURT: All right.  Now, it's 1. -

21         THE WITNESS:  6 billion.

22         THE COURT: - 6 billion in face amount?

23         THE WITNESS: Uh-huh.

24         THE COURT: Help me out here, what did - and I

25    understand that there's a residual benefit that may flow to

1    the debtors' estate, and the debtors have $26 million in

2    reserves -

3             THE WITNESS: Right.

4             THE COURT:  - as additional backstop to the

5    agreements.  What do you have to get in order for there to be

6    some benefit to the estate for these loans?

7             THE WITNESS: Are you referring in terms of ultimate

8    sale price?

9             THE COURT: Yes.

10            THE WITNESS: And what benefit this will provide?

11            THE COURT: Right.

12            THE WITNESS: Well, on any transaction, like was

13   stated, there's usually a four week time frame of due

14   diligence where a due diligence team come in and look at the

15   loan.  They look at the credit.  They look at the value of

16   the property, and they look at the compliance of how the loan

17   is under it, and so, they'll check the credit worthiness of

18   the borrower.  Is the borrower a first-time home buyer?  Has

19   he financed ten properties?  Does he have, you know, how many

20   loans does he have?  What is his ability to repay that loan?

21   So they'll go through, and they'll do their testing, and

22   they'll see that, you know, the borrowers are sound

23   borrowers.  They have, you know, the valuation is sound.

24   It's not a pushed valuation on the property where the value

25   in one part of the country for a particular property is X,

1   but, you know, this valuation says Y, they'll make sure

2   that's sound, and they'll do all their testing and it gives

3   them a greater sense that the overall pool is of the general

4   same qualities so it would give them the initiative to

5   probably step up their price and on a pool this big, every -

6   I talk as traders speak, every taking price is real money to

7   the company.  So -

8           THE COURT: Well, all you've just told me is that if

9   these are good loans, you'll get more money.  This is a high

10  quality asset, you'll get more money for it.

11          THE WITNESS: And having the due diligence done

12  before -

13          THE COURT: You understand that the companies that

14  own these loans aren't debtors; correct?

15          THE WITNESS: Correct.

16          THE COURT: All right.  Now, the debtor is backstop

17  shortfalls, at least to the tune of $26 million; correct?

18          THE WITNESS: Yes.

19          THE COURT: Okay.  If I approve this transaction,

20  including the expense reimbursement, money is going to flow

21  out of this debtors' estate to pay that expense

22  reimbursement; right?

23          THE WITNESS: Uh-huh.

24          THE COURT: Okay.  What's coming back to the

25  debtors' estate?  What's the benefit to the debtors' estate

1   for spending a million dollars?

2          THE WITNESS: A higher price on the overall pool

3   which would be far in - exceed of a million dollars on a pool

4   of this size, you know, the payout for -

5          THE COURT: And the beneficiary of the higher price

6   is a non-debtor entity.  How does that benefit the debtors'

7   estate?  Melville and Broadhollow get the benefit of a higher

8   price.

9          THE WITNESS: Right.

10          THE COURT: That the debtors are paying for.  My

11   question to you is, at what point does the higher price that

12   Broadhollow and Melville translate into a benefit to the

13   debtor on the residual?  And it may be the answer is, it

14   depends on what the price breakdown is on 5,200 different

15   loans.

16          THE WITNESS: Yes, how it all winds up.

17          THE COURT: Is it your understanding that the

18   debtors' obligation to pay the expense reimbursement is tied

19   in any way to whether or not the debtors are actually

20   receiving a benefit by the pricing of the loans?

21          THE WITNESS: Could you say that again, I'm sorry.

22          THE COURT: Do you have an understanding as to

23   wether the debtors' obligation to pay the expense

24   reimbursement is tied in any way to whether or not the

25   debtors are receiving a benefit on based on the price

1    achieved for the sale?

2              THE WITNESS: I do not.

3              THE COURT: All right.  Okay, I don't have any

4    further questions.  Mr. McMahon, do you have any followup?

5              MR. McMAHON: No, Your Honor.

6              THE COURT: Redirect, Ms. Morgan?

7                        REDIRECT EXAMINATION

8    BY MS. MORGAN:

9    Q.  Mr. Vaulo, if the loans are paid in full, a hundred

10   percent -

11   A.  Right.

12   Q.  - $26 million reserve fund goes where?

13   A.  Comes back.

14   Q.  Comes back to the debtors' estate -

15   A.  (Microphone not recording.)

16   Q.  Okay.  If the price at auction is 95 percent, is it your

17   understanding that the debtors also get a portion of the

18   reserve fund back?

19   A.  Some portion of it will be released.

20   Q.  Okay.  If the notes are not paid in full, it's your

21   understanding that the swap providers would have to cover; is

22   that correct?

23   A.  That's correct.

24   Q.  And if the swap providers have to cover, they have

25   agreements that would allow them to assert claims against the

1    debtors; is that right?

2    A.  I believe so, yes.

3    Q.  Okay.  Did the debtors see a benefit to having a swap

4    provider be incentivized to be the stalking horse for this

5    auction?

6    A.  Say that again, please.

7    Q.  Did the debtors see a benefit to having one of the swap

8    providers come in and set the floor at the auction?

9    A.  Yes.

10   Q.  And why?

11   A.  That would attract, you know, other bidders to the table.

12   Q.  And the swap providers are incentivized to put in a high

13   bid; is that correct?

14   A.  Right.

15   Q.  If there is no floor and no one else has done due

16   diligence, what do you think that would do typically to the

17   value of an opening bid at an auction, if there's been no due

18   diligence done by someone?

19   A.   It definitely would not help it.  It would lessen it.

20           MS. MORGAN: I have nothing further, Your Honor.

21           MR. McMAHON: Just one followup regarding the swap

22   agreements.

23                    RECROSS-EXAMINATION

24   BY MR. McMAHON:

25   Q.  The claims that the swappers could assert on the tail-

1    end, to the extent that they have to fund a shortfall, those

2    secured claims, what's the nature of those claims they would

3    assert against the debtors?

4              MS. MORGAN: Your Honor, objection.  It calls for a

5    legal conclusion.

6              THE COURT: Sustained.  We'll get into that in

7    argument.

8              MR. McMAHON: Thank you.

9              THE COURT: You may step down, sir.

10             MS. MORGAN: Your Honor, the debtors do believe that

11   the potential for payment of a million dollar expense

12   reimbursement does provide a benefit to the estate.  Again,

13   you asked a question, Your Honor, I'm not sure the witness

14   answered it completely regarding whether the debtor will get

15   any benefit by designating someone as a stalking horse.  The

16   debtor is not required to designate someone as a stalking

17   horse, so, I don't think the debtor would do so unless we

18   believe it's a bid of a sufficient amount that would create a

19   benefit to the estate.  So there would be no obligation if

20   the debtors don't so designate to pay -

21             THE COURT: Help me out on the mechanics of this

22   stalking horse provision.  First of all, there was nothing -

23   maybe I missed it.  I don't recall this being in the original

24   motion.

25             MS. MORGAN: I believe it was, Your Honor.

1          THE COURT: All right.

2          MS. MORGAN: I could have lost track by now, but I

3    believe it was.

4          THE COURT: All right.  I'm surprised I missed it,

5    but - well, I'm not surprised I missed it, frankly.

6          MS. MORGAN: You had but one day to review it, Your

7    Honor.

8          THE COURT: Yeah, that's a long time in this case.

9    Okay.  Help me out.  What's the deadline by designating a

10    stalking horse?

11          MS. MORGAN: It's the day before the auction, which

12    would be the 10th.

13          THE COURT: So then the auction's the 10th or the

14    11th?

15          MS. MORGAN: The 11th.

16          THE COURT: Okay.  So you have until the 10th to

17    designate a stalking horse.  Now, in the event that that

18    stalking horse - How do those people get paid?  Say it's City

19    Bank, not to put a target on anybody's back, but say it's

20    City Bank and you and the Committee designate City Bank as

21    the stalking horse for a bid of X-dollars.

22          MS. MORGAN: Uh-huh.

23          THE COURT:  How does City Bank get paid?  Take me

24    through it.  When do they get money?

25          MS. MORGAN: When?

1          THE COURT: Yeah, or how?  How do they get actually

2    paid for anything?

3          MS. MORGAN: City Bank would have to present us with

4    documents showing their actual out-of-pocket expenses, which

5    we would review, and the debtors' estate, again, would pay

6    the lesser of 500,000 and one-third of those documented

7    expenses if they're chosen as a stalking horse.

8          THE COURT: Okay.  Regardless of whether or not they

9    win.

10         MS. MORGAN: Regardless of whether or not -

11         THE COURT: Just by being the stalking horse.

12         MS. MORGAN: Correct.

13         THE COURT: Okay.  Now, what if they bid - Does the

14   stalking horse bid have to be for 51 percent of the loans or

15   do they just have to be declared the winner for 51 percent of

16   the loans?

17         MS. MORGAN: They just have to be declared the

18   winner.

19         THE COURT: Okay.  So, they don't even need to be a

20   stalking horse; is that right?

21         MS. MORGAN: That's right, but in that case they're

22   only getting the second half.  They're not getting the first

23   half of the expenses.  They're getting the lesser of 500,000

24   or one-half of their outstanding documented expenses.

25         THE COURT: Okay.  So City Bank's a stalking horse

1   and if they put together a syndicate that bids for 51 percent

2   of the loans, they get a million dollars.

3          MS. MORGAN: They get a maximum of a million

4   dollars.

5          THE COURT: Right.

6          MS. MORGAN: Again, if the math works that their

7   documented expenses are less than a million five, then it

8   could be less.

9          THE COURT: All right.  Now, that is in no way tied

10  to any ideas - All that happens.  It's not tied in any way as

11  to what the debtor is to receive.  There's no threshold.

12         MS. MORGAN: There is no dollar threshold, Your

13  Honor, you're right, you're right.  What we think is -

14         THE COURT: Now, when you say if they get a - if

15  they sell at a hundred cents on the dollar, they're going to

16  - that frees up money, et cetera, et cetera.

17         MS. MORGAN: Yes.

18         THE COURT: Is that a hundred percent of the face

19  amount of the debt you're talking about?

20         MS. MORGAN: I believe so, Your Honor.

21         THE COURT: Well, that's not going to happen; is it?

22  I mean, no one's going to pay a hundred -

23         MS. MORGAN: Your Honor, actually we hope it does.

24         THE COURT: Well explain to me the mechanics of

25  that.  Why would I pay one hundred percent of the value of

1    the asset - How do I make -

2              MS. MORGAN: I'm not an expert on that, but I assume

3    it's because someone believes they could do better selling it

4    later.

5              THE COURT: We're talking about a mortgage loan;

6    right?

7              MS. MORGAN: I understand.

8              THE COURT: We're talking about a stream of

9    payments.

10             MS. MORGAN: Yeah, yeah, and perhaps we need my

11   witness back to answer that question, but -

12             THE COURT: Well, I don't - Yeah, I didn't hear any

13   testimony as to why anyone would pay that, but I'm struggling

14   with the concept of maybe I'm just showing my ignorance in

15   the market.  Why anyone would - I mean - Maybe I don't

16   understand what you mean by a hundred percent.  I mean, we're

17   talking about a discounted cashflow of payments; right?

18             MS. MORGAN: Yes.

19             THE COURT: All right.  At some point, regardless of

20   that issue, if you don't get a hundred cents, if you get 95 -

21   at some point there is a cutoff where you get so little for

22   the loans that the whole $26 million residual is eaten up; is

23   that right?

24             MS. MORGAN: That's correct.

25             THE COURT: Do we know what that is?

1          MS. MORGAN: Your Honor, I think it's approximately

2     94 to 95 percent.

3          THE COURT: All right.  Now usually I get some input

4     as to whether a stalking horse bidder should receive

5     protections.  I mean, I have approved generic stalking horse

6     provisions in the past, but there's always a subsequent

7     hearing where we actually get to decide - the Court gets

8     input on whether the debtors' exercise of their business

9     judgment in picking company X as the stalking horse was

10    reasonable.  Why shouldn't I have that input in this matter?

11         MS. MORGAN: I understand this is unusual, Your

12    Honor, and the best I can tell you, and this is based on

13    input we received from all the parties involved, is that

14    because of the nature of these loans and the fluctuations in

15    the market, if there is a second bite, if you will, if

16    there's a second hearing, we will not get good value for

17    those.   People will just not be willing to put their money

18    on the table and they will not be able to hedge for a long

19    period of time.

20         THE COURT: Well, wait a minute.  Is the stalking

21    horse bid designed to serve as a floor that's going to

22    motivate higher bids?

23         MS. MORGAN: Yes.

24         THE COURT: Well, then you've got to let people know

25    what the floor is; right?

1          MS. MORGAN: But we'll do that at the auction, Your

2     Honor.  I mean, the way these auctions work, it's people

3     making phone calls in minute, two-minute intervals.

4          THE COURT: All right.  So it's okay to tell them on

5     September 11th - What time's the auction, 10 a.m.?

6          MS. MORGAN: I think it's at 8:30.

7          THE COURT: 8:30, all right.  So, at 8:30, everybody

8     gets on the phone, and you say, The opening bid is $1.2

9     billion by City Bank for all 5,700 loans.  And then people

10    respond to that; is that right?

11         MS. MORGAN: Yes.

12         THE COURT: But if you did it on the 10th, if you

13    came in here and you said, The opening bid is $1.2 billion by

14    City Bank and people had the overnight to respond to that,

15    your position is you wouldn't get a $1.2 billion floor bid.

16         MS. MORGAN: That's the debtors' belief, Your Honor,

17    yes.

18         THE COURT: You get 1.1 billion, 1 billion, 100

19    million?

20         MS. MORGAN: Your Honor, I don't know, but I can

21    tell you, again, when I talked about the excruciating nature

22    of these negotiations, a large portion of it dealt with this

23    very issue, and the absolute - I mean, reluctance is much too

24    soft a word for the parties' willingness to have another

25    hearing on that issue.

1           THE COURT: You know what?  I hear you.  Let me hear

2    from the swap participants who are going to benefit from

3    this, and I want you to explain to me why I should do this,

4    because this is extraordinary, and if you're on the phone,

5    pipe up.  Oh, someone's standing up.  Here we go.

6           MS. LANKITIS: Good morning, Your Honor.  Lisa

7    Lankitis from Kirkland & Ellis on behalf of City Bank, one of

8    the swap participants, and I'm here with my co-counsel Mark

9    Hurford.  We do recognize the extraordinary nature of these

10   provisions, but I think it is a very unusual circumstance.

11   We are told by the business people that because of the market

12   fluctuations, if a party is required to put out a typical

13   stalking horse bid far in advance of the auction, it will

14   result in that bid being very low because they'll have to

15   sort of speculate as to what the market will do in response

16   to that bid and in general over the time that that bid is

17   left open, and I think there's concern that if they put out a

18   low bid, it will impact what the bidding is for the assets in

19   general.  If the swap participants say, We've done the

20   diligence and we think this bid is worth 50 cents on the

21   dollar, other parties may be reluctant to come in and bid

22   more and having not had the benefit of a diligence period.

23   So the swap participants, who admittedly are interested in

24   obtaining the highest bid for the assets because they have to

25   true-up to a hundred cents on the other side because of their

1   swap, they're keenly aware of maximizing the value.  They

2   stand in the same position as the debtors and the Committee

3   in wanting to make sure that not only that the best value is

4   received because it benefits them and it also benefits all

5   the other parties by reducing the claim and increasing the

6   chance for the residual.  I think because the debtor has the

7   discretion to designate whether or not a bid constitutes a

8   stalking horse bid, we haven't tried to exercise any control

9   over how that decision would be made or put any procedures in

10  here that would govern how that decision is made.  It's

11  totally in the debtors' and the Committee's discretion.  So

12  if they don't believe that the value of designating that

13  stalking horse bid is worth $500,000 max to the estate, they

14  won't do it.  With respect to the successful - being the

15  successful bidder at the auction, the expenses that we would

16  be reimbursed for are in connection with the diligence,

17  which, I think that Mr. Vaulo's testimony supported, would

18  increase the bid that would be received, but it's also for

19  the expenses in putting together the asset purchase agreement

20  that all parties are going to be bidding off of, and that

21  puts the debtor and the Committee in a great position to

22  evaluate the bids because we're not talking about the typical

23  highest and best where you have ten different bidders bidding

24  off all these different asset purchase agreements, and how do

25  you value and do you agree what this provision is worth.

1    We're just looking at price, and it was very difficult and

2    long to get to an agreement on what that asset purchase

3    agreement could look like, but now we stand in the shoes - we

4    stand in the place of being able to only look at price, and

5    that benefits everybody as well, and as of now, the swap

6    providers are on the hook for those fees and the debtors and

7    the Committee stand to benefit from that being in place.

8         THE COURT: And I understand that piece of it,

9    talking about sort of the tail-end piece, the winning bidder

10   getting up to $500,000, no more than $500,000.  Why can't

11   that be reflected in price or won't that be reflected in

12   price?  I understand your foregoing the ability to do the due

13   diligence that you would normally do post-sale pre-closing or

14   maybe post-closing but you get a look-back period to actually

15   make sure, you know, you bought what you think you bought and

16   there would be price adjustments and you're walking away from

17   that.  Doesn't that just - If I don't approve an expense

18   reimbursement out of the debtors' estate to pay you that,

19   doesn't that just get reflected in a lower price for the

20   assets?  And if that happens, okay, a non-debtor entity gets

21   less than it would normally get, but money doesn't actually

22   flow out of the debtors' estate.

23        MS. LANKITIS: Well, I think that takes an

24   assumption that the swap providers will do the due diligence

25   to insure that they put the highest bid possible out there

1  for these assets.  The swap providers are capable of putting

2  out a bid without doing that diligence.  It would be a low

3  bid, and if they're the only party that shows up under these

4  procedures, the debtors will be obligated to sell for that

5  price, but I think the possibility of having a reimbursement

6  mechanism increases the chances that the bid will be as high

7  as it should be for these assets, and that gives all parties

8  comfort.  I think additionally, originally, the swap

9  providers requested that the reimbursement be as a result of

10  an entry into the agreement and the negotiations that went

11  into this agreement, but it was a concession between the

12  debtors and the swap providers and the debtors wanting to

13  insure that this reimbursement was only made if, in the case

14  of the stalking horse bidder, if a bid was received that

15  provided value to the debtors, and in the case of a

16  successful bid, if they were the winning bid.  So the debtors

17  are insuring that they've got a buyer for these assets before

18  any money comes out of the estate.

19      THE COURT: Right, and it's only the winner's fee,

20  if you will, as Mr. McMahon put it, is only in the event that

21  one bidder buys 51 percent.  What's the advantage there?

22      MS. LANKITIS: Well, that came as a result of an

23  additional change that happened since the time we filed the

24  motion.  When we filed the motion, parties who were bidding

25  on the assets were required to bid on all of the assets in

1    order to participate in the auction, and the debtors felt

2    that leaving that provision as is may not bring the highest

3    number of parties to the table because there may be parties

4    who are interested only in purchasing non-performing loans,

5    whereas other parties may only want to own non-performing

6    loans.  So there was a change made that bidders though they

7    have to put in a bid for all the assets in theory they could

8    put a zero bid in for an asset that they're not interested in

9    owning and thereby someone else could purchase that asset,

10   and the debtors could combine the six highest bids for each

11   pool of assets into one successful bid.

12          THE COURT: Uh-huh.

13          MS. LANKITIS: And then it became difficult to

14   decide how you would determine whether or not the swap

15   providers would be entitled to reimbursement.  So the 51

16   percent, based on the unpaid principal balance was set

17   through the agreement of the parties in order to try to

18   bridge that inconsistency.

19          THE COURT: All right, thank you.  Yes, sir.

20          MR. NEUFELD: Good morning, Your Honor.  Fred

21   Neufeld of Millbank Tweed and John Knight of Richards Layton.

22   I heard one question, Your Honor, I'd like to respond to and

23   then another one I thought was implicit in your colloquy with

24   Ms. Lankitis.  The first one you asked, Why couldn't we come

25   back here on September 10th or September 11th and address the

1    question of the propriety of the expense reimbursement?  I'm

2    a bankruptcy lawyer, and I was involved in a lot of these

3    discussions, and we asked our clients the same questions, and

4    what we heard back, over and over again, many times from the

5    traders, because a number of the swappers have trading desks

6    where they trade every day, every hour in these mortgage

7    loans that the price fluctuates significantly and all the

8    time, and we won't get the right price, meaning the highest

9    price, if we build in any delay in the process, meaning the

10   choice of the successful bidder and anything else that

11   requires us to cut back to the Bankruptcy Court, and no

12   matter how much we explain to the traders that that's the way

13   the process works, they kept reminding us that, Yes, but this

14   is a very liquid commodity, or it used to be, and they need

15   the ability to close the minute that the debtors decide who

16   the successful bidder is because the price might be so

17   different by the time we come back here for a hearing, and we

18   won't get the robust auction that we want with all of the

19   bidders if there's a concern that the trading will get mixed

20   in with delay and who knows where the market will be at 4

21   o'clock that day or 9 o'clock the next morning.  So, that was

22   underlying the document you see that doesn't call for a

23   return to the Bankruptcy Court.  The other question I heard

24   Your Honor asking Ms. Lankitis is, you know, Why do you need

25   this expense reimbursement?  There's a billion six on the

1    table -

2              THE COURT: Right.

3              MR. NEUFELD: - your clients have who knows how much

4    of exposure.  What is a million dollars to your clients?

5    That's a good question, also discussed extensively, and the

6    reality is the due diligence that's required is very

7    expensive.  The witness for the debtors touched on it, but we

8    heard that the professionals that the swappers will engage to

9    conduct the due diligence, meaning going through the loan

10   portfolio to see whether what's being sold is what's being

11   represented, is a very expensive process and to get it done

12   by the time of the auction makes it even more expensive, and

13   where it would seem obvious that we would do it, it's not so

14   obvious, and the ability to be able to go back to our clients

15   this morning and say, Yes, there will be at least a half a

16   million dollars if you're chosen as the stalking horse

17   bidder, which we have no certainty of that we will be chosen.

18   It's totally at the discretion of the debtors in consultation

19   with the Committee, but at least if we are the successful

20   bidder for 51 percent of the portfolio, we will get at least

21   $500,000.  That is actually an incentive to get it done, to

22   get this due diligence done, and without that certainty, the

23   estate doesn't have the certainty we will do the due

24   diligence and then the auction will suffer the consequences.

25             THE COURT: Right.

1          MR. NEUFELD: Thank you, Your Honor.

2          THE COURT: Thank you, I appreciate your comments.

3    Yes, sir, Bank of America.

4          MR. TALMODGE: Yes, Your Honor, Bank of America is

5    also a swap provider.  I'm not going to take any time from

6    the Court, I just want to join in the comments of my

7    colleagues and if Your Honor has any further questions, I'd

8    be happy to try to answer those, but if not, I just wanted to

9    state on the record that we join in those comments.

10          THE COURT: All right, thank you.  Those statements

11   are helpful.  I appreciate it.  Yeah, let me hear from the

12   Committee.  You have - A question before you make your

13   comments.  Can they declare somebody a stalking horse bidder

14   without your approval, and if they can, I guess that's when

15   you get me on the phone?

16          MR. INDELICATO: Well, no, Your Honor.  We have made

17   clear, at least our views to the debtor, that we are going to

18   look very carefully before somebody's declared a stalking

19   horse bidder and that in the give and take in the

20   negotiation, I think we have an understanding with the debtor

21   that we will discuss and consult with them before a stalking

22   horse bidder is declared.  We haven't worked out the

23   procedure if we disagree, but I'm hoping that that won't be

24   necessary and that we will at least come to some agreement as

25   to whether or not we should, you know, kick the first step

1   and declare that there's a stalking horse bidder.  Your

2   Honor, and it sounds like a long time ago, but it's only a

3   few days.  We had a lot of the same concerns the Court did,

4   and we have been involved in some of these other auctions

5   where in fact parties have the ability to conduct the

6   auctions outside the protections of the Bankruptcy Court,

7   outside the supervision of the Committee, or in, and we have

8   found that at least from our perspective as counsels to the

9   Committee, we prefer that it be under our supervision as well

10  as to the Court's to the extent that it can exist.  So, with

11  that basic framework, Your Honor, we started what we believe

12  to be some good faith negotiations with all of the parties to

13  develop procedures that we thought would work.  Obviously,

14  Your Honor, when we were initially put forth with a procedure

15  that said, We want to establish the procedures under the

16  Bankruptcy Court, but at the end of the day, we don't want

17  any input necessarily from the Committee if they disagree

18  with what's going on, and we want to do it outside the rubric

19  of the Court, we obviously had a concern.  We've come a long

20  way since then, Your Honor.  The swap parties and debtor,

21  we've worked together and we've come up with a procedure but

22  we believe if there are issues we can come back to the Court.

23  We believe, on behalf of the Committee, that has substantial

24  value.  We have heard in this case and others the argument

25  from the various parties that these are fluid dynamic

1    auctions.  It's not a normal auction.  That if in fact

2    there's a momentary interruption, that affects the price.  If

3    there's not the ability to put the hedging in place, that

4    affects the price.  Your Honor, we have seen that true in

5    some cases, and depending on the type of the loans, there

6    have been other cases where auctions in the Bankruptcy Court

7    have occurred successfully.  Could they have been better had

8    they been done in this procedure?  Well, I guess we may see

9    if the Court approves these procedures, but we have

10   negotiated, Your Honor, what we believe is a procedures in

11   place that hopefully will give the Court some comfort that

12   the Committee who ultimately will be paying the million

13   dollars, because it's clear that it's not coming out of the

14   swap parties' hide.  If they come out full and there's just

15   the expense reimbursement, it's going to come out of the

16   estate and it's coming out of our hide, and we sort of feel

17   the Court's angst in that and we have it as well, and so we

18   had to make a determination, Was having this procedure in

19   place worth that money?  And, Your Honor, reluctantly we did.

20   We believe that having the Committee have the input with the

21   debtor, having the ability to have to come back to this Court

22   if we have a dispute with respect to ultimately the winning

23   bidder is if it's not the two highest bidders, we believe

24   that had some value.  We also believe, having worked with

25   debtors' counsel in previous cases, that we will be able to

1   negotiate with them in good faith if we have issues with

2   respect to whether or not they could declare a stalking horse

3   bidder, and I believe that we probably will come to an

4   agreement on that.  So, Your Honor, on the whole, I think the

5   Committee feels that reluctantly that this is the best

6   procedure we can put in place.  We believe the swap parties

7   have been cooperative. We believe they have addressed the

8   Committee's concerns while addressing their clients' concerns

9   as well.  We're all dealing with parties who say this needs

10  to be a fluid auction in order to maximize the value.  We all

11  hope they're right.  We're going to see, if the Court

12  approves the procedures, and we believe that this is at least

13  the best way to maximize the value on a short period of time.

14  Your Honor, the alternative was for the various parties to

15  exercise their rights and auction these outside the ambit of

16  the Court and the Committee, and we didn't believe that was

17  in the estate's best interest, and we are willing to see if -

18  to have it done that way, it may cost us up to a million

19  dollars and we're willing to do that, Your Honor.

20          THE COURT: Okay.  Thank you.  Before you sit down,

21  Why limit the expense reimbursement just to the swap parties?

22          MR. INDELICATO: Your Honor, we wanted to limit it

23  to no parties, so, I believe the reasons they wanted to do it

24  to the swap parties had been articulated as far as the

25  Committee is concerned, if we're going to pay it and we could

1    pay it to other parties, I don't think we would be adverse.

2    We've made the determination to make the payments.  They want

3    it paid only to the swap parties, and in the give and take of

4    the negotiations, that was a point that we conceded on.

5        THE COURT: So the tail-end, it actually benefits

6    the estate because it's only if the swap party gets 51

7    percent, either a loan or in syndicate that they get that.

8        MR. INDELICATO: That's correct, Your Honor.

9        THE COURT: That winner's fee, as Mr. McMahon put

10   it.

11       MR. INDELICATO: That's correct, Your Honor, and -

12       THE COURT: And if it's somebody else, if it's not a

13   swap participant group, they don't get a lender's fee.  So

14   not having that available to other people actually helps.

15       MR. INDELICATO: That's correct -

16       THE COURT: But what about setting the floor?  I

17   mean, is there any likelihood at all that anyone other than a

18   swap party would set the floor in this case?

19       MR. INDELICATO: I don't believe so, Your Honor.  I

20   believe there probably - and we have and will be submitting

21   names to the debtor.  I believe anybody who's not a swap

22   party may sit back and just before the auction to see what

23   swap parties do.  I think that may be the dynamic of this

24   auction which is probably why it makes sense to give it to

25   the swap parties.  So the Court is, I think, right in its

1  analysis that it does provide a little bit of a benefit to us

2  if there's some other party that comes in and provides the

3  greatest bidder, we won't have to pay the stalking horse -

4  the breakup fee.

5      THE COURT: All right, thank you.  I mean, let Mr.

6  McMahon actually get a chance to have any followup comments.

7      MR. McMAHON: I'll be very brief, Your Honor.  We

8  know that the standard under O'Brien is not business

9  judgment, and it's not a situation where a group of parties

10  interested in the case, the debtors, the Committee, whoever,

11  get to decide.  Ultimately, it's an administrative expense

12  standard and -

13      THE COURT: Fair enough.

14      MR. McMAHON:  - the one thing I keep coming back

15  to, Your Honor, is the fact that that language in O'Brien,

16  and I think we're all familiar with and I can refer to it if

17  necessary, that a party that has an economic interest in

18  being at the table, independent of the bid protections,

19  shouldn't be getting them, and at least on this record, I

20  think that's fairly clear where the swap parties stand, vis-

21  a-vis the debtors' estates.  The various arguments regarding

22  the expense and the costs and the necessity of it, you've

23  heard the debtors lay out their position with respect to the

24  economics.  The swappers are going in, if they get involved

25  in the process, to the tune of up to - it sounds like a

1   million dollars, if they get involved.  So, the entire idea

2   that a third credit of those expenses is really going to make

3   a material difference in their decision whether or not to

4   participate, again, knowing what their economic risk is on

5   the front end, they're basically - I hate to use this rather

6   simple analogy, but think about the mortgage foreclosure sale

7   where the secured lender walks into the auction with a

8   number, essentially.  I'm in up until this point and then

9   that's it.  Essentially, it has to be the same thing, meaning

10  that the swappers are coming in.  They have their own number

11  gaging what the market value will be vis-a-vis the amount of

12  the secured notes, and they're going to bid, if they have to.

13  The amount of the expense reimbursement, to say that it's

14  really incentivizing them to get involved in the process, I

15  think, just basically is, I guess, overestimating its

16  significance.  Again, we don't believe that a case was made

17  on the record for approval of the expense reimbursement

18  either on the front end or the back end under O'Brien, and

19  third, Your Honor, with respect to benefit to the estate, I

20  think that the record is at best unclear on that point.  It's

21  the debtors' burden to come forward and show that it's a

22  tenable case that the process is going to produce a result

23  where the estate gets some benefit.  We've heard nothing on

24  the record to that point from any type of - in terms of

25  witness testimony to give us any idea as to what this process

1    is going to bring in that regard.  Your Honor, as an under-

2    view, we would share the Court's concerns with respect to

3    limiting the amount to swap parties, but going back to the

4    first point that I raised in my opening, it's still unclear

5    to us why there couldn't be a subsequent hearing at some

6    point where to the extent that a party in interest wants to

7    seek an expense reimbursement in connection with the process,

8    that they could.  It seems to me that we could have that

9    subsequent hearing, and the procedures could go forward

10   without the expense reimbursement being approved today.

11   Thank you.

12           THE COURT: Thank you, Mr. McMahon.  Ms. Morgan, any

13   closing or further comments?

14           MS. MORGAN: Well, Your Honor, I think you've heard

15   from all of the parties that have an economic stake in this,

16   that they believe that this is - this targeted process we've

17   come up with is the best possible process to maximize value

18   for the estate.  It is admittedly unusual, but these are

19   unusual assets that are not readily susceptible to being out

20   in the marketplace for a length of time in order to provide

21   the Court with the oversight and other parties the oversight

22   that you typically have in a bankruptcy scenario.  And we

23   understand that, and that's why it has taken us these many

24   days of negotiations with the Committee who is the ultimate

25   stakeholder here, to come up with a process that we think

1    would generate the most value.  The bid protections are very,

2    very small.  It's not a breakup fee, it's an expense

3    reimbursement of a very small percentage of the entire pool,

4    and we do believe that incentivizes someone and the likely

5    party is a swap provider to come in with a good bid, not a

6    low bid, a good bid based on the due diligence which is

7    expensive, that they're going to be conducting in the next

8    week and a half, two weeks.  So, this again, Your Honor, is

9    something that parties that are knowledgeable in these areas

10   and who had a large economic stake believe will be beneficial

11   for the estate, and we believe with the consultation rights

12   the Committee has, we do have the protections, and if Your

13   Honor is available for us on the 11th, if there were any

14   problem, we could come back to you.  We don't envision a

15   problem, but we think not forcing that step is maximizing

16   value for the estates.

17          THE COURT: Okay.

18          MS. MORGAN: It probably would be - I don't know if

19   need this at this point, Your Honor, but in response to one

20   of your questions about, Could it ever go over a hundred

21   percent, why would it?  I understand my witness couldn't

22   testify to that if you'd like to hear it -

23          THE COURT: That's not necessary.  That's not

24   necessary.  These are - It's interesting, these are different

25   assets than usually seen in a bankruptcy context.  They're

1   kind of a blend between very unique going-concern type assets

2   because there is some due diligence required and basically

3   commodities or currency that trade based solely on price and

4   no due diligence would be required.  I - Needless to say, I'm

5   somewhat troubled by the expense reimbursement.  Not that I

6   don't get sort of last say on whether it happens or not, more

7   concerned by the difficult aspect that these particular

8   assets and that they're owned by a non-debtor entity, and

9   that the expense reimbursement might get paid out of the

10  debtors' estate without a related benefit to the debtors'

11  estate, which I think really touches on Mr. McMahon's issues

12  with regard to the O'Brien standard and whether I'm

13  authorizing something that's actually an actual and necessary

14  expense of the debtors' estate.  But based on the arguments

15  of counsel, both for the debtor, the Committee, and the swap

16  participants, the explanation of the nature of the asset

17  being sold and very importantly the support of the Committee

18  whose hide this will come out of in the event that they make

19  a miscalculation, I will overrule the U.S. Trustee's

20  objection with regard to the payment of the expense

21  reimbursement.  I think in all likelihood that the expense

22  reimbursement will not be paid unless there is an actual -

23  unless it's an actual necessary expense of maximizing value

24  of the debtors' estate.  So, I think O'Brien - I can't say a

25  hundred percent, but I think O'Brien will probably be met,

1    and I think given the exigencies of this case and the type of

2    assets that's being sold, that that's good enough in order to

3    approve what, in the nature of a billion dollar case or

4    multi-billion dollar case, is a *de minimis* payment.  So,

5    having said that, can you walk me through the blackline.  I

6    will overrule the Office of the U.S. Trustee's objection, but

7    let's go through the blackline if we might.

8        MS. MORGAN: Thank you, Your Honor.  Obviously, the

9    first blackline is just on page 2 reflecting the new hearing

10   date of today.

11       THE COURT: Right.

12       MS. MORGAN: On page 3 of the blackline, beginning

13   at paragraph (5), again, I'm sorry, paragraph (2), it's just

14   reflecting that the auction procedures agreement that the

15   debtors are authorized to enter into it in substantially the

16   form attached.  Paragraph (5) is what we added to confirm the

17   Committee's right to consult with the debtors throughout the

18   process.  On page 5 of the blackline, beginning on paragraph

19   (11) and all of these paragraphs (11) through (17) were

20   included at the request of Deutsche Bank, again, the

21   collateral agent who would otherwise be required to conduct

22   an auction very quickly -

23       THE COURT: Right.

24       MS. MORGAN:  - and their counsel is on the phone as

25   well, but paragraph (11) basically just makes clear that

1   these procedures are going to now override the procedures

2   that were previously in place under the MLPSAs, narrowing it

3   down further to a more granular level in paragraph (12).  It

4   says that what typically happened at the 30th-day auction,

5   Your Honor, that there was another 15 days to close.  So that

6   period is being eliminated because of the new procedures in

7   place.

8          THE COURT: Right.

9          MS. MORGAN: Paragraph (13) is saying that Deutsche

10  Bank is not going to be held responsible.  It's going to be

11  released from any claims arising only from the fact that

12  we're changing the procedures to extend the process to sell

13  more loans than we would otherwise sell.  It does not absolve

14  them of their liabilities in connection with their custodial

15  obligations, for instance, under the MLPSAs.  It provides in

16  paragraph (14) that it's binding on all parties to the

17  MLPSAs, and that Deutsche Bank, although it's going to be

18  receiving the bids, doesn't have any obligation to evaluate

19  them or conduct the auction.  In paragraph (16), again, it

20  just does not change Deutsche Bank's rights or the rights of

21  the notes and subordinated notes to participate or monitor

22  the sale.  And this also is at the request of Deutsche Bank,

23  paragraph (17), again, to protect their noteholders, they

24  insisted that the expense reimbursement not be paid from the

25  Melville assets but be paid from the debtors' assets.

1         THE COURT: So it's really Deutsche Bank's fault.

2         MS. MORGAN: I'm sorry?

3         THE COURT: So it's really Deutsche Bank's fault.

4         MS. MORGAN: It's all Deutsche Bank's fault, yes.

5    I'm sure someone's working on a mute button right now, Your

6    Honor.

7         THE COURT: Yeah, that's all right - No response is

8    required.  That was gratuitous.

9         MR. ASHMEAD (TELEPHONIC): Understood, Your Honor.

10        MS. MORGAN: All right.  Your Honor, in the auction

11   procedures - I'm sorry, the agreement itself, in paragraph

12   (3) as Ms. Lankitis indicated, we made a change -

13        THE COURT: Right.

14        MS. MORGAN:  - based on the fact that this is going

15   to be separate pools.  Then we have exhibits listing the swap

16   providers, and I think you need to go back to Exhibit 2 then

17   to see the sale procedures and a blackline format.

18        THE COURT: I like that.  One, two, three, four

19   pages of strikeout.

20        MS. MORGAN: Yes.  We basically started over, Your

21   Honor.  In the proposed sale procedures, the large paragraph

22   that is blacklined, this is, and we didn't talk about this

23   very much, the subordinated noteholder representative is the

24   largest holder of the subordinated notes, and they have a

25   right under their documents to bid at 105 percent.  They get

1   a last look with respect to their piece, and so we've

2   incorporated that into this procedure as well.  At the end of

3   the day, they will have ten minutes, and we'll again have the

4   opportunity that is afforded them under the documents to have

5   a last look on that particular pool.  Your Honor, I think we

6   just made some definitional changes in paragraph (1) assets

7   to be sold to reflect the definitions that were in the

8   motion.  Access to information, again, these are just

9   including in addition to - including the subordinated

10  noteholder representative as to be a recipient also of due

11  diligence information.  We corrected the typo for City Max to

12  Ginnie Mae.   The bid deadline section, we just added noticed

13  parties, the Committee, as well as counsel for Deutsche Bank.

14          THE COURT: Uh-huh.

15          MS. MORGAN: In the bid requirements, the primary

16  changes here, again, are to reflect that we're going to be

17  bidding in six pools, three pools for Melville and three

18  pools for Broadhollow, which the debtors believe is the best

19  way to maximize value.  In paragraph (5), again, this is at

20  the request of the subordinate noteholder representative.  If

21  there's only one timely qualifying bid, there's no need for

22  an auction except that again they get their last look.

23          THE COURT: A look-back, right.

24          MS. MORGAN: Yes.  We've included them as being a

25  participant at the auction.  The auction procedures

1   themselves, Your Honor, also took a lot of time, but we did

2   determine that because it's typically often done on the phone

3   that we would permit bidders to appear by phone and they

4   would basically have to register, if you will, in writing the

5   day before to participate by phone, and they would have to

6   back up any telephonic bid with an email confirmation within

7   two minutes.  The rest of that page on the auction procedures

8   deals primarily with the fact that the subordinated

9   noteholder representative has a seat at the table, and that

10   we're separating this into pools.  And that actually

11   continues onto the next page, that's what those changes are

12   all designed to pick up.  Near the bottom of that first

13   paragraph and continuing on, again, part of the excruciating

14   nature I was talking about earlier, we had a lot of

15   discussion on what kind of auction it should be and so we

16   decided on an open outcry auction on a pool-by-pool basis

17   with limitations on timing, but we tried to give ourselves

18   the flexibility if that didn't work to go to another method

19   or we could go around the room and just say you have a minute

20   or two to make your bid, and also to give the person

21   conducting the auction, you know, flexibility to get it done

22   as quickly as possible but still give people the amount of

23   time necessary to bid, if we have -

24          THE COURT: I assume open outcry is what it sounds

25   like it is.

1          MS. MORGAN: Yes, Your Honor.  We even discussed

2     paddles.

3          THE COURT: Kind of hard to do that on the phone.

4          MS. MORGAN: Yes, yes, that was brought up.  Your

5     Honor, again, you know, it looks a little bit like micro-

6     management, but it is, you know, there's been a decision that

7     the Melville pool should be auctioned first and, you know,

8     how much time it is expected to take, and all of that, again,

9     is intended to give bidders comfort that this whole thing is

10    going to be done quickly, hopefully by 2 o'clock, so that

11    they can hedge any bids before closing the next day.

12         THE COURT: All right.  What time do you need -

13         MS. MORGAN: I would think we would need something a

14    little after 2.

15         THE COURT: On the 11th.

16         MS. MORGAN: Yes.

17         THE COURT: We'll put this on 2 o'clock.

18         MS. MORGAN: Thank you very much, Your Honor.  Does

19    the Court have any other questions about the procedures or

20    the order?

21         THE COURT: No.  Do you have a clean version?

22         MS. MORGAN: Yes.

23         THE COURT: For the reasons set forth previously,

24    I'll overrule the Office of the United States Trustee's

25    objection, and I'll approve the procedures.

1          MS. MORGAN: Thank you very much, Your Honor, and

2    thank you for your time, both Monday and today.

3          THE COURT: One last question, I'm sorry.  Is there

4    going to be some sort of notice on the docket as to who won,

5    and what they paid?

6          MS. MORGAN: I don't see any reason why that

7    couldn't be done, Your Honor, after the fact there shouldn't

8    be an issue.  Does anyone disagree?

9          THE COURT: I would like some - the Court's

10   approving an auction proceeding.  It need not be the next

11   day, but I think I would request, I don't think we need to

12   change the order, that a notice of winning bidder, winning

13   bidder's final.  If there are issues about cost sensitivity

14   with the amount that you may think of when you leave the

15   room, and you don't think of until later, file some sort of

16   motion to file that piece of it under seal.

17         MS. MORGAN: Okay.  Thank you very much.

18         THE COURT: But I would like the record to reflect

19   who actually won the auction, if I'm not going to enter an

20   order approving it.

21         MS. MORGAN: We will commit to do that, Your Honor.

22         (The remainder of this page is intentionally left

23   blank.)

24

25

1          THE COURT: Thank you.  Anything further for today?

2     Thank you very much.  Hearing is adjourned.

3          MS. MORGAN: Thank you, Your Honor.

4          ALL: Thank you, Your Honor.

5          (Whereupon at 10:39 a.m., the hearing in this

6     matter was concluded for this date.)

7

8

9

10

11

12

13

14

15

16

17

18          I, Elaine M. Ryan, approved transcriber for the

19     United States Courts, certify that the foregoing is a correct

20     transcript from the electronic sound recording of the

21     proceedings in the above-entitled matter.

22

23     /s/ Elaine M. Ryan                         August 27, 2007
       Elaine M. Ryan
       2801 Faulkland Road
       Wilmington, DE 19808
       (302) 683-0221