IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware | ) | |
| corporation, et al., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| ------------------------------ | ) | |
| CREDIT SUISSE FIRST BOSTON | ) | Adversary Proceeding |
| MORTGAGE CAPITAL, LLC, | ) | |
| | ) | Case No. 07-51684 (CSS) |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| AMERICAN HOME MORTGAGE CORP., | ) | |
| AMERICAN HOME MORTGAGE | ) | |
| ACCEPTANCE, INC., AMERICAN | ) | |
| HOME MORTGAGE SERVICING, INC., | ) | August 17, 2007 |
| AMERICAN HOME MORTGAGE | ) | |
| INVESTMENT CORP., and AMERICAN | ) | |
| HOME MORTGAGE HOLDINGS, INC., | ) | |
| | ) | |
| Debtor-Defendants | ) | |
| - - - - - - - - - - - - - - - - - - | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor-Defendants:    JOHN DORSEY, ESQUIRE
                             YOUNG, CONAWAY, STARGATT & TAYLOR
                             The Brandywine Building
                             1000 West Street, 17th Floor
                             Wilmington, DE  19801

Audio Operator:              NICKITA BARKSDALE

Transcribed by:              DIANA DOMAN TRANSCRIBING
                             P.O. Box 129
                             Gibbsboro, NJ  08026-0129
                             PHONE:    (856) 435-7172
                             FAX:      (856) 435-7124
                             Email:    DianaDoman@comcast.net

Proceedings recorded by FTR, transcript produced by
transcription service.

(Appearances continued)

| | |
|---|---|
| For the Debtor-Defendants: | SUSHEEL KIRPALANI, ESQUIRE<br>QUINN, EMANUEL, URQUHART,<br>OLIVER & HEDGES, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, NY  10010 |
| For the Committee: | BONNIE GLANTZ FATELL, ESQUIRE<br>BLANK ROME, LLP<br>Chase Manhattan Centre<br>1201 Market Street, Ste. 800<br>Wilmington, DE  19801 |
| For Committee (via telephone): | MARK S. INDELICATO, ESQUIRE<br>HAHN & HESSEN, LLP<br>488 Madison Avenue<br>14th & 15th Floors<br>New York, NY  10022 |
| For Creditor-Plaintiff<br>Credit Suisse: | HOWARD B. COMET, ESQUIRE<br>LORI R. FIFE, ESQUIRE<br>SAIMA MAJID, ESQUIRE<br>WEIL, GOTSHAL & MANGES, LLP<br>767 Fifth Avenue<br>New York, NY 10153 |
| | STEVEN K. KORTANEK, ESQUIRE<br>WOMBLE CARLYLE SANDRIDGE<br>& RICE, PLLC<br>222 Delaware Avenue, Suite 1501<br>Wilmington, DE 19801 |
| For Creditor Morgan Stanley: | DON A. BESKRONE, ESQUIRE<br>ASHBY & GEDDES<br>500 Delaware Avenue<br>P.O. Box 1150<br>Wilmington, DE  19899 |
| For Creditor Bank of America: | LAURIE SELBER SILVERSTEIN, ESQ.<br>POTTER, ANDERSON & CORROON, LLP<br>Hercules Plaza<br>1313 North Market St., 6th Fl.<br>Wilmington, DE  19801 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For Creditor Sociele General: | DAVID A. HALL, ESQUIRE<br>SIDLEY AUSTIN, LLP<br>One South Dearborn<br>Chicago, IL  60603 |

(Telephonic appearances continued)

For Creditor ABN AMRO Bank:      FRED NEUFELD, ESQUIRE
                                 MILBANK, TWEED, HADLEY
                                 & McCLOY, LLP
                                 201 South Figueroa St., 30th Fl.
                                 Los Angeles, CA  90017-5735


For Creditor Freddie Mack:       J. CORY FALGOWSKI, ESQUIRE
                                 REED SMITH, LLP
                                 1201 Market Street, Suite 1500
                                 Wilmington, DE  19801

For Creditor Calyon New York:    LYNNETTE WARMAN, ESQUIRE
                                 JENKENS & GILCHRIST
                                 500 North Akard, Suite  2000
                                 Dallas, TX  75201

For Interested Party
United States of America:        MARY A. DeFALAISE, ESQUIRE
                                 U.S. Department of Justice
                                 P.O. Box 875
                                 Ben Franklin Station
                                 Washington, DC 20044


For Interested Party
Sidley Austin, LLP:              TERESA H. CHAN, ESQUIRE
                                 SIDLEY AUSTIN, LLP
                                 787 Seventh Avenue
                                 New York, NY  10019


For WLR Recovery Fund III:       ERICA M. RYLAND, ESQUIRE
                                 JONES DAY
                                 222 East 41st Street
                                 New York, NY  10017-6702

4

1                          I N D E X

2    CLOSING ARGUMENTS                    PAGE

3    By Mr. Comet                          5

4    By Ms. Fife                          24

5    By Mr. Comet                         39

6    By Mr. Kirpalani                     57

7    Rebuttal by Mr. Comet                81

8

9    BY THE COURT                         PAGE

10   Ruling                               95

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Call to order of the Court at 12:19 p.m.)

2              THE COURT:  Please be seated.  Sorry about the delay

3     in starting this afternoon, my status conference ran over --

4     ran long and we'll even blame Mr. Brady.  All right.

5              MR. COMET:  Hello, Your Honor, Howard Comet for Weil

6     Gotshal and Manges.  I -- in terms of the arguments, Your

7     Honor, I will address most of the issues.  My partner will

8     address the Section 559 issues, if that is okay with the Court.

9              The -- in terms of the issues that we discussed

10    yesterday and that I mentioned in the opening seemed to be

11    issues in dispute between the parties.  I guess a threshold

12    procedural issue raised by the debtors is whether this matter

13    is properly being heard in an adversary proceeding, as opposed

14    to a proof of claim.  I know the argument is couched, in part,

15    in terms of whether there's a violation of the automatic stay

16    or not; although, I think that's not really the question, if

17    there is a -- if there were a question at all.

18              I mean, the purpose of the automatic stay is to

19    channel proceedings against a debtor to the bankruptcy courts

20    to the bankruptcy of the debtor.  And that's where we are, of

21    course, and the real or only issue is the procedural one,

22    should this have begun by a proof of claim or should it have

23    begun by an adversary proceeding.

24              And a proof of claim is simply inappropriate here,

25    we're not seeking money damages, we are seeking to obtain

1    property that, under the parties' agreement, belongs to Credit

2    Suisse and to recover it.  We're seeking equitable relief.

3    Rule 7001 specifically provides for an adversary proceeding for

4    the type of equitable relief we're seeking and there are many

5    cases in which equitable relief claims of this sort have been

6    heard.  In fact, in the New Century bankruptcy case that's

7    pending in this Court, an essentially identical type of

8    adversary proceeding to the one we filed, has been filed by,

9    Young Conaway on behalf of Deutsch Bank Company, Mr. Brady's

10   name even is on the papers.  So that is the appropriate

11   procedure for a claim for the type of equitable relief that

12   we're seeking, Your Honor.

13        Turning then to the more substantive issues.  I think

14   we have certainly established a likelihood of success on

15   claims, which is, of course, the standard for a preliminary

16   injunction.  The claim, the first claim, in terms of claims

17   that would entitle us to the relief we're seeking is the claim

18   that this contract was terminated pre-petition, validly

19   terminated pre-petition.  That is based on the margin call that

20   was made and that the debtors responded by saying they would

21   not provide funds in response to the margin call.

22        THE COURT:  All right.  But how do you get around the

23   fact that you didn't notice the proper party?

24        MR. COMET:  Well, I believe we did notice the proper

25   party, Your Honor.  The --

1          THE COURT:  You didn't notice the party under

2     paragraph 20, though -- or section 20 of the MRA.

3          MR. COMET:  That's correct.  We did not send notice

4     to the parties identified in section 20, but section 20, on its

5     face, reads as a permissive provision, it actually is both

6     permissive and mandatory.  It has mandatory requirements for

7     other types of notice, other than the one we are concerned

8     with; and, in contradistinction, it specifically says you may

9     provide notice to the parties identified there and that's a

10    means of providing a notice under the agreement.

11         It seems to me that distinction suggests that the

12    purpose, or it indicates the purpose for the provision in

13    section 20, insofar as it's the may permissive provision, is to

14    indicate that, if you proceed that way, there can't be any

15    dispute later on as to whether notice was actually received; or

16    there can't be any dispute that proper notice was provided,

17    whether or not somebody says I didn't get it, the fax didn't go

18    through or something of that sort.  It protects the sender

19    against any claim of that sort, but it doesn't obligate the

20    sender to proceed that way, since it's a permissive provision.

21         On the other hand, section 6 has its own notice

22    provision.  It says you provide notice to the party by any

23    written means.  An email is a written means and that is how

24    notice was provided.  So, I believe that we complied with the

25    notice requirement.  Now, as a --

1          THE COURT:  How do you get may in section 20?  May --

2     it says:  "All notices, demands and requests hereunder may be

3     made orally," -- to be termed for properly writing -- "or by

4     other communication, as specified in the previous sentence."

5     Period.  And then it says:  "If the sellers" -- that's -- I see

6     a -- I see a period there at the end of that sentence, don't

7     you?

8          MR. COMET:  Well, the preceding sentence, Your Honor,

9     also says may.  The preceding -- the first sentence says --

10         THE COURT:  And all -- any and all notices -- "any

11    and all notices, statements, demands or other communications

12    may be given by a party to the other."

13         MR. COMET:  Yes.  So that --

14         THE COURT:  "Or sent to such party."  Right?  But

15    here's my point.  My point is, you may be able to read may into

16    sort of the different ways you can give notice, but there's no

17    may as to who gets notice, it says notice, if to sellers, here

18    they are; if to buyers, here they are.  There's nothing

19    permissive about those people getting the notices, that who get

20    -- that's who get the notice.  And 6(A) doesn't say anything

21    about who gets the notice, it says what kind of notices can be

22    given.

23         MR. COMET:  Well, it -- that -- Your Honor, 6(A) does

24    say what kind of notice may be given, it says it has to be

25    given to the party and, you're right, it doesn't say who and,

1    therefore, at least if that were -- certainly, if that were the

2    only notice provision, there would be no requirement to send it

3    to any particular person.

4              Section 20, I believe the may modifies the entire

5    provision, Your Honor.  It says notice may be given to a party

6    by those means or sent to a party at any other place specified.

7    So, I think, in a sense, it means that the entire section is

8    permissive.  If you want to give notice, you can give it this

9    way, but there's no -- to extend the contract in any other

10   place requires giving of notice.  This section doesn't impose

11   any obligation of that, it has to be given in the manner

12   specified here, but you can give it this way and then that will

13   eliminate any dispute about whether you gave proper -- whether

14   notice was given, but --

15             THE COURT:  All right.  I hear -- I --

16             MR. COMET:  -- I think may modifies the entire

17   provision, Your Honor.

18             THE COURT:  I understand.  I understand your

19   argument.

20             MR. COMET:  The Gucci case from New York that we

21   cited is remarkably similar kind of distinction between

22   contract provisions.  If section 20 were really intended, Your

23   Honor, to be the, in effect, the mandatory direction for any

24   types of notice, I think you wouldn't have a separate notice

25   provision in section 6, which you do, which says there the

1    notice can be given to the sellers, any seller by any written

2    means --

3              THE COURT:  Yeah, but the notice provision in 6(A) is

4    really designed -- or actually it's 6(B), but it's really

5    designed to address the timing issue, isn't it?  You get it by

6    10 a.m., you got to satisfy the margin call that day.  If you

7    don't, you got to satisfy it the next day.

8              MR. COMET:  Certainly that's one of the purposes of

9    it, Your Honor, it also provides any written means.  So, at

10   least in that respect, it certainly is different from the

11   methods, the specification of methods in section 20.

12             THE COURT:  As it's more -- it's more narrow.

13             MR. COMET:  Well, yes, it's definitely more narrow.

14   Well, it -- I don't know if it's more narrow or more broad.

15             THE COURT:  Well, it says --

16             MR. COMET:  And it says --

17             THE COURT:  -- may be orally -- may be -- all the

18   means that are listed in 20 are written, in the first sentence,

19   and then it says may be orally, followed by a written

20   confirmation, is the second sentence.  And then 6(A) just says

21   written.  So, you can't make an oral margin call.

22             MR. COMET:  In essence, Your Honor, I suppose you --

23   if you made it orally and confirmed in writing, you would have

24   satisfied the written requirement, in any event.  But it -- I

25   believe that the -- as Your Honor has -- well, I believe the

1   may -- the may provision is permissive.  In any event, Your

2   Honor, the -- to an extent, there's an ambiguity here.  I

3   believe we -- there has -- is a well-established course of

4   conduct --

5            THE COURT:  Well, let's talk about that.  Assume

6   there's an ambiguity and it has to go to course of dealing, the

7   course of dealing is all over the place.  I mean, it seems like

8   every margin call went to a different subset of people.

9   Sometimes Mr. Pino got it, sometimes he didn't and sometimes

10  other people received it, sometimes they didn't.  So, how is

11  the course of dealing sufficient to establish a meeting of the

12  minds as to what the new notice provision is?

13           MR. COMET:  The -- well, I think -- two things, Your

14  Honor.  First, I think, generally, Mr. Pino didn't get

15  anything, in terms of actual margin calls.  There -- the only

16  thing he's on is one email that followed up on a voice mail

17  that discussed a more general issue of providing funds to be

18  ultimately applied to satisfy margin deficits.  But in terms of

19  the actual -- that -- that's that one July 18th memo, which I

20  believe what it -- what it indicates is, we see a problem in

21  the valuation, it doesn't give any specific calculation of a

22  margin deficit.

23           And so it would not be, in essence, a proper -- a

24  margin call, even under the terms of section 6, it doesn't give

25  a calculation of a margin deficit; it says, we see a problem

1   here, we're trying to value the properties, we need these

2   updated broker price opinions from you, it looks like we're

3   gonna have a shortfall, please send us $2 million dollars in

4   order to be ready to deal with that.  But in that it wouldn't

5   be a formal margin call, because it doesn't actually provide a

6   calculation of a margin deficit.  That's the only thing that

7   Mr. Pino's on.

8           All the other communications dealt with other people,

9   but even if they were the various different people, what that

10  course of dealing establishes is that nobody said the

11  communications have to be copied to Mr. Pino and/or Mr. Horn,

12  the course of dealing is that, regardless of whether Mr. Pino

13  or Mr. Horn were -- was communicated with, the margin calls

14  were responded to and, up until August 1st, honored.  So, that

15  is the course of dealing, that there was no requirement or

16  necessity for noticing Mr. Pino or Mr. Horn on the margin

17  calls.

18          That is the practical interpretation of the parties,

19  which there's a ton of case law says that if the parties that

20  follow -- if there's ambiguity in the contract and the parties

21  have followed a practical interpretation of the contract by

22  their conduct for some period of time prior to the time when a

23  dispute actually arises, you would look to that course of

24  conduct as the best evidence, the all virtually conclusive

25  evidence of how the contract should be interpreted.

1          THE COURT:  What about the counter-argument that that

2     may be true, but the debtor's business was changing,

3     deteriorating rapidly and Suisse F.B. was probably well aware

4     that the market was deteriorating rapidly and wouldn't it be

5     reasonable for the debtors to basically fall back to the

6     contractual provisions and move the decisions on margin calls

7     back up to senior management, to senior management, given, you

8     know, the crisis in the industry, the crisis in the sector and

9     the crisis at the debtors?

10          MR. COMET:  Well, a couple of responses to that, Your

11     Honor.  First, I am not sure that argument has been made by the

12     debtors.  But, as quite aside from that --

13          THE COURT:  Well, I'm creative.

14          MR. COMET:  I -- of course, just a few days before

15     the August 1st margin market call, the same course of conduct

16     that had been followed was followed on July 27th and that

17     margin call was honored.

18          Second, it seems to me that if the -- if we're

19     assuming the course of conduct was established and there might

20     be reasons to change it, it seems to be the debtors would have

21     then -- might have some obligation on their side to say to Ms.

22     Rocco, for example, if something comes in, make sure Mr. Pino

23     knows about it.  In fact, we know that what Your Honor -- the

24     question Your Honor is raising is, in a sense, quite different

25     from the actual facts of what occurred.  Based on Mr. Pino's

1    testimony, we know that no matter how the margin call had been

2    sent on August 1st, no matter whom it was sent to, it would not

3    have been paid.  Mr. Pino testified instructions had been given

4    as of August 1st not to pay any margin call, even if it was a

5    legitimate margin call.

6            So, it wouldn't -- they -- it would have made no

7    difference if it had been sent to Mr. Pino or Mr. Horn or what

8    the amount was or what the procedural replying funds was would

9    make no difference.  They had made a decision which, I'm sure

10   Your Honor is aware, many companies on the verge of filing a

11   Chapter 11 case make those decisions, they also keep them

12   secret, they don't like -- they feel they can't communicate

13   them to their counter-parties, because that would give one

14   party inside information that another party doesn't have.  So,

15   they give responses like Ms. Rocco gave, we can't send you a

16   wire.  But and that, of course, is partly speculation on my

17   part, but the instruction under Mr. Pino's testimony was clear,

18   we are not gonna any margin calls.  So, it would have made no

19   difference.

20           But the fact is, it's undisputed that the company

21   received notice, the same person who had dealt with numerous

22   margin calls in the past received the notice and carried out

23   the company's instructions.  I mean, it's not as it, as a

24   result of the fact that it was not sent to Mr. Pino, something

25   untoward happened, which was something different happened that

1    would have happened if it had been sent to Mr. Pino.  She

2    carried out the company's instruction, there's -- there's no

3    possible claim of prejudice from the fact that the notice

4    wasn't sent to Mr. Pino as opposed to being sent to Ms. Rocco,

5    because it would have -- the result would have been the same no

6    matter what.

7            And under those circumstances as well, Your Honor,

8    sort of aside from the contract interpretation, New York case

9    law indicates that the issue is there's no valid objection on

10   notice grounds.  I mean, we have cited several cases from the

11   Appellate Division, First Department of New York, they -- they

12   have cited a case from the New York County Supreme Court.  The

13   Appellate Division First Department has appellate jurisdiction

14   over the New York County Supreme Court.  If you're looking to

15   levels of New York authority, it's certainly higher authority

16   and superseding authority to a decision from the New York

17   County Supreme Court.

18           The cases we have cited say, in the absence of any

19   prejudice or any claim that notice wasn't given, this kind of

20   technical issue is not the basis for a valid objection.  So we

21   believe, Your Honor, that we've established that a likelihood

22   of success that the notice was properly given and was not

23   honored.

24           The other issue that was raised about the margin call

25   was whether margin calls needed to be made based on the overall

1    portfolio value or based on the deficit attributable to

2    inherent distinctiveness individual loans.  I think the

3    contract on that point is absolutely clear that margin deficit

4    can be calculated for any purchased asset, meaning any

5    individual loan, and that a margin call can be based on a

6    margin deficit of that type.  In fact, Mr. Pino, when I asked

7    him about those -- that specific provision of the contract,

8    agreed that where it says any purchased asset, it means an

9    individual loan and that a margin deficit and a margin call can

10   be based on a deficit in an individual loan.

11          I mean, obviously what this contract provision is

12   assigned to do is to, on a loan-by-loan basis, provide for

13   control of the risk that Credit Suisse was undertaking, by

14   making sure there wasn't too great a deficit between market

15   value and the amount of funds they had paid in connection with

16   the con -- the purchase of the individual loan and they were

17   seeking to reduce their risk on each individual loan.  It's

18   obviously possible to have an agreement that could be

19   structured differently, but this one wasn't, it was clearly

20   structured in terms of individual loans and the terms of the

21   agreement are quite clear, I believe, on that.

22          I don't think there's any -- even any possible

23   argument of an ambiguity there, but if there were, --

24          THE COURT:  And what about the two-and-a-half million

25   dollars that your client was sitting on at the time of margin

1    call?

2              MR. COMET:  Their -- I think what the record

3    indicates here, Your Honor, is that the funds were requested,

4    again, the -- there -- you have the email that Mr. Pino

5    identified, funds were requested in anticipation of future

6    revaluing the loans and CSFB wanted funds on deposit to deal

7    with the deficit they expected to occur when the broker price

8    opinions were received and the loans were revalued.  I think

9    the fact that that was not really in dispute is confirmed by

10   what happened in that July 27th margin call.

11             Initially, Credit Suisse said, you know, do you want

12   to apply the funds from one of your accounts, after they were

13   told that American Home wanted to apply the funds by the buy-

14   down account, where the two million plus was sitting.  Ms.

15   Lauridsen checked that and learned that that was restricted for

16   margin call, which seems to me is perfectly consistent with

17   that prior email that they were holding these funds in an

18   anticipation of what would happen when these broker price

19   reviews came in.

20             THE COURT:  Well, isn't that inconsistent with your -

21   - what you said was an unambiguous provision?  If at any time

22   the market value of any purchased asset subject to a

23   transaction is less than buyer's margin amount for such

24   transaction.  So, your argument is that you can make a margin

25   call in an anticipation of a decline in the market, but that's

1    not what the sentence says.

2              MR. COMET:  I --

3              THE COURT:  The market value subject to a transaction

4    is, not will be, but is less than buyer's margin amount.

5              MR. COMET:  Your Honor, I think -- let me try to put

6    that in context.  There's obviously a gap, for want of a better

7    word, between the actual circumstances at any given point in

8    time regarding what market value is and the measurement of

9    that.  The market value can decline, but one may not yet have

10   the exact data to measure it with accuracy.

11             It seems to me what occurred here, a fair inference

12   from the documents, is that Credit Suisse believed the market

13   was declining, the real estate market, it believed that there

14   was going to be a substantial need for additional margin

15   payments in the future, the near future, as soon as American

16   Home, on its side, sent in these broker price opinions and

17   there would be a revaluation at that time.  And, in fact, Mr.

18   Kaiserman testified yesterday that when those opinions were

19   received there was a substantial revaluation that occurred,

20   ultimately occurred shortly after the August 1st margin call.

21             But there obviously was a business decision between

22   Credit Suisse and American Home to provide funds in advance for

23   that eventuality.  I said -- as I said a few minutes ago, I

24   think that the July 18th communication and the sending of the

25   two million dollars would not properly be characterized as a

1    margin call, per se, under the terms of the contract, it was a

2    business decision to sort of make sure there would be funds

3    available for an actual precisely-calculated margin call when

4    the -- when that was -- when the data was available to

5    determine.

6         I think we're getting, in a sense, sidetracked here,

7    Your Honor, in this respect.  The -- whether or not the two

8    million dollar request was a valid margin call or not is

9    obviously not really the issue here and the -- the only issue

10   that I understood to have been raised was, somehow, perhaps the

11   two million dollars should have been applied as of August 1st

12   for margin call.  There's several problems with that.

13        First, the issue of what to do about the two million

14   dollars or two-million-plus came up on July 27th and Credit

15   Suisse told American Home as of that time, we -- we can't apply

16   that to this margin call, you have to send us funds and

17   American Home agreed and sent them funds.  So, at that point,

18   there is more than a course of conduct, I would say that

19   American Home obviously was in, in effect, in agreement with

20   Credit Suisse about the fact that the two million was to be

21   held the future and -- and should really be estopped from

22   arguing that suddenly there was something improper about

23   holding the two million.

24        But more -- but beyond that, Your Honor, on August

25   1st, we know from Mr. Pino, they would not have agreed to the

Comet - Argument                              20

1    margin call no matter what.

2            THE COURT:  No, but his -- his point is that there --

3    that you had no entitlement to a margin call, because if you

4    had applied the two million dollars you were improperly holding

5    onto, if you want to take their argument, that there would have

6    been sufficient liquidity in the investment that your $900,000

7    margin call wouldn't be necessary.

8            MR. COMET:  Well --

9            THE COURT:  That's his point.

10           MR. COMET:  I --

11           THE COURT:  And my question to you is, if not a

12   margin call, what entitles you to two million dollars of the

13   debtors' money?

14           MR. COMET:  There -- there -- the two million

15   dollars, Your Honor, is -- was put into an account where funds

16   were held for buy downs and payments of the sort.  If you

17   review the emails, there's a consistent course of conduct where

18   there are funds of the debtors being held in accounts at Credit

19   Suisse and ultimately applied to either repurchase of loans or

20   margin calls, but only if and when the parties agreed that it

21   would be applied.  Credit Suisse, until there was an event to

22   default, was not going to take that money and apply it

23   unilaterally, it was, in effect, holding it for the debtors to

24   be able to satisfy obligations, but -- so -- so, in that sense,

25   the debtors obviously could have said, I believe, on July 18th,

1  when this request was made, for a good faith deposit of two

2  million dollars.  I think that's even how it's referred to in

3  the email, that --

4             THE COURT:  Which exhibit is that?

5             MR. COMET:  I -- I apologize, I --

6             MR. KIRPALANI:  Debtors' Exhibit 5, Your Honor.

7             THE COURT:  Thank you.

8                         (Pause)

9             MR. COMET:  Yes, it says we greatly appreciate this

10  good faith deposit.  So, this was a showing of good faith, a

11  deposit against future margin, actual margin application.  The

12  contract itself, actually, Your Honor, also says, in the event

13  of margin deficit, then -- then Credit Suisse can apply funds

14  of the sellers that it's holding, that the sellers would

15  otherwise be entitled to.

16             THE COURT:  Well, that begs the question, doesn't it?

17             MR. COMET:  Well, no.  I think it suggests that as

18  part of the normal procedure here, that Credit Suisse at

19  various times was holding funds of the debtors that had not yet

20  been applied to anything and that ultimately could be applied

21  to a margin call.  But the -- and -- but the history here, I

22  think, of this shows that there were many instances where

23  Credit Suisse was doing that, holding funds in accounts and, at

24  times, many times, American Home authorized Credit Suisse to

25  apply it to margin calls.

1      So, the two million dollars, if -- if Mr. -- Ms.

2    Rocco or Mr. Pino had responded on August 1st that we want to

3    apply the two million dollars to this margin call, then you

4    might have had the same issue that American Home didn't raise

5    on July 27th, which is Credit Suisse might have said it's not

6    the appropriate time to apply this, because we -- we're still

7    waiting for those broker price opinions to be incorporated and

8    see what happens with them, then we'll apply those funds; in

9    the meantime, we think you should wire in additional funds.

10    There could have been a dispute and who knows what would have

11    happened, but that's not what occurred.  The only response --

12    the response wasn't apply the two million, that couldn't have

13    been the response.  The company had made a decision it would

14    not honor any margin calls and so it could not have been

15    applied.  And that's what occurred.

16      But I don't -- the -- I don't think there was

17    anything -- in the course of conduct here and under the terms

18    of the contract, there is no -- no question that Credit Suisse,

19    at many point, was holding funds, applied them many times to

20    margin deficits when the debtors authorized it.  Here, the

21    parties had obviously asked for this good faith deposit; the

22    issue had come up on July 27th, should it be applied to a

23    margin call, Credit Suisse said no, American Home agreed.  I

24    don't think it lies with American Home there for it to turn

25    around and say that on August 1st, without their having said

1   anything at all, Credit Suisse was somehow obligated to

2   conclude that it should now apply the two million dollars to

3   this margin call that was made, when it -- it had -- on one

4   hand, it had told American Home we're not doing that now and

5   American Home had acquiesced in that; and on the other hand,

6   American Home's response was not please do that or anything, it

7   was we won't send you any funds.  And, of course, we know the

8   reason for that was they weren't honoring any margin calls.

9           So, that -- that is what occurred and I think, you

10  know, the arguments that are being made now, both as to notice

11  and as to these other -- the other issues are arguments after

12  the fact, inconsistent with the actual circumstances and course

13  of conduct of parties, arguments made by lawyers, as -- as --

14  and I'm one of them too -- as lawyers are want to do aft -- you

15  know, when they look for whatever argument they can make to try

16  to salvage a matter.  I mean, this argument about the two

17  million dollars, that didn't appear even in the debtors'

18  answering papers or in Mr. Pino's declaration, which was filed

19  only earlier this week, it came up for the first time yesterday

20  and it -- it is an argument that's inconsistent with the course

21  of conduct of the parties and has come up after the fact in an

22  attempt to create an issue here, I believe, and I think we have

23  established a likelihood of success on this point.

24          And under those circumstances, Your Honor, the -- it

25  -- the pre-petition -- I think we have established a likelihood

1   of success that the pre-petition termination was valid and,

2   therefore, that we're entitled to the transfer of all -- as the

3   contract provides, to transfer all collections and servicing

4   matters, files and so forth to Credit Suisse.

5           I will -- I also plan to address the harm issues,

6   Your Honor, in terms of irreparable harm and balancing of

7   harms.  Ms. Fife was going to address the, what I would call

8   the bankruptcy termination or pre-petition termination.  So,

9   logically, in sequence, if she could do that now --

10          THE COURT:  Yeah, that's fine.

11          MR. COMET:  Okay.  Thank you, Your Honor.

12                          (Pause)

13          MS. FIFE:  Good afternoon, Your Honor, Laurie Fife

14   from Weil, Gotshal and Manges.

15          If I can just point out one thing to Your Honor in

16   response to your question to Mr. Comet.  If you refer to

17   paragraph 6(C) in the repurchase agreement, the very last

18   sentence says:

19          "Notwithstanding the foregoing, the buyer retains the

20   right, in its sole discretion, to make a margin call in

21   accordance with the provisions of this section."

22          That sentence gives Credit Suisse the right to hold

23   the funds in an account and at the same time make a margin

24   call.  So, we believe that it was valid.

25          As Mr. Comet said, you know, we believe that the

1    testimony demonstrated that the margin call was valid and that

2    we've -- we terminated the contract pre-petition.  However,

3    whether the margin call was appropriately sent, it -- or the

4    notice was sent properly, is really irrelevant here, because

5    section 16(A) of the repurchase agreement is abundantly clear

6    that upon the debtors' bankruptcy filing, Credit Suisse's

7    rights to declare in event of default was deemed to be

8    exercised immediately.

9           As Your Honor is well aware, this type of _ipso_ _facto_

10   provision generally cannot be a basis for terminating or

11   modifying a contract after the commencement of a bankruptcy

12   case, but here, under Section 559 of the _Bankruptcy_ _Code_, it

13   explicitly provides a safe harbor for parties to a repurchase

14   agreement such as the Credit Suisse agreement.  Despite the

15   fact that the debtors asserted on pages 10 and 11 of their

16   response that whether or not the repurchase agreement

17   constitutes, within the mean -- a repurchase agreement within

18   the meaning of 559 is irrelevant, since, you know, they -- the

19   relief they were seeking is just with respect -- since the

20   relief, I'm sorry, that we're seeking is just with respect to

21   the servicing agreements, yesterday the defendants argued that

22   Credit Suisse's relief must be denied, because the repurchase

23   agreement may not fall under the definition of the _Bankruptcy_

24   _Code_.

25          THE COURT:  Let me interrupt you for a second.

1             MS. FIFE:  Yeah.

2             THE COURT:  There is no separate servicing agreement.

3             MS. FIFE:  That's correct.

4             THE COURT:  That the -- what's defined as the

5     servicing agreement in the debtors' brief, my understanding, is

6     the components of the master repurchase agreement, I call the

7     MRA, that deal with the servicing obligation.

8             MS. FIFE:  That's correct.  In fact, I think --

9             THE COURT:  And the MRA defines servicing agreement

10    as an agreement between the debtor and some servicer.

11            MS. FIFE:  Right, and if --

12            THE COURT:  And there is none.

13            MS. FIFE:  If any, and I think the testimony

14    demonstrated yesterday that there was no actual agreement.

15            THE COURT:  Now, jump ahead.

16            MS. FIFE:  Mm-hmm.

17            THE COURT:  Repurchase agreements, do they generally

18    contain such provisions like servicing agreements?  I mean,

19    let's talk about repurchase agreements that aren't mortgaged or

20    don't deal with mortgage-backed securities.

21            MS. FIFE:  I can't respond with respect to non-

22    mortgage loans, --

23            THE COURT:  Okay.

24            MS. FIFE:  -- but I can respond -- respond with

25    respect to mortgage loans and I think, actually, that Mr.

1    Kaiserman testified that in every single situation in which he

2    was involved with a repurchase agreement on a mortgage loan, in

3    that situation the agreements were very similar and they did

4    not contain separate servicing agreements.

5          There are many types of, you know, mortgage-related

6    agreements that do have separate servicing agreements, such as

7    a securitization or a whole loan mortgage.  Your Honor may have

8    read the pleadings that were filed yesterday by Morgan Stanley,

9    as an example.  In that situation, Morgan Stanley had purchased

10   a loan, there's no repo and, in that situation there was an

11   interim servicing agreement and it provided for a fee, it was a

12   nominal fee, five dollars, but nonetheless it was a fee.  As

13   the testimony, as you heard yesterday, from, you know, our

14   witnesses and also from the debtors' witnesses, there's no

15   separate agreement and there's no fee being paid.

16         So, it's -- it's very difficult for us to understand,

17   frankly, how the debtors are taking this position that the

18   contracts are really severable.  I -- you know, it's totally

19   inconsistent with New York law that, you know, requires that

20   there be something in the agreement that demonstrates some sort

21   of, you know, different type of agreement.  And, in an

22   addition, New York establishes that, you know, one way of

23   determining the parties' intent, whether the agreement provides

24   for sep -- is whether the agreement provides for separate

25   consideration.

1          As I said, Mr. Love and Mr. Pino testified that

2     there's no -- Credit Suisse doesn't pay anything for the -- to

3     the defendants for the servicing of the loans.  He also

4     testified that the defendants' obligation to service Credit

5     Suisse's mortgage loans, you know, emanate from the main

6     agreement, because there is no other agreement.  In response to

7     whether CSFB pays anything, Mr. Love testified no, but American

8     Home Mortgage Servicing, you know, gets a credit for servicing

9     from corporate.  I assume he meant corporate -- the parent

10    corporation.  He -- you know, Mr. Love couldn't really explain

11    what that was, but after further questioning, it became clear

12    and, frankly, admitted that this was just a book entry between

13    two affiliates and no cash is transferred.  Hardly a

14    demonstration of a separate servicing agreement between CSFB

15    and the debtors.

16          Mr. Pino stated that the only reason they were

17    transferring the servicing rights is that they knew that if

18    they did, CSFB would have no incentive to sell the loans for

19    more than the amount that they are owed.  In essence, that very

20    statement, Mr. Pino is acknowledging that the mortgage loans

21    could not be sold without the servicing rights.  That's why

22    they're holding up the servicing rights and basically holding

23    us hostage, because they know that they can't -- we can't be

24    sold without the -- the loans can't be sold without the

25    servicing rights.  They are trying to prevent us from selling

Fife - Argument                                    29

1   the loans and, in fact, that establishes that two were not --

2   are not severable.

3        They -- the testimony clearly established that the

4   position in the defendants' response that they filed only

5   yesterday or the day before that, you know, defendants

6   transferring the servicing would jeopardize the debtors'

7   ability to maximize the value of its loan servicing business, I

8   think that's on page 23, and the revenues essential to the

9   debtors' continuing loan service would be lost, which is also

10  on page 23, you know, simply is just, you know, not true.  I

11  mean, the -- Mr. Love and Mr. Pino and particularly Mr. Pino

12  testified that they didn't expect to get any revenues.  In

13  fact, Mr. Pino testified that he want -- well, it was unclear,

14  frankly, what his testimony was, whether these loans were part

15  of the package being sold --

16       THE COURT:  Well, isn't what they are hoping to do,

17  sell the servicing business, both the platform and the

18  servicing rights, to a buyer, --

19       MS. FIFE:  Mm-hmm.

20       THE COURT:  -- including your client's -- the

21  servicing rights affiliated with the loans that your client

22  owns, to allow the buyer of those rights the opportunity to bid

23  on the business --

24       MS. FIFE:  Mm-hmm.

25       THE COURT:  -- of your client's loans?

1          MS. FIFE:  But, Your Honor, I don't understand what

2     that party would be bidding for.  Bidding for the obligation to

3     service the loans?

4          THE COURT:  Well, the --

5          MS. FIFE:  And not get paid anything for it?

6          THE COURT:  Well, I mean, I -- the --

7          MS. FIFE:  The loan --

8          THE COURT:  No, no, not bidding to not get paid, but

9     bidding to -- to do the business, as opposed to you taking the

10    business internally to S.P.S. or you taking the business --

11         MS. FIFE:  But the -- but the loan --

12         THE COURT:  You're gonna sell the loan.

13         MS. FIFE:  But the loans --

14         THE COURT:  Right?

15         MS. FIFE:  -- have already --

16         THE COURT:  Credit Suisse isn't gonna hold these

17    loans.

18         MS. FIFE:  Right.

19         THE COURT:  I don't think anybody disagrees that --

20         MS. FIFE:  Right.

21         THE COURT:  -- they're gonna sell these loans.

22         MS. FIFE:  Sure.

23         THE COURT:  You can either sell them with servicing

24    or without servicing.

25         MS. FIFE:  No, we can't sell them without servicing.

1          THE COURT:  No.  Assume you can sell them as

2    servicing retained --

3          MS. FIFE:  Mm-hmm.

4          THE COURT:  -- or servicing goes with the loans.  Not

5    everybody that buys a mortgage portfolio wants to service it.

6          MS. FIFE:  Mm-hmm.

7          THE COURT:  So, you -- assume you get relief --

8          MS. FIFE:  Right.

9          THE COURT:  -- and you have these loans and S.P.S. is

10   servicing them and you sell them to John Smith Trust Number 72,

11   --

12         MS. FIFE:  Right.

13         THE COURT:  -- with servicing rights retained.

14         MS. FIFE:  Mm-hmm.

15         THE COURT:  John Smith Trust and S.P.S. are gonna

16   enter into a servicing agreement, --

17         MS. FIFE:  Mm-hmm.

18         THE COURT:  -- where S.P.S. is going to get paid 35

19   basis points to service the agreement, to service the loans.

20   Okay?  That's what's gonna happen.

21         MS. FIFE:  Mm-hmm.

22         THE COURT:  All right.  What the debtors want to do,

23   I think, is save the loans, so that they either can cooperate -

24   - cooperatively sell it -- with you, to sell them to somebody

25   or, even if they don't, they're gonna sell the servicing

26   platform to XYZ Corp., so that XYZ Corp. can then come to

                        Fife - Argument                    32

1    Credit Suisse and say, look, we'll do the servicing for you or

2    you can have the servicing back, but if we're doing the

3    servicing for you, it's gonna be 35 basis points.

4                MS. FIFE:  Mm-hmm.

5                THE COURT:  And isn't that what they're trying --

6    it's --

7                MS. FIFE:  But --

8                THE COURT:  -- it's a little less than clear and --

9                MS. FIFE:  Right.

10               THE COURT:  -- I understand Mr. Pino's testimony, but

11   isn't --

12               MS. FIFE:  Right.

13               THE COURT:  -- that what they're trying to

14   accomplish?

15               MS. FIFE:  But I -- I'm not positive that's what

16   they're trying to accomplish, but even if they were, I don't

17   see how they can.  We own the loans.  We've already closed out

18   --

19               THE COURT:  Yeah, but if you're not gonna service

20   them, you're gonna have to pay somebody to do it.

21               MS. FIFE:  Well --

22               THE COURT:  You're gonna have to pay -- you're gonna

23   have to --

24               MS. FIFE:  Well, first of all --

25               THE COURT:  -- -- pay S.P.S. to do it.

1          MS. FIFE:  Well, that's an affiliate, so I'm not sure

2     that we would have to pay, frankly.  S.P.S. is -- as, you know,

3     Mr. --

4          THE COURT:  Well, I'm sure there would be some sort

5     of inter-company -- I'm sure the bank is --

6          MS. FIFE:  Right.

7          THE COURT:  -- more than proficient at making sure

8     that the accounting niceties and corporate organization is

9     accounted for.  So, I'm sure there --

10         MS. FIFE:  Right.

11         THE COURT:  -- would be some sort of --

12         MS. FIFE:  So -- so we -- so, under your --

13         THE COURT:  -- consideration.

14         MS. FIFE:  -- hypothetical, we take the loans and

15    there's --

16         THE COURT:  Maybe you want GMAC to do it.

17         MS. FIFE:  Maybe we want --

18         THE COURT:  GMAC's not gonna do it for free.

19         MS. FIFE:  Right.

20         THE COURT:  So, maybe GMAC buys the debtors'

21    servicing business and part of why they pay for the servicing

22    business is the right to go to you first and say, look, we've

23    got 'em, it's in place; what are so crazy about, we're GMAC,

24    you know we're good for it, 33 basis points, save you a lot of

25    trouble.  And isn't that value to the debtors' estate?

1          MS. FIFE:  I mean, you're giving the debtors a free

2     option for something that, you know, they never contracted for,

3     they're not entitled to.  Where -- what -- you're basically

4     allowing the debtors to profit off of our property.  I mean,

5     how is that fair?  You're, in essence, rewriting a contract --

6          THE COURT:  Well, if you're harmed, you'll have a

7     damages claim.

8          MS. FIFE:  No, but -- but -- but the damage, the

9     money damage is not sufficient to -- to sat -- to -- to make up

10    for the damage that we're gonna have right now.  I mean --

11         THE COURT:  I don't want to get into Mr. Comet's --

12         MS. FIFE:  Right.

13         THE COURT:  -- argument.

14         MS. FIFE:  About -- about harm.

15         THE COURT:  Right.

16         MS. FIFE:  Right.  But it's -- we're not --

17         THE COURT:  My only point to you is, you can --

18         MS. FIFE:  Yeah.

19         THE COURT:  -- you can -- it's a stretch, frankly,

20    but you can posit a scenario that backs up the comment that

21    they were making in their brief that you --

22         MS. FIFE:  No, I -- I -- I -- I --

23         THE COURT:  -- were just --

24         MS. FIFE:  -- I don't agree, Your Honor, because I

25    think we -- you are assuming then that 559 doesn't apply to

1   this agreement, because I'm assuming that it does, okay, and --

2   and I don't really think there was any testimony yesterday that

3   contradicted that.  And if 559 applies to this agreement, then

4   we're entitled to exercise our rights under those -- under that

5   agreement, which means taking the loans and disposing them in

6   any way that we choose.  Right?

7        THE COURT:  Well, go ahead.

8        MS. FIFE:  And -- and going -- no, but part of that

9   agreement is that the -- the debtors are required to transfer

10  their rights and that, too, --

11       THE COURT:  And if they wrongfully don't do that, you

12  have a claim against them.

13       MS. FIFE:  Well, yeah, we have a claim against them,

14  but -- but we're harmed in the meantime.  The debtor -- the

15  debt -- well, how do the debtors lose if we go ahead and -- and

16  liquidate our positions?

17       THE COURT:  Well, the debtor is doing whatever

18  junior lien holder or junior equity person or any unsecured

19  creditors committee in an out-of-money case is doing, they're

20  betting your money --

21       MS. FIFE:  Right.

22       THE COURT:  -- that they're gonna get a better

23  recovery.  And they don't care if they don't get a better

24  recovery, because you'll get harmed and your unsecured claim

25  will be bigger, but what do they care, because they aren't

1   gonna pay unsecured claims in full anyway and maybe they hit

2   the lottery and they get a big number and then, all of a

3   sudden, you get paid in full and there's something back for

4   them.

5            MS. FIFE:  I -- I -- I --

6            THE COURT:  That's what their doing.

7            MS. FIFE:  Right and --

8            THE COURT:  It happens in every case --

9            MS. FIFE:  Right and we --

10           THE COURT:  -- that I have, there's --

11           MS. FIFE:  We have -- and we --

12           THE COURT:  -- that dynamic.

13           MS. FIFE:  That's right and we have no problem

14   selling the loans in a commercially-reasonable manner and we

15   intend to do that.  In fact, that's the way that we sell the

16   loans.  I mean, it's an auction that's -- you know, every --

17   every entity in the world is entitled to bid on it.  It's a

18   closed auction, you can bid -- anyone can bid.  We have no

19   problems with anybody overseeing that process, if they would

20   like.  But -- and -- and we'll sell the loans and, to the

21   extent that there is excess, that -- that money will go to the

22   debtors.  559 explicitly says that.  I mean, that's exactly

23   what's contemplated by -- by the statute, that any excess

24   received, upon liquidation of the assets, shall be paid to the

25   debtors.  That's what -- it's exactly what we are intending to

1    do.  We'll --

2              THE COURT:  So, your real argument, I think, is that,

3    look, this is a repo, it's clearly a repo and allowing the

4    debtors to treat it any other way and, specifically, allowing

5    them to retain something they have no contractual rights to

6    retain is, in effect, frustrating the whole point of the

7    repurchase statute, --

8              MS. FIFE:  And --

9              THE COURT:  -- which is to provide liquidity to the

10   financial markets.

11             MS. FIFE:  That -- that's --

12             THE COURT:  Which is particularly important when the

13   financial markets are hemorrhaging.

14             MS. FIFE:  Right.  That's exactly right.

15             THE COURT:  So, if I don't make them do it, I'm

16   frustrating the entire purpose of Congress.

17             MS. FIFE:  Right.  And, in fact, frankly, I -- I

18   don't un -- I mean, what other agreement is more of a

19   repurchase agreement -- we -- we look -- you know, what other

20   agreement would look like a repurchase agreement that was

21   intended to be covered by 559?  I mean, it -- this is exactly

22   the kind of agreement that was intended and, again, as I said,

23   there is nothing to the contrary in the record and -- and,

24   frankly, I -- you --

25             THE COURT:  Well, if you didn't have -- the problem

1   with mortgages is you gotta manage the income stream.

2           MS. FIFE:  Right.

3           THE COURT:  And you're managing the income stream not

4   from sophisticated corporate debtors, like in a bond or

5   commercial paper, you're managing it for mom and pops, these

6   are scratch dent -- scratch-and --

7           MS. FIFE:  Right.

8           THE COURT:  -- dent loans, foreclosure rates are

9   going up.

10          MS. FIFE:  Mm-hmm.

11          THE COURT:  I mean, there's a real cost to that.

12          MS. FIFE:  Right.

13          THE COURT:  And I think their response to it would

14  be, well, that is what makes it not a repurchase agreement,

15  that added -- well, that added complication of having to pay

16  someone or be involved in managing the income stream --

17          MS. FIFE:  Yeah, but I -- I mean, they can say that,

18  but there's no support for that.  I mean, the -- the --

19  Congress in 2005 amended the definition of repurchase

20  agreements to specifically include, you know, mortgage loans.

21  Right?  And in addition to that, in Section 101(47) of the

22  Bankruptcy Code, it includes interests in -- in mortgages and

23  it includes agreements relating to mortgages.  I mean, what

24  could be more related to this than actually being able to

25  liquidate and exercise our rights with respect to this

Fife / Comet - Argument                                39

1    agreement?

2            If -- if we can't -- if we can't -- if -- if --have

3    the servicing in -- if the servicing -- if we can't service

4    these loans, we -- we can't exercise our rights under -- under

5    559.  And -- and I think Your Honor said it before and actually

6    said it, you know, quite well, I think that that is totally

7    contrary to the intent and purpose of Congress.  That's --

8            THE COURT:  Thank you, Ms. Fife.

9            MS. FIFE:  Thank you.

10           THE COURT:  Mr. Comet, why isn't money damages -- why

11   isn't this just a case about money damages?  Assuming arguendo,

12   the debtors are acting completely and utterly without basis, in

13   gross violation of your contract, frustrating your ability to

14   sell these mortgages at your detriment, when you finally get

15   control of these six weeks later and Countrywide's in its third

16   week of bankruptcy and the mortgage market is flooded and the

17   price on these is going down another 50 percent, you have a

18   claim.  Why isn't that enough?

19           MR. COMET:  Well, two -- two responses to that, Your

20   Honor.  First, it's not enough, because the law is that if you

21   are not going to be able to recover the money damages, that you

22   incur irreparable injury.

23           THE COURT:  Well, you have a claim.  And it's not

24   that you can't recover it, if you have a claim in the full

25   amount, it's the <u>Bankruptcy Code</u> that's going to -- is gonna --

1     it's a question of plan dollars versus claim dollars.

2               MR. COMET:  Well --

3               THE COURT:  Your claim dollars are unaffected.

4               MR. COMET:  I understand that, Your Honor, but -- but

5     the -- obviously, the practical reality is that you will not

6     recover the full amount.

7               THE COURT:  Now, if that were the case, wouldn't I

8     have a flood of these in every bankruptcy I have?

9               MR. COMET:  No, I don't believe so, Your Honor.  The

10    -- this is not -- this is not a situation where our basic claim

11    is money damages and we are, for example, trying to get relief

12    to freeze the debtors assets in order to make sure that we'll

13    be able to recover the money damages, take their property and

14    freeze it in order to be sure we'll be able to recover our

15    money damages.

16              That's actually the <u>Groupo Mexicano</u> case that Mr.

17    Brady referred to yesterday, it's a total -- it's a totally

18    different situation.  They are -- the claim is I have -- the

19    claim by the plaintiff in that case is the defendant owes me

20    money damages.  I want you, the court, to order that some

21    property of the defendants, no question it's the defendant's

22    property, be segregated, because if it isn't, I might not be

23    able to recover my money damages and, therefore, I want this

24    advance relief.

25              If that were the type of claim we were asserting,

1    yes, you might get a flood of them, but that's not the type of

2    claim we are asserting.  What we are trying to do is assert a

3    claim to prevent money damages from accruing in the first

4    place.  We are saying this is our property and we want to

5    prevent the money damages from accruing.

6            Allowing the money damages to accrue under those

7    circumstances, if -- if, on Your Honor's assumption, the

8    debtors are acting wholly improperly so, therefore, despite

9    that, allowing the money damages to accrue, knowing that we

10   can't recover them is irreparable injury and is a different

11   type of claim from the Groupo Mexicano claim, it is not one you

12   would expect a flood of, because not everybody is gonna come in

13   saying the debtor is holding my property.  And, you know,

14   assuming this is a repurchase agreement, which we clearly

15   believe is, and that the purpose of Congress was to ensure

16   against exactly this kind of damage by insuring liquidity, it -

17   - it's contrary to the purpose of that statute, as well to --

18   to say this is -- well, it doesn't matter, you just get a money

19   claim and, even if you can't recover it, so be it.  That would

20   thwart the purpose of the statute.

21           Just one -- on one aside on that, I think Your

22   Honor's statement about how, in the nature of these types of

23   instruments, you need to have this servicing and that's what

24   creates that element of the contract here is a perfect way of

25   saying why this is so inextricably intertwined and can't be

1    severed into separate batters.  Mr. Kaiserman testified

2    yesterday explaining why the servicing remains with the debtors

3    here for this brief period that's expected, because it's all

4    intertwined with the rights and it's simply inseparable.  And

5    so, then to say that you can thwart that purpose and you get a

6    money claim in which you won't get paid, too bad.

7            But the other response, that is that the case law

8    says that's irreparable injury, including there's actually --

9    not in the same context -- but the notion that when you can't

10   recover damages, when it's known you won't be able to cover the

11   damages if something isn't done, that that will be irreparable

12   injury, that was applied even recently, well after Groupo

13   Mexicano, by Judge Gross in this court in the case of -- in the

14   American Tissue case, a decision last December he found that

15   because there was likelihood that the funds -- the claim would

16   not be able to be recovered if he didn't grant the preliminary

17   injunction, that would be irreparable injury, because money

18   damages wouldn't suffice.  And that citation on that -- I'm not

19   sure it's officially reported -- it's 2006 Bankruptcy LEXIS

20   3266, Your Honor.

21           So, it is irreparable injury, it's injury of a

22   particular -- related to a particular type of claim, where

23   we're trying to prevent the injury from occurring in the first

24   place, because it's our property and that's not something

25   you're to get a flood of.

1          But also, Your Honor, I think, based on the testimony

2    yesterday, we have a particularly bizarre situation here where

3    it's not just Credit Suisse that's being hurt by this, the

4    debtors are hurting themselves, frankly, I mean, on their own

5    analysis of what's going on.  In their own analysis of what's

6    going on, they are continuing to service these loans, receiving

7    no income for that, so they're wasting the assets of the estate

8    by servicing these loans with no compensation for it; they're

9    preventing Credit Suisse from selling the loans, in fact,

10   that's their testimony.

11          Why are they doing this?  They want to make sure that

12   Credit Suisse doesn't sell the loans.  Now, why are they doing

13   that?  They say they're doing that, because they want to make

14   sure that the maximum value is obtained for the loans.  And

15   they're doing that even though there is undisputed testimony

16   from Mr. Kaiserman from yesterday that the market is declining.

17   So, they're -- they're creating a situation where Credit Suisse

18   is likely in the end to get less for the loans when they're

19   sold than would if they transferred the servicing now.

20          So, Credit Suisse is being hurt by their claimed --

21   they are being hurt, because they're servicing for nothing and

22   they're force -- they're forcing the loans not to be sold while

23   the value is declining.  Everybody is being hurt by this and

24   it's only to make sure that there be a commercially-reasonable

25   sale.  And as Ms. Fife said, we have no interest in not doing a

1    commercially-reasonable sale, we don't want a claim against us

2    and we're willing to sit down with the debtors and the

3    Creditors Committee and work out how the loan will be sold, to

4    make sure it's acceptable to everybody.  But that --

5              THE COURT:  Their concern is that you are going to --

6    say your loan balance is $23 million dollars.  Once you get

7    there, you don't care and you'll get your 23 million and your

8    client will get out of this one free and clear and there's

9    potential for loss value there.

10             MR. COMET:  I understand, Your Honor, and I think two

11   things to that, again.  First, in the nature of the way these

12   kinds of loans are sold, that it's not really something that

13   Credit Suisse can try to do.  As Ms. Fife said, they are sold

14   at auction.  People come in, they have to conduct due

15   diligence, as Mr. Kaiserman testified, which they can't do if

16   we don't have the servicing files.  After they review the

17   loans, they make a bid on it, we sell it to the highest bidder.

18   We are not going to take a lower bid than the highest bidder

19   just because it's over our amount.  But, again, we are also

20   willing, as I said, to sit down with them, with the Creditors

21   Committee, work out the mechanics on this, make sure that the

22   procedure maximizes the value.

23             THE COURT:  All right.  Let me ask you.  I thought I

24   heard yesterday that you had been -- your client had been

25   provided with the information, is that incorrect?

1           MR. COMET:  We -- well, we have been provided --

2           THE COURT:  Not physical possession of the files,

3      obviously, but --

4           MR. COMET:  We have been provided with some

5      information, pursuant to settlement discussions.  The debtors

6      have insisted we're supposed to be covered by Rule 408 and

7      under an express agreement that we would not use the

8      information to in any way try to transfer the servicing --

9           THE COURT:  All right.

10          MR. COMET:  -- amount.  So, we can't -- we can't sell

11     the loans at this point and I don't believe that information

12     would be sufficient, in any event, even if we wanted to.  We --

13     and it will rapidly become out of date as well, unless it's

14     continually re -- refreshed.

15          Your Honor, furthermore, in -- regarding the issues

16     of -- I mean, I -- our principal concern, in many ways, is the

17     inability to sell the loans and to exercise our rights as

18     owners of the loans, but we're also concerned about the

19     servicing situation.  I think Mr. Kaiserman testified to

20     legitimate reasons for good concern.  Yes, it's been ten days

21     and so far, according to Mr. Love's testimony, things are

22     proceeding okay in the servicing, although, frankly, I was not

23     fully reassured by his testimony.  Despite the statement in his

24     declaration that every penny of the Credit Suisse money is

25     being segregated, he was not clear on that yesterday.

1          THE COURT:  Well, yeah he was.  He was -- he was

2     clear -- he just said that if there is money that you wouldn't

3     otherwise be entitled to, you wouldn't be getting it.   If

4     there's life insurance money, you don't get the -- you don't

5     get the life insurance money.  You would never get the life

6     insurance money.

7          MR. COMET:  Well --

8          THE COURT:  Or if you had a servicing agreement,

9     which you don't, then you wouldn't get the basis points on the

10    collections.  That's what he said.

11         MR. COMET:  Right, but he also said he didn't know if

12    those deductions would be made in case without -- and -- and if

13    there -- if --

14         THE COURT:  Well, with all due respect, I mean, he --

15    he's got a lot to think about and he's got a lot of different

16    clients.  You're just one piece of a rather large operation.

17         MR. COMET:  I agree, Your Honor, and I -- I hope it

18    is the case that everything is being segregated and -- and I

19    didn't say, you know, that -- that he said it wasn't, I just

20    said it wasn't entirely clear, but I hope it is all there.  You

21    know, in ten days things seem to be proceeding okay, but we

22    also learned yesterday, at least I didn't know, that this was

23    likely to go on for quite as long as was said.  We have been

24    thinking in terms of an auction to take place in September and,

25    presumably shortly thereafter, the servicing situation would be

1   cleared up.  But we learned from Mr. Pino that it could go on

2   for another four months or so after that, so we're talking five

3   or six months now.  And -- and the likelihood is, in that

4   passage of time, if we don't get relief, that delinquencies are

5   going to increase, people are going to leave, there are going

6   to be problems that may not have manifested themselves yet in -

7   - in ten days.

8            But beyond that, we have the problem that we can't

9   sell and I don't think that's in dispute, because the debtors'

10  position is they're -- the reason that -- essentially, the sole

11  reason they're holding up the servicing transfer is to prevent

12  us from selling, because they want to control -- have some

13  control over the sales process.  So, I don't think that's a

14  dispute and, as I said, I think that's hurting both sides here

15  and, given the undisputed testimony that values are decreasing,

16  we can't get compensated for that, at least not fully.

17           On the other hand, if the Court orders relief for us

18  and American Home later has a claim, we are good for a hundred

19  cents on the dollar of the money, there's no dispute about

20  that, Mr. Pino agreed and -- and I'm sure it will not -- it

21  would not be disputed.  And we are, you know, prepared to do

22  what's necessary to ensure that, including, as I said, sit down

23  with the debtors, with the committee, work out how a sale will

24  be done and make sure that everybody's interest is maximized,

25  as opposed to the current situation, where everybody is being

1    hurt, even on the debtors' own analysis, by the --

2            THE COURT:  Well, I mean, I'm not in the business of

3    forcing people to settle, but what about the current situation

4    has kept you from having that same conversation?

5            MR. COMET:  I --

6            THE COURT:  I don't the --

7            MR. COMET:  Your --

8            THE COURT:  I don't want the context of settlement

9    negotiations, but --

10           MR. COMET:  I -- I don't want to --

11           THE COURT:  -- but I don't understand how --

12           MR. COMET:  I don't want to disclose settlement

13   negotiations, but nothing has prevented us and -- and we -- we

14   are -- let me put it this way, Your Honor.  We -- we have made

15   our willingness to do that known.

16           THE COURT:  Okay.  Fair enough.  All right.  I am

17   going to ask you again.  Here's what I'm really struggling

18   with, which is this -- the fact that this is, you know, to

19   paraphrase the Third Circuit, a purely economic injury and that

20   you -- your only real argument is that you have a claim against

21   the debtor-in-possession that may not be collectible in full

22   because of the fact that they're in bankruptcy and they're not

23   gonna pay unsecured claims in full.  Do you have a case that

24   says that that, in and of itself, entitles you to irreparable

25   harm -- or shows irreparable harm?

1          MR. COMET:  We cited two -- I believe two Third

2     Circuit cases and I believe they are not specifically in the

3     context of a claim against a bankruptcy debtor, Your Honor, but

4     they hold and they cite numerous other cases that say that --

5     that the -- if -- if it's established that you will be unable

6     to recover for economic injury, that is irreparable injury.

7          THE COURT:  All right.

8          MR. COMET:  And as I said, Judge Gross applied that

9     rule in a bankruptcy case, although --

10         THE COURT:  Yeah, but that was --

11         MR. COMET:  -- on a claim by the trustee against

12    another --

13         THE COURT:  Against someone who was gonna convert the

14    property.

15         MR. COMET:  Well, we think our property is being

16    converted here.

17         THE COURT:  I haven't read that.  I'm supposed to

18    read all my colleagues' opinions, but I --

19         MR. COMET:  The --

20         THE COURT:  It's a rather large pile.

21         MR. COMET:  The -- the -- but I also think, Your

22    Honor, it's one thing to say that all you have is economic

23    injury in a situation where the underlying claim is money

24    damages.  It's another thing to say that where the claim is

25    that someone else is holding your property and preventing you

1   from exercising your rights as an owner.  And that -- that's

2   particularly true in a situation where we're operating under a

3   statutory scheme.  I mean, section 559, that was expressed --

4   is expressly intended to prevent exactly that kind of economic

5   harm.  If the Court thinks we have a likelihood of success on

6   that claim, then to not enforce it, to not give us the relief

7   in the belief that we can be adequately recompensed by a claim

8   for money damages is exactly contrary to the thrust of the

9   statute.  And I --

10            THE COURT:  Well, the statute could have -- the

11   statute could have provided that, the statute could have

12   provided for specific performance of repo agreements.  It

13   doesn't.

14            MR. COMET:  I think it provides, Your Honor -- well,

15   it --

16            THE COURT:  Provides that certain aspects of the

17   Bankruptcy Code don't apply, --

18            MR. COMET:  That --

19            THE COURT:  -- but it doesn't say, for instance,

20   that, you know, you would be entitled to specific performance

21   under that --

22            MR. COMET:  I agree, but this contract says that and

23   the debtors agree in this contract that we're --

24            THE COURT:  And I agree and that's -- and that -- the

25   debtors have acknowledged that, that's part of the contract,

1    but you -- as you know, the cases say that's one element and,

2    in and of itself, not sufficient to establish irreparable

3    injury.

4              MR. COMET:  It may not be, in and of itself,

5    sufficient, but I think if -- it's not the only point here,

6    Your Honor.  They -- they agreed to it.  The statutory scheme

7    contemplates our ability to liquidate.  They have no legitimate

8    reason to withhold here.  I mean, to come to Your Honor's

9    hypothetical about them wanting to sell somehow the servicing

10   license, you know, I -- I don't understand, sort of as a

11   technical matter, how that gets implemented.  The only way I

12   know of that a debtor goes out and sells something in a

13   bankruptcy case, where it's a contract right, is they have to

14   assume and assign the contract to a party who will provide

15   adequate assurance that they will perform the contract.

16             So, it seems to me the only way they can sell

17   anything here related to their contract with CSFB is they have

18   to say they're assuming the separate servicing agreement, which

19   doesn't really exist, that all -- any pre-petition defaults

20   regarding that agreement are going to be cured and that

21   somebody else is going to undertake to assume it and provide

22   adequate assurance they will perform the contract.  So, we're

23   gonna get a commitment on the day this is assumed by this

24   hypothetical buyer that they are going to perform this

25   contract.  They're gonna have to make that commitment before

1   they get any commitment from us that we're gonna pay them 35

2   basis points or whatever.  No one is going to do that.

3              THE COURT:  Why is the servicing agreement an

4   executory contract?  Assume it's severable.  Why is it

5   executory?  The debtors have unfulfilled obligations, but you

6   don't.  It's got to go both ways.

7              MR. COMET:  Well, but if it's not an executory

8   contract, there's still a question of what are they selling.

9   If we don't have any obligations, what is somebody buying?  I

10  don't understand what anybody would be buying.  Now, if all

11  they want to do is say to the potential --

12             THE COURT:  They're buying the option to negotiate

13  with you to reach an agreement to continue to service what's

14  already sitting at their platform for some fee.

15             MR. COMET:  And --

16             THE COURT:  As opposed to you having to take the

17  time, money and risk associated with transferring the files to

18  your servicing platform.  That's what they're selling.

19             MR. COMET:  I understand, Your Honor.  I think --

20             THE COURT:  And I think they would take the posit --

21  maybe they would take the position -- we've got hypotheticals

22  on top of hypotheticals now -- that there's no assumption or

23  assignment involved, it comes with the servicing platform.  The

24  servicing platform includes you have to service whatever's

25  already on there.

1          MR. COMET:  Well, the question then is where, in the

2     meantime, do they get the right to keep holding the files from

3     us and what happens if, at that moment, we say --

4          THE COURT:  They have no right, they're acting in

5     whole violation of the contract.

6          MR. COMET:  Well, --

7          THE COURT:  And you have -- and if you are damaged,

8     you have a claim.

9          MR. COMET:  Well, but I -- it's hard for me to think

10    that --

11         THE COURT:  I mean, people act -- people act in

12    breach of contracts all the time.

13         MR. COMET:  I understand that, Your Honor, but it's

14    hard for me to think that the Court would accept -- if that's

15    the argument they're making -- would accept an arrangement

16    where you admittedly have no right, you're breaching the

17    contract, it's our property, we're entitled to it, but because

18    there's a way we can misuse our naked possession of Credit

19    Suisse's property for to get somebody to pay some money so that

20    they -- theoretically, so they can go and talk to Credit Suisse

21    about a --

22         THE COURT:  Look, I don't like it.  That's not the

23    question.  The question is, if they do it, can you come in and

24    have me do anything about it.

25         MR. COMET:  I agree and -- and I take --

1          THE COURT:  And we --

2          MR. COMET:  I see no --

3          THE COURT:  We keep going back to the issue of,

4    they're damaging you, you have a claim; so be it, you have a

5    claim.  If the market goes down, you're damaged, you have a

6    claim.

7          MR. COMET:  Well, Your Honor, if that were the rule,

8    then what -- what you would be saying is no one can ever come

9    in and say the debtor is holding my property, I want it back.

10   No matter how clear their argument is, no matter how clear it

11   is the debtor is wrong, that has no colorable claim, because

12   the debtor, they can come up with some way to say somebody else

13   will give me some money if I --

14         THE COURT:  And --

15         MR. COMET:  -- if I keep -- if I keep misholding this

16   property and -- and you can then have a claim for, you know,

17   ten cents on the dollar or nothing, that the Court is powerless

18   to order relief.  That can't be the law.  If -- if we're right,

19   if the Court believe we're right, and they have no right to

20   keep holding the property, merely because --

21         THE COURT:  But in your argument, irreparable injury

22   falls out.  As long as you have a likelihood of success on the

23   merits, you win on a preliminary injunction.  Now, I'm pretty

24   sure we covered that in law school, that that wasn't enough.

25         MR. COMET:  Well, I think -- I think the case law is

1    pretty clear, Your Honor, that there is a sort of relationship

2    between the two.  The stronger the probability of success, the

3    less you need to show injury, but --

4              THE COURT:  Okay.

5              MR. COMET:  But look, Your Honor.  If -- if the -- if

6    that's the only issue here is the irreparable injury and the

7    Court is clear that we are likely to win this case, then let's

8    get the case over with, let's schedule a trial.  We can take

9    the same evidence from the preliminary injunction, have a trial

10   next week and resolve this case on the merits, if -- if it's

11   quite clear that we're gonna win and then we don't have any

12   irreparable injury issue any longer.

13             But I think the -- if you're gonna balance the harms

14   here, there's clearly a harm that we won't -- we won't receive

15   reparations for, in the literal terms of the words, Your Honor,

16   because we won't get a hundred cents to the dollar, we will not

17   receive reparations, we will, as in reality, be irreparably

18   harmed.  And the cases in the Third Circuit and otherwise say

19   that inability to pay money damages is irreparable harm and I -

20   - I know of no authority that says that rule which exists

21   doesn't apply in a bankruptcy case.  I can't cite you offhand

22   the bankruptcy cases where that rule has been applied, but I

23   also don't know of one where it says it doesn't apply in a

24   bankruptcy case.

25             We are being, in reality, irreparably harmed, without

1      any bankruptcy fictions to be imposed on it, and if -- if

2      that's the case that they're not -- they won't be harmed at all

3      and, certainly, they can't claim that we're not good for

4      damages and, in fact, as I said, I think they're hurting

5      themselves and there's a simple way to deal with this matter,

6      which is to work out how a sale will be done.

7              I also think it's sort of fundamentally illegitimate

8      to hold the servicing information files hostage for purposes of

9      a separate issue.  I -- I -- it's kind of ironic in a way, Your

10     Honor, Judge, if you'll remember how we started yesterday, I

11     said we can't figure out why they want the servicing here,

12     there's nothing for them to sell, they must be doing it for

13     leverage on -- on some other matter.  And Mr. Kirpalani took

14     umbrage of that and it's kind of ironic, because I think they

15     now agree that that's what's occurring here.  They -- the law

16     provides remedies for them if we don't sell in a commercially-

17     reasonable manner.  They have a claim against us.

18             Why do they get to use self-help to prevent us from

19     what we're entitled to in order to safeguard their claim

20     against us?  They have a remedy for that, let them exercise it.

21     But I think we both have a joint interest in preventing that

22     manner from ever coming to pass, that is the loans being sold

23     for less than equitable value.  We don't want to be sued.  They

24     want them sold at the greatest price.  The best way to do that

25     is to do it as quickly as possible, probably, or certainly

Comet / Kirpalani - Argument                    57

1   that's the undisputed testimony.  We are prepared to work that

2   out with them and I don't think they should be holding the

3   material hostage in connection with what really is a separate

4   claim that they have, if and when we -- they think we haven't

5   sold in a commercially-reasonable manner.

6           THE COURT:  Okay.

7           MR. COMET:  Thank you.

8           THE COURT:  Thank you.  Thorny issues.  And well

9   argued, sir.

10          Let's start where we -- I'm going to put you out of

11  order.  Let's start where we left off, because I'm hot on this

12  now.  What are you doing?

13          MR. KIRPALANI:  Why are we doing --

14          THE COURT:  Yeah.

15          MR. KIRPALANI:  What are we doing?

16          THE COURT:  What's --

17          MR. KIRPALANI:  Okay.

18          THE COURT:  You know, why are you here?

19          MR. KIRPALANI:  Your Honor, we have mortgages --

20  Susheel Kirpalani from Quinn Emanuel, for the record.  We have

21  approximately, I believe it's $4.6 billion dollars, but I

22  forgot to ask Mr. Pino the exact number, of mortgages held for

23  sale.  The debtors will shortly be filing an omnibus motion.

24  Whether these mortgages are purportedly purchased by third

25  parties or the subject of undisputed loan agreements, we

1    believe that there is an asset disposition program that the

2    debtors can control that will ensure that value is maximized

3    for all of these.

4            What Mr. Comet suggested, which is Credit Suisse

5    takes the loans and the servicing and then goes out to the

6    market tomorrow, finds eight bidders, none of whom is likely to

7    want to buy anything right now, and then takes that value and,

8    as long as they've hit enough bidders, he meets commercially-

9    reasonable standards, he's done.  We're not convinced that

10   that's the right way, we think the debtors' business judgment

11   deserves some opportunity.

12           Put aside for a minute -- I apologize, because I'm

13   glossing over a really huge threshold issue and I appreciate

14   that, which is, is it our loan or not.  I understand that.  But

15   you asked what we're doing --

16           THE COURT:  Mm-hmm.

17           MR. KIRPALANI:  -- and I'm not gonna tell you a story

18   that's not right.  Okay, this is the right story.

19           So, what we would propose, to the extent that why

20   can't this be worked out, is that the debtors attempt to market

21   the loans for the benefit of Credit Suisse.  And if we can find

22   buyers that provide what we believe to be the right price, then

23   obviously we can do that and we could transfer the loan

24   servicing to that buyer or to whatever Credit Suisse designates

25   or the like.  They don't want that.  They said, we -- we get no

1    upside, you're gonna get the upside.  I said, that's exactly my

2    point.  And so, our view is that's the right --

3            THE COURT:  But you're in a situation, as I said

4    earlier, that every junior equity --

5            MR. KIRPALANI:  Yes.

6            THE COURT:  -- holder is in any bankruptcy.

7            MR. KIRPALANI:  I think that's exactly, exactly

8    right, Your Honor.

9            THE COURT:  Now, assume it's a secured loan and it's

10   not a repurchase agreement.

11           MR. KIRPALANI:  Then we would have that right.

12           THE COURT:  Except they would be able to come in and

13   have a relief from stay hearing and if it looked like the

14   current value of the collateral is less than the claim, you

15   wouldn't have any equity in the claim -- in the collateral and

16   I'd give them stay relief and they'd be able to go do what they

17   want to do, which is sell their collateral in the market.

18           MR. KIRPALANI:  That is true, Your Honor.

19           THE COURT:  So, how are they worse off by having a

20   repurchase agreement, which is designed to actually put them in

21   a better situation?

22           MR. KIRPALANI:  Well, we don't know, first of all,

23   that the value out there, that they could meet that lift stay

24   showing.  Also, if they were a secured lender, they wouldn't be

25   entitled to specific performance, which is to transfer the loan

1    servicing rights along with it.  I think it does dovetail as to

2    whether this is a repo, the threshold issue.

3            THE COURT:  Well, they would be entitled under the

4    U.C.C. to do a private sale of the mortgages, I believe.

5            MR. KIRPALANI:  That is true, Your Honor, but the

6    query of whether if, at the same time Your Honor was hearing a

7    motion by the debtors and it was a secured loan, to dispose of

8    those assets in an orderly fashion, that would maximize value

9    for the estate, I would think Your Honor would use his

10   discretion to say, you can just sit tight for a little while

11   and let the debtors dispose of assets that are property of the

12   estate.  And there's no reason why this debtor, who's in the

13   business of selling mortgages pre-bankruptcy, we're talking

14   billions a month, billions, could not dispose of $46 million

15   dollars of unpaid principal balance scratch on dead loans.  And

16   that's where we're butting heads, that's where we were butting

17   heads and why we had to come here.

18           Now, the issue of it being a repo or not.  Obviously,

19   we do take issue with the threshold question.

20           THE COURT:  Yeah, I got you all out of whack, so --

21           MR. KIRPALANI:  You got --

22           THE COURT:  -- if you want to start over from the

23   beginning of your --

24           MR. KIRPALANI:  I --

25           THE COURT:  -- outline, that's fine.

1          MR. KIRPALANI:  I can --

2          THE COURT:  Or however you want to do it.

3          MR. KIRPALANI:  I could probably do it any which way.

4    But, yeah, let -- let me do -- I do appreciate that, Judge.

5          First, I think Your Honor hit it squarely on the

6    head, which is the burden is on Credit Suisse to show

7    likelihood of success on the merits.  Implicit in that are two

8    things.  Argument one, that the master repurchase agreement is,

9    in fact, a repo -- or, I'm sorry -- is -- was validly

10   terminated pre-petition.  That's argument one.  If it was,

11   their view is that the servicing was terminated too, it was

12   validly terminated under state law, we had no claims of this.

13   End of story.  The alternative argument they make is that this

14   is a true repo and it rides through under 559.  Including the

15   servicing agreements, which everyone can, I think, stipulate is

16   not itself a repurchase of mortgage loans, mortgage-related

17   securities or any of the enumerated items.  And I take a real

18   strong disagreement with Ms. Fife's interpretation of 559 and

19   101(47) and I'll come back to that.

20         Starting with the first argument, which is, was it

21   validly terminated pre-petition.  We have presented the only

22   witness that had knowledge of the actual events leading up to

23   the notice of the margin call and the notice of determination

24   in the event of default.  The testimony I think was, as Your

25   Honor said -- and maybe you were just asking questions and I

1    don't mean to tag you with saying something -- but Your Honor

2    said the course of dealing was actually all over the place and

3    we agree with that, we think there was no consistent course of

4    dealing.  And so then you do have to go back to what the

5    contract said.

6         And we think the contract, notwithstanding the

7    creative argument, which I think actually came from the witness

8    before it came from Mr. Comet, that the word may doesn't mean

9    you have to follow it.  I think, if you even just look back to

10   the Hartford Underwriters' decision the Supreme Court said, if

11   you use the word may it means to the exclusion of other things

12   and they're not just saying it to be fun and say, oh, you may

13   do this, maybe you don't.  Although the testimony was

14   entertaining, I just don't think it carries the day.

15        I think the notice provisions were clear and I think

16   we do have to look at the circumstances.  We don't have a full

17   evidentiary record, Your Honor, and it's very important on that

18   score.  When Mr. Comet speculates that perhaps the debtors were

19   hiding the fact that they weren't gonna make any margin calls,

20   I can speculate and I would like an opportunity to put a

21   witness on the stand to say it was actually the opposite that

22   was true.  So, if we wanted to speculate over what was told to

23   Credit Suisse before they started making these series of margin

24   calls versus what wasn't told, we can have that trial.

25        But put aside that speculation from me or from Mr.

1  Comet.  The simple question is, if the debtors were in

2  financial distress prior to filing for bankruptcy and they were

3  getting these seriatim margin calls -- and this was a small

4  one.  I mean, you'll hear, probably hear about it soon, there

5  were about $60 million dollars of margin calls that were made

6  against the debtor just in the last two weeks of July, after

7  they already pledged $58 million dollars in the first two weeks

8  of July.  So, this was not a situation where, you know, Mr.

9  Pino would have said, ah, it's 300,000, I don't need to know

10  about this, I've got billions of dollars of cash flow a day, I

11  don't need to know about this.  Those situations were very

12  different.

13        Now we were at a time where every penny counted and I

14  think the course of dealing was -- if -- if they want to argue

15  there was a course of dealing on sending margin notices to

16  subordinates of Mr. Pino, then they can't run away from the

17  fact that there was also a course of dealing that, when it was

18  an issue that the company was disputing and they always had an

19  opportunity to look at it and dispute, not one business day

20  they show up within an event of default notice, when they start

21  that course of dealing in that manner.  They never said that

22  there was a course of dealing where someone other than Mr. Pino

23  got a margin notice and, within one business day, they can

24  serve an event of default and it held and it stuck.  There's no

25  evidence on that course of dealing, because it never happened.

1          What happened when the company was financially flush

2     with case, which was the testimony, or it was too small to be

3     bothering Mr. Pino with it, is it went out to one of the

4     subordinates in the treasury department and it was either met

5     or there were some questions about it, they worked it out and

6     then it was met.  And when Mr. Pino learned of some of them,

7     especially ones that were large, which did rise to his

8     attention, he picked up the phone, he called Mr. Timmerman,

9     Gary Timmerman, who he's known for many years, and said, this

10    isn't right, your calculations aren't right, there's this whole

11    dispute between single loan versus aggregate.

12          I think, at the very least, there was a good faith

13    dispute over how the contract could be interpreted.  Of course,

14    we think we're right, but we don't need to be right for today.

15    All we need to say is that there was a course of dealing when

16    there were disputed issues, which Credit Suisse was on notice

17    that there was a dispute as to that particular issue, single on

18    line-item loans versus the aggregate, that the course of

19    dealing said the parties have a chance to cure, to work it out.

20    And if that had happened, what Mr. Pino said is, if I had known

21    about it and I had known also they were serving an event of

22    default notice the next day, which we had no warning of, would

23    -- I would have picked up the phone told Gary and then it would

24    have come to my attention that they're also sitting on $2.4

25    million dollars of our money.

1           And I gotta -- I gotta address the issue.  You know,

2    Mr. Comet said that, well, there's nowhere in our papers and

3    even Mr. Pino's affidavit didn't mention the $2.4 million

4    dollars.  Honest to God, we only found out about it in the

5    voluntary exchange of information when we were trying to

6    resolve things.  And I'm not getting into settlement

7    discussions, but that's when we found about it.  And I asked --

8    and I asked Mr. Pino, I said, what about this amount, do we

9    include -- include this anyway (sic) and he forgot all about it

10   and he didn't realize that we -- we still had that there, I

11   wonder if they applied it.  And then we asked, did you apply

12   that, and they told us before the trial, no, actually we

13   didn't, and never really explained why.

14          But I think that the course of dealing also, with

15   respect to the $2.4 million dollars, is they always gave the

16   debtor the opportunity to apply what's in the buy-down account.

17   And now it's interesting, one of the very few documents I did

18   manage to get into evidence yesterday was Debtors' Exhibit 5.

19   Mr. Comet says this was a good faith deposit.  You know, I

20   wonder if he's gonna say that when we sue them for a preference

21   and he's gonna say there wasn't -- it -- is then he gonna say

22   it wasn't a margin payment?  We'll -- we'll get to that issue

23   down the road, I'm sure.

24          But let's look at the subject line of Credit Suisse -

25   - I didn't have to ask Mr. Pino about it, because the document

1    itself is an admission -- the subject line from Patricia

2    Robbins, or as Mr. Pino calls her, Patti Robbins of Credit

3    Suisse, says:  "Subject:  American Home margin request."  So, I

4    don't know where Mr. Comet is coming up with the testimony that

5    it wasn't a margin call.  Their own admission, their own

6    evidence says it was.  But I think, even if it wasn't a margin

7    call, even if it was something else, a good faith deposit --

8    and we do reserve the right to argue it was something else, to

9    the extent that this is a repo and then we -- they're telling

10   us we can't sue them to recollect that -- but even if it is

11   something else, Mr. Pino said it didn't matter.  He didn't

12   understand what else it could be.

13            And let's just take a step back, Your Honor, and

14   think about what else could it be.  This was a loan.  They'll

15   call it a repo, they'll say they purchased it and we can have

16   that trial and we probably will, but this was a loan.  If it

17   wasn't a margin call to cover a deficiency in collateral, then

18   it was a prepayment.  They might call it a pre-repurchase

19   payment, it was a prepayment.  So, why didn't they take it and

20   apply it to the $29 million dollars when they came clamoring

21   again for another $933,000?  That's what the course of dealing

22   was.  And there was no evidence to the contrary.  Nobody,

23   nobody could testify that that was not the way they did

24   business over the course of this entire contract.

25            And so, no matter -- there's so many ways to slice or

1    dice that notice and to say the pre-petition default was

2    invalid and it was not validly terminated under state law, that

3    you can almost pick and choose which one of them.  But I think,

4    Your Honor, every single one of them weighs in favor of the

5    debtor and certainly not a -- I believe Your Honor's words was

6    strong probability of success, from another case, in Credit

7    Suisse's favor.  I just don't see it.

8             So then I would like to talk about section 559.

9    Sorry, 559.  This is gonna be interesting.  And section 559

10   obviously refers you back to 101(47) and 101(47) says the term,

11   quote, repurchase agreement means -- and it goes on to include

12   mortgage loans.  Forget about interests and mortgage-related

13   securities, those are, like, vehicles that have mortgage-backed

14   securities, but mortgage loans.  But what Ms. Fife didn't point

15   out to Your Honor is, if you go down to 101(47)(A) Romanette 4,

16   I think it's right on point.  It says:

17            "A master agreement" -- like the master repurchase

18   agreement or the MRA, as Your Honor calls it -- "that provides

19   for an agreement or transaction referred to in clause 1," --

20   which is mortgage loan repo -- "together with all supplements,"

21   -- all the schedules -- "without regard to whether such master

22   agreement provides for an agreement or a transaction that is

23   not a repurchase agreement under this paragraph," -- that, in

24   my view, is servicing agreements, an agreement to service --

25   "except that such master agreement shall be considered to be a

1    repo only with respect to each agreement that is specifically

2    covered in Romanette 1."

3           So, in other words, we don't even have to get to

4    state law separability, we just look at the statute and the

5    statutory language is clear on its face that if you've got a

6    master agreement that has repos of mortgage loans, along with

7    other ancillary agreements to do things that are not the

8    purchase or repurchase of mortgage loans, then those are not

9    part of what is a repo, but it doesn't make the whole -- it

10   doesn't make the aspects that really are repo related any

11   weaker.  That's what that's supposed to be saying.

12          So -- and that's consistent, Your Honor, with the

13   case law prior to the 2005 amendments.  The case law was always

14   559 simply provides for self-help.  They could do whatever they

15   want.  In fact, Bear Stearns, they took it upon themselves and

16   said we believe we've got a true repo, we're selling our loans

17   and we don't care that we don't have the servicing.  And Mr.

18   Pino talked about that yesterday.  Well, maybe they're right,

19   maybe they're wrong, we have to look at that contract and we'll

20   make a decision, but that's self-help.  That's what they're

21   entitled to do under 559.  Now, they may get sued if it wasn't

22   a true repo, but that's not for today.

23          But that's what 559 provides.  It doesn't say that

24   they also can force the debtor to give specific performance, to

25   cooperate, to do anything, to lift a finger to do anything.

1   And I believe the case law and 559 would support that, because

2   -- and that's before the mortgage loan amendments, obviously,

3   because I think Your Honor is the first one to deal with this

4   issue post the amendments.  And but -- but that has to be what

5   101(47) Romanette 4 means, otherwise I don't know what it

6   means, I don't think we're gonna have a mortgage loan repo that

7   provides for vacuum cleaning services, right?  It's gonna

8   provide for some other service that, of course, is gonna be

9   related to the master agreement, that's the servicing.  That's

10  what I believe applies to this, Your Honor.

11          You know, it's interesting.  The next issue I'd like

12  to talk about is, you know, whether or not it is a true sale.

13  And obviously I don't think that the Court could make a finding

14  on that one way or another on this evidentiary record and we

15  certainly are not asking for that.  We think that the court in

16  the CRIIMI MAE bankruptcy case, which was in Maryland in the

17  year 2000 -- I can get the cite for Your Honor in a minute --

18  it really got it right in the sense that they said:

19          "When there are material disputed facts as to what

20  the intentions of the parties were and/or what the objective

21  intentions of the parties are, as expressed from the contract

22  and the economic substance of the transaction, the court should

23  have a full evidentiary record before making a decision."

24          And what -- it's funny, because what the CRIIMI MAE

25  case found the most important -- in that case there were

1   securities -- was that, unlike a real repo -- you asked Ms.

2   Fife, you know, how does it work, how does other repos work,

3   I'd like to try to answer that question, too -- instead of

4   Credit Suisse buying these mortgage loans and then having the

5   right to alienate them, to do whatever they want with them,

6   they were required to redeliver to the debtor exactly the same

7   250 mortgage loans.  If it was a true repo, I would submit,

8   Your Honor, like if I had -- I have 100 shares of IBM or 100

9   AAA Fannie Mae securities and I repoed them to Your Honor, Your

10  Honor only -- you only have one obligation, that's after 180

11  days, if I choose to repurchase them or I will be repurchasing

12  them, you redeliver 100 shares of IBM or 100 Fannie Mae

13  securities, not the exact same ones, you have the right to

14  alienate them.

15         And here, it's so ironic that the biggest issue that

16  Credit Suisse points to, to showing that why we're not acting

17  properly, is that the servicing rights provides for no

18  compensation to the debtor, they're just doing it.  Well, first

19  of all, if we're just doing it, I believe that's an indicia of

20  ownership to the debtor.  Why would we service someone else's

21  property?  We are doing it, because, in substance, these were

22  our loans and, in substance, Credit Suisse was never gonna take

23  those loans at the end of the day.  Never.  It's almost like

24  their true lease, there was never an intent that they were

25  gonna take these loans, it was always intent they're coming

1    back to the debtor, because the debtor was the one securitizing

2    or selling them elsewhere.

3            But, in addition, with respect to whether or not

4    we're compensated for it or not or the servicing being with the

5    repo or not, the uncontroverted testimony from the Credit

6    Suisse side, Mr. Kaiserman, was these loans are impossible to

7    sell, his words were, impossible to sell without the servicing.

8    I would submit that the impossibility of alienating property,

9    by definition, makes it not a true sale.  If it's a true sale,

10   the buyer could alienate it.

11           THE COURT:  How could I ever have a repo of a

12   mortgage --

13           MR. KIRPALANI:  Okay.

14           THE COURT:  -- if I buy that argument?

15           MR. KIRPALANI:  You can have a repo of a mortgage if

16   the agreement provides for a transfer -- well, there's so many

17   issues in that -- but a transfer of the servicing, where the

18   buyer conducts the servicing themselves and then reverts back

19   or they pick a mutually-acceptable third party.  Just like an

20   SPV, Your Honor, take it out of the estate.  If you don't want

21   this argument, take it out of the estate, put every obligation

22   out of the debtor, have a third-party setup where they could

23   have a joint equity interest, for example, in the third party,

24   and have that third party be a special purpose vehicle that

25   does the servicing.  Or have Credit Suisse appoint some third

1    party to do the servicing.

2             THE COURT:  Is that realistic?  Because every time

3    you change services, you're gonna lose the stream.  Every time

4    you change services, you're gonna have disruption in the

5    payment stream, misdirected payments, payments that just stop,

6    you know, people get a bill from GMAC, it used to be somebody

7    else, I don't owe GMAC any money, it goes in the trash can for

8    six months --

9             MR. KIRPALANI:  Right.

10            THE COURT:  -- and then they're in my courtroom at

11   Chapter 7 day.  But that -- that doesn't happen, --

12            MR. KIRPALANI:  It doesn't happen.

13            THE COURT:  -- does it, with mortgages.

14            MR. KIRPALANI:  It doesn't happen, --

15            THE COURT:  Right.

16            MR. KIRPALANI:  -- Your Honor, it doesn't.  And, in

17   fact, --

18            THE COURT:  So, --

19            MR. KIRPALANI:  -- prior to 2005, they didn't do

20   repos of mortgage loans --

21            THE COURT:  Okay, but --

22            MR. KIRPALANI:  -- it just -- it -- maybe, perhaps,

23   because it's so thorny.  It's so hairy.  It's a difficult thing

24   to try to extract away from the debtor a self-help remedy when

25   it comes to mortgage loans.  But I'm sure the smart corporate

1    finance peoples will figure it out and actually, Your Honor, I

2    do believe you'll hear -- you'll -- you'll see mortgage loan

3    repos in this bankruptcy case that are -- are true sales.  We

4    don't believe this one was.  I think there must be some that

5    were.  Frankly speaking, most of the mortgage loan financings

6    were secured loan financings, I think, of the debtor and then

7    most of them are the mortgage-related securities that are much

8    easier to do a true sale of, because there's no servicing for

9    them.

10              But, you know, I can't answer, I would like to -- to

11   think about it or talk to some corporate finance lawyers on how

12   to fix the problem, but the problem is what it is.  This is a

13   new law and this is how the finance world does evolve, they fix

14   the problems based on what the law is, how the law evolves.

15   And Your Honor is the first to consider this issue and I don't

16   want Your Honor to try and consider it if you're not ready to,

17   certainly not on not a full evidentiary record, because there's

18   a lot of issues relating to true sales that we don't even touch

19   upon yet, we don't have the evidence yet, that deals with the

20   benefits of economic ownership and the risks and I think those

21   will militate in favor of the debtor here, but I can't

22   speculate --

23              THE COURT:  Right.

24              MR. KIRPALANI:  -- about the evidence.  The -- I

25   covered that.

1                            (Pause)

2            MR. KIRPALANI:  You know, we do -- Your Honor, I'd be

3    remiss if I didn't raise the issue, but I'm not sure that Your

4    Honor is -- how much Your Honor is gonna give weight to it, but

5    the debtors do dispute the good faith of Credit Suisse with

6    respect to this termination and with respect now to coming to

7    court and seeking relief, whether it's a violation of the

8    automatic stay, whether it's because of the conduct pre-

9    petition, that purposefully, knowingly on their part, made a

10   margin call when they had sufficient cash to cover their own

11   view of valuation.  They should not be entitled to equitable

12   relief before the Court, they shouldn't be, because they didn't

13   act in good faith and they don't have clean hands.  I think we

14   can win without dealing with those issues, but I just -- I

15   would be remiss if I didn't mention them to Your Honor again.

16           With respect to economic injury, I'd like to spend a

17   minute on that.  I think that the only evidence we have on the

18   injury, the irreparable harm or the injury, was clearly it was

19   economic.  Mr. Kaiserman stated that it's impossible to sell.

20   Well, nothing is impossible to sell.  There are some things in

21   my house that I'm sure even I could sell, even though nobody --

22   I don't think anybody wants them.  You could sell whatever they

23   have, Your Honor, the question is, they won't be able to

24   realize the maximum value.  We agree with that, that's why we

25   offered -- we would like to offer -- I won't talk about what we

1    offered in the past -- we would like to offer to sell them for

2    them and hopefully realize, through a big program of selling

3    them in batches, in pools, in the things that the debtor did

4    best pre-bankruptcy, that's what we would like the opportunity

5    to do.

6          But the fact that they believe, that the Credit

7    Suisse believes if they are forced to sell without the

8    servicing, that they can't realize, you know, a proper value

9    for it, that gives rise to monetary damages.  And even if they

10   believe that they're entitled to equitable relief, I think the

11   Third Circuit does and so does the definition in 101(5) of the

12   Bankruptcy Code state that an equitable claim that gives rise

13   to money damages still is a claim and we do believe that that's

14   all this is, this is just a claim.

15         But let's even talk about that.  All Mr. Kaiserman

16   said is that, in his view or his, I guess he called it a lay

17   opinion, the real estate market is all over the place and it's

18   cratering every single day.  We don't have any competent

19   testimony on the value of these scratch-and-dent loans.  These

20   scratch-and-dent loans will have the value that they have,

21   based on the underlying value of the mortgages, which were

22   already discounted to the value of the house.  The value of the

23   house -- so what Mr. Kaiserman started saying is, the entire

24   real estate industry or the real estate marketplace is going

25   down and down and down and so, therefore, the prices are all

1    going to go down further.  That may be true for the next two

2    weeks, three weeks, maybe through tomorrow.  I don't think the

3    debtors concede that that's gonna be true in a few months.  I

4    think nobody could testify with any degree of certainty whether

5    that's actually gonna happen or not.

6            THE COURT:  Fannie Mae says it's gonna go down eight

7    percent next year.  Well, not -- not -- not evidence before the

8    Court.

9            MR. KIRPALANI:  Right.  Your Honor, all I'm saying is

10   that we do believe that we will come up with a program to

11   maximize the value of all loans, whether they are undisputedly

12   owned by the debtor, subject to security interests of third

13   parties or purportedly repoed to third parties, we do have

14   control over that disposition, because the only way to maximize

15   value, which Credit Suisse concedes, is to have us cooperate

16   with them in a specific performance fashion in transferring

17   servicing to someone else.  They can't force us to do it the

18   way they're trying to here, they can only seek monetary

19   damages.  And if they really are minded with maximizing the

20   value, they would work with us to try and give us an

21   opportunity to do that.

22            There's one issue, Your Honor, I don't believe that

23   counsel is correct that for a true repo -- although it

24   comforted me to hear it, because maybe they don't know if it is

25   a true repo -- but for a true repo, the purchase -- the party

1    purchasing needs to act in a commercially-reasonable manner

2    when they resell what they bought.  It's inconsistent with

3    that, but -- but if that's -- if that's their belief, I mean

4    that is somewhat comforting, but we still believe that the

5    proper way to maximize the value is to let the debtors attempt

6    -- and we'll, of course, go to Credit Suisse and say, we've got

7    bids, this is what we have, we can match it up with some other

8    loans that we have.  And I apologize for previewing, but that

9    is something that I know Young Conaway is working on, it's not

10   evidence, I realize that, but just to put context on the case,

11   because it is so new.

12          So, I think, Your Honor, we are at the point where

13   the issue really boils down to this -- the public interest, I

14   think, is the last prong?  I think I addressed the probability

15   of success, the lack thereof and the economic injury, which I

16   don't believe could ever be shoe-horned into a irreparable

17   injury or else we would all be in trouble in other cases.  But

18   they did try to raise the issue of being irreparably harmed by

19   how horribly the debtors would be servicing the mortgages,

20   based on Mr. Kaiserman's experience in, I think it was

21   Fairbanks and People's Choice and New Century.  But I think it

22   was also clear that Mr. Kaiserman had no first-hand knowledge

23   of who -- what reductions in force that were made.  He said he

24   read the newspapers and he heard thousands of people were laid

25   off.  He never bothered to check, which I'm not saying he has

1    to, but he didn't know whether any people had been laid off

2    from the servicing business.  He knew there was a key employee

3    retention program that Your Honor approved, but he didn't know

4    that it was actually working.  He didn't know that there was

5    only two people who had left and that that was consistent with

6    the pre-petition attrition rates at the company.  He also

7    didn't know that the debtors had $23 million dollars of

8    unencumbered cash that they could use in their business.  He

9    also didn't know or didn't take into account that Bank of

10   America gave us use of cash collateral.  And the last thing

11   that he didn't know or bother to find out is that the $50

12   million dollar DIP facility provided by Wilbur Ross is yet

13   undrawn and is projected to be undrawn for the foreseeable

14   future.

15          So, the argument is entirely speculative and

16   unreliable that our employees are not gonna go to work, not

17   gonna do their job and not gonna care whether service --

18   whether mortgages are serviced.  We think that's a horrible

19   message to send to the community.  Of course they care and of

20   course they're gonna service and I can't comment on people in

21   other cases or their employees, I only know ours.

22          With respect -- like -- like Mr. Love himself, Your

23   Honor.  With respect to the public interest, I think the public

24   interest in a bankruptcy case is always, on an issue relating

25   to seizing property from the estate, always in favor of the

1    debtor.  The debtors have the benefit of the automatic stay.

2    We can't swallow the argument about a breathing spell that the

3    debtors desperately require right now so they could put their

4    programs into place and keep the company together, over some

5    argument that the entire real estate mortgage finance industry

6    is gonna go down the toilet and people like me will never be

7    able to get a mortgage again.  I don't think that's a credible

8    argument.  And Your Honor will make that decision, obviously,

9    but there is no competent evidence that preventing Credit

10   Suisse from getting specific performance of a pre-petition

11   contract to turn over servicing rights is gonna cripple,

12   cripple the mortgage finance industry.  I mean, it's a much

13   larger facility in place right now with the debtors, the

14   JPMorgan facility, which is a mortgage finance facility, which

15   is actually structured as a secured loan.  I think they could

16   figure out a way to kind of go back to the way they were doing

17   it as well.

18        But, in any event, Your Honor, that's the only

19   evidence we have on the public interest.  For example, Your

20   Honor might consider whether the public interest of the 250

21   homeowners who are directly implicated by a change in servicing

22   are harmed.  I don't think the 250 homeowners that can't figure

23   out where to send their check, I don't think that that's any --

24   there's any evidence about that.  That's the public interest

25   the Court should be concerned about.  Your Honor, I don't

Kirpalani - Argument                    80

1    think, is gonna be inclined to speculate as to what's gonna

2    happen with the mortgage finance industry.  I mean, I wouldn't

3    dare to do it, I don't think Mr. Pino would dare to do it, I

4    think the investment banker took a different approach, but

5    that's up to him.

6             And, Your Honor, I think that with respect to the

7    final point, if, for some -- for that -- unforeseeable to me,

8    if Your Honor does believe that they did meet their burdens of

9    proof on each of the four elements, we would like to have an

10   opportunity to address the amount of the bond that should be

11   posted.  These are $46 million dollars of unpaid principal

12   balance of mortgages.  I agree they're scratch-and-dents, I

13   agree that most of their value is supported by the underlying

14   real estate, not by the payment history of these folks, but --

15   that's why it's scratch-and-dent to begin with -- but that is

16   the face amount of the mortgages and their loan, I think, now

17   that they have applied the amount of cash that we gave them, I

18   think is $27 million dollars.

19            There is a lot of equity upside there for us, Your

20   Honor, and if they're gonna go take it upon themselves to take

21   these loans and the servicing and go sell them in the open

22   market tomorrow, by doing some conference  call with a bunch of

23   bidders, you know, we would like to be protected from that,

24   Your Honor.  Thank you.

25            THE COURT:  Okay.  Mr. Comet?  A reply?

1          MR. COMET:  Yes, please, Your Honor.

2          One of the difficulties we have had in this

3     proceeding, Your Honor, as short as it has been, is that the

4     debtors' arguments keep changing literally every moment.  Just

5     to pick one example from sort of the end of Mr. Kirpalani's

6     argument, he just told you that the harm you should be

7     concerned about here is the harm to the homeowners, the

8     mortgagors under these loans.  This is what they said in their

9     reply -- in their brief that they filed earlier this week:

10          "CSFB also raises a myriad of alleged harms on behalf

11    of third parties, such as the mortgagors, however, the burden

12    on CSFB is to prove the irreparable harm it will suffer absent

13    the requested relief, not the harm that third parties will

14    suffer."

15          So, basically they argue there that's irrelevant,

16    because we had made numerous arguments about how this is

17    hurting the mortgagors who will not know who is servicing them.

18    We have notified, for example, the custodian of the actual

19    legal agreements here, Deutsch Bank, that they belong to us,

20    they're obligated to transfer them to us.  So, you have a

21    disjunction now between who has the legal control of the papers

22    and who's doing the servicing.  And we raised the issue, this

23    is gonna harm the mortgagors who may be confused by the

24    situation.  Their response was that's irrelevant.  Now Mr.

25    Kirpalani tells you that's the key issue here.  That's sort of

1   what we're facing.

2           Now, we -- in -- in this matter.  We also heard a

3   whole new issue about what the debtors are doing here.  Now, as

4   Your Honor will recall, I tried to find out from Mr. Pino

5   several times what was going on here and I asked him once, "Are

6   you selling these loans in this auction that's gonna take

7   place?" and he said "No, we're not."  Then later he said, "Oh,

8   I misunderstood, we are gonna try to get whoever buys the

9   platform to take them."  And then I said, "You think they're

10  gonna take them without compensation?"  And he said, "Well, I

11  hope we'll resolve it and dispose of the loans before we ever

12  have to transfer anything."  So, those were sort of three

13  different answers.

14          I was afraid to ask him a fourth time, because I

15  figured I'd get a fourth different answer, and I actually have

16  a fourth thing now from Mr. Kirpalani.  What he says they want

17  to do -- and I guess they want to force not just Credit Suisse,

18  if I understood him correctly, but every repo party, is to

19  agree to let them take control of these loans and market them.

20  Now, there's a lot of problems with that, that I see.  First,

21  it just absolutely wipes out the mortgage repo rights under

22  559, it assumes that none of these are covered by 559.

23          Mr. Kirpalani says, well, this is a good thing,

24  because that's their business.  Well, that business, as opposed

25  to the servicing business, we know they laid off almost

1    everybody in that business, who goes out and sells loans, and

2    they're in Chapter 11.  So, that isn't their business any

3    longer.  Those people are gone, most of them.  But they want to

4    take control.

5             We've told them -- and Mr. Kirpalani talked

6    about a lot of things that are in settlement discussions, so I

7    don't really feel too constrained any longer about it, although

8    I think it's inappropriate.  We've told them, if you have

9    bidders who want to buy these loans, we're glad to have you

10   bring people to bid on the loans, that's not an issue here.

11   But the question is, who can control the loan bidding; that

12   really goes to the heart of 559.  And I think Your Honor raised

13   the right question, which is, if this isn't the mortgage repo,

14   then what is.  And I don't think Mr. Kirpalani really answered

15   that question and he said, I need to think about it, need to

16   talk to corporate finance people.

17            I think it could only be this, what the type of

18   agreement we have, which Mr. Kaiserman said is the standard in

19   the industry, including providing for no transfer of servicing

20   in the interim.  Sort of to go back to what I -- we talked

21   about earlier, the servicing here, the situation regarding

22   servicing is inextricably intertwined with the nature of a

23   mortgage repo.  For reasons Your Honor said, you don't want to,

24   when you're selling something, for a few weeks transfer the

25   servicing back and forth.  It's unavoidable, but servicing is

1    necessary in the nature of these kinds of instruments.

2          Now, Congress decided in 2005 to change the law and

3    make mortgages part of the re -- the type of repurchase

4    agreements protected by section 559.  They clearly did that

5    because they thought that would promote commerce, because of

6    the special rights that are given under 559, the right to

7    promptly liquidate the collateral.  If it's not possible to

8    write an agreement that falls under that statute, that won't be

9    recharacterized as secured financing, then the statute will be

10   nullified, it will be invalidated.  And Mr. Kirpalani gave no

11   explanation of how one would write that agreement.

12         One of the things he said just simply makes no

13   practical sense, he said, well, in certain types of other repos

14   involving fungible securities, you can -- the purchaser before

15   the repurchase can go out and sell those and then all he -- his

16   only obligation is to replace them with equivalent instruments.

17   That doesn't work for mortgages.  Every mortgage is unique.  I

18   mean, they have obviously certain similar common

19   characteristics, but what the particular piece of real estate

20   is that underlies it is obviously unique.  Who the borrower is,

21   is obviously unique.  The payment history, all the details are

22   -- make it a unique security, unique piece of property.  And

23   nobody is going to enter into a repurchase agreement where

24   Credit Suisse buys the loans, says, when you come back two

25   weeks from now, American Home, and you want to repurchase,

1    we'll give you another package of different loans.  They're

2    gonna say, well, we'll have to spend two weeks doing due

3    diligence to figure out if they're of equivalent value to the

4    ones we sold you.  That's absolutely and totally unrealistic.

5    You have to sell back the same loans and the servicing can't be

6    transferred in the interim or this whole system becomes

7    unworkable.

8              THE COURT:  Well, is the response to that Congress

9    erred?  I mean, Congress said, okay, I've got a list of things,

10   A, B, C, D and E, that are repurchase agreements, I'm now gonna

11   add four.  It's completely and utterly different from the

12   characteristics that A, B, C, D and E share, which arguably

13   make them repurchase agreements.  Just because Congress says I

14   now add four to that list, which has nothing to do and no

15   characteristics shared by A, B, C, D and E, is that controlling

16   or does the Court still have to say, okay, even though it's

17   included, I have decide whether it's a repurchase agreement or

18   not?  Even though Congress said, okay, mortgages, repurchase

19   agreements can include mortgages or instruments involving

20   mortgages, but if they are fundamentally different from the

21   other 20 enumerated list, the list of the other 20 enumerated

22   instruments, it could be that Congress did do a nullity.

23             MR. COMET:  Well, the -- it's been the law, Your

24   Honor, of course, since Marbury versus Madison, that the courts

25   have the final say on whether something that Congress has done

1    is a nullity, but in my experience, usually, that's only if --

2              THE COURT:  We try to avoid that.

3              MR. COMET:  I -- I --

4              THE COURT:  It gets us in trouble.

5              MR. COMET:  It's a very strong rule about trying to

6    avoid that, Your Honor, I know that and -- and usually, in

7    fact, the only basis I know of in which courts normally would

8    say what Congress did is if it's unconstitutional.  And I

9    haven't heard and I would be startled to hear an argument that

10   section 559 is unconstitutional.

11             So, I think -- I think the short answer to your

12   question is, Your Honor, that, by definition, it can't be a

13   nullity.  And I mean that literally, that --

14             THE COURT:  So, I have -- I have to -- I have to

15   squeeze it in there.  So, I have to change the idea of what a

16   repurchase agreement is, to expand it to include everything

17   that Congress says is a repurchase agreement.

18             MR. COMET:  Well, I wouldn't put it that way, Your

19   Honor, I would say what Congress says is a repurchase agreement

20   is what defines what is a repurchase agreement.  In other

21   words, it doesn't have -- it doesn't have, like, some abstract

22   definition, it may have some -- some abstract qualities that

23   are similar, regardless of the type of instruments, but if

24   Congress says that a repurchase agreement for a mortgage -- for

25   mortgages is covered by 559, then a repurchase agreement for

1    mortgages is covered by 559.  You know, the question then is,

2    what -- what is an acceptable repurchase agreement for

3    mortgages that will be covered by 559.

4            THE COURT:  Right and that's where they -- that's

5    where we're having the conversation --

6            MR. COMET:  I -- I agree.

7            THE COURT:  -- and Mr. Kirpalani's arguing, you know,

8    maybe there aren't any.

9            MR. COMET:  Well, our --

10           THE COURT:  Maybe it's a subset of zero.

11           MR. COMET:  Well, if there aren't any, Your Honor,

12   then -- then the statute is being nullified.  I -- I would

13   suggest there has to be a way for them to be something and --

14           THE COURT:  Well, his response to that would be,

15   okay, but that's where you sever it and you go to one-oh-

16   whatever-forty-seven -- 101(47)(iv) and it says, okay, those

17   parts of the master servicing agreement -- or, excuse me,

18   master repurchase agreement that are actually involving the

19   buying and selling of the loan is a repurchase agreement, but

20   everything else isn't.

21           MR. COMET:  I understand, Your Honor, but I think

22   there -- there's two separate issues here.  I think he's saying

23   both that this isn't a repurchase agreement at all, even with

24   respect to the ownership of the mortgage loan --

25           THE COURT:  Right.

1          MR. COMET:  -- and, secondly, even if it is with

2     respect to the ownership, the servicing part is not.

3          THE COURT:  Right.

4          MR. COMET:  So, just if I could finish for one second

5     on the first part.  The suggestion that what the debtors are

6     going to do here is take these loans and sell the ownership

7     rights of the loans, means fundamentally that the statute is

8     being invalidated.  But to come back to -- and for that reason,

9     I think it's -- if that's what this is -- this dispute is about

10    here, that's what they're trying to do, the Court should reject

11    that and should rule against them.

12          But to come to the -- to the severance argument.

13    There -- there -- we've looked and there seems to be no

14    legislative history about that section, that language in

15    101(47) that separates out master agreements.  In my

16    experience, the term master agreement shows up in many

17    different contexts in contracting and use -- and what it -- one

18    thing it often refers to is, and I think the reason for the

19    term being use in this particular master repurchase agreement,

20    is that it's a contract that sets up a sort of uniform set of

21    terms that the parties will use over and over for the same type

22    of transaction and that's what it means here.  What a master

23    agreement can also mean, and I think the way it's used in the

24    statute, is to mean an agreement that encompasses more than one

25    thing.  It really is the same thing as state severability law,

1    that the debtors have also cited New York law.

2             I think, logically, the concern of Congress was

3    somebody will try to finagle something that has nothing to do

4    with a repurchase agreement into a document they call a

5    repurchase agreement, that actually contains some proper

6    repurchase rights, it would be unrelated matter and, thereby,

7    gain the benefits of 559.  And that lead -- just leads us back

8    to the same issue here, is this a severable matter or not.  And

9    for the reasons we've previously discussed, we think it's

10   inextricably intertwined, there's no other way, practically, to

11   do a mortgage repurchase agreement without the servicing

12   operation the way we've said.

13            The servicing agreement here is not severable,

14   there's no separate compensation, there's no detailed

15   delineation of rights, there's no ability to apportion the

16   contract.  And by the debtors' own position in this case, they

17   -- they -- they're saying, if you control the servicing

18   operation, you effectively nullify in many ways the rights of

19   the owner to control their loans.  They want to use the

20   servicing here to prevent the sale.  They must think that's

21   effective or they wouldn't -- because they're concerned with

22   the sale of the loan, or they wouldn't be fighting it.

23            I mean, the suggestion that Credit Suisse can go out

24   and find somebody to buy this, regardless of the absence of

25   control of the servicing is, of course, contrary to the

1    undisputed testimony by Mr. Kaiserman and he's the only one who

2    testified.  Mr. Kirpalani made a lot of statements about what

3    he thinks the way the market works or things like that, but

4    there's no -- that's not testimony.  Mr. Kaiserman gave

5    undisputed testimony that we can't provide somebody with a due

6    diligence, we don't have the servicing records, we can't tell

7    them who the servicer is, we can't sell this.  I think the

8    Morgan Stanley application Your Honor has received says the

9    same thing.

10           And that's the undisputed testimony and the notion

11   that we should try to find somebody who will pay some steeply

12   discounted price for this and, therefore, we're not harmed is -

13   - is counterproductive.  Again, that's not even what the

14   debtors want, but they'll say that just in order to continue to

15   control the process here.  That -- that's the last thing they

16   want is for us to do that and -- and just have a claim against

17   them.  That makes no sense at all.

18           So, you know, if you balance the harms here, Your

19   Honor, and you apply 559, I think the Court has to rule in our

20   favor.  I think with regard -- I have to comment on Mr.

21   Kirpalani raising a good faith issue here, because if his claim

22   of lack of good faith is not applying the $2 million dollars,

23   which, again, came up very late, I don't see how that claim is

24   legitimately made when that issue had been raised between

25   American Home and Credit Suisse prior to the August 1st margin

1    call, it had been told to American Home that that would not

2    happen and would not be applied at this time, they agreed with

3    that, they sent funds nonetheless.  To say then that, suddenly,

4    Credit Suisse, without their even suggesting it or approving

5    it, should have somehow applied the $2 million dollars that was

6    being held for another purpose, it makes no sense.

7         I -- Mr. Kirpalani said a lot of things about the

8    testimony that I don't recall yesterday.  Maybe I'm not

9    remembering accurately, we don't yet have a transcript, but I

10   don't recall Mr. Pino saying that he would have picked up the

11   phone to try to cure the margin call if he's known about it.

12   His testimony was they -- they -- the company had made the

13   decision they were not paying any margin calls.  Now, Mr.

14   Kirpalani says, why did we one day later serve a default

15   notice.  The only response that Credit Suisse received to this

16   margin call, after repeated requests for a response, was we

17   will not send you money.  Nobody from the debtor picked up the

18   phone and said, we are disputing this margin call, we think you

19   didn't calculate something correctly.  That's the kinds of

20   disputes that had occurred before.

21        It's one thing to say, while you're talking about the

22   margin call, it's in place; it's another thing to say, when you

23   simply refuse to send funds and say nothing else in response to

24   a margin call that a default notice shouldn't be sent.  Credit

25   Suisse waited the amount of time specified in the contract to

1   send the default notice, after their statement that they would

2   send a margin call, and then sent it.  But it -- the -- the

3   testimony that I got from Mr. Pino is it would have made no

4   difference, because they weren't paying any margin calls in any

5   event.  So, on the pre-petition termination, I believe that was

6   correct.

7            As far as the notice, just again to clarify, I think,

8   one point, the -- the course of conduct here, while there are

9   some differences in which particular person at American Home

10  was contacted about margin calls and never responded, is

11  there's differences among the people of consistencies in the

12  fact that no one ever said you need to send margin notices to

13  Mr. Pino and/or Mr. Horn and margin notices were repeatedly

14  sent to people other than Mr. Pino and Mr. Horn and repeatedly

15  honored.  That is consistent, even if the particular identity

16  of the person who they were sending it to was not consistent.

17                            (Pause)

18            MR. COMET:  And finally, Your Honor, I -- the -- I

19  think the issue remains, in the sense a practical one for the

20  Court, you know, would -- can the debtors use their naked

21  possession and control over the servicing files and -- and

22  materials and -- and collections, to accomplish other ends in

23  this case, whether the other end is to control just Credit

24  Suisse's say on the loans or, as we've heard today, to control

25  -- what they want to do is control the sale of all of their

1   repo counter-parties and every other loan from secured clients

2   and so forth, that, I think, is -- is completely inappropriate,

3   but that -- that's -- seems to be the goal here.  They don't

4   really care about the servicing rights from Credit Suisse, they

5   don't -- they're not getting any income from it, they're

6   wasting the assets they state to do it, there's nothing they

7   have to sell, but they want to use this for -- for other

8   reasons.

9           We understand their concern about wanting to maximize

10  the value.  We are prepared to work with them on it.  We're not

11  prepared to agree that they can control the matter, we have to

12  try to work out consensually mechanics for selling them

13  separately and not wait for them to come up with some grand

14  plan to package or dice and slice our loans months from now.

15  That makes no sense for anybody.  And we believe that it is

16  appropriate for the Court to order -- I -- I'm -- we are

17  prepared -- Credit Suisse will undertake that.  If the Court

18  later concludes that it made a mistake and they can show

19  they've incurred some kind of damages, then Credit Suisse will

20  -- will stand responsible for that, that's -- that's not an

21  issue.

22          I don't know exactly what their claim could be

23  though, because all we're actually talking about here is the

24  transfer of the servicing rights and they can't claim any

25  damages from the -- or not the servicing rights, it's really

1   the servicing materials, they don't have the rights.  They

2   can't claim any damages on that, because they're getting no

3   income and they're not selling them.  If they're gonna claim

4   damages it's because we are then allowed to sell the loans.

5   But that's a different point and, as I said before, they have

6   remedies on that.  So, I -- I don't know what -- what the

7   damages are, but if they can show a proper chain of damages

8   from the Court ordering relief, Credit Suisse stands ready to -

9   - to make good on that, if the Court later rules against those,

10  which I -- I don't believe will happen.

11          Last points, Your Honor, just one thing I forgot to

12  mention on 559 and that's this.  Congress, again, amended this

13  law in 2005, intended to encourage, by putting in the statute

14  mortgages, people to do mortgage repurchase agreements, in the

15  belief that that would promote commerce.  To now say to all the

16  people who did that, when -- when your counter-party files for

17  bankruptcy, your counter-party will control the disposition of

18  those loans, is obviously totally antithetical to the statute

19  and totally antithetical to the intent of Congress.  And if

20  that's, therefore, not contrary to the public interest in the

21  circumstances if this case, I don't know what could be.  So, I

22  think, I request, respectfully, that the Court rule in our

23  favor.

24          THE COURT:  All right.  We're gonna take a recess to

25  allow me to think about my ruling.  I want to read a couple

1   cases.  Let's reconvene at 3:15.  All right?  And I'll be

2   prepared to rule at that time.

3              (Brief recess from 2:22 p.m. to 3:13 p.m.)

4              THE DEPUTY:  All rise.

5              THE COURT:  Please be seated.  Thank you for the

6   recess.  I was able to pull together some thoughts.  I won't

7   bury the lead, I'm gonna deny the motion and I'll tell you why.

8              This is a ruling on Credit Suisse First Boston's

9   motion for preliminary injunction.  In order to grant a

10  preliminary injunction, the Court must be convinced that the

11  following factors favor granting preliminary relief:  one, the

12  likelihood that the moving party will succeed on the merits;

13  two, the extent to which the moving party will suffer

14  irreparable harm without injunctive relief; three, the extent

15  to which the non-moving party will suffer irreparable harm if

16  the injunction is issued; and, four, the public interest.

17             In order to frame the analysis properly, I think it's

18  important to review exactly what CSFB is seeking from the Court

19  in connection with its motion for preliminary injunction.  And

20  it's -- I five -- I judge it to be five different things:  one,

21  a declaration that the records are property of CSB -- excuse me

22  -- CSFB and that CFS -- CSFB, Credit Suisse, is entitled to

23  immediate access to and possession of the records and assets,

24  files, and immediate transfer of the servicing rights to SPS.

25  Credit Suisse also seeks a declaration that the defendants are

1    obligated to cooperate with all instructions from SPS and

2    Credit Suisse; two, a declaration that income is property of

3    Credit Suisse and the defendants are obligated to segregate the

4    income and collections received from purchased assets and to

5    remit those into the collection account, the servicer is

6    obligated to remit any collections received from the purchased

7    assets into the CSFB account; three, an order and direction

8    that defendants immediately turn over to Credit Suisse all

9    record and assets files, immediately segregate and remit all

10   income and immediately transfer the servicing rights to SPS;

11   four, an order and direction of an accounting; and five, the

12   imposition of a constructive trust.

13          I think, fairly, Credit Suisse did not present a case

14   on most of this requested relief.  I think it is fair to

15   characterize Credit Suisse's request for relief as a

16   preliminary injunction providing that Credit Suisse is entitled

17   to immediate access and to possession of the records and asset

18   files and immediate transfer of the servicing rights to SPS, so

19   that Credit Suisse can sell the mortgage loans.

20          The first element I'd like to address is the

21   likelihood of Credit Suisse's success on the merits.  And there

22   are a host of issues raised in connection with whether Credit

23   Suisse has demonstrated a strong probability to success on the

24   merits in the litigation.  First, I'd like -- let's address

25   whether there was a pre-petition default under the MRA.

1          The debtors argue that Credit Suisse's pre-petition

2    margin call was not properly issued under the terms of the MRA,

3    because the margin call was not properly delivered under the

4    terms of sections 6 and 20 of the MRA and, regardless of the

5    notice of margin call, there was not an actual margin deficit,

6    under section 6(A) of the MRA, that would give rise to a

7    legitimate margin call; thus, Credit Suisse could not

8    legitimately declare an event of default.  Credit Suisse

9    counters that notice -- that the notice provisions in the MRA

10   are ambiguous and that the parties' course of dealing

11   established that the notice of the margin call was sufficient.

12   Credit Suisse further argues there was a genuine margin deficit

13   to give rise to a valid margin call.

14          The Court need not address the issue of whether there

15   was a margin deficit that gave rise to a valid margin call,

16   because the Court finds that Credit Suisse has not demonstrated

17   a likelihood of success on its argument that the notice of

18   default was properly issued under the terms of the MRA.  The

19   notice provisions of the MRA are not ambiguous.  Section 20 in

20   the MRA is a general notice provision.  It provides that,

21   quote, "Any and all notices, statements, demands or other

22   communications," end quote, under the MRA were to be made to

23   the person set forth in section 20.  Section 6 of the MRA may

24   be read to modify the manner of notice that may be given under

25   section 20.

1          Specifically, section 20 specifies that the notice

2    must be given by mail, facsimile, messenger or otherwise; and

3    section 20 goes on to provide notices may be given orally to be

4    confirmed promptly in writing.  In contrast, section 6 provides

5    that the notice may be given by any re -- write -- excuse me --

6    by any written means.  Section 6 does not, however, modify or

7    limit the persons to which notice is to be provided that are

8    set forth in section 20.  Thus, Credit Suisse was required to

9    send the August 2nd margin call, under section 6 of the MRA, to

10   the persons identified in section 20, which Credit Suisse

11   failed to do.  Thus, there was no legitimate event of default

12   on August 3rd for failure to meet the margin call.

13          The parties' course of dealing under which the

14   debtors admittedly honored margin calls that did not meet the

15   notice provisions of section 20 of the MRA did not assist

16   Credit Suisse.  First, the contract is not ambiguous, so the

17   course of dealing is of no moment; second, the course of

18   dealing was inconsistent and, thus, insufficient to establish a

19   meeting of the minds sufficient to alter the terms of the

20   contract; and third, section 25 of the MRI -- MRA contains a

21   broad no-waiver clause that is specifically designed to address

22   arguments such as that offered by Credit Suisse.

23          Finally, the debtors' position, I think, makes some

24   practical sense.  In the ordinary course of the debtors' pre-

25   petition dealings in the mortgage market, it may have been --

1   it may have made perfect sense for the debtors' decision making

2   on routine margin calls of this size to be handled at lower

3   levels of the debtors' management.  Those provisions, such as

4   section 20, are designed, in part, to address non-routine

5   matters.

6           As the debtors' business quickly deteriorated as a

7   result of the well-publicized decline in the mortgage market

8   and the current worldwide credit crunch, it makes perfect sense

9   for the debtors to require compliance with notice provisions

10  such as section 20; at such times, even routine questions of

11  cash flow must be addressed by senior management.  Thus, in

12  short, the Court finds that Credit Suisse has not demonstrated

13  a likelihood of success on the merits of its claim that there

14  was a pre-petition default and subsequent termination of the

15  MRA.

16          We then turn to whether the MRA is a repurchase

17  agreement under the Bankruptcy Code.  Credit Suisse argues

18  that, regardless of whether there was a pre-petition event of

19  default, the debtors' active insolvency by filing Chapter 11

20  constitutes an immediate event of default under the MRA for

21  which no notice is required, under sections 2, 15(A)(4) and

22  16(A) of the MRA.  Credit Suisse further argues that section

23  365(E)(1) of the Bankruptcy Code, which generally prohibits the

24  enforcement of ipso facto clauses such as the one identified in

25  the MRA and the automatic stay under section 362 are

1  inapplicable, because the MRA is a repurchase agreement under

2  section 559 and 101(47) of the Bankruptcy Code.

3         The debtor counters with two arguments, I think.

4  First, the debtors argue that the MRA actually consists --

5  constitutes two agreements, the repurchase agreement and the

6  servicing agreement.  The debtors further argue that,

7  regardless of the rights under the repurchasing agreement, the

8  servicing agreement is not a repurchase agreement under section

9  559, but rather is an executory contract under section 365 of

10 the Bankruptcy Code, the automatic stay is applicable and

11 Credit Suisse's remedy is limited to requests for assumption or

12 rejection of the servicing agreement.

13        Credit Suisse's response is that the MRA is a single

14 integrated contract and there is no separate servicing

15 agreement between the debtors and any other party, including

16 Credit Suisse.  Moreover, Credit Suisse argues that since the

17 debtors receive no compensation for servicing the mortgages

18 under the MRA, it is absurd to argue that the servicing rights

19 somehow constitute a separate agreement that would be subject

20 to assumption or assignment under section 365 of the Bankruptcy

21 Code.

22        The Court finds Credit Suisse's latter argument

23 particularly persuasive.  Mr. Pino testified at length on this

24 point during cross-examination and the Court found his

25 testimony honest and forthright, but actually in favor of

1  Credit Suisse's position that there is no legitimate argument

2  that the MRA constitutes anything other than a single

3  integrated agreement.  Second, the debtors argue that the MRA

4  is not a repurchase agreement under sections 559 and 101(47) of

5  the Bankruptcy Code.  More specifically, the debtors argue that

6  the MRA may not be a repurchase agreement and they need time to

7  analyze the situation.  In the meantime, Credit Suisse will be

8  left with a portfolio of scratch-and-dent mortgage loans that

9  it cannot sell without the servicing rights in a volatile

10  market that may not improve in the immediate future.

11        Although Credit Suisse bears the burden of proof on

12  all elements in connection with its motion, the Court finds it

13  has met its prima facie case of establishing that the MRA is a

14  repurchase agreement.  Congress recently added mortgage-related

15  securities, mortgage loans and interest in mortgage-related

16  securities or mortgage loans to the definition of repurchase

17  agreement under section 101(47) of the Bankruptcy Code.  It is

18  of no moment that warehouse lenders reacted to the change in

19  law by reconstituting their relationships with companies such

20  as the debtors to repurchase agreements.  Moreover, the

21  servicing issues that relate to any mortgage-related instrument

22  are non-sufficient on their own to exclude that agreement from

23  the definition of a repurchase agreement.

24        I want to make a note here that I'm -- this ruling is

25  limited to this MRA.  Obviously, the Court withholds any

Ruling                                                        102

1   judgment on any other MRAs that may come before it.

2          If the servicing issues, such as those in the MRA,

3   were sufficient to make an agreement such as the MRA not a

4   repurchase agreement, Congress's amendment would have had

5   little or no effect on virtually all mortgage-related purchase

6   agreements.  We'll deal with servicing issues, at least in

7   part.  In short, the MRA is titled a repurchase agreement, it

8   contains normal provisions of a repurchase agreement and it

9   does not contain any provisions that would exclude it from the

10  definition of a repurchase agreement.  It is incumbent on the

11  debtors to provide some evidence to rebut the presumption that

12  the MRA is a repurchase agreement, as it is designated as one,

13  and they have failed to do that.

14         Thus, the Court finds on this preliminary record that

15  Credit Suisse has demonstrated a likelihood of success on the

16  merits of its claim that the MRA is a repurchase agreement, the

17  debtors' Chapter 11 filing constituted an immediate event of

18  default, entitling Credit Suisse to exercise its default

19  remedies under the MRA, and the provisions of the automatic

20  stay in section 365(U)(1) of the Bankruptcy Code are

21  inapplicable.

22         And that turns us to whether Credit Suisse has

23  demonstrated irreparable harm.  In order to demonstrate

24  irreparable harm, the movant must demonstrate a potential harm

25  which cannot be redressed by legal or equitable remedy

1    following trial.  The preliminary injunction must be the only

2    way of protecting the movant from harm.  Importantly, the

3    availability of adequate money damages belies a claim of

4    irreparable injury and the Third Circuit has noted, quote,

5    "that a purely economic injury compensable in money cannot

6    satisfy the irreparable injury requirement," end quote.

7          Credit Suisse argues that the debtors' refusal to

8    transfer the files and servicing rights to SPS, as required

9    under the MRA, prohibits Credit Suisse from selling the

10   mortgages, which will harm Credit Suisse as the price of

11   mortgages continues to fall or, in the very least, will cost

12   Credit Suisse the lost time value of money.  This is a, quote,

13   "economic injury compensable in money that cannot satisfy the

14   irreparable injury requirement," end quote.

15         CSFB cites to a number of Third Circuit cases, as

16   well as Delaware bankruptcy cases, that stand for the

17   proposition that the unsatisfiability of a money judgment can

18   constitute irreparable injury.  Those cases involve instances

19   where a defendant is insolvent and its assets are in danger of

20   dissipation or depletion.  In many instances, an injunction is

21   sought to prevent the transfer of the only available funds

22   outside of the court's jurisdiction.  That is not the case

23   here.  There is no evidence that the assets of the debtors'

24   estate are in danger of further dissipation or depletion.  The

25   debtors are operating in Chapter 11, they've hired company

1  counsel, they've arranged financing and they're engaged in an

2  orderly wind down of their assets -- or, excuse me -- their

3  business.

4        The damage to Credit Suisse's ability to recover on

5  any unsecured claim in this case has, in all probability,

6  already occurred.  The horse is out of the barn.  The fact that

7  the debtors are in Chapter 11 and may not be able to pay

8  unsecured claims in full does not give rise, in and of itself,

9  to irreparable injury.  Indeed, one could argue just the

10  opposite; the fact that the debtors are operating in Chapter 11

11  with financing, etcetera, may actually increase the ability of

12  Credit Suisse to recover on its unsecured claim, if any.  Thus,

13  the cases cited by Credit Suisse are inapposite.

14        Section 16(M) of the MRA does provide that the

15  debtors admit that a failure to comply with Credit Suisse's

16  exercising of its remedies upon an event of default will cause

17  irreparable injury to Credit Suisse.  Of course, in giving

18  weight to parties' contractual statements regarding the nature

19  of harm and attendant remedies that will res -- arise as a

20  result of a breach of contract, they nonetheless

21  characteristically hold that such statements alone are

22  insufficient to support a finding of irreparable harm and an

23  award of injunctive relief.  Absent some further showing of

24  irreparable injury, Credit Suisse has failed to demonstrate

25  that the debtors' failure to comply with Credit Suisse's

1    exercise of its remedies constitutes potential harm that cannot

2    be redressed by a legal or equitable remedy following a trial.

3           Having found that Credit Suisse has failed to

4    establish irreparable harm, the Court need not go further in

5    analyzing Credit Suisse's motion, specifically the prongs of

6    public interest and weighing the harms I don't think I need to

7    get into on this ruling.  Hence, as a result of the foregoing

8    ruling, the motion is denied without prejudice and the Court

9    would direct the debtors to circulate an order and submit it

10   under certification to counsel.

11                         (Pause)

12           THE COURT:  All right?  Mr. Comet?

13           MR. COMET:  Your Honor, can we set an early trial

14   date in this matter, in light of the Court's ruling?

15           THE COURT:  I'll allow the parties to discuss that

16   and if we want to set up a scheduling conference for next week

17   to talk about that, that -- I will accommodate a scheduling

18   conference.  But let's give you a couple days, at least, to

19   discuss the matter and if you can reach an agreement, great; if

20   not, you can come in front of me on a contested scheduling

21   matter and I'll listen to both sides about how much time they

22   need to have a trial that is expeditious, but makes sense in

23   the context of allowing whatever discovery is necessary to

24   occur.

25           MR. COMET:  Thank you, Your Honor.

Colloquy                                    106

1          THE COURT:  You're welcome.

2          MR. KIRPALANI:  Thank you, Your Honor.

3          THE COURT:  All right.  Anything else?  Thank you.

4    Sorry to keep you so late on a Friday.  Yes, Mr. Brady?

5          MR. BRADY:  I'm sorry.  This is on a different

6    matter.  If I can talk scheduling.  You may recall we had a

7    construction loan stipulation that we did with JPMorgan Chase

8    earlier in the case and there is another construction loan

9    portfolio where we want to submit a similar stipulation.  It's

10   subject currently to review by the Committee, Bank of America

11   and the DIP lender, but we expect to have agreement and we'd

12   like to see if we could get it all on next week.  I know we

13   have hearings both Monday and Tuesday set up next week.  It's

14   the same type of stipulation, where they're gonna start making

15   advances under the loan documents to protect their collateral

16   and the underlying borrower, who's expecting advances.

17         THE COURT:  Well, why don't you set it for Monday at

18   1 and if you need more time, we'll continue it.  I think that's

19   when we're set on the retention plan?

20         MR. BRADY:  That's correct, Your Honor.

21         THE COURT:  Because I'm sure your -- you and I are

22   both hopeful that the matter set for Tuesday will be continued,

23   if --

24         MR. BRADY:  Yes.

25         THE COURT:  -- if it's resolved.

1        MR. BRADY:  We're still hopeful and I expect it will

2   be.

3        THE COURT:  All right.  So, you can set it for 1,

4   obviously without prejudice to anyone's right to object that it

5   go forward and -- and we'll deal with it then.

6        MR. BRADY:  Thank you, Your Honor.

7        THE COURT:  All right.  Anything further for today?

8   Mr. Beskrone, you look like --

9        MR. BESKRONE:  Excuse me, Your Honor, Don Beskrone

10  appearing for Morgan Stanley.  You'll recall, yesterday we had

11  a scheduling conference on Morgan Stanley's motion.  Are you

12  going to sign an order on that?  It was attached to our motion.

13  Or you want us to just do a notice.

14        THE COURT:  You're so demanding.

15        MR. BESKRONE:  I apologize, Your Honor.

16        THE COURT:  No, you don't.

17                        (Pause)

18        THE COURT:  All right.  I have a form of order coming

19  up.  What did we say?  Tuesday, the 22nd at 2 p.m.

20        MR. BESKRONE:  No, it --

21        THE COURT:  No, 21st.

22        MR. BESKRONE:  The 21st at 2 p.m.  And I believe we

23  have objections due that morning.

24        THE COURT:  When did I say your objection was due,

25  Mr. Brady, do you remember?  When would you like?

Colloquy                                108

1          MR. BRADY:  I think, my recollection is you said as

2     long as you could see it first thing Tuesday morning, that that

3     would be acceptable.  So, we're looking at that as up until

4     about 6 a.m. Tuesday morning.

5          THE COURT:  All right.  I'll just say -- I'll say

6     August 21 at 9 a.m.  How about that?  I don't get in that

7     early, Mr. Brady.  Anymore.  All right.  Thank you for

8     reminding me, Mr. Beskrone.

9          MR. BESKRONE:  Thank you, Your Honor.

10         THE COURT:  Anything further?  All right.  Hearing

11    none, the hearing is adjourned.  Thank you very much.

12         MR. BRADY:  Thank you, Your Honor.

13         MR. BESKRONE:  Thank you, Your Honor.

14                    (Adjourned at 3:35 p.m.)

15                    * * * * * * * * *

16                 <u>C E R T I F I C A T I O N</u>

17

18    "I, TERRY L. DeMARCO, court-approved transcriber, certify that

19    the foregoing is a correct transcript from the electronic sound

20    recording of the proceedings in the above-entitled matter."

21

22

23    _____        <u>August 27, 2007</u>

24          Terry L. DeMarco                         Date

25