IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ----------------------------------------------------------------- x | Chapter 11 |
| In re: | : |
| | : Case No. 07-11047 (CSS) |
| AMERICAN HOME MORTGAGE | : |
| HOLDINGS, INC., a Delaware corporation, et al., | : Jointly Administered |
| | : |
| Debtors. | : **Objection Deadline: September 12, 2007 at 4:00 p.m.** |
| ----------------------------------------------------------------- x | **Hearing Date: September 17, 2007 at 12:00 Noon** |

**DEBTORS' MOTION FOR AN ORDER (I) TERMINATING THEIR NON-QUALIFIED
DEFERRED COMPENSATION PLAN PURSUANT TO SECTION 363(b)(1) OF THE
BANKRUPTCY CODE AND (II) DIRECTING THE TRUSTEE OF THE DEBTORS'
NON-QUALIFIED DEFERRED COMPENSATION PLAN TRUST TO RETURN
DEBTORS' ASSETS HELD IN TRUST TO THE DEBTORS' ESTATES PURSUANT
TO SECTION 105(a) OF THE BANKRUPTCY CODE**

American Home Mortgage Holdings, Inc., a Delaware corporation, and certain of

its direct and indirect affiliates and subsidiaries, the debtors and debtors in possession in the

above cases (collectively, "AHM" or the "Debtors"),[1] hereby submit this motion (the "Motion")

pursuant to sections 363(b)(1) and 105(a) of title 11, United States Code, 11 U.S.C. §§ 101, et

seq. (the "Bankruptcy Code"), requesting that this Court enter an order (i) terminating their Non-

Qualified Deferred Compensation Plan and (ii) directing the trustee of their Non-Qualified

Deferred Compensation Plan Trust to Return the Debtors' assets held in trust to the Debtors'

estates. In support of this Motion, the Debtors respectfully represent as follows:

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification
number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage
Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance,
Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM
Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York
corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability
company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great
Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538
Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd.,
Suite 200, Irving, Texas 75063.

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is

proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the

relief requested herein are sections 363(b)(1) and 105(a) of the Bankruptcy Code.

## BACKGROUND

2.      On August 6, 2007 (the "Petition Date"), each of the Debtors filed with

this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.      Each Debtor is continuing to operate its business and manage its

properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

4.      The Debtors' chapter 11 cases are being jointly administered pursuant to

Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

5.      An official committee of unsecured creditors (the "Committee") was

appointed on August 14, 2007.  No trustee or examiner has been appointed.

## THE DEBTORS' BUSINESS[2]

6.      Prior to the filing of these bankruptcy cases, AHM's business primarily

entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage

loans and mortgage-backed securities resulting from the securitizations of residential mortgage

loans.  AHM also invested in securitized mortgage loans originated by others and originated and

sold mortgage loans to institutional investors.  AHM offered an array of mortgage products and

---

[2]      A detailed description of the Debtors' businesses and related business information is set forth in the
Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief [Docket No. 2],
which is incorporated by reference as if fully set forth herein at length.

DB02:6187124.2                                                                                          066585.1001

primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

7.    As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

8.    A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

## EVENTS LEADING TO THE CHAPTER 11 FILING

9.    Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

- 3 -

10.     The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities.  The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

11.     In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans.  During this time, certain of the Debtors' warehouse lenders -- the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

12.     On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

13.     The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business.  As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees.  The Debtors, as of the Petition Date, employed approximately 1,000 absolutely essential employees to the Debtors' continued operations, although that number is

expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

14.    In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

15.    Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## THE TRUST AGREEMENT

16.    On October 1, 2003, AHM Holdings, Inc., one of the Debtor entities, adopted the American Home Mortgage Holdings, Inc. Deferred Compensation Plan (the "Plan").[3] The Plan was maintained for the purpose of providing deferred compensation for a select group of management or highly compensated employees under Title I of the Employee Retirement Income Security Act of 1974.[4]

17.    On January 1, 2004, AHM Holdings entered into the Non-Qualified Deferred Compensation Plan Trust Agreement (the "Trust Agreement") with Merrill Lynch Trust Company, FSB to establish a trust (the "Trust") which would provide AHM Holdings with a source of funds to assist it in meeting its liabilities to the individuals participating in the Plan

---

[3]    A fully executed copy of the Plan is appended hereto as Exhibit A.  The Plan was amended on August 6, 2004 (the "First Amendment").  A copy of the First Amendment is attached to the Plan.

[4]    The Debtors have omitted Schedule A to the Plan which lists the names of the Participants.

066585.1001

(the "Participants"). A copy of the fully executed Trust Agreement is attached hereto as Exhibit B.

18.    While the Trust was intended to provide additional assurance to the Participants that their unfunded deferred compensation benefits under the Plan would be met in the future, the rights of the Participants to the benefits in the Plan and Trust do not exceed those of a general creditor of the Debtors. *See Trust Agreement* at § 1(d) ("Any assets held by the Trust will be subject to the claims of the Company's general creditors under federal and state law in the event of Insolvency…").

19.    The Trust was intended to be a "grantor trust" of the Debtors, which means that the Assets remain the property of the Debtors.

20.    The Participants had no preferred claim on, or any beneficial interest, in the Assets. *See Trust Agreement* at § 1(d).

21.    According to the Trust Agreement, "If at any time the Trustee has determined that the Company is Insolvent, the Trustee shall discontinue payments to Plan participants or their beneficiaries and shall hold the assets of the Trust for the benefit of the general creditors of the Company." *See Trust Agreement* at § 3(b)(iii). AHM Holdings is insolvent within the meaning of the Trust Agreement's definition of insolvency, which states in relevant part, "The Company shall be considered 'Insolvent' for purposes of this Trust Agreement if…(ii) the Company is subject to a pending proceeding as a debtor under the United States Bankruptcy Code." *See Trust Agreement* at § 3(a).

22.    Thus, upon AHM Holdings' filing of its voluntary petition for relief on the Petition Date, the Assets can no longer be used to pay benefits to the Participants but must be

held by the Trustee for the benefit of the general creditors of the Debtors. *See Trust Agreement* §§ 3(a) and 3(b)(iii).

## RELIEF REQUESTED

23.     By this Motion, the Debtors seek the entry of an order (i) terminating the Plan pursuant to section 363(b)(1) of the Bankruptcy Code and (ii) directing the trustee of the Trust (the "Trustee") to return the Assets, which are property of the estates, to the Debtors' bankruptcy estates.

## BASIS FOR RELIEF REQUESTED

### (i)     Debtors' Motion for Authorization to Terminate the Plan Pursuant To § 363(b)(1) of the Bankruptcy Code

24.     The Plan allows the Debtors to terminate the Plan at any time. *See Plan* § 12.8 ("While the Plan is intended as a permanent program, the Board shall have the right at any time to declare the Plan terminated completely as to the Company or as to any division, facility or other operational unit thereof."). The Debtors' contractual right to terminate the Plan constitutes property of the estate within the meaning of section 541 of the Bankruptcy Code, and the Debtors' use of that right may arguably constitute a use of property of the Debtors' bankruptcy estates outside of the ordinary course of business. Thus, the Debtors seek this Court's authorization, out of an abundance of caution, to exercise their contractual right to terminate the Plan.

25.     Section 363(b)(1) of the Bankruptcy Code authorizes a debtor, after notice and a hearing, to use property of the estate other than in the ordinary course of business. 11 U.S.C. § 363(b)(1). Courts may approve a debtor's use of property of the estate under section 363(b)(1) of the Bankruptcy Code if it is based upon the exercise of the debtor's sound business judgment and proposed in good faith and for fair value. *See Committee of Equity Security*

*Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983); *Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986). The debtor must establish a valid purpose for the use of property of the estate outside of the ordinary course of business. *Lionel*, 772 F.2d 1070-71. If a sound business rationale exists, then a presumption attaches that the decision was informed, in good faith and in the honest belief that the action was in the best interests of the estate. *Integrated Resources*, 147 B.R. at 656.

26.    Courts have applied four factors in determining whether a sound business justification exists: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration has been provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice has been provided. *In re Lionel Corp.*, 722 F.2d at 1071 (setting forth the "sound business purpose" test); *In re Abbotts Dairies*, 788 F.2d at 145-47 (implicitly adopting the articulated business justification test of *Lionel* and adding the "good faith" requirement); *In re Delaware & Hudson Ry. Co.*, 124 B.R. at 176 (adopting *Lionel* in this district). The termination of the Plan meets each of these requirements.

27.    As stated above, the Debtors filed voluntary petitions for relief on the Petition Date. Given the Debtors' insolvency within the meaning of the Trust Agreement, as well as their inability to continue to fund the Trust, the Debtors respectfully submit that their decision to terminate the Plan constitutes an exercise of sound business judgment made in good faith. Further evidence that the Debtors' decision to terminate the Plan is in the best interests of their bankruptcy estates is the fact that, pursuant to the terms of the Trust and prevailing

- 8 -

substantive non-bankruptcy law, the Assets reverted to the Debtors will be subject to the claims of their general creditors. Thus, the Debtors submit that their decision to terminate the Plan constitutes an exercise of sound business judgment, and that their decision to use their contractual rights to terminate the Plan should be approved pursuant to section 363(b)(1) of the Bankruptcy Code.

      (ii)      **Debtors' Motion for Order Directing Merrill Lynch Trust Company, FSB to Revert Assets to Debtors' Estates Pursuant to § 105(a) of the Bankruptcy Code**

      28.      Section 105(a) of the Bankruptcy Code provides in relevant part, "The court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). By the terms of the applicable provisions of the Plan and Trust Agreement, the Assets of the Trust were subject to the claims of the Debtors' general creditors and became property of the Debtors' bankruptcy estates on the Petition Date. Moreover, the Participants do not have any beneficial ownership interest in the Assets, because the Assets at all times remained property of the Debtors. Thus, the Debtors seek the entry of an order directing the Trustee, Merrill Lynch Trust Company, FSB, to revert the Assets to the Debtors' bankruptcy estates, pursuant to section 105(a) of the Bankruptcy Code, for the benefit of the Debtors' general creditors.

**NOTICE**

      29.      Notice of this Motion will be provided to (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Bank of America, N.A., as Administrative Agent for the lenders under that certain Credit Agreement dated August 30, 2004; (iv) counsel to the Agent for the Debtors' Postpetition Lender; (v) Merrill Lynch Trust Company, FSB; (vi) the Participants; and (vii) all parties entitled to notice under Del. Bankr. LR

- 9 -

                                                              

2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other

or further notice is required.

### NO PRIOR MOTION

30.    No previous motion for the relief sought herein has been made to this or

any other Court.

### CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form annexed hereto as Exhibit C, granting the relief requested in the Motion

and such other and further relief as may be just and proper.

Dated:     Wilmington, Delaware
           August 30, 2007

                        YOUNG CONAWAY STARGATT & TAYLOR, LLP

                        _____
                        James L. Patton, Jr. (No. 2202)
                        Joel A. Waite (No. 2925)
                        Pauline K. Morgan (No. 3650)
                        Sean M. Beach (No. 4070)
                        Matthew B. Lunn (No. 4119)
                        Kara Hammond Coyle (No. 4410)
                        Kenneth J. Enos (No. 4544)
                        The Brandywine Building
                        1000 West Street, 17th Floor
                        Wilmington, Delaware 19801
                        Telephone: (302) 571-6600
                        Facsimile: (302) 571-1253

                        Proposed Counsel for Debtors and
                        Debtors in Possession

DB02:6187124.2                                                        066585.1001

## **EXHIBIT A**

### **PLAN**

**AMERICAN HOME MORTGAGE HOLDING, INC.**
**DEFERRED COMPENSATION PLAN**

SEP  8 2004



# AMERICAN HOME MORTGAGE, INC.
## DEFERRED COMPENSATION PLAN

### TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS .......................................................................... 1
    Section 1 1    General ............................................................................. 1
    Section 1 2    Administrator ................................................................... 1
    Section 1 3    Beneficiary ....................................................................... 1
    Section 1 4    Benefit Commencement Date ........................................ 1
    Section 1 5    Board ................................................................................. 2
    Section 1 6    Change in Control ............................................................ 2
    Section 1 7    Code .................................................................................. 2
    Section 1 8    Company ........................................................................... 2
    Section 1.9    Compensation ................................................................... 2
    Section 1 10    Compensation Deferral Agreement ............................... 3
    Section 1 11    Deemed Investment Fund ............................................... 3
    Section 1.12    Effective Date .................................................................. 3
    Section 1.13    Employee .......................................................................... 3
    Section 1 14    ERISA .............................................................................. 3
    Section 1 15    Excess Compensation ..................................................... 3
    Section 1 16    Hours of Service .............................................................. 3
    Section 1 17    In Service Distribution ................................................... 5
    Section 1 18    In Service Sub Account ................................................... 5
    Section 1.19    In Service Distribution Date .......................................... 6
    Section 1 20    In Service Distribution Valuation Date ........................ 6
    Section 1.21    Nonqualified Accounts .................................................... 6
    Section 1 22    Nonqualified Company Matching Account ................... 6
    Section 1 23    Nonqualified Deferred Compensation Account ........... 6
    Section 1 24    Participating Employer .................................................... 6
    Section 1 25    Participant ........................................................................ 6
    Section 1 26    Payday ............................................................................... 6
    Section 1 27    Plan .................................................................................. 6
    Section 1 28    Plan Year ......................................................................... 7
    Section 1.29    Rules of the Plan ............................................................. 7
    Section 1.30    Year of Service ................................................................ 7
    Section 1 31    Termination of Employment .......................................... 7
    Section 1 32    Valuation Date ................................................................. 7
    Section 1 33    Vested ............................................................................... 7

ARTICLE II. ELIGIBILITY ........................................................................ 8
    Section 2 1    Requirements for Participation ...................................... 8
    Section 2.2    Designation of Beneficiary ............................................ 8

SEP  8 2004

ARTICLE III PARTICIPANTS' DEFERRALS ... 8
    Section 3 1    Deferral of Excess Compensation ... 8
    Section 3 2    Deferral Election Procedure ... 8
    Section 3 3    Content of Compensation Deferral Agreement ... 9

ARTICLE IV. CREDITING OF DEFERRALS AND COMPANY MATCHING CONTRIBUTIONS ... 10
    Section 4 1    Determination of Credits ... 10

ARTICLE V NONQUALIFIED ACCOUNTS ... 11
    Section 5 1    Nonqualified Deferred Compensation Account ... 11
    Section 5 2    Nonqualified Company Matching Account ... 11
    Section 5 3    Assignments Prohibited ... 11
    Section 5.4    Fund ... 11

ARTICLE VI DEEMED INVESTMENT OPTIONS, VALUATION OF NONQUALIFIED ACCOUNTS ... 12
    Section 6 1    Investment Options ... 12
    Section 6 2    Investment Credits and Debits ... 12
    Section 6 3    Determination of Values ... 12
    Section 6 4    Applicability of Nonqualified Account Values ... 12

ARTICLE VII VESTING OF NONQUALIFIED ACCOUNTS ... 13
    Section 7 1    Vesting of Nonqualified Accounts ... 13

ARTICLE VIII. BENEFITS UPON TERMINATION OF EMPLOYMENT ... 13
    Section 8 1    Distributions on Termination of Employment ... 13
    Section 8 2    Effect of Delay or Failure to Ascertain Amount Distributable or to Locate Distributee ... 14
    Section 8 3    Small Account Balance Lump Sum Payment ... 14
    Section 8 4    Forfeitures ... 14

ARTICLE IX BENEFITS UPON DEATH ... 14
    Section 9 1    Distribution on Death ... 14

ARTICLE X. OTHER DISTRIBUTIONS FROM NONQUALIFIED ACCOUNTS ... 15
    Section 10 1    In Service Distribution ... 15
    Section 10 2    Unforeseeable Emergency ... 15
    Section 10.3    Court Order ... 15
    Section 10 4    In General ... 16

ARTICLE XI ADMINISTRATIVE PROVISIONS ... 16
    Section 11 1    Administrator's Duties and Powers ... 16
    Section 11 2    Conflicting Claims ... 17
    Section 11 3    Majority Rule ... 17
    Section 11 4    Final Effect of Administrator Action ... 17

SEP 8 2004

Section 11 5    Expenses . . . . . . . . . . . . . 17
Section 11 6    Indemnification by the Company, Liability Insurance . . . . . 17
Section 11 7    Inspection of Records . . . . . . . . . . 18
Section 11 8    Limitations Upon Powers . . . . . . . . . . 18
Section 11 9    Recordkeeping . . . . . . . . . . 18
Section 11 10   Service of Process . . . . . . . . . . 18
Section 11 11   Service in More than One Capacity . . . . . . . 18

ARTICLE XII  MISCELLANEOUS PROVISIONS . . . . . . 19
Section 12 1    Amendment of Plan . . . . . . . . . . 19
Section 12 2    Consolidation or Merger, Adoption of Plan by Other Companies . . . . 19
Section 12 3    Errors and Misstatements . . . . . . . . 19
Section 12 4    Limitation on Rights of Employees . . . . . . . 19
Section 12 5    Payment on Behalf of Minor, Etc . . . . . . . 20
Section 12 6    Pronouns and Plurality . . . . . . . . 20
Section 12 7    References . . . . . . . . . . . . 20
Section 12 8    Termination of the Plan . . . . . . . . 20
Section 12 9    Titles. . . . . . . . . . . . . 20

ARTICLE XIII  CLAIMS PROCEDURES . . . . . . . 21
Section 13 1    Governing Law, Lawsuits, Jurisdiction, And Venue . . . 21
Section 13 2    Claims Procedure . . . . . . . . . 21
Section 13 3    Claims Review Procedure . . . . . . . . 21

SEP  8 2004

## AMERICAN HOME MORTGAGE HOLDING, INC
## DEFERRED COMPENSATION PLAN

American Home Mortgage Holding, Inc., a corporation duly organized and existing under the laws of the State of Delaware and having its principal office at Melville, New York, by resolution of its Board of Directors adopted the American Home Mortgage Holding, Inc Deferred Compensation Plan (the "Plan"), effective October 1, 2003, for the benefit of its eligible employees

The Plan is a nonqualified deferred compensation plan pursuant to which certain eligible employees of the Company (as hereinafter defined) and its affiliates may elect to defer compensation. The Plan is unfunded and maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees, within the meaning of Sections 201(2), 301(a)(3) and 401(a)(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") The Plan is intended to be exempt from the requirements of Parts 2, 3 and 4 of Title I of ERISA as a "top hat" plan, and to be eligible for the alternative method of compliance for reporting and disclosure available for unfunded "top hat" plans

## ARTICLE I.
## DEFINITIONS

Section 1 1    <u>General</u>

Whenever the following terms are used in the Plan with the first letter capitalized, they shall have the meaning specified below unless the context clearly indicates to the contrary

Section 1 2    <u>Administrator</u>

"Administrator" shall mean the Company acting through its chief executive officer or his delegate The Administrator shall have all duties and responsibilities imposed by ERISA, except as specifically assigned to, delegated to or reserved to the Board under the Plan

Section 1 3    <u>Beneficiary</u>

"Beneficiary" shall mean a person or trust properly designated by a Participant or former Participant to receive benefits, as provided in Section 2 2

Section 1.4    <u>Benefit Commencement Date</u>

"Benefit Commencement Date" shall mean the date as of which distribution of a Participant's accounts under the Plan shall occur This shall be a period of time as is reasonably required by the Administrator to arrange for distribution of benefits

SEP    8 2004

Section 1.5    Board

"Board" shall mean the board of directors of the Company  The Board may delegate any power or duty otherwise allocated to the Administrator to any other person or persons

Section 1 6    Change in Control

"Change in Control" means the occurrence of: (a) any merger or consolidation in which the Company, or a Participating Employer, is not the surviving corporation and which results in the holders of the outstanding voting securities of the Company or a Participating  Employer (determined immediately prior to such merger or consolidation) owning less than a majority of the outstanding voting securities of the surviving corporation (determined immediately following such merger or consolidation), (b) any sale or transfer by the Company or a Participating Employer of all or substantially all of its assets, or (c) any tender offer or exchange offer for or the acquisition, directly or indirectly, by any person or group of all or a majority of the then-outstanding voting securities of the Company or a Participating Employer

Section 1.7    Code

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time

Section 1 8    Company

(a)    "Company" shall mean American Home Mortgage Holding, Inc  and any other firm which subsequently adopts the Plan as a whole or as to any one or more divisions, in accordance with Section 12.2(b), and any successor company which continues the Plan under Section 12 2(a), acting in each case through the board of directors of the company in question

(b)    "Company Affiliate" shall mean any employer which, at the time of reference, was, with the Company, a member of a controlled group of corporations or trades or businesses under common control, or a member of an affiliated service group, as determined under regulations issued by the Secretary of the Treasury or his delegate under Code Sections 414(b), (c) and (m) and any other entity required to be aggregated with the Company pursuant to regulations issued under Code Section 414(o)

Section 1 9    Compensation

"Compensation" shall mean the sum of (a) the amount reported in the "Wages Tips and Other Compensation" Box on IRS Form W-2 issued to a Participant by the Company for the Plan Year, and (b) any amount which is contributed by the Company pursuant to a Compensation reduction agreement and which is not includible in the gross income of the employee under this Plan and sections 125, 402(e)(3), 402(g)(3), 402(h)(1)(B), 132(f)(4), 403(b) or 457 of the Code for the Plan Year.  Notwithstanding the above, for the initial short Plan Year beginning on October 1, 2003, Compensation shall also include amounts paid to a Participant by Principal Residential Mortgage, Inc  during the 2003 calendar year, provided, however, that for purposes of determining the amount credited to a Participant's Nonqualified Company Matching Account

SEP  8 2004

under Section 4 1(b), if any, Compensation shall not include any amounts paid by Principal Residential Mortgage, Inc

Section 1 10    <u>Compensation Deferral Agreement</u>

"Compensation Deferral Agreement" shall mean the deferral election form, or such other forms furnished by the Plan Administrator (or screens on the Participant Website approved by the Plan Administrator), on which a Participant elects: (a) the amount of deferral of Excess Compensation to be deferred beginning the first day of the following Plan Year; (b) any In Service Distribution Dates for that year's, or a portion of that year's, deferrals; and (c) the Form of distribution payable upon Termination and In Service Distribution Dates.

Section 1 11    <u>Deemed Investment Fund</u>

"Deemed Investment Fund" or "Deemed Investment Funds" shall mean, as the context indicates, any one or more of the investment funds which is authorized by the Administrator at the time of reference for deemed investment of Participants' Nonqualified Accounts pursuant to Article IV  The investment performance of such Deemed Investment Funds shall at all times be equivalent to the performance of those investment funds available for the investment of contributions made to the American Home Mortgage 401(k) Savings Plan

Section 1 12    <u>Effective Date</u>

"Effective Date" shall mean October 1, 2003

Section 1 13    <u>Employee</u>

"Employee" shall mean any individual who is employed by the Company (or, if the Administrator so designates, by any Company Affiliate), including officers

Section 1 14    <u>ERISA</u>

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time

Section 1 15    <u>Excess Compensation</u>

"Excess Compensation" shall mean the amount of Compensation that becomes payable in any Plan Year which exceeds two-hundred thousand dollars ($200,000 00)

Section 1 16    <u>Hours of Service</u>

"Hours of Service" shall mean those Hours of Service which an Employee will be credited with under the Plan as follows.

> (a)    One hour for each hour for which an Employee is directly or indirectly paid, or entitled to payment, by the Company for the performance of

SEP   8 2004

duties. These hours shall be credited to the Employee for the computation period or periods in which the duties are performed, and

(b)   One hour for each hour for which an Employee is directly or indirectly paid, or entitled to payment, by the Company for reasons (such as vacation, holiday, sickness, incapacity including disability, layoff, jury duty, military duty, or leave of absence, including a leave taken pursuant to the Family Medical Leave Act of 1993) other than for the performance of duties These hours shall be credited to the Employee for the computation period or periods in which the non-performance of duties occurs; and

(c)   One hour for each hour of the normally scheduled work hours for each week during any period for which an Employee is on an excused leave of absence from work with the Company for military service with the armed forces of the United States, but not to exceed the period required under the law pertaining to veteran's re-employment rights, provided, however, if the Employee fails to report for work at the end of such leave during which the Employee has re-employment rights the Employee shall not receive credit for hours on such leave; and

(d)   One hour for each hour for which back pay, irrespective or mitigation of damages, has been awarded to the Employee  Credit for such hours shall be given in the computation period or periods to which the award or agreement pertains rather than the computation period in which the award, agreement or payment was made

(e)   In the case of any Employee who is absent from work for any period by reason of the pregnancy of the Employee, the birth of a child of the Employee, the placement of a child with the Employee in connection with the adoption of such child by such Employee, or for the purpose of caring for such child for a period beginning immediately following such birth or placement, the Plan shall treat as Hours of Service, solely for the purpose of determining whether a Break-in-Service has occurred, the following Hours of Service.

   (i)    The Hours of Service which otherwise would normally have been credited to such Employee but for such absence; and

   (ii)   Provided that the total number of hours treated as Hours of Service by reason of such pregnancy or placement shall not exceed five hundred one (501) hours except as otherwise required under the Family and Medical Leave Act of 1993

(f)   Notwithstanding paragraph (b) above.

4

SEP  8 2004

(i)   Not more than five hundred one (501) hours shall be credited on account of any single continuous period during which the Employee performs no duties except as otherwise required under the Family and Medical Leave Act of 1993,

(ii)  No hours shall be credited because a payment is made or due under a plan maintained solely for the purpose of complying with applicable worker's compensation or unemployment compensation or disability insurance laws, and

(iii) No hours shall be credited for a payment which solely reimburses an Employee for medical or medically related expenses incurred by such Employee.

(g)  Notwithstanding paragraph (d) above, the same Hours of Service shall not be credited both under paragraphs (a) or (b), as the case may be, and under paragraph (d)

The determination of Hours of Service for reasons other than the performance of duties and the crediting of Hours of Service to computation periods shall be made in accordance with Department of Labor Regulations Sections 2530 200b-2(b) and (c), which are incorporated herein by reference

An Employee will be credited with Hours of Service, as determined under this Section, for employment with an Affiliated Company that has adopted the Plan  Any individual considered an Employee under Code sections 414(m) or (n) will be credited with Hours of Service, as determined under this Section

Section 1 17   In Service Distribution

"In Service Distribution" shall mean a payment by the Company to the Participant following a date elected by the Participant (the In Service Distribution Date) of the amount represented by the account balance in the In Service Sub-Account pertaining to that In Service Distribution   In Service Distributions shall be made in accordance with Participants' In Service Distribution form of payment election

Section 1 18   In Service Sub Account

"In Service Sub-Account" shall mean a separate Sub-Account of the Nonqualified Deferred Compensation Account, created whenever a Participant elects a new In Service Distribution Date (not already established with a Sub-Account) with respect to a portion, or all, of his or her deferral contributions, to which such portion of deferral specified by the Participant is credited and Deemed Invested

5

SEP   8 2004

Section 1 19   In Service Distribution Date

"In Service Distribution Date" shall mean the date selected by the Participant, following which the In Service Distribution Sub-Account Balance shall be distributed in accordance with the Plan

Section 1 20   In Service Distribution Valuation Date

"In Service Distribution Valuation Date" shall mean the last day of the calendar month in which the In Service Distribution Date falls

Section 1 21   Nonqualified Accounts

"Nonqualified Account" or "Nonqualified Accounts" of a Participant shall mean, as the context indicates, any one or both of his Nonqualified Deferred Compensation Account and his Nonqualified Company Matching Account

Section 1 22   Nonqualified Company Matching Account

"Nonqualified Company Matching Account" of a Participant shall mean the bookkeeping account, if any, established on behalf of the Participant in accordance with Section 5 2

Section 1 23   Nonqualified Deferred Compensation Account

"Nonqualified Deferred Compensation Account" of a Participant shall mean the bookkeeping account, if any, established on behalf of the Participant in accordance with Section 5 1

Section 1 24   Participating Employer

"Participating Employer" shall means a subsidiary or affiliate of the Company that has adopted the Plan  "Employer(s)" shall mean the Company and all Participating Employers when the context so requires

Section 1 25   Participant

"Participant" shall mean each Employee designated to be eligible to participate in the Plan as provided in Article II

Section 1 26   Payday

"Payday" of a Participant shall mean the regular and recurring established day for payment of Compensation to Employees in his classification or position

Section 1 27   Plan

"Plan" shall mean the American Home Mortgage Holding, Inc  Deferred Compensation Plan as stated herein

6

SEP  8

Section 1.28    <u>Plan Year</u>

"Plan Year" shall mean the twelve-month period commencing on January 1 and ending on December 31    Notwithstanding the foregoing, there shall be an initial short Plan Year commencing on October 1, 2003, and ending December 31, 2003

Section 1.29    <u>Rules of the Plan</u>

"Rules of the Plan" shall mean the rules adopted by the Administrator pursuant to Section 11 1 for the administration, interpretation or application of the Plan

Section 1.30    <u>Year of Service</u>

"Year of Service" shall mean a consecutive twelve (12) month computation period during which an Employee has completed at least one thousand (1000) Hours of Service    Such Year of Service shall be deemed completed as of the last day of the relevant computation period    For purposes of determining vesting under ARTICLE VII the computation period shall coincide with the Plan Year

Section 1 31    <u>Termination of Employment</u>

"Termination of Employment" shall mean the time when the employee-employer relationship between the Employee and the Company is terminated for any reason, with or without good cause, including, but not by way of limitation, a termination by resignation, discharge, disability, death or retirement, but excluding transfers among and between the Company and any Company Affiliate    The Administrator, in its absolute discretion, shall determine the effect of all matters and questions relating to Termination of Employment, including, but not by way of limitation, the question of whether a Termination of Employment resulted from disability, and all questions of whether particular leaves of absence constitute Terminations of Employment

Section 1 32    <u>Valuation Date</u>

"Valuation Date" shall mean the last day of each Plan Year and any other date as of which the Administrator elects to make a valuation of Nonqualified Accounts in accordance with the Rules of the Plan.

Section 1 33    <u>Vested</u>

"Vested," when used with reference to a Participant's Nonqualified Accounts, shall mean not subject to forfeiture, except as provided in the Plan, and unconditionally subject to distribution on his behalf, but only in accordance with the Plan

SEP    8 2004

## ARTICLE II.
## ELIGIBILITY

Section 2 1    Requirements for Participation

Each Employee listed on Schedule A to the Plan shall be eligible to participate in the Plan during any Plan Year provided that (a) he has elected to defer from his Compensation the maximum amount then permitted under Section 402(g) of the Code to the American Home Mortgage 401(k) Savings Plan, or such lesser amount as determined under the terms of that plan to satisfy its non-discrimination requirements, and (b) he is among a select group of management or highly compensated Employees

Section 2 2    Designation of Beneficiary

(a)    Each Participant or former Participant shall have the right to designate, revoke and redesignate one or more Beneficiaries hereunder and to direct payment of the Vested amount credited to his Nonqualified Accounts to such Beneficiaries upon his death

(b)    Designation, revocation and redesignation of Beneficiaries must be made in writing in accordance with the Rules of the Plan on a form provided by the Administrator and shall be effective upon delivery to the Administrator

(c)    If a Participant dies without having a Beneficiary designation then in force, or if all the Beneficiaries designated by a Participant predecease him, his Beneficiary shall be his surviving spouse, or if none, his surviving descendants, per stirpes, or if none, the Participant's Account Balance shall be paid to the executor or administrator of his estate for the benefit of the Participant's estate

## ARTICLE III.
## PARTICIPANTS' DEFERRALS

Section 3 1    Deferral of Excess Compensation

Each Participant may elect to defer to his Nonqualified Deferred Compensation Account for any Plan Year up to fifty percent (50%) of his Excess Compensation for such Plan Year

Section 3 2    Deferral Election Procedure

Each Employee who may be a Participant in the Plan shall make deferral elections under the Plan by completing and submitting to the Plan Administrator a written Compensation Deferral Agreement provided by the Plan Administrator (or completing and electronically submitting the deferral election screen on the Participant website, when made available by the Plan Administrator)  Deferral elections shall be made during an annual enrollment period which shall end no later than December 1 preceding the Plan Year to which the deferral election relates, unless the enrollment period is extended by the Plan Administrator because of extraordinary circumstances  In no event may an enrollment period be extended beyond the last day of the month prior to the beginning of the Plan Year to which the deferral elections refer

8

SEP    8 2004

Notwithstanding the foregoing, an Eligible Employee who becomes eligible to be a Participant during any Plan Year may, in the initial year of eligibility only, may make a deferral election no later than thirty days after the date on which such Employee first becomes eligible to be a Participant

Section 3 3    Content of Compensation Deferral Agreement

The Participant shall set forth on the Compensation Deferral Agreement:

(a)    his consent that he, his successors in interest and assigns and all persons claiming under him shall be bound, to the extent authorized by law, by the statements contained therein and by the provisions of the Plan as they now exist, and as they may be amended from time to time,

(b)    the amount of his Excess Compensation to be deferred under Article III and, in such case, his authorization to the Company to reduce his Compensation in accordance with Section 4 1(a), and

(c)    The Compensation Deferral Agreement shall also indicate the Participant's election of In Service Distribution Date(s) (if any). An In Service Distribution election shall pertain to such portion of deferred Compensation for the Plan Year as elected by the Participant and shall cause an In Service Sub-Account to be established (unless such Sub-Account already exists), to which such portion of deferred Compensation shall be credited   In the event an In Service Sub-Account has already been established for the In Service Distribution Date referred to in the deferral election, such portion of deferred Compensation shall be credited to the existing In Service Sub-Account.

(d)    A Participant may maintain up to three (3) In Service Sub-Accounts.

(e)    A Participant may change or cancel an In Service Distribution Date once only, as follows:

(i)    An In Service Distribution Date change (including a cancellation) may be made by submitting a new Compensation Deferral Agreement or such other form as may be provided for In Service Distribution Date changes by the Plan Administrator (or completing and electronically submitting the appropriate screen on the Participant website, when available) at any time, so long as the date that such form is submitted to the Plan Administrator is at least thirteen (13) months prior to the In Service Distribution Date being changed, and

(ii)    The In Service Distribution Date may be extended to a subsequent year (and must be extended by at least one year), but it may not be made to occur sooner than the original date

(iii)    The In Service Distribution Date may be cancelled, even after a change   A cancellation of an In Service Distribution Date shall cause the In Service

9

SEP 8 2004

Sub-Account associated with it to be merged into the Nonqualified Deferred Compensation Account

(iv)     Making an In Service Distribution Date change or cancellation in accordance with the Plan is specific to the In Service Distribution to which it refers, and shall not affect other In Service Distributions or the ability of the Participant to make new In Service Distribution elections with respect to new deferral contributions

(f)     Any portion of a deferral not credited to an In Service Distribution Sub-Account will be credited to the Nonqualified Deferred Compensation Account

(g)     The Compensation Deferral Agreement shall indicate the Participant's election of a payment schedule for his Termination of Employment Benefit  A Participant shall elect to have such benefit distributed. (a) a portion, or all, in a single lump sum payable as soon as administratively practicable following the Termination Valuation Date; and/or (b) the balance (assuming it is at least $25,000) in up to ten (10) annual installment payments payable at the time described in Section 8 1  An election of a payment schedule for a Participant's Retirement Benefit shall pertain to the entire Nonqualified Account Balance  A Participant shall be permitted to change his or her payment schedule election at any time by filing a new Compensation Deferral Agreement (or by following such procedures as are set by the Plan Administrator regarding using the Participant website, when available), provided such election is made at least thirteen (13) months prior to the Participant's date of Retirement  Any payment schedule election made within thirteen months of Retirement shall be null and void, and the most recent payment schedule election which is dated at least thirteen months prior to Retirement will be in effect

(h)     The Compensation Deferral Agreement shall also indicate the Participant's election of payment schedule for each In Service Distribution Date  Permitted payment schedules for In Service Distributions are a single lump sum or (assuming the In Service Distribution Sub-Account Balance is at least $10,000) from two (2) to five (5) annual installment payments  A Participant shall be permitted to change his or her payment schedule election for an In Service Distribution at any time by filing a new Compensation Deferral Agreement (or by following such procedures as are set by the Plan Administrator regarding using the Participant website, when available), provided such election is made at least thirteen (13) months prior to the In Service Distribution Date

(i)     Such other information as may be required for the administration of the Plan

### ARTICLE IV.
### CREDITING OF DEFERRALS AND COMPANY MATCHING CONTRIBUTIONS

Section 4 1     Determination of Credits

(a)     Pursuant to the Rules of the Plan, as of each Payday with respect to which a Participant has a current deferral election in effect, such Participant's Nonqualified Deferred Compensation Account shall be credited with an amount which is equal to the amount of Excess

SEP   8 2004

Compensation otherwise payable on such Payday that such Participant elected to defer under Section 3 1

(b)    Pursuant to the Rules of the Plan, during the first quarter of the succeeding Plan Year, the Nonqualified Company Matching Account of each Participant who elected to defer Excess Compensation for the prior Plan Year shall be credited with an amount which is equal to fifty percent (50%) of the first six percent (6%) of Excess Compensation credited to his Nonqualified Deferred Compensation Account maintained under Section 5 1 for the Plan Year

## ARTICLE V.
## NONQUALIFIED ACCOUNTS

Section 5 1    Nonqualified Deferred Compensation Account

The Administrator shall establish and maintain for each Participant a Nonqualified Deferred Compensation Account to which shall be credited the amounts determined under Section 4 1(a) and credited or debited the amounts determined under Article VI

Section 5.2    Nonqualified Company Matching Account

(a)    The Administrator shall establish and maintain for each Participant a Nonqualified Company Matching Account to which shall be credited the amounts determined under Section 4 1(b) and credited or debited the amounts determined under Article VI

Section 5 3    Assignments Prohibited

No part of the Nonqualified Accounts of a Participant shall be liable for the debts, contracts or engagements of any Participant, his Beneficiaries or successors in interest, or be taken in execution by levy, attachment or garnishment or by any other legal or equitable proceeding, nor shall any such person have any rights to alienate, anticipate, commute, pledge, encumber or assign any benefits or payments hereunder in any manner whatsoever except to designate a Beneficiary as provided herein

Section 5.4    Fund

(a)    The Administrator, in its discretion, may elect to establish a Fund containing assets equal to the amounts credited to Participants' Nonqualified Accounts, and may elect in its discretion to hold the Fund in trust, provided, however, that such Fund shall remain a general asset of the Company subject to the rights of creditors of the Company in the event of the Company's bankruptcy or insolvency as may be defined in any such trust

11

SEP    8 2004

## ARTICLE VI.
## DEEMED INVESTMENT OPTIONS;
## VALUATION OF NONQUALIFIED ACCOUNTS

Section 6 1    <u>Investment Options</u>

(a)    Each Participant may elect in accordance with the Rules of the Plan to have amounts credited to his Nonqualified Accounts deemed to be invested entirely in any one or more Deemed Investment Funds in such proportions as are permitted by the Administrator under the Rules of the Plan, and to change any prior such election, and

(b)    Any such election under subsection 6 1(a) shall remain in effect until revoked or modified by the Participant  In the event that a Nonqualified Account is deemed invested in more than one Investment Fund, changes in proportions due to investment results shall not require any deemed transfer of values between Deemed Investment Funds

(c)    Deemed purchases and sales of assets in the Deemed Investment Funds as required under this Section shall be made within a reasonable time after the Participant submits a written election to the Administrator (or completing and electronically submitting the election on the Participant website, when made available by the Plan Administrator)of any such change on the prescribed form, and such Participant's Nonqualified Accounts shall be adjusted to reflect amounts deemed realized in such transaction

(d)    If a Participant fails or declines to make an election under this Section, such Participant's Nonqualified Accounts shall be deemed held in one or more Deemed Investment Funds as directed by the Administrator in accordance with the Participant election form

Section 6 2    <u>Investment Credits and Debits</u>

On each Valuation Date, additional amounts shall be credited (or debited) to each Participant's Nonqualified Deferred Compensation Account and Nonqualified Company Matching Account, such amounts to be equal to the earnings (or losses) that would have been credited (or debited) had such Nonqualified Accounts been invested entirely among the Deemed Investment Funds in the proportions elected by the Participant pursuant to Section 6 1

Section 6 3    <u>Determination of Values</u>

If the Administrator elects to establish a Fund in accordance with Section 5 4, as of each Valuation Date, the Administrator shall determine the fair market value of each asset in the Fund, if any, based upon the investment performance of the Deemed Investment Funds  Fair market value so determined shall be conclusive for all purposes of the Plan

Section 6 4    <u>Applicability of Nonqualified Account Values</u>

The value of a Nonqualified Account as determined as of a given date under this Article, plus any amounts subsequently allocated thereto under Sections 4 1(a) and (b) shall remain the value thereof for all purposes of the Plan until revalued hereunder

12

SEP   8 2004

## ARTICLE VII.
## VESTING OF NONQUALIFIED ACCOUNTS

Section 7.1    <u>Vesting of Nonqualified Accounts</u>

(a)    Each Participant's interest in his Nonqualified Deferred Compensation Account shall be Vested at all times.

(b)    Each Participant's interest in his Nonqualified Company Matching Account shall become Vested in accordance with the following schedule.

| Years of Service | Vested Percentage |
|---|---|
| 1 year | 20% |
| 2 years | 40% |
| 3 years | 60% |
| 4 years | 80% |
| 5 or more years | 100% |
| Change in Control | 100% |

## ARTICLE VIII.
## BENEFITS UPON TERMINATION OF EMPLOYMENT

Section 8.1    <u>Distributions on Termination of Employment</u>

(a)    A Participant who has a Termination of Employment for any reason other than death shall receive on his Benefit Commencement Date the Vested amount credited to his Nonqualified Accounts determined as of the last Valuation Date for such Nonqualified Accounts under Article VI, less any amounts required to be withheld by law, in the form elected in his Compensation Deferral Agreement. At the time benefits become available for distribution, they will be reportable as taxable income and subject to applicable income, withholding and FICA and FUTA taxes. A Participant will not have the right to defer such taxation beyond his Benefit Commencement Date.

(b)    If the Participant has elected to receive distributions from his Nonqualified Accounts in installment payments, annual cash payments will be made beginning as soon as administratively practicable following the applicable Valuation Date or, in the event of a partial lump sum election, following the first anniversary of the partial lump sum payment made following Termination of Employment. Such payments shall continue annually on or about the anniversary of the previous installment payment until the number of installment payments elected has been paid. The installment payment amount shall be determined annually as the result of a calculation, performed on the Annual Valuation Date, where (i) is divided by (ii):

(i)    equals the value of the Nonqualified Account on the Annual Valuation Date, and

13

SEP    8 2004

(ii)    equals the remaining number of installment payments

Section 8 2    <u>Effect of Delay or Failure to Ascertain Amount Distributable or to Locate Distributee</u>

(a)    If an amount payable under Article VIII or IX cannot be ascertained or the person to whom it is payable has not been ascertained or located within the stated time limits and reasonable efforts to do so have been made, then distribution shall be made not later than 30 days after such amount is determined or such person is ascertained or located, or as prescribed in subsection 8 2(b).

(b)    If, within one year after a Participant has a Termination of Employment, the Administrator, in the exercise of due diligence, has failed to locate him (or if such Termination of Employment is by reason of his death, has failed to locate the person entitled to his Vested Nonqualified Accounts under Section 9 1), his entire distributable interest in the Plan shall be forfeited; provided, however, that if the Participant (or in the case of his death, the person entitled thereto under Section 9 1) makes a proper claim thereof pursuant to the Rules of the Plan, the amount so forfeited shall be paid to such Participant or such person in a lump sum not later than 30 days after such claim is made

Section 8 3    <u>Small Account Balance Lump Sum Payment</u>

In the event that the balance of a Participant's Nonqualified Account is less than $25,000 or a Participant's In Service Distribution Sub-Account Balance is less than $10,000 on the initial Termination or In Service Distribution Valuation Date for such Nonqualified Account, the In Service Distribution or Termination of Employment Benefit, as applicable, shall be paid in a lump sum and any form of payment election to the contrary shall be null and void.

Section 8 4    <u>Forfeitures</u>

(a)    If a Participant has a Termination of Employment, the portions of his Nonqualified Company Matching Account which are not Vested shall be forfeited on the date of such Termination of Employment

(b)    Amounts forfeited under subsection 8 4(a) above may be used to pay Plan expenses pursuant to Section 11 5, and if not so applied shall remain part of the Company's general assets

**ARTICLE IX.**
**BENEFITS UPON DEATH**

Section 9 1    <u>Distribution on Death</u>

(a)    Upon the death of a Participant or former Participant, the Vested amount credited to his Nonqualified Accounts determined as of the last Valuation Date for such Nonqualified Accounts under Article VI, less any amounts required to be withheld by law, shall be paid in one lump sum to such Participant's or former Participant's Beneficiaries

14

SEP    8 2004

(b)    Payments under Section 9 1(a) shall be made within a period of time as is reasonably required by the Administrator to arrange for distribution of benefits after the Participant's or former Participant's death occurs

## ARTICLE X.
## OTHER DISTRIBUTIONS FROM NONQUALIFIED ACCOUNTS

Section 10 1    In Service Distribution

(a)    In the event an In Service Distribution Sub-Account Balance shall be less than $10,000 on the initial In Service Distribution Valuation Date, the In Service Distribution shall be made in a single lump sum as soon as administratively practicable following the In Service Distribution Valuation Date   Otherwise, each In Service Distribution shall be paid in accordance with the payment schedule election made with respect thereto, beginning as soon as administratively practicable following the In Service Distribution Valuation Date   In the event a Participant has elected installment payments for an In Service Distribution, the installment payments shall be determined as set forth in Section 8 1(b) of the Plan

(b)    Notwithstanding a Participant's election to receive an In Service Distribution, all In Service Distribution Sub-Account Balances shall be distributable as part of a Death, or Termination Benefit if the triggering date for such Death or Termination Benefit occurs prior to the completion of payment(s) elected in connection with any In Service Distribution Date

Section 10 2    Unforeseeable Emergency

A Participant may request, in writing to the Plan Administrator, a withdrawal from his or her Nonqualified Deferred Compensation Account if the Participant experiences an "unforeseeable emergency" An unforeseeable emergency is a severe financial hardship to the participant resulting from a sudden and unexpected illness or accident of the participant or of a dependent (as defined in section 152(a)) of the participant, loss of the participant's property due to casualty, or other similar extraordinary and unforeseeable circumstances arising as a result of events beyond the control of the participant, as defined in Reg 1 457-2(h)(4). The Plan Administrator, in its sole discretion, shall determine whether a Participant has experienced an unforeseeable emergency   Withdrawals of amounts because of an unforeseeable emergency are limited to the extent reasonably needed to satisfy the emergency need, which cannot be met with other resources of the Participant   The amount of such unforeseeable emergency withdrawal shall be subtracted first from the vested portion of the Participant's general Nonqualified Deferred Compensation Account until depleted and then from the In Service Distribution Sub-Accounts (if any) beginning with the most distant   Values for purposes of administering this Section shall be determined on the date the Plan Administrator approves the amount of the unforeseeable emergency withdrawal, or such other date determined by the Plan Administrator

Section 10 3    Court Order

In the event a Court of competent jurisdiction orders a division of "plan assets" or a distribution of a Participant's Account or portion thereof pursuant to a QDRO or other valid

15

SEP  8 2004

Judgment or Court Order, the Plan Administrator shall treat such request as though it were a request for a Hardship withdrawal which satisfied the requirements of an unforeseen severe financial hardship and make a distribution to the Participant in the amount necessary to satisfy the QDRO, Judgment or Court Order

Section 10 4    In General

Other than a distribution described in Article X, no distribution shall be made to any Participant from his Nonqualified Accounts before he has a Termination of Employment

## ARTICLE XI.
## ADMINISTRATIVE PROVISIONS

Section 11 1    Administrator's Duties and Powers

(a)    The Administrator shall conduct the general administration of the Plan in accordance with the Plan and shall have all the necessary power and authority to carry out that function  Among its necessary powers and duties, are the following:

(i)    To delegate all or part of its function as Administrator to others and to revoke any such delegation

(ii)    To determine questions of eligibility and vesting of Participants and their entitlement to benefits

(iii)    To select and engage attorneys, accountants, actuaries, trustees, appraisers, brokers, consultants, administrators, physicians or other persons to render service or advice with regard to any responsibility the Administrator or the Board has under the Plan, or otherwise, to designate such persons to carry out responsibilities, and (with the Company, the Board and its officers, trustees and Employees) to rely upon the advice, opinions or valuations of any such persons, to the extent permitted by law, being fully protected in acting or relying thereon in good faith

(iv)    To interpret the Plan for purpose of the administration and application of the Plan, in a manner not inconsistent with the Plan or applicable law and to amend or revoke any such interpretation

(v)    To adopt Rules of the Plan that are not inconsistent with the Plan or applicable law and to amend or revoke any such rules.

(b)    Every finding, decision, and determination made by the Administrator shall, to the full extent permitted by law, be final and binding upon all parties, except to the extent found by a court of competent jurisdiction to constitute an abuse of discretion.

16

SEP  8 2004

Section 11 2    Conflicting Claims

If the Administrator is confronted with conflicting claims concerning a Participant's Nonqualified Accounts, the Administrator may interplead the claimants in an action at law, or in an arbitration conducted in accordance with the rules of the American Arbitration Association, as the Administrator shall elect in its sole discretion, and in either case, the attorneys' fees, expenses and costs reasonably incurred by the Administrator in such proceeding shall be charged to and paid from the Participant's Nonqualified Accounts

Section 11 3    Majority Rule

If more than one person is acting as the Administrator, they shall act by a majority of their members in office, provided, however, that the Administrator may appoint one of its members or a delegate to act on behalf of the Administrator on matters arising in the ordinary course of administration of the Plan or on specific matters

Section 11 4    Final Effect of Administrator Action

All actions taken and all determinations made by the Administrator in good faith shall be final and binding upon all Participants and any person interested in the Plan

Section 11 5    Expenses

The expenses necessary to administer the Plan including, but not limited to, expenses involved in retaining necessary professional assistance for the Plan, including but not limited to, attorneys, accountants, actuaries, pension consultants or investment advisors shall be paid by the Administrator out of the Company's general assets until such time as the aggregate amount of annual Participant deferral elections under Section 3 1 equal five hundred thousand dollars ($500,000 00) for any Plan Year    Once the aggregate amount of annual Participant deferral elections under Section 3 1 equals five hundred thousand dollars ($500,000 00) for the remainder of such Plan Year and each Plan Year thereafter the expenses may be paid out of the Nonqualified Accounts under the Plan.

Section 11 6    Indemnification by the Company, Liability Insurance

(a)    The Company shall pay or reimburse any of the Company's officers, directors or Employees who administer the Plan for all expenses incurred by such persons in, and shall indemnify and hold them harmless from, all claims, liability and costs (including reasonable attorneys' fees) arising out of the good faith performance of their Plan functions

(b)    The Company may obtain and provide for any such person liability insurance against liabilities imposed on him by law, at the Company's expense

SEP   8 304

Section 11 7    Inspection of Records

Copies of the Plan and records of a Participant's Nonqualified Accounts shall be open to inspection by him or his duly authorized representatives upon reasonable advance notice at the office of the Company at any reasonable business hour

Section 11.8    Limitations Upon Powers

The Plan shall be uniformly and consistently administered, interpreted and applied with regard to all Participants in similar circumstances   The Plan shall be administered, interpreted and applied fairly and equitably and accordance with the specified purposes of the Plan.

Section 11 9    Recordkeeping

(a)    The Administrator shall maintain suitable records as follows:

(i)    Records of each Participant's individual Nonqualified Accounts which, among other things, shall show separately such Participant's deferrals under Section 4 1(a), Company matching amounts under Section 4.1(b) and the gains and losses thereon; and any forfeitures therefrom

(ii)    Records which show the operations of the Plan during each Plan Year

(iii)    Records of its deliberations and decisions

(b)    The Administrator may appoint a secretary to keep the record of proceedings, to transmit its decisions, instructions, consents or directions to any interested party, to execute and file, on behalf of the Administrator, such documents, reports or other matters as may be necessary or appropriate under ERISA and to perform ministerial acts

(c)    The Administrator shall not be required to maintain any records or accounts which duplicate any records or accounts maintained by the Company

Section 11 10  Service of Process

The Secretary of the Company is hereby designated as agent of the Plan for the service of legal process

Section 11 11  Service in More than One Capacity

Any person or group of persons may serve in more than one capacity with respect to the Plan

18

SEP  8 2004

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

Section 12.1    Amendment of Plan

As limited by any applicable law, the Plan may be wholly or partially amended by the Board from time to time including retroactive amendments, provided, however, that no amendment shall decrease the Vested percentage or amount of interest any Participant or any other person entitled to payment under the Plan has in the Participant's Nonqualified Accounts Notwithstanding the foregoing, upon a Change in Control the Plan shall not be amended to eliminate the form of distributions elected by a Participant in his Compensation Deferral Agreement

Section 12.2    Consolidation or Merger, Adoption of Plan by Other Companies

(a)    In the event of the consolidation or merger of the Company with or into any other corporation, or the sale by the Company of its assets, the resulting successor may continue the Plan by adopting it in a resolution of its board of directors. If within 90 days from the effective date of such consolidation, merger or sale of assets, such new corporation does not adopt the Plan, the Plan shall be terminated in accordance with Section 12.9

(b)    A Company Affiliate may, with the approval of the Board, adopt the Plan as a whole or as to any one or more divisions effective as of the first day of any Plan Year by resolution of its own board of directors or agreement of its partners. Such Company Affiliate shall give written notice of such adoption to the Administrator by its duly authorized officers

Section 12.3    Errors and Misstatements

In the event of any misstatement or omission of fact by a Participant to the Administrator or any clerical error resulting in payment of benefits in an incorrect amount, the Administrator shall promptly cause the amount of future payments to be corrected upon discovery of the facts and shall pay the Participant or any other person entitled to payment under the Plan any underpayment in cash in a lump sum or to recoup any overpayment from future payments to the participant or any other person entitled to payment under the Plan in such amounts as the Administrator shall direct or to proceed against the Participant or any other person entitled to payment under the Plan for recovery of any such overpayment.

Section 12.4    Limitation on Rights of Employees

The Plan is strictly a voluntary undertaking on the part of the Company and shall not constitute a contract between the Company and any Employee, or consideration for, or an inducement or condition of, the employment of an Employee  Nothing contained in the Plan shall give any Employee the right to be retained in the service of the Company or to interfere with or restrict the right of the Company, which is hereby expressly reserved, to discharge or retire any Employee, except as provided by law, at any time without notice and with or without cause Inclusion under the Plan will not give any Employee any right or claim to any benefit hereunder except to the extent such right has specifically become fixed under the terms of the Plan  The

19

SEP    8  2004

doctrine of substantial performance shall have no application to Employees, Participants or any other persons entitled to payments under the Plan. Each condition and provision, including numerical items, has been carefully considered and constitutes the minimum limit on performance which will give rise to the applicable right

Section 12.5    Payment on Behalf of Minor, Etc.

In the event any amount becomes payable under the Plan to a minor or a person who, in the sole judgment of the Administrator is considered by reason of physical or mental condition to be unable to give a valid receipt therefor, the Administrator may direct that such payment be made to any person found by the administrator in its sole judgment, to have assumed the care of such minor or other person. Any payment made pursuant to such determination shall constitute a full release and discharge of the Company, the Board, the Administrator, and each of their respective officers, directors and employees

Section 12.6    Pronouns and Plurality

The masculine pronoun shall include the feminine pronoun, and the singular the plural where the context so indicates

Section 12.7    References

Unless the context clearly indicates to the contrary, a reference to a statute, regulation or document shall be construed as referring to any subsequently enacted, adopted or executed statute, regulation or document

Section 12.8    Termination of the Plan

(a)    While the Plan is intended as a permanent program, the Board shall have the right at any time to declare the Plan terminated completely as to the Company or as to any division, facility or other operational unit thereof

(b)    Discharge or layoff of Employees of the Company or any unit thereof without such a declaration shall not result in a termination of the Plan

(c)    In the event of termination of all or part of the Plan, the Administrator shall continue to maintain Participants' Nonqualified Accounts and payment of such Nonqualified Accounts shall be made in accordance with Articles VIII and IX

Section 12.9    Titles

Titles are provided herein for convenience only and are not to serve as a basis for interpretation or construction of the Plan

20

SEP   8  2004

## ARTICLE XIII.
## CLAIMS PROCEDURES

Section 13.1   <u>Governing Law, Lawsuits, Jurisdiction, And Venue</u>

This Plan shall be construed, administered and governed in all respects under and by applicable federal laws   To the extent not preempted by federal law, and where state law is applicable, the laws of the state of New York shall apply   No lawsuit claiming entitlement to benefits under this Plan may be filed prior to exhausting the claims and claims review procedures described in Sections 13.2 and 13 3   Any such lawsuit must be initiated no later than (a) one year after the event(s) giving rise to the claim occurred, or (b) 60 days after a final written decision was provided to the claimant under Section 13 3, whichever is sooner  Any legal action involving benefits claimed or legal obligations relating to or arising under this Plan may be filed only in Federal District Court for the Eastern District of New York

Section 13 2   <u>Claims Procedure.</u>

Claims for benefits under the Plan shall be filed in writing, within 60 days after the event giving rise to a claim, with the Administrator, who shall have absolute discretion to determine whether benefits are payable under the Plan, interpret and apply the Plan, evaluate the facts and circumstances, and make a determination with respect to the claim in the name and on behalf of the Company  The claim shall include a statement of all relevant facts and copies of all documents, materials, or other evidence that the claimant believes relevant to the claim  The Company shall notify the claimant in writing of the disposition of a claim within 60 days after the claim is filed  The Administrator in his or her sole discretion, may extend this 60-day period an additional 60 days by providing written notice of the extension to the claimant before the original 60-day period expires  If the claim is denied, the specific reasons for the denial shall be set forth in writing, pertinent provisions of the Plan shall be cited, and, where appropriate, an explanation as to how the claimant may perfect the claim or submit the claim for further review will be provided

Section 13 3   <u>Claims Review Procedure.</u>

Any Participant, former Participant, or Beneficiary of either, who has been denied a benefit claim, shall be entitled upon written request to a review of the denied claim  The request, together with a written statement of the claimant's position, shall be filed no later than 60 days after receiving the written notice of denial provided for in Section 13 2 with the Company's Board of Directors, who shall promptly inform the Administrator   The Administrator shall notify the claimant of the Board's decision, in writing, within 60 days after receiving the request for review  The Board, in its discretion, may extend this 60-day period an additional 60 days by providing written notice of the extension to the claimant before the original 60-day period expires  The written decision shall state the facts and Plan provisions upon which the decision is based and shall be final and binding on all parties

IN WITNESS WHEREOF, the Company has caused this instrument to be executed on the date indicated above

21

SEP   8 2004

AMERICAN HOME MORTGAGE HOLDING,
INC

By. _____ 9/30/03

Leo Loucas

Its:   Vice President of Human Resources

22

SEP 8 2004

### FIRST AMENDMENT
### TO THE
### AMERICAN HOME MORTGAGE HOLDING, INC
### DEFERRED COMPENSATION PLAN

**THIS AMENDMENT** is made and entered into the 6 <sup>th</sup> day of _August_ , 2004, by American Home Mortgage Holding, Inc. (the "Employer"):

**WHEREAS**, the Employer heretofore adopted the American Home Mortgage Holding, Inc. Deferred Compensation Plan originally effective September 1, 2003; and

**WHEREAS**, the Employer desires to amend the Plan; and

**WHEREAS**, under the terms of the Plan, the Employer has the right to amend the Plan.

**NOW, THEREFORE**, the Employer hereby amends the Plan effective as of September 1, 2004, as follows:

### I.

Section 1.10 of the Plan is hereby amended by deleting the word "Excess" therefrom.

### II.

Section 1.15 of the Plan entitled "Excess Compensation" is hereby deleted in its entirety.

### III.

Section 2.1 of the Plan is hereby deleted in its entirety and the following language is hereby inserted in lieu thereof:

"2.1    Section 2.1    Requirements for Participation

Each Employee who earned Compensation from the Employer in an amount equal to or greater than $200,000 during the previous calendar year shall be eligible to participate in the Plan during any subsequent Plan Year, provided that such Employee is among a select group of management or highly compensated Employees. Notwithstanding the above, for the 2004 Plan Year compensation earned by an Employee from Washington Mutual during the 2003 calendar year shall be included when calculating an Employee's Compensation for purposes of this Section 2.1. "

### IV.

Section 3.1 of the Plan is hereby deleted in its entirety and the following language is inserted in lieu thereof:

"3.1    Section 3.1    Deferral of Compensation

SEP    8 2004

## **EXHIBIT B**

## **TRUST AGREEMENT**

## American Home Mortgage Holdings, Inc.
## Deferred Compensation Plan Trust Agreement

**TRUST UNDER:**
American Home Mortgage Holdings, Inc. Deferred Compensation Plan

**DEFERRED COMPENSATION PLAN**[1]

This Agreement made January 1, 2004 by and between American Home Mortgage Holdings, Inc. (the "Company") and Merrill Lynch Trust Company, FSB, (the "the Trustee");

WHEREAS, the Company has adopted the Non-Qualified Deferred Compensation Plan identified above.

WHEREAS, the Company has incurred or expects to incur liability under the terms of such Plan with respect to the individuals participating in such Plan.

WHEREAS, the Company wishes to establish a trust (the "Trust") and to contribute to the Trust assets that shall be held therein, subject to the claims of the Company's creditors in the event of the Company's Insolvency, as herein defined, until paid to Plan participants and their beneficiaries in such manner and at such times as specified in the Plan;

WHEREAS, it is the intention of the parties that this Trust shall constitute an unfunded arrangement and shall not affect the status of the Plan as an unfunded plan maintained for the purpose of providing deferred compensation for a select group of management or highly compensated employees for purpose of Title I of the Employee Retirement Income Security Act of 1974.

WHEREAS, it is the intention of the Company to make contributions to the Trust to provide itself with a source of funds to assist it in the meeting of its liabilities under the Plan;

NOW, THEREFORE, the parties do hereby establish the Trust and agree that the Trust shall be comprised, held and disposed of as follows:

Section 1. **Establishment Of Trust**

(a) **Deposit of Funds.** The Company hereby deposits with the Trustee in trust such cash and/or marketable securities, if any, which shall become the principal of the Trust to be held, administered and disposed of by the Trustee as provided in this Trust Agreement.

(b) **Irrevocability.** The Trust hereby established shall be irrevocable.

(c) **Grantor Trust.** The Trust is intended to be a grantor trust, of which the Company is the grantor, within the meaning of subpart E, Part I, subchapter J, chapter 1, subtitle A of the Internal Revenue Code of 1986, as amended, and shall be construed accordingly.

---

[1] This trust is intended to comply with the model grantor trust requirement of Revenue Procedure 92-64. While Merrill Lynch believes that this Trust Agreement complies with the Revenue Procedure it provides no assurance that modifications to the terms contained herein would not be required by the Internal Revenue Service during the review process in the event the Company were to apply for a ruling as to the tax consequences of its plan and this trust. If the Company desires to obtain such a ruling from the Internal Revenue Service, a copy of this Trust Agreement with all substituted or additional language underlined as required by the Revenue Procedure is available through your Merrill Lynch Financial Consultant.

(d) **Trust Assets.** The principal of the Trust, and any earnings thereon, shall be held separate and apart from other funds of the Company and shall be used exclusively for the uses and purposes of Plan participants and general creditors as herein set forth. Plan participants and their beneficiaries shall have no preferred claim on, or any beneficial ownership interest in, any assets of the Trust. Any rights created under the Plan and this Trust Agreement shall be mere unsecured contractual rights of Plan participants and their beneficiaries against the Company. Any assets held by the Trust will be subject to the claims of the Company's general creditors under federal and state law in the event of Insolvency, as defined in Section 3(a) herein.

(e) **Additional Deposits.** The Company, in its sole discretion, may at any time, or from time to time, make additional deposits of cash or other property in trust with the Trustee to augment the principal to be held, administered and disposed of by the Trustee as provided in this Trust Agreement. Neither the Trustee nor any Plan participant or beneficiary shall have any right to compel such additional deposits.

(f) **Acceptance of Additional Deposits.** The Trustee shall not be obligated to receive such cash and/or property unless prior thereto the Trustee has agreed that such cash and/or property is acceptable to the Trustee and the Trustee has received such reconciliation, allocation, investment or other information concerning, or representation with respect to, the cash and/or property as the Trustee may require. The Trustee shall have no duty or authority to (a) require any deposits to be made under the Plan or to the Trustee; (b) compute any amount to be deposited under the Plan to the Trustee; or (c) determine whether amounts received by the Trustee comply with the Plan. Assets of the Trust may, in the Trustee's discretion, be held in an account with an affiliate of the Trustee.

Section 2. **Payments To Plan Participants And Their Beneficiaries**

(a) **Payment of Benefits by Trustee.** With respect to each Plan participant, the Company shall deliver to the Trustee a schedule (the "Payment Schedule") that indicates the amounts payable in respect of the participant (and his or her beneficiaries), that provides a formula or other instructions acceptable to the Trustee for determining the amounts so payable, the form in which such amounts are to be paid (as provided for or available under the Plan), and the time of commencement for payment of such amounts. The Payment Schedule shall be delivered to the Trustee not more than thirty (30) business days nor fewer than fifteen (15) business days prior to the first date on which a payment is to be made to the Plan participant. Any change to a Payment Schedule shall be delivered to the Trustee not more than thirty (30) business days nor fewer than fifteen (15) business days prior to the date on which the first payment is to be made in accordance with the changed Payment Schedule. Except as otherwise provided herein, the Trustee shall make payments to Plan participants and their beneficiaries in accordance with such Payment Schedule. The Trustee shall make provisions for the reporting and withholding of any federal, state or local taxes that may be required to be withheld with respect to the payment of benefits pursuant to the terms of the Plan and shall pay amounts withheld to the appropriate taxing authorities or determine that such amounts have been reported, withheld and paid by the Company, it being understood between the parties hereto that (1) the Company shall on a timely basis provide the Trustee specific information as to the amount of taxes to be withheld and (2) the Company shall be obligated to receive such withheld taxes from the Trustee and properly pay and report such amounts to the appropriate taxing authorities.

(b) **Entitlement to Benefits.** The entitlement of a Plan participant or his or her beneficiaries to benefits under the Plan shall be determined by the Company or such party as it shall designate under the Plan, and any claim for such benefits shall be considered and reviewed under the procedures set out in the Plan.

2

(c) **Payment of Benefits by Company.** The Company may make a payment of benefits directly to Plan participants or their beneficiaries as they become due under the terms of the Plan. If the Company determines to make a payment of a deferred compensation benefit directly to a participant or beneficiary as the benefit becomes payable to the participant or such participant's beneficiary under the terms of the Plan, the Company shall notify the Trustee of the decision to make payment of the benefit directly to the participant or the participant's beneficiary prior to the time such benefit becomes payable. The Company shall provide written certification to the Trustee evidencing such payment, and may at that time or at a subsequent time request reimbursement from the Trustee of the amount of such payment. The Trustee, upon receipt of such written certification and such request, shall distribute such amount to the Company. In addition, if the principal of the Trust, and any earnings thereon, are not sufficient to make payments of benefits in accordance with the terms of the Plan, the Company shall make the balance of each payment as it falls due. The Trustee shall notify the Company where principal and earnings are not sufficient.

(d) **No Duty to Determine Sufficiency.** The Trustee shall have no responsibility to determine whether the Trust is sufficient to meet the liabilities under the Plan, and shall not be liable for payments or Plan liabilities in excess of the value of the assets held in the Trust.

**Section 3.** <u>Trustee Responsibility Regarding Payments To Trust Beneficiary When The Company Is Insolvent</u>

(a) **Insolvency.** The Trustee shall cease payment of benefits to Plan participants and their beneficiaries if the Company is Insolvent. The Company shall be considered "Insolvent" for purposes of this Trust Agreement if (i) the Company is unable to pay its debts as they become due, or (ii) the Company is subject to a pending proceeding as a debtor under the United States Bankruptcy Code.

(b) **Notice of Insolvency.** At all times during the continuance of this Trust, as provided in Section 1(d) hereof, the principal and income of the Trust shall be subject to claims of general creditors of the Company under federal and state law as set forth below.

(i) The Board of Directors and the Chief Executive Officer of the Company (or, if there is no Chief Executive Officer, the highest ranking officer) shall have the duty to inform the Trustee in writing of the Company's Insolvency. If a person claiming to be a creditor of the Company alleges in writing to the Trustee that the Company has become Insolvent, the Trustee shall determine whether the Company is Insolvent and, pending such determination, the Trustee shall discontinue payment of benefits to Plan participants or their beneficiaries.

(ii) Unless the Trustee has actual knowledge of the Company's Insolvency, or has received notice from the Company or a person claiming to be a creditor alleging that the Company is Insolvent, the Trustee shall have no duty to inquire whether the Company is Insolvent. The Trustee may in all events rely on such evidence concerning the Company's solvency as may be furnished to the Trustee and that provides the Trustee with a reasonable basis for making a determination concerning the solvency of the Company.

(iii) If at any time the Trustee has determined that the Company is Insolvent, the Trustee shall discontinue payments to Plan participants or their beneficiaries and shall hold the assets of the Trust for the benefit of the general creditors of the Company. Nothing in this Trust Agreement shall in any way diminish any rights of Plan participants or their beneficiaries to pursue their rights as general creditors of the Company with respect to benefits due under the Plan or otherwise.

3

(iv) The Trustee shall resume the payment of benefits to Plan participants or their beneficiaries in accordance with Section 2 of this Trust Agreement only after the Trustee has determined that the Company is not Insolvent (or is no longer Insolvent).

(c) **Amount of Payments after Insolvency.** Provided that there are sufficient assets, if the Trustee discontinues the payment of benefits from the Trust pursuant to Section 3(b) hereof and subsequently resumes such payments, the first payment following such discontinuance shall include the aggregate amount of all payments due to Plan participants or their beneficiaries under the terms of the Plan for the period of such discontinuance, less the aggregate amount of any payments made to Plan participants provided for hereunder during any such period of discontinuance; provided that the Company has given the Trustee the information with respect to such payments made during the period of discontinuance prior to resumption of payments by the Trustee.

## Section 4. Payments To The Company

Except as provided in subsection (c) of Section 2 and Section 3 of this Trust Agreement, because the Trust is irrevocable in accordance with subsection (b) of Section 1 of the Trust Agreement, the Company shall have no right or power to direct the Trustee to return to the Company or to divert to others any of the Trust assets before the payments of all benefits have been made to Plan participants or their beneficiaries pursuant to the terms of the Plan and this Trust Agreement.

## Section 5. Investment Authority

(a) **Investment of Principal and Interest.** Except as provided in subsection (d) of this Section 5, the Trustee shall invest and reinvest the principal and income of the Trust as directed by the Company (including directions provided to the Trustee with respect to participant-directed deemed investment elections made in accordance with the terms of the Plan), which directions may be changed from time to time, all in accordance with procedures established by the Trustee. The Trustee may limit the categories of assets in which the Trust may be invested.

(b) **Voting Rights.** The Trustee may invest in securities (including stock or rights to acquire stock) or obligations issued by the Company. All rights associated with assets of the Trust shall be exercised by the Trustee or the person designated by the Trustee, and shall in no event be exercised by or rest with Plan participants, except that voting rights with respect to Trust assets will be exercised by the Company, unless an investment manager has been appointed pursuant to subsection (d) of this Section 5 and voting authority has been delegated to such investment manager.

(c) **Substitution of Assets.** The Company shall have the right at any time, and from time to time in its sole discretion, to substitute assets of equal fair market value for any asset held by the Trust. This right is exercised by the Company in a nonfiduciary capacity without the approval or consent of any person in a fiduciary capacity.

(d) **Appointment of Investment Manager.** The Company may appoint one or more investment managers, including any entities affiliated with the Trustee, to direct the investment of any part or all of the assets of the Trust fund by the Trustee. An "investment manager" shall mean a person, persons, or entity who has the power to manage, acquire, or dispose of such portion of the assets contributed to the Trust as determined by the Company and who is otherwise described in this section of the Trust Agreement.

AUG 1 6

(i)    Appointment of an investment manager shall be made by written agreement between the Company and the investment manager and the investment manager shall act in accordance with the provisions of such investment management agreement. The Trustee shall receive a copy of each such agreement and all amendments, modifications, and terminations thereof and shall give written acknowledgment of receipt of same. Until receipt of a copy of each such amendment, modification, or termination, the Trustee shall be fully protected in assuming the continuing authority of such investment manager under the terms of the original agreement with the Company. The agreement between the Company and the investment manager shall specify those powers, rights, and duties of the Trustee under this Trust that are allocated to the investment manager and the portion of the assets of the Trust fund subject to the investment manager.

(ii)    The Trustee shall have custody of the assets comprising the portion of the Trust fund with respect to which the investment manager has investment authority.

(iii)    After such written agreement has been so executed between the Company and the investment manager, the Trustee shall have no obligation or responsibility for those investment duties and powers which are allocated to an investment manager. One of those powers is voting proxies; however, the investment manager will not have that power if the agreement described herein expressly precludes the investment manager from voting proxies (and the Trustee shall have the power subject to the powers retained by the Company).

(iv)    An "investment manager" so appointed pursuant to this section and for purposes of this Trust Agreement shall be:  (i) a registered investment adviser under the Investment Advisers Act of 1940; (ii) if not registered as an investment adviser under such Act because of paragraph (1) of section 203A(a) of such Act, is registered as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business and satisfied any applicable filing requirements; (iii) a bank, as defined in said Act; (iv) an insurance company qualified to manage, acquire and dispose of the assets of the Plan under the laws of more than one State of the United States; or (v) an independent third party that shall be an "authorized party" who shall be authorized as a broker/dealer and who shall be designated or appointed by the Company and that shall have the power and authority to supervise, manage and direct the investment of assets that comprise all or a portion of the Trust fund as herein provided. An "authorized party" shall mean a person, persons, or entity who shall be in the business of providing investment advisory services and have the experience, ability and capability of performing the services and assuming the related obligations and responsibilities described herein as investment manager. Any such investment manager shall acknowledge to the Company in writing that it accepts such appointment.

(v)    Any entity affiliated with the Trustee or the investment manager may act as broker or dealer to execute transactions, including the purchase of any securities directly distributed, underwritten, or issued by an entity affiliated with the Trustee or the investment manager, at standard commission rates, mark-ups or concessions, and to provide other management or investment services with respect to such Trust, including the custody of assets.

(vi)    Any direction provided to the Trustee by an investment manager shall be provided in writing, or by telephonic or electronic methods acceptable to the Trustee and confirmed in writing as soon as practicable. Alternatively, an investment manager may provide investment instructions directly to the broker or dealer and receipt by the Trustee of a confirmation of the transaction from the broker or dealer shall be conclusive evidence of such transactions. In either case, the Trustee shall have the authority within twenty-four (24) hours of receipt of such direction from the investment manager or confirmation of a transaction to instruct the investment manager to rescind the transaction if the Trustee determines that the investment is inconsistent with its operational or administrative requirements.

5

(vii) Notwithstanding any provision of this Trust Agreement to the contrary, the Trustee shall not be liable for any loss or diminution of any assets managed by an investment manager, including without limitation any loss or diminution caused by any action or inaction taken or omitted by it at the direction of an investment manager or for failing to invest or reinvest, review or monitor the investment of assets or otherwise deal with the investment of such assets subject to the investment responsibility of the investment manager. In addition, the Trustee shall not be liable for the diversification of any assets managed by an investment manager, which shall be solely the responsibility of the Company. An investment manager may resign at any time upon written notice to the Trustee and the Company. The Company may remove an investment manager at any time by written notice to the investment manager and the Trustee.

(viii) The Company may, prior to a change in control, by written notice to the Trustee assume investment responsibility for any portion or all of the Trust assets. The Trustee shall have no responsibility or liability for the investment of such assets for which the Company has assumed such investment responsibility except to act with respect to such assets as directed by the Company.

(ix) The Trustee may pay any such investment manager for any such services from the assets of the Trust without reduction for any fees or compensation paid to the Trustee for the services of the Trustee as trustee.

(x) In the event the Company is insolvent for purposes of Section 3 and the Company fails to provide effective investment instructions to the Trustee as provided in subsection (a) or subsection (d) of this Section 5, the Trustee may appoint one or more investment advisers who are registered as investment advisers under the Investment Advisers Act of 1940, who may be affiliates of the Trustee, to provide investment advice on a discretionary or non-discretionary basis with respect to all or a specified portion of the assets of the Trust.

(e) **Powers of Trustee.** Subject to subsections (a) and (d) of this Section 5, the Trustee, or the Trustee's designee, is authorized and empowered:

(i) To invest and reinvest Trust assets, together with the income therefrom, in common stock, preferred stock, convertible preferred stock, bonds, debentures, convertible debentures and bonds, mortgages, notes, commercial paper and other evidences of indebtedness (including those issued by the Trustee), shares of mutual funds (which funds may be sponsored, managed or offered by an affiliate of the Trustee), guaranteed investment contracts, bank investment contracts, other securities, policies of life insurance, annuity contracts, options, options to buy or sell securities or other assets, and all other property of any type (personal, real or mixed, and tangible or intangible);

(ii) To deposit or invest all or any part of the assets of the Trust in savings accounts or certificates of deposit or other deposits in a bank or savings and loan association or other depository institution, including the Trustee or any of its affiliates, provided with respect to such deposits with the Trustee or an affiliate the deposits bear a reasonable interest rate;

(iii) To hold, manage, improve, repair and control all property, real or personal, forming part of the Trust; to sell, convey, transfer, exchange, partition, lease for any term, even extending beyond the duration of this Trust, and otherwise dispose of the same from time to time;

(iv) To hold in cash, without liability for interest, such portion of the Trust as is pending investments, or payment of expenses, or the distribution of benefits;

6

(v)  To take such actions as may be necessary or desirable to protect the Trust from loss due to the default on mortgages held in the Trust including the appointment of agents or trustees in such other jurisdictions as may seem desirable, to transfer property to such agents or trustees, to grant to such agents such powers as are necessary or desirable to protect the Trust, to direct such agent or trustee, or to delegate such power to direct, and to remove such agent or trustee;

(vi)  To settle, compromise or abandon all claims and demands in favor of or against the Trust;

(vii)  To exercise all of the further rights, powers, options and privileges granted, provided for, or vested in trustees generally under the laws of the state in which the Trustee has its principal place of business so that the powers conferred upon the Trustee herein shall not be in limitation of any authority conferred by law, but shall be in addition thereto;

(viii)  To borrow money from any source and to execute promissory notes, mortgages or other obligations and to pledge or mortgage any trust assets as security; and

(ix)  To maintain accounts at, execute transactions through, and lend on an adequately secured basis stocks, bonds or other securities to, any brokerage or other firm, including any firm which is an affiliate of the Trustee.

## Section 6. Additional Powers Of The Trustee

To the extent necessary or which it deems appropriate to implement its powers under Section 5 or otherwise to fulfill any of its duties and responsibilities as the Trustee of the Trust, the Trustee shall have the following additional powers and authority:

(a)  To register securities, or any other property, in its name or in the name of any nominee, including the name of any affiliate or the nominee name designated by any affiliate, with or without indication of the capacity in which property shall be held, or to hold securities in bearer form and to deposit any securities or other property in a depository or clearing corporation;

(b)  To designate and engage the services of, and to delegate powers and responsibilities to, such agents, representatives, advisers, counsel and accountants as the Trustee considers necessary or appropriate, any of whom may be an affiliate of the Trustee or a person who renders services to such an affiliate, and, as part of its expenses under this Trust Agreement, to pay their reasonable expenses and compensation;

(c)  To make, execute and deliver, as the Trustee, any and all deeds, leases, mortgages, conveyances, waivers, releases or other instruments in writing necessary or appropriate for the accomplishment of any of the powers listed in this Trust Agreement; and

(d)  Generally to do all other acts which the Trustee deems necessary or appropriate for the protection of the Trust.

## Section 7. Disposition Of Income

During the term of this Trust Agreement, all income received by the Trust, net of expenses and taxes, shall be accumulated and reinvested pursuant to the provisions of Section 5.

### Section 8.  Accounting By The Trustee

The Trustee shall keep accurate and detailed records of all investments, receipts, disbursements, and all other transactions required to be made, including such specific records as shall be agreed upon in writing between the Company and the Trustee.  Within ninety (90) calendar days following the close of each calendar year and within ninety (90) calendar days after removal or resignation of the Trustee, the Trustee shall deliver to the Company a written account of its administration of the Trust during such year or during the period from the close of the last preceding year to the date of such removal or resignation, setting forth all investments, receipts, disbursements and other transactions effected by it, including a description of all securities and investments purchased and sold with the cost or net proceeds of such purchases or sales (accrued interest paid or receivable being shown separately), and showing all cash, securities and other property held in the Trust at the end of such year or as of the date of such removal or resignation, as the case may be. The Trustee may satisfy its obligation under this Section 8 by rendering to the Company monthly statements setting forth the information required by this section separately for the month covered by the statement.

### Section 9.  Responsibility And Indemnity Of The Trustee

(a)  **Fiduciary Standard.**  The Trustee shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, provided, however, that the Trustee shall incur no liability to any person for any action taken pursuant to a direction, request or approval given by the Company which is contemplated by, and in conformity with, the terms of the Plan and this Trust and is given in writing by the Company or in such other manner prescribed by the Trustee. The Trustee shall also incur no liability to any person for any failure to act in the absence of direction, request or approval from the Company which is contemplated by, and in conformity with, the terms of this Trust.  In the event of a dispute between the Company and a party, the Trustee may apply to a court of competent jurisdiction to resolve the dispute.

(b)  **Indemnification of Trustee.**  The Company hereby indemnifies the Trustee and each of its affiliates (collectively, the "Indemnified Parties") against, and shall hold them harmless from, any and all loss, claims, liability, and expense, including reasonable attorneys' fees, imposed upon or incurred by any Indemnified Party as a result of any acts taken in accordance with the directions from the Company or any designee of the Company, or by reason of the Indemnified Party's good faith execution of its duties with respect to the Trust, including, but not limited to, its holding of assets of the Trust.  The Company's obligations in the foregoing regard shall be satisfied promptly by the Company, provided that in the event the loss, claim, liability or expense involved is determined by a no longer appealable final judgment entered in a lawsuit or proceeding to have resulted from the gross negligence or willful misconduct of the Trustee, the Trustee shall promptly on request thereafter return to the Company any amount previously received by the Trustee under this section with respect to such loss, claim, liability or expense.  If the Company does not pay such costs, expenses and liabilities in a reasonably timely manner, the Trustee may obtain payment from the Trust without direction from the Company.

(c)  **Legal Counsel.**  The Trustee may consult with legal counsel (who may also be counsel for the Company generally) with respect to any of its duties or obligations hereunder.

(d)  **Other Advisers.**  The Trustee may hire agents, accountants, actuaries, investment advisers, financial consultants or other professionals to assist it in performing any of its duties or obligations hereunder.

(e) **Authority of Trustee.** The Trustee shall have, without exclusion, all powers conferred on the Trustee by applicable law, unless expressly provided otherwise herein, provided, however, that if an insurance policy is held as an asset of the Trust, the Trustee shall have no power to name a beneficiary of the policy other than the Trust, to assign the policy (as distinct from conversion of the policy to a different form) other than to a successor Trustee, or to loan to any person the proceeds of any borrowing against such policy.

(f) **Loan Against Insurance Policy.** However, notwithstanding the provisions of Section 9(e) above, the Trustee may loan to the Company the proceeds of any borrowing against an insurance policy held as an asset of the Trust.

(g) **Limitation on Trustee.** Notwithstanding any powers granted to the Trustee pursuant to this Trust Agreement or to applicable law, the Trustee shall not have any power that could give this Trust the objective of carrying on a business and dividing the gains therefrom, within the meaning of Section 301.7701-2 of the Procedure and Administrative Regulations promulgated pursuant to the Internal Revenue Code.

## Section 10. Compensation And Expenses Of The Trustee

The Trustee is authorized, unless otherwise agreed by the Trustee, to withdraw from the Trust without direction from the Company the amount of its fees in accordance with the fee schedule agreed to by the Company and the Trustee. The Company shall pay all administrative expenses, but if not so paid, the expenses shall be paid from the Trust.

## Section 11. Resignation And Removal Of The Trustee

(a) **Resignation, or Removal.** The Trustee may resign at any time by written notice to the Company which shall be effective thirty (30) calendar days after receipt of such notice unless the Company and the Trustee agree otherwise. Prior to a change in control, the Trustee may be removed by the Company on thirty (30) calendar days notice or upon shorter notice accepted by the Trustee. After a change in control, the Trustee may only be removed by a vote of seventy-five percent (75%) of all of the participants in the Plan, whether employed by the Company, and if a participant is dead, his or her beneficiary (who collectively shall have one vote among them and shall vote in place of such deceased participant) on thirty (30) calendar days notice or upon shorter notice accepted by the Trustee.

(b) **Successor Trustee.** In the event of the resignation or removal of a Trustee, a successor trustee shall be appointed by the effective date of such resignation or removal. The Company shall give notice of any such appointment to the retiring Trustee and the successor trustee. A successor trustee shall be appointed in accordance with the following provisions:

(i) At any time prior to a change in control, a successor trustee shall be appointed by the Company pursuant to Section 12 of this Trust Agreement. If the Trustee should resign or be removed, and the Company does not notify the Trustee of the appointment of a successor trustee within forty-five (45) calendar days of the notice of the resignation or removal of the Trustee, then the Company shall be deemed to have appointed the Chief Executive Officer and Chief Financial Officer of the Company as successor trustees.

(ii) After the occurrence of a change in control, the Trustee who is the trustee on the date of the change in control may not be removed by the Company for three (3) years from the date of the change in control. If the Trustee determines to resign within three (3) years from the date of a change in control, the Trustee shall, prior to the effective date of such resignation, apply to a court of competent jurisdiction for the appointment of a successor trustee or for instructions. All expenses of the Trustee in connection with the proceeding shall be allowed as administrative expenses of the Trust.

(iii) Notwithstanding any provision in subsection (a) of this Section 11, no resignation by or removal of the Trustee shall be effective prior to the effective date of the appointment of a successor trustee by the Company or a court of competent jurisdiction.

(c) **Transfer of Assets to Successor.** Subject to the provisions of this Section 11, upon the resignation or removal of the Trustee, assets held in the Trust shall be transferred to the successor trustee as provided in this subsection.

(i) Upon resignation or removal of the Trustee and appointment of a successor trustee, all assets shall be transferred to the successor trustee. The transfer shall be completed within sixty (60) calendar days after receipt of notice of resignation, removal or transfer, unless the Company extends such period of time, provided that the Trustee is provided assurance by the Company satisfactory to the Trustee that all fees and expenses reasonably anticipated and incurred will be paid.

(ii) In the event of the resignation or removal of a trustee, the retiring trustee shall within sixty (60) calendar days after the effective date of resignation or removal furnish to the successor trustee and the Company a final accounting of its administration of the Trust. A successor trustee shall succeed to the right and title of the predecessor trustee in the assets of the Trust fund and the retiring trustee shall deliver the property comprising the assets of the Trust fund (less any unpaid fees and expenses of the retiring trustee) to the successor trustee, together with any instruments of transfer, conveyance, assignment and further assurance as the successor trustee may reasonably require.

(iii) Upon settlement of the account and transfer of the assets of the Trust to the successor trustee, all rights and privileges under the Trust Agreement shall vest in the successor trustee and all responsibility and liability of the Trustee with respect to the Trust and assets thereof shall terminate subject only to the requirement that the Trustee execute all necessary instruments or documents to transfer the assets of the Trust to the successor trustee.

Section 12. <u>Appointment Of Successor</u>

(a) **Company Appointment of Successor.** If the Trustee resigns or is removed in accordance with Section 11(a) or Section 11(b), the Company may appoint any third party, such as a bank trust department or other party that may be granted corporate trustee powers under state law, as a successor to replace the Trustee upon resignation or removal. The appointment shall be effective when accepted in writing by the new trustee, who shall have all of the rights and powers of the former trustee, including ownership rights in the Trust assets. The former trustee shall execute any instrument or document necessary or reasonably requested by the Company or the successor trustee to evidence the transfer.

10

(b) **Court Appointment of Successor.** If the Trustee resigns or is removed, a successor shall be appointed, in accordance with Section 12(a) hereof, by the effective date of resignation or removal under Section 11(a) or Section 11(b). If no such appointment has been made, the Trustee may apply to a court of competent jurisdiction for appointment of a successor or for instructions. All expenses of the Trustee in connection with the proceeding shall be allowed as administrative expenses of the Trust.

(c) **Duty of Successor Trustee.** The successor trustee need not examine the records and acts of any prior trustee and may retain or dispose of existing Trust assets, subject to Sections 8 and 9. The successor trustee shall not be responsible for and the Company shall indemnify and defend the successor trustee from any claim or liability resulting from any action or inaction of any prior trustee or from any other past event, or any condition existing at the time it becomes successor trustee.

Section 13. <u>Amendment Or Termination</u>

(a) **Amendment of the Trust Agreement.** Subject to the limitations set forth in this provision, the Trust Agreement may be amended by a written instrument executed by the Trustee and the Company. Notwithstanding the foregoing, no such amendment shall conflict with the terms of the Plan or shall make the Trust revocable after it has become irrevocable in accordance with the provisions of this Trust Agreement.

(i) Any amendment to this Trust Agreement shall be set forth in writing and signed by the Company and the Trustee. Any amendment may be current, retroactive or prospective, in each case as provided therein, provided, however, that no such amendment shall conflict with the terms of the Plan or shall cause the Trust to be revocable.

(ii) In connection with the exercise of the rights under this part (ii) of this subsection (a):

(A) prior to a change in control, the Trustee shall have no responsibility to determine whether any proposed amendment complies with the terms and conditions of the Plan and may reasonably rely on the directions of the Company with respect thereto, unless the Trustee has actual knowledge of a proposed transaction or transactions that would result in a change in control; and

(B) after a change in control, the power of the Company to amend this Trust Agreement shall cease, and the power to amend that was previously held by the Company shall, instead, be exercised by a vote of seventy-five percent (75%) of the participants in the Plan and, if a participant is dead, his or her beneficiaries (who collectively shall have one vote among them and shall vote in place of such deceased participant), with the consent of the Trustee.

(b) **Termination by Company.** The Trust shall not terminate until the date on which Plan participants and their beneficiaries are no longer entitled to benefits pursuant to the terms of the Plan. Upon termination of the Trust any assets remaining in the Trust shall be returned to the Company.

(c) **Termination with Participant Approval.** Upon written approval of participants or beneficiaries entitled to payment of benefits pursuant to the terms of the Plan, the Company may terminate this Trust prior to the time all benefit payments under the Plan have been made. All assets in the Trust at termination shall be returned to the Company.

11

**Section 14.** <u>Miscellaneous</u>

(a) **Severability.** Any provision of this Trust Agreement prohibited by law shall be ineffective to the extent of any such prohibition, without invalidating the remaining provisions hereof.

(b) **No Assignment of Benefits.** Benefits payable to Plan participants and their beneficiaries under this Trust Agreement may not be anticipated, assigned (either at law or in equity), alienated, pledged, encumbered or subjected to attachment, garnishment, levy, execution or other legal or equitable process.

(c) **Governing Law.** This Trust Agreement and its enforcement shall be governed by and construed in accordance with the laws of the state in which the Trustee has its principal place of business.

(d) **Survival.** The provisions of Sections 2(d), 3(b)(iii), 9(b) and 15 of this Agreement shall survive termination of this Agreement.

(e) **Conflict with Plan Document.** The rights, duties, responsibilities, obligations and liabilities of the Trustee are as set forth in this Trust Agreement, and no provision of the Plan or any other documents shall affect such rights, responsibilities, obligations and liabilities. If there is a conflict between provisions of the Plan and this Trust Agreement with respect to any subject involving the Trustee, including but not limited to the responsibility, authority or powers of the Trustee, the provisions of this Trust Agreement shall be controlling.

**Section 15.** <u>Arbitration</u>

(a) **Binding Effect.** Arbitration is final and binding on the parties.

(b) **Waiver of Other Remedies.** The parties waive their right to seek remedies in court, including the right to jury trial.

(c) **Discovery.** Pre-arbitration discovery is generally more limited than and different from court proceedings.

(d) **Award.** The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or seek modification of rulings by the arbitrators is strictly limited.

(e) **Arbitrators.** The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

12

AUG 1 6 2014

(f)  The Company agrees that all controversies which may arise between the Company and either or both the Trustee and its affiliate Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S") in connection with the Trust, including, but not limited to, those involving any transactions, or the construction, performance, or breach of this or any other agreement between the Company and either or both the Trustee and MLPF&S, whether entered into prior, on, or subsequent to the date hereof, shall be determined by arbitration. Any arbitration under this Agreement shall be conducted only before the New York Stock Exchange, Inc., the American Stock Exchange, Inc., or arbitration facility provided by any other exchange of which MLPF&S is a member, the National Association of Securities Dealers, Inc., or the Municipal Securities Rulemaking Board, and in accordance with its arbitration rules then in force. The Company may elect in the first instance whether arbitration shall be conducted before the New York Stock Exchange, Inc., the American Stock Exchange, Inc., other exchange of which MLPF&S is a member, the National Association of Securities Dealers, Inc., or the Municipal Securities Rulemaking Board, but if the Company fails to make such election, by registered letter or telegram addressed to Merrill Lynch Trust Company, FSB, Employee Benefit Trust Operations, P.O. Box 30532, New Brunswick, New Jersey 08989-0532, before the expiration of five days after receipt of a written request from MLPF&S and/or the Trustee to make such election then MLPF&S and/or the Trustee may make such election. Judgment upon the award of arbitrators may be entered in any court, state or federal, having jurisdiction. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; who is a member of putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until:

(i)  the class certification is denied;

(ii)  the class is decertified; or

(iii)  the customer is excluded from the class by the court.  Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

13

**Section 16.  Effective Date**

The effective date of this Trust Agreement shall be ~~January 1~~, 2004.  *September 7*

IN WITNESS WHEREOF, the Company and the Trustee have executed this Trust Agreement each by action of a duly authorized person.

By signing this Agreement, the undersigned Company acknowledges (1) that, in accordance with Section 15 of this Agreement, the Company is agreeing in advance to arbitrate any controversies which may arise with either or both the Trustee or MLPF&S and (2) receipt of a copy of this Agreement.

**Merrill Lynch Trust Company, FSB**

By: *Melanie Madeira*

Name/Title: *MELANIE MADEIRA*

Date: *September 7, 2004*

**American Home Mortgage Holdings, Inc.**

By: *Stephen A. Hozie*

Name/Title: *Stephen A. Hozie   EVP + CFO*

Date: *8/6/04*

*Add second signature if required:*

By: _____

Name/Title: _____

Date: _____

14

3 2004

American Home Mortgage Holdings, Inc. Copy

Section 16.  **Effective Date**

   The effective date of this Trust Agreement shall be ~~January 1,~~ *September 7,* 2004.

   IN WITNESS WHEREOF, the Company and the Trustee have executed this Trust Agreement each by action of a duly authorized person.

   By signing this Agreement, the undersigned Company acknowledges (1) that, in accordance with Section 15 of this Agreement, the Company is agreeing in advance to arbitrate any controversies which may arise with either or both the Trustee or MLPF&S and (2) receipt of a copy of this Agreement.

**Merrill Lynch Trust Company, FSB**

By: *Melanie Madeira*

Name/Title: *MELANIE MADEIRA*

Date: *September 7, 2004*

**American Home Mortgage Holdings, Inc.**

By: *Stephen A. Hozie*

Name/Title: *Stephen A. Hozie  EVP + CFO*

Date:_____

*Add second signature if required:*

By:_____

Name/Title:_____

Date:_____

15

**Merrill Lynch Trust Company Copy**

**Section 16.  Effective Date**

The effective date of this Trust Agreement shall be ~~January 1~~ _September 7,_ 2004.

IN WITNESS WHEREOF, the Company and the Trustee have executed this Trust Agreement each by action of a duly authorized person.

By signing this Agreement, the undersigned Company acknowledges (1) that, in accordance with Section 15 of this Agreement, the Company is agreeing in advance to arbitrate any controversies which may arise with either or both the Trustee or MLPF&S and (2) receipt of a copy of this Agreement.

**Merrill Lynch Trust Company, FSB**

By: _Melanie Madding_

Name/Title: _MELANIE MADDING, AVP_

Date: _September 7, 2004_

**American Home Mortgage Holdings, Inc.**

By: _Stephen A. Hozie_

Name/Title: _Stephen A. Hozie  EVP+CFO_

Date: _8/6/2004_

*Add second signature if required:*

By:_____

Name/Title:_____

Date:_____

16

1 6 2004