**EXHIBIT B**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

DANA MARLIN, on behalf of himself and all others
similarly situated,

                              Plaintiff,

                v.

CITIGROUP GLOBAL MARKETS INC., DELOITTE
& TOUCHE LLP, ROBERT BERNSTEIN, STEPHEN
A. HOZIE, JOHN A. JOHNSTON, NICHOLAS R.
MARFINO, MICHAEL A. McMANUS JR., C.
CATHLEEN RAFFAELI, KENNETH P. SLOSSER,
MICHAEL STRAUSS, KRISTIAN SALOVAARA and
IRVING J. THAU,

                          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO. **07 3580**

**PLATT, J.**

"ECF **BOYLE, M.**

CLAS.

**FILED**

**JURY TRIAL DEMANDED**

U.S. DISTRICT COURT E.D.N.Y.

★ AUG 27 2007 ★

BROOKLYN OFFICE

1.     Plaintiff, on behalf of himself and all other persons similarly situated, brings this law suit upon personal knowledge and information and belief obtained through an investigation by his attorneys of the Defendants and American Home Mortgage Investment Corporation's ("AHM") filings with the Securities and Exchange Commission ("SEC"), certain analysts reports and advisories regarding AHM, press releases, and news reports about AHM. Plaintiff believes that additional discovery of these matters will reveal further evidentiary support for these allegations.

**NATURE OF ACTION**

2.     Plaintiff brings this class action on behalf of himself and all other persons who purchased shares of AHM common stock issued pursuant to the Registration Statement, Prospectus, and Prospectus Supplement dated April 30, 2007 (defined below), and all purchasers of AHM common stock who can trace their purchases to the April 30, 2007, secondary offering from AHM.

1

3.     The Offering Materials contained a number of untrue statements of material fact and misleading omissions. As result, Plaintiff and other class members purchased AHM common stock at an inflated price and suffered damages when the price plummeted in July and early August 2007. The Offering Materials consisted of: (a) the Registration Statement dated December 15, 2004, and made effective as of April 30, 2007, by the Prospectus Supplement; (b) the Prospectus dated January 6, 2005, offering $761,875,000 of securities for sale, and made effective as of April 30, 2007, by the Prospectus Supplement; (c) the Prospectus Supplement dated April 30, 2007 (the "Prospectus Supplement") issued in connection with the offering of four million (4,000,000) shares of AHM common stock; and (d) all documents incorporated by reference into each and every document listed in (a)-(c)of this paragraph (collectively referred to as the "Offering Materials").

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action under Section 22 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77v. The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.

5.     Venue is proper in this district pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b) and (c) because many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information to the investing public, occurred in this district.

6.     In connection with the acts, transactions, and conduct alleged herein, Defendants used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

## PARTIES

7.      Plaintiff, Dana Marlin, is a resident and citizen of California. He purchased 17,300 shares of AHM common stock in the April 30, 2007, secondary offering at a price of $23.80 per share.  Plaintiff purchased these shares directly from Defendant Citigroup, the underwriter, in the public offering and are traceable to a registered offering, pursuant to the Registration Statement, Prospectus, and Prospectus Supplement.

8.      AHM is a Maryland corporation operating as a real estate investment trust (REIT). AHM has its principal executive office in Melville, New York.  AHM filed for Chapter 11 bankruptcy protection on August 6, 2007.   AHM is not a defendant in this action.

9.      Defendant Citigroup Global Markets Inc. ("Citigroup") was the sole underwriter of the approximately four million (4,000,000) shares of AHM stock sold pursuant to the Offering Materials.

10.      Defendant Deloitte & Touche LLP is named in the Offering Materials as having prepared and certified certain reports and valuations used in connection with the Offering Materials, including the consolidated financial statements for 2004, 2005, and 2006, and AHM management's report on the effectiveness of internal control over financial reporting as of December 31, 2006.

11.      Defendant Robert Bernstein signed the Registration Statement in his capacity as Controller of AHM.

12.      Defendant Stephen A. Hozie signed the Registration Statement in his capacity as Chief Financial Officer of AHM.  Defendant Stephen A. Hozie also signed the AHM 2006 10-K filed March 1, 2007, which was incorporated by reference into the Prospectus Supplement.

3

Case 2:07-cv-03580-CPS Document Filed 08/27/2009 Page 4 of 33

13.     Defendant John A. Johnston signed the Registration Statement in his capacity as a member of AHM's Board of Directors (the "Board"), a position he has held since March 2000. Defendant John A. Johnston also signed the AHM 2006 10-K filed March 1, 2007, which was incorporated by reference into the Prospectus Supplement.

14.     Defendant Nicholas R. Marfino signed the Registration Statement in his capacity as a member of the Board, a position he has held since July 2001. Defendant Nicholas R. Marfino also signed the AHM 2006 10-K filed March 1, 2007, which was incorporated by reference into the Prospectus Supplement.

15.     Defendant Michael A. McManus, Jr. signed the Registration Statement in his capacity as a member of the Board, a position he has held since December 2001. Defendant Michael A. McManus, Jr. also signed the AHM 2006 10-K filed March 1, 2007, which was incorporated by reference into the Prospectus Supplement.

16.     Defendant C. Cathleen Raffaeli signed the Registration Statement in her capacity as a member of the Board, a position she has held since October 1999. Defendant C. Cathleen Raffaeli also signed the AHM 2006 10-K filed March 1, 2007, which was incorporated by reference into the Prospectus Supplement.

17.     Defendant Kenneth P. Slosser signed the Registration Statement in his capacity as a member of the Board.

18.     Defendant Michael Strauss signed the Registration Statement in his capacity as acting Chairman of the Board, Chief Executive Officer, and President of AHM , a position he has held since 1999. Defendant Michael Strauss also signed the AHM 2006 10-K filed March 1, 2007, which was incorporated by reference into the Prospectus Supplement.

4

19.     Defendant Kristian Salovarra authorized the filing of the Prospect Supplement in his capacity as a member of the Board.

20.     Defendant Irving J. Thau signed the Registration Statement in his capacity as a member of the Board, a position he has held since April 2004. Defendant Irving J. Thau also signed the AHM 2006 10-K filed March 1, 2007, which was incorporated by reference into the Prospectus Supplement.

21.     The Defendants listed in paragraphs 11 through 20 are collectively referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased AHM common stock sold pursuant to the Offering Materials. Excluded from the Class are (a) the Defendants, (b) members of the Individual Defendants' immediate families, (c) any entity in which any Defendant has a controlling interest or is a part or subsidiary of, or is controlled by, and (d) any affiliates, legal representatives, heirs, predecessors, successors, and assigns of any of the Defendants.

23.     The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. Although the exact number of Class members can be ascertained only through discovery, it is believed that thousands of different investors purchased the 4,000,000 shares of AHM stock sold pursuant to the Offering Materials.

5

24.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class, including the following:

      a.     Whether Defendants violated Sections 11, 12(a)(2), and 15 of the Securities Act as alleged herein;

      b.     Whether the Offering Materials contained untrue or misleading statements of material fact;

      c.     Whether the Offering Materials omitted facts necessary to make the statements made (in the circumstances in which they were made) not misleading; and

      d.     Whether the members of the Class sustained damages and, if so, the proper measure of those damages.

25.     Plaintiff's claims are typical of the claims of the other Class members. They are based on the same legal theories, and Plaintiff and the Class members sustained damages arising out of the same wrongful conduct.

26.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation. Plaintiff has no interests antagonistic to those of the Class.

27.     A class action is superior to other methods for the fair and efficient adjudication of this controversy. Joinder of all members of the Class is impracticable, and because the damages suffered by most individual Class members will be relatively small, the expense and burden of individual litigation outweighs the benefits. Plaintiff anticipates no difficulty in managing this case as a class action.

## SUBSTANTIVE ALLEGATIONS

28.     On April 30, 2007, AHM filed the Prospectus Supplement announcing its intent to

sell 4,000,000 shares of common stock as part of the secondary offering of securities on a delayed

basis authorized by the December 15, 2004, Registration Statement.

29.     The Prospectus Supplement also explained that AHM granted the underwriter,

Citigroup, "an option to purchase up to 600,000 additional shares . . . to cover over-allotments, if

any."  Citigroup purchased the shares at $23.10 per share.

30.     The stock offering was completed May 4, 2007, with all 4,000,000 shares sold to the

investing public at $23.80 per share.

31.     The Offering Materials touted AHM as in the business of investing in mortgage-

backed securities and mortgage loans resulting from the securitization of residential mortgage loans

that their subsidiaries originate and service.  However, unlike the explicit sub-prime mortgage

companies that had recently depreciated, Defendants touted AHM's portfolio as consisting of the

highest quality "prime" and alternate "A" quality mortgage loans, made to "high-quality borrowers"

that were adequately secured by one- to four-family dwellings in the Offering Materials.

32.     Thus, under the heading Our Company, the Prospectus Supplement stated:

> " Most of our portfolio consists of securitized adjustable-rate
> mortgage loans, or ARM loans, that are of prime and alternate "A"
> quality."

Prospectus Supplement at S-1.

33.     Under the heading Mortgage Holdings Segment, the Prospectus

Supplement stated:

> "Additional risk mitigation strategies that we employ include using

7

cash flow matching to limit our exposure to changes in the slope of
the yield curve, and limiting the extension and repayment risk of
our holdings by investing primarily in ARM and hybrid-ARM
securitized loans."

"The size of our leveraged portfolio of mortgage loans held for
investment and mortgage-backed securities was approximately
$15.6 billion as of December 31, 2006. Of our securities, 93.9%
were either agency obligations or rated AAA by Standard &
Poor's, while 3.8% were rated AA to BBB, and 2.3% were rated
BB and below, or were unrated. On December 31, 2006, 4.6% of
our loans were securitized loans with interest rates initially set for
five years, while 0.3% had interest rates initially set for three years,
and 46.6% had interest rates initially set for less than three years.
Finally, on December 31, 2006, the difference between the
duration of our portfolio of securitized mortgage loans and the
duration of their liabilities and associated hedges was 0.07 years."

Prospectus Supplement at S-2

34.   Under the heading Loan Origination Business, the Prospectus Supplement

stated:

"Our origination business seeks to utilize a combination of skilled
loan officers, advanced technology, a broad product line and a high
level of customer service to successfully compete in the
marketplace. We offer a broad array of mortgage products and
primarily make loans to borrowers with good credit profiles. The
weighted-average FICO score for our $58.9 billion of total
originations in 2006 was 716. A FICO score condenses a
borrower's credit history into a single number, generally ranging
from 340 to 820. Borrowers with a FICO score of over 700 are
typically considered high-quality borrowers. All of the loans we
made in 2006 were secured by one- to four-family dwellings."

Prospectus Supplement at S-2.

35.   Under the heading Our Company, the Prospectus Supplement stated:

"Generally, loans we originate are high-credit-quality, prime loans
that are either eligible for sale to Fannie Mae or Freddie Mac, or
are jumbo loans for borrowers with high FICO credit scores,

8

typically 680 or above."

Prospectus Supplement at 1.

36.    Under the heading Item 1. Business, the 2006 10-K, which was incorporated

by reference into the Prospectus Supplement, stated:

> "Most of our portfolio consists of securitized adjustable-rate
> mortgage loans, or ARM loans, that are of prime and alternate "A"
> quality."

> "As of December 31, 2006, we held a leveraged portfolio of
> mortgage loans held for investment and mortgage-backed securities
> in the amount of approximately $15.6 billion in order to generate
> net interest income and serviced approximately 197,000 loans with
> an aggregate principal amount of approximately $46.3 billion."

2006 10-K at 2.

37.    Under the heading Loan Origination Segment, the 2006 10-K, which was

incorporated by reference into the Prospectus Supplement, stated:

> "We offer a broad array of mortgage products and primarily make
> loans to borrowers with good credit profiles. The weighted-average
> FICO score for our $58.9 billion of total originations in 2006 was
> 716. All of the loans we made in 2006 were secured by one- to
> four-family dwellings."

> "Our loan origination business has rapidly grown its market share
> and scale since we became a public company in 1999. The
> aggregate principal amount of our total loan originations was
> approximately $58.9 billion in 2006, compared to $45.3 billion in
> 2005, $23.1 billion in 2004, $21.7 billion in 2003 and $12.2 billion
> in 2002. Based on Freddie Mac's Office of the Chief Economist
> Economic and Housing Market Outlook estimates of total industry
> originations, our national market share was 0.56% in 2003, 0.79%
> in 2004, 1.39% in 2005 and 2.22% in 2006. We believe our growth
> has made our mortgage banking operation more profitable and
> more effective at serving our customers. Specifically, growth in
> originations has lowered the per-loan cost of our centralized
> support operations and, consequently, our overall per-loan cost of

9

> origination. Our growth has also given us a relatively large
> presence in the secondary mortgage market, and, as a result, has
> improved our ability to execute loan sales to third-party purchasers.
> In addition, our size has enabled us to negotiate better terms with
> warehouse lenders and credit enhancers such as Fannie Mae and
> Freddie Mac. Finally, our size has made it possible for us to
> profitably enter businesses ancillary to mortgage lending, such as
> mortgage reinsurance, title brokerage and vendor management."

2006 10-K at 5.

38.     Under the heading Mortgage Products, the 2006 10-K, which was

incorporated by reference into the Prospectus Supplement, stated:

> "We offer a broad and competitive range of mortgage products that
> aim to meet the mortgage needs of primarily high-credit-quality
> borrowers. Our product line includes ARM loans, conventional
> conforming fixed-rate loans, alternate "A" loans, jumbo fixed rate
> loans, home equity or second mortgage loans, government fixed
> rate loans, non-prime loans and construction loans."

2006 10-K at 5.

39.     Under the heading Quality Control, the 2006 10-K, which was incorporated

by reference into the Prospectus Supplement, stated:

> "We perform monthly quality control testing on a statistical sample
> of the loans we originate. The quality control testing includes
> checks on the accuracy of the borrower's income and assets and the
> credit report used to make the loan, reviews whether the loan
> buyer's underwriting standards were properly applied and
> examines whether the loan complies with government regulations.
> Quality control findings are summarized in monthly reports that we
> use to identify areas that need corrective action or could use
> improvement. To date, those reports have not identified any
> material quality control concerns, although there can be no
> assurances that we will not experience material quality control
> concerns in the future."

2006 10-K at 7.

40.    Under the heading Comparison of the Three Months Ended March 31, 2007

and December 31, 2006, the April 30, 2007 8-K/A stated:

"Michael Strauss, American Home's Chief Executive Officer
commented, "As has been well publicized, the first quarter was a
difficult period for mortgage lenders. Our company also found the
first quarter to be challenging. During the quarter, a severe
disruption in the secondary mortgage market caused the prices we
received for our loan production to be far less than in previous
quarters. Specifically, our company's gain on sale margin
excluding delinquency related charges was 1.09% during the first
quarter compared to 1.52% during the fourth quarter of 2006. Also,
during the first quarter our company set aside a record level of
reserves for delinquency related charges including $60.5 million of
reserving associated with our loans held for sale. This high level of
reserving caused our gain on sale margin net of loans held for sale
delinquency reserves to be 0.74% in the first quarter compared to
1.42% in the fourth quarter of 2006. Finally, during the first quarter
our company experienced a loss in the value of the mortgage-
backed securities and hedges in our mortgage holdings segment."

"These factors caused our company's first quarter income to be
significantly reduced despite gains in net interest income stemming
from improved portfolio and warehouse spreads and despite strong
revenue from mortgage servicing."

"While I am disappointed by our company's results, our company
will always be susceptible to significant disruptions in the
secondary mortgage market. It does appear that the secondary
market is stabilizing. During April, more loan buyers have been
bidding to buy our loan pools. Additionally, spreads on some junior
mortgage securities have retraced a portion of the sharp widening
that occurred in March, junior mortgage securities are trading in a
more orderly fashion, and the ABX index is off its lows. We will
have to see how market conditions develop as the year progresses.
For now, however, our company's working assumption, which is
incorporated into our earnings guidance, is that our gain on sale
margins, excluding delinquency related charges, will continue near
the low levels we experienced during the first quarter."

"While our company remains susceptible to disruptions in the
secondary mortgage market, we can and have taken actions to

11

reduce our delinquency related charges. It is important to note that most of our company's delinquency related expenses are not due to delinquency in our portfolio, but instead result from early payment defaults on loans sold that we were required to repurchase, or on loans we hold pending sale. Indeed, 87% of the first quarter's delinquency related charges stem from our loans held for sale, not our portfolio. Moreover, the vast majority of our delinquent loans held for sale are due to our previously offering a particular type of product, namely stated income loans where a high portion of a home's value is borrowed. These types of loans have accounted for approximately 15% of our loan production, but resulted in 73% of our delinquent loans held for sale at March 31, 2007."

"Our company discontinued offering the high loan-to-value, stated income loans that resulted in the great majority of our delinquency related charges, generally in late February. As a result, our company is now in a "tail" period that will include repurchasing loans that were recently sold and are still inside the period in which our sale is subject to repurchase, which is usually three months. As the tail period winds down, our company's delinquency related charges should begin to diminish."

April 30, 2007 8-K/A at 2.

41.     Under the heading Earnings Outlook, the April 30, 2007 8-K/A stated:

"As described above, the Company is reducing its full year 2007 earnings guidance to $3.25 to $3.75 per share. The new guidance reflects an expectation that quarterly earnings will modestly increase sequentially throughout the year, with each successive quarter through the year coming in modestly ahead of the previous quarter."

"Underlying the Company's earnings guidance is the assumption that gain on sale margins will continue near the depressed levels of the first quarter through the balance of the year. Also underlying earnings guidance is the assumption that delinquency related charges on discontinued products will diminish gradually as the year progresses."

April 30, 2007 8-K/A at 5.

42.     The Defendants also touted the value of AHM's mortgage loan assets.

12

43.    Under the heading Loan Origination Business, the Prospectus Supplement

stated:

>"Our loan origination business originates the securitized loans in
>which we invest. It also originates additional loans that we sell,
>typically at a gain. We are one of the nation's largest home
>mortgage lenders. During 2006, we originated approximately
>$58.9 billion of home loans. Our originations are sourced through
>our own sales force of approximately 2,450 loan officers and
>account executives, as well as through mortgage brokers. During
>2006, approximately 35% of our originations were through our
>own sales force, while approximately 55% were through mortgage
>brokers. We operate over 550 retail and wholesale loan production
>offices located in 47 states and the District of Columbia in support
>of our origination effort."

Prospectus Supplement at S-2.

44.    Under the heading Experts, the Prospectus Supplement stated:

>"The consolidated financial statements as of December 31, 2006 and 2005,
>and for each of the three years in the period ended December 31, 2006 and
>management's report on the effectiveness of internal control over financial
>reporting as of December 31, 2006, incorporated by reference in this
>prospectus supplement have been audited by Deloitte & Touche LLP, an
>independent registered public accounting firm, as stated in their report,
>which is incorporated by reference herein, and has been so included and
>incorporated in reliance upon the report of such firm given upon their
>authority as experts in accounting and auditing."

Prospectus Supplement at S-14.

45.    Under the heading Newly Issued Accounting Pronouncements, the 2006 10-

K, which was incorporated by reference into the Prospectus Supplement, stated:

>"In September 2006, the FASB issued SFAS No. 157, "*Fair Value
>Measurements*" ("SFAS No. 157"), which provides for enhanced
>guidance for using the fair value to measure assets and
>liabilities. SFAS No. 157 defines fair value, establishes a
>framework for measuring fair value in generally accepted
>accounting principles ("GAAP"), and expands disclosures about

13

fair value measurements. SFAS No. 157 is applicable under other accounting pronouncements that either require or permit fair value measurements and does not require any new fair value measurements. SFAS No. 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years. The Company is in the process of analyzing the impact of SFAS No. 157 on its consolidated financial statements."

"In February 2007, the FASB issued SFAS No. 159, *"The Fair Value Option for Financial Assets and Financial Liabilities"* ("SFAS No. 159"), which provides companies with an option to report selected financial assets and liabilities at fair value. The objective of SFAS No. 159 is to reduce both complexity in accounting for financial instruments and the volatility in earnings caused by measuring related assets and liabilities differently. SFAS No. 159 establishes presentation and disclosure requirements and requires companies to provide additional information that will help investors and other users of financial statements to more easily understand the effect of the company's choice to use fair value on its earnings. SFAS No. 159 also requires entities to display the fair value of those assets and liabilities for which the company has chosen to use fair value on the face of the balance sheet. SFAS No. 159 is effective for financial statements issued for fiscal years beginning after November 15, 2007 and early adoption is permitted for fiscal years beginning on or before November 15, 2007 provided that the entity makes that choice in the first 120 days of the fiscal year, has not issued financial statements for any interim period of the fiscal year of adoption and also elects to apply the provisions of SFAS No. 157. The Company is in the process of analyzing the impact of SFAS No. 159 on its consolidated financial statements."

2006 10-K at 63.

46.     Under the heading Notes to Consolidated Financial Statements Note 21 – Fair Value of Financial Instruments, the 2006 10-K, which was incorporated by reference into the Prospectus Supplement, stated:

"Fair value estimates are made as of a specific point in time based on estimates using present value or other valuation techniques.

14

These techniques involve uncertainties and are significantly affected by the assumptions used and the judgments made regarding risk characteristics of various financial instruments, discount rates, estimates of future cash flows, future expected loss experience and other factors."

\* \* \*

"Fair value estimates are based on existing financial instruments without attempting to estimate the value of anticipated future business and the value of assets and liabilities that are not considered financial instruments. Accordingly, the aggregate fair value amounts presented do not represent the underlying value of the Company."

"The carrying values of the following assets and liabilities all approximate their fair values due to their short-term nature, terms of repayment or interest rate associated with the asset or liability:

- Cash and cash equivalents;

- Accounts receivable and servicing advances;

- Warehouse lines of credit;

- Commercial paper; and

- Payable for securities purchased."

"The following describes the methods and assumptions used by the Company in estimating fair values of other financial instruments:

> a. *Securities*—Fair value is based on published market valuations or price quotations provided by securities dealers.

> b. *Mortgage Loans Held for Sale, net*—Fair value is estimated using outstanding commitments from investors or current investor yield requirements calculated on the aggregate basis.

> c. *Mortgage Loans Held for Investment, net*—Fair value is estimated using discounted cash flow analyses and using interest rates currently being offered for loans with similar

15

terms to borrowers of similar credit quality and risk. The fair value of nonaccrual loans and the allowance for losses on loans are approximated by their book values."

2006 10-K at F-38 and F-39.

47.     Under the heading First Quarter Results, the April 30, 2007 8-K/A stated:

"During the first quarter, the Company adopted Statement of Financial Accounting Standards No. 159, *"The Fair Value Option for Financial Assets and Financial Liabilities"* ("SFAS 159"). As a result of the adoption of SFAS 159, the Company recorded a reduction to the January 1, 2007 opening balance of retained earnings and an offsetting decrease to other comprehensive loss of $54.5 million. The net effect of these two entries did not change the Company's book value, but did reduce both retained earnings and other comprehensive loss by a like amount."

"During the first quarter of 2007, the Company's net interest income, plus the positive carry from interest rate swaps, was $64.3 million compared to $48.9 million in the fourth quarter of 2006. Of the $64.3 million, $19.0 million was from portfolio loans, $18.3 million was from mortgage-backed securities, $3.8 million was from swaps associated with mortgage-backed securities, $2.8 million was from American Home Bank, and $33.9 million was from loans in warehouse, reduced by $13.5 million of net interest expense on trust preferred securities, the financing of servicing assets, and other. By comparison, the components of the $48.9 million of net interest income, plus the positive carry from interest rate swaps, earned in the fourth quarter of 2006 were $12.4 million from portfolio loans, $14.7 million from mortgage-backed securities, $6.3 million from swaps associated with mortgage-backed securities, $0.6 million was from American Home Bank and $26.8 million from loans in warehouse, including loans held for investment pending securitization, reduced by $11.9 million of interest expense on trust preferred securities and the financing of servicing assets."

"During the first quarter of 2007, portfolio loans earned a net interest margin of 1.56% and had an average balance of $4.9 billion, compared to a net interest margin of 1.42% and an average balance of $3.5 billion in the fourth quarter of 2006. During the first quarter, mortgage-backed securities had an average balance of

16

$8.7 billion, earned a net interest margin on a stand-alone basis of 0.84%, and earned a net interest margin including income from associated swaps of 1.01%. By comparison, in the fourth quarter of 2006, mortgage-backed securities had an average balance of $9.2 billion, earned net interest margin on a stand-alone basis of 0.64%, and earned a net interest margin including income from associated swaps of 0.91%. In the first quarter, loans in warehouse, including loans held for investment pending securitization, had an average balance of $9.9 billion and earned a net interest margin of 1.37%. By comparison, during the fourth quarter of 2006, loans in warehouse, including loans held for investment pending securitization, had an average balance of $10.0 billion and earned a net interest margin of 1.08%."

"During the first quarter, the Company's provision expense associated with loans held for investment was $9.1 million, while its quarter-end allowance for loan loss balance was $16.6 million and its non-performing loans held for investment were $96.1 million. By comparison, for the fourth quarter of 2006, the Company's provision expense was $6.7 million, while its quarter-end allowance for loan loss balance was $14.2 million and its non-performing loans held for investment were $82.4 million. Additionally, in the first quarter, the Company's gain on sale was reduced by $60.5 million to account for additional reserving against the Company's loans held for sale and additions to its contingent reserve for repurchases. At quarter-end, reserves associated with delinquent loans held for sale were $52.8 million, while non-performing loans held for sale were $242.9 million. By comparison, in the fourth quarter, additions to reserves charged to gain on sale were $14.5 million, reserves associated with loans held for sale were $22.0 million, and non-performing loans held for sale were $124.3 million."

April 30, 2007 8-K/A at 3 and 4.

48.     Under the heading First Quarter Results, the April 30, 2007 8-K/A stated:

"The Company's total revenues in the first quarter of 2007 were $197.2 million. Of these revenues, $60.5 million was from net interest income, $126.8 million was from gain on mortgage loans including origination fees and net of hedges and additions to loss reserves, $46.1 million was from mortgage servicing fees, $3.8 million was from interest carry on free-standing swaps and $3.1

17

million was from other sources. Revenues were decreased by $24.9
million due to realization of servicing cash flows; $1.1 million due
to a decrease in the value of servicing due to changes in
assumptions net of hedges; $8.0 million due to realized and
unrealized losses on mortgage-backed securities and derivatives
held, net of hedges and $9.1 million due to provisioning for loan
losses. During the first quarter, the Company's expenses were
$179.2 million, and the Company's pre-tax income was $18.0
million. Also during the quarter, the Company's tax benefit was
$12.7 million. Consequently, net income for the quarter was $30.7
million while preferred dividends were $3.3 million and net
income available to common stockholders was $27.4 million,
resulting in earnings per diluted share of $0.54. Book value
attributable to common stockholders at March 31, 2007 was $1.09
billion, or $21.68 per common share, compared to $1.14 billion, or
$22.64 per common share, at December 31, 2006."

April 30, 2007 8-K/A at 5.

49.     The Offering Materials also discussed AHM's financing and access to

credit that was crucial to its business model.  Thus, under the heading Loan Servicing

Business, the Prospectus Supplement stated:

"Our loan servicing business also provides us with a
countercyclical source of revenue and a stable cash flow, as net
income from servicing activities generally tends to increase during
periods of rising interest rates when revenue from originations
generally tends to diminish."

"As of December 31, 2006, AHM Servicing serviced
approximately 197,000 loans with an aggregate principal amount
of approximately $46.3 billion. The weighted-average servicing
fee on our servicing portfolio as of December 31, 2006 was
0.347% of the principal amount of each loan we service. We
expect our servicing business to grow as we increase our portfolio
of self-originated mortgage loans and mortgage-backed
securities."

Prospectus Supplement at S-3.

50.     Under the heading Price Range of Common Stock and Dividend Policy, the

18

Prospectus Supplement stated:

> "We intend to make regular quarterly distributions to our
> stockholders. On April 6, 2007, we announced that commencing
> with the quarterly dividend expected to be paid in July 2007, our
> Board of Directors has lowered the dividend on our common stock
> to $0.70 per share, or $2.80 per share annualized, subject to future
> business conditions."

Prospectus Supplement at S-8.

51.     Under the heading Our Company, the Prospectus Supplement stated:

> "We generally borrow a substantial portion of the funds required to
> invest in our mortgage-backed securities, and will seek to maintain
> an overall debt-to-equity ratio ranging from 10:1 to 12:1. The
> liabilities we use to fund our portfolio of mortgage-backed
> securities are primarily repurchase agreements with maturities
> ranging from one to twelve months."

Prospectus Supplement at 2.

52.     Under the heading Competitive Advantages, the Prospectus Supplement

stated:

> "Because we believe we can earn a higher yield than mortgage
> REITs that primarily purchase their assets in the capital markets,
> we can afford to sacrifice a portion of this yield to reduce (i) our
> interest rate risk, by limiting our portfolio to ARMs and attempting
> to match-fund our liabilities and hedges with our assets and (ii) our
> credit risk, by focusing on highly rated assets."

> "We believe that we have a competitive advantage over other
> mortgage REITs that self-originate mortgage-backed securities
> because we typically originate a larger volume of loans than those
> companies and, consequently, can select the types of loans we
> would like to retain as long-term assets — specifically, high-credit-
> quality ARM loans."

Prospectus Supplement at 4.

53.     Under the heading Liquidity and Capital Resources, the 2006 10-K, which

19

was incorporated by reference into the Prospectus Supplement, stated:

> "As of December 31, 2006, we had arrangements to enter into reverse repurchase agreements, a form of collateralized short-term borrowing, with eighteen different financial institutions and had borrowed funds from ten of these counterparties. Because we borrow money under these agreements based on the fair value of our mortgage-backed securities, and because changes in interest rates can negatively impact the valuation of mortgage-backed securities, our borrowing ability under these agreements could be limited and lenders could initiate margin calls in the event interest rates change or the value of our mortgage-backed securities declines for other reasons."

> "As of December 31, 2006, we had $8.6 billion of reverse repurchase agreements outstanding with a weighted-average borrowing rate of 5.40% before the impact of interest rate swaps and a weighted-average remaining maturity of eleven months. As of December 31, 2005, we had $9.8 billion of reverse repurchase agreements outstanding with a weighted-average borrowing rate of 4.40% before the impact of interest rate swaps and a weighted-average remaining maturity of four months."

> "We issue adjustable-rate collateralized debt obligations to finance certain portions of our mortgage loans held for investment. The collateralized debt obligations are collateralized primarily by adjustable-rate mortgage ("ARM") loans that have been placed in a trust. As of December 31, 2006, our collateralized debt obligations had a balance of $4.9 billion and an effective interest cost of 5.53%."

> "To originate a mortgage loan, we draw against either a $3.3 billion SLN commercial paper program, a $2.0 billion pre-purchase facility with UBS Real Estate Securities Inc. ("UBS"), a facility of $2.5 billion with Bear Stearns, a $1.3 billion bank syndicated facility led by Bank of America, N.A. (which includes a $446.3 million term loan facility which we use to finance our MSRs), a facility of $125 million with J.P. Morgan Chase, a $750 million facility with IXIS Real Estate Capital, Inc. ("IXIS"), a $350 million facility with Credit Suisse First Boston Mortgage Capital LLC, a $1.0 billion facility with Barclays Bank PLC ("Barclays"), and a $1.5 billion syndicated facility led by Calyon New York Branch ("Calyon"). The Bank of America, IXIS and Calyon facilities are

committed facilities. In addition, we have gestation facilities with
UBS, Greenwich Capital Financial Products, Inc. ("Greenwich"),
Societe Generale, and Deutsche Bank ("Deutsche"). These
facilities are secured by the mortgages owned by us and by certain
of our other assets. Advances drawn under the facilities bear
interest at rates that vary depending on the type of mortgages
securing the advances. These loans are subject to sublimits,
advance rates and terms that vary depending on the type of
securing mortgages and the ratio of our liabilities to our tangible
net worth. At February 22, 2007, the aggregate outstanding balance
under the commercial paper program was $2.8 billion, the
aggregate outstanding balance under the warehouse facilities was
$3.3 billion, the aggregate outstanding balance in drafts payable
was $4.0 million and the aggregate maximum amount available for
additional borrowings was $5.3 billion."

2006 10-K at 57.

54.    Under the heading Liquidity and Capital Resources, the 2006 10-K, which

was incorporated by reference into the Prospectus Supplement, stated:

"The documents governing our warehouse facilities contain a
number of compensating balance requirements and restrictive
financial and other covenants that, among other things, require us
to adhere to a maximum ratio of total liabilities to tangible net
worth and maintain a minimum level of tangible net worth and
liquidity, as well as to comply with applicable regulatory and
investor requirements. The facility agreements also contain
covenants limiting the ability of our subsidiaries to transfer or sell
assets other than in the ordinary course of business and to create
liens on the collateral without obtaining the prior consent of the
lenders, which consent may not be unreasonably withheld."

"In addition, under our warehouse facilities, we generally cannot
continue to finance a mortgage loan that we hold if:

●     the loan is rejected as "unsatisfactory for purchase" by the
    ultimate investor and has exceeded its permissible 120-day
    warehouse period;

●     we fail to deliver the applicable mortgage note of other
    documents evidencing the loan within the requisite time

period;

- the underlying property that secures the loan has sustained a casualty loss in excess of 5% of its appraised value; or

- the loan ceases to be an eligible loan (as determine pursuant to the applicable facility agreement)."

"As of December 31, 2006, our aggregate warehouse facility borrowings were $1.3 billion (including $50.0 million of borrowings under a working capital sub-limit) and our outstanding drafts payable were $12.8 million, compared to $3.5 billion in aggregate warehouse facility borrowings (including $21.6 million of borrowings under a working capital sub-limit) and outstanding drafts payable of $20.8 million as of December 31, 2005. At December 31, 2006, our loans held for sale were $1.5 billion and our loans held for investment were $6.3 billion compared to loans held for sale of $2.2 billion and loans held for investment of $3.5 billion at December 31, 2005."

"In addition to the warehouse facilities, we have purchase and sale agreements with UBS, Greenwich, Societe Generale, and Deutsche. These agreements allow us to accelerate the sale of our mortgage loan inventory, resulting in a more effective use of the warehouse facility. Aggregate amounts sold and being held under these agreements at December 31, 2006 and December 31, 2005 were $6.2 billion and $3.2 billion, respectively. Aggregate amounts so held under these agreements at February 22, 2007 were $4.0 billion. These agreements are not committed facilities and may be terminated at the discretion of the counterparties."

"We make certain representations and warranties under the purchase and sale agreements regarding, among other things, the loans' compliance with laws and regulations, their conformity with the ultimate investors' underwriting standards and the accuracy of information. In the event of a breach of these representations or warranties or in the event of an early payment default, we may be required to repurchase the loans and/or indemnify the investor for damages caused by that breach. We have implemented strict procedures to ensure quality control and conformity to underwriting standards and minimize the risk of being required to repurchase loans. From time to time we have been required to repurchase loans that we sold."

22

> "We also have a $446.3 million term loan facility with a bank
> syndicate led by Bank of America which we use to finance our
> MSRs. The term loan facility expires on August 9, 2007, but we
> have an option to extend the term for twelve additional months at a
> higher interest rate. We expect to renew the term loan facility at
> similar or better terms prior to the expiration date. Interest is based
> on a spread to the LIBOR and may be adjusted for earnings on
> escrow balances. At December 31, 2006 and December 31, 2005,
> borrowings under our term loan facility were $298.5 million and
> $206.2 million, respectively."

> "Cash and cash equivalents decreased to $398.2 million at
> December 31, 2006 from $575.7 million at December 31, 2005."

2006 10-K at 58.

    55.    Under the heading Liquidity and Capital Resources, the 2006 10-K, which

was incorporate by reference into the Prospectus Supplement, stated:

> "Our primary sources of cash and cash equivalents during the year
> ended December 31, 2006, were as follows:

> - $56.0 billion of proceeds from principal received from sales
>   of mortgage loans held for sale;

> - $3.9 billion of principal proceeds from sales of mortgage-
>   backed securities;

> - $3.8 billion increase in collateralized debt obligations; and

> - $2.2 billion of principal repayments of mortgage-backed
>   securities."

2006 10-K at 59.

    56.    Under Notes to Consolidated Financial Statements Note 9 – Warehouse

Lines of Credit, Reverse Repurchase Agreements and Commercial Paper, the 2006 10-K,

which was incorporated by reference into the Prospectus Supplement, stated:

23

"To originate a mortgage loan, the Company draws against either a $3.3 billion SLN commercial paper program, a $2.0 billion pre-purchase facility with UBS Real Estate Securities Inc., a facility of $2.5 billion with Bear Stearns, a $1.3 billion bank syndicated facility led by Bank of America, N.A. (which includes a $446 million term loan facility which the Company uses to finance its MSRs), a facility of $750 million with Morgan Stanley Bank ("Morgan Stanley"), a facility of $125 million with J.P. Morgan Chase, a $750 million facility with IXIS Real Estate Capital, Inc. ("IXIS"), a $350 million facility with Credit Suisse First Boston Mortgage Capital LLC, a $1.0 billion facility with Barclays Bank PLC ("Barclays"), and a $1.5 billion syndicated facility led by Calyon New York Branch ("Calyon"). The Bank of America, IXIS, Morgan Stanley and Calyon facilities are committed facilities. The interest rate on outstanding balances fluctuates daily based on a spread to the LIBOR and interest is paid monthly."

"The facilities are secured by mortgage loans and other assets of the Company. The facilities contain various covenants pertaining to maintenance of net worth, working capital and maximum leverage. At December 31, 2006, the Company was in compliance with respect to the loan covenants."

"Included within the Bank of America line of credit, the Company has a working capital sub-limit that allows for borrowings up to $50 million at a rate based on a spread to the LIBOR that may be adjusted for earnings on compensating balances on deposit at creditors' banks. As of December 31, 2006, borrowings under the working capital line of credit were $50.0 million."

"The following table summarizes the Company's warehouse lines of credit:

24

|  | As of and for the Year Ended December 31, | |
|  | 2006 | 2005 |
|  | (Dollars in thousands) | |
| Balance outstanding at year end | $    $1,304,541 | $ 3,474,191 |
| Weighted-average interest rate at year end | 5.94% | 4.78% |
| Average balance outstanding for the year | $    6,374,157 | $ 2,863,982 |
| Maximum balance outstanding at any month end | $    5,393,952 | $ 4,116,939 |

"As of December 31, 2006 and 2005, the Company's warehouse lines of credit had remaining maturities within 30 days."

2006 10-K at F-25.

57.     Under the heading Comparison of the Three Months Ended March 31, 2007

and December 31, 2006, the April 30, 2007 8-K/A stated:

"During the first quarter, our company did achieve a record for loan production of $16.7 billion and for market share of 2.54%."

"As described in the headline of this earnings release, our company is reducing its full year 2007 earnings guidance to $3.25 to $3.75 per share. The reduction assumes continued weakness in the secondary mortgage markets with little improvement in our company's gain on sale margin. It also assumes a gradual reduction in delinquency related charges associated with selling and repurchasing those loan products our company has discontinued offering. Our projection is that our company's earnings per share will increase sequentially with earnings in the second quarter exceeding those in the first quarter, and earnings in the third and fourth quarter continuing to modestly improve."

"Our company is reaffirming its $0.70 per share per quarter dividend policy. Please note, however, that our company is only

25

obligated to pay dividends upon dividends being declared by our
Board of Directors, and that the dividend policy is subject to
change at any time without prior notice."

April 30, 2007 8-K/A at 3.

58.      Under the heading First Quarter Results, the April 30, 2007 8-K/A stated:

"Throughout the first quarter, the Company continued to pursue a
strategy of matching the duration of its portfolio assets with the
duration of its liabilities, net of hedges. At March 31, 2007, the
composition of the Company's loans held for investment and loans
underlying its mortgage-backed securities was 43.7% 5/1 ARM
loans, 28.7% short reset ARMs, 15.8% fixed rate loans, 5.1% 7/1
ARM loans, 1.9% 3/1 ARM loans, 1.4% HELOC and closed-end
seconds, and 3.4% other ARM types. On March 31, 2007, the
mortgage-backed securities portfolio's duration, net of liabilities
and hedges, was estimated to be 0.01 years and its projected
average life was 2.27 years. The composition of the mortgage-
backed securities portfolio by credit quality based on Standard &
Poor's ratings was 92.1% Agency and AAA, 5.0% AA, A, and
BBB and 2.9% BB, B, and unrated."

April 30, 2007 8-K/A at 4.

59.      Under the heading Dividend Policy, the April 30, 2007 8-K/A stated:

"Based on the Company's projections for earnings and cash flow,
the Company's dividend policy of $0.70 per quarter or $2.80 on an
annualized basis is being maintained."

April 30, 2007 8-K/A at 5.

60.      However, the statements referenced above in ¶¶ 31-59 were each materially false and

misleading, both alone and taken together, because they misrepresented the following materially

adverse facts about AHM:

          a.   a substantial amount of AHM's reported profits were derived from "phantom
               interest" payment mortgages—mortgages made to ostensible "high credit" customers,
               but which were made with little or no money down, no proof of income, and did not
               even require them to pay the full amount of interest being accrued—which had a

26

much higher incidence of delinquency and foreclosure than normal "high quality" mortgages;

b. AHM's was experiencing increasing difficulty in obtaining short-term credit to fund its home loans;

c. AHM's was experiencing increasing difficulty in generating cash flows and meeting its margin calls;

d. the terms of the margin provisions with AHM's lenders were becoming increasingly onerous;

e. the fact that AHM reported a profit in the first fiscal quarter of 2007 only by changing accounting policies to allow it to report profits on sales of mortgages that had not yet been sold;

f. the fact that the profit booked by AHM was dependent on too generous estimates of the market values of the mortgages that were booked as a profit before they had been sold, and so the value of assets on the books were inflated and the reported income were inflated for the first quarter 2007;

g. that AHM was experiencing an increasing delinquency rate which also depressed earnings;

h. that the dividend rates announced would not be satisfied because of increasing difficulties with generating cash flow and income; and

i. that AHM was having increasing difficulty selling its loans, further depressing earnings.

61.   AHM issued a press release announcing that it would take "substantial charges for credit-related expenses in the second quarter" on June 28, 2007. AHM further stated that its charges to its second quarter earnings would be "substantial," by revealing:

> "The Company's delinquency-related charges in the second quarter will be substantial. In addition, the Company expects that it will reclassify a portion of its other comprehensive loss. The reclassification will be charged to current quarter earnings, but will reduce other comprehensive loss by a like amount, and consequently will not affect the Company's equity. Altogether, the total amount of loss in the second quarter is expected to be contained. Specifically, the Company expects that its total stockholder's equity will actually

27

be higher at the end of the second quarter compared to the first quarter of 2007."

62.    AHM faced inquiry and speculation in mid July regarding problems with financing. In response to this speculation, AHM stated that "No warehouse lines have been pulled."

63.    AHM then issued a press release on July 27, 2007, announcing that it would not pay its long promised dividend "to preserve liquidity," stating:

> "...its Board of Directors has decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipates delaying payment of its quarterly cash dividends on its Series A. Cumulative Redeemable Preferred Stock and Series B Cumulative Redeemable Preferred Stock in order to preserve liquidity until it obtains a better understanding of the impact that current market conditions in the mortgage industry and the broader credit market will have on the Company's balance sheet and overall liquidity. The disruption in the credit markets in the past few weeks has been unprecedented in the Company's experience and has caused major write-downs of its loan and security portfolios and consequently has caused significant margin calls with respect to its credit facilities."

64.    On July 30, 2007, the NYSE halted trading in AHM stock before the market opened.

65.    On July 31, 2007, AHM reported that it was "currently experiencing a hindering of access to its traditional credit facilities," that it had "substantial unpaid margin calls," and that it would no longer be able to fund at least $750 million in mortgage loans to which it had agreed.

66.    On August 2, 2007, Defendant Michael Strauss conceded that AHM was "no longer viable," and on August 6, 2007, it filed for Chapter 11 bankruptcy protection.

67.    The price of AHM's common stock closed at $0.44 on August 6, 2007.

## COUNT I

### Against All Defendants for
### Violations of Section 11 of the Securities Act

68.     Plaintiff realleges each of the allegations set forth in the foregoing and subsequent paragraphs, as if fully set forth herein.

69.     This Count is asserted against all Defendants for violations of Section 11 of the Securities Act, which creates liability where a registration statement contains "an untrue statement of a material factor omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." 15 U.S.C. § 77k(a).

70.     The Individual Defendants each signed or consented to being named a director in the Offering Materials pursuant to which the shares of AHM common stock were sold, subjecting them to liability for any false or misleading statements in the Offering Materials under 15 U.S.C. § 77k(a)(1) and (2).

71.     Deloitte & Touche acted as an "accountant . . . or . . . person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him," subjecting it to liability for any false or misleading statements in the Offering Materials under 15 U.S.C. § 77k(a)(4).

29

72.     Citigroup acted as underwriter for the shares sold pursuant to the Offering Materials, subjecting it to liability for any false or misleading statements in the Offering Materials under 15 U.S.C. § 77k(a)(5).

73.     The Offering Materials contained untrue statements of fact and misleading omissions as alleged herein.

74.     This Count and Complaint does not allege any intentional fraud. It is based solely upon violations of Section 11 of the Securities Act, which requires only that a registration statement contain false statements or misleading omissions, regardless of any defendant's state of mind.

## COUNT II

### Against Citigroup and the Individual Defendants for
### Violations of Section 12(a)(2) of the Securities Act

75.     Plaintiff realleges each of the allegations set forth in the foregoing and subsequent paragraphs as if fully set forth herein.

76.     This Count is asserted against Citigroup and the Individual Defendants for violations of Section 12(a)(2) of the Securities Act, which creates liability against "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading . . . ." 15 U.S.C. § 77l(a)(2)

77.     Each of the Defendants offered or sold shares of AHM's common stock by means of the Offering Materials, including the Prospectus Supplement, which contained untrue statements of material fact and misleading omissions as alleged herein.

30

78.     This Count and Complaint does not allege any intentional fraud.  It is based solely upon violations of Section 12 of the Securities Act, which requires only that a prospectus contain false statements or misleading omissions, regardless of any defendant's state of mind.

### COUNT III

### Against the Individual Defendants for
### Violations of Section 15 of the Securities Act

79.     Plaintiff realleges each of the allegations set forth in the foregoing and subsequent paragraphs, as if fully set forth herein.

80.     This Count is brought against the Individual Defendants pursuant to Section 15 of the Securities Act, which subjects to joint and several liability "[e]very person who . . . controls any person liable" under Sections 11 or 12 of the Securities Act. 15 U.S.C. § 77o.

81.     This Count and Complaint does not allege any intentional fraud. It is based solely upon violations of Section 12 of the Securities Act, which requires only that a prospectus contain false statements or misleading omissions, regardless of any defendant's state of mind.

82.     Each of the Individual Defendants was a controlling person of AHM within the meaning of Section 15 at the time of the April 30, 2007, stock offering. They are therefore liable jointly and severally to the same extent as AHM.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

i. Declaring this action to be a proper class action and certifying Plaintiff as class representative and Plaintiff's counsel as class counsel under Rule 23 of the Federal Rules of Civil Procedure;

ii. Awarding damages in favor of Plaintiff and the Class against all Defendants for the damages sustained by the Plaintiff and the Class, with interest;

iii. Awarding Plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts; and

iv. Granting such other relief the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: August 15, 2007                    **MURRAY, FRANK & SAILER LLP**

By: _____
                    Marvin Frank (MF-1436)
275 Madison Ave; Suite 801
New York, New York 10016-1101
Tel:    (212) 682-1818
Fax:    (212) 682-1892

**SUSMAN HEFFNER & HURST LLP**
Arthur T. Susman
Matthew T. Heffner
Matthew T. Hurst
Glenn L. Hara
Two First National Plaza, Suite 600
Chicago, Illinois 60603
Tel:    (312) 346-3466
Fax:    (312) 346-2829

Attorneys for Plaintiff

32

## CERIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Dana Marlin declares the following under penalties of perjury:

1.  My name is Dana Marlin.

2.  I have reviewed the complaint prepared by Susman Heffner & Hurst LLP, whom I designate as counsel for me in this action for all purposes.

3.  I have authorized Susman Heffner & Hurst LLP to commence litigation against any defendants as may be appropriate.

4.  I did not acquire American Home Mortgage Investment Corp. ("AHM") common stock at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

5.  I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

6.  I will not accept any payment for serving as a representative party beyond its pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

7.  I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

8.  Since April 30, 2007, I have made the following transactions in AHM, and will provide records of those transactions upon request:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 17,300 | Buy | 4/30/07 | $23.80 |
| 2,000 | Sell | 5/1/07 | $23.50 |
| 5,000 | Sell | 5/1/07 | $23.50 |
| 5,000 | Sell | 5/2/07 | $22.636 |
| 800 | Sell | 5/8/07 | $22.51 |
| 2,500 | Sell | 5/22/07 | $22.401 |
| 2,000 | Sell | 8/1/07 | $1.30 |

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24 of AUGUST, 2007

Dana Marlin