IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| -------------------------------------------------------- x | Chapter 11 |
| In re: | : |
| | : Case No. 07-11047 (CSS) |
| AMERICAN HOME MORTGAGE | : |
| HOLDINGS, INC., a Delaware corporation, et al.,[1] | : Jointly Administered |
| | : |
| Debtors. | : **Hearing Date: September 17, 2007 at 12:00 p.m.** |
| | : **Objection Deadline: September 10, 2007 at 4:00 p.m.** |
| -------------------------------------------------------- x | |

**APPLICATION FOR ORDER PURSUANT TO SECTIONS 327
AND 328 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 2014
APPROVING THE RETENTION OF PHOENIX CAPITAL, INC. AS INVESTMENT
BANKERS FOR THE DEBTORS *NUNC PRO TUNC* TO PETITION DATE**

The above-captioned debtors and debtors-in-possession (collectively, the

"Debtors"), by and through their undersigned proposed attorneys, hereby submit this application

(the "Application") for an order pursuant to sections 327(a) and 328(a) of the United States

Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), Rule 2014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the employment and

retention of Phoenix Capital, Inc. ("Phoenix"), as the Debtors' investment bankers effective,

*nunc pro tunc* to the Petition Date (as defined below).  In support of the Application, the Debtors

rely upon and incorporate by reference the Declaration of Brett Schaffer (the "Schaffer

Declaration"), a copy of which is attached hereto as Exhibit A.  In further support of the

Application, the Debtors respectfully represent as follows:

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp.
("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM
Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a
Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558);
American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407);
Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp.
("Great Oak"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road,
Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving,
Texas 75063.

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 327 and 328 of the Bankruptcy Code and Bankruptcy Rule 2014.

## STATUS OF THE CASE

2.      On the August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.      Each Debtor is continuing to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      The Debtors' chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

5.      An official committee of unsecured creditors (the "Committee") was appointed on August 14, 2007.  No trustee or examiner has been appointed.

## THE DEBTORS' BUSINESS[2]

6.      Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans.  AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors.  AHM offered an array of mortgage products and

---

[2]  The facts set forth herein are derived from the Declaration of Michael Strauss in Support of the Debtors Chapter 11 Petitions and First Day Relief, which is incorporated by reference as if fully set forth herein at length [Docket No. 2].

066585.1001

primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

7.    As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

8.    A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

## EVENTS LEADING TO THE CHAPTER 11 FILING

9.    Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

DB02:6182065.1

066585.1001

10.    The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

11.    In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders -- the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

12.    On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

13.    The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors, as of the Petition Date, employed approximately 1000 absolutely essential employees to the Debtors' continued operations, although that number is

expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

14.    In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

15.    Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## RELIEF REQUESTED

16.    By this Application, the Debtors respectfully request that the Court enter an order, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, authorizing the Debtors to employ and retain Phoenix as their investment bankers, effective *nunc pro tunc* to the Petition Date. The Debtors seek to retain and employ Phoenix pursuant to the terms of the engagement set forth in the letter agreement, dated August 23, 2007, and attached hereto as Exhibit C (the "Engagement Letter") for the purposes of assisting the Debtors with the disposition of the (i) Mortgage Servicing Rights; and (ii) Servicing Platform (as those terms are defined in the Engagement Letter, collectively, the "Core Asset Sale").

## BASIS FOR RELIEF REQUESTED

17.    Bankruptcy Code section 327(a) provides, in relevant part, as follows:

Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants,

5

appraisers, auctioneers, or other professionals persons, that do not
hold or represent an interest adverse to the estates, and that are
disinterested persons, to represent or assist the trustee in carrying
out the trustee's duties under this title.

11 U.S.C. § 327(a).

18.    Bankruptcy Code section 328(a) provides, in relevant part, as follows:

The trustee . . . with the court's approval, may employ or authorize
the employment of a professional person under section 327 . . . of
this title . . . on any reasonable terms and conditions of
employment, including on a retainer, on an hourly basis, or on a
contingent fee basis.  Notwithstanding such terms and conditions,
the court may allow compensation different from the compensation
provide under such terms and conditions after the conclusion of
such employment, if such terms and conditions prove to have been
improvident in light of developments not capable of being
anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a).

19.    Bankruptcy Rule 2014 provides, in relevant part, as follows:

An order approving the employment of financial advisors . . . or other
professionals pursuant to § 327 . . . of the Code shall be made only on application
of the trustee or committee.

Fed. R. Bankr. P. 2014.

A.    **Phoenix's Qualifications**

20.    The Debtors have selected Phoenix based on its extensive experience in

providing investment banking solutions to businesses in the mortgage banking and mortgage

servicing industries and based on Phoenix's general familiarity with the Debtors' business.

Phoenix has participated in the sale and transfer of hundreds of servicing portfolios totaling

nearly half a trillion dollars, and have been retained to conduct buyer representation analysis on a

wide variety of servicing transactions, evaluating over $1 trillion in mortgage servicing assets.

**B.    Services To Be Provided[3]**

21.    Generally, Phoenix is being retained to assist the Debtors in their bankruptcy cases and to assist the Debtors with the Core Asset Sale regardless of the form of the transaction. Specifically, as more fully set forth in the Engagement Letter, the services that Phoenix will provide to the Debtors include, but are not be limited to:

a.    Provide financial advice and assistance to the Debtors in connection with a Core Asset Sale, identify potential acquirors and, at the Debtors' request, contact such potential acquirors (each a "Purchaser Entity");

b.    Determine a range of values for the Core Assets on a liquidation basis;

c.    Assist the Debtors in preparing a memorandum (with any amendments or supplements thereto, the "Sale Memorandum"), to be used in soliciting potential acquirors of its assets, provided that (A) the Sale Memorandum shall be based entirely upon information supplied by the Debtors (as it concerns the Debtors as opposed to competitors or the market generally), (B) the Debtors shall be solely responsible for the accuracy and completeness of the Sale Memorandum (as it concerns the Debtors as opposed to competitors or the market generally), and (C) other than as contemplated by this subparagraph, the Sale Memorandum shall not be used, reproduced, disseminated, quoted or referred to at any time in any way, except with Phoenix's prior written consent which shall not be unreasonably withheld or delayed;

d.    Assist the Debtors and/or participate in negotiations with potential acquirors of the Core Assets;

e.    Advise and attend meetings of the Debtors' Board of Directors and its Committees and, if appropriate, its creditors;

f.    Participate in any hearings before any court with respect to the matters upon which Phoenix has provided advice, including, as relevant, coordinating with the Debtors' counsel as to necessary testimony relating thereto; and

g.    If requested, render an opinion as to the fairness of the consideration to be received in connection with a Core Asset Sale.

---

[3] This summary is presented for convenience purposes only. The terms set forth in the Engagement Letter are controlling in all respects. Capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to such terms in the Engagement Letter.

22.     The Debtors require qualified professionals to render these essential professional services. As noted above, Phoenix has substantial expertise in all of the areas for which it is proposed to be retained. Accordingly, the Debtors submit that Phoenix is well qualified to perform these services and assist the Debtors in these chapter 11 cases.

23.     By separate application, the Debtors are seeking authority to retain Milestone Advisors, LLC ("Milestone") as investment bankers and financial advisors to assist the Debtors in marketing the Debtors' Mortgage Servicing Rights and Servicing Platform. Milestone will also be performing financial advisory services for the Debtors in addition to the joint investment banking efforts of Phoenix and Milestone.[4] Phoenix and Milestone have discussed a division of responsibility and will make every effort to avoid duplication. Further, as explained below and as set forth fully in the Engagement Letter, Phoenix and Milestone have agreed to split certain transaction "success" fees.

## C.    Payment of Fees and Expenses

24.     Subject to this Court's approval, in accordance with the provisions of section 328(a) of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors propose to pay Phoenix according to the terms set forth in the Engagement Letter.

25.     Phoenix will work with Milestone to effectuate the Core Asset Sale of the Debtors' Mortgage Servicing Rights. In the event of a Core Asset Sale of the Debtors' Mortgage Servicing Rights (whether alone or combined with the sale of the Debtors' Servicing Platform), the Debtors shall pay Phoenix and Milestone an aggregate success fee equal to (i) $1,000,000,

---

[4]  See [Docket No. 227].

066585.1001

plus (a) $1,000,000, pro rated for any proceeds received by the Debtors in excess $446 million and up to $460 million, plus (b) 6.25% of any proceeds received by the Debtors in excess of $460 million.

26.    The Engagement Letter provides that in the event of a sale of the Debtors' Servicing Platform that is separate and distinct from the sale of the Debtors' Mortgage Servicing Rights, the Debtors shall pay Phoenix and Milestone an aggregate success fee equal to (i) $500,000, plus (ii) 5.0% of any proceeds received by the Debtors in excess of $10 million.

27.    Phoenix has agreed to split any fees payable by the Debtors for a sale of the Servicing Platform and/or the Mortgage Servicing Rights, 60% to Milestone and 40% to Phoenix.

28.    The Debtors propose to reimburse Phoenix for all reasonable travel and other out-of-pocket expenses (including counsel fees) incurred by Phoenix in connection with the services to be rendered by Phoenix, whether or not a transaction is consummated.

29.    The Debtors submit that the proposed fee structure and fees and expense reimbursement provisions described above are consistent with normal and customary billing practices for cases of this size and complexity that require the level and scope of services outlined above.  Phoenix and the Debtors also believe that the foregoing compensation arrangements are both reasonable and market-based.

30.    The Debtors propose that all compensation and expenses will be sought in accordance with section 328(a) of the Bankruptcy Code, as incorporated in sections 329 and 331 of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and orders of the Court, and will not be subject to the standard of review in section 330 of the Bankruptcy Code.

066585.1001

## D.    **Indemnification and Limitation of Liability**

31.    The Debtors have also agreed to indemnify and hold Phoenix harmless against any claims, liabilities and obligations arising out of its retention under the Engagement Letter as set forth more fully in Appendix I to the Engagement Letter. However, notwithstanding anything to the contrary in the Engagement Letter or any agreements incorporated by reference in the Engagement Letter (including, without limitation Appendix I), the Debtors agree to indemnify and hold Phoenix harmless (the "Indemnification Agreement") to the extent set forth below:

a.    Phoenix shall not be entitled to indemnification, contribution or reimbursement pursuant to the Engagement Letter for services other than those described in the Engagement Letter, unless such services and indemnification therefore are approved by the Court;

b.    The Debtors shall have no obligation to indemnify Phoenix, or provide contribution or reimbursement to Phoenix, for any claim or expense that is either: (i) judicially determined (the determination having become final) to have arisen from Phoenix's gross negligence or willful misconduct; (ii) for a contractual dispute in which the Debtors allege the breach of Phoenix's contractual obligations unless the Court determines that indemnification, contribution or reimbursement would be permissible pursuant to In re United Artists Theatre Co., 315 F.3d 217 (3d Cir. 2003); or (iii) settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by the Court, after notice and a hearing to be a claim or expense for which Phoenix should not receive indemnity, contribution or reimbursement under the terms of the Engagement Letter as modified by the order of the Court; and

c.    If, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these cases (that order having become a final order no longer subject to appeal), and (ii) the entry of an order closing these chapter 11 cases, Phoenix believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution and/or reimbursement obligations under the Engagement Letter (as modified by this Order), including without limitation the advancement of defense costs, Phoenix must file an application therefore in this Court, and the Debtors may not pay any such amounts to Phoenix before the entry of an order by this Court approving the payment. This subparagraph (c) is

DB02:6182065.1 066585.1001

intended only to specify the period of time under which the Court shall have jurisdiction over any request for fees and expenses by Phoenix for indemnification, contribution or reimbursement, and not a provision limiting the duration of the Debtors' obligation to indemnify Phoenix. All parties in interest shall retain the right to object to any demand by Phoenix for indemnification, contribution or reimbursement.

32.    The Debtors believe that the Indemnification Agreement is customary and reasonable for investment bankers, both out-of-court and in chapter 11 proceedings. See e.g., In re United Artists Theatre Company, 315 F.3d 217 (3d Cir. 2003) (authorizing the indemnification of Houlihan Lokey by the debtors); In re Joan & David Halpern, Inc., 248 B.R. 43 (Bankr. S.D.N.Y. 2000). The Indemnification Agreement is also similar to other indemnification provisions that have been approved by bankruptcy courts in the district. See e.g., In re Premium Papers Holdco, LLC, Ch. 11 Case No. 06-10269 (CSS) (Bankr. D. Del. May 3, 2006) (order authorizing retention of Giuliani Capital Advisors on similar terms); In re Burlington Industries, Inc., Ch. 11 Case No. 01-11282 (RJN) (Bankr. D. Del. May 21, 2003) (order authorizing retention of Hostmann on similar terms); In re Oakwood Homes Corporation, Ch. 11 Case No. 02-13396 (PJW) (Bankr. D. Del. July 21, 2003) (order authorizing retention of Hostmann on similar terms).

33.    Finally, notwithstanding the limitation of liability provision or provisions in the Engagement Letter or any agreements incorporated by reference therein (including, without limitation Appendix I), the Engagement Letter shall be modified to delete such provision or provisions from the Engagement Letter.

**D.    Phoenix's Disinterestedness**

34.    To check and clear potential conflicts of interest in this case, Phoenix researched its relationship with the following entities (collectively, the "Interested Parties"):

a.    The Debtors;

11

b.    The Debtors' officers and directors;

c.    Companies affiliated with the Debtors' officers and directors;

d.    The Debtors' top forty (40) unsecured creditors;

e.    Bank of America, N.A., as Administrative Agent for the lenders under the Second Amended and Restated Credit Agreement dated August 10, 2006;

f.    Persons holding a large percentage of the Debtors' issued and outstanding voting securities; and

g.    The Debtors' professionals in these bankruptcy cases.

The identities of the Interested Parties were provided to Phoenix by the Debtors.

35.    To the best of the Debtors' knowledge, information, and belief, other than in connection with this case, Phoenix has no connection with the Debtors, their creditors, the United States Trustee, or any other party with an actual or potential interest in this chapter 11 case or their respective attorneys or accountants, except as set forth in the Schaffer Declaration.

36.    To the best of the Debtors' knowledge, information, and belief, Phoenix neither holds nor represents any interest adverse to the Debtors or to their estates in the matters for which Phoenix is proposed to be retained. Accordingly, the Debtors believe that Phoenix is a "disinterested person," as defined in section 101(14) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code. The Debtors' knowledge, information, and belief regarding the matters set forth herein are based, and made in reliance, upon the Schaffer Declaration.

E.    **Engagement Under Section 328 is Reasonable and Appropriate Under the Circumstances**

37.    Section 328 of the Bankruptcy Code provides, in relevant part, that a debtor "with the court's approval, may employ or authorize the employment of a professional person under section 327 on any reasonable terms and conditions of employment, including on a

DB02:6182065.1                                                                                          066585.1001

retainer, on an hourly basis, or on a contingent fee basis." 11 U.S.C. § 328(a). For the reasons set forth in the Application, section 328(a) therefore permits this Court to approve the terms of the proposed engagement of Phoenix as set forth in the Engagement Letter.

38.     The Debtors respectfully submit that the terms of the proposed retention are reasonable and based on the customary compensation charged by Phoenix and comparably skilled practitioners in matters outside and other than chapter 11 cases, as well as cases under chapter 11, and have been approved and implemented by Courts in this and other jurisdictions. Indeed, the entire engagement as set forth in the Engagement Letter is common within the industry and reflects what is considered to be "market" both in and out of chapter 11 proceedings, in light of Phoenix's experience in reorganizations and the scope of work to be performed pursuant to its engagement. Accordingly, the Debtors respectfully submit that the terms of the proposed engagement of Phoenix should be approved.

## NOTICE

39.     Notice of this Application will be provided to (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Bank of America, N.A., as Administrative Agent for the lenders under the Second Amended and Restated Credit Agreement dated August 10, 2006; (iv) counsel to the Debtors' postpetition lender; (v) the Securities and Exchange Commission; and (vi) all parties entitled to notice under Del. Bankr. LR 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

DB02:6182065.1                                                                                    066585.1001

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter an order under sections 327(a) and 328(a) of the Bankruptcy Code and Rule 2014 of the Bankruptcy Rules, substantially in the form attached hereto as <u>Exhibit D</u>, approving the employment of Phoenix pursuant to the terms of the Engagement Letter to perform the services described herein, and grant the Debtors such other and further relief as is just.

Dated: Wilmington, Delaware
    August 31 , 2007

        YOUNG CONAWAY STARGATT & TAYLOR, LLP

        *Travis Turner (No. 4926)*
        James L. Patton, Jr. (No. 2202)
        Joel A. Waite (No. 2925)
        Pauline K. Morgan (No. 3650)
        Sean M. Beach (No. 4070)
        Matthew B. Lunn (No. 4119)
        Kara Hammond Coyle (No. 4410)
        Kenneth J. Enos (No. 4544)
        The Brandywine Building
        1000 West Street, 17th Floor
        Wilmington, Delaware 19801
        Telephone: (302) 571-6600
        Facsimile: (302) 571-1253

        Proposed Counsel for Debtors and
        Debtors in Possession

DB02:6182065.1             066585.1001

# **EXHIBIT A**

## SCHAFFER DECLARATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------- x
In re:                                             :   Chapter 11
                                                   :
AMERICAN HOME MORTGAGE                             :   Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,1   :
                                                   :   Jointly Administered
                         Debtors.                  :
-------------------------------------------------- x
```

**DECLARATION OF JOHN J. SCHAFFER IN SUPPORT OF APPLICATION FOR
ORDER PURSUANT TO SECTIONS 327 AND 328 OF THE BANKRUPTCY CODE
AND BANKRUPTCY RULE 2014 APPROVING THE RETENTION OF PHOENIX
CAPITAL, INC. AS INVESTMENT BANKERS FOR THE DEBTORS *NUNC PRO TUNC*
TO THE PETITION DATE**

I, Brett Schaffer, pursuant to 28 U.S.C. §1746, declare:

1.      I am President of Phoenix Capital, Inc. ("Phoenix"), at 999 Eighteenth
Street, Suite #1400, Denver, CO 80202. I am duly authorized to make this supplemental
declaration (the "Declaration") on behalf of Phoenix. I submit this Declaration in accordance
with sections 327 and 328 of title 11 of the United States Code (the "Bankruptcy Code") and
Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") in connection
with the application (the "Application") of the above captioned debtors and debtors in possession
(collectively the "Debtors") for an order pursuant to sections 327 and 328 of the Bankruptcy

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp.
("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM
Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a
Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558);
American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407);
Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp.
("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road,
Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving,
Texas 75063.

066585.1001

Code and Bankruptcy Rule 2014 authorizing the Debtors to retain and employ Phoenix as its investment bankers.

2.    Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein and, if called as a witness, I would testify thereto.  Capitalized terms and phrases not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

3.    Phoenix has in the past performed prepetition investment banking analysis on a preliminary basis for the Debtors.  However, Phoenix has no prepetition claims related to such prepetition services, nor was Phoenix paid any amounts for such services.

4.    To check and clear potential conflicts of interest in this case, Phoenix researched its relationship with the following entities, the identities of which were provided by the Debtors:

      a.    The Debtors;

      b.    The Debtors' officers and directors;

      c.    Companies affiliated with the Debtors' officers and directors;

      d.    The Debtors' top forty (40) unsecured creditors;

      e.    Bank of America, N.A., as Administrative Agent for the lenders under the Second Amended and Restated Credit Agreement dated August 10, 2006;

      f.    Persons holding a large percentage of the Debtors' issued and outstanding voting securities;

      g.    The Debtors' professionals in these bankruptcy cases.

5.    Phoenix has served or is currently serving as financial advisors and/or as investment bankers to the following entities, though Phoenix is not currently aware of any direct conflicts.

| Former Unrelated Clients |
|---|
| ABN AMBRO Bank N.V. |
| ABN AMRO Bank |
| Bank of America |
| Fannie Mae |
| Federal Home Loan Mortgage Corp |
| Goldman Sachs Asset Management, L.P. |
| IndyMac |
| **Current Unrelated Clients** |
| Bear, Stearns & Co. Inc |
| Citibank |
| Citigroup Global Markets Inc |
| Deutsche Bank |
| EMC (Bear) |
| HSBC |
| Huntington Bancshares Inc |
| Impac Funding Corporation |
| JPMorgan Chase Bank, N.A. |
| Morgan Stanley |
| Sovereign Bank |
| The Royal Bank of Scotland plc |
| UBS Securities |
| Wachovia Bank, N.A. |
| Wells Fargo |

6.    Phoenix is continuing to review the Debtors' list of creditors and other

parties in interest in these chapter 11 cases. To the extent that I become aware of any additional

connections or relationships that may be relevant to Phoenix's assistance to the Debtors, I will

file a supplemental affidavit.

7.    Phoenix is a "disinterested person" as that term is defined in section

101(14) of the Bankruptcy Code in that said firm, its partners, counsel and associates:

> a.    are not creditors, equity security holders or insiders of the Debtors;
>
> b.    are not and were not, within two (2) years before the date of the filing of the Debtors' chapter 11 petitions, a director, officer, or employee of the Debtors; and
>
> c.    does not have an interest materially adverse the Debtors' estates or of any class of creditors or equity security holders, by reason of

3

any direct or indirect relationship to, connection with, or interest in any of the Debtors, or for any other reason.

8.     Phoenix was retained pursuant to the terms of an engagement agreement dated August 23, 2007 (the "Engagement Letter"), a copy of which is attached to the Application as Exhibit C.

9.     Phoenix will work with Milestone to effectuate the Core Asset Sale of the Debtors' Mortgage Servicing Rights.  In the event of a Core Asset Sale of the Debtors' Mortgage Servicing Rights (whether alone or combined with the sale of the Debtors' Servicing Platform), the Debtors shall pay Phoenix and Milestone an aggregate success fee equal to (i) $1,000,000, plus (a) $1,000,000, pro rated for any proceeds received by the Debtors in excess $446 million and up to $460 million, plus (b) 6.25% of any proceeds received by the Debtors in excess of $460 million.

10.     The Engagement Letter provides that in the event of a sale of the Debtors' Servicing Platform that is separate and distinct from the sale of the Debtors' Mortgage Servicing Rights, the Debtors shall pay Phoenix and Milestone an aggregate success fee equal to (i) $500,000, plus (ii) 5.0% of any proceeds received by the Debtors in excess of $10 million.

11.     Phoenix has agreed to split any fees payable by the Debtors for a sale of the Servicing Platform and/or the Mortgage Servicing Rights, 60% to Phoenix and 40% to Phoenix.

12.     The Debtors have agreed to reimburse Phoenix for all reasonable travel and other out-of-pocket expenses (including counsel fees) incurred by Phoenix in connection with the services to be rendered by Phoenix, whether or not a transaction is consummated.

13.     No promises have been received by Phoenix or by any officer or employee thereof as to compensation in connection with these cases other than in accordance with the

4

provisions of the Bankruptcy Code.  Phoenix has no agreement with any other entity (other than Milestone) to share with such entity any compensation received by the Phoenix in connection with these chapter 11 cases.

## CONCLUSION

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Dated:  August 28, 2007

_____
Brett Schaffer
President of Phoenix Capital, Inc.

066585.1001

# **EXHIBIT B**

## RULE 2014 STATEMENT

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------ x
In re:                                                            :    Chapter 11
                                                                  :
AMERICAN HOME MORTGAGE                                             :    Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,[1]               :
                                                                  :    Jointly Administered
                                        Debtors.                  :
------------------------------------------------------------------ x

## STATEMENT PURSUANT TO RULE 2014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURES AND SECTION 329 OF THE BANKRUPTCY CODE

1.      Phoenix Capital, Inc. ("Phoenix" or the "Firm"), pursuant to Rule 2014 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), section 329 of title 11 of

the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), and Rule 2014 of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules"), seeks to be retained by the Court in the cases of the

above-captioned debtors and debtors in possession (the "Debtors").

2.      Compensation agreed to be paid by the Debtors to Phoenix is to be for

services rendered in connection with these cases.[2] The Debtors agreed to pay Phoenix for the

services rendered or to be rendered in connection with a Core Asset Sale as set forth in the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

[2] Capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to such terms in the Engagement Letter.

Engagement Letter. The Debtors have also agreed to reimburse Phoenix for its actual and necessary expenses incurred in connection with these cases as set forth in the Engagement Letter.

3.      Phoenix intends to apply to the Court for payment of compensation and reimbursement of expenses and payment of other charges in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330, the District of Delaware Local Bankruptcy Rules, and orders of this Court.

4.      Phoenix does not hold any prepetition claims against the Debtors.

5.      The services to be rendered include all those services set forth in the Application for Order Pursuant to Sections 327 and 328 of the Bankruptcy Code and Bankruptcy Rule 2014 Approving the Retention of Phoenix Capital, Inc. as Investment Bankers for the Debtors Nunc Pro Tunc to Petition Date.

6.      Phoenix further states that it has not shared, nor agreed to share (a) any compensation it has received or may receive with another party or person, other than with Milestone or the officers, employees, or shareholders of Phoenix, or (b) any compensation another person or party has received or may receive.

Dated:      August 28, 2007

Brett Schaeffer
Phoenix Capital, Inc.

2

## **EXHIBIT C**

<u>ENGAGEMENT LETTER</u>

DB02:6182065.1

066585.1001



**Phoenix CAPITAL**
Inc.

August 8, 2007

Mr. Michael Strauss
Chairman, Chief Executive Officer and President
American Home Mortgage Investment Corp.
538 Broadhollow Road
Melville, NY 11747

Dear Mr. Strauss:

      This agreement ("Agreement") sets forth the terms of the engagement by American Home Mortgage Investment Corp. (the "Company") of Phoenix Capital, Inc. ("Phoenix") pursuant to which Phoenix, in coordination with Milestone Advisors, LLC ("Milestone") shall act as a financial advisor and investment banker to the Company in connection with Core Asset Sales (as defined below) pursuant to related proceedings under Chapter 11 of Title 11 U.S.C. §§101 et seq., (the "Bankruptcy Code") and with respect to such other financial and investment banking matters as to which the Company and Phoenix may agree in writing during the term of this engagement agreement (the "Agreement").

      1.    <u>Scope of Services.</u>  In connection with the analysis and pursuit of the above-mentioned financial advisory services and Core Asset Sales, Phoenix will, as the Company's financial advisor and investment banker, and in conjunction with Milestone, work on one or more of the following activities, as requested from time to time by management of the Company (hereinafter referred to as the "Services"):

Mr. Michael Strauss
August 8, 2007
Page 2

(a)  Core Asset Sale Services.  If the Company pursues a Core Asset Sale (as defined below), Phoenix shall, in each case, if requested by the Company:

    i.   provide financial advice and assistance to the Company in connection with a Core Asset Sale, identify potential acquirors and, at the Company's request, contact such potential acquirors (each a "Purchaser Entity");determine a range of values for the Company's Core Assets on a liquidation basis;

    ii.   assist the Company in preparing a memorandum (with any amendments or supplements thereto, the "Sale Memorandum"), to be used in soliciting potential acquirors of its assets, provided that (A) the Sale Memorandum shall be based entirely upon information supplied by the Company (as it concerns the Company as opposed to competitors or the market generally), (B) the Company shall be solely responsible for the accuracy and completeness of the Sale Memorandum (as it concerns the Company as opposed to competitors or the market generally), and (C) other than as contemplated by this subparagraph (b)(ii), the Sale Memorandum shall not be used, reproduced, disseminated, quoted or referred to at any time in any way, except with Phoenix's prior written consent which shall not be unreasonably withheld or delayed; and

    iii.   assist the Company and/or participate in negotiations with potential acquirors of the Core Assets;

    iv.   advise and attend meetings of the Company's Board of Directors and its Committees and, if appropriate, its creditors;

    v.   participate in any hearings before any court with respect to the matters upon which Phoenix has provided advice, including, as relevant, coordinating with the Company's counsel as to necessary testimony relating thereto; and

    vi.   if requested, render an opinion as to the fairness of the consideration to be received in connection with a Core Asset Sale.

For purposes of this Agreement, the term "Core Asset Sale" shall mean the sale of one or more of the Company's following assets or divisions: (i) Mortgage Servicing Rights, and (ii) Servicing Platform.

In rendering its services to the Company hereunder, Phoenix is not assuming any responsibility for the Company's underlying business decision to pursue (or not to pursue) any business strategy or to effect (or not to effect) any Core Asset Sale or other transaction. The Company agrees that Phoenix shall not have any obligation or responsibility to provide accounting, audit, "crisis management", or business consultant services for the Company and shall have no responsibility for designing or implementing operating, organization, administrative, cash management or liquidity improvements, or to provide any valuation opinions or any advice or opinions with respect to solvency in connection with any transaction.

Mr. Michael Strauss
August 8, 2007
Page 3

The Company confirms that it will rely on its own counsel, accountants and other similar expert advisors for legal, accounting, tax and other similar advice.

The Company shall make available to Phoenix all material information concerning the business, assets, operations, financial condition and prospects of the Company that Phoenix reasonably requests in connection with the services to be performed for the Company hereunder and shall provide Phoenix with reasonable access to the Company's officers, directors, employees, independent accountants, counsel and other advisors and agents as Phoenix reasonably requests. In order to coordinate effectively the Company's and Phoenix's activities to effect a Core Asset Sale, the Company will promptly inform Phoenix of any discussions, negotiations or inquiries regarding a possible Core Asset Sale (including any such discussions, negotiations or inquiries that have occurred in the six month period prior to the date of this Agreement). The Company represents that, to the best of its knowledge, all information furnished by it or on its behalf to Phoenix, at all times during Phoenix's engagement, (including information contained in any Sale Memorandum) (i) will be accurate and complete in all material respects, and (ii) will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which such statements are made. The Company recognizes and confirms that in advising the Company and completing its engagement hereunder, Phoenix will be using and relying on publicly available information and on data, material and other information furnished to Phoenix by the Company and other parties. It is understood that in performing pursuant to this Agreement, Phoenix may assume and rely upon the accuracy and completeness of, and is not assuming any responsibility for independent certification of, such publicly available information and other information so furnished.

2.  Compensation. Phoenix's compensation for services to be performed under this Agreement will consist of the following cash fees:

    (a) Core Asset Sale Fees:

        i.  Phoenix acknowledges that the most successful sale of the Servicing Platform and Mortgage Servicing Rights will be accomplished through a joint effort of Phoenix and Milestone, and therefore agrees to work with Milestone to effectuate the sale of the Servicing Platform and Mortgage Servicing Rights. In the event of a Core Asset Sale of the Company's Mortgage Servicing Rights (whether alone or if combined with the sale of the Company's Servicing Platform), the Company shall pay Phoenix and Milestone an aggregate success fee equal to: (i) $1,000,000, plus (a) $1,000,000, pro rated for any proceeds received by the Company in excess of $446 million and up to $460 million, plus (b) 6.25% of any proceeds received by the Company in excess of $460 million. In the event of a Core Asset Sale of the Company's Servicing Platform in a transaction that is separate and distinct from the sale of the Company's Mortgage Servicing Rights, the Company shall pay Phoenix and Milestone an aggregate success fee equal to: (i) $500,000, plus (ii) 5.0% of any proceeds received by the Company in excess of $10 million. Phoenix and Milestone have agreed to split any fees payable by the Company for a sale of the Servicing Platform and/or a sale of the Mortgage Servicing Rights, 40% to Phoenix and 60% to Milestone. The Company shall enter into a separate agreement with Milestone reflecting such terms.

Mr. Michael Strauss
August 8, 2007
Page 4

3. <u>Confidential Review.</u> Phoenix and its agents and counsel, if any, will be accorded access to and may examine documents, records and other materials and information of the Company and its subsidiaries as Phoenix reasonably deems appropriate to perform its obligations hereunder. Phoenix shall keep all such information, to the extent confidential and proprietary to the Company, confidential except to the extent disclosure is required by any judicial, administrative or self-regulatory agency or organization. The following information shall not be deemed confidential or proprietary:

    (a) Information that at the time of disclosure, or after disclosure, is or subsequently becomes generally available to the public or within the industries in which the Company or Phoenix and its affiliates conduct business, other than as a result of a breach by Phoenix or its agents or counsel of its obligations under this Agreement;

    (b) Information that prior to or at the time of disclosure by the Company, was already in the possession of Phoenix or its affiliates (provided that Phoenix or its affiliates, at the time of such disclosure was not subject to a non-disclosure obligation relating to such information including any non-disclosure obligation under applicable "Insider Trading" laws and regulations) or could have been developed by them from information then in their possession, by the application of other information or techniques in their possession or generally available to the public or available to them, other than from the Company or its agents;

    (c) Information that at the time of disclosure or subsequent to disclosure, is obtained by Phoenix or its affiliates from a third party who is lawfully in possession of the information and who is not in violation of any contractual, legal or fiduciary obligation to the Company with respect to that information; or

    (d) Information that is or was independently developed by Phoenix or its affiliates from information lawfully obtained by Phoenix or its affiliates from parties lawfully in possession of such information and who are not in breach of any contractual, legal or fiduciary obligation to the Company with respect to the information.

The Company has furnished and will continue to furnish or cause to be furnished to Phoenix such information as Phoenix believes appropriate to its assignment (all information so furnished being the "Information"). The Company recognizes and confirms that Phoenix: (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the Services without having independently verified the same; (b) does not assume responsibility for the accuracy or completeness of the Information and such other information; and (c) will not make an appraisal of any assets or liabilities of the Company or a Purchaser Entity or any of their market competitors.

Phoenix shall have no right to make any representation which will be binding upon the Company without the prior written consent of the Company.

4. <u>Out-of-Pocket Expenses:</u> In addition to any fees payable by the Company to Phoenix hereunder, the Company, shall whether or not any transaction contemplated by this Agreement shall be proposed or consummated, reimburse Phoenix on a monthly basis for its reasonable travel and

Mr. Michael Strauss
August 8, 2007
Page 5

other reasonable out of pocket expenses (including all fees, disbursements and other reasonable charges of one firm of counsel, if any, to be retained by Phoenix, and of other consultants and advisors retained by Phoenix with the Company's consent) incurred in connection with, or arising out of Phoenix's activities under or contemplated by this Agreement. The Company shall also reimburse Phoenix, at such times as Phoenix shall request for any sale, use or similar taxes (including additions to such taxes, if any) arising in connection with any matter referred to or contemplated by this Agreement. All such reimbursements shall be made promptly upon submission by Phoenix of statements for such expenses.

5. <u>Term:</u>  This Agreement and the retention of Phoenix hereunder shall remain in full force and effect for twelve (12) months from the date hereof unless terminated earlier (the "Engagement Period") and may be terminated by the Company or Phoenix at any time, with or without cause, upon 30 days written notice to that effect to the other party, without further obligation to each other, except it is agreed that the provisions relating to indemnification, limitation of liabilities, contribution, settlement, the provisions relating to the payment of fees and expenses, confidentiality, the status of Phoenix as an independent contractor, the limitation on to whom Phoenix shall owe any duties, and the waiver of the right to trial by jury in this Agreement will survive any such termination.  If this Agreement expires or is terminated by the Company, any agreement or other written arrangement entered into by the Company regarding a Core Asset Sale within a 12 month period following the termination or expiration of this Agreement shall be deemed to give rise to the Core Asset Sale Fee set forth in Paragraph 2, payable by the Company to Phoenix.

6. <u>Independent Contractor:</u>  The Company acknowledges and agrees that it is a sophisticated business enterprise and that Phoenix has been retained pursuant to this Agreement to provide services to the Company. In such capacity, Phoenix shall act as an independent contractor, and any duties of Phoenix arising out of its engagement pursuant to this Agreement shall be contractual in nature and shall be owed solely to the Company.  Each party disclaims any intention to impose any fiduciary duty on the either.

7. <u>Announcement:</u>  If a Core Asset Sale is completed, the Company acknowledges and agrees that Phoenix may, at its option and expense, place an announcement in such newspapers and periodicals as it may choose, subject to the Company's prior approval which shall not be unreasonably withheld, stating that Phoenix has acted as a Financial Advisor to the Company in connection with the Core Asset Sale.  Other than announcements consistent with the preceding sentence, neither party shall make any public announcement relating to the content of this Agreement or any proposed acquisition or transaction in the absence of mutual written agreements by the parties regarding the content and timing of such announcement.

8. <u>Indemnification, Contribution, and Limitation of Liability:</u> The Company agrees, as of August 6, 2007, to indemnify Phoenix and its controlling persons, representatives, and agents in accordance with the indemnification provisions set forth in Appendix I, and agrees to the other provisions of Appendix I, which is incorporated herein by this reference, with respect to financial advisory services provided by Phoenix both prior to and following the Company's bankruptcy filing and regardless of whether a Core Asset Sale is consummated.

Mr. Michael Strauss
August 8, 2007
Page 6

9.  Beneficiaries:  This Agreement shall inure to the sole and exclusive benefit of Phoenix and the Company and the persons referred to in Appendix I and their respective successors and representatives.  The obligations and liabilities under this Agreement shall be binding upon Phoenix and the Company.

10. Amendments:  This Agreement may be modified or amended, or its provisions waived, only in writing signed by the person or persons against whom enforcement of the modification, amendment or waiver is sought.

11. No Commitment: This Agreement does not and will not constitute any agreement, commitment or undertaking, express or implied on the part of Phoenix or any affiliate to purchase or to sell any securities or to provide any financing and does not ensure the successful arrangement or completion of a Core Asset Sale.

12. Entire Agreement:  This Agreement constitutes the entire Agreement between the parties and supersedes and cancels any and all prior or contemporaneous arrangements, understandings and agreements, written or oral, between them relating to the subject matter hereof.

13. Severability:  If any portion of this Agreement shall be held or made unenforceable or invalid by a statute, rule, regulation, decision of a tribunal or otherwise, the remainder of this Agreement shall not be affected thereby and shall remain in full force and effect, and, to the fullest extent, the provisions of the Agreement shall be severable.

14. Governing Law; Waiver of Trial by Jury:  This Agreement, and the rights and obligations of the parties hereto, shall be governed by and construed in accordance with Delaware law (without regard to any rules or principles of conflicts of law that might look to any jurisdiction outside of the State of New York).  Any dispute arising hereunder shall be brought before a court in the State of New York.

**EACH OF THE PARTIES HERETO (ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS STOCKHOLDERS AND INDEMNIFIED PARTIES) WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERACTION (WHETHER BASED UPON CONTRACT, OR OTHERWISE) RELATED TO OR ARISING OUT OF THE ENGAGEMENT PURSUANT TO, OR THE PERFORMANCE OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT.**

15. Waiver, Amendment and Modification; Headings:  No waiver, amendment or other modification of this Agreement shall be effective unless signed in writing by each of the parties hereto.  The headings used herein are for ease of reference only and shall not be used to construe the meaning of this Agreement.

16. Authority: The Company and Phoenix represent and warrant that they have full power and authority to execute and deliver this Agreement and to assume the obligations set forth herein, and this Agreement has been duly authorized, executed and delivered by the Company and constitutes a valid, binding and legally enforceable obligation of the Company and Phoenix

Mr. Michael Strauss
August 8, 2007
Page 7

(except (i) as may be limited by laws pertaining to bankruptcy, insolvency, reorganization, moratorium, receivership, conservatorship or other laws affecting creditors' rights generally, and (ii) as may be limited by laws governing specific performance, injunction relief and all other equitable remedies.

If the foregoing terms correctly set forth our agreement, please sign and return to us a duplicate copy of this Agreement. We look forward to working with you toward the successful conclusion of this engagement and developing a long-term relationship with the Company.

Mr. Michael Strauss
August 8, 2007
Page 8

Very truly yours,

**PHOENIX CAPITAL, INC.**

By: _Brett H. Schaffer_

Brett H. Schaffer
President

Confirmed and accepted as of this _3rd_ day of August 2007

**AMERICAN HOME MORTGAGE INVESTMENT CORP.**

By _John Kalas_    JOHN KAZAS
         SVP   DEPUTY GEN COUNSEL

Mr. Michael Strauss
Chairman, Chief Executive Officer and President