Loans hereunder, any material or significant contingent liability or liability for taxes, long-term leases or unusual forward or long-term commitments that is not reflected in the foregoing financial statements or the notes thereto in accordance with GAAP and that in any such case is material in relation to the business, operations, properties, assets, financial or other condition or prospects of the Borrowers.

6.03     Litigation.  Except as set forth in Schedule 6.03, there are no actions, suits, arbitrations, investigations or proceedings pending or, to its knowledge, threatened against any Borrower or any Affiliate of any Borrower or affecting any of the property thereof before any Governmental Authority, (i) as to which individually or in the aggregate there is a reasonable likelihood of an adverse decision which would be reasonably likely to have a Material Adverse Effect, or (ii) which questions the validity or enforceability of any of the Loan Documents or any action to be taken in connection with the transactions contemplated hereby or thereby and there is a reasonable likelihood of a materially adverse decision or a Material Adverse Effect.  The disclosure of any action, suit, arbitration, investigation or proceeding on Schedule 6.03 shall not operate as a consent to such matter, or a waiver or an amendment of any right, power, or remedy of the Administrative Agent or any Lender with respect to such matter, including the Administrative Agent's and the Lenders' right to exercise its remedies in the event that any matter listed on Schedule 6.03 is, results in, or has a Material Adverse Change or has a Material Adverse Effect.

6.04     No Breach.  Subject to the entry of the Interim Order (or the Final Order, when applicable), neither (a) the execution and delivery of the Loan Documents or (b) the consummation of the transactions therein contemplated in compliance with the terms and provisions thereof will conflict with or result in a breach of the charter or by-laws of any Borrower, or any applicable law, rule or regulation, or any order, writ, injunction or decree of any Governmental Authority, or other instrument, indenture, or other material agreement, to which any Borrower or any of its Subsidiaries is a party or by which any of them or any of their property is bound or to which any of them is subject (other than conflicts, breaches and defaults the enforcement of which will be stayed by virtue of the filing of the Chapter 11 Cases), or constitute a default under any such instrument, indenture, or other material agreement or (except for the Liens created pursuant to this Loan Agreement) result in the creation or imposition of any Lien upon any property of any Borrower or any of its Subsidiaries, pursuant to the terms of any such agreement or instrument.

6.05     Action.  Subject to the entry of the Interim Order (or the Final Order, when applicable), each Borrower has all necessary corporate or other power, authority and legal right to execute, deliver and perform its obligations under each of the Loan Documents to which it is a party; the execution, delivery and performance by each Borrower of each of the Loan Documents to which it is a party has been duly authorized by all necessary corporate or other action on its part; and each Loan Document has been duly and validly executed and delivered by each Borrower and constitutes a legal, valid and binding obligation of each Borrower, enforceable against each Borrower in accordance with its terms.

6.06     Approvals.  No authorizations, approvals or consents of, and no filings or registrations with, any Governmental Authority, or any other Person, are necessary for the

- 51 -

execution, delivery or performance by any Borrower of the Loan Documents to which it is a party or for the legality, validity or enforceability thereof, except for the Interim Order (or the Final Order, when applicable) and those consents which have been obtained.

6.07    Margin Regulations.  Neither the making of any Loan hereunder, nor the use of the proceeds thereof, will violate or be inconsistent with the provisions of Regulation T, U or X.

6.08    Taxes.  Each Borrower and its Subsidiaries have filed all federal income Tax Returns and all other material Tax Returns that are required to be filed by them and have paid all Taxes otherwise required to be paid by them, except for any such taxes (other than payroll Taxes), if any, that are being appropriately contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been provided in accordance with GAAP or except as permitted by the Bankruptcy Code to the contrary.  The charges, accruals and reserves on the books of each Borrower and its Subsidiaries in respect of taxes and other governmental charges are adequate The information provided to the Administrative Agent and the Lenders with respect to any Tax Refund Receivables is accurate and complete in all respects.

6.09    Intellectual Property.  Each Borrower owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business as currently conducted.  No material claim has been asserted and is pending by any Person challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any Intellectual Property, nor does any Borrower know of any valid basis for any such claim.  The use of Intellectual Property by each Borrower does not infringe on the rights of any Person in any material respect.

6.10    Environmental Matters.

(a)    The operations of the Borrowers have been and are in compliance with all Environmental Laws, including obtaining and complying with all required environmental, health and safety Permits, other than non-compliances that in the aggregate have (i) no reasonable likelihood of the Borrowers incurring Environmental Liabilities and Costs in excess of $50,000 and (ii) no Material Adverse Effect.

(b)    None of the Borrowers or any Property currently or, to the knowledge of the Borrowers, previously owned, operated or leased by or for any Borrower is subject to any pending or, to the knowledge of the Borrowers, threatened, claim, order, agreement, notice of violation, notice of potential liability or is the subject of any pending or threatened proceeding or governmental investigation under or pursuant to Environmental Laws other than those that in the aggregate have (i) no reasonable likelihood of the Borrowers incurring Environmental Liabilities and Costs in excess of $50,000 and (ii) no Material Adverse Effect.

(c)    None of the Borrower or any of its Subsidiaries is a treatment, storage or disposal facility requiring a Permit under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, the regulations thereunder or any state analog.

- 52 -

(d)       There are no facts, circumstances or conditions arising out of or relating to the operations or ownership of real property owned, operated or leased by the Borrowers that are not specifically included in the financial information furnished to the Lenders other than those that in the aggregate have (i) no reasonable likelihood of the Borrowers incurring Environmental Liabilities and Costs in excess of $50,000 and (ii) no Material Adverse Effect.

(e)       As of the date hereof, to the knowledge of the Borrowers; no Environmental Lien has attached to any property of any Borrower and, to the knowledge of the Borrowers, no facts, circumstances or conditions exist that could reasonably be expected to result in any such Lien attaching to any such property.

(f)       The Borrowers have provided the Lenders with copies of all environmental, health or safety audits, studies, assessments, inspections, investigations or other environmental health and safety reports relating to the operations of the Borrowers or any of their real property that are in the possession, custody or control of the Borrowers.

6.11       Investment Company Act.    No Borrower nor any Subsidiary of a Borrower is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.    No Borrower is subject to any federal or state statute or regulation that limits its ability to incur indebtedness.

6.12       No Legal Bar.    Subject to the entry of the Interim Order (or the Final Order, when applicable), neither the execution, delivery and performance of this Loan Agreement, the borrowings hereunder and the use of the proceeds thereof nor the provisions of any other Loan Documents will violate any Requirement of Law or Contractual Obligation (other than violations the enforcement of which will be stayed by virtue of the filing of the Chapter 11 Cases) of any Borrower or of any Subsidiary of a Borrower and will not result in, or require, the creation or imposition of any Lien (other than the Liens created hereunder) on any of its respective properties or revenue, pursuant to any such Requirement of Law or Contractual Obligation.

6.13       No Default.    No Default or Event of Default has occurred and is continuing.

6.14       Collateral; Collateral Security; Administrative Priority.

(a)       Except for Permitted Liens, no Borrower has assigned, pledged, or otherwise conveyed or encumbered any Collateral to any other Person.    The Borrowers represents that they are the sole owners of the Collateral and have good and marketable title thereto free and clear of all Liens, other than the Lien of the Administrative Agent and Permitted Liens.

(b)       The provisions of this Loan Agreement, together with the Interim Order (or the Final Order, when applicable), are effective to create in favor of the Administrative

NY1-4012525v8
DIP Credit Agreement -- AHM
JP011771
000000 - 000000

Agent a valid and perfected security interest in all right, title and interest of the Borrowers in, to and under the Collateral.

(c)     Upon the entry of the Interim Order (or the Final Order when applicable), the Administrative Agent has the priority of Liens and claims as set forth in Section 4.09.

6.15     <u>Location of Books and Records</u>.  The location where each Borrower keeps its books and records including all computer tapes and records relating to the Collateral is at 538 Broadhollow Road Melville, New York.

6.16     <u>True and Complete Disclosure</u>.  The information, reports, financial statements, exhibits and schedules furnished in writing by or on behalf of the Borrowers to the Administrative Agent or any Lender in connection with the negotiation, preparation or delivery of this Loan Agreement, the other Loan Documents or included herein or therein or delivered pursuant hereto or thereto, when taken as a whole, do not contain any untrue statement of material fact or omit to state any material fact necessary to make the statements herein or therein, in light of the circumstances under which they were made, not misleading.  All written information furnished after the date hereof by or on behalf of the Borrowers to the Administrative Agent or any Lender in connection with this Loan Agreement, the other Loan Documents and the transactions contemplated hereby and thereby will be true, complete and accurate in every material respect, or (in the case of the Budget (other than historical information) or projections) based on reasonable estimates, on the date as of which such information is stated or certified.  There is no Material Adverse Change and no fact known to a Responsible Officer that could reasonably be expected to have a Material Adverse Effect that has not been disclosed herein, in the other Loan Documents or in a report, financial statement, exhibit, schedule, disclosure letter or other writing furnished to the Lenders for use in connection with the transactions contemplated hereby or thereby.

6.17     <u>ERISA</u>.  Each Plan to which a Borrower or its Subsidiaries make direct contributions, and, to the knowledge of each Borrower, each other Plan and each Multiemployer Plan, is in compliance in all material respects with, and has been administered in all material respects in compliance with, the applicable provisions of ERISA, the Code and any other federal or state law.  No event or condition has occurred and is continuing as to which any Borrower would be under an obligation to furnish a report to the Administrative Agent under <u>Section 7.01(g)</u> hereof.  No accumulated funding deficiency (as defined in <u>Section 412</u> of the Code or <u>Section 302</u> of ERISA) has occurred with respect to any Plan.  No Borrower nor any ERISA Affiliate is subject to any present or potential liability under Title IV of ERISA that, individually or in the aggregate, could have a Materially Adverse Effect.  No material liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Plan or trust established under Title IV of ERISA has been, or is expected by any Borrower or any ERISA Affiliate to be, incurred by any Borrower or any ERISA Affiliate.  No Borrower nor any ERISA Affiliate has any contingent liability with respect to any post-retirement benefit under any "welfare plan" (as defined in <u>Section 3(1)</u> of ERISA), other than liability for continuation coverage under Part 6 of Title I of ERISA.  No Lien under <u>Section 412(a)</u> of the Code or <u>302(f)</u> of ERISA or requirement to provide security under <u>Section 401(a)(29)</u> of the Code or <u>Section</u>

- 54 -

307 of ERISA has been or is reasonably expected by any Borrower or any ERISA Affiliate to be imposed on the assets of any Borrower or any ERISA Affiliate. No Borrower, the Parent nor any ERISA Affiliate has engaged in any transaction prohibited by Section 408 of ERISA or Section 4975 of the Code. As of the Closing Date and throughout the term of the Loan Agreement, each Borrower is not and will not be an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title 1 of ERISA, and none of the assets of the Borrowers will constitute "plan assets" of one or more such plans for purposes of Title 1 of ERISA or Section 4975 of the Code.

6.18    Use of Proceeds. The Borrowers will use the proceeds of the Loans to finance working capital and for other general corporate purposes of the Borrowers in accordance with the Budget and to fund Lender Expenses and fees pursuant to Section 3.07 and the repayment of any other Obligations.

6.19    Insurance. All insurance required to be obtained and maintained by any Borrower pursuant to the Loan Documents has been obtained. All premiums then due and payable on all such insurance have been paid.

6.20    No Agent or Lender Licenses. Neither the Administrative Agent nor any Lender will be required solely as a result of this Loan Agreement or the financing or taking a pledge of the mortgage loans to be licensed, registered or approved or to obtain permits or otherwise qualify (i) to do business in any state in which it is not currently so required or (ii) under any state consumer lending, fair debt collection or other applicable state statute or regulation.

6.21    Subsidiaries. All of the Subsidiaries of the Borrowers at the date hereof are listed on Schedule 6.21 to this Loan Agreement.

6.22    Origination of Unencumbered Whole Loans. The Unencumbered Whole Loans were originated in all material respects pursuant to origination practices that are legal and proper, prudent, and customary in the residential mortgage loan servicing business.

6.23    Orders. The Interim Order (or the Final Order, when applicable) is in full force and effect and has not been stayed.

6.24    REIT Status. The Parent has elected to be treated as a REIT for U.S. federal income tax purposes. AHMH is a taxable REIT Subsidiary of the Parent. AHMC is a taxable REIT Subsidiaries of AHMIC. AHMA is a qualified REIT Subsidiary of the Parent. Each of the Parent, AHMH, AHMC and AHMA is in compliance with the provisions of the Code governing its REIT status, as applicable.

6.25    MERS Membership. As of the Closing Date, AHMH is a MERS Member, the Borrowers are authorized users of the MERS System pursuant to the membership of AHMH, and AHMH and the Borrowers are in compliance with all terms and conditions of membership in MERS.

- 55 -

6.26    Collection Accounts and Escrow Accounts. The collection accounts and escrow accounts of the Borrowers held for the benefit of third parties shall be fully funded (or the applicable amounts shall be on deposit in segregated accounts) in accordance with the terms of the applicable securitization documents. At any time upon the request of the Administrative Agent, the Borrowers shall provide an officer's certificate in support thereof, in form and substance satisfactory to the Administrative Agent.

6.27    Anti-Terrorism Law Compliance. No Borrower is in violation of any law or regulation, or is identified in any list, of any Governmental Authority (including, without limitation, the U.S. Office of Foreign Asset Control list, Executive Order No. 13224 or the USA Patriot Act) that prohibits or limits the conduct of business with or the receiving of funds, goods or services to or for the benefit of certain Persons specified therein or that prohibits or limits any Lender from making any Loans to any Borrower or from otherwise conducting business with any Borrower.

**Section 7.  Covenants of the Borrowers**. Each Borrower covenants and agrees with the Administrative Agent and the Lenders that, so long as any Loan is outstanding and until payment in full of all Obligations:

7.01    Financial Statements and Other Information. The Borrowers shall deliver (or cause to be delivered) to the Administrative Agent and each Lender:

(a)    by the 15th and last day of each month, the Borrowers shall update the Budget, such updated Budget to be reasonably satisfactory to the Administrative Agent and to include actual numbers for historical periods included in the Budget;

(b)    contemporaneous with the filing thereof, copies of all pleadings, motions, applications, financial information and other papers and documents filed by the Borrowers in the Chapter 11 Cases, with copies of such papers and documents also provided to or served on the Administrative Agent's counsel;

(c)    promptly after the sending thereof, copies of all material written reports and all term sheets for a plan of reorganization given by the Borrowers to the Committee or any other official or unofficial creditors' committee in the Chapter 11 Cases;

(d)    from time to time such other information regarding the financial condition, operations, or business of the Borrowers or any Affiliate of the Borrowers as the Administrative Agent or any Lender may reasonably request; and

(e)    as soon as reasonably possible, and in any event within ten (10) Business Days after a Responsible Officer knows, or with respect to any Plan or Multiemployer Plan to which any Borrower or any of its Subsidiaries makes direct contributions, has reason to believe, that any of the events or conditions specified below with respect to any Plan or Multiemployer Plan has occurred or exists, a statement signed by a senior financial officer of the Administrative Borrower setting forth details respecting such event or condition and the action, if any, that such Borrower or its ERISA Affiliate proposes to take with respect thereto (and a copy

- 56 -

of any report or notice required to be filed with or given to PBGC by the Borrowers or an ERISA Affiliate with respect to such event or condition):

    (i)        any reportable event, as defined in <u>Section 4043(b)</u> of ERISA and the regulations issued thereunder, with respect to a Plan, as to which PBGC has not by regulation or otherwise waived the requirement of <u>Section 4043(a)</u> of ERISA that it be notified within thirty (30) days of the occurrence of such event (provided that a failure to meet the minimum funding standard of <u>Section 412</u> of the Code or <u>Section 302</u> of ERISA, including, without limitation, the failure to make on or before its due date a required installment under <u>Section 412(m)</u> of the Code or <u>Section 302(e)</u> of ERISA, shall be a reportable event regardless of the issuance of any waivers in accordance with <u>Section 412(d)</u> of the Code); and any request for a waiver under <u>Section 412(d)</u> of the Code for any Plan;

    (ii)       the distribution under <u>Section 4041(c)</u> of ERISA of a notice of intent to terminate any Plan or any action taken by the Borrower, the Parent or an ERISA Affiliate to terminate any Plan;

    (iii)      the institution by PBGC of proceedings under <u>Section 4042</u> of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or the receipt by any Borrower or any ERISA Affiliate of a notice from a Multiemployer Plan that such action has been taken by PBGC with respect to such Multiemployer Plan;

    (iv)      the complete or partial withdrawal from a Multiemployer Plan by any Borrower or any ERISA Affiliate that results in liability under <u>Section 4201</u> or <u>4204</u> of ERISA (including the obligation to satisfy secondary liability as a result of a purchaser default) or the receipt by any Borrower or any ERISA Affiliate of notice from a Multiemployer Plan that it is in reorganization or insolvency pursuant to <u>Section 4241</u> or <u>4245</u> of ERISA or that it intends to terminate or has terminated under <u>Section 4041A</u> of ERISA;

    (v)       the institution of a proceeding by a fiduciary of any Multiemployer Plan against any Borrower or any ERISA Affiliate to enforce <u>Section 515</u> of ERISA, which proceeding is not dismissed within 30 days; and

    (vi)      the adoption of an amendment to any Plan that, pursuant to <u>Section 401(e)</u> of the Code or <u>Section 307</u> of ERISA, would result in the loss of tax-exempt status of the trust of which such Plan is a part if any Borrower or an ERISA Affiliate fails to timely provide security to such Plan in accordance with the provisions of said Sections.

    7.02    <u>Litigation</u>.  Each Borrower shall promptly, and in any event within 5 Business Days after service of process on such Borrower, give to the Administrative Agent and the Lenders notice of all legal or arbitrary proceedings affecting the Borrowers that questions or challenges the validity or enforceability of any of the Loan Documents or as to which there is a reasonable likelihood of adverse determination which would result in a Material Adverse Effect.

- 57 -

7.03     Existence, Etc. Each Borrower shall:

(a)     preserve and maintain its legal existence and all of its material rights, privileges, licenses and franchises;

(b)     comply with the requirements of all applicable laws, rules, regulations and orders of Governmental Authorities (including, without limitation, truth in lending, real estate settlement procedures and all environmental laws, rules, regulations and orders of Governmental Authorities) if failure to comply with such requirements would be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect;

(c)     keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied;

(d)     not move its chief operating office;

(e)     pay and discharge and make deposit of all Taxes, assessments and governmental charges or levies imposed on it or on its income or profits or on any of its Property or which it is otherwise required to deposit prior to the date on which such Taxes are due, except for any such Tax, assessment, charge or levy (excluding payroll Taxes) the payment of which is being contested in good Faith and by proper proceedings and against which adequate reserves are being maintained in accordance with GAAP or except as permitted by the Bankruptcy Code; and

(f)     permit representatives of the Administrative Agent, any Lender or any Lender-Related Party, during normal business hours upon reasonable advance notice (or at any time and from time to time during the continuance of an Event of Default), to examine, copy and make extracts from its books and records, to inspect any of its Properties, and to discuss its business and affairs with its, all to the extent reasonably requested by the Administrative Agent, any Lender or any Lender-Related Party.

7.04     Prohibition of Fundamental Changes.     Except for Permitted Dispositions, no Borrower will enter into any transaction of merger or consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation, winding up or dissolution) or sell all or substantially all of its assets.

7.05     [Reserved]

7.06     Satisfaction of Conditions Precedent for the Final Order.     Each Borrower shall use its commercially reasonable best efforts to satisfy the conditions precedent to obtain the Final Order by September 7, 2007.

7.07     Notices. Each Borrower shall give notice to the Administrative Agent and the Lenders promptly:

(a)     upon any Borrower becoming aware of, and in any event within one (1) Business Day after, the occurrence of any Default or Event of Default or any event of default

- 58 -

NYI-4012525v8
DIP Credit Agreement -- AHM
JP011771
000000 - 000000

or default under any other material agreement of a Borrower (except any such default the enforcement of which is stayed by the filing of the Chapter 11 Cases);

(b)        upon, and in any event within one (1) Business Day after, service of process on any Borrower or any Affiliate of any Borrower, or the Administrative Agent thereof for service of process, in respect of any legal or arbitrable proceedings affecting any Borrower or any Subsidiary or Affiliate of any Borrower (i) that questions or challenges the validity or enforceability of any of the Loan Documents or (ii) in which the amount in controversy exceeds $100,000, unless such proceeding is stayed by the commencement of the Chapter 11 Cases;

(c)        upon any Borrower becoming aware of any Material Adverse Change, or any Material Adverse Effect; and

(d)        upon the entry of a judgment or decree affecting the Borrowers in an amount in excess of $100,000, unless collection of such judgment or decree is stayed by the commencement of the Chapter 11 Cases.

Each notice pursuant to this Section 7.07 shall be accompanied by a statement of a Responsible Officer of the applicable Borrower setting forth details of the occurrence referred to therein and stating what action the applicable Borrower has taken or proposes to take with respect thereto.

7.08      Servicing.  Each Borrower shall not permit any Person other than a Borrower or AHMS to service Unencumbered Whole Loans without the prior written consent of the Administrative Agent, which consent shall not be unreasonably withheld.

7.09      Lines of Business.  The Borrowers will not engage to any substantial extent in any line or lines of business activity other than the businesses engaged in by the Borrowers as of the Closing Date.

7.10      Transactions with Affiliates.  Other than with respect to transactions solely among the Borrowers, no Borrower will enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of property or the rendering of any service, with any Affiliate unless such transaction is (a) otherwise permitted under this Loan Agreement or the other Loan Documents, (b) in the ordinary course of such Borrower's business and (c) upon fair and reasonable terms no less favorable to such Borrower than it would obtain in a comparable arm's length transaction with a Person which is not an Affiliate, or make a payment that is not otherwise permitted by this Section 7.11 to any Affiliate.

7.11      Use of Proceeds.  The Borrowers will use the proceeds of the Loans to finance working capital and for other general corporate purposes of the Borrowers in accordance with the Budget and to fund Lender Expenses and fees pursuant to Section 3.07 and the repayment of any other Obligations.

7.12      Limitation on Liens.  No Borrower will, nor will it permit or allow others to, create, incur or permit to exist any Lien, security interest or claim on or to any Collateral, except for (i) Liens existing on the Filing Date, (ii) Liens on the Collateral created

- 59 -

pursuant to this Loan Agreement and the other Loan Documents and (iii) other Liens acceptable to the Administrative Agent (collectively, "Permitted Liens"). Each Borrower will defend the Collateral against, and will take such other action as is necessary to remove, any Lien, security interest or claim on or to the Collateral, other than the security interests created or allowed under this Loan Agreement, and each Borrower will defend the right, title and interest of the Administrative Agent and the Lenders in and to any of the Collateral against the claims and demands of all persons whomsoever.

       7.13      Limitation on Sale of Assets. No Borrower will convey, sell, lease, assign, transfer or otherwise dispose of (collectively, "Transfer"), any of its Property, business or assets (including, without limitation, receivables and leasehold interests) whether now owned or hereafter acquired, other than Permitted Dispositions.

       7.14      Limitation on Distributions. No Borrower will make any payment on account of, or set apart assets for a sinking or other analogous fund for the purchase, redemption, defeasance, retirement or other acquisition of any stock or senior or subordinate debt of such Borrower, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of such Borrower.

       7.15      Restricted Payments.  No Borrower shall make any Restricted Payments other than Restricted Payments by any Borrower to any other Borrower.

       7.16      Loans, Investments, Etc. The Borrowers shall not make or commit or agree to make any loan, advance, guarantee of obligations, other extension of credit or capital contributions to, or hold or invest in or commit or agree to hold or invest in, or purchase or otherwise acquire or commit or agree to purchase or otherwise acquire any shares of the Equity Interests, bonds, notes, debentures or other securities of, or make or commit or agree to make any other investment in, any other Person, or purchase or own any futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or permit any of its Subsidiaries to do any of the foregoing, except for: (i) investments existing on the Closing Date, as set forth on Schedule 7.16 hereto, but not any increase in the amount thereof as set forth in such Schedule or any other modification of the terms thereof, (ii) loans and advances by any Borrower to another Borrower made in the ordinary course of business, and (iii) cash and Cash Equivalents held in Control Accounts and the Loan Account.

       7.17      Orders, Administrative Priority; Lien Priority; Payment of Claims.

       (a)      The Borrowers shall not at any time seek, consent to or suffer to exist any modification, stay, vacation or amendment of the Orders except for modifications and amendments agreed to by the Administrative Agent.

       (b)      The Borrowers shall not at any time suffer to exist a priority for any administrative expense of unsecured claim against any Borrower (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative

- 60 -

expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code) equal or superior to the priority of the Lenders in respect of the Obligations, except for the Carve-Out Amount having priority over the Obligations to the extent set forth in the definition thereof.

(c)     The Borrowers shall not at any time suffer to exist any Lien on the Collateral having a priority equal or superior to the Lien in favor of the Administrative Agent and the Lenders in respect of the Collateral except for Permitted Liens.

(d)     Prior to the date on which the Obligations have been paid in full in cash and the Commitments have been terminated, the Borrowers shall not pay any administrative expense claims except (i) UST/Clerk Fees and Priority Professional Expenses (each such term, as defined in the Applicable Order) and other payments pursuant to the definition of the term "Carve-Out Amount," (ii) any Obligations due and payable hereunder, (iii) other administrative expense claims incurred in the ordinary course of the business of the Borrowers or their respective Chapter 11 Cases and (iv) as otherwise provided in the Orders.

7.18     No Amendment or Waiver.  No Borrower will, without the prior consent of the Lenders, nor will it permit or allow others to amend, modify, terminate or waive any provision of any Unencumbered Whole Loan to which such Borrower is a party in any manner that shall reasonably be expected to materially and adversely affect the value of such loan as Collateral.

7.19     Maintenance of Property; Insurance.  Each Borrower shall keep all of its property useful and necessary in its business in good working order and condition.  Each Borrower shall maintain errors and omissions insurance or mortgage impairment insurance and blanket bond coverage in such amounts as are in effect on the Closing Date (as disclosed to the Lenders in writing) and shall not permit the reduction of such coverage without the written consent of the Lenders, and shall also cause to be maintained such other insurance with financially sound and reputable insurance companies, and with respect to property and risks of a character usually maintained by entities engaged in the same or similar business similarly situated, against loss, damage and liability of the kinds and in the amounts customarily maintained by such entities.

7.20     ERISA.  No Borrower will engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by the Administrative Agent or any Lender of any of its rights under this Loan Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA or result in a violation of a state statute regulating governmental plans that would subject the Lender to liability for a violation of ERISA or such state statute.

7.21     Other Indebtedness.  The Borrowers shall not incur any other Indebtedness (including any accrued interest thereon), other than Indebtedness incurred under this Loan Agreement.

7.22     Prepetition Payments.

- 61 -

(a)        The Borrowers will not (i) make any payment or prepayment on or redemption or acquisition for value (including, without limitation, by way of depositing with the trustee with respect thereto money or securities before due for the purpose of paying when due) of any Pre-Petition Credit Facilities or other pre-Filing Date obligations of any Borrower, (ii) pay any interest on any Pre-Petition Credit Facilities of any Borrower (whether in cash, in kind securities or otherwise), or (iii) make any payment or create or permit any Lien pursuant to Section 361 of the Bankruptcy Code (or pursuant to any other provision of the Bankruptcy Code authorizing adequate protection), or apply to the Bankruptcy Court for the authority to do any of the foregoing; provided that, to the extent permitted in the Orders, (x) the Borrowers may make payments for administrative expenses that are allowed and payable under Sections 330 and 331 of the Bankruptcy Code, and (y) the Borrowers may make Prepetition Payments to such other claimants and in such amounts as may be consented to by the Administrative Agent and approved by the Bankruptcy Court.

(b)        Will not amend or modify in any respect any Indebtedness existing on the Filing Date.

7.23        MERS.

(a)        Each of the Borrowers shall, at all times, maintain its status as a MERS Member (or, if applicable, as an authorized user of the MERS System) and at all times remain in compliance with all terms and conditions of membership in MERS, including the MERSCORP, Inc. "Rules of Membership" most recently promulgated by MERSCORP, Inc., the "MERS Procedures Manual" most recently promulgated by MERS, and any and all other guidelines or requirements set forth by MERS or MERSCORP, as each of the foregoing may be modified from time to time, including, but not limited to, compliance with guidelines and procedures set forth with respect to technological capabilities, drafting and recordation of deeds of trust or mortgages, registration of deeds of trust or mortgages on the MERS System, including registration of the interest of the Administrative Agent and the Lenders in such mortgages and membership requirements; provided, however, that any of the Borrowers may resign from the MERS System (or cease to be an authorized user of the MERS System) so long as such Borrower has delivered to the Administrative Agent: (1) written notice that it intends to resign from the MERS System (or cease to be an authorized user of the MERS System) no later than 60 days prior to the proposed effective date of such resignation or cessation, and (2) such evidence as the Administrative Agent may request that upon the effective date of such Borrower's resignation from the MERS System (or cessation as an authorized user of the MERS System) and at all times thereafter, no deed of trust or mortgage shall be registered to such Borrower on the MERS System unless such Borrower shall be a MERS Member (or an authorized user of the MERS System).

(b)        Each of the Borrowers that is a MERS Member shall promptly, upon the request of the Administrative Agent, execute and deliver to the Administrative Agent an assignment of mortgage, in blank, with respect to any MERS Mortgage that the Administrative Agent reasonably determines shall be removed from the MERS System.

- 62 -

(c)        Upon the registration of any Mortgage on the MERS System, each of the Borrowers designates the Administrative Agent in the Custodian Category and the Interim Funder Category with respect to such Mortgage.

(d)        Each of the Borrowers agrees that it shall not de-register or attempt to de-register any deed of trust or mortgage from the MERS System unless such Borrower has complied with the requirements set forth in the Electronic Tracking Agreement (as defined for the purposes of the MERS System and the requirements hereof relating to a release of Collateral.

(e)        Each of the Borrowers shall employ officers who have the authority, pursuant to a corporate resolution of MERS, to execute assignments of deeds of trust and mortgages in the name of MERS in the event de-registration of a deed of trust or mortgage from the MERS System is necessary or desirable.

(f)        Each of the Borrowers shall execute and deliver to the Administrative Agent such blank assignments of deeds of trust and mortgages as the Administrative Agent may require.

7.24      REIT.  Each of the Borrowers shall maintain its status described in Section 6.24.

7.25      Retention of CRO.  The Borrowers shall continue to retain a chief restructuring officer reasonably acceptable to the Administrative Agent (it being understood that the retention of Kroll Zolfo Cooper as restructuring firm and Stephen F. Cooper as chief restructuring officer shall be acceptable to the Administrative Agent) that has substantial experience and expertise advising Chapter 11 debtors-in-possession in large and complex bankruptcy cases; provided that the Borrowers shall be permitted to replace any such advisor(s) with any other advisors satisfying the requirements of this Section and shall be permitted a period of time (not to exceed 10 Business Days) to file an application with the Bankruptcy Court to employ such replacement advisor(s).

**Section 8. Events of Default.**  Each of the following events shall constitute an event of default (an "Event of Default") hereunder:

(a)        the Borrowers shall fail to make a payment of (i) when and as required to be paid herein, any amount of principal of any Loan, (ii) within three days after the same becomes due, any interest on any Loan or any fee due hereunder or (iii) within five days after the same becomes due, any other amount payable hereunder or under any other Loan Document (whether at stated maturity or upon acceleration); or

(b)        the Borrowers shall fail to make any mandatory prepayment under Section 2.06; or

(c)        the Borrowers shall default in the payment of any other Obligation or any other amount due under any other Loan Document, and such default shall have continued unremedied for 5 Business Days; or

- 63 -

(d)        any representation, warranty or certification made or deemed made herein (including in Section 6) or in any other Loan Document by any Borrower or any certificate furnished to the Administrative Agent or any Lender pursuant to the provisions thereof, shall prove to have been false or misleading in any material respect as of the time made or furnished; or

(e)        (i) the Borrowers shall fail to comply with  the requirements of Section 7.02, Section 7.03(a), Section 7.07(a), Section 7.08, Sections 7.11 through 7.18, or Sections 7.20 through 7.25 hereof; or (ii) the Borrowers shall otherwise fail to observe or perform any other agreement contained in this Loan Agreement or any other Loan Document and such failure to observe or perform shall continue unremedied for a period of 10 Business Days; or

(f)        except for any judgment the enforcement of which is stayed by the commencement of the Chapter 11 Cases, a final judgment or judgments for the payment of money in excess of (i) $50,000, individually, or (iii) $250,000 in the aggregate, per calendar year (to the extent that it is, in the reasonable determination of the Administrative Agent, uninsured and provided that any insurance or other credit posted in connection with an appeal shall not be deemed insurance for these purposes) shall be rendered against any Borrower or any of its Subsidiaries by one or more courts, administrative tribunals or other bodies having jurisdiction over them and the same shall not be discharged (or provision shall not be made for such discharge) or bonded, or a stay of execution thereof shall not be procured, within 30 days from the date of entry thereof and any such Borrower or any such Subsidiary shall not, within said period of 30 days, or such longer period during which execution of the same shall have been stayed or bonded, appeal therefrom and cause the execution thereof to be stayed during such appeal; or

(g)        any Loan Document shall for whatever reason (including an event of default thereunder) be terminated or the Lien on the Collateral created by this Loan Agreement and the Orders, any Borrower's material obligations hereunder or under any Loan Document shall cease to be in full force and effect or, in the Administrative Agent's good faith determination, otherwise cease to benefit the Administrative Agent or any Lender, or the enforceability thereof shall be contested by any Borrower; or

(h)        the occurrence of a Material Adverse Change or a Material Adverse Effect; or

(i)        (i) any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any material "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan, any Borrower or any ERISA Affiliate shall fail to make a required installment payment to any Plan on or before the date due under Section 302 of ERISA or Section 412 of the Code, or any Lien in favor of the PBGC or a Plan shall arise on the assets of any Borrower or any ERISA Affiliate, (iii) a reportable event as defined in Section 4043(b) of ERISA and the regulations issued thereunder shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to

- 64 -

terminate, any Plan, which reportable event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Lender, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Plan shall terminate for purposes of Title IV of ERISA, (v) any Borrower or any ERISA Affiliate shall, or in the reasonable opinion of the Administrative Agent is likely to, incur any liability in connection with a withdrawal from, or the insolvency or reorganization of, a Multiemployer Plan, (vi) any Borrower or any ERISA Affiliate shall fail to pay when due or is in default on an amount which it shall have become liable to pay to the PBGC, any Plan, any Multiemployer Plan or a trust established under Section 4049 of ERISA, or (vii) a condition shall exist by reason of which the PBGC would be entitled to obtain a decree adjudicating that an ERISA Plan must be terminated or have a trustee appointed to administer any ERISA Plan, (viii) any other event or condition shall occur or exist with respect to any Plan which could subject any Borrower or any ERISA Affiliate to any tax, penalty or other liability or the imposition of any Lien or security interest on any Borrower or any ERISA Affiliate, (ix) any Borrower shall incur any liability for any post-retirement or post-termination health or life insurance or (x) the assets of any Borrower become or are deemed to be "plan assets" of a plan subject to ERISA or Section 4975 of the Code. No Event of Default shall be deemed to be, or have been, waived or corrected because of any disclosure by any Borrower; and in each case in clauses (i) through (ix) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect; or

(j)      any Change of Control; or

(k)      any Borrower shall grant, or suffer to exist, any Lien on any Collateral except the Liens in favor of the Administrative Agent and the Secured Parties and other Permitted Liens; or the Liens granted hereunder shall cease to be valid and perfected (i) first priority Liens on the First Lien Collateral or (ii) Liens on the Second Lien Collateral subject, as to priority, only to Liens existing on the Filing Date securing the Senior Claims, in each case in favor of the Administrative Agent and the Lenders, or there shall be Liens in favor of any Person, except in each case Permitted Liens; or

(l)      any Borrower shall default under, or fail to perform as required under, or shall otherwise materially breach the terms of any instrument, agreement or contract between such Borrower entered into or assumed on or after the Filing Date, on the one hand, and the Administrative Agent, or any of the Administrative Agent's Affiliates on the other or, after the Filing Date, any Borrower shall default under, or fail to perform as requested under, the terms of any repurchase agreement, loan and security agreement or similar credit facility or agreement for borrowed funds or Indebtedness in excess of $100,000 entered into by such Borrower and any third party, which default or failure entitles any party to require acceleration, prepayment, redemption, purchase or defeasement of any Indebtedness thereunder or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case prior to the stated maturity thereof, excluding, in each case, Indebtedness under this Loan Agreement and obligations under repurchase agreements or similar agreements to the extent any enforcement action is taken pursuant to Section 555, 559, 560, or 561 of the Bankruptcy Code; or

- 65 -

(m)        the Bankruptcy Court shall not have entered the Final Order by September 7, 2007; or

(n)        an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, or any Borrower shall file an application for on order with respect to any Chapter 11 Case seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or

(o)        an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a Chapter 7 case; or

(p)        (i) the Borrowers file a plan of reorganization in the Chapter 11 Cases which does not contain a provision for termination of the Commitments and payment in full in cash of all Obligations of the Borrowers hereunder and under the other Loan Documents on or before the effective date of such plan or plans or (ii) an order shall be entered by the Bankruptcy Court confirming a plan of reorganization in any of the Chapter 11 Cases which does not contain a provision for termination of the Commitments and payment in full in cash of all Obligations of the Borrowers hereunder and under the other Loan Documents and the release of the Administrative Agent and the Lenders in full from all claims of the Borrowers and their respective estates on or before the effective date of such plan or plans upon entry thereof; or

(q)        an order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the Commitments, and payment in full in cash of all Obligations of the Borrowers hereunder and under the other Loan Documents upon entry thereof; or

(r)        an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court or any other court of competent jurisdiction without the express prior written consent of the Lenders, (i) to revoke, reverse, stay for a period in excess of 10 days, vacate, rescind, modify, supplement or amend the Orders, this Loan Agreement or any other Loan Document, in each case in a manner that is adverse the Administrative Agent and the Lenders, or (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Borrowers equal or superior to the priority of the Lenders in respect of the Obligations, except for allowed administrative expenses having priority over the Obligations to the extent set forth in the definition of "Carve-Out Amount," or (iii) to grant or permit the grant of a Lien on the Collateral other than Permitted Liens; or

(s)        an application for any of the orders described in clauses (n), (o), (q), (r) or (w) shall be made by a Person other than the Borrowers, and such application is not being diligently contested by the Borrowers in good faith; or

(t)        any Chapter 11 Case shall be dismissed (or the Bankruptcy Court shall make a ruling requiring the dismissal of any Chapter 11 Case), suspended or converted to a case

NYI-4012525v8
DIP Credit Agreement -- AHM
JP011771
000000 - 000000

under chapter 7 of the Bankruptcy Code, or any Borrower shall file any pleading requesting any such relief; or an application shall be filed by any Borrower for the approval of, or there shall arise, (i) any other Claim having priority senior to or *pari passu* with the claims of the Secured Parties under the Loan Documents and the Orders or any other claim having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code (other than the Carve-Out) or (ii) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted herein, except as expressly provided herein;

(u)    except as permitted by the Orders or as otherwise agreed to by the Administrative Agent, the Borrowers shall make any Pre-Petition Payment other than Pre-Petition Payments authorized by the Bankruptcy Court in accordance with "first day" orders reasonably satisfactory to the Administrative Agent; or

(v)    (i) any Borrower challenges or (ii) any other Person successfully challenges, in each case the rights of the Administrative Agent or any Lender under this Loan Agreement or any Loan Document, including, without limitation, the Liens hereunder; or

(w)    an order shall be entered by the Bankruptcy Court that is not stayed pending appeal granting relief from the automatic stay to any creditor of any of the Borrowers with respect to any claim which in the aggregate could have a Material Adverse Effect; provided, however, that it shall not be an Event of Default if relief from the automatic stay is granted (i) solely for the purpose of allowing such creditor to determine the liquidated amount of its claim against the Borrowers, or (ii) to permit the commencement of and/or prosecution of a proceeding to collect against an insurance company.

**Section 9. Remedies Upon Default.** Upon the occurrence of one or more Events of Default (subject to the expiration of the applicable cure period contained therein), the Administrative Agent may, and shall at the request of the Required Lenders, immediately declare the principal amount of the Loans then outstanding to be immediately due and payable, together with all interest and other amounts payable hereunder (including amounts payable pursuant to Sections 2.05, and 3.07 hereof) thereon and reasonable fees and out-of-pocket expenses accruing under this Loan Agreement. Upon such declaration, the balance then outstanding shall become immediately due and payable, without further order of, or application to, the Bankruptcy Court, without presentment, demand, protest or other formalities of any kind, all of which are hereby expressly waived by each Borrower and the Administrative Agent may exercise any and all of its other rights and remedies under applicable law (including, but not limited to, the Bankruptcy Code), hereunder and under the other Loan Documents, including, but not limited to, the transfer of servicing of the Collateral or the liquidation of the Collateral on a servicing released basis.

**Section 10.    Administrative Agent.**

10.01    Appointment. Each Lender (and each subsequent holder of any Loans by its acceptance thereof), hereby irrevocably appoints and authorizes the Administrative Agent to perform the duties of the Administrative Agent as set forth in this Loan Agreement including: (i) to receive on behalf of each Lender any payment of principal of or interest on the Loans

- 67 -

outstanding hereunder and all other amounts accrued hereunder for the account of the Lenders and paid to the Administrative Agent, and to distribute promptly to each Lender its Pro Rata Share of all payments so received, (ii) to distribute to each Lender copies of all material notices and agreements received by the Administrative Agent and not required to be delivered to each Lender pursuant to the terms of this Loan Agreement, provided that the Administrative Agent shall not have any liability to the Lenders for the Administrative Agent's inadvertent failure to distribute any such notices or agreements to the Lenders and (iii) subject to <u>Section 10.03</u> of this Agreement, to take such action as the Administrative Agent deems appropriate on its behalf to administer the Loans and the Loan Documents and to exercise such other powers delegated to the Administrative Agent by the terms hereof or the Loan Documents (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and) instructions and the power to make or to refuse to make determinations and calculations) together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof. As to any matters not expressly provided for by this Loan Agreement and the other Loan Documents (including, without limitation, enforcement or collection of the Notes), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions of the Required Lenders shall be binding upon all Lenders and all subsequent holders of Notes; <u>provided, however,</u> that the Administrative Agent shall not be required to take any action which, in the reasonable opinion of the Administrative Agent, exposes the Administrative Agent to liability or which is contrary to this Loan Agreement or any Loan Document or applicable law.

10.02    <u>Nature of Duties</u>.  The Administrative Agent shall have no duties or responsibilities except those expressly set forth in this Loan Agreement or in the Loan Documents.  The duties of the Administrative Agent shall be mechanical and administrative in nature.  The Administrative Agent shall not have by reason of this Loan Agreement or any Loan Document a fiduciary relationship in respect of any Lender.  Nothing in this Loan Agreement or any of the Loan Documents, express or implied, is intended to or shall be construed to impose upon the Administrative Agent any obligations in respect of this Loan Agreement or any of the Loan Documents except as expressly set forth herein or therein.  Each Lender shall make its own independent investigation of the financial condition and affairs of the Borrowers in connection with the making and the continuance of the Loans hereunder and shall make its own appraisal of the creditworthiness of the Borrowers and the value of the Collateral, and the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the initial Loans hereunder or at any time or times thereafter, provided that, upon the reasonable request of a Lender, the Administrative Agent shall provide to such Lender any documents or reports delivered to the Administrative Agent by the Borrowers pursuant to the terms of this Loan Agreement or any Loan Document.  The Administrative Agent shall seek any consent or approval of the Required Lenders to the taking or refraining from taking any action hereunder by sending notice thereof to each Lender.  The Administrative Agent shall promptly notify each Lender any time that the Required Lenders have instructed the Administrative Agent to act or refrain from acting pursuant hereto.

- 68 -

10.03     Rights, Exculpation, Etc. The Administrative Agent and its directors, officers, agents or employees shall not be liable to the Secured Parties or their participants or assignees for any action taken or omitted to be taken by it under or in connection with this Loan Agreement or the other Loan Documents, Without limiting the generality of the foregoing, the Administrative Agent (i) may treat the payee of any Note as the holder thereof until the Administrative Agent receives written notice of the assignment or transfer thereof, pursuant to Section 11.15 hereof, signed by such payee and in form satisfactory to the Administrative Agent; (ii) may consult with legal counsel (including, without limitation, counsel to the Administrative Agent or counsel to the Borrowers), independent public accountants, and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel or experts; (ii) make no warranty or representation to any Secured Party and shall not be responsible to any Secured Party for any statements, certificates, warranties or representations made in or in connection with this Loan Agreement or the other Loan Documents; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Loan Agreement or the other Loan Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the Collateral or other Property (including, without limitation, the books and records) of any Person; (v) shall not be responsible to any Secured Party for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Loan Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (vi) shall not be deemed to have made any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Borrower in connection therewith, nor shall the Administrative Agent be responsible or liable to the Secured Parties for any failure to monitor or maintain any portion of the Collateral.  The Administrative Agent shall not be liable for any apportionment or distribution of payments made in good faith pursuant to Section 3.03, and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Secured Party to whom payment was due but not made, shall be to recover from other Secured Parties any payment in excess of the amount which they are determined to be entitled.  The Administrative Agent may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Loan Agreement or of any of the Loan Documents the Administrative Agent is permitted or required to take or to grant, and if such instructions are promptly requested, the Administrative Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Loan Documents until it shall have received such instructions from the Required Lenders.  Without limiting the foregoing, no Secured Party shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting under this Agreement, the Notes or any of the other Loan Documents in accordance with the instructions of the Required Lenders.

10.04     Reliance. The Administrative Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by

- 69 -

the proper Person, and with respect to all matters pertaining to this Loan Agreement or any of the Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

10.05    Indemnification.  To the extent that the Administrative Agent is not reimbursed and indemnified by any Borrower, the Lenders will reimburse and indemnify the Administrative Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Administrative Agent in any way relating to or arising out of this Loan Agreement or any of the Loan Documents or any action taken or omitted by the Administrative Agent under this Loan Agreement or any of the Loan Documents, in proportion to each Lender's Pro Rata Share, including, without limitation, all advances and disbursements made pursuant to Section 10.08; provided, however, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final judicial determination that such resulted from the Administrative Agent's gross negligence or willful misconduct  The obligations of the Lenders under this Section 10.05 shall survive the payment in full of the Loans and the termination of this Loan Agreement.

10.06    Agent Individually.  With respect to its Pro Rata Share of the Total Commitment hereunder, the Loans made by it and the Notes issued to or held by it, the Administrative Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender or holder of a Note.  The terms "Lenders" or "Required Lenders" or any similar terms shall, unless the context clearly otherwise indicates, include the Administrative Agent in its individual capacity as a Lender or one of the Required Lenders.  The term "Administrative Agent" means the Administrative Agent solely in its individual capacity as an administrative agent hereunder and under each other Loan Document.  The Administrative Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with the Borrowers as if it were not acting as an Administrative Agent pursuant hereto without any duty to account to the Lenders.

10.07    Successor Agent.

(a)    The Administrative Agent may resign from the performance of all its functions and duties hereunder and under the other Loan Documents at any time by giving at least thirty (30) Business Days' prior written notice to the Administrative Borrower and each Lender.  Such resignation shall take effect upon the acceptance by a successor Administrative Agent of appointment pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)    Upon any such notice of resignation, the Required Lenders shall be entitled to appoint a successor Administrative Agent who, in the absence of a continuing Event of Default, shall be reasonably satisfactory to the Administrative Borrower.  Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring

- 70 -

Administrative Agent shall be discharged from its duties and obligations under this Loan Agreement and the other Loan Documents.   After the Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Section 10 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under this Loan Agreement and the other Loan Documents.

(c)     If a successor Administrative Agent shall not have been so appointed within said thirty (30) Business Day period, the retiring Administrative Agent shall then appoint a successor Administrative Agent who, if an Event of Default is not continuing, shall be reasonably satisfactory to the Administrative Borrower, who shall serve as the Administrative Agent until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

10.08    Collateral Matters.

(a)     The Secured Parties hereby irrevocably authorize the Administrative Agent, at its option and in its discretion, to release any Lien granted to or held by the Administrative Agent upon any Collateral upon termination of the Total Commitment and payment and satisfaction of all Loans and all other Obligations which have matured and which the Administrative Agent has been notified in writing are then due and payable; or constituting Property being sold or disposed of pursuant to a Permitted Disposition or in the ordinary course of any Borrower's business and in compliance with the terms of this Loan Agreement and the other Loan Documents; or constituting Property in which the Borrowers owned no interest at the time the Lien was granted or at any time thereafter; or if approved, authorized or ratified in writing by the Required Lenders subject to Section 11.01.

(b)     Without in any manner limiting the Administrative Agent's authority to act without any specific or further authorization or consent by the Secured Parties (as set forth in Section 10.08(a)), each Secured Party agrees to confirm in writing, upon request by the Administrative Agent, the authority to release Collateral conferred upon the Administrative Agent under Section 10.08(a). Upon receipt by the Administrative Agent of confirmation from the Lenders of its authority to release any particular item or types of Collateral (or, at the option of the Administrative Agent in the absence of such receipt, in reliance on Section 10.08(a), and upon prior written request by any Borrower, the Administrative Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Administrative Agent for the benefit of the Secured Parties upon such Collateral; provided, however, that (i) the Administrative Agent shall not be required to execute any such document on terms which, in the Administrative Agent's opinion, would expose the Administrative Agent to liability or create any obligations or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Lien upon (or obligations of any Borrower in respect of) all interests in the Collateral retained by any Borrower.

(c)     The Administrative Agent shall have no obligation whatsoever to any Secured Party to assure that the Collateral exists or is owned by the Borrowers or is cared for,

- 71 -

protected or insured or has been encumbered or that the Lien granted to the Administrative Agent pursuant to this Agreement has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Administrative Agent in this Section 10.08 or in any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Administrative Agent may act in any manner it may deem appropriate, in its sole discretion, given the Administrative Agent's own interest in the Collateral as one of the Secured Parties and that the Administrative Agent shall have no duty or liability whatsoever to any other Secured Party.

(d)     The Administrative Agent acknowledges that, to the extent that the Collateral includes items (such as stock certificates, Residuals, instruments and chattel paper) which are held in the possession of the Administrative Agent, or a third party on its behalf, pursuant to the Loan Documents, the Administrative Agent is also holding such items in its possession as agent and bailee of the Secured Parties for the benefit of, and for purposes of perfecting the security interest of, the Secured Parties in such items.

### Section 11.     Miscellaneous.

11.01     Amendments, Etc.    No amendment or waiver of any provision of this Agreement or any Note, and no consent to any departure by the Borrowers therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders, and, in the case of an amendment, the Borrowers, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given, provided, however, that no amendment, waiver or consent shall (i) increase the Commitment of any Lender, reduce the principal of, or interest on, the Loans payable to any lender, reduce the amount of any fee payable for the account of any Lender, or postpone or extend any date fixed for any payment of principal of, or interest or fees on, the Loans payable to any Lender, in each case without the written consent of any Lender affected thereby, (ii) increase the Total Commitment, except as contemplated in the definition of "Maximum Credit," (iii) change the percentage of the Total Commitment or of the aggregate unpaid principal amount of the Notes that is required for the Lenders or any of them to take any action hereunder, (iv) amend the definition of "Required Lenders" or "Pro Rata Share," (v) release all or a substantial portion of the Collateral (except as otherwise provided in this Loan Agreement and the other Loan Documents), subordinate any Lien granted in favor of the Administrative Agent for the benefit of the Secured Parties, or release any Borrower, (vi) modify, waive, release or subordinate the super priority claim status of the Obligations (except as permitted in this Loan Agreement and the Loan Documents), (vii) amend, modify or waive this Section 11.01 of this Loan Agreement, in the case of clauses (ii) through (vii), without the written consent of each Lender, and (viii) amend, modify or waive this Loan Agreement in such a manner that by its terms disproportionately (in comparison with the other Lenders) affects the rights or duties under this Loan Agreement of any Lenders, without the written consent of such affected Lenders. Notwithstanding the foregoing, no amendment, waiver or consent shall affect the rights or duties of either Administrative Agent (but not in its capacity as a Lender) under this Loan Agreement or the other Loan Documents, unless in writing and signed by the Administrative Agent. The

- 72 -

parties to this Loan Agreement acknowledge that all material amendments to this Loan Agreement will require the consent of the Bankruptcy Court.

11.02    Waiver.  No failure on the part of the Administrative Agent or any Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any Loan Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

11.03    Notices.

(a)    Except as otherwise expressly permitted by this Loan Agreement or expressly provided otherwise in the applicable Loan Document, all notices, requests and other communications provided for herein and under the other Loan Documents (including, without limitation, any modifications of, or waivers, requests or consents under, this Loan Agreement) shall be given or made in writing (including, without limitation, by telex or telecopy) delivered to the intended recipient at the "Address for Notices" specified below its name on the signature pages hereof); or, as to any party, at such other address as shall be designated by such party in a written notice to each other party.  Except as otherwise provided in this Loan Agreement and except for notices given under Section 2 (which shall be effective only on receipt), all such communications shall be deemed to have been duly given when transmitted by telex or telecopier or personally delivered or, in the case of a mailed notice, upon receipt, in each case given or addressed as aforesaid.

(b)    Nothing in this Loan Agreement or in any other Loan Document shall be construed to limit or affect the obligation of the Borrowers or any other Person to serve upon the Lenders in the manner prescribed by the Bankruptcy Code of the Federal Rules of Bankruptcy Procedure any pleading or notice required to be given to the Lenders pursuant to the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure.

11.04    Indemnification and Expenses.

(a)    Each Borrower shall hold the Administrative Agent, each Lender-Related Party and each Participant (the Administrative Agent, each Lender-Related Party and each Participant, an "Indemnified Party") harmless from and indemnify any Indemnified Party, on an after-Tax basis, against all liabilities, losses, damages, judgments, costs and expenses of any kind which may be imposed on, incurred by or asserted against such Indemnified Party (collectively, the "Indemnified Liabilities") relating to or arising out of this Loan Agreement, the Note, any other Loan Document or any transaction contemplated hereby or thereby, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Loan Agreement, the Note, any other Loan Document or any transaction contemplated hereby or thereby.  Without limiting the generality of the foregoing, each Borrower agrees to hold any Indemnified Party harmless from and indemnify such Indemnified Party against all Indemnified Liabilities with respect to all mortgage loans relating to or arising out of any violation or alleged violation of any environmental law, rule or regulation or any consumer credit laws, including

- 73 -

without limitation laws with respect to unfair or deceptive lending practices and predatory lending practices, the Truth in Lending Act or the Real Estate Settlement Procedures Act. In any suit, proceeding or action brought by an Indemnified Party in connection with any mortgage loan for any sum owing thereunder, or to enforce any provisions of any mortgage loan, each Borrower will save, indemnify and hold such Indemnified Party harmless from and against all expense, loss or damage suffered by reason of any defense, set-off, counterclaim, recoupment or reduction or liability whatsoever of the account debtor or obligor thereunder, arising out of a breach by any Borrower of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to or in favor of such account debtor or obligor or its successors from any Borrower. Each Borrower also agrees to reimburse on Indemnified Party as and when billed by such Indemnified Party for all such Indemnified Party's costs and expenses incurred in connection with the enforcement or the preservation of such Indemnified Party's rights under this Loan Agreement any other Loan Document or any transaction contemplated hereby or thereby, including without limitation the reasonable fees and disbursements of its counsel. Each Borrower hereby acknowledges that, notwithstanding the fact that the Loans are secured by the Collateral, the obligation of each Borrower with respect to each Loan is a recourse obligation of each Borrower. The foregoing to the contrary notwithstanding, the Borrowers shall have no obligation to any Indemnified Party under this Section 11.04 with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnified Party. In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential, or punitive damages.

(b)       Each Borrower shall pay as and when billed by the Administrative Agent and the Lenders all of the Lender Expenses through the Closing Date, including all reasonable out-of-pocket costs and expenses (including reasonable fees, disbursements and expenses of counsel) incurred by the Administrative Agent, the Lenders and their Affiliates in connection with the development, due diligence review, preparation and execution of (A) this Loan Agreement and any other Loan Document; and (B) from and after the Closing Date, any Loan Document, amendment, restatement, supplement, or modification of this Loan Agreement or any other Loan Document. Each Borrower shall pay as and when billed by the Administrative Agent or any Lender all Lender Expenses from and after the Closing Date including all of the out-of-pocket costs and expenses incurred by the Administrative Agent, the Lenders and any of their respective Affiliates in connection with the consummation and administration of the transactions contemplated hereby and thereby or with respect to the Collateral, including, without limitation, (i) all the reasonable fees, disbursements and expenses of counsel, (ii) search fees and filing and recording fees, (iii) all reasonable due diligence, inspection, testing and review costs and expenses, and (iv) those costs and expenses incurred pursuant to Sections 11.04(a), 11.04(e) and 11.16 hereof. Without limiting the foregoing, the Borrowers shall be required to pay the actual charges paid or incurred by the Administrative Agent, any Lender or any of their respective Affiliates for the services of any third-party hired by the Administrative Agent, any Lender or any of their respective Affiliates for performing financial audits, appraising the Collateral, or assessing compliance by any Borrower or any Affiliate or Subsidiary of any Borrower with the terms, conditions, representations and other provisions of any of the Loan Documents, including, without limitation, third-party underwriting and residual interest valuation

- 74 -

firms.  So long as the aggregate amount of thereof are at any time due and payable do not exceed the amount on deposit in the Lender Expenses Escrow Subaccount the Administrative Agent shall pay on the Borrowers' behalf all of the foregoing fees, charges and other Lender Expenses that are then due and payable with amounts on deposit in the Lender Expenses Escrow Subaccount.

(c)       Without limiting <u>Section 11.04(b)</u>, the Lenders shall be authorized to engage a specialty finance consulting firm reasonably acceptable to the Borrowers to assist in reviewing and monitoring this Facility, the Borrowers' operations and business plan and such other matters as the Lenders shall reasonably require.  The budget for such services will be reviewed with and subject to the reasonable approval of the Borrowers, and the cost of such engagement will be reimbursed by the Borrowers.

(d)       The Borrowers shall pay to the Administrative Agent all audit, appraisal, and valuation fees and charges for each financial audit of any Borrower or the Collateral, expenses incurred by any Lender-Related Party for the establishment of electronic collateral reporting systems, to appraise the Collateral, or any portion thereof, or to monitor or assess the performance of any Borrower under any of the Loan Documents.

(e)       Each Borrower acknowledges that the Administrative Agent and each Lender has the right to perform continuing due diligence reviews with respect to any or all of the Collateral or the Borrowers, as desired by the Administrative Agent or such Lender from time to time, for purposes of verifying compliance with the representations, warranties and specifications made hereunder, or otherwise, and each Borrower agrees that the Administrative Agent or such Lender or its authorized representatives will be permitted during normal business hours on any business day to examine, inspect, make copies of, and make extracts of, and any and all documents, records, agreements, instruments or information relating to the Collateral in the possession, or under the control, of the Borrowers or any custodian.  Each Borrower also shall make available to the Administrative Agent and the Lenders a knowledgeable financial or accounting officer for the purpose of answering questions respecting the Collateral.  The Borrowers, the Administrative Agent and the Lenders further agree that all reasonable out-of-pocket costs and expenses incurred by the Administrative Agent and the Lenders in connection with the Administrative Agent's or any Lender's due diligence review of Collateral pursuant to this <u>Section 11.04(f)</u> shall be paid by the Borrowers.

11.05       <u>Amendments</u>.  Except as otherwise expressly provided in this Loan Agreement, any provision of this Loan Agreement may be modified or supplemented only by an instrument in writing signed by the Borrowers, the Administrative Agent and the Lenders required pursuant to <u>Section 11.01</u> and any provision of this Loan Agreement may be waived by the Lenders required pursuant to <u>Section 11.01</u>.

11.06       <u>Successors and Assigns</u>.  This Loan Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

- 75 -

11.07    Survival. The obligations of the Borrowers under Sections 3.06 and 11.04 hereof shall survive the payment of the Obligations and the termination of this Loan Agreement. In addition, each representation and warranty made, or deemed to be made by a request for a borrowing, herein or pursuant hereto shall survive the making of such representation and warranty, and the Administrative Agent and the Lenders shall not be deemed to have waived, by reason of making any Loan, any Default that may arise by reason of such representation or warranty proving to have been false or misleading, notwithstanding that the Administrative Agent and the Lenders may have had notice or knowledge or reason to believe that such representation or warranty was false or misleading at the time such Loan was made.

11.08    Captions. The table of contents and captions and section headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Loan Agreement.

11.09    Counterparts: Telefacsimile Execution. This Loan Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Loan Agreement by signing any such counterpart. Delivery of an executed counterpart of this Loan Agreement by telefacsimile shall be equally as effective as delivery of an original executed counterpart of this Loan Agreement. Any party delivering an executed counterpart of this Loan Agreement by telefacsimile also shall deliver an original executed counterpart of this Loan Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Loan Agreement. This Section shall apply to each other Loan Document *mutatis mutandis*.

11.10    LOAN AGREEMENT CONSTITUTES SECURITY AGREEMENT: GOVERNING LAW. THIS LOAN AGREEMENT SHALL BE GOVERNED BY NEW YORK LAW WITHOUT REFERENCE TO CHOICE OF LAW DOCTRINE (BUT WITH REFERENCE TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, WHICH BY ITS TERMS APPLIES TO THIS LOAN AGREEMENT), EXCEPT AS GOVERNED BY THE BANKRUPTCY CODE, AND SHALL CONSTITUTE A SECURITY AGREEMENT WITHIN THE MEANING OF THE UNIFORM COMMERCIAL CODE.

11.11    CERTAIN, WAIVERS: WAIVER OF JURY TRIAL.

(a)    EACH BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO OR IN THE NATURE OF SET-OFF, ABATEMENT, SUSPENSION, RECOUPMENT OR OTHER RIGHT TO WITHHOLD ANY PAYMENT OR PERFORMANCE DUE BY SUCH BORROWER OR ON ITS BEHALF, TO OR FOR THE BENEFIT OF THE ADMINISTRATIVE AGENT OR ANY LENDER OR RELATED TO THE COLLATERAL.

(b)    WAIVER OF JURY TRIAL. EACH OF THE BORROWERS, THE AGENTS AND THE LENDERS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY

NYI-4012525v8
DIP Credit Agreement -- AHM
JP011771
000000 - 000000

JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS LOAN AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

    11.12  <u>Acknowledgments</u>. Each Borrower hereby acknowledges that:

    (a)  it has been advised by counsel in the negotiation, execution and delivery of this Loan Agreement and the other Loan Documents;

    (b)  each of the Administrative Agent and the Lenders has no fiduciary relationship to the Borrowers, and the relationship between the Borrowers and the Administrative Agent and the Lenders is solely that of debtor and creditor; and

    (c)  no joint venture exists among or between the Administrative Agent, the Lenders and the Borrowers.

    11.13  <u>No Party Deemed Drafter</u>. Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Loan Agreement.

    11.14  <u>Parent as Agent for Borrowers</u>. Each Borrower hereby irrevocably appoints the Parent as the borrowing agent and attorney-in-fact for the Borrowers (the "<u>Administrative Borrower</u>") which appointment shall remain in full force and effect unless and until the Administrative Agent shall have received prior written notice signed by all of the Borrowers that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower. Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (i) to provide the Administrative Agent with all notices with respect to Loans obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and (ii) to take such action as the Administrative Borrower deems appropriate or its behalf to obtain Loans and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement. It is understood that the handling of the Loan Account and Collateral of the Borrowers in a combined fashion, as more fully set forth herein, is done solely as an accommodation to the Borrowers in order to utilize the collective borrowing powers of the Borrowers in the most efficient and economical manner and at their request, and that neither the Administrative Agent nor the Lenders shall incur liability to the Borrowers as a result hereof. Each of the Borrowers expects to derive benefit, directly or indirectly, from the handling of the Loan Account and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group. To induce the Administrative Agent and the Lenders to do so, and in consideration thereof, each of the Borrowers hereby jointly and severally agrees to indemnify the Indemnified Parties and hold the Indemnified Parties harmless against any and all liability, expense, loss or claim of damage or injury, made against such Indemnified Party by any of the Borrowers or by any third party whosoever, arising from or incurred by reason of (a) the handling of the Loan Account and the Collateral of the Borrowers as herein provided, (b) the Administrative Agent's and the lenders' reliance on any instructions of the Administrative Borrower, or (c) any other action taken by the Administrative Agent or any Lender hereunder or under the other Loan Documents; <u>provided</u>, <u>however</u>, that the Borrowers shall not have any

- 77 -

obligation to any Indemnified Party under this <u>Section 11.14</u> for any Indemnified Liabilities caused by the gross negligence or willful misconduct of such indemnified Party, as determined by final judgment of a court of competent jurisdiction.

11.15    <u>Assignments; Participations</u>.

(a)    This Loan Agreement and the Notes shall be binding upon and inure to the benefit of the Borrowers and the Administrative Agent and each Lender and their respective successors and assigns (including, except for the right to request Loans, any trustee succeeding to the rights of the Borrowers pursuant to Chapter 11 of the Bankruptcy Code or pursuant to any conversion to a case under Chapter 7 of the Bankruptcy Code); provided, however, that each of the Borrowers may not assign or transfer any of their rights hereunder, or under the Notes, without the prior written consent of each Lender and any such assignment without the Lenders' prior written consent shall be null and void.

(b)    Each Lender may, with the written consent of (x) the Administrative Agent and (y) the Administrative Borrower; (which consent, in the case of either clauses (x) or (y), is not to be unreasonably withheld) assign to one or more other lenders or other entities all or a portion or its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitment, the Loans made by it and the Notes held by it); provided, however, that no consent of the Administrative Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, or if a Event of Default has occurred and is continuing; and provided, further, however, that (i) such assignment is in an amount which is at least $1,000,000 or a multiple of $100,000 in excess thereof (or the remainder of such Lender's Commitment) and (ii) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance, an Assignment and Acceptance, together with any Note subject to such assignment. Upon such execution, delivery and acceptance, from and after the effective date specified in each Assignment and Acceptance, which effective date shall be al least three (3) Business Days after the delivery thereof to the Administrative Agent (or such shorter period as shall be agreed to by the Administrative Agent and the parties to such assignment), (A) the assignee thereunder shall become a "Lender" hereunder and, in addition to the rights and obligations hereunder held by it immediately prior to such effective date, have the rights and obligations hereunder that have been assigned to it pursuant to such Assignment and Acceptance and (B) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(i)    By executing and delivering an Assignment and Acceptance, the assigning Lender and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (A) other than as provided in such Assignment and Acceptance, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Loan Agreement or any other Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or

- 78 -

any other Loan Document furnished pursuant hereto; (B) the assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrowers or any of their Subsidiaries or the performance or observance by the Borrowers of any of their obligations under this Loan Agreement or any other Loan Document furnished pursuant hereto; (C) such assignee confirms that it has received a copy of this Loan Agreement and the other Loan Documents, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (D) such assignee will, independently and without reliance upon the Assigning Lender, the Administrative Agent or any Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Loan Agreement and the other Loan Documents; (E) such assignee appoints and authorizes the Administrative Agent to take such action as the Administrative Agent on its behalf and to exercise such powers under this Loan Agreement and the other Loan Documents as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto; and (F) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Loan Documents are required to be performed by it as a Lender.

(ii)     The Administrative Agent shall maintain, or cause to be maintained at the Payment Office, a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names and addresses of the Lenders and the Commitments of, and principal amount of the Loans owing to each Lender from time to time (the "Register"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrowers, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Administrative Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(iii)    Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an assignee, together with the Notes subject to such assignment, the Administrative Agent shall, if the Administrative Agent consents to such assignment and if such Assignment and Acceptance has been completed (i) accept such Assignment and Acceptance, (ii) give prompt notice thereof to the Administrative Borrower, (iii) record the information contained therein in the Register, and (iv) prepare and distribute to each Lender and the Administrative Borrower a revised Schedule B hereto after giving effect to such assignment, which revised Schedule B shall replace the prior Schedule B and become part of this Agreement.

(iv)     A Registered Loan (and the Note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each Note shall expressly so provide), together with the surrender of the Note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such Note, whereupon,

- 79 -

at the request of the designated assignee) or transferee(s), one or more new Notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s). Prior to the registration of assignment or sale of any Registered Loan (and the Note, if any evidencing the same), the Administrative Agent shall treat the Person in whose name such Registered Loan (and the Note, if any, evidencing the same) is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.

(v)     In the event that any Lender sells participations in a Registered Loan, such Lender shall maintain a register on which it enters the name of all participants in the Loans held by it (the "Participant Register"). A Registered Loan (and the Note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each Note shall expressly so provide). Any participation of such Registered Loan (and the Note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register.

(vi)    Any foreign Person who purchases or is assigned or participates in any portion of such Registered Loan shall provide the Administrative Agent (in the case of a purchase or assignment) of the Lender (in the case of a participation) with a completed Internal Revenue Service Form W-8 (Certificate of Foreign Status) or a substantially similar form for such purchaser, participant or any other affiliate who is a holder of beneficial interests in the Registered Loan.

(c)     Each Lender may sell participations to one or more banks or other entries ("Participants") in or to all or a portion of its rights and obligations under this Loan Agreement and the other Loan Documents (including, without limitation, all or a portion of any of its Commitments and any Loans made by it); provided, that (i) such Lender's obligations under this Loan Agreement (including without limitation, its Commitment hereunder) and the other Loan Documents shall remain unchanged; (ii) such lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Loan Agreement and the other Loan Documents, and (iii) a participant shall not be entitled to require such Lender to take or omit to take any action hereunder except (A) action directly effecting an extension of the maturity dates or decrease in the principal amount of the Loans, or (B) action directly effecting an extension of the due dates or a decrease in the rate of interest payable on the Loans or the fees payable under this Agreement, or (C) except for Permitted Dispositions, actions directly effecting a release of all or substantially all of the Collateral or any Borrower.

(d)     Each Lender may furnish any information concerning the Borrowers in the possession of such Lender from time to time to assignees and Participants (including prospective assignees and Participants) who agree to be bound by the provisions of Section 11.21 and this Section 11.16(d) only after notifying the Administrative Borrower in writing and only for the sole purpose of evaluating participations or assignments, as the case may be, and for no other purpose.

- 80 -

(e)      The Borrowers, at no material costs or expenses to the Borrower, agree to cooperate with the Lenders in connection with any such assignment or participation, to execute and deliver such replacement Notes and other documents in order to give effect to such assignment or participation.

11.16      Set-Off.    In addition to any rights and remedies of each Lender provided by this Loan Agreement and by law, each Lender shall have the right during the continuance of an Event of Default, without prior notice to the Borrowers, any such notice being expressly waived by the Borrowers to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrowers hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all Property and deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any Affiliate thereof to or for the credit or the account of any Borrower.  Each Lender may set-off cash, the proceeds of the liquidation of any Collateral and all other sums or obligations owed by such Lender or its Affiliates to any Borrower against all of the Borrowers' obligations to such Lender or its Affiliates, whether under this Loan Agreement or under any other agreement between the parties or between any Borrower and any affiliate of such Lender, or otherwise, whether or not such obligations are then due, without prejudice to such Lender's or its Affiliate's right to recover any deficiency.  Each Lender agrees promptly to notify the Borrower after any such set-off and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such set-off and application.

11.17      Entire Agreement.    This Loan Agreement and the other Loan Documents embody the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings relating to the matters provided for herein or therein.  No alteration, waiver, amendments, or change or supplement hereto or thereto shall be binding or effective unless the same is set forth in writing by a duly authorized representative of each party hereto.  Notwithstanding the foregoing or anything else in any Loan Document to the contrary, in the event of any conflict between terms and provisions of this Loan Agreement or any other Loan Document and the Orders, the terms and provisions of the Orders shall prevail.

11.18      Records.    The unpaid principal of and interest on the Notes, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability, the Commitments, and the accrued and unpaid fees payable pursuant to Section 3.07 hereof, shall at all times be ascertained from the records of the Administrative Agent, which shall be conclusive and binding absent manifest error.

11.19      Confidentiality.    The Administrative Agent, each Lender, each Borrower and their Affiliates shall take normal and reasonable precautions to maintain the confidentiality of all non-public information obtained pursuant to the requirements of this Loan Agreement and the other Loan Documents which has been identified as such by the Borrowers, but may, in any event, make disclosures (i) in the case of the Administrative Agent or any Lender, as reasonably required by any participant or assignee in connection with the

- 81 -

contemplated assignment of any interest under this Loan Agreement or participations therein and in accordance with Section 11.15(d), or (ii) as required or requested by any governmental agency or representative thereof or as required pursuant to legal process, or (iii) to its officers, attorneys, accountants, agents, and advisors who are directly involved in the transactions described in this Loan Agreement, or (iv) as required by law, or (v) in connection with litigation involving the Administrative Agent or any Lender.

    11.20  Public Announcements. The Administrative Agent may issue and disseminate to the public general information describing this credit facility, including a general description of the Borrowers' businesses, and may use Borrowers' names in published advertising and other promotional materials.

    11.21  USA Patriot Act. Each Lender subject to the USA Patriot Act hereby notifies the Borrowers that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of each Borrower and other information that will allow such Lender to identify such Borrower in accordance with the USA Patriot Act.

* * * * *

NYI-4012525v8
DIP Credit Agreement -- AHM
JP011771
000000 - 000000

IN WITNESS WHEREOF, the parties hereto have caused this Loan Agreement to be duly executed and delivered as of the day and year first above written.

**LENDERS:**

**WLR RECOVERY FUND III, L.P.,**
  **as a Lender and as the Administrative Agent**

**By:**   **WLR Recovery Associates III LLC,**
       **its General Partner**

By: _____
Name: _DAVID H. STORPER_____
Title: _PRINCIPAL MEMBER_____

Address for Notices:

WLR Recovery Fund III, L.P.
1166 Avenue of the Americas, 27th Floor
New York, New York, 10036
Attention:
Telecopier No.: 212-317-4891
Telephone No.: 212-826-1100

**BORROWERS:**

**AMERICAN HOME MORTGAGE INVESTMENT CORP**

By: _____
Name: _Craig Pino_____
Title: _EVP & Treasurer_____

**AMERICAN HOME MORTGAGE HOLDINGS, INC.**

By: _____
Name: _Craig Pino_____
Title: _SVP & Treasurer_____

**AMERICAN HOME MORTGAGE CORP.**

- 83 -

By: _____
Name: _Craig Pino_____
Title: _SVP & Treasurer_____

**AMERICAN HOME MORTGAGE
ACCEPTANCE, INC.**

By: _____
Name: _Craig Pino_____
Title: _SVP & Treasurer_____

**AMERICAN HOME MORTGAGE VENTURES
LLC**

By: _____
Name: _Stephen A. Hozie_____
Title: _EVP + CFO_____

**HOMEGATE SETTLEMENT SERVICES, INC.**

By: _____
Name: _Craig Pino_____
Title: _SVP & Treasurer_____

**GREAT OAK ABSTRACT CORP.**

By: _____
Name: _Stephen A. Hozie_____
Title: _EVP + CFO_____

Address for Notices:

c/o American Home Mortgage Investment Corp
538 Broadhollow Road
Melville, New York
Attention:
Telecopier No.:
Telephone No.:

With a copy to:

[ ]

And to:

[ ]

- 84 -

NYI-4012525v8
DIP Credit Agreement -- AHM
JP011771
000000 - 000000

## Exhibit A

### Interim Order

See attached.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| *In re* | : | |
| | : | Chapter 11 |
| AMERICAN HOME MORTGAGE | : | Case No. [_____] [____] |
| HOLDINGS, INC., *et al.*, | : | Jointly Administered |
| | : | |
| Debtors. | : | |
| | : | |

## INTERIM ORDER PURSUANT TO SECTIONS 105(a), 362, AND 364 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001 AND 9014: (A) APPROVING DEBTOR-IN-POSSESSION FINANCING, (B) GRANTING LIENS AND ALLOWING SUPERPRIORITY ADMINISTRATIVE CLAIMS, (C) SCHEDULING A FINAL HEARING, AND (D) GRANTING RELATED RELIEF

Upon the Motion for Interim and Final Orders (I) Authorizing Certain Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364(c); (II) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001(c); and (III) Granting Related Relief (the "Motion") dated August 6, 2007 of American Home Mortgage Investment Corp. ("AHMIC"), and certain of the other debtors in the above-captioned chapter 11 cases, seeking, *inter alia*:

(i)  authorization for debtors AHMIC, American Home Mortgage Holdings, Inc., American Home Mortgage Corp., American Home Mortgage Acceptance, Inc., American Home Mortgage Ventures LLC, Homegate Settlement Services, Inc., and Great Oak Abstract Corp. (collectively, the "Borrowers") to obtain postpetition financing (the "DIP Facility") pursuant to sections 105(a), 362, and 364 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), by entering into that certain $50,000,000 Debtor-in-Possession Loan and Security Agreement dated as of August __, 2007 (as the same may be amended, supplemented, or otherwise modified from time

to time, the "DIP Credit Agreement"[1], a copy of which is annexed hereto as Exhibit "A") by and among the Borrowers, the several lenders from time to time party thereto (collectively, the "Lenders"), WLR Recovery Fund III, L.P., in its capacity as Lender and Administrative Agent (collectively, the Lenders and the Administrative Agent, the "Secured Parties"), subject to the terms and conditions set forth in this Order, the DIP Credit Agreement, and all related guaranty, security, and other agreements, documents, notes, and instruments executed or delivered pursuant hereto or in connection herewith or therewith (collectively, with the DIP Credit Agreement, and as any of the same shall be amended, restated, supplemented or otherwise modified from time to time in accordance with this Interim Order, the "DIP Financing Documents");

(ii) the granting of superpriority administrative status pursuant to section 364(c)(1) of the Bankruptcy Code for all Obligations of the Borrowers arising under the DIP Financing Documents (collectively, the "DIP Obligations");

(iii) the granting of liens, mortgages and security interests in favor of the Administrative Agent for the benefit of the Secured Parties pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code; and

(iv) requesting, pursuant to Bankruptcy Rules 2001 and 4001, that an interim hearing (the "Emergency Interim Hearing") be held before the Court on an emergency basis to consider entry of this interim order, and further requesting that a final hearing (the "Final Hearing") thereafter be held before the Court to consider entry of a final order (the "Final Order") authorizing the financing contemplated by the DIP Financing Documents, pursuant to the notice and other provisions set forth in the Motion.

---

[1] Capitalized terms used herein but not otherwise defined herein shall have the meanings set forth in the DIP Credit Agreement.

The Emergency Interim Hearing having been held on August __, 2007, and upon all of the pleadings filed with the Court and upon the record of the Emergency Interim Hearing, and after due deliberation and consideration, and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS PURSUANT TO BANKRUPTCY RULE 7052:**

A.    **Commencement of Cases**.  On August ___, 2007 (the "Commencement Date"), each of the debtors in the above-captioned cases (the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their assets as debtors in possession pursuant to sections 1107(a) and 1108.  No statutory committees have yet been appointed in these cases.  Pursuant to order of the Court, the Debtors' cases are being jointly administered under the case number above.

B.    **Jurisdiction and Venue**.  The Court has jurisdiction over these proceedings and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and this is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for proceedings on the Motion is proper in this Court pursuant to 28 U.S.C. § 1409.

C.    **Notice**.  Notice by facsimile of the Emergency Interim hearing has been given to (a) the United States Trustee, (b) counsel for the Administrative Agent, (c) counsel for Bank of America, N.A. as administrative agent with repect to a certain secured credit agreement dated August 30, 2004, and (d) the forty largest unsecured creditors of the Debtors, determined on a consolidated basis.  Such notice satisfies Bankruptcy Rule 4001(c) and (d).

D.    **Necessity of Financing**.  The ability of the Borrowers to finance their operations requires the availability of additional working capital, the absence of which would immediately and irreparably harm the Borrowers, their estates and their creditors.  The DIP Facility will allow

the Borrowers to continue the operation of their businesses and administer and preserve the value of their estates, for the benefit of their estates and creditors.

E.     **No Credit Available on Other Terms**.  The Borrowers are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code or pursuant to sections 364(a) and 364(b) of the Bankruptcy Code.

F.     **Willingness to Lend**.  The Lenders are willing to make the DIP Facility available and to make the loans and advances pursuant to the terms of the DIP Financing Documents, but only if (a) the Administrative Agent on behalf of the Lenders is granted a superpriority administrative expense claim with respect to the DIP Obligations, pursuant to section 364(c)(1) of the Bankruptcy Code, and (b) the Administrative Agent on behalf of the Lenders is granted a security interest in and liens on the Collateral (collectively, the "DIP Liens"), pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, in the priority set forth herein.

G.     **Business Judgment and Good Faith**.  Based on the record before the Court, the terms of the DIP Facility are fair, just, and reasonable under the circumstances, are appropriate for secured financing to a debtor in possession, reflect the Borrowers' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  Based on the record before the Court, the terms of the DIP Facility have been negotiated in good faith and at arm's length by and among the parties, with all parties represented by counsel.  Based on the record before the Court, any credit extended under the terms of the DIP Facility is hereby found to be extended in good faith by the Lenders as that term is used in section 364(e) of the Bankruptcy Code.  Based on the record before the Court, the Secured Parties are hereby found to be acting in good faith within the meaning of section 364(e) of the Bankruptcy Code in closing the transactions contemplated in

- 4 -

the DIP Financing Agreements after the entry of this Interim Order. Based on the record before

the Court, none of the Secured Parties is an "insider" or "affiliate" of any of the Debtors (as such

terms are defined in the Bankruptcy Code).

      H.     **Property of the Estate**. Each item of the Collateral constitutes property of the

estate of at least one Borrower.

      I.     **Good Cause**. Authorizing the DIP Facility and other relief granted herein is

necessary, essential, appropriate and in the best interest of the Borrowers, their creditors, and

their estates, as its implementation will, among other effects, provide the Borrowers with the

necessary liquidity to (a) minimize disruptions to their on-going operations, (b) preserve and

maximize the value of their estates for the benefit of all creditors of the Borrowers, and (c) avoid

immediate irreparable harm to the Borrowers, their creditors, their businesses, their employees,

and their estates.

      Based on the foregoing,

      **IT IS HEREBY ORDERED, ADJUDGED AND DECREED**, that:

      1.     The Motion is granted in accordance with the terms of this Interim Order. Any

objections to the Motion with respect to entry of this Interim Order that have not been

withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied

and overruled.

      2.     The Borrowers are hereby authorized, pursuant to the terms of this Interim Order

and the terms and conditions of the DIP Financing Documents, to borrow funds under the DIP

Facility in such amount or amounts as may be available to or for the benefit of the Borrowers

from the Secured Parties, which shall not exceed the aggregate amount (the "Interim Amount")

equal to $12,000,000 during the period from the entry of this Interim Order through the entry of

the Final Order, in accordance with, and subject to, the terms of the DIP Financing Documents and this Interim Order.

3.       Except as otherwise expressly set forth in this Interim Order, the terms and conditions of the DIP Financing Documents are hereby approved in all respects. Upon execution and delivery by the Borrowers of the DIP Financing Documents, the DIP Financing Documents shall constitute valid and binding obligations of the Borrowers, enforceable against each of the Borrowers in accordance with their terms; *provided,* notwithstanding any other provision of this Order or of the DIP Financing Documents, the Borrowers shall not, prior to the entry of the Final Order approving the DIP Financing Documents, borrow an aggregate principal amount of Loans more then the Interim Amount. The DIP Financing Documents shall be sufficient and conclusive evidence of the borrowing arrangements by and among the Borrowers and the Secured Parties. All provisions in the DIP Financing Documents are binding and enforceable in full even if not expressly referenced in this Interim Order.

4.       The Borrowers are hereby authorized and directed to do and perform all acts and to make, execute, and deliver all instruments and documents (including, without limitation, the execution of all guaranty and security agreements, mortgages, financing statements, and other filings and registrations) which may be required or necessary for the Borrowers' performance under the DIP Financing Documents.

5.       Each officer of each Borrower, and each such other individual as may be so authorized by the Board of Directors of such Borrower, acting singly, is hereby authorized to execute and deliver any and all of the DIP Financing Documents and related documents, such execution and delivery to be conclusive of their respective authority to act in the name and on behalf of the Borrowers.

- 6 -

6.     AHMIC is hereby authorized to act as the Administrative Borrower on behalf of each other Borrower with respect to the Borrowers' rights and obligations under the DIP Financing Documents, including, without limitation, requesting Loans thereunder. Each Borrower shall be jointly and severally liable for all DIP Obligations regardless of whether the DIP Obligations were incurred or requested by AHMIC or any other Borrower. Any notice given to, or demand made on, AHMIC by the Secured Parties, pursuant to this Interim Order or the DIP Financing Documents shall constitute notice to, or demand on, all Borrowers without any requirement to provide any such notice or demand (or copy thereof) to the other Borrowers.

**ADMINISTRATIVE CLAIM**

7.     As protection to the Secured Parties and to secure the repayment of the DIP Obligations, all of the DIP Obligations shall have the status of allowed superpriority administrative expense claims, in accordance with section 364(c)(1) of the Bankruptcy Code, and shall have priority over all administrative expense claims and unsecured claims against the Borrowers, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, any adequate protection-related claims and any administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, to the extent permitted by applicable law. For the avoidance of doubt, the Secured Parties shall not seek to enforce, directly or indirectly, an administative priority claim in respect of any asset which constitutes the BofA Collateral.

**LIENS AND COLLATERAL**

8.     As further protection to the Secured Parties and to secure the repayment of the DIP Obligations, the Administrative Agent, for the benefit of the Secured Parties, shall have and

- 7 -

is hereby granted: (a) pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, and enforceable perfected first priority security interest in and lien on all the property and assets of each of the Borrowers and their estates of every kind or type whatsoever, tangible, intangible, real, personal and mixed, whether now owned or existing or hereafter acquired or arising and regardless of where located, whether within the United States or in other locations (including, without limitation, all property of the estates of each of the Borrowers within the meaning of section 541 of the Bankruptcy Code) that is not otherwise encumbered by valid, perfected, enforceable, and nonavoidable liens and security interests existing on or in the Collateral on the Commencement Date (collectively, the "Pre-Existing Liens"); and (b) pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, and enforceable perfected second priority security interest in and lien on all the property and assets of each of the Borrowers and their estates of every kind or type whatsoever, tangible, intangible, real, personal and mixed, whether now owned or existing or hereafter acquired or arising and regardless of where located, whether within the United States or in other locations (including, without limitation, all property of the estates of each of the Borrowers within the meaning of section 541 of the Bankruptcy Code) that is encumbered by the Pre-Existing Liens, *provided*, should any such Pre-Existing Lien be voided, extinguished or determined not be valid, the Liens granted to the Administrative Agent hereunder shall, notwithstanding anything to the contrary in Section 551 of the Bankruptcy Code, be deemed perfected first priority liens without any further action by the Secured Parties or the Court.

9.      Nothing in the foregoing paragraph shall be deemed to grant a security interest in or lien on the BofA Collateral or any Avoidance Actions. The Administrative Agent acknowledges that pursuant to that certain Interim Order (I) Authorizing Debtors' Limited Use

- 8 -

of Cash Collateral, (II) Granting Replacement Liens, Adequate Protection and Administrative

Expense Priority to Certain Prepetition Secured Parties and (III) Scheduling Final Hearing

Pursuant to Bankruptcy Rule 4001 (the "Cash Collateral Order") entered as a "first day order" in

these cases substantially contemporaneously with the entry of this Interim Order, Bank of

America N.A., as administrative agent for certain secured prepetition lenders has been granted a

lien on and security interest in certain collateral that is separate and distinct from, and shall not

constitute part of, the Collateral.

10.     The above-described liens and security interests granted to the Administrative

Agent herein shall not (a) be subject to any lien or security interest that is avoided and preserved

for the benefit of the Borrowers' estates as a result of any Avoidance Actions, or (b) be

subordinated to or made pari passu with any other lien or security interest pursuant section

364(d) of the Bankruptcy Code or otherwise.

11.     No other liens or priority status, other than Permitted Liens, shall have priority

superior to or pari passu with those granted by this Interim Order to the Secured Parties, or shall

be granted while any portion of the DIP Obligations remains outstanding, absent the express

written consent of the Administrative Agent.

12.     This Interim Order shall be sufficient and conclusive evidence of the validity,

perfection, and priority of the Administrative Agent's liens upon the Collateral, without the

necessity of filing or recording any financing statement, mortgage or other instrument or

document which may otherwise be required under the law of any jurisdiction or the taking of any

other action to validate or perfect such liens or security interests in the Collateral or to entitle the

Administrative Agent to the priorities granted herein.  The Administrative Agent shall not be

required to file any financing statements, mortgages, notices of lien or similar instruments in any

jurisdiction or filing office, or to take any other action in order to perfect the Administrative Agent's liens and security interests granted by or pursuant to this Interim Order or the DIP Financing Documents.

13.     Upon entry of the Final Order, pursuant to sections 364(c)(2) and (3) of the Bankruptcy Code, any provision of any lease or other license, contract or other agreement that requires the consent or approval of one or more parties, or requires the payment of any fees or obligations to any governmental entity, in order for any of the Borrowers to pledge, grant, sell, or otherwise transfer any such interest or the proceeds thereof or other Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code and shall have no force and effect with respect to the transactions granting the Secured Parties a senior security interest in such interest or the proceeds of any assignment and/or sale thereof by any of the Borrowers in favor of the Secured Parties in accordance with the terms of the DIP Financing Documents.

14.     Should the Secured Parties, in their sole discretion (but not as a requirement hereunder), from time to time choose to file financing statements, mortgages, notices of lien or similar instruments, take possession of any Collateral, or take any other action to validate or perfect any such security interests or Liens, the Borrowers and their officers are hereby directed to execute any such documents or instruments as the Secured Parties may reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of the entry of this Interim Order.

15.     The Secured Parties may, in their discretion, file a copy of this Interim Order as a financing statement or mortgage with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the

- 10 -

Borrowers have real or personal property, and, in such event, the applicable filing or recording officer or registrar is authorized to file or record such copy of this Interim Order.

16.     Until such time as all DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder are terminated in accordance with the DIP Financing Documents, the Borrowers shall not in any way prime or otherwise adversely affect the liens granted under this Interim Order by offering a subsequent lender or a party-in-interest a superior or pari passu lien or claim pursuant to sections 364(c)(1), 364(d), or 507(b) of the Bankruptcy Code, or otherwise.

17.     Until such time as all DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder are terminated in accordance with the DIP Financing Documents, the Borrowers shall not in any way grant junior encumbrances on the Collateral and shall not otherwise encumber otherwise unencumbered assets or unencumbered estate property.

18.     Subject to the entry of the Final Order, neither the Collateral nor the Secured Parties shall be subject to surcharge, pursuant to sections 506(c) or 105 of the Bankruptcy Code or otherwise, by any of the Debtors or any other party, until all DIP Obligations are indefeasibly paid in full to the Secured Parties in cash, and no such consent shall be implied from any action, inaction, or acquiescence by the Secured Parties, including but not limited to the funding of the Borrowers' ongoing operations by the Secured Parties.

19.     In no event shall the Secured Parties be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral.

20.     Notwithstanding anything in this Interim Order to the contrary, the liens and security interests granted to the Administrative Agent shall not extend to any assets that are not property of the estates.

DB02:6164403.1                                                                                   066585.1001

**CARVE-OUT**

21.      Notwithstanding the foregoing provisions of this Interim Order, the following

amounts shall be payable from and chargeable against the Collateral (and prior to the liens and

superpriority claims granted to the Administrative Agent herein) (the "Carve-Out"): (a) amounts

payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Court

(collectively, the "UST/Clerk Fees"); and (b) allowed fees and expenses of attorneys,

accountants, and other professionals retained in the Chapter 11 Cases pursuant to sections 327

and 1103 of the Bankruptcy Code (except to the extent such fees and expenses are incurred for

services rendered in connection with the prosecution of actions, claims or causes of action

against the Secured Parties or in improperly preventing or hindering or unreasonably delaying,

whether directly or indirectly, the Secured Parties' assertion or enforcement of the Secured

Parties Liens or realization upon the Collateral) (the "Priority Professional Expenses"), but the

amount entitled to priority under this sub-clause shall not exceed $5,000,000 outstanding in the

aggregate at any time (the "Carve-Out Amount"); *provided,* after the Administrative Agent has

provided notice to the Borrowers pursuant to the terms of the DIP Financing Documents of the

occurrence of an Event of Default or a default hereunder by the Borrowers in any of their

obligations under this Interim Order, any payments actually made to such professionals after the

occurrence of such Event of Default or default hereunder, under sections 330 and 331 of the

Bankruptcy Code or otherwise, to the extent allowed by final order of the Court, shall reduce the

Carve-Out Amount on a dollar-for-dollar basis.  Nothing contained herein shall be construed as

consent to the allowance of any fees and expenses referred to above and shall not affect any right

of the Secured Parties to object to the reasonableness of such amounts.

22.     So long as an Event of Default shall not have occurred, the Borrowers shall be permitted to pay the Priority Professional Expenses of the kind specified in section 503(b) of the Bankruptcy Code allowed under Sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, within the parameters of this Interim Order and the amounts to be advanced pursuant to the DIP Financing Documents, without reduction of the Carve-Out Amount; *provided* the aggregate of any such payments made on or after the occurrence of a Default or Event of Default to professionals shall not exceed the Carve-Out Amount.  The Borrowers shall not be permitted under any circumstance to pay, from the Carve-Out Amount or otherwise, any fees or expenses incurred by any party, including the Debtors or the Creditors' Committee, in connection with the filing and prosecution or defense of any claims, causes of action, adversary proceedings or other litigation against the Secured Parties, including, without limitation, challenging the amount, validity, priority or enforceability of, or asserting any defense, counterclaim, or offset to, the DIP Obligations or the liens granted to the Administrative Agent in respect thereof.

**REMEDIES**

23.     Notwithstanding the provisions of section 362 of the Bankruptcy Code and without any further order of, or application or motion to, the Court, in the event of the occurrence of an Event of Default, and at all times thereafter, and without any restriction or restraint by any stay under section 362 of the Bankruptcy Code against the enforcement of the liens and security interests or any other rights granted to the Secured Parties pursuant to the DIP Financing Documents, the Administrative Agent may, by written notice to the Borrowers as provided in the DIP Financing Documents, (a) terminate forthwith all or any portion of the DIP Facility and the Secured Parties' obligation to make any further loans or advances, (b) declare the DIP

Obligations to be immediately due and payable, and (c) take any and all actions and exercise any and all rights and remedies allowed under the DIP Financing Documents, which the Secured Parties may deem appropriate. Notwithstanding the foregoing, but without limiting any of the Secured Parties' rights or remedies, the Secured Parties shall not consummate foreclosure on the Collateral or otherwise seize control of assets of the Borrowers' estates (it being understood that the giving of a notice of exclusive control or similar notice under any control agreement shall not constitute a foreclosure on the Collateral or the seizing of control of assets of the Borrowers) absent five (5) business days' prior written notice of an Event of Default to the Borrowers, counsel to any official committee appointed in these cases, and the United States Trustee; *provided*, that in any hearing related to the giving of any such notice, the only issues that may be raised by any party shall be whether, in fact, (i) an Event of Default has occurred and is continuing, or (ii) such Event of Default is primarily due to, or primarily arises from, the willful misconduct of the Secured Parties.

24.    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby lifted to grant the liens and security interests to the Secured Parties contemplated by the DIP Financing Documents and this Interim Order, and is further lifted to the extent of the exercise by the Secured Parties of any rights or remedies under the DIP Financing Documents, subject only to the notice requirement set forth in the foregoing paragraph.

**OTHER PROVISIONS**

25.    **Use of Proceeds.** From and after the Commencement Date, the Borrowers shall use the proceeds of the Loans solely in accordance with and subject to the conditions set forth in this Interim Order and the DIP Financing Documents. Nothing in this Interim Order shall be construed to require the Lenders to make advances or extensions of credit or other financial

- 14 -

accommodations to permit the Borrowers to make any payments, except to the extent expressly provided for in this Interim Order and the DIP Financing Documents.

26.     **Escrows.**  The Borrowers are hereby directed to (a) execute and deliver such documentation as required pursuant to the DIP Financing Documents to establish the Interest Escrow Account and the Lender Expenses Escrow Account, and (b) borrow Loans under the DIP Facility to fund the Interest Escrow Account and the Lender Expenses Escrow pursuant to the terms of the DIP Financing Documents, prior to any other borrowings under the DIP Facility.

27.     **Bank Accounts.**  Any proceeds of the sale, lease or other disposition of the Collateral, including all Cash Collateral of the Secured Parties, shall be used in accordance with the provisions of this Interim Order and the DIP Financing Documents and shall be applied in payment of the Borrowers' obligations under, and in the manner provided in, the DIP Financing Documents.  The Borrowers are authorized and directed to deposit such proceeds into such account or accounts as the Administrative Agent shall direct and as provided for in the DIP Financing Documents, and upon such deposit, such proceeds shall become the sole and exclusive property of the Secured Parties and may be applied by the Administrative Agent against the Borrowers' obligations as provided in the DIP Financing Documents.  The Borrowers are deemed to have irrevocably waived any right to direct the manner of application of any payments to the Secured Parties or any other receipts by the Secured Parties of proceeds of any of the Collateral, including all of the Lenders' Cash Collateral, other than as expressly set forth in this Interim Order and the Postpetition Financing Documents.  The Borrowers are hereby directed to establish one or more bank accounts as provided in the DIP Financing Documents, into which all of the Lenders' Cash Collateral shall be held.

DB02:6164403.1                                                                                                                066585.1001

28.     **Immediate Effectiveness.**  Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

29.     **Survival.**  (a) The terms and provisions of this Interim Order and the DIP Financing Documents, and the liens and security interests granted to the Administrative Agent and the superpriority status of the administrative claims and payment provisions contained in this Interim Order and the DIP Financing Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash, and DIP Financing Documents are terminated.

(b)     The liens, security interests, administrative priorities and other rights and remedies granted to the Secured Parties by the provisions of this Interim Order, as well as the Borrowers' obligations pursuant to the DIP Financing Documents and this Interim Order, shall continue beyond and survive the expiration of this Interim Order, and, to the extent permitted by applicable law, shall not be modified, altered or impaired in any manner by (a) any other financing or extension of credit or incurrence of indebtedness by any of the Borrowers under section 364 of the Bankruptcy Code or otherwise (except as contemplated by the DIP Financing Documents), (b) the entry of an order or orders confirming any plan or plans of reorganization or liquidation in these cases, or (c) the entry of an order converting these cases to cases under chapter 7 of the Bankruptcy Code, suspending, or dismissing these cases.

(c)     This Interim Order and DIP Financing Documents shall be valid, binding and enforceable by the Secured Parties against the Borrowers, their respective successors and

- 16 -

assigns, including, without limitation, any chapter 11 or chapter 7 trustee appointed as a representative of any of the Borrowers' estates; *provided*, the Secured Parties shall have no obligation to extend any financing to any such chapter 11 or chapter 7 trustee or similar person.

(d)     If any provision of this Interim Order is hereafter modified, vacated, reversed or stayed by subsequent order of this or any other court for any reason, such modification, vacation, reversal or stay shall not affect the validity and priority of any of the DIP Obligations incurred under this Interim Order and the DIP Financing Documents, and, prior to the effective date of any such modification, vacation, reversal or stay, the validity, enforceability or priority of the DIP Obligations shall be governed in all respects by the original provisions of this Interim Order, and the Secured Parties and Lender-Related Parties shall be entitled to all the rights, privileges and benefits granted herein. The transactions contemplated by the DIP Facility have been entered into by the Secured Parties in good faith, and, as a result, the Secured Parties are entitled to the protections afforded by Section 364(e) of the Bankruptcy Code in the event of any reversal or modification of this Interim Order.

(e)     Under no circumstances, except with the written consent of the Administrative Agent, shall (a) any plan of reorganization or liquidation in any of the Borrowers' chapter 11 cases be confirmed or become effective unless such plan provides that all DIP Obligations are paid in full in cash on or before the effective date of such plan; or (b) the liens, rights and remedies granted to the Secured Parties pursuant to or in connection with the DIP Financing Documents and this Interim Order be modified, altered or impaired in any manner by a chapter 11 plan or order of confirmation of a chapter 11 plan for any of the Borrowers.

30.     **Indemnities.**  Each Borrower shall hold the Administrative Agent, each Lender-Related Party and each Participant (the Administrative Agent, each Lender-Related Party and

each Participant, an "Indemnified Party") harmless from and indemnify any Indemnified Party, on an after-Tax basis, against all liabilities, losses, damages, judgments, costs and expenses of any kind which may be imposed on, incurred by or asserted against such Indemnified Party (collectively, the "Indemnified Liabilities") relating to or arising out of this Loan Agreement, the Note, any other Loan Document or any transaction contemplated hereby or thereby, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Loan Agreement, the Note, any other Loan Document or any transaction contemplated hereby or thereby.  Without limiting the generality of the foregoing, each Borrower agrees to hold any Indemnified Party harmless from and indemnify such Indemnified Party against all Indemnified Liabilities with respect to all mortgage loans relating to or arising out of any violation or alleged violation of any environmental law, rule or regulation or any consumer credit laws, including without limitation laws with respect to unfair or deceptive lending practices and predatory lending practices, the Truth in Lending Act or the Real Estate Settlement Procedures Act.  In any suit, proceeding or action brought by an Indemnified Party in connection with any mortgage loan for any sum owing thereunder, or to enforce any provisions of any mortgage loan, each Borrower will save, indemnify and hold such Indemnified Party harmless from and against all expense, loss or damage suffered by reason of any defense, set-off, counterclaim, recoupment or reduction or liability whatsoever of the account debtor or obligor thereunder, arising out of a breach by any Borrower of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to or in favor of such account debtor or obligor or its successors from any Borrower.  Each Borrower also agrees to reimburse an Indemnified Party as and when billed by such Indemnified Party for all such Indemnified Party's resonable costs and expenses incurred in connection with the enforcement or the preservation of such Indemnified Party's

rights under this Order or any DIP Financing Document or any transaction contemplated hereby or thereby, including without limitation the reasonable fees and disbursements of its counsel. Each Borrower hereby acknowledges that, notwithstanding the fact that the Loans are secured by the Collateral, the obligation of each Borrower with respect to each Loan is a recourse obligation of each Borrower. The foregoing to the contrary notwithstanding, the Borrowers shall have no obligation to any Indemnified Party under this paragraph with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the bad faith, gross negligence, or willful misconduct of such Indemnified Party. In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential, or punitive damages.

31.    **Exculpation.** Nothing in this Interim Order, the DIP Financing Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the Secured Parties any liability for any claims arising from the pre-petition or post-petition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts. So long as the Secured Parties comply with their obligations under the DIP Financing Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage or destruction of the Collateral shall be borne by the Borrowers.

32. **Payment of Lenders' Fees and Expenses.** The Borrowers are hereby authorized and directed to pay the fees as they come due under the DIP Financing Documents to the Secured Parties without further Court order, including without limitation, the Facility Fee, the commitment fee set forth in Section 3.07(b) of the DIP Credit Agreement, and all reasonable out-of-pocket costs and expenses of the Secured Parties (including reasonable attorney's fees and expenses) as provided for under the DIP Financing Documents. The Borrowers shall send copies of invoices received by them for such out-of-pocket costs and expenses (including attorneys' fees and expenses) to (a) the United States Trustee, and (b) counsel to any official committee appointed in these cases.

33. **No Waiver of Secured Parties' Rights.** Notwithstanding anything to the contrary herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights of the Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of the Secured Parties to (a) request the conversion of any of the Borrowers' cases to cases under chapter 7 of the Bankruptcy Code or the appointment of a chapter 11 trustee, examiner, fiduciary, or responsible person with expanded powers, or (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans of reorganization or liquidation for any of the Borrowers.

34. **Conflicts.** To the extent of any conflict between or among the express terms or provisions of any of the DIP Financing Documents and the Motion, the terms and provisions of the DIP Financing Documents shall govern. To the extent of any conflict between or among the express terms or provisions of any of the DIP Financing Documents or the Motion on the one

- 20 -

hand, and the terms and provisions of this Interim Order on the other hand, the terms and provisions of this Interim Order shall govern.

35.     **Amendments.** The Borrowers and the Secured Parties may finalize, amend, modify, supplement or waive any provision of the DIP Financing Documents if such amendment, modification, supplement or waiver is permitted under the terms of the DIP Financing Documents and is not material (in the good faith judgment of the Secured Parties and the Borrowers) without any need to apply to, or receive further approval from, the Court.

36.     **No Proofs of Claim.** The Secured Parties are each hereby relieved of the requirement to file proofs of claim in these cases with respect to any DIP Obligations.

37.     **Reservation of Rights Under Certain Bankruptcy Code Provisions.** No rights of any entity in connection with a contract or transaction of the kind listed in §§ 555, 559, 560, and 561 of the Bankruptcy Code, whatever they might or might not be, are affected by the entry of this Interim Order.

38.     **No Third Party Beneficiaries.** No third party is intended to be or shall be deemed to be a third party beneficiary of the provisions of this Interim Order or the DIP Financing Documents.

39.     **Retention of Jurisdiction.** The Court shall retain jurisdiction to hear and determine all matters arising from this Interim Order and its implementation.

40.     **Headings.** Paragraph headings used herein are solely for a convenience and shall convey no substantive import.

41.     **Final Hearing.** The Final Hearing on the Motion shall be held before the Court on the ___ day of ___, ___, 2007 at __: __ .m. in Courtroom _ at 824 Market Street, Wilmington, Delaware 19801. The Borrowers shall mail copies of this Interim Order and notice

- 21 -

of the Final Hearing (including the Objection Deadline, as such term is hereinafter defined) to the parties that were given notice of the Interim Hearing and to any other party which has filed a request for notices with this Court. Any party in interest objecting to the relief sought in the Final Order shall file with the court (with a courtesy copy to chambers) its written objection and serve such objection so as to be received no later than _____, 2007 by 4:00 p.m. local Delaware time (the "Objection Deadline"), on (i) Young, Conaway Stargatt & Taylor, LLP, The Brandywine Building, 100 West Street, 17th Floor, Wilmington, Delaware 19889-0391, Attention Joel Waite, Esq., Counsel to the Debtors; (ii) Jones Day, 222 East 41st Street, New York, New York 10017, Attention: Corinne Ball, Esq. and Erica M. Ryland, Esq. and Greenberg Traurig LLP, 1007 North Orange Street, Suite 1200, Wilmington, DE 19801, Attention: Victoria Counihan, Esq., Counsel to the Administrative Agent; (iii) Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022, Attention: Margot B. Schonholtz, Esq., and Scott D. Talmadge, Esq. and Potter Anderson & Corroon LLP, Hercules Plaza, 6th Floor, 1313 North Market Street, Wilmington, Delaware 19801, Attention: Laurie Selber Silverstein, Esq., Counsel for Bank of America, N.A.; and (iv) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801.

Dated: August __, 2007
Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

- 22 -

Exhibit B

BORROWING NOTICE

Dated: _____ __, 200_

WRL Recovery Fund III, L.P.
    as Administrative Agent
1166 Avenue of the Americas, 27th Floor
New York, New York 10036
Attention: _____
Telecopier No.: 212-317-4891

Ladies and Gentlemen:

This Borrowing Notice is delivered to you pursuant to Section 2.03(a) of the Loan Agreement, dated as of August 6, 2007 (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), among American Home Mortgage Investment Corp.("AHMIC") and certain of AHMIC's subsidiaries, each as a debtor and a debtor-in-possession, as borrower (collectively, the "Borrowers" and individually each a "Borrower"), the Lenders from time to time party to the Loan Agreement, including the initial lenders as set forth on Schedule B of the Loan Agreement, and WLR Recovery Fund III, L.P., as administrative agent for Lenders (in such capacity, the "Administrative Agent"). Unless otherwise defined, terms used herein have the meanings provided in the Loan Agreement.

The Administrative Borrower hereby gives you notice of and requests a Loan under the Loan Agreement (the "Proposed Borrowing") for the account of the Borrowers, and in connection therewith sets forth below the information relating to such Proposed Borrowing:

1.      The Funding Date of the Proposed Borrowing is _____ __, 200_.

2.      The aggregate amount of the Proposed Borrowing is $[_____].

The Administrative Borrower, on behalf of itself and the other Borrowers, hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing requested hereby, before and immediately after giving effect thereto and to the application of the proceeds therefrom:

(a)      no Default or Event of Default shall have occurred and be continuing or would result from the making of such Proposed Borrowing;

(b)      the amount and intended use of proceeds of such Loan are in compliance with the Budget;

(c)     the representations and warranties made by each Borrower in <u>Section 6</u> of the Loan Agreement, and in each of the other Loan Documents, are true and complete on and as of the date of the making of such Proposed Borrower in all material respects with the same force and effect as if made on and as of such date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date); and

(d)     each of the other conditions precedent set forth in <u>Section 5.02</u> of the Loan Agreement have been satisfied.

Please wire transfer the proceeds of the Proposed Borrowing to the account set forth on <u>Schedule I</u> attached hereto.

[Signature page follows]

IN WITNESS WHEREOF, the Administrative Borrower has caused this Borrowing Notice to be executed and delivered, and the certification and representations and warranties contained herein to be made, by its duly Authorized Officer this __ day of _____, 200_.

> AMERICAN HOME MORTGAGE
> INVESTMENT CORP., as Administrative
> Borrower on behalf of each of the Borrowers
>
> By:_____
>     Name:
>     Title:

SCHEDULE 1 TO BORROWING NOTICE

[Wire Transfer instructions to be provided by the Borrowers.]

Schedule A

## Borrowers

American Home Mortgage Investment Corp., a Maryland corporation
American Home Mortgage Holdings, Inc., a Delaware corporation
American Home Mortgage Corp., a New York corporation
American Home Mortgage Acceptance, Inc., a Maryland corporation
American Home Mortgage Ventures LLC, a Delaware limited liability company
Homegate Settlement Services, Inc., a New York corporation
Great Oak Abstract Corp., a New York corporation

NYI-4012525v8
DIP Credit Agreement -- AHM
JP011771
000000 - 000000

Schedule B

Initial Lenders

| Lender | Commitment |
|---|---|
| WLR Recovery Fund III, L.P. | $50,000,000.00 |

- 86 -

## Schedule C

### Budget

See attached

AMERICAN HOME MORTGAGE
CASH FORECAST – CORPORATE NON-SERVICING

($ millions)

| Projected Cash Flows | 13 Weeks Ending 11/2/07 | 28 Days ended 11/30/07 | 12/23/07 | 1/31/07 | Month Ended 2/28/07 | 3/31/07 | 4/30/07 | 5/31/07 | 6/30/07 | 7/31/07 | 12 Months Ended 7/31/07 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Restructuring Professionals [a] | $ 6.6 | $ 4.1 | $ 5.0 | $ 5.0 | $ 1.6 | $ 0.8 | $ 0.8 | $ 1.6 | $ 0.8 | $ 0.8 | $ 27.4 |
| DIP Fees | 0.5 | | | | | | | | | | 0.5 |
| Wind Down Costs | 2.5 | | | | | | | | | | 2.5 |
| Outstanding Check Float | - | | | | | | | | | | - |
| A/P Checks Cleared | 5.7 | 1.8 | 1.8 | 1.8 | 1.0 | 1.0 | 1.0 | | 0.5 | 0.5 | 15.5 |
| Vendor Deposits | 2.0 | | | | | | | | | | 2.0 |
| HUD/FHA/VA Payments | - | | | | | | | | | | - |
| Payroll & Payroll Taxes [b] | 7.5 | 1.7 | 1.7 | 1.7 | 1.2 | 1.2 | 1.2 | 0.8 | 0.6 | 0.6 | 18.0 |
| Retention Payments [c] | 1.2 | 0.4 | 0.4 | 2.2 | 0.5 | 0.5 | 0.5 | 0.2 | 0.2 | 0.2 | 6.3 |
| Health Insurance-BCBS | 7.0 | 1.7 | 1.7 | 1.7 | 1.2 | 1.2 | 1.2 | 0.6 | 0.6 | 0.6 | 17.5 |
| Other | - | | | | | | | | | | - |
| Projected Cash Flows | $ 33.0 | $ 9.7 | $ 10.7 | $ 12.5 | $ 5.4 | $ 4.6 | $ 4.6 | $ 3.7 | $ 2.7 | $ 2.7 | $ 89.7 |

(a) Includes attorneys, bankers, crisis managers, et al. 20% holdback paid every 4th month.

(b) Payroll assumes reductions of headcount through the forecast period.

(c) Assumes current retention plan ends in January, and remaining staff receive 40% rate for balance of forecast period.