IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x

In re:                                          :    Chapter 11

AMERICAN HOME MORTGAGE HOLDINGS, INC.,          :    Case No. 07-11047 (CSS)
a Delaware corporation, et al.,
                                                :    Jointly Administered
    Debtors.                                    :
                                                     **Ref. Docket No. 243**
                                                :    **Hrg. Date: Sept. 7, 2007 at 11:00 a.m.**

---------------------------------------------------------------- x

### DEBTORS' PRELIMINARY OBJECTION TO THE MOTION OF THE UNITED STATES FOR AN ORDER (I) REQUIRING TURNOVER OF NON-ESTATE PROPERTY BELONGING TO THE GOVERNMENT NATIONAL MORTGAGE ASSOCIATION AND (II) DECLARING THAT THE GOVERNMENT NATIONAL MORTGAGE ASSOCIATION IS NOT SUBJECT TO THE AUTOMATIC STAY

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and

debtors in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] hereby object

(the "Preliminary Objection")[2] to the Motion of the United States for an Order (I) Requiring

Turnover of Non-Estate Property Belonging to the Government National Mortgage Association

("GNMA") and (II) Declaring that GNMA is not Subject to the Automatic Stay, D.I. 243 (Aug.

20, 2007) (the "Turnover Motion"). In support of such Preliminary Objection, the Debtors

respectfully represent as follows:

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

[2]    Given the expedited time frame for this matter, the Debtors had to prepare and file this Preliminary Objection before the conclusion of discovery. The Debtors reserve the right to supplement this objection, or bring such other and further objections as are appropriate, based on information obtained in discovery.

## INTRODUCTION

GNMA's Turnover Motion is the latest installment in a campaign by GNMA to establish absolute and unchecked authority over its issuer-servicers. Knowing full well that the Debtors disputed the validity of GNMA's purported prepetition termination of their servicing rights, GNMA filed a garden-variety "motion" seeking turnover of a valuable asset of the Debtors' bankruptcy estates and declaratory relief that the automatic stay was not applicable on shortened notice. When confronted with the impropriety of seeking such extraordinary relief via motion rather adversary complaint, GNMA took the untenable position that its enabling statute operates as a blanket waiver of any and all federal laws (including the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure) that might otherwise prevent the uninhibited exercise of its unfettered discretion in dealings with GNMA issuer-servicers such as the Debtors. As discussed below, GNMA's purported termination of the Debtors' servicing rights is tainted with violation of the Debtors' due process rights, the vindication of which requires a full and fair trial with all the protections of the adversary process. Indeed, GNMA's attempt to deprive the Debtors and their estates of these rights shielded from judicial review is precisely the type of action the automatic stay was designed to prevent.

## FACTS

### I.    Debtors' Background

Before filing their petitions for bankruptcy on August 6, 2007 (the "Petition Date"), the Debtors were in the business of originating, servicing, and selling mortgage loans, as well as investing in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. (See generally Decl. of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief, D.I. 2 (Aug. 6, 2007) (the "Strauss

Decl.").) The Debtors also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. (Id.) The Debtors offered an array of the mortgage products and primarily made loans to borrowers with good credit profiles. (Id.) Most of the Debtors' portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate a quality. (Id.)

A large component of AHM's business is the servicing of loans, which is conducted through American Home Mortgage Servicing, Inc. ("AHM Servicing"). (See Decl. of Craig Pino in Support of Debtors' Memorandum of Law (I) In Support of Their Motion to Dismiss Complaint and (II) in Opposition to Credit Suisse First Boston Mortgage Capital LLC's Motion for Temporary Retraining Order and Declaratory and Injunctive Relief, Adv. Pro. No. 07-51684, D.I. 18 (the "Pino Decl.") ¶ 4; Decl. of Robert L. Love, Jr. in Support of Debtors Memorandum of Law (I) In Support of Their Motion to Dismiss Complaint and (II) in Opposition to Credit Suisse First Boston Mortgage Capital LLC's Motion for Temporary Retraining Order and Declaratory and Injunctive Relief, Adv. Pro. No. 07-51684, D.I. 19 (the "Love Decl.") ¶ 4.) The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. (Id.) As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans having an aggregate outstanding principal balance of approximately $46.3 billion. (Id.) AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates. (Id.)

The Debtors' decision to seek protection under the bankruptcy laws reflects that the roiled subprime mortgage market hurt the Debtors' loan origination business, not their servicing business. Beginning in late 2006, and continuing through 2007, the credit markets

became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages.  (See generally Strauss Decl.)  The failure of two major hedge funds with concentrated investments in subprime loans exacerbated these concerns.  (Id.)  These concerns spread beyond the subprime market and into other segments of the credit markets and have been reflected in the widening of the spread between the rate of interest on U.S. Treasury-issued securities and general corporate debt securities.  (Id.)  The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.  (Id.)

In the weeks before the Petition Date, these unprecedented disruptions in the credit markets caused major write-downs of the Debtors' loan and security portfolios.  Following these write-downs, the Debtors' lenders made margin calls with respect to hundreds of millions of dollars of the Debtors' loans.  (Id.)  At the same time, certain of the Debtors' warehouse lenders—the financial institutions that provided short-term credit facilities the Debtors used to originate and purchase loans—began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.  (Id.)  The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business.  (Id.)

Despite these troubles in the loan origination business, the Debtors' servicing business remains fully staffed, uninterrupted, and profitable to the Debtors.  (Love Decl. ¶ 6.)

## II.   Servicing of GNMA Mortgages

AHM Servicing began to service existing pools and loan packages under the GNMA I MBS Program and the GNMA II MBS Program, as governed by the applicable

guaranty agreements (the "Guaranty Agreements") when it acquired Columbia National

Incorporated. After that time, AHM Servicing submitted and serviced new pools of mortgages

backed by GNMA securities.

On August 1, 2007, GNMA allegedly sent a letter to AHM Servicing contending

that an event of immediate default occurred under the terms of the Guaranty Agreement as a

result of "American Home Investment Corporation announc[ing] that it does not have sufficient

cash to fund new loans, and . . . suspend[ing] a scheduled stock dividend due to concerns about

inadequate cash flow to handle losses attributable to a deteriorating mortgage market" and AHM

Servicing "submit[ing] audited financial statements that showed a negative net income for fiscal

year 2006." (See Turnover Motion Ex. H.) GNMA contended that, due to the purported events

of default, it was entitled to extinguish any of AHM Servicing's rights in the mortgage pools.

(Id.) In the August 1 letter, GNMA also represented to AHM Servicing that "GNMA will

provide American Home an opportunity to remedy the default" by taking the following actions

within 24 hours:

1) providing in writing a detailed description of the above-referenced situation
within twenty-four hours from the date of this letter;

2) providing a thorough description of the events leading to this situation;

3) providing reasons why GNMA was not notified;

4) describing what plans AHM Servicing had to address its liquidity problem,
and;

5) describing what actions AHM Servicing had taken to ensure it is able to
continue as a going concern and otherwise comply with all other GNMA
Issuer requirements.

(Id.)

AHM Servicing did not receive the August 1 letter until the afternoon of August 2, 2007.[3]  (See Turnover Motion Ex. I.)  Thus, with less than twelve hours to cure the alleged default pursuant to GNMA's comprehensive instructions, AHM Servicing prepared and sent a response to GNMA on August 2.  The response disputed that an event of default had occurred and how it was unable to provide the comprehensive response GNMA had requested in the truncated time frame GNMA sought to impose, due to GNMA's failure to supply and describe the relevant documentation of the alleged event of default.  (Id.)  Moreover, AHM Servicing assured GNMA that it remained "capable of servicing mortgages in the same manner that they have historically conducted their servicing operations" and that AHM Servicing wanted to work with GNMA to resolve this dispute.  (Id.)

        But GNMA's representation that AHM Servicing would have an opportunity to cure the default GNMA had precipitously declared was illusory.  On August 2, 2007 at 6:42 p.m., six hours before AHM Servicing's cure response was due, GNMA informed Bank of New York that it was going to default AHM Servicing the next day.  (See Exhibit A attached hereto.)  GNMA also had already issued a notice to JP Morgan Chase requiring it to re-title all of principal and interest custodial accounts currently held in the name of AHM Servicing to GNMA and wire the funds to a new GNMA account.[4]  (See Turnover Motion Ex. L.)

        The next day, August 3, 2007, GNMA sent a letter to AHM Servicing terminating it as a servicer of the Mortgage-Backed Securities pools established under the Guaranty Agreements.  (See Turnover Motion Ex. K.)  GNMA concluded that because AHM Servicing did not utilize the "opportunity" to provide all of the information regarding the alleged default in the

---

[3]        Notably, GNMA did not attach proof of delivery of the August 1 letter to the Turnover Motion.  To date, no evidence has been provided by GNMA to established that the letter was sent on August 1, 2007.

[4]        On August 3, 2007, GNMA also directed American Home Bank to re-title all principal and interest custodial accounts and taxes and insurance custodial accounts currently held in the name of AHM Servicing to GNMA.

24-hour (in actuality, 12-hour) cure period, GNMA declared an event of default under Section

10.01(a) of the Guaranty Agreements and requested AHM Servicing's cooperation in the

transition of servicing to either GNMA or the as-yet unidentified designee. (Id.) Also on August

3, people who asserted they were GNMA representatives arrived, unannounced, at AHM

Servicing's office in Irving, Texas. When these people were denied access, they stood in a line

in front of the doors and sat on the stairs, preventing AHM Servicing employees from entering

the office. (See Decl. of Theresa Chase in Support of Debtors' Preliminary Objection to the

Motion of the United States for an Order (I) Requiring Turn-Over of Non-Estate Property

Belonging to the Government National Mortgage Association and (II) Declaring that the

Government National Mortgage Association is not Subject to the Automatic Stay, filed

concurrently herewith (the "Chase Decl.") ¶5.)

On August 6, 2007, the Debtors filed their petitions for bankruptcy. After the

Petition Date, AHM Servicing continued to service the loans. This servicing included, *inter alia*,

collecting mortgage payments and remitting them on a daily basis to custodial accounts for

principal and interest ("P&I Accounts") and tax and insurance escrows ("T&I Accounts" with

the P&I Accounts, the "Custodial Accounts"), responding to borrower inquiries and maintaining

control over collection and default mitigation processes. (Chase Decl. ¶ 6.) Due to GNMA's re-

titling of the Custodial Accounts, AHM Servicing was only able to deposit amounts collected

into the Custodial Accounts, but could no longer direct due and owing payments out of the

account. (Id.)

In order to prevent harm to the underlying mortgagors, AHM Servicing advanced

payments for due and owing taxes and insurance ("T&I Payments") out of its operating funds.

(Chase Decl. ¶ 7) Failure to make these T&I Payments could result in harm to the mortgagors,

including imposition of late fees, penalties, or tax liens and loss of insurance coverage. (Id.) AHM Servicing requested reimbursement of such advances from GNMA out of the T&I Accounts, where the funds collected for this purpose where held. Even though GNMA held the money for these T&I Payments, instead of allowing AHM Servicing to direct payment of these funds to the proper entities, it refused to return the advances made by AHM Servicing on the mortgagors' behalves. (Id.)   On August 24, 2007, after advancing a total of $548,588.05, AHM Servicing determined it could no longer advance funds without GNMA's cooperation or assurance that funds advanced on behalf of the mortgagors would be reimbursed out of the T&I Account funds. (Id.)

Since the Petition Date, AHM Servicing also issued checks to certain GNMA I Security Holders. (Chase Decl. ¶ 8.) Those checks were also funded out of AHM Servicing's operating funds. (Id.) All other payments due and owing GNMA I and II Security Holders should have been electronically made out of the P&I Accounts. (Id.) Given that AHM Servicing continued to collect mortgage payments and make daily deposits into the Custodial Accounts, sufficient funds should have been available to make these payments. However, in addition to GNMA withholding consent for AHM Servicing to direct electronic payments, GNMA swept these accounts on a daily basis. (Id.) So, with the funds properly collected and available to GNMA, AHM Servicing cannot reconcile GNMA's statement that it paid out approximately $1.2 million of its own funds to cover scheduled payments to investors. (See Turnover Motion 9-10.) As of August 24, 2007, AHM Servicing ceased making deposits into the Custodial Accounts. (Chase Decl. ¶ 9.) Instead, all mortgage payments collected are being held in an AHM clearing account pending resolution of this dispute. (Id.)

On August 20, 2007, the United States filed the Turnover Motion on behalf of

GNMA. After a teleconference with the parties on August 22, 2007, the Court determined that

the Turnover Motion, including any procedural defects, would be heard on September 7, 2007,

and that the parties could conduct informal discovery prior to that date.

## ARGUMENT

### I.    The Turnover Motion is Procedurally Improper; To Obtain the Relief Requested, GNMA Must Commence an Adversary Proceeding

As with GNMA's hasty notice of default and its ill-conceived "raid" on AHM

Servicing's office in Irving, Texas, GNMA's Turnover Motion attempts to go too far, too fast

and seeks to summarily derogate the Debtors' right to an orderly unwinding of its relationship

with GNMA. The Turnover Motion seeks an order "(i) requiring [AHM Servicing] to turn over

property belonging to GNMA and (ii) declaring that GNMA is not subject to the automatic stay."

(Turnover Motion 1 (emphasis added).) But Bankruptcy Rule 7001 is clear that any proceeding

to recover property, to determine the validity or extent of an interest in property, or to obtain

declaratory relief relating to the foregoing is an adversary proceeding governed by the adversary

rules.[5] Fed. R. Bankr. P. 7001(1), (2), and (9). See In re Expresstrak, L.L.C., Case No. 03-

67235, 2004 Bankr. LEXIS 114, *12-13 (Bankr. E.D. Mich. Jan. 20, 2004) (holding that motion

seeking determination that automatic stay did not apply for the purpose of recovering property

from the debtor was procedurally improper; Fed. R. Bankr. P. 7001(9) required commencement

of an adversary proceeding). In the Turnover Motion GNMA does not cite any authority

exempting it from Fed. R. Bankr. P. 7001.

---

[5]    Additionally, because GNMA is well aware that Bank of America asserts a lien in the Debtors' servicing rights, the Turnover Motion is essentially a "proceeding to determine the validity . . . or extent of a lien" within the meaning of Fed. R. Bankr. P. 7001(2).

The distinction between "adversary proceedings" and "contested matters" under the Federal Rules of Bankruptcy Procedure is an important one, and is the result of a careful balancing of the competing interests of debtors, creditors, and other parties in interest, with concerns of due process, expediency, and judicial economy.

> In general, an adversary proceeding involves more complex issues affecting substantial rights of the debtor, its creditors and third parties. The filing of a complaint triggers application of the Federal Rules of Civil Procedure, which have proved effective in facilitating adjudication of a wide range of controversies. . . . More complete relief, trial by jury, the possibility of pleading affirmative defenses and counterclaims, intervention, summary judgment, appeal as of right, and an opportunity for more thorough discovery and trial preparation are familiar features of the Federal Rules of Civil Procedure which are available in adversary proceedings.

In re Riding, 44 B.R. 846, 858-59 (Bankr. D. Utah 1984) (citation omitted). See In re Lawler, 75 B.R. 979, 983 (Bankr. N.D. Tex. 1987) ("An adversary proceeding requires that a complaint be filed, a filing fee be paid, and a Summons be issued."). In determining which types of disputes required the full procedural protections afforded by the adversary process, the drafters of the Bankruptcy Rules operated from the premise that "to the extent possible practice before the bankruptcy courts and the district courts should be the same." Fed. R. Bankr. P. 7001 advisory committee's note.

In seeking an adjudication of the parties' respective rights, an adversary proceeding would clearly be a more just and efficient way for GNMA to proceed. Had GNMA commenced an adversary proceeding (or sued in district court), it would have been required to provide a "short and plain statement of [its] claim showing that [it] is entitled to relief, Fed. R. Civ. P. 8(a)(2), consisting of "simple, concise, and direct" averments in individually numbered paragraphs, Fed. R. Civ. P. 8(e)(1) & 10(b), which the Debtors could answer in a responsive

pleading or challenge for legal sufficiency by motion under Fed. R. Civ. P. 12(b)(6).[6] Absent

modification by the Court for cause, the Debtors would have had thirty days to file their

responsive pleading, Fed. R. Bankr. P. 7012(a), at least five more days until the pretrial

scheduling conference, see Del. Bankr. L.R. 7004-2, and such additional time as the Court

deemed appropriate to conduct discovery and pretrial motion practice. And had GNMA wished

to obtain mandatory injunctive relief in advance of a full trial on the merits, it would have had to

establish, among other things, that it would suffer immediate and irreparable (i.e., non-

pecuniary) harm in the absence of such relief—which at least one other similarly-situated

creditor has failed to establish in these bankruptcy cases. See Order, Credit Suisse First Boston

Mortgage Capital LLC v. Am. Home Mortgage Corp. (In re Am. Home Mortgage Corp.), Adv.

Proc. No. 07-51684(CSS), D.I. 32 (Bankr. D. Del. Aug. 24, 2007) (denying plaintiff's

application for temporary restraining order).

GNMA decided to pursue its remedies by motion rather than by adversary

complaint to short-circuit the Debtors' ability to protect their interests by creating intense, short-

term pressure on the Debtors with little risk to GNMA.[7] Clearly, the upside to GNMA of

proceeding via contested matter (i.e., the chance to obtain final relief within an abbreviated time

frame without full pleadings or discovery and without a showing of irreparable harm)

significantly outweighs any downside (i.e., that the Court will deny the Turnover Motion and

require GNMA to do things the right way by filing an adversary complaint). Meanwhile, the

Debtors must divert valuable human resources to yet another expedited litigation matter at a

---

[6]    Because the automatic stay applies (as discussed below), GNMA would also have had to seek and retain relief from the stay as a prerequisite to bringing its suit against the Debtors.

[7]    GNMA has imposed financial pressure as well. In addition to re-titling the custodial accounts (thus requiring the Debtors to advance their own funds to make the T&I Payments), GNMA instructed HUD to "block" all payments to AHM based on FHA mortgage insurance claims, including both payments related to GNMA-pools and non-GNMA pools.

critical time in these chapter 11 cases and at peril of potential breach of their post-petition credit

agreement (i.e., because the Debtors acknowledge that Bank of America has a valid lien in the

GNMA servicing rights, which the Debtors are obligated to defend).

Although the Debtors are doing their best to conduct necessary discovery within

the short time frame before the hearing on the Turnover Motion, it is incredibly unlikely there

can be a full and fair adjudication of all issues raised by the Turnover Motion on the limited

factual record that will be developed at that hearing. As such, if the Court rules for GNMA at

that time the Debtors will have been deprived of due process of law twice—once by GNMA's

summary termination of the Debtors' valuable servicing rights, and again by this Court's

enforcement of such termination without meaningful review of the circumstances surrounding it.

Whether or not GNMA believes it is bound by the Bankruptcy Code or automatic

stay as a general matter, see infra § III, when seeking affirmative relief from this Court,

GNMA—like any other party—must follow this Court's procedural rules. Accordingly, denial

of the Turnover Motion as an improperly filed adversary complaint is the proper disposition

here. See Expresstrak, 2004 Bankr. LEXIS 114 at *36 (denying request for determination that

automatic stay did not apply). See also In re Lavell, 167 B.R. 243 (N.D. Ala. 1994) (affirming

bankruptcy court's denial of motion to reimpose automatic stay because it was an action for

injunctive relief); In re Parker, 154 B.R. 240 (Bankr. S.D. Ohio 1993) (denying motion seeking

to reimpose automatic stay for same reason); In re Smith & Son Septic & Sanitation Serv., 88

B.R. 375 (Bankr. D. Utah 1988) (denying motion seeking judgment for unpaid U.S. Trustee's

fees because it was an action to recover money); In re Sun Belt Elec. Constructors, Inc., 56 B.R.

686, 688 (Bankr. N.D. Ga. 1986) (denying motion to enforce contract because it was an action

for injunctive or equitable relief).[8]

## II.    GNMA's Purported Summary Termination of the Debtors' Servicing Rights Prepetition Deprived the Debtors of Property without Due Process of Law in Violation of the Fifth Amendment

In its Turnover Motion, GNMA makes much of its summary termination of the

Debtors' servicing rights in the days immediately prior to the Petition Date, which it contends

prevented such servicing rights from becoming property of the Debtors' bankruptcy estates.  But

this argument proves too much.  While GNMA is a "unique entity" with "distinct federal

statutory rights not shared by other creditors" (Turnover Motion 2), it is also a government

agency with distinct constitutional obligations not borne by private actors.  Whatever rights

GNMA may have under its enabling statute, its self-promulgated regulations, or its contracts of

adhesion with AHM Servicing, GNMA's exercise of such rights was at all times circumscribed

by the Fifth Amendment, which prohibits the deprivation of property without due process of law.

Consolidated Mortgage & Fin. Corp. v. Harris, C.A. No. 78-0721, 1979 U.S. Dist. LEXIS 15370,

*24-29 (D.D.C. Sept. 5, 1979) (applying Fifth Amendment due process analysis to termination of

GNMA guaranty agreement).  Contrary to well-established principles of procedural due process,

GNMA did not afford AHM Servicing a meaningful opportunity to be heard in response to the

August 1 declaration of default before terminating the Guaranty Agreements a mere two days

later.  See id. at *27 (noting that, at a minimum, due process requires "notice to the person whose

---

[8]        Accord In re McKay, 732 F.2d 44, 45 (3d Cir. 1984) (reversing confirmation of chapter 13 plan that purported to avoid judicial liens pursuant to 11 U.S.C. § 522(f) because, under the adversary rules, the debtor "bears the burden of filing a complaint with the bankruptcy court"); In re Riding, 44 B.R. 846 (Bankr. D. Utah 1984) (vacating turnover order as improvidently granted where debtor had proceeded by motion rather than by adversary complaint); In re UNR Indus., 23 B.R. 144 (Bankr. N.D. Ill. 1982) (vacating order modifying stay where creditor had proceeded by motion and bankruptcy rules then in effect required adversary complaint); In re Allen, 17 B.R. 119 (Bankr. D. Utah 1981) (denying motion to lift stay under former bankruptcy rules).

interest is at stake of the case against him, as well as an opportunity to meet it"). Accordingly,

such termination is not a valid basis for a turnover order from this Court.

A.    **AHM Servicing's Rights under the Guaranty Agreements Are "Property" Interests Protected by the Fifth Amendment**

As GNMA acknowledges in its Turnover Motion, it is a wholly-owned

corporation within the United States Department of Housing and Urban Development ("HUD").

GNMA operates under the supervision of the Secretary of HUD, and its president is appointed by

the President of the United States, by and with the advice and consent of the United States

Senate. 12 U.S.C. § 1273(a). Consistent with general policies and bylaws established by the

Secretary of HUD, GNMA is empowered by statute to promulgate rules, regulations, and

requirements governing the manner in which it conducts its general business. 12 U.S.C.

§ 1273a(a); see generally 24 C.F.R. §§ 300.1-350.11 (GNMA regulations). The GNMA

Mortgage-Backed Securities Guide (the "MBS Guide") and the Guaranty Agreements

themselves were promulgated (at least ostensibly)[9] pursuant to such authority. 300 C.F.R.

§ 320.1.

Where a contract between a federal government agency and private party is

terminable only "for cause," the private party has a "property" interest protected by the Fifth

Amendment. See Unger v. Nat'l Residents Matching Program, 928 F.2d 1392, 1399 (3d Cir.

1992).[10] While the Guaranty Agreements purport to reserve absolute discretion to GNMA in

determining whether an event of default has occurred (and, if so, whether to terminate or to

---

[9]    To the extent the MBS Guide and the Guaranty Agreements would allow GNMA to violate the Fifth Amendment, of course, they were not promulgated pursuant to any valid regulatory or statutory authority.

[10]    Unger was decided under the Fourteenth Amendment, but its holding is equally applicable to the Fifth Amendment. See 928 F.2d at 1397-99 (discussing Fourteenth and Fifth Amendment interchangeably, citing cases applying both). Accord Lynch v. United States, 292 U.S. 571 ("Rights against the United States arising out of a contract with it are protected by the Fifth Amendment."). For the sake of simplicity, the Debtors will hereinafter cite Fourteenth Amendment due process cases as direct authority for Fifth Amendment due process principles.

forbear from terminating the contracts),[11] no provision of the Guaranty Agreements permits GNMA to terminate "at will." Because the Guaranty Agreements were terminable only for cause (i.e., upon one of the enumerated events of default), it is beyond dispute that AHM Servicing was entitled to due process of law before its rights under the Guaranty Agreements could be finally terminated. Unger, 928 F.2d at 1399; Consolidated Mortgage, 1979 U.S. Dist. LEXIS 15370 at *24 (noting GNMA had conceded that its guaranty agreement with the plaintiff issuer-servicer gave rise to a Fifth Amendment "property" interest). See Parratt v. Taylor, 451 U.S. 527, 540 (1981) ("Our past cases mandate that some kind of hearing is required at some time before a State finally deprives a person of his property interests.").

**B.**     **Requiring AHM Servicing to Respond Within 24 Hours from the Declaration of Default Did Not Afford It a Meaningful Opportunity to be Heard Prior to Termination of its Servicing Rights**

The Debtors expect fulsome discovery would reveal that termination of an issuer-servicer for cause is an unusual event, and that AHM Servicing is one of the largest (if not the larges) issuer-servicers GNMA has ever terminated.[12] The Debtors suspect that GNMA, like any number of other parties who scrambled to take their chips off the table in the days leading up to the Petition Date, panicked when it heard the Debtors' loan origination business was in trouble

---

[11]     "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." Lynch v. United States, 292 U.S. at 579. Accordingly, under hornbook principles of contract law, GNMA was required to exercise its "absolute" discretionary authority under the Guaranty Agreements in good faith. Asco-Falcon II Shipping Co. v. United States, 18 Cl. Ct. 484, 491-492 (1989) (observing that "the obligation of good faith and fair dealing is a covenant which is implied in . . . every contract" and that the federal government "has an ever present obligation to perform its duties under a contract reasonably and in good faith"). In addition, as an agency of the federal government, GNMA must not act arbitrarily or capriciously in its dealings with others. See 5 U.S.C. § 706(2)(A) (permitting review of agency actions and determinations for arbitrariness).

[12]     This would account for the dearth of decisional law concerning termination of GNMA issuer-servicer status. It also might explain some of the imprudent decisions GNMA has made in the context of this dispute, not the least of which was its re-titling of and assumption of exclusive control over the T&I Accounts when it did not (and still does not) know where, when, and to whom T&I Payments must be made (which, in addition to any consequences for innocent mortgagors, threatens the collateral base of the GNMA security holders).

and assumed (without inquiring further) that this meant the servicing operations were in trouble as well. Based on this mistaken assumption, GNMA quickly cobbled together a declaration of default, setting conditions for forbearance which it knew would be impossible for the Debtors to meet within the 24-hour time frame allotted (much less the 12-hour time frame the Debtors actually had to respond), and, having pre-determined that any response from the Debtors would be inadequate, issued termination notices to the Funds Custodians which may well have crossed the Debtors' August 2 reply letter in the mail.

The foregoing termination procedures stand in sharp contrast to the procedures employed by GNMA in the Consolidated Mortgage case, which involved a due process challenge by a GNMA issuer-servicer ("Consolidated") to the termination of its servicing rights. See generally 1979 U.S. Dist. LEXIS 15370. GNMA had placed Consolidated on its "Close Watch" list as early as January 1977 due to reporting problems and a high ratio of delinquencies in Consolidated's mortgages. Id. at *5. In January 1978, GNMA received audited financial statements from Consolidated indicating (i) a net worth below that required by GNMA's regulations and (ii) a significant liability owed to a Puerto Rican bank ("Banco") in connection with certain loan transactions. Id. at *5-6. Representatives of GNMA met with Banco and Consolidated management in Puerto Rico on February 7 and learned additional unfavorable details concerning Consolidated's financial condition. Id. at *6. Later that day, after the GNMA representatives consulted with GNMA's management in Washington, D.C., GNMA sent Consolidated a letter (i) declaring it in default with respect to all of its mortgage pools based on impending insolvency and change in business status and (ii) ordering it to transfer its servicing responsibilities to another servicer. Id. On February 10, GNMA and Consolidated representatives met again and entered into a ninety-day moratorium agreement that permitted

Consolidated to continue servicing its existing mortgage pools while attempting to satisfy

GNMA that its financial condition would not adversely affect GNMA. Id. at *6-7. After further

developments reflecting poorly on Consolidated's financial condition in March and early April,

GNMA notified Consolidated that it should submit a proposal for the transfer of its servicing

rights to another lending institution by April 7. Id. at *7. On April 10, after Consolidated

informed GNMA it had received no offers to purchase its servicing rights, GNMA terminated the

work-out agreement and began its own search for a substitute servicer. Id.

In concluding that GNMA had "generously complied with due process

requirements," the Consolidated Mortgage court noted that Consolidated had been on notice of

its failure to comply with GNMA standards as early as March 1977, when GNMA informed it of

its unsatisfactory delinquency ratio, and that GNMA had given it an ample opportunity to

attempt compliance. 1979 U.S. Dist. LEXIS 15370 at *28.

> In addition, GNMA investigators met with Consolidated representatives
> on February 6 and 7 before declaring a default. A total of seven meetings
> occurred prior to the termination on April 10. At each of these meetings,
> Consolidated had the opportunity to discuss its situation with GNMA
> representatives, and meet its charges of noncompliance, insolvency and
> change in business circumstances, and to present evidence of its ability to
> continue its servicing functions.

Id. at 28-29.

It is telling that the Debtors here were afforded none of the due process

protections that were present in the Consolidated Mortgage case. To be clear, the Debtors do not

suggest that due process entitled them to seven meetings with GNMA prior to the termination of

their servicing rights. However, somewhere on the spectrum between the generous procedures

employed by GNMA in the Consolidated Mortgage case and the summary procedures employed

here lies a level of due process which comports with the Fifth Amendment and which the

Debtors were denied. The Debtors contend that, at a minimum, they were entitled to one

meeting with GNMA where they would have had a meaningful opportunity to present evidence of their ability to continue servicing the GNMA mortgage portfolio. See, e.g., Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 16 (1978) (holding that, prior to termination of public utility service for nonpayment of a disputed bill, "due process requires the provision of an opportunity for the presentation to a designated employee of a customer's complaint that he is being overcharged or charged for services not rendered"). Cf. Goss v. Lopez, 419 U.S. 565, 581 (1975) (holding that high-school student facing temporary suspension from school "must be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story"). See also Londoner v. Denver, 210 U.S. 373, 386 (1908) ("[A] hearing in its very essence demands that he who is entitled to it shall have the right to support his allegations by argument however brief, and, if need be, by proof, however informal."). And even if such a pre-termination "hearing" was not required, see, e.g., Town Court Nursing Center, Inc. v. Beal, 586 F.2d 266, (3d Cir. 1978) (holding that written submissions were sufficient to allow Medicare provider to present its case against termination/non-renewal of its provider agreement), then the Debtors should at least have been afforded a reasonable amount of time to prepare their written response to the August 1 default letter.

C.  **GNMA's Violation of AHM Servicing's Due Process Rights is Grounds for Denial of the Turnover Motion**

Under the federal Administrative Procedures Act, 5 U.S.C. §§ 701-706, a person aggrieved by an action of a federal government agency is entitled to judicial review thereof, 5 U.S.C. § 702, in "any applicable form of legal action" including "civil . . . proceedings for judicial enforcement" of such agency action, 5 U.S.C. § 703. In such an action, the reviewing court "shall decide all relevant questions of law, interpret constitutional and statutory provisions,

and determine the meaning or the applicability of the terms of the agency action." 5 U.S.C.

§ 706. The reviewing court also "shall"

> (1) compel agency action unlawfully withheld or unreasonably delayed; and

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law;

>> (B) contrary to constitutional right, power, privilege, or immunity;

>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]

>> (D) without observance of procedure required by law . . . .

5 U.S.C. § 706. Accordingly, because the termination of the Guaranty Agreements violated

AHM Servicing's Fifth Amendment due process rights, this Court should set aside such

termination and deny the Turnover Motion. Id.; Armstrong v. Manzo, 380 U.S. 545, 552 (1965)

(finding that an appropriate remedy a for due process violation was to "restore[] the [aggrieved

party] to the position he would have occupied had due process of law been accorded to him in

the first place").

In keeping with its broad claim of immunity from inconvenient federal laws,

GNMA will likely argue that its enabling statute (discussed below) exempts its decisions from

judicial scrutiny under the Administrative Procedures Act. Indeed, GNMA advanced a similar

reading of its enabling statute in DRG Funding Corp. v. Secretary of Housing & Urban Dev.,

Civ. Act. No. 88-2202, 1988 U.S. Dist. LEXIS 16526 (D.D.C. Aug. 12, 1988), in opposition to

an issuer-servicer's application for a temporary restraining order against GNMA pursuant to the

All Writs Act, 28 U.S.C. § 1651. The plaintiff in DRG Funding sued under the Administrative

Procedures Act, contending "that HUD and GNMA ha[d] transgressed their own implementing

statutes by ignoring clear Congressional commands with respect to the dating of debentures and the payment of debenture interest." Id. at *15.  The court concluded that construing GNMA's enabling statute to preclude the plaintiff's lawsuit "would deprive aggrieved parties of any judicial review of [HUD's and GNMA's] acts, and would sanction (in an anomalous fashion) a decision by HUD and GNMA to disregard Congressional intent," a result Congress obviously could not have intended.  Id. at *15.  Accord Webster v. Doe, 486 U.S. 592, 603 (1988) ("[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear. . . .  We require this heightened showing in part to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." (quotations omitted)).  So too here, the Court should resist any interpretation of GNMA's enabling statute that would cloak GNMA's actions from judicial review.

### III.    GNMA is Subject to the Automatic Stay

As support for its contention that it is not bound by the Bankruptcy Code, GNMA relies primarily on section 306(g) of the National Housing Act (the "NHA"), codified at 12 U.S.C. § 1271(g).  The statute provides, in relevant part, that

> no Federal law (except Federal law enacted expressly in limitation of this subsection after October 8, 1980), shall preclude or limit the exercise by [GNMA] of (A) its power to contract with the issuer . . . , (B) its rights to enforce any such contract with the issuer, or (C) its ownership rights . . . in the mortgages constituting the trust or pool against which the guaranteed securities are issued.

12 U.S.C. § 1271(g)(1).  GNMA then quotes a passage from the legislative history of the Housing and Community Development Act of 1980 (the "HCDA"), which amended the NHA to include the above-quoted language, as evidence that the Bankruptcy Code was not intended to limit GNMA in any way.

Since the enactment of the HCDA in 1980 there have been only three reported decisions from bankruptcy courts considering whether GNMA is bound by the automatic stay. See In re Commonwealth Mortgage Co., 145 B.R. 368 (Bankr. D. Mass. 1992) (not bound); In re Adana Mortgage Bankers, Inc., 12 B.R. 1012 (Bankr. N.D. Ga. 1981) (hereinafter, "Adana II") (bound), vacated on non-substantive grounds, 687 F.2d 344 (11th Cir. 1982); Whitcomb & Keller Mortgage Co., 8 B.R. 83 (Bankr. D. Ind. 1980) (not bound).

In Adana II, Judge William L. Norton, Jr. thoroughly analyzed the NHA and concluded it did not fully exempt GNMA from the Bankruptcy Code. See generally 12 B.R. 1012. Specifically, Judge Norton concluded that the automatic stay was procedural and remedial in nature, not substantive, and thus did not "preclude or limit the exercise by [GNMA] of . . . its rights to enforce [its] contract with the issuer" within the meaning of the statute. Id. at 1016 (citing Continental Ill. Nat'l Bank & Trust Co. v. Chicago R.I. & Par. Ry., 294 U.S. 648, 676, 681 (1935)). Finding that the language of the NHA was clear and unambiguous on this point, Judge Norton declined GNMA's invitation to consider the legislative history of the HCDA. Id. Perhaps more importantly, Judge Norton seriously questioned the probative value of such "legislative history," in part due to the uncanny resemblance between the statement of the House of Representatives' Committee on Banking, Finance and Urban Affairs and an argument advanced in one of GNMA's briefs earlier in the bankruptcy proceedings prior to passage of the HCDA.[13] Id. at 1015 n.2. Accordingly, Judge Norton held that, under the NHA as amended,

---

[13]     Earlier in the bankruptcy case Judge Norton held GNMA in contempt for repeated violations of the automatic stay in connection with its attempts to terminate the debtor's servicing rights, but deferred ruling on sanctions to give GNMA an opportunity to purge the contempt by subsequent action. See generally In re Adana Mortgage Bankers, Inc., 12 B.R. 989 (Bankr. N.D. Ga. 1980) (hereinafter, "Adana I"), vacated on non-substantive grounds, 687 F.2d 344 (11th Cir. 1982). GNMA had argued (unsuccessfully) that the Bankruptcy Code did not affect its rights under the NHA in effect at the time. Id. at 999-1001. Rather than purge the contempt by engaging in reasonable conduct, however, GNMA lobbied for passage of the HDCA, and then argued at the sanctions hearing (quoting the very passage from the legislative history it quotes here) that the amendment to the NHA was a

GNMA would be entitled to exercise its contractual rights in bankruptcy to the fullest extent otherwise permitted by applicable law, but only after seeking and obtaining relief from the automatic stay. Id. at 1016. In light of GNMA's heavy-handed tactics, its persistent disrespect for the bankruptcy proceedings and court orders, and its callous disregard of the debtor's and other creditors' rights, the Court entered sanctions against GNMA for its prior stay violations. Id. at 1022-24.

      GNMA argues in its Turnover Motion that the Adana II decision is not precedential because it was vacated by the Eleventh Circuit. However, the decision (along with Adana I) was vacated by agreement of the parties, 687 F.2d at 344, presumably because GNMA had settled the underlying dispute with the debtor by stipulating that it would sell the mortgage portfolio in a commercially reasonable manner and pay the net proceeds of such sale to the bankruptcy estate, see In re Adana Mortgage Bankers, Inc., 12 B.R. 977, 989 (Bankr. N.D. Ga. 1980) (hereinafter, "Adana III") (discussing stipulation).[14] Given that Adana II is only one of

---

"clarifying" amendment indicating that Congress never intended the Bankruptcy Code to apply to GNMA. Adana II, 12 B.R. at 1014-1015. The Court rejected this argument out of hand:

> The House Report should not be used to construe an otherwise clear statutory provision. Moreover, the congressional report of one committee regarding legislation in one area of law is doubtful authority for interpreting congressional intent on a prior law drafted and considered by another committee of Congress. This court recognizes the cross-currents of congressional interests and opinions, and the influences of vested interests, including Federal agencies, upon committees and committee staffs. It also recognizes how comments sometimes mysteriously get into committee reports. The comments of one committee report regarding a bill unconnected to a prior act of another committee and another Congress are of questionable weight in construing congressional intent.

Id. at 1016.

[14]    Notably, Judge Norton stated that if GNMA had not stipulated to this outcome, he would have ordered it:

> If GNMA were allowed to terminate the issuer's servicing rights without any obligation to replace the value of that removed asset, not only would the issuer be deprived of the fruits of its labor, but a clear "windfall" corresponding to the issuer's loss would be conferred upon either GNMA (if it retained the portfolio or sold it and retained the proceeds) or a transferee of the portfolio (if GNMA transferred the servicing portfolio without consideration). When GNMA's right to remove the servicing portfolio occurs in a bankruptcy context, such obvious inequity should not and need not result. The equitable powers of the Bankruptcy Court under 28 U.S.C. § 1481 and Section 362(d)(1) to modify or condition the automatic stay in accordance with the equities, and under Section 105(a) of the Bankruptcy Code furnish ample authority to issue any order necessary or

three decisions interpreting the NHA (none of which are binding upon this Court, incidentally), and is by far the most thorough, it is obviously relevant for the Court to consider when evaluating critically GNMA's broad assertion of immunity from the bankruptcy laws and process.

As further support for its contention that it is exempt from the Bankruptcy Code, GNMA cites section 309(a) of the NHA, which provides that "no attachment, injunction, or other process, mesne or final, shall be issued against the property of [GNMA] or against [GNMA] with respect to its property." 12 U.S.C. § 1723a(a). As a threshold matter, the automatic stay is not a form of legal "process" that is "issued" in any sense of those terms—it is a self-executing injunction that arises by legislative decree upon the filing of a bankruptcy petition. Moreover, courts construing section 309(a) of the NHA have concluded that it "precludes injunctions <u>only against the real property securing GNMA mortgages and the mortgages themselves</u> but not as to the other attributes of GNMA." <u>DRG Funding Corp.</u>, 1988 U.S. Dist. LEXIS 16526 at *8 (emphasis added) (citing <u>Fox v. Dept. of Housing & Urban Dev.</u>, 532 F. Supp. 540 (E.D. Pa.), <u>rev'd on other grounds</u>, 680 F.2d 315 (3d Cir. 1982)). Thus, to the extent the automatic stay precludes GNMA from proceeding against the Debtors <u>in personam</u> in a judicial proceeding that could have been commenced prepetition, 11 U.S.C. § 362(a)(1), or from attempting to obtain the servicing files from the Debtors' bankruptcy estates or to exercise control over the Debtors' servicing rights, <u>see</u> 11 U.S.C. § 362(a)(3), the NHA is not implicated.

In sum, as noted by Judge Norton in <u>Adana II</u>,

---

appropriate to carry out the provisions of Title 11 U.S.C. Thus, any order granting relief from the automatic stay to GNMA for the purpose of terminating GNMA Guaranty Agreements could be conditioned upon a commercially reasonable transfer of the servicing portfolio to a transferee approved by GNMA, with the net proceeds of such a transfer to become part of the bankruptcy estate. But for the stipulation in this case preserving the value of the debtor's servicing portfolio for the estate, the Court would have found it necessary to apply these equitable powers.

<u>Adana III</u>, 12 B.R. at 989.

it is the established public policy of Congress expressed in the Bankruptcy Code to substitute for the chaos of insolvency a structured statute with a balancing of rights of debtors and creditors. Into this statutory framework, the Congress has decreed that all property and property rights of and in the possession of the debtor at the time of filing pass to the jurisdiction of the Bankruptcy Court and under the protection of the automatic stay. All creditors and parties of interest of the debtor are covered by the jurisdiction of the Bankruptcy Court. All parties desiring relief from the jurisdiction shall petition the court for relief. The October 8, 1980 amendment to the Housing Act of 1980 did not carve out an exception or clarify a prior exception in Section 306(g) of the Housing Act of GNMA. To have done so would have been unique and contrary to fundamental policy of the Bankruptcy Reform Act of 1978.

12 B.R. at 1017-18. Application of the automatic stay to GNMA does not alter its substantive rights—it merely serves to maintain order in an otherwise chaotic bankruptcy process and to provide a forum, consistent with the mandates of due process, for the adjudication of any dispute concerning the validity of the particular GNMA action that is stayed.

## RESERVATION OF RIGHTS

The Debtors reserve the right to amend, modify, or supplement this Preliminary Objection, to file a reply to any response thereto, and to file additional objections to the relief sought in the Turnover Motion based upon information obtained from GNMA in the course of discovery in these matters. The Debtors further reserve their rights to assert against GNMA any and all claims for legal or equitable relief (including, without limitation, claims for money damages) arising from or in any way connected with GNMA's asserted termination of the Guaranty Agreements or subsequent conduct.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an Order

denying the Turnover Motion and granting the Debtors such other and further relief as is just and

proper.

Dated:    Wilmington, Delaware
          September 4, 2007

                              YOUNG CONAWAY STARGATT & TAYLOR, LLP


                              _____
                              James L. Patton, Jr. (No. 2202)
                              Robert S. Brady (No. 2847)
                              John T. Dorsey (No. 2988)
                              Rolin P. Bissell (No. 4478)
                              Sharon M. Zieg (No. 4196)
                              Erin D. Edwards (No. 4392)
                              The Brandywine Building
                              1000 West Street, 17th Floor
                              Wilmington, Delaware 19801
                              Telephone: (302) 571-6600
                              Facsimile: (302) 571-1253

                              Proposed Counsel for Debtors and
                              Debtors in Possession

<u>Exhibit A</u>

**Emails between GNMA and Bank of New York dated August 2, 2007 - August 3, 2007**

## Foster, Ted B

| | |
|---|---|
| **From:** | Foster, Ted B |
| **Sent:** | Friday, August 03, 2007 11:03 AM |
| **To:** | 'Karmen_L._Young@hud.gov'; St Laurent, Paul |
| **Subject:** | FW: Default of Issuer 1677 |
| **Importance:** | High |

**From:** Shyamala.Gopal@BANKOFNY.COM [mailto:Shyamala.Gopal@BANKOFNY.COM]
**Sent:** Friday, August 03, 2007 9:48 AM
**To:** Foster, Ted B
**Cc:** jumedia.buchner@BANKOFNY.COM; Karmen_L._Young@hud.gov; St Laurent, Paul; Weakland, Thomas R
**Subject:** Re: Default of Issuer 1677
**Importance:** High

Ted:

Issuer 1677 did not issue any pools for the month of July.

The last this issuer issued pools was in February 2007.

Please let me know if you need additional information.

Shyamala Gopal
Vice President
The Bank Of New York
Ginnie Mae/Loan Agency/Corporate & Speciality Products
Phone: 212-815-2264
Fax: 212-313-0107

| | |
|---|---|
| "Foster, Ted B" <ted.b.foster@hud.gov> | To <jumedia.buchner@bankofny.com>, <Shyamala.Gopal@bankofny.com> |
| | cc "St Laurent, Paul" <paul.stJaurent@hud.gov>, <Karmen_L._Young@hud.gov>, |
| 08/02/2007 06:42 PM | "Weakland, Thomas R" <Thomas.R.Weakland@hud.gov> |
| | Subject Default of Issuer 1677 |

Jumedia —
We are defaulting American Home Mortgage, Issuer #1677 tomorrow.  Please review Ginnie Mae's issuance
activity for July 2007 and determine whether #1677 issued any pools during the month.  If so, please forward
those pool numbers, along with their RPBs, to me and Karmen Davis-Young.  You can contact me with any
questions.
Thanks - Ted

GNMA02614

8/28/2007