**LEASE AGREEMENT**
**(Multi-Tenant Office)**

**LEASE AGREEMENT**

**Multi-Tenant Office**

**INDEX**

| Section | Description |
|---|---|
| 1. | Summary of Terms and Certain Definitions. |
| 2. | Premises |
| 3. | Acceptance of Premises |
| 4. | Delays |
| 5. | Use; Compliance. |
| 6. | Term |
| 7. | Minimum Annual Rent |
| 8. | Operation of Property; Payment of Expense |
| 9. | Signs |
| 10. | Alterations and Fixtures |
| 11. | Mechanics' Liens |
| 12. | Right of Entry |
| 13. | Damage by Fire or Other Casualty. |
| 14. | Condemnation. |
| 15. | Non-Abatement of Rent |
| 16. | Indemnification of Landlord and Tenant |
| 17. | Waiver of Claims |
| 18. | Quiet Enjoyment |
| 19. | Assignment and Subletting. |
| 20. | Subordination; Mortgagee's Rights. |
| 21 | Recording; Tenant's Certificate |
| 22. | Surrender; Abandoned Property |
| 23. | Curing Tenant's Defaults |
| 24. | Defaults – Remedies. |
| 25. | Representation of Tenant |
| 26. | Liability of Landlord |
| 27. | Interpretation; Definitions. |
| 28. | Notices |
| 29. | Security Deposit |
| 30. | Renewal Option |
| 31. | Termination Option |
| 32. | Landlord Improvements |
| 33. | Broker Identification and Indemnity |
| 34. | Right of First Refusal-Contiguous Space |

**THIS LEASE AGREEMENT** is made by and between **Charlotte D. Harrell, LLC** a South Carolina limited partnership (**"LANDLORD"**) with its physical address at 2000 Sam Rittenberg Boulevard, Suite 140, Charleston, SC  29407 and **American Home Mortgage Corporation** organized under the laws of New York (**"TENANT"**) with its address at 538 Broadhollow Road, Melville, New York, 11747 and is dated as of the date on which this Lease has been fully executed by Landlord and Tenant.

1.    **Summary of Terms and Certain Definitions**.

**(a) "BUILDING":**    That certain building located at 2000 Sam Rittenberg Boulevard deemed to contain 29,249 rentable square feet on the second floor and lobby areas for purposes of this Lease.

**(b) "PREMISES":**    Those certain premises located within the Building known as Suite _3009_. The rentable square feet contained within the upfitted Premises shall be deemed to be the product equal to (a) the gross rentable square footage within the Premises as is certified by James Verkaik, Landlord's architect, multiplied by (b) a core factor of  0.135, which product is hereby deemed to be 4,738 square feet (such product hereinafter referred to as the **"Premises Rentable Square Footage"** and each square foot within such product as a **"Premises Rentable Square Foot"**). (§2) Address:   2000 Sam Rittenberg Blvd., Suite _3009_, Charleston, SC  29407

**(c)"TERM":  Sixty (60)** months plus any partial month from the Commencement Date  until the first day of the first full calendar month during the Term (§5)

**(i)**    **"COMMENCEMENT DATE"**: On or before ninety (90) days from the issuance of a building permit, Landlord shall deliver possession of the premises ("Premises Delivery") upon substantial completion of the improvements described on Exhibit "G" hereto and the issuance of a certificate of occupancy for the Premises. The Commencement Date shall be the date of Premises Delivery.  In no event shall the Commencement Date be later than the date on which the Tenant occupies the space.

**(ii)**    **"EXPIRATION DATE"**:  On the last day of the sixtieth (60th) full month of the initial Term of this Lease.

**(d) Minimum Rent (§6) & Operating Expenses (§7)**

**(i)**    **"MINIMUM ANNUAL RENT":** Minimum Annual Rent means the Premises Rentable Footage multiplied by the Rental Rate Per Premises Square Foot for each Lease Year as listed below, payable in equal monthly installments.

- 2 -

| Lease Year | Rental Rate Per Premises Rentable Square Foot | Annual | Monthly |
|:---:|:---:|:---:|:---:|
| 1 | $20.50 | $97,129.00 | $8,094.08 |
| 2 | $21.12 | $100,066.56 | $8,338.88 |
| 3 | $21.75 | $103,051.50 | $8,587.63 |
| 4 | $22.40 | $106,131.20 | $8,844.27 |
| 5 | $23.07 | $109,305.66 | $9,108.81 |

**(ii) Estimated "ANNUAL OPERATING EXPENSES".** This is a full-service Lease. The Minimum Annual Rent and monthly installments set forth above includes Tenant's monthly contribution toward Landlord's estimated Annual Operating Expenses.

**(e)"PROPORTIONATE SHARE"** (§8(a) ): The percentage equal to (the Premises Rentable Square Footage / 29,249) x 100%, which is deemed to be 16.20%.

**(f)"USE"** (§4) Mortgage Lending activities and ancillary uses.

**(g)"SECURITY DEPOSIT"** (§28): Equal to One Month's Rent (Eight Thousand Ninety-Four and 08/100 ($8,094.08) Dollars)

**(h)CONTENTS:** This Lease consists of the Index, Sections 1- 28 and the following, all of which are attached hereto and made a part of this Lease:

> Exhibits: "A"  Plan Showing Premises
> "B"  Commencement Certificate Form
> "C"  Building Rules
> "D"  Cleaning Schedule
> "E"  Estoppel Certificate Form
> "F"  Estimated Operating Budget
> "G"  Work Letter

2.    **Premises.**  Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Premises as shown as attached Exhibit "A" within the Building (the Building and the lot on which it is located, the **"PROPERTY"**), together with the non-exclusive right with Landlord and other occupants of the Building to use all areas and facilities provided by Landlord for the use of all tenants in the Property including any lobbies, hallways, driveways, sidewalks and parking, loading and landscaped areas (the **"COMMON AREAS"**).

3.    **Acceptance of Premises.**  Tenant has examined and knows the condition of the Property, the zoning, streets, sidewalks, parking areas, curbs and access ways adjoining it,

- 3 -

visible easements, any surface conditions and the present uses, and Tenant accepts them in the condition in which they now are, without relying on any representation, covenant or warranty by Landlord. Tenant and its agents shall have the right, at Tenant's own risk, expense and responsibility, upon seven (7) days advance notice by Landlord, to enter upon the Premises prior to the Commencement Date for telephone and communication systems "hook up", "debugging" and furniture installation.

4.     **Delays.**   Tenant shall have the option to terminate this Lease upon written notice to Landlord if the Commencement Date has not occurred within six (6) months from the date hereof.

5.     **Use; Compliance**.

(a)     **Permitted Use.**   Tenant shall occupy and use the Premises for and only for the Use specified in Section 1 (f) above and in such a manner as is lawful, reputable and will not create any nuisance or otherwise interfere with any other tenant's normal operations or the management of the Building. All Common Areas shall be subject to Landlord's exclusive control and management at all times. Tenant shall not use or permit the use of any portion of the Common Areas for other than their intended use.

(b)     **Compliance.** From and after the Commencement Date, Tenant shall comply promptly, at its sole expense, (including making any alterations or improvements) with all laws (including the ADA), ordinances, notices, orders, rules, regulations and requirements regulating the Property during the Term which impose any duty upon Landlord or Tenant with respect or Tenant's use, occupancy or alteration of, or Tenant's installations in or upon, the Property including the Premises, (as the same may be amended, the **"LAWS AND REQUIREMENTS"** and the building rules attached as Exhibit "C", as amended by Landlord from time to time, (the **"BUILDING RULES"**). Provided, however, that Tenant shall not be required to comply with the Laws and Requirements with respect to the footings, foundations, structural steel columns and girders forming a part of the Property unless the need for such agents, contractors, licensees or invitees (**"AGENTS"**) of Tenant. With respect to Tenant's obligations as to the Property, other than the Premises, at Landlord's option and at Tenant's expense, Landlord may comply with any repair, replacement or other construction requirements of the Laws and Requirements and Tenant shall pay to Landlord all costs thereof as additional rent. Landlord warrants that the Property and Premises shall be in compliance with the ADA and the Laws and Requirements upon the Commencement Date of this Lease.

(c)     **Environmental.** Tenant shall comply, at its sole expense, with all Laws and Requirements as set forth above, all manufacturers' instructions and all requirements of insurers relating to the treatment, production, storage,

- 4 -

handling, transfer, processing, transporting, use, disposal and release of hazardous substances, hazardous mixtures, chemicals, pollutants, petroleum products, toxic or radioactive matter (the **"RESTRICTED ACTIVITIES"**).

(d) **Notice.** If at any time during or after the Term, Tenant becomes aware of any inquiry, investigation or proceeding regarding the Restricted Activities or becomes aware of any claims, actions or investigations regarding the ADA, Tenant shall give Landlord written notice, within 5 days after first learning thereof, providing all available information and copies of any notices.

6. **Term.** The term of this Lease shall commence on the Commencement Date and shall end at 11:59 p.m. on the last day of the Term (the **"EXPIRATION DATE"**), without the necessity for notice from either party, unless sooner terminated in accordance with the terms hereof. At Landlord's request, Tenant shall confirm the Commencement Date and Expiration Date by executing a lease commencement certificate in the form attached as Exhibit "B".

7. **Minimum Annual Rent.** Tenant agrees to pay to Landlord the Minimum Annual Rent in equal monthly installments in the amount set forth in Section 1(d) (as increased at the beginning of each lease year as set forth in Section 1(d) ), in advance, on the first day of each calendar month during the Term, without notice, demand or setoff, at Landlord's address designated at the beginning of this Lease unless Landlord designates otherwise; provided that rent for the first full month shall be paid at the signing of this Lease. If the Commencement Date falls on a day other than the first day of a calendar month, the rent shall be apportioned pro rata on a per diem basis for the period from the Commencement Date. As used in this Lease, the term **"lease year"** means the period from the Commencement Date through the succeeding 12 full calendar months (including for the first lease year any partial month from the Commencement Date until the first day of the first full calendar month) and each successive 12 month period thereafter during the Term.

8. **Operation of Property: Payment of Expense**.

(a) **Payment of Operating Expenses.**

(i) **Payment of Operating Expenses**. Tenant shall pay to Landlord, as additional rent, its contribution toward Landlord's estimated Annual Operating Expenses in equal monthly installments, which estimated contribution has been included in the Rental Rate Per Premises Square Foot set forth in §1(d)(i), from the Commencement Date and continuing throughout the Term on the first day of each calendar month during the Term, as additional rent, without notice, demand or setoff, providing that the monthly installment for the first full month shall be paid at the signing of this Lease.

(ii) **Tenant's share of Landlord's Annual Operating Expenses during calendar years 2006 and 2007**. Tenant's contribution toward Landlord's estimated Annual Operating Expenses has been included in the Rental Rate Per

- 5 -

Premises Square Foot set forth in §1(d)(i) and during calendar years 2006 and 2007 will not be subject to adjustment as provided in §8(a)(vi).

(iii)    **Calculation of Tenant's share of Landlord's Annual Operating Expenses from calendar year 2008 through the end of the Initial Term.** "2007 Expense" shall mean Tenant's Proportionate Share of Landlord's actual Annual Operating Expenses for calendar year 2007, grossed up to reflect 95% second-floor occupancy during any calendar year in which the second floor of the Building is not fully occupied. At the end of each subsequent calendar year, if Tenant's Proportionate Share of Landlord's actual Annual Operating Expenses exceeds the 2007 Expense, Tenant will be billed for the excess in accordance with subsection 8(a)(vi) below. No credits will be given to Tenant if Tenant's Proportionate Share of Landlord's actual Annual Operating Expenses is less than the 2007 Expense.

(iv)    **Application of Payments.** Landlord shall apply such payments to the annual operating costs to Landlord of operating and maintaining the Property during each calendar year of the Term, which costs may include by way of example rather than limitation:  insurance premiums, fees, impositions, costs for repairs, maintenance, service contracts, management and administrative fees, governmental permits, overhead expenses, costs of furnishing water, sewer, gas, fuel, electricity, other utility services, janitorial service, trash removal, security services, landscaping and grounds maintenance, and the costs of any other items attributable to operating or maintaining any or all of the Property excluding any costs which under generally accepted accounting principles are capital expenditures; provided, however, that annual operating costs also shall include the annual amortization (over an assumed useful life of ten years) of the costs (including financing charges) of building improvements made by Landlord to the Property that are required by any governmental authority or for the purpose of reducing operating expenses or directly enhancing the safety of tenants in the Building generally. Tenant's obligation to pay its Proportionate Share of the Annual Operating Expenses pursuant to this Section 8 shall survive the expiration or termination of this Lease.

(v)    **Computation of Tenant's Share of Annual Operating Costs.** After the end of each calendar year of the Term, Landlord shall compute Tenant's share of the annual operating costs described above incurred during such calendar year by (A) calculating an appropriate adjustment, using generally accepted accounting principles, to avoid allocating to Tenant or to any other tenant (as the case may be) those specific costs which Tenant or any other tenant has agreed to pay; (B) calculating an appropriate adjustment, using generally accepted accounting principles, to avoid allocating to any vacant space those specific costs which were not incurred for such space; and (C) multiplying the adjusted annual operating costs by Tenant's Proportionate Share.

(vi) **Reconciliation.** By April 30th of each year (and as soon as practicable after the expiration termination of this Lease or at any time in the event of a sale of the Property), Landlord shall provide Tenant with a statement of the actual amount of such annual operating costs for the preceding calendar year or part thereof. Beginning with expenses incurred in calendar year 2008, Tenant shall pay to Landlord the amount of any deficiency then due from Tenant to Landlord as calculated pursuant to §8(a)(iii) above. Tenant shall have the right to inspect the books and records used by Landlord in calculating the annual operating costs within 60 days of receipt of the statement during regular business hours after having given Landlord at least 48 hours prior written notice; provided, however, that Tenant shall make all payments of additional rent without delay, and that Tenant's obligation to pay such additional rent shall not be contingent on any such right.

(b) **Impositions.** As used in this Lease the term "impositions" refers to all levies, taxes (including sales taxes and gross receipt taxes) and assessments, which are applicable to the Term, and which are imposed by any authority or under any law, ordinance or regulation thereof, or pursuant to any recorded covenants or agreements, and the reasonable cost of contesting any of the foregoing, upon or with respect to the Property or any part thereof, or any improvements thereto. Tenant shall pay to Landlord with the monthly payment of Minimum Annual Rent any imposition imposed directly upon this Lease or the Rent (defined in Section 7(g)) or amounts payable by any subtenants or other occupants of the Premises, or against Landlord because of Landlord's estate or interest herein.

(i) Nothing herein contained shall be interpreted as requiring Tenant to pay any income, excess profits or corporate capital stock tax imposed or assessed upon Landlord, unless such tax or any similar tax is levied or assessed in lieu of all or any part of any imposition or an increase in any imposition.

(ii) If it shall not be lawful for Tenant to reimburse Landlord for any of the impositions, the Minimum Annual Rent shall be increased by the amount of the portion of such imposition allocable to Tenant, unless prohibited by law.

(c) **Insurance.**

(i) **Property.** Landlord shall keep in effect insurance against loss or damage to the Building or the Property by fire and such other casualties as may be included within fire, extended coverage and special form insurance covering the full replacement cost of the Building (but excluding coverage of Tenant's personal property in, and any alterations by Tenant to, the Premises), and such other insurance as Landlord may reasonably deem appropriate or as may be required from time-to-time by any mortgagee.

- 7 -

(ii) **Liability**. Tenant, at its own expense, shall keep in effect comprehensive general public liability insurance with respect to the Premises and the Property, including contractual liability insurance, with such limits of liability for bodily injury (including death) and property damage as reasonably may be required by Landlord from time-to-time, but not less than a combined single limit of $1,000,000 per occurrence and a general aggregate limit of not less than $2,000,000 (which aggregate limit shall apply separately to each of Tenant's locations if more than the Premises); however, such limits shall not limit the liability of Tenant hereunder. The policy of comprehensive general public liability insurance also shall name Landlord and Landlord's agent as insured parties with respect to any policies carried by Landlord and that any coverage carried by Landlord shall be excess insurance, shall provide that it shall not be cancelable or reduced without at least 30 days prior written notice to Landlord and shall be issued in form satisfactory to Landlord. The insurer shall be a responsible insurance carrier which is authorized to issue such insurances and licensed to do business in the state in which the Property is located and which has at all times during the Term a rating of no less than A VII in the most current edition of Best's Insurance Reports. Tenant shall deliver to Landlord on or before the Commencement Date, and subsequently renewals of, a certificate of insurance evidencing such coverage and the waiver of subrogation described below.

(iii) **Waiver of Subrogation**. Landlord and Tenant shall have included in their respective property insurance policies waivers of their respective insurers' right of subrogation against the other party. If such a waiver should be unobtainable or unenforceable, then such policies of insurance shall state expressly that such polices shall not be invalidated if, before a casualty, the insured waives the right of recovery against any party responsible for a casualty covered by the policy.

(iv) **Increase of Premiums**. Tenant agrees not to do anything which will increase the cost of Landlord's insurance or which will prevent Landlord from procuring policies (including public liability) from companies and in a form satisfactory to Landlord. If any breach of the preceding sentence by Tenant causes the rate of fire or other insurance to be increased, Tenant shall pay the amount of such increase as additional rent within fifteen calendar (15) days of being billed.

(d) **Repairs and Maintenance; Common Areas; Building Management**.

(i) Tenant at its sole expense shall maintain the Premises in a neat and orderly condition.

(ii) Landlord, shall make all necessary repairs to the Premises, the Common Areas and any other improvements located on the Property, provided that Landlord shall have no responsibility to make any repair until Landlord received written notice of the need for such repair. Landlord shall operate and

- 8 -

manage the Property and shall maintain all Common Areas and any paved areas appurtenant to the Property in a clean and orderly condition. Landlord reserves the right to make alterations to the Common Areas from time to time.

(iii)    Notwithstanding anything herein to the contrary, repairs and replacements to the Property including the Premises made necessary by Tenant's use, occupancy or alteration of, or Tenant's installation in or upon the Property, or by any act or omission of Tenant or its Agents shall be made at the sole expense of Tenant to the extent not covered by any applicable insurance proceeds paid to Landlord. Tenant shall not bear the expense of any repairs or replacements to the Property arising out of or caused by any other tenant's use, occupancy or alteration of, or any other tenant's installation in or upon, the Property or by any act or omission of any other tenant or any other tenant's agents.

(e)    **Utilities**.

Landlord will furnish the Premises with electricity, heating and air conditioning for the normal use and occupancy of the Premises as general offices between 8:00 a.m. and 7:00 p.m., Monday through Friday and Saturdays between 9:00 a.m. and 2:00 p.m. (legal holidays excepted). If Tenant shall require electricity or install electrical equipment including but not limited to electrical heating, refrigeration equipment, electronic data processing machines, or machines or equipment using current in excess of 110 volts, which will in any way increase the amount of electricity usually furnished for use as general office space, or if Tenant shall attempt to use the Premises in such a manner that the services to be furnished by Landlord would be required during periods other than or in addition to business hours referred to above, Tenant will obtain Landlord's prior written approval and will pay for the resulting additional direct expense, including the expense resulting from the installation of such equipment and meters, as additional rent promptly upon being billed. Landlord shall not be responsible or liable for any interruption in utility service, nor shall such interruption affect the continuation or validity of this Lease.

(f)    **Janitorial Services.** Landlord will provide Tenant with trash removal and janitorial services pursuant to a cleaning schedule attached as Exhibit "D".

(g)    **"Rent."** The term "RENT" as used in this Lease means the Minimum Annual Rent, Annual Operating Expenses and any other additional rent or sums payable by Tenant to Landlord pursuant to this Lease, all of which shall be deemed rent for purposes of Landlord's rights and remedies with respect thereto. Tenant shall pay all Rent to Landlord within 30 days after Tenant is billed, unless otherwise provided in this Lease, and interest shall accrue on all sums due but unpaid.

9.    **Signs**. Landlord, at Landlord's expense, will place Tenant's name and suite number on the Building standard sign and on or beside the entrance door to the Premises.

- 9 -

Except for signs which are located wholly within the interior of the Premises and not visible from the exterior of the Premises, no signs shall be placed on the Property without the prior written consent of Landlord. All signs installed by Tenant shall be maintained by Tenant in good condition and Tenant shall remove all such signs at the termination of this Lease and shall repair any damage caused by such installation, existence or removal. Tenant may place its sign, at Tenant's sole expense, in one of the two available spaces upon the monument sign in compliance with the signage requirements of this paragraph. Tenant shall, in cooperation with Landlord's signage contractor, prepare and submit plans for its proposed monument sign to Landlord, to be approved by Landlord and Landlord's signage contractor. The monument sign requested by Tenant shall be manufactured by Landlord's signage contractor pursuant to such plans at Tenant's sole expense. It shall be the responsibility of the Tenant to pay for the removal of its monument sign from the monument upon expiration of the Lease.

10. **Alterations and Fixtures**.

(a)    Subject to Section 10, Tenant shall have the right to install its trade fixtures in the Premises, provided that no such installation or removal thereof shall affect any structural portion of the Property nor any utility lines, communications lines, equipment or facilities in the Building serving any tenant other than Tenant.

(b)    At the expiration or termination for this Lease and at the option of Landlord or Tenant, Tenant shall remove such installation(s) and, in the event of such removal, Tenant shall repair any damage caused by such installation or removal; if Tenant, with Landlord's written consent, elects not to remove such installation(s) at the expiration or termination of this Lease, all such installations shall remain on the Property and become the property of Landlord without payment by Landlord.

(c)    Except for non-structural changes which do not exceed $10,000 in the aggregate, Tenant shall not make or permit to be made any alterations to the Premises without Landlord's prior written consent. Tenant shall pay the costs of any required architectural/engineering reviews. In making any alterations, (i) Tenant shall deliver to Landlord the plans, specifications and necessary permits, together with certificates evidencing that Tenant's contractors and subcontractors have adequate insurance coverage naming Landlord and Landlord's agent as additional insureds, at least 10 days prior to commencement thereof, (ii) such alterations shall not impair the structural strength of the building or any other improvements or reduce the value of the Property or affect any utility lines, communications lines, equipment or facilities in the Building serving any tenant other than Tenant, (iii) Tenant shall comply with Section 10, and (iv) the occupants of the Building and of any adjoining property shall not be unreasonably disturbed thereby. All alterations to the Premises by Tenant shall be the property of Tenant until the expiration or termination of this Lease: at that time all such alterations

- 10 -

shall remain on the Property and become the property of Landlord without payment by Landlord unless Landlord gives written notice to Tenant to remove the same, in which even Tenant will remove such alterations and repair any resulting damage. At Tenant's request prior to Tenant making any alterations, Landlord shall notify Tenant in writing, whether Tenant is required to remove such alterations at the expiration or termination of this Lease.

11.    **Mechanics' Liens**.  Tenant shall pay promptly any contractors and materialmen who supply labor, work or materials to Tenant at the Property and shall take all steps permitted by law in order to avoid the imposition of any mechanic's lien upon all or any portion of the Property.  Should any such lien or notice of lien be filed for work performed for Tenant other than by Landlord, Tenant shall bond against or discharge the same within fifteen (15) days after Tenant has notice that the lien or claim is filed regardless of the validity of such lien or claim.  Nothing in this Lease is intended to authorize Tenant to do or cause any work to be done or materials to be supplied for the account of Landlord, all of the same to be solely for Tenant's account and at Tenant's risk and expense.  Throughout this Lease the term "**mechanic's lien**" is used to include any lien, encumbrance or charge levied or imposed upon all of any portion of, interest in or income from the Property on account of any mechanic's, laborer's, materialman's or construction lien or any mechanic's notice of intention to file a lien given to Landlord or Tenant, any stop order given to Landlord or Tenant, any notice of refusal to pay naming Landlord or Tenant and any injunctive or equitable action brought by any person claiming to be entitled to any mechanic's lien.

12.    **Right of Entry**.

(a)    Tenant shall permit Landlord and its Agents to enter the Premises at all reasonable times following reasonable notice (except in the event of an emergency), for the purpose of inspection, maintenance or making repairs, alterations or additions as well as to exhibit the Premises for the purpose of sale or mortgage and, during the last  six (6) months of the Term, to exhibit the Premises to any prospective tenant, with reasonable advance notice and at reasonable times.  Landlord will make reasonable efforts not to inconvenience Tenant in exercising the foregoing rights, but shall not be liable for any loss of occupation or quiet enjoyment thereby occasioned.

13.    **Damage by Fire or Other Casualty**.

(a)    If the Premises or Building shall be damaged or destroyed by fire or other casualty, Tenant promptly shall notify Landlord and Landlord, subject to the condition set forth in this Section 13, shall repair such damage and restore the Premises to substantially the same condition in which they were immediately prior to such damage or destruction, but not including the repair, restoration or replacement of the fixtures or alterations installed by Tenant.  Landlord shall notify Tenant in writing, within 30

- 11 -

days after the date of the casualty, if Landlord anticipates that the restoration will take more than 180 days from the date of the casualty to complete; in such event, either Landlord or Tenant may terminate this Lease effective as of the date of casualty by giving written notice to the other within 10 days after Landlord's notice. Further, if a casualty occurs during the last 12 months of the Term or any extension thereof, Landlord may cancel this Lease unless Tenant has the right to extend the Term for at least 3 more years and does so within 30 days after the date of the casualty.

(b) Landlord shall maintain a 12-month rental coverage endorsement or other comparable form of coverage as part of its fire, extended coverage and special form insurance. Tenant will receive an abatement of its Minimum Annual Rent and Annual Operating Expenses to the extent the Premises are rendered untenantable as determined by the carrier providing the rental coverage endorsement.

14. **Condemnation**.

(a) **Termination.** If (i) all of the Premises are taken by a condemnation or otherwise for any public or quasi-public use, (ii) any part of the Premises is so taken and the remainder thereof is insufficient for the reasonable operation of Tenant's business in Tenant's commercially reasonable opinion or (iii) any of the Property is so taken, and, in Landlord's opinion, it would be impractical or the condemnation proceeds are insufficient to restore the remainder of the Property, then this Lease shall terminate and all unaccrued obligations hereunder shall cease as of the day before possession is taken by the condemnor.

(b) **Partial Taking.** If there is a condemnation and this Lease has not been terminated pursuant to this Section, (i) Landlord shall restore the Building and the improvements which are a part of the Premises to a condition and size as nearly comparable as reasonable possible to the condition and size thereof immediately prior to the date upon which the condemnor took possession and (ii) the obligations of Landlord and Tenant shall be unaffected by such condemnation except that there shall be an equitable abatement of the Minimum Annual Rent according to the rental value of the Premises before and after the date upon which the condemnor took possession and/or the date Landlord completes such restoration.

(c) **Award.** All compensation awarded for any taking (or the proceeds of private sale in lieu thereof), whether for the whole or a part of the Premises, shall be the property of the Landlord, whether such award is compensation for damages to Landlord's or Tenant's interest in the Premises, and Tenant shall have no claim against Landlord or the condemnor for the value of its leasehold estate in the Premises or for lost

- 12 -

profits, provided, however that Tenant shall have the right to make a claim against the condemnor, but not the Landlord, for moving expenses and business dislocation damages to the extent that such claim does not reduce the sums otherwise payable by the condemnor to Landlord

(d)   **Temporary Taking.** No temporary taking of the Premises shall terminate this Lease or give Tenant any right to any rental abatement. Such a temporary taking will be treated as if Tenant had sublet the Premises to the condemnor and had assigned the proceeds of the subletting to Landlord to be applied on account of Tenant's obligations hereunder. Any award for such a temporary taking during the Term shall be applied first, to Landlord's costs of collection and, second, on account of sums owing by Tenant hereunder, and if such amounts applied on account of sums owing by Tenant hereunder should exceed the entire amount owing by Tenant for the remainder of the Term, the excess will be paid to Tenant.

15.   **Non-Abatement of Rent.** Except as otherwise expressly provided as to damage by fire or other casualty in Section 13(b) and as to condemnation in Section 14(b), there shall be no abatement or reduction of the Rent for any cause whatsoever, and this Lease shall not terminate, and Tenant shall not be entitled to surrender the Premises.

16.   **Indemnification of Landlord and Tenant.** Subject to Section 8(c)(iii) , Tenant will protect, indemnify and hold harmless Landlord and its Agents from and against any and all claims, actions, damages, liability and expense (including fees of attorneys, investigators and experts) in connection with loss of life, personal injury or damage to property in or about the Premises arising out of the occupancy or use of the Premises by Tenant or its Agents or occasioned wholly or in part by any act or omission of Tenant or its Agents, whether prior to, during or after the Term, except to the extent such loss, injury or damage was caused by the negligence of Landlord or its Agents. In case any action or proceeding is brought against Landlord and/or its Agents by reason of the foregoing, Tenant, at its expense, shall resist and defend such action or proceeding, or cause the same to be resisted and defended by counsel (reasonable acceptable to Landlord and its Agents) designated by the insurer whose policy covers such occurrence or by counsel designated by Tenant and approved by Landlord and its Agents. Tenant's obligations pursuant to this Section 16 shall survive the expiration or termination of this Lease.

Landlord shall indemnify, defend and save harmless Tenant and its Agents from and against any and all claims, actions, damages, suits, judgments, decrees, orders, liability and expense (including costs and attorney's fees) in connection with any third-party (a) loss of life, (b) bodily injury, (c) personal injury and/or (d) damage to property occurring in the Premises or the Common Areas to the extent caused by Landlord and its Agents willful misconduct or negligence and to the extent covered by Landlord's liability insurance.

17.   **Waiver of Claims.** Landlord and Tenant each hereby waives all claims for recovery against the other for any loss or damage which may be inflicted upon the property of

such party even if such loss or damage shall be brought about by the fault or negligence of the other party or its Agents; provided, however, that such waiver by Landlord shall be effective with respect to any liability of Tenant described in Sections 5(c) and 8(d)(iii).

18.  **Quiet Enjoyment.**  Landlord covenants that Tenant, upon performing all of its covenants, agreement and condition of this Lease, shall have quiet and peaceful possession of the Premises as against anyone claiming by or through Landlord, subject, however, to the exceptions, reservation and conditions of this Lease.

19.  **Assignment and Subletting**.

   (a)  **Limitation.**   Tenant shall not transfer this Lease, voluntarily or by operation of law, without the prior written consent of Landlord, provided that Landlord's consent will not be withheld so long as (1) the financial condition of the proposed transferee is satisfactory to Landlord in its sole discretion; and (2) the business reputation of the proposed transferee is reasonably satisfactory to Landlord.  However, Landlord's consent shall not be required in the event of any transfer by Tenant to an affiliate, parent or subsidiary of Tenant which is controlling, controlled by or under common control with Tenant or by way of merger, consolidation or acquisition of all or substantially all of Tenant's assets which is at least as creditworthy as Tenant as of the date of this Lease and provided Tenant delivers to Landlord the instrument described in Section (c)(iii) below, together with a certification of such creditworthiness by Tenant and such affiliate, parent, subsidiary or other entity, and further provided that such transfer would not put Landlord at risk of default under any existing lease. Any transfer not in conformity with this Section 19 shall be void at the option of Landlord, and Landlord may exercise any or all of its rights under Section 24.  A consent to one transfer shall not be deemed to be a consent to any subsequent transfer. "Transfer" shall include any sublease, assignment, license or concession agreement, change in ownership or control of Tenant, mortgage or hypothecation of this Lease or Tenant's interest therein or in all or a portion of the Premises.

   (b)  **Conditions.**  Notwithstanding the above, the following shall apply to any transfer, with or without Landlord's consent:

   (i)   As of the date of any transfer, Tenant shall not be in default under this Lease beyond the applicable cure period nor shall any act or omission have occurred which would constitute a default with the giving of notice and or the passage of time.

   (ii)   No transfer shall relieve Tenant of its obligation to pay the Rent and to perform all its other obligations hereunder.  The acceptance of Rent by Landlord from any person shall not be deemed to be a waiver by Landlord of any provision of this Lease or to be a consent to any transfer.

- 14 -

(iii)    Each transfer shall be a written instrument in form and substance satisfactory to Landlord which shall (A) include an assumption of liability by an transferee of all Tenant's obligation and the transferee's ratification of and agreement to be bound by all the provisions of this ease, (B) afford Landlord the right of direct action against the transferee pursuant to the same remedies as are available to Landlord against Tenant and (C) be executed by Tenant and the transferee.

(iv)    Tenant shall pay, within 10 days of receipt of an invoice which shall be no less than $250, Landlord's reasonable attorneys' fees and costs in connection with the review, processing and documentation of any transfer for which Landlord's consent is requested.

20.  **Subordination: Mortgagee's Rights**.

(a)    This Lease shall be subordinate to any first mortgage or other primary encumbrance now or hereafter affecting the Premises.  Although the subordination is self-operative, within 10 days after written request, Tenant shall execute and deliver any further instruments confirming such subordination of this ease and any further instrument of attornment that may be desired by any such mortgagee or Landlord.  However, any mortgagee may at any time subordinate its mortgage to this Lease, without Tenant's consent, by giving written notice to Tenant, and thereupon this Lease shall be deemed prior to such mortgage without regard to their respective dates of execution and delivery; provided, however, that such subordination shall not affect any mortgagee's right to condemnation awards, casualty insurance proceeds, intervening liens or any right which shall arise between the recording of such mortgage and the execution of this Lease.  Landlord shall use commercially reasonable efforts to obtain a Non-disturbance Agreement in Tenant's favor from any such mortgagee.

(b)    It is understood and agreed that any mortgagee shall not be liable to Tenant for any funds paid by Tenant to Landlord unless such funds actually have been transferred to such mortgagee by Landlord.

(c)    Notwithstanding the provisions of Sections 13 and 14 above, Landlord's obligation to restore the Premises after a casualty or condemnation shall be subject to the consent and prior rights of Landlord's first mortgagee.

21.  **Recording: Tenant's Certificate.**    Tenant shall not record this Lease or a memorandum thereof without Landlord's prior written consent.  Within twenty (20) days after Landlord's written request from time to time:

(a)    Tenant shall execute, acknowledge and deliver to Landlord a written statement certifying the Commencement Date and Expiration Date of this Lease, that this Lease is in full force and effect and has not been modified

- 15 -

and otherwise as set forth in the form of estoppel certificate attached as Exhibit "E" or with such modifications as may be necessary to reflect accurately the stated facts and/or such other certifications as may be reasonably requested by a mortgagee or purchaser. Tenant understands that its failure to execute such document may cause Landlord serious financial damage by causing the failure of a financing or sale transaction.

(b)     Tenant shall furnish to Landlord, Landlord's mortgagee, prospective mortgagee or purchaser reasonably requested financial information.

22.    **Surrender; Abandoned Property**

(a)     Subject to the terms of Sections 9(b), 12(a) and 13(b), at the expiration or termination of this Lease, Tenant promptly shall yield up in the same condition, order and repair in which they are required to be kept throughout the Term, the Premises and all improvements thereto, and all fixtures and equipment servicing the Building, ordinary wear and tear excepted.

(b)     Upon or prior to the expiration or termination of this Lease, Tenant shall remove any personal property from the Property. Any personal property remaining thereafter shall be deemed conclusively to have been abandoned, and Landlord, at Tenant's expense, may remove, store, sell or otherwise dispose of such property in such manner as Landlord may see fit and/or Landlord may retain such property as its property. If any party thereof shall be sold, then Landlord may receive and retain the proceeds of such sale and apply the same, at its option, against the expenses of the sale, the cost of moving and storage and any Rent due under this Lease.

(c)     Subject to the terms of this subsection and provided Tenant is not in default hereunder, Landlord hereby consents to Tenant remaining in its premises for up to three (3) months after the Expiration Date as a holdover tenant. If Tenant, or any person claiming through Tenant, shall continue to occupy the Premises after the expiration or termination of this Lease or any renewal thereof, such occupancy shall be deemed to be under a month-to-month tenancy under the same terms and condition set forth in this Lease, except that the monthly installment of the Minimum Annual Rent during such continued occupancy shall be 125% the amount applicable to the last month of the Term. Anything to the contrary notwithstanding, any holding over by Tenant without Landlord's prior written consent shall constitute a default hereunder and shall be subject to all the remedies available to Landlord.

23.    **Curing Tenant's Defaults.** If Tenant shall be in default in the performance of any its obligations hereunder (beyond any applicable cure period), Landlord, without any obligation to do so, in addition to any other rights it may have in law or equity, may elect to cure such default on behalf of Tenant after five calendar (5) days written notice (except in the

- 16 -

case of emergency) to Tenant.  Tenant shall reimburse Landlord within seven (7) calendar days for any sums paid or costs incurred by Landlord in curing such default, including interest thereon from the respective dates of Landlord's incurring such costs, which sums and costs together with interest shall be deemed additional rent.

24.    **Defaults – Remedies**.

(a)    **Defaults.**  It shall be an event of default:

(i)    If Tenant does not pay in full within fifteen (15) days of being due any and all Rent;

(ii)    If Tenant fails to observe and perform or otherwise breaches any other provision of this Lease;

(iii)    If Tenant becomes insolvent or bankrupt in any sense or makes a general assignment for the benefit of creditors or offers a settlement to creditors, or if a petition in bankruptcy or for reorganization or for an arrangement with creditors under any federal of state law is filed by or against Tenant, or a bill in equity or other proceeding for the appointment of a receiver for any of Tenant's assets is commenced, or if any of the real or personal property of Tenant shall be levied upon; provided, however, that any proceeding brought by anyone other than Landlord or Tenant under any bankruptcy, insolvency, receivership or similar law shall not constitute a default until such proceeding has continued unstayed for more than 60 consecutive days.

(b)    **Remedies.**    Then, and in any such event, Landlord shall have the following rights:

(i)    To charge a late payment fee equal to the greater of $100 or 5% of any amount owed to Landlord pursuant to this Lease which is not paid within five(5) days after the due date.

(ii)    To enter and repossess the Premises, by breaking open locked doors if necessary, and remove all persons and all or any property therefrom, by action at law or otherwise, without being liable for prosecution or damages therefore, and Landlord may, at Landlord's option, make alterations and repairs in order to relet the Premises and relet all or any part(s) of the Premises for Tenant's account.  Tenant agrees to pay to Landlord on demand any deficiency that may arise by reason of such reletting.  In the event of reletting without termination of this Lease, Landlord may at any time thereafter elect to terminate this Lease for such previous breach.

(iii)    To accelerate the whole or any part of the Rent for the balance of the Term, and declare the same to immediately due and payable

- 24 -

**IN WITNESS WHEREOF,** and in consideration of the mutual entry into this Lease and for other good and valuable consideration, and intending to be legally bound, Landlord and Tenant have executed this Lease.

Date signed:

_9·7·06_

**Landlord:**

Charlotte D. Harrell, LLC

Attest:

Name: _Robert A Caldwell_
Title: _PM_

By: _Brell_
Name: _HARRELL_
Title:

Date signed:

_8/30/06_

**Tenant:**

American Home Mortgage Corp.

Attest:

_Denise Latham_
Name: _DENISE LATHAM_
Title: _ADMIN ASST._

By: _CH_
Name: _ALAN HORN_
Title: _EVP_

**EXHIBIT "A"**
**PREMISES**

- 17 -

(iv)    To terminate this Lease and the Term without any right on the part of Tenant to save the forfeiture by payment of any sum due or by other performance of any condition, term, or covenant broken.

(v)    Notwithstanding anything to the contrary contained here in, Landlord shall have the duty to use reasonable efforts to mitigate its damages and to take reasonable steps to relet the Premises for such rent and upon such terms as Landlord deems are not unreasonable under the circumstances.

(c)    **Grace Period.** Notwithstanding anything hereinabove stated, neither party will exercise any available right because of any non-monetary default of the other, except those remedies contained in subsection (b)(i) of this Section, unless such party shall have first given thirty (30) days written notice thereof to the defaulting party, and the defaulting party shall have failed to cure the default within such period; provided, however, that:

(i)    No such notice shall be measured of Tenant fails to comply with the provisions of Sections 11 or 21(a), in the case of emergency as set forth in Section 23 or the event of any default enumerated in subsections (a) (iii) and (iv) of this Section.

(ii)    Landlord shall not be required to give such thirty (30) days notice more than 2 times during any 12 month period.

(iii)    If the default consists of something other than the failure to pay money which cannot reasonably be cured within thirty (30) days, neither party will exercise any right if the defaulting party begins to cure the default within the thirty (30) days and continues actively and diligently in good faith to completely cure said default.

(iv)    Tenant agrees that any notice given by Landlord pursuant to this Section which is served in compliance with Section 28 shall be adequate notice for the purposes of Landlord's exercise of any available remedies.

(d)    **Non-Waiver; Non-Exclusive.**  No waiver by Landlord of any breach by Tenant shall be a waiver of any subsequent breach, nor shall any forbearance by Landlord to seek a remedy for any breach by Tenant be a waiver by Landlord of any rights and remedies with respect to such or any subsequent breach.  Efforts by Landlord to mitigate the damages caused by Tenant's default shall not constitute a waiver of Landlord's right to recover damages hereunder.  No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy provided herein or by law, but each shall be cumulative and in addition to every other right or remedy given herein or now or hereafter existing at law or in equity.  No payment by Tenant or receipt or acceptance by Landlord of a lesser amount than the total amount due Landlord under this Lease shall be deemed to be other than on account,

- 18 -

nor shall any endorsement or statement or any check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of Rent due, or Landlord's right to pursue any other available remedy.

(e)     **Cost and Attorney's Fees.**  If either party commences an action against the other party arising out of or in connection  with this Lease, the prevailing party shall be entitled to have and recover from the losing party attorneys' fees, costs of suit, investigation expenses and discovery cost, including costs of appeal.

25.    **Representation of Tenant.**  Tenant represents to Landlord and agrees that:

(a)     The word **"Tenant"** as used herein include the Tenant named above as well as its successors and assigns, each of which shall be under the same obligation and liabilities and each of which shall have the same rights, privileges and powers as it would have possessed had it originally signed this least as Tenant.  Each and every of the persons named above as Tenant shall be bound jointly and severally by the terms, covenants and agreements contained herein.  However, no such rights, privileges or powers shall inure to the benefit of any assignee of Tenant immediate or remote, unless Tenant has complied with the terms of Section 18 and the assignment to such assignees is permitted or has been approved in writing by Landlord.  Any notice required or permitted by the terms of this Lease may be given by or to any one of the persons named above as Tenant, and shall have the same force and effect as if given by or to all thereof.

(b)     If Tenant is a corporation, partnership or any other form of business association or entity, Tenant is duly formed and in good standing, and has full corporate or partnership power and authority, as the case may be, to enter into this Lease and has taken all corporate or partnership action, as the case may be, necessary to carry out the transaction contemplated herein, so that when executed, this Lease constitutes a valid and binding obligation enforceable in accordance with its terms.  Tenant shall provide Landlord with corporate resolutions or other proof in a form acceptable to Landlord, authorizing the execution of this Lease at the time of such execution.

26.  **Liability of Landlord.**   The word **"Landlord"** as used herein includes the Landlord named above as well as its successors and assigns, each of which shall have the same rights, remedies, powers, authorities and privileges as it would have had it originally signed this Lease as Landlord.  Any such person or entity, whether or not named herein, shall have no liability hereunder after it ceases to hold title to the Premises except for obligations already accrued (and, as to any unapplied portion of Tenant's Security Deposit, Landlord shall be relieved of all liability therefore upon transfer of such portion to its successor in interest) and Tenant shall look solely to Landlord's successor in interest for the performance of the

- 19 -

covenants and obligations of the Landlord hereunder which thereafter shall accrue. Neither Landlord nor any principal of Landlord nor any owner of the Property, whether disclosed or undisclosed, shall have any personal liability with respect to any of the provisions of this Lease or the Premises, and if Landlord is in breach or default with respect to Landlord's obligations under this Lease or otherwise, Tenant shall look solely to the interest of Landlord in the Property for the satisfaction of Tenant's claims. Notwithstanding the foregoing, no mortgagee or ground lessor succeeding to the interest of the Landlord hereunder (either in terms of ownership or possessory rights) shall be (a) liable for any previous act or omission of a prior landlord, (b) subject to any rental offsets or defenses against a prior landlord or (c) bound by any amendment of this Lease made without its written consent, or by payment by Tenant of Minimum Annual Rent in advance in excess of one monthly installment.

27.  **Interpretation; Definitions.**

(a)  **Captions.** The captions in this Lease are for convenience only and are not part of this Lease and do not in any way define, limit describe or amplify the terms and provisions of this Lease or the scope or intent thereof.

(b)  **Entire Agreement.** This Lease represents the entire agreement between the parties hereto and there are no collateral or oral agreements or understanding between Landlord and Tenant with respect to the Premises or the Property. No rights, easements or licenses are acquired in the Property or any land adjacent to the Property by the Tenant by implication or otherwise except as expressly set forth in the provisions of this Lease. This Lease shall not be modified in any manner except by an instrument in writing executed by the parties. The masculine (or neuter) pronoun and the singular number shall include the masculine, feminine and neuter genders and the singular and plural number. The word **"including"** followed by any specific item(s) is deemed to refer to examples rather than to be words of limitation. Both parties have participated fully and equally in the negotiation and preparation of this Lease, this Lease shall not be more strictly construed, nor any ambiguities in this Lease resolved, against either Landlord or Tenant.

(c)  **Covenants.** Each covenant, agreement, obligation term, condition or other provision herein contained shall be deemed and construed as a separate and independent covenant of the party bound by, undertaking or making the same, not dependent on any other provision of this Lease unless otherwise expressly provided. All of the terms and conditions set forth in this Lease shall apply throughout the Term unless otherwise expressly set forth herein.

(d)  **Interest.** Wherever interest is required to be paid hereunder, such interest shall be at the highest rate permitted under the law but not in excess of twelve (12%) per annum.

- 20 -

(e)    **Severability; Governing Law.**  If any provisions of this Lease shall be declared unenforceable in any respect, such unenforceability shall not effect any other provision of this Lease, and each such provision shall be deemed to be modified, if possible, in such a manner as to render it enforceable and to preserve to the extent possible the intent of the parties as set forth herein.  This Lease shall be construed and enforced in accordance with the laws of the state in which the Property is located.

(f)    **"Mortgage" and "Mortgagee."**  The word **"mortgage"** as used herein includes any lien or encumbrance on the Premises or the Property or on any part of or interest in or appurtenance to any of the foregoing, including without limitation any ground rent or ground lease if Landlord's interest is or becomes a leasehold estate.  The word **"mortgagee"** as used herein includes the holder of any mortgage, including any ground lessor if Landlord's interest is or becomes a leasehold estate.  Wherever any right is given to a mortgagee, that right may be exercised on behalf of such mortgagee by any representative or servicing agent of such mortgagee.

(g)    **"Person."**  The word **"person"** is used herein to include a natural person, a partnership, a corporation, an association and any other form of business association or entity.

28.    **Notices.**  Any notice or other communication under this Lease shall be in writing and addressed to Landlord or Tenant at their respective addresses with a copy to any mortgagee or other party designated by Landlord.  Each notice or other communication shall be deemed given if sent by prepaid overnight delivery service or by certified mail, return receipt requested, postage prepaid or in any other manner, with delivery in any case evidenced by a receipt, and shall be deemed received on the day of actual receipt by the intended recipient or on the business day of delivery is refused.  The giving of notice by Landlord's attorneys, representatives and agents under this Section shall be deemed to be the acts of Landlord; however, the foregoing provisions governing the date on which a notice is deemed to have been received shall mean and refer to the date on which a party to this Lease, and not its counsel or other recipient to which a copy of the notice may be sent, is deemed to have received the notice.

Notices to Tenant:


With Copy to:
American Home Mortgage Corp -  Real Estate Services Department
538 Broadhollow Rd
Melville, NY 11747
ATT:  VP Corporate Real Estate

With Copy to:
American Home Mortgage Corp

- 21 -

538 Broadhollow Rd
Melville, NY 11747
ATT: General Counsel

Notices to Landlord:

Charlotte D. Harrell, LLC
Attn: Robert W. Harrell, Sr.
2000 Sam Rittenberg Blvd, Suite 124
Charleston, SC  29407

With Copy To:
Anchor Commercial
Attn: Bob Nuttall, Jr.
126 Seven Farms Drive, Suite 110
Charleston, SC 29492

With Copy To:
Warren & Sinkler, L.L.P.
P.O. Box 1254
Charleston, SC  29402
Attn: John H. Warren, III

29.    **Security Deposit.**  At the time of signing this Lease, Tenant shall deposit with Landlord the Security Deposit to be retained by Landlord as cash security for the faithful performance and observance by Tenant of the provisions of this Lease.  Tenant shall not be entitled to any interest whatever on the Security Deposit.  Landlord shall have the right to commingle the Security Deposit with its other funds.  Landlord may use the whole or any part of the Security Deposit for the payment of any amount as to which Tenant is in default hereunder or to compensate Landlord for any loss or damage it may suffer by reason of the Tenant's default under this Lease.  If Landlord uses all or any portion of the Security Deposit as herein provided, within 10 days after written demand therefor, Tenant shall pay Landlord cash in amount equal to that portion of the Security Deposit used by Landlord.  If Tenant shall comply fully and faithfully with all of the provisions of this Lease, the Security Deposit shall be returned to Tenant promptly after the Expiration Date and surrender of the Premises to Landlord.

30.    **Renewal Option.**  Tenant shall have three (3) options to renew this Lease for a consecutive term of five (5) years at a rate which is increased at existing market rates over the previous year's rate and which increases at existing market rates per year, unless there are Tenant Improvements requested by Tenant at that time the renewal will be negotiable, by providing one hundred eighty (180) day's advance written notice to Landlord to exercise this option.  Absent any such timely notice, or should Landlord and Tenant fail to negotiate a rental rate for the option period within thirty (30) days from the date Tenant provides to Landlord said written notice, this option to renew shall be null and void and of no further effect.  This option to renew shall only be valid provided Tenant shall not be in breach or default under any

- 22 -

of the terms and conditions of this Lease (beyond the applicable cure period) either at the time notice is given or on the Expiration Date of the initial term hereof. The annual and monthly rental for the option period shall be adjusted accordingly should the size of the Premises change during the term of this Lease and any extensions of this Lease. Notwithstanding anything contained in this Lease to the contrary, the option to renew granted in this Paragraph 30 shall be null and void and of no further effect upon Landlord's written approval of any assignment of this Lease or any sublet of the Premises as provided in Paragraph 19 of this Lease, but shall remain in effect in the event of an assignment or sublet to an affiliate of Tenant as defined in Paragraph 19.

31.    **Termination Option.** Tenant shall have the right to terminate the lease after the thirty sixth (36th)month. Tenant shall give Landlord six (6) months prior written notice and pay two months' rent and a rent penalty equal to all unamortized construction costs and commissions costs due on the termination date.

32.    **Landlord Improvements.** Landlord shall provide a "Turn-Key" built in accordance with the mutually approved plans and specifications set forth in the Work Letter and Floor Plan attached as Exhibit "G", such build out to be at Landlord cost. The build out shall use Building Standard finishes.

33.    **Broker Identification and Indemnity**.

    (a)    Tenant and Landlord represent and warrant to each other that Caldwell Commercial, LLC and Swearingen Realty Group, LLC are the only brokers or finders that have had any dealings, negotiations or consultations with Tenant relating to the Premises or this transaction and that no other broker or finder called the Premises to Tenant's attention for lease or took any part in any dealings, negotiations, or consultations relating to the Premises or this lease. Landlord will pay to Caldwell Commercial, LLC a Commission of 6% pursuant to the terms of a separate agreement, and Caldwell Commercial will pay to Swearingen Realty Group, LLC one half of such amount pursuant to the terms of a separate agreement.

    (b)    Tenant agrees to be responsible for, indemnify, defend and hold harmless Landlord from and against all costs, fees (including, without limitation, attorney's fees), expenses, liabilities and claims incurred or suffered by Landlord arising from any breach by Tenant of Tenant's foregoing representation and warranty.

34.    **Right of First Refusal-Contiguous Space.** Tenant shall have an ongoing Right of First Refusal to Lease any available space which is contiguous with the Premises. Tenant shall respond within 10 days of a written notice from Landlord and if it elects to exercise such Right of First Refusal, Tenant shall execute an Amendment to this Lease Agreement within 15 days after receipt of such written notice. Failure of Tenant to act within the time or terms included herein or Tenant's refusal to lease the space being

- 23 -

proposed will completely void this Right of First Refusal and relieve the Landlord of any future responsibility to give such notices to Tenant.

*[Remainder of page intentionally left blank, signatures to follow]*



## EXHIBIT "B"
## LEASE COMMENCEMENT CERTIFICATE

The undersigned, as duly authorized officers and/or representatives of **Charlotte D. Harrell, LLC** ("Landlord") and **American Home Mortgage Corp.** ("Tenant"), hereby agree as follows with respect to the Lease Agreement (the "Lease") between them for premises located at 200 Sam Rittenberg Boulevard, Suite _____ Charleston, SC 29407

(the "Premises"):

1. **Date of Lease:** _____, 20_____

2. **Commencement Date:** _____, 20_____

3. **Expiration Date:** _____, 20_____

4. **Suite Number:** _____

5. **Premises Rentable Square Feet:** number of gross rentable square feet within the Premises as certified by James Verkaik, Landlord's architect x core factor of 0.135. The Premises Rentable Square Feet is deemed to be 4,738 square feet.

6. **Proportionate Share:** (Premises Rentable Square Footage / 29,249) x 100%. The Proportionate Share is deemed to be 16.20%

7. Minimum Annual Rent for each Lease Year = (Rental Rate per Premises Rentable Square Foot) x (number of Premises Rentable Square Feet) x 12.

Rent and operating expenses due on or before the Commencement Date for the period from the Commencement Date until the first day of the next calendar month. (Not applicable if the Commencement Date is the first day of the calendar month):

**Prorated Minimum Annual Rent for the first partial month, if any, of the first Lease Year:** $_____

Thereafter regular monthly payments due in the following amounts :

**Monthly Rent Installment for first Lease Year:** **$8,094.08**

**Monthly Rent Installment for second Lease Year:** **$8,338.88**

**Monthly Rent Installment for third Lease Year:** **$8,587.63**

**Monthly Rent Installment for fourth Lease Year:** **$8,884.27**

**Monthly Rent Installment for fifth Lease Year:** **$9,108.81**

8. Tenant certifies that, as of the date hereof, (a) the Lease is in full force and effect and has not been amended, (b) Tenant has no offsets or defenses against any provision of the

Lease and (c) Landlord has substantially completed any improvements to be performed by Landlord in accordance with the Lease, excepting the Punch List items set forth on the Schedule attached hereto and initialed by Landlord and Tenant, if any.

**IN WITNESS WHEREOF,** Landlord and Tenant, intending to be legally bound, have executed this Certificate as of _____, 2006.

LANDLORD:

**Charlotte D. Harrell, LLC**

By: _____

Name: _____

Title: _____

TENANT:

**American Home Mortgage Corp.**

Witness/Attest:

_____    By:_____

Name:_____

_____    Title:_____

## EXHIBIT "C"
## BUILDING RULES

1.    Any sidewalks, lobbies, passages, elevators and stairways shall not be obstructed or used by Tenant for any purpose other than ingress and egress from and to the Premises. Landlord shall in all cases retain the right to control or prevent access by all persons whose presence, in the judgment of Landlord, shall be prejudicial to the safety, peace or character of the Property.

2.    The toilet rooms, toilets, sinks, urinals, faucets, plumbing or other service apparatus of any kind shall not be used for any purposes other than those for which they were installed, and no sweepings, rubbish, rags, ashes, chemicals or other refuse or injurious substances shall be placed therein or used in connection therewith or left in any lobbies, passages, elevators or stairways.

3.    Tenant shall comply with all safety, fire protection and evacuation procedures and regulations established by Landlord or any governmental agency. No person shall go on the roof without Landlord's permission.

4.    Skylights, windows, doors and transoms shall not be covered or obstructed by Tenant, and Tenant shall not install any window covering which would affect the exterior appearance of the Building, except as approved in writing by Landlord, Tenant shall not remove, without Landlord's prior written consent, any shades, blinds or curtains in the Premises.

5.    Without Landlord's prior written consent, Tenant shall not hang, install, mount, suspend or attach anything from or to any sprinkler, plumbing, utility or other lines. If Tenant hangs, installs, mounts, suspends or attaches anything from or to any doors, windows, walls, floors or ceilings, Tenant shall sand and spackle all holes and repair any damage caused thereby or by the removal thereof at or prior to the expiration or termination of the lease. Without Landlord's prior written consent, no walls or partitions shall be painted, papered or otherwise covered or moved in any way or marked or broken; nor shall any connection be made to electric wires for running fans or motors or other apparatus, devices or equipment; nor shall machinery of any kind other than customary small business machines be allowed in the Premises; nor shall tenant use any other method of heating, air conditioning or air cooling than that provided by Landlord; nor shall any mechanics be allowed to work in or about the Building other than those employed by Landlord.

6.    Tenant shall not change any locks nor place additional locks upon any doors and shall surrender all keys and passes at the end of the Term.

7.    Tenant shall not use nor keep in the Building any matter having an offensive odor, not explosive nor highly flammable material, nor shall any animals other than seeing-eye dogs in the company of their masters be brought into or kept in or about the Premises.

8.    If Tenant desires to introduce electrical, signaling, telegraphic, telephonic, protective alarm or other wires or apparatus or devices, Landlord shall direct where and how

the same are to be placed, and except as so directed, no installation boring or cutting shall be permitted. Landlord shall have the right to prevent and to cut off the transmission of excessive or dangerous current of electricity or annoyances into or through the Building or the Premises and to require the changing of wiring connections or layout at Tenant's expense, to the extent that Landlord may deem necessary, and further to require compliance with such reasonable rules as Landlord may establish relating thereto, and in the event of non-compliance with the requirement or rules, Landlord shall have the right immediately to cut wiring or to do what it considers necessary to remove the danger, annoyance or electrical interference with apparatus in any part of the Building. All wires installed by Tenant must be clearly tagged at the distributing boards and junction boxes and elsewhere where required by Landlord, with the number of the offices to which said wires lead, and the purpose for which the wires respectively are used, together with the name of the concern, if any, operating same.

9.     Tenant shall not place weights anywhere beyond the safe carrying capacity of the Building which is designed to normal office building standards for floor loading capacity. Landlord shall have the right to exclude from the Building heavy furniture, safes and other articles which may be hazardous or to require them to be located at designated places in the Premises. Tenant shall obtain Landlord's written consent prior to the installation of any vending machines in the Premises.

10.     The use of rooms as sleeping quarters is strictly prohibited at all times.

11.     Tenant shall have the right, at Tenant's sole risk and responsibility, to use its proportional share of the parking spaces at the Property as reasonably determined by Landlord. Tenant shall comply with all parking regulations promulgated by Landlord from time to time for the orderly use of the vehicle parking areas, including without limitation the following: Parking shall be limited to automobiles, passenger or equivalent vans, motorcycles, light four wheel pickup trucks and (in designated areas) bicycles. No vehicles shall be left in the parking lot overnight. Parked vehicles shall not be used for vending or any other business or other activity while parked in the parking areas. Vehicles shall be parked only in striped parking spaces, except for loading and unloading, which shall occur solely in zones marked for such purpose, and be so conducted as to not reasonably interfere with traffic flow within the Property or with loading and unloading areas for other tenants. Employee and tenant vehicles shall not be parked in spaces marked for visitor parking or other specific use. All vehicles entering or parking in the parking areas shall do so at owner's sole risk, and Landlord assumes no responsibility for any damage, destruction, vandalism or theft. Tenants shall cooperate with Landlord in any measures implemented by Landlord to control abuse of the parking areas, including without limitation access control programs, tenant and guest vehicle identification programs, and validated parking programs, provided that no such validated parking program shall result in Tenant being charged for spaces to which it has a right to free use under its lease. Each vehicle owner shall promptly respond to any sounding vehicle alarm or horn, and failure to do so may result in temporary or permanent exclusion of such vehicle from the parking areas. Any vehicle which violates the parking regulations may be cited, towed at the expense of the owner, temporarily or permanently excluded from the parking areas, or subject to other lawful consequences.

12.    Tenant shall not smoke in the Building which Landlord has designated as a non-smoking building.

13.    Canvassing, soliciting and distribution of handbills or other written material, and peddling in the Building are prohibited, and Tenant shall cooperate to prevent same.

14.    Tenant shall provide Landlord with a written identification of any vendors engaged by Tenant to perform services for Tenant at the Premises (examples: security guards/monitors, telecommunications installers/maintenance).  Tenant shall permit Landlord's employees and contractors and no one else to clean the Premises unless Landlord consents in writing.  Tenant assumes all responsibilities for protecting its Premises from theft and vandalism and Tenant shall see each day before leaving the Premises that all lights are turned out and that the windows and the doors and closed and securely locked.

15.    Landlord shall provide Tenant with the move-in and move-out policies for the Building with which Tenant shall comply.  Throughout the Term, no furniture, packages, equipment, supplies or merchandise of Tenant will be received in the Building, or carried up or down in the elevators or stairways. Except during such hours as shall be designated by Landlord, and Landlord in all cases shall also have the exclusive right to prescribe the method and manner in which the same shall be brought in or taken out of the Building.  At the end of the Term, Tenant's obligations regarding surrender of the Premises shall include Tenant's obligation to shampoo all carpet, strip and re-wax all vinyl composite tile and replace any damaged ceiling tiles, the cost of which obligations shall be deducted from the Security Deposit if not completed by Tenant prior to the Expiration Date.

16.    Tenant shall not place oversized cartons, crates or boxes in any area for trash pickup without Landlord's prior approval.  Landlord shall be responsible for trash pickup of normal office refuse placed in ordinary office trash receptacles only.  Excessive amounts of trash or other out-of-the-ordinary refuse loads will be removed by Landlord upon request at Tenant's expense.

17.    Tenant shall cause all of Tenant's Agents to comply with these Building Rules.

18.    Landlord reserves the right to rescind, suspend or modify any rules or regulations and to make such other rules and regulations as, in Landlord's reasonable judgment, may from time to time be needed for the safety, care, maintenance, operation and cleanliness of the Property.  Notice of any action by Landlord referred to in this paragraph, given to Tenant, shall have the same force and effect as if originally made a part of the foregoing Lease.  New rules or regulations will not, however, be unreasonably inconsistent with the proper and rightful enjoyment of the Premises by Tenant under the Lease.

19.    These Building Rules are not intended to give Tenant any rights or claims in the event that Landlord does not enforce any of them against any other tenants or if Landlord does not have the right to enforce them against any other tenants and such non-enforcement will not constitute a waiver as to Tenant.

20.    Tenant shall be deemed to have read these Building Rules and to have agreed to abide by them as a condition to Tenant's occupancy of the Premises.

**EXHIBIT "D"**
**CLEANING SCHEDULE**

The cleaning schedule outlined below is subject to change, from time to time, to better accommodate the needs of the building and its occupants.

The following will be performed 5x/week (M – F after 6:00 p.m.):

Common areas swept, mopped, vacuumed (except for stairwells, which will be cleaned 1x/wk;
Common area glass and railings cleaned;
Elevators wiped down; floor cleaned;
Stairwells kept free of debris/litter;
Ashtrays emptied and trash removed from all common areas and suites.

The following will be performed 1x/week:

Dust and vacuum interiors of office suites;

Mop stairwells & landings

I.      GENERAL CLEANING - DAILY SERVICES

1. Sweep all hard surface flooring, damp mop all flooring in entrance lobby.

2. Vacuum all carpeted areas and rugs, moving light furniture other than desks, file cabinets, etc.

3. Spot clean all common area carpets as needed.

4. Empty, clean and damp dust all wastepaper baskets, receptacles, etc.; wash if necessary.

5. Dust and wipe clean all fixtures, telephones and window sills as needed.

6. Dust all baseboards as needed.

7. Clean all water fountains and coolers.

8. Remove all fingerprints from door facing and doors.

9. Spot clean glass to remove smudges.

10. Work behind locked doors.

11. Leave only designated lights burning.

12. Vacuum, sweep or mop building stairways.

II.    LAVATORIES

A.    DAILY SERVICES

    1.    Sweep and mop all flooring with disinfectant cleaner.

    2.    Wash and polish all mirrors, powder shelves, bright work, enameled surfaces, etc., including but not limited to, flushometers, piping and toilet seat hinges.

    3.    Wash and wipe dry both sides of all toilet seats.

    4.    Wipe clean all toilet tissue, soap, towel and sanitary napkin dispensers and disposable units.

    5.    Wash all basins, bowls and urinals, and disinfect.

    6.    Wash all partition, dispensers and receptacles using germicidal disinfectant.

    7.    Empty wastepaper and refuse in a designated area.

    8.    Dust ledges.

    9.    Resupply toilet tissue, soap dispensers and paper towels as needed.

III.    RESILIENT FLOORS

A.    DAILY SERVICES

    1.    Sweep and mop daily.

    2.    Remove spillage.

    3.    Remove gum, tar, etc.

IV.    JANITOR CLOSETS

A.    DAILY SERVICES

    1.    Clean sink or basin.

    2.    Remove waste and place in disposal.

    3.    Sweep and mop floor.

    4.    Maintain organized supply cabinets and/or shelves.

**EXHIBIT "E"**
**TENANT ESTOPPEL CERTIFICATE**

Please refer to the documents described in Schedule 1 hereto (the "Lease Documents") including the "Lease" therein described; all defined terms in this Certificate shall have the same meanings as set forth in the Lease unless otherwise expressly set forth herein. The undersigned Tenant hereby certifies that it is the tenant under the Lease. Tenant hereby further acknowledges that it has been advised that the Lease may be collaterally assigned in connection with a proposed financing secured by the Property and/or may be assigned in connection with a sale of the Property and certifies both to Landlord and to any and all prospective mortgagees and purchasers of the Property, including any trustee on behalf of any holders of notes or other similar instruments, any holders from time to time of such notes or other instruments, and their respective successors and assigns (the "Mortgagees" that as of the date hereof:

1.    The information set forth in attached Schedule 1 is true and correct.

2.    Tenant is in occupancy of the Premises and the Lease is in full force and effect and, except by such writings as are identified on Schedule 1, has not been modified, assigned, supplemented or amended since its original execution, nor are there any other agreements between Landlord and Tenant concerning the Premises, whether oral or written.

3.    All conditions and agreements under the Lease to be satisfied or performed by Landlord have been satisfied and performed.

4.    Tenant is not in default under the Lease Documents, Tenant has not received any notice of default under the Lease Documents, and, to Tenant's knowledge, there are no events which have occurred that, with the giving of notice and/or the passage of time, would result in a default by Tenant under the Lease Documents.

5.    Tenant has not paid any Rent due under the Lease more than 30 days in advance of the date due under the Lease and Tenant has no rights of setoff, counterclaim, concession or other rights of diminution of any Rent due and payable under the Lease except as set forth in Schedule 1.

6.    To Tenant's knowledge, there are no uncured defaults on the part of Landlord under the Lease Documents, Tenant has not sent any notice of default under the Lease Document to Landlord, and there are no events which have occurred that, with the giving of notice and/or the passage of time, would result in a default by Landlord thereunder, and that at the present time Tenant has no claim against Landlord under the Lease Documents.

7.    Except as expressly set forth in Part G of Schedule 1, there are no provisions for any, and Tenant has no, options with respect to the Premises or all or any portion of the Property.

8.    Except as set forth on Part M of Schedule 1, no action, voluntary or involuntary, is pending against Tenant under federal or state bankruptcy or insolvency law.

9.    The undersigned has the authority to execute and deliver this Certificate on behalf of Tenant and acknowledges that all Mortgagees will rely upon this Certificate in purchasing the Property or extending credit to Landlord or its successors in interest.

10.   This Certificate shall be binding upon the successors, assigns and representatives of Tenant and any party claiming through or under Tenant and shall inure to the benefit of all Mortgagees.

IN WITNESS WHEREOF, Tenant has executed this Certificate this _____ day of _____, 20_____.

<br>

_____
Name of Tenant

By:_____
Title:_____

**SCHEDULE 1 TO TENANT ESTOPPEL CERTIFICATE**
<u>**Lease Documents, Lease Terms and Current Status**</u>

A.    Date of Lease:

B.    Parties:

C.    Landlord:

D.    Tenant d/b/a:

E.    Premises known as:

F.    Modifications, Assignments, Supplements or Amendments to Lease:


G.    Commencement Date:

    1).    Expiration of Current Term:

H.    Options:

    1.    Security Deposit Paid to Landlord:    $

    2.    Current Fixed Minimum Rent (Annualized):    $

    3.    Current Additional Rent (and, if applicable, Percentage Rent) (Annualized):    $

    4.    Current Total Rent:    $

I.    Square Feet Demised:

J.    Tenant's Bankruptcy or other Insolvency Actions:

## EXHIBIT "F"
## ESTIMATED OPERATING BUDGET

| | |
|---|---|
| Electric | 1.00 |
| Water/Sewer | 0.07 |
| Fire Protection | 0.02 |
| HVAC Repair | 0.06 |
| Trash Removal | 0.05 |
| Landscaping Maint. | 0.10 |
| Plumbing Repairs | 0.03 |
| Electrical Repairs | 0.04 |
| Elevator Maint./Repair | 0.12 |
| Elevator Phone | 0.02 |
| Pest Control | 0.10 |
| Janitorial | 0.85 |
| Roof | 0.05 |
| Locks/Keys | 0.01 |
| Signage | 0.01 |
| General Repair/Maint. | 0.10 |
| Lot Sweeping/Repairs | 0.07 |
| Window Cleaning | 0.05 |
| Property Tax | 0.70 |
| Insurance | 0.50 |
| Business License | 0.07 |
| User Disposal Fee | 0.08 |
| Administrative | 0.02 |
| Management Fee | 0.87 |
| Miscellaneous | 0.01 |
| $ | 5.00 |

**EXHIBIT "G"**
**WORK LETTER AND FLOOR PLAN**

**J A M E S   P.   V E     K A I K**
2188 Andover Way
O(843)216-7577
C(843)200-3509

**A R C  'I T E C T   L L C**
Mount Pleasant    South Carolina
29466
jverkaik@comcast.net

August 2, 2006

Tenant Up-Fit
Harrell Square
Charleston, SC

Listed below is an outline spec for the above referenced project. The outline spec will follow the CSI format. All sections of the CSI format will be listed although certain fields will be listed as "Not Required" if no construction is done in that particular field.

**Division 1- General Conditions**
 Administration of the Project by General Contractor

**Division 2- Site Construction**
 All site construction was completed with the base building construction.

**Division 3- Concrete**
 1. Concrete cutting as required for plumbing.

**Division 4- Masonry**
 Not Required

**Division 5- Metals**
 1. Tenant demising partition consist of 3 5/8", 25 gauge minimum, metal studs at 16" on center from finished concrete floor to underside of roof deck and suite demising walls shall be insulated.
 2. Interior studs consist of 3 5/8", 25 gauge minimum, metal studs at 16" on center. All interior stud walls to extend to min. 6" above finished ceiling and braced diagonally, as required, to structure above.

**Division 6- Wood and Plastics**
 1. Blocking is to be provided as required to help support cabinets, counters, plumbing fixture or anywhere deemed necessary b subcontractors for support of their trades.
 2. Plywood back board is provided in the electrical room for attachment of phone company equipment by others.
 3. Plastic laminate counters are provided in restrooms, work/fax rooms and all others areas where millwork is called out. Plastic laminate to be by Wilsonart, or approved equal, and color is to be selected by tenant.
 4. Cabinets and countertops to be provide and located as per plans. Base cabinets are built of ¾" high density particle board with a melamine interior finish. Interior colors include white, cream or grey and are to be selected by owner. Exterior plastic laminate color to be selected by tenant from landlords standard color ring. Edge banding is 3mm vinyl and to be provided on all cabinet door and drawer edges. Upper cabinets are ¾" high density particle board with melamine interior finish, same

- 1 -

as above, and exterior door    lors to be selected by tenant. All door   ges are European design, door and drawer pulls are 4'  aluminum wire pulls.

## Division 7- Thermal and Moisture Protection

1. Exterior walls to receive 2" of rigid styrofoam insulation board that is to extend from the finished floor to the underside of the roof deck.

2. Interior walls that are to be insulated, as an Aviation Business Park standard, include the restroom walls, kitchen exterior walls and conference room walls. These walls are to be insulted with 3 ½" batt insulation from finished floor to top of stud wall.

3. All exterior door openings and window openings have been caulked and sealed as part of the base building construction.

## Division 8- Doors and Windows

1. Interior door frames are natural anodized aluminum finish frames, to match exterior storefront, with snap trim.

2. Interior doors are 1 ¾" solid core birch veneer doors that are pre-finished from the factory. Color to be selected by tenant. Hardware is to be brushed nickel finish and will include a set of hinges as well as silencers and door handle. Additional hardware could include a closer, door stop, view window and grille. Refer to the door schedule for the hardware package to be included with each door.

3. Exterior glazing, existing with base building, is 1" insulated, tinted, low E glazing in a natural anodized aluminum framing system.

## Division 9- Finishes

1. Reception area to have ceramic tile flooring, see floor plans for exact location, and base. Tile type and color to be selected by tenant from landlords standard sample boards. Tile to be thinset to concrete floor and grouted as per manf. specs.

2. Carpet to be 28 oz. level loop commercial grade glue down. Color to be selected by tenant from landlords standard sample boards.

3. Base to be 4" vinyl base. Color to be selected by tenant from landlords standard color chain.

4. VCT (Vinyl Composition Tile) to be Armstrong 12"x12" Standard Excelon commercial grade tile. Tile color to be selected by tenant from landlords standard color samples.

5. Interior walls to be finished with 5/8" standard gypsum board. Walls to be taped, floated and finished as per standard manufacturers specifications. Walls are to be primed and painted. Walls to receive one(1) coat of primer and (2)two coats of eggshell finish paint.

6. Suspended ceiling to be either 2'x2' or 2'x4', see reflected ceiling plan for tile locations. Tile to be Armstrong Tegular suspended ceiling tile with 15/16" grid and USG MS-274 Seismic Shadow perimeter molding.

## Division 10- Specialties
Not Required

## Division 11- Equipment
Not Required

## Division 12- Furnishings
Not Required

- 2 -

**Division 13- Special Construction**
      Entire Tenant space is sprinkled as per Fire Marshall and State of South Carolina codes.

**Division 14- Conveying Equipment**
      Not Required

**Division 15- Mechanical/Plumbing**
      1. Tenant space is heated and cooled with a split system HVAC units. Duct work provides air circulation to all interior spaces with a plenum return. Units are thermostatically controlled from within each tenants space. The system is designed to provide maximum comfort by the use of multiple rooftop units designed in a zoned system. Units are manufactured by Carrier or approved equals. Refer to Mechanical plans for exact supply and return air grille locations. Ventilation of the Lan Room, unless otherwise directed by tenant, is provided by a return air grille in the ceiling and a 24"x24" grille in the door.
      2. A hot water heater in included and is generally located above the breakroom on a platform.
      7. The kitchen is provided with a kitchen sink and a water connection for a refrigerators ice maker. Refrigerator not in this contract.

**Division 16- Electrical**
      1. Each office, space, and/or area is to be provided with electrical lighting which is switched in that individual space. Banks of light switches are located for convenience and ease of use. Lighting can include, but not be limited to, 2'x2' or 2'x4" parabolic fluorescent light fixtures, recessed can lighting, directional recessed can lighting, or utility fluorescent light fixtures. See Electrical lighting plan for quantities and locations of light fixtures.
      2. As per code, exit lighting, night lighting and emergency lighting are provided.
      3. Each office is provided with one(1) powered receptacle on each wall, unless it is a full window wall, and one(1) data drop per office which will have a receptacle box at standard height from the floor, a pull string for installers use, and a conduit that terminates just above the partition top plate. It is the tenants responsibility to have all their phone, data, DSL, cat 5, etc. lines run by an independent installer of their choice. The landlord will provide the box and conduit to the ceiling only. Coordinate with project manager and on site superintendent.
      4. Power will be provided throughout the tenants space as per code, at a minimum, and/or at tenants direction. Phone, data, DSL, cat 5 drops are to be located by the tenant and are to be shown on Electrical Power Plans.
      5. Main power is to enter the space in the Electrical Room which is generally located at the rear of the space. Electrical panels are designed and installed based on the tenants electrical loads. Distribution of power and lighting is thru flex conduit and sized as per the National Electric Code.