COMMERCIAL OFFICE LEASE

BY AND BETWEEN

TPRF/THC HAVENPARK, LLC,
a Delaware limited liability company

AS LANDLORD,

AND

AMERICAN HOME MORTGAGE CORP.,
a New York corporation

AS TENANT

9680 Haven Avenue, a portion of 3rd Floor
Rancho Cucamonga, California 91730

TABLE OF CONTENTS

PAGES

1.    BASIC LEASE PROVISIONS. ........................................................................................ 1

      1.1.    Tenant ............................................................................................................... 1

      1.2.    Landlord............................................................................................................ 1

      1.3.    Description of Real Property. ........................................................................... 1

      1.4.    Lease Term ...................................................................................................... 2

      1.5.    Base Rent......................................................................................................... 2

      1.6.    Tenant's Share ................................................................................................. 2

      1.7.    Security Deposit................................................................................................ 2

      1.8.    Base Year......................................................................................................... 2

      1.9.    Tenant Improvement Allowance....................................................................... 3

      1.10.   Permitted Use .................................................................................................. 3

      1.11.   Parking ............................................................................................................. 3

      1.12.   Brokers ............................................................................................................. 3

      1.13.   Exhibits............................................................................................................. 3

2.    PREMISES AND COMMON AREAS. ............................................................................ 3

      2.1.    Premises........................................................................................................... 3

      2.2.    Common Areas.................................................................................................. 3

      2.3.    Square Footage ................................................................................................ 4

3.    LEASE TERM. ............................................................................................................... 4

      3.1.    Lease Term ....................................................................................................... 4

      3.2.    Commencement Date Letter............................................................................. 4

      3.3.    Lease Year ........................................................................................................ 4

      3.4.    Option to Extend Lease Term ........................................................................... 5

      3.5.    Early Occupancy by Tenant.............................................................................. 6

i

PAGES

| | | | |
|---|---|---|---|
| 4. | Rent. | ................................................................................................................ | 7 |
| | 4.1. | Payment of Base Rent .................................................................... | 7 |
| | 4.2. | Abatement of Base Rent ................................................................. | 7 |
| | 4.3. | Additional Rent. ............................................................................. | 7 |
| 5. | | REPRESENTATIONS AND WARRANTIES. .............................................. | 11 |
| | 5.1. | Landlord's Representations and Warranties..................................... | 11 |
| | 5.2. | Tenant's Representations and Warranties ....................................... | 11 |
| 6. | | INTENTIONALLY OMITTED. ..................................................................... | 11 |
| 7. | | HOLDING OVER. ..................................................................................... | 11 |
| 8. | USE. | ................................................................................................................ | 11 |
| 9. | | MAINTENANCE AND REPAIRS. ............................................................... | 12 |
| | 9.1. | Landlord's Obligations .................................................................... | 12 |
| | 9.2. | Tenant's Obligations ...................................................................... | 12 |
| 10. | | ALTERATIONS; TENANT IMPROVEMENTS. ............................................ | 12 |
| | 10.1. | Landlord's Consent to Alterations ................................................... | 13 |
| | 10.2. | Manner of Construction.................................................................. | 13 |
| | 10.3. | Bond; Notice of Completion ........................................................... | 13 |
| | 10.4. | Payment for Improvements ............................................................ | 14 |
| | 10.5. | Landlord's Property........................................................................ | 14 |
| 11. | LIENS. | ................................................................................................................ | 14 |
| 12. | | BUILDING SERVICES............................................................................... | 15 |
| | 12.1. | Basic Services ............................................................................... | 15 |
| | 12.2. | Excess Usage................................................................................ | 15 |
| | 12.3. | Additional Electrical Service........................................................... | 15 |
| | 12.4. | HVAC Balance................................................................................ | 15 |
| | 12.5. | Telecommunications ...................................................................... | 16 |

|       | 12.6. | After-Hours Use | 16 |
|       | 12.7. | Reasonable Charges | 16 |
| 13. | | RIGHTS OF LANDLORD. | 16 |
|       | 13.1. | Right of Entry | 16 |
|       | 13.2. | Maintenance Work | 17 |
|       | 13.3. | Rooftop | 17 |
| 14. | | INDEMNIFICATION; EXEMPTION OF LANDLORD FROM LIABILITY. | 17 |
|       | 14.1. | Waiver and Indemnification by Tenant | 17 |
|       | 14.2. | Duty to Defend; Attorneys Fees and Expenses | 18 |
|       | 14.3. | Exemption of Landlord from Liability | 18 |
|       | 14.4. | Security | 18 |
|       | 14.5. | Survival | 19 |
| 15. | | INSURANCE. | 19 |
|       | 15.1. | Tenant's Insurance | 19 |
|       | 15.2. | Landlord's Insurance | 20 |
|       | 15.3. | Waiver of Subrogation | 20 |
|       | 15.4. | Form of Policies | 20 |
|       | 15.5. | Compliance with Law | 21 |
| 16. | | ASSIGNMENT AND SUBLETTING. | 21 |
|       | 16.1. | Transfers | 21 |
|       | 16.2. | Additional Transfers | 22 |
|       | 16.3. | Landlord's Consent | 22 |
|       | 16.4. | Transfer Premium | 23 |
|       | 16.5. | Landlord's Option as to Subject Space | 23 |
|       | 16.6. | Effect of Transfer | 24 |

|        | 16.7.  | Occurrence of Default | 24 |
| 17.    | CASUALTY | | 25 |
|        | 17.1.  | Casualty Notice | 25 |
|        | 17.2.  | Termination by Tenant | 25 |
|        | 17.3.  | Termination by Landlord | 25 |
|        | 17.4.  | Repair by Landlord | 25 |
|        | 17.5.  | Proration of Rent | 25 |
|        | 17.6.  | Tenant's Waivers | 26 |
|        | 17.7.  | Release and Discharge | 26 |
| 18.    | EMINENT DOMAIN. | | 26 |
| 19.    | SUBORDINATION. | | 26 |
| 20.    | DEFAULT AND REMEDIES. | | 27 |
|        | 20.1.  | Event of Default | 27 |
|        | 20.2.  | Remedies. | 28 |
| 21.    | TRANSFER OF LANDLORD'S INTEREST. | | 30 |
| 22.    | PARKING. | | 30 |
| 23.    | WAIVER. | | 30 |
| 24.    | ESTOPPEL CERTIFICATE. | | 31 |
| 25.    | LIABILITY OF LANDLORD. | | 31 |
| 26.    | INABILITY TO PERFORM. | | 31 |
| 27.    | HAZARDOUS MATERIAL. | | 32 |
| 28.    | SURRENDER OF PREMISES; REMOVAL OF PROPERTY. | | 33 |
| 29.    | SIGNAGE RIGHTS. | | 34 |
|        | 29.1.  | Premises Signage | 34 |
|        | 29.2.  | Building Directory | 34 |
|        | 29.3.  | Monument Signage | 34 |

| 30. | MISCELLANEOUS. ................................................................................................ 35 |
|---|---|
| 30.1. | SEVERABILITY; ENTIRE AGREEMENT ........................................................ 35 |
| 30.2. | Substitution of Other Premises.......................................................................... 35 |
| 30.3. | Attorneys' Fees; Waiver of Jury Trial.............................................................. 35 |
| 30.4. | Time of Essence ................................................................................................ 36 |
| 30.5. | Headings; Joint and Several .............................................................................. 36 |
| 30.6. | Reserved Area.................................................................................................... 36 |
| 30.7. | NO OPTION........................................................................................................ 36 |
| 30.8. | Use of Real Property Name; Improvements...................................................... 36 |
| 30.9. | Rules and Regulations........................................................................................ 36 |
| 30.10. | Quiet Possession................................................................................................ 37 |
| 30.11. | Rent.................................................................................................................... 37 |
| 30.12. | Successors and Assigns...................................................................................... 37 |
| 30.13. | Notices................................................................................................................ 37 |
| 30.14. | Right of Landlord to Perform ............................................................................ 37 |
| 30.15. | Landlord's Access.............................................................................................. 37 |
| 30.16. | Changes in Real Property................................................................................... 38 |
| 30.17. | Real Property Name .......................................................................................... 38 |
| 30.18. | Facsimile Signature .......................................................................................... 38 |
| 30.19. | Survival of Obligations ..................................................................................... 38 |
| 30.20. | Confidentiality ................................................................................................... 38 |
| 30.21. | Governing Law................................................................................................... 38 |
| 30.22. | Exhibits.............................................................................................................. 38 |
| 30.23. | Independent Covenants...................................................................................... 38 |
| 30.24. | Counterparts....................................................................................................... 39 |
| 30.25. | Standard for Conduct and Consent.................................................................... 39 |

**COMMERCIAL OFFICE LEASE**

This Commercial Office Lease ("**Lease**") is made and entered into as of August 11, 2006 ("**Effective Date**"), by and between the undersigned parties, and in consideration of the mutual covenants and agreements contained herein, and for good and valuable consideration, the undersigned parties agree to the following terms and conditions:

1. **BASIC LEASE PROVISIONS.**

1.1.    **Tenant.** The **"Tenant"** under this Lease is **AMERICAN HOME MORTGAGE CORP.**, a New York corporation. Tenant's address for receipt of notices is as follows:

> American Home Mortgage Corp.
> 538 Broadhollow Road
> Melville, New York 11747
> Attn: Donna Kiessel
> Telephone:  (631) 622-5390
> Facsimile:    (866) 295-4776
> E-mail:  Donna.Kiessel@americanhm.com

1.2.    **Landlord.** The **"Landlord"** for purposes of this Lease is **TPRF/THC HAVENPARK, LLC,** a Delaware limited liability company.  Landlord's address for receipt of notices is as follows:

> TPRF/THC Havenpark, LLC
> c/o The Hileman Company, LLC
> P.O. Box 17657
> Beverly Hills, California  90209
> Attn: Jack D. Hileman
> Telephone: (310) 470-3461
> Facsimile:   (310) 470-1672
> jhileman@hilemanco.com

1.3.    **Description of Real Property.**

1.3.1.  **Premises.**  Subject to the terms, covenants, and conditions set forth herein, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the following premises: approximately 10,000 rentable square feet of floor space on the 3rd floor of the Building (as defined below), as more particularly shown on the space plan attached hereto as **Exhibit "A"** ("**Premises**").

1.3.2.  **Building; Project.**  The Premises will be located in a 3-story office building which, as of the Effective Date, has not yet been completed, and is identified as "Building A" on the site plan attached hereto as **Exhibit "B"** ("**Building**"). The Building will have a street address 9680 Haven Avenue, Rancho Cucamonga, California 91730, and is anticipated to contain approximately 75,000 rentable square feet of floor space.  The Building, when constructed, will be part of a mixed-use, multi-building project known as "HavenPark", as more particularly described on the site plan attached hereto as **Exhibit "B"** ("**Project**"). Notwithstanding anything herein to the contrary, the site plan attached hereto as **Exhibit "B"** is for illustration purposes only and shall not impose any obligation upon Landlord to construct the Premises, the Building, or the Project in conformity with **Exhibit "B"**.

1

1.3.3. **Real Property.** The Premises, the Building and the Project (excluding the adjacent Hotel shown on **Exhibit "B"**) are located upon that certain parcel of real property in the City of Rancho Cucamonga, County of San Bernardino, State of California, as shown on the site plan attached hereto as **Exhibit "B"** ("**Land**"), which is owned in fee by the Landlord. The Land, the Premises, the Building, the Project (excluding the adjacent Hotel shown on **Exhibit "B"**), and all appurtenances thereto, and improvements thereon, are collectively referred to herein as the "**Real Property**".

1.3.4. **Common Areas.** The areas, improvements, facilities, installations, and equipment within the Real Property for the common use and benefit of the tenants and occupants of the Property, and their employees, agents, licensees, customers and other invitees ("**Common Areas**") shall include the common corridors and hallways, stairwells, elevators, public restrooms, parking areas, pathways, exits, entrances, access roads, driveways, sidewalks, retaining walls, landscaped areas, and other public or common areas located around the Building (excluding the roof), in the Project and on the Real Property.

1.4.    **Lease Term.** The term of this Lease is five (5) years ("**Lease Term**"), commencing on the "**Commencement Date**" and expiring on the "**Expiration Date**" (as those terms are defined in Section 3 below), subject to extension in accordance with Section 3.4 below.

1.5.    **Base Rent.** Tenant shall pay to Landlord the monthly "**Base Rent**" per rentable square foot (RSF) pursuant to the following amounts (which amounts reflect an annual increase of three percent (3%) over Base Rent for the preceding year), subject to the terms of this Lease; provided that, prior to the Commencement Date, Tenant shall notify Landlord in writing of Tenant's election to pay Base Rent based upon either Base Rent Option 1 or Base Rent Option 2 as follows:

| Months | Base Rent Option 1<br>Monthly Base Rent/RSF<br>(TI Allowance $35/USF) | Base Rent Option 2<br>Monthly Base Rent/RSF<br>(TI Allowance $45/USF) |
|---|---|---|
| 1 | $2.20 | $2.40 |
| 2 – 5 | $0.00 | $0.00 |
| 6 – 12 | $2.20 | $2.40 |
| 13 – 24 | $2.27 | $2.47 |
| 25 – 36 | $2.34 | $2.54 |
| 37 – 48 | $2.41 | $2.62 |
| 49 – 60 | $2.48 | $2.70 |

1.6.    **Tenant's Share. "Tenant's Share"** for purposes of this Lease is thirteen and 33/100ths percent (13.33%), calculated in accordance with Section 4.3.1.9.

1.7.    **Security Deposit.** None.

1.8.    **Base Year.** 2007.

2

1.9.     **Tenant Improvement Allowance.**  Landlord shall provide Tenant an allowance for the construction of Tenant Improvements (as defined in the Work Letter) in the amount of either (i) Thirty-Five and No/100 Dollars ($35.00) per useable square foot of floor space if Tenant elects Base Rent Option 1, or (ii) Forty-Five and No/100 Dollars ($45.00) per useable square foot of floor space if Tenant elects Base Rent Option 2, subject to the terms of the Tenant Improvement Work Letter attached hereto as **Exhibit "C"** ("**Work Letter**").

1.10.  **Permitted Use.**     The Premises shall be used for general office and administrative uses, and any other lawful use which is permitted by the local zoning ordinances applicable to the Building, so long as such use is consistent with the character of the Building as a Class A office building ("**Permitted Use**"), subject to Section 8 below.

1.11.  **Parking.**  Tenant shall have the right to the use of up to 35 unreserved surface parking spaces and 5 reserved surface parking spaces in the Project (4 spaces per 1,000 rentable square feet of floor space), subject to Section 22 below.

1.12.  **Brokers.  CB RICHARD ELLIS** is the "**Landlord's Broker**" and **STRATA REALTY** is the "**Tenant's Broker**" for purposes of this Lease.

1.13.  **Exhibits.**  The following exhibits are attached to, and incorporated as a part of, this Lease:

| EXHIBIT "A" – | PREMISES SPACE PLAN |
|---|---|
| EXHIBIT "B" – | PROJECT SITE PLAN |
| EXHIBIT "C" – | WORK LETTER |
| EXHIBIT "D" – | COMMENCEMENT DATE LETTER |
| EXHIBIT "E" – | RULES AND REGULATIONS |

## 2.     PREMISES AND COMMON AREAS.

2.1.     **Premises.**  As of the Effective Date of this Lease, Landlord has not yet completed construction of the Base Building.  The obligations of the parties under this Lease are contingent upon Landlord's completion of the "Base Building" and "Landlord's Work" (as those terms are defined in the Work Letter).  If Landlord has not yet commenced construction of the Base Building by June 1, 2007, Landlord shall have the right to terminate this Lease effective immediately upon delivery of written notice of termination to Tenant.  Landlord shall not be obligated to provide or pay for any improvement work or services related to the improvement of the Premises, the Building or any other portion of the Real Property, except as expressly provided in this Lease and the Work Letter.  Tenant agrees to accept the Premises, the Building, and all other portions of the Real Property **"as is", "where-is", "with all faults", and "without any representations or warranties."**  Tenant expressly warrants and represents that Tenant will rely solely on its own investigation and inspection of the Real Property in its decision to enter into this Lease.  Upon Tenant's acceptance of the Premises following the completion of Landlord's Work and the Base Building, Tenant shall be deemed to have waived and disclaimed any objection to, cause of action based upon, or claim that its obligations hereunder should be reduced or limited because of the condition of the Premises, the Building, or any other portion of the Real Property, or the suitability of same for Tenant's purposes.  Tenant hereby waives subsection 1 of Section 1932 and Sections 1941 and 1942 of the Civil Code of California or any successor provision of law.

2.2.     **Common Areas.**

3

2.2.1. **Tenant's Rights in Common Areas.** Landlord hereby grants to Tenant the right to the nonexclusive use by Tenant and Tenant's employees, agents, contractors and invitees, of the Common Areas; provided, however, that Tenant's use thereof shall be subject to (i) the provisions of any covenants, conditions and restrictions regarding the use thereof now or hereafter recorded against the Real Property, and (ii) such reasonable, non-discriminatory rules, regulations and restrictions as Landlord may make from time to time (which shall be provided in writing to Tenant).

2.2.2. **Landlord's Rights in Common Areas.** Landlord reserves the right from time to time to (i) make use any of the Common Areas, (ii) make any changes, additions, deletions, improvements, repairs and/or replacements in or to the Common Areas and/or the Real Property, or any portion or elements thereof, including, without limitation, changes in the location, size, shape and number of driveways, entrances, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas, walkways, plazas, courtyards, transportation areas, and parking areas (subject to Section 22 below), (iii) close temporarily any of the Common Areas while engaged in making repairs, improvements or alterations to the Real Property, and (iv) perform such other acts and make such other changes with respect to the Real Property as Landlord may, in the exercise of good faith business judgment, deem to be appropriate in connection with any of the foregoing rights.

2.3. **Square Footage.** For purposes hereof, the "rentable square feet" of floor space in the Project (including the Premises and the Building) shall be calculated by Landlord pursuant to the Building Owners and Managers Association International Standard Method for Measuring Floor Area in Office Building, ANSI Z65.1-1996 (the "**BOMA Standard**"). The number of rentable square feet of floor space in the Project will be subject to verification from time to time by Landlord's planner/designer and such verification shall be made in accordance with the provisions of this Section 2.3. If Landlord's planner/designer determines that the number of rentable square feet of floor space in the Project verified pursuant to the BOMA Standard is different from the amounts thereof set forth in this Lease, Landlord shall modify all amounts, percentages, and figures appearing or referred to in this Lease to conform to such corrected measurements, and Landlord and Tenant shall confirm any such modifications in writing.

3. **LEASE TERM.**

3.1. **Lease Term.** The Lease Term shall commence as of the later to occur of (i) January 1, 2007, or (ii) the date upon which the Premises are "Ready for Occupancy" (as defined in the Work Letter) ("**Commencement Date**"), and shall expire as of 11:59 p.m. on the fifth (5th) anniversary of the Commencement Date ("**Expiration Date**"). The term "Lease Term" as used herein shall mean the original Lease Term as it may be extended pursuant to Section 3.4 below.

3.2. **Commencement Date Letter.** Landlord may deliver to Tenant a Commencement Date Letter in a form substantially similar to that attached hereto as **Exhibit "D"**, which Tenant shall execute and return to Landlord within twenty (20) business days of receipt thereof, if acceptable to Tenant.

3.3. **Lease Year.** For purposes of this Lease, the term "**Lease Year**" shall mean each consecutive twelve (12) month period during the Lease Term, with the first Lease Year commencing on the Commencement Date; however, (i) if the Commencement Date falls on a day other than the first day of a calendar month, the first Lease Year shall commence on the first day of the first full calendar month after the Commencement Date, and each succeeding

4

Lease Year shall commence on the first (1st) anniversary of the first day of the first full month after the Commencement Date.

   3.4.   **Option to Extend Lease Term.** Tenant shall have two (2) options (each, an "**Option**") to extend the Lease Term for additional periods of three (3) years each (individually and collectively, the "**Option Term**"). Tenant's options hereunder shall be exercisable by written notice delivered by Tenant to Landlord as provided in Section 3.4.1 below, provided that, as of the date of delivery of each such notice, Tenant is not in default hereunder beyond applicable notice and cure periods. Upon the proper exercise of any such option to extend by Tenant, and provided that, as of the end of the Lease Term (as it may have been extended), Tenant is not in default under this Lease beyond applicable notice and cure periods, the Lease Term shall be extended for a period of three (3) years. The option rights granted to Tenant under this Section are personal to the Tenant originally named in this Lease (and not any assignee, sublessee or other transferee of Tenant's interest in this Lease) and may only be exercised if the Tenant, or any subsidiaries, partners, or other affiliates of Tenant ("**Affiliates**"), occupies the entire Premises.

   3.4.1.   **Exercise of Option.** The options contained in this Section 3.4 shall be exercised by Tenant, if at all, only in the following manner: (i) not more than nine (9) months nor less than six (6) months prior to the expiration of the Lease Term, or extended Lease Term, as applicable, Tenant shall deliver written notice to Landlord stating that Tenant is interested in exercising the applicable option ("**Tenant's Notice of Interest**"); (ii) within thirty (30) days of Landlord's receipt of Tenant's Notice of Interest, Landlord shall deliver a written notice (the "**Option Rent Notice**") to Tenant setting forth the "**Option Rent**" (as that term is defined below), which shall be applicable to this Lease during the applicable Option Term; and (iii) if Tenant wishes to exercise such option, within fifteen (15) days of Tenant's receipt of the Option Rent Notice, Tenant shall exercise the applicable Option by delivering written notice to Landlord of Tenant's exercise of the Option ("**Option Exercise Notice**"); provided, however, that Tenant may, at its option, object to the Option Rent stated in the Option Rent Notice, in which case the parties shall follow the procedure in Section 3.4.3.1 below for determination of the Option Rent. Notwithstanding the foregoing, Tenant shall not have the right to object to the Option Rent set forth in the Option Rent Notice if such Option Rent is calculated based on the Base Rent as increased by all escalations thereto for the month preceding the effective date for the applicable Option Term. If Tenant fails to object to the Option Rent in Tenant's written exercise notice, Tenant shall be deemed to have approved of the Option Rent.

   3.4.2.   **Option Rent.** The Base Rent payable by Tenant during each Option Term (the "**Option Rent**") shall be equal to the then-prevailing "Fair Market Rental" (as defined below); provided, however, in no event shall the Base Rent during the first Option Term be less than the Base Rent, as increased by escalations thereto, in effect for the last month of the Lease Term, and in no event shall the Base Rent during the second Option Term be less than the Base Rent, as increased by all escalations thereto, in effect for the last month of the first Option Term. As used herein, "**Fair Market Rental**" shall mean the then-prevailing face or stated rent, including all escalations if such escalations are contained in comparable deals in which other tenants in the Building are leasing non-sublease, non-encumbered, non-equity, non-expansion, and non-renewal space in the Building comparable in size and location to the Premises for a term of five (5) years ("**Comparable Deals**").

   3.4.3.   **Determination of Option Rent.** If Tenant timely and appropriately objects to the Option Rent, Landlord and Tenant shall attempt to agree upon the Option Rent, using good faith efforts. If Landlord and Tenant fail to reach agreement within forty-five (45)

5

days following Tenant's receipt of the Option Rent Notice (the "**Outside Agreement Date**"), then Tenant shall elect to either (i) rescind the Option Exercise Notice, or (ii) have the Option Rent determined in accordance with Sections 3.4.3.1 through 3.4.3.7 below. If Tenant elects to have the Option Rent determined in accordance with Sections 3.4.3.1 through 3.4.3.7 below, and one party fails to submit its separate determination of Option Rent to arbitration by 11:59 p.m. (PST) of the fifth (5th) day following the Outside Agreement Date, such party shall be deemed to have approved of the Option Rent submitted by the other party.

3.4.3.1. Landlord and Tenant shall each appoint one arbitrator who shall by profession be a certified real estate appraiser or licensed broker who shall have been active over the five (5) year period ending on the date of such appointment in the valuation of commercial office properties in the San Bernardino and Riverside County, California area. The determination of the arbitrators shall be limited solely to the issue of whether Landlord's or Tenant's submitted Option Rent is closer to the actual Option Rent, as determined by the arbitrators, taking into account only the requirements of Section 3.4.2 of this Lease. Each such arbitrator shall be appointed within thirty (30) days after the applicable Outside Agreement Date.

3.4.3.2. Within ten (10) days of the date of the appointment of the last appointed arbitrator, the two arbitrators so appointed shall agree upon and appoint a third arbitrator who shall be qualified under the same criteria set forth above for qualification of the initial two arbitrators.

3.4.3.3. Within thirty (30) days of the appointment of the third arbitrator, the three arbitrators shall reach a decision as to whether the parties shall use Landlord's or Tenant's submitted Option Rent and shall notify Landlord and Tenant thereof.

3.4.3.4. The decision of the majority of the three arbitrators shall be binding upon Landlord and Tenant.

3.4.3.5. If either Landlord or Tenant fails to appoint an arbitrator within thirty (30) days after the applicable Outside Agreement Date, the arbitrator appointed by one of them shall reach a decision, notify Landlord and Tenant thereof, and such arbitrator's decision shall be binding upon Landlord and Tenant.

3.4.3.6. If the two arbitrators fail to agree upon and appoint a third arbitrator within the time period provided in Section 3.4.3.2 above, then the parties shall mutually select the third arbitrator. If Landlord and Tenant are unable to agree upon the third arbitrator within ten (10) days, then either party may, upon at least five (5) days prior written notice to the other party, request the presiding Judge of the San Bernardino County Superior Court, acting in his private and non-judicial capacity, to appoint the third arbitrator. Following the appointment of the third arbitrator, the panel of arbitrators shall within thirty (30) days thereafter reach a decision as to whether Landlord's or Tenant's submitted Option Rent shall be used and shall notify Landlord and Tenant thereof.

3.4.3.7. The cost of the arbitrators and the arbitration proceeding shall be paid by Landlord and Tenant equally.

3.5.   **Early Occupancy by Tenant.** Tenant may enter the Premises prior to the Commencement Date for the purpose of constructing Tenant Improvements, subject to the terms of this Section 3.5. If Tenant wishes to exercise this right of early entry, Tenant shall

6

provide Landlord with two (2) business days prior written notice and further agrees that (a) Tenant shall comply with all provisions of this Lease other than the obligation to pay Rent (excluding any costs incurred for overstandard use by Tenant), and all of the provisions of this Lease, other than those provided above, shall be binding upon Tenant; (b) Tenant and its employees, contractors, agents and representatives shall comply with all applicable laws, regulations, permits and other approvals applicable to such beneficial occupancy of the Premises; and (c) Tenant shall indemnify, defend, protect and hold Landlord and the Premises harmless from and against all liens, liabilities, losses, damages, costs, expenses, demands, actions, causes of action and claims (including, without limitation, attorneys' fees and costs) arising out of the use, construction or occupancy of the Premises by Tenant and/or its agents, employees, contractors and representatives ("**Tenant Parties**") prior to the Commencement Date.

4.    **Rent.**

4.1.    **Payment of Base Rent.** From and after the Commencement Date, Tenant shall pay, without notice, demand, setoff or deduction, to Landlord, or to such other person or at such other place as directed from time to time by written notice to Tenant from Landlord, in currency, by direct deposit into Landlord's bank account, which currency at the time of payment is legal tender for private or public debts in the United States of America, the Rent (as defined below) in equal monthly installments in advance on or before the first (1st) day of each and every month during the Lease Term.  Landlord shall deliver to Tenant, prior to the Tenant's execution of this Lease, written instructions regarding Tenant's direct deposit of Rent into Landlord's bank account.  The Base Rent for the first (1st) full month of the Lease Term shall be paid by Tenant to Landlord at the time of Tenant's execution of this Lease.  If any rental payment date (including the Commencement Date) falls on a day of the month other than the first day of such month or if any rental payment is for a period which is shorter than one month, then the rental for any such fractional month shall be a proportionate amount of a full calendar month's rental based on the proportion that the number of days in such fractional month bears to the number of days in the calendar month during which such fractional month occurs.  All other payments or adjustments required to be made under the terms of this Lease that require proration on a time basis shall be prorated on the same basis.  The term "**Rent**" as used in this Lease means Base Rent, Additional Rent, and any other charges due and payable by Tenant under this Lease.

4.2.    **Abatement of Base Rent.** Tenant's obligation to pay Base Rent shall be abated during the second (2nd) through fifth (5th) full calendar months after the Commencement Date ("**Rent Abatement Period**"); provided, however, if Tenant commits an Event of Default at any time during the Rent Abatement Period, Tenant shall not be entitled to receive any abatement of Base Rent pursuant to this Section 4.2 unless and until Tenant cures the Event of Default to the satisfaction of Landlord.

4.3.    **Additional Rent.**

4.3.1.    **Defined Terms.**

4.3.1.1.    "**Additional Rent**" means Tenant's Share of any Allocated Direct Cost Increase pursuant to this Section 4.3.  Landlord shall be entitled to exercise the same rights and remedies with respect to Tenant's defaults in the payment of Additional Rent as Landlord is entitled to exercise with respect to Tenant's defaults in the payment of Rent.

7

4.3.1.2. "**Allocated Direct Costs**" means the portion of Direct Costs that Landlord allocates to the Building in a manner consistent with the allocation of "Common Expenses" for the Project pursuant to the Declaration of Covenants, Conditions and Restrictions and Reservation of Easements for HavenPark ("**Project CC&Rs**"), which will be or have been recorded against the Project. Notwithstanding the foregoing, Landlord may allocate Direct Costs disproportionately among the buildings in the Project if such Direct Costs are attributable to a specific building due to a disproportionate or exclusive burden imposed by the activities or uses attributable to a specific building or buildings.

4.3.1.3. "**Allocated Direct Cost Increase**" means any increase in Allocated Direct Costs actually incurred and paid by Landlord for each calendar year during the Lease Term over and above the Allocated Direct Costs incurred and paid by Landlord during the Base Year.

4.3.1.4. "**Base Year**" means calendar year 2007.

4.3.1.5. "**Direct Costs**" means the sum of the Insurance Costs, plus Operating Costs, plus Tax Costs, plus Utilities Costs.

4.3.1.6. "**Insurance Costs**" shall mean all costs of fire, extended coverage, boiler, sprinkler, public liability, property damage, rent, earthquake and other insurance maintained by Landlord for the Building, the Project, and any of its contents, all as reasonably determined by Landlord or as may be required by any mortgagees of the Real Property, and as more particularly described in Section 15.2, below.

4.3.1.7. "**Operating Costs**" means the following costs and expenses incurred by Landlord in connection with the maintenance, operation, replacement, ownership and repair of the Building, the Project and the Real Property: salaries, wages, payroll taxes, fringe benefits, employment taxes, workers' compensation, uniforms and dry cleaning thereof for all persons who perform duties connected with the operation, maintenance and repair of the Real Property, its equipment, the intrabuilding cabling and wiring and the adjacent walks and landscaped areas, including janitorial, gardening, security, parking, operating engineer, elevator, painting, plumbing, heating, ventilating, air conditioning, carpentry, window washing, hired services, personal property taxes on property used for maintenance and operations, fees, costs, expenses or dues payable pursuant to the terms of any covenants, conditions or restrictions or owners' association, capital expenditures for cost savings (amortized at an annual rate which when added to interest costs is reasonably calculated to equal the amount of Operating Costs to be saved in each calendar year throughout the Lease Term, as determined at the time Landlord elected to proceed with the capital improvement or acquisition of the capital equipment to reduce Operating Costs, which amortization shall be performed in accordance with generally accepted accounting principles); capital expenditures required by government regulations, laws, or ordinances (including, without limitation, interpretations thereof) enacted or first becoming effective after the date of this Lease, including, but not limited to the Americans with Disabilities Act (provided that such capital improvements shall be amortized over their useful lives as determined by generally accepted accounting principles); the cost of all building and cleaning supplies and materials; the cost of all charges for cleaning, maintenance and service contracts and other services with independent contractors and administration fees; and any license, permit and inspection fees. In the event, during any calendar year, the total

8

rentable square feet of floor space in the Real Property is less than ninety-five percent (95%) occupied at all times, Operating Costs shall be adjusted as though ninety-five percent (95%) of the rentable square feet of floor space in the Real Property were occupied at all times, and the increase or decrease in the sums owed hereunder shall be based upon such Operating Costs as so adjusted.

4.3.1.8. "**Tax Costs**" means any and all real estate taxes, assessments, and all other charges assessed, reassessed, or levied upon the Real Property and appurtenances thereto, or upon the rents, issues, profits or income received or derived from the Real Property, which are collected by the United States, the State of California, or any local government authority or agency or any political subdivision thereof. When calculating Tax Costs for the Base Year, special assessments shall only be deemed included to the extent that such special assessments are included in Tax Costs for the applicable subsequent calendar year during the Lease Term. Tax Costs shall not include excess profits taxes, franchise taxes, gift taxes, capital stock taxes, inheritance and succession taxes, estate taxes, and federal and state income taxes to the extent applicable to Landlord's general or net income (as opposed to rents, receipts or income attributable to operations at the Real Property).

4.3.1.9. "**Tenant's Share**" is identified in Section 1.6, and is calculated by dividing the number of rentable square feet of the Premises, as set forth in Section 1.3.1, by the total rentable square feet of floor space in the Building, as set forth in Section 1.3.2. If either the number of rentable square feet of floor space in the Premises and/or the total rentable square feet of floor space in the Building changes, Tenant's Share shall be appropriately adjusted, and, as to the Lease Year in which such change occurs, Tenant's Share for such year shall be determined on the basis of the number of days during such Lease Year that each such Tenant's Share was in effect. If the number of rentable square feet of floor space in the Building is expanded or reduced, then Tenant's Share shall be proportionately adjusted based on the increase or decrease in the number of rentable square feet, and as to the calendar year in which such change occurs, Tenant's Share for such calendar year shall be determined on the basis of the number of days during that particular calendar year that such Tenant's Share was in effect.

4.3.1.10."**Utilities Costs**" means all actual charges for utilities for the Building and the Project incurred by Landlord, including, but not limited to, the costs of water, sewer and electricity, and the costs of heating, ventilation, and air-conditioning ("**HVAC**") and other utilities (but excluding those charges for which tenants directly reimburse Landlord or pay directly to the utility company) as well as related fees, assessments and surcharges. Utilities Costs shall be calculated assuming the Building and the Project are at least 95% occupied. If, during all or any part of any Lease Year or the Base Year, Landlord shall not provide any utilities (the cost of which, if provided by Landlord, would be included in Utilities Costs) to a tenant (including Tenant) who has undertaken to provide same instead of Landlord and Landlord reimburses such tenant for the cost of such utilities, Utilities Costs shall be deemed to be increased by an amount equal to actual cost of such utilities reimbursed by Landlord to such tenant. Utilities Costs shall include any costs of utilities which are allocated to the Real Property under any declaration, restrictive covenant, or other instrument pertaining to the sharing of costs by the Real Property or any portion thereof, including any covenants, conditions or restrictions now or hereafter recorded against or affecting the Real Property. Notwithstanding the foregoing to the contrary, Utilities Costs shall not include any

9

penalties, interest, late charges or other costs of any kind attributable to Landlord's delinquent payment of any Utilities Costs.

4.3.2. **Payment of Additional Rent.** In the first calendar year of the Project, Landlord shall give Tenant an estimated annual expense statement, and in each calendar year thereafter, the Actual Statement for the preceding calendar year ("**Estimate Statement**") which shall set forth Landlord's reasonable estimate ("**Estimate**") of the total amount of Allocated Direct Costs and the estimated Allocated Direct Cost Increase for the upcoming calendar year (the "**Estimated Increase**"). Tenant shall pay to Landlord, without notice, demand, setoff or deduction, except as otherwise expressly provided in this Lease, one-twelfth (1/12th) of Tenant's Share of the total Estimated Increase along with the monthly installment of Base Rent due and payable in accordance with Section 4.1 above. The failure of Landlord to timely furnish the Estimate Statement for any calendar year shall not preclude Landlord from subsequently enforcing its rights to collect any Estimated Increase under this Section 4.3, once such Estimated Increase has been determined by Landlord. If the Estimate Statement shows that an Estimated Increase is calculated for the then-current calendar year, Tenant shall pay, with its next installment of monthly Rent due, one-twelfth ($1/12^{th}$) of Tenant's Share of the Estimated Increase for the then-current calendar year. If Landlord is unable to provide a new Estimate Statement prior to the end of the calendar year, Tenant shall continue to pay one-twelfth (1/12th) of Tenant's Share of the total Estimated Increase based on the Estimate Statement for the previous calendar year delivered to Tenant, and Tenant shall credit such amounts paid against the Estimated Increase for the new calendar year after Tenant receives the Estimate Statement and the Estimated Increase is determined. If this Lease terminates on any date other than the last day of a calendar year, any additional Allocated Direct Cost Increase payable hereunder by Tenant during the calendar year in which this Lease terminates shall be prorated on an annual basis in proportion to the number of days which have elapsed from the commencement of said calendar year to and including said date on which this Lease terminates.

4.3.3. **Actual Statement.** Within sixty (60) days of the end of each calendar year during the Lease Term, Landlord shall deliver to Tenant a statement ("**Actual Statement**") setting forth the Allocated Direct Costs actually incurred or accrued for such preceding calendar year and the Allocated Direct Cost Increase. Upon receipt of the Actual Statement for each calendar year during the Lease Term, if the Estimated Increase paid by Tenant are less than the actual Allocated Direct Cost Increase as specified on the Actual Statement, Tenant shall pay, with its next installment of monthly Rent due, the an amount equal to Tenant's Share of the Allocated Direct Cost Increase for the preceding calendar year, less any Estimated Increase, if any, paid during such calendar year ("**Underpayment**"). If, however, the Statement indicates that the Estimated Increase for the preceding calendar year are greater than the Allocated Direct Cost Increase for such calendar year as indicated on the Actual Statement (an "**Overpayment**"), such Overpayment shall be credited against the next installments of Estimated Increase payable by Tenant. The failure of Landlord to timely furnish the Actual Statement for any calendar year shall not prejudice Landlord from enforcing its rights under this Section 4.3, once such Actual Statement has been delivered to Tenant. After the expiration or earlier termination of the Lease Term and Tenant's vacation of the Premises, (i) if an Underpayment is determined to exist for the calendar year in which this Lease expires or terminates, Tenant shall pay to Landlord, within thirty (30) days after Landlord's demand for payment thereof, such Underpayment, or (ii) if an Overpayment is determined to exist for the calendar year in which this Lease expires or terminates, Landlord shall pay to Tenant, within thirty (30) days after such final determination by Landlord, such Overpayment. The provisions of this Section 4.3.4 shall survive the expiration or earlier termination of this Lease.

10

5.    **REPRESENTATIONS AND WARRANTIES.**

5.1.    **Landlord's Representations and Warranties.** Landlord hereby represents and warrants to Tenant that Landlord has had dealings only with Landlord's Broker, and that Landlord knows of no other person or entity claiming to be entitled to a commission, finder's fee, or other like payment in connection with this Lease, other than Landlord's Broker and Tenant's Broker.

5.2.    **Tenant's Representations and Warranties.** Tenant hereby represents and warrants to Landlord that Tenant (i) has full authority and has obtained all internal consents and authorizations necessary to validly enter into the Lease, to the lease the Premises from Landlord, and to perform all of Tenant's obligations, covenants, and duties under the Lease, and (ii) has had dealings only with Tenant's Broker, and that Tenant knows of no other person or entity claiming to be entitled to a commission, finder's fee, or other like payment in connection with this Lease, other than Landlord's Broker and Tenant's Broker.

6.    **INTENTIONALLY OMITTED.**

7.    **HOLDING OVER.**

Nothing contained in this Section 7 shall be construed as consent by Landlord to any holding over of the Premises by Tenant, and Landlord expressly reserves the right to require Tenant to surrender possession of the Premises to Landlord as provided in this Lease upon the expiration or earlier termination of the Lease Term.    If Tenant, without Landlord's written consent, hold over after the expiration or termination of this Lease, Tenant shall become a tenant at sufferance upon each and all of the terms herein provided as may be applicable to such a tenancy and any such holding over shall not constitute an extension of this Lease. During such holding over, Tenant shall pay in advance, monthly, Rent at a rate equal to one hundred twenty five percent (125%) of the rate in effect for the last month of the Lease Term of this Lease, in addition to, and not in lieu of, all other payments required to be made by Tenant hereunder; provided that if Landlord informs Tenant in writing at least thirty (30) days prior to the Expiration Date that Landlord has entered into a fully executed lease or letter of intent with a third party for all or a portion of the Premises, then after the first month of any such holdover, such holdover rate shall increase to one hundred seventy five percent (175%) of the rate in effect for the last month of the Lease Term.

8.    **USE.**

Tenant shall use and occupy the Premises only for the Permitted Use set forth in Section 1.10 above, and Tenant shall not use or occupy the Premises or permit the same to be used or occupied for any other purpose without the prior written consent of Landlord, which consent may be given or withheld in Landlord's reasonable discretion. Tenant shall use the Premises in such a manner so as not to interfere with or infringe upon the rights of other tenants or occupants of the Real Property.    Subject to the terms of this Lease, Tenant shall have access to the Premises, the Common Areas, and the parking facility serving the Real Property twenty-four (24) hours per day seven (7) days per week.    Tenant shall, at its sole cost and expense, promptly comply with all laws, statutes, ordinances, governmental regulations or requirements ("**Laws**") now in force or which may hereafter be in force relating to or affecting (i) the condition, use or occupancy of the Premises (excluding structural changes to the Building not related to Tenant's particular use of the Premises), and (ii) improvements installed or constructed in the Premises by or for the benefit of Tenant.    Tenant shall comply with all recorded covenants,

11

conditions and restrictions now or hereafter affecting the Real Property, including but not limited to, the Project CC&Rs. In connection with Tenant's compliance obligations under any such Laws and/or such recorded covenants, conditions and restrictions, Tenant agrees to, upon request: (A) develop an active recycling program to reduce solid waste, and participate in any such recycling program developed by Landlord or required under such covenants, conditions and restrictions, and/or developed by any local municipalities or governmental agencies having jurisdiction over the Real Property; (B) use commercially reasonable efforts to cooperate in and comply with programs which may be undertaken by Landlord independently, or in cooperation with local municipalities or governmental agencies or other property owners in the vicinity of the Project, to reduce peak levels of commuter traffic; such programs may include, but shall not be limited to, carpools, vanpools and other ride sharing programs, public and private transit, and flexible work hours; (C) to the extent any such traffic mitigation programs are deemed mandatory by such local municipalities or government agencies, to comply with such programs (including any programs implemented by Landlord or required under any covenants, conditions and restrictions recorded against the Real Property; and (D) in connection with Tenant's obligations under clauses (B) and (C) hereinabove, Tenant agrees to appoint one of its employees to act as a liaison to the transportation coordinator in the Project, if any. Tenant shall not do or permit to be done anything which would invalidate or increase the cost of any fire and extended coverage insurance policy covering the Real Property, and Tenant shall comply with all rules, orders, regulations and requirements of any organization which sets out standards, requirements, or recommendations commonly referred to by major fire insurance underwriters. Tenant shall, within thirty (30) days after demand, reimburse Landlord for any additional premium charges for any such insurance policy assessed or increased by reason of Tenant's failure to comply with the provisions of this Section 8.

9.    **MAINTENANCE AND REPAIRS.**

9.1.    **Landlord's Obligations.** Landlord shall maintain, repair, and replace any plant, machinery, transformers, duct work, cable, wires, and other equipment, facilities, and systems designed to supply heat, ventilation, air conditioning, humidity, or any other services or utilities, or comprising or serving as any component or portion of the electrical, gas, steam, plumbing, sprinkler, communications, alarm, security, or fire/life safety systems or equipment, or any other mechanical, electrical, electronic, computer or other systems or equipment which serve the Building and the Project in whole or in part ("**Building Systems**"), and the structural portions of the base, shell, and core of the Building, including the foundation, floor/ceiling slabs, roof, curtain wall, exterior glass, columns, beams, shafts, stairs, stairwells, elevator cabs, and all portions of the Common Areas. Tenant waives all rights to make repairs at the expense of Landlord, or to deduct the cost thereof from Rent.

9.2.    **Tenant's Obligations.** Tenant shall, at its sole cost and expense, (i) keep all portions of the Premises, except for the Building Systems outside the Premises, in good condition and repair, and (ii) promptly repair any and all damage or injury to the Premises or any other portions of the Real Property caused by the negligence or intentional act or omission of Tenant, its employees, agents or visitors, guests, invitees or licensees; provided, however, that Landlord shall have the right, but not the obligation, to select a contractor to oversee such repairs by Tenant. If Tenant does not commence the repair of any damage caused by Tenant within thirty (30) days of Tenant's receipt of Landlord's written demand, Landlord shall have the right to undertake such repairs and charge Tenant for the cost thereof, which cost shall be paid by Tenant within thirty (30) business days from invoice from Landlord.

10.    **ALTERATIONS; TENANT IMPROVEMENTS.**

12

10.1.  **Landlord's Consent to Alterations.**  Tenant may not make any improvements, alterations, additions or changes to the Premises (collectively, the "**Alterations**") without first obtaining the prior written consent of Landlord to such Alterations, which consent shall be requested by Tenant not less than fifteen (15) business days prior to the commencement thereof.  Landlord shall not unreasonably withhold or delay its consent for any Alterations, except that Landlord may withhold its consent, in its sole and absolute discretion, with respect to such Alterations which (i) affect any area, or which can be seen from any area, outside the Premises or the Building, and/or (ii) affect the Building Systems or structural components of the Building.  Notwithstanding anything to the contrary contained in this Section 10.1, Tenant may make non-structural interior alterations, additions or improvements to the interior of the Premises (collectively, the "**Permitted Alterations**") without Landlord's consent, provided that: (i) Tenant delivers to Landlord written notice of such Permitted Alterations at least ten (10) business days prior to the commencement thereof; (ii) the aggregate cost of all such Permitted Alterations during any twelve (12) consecutive month period does not exceed Twenty-Five Thousand Dollars ($25,000.00); (iii) such Permitted Alterations shall be performed by or on behalf of Tenant in compliance with the other provisions of this Section 10; (iv) such Permitted Alterations do not require the issuance of a building permit or other governmental approval; (v) such Permitted Alterations do not affect any Building Systems or the ground floor lobby areas of the Building, and cannot be seen from outside the Premises; and (vi) such Permitted Alterations shall be performed by qualified contractors and subcontractors.

10.2.  **Manner of Construction.**  Landlord may impose, as a condition of its consent to all Alterations or repairs of the Premises, such commercially reasonable requirements as Landlord may deem desirable (and which are not inconsistent with the rights of Tenant under this Lease), including, but not limited to, the requirement that Tenant utilize for such purposes only contractors, materials, mechanics, and materialmen reasonably approved by Landlord, except that Landlord may designate the contractors and subcontractors to perform all work affecting the Building Systems or structural components of the Building.  Tenant shall construct such Alterations and perform such repairs in conformance with any and all applicable rules and regulations of any federal, state, county or municipal code or ordinance and pursuant to a valid building permit, issued by the applicable governmental agency for the city or county in which the Premises are located, and otherwise in compliance with Landlord's reasonable, non-discriminatory construction rules and regulations.    Landlord's approval of the plans, specifications and working drawings for the Alterations shall create no responsibility or liability on the part of Landlord for their completeness, design sufficiency, or compliance with all laws, rules and regulations of governmental agencies or authorities.  All work with respect to any Alterations must be done in a good and workmanlike manner and diligently prosecuted to completion so that the Premises shall at all times be a complete unit except during the period of work.  In performing the work of any such Alterations, Tenant shall have the work performed in such manner so as not to obstruct access to the Building or Real Property or the Common Areas for any other tenant of the Real Property, and so as not to obstruct the business of Landlord or other tenants in the Real Property, or interfere with the labor force working on the Real Property.

10.3.  **Bond; Notice of Completion.**  Landlord may, in its discretion, require Tenant to obtain a lien and completion bond, or, at Tenant's option, some alternate form of security reasonably satisfactory to Landlord, in an amount sufficient to ensure the lien-free completion of such Alterations and naming Landlord as a co-obligee.  Upon completion of any Alterations, Tenant agrees to cause a Notice of Completion to be recorded in the Office of the County Recorder for the County in which the Premises are located in accordance with Section 3093 of

13

the California Civil Code or any successor statute, and Tenant shall deliver to Landlord a reproducible copy of the "as built" drawings of the Alterations.

10.4.  **Payment for Improvements.**  If payment is made directly to contractors, Tenant shall comply with Landlord's reasonable requirements for final lien releases and waivers in connection with Tenant's payment for work to contractors.  If Tenant orders any work directly from Landlord, Tenant shall pay to Landlord a percentage of the cost of such work (such percentage to be established on a uniform basis for the Real Property) sufficient to compensate Landlord for all overhead, general conditions, fees and other costs and expenses arising from Landlord's involvement with such work.  If Tenant does not order any work directly from Landlord, Tenant shall promptly reimburse Landlord for Landlord's reasonable, actual, out-of-pocket costs and expenses actually incurred in connection with Landlord's review of such work.

10.5.  **Landlord's Property.**  All Alterations, improvements and/or fixtures (excluding Tenant's trade fixtures, moveable furniture and personal property) which may be installed or placed in or about the Premises, from time to time, shall be at the sole cost of Tenant and shall become the property of Landlord if not removed by Tenant prior to the expiration of the Lease Term or earlier termination of this Lease; provided, however, that: (i) Tenant may not remove any Tenant Improvements (as defined in the Work Letter attached hereto as **Exhibit "C"**) or Alterations paid for by Landlord with Landlord's own funds or out of any tenant improvement allowances provided by Landlord (except any such removal made in connection with Alterations approved by Landlord); and (ii) Landlord may, by written notice delivered to Tenant concurrently with Landlord's approval of the final working drawings for any Alterations (or for the initial tenant improvements constructed for the Premises), identify those Alterations (or initial tenant improvements for Tenant's initial occupancy, as the case may be) which Landlord will require Tenant to remove at the expiration or earlier termination of this Lease.  If Landlord requires Tenant to remove any such Alterations (or any such initial tenant improvements) which are constructed for the Premises, Tenant, at its sole cost and expense, shall remove the identified Alterations and improvements on or before the expiration or earlier termination of this Lease and repair any damage to the Premises caused by such removal.  If Tenant fails to complete such removal and/or to repair any damage caused by the removal of any Alterations or improvements, Landlord may do so and may charge the cost thereof to Tenant. Notwithstanding the foregoing or anything to the contrary contained herein, Tenant shall not be required to remove its initial Tenant Improvements (including cabling) upon the expiration or earlier termination of this Lease.

11.    **LIENS.**

Tenant shall keep the Premises and the Real Property free from any mechanics' liens, vendors' liens, or any other liens arising out of any work performed, materials furnished, or obligations incurred by Tenant, and Tenant agrees to defend, indemnify, and hold Landlord harmless from and against any such liens, claims, or actions thereon.  Before commencing any Alterations, additions, or improvements to the Premises ("**Work**"), Tenant shall give Landlord at least ten (10) business days written notice of the proposed commencement of such Work so that Landlord may post appropriate notices of non-responsibility.  If any claim or lien arising out of any such Work performed, materials furnished, or obligations incurred by Tenant is filed of record against the Premises or the Real Property, and such claim or lien is not removed or discharged within ten (10) days of Tenant's receipt of notice of the filing, Landlord may, in its sole discretion (i) pay and discharge said lien regardless of whether such lien is lawful or correct, or (ii) demand that Tenant promptly deposit with Landlord an amount equal to one hundred fifty percent (150%) of the amount of such claim, which sum may be retained by

14

Landlord until such claim shall have been removed of record or until a final judgment has been rendered on such claim, at which time Landlord shall have the right to apply such deposit in discharge of the judgment and any costs, including attorneys' fees and costs incurred by Landlord with respect to such claim. Landlord shall promptly return the balance of any such deposit to Tenant.

12.   **BUILDING SERVICES.**

12.1.   **Basic Services.** Landlord agrees to furnish to the Premises the following basic services: (i) air conditioning and heat all in such reasonable quantities as in the judgment of Landlord is reasonably necessary for the comfortable occupancy of the Premises, from 8:00 a.m. to 5:00 p.m. Mondays through Fridays and 9:00 a.m. to 12:00 p.m. on Saturdays, excepting local and national holidays, (ii) adequate electric current for normal lighting and normal office machines, elevator service, and water on the same floor as the Premises for lavatory and drinking purposes in such reasonable quantities as in the judgment of Landlord is reasonably necessary for the Permitted Use and in compliance with applicable Laws, and (iii) janitorial and maintenance services five (5) days per week, excepting local and national holidays. Tenant shall comply with all rules and regulations which Landlord may establish for the proper functioning and protection of the Common Area HVAC, elevator, electrical, intrabuilding cabling and wiring, and plumbing systems. Except as expressly provided for herein, Landlord shall not be liable for, and there shall be no Rent abatement as a result of, any stoppage, reduction or interruption of any such services caused by governmental rules, regulations or ordinances, riot, strike, labor disputes, breakdowns, accidents, necessary repairs or other cause. Except as specifically provided in this Section 12, Tenant agrees to pay for all utilities and other services utilized by Tenant and any additional building services furnished to Tenant which are not uniformly furnished to all tenants of the Building, at the prevailing rate charged by Landlord to other tenants of the Building for such utilities or services on a non-discriminatory basis.

12.2.   **Excess Usage.** Tenant will not, without the prior written consent of Landlord, use any apparatus or device in the Premises which will in any way increase the amount of electricity or water usually furnished or supplied to the Premises for the Permitted Use; nor connect any apparatus, machine or device with water pipes or electric current (except through existing electrical outlets in the Premises), for the purpose of using electric current or water.

12.3.   **Additional Electrical Service.** If Tenant shall require electric current in excess of that which Landlord is obligated to furnish under Section 12.1 above, Tenant shall first obtain the written consent of Landlord, which Landlord may refuse in its sole and absolute discretion. Additionally, Landlord may cause an electric current meter or submeter to be installed in or about the Premises to measure the amount of any such excess electric current consumed by Tenant in the Premises. The cost of any such meter and of installation, maintenance and repair thereof shall be paid for by Tenant and Tenant agrees to pay to Landlord, promptly upon demand therefor by Landlord, for all such excess electric current consumed by any such use as shown by said meter at the rates charged for such service by the city in which the Premises are is located, or the local public utility, as the case may be, furnishing the same, plus any additional expense incurred by Landlord in keeping account of the electric current so consumed.

12.4.   **HVAC Balance.** If any lights, machines or equipment (including but not limited to computers and computer systems and appurtenances) are used by Tenant in the Premises which materially affect the temperature otherwise maintained by the air conditioning system, or generate substantially more heat in the Premises than would be generated by the building

15

standard lights and usual office equipment, Landlord shall have the right to install any machinery and equipment which Landlord reasonably deems necessary to restore temperature balance, including but not limited to modifications to the standard air conditioning equipment, and the cost thereof, including the cost of installation and any additional cost of operation and maintenance occasioned thereby, shall be paid by Tenant to Landlord upon demand by Landlord. Notwithstanding the foregoing, Landlord acknowledges that Tenant will be using and maintaining computer and electronic equipment in certain offices within the Premises which must remain on at all times and will require twenty-four (24) hour cooling and ventilation, and Landlord agrees to reasonably cooperate with Tenant to provide sufficient after-hours air conditioning to such office suites to ensure the continued operation of such equipment (subject to any standard charges of Landlord for such after hours services).

12.5. **Telecommunications.** Upon request from Tenant from time to time, Landlord will provide Tenant with a listing of telecommunications and media service providers serving the Real Property, and Tenant shall have the right to contract directly with the providers of its choice. If Tenant wishes to contract with or obtain service from any provider which does not currently serve the Real Property, or wishes to obtain from an existing carrier services which will require the installation of additional equipment, such provider must, prior to providing service, enter into a written agreement with Landlord setting forth the terms and conditions of the access to be granted to such provider. In considering the installation of any new or additional telecommunications cabling or equipment at the Real Property, Landlord will consider all relevant factors in a reasonable and non-discriminatory manner, including, without limitation, the existing availability of services at the Real Property, the impact of the proposed installations upon the Real Property, and its operations and the available space and capacity for the proposed installations. Landlord may also consider whether the proposed service may result in interference with or interruption of other services or the business operations of other tenants or occupants of the Real Property. In no event shall Landlord be obligated to incur any costs or liabilities in connection with the installation or delivery of telecommunication services or facilities at the Real Property. All such installations shall be subject to Landlord's prior approval and shall be performed in accordance with the terms of Section 10. If Landlord approves the proposed installations in accordance with the foregoing, Landlord will deliver its standard form agreement upon request and will use commercially reasonable efforts to promptly enter into an agreement on reasonable and non-discriminatory terms with a qualified, licensed and reputable carrier confirming the terms of installation and operation of telecommunications equipment consistent with the foregoing.

12.6. **After-Hours Use.** If Tenant requires HVAC during times other than the times provided in Section 12.1 above, Tenant shall give Landlord such advance notice as Landlord shall reasonably require and shall pay $50.00 per hour with a 2 hour minimum.

12.7. **Reasonable Charges.** Landlord may impose a reasonable charge for any utilities or services (other than electric current and heating, ventilation and/or air conditioning which shall be governed by Sections 12.3 and 12.6 above) utilized by Tenant in excess of the amount or type that Landlord reasonably determines is typical for the Permitted Use.

13.    RIGHTS OF LANDLORD.

13.1. **Right of Entry.** Landlord and its agents shall have the right to enter the Premises at all reasonable times for the purpose of cleaning the Premises and at all other reasonable times upon at least twenty-four (24) hours prior notice, or less in case of an emergency, for the following purposes: (i) examining or inspecting the Premises, (ii) serving or

16

posting and keeping posted thereon notices as provided by law, or which Landlord deems necessary for the protection of Landlord or the Real Property, (iii) showing the Premises to prospective tenants during the last nine (9) months of the Lease Term, (iv) showing the Premises to lenders or purchasers of the Real Property, (v) and for making such alterations, repairs, improvements, or additions to the Premises or the Real Property as Landlord may deem necessary or desirable. If Tenant is not present to allow Landlord entry upon the Premises after Tenant's receipt of adequate notice from Landlord requesting such entry as permitted hereunder, Landlord may enter by means of a master key, or may forcibly enter in the case of an emergency, in each event without liability to Tenant and without affecting this Lease.

13.2. **Maintenance Work.** Landlord reserves the right from time to time, but subject to payment by and/or reimbursement from Tenant as otherwise provided herein: (i) to install, use, maintain, repair, replace, and relocate pipes, ducts, conduits, wires, cabling, appurtenant fixtures, equipment spaces, and mechanical systems, wherever located in the Premises or on the Real Property, (ii) to alter, close or relocate any facility in the Premises or the Common Areas or otherwise conduct any of the above activities for the purpose of complying with a general plan for fire/life safety for the Real Property or otherwise, and (iii) to comply with any federal, state or local law, rule or order; provided, however, that in no event shall Tenant be permitted to withhold or reduce Rent or other charges due hereunder, or make any claim for constructive eviction, or otherwise make any claim against Landlord for interruption or interference with Tenant's business and/or operations.

13.3. **Rooftop.** If Tenant desires to use the rooftop of the Building for any purpose, including the installation of communication equipment to be used from the Premises, such rights will be granted in Landlord's reasonable discretion and Tenant must negotiate the terms of any rooftop access with Landlord or the rooftop management company or lessee holding rights to the rooftop from time to time. Any rooftop access granted to Tenant will be at prevailing rates and will be governed by the terms of a separate written agreement or an amendment to this Lease.

14.  INDEMNIFICATION; EXEMPTION OF LANDLORD FROM LIABILITY.

14.1. **Waiver and Indemnification by Tenant.** Tenant hereby assumes all risk of damage to property and injury to persons, in, on, or about the Premises from any cause whatsoever and agrees that Landlord, and its members, partners and subpartners, and their respective officers, agents, property managers, employees, and independent contractors (collectively, "**Landlord Parties**") shall not be liable for, and are hereby released from any responsibility for, any damage to property or injury to persons or resulting from the loss of use thereof, which damage or injury is sustained by Tenant or by other persons claiming through Tenant, except when and to the extent that any such loss, cost, and damage, expense, and/or liability arises out of or relates to the gross negligence or willful misconduct of the Landlord or any more of the Landlord Parties. In addition, Tenant shall, and hereby does, indemnify, defend and hold harmless the Landlord Parties from and against all loss, cost, damage, expense, and/or liability of any and every kind and nature (including but not limited to attorney fees and costs) incurred, suffered by, or claimed against the Landlord Parties or any of them, by reason of, arising out of or relating to the following (in each case, however, except when and to the extent that any such loss, cost, damage, expense, and/or liability arises out of or relates to the gross negligence or willful misconduct of the Landlord or any one or more of the Landlord Parties):

17

14.1.1. Tenant's use of the Premises or any portion of the Real Property, or from the conduct of its business or from any activity, work or thing which may be permitted or suffered by Tenant in or about the Premises or the Real Property;

14.1.2. Any breach or default in the performance of any obligation on Tenant's part to be performed under this Lease; and

14.1.3. Any negligence or willful misconduct of Tenant or any of its agents, contractors, employees or invitees, patrons, customers or members in or about the Real Property.

14.2.  **Duty to Defend; Attorneys Fees and Expenses.**  Upon written request by any party entitled to indemnification and defense pursuant to this Section 14 ("**Indemnified Party**"), the party required to indemnify and defend the Indemnified Party pursuant to this Section 14 ("**Indemnifying Party**") shall defend same (if requested by any of the Indemnified Parties, in the name of the Indemnified Parties) by attorneys and other professionals approved by the Indemnified Parties. Notwithstanding the foregoing, any Indemnified Parties may, in their sole and absolute discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of any claim or proceeding. Upon demand, the Indemnified Party shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse the Indemnified Parties for the reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories, and other professionals in connection therewith.

14.3.  **Exemption of Landlord from Liability.**  Except as expressly provided in this Lease, Landlord and the Landlord Parties shall not be liable for injury to Tenant's business, or loss of income therefrom, however occurring (including, without limitation, from any failure or interruption of services or utilities), for damage that may be sustained by the person, goods, wares, merchandise or property of Tenant or any of the Tenant Parties directly or indirectly caused by or resulting from any cause whatsoever, including, but not limited to, fire, steam, electricity, gas, water, or rain which may leak or flow from or into any part of the Premises, or from the breakage, leakage, obstruction or other defects of the pipes, sprinklers, wires, appliances, plumbing, air conditioning, light fixtures, or mechanical or electrical systems, or from intrabuilding cabling or wiring, whether such damage or injury results from conditions arising upon the Premises or upon other portions of the Real Property or from other sources or places and regardless of whether the cause of such damage or injury or the means of repairing the same is inaccessible to Tenant. Landlord and the Landlord Parties shall not be liable to Tenant for any damages arising from any willful or negligent action or inaction of any other tenant of the Real Property.

14.4.  **Security.**  Tenant acknowledges that Landlord's election whether or not to provide any type of mechanical surveillance or security personnel whatsoever in the Building is solely within Landlord's discretion. Except to the extent resulting from Landlord's negligence, Landlord and the Landlord Parties shall have no liability in connection with the provision, or lack, of such services, and Tenant hereby agrees to hold Landlord and the Landlord Parties harmless with regard to any such potential claim. Landlord and the Landlord Parties shall not be liable for losses due to theft, vandalism, or like causes. Tenant shall defend, indemnify, and hold Landlord and the Landlord Parties harmless from any such claims made by any employee, licensee, invitee, contractor, agent or other person whose presence in, on or about the Premises or the Real Property is attendant to the business of Tenant.

18

14.5. **Survival**. The provisions of this Section 14 shall survive the expiration or sooner termination of this Lease.

15. **INSURANCE.**

15.1. **Tenant's Insurance**. From and after the date which is the earlier of (i) the date Tenant enters any portion of the Premises to commence occupancy thereof or perform any work under this Lease or install any of Tenant's personal property or equipment therein, or (ii) the Commencement Date ("**Insurance Start Date**"), and continuing thereafter throughout the Lease Term, Tenant shall maintain the following coverages in the following amounts:

15.1.1. Commercial General Liability Insurance covering the insured against claims of bodily injury, personal injury and property damage arising out of Tenant's operations, assumed liabilities or use of the Premises, including a Broad Form Commercial General Liability endorsement covering the insuring provisions of this Lease and the performance by Tenant of the indemnity agreements set forth in Section 14.1 of this Lease, for limits of liability not less than:

| Bodily Injury and Property Damage Liability | $2,000,000.00 each occurrence $3,000,000.00 annual aggregate |
| --- | --- |
| Personal Injury Liability | $2,000,000.00 each occurrence $2,000,000.00 annual aggregate |

15.1.2. Physical Damage Insurance covering (i) all office furniture, trade fixtures, office equipment, merchandise and all other items of Tenant's property on the Premises installed by, for, or at the expense of Tenant, (ii) the Tenant Improvements, including any Tenant Improvements which Landlord permits to be installed above the ceiling of the Premises or below the floor of the Premises, and (iii) all other improvements, Alterations and additions to the Premises, including any improvements, Alterations or additions installed at Tenant's request above the ceiling of the Premises or below the floor of the Premises. Such insurance shall be written on a "physical loss or damage" basis under a "special form" policy, for the full replacement cost value new without deduction for depreciation of the covered items and in amounts that meet any co-insurance clauses of the policies of insurance and shall include a vandalism and malicious mischief endorsement, and sprinkler leakage coverage.

15.1.3. Worker's compensation insurance as required by law.

15.1.4. Comprehensive automobile liability insurance having a combined single limit of not less than One Million Dollars ($1,000,000) per occurrence and insuring Tenant against liability for claims arising out of ownership, maintenance, or use of any owned, hired or non-owned automobiles.

15.1.5. Business interruption, loss-of-income and extra expense insurance in such amounts as will reimburse Tenant for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent tenants or attributable to prevention of access to the Premises or to the Building as a result of such perils.

15.1.6. Such other reasonable types of insurance coverage and in such reasonable amounts covering the Premises and Tenant's operations therein, as may be

19

reasonably requested by Landlord; provided that such increased coverage shall not be in excess of that required by landlords of tenants leasing comparable-sized space in Comparable Buildings.

15.2. **Landlord's Insurance**. Except as may otherwise be excluded from the definition of Direct Costs, Landlord may, as a cost to be included in Direct Costs, procure and maintain at all times during the Lease Term of this Lease, a policy or policies of insurance covering loss or damage to the Real Property and all improvements located thereon, except for any tenant improvements not paid for by Landlord, in the amount of the full replacement costs without deduction for depreciation thereof, providing protection against all perils included within the classification of fire and extended coverage, vandalism coverage and malicious mischief, sprinkler leakage, water damage, and special extended coverage on the building. Additionally, Landlord may, but shall not be obligated to, carry:  (i) Bodily Injury and Property Damage Liability Insurance and/or Excess Liability Coverage Insurance; and (ii) Earthquake and/or Flood Damage Insurance; and (iii) Rental Income Insurance; and (iv) any other forms of insurance Landlord may deem appropriate or that any lender may require.  The costs of all insurance carried by Landlord shall be included in Operating Costs.

15.3. **Waiver of Subrogation**. Landlord and Tenant agree to have their respective insurance companies issuing property damage insurance waive any rights of subrogation that such companies may have against Landlord or Tenant, as the case may be. Anything in this Lease to the contrary notwithstanding (including the provisions of Section 15.1 above), Landlord and Tenant hereby waive and release each other of and from any and all rights of recovery, claims, actions or causes of actions against each other, their respective agents, officers and employees, for any loss or damage that may occur to the Premises, Building or Real Property, or personal property within the Building, regardless of cause or origin, including the negligence of Landlord and Tenant and their respective agents, officers and employees, but only to the extent the releasing party's loss or damage is covered under casualty insurance policies in effect at the time of such loss or damage or would have been covered by the casualty insurance required to be carried under Sections 15.1 and 15.2 above had the releasing party complied with its applicable insurance obligations thereunder. Each party agrees to give immediately to its respective insurance company which has issued policies of insurance covering any risk of direct physical loss, written notice of the terms of the mutual waivers contained in this Section 15.3, and to have such insurance policies properly endorsed, if necessary, to prevent the invalidation of said insurance coverage by reason of said waivers.

15.4. **Form of Policies**. The minimum limits of policies of insurance required to be carried by Landlord and Tenant under this Lease shall in no event limit the liability of Tenant or Landlord under this Lease.  Tenant's insurance shall:  (i) name Landlord, and any property manager and mortgagee of Landlord, as additional insureds, as their respective interests may appear; (ii) specifically cover the liability assumed by Tenant under this Lease to the extent insurable by a commercially reasonably available Commercial General Liability Policy, including, but not limited to, Tenant's obligations under Section 14.1 of this Lease; (iii) be issued by an insurance company having a rating of not less than A VIII in Best's Insurance Guide and approved to do business in the State of California; (iv) be primary insurance as to all claims thereunder and provide that any insurance carried by Landlord is excess and is non-contributing with any insurance requirement of Tenant; (v) provide that said insurance shall not be canceled or coverage changed unless twenty (20) days' prior written notice shall have been given to Landlord and any mortgagee or ground or underlying lessor of Landlord; (vi) contain a cross-liability endorsement or severability of interest clause reasonably acceptable to Landlord; and (vii) include commercially reasonable deductibles (which shall in no event exceed $10,000.00

20

for the insurance required in Sections 15.1 and 15.2 above). Tenant shall deliver certificates of such policies to Landlord on or before the Insurance Start Date and at least twenty (20) days before the expiration dates thereof. In the event Tenant shall fail to procure such insurance, or to deliver such policies or certificate within such time periods, Landlord may, at its option after written notice to Tenant, procure such policies for the account of Tenant, and the cost thereof shall be paid to Landlord as Additional Rent within ten (10) days after delivery to Tenant of bills therefor. At Tenant's option, Tenant may provide the coverages required under this Section 15 through blanket policies of insurance covering Tenant's other properties so long as the coverage required under this Lease with respect to the Premises and Real Property is not reduced or impaired as a result thereof (including as a result of any claims made or aggregate limits with respect to such other properties).

15.5. **Compliance with Law.** Tenant shall not carry any stock of goods or do anything in or about the Premises that will in any way tend to increase the insurance rates for the Real Property. Tenant agrees to pay Landlord forthwith upon demand the amount of any increase in premiums for insurance that may be carried during the Lease Term of this Lease, or the amount of insurance to be carried by Landlord on the Real Property resulting from the foregoing, or from Tenant doing any act in or about the Premises that will increase the insurance rates, whether or not Landlord shall have consented to such act on the part of Tenant. If Tenant installs upon the Premises any electrical equipment which causes an overload of electrical lines of the Premises, Tenant shall at its own cost and expense, in accordance with all other Lease provisions, make whatever changes are necessary to comply with requirements of the insurance underwriters and any governmental authority having jurisdiction thereover, but nothing herein contained shall be deemed to constitute Landlord's consent to such overloading. Tenant shall, at its own expense, comply with all insurance requirements applicable to the Premises including without limitation, the installation of fire extinguishers or an automatic dry chemical extinguishing system.

## 16.   ASSIGNMENT AND SUBLETTING.

16.1. **Transfers.** Tenant shall not, without the prior written consent of Landlord, assign, mortgage, pledge, hypothecate, encumber, or permit any lien to attach to, or otherwise transfer, this Lease or any interest hereunder, permit any assignment or other such foregoing transfer of this Lease or any interest hereunder by operation of law, sublet the Premises or any part thereof, or permit the use of the Premises by any persons other than Tenant and its employees or Affiliates (all of the foregoing are hereinafter sometimes referred to collectively as "Transfers" and any person to whom any Transfer is made or sought to be made is hereinafter sometimes referred to as a "Transferee"). If Tenant wishes to obtain Landlord's consent to any Transfer, Tenant shall notify Landlord in writing ("Transfer Notice") of the following: (i) the proposed effective date of the Transfer, which shall not be less than thirty (30) days nor more than one hundred eighty (180) after the date of delivery of the Transfer Notice, (ii) a description of the portion of the Premises to be transferred ("Subject Space"), (iii) all of the terms of the proposed Transfer and the consideration therefor, including a calculation of the "Transfer Premium," as that term is defined in Section 16.4 below, in connection with such Transfer, the name and address of the proposed Transferee, and a copy of all existing and/or proposed documentation pertaining to the proposed Transfer, including all existing operative documents to be executed to evidence such Transfer or the agreements incidental or related to such Transfer, and (iv) current financial statements of the proposed Transferee certified by an officer, partner or owner thereof, and any other information reasonably required by Landlord which will enable Landlord to determine the financial responsibility, character, and reputation of the proposed Transferee, nature of such Transferee's business and proposed use of the Subject Space. Any Transfer made without Landlord's prior written consent shall, at Landlord's option,

21

be null, void and of no effect, and shall, at Landlord's option, constitute a default by Tenant under this Lease. Regardless of whether Landlord grants its consent, Tenant shall pay Landlord's actual, documented and reasonable legal fees incurred by Landlord, within ten (10) days after written request by Landlord.

16.2. **Additional Transfers.** For purposes of this Lease, the term "Transfer" shall also include: (i) if Tenant is a partnership (including a limited liability partnership), the withdrawal or change, voluntary, involuntary or by operation of law, of fifty percent (50%) or more of the partners, or transfer of fifty percent (50%) or more of partnership interests, within a twelve (12)-month period, or the dissolution of the partnership without immediate reconstitution thereof; and (ii) if Tenant is a closely held corporation or limited liability company (i.e., whose stock or membership interests are not publicly held and not traded through an exchange or over the counter), (A) the dissolution, merger, consolidation or other reorganization of Tenant, (B) the sale or other transfer of more than an aggregate of fifty percent (50%) of the voting shares or membership interests of Tenant within a twelve (12)-month period (other than transfer of voting shares or membership interests to immediate family members by reason of gift or death) or (C) the sale, mortgage, hypothecation or pledge of more than an aggregate of fifty percent (50%) of the value of the unencumbered assets of Tenant within a twelve (12) month period. Notwithstanding anything herein to the contrary, Landlord's consent shall not be required for any of the following: (i) an assignment of this Lease or subletting of all or a portion of the Premises to (A) an entity which is controlled by, controls, or is under common control with Tenant (or a valid assignee of this Lease), or (B) a purchaser of all or substantially all of the assets of Tenant, or of an entity which is controlled by, controls or is under common control with Tenant (or a valid assignee of this Lease); (ii) a transfer, by operation of law or otherwise, in connection with the merger, consolidation or other reorganization of Tenant or of an entity which is controlled by, controls, or is under common control with Tenant (or a valid assignee of this Lease); or (iii) the temporary use or occupancy of portions of the Premises by any party in connection with Tenant's usual course of business or with an entity which is controlled by, controls or is under common control with Tenant (or a valid assignee of this Lease).

16.3. **Landlord's Consent.** Landlord shall not unreasonably delay, withhold or condition its consent to any proposed Transfer of the Subject Space to the Transferee on the terms specified in the Transfer Notice. Landlord shall notify Tenant of Landlord's consent or reasonable disapproval of any such Transfer within thirty (30) days after Landlord's receipt of the Transfer Notice and all other information required to be delivered by Tenant to Landlord in connection with such proposed Transfer as set forth in Section 16.1 above. The parties hereby agree that it shall be reasonable for Landlord to withhold its consent to any proposed Transfer if one or more of the following circumstances apply, without limitation as to other reasonable grounds for withholding consent:

16.3.1. The Transferee is of a character or reputation or engaged in a business which is not consistent with the quality of the Building or the Real Property as a first-class multi-tenant office building project;

16.3.2. The Transferee intends to use the Subject Space for purposes which are not permitted under this Lease;

16.3.3. The Transferee is a governmental agency or instrumentality thereof;

16.3.4. The Transfer will result in more than a lawfully authorized number of occupants per floor within the Subject Space;

22

16.3.5. The Transferee is not a party of reasonable financial worth and/or financial stability in light of the responsibilities involved under the Lease on the date consent is requested;

16.3.6. The terms of the proposed Transfer will allow the Transferee to exercise a right of renewal, right of expansion, right of first offer, or other similar right held by Tenant, in violation of the express terms of this Lease;

16.3.7. The rent to be paid by the proposed Transferee is less than ninety-five percent (95%) of the rate at which Landlord is then offering comparable space in the Building;

16.3.8. the Sublet Space lacks appropriate means of ingress and egress and/or will not be in conformity with all applicable building and safety codes; or

16.3.9. Either the proposed Transferee, or any person or entity which directly or indirectly, controls, is controlled by, or is under common control with, the proposed Transferee, (i) occupies space in the Project at the time of the request for consent, or (ii) is negotiating with Landlord to lease space in the Project at such time.

If Landlord consents to any Transfer pursuant to the terms of this Section 16.3 (and does not exercise any recapture rights Landlord may have under Section 16.5 of this Lease), Tenant may, within six (6) months after Landlord's consent, but not later than the expiration of said six (6)-month period, enter into such Transfer of the Premises or portion thereof, upon substantially the same terms and conditions as are set forth in the Transfer Notice furnished by Tenant to Landlord pursuant to Section 16.1 of this Lease, provided that if there are any changes in the terms and conditions from those specified in the Transfer Notice (i) such that Landlord would initially have been entitled to refuse its consent to such Transfer under this Section 16.3, or (ii) which would cause the proposed Transfer to be materially more favorable to the Transferee than the terms set forth in Tenant's original Transfer Notice, Tenant shall again submit the Transfer to Landlord for its approval and other action under this Section 16 (including Landlord's right of recapture under Section 16.5 of this Lease).

16.4. **Transfer Premium.** If Landlord consents to a Transfer, as a condition thereto which the parties hereby agree is reasonable, Tenant shall pay to Landlord fifty percent (50%) of any "Transfer Premium," as that term is defined in this Section 16.4, received by Tenant from such Transferee. "**Transfer Premium**" shall mean all rent, additional rent, parking charges and other consideration received from such Transferee in excess of the Rent, Additional Rent, and other consideration payable by Tenant under this Lease on a per rentable square foot basis if less than all of the Premises is transferred, after deducting the actual, reasonable and documented expenses incurred by Tenant for (i) any changes, alterations, and improvements made to the Premises, and/or any tenant improvement allowance provided by Tenant to the Transferee, in connection with the Transfer, (ii) any brokerage commissions and advertising expenses in connection with the Transfer, and (iii) reasonable legal fees incurred by Tenant in negotiating the Transfer and obtaining Landlord's consent thereto. "Transfer Premium" shall also include, but not be limited to, key money and bonus money paid by Transferee to Tenant in connection with such Transfer, and any payment in excess of fair market value for services rendered by Tenant to the Transferee in connection with such Transfer.

16.5. **Landlord's Option as to Subject Space.** Notwithstanding anything to the contrary contained in this Section 16, Landlord shall have the option, by giving written notice to Tenant within thirty (30) days after receipt of any Transfer Notice, to recapture the Subject

23

Space. Such recapture shall cancel and terminate this Lease, with respect to the Subject Space as of the date stated in the Transfer Notice as the effective date of the proposed Transfer until the last day of the term of the Transfer as set forth in the Transfer Notice. In the event of a recapture by Landlord, if this Lease shall be canceled with respect to less than the entire Premises, the Rent reserved herein shall be prorated on the basis of the number of rentable square feet retained by Tenant in proportion to the number of rentable square feet contained in the Premises, and this Lease as so amended shall continue thereafter in full force and effect, and upon request of either party, the parties shall execute written confirmation of the same. If Landlord declines, or fails to elect in a timely manner to recapture the Subject Space under this Section 16.5, then, provided Landlord has consented to the proposed Transfer, Tenant shall be entitled to proceed to transfer the Subject Space to the proposed Transferee, subject to provisions of the last paragraph of Section 16.3 of this Lease.

16.6.  **Effect of Transfer.**  If Landlord consents to a Transfer, (i) the terms and conditions of this Lease shall in no way be deemed to have been waived or modified, (ii) such consent shall not be deemed consent to any further Transfer by either Tenant or a Transferee, (iii) Tenant shall deliver to Landlord, promptly after execution, an original executed copy of all documentation pertaining to the Transfer in form reasonably acceptable to Landlord, (iv) Tenant shall furnish upon Landlord's request a complete statement, certified by an independent certified public accountant, by an authorized officer of Tenant, setting forth in detail the computation of any Transfer Premium Tenant has derived  and shall derive from such Transfer, and (v) no Transfer relating to this Lease or agreement entered into with respect thereto, whether with or without Landlord's consent, shall relieve Tenant or any guarantor of this Lease from liability under this Lease.  Landlord or its authorized representatives shall have the right at all reasonable times and upon prior reasonable notice to Tenant to audit the books, records, and papers of Tenant relating to any Transfer, and shall have the right to make copies thereof. If the Transfer Premium respecting any Transfer shall be found understated, Tenant shall, within ten (10) days after demand, pay the deficiency, and if found understated by more than five percent (5%), Landlord's cost of such audit.

16.7.  **Occurrence of Default.**  Any Transfer hereunder shall be subordinate and subject to the provisions of this Lease, and if this Lease shall be terminated during the term of any Transfer, Landlord shall have the right to:  (i) treat such Transfer as cancelled and repossess the Subject Space by any lawful means; or (ii) require that such Transferee attorn to and recognize Landlord as its landlord under any such Transfer.  If Tenant shall be in default under this Lease, after the expiration of all applicable cure periods provided in this Lease, Landlord is hereby irrevocably authorized, as Tenant's agent, to direct any Transferee to make all payments under or in connection with the Transfer directly to Landlord (which Landlord shall apply towards Tenant's obligations under this Lease) until such default is cured; provided that Landlord's authorization to act as Tenant's agent shall not prejudice Tenant's right to challenge Landlord's claim of default in a court of competent jurisdiction.  Tenant hereby agrees that such Transferee shall rely on any representation by Landlord that Tenant is in default hereunder after the expiration of the applicable notice and cure periods provided in this Lease, without any need for confirmation thereof by Tenant. Upon any assignment, the assignee shall assume in writing all obligations and covenants of Tenant thereafter to be performed or observed under this Lease. No collection or acceptance of Rent by Landlord from any Transferee shall be deemed a waiver of any provision of this Section 16 or the approval of any Transferee or a release of Tenant from any obligation under this Lease, whether theretofore or thereafter accruing. In no event shall Landlord's enforcement of any provision of this Lease against any Transferee be deemed a waiver of Landlord's right to enforce any term of this Lease against Tenant or any

24

other person. If Tenant's obligations hereunder have been guaranteed, Landlord's consent to any Transfer shall not be effective unless the guarantor also consents to such Transfer.

17.    **CASUALTY.**

17.1.  **Casualty Notice.**  If any portions of the Premises and/or Real Property are damaged by fire, casualty, or other occurrence ("**Casualty**"), Landlord shall notify Tenant in writing ("**Casualty Notice**") within thirty (30) days of the occurrence of such Casualty with Landlord's estimate of whether such Casualty can be repaired and/or restored within one hundred eighty (180) days after the occurrence of the Casualty.  If Landlord determines that such repair and restoration cannot be completed within one hundred eighty (180) days, the Casualty Notice must be accompanied by a certification by an independent licensed architect having significant experience in the design and construction of commercial buildings in the general vicinity of the Real Property ("**Architect**"), which certification must state the estimated period required to repair or restore such damage ("**Estimated Repair/Restoration Period**").

17.2.  **Termination by Tenant.**  In addition to all other remedies Tenant may have under this Lease, at law or in equity, if the Casualty materially and adversely interferes with Tenant's business operations, or Tenant's unfettered use of, and access to, the Premises (as reasonably determined by Tenant), Tenant shall have the right to terminate this Lease upon thirty (30) days written notice to Landlord in the following events:

17.2.1. If the Estimated Repair/Restoration Period is greater than one hundred eighty (180) days; or

17.2.2. if Landlord fails to deliver the Casualty Notice to Tenant within thirty (30) days of the occurrence of the Casualty; or

17.2.3. if Landlord fails to fails to diligently pursue and complete the repair or restoration the Casualty within the Estimated Repair/Restoration Period; or

17.2.4. if the Casualty occurs during the last six (6) months of the Lease Term.

17.3.  **Termination by Landlord.**  Landlord may terminate this Lease upon forty-five (45) days written notice to Tenant if (i) the Estimated Repair/Restoration Period is greater than one (1) year, and (ii) the cost to repair and/or restore the Casualty is greater than fifty percent (50%) of the replacement cost of the improvements on the Real Property; provided, however, that Tenant shall be entitled to remain in the Premises for up to six (6) months after receipt of Landlord's notice of termination.

17.4.  **Repair by Landlord.**  Unless this Lease is terminated in accordance with this Section 17, Landlord shall diligently and promptly pursue the repair and restoration of the Casualty within the Estimated Repair/Restoration Period, at Landlord's sole cost and expense. Until the repair and restoration of the Casualty are completed, all Rent shall be equitably abated to the extent that damage to the Premises and/or other portions of the Real Property materially and adversely interferes with Tenant's business operations, and/or Tenant's use of, and access to, the Premises and Real Property.

17.5.  **Proration of Rent.**  If this Lease is terminated pursuant to this Section 17, Rent shall be prorated as of the date of such termination.

25

17.6. **Tenant's Waivers.** With respect to any damage which Landlord is obligated to repair or elects to repair, Tenant, as a material inducement to Landlord entering into this Lease, irrevocably waives and releases its rights under the provisions of Sections 1932 and 1933 of the California Civil Code.

17.7. **Release and Discharge.** Landlord and Tenant do each hereby release and discharge the other party and any officer, agent, employee or representative of such party from any Casualty for which insurance is required to be carried by the injured party under the terms of this Lease.

18.   **EMINENT DOMAIN.**

If the whole of the Premises or the Real Property or so much thereof as to render the balance unusable by Tenant shall be taken under power of eminent domain, or is sold, transferred or conveyed in lieu thereof, this Lease shall automatically terminate as of the date of such condemnation, or as of the date possession is taken by the condemning authority, at Landlord's option. No award for any partial or entire taking shall be apportioned, and Tenant hereby assigns to Landlord any award which may be made in such taking or condemnation, together with any and all rights of Tenant now or hereafter arising in or to the same or any part thereof; provided, however, that Tenant may assert a claim for the unamortized cost of any leasehold improvements paid for by Tenant, Tenant's personal property, fixtures and moving expenses, the value of Tenant's leasehold estate and the loss of Tenant's business. In the event of a partial taking described in this Section 18, or a sale, transfer or conveyance in lieu thereof, which does not result in a termination of this Lease, the rent shall be apportioned according to the ratio that the part of the Premises remaining useable by Tenant bears to the total area of the Premises.

19.   **SUBORDINATION.**

This Lease is subject and subordinate to all ground or underlying leases, mortgages and deeds of trust which affect the property or the Real Property, including all renewals, modifications, consolidations, replacements and extensions thereof; provided, however, if the lessor under any such lease or the holder or holders of any such mortgage or deed of trust shall advise Landlord that they desire or require this Lease to be prior and superior thereto, upon written request of Landlord to Tenant, Tenant agrees to promptly execute, acknowledge and deliver any and all documents or instruments which Landlord or such lessor, holder or holders deem necessary or desirable for purposes thereof. Landlord shall have the right to cause this Lease to be and become and remain subject and subordinate to any and all ground or underlying leases, mortgages or deeds of trust which may hereafter be executed covering the Premises, the Real Property or the property or any renewals, modifications, consolidations, replacements or extensions thereof, for the full amount of all advances made or to be made thereunder and without regard to the time or character of such advances, together with interest thereon and subject to all the terms and provisions thereof; provided, however, that Landlord obtains from the lender or other party in question a written undertaking in favor of Tenant to the effect that such lender or other party will not disturb Tenant's right of possession under this Lease if Tenant is not then or thereafter in breach of any covenant or provision of this Lease. Tenant agrees, within ten (10) business days after Landlord's written request therefor, to execute, acknowledge and deliver upon request any and all documents or instruments reasonably requested by Landlord or reasonably necessary or proper to assure the subordination of this Lease to any such mortgages, deed of trust, or leasehold estates. Tenant agrees that in the event any proceedings are brought for the foreclosure of any mortgage or

26

deed of trust or any deed in lieu thereof, to attorn to the purchaser or any successors thereto upon any such foreclosure sale or deed in lieu thereof as so requested to do so by such purchaser and to recognize such purchaser as the lessor under this Lease; Tenant shall, within ten (10) business days after request execute such further instruments or assurances as such purchaser may reasonably deem necessary to evidence or confirm such attornment.  Tenant agrees to provide copies of any notices of Landlord's default under this Lease to any mortgagee or deed of trust beneficiary whose address has been provided to Tenant and Tenant shall provide such mortgagee or deed of trust beneficiary a commercially reasonable time after receipt of such notice within which to cure any such default.  Tenant waives the provisions of any current or future statute, rule or law which may give or purport to give Tenant any right or election to terminate or otherwise adversely affect this Lease and the obligations of the Tenant hereunder in the event of any foreclosure proceeding or sale.

## 20.   DEFAULT AND REMEDIES.

20.1.  **Event of Default.**  Each of the following acts or omissions of Tenant or of any guarantor of Tenant's performance hereunder, or occurrences, shall constitute an "**Event of Default**":

20.1.1. Failure or refusal to pay Rent or Additional Rent or any other amount to be paid by Tenant to Landlord hereunder within five (5) business days after written notice that the same is due or payable hereunder; said five (5) business day period shall be in lieu of, and not in addition to, the notice requirements of Section 1161 of the California Code of Civil Procedure or any similar or successor law;

20.1.2. Except where a specific time period is otherwise set forth for Tenant's performance in this Lease, in which event the failure to perform by Tenant within such time period shall be a default under this Section 20.1.2, and except as set forth in Section 20.1.1 above and Section 20.1.3 through and including Section 20.1.6 below, failure to perform or observe any other covenant or condition of this Lease to be performed or observed within thirty (30) days following written notice to Tenant of such failure.  Such thirty (30) day notice shall be in lieu of, and not in addition to, any required under Section 1161 of the California Code of Civil Procedure or any similar or successor law;

20.1.3. The taking in execution or by similar process or law (other than by eminent domain) of the estate hereby created;

20.1.4. The filing by Tenant or any guarantor hereunder in any court pursuant to any statute of a petition in bankruptcy or insolvency or for reorganization or arrangement for the appointment of a receiver of all or a portion of Tenant's property; the filing against Tenant or any guarantor hereunder of any such petition, or the commencement of a proceeding for the appointment of a trustee, receiver or liquidator for Tenant, or for any guarantor hereunder, or of any of the property of either, or a proceeding by any governmental authority for the dissolution or liquidation of Tenant or any guarantor hereunder, if such proceeding shall not be dismissed or trusteeship discontinued within sixty (60) days after commencement of such proceeding or the appointment of such trustee or receiver; or the making by Tenant or any guarantor hereunder of an assignment for the benefit of creditors.  Tenant hereby stipulates to the lifting of the automatic stay in effect and relief from such stay for Landlord in the event Tenant files a petition under the United States Bankruptcy laws, for the purpose of Landlord pursuing its rights and remedies against Tenant and/or a guarantor of this Lease;

27

20.1.5. Tenant's failure to cause to be released or bonded over (or a deposit paid to Landlord in accordance with the terms hereof) any mechanics liens filed against the Premises or the Real Property within twenty (20) days after the date the same shall have been filed or recorded; or

20.1.6. Tenant's failure to observe or perform according to the provisions of Section 8 (Use), Section 19 (Subordination), or Section 24 (Estoppel Certificates) within five (5) business days after written notice from Landlord, provided that the applicable initial period in which Tenant has to perform under such Sections (if any) has expired.

### 20.2. **Remedies.**

20.2.1. Upon the occurrence of an Event of Default under this Lease as provided in Section 20.1 above, Landlord may exercise all of its remedies as may be permitted by law, including but not limited to the remedy provided by Section 1951.4 of the California Civil Code, and including without limitation, terminating this Lease, reentering the Premises and removing all persons and property therefrom, which property may be stored by Landlord at a warehouse or elsewhere at the risk, expense and for the account of Tenant. If Landlord elects to terminate this Lease, Landlord shall be entitled to recover from Tenant the aggregate of all amounts permitted by law, including but not limited to (i) the worth at the time of award of the amount of any unpaid rent which had been earned at the time of such termination; plus (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the Lease Term after the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus (iv) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, specifically including but not limited to, tenant improvement expenses, brokerage commissions and advertising expenses incurred; and (v) at Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law. The term "rent" as used in this Section 20.2.1 shall be deemed to be and to mean all sums of every nature required to be paid by Tenant pursuant to the terms of this Lease, whether to Landlord or to others. As used in subparts (i) and (ii) of this Section 20.2, the "worth at the time of award" shall be computed by allowing interest at the rate set forth in Section 20.2.5, below, but in no case greater than the maximum amount of such interest permitted by law. As used in subpart (iii), above, the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

20.2.2. Nothing in this Section 20.2 shall be deemed to affect Landlord's right to indemnification for liability or liabilities arising prior to the termination of this Lease for personal injuries or property damage under the indemnification clause or clauses contained in this Lease.

20.2.3. Notwithstanding anything to the contrary set forth herein, Landlord's re-entry to perform acts of maintenance or preservation of or in connection with efforts to relet the Premises or any portion thereof, or the appointment of a receiver upon Landlord's initiative to protect Landlord's interest under this Lease shall not terminate Tenant's right to possession of the Premises or any portion thereof and, until Landlord does elect to terminate this Lease, this Lease shall continue in full force and effect and Landlord may enforce all of Landlord's rights and remedies hereunder including, without limitation, the remedy described in California Civil

28

Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if Lessee has the right to sublet or assign, subject only to reasonable limitations). Accordingly, if Landlord does not elect to terminate this Lease on account of any default by Tenant, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all rent as it becomes due.

20.2.4. All rights, powers and remedies of Landlord hereunder and under any other agreement now or hereafter in force between Landlord and Tenant shall be cumulative and not alternative and shall be in addition to all rights, powers and remedies given to Landlord by law, and the exercise of one or more rights or remedies shall not impair Landlord's right to exercise any other right or remedy.

20.2.5. Any amount due from Tenant to Landlord hereunder which is not paid when due shall bear interest at the lower of ten percent (10%) per annum or the maximum lawful rate of interest from the due date until paid, unless otherwise specifically provided herein, but the payment of such interest shall not excuse or cure any default by Tenant under this Lease. In addition to such interest: (i) if Rent is not paid on or before the fifth (5th) day after written notice from Landlord that the same is due a late charge equal to One Thousand Dollars ($1,000.00) shall be immediately due and owing and shall accrue for each calendar month or part thereof until such rental, including the late charge, is paid in full, which late charge Tenant hereby agrees is a reasonable estimate of the damages Landlord shall suffer as a result of Tenant's late payment and (ii) an additional charge of $25 shall be assessed for any check given to Landlord by or on behalf of Tenant which is not honored by the drawee thereof; which damages include Landlord's additional administrative and other costs associated with such late payment and unsatisfied checks and the parties agree that it would be impracticable or extremely difficult to fix Landlord's actual damage in such event. Such charges for interest and late payments and unsatisfied checks are separate and cumulative and are in addition to and shall not diminish or represent a substitute for any or all of Landlord's rights or remedies under any other provision of this Lease.

20.2.6. Whether or not Landlord elects to terminate this Lease on account of any default by Tenant, as set forth in this Section 20.2, Landlord shall have the right to terminate any and all subleases, licenses, concessions or other consensual arrangements for possession entered into by Tenant and affecting the Premises or may, in Landlord's sole discretion, succeed to Tenant's interest in such subleases, licenses, concessions or arrangements. In the event of Landlord's election to succeed to Tenant's interest in any such subleases, licenses, concessions or arrangements, Tenant shall, as of the date of notice by Landlord of such election, have no further right to or interest in the rent or other consideration receivable thereunder.

20.2.7. Landlord shall not be in default under this Lease unless Landlord fails to perform obligations required of Landlord within thirty (30) days after written notice is delivered by Tenant to Landlord and to the holder of any mortgages or deeds of trust (collectively, "Lender") covering the Premises whose name and address shall have theretofore been furnished to Tenant in writing, specifying the obligation which Landlord has failed to perform; provided, however, that if the nature of Landlord's obligation is such that more than thirty (30) days are required for performance, then Landlord shall not be in default if Landlord or Lender commences performance within such thirty (30) day period and thereafter diligently prosecutes the same to completion.

29

20.2.8. In the event of any default, breach or violation of Tenant's rights under this Lease by Landlord, Tenant's exclusive remedies shall be an action for specific performance or actual damages. Without limiting any other waiver by Tenant which may be contained in this Lease, Tenant hereby waives the benefit of any laws granting it the right to perform Landlord's obligation, or the right to terminate this Lease on account of any Landlord default.

## 21.   TRANSFER OF LANDLORD'S INTEREST.

In the event of any transfer or termination of Landlord's interest in the Premises or the Real Property by sale, assignment, transfer, foreclosure, deed-in-lieu of foreclosure or otherwise whether voluntary or involuntary, Landlord shall be automatically relieved of any and all obligations and liabilities on the part of Landlord from and after the date of such transfer or termination. Tenant agrees to attorn to the transferee upon any such transfer and to recognize such transferee as the lessor under this Lease, provided that such transferee agrees in writing to assume all of Landlord's obligations under this Lease, and Tenant shall, within five (5) business days after request, execute such further instruments or assurances as such transferee may reasonably deem necessary to evidence or confirm such attornment.

## 22.   PARKING.

Tenant shall have the right to use the number of unreserved and reserved parking spaces specified in Section 1.11 above. Tenant's continued right to use the parking spaces is conditioned upon Tenant abiding by all rules and regulations which are prescribed from time to time for the orderly operation and use of the parking facility where the parking spaces are located, including any sticker or other identification system established by Landlord, Tenant's cooperation in seeing that Tenant's employees and visitors also comply with such rules and regulations, and Tenant not being in default under this Lease. Landlord specifically reserves the right to change the size, configuration, design, layout and all other aspects of the Real Property parking facility at any time and Tenant acknowledges and agrees that Landlord may, without incurring any liability to Tenant and without any abatement of rent under this Lease, from time to time, close-off or restrict access to the Real Property parking facility for purposes of permitting or facilitating any such construction, alteration or improvements. Landlord may, from time to time, relocate any reserved parking spaces (if any) to another location in the Real Property parking facility. Landlord may delegate its responsibilities hereunder to a parking operator or a lessee of the parking facility in which case such parking operator or lessee shall have all the rights of control attributed hereby to the Landlord.

## 23.   WAIVER.

No waiver by Landlord or Tenant of any provision of this Lease shall be deemed to be a waiver of any other provision hereof or of any subsequent breach by Tenant or Landlord, as applicable, of the same or any other provision. No provision of this Lease may be waived by Landlord or Tenant, except by an instrument in writing executed by the waiving party. Landlord's consent to or approval of any act by Tenant requiring Landlord's consent or approval shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act of Tenant, whether or not similar to the act so consented to or approved. No act or thing done by Landlord or Landlord's agents during the Lease Term of this Lease shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid unless in writing and signed by Landlord. The subsequent acceptance of rent hereunder by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay

30

763092.6

the particular rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such rent. Any payment by Tenant or receipt by Landlord of an amount less than the total amount then due hereunder shall be deemed to be in partial payment only thereof and not a waiver of the balance due or an accord and satisfaction, notwithstanding any statement or endorsement to the contrary on any check or any other instrument delivered concurrently therewith or in reference thereto. Accordingly, Landlord may accept any such amount and negotiate any such check without prejudice to Landlord's right to recover all balances due and owing and to pursue its other rights against Tenant under this Lease, regardless of whether Landlord makes any notation on such instrument of payment or otherwise notifies Tenant that such acceptance or negotiation is without prejudice to Landlord's rights.

## 24.   ESTOPPEL CERTIFICATE.

Tenant shall upon not less than ten (10) business days' prior written notice from Landlord, execute, acknowledge and deliver to Landlord a statement in writing certifying the following information: (i) that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as modified, is in full force and effect); (ii) the dates to which the rental and other charges are paid in advance, if any; (iii) the amount of Tenant's security deposit, if any; and (iv) acknowledging that there are not, to Tenant's knowledge, any uncured defaults on the part of Landlord hereunder, and no events or conditions then in existence which, with the passage of time or notice or both, would constitute a default on the part of Landlord hereunder, or specifying such defaults, events or conditions, if any are claimed. It is expressly understood and agreed that any such statement may be relied upon by any prospective purchaser or encumbrancer of all or any portion of the Real Property. Tenant's failure to deliver such statement within such time shall constitute an admission by Tenant that all statements contained therein are true and correct. Tenant hereby irrevocably appoints Landlord as Tenant's attorney-in-fact and in Tenant's name, place and stead to execute any and all documents described in this Section 24 if Tenant fails to do so within the specified time period. At any time during the Lease Term, Landlord may require Tenant to provide Landlord with Tenant's current financial statement and financial statements of the two (2) years prior to the current financial statement year. Such statements shall be prepared in accordance with generally accepted accounting principles and, if such is the normal practice of Tenant, shall be audited by an independent certified public accountant.

## 25.   LIABILITY OF LANDLORD.

Notwithstanding anything in this Lease to the contrary, any remedy of Tenant for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord in the event of any default by Landlord hereunder or any claim, cause of action or obligation, contractual, statutory or otherwise by Tenant against Landlord or the Landlord Parties concerning, arising out of or relating to any matter relating to this Lease and all of the covenants and conditions or any obligations, contractual, statutory, or otherwise set forth herein, shall be limited solely and exclusively to an amount which is equal to the interest of Landlord in and to the Real Property. No other property or assets of Landlord or any Landlord Party shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease, Landlord's obligations to Tenant, whether contractual, statutory or otherwise, the relationship of Landlord and Tenant hereunder, or Tenant's use or occupancy of the Premises.

## 26.   INABILITY TO PERFORM.

31

763092.6