This Lease and the obligations of Landlord and Tenant hereunder shall not be affected or impaired because Landlord or Tenant, as the case may be, is unable to fulfill any of its obligations hereunder or is delayed in doing so, if such inability or delay is caused by reason of any prevention, delay, stoppage due to strikes, lockouts, acts of God, or any other cause previously, or at such time, beyond the reasonable control or anticipation of Landlord or Tenant, as the case may be (collectively, a **"Force Majeure"**), and Landlord's or Tenant's, as the case may be, obligation under this Lease shall be forgiven and suspended by any such Force Majeure (except for Tenant's obligations to pay Rent and any other charge or sum payable by Tenant under this Lease).

## 27.    HAZARDOUS MATERIAL.

27.1.    Tenant shall not cause or permit any Hazardous Material (as defined in Section 27.4 below) to be brought, kept or used in or about the Real Property by Tenant, its agents, employees, contractors, or invitees, other than customary general office products in the Premises, such as inks, photocopy supplies, computer supplies, and typical office cleaning products, all or some of which may be categorized as Hazardous Materials, provided such use and maintenance is in strict accordance with all laws, is handled in a safe manner at all times and Landlord is provided with a written list and description of any such Hazardous Materials in a reasonable period of time prior to their use in the Premises.

27.2.    Tenant indemnifies Landlord and the Landlord Parties from and against any breach by Tenant of the obligations stated in the preceding sentence, and agrees to defend and hold Landlord and the Landlord Parties harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities, or losses (including, without limitation, diminution in value of the Real Property, damages for the loss or restriction or use of rentable or usable space or of any amenity of the Real Property, damages arising from any adverse impact or marketing of space in the Real Property, and sums paid in settlement of claims, attorneys' fees and costs, consultant fees, and expert fees) which arise during or after the Lease Term of this Lease as a result of such breach. This indemnification of Landlord and the Landlord Parties by Tenant includes, without limitation, costs incurred in connection with any investigation of site conditions or any cleanup, remedial, removal, or restoration work required by any federal, state, or local governmental agency or political subdivision because of Hazardous Material present in the soil or ground water on or under the Real Property. Without limiting the foregoing, if the presence of any Hazardous Material on the Real Property caused or permitted by Tenant results in any contamination of the Real Property, Tenant shall promptly take all actions at its sole expense as are necessary to return the Real Property to the condition existing prior to the introduction of any such Hazardous Material and the contractors to be used by Tenant for such work must be approved by Landlord, which approval shall not be unreasonably withheld so long as such actions would not potentially have any material adverse long-term or short-term effect on the Real Property and so long as such actions do not materially interfere with the use and enjoyment of the Real Property by the other tenants thereof; provided however, Landlord shall also have the right, by written notice to Tenant, to directly undertake any such mitigation efforts with regard to Hazardous Materials in or about the Real Property due to Tenant's breach of its obligations pursuant to this Section 27) (subject to any applicable notice and cure periods hereunder), and to charge Tenant, as Rent, for the costs thereof.

27.3.    It shall not be unreasonable for Landlord to withhold its consent to any proposed Transfer if (i) the proposed transferee's anticipated use of the Premises involves the generation, storage, use, treatment, or disposal of Hazardous Material; (ii) the proposed Transferee has been required by any prior landlord, lender, or governmental authority to take remedial action in

32

connection with Hazardous Material contaminating a property if the contamination resulted from such Transferee's actions or use of the property in question; or (iii) the proposed Transferee is subject to an enforcement order issued by any governmental authority in connection with the use, disposal, or storage of a Hazardous Material.

27.4.  As used herein, the term "**Hazardous Material**" means any hazardous or toxic substance, material, or waste which is or becomes regulated by any local governmental authority, the State of California or the United States Government.  The term "Hazardous Material" includes, without limitation, any material or substance which is (i) defined as "Hazardous Waste," "Extremely Hazardous Waste," or "Restricted Hazardous Waste" under Sections 25115, 25117 or 25122.7, or listed pursuant to Section 25140, of the California Health and Safety Code, Division 20, Chapter 6.5 (Hazardous Waste Control Law), (ii) defined as a "Hazardous Substance" under Section 25316 of the California Health and Safety Code, Division 20, Chapter 6.8 (Carpenter-Presley-Tanner Hazardous Substance Account Act), (iii) defined as a "Hazardous Material," "Hazardous Substance," or "Hazardous Waste" under Section 25501 of the California Health and Safety Code, Division 20, Chapter 6.95 (Hazardous Materials Release Response Plans and Inventory), (iv) defined as a "Hazardous Substance" under Section 25281 of the California Health and Safety Code, Division 20, Chapter 6.7 (Underground Storage of Hazardous Substances), (v) petroleum, (vi) asbestos, (vii) listed under Article 9 or defined as Hazardous or extremely hazardous pursuant to Article 11 of Title 22 of the California Administrative Code, Division 4, Chapter 20, (viii) designated as a "Hazardous Substance" pursuant to Section 311 of the Federal Water Pollution Control Act (33 U.S.C. § 1317), (ix) defined as a "Hazardous Waste" pursuant to Section 1004 of the Federal Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq. (42 U.S.C. § 6903), or (x) defined as a "Hazardous Substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq. (42 U.S.C. § 9601).

27.5.  As used herein, the term "**Environmental Laws**" means any applicable federal, state or local law, ordinance, or regulation relating to any Hazardous Material affecting the Real Property, including, without limitation, the laws, ordinances, and regulations referred to in Section 27.4 above.

## 28.  SURRENDER OF PREMISES; REMOVAL OF PROPERTY.

28.1.  The voluntary or other surrender of this Lease by Tenant to Landlord, or a mutual termination hereof, shall not work a merger, and shall at the option of Landlord, operate as an assignment to it of any or all subleases or subtenancies affecting the Premises.

28.2.  Upon the expiration of the Lease Term of this Lease, or upon any earlier termination of this Lease, Tenant shall quit and surrender possession of the Premises to Landlord in good order and condition, reasonable wear and tear and repairs which are Landlord's obligation excepted, and shall, without expense to Landlord, remove or cause to be removed from the Premises all debris and rubbish, all furniture, equipment, business and trade fixtures, free-standing cabinet work, moveable partitioning, telephone and data cabling and other articles of personal property owned by Tenant or installed or placed by Tenant at its own expense in the Premises, and all similar articles of any other persons claiming under Tenant (unless Landlord exercises its option to have any subleases or subtenancies assigned to it), and Tenant shall repair all damage to the Premises resulting from the  removal of such items from the Premises.

33

28.3. Whenever Landlord re-enters the Premises as provided in Section 13.1 hereof, or as otherwise provided in this Lease, any property of Tenant not removed by Tenant upon the expiration of the Lease Term of this Lease (or within forty-eight (48) hours after a termination by reason of Tenant's default, unless otherwise agreed to in writing between Landlord and Tenant), as provided in this Lease, shall be considered abandoned and Landlord may remove any or all of such items and dispose of the same in any manner or store the same in a public warehouse or elsewhere for the account and at the expense and risk of Tenant, and if Tenant shall fail to pay the cost of storing any such property after it has been stored for a period of thirty (30) days or more, Landlord may sell any or all of such property at public or private sale, in such manner and at such times and places as Landlord, in its sole discretion, may deem proper, without notice to or demand upon Tenant, for the payment of all or any part of such charges or the removal of any such property, and shall apply the proceeds of such sale as follows: first, to the cost and expense of such sale, including reasonable attorneys' fees and costs for services rendered; second, to the payment of the cost of or charges for storing any such property; third, to the payment of any other sums of money which may then or thereafter be due to Landlord from Tenant under any of the terms hereof; and fourth, the balance, if any, to Tenant.

28.4. Except as provided in Section 28.2 above, all fixtures, equipment, leasehold improvements, Alterations and/or appurtenances attached to or built into the Premises prior to or during the Lease Term, whether by Landlord or Tenant and whether at the expense of Landlord or Tenant, or of both, shall be and remain part of the Premises and shall not be removed by Tenant at the end of the Lease Term unless otherwise expressly provided for in this Lease. Such fixtures, equipment, leasehold improvements, Alterations, additions, improvements and/or appurtenances shall include but not be limited to: all floor coverings, drapes, paneling, built-in cabinetry, molding, doors, vaults (including vault doors), plumbing systems, security systems, electrical systems, lighting systems, silencing equipment, communication systems, all fixtures and outlets for the systems mentioned above and for all telephone, radio, telegraph and television purposes, and any special flooring or ceiling installations.

29.    **SIGNAGE RIGHTS.**

29.1. **Premises Signage.** Landlord shall install Tenant's identifying signage at the entrance to the Premises (which may be located on the Premises' entry doors) in a manner consistent with Landlord's Building standard signage program. Landlord shall pay for the costs of installing Tenant's entry signage; provided, however, that such costs shall be included in Operating Costs. Any modification to Tenant's entry signage requested by Tenant subsequent to the initial installation of the same shall be made at Tenant's expense.

29.2. **Building Directory.** Landlord shall install Tenant's name and the suite number of the Premises in the ground floor lobby directory (or its equivalent) to be located in the ground floor lobby of the Building. Landlord shall pay for the costs of installing Tenant's name and the suite number of the Premises in the ground floor lobby directory; provided, however, that such costs shall be included in Operating Costs. Any modification to Tenant's name requested by Tenant subsequent to the initial installation of the same shall be made at Tenant's expense.

29.3. **Monument Signage.** Landlord shall install, at Tenant's expense, Tenant's name on the Common Area monument signage adjacent to the main entry to the Building. Tenant may include the cost of installing Tenant's monument signage as part of the Tenant Improvement Allowance. The size, color and typestyle of Tenant's monument signage must be

34

consistent with Landlord's requirements for signs of other tenants in the Project. Tenant's monument signage shall not include any logos.

30.   MISCELLANEOUS.

30.1.   SEVERABILITY; ENTIRE AGREEMENT. ANY PROVISION OF THIS LEASE WHICH SHALL PROVE TO BE INVALID, VOID, OR ILLEGAL SHALL IN NO WAY AFFECT, IMPAIR OR INVALIDATE ANY OTHER PROVISION HEREOF AND SUCH OTHER PROVISIONS SHALL REMAIN IN FULL FORCE AND EFFECT. THIS LEASE AND THE EXHIBITS AND ANY ADDENDUM ATTACHED HERETO CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO WITH REGARD TO TENANT'S OCCUPANCY OR USE OF ALL OR ANY PORTION OF THE REAL PROPERTY, AND NO PRIOR AGREEMENT OR UNDERSTANDING PERTAINING TO ANY SUCH MATTER SHALL BE EFFECTIVE FOR ANY PURPOSE. NO PROVISION OF THIS LEASE MAY BE AMENDED OR SUPPLEMENTED EXCEPT BY AN AGREEMENT IN WRITING SIGNED BY THE PARTIES HERETO OR THEIR SUCCESSOR IN INTEREST.

30.2.   **Substitution of Other Premises.** Landlord shall have the right to move Tenant to other space in the Real Property comparable in size to the Premises, and all terms hereof shall apply to the new space with equal force. In such event, Landlord shall give Tenant at least thirty (30) days prior notice of Landlord's election to so relocate Tenant, and shall move Tenant's effects to the new space at Landlord's sole cost and expense at such time and in such manner as to inconvenience Tenant as little as reasonably practicable. The new space shall be delivered to Tenant with improvements substantially similar to those improvements existing in the Premises at the time of Landlord's notification to Tenant of the relocation, which improvements shall be paid for by Landlord at Landlord's cost. Simultaneously with such relocation of the Premises, the parties shall immediately execute an amendment to this Lease stating the relocation of the Premises.

30.3.   **Attorneys' Fees; Waiver of Jury Trial.**

30.3.1. In any action to enforce the terms of this Lease, including any suit by Landlord for the recovery of rent or possession of the Premises, the losing party shall pay the successful party a reasonable sum for attorneys' fees and costs in such suit and such attorneys' fees and costs shall be deemed to have accrued prior to the commencement of such action and shall be paid whether or not such action is prosecuted to judgment.

30.3.2. Should Landlord, without fault on Landlord's part, be made a party to any litigation instituted by Tenant or by any third party against Tenant, or by or against any person holding under or using the Premises by license of Tenant, or for the foreclosure of any lien for labor or material furnished to or for Tenant or any such other person or otherwise arising out of or resulting from any act or transaction of Tenant or of any such other person, Tenant covenants to save and hold Landlord harmless from any judgment rendered against Landlord or the Premises or any part thereof and from all costs and expenses, including reasonable attorneys' fees and costs incurred by Landlord in connection with such litigation.

30.3.3. When legal services are rendered by an attorney at law who is an employee of a party, attorneys' fees and costs incurred by that party shall be deemed to include an amount based upon the number of hours spent by such employee on such matters multiplied by an appropriate billing rate determined by taking into consideration the same factors, including

35

but not limited by, the importance of the matter, time applied, difficulty and results, as are considered when an attorney not in the employ of a party is engaged to render such service.

30.3.4. EACH PARTY HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION SEEKING SPECIFIC PERFORMANCE OF ANY PROVISION OF THIS LEASE, FOR DAMAGES FOR ANY BREACH UNDER THIS LEASE, OR OTHERWISE FOR ENFORCEMENT OF ANY RIGHT OR REMEDY HEREUNDER.

30.4.  **Time of Essence.** Each of Tenant's covenants herein is a condition and time is of the essence with respect to the performance of every provision of this Lease.

30.5.  **Headings; Joint and Several.** The section headings contained in this Lease are for convenience only and do not in any way limit or amplify any term or provision hereof. The terms "**Landlord**" and "**Tenant**" as used herein shall include the plural as well as the singular, the neuter shall include the masculine and feminine genders and the obligations herein imposed upon Tenant shall be joint and several as to each of the persons, firms or corporations of which Tenant may be composed.

30.6.  **Reserved Area.** Tenant hereby acknowledges and agrees that the exterior walls of the Premises and the area between the finished ceiling of the Premises and the slab of the floor above the Premises have not been demised and the use thereof together with the right to install, maintain, use, repair and replace pipes, ducts, conduits, wiring and cabling leading through, under or above the Premises or throughout the Building in locations which will not materially interfere with Tenant's use of the Premises and serving other parts of the Building are hereby excepted and reserved unto Landlord.

30.7.  NO OPTION.  THE SUBMISSION OF THIS LEASE BY LANDLORD, ITS AGENT OR REPRESENTATIVE FOR EXAMINATION OR EXECUTION BY TENANT DOES NOT CONSTITUTE AN OPTION OR OFFER TO LEASE THE PREMISES UPON THE TERMS AND CONDITIONS CONTAINED HEREIN OR A RESERVATION OF THE PREMISES IN FAVOR OF TENANT, IT BEING INTENDED HEREBY THAT THIS LEASE SHALL ONLY BECOME EFFECTIVE UPON THE EXECUTION HEREOF BY LANDLORD AND TENANT AND DELIVERY OF A FULLY EXECUTED LEASE TO TENANT.

30.8.  **Use of Real Property Name; Improvements.** Tenant shall not be allowed to use the name, picture or representation of the Real Property, or words to that effect, in connection with any business carried on in the Premises or otherwise (except as Tenant's address) without the prior written consent of Landlord, not to be unreasonably withheld or delayed.  In the event that Landlord undertakes any additional improvements on the Real Property including but not limited to new construction or renovation or additions to the existing improvements, Landlord shall not be liable to Tenant for any noise, dust, vibration or interference with access to the Premises or disruption in Tenant's business caused thereby.

30.9.  **Rules and Regulations.** Tenant shall observe faithfully and comply strictly with the rules and regulations attached to this Lease as **Exhibit "E"** and made a part hereof ("**Rules and Regulations**"), and such other Rules and Regulations as Landlord may from time to time reasonably adopt for the safety, care and cleanliness of the Real Property, the facilities thereof, or the preservation of good order therein. Landlord shall not be liable to Tenant for violation of any such Rules and Regulations, or for the breach of any covenant or condition in any lease by any other tenant in the Real Property. A waiver by Landlord of any Rules and Regulations for

36

763092.6

any other tenant shall not constitute nor be deemed a waiver of the Rules and Regulations for this Tenant.

30.10. **Quiet Possession.** Upon Tenant's paying the Rent and other sums provided hereunder and observing and performing all of the covenants, conditions and provisions on Tenant's part to be observed and performed hereunder, Tenant shall have quiet possession of the Premises for the entire Lease Term hereof, subject to all of the provisions of this Lease.

30.11. **Rent.** All payments required to be made hereunder to Landlord shall be deemed to be "**Rent**", whether or not described as such.

30.12. **Successors and Assigns.** Subject to the provisions of Section 14 hereof, all of the covenants, conditions and provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns.

30.13. **Notices.** Any notice required or permitted to be given hereunder shall be in writing and may be given by personal service evidenced by a signed receipt or sent by registered or certified mail, return receipt requested, or via overnight courier, and shall be effective upon proof of delivery, addressed to Tenant at the addresses set forth in Section 1.1 above, and to Landlord at the addresses set forth in Section 1.2 above. Either party may by notice to the other specify a different address for notice purposes except that, upon Tenant's taking possession of the Premises, the Premises shall constitute Tenant's address for notice purposes. A copy of all notices to be given to Landlord hereunder shall be concurrently transmitted by Tenant to such party hereafter designated by notice from Landlord to Tenant. Any notices sent by Landlord regarding or relating to eviction procedures, including without limitation three day notices, may be sent by regular mail.

30.14. **Right of Landlord to Perform.** All covenants and agreements to be performed by Tenant under any of the terms of this Lease shall be performed by Tenant at Tenant's sole cost and expense and without any abatement of rent. If Tenant shall fail to pay any sum of money, other than rent, required to be paid by it hereunder or shall fail to perform any other act on its part to be performed hereunder, and such failure shall continue beyond any applicable cure period set forth in this Lease, Landlord may, but shall not be obligated to, without waiving or releasing Tenant from any obligations of Tenant, make any such payment or perform any such other act on Tenant's part to be made or performed as is in this Lease provided. All sums so paid by Landlord and all reasonable incidental costs, together with interest thereon at the rate of ten percent (10%) per annum from the date of such payment by Landlord, shall be payable to Landlord on demand and Tenant covenants to pay any such sums, and Landlord shall have (in addition to any other right or remedy of Landlord) the same rights and remedies in the event of the nonpayment thereof by Tenant as in the case of default by Tenant in the payment of the rent.

30.15. **Landlord's Access.** Every part of the Real Property except the inside surfaces of all walls, windows and doors bounding the Premises (including exterior building walls, the rooftop, core corridor walls and doors and any core corridor entrance), and any space in or adjacent to the Premises or within the Real Property used for shafts, stacks, pipes, conduits, fan rooms, ducts, electric or other utilities, sinks or other building facilities, and the use thereof, as well as access thereto through the Premises for the purposes of operation, maintenance, decoration and repair, are reserved to Landlord. Tenant shall permit Landlord to install, use and maintain pipes, ducts and conduits within the walls, columns and ceilings of the Premises and

37

throughout the Real Property. Landlord shall not materially and unreasonably interfere with Tenant's permitted use of the Premises in connection with the same.

30.16. **Changes in Real Property.** Landlord reserves the right, without incurring any liability to Tenant therefor, to make such changes in or to the Real Property and the fixtures and equipment thereof, as well as in or to the street entrances, halls, passages, elevators, stairways and other improvements thereof, as it may deem necessary or desirable. Landlord shall not materially and unreasonably interfere with Tenant's permitted use of the Premises in connection with the same.

30.17. **Real Property Name.** Landlord may adopt any name for the Real Property and Landlord reserves the right, from time to time, to change the name and/or address of the Real Property.

30.18. **Facsimile Signature.** Each party hereto is authorized to rely upon the signatures of each person and entity on this Lease which are delivered by facsimile as constituting an irrevocable, actual, current delivery of this Lease with original signatures of each person and entity.

30.19. **Survival of Obligations.** Any obligations of Tenant occurring prior to the expiration or earlier termination of this Lease shall survive such expiration or earlier termination.

30.20. **Confidentiality.** Tenant acknowledges that the content of this Lease and any related documents are confidential information. Tenant shall keep such confidential information strictly confidential and shall not disclose such confidential information to any person or entity other than Tenant's financial, legal and space planning consultants and any proposed Transferees.

30.21. **Governing Law.** This Lease shall be governed by and construed in accordance with the laws of the State of California. No conflicts of law rules of any state or country (including, without limitation, California conflicts of law rules) shall be applied to result in the application of any substantive or procedural laws of any state or country other than California. All controversies, claims, actions or causes of action arising between the parties hereto and/or their respective successors and assigns, shall be brought, heard and adjudicated by the courts of the State of California, with venue in the County of Los Angeles. Each of the parties hereto hereby consents to personal jurisdiction by the courts of the State of California in connection with any such controversy, claim, action or cause of action, and each of the parties hereto consents to service of process by any means authorized by California law and consent to the enforcement of any judgment so obtained in the courts of the State of California on the same terms and conditions as if such controversy, claim, action or cause of action had been originally heard and adjudicated to a final judgment in such courts. Each of the parties hereto further acknowledges that the laws and courts of California were freely and voluntarily chosen to govern this Lease and to adjudicate any claims or disputes hereunder.

30.22. **Exhibits.** The Exhibits attached hereto are incorporated herein by this reference as if fully set forth herein.

30.23. **Independent Covenants.** This Lease shall be construed as though the covenants herein between Landlord and Tenant are independent (and not dependent) and Tenant hereby expressly waives the benefit of any statute to the contrary and agrees that if Landlord fails to perform its obligations set forth herein, Tenant shall not be entitled to make any

38

repairs or perform any acts hereunder at Landlord's expense or to set off of any of the rent or other amounts owing hereunder against Landlord.

30.24. **Counterparts.** This Lease may be executed in counterparts, each of which shall be deemed an original, but such counterparts, when taken together, shall constitute one agreement.

30.25. **Standard for Conduct and Consent.** Notwithstanding anything to the contrary contained in the Lease, except to the extent this Lease provides that Landlord's or Tenant's approval or consent may be given or withheld in such party's "sole" or "absolute" discretion, any time the consent of Landlord or Tenant is required, such consent shall not be unreasonably withheld, conditioned or delayed. Except as otherwise provided in this Lease, whenever this Lease grants Landlord or Tenant the right to take action, exercise discretion, establish rules and regulations or make allocations or other determinations, Landlord and Tenant shall act reasonably and in good faith.

IN WITNESS WHEREOF, the parties have executed this Lease, consisting of the foregoing provisions and Articles, including all exhibits and other attachments referenced therein, as of the date first above written.

"LANDLORD"

TPRF/THC HAVENPARK, LLC,
a Delaware limited liability company

By:     The Hileman Company, LLC,
a Delaware limited liability company
Its Manager

By: _____
Print Name: ___Jack D. Hileman___
Title:_____President_____

"TENANT"

AMERICAN HOME MORTGAGE CORP.,
a New York corporation

By: _____
Print Name:_____JOHN KALAS_____
Title: _____SVP_____

39

763092.6

**EXHIBIT "A"**

**PREMISES SPACE PLAN**



A-1

763092.6

**EXHIBIT "B"**

## PROJECT SITE PLAN

**(SEE ATTACHED)**

B-1



EXHIBIT "C"

<u>WORK LETTER</u>

(SEE ATTACHED)

## TENANT IMPROVEMENT WORK LETTER

This Tenant Improvement Work Letter ("**Work Letter**") is attached as Exhibit "C" to, and forms part of, that certain Commercial Office Lease dated August 11, 2006 ("**Lease**"), between **TPRF/THC HAVENPARK, LLC**, a Delaware limited liability company ("**Landlord**") and **AMERICAN HOME MORTGAGE CORP.**, a New York corporation ("**Tenant**"). This Work Letter shall set forth the terms and conditions relating to the construction of the "**Tenant Improvements**," as that term is defined in Section 2.1, below, in the Premises. This Work Letter is intended to address the material issues in connection with the construction of the Tenant Improvements, in sequence, as such issues will arise during the actual construction of the Tenant Improvements. All terms not defined herein shall have the same meaning as set forth in the Lease. All references in this Work Letter to Articles or Sections of "the Lease" shall mean the relevant portion of the Lease, and all references in this Work Letter to Sections of "this Work Letter" shall mean the relevant portion of Sections 1 through 6 of this Work Letter.

## SECTION 1

## BASE BUILDING AND LANDLORD'S WORK

1.1    **Base Building Description.** Landlord shall construct, at its sole cost and expense, the base, shell and core of (i) the Building, (ii) the floor of the Building on which the Premises is located, and (iii) the Premises (collectively, the "**Base Building**") as more particularly described on Attachment 1 to this Work Letter.

1.2    **Landlord Work.** Landlord shall, at Landlord's sole cost and expense, cause the construction or installation of the following items on the floor of the Building containing the Premises (collectively, the "**Landlord Work**"):

1.2.1    Public Corridor (only as to that portion of the Premises, if any, which occupies only a portion of a floor, rather than an entire floor, of the Building). The actual public corridor wall (excluding drywall on the Premises side of the corridor), which is adjacent to the Premises.

1.2.2    Demising Walls Between Tenants (only as to that portion of the Premises, if any, which occupies only a portion of a floor, rather than an entire floor, of the Building). One-half of the cost of the demising partitions between tenants which are adjacent to the Premises.

## SECTION 2

## TENANT IMPROVEMENTS

2.1    **Tenant Improvement Allowance.** Tenant shall be entitled to a one-time tenant improvement allowance (the "**Tenant Improvement Allowance**") in the amount of up to, but not exceeding one of the following amounts:  (i) Thirty-Five and No/100 Dollars ($35.00) per useable square foot of floor space in the Premises if Tenant elects Base Rent Option 1 under the Lease, or (ii) Forty-Five and No/100 Dollars ($45.00) per useable square foot of floor space in the Premises if Tenant elects Base Rent Option 2 under the Lease, for the costs relating to the initial design (including, but not limited to, permitting, space planning, working drawings and engineering) and construction of Tenant's Improvements which are permanently affixed to the Premises (the "**Tenant Improvements**").  In no event shall Landlord be obligated to make

-1-

disbursements of Landlord's funds pursuant to this Work Letter (A) in a total amount that exceeds the Tenant Improvement Allowance, or (B) for any costs incurred later than six (6) months after the Commencement Date.

2.2    **Disbursement of the Tenant Improvement Allowance.**

2.2.1    **Tenant Improvement Allowance Items.** Except as otherwise set forth in this Work Letter, the Tenant Improvement Allowance shall be disbursed by Landlord (each of which disbursements shall be made pursuant to Landlord's disbursement process as described below) for costs related to the construction of the Tenant Improvements and for the following items and costs (collectively, the "**Tenant Improvement Allowance Items**"):

2.2.1.1    payment of the fees of the "Architect" and the "Engineers," as those terms are defined in Section 3.1 of this Work Letter;

2.2.1.2    the payment of plan check, permit and license fees relating to construction of the Tenant Improvements;

2.2.1.3    the cost of construction of the Tenant Improvements, including, without limitation, contractors' fees and general conditions, costs of materials and services, testing and inspection costs, freight elevator usage, costs of trash removal and cost of hoists;

2.2.1.4    the cost of any changes in the Base Building when such changes are required by the Construction Drawings (including if such changes are due to the fact that such work is prepared on an unoccupied basis), such cost to include all direct architectural and/or engineering fees and expenses reasonably incurred in connection therewith;

2.2.1.5    the cost of any changes to the Construction Drawings or Tenant Improvements required by the applicable Laws;

2.2.1.6    The cost of freestanding workstations, built-in, and moveable furniture, fixtures, and equipment for the Premises;

2.2.1.7    Any moving or relocation costs incurred by Tenant;

2.2.1.8    The cost of voice and data wiring and systems within the Premises;

2.2.1.9    sales and use taxes and gross receipts taxes;

2.2.1.10    the "Tenant Coordination Fee," as that term is defined in Section 4.4 of this Work Letter;

2.2.1.11    any engineering costs associated with completion of the State of California energy utilization calculations under Title 24 legislation required in connection with the Tenant Improvements;

2.2.1.12    The costs of any monument signage installed by Tenant in accordance with Section 29.3 of the Lease; and

-2-

2.2.1.13 all other costs to be expended by Landlord in connection with the construction of the Tenant Improvements.

2.2.2  Disbursement of the Tenant Improvement Allowance.  During the design and construction of the Tenant Improvements, Landlord shall make monthly disbursements of the Tenant Improvement Allowance for Tenant Improvement Allowance Items for the benefit of Tenant and shall authorize the release of monies for the benefit of Tenant pursuant to Landlord's standard disbursement process; provided, however, that Landlord shall have no obligation to disburse any portion of the Tenant Improvement Allowance until after Landlord's receipt of (i) an application and certification for payment of the "Contractor," as that term is defined in Section 4.1 of this Work Letter, showing the schedule, by trade of percentage of completion of the Tenant Improvements in the Premises, detailing the portion of the work completed and the portion not completed, (ii) executed statutory mechanics' lien releases which comply with the applicable provisions of California Civil Code Section 3262(d) (although Landlord, and not Tenant, shall be responsible for obtaining such lien releases, and in connection therewith Landlord shall use commercially reasonable efforts to promptly obtain such lien releases), (iii) other information and documentation reasonably required by Landlord; and (vi) if there is an Over-Allowance Amount required to be paid by Tenant pursuant to Section 4.3 below for such disbursement, Landlord shall only be required to make a disbursement equal to Landlord's pro rata share of the Tenant Improvement Allowance and only after Tenant has paid its pro rata share of the Over-Allowance Amount. For purposes hereof, Landlord's pro rata share for each such disbursement amount of the Tenant Improvement Allowance shall equal the percentage resulting from dividing the Tenant Improvement Allowance (less sums already disbursed for any Non-Construction Allowance Items, as defined below), by the total cost of the Tenant Improvement Allowance Items (less sums already disbursed for any Non-Construction Allowance Items) as estimated in the Cost Proposal delivered pursuant to Section 4.2 (as may be revised from time to time), and Tenant's pro rata share for each such disbursement of the Over-Allowance Amount shall equal the Over-Allowance Amount divided by such total cost of the Tenant Improvement Allowance Items (less sums already disbursed for any Non-Construction Allowance Items, as defined below). Notwithstanding the foregoing, with respect to fees and expenses of the Architect or Engineers or any other pre-construction items for which the payment scheme set forth in items (i) and (ii) of the immediately preceding sentence is not applicable (collectively, the "Non-Construction Allowance Items"), Landlord shall make disbursements of the Tenant Improvement Allowance therefor on a monthly basis following Landlord's receipt of invoices and other reasonable evidence that Tenant has incurred the cost for the applicable Non-Construction Allowance Items (unless Landlord has received a preliminary notice in connection with such costs, in which event conditional lien releases must be submitted in connection with such costs) and such other information and documentation reasonably required by Landlord.

2.3  Standard Tenant Improvement Package. Landlord has established specifications (the "Specifications") for the Building standard components to be used in the construction of the Tenant Improvements in the Premises (collectively, the "Standard Improvement Package"), which Specifications can be obtained by Tenant from Landlord upon request. The quality of Tenant Improvements shall be equal to or of greater quality than the quality of the Specifications, provided that Landlord may, at Landlord's option, require the Tenant Improvements to comply with certain Specifications as designated by Landlord. Landlord may make changes to the Specifications for the Standard Improvement Package from time to time.

764551.3

## SECTION 3

## CONSTRUCTION DRAWINGS

3.1     Selection of Architect/Construction Drawings.  Landlord shall retain a qualified architect/space planner (the "**Architect**") to prepare the "**Construction Drawings**," as that term is defined in this Section 3.1.  Landlord shall retain the necessary engineering consultants (the "**Engineers**") to prepare all plans and engineering working drawings relating to the structural, mechanical, electrical, plumbing, HVAC, life safety, and sprinkler work of the Tenant Improvements.  The plans and drawings for the Tenant Improvements to be prepared by Architect and the Engineers hereunder shall be known collectively as the "**Construction Drawings**."  Landlord and Architect shall verify, in the field, the dimensions and conditions as shown on the relevant portions of the Building Plans, Landlord and Architect shall be solely responsible for the same.  Landlord's review of the Construction Drawings as set forth in this Section 3, shall be for its sole purpose and shall not imply Landlord's review of the same, or obligate Landlord to review the same, for quality, design, compliance with applicable Laws or other like matters.  Accordingly, notwithstanding that any Construction Drawings are reviewed by Landlord or its space planner, architect, engineers and consultants, and notwithstanding any advice or assistance which may be rendered to Tenant by Landlord or Landlord's space planner, architect, engineers, and consultants, Landlord shall have no liability whatsoever in connection therewith and shall not be responsible for any omissions or errors contained in the Construction Drawings.

3.2     Space Plan.  Landlord shall provide to Tenant, at Landlord's sole expense, a preliminary "test fit" space plan for the Tenant Improvements in the Premises (including one set of revisions to the space plan) prepared by the Architect at Landlord's direction.  Landlord and the Architect shall prepare, to scale, the final space plan for the Tenant Improvements in the Premises (collectively, the "**Final Space Plan**"), which Final Space Plan shall include a layout and designation of all offices, rooms (including all mechanical and electrical rooms) and other partitioning, their intended use, and equipment to be contained therein, as well as any special or excess floor loading conditions therein, and shall deliver the Final Space Plan to Landlord for Landlord's reasonable approval.  Landlord shall, within ten (10) business days after Landlord receives such Final Space Plan, either (i) approve the Final Space Plan, (ii) approve the Final Space Plan subject to specified conditions to be complied with when the Final Working Drawings are submitted to Landlord, or (iii) disapprove the Final Space Plan and return the same to Architect with requested revisions; provided, however, that Landlord shall only disapprove the Final Space Plan for reasonable and material reasons, such as: (A) an adverse effect on the structural integrity of the Building; (B) non-compliance with applicable Laws; (C) an adverse effect on the main systems and equipment servicing the Building; (D) an adverse effect on the common areas or the exterior appearance of the Building or Real Property; or (E) inconsistency with the Building Plans (individually or collectively, a "**Design Problem**").  If Landlord notifies Tenant of such disapproval, Landlord shall cause the Final Space Plan to be revised to correct any such Design Problem, and shall deliver such revised Final Space Plan to Tenant for Tenant's reasonable approval within five (5) business days thereafter.  Tenant shall approve or disapprove of the resubmitted Final Space Plan, based upon the criteria set forth in this Section 3.2, within five (5) business days after Tenant receives such resubmitted Final Space Plan.  The foregoing process shall be repeated until Landlord and Tenant mutually approve the Final Space Plan.

3.3     Final Working Drawings.  Based upon and in compliance with the Final Space Plan, Landlord shall cause the Architect and the Engineers to complete the architectural and

-4-

engineering drawings for the Premises, and the final architectural working drawings in a form which is complete to allow subcontractors to bid on the work and to obtain all applicable permits (collectively, the "**Final Working Drawings**") and shall submit the same to Tenant for Tenant's approval. The Final Working Drawings may be submitted in one or more stages at one or more times. Tenant shall, within ten (10) business days after Tenant receives the Final Working Drawings, either (A) approve the Final Working Drawings, (B) approve the Final Working Drawings subject to specified conditions to be satisfied prior to submitting the Approved Working Drawings for Permits as set forth in Section 3.4 below, if the Final Working Drawings do not comply with the Final Space Plan or contain a Design Problem, or (C) disapprove the Final Working Drawings and return the same to Landlord with requested revisions if the Final Working Drawings do not comply with the Final Space Plan or contain a Design Problem. If Tenant notifies Landlord of such disapproval, Landlord shall cause the Final Working Drawings to be revised to correct any such Design Problem, and/or non-compliance with the Final Space Plan and shall deliver such revised Final Working Drawings to Tenant within five (5) business days thereafter. Tenant shall approve or disapprove of the resubmitted Final Working Drawings, based upon the criteria set forth in this Section 3.3, within ten (10) business days after Tenant receives such resubmitted Final Working Drawings. The foregoing process shall be repeated until Landlord and Tenant mutually approve the Final Working Drawings. The Final Working Drawings as finally approved by Landlord and Tenant pursuant to this Section 3.3 shall be referred to herein as the "**Approved Working Drawings**."

    3.4    _Approved Working Drawings; Permits_. Immediately after approval by Landlord and Tenant of the Approved Working Drawings, Landlord shall submit the same to the appropriate municipal authorities for all applicable building permits necessary to allow Contractor to commence and fully complete the construction of the Tenant Improvements (the "**Permits**"), and shall have the Approved Working Drawings completed and submitted to such municipal authorities in such sufficient condition as to have the applicable local municipal authorities issue the Permits to the Contractor; provided, however, that after Landlord and Tenant approve the Final Space Plan or any portion of the Final Working Drawings, Landlord shall submit the same to the appropriate municipal authorities to begin the process of obtaining the Permits. No changes, modifications or alterations in the Final Space Plan or Approved Working Drawings may be made without the prior written consent of both Landlord and Tenant, which consent shall not be unreasonably withheld or delayed, provided that Landlord may withhold its consent, in its sole discretion, to any change in the Final Space Plan or Approved Working Drawings if such change would (i) delay the "**Substantial Completion**" of the Premises as that term is defined in Section 5.1 below, unless Tenant agrees in writing to be responsible for any such delay and for the cost of any such delay resulting therefrom, and/or (ii) create a Design Problem.

    3.5    _Time Deadlines_. Landlord shall use its reasonable, good faith efforts and all due diligence to cooperate with the Architect, the Engineers and Tenant to complete all phases of the Construction Drawings and the permitting process and to receive the Permits, and with Contractor for approval of the "**Cost Proposal**," as that term is defined in Section 4.2 of this Work Letter, as soon as commercially reasonable after the execution of the Lease, and, in that regard, shall meet with Tenant on a scheduled basis to be determined by Landlord, to discuss Landlord's progress in connection with the same.

764551.3

## SECTION 4

## CONSTRUCTION OF THE TENANT IMPROVEMENTS

4.1    Contractor.  If Tenant elects to have Landlord responsible for the management and supervision of the Tenant Improvement construction, Landlord shall select and retain a general contractor (the "**Contractor**") to construct the Tenant Improvements. Following the parties' approval of the Approved Working Drawings, the Contractor shall submit the Approved Working Drawings for competitive bidding to at least three (3) subcontractors per trade selected by the Contractor and Landlord. The subcontractor bids shall be submitted promptly to Landlord and a reconciliation shall be performed by Landlord to adjust inconsistent or incorrect assumptions so that a like-kind comparison can be made and a low bidder determined. The subcontractors with the lowest qualified bids per trade shall be selected, unless otherwise mutually approved by Tenant and Landlord. Notwithstanding anything to the contrary contained in this Work Letter, Landlord and the Contractor shall not be required to solicit bids from subcontractors relating to the structural, mechanical, electrical, plumbing, HVAC, life safety and sprinkler work of the Tenant Improvements, provided that Landlord and Contractor select such subcontractors that were originally selected in connection with the construction of the Base Building.

4.2    Cost Proposal.  Within twenty (20) business days after the Approved Working Drawings are signed by Landlord and Tenant, Landlord shall provide Tenant with a cost proposal in accordance with the Approved Working Drawings, which cost proposal shall include, as nearly as possible, the cost of all Tenant Improvement Allowance Items incurred or to be incurred in connection with the design and construction of the Tenant Improvements (the "**Cost Proposal**"). Tenant shall approve the Cost Proposal or notify Landlord in writing of Tenant's reasonable disapproval (with specific reasons for disapproval noted) of the Cost Proposal within ten (10) business days of the receipt of the same; if Tenant notifies Landlord of such reasonable disapproval, Landlord shall incorporate such reasonable revisions to the Cost Proposal proposed by Tenant as Landlord shall reasonably approve and deliver the revised Cost Proposal to Tenant, which revised Cost Proposal Tenant shall approve, execute and return to Landlord within four (4) business days after Tenant's receipt of same. The date by which Tenant must approve and deliver the Cost Proposal to Landlord shall be known hereafter as the "**Cost Proposal Delivery Date**".

4.3    Over-Allowance Amount.  If the cost of the Tenant Improvement Allowance Items as set forth in the approved Cost Proposal exceeds the Tenant Improvement Allowance (such excess shall be referred to herein as the "**Over-Allowance Amount**"), Tenant shall pay to Landlord, within twenty (20) days after Landlord's invoice therefor, Tenant's pro rata share of such Over-Allowance Amount as determined pursuant to Section 2.2.2 above, and such payment by Tenant shall be a condition to Landlord's obligation to disburse or pay Landlord's pro rata portion of the Tenant Improvement Allowance (other than for any Non-Construction Allowance Items).  Upon Landlord's receipt of such payment by Tenant, Landlord shall disburse such payments to the Contractor (or applicable party) concurrently with Landlord's disbursement of Landlord's pro rata corresponding portion of the Tenant Improvement Allowance pursuant to the procedures set forth in Section 2.2.2 of this Work Letter.  In the event that, after the Cost Proposal Delivery Date, the costs of the Tenant Improvement Allowance Items shall change, such changes shall be incorporated into the last approved Cost Proposal and Landlord's and Tenant's pro rata share of such additional costs shall be adjusted to take into account such changes.

-6-

4.4    Tenant Coordination Fee. If Tenant elects to have Landlord responsible for the management and supervision of the Tenant Improvement construction, Tenant shall pay a construction supervision and management fee (the **"Tenant Coordination Fee"**) to Landlord in the amount equal to the product of (A) Five percent (5%) and (B) an amount equal to the sum of the Tenant Improvement Allowance plus the Over Allowance Amount (as such Over Allowance Amount may increase pursuant to the terms of this Work Letter). Landlord shall not be entitled to any fee other than the Tenant Coordination Fee relating to the construction of the Tenant Improvements.

4.5    Notice of Completion; Copy of Record Set of Plans. Within ten (10) business days after completion of construction of the Tenant Improvements, Landlord shall cause a statutory Notice of Completion to be recorded in the office of the County Recorder for the county in which the Premises are located in accordance with Section 3093 of the Civil Code of the State of California or any successor statute, and shall furnish a copy thereof to Tenant upon such recordation. If Landlord fails to do so, after having received ten (10) business days' prior notice from Tenant, Tenant may execute and file the same on behalf of Landlord as Landlord's agent for such purpose, at Tenant's sole reasonable cost and expense. At the conclusion of construction, (i) Landlord shall cause the Architect (A) to update the Approved Working Drawings as necessary to reflect all changes made to the Approved Working Drawings during the course of construction, (B) to certify to the best of the Architect's knowledge that the "record-set" of as-built drawings are true and correct, which certification shall survive the expiration or termination of this Lease, and (C) to deliver to Tenant two (2) sets of copies of such record set of drawings within ninety (90) days following issuance of a certificate of occupancy for the Premises.

## SECTION 5

## SUBSTANTIAL COMPLETION OF PREMISES;

## COMMENCEMENT DATE ADJUSTMENTS

5.1    Ready for Occupancy. For purposes of the Lease, the Premises shall be **"Ready for Occupancy"** on the date that Substantial Completion (as defined below) of the Premises occurs. As used herein, **"Substantial Completion"** of the Premises shall occur upon: (i) the completion of construction of the Tenant Improvements in the Premises pursuant to the Approved Working Drawings, with the exception of any punch-list items which will not materially and adversely interfere with Tenant's ability to commence its business operations in the Premises (which punch-list items shall be diligently completed by Landlord pursuant to this Section 5.1 below); and (ii) the issuance of the temporary certificate of occupancy or its equivalent from the City of Rancho Cucamonga permitting occupancy of the Premises. Within thirty (30) days after the date of Substantial Completion of the Premises, Landlord's and Tenant's respective representatives shall inspect the Premises and identify "punch-list" items and jointly prepare a written "punch-list." Landlord shall diligently complete all "punch-list" items set forth on such list as soon as reasonably possible. Landlord shall, however, be under no obligation to repair any damage caused by Tenant in connection with Tenant's move into the Premises, the exercise by Tenant of its rights under Section 6.5 below and/or otherwise caused by Tenant, all of which shall be repaired by Tenant at Tenant's cost.

5.2    Delay of the Substantial Completion of the Premises. The Commencement Date shall occur as set forth in the Lease; provided, however, that the Commencement Date shall be deemed to be the date the Commencement Date would have occurred if no Acceleration Event

-7-

or Delay Event, as set forth below, had occurred. If the Substantial Completion of the Premises is delayed due to an Acceleration Event or a Delay Event, then notwithstanding anything to the contrary set forth in the Lease or this Work Letter and regardless of the actual date of the Substantial Completion of the Premises, the Commencement Date shall be accelerated or delayed as follows:

5.2.1    Commencement Date Acceleration. The Commencement Date shall be accelerated by the number of days Substantial Completion is delayed to the extent such delay was caused by the following (each, an "Acceleration Event"):

5.2.1.1    Tenant's failure to approve and deliver the Cost Proposal to Landlord by the Cost Proposal Delivery Date;

5.2.1.2    Tenant's failure to timely approve any matter requiring Tenant's approval;

5.2.1.3    a breach by Tenant of the terms of this Work Letter or the Lease;

5.2.1.4    changes in any of the Construction Drawings after disapproval of the same by Landlord for a Design Problem;

5.2.1.5    Tenant's request for changes in the Approved Working Drawings;

5.2.1.6    Tenant's requirement for materials, components, finishes or improvements which are not available in a commercially reasonable time given the anticipated date of Substantial Completion of the Premises, as set forth in the Lease, or which are different from, or not included in, the Standard Improvement Package;

5.2.1.7    changes to the Base Building, structural components or Systems and Equipment of the Building required by the Approved Working Drawings, unless such changes are required as a result of the failure of the Base Building to comply with applicable Laws in effect as of the date the Approved Working Drawings are approved by Landlord and Tenant, as such noncompliance shall be determined strictly on an unoccupied basis, without regard to any of the Tenant Improvements to be constructed in the Premises or Tenant's proposed use of the Premises;

5.2.1.8    the exercise by Tenant of its rights under Section 6.5 below; or

5.2.1.9    any other acts or omissions of Tenant, or its agents or employees in express contravention of this Work Letter or the Lease.

5.2.2    Commencement Date Delay. The Commencement Date shall be delayed by the number of days Substantial Completion is delayed to the extent such delay was caused by the following (each, a "Delay Event"):

5.2.2.1    fire, earthquake, damage or destruction to the Building, explosion, flood, hurricane, the elements, acts of God or the public enemy, war, invasion, insurrection, rebellion, or riots ("Force Majeure");

-8-

764551.3

5.2.2.2 the inability to secure customary materials, supplies or labor through ordinary sources by reason of regulation or order of any government or regulatory body;

5.2.2.3 changes in applicable laws;

5.2.2.4 unreasonably delays in Landlord's delivery of an acceptable Final Space Plan or Final Working Drawings and/or completion and submission of the Approved Working Drawings in such sufficient condition as to have the Permits issued by the City in which the Premises are located;

5.2.2.5 failure of Landlord to timely provide any approvals or disapprovals required of Tenant within the time frames specified in this Work Letter;

5.2.2.6 unreasonable interference by Landlord or its employees or agents or contractors with the completion of the Tenant Improvements and which objectively precludes construction of the Tenant Improvements by any person, which interference relates to access by Tenant, its agents and contractors to the Building or any Building facilities (including loading docks and freight elevators) or service (including temporary power and parking areas) during normal construction hours, or the use thereof during normal construction hours;

5.2.2.7 the acts or failures to act of Landlord or its agents or contractors with respect to payment of any contractors and/or any cessation of construction of the Tenant Improvements as a result thereof, unless due to an Acceleration Event.

## SECTION 6

## MISCELLANEOUS

6.1     Tenant's Representative.  Tenant has designated Donna Kiessel as its sole representative with respect to the matters set forth in this Work Letter, who, until further notice from Tenant to Landlord, shall have full authority and responsibility to act on behalf of the Tenant as required in this Work Letter.

6.2     Landlord's Representative.  Landlord has initially designated Gary L. Mayer as its sole representative with respect to the matters set forth in this Work Letter, who, until further notice to Tenant, shall have full authority and responsibility to act on behalf of the Landlord as required in this Work Letter.

6.3     Time of the Essence in This Work Letter.  Unless otherwise indicated, all references herein to a "number of days" shall mean and refer to calendar days.  If any item requiring approval by Landlord is timely disapproved by Landlord, the procedure for preparation of the document and approval thereof shall be repeated until Landlord approves the document.

6.4     Tenant's Lease Default.  Notwithstanding any provision to the contrary contained in this Lease, if Tenant is in default under this Lease beyond any applicable notice and cure period at any time on or before Substantial Completion of the Premises, then (i) in addition to all other rights and remedies granted to Landlord pursuant to the Lease, Landlord may cause Contractor to cease the construction of the Tenant Improvements (in which case Tenant shall be responsible for any delays in Substantial Completion of the Premises caused by such work stoppage), and (ii) all other obligations of Landlord under the terms of this Work Letter shall be suspended until such time as such default is cured pursuant to the terms of the Lease (in which

-9-

case, Tenant shall be responsible for any delays in Substantial Completion of the Premises, caused by such inaction by Landlord).

6.5    <u>Tenant's Entry Into the Premises Prior to Substantial Completion</u>.  Provided that Tenant and its agents do not interfere with Contractor's work in the Building and the Premises, Landlord and Contractor shall allow Tenant access to the Premises prior to the Substantial Completion of the Premises for the purpose of Tenant installing overstandard equipment or fixtures and systems furniture (including Tenant's data and telephone equipment) in the Premises.  Prior to Tenant's entry into the Premises as permitted by the terms of this <u>Section 6.5</u>, Tenant shall submit a schedule to Landlord and Contractor, for their approval, which schedule shall detail the timing and purpose of Tenant's entry.

-10-

## ATTACHMENT 1

## BASE BUILDING DESCRIPTION

**HavenPark Office Buildings**
Rancho Cucamonga, California
Core & Shell Building Description 11-1-05

The Buildings have been designed to be in conformance with the following codes:

- The 2001 California Building Code, incorporating the "Uniform Building Code, Volumes 1 and 2", 1997 Edition, including all appendices thereto

- The 2001 California Mechanical Code, incorporating the "Uniform Mechanical Code", 2000 Edition

- The 2001 California Plumbing Code, incorporating the "Uniform Plumbing Code", 2000 Edition, including all appendices thereto

- The 2001 California Electrical Code, incorporating the "National Electrical Code"

- 1999 Edition, including the "Uniform Administrative Code Provisions for the National Electrical Code"

- The Buildings are designed to comply with all regulations and specifications as defined in the American with Disabilities Act

1.1    Base Building Definition.

(a)    General.    The Base Building shall include three (3) floors above grade. All areas within the Base Building shall have been fully permitted by the City Rancho Cucamonga. Premises shall be broom clean and all systems serving the Premises shall be in good working order prior to construction of the Tenant Improvements. The net rentable area of each Building is approximately 75,684 square feet.

(b)    Structure.    The Base Building shall include concrete foundations with steel reinforcing, a concrete floor slab on grade for the first floor, and a concrete floor slabs over metal decking for the second and third floors. The Base Building's main structural system is comprised of interior steel beams, girders, and columns, and exterior concrete wall panels. All steel columns and beams will be spray fireproofed to achieve a one-hour rating. The Base Building shall also utilize interior concrete shear walls with steel reinforcing to improve its capacity to resist lateral forces during an earthquake. The floor areas of the Premises can accommodate the placement of furnishings, fixtures, and equipment with the following load limitations:

|  |  |
|---|---|
| Live Load: | 80 lbs/sf. |
| Dead Load: | 55 lbs/sf. |
| Partition Load: | 20 lbs/sf. |

-11-

764551.3

The Base Building has been designed to accommodate a typical finished ceiling height of 10' – 0" above the finished concrete floor. Floor flatness for the ground floor slab of the Base Building is specified to conform to an F'f of 50 and an F'l of 40.

(c)   Windows and Glazing. The exterior window system features 'punched' window openings on all elevations on both floors with a typical window size of 6'-0" wide x 10'-0" high. The top of each window is located at 10' – 0" above the floor level. The windows are 1" insulated glazing with a ceramic frit pattern to reduce glare. The window glazing also incorporates a high performance, low emissitivity coating for energy efficiency. The mullions are clear anodized aluminum with silicone sealant to all adjoining surfaces. The interior frames are assembled in accordance with current curtain wall industry standards, and will include floor and ceiling closures as well as jamb drywall receivers finished to match the window systems. Landlord will provide horizontal louver blinds for all exterior tenant area windows, stocked in the lease area, for installation by the Tenant's interior contractor.

(d)   Exterior Walls and Roof. All exterior walls of the Base Building are constructed of reinforced concrete panels. The interior side of all exterior walls will be provided with metal studs and thermal insulation at exterior walls exposed to the lease premises, and thermal insulation above the tenant ceiling line. Areas of the exterior are also clad with aluminum panels and cultured stone. The roof will be covered by a high performance PVO membrane roofing system.

(e)   Interior Walls and Surfaces. All interior walls in the Base Building core areas shall be constructed with metal stud framing and gypsum wall board, or exposed concrete shear walls. All gypsum board surfaces shall be adequately fastened, joints taped, finished with joint compound, sanded, and ready to receive Tenant's finishes. The interior walls of mechanical, electrical, and telephone rooms shall be finished by the Landlord. All the interior walls of the exit stairwells shall be finished by the Landlord.

(f)   Ground Floor Entrance Lobby. The Base Building shall include a custom designed main entry lobby on the ground floor, with natural stone floor finishes in the main portion thereof. The entry doors are glass all-glass 'Herculite' type, set in a two story glass storefront. The walls of the entry lobby shall be designed and finished with a number of different materials including cultured stone, wood veneer, custom reveals, metal panels, and textured wall coatings. The lobby also incorporates specialized light fixtures that have been designed to highlight the custom wall shapes and finishes.

(g)   Elevators. The Base Building shall be equipped with two (2) hydraulic elevators, each with a capacity rating of 3,000 lbs. and a speed rating of 150 feet per minute. One elevator is supplied with protective blanket hooks and one complete set of full height protective blankets. The elevator cabs shall have a stone floor, a stainless steel ceiling with recessed down-lights, stainless steel interior doors, wood veneer side wall panels, and a custom designed glass fixture on the rear wall with a custom handrail. The interior dimensions of the elevator cab are approximately 6 feet and 8 inches wide, by 4 feet and 9 inches deep, by 8 feet and 8 inches high. The elevator doors are 3 feet and 6 inches wide, by 7 feet and 0 inches high. The elevator is equipped with emergency communication devices and an emergency battery powered back-up system in the event of a power failure.

(h)   Core Doors. All Base Building core doors (including but not limited to restrooms, electrical rooms, telephone rooms, and janitor's closets) on office floors shall include

premium stain grade solid core wood and hollow metal doors, hollow metal frames, and commercial grade, brushed chrome hardware, with ratings as required per opening.

(i)    Stairway Exits. Two exit stairs shall be provided in the Base Building with all interior surfaces painted except the exposed concrete floors. Illuminated exit signage shall be provided as required for unoccupied floors. The Tenant shall be permitted to use these stairs for floor to floor travel between Tenant's floors as permitted by applicable law, provided the Tenant, at its sole cost and expense, shall purchase and install all equipment necessary to maintain the integrity of the Tenant's security system without violating the Base Building's security system of electronically controlled door hardware.

(j)    Toilet Rooms. All floors on which the Premises are located will include men's and women's toilet rooms. These toilet rooms will provide fixtures and finishes including but not limited to the following: ceramic tile floors and wall surfaces, natural stone lavatory counter tops, floor and ceiling mounted stainless steel toilet partitions, custom cove lighting, toilet accessories (paper towel dispensers, toilet paper/seat cover dispensers, waste receptacles, soap dispensers, and grab bars), mirrors (above lavatory tops) framed of stainless steel on all sides, and HVAC distribution and exhaust. A janitor's closet will be provided on each floor adjacent to the toilet rooms, and is equipped with a floor mounted mop sink. Each floor of the Base Building will be provided with main waste line extensions from the core area to centralized areas in the unoccupied floor for future Tenant connection.

(k)    Mechanical and HVAC Systems. The Base Building will include commercial grade roof mounted package VAV units with a hot water boiler and pumps for the reheat system and a direct digital control (DDC) system for the controls. Each floor will be served by a separate and independent unit with main trunk ducting, and hot water reheat piping within the space for future connection by Tenant. The toilet areas will be exhausted per code with conditioned make up for the core system. Lobby areas are conditioned by VAV boxes with hot water reheat coils and supply and return air ducting in the side walls and ceilings. The systems are capable of maintaining summer indoor conditions of 75 degree F. dry-bulb temperature and 40-50% relative humidity at outdoor conditions of 101 degrees F. dry-bulb and 72 degrees F. wetbulb. During the winter heating season, an indoor condition of 72 degrees F. can be maintained with an outdoor condition of 34 degrees F. These conditions are predicated on a maximum occupancy load of 100 square feet per person and 15 CFM per person outdoor air (ASHRAE and California Building Code requirements). Because the building air handling systems are VAV, there is a wide range of available zoning densities, depending on the budget available for the tenant air conditioning build-outs. Densities can range from minimum zoning (1,500 - 2,000 sq.ft./zone) to denser, class "A" condition (750 – 1,000 sq.ft./zone). Similarly, air distribution densities (number of ceiling diffusers and return air grilles) can vary widely to suit specific tenant needs, subject to budgetary requirements. Domestic hot water will be supplied by a gas-fired hot water heater.

(l)    Electrical Power Systems and Lighting. The main power service to the building is 277/480 volts/three phase/four wire single feed located in the ground floor electrical room on the end of each office Building. This electrical room is directly accessible from the exterior grade. From this room, a 2500 ampere, 277/480 volt switchboard supplies power to the Base Building and future Tenant power requirements. The three office floors shall be provided with a total connected power load capacity of 23.5 watts per rentable square foot (which includes HVAC), of which 13.0 watts per rentable square foot is available for Tenant lighting and power requirements, utilized via Landlord provided transformers and panels. All electrical usage by the Tenant that exceeds the provided amounts delineated above will be at the sole

-13-

cost and expense of the Tenant. Lighting will be provided in all Common Areas, including janitor's closets, stairs, electrical rooms, telephone rooms, and elevator machine room with Landlord's standard lighting fixtures. The toilet rooms, main lobby and ground level service area are provided with lighting. Battery back-ups are provided for emergency egress path lighting requirements.

(m)    Fire and Life Safety Systems.  Both office floors shall be provided with fire extinguishers as required by the City of Rancho Cucamonga Fire Department, as well as exit signs and smoke seal door assemblies as required for fire rated conditions on unoccupied floors. A fire sprinkler system is provided on all floors, which includes vertical risers, main loop, temporary branch distribution piping, and sprinkler heads as necessary to meet minimum code requirements for unoccupied floors. The Base Building fire protection system is monitored by an off-site monitoring system.

(n)    Communications Systems.  A main telephone room is located in the core of the Building on the ground floor. Conduits and floor openings are provided from this room to a room on each floor for distribution of future Tenant telephone requirements. Plywood telephone backboards are provided in each telephone room. The Building is provided with two 4" conduits connecting the main telephone room to a pull box in the street right of way, where fiber optic service technology can be obtained from a local service provider.

(o)    Security System.  The main entry lobby of the Building is controlled by a 24 hour key card activated lock system.

(p)    Loading Facilities.  A loading area will be located adjacent to the Base Building, and a completely enclosed a trash and recycling enclosure will be provided.

(q)    Building Specific.  The Base Building is designed to include including Architectural, Structural, Mechanical, Electrical, Plumbing, and Fire Life Safety scopes of work. Documents are as prepared by House & Robertson Inc. (Architects), SKT Structural Engineering (Structural), TKSC Engineering (Mechanical and Plumbing), Konsortum1 (Electrical), Thomsen Engineering, Inc. (Site/Civil), and Calvin R. Abe Associates (Landscape), which can be made available from the Landlord at the request of the Tenant for the verification of Base Building provisions, and/or the design of Tenant Improvements.

1.2    Exclusions from Base Building Improvements.

The Base Building Improvements shall include all of the items described in Section 1.1 and shall not include any of the Tenant Improvements (as defined herein). Without limiting the generality of the foregoing, the Base Building shall exclude the following:

(a)    Tenant ceilings and lighting in the Premises;

(b)    Floor finishes in the Premises;

(c)    Interior finishes of any kind in the Premises;

(d)    Interior partitions, doors, frames, and hardware within the Premises;

-14-

764551.3

(e)     Terminal boxes, reheat coils, heating hot water distribution or other HVAC or air distribution devices, including distribution ductwork and controls, beyond the core of the Building (except as described in Section 1.1);

(f)     Tenant's furniture, fixtures, and equipment, including telephones, computers, and cabling;

(g)     Distribution of electrical services, plumbing, or gas services and sprinklers from the core (except as provided for in Section 1.1), and domestic hot distribution beyond the water heater and associated hot water piping;

(h)     Any and all Tenant signage and the power for such signage;

(i)     Security, Fire and Life Safety systems throughout the Premises, including the City of Rancho Cucamonga requirements for strobes, exit lighting and signage, intercoms, and fire extinguishers;

(j)     Gypsum board on the inside face of the exterior wall of each floor of the Building, studs and gypsum board at interior columns or at core shear walls exposed to the Premises.

1.3     Site Improvements.

The Base Building and the surrounding Project have undergone an extensive design and master planning process. The improvements to the Common Areas include asphaltic concrete paving and striping of the parking areas, all new landscaping and an automatic irrigation system. The Buildings are connected to the other buildings, parking and public sidewalk by textured concrete walkways. Each building contains upgraded landscaping and site amenities at the building entry plaza, including stone site walls, trellis elements and unique lighting. The improvements also include new freestanding lighting in the parking areas, new lighting for the pedestrian walkways, and lighting in the landscaping areas. The site vehicular entrances will contain distinctive environmental graphics and wayfinding elements to add cohesiveness to the overall development. Also included are new site utilities from the street right of way to the Building. All Buildings on the site will be interconnected with two 4" underground conduits per Building.

*Note: The Buildings are currently in being developed through detailed construction documents. Certain modifications to these specifications may be necessary as the building documentation is completed.*

764551.3

EXHIBIT "D"

## COMMENCEMENT DATE LETTER

TO: _____     DATE: _____

     _____

     _____

RE:   Lease dated _____, 200___, between _____

     _____ ("**Landlord**"), and _____

     _____ ("**Tenant**"), concerning Suite _____, located at

     _____.

Ladies and Gentlemen:

     In accordance with the Lease, Landlord wishes to advise and/or confirm the following:

     1.    That the Premises have been accepted herewith by the Tenant as being substantially complete in accordance with the Lease and that there is no deficiency in construction.

     2.    That the Tenant has taken possession of the Premises and acknowledges that under the provisions of the Lease, the Lease Term of said Lease commenced on _____, 200___, and the Expiration Date shall be _____.

     3.    That in accordance with the Lease, Base Rent commenced to accrue on _____.

     4.    If the Commencement Date is other than the last day of a month, the first billing will contain a pro-rata adjustment.

     5.    Effective as of the Commencement Date, rent is due and payable in advance on the first day of each and every month during the term of said Lease. Your rent checks should be made payable to _____."

     6.    The exact number of rentable square feet within the Premises is _____ square feet.

     7.    Tenant's Share, as adjusted based upon the exact number of rentable square feet within the Premises is _____%.

AGREED AND ACCEPTED:

TENANT:

_____

By:_____

    Its:_____

## EXHIBIT "E"

## RULES AND REGULATIONS

So long as they are not in conflict with the terms of the Lease, Tenant will observe and comply with the Rules and Regulations and, after notice thereof, all reasonable, non-discriminatory modifications thereof and additions thereto from time-to-time made in writing by Landlord. Landlord shall not be responsible to Tenant for the nonperformance of any of said Rules and Regulations by or otherwise with respect to the acts or omissions of any other tenants or occupants of the Building or Real Property. In the event of any inconsistency between the Rules and Regulations and the Lease, the terms of the Lease shall govern.

1.      Tenant shall not alter any lock or install any new or additional locks or bolts on any doors or windows of the Premises without obtaining Landlord's prior written consent. Tenant shall bear the cost of any lock changes or repairs required by Tenant. Landlord will furnish two (2) keys for the Premises, and any additional keys required by Tenant must be obtained from Landlord at Landlord's actual cost. Upon the termination of this Lease, Tenant shall restore to Landlord all keys of stores, offices, and toilet rooms, either furnished to, or otherwise procured by, Tenant and in the event of the loss of keys so furnished, Tenant shall pay to Landlord the cost of replacing same or of changing the lock or locks opened by such lost key if Landlord shall deem it necessary to make such changes.

2.      All doors opening to public corridors shall be kept closed at all times except for normal ingress and egress to the Premises, unless electrical hold backs have been installed.

3.      Landlord reserves the right to close and keep locked all entrance and exit doors of the Building during such hours as are customary for Comparable Buildings. Tenant, its employees and agents must be sure that the doors to the Building are securely closed and locked when leaving the Premises if it is after the normal hours of business for the Real Property. Any tenant, its employees, agents or any other persons entering or leaving the Building at any time when it is so locked, or any time when it is considered to be after normal business hours for the Real Property, may be required to sign the Building register when so doing. Access to the Building or the Real Property may be refused unless the person seeking access has proper identification or has a previously arranged pass for access. Landlord and its agents shall in no case be liable for damages for any error with regard to the admission to or exclusion from the Building or Real Property of any person. In case of invasion, mob, riot, public excitement, or other commotion, Landlord reserves the right to prevent access to the Building and/or Real Property during the continuance of same by any means it deems appropriate for the safety and protection of life and property.

4.      Safes and other heavy objects shall, if considered necessary by Landlord, stand on supports of such thickness as is necessary to properly distribute the weight. Landlord will not be responsible for loss of or damage to any such safe or property in any case. All damage done to any part of the Building, their contents, occupants or visitors by moving or maintaining any such safe or other property shall be the sole responsibility of Tenant and any expense of said damage or injury shall be borne by Tenant.

5.      No furniture, freight, packages, supplies, equipment or merchandise will be brought into or removed from the Building or carried up or down in the elevators in the Building, except upon prior notice to Landlord, and in such manner, in such specific elevator, and between such hours as shall be designated by Landlord. Tenant shall provide Landlord with not less than twenty

E-1

(24) hours prior notice of the need to utilize an elevator for any such purpose, so as to provide Landlord with a reasonable period to schedule such use in the Building and to install such padding or take such other actions or prescribe such procedures as are appropriate to protect against damage to the elevators or other parts of the Building.

6.    Landlord shall have the right to control and operate the public portions of the Building and of the Real Property, the public facilities, the HVAC, and any other facilities furnished for the common use of tenants, in such manner as is customary for Comparable Buildings.

7.    The requirements of Tenant will be attended to only upon application at the management office for the Real Property or at such office location designated by Landlord. Employees of Landlord shall not perform any work or do anything outside their regular duties unless under special instructions from Landlord.

8.    Tenant shall not disturb, solicit, or canvass any occupant of the Building or Real Property and shall cooperate with Landlord or Landlord's agents to prevent the same.

9.    The toilet rooms, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed, and no foreign substance of any kind whatsoever shall be thrown therein. The expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the tenant who, or whose employees or agents, shall have caused it.

10.  Tenant shall not overload the floors of the Premises, nor mark, drive nails or screws, or drill into the partitions, woodwork or plaster (except for hanging pictures and artwork) or in any way deface the Premises or any part thereof without Landlord's consent first had and obtained.

11.  Except for vending machines intended for the sole use of Tenant's employees and invitees, no vending machine or machines of any description other than fractional horsepower office machines shall be installed, maintained or operated upon the Premises without the written consent of Landlord.

12.  Tenant shall not use or keep in or on the Premises, the Building or Real Property any kerosene, gasoline or other inflammable or combustible fluid or material, other than customary office and cleaning supplies typically used by general office users in first-class office buildings, so long as Tenant complies with all applicable laws in connection with such use.

13.  Tenant shall not use any method of heating or air conditioning other than that which may be supplied by Landlord, without the prior written consent of Landlord.

14.  Tenant shall not use, keep or permit to be used or kept, any foul or noxious gas or substance in or on the Premises, or permit or allow the Premises to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Building or Real Property by reason of noise, odors, or vibrations, or interfere in any way with other tenants or those having business therein.

15.  Tenant shall not bring into or keep within the Premises or Buildings any bicycles or other vehicles, and shall not bring into or keep within the Building, the Real Property or the Premises any animals or birds (other than seeing-eye dogs).

16.    No cooking shall be done or permitted by Tenant in any kitchens, eating areas of elsewhere on the Premises, nor shall the Premises be used for the storage of merchandise, for lodging or for any immoral purposes. Notwithstanding the foregoing, Underwriters' laboratory-listed equipment and microwave ovens may be used in the Premises for heating food and brewing coffee, tea, hot chocolate and similar beverages, provided that such use is in accordance with all applicable federal, state and city laws, codes, ordinances, rules and regulations, and does not cause odors which are objectionable to Landlord and/or other tenants.

17.    Landlord will approve where and how telephone and telegraph wires are to be introduced to the Premises. No boring or cutting for wires shall be allowed without the consent of Landlord. The location of telephone, call boxes and other office equipment affixed to the Premises shall be subject to the approval of Landlord.

18.    Landlord reserves the right to exclude or expel from the Building and/or Real Property any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs.

19.    Tenant, its employees and agents shall not loiter in the entrances or corridors, nor in any way obstruct the sidewalks, lobby, halls, stairways or elevators, and shall use the same only as a means of ingress and egress for the Premises.

20.    Tenant shall not waste electricity, water or air conditioning and agrees to cooperate fully with Landlord to ensure the most effective operation of the HVAC system of the Building, and shall refrain from attempting to adjust any controls. This includes the closing of exterior blinds, disallowing the sun rays to shine directly into areas adjacent to exterior windows.

21.    Any persons employed by Tenant to do janitorial work shall be subject to the prior written approval of Landlord, and while in the Project and outside of the Premises, shall be subject to and under the control and direction of the Project manager (but not as an agent or servant of such manager or of Landlord), and Tenant shall be responsible for all acts of such persons.

22.    Tenant shall store all its trash and garbage within the interior of the Premises. No material shall be placed in the trash boxes or receptacles if such material is of such nature that it may not be disposed of in the ordinary and customary manner of removing and disposing of trash and garbage in the city in which the Real Property is located without violation of any law or ordinance governing such disposal. All trash, garbage and refuse disposal shall be made only through entry-ways and elevators provided for such purposes at such times as Landlord shall designate.

23.    Tenant shall comply with all safety, fire protection and evacuation procedures and regulations established by Landlord or any governmental agency.

24.    Tenant shall assume any and all responsibility for protecting the Premises from theft, robbery and pilferage, which includes keeping doors locked and other means of entry to the Premises closed, when the Premises are not occupied.

25.    Landlord may waive any one or more of these Rules and Regulations for the benefit of any particular tenant or tenants so long as such waiver shall not unreasonably interfere with Tenant's permitted use of or access to the Premises, but no such waiver by Landlord shall be construed as a waiver of such Rules and Regulations in favor of any other tenant or tenants, nor prevent Landlord from thereafter enforcing any such Rules or Regulations against any or all tenants of the Building or Real Property.

E-3

26.   Tenant shall not attach any awnings or other projection to the outside walls of the Building. No curtains, blinds, shades or screens shall be attached to or hung in, or used in connection with, any window or door of the Premises without the prior written consent of Landlord. All electrical ceiling fixtures hung in offices or spaces along the perimeter of either of the Building must be fluorescent and/or of a quality, type, design and bulb color approved by Landlord.

27.   The sashes, sash doors, skylights, windows, and doors that reflect or admit light and air into the halls, passageways or other public places in the Building shall not be covered or obstructed by Tenant, nor shall any bottles, parcels or other articles be placed on the windowsills.

28.   The washing and/or detailing of or, the installation of windshields, radios, telephones in or general work on, automobiles shall not be allowed on the Real Property.

29.   Food vendors shall be allowed in the Building upon receipt of a written request from Tenant. Under no circumstance shall any food vendor be permitted to cook or prepare food in the Building or display its products in a public or common area, including corridors and elevator lobbies. Any failure to comply with this rule shall result in immediate permanent withdrawal of the vendor from the Building.

30.   Tenant must comply with requests by the Landlord concerning the informing of their employees of items of importance to the Landlord.

31.   Tenant shall comply with any non-smoking ordinance adopted by any applicable governmental authority.

32.   Except as expressly set forth in the Lease, Tenant hereby acknowledges that Landlord shall have no obligation to provide guard service or other security measures for the benefit of the Premises, the Building or the Project. Tenant hereby assumes all responsibility for the protection of Tenant and its agents, employees, contractors, invitees and guests, and the property thereof, from acts of third parties, including keeping doors locked and other means of entry to the Premises closed, whether or not Landlord, at its option, elects to provide security protection for the Project or any portion thereof. Tenant further assumes the risk that any safety and security devices, services and programs which Landlord elects, in its sole discretion, to provide may not be effective, or may malfunction or be circumvented by an unauthorized third party, and Tenant shall, in addition to its other insurance obligations under this Lease, obtain its own insurance coverage to the extent Tenant desires protection against losses related to such occurrences. Tenant shall cooperate in any reasonable safety or security program developed by landlord or required by law.

33.   All office equipment of any electrical or mechanical nature shall be placed by Tenant in the Premises in settings approved by Landlord, to absorb or prevent any vibration, noise and annoyance.

34.   Tenant shall not use in any space or in the public halls of the Building, any hand trucks except those equipped with rubber tires and rubber side guards.

35.   No auction, liquidation, fire sale, going-out-of-business or bankruptcy sale shall be conducted in the Premises without the prior written consent of Landlord.

E-4

36.   No tenant shall use or permit the use of any portion of the Premises for living quarters, sleeping apartments or lodging rooms.

37.   Landlord reserves the right at any time to change or rescind any one or more of these Rules and Regulations, so long as the proposed changes do not increase Tenant's obligations or decrease Tenant's rights, or to make such other and further reasonable Rules and Regulations as in Landlord's judgment may from time to time be necessary for the management, safety, care and cleanliness of the Premises, Buildings and the Real Property, and for the preservation of good order therein, as well as for the convenience of other occupants and tenants therein.  Tenant shall be deemed to have read these Rules and Regulations and to have agreed to abide by them as a condition of its occupancy of the Premises.