IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | Case No.07-11047(CSS) |
| HOLDINGS, INC., *et al.*, | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| _____ | ) | Ref. D.I. 600 |

**REPLY TO DEBTORS' PRELIMINARY OBJECTION TO MOTION
OF THE UNITED STATES FOR AN ORDER (I) REQUIRING TURN-OVER OF
NON-ESTATE PROPERTY BELONGING TO THE GOVERNMENT NATIONAL
MORTGAGE ASSOCIATION AND (II) DECLARING THAT THE
GOVERNMENT NATIONAL MORTGAGE ASSOCIATION IS
<u>NOT SUBJECT TO THE AUTOMATIC STAY</u>**

The United States, on behalf of the Government National Mortgage Association

("GNMA"), hereby replies to the Debtors' Preliminary Objection to Motion of the United States

for an Order (I) Requiring Turn-Over of Non-Estate Property Belonging to the Government

National Mortgage Association and (II) Declaring That the Government National Mortgage

Association Is Not Subject to the Automatic Stay filed by on September 4, 2007 (the

"Objection").[1]  In support, GNMA respectfully states as follows:

**I.      GNMA Does Not Need To File An Adversary Proceeding To Retrieve Its Property.**

The NHA[2] explicitly states that, "No State or local law, **and no Federal law** (except

---

[1]  This reply also addresses the limited response of JP Morgan Chase Bank, N.A. [D.I. 556] and the Joinder
to the Objection by the Bank of America, N.A. [D.I. 602], both of which were filed on September 4, 2007, and the
objection filed by the Creditors' Committee [D.I. 605] on September 5, 2007.

[2]  Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion of the
United States for an Order (I) Requiring Turn-over of Non-estate Property Belonging  To the Government National
Mortgage Association and (II) Declaring That the Government National Mortgage Association Is Not Subject to the
Automatic Stay filed by GNMA on August 20, 2007, Docket No. 243 (the "Motion").

Federal law enacted expressly in limitation of this subsection after October 8, 1980), shall

preclude or limit the exercise by [GNMA] of (A) its power to contract with the issuer on the

terms stated in the preceding sentence, (B) its rights to enforce any such contract with the issuer,

or (C) its ownership rights, as provided in the preceding sentence, in the mortgages constituting

the trust or pool against which the guaranteed securities are issued." 12 U.S.C. § 1721(g)(1)

(emphasis added).  Thus, GNMA may enforce its contractual rights "notwithstanding any

Federal, State, or other law to the contrary," In re Whitcomb & Keller Mortg. Co., Inc., 8 B.R.

83, 86 (Bankr. Ind. 1980), and the Motion is the proper procedural vehicle for GNMA to assert

its rights.  In re Commonwealth Mortg. Co., Inc., 145 B.R. 368, 369 (Bankr. Mass. 1992)

(rejecting argument that GNMA's motion for exemption from automatic stay must be brought as

an adversary proceeding).  See Whitcomb, 8 B.R. at 84 (denying debtor's request for a

restraining order after allowing GNMA's "request for prompt hearing" on the matter).

Accordingly, the Court may proceed with the Motion on its merits.  Id. See also In re Javens, 107

F.3d 359, 363 (6th Cir. 1997) (upholding ruling that city did not willfully violate stay after

bankruptcy court entered orders granting city's motions that stay did not apply); U.S. v. Silva,

359 B.R. 613, 616 (W.D. Tex. 2007) (granting HUD's motion that automatic stay does not

apply).[3]

---

[3]  The Debtors also allege that the Motion is "essentially a 'proceeding to determine the validity . . . or extent of a lien'" under Fed. R. Bankr. P. 7001(2) because GNMA "is well aware that Bank of America asserts a lien in the Debtors' servicing rights."  Objection at 9.  Issuers can only pledge their servicing rights by executing a pledge of servicing Acknowledgment Agreement with the secured party and GNMA.  See MBS Guide Chapter 21, which may be found at http://www.ginniemae.gov/guide/guidtoc.asp?subTitle=Issuers. GNMA did not execute an Acknowledgment Agreement with AHM Servicing and Bank of America, and GNMA's repeated requests to the Debtors for documentation supporting this allegation and the Bank of America's alleged lien have been ignored.

The Debtors further allege that GNMA has placed financial pressure on them by allegedly instructing HUD

Furthermore, although the Debtors' assert that they are still servicing the GNMA Portfolio, they admit that they will no longer make advances for T&I Payments and are withholding mortgage payments that must be passed through to Security Holders each month. See Objection at 8.  If AHM Servicing was still an issuer under the MBS Program and properly servicing the GNMA Portfolio, it would be obligated to advance such payments.  See Guaranty Agreements at § 4.03.  Furthermore, without the Servicing Files improperly being retained by the Debtors, GNMA is unable to service the GNMA Portfolio, including making T&I Payments the Debtors refuse to make.  In other words, the Debtors refuse to service the GNMA Portfolio as required if they were a current GNMA issuer, and by failing to turn over the Servicing Files, are preventing GNMA from doing so.  This creates an untenable situation from which the mortgagors and the Security Holders will suffer.  As such, proceeding by adversary proceeding – which could take months to resolve — is not a "more just and efficient way for GNMA to proceed," Objection at 10, and would adversely limit GNMA's rights to enforce its Guaranty Agreements under the NHA.

Accordingly, not only may GNMA bring its requested relief by Motion, but the Court must address this matter immediately to prevent the Debtors from causing harm to the mortgagors and the Security Holders.

## II.    It Is Within GNMA's Sole Discretion To Default An Issuer.

GNMA's right to default an issuer and terminate the issuer's servicing rights are clear and

---

to block FHA mortgage insurance claims to AHM Servicing.  Not only is this allegation is irrelevant to GNMA's rights under the NHA or its pre-petition default of AHM Servicing, but the Debtors fail to disclose that they owe HUD over a million dollars in FHA mortgage insurance premiums.

unambiguous under the Guaranty Agreements.  See Guaranty Agreements at § 10.01(a), attached as Exhibit A to the Motion.  It is within GNMA's "sole discretion" to determine whether an event of default has occurred, which includes, but is not limited to, the pending or actual insolvency of an issuer, a material change in business status that affects an issuer's ability to carry out its obligations under the Guaranty Agreements, or the issuer's failure to notify GNMA in advance that it intends to file bankruptcy protection or sell GNMA servicing rights.  Id. The Debtors, however, try to shift the Court's attention from the real issue– i.e., whether the NHA precludes the Debtors from using the Bankruptcy Code to limit or enjoin GNMA from enforcing its contractual rights under the MBS Program – by improperly challenging GNMA's right to exercise its sole discretion to default AHM Servicing.  Objection. at 13.  This argument fails to acknowledge GNMA's unequivocal rights under the NHA, and that whatever due process AHM Servicing may be entitled to would be controlled by the Guaranty Agreements.  However, even if challenge of GNMA's termination of AHM Servicing's issuer rights were relevant, GNMA's exercise of its "sole discretion" to default AHM Servicing was done in good faith.

**A.    GNMA Exercised Good Faith When Determining, In Its "Sole Discretion," That an Event of Immediate Default Existed.**

"The power to declare a default by the issuer of mortgage-backed securities and to take up the pool of mortgages against which the securities are issued is confided to the sole discretion of GNMA."  Federal Deposit Ins. Corp. v. Bernstein, 944 F.2d 101, 106 (2d Cir. 1991) (citing 12 U.S.C. § 1721(g)); Guaranty Agreements § 10.01(a).  In exercising its sole discretion to terminate an issuer's servicing rights, GNMA's actions are governed by the applicable Guaranty Agreements under ordinary principles of contract law.  Consolidated Mortg. and Finance Corp. v.

4

Harris, No. 78-0721, 1979 U.S. Dist. Lexis 15370 (D.C. D.C. September 5, 1979) ("Consolidated I"). GNMA must only act in good faith when terminating an issuer's servicing rights, see Centex Corp. v. U.S., 395 F.3d 1283, 1304 (Fed. Cir. 2005) (covenant of good faith and fair dealing implicit in Government contracts), and its decision to default an issuer "may not be preempted by the court. . . ." Samuel T. Isaac & Associates, Inc. v. U.S., 5 Cl. Ct. 490, 493 (Cl. Ct. 1984) ("Isaac I"). Specifically, it is "[w]ell established that where a contract or regulation provides that a designated official or government agency is to exercise discretion with respect to whether a particular default warrants termination of a contract, the contractor is entitled to an exercise of judgment by that designee. . . ." Id. (discussing GNMA's rights to terminate issuer's servicing rights under 12 U.S.C. § 1721(g)). Further, GNMA "may justify a default termination of a contract by proving that at the time of the termination, an adequate ground for termination existed even though it was then unknown to the government." Samuel T. Isaac & Associates, Inc. v. U.S., 7 Cl. Ct. 255, 258 (Cl. Ct. 1985) ("Isaac II").[4]

Debtors suggest that GNMA failed to exercise good faith by giving AHM Servicing no more than 24 hours to respond to GNMA's August 1, 2007 letter (the "8/1 Letter")[5] requesting that AHM Servicing provide GNMA with certain information regarding its current financial condition. Objection at 15. The Debtors further suggest that they are entitled to the same "due process protections" afforded the GNMA issuer in the Consolidated I case in which, the Debtors

---

[4] Once GNMA defaults an issuer, all rights and interest that the issuer had in the mortgage portfolio which included GNMA loans becomes the absolute property of GNMA. Consolidated Mortg. and Finance Corp. v. Landrieu, 493 F.Supp.1284, 1288 (D.C. D.C. 1980) (citing to 12 U.S.C. § 1721(g)) ("Consolidated II"). Consequently, the issuer's "rights and interest in future servicing income" is extinguished and GNMA is "free to sell the right to service [its] portfolio and derive income thereby." Id.

[5] A copy of the 8/1 Letter is attached to the Motion as Exhibit H.

assert, GNMA gave the issuer "an ample opportunity to attempt compliance." Id. at 17.

First, GNMA's exercise of its "sole discretion" to determine when an event of immediate default has occurred depends upon the individual facts of each case. The circumstances leading up a default can widely vary. No two GNMA issuers are exactly alike, nor are they necessarily in the same position financially or would they have the identical ability and/or desire to continue as a GNMA issuer. Therefore, GNMA need not treat each issuer identically. Rather, GNMA must only use its discretion in good faith.

Second, the facts in the Consolidated I case are significantly different from those in this case. In Consolidated I, the issuer was responsive to GNMA's inquiries into its financial condition and met with GNMA representatives; after GNMA determined to default the issuer, GNMA was able to deliver its letter declaring the default in person. Consolidated I, 1979 U.S. Dist. Lexis 15370 * at 5. GNMA and the issuer then agreed to a 90-day moratorium to permit the issuer to continue servicing its GNMA portfolio while it attempted to satisfy GNMA that its financial condition would not affect GNMA. Id. at 6. However, after repeatedly informing GNMA about its deteriorating financial condition, GNMA ordered the issuer to transfer the servicing of the GNMA portfolio. Id. at 7. When the issuer failed to find a suitable servicer, GNMA found its own servicer and  had the issuer's servicing rights transferred, prompting the issuer to file an action challenging the original default. Id.

Here, on the other hand, GNMA sent the 8/1 Letter and received a letter from counsel to AHM Servicing the next day (the "8/2 Letter"), which is attached to the Motion as Exhibit I. In the 8/2 Letter, AHM Servicing did not address GNMA's concerns or provide any of the

information requested by GNMA, nor did it indicate that it would like additional time to provide

such information.  Rather, the 8/2 Letter stated that any attempt to interfere with AHM

Servicing's operations "harms our ability to ensure continuity of servicing operations . . . . we

look forward to resolving this matter . . . so that we may continue our longstanding servicing

relationship."  Motion at Exhibit I.  Because AHM Servicing ignored GNMA's concerns about

AHM Servicing's troubled financial condition and did not ask for more time or assistance to

respond to the 8/1 Letter, GNMA, having an obligation to protect government assets, see infra at

p.9, tried to retrieve its assets from AHM Servicing on August 3, 2007.  Unlike the issuer in

Consolidated I, AHM Servicing refused to meet with GNMA representatives on August 3, 2007,

or accept the letters of default in person.  AHM Servicing also had GNMA representatives

removed from its facilities.

      Further, it became evident a few days later that AHM Servicing misled GNMA when it

sent the 8/2 letter inasmuch as AHM Servicing filed for bankruptcy protection and gave notice

that it wanted to sell the servicing rights instead of "continu[ing] [its] longstanding servicing

relationship" with GNMA.  Indeed, the Debtors admit that they kept GNMA in the dark about

their intention to file for bankruptcy and sell the servicing rights to the GNMA Portfolio[6] in

violation of the Guaranty Agreements.  See Guaranty Agreements at Arts. VII, X.  Thus, unlike

the issuer in the Consolidated I case who tried to satisfy GNMA's concerns and its

responsibilities to GNMA (including being forthright about its financial condition), AHM

---

[6] See Debtors' Responses to United States' First Set of Interrogatories, Requests for Admissions and
Requests for Documents attached hereto as Exhibit A at 11 (admitting that they did not give GNMA advance notice
that they intended to file for bankruptcy protection and sell the GNMA Portfolio).

Servicing breached its obligations under the Guaranty Agreements by failing to notify GNMA of its true financial status or its intentions with respect to the GNMA Portfolio.  Consequently, GNMA did not treat AHM Servicing as it did the issuer in <u>Consolidated I</u>.

Finally, as the court in <u>Consolidated I</u> acknowledged, a party's Fifth Amendment rights against the United States arising out of a contract may be defined by the terms of the contract. <u>Consolidated I</u>, 1979 U.S. Dist. Lexis 15370 at *24.  Under the Guaranty Agreements, GNMA is not required to give the Debtors <u>any</u> advance notice before it determines whether an immediate event of default has occurred.  Guaranty Agreement at §10.01(a).  Again, GNMA is only required to act in good faith when it makes a determination that an event of immediate default has occurred.  It need not even later demonstrate that an event of immediate default has actually happened; it merely needs to not have acted in bad faith.  <u>See</u> <u>United States  v. Mansion House Center, North Redevelopment Co.</u>, 607 F.Supp. 392 (D.C.  Mo. 1985).[7]  Accordingly, the Debtors' complaints that they were not afforded due process protection like the issuer in <u>Consolidated I</u> are unfounded.  <u>See</u> <u>Consolidated I</u>, 1979 U.S. Dist. Lexis 15370 at *26 (noting that the issuer was "a sophisticated lending institution, which dealt with the government on a basis of voluntarily executed contracts. . . . [which] should in some respect bind the defaulting

---

[7]  In that case, HUD had entered into a foreclosure settlement agreement with certain partnerships (the "Owner Partnerships") which provided that HUD had the option of declaring the agreement null in void if, "in [its] opinion," it determined that title to the properties at issue was "unmerchantable."  <u>Mansion House</u>, 607 F.Supp. at 394.  HUD exercised its option to void the agreement and the Owner Partnerships filed a motion to compel closing and performance of the foreclosure agreement.  <u>Id</u>. at 396.  The court recognized that the terms in the agreement giving HUD power to terminate the agreement based on its opinion and option were unambiguous.  <u>Id</u>.  The court then rejected the Owner Partnership's argument that HUD could only terminate the agreement if it was correct that title to the properties was unmerchantable because the agreement explicitly allowed "HUD the option to act on its own opinion as to the merchantability of the title in question. . . ." <u>Id</u>. at 395.   As such, in exercising its discretion, HUD was only required not to act in bad faith.  <u>Id</u>. at 396.

private party as well as the government.").[8]

Further, GNMA unquestionably exercised good faith when it defaulted AHM Servicing inasmuch as it:

> * * * need[ed] to protect its financial interest as guarantor of the issuer's securities.  This requires an ability to move quickly to assume ownership and servicing responsibilities of pooled mortgages upon an issuer's default. Any interruption in servicing performance would necessitate not only advances of funds by GNMA, but would also tarnish the reputation of GNMA securities.  The resulting impairment of GNMA's reputation would interfere with the stated purpose of the program to attract investment capital in the housing market.  These interest signal vigilant GNMA monitoring for strict adherence to HUD regulations designed to ensure the program's success.

Consolidated I, 1979 U.S. Dist. Lexis 15370 at **27-28; see 12 U.S.C. § 1716 (MBS Program should have minimum "adverse effect upon the residential mortgage market and minium loss to the Federal Government").  Thus, GNMA properly moved quickly once AHM Servicing refused to cooperate with GNMA.  See id.  See also Bernstein, 944 F.2d at 107 (rejecting argument that GNMA was not justified in automatically terminating issuer's servicing rights when issuer failed to comply with MBS Program rules even though issuer's actions did not ultimately harm security holders).

**B.    The Administrative Procedures Act Does Not Apply To GNMA's Termination of AHM Servicing's Issuer Rights**.

The Debtors ask that the Court deny the Motion pursuant to the Administrative

---

[8] Furthermore, in Consolidated II, the court held, among other things, that under the MBS Program, the issuer had limited rights to enjoy future servicing income under the applicable GNMA Guaranty Agreements because the issuer agreed to assign GNMA all of the issuers' right, title and interest in the GNMA pooled mortgages, and that GNMA was authorized by law to default the issuer and terminate its servicing rights.  Consolidated II, 493 F.Supp. at 1287.  The court also found that the issuer was liable to GNMA for losses attributable to the issuer upon transfer of the GNMA portfolio and  "noted" that "upon execution of the Guaranty Agreements, [the issuer] assumed the risks inherent in participation in the GNMA program."  Id. at 1292.

Procedures Act, 5 U.S.C. §§ 701-706 (the "APA"). See Objection at 18.  The APA allows

judicial review of certain agency actions in the event that the agency's conduct is not subject to

some other legal remedy, see 5 U.S.C. § 702, but does not allow judicial review of "agency

action committed to agency discretion by law."  5 U.S.C. § 701.  See Shiffler v. Schlesinger, 548

F.2d 96, 100 n.1 (3rd Cir. 1977).  As discussed supra, GNMA's decision to default an issuer is

within its "sole discretion" under the NHA and the MBS Program and may "not be preempted by

the court."  Isaac I, 5 Cl. Ct. at 493.  This decision, therefore, is not subject to APA review in this

or any forum.

Furthermore, the Debtors do not establish that GNMA's conduct is not subject to some

other legal remedy, or that this Court has jurisdiction to review GNMA's determination to

declare a default.  The Debtors argue that GNMA conduct must be governed by general contract

law.  See Objection at 15.  The Court of Federal Claims generally has jurisdiction over contract

claims brought against the United States for damages.  See M.A. DeAtley Const., Inc. v. U.S.  75

Fed. Cl. 575 (Fed. Cl. 2007). The relief requested by the Debtors' in their Objection raises the

obvious point that, if the Debtors wish to challenge GNMA's termination of its issuer rights

and/or seek damages, they must do so in the proper forum pursuant to proper procedure.  An

objection is not the appropriate forum to seek affirmative relief.  Since the Debtors have failed to

take action to challenge the default, and have failed to seek an injunction to stay the default,

AHM Servicing must abide by the terms of the Guaranty Agreements and the MBS Program and

honor the default.[9]

## III.    Other Grounds For Immediate Default of AHM Servicing Exists.

Even if the Court had jurisdiction to review GNMA's decision to default AHM Servicing, and assuming that GNMA failed to exercise its discretion in good faith, there is no question that grounds for immediate default currently exist under Article X of the Guaranty Agreements.  As detailed in the Motion, GNMA is not subject to the automatic stay pursuant to the NHA; therefore, GNMA may terminate AHM Servicing's issuer rights at anytime.

First, after GNMA issued the default letters to AHM Servicing and AHM Corp., both companies filed for relief under chapter 11 of the Bankruptcy Code in violation of sections 10.01(a)(5) and 10.01(a)(6) of the Guaranty Agreements.  These sections provide in relevant part that an immediate default occurs if there is "impending or actual insolvency of the Issuer" and there is "[a]ny change with respect to the business status of the Issuer . . . which materially adversely affects Ginnie Mae . . . or which materially adversely affects the ability of the Issuer to carry out its obligations" under the Guaranty Agreements.  Bankruptcy and the sale of the GNMA Portfolio clearly represent impending or actual insolvency on the part of AHM Servicing, see Deposition Transcript of Craig S. Pino dated September 5, 2007 at 98 (testifying that, to

---

[9]  The Debtors assert that the GNMA is subject to the automatic stay. Objection at 20. The Debtors' only support for its position are the two decisions by Judge Norton in the Northern District of Georgia that have been vacated. See Motion fn.16.  Judge Norton's original opinion that the NHA did not preclude the application of the automatic stay was entered prior to the 1980 amendment to the NHA that explicitly states, "No State or local law, and no Federal law (except Federal law enacted expressly in limitation of this subsection after October 8, 1980), shall preclude or limit the exercise by the Association of (A) its power to contract with the issuer on the terms stated in the preceding sentence, (B) its rights to enforce any such contract with the issuer, or (C) its ownership rights, as provided in the preceding sentence, in the mortgages constituting the trust or pool against which the guaranteed securities are issued." 12 U.S.C. § 1721(g)(1) (emphasis added).  Judge Norton's second opinion issued shortly after the amendment, although acknowledging the amendment and legislative history, disregards such history, the intent behind the amendment and the plain language of the statute.

prevent insolvency, the Debtors did not make dividend payments)[10] and/or a change in AHM

Servicing's business status that materially adversely affects GNMA and AHM Servicing's ability

to carry out its obligations under the Guaranty Agreements.  Specifically, in this case, AHM

Servicing is trying to sell its servicing rights and avoid its obligations to GNMA under the

Guaranty Agreements.

Second, despite claiming that it is still servicing the GNMA Portfolio, AHM Servicing

admits that it will no longer advance funds for T&I Payments.  Objection at 8.  If AHM Servicing

was still a GNMA issuer, its refusal to advance such funds violates section 4.07 of the Guaranty

Agreements and is grounds for immediate default.[11]  Guaranty Agreements §10.01(a)(4).

Third, AHM Servicing was required to give GNMA "advance notice of: (1) any

contemplated changes affecting the business status of the Issuer, including, but not limited to any

merger, consolidation, sale or other transfer of any part or all of its business . . . (2) any change in

ownership or control of the Issuer; and (3) any voluntary or involuntary action or proceeding

under the Federal bankruptcy status . . . whether for purposes of bankruptcy, reorganization,

winding up the affairs of the Issuer, or otherwise . . . ." Guaranty Agreements § 7.02(c).  As

stated previously, on August 2, 2007, after receiving a request from GNMA to clarify why AHM

Servicing was not in immediate default, AHM Servicing told GNMA that any attempt to interfere

with its operations "harms our ability to ensure continuity of servicing operations" and that it

---

[10]  Mr. Pino testified that he believes he is the Treasurer and Executive Vice President of American Home
Mortgage Corporation, AHM Servicing, and American Home Mortgage Holdings and American Home Mortgage
Acceptance Corp.  Id. at 8-9.  Relevant excerpts of Mr. Pino's deposition transcript are attached hereto as Exhibit B.

[11]  Because the Debtors refuse to turn over the Servicing Files, GNMA is unable to make these payments.

"look[ed] forward to resolving this matter . . . so that we may continue our longstanding servicing relationship." Motion at Exhibit I.  However, AHM Servicing filed for bankruptcy relief four days later and never gave GNMA advance notice that it was filing for bankruptcy and that it intended to sell the GNMA Portfolio.  See Exhibit A at 11.  Therefore, the statements made to GNMA on August 2, 2007, on behalf of AHM Servicing were contrary to AHM Servicing's actions, and grounds for immediate default under section 10.01(a)(9) of the Guaranty Agreements.

Finally, the Federal National Mortgage Company ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") gave the Debtors notice on July 31, 2007, and August 1, 2007, respectively, that they were terminating the Debtors' servicing rights.  See e.g., Docket Nos. 368.  Although the Debtors subsequently disputed the terminations, "[a]ny withdrawal or suspension of the Issuer's . . . approved seller/servicer status" by Fannie Mae or Freddie Mac is grounds for immediate default.  Guaranty Agreements 10.01(a)(8).  Even though GNMA was not aware of these terminations when it issued the August 3, 2007, default letters, the Fannie Mae and Freddie Mac terminations were grounds to immediately default AHM Servicing; thus, GNMA's default of AHM Servicing was also justified by these terminations. See Isaac II, 7 Cl. Ct. at 258 (GNMA may terminate servicing rights for reasons unknown to GNMA at the time of default).[12]

---

[12] In Isaac I and Isaac II, the issuer sought damages from GNMA for improper default of its issuer status after GNMA terminated the issuer's servicing rights for issuing dishonored checks to security holders, which indicated a change in the issuer's business status that materially adversely affected GNMA under the applicable Guaranty Agreements.  Isaac I, 5 Cl. Ct. at 491. The issuer claimed that bank error was the cause of the dishonored checks and that it should have been allowed to rebut evidence against it prior to GNMA's extinguishment of its issuer rights.  Id.  It was later discovered, however, that the issuer had pled guilty to financial crimes, including embezzlement, which was an undisputed cause for immediate default under the applicable Guaranty Agreement.  Id.

Accordingly, there are additional grounds upon which GNMA could have or may now immediately default AHM Servicing under the Guaranty Agreements. Because these grounds exist, and because the NHA protects GNMA's rights to enforce the Guaranty Agreements, GNMA may, if it had to, default AHM Servicing notwithstanding the fact that AHM Servicing has filed for bankruptcy protection.

## CONCLUSION

GNMA respectfully requests that this Court enter an order (i) overruling all objections to the Motion; (ii) directing AHM Servicing to assist GNMA in the transfer of the GNMA Portfolio, including the turn-over of the Servicing Files, to Countrywide (iii) declaring that automatic stay does not apply to GNMA, and (iv) granting any other such relief is just.

**[REMAINDER OF THE PAGE LEFT INTENTIONALLY BLANK]**

---

at 493. The Court found that, even though GNMA did not originally default the issuer based on his financial crimes, it could still exercise its discretion to default the issuer by showing that adequate grounds existed for the default even though it was unknown by the government at the time of the default. Id. at 258.

Dated: September 10, 2007

Respectfully Submitted

PETER D. KEISLER
Assistant Attorney General

DAVID C. WEISS
Acting United States Attorney

ELLEN W. SLIGHTS  (DE Bar No. 2782)
Assistant United States Attorney
1007 Orange Street, Suite 700
P.O. Box 2046
Wilmington, Delaware 19899-2046

/s/ Mary A. DeFalaise
J. CHRISTOPHER KOHN
JAMES G. BRUEN, JR.
MARY A. DEFALAISE
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 875
Ben Franklin Station
Washington D.C. 20044
Tel. (202) 307-0183
Fax (202) 307-0494

Attorneys for the Government
National Mortgage Association