# EXHIBIT B

# Craig S. Pino

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | |
| HOLDINGS, INC., et al., | ) | Case No. 07-11047 (CSS) |
| | ) | |
| Debtors. | ) | Jointly Administered |

    Deposition of CRAIG S. PINO taken pursuant to notice at the law offices of Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware, beginning at 9:46 a.m., on Tuesday, September 5, 2007, before Debra A. Donnelly, Registered Professional Reporter and Notary Public.

APPEARANCES:

    NEIL M. PERETZ, ESQUIRE
    United States Department of Justice
        100 L Street, NW
        Washington, DC 20530
        for Government National Mortgage Association
           and
    KATHERINE A. DAVIES, ESQUIRE
    AYAULY AINASHBEKOVA, ESQUIRE
    U.S. DEPARTMENT OF HOUSING and URBAN DEVELOPMENT
        451 7th Street SW, Room 9254
        Washington, D.C.  20410
        for Government National Mortgage Association

- - - - - - - - - - - - - - - - - - - - - - - -
CORBETT & WILCOX
REGISTERED PROFESSIONAL REPORTERS
230 N. MARKET STREET  WILMINGTON, DELAWARE  19801
(302) 571-0510
Corbett & Wilcox is not affiliated
with Wilcox & Fetzer, Court Reporters

fbf3ca7e-6173-4638-a7cf-9d1216eed32f

Craig S. Pino

## Page 2

1  APPEARANCES (CONT'D):
2    JOHN T. DORSEY, ESQUIRE
     ERIN EDWARDS, ESQUIRE
3    YOUNG CONAWAY STARGATT & TAYLOR
     1000 West Street, 17th Floor
4    Wilmington, Delaware 19801
     for Respondent
5
6
             EXAMINATION
7  BY MR. PERETZ:
8    Q.  Good morning.  Thank you for coming in today.
9    A.  Sure.
10   Q.  My name is Neil Peretz, and I'm with the
11 Department of Justice.  I'm here representing the
12 Government National Mortgage Association, which is
13 otherwise known as Ginnie Mae or GNMA, which is a wholly
14 owned corporation of the United States Department of
15 Housing and Urban Development.  And we're here at the
16 deposition of Mr. Craig Pino; am I pronouncing your name
17 right?
18   A.  Yes.
19   Q.  Great.
20       Of American Home Mortgage, and that's
21 pursuant to the Federal Rules of Civil Procedure,
22 30(b)(6), and the witness has already been sworn.
23       Mr. Pino, could you state your full name
24 and address for the record?

## Page 3

1    A.  It's Craig Severin Pino, and my address is
2  3 Legends Circle, Melville, New York.
3    Q.  Thank you.
4    A.  Sure.
5    Q.  I think we'll just go around the room and
6  people will give their own introduction about who is
7  present.
8        MS. DAVIES:  My name is Kathy Davies,
9  and I am an attorney with the Department of Housing and
10 Urban Development.
11       MS. AINASHBEKOVA:  My name is Ayauly
12 Ainashbekova, and I am an attorney with the Housing and
13 Urban Development as well.
14       MR. DORSEY:  John Dorsey, Young Conaway
15 Stargatt & Taylor, on behalf of the respondent.
16       MS. EDWARDS:  Erin Edwards, Young
17 Conaway Stargatt & Taylor, on behalf of the respondent.
18 BY MR. PERETZ:
19   Q.  And the deposition is taking place in
20 Wilmington, Delaware, at the offices of Young Conaway
21 Stargatt & Taylor.
22       Did I pronounce that properly?
23       MR. DORSEY:  Stargatt.
24 BY MR. PERETZ:

## Page 4

1    Q.  So before we get started, I just wanted to
2  bring up a few housekeeping matters.
3    A.  Okay.
4    Q.  The first is, as you would know, the
5  transcript is being prepared by a court reporter and, I
6  guess, checked by another one to facilitate it being
7  completed quickly.
8        That will be, the transcript will be
9  provided to you if you would like to have an opportunity
10 to review it.
11       Would you like that?
12   A.  Yes, please.
13   Q.  Okay.  I guess we're shooting for a
14 turn-around time of tomorrow morning on the transcript.
15       I will just go through the mechanics of
16 a deposition first.  Have you ever been deposed before?
17   A.  No, I have not.
18   Q.  But you did testify at least once, I noted?
19   A.  Yes, I did.
20   Q.  Did you testify on any prior occasion to that
21 in a court?
22   A.  Yes.
23   Q.  Okay.  What was that matter?
24   A.  Traffic accident.

## Page 5

1    Q.  We won't go into that.
2        The process for today's deposition is
3  that I will be asking questions and you will be answering
4  those questions under oath now that you've been sworn in.
5  Your answers need to be spoken aloud so the court
6  reporter can record them.  So, for example, a yes is
7  better than a nod.
8        Your counsel might be objecting to some
9  of the questions from time to time.  In part, that's for
10 the record, for the court reporter, so you should still
11 answer the questions unless your counsel instructs you
12 not to do so on the basis of a privilege.
13       Does that match your understanding,
14 counsel?
15       MS. EDWARDS:  Yes.
16 BY MR. PERETZ:
17   Q.  If there is any question that I ask you that
18 you don't understand, please let me know and I will try
19 to clarify it or rephrase it.  If you don't say something
20 that indicates to me that you don't understand a
21 question, then I'm going to assume that you did
22 understand the question itself.
23       Do you understand everything I've gone
24 through thus far?

2  (Pages 2 to 5)

fbf3ca7e-6173-4638-a7cf-9d1216eed32f

# Craig S. Pino

## Page 6

1    A.  Yes.

2    Q.  If I ask you a question about a document which

3  is, I think, not so likely today, I will try to hand you

4  a copy of the document in advance and before doing so the

5  court reporter would mark the document for the record

6  with an exhibit number.  And I would, of course, provide

7  a copy to your counsel as well.

8        If you need a break, just let me know

9  and we'll try to make that happen.  We may not be able to

10  make it happen immediately when you ask if we're in the

11  middle of a question, but she will try to do it shortly

12  thereafter.  And I guess everyone else here can nudge me

13  as well if a break is appropriate.

14        During the pendency of a question, if we

15  take, whether we are on a break or not, it's not

16  appropriate to discuss that question with counsel because

17  you are still under oath at that time.

18        Just by way of background, I'm not a

19  mortgage banker or a mortgage expert, so please bear with

20  me if my questions are not phrased in the most accurate

21  way.  Maybe I can try to rephrase them to use the

22  terminology that you are more familiar with.

23        Are you taking any medications today

24  that might make it difficult for you to understand my

## Page 7

1  questions?

2    A.  No, I'm not.

3    Q.  Are you sick today at all?

4    A.  No.

5    Q.  Okay.  Great.

6        Is there any other reason that you

7  wouldn't be able to answer my questions fully and

8  truthfully?

9    A.  No, there is not.

10    Q.  Great.

11        In preparing for the deposition today,

12  did you review any particular documents?

13    A.  I'm sorry, ask that one more time.

14    Q.  In preparing for today's deposition, did you

15  review any particular documents?

16    A.  I did.

17    Q.  Okay.  And which documents are those?

18    A.  I reviewed the Bank of America secured credit

19  facility, I believe dated August 2006.  I reviewed a form

20  of, I believe it's called a Ginnie Mae acknowledgment

21  agreement.  I reviewed your, the questions that Ginnie

22  Mae had submitted to American Home and American Home's

23  responses to those questions.

24    Q.  Okay.  Was that the document entitled

## Page 8

1  Interrogatories, maybe, or Request For Admissions?

2    A.  I thought it was --

3    Q.  Or was it a letter?

4    A.  Called a response to -- I thought it was

5  called a response.

6    Q.  Okay.  It was a legal type of document?

7    A.  Yeah, a legal document.  Yes.

8    Q.  As opposed to an informal letter?

9    A.  Yes.

10    Q.  Were there any other documents that you

11  reviewed?

12    A.  I read Ginnie Mae's request for information to

13  American Home dated August 1st, and I believe a letter

14  from Ginnie Mae dated August 3rd to American Home.  I

15  believe that was all.

16    Q.  Nothing else that you can recollect?

17    A.  No.

18    Q.  Could you state your job title for the record?

19    A.  I am executive vice president, treasurer and

20  chief investment officer for American Home.

21    Q.  Which American Home entity is that?

22    A.  American Home Mortgage Investment Corp.

23    Q.  Okay.  And have you been an employee of any

24  other American Home entities previously or currently?

## Page 9

1    A.  I believe I am an officer of American Home

2  Mortgage Corporation, American Home Mortgage Servicing

3  Inc., and American Home Mortgage Holdings and American

4  Home Mortgage Acceptance Corp.

5    Q.  Okay.  When you say an officer, does that mean

6  that you are on the board of directors of those?

7    A.  No, treasurer, I believe, of all of those

8  entities and I believe an executive vice president of all

9  of those entities as well.

10    Q.  Okay.  And in your current role you are

11  involved in the sale of American Home Mortgage Servicing.

12  Is that right?

13    A.  Yes, I am.

14    Q.  What are your day-to-day responsibilities in

15  that process?

16    A.  I am a participant of the liquidity committee,

17  which is really the committee that's managing the process

18  of selling the assets of the company.

19    Q.  What do you have to do as a member of the

20  liquidity committee related to the sale of American Home

21  Mortgage Servicing?

22    A.  With regard to the sale of the servicing, it

23  is mostly an advisory and a supportive role in helping

24  gather information, analyze strategies or decisions

3  (Pages 6 to 9)

fbf3ca7e-6173-4638-a7cf-9d1216eed32f

Craig S. Pino

## Page 98

1        And I think also that at that point in
2    time, the amount of -- that we had enough cash on hand or
3    very close to the amount of cash on hand needed to meet
4    the pending margin calls and the stock dividend.
5    However, we weren't certain that if we were to meet the
6    margin calls on the 27th, that we weren't just going to
7    wake up on whatever Monday was, the 31st, and have
8    another $20 million of margin calls. Because in our view
9    there was some irrationality to how the financial
10   counter-parties were imposing these requests. And so --
11       Q.  "These requests" meaning?
12       A.  These margin call requests. So the decision
13   not to pay the dividend, and I think to some extent not
14   to meet the margin calls that we had been requested to
15   have met was to prevent our insolvency.
16       Q.  Okay. And what do you think was the amount of
17   margin calls that were possibly in dispute out of the,
18   let's say, 38 million?
19       MS. EDWARDS: Objection to form.
20       THE WITNESS: Probably more than 20.
21   BY MR. PERETZ:
22       Q.  Twenty of the 38?
23       A.  Yeah.
24       Q.  Was the basis for those disputes about margin

## Page 99

1    call amounts related to how the collateral was to be
2    valued or something else?
3        MS. EDWARDS: Objection to form.
4        THE WITNESS: It was our belief that
5    there were some just mechanical calculation errors in how
6    lenders applied values to buckets of collateral. Not
7    necessarily the market value of the underlying loans, but
8    where a loan times an advance rate would calculate the
9    amount of collateral value that we had and spread among a
10   number of different buckets on a facility, the aggregate
11   of all of those buckets would add up to a total
12   collateral amount that, in some instances, a bank had
13   miscalculated the total amount of collateral available to
14   us. In others, we thought banks had pretty significantly
15   undervalued the amount of the market value of the assets.
16   BY MR. PERETZ:
17       Q.  When you say miscalculated the amount of
18   collateral, could you just help me understand an example
19   of what that might be?
20       A.  Could I borrow your pen, and just a scratch
21   piece of paper. It just helps me talk. So in, in one
22   credit facility we had an amount of --
23       Q.  We can create an exhibit, too.
24       A.  Well, it's just going to help me talk while

## Page 100

1    I'm doing this. But if we had a bucket for
2    non-performing loans, so up to some percentage which
3    would equal about $31 million of the credit facility
4    collateral value would be available for non-performing
5    loans.
6        Q.  Okay.
7        A.  If those loans were priced at par, and we had
8    $50 million, as an example of value, and they're priced
9    at par and we were able to borrow, you know, 90 percent
10   against that value, we would have $45 million of
11   collateral available for us to lend against, to borrow
12   against.
13       However, the limit of that bucket was 31
14   million. So in this example we would be, whatever that
15   is, $14 million over our borrowing limit. That being we
16   were capped at being able to borrow $31 million, even
17   though we had $45 million of available collateral.
18       Q.  But you are saying that collateral was in a
19   certain category?
20       A.  In a certain category, nonperforming or
21   impaired, I believe is the bucket on the facility.
22       Q.  Okay.
23       A.  Okay. So what the lender would do would say,
24   okay, well, you've got $45 million of collateral. Now,

## Page 101

1    there is more buckets. And the way they calculated the
2    net available to us was somewhat manual. So they would
3    say, okay, you've got $45 million of collateral, but you
4    can only borrow $31 million. So we're going to take your
5    $45 million of available in that bucket, we're going to
6    take a hundred million dollars maybe available in another
7    bucket. We're going to take, you know, $55 million
8    available in another bucket and add those all up to come
9    up to 200 million, I think.
10       And then we're going to back off 14
11   million because you're over your limit in this impaired
12   bucket. That lender came in somewhere right prior to the
13   27th and said to us, well, actually, this $50 million is
14   not worth par. Now it's worth, let's say, 90 cents. So
15   they took 50 times 90, now my math is going to get
16   difficult, but you've got $45 million, and you can only
17   borrow 90 cents against that. So --
18       Q.  You can only borrow 90 cents against the 45
19   after you took 90 percent of the 50?
20       A.  Yeah, you took 90 percent because this is the
21   market value. And the second 90 percent is the advance
22   rate. And to come up with a collateral value, you've got
23   the loan, times the market value, times the advance rate
24   gives you the amount of collateral that you can borrow.

26  (Pages 98 to 101)

fbf3ca7e-6173-4638-a7cf-9d1216eed32f

# Craig S. Pino

Page 126

```
 1              C E R T I F I C A T E
    STATE OF DELAWARE
 2
    NEW CASTLE COUNTY
 3
 4      I, Debra A. Donnelly, a Notary Public within and for
 5  the County and State aforesaid, do hereby certify that
 6  the foregoing deposition of CRAIG S. PINO was taken
 7  before me, pursuant to notice, at the time and place
 8  indicated; that said deponent was by me duly sworn to
 9  tell the truth, the whole truth, and nothing but the
10  truth; that the testimony of said deponent was correctly
11  recorded in machine shorthand by me and thereafter
12  transcribed under my supervision with computer-aided
13  transcription; that the deposition is a true record of
14  the testimony given by the witness; and that I am neither
15  of counsel nor kin to any party in said action, nor
16  interested in the outcome thereof.
17      WITNESS my hand and official seal this  5th  day
18  of September A.D., 2007.
19
20
    _____
21    DEBRA A. DONNELLY, RPR
      CERTIFICATE #151-PS
22    EXPIRATION:  PERMANENT
23
24
```

33  (Page 126)

fbf3ca7e-6173-4638-a7cf-9d1216eed32f