# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | ) Chapter 11 |
| | ) |
| AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation, et al., | ) Case No. 07-11047 (CSS) ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) Related Docket Item Nos. 11, 113, 403 |
| | ) Sale Hearing Date: October 1, 2007 @ 10:00 a.m. |
| | ) Objection Deadline: September 13, 2007 @ 4:00 p.m. |

**OBJECTION OF DB STRUCTURED PRODUCTS, INC. TO EMERGENCY MOTION OF THE DEBTORS FOR ORDERS: (A)(I) APPROVING SALE PROCEDURES; (II) SCHEDULING A HEARING TO CONSIDER SALE OF CERTAIN ASSETS USED IN THE DEBTORS' LOAN SERVICING BUSINESS; (III) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (IV) GRANTING RELATED RELIEF; AND (B)(I) AUTHORIZING THE SALE OF SUCH ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (IV) GRANTING RELATED RELIEF**

DB Structured Products, Inc. ("DBSP"), by and through its undersigned counsel, and in accordance with section 363(b) of title 11 of the United States Code (as amended, the "Bankruptcy Code") and Rules 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), hereby files this objection (the "Objection") to the *Emergency Motion of the Debtors for Orders: (A)(1) Approving Sale Procedures; (II) Scheduling a Hearing to Consider Sale of Certain Assets Used in the Debtors' Loan Servicing Business; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief; and (B)(I) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Purchase Agreement Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; (III)*

A/72199728.3

*Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* [Doc. No. 11] (the "Sale Motion"), and in support of its Objection, respectfully submits as follows:

## I.    PRELIMINARY STATEMENT

1. DBSP, as purchaser, American Home Mortgage Corp. ("AHM Corp."), as seller, and American Home Mortgage Servicing, Inc. (the "Servicer"), as servicer, are parties to that certain Master Mortgage Loan Purchase and Servicing Agreement dated as of May 1, 2006 (the "Agreement"), pursuant to which DBSP purchased mortgages from Seller with the expressly acknowledged intention of subsequently selling those mortgages to third parties. However, DBSP's ability to sell or securitize mortgages that it purchases is impeded where the relevant mortgages are not serviced by a Federal National Mortgage Association ("FNMA") qualified seller/servicer. Thus, the Agreement requires the Servicer to be an FNMA qualified servicer, and the Agreement further provides that Servicer's failure to be so qualified at any point in time is an Event of Default under the Agreement.

2. The Servicer lost its FNMA qualification before the commencement of its chapter 11 case, creating an Event of Default under the Agreement. As a result, DBSP was precluded from securitizing mortgages purchased under the Agreement. DBSP has been forced to retain these mortgages at substantial monetary risk and probable loss, which cannot now be remedied and which, in fact, has not been remedied by the Debtors' subsequent settlement agreement with FNMA.

3. DBSP has been deprived of the benefit of its bargain by the Debtors' failure to perform under the Agreement. Indeed, because the harm resulting from these postpetition defaults cannot be remedied and are incurable, the Agreement may not be assumed

and assigned by the Debtors to any third party in the absence of DBSP's consent.

4. Moreover, even if the Debtors are permitted to assume and assign the Agreement, the Debtors could only do so in the Agreement's entirety with all of its benefits and burdens. Currently, the proposed cure amount set forth by the Debtors in the Assumption Notice (as defined below) is $0. In fact, the Debtors' obligations to DBSP under the Agreement, including Premium Recapture Amounts (as defined below) and Repurchase Obligations (as defined below), exceed $18 million, plus additional, as yet unliquidated amounts.

## II. BACKGROUND
### A. Procedural Background

5. On August 6, 2007 (the "Petition Date"), AHM Corp., the Servicer, and certain of their affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned cases (the "Cases").

6. The Cases are being jointly administered pursuant to an order of this Court entered on August 7, 2007 [Doc. No. 60].

7. On August 6, 2007, the Debtors filed the Sale Motion.

8. On August 9, 2007, this Court entered its *Order Approving (I) Sale Procedures; (II) Scheduling a Hearing to Consider Sale of Certain Assets Used in the Debtors' Loan Servicing Business; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief* [Doc. No. 113] (the "Sales Procedures Order") establishing procedures for the sale of the Debtors' servicing business (the "Proposed Sale") and providing, among other things, that an auction to sell that business shall take place on September 10, 2007.

9. On August 27, 2007, the Debtors served a *Notice of (I) Possible Assumption and Assignment of Certain Leases, License Agreements, and Executory Contracts;*

*and (II) Proposed Cure Obligations, If Any* [Doc. No. 403] (the "Assumption Notice"), which provides that the Debtors propose to assume and assign the following contract as part of the Proposed Sale of their Servicing Rights:

| Name and Contact Information of Counterparty(ies) for Notice | Name of Agreement | Type of Agreement/ Arrangement | Proposed Cure Amount |
|---|---|---|---|
| DB Structured Products, Inc. 60 Wall Street New York, NY 10005 Attn: Michael Commaroto | Master Mortgage Loan Purchase and Servicing Agreement, dated as of May 1, 2006, by and among American Home Mortgage Corp. (Seller), American Home Mortgage Servicing, Inc. (Servicer), and DB Structured Products, Inc. (Initial Purchaser) | Loan Sale and Servicing Agreement | $0.00 |

10. On September 4, 2007, this Court entered its *Final Order (I) Authorizing Debtors' Limited Use of Cash Collateral, and (II) Granting Replacement Liens and Adequate Protection to Certain Pre-Petitition Secured Parties* [Doc. No. 554] (the "Cash Collateral Order"). The Cash Collateral Order, among other things, requires the Debtors to continue to perform mortgage loan servicing functions in the ordinary course.

**B.    The Agreement and the Servicing Obligations**

11. Prior to the Petition Date, the Debtors engaged in the origination, sale and servicing of real estate mortgages. DBSP, the Servicer and AHM Corp. are parties to the Agreement. A true and correct copy of the Agreement, including the Servicing Addendum, is annexed as Exhibit A hereto. The Agreement provides for the sale from time to time of mortgage loans to DBSP. In addition, the Agreement provides that the Servicer shall service the mortgages purchased by DBSP pursuant to the Servicing Addendum that is Exhibit 8 to the Agreement (the "Servicing Addendum").

12. The sales of mortgage loans under the Agreement are expressly subject to the obligation of AHM Corp. to repurchase any mortgage loan from DBSP if, among other

reasons, the representations and warranties made pursuant to Sections 7.01, 7.02, and 7.03 of the Agreement relating to any mortgage loan are breached and such breach materially and adversely affects the value of the mortgage loans or the interest of DBSP (the "Repurchase Obligations"). See Agreement at 35-36, Subsection 7.04. AHM Corp. also is obligated to reimburse DBSP for any premium purchase price paid on any mortgage loan that is prepaid or expected to prepay within three months of the Closing Date (such amounts, the "Premium Recapture Amounts"). See Agreement at 38, Subsection 7.05.

13. Pursuant to the Agreement and the Servicing Addendum, the Servicer is required, among other things, to: (a) collect payments on the underlying mortgages, follow such collection procedures as it would for mortgages held for its own account, including foreclosing on defaulted mortgages; (b) establish segregated custodial accounts to hold principal, interest payments, insurance and condemnation payments and other amounts in respect of the purchased mortgages; (c) establish segregated escrow accounts to hold amounts required to be escrowed; (d) maintain records on required payments such as tax assessments and insurance; and (e) distribute funds to DBSP from the custodial accounts and otherwise as required by the Agreement.

14. The Agreement and the rights and obligations of the Servicer may be terminated by DBSP both upon the occurrence of an Event of Default and without cause. Section 14 of the Agreement provides that, upon the occurrence of an Event of Default, DBSP may terminate the rights and obligations of the Servicer under the Agreement. Agreement § 14, p. 58. In addition, DBSP may terminate the Servicer without cause upon payment to the Servicer of the fair market value of the servicing rights. Id. § 15.

15. Section 15 of the Agreement requires the Servicer, upon written notice of

termination, to execute documents, transfer mortgage files and to otherwise take all actions "necessary or appropriate to effect the purposes of such notice of termination." Id. § 15, p. 59. Further, the Servicer is obligated to cooperate with DBSP and any successor servicer "in effecting the termination of the Servicer's responsibilities and rights [] as servicer" including by transferring cash in custodial accounts and escrow accounts.

16. DBSP purchased mortgages from AHM Corp. pursuant to the Agreement, and Servicer currently is the servicer for over $189 million in aggregate principal amount of mortgages purchased and held by DBSP.

17. A financially critical aspect of DBSP's business and a principal commercial basis of its transactions with the Debtors is its ability to sell and/or securitize the mortgages it purchases from the Debtors. Accordingly, DBSP's expectation that it would be able to sell and securitize the purchased mortgages was an important factor in negotiating the terms of the Agreement and is acknowledged in the preamble paragraphs of the Agreement. Agreement, p.1.[1] As described below, due to pre- and post-petition defaults of the Servicer under the Agreement, DBSP was no longer able to sell or securitize purchased mortgages serviced by the Servicer and, as a result, has suffered irreparable and continuing harm that cannot now be remedied by any attempt by the Debtors to comply with the Agreement in the future or by assuming and assigning the Agreement to a party that can comply with its terms.

C.  **The Continuing Defaults and Notice of Termination**

18. There are continuing Events of Default that entitle DBSP, by the terms of

---

[1] The Agreement provides as follows: "Whereas, following its purchase of the Mortgage Loans from the Seller, the Purchaser desires to sell some or all of the Mortgage Loans to one or more purchasers as a Whole Loan Transfer or an Agency Transfer in a whole loan or participation format or a public or private mortgage-backed securities transaction." Agreement, p.1.

the Agreement, to terminate the Servicer. Among other things, the failure by the Servicer to meet the qualifications of either a FNMA or FHLMC seller/servicer constitutes an Event of Default under the Agreement. Agreement § 14.01(vi).

19. On or about August 1, 2007, DBSP became aware that the Servicer was no longer qualified as a seller/servicer by FNMA. As a result, DBSP was not able to securitize mortgages purchased pursuant to the Agreement after the Debtors ceased to be FNMA qualified. Indeed, many of the mortgage loans sold by DBSP in the ordinary course were purchased directly by FNMA, which would no longer do so given the Servicer's lack of FNMA qualification.

20. On August 1, 2007, DBSP sent a Notice of Default and Termination to the Servicer terminating the Servicer, which stated as follows:

> DBSP hereby notifies the Servicer that, because the Servicer has failed to meet the qualifications of a FNMA seller/servicer, which failure constitutes and Event of Default pursuant to Subsection 14.01(vi) of the Agreement, the Servicer is hereby terminated as the servicer under the Agreement. This termination shall become effective as of DBSP's appointment of a successor servicer in accordance with section 16 of the Agreement.

A true and correct copy of the Notice of Default and Termination is annexed as Exhibit B hereto.

### III. ARGUMENT

21. Section 365 of the Bankruptcy Code provides that if the debtor has defaulted on a contract prior to assumption, the debtor cannot assume that contract unless it: (1) cures the default; compensates the nondebtor party for any actual pecuniary losses resulting from the default; and (3) provides adequate assurance of future performance under the contract. 11 U.S.C. § 365(b). As made clear by the amendments effected by the Bankruptcy Abuse

Prevention and Consumer Protection Act of 2005 ("BAPCPA"), with the limited exceptions of penalty rates and penalty provisions, the debtor is required to cure all nonmonetary defaults as well. Id.

A.  **The Debtors Cannot Sell the Rights to Service DBSP's Loans Because The Defaults Under the Agreement Are Incurable**

22. There are material defaults under the Agreement that have caused, and continue to cause, substantial economic risk and loss to DBSP. By the express terms of the Agreement, the Servicer and AHM Corp. were aware that DBSP purchased the mortgages with the intention of selling them and in engaging in mortgage-backed securities transactions. DBSP has been deprived of the benefit of its bargain by the Debtors' failure to perform under the Agreement. The Agreement is in default because, among other things, the Servicer ceased to be a FNMA qualified seller/servicer as required by the Agreement. Even if the Servicer were to become FNMA qualified now, DBSP has suffered, and continues to suffer, irreparable harm as a result of this default.[2] For so long as the Servicer has not been FNMA qualified, DBSP has been unable to sell or securitize the mortgages purchased under the Agreement. As a result, DBSP has been forced to maintain these mortgages at substantial monetary risk and likely loss, which cannot now be remedied by the Servicer becoming FNMA qualified. The harm caused to DBSP has been exacerbated by prevailing market conditions and could not be remedied by either the Servicer's reinstatement as an FNMA qualified servicer or its assumption and assignment of the

---

[2] The recent settlement agreement [Doc. No. 611, Exh. A] (the "FNMA Settlement Agreement") between the Debtors and FNMA has done nothing to bring the Debtors into compliance with the Agreement. To be sure, the FNMA Settlement Agreement provides that *AHM Corp.* shall be "deemed an approved Fannie Mae servicer" during the limited term of the FNMA Settlement Agreement, but the FNMA Settlement Agreement does not confer that status upon the Servicer itself. See FNMA Settlement Agreement at 2, ¶ 1. Moreover, the "deemed approval" is entirely illusory and would not bring the Servicer into compliance with the Agreement in any event. This is because the FNMA Settlement Agreement limits such approval to FNMA's existing loan portfolio and, indeed, expressly provides that "shall not acquire servicing of

Agreement to a FNMA qualified servicer. The existing defaults and the resulting harm cannot be cured. Because the harm suffered by DBSP is not remediable, the Agreement cannot be assumed and assigned as the Debtors apparently intend.

23.    As the Third Circuit has recognized in the context of leases, the bankruptcy court has some latitude to waive strict enforcement of provisions in the assumption process. See In re Joshua Slocum, 922 F.2d 1081, 1090-91 & n.8 (3d Cir. 1990); see also Vanderpark Properties, Inc. v. Buchbinder (In re Windmill Farms, Inc.), 841 F.2d 1467, 1473 (9th Cir. 1988) (bankruptcy court did not err in finding alleged non-monetary defaults, including the failure to maintain insurance and make repairs, were "not of sufficient substance to preclude assumption of the lease"). According to the Third Circuit, the relevant factors in determining whether to exercise this discretion are the materiality of the default at issue and whether the default caused "substantial economic detriment" to the non-debtor party. See Joshua Slocum, 922 F.2d at 1092; see also In re Whitsett, 163 B.R. 752, 754 (Bankr.E.D.Pa. 1994) (in deciding whether debtor's compliance with provisions in a debtor-tenant lease should be deemed insignificant in the assumption process, "the determining 'factor' appears to be the 'materiality' of the default.").

24.    The issue here is whether the Debtors' defaults under the Agreement are of "sufficient substance" and reflect the requisite "materiality and economic significance" under Windmill Farms and Joshua Slocum. There can be no question from the plain language of the Agreement that the failure to maintain FNMA qualified status was and remains a material default of the Agreement. See Whitsett, 163 B.R. at 754. Given that DBSP has been unable to sell or

---

additional Fannie Mae loans, sell additional loans to Fannie Mae or seek to assume the Contract." Id. at 5, ¶ 7.

securitize the loans purchased from the Debtors, the substantial economic detriment to DBSP is readily apparent. See Joshua Slocum, 922 F.2d at 1092. DBSP must maintain at great economic risk the mortgage loans purchased from the Debtors under the Agreement which DBSP was unable to securitize, and that ongoing risk is directly attributable the Debtors' nonmonetary default. Even if the Debtors were to assign the Agreement to an FNMA approved servicer now, that would not undo this historical fact. See In re Lee West Enterprises, 179 B.R. 204, 207 (Bankr.C.D.Cal. 1995) (quoting In re Toyota of Yonkers, Inc., 135 B.R. 471 (Bankr.S.D.N.Y. 1992) ("If this default occurred, it is incapable of cure or remedy because the debtor cannot undo this historical fact.")).

25. Although most published cases dealing with incurable defaults deal within the context of franchisees, the same analyses have been applied in other contexts and is applicable here. See, e.g., In re Anne Cara Oil Co., 32 B.R. 643, 648 (Bankr. D. Mass. 1983) (likely that commingling of products, set forth as conditional grounds for termination, also an incurable default). The Debtors' loss of FNMA qualification is a historical fact which cannot be cured in light of DBSP's ongoing financial risk with respect to the unsecuritized loans it has been forced to retain. If the Debtor has committed an incurable breach, the Debtor has no continuing rights under the Agreement. See Anna Cara, 32 B.R. at 648 (citing Good Hope Refineries, Inc. v. Benavides, 602 F.2d 998, 1003 (1st Cir. 1979)). It may therefore not assume or assign it without DBSP's consent.

**B.    In the Alternative, Should the Court Determine that Defaults Under the Agreement Are Curable, the Debtors Must Compensate DBSP for Actual Pecuniary Losses Resulting from the Defaults and Provide Adequate Assurance of Future Performance**

26. Even if the Court were to determine that the Agreement may be assumed and assigned, DBSP would be entitled to a substantial cure payment in connection with any such

assumption and assignment. The Agreement can only be assumed and assigned, if at all, with all of its benefits and burdens. Furthermore, any prospective purchaser would need to provide adequate assurance that it could perform the Repurchase Obligations and pay the Premium Recapture Amounts under the terms of the Agreement. See 11 U.S.C. § 365(b); N.L.R.B. v. Bildisco and Bildisco, 465 U.S. 513, 531-32 (1984) ("Should the debtor-in-possession elect to assume the executory contract, however, it assumes the contract *cum onere* and the expenses and liability incurred may be treated as administrative expenses, which are afforded the highest priority on the debtor's estate") citing In re Italian Cook Oil Co., 190 F.2d 994, 996 (3d Cir. 1951) ("The trustee, however, may not blow hot or cold. If he accepts the contract he accepts it *cum onere*. If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other."); cf. Tenet Healthsystem Philadelphia, Inc. v. National Union of Hospital and Health Care Employees (In re Allegheny Health Educ. And Res. Foundation), 383 F.3d 169, 177-78 (3d Cir. 2004) (a counterparty must object to a sale to ensure its contract is assumed and assigned with all burdens and that the appropriate cure amount is paid) citing American Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76 (3d Cir. 1999).

27.    Accordingly, the Agreement cannot be assumed and assigned absent a full cure of all outstanding obligations owing to DBSP, which as of September 1, 2007, amounted to $18,001,454.88 on account of the Repurchase Obligations and Premium Recapture Amounts.[3]

28.    The Debtors must also provide DBSP with adequate assurance that any potential buyer can meet the Repurchase Obligations and satisfy claims for Premium Recapture Amounts required after the Proposed Sale closes. Accordingly, DBSP reserves its right to later

---

[3] DBSP continues to investigate the obligations owing under the Agreement and expressly reserves all rights under the Agreement to assert additional claims, including claims for damages proximately caused by the Debtors' various breaches of the Agreement.

object to the financial or other qualifications of any proposed assignee, or to contest the assignment of the Agreement to any assignee on all available grounds.

## IV. CONCLUSION

WHEREFORE, DBSP respectfully requests that the Sale Motion be denied to the extent that it purports to affect any right of DBSP under the Agreement.

Dated: September 10, 2007

**BINGHAM McCUTCHEN LLP**
Steven Wilamowsky
399 Park Avenue
New York, NY 10022
(212) 705-7000

- and -

**ASHBY & GEDDES, P.A.**

/s/ Am Winfree

William P. Bowden (I.D. #2553)
Don A. Beskrone (I.D. #4380)
Gregory A. Taylor (I.D. #4008)
Amanda M. Winfree (I.D. #4615)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Counsel to DB Structured Products, Inc.*

183973.1