IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AMERICAN HOME MORTGAGE<br>HOLDINGS, INC., et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 07-11047 (CSS)<br>(Jointly Administered)<br><br>Proposed Objection Deadline: September 13, 2007 @ 4:00 p.m.<br>Proposed Hearing Date: September 17, 2007 @ 12:00 p.m. |

## MOTION OF FEDERAL HOME LOAN MORTGAGE CORPORATION FOR AN ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362

Federal Home Loan Mortgage Corporation ("Freddie Mac"), through its undersigned counsel, submits this Motion For An Order Granting Relief From The Automatic Stay pursuant to 11 U.S.C. § 362(d) (the "Motion"). In support of this Motion, Freddie Mac states as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G) and (O). Venue in this Court is proper pursuant to 28 U.S.C. § 1408.

### FACTUAL BACKGROUND

#### The Bankruptcy Case

2. On August 6, 2007 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are operating their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

## Freddie Mac and its Business

3. Freddie Mac is a corporate instrumentality of the United States of America, chartered by Congress under the Federal Home Loan Mortgage Corporation Act, Title III of the Emergency Home Finance Act of 1970, 12 U.S.C. §§ 1451-59. Congress created Freddie Mac for the purpose of increasing the funds available to home buyers via the creation of a secondary mortgage market for the purchase and sale of conventional residential mortgage loans. To achieve this congressionally mandated purpose, Freddie Mac, among other activities, purchases conventional mortgage loans from mortgage seller/servicers approved by Freddie Mac, pools those loans into mortgage-backed securities, and then sells those securities to investors. Capital from investors is then used to buy more mortgage loans, and in this way, Freddie Mac facilitates the flow of funds from investors to homebuyers.

4. Freddie Mac purchases mortgage loans from approved mortgage loan originators or "seller/servicers" and contracts with those seller/servicers to service the loans. Mortgage seller/servicers agree to sell and service mortgages pursuant to the terms and conditions contained in certain purchase documents (collectively, the "Purchase Documents") consisting of, *inter alia*, a purchase contract, Freddie Mac's Sellers and Servicers Guide (the "Guide"), and bulletins issued periodically by Freddie Mac to its seller/servicers which supplement the parties' agreement as set forth in the Purchase Documents.

5. The Guide, which consists of several hundred pages[1], sets forth in detail the terms and conditions of the transactions between Freddie Mac and its seller/servicers. The Guide expressly provides that seller/servicers agree to sell mortgage loans to and agree to service mortgage loans for Freddie Mac in accordance with the standards set forth in the Guide. See

---

[1] Due to its size, the Guide is not attached as an Exhibit. Rather, relevant portions of the Guide are cited herein.

Guide Sections 1.2 and 50.2. The Guide further provides that it and the other Purchase Documents constitute the entire agreement between Freddie Mac and its seller/servicers. Id.

6. In sum, the Guide is the basic contract between Freddie Mac and its sellers and servicers. The seller/servicers agree to all terms, requirements and conditions set forth in the Guide. Specifically, pursuant to the Guide, a seller/servicer agrees and warrants at all times that it, *inter alia*, be able to demonstrate to Freddie Mac's satisfaction that it has sufficient capitalization, profitability, liquidity, and funding sources to support its ongoing operations and its commitments to Freddie Mac. See Guide Section 4.2.

7. For each mortgage purchased by Freddie Mac, the Freddie Mac seller/servicer agrees that it will maintain a mortgage file and all underlying books and records (the "Mortgage Loan Files"), which are owned by Freddie Mac, pertaining to any mortgages serviced by the servicer in accordance with the terms and conditions of the Guide. See Guide § 52.1. The Mortgage Loan Files must be maintained during the time Freddie Mac retains any ownership interest in the mortgage and for a period thereafter. See Guide § 52.3.

8. Each Freddie Mac seller/servicer also warrants that all information submitted to Freddie Mac is true, complete and accurate, and agrees to allow Freddie Mac to inspect all of the mortgage loan origination files. See Guide §§ 6.1 and 6.3. In addition, all sellers and servicers agree, on request, to deliver original documents from the Mortgage Loan Files to Freddie Mac. See Guide § 73.3.

**Freddie Mac's Agreement with American Home Mortgage Corporation**

9.  Prior to the Petition Date, debtor American Home Mortgage Corp. ("AHM") was a Freddie Mac seller/servicer. AHM serviced approximately 4,547 Freddie Mac mortgage loans with a total value of approximately $796,782,744.55 (the "Mortgage Loans").

10.  As a Freddie Mac seller/servicer, AHM's relationship with Freddie Mac is governed by the terms and conditions of the Purchase Documents and the Guide. The Guide includes, *inter alia*, the following relevant terms and conditions:

> § 5.2 Without limiting Freddie Mac's right to take whatever other action it deems appropriate to protect its interests and enforce its rights (including disqualification or suspension for reasons not listed below), Freddie Mac may disqualify or suspend a Seller or a Servicer for any of the following reasons:
>
> * * * *
>
> 8. The Seller's or the Servicer's failure to maintain qualified loan origination or Servicing staff and/or adequate facilities to assure (i) the investment quality of the Mortgages sold to Freddie Mac or (ii) the adequacy of the Servicing of the Mortgages purchased by Freddie Mac.
>
> 9. Any weakness or notable change in the financial or organizational status of the Seller or the Servicer that, in the opinion of Freddie Mac, could adversely affect Freddie Mac.
>
> 10. The failure of the Seller or the Servicer to meet any requirement as may be prescribed by Freddie Mac for eligibility as a Seller or a Servicer.
>
> * * * *
>
> 15. The Seller or the Servicer's failure to observe or comply with any term or provision of the Purchase Documents.
>
> * * * *
>
> 19. Failure by the Seller or the Servicer to perform under any contract with Freddie Mac including, but not limited to, a contract with Freddie Mac's Securities Sales and Trading Group.
>
> * * * *
>
> § 73.1 Freddie Mac may terminate Servicing by the Servicer at any time with cause for any of the reasons for disqualification cited in Section 5.2 . . . . Termination of servicing with cause is a basis for immediate disqualification as a Seller/Servicer . . . .
>
> § 73.2 If Freddie Mac transfers the Servicing of any Mortgage, the Servicing Compensation . . . is paid to the new Servicer.

§ 73.3 Upon termination of the Servicing of any Mortgage, the Servicer is responsible for supplying . . . all reports, documents and information . . . requested by Freddie Mac on the date specified by Freddie Mac.

§ 73.4 The remittance to Freddie Mac of Mortgage collections for each Mortgage for which Servicing is terminated must be made on the date specified by Freddie Mac . . . . Additionally, all Escrow Funds, Escrow Accounts and prepared installments . . . must be transferred to the new Servicer on the date specified by Freddie Mac.

The Servicer must use its best efforts to effect the orderly and efficient Transfer of Servicing to the new Servicer.

**AHM's Default and Freddie Mac's Termination of its Agreements with AHM**

11. On or prior to July 31, 2007, AHM's financial condition deteriorated dramatically. And, on July 31, 2007, AHM announced that it had not funded its lending obligations of $300 million on July 30, 2007, and that it would not be able to fund its lending obligations of $450-500 million on July 31. Press releases issued by AHM stated that it anticipated the liquidation of its assets.[2] The stock of AHM's parent declined in value precipitously. The deterioration of AHM's financial condition constituted a breach of its obligations under the Guide.

12. In addition, AHM has breached its obligations under the Guide in numerous other respects, including but not limited to, the following:

    a. AHM failed to report and remit funds to Freddie Mac in a timely manner for repurchases issued for loans determined to be of non-investment quality;

    b. AHM failed to meet Guide requirements to repurchase mortgages after receipt of Freddie Mac's repurchase letter; and

---

[2] See August 1, 2007 Wall Street Journal, p. 1 ("Traders said yesterday's stock-market selloff was ignited by a warning from American Home Mortgage that pressure to repay its creditors may cause it to liquidate its assets. Its shares subsequently plunged 89% to $1.13.").

  c. As to certain loans, AHM did not appeal from Freddie Mac's request for repurchase but did not repurchase the loan as required by the Guide.[3]

 13. By overnight letter dated August 1, 2007 (the "Termination Notice"), Freddie Mac notified AHM that AHM's eligibility to sell and/or service Freddie Mac mortgages was terminated immediately. A true and correct copy of this letter is attached hereto and incorporated herein by reference as Exhibit A. The Termination Notice was also sent via facsimile to AHM at 10:23 a.m. on August 1, 2007. In addition, on August 1, 2007, representatives of Freddie Mac left telephone messages with AHM's President and made several other phone calls to AHM personnel attempting to advise them of the termination.

 14. The Termination Notice constituted a valid termination pursuant to the Purchase Documents and the Guide.

 15. Freddie Mac's pre-petition Termination Notice explicitly required AHM to deliver all Freddie Mac files and records to Freddie Mac or Freddie Mac's designee forthwith, subject to Freddie Mac's reservation of all rights to pursue additional and further remedies. All such relief requested by Freddie Mac was made in accordance with the Guide as agreed to by AHM, including but not limited to, the Guide's requirements for delivery of files, documents and records upon termination of AHM's relationship with Freddie Mac.

 16. AHM actually received notification of its termination on August 1, 2007, but failed and refused to deliver the files and records requested by Freddie Mac despite specific oral and written requests that it do so in violation of Sections 73.3 and 73.4 of the Guide. Likewise, AHM has refused to deliver the power of attorney required by Freddie Mac to effectuate the

---

[3] Freddie Mac's investigation into other breaches continues.

transfer of the Mortgage Loan Files or provide full accounting for and/or delivery of funds due and owing to Freddie Mac.

17. Additionally, pursuant to its rights under the Guide, Freddie Mac demanded delivery of the Freddie Mac portfolio files on August 1, 2007, at defendant's servicing facility in Irving, Texas, but was wrongfully refused access to such files. Instead, AHM had its security personnel escort the Freddie Mac representatives out of AHM's facility.

18. Freddie Mac has exercised due care and diligence in selecting an "interim servicer" (U.S. Bank) to which AHM is to transfer its mortgage funds and related documents. Freddie Mac ensures that an "interim servicer" is one that is capable of handling the immediate transfer of mortgage funds and records in large quantities. U.S. Bank is well qualified and capable of servicing Freddie Mac's Mortgage Loans, having been utilized as an "interim servicer" by Freddie Mac in the recent past.

19. Despite AHM's wrongful refusal to turn over Freddie Mac's Mortgage Loan Files, Freddie Mac did succeed, on August 1, 2007, in securing possession of AHM's custodial account funds relating to the Freddie Mac Mortgage Loans (the "Custodial Account Funds"), pursuant to its rights under the Purchase Documents. These Custodial Account Funds included, but may not have been limited to, borrowers' principal and interest payments, and escrow funds used to pay property taxes and insurance for those borrowers. The total amount of Custodial Account Funds secured by Freddie Mac was $6,955,404.08.

20. As it is without access to or use of the Custodial Account Funds, AHM will be without the funds necessary to pay Freddie Mac's borrowers' insurance premiums or periodic real property tax liabilities.

21. Even though Freddie Mac secured possession of the Custodial Account Funds, without the Mortgage Loan Files, including loan servicing electronic data and other servicing

files and records (which identify, among other information, the various insurance companies and the various local taxing authorities), neither Freddie Mac nor its designee will be able to pay Freddie Mac's borrowers' insurance premiums or periodic real property tax liabilities.

22.  As of August 24, 2007, AHM ceased making advances in payment of Freddie Mac's borrowers' insurance premiums or periodic real property tax liabilities. There is, therefore, the imminent risk that borrowers' insurance policies may lapse for non-payment, and real property tax bills will go unpaid resulting in increased tax liabilities and possible tax foreclosure sales.

23.  Additionally, for as long as Freddie Mac remains unable to effect a transfer of servicing responsibilities from AHM to U.S. Bank (or another Freddie Mac designee), Freddie Mac's borrowers will have no choice but to continue to deal with AHM.

24.  Borrowers will continue to: make their periodic principal and interest payments to AHM; contact AHM in the event they wish to pay off their mortgage loans; contact AHM if they run into financial difficulties, including if they are in default and require assistance to avoid losing their homes to foreclosure; and communicate with AHM with respect to all manner of issues that may arise with respect to the servicing of the loans.

### The Texas Action

25.  On August 2, 2007, Freddie Mac commenced an action in the United States District Court for the Northern District of Texas (the "Texas District Court") by filing a Complaint and Request for Temporary Restraining Order, Preliminary Injunction and Permanent Injunction (the "Complaint") alleging claims for declaratory judgment, injunctive relief, sequestration and breach of contract.

26.  On August 2, 2007, the Texas District Court held a hearing on Freddie Mac's request for a temporary retraining order. Counsel for AHM appeared at the hearing.

27. On August 3, 2007, the Texas District Court entered Memorandum Opinion and Order (the "TRO Order") granting Freddie Mac's request for a temporary restraining order. A true and correct copy of the TRO Order is attached hereto as Exhibit B.

28. The TRO Order ordered that "pending a preliminary injunction hearing" AHM and its officers, agents, representatives, employees and attorneys

> must (i) immediately deliver to [Freddie Mac], or its designee, all mortgage loans files heretofore serviced by [AHM] on behalf of Freddie Mac . . . (ii) immediately deliver to [Freddie Mac], or its designee, all funds derived from these mortgage loans, including any funds designated as impounded funds, less servicing fees earned, and thereafter deliver any additional funds [AHM] may receive with respect to these loans; (iii) refrain from destroying, altering or disposing of the mortgage loan documents required to be delivered to [AHM] or its designated interim servicer; and (iv) refrain from taking any other action with respect to mortgage loans heretofore serviced by [AHM] on behalf of [Freddie Mac] . . . .

TRO Order at p. 12.

29. In granting the temporary restraining order, the Texas District Court determined that Freddie Mac was "substantially likely to succeed on the merits of its claims." TRO Order at p. 7. In reaching this determination, the Texas District Court aptly noted that:

> Other courts have recognized that Freddie Mac has the discretion to terminate a servicer for cause for violations of the Guide, and that Freddie Mac's decision to terminate also immediately terminates the seller or servicer's rights to service any Freddie Mac mortgage:
>
>> § 5.2 of the Guide gives Freddie Mac the right to take whatever action it deems necessary to protect its interests, including disqualification or suspension of a seller or servicer. Under § 5.2, Freddie Mac may suspend or disqualify a seller or servicer either for cause or without cause, and such action is effective immediately upon notice of suspension or disqualification. Significantly, § 5.2 also states that the decision to suspend or disqualify a seller without cause, to terminate a service without cause is conclusive. . . . [W]hen Freddie Mac gave the notice of termination, [Defendant's] right to service the Freddie Mac portfolio ceased to exist.
>
> *In re LiTenda Mortgage Corp.*, 246 B.R. 185, 192 (Bankr. D.N.J. 2000). In another case involving a terminated seller and servicer, the Ninth Circuit Court of Appeals held that Freddie Mac "terminated [Defendant's] eligibility to sell and

> service mortgages, . . . by oral notice, effective immediately, followed by written confirmation. Upon termination, [Defendant] ceased to be a "Seller/Servicer" and by the terms of the contract had no right to service mortgages owned by Freddie Mac." *American Bankers Mortgage Corp. v. Federal Home Loan Mortgage Corp.*, 75 F.3d 1401, 1412 (9th Cir.), *cert. denied*, 519 U.S. 812 (1996).

TRO Order at p. 7.

30.     In consideration of these precedents and applying the facts of the instant dispute, the Texas District Court found that:

> Plaintiff has established that it had concerns about the financial condition of AHM, that AHM's financial condition has deteriorated, and that this is [sic] valid basis for the disqualification and termination of AHM as a Freddie Mac seller and servicer. Because the decision to terminate immediately divests AHM of its rights to service existing loans, Plaintiff has also shown that it is entitled to receive the mortgage files and funds associated with loans owned by Freddie Mac but previously serviced by AHM.

TRO Order at p. 8.

31.     Despite the TRO Order's mandate that the files be turned over "immediately" and despite the fact that Freddie Mac posted a bond as required by the TRO Order on Friday, August 3, 2007, AHM failed to return the Mortgage Loan Files prior to its Monday, August 6, 2007 Petition Date. Subsequent to the entry of the TRO Order, on Saturday, August 4, 2007, representatives of Freddie Mac spent several hours attempting to contact Mr. David Friedman, Senior Vice President of Servicing for AHM, and to otherwise gain access to the Mortgage Loan Files being held by AHM. Despite these efforts, Freddie Mac was ultimately unsuccessful in realizing the "immediate" turnover of the Mortgage Loan Files mandated by the TRO Order.

32.     As of the date of this Motion, AHM has failed to comply with the terms of the TRO Order, including, but not limited to, turnover of the Mortgage Loan Files.

### Post-Petition Discussions

33.     Shortly after the Petition Date, on Wednesday, August 8, 2007, Freddie Mac initiated contact with the Debtors regarding its proposal to settle the controversy relating to

Freddie Mac's prepetition termination of AHM as servicer and AHM's refusal to turn over the Mortgage Loan Files. On Thursday, August 9, 2007, the parties held a telephone conference during which Freddie Mac communicated the terms of its settlement proposal.

34. On Tuesday, August 14, 2007, having failed to receive a favorable response from the Debtors regarding its settlement proposal, Freddie Mac informed the Debtors of its intent to file appropriate papers with the Court to gain possession of the Mortgage Loan Files and otherwise secure its rights with respect to the terminated servicing.

35. On August 16-17, 2007, Freddie Mac, the Debtors and the Debtors' pre-petition lender, Bank of America, NA ("BofA"), held telephone conferences to discuss Freddie Mac's settlement proposal. On August 17, 2007, Freddie Mac advised the parties to the settlement discussions that it was prepared to file an appropriate motion seeking relief from the automatic stay. Based upon the settlement negotiations, the requests of the parties, and a verbal understanding regarding the basic terms of the settlement, Freddie Mac agreed to temporarily forbear, at its discretion, from filing its stay relief motion.

36. On Monday, August 20, 2007, the parties reached a written agreement in principle regarding the basic terms of Freddie Mac's settlement proposal, subject to entering into appropriate stipulations to document the settlement and, ultimately, court approval. The agreement explicitly rejected one of the main tenets of Debtors' proposal, and specifically provided for the immediate transfer of Freddie Mac's servicing portfolio to BofA. Based upon reaching the settlement in principle, and at the urging of the parties, Freddie Mac renewed its agreement to temporarily forbear, at its discretion, from filing its stay relief motion.

37. Over three weeks have passed since the parties reached the agreement in principle regarding settlement. During that time, Freddie Mac counsel has provided to Debtors and BofA numerous drafts of the settlement documents. Initially, Freddie Mac reluctantly continued to

forbear, in good faith, from filing its stay relief motion as document revisions proceeded and based upon representations from counsel that various decision makers were unavailable to permit finalization of the documents.

38. Recently, however, it has become clear that the delays have been caused by the Debtors' apparent desire to cast aside the parties' settlement in principle and implement the alternative terms that were explicitly rejected in the initial agreement in principle. After more than two weeks of revisions to stipulations of settlement, the Debtors have refused to proceed with finalizing those stipulations until the Debtors' management has exhausted all opportunities to discuss its alternative proposal with Freddie Mac business contacts. On information and belief, the Debtors have independently contacted numerous officials within Freddie Mac effectively seeking a re-hearing of the rejected terms. Despite Freddie Mac's repeated refusal to alter the terms for settlement, the Debtors have persisted. Due to these delays and the Debtors' apparent unwillingness to finalize the settlement in principle on its original basic terms, Freddie Mac is compelled to file this Motion.

## RELIEF REQUESTED

39. By this Motion, Freddie Mac seeks entry of an order granting relief from the automatic stay to permit Freddie Mac to exercise and enforce all of its rights and remedies against its property in accordance with the provisions of the Purchase Documents, the Guide, and applicable law, including, without limitation, pursuing the Texas District Court litigation and obtaining possession of the Mortgage Loan Files.

## BASIS FOR RELIEF REQUESTED

### AHM Does Not Have Any Property Rights in the Mortgages Sold to Freddie Mac or the Servicing Rights Related to Loans Owned by Freddie Mac

40. Due to Freddie Mac's valid prepetition termination of AHM's eligibility to sell mortgages to and to service mortgages for Freddie Mac under the Purchase Documents, the

Debtors maintain no interest with respect to the servicing rights relating the Freddie Mac Mortgage Loans. Property rights do not arise under the Bankruptcy Code. In re Pinetree, Ltd., 876 F.2d 34 (5th Cir. 1989). Rather, those rights arise under applicable non-bankruptcy law. Butner v. United States, 440 U.S. 48, 56 (1979); Commerce Bank v. Mountain View Village, Inc., 5 F.3d 34, 37 (3d Cir. 1993). Under applicable non-bankruptcy law, once Freddie Mac terminates a servicing agreement and the seller/servicer's eligibility to service its mortgages, all of the seller/servicer's rights under the servicing agreement are extinguished.

41. Section 5.1 of the Guide provides that Freddie Mac may terminate a seller/servicer's eligibility to be a seller/servicer at its discretion and upon any breach by the seller/servicer. Mortgage Network Corp. v. Federal Home Loan Mortgage Corp, Case No. SACV 93-303 at 5, 9 (C.D. Cal. Dec. 20, 1993), aff'd., 77 F.3d 489 (table), 1996 WL 64984 (9th Cir.), cert. denied, 519 U.S. 812 (1996).

42. Once eligibility is terminated, the seller/servicer ceases to be a seller/servicer and has no right to service mortgages owned by Freddie Mac. American Bankers Mtge. Corp. v. Federal Home Loan Mtge. Corp., 75 F.3d 1401, 1412 (9th Cir. 1995), cert. denied, 519 U.S. 812 (1996); Mortgage Network, 1996 WL 64984 at 1. The terminated seller/servicer has "no remaining possessory rights in the servicing rights to its mortgage portfolio. . . ." American Bankers, 75 F.3d at 1412; see also Mortgage Network, 1996 WL 64984 at 1 ("Upon termination, TMNI ceased to be a "Seller/Servicer" as defined in [the] Guide . . . and by the terms of the contract . . . had no right to service mortgages owned by Freddie Mac. Therefore, it had no remaining possessory interest in the servicing rights"). Actually, "the contractual rules for the change of servicing on the termination of a servicer with cause display an unmistakable intention to terminate all of that servicer's rights under the contract as of the time of termination." Mortgage Network, 1996 WL 64984 at 9.

43. As the court held in In re LiTenda Mortgage Corp., 246 B.R. 185 (Bankr. D.N.J. 2000), affirmed 276 F.3d 578 (Table) (3d Cir. 2001):

> § 5.2 of the Guide gives Freddie Mac the right to take whatever action it deems necessary to protect its interests, including disqualification or suspension of a seller or servicer. Under § 5.2, Freddie Mac may suspend or disqualify a seller or servicer either for cause or without cause, and such action is effective immediately upon notice of suspension or disqualification. Significantly, § 5.2 also states that the decision to suspend or disqualify a seller without cause, to terminate a service without cause is conclusive. . . . [W]hen Freddie Mac gave the notice of termination, [Defendant's] right to service the Freddie Mac portfolio ceased to exist.

Id. at 192; see also TRO Order at p. 7.

44. Pursuant to the Termination Notice, Freddie Mac terminated AHM's eligibility to service Freddie Mac's loans pre-petition. See TRO Order at p. 7 (finding that Freddie Mac was substantially likely to succeed on the merits of its claims and citing Litenda and similar cases finding Freddie Mac's termination of servicing to be valid in factually similar scenarios). Accordingly, AHM does not have any property interests in the mortgages or the income derived therefrom for those loans that were sold to Freddie Mac pre-petition or any interest in the servicing rights for the Mortgage Loans owned by Freddie Mac.

### Cause Exists to Lift the Automatic Stay as to Freddie Mac

45. To the extent that the automatic stay applies to AHM's mere possession of the Mortgage Loan Files, cause exists to lift the automatic stay to enable Freddie Mac to exercise its right to recover the Mortgage Loan Files. Section 362(d) of the Bankruptcy Code provides for circumstances under which this Court may terminate, annul, modify, or condition the automatic stay. Section 362(d)(1) of the Bankruptcy Code provides that

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay --

>(1) for cause, including the lack of adequate protection of an interest in property of such party in interest.

11 U.S.C. § 362(d)(1). Under Section 362(d)(1), Freddie Mac "bears the burden of establishing a prima facie case of cause, at which point the burden of proof shifts to debtor" to demonstrate the absence of cause. See In re Aardvark, Inc., No. 96-412-SLR, 1997 U.S. Dist. LEXIS 3304, at *13 (D.Del. Mar. 4, 1997) (quoting In re Phoenix Pipe & Tube, L.P., 154 B.R. 197, 198 (Bankr. E.D.Pa. 1993)); 11 U.S.C. § 362(g).

46. The Bankruptcy Code specifically provides that "cause" includes a lack of adequate protection. 11 U.S.C. § 362(d)(1). A lack of adequate protection, however, does not constitute the sole basis for "cause" for relief from the stay. See 11 U.S.C. § 102(3) ("'includes' and 'including' are not limiting"). Thus, Section 362(d)(1) leaves "courts to consider what constitutes cause based on the totality of the circumstances in each particular case." In re Wilson, 116 F.3d 87, 90 (3d Cir. 1997) (citing In re Trident Assocs., 52 F.3d 127 (6th Cir. 1995)).

47. The Bankruptcy Code does not define "cause" and it must therefore be "determined on a case-by-case basis." Izzarelli v. Rexene Products Co. (In re Rexene Products Co.), 141 B.R. 574, 576 (Bankr. D.Del. 1992); Matter of Pursuit Athletic Footwear, Inc., 193 B.R. 713, 718 (Bankr. D.Del. 1996); In re Wedgewood, 878 F.2d 693, 697 (3d Cir. 1989); In re Pro Football Weekly, Inc., 60 B.R. 824, 826 (N.D. Ill. 1986).

48. The totality of the circumstances present in this case constitute sufficient "cause" to warrant relief from the automatic stay under Section 362(d)(1) of the Bankruptcy Code.

49. "[I]t is a well 'recognized principle of bankruptcy law that an executory contract or lease validly terminated prior to the institution of the bankruptcy proceedings, is not resurrected by the filing of the petition in bankruptcy and cannot therefore be included among the debtor's assets.'" McDaniel v. Metropolis Towers Apartment Corp., 2002 WL 106587 at 3 (D.N.J. Feb. 26, 2002) (quoting In re Robertson, 147 B.R. 358, 361 (Bankr. D.N.J. 1992).

50. It follows that if an agreement is terminated prepetition, "cause" exists to lift the automatic stay to enable the terminating party to recover possession of any underlying property. See In re Nasir, 217 B.R. 995, 997 (Bankr. E.D.Va. 1997) ("a landlord's desire to evict a debtor tenant whose lease has been terminated prepetition is sufficient cause for the bankruptcy court to grant relief from stay under § 362(d)(1)"); see also In re Greenfield Dry Cleaning & Laundry, Inc., 249 B.R. 634, 644 (Bankr. E.D.Pa. 2000); Bell v. Alden Owners, Inc., 199 B.R. 451, 463 (S.D.N.Y. 1996) ("cause exists for granting relief from the automatic stay when an executory contract is validly terminated prior to the commencement of a bankruptcy case."); In re Knight Jewelry, 168 B.R. 199, 201 (Bankr. W.D.Mo. 1994) ("Since the lease was terminated before the bankruptcy case was filed, cause exists to grant relief from the automatic stay."); In re Syndicom Corp., 268 B.R. 26, 45 (Bankr. S.D.N.Y. 2001); In re Hill, 307 B.R. 821, 824 (Bankr. W.D.Pa. 2004) (possessory interest in property "is not sufficient to preclude annulment of the stay, at least where no lease exists."); In re Fitzgerald, 237 B.R. 252, 262 (Bankr. D.Conn. 1999) ("Based upon FNMA's showing [that the Debtor was left only with a bare possessory interest in the Property at the commencement of the case], the court finds that FNMA has satisfied its initial burden under Section 362(d)(1).").

51. In accordance with the foregoing authorities, Freddie Mac's prepetition termination of AHM as a seller/servicer, together with its desire to take possession of the Mortgage Loan Files in accordance with the TRO Order, constitute sufficient "cause" for relief from the automatic stay to the extent applicable to AHM's mere possession of the Mortgage Loan Files.

52. Although courts have found "cause" for stay relief based solely upon a prepetition termination of the parties' agreement, "cause" is further established in this case based upon the inability of AHM to properly service the Mortgage Loans. Due to Freddie Mac's seizure of the

Custodial Account Funds in accordance with its rights under the Purchase Documents, AHM is without the funds necessary to pay Freddie Mac's borrowers' insurance premiums and/or periodic real property tax liabilities. Furthermore, without access to its Mortgage Loan Files, neither Freddie Mac nor any interim servicer has the necessary information to be able to pay these insurance premiums or periodic real property tax liabilities.

53.    As of August 24, 2007, AHM apparently ceased making advances in payment of Freddie Mac's borrowers' insurance premiums or periodic real property tax liabilities. Therefore, there is the imminent risk that borrowers' insurance policies may lapse for non-payment, subjecting the borrowers to a risk of loss of their mortgaged properties (and Freddie Mac's collateral). In the event of a loss due to failure to maintain insurance, the borrower could potentially assert claims against both Freddie Mac and the Debtors for the uncompensated loss occurring to his/her home due to failure to maintain insurance. In addition, real property tax bills will go unpaid resulting in increased tax liabilities and possible tax foreclosure sales. Stay relief is proper to avoid these serious consequences stemming from AHM's inability to service the Freddie Mac Mortgage Loans.

54.    In this case, AHM sold its interests in the Mortgage Loans and their proceeds to Freddie Mac pre-petition. In addition, prior to the Petition Date, Freddie Mac terminated the servicing agreement with AHM pursuant to the Termination Notice and in accordance with the Purchase Documents. Consequently, AHM does not have any interests in the underlying mortgages or the proceeds therefrom or to the servicing rights for the Freddie Mac Mortgage Loans.

55.    Due to Freddie Mac's pre-petition termination of the Purchase Documents cause exists for relief from the automatic stay under Section 362(d)(1) of the Bankruptcy Code. Additionally, the totality of the circumstances dictates that the automatic stay be lifted to enable

Freddie Mac to enforce its rights to recover the Mortgage Loan Files in accordance with the mandate of the TRO Order.

WHEREFORE, Freddie Mac requests that the Court enter an Order (i) granting the Motion, (ii) terminating the automatic stay pursuant to 11 U.S.C. § 362(d)(1) to enable Freddie Mac to exercise its rights under the Purchase Documents and the TRO Order to recover the Mortgage Loan Files and related documents and continue pursuing the pending litigation in the Texas District Court, (iii) requiring Debtors to grant immediate access to employees and agents of Freddie Mac, and its designees, to Debtors' offices for the purpose of obtaining and retrieving the Mortgage Loan Files, (iv) requiring Debtors to order their employees to cooperate with respect to the obtaining and retrieving of the Mortgage Loan Files, and (v) granting such other further relief this Court deems just and proper.

Dated: September 10, 2007
      Wilmington, Delaware

Respectfully submitted,

By: /s/ J. Cory Falgowski
J. Cory Falgowski (No. 4546)
REED SMITH LLP
1201 Market Street, Suite 1500
Wilmington, DE 19801
Telephone: 302-778-7500
Facsimile: 302-778-7575
E-mail: jfalgowski@reedsmith.com

and

Peter S. Clark II, Esquire
REED SMITH LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103-7301
Telephone: 215-851-8100
Facsimile: 215-851-1420
E-mail: pclark@reedsmith.com

and

- 19 -

        George Kielman, Esquire
        Associate General Counsel for Litigation
        FreddieMac
        8200 Jones Branch Drive - MS 202
        McLean, VA 22102
        Telephone: 703-903-2640
        Facsimile: 703-903-3691
        E-mail: george_kielman@freddiemac.com

        Counsel for Federal Home Loan Mortgage Corporation