# EXHIBIT A

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE ("First Amendment") is made as of the 1L͟ day of June, 2005, by and between **HAZELTINE GATES, L.L.C.**, a Delaware limited liability company ("Landlord") and **AMERICAN HOME MORTGAGE CORP. OF NEW YORK**, a New York corporation ("Tenant").

### RECITALS:

WHEREAS, Landlord and Tenant are parties to that certain lease agreement dated May 18, 2005, concerning the leasing of approximately 4,544 square feet of space designated as Suite 500 (the "Initial Premises") in the Building located at 1107 Hazeltine Boulevard, Chaska, MN (the "Lease"); and

WHEREAS, the parties now desire to further modify the Lease as provided herein.

NOW, THEREFORE, in consideration of the mutual promises and covenants hereinafter set forth, the parties agree as follows:

1. **Interpretation of First Amendment.**    The Lease is hereby modified and supplemented. Wherever there exists a conflict between this First Amendment and the Lease, the provisions of this First Amendment shall control. Unless otherwise indicated in this First Amendment, capitalized terms shall be defined in the manner provided in the Lease. Except as modified hereby, all provisions of the Lease shall remain in full force and effect.

2. **Expansion of Premises.**   Landlord hereby demises and leases to Tenant and Tenant hereby leases and takes from Landlord an additional approximately 2,174 rentable square feet as depicted on *Exhibit A* attached hereto and made a part hereof (the "Expansion Premises") to be added to the Initial Premises as Suite 500 in the Building to have and to hold for the term specified in paragraph 3 hereof. Effective as of the E.P. Commencement Date, the Initial Premises, consisting of approximately 4,544 square feet, and the Expansion Premises, consisting of approximately 2,174 square feet, shall be deemed to be the "Premises", for a total of approximately 6,718 square feet, for all purposes under the Lease.

3. **Lease Term.**   The term of the Lease with regard to the Expansion Premises shall commence on August 1, 2005 (the "E.P. Commencement Date"), and Tenant shall have possession of the Expansion Premises as of said date, subject to the completion of Landlord's Work. The expiration date of the Lease with regard to the Expansion Premises is June 30, 2010.

[Remainder of Page Intentionally Left Blank]

4. **Base Rent.** Article 1(E) of the Lease is deleted in its entirety and replaced with the following:

"E.    Base Rent:          Payable in monthly installments as follows:

| Period | PSF | Monthly |
|---|---|---|
| 7/1/05 – 7/31/05 | $10.00 | $3,786.67 |
| 8/1/05 – 6/30/06 | $10.00 | $5,598.33 |
| 7/1/06 – 6/30/07 | $10.50 | $5,878.25 |
| 7/1/07 – 6/30/08 | $11.00 | $6,158.17 |
| 7/1/08 – 6/30/09 | $11.50 | $6,438.08 |
| 7/1/09 – 6/30/10 | $12.00 | $6,718.00" |

5. **Use of Expansion Premises.** Tenant shall use the Expansion Premises solely for the purpose of general office use.

6. **Acceptance of Expansion Premises.** It is understood that, except for Landlord's Work, Tenant is taking the Expansion Premises in "AS-IS" condition.

7. **Proportionate Share.** Effective August 1, 2005, Article 1(F) of the Lease is deleted in its entirety and replaced with the following:

"F. Proportionate Share:  6.52% (6,718/103,087) (which may be adjusted up or down by Landlord at such time as the entire Building is remeasured)."

8. **Landlord's Additional Work.** On or before August 1, 2005, Landlord shall, at Landlord's sole cost and expense, construct or install those improvements or alterations described in the proposal prepared by Cirks Construction, Inc. dated June 14, 2005, attached hereto as Schedule 1 ("Landlord's Additional Work"). Tenant may not order any changes in the work without the prior written approval of Landlord, and in the event such change results in an increase in the contract price of Landlord's Additional Work, Tenant shall be responsible for the payment of such increased cost, which shall be payable to Landlord upon completion of Landlord's Additional Work.

Landlord will use its best efforts to achieve substantial completion of Landlord's Additional Work by August 1, 2005. Tenant shall have no right to enter or occupy the Expansion Premises until the same are tendered by Landlord. Landlord shall not be liable for any damages to or losses of Tenant caused by or arising out of any delay in completion of Landlord's Additional Work or tendering the Expansion Premises to Tenant. Tenant shall permit Landlord access to the Expansion Premises for the purposes of permitting Landlord to perform Landlord's Additional Work and no such entry shall be construed as an eviction,

render Landlord liable for damages by abatement of rent or otherwise or relieve Tenant of its obligations under this Lease.

Notwithstanding the foregoing, Landlord shall have no obligation to pay more than $45,210.00 for the cost of Landlord's Additional Work. In the event the total cost of Landlord's Additional Work exceeds the total sum of $45,210.00, Tenant agrees to reimburse Landlord for all costs in excess of $45,210.00, in a lump sum payment due and payable from Tenant to Landlord upon completion of Landlord's Additional Work.

9. **Contingency.** Landlord and Tenant agree that this Lease is entered into on the express condition precedent that Landlord shall be able to amend or terminate the three (3) leases currently in effect with respect to portions of the Expansion Premises as well as to obtain possession of said Expansion Premises (the "Terminations"). The parties further agree that in the event of any delay or inability of the part of Landlord to effect such Terminations and/or is prevented from delivering possession of the Expansion Premises to Tenant on the E.P. Commencement Date, there shall be no claim of any type or nature on the part of Tenant against Landlord, nor shall this Lease be terminated. The E.P. Commencement Date shall be amended to the date the Landlord delivers possession of the Expansion Premises to Tenant, with all rent for the Expansion Premises accruing from said amended E. P. Commencement Date. The parties shall execute an amendment to the Lease within thirty (30) days after the Expansion Premises are delivered to Tenant, specifying such amended E.P. Commencement Date. Notwithstanding the foregoing, in the event Landlord is unable to achieve the Terminations on terms satisfactory to Landlord, in its sole discretion, on or before August 15, 2005, Landlord shall have the option to terminate this First Amendment by providing written notice to Tenant on or before August 31, 2005.

10. **Miscellaneous.** This First Amendment represents the entire agreement of the parties with respect to its subject matter, may only be amended in a writing signed by the parties hereto, and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

**IN WITNESS WHEREOF,** Landlord and Tenant have caused this First Amendment to Lease to be signed and delivered as of the date first above written.

**LANDLORD**
HAZELTINE GATES, L.L.C., a Delaware
limited liability company
By: John B. Goodman Enterprises, Inc.
Its: Member Manager

By: _____
Its: _____

**TENANT**
AMERICAN HOME MORTGAGE CORP.
OF NEW YORK, a New York corporation

By: _____
Its: _____

EXHIBIT A



FLOOR PLAN

EXHIBIT A

## Schedule 1 – Landlord's Additional Work

### CIRKS CONSTRUCTION, INC.

1687 Wedgewood Circle
Arden Hills, Minnesota 55112

GENERAL CONTRACTORS                                PHONE: 651-633-9059

June 14, 2005

~~The Goodman Group~~ Hazeltine Gates, LLC
1107 Hazeltine Blvd.
Chaska, MN 55318

RE: American Home Mortgage Expansion

Dear Mr. Pat Skinner:

We are pleased to submit our preliminary proposal for the American Home Mortgage expansion per WCL Interiors undated (not to scale) plan received 6-8-05. Our scope of work includes:

1) Demolition: (walls, doors, ceiling system and carpet/base)
2) Drywall:
   A. Repair at demolition
   B. Build new interior walls to ceiling grid (with sound insulation at private offices)
3) Carpentry:
   A. Relocate/reinstall six (6) existing door packages
   B. F&I two (2) new interior door packages
   C. F&I six (6) new locksets for existing doors
4) Electrical:
   A. Demo as needed
   B. Remove/reinstall 28 existing light fixtures
   C. Install eight (8) single-pole switches
   D. Install 24 duplex outlets
   E. Install 10 phone/data
   F. F&I one (1) new EXIT light
5) Life Safety/Fire Alarm:
   A. $1,000.00 allowance
6) HVAC:
   A. Relocate five (5) stats
   B. Relocate five (5) existing diffusers
   C. F&I three (3) new diffusers
   D. F&I new return air grilles

## Schedule 1 – Landlord's Additional Work
### (continued)

7) Sprinkler work per code (approx. 15 heads)
8) Acoustical:
    A. Patch ceiling grid
    B. F&I new 2'x4' ceiling tile throughout
9) Decorating:
    A. Paint all walls
    B. Paint hollow metal frames
    C. Paint radiation
    D. Finish new doors
10) Flooring:
    A. $11.00/sy carpet allowance
    B. Direct glue installation
    C. Carpet base
    D. Floor prep
11) Misc.:
    A. Wall prep
    B. Construction dumpster
    C. Construction/final clean up
    D. Permit and fees

The cost of the above described work is: Forty-Five Thousand Two Hundred Ten and 00/100 ($45,210.00).     $20.80/# (2174 RSF)

Sincerely,

Stephen D. Cirks
President

SDC/lmc

# LEASE

## BY AND BETWEEN

## HAZELTINE GATES, L.L.C.

### a Delaware limited liability company
(Landlord)

### AND

## American Home Mortgage Corp. of New York,
a New York Corporation
(Tenant)

# LEASE AGREEMENT

THIS LEASE AGREEMENT is entered by and between Hazeltine Gates, L.L.C., a Delaware limited liability company ("Landlord") and American Home Mortgage Corp. of New York, a New York corporation (Tenant") as of this ___ day of May, 2005.

## WITNESSETH:

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

A.    Premises: Approximately 4,544 rentable square feet of office space that the parties have designated as Suite No. 500 as depicted on Exhibit "A" attached hereto.

B.    Building: That certain building and all appurtenant improvements including but not limited to parking, sidewalks, landscaping and garages, if any, commonly known as HAZELTINE GATES OFFICE BUILDING that is located at 1107 Hazeltine Boulevard, Chaska, MN 55318 (the "Building").

C.    Lease Term: Approximately five (5) years, commencing on July 1, 2005 (the "Commencement Date") and expiring on June 30, 2010 (the "Expiration Date").

D.    Security Deposit:    $7,000.00 payable on the date hereof.

E.    Base Rent:    Payable in monthly installments as follows:

| Period | PSF | Monthly | Annual |
|---|---|---|---|
| 7/1/05 – 6/30/06 | $10.00 | $3,786.67 | $45,440.04 |
| 7/1/06 – 6/30/07 | $10.50 | $3,976.00 | $47,712.00 |
| 7/1/07 – 6/30/08 | $11.00 | $4,165.33 | $49,983.96 |
| 7/1/08 – 6/30/09 | $11.50 | $4,354.67 | $52,256.04 |
| 7/1/09 – 6/30/10 | $12.00 | $4,544.00 | $54,528.00 |

F.    Proportionate Share: 4.41% (4,544/103,087) (which may be adjusted up or down by Landlord at such time as the entire Building is remeasured).

G.    Brokers:    Welsh Companies

H.    Guarantors:    American Home Mortgage Investment Corp., a Maryland corporation

The foregoing information is referred to in, and is modified and limited by, the other provisions of this Lease.

## 1 - Premises

Landlord hereby demises and leases the Premises to Tenant, and Tenant hereby rents and takes the Premises from the Landlord, subject to and with the benefit of the terms, covenants, conditions and provisions of this Lease. Landlord shall deliver possession of the Premises to Tenant on the Commencement Date.

# TABLE OF CONTENTS

| <u>TITLE</u> | <u>PAGE</u> |
|---|---|
| LEASE | 1 |
| 1 - Premises | 1 |
| 2 - Acceptance of Premises | 2 |
| 3 - Term | 2 |
| 4 - Use | 2 |
| 5 - Base Rent | 2 |
| 6 - Operating Costs | 2 |
| 7 - Additional Taxes | 5 |
| 8 - Obligations of Landlord | 5 |
| 9 - Obligations of Tenant | 5 |
| 10 - Waiver of Claim | 8 |
| 11 - Waiver of Subrogation | 8 |
| 12 - Indemnification | 8 |
| 13 - Tenant's Insurance | 8 |
| 14 - Damage or Destruction | 9 |
| 15 - Eminent Domain | 10 |
| 16 - Default | 10 |
| 17 - Hazardous Materials | 11 |
| 18 - Notices | 12 |
| 19 - Brokers | 12 |
| 20 - Holding Over | 12 |
| 21 - Relocation | 13 |
| 22 - Subordination | 13 |
| 23 - Attornment | 13 |
| 24 - Mortgage and Ground Lessor Protection | 13 |
| 25 - Estoppel Certificate | 14 |
| 26 - Service Charge | 14 |
| 27 - Landlord's Lease Undertaking | 14 |
| 28 - Security Deposit | 14 |
| 29 - Rights Reserved by Landlord | 15 |
| 30 - Attorneys Fees | 15 |
| 31 - General | 16 |
| 32 – Notice to Vacate | 16 |
| EXHIBIT A - Description of Premises | 17 |
| EXHIBIT B - Tenant's Work | 18 |
| EXHIBIT C - Personal Guaranty | 19 |
| EXHIBIT D - Guaranty by a Corporation | 21 |
| EXHIBIT E - Rules And Regulations | 23 |
| EXHIBIT F – RIDER | 27 |
| SCHEDULE 1 – Landlord's Work | 29 |

## 2 - Acceptance of Premises

It is understood that Tenant is taking the Premises in "As Is" condition. Tenant acknowledges that Landlord has not made any representation or warranty with respect to the condition of the Premises or the Building or with respect to the suitability or fitness of either for the conduct of Tenant's permitted use or for any other purpose. Tenant's taking of possession of the Premises shall be conclusive evidence that Landlord has performed Landlord's Work and Tenant has accepted the Premises in good order and satisfactory condition.

Tenant agrees, at Tenant's sole cost and expense, to perform all work of whatsoever nature that is necessary to complete the Premises and open the Premises for business, including but limited to, its obligations set forth in Exhibit B (herein called "Tenant's Work"). Tenant agrees to furnish Landlord with a set of plans and specifications, in accordance with the terms of Exhibit B, describing Tenant's Work in such detail as Landlord may reasonably require, subject to Landlord's approval. Approval of plans and specifications by Landlord shall not constitute the assumption of any responsibility by Landlord for their accuracy or sufficiency and Tenant shall be solely responsible for such plans and specifications. All such repairs, renovations and improvements shall become the property of Landlord upon the installation or performance thereof.

## 3 - Term

The term of this Lease (the "Lease Term") shall begin upon the Commencement Date and shall continue until the Expiration Date, unless sooner terminated as herein set forth. If the Landlord, for any reason whatsoever, cannot deliver possession of the said Premises to the Tenant on the Commencement Date, this Lease shall not be void or voidable, nor shall Landlord be liable to Tenant for any loss or damage resulting therefrom, but rather, the Lease Term shall commence upon, and the Commencement Date shall be, the date that possession of the Premises is so tendered to Tenant (except for Tenant - caused delays which shall not be deemed to delay commencement of the Lease Term), and the Expiration Date shall be extended by an equal number of days. In the event that Landlord shall permit Tenant to occupy the Premises prior to the Commencement Date, such occupancy shall not advance the Expiration Date.

## 4 - Use

Tenant shall use the Premises only for general office purposes.

## 5 - Base Rent

Tenant shall pay the Landlord for the entire term hereof a fixed rent (herein called "Base Rent") in the amount set forth herein without any set off or deduction. Base Rent shall be paid in monthly installments, in advance, on the first day of each calendar month during the Lease Term. If the initial or last month of the Lease Term is less than a full calendar month, Base Rent for such partial month shall be prorated in the proportion that the number of days this Lease is in effect during such partial month bears to the total number of days in the calendar month, payable in advance.

## 6 - Operating Costs

Tenant shall, for the entire Lease Term, pay to Landlord as additional rent, without any set off or deduction therefrom, its Proportionate Share of all costs which Landlord may incur in owning, maintaining, managing and operating the Building for each calendar year during the Lease Term ("Operating Costs"). Tenant's "Proportionate Share" shall consist of the fraction, the numerator of which is the number of rentable square feet in the Premises and the denominator of which is the

total amount of rentable square feet in the Building. Said "Operating Costs" shall include but shall not be limited to:

i.      All real estate taxes and annual installments of special assessments payable each year during the Lease Term (on a payable versus assessed basis) with respect to the land, building and other improvements in the Building, and any attorneys fees, accounting and appraisal fees and other costs incurred in connection with any proceeding to contest any taxes and assessments;

ii.     Premiums for property, casualty, liability, rent interruption or other types of insurance carried by Landlord.

iii.    Salaries, wages and other amounts paid or payable for personnel including the Building manager, superintendent, operation and maintenance staff, and other employees of Landlord involved in the maintenance and operation of the Building, including contributions and premiums towards fringe benefits, unemployment, disability and worker's compensation insurance, pension plan contributions and similar premiums and contributions and the total charges of any independent contractors or property managers engaged in the operation, repair, care, maintenance and cleaning of any portion of the Building.

iv.     Cleaning expenses, including without limitation janitorial services, window cleaning, and garbage and refuse removal.

v.      Landscaping expenses, including without limitation irrigating, trimming, mowing, fertilizing, seeding, and replacing plants.

vi.     Heating, ventilating, air conditioning and steam/utilities expenses, including fuel, gas, electricity, water, sewer, telephone and other services.

vii.    Subject to the provisions of Section (xiii) below, the cost of maintaining, operating, repairing and replacing components of equipment or machinery, including without limitation heating, refrigeration, ventilation, electrical, plumbing, mechanical, elevator, escalator, sprinklers, fire/life safety, security and energy management systems, including service contracts, maintenance contracts, supplies and parts.

viii.   Other items of repair or maintenance of elements of the Building.

ix.     The costs of policing, security and supervision of the Building.

x.      Fair market rental and other costs with respect to the management office for the Building.

xi.     The cost of the rental of any machinery or equipment and the cost of supplies used in the maintenance and operation of the Building.

xii.    Audit fees and the cost of accounting services incurred in the preparation of statements referred to in this Lease and financial statements, and in the computation of the rents and charges payable by tenants of the Building.

xiii.   The costs of improvements, repairs, or replacements to the Building or the equipment or machinery used in connection with the Building if the capital

improvement is made after the date of this Lease and is intended to reduce Operating Costs provided; however, any such costs which are properly charged to a capital account shall not be included in Operating Costs in a single year but shall instead be amortized over their useful lives, as determined by the Landlord in accordance with generally accepted accounting principles, and only the annual amortization amount shall be included in the Operating Costs for a particular year.

xiv. Legal fees and expenses, including, but not limited to, such expenses that relate to seeking or obtaining reductions in or refunds of real estate taxes, or components thereof.

xv. A fee for the administration and management of the Building appropriate to the standard of the Building as reasonably determined by the Landlord from time to time.

Operating Costs shall not include costs of alteration of the premises of tenants of the Building, depreciation charges, interest and principal payments on mortgages, ground rental payments, real estate brokerage and leasing commissions, expenses incurred in enforcing obligations of tenants of the Building, salaries and other compensation of executive officers of the managing agent of the Building senior to the Building manager, costs of any special service provided to any one tenant of the Building but not to tenants of the Building generally, and costs of marketing or advertising the Building.

If the Building does not have one hundred percent (100%) occupancy during an entire calendar year then the variable cost component of Operating Costs shall be equitably adjusted so that the total amount of Operating Costs equals the total amount which would have been paid or incurred by Landlord had the Building been one hundred percent (100%) occupied for the entire calendar year. In no event shall Landlord be entitled to receive from Tenant and any other tenants in the Building an aggregate amount in excess of the actual Operating Costs as a result of the foregoing provisions.

As soon as reasonably practicable prior to the commencement of each calendar year during the Lease Term, Landlord shall furnish to Tenant an estimate of the Operating Costs for the next calendar year, and Tenant shall pay, as additional rent hereunder, together with each monthly installment of Base Rent, one-twelfth (1/12th) of its estimated annual Proportionate Share of such Operating Costs. As soon as practicable after the end of each calendar year during the Lease Term, Landlord shall furnish to Tenant a statement of the actual Operating Costs for the previous calendar year, including a statement of Tenant's Proportionate Share of such amount. Within thirty (30) days thereafter, Tenant shall pay to Landlord, or Landlord shall refund to Tenant, as the case may be, the difference between the additional rent paid by Tenant for such Operating Cost and the Tenant's Proportionate Share of actual Operating Costs. Tenant's share of such Operating Costs for the years in which the Lease commences and expires shall be prorated based upon the dates of commencement and expiration of the Lease Term.

The statements furnished to Tenant shall constitute a final determination as between Tenant and Landlord of the real estate taxes and operating expenses for the periods represented, unless Tenant within 90 days after they are furnished shall give written notice to Landlord that it disputes their accuracy, which notice shall specify the particular respects in which the statement is inaccurate. Any follow up audit shall be conducted at the property management office where the accounting records are kept at the expense of the Tenant. All information obtained due to this accounting shall be kept confidential between Landlord and Tenant.

4

## 7 - Additional Taxes

Tenant shall also pay as additional rent to Landlord, together with each monthly installment of Base Rent, the amount of any gross receipts tax, sales tax or similar tax (but excluding therefrom any income tax) payable, or which will be payable, by Landlord by reason of the receipt of the monthly Base Rent, adjustments thereto and additional rents.

## 8 - Obligations of Landlord

Landlord agrees that it shall:

(a)     Subject to any laws or governmental regulations now or hereafter in effect, furnish heat and air conditioning which maintains a temperature that, in Landlord's judgment, allows for comfortable occupancy of the Premises for normal business operations daily from 8:00 a.m. to 6:00 p.m. (Saturdays to 1:00 p.m.), Sundays and holidays excepted.

(b)     Provide non-attended passenger elevator service in common with other occupants of the Building.

(c)     Provide normal janitor service in and about the Premises, Saturdays, Sundays and holidays excepted.

(d)     Provide water for drinking, lavatory and toilet purposes drawn through fixtures, if any, installed by Landlord.

(e)     Provide electricity for the Premises for normal lighting and office use. A service charge will be assessed for extraordinary usage of electricity or after-hours heating and air conditioning services and shall be payable upon receipt of billing. Tenant will use its best efforts to prevent waste of electricity.

(f)     Except as provided in Paragraph 9 hereinbelow, Landlord shall maintain the Building in reasonable order and repair throughout the Lease Term; provided, however, that Landlord shall not be liable for any failure to make any repairs or to perform any maintenance unless such failure shall persist for an unreasonable time after written notice of the need for such repairs or maintenance is given to Landlord by Tenant. Except as provided in Paragraphs 14 and 15, there shall be no abatement of rent, nor shall there be any liability of Landlord, by reason of any injury or inconvenience to, or interference with, Tenant's business or operations arising from the making of, or failure to make, any maintenance or repairs in or to any portion of the Building.

Tenant understands and acknowledges that Landlord does not warrant that any of the services referred to above will be free from interruption from causes beyond the reasonable control of Landlord. Such interruption of service shall never be deemed an eviction or disturbance of Tenant's use and possession of the Premises or any part thereof or render Landlord liable to Tenant for damages by abatement of rent or otherwise or relieve Tenant from performance of Tenant's obligations under this Lease.

## 9 - Obligations of Tenant

Tenant agrees that it shall:

(a)     Cause the Premises to comply with all laws, ordinances and regulations of any governmental authority having jurisdiction applicable to the Premises and the occupancy

thereof (and take all corrective action required to cure any violation) and will observe the Rules and Regulations attached hereto as Exhibit E and any reasonable amendments, modifications and/or additions as may hereafter be adopted and published from time to time by Landlord for general safety, comfort and convenience of Landlord, occupants and tenants of the Building.

(b)    Give Landlord access to the Premises at all reasonable times, without charge or diminution of rent, to enable Landlord to examine the same and to make such repairs, additions, and alterations as Landlord may deem advisable and for other reasonable purposes related to the operation, maintenance or management of the Building.

(c)    Keep the Premises in good order, repair and condition and replace all glass broken by Tenant with glass of the same quality as that broken, except glass broken by fire or by the risks covered by extended coverage endorsements to the Landlord's fire insurance policies, and commit no waste on the Premises.

(d)    Pay for all electric lamps, starters and ballasts as replaced in the Premises.

(e)    Upon the termination of this Lease in any manner whatsoever, remove Tenant's goods and effects and those of any other person claiming under Tenant, and quit and deliver up the Premises to Landlord peaceably and quietly in as good order and conditions as the same exists at the Commencement Date or as the same may hereafter be put in by Landlord or Tenant, reasonable use, wear and tear thereof and repairs which are Landlord's obligations excepted. Goods and effects not removed by Tenant at the termination of this Lease, however terminated, shall be deemed abandoned and Landlord may dispose of the same as it deems expedient.

(f)    Neither voluntarily nor by operation of law, assign, transfer, mortgage, pledge, hypothecate or encumber this Lease or any interest therein, and shall not sublet the Premises or any part thereof, or any right or privilege appurtenant thereto, or suffer any other person (the employees, agents, servants, and invitees of Tenant excepted) to occupy or use the Premises or any portion thereof, without the prior written consent of Landlord. Further, if Tenant shall propose to assign or sublet this Lease or any interest therein, it will so notify Landlord, in writing, and Landlord shall have the right by giving notice to Tenant thirty (30) days after receipt of Tenant's notice to regain possession of the Premises and terminate the Lease as of the date on the proposed assignment or subletting. Tenant's notice to Landlord must be accompanied by a statement containing (i) the name and address of the proposed assignee or subtenant; (ii) such financial information with respect to the proposed assignee or subtenant as Landlord shall reasonably require; (iii) the type of use proposed for the Premises; (iv) all of the principal terms of the proposed assignment or subletting; and (v) four (4) originals of the assignment or sublease on a form approved by Landlord and four (4) originals of the Landlord's Consent to Sublease or Assignment and Assumption of Lease and Consent. If an assignment or sublease is approved by Landlord, Tenant shall remain liable for all obligations under the Lease. If Landlord consents to any such assignment or subletting, all sums or other economic consideration received by Tenant in connection with such assignment or subletting, whether denominated as rental or otherwise, which exceeds, in the aggregate, the total sum which Tenant is obligated to pay Landlord under this Lease (prorated to reflect obligations allocable to less than all of the Premises under a sublease) shall be paid to Landlord as additional rent under the Lease without affecting or reducing any other obligation of Tenant hereunder. Notwithstanding anything contained in this Paragraph 9 to the contrary, Tenant expressly covenants and agrees not to enter into any lease, sublease, license, concession or other agreement for use, occupancy or utilization of the Premises which provides for rental or other payment for such use, occupancy or utilization

6

based in whole or in part on the net income or profits derived by any person from the property leased, used, occupied or utilized (other than an amount based on a fixed percentage or percentages of receipts or sales), and that any such purported lease, sublease, license, concession or other agreement shall be absolutely void and ineffective as a conveyance of any right or interest in the possession, use, occupancy or utilization of any part of the Premises.

(g)     Not place signs on the Premises. Landlord will provide building standard signage on or adjacent to Tenant's entrance door at Tenant's expense.

(h)     Not overload, damage or deface the Premises or do any act which may make void or voidable any insurance on the Premises or the Building or which may result in an increased or extra premium payable for Landlord's insurance covering the Building.

(i)     Not make any alterations, additions, or improvements in or to the Premises (the "Alterations") without the prior written approval of the Landlord. Landlord may impose as a condition to such consent such requirements as Landlord in its sole discretion deems necessary or desirable including without limitation: Tenant's submission to Landlord, for Landlord's prior written approval, of all plans and specifications relating to the Alterations; Landlord's prior written approval of the time or times when the Alterations are to be performed; Landlord's prior written approval of the contractors and subcontractors performing work in connection with the Alterations; Tenant's receipt of all necessary permits and approvals from all governmental authorities having jurisdiction prior to the construction of the Alterations; Tenant's written notice of whether the Alterations include the Handling of any Hazardous Materials, Tenant's delivery to Landlord of such bonds and insurance as Landlord shall reasonably require; and Tenant's payment to Landlord of all costs and expenses incurred by Landlord because of Tenant's Alterations, including but not limited to costs incurred in reviewing the plans and specifications for, and the progress of, the Alterations. All work relating to the Alterations shall be performed in compliance with the plans and specifications approved by Landlord, all applicable laws, ordinances, rules, regulations and directives of all governmental authorities having jurisdiction and the requirements of all carriers of insurance on the Premises and the Building, the Board of Underwriters, Fire Rating Bureau, or similar organization. All work shall be performed in a diligent, first class manner and so as not to unreasonably interfere with any other tenants or occupants of the Building. All costs incurred by Landlord relating to the Alterations shall be payable to Landlord by Tenant as additional rent upon demand. All Alterations which are made by Landlord or Tenant to the Premises, except movable office furniture, shall become the property of the Landlord upon installation and shall remain upon and be surrendered with the Premises, as a part thereof, at the termination of this Lease.

(j)     Keep the Premises and the Building free from any liens arising out of any work performed, materials furnished or obligations incurred by Tenant.

(k)     Tenant, at its own expense, may install drapes and window covering (and if installed shall maintain them in attractive and safe condition); provided, however, in the sole discretion of Landlord they are in harmony with the exterior and interior appearance of the Building and create no safety or fire hazard.

(l)     Tenant shall not use the Premises, or permit the Premises to be used, in any manner which: (a) violates any applicable laws; (b) causes or is reasonably likely to cause damage to the Building or the Premises; (c) violates a requirement or condition of any fire and extended insurance policy covering the Building and/or the Premises, or increases the cost of such policy; (d) constitutes or is reasonably likely to constitute a nuisance, annoyance or

7

inconvenience to other tenants or occupants of the Building or its equipment, facilities or systems; (e) interferes with, or is reasonably likely to interfere with, the transmission or reception of microwave, television, radio, telephone, or other communication signals by antennae or other facilities located in the Building; or (f) violates the Rules and Regulations described in Exhibit E.

## 10 - Waiver of Claim

Notwithstanding any contrary provision herein, Tenant hereby waives any claims against Landlord relating to, and Landlord shall not be liable to Tenant for, any damage to any equipment, inventory, tenant fixture or other personal property situated in the Premises or in, on or about the Building due to any condition, design or defect in the Building or leakage of the roof, window and pipes, or of damage from gas, oil, water, steam, smoke or electricity, or due to any other cause whatsoever, including Landlord's gross negligence, and Tenant assumes all risks of damage to such property.

## 11 - Waiver of Subrogation

Each party hereby waives any right of recovery against the other for injury or loss due to hazards covered by insurance, to the extent of the injury or loss covered thereby. Any policy of insurance to be provided by Tenant or Landlord pursuant to this Lease shall contain a clause denying the applicable insurer any right of subrogation against the other party.

## 12 - Indemnification

Tenant shall indemnify Landlord from and against any and all demands and liabilities arising from or relating to injury or loss of life to persons or damage to or loss of property to the extent attributable to the use and occupancy of the Premises and Building by Tenant or its agents, employees, invitees or arising from Tenant's negligence or intentional misconduct or arising from Tenants retention of possession after the expiration or termination of the Lease or arising from Tenants' violation of any provision of this Lease. Subject to the provisions of Paragraph 11 hereof and the foregoing sentence, Landlord shall indemnify Tenant from and against any and all demands and liabilities arising from or relating to injury or loss of life to persons or damage to or loss of property to the extent arising from Landlord's sole negligence or intentional misconduct.

## 13 - Tenant's Insurance

(a)     Property Insurance. At all times during the Lease Term, Tenant shall procure and maintain, at its sole expense "all-risk" property insurance, in an amount not less than one hundred percent (100%) of the replacement cost covering (a) all leasehold improvements in and to the Premises which are made at the expense of Tenant; and (b) Tenant's trade fixtures, equipment and other personal property from time to time situated in the Premises. The proceeds of such insurance shall be used for the repair or replacement of the property so insured, except that if not so applied or if this Lease is terminated following a casualty, the proceeds applicable to the leasehold improvements shall be paid to Landlord and the proceeds applicable to Tenant's personal property shall be paid to Tenant.

(b)     Liability Insurance. At all times during the Lease Term, Tenant shall procure and maintain, at its sole expense, general liability insurance applying to the use and occupancy of the Premises and the business operated by Tenant. Such insurance shall have a minimum combined single limit of liability of at least $1,000,000 per occurrence and a general aggregate limit of at least $2,000,000. All such policies shall be written to apply to all bodily injury, property damage, personal injury losses and shall be endorsed to include Landlord and its agents, beneficiaries, partners, employees, and any deed of trust holder or

8

mortgagee of Landlord or any ground lessor as additional insureds. Such liability insurance shall be primary and not excess or contributing to any other insurance as may be available to the additional insureds.

(c)   Workers' Compensation Insurance. At all times during the Lease Term, Tenant shall procure and maintain Workers' Compensation Insurance in accordance with the laws of the State of Minnesota.

(d)   Policy Requirements. All insurance required to be maintained by Tenant shall be issued by insurance companies authorized to do insurance business in the State of Minnesota and reasonably acceptable to Landlord. A certificate of insurance (or, at Landlord's option, copies of the applicable policies) evidencing the insurance required herein shall be delivered to Landlord not less than thirty (30) days prior to the Commencement Date. No such policy shall be subject to cancellation or modification without thirty (30) days prior written notice to Landlord and to any deed of trust holder, mortgagee or ground lessor designated by Landlord to Tenant. Tenant shall furnish Landlord with a replacement certificate with respect to any insurance not less than thirty (30) days prior to the expiration of the current policy. Tenant shall have the right to provide the insurance required herein pursuant to blanket policies, but only if such blanket policies expressly provide coverage to the Premises and the Landlord as required by this Lease.

## 14 - Damage or Destruction.

(a)   Total Destruction. Except as provided in Paragraph (c) below, this Lease shall automatically terminate if the Premises are totally destroyed.

(b)   Partial Destruction of Premises. If the Premises are damaged by any casualty and, in Landlord's opinion, the Premises (exclusive of any Alterations made to the Premises by Tenant) can be restored to its pre-existing condition within two hundred seventy (270) working days after the date of the damage or destruction, Landlord shall, upon written notice from Tenant to Landlord of such damage, except as provided in Paragraph (c) below, promptly and with due diligence repair any damage to the Premises (exclusive of any Alterations to the Premises made by Tenant, which shall be promptly repaired by Tenant at its sole expense) and, until such repairs are completed, the Rent shall be abated from the date of damage or destruction in the same proportion that the rentable area of the portion of the Premises which is unusable by Tenant in the conduct of its business bears to the total rentable area of the Premises. If such repairs cannot, in Landlord's opinion, be made within said two hundred seventy (270) day period, then Landlord may, at its option, exercisable by written notice given to Tenant within thirty (30) days after the date of the damage or destruction, elect to make the repairs within a reasonable time after the damage or destruction, in which event this Lease shall remain in full force and effect but the Rent shall be abated as provided in the preceding sentence; if Landlord does not so elect to make the repairs, then either Landlord or Tenant shall have the right, by written notice given to the other within sixty (60) days after the date of the damage or destruction, to terminate this Lease as of the date of the damage or destruction.

(c)   Exceptions to Landlord's Obligations. Notwithstanding anything to the contrary contained in this Paragraph 14, Landlord shall have no obligation to repair the Premises if either: (a) the Building in which the Premises are located is so damaged as to require repairs to the Building exceeding twenty percent (20%) of the full insurable value of the Building; or (b) Landlord elects to demolish the Building in which the Premises are located; or (c) the damage or destruction occurs less than two (2) years prior to the Termination Date, exclusive of option periods. Further, Tenant's Rent shall not be abated if either (i) the

9

damage or destruction is repaired within five (5) business days after Landlord receives written notice from Tenant of the casualty, or (ii) Tenant, or any officers, partners, employees, agents or invitees of Tenant, or any assignee or subtenant of Tenant, is, in whole or in part, responsible for the damage or destruction.

(d)     Waiver. The provisions contained in this Lease shall supersede any contrary laws now or hereafter in effect relating to damage or destruction.

## 15 - Eminent Domain

If the entire Premises are taken by eminent domain or sale in lieu of condemnation, this Lease shall automatically terminate as of the date the condemning authority acquires possession. If a portion of the Building or the Premises are taken by eminent domain, Landlord shall have the right to terminate this Lease as of the date the condemning authority acquires possession by giving notice thereof to Tenant within ninety (90) days after such date of taking. To the extent that the Premises are rendered untenantable as a consequence of any such condemnation, the Rent shall proportionately abate. All damages awarded for a taking under the power of eminent domain shall belong to and be the exclusive property of Landlord, whether such damages by awarded as compensation for a diminution in the value of the leasehold estate hereby created or to the fee of the Premises; provided, however, that Landlord shall not be entitled to any separate award made to Tenant for the value and cost of the removal of its personal property and fixtures.

## 16 - Default

In the event Tenant shall default (i) in making its payments when due hereunder or (ii) in performing any of the other agreements, terms and conditions of this Lease, or (iii) abandons the Premises, then, in any such event, Landlord may, as its election and in addition to all other remedies available at law or in equity, cure any defaults of Tenant and charge the cost thereof to Tenant as additional rent hereunder, terminate this Lease through the delivery of written notice to that effect to Tenant and/or terminate Tenant's right to possession only, without terminating the Lease. In the pursuit of such designated remedies, the following provisions shall be applicable:

(a)     Re-Entry Without Termination. Upon any termination of Tenant's right to possession of the Premises without termination of this Lease, Landlord may, at Landlord's option, enter into the Premises, cure any defaults of Tenant and charge the cost thereof to Tenant as additional rent hereunder, remove Tenant's signs and other evidences of tenancy, and take and hold possession thereof without such entry and possession terminating this Lease or releasing Tenant, in whole or in part, from any obligation hereunder, including Tenant's obligation to pay Base Rent, its Proportionate Share of Operating Costs and all other sums payable by Tenant hereunder (collectively, "Rent") for the full Lease Term. Landlord may, but need not, relet the Premises or any part thereof for such rent and upon such terms as Landlord, in its sole discretion, shall determine (including the right to relet the Premises as part of a larger area and the right to change the character or the use made of the Premises), and Landlord shall not be required to accept any tenant offered by Tenant or to observe any instructions given by Tenant about such reletting. In any such case, Landlord may make repairs, alterations and additions in or to the Premises, and redecorate the same to the extent Landlord deems necessary or desirable, in its sole discretion. All rentals and other sums received by Landlord from any such reletting shall be applied as follows: first, to the payment of any indebtedness other than Rent, due hereunder from Tenant to Landlord; second, to the payment of any costs and expenses of such alterations and repairs; third; to the payment of Landlord's expenses of reletting, including, without limitation, broker's commissions, attorneys fees and lease inducements, such as moving or leasehold improvement allowances; fourth, to the payment of Base Rent and other charges due and

10

unpaid hereunder; and the residue, if any, shall be held by Landlord and applied in payment of future Rent as the same may become due and payable hereunder. Notwithstanding any such re-entry by Landlord, Landlord may at any time hereafter elect to terminate this Lease for such previous breach.

(b)    <u>Damages in the Event of Termination</u>. It is acknowledged that the damages that would be incurred by Landlord in connection with the termination of this Lease following a default by Tenant would be difficult to estimate or ascertain. In the event Landlord elects to terminate this Lease, whether subsequent to or contemporaneously with a termination of possession and re-entry pursuant to the foregoing Paragraph 16 (a), Landlord may recover from Tenant, as liquidated damages, an amount equal to the sum of the following: (i) all unpaid Rent that is payable by Tenant hereunder and that accrues as of the effective date of termination; plus (ii) a sum of money equal to the entire amount of Rent that would be payable under the Lease for the balance of the Lease Term, which latter amount shall be immediately due and payable upon demand but which shall be discounted to present value using a discount rate equal to the discount rate of the Federal Reserve Bank of Minneapolis as of the date of termination plus one percent (1%). For purposes of calculating the amount of Tenant's Proportionate Share of Operating Costs and other items of additional rent that would be payable under the Lease for the period succeeding the effective date of termination, such amounts shall be computed on the basis of the average monthly amount of Tenant's Proportionate Share of Operating Costs and other items of additional rent accruing during the twenty-four (24) month period immediately preceding the default to which such termination related (exclusive of any months in which Tenant received "free" or abated rent concessions).

## 17 - Hazardous Materials

(a)    No Hazardous Materials, as defined herein, shall be Handled, as also defined herein, upon, about, above or beneath the Premises or any portion of the Building by or on behalf of Tenant, its subtenants or its assignees, or their respective contractors, clients, officers, directors, employees, agents, or invitees. Any such Hazardous Materials so Handled shall be known as Tenant's Hazardous Materials. Notwithstanding the foregoing, normal quantities of those Hazardous Materials customarily used in the conduct of general administrative and executive office activities (e.g., copier fluids and cleaning supplies) may be used and stored at the Premises without Landlord's prior written consent, but only in compliance with all applicable Environmental Laws, as defined herein.

(b)    Notwithstanding the obligation of Tenant to indemnify Landlord pursuant to this Lease, Tenant shall, at its sole cost and expense, promptly take all actions required by any federal, state or local governmental agency or political subdivision, or necessary for Landlord to make full economic use of the Premises or any portion of the Building, which requirements or necessity arises from the Handling of Tenant's Hazardous Materials upon, about, above or beneath the Premises or any portion of the Building. Such actions shall include, but not be limited to, the investigation of the environmental condition of the Premises or any portion of the Building, the preparation of any feasibility studies or reports and the performance of any cleanup, remedial, removal or restoration work. Tenant shall take all actions necessary to restore the Premises or any portion of the Building to the condition existing prior to the introduction of Tenant's Hazardous Materials, notwithstanding any less stringent standards or remediation allowable under applicable Environmental Laws. Tenant shall nevertheless obtain Landlord's written approval prior to undertaking any actions required by this Paragraph, which approval shall not be unreasonably withheld so long as such actions would not potentially have a material adverse long-term or short-term effect on the Premises or any portion of the Building.

11

(c)     "Environmental Laws" means and includes all now and hereafter existing statutes, laws, ordinances, codes, regulations, rules, rulings, orders, decrees, directives, policies and requirements by any federal, state or local governmental authority regulating, relating to, or imposing liability or standards of conduct concerning public health and safety or the environment.

(d)     "Hazardous Materials" means: (a) any material or substance: (i) which is defined or becomes defined as a "hazardous substance," "hazardous waste" "infectious waste," "chemical mixture or substance," or "air pollutant" under Environmental Laws; (ii) containing petroleum, crude oil or any fraction thereof which is liquid at standard conditions of temperature and pressure, (iii) containing polychlorinated biphenyls (PCB's); (iv) containing asbestos; (v) which is radioactive; or (b) any other pollutant or contaminant or hazardous, toxic, flammable or dangerous chemical, waste, material or substance, as all such terms are used in their broadest sense, and defined, regulated or become regulated by Environmental Laws, or which cause a nuisance upon or waste to the Premises or any portion of the Building.

(e)     "Handle," "Handled," or "Handling" shall mean any installation, handling, generation, storage, treatment, use, disposal, discharge, release, manufacture, refinement, presence, migration, emission, abatement, removal, transportation, or any other activity of any type in connection with or involving Hazardous Materials.

## 18 - Notices

All bills, statements, notices or communications which Landlord may desire or be required to give to Tenant shall be deemed sufficiently given or rendered if in writing and either delivered to Tenant personally or sent by registered or certified mail addressed to Tenant at the Premises, and the time of rendition thereof or the giving of such notice or communication shall be deemed to be the time when the same is delivered to Tenant or deposited in the mail as herein provided. Any notice by Tenant to Landlord must be served by registered or certified mail addressed to Landlord at the address where the last previous rental hereunder was payable, or in case of subsequent change upon notice given, to the latest address furnished.

## 19 - Brokers

The parties recognize as the broker(s) who procured this Lease the firm(s) specified herein and agree that Landlord shall be solely responsible for the payment of any brokerage commissions to said broker(s), and that Tenant shall have no responsibility therefor unless written provision to the contrary has been made a part of this Lease. If Tenant has dealt with any other person or real estate broker with respect to leasing, subleasing or renting space in the Building, Tenant shall be solely responsible for the payment of any fee due said person or firm and Tenant shall protect, indemnify, hold harmless and defend Landlord from any liability in respect thereto.

## 20 - Holding Over

Should Tenant continue to occupy the Premises after expiration of the Lease Term or any renewal or renewals thereof, or after a forfeiture occurs, Tenant's occupancy shall, at Landlord's option, be deemed to create a tenancy from month to month. Such tenancy shall be upon the same terms and conditions of this Lease, except that the monthly Base Rent during such month-to-month tenancy shall be ~~two (2)~~ one and one half (1.5) times the amount of the monthly installment of Base Rent payable in the month preceding the month in which such expiration occurred. The foregoing shall not be construed as a consent by Landlord to any such holding over or as a waiver by Landlord of its right to reacquire possession of the Premises through summary proceedings or to recover damages arising from such holdover.

## 21 - Relocation

Landlord shall have the right, at its option upon not less than thirty (30) days prior written notice to Tenant, to relocate Tenant and to substitute for the Premises described above other space in the Building containing at least as much rentable area as the Premises described herein. If Tenant is already in occupancy of the Premises, then Landlord shall also reimburse Tenant for Tenant's reasonable moving and telephone relocation expenses and for reasonable quantities of new stationery upon submission to Landlord of receipts for such expenditures incurred by Tenant.

## 22 - Subordination

This Lease, and the rights of Tenant hereunder, are and shall be subordinate to the interests of (i) all present and future ground leases and master leases of all or any part of the Building; (ii) present and future mortgages and deeds of trust encumbering all or any part of the Building or the underlying real estate; (iii) all past and future advances made under any such mortgages or deed of trust; and (iv) all renewals, modifications, replacements and extensions of any such ground leases, master leases, mortgages and deeds of trust; provided, however, that any lessor under any such ground lease or master lease or any mortgagee or beneficiary under any such mortgage or deed of trust shall have the right to elect, by written notice given to Tenant, to have this Lease made superior in whole or in part to any such ground lease, master lease, mortgage or deed of trust. Upon demand, Tenant shall execute, acknowledge and deliver any instruments reasonable requested by Landlord or any such lessor, mortgagee or beneficiary to effect the purposes of this Paragraph 22. Such instruments may contain, among other things, provisions to the effect that such lessor, mortgagee or beneficiary (hereafter, for the purposes of this Paragraph 22, a "Successor Landlord") shall (i) not be liable for any act or omission of Landlord or its predecessors, if any, prior to the date of such Successor Landlord's succession to Landlord's interest under this Lease; (ii) not be subject to any offsets or defenses which Tenant might have been able to assert against Landlord or its predecessors, if any, prior to the date of such Successor Landlord's succession to Landlord's interest under this Lease; (iii) not be liable for the return of any security deposit under the Lease unless the same shall have actually been deposited with such Successor Landlord; and (iv) be entitled to receive notice of any Landlord default under this Lease plus a reasonable opportunity to cure such default prior to Tenant having any right or ability to terminate this Lease as a result of such Landlord default.

## 23 - Attornment

If requested to do so, Tenant shall attorn to and recognize as Tenant's landlord under this Lease any superior lessor, superior mortgagee or other purchaser or person taking title to the Building by reason of the termination of any superior lease or the foreclosure of any superior mortgage or deed of trust, and Tenant shall, upon demand, execute any documents reasonably requested by any such person to evidence the attornment described in this Paragraph 23. Landlord shall have the right to sell, convey, transfer and assign, in whole or in part, all of its rights and obligations hereunder and in the Building, and the property referred to herein and in such case, no further liability or obligations shall thereafter accrue against Landlord hereunder. Tenant agrees to attorn to such transferee.

## 24 - Mortgage and Ground Lessor Protection

Tenant agrees to give any holder of any mortgage and any ground lessor, by registered or certified mail, a copy of any notice of default served upon the Landlord by Tenant, provided that prior to such notice Tenant has been notified in writing (by way of service on Tenant of a copy of Assignment of Rents and Leases, or otherwise) of the address of such mortgage holder or ground lessor (hereafter the "Notified Party"). Tenant further agrees that if Landlord shall have failed to cure such default within twenty (20) days after such notice to Landlord (or if such default cannot be cured or corrected

within that time, then such additional time as may be necessary if Landlord has commenced within such twenty (20) days and is diligently pursuing the remedies or steps necessary to cure or correct such default), then the Notified Party shall have an additional thirty (30) days within which to cure or correct such default (or if such default cannot be cured or corrected within that time, then such additional time as may be necessary if the Notified Party has commenced within such thirty (30) days and is diligently pursuing the remedies or steps necessary to cure or correct such default). Until the time allowed, as aforesaid, for the Notified Party to cure such default has expired without cure, Tenant shall have no right to, and shall not, terminate this Lease on account of Landlord's default.

## 25 - Estoppel Certificate

Tenant shall at any time and from time to time upon not less than ten (10) days' prior written notice from Landlord execute, acknowledge and deliver to Landlord a statement in writing, (i) certifying that this Lease is unmodified and in full force and effect (or if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect), and the date to which the rental and other charges are paid in advance, if any; (ii) acknowledging that there are not, to Tenant's knowledge, any uncured defaults on the part of the Landlord hereunder, or specifying such defaults, if any are claimed; and (iii) such other matters as Landlord may request. Any such statement may be relied upon by any prospective purchaser or encumbrancer of all or any portion of the Building. Failure to sign the statement or failure to specify any default claimed shall be deemed approval of the statement submitted to Tenant by Landlord.

## 26 - Service Charge

Tenant agrees to pay a service charge equal to the greater of $100 or five percent (5%) per month on any portion thereof of any payment of monthly Base Rent or additional rent payable by Tenant hereunder which is not paid within five (5) days from the date due.

## 27 - Landlord's Lease Undertaking

Notwithstanding anything to the contrary contained in this Lease or in any exhibits, Riders or addenda hereto attached (collectively the "Lease Documents"), it is expressly understood and agreed by and between the parties hereto that: (a) the recourse of Tenant or its successors or assigns against Landlord with respect to the alleged breach by or on the part of Landlord of any representation, warranty, covenant, undertaking or agreement contained in any of the Lease Documents (collectively, "Landlord's Lease Undertakings") shall extend only to Landlord's interest in the real estate of which the Premises demised under the Lease Documents are a part (Landlord's Real Estate") and not to any other assets of Landlord or of its constituent members or partners; and (b) except to the extent of Landlord's interest in Landlord's Real Estate, no personal liability or personal responsibility of any sort with respect to any of Landlord' Lease Undertakings or any alleged breach thereof is assumed by, or shall at any time be asserted or enforceable against, Landlord, its constituent partners, members, or against any of their respective directors, officers, employees, agents, constituent partners, beneficiaries, trustees or representatives.

## 28 - Security Deposit

The amount, if any, of the security deposit designated herein shall, upon receipt by Landlord, be held by Landlord as security for the faithful performance by Tenant of all the terms, covenants and conditions of this Lease to be kept and performed by Tenant. If Tenant defaults with respect to any provision of this Lease, including but not limited to the provisions relating to the payment of any amount which Landlord may spend or become obligated to spend by reason of Tenant's default, or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of

Tenant's default, Landlord may use, apply or retain all or any portion of the security deposit to cure such default or to compensate Landlord for any loss or damage which Landlord may suffer thereby. If any portion of said security deposit is so used or applied, Tenant shall within five (5) days after written demand therefore, deposit cash with Landlord in an amount sufficient to restore the security deposit to its original amount. Landlord shall not be required to keep this security deposit separate from its general funds, and Tenant shall not be entitled to interest on such deposit. If Tenant shall fully and faithfully perform every provision of this Lease to be performed by it, the security deposit or any balance thereof shall be returned to Tenant (or, at Landlord's option, to the last assignee of Tenant's interest hereunder) at the expiration of the Lease Term. In the event of termination of Landlord's interest in this Lease, Landlord shall transfer said deposit to Landlord's successor in interest.

## 29 - Rights Reserved by Landlord

Landlord reserved the following rights exercisable without notice (except as otherwise expressly provided to the contrary in this Lease) and without being deemed an eviction or disturbance of Tenant's use or possession of the Premises or giving rise to any claim for set-off or abatement of Rent: (i) to change the name or street address of the Building; (ii) to install, affix and maintain all signs on the exterior and/or interior of the Building; (iii) to designate and/or approve prior to installation, all types of signs, window shades, blinds, drapes, awnings or similar items, and all internal lighting that may be visible from the exterior of the Premises; and, notwithstanding the provisions of Paragraph 9 (i), (j), and (k), the design, arrangement, style, color and general appearance of the portion of the Premises visible from the exterior, and the contents thereof, including, without limitation, furniture, fixtures, signs, art work, wall coverings, carpet, and decorations, and all changes, additions and removals thereto, shall, at all times, have the appearance of premises having the same type of exposure and used for substantially the same purposes that are generally prevailing in office buildings in the area. Any violation of this provision shall be deemed a material breach of this Lease; (iv) to display the Premises and/or the Building to mortgages, prospective mortgagees, prospective purchasers and ground lessors at reasonable hours upon reasonable advance notice to Tenant; (v) to change the arrangement of common areas, entrances, doors, corridors, elevators and/or stairs in the Building, provided no such change shall materially adversely affect access to the Premises; (vi) to grant any party the exclusive right to conduct any business or render any service in the Building, provided such exclusive right shall not operate to prohibit Tenant from using the Premises for the purposes permitted under this Lease; (vii) to prohibit the placement of vending or dispensing machines of any kind in or about the Premises other than for use by Tenant's employees; (viii) to prohibit the placement of video or other electronic games in the Premises; (ix) to have access for Landlord and other tenants of the Building to any mail chutes and boxes located in or on the Premises according to the rules of the United States Post Office and to discontinue any mail chute business in the Building; (x) to close the Building after normal business hours, except that Tenant and its employees and invitees shall be entitled to admission at all times under such rules and regulations as Landlord prescribes for security purposes; (xi) to install, operate and maintain security systems which monitor, by closed circuit television or otherwise, all persons entering or leaving the Building; (xii) to install and maintain pipes, ducts, conduits, wires and structural elements located in the Premises which serve other parts or other tenants of the Building; and (xiii) to retain at all times master keys or pass keys to the Premises.

## 30 - Attorneys Fees

If either Landlord or Tenant shall commence any action or other proceeding against the other arising out of, or relating to, this Lease or the Premises, the prevailing party shall be entitled to recover from the losing party, in addition to any other relief, its actual attorneys fees irrespective of whether or not the action or other proceeding is prosecuted to judgment and irrespective of any court schedule of

reasonable attorneys' fees. In addition, Tenant shall reimburse Landlord, upon demand, for all reasonable attorneys' fees incurred in collecting Rent or otherwise seeking enforcement against Tenant, its sublessees and assigns, of Tenant's obligations under this Lease.

## 31 - General

The submission of this Lease to Tenant or its broker or other agent, does not constitute an offer to Tenant to lease the Premises. This Lease shall have no force and effect until (a) it is executed and delivered by Tenant to Landlord and (b) it is fully reviewed and executed by Landlord; provided, however, that, upon execution of this Lease by Tenant and delivery to Landlord, such execution and delivery by Tenant shall, in consideration of the time and expense incurred by Landlord in reviewing the Lease and Tenant's credit, constitute an offer by Tenant to lease the Premises upon the terms and conditions set forth herein (which offer to lease shall be irrevocable for twenty (20) business days following the date of delivery). This Lease does not create the relationship of principal and agent or of partnership or of joint venture or of any association between Landlord and Tenant, the sole relationship between Landlord and Tenant being that of lessor and lessee. Remedies under the Lease are cumulative and not exclusive of all rights and remedies available to Landlord at law or equity. No waiver of any default of Tenant hereunder shall be implied from any omission by Landlord to take any action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default specified in the express waiver and that only for the time and to the extent therein stated. Each term and each provision of this Lease performable by Tenant shall be construed to be both a covenant and a condition. Landlord shall not be liable for any obligation after a transfer of its interest in the Building. Time is of the essence of this Lease and performance of all obligations hereunder. The topical headings of the several paragraphs and clauses are for convenience only and do not define, limit or construe the contents of such paragraphs or clauses. All obligations of Tenant hereunder not fully performed as of the expiration or earlier termination of the Lease Term shall survive the expiration or earlier termination of the Lease Term. All preliminary negotiations are merged into and incorporated in this Lease. This Lease can only be modified or amended by an Agreement in writing signed by the parties here to. All provisions hereof shall be binding upon the heirs, successors and assigns of each party hereto and are separate and independent. This Lease shall be governed by and construed in accordance with the laws of the State of Minnesota.

## 32 - Notice to Vacate

If Tenant desires to vacate the Premises on the expiration date of this Lease, Tenant must give Landlord 120 days prior written notice. If Tenant fails to give proper notice to vacate, Tenant will be deemed to be "holding over" and subject to the provisions of Article 20 of the Lease

LANDLORD AND TENANT have executed this Lease on the day and year first above written.

LANDLORD:
Hazeltine Gates, L.L.C., a Delaware limited liability company
By: John B. Goodman Enterprises, Inc.
Its: Managing Member

By: _____

Its: _____ **U Pus .** _____

Date: _____ **5|19|05** _____

TENANT:
American Home Mortgage Corp. of New York, a New York corporation

By: _____
    Alan B. Horn
    Executive Vice President

Its: _____

Date: _____ **5|18|05** _____

**EXHIBIT A – Description of Premises**



HAZELTINE GATES
FIFTH FLOOR

EXHIBIT A

17

## EXHIBIT B - Tenant's Work

None.

## EXHIBIT C - Personal Guaranty

~~FOR VALUE RECEIVED, and in consideration for, and as an inducement to Hazeltine Gates, L.L.C., a Delaware limited liability company, as Landlord, to enter into the foregoing Lease dated _____, 20____ (the "Lease"), with _____, a _____ corporation, as Tenant, the undersigned individual(s)_____ hereby absolutely and unconditionally guarantees to Landlord, its successors and assigns, the prompt and full payment of all rent and all other payments to be made by Tenant under the Lease, and the full performance and observance by Tenant, for which the undersigned shall be jointly and severally liable with Tenant. The undersigned hereby waives any notice of nonpayment, nonperformance or nonobservance, or proof of notice or demand. The undersigned agrees that in the event of a default by Tenant under the Lease, Landlord may proceed against the undersigned before, after or simultaneously with proceeding against Tenant. This Guaranty shall not be terminated, affected, or impaired in any manner by reason of: (1) the assertion by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease; (2) the commencement of summary or other proceedings against Tenant; (3) the failure of Landlord to enforce any of its rights against Tenant; or (4) the granting by Landlord of any extensions of time to Tenant. The undersigned further covenants and agrees that: (1) the undersigned shall be bound by all the provisions, terms, conditions, restrictions and limitations contained in the Lease which are to be observed or performed by Tenant thereunder, the same as if the undersigned were named therein as Tenant; and (2) this Guaranty shall be absolute and unconditional and shall be in full force and effect with respect to any amendment, addition, assignment, sublease, transfer or other modification of the Lease, whether or not the undersigned shall have knowledge or have been notified of or agreed or consented thereto. If Landlord at any time is compelled to take action, by legal proceedings or otherwise, to enforce or compel compliance with the terms of this Guaranty, the undersigned shall, in addition to any other rights or remedies to which Landlord may be entitled hereunder or as a matter of law or in equity, pay to Landlord all costs, including reasonable attorneys' fees, incurred or expended by Landlord in connection therewith. In the event the Lease is disaffirmed by a Trustee in Bankruptcy for Tenant, the undersigned agrees that it shall, at the election of Landlord, either assume the Lease and perform all of the covenants, terms and conditions of Tenant thereunder or enter into a new lease, which said new lease shall be in form and substance identical to the Lease. All duties and obligations of the undersigned pursuant to this guaranty shall be binding upon the successors and assigns of the undersigned. For purposes of this Guaranty, the word "Tenant" shall include the successors and assigns of the undersigned. This Guaranty shall be governed by and construed in accordance with the laws of the State of Minnesota.~~

~~The undersigned further agrees that, to the extent that the Tenant makes a payment or payments to the Landlord or the Landlord receives any proceeds of collateral, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or otherwise is required to be repaid to the Tenant, its estate, trustee, receiver or any other party, including, without limitation, under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such payment or repayment, the obligations of Tenant or part thereof which has been paid, reduced or satisfied by such amount shall be reinstated and continued in full force and effect as of the ate such initial payment, reduction or satisfaction occurred. The undersigned shall defend and indemnify the Landlord of and from any claim or loss under this paragraph including the Landlord's attorneys and paralegal fees and expenses and other expenses in the defense of any such action or suit. The undersigned waives and shall have no right of subrogation, indemnification, reimbursement or exoneration with respect to the liabilities of Tenant under the Lease or any rights of contribution from any other guarantors of such liabilities.~~

Dated: _____, 20____

Signature:_____        Signature: _____

Address:_____        Address:_____
_____        _____

## EXHIBIT D - Guaranty by a Corporation

FOR VALUE RECEIVED, and in consideration for, and as an inducement to Hazeltine Gates, L.L.C., a Delaware limited liability company, as Landlord, to enter into the foregoing Lease dated May ___, 2005 the "Lease"), with American Home Mortgage Corp. of New York, a New York corporation, as Tenant, the undersigned corporation American Home Mortgage Investment Corp., hereby absolutely and unconditionally guaranties to Landlord, its successors and assigns, the prompt and full payment of all rent and all other payments to be made by Tenant under the Lease, and the full performance and observance by Tenant of all the other terms, covenants, conditions and agreements therein provided to be performed and observed by Tenant, for which the undersigned shall be jointly and severally liable with Tenant. The undersigned hereby waives any notice of nonpayment, nonperformance or nonobservance, or proof of notice or demand. The undersigned agrees that in the event of a default by Tenant under the Lease, Landlord may proceed against the undersigned before, after or simultaneously with proceeding against Tenant. This Guaranty shall not be terminated, affected, or impaired in any manner by reason of: (1) the assertion by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease; (2) the commencement of summary or other proceedings against Tenant; (3) the failure of Landlord to enforce any of its rights against Tenant; or (4) the granting by Landlord of any extensions of time to Tenant. The undersigned further covenants and agrees that: (1) the undersigned shall be bound by all the provisions, terms, conditions, restrictions and limitations contained in the Lease which are to be observed or performed by Tenant thereunder, the same as if the undersigned were named therein as Tenant; and (2) this Guaranty shall be absolute and unconditional and shall be in full force and effect with respect to any amendment, addition, assignment, sublease, transfer or other modification of the Lease, whether or not the undersigned shall have knowledge or have been notified of or agreed or consented thereto. If Landlord at any time is compelled to take action, by legal proceedings or otherwise, to enforce or compel compliance with the terms of this Guaranty, the undersigned shall, in addition to any other rights or remedies to which Landlord may be entitled hereunder or as a matter of law or in equity, pay to Landlord all costs, including reasonable attorneys' fees, incurred or expended by Landlord in connection therewith. In the event the Lease is disaffirmed by a Trustee in Bankruptcy for Tenant, the undersigned agrees that it shall, at the election of Landlord, either assume the Lease and perform all of the covenants, terms and conditions of Tenant thereunder or enter into a new lease, which said new lease shall be in form and substance identical to the Lease. All duties and obligations of the undersigned pursuant to this Guaranty shall be binding upon the successors and assigns of the undersigned. For purposes of this Guaranty, the word "Tenant" shall include the successors and assigns of the undersigned. This Guaranty shall be governed by and construed in accordance with the laws of the State of Minnesota.

The undersigned further agrees that, to the extent that the Tenant makes a payment or payments to the Landlord or the Landlord receives any proceeds of collateral, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or otherwise is required to be repaid to the Tenant, its estate, trustee, receiver or any other party, including, without limitation, under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such payment or repayment, the obligations of Tenant or part thereof which has been paid, reduced or satisfied by such amount shall be reinstated and continued in full force and effect as of the date such initial payment, reduction or satisfaction occurred. The undersigned shall defend and indemnify the Landlord of an from any claim or loss under this paragraph including the Landlord's attorneys and paralegal fees and expenses and other expenses in the defense of any such action or suit. The undersigned waives and shall have no right of subrogation, indemnification, reimbursement or exoneration with respect to the liabilities of Tenant under the Lease or any rights of contribution from any other guarantors of such liabilities.

21

AMERICAN HOME MORTGAGE INVESTMENT
CORP.

Signature: _____

Print: _____

Corporate Address: 538 Broadhollow Rd
Melville, NY 11747

Title:_____

Date:_____

22

### EXHIBIT E - Rules And Regulations

1.      The sidewalks, entrances, passages, courts, elevators, vestibules, stairways, corridors or
        halls shall not be obstructed or used for any purpose other than ingress and egress. The
        halls, passages, entrances, elevators, stairways and roof are not for the use of the general
        public, and Landlord shall in all cases retain the right to control or prevent access thereto by
        all persons whose presence in the judgment of Landlord shall be prejudicial to the safety,
        character, reputation or interest of Landlord and its tenants, provided that nothing herein
        contained shall be construed to prevent such access by persons with whom the tenant
        normally deals in the ordinary course of its business unless such persons are engaged in
        illegal activities. No tenant and no employees of any tenant shall go upon the roof of the
        Building without the written consent of Landlord.

2.      No awnings or other projections shall be attached to the outside walls or surfaces of the
        Building nor shall the interior or exterior of any windows be coated without the prior written
        consent of Landlord. Except as otherwise specifically approved by Landlord, all electrical
        ceiling fixtures hung in offices or spaces along the perimeter of the Building must be
        fluorescent and of a quality, type, design and bulb color approved by Landlord. Tenant shall
        not place anything or allow anything to be placed near the glass of any window, door,
        partition or wall which may appear unsightly from outside the Premises.

3.      No sign, picture, plaque, advertisement, notice or other material shall be exhibited, painted,
        inscribed or affixed by any tenant on any part of, or so as to be seen from the outside of, the
        Premises or the Building without the prior written consent of Landlord. In the event of the
        violation of the foregoing by any tenant, Landlord may remove the same without any liability,
        and may charge the expense incurred in such removal to the tenant violating this rule.
        Interior signs on doors and the directory tablet shall be inscribed, painted or affixed for each
        tenant by Landlord at the expense of such tenant, and shall be of a size, color and style
        acceptable to Landlord.

4.      The toilets and wash basins and other plumbing fixtures shall not be used for any purpose
        other than those for which they were constructed, and no sweepings, rubbish, rags or other
        substances shall be thrown therein. All damage resulting from any misuse of the fixtures
        shall be borne by the tenant who, or whose servants, employees, agents, visitors or
        licensees, shall have caused the same.

5.      No tenant or its officers, agents, employees or invitees shall mark, paint, drill into, or in any
        way deface any part of the Premises or the Building. No boring, cutting or stringing of wires
        or laying of linoleum or other similar floor coverings shall be permitted except with the prior
        written consent of Landlord and as Landlord may direct.

6.      No bicycles, vehicles or animals of any kind shall be brought into or kept in or about the
        Premises and no cooking shall be done or permitted by any tenant on the Premises except
        that microwave cooking in a UL-approved microwave oven and the preparation of coffee,
        tea, hot chocolate and similar items for the tenant and its employees and business visitors
        shall be permitted. Tenant shall not cause or permit any unusual or objectionable odors to
        escape from the Premises.

7.      The Premises shall not be used for manufacturing or for the storage of merchandise except
        as such storage may be incidental to the use of the Premises for general office purposes.
        No tenant shall engage or pay any employees on the Premises except those actually

working for such tenant on the Premises nor advertise for laborers giving an address at the Premises. The Premises shall not be used for lodging or sleeping or for any immoral or illegal Purposes.

8.  No tenant or its officers, agents, employees or invitees shall make, or permit to be made any unseemly or disturbing noises, sounds or vibrations or disturb or interfere with occupants of this or neighboring buildings or Premises or those having business with them whether by the use of any musical instrument, radio, phonograph, unusual noise, or in any other way.

9.  No tenant or its officers, agents, employees or invitees shall throw anything out of doors, or down the passageways.

10. Tenant shall not maintain armed security in or about the Premises nor possess any weapons, explosives, combustibles or other hazardous devices in or about the Building and/or Premises.

11. No tenant or its officers, agents, employees or invitees shall at any time use, bring or keep upon the Premises any inflammable, combustible, explosive, foul or noxious fluid, chemical or substance, or do or permit anything to be done in the leased Premises, or bring or keep anything therein, which shall in any way increase the rate of fire insurance on the Building, or on the property kept therein, or obstruct or interfere with the rights of other tenants, or in any way injure or annoy them, or conflict with the regulations of the Fire Department or the fire laws, or with any insurance policy upon the Building, or any part thereof, or with any rules and ordinances established by the Board of Health or other governmental authority.

12. No additional locks or bolts of any kind shall be placed upon any of the doors or windows by any tenant, nor shall any changes be made in existing locks or the mechanism thereof. Each tenant must, upon the termination of this tenancy, restore to Landlord all keys of stores, offices, and toilet rooms, either furnished to, or otherwise procured by, such tenant, and in the event of the loss of any keys so furnished, such tenant shall pay to Landlord the cost of replacing the same or of changing the lock or locks opened by such lost key if Landlord shall deem it necessary to make such change.

13. All removals, or the carrying in or out of any safes, freight, furniture, or bulky matter of any description must take place during the hours which Landlord may determine from time to time. The moving of safes or other fixtures of bulky matter of any kind must be made upon previous notice to the manager of the Building and under his or her supervision, and the persons employed by any tenant for such work must be acceptable to Landlord. Landlord reserves the right to inspect all safes, freight or other bulky articles to be brought into the Building and to exclude from the Building all safes, freight or other bulky articles which violate any of these Rules and Regulations or the Lease of which these Rules and Regulations are a part. Landlord reserves the right to prohibit or impose conditions upon the installation in the Premises of heavy objects which might overload the building floors. Landlord will not be responsible for loss of or damage to any safes, freight, bulky articles or other property from any cause, and all damage done to the Building by moving or maintaining any such safe or other property shall be repaired at the expense of the tenant.

14. No tenant shall purchase or otherwise obtain for use in the Premises water, ice, towel, vending machine, janitorial, maintenance or other like services, or accept barbering or bootblacking services, except from persons authorized by Landlord, and at hours and under regulations fixed by Landlord.

15. Landlord shall have the right to prohibit any advertising by any tenant which, in Landlord's opinion, tends to impair the reputation of the Building or its desirability as an office building and upon written notice from Landlord any tenant shall refrain from or discontinue such advertising.

16. Landlord reserves the right to exclude from the Building between the hours of 10:00 p.m. and 7:00 a.m. and at all hours of Saturdays, Sundays and legal holidays all persons who do not present a pass signed by Landlord. Landlord shall furnish passes to persons for whom any tenant requests the same in writing. Each tenant shall be responsible for all persons for whom he requests passes and shall be liable to Landlord for all acts of such persons. Landlord shall in no case be liable for damages for any error with regard to the admission to or exclusion from the Building of any person. In the case of invasion, mob, riot, public excitement or other commotion, Landlord reserves the right to prevent access to the Building during the continuance of the same, by the closing of the gates and doors or otherwise, for the safety of the tenants and others and the protection of the Building and the property therein.

17. Any persons employed by any tenant to do janitorial work, shall, while in the Building, be subject to the prior written approval of the Landlord and subject to the Rules and Regulations of the Building. Tenant shall be responsible for all acts of such persons and Landlord shall not be responsible for any loss or damage to property in the Premises, however occurring.

18. All doors opening onto public corridors shall be kept closed, except when in use for ingress and egress, and left locked when not in use.

19. The requirements of tenants will be attended to only upon application to the Office of the Building.

20. Canvassing, soliciting and peddling in the Building are prohibited and each tenant shall cooperate to prevent the same.

21. All office equipment of any electrical or mechanical nature shall be placed by tenants in the Premises in settings approved by Landlord, to absorb or prevent any vibration, noise or annoyance.

22. No air conditioning unit or other similar apparatus shall be installed or used by any tenant without the written consent of Landlord.

23. There shall not be used in any space, or in the public halls of the Building either by any tenant or others, any hand trucks except those equipped with rubber tires and side guards.

24. Landlord will direct electricians as to where and how telephone and telegraph wires are to be introduced. No boring or cutting for wires or stringing of wires will be allowed without written consent of Landlord. The location of telephones, call boxes and other office equipment affixed to the Premises shall be subject to the approval of Landlord. All such work shall be effected pursuant to permits issued by all applicable governmental authorities having jurisdiction.

25. No vendor with the intent of selling such goods shall be allowed to transport or carry beverages, food, food containers, etc., on any passenger elevators. The transportation of such items shall be via the service elevators in such manner as prescribed by Landlord.

26. Tenants shall cooperate with Landlord in the conservation of energy used in or about the Building, including without limitation, cooperating with Landlord in obtaining maximum effectiveness of the cooling system by closing drapes or other window coverings when the sun's rays fall directly on windows of the Premises, and closing windows and doors to prevent heat loss. Tenant shall not obstruct, alter or in any way impair the efficient operation of Landlord's heating, lighting, ventilating and air conditioning system and shall not place bottles, machines, parcels or any other articles on the induction unit enclosure so as to interfere with air flow. Tenant shall not tamper with or change the setting of any thermostats or temperature control valves, and shall in general use heat, gas, electricity, air conditioning equipment and heating equipment in a manner compatible with sound energy conservation practices and standards.

27. All parking ramps and areas, pedestrian walkways, plazas, and other public areas forming a part of the Building shall be under the sole and absolute control of Landlord with the exclusive right to regulate and control these areas. Tenant agrees to conform to the rules and regulations that may be established by Landlord for these areas from time to time.

28. Landlord reserves the right to exclude or expel from the Building any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of the rules and regulations of the Building.

29. Smoking is not permitted anywhere inside or outside of the Building, including, without limitation, the Premises, common areas and parking garage. Smoking may be permitted outside of the Building only in the specific area(s) designated by Landlord from time to time, if any.

## EXHIBIT F – RIDER

RIDER TO THAT CERTAIN LEASE dated effective as of May 18th, 2005, by and between Hazeltine Gates, L.L.C., a Delaware limited liability company, as Landlord, and American Home Mortgage Corp. of New York, a New York corporation, as Tenant.

    1. <u>Interpretation of Rider.</u> This Lease is hereby modified and supplemented. Wherever there is a conflict between this Rider and the Lease or the Exhibits thereto, the provisions of this Rider shall control. Unless otherwise indicated in this Rider, terms shall be defined in the manner provided in the Lease.

    2. <u>Parking.</u> During the term of the Lease, Tenant shall lease two (2) underground garage parking spaces, such spaces to be determined by Landlord. Tenant agrees to pay Landlord the sum of $75.00 per month per stall plus applicable taxes for the spaces, as additional rent, payable with the monthly Base Rent. Landlord shall have the right to increase the monthly parking rate to Tenant from time to time during the Lease upon thirty (30) days advance written notice to Tenant. Landlord reserves the right to terminate Tenant's right to said parking spaces, at any time and for any reason, upon five (5) days advance written notice to Tenant. Tenant agrees to comply with all rules and regulations concerning parking and the use of the underground parking garage.

    3. <u>Landlord's Work.</u> On or before the Commencement Date, Landlord shall, at Landlord's sole cost and expense, construct or install those improvements or alterations in substantial accordance with the plans and specifications ("Plans and Specifications") prepared by WCL Associates, Inc., attached hereto as Schedule 1 ("Landlord's Work"). Landlord shall have the authority to make any changes in the Plans and Specifications required by any applicable laws or which are not inconsistent with the intent of the Plans and Specifications. Tenant may not order any changes in the work without the prior written approval of Landlord, and in the event such change results in an increase in the contract price of Landlord's Work, Tenant shall be responsible for the payment of such increased cost, which shall be payable to Landlord on the Commencement Date.

Landlord will use its best efforts to achieve substantial completion of Landlord's Work by July 1, 2005. Tenant shall have no right to enter or occupy the Premises until the same are tendered by Landlord. Landlord shall not be liable for any damages to or losses of Tenant caused by or arising out of any delay in completion of Landlord's Work or tendering the Premises to Tenant. Tenant shall permit Landlord access to the Premises for the purposes of permitting Landlord to perform Landlord's Work and no such entry shall be construed as an eviction, render Landlord liable for damages by abatement of rent or otherwise relieve Tenant of its obligations under this Lease.

Notwithstanding the foregoing, Landlord shall have no obligation to pay more than $90,880.00 for the cost of Landlord's Work. In the event the total cost of Landlord's Work exceeds the total sum of $90,880.00, Tenant agrees to reimburse Landlord for all costs in excess of $90,880.00, in a lump sum payment due and payable from Tenant to Landlord upon completion of Landlord's Work.

    4. <u>Contingency.</u> Landlord and Tenant agree that this Lease is entered into on the express condition precedent that Landlord shall be able to terminate the five (5) leases currently in effect with respect to portions of the Premises as well as to obtain possession of said Premises (the "Terminations"). The parties further agree that in the event of any delay or inability of the part of Landlord to effect such Terminations and/or is prevented from delivering possession of the Premises to Tenant on the Commencement Date, there shall be no claim of any type or nature on the part of Tenant against Landlord, nor shall this Lease be terminated. The Commencement Date shall be amended to the date the Landlord delivers possession of the Premises to Tenant, with all rent accruing from said amended commencement date, and the expiration date shall be extended accordingly. The parties shall execute an amendment to the Lease within thirty (30) days after the Premises are delivered to Tenant, specifying such amended commencement and expiration dates.

Notwithstanding the foregoing, in the event Landlord is unable to achieve the Terminations on terms satisfactory to Landlord, in its sole discretion, on or before July 1, 2005, Landlord shall have the option to terminate this Lease by providing written notice to Tenant on or before July 10, 2005.

5.  Early Occupancy.  Subject to the completion of Landlord's Work, Tenant may have the right to occupy the Premises prior to the Commencement Date at no cost, subject to all other terms and conditions of this Lease and provided Tenant has delivered to Landlord the executed Lease, security deposit and insurance certificate required hereunder.

6.  Signage.  Paragraph 9(g) of the Lease is hereby modified to state the Landlord shall provide building standard signage on or adjacent to Tenant's entrance door and shall permit Tenant's name to be placed on the building directory located in the lobby and on the Building's pylon sign, at Landlord's sole cost and expense.

7.  Assignment.  Notwithstanding anything to the contrary in Paragraph 9(f) of the Lease, Tenant shall have the right, upon ten (10) days prior written notice to Landlord, but without the consent or approval necessary from Landlord (a "Permitted Assignment") to assign this Lease to any affiliate or subsidiary of Tenant, or to any person, firm or entity purchasing all or substantially all of the Tenant's assets, or to any corporation resulting from the consolidation and merger of Tenant into or with any other entity; provided, however, that in the event of such a Permitted Assignment, the assignee shall assume in writing the terms and conditions set forth herein to be observed and performed by Tenant and agrees to attorn to Landlord in the performance of such assumed obligations. It being further agreed that nothing herein shall be construed as releasing Tenant from any of its liabilities or other obligations hereunder unless specifically consented to in writing by Landlord. For purposes of this paragraph, "affiliate" shall mean any person or entity that controls, is controlled by or is under common control with Tenant, with "control" meaning ownership of more than fifty percent (50%) of the voting interests in the entity in question.

IN WITNESS WHEREOF, the parties have executed this Rider effective as of the day and year first written above.

LANDLORD:
Hazeltine Gates, L.L.C., a Delaware limited liability company
By: John B. Goodman Enterprises, Inc.
Its: Managing Member

By: _____

Its: _____O. Pres_____

Date: ____5/19/05_____

TENANT:
American Home Mortgage Corp. of New York, a New York corporation

By: _____

Its: _____
Alan B. Horn
Executive Vice President

Date: ____5/18/05_____

## SCHEDULE 1 – Landlord's Work

