IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x   Chapter 11
In re:                                                           :
                                                                 :   Case No. 07-11047 (CSS)
AMERICAN HOME MORTGAGE                                           :
HOLDINGS, INC., a Delaware corporation, et al.,[1]               :   Jointly Administered
                                                                 :
                       Debtors.                                  :   Hearing Date: September 17, 2007 at 12:00 p.m. (ET)
                                                                 :   Docket Ref. No. 229
---------------------------------------------------------------- x

## DEBTORS' OBJECTION TO MOTION OF DB STRUCTURED PRODUCTS, INC. FOR RELIEF FROM THE AUTOMATIC STAY

The above-captioned debtors and debtors-in-possession (the "Debtors") object (the "Objection") to the *Motion of DB Structured Products, Inc. for Relief from the Automatic Stay* [Docket No. 229] (the "Motion") filed on August 17, 2007 by DB Structured Products, Inc. ("DBSP"). As discussed below, the Motion seeks to lift the automatic stay in order to allow DBSP to terminate a contract with the Debtors, and thereby deprive them of valuable contractual rights that the Debtors are currently attempting to sell for the benefit of the Debtors' estates and their creditors. DSBP, however, fails to meet even the basic *prima facia* requirements for relief from the automatic stay, and therefore, the Motion should be denied. In support of this Objection, the Debtors respectfully represent as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

## STATUS OF CASE AND JURISDICTION

1.     On August 6, 2007 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in possession of their properties and have continued to operate their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.     An official committee of unsecured creditors (the "Committee") was appointed on August 14, 2007. No trustee or examiner has been appointed.

3.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

4.     Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

5.     As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination

offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

6. A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion.

7. AHM Servicing constitutes a valuable asset of the Debtors' estates. The operations of AHM Servicing have not been interrupted by the bankruptcy proceedings. AHM Servicing continues to service loans, and remains fully staffed, as the layoffs made by AHM did not include the employees of AHM Servicing.

8. AHM Corp., AHM Servicing, and DBSP are parties to a Master Mortgage Loan Purchase and Servicing Agreement dated as of May 1, 2006 (the "Servicing Contract"). Pursuant to the terms of the Servicing Contract, DBSP purchased mortgage loans from AHM Corp. so that it could engage in securitization transactions with respect to such loans. The Servicing Contract further provides that AHM Servicing would service the mortgage loans purchased by DBSP.

9. The Servicing Contract can be terminated with or without cause. Under the "with cause" termination provision, set forth in section 14 of the Servicing Contract, there must be a continuing event of default to effect termination. The "without cause" provision, set forth in

section 15 of the Servicing Contract, requires DBSP to pay AHM Servicing the fair market value of the related servicing rights as mutually agreed upon by the parties.

10. On August 1, 2007, DBSP sent AHM Servicing a purported notice of default and conditional termination (the "Conditional Termination Letter"). The Conditional Termination Letter alleged that AHM Servicing failed to meet the qualifications of a FNMA ("Fannie Mae") servicer, an event of default under subsection 14.01(vi) of the Servicing Contract. The Conditional Termination Letter also stated that the termination would become effective only upon the appointment of a successor servicer in accordance with section 16 of the Servicing Contract.

## **OBJECTION**

11. Significantly, DBSP seeks relief from the automatic stay to terminate the Servicing Contract with the Debtors **for cause**. DBSP does not seek authority to terminate the agreement **without cause** which would require DBSP to pay the Debtors the fair market value of the Servicing Rights. The sole basis relied upon by DBSP for terminating the Servicing Contract for cause is the Debtors alleged loss of their Fannie Mae approved servicer status. DBSP argues that this disputed loss of status is a non-curable breach of the Servicing Contract which makes the contract non-assignable under section 365 of the Bankruptcy Code. As set forth below, while there was a dispute for a short period of time over the Debtors' status with Fannie Mae, there is no dispute that the Debtors are currently Fannie Mae approved servicers on an interim basis to enable the Debtors to close a sale of the related servicing rights on or before October 31, 2007. Thus, DBSP's argument that the alleged default is ongoing and not curable is simply wrong. Moreover, DBSP has not established that it has suffered any harm, either during the dispute over the Debtors'

status with Fannie Mae, or now. Finally, DBSP cannot establish that it is not being adequately protected. As a consequence, DBSP's Motion is meritless and must be denied.

## I. **DBSP Has Failed To Meet Its Burden To Show Sufficient Cause To Lift The Stay**

12. DBSP alleges in its Motion that cause exists to modify the stay because (i) there are material post-petition defaults under the Servicing Contract that have caused, and continue to cause, substantial economic risk and loss to DBSP; (ii) DBSP's interest in the Servicing Contract is not being adequately protected; and (iii) the existing defaults and the resulting harm is incurable and thus the Servicing Contract cannot be assumed and assigned to a third party. See Motion at ¶ 20. As set forth below, DBSP allegations are unsupported, and more importantly, factually incorrect, and therefore, are insufficient to support its claim that the Servicing Contract can be terminated.

13. Moreover, as the moving party, DBSP has the burden to establish a *prima facie* cause to lift the stay. Only upon such a showing does the burden shift to the Debtors to establish that the stay should not be lifted. See In re Pursuit Athletic Footwear, Inc., 193 B.R. 713, 718 (Bankr. D. Del. 1996). In order to establish a *prima facie* case, DBSP must introduce some evidence to prove that cause to lift the stay exists. DBSP, however, has not introduced any evidence, instead choosing to rely on mere speculative and conclusory allegations. Indeed, DBSP has failed to even provide the Court with a copy of the Conditional Termination Letter which it claims establishes a prepetition termination.

DB02:6219897.3                                                                                                       066585.1001

## A. There Are Currently No Material Post-Petition Defaults.

14. The sole alleged default asserted by DBSP is that the Debtors do not meet the requirements of a Fannie Mae servicer as required by section 14.01(vi) of the Servicing Contract. Prior to the Petition Date, the Debtors did receive a purported termination notice from Fannie Mae, which the Debtors disputed. However, within approximately three (3) weeks, the Debtors and Fannie Mae resolved the dispute and a stipulation (the "Stipulation") addressing that resolution was recently approved by this Court.[3] Under the Stipulation, Fannie Mae agrees to allow the Debtors to perform the duties of a loan servicer with respect to the portfolio of mortgages owned by Fannie Mae. See Stipulation at ¶ 1. The Debtors are deemed to be an approved Fannie Mae loan servicer on an interim basis to enable the Debtors to market the related servicing rights and to negotiate and close a sale on or before October 31, 2007. See Stipulation at ¶ 2.

15. Accordingly, the Debtors are currently not in default under the plain meaning of the Servicing Contract. Section 14 of the Servicing Contract provides in relevant part:

> In case one or more of the following Events of Default by the Servicer shall occur and be continuing, that is to say . . . (vi) the Servicer ceases to meet the qualifications of either a FNMA or FHLMC seller/servicer . . . then, and in each and every such case, so long as an Event of Default shall not have been remedied, the Purchaser, by notice in writing to the Servicer, may . . . terminate all the rights and obligations of the Servicer as servicer under this Agreement. . . .
> (emphasis added).

16. DBSP asserts, without providing any explanation, that the Servicing Contract cannot be cured even if the Debtors were to be reinstated as Fannie Mae servicers. The Debtors disagree. Reinstatement of Fannie Mae servicer status is precisely the contemplated cure to

---

[3] See *Order Granting Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for an Order Approving and Authorizing Compromise and Settlement Agreement with Fannie Mae* (Docket No. 611).

subsection 14.01(vi) of the Servicing Contract. DBSP fails to state why reinstatement of Fannie Mae status would not cure this default.

### B. DBSP Is Adequately Protected

17. DBSP alleges that the stay can be lifted because the Debtors have not provided adequate protection to DBSP for the continuing risk and loss arising from the Debtors' inability to be Fannie Mae servicer qualified. See Motion at ¶ 25. Once again, DBSP does not even attempt to explain how they are not adequately protected, let alone introduce any evidence to prove their allegations. In fact, DBSP was and remains adequately protected under the Servicing Contract. As explained above, the Debtors are deemed Fannie Mae loan servicers on an interim basis pursuant to the approved Stipulation. The Debtors have provided and continue to provide uninterrupted servicing of DBSP's loans, and the record indicates as such. As the Court heard during the hearing on CSFB's[4] motion for a temporary restraining order (the "TRO Hearing"), measures taken by the Debtors prior to the Petition Date ensured that AHM Servicing would continue to have the ability to service its mortgage loan portfolio uninterrupted. See TRO Hr'g Tr. 88:2-25, August 16, 2007 [Docket No. 404]. Specifically, the critical vendor and non-insider retention motions were designed to ensure that AHM Servicing remains fully in tact. Id. The record clearly establishes that DBSP remains adequately protected because of the Debtors' full ability to service mortgage loans. DBSP does not even attempt to dispute this record, and failure to do so renders its lack of adequate protection argument meritless.

18. DBSP also contends that even if the Debtors were to regain Fannie Mae status (which they have), it has suffered irreparable harm, yet it provides no supportable basis for this conclusory statement. See Motion at ¶ 25. DBSP makes the conclusory statement that it is not

---

[4] Credit Suisse First Boston Mortgage Capital LLC

able to securitize certain mortgages as a result of Debtors' alleged loss of Fannie Mae status. Even if Debtors had lost their Fannie Mae status, which it disputes, DBSP has not shown what, if any, harm it allegedly suffered. Significantly, DBSP does not explain how many of the $189 million in mortgages it currently holds it has been unable to securitize. Moreover, it has not provided any evidence that it has even attempted to securitize mortgages, let alone that it has been unable to do so. Thus, DBSP has failed to prove the extent, if any, of harm it has allegedly suffered as a result of Debtors brief disputed status with Fannie Mae.

19. DBSP has the burden to establish it has suffered harm and it has completely failed to do so. Further, since the Debtors have resolved their dispute with Fannie Mae, the harm to DBSP due to the alleged breach of the Servicing Contract, if any, has been remedied, precisely as contemplated by the Servicing Contract. Indeed, DBSP seeks to rewrite the Servicing Contract to remove any ability by the Debtors to remedy an alleged default. Moreover, any alleged harm that DBSP might have suffered during the Fannie Mae dispute period would be economic and it could be satisfied by monetary payment. Thus, DBSP's assertion that it has suffered irreparable harm is incorrect. See Frank's GMC Truck Center, Inc. v. General Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988) ("The availability of adequate monetary damages belies a claim of irreparable injury"); Order, In re American Home Mortgage Holdings, Inc., Adv. Proc. No. 07-51684 (CSS) (Bankr. D. Del. August 24, 2007) (denying CSFB's motion for a temporary restraining order because, *inter alia*, CSFB failed to show irreparable injury).

### C. The Alleged Default Has Been Remedied And The Servicing Contract Can Be Assumed And Assigned

20. Last, DBSP alleges that cause exists to lift the stay because the Servicing Contract cannot be assumed and assigned, due to the allegedly incurable default. See Motion at ¶¶ 26-27. Section 16 of the Servicing Contract states that termination is not effective until a successor

servicer is appointed. The Conditional Termination Letter references this provision and acknowledges that the termination of the Servicing Contract is not effective until the appointment of a successor. There is no dispute that as of the Petition Date, the Servicing Contract was not validly terminated. Clearly, allowing the Debtors to sell the servicing rights, which they are entitled to do, is in the best interests of the Debtors' estates and creditors, and will also ensure the orderly liquidation of the Debtors' assets.

21.     Indeed, to the extent the Servicing Contract is executory,[6] DBSP's sole and exclusive remedy is to compel the Debtors to either reject or assume the Servicing Contract, rather than seeking relief to terminate. See In re Sweetwater, 40 B.R. 733, 745 (Bankr. D. Utah 1984) (holding that exclusive remedies of non-debtor party to executory contract are found in § 365). The automatic stay is designed to prevent third parties from interfering with a debtors' rights under an executory contract. Under section 362(a)(3) of the Bankruptcy Code, the automatic stay protects debtors from all acts that seek to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate. 11 U.S.C. § 362(a)(3). To the extent the Servicing Contract is executory, it is property of the Debtors' estates within the meaning of section 541 of the Bankruptcy Code. See L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.), 209 F.3d 291, 302 (3d Cir. 2000) ("Both executory contracts and

---

[6] The Debtors have not completed their analysis of whether the Servicing Contract is executory and governed by section 365 of the Bankruptcy Code, or whether it is a contract right that can be sold pursuant to section 363 of the Bankruptcy Code. See Findings of Fact and Conclusion of Law in Support of Confirmation Order at ¶ LL, USA Commercial Mortgage Co., et al., Case No. 06-10725 (LBR) (Bankr. D. Nev. Jan. 8, 2007) (Docket No. 2377) (finding that loan servicing agreements are not executory contracts under Bankruptcy Code section 365 and can be transferred to asset purchaser under Bankruptcy Code sections 1123 and 363(b) without being assumed and assigned to asset purchaser under Bankruptcy Code section 365).

unexpired leases, for example, are included in the definition of 'property of the estate' contained in section 541"). Accordingly, the stay should remain in effect so that DBSP cannot circumvent its exclusive and sole remedy to compel the Debtors to assume or reject the Servicing Contract.

22. Curiously, DBSP also relies on a Massachusetts opinion which granted relief to the movants who sought to terminate a contract which had a "without cause" termination provision. See In re Commonwealth Mortgage Co., 149 B.R. 4 (Bankr. D. Mass. 1992). In Commonwealth, the court found that the Movant had failed to meet its burden of proving that the automatic stay should be lifted for cause. The court held, however, that the stay could be lifted to terminate the contract without cause **after** the Movant paid the termination fee required under the contract. Here, DBSP is not seeking to terminate pursuant to the "without cause" provision, found in section 15 of the Servicing Contract. Even if it was, the "without cause" termination provision requires DBSP to pay Debtors the "fair market value of the related servicing rights as mutually agreed to" by the parties. See Servicing Contract at § 15. DBSP, however, wants authority to terminate the Servicing Contract without any compensation or any benefit to the estate.

## II. Policy Reasons Support Enforcement Of The Automatic Stay

23. DBSP has clearly ignored the purpose of the automatic stay provided under section 362 of the Bankruptcy Code, which is threefold: "to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." See Borman v. Raymark Ind., Inc., 946 F.2d 1031, 1036 (3d Cir. 1991) (emphasis added), quoting St. Croix Condominium Owners v. St. Croix Hotel, 682 F.2d 446, 448 (3d Cir. 1982), as quoted in In re Rexene Products, Co., 141 B.R. 574, 576 (Bankr. D. Del. 1992). Further, the automatic stay is designed to give a debtor a

"breathing spell" free from lawsuits and other collection type activities while the debtor attempts to reorganize its affairs. See H.R. Rep. No. 595, 95th Cong. 1st Sess. 340 (1977); <u>Maritime Electric Co., Inc. v. United New Jersey Bank</u>, 959 F.2d 1194, 1204 (3d Cir. 1992) ("The automatic stay serves several purposes. First, it gives a bankrupt a breathing spell from creditors by stopping all collection activities, all harassment, and all foreclosure actions").

24.    The management team, remaining employees, and the professionals of the Debtors have been feverishly working since the commencement of these cases towards the auction of assets of AHM Servicing, currently scheduled for September 24, 2007, which will maximize the value of the estates for all creditors. It is clear that to enable lenders, including DBSP, to proceed with the termination of their servicing agreements will be extremely burdensome and disruptive, particularly when the Debtors are preparing for the upcoming sale. There are significant demands on the time of the management and employees, and giving them the "breathing spell" to focus on the asset sale serves the purpose of the automatic stay.

*Remainder of Page Intentionally Left Blank*

DB02:6219897.3                                                                                                                  066585.1001

## **CONCLUSION**

25.  The Court should deny the Motion because DBSP has not met its burden in establishing cause to modify the stay. Since the dispute over the Debtors' Fannie Mae status is now resolved, the stated reason for declaring default and seeking termination no longer exists. DBSP may proceed with its securitization transactions. Further, enforcing the stay so that the Debtors can assume and assign the Servicing Contract is in the best interests of the Debtors' estates and creditors, and will also enable the Debtors to focus their attention on the upcoming asset sale and other restructuring efforts.

26.  For the reasons set forth above, the Debtors respectfully request that the Court deny the Motion and the relief requested therein.

Dated:   Wilmington, Delaware
         September 11, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Sanjay Bhatnagar*

James L. Patton, Jr. (No. 2202)
John T. Dorsey (No. 2988)
Sharon M. Zieg (No. 4196)
Erin Edwards (No. 4392)
Sanjay Bhatnagar (No. 4829)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for the Debtors and Debtors in Possession