UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| AMERICAN HOME MORTGAGE | . | Case No. 07-11047(CSS) |
| HOLDINGS, INC., a Delaware | . | (Jointly Administered) |
| Corporation, *et al.*, | . | |
| | . | |
| | . | August 24, 2007 |
| | . | 1:00 p.m. |
| Debtors. | . | (Wilmington) |
| | . | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE CLERK: All rise.

2          THE COURT: Please be seated.

3          MS. MORGAN: Good afternoon, Your Honor.

4          THE COURT: Good afternoon, Ms. Morgan.

5          MS. MORGAN: Pauline Morgan from Young, Conaway,

6    Stargatt, & Taylor on behalf of the Debtors.  Your Honor, if

7    I may, I've had a request that we take the last item on the

8    agenda first, because I understand there is a resolution.  Is

9    that acceptable to the Court?  That's the Morgan Stanley

10   matter.

11         THE COURT: Let's see what it is.

12         MS. MORGAN: The Morgan Stanley - -

13         THE COURT: Yes.  That's fine.

14         MS. MORGAN:  - - matter, Your Honor.

15         THE COURT: Yes.  That's fine.  I'm sorry.

16         MS. MORGAN: Thank you, Your Honor.

17         MR. DORSEY: Good afternoon, Your Honor.

18         THE COURT: Good afternoon, Mr. Dorsey.

19         MR. DORSEY: We're presenting today a stipulation

20   and agreement between the Debtors and Morgan Stanley that

21   resolves Morgan Stanley's motion for a temporary restraining

22   order as well as a number of accounts and a complaint that

23   they have filed in the Bankruptcy Court.  This is an agreed

24   upon stipulation.  I understand the Committee and the Bank of

25   America have both signed off on the agreement.  There are a

1    few interlineated items that were added just this afternoon,

2    as we came into the courtroom today, that I wanted to point

3    out and put onto the record.  I'm not sure if Your Honor has

4    a copy of the stipulation.

5            THE COURT: I don't.

6            MR. DORSEY: Can I hand up a copy, Your Honor.

7            THE COURT: Yes, please.  Okay.

8            MR. DORSEY: What has been added to the agreement,

9    Your Honor, the first one is in paragraph 6.  Which, the

10   language was added after the phrase mortgage loans in the

11   second line.  And Morgan Stanley shall pay for such services.

12   Just to clarify that while – –

13           THE COURT: What, wait a minute.  Where are you?

14           MR. DAVIS: Paragraph 6 of the stipulation, Your

15   Honor.

16           THE COURT: Until the new transfer date?

17           MR. DORSEY: Correct.

18           THE COURT: Oh.  I don't have any interlineation in

19   what you handed up.  Oh, you're reading it to me.

20           MR. DORSEY: I'm reading that to you.

21           THE COURT: Oh, I apologize.  Okay.

22           MR. DORSEY: After mortgage loans, the language, And

23   Morgan Stanley shall pay for such services has been added.

24           THE COURT: Okay.

25           MR. DORSEY: In paragraph 7, at the end of the first

1   sentence the following has been added, Less any amounts owed

2   to AHM Servicing for advances or fees under the interim

3   servicing agreement.

4           THE COURT: Okay.

5           MR. DORSEY: And finally, in paragraph 9, at the end

6   of the sentence has been added, Provided that any material

7   modification shall be on prior notice to Bank of America,

8   N.A. and the Committee.  And other than that, Your Honor,

9   there are no additional changes.  If Your Honor has any

10  questions, I'd be happy to address them.

11          THE COURT: Has this stipulation been filed with the

12  Court?

13          MR. DORSEY: It has not, Your Honor.  We just

14  finalized it - -

15          THE COURT: All right.

16          MR. DORSEY:  - - in the courtroom just a few

17  minutes ago.

18          THE COURT: All right.  Give me a minute to actually

19  read the terms.

20          MR. DORSEY: Just so Your Honor has a context, the

21  stipulation is a consensual transfer of the servicing of the

22  Morgan Stanley loans.

23          THE COURT: What's a Hello and Goodbye letter?

24          MR. DORSEY: Those are letters that will notify the

25  underlying mortgagors that - -

1          THE COURT: Okay.

2          MR. DORSEY: - - the servicing is being transferred

3    to a new servicer.

4          THE COURT: All right.  Does anyone wish to be heard

5    in connection with this matter?  Or resolution?

6          MR. INDELICATO: Your Honor, Mark Indelicato from

7    Hahn & Hessen, proposed counsel to the Committee.  Your

8    Honor, the Committee has looked at this, and we have worked

9    with the Debtor over the last two days to get our arms around

10   all of the facts.  What I can tell the Court is that based on

11   the information that has been provided to us, and the

12   representations made by the Debtor and Debtors' counsel, the

13   Committee is of a mind that this actually does make sense.

14   We would have liked some more information, but based on what

15   we have, we believe this transaction does make sense, and we

16   do not oppose it.

17         THE COURT: Okay.  Thank you.  Anyone else?  Mr.

18   Dorsey, how do you want to proceed?

19         MR. DORSEY: May I hand up the final version of the

20   order, Your Honor, for your signature?

21         THE COURT: Yes.  This contains the interlineations

22   you read into the record?

23         MR. DORSEY: That's correct, Your Honor.

24         THE COURT: All right.  I'll approve the order.

25         MR. DORSEY: Thank you, Your Honor.

1          THE COURT: Anyone related to this matter is

2    excused, if they wish.

3          UNIDENTIFIED SPEAKER: Thank you, Your Honor.

4          MS. MORGAN: Thank you, Your Honor.  I'm also told

5    that Mr. Monaco would like to make a *pro hac vice*

6    application.

7          THE COURT: All right.

8          MR. MONACO: Thank you, Your Honor.  For the record,

9    Frank Monaco of Womble Carlyle for Credit Suisse.  Your

10   Honor, on the phone is my co-counsel, Christopher Marcus from

11   the Weil Gotshal firm.  We did file a *pro hac vice* motion

12   this morning, and I believe he would like to address the

13   Court with respect to item no. 5 when we come to it.  And

14   just so that Your Honor is aware, and I don't interfere with

15   the flow of the proceedings, we did file a limited objection

16   shortly before the hearing to that - -

17         THE COURT: All right.

18         MR. MONACO:  - - to that motion, and I have copies

19   here for the Court, and any other party in the courtroom who

20   would like to have a copy.

21         THE COURT: All right.  Why don't you give me a

22   copy?

23         MR. MONACO: Sure.

24         THE COURT: His admission will be granted for

25   purposes of today's hearing.  Thank you.  Okay, Ms. Morgan.

1          MS. MORGAN: Thank you, Your Honor.  Your Honor,

2     that brings us to the first item on the agenda, which is the

3     Debtors' motion for a final order today authorizing the

4     implementation of a non-insider employee retention plan under

5     §§105, 363, and 503 of the Bankruptcy Code.  As Your Honor

6     will recall, we had an interim hearing on this motion on

7     August 7th, the first day hearing.  And at that time the Court

8     granted, on an interim basis, the motion in part, excluding

9     anyone with the title of Assistant VP, Vice President, or

10    Senior Vice President from the program.  Since, since the

11    first day hearing, Your Honor, we have revised the plan to

12    exclude Senior VP's from the program.  So coming to the

13    hearing today, we are intending to, of course, seek final

14    approval of the entire program, but also include the

15    Assistant Vice Presidents and Vice Presidents.  As you are

16    also aware, Your Honor, we have an objection from the Office

17    of the United States Trustee, and we have been providing

18    information to Mr. McMahon, informal discovery, as he's

19    requested.  We've also had discussions with the Official

20    Committee of Unsecured Creditors.  And based on the

21    information provided to both Mr. McMahon and Mr. Indelicato

22    and his team, both would be prepared to consent to the relief

23    requested if the Debtors modify the program further to delete

24    the eight individuals with a base salary of 200 thousand or

25    more from the program.  And this, again, just happened

1    minutes before we came before Your Honor today.  But the

2    Debtors are amenable to amending the program further.  Again,

3    the Senior VP's are not included, and we would also take,

4    remove from the program the eight people with a base salary

5    of 200 thousand or more.  Of course without prejudice to the

6    Debtors' rights to seek a different incentive plan under 503

7    for those individuals, or any other employees of the Debtor.

8    So we're prepared to do that today, you're also, Your Honor,

9    we also have a witness who's prepared to walk us through the

10    titled officers, if you will.  We did also have testimony in

11    the first day from Mr. Strauss explaining the details of the

12    program and the outline of it, and the reason for it.  I'm

13    not sure how much of a record Your Honor would like today,

14    but we can put on a full record, or we can incorporate the

15    record from the prior hearing and supplement it, if you like.

16         THE COURT: So the Debtors are going to modify the

17    program to resolve any issues with the Office of the US

18    Trustee and the Committee.  So we're moving forward on a

19    consensual basis.

20         MS. MORGAN: Correct, Your Honor.

21         THE COURT: Is there any, is there any opposition to

22    the Court taking judicial notice and incorporating the record

23    of the hearing at the first day in connection with the

24    retention plan?

25         MR. INDELICATO: No, Your Honor.

1          MR. McMAHON: No objection from the United States

2    Trustee, Your Honor.

3          THE COURT: All right.  You can either proffer or

4    take your witness through direct on the issue of why the Vice

5    Presidents and Assistant Vice Presidents who make less than

6    $200 thousand a year are not officers of the Debtors.

7          MS. MORGAN: Fine, Your Honor.  I'd like to call Mr.

8    Alan Horn to the stand, please.

9          THE COURT: Please rise, sir.  I'm sorry.  Place

10   your hand on the Bible.  There you go.

11              **ALAN HORN, DEBTORS' WITNESS, SWORN**

12                        DIRECT EXAMINATION

13   BY MS. MORGAN:

14   Q.   Good afternoon, Mr. Horn.  By whom are you employed?

15   A.   American Home Mortgage Investment Corp.

16   Q.   And what titles do you hold?

17   A.   Executive Vice President, General Counsel, and

18   Secretary.

19   Q.   And what are your job responsibilities at American Home?

20   A.   I manage the legal function for the company.  My

21   mission, if you will, has been to ensure that the company

22   complies with laws and regulations as they impact the

23   business.  And as an aside, I also, for reasons I have not

24   been able to figure out, have the facilities function

25   reporting to me.

1   Q.   Okay.  And in connection with your duties, do you also

2   participate in Board meetings?

3   A.   Yes I do.  As the Secretary of the company.  I am

4   secretary for all Board meetings.

5   Q.   Okay.  And how long have you been employed by American

6   Home?

7   A.   Since January, 2003.

8   Q.   Mr. Horn, are you familiar with the testimony provided

9   at the first day hearing by Mr. Strauss?

10  A.   Yes.

11  Q.   Okay.  Just very briefly and generally, then, if you

12  would describe the company's business prior to August 3rd of

13  2007.

14  A.   Prior to that date, we were in two businesses.  One was

15  the mortgage origination business, the second the mortgage

16  servicing business.  The mortgage origination business,

17  effectively the business of making mortgage loans to

18  borrowers.  That was done through three channels.  Retail,

19  which is direct to borrowers.  Wholesale, where borrowers are

20  introduced to the company through brokers.  And

21  correspondent, which purchased mortgage loans from other

22  lenders.  Mortgage servicing business, as the name would

23  suggest, was responsible, and is responsible for processing

24  and servicing mortgage loans post-closing.  And that entails

25  applying of payments, issuing statements, processing mortgage

1   documents as loans are paid, etcetera.

2   Q.   And how many employees did the Debtors have when it was

3   conducting all of these types of businesses?

4   A.   About 75 hundred.

5   Q.   And in the days and weeks leading up to the bankruptcy

6   filing, did the nature of the business change?

7   A.   Yes.

8   Q.   How so?

9   A.   Specifically, the company, in the days prior to the

10  filing, terminated and closed the loan production business.

11  Q.   And was there a reduction of force in light of that

12  change?

13  A.   Yes there was.  We, we went through a reduction of force

14  separating approximately 65 hundred employees in the loan

15  production business, and many employees who had supported

16  that business.

17  Q.   So leaving the Debtors, as of the petition date, with

18  about a thousand employees.  Is that right?

19  A.   That's correct.

20  Q.   Okay.  Mr. Horn, are you familiar with the non-insider

21  employee retention plan that the Debtors are seeking approval

22  of today?

23  A.   Yes I am.

24  Q.   How was the plan developed?

25  A.   The plan was developed by our restructuring advisors in

1    conjunction with our CEO and our Human Resources Manager.

2    Q.   And were you involved in any of those discussions and

3    consultations about the plan?

4    A.   I was.

5    Q.   Okay.  Did the plan participants themselves have input

6    into the plan?

7    A.   They did not.

8    Q.   Was the plan presented to them for approval?

9    A.   No it was not.

10   Q.   Was the plan presented to the Debtors' Board of

11   Directors prior, prior to being filed with the Bankruptcy

12   Court?

13   A.   Not it was not.

14   Q.   Was it presented to the compensation committee of the

15   Board of Directors for approval?

16   A.   No.

17   Q.   And why, why was it determined that that wasn't

18   necessary?

19   A.   It was determined it wasn't necessary because the view

20   was that the employees covered by the plan were not senior

21   people in the company, that the plan was addressing ordinary

22   course-type compensation issues that were generally delegated

23   to management.

24   Q.   Okay.  Other than the modifications made on the record

25   just now, eliminating eight individuals, does the plan

1   currently cover every employee with the title of Vice

2   President, Assistant Vice President, or below?

3   A.   Yes.

4   Q.   Okay.  And why did the, why were the VP's and AVP's

5   included in the program?

6   A.   They're included in the program because, first, they're

7   really deemed critical to the company accomplishing its

8   mission in the bankruptcy proceeding, in keeping the core

9   businesses operating and maximizing asset value, and in

10  limiting exposure to claims.  These people are deemed to be

11  vital to those, to those ends.

12  Q.   Does the plan treat the Assistant Vice Presidents and

13  Vice Presidents differently from the rank and file?

14  A.   No it does not.

15  Q.   Okay.  Of the seven, 75 hundred employees, or so, prior

16  to August 3rd, do you know how many of them were Assistant

17  Vice Presidents or Vice Presidents?

18  A.   There were approximately, I don't recall.

19  Q.   Okay.  Did the company and its Board of Directors

20  recognize the Assistant VP's and VP's as officers with

21  control over the operation of the business?

22  A.   No.

23  Q.   Okay.  In fact, many of them were terminated on August

24  3rd, were they not?

25  A.   That's correct.

1   Q.   Okay.  Of the, of the employees on the petition date, of

2   a thousand or so, do you know how, about, approximately how

3   many are Assistant VP's and VP's?

4   A.   About 170.

5   Q.   Okay.  So who's not covered by this plan?

6   A.   Senior Vice Presidents and above, plus eight people

7   carrying Vice President titles.

8   Q.   Okay.  Did the eight, I'm sorry, 170 or so AVP's and

9   VP's function in the role of senior officers with respect to

10  policy making?

11  A.   No.  They had no role in policy making.

12  Q.   Did they have any input in the decision to file these

13  bankruptcy cases?

14  A.   No.

15  Q.   Are they responsible for conducting negotiations with

16  respective purchasers of the Debtors' business?

17  A.   No they're not.

18  Q.   Do they direct the company's financial or legal advisors

19  in conducting the case?

20  A.   No.

21  Q.   Are any of their salaries directly approved by the

22  compensation committee of the Board?

23  A.   No.

24  Q.   Are any of the VP's eligible to succeed a president of

25  CEO if those positions become available?

1   A.   They're not eligible, no.

2   Q.   Do any of these individuals have authority to bind the

3   company, for instance, to enter into contracts on behalf of

4   the company?

5   A.   No they're not.

6   Q.   Do they have check signing authority?

7   A.   Very limited check signing authority in certain cases.

8   Q.   Do they have the authority to hire and fire?

9   A.   They have the authority to fire within certain

10  restrictions relative to their individual responsibilities or

11  applicable to those responsibilities.  They do not have

12  authority to hire.

13  Q.   So, so if one of them lost an administrative assistant

14  in the reduction in force, they don't even have the authority

15  to hire a new one?

16  A.   Correct.  That would have to be approved by an Executive

17  Manager.

18  Q.   Are, is the company required by securities laws to

19  disclose the compensation of certain officers?

20  A.   Yes.

21  Q.   And who are they?

22  A.   That would be the CEO, the CFO, and the top three, other

23  top three compensated individuals as, within the rules of the

24  SEC.

25  Q.   And are any of the AVP's and VP's who are part of this

1   program included in those SEC filings?

2   A.   No.

3   Q.   How important is it for the Debtors to remain, to keep

4   these AVP's and VP's in their employ?

5   A.   It is absolutely critical for the Debtors to keep these

6   people employed.  As I mentioned before, they're vital to the

7   company in, for, in order for the company to accomplish the

8   sale of assets, to limit exposure to claims, to drive the

9   core businesses of the company, as they wind down through

10  this process.

11  Q.   And do you think the plan that we're seeking approval of

12  today is reasonably designed to incentivize them to stay?

13  A.   Yes I do.

14          MS. MORGAN: Your Honor, no further questions.

15          THE COURT: Any cross examination by anyone?  All

16  right.  You may step down.  Thank you.  Any further

17  witnesses?

18          MS. MORGAN: No, Your Honor.

19          THE COURT: All right.  Any further evidence by

20  anyone?  All right.  I'll close the evidence on this matter,

21  and I'll hear argument.

22          MS. MORGAN: Thank you, Your Honor.  Your Honor,

23  since the enactment of the amendments to the Bankruptcy Code

24  in October of 2005, Courts have held that by its terms,

25  §503(c)(1) applies only to insiders, and doesn't restrict the

1   payment of retention bonuses to non-insiders under §503

2   (c)(3).  Many cases, Your Honor, have acknowledged that.  For

3   instance, the Calpine decision in the Southern District

4   approving a KERP plan for non-insiders.  In Your Honor's case

5   of Premium Papers Holdings, the requirements of 503(c)(1)

6   were not considered in that case with respect to non-insider

7   key employees.  Your Honor, also the CEP Holdings case of the

8   Northern District of Ohio.  There the Court held that insider

9   payments couldn't be justified by the facts and

10  circumstances, but payments to non-insiders were justified.

11  503(c)(3) permits payments outside of the ordinary course of

12  business, as long as it's justified by the facts and

13  circumstances of the case.  Which, at least Judge Walrath has

14  determined to mean the business judgment standard must be

15  satisfied.  And factors used to determine if the structure of

16  a compensation proposal satisfies that test include whether

17  there's a reasonable relationship between the plan and its

18  proposed results, whether the cost of the plan is reasonable

19  in the context of the Debtors' assets, liabilities, and

20  earning potential, whether the scope of the plan is fair and

21  reasonable, whether it discriminates against certain

22  employees unfairly.  And Your Honor, the Code, with respect

23  to what constitutes an officer, I'm sorry, what constitutes

24  an insider for a corporation it means a director, an officer,

25  or person in control.  However, the term officer is not

1  defined.  Courts, since the enactment of the amendments, have

2  also analyzed that provision in the context of §503, and many

3  of them have determined that individuals with the titles of

4  Vice President or Assistant Vice President are not officers

5  within the meaning of §503.  For instance, this Court, in the

6  Smart Papers case found that Vice Presidents were not

7  necessarily officers.  Also, in the CEP Holdings case which I

8  mentioned, the Court found that Vice Presidents of Sales,

9  Senior Vice Presidents of Operations, Vice President of

10  Purchasing, and Senior Vice President of Quality and Lien

11  were not officers within the meaning of §503.  The Court

12  indicated there that the position of officer status is not

13  conferred by job title, but only by Board action or corporate

14  documents.  Which is consistent with Delaware Corporate Law.

15  Your Honor, in the Three A's Holdings case, Judge Shannon

16  also held that Vice Presidents were not officers, noting that

17  officers, those officers in that case were not appointed in

18  accordance with the Debtors bylaws.  Which is similar to what

19  is the case here.  Also the RepCo case by Judge Drain,

20  similar holding, and also Judge Shannon's decision in

21  LG.Philips, also a similar holding.  In New Century, which is

22  in an industry similar to this one, Judge Carey recognized

23  the financial industry's open use of various titles for its

24  employees, and determined that individuals holding the

25  position of Vice President and Assistant Vice President were

1    not, under the circumstances, officers for purposes of

2    503(c), because they had no control over the Debtors and did

3    not participate in policy making functions.  Your Honor,

4    also, the Vice Presidents and Assistant Vice Presidents in

5    this case are not persons in control within the meaning of

6    the insider definition.  In LG.Philips, Judge Shannon

7    determined that influence could not be implied merely by the

8    number of employees or the level of their responsibilities or

9    compensation.  He said, The fact that these individuals may

10   have important responsibilities doesn't necessarily confer

11   insider status on them.  The fact that a person has

12   considerable expertise, does not reflect that she's an

13   insider, it means that she simply does a good job.  Your

14   Honor, we believe the record reflects in this case that the

15   Assistant VP's and VP's are not officers within the meaning

16   of §503.  They do not have control over the governance and

17   the strategic direction of the company, they are not

18   appointed by the Board of Directors, their compensation is

19   not controlled by the Board of Directors, they have no

20   authority to hire, they do not have, they have very limited

21   check signing authority.  In short, they do not direct the

22   operations of the company in any meaningful sense.  They are

23   managerial employees who are important and essential to our

24   operations going forward.  Despite their titles, again they

25   do not exert any control over the company.  So the Debtors

1   submit that based on the evidence before you, these

2   individuals are not insiders within the meaning of §§101 or

3   503(c), and the Debtors submit that they've demonstrated that

4   the proposed retention plan is necessary to retain these

5   employees, and that the plan is reasonably designed to

6   achieve the result of retaining those employees.  And we ask

7   that the plan be approved.

8           THE COURT: All right.  Anyone else wish to be heard

9   in connection with this matter?

10          MR. INDELICATO: Your Honor, Mark Indelicato from

11   Hahn & Hessen on behalf of the Committee.  Your Honor, this

12   was the first, one of the first items the Debtor asked the

13   Committee to take up, and we had our financial advisors get

14   involved with the Debtor and their financial advisors to make

15   a determination of whether or not we thought not only the

16   issues about AVP's and VP's was appropriate, but whether or

17   not the entire plan was appropriate given that it was only

18   entered on an interim order.  Your Honor, in doing that we

19   considered a number of factors including the necessity of the

20   plan to ensure that this, this liquidation went along

21   smoothly, and in order to maximize value for creditors.  We

22   looked at the scope of the plan to see whether this was

23   consistent with other plans entered, not only in this

24   industry, but in other industries as well.  We looked at,

25   particularly, the cost and the number of parties that were

1    involved.  We also took a pragmatic approach looking at the

2    AVP's and VP's to see whether or not we felt they were

3    insiders and parties in control.  In doing that analysis,

4    Your Honor, we considered not only job titles, but the level

5    of compensation.  And having done this analysis, we

6    determined that the plan, in fact, was necessary in some way,

7    shape, or form.  We felt overall the cost was reasonable

8    within the type of plan that it was, not only in this

9    industry, but for these type of plans in general.  The one

10   problem we had, Your Honor, and we brought this back to the

11   Debtors' attention, was in looking at the VP's, there were a

12   number of VP's which we felt had compensation, although it

13   was not clear from their titles that they might have been

14   parties in control, it was evident to us at least there was a

15   question given the level of their compensation whether or not

16   they were parties who could effect influence on the

17   administration and operations of the business.  With the

18   Debtors acknowledgment or agreement, at least, to table those

19   eight individuals for today, the Committee would recommend

20   that the Court support this.  We believe it is necessary, and

21   we believe ultimately it will - - down to the benefit of the

22   creditors.  Thank you.

23        THE COURT: Thank you.  Mr. McMahon.

24        MR. McMAHON: Your Honor, good afternoon.    Joseph

25   McMahon for the United States Trustee.  Without getting into

1    whether, I guess, we agree completely or not with the

2    Debtors' view of the law in this area, we are agreeable to

3    the resolution that's been put before the Court to remove

4    those eight individuals from the proposed program.  And that

5    was done, Your Honor, after we did submit an informal

6    document request to the Debtors for a number of documents we

7    would consider to be relevant.  Pre-petition compensation

8    plans, board, I'm sorry, corporate by-laws, to the extent

9    that there were any corporate resolutions designating these

10   people as officers, we asked for those documents.  We did not

11   receive any responsive documents in that regard, consistent

12   with Mr. Strauss' testimony.  In light of that, and in having

13   the opportunity to review the information which the Debtors

14   provided us, we were comfortable with the resolution.

15          THE COURT: All right.  Thank you, Mr. McMahon.

16   Anyone else?  My thinking on this issue continues to evolve.

17   And the definition of officer, of course, is not set forth in

18   the Bankruptcy Code.  And whether or not it means all people

19   who have, all persons who have titles such as Assistant Vice

20   President in a company of this size I think is, is an open

21   issue.  They're certainly called officers, and I think until

22   proven otherwise they should be treated as such based on

23   their title.  But the Debtors have presented an

24   uncontroverted, uncontested evidentiary record today before

25   the Court, and it resolved their issues with the Office of

1    the United States Trustee and the Committee, that the

2    Assistant Vice Presidents and Presidents that are covered by

3    the retention plan, as modified, are not officers within the

4    context of the definition of insider in the Bankruptcy Code.

5    And I'm satisfied that based on the evidentiary record in

6    this case, and under the facts and circumstances of this

7    case, including the significant fact that it has, there is no

8    pending objection by the Office of the US Trustee or the

9    Committee, that I will approve the retention plan and find

10   that it is, in fact, a non-insider retention plan, and thus

11   503(c)(1) is not implicated.  So to the extent 503(c)(3) is

12   the applicable limitation, if there is any on a retention

13   plan outside the ordinary course of business, based on the

14   uncontested record today, and the incorporated record from

15   the first day hearing, I believe that this program is

16   justified by the facts and circumstances, excuse me, facts

17   and circumstances of the case and I'll approve the, approve

18   the motion and sign the final order.  And you may approach.

19        MS. MORGAN: Thank you, Your Honor.

20        THE COURT: Thank you.

21        MS. MORGAN: Your Honor the black line is against

22   the one originally proposed with the motion.  And really, the

23   only change of significance is that it approves the plan as

24   modified on the record at the hearing.

25        THE COURT: All right.  I have signed the order.

1          MS. MORGAN: Thank you, Your Honor.  I would like to

2    yield the podium to my colleague, Mr. Beach.

3          THE COURT: All right.

4          MR. BEACH: Good afternoon, Your Honor.  May it

5    please the Court, Sean Beach from Young Conaway on behalf of

6    the Debtors.  Your Honor, the next two items on the agenda

7    are the motion to approve a license agreement, and licensing

8    of certain office space, and furniture, fixtures, and

9    equipment to Indymac as well as a motion to sell that

10   furniture, fixture, and equipment and to assume and assign

11   those office leases.  Your Honor, since these motions are

12   related, and the argument and testimony are intertwined, I'd

13   like to take those in tandem if it's acceptable to Your

14   Honor.

15         THE COURT: That's fine.

16         MR. BEACH: Your Honor, the motions were filed on

17   August 10th, 2007 at Docket Nos. 135 and 137.  The motions

18   were served on the same day on Indymac's counsel, the United

19   States Trustee, the Committee, the SEC, the Debtors' top 40

20   unsecured creditors, all parties who have requested notice

21   pursuant to Rule 2002, Bank of America, the DIP lender, the

22   landlords of the office leases, potential bidders, taxing

23   authorities, and all parties known to have liens against

24   these assets.  The Court has entered an order approving the

25   shortened notice period with respect to both of these

1    motions, and as a result the Debtors believe that sufficient

2    notice has been given with respect to these motions.  Your

3    Honor, as you heard with respect to Mr. Horn's testimony, and

4    have repeatedly heard throughout this case, shortly prior to

5    the petition date, there was a termination of approximately

6    65 hundred employees.  Those employees were primarily

7    employed with, in connection with the Debtors' origination

8    business.  And as a result of those terminations,

9    approximately 600 office spaces were left vacant shortly

10   before the petition date.  The Debtors and Indymac began

11   discussions on July 27th regarding the potential leasing, or

12   assumption and assignment of those office spaces and the sale

13   of the FF&E located within those office spaces.  The Debtors

14   knew that they would need to make quick decisions with

15   respect to these office leases and the FF&E because of the

16   accrual of over $3.4 million in administrative fees related

17   to the rent in these office spaces on a monthly basis.  And

18   that's why on August 7th, the Debtors entered into a license

19   agreement with Indymac to license the office space, and the

20   use of the FF&E to Indymac while the Debtors sought approval

21   of the ultimate assumption and assignment, and the sale of

22   those office assets.  With respect to the letter agreement,

23   Your Honor, the material terms of the letter agreement

24   include in consideration for the sale of the office assets,

25   Indymac shall pay AHM a cash payment of $2.5 million, assume

1    certain liabilities in connection with the office assets,

2    namely phone company arrearages with respect to any of the

3    office assets in an amount not to exceed $50 thousand, and

4    amounts necessary to satisfy other arrearages in an amount

5    not to exceed an additional $50 thousand.  Take an assignment

6    of and assume all liabilities under the office leases that

7    are not excluded leases, and pay the Debtors an amount equal

8    to the security deposits, if any, held by landlords in

9    connection with the office leases that are not excluded

10   leases.  Less any charges made or claims by retained by the

11   landlords with regard to their security deposit relating to

12   the Debtors occupancy.  And any amounts paid by Indymac to

13   the landlords to cure any of the Debtors' defaults or other

14   obligations with respect to the office leases.  Under the

15   letter agreement, with certain limitations, Indymac was

16   entitled to add or exclude offices.  The original list of

17   offices filed with the motion was approximately 70 offices,

18   and after certain additions and exclusions, the current list

19   that the Debtors seek approval for today is approximately 98

20   offices.  Given the increase of the offices under the letter

21   agreement, the cash payment shall increase by an amount equal

22   to 60% of AHM's book value of the FF&E, for FF&E not paid for

23   at a 60% of book value rate.  As part of the cash payment.

24   Subject to the payment of any cure amounts and other claims

25   with respect to the office leases from the cash payment, the

1   office assets shall be transferred to Indymac free and clear

2   of any claims, arrearages, and encumbrances.  Indymac's offer

3   to acquire the office assets is contingent upon approval by

4   the Bankruptcy Court of a sale and assignment of the office

5   assets that permits Indymac to assume office leases for not

6   less than 75% of the offices, after exclusion of excluded

7   leases.  The Debtors have agreed to represent on the record,

8   have agreed with Indymac to represent on the record that

9   Indymac is not taking an assignment of, and the Debtors are

10  not assuming at this time, any equipment leases for equipment

11  at the office locations assigned to Indymac under the letter

12  agreement.  The Debtors believe that they own substantially

13  all of the furniture and non-leased equipment that was

14  located at the office locations as of August 7th, 2007, and

15  are selling such assets to Indymac under the terms of the

16  letter agreement.  The Debtors will use their reasonable best

17  efforts to file motions to assume and assign these equipment

18  leases, to reject or abandon them, or to otherwise remove

19  them from these office locations into a central location

20  prior to the closing of any sale with respect to these office

21  assets.  In addition, the sale motion provided a bid deadline

22  of August 21st, with an auction to be set for August 23rd.  The

23  Debtors did not receive any bids with respect to the, any

24  competing bids with respect to the office assets.  There were

25  certain expressions of interest with regard to some of the

1    offices that are proposed to be assumed and assigned, and

2    with respect to the sale, to be heard today.  None of those

3    expressions of interest turned into bids, and they weren't in

4    the, the, they weren't anywhere near the volume of leases

5    that Indymac, that are proposed under the Indymac letter

6    agreement.  The sale motion provides for cure notice

7    procedures whereby the Debtor shall serve cure notices within

8    two business days following the approval, and cure notice

9    parties are required to respond by September 7th, 2007.

10   Subject to a reconciliation, the Debtors believe that the

11   value of the sale, with the additional leases added, is in

12   excess of $3 million, which includes the $2.5 million

13   original cash payment, the value of security deposits, the

14   value of additional branch offices added, the value of the

15   assumed liabilities, minus removed branches and the Debtors'

16   cure obligations.  In addition, the Debtors anticipate a

17   reduction to unsecured rejection damages claims up to $5.7

18   million with respect to these assumptions.  Your Honor, with

19   respect to the license agreement, the material terms are that

20   the Debtor has granted Indymac a license to use the office

21   space, and all furniture, fixtures, and equipment located

22   within the office space, including utilities, telephone, and

23   internet service supplied to such office space, and all other

24   items owned, rented, leased, and otherwise controlled by the

25   licensor at the office locations.  The term of the license

1   commences as of the date that Indymac obtains access to the

2   premise and continues until terminated by either party on 15

3   days, business day notice.  During the term Indymac is

4   required to pay the Debtors a license fee equal to the

5   monthly rental amount, including operating expenses,

6   utilities, taxes, and certain other items.  In addition,

7   Indymac is required to pay the Debtors a fee of $25 thousand,

8   which will pay for up to four employees of the Debtors to

9   deal with some of the administrative expenses related to the

10  licensing arrangement.  The parties have further stipulated

11  that at close, at the closing of the sale and assignment of

12  the office assets, the cash payment shall be reduced or

13  increased to an, to the extent payments made by Indymac under

14  the license, based on estimated obligations of the Debtors to

15  third party vendors, were in excess of or lower than the

16  amount of actual paid invoices, the Debtors have requested

17  that the license payments be made based on the Debtors' good

18  faith estimate, and Indymac has agreed to accommodate this

19  request.  Your Honor, the Debtors have been in discussions

20  with the SEC over the past weeks, as well as the US Trustee,

21  with regard to certain confidential information that's

22  contained in these office spaces.  The Debtors have agreed to

23  use their best efforts to remove, before the effective date,

24  any and all consumer confidential information at any of the

25  premises, including, without limitation, any and all customer

1    loan profiles, and Indymac has agreed to use its best efforts

2    to package and deliver to the Debtors any consumer

3    confidential information that it discovers remaining at the

4    premises on or after the effective date.  In addition,

5    persons with access to the premises were given the following

6    notice: All persons or parties who have access to the former

7    AHM computers or information are hereby directed to preserve

8    all records formerly associated with AHM, including but not

9    limited to work papers, notes, emails, reports, files, loan

10   documents, computers, hard drives, and all other material,

11   all other such material must be maintained.  Under no

12   circumstances should any such materials be deleted or

13   destroyed.  Failure to comply may be a violation of Federal

14   or local law.  Finally, both parties agreed to certain

15   limited indemnifications under the agreement.  Your Honor, if

16   it's acceptable, I would like to proceed by proffer.  Mr.

17   John Nelligan, who is a principle at Milestone, is available

18   in the courtroom for cross examination.

19          THE COURT: Is there any objection to the use of a

20   proffer?

21          MR. INDELICATO: On behalf of the Committee, no,

22   Your Honor.

23          THE COURT: All right.

24          MR. McMAHON: Same for the US Trustee, Your Honor.

25          THE COURT: All right.  You may proceed.

1          MR. BEACH: Thank you, Your Honor.  If called to

2     testify, Mr. Nelligan would testify that he is the principle

3     of Milestone Advisors, LLC.  Prior to founding Milestone, Mr.

4     Nelligan was a Senior Vice President in the financial

5     services group of Friedman, Billings, Ramsey & Company, Inc.,

6     focused on M&A and management led buyout transactions.  Prior

7     to joining FBR, Mr. Nelligan was an associate of Hobbs

8     Financial, Inc., a privately held investment bank focused

9     primarily on private equity investments and M&A transactions

10    within the financial services sector.  He received a Bachelor

11    of Science from the University of Vermont with a

12    concentration in finance.  The Debtors have sought Court

13    authority to formally retain Milestone as their investment

14    banker and financial advisor to assist in their restructuring

15    and sale efforts.  In that capacity, Mr. Nelligan has

16    primarily, primary responsibility for the marketing and sale

17    of the Debtors businesses.  Mr. Nelligan would further

18    testify that on July 27th, 2007, the Debtors approached

19    Indymac bank to discuss an assignment of certain of the

20    Debtors' office leases and the sale of FF&E located therein.

21    Both before and after contacting Indymac, the Debtors engaged

22    in a due diligence inquiry regarding Indymac.  Following the

23    due diligence, on August 7th, 2007, the Debtors entered into a

24    license agreement with Indymac for the right to use the

25    office space and all furniture, fixture, and equipment

 1    located within such office space at certain of the Debtors'

 2    real property lease locations.  Indymac agreed to pay the

 3    expenses in accordance with the license agreement, and

 4    certain other amounts, to the Debtors.  Contemporaneously

 5    therewith, the Debtors agreed to assume and assign the leases

 6    and sell the FF&E therein to Indymac or a higher or better

 7    bidder, pursuant to the terms of a letter agreement dated

 8    August 7th, 2007.  The license agreement and the letter

 9    agreement were heavily vetted with Indymac, and were the

10    product of good faith, arm's length negotiations.  Both

11    parties were represented by outside counsel.  Furthermore,

12    Indymac is not an insider, or otherwise affiliated with the

13    Debtors.  Mr. Nelligan would further testify that on August

14    10th, 2007, the Debtors filed a motion to approve the license

15    agreement, and contemporaneously therewith, a motion to

16    approve the assumption of certain real property leases, lease

17    locations, and the FF&E therein to Indymac, or the highest

18    and best bidder, pursuant to the terms of the letter

19    agreement.  He would testify that the sale motion contained

20    bidding procedures in the event interested parties wished to

21    submit competing bids for, for these assets.  He would

22    testify that he is familiar with the bidding procedures

23    related to the proposed sale, and the various dates set forth

24    therein.  The bid deadline of August 21st and auction date of

25    August 23rd allowed sufficient time to conduct a fair an open

1    sale process.  He would further testify that the bidding

2    procedures do not contain bid protections in the form of a

3    breakup fee, expense reimbursement, or any significant

4    overbid.  The letter agreement, as executed by Indymac,

5    served as a template for other potential purchasers to use as

6    a model if they wished to bid on the assets.  The sale motion

7    and related bidding procedures were served via overnight mail

8    on interested parties, including the landlords at the lease

9    locations, to provide as much notice as was practicable under

10   the circumstances.  In addition, a list of potential

11   purchasers identified by Milestone were contacted via

12   telephone to asses their interest in the office assets.

13   While the Debtors did receive inquiries regarding small

14   portions of the office assets, the Debtors did not receive

15   any qualified bids for the office assets as a whole.  And

16   despite the fact that no qualified bids were received, Mr.

17   Nelligan would state that the bidding procedures did not

18   shield bidding by other prospective purchasers.  The bidding

19   procedures were fair and reasonable, and were tailored in

20   such a way to foster an open and competitive bidding process

21   that would ensure the maximum benefit to the Debtors'

22   bankruptcy estates.  With respect to the proposed sale, Mr.

23   Nelligan would testify that the Debtors engaged in good

24   faith, arm's length negotiations with Indymac.  In his

25   business judgment, the sale to Indymac offered the highest

1  value to the Debtors' estates, provided a strong baseline for

2  which to conduct an auction, and represented the highest

3  certainty of closing, and therefore was the most practical

4  transaction to implement expeditiously.  If the sale is not

5  approved, as no other party has submitted a qualified bid for

6  the assets, there is no assurance that any other party will

7  make any purchase offer.  Indymac is not affiliated with,

8  does not own an interest in, and is not related in any way to

9  the Debtors, and is not an insider of the Debtors as the term

10  is defined in the Bankruptcy Code.  Approval of the proposed

11  sale is in the best interest of the Debtors and their

12  creditors.  And that would conclude the proffer of Mr.

13  Nelligan.

14       THE COURT: Does anyone wish to cross examine the

15  witness?  All right.  Hearing none, the Court will accept the

16  testimony.

17       MR. BEACH: Thank you, Your Honor.  What I would

18  like to do now is we also have a witness from Indymac.  Mr.

19  Greg Garrabrants, and I'd like to let Mr. Hehn proceed with

20  that testimony, Your Honor.

21       THE COURT: All right.  Mr. Hehn.

22       MR. HEHN: Good afternoon, Your Honor.  Curtis Hehn

23  from the law firm of Pachulski, Stang, Ziehl, Young, Jones, &

24  Weintraub on behalf of Indymac Bank.  Your Honor, in the

25  courtroom is Greg Garrabrants.  He's the Senior Vice

1    President of Indymac Bank.  We would propose to proffer his

2    testimony with respect to adequate assurance of future

3    performance upon the part of Indymac if that is acceptable to

4    the Court.

5         THE COURT: Any objection?  Mr. Lastowski.  Hang on.

6    Mr. Lastowski has a comment.

7         MR. LASTOWSKI: Just, Your Honor, before I say

8    anything, I just want to have a clarification from Debtors'

9    counsel.  We had filed an objection to this motion on behalf

10   of STWB, Inc.  And I was told this morning that they were

11   going to be carved out of the sale.  And if that's the case

12   - -

13        THE COURT: Mr. Beach?

14        MR. BEACH: Your Honor, I believe STWB, if that's

15   the correct initials, filed an objection to the sale

16   procedures motion.  And not the - -

17        THE COURT: You may have the wrong motion, Mr.

18   Lastowski.

19        MR. LASTOWSKI: Sorry, Your Honor.

20        THE COURT: It's all right.  You're thinking of the

21   REO motion.  I expect.  Right.  Any objection to the use of a

22   proffer?  You may proceed.

23        MR. HEHN: Thank you, Your Honor.

24        UNIDENTIFIED SPEAKER: Your Honor?

25        THE COURT: Yes.

1          UNIDENTIFIED SPEAKER: Will we still have the chance

2     to cross examine after he's done?

3          THE COURT: Well, yes.  Obviously.  It's to whether

4     we're going to do direct or proffer.  Go ahead.  Mr. Hehn.

5          MR. HEHN: Your Honor, Mr. Garrabrants is the Senior

6     Vice President, and head of Mergers and Acquisitions for

7     Indymac Bank.  He's served in this position for the last year

8     and a half, approximately.  Before then, Mr. Garrabrants was

9     an investment banker at Goldman Sachs for approximately two

10    years, and before then he worked at Mackenzie & Company in

11    corporate finance for approximately four years.  With respect

12    to Indymac's ability to perform on the assumed and assigned

13    leases, Your Honor, Indymac, Indymac Bank does have the

14    financial wherewithal to meet all of those commitments.

15    Indymac is the 7th largest savings and loan in the nation.

16    Excuse me.  Mr. Garrabrants would testify under oath, that

17    Indymac is the 7th largest savings and loan in the nation, and

18    a principle subsidiary of Indymac BanCorp Inc.  As of June

19    30th, 2007, Indymac had approximately 30 billion in assets and

20    3.5 billion of total operating liquidity.  Indymac is

21    investment grade rated by all four rating agencies, with only

22    1% of assets considered non-investment grade, residual

23    securities.  Indymac is specifically in the same business as

24    the Debtors.  Home mortgage products that they produce are

25    primarily single family, first lien mortgages, 90% of which

1    are salable to Fannie May, Freddie Mac, or Ginnie Mae.

2    Indymac does not offer any sub-prime loans which are not

3    saleable to those entities.  Also Indymac is not dependent

4    upon financing from Wall Street.  So it does have the ability

5    to meet its financial obligations under the leases.  In

6    addition, Your Honor, to the extent that any of these leases

7    are shopping center leases, it is going to be the same type

8    of use that Indymac is going to carry on at the premises, as

9    the Debtors were carrying on.  Mr. Garrabrants is available

10    for cross examination, to the extent anybody wishes to cross

11    examine him.  And it's certainly the Debtors' intention to

12    comply, or Indymac's intention to comply with all of the

13    lease obligations for the leases that they're assuming.

14         THE COURT: All right.  Does anyone wish to cross

15    examine the witness?

16         MR. LEMISCH: Your Honor, Ray Lemisch, Benesch

17    Friedlander representing DDR.  I don't say I have to cross

18    examine - - I don't, I'm not cross examining him about the

19    ability to pay.  I'm just curious about exactly what the

20    transaction is.  So.  With the assumption of the leases.  I'm

21    not quite sure I understand what is being assumed, and what

22    is not being assumed.  I don't know if he's the proper party

23    to answer that question or not.  Or those questions.

24         THE COURT: Mr. Hehn.  I assume he knows what he's

25    buying.

1          MR. HEHN: I was just going to say, I'm not sure I

2    understand the question.  There's 98 leases that are going to

3    be assumed and assigned to Indymac, along with the FF&E

4    that's going to be purchased as part of the transaction.

5    Which does not include leased equipment.  Beyond that, I'm

6    not sure what to provide in way of an adequate response.

7          MR. LEMISCH: It's not specifically to my client's

8    lease, per say.  But conceptually, what types of liabilities?

9    I'm not sure whether they're assuming historic liabilities,

10   or are you just taking over the leases going forward, and all

11   of the arrearages are coming out of a $50 thousand pool, or

12   something like that.

13         THE COURT: What historical liabilities?  In

14   connection with - -

15         MR. HEHN: Well, Your Honor - -

16         THE COURT:  - - the lease payments?

17         MR. LEMISCH: No.  There's more than that.  There

18   could be cam charges, year end true-ups, indemnification

19   issues that the Debtor is currently liable for.

20         THE COURT: Under the terms of the lease.

21         MR. LEMISCH: Correct.

22         THE COURT: Mr. Hehn, you're taking the lease,

23   right?

24         MR. HEHN: Leases are assumed coup monare(phonetic).

25   We're taking all of it.  I think the confusion may be the

1    result of a provision in the letter agreement where there is

2    the ability to have a true-up between the Debtors and Indymac

3    with respect to the terms thereof.  But as far as landlords

4    go, the obligations are being assumed.  They're going to have

5    to be cured.

6            THE COURT: Who has the cure obligation?

7            MR. BEACH: Your Honor, Indymac has cure obligations

8    with respect to arrearages up to a hundred thousand dollars

9    in the aggregate.  The Debtors have cure obligations beyond

10   that with respect to the leases.  We are, we do have a cure

11   notice period, as I referenced earlier.  We are to serve

12   that, those cure notices out within two business days, and

13   parties have until September 7th, under our proposed notice

14   period, to object to that.

15           THE COURT: All right.  Mr. Lemisch.

16           MR. LEMISCH: Your Honor - -

17           THE COURT: So they're, they're - -

18           MR. BEACH:  So that's - -

19           THE COURT: The first hundred thousand dollars gets

20   paid by the acquirer, and everything else goes through the

21   Debtor.  And you have until the date identified to object.

22           MR. LEMISCH: And do we, how do we know that the

23   Debtor has sufficient funds to make payment of all the cure

24   amounts?

25           THE COURT: They have a - - help me out, Ms. Morgan

1    - - $56 million untapped DIP loan?

2            MS. MORGAN: Fifty million, Your Honor.

3            THE COURT: Yeah.

4            MR. LEMISCH: Okay.

5            THE COURT: But you're no better, you're no better

6    off one way or the other.  I mean - -

7            MR. LEMISCH: Well, I'm probably better off if I

8    have the acquirer, who has, you know, investment grade

9    securities, assume all the obligations.  Including all the

10   pre-petition obligations.  I personally think I'm better off

11   that way.  But - -

12           THE COURT: Well, yeah.  Okay.  I, my point was, I

13   suppose, the status quo versus, versus the assumption.  But,

14   no, I understand your point.  You're certainly better off

15   with the acquirer assuming all the liability.

16           MR. LEMISCH: Right.  And with the - -

17           THE COURT: But I think the testimony is, and this

18   is, we're getting into argument at this point.  The facts are

19   that the Debtor is obligated for all cure in excess of a

20   hundred thousand dollars.

21           MR. LEMISCH: And the representation is there's $50

22   million of free money that's available to pay these cures,

23   among other things.

24           THE COURT: Well, now we're going to get Ms.

25   Silverstein up.  Oh, no.  I'm sorry.  She's Bank of America.

1   I apologize.  The DIP lender isn't going to cal the money

2   free.  My point was that, I mean, Ms. Morgan help me out.  I

3   mean, there's, I'm trying to remember the last hearing.  How

4   much cash did you say you had?

5           MS. MORGAN: Your Honor, I don't know how much cash

6   we have at this moment.  Going into the bankruptcy, we had

7   approximately, I believe 22 million.

8           THE COURT: 22, 23 million.

9           MS. MORGAN: Yes.

10          THE COURT: Plus you haven't tapped the DIP line

11  yet.

12          MS. MORGAN: That's correct, Your Honor.

13          THE COURT: Now the DIP loan is subject to a budget.

14          MS. MORGAN: That's correct, Your Honor.

15          THE COURT: So.

16          MR. LEMISCH: Okay.  Thank you, Your Honor.

17          THE COURT: You're welcome.  Anyone want to cross

18  examine the witness?  There's a gentleman in the back there I

19  don't recognize.

20          MR. YODER: Your Honor, may it please the Court.

21  James Yoder on behalf of American Commercial Realty, Inc.

22  And I do have one question.

23          THE COURT: Okay.  Mr. Hehn, will you have your

24  witness take the stand?

25          **GREG GARRABRANTS, INDYMAC'S WITNESS, SWORN**

1          THE COURT: You may proceed, Mr. Yoder.

2                    CROSS EXAMINATION

3    BY MR. YODER:

4    Q.   Good afternoon, sir.  Perhaps to, I'd like to put my

5    question in context first by explaining who my client is.  I

6    represent American Commercial Realty, Incorporated, and they

7    own a shopping center in Miami, Florida that's, the lease

8    with the Debtor is on the additional lease list.  Okay?  And

9    I appreciate that on the direct proffer counsel indicated

10   that Indymac will be abiding by the use, will be in the same

11   use of the leases that the Debtor has formerly has.  I take

12   that to mean mortgage, the mortgage business.  Correct?

13   A.   Correct.

14   Q.   And to the extent that there are other types of banking

15   services rendered by Indymac, they will not be rendered in a

16   shopping center that has a use restriction because there's

17   already a bank in the shopping center?

18   A.   That's correct.

19   Q.   Okay.  All right.  I just wanted to make sure there was

20   a negative aspect to the use restrictions.  Okay.  Thanks.

21          THE COURT: Any further questions.  Hearing none,

22   you may step down, sir.  Or, unless there is redirect, Mr.

23   Hehn.  I'm sorry.  All right.  You may step down.

24          MR. HEHN: No redirect, Your Honor.  Thank you.

25          THE COURT: Any further evidence?

1          MR. BEACH:  Your Honor, I'll only note that we also

2    filed a declaration of Kevin Neistram(phonetic) from Krall

3    Zocco Cooper(phonetic) this morning in support of business

4    judgment.  We haven't had any objection in that regard, but

5    out of an abundance of caution I filed the declaration to

6    support that.

7          THE COURT: And so you'd like to have that admitted

8    into evidence?  Any - -

9          MR. BEACH: I would, Your Honor.

10          THE COURT:  - - opposition to admission of the

11    declaration into evidence?  In support of the motion.  All

12    right.  Hearing none, it's admitted without objection.

13          MR. BEACH: Thank you, Your Honor.

14          THE COURT: Any other evidence by any party?  None?

15    All right.  That will close the evidence, then.

16          MR. BEACH: Thank you, Your Honor.  Next I'd like to

17    address the objections we received.  With respect to the

18    license agreement, there was an objection by DDR Southwest

19    Fountains, LLC, *et al.*  Only one of the three leases with

20    regard to that objection, namely the Plantation, Florida

21    location, is related to the Indymac sale and license motions.

22    DDR has indicated that if testimony is provided to show

23    adequate assurance of future performance, and if Indymac

24    represents that it will abide by the lease terms, I believe

25    that went to the gentleman's - -

1        THE COURT: Mr. Lemisch are you satisfied?

2        MR. BEACH:  Your Honor, I will note one other

3   thing.  And that is that most of the August rent has been

4   paid.  Other of the August rent and other obligations are

5   being, payments are being provided by Indymac under the

6   license agreement, and we're required to pay those over to

7   satisfy the outstanding obligations.  In addition to that,

8   Your Honor, we do have the $50 million DIP, we'll have the

9   proceeds from the sale, and I think there's sufficient

10  evidence on the record that we can satisfy this cure

11  obligation.

12       THE COURT: Well, let's let Mr. Lemisch speak.

13       MR. LEMISCH: Your Honor, I, after hearing the

14  testimony, I think we, we're satisfied with Indymac's ability

15  to perform.  My, most of my concern was really directed at

16  what would happen with arrearages that hadn't been

17  ascertained, and whether there was sufficient funds.  And

18  with the representations made from Debtors' counsel, I'm

19  assuming there's no restriction on the amount of the Debtors'

20  funds, either in cash or under the line, that would be

21  allowable to be used for curing.  So that that sounds like

22  plenty of money with only a hundred leases that they're

23  talking about.

24       THE COURT: Well, I'm sure there are limitations,

25  but the question is whether there, there's enough to pay the

1    arrearages.  I can't imagine, for example, let's be specific

2    with your, your lease that's subject here.  They're in

3    arrears for probably what?  One month's rent, and then - -

4              MR. LEMISCH: Yeah.  The amount - -

5              THE COURT:  - - true-ups on cam, insurance, and

6    real estate, right?

7              MR. LEMISCH: And potential indemnification claims

8    which are unknown at this point.  I don't know that there are

9    any issues that are outstanding regarding that.

10             THE COURT: All right.

11             MR. LEMISCH: But there is some sort of vague

12    liabilities out there.  I also note that, in the testimony

13    it's clear that the, any equipment leases are not being

14    assumed or assigned or rejected at this moment.  So I guess,

15    I'm just assuming as a landlord that to the extent that any

16    of the equipment leases are rejected, we're not going to be

17    responsible for dealing with any of that.  That Indymac, for

18    instance, in this case, with my one client, would then have

19    to deal with the equipment in place, and things like that, as

20    the tenant.  Even though it's not their equipment.  Or

21    they'll coordinate with the Debtor.  I, we just don't want

22    things left in our property or not taken care of in some

23    fashion.  So.

24             THE COURT: Well, the terms of the lease are what

25    they are, and I'm sure they don't, I'm sure they provide that

1    they can't just throw stuff out in the parking lot.  And if

2    they do, you'll have a claim against the assignee of the

3    lease.  Who's more liquid than the assignor.

4             MR. LEMISCH: That's fine with me, Your Honor.

5             THE COURT: All right.  So consider that resolved.

6             MR. BEACH: Your Honor, the only other objection to

7    the license motion was by Waldner's Business Environments,

8    Inc., Docket No. 271.  I've agreed with Waldner's to put a

9    representation on the record indicating that my client has

10   informed me that the furniture that Waldner's claims a

11   reclamation right to is either in Melville, New York and/or

12   in a Waldner's warehouse, and not subject to sale or

13   abandonment under any of the motions up for consideration

14   today.

15            THE COURT: Very well.

16            MR. BEACH: That includes the sale motion as well as

17   the sale procedures motion that I'll address next on the

18   agenda.

19            THE COURT: All right.

20            MR. BEACH: The objections with respect to the sale

21   motion were an objection by DDR, which I presume is resolved

22   as well.

23            THE COURT: Sounds like it is, yes.

24            MR. BEACH: Then - -

25            THE COURT: And Waldner's.

1          MR. BEACH: And Waldner's as well.  Indian Valley

2     Properties.  That was listed as an objection to the sale

3     motion, Your Honor.  It should have been listed as an

4     objection to the sale procedures motion, which is the next

5     docket, next agenda item.

6          THE COURT: All right.  American Commercial Realty.

7     That was the letter?  Is that correct?

8          MR. BEACH: Yes, Your Honor.  That was, I believe an

9     informal objection that was filed, contending that notice was

10    inadequate, and that they wanted to bid on the lease for

11    Miami, for the Miami, Florida location.

12         THE COURT: Is that resolved?  Mr. Yoder is that

13    resolved?

14         MR. YODER: Yes it is, Your Honor.

15         THE COURT: He's indicating it is.  All right.

16         MR. BEACH: Thank you, Your Honor.

17         THE COURT: And that leaves De Lage, or De Loge?

18         MR. BEACH: I call it De Lage Landen Financial.  But

19    I don't know what the appropriate pronunciation is.  I think

20    it's - -

21         THE COURT: I think the appropriate pronunciation is

22    going to be DLL.

23         MR. BEACH: That works for me, Your Honor.  Your

24    Honor, I believe the DLL objection with respect to the

25    Indymac sale motion is resolved.  I made representations to

1     the, to DLL's counsel that we will not be seeking to assume

2     and assign or reject those copier leases in connection with

3     this sale.  And they won't be assumed and assigned to

4     Indymac.

5              THE COURT: Okay.

6              MR. BEACH: I believe counsel is here.

7              THE COURT: All right.  Mr. Lastowski.

8              MR. LASTOWSKI: Mr. Beach has correctly

9     characterized our dialog.  I would just note that the

10    proposed order that was filed with the motion defines office

11    assets fairly broadly, as all FF&E.  And I'd like to see a

12    copy of the order that's actually signed and entered, before

13    it it signed and entered, to be sure that it explicitly

14    excludes the, our client's rented equipment.

15             THE COURT: All right.

16             MR. LASTOWSKI: And the only other statement I have,

17    it's really a, maybe more of a question.  Is that as part of

18    the presentation, it was stated that the leases are being

19    assumed and assigned.  That there is some leased equipment at

20    these premises.  And that there was an understanding that the

21    Debtors would file motions to either assume and assign those

22    leases, or reject and abandon, I think the expression was

23    forthwith or prior to closing.  And I was wondering if we

24    could have some clarification as to whether the motions would

25    be filed in such a manner that orders would be entered on

1    those motions prior to closing so that the lessors could come

2    in before the premises are actually transferred to retrieve

3    their equipment.

4         MR. BEACH: Your Honor, we have not filed those

5    motions.  We believe we need to move quickly to determine

6    whether or not we want to reject, assume and assign, or move

7    the equipment.  Given the accrual of administrative expenses,

8    the Debtors are considering their options now and hope to,

9    you know, have a motion on file that resolves these items.

10   But Your Honor, there - -

11        THE COURT: Let's - - I think I'll get to Mr., I

12   think the point of Mr. Lastowski's question is if he's got a

13   problem getting his, with what's going on, and it's post-

14   closing, where does he go to get it resolved?  Is that what

15   you're getting at Mr. Lastowski?

16        MR. LASTOWSKI: That is correct, Your Honor.

17        THE COURT: Yeah.  You can come back here.  And

18   we'll deal with it.  So, Indymac, you know, you can explain

19   to me if Mr. Lastowski has a problem.

20        MR. HEHN: If there's any problems, call Indymac.

21   We'll obviously work with whoever the lessors are to

22   facilitate whatever needs to be done.

23        THE COURT: Right.  Okay.  You got an order?

24        MR. BEACH: Yes I do, Your Honor.  There are a

25   couple of changes at the request of the Office of the United

1    States Trustee.  May I approach?

2            THE COURT: Yup.  This is number two?

3            MR. BEACH: That's number two, Your Honor.  And if I

4    may just walk through the black line, then I'll hand you

5    clean copies of, of both of those items.

6            THE COURT: All right.

7            MR. BEACH: Your Honor, the first change was to

8    paragraph (i).  The addition is to state that in connection

9    with the motion, the Debtors have represented to this Court

10   that they are not seeking to sell or lease personally

11   identifiable information or interest in consumer credit

12   contracts.  The Debtors are not seeking to sell personally

13   identifiable information.  The Debtors are currently working

14   with the SEC with respect to the sale of computers which may

15   contain some personally identifiable information, but we are

16   not selling any of that information for profit in connection

17   with this sale.  There's a clarification from the, at the

18   request of the DIP lenders in paragraph 4.

19           THE COURT: Um-hum.

20           MR. BEACH: That liens attach to proceeds.

21           THE COURT: Where's the carve-out from the

22   definition of office assets to exclude the leased equipment?

23           MR. BEACH: Your Honor, we didn't even ask for that

24   relief in the motion.  I, you know, this is the first I heard

25   that they, that they wanted a carve-out in the order.  I'm

1  happy to provide that in the order.

2       THE COURT: Well you told me you were, you told me

3  you weren't assuming and assigning the leases.

4       MR. BEACH: The equipment leases.  That's right,

5  Your Honor.

6       THE COURT: It says authorizing the sale of certain

7  assets on page 1 of the order.  Which it defines as office

8  assets.  And there's no limitation as to what that means.

9  And then you go back and in paragraph 2 it says, Sell,

10  transfer, and convey the office assets to IMB.  What's the,

11  how do I know what an office asset is?

12       MR. BEACH: It probably should have referred to the

13  definition in the motion, Your Honor.  We can make a change

14  that will clarify that and submit it under certification of

15  counsel if that's acceptable to Your Honor.

16       THE COURT: Yeah.  Let's get a little more

17  specificity on that.

18       MR. BEACH: Yes, Your Honor.  The other changes to

19  the motion are in paragraph 11, with respect to certain

20  requested language from Indymac.  I believe Indymac has no

21  objection to those changes.

22       THE COURT: Okay.  All right.  Subject to a narrower

23  definition of office assets in the order to make it clearer

24  that it's limited to the FF&E related to the office leases,

25  and it excludes any leased equipment, or any other equipment

1    you've agreed to exclude, I'll approve the order upon

2    submission.

3           MR. BEACH: Thank you, Your Honor.  With respect to

4    the license agreement order, there have been no changes.  May

5    I - -

6           THE COURT: Yes.

7           MR. BEACH:  - - approach with that?

8           THE COURT: You may approach.  If you want that sale

9    order today, I have got to leave at 4:30.  So.

10          MR. BEACH: Thank you, Your Honor.

11          THE COURT: All right.  I've approved the order for

12   that, that you submitted in connection with the license

13   agreement, and I'll await an order on the sale agreement

14   under certification of counsel.

15          MR. BEACH: Your Honor, the next item on the agenda

16   today is a motion to establish procedures with respect to the

17   assumption and assignment of office leases and other

18   executory contracts, and the, approve the procedures with

19   respect to the sale and abandonment of furniture, fixtures,

20   and equipment pursuant to §§105, 363, 365, and 554 of the

21   Bankruptcy Code.  Your Honor, the motion was filed on August

22   15th, 2007 with a corrected exhibit filed the following day at

23   Docket Nos. 183 and 190.  The motion and corrected exhibit

24   were served on the day they were filed on the US Trustee, the

25   SEC, and Debtors 40 largest unsecured creditors, all parties

1    who have requested notice pursuant to Rule 2002, Bank of

2    America, the DIP lender, and the landlords to the office

3    leases, and potential bidders.  The Court entered an order

4    approving the shortened notice period with respect to this

5    motion, and the Debtors submit that adequate and sufficient

6    notice has been provided under the circumstances.  Your

7    Honor, the statements made with respect to the previous

8    motions in regard to the vacant office leases and our need to

9    try to, to assign these office leases and obtain value for

10   the FF&E in the short term, so as not to accrue unnecessary

11   administrative expenses, is the same rationale for setting up

12   these procedures with respect to these assumption and

13   assignments and sales.  The value of the office leases

14   diminish as the length of time they remain empty increases,

15   given that prospective buyers will most likely be interested

16   in rehiring the Debtors' former employees in these branch

17   offices to conduct business similar to the way Indymac, to

18   the Indymac sale worked.  Failure to expeditiously sell the

19   office assets could also result in excessive administrative

20   burdens, as post-petition monthly rent becomes due.

21   Accordingly the costs and delays associated with seeking

22   Court approval of each individual sale could substantially

23   undermine the economic benefits of the transaction.  Your

24   Honor, with respect to the procedures, I think it might be

25   helpful if I approach with a black line.

1          THE COURT: Okay.

2          MR. BEACH: There have been a number of requested

3   changes from the Office of the United States Trustee, and it

4   might be easier to walk through them that way.

5          THE COURT: Okay.  Thank you.

6          MR. BEACH: Your Honor, the procedures start on the

7   third page of the order on the last so ordered paragraph.

8   And the Debtors have established a cap that the, with respect

9   to the sale of the office assets related to any individual

10  production office of a value of $100 thousand to any single

11  buyer, or group of related buyers.  That are not insiders.

12  The Debtors propose to send a notice out seven days prior to

13  any closing of the sale.  And the sale notice parties will be

14  served by overnight mail, electronic mail, or facsimile to

15  the extent we have that information.  The Debtors have agreed

16  to email specifically the SEC, and they've provided that

17  information, with respect to the sale notices.  The parties

18  we propose to serve with the sale notice are the United

19  States Trustee, counsel to the Creditors Committee, the

20  landlord or non-debtor party to the office leases to be

21  assigned, counsel to the Debtors' post-petition lenders,

22  counsel to Bank of America, the Securities and Exchange

23  Commission, and any party known to the Debtors to be

24  asserting an interest or lien on any of the office assets to

25  be sold.  The seven business, the seven day notice period

1    will begin on the day following the service of the notice.

2    The content of the sale notice will include, in reasonable

3    detail, the identification of the office assets, including

4    the location of the office leases and FF&E being assumed and

5    assigned or sold, identification of the purchaser of the

6    office assets, proposed cure amount, if any, purchase price,

7    and an estimate of the book value or if that's not available,

8    the fair market value of the goods.  And if a sale agreement

9    has been executed at the time, then we will attach that to

10   the sale notice.  The sale notice party may object to the

11   procedures within five days of service.  If the sale party

12   objects to the proposed sale in accordance with the sale

13   procedures, the Debtors won't take further action unless they

14   resolve that objection with the objecting party, or get a

15   further order from the Court.  The Debtors are requesting,

16   under these procedures, the ability to set any objection to

17   any sale notice up for hearing on five days notice.  At least

18   five days before the next omnibus hearing date.  And we also

19   request that to the extent a purchaser would like an order of

20   the Court, that we be able to submit that order under

21   certification of counsel.  Your Honor, the next paragraph is

22   a substantial change by the United States Trustee which

23   tightens up the abandonment procedures, and sets a cap of $50

24   thousand at any single office site for what the Debtors can

25   abandon.  At any given time.  Would Your Honor like me to

1    read through these changes or - -

2         THE COURT: Nope.  Nope.  I read them.  Anyone wish

3    to be heard in connection with this matter?  Any objections

4    pending?  Mr. Lemisch.  I'll hear from the Committee first.

5         MR. INDELICATO: Your Honor, Mark Indelicato on

6    behalf of the Committee.  Your Honor, I have no objections to

7    the procedures, and on behalf of the Committee we support

8    them.  Although I just make one request of the Debtor.  In

9    the notice that they send out, I would request that they put

10   the date that they expect there would be any objections to be

11   sent to them, and not just five days.  Because, as we've seen

12   in other cases, there may become times when you're getting

13   multiple notices over a short day period, so if you put the

14   actual date in, then parties know when they have to respond.

15   As opposed to trying to gauge when one was served as opposed

16   to another.

17        THE COURT: That's fine.  Make that change.  That's

18   a good change.  Mr. Lemisch.

19        MR. LEMISCH: Thank you, Your Honor.  In lieu of the

20   fact that I'm now aware of the fiscal responsibility of the

21   Debtor, my comments will be limited to timing.  From a

22   landlord's perspective, it seems that five days to react and

23   object doesn't seem like a lot.  Especially since we're

24   talking about a holiday coming up.  They could give these

25   notices on Friday at 4:50, and then you've got, Friday counts

1   as a day, Saturday, Sunday, and Monday holiday weekends, and

2   then all of a sudden on Tuesday, if there's no response, it's

3   all done.  And I think that that's, from a landlord

4   perspective, it's just, that's, doesn't seem quite fair.

5           THE COURT: Well, maybe I'm naive.  I assume that

6   these were all business days.

7           MR. LEMISCH: No, they're not, Your Honor.  It's

8   five days.

9           THE COURT: Well - -

10          MR. BEACH: Your Honor, we - -

11          THE COURT:  - - any day less than eight that

12  doesn't say it's a business, a calendar day is, as far as I'm

13  concerned a business day.  So you need to, just for general

14  purposes.  But why don't you respond to the comment.

15          MR. BEACH: Your Honor, this is also a discussion

16  that I had with the United States Trustee.  And this is a

17  situation, Your Honor, where we are in a position where most

18  of this needs to happen by the end of August, which as we're

19  all well aware of, is coming up quickly.  And to the extent

20  that we're not able to get a number of these sales done by

21  the end of August, we believe that they may fall through,

22  either because a purchaser will back out of the transactions

23  - - and Your Honor, I'll submit that we have approximately 42

24  transactions in the pipeline so far, which will add

25  substantial value to the Debtors estates, and cash payments,

1   assumption of liabilities, and reduction of rejection

2   damages.  And - -

3          THE COURT: How are you providing the notice?

4   FedEx, or - -

5          MR. BEACH: We're providing it by FedEx and, if we

6   have information, email and fax to any party that provides us

7   with that information.

8          THE COURT: And if you know that they're represented

9   by counsel, that the notices also go to counsel.

10          MR. BEACH: Absolutely, Your Honor.

11          THE COURT: All right.  Mr. Lemisch.

12          MR. LEMISCH: I understand the Debtors' position,

13   Your Honor, I just, I feel that it's just putting an undue

14   burden on all the landlords.  I mean, what they've said is

15   pretty clear.  That they're going to be sending out notices,

16   and it's, it's likely that they'll be sending out notices

17   Friday of Labor Day weekend.  And then on Tuesday they're

18   going to confirm sales.  Or Wednesday morning at 12:01 a.m.

19   Whatever their timing is.  It just - - and what you're

20   expecting the landlords to do to react, decide whether the

21   purchasing party is a viable entity, whether the cure amount

22   is an accurate amount.  My view is if the landlords actually

23   get notices, it's going to create a stream of objections, and

24   then create a bunch of hearings unnecessarily.

25          MR. BEACH: Your Honor, I may have a resolution to

1   this.  With regard to Mr. Lemisch's clients, we've agreed to

2   remove them from this procedures order.

3              MR. LEMISCH: That works.

4              THE COURT: Okay.

5              MR. LEMISCH: Just so that includes the abandonment

6   part, so that's going to be a separate issue that we'll have

7   to deal with.  If they want to abandon stuff in our store,

8   we'll have to have separate discussions.

9              MR. BEACH: Correct, Your Honor.

10             THE COURT: All right.

11             MR. LEMISCH: Thank you, Your Honor.

12             THE COURT: You're welcome.  Mr. Lastowski.

13             MR. BEACH:  Your Honor, we've also made the same

14   concession with regard to STWB, and we are, we have agreed to

15   remove that from this order as well.

16             THE COURT: All right.  Anyone else?

17             MR. FOLDS(Telephonic): Your Honor, I'm on the

18   phone.  This is David Folds from the firm DLA Piper.  Our

19   firm filed the limited objection which is listed as (e) under

20   the amended docket for this morning under this motion.  We

21   filed a limited objection on behalf of BP Kingstowne Office

22   Building KLP and a separate landlord, the Trustees of Mall

23   Road Trust.  And based on my discussions with counsel last

24   night, it's my understanding that we have also been removed

25   from the request under this procedures order.  I just wanted

1    to confirm that on the record.

2              THE COURT: Mr. Beach.

3              MR. BEACH: That's correct, Your Honor.

4              THE COURT: Okay.

5              MR. FOLDS(Telephonic): Thank you, Your Honor.

6              THE COURT: You're welcome.  Mr. Lastowski, you look

7    like you still have something to say.

8              MR. LASTOWSKI: Yes, Your Honor.  A short bit to

9    say.  I'm here also on behalf of the entity we've referred to

10   as DLL earlier.

11             THE COURT: Right.

12             MR. LASTOWSKI: Your Honor coined the acronym.  We

13   had filed an objection.  We're, again, an equipment lessor,

14   and I should point out to the Court that the procedures don't

15   address equipment leases.  That they address solely

16   assumption and assignment of real estate leases.  And they're

17   silent as to what's going to happen as to office equipment.

18   In dialog with Debtors' counsel, I've been advised that

19   they're going to defer the decision to assume, whether to

20   assume and assign or to reject until after the sales, and

21   perhaps the equipment will be stored off-site somewhere.  But

22   I think I should bring that to the Court's attention.  And

23   also note that there is some ambiguity in the order that's

24   been presented to Your Honor, unless it's been amended,

25   because it does refer to a sale of assets free and clear of

1    all liens, claims, and encumbrances.  Assets is not a defined

2    term.  Office assets is.  Office assets has the definition

3    that we examined earlier in connection with the other motion.

4    And again, the only, an observation I would make is we would

5    like to get in, and get our equipment, and take it back, have

6    the Debtor reject the lease, stop the administrative claims

7    from accruing.  And the sooner we can do that, the better.

8    But there are no provisions in these procedures for that.

9    There are expedited procedures for assuming and assigning

10   real estate leases, but not for any rejection motions if, and

11   motions to abandon.

12           THE COURT: All right.

13           MR. BEACH: Your Honor, if I may make one

14   correction.  We are seeking authority under this sale

15   procedures motion to be able to assume and assign executory

16   contracts, including equipment leases.  We have not sought

17   authority to reject any leases under the sale procedures.  We

18   have no objection to doing that at Mr. Lemisch's request, but

19   it's not relief that we have sought.

20           THE COURT: Well that was Mr. Lastowski.

21           MR. BEACH: I'm sorry.

22           THE COURT: He's the tall one.

23           MR. LASTOWSKI: Well, perhaps there's some ambiguity

24   in the procedures, but I just see references to obtaining

25   approval of an assumption and assignment where a landlord

1    consent is not obtained, and it seems to be, by its language,

2    restricted to, to real estate leases.

3         MR. BEACH: Your Honor, I believe the motion is

4    clear on that point, and I'm trying to determine if we might

5    have a definitional problem in this order.  Again, I wasn't

6    - -

7         THE COURT: Well, it says, Effectuate the sale of

8    certain assets no longer necessary to the Debtors' mortgage

9    origination business including, but not limited to, real

10   property leases, defined office leases, and sale of FF&E

11   located therein, office assets.  So I don't see, I read that

12   that it's procedures governing the assumption and assignment

13   of real property leases and the sale of FF&E.  And I don't, I

14   agree with Mr. Lastowski, at least in the order, I don't see

15   the request for authority to assume and assign real property,

16   or not, excuse me, personal property leases.  Other, I guess

17   you could say that definition of office leases was, it does

18   say including, but not limited to real property leases.  So I

19   guess they're taking the position that if the motion

20   references personal property leases as well, that it would

21   apply.

22        MR. LASTOWSKI: Yeah, but as often happens, is

23   further ambiguities, because all of those are wrapped into

24   the definition of office assets.  And at least, the version

25   of the sale, the order I was looking at, at page 2, the third

1   ordered clause from the bottom, it says that each sale of

2   assets shall be free and clear of any liens.  With all liens

3   transferring, blah, blah, blah, and it suggest there that, I

4   mean, there's no real language here talking about – –

5           THE COURT: Well, they can't sell a lease.

6           MR. LASTOWSKI: Yeah.

7           THE COURT: They can assume, they can't sell a real

8   property lease either.

9           MR. LASTOWSKI: Well, they can – –

10          THE COURT: They can assume and assign the lease, or

11  they can sell an asset.

12          MR. LASTOWSKI: Correct.  And there's some ambiguity

13  here where they may, it may be construed to give authority to

14  sell the, our equipment.

15          THE COURT: Well, if it's, if it's leased equipment,

16  they can't sell it.  If it's not a true lease, they can sell

17  it.  And I'm not deciding that today.  So maybe you can work

18  out your ambiguities with Mr. Beach.  But my understanding is

19  that I'm approving the procedures governing the assumption

20  and assignment of real property leases and personal property

21  leases at the identified locations.  Is that correct?  Is

22  that your position?  Tell me what you want.

23          MR. BEACH: I'm sorry.  Can you state that again,

24  Your Honor?

25          THE COURT: Well, what do you want me to do?  I know

1    I - -

2              MR. BEACH: I would like - -

3              THE COURT:  - - I know I'm authorizing procedures

4    for the, for the assignment of real property leases.  I know

5    I'm approving procedures for the sale of owned assets located

6    at those properties.  What do you want me to do in connection

7    with leased, personal property leases related to these office

8    locations?

9              MR. BEACH: Your Honor, we would like to clarify in

10   the order that we would like the ability to assume and assign

11   other equipment leases as well.

12             THE COURT: All right.  I think you need to tighten

13   up the definitions, then, to make that clear, and then you

14   should probably put something in there that you don't need

15   that will make Mr. Lastowski feel better, which is you can't

16   sell a lease.  You are only seeking to assume and assign

17   leases and you're only seeking to sell owned property.

18             MR. BEACH: Yes, Your Honor.  We had no intention of

19   selling - -

20             THE COURT: I understand.

21             MR. BEACH:  - - those leases.

22             THE COURT: But if you tighten up that language,

23   I'll approve the order.

24             MR. BEACH: Okay.  We'll submit that under

25   certification of counsel, Your Honor.

1          THE COURT: Okay.  Yes, sir.

2          MR. LASTOWSKI: Your Honor, in connection with the

3     prior motion, we already raised the issue of what happens if

4     the leases are assumed and assigned, and there's a new person

5     on the premises and we need to get our equipment back, and

6     your response was you can come back and see me.  I'm assuming

7     that's the case in connection with the leases that are the

8     subject of these procedures.

9          THE COURT: Yes.

10         MR. LASTOWSKI: Thank you.

11         THE COURT: All right.  I think that moves us on to

12    item 5.

13         MR. BEACH: Your Honor, I've just received an

14    interlineated version of the Indymac sale order.

15         THE COURT: Has Mr. Lastowski seen it?  Yeah.  Show

16    it to him.

17         MR. BEACH: I believe he has seen it, and has

18    approved it.

19         MR. HEHN: Yeah.  It's Mr. Lastowski's change, Your

20    Honor.

21         THE COURT: All right.

22         MR. HEHN: And it specifically carves leased

23    equipment - -

24         THE COURT: Okay.

25         MR. HEHN:  - - out of the FF&E, so it's explicit

1    now.

2              THE COURT: All right.  I'll sign it.

3              MR. BEACH: Thank you, Your Honor.

4              THE COURT: You can approach.  Thank you.

5              MR. LEMISCH: At the request of Debtors' counsel, I

6    just wanted to, instead of having them redo the order, since

7    you're going on vacation, everyone's running around, I can

8    rely on the record.  Just confirm that my clients, the two in

9    the objection, are with, are not part of this procedure, and

10   we're fine with that.

11             THE COURT: All right.

12             MR. BEACH: May I approach, Your Honor?

13             THE COURT: Yes.  This is, this is the - - which

14   order is this?  Is this item 2?  Or item 3?  Item 3.  All

15   right.

16             MR. BEACH: Your Honor, the next item on the agenda

17   will be handled by Mr. Lunn, and I'll cede the podium to him.

18             THE COURT: All right.

19             MR. LUNN: Good afternoon, Your Honor.

20             THE COURT: Good afternoon.

21             MR. LUNN: May it please the Court, Matthew Lunn

22   from Young Conaway on behalf of the Debtors.  Your Honor,

23   this is agenda item no. 5.  This relates to the motion that

24   the Debtors filed on Wednesday and filed a motion to shorten

25   notice contemporaneously therewith, which Your Honor granted

1   on Thursday.  The motion seeks entry of an order confirming

2   the Debtors ability to sell REO, or Real Estate Owned

3   property to make, and continue to make certain servicing

4   advances related to the REO, deducting the related expenses

5   from the proceeds of the REO, and allowing the Debtors to

6   distribute the remaining proceeds of the sale in accordance

7   with the various loan documents.  Loan servicing documents,

8   excuse me.  As Your Honor has heard throughout the various

9   hearings in this matter, a large component of the Debtors'

10  business relates to the servicing of loans which, as Your

11  Honor is aware, generally entails a collecting of mortgage

12  payments, administering tax and insurance escrows, responding

13  to borrower inquiries, maintaining control of collection

14  accounts, and default mitigation processes such as the

15  commencement of foreclosure proceedings.  In the ordinary

16  course, the Debtors commenced foreclosure proceedings on

17  delinquent mortgages, and then attempt to sell such real

18  estate, or REO, through the normal channels one would sell

19  his or her own real estate, through various real estate

20  brokers.  The Debtors currently estimate that approximately

21  85 pending sales of REO are scheduled before the end of

22  August, and with an additional 300 over the next 60 days.  As

23  the motion lays out, Your Honor, various title insurance

24  companies and escrow agents, since the filing of the

25  petition, have essentially halted the Debtors' business

1   operations with respect to the continued sale of REO.  The

2   Debtors have attempted to work with these title insurance

3   companies and escrow agents, but have been unsuccessful in

4   convincing them that they're entitled to sell REO and conduct

5   business in the ordinary course, absent an order of the Court

6   authorizing each and every sale, or at least an order

7   confirming that the Debtors have ability to sell REO in the

8   ordinary course.  Actions, these actions by the title

9   insurance companies and escrow agents are significantly

10  hindering and impairing the Debtors ability to conduct its

11  business operations, it's creating unnecessary and

12  unwarranted administrative expenses, and furthermore, is

13  impeding the sale and thereby affecting the ultimate

14  purchasers of the REO by scheduled closing dates being moved

15  because of title insurance companies.  The Debtors submit

16  that the sale of the REO, the funding and deducting of the

17  loan servicing advances in connection with the REO, such as

18  the preservation costs, title, or insurance maintenance, the

19  like, is an ordinary course of business transaction and thus

20  is, should be approved under §363(c)(1).  The Debtors are in

21  the business of servicing mortgages pursuant to the various

22  loan documents, connection with the servicing of, in

23  connection with those servicing functions, the Debtors

24  obviously commence foreclosure proceedings, and sell the REO

25  to minimize any losses.  Moreover, Your Honor, the parties

1   should expect that the Debtors are parties to various loan

2   servicing documents that require them to foreclose upon

3   delinquent properties and then sell those properties.  Your

4   Honor, for these reasons, the Debtors would request that the

5   Court confirm the Debtors' ability to sell the REO in the

6   ordinary course, to give the comfort to the title insurance

7   companies so as not to, in essence, grind the Debtors'

8   business operations to a halt with respect to the sale of the

9   REO.  There were a few objections, Your Honor.  Two of which

10  have been filed.  One was by Ginnie Mae, the other filed by

11  CSFB today.  We also received an informal objection from

12  BofA, and the Committee also raised and asked for an

13  insertion of a provision in the lead in paragraph of the

14  order.  I have a black line of the order, Your Honor, if I

15  may approach.

16           THE COURT: Yes.  Thank you.

17           MR. LUNN: Your Honor, the second ordered paragraph,

18  which appears on page 2 of the black line, this incorporates

19  a comment received from BofA.  The accept as otherwise

20  provided herein.  And the other comment is also in paragraph

21  (b) of that ordered paragraph, which provides that in

22  accordance with the relevant loan servicing documents, or

23  loan servicing agreements.  The second comment was actually

24  the request of Wells Fargo, which they have, neglected to

25  mention that they also raised an informal objection.  And

1   with the inclusion of that language, we have resolved the

2   informal objection of Wells Fargo, Your Honor.  The first - -

3   or actually, I'm sorry, Your Honor, the fourth ordered

4   paragraph on that page.  This is the language that was

5   requested by BofA.  In essence, Your Honor, in boiling it

6   down, the Debtors are going to continue to comply with the

7   terms of the cash collateral order, and nothing in this order

8   would modify the terms of the cash collateral, cash

9   collateral order.  That's the essence of that revision.  And

10  with the inclusion of that provision, Your Honor, that

11  resolves BofA's concerns.  The first full ordered paragraph

12  on page 3.  This is the language that was suggested by Ginnie

13  Mae in its limited objection.  The Debtors do not sell REO

14  that is backed by Ginnie Mae under the various documents

15  between the Debtors and Ginnie Mae.  The Debtors, upon

16  foreclosing, are required to turn that property over to

17  Ginnie Mae for liquidation.  So that just makes clear that we

18  will not sell ay REO related to Ginnie Mae.  And with this,

19  and the reservations to the Debtors' right to contest, and

20  nothing prejudices the Debtors' rights to contest Ginnie

21  Mae's motions and pleadings, Ginnie Mae has signed off on the

22  form of order, Your Honor.  That leaves CSFB, Your Honor.

23  CSFB, and I reviewed the objection while we were sitting at

24  counsel table.  What they are asking the Debtors to do is

25  essentially represent that we will, or inclusion in the

1    order, that we will act with a degree of skill and care

2    customarily required in connection with foreclosures, and - -

3    I'm just trying to find - - excuse me, Your Honor.  And that

4    we will immediately remit the funds to CSFB.  Your Honor, I'm

5    not aware exactly what the documents require us to do, but

6    what I would imagine that they do require us to do is to

7    foreclose in a commercially reasonable manner, to act in

8    accordance with the terms of the documents.  The purpose of

9    this motion, Your Honor, and the order, is to provide comfort

10   to the title insurance companies and escrow agents who are

11   impeding our ability to close on REO sales as required.  Your

12   Honor, I submit that the inclusion of the language that CSFB

13   has requested would do nothing more than create a cloud on

14   what the Debtors' ability to do, under this order, and

15   obviously then the purpose of this order.

16        THE COURT: Well let me hear from Credit Suisse.

17        MR. MARCUS(Telephonic): Good afternoon, Your Honor.

18   This is Christopher Marcus from Weil, Gotshal, & Manges on

19   behalf of Credit Suisse.  I guess a little bit of an

20   explanation might be helpful, as we filed the objection so

21   close to the actual hearing.  And having heard counsel's

22   response, I'm hopeful that, that our objection actually, our

23   limited objection, actually, shouldn't be too controversial.

24   Under the, the repurchase agreement that is between the

25   Debtors and Credit Suisse, which I'm sure the Court is

1    familiar with from the adversary proceeding, the, the Debtors

2    sell certain loans to CSFB and then CSFB at some point in

3    time sells them back to the Debtors.  If at some point in

4    time, while CSFB is holding a loan, there's a provision which

5    provides that the Debtors may continue to service the loans

6    until they're purchased back from CSFB.  And I think what

7    we're trying to address in our limited objection is the

8    situation where in this, this limited period, which

9    essentially exists right now, if the Debtors need to

10   foreclose on one of these loans, and then sell the REO, what

11   happens?  And I believe that counsel mentioned his assumption

12   about what the agreement provides with respect to this

13   scenario, and actually the agreement doesn't really provide

14   what happens in this scenario.  It doesn't have any provision

15   for the Debtors to deduct fees, or other costs in connection

16   with a foreclosure.  It's, it's sort of silent on this.  And

17   this, this of course, goes to Credit Suisse's position that

18   there isn't really a servicing agreement here.  It's just a,

19   an interim servicing that occurs while Credit Suisse is

20   holding the loans.  It's not its own separate agreement.  And

21   so Credit Suisse does not want to get in the way of, of what

22   the Debtors are looking to do here, and that's facilitate

23   these transactions with the insurance companies and with the

24   title insurance, the insurance companies and with the title

25   insurers.  But counsel mentioned that sort of the purpose of

1    the motion was, was just that.  And that's, that's not

2    exactly what they're asking for.  They're asking for more

3    than that.  In fact, the motion itself says that they're

4    seeking to confirm the Debtors' authority to continue funding

5    loan service advances, and deducting loan servicing advances,

6    which include costs related to foreclosure proceedings, from

7    the proceeds of the sale.  And our position is that the

8    Debtors don't have that authority to be confirmed.  That

9    authority doesn't exist under the agreement.  If the Debtors

10   foreclose on one of these loans, and sell the REO, then the

11   proceeds of the sale, without deduction, should be placed in

12   an escrow, I'm sorry, in the collateral account in accordance

13   with the terms of the agreement.  It's not, this motion

14   itself, which the Debtors agree is one of clarification,

15   should not be one that's used to write into the agreement an

16   ability to deduct certain fees and expenses which does not

17   otherwise exist.  The other part of the objection was with

18   respect to exercising skill and commercially reasonable care

19   with respect to the foreclosure process itself.  It doesn't

20   sound like the Debtors have any objection to that, and I, I

21   would assume that there is none.  Although again, the

22   agreement itself does not set up a, really a procedure for

23   what happens.  But we just wanted to make sure that that was

24   absolutely clear.  But with respect to, you know, confirming

25   the Debtors' authority to start deducting things from the

1   proceeds of a sale, if they happen to sell one of these

2   REO's, just want to make sure that that's not happening under

3   this agreement, because this agreement does not authorize

4   them to do that.

5          MR. LUNN: Your Honor, we're not asking by this

6   order to do something that's not in accordance with the terms

7   of anyone's loan servicing agreements.  Anyone's agreements

8   - -

9          THE COURT: But his point is, his position is he

10  doesn't have a loan servicing agreement.  Here's his

11  position.  He has a repurchase agreement with you that he

12  terminated pre-petition or no later than the filing of the

13  petition date.  That it doesn't contain separate loan

14  servicing rights that the Debtor own.  That the Debtors

15  aren't entitled to payment of dollar one under the terms of

16  the repurchase agreement, because there is no loan servicing

17  agreement between Credit Suisse and the Debtors.  That

18  nonetheless, you're required, as you want to, to continue to

19  interim servicing an agreement pending the sale of the

20  underlying mortgage by either the Debtors or Credit Suisse.

21  And that in the interim, if you foreclose on one of his

22  covered properties that you are servicing, that you not

23  somehow have the right to deduct the cost of foreclosing on

24  the property, and selling the property.  And the problem is

25  that the paragraph reads: Ordered that the Debtors are

1   authorized to A, sell REO in the ordinary course of business

2   free and clear of any and all liens and encumbrances.  That's

3   not a problem.  B, continue the funding of loan servicing

4   advances related to the REO, except as otherwise provided

5   herein, and deducting such loan servicing advances from the

6   proceeds of the sale of the REO in accordance with the

7   relevant loan servicing agreements.  His issue is he wants to

8   make sure that that provision is not somehow giving you the

9   right to what you don't, he thinks, already have.  Which is

10   the right to do that at all.  Under his repurchase agreement,

11   which he says is different from a relevant loan servicing

12   agreement.  And that's the subject of the litigation that's

13   been filed.  And the same with the distribute the balance, C,

14   Distribute the balance of the sale proceeds in accordance

15   with the relevant loan servicing agreements.  So I think the

16   issue you've got with him is are you somehow expanding the

17   Debtors' rights by using the term, Relevant loan servicing

18   agreement - -

19         MR. LUNN: That - -

20         THE COURT:  - - vis a vis Credit Suisse.  And if

21   you're not, then we should be able to carve him out somehow

22   to make that clear.

23         MR. LUNN: Your Honor, we are not trying to expand

24   our rights.

25         THE COURT: How about we do this?  Continue the

1    funding of loan servicing advances related to the REO.  What

2    do you suggest, sir, to - - I'm trying to address your

3    concern to make it clear that everybody's rights are

4    reserved.  But I don't want to cloud the language to defeat

5    the purpose of the motion.

6        MR. MARCUS(Telephonic): Um-hum.

7        THE COURT: If I put in something that's too, you

8    know, too cloudy, the title insurance companies are going to

9    get all squirrelly, and the Debtors won't be able to

10   accomplish what they're trying to accomplish.  But I

11   understand your position.

12       MR. MARCUS(Telephonic): I could suggest - -

13       THE COURT: I know it's difficult to negotiate over

14   the telephone on a black line you haven't seen.

15       MR. MARCUS(Telephonic): Yeah.  Thank you, Your

16   Honor.  I appreciate that.

17       MR. LUNN: Your Honor, I think - - main counsel just

18   handed me something I think may work.  B would provide now,

19   if we insert - - and I'm just going to start reading - - And

20   deducting such loan servicing advances from the proceeds of

21   the sale of REO, if permitted, in accordance with the

22   relevant loan servicing agreements, or governing documents.

23       THE COURT: And the same on the distribution.

24       MR. LUNN: We can carry that language to the

25   distribution as well.

1          THE COURT: All right.

2          MR. LUNN: Yes, Your Honor.

3          THE COURT: I think that addresses your issue, sir.

4   In other words, they're not, they're not going to have

5   authority to do it unless they're permitted to do it under

6   the relevant loan servicing agreement or, what was the term

7   you used?

8          MR. LUNN: Governing documents.

9          THE COURT: Or governing documents.  Which I mean to

10  include, which I think includes repurchase agreements such as

11  yours.  Now I do think you had an issue, though, he said you

12  didn't, on the commercial reasonableness matter.  You don't

13  want that in the order.  Is that correct, Mr. Lunn?

14         MR. LUNN: That is correct, Your Honor.  I don't

15  think there would be any requirement for us to include that.

16  We're to foreclose and proceed with the sale of REO as we

17  always have done.

18         THE COURT: Yeah, well, all I'm, I'm authorizing, I

19  don't think that's necessary.  To the extent you don't do it,

20  we're back where we've been a number of times in this case.

21  To the extent you don't do it, you're creating claims against

22  the estate.  But all this does is confirm you have the

23  authority to continue to act in the ordinary course of

24  business.  It's not somehow delineating the standard of care

25  that you need to operate.  And I'm not going to get involved

1   in that.  So I don't think the order needs to reflect that.

2         MR. LUNN: Thank you, Your Honor.

3         MR. MARCUS(Telephonic): I'm sorry, Your Honor.  I,

4   just to be clear.  And I apologize, it's just difficult to

5   try to read this - -

6         THE COURT: I know it is.

7         MR. MARCUS(Telephonic): Put it in over the phone.

8   With respect to the standard of care, Your Honor doesn't want

9   to put a standard of care into the order, but to the extent

10  that there's a failure to meet whatever standard of care is

11  otherwise applicable, we would, you expect them to operate,

12  and if they don't there's, we would have whatever claims we

13  have against the estate.

14        THE COURT: Correct.

15        MR. MARCUS(Telephonic): Okay.  And then with

16  respect to B and C, there will be an indication in both of

17  those paragraphs that they will only be able to deduct or

18  distribute if permitted and in connection with relevant loan

19  servicing agreements, or other, or other agreement?

20        THE COURT: Governing documents.

21        MR. MARCUS(Telephonic): Other governing documents.

22  Thank you.

23        THE COURT: Yeah.  All right.

24        MR. LUNN: Your Honor, I also neglected in skipping

25  over the first page.  The Committee asked that we insert in

1    the lead in paragraph after the word betters, or owned by

2    investors for whom the Debtors act as servicer, and then

3    define that as REO.

4            THE COURT: Right.

5            MR. LUNN: Your Honor, I have, I have interlineated

6    the order to address Credit Suisse's issue.  May I approach?

7            THE COURT: Yes.  Any other objections other than

8    Credit Suisse, or anyone else want to be heard?

9            MR. INDELICATO: Your Honor, Mark Indelicato from

10   Hahn & Hessen on behalf of the Committee.  I just wanted to

11   sort of make a statement on the record.  With the change that

12   the Committee requested, because this is a servicing business

13   dealing with $46 billion worth of mortgage loans, it does

14   change the definition of REO property.  And if you just carry

15   that through, I don't think it's the intention of the

16   parties.  And if you look at the paragraph added by BofA, it

17   only talks about the REO property that's their collateral.

18   But I just, there was a definition change of REO property,

19   and so, just so everyone understands that the BofA section

20   that was added just deals with whatever is their collateral,

21   they have the rights to.  But if it's not their collateral,

22   it will be dealt with in accordance with the governing

23   documents.

24           THE COURT: Right.  I understand it to mean that.

25           MS. CALLOWAY: Your Honor, good afternoon.  Mary

1    Calloway on behalf of Society Generale.  This is not an

2    objection, and I think the comments of both Your Honor and

3    counsel clarify this.  But there are other parties in a

4    situation similar to Credit Suisse, and we've been talking

5    about the language that's been added to the order as

6    addressing the Credit Suisse problem.  But I think it's all,

7    everyone would agree that the language is broad enough that

8    it would apply to any party who is in a similar situation.

9            THE COURT: Yes.

10           MS. CALLOWAY: Thank you.

11           MR. MARCUS(Telephonic): Your Honor, again, this is

12    Christopher Marcus from Weil, Gotshal, & Manges.  I just

13    wanted to make one more, one more clarification.  And that is

14    our position is obviously that there is no entitlement under

15    the loan agreement, I'm sorry, under the repurchase

16    agreement, to deduct anything.  And if the language is going

17    to say, If permitted under the agreement, and the Debtors

18    determine that somehow our repurchase agreement does entitle

19    them to deduct something, that, obviously that is a contested

20    issue, and that before they just deduct and conclude that

21    they are permitted that they would come back to court.  And I

22    don't know that we need to add anything to the order, but as

23    long as that's confirmed, that it's not a unilateral decision

24    by the Debtors, I think I'd be satisfied with that.

25           THE COURT: I don't think we need to get into that,

1  frankly.  That's not an issue for today.  That's an issue in

2  your adversary proceeding.  I'm not going to put any

3  additional obligations on the Debtor one way or the other.

4  They understand your claims, and I'm sure that they

5  understand that if they act in violation of their contractual

6  agreements, there will, there'll be risk.  So I don't think

7  any additional language is necessary.  Obviously all your

8  rights are reserved in connection with your adversary

9  proceeding.  Ms. Silverstein.

10      MS. SILVERSTEIN: Your Honor, Laurie Silverstein on

11  behalf of Bank of America.  We did have language inserted

12  with respect to REO which serves as our collateral.  And that

13  does resolve our objection.

14      THE COURT: Okay.  Thank you.  Anything further?

15  All right.  I've signed the order.

16      MR. LUNN: Thank you, Your Honor.

17      THE COURT: Anything further for today?  Mr. Beach,

18  you have one last order?

19      MR. BEACH: Your Honor I do.  I've worked with Mr.

20  Lastowski, and we've marked up, or interlineated, in a number

21  of places just to make clarifications that, of the definition

22  of equipment leases, and to make clear that we're doing a

23  sale, sales and assignments.  If I may approach - -

24      THE COURT: Yup.

25      MR. BEACH: - - it may be easiest just for Your

1    Honor to take a look.

2            THE COURT: Mr. Marcus, can I ask you to mute your

3    phone, please.

4            MR. MARCUS(Telephonic): I apologize.

5            THE COURT: That's okay.  That's fine.  Is that a,

6    is that a common roman entry?  The landlord, comma, lessor,

7    or non-debtor party of the office leases or equipment lease

8    to be assigned.  Yeah.  Okay.

9            MR. BEACH: Yes, Your Honor.

10           THE COURT: I want that clear.  Okay.  Is this

11   acceptable, Mr. Lastowski?

12           MR. LASTOWSKI: Yes, Your Honor.

13           THE COURT: All right.  Thank you.  I'll enter the

14   order.

15           MR. BEACH: Thank you, Your Honor.

16           THE COURT:  Anything further for today?

17           MS. SILVERSTEIN: Your Honor, Laurie Silverstein.

18   If I may?

19           THE COURT: Yes.

20           MS. SILVERSTEIN: I was - - for Bank of America,

21   again.  I was more focused this morning on Morgan Stanley and

22   REO, and I failed to put a statement on the record with

23   respect to the employee retention motion.  BofA did not

24   object to the employee retention motion.  But we want to make

25   clear on the record that to the extent that the payments

1   approved are to employees that are part of the servicing

2   business, and for which BofA's cash collateral is being used,

3   that those payments must be made in accordance with the

4   budget.  And I did discuss that with Ms. Morgan, and she

5   understood that, and it was probably implicit, but I did want

6   to put that on the record.

7            THE COURT: Very well.  Thank you.

8            MS. SILVERSTEIN: Thank you.

9            THE COURT: Anything else?

10           MS. MORGAN: No, Your Honor.

11           THE COURT: All right.  Thank you very much.  I'll

12   get these orders docketed.  I hope you enjoy your weekend.

13   Hearing is adjourned.

14           ALL: Thank you, Your Honor.

15       (Whereupon at 3:11 p.m. the hearing in this matter was

16   concluded for this date.)

17

18           I, Jennifer Ryan Enslen, approved transcriber for

19   the United States Courts, certify that the foregoing is a

20   correct transcript from the electronic sound recording of the

21   proceedings in the above entitled matter.

22

23    _/s/Jennifer Ryan Enslen_                 ___09/11/07___
     Jennifer Ryan Enslen
24   43 Bay Boulevard
     Newark, DE 19702
25   (302)836-1905