UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| AMERICAN HOME MORTGAGE | . | Case No. 07-11047(CSS) |
| HOLDINGS, INC., a Delaware | . | (Jointly Administered) |
| Corporation, *et al.*, | . | |
| | . | |
| | . | September 4, 2007 |
| | . | 11:00 a.m. |
| Debtors. | . | (Wilmington) |
| | . | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**<u>INDEX</u>**

<u>ADMITTED</u>

<u>EXHIBITS FOR THE DEBTOR</u>:


EXHIBIT 1 - Summary Price Calculation - **Under Seal**    75

1          THE CLERK: All rise.

2          THE COURT: Please be seated.  Good morning.

3          MS. MORGAN: Good morning, Your Honor.  Pauline

4   Morgan from Young, Conaway, Stargatt, & Taylor on behalf of

5   the Debtors.  Your Honor, proceeding with today's agenda, as

6   indicated, items 1 and 2 are adjourned by agreement.  I

7   understand the Court has signed orders on 3 and 4.  We thank

8   the Court for that.  Your Honor, item 5 is the Debtors'

9   application to retain Cadwalader, Wichersham, & Taft under

10  §327(e) of the Bankruptcy Code.  We do have an objection by

11  the United State Trustee, and the Debtors, as well as

12  Cadwalader and the US Trustee have been discussing that

13  matter, and would like to adjourn that matter for a week or

14  two.  I understand our next omnibus is the 17th.  Your Honor,

15  if it's acceptable, what we might also suggest is if there

16  was the chance that we could work something out, could we

17  submit that proposed order, assuming the US Trustee signs

18  off, under certificate of counsel?

19          THE COURT: Yes.

20          MS. MORGAN: Thank you, Your Honor.

21          THE COURT: So you can, we'll continue that to the

22  17th, and if it's resolved in the interim, you can submit an

23  order under certification of counsel.  If I have any, any

24  issues, I'll let the parties know and we'll hear it on the

25  17th.

1          MS. MORGAN: Very well.  Thank you, Your Honor.

2    Your Honor, item 6 on the agenda is the Debtors' application

3    to retain Young Conaway as counsel for the Debtors.  We've

4    also had discussions with the US Trustee about this

5    application, and the only change we are making, and I'll

6    submit a revised form of order, is to agree, for now, to put

7    off the issue of the evergreen retainer.  So we have agreed

8    with the US Trustee to adjourn that to the October 1st

9    hearing.  But otherwise, I believe the application is

10   acceptable to the US Trustee.  We did file a supplemental

11   disclosure at the US Trustee's request.

12          THE COURT: Okay.  So you're adjourning the retainer

13   issues to October 1, but otherwise you are going to submit an

14   order under certification of counsel?

15          MS. MORGAN: Yes.  Well, no.  Actually, Your Honor,

16   I'd like to submit it right now.

17          THE COURT: Oh, okay.

18          MS. MORGAN: Thank you.

19          THE COURT: Thank you.  Does anyone wish to be heard

20   in connection with this matter?  All right.  Hearing none,

21   I'll approve the order.

22          MS. MORGAN: Thank you, Your Honor.  Item 7 is the

23   emergency motion of Impac Funding Corporation for relief from

24   the automatic stay.  Your Honor, the Debtors do have a

25   settlement in principle with Impac Funding.  A stipulation

1    has been prepared and circulated to counsel for Impac, as

2    well as to counsel for BofA as administrative agent, and

3    counsel for the Creditors Committee.  And we anticipate

4    filing that stipulation, once we've collected comments, under

5    certificate of counsel.

6            THE COURT: All right.  Do you want to carry it,

7    just in case it falls through, to the 17th?

8            MS. MORGAN: That would be fine, Your Honor.  Thank

9    you.

10            THE COURT: Does anyone wish to be heard in

11    connection with that?  Mr. Riley is rising.  No?  All right.

12    So that's continued to 9/17 and I'll await a stipulation

13    under cert.

14            MS. MORGAN: Yes, Your Honor.  Your Honor, item 8 is

15    the Debtors' motion for entry of a final order establishing

16    procedures for utility companies, and preventing them from

17    altering, refusing, or discontinuing utility service.  Your

18    Honor, at the first day we modified the order slightly to, to

19    reflect Your Honor's rulings in prior cases that requests for

20    additional adequate assurance can be made at any time, and

21    are not limited.  And we've carried those through to a

22    revised form of order.  Notice of entry of the interim order

23    has been served on approximately 19 hundred utility

24    companies, as well as the top 40 unsecured creditors, the

25    United States Trustee, the lenders, and counsel to the

1   Committee.  We did receive only one objection from Alabama

2   Power Company, and we've resolved that objection by an

3   agreement to provide additional adequate assurance.

4        THE COURT: All right.

5        MS. MORGAN: So that matter is resolved.  And if I

6   may approach with an order?

7        THE COURT: Yes.  Thank you.

8        MS. MORGAN: And Your Honor, just to make clear on

9   the record, the black lines, again, reflect that this is a

10  final order.  It also refers back to the record of the August

11  7th hearing.  I did want to confirm for the Court that we have

12  established the secured, the adequate assurance escrow.

13       THE COURT: All right.  Does anyone wish to be heard

14  in connection with this matter?  Hearing none, I'll approve

15  the order on a final basis.

16       MS. MORGAN: Thank you, Your Honor.  Your Honor, the

17  next two items on the agenda will be handled by my partner,

18  Mr. Waite.

19       THE COURT: Good morning, Mr. Waite.

20       MR. WAITE: Good morning, Your Honor.  Joel Waite

21  from Young, Conaway, Stargatt, & Taylor on behalf of the

22  Debtors.  Your Honor, the next two items are the hearing on

23  the final cash collateral order and the final DIP financing

24  order.  As we told the Court first day, we have two financing

25  arrangements here which are separate, really dealing with

1    separate buckets.  The cash collateral is the use of funds to

2    operate the servicing business.  The DIP financing is funds

3    to deal with the rest of the business and the liquidation of

4    the Debtors' assets.  Turning first to the cash collateral

5    motion, Your Honor.  On August 7th, the Court entered an

6    interim order granting use of cash collateral and adequate

7    protection through September 7th.  We're now seeking a final

8    order for continued use of cash collateral, and have agreed

9    on extended period of time that will run us through October

10   31st.  And that is reflected in the final form of order, which

11   was filed first thing this morning, and I believe a copy was

12   being delivered to Your Honor's chambers.

13       THE COURT: I have it, and I've reviewed it.

14       MR. WAITE: Your Honor, as we indicated first day,

15   Bank of America, as administrative agent for the group of

16   pre-petition lenders, asserts that all or virtually all of

17   the Debtors' cash generated from the servicing business in

18   the ordinary course constitutes its cash collateral.  Using

19   that cash collateral is necessary to maintain the servicing

20   business while we proceed through this process.  And as the

21   Court is aware, the Debtors are in the midst of a sale

22   process for the servicing business, and therefore it's

23   particularly critical that we continue operations in the

24   ordinary course while we try to sell those assets.  We

25   indicated first day we began negotiating with Bank of America

1    just a few days before the petition date.  Those negotiations

2    were conducted in good faith, and were intensive, and ran

3    literally around the clock up until the petition date.  That

4    resulted in the cash collateral agreement that was in the

5    interim order.  But the negotiations did not end there.  We

6    have been engaged in further negotiations throughout this

7    past weekend which resulted in a number of changes to the

8    cash collateral order, and Your Honor may have seen there

9    were a number of changes made in response to the Committee's

10   objection, which I'm happy to report has been resolved.  Your

11   Honor, just briefly, pursuant to the cash collateral order,

12   the Debtors are permitted to use cash collateral to pay those

13   expenses which are set forth in a budget, which is attached

14   to the order, that relate to operating the servicing

15   business.  The order provides for the budgeted items to carry

16   over on a cumulative basis, and we do have a 30% variance

17   permitted for servicing advances due to the inherent

18   unpredictability of when servicing advances will need to be

19   paid.  In exchange for the use of cash collateral, we, as

20   indicated at the first day, are providing Bank of America

21   with replacement liens in the same assets in which they had

22   valid perfected liens as of the petition date.  We have not

23   granted them, and the final order does not grant them, new

24   liens in any other assets of the estate, and they are not

25   receiving any super priority or administrative claim under

1    §507(b) or otherwise.  We've also agreed in the order to pay

2    certain fees, costs, and expenses of the lenders, including

3    their professional fees in accordance with the pre-petition

4    agreements.  And there is a mechanism in the order that

5    provides for an objection ability for the Debtors, the

6    Committee, and the US Trustee to those fees.  We've also

7    provided in the order that on September 5th there will be a

8    pay down from cash on hand related to the servicing business

9    of amounts in excess of $10 million.  And the final order

10   includes a further pay down of cash in excess of $5 million

11   on October 24th.  Your Honor, the stipulation also includes a

12   number of standard stipulations and acknowledgments which are

13   typical in consensual cash collateral orders which appear in

14   paragraphs (c), (d), (e), and (f).  And those have carried

15   over.  There's also a release in paragraph (g) which releases

16   the pre-petition secured parties which, by definition,

17   includes those parties only in their capacities as

18   administrative agent and lenders under the second amended

19   credit agreement, but not in other capacities.  And we have

20   preserved in the order, in paragraph 20, the rights of the

21   Committee and other parties in interest to challenge those

22   stipulations and to pursue various claims.  With respect to

23   other parties in interest, the time period to commence any

24   such actions, assuming that they have standing, or can obtain

25   standing, is October 22nd.  And with respect to the Committee,

1    by agreement that deadline has been extended out to December

2    4th.   Your Honor, as I indicated, this cash collateral

3    agreement will now run through October 31st.  If we have to,

4    we'll be back in asking Court for further extension, if that

5    is necessary.  And of course, the Debtors have reserved in

6    the stipulation, or the order, the right to seek contested

7    use of cash collateral.  Your Honor, as indicated in the

8    agenda, we received an objection from the Committee, four

9    objections which I would call reservation of rights, similar

10   to what the Court saw at the first day hearing, and a

11   joinder.  I think maybe what makes sense at this point, if

12   it's acceptable to the Court, is to walk through the black

13   line changes to the form of order, which I think addresses

14   all the Committee's concerns, and then we can proceed to deal

15   with the reservation of rights?

16           THE COURT: Yes.

17           MR. WAITE: Okay.  Does Your Honor have a copy of

18   the black line?

19           THE COURT: I have the one that you - -

20           MR. WAITE: The one that was filed this morning?

21           THE COURT: The one that was filed.

22           MR. WAITE: Yes.

23           THE COURT: Yes.

24           MR. WAITE: Your Honor, just proceeding, beginning

25   on page 1, the changes on this page really were just changes

1    to convert the order to a final order.  The same thing on

2    page 2.  Except at the bottom of the page we have

3    acknowledged that the Committee was formed on August 14th.  On

4    page 5 in paragraph (f), we've added a little language just

5    to further clarify that the stipulation regarding the bank's

6    liens and accounts, which are subject to set off, that our

7    other financial institutions includes accounts that are held

8    for the benefit of the pre-petition secured parties.  On page

9    6, again I think these are largely changes to - -

10          THE COURT: Just, my pages aren't numbered.  So just

11   make sure you reference the paragraph's numbers - -

12          MR. WAITE: Okay.

13          THE COURT:  - - and we'll be fine.

14          MR. WAITE: Sorry, sorry about that, Your Honor.

15          THE COURT: That's okay.

16          MR. WAITE: The next page, which is paragraphs (h)

17   and (i), these changes are just to make the order a final

18   order.

19          THE COURT: All right.

20          MR. WAITE: Same on the next page.  Which, the

21   bottom has page 1, or paragraph 1.  We redefined the budget

22   period, which appears on top of the next page, in paragraph

23   1.  We just moved that to a different place in the paragraph.

24   Your Honor, at the bottom of this page, you'll see a

25   reference to non-conforming use, and we provided that if we

1    are going to seek an non-conforming use we have to have the

2    consent of the administrative agent, but we also have to give

3    notice to the Committee, and we've negotiated a one business

4    day objection period with the Committee.

5          THE COURT: All right.

6          MR. WAITE: Your Honor, on page 9, paragraph 2,

7    there are a substantial number of changes here.  What we've

8    really tried to do is set forth in greater detail what

9    accounts exist and how the money actually flows.  We didn't

10   have the opportunity to spell it out in that great of detail

11   at the interim hearing.  And it's my understanding that the

12   business people on both sides have been through this, and we

13   believe this accurately reflects the way the funds are

14   flowing at this point.

15         THE COURT: All right.

16         MR. WAITE: In connection with this, I'll make one

17   note for the Court.  There are a few Deutsche Bank accounts

18   which were frozen pre-petition.  We have been working to try

19   to get the funds from those accounts released, and we will

20   continue doing so.  And the Debtor has committed to try to

21   get that accomplished.  But we have agreement with the, with

22   the lenders that the fact that those accounts are frozen, and

23   we are not able to transfer them over to these accounts would

24   not be an event of default, until such time as they are

25   released by Deutsche Bank.

1          THE COURT: All right.

2          MR. WAITE: Your Honor, the next page, we're still

3    in paragraph 2, in the middle of the page, I want to point

4    out there's a reference with respect to transferring

5    collateral from any Debtor to any other Debtor.  We've added

6    an exception with respect to budgeted items or amounts agreed

7    to by the administrative agent.  And this is just, really, to

8    reflect the way the funds actually flow.  Certain expenses

9    are paid out of the corporate account, and then are just

10   reimbursed from the - -

11         THE COURT: Um-hum.

12         MR. WAITE:  - - servicing account.  And that's just

13   to permit that to occur in the ordinary course.  If Your

14   Honor has any questions along the way, please stop me.

15   Turning over to the top of the next page.  It's the very end

16   of paragraph 10.  This really relates to our reporting for

17   the various bank accounts.  The way it was written in the

18   initial order, to comply with it literally meant we provided

19   a three foot stack of paper that was largely difficult to be

20   useful.  And so we've changed this to provide for providing

21   of a more summary report, and then we'll provide the backup

22   to the extent the agent requests it.

23         THE COURT: Okay.

24         MR. WAITE: Your Honor, I think the rest of the

25   changes in paragraphs 3 and 4 are just to convert it to a

1    final order.  Your Honor, in paragraph 5 we've made a number

2    of changes.  The original interim order provided that other

3    than with respect to certain ordinary course collections that

4    any sale of assets we would be paying over the gross proceeds

5    to the lender.  And we didn't have the time to fully

6    negotiate this in connection with the interim.  What we've

7    provided here now is that with respect to sales of assets or

8    other dispositions primarily out of the ordinary course, that

9    there is a mechanism for net proceeds.  And we have the

10   ability to deduct necessary direct costs of the Debtors in

11   connection with those dispositions.  Those amounts have to be

12   reasonably acceptable to the administrative agent, and we

13   have specifically agreed to exclude the fees of Kroll Zolfo

14   Cooper, who has the interim management of the company.  But

15   other than that, to the extent we do not reach agreement,

16   there is a mechanism that permits us to come back to the

17   Court and have the Court determine what is an appropriate

18   direct cost of disposition of the collateral.  Hopefully

19   we'll reach agreement in connection with any sale

20   transactions and won't have to bother the Court with that.

21   But we, we have reserved that mechanism.  Your Honor, in that

22   paragraph, it's probably starting about seven lines down from

23   the top of the page, there is a exception, other than.  It

24   deals with certain types of collections which are not subject

25   to the net proceeds.  And those are meant to cover the

1    ordinary course collections of servicing revenues, PMI on

2    mortgage loans, things that are done in the ordinary course

3    of operating the business, which are already, the expenses of

4    dealing with those are already covered by the regular budget.

5            THE COURT: All right.  And they're being

6    segregated.

7            MR. WAITE: Those funds, when they come in, are

8    being put into their - -

9            THE COURT: Appropriate accounts.

10           MR. WAITE: I'm talking about BofA's loans at this

11   point, not other party's.

12           THE COURT: Not anyone else's.

13           MR. WAITE: That's right.  We're not affecting,

14   we're not using anyone else's cash pursuant to - -

15           THE COURT: But this is the servicing of the BofA

16   loans.

17           MR. WAITE: Well, it's the servicing revenue from

18   servicing all of the loans.

19           THE COURT: Right.

20           MR. WAITE: But, which BofA has a lien.

21           THE COURT: Right.

22           MR. WAITE: With respect to the mortgage loans,

23   we're referring to - -

24           THE COURT: Right.

25           MR. WAITE: - - BofA's mortgage loans, and when we

1  collect principle and interest of those, they get put into

2  collateral agent accounts in the ordinary course.

3       THE COURT: I understand.

4       MR. WAITE: And so those parts are not subject to

5  the net proceeds concept.  But to the extent we do a whole

6  loan sale of loans, or sale of a servicing business, those

7  types of transactions out of the ordinary course, the net

8  proceeds mechanism would apply.  Does Your Honor have any

9  further questions about that before I move on?

10      THE COURT: No.

11      MR. WAITE: Okay.  Your Honor, at the bottom of that

12  page, still in paragraph 5, turning over to the top of the

13  next page, we've made some changes with respect to the sale

14  process to make it clear that other than with respect to

15  modifications to the sale process which have been implemented

16  to date, and I believe have all been agreed to by the

17  administrative agent, any further changes will not be made

18  without the written consent of the agent.  Which they shall

19  not unreasonably withhold.  And so the way we envision this

20  working is any, any change we would want, we would go to

21  them, seek their consent, if they don't grant consent, and we

22  think they're acting unreasonably, we have the right to come

23  back and ask the Court to so find.  Your Honor, in paragraph

24  6 there's some, the first part of that black line is just to

25  clarify now we're dealing with the servicing account which

1    has been defined.  The second part, romanette two, refers to

2    $3 million of BofA construction lockbox account.  There has

3    been a line item added to the budget.  What this is meant to

4    deal with, there are certain construction loans that BofA has

5    that have advances that need to be paid, and we've dealt with

6    this by incorporating it into the budget, and providing that

7    funds from that account can be used to fund those future

8    advances.  These funds in this account are collections on

9    account of construction loans that are BofA loans.  Any

10   questions, Your Honor?

11            THE COURT: No.

12            MR. WAITE: Okay.

13            THE COURT: You'll hear from me.

14            MR. WAITE: Okay.  You were looking intently, so I

15   didn't want to move on without asking.  Your Honor, at the

16   top of the next page, again still on paragraph 6 - -

17            THE COURT: That begs the question how do I normally

18   look?  Glassy eyed?

19            MR. WAITE: I'm not going there, Your Honor.  Your

20   Honor, at the top of the next page, I mentioned earlier that

21   there is a pay down of amounts in excess of $10 million as of

22   September 5th.  That was in the interim order, and we've now

23   added for a further pay down on October 24th of amounts in

24   excess of 5 million.  Your Honor, at the bottom of the page,

25   we've just added the Committee and the United States Trustee

1    just to make it clear that if they file an objection that

2    that right's reserved.  Your Honor, next page, paragraph 8,

3    this provision originally provided that we couldn't pay any

4    administrative expenses under 328, 330, or 331.  We've now

5    added an except as provided in paragraph 5, because we've now

6    built in the concept of net proceeds in connection with

7    certain dispositions.  And we've also added a provision at

8    the end to make it clear that the US Trustee's fees are not

9    excepted from that.  Turning over to the next page, paragraph

10   10, we specifically provided for filing of a collateral

11   reconciliation.  It's a report that the company has been

12   working on intensively, and we've set a deadline of September

13   21st for that report to be filed, and September 25th for any

14   additional funds to be transferred into the BofA accounts as

15   a result of that report.  Turning to the next page, paragraph

16   11, again we've moved out the termination date to October

17   31st.  At the request of the Committee, the event of default

18   relating to relief from the automatic stay has been modified

19   to refer to one or more orders involving collateral having a

20   value in excess of a million dollars.  The idea was to make

21   this something material.  Your Honor, the next page, 18,

22   still in paragraph 11, we've added language if on that date

23   such termination event remains uncured, just to make it clear

24   that with respect to the reporting events of default that

25   there's not just a two day notice period, but a cure period,

1   and it's now been extended to the third business day at the

2   request of the Committee.  Your Honor, at the end of the, the

3   very end of paragraph 11, which appears on the top of the

4   next page, we've added language, again at the request of the

5   Committee, and certainly the Debtor is happy about this

6   addition, to provide that upon the event of default, the

7   Debtors would still be able to use cash collateral to pay

8   disbursements which are set forth in the budget which had

9   actually been incurred but unpaid as of the event of default.

10  Your Honor, at the bottom of that page, paragraph 13, this is

11  the 506(c) waiver, which initially was intended to be entered

12  as part of a final hearing, and we've now provided for that.

13  And that has been agreed to by the Debtors and the Committee

14  in connection with the other concessions provided by the pre-

15  petition lenders.  Your Honor, page 20, the next page,

16  paragraphs 14 through 18, those are just changes to convert

17  it to a final order.  Same on the next page with respect to

18  paragraph 19.  In paragraph 20, we've specifically set forth

19  the date for other parties in interest to raise - -

20          THE COURT: Right.

21          MR. WAITE:  - - challenges, and we have a later

22  date for the Committee.  Next page, still in paragraph 20, at

23  the very end, the lenders have consented to granting the

24  Committee standing.  So they will now have standing, and will

25  not have to seek it from the Court.  Paragraph 23, these are,

1    again, changes - - I'm sorry.  Page 23, paragraphs 21 through

2    23, these are just changes to make the order final.  The next

3    page, we've added paragraphs 24, 25, and 26.  These are

4    really just a design to permit the pre-petition secured

5    parties to file a single consolidated proof of claim, rather

6    than individual claims by each participant and in each case.

7    And it's really meant to provide administrative ease for all

8    parties in dealing with their claims.

9              THE COURT: Why, why - - explain to me the basis for

10    continuing the provision that they don't need to file a

11    statement under 2019.

12              MR. WAITE: You wanted to handle that Margot?

13              THE COURT: I mean, I don't know if they have to or

14    not.  But - -

15              MS. SCHONHOLTZ: Your Honor, Margot Schonholtz.

16              THE COURT:  - - why is it in this order - -

17              MS. SCHONHOLTZ: Margot Shonholtz for BofA.  The

18    reason is the administrative agent is the party here.  And

19    getting the benefits, and filing the proof of claim.  We're

20    not doing it on behalf of individuals which would implicate

21    2019.

22              THE COURT: So you don't need this sentence?

23              MS. SCHONHOLTZ: Yes.  Well, we need the sentence

24    just to make it clear.

25              THE COURT: Make what clear?  2019's either

1   applicable or it isn't.

2        MS. SCHONHOLTZ: In our view it's not applicable,

3   but we've seen instances where people argue later that it

4   might be.  And we just wanted to avoid any ambiguity.  We

5   don't believe it's applicable.  But we have seen cases in

6   other jurisdictions - -

7        THE COURT: All right.  Let's - - well, here's my

8   problem.  Which is, nobody's gotten notice of this particular

9   provision.  I don't know if it's applicable or not.  It

10  doesn't sound like it's applicable to me.  But you're having

11  me put a sentence in an order that indicates that I decided

12  it's not applicable.  And I'm troubled by that.

13       MS. SCHONHOLTZ: I don't want you to be troubled,

14  Your Honor.  This was really designed to facilitate one proof

15  of claim and ease of administration for this estate.

16       THE COURT: Right.

17       MS. SCHONHOLTZ: We don't believe it's applicable.

18  We don't want to have an argument later.  It's clearly up to

19  Your Honor.  If you're not comfortable, you're not

20  comfortable.

21       THE COURT: Yeah.  I'm going to strike that

22  sentence.  I'm all for one proof of claim, I just, I don't

23  think I'm going to give you an advisory opinion in this order

24  as to whether or not 2019's applicable.

25       MS. SCHONHOLTZ: Okay.  And obviously we've made our

1    statement on the record.

2              THE COURT: Certainly.

3              MS. SCHONHOLTZ: Thank you.

4              MR. WAITE: Your Honor, moving on to paragraph 27.

5    This is a new paragraph just to indicate that notices and

6    reports and so forth provided to BofA or from BofA will be

7    provided to the Committee.  We've actually modified this

8    language slightly since I filed the black line, but I didn't,

9    it didn't warrant a new black line.  But we've revised it to

10   say that those will be provided to the Committee, and the DIP

11   lender, or their advisors.

12             THE COURT: Which paragraph are you in?

13             MR. WAITE: This is paragraph 27.

14             THE COURT: Okay.  Or their advisors.  Okay.

15             MR. WAITE: Or their advisors.  And in many

16   instances the financial information would go directly to the

17   advisors.

18             THE COURT: Sure.

19             MR. WAITE: Your Honor, paragraph 28 was added just

20   to make clear what has, I think, been the arrangement since

21   day one, and was reflected on the record of the first day

22   hearing.  That in the context of this cash collateral order,

23   the administrative agent, and the pre-petition secured

24   parties are not receiving administrative expense claim or

25   priority claim under 507(b) or otherwise on account of any

1    collateral diminution.  There is a provided however at the

2    end of that paragraph, and that really was meant to deal with

3    situations where the Debtor, in violation of this order,

4    would somehow, you know, convert, hide, or improperly dispose

5    of - - collateral, none of which we intend to do.  But they

6    wanted to preserve the ability to come back in that context.

7              THE COURT: All right.

8              MR. WAITE: Your Honor, the pleading we filed this

9    morning, the clean copy that was attached to that, we've

10   attached a copy of the budget to that.  There was minor

11   changes to the budget, really to add the, I think there was

12   some corrections to some of the servicing advances, some

13   corrections to the timing of when we expect revenues to come

14   in, and we added some line items to deal with the Bank of

15   America construction lockbox account that we discussed.

16             THE COURT: Okay.

17             MR. WAITE: But that budget has been agreed to by

18   the pre-petition lenders.

19             THE COURT: Okay.

20             MR. WAITE: Your Honor, that, that really describes

21   the changes we've made, and based upon those changes, it's my

22   understanding that the Committee's objection is resolved, and

23   I would ask the Committee at this point to formally withdraw

24   their objection on the record.

25             THE COURT: All right.

1          MR. FELGER: Good morning, Your Honor.

2          THE COURT: Good morning.

3          MR. FELGER: Mark Felger of Cozen O'Connor, proposed

4    special conflicts counsel for the Committee.  I rise simply

5    to confirm that with the changes to the form of order, the

6    Committee withdraws its objection.

7          THE COURT: Okay.  Thank you.

8          MR. FELGER: Thank you, Your Honor.

9          THE COURT: All right.

10         MR. WAITE: Your Honor, before I turn to the

11   reservation of rights does Your Honor have any other

12   questions regarding the order?

13         THE COURT: No.

14         MR. WAITE: Your Honor, we did receive a number of

15   reservation of rights similar to what we saw at the first day

16   hearing.  I'm happy to report that we're down to a handful

17   rather than 15 or 20 people who have to come up and put

18   things on the record.

19         THE COURT: It's amazing what notice will

20   accomplish.

21         MR. WAITE: It does help, Your Honor.  Your Honor,

22   in connection with those objections/reservations of rights,

23   let me just put on the record again that by this order we are

24   only seeking permission and this order only grants the

25   Debtors permission to use the cash collateral of Bank of

1    America's administrative agent for the pre-petition secured

2    parties.  It does not grant, nor are we asking for, the right

3    to use the cash collateral of any other party.  Nothing in

4    this order grants any liens on any assets which are not

5    property of the estate.  Nor do I think we could do that

6    anyhow.  And certainly we're not, by this order, making

7    determinations as to whether assets that a party may assert

8    is not property of the estate is or isn't.  Those will be

9    dealt with in the context of separate adversary proceedings.

10   I'm hopeful that, that those statements - - and let me

11   further state that with respect to the loans that are owned

12   by other parties where we are conducting servicing and

13   collecting the principle and interest, that consistent with

14   the cash management order that was entered first day, you

15   know, post-petition those amounts are being, my

16   understanding, being paid into the various custodial accounts

17   in the ordinary course.  So hopefully that will resolve the

18   objections.  I'm sure I'll be told if it doesn't.  Your

19   Honor, one further clarification.  I know one party, Impac,

20   had asked for clarification of the meaning of some language

21   in paragraph 8 regarding no party being able to, basically,

22   collect an administrative claim from the bank's collateral.

23   And just to make it clear, we're not, that provision does not

24   say that the Debtors can't incur administrative expenses,

25   that people don't have claims for administrative expenses.

1   What it says is they can't seek to have it paid out of the

2   bank's collateral until the bank is paid.  And all that does

3   is recognize that the secured claim trumps the admin claim.

4          THE COURT: All right.

5          MR. WAITE: With that, let me - -

6          THE COURT: Does anyone wish to be heard?

7          MR. KORTANEK: Thank you, Your Honor.  Steve

8   Kortanek with Womble Carlyle.  We're local counsel for Credit

9   Suisse, First Boston Mortgage Capital.  We did not file a

10  written objection, Your Honor, or reservation of rights.  But

11  Mr. Waite's statement is consistent with the reservation that

12  we would make orally today, Your Honor.  So we would accept

13  his, the Debtors' reservation of rights, Your Honor, with

14  respect to the cash collateral - -

15         THE COURT: Very well.

16         MR. KORTANEK:  - - motion.

17         THE COURT: Thank you.

18         MR. KORTANEK: Thank you, Your Honor.

19         THE COURT: Good morning.

20         MR. GOLDBERG: Good morning, Your Honor.  Brian

21  Goldberg of Dickstein Shapiro on behalf of Royal Bank of

22  Scotland, PLC.  Our, we were one of the parties who did, in

23  fact, file a reservation of rights with respect to the cash

24  collateral order.  Our concern is whether or not the funds

25  that we assert are our client's property have been commingled

1    with the, with other cash that, to which the pre-petition

2    secured parties would assert is, also constitutes their cash

3    collateral.  We are uncertain of the protections provided,

4    either on the record or within the order, are sufficient to

5    preserve whatever rights or to prevent further commingling of

6    such assets to the extent that commingling has not yet

7    occurred.

8            THE COURT: All right.  Mr. Waite, can you respond

9    to that?

10           MR. WAITE: As I indicated, to the extent we're

11   servicing loans post-petition, it's my understanding that

12   amounts are being placed into the appropriate custodial

13   accounts.  I'm not aware of any commingling issue with

14   respect to Royal Bank of Scotland.  Obviously we're working

15   with all parties, and we'll try to continue to work with

16   Royal Bank of Scotland to get them information.  But nothing

17   in this order is authorizing us to do any of the, of the

18   items he is suggesting might be happening.

19           THE COURT: So if you convert his property - -

20           MR. WAITE: He's - -

21           THE COURT: - - nothing prevents him from trying to

22   get it back from either you or the administrative agent.

23           MR. WAITE: That's correct.

24           THE COURT: Correct?  All right.  There you are,

25   sir.

1           MR. WAITE: That's correct.

2           THE COURT:  They can't, I'm not signing any orders

3    allowing them to steal today.

4           MR. GOLDBERG: Thank you very much, Your Honor.

5    That's exactly the kind of clarification we were looking for.

6    Thank you very much.

7           THE COURT: We'll reserve that for another day.

8           MR. GOLDBERG: Thank you.  Thank you.

9           MR. WAITE: Nor would I ever ask the Court to sign

10   such an order.

11          THE COURT: I don't know about that.

12          MR. WAITE: Not today, Your Honor.

13          THE COURT: Mr. Riley.

14          MR. RILEY: Good morning, Your Honor.  Richard Riley

15   for Impac Funding.  You heard earlier that Impac Funding has

16   resolved its emergency motion with the Debtor, and subject to

17   a stipulation.  Based on that, and based on the Debtors'

18   reservation of rights, we'll stand down on our objection.

19          THE COURT: All right.  Thank you, sir.

20          MR. TOP: Good morning, Your Honor.  Frank Top from

21   Chapman & Cutler on behalf of Wells Fargo Bank as Master

22   Servicer.  And again, we joined in with a couple of other

23   entities on a limited objection and reservation of rights.

24   And with Mr. Waite's assurances that they're not granting any

25   liens on any custodial accounts or cash that belongs to the

1    securitization trusts, we are fine with that representation.

2         THE COURT: Thank you.  Mr. Chipman.

3         MR. CHIPMAN: Good morning, Your Honor.  For the

4    record, William Chipman, Edwards, Angell, Palmer, & Dodge on

5    behalf of Countrywide.  Your Honor, we didn't file an

6    objection.  I want to thank counsel for the Debtor for

7    getting us information relating to our custodial accounts,

8    and with Mr. Waite's representations on the record we're fine

9    that they're not getting a lien or claim on our, on our

10   assets.  Thank you, Your Honor.

11        THE COURT: Your welcome.  Anything further?  Yup.

12        MR. ROVIRA: Good morning, Your Honor.  Alex Rovira

13   of Sidley Austin on behalf of Bear Stearns Mortgage Capital

14   Corporation and EMC Mortgage Capital.  Your Honor, I heard

15   Debtors' representation, but I still find that it's not

16   clear.  Especially when the Debtors are disputing the rights

17   of, the property rights of our clients.  The title is still

18   in dispute, and they are claiming that it is property of the

19   estate.  We have asked the Debtors several times whether our

20   servicing interests are part of their servicing business, and

21   they have responded either one of two ways.  The first is

22   that the servicing business will have to be determined on a

23   case by case basis.  That's why we had to file our complaint.

24   The second response is that yes, EMC's property is in fact

25   part of the Debtors servicing business.  As such the Debtors

1  are claiming ownership and interest in property which we

2  strongly believe is not that of the Debtors.  And at a

3  minimum, such property's title is in dispute.  Your Honor, as

4  other people have mentioned and represented, by their motion

5  the Debtors should not be able to affect the rights of

6  property which they do not own, or over which title is in

7  dispute.  And this Court should not enter an order that would

8  affect the rights of the rightful owners of such property.

9  Your Honor, it is not enough that they made those

10  representations.  It is not enough that they provided that

11  rights under §§555, 556, and 559 to 569, to 561 will not be

12  affected.  It is not enough for that when they dispute the

13  property rights of our clients.  Even in the face of formal

14  complaints, including our clients, the Debtors refuse to

15  alter their strategy, and have ignored the property rights of

16  our clients and others.  If, in fact, the Debtors can attest

17  that my client, Bear Stearn Mortgage Capital Corp. and EMC's

18  property is not included in this motion, then we respectfully

19  request that the Debtors provide an accounting of such

20  property, because such property has not been transferred over

21  to EMC as we have made several demands for it to be

22  transferred.  Your Honor, if they're able to represent on the

23  record, I don't understand why it can't be put in the order.

24  In the order that, some language that notwithstanding

25  anything in that order, any property deemed to not be

1    property of the estate shall not be affected in any way by

2    that order.  Including that no security interests, liens are

3    attached to such property, and that the use or conversion of

4    such property shall be granted administrative priority.  Your

5    Honor, the order should be clear that the secured party shall

6    have no security right, lien, or other interest in or claim

7    to any property that is determined to be property of EMC or

8    BSMCC.  Thank you, Your Honor.

9         THE COURT: Um-hum.  Mr. Waite.

10        MR. WAITE: Your Honor, I don't know how many

11   different ways I can say it, but to the extent that the, the

12   assets that they are referring to is determined to be

13   property of the estate, then we're entitled to grant a lien

14   in it.  To the extent that it's not property of the estate,

15   and the Court ultimately determines that in the context of

16   the adversary they've commenced or otherwise, then nothing in

17   this order grants a lien in it.  Last time I checked the

18   Bankruptcy Code, we didn't have the right to grant liens in

19   property - -

20        THE COURT: Well, I think - -

21        MR. WAITE:  - - that's not property of the estate.

22        THE COURT:  - - his, his objection goes to since

23   it's in dispute, the order shouldn't even, it should be

24   carved out in its entirety.

25        MR. WAITE: Your Honor, we have disputes with a lot

1    of parties, and to try to muck up this order with individual

2    language that deals with each of these disputes.  I mean, I

3    think the better way to deal with it is the way we have.  And

4    all we're granting is replacement liens in the same assets in

5    which the lenders had a pre-petition lien, and only to the

6    extent that it's property of the estate.  If they properly

7    terminated rights, and it was no longer property of the

8    estate as of the filing of the petition, and the Court

9    ultimately determines that, nothing in this order grants a

10   lien in it, and the Debtor, I mean the lenders are prepared

11   to acknowledge that, which they have at the first day

12   hearing.  But to, but at this point, it is in dispute, and I

13   don't want to put any language in the order that would

14   somehow implicate that the assets they're referring to is not

15   property of the estate, because there is a dispute about

16   that.

17             THE COURT: Okay.

18             MR. WAITE: But we're not granting liens on it to

19   the extent that this Court ultimately determines it's not

20   property of the estate.  So I'd ask that the Court overrule

21   the objection.

22             THE COURT: All right.  Does anyone else wish to be

23   heard in response to that?  Let me hear, actually let me hear

24   from BofA on what if I ultimately rule in Bear Stearns favor

25   and what their understanding of that effect would be.

1          MS. SCHONHOLTZ: I'm not sure what that means, Your

2    Honor.

3          THE COURT: All right.

4          MS. SCHONHOLTZ: I think the order is clear - -

5          THE COURT: That's not you.  That's someone on the

6    phone, I think.

7          MS. SCHONHOLTZ: I think the order is clear that we

8    are only seeking replacement liens on our own collateral.  We

9    are not presumptuous enough to suggest we're taking liens on

10   anybody else's.  We've given up a lot of claims that we

11   ordinarily would assert in a cash collateral order.  What I

12   don't want to happen is to start to carve away at this order

13   by putting in stuff that would suggest that what might be

14   property of the estate might not be property of the estate.

15   It starts, it starts a parade.  I think the law is clear.  I

16   can't get liens on stuff that the Debtor doesn't own, and I'm

17   only seeking replacement liens on what we had before.

18         THE COURT: All right.

19         MS. SCHONHOLTZ: Thank you.

20         THE COURT: You're welcome.  I'm going to overrule

21   the objection.  I think the reservations in the order are

22   sufficient.  The reservations on the record are sufficient.

23   And as I said at the interim order, I think that obviously

24   the Debtor can only be authorized to grant liens in property

25   of the estate.  The fact that there is a dispute on who owns

1   certain property, I don't think is enough, certainly in this

2   case, and I'd say more generally not enough in order to hold

3   up cash collateral or DIP financing orders.  As long as there

4   are sufficient reservations and acknowledgments in those

5   orders that to the extent the Court ultimately determines

6   that certain property is not property of the estate, or some

7   other similar type finding, that that property is not subject

8   to the order.  And those are contained in this order.  I

9   think, frankly, they're standard in most orders.  So I'm

10  going to overrule the objection.  Anyone else?  Yes, sir.

11          MR. GOLDBERG: Your Honor, we would - - Brian

12  Goldberg again on behalf of Royal Bank of Scotland.  We would

13  ask that a, perhaps somewhere in paragraph 1 of the order

14  there just be some express acknowledgment of the various

15  clarifications and reservations that were made at the

16  hearing.  Because as the language currently states, it just

17  simply says that all objections are overruled.  If it's Your

18  Honor's opinion that it's addressed by it says to the extent

19  it's settled, then we would accept that.  I'm just not sure

20  if that's - - there's been a lot of language discussed here

21  today, which our client is comfortable with.

22          THE COURT: Um-hum.

23          MS. FATELL: However, just some acknowledge, just

24  so, if for some reason this ever is looked at later, some

25  acknowledgment.  I think it would go in paragraph 1.  Just

1    in, and where it says, you know – –

2            THE COURT: Well let me, I, I think you're covered

3    by the very intro to the final order paragraph which provides

4    at its end, middle of page 2, In, Solely in accordance with

5    the terms and conditions set forth in this final order, and

6    the Court having considered the offers of proof, evidence

7    educed, and the statements of counsel at the interim and

8    final hearing.  In my mind, that incorporates the

9    reservations of rights that are contained on the record.  I

10    think that's sufficient.

11            MR. GOLDBERG: Thank you very much, Your Honor.

12            THE COURT: Your welcome.

13            MR. WAITE: Your Honor, I think the only other

14    response filed was the joinder that was filed to the

15    Committee's objection which I think disappears by operation

16    of the law once the objection was withdrawn.

17            THE COURT: Who filed the joinder?

18            MR. WAITE: Deutsche Bank.

19            THE COURT: Deutsche Bank.  All right.

20            MR. WAITE: Your Honor, I have stricken the last

21    sentence of paragraph 24 per Your Honor's comment.  And with

22    that I'd ask that I may approach with the order?

23            THE COURT: Yes.  Is the budget attached?  Thank

24    you.  Signed the order.

25            MR. WAITE: Thank you, Your Honor.  Your Honor,

1    moving to item no. 10, which is the final DIP motion.  Your

2    Honor, on August 7th, the Court entered an interim order

3    approving Debtor in Possession financing and authorizing

4    borrowings up to $12 million.  Today we're seeking a final

5    order with respect to that motion.  Your Honor, the borrowers

6    under this facility include all the Debtors other than

7    American Home Mortgage Servicing.  Your Honor, the financing

8    under this facility is to be used to facilitate the, the

9    orderly liquidation and wind down of the non-servicing

10   businesses and asset sales.  As we indicated at the first day

11   hearing, in exchange for the financing, we are providing the

12   DIP lenders with super priority administrative claims, first

13   priority liens on all unencumbered assets of the borrowers,

14   and second priority liens on all encumbered assets of the

15   borrowers, except for any collateral that is the BofA

16   collateral.  That was agreed to by the parties.  Your Honor,

17   the, as we indicated the first day, the financing is needed

18   to provide the liquidity we need to get through this process

19   and provide assurance and comfort to our employees, vendors,

20   and creditors, and other parties we deal with that we will

21   have the funds available to proceed through this orderly

22   liquidation and maximize the value of these estates for the

23   benefit of all parties.  Your Honor, the DIP agreement was

24   negotiated in good faith and at arm's length.  And we believe

25   that the terms of it are fair and reasonable, and

1   commercially reasonable.  Your Honor just, again, for the

2   record, the lender is WLR Recovery Fund III, LLP.  The

3   facility is a $50 million facility, 10 million of which is

4   discretionary for the lenders.  The maturity date is the

5   earlier of 12 months after the closing date or the effective

6   date of a plan.  The interest rate is LIBOR plus three.

7   Default rate is two percentage points higher.  As I indicated

8   the facility is to be used for working capital for the non-

9   servicing business.  There are no priming liens being granted

10  in connection with this facility.  It provides a $5 million

11  carve out after an event of default, as well as US Trustee's

12  fees.  The facility fee that was paid, there's a facility fee

13  of $175 thousand annually, which is paid monthly.  The

14  commitment fee was 1%, and that was paid following the entry

15  of the interim order.  In terms of the event of default, they

16  are set forth in, I believe, section 8 of the credit

17  agreement, but represent fairly standard events of default

18  for a facility of this nature.  And I ran through those on

19  the record at the first day hearing.  Your Honor, we believe

20  the financing is fair and reasonable, and we would ask that

21  the Court enter a final order.  We did get objections from

22  the Committee, which has been resolved, and there was also an

23  objection filed by RREEF Management Company, which was a

24  landlord.  I've been authorized to advise the Court that that

25  objection is not being pursued, that that lease is on a

1   motion to be rejected.  And then we had a similar reservation

2   of rights that we had with respect to the cash collateral.

3   Your Honor, again, we filed a, a clean and black line copies

4   of the order, and I assume Your Honor has seen those.

5          THE COURT: Um-hum.

6          MR. WAITE: Your Honor, if you want I can run

7   through the changes to the order again.  Is your black line

8   copy page numbers?

9          THE COURT: This one is, yes.

10          MR. WAITE: Okay.  Your Honor, the changes on page 1

11   and 2 really just relate to converting it to a final order.

12   Same as on page 3.  As well as the top of page 4.  There's a

13   typographical correction on page 5.  Your Honor, the changes

14   on page 6, likewise, are to convert the order to a final

15   order.  Your Honor, on page 7, there's a new paragraph 7

16   which has been added.  That was added at the request of the

17   Committee simply to provide that while the Debtors are

18   jointly and separately liable for the financing, to the

19   extent that it is used in differing, varying amounts between

20   the various estates, there would be administrative priority

21   claim between the estates to maintain the relative priorities

22   for those estates pending some determination as to whether

23   the estates should be consolidated.

24          THE COURT: Okay.

25          MR. WAITE: Your Honor, on page 9 there's some

1    language just to clarify that there is no lien being granted

2    on avoidance actions.  Your Honor the changes on pages 10 and

3    11 are just technical corrections.  Same as on page 12.  As

4    well as 13 and 14.  Page 15, paragraph 24, it's just

5    providing for notice to be provided to counsel to BofA and to

6    the Creditors Committee.  Page 16, again, technical

7    corrections.  Page 17 at the top is a correction that was

8    requested by the Committee.  Just to clarify, the language

9    read that proceeds from dispositions of collateral would

10   become the sole and exclusive property of the secured

11   lenders, and the language just makes it clear that that's

12   only until such time as they're paid in full.  Page 18 and 19

13   are just technical changes.  Same with page 20.  Page 21,

14   paragraph 32 has been amended at the request of the Committee

15   to make it clear that the exculpation provision would not

16   exculpate the secured parties if a matter was determined to

17   have resulted from bad faith, gross negligence, or wilful

18   misconduct.  Page 22, just technical corrections.  Page 23,

19   in paragraph 36, we were providing that there will be three

20   days prior written notice to the Committee and counsel to

21   BofA of any amendments to the credit agreement.  Pages 24 and

22   25 are just to delete the paragraph regarding final hearing.

23   I believe with those changes, the Committee's objection is

24   resolved, and I'm going to ask them to formally withdraw it

25   on the record.

1          THE COURT: Okay.

2          MR. INDELICATO: Good morning, Your Honor.  Mark

3    Indelicato from Hahn & Hessen.  Based on the changes that

4    they've made to the order, the Committee is comfortable that

5    the estate is, and the creditors are protected.  And as a

6    result of that, we withdraw our objection.

7          THE COURT: All right.  Thank you.

8          MR. WAITE: Your Honor, that leaves the various

9    reservation of rights that were filed.  I think they are by

10   the same parties who have objected to the cash collateral,

11   and again hopefully we can make the same representation here.

12   That we are not granting liens on any assets which are not

13   property of the estate.  And hopefully that will be

14   sufficient to - -

15         THE COURT: And no priming liens.

16         MR. WAITE: No priming liens.  That's correct, Your

17   Honor.  But I'll ask if anyone else wants to be heard.

18         THE COURT: All right.  Yes, sir.

19         MR. GOLDBERG: Your Honor, thank you.  Brian

20   Goldberg again on behalf of Royal Bank of Scotland.  We would

21   simply just ask that the Court confirm on the record that the

22   additional clarifications and reservations that were stated

23   with respect to the cash collateral order would apply as well

24   to the DIP financing to the extent, with issues of

25   commingling or assets that were our, our client's property

1    somehow were commingled and have potentially lost their

2    status as such.

3         THE COURT: I will.  Yes.  I mean, again, I don't

4    view this order as doing anything other than providing the

5    Debtors the authority to grant liens in property of the

6    estate.  If that is property of the estate because of some

7    malfeasance or conversion of your property, then they're not

8    going to be permitted to give a lien in it.

9         MR. GOLDBERG: Thank you very much, Your Honor.

10   That's exactly what we were - -

11        THE COURT: All right.

12        MR. GOLDBERG: - - seeking.  Thank you, Your Honor.

13        THE COURT: And again, I view this order as

14   incorporating the record at the hearing, which would include

15   any reservation of rights.

16        MR. TOP: Your Honor, Frank Top from Chapman &

17   Cutler on behalf of Wells Fargo as Master Servicer.  Again,

18   with that same reservation of rights, we're satisfied.

19        THE COURT: Okay.

20        MR. KORTANEK: Your Honor, Steve Kortanek again for

21   Credit Suisse.  We echo the same reservation that the Debtors

22   made, and we incorporated with respect to cash collateral as

23   to the DIP financing.  I rise simply because we did not file

24   a formal reservation.

25        THE COURT: Fair enough.

1          MR. KORTANEK: Thank you, Your Honor.  Yes, sir.

2          MR. ROVIRA: Your Honor, Alex Rovira again from

3     Sidley Austin on behalf of Bear Stearns.  Your Honor I'm just

4     going to raise the same objection and the same reservation of

5     rights.  I still don't believe that the order is clear.

6     Especially when they continue to believe and argue that our

7     property is property of their estate.  And that is not

8     correct, and that is unclear.  And there shouldn't be, I

9     think, an order from this Court that allows them to place

10    liens on things that they purport to be property of the

11    estate.  At least not until it's finally determined.

12         THE COURT: I understand.  For the reasons I set

13    forth on the record in connection with the cash collateral

14    objection, filed by Bear Stearns, I'll overrule that

15    objection.  Yes, sir.

16         MR. ACKERLY: May it please the Court, my name is

17    Ben Ackerly, and I'm here on behalf of Calyon, New York

18    Branch.  If the Court would look at paragraph (h) of the

19    proposed order, as I read paragraph (h), the Court is making

20    a finding that each item in the DIP collateral constitutes

21    property of the estate of at least one borrower.  And in the

22    loan agreement is a three page laundry list of what the

23    collateral is.  And then if you look over at paragraph 21,

24    paragraph 21 of the order says, Notwithstanding anything in

25    this final order to the contrary, the liens and security

1    interests granted to the administrative agent shall not

2    extend to any assets that are not property of the borrower's

3    estate.  Now it seems to me (h) and paragraph 21 are

4    inconsistent.

5         THE COURT: How so?

6         MR. ACKERLY: The way I read it, you're making a

7    finding that all of the DIP collateral is property of the

8    estate.  And so in paragraph 21, there is a finding that the

9    liens in here don't attach to anything that's not property of

10   the estate.  Now the Debtors just, in the laundry list of

11   items there are mortgage loans listed, and all of us who have

12   clients who are parties to repo agreements, have a claim in

13   this case that those, that those mortgage loans are not

14   property of the estate.  So that's my concern.  Perhaps the

15   Debtor can clarify that, or perhaps - -

16        THE COURT: They've obviously drafted (h) as broadly

17   as possible and then carved out 321.  So I don't, I mean you

18   can view them as inconsistent, I mean, but my mind is 21

19   trumps (h).  So somebody tell me if that's wrong.

20        MR. ACKERLY: Okay.  I'm fine with that.

21        THE COURT: If 21 doesn't trump (h) speak now, or

22   forever hold your peace.  I didn't hear anybody.  So 21

23   trumps (h).

24        MR. WAITE: And Your Honor, I would just point out

25   too the definition of collateral in the credit agreement

1    refers to property of the estates.  And with respect to his

2    reference - -

3          THE COURT: Including but not limited to.

4          MR. WAITE: Exactly.  And with respect to his repo

5    rights, we have the reservation paragraph, 38, that we had in

6    the interim order that continues in the final order.

7          THE COURT: Okay.

8          MR. WAITE: If we're done with reservation of

9    rights, I'd ask that, unless Your Honor has any questions, I

10   be able to submit the proposed final order.

11         THE COURT: Yes.  Please.  You may approach.

12         MR. WAITE: And I've attached the credit agreement,

13   and it does have the budget attached, which has not changed

14   from the budget attached to the interim.

15         THE COURT: All right.  Thank you.  All right.  I've

16   signed the order.

17         MR. WAITE: Thank you, Your Honor.  I think the next

18   item up will be handled by my partner, Ms. Morgan.  And with

19   Your Honor's permission may I be excused at this point?

20         THE COURT: Yes.

21         MR. WAITE: Thank you.

22         THE COURT: Ms. Morgan, can we take a ten minute

23   recess, please?

24         MS. MORGAN: Of course.  Thank you, Your Honor.

25         (Whereupon at 12:07 p.m. a recess was taken in the

1   hearing in this matter.)

2       (Whereupon at 12:16 p.m. the hearing in this matter

3   reconvened and the following proceedings were had:)

4           THE CLERK: All rise.

5           THE COURT: Please be seated.  Thank you.

6           MS. MORGAN: Good afternoon, again, Your Honor.  I

7   think we're up to item 11 on the agenda.

8           THE COURT: Okay.

9           MS. MORGAN: Which is the Debtors' application under

10  §§105 and 363 to approve an agreement with Kroll Zolfo

11  Cooper, LLC, Steven Cooper, and Kevin Nystrom.  KZC is

12  serving as interim management to the Debtors, and Steven

13  Cooper is Chief Restructuring Officer, and Kevin Nystrom is

14  Director of Restructuring.  Your Honor, there was an informal

15  response by the US Trustee as well as a limited objection by

16  the Official Committee, and I'm pleased to report that we

17  have worked out both of those objections.  The changes

18  requested by the US Trustee are pretty significant, and I

19  think it makes sense if I could hand up a black line and walk

20  through them.

21          THE COURT: Yes.  Thank you.

22          MS. MORGAN: Your Honor, on page 2 of the black

23  line, mine is not page numbered.  We're basically gutting

24  what used to be page 2.  But basically this is, this is

25  saying the application is granted as modified herein.  And

1  then we begin the modifications which are at the bottom of

2  that page.  Again, this is to clarify, at the US Trustee's

3  request, that KZC is providing management services to the

4  Debtors on the terms of the agreement subject to this order.

5  At the top of the next page, subparagraph (a), again this is

6  in accordance with the Jay Alix protocol, but it makes clear

7  that KZC and its affiliates are not acting as financial

8  advisor, claims agent, claims administrator, investor, or

9  acquirer.  And only as interim management.  In (b), Your

10 Honor, we have agreed with the US Trustee that if there will

11 be additional executive officer positions that are different

12 from the executive officers currently contemplated, or if

13 there's any material change in the agreement as modified by

14 this order, or if the functions materially change, or new

15 executive officers are added, that we will file a motion.  On

16 notice, obviously, to interested parties.  Item (c) indicates

17 that the US, I'm sorry, that KZC will file with the Court,

18 and provide to the US Trustee and the Committee, a report of

19 staffing for engagement in the previous month.  And we've

20 already done that, Your Honor, and submitted it both to the

21 US Trustee and the Committee for the previous month.  And

22 again making clear that staffing shall be subject to review.

23 Subparagraph (d) indicates that none of the individuals at

24 KZC will serve as a director of the Debtors during the

25 pendency of the cases.  Subparagraph (e) provides that their

1    reports of compensation earned will be served and filed on a

2    monthly basis rather than a quarterly basis, as the protocol

3    permits.  It has detailed information as to what the summary

4    charge should look like.  Again, this is at the request of

5    the United States Trustee.  We've also agreed that there will

6    be detailed time entries describing the tasks and organized

7    into project category as of September 1.  Where personnel are

8    providing services on an hourly rate, their time increments

9    will be 1/10ths of an hour.  And the US Trustee agreed that

10   for those, at a flat rate, they will be in increments of one

11   hour.  And again clarifying that compensation is subject to

12   review by the Court should there be an objection.

13   Subparagraph (f), again clarifies any success fees,

14   transaction fees, or other back end fees are subject to Court

15   approval at the conclusion of the case on a reasonableness

16   standard.  The agreement actually did merely provide for a

17   reservation of rights to come back to the Court.  So that's

18   not really a significant change.  And again, the last

19   sentence says that none of those fees shall be sought upon

20   conversion, or dismissal, or for, or on appointment of a

21   trustee.  Subparagraph (g) makes clear that the

22   indemnification provisions of the agreement are being

23   replaced by this.  And what this essentially says is that

24   those that are serving in an officer capacity are getting the

25   same indemnification as is provided to the officers of the

1    Debtors under the bylaws and corporate charter.  It says here

2    also, at the next page, at the end of paragraph (g) that

3    paragraph 8 of the agreement is deleted.  That was the

4    limitation of liability section, Your Honor.  And that is

5    being deleted.

6              THE COURT: Does, does the indemnification under

7    subparagraph (g) include advancement?

8              MS. MORGAN: Your Honor, it would if the bylaws so

9    provide, and I believe they do so provide.

10             THE COURT: All right.

11             MS. MORGAN: Subparagraph (h), Your Honor, again

12   confirms no indemnification for non-officers and affiliates

13   of KZC.  Subparagraph (i), KZC has agreed that for three

14   years after the conclusion of this engagement neither it, nor

15   any of its affiliates will make any investments in the

16   Debtors or the Reorganized Debtors.  Subparagraph (j)

17   reflects the continuing obligation of KZC to disclose any

18   facts, any additional facts separate from those set forth in

19   the affidavit of Steve Cooper with respect to other

20   engagements that KZC is involved with, or has been involved

21   with.  Subparagraph (a), as we did with the Young Conaway

22   application, Your Honor, we've agreed to defer the evergreen

23   retainer request to a date to be determined.  Subparagraph

24   (l) again indicates that notwithstanding anything in the

25   agreement to the contrary, KZC employees who are officers are

1  subject to the duties and obligations of officers under

2  applicable law.  And finally subparagraph (m) indicates that

3  KZC will not be entitled to apply to the Debtors to pay for

4  their own legal expenses.  Paragraph 3, Your Honor, we just

5  added some provisions making clear that the agreement is

6  modified by this order, and is subject to the enhanced, if

7  you will, compensation review procedures in this order.  And

8  then the very last paragraph, Your Honor, is a new paragraph

9  added at the request of the Official Committee of Unsecured

10 Creditors.

11        THE COURT: Okay.

12        MS. MORGAN: And we have agreed with the Committee

13 that in one year, so we've picked the date of July 31, 2008,

14 we will confer with the Committee as to whether the $250

15 thousand flat rate for Mr.'s Cooper and Nystrom is still

16 appropriate going forward.  And if we're unable to agree, if

17 there is a change needed at all, and if we're unable to

18 agree, the Committee would come back and have to file a

19 motion and seek to modify that.

20        THE COURT: All right.

21        MS. MORGAN: And the burden would be with them to,

22 to prove the reasonableness of its alternative fee structure.

23 And with those changes, Your Honor, we believe that both the

24 Committee and the United States, United States Trustee

25 support the approval of the order.  And I would yield the

1    podium to Committee counsel.

2         THE COURT: Does anyone wish to be heard?  Mr.

3    Indelicato.

4         MR. INDELICATO: Good afternoon, Your Honor.  Mark

5    Indelicato from Hahn & Hessen on behalf of the Committee.

6    Your Honor, as is common in these cases, one of the first

7    things the Committee is concerned about is the exorbitant

8    fees that the case could potentially have with professionals

9    from all sides.  When we examined the application of Zolfo,

10   Kroll Zolfo Cooper, the Committee was concerned about the

11   retention.  Not necessarily about the qualifications.  I

12   don't think we had any question about that.  But the

13   potential fees that could be charged.  The fees for Mr.

14   Cooper and Mr. Nystrom being $250 thousand a month without

15   any minimum hours required, without any cap on how long it

16   was going to last.  And then that there potentially being

17   additional hourly employees thereafter.  Your Honor, as a

18   result of the changes requested by the US Trustee and our

19   objection, we have become more comfortable with the

20   application and its retention.  Now that they are going to be

21   filing monthly time records, and give the Committee an

22   opportunity on a monthly basis to review what's going on, and

23   if the Committee feels there's an issue, bring it to this

24   Court's attention.  We were also, having the ability to

25   reexamine it after a 12 month period.  I will tell you, Your

1  Honor, that was a negotiated time period.  The Committee

2  wanted less, they didn't want any, but we were comfortable

3  with the 12 month period given the way we saw the case going.

4  Your Honor, so based on that, the Committee again was

5  comfortable with the retention as it exists.  Not thrilled,

6  but they believe that the work needed to be done, believed

7  that we needed to get them retained on this basis.  And as a

8  result of that, the Committee will support this retention,

9  mindful of the fact that the Committee is going to keep a

10  watchful eye on these and all expenses, and if we believe

11  there's any issue, we're going to bring it immediately to the

12  Court's attention.

13         THE COURT: Thank you.  Anyone further?  All right.

14  Ms. Morgan.

15         MS. MORGAN: Your Honor, with that the Debtors would

16  request that Your Honor approve the order as modified.  We

17  certainly believe that approval of the agreement is in the

18  best interest of the estate and the services of KZC are

19  absolutely necessary.

20         THE COURT: All right.

21         MS. MORGAN: May I approach with an order?

22         THE COURT: Yes.  Thank you.  The Court will approve

23  the order reflecting the changes resolving the objection of

24  the Committee and the Office of the United States Trustee.

25         MS. MORGAN: Thank you, Your Honor.  Your Honor, Mr.

1  Lunn will handle the next few items on the agenda.  Thank

2  you.

3         THE COURT: All right.

4         MR. LUNN: Good afternoon, Your Honor.  May it

5  please the Court, Matthew Lunn from Young Conaway on behalf

6  of the Debtors.  Agenda item no. 12, Your Honor, is the

7  Debtors' motion to retain professionals in the ordinary

8  course of business, pursuant to §§327, 328, and 330.  As Your

9  Honor can imagine, the Debtors employ a number of

10  professionals not only related to the foreclosure proceedings

11  and bringing REO to market and to sale, but also your

12  traditional counsel related to regulatory matters, trademark

13  matters, and litigation matters.  Your Honor, there were two

14  objections received to the motion.  One by, an informal

15  objection by the Office of the United States Trustee that

16  could be probably best characterized as conform to the order

17  that was entered in New Century and also the affidavit that

18  was entered by Judge Carey in the New Century matter.  And a

19  limited objection by the Committee which could probably be

20  best characterized as, include provisions so that we can

21  monitor the fees and the scope of the services being provided

22  by the ordinary course professionals.  Your Honor, the

23  objections have been resolved.  The markup of the order again

24  is fairly significant, and it would probably be best if I

25  walked Your Honor through those revisions.

1          THE COURT: All right.

2          MR. LUNN: May I approach?

3          THE COURT: Yes.  Thank you.

4          MR. LUNN: Your Honor, the revisions begin on page 2

5   of the black line, and these revisions essentially are to

6   conform to the other revisions that are made in the

7   subsequent provisions of the order.  The, turning to page 3

8   of the black line, Your Honor, the first - -

9          THE COURT: Hang on, hang on.

10         MR. LUNN: I'm sorry.

11         THE COURT: Okay.  Okay.

12         MR. LUNN: Moving to page 3, Your Honor.  The first

13  ordered paragraph.  This was a revision suggested by the

14  Office of the United States Trustee.  This is a provision

15  that was in the form of order entered by Judge Carey in New

16  Century.  The ordered provision, the next ordered provision

17  which is struck, or stricken has been moved to a later place

18  in the order.

19         THE COURT: Okay.

20         MR. LUNN: The next ordered paragraph that provides

21  that within 30 days the professionals shall file a retention

22  affidavit.  That again, is a provision that was in the New

23  Century order and we've carried and agreed to carry it to

24  this order.  The next ordered paragraph really talks about

25  just the service of the affidavits and the ability of the

1    notice parties to file an objection to the form of affidavit

2    submitted by the ordinary course professionals.  Page 4 of

3    the black line, Your Honor.

4              THE COURT: The affidavits get filed, right?

5              MR. LUNN: Yes.

6              THE COURT: All right.

7              MR. LUNN: They will be filed.  The full, first full

8    ordered paragraph in the middle of that, Your Honor, is just

9    to make certain that the Committee's rights are reserved with

10   respect to objecting to ordinary course professional fees

11   that are incurred during the case.  The references to Exhibit

12   A to the motion and Exhibit B to the motion are just clean up

13   revisions, Your Honor.  The ordered paragraph that begins at

14   the bottom of page 4, and carries on to page 5, this was

15   requested by counsel for the Committee and is to allow

16   oversight to the Committee with respect to the fees, and

17   their ability to object to fees and the fee statements

18   submitted by the ordinary course professionals within 10

19   business days.  If a portion of the fees that are objected to

20   or otherwise contested, the Debtors have agreed not to pay

21   those objected to or otherwise disputed fees until there is a

22   resolution.

23             THE COURT: So the Committee is going to review all

24   the monthly invoices of all the ordinary course retention - -

25             MR. LUNN: That's what they requested, Your Honor.

1          THE COURT: How is that going to save money?

2          MR. LUNN: Your Honor, I was told that they wouldn't

3   spend a lot of time on it - -

4          THE COURT: All right.

5          MR. LUNN: - - but they wanted the oversight.

6          THE COURT: Okay.

7          MR. LUNN: The next ordered paragraph on page 5,

8   we've incorporated a concept of not only the monthly caps,

9   but also of three month caps for each of the ordinary course

10  professionals that were identified on Exhibit A and Exhibit

11  B.  For Exhibit A ordinary course professionals a three month

12  cap of 75 thousand.  And with respect to those on Exhibit B,

13  185 thousand for three months.  The last ordered paragraph on

14  page 5 just carries those three month cap concepts to what

15  was already in the order.  Page 6 of the black line, this is,

16  the first ordered paragraph is the one that was struck in the

17  beginning of the order.  It's moved to right here.  Which is

18  the first ordered paragraph on page 6.  The Committee, the

19  next ordered paragraph, the Committee also requested the

20  ability to monitor what ordinary course professionals are

21  handling what services, and were concerned about the fact

22  that once we sell a loan portfolio or otherwise sell the

23  servicing business, that we have the ability to stop, tell

24  the ordinary course professionals to stop working as of a

25  certain date so that additional fees are not incurred with

1    respect to those loan portfolios or the servicing business.

2    So that order provision is meant to capture that.  Next

3    ordered provision is just the right to adjust caps in the

4    event that we need to adjust the caps.  The next order

5    provision is again a New Century order provision where we

6    will file quarterly statements certifying that we're

7    complying and identifying the amounts paid within every 90

8    days.

9            THE COURT: Okay.

10           MR. LUNN: And finally, Your Honor, the ordered

11   paragraph that begins at the bottom of page 6 and carries

12   over to page 7, the Committee was concerned about the overall

13   necessity of each of the ordinary course professionals that

14   were identified on Exhibits A, B, and C, and what we've

15   negotiated is the provision that allows them to come back to

16   the Court, or come back to the Debtors, and say These

17   ordinary course professionals are doing something more than

18   ordinary course, or are not otherwise needed, retain them by

19   a formal application.  And which the Debtors have agreed to

20   do so.

21           THE COURT: All right.

22           MR. LUNN: And I believe with those revisions, and I

23   believe the Committee wanted to make a statement on the

24   record with respect to this, the objections have been

25   resolved, Your Honor.

1          THE COURT: All right.  Thank you.

2          MS. FATELL: Good afternoon, Your Honor.  Bonnie

3   Fatell from Blank Rome, co-counsel to the Creditors

4   Committee.  Mr. Lunn has correctly set forth the summary of

5   the objections and the resolution of those objections.  I

6   first want to thank counsel to the Debtors for the

7   cooperation in working through the various issues.  In the

8   aggregate, this is a lot of money if all of these

9   professionals perform to the maximum that they are authorized

10  to under this proposed order.  So it was important to the

11  Committee that we have some oversight and the ability to

12  monitor the, not only the services that are being performed,

13  but also the professionals.  For example, there are

14  litigation professionals who are handling defense work.

15  Well, if the stay is in place, they should not have anything

16  to do other than file a notice to the Court indicating that

17  it's stayed.  The appropriate court, I should say.  So we

18  just wanted to make sure that this was not a blank check for

19  these various professionals to feel that they had the ability

20  to just continue to perform services, notwithstanding the

21  bankruptcy.  With respect to the review of the monthly

22  invoices, Your Honor, we do not anticipate that that will be

23  an expense to the estate of anything substantial.  We just

24  want to make sure that on an ongoing basis we see that the

25  services are being performed as minimally as is necessary,

1    and that again, they're not extraordinary expenses.  The last

2    point, Your Honor, is that we were very concerned that to the

3    extent there's no benefit to the estate because a mortgage

4    has been, the servicing of a mortgage has been transferred,

5    that there be a mechanism in place, which the Debtors have

6    agreed to, so that those foreclosure attorneys would be

7    notified promptly that they should cease providing any

8    services, because they would not benefit the estate.

9              THE COURT: All right.

10             MS. FATELL: Thank you.

11             MR. LUNN: I have a proposed form of order.

12             THE COURT: You may approach.

13             MR. LUNN: Thank you.

14             THE COURT: Thank you.  The Court will approve the

15   order containing the provisions resolving the Committee's

16   objection.

17             MR. LUNN: I should note, Your Honor that we've

18   attached the – –

19             THE COURT: Um-hum.

20             MR. LUNN: – – form of affidavit as Exhibit A to the

21   order, and that's the exact affidavit that was approved by

22   Judge Carey in the New Century case.  And that was at the

23   request of the US Trustee.

24             THE COURT: Oh, yeah.  I'm sorry.  And also

25   resolving the US Trustee's issues as well.

1          MR. LUNN: Thank you, Your Honor.

2          THE COURT: Okay.

3          MR. LUNN: The next agenda item, Your Honor, is

4    agenda item 13.  And as the agenda indicates this matter is

5    being adjourned over to the September 17th hearing.  There

6    were informal concerns raised by the US Trustee, and also a

7    limited objection by the Committee.  Your Honor, as with the

8    Cadwalader retention, we'd like to, if in the event the

9    parties are able to reach an agreement, submit a form of

10   order under certification of counsel in advance of the 17th.

11         THE COURT: Okay.  That's fine, subject to, I'll

12   look at it and I'll let you know if I have a problem with it.

13         MR. LUNN: Understood, Your Honor.  Thank you.

14         THE COURT: I didn't, frankly, review the motion

15   because it was indicated it was continued.

16         MR. LUNN: Understood, Your Honor.  Agenda item no.

17   14, Your Honor, is the Debtors' motion to reject certain

18   unexpired leases of non-residential real property, and to

19   abandon certain furniture, fixtures, and equipment.  Your

20   Honor, by the motion we're seeking entry of the order that

21   authorizes the rejection of the non-residential real property

22   leases, approximately 36 that were identified on the exhibit,

23   effective as of August 31, 2007, and the authority to abandon

24   the furniture, fixtures, and equipment located within those

25   premises.  As Your Honor has heard a number of times early on

1   in these cases, the Debtors, in the beginning of August,

2   ceased their loan production business operations.  These

3   lease locations relate to the Debtors operations with respect

4   to the loan origination business, and therefore are no longer

5   necessary to the Debtors' ongoing business operations.  The

6   Debtors reviewed the leases and determined that they have no

7   economic material value and thus decided to, or determined to

8   reject these leases.  We received two objections, Your Honor.

9   One by Boston Properties Limited Partnership, which I'm happy

10  to inform Your Honor that we have resolved with the landlord,

11  and we will be submitting a stipulation under a 9019 motion.

12  They had requested, among other things, the ability to set

13  off the deposit against the rejection damage claim.  Which we

14  will work through a form of order, and then submit it under a

15  9019 motion.  The remaining objection, Your Honor, is, was

16  filed by De Lage Landen, which is an equipment lessor.

17  Essentially, Your Honor, they raised, I think, two points.

18  One was that we cannot abandon property that is not the

19  Debtors.  Obviously we're not seeking the authority to

20  abandon furniture, fixtures, and/or equipment that the

21  Debtors do not own.  And secondly, that the Debtors did not

22  file and have not moved to reject the equipment leases

23  located within the leased premises.  Your Honor, on Thursday,

24  August 30th, the Debtors did file a motion to reject among

25  other things the equipment leases located in the 36 lease

1    locations, and on August 31ˢᵗ followed up that motion, which

2    stated we unequivocally surrender possession, with a letter

3    to De Lage Landen and an email to De Lage Landen's counsel

4    attaching that letter saying that we surrender possession of

5    the equipment, and go pick it up at the lease locations.

6    Accordingly, Your Honor, we, the Debtors, feel that the

7    objection is moot at this point, given those, given those

8    facts.  Your Honor, De Lage - -

9        THE COURT: Didn't we deal with this issue like two

10   weeks ago?  Somewhere?

11       MR. LUNN: We dealt with it in connection with the

12   abandonment.  But Your Honor they are requesting additional

13   language be included in the order that talks about, or that

14   reserves their right to come back and, not so much reserve,

15   Your Honor, but rather that they're granted relief from the

16   stay to go pick up their equipment.  Your Honor, they haven't

17   moved for relief from the stay.  It's not necessary.  Their

18   objection is moot.  We've unequivocally surrendered

19   possession.  We told them to go get the equipment.  They've

20   also asked for provisions in the order - -

21       THE COURT: Well, if you've consented, if you've

22   abandoned the equipment, and you've told them to come pick it

23   up, what's the harm in granting them stay relief to ensure

24   they're not violating any law in doing so?  In doing what

25   you've asked them to do?

1          MR. LUNN: I don't think that it's necessary, Your

2    Honor, to give - -

3          THE COURT: I understand it's not necessary.  What's

4    the harm?  What's the - -

5          MR. LUNN: There probably is no harm, Your Honor.

6          THE COURT: All right.

7          MR. LUNN: But then again, what their concerned

8    about - -

9          THE COURT: As long as it's limited to - -

10          MR. LUNN: Right.  As long as it's limited - -

11          THE COURT:  - - the abandoned property.

12          MR. LUNN:  - - their abandoned property, or their

13    lease that's subject to these lease locations.

14          THE COURT: Um-hum.

15          MR. LUNN: Additionally they were concerned about

16    landlords not agreeing to let them in.  And the Debtors

17    obviously will cooperate with De Lage Landen and have

18    conversations with landlord counsel to say that De Lage

19    Landen can come in and get their equipment.  To the extent

20    that it's even there.

21          THE COURT: Right.  Let me hear from, I guess it's

22    Mr. Riley.

23          MR. RILEY: Good afternoon, Your Honor.  Richard

24    Riley from Duane Morris for De Lage Landen.  It, we had asked

25    for some safeguards for the equipment.  The, if the real

1    estate leases are rejected, they have filed a motion to

2    reject our equipment leases, but they simply are not

3    rejected.  There will be a gap period between the rejection

4    of the real estate leases and the rejection of the equipment

5    leases.  We had requested, and the leases provide, that the

6    Debtor have to, has to safeguard the equipment, and cooperate

7    with us in picking up the equipment.  So we, we suggested

8    some language to Debtors' counsel about giving us relief from

9    stay to go get the equipment, and that is mainly to help us

10   with the landlords.  To get the cooperation of the landlords.

11   We have found in other instances that without an order giving

12   us relief from stay, the landlords may not be cooperative or

13   let us get our equipment.  We also asked just for cooperation

14   from the landlords and the Debtor - -

15            THE COURT: Well, I can't give you cooperation from

16   the landlords.

17            MR. RILEY: Well, a provision, well, I guess a

18   provision for cooperation from the Debtor helping us locate

19   the equipment and find out what equipment is there.  And then

20   just a reservation of rights that we can come back here if we

21   have disputes with getting the equipment out.  And then just

22   a reservation of our claims under the Bankruptcy Code, mainly

23   365(d)(5).

24            THE COURT: All right.  Mr. Lunn.  I'm struggling to

25   see why that's not unreasonable.  Or why that's unreasonable.

1    Excuse me.

2            MR. LUNN: Your Honor - -

3            THE COURT: Here's what we're going to do.  I'm

4    going to, I'm going to, let's give them stay relief limited

5    to what you've actually authorized them to do.  Which is to

6    come and get the abandoned equipment.  I think, frankly, Mr.

7    Riley raises a very valid point.  Which is if they have an

8    order that indicates they have stay relief, they're more

9    likely to be able to get cooperation from the landlords.

10   Two, I don't see any problem putting a reasonable cooperation

11   with the Debtor provision in the order.  I can't give them

12   anything in connection with the landlords, they're not in

13   front of me.  If a landlord refuses to let them in, that's an

14   issue between them and the landlord, and they'll have to deal

15   with that in the appropriate jurisdiction.  And then, I think

16   a reservation of rights would be appropriate.  So could we

17   - -

18           MR. LUNN: We'll work on a form of order, Your

19   Honor.

20           THE COURT: Yeah.

21           MR. LUNN: And submit - -

22           THE COURT: Work with Mr. Riley on a form of order,

23   and submit it under certification of counsel.

24           MR. LUNN: Certification.

25           THE COURT: So I'm going to grant his objection to

1    that extent.  Or sustain his objection to that extent and

2    otherwise grant the motion.

3              MR. LUNN: All right.  Thank you, Your Honor.  And

4    we will submit that under certification of counsel.

5              THE COURT: Very well.

6              MR. LUNN: The next agenda item, Your Honor, is the

7    application to retain Northwest Trustee as foreclosure

8    professionals.  As was indicated in the agenda, we are

9    working through issues with the United States Trustee to

10   resolve their informal objection which went to them having a

11   pre-petition claim and certain of, they required supplemental

12   disclosures with respect to certain of their affiliates.

13   Your Honor, we have not quite gotten there yet with Northwest

14   Trustee.  We have sent over a supplemental affidavit to the

15   United States Trustee so that they can sign off on the

16   supplemental.  Assuming that they do we request that we,

17   likewise with respect to the Kekst, stay, and also

18   Cadwalader, submit a form of order under certification of

19   counsel.

20             THE COURT: That's fine.  We'll continue it to

21   September 17th, and if in the interim you work it out, you can

22   submit a form of order under certification of counsel and

23   I'll either sign it or let you know that we need to go

24   forward at a hearing.

25             MR. LUNN: Thank you, Your Honor.  The next agenda

1  item, Your Honor, which is item 16, will be handled by my

2  colleague Mr. Beach.

3          THE COURT: All right.

4          MR. BEACH: Good afternoon, Your Honor.  May it

5  please the Court, Sean Beach from Young, Conaway, Stargatt, &

6  Taylor on behalf of the Debtors.  Your Honor, the 16th and 17th

7  items on the agenda today are respectively the motion to sell

8  certain servicing rights to Barclays Bank PLC free and clear

9  of liens, claims, and encumbrances, as well as a motion to

10 file certain of the purchase price information related to

11 that sale motion under seal.  Your Honor, if it's acceptable,

12 I will address both of these motions in tandem, as the

13 argument and testimony will relate to both.

14         THE COURT: That's fine.

15         MR. BEACH: At the outset, Your Honor, I'll say

16 rather sheepishly, that the request for relief under 1146(c)

17 was an error, and we're stricken that from the form of order.

18 There were a number of changes requested by counsel for Bank

19 of America, and we do have a revised form of order which

20 reflects those changes as well as negotiations with Barclays.

21 I am pleased to say that with those changes, and with Your

22 Honor's indulgence to extend the objection deadline for Bank

23 of America, we have been able to resolve the issues, and the

24 motions are now unopposed.  I think it may be beneficial for

25 Your Honor if I can hand up a form of black line of these

1   orders as well as a purchase price calculation.  With respect

2   to the purchase price calculation, Your Honor, some of that

3   information we are requesting be kept under seal.  But I

4   think it may assist Your Honor in getting a sense of how the

5   calculation works under the sale agreement.

6           THE COURT: All right.

7           MR. BEACH: May I approach?

8           THE COURT: Yes you may.  Thank you.

9           MR. BEACH: Your Honor, the Debtors have been

10  servicing and administering the portfolio, this portfolio of

11  first lien adjustable rate mortgage loans on a servicing

12  retained basis.  Which mortgage loans American Home, American

13  Home Mortgage Corp. sold to Barclays on May 1, 2007.  The

14  terms by which AHM has been servicing these loans are

15  contained under a servicing agreement with Barclays.  Since

16  the sudden upheaval of the Debtors' businesses, the Debtors

17  have sought to sell their businesses and assets to financial

18  and other strategic purchasers.  On August 9th, 2007, this

19  Court approved sale procedures with respect to the Debtors'

20  servicing assets.  The sale procedures expressly provided the

21  Debtors with the ability to sell certain of the servicing

22  assets outside of the larger sale, and to waive the sale

23  procedures and the auction process with respect to those

24  sales.  So when some interested parties have previously

25  received notice of the Debtors intent to sell these servicing

1    assets, their right to sell such assets separately, the

2    Debtors' right to waive the sale procedures, and also with

3    the private sale motion that was filed last week, Your Honor.

4    The Debtors anticipate that there will be a buyer for the

5    bulk of the loan servicing business, and however think that,

6    in their business judgment that the Barclays sale provides

7    the highest and best value that could be obtained for these

8    servicing rights that are implicated in the motion today.

9    And that the private sale will not interfere with the bulk

10   sale of servicing assets to be sold, but will simply carve

11   out these servicing rights under the bulk sale of the assets.

12   With respect to the request to seal the actual purchase

13   price, Your Honor, we believe that without sealing this

14   information we could set an artificial ceiling that would

15   hinder our ability to get the best price for other servicing

16   assets that are currently in negotiation.  Your Honor, with

17   respect to the purchase agreement, the assets that are being

18   sold under the sale agreement are the, transfer all of the

19   Debtors' right, title, and interests set forth under the

20   Barclays servicing agreement.  It confirms the termination of

21   the Barclays servicing agreement itself.  In return, any

22   liabilities that the Debtors incurred under the Barclays

23   servicing agreement will be assumed by Barclays and Barclays

24   will also pay an additional consideration based on the unpaid

25   principle balance of the, the loans.  And the way that that

1  purchase price calculation will work, Your Honor, is set

2  forth in the hand out I've provided to you.  In sum, this

3  portfolio contains 1,777 mortgage loans as of September 1st

4  that are being serviced under the agreement.  §3.1 of the APA

5  sets out the purchase price calculation, and the way it

6  essentially works is the net unpaid principle balance, after

7  certain deductions, which is approximately 741 million is

8  multiplied by the purchase price percentage, which we're

9  asking Your Honor to keep under seal today, minus $62.50 per

10  loan that is not covered under a tax servicing contract.  The

11  Debtors estimate that amount to be approximately $111

12  thousand.  Plus all outstanding advances as of the transfer

13  date.  The Debtors are responsible for paying for the

14  transfer costs except for 70%, 75% of the cost of sending out

15  Goodbye letters to the mortgagors.  The sale agreement also

16  sets forth the servicing transfer procedures, and the

17  modified sale order sets the transfer date as September 14th,

18  2007.  The modified order also modifies §2.01(c) of the sale

19  agreement to include a release by Barclays of the Debtors

20  with respect to all claims and causes of action under the

21  servicing agreement arising prior to the transfer date.  The

22  sale agreement provides for a 210 day adjustment period to

23  the extent any errors are discovered with respect to the

24  information used in the purchase price calculation.  Under

25  the modified sale order, and based on negotiations with Bank

1    of America and discussions with Barclays, this errors

2    adjustment period has been reduced to 60 days.  Unless Your

3    Honor has additional questions about the asset purchase

4    agreement, I would propose to proffer the testimony of Mr.

5    Robert Johnson, who's available in the courtroom today.

6            THE COURT: Any objection to the use of a proffer?

7    Hearing none, you may proceed.

8            MR. BEACH: If called to the stand, Mr. Johnson

9    would testify that he is the Executive Vice President,

10   Capital Markets, of American Home Mortgage Investment Corp.,

11   and has been with the company since 2001.  Mr. Johnson

12   received a Bachelor of Arts degree from the University of

13   Richmond, and has worked in the mortgage lending industry

14   since 1994.  Prior to joining American Home, Mr. Johnson

15   managed the secondary mortgage division of Comnet Mortgage

16   Services.  In his career in the mortgage lending industry, he

17   has overseen and participated in numerous sales of both

18   mortgage loan servicing rights and mortgage loans on a

19   servicing released and retained basis.  Mr. Johnson would

20   testify that he has been responsible for, among other things,

21   overseeing the sale of various facets of the Debtors'

22   servicing operations.  With respect to the proposed sale of

23   the Debtors' loan servicing business, his duties have

24   included facilitating due diligence by interested parties,

25   both individually and through the Debtors' advisors,

1    Milestone Advisors, LLC and Phoenix Capital, Inc.,

2    communicating with these interested parties regarding the

3    financial condition and performance of the Debtors'

4    businesses, and working on behalf of the Debtors to encourage

5    competitive bidding for the Debtors' assets in order to

6    ensure that the Debtors are able to obtain the highest and

7    best available value.  Mr. Johnson has been personally

8    involved in the majority of the Debtors' servicing sale

9    efforts, including the proposed sale of the portfolio of

10   servicing rights to Barclays that is before Your Honor today.

11   Mr. Johnson would further testify that he is familiar with

12   the sale procedures relating to the proposed sale of

13   substantially all of the Debtors' mortgage loan servicing

14   assets approved by the Court on August 9th, 2007.  He would

15   testify that he is familiar with the motion to sell a portion

16   of the Debtors' servicing rights to Barclays, and the motion

17   to seal certain confidential commercial information contained

18   in Barclays sale motion.  Mr. Johnson would state that he is

19   aware that all known potential bidders previously received

20   notice of the Debtors' intent to sell substantially all of

21   their servicing assets, and has communicated with many

22   parties interested in all or a portion of these assets,

23   including Barclays.  He would testify that he is aware that

24   the sale procedures permit the Debtors to sell portions of

25   the servicing assets separate from the larger servicing asset

1    sale, and that the Debtors may waive the sale procedures.

2    Mr. Johnson would testify that in his business judgment, the

3    private sale to Barclays is in the best interest of the

4    Debtors' estates and creditors, and will result in the

5    highest and best value for such servicing assets, and that

6    waiving the sale procedures is warranted here.  Mr. Johnson

7    would testify that the Debtors anticipate receiving a bid

8    that will be a qualified bid for substantially all of the

9    Debtors' servicing business, however, the Debtors have also

10   been in contact with several parties, including Barclays, who

11   are not interested in bidding on the entirety of the

12   servicing business, but are interested in purchasing portions

13   of the servicing rights that relate to the specific loan

14   portfolios.  Mr. Johnson, representatives of Milestone,

15   representatives of Phoenix, and other representatives of the

16   Debtors have communicated with each of these parties, and

17   have engaged in negotiations for the purchase of various

18   portions of the servicing business.  Mr. Johnson would

19   testify that it is common and ordinary in the mortgage

20   lending industry for an originator of mortgage loans to sell

21   those loans themselves to a third party, and maintain the

22   servicing obligations with respect to those loans for a

23   period of time under the terms of a servicing agreement,

24   which is precisely what we have here.  He would state that

25   based on his understanding of the mortgage loan business a

 1   mortgage loan portfolio is more highly valued by the lender

 2   if it is in control of both the servicing and the loans it

 3   owns.  Therefore, he believes that there is more of an

 4   incentive for a lender, such as Barclays, to purchase the

 5   servicing rights relative to its loans.  Mr. Johnson believes

 6   that the consideration proposed in the Barclays sale

 7   agreement is fair, reasonable, and consistent with Barclays

 8   added incentive to acquire these specific servicing rights.

 9   If the private sale is not approved, Barclays would continue

10   to have an added incentive, but would have no reason to

11   submit a bid other than a bid nominally higher than a bid

12   that might be received at auction.  Barclays agreed to the

13   terms of the agreement for the purchase of the Barclays

14   servicing rights with the condition that the sale of the

15   Barclays servicing rights not be included in the auction of

16   the sale of the remainder of the servicing business, and that

17   approval of the sale be obtained quickly to ensure that the

18   transfer of servicing occurred in September of 2007.  The

19   value of, the value of Barclays' offer to purchase the

20   servicing rights exceeds the purchase price percentage that a

21   willing buyer would likely pay if the servicing rights were

22   included in the broader sale of Debtors' servicing business.

23   Further potential purchasers have been informed that the

24   private sale is going forward with respect to the Barclays

25   servicing rights, and that those assets will not be included

1   in the larger sale.  Mr. Johnson would testify that to the

2   best of his knowledge, understanding, and belief, this has

3   not in any way materially impacted the proposed sale of the

4   remaining servicing business.  Based on the proposed price

5   that Barclays is prepared to pay for the servicing rights,

6   Mr. Johnson would testify that the Debtors determined it is

7   necessary and appropriate to seek approval of a private sale

8   of the Barclays servicing rights outside the auction process.

9   The consideration to be paid is fair and reasonable, will

10  result in the highest and best value for such assets, and

11  that the transaction is in the best interest of the Debtors'

12  estates and creditors.  That is it unlikely any other bidder

13  would bid more at an auction, and that the risks associated

14  with delaying the sale to Barclays would, could negatively

15  impact the price Barclays is willing to pay.  Based on his

16  involvement in the sale process and negotiations, the

17  transaction was negotiated at arm's length and in good faith.

18  To the best of Mr. Johnson's knowledge, there was never any

19  collusion among potential bidders and Barclays is not an

20  insider of the Debtors.  No party took any action to

21  discourage bidders from making an offer on the Barclays

22  servicing rights, or to prohibit any interested party from

23  access to information that would allow them to make a higher

24  or better bid for the Barclays servicing rights.  With

25  respect to the confidential commercial information, Mr.

1   Johnson would testify that the Debtors are in discussions

2   with several other parties interested in servicing rights.

3   He would testify that if the purchase price or purchase

4   percentage is publicly disclosed, Mr. Johnson believes that

5   such disclosure will make it more difficult for the Debtors

6   to negotiate even better deals with similarly situated

7   lenders.  That other lenders would use such information

8   against the Debtors in negotiations, and could use the

9   purchase price percentage as an artificial ceiling in their

10  negotiations with the Debtors.  Which could impair the price

11  that the Debtors would otherwise be able to attain.  Mr.

12  Johnson would testify that the purchase price percentage and

13  purchase price are commercial information that must be kept

14  confidential so as not to devalue other potential

15  transactions.  That would conclude the proffer of Mr.

16  Johnson, who again is available in the courtroom today.

17          THE COURT: Does anyone wish to cross examine Mr.

18  Johnson?  All right, hearing none, I'll accept the testimony.

19  Let's, I'd also like to have the summary price calculation

20  admitted into evidence.  Mark it as Debtors' Exhibit 1, and

21  it will be admitted under seal.

22          MR. BEACH: Thank you, Your Honor.

23          THE COURT: All right.  Does anyone wish to be heard

24  in connection with the motion?  I'm sorry.  Mr. Beach, did

25  you have anything further?

1          MR. BEACH: No.  I was just going to suggest we run

2     through the changes in the order, Your Honor.

3          THE COURT: Let's do that first.  You know I don't

4     need to go through the seal order, just the sale order.

5          MR. BEACH: Thank you, Your Honor.  There were some

6     clerical changes in the first couple pages.

7          THE COURT: All right.

8          MR. BEACH: The first material change is, or more

9     substantial change is in paragraph (h) on page 3.  Your

10    Honor, we were just making it clear that - - and this is at

11    the request of Bank of America - - that liens will attach to

12    the net proceeds.  There's a later paragraph that provides

13    that the, that any proceeds from this sale, including

14    advances, will be paid in accordance with the cash collateral

15    order.  Your Honor, that is in paragraph 12.  New paragraph

16    12.

17         THE COURT: Okay.

18         MR. BEACH: Paragraph (i) is striking out the

19    1146(c) relief.  Paragraph 4, Your Honor, adds the

20    modifications to the asset purchase agreement.

21         THE COURT: Um-hum.

22         MR. BEACH: One is the, (a) is the change of the

23    transfer date to September 14th, (b) is the release that I

24    spoke about earlier, (c) is to clarify that the unpaid

25    principle balance calculations are all as of September 1st.

1          THE COURT: Okay.

2          MR. BEACH: And (d) is the, simply correcting the,

3   or changing the errors adjustment period to 60 days from 210

4   days.

5          THE COURT: All right.

6          MR. BEACH: In paragraph 6, we deleted the 1146(c)

7   exemption.  Paragraph 7, that, that paragraph previously said

8   that this order trumps any other orders.  It now says that

9   this order trumps only the sale procedures order entered on

10  August 9th.

11         THE COURT: Okay.

12         MR. BEACH: Paragraph 8 added a provision to say

13  that the Debtors will consult with and provide notice to the

14  Committee, DIP lender, and administrative agent with respect

15  to any modifications, amendments, or supplements to the asset

16  purchase agreement.  Paragraph 11 is simply a confirmation

17  that the reps and warranties do not survive.  Paragraph 12 is

18  the cash collateral paragraph I mentioned earlier.  Paragraph

19  13 confirms that this order governs over any inconsistencies

20  in the agreement.  Paragraph 14 is, provides that the

21  standard 6004 will not apply.

22         THE COURT: Right.

23         MR. BEACH: And that concludes the changes, Your

24  Honor.

25         THE COURT: Does anybody wish to be heard in

1    connection with these motions?  Hear from the Committee.

2            MR. INDELICATO: Your Honor, Mark Indelicato again

3    on behalf of the Committee.  Your Honor, this was another one

4    of those items that we've had to deal with on a rather

5    expedited basis.  Your Honor, the way we dealt with it is we

6    got our financial advisors involved very quickly, and based

7    on certain representations made by the Debtor, because our

8    primary concerns were, 1, was it a good price, and 2, was it

9    going to affect the value of the sale of the servicing

10   platform?  We became comfortable based on certain

11   representations that were made that it was not going to

12   affect the value of the servicing platform.  And in fact,

13   that we were going to get a higher return on this than we

14   might otherwise have gotten from a willing buyer.  From our

15   experience as counsel to the Committee in several other

16   cases, Your Honor, this does appear to be a good price for

17   these assets, although we're hoping not the ceiling.  But we

18   believe it is a good price.  And as a result of that, in

19   conjunction with our financial advisors review, and the

20   representations made by the Debtor, including on the proffer

21   today, we support the motion.

22           THE COURT: Okay.  Thank you.  Anyone else?  Mr.

23   Beach, do you have a final form of order?

24           MR. BEACH: I do, Your Honor.  May I approach?

25           THE COURT: Yes.  Okay.  Thank you.  Based on the

1   proffer of testimony, including the admission of the exhibit

2   under seal, and the changes to the order set forth on the

3   record, and the support of the Committee, the Court will

4   approve both the seal motion and the sale motion.

5        MR. BEACH: Thank you, Your Honor.  Your Honor the

6   18th item on the agenda will be handled by Ms. Morgan.

7        THE COURT: Go ahead.

8        MS. MORGAN: Your Honor, item 18 on today's agenda

9   is the Debtors' motion to approve a settlement agreement with

10  Fannie Mae pursuant to Bankruptcy Rule 9019.  This motion was

11  filed on August 24 with a request for shortened notice.  And

12  Your Honor, again, thanks to the Court for allowing us some

13  flexibility on the objection deadline, I'm pleased to report

14  that I think this is being presented on a consensual basis

15  today.  We did give an extension to the Bank of America, as

16  administrative agent, and we have made some changes which are

17  supported by the Committee, as well as BofA, and Fannie Mae.

18  Your Honor, as set forth in the motion, the Debtors service a

19  portfolio of mortgages owned by Fannie Mae pursuant to a

20  mortgage selling and servicing contract as supplemented by

21  the Fannie Mae selling and servicing guides.  It's a large

22  pool for the Debtors.  Approximately 36,700 loans with an

23  aggregate unpaid principle balance of 5.2 billion.  The

24  servicing rights in connection with that pool represent

25  approximately 15% in loan value of the loans the Debtors

1   service.  On July 31 Fannie Mae sent a notice of termination

2   to the Debtors purporting to terminate the contract rights

3   pre-petition.  The Debtors have disputed whether Fannie Mae

4   effectively terminated its contract pre-petition.  But rather

5   than litigate over the point, Your Honor, the parties have

6   entered into this settlement agreement.  And the settlement

7   agreement is attached to the motion, and the principle terms

8   are as follows.  The parties each reserve their rights in

9   connection with whether the pre-petition termination was

10  effective or not effective.  But without prejudice to that,

11  Your Honor, the Debtors are deemed an approved Fannie Mae

12  servicer during the terms of this agreement.  The company is

13  permitted to continue to service the Fannie Mae portfolio,

14  and to collect its customary fees in connection with the

15  servicing of that portfolio.  Probably most importantly, the

16  Debtors are permitted to market and, market the servicing

17  rights for sale in connection with the motion approved,

18  motion for bidding procedures approved on the first day of

19  the case, on or before October 31st.  The settlement agreement

20  requires the Debtors, among other things, to continue to

21  provide an acceptable level of service for the loan

22  portfolio, to provide reasonable access to Fannie Mae

23  representatives, which we have been doing.  It also requires

24  the Debtors to solicit bids and conduct an auction and have a

25  sale in accordance with certain benchmarks set forth in the

1   stipulation.  And those benchmarks mirror, Your Honor, the

2   Court's order entered I think on the 9th in connection with

3   the, the procedures governing the servicing sale.  We have

4   already determined that those dates need to be moved a little

5   bit.  And I think probably it makes sense for me to take a

6   little detour at this point, and tell you where we are with

7   that process.  We have been negotiating with several

8   interested purchasers, and at this point the Debtors feel

9   relatively confident that they will be in a position to

10  submit to the Court a motion for approval of a stalking horse

11  agreement.  I can't tell you the timing of that exactly, but

12  the parties have been working very diligently on that, and it

13  has, basically throughout this process, the Debtors

14  determined that it would be beneficial to have a stalking

15  horse agreement in place, again, to set the floor for bids.

16  And it became necessary in our view to modify the dates a

17  little bit.  The order Your Honor approved after the first

18  day hearing allowed us some flexibility as long as we

19  consulted with the administrative agent, the DIP lender, and

20  the Official Committee.  Which we did, Your Honor, and last

21  Friday we sent out a notice moving some of those dates.  The

22  bid deadline was originally set for the 6th, which is right

23  around the corner.  So we felt that it was important to get

24  notice out to people right away that we were moving that.  So

25  the notice indicated that the bid deadline is being moved

1    from the 6th to the 18th.  The auction date is being moved from

2    the 10th to the 24th.  And the sale hearing, which was

3    scheduled for the 17th, we would like to move to October 1.

4    Which is another omnibus date.  So it's roughly a two week

5    move for these dates.  And Your Honor, our intention is with

6    respect, when we do, and hopefully we will, have a stalking

7    horse agreement in place, and a motion to approve certain

8    auction protections, we will, you know, ask the Court at that

9    time, in that order, to formally bless the new dates, which

10   we hope will coincide with the stalking horse agreement.

11   Your Honor, that necessitated an immediate change to the

12   Fannie Mae agreement, because the settlement was based on the

13   dates approved at the first day hearing.  I am pleased to

14   report that we've discussed the issue with Fannie Mae and

15   they have agreed to extend the dates to the new dates

16   proposed by the Debtors.  And there is some flexibility,

17   again, if the Court should order the dates to change again.

18        THE COURT: I'm going to interrupt you for just a

19   moment.

20        MS. MORGAN: Sure.

21        THE COURT: Someone on the phone needs, is making a

22   lot of noise.  I apologize.  But you going to need to mute

23   your phone - - we're hearing a lot of shuffling of papers,

24   and what not - - if you're going to participate

25   telephonically.  Thank you.  Go ahead.

1           MS. MORGAN: Your Honor, the Fannie Mae agreement

2    provides that upon a sale of the Fannie Mae portfolio of

3    servicing rights, the proceeds are to be distributed in a

4    certain way.  Basically first to pay Fannie Mae amounts that

5    are due from the Debtors.  Secondly to pay BofA as

6    administrative agent, which has a lien on these servicing

7    rights.  And if anything remains thereafter, to the Debtors.

8    The agreement also sets forth certain events of default.

9    Again, including failure to adhere to the schedule.  And it

10   allows the Debtors, though, to cure those defaults within two

11   business days.  Fannie Mae is required to provide written

12   notice of default and allow us an opportunity to cure.  With

13   that, Your Honor, we believe we have, we don't intend to

14   default, obviously, but we have some protections built into

15   the stipulation to allow us to cure or allow us to come back

16   to the Court, if necessary.  Your Honor, through negotiations

17   with Bank of America in the past few days, we have also

18   changed the order further to provide that if there is an

19   uncured event of default, BofA would be permitted to come in

20   and be a, an interim sub-servicer on behalf of Fannie Mae.

21   And we also think this is beneficial to the estate, because

22   otherwise if there were to be an uncured event of default,

23   Fannie Mae would merely have the right to take its portfolio

24   and sell it on its own.  The BofA changes that have been

25   negotiated throughout the weekend actually, again, afford the

1    Debtors the potential that if it is sold, that again the

2    proceeds are distributed much like was anticipated in the

3    settlement agreement to begin with.  First to Fannie Mae,

4    secondly to BofA in its role as administrative agent, and

5    again, if anything remains, to the estate.  With that, Your

6    Honor, it probably makes sense for me to go through the

7    order, because those changes are significant.  May I approach

8    with a black line?

9         THE COURT: Yes.  Thank you.

10        MS. MORGAN: Your Honor, you'll see the changes

11   begin on page 2.  And in the second ordered paragraph on page

12   2 this reflects the change in the dates that I just went

13   through.  The deadline in paragraph 2(b) of the stipulation,

14   and that would be the bid deadline - -

15        THE COURT: Um-hum.

16        MS. MORGAN:  - - extended to September 18th, or such

17   other date as set by the Court.  The sale date was in 2(c) of

18   the stipulation, and it was previously September 17th, now

19   being moved to October 1.  And then finally, romanette three

20   says if there's uncured event of default under this

21   stipulation - -

22        THE COURT: Right.

23        MS. MORGAN:  - - the following paragraph applies.

24   And I guess I should say paragraphs.  But it basically again,

25   as I indicated, Your Honor, provides that if there is an

1  uncured event of default, BofA can come in and act as interim

2  sub-servicer in exchange for the same servicing compensation

3  that was provided to the Debtors under the contract.  And I

4  understand that BofA currently is a Fannie Mae servicer, so

5  this was not a difficult concession for the parties.  BofA

6  shall not be liable for the Debtors' representation and

7  warranty obligations in its capacity as interim servicer.

8  However, there is a mechanism, and it is in paragraph 1, and

9  it is also in the stipulation that's attached, that again,

10  allows for Fannie Mae to be compensated for that.  Your

11  Honor, paragraph 1 is really not too much different than the

12  settlement agreement itself.  It again essentially provides

13  that first Fannie Mae gets paid, BofA gets paid second - -

14        THE COURT: And this is, this is all in the event of

15  an uncured event of default.

16        MS. MORGAN: Correct.

17        THE COURT: All right.

18        MS. MORGAN: And only in that event, Your Honor.

19        THE COURT: All right.

20        MS. MORGAN: And again, paragraph 2 continues with

21  how the proceeds are to be distributed.

22        THE COURT: All right.

23        MS. MORGAN: But essentially it is very similar to

24  what was provided in the initial settlement agreement that

25  was attached to the motion.

1          THE COURT: Okay.

2          MS. MORGAN: Your Honor, we did receive, in addition

3     to the informal objection by BofA, which I believe has been

4     resolved by the revised form of order, we did receive a

5     limited response and reservation of rights from Royal Bank of

6     Scotland.  It's again seeking, I believe, to seek

7     clarification that none of the proceeds of its alleged

8     collateral are being distributed under this motion.  Your

9     Honor, I can state for the record that this motion has

10    nothing to do with RBS collateral.  The distribution of

11    proceeds would not be of RBS collateral.  This motion, or the

12    order, doesn't affect RBS collateral in any way.  So I'm

13    hoping that that, in addition to the reservations made

14    earlier in connection with cash collateral, would satisfy the

15    RBS limited response, which is not really an objection.

16         THE COURT: All right.

17         MS. MORGAN: And Your Honor, I think I mentioned,

18    but I will mention again, that we did share the revised form

19    of order with the Official Committee of Unsecured Creditors,

20    which also has no objection to the approval of the settlement

21    as modified by this order.  The Debtors believe that this is

22    a fair and reasonable compromise of the parties claims, in

23    fact that it's a very beneficial settlement from the Debtors'

24    perspective.  We find it very important to remain a Fannie

25    Mae approved servicer, and we believe that Fannie Mae's

1    agreement to allow us to continue to act as servicer, and to

2    allow us to market the servicing portfolio is a substantial

3    benefit to the estate.  So we believe the settlement is, is

4    very favorable from the Debtors' perspective.  And approval

5    of it is in the best interest of the estate.

6             THE COURT: All right.  Does anyone wish to be

7    heard?

8             MR. POWER: Good afternoon, Your Honor.  Mark Power

9    from Hahn & Hessen, counsel to the Committee.  Your Honor, as

10   my partner said with respect to the Barclays deal, this was

11   also a rushed transaction.  However the Committee's financial

12   advisors spoke to the Debtor and got some information

13   regarding this transaction.  Quite frankly, this is one of

14   those situations where either you face a choice of litigating

15   and having a very uncertain risk about the assets and the

16   value preserved for the estate, or you cut a deal which

17   basically preserves the status quo, and gives the Debtor an

18   opportunity to try to maximize value.  The Debtor elected to

19   choose the latter, and the Committee supports the business

20   judgment of the Debtor in that regard.  We believe the

21   transaction as proposed, Your Honor, is in the best interest

22   of the estate, and we therefore support it.

23            THE COURT: Thank you Mr. Power.  Yes sir.

24            MR. GOLDBERG: Good afternoon, Your Honor.  Thank

25   you.  Again, Brian Goldberg of Dickstein Shapiro on behalf of

1  Royal Bank of Scotland.  Based on the representations and

2  clarifications made by counsel for the Debtor in connection

3  with seeking approval of the motion, Royal Bank of Scotland

4  is satisfied that their interest will be protected in

5  connection with the, to the extent the Court does grant the

6  Debtors' motion.

7          THE COURT: Okay.  Thank you, very much.

8          MR. GOLDBERG: Thank you, Your Honor.

9          THE COURT: Anyone else?  All right.

10         MS. MORGAN: Your Honor, may I approach - -

11         THE COURT: Yes.

12         MS. MORGAN:  - - with a clean version?

13         THE COURT: Um-hum.  Settlement agreement is

14  attached?  Again, based on the representations of counsel and

15  the review of the stipulation as modified by the order, I

16  think that the Debtors clearly satisfy the 9019 standards,

17  and I'll approve the agreement.

18         MS. MORGAN: Thank you, Your Honor.  Your Honor the

19  next two matters on the agenda are adversary matters.  The

20  first one, an adversary commenced by Calyon, New York branch.

21  So I would cede the podium to Mr. Kirpalani, special counsel

22  to the Debtors.

23         THE COURT: All right.

24         MR. KIRPALANI: Good afternoon, Your Honor.

25         THE COURT: Good afternoon.

1              MR. KIRPALANI: Susheel Kirpalani from Quinn

2     Emmanuel on behalf of American Home.  The two matters that we

3     have were actually heard initially at the request of the

4     Plaintiffs in these two adversary proceedings by Judge Carey

5     last week.  And Judge Carey entered ordered, entered orders

6     as the duty judge, I believe, in your absence that we would

7     come back today and have Your Honor resolve these.  With

8     respect to Calyon, initially they did file an emergency

9     motion for a preliminary injunction, as well as for an

10    expedited trial.  And I believe, through discussions had with

11    Calyon's counsel over the weekend, we've reached an agreement

12    with them so that today would not actually be a preliminary

13    injunction hearing, which I don't think we, on the Debtors'

14    side, had any fear of that.  But in any event, we've resolved

15    that such that we would just use today to discuss scheduling

16    of what they are requesting, which is another expedited

17    trial, like Credit Suisse.  The same is true with Bear

18    Stearns.  Bear Stearns did not move for a preliminary

19    injunction based on Your Honor's rulings on irreparable harm

20    issues with the Credit Suisse matter, but they too would like

21    an expedited trial.  I have tried to resolve scheduling with

22    both Calyon and Bear Stearns last week, and I've made some

23    progress with Calyon here in the courtroom.  And I think we

24    will have a, a consensual scheduling with Calyon, but I'd

25    like to cede the podium to them, so that they could address

1    if they have any other issues before we get into the

2    scheduling.

3            THE COURT: All right.  Very well.

4            MR. ACKERLY: Ben Ackerly on behalf of Calyon, Your

5    Honor.  Mr. Kirpalani is correct.  We had reached an

6    agreement on the preliminary injunction matter, and we'll

7    submit to the Court a stipulation with respect to that.  As

8    far as the expedited trial, the concern, of course, has to do

9    with the proposed sale of the servicing business.  It appears

10   that we may be able to agree, subject to the Court's

11   schedule, to a trial on the merits the last week in October,

12   which would be satisfactory to us.  And I believe that Mr.

13   Kirpalani and I can probably work out the, work out the

14   details of that.  The only major exception would be is that

15   we would want to reserve our right, and I think Mr. Kirpalani

16   is okay with this, to come back into the Court on an

17   emergency basis if in the interim the Debtor is not able to

18   continue servicing our mortgages.  It's contemplated that the

19   servicing business will be sold October 1, currently, and we

20   want to be sure that the Debtor is able to continue to

21   service our mortgages in the interim.  So I'm confident that

22   we probably will work it out, and be able to submit a

23   stipulation - -

24           THE COURT: All right.

25           MR. ACKERLY: - - on that too.

1          THE COURT: I think that timing will work.

2          MR. ACKERLY: Okay.  All right.

3          THE COURT: Subject to reservations.

4          MR. ACKERLY: Thank you.

5          MR. KIRPALANI: Thank you, Your Honor.  And just so

6     Your Honor understands the scope of what we have been

7     discussing.  It's similar to the Credit Suisse matter in that

8     this is their show in the sense that they're moving for an

9     expedited trial on the grounds that they're entitled to take

10    the servicing rights.  And there are all sorts of issues that

11    are intertwined with that, such as ipso facto, what does 559

12    provide, as well as the counter claim, the only counter claim

13    that we'd be required to assert at this time, which is

14    whether or not this is actually a true repurchase agreement.

15    And with respect to any other counter claims that the Debtors

16    have, whether they arise under this same agreement or not.

17    We would not be trying those on an expedited basis.  We've

18    not yet had an opportunity to analyze and investigate those

19    facts.

20          THE COURT: All right.

21          MR. KIRPALANI: So it's similar in that regard to

22    Credit Suisse.

23          THE COURT: Okay.

24          MR. KIRPALANI: With respect to Bear Stearns we have

25    not made substantial progress, regrettably, with respect to

1   scheduling what I would ask the Court from our position is we

2   are trying to be as efficient as possible by utilizing the

3   same lawyers that are very familiar with these issues from

4   Credit Suisse, then Calyon, and then will be Bear Stearns.

5   And that we would like the trial dates to be scheduled,

6   consistent with Your Honor's calendar and availability, at

7   least a few weeks after the post-trial briefing of the Calyon

8   matter.  That's what we agreed with Calyon, they would come a

9   few weeks after we'd finished post-trial briefing with Credit

10  Suisse, and we'd like Bear Stearns to happen a few weeks

11  after that.  I think from their perspective, I'll let them

12  speak for themselves, they would like to kind of dual track

13  trials, depositions, and documents.  And from our

14  perspective, you know, although we might be able to

15  accommodate some amount of dual tracking, it would be, it

16  would be very, a much less efficient way to go about it.

17  Particularly with respect to the attention of management who

18  are trying to focus on the sale efforts during the next 30 to

19  45 days.  And in terms of the need for the speed of these

20  trials.  The, October 1 is set as the sale hearing date with

21  a projected closing of October 31st, but it is entirely

22  possible that the buyer of the servicing business will

23  require a period of time to obtain licensing, and it may take

24  longer than that before any actual transfer of servicing even

25  occurs.  So the alleged harm of not having a servicer for

1  some period of time, or not knowing who the servicer is going

2  to be, I think will not ever come to fruition.  And that's

3  the reason that Calyon's counsel agreed with me that if they

4  have the right to come into court in the event of an

5  interruption of service, you know, which of course we're okay

6  with, then they could live with the longer, more reasonable

7  time table.

8          THE COURT: What week did we talk about with Calyon?

9  The week of the 22nd?

10         MR. KIRPALANI: It would be the week of the 29th.  Of

11 October.

12         THE COURT: The week of the 29th.

13         MR. KIRPALANI: Um-hum.

14         THE COURT: Of October.  All right.  Let me hear

15 from Bear Stearns.

16         MR. CROWELL: Your Honor, Nick Crowell from Sidley

17 Austin for Bear Stearns and EMC Mortgage.  I disagree with

18 Mr. Kirpalani.  I don't think it will be more efficient to

19 put our hearing out until I guess it sounds like November

20 now.  We were pretty close last week, and we're a couple of

21 weeks apart.  We thought it would be more efficient, because

22 our issues are nearly identical to the issues raised by CSFB.

23 We have a repo agreement with the Debtor.  There's no

24 question it's a repo agreement.  We've asked them multiple

25 times over the last three weeks to tell us what their defense

1   is to our claim that we're entitled to our servicing.  We've

2   already sold the loans that are subject to the agreement on a

3   servicing release basis, and we've never received a response

4   from them as to why they think they're entitled to the

5   servicing rights.  I asked them specifically whether they're

6   going to be asserting that it's not a repo agreement, and I

7   didn't get a response.  We just think that in the matter, in,

8   for efficiency's purpose, that discovery should be on the

9   same track with CSFB.  This is a one day trial at most.  This

10  is really a narrow issue.  We're going to agree, just like

11  CSFB and Calyon has agreed to defer the potential counter

12  claims that the Debtor has.  But we would like to have the

13  trial the first, subject obviously to the Court's

14  availability, during the first week of October.

15          THE COURT: The first week of October?

16          MR. CROWELL: That's, well that's the date that,

17  that they agreed with CSFB to at least come to the Court and

18  request.  And another reason for that, Your Honor, is my

19  client would like to have the servicing rights transferred to

20  them before the November servicing begins.  And if we delay

21  this hearing out until the end of October, and the decision

22  until perhaps November, that's not going to happen.

23          THE COURT: Did you sell the loans on a servicing

24  retained or release basis?

25          MR. CROWELL: Release basis, Your Honor.

1          THE COURT: Well now you're two months apart, Mr.

2     Kirpalani.  Right?

3          MR. KIRPALANI: Well, yeah.  That's correct, Your

4     Honor.  When we were discussing with Bear Stearns, they were

5     the first to approach the Debtors, or actually I approached

6     them to ask, rather than go on an emergency basis before a

7     judge unfamiliar with the case, why don't we try to talk

8     about scheduling.  At that time, we had some to a similar

9     agreement where I wound up with Calyon.  But when that deal

10    fell apart because they wouldn't agree to a one week

11    difference or a two week difference, Calyon surfaced as

12    asking if they could take the spot.  And I said absolutely.

13    So I don't really know how that prejudices us, or should

14    prejudice us.  All I'll say, Your Honor, in terms of, you

15    know, that they sold this on a servicing released basis,

16    we're talking about an affiliate of Bear Stearns.  So, you

17    know, and to the extent they were worried about claims, if

18    you read their complaint they state there are claims that

19    could be asserted by EMC against Bear Stearns.  I don't

20    really think that's a viable or defensible position.  This is

21    an affiliate of theirs where they decided to park the loans.

22         THE COURT: So I see two issues here.  I see do I

23    dual track them with Credit Suisse, or do I dual track them

24    with Calyon, or do I put them at the back of the line because

25    they didn't cut a deal with you?

1           MR. KIRPALANI: I think that's right, Your Honor.

2           THE COURT: So I'm not going to put them to the back

3    of the line.  So in my mind, it's a question of whether I

4    dual track them with Credit Suisse or I dual track them with

5    Calyon.  And Bear Stearns you're going to need to tell me how

6    you are prejudiced by me dual tracking you with Calyon.

7           MR. CROWELL: The reason being, Your Honor - -

8           MR. COMET(Telephonic): Your Honor?  Excuse me.

9    This is Howard Comet from Weil Gotshal.  If I could just

10   interject something here, on behalf of Credit Suisse.  I

11   apologize - -

12          THE COURT: Well, hang on.

13          MR. COMET(Telephonic):  - - for interrupting.  The

14   - -

15          THE COURT: Well you are interrupting.  Hang on.

16   I'll let you speak in just a moment, okay?

17          MR. COMET(Telephonic): Thank you, Your Honor.

18   Sorry.

19          THE COURT: All right.

20          MR. CROWELL: Your Honor, I think the reason we'd be

21   prejudiced again is because we want to have the servicing

22   transferred prior to the November servicing and the letters

23   going out to the, to the people who hold the, or who owe on

24   the loans.  And if we are tracked with Calyon, that's not

25   going to happen.  There's no chance that's going to happen.

1    We're not going to be able to get the Goodbye letters out,

2    etcetera.  And again, we - -

3         THE COURT: So it will be transferred in December,

4    not November?

5         MR. CROWELL: Right.

6         THE COURT: All right.

7         MR. CROWELL: Well, it will be transferred in - -

8    right.  I mean, we were hoping to get it transferred in

9    October, so we could service them in November.  That's

10   correct, Your Honor.

11        THE COURT: All right.  And how is that, how is that

12   harmful?

13        MR. CROWELL: We think it's harmful, because we

14   think that our, that EMC has a, the way that they have set up

15   servicing, we'll be able to do servicing better than the

16   Debtor at this point.

17        THE COURT: All right.  I'll hear from Credit

18   Suisse.

19        MR. COMET(Telephonic): Thank you, Your Honor.

20   Howard Comet from Weil Gotshal on behalf of Credit Suisse.

21   When we worked out the schedule with Mr. Kirpalani that the

22   Court has approved for a trial in the first week in October,

23   that was prior to the filing of any of the additional

24   adversary complaints by Bear Stearns or Calyon.  And there is

25   a substantial overlap in the matters here, and frankly I

1    think it probably makes sense from the Debtors' perspective,

2    and everyone's perspective to try to coordinate the matters

3    as much as possible.  We, we would be willing, if it would

4    facilitate this, although we're obviously not interested in

5    delay either, but to postpone the trial of our matter for a

6    week or two, to say the middle of October if that made sense,

7    in order to coordinate the matters and perhaps not try this

8    thing three times.  Maybe if Calyon is set on the last week

9    in October, maybe Bear Stearns and Credit Suisse could

10   proceed the second or third week in October, and try them out

11   together.  I think we would then do the depositions together,

12   to the extent they're needed.  Otherwise management, frankly,

13   of the Debtors might have to have the same people deposed

14   multiple times on the same matters, which would not, not seem

15   to make sense.  So although we, again, are not interested in

16   any substantial delay, we would be willing to try to work out

17   a coordinated schedule to try the matters together.  And if

18   that involved a delay of a week or two, that would be all

19   right with us.

20           THE COURT: All right.  Let me propose this.  Mr.

21   Comet, I certainly appreciate, I truly appreciate your

22   comments, and I think they hold some merit.  I assume,

23   however, that the week of the 29th you would consider too

24   large a delay.

25           MR. COMET(Telephonic): I, yes, Your Honor.

1           THE COURT: All right.

2           MR. COMET(Telephonic): We would consider that too

3    long a delay.

4           THE COURT: Okay.

5           MR. COMET(Telephonic): We would vastly prefer if it

6    could be sooner than that.

7           THE COURT: Let me propose this.  Mr. Kirpalani, I

8    propose - - you're not going to, your wife's not going to

9    like me.  But I propose triple tracking these.  Because I

10   think there is something to be said for, hopefully the legal

11   arguments are certainly very similar, although each, each

12   matter is factually probably distinct.  And I would propose

13   starting Monday, October 15th in the afternoon, and proceeding

14   throughout the week.  Until you are finished.  And adjusting

15   the schedules accordingly.  And that would be for Credit

16   Suisse, Calyon, and Bear Stearns.  Does that work for you?

17   Scheduling-wise?

18          MR. KIRPALANI: Of course it does.  But the, the one

19   question I have, Your Honor is I'm not sure where the parties

20   are with respect to what Mr. Comet had agreed to with me.

21   Which is pre-petition factual was it terminated or not, those

22   factual issues, do we have to try all of those issues?  In

23   this expedited fashion?  Or are we dealing with the legal

24   issue of ipso facto termination?  If it's the former, I think

25   it's a much easier pill to swallow.  If it's, if it's

1   something that we're going to have to go into - -

2          THE COURT: Well, let's, let's put it this way.  If

3   the parties are basically on the same page as Credit Suisse,

4   I think it's a no-brainer.  You've got the 15th.  If it turns

5   out you believe the issues are mushrooming, let me know.

6   Call me on the phone, and we'll have a conference call.  And

7   if, I'll consider the matter, and if I need to bifurcate the

8   trial and have the other matters heard on a, if I feel that's

9   appropriate, I'll do that.

10         MR. KIRPALANI: Okay.  Thank you, Your Honor.

11         THE COURT: Is those dates, Mr. Comet, does that

12  work for you?  The week of the 15th?

13         MR. COMET(Telephonic): Yes it does, Your Honor.

14  Thank you.

15         THE COURT: Okay.  I figure if I was moving your

16  trial, I should probably ask you if it was all right.

17         MR. COMET(Telephonic): Thank you.

18         THE COURT: All right.  Anything further for today?

19  So I'll just wait - - and I did enter an order earlier today

20  approving the scheduling stipulation, so I'll, we'll just

21  have to submit a revised order.

22         MR. KIRPALANI: Yeah.  We'll put together an order

23  that covers all three adversaries, Your Honor.

24         THE COURT: That would be ideal.

25         MR. KIRPALANI: Okay.

1        THE COURT: Yes.  All right.  So I am going to

2   cancel the hearing that I had previously scheduled for Credit

3   Suisse for the 3ʳᵈ.  All right?

4        MS. MORGAN: Thank you, Your Honor.  That concludes

5   our agenda for today.

6        THE COURT: Okay.  Thank you very much.  Hearing is

7   adjourned.

8        (Whereupon at 1:34 p.m. the hearing in this matter was

9   concluded for this date.)

10

11

12

13

14

15

16

17

18        I, Jennifer Ryan Enslen, approved transcriber for

19   the United States Courts, certify that the foregoing is a

20   correct transcript from the electronic sound recording of the

21   proceedings in the above entitled matter.

22

23    _/s/Jennifer Ryan Enslen_                    ___09/11/07___
     Jennifer Ryan Enslen
24   43 Bay Boulevard
     Newark, DE 19702
25   (302)836-1905