IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ------------------------------------------------------------ x | Chapter 11 |
| In re: | : |
|  | : Case No. 07-11047 (CSS) |
| AMERICAN HOME MORTGAGE | : |
| HOLDINGS, INC., a Delaware corporation, et al.,[1] | : Jointly Administered |
|  | : |
| Debtors. | : |
| ------------------------------------------------------------ x | **Doc. Ref. No. 529** |

**NOTICE OF FILING OF SUPPLEMENT TO EXHIBIT C OF THE APPLICATION FOR AN ORDER PURSUANT TO SECTIONS 327 AND 328 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 2014 APPROVING THE RETENTION OF PHOENIX CAPITAL, INC. AS INVESTMENT BANKERS FOR THE DEBTORS <u>NUNC PRO TUNC TO PETITION DATE</u>**

PLEASE TAKE NOTICE that on August 31, 2007, the above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>"), filed the *Application for an Order Pursuant to Sections 327 and 328 of the Bankruptcy Code and Bankruptcy Rule 2014 Approving the Retention of Phoenix Capital, Inc. as Investment Bankers for the Debtors Nunc Pro Tunc to Petition Date* [Docket No. 529] (the "<u>Application</u>").[2]

PLEASE TAKE NOTICE that <u>Exhibit C</u> to the Application did not contain Appendix I to the engagement letter of Phoenix Capital, Inc. (the "<u>Engagement Letter</u>"). A complete, fully executed copy of the Engagement Letter (including Appendix I) is attached hereto as <u>Exhibit A</u>.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("<u>AHM Holdings</u>") (6303); American Home Mortgage Investment Corp. ("<u>AHM Investment</u>"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("<u>AHM Acceptance</u>"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("<u>AHM Servicing</u>"), a Maryland corporation (7267); American Home Mortgage Corp. ("<u>AHM Corp.</u>"), a New York corporation (1558); American Home Mortgage Ventures LLC ("<u>AHM Ventures</u>"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("<u>Homegate</u>"), a New York corporation (7491); and Great Oak Abstract Corp. ("<u>Great Oak</u>"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

[2] All terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Dated: Wilmington, Delaware  YOUNG CONAWAY STARGATT & TAYLOR, LLP
September 13, 2007

*Travis Turner* (No. 4926)
James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Kara Hammond Coyle (No. 4410)
Kenneth J. Enos (No. 4544)
Margaret B. Whiteman (No. 4652)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession

# EXHIBIT A



Phoenix Capital
Inc.

August 8, 2007

Mr. Michael Strauss
Chairman, Chief Executive Officer and President
American Home Mortgage Investment Corp.
538 Broadhollow Road
Melville, NY 11747

Dear Mr. Strauss:

    This agreement ("Agreement") sets forth the terms of the engagement by American Home Mortgage Investment Corp. (the "Company") of Phoenix Capital, Inc. ("Phoenix") pursuant to which Phoenix, in coordination with Milestone Advisors, LLC ("Milestone") shall act as a financial advisor and investment banker to the Company in connection with Core Asset Sales (as defined below) pursuant to related proceedings under Chapter 11 of Title 11 U.S.C. §§101 et seq., (the "Bankruptcy Code") and with respect to such other financial and investment banking matters as to which the Company and Phoenix may agree in writing during the term of this engagement agreement (the "Agreement").

    1.    <u>Scope of Services.</u>  In connection with the analysis and pursuit of the above-mentioned financial advisory services and Core Asset Sales, Phoenix will, as the Company's financial advisor and investment banker, and in conjunction with Milestone, work on one or more of the following activities, as requested from time to time by management of the Company (hereinafter referred to as the "Services"):

Mr. Michael Strauss
August 8, 2007
Page 2

    (a)  <u>Core Asset Sale Services.</u> If the Company pursues a Core Asset Sale (as defined below), Phoenix shall, in each case, if requested by the Company:

    i.  provide financial advice and assistance to the Company in connection with a Core Asset Sale, identify potential acquirors and, at the Company's request, contact such potential acquirors (each a "Purchaser Entity"); determine a range of values for the Company's Core Assets on a liquidation basis;

    ii.  assist the Company in preparing a memorandum (with any amendments or supplements thereto, the "Sale Memorandum"), to be used in soliciting potential acquirors of its assets, provided that (A) the Sale Memorandum shall be based entirely upon information supplied by the Company (as it concerns the Company as opposed to competitors or the market generally), (B) the Company shall be solely responsible for the accuracy and completeness of the Sale Memorandum (as it concerns the Company as opposed to competitors or the market generally), and (C) other than as contemplated by this subparagraph (b)(ii), the Sale Memorandum shall not be used, reproduced, disseminated, quoted or referred to at any time in any way, except with Phoenix's prior written consent which shall not be unreasonably withheld or delayed; and

    iii.  assist the Company and/or participate in negotiations with potential acquirors of the Core Assets;

    iv.  advise and attend meetings of the Company's Board of Directors and its Committees and, if appropriate, its creditors;

    v.  participate in any hearings before any court with respect to the matters upon which Phoenix has provided advice, including, as relevant, coordinating with the Company's counsel as to necessary testimony relating thereto; and

    vi.  if requested, render an opinion as to the fairness of the consideration to be received in connection with a Core Asset Sale.

For purposes of this Agreement, the term "Core Asset Sale" shall mean the sale of one or more of the Company's following assets or divisions: (i) Mortgage Servicing Rights, and (ii) Servicing Platform.

In rendering its services to the Company hereunder, Phoenix is not assuming any responsibility for the Company's underlying business decision to pursue (or not to pursue) any business strategy or to effect (or not to effect) any Core Asset Sale or other transaction. The Company agrees that Phoenix shall not have any obligation or responsibility to provide accounting, audit, "crisis management", or business consultant services for the Company and shall have no responsibility for designing or implementing operating, organization, administrative, cash management or liquidity improvements, or to provide any valuation opinions or any advice or opinions with respect to solvency in connection with any transaction.

Mr. Michael Strauss
August 8, 2007
Page 3

The Company confirms that it will rely on its own counsel, accountants and other similar expert advisors for legal, accounting, tax and other similar advice.

The Company shall make available to Phoenix all material information concerning the business, assets, operations, financial condition and prospects of the Company that Phoenix reasonably requests in connection with the services to be performed for the Company hereunder and shall provide Phoenix with reasonable access to the Company's officers, directors, employees, independent accountants, counsel and other advisors and agents as Phoenix reasonably requests. In order to coordinate effectively the Company's and Phoenix's activities to effect a Core Asset Sale, the Company will promptly inform Phoenix of any discussions, negotiations or inquiries regarding a possible Core Asset Sale (including any such discussions, negotiations or inquiries that have occurred in the six month period prior to the date of this Agreement). The Company represents that, to the best of its knowledge, all information furnished by it or on its behalf to Phoenix, at all times during Phoenix's engagement, (including information contained in any Sale Memorandum) (i) will be accurate and complete in all material respects, and (ii) will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which such statements are made. The Company recognizes and confirms that in advising the Company and completing its engagement hereunder, Phoenix will be using and relying on publicly available information and on data, material and other information furnished to Phoenix by the Company and other parties. It is understood that in performing pursuant to this Agreement, Phoenix may assume and rely upon the accuracy and completeness of, and is not assuming any responsibility for independent certification of, such publicly available information and other information so furnished.

2. Compensation. Phoenix's compensation for services to be performed under this Agreement will consist of the following cash fees:

   (a) Core Asset Sale Fees:

   i. Phoenix acknowledges that the most successful sale of the Servicing Platform and Mortgage Servicing Rights will be accomplished through a joint effort of Phoenix and Milestone, and therefore agrees to work with Milestone to effectuate the sale of the Servicing Platform and Mortgage Servicing Rights. In the event of a Core Asset Sale of the Company's Mortgage Servicing Rights (whether alone or if combined with the sale of the Company's Servicing Platform), the Company shall pay Phoenix and Milestone an aggregate success fee equal to: (i) $1,000,000, plus (a) $1,000,000, pro rated for any proceeds received by the Company in excess of $446 million and up to $460 million, plus (b) 6.25% of any proceeds received by the Company in excess of $460 million. In the event of a Core Asset Sale of the Company's Servicing Platform in a transaction that is separate and distinct from the sale of the Company's Mortgage Servicing Rights, the Company shall pay Phoenix and Milestone an aggregate success fee equal to: (i) $500,000, plus (ii) 5.0% of any proceeds received by the Company in excess of $10 million. Phoenix and Milestone have agreed to split any fees payable by the Company for a sale of the Servicing Platform and/or a sale of the Mortgage Servicing Rights, 40% to Phoenix and 60% to Milestone. The Company shall enter into a separate agreement with Milestone reflecting such terms.

Mr. Michael Strauss
August 8, 2007
Page 4

3. **Confidential Review.** Phoenix and its agents and counsel, if any, will be accorded access to and may examine documents, records and other materials and information of the Company and its subsidiaries as Phoenix reasonably deems appropriate to perform its obligations hereunder. Phoenix shall keep all such information, to the extent confidential and proprietary to the Company, confidential except to the extent disclosure is required by any judicial, administrative or self-regulatory agency or organization. The following information shall not be deemed confidential or proprietary:

   (a) Information that at the time of disclosure, or after disclosure, is or subsequently becomes generally available to the public or within the industries in which the Company or Phoenix and its affiliates conduct business, other than as a result of a breach by Phoenix or its agents or counsel of its obligations under this Agreement;

   (b) Information that prior to or at the time of disclosure by the Company, was already in the possession of Phoenix or its affiliates (provided that Phoenix or its affiliates, at the time of such disclosure was not subject to a non-disclosure obligation relating to such information including any non-disclosure obligation under applicable "Insider Trading" laws and regulations) or could have been developed by them from information then in their possession, by the application of other information or techniques in their possession or generally available to the public or available to them, other than from the Company or its agents;

   (c) Information that at the time of disclosure or subsequent to disclosure, is obtained by Phoenix or its affiliates from a third party who is lawfully in possession of the information and who is not in violation of any contractual, legal or fiduciary obligation to the Company with respect to that information; or

   (d) Information that is or was independently developed by Phoenix or its affiliates from information lawfully obtained by Phoenix or its affiliates from parties lawfully in possession of such information and who are not in breach of any contractual, legal or fiduciary obligation to the Company with respect to the information.

The Company has furnished and will continue to furnish or cause to be furnished to Phoenix such information as Phoenix believes appropriate to its assignment (all information so furnished being the "Information"). The Company recognizes and confirms that Phoenix: (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the Services without having independently verified the same; (b) does not assume responsibility for the accuracy or completeness of the Information and such other information; and (c) will not make an appraisal of any assets or liabilities of the Company or a Purchaser Entity or any of their market competitors.

Phoenix shall have no right to make any representation which will be binding upon the Company without the prior written consent of the Company.

4. **Out-of-Pocket Expenses:** In addition to any fees payable by the Company to Phoenix hereunder, the Company, shall whether or not any transaction contemplated by this Agreement shall be proposed or consummated, reimburse Phoenix on a monthly basis for its reasonable travel and

Mr. Michael Strauss
August 8, 2007
Page 5

other reasonable out of pocket expenses (including all fees, disbursements and other reasonable charges of one firm of counsel, if any, to be retained by Phoenix, and of other consultants and advisors retained by Phoenix with the Company's consent) incurred in connection with, or arising out of Phoenix's activities under or contemplated by this Agreement. The Company shall also reimburse Phoenix, at such times as Phoenix shall request for any sale, use or similar taxes (including additions to such taxes, if any) arising in connection with any matter referred to or contemplated by this Agreement. All such reimbursements shall be made promptly upon submission by Phoenix of statements for such expenses.

5. <u>Term:</u> This Agreement and the retention of Phoenix hereunder shall remain in full force and effect for twelve (12) months from the date hereof unless terminated earlier (the "Engagement Period") and may be terminated by the Company or Phoenix at any time, with or without cause, upon 30 days written notice to that effect to the other party, without further obligation to each other, except it is agreed that the provisions relating to indemnification, limitation of liabilities, contribution, settlement, the provisions relating to the payment of fees and expenses, confidentiality, the status of Phoenix as an independent contractor, the limitation on to whom Phoenix shall owe any duties, and the waiver of the right to trial by jury in this Agreement will survive any such termination. If this Agreement expires or is terminated by the Company, any agreement or other written arrangement entered into by the Company regarding a Core Asset Sale within a 12 month period following the termination or expiration of this Agreement shall be deemed to give rise to the Core Asset Sale Fee set forth in Paragraph 2, payable by the Company to Phoenix.

6. <u>Independent Contractor:</u> The Company acknowledges and agrees that it is a sophisticated business enterprise and that Phoenix has been retained pursuant to this Agreement to provide services to the Company. In such capacity, Phoenix shall act as an independent contractor, and any duties of Phoenix arising out of its engagement pursuant to this Agreement shall be contractual in nature and shall be owed solely to the Company. Each party disclaims any intention to impose any fiduciary duty on the either.

7. <u>Announcement:</u> If a Core Asset Sale is completed, the Company acknowledges and agrees that Phoenix may, at its option and expense, place an announcement in such newspapers and periodicals as it may choose, subject to the Company's prior approval which shall not be unreasonably withheld, stating that Phoenix has acted as a Financial Advisor to the Company in connection with the Core Asset Sale. Other than announcements consistent with the preceding sentence, neither party shall make any public announcement relating to the content of this Agreement or any proposed acquisition or transaction in the absence of mutual written agreements by the parties regarding the content and timing of such announcement.

8. <u>Indemnification, Contribution, and Limitation of Liability:</u> The Company agrees, as of August 6, 2007, to indemnify Phoenix and its controlling persons, representatives, and agents in accordance with the indemnification provisions set forth in Appendix I, and agrees to the other provisions of Appendix I, which is incorporated herein by this reference, with respect to financial advisory services provided by Phoenix both prior to and following the Company's bankruptcy filing and regardless of whether a Core Asset Sale is consummated.

Mr. Michael Strauss
August 8, 2007
Page 6

9. <u>Beneficiaries:</u> This Agreement shall inure to the sole and exclusive benefit of Phoenix and the Company and the persons referred to in Appendix I and their respective successors and representatives. The obligations and liabilities under this Agreement shall be binding upon Phoenix and the Company.

10. <u>Amendments:</u> This Agreement may be modified or amended, or its provisions waived, only in writing signed by the person or persons against whom enforcement of the modification, amendment or waiver is sought.

11. <u>No Commitment:</u> This Agreement does not and will not constitute any agreement, commitment or undertaking, express or implied on the part of Phoenix or any affiliate to purchase or to sell any securities or to provide any financing and does not ensure the successful arrangement or completion of a Core Asset Sale.

12. <u>Entire Agreement:</u> This Agreement constitutes the entire Agreement between the parties and supersedes and cancels any and all prior or contemporaneous arrangements, understandings and agreements, written or oral, between them relating to the subject matter hereof.

13. <u>Severability:</u> If any portion of this Agreement shall be held or made unenforceable or invalid by a statute, rule, regulation, decision of a tribunal or otherwise, the remainder of this Agreement shall not be affected thereby and shall remain in full force and effect, and, to the fullest extent, the provisions of the Agreement shall be severable.

14. <u>Governing Law; Waiver of Trial by Jury:</u> This Agreement, and the rights and obligations of the parties hereto, shall be governed by and construed in accordance with Delaware law (without regard to any rules or principles of conflicts of law that might look to any jurisdiction outside of the State of New York). Any dispute arising hereunder shall be brought before a court in the State of New York.

**EACH OF THE PARTIES HERETO (ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS STOCKHOLDERS AND INDEMNIFIED PARTIES) WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERACTION (WHETHER BASED UPON CONTRACT, OR OTHERWISE) RELATED TO OR ARISING OUT OF THE ENGAGEMENT PURSUANT TO, OR THE PERFORMANCE OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT.**

15. <u>Waiver, Amendment and Modification; Headings:</u> No waiver, amendment or other modification of this Agreement shall be effective unless signed in writing by each of the parties hereto. The headings used herein are for ease of reference only and shall not be used to construe the meaning of this Agreement.

16. <u>Authority:</u> The Company and Phoenix represent and warrant that they have full power and authority to execute and deliver this Agreement and to assume the obligations set forth herein, and this Agreement has been duly authorized, executed and delivered by the Company and constitutes a valid, binding and legally enforceable obligation of the Company and Phoenix

Mr. Michael Strauss
August 8, 2007
Page 7

(except (i) as may be limited by laws pertaining to bankruptcy, insolvency, reorganization, moratorium, receivership, conservatorship or other laws affecting creditors' rights generally, and (ii) as may be limited by laws governing specific performance, injunction relief and all other equitable remedies.

If the foregoing terms correctly set forth our agreement, please sign and return to us a duplicate copy of this Agreement. We look forward to working with you toward the successful conclusion of this engagement and developing a long-term relationship with the Company.

Mr. Michael Strauss
August 8, 2007
Page 8

Very truly yours,

**PHOENIX CAPITAL, INC.**

By: *[signature]*
Brett H. Schaffer
President

Confirmed and accepted as of this 23rd day of August 2007

**AMERICAN HOME MORTGAGE INVESTMENT CORP.**

By *[signature]* JOHN KAZAS
SVP DEPUTY GEN COUNSEL

Mr. Michael Strauss
Chairman, Chief Executive Officer and President

## APPENDIX I

The Company agrees to indemnify and hold harmless Phoenix and its affiliates (as defined in Rule 405 under the Securities Act of 1933, as amended) and their respective directors, officers, employees, agents and controlling persons (Phoenix and each such person being an "Indemnified Party") from and against all losses, claims, damages and liabilities (or actions, including shareholder actions, in respect thereof), joint or several, to which such Indemnified Party may become subject under any applicable federal or state law, or otherwise, which are related to or result from the performance by Phoenix of the services contemplated by or the engagement of Phoenix pursuant to, this Agreement and will promptly reimburse any Indemnified Party for all reasonable expenses (including reasonable counsel fees and expenses) as they are incurred in connection with the investigation of, preparation for or defense arising from any threatened or pending claim, whether or not such Indemnified Party is a party and whether or not such claim, action or proceeding is initiated or brought by the Company. The Company will not be liable to any Indemnified Party under the foregoing indemnification and reimbursement provisions, (i) for any settlement by an Indemnified Party effected without its prior written consent (not to be unreasonably withheld); or (ii) to the extent that any loss, claim, damage or liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted primarily from Phoenix's willful misconduct or gross negligence. The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its security holders or creditors related to or arising out of the engagement of Phoenix pursuant to, or the performance by Phoenix of the services contemplated by, this Agreement except to the extent that any loss, claim, damage or liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted primarily from Phoenix's, willful misconduct or gross negligence.

Promptly after receipt by an Indemnified Party of notice of any intention or threat to commence an action, suit or proceeding or notice of the commencement of any action, suit or proceeding, such Indemnified Party will, if a claim in respect thereof is to be made against the Company, pursuant hereto, promptly notify the Company, in writing of the same. In case any such action is brought against any Indemnified Party and such Indemnified Party notifies the Company of the commencement thereof, the Company, may elect to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Party, and an Indemnified Party may employ counsel to participate in the defense of any such action provided, that the employment of such counsel shall be at the Indemnified Party's own expense, unless (i) the employment of such counsel has been authorized in writing by the Company (ii) the Indemnified Party has reasonably concluded (based upon advice of counsel to the Indemnified Party) that there may be legal defenses available to it or other Indemnified Parties that are different from or in addition to those available to the Company, or that a conflict or potential conflict exists (based upon advice of counsel to the Indemnified Party) between the Indemnified Party and the Company that makes it impossible or inadvisable for counsel to the Indemnifying Party to conduct the defense of both the Company and the Indemnified Party (in which case the Company not have the right to direct the defense of such action on behalf of the Indemnified Party), or (iii) the Company has not in fact employed counsel reasonably satisfactory to the Indemnified Party to assume the defense of such action within a reasonable time after receiving notice of the action, suit or proceeding, in each of which cases the reasonable fees, disbursements and other charges of such counsel will be at the expense of the Company; provided, further, that in no event shall the Company be required to pay fees and expenses for more than one firm of attorneys representing Indemnified Parties unless the defense of one Indemnified Party is unique or separate from that of another Indemnified Party subject to the same claim or action. Any failure or delay by an Indemnified Party to give the notice referred to in this paragraph shall not affect such Indemnified

Mr. Michael Strauss
August 8, 2007
Page 10

Party's right to be indemnified hereunder, except to the extent that such failure or delay causes actual harm to the Company or prejudices its ability to defend such action, suit or proceeding on behalf of such Indemnified Party.

If the indemnification provided for in this Agreement is for any reason held unenforceable by an Indemnified Party, the Company agrees to contribute to the losses, claims, damages and liabilities for which such indemnification is held unenforceable (i) in such proportion as is appropriate to reflect the relative benefits to the Company on the one hand, and Phoenix on the other hand, of the transaction contemplated by the Agreement whether or not the transaction is consummated or, (ii) if (but only if) the allocation provided for in clause (i) is for any reason unenforceable, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of the Company on the one hand and Phoenix, on the other hand, as well as any other relevant equitable considerations. The Company agrees that for the purposes of this paragraph the relative benefits to the Company and Phoenix of the transaction as contemplated shall be deemed to be in the same proportion that the total value received or contemplated to be received by the Company or its shareholders, as the case may be, as a result of or in connection with the transaction, bear to the fees paid or to be paid to Phoenix under this Agreement. Notwithstanding the foregoing, the Company expressly agrees that Phoenix shall not be required to contribute any amount in excess of the amount by which fees paid Phoenix hereunder (excluding reimbursable expenses), exceeds the amount of any damages which Phoenix has otherwise been required to pay.

The Company agrees that without Phoenix's prior written consent, which shall not be unreasonably withheld, it will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which indemnification could be sought under the indemnification provisions of this Agreement (in which the Phoenix or any other Indemnified Party is an actual or potential party to such claim, action or proceeding), unless such settlement, compromise or consent includes an unconditional release of each Indemnified Party from all liability arising out of such claim, action or proceeding.

In the event that an Indemnified Party is requested or required to appear as a witness in any action brought by or on behalf of or against the Company in which such Indemnified Party is not named as a defendant, the Company agrees to promptly reimburse Phoenix on a monthly basis for all expenses incurred by it in connection with such Indemnified Party's appearing and preparing to appear as such a witness, including, without limitation, the reasonable fees and disbursements of its legal counsel. In addition to any reimbursed fees, expenses or costs outlined hereunder, Phoenix shall also receive from the Company cash compensation of $2,000.00 per person, per day, plus reasonable out-of-pocket expenses and costs should Phoenix be required to provide testimony in any formal or informal proceeding regarding the Company

If multiple claims are brought, with respect to at least one of which indemnification is permitted under applicable law, and provided for under this Agreement, the Company agrees that any judgment or arbitrate award shall be conclusively deemed to be based on claims as to which indemnification is permitted and provided for, except to the extent the judgment or arbitrate award expressly states that it, or any portion thereof, is based solely on a claim as to which indemnification is not available.