## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| American Home Mortgage Holdings, Inc., <u>et al.</u>,[1] | Case No. 07-11047 (CSS)<br>Jointly Administered |
| Debtors. | **Related Docket Item Nos: 11, 113, 403, 674**<br>**Sale Hearing Date: October 1, 2007 at 10:00 a.m.**<br>**Objection Deadline: September 20, 2007 at 4:00 p.m.** |

### SOCIÉTÉ GÉNÉRALE'S (I) OBJECTION TO THE ASSUMPTION AND ASSIGNMENT OF THE PURCHASE AGREEMENT AND PROPOSED CURE AMOUNT IN CONNECTION WITH THE SALE OF THE DEBTORS' SERVICING BUSINESS AND (II) LIMITED OBJECTION TO THE SALE OF THE DEBTORS' SERVICING BUSINESS

Société Générale ("<u>SG</u>"), in its capacity as Administrative Agent for Barton

Capital LLC, by and through its undersigned counsel, hereby objects (the "<u>Objection</u>") to the

Debtors' assumption and assignment of the Purchase Agreement (as defined below) and

proposed cure amount in connection with the sale of the Debtors' Servicing Business (as defined

below) and, to the limited extent set forth below, to the sale of the Debtors' Servicing Business.

In support of its Objection, SG represents as follows:[2]

---

[1]    The Debtors are: American Home Mortgage Holdings, Inc. (6303); American Home Mortgage Investment Corp. (3914); American Home Mortgage Acceptance, Inc. (1979); American Home Mortgage Servicing, Inc. (7267); American Home Mortgage Corp. (1558); American Home Mortgage Ventures LLC (1407); Homegate Settlement Services, Inc. (7491); and Great Oak Abstract Corp. (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for American Home Mortgage Servicing, Inc., whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

[2]    The factual allegations set forth in the Objection are supported by the Declaration of James F. Ahern In Support of Société Générale's (I) Objection to the Assumption and Assignment of the Purchase Agreement and Proposed Cure Amount in Connection with the Sale of the Debtors' Servicing Business and (II) Limited Objection to the Sale of the Debtors' Servicing Business attached hereto as <u>Exhibit E</u>.

## SUMMARY OF OBJECTION

1.    By notice dated August 27, 2007, and later amended on September 10, 2007 (the "Assumption Notice"), the Debtors notified SG of their intent to assume the Purchase Agreement and assign the Purchase Agreement – with a proposed cure amount of $0.00 – to an unidentified third party in connection with the sale of the Debtors' mortgage loan servicing business.  In their attempt to assume and assign the Purchase Agreement, the Debtors are conveniently ignoring the reality that the Purchase Agreement, and all of the Debtors' rights thereunder, including servicing rights, was validly terminated on August 3, 2007, prior to the Petition Date (as defined below), thus rendering the Purchase Agreement non-executory and therefore incapable of assumption and assignment.

2.    The Debtors also appear to be ignoring the reality that since the collapse of their loan origination business, they are irrefutably incapable of performing their core obligations under the Purchase Agreement, thereby frustrating the very purpose of the Purchase Agreement.  Indeed, the Debtors' inability to sell mortgage loans to SG or to effectuate the sale of mortgage loans to Approved Takeout Investors (as defined below) are defaults under the Purchase Agreement that cannot be cured by their future performance, thus further preventing the assumption and assignment of the Purchase Agreement.

3.    Additionally, even assuming, *arguendo*, that the Purchase Agreement is an executory contract otherwise capable of assumption and assignment, there are significant monetary defaults under the Purchase Agreement, which must be cured prior to any assumption and assignment, resulting from the Debtors' failure to remit millions of dollars collected on SG's behalf in accordance with the terms of the Purchase Agreement.  SG estimates that such cure amount may exceed $8 million.

2

4.      Furthermore, to date, the Debtors have neither identified the proposed assignee of the Purchase Agreement nor established the requisite adequate assurance of future performance required by section 365(f) of the Bankruptcy Code.  Before the Debtors are permitted to assume and assign the Purchase Agreement, the Debtors must, at a minimum, provide adequate assurances that any assignee is capable of servicing the Mortgage Loans (as defined below) as required under the Purchase Agreement, effectuating the sale of Mortgage Loans to Approved Takeout Investors in a timely fashion, paying any Takeout Deficiency Fees (as defined below) that may accrue pursuant to the terms of the Purchase Agreement and performing all other obligations under the Purchase Agreement.

5.      Finally, as set forth in greater detail below, SG objects to the sale of the Servicing Business to the extent any such sale purports to transfer an ownership interest in any of the Mortgage Loan Assets (as defined below), including the Mortgage Loans, the servicing rights and the Collections (as defined below), through the assumption and assignment of the Purchase Agreement or otherwise.

6.      For these reasons, and for the reasons set forth in greater detail below, SG objects to the assumption and assignment of the Purchase Agreement and the proposed cure amount.

## BACKGROUND

I.      **The Purchase Agreement and Termination**

7.      On October 16, 2006, SG, as Administrative Agent for the Purchasers (as defined in the Purchase Agreement), Barton Capital LLC, as Conduit Purchaser and Committed Purchaser, Société Générale as Funding Agent, American Home Mortgage Corp. ("AHMC") and American Home Mortgage Servicing, Inc. ("AHMS") entered into that certain Mortgage Loan

3

Purchase and Sale Agreement (as amended, the "Purchase Agreement"), pursuant to which the Purchasers, through the Administrative Agent or Funding Agent, purchase from AHMC certain mortgage loans originated by AHMC (the "Mortgage Loans"). A copy of the Purchase Agreement is attached hereto as Exhibit A.

8.      The Purchase Agreement is a "whole loan" purchase agreement, whereby all right, title and interest in and to the Mortgage Loans and related assets, including all servicing rights (as defined in the Purchase Agreement, the "Mortgage Loan Assets"),[3] are transferred and conveyed to SG. The Purchase Agreement expires by its terms on October 15, 2007.

---

[3]    Pursuant to Section 2.02(a), the conveyance of the Mortgage Loans from AHMC to SG was a transfer of all right, title and interest in, to and under:

> (i) each Mortgage Loan (including the Mortgage Note evidencing such Mortgage Loan and the other Principal Mortgage Documents) and any and all moneys of whatsoever nature payable (upon the occurrence of any event) with respect to each such Mortgage Loan subject to the terms of this Agreement, (ii) all rights, powers and remedies of the Seller under or in connection with each such Mortgage Loan (including the Mortgage Note evidencing such Mortgage Loan and the other Principal Mortgage Documents), whether arising under the terms of such Mortgage Loan, by statute, at law or in equity, or otherwise arising out of any default by the Mortgagor under such Mortgage Loan, including (without limitation) all rights to give or receive any notice, consent, approval or waiver thereunder, (iii) the Mortgages, the Principal Mortgage Documents and all other items of the Document Files relating to such Mortgage Loans and the contents thereof, (iv) all security interests and liens securing repayment of such Mortgage Loans, (v) all documents of title, books and records concerning the foregoing property (including, without limitation, all data from computer programs, tapes, disks and related items containing any such information), (vi) the title insurance policies obtained in connection with such Mortgage Loans, and all insurance policies, if any, supporting repayment of such Mortgage Loans; (vii) all Mortgaged Property related to such Mortgage Loans, (viii) all guarantees, supporting obligations and collateral, if any, received with respect to, or supporting repayment of, such Mortgage Loans; and (ix) to the extent that the same then or thereafter exist, all proceeds, products, rents and profits of the foregoing of any nature whatsoever, including (without limitation) all proceeds of the sale, and proceeds of the

9.    As set forth in section 3.02 of the Purchase Agreement (Ex. A, § 3.02, p. 38), before SG is obligated to purchase any Mortgage Loan, AHMC must secure a commitment (a "Takeout Commitment") from a pre-approved third party lender (an "Approved Takeout Investor") to purchase the Mortgage Loan from SG on a specified future date (the "Anticipated Settlement Date") and at a committed purchase price (the "Anticipated Takeout Amount").

10.    A "Takeout Failure" occurs when there has been the failure of a Mortgage Loan to be purchased by the related Takeout Investor for any reason on the Anticipated Settlement Date and at the Approved Takeout Amount. (Ex. A, § 1.01, p. 26). With respect to any Mortgage Loan which is subject to a Takeout Failure, a "Takeout Deficiency Fee" in an amount equal to (i) the Anticipated Takeout Amount for such Mortgage Loan minus (ii) any amounts actually received by SG upon the sale of such Mortgage Loan shall be payable by AHMC to SG (for Mortgage Loans not sold within 180 days after they are purchased, the amount in clause (ii) is deemed zero). (Ex. A, § 1.01, p. 25-26).

11.    Mortgage Loans that are not sold to the committed Approved Takeout Investor within fifteen (15) days after the Anticipated Settlement Date for a price equal to the Anticipated Takeout Amount are considered "Fall-Out Loans."

12.    During the period that SG owns the Mortgage Loans, AHMS acts as servicer on the Mortgage Loans pursuant to the terms of the Purchase Agreement. In its capacity as servicer for the Mortgage Loans, AHMS collects on behalf of, and holds in trust for, SG, among other things, principal and interest payments made on the Mortgage Loans from end-

conversion, voluntary or involuntary, of any proceeds thereof (the items described in clauses (i) through (ix) above, the "Mortgage Loan Assets").
(Ex. A, § 2.02(a), pp. 29-30)

borrowers (the "P&I Collections"). Pursuant to the Purchase Agreement, AHMS is obligated to remit the P&I Collections to a segregated trust account established in SG's name (the "Collection Account") on the tenth (10th) day of each month (the "Remittance Date"). (Ex. A, § 1.01, p. 23; Ex. A, § 5.02(a), p. 44). AHMS and AHMC failed to remit P&I Collections into the Collection Account on August 10, 2007, as required under the Purchase Agreement, which remittance should have included P&I Collections collected on SG's behalf since July 1, 2007.

13.    With respect to the proceeds of the sale of Mortgage Loans to Approved Takeout Investors, AHMS and AHMC are required to direct all Approved Takeout Investors to deposit such proceeds (the "Mortgage Loan Sale Proceeds" and with the P&I Collections, the "Collections") directly into the Collection Account. (Ex. A, § 5.02(a), p. 44).[4]    In the event, however, that Mortgage Loan Sale Proceeds are sent to AHMC or AHMS instead of being deposited directly into the Collection Account, AHMC or AHMS must deposit the Mortgage Loan Sale Proceeds into the Collection Account within two (2) business days after receipt. (Id.). Section 5.02(a) of the Purchase Agreement provides that all Collections in the Debtors' possession are held in trust for SG's benefit. (Id.).

14.    Collections in the Collection Account are allocated through various waterfalls contained in the Purchase Agreement depending upon the type of Collections. Mortgage Loan Sale Proceeds are allocated through the waterfall set forth in section 5.03 of the Purchase Agreement (the "Section 5.03 Waterfall").[5] P&I Collections constituting interest on

---

[4]    The date on which SG receives Mortgage Loan Sale Proceeds into the Collection Account is referred to in the Purchase Agreement as the "Settlement Date."

[5]    The Section 5.03 Waterfall provides for the allocation of Mortgage Loan Sale Proceeds on any Settlement Date in the following fashion:

the Mortgage Loans are allocated through the waterfall set forth in section 5.04 of the Purchase

Agreement (the "Section 5.04 Waterfall").[6] Collections constituting principal collected on the

---

first, to each Funding Agent, for the benefit of the applicable Purchasers in the related Purchaser Group, an amount equal to such Purchaser Group's Pro Rata Share of the Net Investment allocable to such Mortgage Loan relating to such Settlement Date;

second, to each Funding Agent, for the benefit of the applicable Purchasers in the related Purchaser Group, on a *pro rata* basis, for any unpaid Yield from prior Remittance Dates and Net Investment from prior Settlement Dates;

third, to or at the direction of the Seller, the aggregate of the Completion Fees for such Mortgage Loans relating to such Settlement Date;

fourth, to each applicable Funding Agent, for itself and for the benefit of the applicable Purchasers in the related Purchaser Group, and to the Administrative Agent, on a *pro rata* basis, for any other amounts due to such parties, including, without limitation, amounts due under Section 2.04, any unpaid Program Fee, Administrative Agent Fee and Unused Fee from prior Remittance Dates and any Indemnified Claims which are due and unpaid; and

fifth, to the Servicer to be held in trust until the next Remittance Date.

(Ex. A, § 5.03, pp. 45-46).

[6]    The Section 5.04 Waterfall provides for the allocation of P&I Collections constituting interest on Mortgage Loans in the following fashion:

first, to each Funding Agent, for the benefit of the applicable Purchaser(s) in the related Purchaser Group, on a *pro rata* basis, an amount equal to all accrued and unpaid Yield for such Purchaser Group on the Net Investment related to all Mortgage Loans which are subject to this Agreement as of such Remittance Date and all Mortgage Loans which have been sold by the Administrative Agent since the immediately preceding Remittance Date and any other amounts payable pursuant to Section 7.02(d) hereof;

second, to the Administrative Agent and each Funding Agent (for the benefit of the applicable Purchaser(s) in the related Purchaser Group), on a *pro rata* basis, the Administrative Agent Fee, the Unused Fee and the Program Fee relating to such Remittance Date;

third, to each Funding Agent, for the benefit of the applicable Purchasers in the related Purchaser Group, on a *pro rata* basis, for any unpaid Yield from prior Remittance Dates and Net Investment from prior Settlement Dates;

fourth, to or at the direction of the Seller, the aggregate amount of any remaining unpaid Completion Fees with respect to the Mortgage Loans which were sold by the Administrative Agent prior to such Remittance Date;

fifth, to each applicable Funding Agent, for itself and for the benefit of the applicable Purchasers in the related Purchaser Group, and to the Administrative Agent, on a *pro rata* basis, for any other amounts due to such parties, including, without limitation, amounts due under Section 2.04, any unpaid Program Fee, Administrative Agent Fee and Unused Fee from prior Remittance Dates and any Indemnified Claims which are due and unpaid; and

sixth, all remaining amounts to the Servicer, as the Servicing Fee.

(Ex. A, § 5.04, pp. 46-47)

Mortgage Loans and any other amounts remitted to SG under Section 2.04 of the Purchase

Agreement in the Collection Account are allocated through the waterfall set forth in section 5.05

of the Purchase Agreement (the "Section 5.05 Waterfall"[7] and with the Section 5.03 Waterfall

and Section 5.04 Waterfall, the "Waterfalls").

      15.    The Waterfalls contemplate allocations to AHMC for Completion Fees

and to AHMS for Servicer Fees.  Subject to requirements set forth in the Purchase Agreement,

when AHMC effectuates the sale of a Mortgage Loan, AHMC accrues a "Completion Fee" in an

amount equal to 2% of the Mortgage Loan Sale Proceeds.  The Purchase Agreement provides

that the Completion Fee is to be paid in accordance with the Waterfalls "and in any event the

Completion Fee relating to any Mortgage Loan shall not be payable to [AHMC] (i) until the date

of receipt by [SG] of the related Anticipated Takeout Amount with respect to such Mortgage

---

[7]   The Section 5.05 Waterfall provides for the allocation of Collections constituting principal on
Mortgage Loans and any other amounts remitted to SG under section 2.04 of the Purchase Agreement
in the Collection Account in the following fashion:

first, to each Funding Agent, for the benefit of the applicable Purchaser(s) in the related Purchaser
Group, an amount equal to such Purchaser Group's Pro Rata Share of the Net Investment allocable to
the Mortgage Loans for which such Collections were received;

second, to each Funding Agent, for the benefit of the applicable Purchasers in the related Purchaser
Group, on a *pro rata* basis, for any unpaid Yield from prior Remittance Dates and Net Investment
from prior Settlement Dates;

third, to or at the direction of the Seller, the aggregate amount of any remaining unpaid Completion
Fees with respect to the Mortgage Loans which were sold by the Administrative Agent prior to such
Remittance Date;

fourth, to each applicable Funding Agent, for itself and for the benefit of the applicable Purchasers in
the related Purchaser Group, and to the Administrative Agent, on a *pro rata* basis, for any other
amounts due to such parties, including, without limitation, amounts due under Section 2.04, any
unpaid Program Fee, Administrative Agent Fee and Unused Fee from prior Remittance Dates and any
Indemnified Claims which are due and unpaid; and

fifth, all remaining amounts to the Servicer, as the Servicing Fee.

(Ex. A, § 5.05, p. 47-48)

Loan and (ii) if there are not sufficient funds to pay such Completion Fee pursuant to the application of Collections" under the Waterfalls. (Ex. A, § 2.04(b), p. 32).

16.    AHMS is entitled to an allocation in the form of a Servicer Fee of any amounts remaining after satisfaction of the Section 5.04 Waterfall and Section 5.05 Waterfall.

17.    To the extent any Mortgage Loan Sale Proceeds remain after satisfaction of the Section 5.03 Waterfall (such proceeds being hereinafter referred to as "Gain On Sale"), such proceeds are allocated to AHMS to hold in trust until the next Remittance Date, when they are to be applied to the Section 5.05 Waterfall. Gain On Sale may become a portion of the Servicer Fee under the Section 5.05 Waterfall to the extent there are sufficient funds remaining in the Collection Account on a Remittance Date to satisfy the Section 5.05 Waterfall. In the event all other amounts owing under the Section 5.05 Waterfall are not paid in full, however, AHMS is not entitled to any Servicer Fee, including any Gain On Sale, under the Section 5.05 Waterfall.

18.    After the occurrence of a Termination Event, Completion Fees[8] and Servicer Fees otherwise allocable to AHMC or AHMS under the Waterfalls are retained in the Collection Account for application to amounts other than Completion Fees and Servicer Fees under the Waterfalls on future Remittance Dates.

---

[8]    The Purchase Agreement provides a limitation on the retention of Completion Fees otherwise allocable to AHMC which is not applicable under the present circumstances. The Waterfalls provide that on and after the date a Termination Event occurs with respect to each Mortgage Pool (as defined in the Purchase Agreement), no Completion Fee shall be retained in the Collection Account if after giving effect to such retention, the sum of (i) the aggregate Takeout Deficiency Fees paid with respect to the Mortgage Loans in such Mortgage Pool as of such date and (ii) the aggregate Completion Fees for Mortgage Loans in such Mortgage Pool which have not been paid to AHMC as of such date shall exceed 5% of the aggregate Purchase Price for the Mortgage Loans included in such Mortgage Pool.

19.    Pursuant to section 8.01 of the Purchase Agreement, a Termination Event occurs when, among other things, AHMC and/or AHMS fails to make any payment when such payment comes due with respect to any Indebtedness (as defined in the Purchase Agreement) with an unpaid principal balance over $1.5 million.  (Ex. A, §8.01, pp. 68-69).  Under such circumstances, a Termination Event occurs automatically under the Purchase Agreement, giving SG the right to declare a Termination Date.

20.    The occurrence and continuance of a Termination Event, in turn, triggers a Servicer Termination Event pursuant to section 4.02(a)(vii) of the Purchase Agreement.  (Ex. A, p. 42).  Following a Servicer Termination Event, SG, upon written notice to AHMC and AHMS, may terminate all of AHMS' servicing rights and obligations with respect to the Mortgage Loans and assume control of the servicing rights, including the sale and transfer of such servicing rights to a successor servicer (the "Successor Servicer").  (Ex. A., § 4.02, p.42).  Additionally, pursuant to section 5.02(a) of the Purchase Agreement, during the occurrence and continuance of a Termination Event, all P&I Collections are to be deposited into the Collection Account within two (2) business days of receipt.  (Ex. A, § 5.02(a), p. 44).

21.    On July 27, 2007, AHMI, AHMS, AHMC and American Home Mortgage Acceptance, Inc. (the "BofA Borrowers"), each a borrower under the Second Amended and Restated Credit Agreement dated as of August 10, 2006 (the "BofA Credit Agreement"), were notified by Bank of America, N.A., as Administrative Agent, Swingline Lender and Lender ("BofA") under the BofA Credit Agreement, that pursuant to the terms of the BofA Credit Agreement, the BofA Borrowers were obligated to pay a mandatory prepayment of $26,779,622 (the "Mandatory Prepayment").  The Mandatory Prepayment was due on July 30, 2007.  The

BofA Borrowers failed to make the Mandatory Prepayment, and on August 1, 2007, BofA declared an event of default under the BofA Credit Agreement.[9]

22.     The failure to pay the Mandatory Prepayment was a Termination Event under section 8.01(g) of the Purchase Agreement as of August 1, 2007. (Ex. A, pp. 68-69). The occurrence and continuance of the foregoing Termination Event triggered a Servicer Termination Event under section 4.02(a)(vii). (Ex. A, p. 42). Consequently, on August 2, 2007, SG sent a notice (the "Termination Notice")[10] to AHMC and AHMS declaring the Termination Date to have occurred, and terminating AHMS' servicing rights under the Purchase Agreement based on the occurrence and continuance of the Termination Event. In addition, in the Termination Notice, SG demanded and declared that:

(i)     All Collections be deposited into the Collection Account within two (2) business days;

(ii)    AHMS' authority with respect to the Collection Account was revoked; and

(iii)   AHMS' servicing rights with respect to the Mortgage Loans were terminated and that SG was assuming control over the disposition of the servicing rights, including the sale or transfer to a Successor Servicer.

23.     Despite having received the Termination Notice on August 2, 2007, neither AHMC nor AHMS remitted the Collections in their possession to the Collection Account within two (2) business days, as demanded in the Termination Notice. Moreover, AHMC and AHMS have not been remitting P&I Collections into the Collection Account within two (2) business days of receipt, as required by section 5.02(a) of the Purchase Agreement.

## II.    Bankruptcy Filing and Sale Procedure Motion

---

[9]   A true and correct copy of BofA's notice of default is attached hereto as Exhibit B.

[10]  A true and correct copy of the Termination Notice and the facsimile confirmation confirming delivery of the Termination Notice on August 2, 2007 are attached hereto as Exhibits C and D, respectively.

24.     On August 6, 2007 (the "Petition Date") the Debtors filed with this Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

25.     Along with their petitions, the Debtors filed motions seeking certain first day relief, including an Emergency Motion for Orders: (A)(1) Approving Sale Procedures; (II) Scheduling a Hearing to Consider Sale of Certain Assets Used in the Debtors' Loan Servicing Business; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief; and (B)(I) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests; (II) Authorizing and Approving Purchase Agreement Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief (the "Sale Procedure Motion").

26.     The Sale Procedure Motion contemplates a sale of the Debtors' assets related to the Debtors' mortgage loan servicing business (the "Servicing Business"), including the Debtors' rights to service mortgage loans pursuant to the various servicing agreements to which they are a party and the Debtors' rights to any servicing fees arising therefrom.   On August 7, 2007, this Court granted the Sale Procedure Motion and established the procedures for conducting a sale of the Servicing Business (the "Sale Procedures").

27.     The Assumption Notice, as filed on August 27, 2007 and later amended on September 10, 2007, included an exhibit of contracts the Debtors sought to assume and assign (the "Assumed and Assigned Contracts") in connection with the sale of the Servicing Business and the proposed cure amounts for each Assumed and Assigned Contract.   The Debtors included

the Purchase Agreement among the Assumed and Assigned Contracts, and proposed a cure

amount of $0.00.

## OBJECTION TO THE ASSUMPTION AND ASSIGNMENT OF THE PURCHASE AGREEMENT

**I.      The Purchase Agreement Was Terminated Prepetition and Therefore Is Not An Executory Contract Capable of Assumption and Assignment**

28.     Sections 365(b) and 365(f) of the Bankruptcy Code authorize a debtor-in-

possession to assume and assign <u>executory</u> contracts. <u>See</u> 11 U.S.C. §§ 365(b) & (f).  "[An

executory contract is] a contract under which the obligation of both the bankrupt and the other

party to the contract are so far unperformed that the failure of either to complete performance

would constitute a material breach excusing performance of the other." <u>Sharon Steel Corp. v.</u>

<u>Nat'l Fuel Gas Distr. Corp.</u>, 872 F.2d 36, 39 (3d Cir. 1989); <u>see also</u> <u>Enterpr. Energy Corp. v.</u>

<u>U.S. (In re Columbia Gas System Inc.)</u>, 50 F.3d 233, 239 (3d Cir. 1995) (quoting <u>Sharon Steel</u>

<u>Corp.</u>); <u>General DataComm Indus., Inc. v. Arcara (In re General DataComm Indus., Inc.)</u>, 407

F.3d 616, 623 (3d Cir. 2005) (same).  It is hornbook bankruptcy law that a contract that has been

terminated prepetition is by definition <u>not</u> an executory contract, and therefore cannot be

assumed and assigned pursuant to section 365 of the Bankruptcy Code. <u>See</u> <u>In re EBIC I, Inc.</u>,

356 B.R. 631, 638 (Bankr. D. Del. 2006) (citing <u>Counties Contracting & Constr. Co. v.</u>

<u>Constitution Life Ins. Co.</u>, 855 F.2d 1054, 1061 (3d Cir. 1988)); <u>see also</u> <u>In re Greenfield Dry</u>

<u>Cleaning & Laundry, Inc.</u>, 249 B.R. 634 (Bankr. E.D. Pa. 2000) (citing <u>In re Triangle Labs., Inc.</u>,

663 F.2d 463, 467-68 (3d Cir. 1981)).

29.     Moreover, under New York law, which governs the Purchase Agreement,

it is well settled that a contract should be enforced by its terms when such contract is clear and

unambiguous on its face. <u>See</u> <u>Chrysler Capital Corp. v. Bankers Trust Co.</u>, 810 F. Supp. 74, 75-

76 (S.D.N.Y. 1992) (awarding declaratory relief when contract unambiguous on its face); <u>Bayer</u> <u>Corp. v. Chestnut Acquisition Corp.</u>, 189 F. Supp. 2d 153, 157 (S.D.N.Y. 2002) (holding that contract should be enforced by its terms when clear and unambiguous); <u>Rocco v. City of</u> <u>Schenectady</u>, 683 N.Y.S.2d 622, 624 (N.Y. App. Div. 1998) (courts must determine the rights of parties to a contract based on the unambiguous terms of the contract).

30.    AHMC and AHMS' failure to pay the Mandatory Prepayment to BofA on July 30, 2007 constituted a Termination Event under section 8.01(g) of the Purchase Agreement, the continuance of which triggered a Servicer Termination Event pursuant to Section 4.02(a)(vii) of the Purchase Agreement.

31.    On August 2, 2007, pursuant to Section 4.02(a) of the Purchase Agreement, SG sent AHMC and AHMS the Termination Notice, which (i) notified AHMC and AHMS of the Termination Event and the Servicer Termination Event and declared the occurrence of the Termination Date; (ii) unequivocally terminated AHMS' servicing rights with respect to the Mortgage Loans; (iii) documented the transfer of control over the disposition of the servicing rights to SG to sell or otherwise transfer the servicing rights to a successor servicer; (iv) revoked AHMS' authority with respect to the Collection Account; and (v) demanded that all Collections in AHMS' possession be deposited into the Collections Account within two (2) business days.

32.    The Termination Notice was received by AHMC and AHMS on August 2, 2007 and became effective not later than August 3, 2007 pursuant to section 11.07 of the Purchase Agreement.

33.     The requirements and procedures set forth in the Purchase Agreement for terminating AHMS' servicing rights and declaring the Termination Date are clear and unambiguous.  SG has complied in all respects with these clear and unambiguous terms. Therefore, consistent with New York law, the Purchase Agreement (including all servicing rights thereunder) was properly terminated by its terms prior to the Petition Date, and is not, by definition, an executory contract capable of assumption and assignment pursuant to section 365 of Bankruptcy Code.

## II.     The Debtors are Incapable of Curing All Defaults Under the Purchase Agreement

34.     Assuming, *arguendo*, that this Court determines the Purchase Agreement is an executory contract as of the Petition Date, the Debtors are incapable of performing their core obligations under the Purchase Agreement, resulting in numerous defaults which the Debtors cannot cure, thus rendering the Purchase Agreement incapable of assumption.

35.     Sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are clear – an executory contract may only be assumed and assigned if the debtor-in-possession cures or provides adequate assurance that the debtor-in-possession will promptly cure any defaults existing at the time of assumption.  See 11 U.S.C. §§ 365(b)(1), (f)(2).  A debtor-in-possession may not assume and assign a contract under which there are non-monetary defaults which are based on historical facts that cannot be cured by future performance.  See In re Claremont Acquisition Corp., 113 F.3d 1029, 1033 (9th Cir. 1997) (holding that the debtor was barred from assuming the contract because the debtors' default was a historical fact that could not be cured); see also Beckett v. Coatesville Hous. Assocs., Case No. 00-5337, 2001 U.S. Dist. LEXIS 9281, at *17 (E.D. Pa. July 5, 2001) (similar); and see In re New Breed Realty Enters., Inc., 278 B.R.

314, 319 (E.D.N.Y. 2002) (finding that section 365(b) requires that all defaults, including non-monetary defaults, be cured as a prerequisite to assuming an executory contract).

36.     Section 8.01(s) of the Purchase Agreement, provides, in relevant part, that a Termination Event occurs when "[t]here shall have occurred any event that could be reasonably expected to have a Material Adverse Effect on the enforceability or collectability of any significant portion of the Mortgage Loans or the Takeout Commitments . . . or the ability of [AHMC] or [AHMS] to perform [under the Purchase Agreement] . . .."

37.     It is beyond debate that the culmination of events surrounding the Debtors' epic financial collapse has left the Debtors completely incapable of performing key obligations under the Purchase Agreement.  Indeed, the last several months have seen the Debtors shutter their loan origination business, terminate over 90% of their workforce, file for chapter 11 bankruptcy protection and now, proceed with the contemplated sale of their Servicing Business.

38.     As a result of these events, the Debtors are no longer capable of originating Mortgage Loans to sell to SG under the Purchase Agreement.  This inability to perform constitutes a default under the Purchase Agreement that the Debtors cannot cure.  (Ex. A, § 8.01(s)).  In addition, the Debtors have been unable to perform their obligations in respect of the Takeout Commitments, or to effectuate the sales of Mortgage Loans to Approved Takeout Investors.  Since early August 2007, Approved Takeout Investors have been unwilling to honor their prior commitments to purchase the Mortgage Loans.  In fact, there has not been a sale of any Mortgage Loans to an Approved Takeout Investor since July 30, 2007, with perhaps the most glaring failure being the refusal of an Approved Takeout Investor to purchase

approximately $172.6 million in Mortgage Loans on July 31, 2007. This inability of the Debtors

to effectuate sales to Approved Takeout Investors also constitutes a default under the Purchase

Agreement that the Debtors cannot cure. (Ex. A, § 8.01(s)).

39.    The Purchase Agreement was designed for SG to hold ownership of the

Mortgage Loans for a limited period of time. The Debtors inability to effectuate sales to

Approved Takeout Investors has resulted in the entire pool of outstanding Mortgage Loans

becoming Fall-Out Loans. It is worth noting that several of the Termination Events provided for

under the Purchase Agreement were specifically crafted to protect SG from high rates of Fall-

Out Loans (Ex. A., §§ 8.01 (q), (y) & (ff), pp. 70-72). Even more fundamental, however, the

Debtors are simply unable to perform the primary purpose of the Purchase Agreement – to

effectuate the sale Mortgage Loans. Moreover, there has been no showing nor could there be a

showing by the Debtors that they will be able to perform this function in the future, thus

rendering the Purchase Agreement incapable of assumption.[11]

40.    In addition to the foregoing defaults that cannot be cured, section 8.01(j)

provides that it is a Termination Event if any of the Federal Home Loan Mortgage Corporation

("FHLMC"), Fannie Mae ("FNMA") or the Government National Mortgage Association

("GNMA") terminates or revokes any rights of either AHMC or AHMS. In the present case,

---

[11]    Although the defaults discussed above primarily relate to failures in the Debtors' loan origination
business, because the servicing rights the Debtors seek to assign are contained within the Purchase
Agreement, the defaults related to the Debtors' loan origination business must still be fully cured
prior to any assumption and assignment. The Purchase Agreement is a single, integrated contract,
which the Debtors must assume in its entirety and cure all defaults thereunder accordingly. See
Schlumberger Res. Mgmt Servs v. CellNet Data Sys. (In re CellNet Data Sys.), 327 F.3d 242, 249 (3d
Cir. 2003) (stating that the trustee's decision to assume or reject an executory contract is an all or
nothing proposition); Cinicola v. Scharffenberger, 248 F.3d 110, 119 (3d Cir. 2001) (stating that, "[i]f
the trustee meets the assumption requirements under section 365, it must assume the executory
contract entirely).

GNMA terminated the Debtors' rights to service GNMA mortgage loans as of August 3, 2007.
See Motion of the United States for an Order (I) Requiring Turn-Over of Non-Estate Property
Belonging to the Government National Mortgage Association and (II) Declaring that the
Government National Mortgage Association is Not Subject to the Automatic Stay, (Docket No.
243) p. 8.  Additionally, on August 1, 2007, FHLMC terminated AHMC's eligibility to sell
and/or service FHLMC mortgage loans.  See Motion of Federal Home Mortgage Corporation for
an Order Granting Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362, (Docket No.
676) p. 6, ¶ 13.  Consequently, as of August 1, 2007, AHMS and AHMC were in default under
section 8.01(j) of the Purchase Agreement.

      41.     Moreover, section 8.01(k)(i) of the Purchase Agreement provides that it is
a Termination Event if any Governmental Authority, including FHLMC, cancels AHMC's right
to be either seller or servicer of such Governmental Authority's insured or guaranteed mortgage
loans or mortgage-backed securities.  As previously set forth, on August 1, 2007, FHLMC
terminated AHMC's eligibility to sell and/or service FHLMC mortgage loans.  See Motion of
Federal Home Mortgage Corporation for an Order Granting Relief from the Automatic Stay
Pursuant to 11 U.S.C. § 362, (Docket No. 676) p. 6, ¶ 13. Consequently, as of August 1, 2007,
AHMS and AHMC were in default under section 8.01(k)(i) of the Purchase Agreement.

      42.     Additionally, section 8.01(k)(iii) of the Purchase Agreement provides that
it is a Termination Event if AHMC receives notice from a Governmental Authority, including
FNMA or FHLMC, that such Governmental Authority intends to revoke AHMC's right to be a
seller or servicer of such Governmental Authority's insured or guaranteed mortgage loans and
such notice is not withdrawn within ten (10) days of receipt.  In the present case, FNMA sent the
Debtors notice on July 31, 2007 that FNMA intended to terminate the Debtors' rights to service

FNMA mortgage loans. See Debtors' Motion Pursuant to Section 105 of the Bankruptcy Code and Bankruptcy Rule 9019 for an Order Approving and Authorizing Compromise and Settlement Agreement with Fannie Mae, (Docket No. 368) ¶17. On August 1, 2007, FHLMC sent AHMC notice terminating AHMC's eligibility to sell and/or service FHLMC mortgage loans. See Motion of Federal Home Mortgage Corporation for an Order Granting Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362, (Docket No. 676) p. 6, ¶ 13. It does not appear that either FNMA or FHLMC withdrew their notices within ten (10) days of the Debtors' receipt of such notices. Consequently, the Debtors' receipt of FNMA's notice of termination on July 31, 2007 became a default under the Purchase Agreement on August 10, 2007. The Debtors' receipt of FHLMC's notice of termination on August 1, 2007 became a default under the Purchase Agreement on August 11, 2007.

43.    The Debtors cannot cure their defaults under the Purchase Agreement with respect to the termination of AHMS' rights to service the GNMA or FHLMC loans or the receipt of the FNMA and FHLMC termination notices, which were not withdrawn within ten (10) days. Indeed, each of these defaults is a non-monetary default involving historical facts, that cannot be undone with future performance. Because the Debtors are unable to cure the foregoing defaults, SG submits that the Purchase Agreement cannot be assumed and assigned.

**III.    Even Assuming Purchase Agreement is an Executory Contract and Defaults are Capable of Cure, Debtors Must Cure All Existing Defaults and Assume the Purchase Agreement in its Entirety**

44.    For the reasons discussed above, the Purchase Agreement is incapable of being assumed. However, if the Court otherwise determines that the Purchase Agreement is an executory contract and the defaults thereunder are capable of cure, the Debtors must cure all such defaults and assume the Purchase Agreement in its entirety and with all burdens.

A.    <u>Cure Amounts</u>

45.    In order to cure the defaults under the Purchase Agreement, the Debtors must cure each of the defaults set forth in Section II of the Objection and must pay to SG a cure amount at least equal to the following amounts (collectively, the "<u>Cure Amount</u>"):

(1)    an amount equal to <u>all</u> P&I Collections collected by AHMS from July 1, 2007 to the present date (the "<u>P&I Cure</u>");

(2)    an amount equal to <u>all</u> Mortgage Loan Sale Proceeds received by AHMS, but not previously remitted into the Collection Account (the "<u>Mortgage Loan Sale Proceeds Cure</u>");

(3)    an amount equal to <u>all</u> Completion Fees collected and retained by AHMS or AHMC (i) in connection with any Mortgage Loan sold after July 1, 2007 for an amount less than the Anticipated Takeout Amount or (ii) after August 1, 2007 (collectively, the "<u>Completion Fee Cure</u>");

(4)    an amount equal to <u>all</u> Gain On Sale earned on any sale of Mortgage Loans, which was retained by the Debtors as a Servicing Fee or otherwise from July 10, 2007 to the present date (the "<u>Gain on Sale Cure</u>"); and

(5)    an amount equal to all Takeout Deficiency Fees for any Mortgage Loans sold after July 1, 2007 which are the subject of a Takeout Failure (the "<u>Deficiency Fee Cure</u>").

46.    SG estimates that the Cure Amount may exceed $8 million.[12]

*(i)    The P&I Cure*

47.    In the absence of a Termination Event, the Purchase Agreement obligates AHMS to remit to the Collection Account all P&I Collections on the 10th day of each month.

---

[12]    The Debtors have continued to service the Mortgage Loans despite the valid pre-Petition Date termination of the Purchase Agreement. Despite the Debtors many statements in this Court that their Servicing Business remains intact and that they continue to function in the ordinary course, the Debtors have failed to provide SG with the full information and cooperation necessary for SG to determine the amounts collected on behalf of SG and the amounts that must be remitted to SG in order to cure the defaults under the Purchase Agreement. Therefore, SG is not in a position at this time to identify with specificity the exact amounts that are required to cure the defaults under the Purchase Agreement.

Upon occurrence of a Termination Event, the Purchase Agreement obligates AHMS to remit to the Collection Account all P&I Collections within 2 business days of receipt. AHMS has failed to remit any P&I Collections to the Collection Account collected on SG's behalf since July 1, 2007. This failure constitutes a default under the Purchase Agreement. In order to cure such default, AHMS must remit all P&I Collections to the Collection Account received from July 1, 2007 through and including the date of assumption.

> (ii)    *Sale Proceeds Cure*

48.    The Purchase Agreement obligates AHMC and AHMS to direct all Approved Takeout Investors to deposit Mortgage Loan Sale Proceeds directly into the Collection Account. To the extent Mortgage Loan Sale Proceeds are received by either AHMC or AHMS, AHMC and AHMS are required to deposit any such proceeds into the Collection Account within 2 business days of receipt. To the extent either AHMC or AHMS has failed to comply with their obligations with respect to the remittance of Mortgage Loan Sale Proceeds, such failure would constitute a default. In order to cure such default, AHMS and/or AHMC must remit all such Mortgage Loan Sale Proceeds to the Collection Account through and including the date of assumption.

> (iii)    *Completion Fee Cure*

49.    The Purchase Agreement contemplates an allocation of Collections to AHMC as a Completion Fee. This Completion Fee, however, is not payable (i) until the date of receipt by SG of the related Anticipated Takeout Amount for the Mortgage Loan being sold and (ii) if there are not sufficient funds to allocate to the Completion Fee pursuant to the Waterfalls. To the extent the Debtors sold Mortgage Loans since July 1, 2007, for amounts less than the

Anticipated Takeout Amount for any such Mortgage Loan, no Completion Fee is payable.  To

the extent AHMC or AHMS has retained a Completion Fee in connection with the sale of any

such Mortgage Loan, such retention would constitute a default.  In order to cure such default,

AHMS and/or AHMC must remit all such Completion Fees to the Collection Account.

50.    Additionally, from and after the occurrence of a Termination Event,

Collections which would otherwise be allocable to AHMC as a Completion Fee are to be

retained in the Collection Account and utilized at future Remittance Dates to defray other

amounts owing under the Waterfalls.  Since a Termination Event occurred on August 1, 2007,

AHMC has no right to any Completion Fee subsequent to August 1, 2007.  To the extent AHMC

has retained any Completion Fees subsequent to August 1, 2007, this would constitute a default.

In order to cure such default, AHMC and/or AHMS must remit all such Completion Fees to the

Collection Account through and including the date of assumption.

*(iv)    Gain on Sale Cure*

51.    The Section 5.03 Waterfall provides that the Gain On Sale shall be

allocated to AHMS to hold in trust until the next Remittance Date.  On such Remittance Date,

the Gain On Sale is to be allocated through the Section 5.05 Waterfall, with any amounts

remaining to be available to allocate to AHMS as a portion of the Servicing Fee.  Section 5.05

provides that upon the occurrence of a Termination Event, amounts in the Collection Account,

including Gain On Sale, otherwise allocable to any Servicer Fee or Completion Fee arrearages

are to be retained in the Collection Account and made available on any subsequent Remittance

Date to pay all amounts owing under the Waterfalls except the Completion Fee and Servicer Fee.

A Termination Event occurred on August 1, 2007.  The next Remittance Date was August 10,

2007.  Because of the Termination Event, no Gain On Sale realized after July 10, 2007 (the prior

Remittance Date) could be retained by AHMS or AHMS as a Completion Fee or as a Servicer

Fee under the Section 5.05 Waterfall.  To the extent AHMS or AHMC has retained any Gain On

Sale since July 10, 2007, this would constitute a default.  In order to cure such default, AHMS

and/or AHMS must remit all such Gain On Sale to the Collection Account through and including

the date of assumption.

(v)    <i>Deficiency Fee Cure</i>

52.    When a Takeout Failure occurs, SG is entitled to payment of the Takeout

Deficiency Fee related to each Mortgage Loan which is the subject of the Takeout Failure.

Many Mortgage Loans sold by the Debtors since July 1, 2007, are the subject of a Takeout

Failure.  Therefore, AHMC is obligated to pay SG the Takeout Deficiency Fee with respect to

such Mortgage Loans.  The failure to pay such Takeout Deficiency Fee constitutes a default.  In

order to cure such default, AHMS and/or AHMS must pay to SG any Takeout Deficiency Fee

related to Mortgage Loans sold from July 1, 2007, through and including the date of assumption.

B.    <u>The Purchase Agreement May Only Be Assumed in its Entirety</u>

53.    It is black letter law that a debtor in possession may assume and assign an

executory contract, if at all, with all the related benefits and burdens.  <u>See</u> 11 U.S.C. § 365(b);

<u>N.L.R.B. v. Bildisco and Bildisco</u>, 465 U.S. 513, 531-32; 104 S.Ct. 1188, 1199 (1984) ("Should

the debtor-in-possession elect to assume the executory contract, however, it assumes the contract

<i>cum onere</i> . . . ."); <u>see also</u> <u>In re Italian Cook Oil Corp</u>., 190 F.2d 994, 996 (3d Cir. 1951) ("The

trustee, however, may not blow hot or cold.  If he accepts the contract, he accepts it <i>cum onere</i>.

If he receives the benefits he must adopt the burdens.  He cannot accept one and reject the

other."); <u>In re Fleming Co., Inc.</u>, Case No. 05-2365, 2007 U.S. App. LEXIS 19927, at *20 (3d

Cir. August 22, 2007) (stating that section 365(f) requires a debtor to assume a contract subject

23

to the benefits and burdens thereunder); In re ANC Rental Corp., 277 B.R. 226, 238 (Bankr. D. Del. 2002) (stating that a debtor may not accept the benefits and reject the burdens of a contract); United Air Lines, Inc. v. U.S. Bank Trust, N.A. as Trustee (In re UAL Corp.), 346 B.R. 456, 467 (Bankr. N.D. Ill. 2006) (same). This black letter maxim applies in the instant situation.

54.     The Purchase Agreement places many obligations on AHMS and AHMC, including arranging for sales of Mortgage Loans to Approved Takeout Investors and payment of Takeout Deficiency Fees and other fees and amounts under the Purchase Agreement. Additionally, the Purchase Agreement, even in the absence of a Termination Event, expires pursuant to its terms on October 15, 2007. Any order authorizing the assumption of the Purchase Agreement and any subsequent assignment must make clear that the Debtors are assuming the Purchase Agreement in its entirety and are assuming all obligations thereunder and are bound by all the provisions contained therein, including the October 15, 2007 expiration date.

## IV.     Any Assignee Must Provide Adequate Assurance of Future Performance

55.     Section 365(f)(2) provides that a contract may only be assumed and assigned after the debtor-in-possession has made a showing of adequate assurance of future performance by the proposed assignee regardless of whether or not there has been a default under the contract. See 11 U.S.C. § 365(f)(2).

56.     In the present case, the Debtors have not even identified the proposed assignee of the Purchase Agreement, let alone established that the proposed assignee can adequately perform the Debtors' obligations under the Purchase Agreement. SG submits that prior to any assumption and assignment of the Purchase Agreement, the Debtors must make an evidentiary showing establishing, at a minimum, that any proposed assignee of the Purchase Agreement is fully capable of servicing the Mortgage Loans, effectuating the sale of Mortgage

Loans to Approved Takeout Investors or other acceptable third parties on terms acceptable to SG, paying, when they come due, any Takeout Deficiency Fees and performing all other obligations under the Purchase Agreement. Absent such a showing, assumption and assignment of the Purchase Agreement is wholly improper.

## LIMITED OBJECTION TO THE SALE OF THE SERVICING BUSINESS

57. SG owns all right, title and interest in and to the Mortgage Loan Assets, including the Mortgage Loans, the servicing rights and the Collections and the Mortgage Loans were delivered to SG on a servicing release basis. (Ex. A, §§ 2.02(a), 2.04(d), pp. 29-30, 32). Therefore, the only interest the Debtors have in the servicing rights is a contractual interest created under the Purchase Agreement. As set forth above, this interest was validly terminated not later than August 3, 2007. As a result, the servicing rights cannot be sold in connection with the sale of the Servicing Business. Moreover, even assuming the Purchase Agreement was not validly terminated, for the reasons set forth above, the defaults thereunder are incapable of cure, thus rendering the Purchase Agreement incapable of assumption and assignment and preventing the sale of the servicing rights.

58. If, however, the Court determines that the Purchase Agreement can be assumed and assigned in connection with the sale of the Servicing Business, the Debtors must cure all defaults thereunder and pay the Cure Amount. Additionally, any rights acquired by the prospective purchaser will be contractual in nature, limited by, and be solely as set forth in, the Purchase Agreement, including the provision providing for the October 15, 2007, expiration date. Therefore, SG objects to the sale of the Servicing Business to the extent the Debtors purport to sell any ownership interest in the Mortgage Loan Assets, including the Mortgage Loans, the servicing rights and the Collections, through the assumption and assignment of the

Purchase Agreement or otherwise.  SG also reserves its right to raise any and all claims against the prospective purchaser under the Purchase Agreement that SG may have raised against the Debtors.

## RESERVATION OF RIGHTS

59.     SG reserves the right to supplement and amend this Objection, including to allege additional Cure Amounts or additional defaults under the Purchase Agreement or to raise additional objections to the assumption and assignment of the Purchase Agreement or the sale of the Servicing Business, based upon information obtained from the Debtors during the course of discovery related to this Objection.

## CONCLUSION

60.     For the reasons set forth above, SG respectfully requests this Court sustain SG's objection and deny the Debtors' request to assume and assign the Purchase Agreement.  In the alternative, SG requests this Court enter an order requiring (i) the Debtors to cure all defaults under the Purchase Agreement, (ii) the Debtors to pay the Cure Amounts set forth herein, (iii) the Debtors to assume and assign the Purchase Agreement in its entirety, and (iv) any assignee to be bound by all the terms, provisions and obligations under the Purchase Agreement, including the October 15, 2007 expiration date.  Additionally, for the reasons set forth above, SG respectfully requests this Court deny any sale of the Servicing Business to the extent any such sale purports to sell an ownership interest in the Mortgage Loan Assets, including the Mortgage Loans, the servicing rights and the Collections.

Dated: Wilmington, Delaware
September 13, 2007

Respectfully submitted,

SIDLEY AUSTIN LLP
Larry J. Nyhan
Melville W. Washburn
Matthew A. Clemente
David A. Hall
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

-and-

BUCHANAN INGERSOLL & ROONEY PC

Teresa K.D. Currier (No. 3080)
Mary F. Caloway (No. 3059)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801-1054
Telephone: (302) 552-4200
Facsimile: (302) 552-4295

Counsel to Société Générale

CHI 3983357v.11