# EXHIBIT A

**EXECUTION COPY**

MORTGAGE LOAN PURCHASE AND SALE AGREEMENT

among

AMERICAN HOME MORTGAGE CORP.,

as Seller,

AMERICAN HOME MORTGAGE SERVICING, INC.,

as Servicer,

THE ENTITIES PARTIES HERETO AS CONDUIT PURCHASERS,

THE ENTITIES PARTIES HERETO AS COMMITTED PURCHASERS,

THE ENTITIES PARTIES HERETO AS FUNDING AGENTS,

and

SOCIETE GENERALE,

as Administrative Agent for the Purchasers

Dated as of October 16, 2006

## TABLE OF CONTENTS

ARTICLE I
DEFINITIONS

SECTION 1.01. Definitions ................................................................................ 2

SECTION 1.02. Other Definitional Provisions. ........................................... 27

ARTICLE II
THE MORTGAGE LOAN PURCHASE FACILITY

SECTION 2.01. Procedures for Purchases of Mortgage Loans. ...................... 28

SECTION 2.02. Title to Mortgage Loans; Intent of Parties............................. 29

SECTION 2.03. Takeout Commitments............................................................ 31

SECTION 2.04. Sales of Mortgage Loans to Approved Takeout Investors. ................... 31

SECTION 2.05. Payment of Takeout Deficiency Fee....................................... 33

SECTION 2.06. Reductions and Increases to the Maximum Purchase Limit................ 34

SECTION 2.07. Sharing Payments .................................................................. 36

SECTION 2.08. Extension of Term .................................................................. 36

ARTICLE III
CONDITIONS PRECEDENT

SECTION 3.01. Conditions Precedent to the Obligations of the Purchasers................. 37

SECTION 3.02. Conditions Precedent to Purchases ........................................ 38

ARTICLE IV
ADMINISTRATION AND SERVICING OF LOANS

SECTION 4.01. Acceptance of Appointment; Duties of Servicer. .................... 40

SECTION 4.02. Replacement of Servicer........................................................ 41

SECTION 4.03. Indemnification by Servicer .................................................. 44

ARTICLE V
ALLOCATION AND APPLICATION OF COLLECTIONS

SECTION 5.01. Rights of the Purchasers ........................................................ 44

SECTION 5.02. Establishment of Collection Account. ..................................................44

SECTION 5.03. Allocations and Distributions on Settlement Dates ..............................45

ARTICLE VI
REPRESENTATIONS AND WARRANTIES; COVENANTS

SECTION 6.01. Representations of the Seller and the Servicer. ......................................49

SECTION 6.02. Additional Representations of the Seller ...............................................52

SECTION 6.03. Additional Representations and Warranties of the Servicer ................54

SECTION 6.04. Survival of Representations ...................................................................55

SECTION 6.05. Covenants ..............................................................................................55

SECTION 6.06. Negative Covenants ...............................................................................61

ARTICLE VII
INDEMNIFICATION; EXPENSES; RELATED MATTERS

SECTION 7.01. Indemnities .............................................................................................63

SECTION 7.02. Indemnity for Taxes, Reserves and Expenses ......................................64

SECTION 7.03. Taxes.......................................................................................................66

SECTION 7.04. Other Costs, Expenses and Related Matters. ........................................67

ARTICLE VIII
TERMINATION EVENTS

SECTION 8.01. Termination Events.................................................................................67

SECTION 8.02. Waiver of Past Defaults .........................................................................72

ARTICLE IX
THE ADMINISTRATIVE AGENT; FUNDING AGENTS

SECTION 9.01. Authorization and Action of Administrative Agent. .............................72

SECTION 9.02. Administrative Agent's Reliance, Etc ...................................................73

SECTION 9.03. Credit Decision ......................................................................................73

SECTION 9.04. Indemnification of the Administrative Agent ........................................74

SECTION 9.05. Successor Administrative Agent.............................................................74

ii

SECTION 9.06. Payments by the Administrative Agent ....................................................75

SECTION 9.07. Authorization and Action of Funding Agent. ...........................................75

SECTION 9.08. Funding Agent's Reliance, Etc .................................................................76

SECTION 9.09. Credit Decision ........................................................................................77

SECTION 9.10. Indemnification of the Funding Agent ....................................................77

SECTION 9.11. Successor Funding Agent .........................................................................77

SECTION 9.12. Payments by a Funding Agent ..................................................................78

ARTICLE X
ASSIGNMENTS AND PARTICIPATIONS

SECTION 10.01. Assignments; Additional Purchaser Groups. .........................................78

SECTION 10.02. Participations. .........................................................................................81

SECTION 10.03. Replacement of a Purchaser Group .......................................................81

ARTICLE XI
MISCELLANEOUS

SECTION 11.01. Termination of Agreement; Survival.....................................................82

SECTION 11.02. Protection of Right, Title and Interest to Purchased Assets. ................82

SECTION 11.03. Waivers; Cumulative Remedies; Amendments. ....................................83

SECTION 11.04. Governing Law; Submission to Jurisdiction; Integration.....................83

SECTION 11.05. Counterparts............................................................................................84

SECTION 11.06. Headings .................................................................................................84

SECTION 11.07. Notices ....................................................................................................84

SECTION 11.08. Successors and Assigns. .........................................................................85

SECTION 11.09. Severability of Provisions.......................................................................85

SECTION 11.10. Further Assurances .................................................................................85

SECTION 11.11. Confidentiality. .......................................................................................86

SECTION 11.12. Setoff.......................................................................................................87

CHI 3469370v.24

SECTION 11.13. Merger and Integration .................................................................. 87

SECTION 11.14. Certificates and Opinions of Counsel. .......................................... 87

SECTION 11.15. Non-Petition Covenant .................................................................. 87

SECTION 11.16. Limited Recourse. .......................................................................... 88

EXHIBITS

| | | |
|---|---|---|
| Exhibit A | -- | Form of Assignment and Assumption Agreement |
| Exhibit B | -- | Form of Joinder Agreement |
| Exhibit C | -- | Form of Daily Report |
| Exhibit D | -- | Form of Initial Purchase Date Notice |
| Exhibit E | -- | Form of Monthly Statement |
| Exhibit F | -- | Form of Trade Assignment |
| Exhibit G | -- | Form of Purchase Date Notice |
| Exhibit H | -- | Form of Maximum Purchase Limit Increase Notice |
| Exhibit I-1 | -- | Form of Seller Compliance Certificate |
| Exhibit I-2 | -- | Form of Servicer Compliance Certificate |
| Exhibit I-3 | -- | Form of AHMIC Compliance Certificate |

SCHEDULES

| | | |
|---|---|---|
| Schedule A | -- | Purchaser Groups |
| Schedule B | -- | Notice Addresses |
| Schedule C | -- | Approved Takeout Investors |
| Schedule D | -- | Litigation |
| Schedule E | -- | Delegated Servicing Duties |
| Schedule F | -- | Trade Names |

CH1 3469370v.24

## MORTGAGE LOAN PURCHASE AND SALE AGREEMENT

THIS MORTGAGE LOAN PURCHASE AND SALE AGREEMENT, entered into and dated as of October 16, 2006 (as hereinafter amended, restated, supplemented or otherwise modified from time to time, the "Agreement"), is by and among:

AMERICAN HOME MORTGAGE CORP. ("AHM"), a New York corporation, as the Seller;

AMERICAN HOME MORTGAGE SERVICING, INC. ("AHMS"), a Maryland corporation, as the Servicer;

BARTON CAPITAL LLC, a Delaware limited liability company ("Barton"), and each other entity from time to time party hereto as conduit purchasers, each as a Conduit Purchaser;

Barton and each other entity from time to time party hereto as committed purchasers, each, individually, as a Committed Purchaser;

SOCIETE GENERALE, a banking corporation organized under the laws of France, acting through its New York Branch ("SG"), and each other entity party hereto from time to time as funding agents, each as a Funding Agent; and

SG, as Administrative Agent.

### PRELIMINARY STATEMENTS

WHEREAS, the Seller desires to sell to the Purchasers Mortgage Loans;

WHEREAS, subject to the terms and conditions contained herein, the Administrative Agent, on behalf of the Purchasers, will purchase such Mortgage Loans;

WHEREAS, the Seller will cause the Mortgage Loans purchased by the Administrative Agent, on behalf of the Purchasers, to be sold to one or more Approved Takeout Investors; and

WHEREAS, AHMS has agreed to act as the initial Servicer hereunder.

NOW THEREFORE, in consideration of the premises, the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each party agrees as follows:

ARTICLE I
DEFINITIONS

SECTION 1.01.    Definitions. As used in this Agreement, terms defined in the foregoing paragraphs shall have their defined meanings when used herein, and the following terms shall have the following meanings:

"Accepted Servicing Standards" shall mean the same manner in which the Servicer services and administers similar mortgage loans for its own portfolio, giving due consideration to customary and usual standards of practice of mortgage lenders and loan servicers administering similar mortgage loans and in accordance with Agency Guidelines, as applicable, but without regard to any relationship that the Servicer or any Affiliate of the Servicer may have with the related Mortgagor, or the Servicer's right to receive compensation for its services hereunder.

"Accounting Based Consolidation Event" shall mean, with respect to any Conduit Purchaser, the occurrence of any change in accounting standards or the issuance of any pronouncement or release by any accounting body or any other body charged with the promulgation or administration of accounting standards (including, without limitation, the Financial Accounting Standards Board, the American Institute of Certified Public Accountants or the Securities and Exchange Commission) or the occurrence of any change in the interpretation or application of any accounting standard, the effect of which (in any such event) is to cause or require the consolidation of all or any portion of the assets and liabilities of such Conduit Purchaser allocable to the Net Investment with the assets and liabilities of its related Funding Agent or any Affiliate thereof or the effect of which is to deem all or any portion of the assets and liabilities of such Conduit Purchaser allocable to the Net Investment to be consolidated with the assets and liabilities of such Funding Agent or any Affiliate thereof.

"Adjusted Consolidated Funded Debt" shall mean, on any date of determination, the *sum* of (a) the Consolidated Funded Debt of AHMIC and any other Person which would be reflected on the consolidated balance sheet of AHMIC prepared in accordance with GAAP if such balance sheet were prepared as of such date of determination, *less* (b) 50% of any Subordinated Debt *less* (c) the mortgage debt associated with the building and the land located at 538 Broadhollow Road, Melville, New York.

"Administrative Agent" shall mean SG, in its capacity as administrative agent for the Purchasers, or any successor administrative agent thereto.

"Administrative Agent Fee" shall mean the "Administrative Agent Fee" payable to the Administrative Agent, on each Remittance Date as set forth in the Agent Fee Letter.

"Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such specified Person. For purposes of this definition, "control" when used with respect to any specified Person shall mean the power to direct the management and policies of such Person, directly or indirectly, whether

2

through the ownership of voting securities, by contract, or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agency Guidelines" shall mean the FHLMC Guidelines, the FNMA Guidelines or the GNMA Guidelines, as applicable.

"Agent Fee Letter" shall mean that certain letter agreement dated as of the date hereof by and between AHM and the Administrative Agent.

"Aggregate Collateral Value" shall mean an amount equal to the sum of the products of the book values (as determined in accordance with GAAP) of the consolidated assets of AHMIC and its Subsidiaries, such assets being categorized in the classes set forth on the calculation schedule that is part of Exhibit E attached to the Credit Agreement, times the percentage multiplier for each such class set forth on such calculation schedule.

"AHM" shall have the meaning set forth in the preamble hereto.

"AHMIC" shall mean American Home Mortgage Investment Corp., a Maryland corporation.

"AHMS" shall have the meaning set forth in the preamble hereto.

"Alt-A Loan" shall mean a Mortgage Loan (other than a Conforming Loan or a Jumbo Loan) that (i) does not conform to the conventional underwriting standards of FNMA, FHLMC or GNMA but that is underwritten in a manner designed to be purchased by an Approved Takeout Investor (other than FNMA, FHLMC or GNMA), within guidelines generally acceptable to industry norms for "Alt-A" loans, (ii) has a demonstrated secondary market and is readily securitizable, and (iii) matches all applicable requirements for purchase under the requirements of a Takeout Commitment specifically issued for the purchase of such Mortgage Loan.

"Anticipated Settlement Date" shall mean, with respect to a Mortgage Loan, the date specified in the related Takeout Confirmation on which it is anticipated that the Settlement Date will occur.

"Anticipated Takeout Amount" shall mean, with respect to a Mortgage Loan, the price specified in the related Takeout Confirmation which the related Approved Takeout Investor has agreed to pay for such Mortgage Loan.

"Applicable Agency" shall mean GNMA, FNMA or FHLMC, as applicable.

"Applicable Rate" shall mean an amount (expressed as a percentage) equal to:

(i) if the applicable Purchaser is a Conduit Purchaser which is funding its share of the Net Investment by issuing its Commercial Paper, the CP Rate for such Conduit Purchaser; and

3

(ii) if the applicable Purchaser is funding its share of the Net Investment other than by issuing Commercial Paper the sum of (x) the one-month LIBOR Rate and (y) 1.50%;

provided, however, that (1) with regard to clause (ii) above, if any Purchaser shall have notified the Administrative Agent that a LIBOR Disruption Event has occurred, the "Applicable Rate" shall be the Base Rate and (2) following the occurrence and during the continuance of a Termination Event, the "Applicable Rate" shall be the Base Rate.

"Appraised Value" shall mean, (i) with respect to any Mortgage Loan secured by a first priority Mortgage, (A) the lower of the sales price and the appraised value of the related Mortgaged Property at the time of origination of such Mortgage Loan, if the Mortgage Loan is a refinance of any existing lien and the last sale of the Mortgaged Property occurred within 12 months prior to the origination of such Mortgage Loan, or (B) the appraised value of the related Mortgaged Property at the time of origination of such Mortgage Loan, if the Mortgage Loan is a refinance of any existing lien and the last sale of the Mortgaged Property occurred more than 12 months prior to the origination of such Mortgage Loan, (C) the lower of the sales price of the related Mortgage Property at the time of origination of the Mortgage Loan or the appraised value of such property at such time, if the Mortgage Loan is a purchase money loan, and (ii) with respect to any Mortgage Loan secured by a second priority Mortgage, (A) if such Mortgage Loan was originated more than 12 months after the last sale of the related Mortgaged Property, the appraised value of the related Mortgaged Property at the time of origination of such Mortgage Loan (or if no appraisal is obtained in connection with the origination of such Mortgage Loan, the appraised value of the related Mortgaged Property determined no more than 12 months prior to the origination of such Mortgage Loan) or (B) if such second priority Mortgage was originated simultaneously with or not more than 12 months after the sale of the related Mortgaged Property, the lesser of the appraised value at origination of such Mortgage Loan (or if no appraisal is obtained in connection with the origination of such Mortgage Loan, the appraised value of the related Mortgaged Property determined no more than 12 months prior to the origination of such Mortgage Loan) and the sales price for such sale of the related Mortgaged Property.

"Approvals" shall mean, with respect to the Servicer, the approvals obtained by the Applicable Agency in designation of the Servicer as a GNMA-approved issuer, a GNMA-approved servicer, a FHA-approved mortgagee, a VA-approved lender, a FNMA approved lender or a FHLMC-approved Seller/Servicer, as applicable, in good standing.

"Approved Takeout Investor" shall mean any of (i) an entity listed on Schedule C hereto, provided, that any entity listed on Schedule C (or its parent) which is rated by Standard and Poor's and Moody's which no longer has senior long-term unsecured debt ratings of at least BBB+ and Baa1 (or in the case of ResCap, BBB- and Baa3) by Standard & Poor's and Moody's, respectively, shall cease to be an Approved Takeout Investor immediately upon such downgrade, (ii) a securities dealer or financial institution that has (or its parent has) a senior long-term unsecured debt rating of at least BBB+ and Baa1 by Standard and Poor's and Moody's, respectively, and is specified in writing by the Seller to the Administrative Agent and each Funding Agent or (iii) an entity which is acceptable to the Administrative Agent and each of the Funding Agents, on behalf of the applicable Purchasers, as notified to the Seller in writing by the

4

Administrative Agent; provided that upon any default by such Approved Takeout Investor under any Takeout Commitment issued by it, such entity shall immediately cease to be an Approved Takeout Investor.

"Assignment and Assumption Agreement" shall mean an Assignment and Assumption Agreement substantially in the form of Exhibit A attached hereto.

"Base Rate" shall mean, on any day, a rate per annum equal to the greater of (i) the prime rate of interest announced publicly by SG from time to time, changing when and as said prime rate changes (such rate not necessarily being the lowest or best rate charged by SG) and (ii) the sum of (a) 1.50% and (b) the rate equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by SG from three Federal funds brokers of recognized standing selected by it.

"Business Day" shall mean any day other than (i) a Saturday or Sunday or (ii) any day on which banks in New York City or Chicago, Illinois are authorized or obligated by law or executive order to be closed.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Collateral" shall have the meaning set forth in Section 2.02(d).

"Collection Account" shall mean the account designated as such for the deposit of Collections, established and maintained pursuant to Section 5.02.

"Collection Account Control Agreement" shall mean the Collection Account Control Agreement with respect to the Collection Account dated the date hereof among the Seller, the Servicer, the Administrative Agent and the Custodian, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Collections" shall mean with respect to each Mortgage Loan, (i) all amounts received under the related Takeout Commitment or other sale of such Mortgage Loan and (ii) all principal and interest collections, insurance proceeds and other cash proceeds relating to such Mortgage Loan.

"Combined Loan-to-Value Ratio shall mean, with respect to any Mortgage Loan secured by a second priority Mortgage, the fraction, expressed as a percentage found by dividing (i) the sum of (A) the original principal balance of such second priority Mortgage Loan and (B) the aggregate unpaid principal balance, at the time of origination of the second priority Mortgage Loan, of all other mortgage loans, if any, secured by senior liens on the related Mortgaged Property by (ii) the Appraised Value of the related Mortgaged Property.

5

"<u>Commercial Paper</u>" shall mean, with respect to each Conduit Purchaser, the promissory notes issued by such Conduit Purchaser in the commercial paper market.

"<u>Committed Purchaser</u>" shall mean each of the several entities identified on <u>Schedule A</u> and each entity specified as such in the Assignment and Assumption Agreement or Joinder Agreement pursuant to which such financial institution became a party hereto, and their respective successors and assigns.

"<u>Commonly Controlled Entity</u>" of a Person shall mean a person, whether or not incorporated, which is under common control with such Person within the meaning of Section 414(c) of the Code.

"<u>Completion Fee</u>" shall mean with respect to any Mortgage Loan, an amount equal to the product of (i) the aggregate Takeout Amount for the Takeout Commitment relating to such Mortgage Loan or, if a Takeout Failure occurs with respect to such Mortgage Loan, the proceeds from the sale of such Mortgage Loan, and (ii) 2.00%.

"<u>Concentration Limits</u>" shall mean, at any time, after giving effect to the purchase of any Mortgage Loans, (i) the aggregate Anticipated Takeout Amounts for all outstanding Takeout Commitments of any individual Approved Takeout Investor at such time will not exceed the following percentages of the aggregate Anticipated Takeout Amounts for all outstanding Takeout Commitments at such time:  (A) 30% for each Approved Takeout Investor having a senior long-term unsecured debt rating of AA- or better by Standard & Poor's and Aa3 or better by Moody's; <u>provided</u>, that, for purposes of this definition, Countrywide Securities Corp. ("<u>CSC</u>") shall be deemed to have satisfied such ratings requirement unless, subsequent to the date hereof, the senior long-term unsecured debt rating of CSC is downgraded or placed on "negative watch" by Standard & Poor's or Moody's, (B) 20% for each Approved Takeout Investor having a senior long-term unsecured debt rating of A- or better by Standard & Poor's and A3 or better by Moody's, and (C) 10% for all other Approved Takeout Investors; <u>provided</u> that the Concentration Limit for ResCap shall be 5% so long as ResCap has a senior long-term unsecured debt rating of BBB- or better by Standard &Poor's and Baa3 or better by Moody's, and (ii) the aggregate Anticipated Takeout Amounts for all outstanding Takeout Commitments of all Approved Takeout Investors having senior long-term unsecured debt ratings of less than A- by Standard & Poor's or A3 by Moody's shall not exceed 20% of the aggregate Anticipated Takeout Amounts for all outstanding Takeout Commitments at such time.

"<u>Conduit Purchaser</u>" shall mean, each of the several commercial paper conduits identified on <u>Schedule A</u> and each commercial paper conduit specified as such in the Assignment and Assumption Agreement or Joinder Agreement pursuant to which such commercial paper conduit became a party hereto, and their respective permitted successors and assigns.

"<u>Conforming Loan</u>" shall mean (i) a Mortgage Loan that complies with all applicable requirements for purchase under a FNMA, FHLMC, GNMA or similar Governmental Authority standard form of conventional mortgage loan purchase contract, then in effect, or (ii) an FHA Loan or a VA Loan.

6

"<u>Consolidated Funded Debt</u>" shall mean, with respect to any Person and on any date of determination, Indebtedness in any of the following categories:

(i)  Debt for borrowed money, including the Credit Agreement Obligations;

(ii) Debt constituting an obligation to pay the deferred purchase price of property;

(iii) Debt evidenced by a bond, debenture, note or similar instrument;

(iv) Debt constituting, as of any date, any lease of property, real or personal, which would be capitalized on a balance sheet of the lessee prepared as of such date in accordance with GAAP, together with any other lease by such lessee which is in substance a financing lease, including, without limitation, any lease under which (i) such lessee has or will have an option to purchase the property subject thereto at a nominal amount or any amount less than a reasonable estimate of the fair market value of such property as of the date such lease is entered into, or (ii) the term of the lease approximates or exceeds the expected useful life of the property leased thereunder.

(v)  Debt constituting a non-contingent obligation to reimburse the issuer of any letter of credit or any guarantor or surety for payments made by such issuer, guarantor or surety; and

(vi) Any obligation under any guaranty with respect to Debt of any other Person of the types described in clauses (i) through (v) above.

"<u>Co-op Assignment</u>" shall mean, with respect to a Co-op Loan, the original assignment or other documents evidencing the assignment to the Seller as the last endorsee or its assigns of the original lender's liens on the related Co-op Lease and Co-op Stock Certificates.

"<u>Co-op Documents</u>" shall mean, with respect to a Co-op Loan (i) the originals of the related Co-op Assignment, Co-op Form UCC-3 and Co-op Stock Certificates, and (ii) certified copies of the related Co-op Lease and the pledge agreement creating a lien on the related Co-op Stock Certificates.

"<u>Co-op Form UCC-3</u>" shall mean the Form UCC-2 or 3 under the UCC as in effect in the applicable jurisdiction reflecting the assignment of the security interest of the institution originating a Co-op Loan (and the related Form UCC-1).

"<u>Co-op Lease</u>" shall mean, with respect to a Co-op Loan, the lease with respect to the dwelling unit in the related residential cooperative housing corporation occupied by the related Mortgagor.

7

"Co-op Loan" means a Mortgage Loan secured by the pledge of stock allocated to a dwelling unit in a residential cooperative housing corporation and a collateral assignment of the related Co-op Lease.

"Co-op Stock Certificates" means, with respect to a Co-op Loan, the stock certificate or certificates representing the stock allocated to the related dwelling unit of the related residential cooperative housing corporation pledged with respect to such Co-op Loan, with a stock power executed in blank attached.

"CP Rate" shall mean, on any day for any Conduit Purchaser, the per annum rate equivalent to the "weighted average cost" (as defined below) related to the issuance of Commercial Paper that is allocated, in whole or in part, to fund such Conduit Purchaser's share of the Net Investment (and which may also be allocated in part to the funding of other assets of such Conduit Purchaser); provided, however, that if any component of such rate is a discount rate in calculating the CP Rate for such Conduit Purchaser's share of the Net Investment for such date, the rate used to calculate such component of such rate shall be a rate resulting from converting such discount rate to an interest bearing equivalent rate per annum.  As used in this definition, the "weighted average cost" shall consist of (x) the actual interest rate paid to purchasers of Commercial Paper issued by such Conduit Purchaser, (y) the costs associated with the issuance of such Commercial Paper (including dealer fees and commissions to placement agents), and (z) interest on other borrowing or funding sources by such Conduit Purchaser (other than under any Program Support Agreement), including to fund small or odd dollar amounts that are not easily accommodated in the commercial paper market.

"Credit Agreement" shall mean the Second Amended and Restated Credit Agreement, dated as of August 10, 2006, as may be amended from time to time, by and among AHMIC, AHM, AHMS, American Home Mortgage Acceptance, Inc., certain lenders from time to time party thereto, and Bank of America, N.A.

"Credit Agreement Obligations" shall mean any and all debts, obligations and liabilities of AHM, the Servicer, the Performance Guarantors and American Home Mortgage Acceptance, Inc. to Bank of America, N.A. as administrative agent under the Credit Agreement and the lenders from time to time party thereto (whether now existing or hereafter arising, voluntary or involuntary, whether or not jointly owed with others, direct or indirect, absolute or contingent, liquidated or unliquidated, and whether or not from time to time decreased or extinguished and later increased, created or incurred), arising out of or related to the Loan Documents (as defined in the Credit Agreement).

"Credit and Collection Policy" shall mean those credit and collection policies and practices of the Seller and the Servicer, in existence on the date hereof, relating to originating, servicing and enforcing mortgage loans and the foreclosure and liquidation of the related mortgaged properties, as modified from time to time in accordance with this Agreement.

"Credit File" shall mean all Mortgage Loan papers and documents required to be maintained pursuant to the Sale Agreement, and all other papers and records of whatever kind or description whether developed or originated by the Seller or others, required by law to document

8

or service the Mortgage Loan; <u>provided</u>, however, that such Mortgage Loan papers, documents and records shall not include any Mortgage Loan papers, documents or records which are contained in the Custodial File.

"<u>Cure Date</u>" shall mean, with respect to any Mortgage Loan, the date occurring 15 days after the Anticipated Settlement Date.

"<u>Custodial Agreement</u>" shall mean the Custodial Agreement, dated as of the date hereof among the Seller, the Servicer, the Administrative Agent and the Custodian.

"<u>Custodial File</u>" shall mean, with respect to each Mortgage Loan, the documents that are required to be delivered to the Custodian pursuant to the Custodial Agreement.

"<u>Custodian</u>" shall mean (i) Deutsche Bank National Trust Company or (ii) any successor custodian which (A) has appropriate trust powers to act as a custodian of the Mortgage Loans, (B) enters into an agreement substantially similar to the Custodial Agreement, and (C) satisfies the criteria established by each Applicable Agency for qualified custodians and such other criteria reasonably determined by the Administrative Agent (in consultation with the Funding Agents).

"<u>Daily Report</u>" shall mean a report in the substantially the form of <u>Exhibit C</u> attached hereto and executed and delivered by a Servicing Officer.

"<u>Debt</u>" shall mean (a) all indebtedness or other obligations of a Person (and, if applicable, that Person's subsidiaries, on a consolidated basis) that, in accordance with GAAP consistently applied, would be included in determining total liabilities as shown on the liabilities side of a balance sheet of that Person on the date of determination, <u>plus</u> (b) all indebtedness of other obligations of that Person (and, if applicable, that Person's subsidiaries, on a consolidated basis) for borrowed money or for the deferred purchase price of property or services. For purposes of calculating a Person's Debt, Subordinated Debt (as defined below) not due within one year of that date may be excluded from that Person's indebtedness. For purposes of this definition, "Subordinated Debt" shall mean all indebtedness of a Person for borrowed money that is effectively subordinated in right of payment to all other present and future obligations on terms acceptable to the Required Funding Agents.

"<u>Debtor Laws</u>" shall mean all applicable liquidation, conservatorship, bankruptcy, fraudulent transfer or conveyance, moratorium, arrangement, receivership, insolvency, reorganization or similar laws from time to time in effect affecting the rights of creditors generally.

"<u>Defective Mortgage Loan</u>" shall mean, (a) a Mortgage Loan for which, either (i) the Document File does not contain a document required to be contained therein, (ii) a document within a Document File is, in the reasonable judgment of the Administrative Agent, any Funding Agent or the applicable Approved Takeout Investor, defective or inaccurate in any material respect, as determined upon evaluation of the Document File against the requirements of the related Sale Agreement, (iii) a document in the Document File is not legal, valid or binding, or

9

(iv) one of the representations and warranties in Section 6.02 hereof has been breached as of the related Purchase Date or (b) a Wet Loan for which any of the items in the related Custodial File have not been delivered to the Custodian within ten (10) days of the related Purchase Date.

"Delinquent Mortgage Loan" shall mean a Mortgage Loan under which the Mortgagor has missed two (2) Monthly Payments in a row as measured by the Office of Thrift Supervision method of delinquency or the Mortgagor has taken any action, or suffered any event of the type described in Sections 8.1(d), 8.1(e) or 8.1(f) or is in foreclosure.

"Document File" shall mean the Credit File and the Custodial File.

"Electronic Tracking Agreement" shall mean the Electronic Tracking Agreement dated the date hereof among the Administrative Agent, the Seller, the Servicer, MERS and MERSCORP, INC., as such agreement may be amended, restated, supplemented or otherwise modified from time to time.

"Eligible Assignee" shall mean (i) each Funding Agent, each Committed Purchaser or any of their Affiliates, (ii) any Person managed by any Funding Agent, any Committed Purchaser or any of their Affiliates, or (iii) any financial or other institution that is acceptable to the Funding Agent related to the Purchaser that is making the assignment and, unless a Termination Event has occurred or is continuing, the Seller (which consent shall not be unreasonably withheld).

"Eligible Institution" shall mean a depository institution (which may be the Administrative Agent) organized under the laws of the United States or any one of the states thereof, including, the District of Columbia (or any U.S. branch of a foreign depository institution), which is a member of the FDIC, and either (i) which at all times has a short-term unsecured debt rating of at least "P-1" by Moody's, at least "A-1" by Standard & Poor's and, if rated by Fitch, at least "F1" by Fitch or (ii) which shall have corporate trust powers with accounts subject to regulations regarding fiduciary funds on deposit substantially similar to 12 C.F.R. Section 9.10(b).

"Eligible Investments" shall mean:

(a)    direct obligations of, or guaranteed as to the full and timely payment of principal and interest by, the United States or obligations of any agency or instrumentality thereof, if such obligations are backed by the full faith and credit of the United States;

(b) federal funds, certificates of deposit, time deposits and bankers' acceptances (which shall each have an original maturity of not more than 90 days and, in the case of bankers' acceptances, shall in no event have an original maturity of more than 365 days) of any United States depository institution or trust company organized under the laws of the United States or any state and subject to examination and supervision by federal or state financial institutions regulatory authorities; provided, however, that the short-term obligations of such depository institution or trust company are rated "A-1+" by Standard & Poor's, "P-1" by Moody's and, if rated by Fitch, "F1+" by Fitch;

10

(c) commercial paper (having original maturities of not more than 30 days) of any corporation incorporated under the laws of the United States or any state thereof which on the date of the acquisition are rated "A-1+" by Standard & Poor's, "P-1" by Moody's and, if rated by Fitch, "F1+" by Fitch;

(d) securities of money market funds rated "Aam" or better by Standard & Poor's, "Aa" or better by Moody's and, the highest such ratings category by Fitch (if rated by Fitch); and

(e) any other investment approved in writing by the Administrative Agent;

provided that in the case of each of the investments described above, such investment is a "securities entitlement" within the meaning of Section 8-102(17) of the UCC.

Any such Eligible Investment may be purchased by or through the Administrative Agent or any of its Affiliates.

"Eligible Mortgage Loan" shall mean a Mortgage Loan that, as of the related Purchase Date:

(a)     (i) is a closed and fully funded Mortgage Loan; (ii) has a maximum term of maturity of 40 years and the proceeds of which were used either to finance a portion of the purchase price of a Mortgaged Property encumbered by the related Mortgage or to refinance a loan secured by such Mortgaged Property, (iii) is secured by a perfected first or second priority Mortgage on residential real property consisting of land and a one-to-four family dwelling thereon which is completed and ready for owner occupancy, including co-operative units, townhouses and condominiums, (iv) was underwritten according to the Seller's Underwriting Guidelines and was originated or purchased by the Seller and (v) that Seller has full right to sell, assign and transfer without the consent of the related Mortgagor;

(b)     is a Conforming Loan, a Second Lien Loan, a Jumbo Loan or an Alt-A Loan;

(c)     the Seller has agreed to sell and an Approved Takeout Investor has agreed to buy at a specified price under a Takeout Commitment to be settled on or before a pre-determined Settlement Date and is subject to a Takeout Commitment which the Seller has the full right to sell, assign or transfer either without the consent of the related Approved Takeout Investor or with the consent of the Approved Takeout Investor and such consent has been obtained and for which a Trade Assignment, executed by the Seller, has been delivered to the related Approved Takeout Investor;

(d)     satisfies, and has been originated in accordance with and complies with, all applicable requirements of the Credit and Collection Policy and, with respect to any Conforming Loan, which also satisfies and has been originated in accordance with, all applicable requirements of the applicable Agency Guidelines;

(e)     with respect to which the related Mortgaged Property is located within the United States or one of its territories;

11

(f)    in which the Administrative Agent has been granted and has a perfected, first-priority, ownership interest for the benefit of the Purchasers;

(g)    for which there exists only one original Mortgage Note and such Mortgage Note is payable to or endorsed (without recourse) in blank and each of such Mortgage Loan and the related Mortgage Note is a legal, valid and binding obligation of the Mortgagor thereof;

(h)    for which, other than in respect of Wet Loans, the Custodial Files have been received by the Custodian and are in form and substance acceptable to the Custodian pursuant to the terms of the Custodial Agreement;

(i)    with respect to which the related Mortgaged Property is not subject to any delinquent tax or assessment lien;

(j)    with respect to which the related Mortgagor is not an Affiliate of the Seller or the Purchasers, and is not a government or a governmental subdivision or agency; provided, however, that an otherwise "Eligible Mortgage Loan" owed by an Affiliate of the Seller shall not be excluded under this clause (j), to the extent that such Mortgage Loan complies with the Credit and Collection Policy and is otherwise an "arm's length" transaction;

(k)    (i) if such Mortgage Loan is an FHA Loan or VA Loan, has a minimum FICO score of 550 and (ii) if such Mortgage Loan is not an FHA Loan or VA Loan (A) has a minimum FICO score of 640 and (B) the FICO score of which, when included in the weighted average of all FICO scores for all Mortgage Loans, does not cause such weighted average FICO score to be less than 690;

(l)    is eligible for inclusion in a mortgage-backed securities transaction for similar loans;

(m)    is not a Section 32 Loan or a "High Cost Home Loan" within the meaning of the Georgia Fair Lending Act and which, if such Mortgage Loan is a "Covered Loan" within the meaning of the Georgia Fair Lending Act, the Seller has ensured, among other things, that if such Covered Loan refinances an existing "Home Loan" (as such term is defined in the Georgia Fair Lending Act) that was consummated within the previous five years, the Covered Loan has provided a reasonable, tangible net benefit to the Seller considering all of the circumstances;

(n)    simultaneously with the purchase by the Administrative Agent, for the benefit of the Purchasers hereunder, is owned by the Seller free and clear of any Lien of any other Person other than the Administrative Agent for the benefit of the Purchasers;

(o)    together with the related Mortgage Loan and Mortgage Note, does not contravene any Governmental Requirements applicable thereto (including, without limitation, the Real Estate Settlement Procedures Act of 1974, as amended, and all laws, rules and regulations relating to usury, truth-in-lending, fair credit billing, fair credit reporting, equal credit opportunity, fair debt collection practices, privacy and other applicable federal, state and local consumer protection laws) and with respect to which no party to the related Mortgage Loan and Mortgage Note is in violation of any Governmental Requirements (or procedure prescribed

12

thereby) if such violation would impair the collectability of such Mortgage Loan or the saleability of such Mortgage Loan under the applicable Takeout Commitment;

(p)    (i) is not a Delinquent Mortgage Loan; (ii) has not previously been sold to an Approved Takeout Investor and repurchased by Seller; (iii) has a Loan-to-Value Ratio not in excess of 100%, and if its Loan-to-Value Ratio is in excess of 80% it has primary mortgage insurance; (iv) has a Combined Loan-to-Value Ratio not in excess of 100% if such Mortgage Loan is secured by a second priority Mortgage, and (v) has an original principal balance not in excess of $3,000,000;

(q)    is denominated and payable in United States dollars within the United States and the Mortgagor of which is a natural person who is a United States citizen or resident alien or a corporation or an inter vivos revocable trust or other legal entity organized under the laws of the United States or any State thereof or the District of Columbia;

(r)    is not, and the obligation of the related Approved Takeout Investor to pay the related Anticipated Takeout Amount is not, subject to any right of rescission, setoff, counterclaim or other dispute whatsoever;

(s)    is covered by the types and amounts of insurance required by Section 6.05(f)(ii);

(t)    with respect to which all applicable loan level representations and warranties made by the related Seller in this Agreement are true and correct in all material respects and with respect to which all applicable loan level covenants made in this Agreement have been complied with;

(u)    is subjected to the following "Quality Control" measure by personnel of the Seller before the Mortgage Note is funded by the Seller: for those Mortgage Loans not originated by the Seller, is subject to being selected at random for a review for thoroughness and compliance (including truth-in-lending, good faith estimates and other disclosures);

(v)    was originated no more than 90 days prior to the Anticipated Settlement Date with respect to such Mortgage Loan;

(w)    the Anticipated Settlement Date for such Mortgage Loan is no more than 45 days after the related Purchase Date for such Mortgage Loan;

(x)    for which the Mortgagor is required to make monthly payments of principal and/or interest;

(y)    with respect to which all representations and warranties made by the Seller under the related Sale Agreement and Takeout Commitment and any related document or agreement are true and correct in all material respects;

13

(z)    was originated in compliance with local, state and federal law applicable thereto at the time of origination, including without limitation, required disclosures of points, charges and fees;

(aa)    was originated using credit policies in effect at the time of such origination, which were designated to provide guidelines in underwriting the creditworthiness of the Mortgagors and to determine the Mortgagors' ability to repay the debt, and in accordance with such policies, the Seller considered, among other things, the credit history of the Mortgagor and other credit indicators such as income verification and/or debt-to-income ratios of the Mortgagor, and was not originated based solely on an estimation of the value of the mortgaged property without any consideration of the potential ability of the Mortgagor to repay the amount owed under the Mortgage Loan;

(bb)    complies with the provisions of the Home Ownership and Equity Protection Act of 1994 (15 U.S.C. § 1602(aa)) or Regulation Z (12 C.F.R. 226.32);

(cc)    for which (i) the Mortgagor was not required to purchase any credit life, disability, accident or health insurance product as a condition of obtaining the Mortgage Loan, and (ii) the Mortgagor has not obtained a prepaid single-premium credit life, disability, accident or health policy in connection with the origination of the Mortgage Loan;

(dd)    satisfies, and for which the Seller has satisfied, all criteria, covenants and conditions specified in the applicable Sale Agreement and Takeout Confirmation with respect to the applicable Takeout Commitment which must be satisfied in order for such Mortgage Loan to be purchased at the Anticipated Takeout Amount by the applicable Approved Takeout Investor on the Anticipated Settlement Date; and

(ee)    with respect to which, if such Mortgage Loan is a Co-Op Loan, (1) the co-operative project is undamaged, (2) there is no breach, default, violation or event of acceleration existing under the mortgage secured by the co-operative project, (3) the related co-operative housing corporation is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation and it has requisite power and authority to own its properties and transact the business in which it is engaged, and (4) the related co-operative housing corporation is in compliance in all material respects with all applicable legal requirements and it is not in default or violation of any order, writ, injunction, decree, or demand of any governmental authority, the violation of which might material adversely affect the condition (financial or otherwise) or business of the cooperative housing corporation.

"Employee Plan" shall mean an employee pension benefit plan covered by Title IV of ERISA and established or maintained by any of the Seller, the Servicer or any ERISA Affiliate.

"Enforceability Exceptions" shall mean the inability of any Person to enforce its legal or equitable remedies against any other Person due to (i) bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting creditors' rights generally, and (ii) general principles of equity, including, without limitation, concepts of materiality,

14

reasonableness, good faith and fair dealing and the possible unavailability of specific performance, regardless of whether considered in a proceeding at equity or at law.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute.

"ERISA Affiliate" shall mean any corporation, trade or business that is a member of a controlled group of corporations or a controlled group of trades or businesses, as described in Sections 414(b), (c), (m) and (o) of the Code, or Section 4001 of ERISA, of which the Performance Guarantors are members.

"Excluded Taxes" has the meaning given to such term in Section 7.03 hereof.

"Fall-Out Loan" shall mean a Mortgage Loan purchased hereunder which was not purchased by the related Approved Takeout Investor pursuant to the related Takeout Commitment within 15 days after the Anticipated Settlement Date for a purchase price equal to the Anticipated Takeout Amount for such Mortgage Loan.

"Fall-Out Rate" shall mean, for any calendar month, a fraction (expressed as a percentage) having as its numerator the aggregate outstanding principal balance of all Mortgage Loans purchased hereunder during such calendar month that are Fall-Out Loans, and the denominator of which is the aggregate outstanding principal balance of all Mortgage Loans purchased hereunder during such calendar month.

"FDIC" shall mean the Federal Deposit Insurance Corporation, or its successors and assigns.

"Fee Letter" shall mean (a) that certain letter agreement dated as of the date hereof by and among the Seller, the Funding Agents, on behalf of the applicable Purchasers which are original signatories hereto, and the Administrative Agent; and (b) each letter agreement dated as of the Effective Date (as defined in the applicable Joinder Agreement) of any Joinder Agreement by and among the Seller, the Funding Agent for the Purchaser Group becoming a party hereto pursuant to such Joinder Agreement, on behalf of the applicable Purchasers, and the Administrative Agent.

"FHA" shall mean the Federal Housing Administration, which is a sub-division of HUD, or any successor thereto. The term "FHA" is used interchangeably in this Agreement with the term "HUD".

"FHA Loan" shall mean a Mortgage Loan, the ultimate payment of which is partially or completely insured by the FHA or with respect to which there is a current, binding and enforceable commitment for such insurance issued by the FHA.

"FHLMC" shall mean the Federal Home Loan Mortgage Corporation, or any successor thereto.

CHI 3469370v.24

"FHLMC Guidelines" shall mean the Freddie Mac Seller and Servicer Guidelines, as such guidelines may hereafter from time to time be amended.

"FICO Score" shall mean, with respect to the Mortgagor under a particular Mortgage Loan, a credit rating established by Fair Isaac Corporation.

"Fitch" shall mean Fitch, Inc. and any successor thereof.

"Fiscal Year" shall mean the twelve-month period ending on the last calendar day of each December, provided, that the Seller may elect to change its "Fiscal Year" in accordance with Section 6.06(b).

"FNMA" shall mean Fannie Mae, formerly known as the Federal National Mortgage Association, or any successor thereto.

"FNMA Guidelines" shall mean the Fannie Mae MBS Selling and Servicing Guidelines, as such guidelines may hereafter from time to time be amended.

"Funding Agent" shall mean, with respect to any Conduit Purchaser and its Related Committed Purchasers, each entity set forth opposite such Conduit Purchaser's name on Schedule A, or the entity identified as such on the Assignment and Assumption Agreement or Joinder Agreement pursuant to which such entity became a party hereto, and their respective permitted successors and assigns.

"GAAP" shall mean generally accepted accounting principles consistently applied in the United States.

"Governmental Authority" shall mean any applicable nation or government, any agency, department, state or other political subdivision thereof, or any instrumentality thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government. Governmental Authority shall include, without limitation, each of FHLMC, FNMA, FHA, HUD, VA and GNMA.

"Governmental Requirement" shall mean any law, statute, code, ordinance, order, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, authorization or other requirement (including, without limitation, any of the foregoing that relate to energy regulations and occupational, safety and health standards or controls and any hazardous materials laws) of any Governmental Authority that has jurisdiction over the Seller, the Servicer or any of their respective properties.

"GNMA" shall mean the Government National Mortgage Association or any successor thereto.

"GNMA Guidelines" shall mean the GNMA Mortgage-Backed Securities Guide I or II, as such Guidelines may hereafter from time to time be amended.

"HUD" shall mean the United States Department of Housing and Urban Development, or any federal agency or official thereof which may from time to time succeed to the functions thereof with regard to FHA Insurance. The term "HUD" is used interchangeably in this Agreement with the term "FHA".

"Indebtedness" shall mean, for any Person, without duplication, and at any time, (a) all obligations required by GAAP to be classified on such Person's balance sheet as liabilities, (b) obligations secured (or for which the holder of the obligations has an existing contingent or other right to be so secured) by any Lien existing on property owned or acquired by such Person, (c) obligations that have been (or under GAAP should be) capitalized for financial reporting purposes, and (d) all guaranties, endorsements, and other contingent obligations with respect to obligations of others.

"Indemnified Claims" shall mean Section 7.02 Costs, Taxes and/or Losses, as the context requires.

"Indemnified Parties" shall have the meaning specified in Section 7.01.

"Initial Purchase Date Notice" shall have the meaning specified in Section 2.01(b) hereof.

"Interest Period" shall mean, with respect to each Mortgage Loan, the period commencing on the Purchase Date of such Mortgage Loan and ending on the applicable Settlement Date for such Mortgage Loans.

"Investment Company Act" shall mean the Investment Company Act of 1940, as amended from time to time, and any successor statute.

"Joinder Agreement" shall mean a joinder agreement substantially in the form set forth in Exhibit B hereto pursuant to which the members of a new Purchaser Group become parties to this agreement.

"Jumbo Loan" shall mean a Mortgage Loan (other than a Conforming Loan) that (i) is underwritten in a manner designed to be purchased by an Approved Takeout Investor (other than FNMA, FHLMC or GNMA), (ii) matches all applicable requirements for purchase under the requirements of a Takeout Commitment issued for the purchase of such Mortgage Loan, and (3) differs from a Conforming Loan solely because the principal amount of such Mortgage Loan exceeds the limit set for Conforming Loans by FNMA, FHLMC or GNMA from time to time, but shall not exceed $999,999; provided, however, that a Jumbo Loan having an original principal balance in excess of $999,999 but not more than $3,000,000 shall qualify as a Super Jumbo Loan. The term Jumbo Loan includes Super Jumbo Loans.

"LIBOR Business Day" shall mean, with respect to the determination of the LIBOR Rate, any Business Day, other than a Business Day on which banking institutions in London, England trading in dollar deposits in the London interbank market are authorized or obligated by law or executive order to be closed.

17

"LIBOR Disruption Event" shall mean, with respect to any Interest Period, any of the following: (a) a determination by any Committed Purchaser or Liquidity Provider that it would be contrary to law or to the directive of any central bank or other governmental authority (whether or not having the force of law) to obtain dollars in the London interbank market to make, fund or maintain its portion of the Net Investment during such Interest Period, (b) the failure of all of the sources listed in the definition of "LIBOR Rate" to publish a London interbank offered rate as of 11:00 a.m. on the second Business Day prior to the first day of such Interest Period, (c) a determination by any Committed Purchaser or Liquidity Provider that the rate at which deposits of United States dollars are being offered in the London interbank market does not accurately reflect the cost to such Person of making, funding or maintaining its portion of the Net Investment for such Interest Period or (d) the inability of any Committed Purchaser or Liquidity Provider, because of market events not under the control of such Committed Purchaser or Liquidity Provider, to obtain United States dollars in the London interbank market to make, fund or maintain its portion of the Net Investment for such Interest Period.

"LIBOR Rate" shall mean, for any applicable period, the rate per annum (rounded upward, if necessary, to the nearest whole multiple of 1/16th of one percent) appearing on Telerate Page 3750 (or any successor page) as the London interbank offered rate for deposits in U.S. dollars in a principal amount of at least $1,000,000 for such period at approximately 11:00 a.m. (London time) two LIBOR Business Days prior to the first day of such period divided by the remainder of one minus the LIBOR Reserve Percentage applicable on such day. If for any reason such rate is not available for any day, the rate per annum (rounded upward, if necessary, to the nearest whole multiple of 1/16th of one percent) appearing on such other replacement quotation service such as the Reuters Screen LIBO Page or the Bloomberg L.P. Screen LIBO Page.

"LIBOR Reserve Percentage" shall mean, as of any day, the percentage (expressed as a decimal) in effect on such day, as prescribed by the Board of Governors of the Federal Reserve System (or any successor), for determining the maximum reserve requirements applicable to "Eurocurrency Liabilities" pursuant to Regulation D or any other applicable regulation of the Board of Governors of the Federal Reserve System (or any successor) which prescribes reserve requirements applicable to "Eurocurrency Liabilities" as currently defined in Regulation D.

"Lien" shall mean any security interest, mortgage, deed of trust, charge, pledge, hypothecation, assignment, deposit arrangement, equity, encumbrance, lien (statutory or other), preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC (other than any such financing statement filed for informational purposes only) or comparable law of any jurisdiction to evidence any of the foregoing.

"Liquidity Provider" shall mean the Person or Persons who will provide liquidity support to a Conduit Purchaser pursuant to a Liquidity Provider Agreement.

18

"Liquidity Provider Agreement" shall mean an agreement between a Conduit Purchaser and a Liquidity Provider evidencing the obligation of such Liquidity Provider to provide liquidity support to such Conduit Purchaser in connection with the issuance by such Conduit Purchaser of Commercial Paper.

"Loan Agreement" shall mean that certain Amended and Restated Loan Agreement dated as of November 22, 2005 among AHM SPV I, LLC, as the Borrower, AHMS, as the Servicer, the Issuers, Banks and Managing Agents party thereto and Calyon New York Branch, as Administrative Agent, as the same may be amended from time to time.

"Loan Management System" shall mean the computerized electronic loan management system maintained by Servicer for the Mortgage Loans.

"Loan-to-Value Ratio" shall mean, with respect to any Mortgage Loan, the fraction, expressed as a percentage found by dividing the original principal balance of a Mortgage Loan by the Appraised Value.

"Losses" shall mean any and all damages, losses, claims, liabilities, costs and expenses, including, without limitation, reasonable attorneys' fees (which such attorneys may be employees of an Indemnified Party) and disbursements incurred by any Person specified; provided that Losses shall not include any special, indirect, consequential and punitive losses, liabilities or damages (including lost profits) unless such special, indirect, consequential and punitive losses, liabilities or damages have been awarded against the applicable Indemnified Party seeking indemnification.

"Material Adverse Effect" shall mean, with respect to any Person, any material adverse effect on (i) the validity or enforceability of this Agreement or any other Principal Agreement, (ii) the business, operations, total property or financial condition of such Person taken as a whole, (iii) the Collateral taken as a whole, (iv) the ownership interest of the Administrative Agent and the Purchasers in the Mortgage Loans or Takeout Commitments, or the enforceability or priority of the Lien in favor of the Administrative Agent on any material portion of the Collateral, or (v) the ability of such Person to fulfill its obligations under this Agreement or any other Principal Agreement.

"Maximum Purchase Limit" shall mean $500,000,000 or such greater or lesser amount determined pursuant to Section 2.06(b) hereof.

"Maximum Purchase Limit Increase Notice" shall have the meaning given to such term in Section 2.06(b) hereof.

"MERS" shall mean Mortgage Electronic Registration Systems, Inc., a Delaware corporation.

"MERS Designated Mortgage Loan" shall mean a Mortgage Loan registered to or by the Seller on the MERS electronic mortgage registration system.

19

"Monthly Payment" shall mean the scheduled monthly payment of principal and/or interest on a Mortgage Loan.

"Monthly Statement" shall mean the statement required to be prepared by Servicer on a monthly basis pursuant to Section 6.05(q), substantially in the form attached hereto as Exhibit E.

"Moody's" shall mean Moody's Investors Service, Inc. and any successor thereof.

"Mortgage" shall mean the mortgage, deed of trust or other instrument creating a first-lien or second-lien on a fee simple estate in Mortgaged Property securing a Mortgage Note.

"Mortgage Loan" shall mean a residential mortgage loan owned by AHM which the Administrative Agent purchases, on behalf of the Purchasers on a Purchase Date, and which is included in a Mortgage Pool and which is secured by a Mortgage on residential real estate or a lien on the stock of Mortgagor allocated to such Mortgagor's dwelling unit in a residential cooperative housing corporation.

"Mortgage Loan Assets" shall have the meaning set forth in Section 2.02(a).

"Mortgage Note" shall mean the original executed promissory note or other evidence of the indebtedness of a Mortgagor under a Mortgage Loan.

"Mortgage Pool" shall mean a pool of Mortgage Loans which the Administrative Agent purchases, on behalf of the Purchasers, on a Purchase Date.

"Mortgaged Property" shall mean the underlying real property located in any state of the United States and subject to a Mortgage (including, without limitation, all buildings, improvements and fixtures thereon and all additions, alterations and replacements made at any time with respect to the foregoing) securing a Mortgage Loan; provided, however, in the case of a Co-op Loan, "Mortgaged Property" shall mean the real estate in which the related Mortgagor has an interest by virtue of its stock ownership in a residential cooperative housing association.

"Mortgagor" shall mean the obligor(s) on a Mortgage Note.

"Multiemployer Plan" shall mean a multiemployer plan defined in Sections 3(37) or 4001(a)(3) of ERISA or Section 414(f) of the Code to which Seller or any ERISA Affiliate is required to make contributions.

"Net Cash Proceeds" shall mean, with respect to the issuance of any capital stock by AHMIC, the amount of cash received by AHMIC in connection with such transaction after deducting therefrom all fees (including, without limitation, investment banking fees), commissions, costs and other expenses to the extent attributable to such transaction.

"Net Investment" shall mean an amount equal to (a) the sum of the aggregate Purchase Prices paid for the Mortgage Loans by the Purchasers in accordance with Section 2.01, minus (b) the Collections and other amounts received and distributed on account of such Net

20