Investment pursuant to Sections 5.03, 5.04 or 5.05; provided, however, that if the Net Investment shall have been reduced by any distribution of any portion of Collections or other amounts and thereafter such distribution is rescinded or must otherwise be returned for any reason, the Net Investment shall be increased by the amount of such distributions, all as though such rescinded or returned distribution had not been made.

"Nonrenewing Amount" has the meaning given to such term in Section 2.08 hereof.

"Officer's Certificate" shall mean a certificate signed by any Senior Vice President or more senior officer of the Seller or the Servicer, and delivered to the Administrative Agent.

"Opinion of Counsel" shall mean a written opinion of counsel to the indicated party.

"Option ARM Loan" shall mean a Mortgage Loan which (i) provides for the adjustment of the interest rate payable in respect thereof, (ii) provides the Mortgagor with multiple Monthly Payment options and (iii) may result in a portion of the interest accrued on such Mortgage Loan in any month which exceeds the related Monthly Payment for such month to be added to the principal balance thereof.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established under ERISA, or any successor thereto.

"Performance Guarantors" shall mean, together, American Home Mortgage Holdings, Inc., a Delaware corporation, and AHMIC, and their respective successors and assigns.

"Performance Guaranty" shall mean the Performance Guaranty of even date herewith made by the Performance Guarantors in favor of the Administrative Agent for the benefit of the Purchasers, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Person" shall mean an individual, partnership, corporation (including a business trust), joint-stock company, limited liability company, trust, unincorporated association, joint venture, government (or any agency or political subdivision thereof) or other entity.

"Plan" shall mean as to any Person, any pension plan that is covered by Title IV of ERISA and in respect of which such Person or a Commonly Controlled Entity of such Person is an "employer" as defined in Section 3(5) of ERISA.

"Potential Termination Event" shall mean an event which, with the giving of notice or the passage of time or both, would constitute a Termination Event.

"Principal Agreements" shall mean this Agreement, the Sale Agreements, the Takeout Commitments, the Takeout Confirmations, the Trade Assignments, the Collection Account Control Agreement, the Custodial Agreement, the Performance Guaranty, the

21

Electronic Tracking Agreement, the Fee Letter, the Agent Fee Letter and any and all other agreements or instruments now or hereafter executed or delivered by or on behalf of the Seller or the Servicer in connection therewith, as any of the same are amended, restated, supplemented or otherwise modified from time to time.

"Principal Mortgage Documents" shall mean:

(i) the original of each Mortgage Note, endorsed in blank (without recourse) and all intervening endorsements thereto;

(ii) an original executed assignment in blank for each Mortgage securing such Mortgage Loan, in recordable form, executed by the Seller, in the case of each Mortgage Loan that is not a MERS Designated Mortgage Loan (or, if such Mortgage Loan is a Co-op Loan, the related Co-op Documents referred to in clause (i) of the definition of Co-op Documents); and

(iii) a certified copy of the executed Mortgage related to such Mortgage Note (or, if such Mortgage Loan is a Co-op Loan, the related Co-op Documents referred to in clause (ii) of the definition of Co-op Documents).

"Pro Rata Share" shall mean, for a Purchaser Group at any time of determination, a fraction (expressed as a percentage) having the Purchaser Group Limit for such Purchaser Group as its numerator and the Maximum Purchase Limit as its denominator; provided, however, that if any Purchaser fails to fund any amount as required hereunder, "Pro Rata Share" shall mean, for purposes of making all distributions hereunder, a fraction (expressed as a percentage) having the actual portion of the outstanding Net Investment funded by each Purchaser Group as its numerator and the outstanding Net Investment as its denominator.

"Program Fee" shall mean the fee payable to each Funding Agent, on behalf of the applicable Conduit Purchaser(s), on each Remittance Date as set forth in the Fee Letter.

"Program Support Agreement" shall mean an agreement between a Conduit Purchaser and a Program Support Provider evidencing the obligation of such Program Support Provider to provide liquidity or credit enhancement or asset purchase facilities for or in respect of any assets or liabilities of any Conduit Purchaser in connection with the issuance by such Conduit Purchaser of Commercial Paper, including, without limitation, a Liquidity Provider Agreement.

"Program Support Provider" shall mean the Person or Persons who will provide program support to a Conduit Purchaser pursuant to a Program Support Agreement, including, without limitation, a Liquidity Provider.

"Purchase Date" shall mean each date on which the Purchasers purchase Mortgage Loans from the Seller pursuant to Section 2.01.

22

CH1 3469370v.24

"Purchase Date Notice" shall have the meaning specified in Section 2.01(c) hereof.

"Purchase Price" shall mean, for each Mortgage Loan purchased on any Purchase Date, an amount equal to the lesser of (a) the Anticipated Takeout Amount for the Takeout Commitment relating to such Mortgage Loan, minus the expected Completion Fee applicable to such Mortgage Loan based on the Anticipated Takeout Amount and (b) the unpaid principal balance of the Mortgage Loan.

"Purchaser Group" shall mean each group of Purchasers consisting of a Conduit Purchaser, the Related Committed Purchasers, the related Liquidity Providers and Program Support Providers, if any, the Related Funding Agent and their respective assigns and participants.

"Purchaser Group Limit" shall mean, with respect to any Purchaser Group, the amount set forth opposite such Purchaser Group's Conduit Purchaser's name on Schedule A, or as identified in the Assignment and Assumption Agreement or Joinder Agreement pursuant to which the members of such Purchaser Group became a party hereto, as the same may be reduced from time to time pursuant to the terms hereof.

"Purchaser" shall mean a Conduit Purchaser and/or a Committed Purchaser, as the context requires.

"Related Committed Purchaser" shall mean, with respect to any Conduit Purchaser, each Committed Purchaser set forth opposite such Conduit Purchaser's name on Schedule A, or the entity specified as such in the Assignment and Assumption Agreement or Joinder Agreement pursuant to which such entities became party hereto, and their respective permitted successors and assigns.

"Related Funding Agent" shall mean, with respect to any Conduit Purchaser, the Funding Agent set forth opposite such Conduit Purchaser's name on Schedule A, or with respect to any Conduit Purchaser not listed on Schedule A, the entity specified as a Funding Agent in the Assignment and Assumption Agreement or Joinder Agreement pursuant which such Conduit Purchaser became party hereto, and their respective permitted successors and assigns.

"Remittance Date" shall mean the tenth (10th) day of each month, or if such day is not a Business Day, the immediately succeeding Business Day.

"Reportable Event" shall have the meaning set forth in Section 4043(c) of ERISA (other than a Reportable Event as to which the provision of 30 days notice to the PBGC is waived under applicable regulations, provided, that a failure to meet the minimum funding standard of Section 412 of the Code and of Section 302 of ERISA shall be a Reportable Event regardless of the issuance of any such waiver), or shall mean the occurrence of any of the events described in Section 4063(a) or 4069(a) of ERISA.

23

"Required Funding Agents" shall mean the Funding Agents for the Purchaser Groups having aggregate Purchaser Group Limits in excess of fifty percent (50%) of the Maximum Purchase Limit.

"Requirement of Law" as to any Person shall mean the articles of incorporation, by-laws, certificate of formation and limited liability company agreement or other organizational or governing documents of such Person, and any law, statute, code, ordinance, order, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, authorization or other determination, direction or requirement (including, without limitation, any of the foregoing that relate to energy regulations and occupational, safety and health standards or controls and any hazardous materials laws) of any Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Reuters Screen LIBO Page" shall mean the display designated as page "LIBO" on the Reuters Monitor Money Rates Service (or such other page as may replace the LIBO page on that service for the purposes of displaying London interbank offered rates of major banks).

"Sale Agreement" shall mean the agreement and any other correspondent agreements providing for the purchase by an Approved Takeout Investor of Mortgage Loans from the Seller.

"Second Lien Loan" shall mean a Mortgage Loan that (i) is secured by a second priority Mortgage on residential real property, (ii) has a demonstrated secondary market and is readily securitizable, and (iii) matches all applicable requirements for purchase under the requirements of a Takeout Commitment specifically issued for the purchase of such Mortgage Loan.

"Section 7.02 Costs" has the meaning given to such term in Section 7.02.

"Seller" shall mean AHM.

"Servicer" shall mean initially AHMS, and thereafter any Person appointed as Successor Servicer pursuant to the terms of this Agreement.

"Servicer Termination Event" shall have the meaning specified in Section 4.02.

"Servicing Fee" shall mean a fee payable to the Servicer in the amount set forth in Sections 5.04 and 5.05.

"Servicing Officer" shall mean any representative of the Servicer involved in, or responsible for, the administration and servicing of the Mortgage Loans whose name appears on a list of servicing officers (or as may be designated by such Person) furnished to the Administrative Agent by the Servicer, as such list may from time to time be amended.

"Settlement Date" shall mean, with respect to each Mortgage Loan, the date on which payment for such Mortgage Loan is received by the Administrative Agent on behalf of the

24

Purchasers from an Approved Takeout Investor pursuant to the applicable Takeout Commitment or from any other Person if such Mortgage Loan is a Fall-Out Loan.

"SG" shall have the meaning set forth in the preamble hereto.

"Standard & Poor's" shall mean Standard and Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereof.

"Subordinated Debt" shall mean the Debt of AHMIC and its Subsidiaries subordinated to the Credit Agreement Obligations in the manner and to the extent required by Bank of America, N.A., as administrative agent under the Credit Agreement, pursuant to written subordination agreements satisfactory in form and substance to Bank of America, N.A., as administrative agent under the Credit Agreement.

"Subsidiary" shall mean, with respect to any Person, any corporation or other entity of which securities having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at the time directly or indirectly owned by such Person, or one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries.

"Successor Servicer" shall have the meaning specified in Section 4.02.

"Super Jumbo Loan" shall mean a Jumbo Loan having an original principal balance in excess of $999,999 but not more than $3,000,000.

"Takeout Amount" shall mean, with respect to each Mortgage Loan, the principal proceeds paid by the Approved Takeout Investor in connection with the related Takeout Commitment for such Mortgage Loan.

"Takeout Commitment" shall mean a fully executed commitment from an Approved Takeout Investor to the Seller, with respect to such Approved Takeout Investor's commitment related to specific Mortgage Loans, confirming the details of a forward trade between such Approved Takeout Investor and the Seller with respect to such Mortgage Loans, which commitment shall be enforceable and in full force and effect, and shall be validly and effectively assigned to the Administrative Agent, on behalf of the Purchasers, pursuant to a Trade Assignment.

"Takeout Confirmation" shall mean the written notification to the Seller from the related Approved Takeout Investor containing all of the relevant details of the Takeout Commitment, which notification may take the form of a trade confirmation.

"Takeout Deficiency Fee" shall mean with respect to each Mortgage Loan which is subject to a Takeout Failure, a fee in the amount equal to (i) the Anticipated Takeout Amount for such Mortgage Loan minus (ii) any amounts actually received by the Administrative Agent upon the sale of such Mortgage Loan to an Approved Takeout Investor or any other Person (which amount in this clause (ii) shall be deemed to be zero for any Mortgage Loan which is not sold within 180 days after it is purchased hereunder by the Administrative Agent, on behalf of

25

the Purchasers), which fee is payable by the Seller to the Administrative Agent, on behalf of the Purchasers, pursuant to the terms hereof.

"Takeout Failure" shall mean the failure of a Mortgage Loan to be purchased by the related Approved Takeout Investor for any reason whatsoever on the Anticipated Settlement Date and at the Anticipated Takeout Amount for such Mortgage Loan.

"Tangible Net Worth" shall mean, with respect to any Person, the excess of total assets of such Person over the total liabilities of such Person determined in accordance with GAAP, but excluding from the determination of total assets:  (a) all assets which would be classified as intangible assets under GAAP, including, without limitation, goodwill (whether representing the excess cost over book value of assets acquired or otherwise), patents, trademarks, trade names, copyrights, franchises and deferred charges (including, without limitation, unamortized debt discount and expense, organization costs and research and product development costs), (b) loans or other extensions of credit to officers, employees, shareholders or Affiliates of such Person (other than the Servicer, the Sellers, the Performance Guarantors and American Home Mortgage Acceptance, Inc.) and (c) investments in Subsidiaries of such Person (other than the Servicer, the Sellers, the Performance Guarantors and American Home Mortgage Acceptance, Inc.).

"Taxes" has the meaning given to such term in Section 7.03(a).

"Telerate Page 3750" shall mean page 3750 of the Bridge Telerate Market Report screen.

"Termination Date" shall mean the earliest of (i) that Business Day which the Seller designates as the Termination Date by written notice to the Purchasers at least thirty (30) days prior to such date, (ii) the date of declaration or automatic occurrence of the Termination Date pursuant to Section 8.01, and (iii) October 15, 2007, or such later date to which the Termination Date may be extended in accordance with Section 2.08.

"Termination Event" shall have the meaning specified in Section 8.01.

"Trade Assignment" shall mean a letter substantially in the form of Exhibit F.

"Trust Receipt" shall mean the trust receipts issued by the Custodian evidencing the Mortgage Loans it holds, in the forms attached as Exhibits F and F-1 to the Custodial Agreement.

"UCC" shall mean the Uniform Commercial Code, as amended from time to time, as in effect in the relevant jurisdiction.

"Underwriting Guidelines" shall mean the Seller's Underwriting Guidelines, a copy of which has been provided to the Administrative Agent.

"<u>Unused Fee</u>" shall mean the "Unused Fee" payable to each Funding Agent, on behalf of the applicable Conduit Purchaser(s), on each Remittance Date as set forth in the Fee Letter.

"<u>VA</u>" shall mean the Department of Veterans Affairs, or any successor thereto.

"<u>VA Loan</u>" shall mean a Mortgage Loan, the payment of which is partially or completely guaranteed by the VA under the Servicemen's Readjustment Act of 1944, as amended, or Chapter 37 of Title 38 of the United States Code or with respect to which there is a current binding and enforceable commitment for such a guaranty issued by the VA.

"<u>Wet Loan</u>" shall mean a wet-funded Mortgage Loan for which, as of the related Purchase Date, the Custodial File is incomplete and which shall have the following additional characteristics:

(i)     the proceeds thereof have been funded by the Seller, or the transferor of such Mortgage Loan to the Seller, prior to such Purchase Date;

(ii)    the proceeds thereof have not been returned to the Seller, or the transferor of such Mortgage Loan to the Seller, by the escrow or closing agent for such Wet Loan; and

(iii)   upon recordation of the related Mortgage, such Mortgage Loan will constitute a first lien or second lien on the premises described therein.

"<u>Yield</u>" shall mean for each Purchaser Group for each portion of the Net Investment related to a Mortgage Loan and the applicable Interest Period an amount equal to the product of (i) such Purchaser Group's Pro Rata Share of such portion of the Net Investment, (ii) the Applicable Rate for such Purchaser Group for such Interest Period and (iii) a fraction, having as its numerator, the number of days in such Interest Period and, as its denominator, 360.

SECTION 1.02.    <u>Other Definitional Provisions</u>.

(a) All terms defined in this Agreement shall, unless specifically provided to the contrary, have the defined meanings when used in any Principal Agreement, certificate or other document made or delivered pursuant hereto unless otherwise defined therein.

(b) As used herein and in any certificate or other document made or delivered pursuant hereto or thereto, accounting terms not defined in <u>Section 1.01</u>, and accounting terms partly defined in <u>Section 1.01</u> to the extent not defined, shall have the respective meanings given to them under generally accepted accounting principles, as applicable, as in effect on the date hereof. To the extent that the definitions of accounting terms herein are inconsistent with the meanings of such terms under generally accepted accounting principles or regulatory accounting principles, the definitions contained herein shall control.

(c) The words "<u>hereof</u>," "<u>herein</u>" and "<u>hereunder</u>" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular

27

provision of this Agreement; and Section, Schedule and Exhibit references contained in this Agreement are references to Sections, Schedules and Exhibits in or to this Agreement unless otherwise specified.

(d) Reference to any agreement shall mean such agreement as it is amended, restated, supplemented or otherwise modified from time to time.

(e) Reference to any party shall mean that party, its successors and assigns permitted by the terms of this Agreement.

ARTICLE II
THE MORTGAGE LOAN PURCHASE FACILITY

SECTION 2.01.    Procedures for Purchases of Mortgage Loans.

(a) On each Purchase Date, subject to terms and conditions set forth in this Agreement, and in reliance on the covenants, representations and agreements set forth herein, the Seller may offer to sell Mortgage Loans to the Purchasers, up to the Maximum Purchase Limit, and each Conduit Purchaser, acting through its Funding Agent, may, in its discretion, and each Committed Purchaser, acting through its Funding Agent, shall, if the related Conduit Purchaser determines not to so purchase, purchase such Mortgage Loans. Without limiting any other provision of this Agreement, the obligation of any Purchaser to purchase Mortgage Loans on the applicable Purchase Date is subject to the satisfaction of the conditions precedent set forth in Section 3.02 hereof.

(b) Not later than 1:00 p.m. (New York time) on the Business Day preceding the applicable Purchase Date, the Seller shall deliver (by telecopy or other electronic means) to each Funding Agent and the Administrative Agent a written notice, substantially in the form attached hereto as Exhibit D (an "Initial Purchase Date Notice"), specifying among other things, the requested Purchase Date and the aggregate Purchase Price payable for the Mortgage Loans to be purchased on such Purchase Date (which Purchase Price shall be equal to at least $10,000,000 in the aggregate).

(c) On or before 12:00 noon (New York time) on each Purchase Date, the Servicer shall deliver to the Administrative Agent the following items on such Purchase Date:

(i) a written notice, substantially in the form attached hereto as Exhibit G (a "Purchase Date Notice");

(ii) an executed Trade Assignment for each Takeout Commitment relating to each Mortgage Loan, together with a copy of each related Takeout Confirmation; and

(iii) the cumulative Trust Receipt covering all Mortgage Loans purchased hereunder and then held by the Custodian (including the Mortgage Loans being purchased, but excluding all Wet Mortgage Loans, fully completed and authenticated by the Custodian and an acknowledgment by the Custodian of the

28

Wet Loans for which a Trust Receipt will be delivered within 10 days after such Purchase Date.

(d) On each Purchase Date prior to the Termination Date, each Conduit Purchaser, through its respective Funding Agent, may (but is not committed to), at the request of the Seller pursuant to a Purchase Date Notice, fund its Purchaser Group's Pro Rata Share of the applicable Purchase Price. If any Conduit Purchaser chooses at any time not to fund its Purchaser Group's Pro Rata Share of a Purchase Price when requested by the Seller, the related Committed Purchasers, through its respective Funding Agent, shall, subject to the provisions of Section 3.02 hereof, fund such Purchaser Group's Pro Rata Share of such Purchase Price. Each Purchaser shall remit such payment to the Seller no later than 12:00 noon (New York time) at the account specified in the Purchase Date Notice in immediately available funds. On each Purchase Date, the Net Investment shall automatically increase by the amount of the Purchase Price funded by the applicable Purchasers on such Purchase Date and each Purchaser's funding of its portion of such Purchase Price shall represent an increase in the related Purchaser Group's respective Pro Rata Share of the outstanding Net Investment. Each Funding Agent shall provide prompt notice to the Seller if the related Conduit Purchaser elects not to fund a Purchase Price.

(e) Under no circumstances shall (i) the Purchasers fund any Purchase Price to the extent that, after giving effect to such funding, the Net Investment would exceed the Maximum Purchase Limit or (ii) any Purchaser fund any portion of its Purchaser Group's Pro Rata Share of the Purchase Price to the extent that, after giving effect to such funding, the related Purchaser Group's Pro Rata Share of the Net Investment would exceed its Purchaser Group Limit.

SECTION 2.02.        Title to Mortgage Loans; Intent of Parties.

(a) The sale by the Seller and the purchase of Mortgage Loans by the Administrative Agent, for the benefit of the Purchasers, shall constitute a transfer, assignment, and conveyance by the Seller to the Administrative Agent, for the benefit of the Purchasers, without recourse (other than as expressly provided for in this Agreement), of all right, title and interest of the Seller (excluding any obligations of the Seller thereunder) in, to and under (i) each Mortgage Loan (including the Mortgage Note evidencing such Mortgage Loan and the other Principal Mortgage Documents) and any and all moneys of whatsoever nature payable (upon the occurrence of any event) with respect to each such Mortgage Loan subject to the terms of this Agreement, (ii) all rights, powers and remedies of the Seller under or in connection with each such Mortgage Loan (including the Mortgage Note evidencing such Mortgage Loan and the other Principal Mortgage Documents), whether arising under the terms of such Mortgage Loan, by statute, at law or in equity, or otherwise arising out of any default by the Mortgagor under such Mortgage Loan, including (without limitation) all rights to give or receive any notice, consent, approval or waiver thereunder, (iii) the Mortgages, the Principal Mortgage Documents and all other items of the Document Files relating to such Mortgage Loans and the contents thereof, (iv) all security interests and liens securing repayment of such Mortgage Loans, (v) all documents of title, books and records concerning the foregoing property (including, without limitation, all data from computer programs, tapes, disks and related items containing any such information), (vi) the title insurance policies obtained in connection with such Mortgage Loans, and all insurance policies, if any, supporting repayment of such Mortgage Loans; (vii) all

29

Mortgaged Property related to such Mortgage Loans, (viii) all guarantees, supporting obligations and collateral, if any, received with respect to, or supporting repayment of, such Mortgage Loans; and (ix) to the extent that the same then or thereafter exist, all proceeds, products, rents and profits of the foregoing of any nature whatsoever, including (without limitation) all proceeds of the sale, and proceeds of the conversion, voluntary or involuntary, of any proceeds thereof (the items described in clauses (i) through (ix) above, the "Mortgage Loan Assets"). The foregoing transfer, sale, assignment and conveyance shall not constitute and is not intended to result in the creation, or an assumption by the Administrative Agent, any Funding Agent or any Purchaser, of any obligation of the Seller or any other Person in connection with the Mortgage Loans or under any agreement or instrument relating thereto, including any obligation to any obligor or guarantor under the Mortgage Loans.

(b) From and after the Purchase Date for the Mortgage Loans, and subject to the remedies of the Purchasers hereunder, the Seller shall remain the last named payee or endorsee of each Mortgage Note and the mortgagee or assignee of record of each Mortgage, in trust for the benefit of the Purchasers, for the sole purpose of facilitating the servicing of such Mortgage Loan. Following the occurrence of a Takeout Failure and the continuance thereof unremedied for fifteen (15) days, the Administrative Agent may, and shall at the request of the Required Funding Agents, require that the Seller execute assignments of mortgages in blank or such documents and instruments necessary such that the Administrative Agent is named as payee or endorsee of each Mortgage Note and the mortgagee or assignee of record of each Mortgage relating to such Mortgage Loans. Notwithstanding anything to the contrary contained herein, the Administrative Agent, the Funding Agents and the Purchasers agree to use their best efforts to avoid holding an ownership interest in a Mortgage Loan hereunder for more than one year or such other period permitted by each Applicable Agency for a holder of mortgage loans which is not an "approved mortgagee" under applicable Agency Guidelines.

(c) The Seller shall maintain a complete set of books and records for each Mortgage Loan which shall be clearly marked electronically to reflect the ownership interest of the Administrative Agent, for the benefit of the Purchasers, in each Mortgage Loan.

(d) The Purchasers and the Seller confirm that the transactions contemplated herein are intended to be sales of the Mortgage Loans by the Seller to the Administrative Agent, for the benefit of the Purchasers, rather than borrowings secured by the related Mortgage Loans. In the event, for any reason, any transaction is construed by any court or regulatory authority as a borrowing rather than as a sale, the Seller and the Purchasers intend that the Administrative Agent or its assignee, as the case may be, shall have, and hereby has, a perfected first priority security interest in all of Seller's now existing or hereafter acquired or arising right, title and interest in and to (i) the Mortgage Loan Assets, (ii) the Takeout Amounts, (iii) the Takeout Commitments, (iv) the Collection Account and all investments, securities entitlements, financial assets and investment property contained therein, and all certificates and instruments evidencing the same and (v) the proceeds of any and all of the foregoing (collectively, the "Collateral"), free and clear of adverse claims. In such case, the Seller shall be deemed to have hereby granted to the Administrative Agent or its assignee, as the case may be, a first priority security interest in and lien upon the Collateral, free and clear of adverse claims. In such event, (i) this Agreement shall constitute a security agreement, and the Administrative Agent or

30

each such assignee shall have all of the rights of a secured party under applicable law and (ii) each of the Seller and each Purchaser represents and warrants as to itself that each remittance of amounts by the Seller to the Purchasers under this Agreement will have been (x) in payment of a debt incurred by the Seller in the ordinary course of business or financial affairs of Seller and such Purchaser and (y) made in the ordinary course of business or financial affairs of the Seller and such Purchaser.

SECTION 2.03.     Takeout Commitments.  The Seller hereby assigns to the Administrative Agent, for the benefit of the Purchasers, free of any security interest, lien, claim or encumbrance of any kind, the Seller's rights under each Takeout Commitment and to receive the Takeout Amount therefor from the related Approved Takeout Investor.  Subject to the Purchasers' rights hereunder, unless otherwise directed by the Administrative Agent, the Seller agrees that it will satisfy the Takeout Commitment on the Settlement Date specified therein.  The Seller understands that, as a result of this Section 2.03 and each Trade Assignment, the Administrative Agent, on behalf of the Purchasers, will succeed to the rights of the Seller with respect to each Takeout Commitment subject to a Trade Assignment and the obligation of the Seller to deliver the applicable Mortgage Loans against the receipt by the Administrative Agent of an amount equal to the Anticipated Takeout Amount therefor, and that in directing the Seller to deliver the applicable Mortgage Loans to the applicable Approved Takeout Investor under each such Takeout Commitment, the Administrative Agent will stand in the place and stead of the Seller as provided in the applicable Trade Assignment and, consequently, will be acting as a non-dealer in exercising its rights and fulfilling its obligations assigned pursuant to this Section 2.03 and each Trade Assignment.  Notwithstanding the assignments hereunder, other than the obligation of the Seller to deliver the applicable Mortgage Loans against the receipt by the Administrative Agent of an amount equal to the Anticipated Takeout Amount therefor, none of the Administrative Agent, any Funding Agent or any Purchaser is receiving or assuming any obligation of the Seller under any Sale Agreement, Takeout Commitment, or Takeout Assignment.

SECTION 2.04.     Sales of Mortgage Loans to Approved Takeout Investors.

(a) On each Settlement Date, the Administrative Agent may, at its option, either (i) instruct the Custodian to deliver to the applicable Approved Takeout Investor, in accordance with such Approved Takeout Investor's instructions, the Custodial File in respect of the Mortgage Loans subject to such Approved Takeout Investor's Takeout Commitment, in the manner and at the time set forth in the Custodial Agreement, or (ii) provide for the delivery of the Custodial File through an escrow arrangement satisfactory to the Administrative Agent and such Approved Takeout Investor.  The Seller shall, not later than two (2) Business Days prior to the related Anticipated Settlement Date or such other time as may be agreed upon by the Seller and the Approved Takeout Investor to meet the Anticipated Settlement Date, deliver to the applicable Approved Takeout Investor the related Credit File (if required by the Approved Takeout Investor) and thereafter any and all additional documents reasonably requested by such Approved Takeout Investor to enable it to purchase such Mortgage Loans on or before such Anticipated Settlement Date.

31

(b) The Completion Fee shall be paid in accordance with Sections 5.03, 5.04 and 5.05, and in any event the Completion Fee relating to any Mortgage Loan shall not be payable to the Seller (i) until the date of receipt by the Administrative Agent of the related Anticipated Takeout Amount with respect to such Mortgage Loan and (ii) if there are not sufficient funds to pay such Completion Fee pursuant to the application of Collections as set forth in Sections 5.03, 5.04 or 5.05.

(c) If (i) any Mortgage Loan is a Defective Mortgage Loan pursuant to clause (a) of the definition thereof at the time of the delivery of the related Trust Receipt to the Administrative Agent and in the Administrative Agent's sole judgment the defects in such Mortgage Loan will not be cured (or in fact are not cured) by the Seller as of the Cure Date, or (ii) if any Mortgage Loan is a Defective Mortgage Loan pursuant to clause (b) of the definition thereof, or (iii) the first Monthly Payment due on any Mortgage Loan following the related Purchase Date is not made within 30 days of its due date, the Required Funding Agents may require that the Seller, upon receipt of notice from the Required Funding Agents of their exercise of such right, either (x) repurchase the Administrative Agent's ownership interest in such Mortgage Loan by remitting to the Funding Agents within one (1) Business Day thereafter the amount paid by the Purchasers for such Mortgage Loan plus interest at the Applicable Rate on the principal amount thereof from the date of the Administrative Agent's purchase of the related Mortgage Loan to the date of such repurchase or (y) deliver to the Custodian a Mortgage Loan in exchange for such Mortgage Loan, which newly delivered Mortgage Loan shall be an Eligible Mortgage Loan. If the aggregate principal balance of all Mortgage Loan(s) that are delivered pursuant to clause (y) of the immediately preceding sentence is less than the aggregate principal balance of all Mortgage Loans that are being replaced by such Mortgage Loans, the Seller shall remit with such Mortgage Loan to the Funding Agents an amount equal to the difference between the aggregate principal balance of the new Mortgage Loans delivered and the aggregate principal balance of the Mortgage Loans being replaced thereby.

(d) Each Mortgage Loan delivered to the Administrative Agent hereunder shall be delivered on a servicing released basis free of any servicing rights in favor of the Seller or the Servicer and free of any interest, lien, encumbrance or claim of any kind of the Seller. The Seller hereby waives its right to assert any interest, lien, encumbrance or claim of any kind on each such Mortgage Loan. Upon transfer of such servicing rights to any Successor Servicer, the Seller shall deliver or cause to be delivered all files and documents relating to each Mortgage Loan held by the Seller to the Successor Servicer. The Seller shall promptly take such actions and furnish to the Administrative Agent such documents that the Administrative Agent deems reasonably necessary or reasonably appropriate to enable it to cure any defect in each such Mortgage Loan or to enforce such Mortgage Loans, as appropriate.

(e) In the event that a Mortgage Loan is not purchased by an Approved Takeout Investor on or before the Cure Date, upon not less than five (5) days notice from the Administrative Agent to the Seller, the Seller shall use commercially reasonable efforts to obtain a Takeout Commitment from another Approved Takeout Investor to purchase such Mortgage Loan as soon as possible. In the event that a Mortgage Loan is not purchased by an Approved Takeout Investor on or before the 30th day after the Anticipated Settlement Date, the

32

Administrative Agent may, but shall not be obligated to, arrange for the sale of such Mortgage Loan as soon as possible.

(f) In addition to any rights and remedies of the Administrative Agent, the Funding Agents and the Purchasers provided by this Agreement and by law, the Administrative Agent, the Funding Agents and the Purchasers shall have the right, without prior notice to the Seller, any such notice being expressly waived by the Seller to the extent permitted by applicable law, upon any amount becoming due and payable by the Seller hereunder to set-off and appropriate and apply against such amount any and all property and deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, or matured, at any time held or owing by the Administrative Agent, any Funding Agent, any Purchaser or any Affiliate thereof to or for the credit or the account of the Seller (including, without limitation, the amount of any accrued and unpaid Completion Fees). The Administrative Agent, any Funding Agent and any Purchaser may also set-off cash and all other sums or obligations owed by such Person or its Affiliates to the Seller (whether under this Agreement or under any other agreement between the parties or between the Seller and any Affiliate of the Administrative Agent, any Funding Agent or any Purchaser) against all of the Seller's obligations to such Person or its Affiliates (whether under this Agreement or under any other agreement between the parties or between the Sellers and any Affiliate of such Person). The exercise of any such right of set-off shall be without prejudice to the Administrative Agent's, any Funding Agent's, any Purchaser's or its Affiliate's right to recover any deficiency.

(g) The Seller agrees that, with respect to any Mortgage Loan purchased by the Administrative Agent, the related Takeout Commitment shall have an expiration date which is not later than 60 calendar days after the related Purchase Date. The Seller further agrees that any additional Takeout Commitment that it obtains with respect to such Mortgage Loan if the initial Takeout Investor does not perform under such Takeout Commitment shall have an expiration date which is not later than 75 calendar days after the related Purchase Date.

(h) The Seller shall notify and provide the Funding Agents with copies of any material changes made to any Sale Agreement between the Seller and any Approved Takeout Investor within two (2) Business Days after such change.

SECTION 2.05.     Takeout Deficiency Fee.  In the event that any Takeout Failure occurs with respect to any Mortgage Loan, then at any time on or after the earlier of (i) the date such Mortgage Loan is sold and (ii) 180 days after the Purchase Date for such Mortgage Loan, the Administrative Agent may demand, and the Seller shall pay to the Administrative Agent, on behalf of the Purchasers, within one (1) Business Day after such demand, all or a portion of the Takeout Deficiency Fee for such Mortgage Loan; provided, however, that with respect to each Mortgage Pool, no Takeout Deficiency Fee shall be paid if after giving effect to such payment, the sum of (i) the aggregate Takeout Deficiency Fees paid with respect to the Mortgage Loans in such Mortgage Pool as of such date and (ii) the aggregate Completion Fees for Mortgage Loans in such Mortgage Pool which have not been paid to the Seller as of such date shall exceed 5% of the aggregate Purchase Price for the Mortgage Loans included in such Mortgage Pool. Any Takeout Deficiency Fee received by the Administrative Agent shall be

33

applied to the unpaid Net Investment and accrued Yield with respect to such Mortgage Loan and all other amounts due to the Purchasers and the Funding Agents and distributed on a pro rata basis among the Purchaser Groups.

SECTION 2.06.        Reductions and Increases to the Maximum Purchase Limit.

(a) The Seller may, from time to time upon at least sixty (60) days' prior written notice to the Administrative Agent, elect to reduce the Maximum Purchase Limit, provided, that, after giving effect to any such reduction the outstanding Net Investment shall not exceed the Maximum Purchase Limit. Promptly following its receipt of any such notice, the Administrative Agent shall deliver written notice to each Funding Agent of such reduction. Any such reduction shall be permanent and shall reduce each Purchaser Group Limit hereunder ratably in accordance with the respective Purchaser Group's Pro Rata Share of such reduction to the Maximum Purchase Limit.

(b) The Seller may, from time to time upon at least fifteen (15) days' prior written notice to the Administrative Agent, request an increase to the Maximum Purchase Limit; provided, however, that unless otherwise agreed to by the Funding Agents or an existing Purchaser Group or Purchaser Groups agrees to increase its Purchaser Group Limit by an amount equal to the requested increase to the Maximum Purchase Limit, the Seller shall obtain one or more additional Purchaser Groups with aggregate Purchaser Group Limits equal to the requested increase to the Maximum Purchase Limit. Each such notice shall be substantially in the form of Exhibit H hereto (each a "Maximum Purchase Limit Increase Notice") and shall specify (i) the proposed date such increase shall become effective, (ii) the proposed amount of such increase (which amount, to the extent the Seller has requested the existing Purchaser Groups to increase their respective Pro Rata Share of the Maximum Purchase Limit, shall be at least $25,000,000 per Purchaser Group), and (iii) the members of the additional Purchaser Group, if any. Such increase to the Maximum Purchase Limit shall become effective, if, and only if, (i) the Administrative Agent has approved such increase (such approval not to be unreasonably withheld), by executing such Maximum Purchase Limit Increase Notice and (ii) (A) to the extent all of the Purchaser Groups have not agreed to such increase in the Maximum Purchase Limit, the related Purchasers and Related Funding Agent of one or more of the Purchaser Groups have, in their sole discretion, agreed to increase its related Purchaser Group Limit in an amount equal to the requested increase to the Maximum Purchase Limit or (B) to the extent that the related Purchasers and Related Funding Agent of one or more of the Purchaser Groups have, in their sole discretion, agreed to increase the Maximum Purchase Limit or its related Purchaser Group Limit in an amount which is less than the Seller's requested increase to the Maximum Purchase Limit, the Seller has reduced its requested increase to the Maximum Purchase Limit to an amount equal to such lower amount or (C) the Seller has obtained one or more additional Purchaser Groups with aggregate Purchaser Group Limits (each of which shall be a minimum amount of $100,000,000) equal to the requested increase to the Maximum Purchase Limit. To the extent additional Purchaser Groups are not obtained by the Seller with respect to such increase to the Maximum Purchase Limit, such increase shall increase each Purchaser Group Limit hereunder ratably in accordance with the respective Purchaser Group's Pro Rata Share of such increase to the Maximum Purchase Limit; provided, however, that if any Purchaser Group elects not to increase its Pro Rata Share of the Maximum Purchase Limit, one or more of the

34

remaining Purchaser Group(s) can elect to so increase its share of the Maximum Purchase Limit. Nothing contained herein shall constitute a commitment on the part of any Purchaser hereunder to agree to any such increase.

CH1 3469370v.24

SECTION 2.07.    <u>Sharing Payments</u>.  If any Purchaser (for purposes of this Section only, a "<u>Recipient</u>") shall obtain any payment or other recovery (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) on account of its share of the Net Investment (other than pursuant to Article V hereof) in excess of its ratable share of payments to which such Purchaser is entitled hereunder, such Recipient shall forthwith purchase from the other Purchasers entitled to a share of such excess payment or recovery participations in such Recipient's interest in its share of the Net Investment as shall be necessary to cause such Recipient to share in such excess payment or recovery ratably with each other Person entitled thereto; <u>provided</u>, <u>however</u>, that if all or any portion of such excess payment or recovery is thereafter recovered from such Recipient, such purchase from each such other Person shall be rescinded and each such other Person shall repay to the Recipient the purchase price paid by such Recipient for such participation to the extent of such recovery, together with an amount equal to such other Person's ratable share (according to the proportion of (a) the amount of such other Person's required payment to (b) the total amount so recovered from the Recipient) of any interest or other amount paid or payable by the Recipient in respect of the total amount so recovered.

SECTION 2.08.    <u>Extension of Term</u>.  The Seller may, at any time during the period which is no more than sixty (60) days or less than thirty (30) days immediately preceding the date set forth in clause (iii) of the definition of Termination Date (as such date may have previously been extended pursuant to this <u>Section 2.08</u>), request that the then applicable date set forth in clause (iii) of the definition of Termination Date be extended for an additional 364 days. Any such request shall be in writing and delivered to the Administrative Agent, and shall be subject to the following conditions:  (a) at no time will this Agreement have a remaining term of more than 364 days and, if any such request would result in a remaining term of more than 364 days, such request shall be deemed to have been made for such number of days so that, after giving effect to such extension on the date requested, such remaining term will not exceed 364 days, (b) neither the Administrative Agent nor any Purchaser shall have any obligation to extend the Termination Date at any time, and (c) any such extension shall be effective only upon the written agreement of the Administrative Agent, each Funding Agent, each Purchaser, the Seller and the Servicer; <u>provided</u>, <u>however</u>, that the Termination Date shall not occur as a result of a Purchaser Group's failure to agree to any such extension if, on or prior to such date, either (1) such Purchaser Group is replaced by another Purchaser Group which has a Purchaser Group Limit equal to that of such nonrenewing Purchaser Group (the "<u>Nonrenewing Amount</u>") or (2) the Maximum Purchase Limit shall have been reduced by an amount equal to the Nonrenewing Amount and the outstanding Net Investment as of such date is not greater than the Maximum Purchase Limit as so reduced (after giving effect to any decreases in the Net Investment pursuant to <u>Article V</u> occurring on such date). The Administrative Agent will (on behalf of itself, the Purchasers and the Funding Agents) respond to any such request within thirty (30) days of its receipt of such request, <u>provided</u>, that a failure by the Administrative Agent to respond within such 30-day period shall be deemed to be a rejection of the requested extension.

ARTICLE III
CONDITIONS PRECEDENT

36

SECTION 3.01.   Conditions Precedent to the Obligations of the Purchasers.   The Purchasers' obligations hereunder shall be subject to the satisfaction (or waiver by the Administrative Agent and the Funding Agents) on the date hereof of each of the following conditions precedent:

(a)   On or before the date hereof, the Seller shall deliver or cause to be delivered the following documents to the Administrative Agent:

(i)        An Officer's Certificate of the Seller, the Servicer and each Performance Guarantor, including, without limitation, identification of the Servicing Officers;

(ii)        Certificate of the Secretary or Assistant Secretary of each of the Seller, the Servicer, and each Performance Guarantor certifying the resolutions adopted by its Board of Directors approving the execution, delivery and performance of this Agreement and each of the other Principal Agreements to which it is a party and the transactions contemplated hereunder and thereunder (copies attached thereto), the incumbency and signatures of the officers of such entity authorized to sign this Agreement and each of the other Principal Agreements to which it is a party, and the certificate of incorporation and bylaws of such entity on the date of such certification (copies attached thereto);

(iii)        A certificate of the Secretary of State of the jurisdiction of organization of each of the Seller, the Servicer and each Performance Guarantor, certifying the due incorporation, good standing and authority to conduct business, dated not more than thirty (30) days prior to the date hereof;

(iv)        A duly executed copy of this Agreement, the Custodial Agreement, the Collection Account Control Agreement, the Electronic Tracking Agreement, the Performance Guaranty and any documents executed by it in connection therewith;

(v)        Executed copies of the Fee Letter and the Agent Fee Letter;

(vi)        UCC financing statements with respect to the assets purchased hereunder in such manner and form and in such jurisdictions as will meet the requirements of applicable state law in order to perfect the Administrative Agent's security interest, on behalf of the Purchasers, in such assets;

(vii)        Opinions of Counsel for the Seller, the Servicer and each Performance Guarantor with respect to corporate matters, enforceability, true sale and perfection of security interest;

(viii)        If required with respect to a Conduit Purchaser, a letter to such Conduit Purchaser from each rating agency rating the Commercial Paper of such Conduit Purchaser confirming that such Conduit Purchaser's participation in the transaction contemplated by this Agreement will not result in the downgrade or withdrawal of its Commercial Paper rating; and

37

CHI 3469370v.24

(ix)        Such other documents, Opinions of Counsel and certificates as the Administrative Agent or any Funding Agent may reasonably request.

(b) On or before the date hereof, Seller shall have paid to the extent due all reasonable fees and out-of-pocket costs and expenses (including, without limitation, reasonable legal fees and expenses) required to be paid hereunder and under the Principal Agreements, including amounts due under each of the Fee Letter and the Agent Fee Letter.

SECTION 3.02.    <u>Conditions Precedent to Purchases</u>.  The Purchasers' obligation to fund the Purchase Price of any purchases of Mortgage Loans on any Purchase Date (including the initial Purchase Date) and the right of the Seller to sell one or more Mortgage Loans on any Purchase Date shall be subject to the satisfaction (or waiver by the Funding Agents) of each of the conditions set forth in <u>Section 3.01</u> and the following conditions precedent:

(a)  With respect to each Purchase Date, the Seller shall have delivered to the Administrative Agent each of the items required under <u>Sections 2.01(b)</u> and <u>(c)</u>.

(b)  With respect to each Purchase Date, the Custodian shall have delivered to the Administrative Agent a Trust Receipt certifying that (A) on the applicable date of purchase, the Custodial Files with respect to each Mortgage Loan are in its custody, and, as of the applicable date, are being held by such Custodian for the benefit of the Purchasers and (B) with respect to Wet Loans, that the Custodian has received the related Purchase Date Notice.

(c)  With respect to each Purchase Date, prior to 11:00 a.m. (New York time) on such Purchase Date, the Administrative Agent shall have received a fully executed valid and enforceable Takeout Commitment and Trade Confirmation from an Approved Takeout Investor and a valid and enforceable Trade Assignment for each Takeout Commitment with respect to each Mortgage Loan, executed by the Seller.

(d)  After giving effect to the purchase of such Mortgage Loans, the Concentration Limits will not be exceeded.

(e)  After giving effect to the purchase of such Mortgage Loans, the aggregate outstanding balance of all Mortgage Loans which are Wet Loans and subject to this Agreement as of such date does not exceed 10% of the Maximum Purchase Limit as of such date.

(f)  After giving effect to the purchase of such Mortgage Loans, the aggregate outstanding balance of all Mortgage Loans which are FHA Loans or VA Loans and subject to this Agreement as of such date does not exceed 20% of the Maximum Purchase Limit as of such date.

(g)  After giving effect to the purchase of such Mortgage Loans, the aggregate outstanding balance of all Mortgage Loans which are Option ARM Loans and subject to this Agreement as of such date does not exceed 25% of the Maximum Purchase Limit as of such date.

CH1 3469370v.24

(h) After giving effect to the purchase of such Mortgage Loans, the aggregate outstanding balance of all Mortgage Loans which have a term of maturity of over 30 years and are subject to this Agreement as of such date does not exceed 10% of the Maximum Purchase Limit as of such date.

(i) After giving effect to the purchase of such Mortgage Loans, the aggregate outstanding balance of all Mortgage Loans which are supported by second lien Mortgages and subject to this Agreement as of such date does not exceed 15% of the Maximum Purchase Limit as of such date.

(j) After giving effect to the purchase of such Mortgage Loans and as of such Purchase Date, (i) the aggregate outstanding balance of all Mortgage Loans subject to this Agreement as of such date and which were originated more than 90 days prior to such date does not exceed 10% of the Maximum Purchase Limit as of such date, (ii) the aggregate outstanding balance of all Mortgage Loans subject to this Agreement as of such date and which have been subject to this Agreement for more than 60 days does not exceed 10% of the Maximum Purchase Limit, and (iii) no Mortgage Loan as of such date has been subject to this Agreement for more than 180 days.

(k) The representations and warranties of the Seller and the Servicer contained in this Agreement or any Principal Agreement (other than those representations and warranties that, by their express terms, are limited to the effective date of the document or agreement in which they are initially made) shall be true and correct in all material respects on and as of such Purchase Date.

(l) No Termination Event or Potential Termination Event shall have occurred and be continuing, or would result from such Purchase (unless such Termination Event or Potential Termination Event, as applicable, has been waived in writing by the Funding Agents), and no change or event that constitutes a Material Adverse Effect shall have occurred and be continuing as of the date of such Purchase.

(m) This Agreement and each of the other Principal Agreements are in full force and effect.

(n) Each of the Seller's, the Servicer's and the Performance Guarantors' representations and warranties in this Agreement and each of the other Principal Agreements to which it is a party and in any officer's certificate delivered to the Administrative Agent or Funding Agents in connection herewith or therewith shall be true and correct in all material respects on and as of the date hereof and such Purchase Date, with the same effect as though such representations and warranties had been made on and as of such date, and the Seller, the Servicer and the Performance Guarantors shall have complied with all the agreements and satisfied all the conditions under this Agreement and each of the other Principal Agreements to which it is a party in all material respects on its part to be performed or satisfied at or prior to the date hereof or Purchase Date, as applicable (the acceptance of any Purchase Price shall be deemed to constitute a representation and warranty by the Seller and the Servicer that the foregoing statements are true).

39

(o) No change shall have occurred in any law, rule or regulation that would prohibit the consummation of any transaction contemplated hereby, that would impose limits on the amounts that the Purchasers may legally receive or that would impose a material tax or levy (other than Excluded Taxes or a tax or levy covered by the indemnity provisions set forth in Sections 7.02 and 7.03 hereof) on the Net Investment or payments received in respect of the Net Investment.

(p) No action, proceeding or investigation shall have been instituted or threatened, nor shall any order, judgment or decree have been issued or proposed to be issued by any court, agency or authority to set aside, restrain, enjoin or prevent the consummation of any transaction contemplated hereby or seeking material damages against the Funding Agents, Administrative Agent or Purchasers in connection with the transactions contemplated by the Principal Agreements.

(q) The Seller shall have delivered to the Administrative Agent for filing, all UCC-1 financing statements or other instruments in respect of the Mortgage Loans and other Collateral related thereto as required by the Administrative Agent in order to perfect the Administrative Agents' and the Purchasers' security interest in such Mortgage Loans.

(r) The Seller shall have delivered to the Administrative Agent a sufficient number of originals such that the Administrative Agent may have an executed original thereof, of such other documents, certificates and opinions of counsel, including (i) such other documents as may be necessary to perfect or maintain the priority of any Lien granted or intended to be granted hereunder and including favorable written opinions of counsel with respect thereto and (ii) such documents and certificates to confirm the Seller's, the Servicer's and the Performance Guarantors' compliance with the Principal Agreements, in each case as the Administrative Agent may reasonably request.

(s) The Collection Account shall be established and in existence and free from any Lien other than pursuant to the Collection Account Control Agreement.

(t) The Termination Date shall not have occurred.

(u) The aggregate outstanding balance of all Mortgage Loans which have been subject to this Agreement since the date hereof and which have become Fall-Out Loans does not exceed 10% of the aggregate Purchase Prices for all purchases outstanding at such time.

(v) Each Mortgage Loan subject to such purchase on such date shall have an interest rate of not less than 30-day LIBOR determined as of such day plus 0.75%.

## ARTICLE IV
## ADMINISTRATION AND SERVICING OF LOANS

SECTION 4.01.        Acceptance of Appointment; Duties of Servicer.

(a) AHMS is hereby appointed as the Servicer of the Mortgage Loans purchased hereunder. AHMS hereby accepts such appointment and agrees to act as Servicer under this

40

Agreement, for the benefit of the Purchasers, and the Purchasers and the Seller hereby consent to AHMS acting as Servicer. The Servicer shall service, administer and enforce such Mortgage Loans as Servicer in a manner consistent with the terms of this Agreement. The Servicer shall have no further servicing obligations or duties to the Purchasers under the terms of this Agreement with respect to the relevant Mortgage Loans upon the purchase of such loan by the applicable Approved Takeout Investor.

(b) The Servicer shall service and administer the Mortgage Loans in the best interests of and on behalf of the Purchasers in accordance with this Agreement, the terms of the Principal Mortgage Documents, the standard requirements of the issuers of Takeout Commitments covering the same and to the extent consistent with such terms, and Accepted Servicing Standards. The Servicer shall at all times comply with applicable law, FHA regulations and VA regulations and the requirements of any private mortgage insurer so that the FHA insurance, VA guarantee or any other applicable insurance or guarantee in respect of any Mortgage Loan is not voided or reduced. The Servicer shall at all times maintain accurate and complete records of its servicing of the Mortgage Loans, and the Administrative Agent may, and shall upon the reasonable request of any Funding Agent, at any time during the Servicer's business hours on reasonable prior notice, examine and make copies of such records. In addition, if the sale of a Mortgage Loan is not made to the applicable Takeout Investor on or before the Anticipated Settlement Date, the Servicer shall promptly deliver to the Administrative Agent monthly reports regarding the status of such Mortgage Loans, which reports shall include, but shall not be limited to, a description of those Mortgage Loans in default for more than thirty (30) days, and such other circumstances with respect to any Mortgage Loans (whether or not such Mortgage Loans are included in the foregoing list) that could materially adversely affect any of such Mortgage Loans, the Purchasers' ownership of any of such Mortgage Loans or the collateral securing any of such Mortgage Loans. The Servicer shall deliver such a report to the Administrative Agent every thirty (30) days until (i) the sale of such Mortgage Loan to an Approved Takeout Investor or another Person or (ii) such report is being provided by a Successor Servicer. Following its receipt thereof, the Administrative Agent agrees to promptly forward copies of such report to each Funding Agent.

SECTION 4.02.    Replacement of Servicer.

(a) The Required Funding Agents shall be entitled, by written notice to Seller and Servicer to effect termination of Servicer's servicing rights and obligations respecting the affected Mortgage Loans in the event any of the following circumstances or events ("Servicer Termination Events") occur and are continuing:

(i)        any failure by the Servicer to remit to the Administrative Agent when due any payment or transfer of funds required to be made by it under the terms of this Agreement which continues unremedied for a period of five (5) calendar days after the due date; provided, however, that such grace period shall not apply to the Servicer's obligation to remit Collections to the Collection Account pursuant to Section 5.02(a); or

(ii)        failure by the Servicer duly to observe or perform in any material respect any of its other covenants or agreements set forth in this Agreement or in any

41

Principal Agreement which continues unremedied beyond the expiration of any applicable grace or notice period; or

(iii)    any representation, warranty or certification made or deemed made herein or in any Principal Agreement by the Servicer or in any certificate furnished to the Administrative Agent, any Funding Agent or any Purchaser pursuant to the provisions thereof, shall prove to have been false or misleading in any material respect as of the time made or furnished; or

(iv)    (A) the Servicer shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted against the Servicer or by the Servicer seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property and, in the case of an involuntary proceeding described above, such proceeding shall continue undismissed, unstayed and in effect for a period of sixty (60) consecutive days; or (B) the Servicer's Board of Directors shall vote affirmatively to authorize any of the actions set forth in clause (A) above in this subsection (iv); or

(v)    any action or omission to act by the Servicer which constitutes gross negligence or willful misconduct causes a Takeout Failure, such Takeout Failure shall continue unremedied after the Cure Date and such occurrence has a Material Adverse Effect; or

(vi)    the Servicer ceases to meet the qualifications for maintaining all applicable Approvals; or

(vii)    the occurrence and continuance of a Termination Event.

In the case of the event described in subsection (iv), immediately upon the occurrence of any such event, regardless of whether notice of such event shall have been given to or by the Administrative Agent, and in each and every other case, so long as the Servicer Termination Event shall not have been remedied (but only to the extent, and within the time period, of any remedy period provided above), in addition to whatever rights the Purchasers may have at law or equity to damages, including injunctive relief and specific performance, by notice in writing to the Servicer and the Seller, the Administrative Agent may (and shall at the direction of the Required Funding Agents) terminate all the servicing rights and obligations of the Servicer under this Agreement and assume control of the disposition of such servicing rights, including the sale and transfer of such servicing rights as determined by the Administrative Agent. Upon receipt by the Servicer and the Seller of such written notice, subject to the terms of this Section 4.02, all authority and power of the Servicer respecting its mortgage servicing rights and duties under this Agreement, shall pass to and be vested in the successor servicer appointed by the Required Funding Agents (a "Successor Servicer"). The Servicer, upon receipt of such notice of

42

termination, may negotiate the transfer, sale and assignment of its interest under this Agreement to any Successor Servicer so appointed by the Required Funding Agents. The Servicer's privilege of sale and transfer hereunder shall terminate automatically if not exercised by completing the sale, transfer and assignment on or before the last day of the second calendar month following the month in which notice of termination shall have been given as provided above in this <u>Section 4.02</u>. If such a sale and transfer by the Servicer is properly consummated within the period of time specified in such notice, the Servicer may retain the proceeds of the sale as liquidated damages, subject to any claims of the Administrative Agent and the Purchasers for moneys due pursuant to this Agreement.

If the Servicer, after notice of termination as above provided in this <u>Section 4.02</u>, shall not have sold, transferred and assigned its interests in this Agreement within the time permitted above, or the Servicer elects to permit the Administrative Agent, on behalf of the Purchasers, to arrange such sale, the Administrative Agent shall arrange for the transfer of servicing to another party, and the Servicer shall continue servicing the Mortgage Loans under this Agreement until the Administrative Agent gives the Servicer notice of the transfer and its effective date. In arranging for the transfer, sale and assignment of the Servicer's interests under this Agreement, the Administrative Agent may at its sole option solicit, by public announcement, bids from organizations reasonably acceptable to it for the purchase of the servicing functions. Within ten (10) days after any such public announcement, the Administrative Agent shall be authorized to negotiate and, subject to the consent of the Required Funding Agents, effect the transfer, sale and assignment of such servicing rights to the party submitting the highest satisfactory bid. The Administrative Agent shall deduct all costs and expenses of any public announcement and of any sale, transfer and assignment of such servicing rights including, without limitation any brokerage fees, from any sum received by the Purchasers from the successor to the Servicer for the sale, transfer and assignment of such servicing rights. After such deductions, the remainder of such sum shall be paid by the Administrative Agent to the Servicer for transfer of the servicing rights and obligations under this Agreement to the Servicer's successor.

Upon written request by the Administrative Agent, the Servicer shall prepare, execute and deliver to the Successor Servicer any and all documents and other instruments, place in such successor's possession all files pertaining to such Mortgage Loans and do or cause to be done all other acts or things necessary to effect the purposes of such notice of termination, including, but not limited to, the transfer, endorsement and assignment of the Mortgage Loans and related documents, at the Servicer's sole expense.

43

SECTION 4.03.    <u>Indemnification by Servicer</u>. The Servicer shall indemnify and hold harmless each Indemnified Party against any and all Losses resulting from or otherwise arising in connection with (i) the failure of the Servicer to perform its obligations (including, without limitation, any failure to perform servicing obligations) in accordance with the terms of this Agreement, (ii) the breach by the Servicer of any representation or warranty made by the Servicer in the Custodial Agreement, (iii) any commingling of Collections with respect to the Mortgage Loans with funds of the Servicer, and (iv) any Takeout Failure if such Takeout Failure was caused by the Servicer's action or failure to take action.

ARTICLE V

ALLOCATION AND APPLICATION OF COLLECTIONS

SECTION 5.01.    <u>Rights of the Purchasers</u>. The Net Investment shall represent an ownership interest in the applicable Mortgage Loans and Takeout Commitments, including the right to receive the Collections and other amounts at the times and in the amounts specified in this <u>Article V</u> to be deposited in the Collection Account or to be paid to the Purchasers.

SECTION 5.02.    <u>Establishment of Collection Account</u>.

(a) Servicer shall establish and shall thereafter maintain with the Custodian a segregated trust account in the name of the Administrative Agent for the benefit of the Purchasers (the "Collection Account"). Any funds on deposit from time to time in the Collection Account shall be deemed held in trust for the benefit of the Purchasers. The Administrative Agent, for the benefit of the Purchasers, shall possess all right, title and interest in all funds on deposit from time to time in the Collection Account and in all proceeds thereof. The Collection Account shall be under the sole dominion and control of the Administrative Agent for the benefit of the Purchasers. The Collection Account shall be dedicated to and used solely for the deposit of Collections. Servicer shall not establish a new Collection Account without the prior written consent of the Administrative Agent. If, at any time, the institution holding the Collection Account ceases to be an Eligible Institution, Servicer shall within thirty (30) days establish a new Collection Account meeting the conditions specified above with an Eligible Institution, and shall transfer any cash and/or any investments to such new Collection Account, and from the date such new Collection Account is established, it shall be the "Collection Account." Servicer shall have the power, revocable by the Administrative Agent upon the written direction of the Funding Agents, to make withdrawals and payments from the Collection Account in accordance with this Agreement and to instruct the Administrative Agent to make withdrawals and payments from the Collection Account for the purposes of carrying out the Servicer's or the Administrative Agent's duties hereunder. The Servicer and the Seller shall direct all Approved Takeout Investors to deposit Collections constituting proceeds of the sales of the Mortgage Loans directly to the Collection Account. All Collections constituting proceeds of the sales of the Mortgage Loans otherwise remitted to the Servicer or Seller shall be remitted to the Collection Account by the Servicer as soon as practicable, but in no event later than two (2) Business Days after receipt. All Collections not constituting proceeds of the sales of the Mortgage Loans shall be held in trust by the Servicer for the benefit of the Administrative Agent until the following Remittance Date and on each Remittance Date, all such Collections, together with all Collections remitted to the

44

Servicer pursuant to Section 5.03(v), shall be remitted by the Servicer to the Collection Account; provided that at any time after the occurrence and during the continuance of a Termination Event, all such Collections shall be remitted to the Collection Account by the Servicer as soon as practicable, but in no event later than two (2) Business Days after receipt.

(b) Funds on deposit in the Collection Account shall be invested by the Eligible Institution in Eligible Investments in the name of the Administrative Agent for the benefit of the Purchasers, as directed in writing by the Servicer, that will mature or otherwise be available for withdrawal without penalty on each Settlement Date, with all realized interest and other investment earnings (net of losses and investment expenses) to remain a part of the Collection Account. In the event that the Administrative Agent has not received written directions from the Servicer, the Administrative Agent shall invest any cash amounts in the Collection Account in Eligible Investments set forth in clause (d) of the definition thereof. The Administrative Agent shall provide to the Servicer monthly written confirmation of such investments, describing the Eligible Investments in which such amounts have been invested. Any funds in the Collection Account not so invested must be deposited by the Custodian with an Eligible Institution and insured by the FDIC to the limits established by the FDIC. Each Eligible Investment shall be a "securities entitlement" within the meaning of Section 8-102(17) of the UCC.

SECTION 5.03.     Allocations and Distributions on Settlement Dates. On each Settlement Date, funds received into the Collection Account which constitute Collections received in connection with the sale of any Mortgage Loan shall be allocated and distributed by Servicer, or if the Administrative Agent has delivered written notice to the Servicer that the Servicer shall no longer make distributions of Collections, then by the Administrative Agent, in the following priority:

(i)   first, to each Funding Agent, for the benefit of the applicable Purchasers in the related Purchaser Group, an amount equal to such Purchaser Group's Pro Rata Share of the Net Investment allocable to such Mortgage Loan relating to such Settlement Date;

(ii)   second, to each Funding Agent, for the benefit of the applicable Purchasers in the related Purchaser Group, on a *pro rata* basis, for any unpaid Yield from prior Remittance Dates and Net Investment from prior Settlement Dates;

(iii)   third, to or at the direction of the Seller, the aggregate of the Completion Fees for such Mortgage Loans relating to such Settlement Date;

(iv) fourth, to each applicable Funding Agent, for itself and for the benefit of the applicable Purchasers in the related Purchaser Group, and to the Administrative Agent, on a *pro rata* basis, for any other amounts due to such parties, including, without limitation, amounts due under Section 2.04, any unpaid Program Fee, Administrative Agent Fee and Unused Fee from prior Remittance Dates and any Indemnified Claims which are due and unpaid; and

45