(v) <u>fifth</u>, to the Servicer to be held in trust until the next Remittance Date;

<u>provided</u>, <u>however</u>, (A) on and after the date on which a Termination Event occurs, and (B) on any date on which the aggregate outstanding principal balance of all Mortgage Loans which have not been sold to an Approved Takeout Investor within 15 days after the Anticipated Settlement Date exceeds 20% of the aggregate outstanding principal balance of all Mortgage Loans subject to this Agreement as of such date, the amounts described in items (iii) and (v) above shall be (1) retained in the Collection Account, (2) available on any subsequent Settlement Date to be withdrawn from the Collection Account by the Administrative Agent to pay shortfalls in the amounts described in items (i), (ii) and (iv) above and (3) only remitted to the Seller and the Servicer, as applicable, following the payment in full of the amounts described in items (i), (ii) and (iv) above for all subsequent Settlement Dates.   Notwithstanding the foregoing, with respect to each Mortgage Pool, no Completion Fee shall be retained in the Collection Account if after giving effect to such retention, the sum of (i) the aggregate Takeout Deficiency Fees paid with respect to the Mortgage Loans in such Mortgage Pool as of such date and (ii) the aggregate Completion Fees for Mortgage Loans in such Mortgage Pool which have not been paid to the Seller as of such date shall exceed 5% of the aggregate Purchase Price for the Mortgage Loans included in such Mortgage Pool.

SECTION 5.04.    <u>Allocations and Distributions of Interest Collections on Remittance Dates</u>. On each Remittance Date, all Collections of interest paid by or on behalf of the Mortgagors and all other Collections other than those described in <u>Sections 5.03</u> or <u>5.05</u> which are received into the Collection Account shall be allocated and distributed by the Servicer, or if the Administrative Agent has delivered written notice to the Servicer that the Servicer shall no longer make distributions of Collections, then by the Administrative Agent, in the following priority:

(i) <u>first</u>, to each Funding Agent, for the benefit of the applicable Purchaser(s) in the related Purchaser Group, on a *pro rata* basis, an amount equal to all accrued and unpaid Yield for such Purchaser Group on the Net Investment related to all Mortgage Loans which are subject to this Agreement as of such Remittance Date and all Mortgage Loans which have been sold by the Administrative Agent since the immediately preceding Remittance Date and any other amounts payable pursuant to <u>Section 7.02(d)</u> hereof;

(ii) <u>second</u>, to the Administrative Agent and each Funding Agent (for the benefit of the applicable Purchaser(s) in the related Purchaser Group), on a *pro rata* basis, the Administrative Agent Fee, the Unused Fee and the Program Fee relating to such Remittance Date;

(iii) <u>third</u>, to each Funding Agent, for the benefit of the applicable Purchasers in the related Purchaser Group, on a *pro rata* basis, for any unpaid Yield from prior Remittance Dates and Net Investment from prior Settlement Dates;

46

(iv) <u>fourth</u>, to or at the direction of the Seller, the aggregate amount of any remaining unpaid Completion Fees with respect to the Mortgage Loans which were sold by the Administrative Agent prior to such Remittance Date;

(v) <u>fifth</u>, to each applicable Funding Agent, for itself and for the benefit of the applicable Purchasers in the related Purchaser Group, and to the Administrative Agent, on a *pro rata* basis, for any other amounts due to such parties, including, without limitation, amounts due under <u>Section 2.04</u>, any unpaid Program Fee, Administrative Agent Fee and Unused Fee from prior Remittance Dates and any Indemnified Claims which are due and unpaid; and

(vi) <u>sixth</u>, all remaining amounts to the Servicer, as the Servicing Fee;

<u>provided</u>, <u>however</u>, (A) on and after the date on which a Termination Event occurs, and (B) on any date on which the aggregate outstanding principal balance of all Mortgage Loans which have not been sold to an Approved Takeout Investor within 15 days after the Anticipated Settlement Date exceeds 20% of the aggregate outstanding principal balance of all Mortgage Loans subject to this Agreement as of such date, the amounts described in items (iv) and (vi) above shall be (1) retained in the Collection Account, (2) available on any subsequent Remittance Date to be withdrawn from the Collection Account by the Administrative Agent to pay shortfalls in the amounts described in items (i) through (iii) and (v) above and in <u>Section 5.05</u> and (3) only remitted to the Seller and the Servicer, as applicable, following the payment in full of the amounts described in items (i) through (iii) and (v) above and in <u>Section 5.05</u> for all subsequent Remittance Dates.  Notwithstanding the foregoing, with respect to each Mortgage Pool, no Completion Fee shall be retained in the Collection Account if after giving effect to such retention, the sum of (i) the aggregate Takeout Deficiency Fees paid with respect to the Mortgage Loans in such Mortgage Pool as of such date and (ii) the aggregate Completion Fees for Mortgage Loans in such Mortgage Pool which have not been paid to the Seller as of such date shall exceed 5% of the aggregate Purchase Price for the Mortgage Loans included in such Mortgage Pool.  On the second Business Day preceding each Remittance Date, each Funding Agent shall deliver a written notice to the Seller and the Servicer stating the amount of all accrued and unpaid fees and Yield for its related Purchaser Group on the Net Investment related to all Mortgage Loans which will be subject to this Agreement as of the immediately succeeding Remittance Date and all Mortgage Loans which have been sold by the Administrative Agent since the immediately preceding Remittance Date.

SECTION 5.05.    <u>Allocations and Distributions of Principal Collections on Remittance Dates</u>.  On each Remittance Date, funds received into the Collection Account which constitute Collections of principal paid by the Mortgagors on all Mortgage Loans and all amounts remitted to the Administrative Agent pursuant to <u>Section 2.04</u> shall be allocated and distributed by the Servicer, or if the Administrative Agent has delivered written notice to the Servicer that the Servicer shall no longer make distributions of Collections, then by the Administrative Agent, in the following priority:

(i)    <u>first</u>, to each Funding Agent, for the benefit of the applicable Purchaser(s) in the related Purchaser Group, an amount equal to such Purchaser

47

Group's Pro Rata Share of the Net Investment allocable to the Mortgage Loans for which such Collections were received;

(ii) <u>second</u>, to each Funding Agent, for the benefit of the applicable Purchasers in the related Purchaser Group, on a *pro rata* basis, for any unpaid Yield from prior Remittance Dates and Net Investment from prior Settlement Dates;

(iii)<u>third</u>, to or at the direction of the Seller, the aggregate amount of any remaining unpaid Completion Fees with respect to the Mortgage Loans which were sold by the Administrative Agent prior to such Remittance Date;

(iv)<u>fourth</u>, to each applicable Funding Agent, for itself and for the benefit of the applicable Purchasers in the related Purchaser Group, and to the Administrative Agent, on a *pro rata* basis, for any other amounts due to such parties, including, without limitation, amounts due under <u>Section 2.04</u>, any unpaid Program Fee, Administrative Agent Fee and Unused Fee from prior Remittance Dates and any Indemnified Claims which are due and unpaid; and

(v) <u>fifth</u>, all remaining amounts to the Servicer, as the Servicing Fee;

48

provided, however, (A) on and after the date on which a Termination Event occurs and (B) on any date on which the aggregate outstanding principal balance of all Mortgage Loans which have not been sold to an Approved Takeout Investor within 15 days after the Anticipated Settlement Date exceeds 20% of the aggregate outstanding principal balance of all Mortgage Loans subject to this Agreement as of such date, the amounts described in items (iii) and (v) above shall be (1) retained in the Collection Account, (2) available on any subsequent Remittance Date to be withdrawn from the Collection Account by the Administrative Agent to pay shortfalls in the amounts described in items (i), (ii) and (iv) above and (3) only remitted to the Seller and the Servicer, as applicable, following the payment in full of the amounts described in items (i), (ii) and (iv) above for all subsequent Remittance Dates.  Notwithstanding the foregoing, with respect to each Mortgage Pool, no Completion Fee shall be retained in the Collection Account if after giving effect to such retention, the sum of (i) the aggregate Takeout Deficiency Fees paid with respect to the Mortgage Loans in such Mortgage Pool as of such date and (ii) the aggregate Completion Fees for Mortgage Loans in such Mortgage Pool which have not been paid to the Seller as of such date shall exceed 5% of the aggregate Purchase Price for the Mortgage Loans included in such Mortgage Pool.

ARTICLE VI
REPRESENTATIONS AND WARRANTIES; COVENANTS

SECTION 6.01.    Representations of the Seller and the Servicer.

The Seller and the Servicer each represents and warrants, as to itself, on the date hereof and on each Purchase Date to the Administrative Agent, the Funding Agents and the Purchasers as follows:

(a) Organization and Good Standing.  It (i) is a corporation duly organized and existing in good standing under the laws of the jurisdiction of its organization, (ii) is duly qualified to do business and in good standing in all jurisdictions in which its failure to be so qualified could have a Material Adverse Effect, (iii) has the requisite entity power and authority to own its properties and assets and to transact the business in which it is engaged and is or will be qualified in those states wherein it proposes to transact business in the future except to the extent the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect and (iv) is in compliance with all Requirements of Law.  American Home Mortgage Corp. is incorporated in New York and in no other jurisdiction, and American Home Mortgage Servicing, Inc. is incorporated in Maryland and in no other jurisdiction.

(b) Authorization and Power.  It has the requisite entity power and authority to execute, deliver and perform this Agreement and the other Principal Agreements to which it is a party; it is duly authorized to and has taken all requisite entity action necessary to authorize it to, execute, deliver and perform this Agreement and the other Principal Agreements to which it is a party and is and will continue to be duly authorized to perform this Agreement and such other Principal Agreements.

49

(c) <u>No Conflicts or Consents</u>. Neither the execution and delivery by it of this Agreement or the other Principal Agreements to which it is a party, nor the consummation of any of the transactions herein or therein contemplated, nor compliance with the terms and provisions hereof or with the terms and provisions thereof, will (i) contravene or conflict with any Requirement of Law to which it is subject, or any indenture, mortgage, deed of trust, or other agreement or instrument to which it is a party or by which it may be bound, or to which its property may be subject, or (ii) result in the creation or imposition of any Lien, other than the Liens of the Administrative Agent pursuant to this Agreement on the property of the Seller.

(d) <u>Enforceable Obligations</u>. This Agreement and the other Principal Agreements to which it is a party have been duly and validly executed by it and are its legal, valid and binding obligations, enforceable in accordance with their respective terms, except as limited by the Enforceability Exceptions.

(e) <u>Full Disclosure</u>. There is no fact known to it that it has not disclosed to the Administrative Agent and the Funding Agents that could reasonably be expected to have a Material Adverse Effect. Neither its financial statements nor any Monthly Statements, reports, officer's certificate or statement delivered by it to the Administrative Agent, the Funding Agents or the Purchasers in connection with this Agreement, contains any untrue or inaccurate statement of material fact or omits to state a material fact necessary to make such information not misleading.

(f) <u>No Default</u>. It is not in default under any loan agreement, mortgage, security agreement or other agreement or obligation to which it is a party or by which any of its property is bound, if such default would also be a Termination Event (or, with notice or passage of time would become a Termination Event) under either of <u>subparagraphs (g)</u> or <u>(h)</u> of <u>Section 8.01</u> of this Agreement.

(g) <u>Litigation</u>.

(i) Except as set forth on <u>Schedule D</u>, there are no actions, suits or proceedings, including arbitrations and administrative actions, at law or in equity (other than, in the case of the Servicer, any actions, suits or proceedings with damage claims of $1,000,000 or less), either by or before any Governmental Authority, now pending or, to its knowledge, threatened by or against it or any of its Subsidiaries, and pertaining to any Governmental Requirement affecting its property or rights or any of its Subsidiaries which if determined adversely, could reasonably be expected to have a Material Adverse Effect.

(ii) Neither it nor any of its Subsidiaries is in default with respect to any Governmental Requirements.

(iii) It is not liable on any judgment, order or decree (or any series of judgments, orders, or decrees) that could reasonably be expected to have a Material Adverse Effect and that has not been paid, stayed or dismissed within 60 days.

50

(h) <u>Taxes</u>. All tax returns required to be filed by it in any jurisdiction have been filed, except where extensions of time to make those filings have been granted by the appropriate taxing authorities and the extensions have not expired, and all taxes, assessments, fees and other governmental charges upon it or upon any of its properties, income or franchises have been paid prior to the time that such taxes could give rise to a Lien thereon, unless protested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been established on its books. There is no tax assessment or to Seller's and Servicer's best knowledge, proposed tax assessment against it that could reasonably be expected to have a Material Adverse Effect.

(i) <u>Permits, Patents, Trademarks, Etc.</u>

(i) It has all permits and licenses necessary for the operation of its business except to the extent the failure to maintain such permits or licenses could not reasonably be expected to have a Material Adverse Effect.

(ii) It owns or possesses (or is licensed or otherwise has the necessary right to use) all patents, trademarks, service marks, trade names and copyrights, technology, know-how and processes, and all rights with respect to the foregoing, which are necessary for the operation of its business, without any conflict with the rights of others. The consummation of the transactions contemplated hereby will not alter or impair any of such rights of it.

(j) <u>Status Under Certain Federal Statutes</u>. It is not an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

(k) <u>No Approvals Required</u>. Other than consents and approvals previously obtained and actions previously taken, neither the execution and delivery of this Agreement and the other Principal Agreements to which it is a party, nor the consummation of any of the transactions contemplated hereby or thereby requires the consent or approval of, the giving of notice to, or the registration, recording or filing by it of any document with, or the taking of any other action in respect of, any Governmental Authority that has jurisdiction over it or any of its property.

(l) <u>Environmental Matters</u>. There have been no past, and there are no pending or to the Seller's knowledge threatened, claims, complaints, notices, or governmental inquiries against it regarding any alleged violation of, or potential liability under, any environmental laws that could reasonably be expected to have a Material Adverse Effect. It and its properties are in substantial compliance in all respects with all environmental laws and related licenses and permits, unless the failure to comply strictly in all respects with all environmental laws and related licenses and permits could reasonably be expected to have a Material Adverse Effect. No conditions exist at, on or under any property now or previously owned or leased by it that could give rise to liability under any environmental law that could be expected to have a Material Adverse Effect.

51

(m)<u>Eligibility</u>. It is approved and qualified and in good standing as a lender or seller/servicer, as follows:

(i) It is a FNMA approved seller/servicer and a FNMA approved seller (in good standing) of mortgage loans, eligible to originate, purchase, hold, sell and service mortgage loans to be sold to FNMA.

(ii) It is a FHLMC approved seller/servicer (in good standing) of mortgage loans, eligible to originate, purchase, hold, sell and service mortgage loans to be sold to FHLMC.

(iii)It is an approved FHA servicer, VA servicer and GNMA issuer (in good standing) of mortgage loans, eligible to originate, purchase, hold, sell and service mortgage loans to be pooled into GNMA mortgage-backed securities pools and to issue GNMA mortgage-backed securities.

(n) <u>Location of Records</u>. The office where it keeps all the books, records and other information (including, without limitation, computer programs, tapes, disks, punch cards, data processing software and related property and rights) maintained by it with respect to the Mortgage Loans and other related assets purchased hereunder are located at its address referred to in <u>Section 11.07</u> hereof.

(o) <u>Validity of Takeout Commitments</u>. Each Takeout Commitment subject to a Trade Assignment constitutes a valid and enforceable commitment by the Approved Takeout Investor to purchase the Mortgage Loans at the price set forth in such Takeout Commitment.

(p) <u>Employee Benefit Plans</u>. (i) No Employee Plan of the Seller, the Servicer or any ERISA Affiliate has incurred an "accumulated funding deficiency" (as defined in Section 302 of ERISA or Section 412 of the Code), (ii) neither the Seller, the Servicer nor any ERISA Affiliate has incurred liability under ERISA to the PBGC, (iii) neither the Seller, the Servicer nor any ERISA Affiliate has partially or fully withdrawn from participation in a Multiemployer Plan, (iv) no Employee Plan of the Seller, the Servicer or any ERISA Affiliate has been the subject of involuntary termination proceedings, (v) neither the Seller, the Servicer nor any ERISA Affiliate has engaged in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code), and (vi) no "reportable event" (as defined in Section 4043 of ERISA) has occurred in connection with any Employee Plan of the Seller, the Servicer or any ERISA Affiliate other than events for which the notice requirement is waived under applicable PBGC regulations.

SECTION 6.02.      <u>Additional Representations of the Seller</u>. The Seller further represents and warrants on the date hereof and on each Purchase Date to the Administrative Agent, the Funding Agents and the Purchasers as follows:

(a) <u>Solvency</u>. Both prior to and after giving effect to each purchase hereunder, (i) the fair value of the property of the Seller is greater than the total amount of liabilities, including contingent liabilities, of the Seller, (ii) the present fair salable value of the assets of the

52

Seller is not less than the amount that will be required to pay all probable liabilities of the Seller on its debts as they become absolute and matured, (iii) the Seller does not intend to, and does not believe that it will, incur debts or liabilities beyond the Seller's abilities to pay such debts and liabilities as they mature and (iv) the Seller is not engaged in a business or a transaction, and is not about to engage in a business or a transaction, for which the Seller's property would constitute unreasonably small capital.

(b) <u>Ownership Interest</u>. Upon each purchase of Mortgage Loans by the Purchasers hereunder, the Purchasers shall acquire all of the Seller's right, title and interest in and to such assets purchased hereunder and, in case any such transaction is deemed by any court or regulatory authority not to be a purchase and sale of the relevant Mortgage Loans, a valid and perfected first priority interest in each such Mortgage Loan then existing or thereafter arising, in each case free and clear of any Lien except as provided herein or arising as a result of any action taken by the Administrative Agent or any assignee thereof; and no effective financing statement or other instrument similar in effect, covering any Mortgage Loan, any interest therein, or the related Collateral with respect thereto is on file in any recording office except such as may be filed in favor of the Administrative Agent on behalf of the Purchasers in accordance with this Agreement or in connection with a Lien arising solely as the result of any action taken by the Purchasers (or any assignee thereof) or by the Administrative Agent.

(c) <u>No Liens</u>. Each Mortgage Loan purchased by the Purchasers hereunder, immediately prior to the sale to the Purchasers hereunder, shall be owned by the Seller free and clear of any Lien, except those arising as a result of any action taken by the Administrative Agent (for the benefit of the Purchasers) or any assignee thereof.

(d) <u>Financial Condition</u>. The balance sheet of the Seller as at June 30, 2006, a copy of which has been furnished to the Funding Agents, fairly presents the financial condition of the Seller as at such date, in accordance with GAAP, and since June 30, 2006, there has been no material adverse change in the business, operations, property or financial condition of the Seller.

(e) <u>Principal Office, Etc</u>. The principal office, chief executive office and principal place of business of:

(i) American Home Mortgage Corp. is at 538 Broadhollow Road, Melville, New York 11747, and

(ii) American Home Mortgage Servicing, Inc. is at 538 Broadhollow Road, Melville, New York 11747 (executive offices), and its principal place of business is at 4600 Regent Blvd., Suite 200, Irving, Texas 75063,

or at such other locations of which the Administrative Agent has been notified in accordance with <u>Section 6.06(e)</u>.

(f) <u>Trade Names</u>. The Seller's legal name is as set forth in this Agreement, and the Seller is not known by and does not use any trade name, fictitious name, assumed name or doing-business-as name except as set forth on <u>Schedule F</u>.

(g) <u>Eligible Mortgage Loans</u>. Each Mortgage Loan is an Eligible Mortgage Loan as of its related Purchase Date.

SECTION 6.03.    <u>Additional Representations and Warranties of the Servicer</u>. The Servicer represents and warrants on the date hereof and on each Purchase Date to the Administrative Agent, the Funding Agents and the Purchasers as follows:

(a) <u>Financial Condition</u>.

(i) The Servicer has delivered to the Administrative Agent (x) copies of AHMIC's consolidated balance sheet, as of June 30, 2006, and the related consolidated statements of income, stockholder's equity and cash flows for the year ended on such date, audited by independent certified public accountants of recognized national standing and (y) copies of each Performance Guarantor's balance sheet, as of June 30, 2006, and the related consolidated statements of income, and with respect to AHMIC only, stockholder's equity and cash flows for the six months ended on such date, ("<u>Interim Statements</u>"); and all such financial statements fairly present the financial condition of the Seller and the Servicer as of their respective dates, subject, in the case of the Interim Statements, to normal year end adjustments and the results of operations of the Seller and the Servicer for the periods ended on such dates and have been prepared in accordance with GAAP.

(ii) As of the date thereof, there are no obligations, liabilities or Indebtedness (including contingent and indirect liabilities and obligations or unusual forward or long-term commitments) of the Seller or the Servicer required to be recorded under GAAP that are not reflected on their financing statements.

(iii) No change that constitutes a Material Adverse Effect has occurred in the financial condition or business of the Seller or the Servicer since June 30, 2006.

(b) <u>Ownership</u>. On the date of this Agreement, AHMIC has beneficial ownership, directly or indirectly, of 100% of the issued and outstanding shares of each class of the stock of the Servicer and the Seller.

54

SECTION 6.04.    _Survival of Representations_.  All representations and warranties by the Seller and the Servicer herein shall survive the making of the purchases hereunder, and any investigation at any time made by or on behalf of the Administrative Agent, the Funding Agents or the Purchasers shall not diminish the right of the Administrative Agent, the Funding Agents or the Purchasers to rely thereon.

SECTION 6.05.    _Covenants_.  The Seller and the Servicer shall each at all times comply with the covenants applicable to it contained in this Section 6.05, from the date hereof until this Agreement terminates and the date all obligations of the Seller and the Servicer hereunder are indefeasibly paid in full.

(a)  _Financial Statements and Reports_.  The Seller and/or the Servicer, as applicable, shall furnish to the Funding Agents the following, all in form and detail reasonably satisfactory to the Funding Agents:

(i)  promptly after becoming available, and in any event within 120 days after the close of each Fiscal Year of AHMIC, AHMIC's audited consolidated and consolidating balance sheet as of the end of such Fiscal Year, and the related statements of income, stockholder's equity and cash flows of AHMIC for such year showing within such consolidating balance sheets and statements of income the balance sheet and statements of income for the Seller accompanied by (i) the related report of independent certified public accountants reasonably acceptable to the Funding Agents, which report shall be to the effect that such statements have been prepared in accordance with GAAP applied on a basis consistent with prior periods except for such changes in such principles with which the independent certified public accountants shall have concurred and (ii) if issued, the auditor's letter or report to management customarily given in connection with such audit;

(ii)  promptly after becoming available, and in any event within 60 days after the end of each fiscal quarter, excluding the fourth fiscal quarter, of each Fiscal Year of AHMIC, the unaudited consolidated and consolidating balance sheet of AHMIC as of the end of such fiscal quarter and the related statements of income, stockholders' equity and cash flows of AHMIC for such fiscal quarter and the period from the first day of the then current Fiscal Year of the Performance Guarantors through the end of such fiscal quarter, showing within such consolidating balance sheets and statements of income the balance sheet and statements of income for the Servicer certified by a Financial Officer of the Servicer, to have been prepared in accordance with GAAP applied on a basis consistent with prior periods, subject to normal year-end adjustments;

(iii)  promptly upon receipt thereof, a copy of each other report submitted to each of the Servicer, the Seller and the Performance Guarantors by independent certified public accountants in connection with any annual, interim or special audit of the books of such Person;

55

(iv) promptly and in any event within twenty (20) days after the reasonable request of the Administrative Agent or any Funding Agent at any time and from time to time, a certificate, executed by a responsible officer of the Servicer and the Seller, setting forth all of such Person's warehouse borrowings and a description of the collateral related thereto;

(v) promptly and in any event within 60 days after the end of each of the first three (3) quarters in each Fiscal Year of the Seller, and within 120 days after the close of the Seller's Fiscal Year, completed officer's certificates in the from of Exhibits I-1 and I-2 hereto, executed by the president or chief financial officer of each of the Seller and the Servicer, respectively;

(vi) upon written request of the Administrative Agent (who shall so request at the request of any Funding Agent), promptly and in any event within 60 days after the end of each quarter (120 days in the case of the fourth quarter), a management report regarding the Seller's Mortgage Loan production for the prior quarter and year-to-date, in form and detail as reasonably required by the Administrative Agent;

(vii) promptly furnish copies of all reports and notices with respect to any "reportable event" defined in Title IV of ERISA that the Seller or the Servicer files or that the Seller or the Servicer is required to file under ERISA with the Internal Revenue Service, the PBGC or the U.S. Department of Labor or that the Seller or the Servicer receives from the PBGC;

(viii) immediately after (A) becoming aware of the expiration, forfeiture, termination, or cancellation of, or default under, any Takeout Commitment, or (B) the receipt of any notice from, or the taking of any other action by any Approved Takeout Investor indicating an intent not to honor, or claiming a default under a Sale Agreement or Takeout Commitment that could reasonably be expected to have a Material Adverse Effect if such Takeout Commitment is not replaced with another Takeout Commitment, the Seller or Servicer shall provide telephone notice thereof confirmed in writing within one (1) Business Day, together with a detailed statement by a responsible officer of the Seller specifying the nature of the event and what action the Seller is taking or proposes to take with respect thereto;

(ix) promptly after the Seller obtains knowledge thereof, notice of any Termination Event or Potential Termination Event;

(x) promptly after the Servicer obtains knowledge thereof, notice of any Servicer Termination Event or of any condition or event that, with the giving of notice or lapse of time or both and unless cured or waived, would constitute a Servicer Termination Event;

56

(xi) promptly following the request of the Administrative Agent or any Funding Agent, a copy of the "HUD Audit Opinion" or "Agency Audit Opinion", as applicable; and

(xii)    such other material information concerning the business, properties or financial condition of the Seller or the Servicer as the Administrative Agent or any Funding Agent may reasonably request.

(b) <u>Taxes and Other Liens</u>. The Seller shall pay and discharge promptly all taxes, assessments and governmental charges or levies imposed upon it or upon its income or upon any of its property as well as all claims of any kind (including claims for labor, materials, supplies and rent) that, if unpaid, might become a Lien upon any or all of its property; <u>provided, however</u>, the Seller shall not be required to pay any such tax, assessment, charge, levy or claim if the amount, applicability or validity thereof shall currently be contested in good faith by appropriate proceedings diligently conducted by it or on its behalf and if it shall have set up reserves therefor adequate under GAAP.

(c) <u>Maintenance</u>. The Seller shall maintain its existence solely as a New York corporation and shall comply with all Governmental Requirements except to the extent the failure to so comply could not reasonably be expected to have a Material Adverse Effect. The Servicer shall maintain its corporate existence and shall comply with all Governmental Requirements except to the extent the failure to so comply could not reasonably be expected to have a Material Adverse Effect.

(d) <u>Filing; Further Assurances</u>. No later than the initial Purchase Date, the Seller shall deliver to the Administrative Agent for filing, the UCC-1 financing statements or other Lien perfection documents described in <u>Section 3.02</u> hereof, which financing statements or Lien perfection documents may be prepared and filed, to the extent effective under applicable state law, in the form of a master or bulk filing describing all Mortgage Loans which are from time to time purchased by the Purchasers hereunder. The Seller and the Servicer shall, each within three (3) Business Days after the request of the Administrative Agent, cure any defects in the execution and delivery of this Agreement or any other Principal Agreement. The Seller and the Servicer shall, each at its expense, promptly execute and deliver to the Administrative Agent, upon the Administrative Agent's reasonable request, all such other and further documents, agreements and instruments necessary to keep the Seller and the Servicer, as applicable, in compliance with the covenants and agreements of the Seller and the Servicer, respectively, in this Agreement and in the other Principal Agreements or to further evidence and more fully describe the collateral intended as security for the Notes, or to correct any omissions in this Agreement or the other Principal Agreements, or more fully to state the security for the obligations set out herein or in any of the other Principal Agreements, or to perfect, protect or preserve any Liens created (or intended to be created) pursuant to any of the other Principal Agreements, or to make any recordings, to file any notices, or obtain any consents.

(e)    <u>Compliance with Laws</u>. The Seller and the Servicer will each comply, in all material respects, with all acts, rules, regulations, orders, decrees and directions of any Governmental Authority applicable to the Mortgage Loans or any part thereof (including,

57

without limitation, any Agency Guidelines); provided, however, that the Seller and the Servicer may contest any act, regulation, order, decree or direction in any reasonable manner which shall not materially and adversely affect the rights of the Purchasers hereunder. The Seller and the Servicer shall each maintain all qualifications and approvals required under Agency Guidelines and all other state and federal licenses, franchises, qualifications and/or approvals necessary to perform its obligations hereunder. The Seller and the Servicer will each comply with all Requirements of Law applicable to it, except where the failure to comply could not reasonably be expected to have a Material Adverse Effect.

(f) <u>Insurance</u>.

(i) The Seller and the Servicer shall each maintain with financially sound and reputable insurers, insurance with respect to its properties and business against such liabilities, casualties, risks and contingencies and in such types and amounts as is customary in the case of Persons engaged in the same or similar businesses and similarly situated, including, without limitation, a fidelity bond or bonds in form and with coverage and with a company reasonably satisfactory to the Administrative Agent and with respect to such individuals or groups of individuals as the Administrative Agent may designate. Upon request of the Administrative Agent, the Seller and the Servicer shall each furnish or cause to be furnished to the Administrative Agent from time to time a summary of the insurance coverage of the Seller and the Servicer, respectively, in form and substance reasonably satisfactory to the Administrative Agent and if requested shall furnish the Administrative Agent with copies of the applicable policies.

(ii) With respect to the Mortgages (i) the Servicer shall cause the improvements on the land covered by each Mortgage to be kept continuously insured at all times by responsible insurance companies against fire and extended coverage hazards under policies, binders, letters, or certificates of insurance, with a standard mortgagee clause in favor of the original mortgagee and its successors and assigns or, in the case of a MERS Designated Mortgage Loan, the beneficial owner of such mortgage loan, and (ii) the Servicer shall cause each such policy to be in an amount equal to the lesser of the maximum insurable value of the improvements or the original principal amount of the Mortgage, without reduction by reason of any co-insurance, reduced rate contribution, or similar clause of the policies or binders.

(g) <u>Accounts and Records</u>. The Seller and the Servicer shall each keep books of record and account in which full, true and correct entries will be made of all material dealings or transactions in relation to its business and activities, in accordance with GAAP. The Seller and the Servicer shall each maintain and implement administrative and operating procedures (including, without limitation, an ability to recreate all records pertaining to the performance of the Seller's obligations under the Sale Agreements and Takeout Commitments and other agreements made with reference to any Mortgage Loans in the event of the destruction of the originals of such records) and keep and maintain all documents, books, records, computer tapes and other information necessary or advisable for the performance by the Seller and the Servicer

58

of its obligations hereunder.   The Servicer will, at its own cost and expense, retain the Loan Management System as a master record of the Mortgage Loans.

(h) <u>Periodic Visits</u>.  The Seller and the Servicer shall permit any officer, employee or agent of the Administrative Agent (including an independent certified public accountant selected by the Administrative Agent) to visit (each such visit, a "<u>Periodic Visit</u>") and inspect any of its properties, examine its books of record and accounts, documents (including without limitation computer tapes and disks), telecopies and extracts from the foregoing, and discuss its affairs, finances and accounts with its officers, accountants, and auditors, and to review the business of originating the Mortgage Loans, the sale of the Mortgage Loans by the Seller, and the servicing of the Mortgage Loans by the Servicer, including the Servicer's collections systems, all during reasonable business hours upon reasonable prior notice and as often as the Administrative Agent may desire and no more than twice a year unless a Termination Event has occurred and is continuing.  The Seller agrees to pay the reasonable costs of reviews and inspections performed pursuant to this <u>Section 6.05(h)</u>, including the costs and expenses charged by the certified public accountant in preparing and delivering to the Administrative Agent with respect to the certified public accountant's review on a scope and in a form reasonably acceptable to the Administrative Agent and each Funding Agent (such report, a "<u>Report of Visit</u>"); provided that if a Report of Visit is prepared and delivered to the Administrative Agent pursuant to another mortgage loan purchase or financing facility with the Seller, such Report of Visit will satisfy the obligation to deliver a Report of Visit hereunder.  A Report of Visit shall be delivered at least once per calendar year.   Notwithstanding the foregoing, the Seller agrees to pay the reasonable costs and expenses charged by a certified public accountant in connection with a collateral audit for agreed upon procedures conducted at the direction of the Administrative Agent (i) within three (3) months after the date hereof and (ii) thereafter no more frequently than once each twelve (12) month period beginning on May 1 of each year during the term of this Agreement.

(i) <u>Notice of Certain Events</u>.  The Seller and the Servicer shall each promptly notify the Administrative Agent in writing upon (a) the receipt of any notice from, or the taking of any other material action by, the holder of any of its promissory notes, debentures or other evidences of Indebtedness with respect to a claimed default, together with a detailed statement by a responsible officer of the Seller or the Servicer, as the case may be, specifying the notice given or other material action taken by such holder and the nature of the claimed default and what action the Seller or the Servicer is taking or proposes to take with respect thereto, but only if such alleged default or event of default (if it were true) would also be a Termination Event or a Potential Termination Event under this Agreement; (b) the commencement of, or any determination in, any legal, judicial or regulatory proceedings that, if adversely determined, could also be a Termination Event or a Potential Termination Event under this Agreement; (c) any dispute between the Seller or the Servicer, as the case may be, and any Governmental Authority or any other Person that, if adversely determined, could have a Material Adverse Effect; (d) any adverse change in the business or financial condition of the Seller or the Servicer, including, without limitation, the Seller's or the Servicer's insolvency, that could reasonably be expected to have a Material Adverse Effect; (e) any other event or condition known to it that could reasonably be expected to have a Material Adverse Effect; (f) the receipt of any notice from, and or the taking of any action by any Governmental Authority indicating an intent to

59

cancel the Seller's or the Servicer's right to be either a seller or servicer of such Governmental Authority's insured or guaranteed Mortgage Loans; (g) the receipt of any notice of any final judgment or order for payment of money applicable to the Servicer that could reasonably be expected to have a Material Adverse Effect, or the receipt of any notice of any final judgment or order for payment of money applicable to the Seller and (h) any downgrade in the senior long-term unsecured debt rating of any Approved Takeout Investor to below BBB+ or Baa1 by Standard & Poor's or Moody's respectively.  Upon receipt of any notice under this <u>Section 6.05(i)</u>, the Administration Agent shall provide a copy of such notice to each of the Funding Agents.

(j) <u>Performance of Certain Obligations</u>.  The Seller and the Servicer shall each perform and observe each of the provisions of each Mortgage Loan, Sale Agreement, Takeout Commitment and Trade Assignment on its part to be performed or observed and will cause all things to be done that are necessary to have each Mortgage Loan comply with the requirements of such Sale Agreement, Takeout Commitment and Trade Assignment.

(k) <u>Credit and Collection Policy</u>.  Each of the Seller and the Servicer will comply in all material respects with its Credit and Collection Policy with respect to the Mortgage Loans.

(l) <u>Compliance with Material Agreements</u>.  The Seller and the Servicer shall each comply in all material respects with all agreements, indentures, mortgages or documents (including, with respect to the Seller, the Articles of Organization) binding on it or materially affecting its property or business in all cases where the failure to so comply could reasonably be expected to result in a Material Adverse Effect.

(m) <u>Operations and Properties</u>.  The Seller and the Servicer shall each act prudently and in accordance with customary industry standards in managing and operating its property and shall continue to underwrite, hedge and sell mortgage loans in the same diligent manner it has applied in the past.

(n) <u>Environmental Compliance</u>.  The Seller and the Servicer shall each use and operate all of its facilities and properties in compliance with all environmental laws, keep all necessary permits, approvals, certificates, licenses and other authorizations relating to environmental matters in effect and remain in compliance therewith, and handle all hazardous materials in compliance with all applicable environmental laws.

(o) <u>Special Affirmative Covenants Concerning Collateral</u>.  The Seller shall at all times warrant and defend the right, title and interest of the Purchasers and the Administrative Agent in and to the Collateral against the claims and demands of all Persons whomsoever.  In addition, the Servicer shall, no less than on an annual basis, review financial statements, compliance with financial parameters, FNMA and FHLMC approvals (if applicable), and state licenses of all Persons from whom the Sellers acquire Mortgage Loans.

(p) <u>Treatment as a Sale</u>.  The Seller will account for the transactions contemplated by this Agreement as sales as defined by GAAP and for federal income tax purposes.

(q) <u>Servicer Reporting</u>. The Servicer will deliver to the Funding Agents and the Administrative Agent:

(i) on each Remittance Date, a Monthly Statement for the immediately preceding month;

(ii) on each Business Day on which any Mortgage Loans constitute Wet Loans, a report showing the percentage of the Mortgage Loans which constitute Wet Loans as of such day; and

(iii) on each Business Day, a Daily Report.

SECTION 6.06. <u>Negative Covenants</u>. The Seller and the Servicer shall each at all times comply with the covenants applicable to it contained in this <u>Section 6.06</u>, from the date hereof until the later of the Termination Date and the date all of the Obligations are indefeasibly paid in full:

(a) <u>Limitations on Mergers and Acquisitions</u>. It shall not (i) merge or consolidate with or into any corporation or other entity unless it is the surviving entity of any such merger or consolidation or it has obtained the Administrative Agent's prior written consent or (ii) liquidate or dissolve.

(b) <u>Fiscal Year</u>. Neither the Seller nor the Servicer shall change its fiscal year other than to conform with changes that may be made to the Performance Guarantors' fiscal year and then only after notice to the Administrative Agent and after whatever amendments are made to this Agreement as may be reasonably required by the Administrative Agent and the Funding Agents, in order that the reporting criteria for the Termination Events contained in <u>Section 8.01</u> <u>(z)</u> through <u>(dd)</u> remain substantially unchanged.

(c) <u>Actions with Respect to Collateral</u>.

(i) Neither the Seller nor the Servicer shall compromise, extend, release, or adjust payments on any Collateral, accept a conveyance of mortgaged property in full or partial satisfaction of any Mortgage debt or release any Mortgage securing or underlying any Collateral, except as permitted by the related Approved Takeout Investor or as contemplated in the servicing guidelines distributed thereby and only if such action would not result in a Termination Event or a Potential Termination Event.

(ii) The Seller shall not agree to the amendment or termination of any Sale Agreement or Takeout Commitment in which the Administrative Agent has an interest or to substitution of a Takeout Commitment for a Takeout Commitment in which the Administrative Agent has a security interest hereunder, if such amendment, termination or substitution may be expected (as determined by the Administrative Agent in its sole discretion) to have a  Material Adverse Effect or to result in a Termination Event or a Potential Termination Event.

61

(iii)The Seller shall not transfer, sell, assign or deliver any Collateral sold to the Administrative Agent to any Person other than the Administrative Agent, except pursuant to a Takeout Commitment.

(iv)The Seller shall not grant, create, incur, permit or suffer to exist any Lien upon any Collateral except for (i) Liens granted to the Administrative Agent hereunder, and (ii) Liens granted to other Persons with respect to Takeout Commitments, so long as the amounts owing to all such Persons and the Administrative Agent hereunder shall not exceed the principal amount of all Takeout Commitments.

(d) <u>Employee Benefit Plans</u>.  Neither the Seller nor the Servicer may permit any of the events or circumstances described in <u>Section 6.01(p)</u> to exist or occur.

(e) <u>Change of Principal Office</u>.  Neither the Seller nor the Servicer shall move its principal office, executive office or principal place of business from the address set forth in <u>Section 6.02(e)</u> without 30-days' prior written notice to the Administrative Agent.  The Seller shall not change its name, identity or place of organization or corporate structure, or add a new jurisdiction of organization without 30 days' prior written notice to the Administrative Agent.

(f) <u>Deposits to Collection Account</u>.  Neither the Seller nor the Servicer shall deposit or otherwise credit, or cause or permit to be so deposited or credited, to the Collection Account, cash or cash proceeds other than proceeds of the Collateral.

(g) <u>Takeout Commitments</u>.  Neither the Seller nor the Servicer shall perform any action or fail to take any action which would permit the related Approved Takeout Investor to refuse to purchase any Mortgage Loan under the terms of the Takeout Commitment or any related document or agreement.

(h) <u>Principal Agreements</u>.  The Seller will perform all of its obligations under each Principal Agreement to which it is a party and will enforce each Principal Agreement to which it is a party in accordance with its terms in all respects.

SECTION 6.07.        <u>Other Credit Agreements</u>.  Each party hereto agrees:

(a) if the any of the financial covenants or related definitions set forth in the Credit Agreement which correspond to the Termination Events set forth in Section 8.01(z) through (dd) are amended after the date hereof and SG, in its capacity as a lender under the Credit Agreement, has agreed to such amendment in writing, then the parties hereto shall amend <u>Section 8.01</u> or the related definitions, as applicable, to conform to the related financial covenants set forth in the Credit Agreement;

(b) if any of Sections 5.1(n), 6.1, 6.18, 7.2, 8.1(d), 8.1(e), or 8.1(q) of the Loan Agreement are amended after the date hereof and SG, in its capacity as a Managing Agent under the Loan Agreement, has agreed to such amendment in writing, then the parties hereto shall amend, respectively, <u>Sections 6.01(l)</u>, <u>6.05(a)(i)</u> through <u>(vii)</u>, <u>6.05(n)</u>, <u>6.06(b)</u>, <u>8.01(b)</u>, <u>(g)</u> or <u>(m)</u>, as applicable, to conform to the related provision set forth in the Loan Agreement; and

62

(c) If at any time prior to the effectiveness of any amendment to this Agreement which the parties have agreed to make pursuant to paragraph (a) or (b) above, a Termination Event shall occur which would not have occurred if such amendment had been effective, such Termination Event is hereby waived by the Administrative Agent, each Funding Agent and each Purchaser until such amendment is effective.

ARTICLE VII
INDEMNIFICATION; EXPENSES; RELATED MATTERS

SECTION 7.01.        Indemnities. (a) Without limiting any other rights which the Administrative Agent, the Funding Agents, or the Purchasers may have hereunder or under applicable law, the Seller hereby agrees to indemnify the Purchasers, the Administrative Agent, the Funding Agents, the Program Support Providers and any of their successors and permitted assigns and any of their respective directors, officers, employees and agents (collectively, the "Indemnified Parties") from and against any and all Losses awarded against or incurred by any of them (excluding, however, (i) Losses to the extent resulting from gross negligence, willful misconduct, bad faith or reckless disregard of any obligation or duty on the part of an Indemnified Party and (ii) Losses specifically excluded from coverage under Sections 4.03 and 7.02 hereof) to the extent caused by:

(i) reliance on any representation or warranty made or deemed made by the Seller or the Servicer or any officers of the Seller or the Servicer under or in connection with this Agreement, any Principal Agreement, any Monthly Statement, any Officer's Certificate or any other statement, certificate, information or report delivered by the Seller pursuant hereto or thereto, which shall have been false or incorrect when made or deemed made or delivered; provided, however, that the foregoing shall exclude any representation or warranty with respect to which the sole remedy for the breach thereof is the repurchase or substitution of the Mortgage Loans which are the subject of such representation or warranty; or

(ii) the failure by the Seller or the Servicer to comply with any term, provision or covenant contained in this Agreement or any other Principal Agreement to which it is a party; or

(iii) any commingling of Collections with respect to the Mortgage Loans with funds of the Seller or the Servicer; or

(iv) any setoff, rescission, counterclaim, or dispute by or of any Approved Takeout Investor to the payment of the Anticipated Takeout Amount with respect to any Mortgage Loan (unless such setoff, rescission, counterclaim or dispute arises from the Administrative Agent's failure to deliver any Mortgage Loan against the receipt by the Administrative Agent of an amount equal to the Anticipated Takeout Amount therefor); or

63

(v) any claim made by any Approved Takeout Investor against the Administrative Agent, any Funding Agent or any Purchaser in connection with any Sale Agreement, Takeout Commitment or Takeout Assignment (unless such claim arises from the Administrative Agent's failure to deliver any Mortgage Loan against the receipt by the Administrative Agent of an amount equal to the Anticipated Takeout Amount therefor).

(b) The provisions of this <u>Section 7.01</u> shall run directly to and be enforceable by an injured party subject to the limitations hereof, and the obligations of the Seller under this <u>Section 7.01</u> shall survive the termination of this Agreement.

SECTION 7.02.       <u>Indemnity for Taxes, Reserves and Expenses.</u>  (a) If after the date hereof, the adoption of any law or bank regulatory guideline or any amendment or change in the interpretation of any existing or future law or bank regulatory guideline by any Governmental Authority charged with the administration, interpretation or application thereof, or the compliance with any directive of any Governmental Authority (in the case of any bank regulatory guideline, whether or not having the force of law):

(i)   shall subject any Indemnified Party to any tax, duty or other charge (other than Excluded Taxes) with respect to this Agreement, the other Principal Agreements, the ownership, maintenance or financing of any interest in the Net Investment, the Mortgage Loans or payments of amounts due hereunder, or shall change the basis of taxation of payments to any Indemnified Party of amounts payable in respect of this Agreement, the other Principal Agreements, the ownership, maintenance or financing of any interest in the Net Investment, the Mortgage Loans or payments of amounts due hereunder or its obligation to advance funds hereunder, under a Liquidity Provider Agreement or a Program Support Agreement (except for changes in the rate of general corporate, franchise, net income or other income tax imposed on such Indemnified Party by the jurisdiction in which such Indemnified Party's principal executive office is located); or

(ii) shall impose, modify or deem applicable any reserve, special deposit or similar requirement (including, without limitation, any such requirement imposed by the Board of Governors of the Federal Reserve System) against assets of, deposits with or for the account of, or credit extended by, any Indemnified Party or shall impose on any Indemnified Party or on the United States market for certificates of deposit or the London interbank market any other condition affecting this Agreement, the other Principal Agreements, the ownership, maintenance or financing of any interest in the Net Investment, the Mortgage Loans or payments of amounts due hereunder or its obligation to advance funds hereunder under a Liquidity Provider Agreement or Program Support Agreement;

and the result of any of the foregoing is to increase the cost to such Indemnified Party with respect to this Agreement, the other Principal Agreements, the ownership, maintenance or financing of any interest in the Net Investment, the Mortgage Loans or the obligations hereunder,

64

the funding of the purchase or any increases hereunder, a Liquidity Provider Agreement or a Program Support Agreement, by an amount reasonably deemed by such Indemnified Party to be material, then, within 15 days after demand by such Indemnified Party, the Seller shall pay to such Indemnified Party such additional amount or amounts as will compensate such Indemnified Party for such increased cost or reduction.

(b) If any Indemnified Party shall have determined that after the date hereof, (i) an Accounting Based Consolidation Event or (ii) the adoption of any applicable law or bank regulatory guideline regarding capital adequacy, or any change therein, or any change in the interpretation thereof by any Governmental Authority, or any directive regarding capital adequacy (in the case of any bank regulatory guideline, whether or not having the force of law) of any such Governmental Authority, to the extent such change is not an Accounting Based Consolidation Event, in either case, has or would have the effect of reducing the rate of return on capital of such Indemnified Party (or its parent) as a consequence of such Indemnified Party's obligations hereunder or with respect hereto a level below that which such Indemnified Party (or its parent) could have achieved but for such Accounting Based Consolidation Event, adoption, change, request or directive (taking into consideration its policies with respect to capital adequacy) by an amount reasonably deemed by such Indemnified Party to be material, then, within 15 days after demand by such Indemnified Party, the Seller shall pay to such Indemnified Party, such additional amount or amounts as will compensate such Indemnified Party (or its parent) for such reduction, such compensation to be paid in the case of any Accounting Based Consolidation Event, such compensation to be in the form of a fee payable with respect to the Yield for such Purchaser Group; provided, that the Yield for such Purchaser Group payable on the next Remittance Date is determined in accordance with clause (i) of the definition of "Applicable Rate" and to the extent that the sum of such Yield and such fee does not exceed the Yield for such Purchaser Group that would be paid on such Remittance Date if such Yield was calculated in accordance with clause (ii) or the definition of "Applicable Rate" from and after the date of the occurrence of such Accounting Based Consolidation Event.

(c) Each Indemnified Party agrees to give notice to Seller promptly upon becoming aware of the occurrence of any event or circumstance which would give rise to a claim under this Section 7.02 (a) or (b) and in any event within 30 days after the occurrence thereof; provided that the failure to give such notice within such time period shall not affect such Indemnified Party's rights to make a demand hereunder.

(d) The Seller shall compensate each Purchaser, upon the written request of the Related Funding Agent, for all reasonable out-of-pocket losses, costs and expenses, including, without limitation, any loss (net of reinvestment income received in the reemployment of such funds in the manner determined by such Purchaser in the exercise of its reasonable discretion), reasonable cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Purchaser (or its Liquidity Providers) to make, fund or maintain its portion of the Net Investment hereunder (or in the case of clause (ii) below, the inability of a Conduit Purchaser to repay its Commercial Paper issued in connection with such Net Investment on the related Settlement Date), (i) if for any reason the Seller fails to sell the Mortgage Loans described in an Initial Purchase Date Notice on the Purchase Date specified therefor (other than the failure of a Purchaser to purchase if all conditions precedent to such purchase have been

65

met), (ii) if for any reason any payment of the portion of the Net Investment funded in connection with the purchase of Mortgage Loans occurs on a date other than the Settlement Date specified in the applicable Purchase Date Notice or (iii) if at any time a Conduit Purchaser decides to fund its portion of the Net Investment pursuant to a Liquidity Provider Agreement. Any request for compensation under this Section 7.02(d) shall be accompanied by a copy of a statement from the Related Funding Agent setting forth in reasonable detail the basis for requesting compensation, and the determination of the amount thereof in such statement shall be rebuttably presumptive evidence of such amount of compensation.

(e) Each Indemnified Party (through its respective Funding Agent) will promptly notify the Administrative Agent and/or the Seller upon learning that amounts for which it is entitled to seek reimbursement under this Section 7.02 ("Section 7.02 Costs") have begun to accrue and in any event within 30 days after the occurrence thereof; provided that the failure to give such notice within such time period shall not affect such Indemnified Party's rights to make a demand hereunder. A notice by the Administrative Agent or the applicable Indemnified Party claiming compensation under this Section 7.02 and setting forth the additional amount or amounts to be paid to it hereunder shall be conclusive in the absence of manifest error. In determining such amount, the Administrative Agent or any applicable Indemnified Party may use any reasonable averaging and/or attributing methods. Each of the Indemnified Parties further agrees to take such steps as may be reasonably available to it to avoid the need for, or reduce the amount of, any such amounts that may thereafter accrue under this Section 7.02; provided, however, that the Indemnified Parties shall have no obligation to take any such step that is inconsistent with its internal policy or legal and regulatory restrictions.

SECTION 7.03.    Taxes.

(a) Any and all payments to the Funding Agents for the benefit of the Purchasers with respect to the Net Investment shall be made, in accordance herewith, free and clear of and without deduction for any present or future income, excise, stamp or franchise taxes and any other taxes, fees, duties, withholdings or other charges of any nature whatsoever imposed by any taxing authority on any recipient (or any assignee of such parties) (such non-excluded items being called "Taxes"), but excluding franchise taxes and taxes imposed on or measured by the recipient's net income or gross receipts (but not including any such tax in the nature of a withholding tax) by the jurisdiction under the laws of which such Purchaser is organized or has its applicable lending office or any political subdivision of any thereof ("Excluded Taxes"). If the Seller shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder with respect to any Purchaser, (i) the Seller shall pay such Purchaser within 15 days after demand therefor, an amount sufficient so that, after making all required deductions (including deductions applicable to additional sums payable under this Section 7.03), such Purchaser receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Seller shall make such deductions and (iii) the Seller shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law. The Purchasers further agree to take such steps as may be reasonably available to it to avoid the need for, or reduce the amount of, any such amounts that may thereafter accrue under this Section 7.03; provided, however, that the Purchasers shall have no obligation to take any such step that is inconsistent with its internal policy or legal and regulatory restrictions.

66

(b) If as a result of any event or circumstances similar to those described in subsection (a) above, any Conduit Purchaser is required to compensate a Liquidity Provider or Program Support Provider in connection with borrowings under the Liquidity Provider Agreement or Program Support Agreement, respectively, by such Conduit Purchaser for the funding or maintenance of such Purchaser's Net Investment hereunder, then within ten (10) days after demand by the Funding Agent for the account of such Conduit Purchaser, the Seller shall pay such Conduit Purchaser within 15 days after demand therefor, such additional amount or amounts as may be necessary to pay such Liquidity Provider or Program Support Provider, as applicable the amounts due or to otherwise reimburse such Conduit Purchaser for amounts paid by it. Such Conduit Purchaser agrees to use its best efforts to enforce the provisions of the Liquidity Provider Agreement or Program Support Agreement, as applicable, which require each Liquidity Provider or Program Support Provider, as applicable, to take certain actions to reduce the amount of such compensation due to such Liquidity Provider or Program Support Provider.

SECTION 7.04.    Other Costs, Expenses and Related Matters.

(a) The Seller agrees, upon receipt of a written invoice, to pay or cause to be paid, and to save the Conduit Purchasers, the Committed Purchasers, the Funding Agents and the Administrative Agent harmless against liability for the payment of, all reasonable out-of-pocket expenses (including, without limitation, attorneys', accountants' and other third parties' fees and expenses, any filing fees and expenses incurred by officers or employees of the Conduit Purchasers, Committed Purchasers, Funding Agents and/or Administrative Agent) or intangible, documentary or recording taxes incurred by or on behalf of the Conduit Purchasers, Committed Purchasers, Funding Agents and Administrative Agent (i) in connection with the negotiation, execution, delivery and preparation of this Agreement, the other Principal Agreements and any documents or instruments delivered pursuant hereto and thereto and the transactions contemplated hereby or thereby and (ii) from time to time (A) relating to any amendments, waivers or consents under this Agreement and the other Principal Agreements, (B) relating to the syndication of the facility contemplated hereby, (C) arising in connection with any Conduit Purchaser's, any Committed Purchaser's, any Funding Agent's or the Administrative Agent's enforcement or preservation of rights, or (D) arising in connection with any audit, dispute, disagreement, litigation or preparation for litigation involving this Agreement or any of the other Principal Agreements.

(b) In addition, the Seller shall pay any and all stamp, sales, excise and other taxes and fees payable or determined to be payable in connection with the execution, delivery, filing and recording of this Agreement or the other agreements and documents to be delivered hereunder, and agrees to indemnify the Indemnified Parties against any liabilities with respect to or resulting from any delay in paying or omission to pay such taxes and fees.

ARTICLE VIII
TERMINATION EVENTS

SECTION 8.01.    Termination Events. Each of the following events shall, upon the occurrence and continuance thereof, be a "Termination Event":

67

(a) The Seller shall fail to make any payment, transfer or deposit as required to be made hereunder, under the Fee Letter or under any other Principal Agreement when due and such failure shall remain unremedied for a period of five (5) calendar days after the due date; or

(b) Any representation or warranty made or deemed to be made by the Seller or any Performance Guarantor or any of their respective officers under or in connection with this Agreement or any other Principal Agreement or other information or report delivered pursuant hereto or thereto shall prove to have been false, misleading or incorrect in any material respect when made; provided that any breach of a representation and warranty in Section 6.02 with respect to a Mortgage Loan as of the related Purchase Date shall not constitute a Termination Event if the Seller complies with its repurchase obligation set forth in Section 2.04(c) with respect to such Mortgage Loan; or

(c) The Seller or any Performance Guarantor shall fail to perform or observe any other material term, covenant or agreement contained in this Agreement or any other Principal Agreement (other than as referred to in Section 8.01(a)) on its part to be performed or observed and any such failure shall remain unremedied beyond the expiration of any applicable grace or notice period expressly provided for therein; or

(d) The Seller, Servicer or any Performance Guarantor generally shall not pay its debts as they become due or shall admit in writing its inability to pay its debts, or shall make a general assignment for the benefit of creditors; or

(e) The Seller, Servicer or any Performance Guarantor shall (i) apply for or consent to the appointment of a receiver, trustee, custodian, intervenor or liquidator of it or of all or a substantial part of its assets; (ii) file a voluntary petition in bankruptcy, (iii) file a petition or answer seeking reorganization or an arrangement with creditors or to take advantage of any Debtor Laws, (iv) file an answer admitting the allegations of or consent to, or default in answering, a petition filed against it in any bankruptcy, reorganization, or insolvency proceeding, or (v) take action for the purpose of effecting any of the foregoing; or

(f) An involuntary petition or complaint shall be filed against the Seller, the Servicer, or any Performance Guarantor seeking bankruptcy or reorganization of the Seller, the Servicer, or any Performance Guarantor or a receiver, custodian, trustee, intervenor or liquidator shall be appointed for all or substantially all of the assets of either the Seller, the Servicer or any Performance Guarantor; or an order, order for relief, judgment or decree shall be entered by any court of competent jurisdiction or other competent authority approving a petition or complaint seeking reorganization of the Seller, the Servicer or any Performance Guarantor or appointing a receiver, custodian, trustee, intervenor or liquidator of the Seller, the Servicer or any Performance Guarantor or of all or substantially all of the assets of the Seller, the Servicer or any Performance Guarantor; or

(g) (i) The Seller, the Servicer or any Performance Guarantor shall fail to make when due and payable or within any applicable grace period (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) any payment on any Indebtedness with an unpaid principal balance of over $1,500,000 with respect to the Seller or the Servicer, or

68

$10,000,000 in the case of either Performance Guarantor; or (ii) any event or condition occurs under any provision contained in any such obligation or any agreement securing or relating to such obligation (or any other breach or default under such obligation or agreement occurs) if the effect thereof is to cause or permit with the giving of notice or lapse of time or both the holder or trustee of such obligation to cause such obligation to become due prior to its stated maturity; or (iii) any such obligation becomes due (other than by regularly scheduled payments) prior to its stated maturity; or (iv) any of the foregoing occurs with respect to any one or more items of Indebtedness with an unpaid principal balance exceeding, in the aggregate, $1,500,000 with respect to the Seller or the Servicer, or $10,000,000 in the case of either Performance Guarantor; or

(h) The Seller, Servicer or any Performance Guarantor shall fail within 30 days to timely appeal any final judgments or to pay, bond or otherwise discharge any judgments or orders for payment of money in each case in excess of $5,000,000, individually or in the aggregate; or

(i) Any Person shall levy on, seize or attach all or any material portion of the assets of the Seller, the Servicer or any Performance Guarantor and within thirty (30) days thereafter the Seller, the Servicer or the Performance Guarantor shall not have dissolved such levy or attachment, as the case may be, and, if applicable, regained possession of such seized assets; or

(j) The Seller or the Servicer becomes ineligible to originate, sell or service mortgage loans to FNMA, FHLMC or GNMA, or FNMA, FHLMC or GNMA shall impose any sanctions upon or terminate or revoke any rights of the Seller or the Servicer; or

(k) If (i) any Governmental Authority cancels the Seller's right to be either a seller or servicer of such Governmental Authority's insured or guaranteed mortgage loans or mortgage-backed securities, (ii) any Approved Takeout Investor cancels for cause any servicing or underwriting agreement between the Seller and such Approved Takeout Investor that could reasonably be expected to have a Material Adverse Effect or (iii) the Seller receives notice from a Governmental Authority that such Governmental Authority intends to revoke such Seller's right to be a seller or servicer of such Governmental Authority's insured or guaranteed mortgage loans or mortgage-backed securities and such notice is not withdrawn within ten (10) days of the receipt thereof; or

(l) Any material provision of this Agreement, or any other Principal Agreement shall for any reason cease to be in full force and effect, or be declared null and void or unenforceable in whole or in part; or the validity or enforceability of any such document shall be challenged or denied; or

(m) A "change in control," with respect to the ownership of AHMIC shall have occurred after the date hereof (and as used in this subparagraph, the term "change in control" shall mean an acquisition by any Person, partnership or group, as defined under the Securities Exchange Act of 1934, as amended, of a direct or indirect beneficial ownership of 10% or more

69