of the then-outstanding voting stock of the Performance Guarantors); or AHMIC shall cease at any time to own directly or indirectly 100% of the stock of the Seller and the Servicer; or

(n) Any purchase hereunder of Mortgage Loans and the other Collateral with respect thereto shall for any reason cease to constitute valid and perfected ownership of such Mortgage Loans and other Collateral in the Administrative Agent, for the benefit of the Purchasers, free and clear of any Lien; or

(o) Any action or omission to act by the Seller which constitutes gross negligence or willful misconduct causes a Takeout Failure, such Takeout Failure shall continue unremedied after the Cure Date and such occurrence has a Material Adverse Effect; or

(p) A Takeout Deficiency Fee exists for any Mortgage Loan and either (i) a demand has been made by the Administrative Agent pursuant to Section 2.05 for the payment of such Takeout Deficiency Fee and it has not paid within five (5) calendar days after it is due, or (ii) such Takeout Deficiency Fee cannot be paid pursuant to the proviso of Section 2.05; or

(q) As of the end of any calendar month, the average of the Fall-Out Rates for such month and the two preceding months exceeds 7.0%; or

(r) The Seller fails to obtain and deliver to the Custodian, the Custodial Files, and the Administrative Agent shall determine that the continuation of such condition could be reasonably expected to have a Material Adverse Effect on the Administrative Agent or the Purchaser; or

(s) There shall have occurred any event that could be reasonably expected to have a Material Adverse Effect on the enforceability or collectability of any significant portion of the Mortgage Loans or the Takeout Commitments or there shall have occurred any other event that could be reasonably expected to have a Material Adverse Effect on the ability of the Seller, the Servicer or the Administrative Agent to collect a significant portion of Mortgage Loans or Takeout Commitments or the ability of the Seller or the Servicer to perform hereunder or a Material Adverse Effect has occurred in the financial condition or business of the Seller or the Servicer since June 30, 2006; or

(t) (i) Any litigation (including, without limitation, derivative actions), arbitration proceedings or governmental proceedings not disclosed in writing by the Seller to the Purchasers, the Administrative Agent and the Funding Agents prior to the date of execution and delivery of this Agreement is pending against the Seller or any Affiliate thereof, or (ii) any development not so disclosed has occurred in any litigation (including, without limitation, derivative actions), arbitration proceedings or governmental proceedings so disclosed, which, in the case of either clause (i) and/or clause (ii), in the reasonable opinion of the Required Funding Agents, could reasonably be expected to have a Material Adverse effect or impair the ability of the Seller, the Servicer or any Performance guarantor to perform its obligations under this Agreement or any other Principal Agreement; or

70

(u) The Internal Revenue Service shall file notice of a lien pursuant to Section 6323 of the Code with regard to any of the assets of the Seller or the Servicer and such lien shall not have been released within 30 days, or the PBGC shall, or shall indicate its intention to, file notice of a lien pursuant to Section 4068 of ERISA with regard to any of the assets of the Seller or the Servicer; or

(v) A successor Custodian shall not have been appointed and accepted such appointment within 180 days after the retiring Custodian shall have given written notice of resignation pursuant to Section 4.4 of the Custodial Agreement; or

(w) The Administrative Agent shall fail or cease to have a valid and perfected first priority ownership interest in the Mortgage Loans and the other Collateral for the benefit of the Purchasers; or

(x) As of any date, the aggregate outstanding balance of all the Mortgage Loans which are Wet Loans and subject to this Agreement as of such date exceeds 10% of the Maximum Purchase Limit as of such date; or

(y) As of any date, (i) the aggregate outstanding balance of all the Mortgage Loans subject to this Agreement as of such date and which were originated more than 90 days prior to such date exceeds 15% of the Maximum Purchase Limit as of such date; or (ii) the aggregate outstanding balance of all Mortgage Loans subject to this Agreement as of such date and which have been subject to this Agreement for more than 60 days exceeds 15% of the Maximum Purchase Limit, or (iii) any Mortgage Loan as of such date has been subject to this Agreement for more than 180 days, and in each case such failure shall remain unremedied for five (5) Business Days; or

(z) The Tangible Net Worth of AHMIC shall be less than $685,000,000 plus 75% of the Net Cash Proceeds of any capital stock (including preferred stock) issued by AHMIC after June 30, 2005, at any time; or

(aa)    The Tangible Net Worth of AHMS shall be less than $30,000,000 at any time; or

(bb)    The Tangible Net Worth of AHM shall be less than $21,000,000 at any time; or

(cc)    AHMIC's net income shall be less than $1.00 for any period of two consecutive fiscal quarters; or

(dd)    AHMIC's ratio of its Aggregate Collateral Value to its Adjusted Consolidated Funded Debt shall be less than 1.00 to 1.00; or

(ee)    A Servicer Termination Event shall have occurred or have been deemed to have occurred; or

71

(ff) At any time, the aggregate outstanding balance of all Mortgage Loans which have been subject to this Agreement since the date hereof and which have become Fall-Out Loans shall exceed 20% of the aggregate Purchase Prices for all purchases outstanding at such time for more than five (5) Business Days; or

(gg)    A Mortgage Loan is released to the Servicer pursuant to Section 3.4 of the Custodial Agreement and not returned in within 14 calendar days after such release;

and in any such event, the Administrative Agent shall, at the request, or may, with the consent, of the Required Funding Agents, by notice to the Seller declare the Termination Date to have occurred, except that, in the case of any event described in subsections (d), (e) or (f) above, the Termination Date shall be deemed to have occurred automatically upon the occurrence of such event; provided, however, that if any involuntary proceeding (as described in subsection (f) above) is dismissed within sixty (60) days after its commencement, and if no other Termination Event has occurred, then following such dismissal, the program shall be reinstated as if the Termination Date had not occurred (it being understood that the Seller and the Servicer shall continue to perform all of their respective obligations hereunder during such sixty-day period and following any such Termination Date).

SECTION 8.02.    Waiver of Past Defaults.  The Administrative Agent, with the prior written consent of the Funding Agents, may, on behalf of the Purchasers, waive in writing any default by the Seller, the Servicer or Successor Servicer in the performance of their respective obligations hereunder and its consequences.  Upon any such waiver of a past default, such default shall cease to exist, and any default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement.  No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived.

ARTICLE IX
THE ADMINISTRATIVE AGENT; FUNDING AGENTS

SECTION 9.01.    Authorization and Action of Administrative Agent.

(a)  Each Conduit Purchaser and each Committed Purchaser hereby appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Principal Agreements as are delegated to the Administrative Agent by the terms hereof and thereof, together with such powers as are reasonably incidental thereto.  In furtherance, and without limiting the generality, of the foregoing, each Conduit Purchaser and each Committed Purchaser hereby appoints the Administrative Agent as its agent to execute and deliver all further instruments and documents, and agrees to take all further action that the Administrative Agent may deem necessary or appropriate or that a Conduit Purchaser or a Committed Purchaser may reasonably request in order to perfect, protect or more fully evidence the interests transferred or to be transferred from time to time by the Seller hereunder, or to enable any of them to exercise or enforce any of their respective rights hereunder.  With respect to actions which are incidental to the actions specifically delegated to the Administrative Agent hereunder, the Administrative Agent shall not be required to take any such incidental action hereunder, but shall be required to act or to refrain

72

from acting (and shall be fully protected in acting or refraining from acting) upon the direction of the Funding Agents; provided, however, the Administrative Agent shall not be required to take any action hereunder if the taking of such action, in the reasonable determination of the Administrative Agent, shall be in violation of any applicable law, rule or regulation or contrary to any provision of this Agreement or shall expose the Administrative Agent to liability hereunder or otherwise. Upon the occurrence and during the continuance of any Termination Event, the Administrative Agent shall take no action hereunder (other than ministerial actions or such actions as are specifically provided for herein) without the prior consent of the Funding Agents. In the event the Administrative Agent requests (with confirmation of receipt) a Conduit Purchaser's or a Committed Purchaser's consent pursuant to the foregoing provisions and the Administrative Agent does not receive a response to such request (either positive or negative) from such Conduit Purchaser or such Committed Purchaser within ten (10) Business Days of Conduit Purchaser's or Committed Purchaser's receipt of such request, then such Conduit Purchaser or such Committed Purchaser (and its percentage interest hereunder) shall be disregarded in determining whether the Administrative Agent shall have obtained sufficient consent hereunder.

    (b) The Administrative Agent shall exercise such rights and powers vested in it by this Agreement and the other Principal Agreements, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

    SECTION 9.02.    <u>Administrative Agent's Reliance, Etc.</u> Neither the Administrative Agent nor any of its directors, officers, agents or employees shall be liable to any Person for any action taken or omitted to be taken by it or them as Administrative Agent under or in connection with this Agreement or any of the other Principal Agreements, except for its or their own gross negligence or willful misconduct. Without limiting the foregoing, the Administrative Agent: (i) may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (ii) makes no warranty or representation to any Conduit Purchaser or any Committed Purchaser and shall not be responsible to any Conduit Purchaser or any Committed Purchaser for any statements, warranties or representations made in or in connection with this Agreement; (iii) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or any of the other Principal Agreements on the part of the Seller or Servicer or to inspect the property (including the books and records) of the Seller or Servicer; (iv) shall not be responsible to any Conduit Purchaser or any Committed Purchaser for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any of the other Principal Agreements or any other instrument or document furnished pursuant hereto or thereto; and (v) shall incur no liability under or in respect of this Agreement or any of the other Principal Agreements by acting upon any notice (including notice by telephone), consent, certificate or other instrument or writing (which may be by telex) believed by it to be genuine and signed or sent by the proper party or parties.

    SECTION 9.03.    <u>Credit Decision</u>. Each Conduit Purchaser and each Committed Purchaser acknowledges that it has, independently and without reliance upon the

73

Administrative Agent, any of the Administrative Agent's Affiliates, any Funding Agent, any other Committed Purchaser or any other Conduit Purchaser and based upon such documents and information as it has deemed appropriate, made its own evaluation and decision to enter into this Agreement and the other Principal Agreements to which it is a party and, if it so determines, to accept the transfer of any interest in the assets purchased hereunder. Each Conduit Purchaser and each Committed Purchaser also acknowledges that it will, independently and without reliance upon the Administrative Agent, any of the Administrative Agent's Affiliates, any Funding Agent, any other Committed Purchaser or any other Conduit Purchaser and based on such documents and information as it shall deem appropriate at the time, continue to make its own decisions in taking or not taking action under this Agreement and the other Principal Agreements to which it is a party.

SECTION 9.04.    Indemnification of the Administrative Agent.  Each Committed Purchaser agrees to indemnify the Administrative Agent (to the extent not reimbursed by the Seller), ratably in accordance with its respective Purchaser Group's Pro Rata Share, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Administrative Agent (in its capacity as such) in any way relating to or arising out of this Agreement and any of the other Principal Agreements or such action taken or omitted by the Administrative Agent hereunder or thereunder, provided that such Committed Purchaser shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's gross negligence or willful misconduct.  Without limitation of the foregoing, each Committed Purchaser agrees to reimburse the Administrative Agent, ratably in accordance with its respective Purchaser Group's Pro Rata Share, promptly upon demand for any out-of-pocket expenses (including counsel fees) incurred by the Administrative Agent in connection with the administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement and the other Principal Agreements, to the extent that such expenses are incurred in the interests of or otherwise in respect of the Conduit Purchasers or the Committed Purchasers hereunder and/or thereunder and to the extent that the Administrative Agent is not reimbursed for such expenses by the Seller in accordance with Section 7.04.

SECTION 9.05.    Successor Administrative Agent.  The Administrative Agent may resign at any time, effective upon the appointment and acceptance of a successor Administrative Agent as provided below, by giving written notice thereof to each Funding Agent, each Conduit Purchaser, each Committed Purchaser, the Seller and the Servicer.  Upon any such resignation, the Funding Agents shall appoint a successor Administrative Agent.  Each Conduit Purchaser and each Committed Purchaser agrees that it shall not unreasonably withhold or delay its approval of the appointment of a successor Administrative Agent.  If no such successor Administrative Agent shall have been so appointed, and shall have accepted such appointment, within thirty (30) days after the retiring Administrative Agent's giving of notice of resignation, then the retiring Administrative Agent may, on behalf of the Conduit Purchasers and the Committed Purchasers, appoint a successor Administrative Agent with the prior consent of the Funding Agents (which such consent will not be unreasonably withheld) which such successor Administrative Agent shall be either (i) a commercial bank organized under the laws

74

of the United States or of any state thereof and having a combined capital and surplus of at least $50,000,000 or (ii) an Affiliate of such a bank. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement. After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this Article IX shall continue to inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement. The successor Administrative Agent shall promptly notify the Seller and Servicer of its appointment hereunder.

SECTION 9.06.    Payments by the Administrative Agent. Unless specifically allocated to a Conduit Purchaser or a Committed Purchaser pursuant to the terms of this Agreement, all amounts received by the Administrative Agent, if any, on behalf of the Conduit Purchasers or Committed Purchasers shall be paid by the Administrative Agent to the applicable Funding Agent (at the account specified in writing to Administrative Agent) in accordance with the related Purchaser Group's Pro Rata Share on the Business Day received by the Administrative Agent, unless such amounts are received after 12:00 noon (New York time) on such Business Day, in which case the Administrative Agent shall use its reasonable efforts to pay such amounts to such Funding Agent, on behalf of the related Purchaser, on such Business Day, but, in any event, shall pay such amounts to such Funding Agent, on behalf of the related Purchaser, not later than 11:00 a.m. (New York time) on the following Business Day.

SECTION 9.07.    Authorization and Action of Funding Agent.

(a) Each Conduit Purchaser and each Committed Purchaser of each Purchaser Group hereby appoints and authorizes the Funding Agent with respect to such Purchaser Group to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Principal Agreements as are delegated to the Funding Agent by the terms hereof and thereof, together with such powers as are reasonably incidental thereto. In furtherance, and without limiting the generality, of the foregoing, each Conduit Purchaser and each Committed Purchaser hereby appoints the related Funding Agent as its agent to execute and deliver all further instruments and documents, and agrees to take all further action that the related Funding Agent may deem necessary or appropriate or that a Conduit Purchaser or a Committed Purchaser may reasonably request in order to perfect, protect or more fully evidence the interests transferred or to be transferred from time to time by the Seller hereunder, or to enable any of them to exercise or enforce any of their respective rights hereunder, and such other instruments or notices, as may be necessary or appropriate for the purposes stated hereinabove. The Conduit Purchasers and Committed Purchasers may direct the related Funding Agent (i) to direct the Administrative Agent to take any action which is incidental to the actions specifically delegated to the Administrative Agent hereunder and (ii) not to take or to cease taking any action which is incidental to the actions specifically delegated to the Administrative Agent hereunder. With respect to actions which are incidental to the actions specifically delegated to a Funding Agent hereunder, a Funding Agent shall not be required to take any such incidental action hereunder, but shall be required to act or to refrain from acting (and shall be fully protected in acting or refraining from acting) upon the direction of the related Conduit Purchaser and Committed

75

Purchaser; provided, however, that no Funding Agent shall be required to take any action hereunder if the taking of such action, in the reasonable determination of such Funding Agent, shall be in violation of any applicable law, rule or regulation or contrary to any provision of this Agreement or shall expose such Funding Agent to liability hereunder or otherwise. Upon the occurrence and during the continuance of any Termination Event, the Funding Agent shall take no action hereunder (other than ministerial actions or such actions as are specifically provided for herein) without the prior consent of the related Conduit Purchaser and Committed Purchaser. The Funding Agent shall not, without the prior written consent of the related Conduit Purchaser (if any interest is held by a Conduit Purchaser at such time) and Committed Purchaser, agree to (i) amend, modify or waive any provision of this Agreement in any way which would (A) reduce or impair Collections or the payment of fees payable hereunder to the Conduit Purchasers or Committed Purchasers or delay the scheduled dates for payment of such amounts, (B) modify any provisions of this Agreement relating to the timing of payments required to be made by the Seller or the Servicer or the application of the proceeds of such payments, and (C) permit the appointment of any Person (other than the Administrative Agent) as Successor Servicer. In addition, each Funding Agent agrees that it shall not agree to any amendment of this Agreement not specifically described in the two preceding sentences without the consent of the related Conduit Purchaser and Committed Purchaser. In the event the Funding Agent requests a Person's consent pursuant to the foregoing provisions and the Funding Agent does not receive a response to such request (either positive or negative) from such Person within ten (10) Business Days of such Person's receipt of such request, then such Person (and its percentage interest hereunder) shall be disregarded in determining whether the Funding Agent shall have obtained sufficient consent hereunder.

(b) The Funding Agent shall exercise such rights and powers vested in it by this Agreement and the other Principal Agreements, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

SECTION 9.08.    Funding Agent's Reliance, Etc.  Neither any Funding Agent nor any of its directors, officers, agents or employees shall be liable to any Person for any action taken or omitted to be taken by it or them as Funding Agent under or in connection with this Agreement or any of the other Principal Agreements, except for its or their own gross negligence or willful misconduct. Without limiting the foregoing, the Funding Agent: (i) may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (ii) makes no warranty or representation to any Conduit Purchaser or any Committed Purchaser and shall not be responsible to any Conduit Purchaser or any Committed Purchaser for any statements, warranties or representations made in or in connection with this Agreement; (iii) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or any of the other Principal Agreements on the part of the Seller or the Servicer or to inspect the property (including the books and records) of the Seller or the Servicer; (iv) shall not be responsible to any Conduit Purchaser or any Committed Purchaser for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, the Net Investment or any other instrument or document furnished pursuant hereto or thereto; and (v)

76

shall incur no liability under or in respect of this Agreement or any of the other Principal Agreements by acting upon any notice (including notice by telephone), consent, certificate or other instrument or writing (which may be by telex) believed by it to be genuine and signed or sent by the proper party or parties.

SECTION 9.09.    Credit Decision.  Each Conduit Purchaser and each Committed Purchaser acknowledges that it has, independently and without reliance upon the Funding Agent, any of the Funding Agent's Affiliates, any other Committed Purchaser or any other Conduit Purchaser and based upon such documents and information as it has deemed appropriate, made its own evaluation and decision to enter into this Agreement and the other Principal Agreements to which it is a party and, if it so determines, to accept the transfer of any interest in the assets purchased hereunder.  Each Conduit Purchaser and each Committed Purchaser also acknowledges that it will, independently and without reliance upon the Funding Agent, any of the Funding Agent's Affiliates, any other Committed Purchaser or any other Conduit Purchaser and based on such documents and information as it shall deem appropriate at the time, continue to make its own decisions in taking or not taking action under this Agreement and the other Principal Agreements to which it is a party.

SECTION 9.10.    Indemnification of the Funding Agent.  Each Committed Purchaser agrees to indemnify the related Funding Agent (to the extent not reimbursed by the Seller), ratably in accordance with its respective pro rata share of its portion of the related Purchaser Group Limit, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Funding Agent (in its capacity as such) in any way relating to or arising out of this Agreement and any of the other Principal Agreements or such action taken or omitted by the Funding Agent hereunder or thereunder, provided that such Committed Purchaser shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Funding Agent's gross negligence or willful misconduct.  Without limitation of the foregoing, each Committed Purchaser agrees to reimburse the Funding Agent, ratably in accordance with its respective pro rata share of its portion of the related Purchaser Group Limit, promptly upon demand for any out-of-pocket expenses (including counsel fees) incurred by the Funding Agent in connection with the administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement and the other Principal Agreements, to the extent that such expenses are incurred in the interests of or otherwise in respect of the Conduit Purchasers or the Committed Purchasers hereunder and/or thereunder and to the extent that the Funding Agent is not reimbursed for such expenses by the Seller.

SECTION 9.11.    Successor Funding Agent.  A Funding Agent may resign at any time, effective upon the appointment and acceptance of a successor Funding Agent as provided below, by giving written notice thereof to the Administrative Agent, each Conduit Purchaser, each Committed Purchaser, the Seller and the Servicer.  Upon any such resignation, the members of the related Purchaser Group acting jointly shall appoint a successor Funding Agent.  Each Conduit Purchaser and each Committed Purchaser agrees that it shall not unreasonably withhold or delay its approval of the appointment of a successor Funding Agent.  If

77

no such successor Funding Agent shall have been so appointed, and shall have accepted such appointment, within thirty (30) days after the retiring Funding Agent's giving of notice of resignation, then the retiring Funding Agent may, on behalf of the Conduit Purchasers and the Committed Purchasers, appoint a successor Funding Agent which shall be either (i) a commercial bank organized under the laws of the United States or of any state thereof and having a combined capital and surplus of at least $50,000,000 or (ii) an Affiliate of such a bank. Upon the acceptance of any appointment as Funding Agent hereunder by a successor Funding Agent, such successor Funding Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Funding Agent, and the retiring Funding Agent shall be discharged from its duties and obligations under this Agreement. After any retiring Funding Agent's resignation hereunder as Funding Agent, the provisions of this Article VII shall continue to inure to its benefit as to any actions taken or omitted to be taken by it while it was Funding Agent under this Agreement. The successor Funding Agent shall promptly notify the Seller and the Servicer of its appointment hereunder.

SECTION 9.12.    <u>Payments by a Funding Agent</u>. Unless specifically allocated to a Conduit Purchaser or a Committed Purchaser pursuant to the terms of this Agreement, all amounts received by a Funding Agent on behalf of the related Conduit Purchaser or Committed Purchaser shall be paid by such Funding Agent to such Conduit Purchaser or Committed Purchaser, as applicable (at the account specified in writing to such Funding Agent) in accordance with such Purchaser's pro rata share of such amount received on the Business Day received by such Funding Agent, unless such amounts are received after 12:00 noon (New York time) on such Business Day, in which case such Funding Agent shall use its reasonable efforts to pay such amounts, on such Business Day, but, in any event, shall pay such amounts not later than 11:00 a.m. (New York time) the following Business Day.

## ARTICLE X
## ASSIGNMENTS AND PARTICIPATIONS

SECTION 10.01.    <u>Assignments; Additional Purchaser Groups</u>.

(a) Each Conduit Purchaser may, from time to time, with prior or concurrent notice to the Seller and the Servicer, in one transaction or a series of transactions, assign to an Eligible Assignee all or a portion of the related Purchaser Group's Pro Rata Share of the Net Investment and such Conduit Purchaser's rights and obligations under this Agreement and any other Principal Agreements to which it is a party. Upon and to the extent of such assignment by a Conduit Purchaser to an Eligible Assignee, (i) such Eligible Assignee shall be the owner of the assigned portion of the related Purchaser Group's Pro Rata Share of the Net Investment, (ii) the related Funding Agent for such Conduit Purchaser will act as the Funding Agent for such Eligible Assignee, with all corresponding rights and powers, express or implied, granted to the related Funding Agent hereunder or under the other Principal Agreements, (iii) such Eligible Assignee and its Liquidity Providers and Program Support Providers and other related parties shall have the benefit of all the rights and protections provided to such Conduit Purchaser and its Liquidity Providers and Program Support Providers and other related parties, respectively, herein and in the other Principal Agreements (including, without limitation, any limitation on recourse against such Conduit Purchaser or related parties, any agreement not to file or join in the filing of

78

a petition to commence an insolvency proceeding against such Conduit Purchaser, and the right to assign to another Eligible Assignee as provided in this paragraph), (iv) such Eligible Assignee shall assume such Conduit Purchaser's right to fund the assigned portion of the related Purchaser Group's Pro Rata Share of any Purchase Prices requested by the Seller subsequent to the date of such assignment and all other rights and obligations, if any, of such Conduit Purchaser under and in connection with this Agreement or any other Principal Agreements, and such Conduit Purchaser shall be released from such obligations, in each case to the extent of such assignment, and the obligations of such Conduit Purchaser and Eligible Assignee shall be several and not joint, (v) all distributions in respect of the related Purchaser Group's Pro Rata Share of the Net Investment shall be made to the applicable Funding Agent, on behalf of such Conduit Purchaser and such Eligible Assignee on a pro rata basis according to their respective interests, (vi) if the definition of the term "Applicable Rate" with respect to the portion of the related Purchaser Group's Pro Rata Share of the Net Investment funded with Commercial Paper issued by such Conduit Purchaser from time to time shall be determined in the manner set forth in the definition of "CP Rate" applicable to such Conduit Purchaser on the basis of the interest rate or discount applicable to Commercial Paper issued by such Eligible Assignee (rather than such Conduit Purchaser), (vii) the defined terms and other terms and provisions of this Agreement and the other Principal Agreements shall be interpreted in accordance with the foregoing, and (viii) if requested by the applicable Funding Agent, the parties will execute and deliver such further agreements and documents and take such other actions as such Funding Agent may reasonably request to evidence and give effect to the foregoing. No assignment by a Conduit Purchaser to an Eligible Assignee of all or any portion of the related Purchaser Group's Pro Rata Share of the Net Investment shall in any way diminish the related Committed Purchaser's obligation under Section 10.01(a) to fund any Purchase Price not funded by such Conduit Purchaser or Eligible Assignee.

(b) Each Committed Purchaser may assign all or a portion of its interests in the Net Investment and its rights and obligations hereunder to any Eligible Assignee. In the case of an assignment by a Committed Purchaser (or assignee thereof) to another Person, the assignor shall deliver to the assignee(s) an Assignment and Assumption Agreement, duly executed, assigning to the assignee a pro rata interest in the Net Investment and the assignor's rights and obligations hereunder. Any assignor hereunder shall promptly execute and deliver all further instruments and documents required hereby, and take all further action, that the assignee may reasonably request, in order to protect or more fully evidence the assignee's right, title and interest in and to such interest and to enable the Administrative Agent, on behalf of such assignee, to exercise or enforce any rights hereunder and under the other Principal Agreements to which such assignor is or, immediately prior to such assignment, was a party. Upon any assignment hereunder, (i) the assignee shall have all of the rights and obligations of the assignor hereunder and under the other Principal Agreements to which such assignor is or, immediately prior to such assignment, was a party with respect to such interest for all purposes of this Agreement and such other Principal Agreements (it being understood that the Committed Purchasers (or assignees thereof), as assignees, shall be obligated to fund Purchase Prices under Section 2.01 in accordance with the terms thereof, notwithstanding that the Conduit Purchasers were not so obligated), and (ii) the assignor shall relinquish its rights with respect to such interest for all purposes of this Agreement and under the other Principal Agreements to which such

79

assignor is or, immediately prior to such assignment, was a party. No such assignment shall be effective unless a fully executed copy of the related Assignment and Assumption Agreement shall be delivered to the Administrative Agent and the Seller. All out-of-pocket costs and legal expenses of the Administrative Agent, the assignor and the assignee incurred in connection with any assignment hereunder shall be borne as agreed among the Seller, such assignor and such assignee.

(c) By executing and delivering an Assignment and Assumption Agreement, the assignor and assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Assumption Agreement, the assignor makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, the other Principal Agreements or any other instrument or document furnished pursuant hereto or thereto or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, the other Principal Agreements, the Mortgage Loans or any such other instrument or document; (ii) the assignor makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Seller or the Servicer or the performance or observance by the Seller or the Servicer of any of their respective obligations under this Agreement, the other Principal Agreements or any other instrument or document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement and such other instruments, documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Assumption Agreement and to purchase such interest; (iv) such assignee will, independently and without reliance upon the Administrative Agent or any of its Affiliates, the Funding Agents or any of their Affiliates, the assignor or any other Purchaser and based on such agreements, documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Principal Agreements; (v) such assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement, the other Principal Agreements and any other instrument or document furnished pursuant hereto or thereto as are delegated to the Administrative Agent by the terms hereof or thereof, together with such powers as are reasonably incidental thereto and to enforce its respective rights and interests in and under this Agreement, the other Principal Agreements and the assets purchased hereunder; (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Principal Agreements are required to be performed by it as such assignee; and (vii) such assignee agrees that it will not institute against any Conduit Purchaser any proceeding of the type referred to in <u>Section 11.15</u> prior to the date which is one year and one day after the payment in full of all Commercial Paper issued by any Conduit Purchaser.

(d) Upon the Seller's request, an additional Purchaser Group may be added to this Agreement at any time by the execution and delivery of a Joinder Agreement by the members of such proposed additional Purchaser Group, the Seller, the Servicer and the Administrative Agent, which execution and delivery shall not be unreasonably refused by such parties. Upon the effective date of such Joinder Agreement, (i) each Person specified therein as a "Conduit Purchaser" shall become a party hereto as a Conduit Purchaser, entitled to the rights and subject

80

to the obligations of a Conduit Purchaser hereunder, (ii) each Person specified therein as a "Committed Purchaser" shall become a party hereto as a Committed Purchaser, entitled to the rights and subject to the obligations of a Committed Purchaser hereunder, (iii) each Person specified therein as a "Funding Agent" shall become a party hereto as a Funding Agent, entitled to the rights and subject to the obligations of a Funding Agent hereunder, (iv) the Maximum Purchase Limit shall be increased by an amount equal to the aggregate Commitments of the Committed Purchasers party to such Joinder Agreement, and (v) appropriate assignments shall be executed among the Purchaser Groups such that, after giving effect to the addition of the new Purchaser Group, each Purchaser Group shall have funded its Pro Rata Share of the Net Investment. On or prior to the effective date of such Joinder Agreement, the Seller, the new Conduit Purchaser and the new Funding Agent shall enter into a fee letter with the Administrative Agent, the Servicer and the Seller for purposes of setting forth the fees payable to the members of such Purchaser Group in connection with this Agreement, which fee letter shall be considered a "Fee Letter" for all purposes of this Agreement.

SECTION 10.02.    Participations.

(a) Any Purchaser may sell participations to one or more Persons in or to all or a portion of its rights and obligations hereunder; provided, however, that (i) such Purchaser's obligations under this Agreement (including, without limitation, any Committed Purchaser's commitment to fund its portion of any Purchase Price hereunder) shall remain unchanged, (ii) such Purchaser shall remain solely responsible to the Seller, the other Purchasers and the Administrative Agent for the performance of such obligations, (iii) the Funding Agent of such Purchaser shall act for the benefit of the members of the related Purchaser Group for all purposes as set forth in this Agreement, and (iv) the Seller, Administrative Agent and the other Purchasers shall continue to deal solely and directly with such Purchaser (or the related Funding Agent) in connection with such Purchaser's rights and obligations under this Agreement.

(b) Notwithstanding anything contained herein, no participant shall be entitled to any payments under Section 7.02 and 7.03 in excess of any amounts which would be payable to the Purchaser from which such participant acquired its interest herein.

SECTION 10.03.    Replacement of a Purchaser Group. In the event a Conduit Purchaser elects (i) to not fund its Pro Rata Share of a Purchase Price, (ii) to not fund its portion of the Net Investment by issuing Commercial Paper or (iii) to assign its interest in the Net Investment to its related Committed Purchaser, the Seller shall have the right to replace the related Purchaser Group by requiring each member of such Purchaser Group to assign all of its respective rights and obligations hereunder to the respective corresponding members of a replacement Purchaser Group (which shall include a Conduit Purchaser, Committed Purchaser and Funding Agent) pursuant to an assignment made in accordance with Section 10.01 hereof and the next sentence of this Section 10.03, by giving thirty (30) days' prior written notice to the Administrative Agent and the related Funding Agent specifying the date on which such assignment shall occur; provided, however, that the Conduit Purchaser of such replacement Purchaser Group (i) shall be a special purpose entity which issues promissory notes in the commercial paper market to fund investments in and/or loans secured by receivables and other cash flow assets, (ii) shall appoint a Funding Agent and (iii) is approved by the Administrative

81

Agent and each of the Funding Agents (other than the Funding Agent for such Conduit Purchaser) which such approval shall not be unreasonably withheld. In the event of any replacement of a Purchaser Group pursuant to this Section 10.03, each of the members of such Purchaser Group agrees to assign, pursuant to an Assignment and Assumption Agreement, all of its respective rights and obligations hereunder to the respective corresponding members of the replacement Purchaser Group upon payment by the replacement Purchaser Group to the Funding Agent of such Purchaser Group in immediately available funds of such Purchaser Group's Pro Rata Share of the Net Investment, all accrued and unpaid Yield due to such Purchaser Group and all other amounts then due to such Purchaser Group under the Principal Agreements.

ARTICLE XI
MISCELLANEOUS

SECTION 11.01.    Termination of Agreement; Survival. This Agreement shall terminate on the date following the date set forth in clause (iii) of the definition of Termination Date (as extended pursuant to Section 2.08) upon which all amounts due to the Purchasers, Funding Agents, the Administrative Agent and the other Indemnified Parties under this Agreement and the other Principal Agreements have been paid in full unless terminated earlier in accordance with the terms of this Agreement; provided, however, that (x) the rights and remedies of the Administrative Agent, any Purchaser or any Funding Agent with respect to any representation and warranty made or deemed to be made by the Seller or the Servicer pursuant to this Agreement or other instrument delivered pursuant hereto and (y) the indemnification and payment provisions of Article VII, shall be continuing and shall survive any termination of this Agreement. The provisions of this Section 11.01 shall survive any termination or cancellation of this Agreement.

SECTION 11.02.    Protection of Right, Title and Interest to Purchased Assets.

(a) The Seller shall cause all financing statements and continuation statements (upon the request of the Administrative Agent) and any other necessary documents covering the Purchasers' right, title and interest to the Mortgage Loans and the other Collateral and its security interest in such Mortgage Loans and other Collateral to be promptly recorded, registered and filed, and at all times to be kept recorded, registered and filed, all in such manner and in such places as may be required by law fully to preserve and protect the right, title and interest of the Purchasers hereunder to such Mortgage Loans and other Collateral. The Seller shall deliver to the Administrative Agent a financing statement recording chart containing the filing information with respect to any documents recorded, registered or filed as provided above, as soon as available following such recording, registration or filing. The Seller and the Servicer shall cooperate fully in connection with the obligations set forth above and will execute any and all documents reasonably required to fulfill the intent of this Section 11.02(a).

(b) The Servicer will give the Administrative Agent prompt written notice of any relocation of any office from which it services the Mortgage Loans purchased hereunder or keeps records concerning such Mortgage Loans or of its principal executive office and whether, as a result of such relocation, the applicable provisions of the relevant UCC would require the filing of any amendment of any previously filed financing or continuation statement or of any new

82

financing statement and shall file such financing statements or amendments as may be necessary to continue the perfection of the Purchasers' security interest in the Mortgage Loans and other Collateral and the proceeds thereof. The Servicer will at all times maintain each office from which it services such Mortgage Loans and its principal executive office within the United States of America.

SECTION 11.03.    Waivers; Cumulative Remedies; Amendments.

(a) No failure to exercise or delay in exercising, on the part of the Administrative Agent, any Funding Agent or any Purchaser, any right, remedy power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, remedy, power or privilege hereunder preclude any other further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided shall be cumulative and nonexclusive of any rights, remedies, powers or privileges provided by law.

(b) Except as provided below, no amendment or modification of any provision of this Agreement shall be effective without the written agreement of the Seller, the Servicer and the Required Funding Agents and no termination or waiver of any provision of this Agreement or consent to any departure therefrom by the Seller or the Servicer shall be effective without the written concurrence of the Required Funding Agents. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. Notwithstanding the foregoing, the written consent of each of the Funding Agents shall be required for any amendment, modification, waiver or release (i) reducing the Net Investment, or any Yield thereon, for any Interest Period, or the amount of any fees payable hereunder or under the terms of the Fee Letter, (ii) postponing any date for any payment of Net Investment, Yield or fees payable hereunder or under the terms of the Fee Letter, (iii) modifying the provisions of this Section 11.03(b), (iv) amending or waiving the Termination Events set forth in Sections 8.01(a), (b) and (e), (v) except as expressly contemplated in this Agreement, releasing the Purchasers' interest in the Mortgage Loans, (vi) changing any of the following definitions: "Required Funding Agents," "Purchase Price," "Concentration Limits," "Approved Takeout Investor," "Eligible Institution," "Eligible Mortgage Loan," "Fall-Out Rate," or "Completion Fee," and (vii) increasing the Commitment of any Purchaser in its Purchaser Group. A condition precedent to any material amendment or any amendment which requires the consent of each of the Funding Agents as described above shall be the receipt by the applicable Funding Agent of written confirmation from each of Standard & Poor's, Moody's and Fitch that the rating of the Commercial Paper of each Conduit Purchaser which is rated by such rating agency shall not be withdrawn or downgraded as a result of such amendment.

SECTION 11.04.    Governing Law; Submission to Jurisdiction; Integration.

(a) THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. EACH PARTY HERETO HEREBY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK FOR

CH1 3469370v.24

PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. NOTHING IN THIS SECTION 11.04 SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT, ANY PURCHASER OR ANY FUNDING AGENT TO BRING ANY ACTION OR PROCEEDING AGAINST THE SELLER, THE SERVICER OR THEIR RESPECTIVE PROPERTY IN THE COURTS OF OTHER JURISDICTIONS.

(b) EACH OF THE PARTIES HERETO HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE AMONG ANY OF THEM ARISING OUT OF, CONNECTED WITH, RELATING TO OR INCIDENTAL TO THE RELATIONSHIP BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR THE OTHER PRINCIPAL AGREEMENTS.

(c) This Agreement contains the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire Agreement among the parties hereto with respect to the subject matter hereof superseding all prior oral or written understandings.

(d) The Seller and the Servicer each hereby appoint Mr. Alan Horn, General Counsel of the Seller and the Servicer, at the address of the Seller and the Servicer set forth on Schedule B as the authorized agent upon whom process may be served in any action arising out of or based upon this Agreement, the other Principal Agreements to which such Person is a party or the transactions contemplated hereby or thereby that may be instituted in the United States District Court for the Southern District of New York and of any New York state court sitting in The City of New York by the Administrative Agent, any Purchasers, any Funding Agent or any assignee of any of them.

SECTION 11.05.    Counterparts.   This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same Agreement.

SECTION 11.06.    Headings. The headings in this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning or interpretation of any provisions hereof.

SECTION 11.07.    Notices. Every demand, notice, and communication under this Agreement shall be in writing (which shall include electronic delivery where contemplated by this Agreement), and shall be deemed to have been duly given, made and received (i) one (1) Business Day after it is delivered against receipt of registered or certified mail or upon actual

84

receipt of registered or certified mail, postage prepaid, return receipt requested; (ii) when delivered by courier with appropriate evidence of receipt; or (iii) one (1) Business Day after it is transmitted via facsimile transmission with appropriate evidence of receipt at the addresses of the recipient set forth in Schedule B hereto.  Any party may alter the address to which communications are to be sent by giving notice of such change of address in conformity with the provisions of this Section 11.07 for giving notice and by otherwise complying with any applicable terms of this Agreement.

SECTION 11.08.    Successors and Assigns.

(a)  This Agreement shall be binding on, and shall inure to the benefit of, the parties hereto and their respective successors and assigns; provided, however, that neither the Seller nor the Servicer may assign any of its rights or delegate any of its duties hereunder or under any of the other Principal Agreements to which it is a party without the prior written consent of the Administrative Agent and Funding Agents.  The Administrative Agent and the Funding Agents hereby consent to the Servicer's delegation of the duties set forth on Schedule E. Notwithstanding any delegation by the Servicer, (i) the Servicer shall be and remain primarily liable to the Administrative Agent, the Funding Agents and the Purchasers for the full and prompt performance of all duties and responsibilities of the Servicer hereunder and (ii) the Administrative Agent, the Funding Agents and the Purchasers shall be entitled to deal exclusively with the Servicer in matters relating to the discharge by the Servicer of its duties and responsibilities hereunder.

(b)  Each of the Seller and the Servicer hereby agrees and consents to the assignment by each Conduit Purchaser from time to time of all or any part of its rights under, interest in and title to this Agreement and the Net Investment to any Liquidity Provider or Program Support Provider for such Conduit Purchaser.  In addition, each of the Seller and the Servicer hereby consents to the assignment by (i) each Conduit Purchaser of all of its rights under, interest in and title to its Pro Rata Share of the Net Investment to the related Committed Purchaser in the event such Conduit Purchaser determines not to fund any Purchase Price hereunder and (ii) any Conduit Purchaser of all or a portion of its rights under, interest in and title to its Pro Rata Share of the Net Investment to an Eligible Assignee as set forth in Section 10.01(a) hereof.

SECTION 11.09.    Severability of Provisions.  If any one or more of the covenants, agreements, provisions or terms of this Agreement shall for any reason whatsoever be held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or rights of the Administrative Agent, Funding Agents and/or Purchasers thereof.

SECTION 11.10.    Further Assurances.  The Seller and the Servicer each agrees to do and perform from time to time, any and all acts and to execute any and all further instruments required or reasonably requested by the Administrative Agent or Funding Agents more fully to effect the purposes of this Agreement in a manner consistent with this Agreement, including, without limitation, the execution of any financing statements or continuation

85

statements or other documents or instruments relating to the assets purchased hereunder for filing under the provisions of the UCC or other relevant laws of any applicable jurisdiction.

SECTION 11.11.    Confidentiality.

(a) The Seller and the Servicer each hereby agrees to maintain the confidentiality of this Agreement, the Fee Letter, the Agent Fee Letter, and all other related documents and drafts thereof in communications with third parties (other than the Seller's and the Servicer's respective employees, accountants, auditors, shareholders or counsel); provided, however, that this Agreement may be disclosed to third parties to the extent such disclosure is (i) required in order to comply with any applicable law, order, regulation or ruling, (ii) required in response to any summons or subpoena or in connection with any litigation, or (iii) related to the structure and tax aspects (as such terms are used in Internal Revenue Code Sections 6011, 6111 and 6112 and the regulations promulgated thereunder) of the transactions contemplated by this Agreement and all other related documents, in the case of this clause (iii), together with all materials of any kind (including opinions or other tax analyses) that are related to such structure and tax aspects.

(b) The Administrative Agent and each Managing Agent and each Purchaser agree to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors who have a reason to use such Information in connection with the administration of the Principal Agreements (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and agree to use the Information solely for purposes of such administration), (ii) to the extent requested by any regulatory authority, (iii) pursuant to any laws, rules, directions, requests, orders or regulations of any judicial, administrative or regulatory authority or proceedings (whether or not having the force or effect of law), or by any subpoena or similar legal process, (iv) to any other party to this Agreement, (v) in connection with the exercise of any remedies under the Principal Agreements or any suit, action or proceeding relating to the Principal Agreements or the enforcement of rights under the Principal Agreements, (vi) to any assignee of or participant in, or any prospective assignee of or participant in, any of its rights or obligations under the Principal Agreements, (vii) to any rating agency, commercial paper dealer or provider of a surety, guaranty or credit or liquidity enhancement to any Conduit Purchaser or any entity organized for the purpose of purchasing, or making loans secured by, financial assets for which any Managing Agent acts as the administrative agent and to any officers, directors, employees, outside accountants and attorneys of any of the foregoing, (viii) with the consent of both the Seller and the Servicer or (ix) to the extent such Information (1) becomes publicly available other than as a result of a breach of this Section or (2) becomes available to the Administrative Agent, any Managing Agent or any Purchaser on a non-confidential basis from a source other than the Seller, the Servicer or any of their Affiliates. For the purposes of this Section, "Information" means this Agreement, the Fee Letter, the Agent Fee Letter and all other related documents and drafts thereof, and all information received from any Performance Guarantor, the Seller or the Servicer relating to any of such Persons or their business, other than any such information that is available to the Administrative Agent, any Managing Agent or any Purchaser

86

on a non-confidential basis prior to disclosure by such Performance Guarantor, the Seller or the Servicer.

SECTION 11.12.    Setoff. The Seller and the Servicer each hereby irrevocably and unconditionally waives all right to setoff that it may have under contract (including this Agreement), applicable law or otherwise with respect to any funds or monies of the Purchasers at any time held by or in the possession of the Seller or the Servicer.

SECTION 11.13.    Merger and Integration. Except as specifically stated otherwise herein, this Agreement sets forth the entire understanding of the parties relating to the subject matter hereof, and all other prior understandings, written or oral are superseded by this Agreement. This Agreement may not be modified, amended, waived or supplemented except as provided herein.

SECTION 11.14.    Certificates and Opinions of Counsel.

(a) Any certificate delivered hereunder may be based, insofar as it relates to legal matters, upon an Opinion of Counsel, unless the Person delivering such certificate knows, or in the exercise of reasonable care should know, that such opinion with respect to the matters upon which such certificate may be based as aforesaid is erroneous. Any Opinion of Counsel or certificate delivered hereunder may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of the Servicer, or the Seller, as the case may be, stating that the information with respect to such factual matters is in the possession of the Servicer or the Seller, as the case may be, unless such counsel or the Person delivering such certificate knows, or in the exercise of reasonable care should know, that such certificate, opinion or representations with respect to such matters are erroneous. Any Opinion of Counsel delivered hereunder may contain exceptions and qualifications satisfactory to the Administrative Agent and the Funding Agents.

(b) Any Opinion of Counsel or certificate delivered hereunder may be based, insofar as it relates to accounting matters, upon a certificate or opinion of or representations by a nationally recognized public accounting firm, unless such counsel or the Person delivering such certificate, as the case may be, knows that the certificate or opinions or representations with respect to the accounting matters upon which the certificate or opinion may be based as aforesaid are erroneous, or in the exercise of reasonable care should know that the same are erroneous.

(c) Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments hereunder, they may, but need not, be consolidated and form one instrument.

SECTION 11.15.    Non-Petition Covenant. Each party hereto hereby covenants and agrees that so long as any Conduit Purchaser has any outstanding indebtedness for borrowed money and for one year and one day thereafter, neither it nor any Affiliate thereof will file any involuntary petition or otherwise institute against, or join with or knowingly or intentionally encourage or cooperate with, any other Person or entity in instituting against, such Conduit Purchaser, any bankruptcy, reorganization, arrangement, insolvency or liquidation

proceeding, or other proceeding under any federal or state bankruptcy or similar law. The provisions of this Section 11.15 shall survive the termination of this Agreement

SECTION 11.16.    Limited Recourse.

(a) Each Conduit Purchaser shall be required to make payment of the amounts required to be paid pursuant hereto only if such Conduit Purchaser has Excess Funds (as defined below). If such Conduit Purchaser does not have Excess Funds, the excess of the amount due hereunder over the amount paid shall not constitute a "Claim" (as defined in Section 101(5) of the Federal Bankruptcy Code) against such Conduit Purchaser until such time as such Conduit Purchaser has Excess Funds. If such Conduit Purchaser does not have sufficient Excess Funds to make any payment due hereunder, then such Conduit Purchaser may pay a lesser amount and make additional payments that in the aggregate equal the amount of deficiency as soon as possible thereafter. The term "Excess Funds" shall mean the excess of (a) the aggregate projected value of such Conduit Purchaser's assets and other property (including cash and cash equivalents), over (b) the sum of (i) the sum of all scheduled payments of principal, interest and other amounts payable on publicly or privately placed indebtedness of such Conduit Purchaser for borrowed money, plus (ii) the sum of all other liabilities, indebtedness and other obligations of such Conduit Purchaser for borrowed money or owed to any credit or liquidity provider, together with all unpaid interest then accrued thereon, plus (iii) all taxes payable by such Conduit Purchaser to the Internal Revenue Service, plus (iv) all other indebtedness, liabilities and obligations of such Conduit Purchaser then due and payable, but the amount of any liability, indebtedness or obligation of such Conduit Purchaser shall not exceed the projected value of the assets to which recourse for such liability, indebtedness or obligation is limited. Excess Funds shall be calculated once each Business Day.

(b)    No claim may be made by the Seller, the Servicer or any other Person against any Purchaser, any Funding Agent, the Administrative Agent or their respective Affiliates, directors, officers, employees, attorneys or agents for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and each of the Seller and the Servicer hereby waives, releases, and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(c)    The provisions of this Section 11.16 shall survive the termination of this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

88

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

AMERICAN HOME MORTGAGE CORP.,
as Seller

By: _____

Name:    Alan B. Horn
Title:    Executive Vice President
         General Counsel & Secretary

AMERICAN HOME MORTGAGE SERVICING,
INC.,
as Servicer

By: _____

Name:    Alan B. Horn
Title:    Executive Vice President
         General Counsel & Secretary

SOCIETE GENERALE, as Administrative Agent

By: _____
    Name: James F. Ahern
    Title: Managing Director


BARTON CAPITAL LLC, as a Conduit Purchaser
and as a Committed Purchaser


By: _____
    Name:
    Title:


SOCIETE GENERALE,
as a Funding Agent

By: _____
    Name: James F. Ahern
    Title: Managing Director

SOCIETE GENERALE, as Administrative Agent

By:_____
    Name:
    Title:


BARTON CAPITAL LLC, as a Conduit Purchaser
and as a Committed Purchaser

By:_____
    Name:   **Doris J. Hearn**
    Title:   **Vice President**


SOCIETE GENERALE,
as a Funding Agent

By:_____
    Name:
    Title: