# EXHIBIT E

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| American Home Mortgage Holdings, Inc., <u>et al.</u>,[1] | Case No. 07-11047 (CSS) Jointly Administered |
| Debtors. | |

**DECLARATION OF JAMES F. AHERN IN SUPPORT OF SOCIÉTÉ GÉNÉRALE'S (I) OBJECTION TO THE ASSUMPTION AND ASSIGNMENT OF THE PURCHASE AGREEMENT AND PROPOSED CURE AMOUNT IN CONNECTION WITH THE SALE OF THE DEBTORS' SERVICING BUSINESS AND (II) LIMITED OBJECTION TO THE SALE OF THE DEBTORS' SERVICING BUSINESS**

STATE OF NEW YORK      )
                                          : ss.:
COUNTY OF NEW YORK   )

James F. Ahern, hereby declares under penalty of perjury that the following is true and correct:

1.      I am a Managing Director of Société Générale ("<u>SG</u>") and head of the U.S. Consumer Asset Securitization Group. My responsibilities include the management of a team of twelve (12) professionals responsible for the organization and execution of securitization transactions involving consumer assets such as credit cards, mortgage loans and auto loans on behalf of SG's clients. I am over the age of eighteen and understand the obligations of an oath. I submit this declaration in support of SG's Objection to the Assumption and Assignment of the

---

[1]      The Debtors are: American Home Mortgage Holdings, Inc. (6303); American Home Mortgage Investment Corp. (3914); American Home Mortgage Acceptance, Inc. (1979); American Home Mortgage Servicing, Inc. (7267); American Home Mortgage Corp. (1558); American Home Mortgage Ventures LLC (1407); Homegate Settlement Services, Inc. (7491); and Great Oak Abstract Corp. (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for American Home Mortgage Servicing, Inc., whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

Purchase Agreement and Proposed Cure Amount (the "Objection").[2]  This declaration is made

based on my personal knowledge, on the regularly maintained business records of SG and on

statements made to me by employees of SG whose duty is to report accurately things they heard

or observed.

### The Agreement

2.      On October 16, 2006, SG, as Administrative Agent for the Purchasers (as

defined in the Purchase Agreement), Barton Capital LLC, as Conduit Purchaser and Committed

Purchaser, Société Générale as Funding Agent, American Home Mortgage Corp. ("AHMC") and

American Home Mortgage Servicing, Inc. ("AHMS") entered into that certain Mortgage Loan

Purchase and Sale Agreement (as amended, the "Purchase Agreement"), pursuant to which the

Purchasers, through the Administrative Agent or Funding Agent, purchase from AHMC certain

mortgage loans originated by AHMC (the "Mortgage Loans").  A true and accurate copy of the

Purchase Agreement is attached to the Objection as Exhibit A.[3]

3.      The Purchase Agreement is a "whole loan" purchase agreement, whereby

all right, title and interest in and to the Mortgage Loans and related assets, including all servicing

rights (as defined in the Purchase Agreement, the "Mortgage Loan Assets"),[4] are transferred and

conveyed to SG.  The Purchase Agreement expires by its terms on October 15, 2007.

---

[2]   Capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms
      in the Objection.

[3]   Citations contained herein that make reference to Exhibit A refer to the Purchase Agreement attached
      as Exhibit A to the Objection.

[4]   Pursuant to Section 2.02(a), the conveyance of the Mortgage Loans from AHMC to SG was a transfer
      of all right, title and interest in, to and under:

          (i) each Mortgage Loan (including the Mortgage Note evidencing such
          Mortgage Loan and the other Principal Mortgage Documents) and any

2

## The Termination Event

4.      Pursuant to section 8.01 of the Purchase Agreement, a Termination Event

occurs when, among other things, AHMC and/or AHMS fails to make any payment when such

payment comes due with respect to any Indebtedness (as defined in the Purchase Agreement)

with an unpaid principal balance over $1.5 million.  (Ex. A, §8.01(g), pp. 68-69).  Under such

circumstances, a Termination Event occurs automatically under the Purchase Agreement, giving

SG the right to declare a Termination Date.

5.      The occurrence and continuance of a Termination Event, in turn, triggers a

Servicer Termination Event pursuant to section 4.02(a)(vii) of the Purchase Agreement.  (Ex. A,

p. 42).  Following a Servicer Termination Event, SG, upon written notice to AHMC and AHMS,

---

and all moneys of whatsoever nature payable (upon the occurrence of
any event) with respect to each such Mortgage Loan subject to the terms
of this Agreement, (ii) all rights, powers and remedies of the Seller under
or in connection with each such Mortgage Loan (including the Mortgage
Note evidencing such Mortgage Loan and the other Principal Mortgage
Documents), whether arising under the terms of such Mortgage Loan, by
statute, at law or in equity, or otherwise arising out of any default by the
Mortgagor under such Mortgage Loan, including (without limitation) all
rights to give or receive any notice, consent, approval or waiver
thereunder, (iii) the Mortgages, the Principal Mortgage Documents and
all other items of the Document Files relating to such Mortgage Loans
and the contents thereof, (iv) all security interests and liens securing
repayment of such Mortgage Loans, (v) all documents of title, books and
records concerning the foregoing property (including, without limitation,
all data from computer programs, tapes, disks and related items
containing any such information), (vi) the title insurance policies
obtained in connection with such Mortgage Loans, and all insurance
policies, if any, supporting repayment of such Mortgage Loans; (vii) all
Mortgaged Property related to such Mortgage Loans, (viii) all
guarantees, supporting obligations and collateral, if any, received with
respect to, or supporting repayment of, such Mortgage Loans; and (ix) to
the extent that the same then or thereafter exist, all proceeds, products,
rents and profits of the foregoing of any nature whatsoever, including
(without limitation) all proceeds of the sale, and proceeds of the
conversion, voluntary or involuntary, of any proceeds thereof (the items
described in clauses (i) through (ix) above, the "Mortgage Loan Assets").

(Ex. A, § 2.02(a), pp. 29-30)

may terminate all of AHMS' servicing rights and obligations with respect to the Mortgage Loans and assume control of the servicing rights, including the sale and transfer of such servicing rights to a successor servicer (the "Successor Servicer").  (Ex. A., § 4.02, p.42).   Additionally, pursuant to section 5.02(a) of the Purchase Agreement, during the occurrence and continuance of a Termination Event, all P&I Collections are to be deposited into the Collection Account within two (2) business days of receipt.  (Ex. A, § 5.02(a), p. 44).

6.     As set forth in the BofA Notice of Default (as defined below), on July 27, 2007, AHMI, AHMS, AHMC and American Home Mortgage Acceptance, Inc. (the "BofA Borrowers"), each a borrower under the Second Amended and Restated Credit Agreement dated as of August 10, 2006 (the "BofA Credit Agreement"), were notified by Bank of America, N.A., as Administrative Agent, Swingline Lender and Lender ("BofA") under the BofA Credit Agreement, that pursuant to the terms of the BofA Credit Agreement, the BofA Borrowers were obligated to pay a mandatory prepayment of $26,779,622 (the "Mandatory Prepayment").  The Mandatory Prepayment was due on July 30, 2007.  The BofA Borrowers failed to make the Mandatory Prepayment, and on August 1, 2007, BofA declared an event of default (the "BofA Notice of Default") under the BofA Credit Agreement.  A true and correct copy of the BofA Notice of Default is attached to the Objection as Exhibit B.

7.     The failure to pay the Mandatory Prepayment was a Termination Event under section 8.01(g) of the Purchase Agreement as of August 1, 2007.  (Ex. A, pp. 68-69).  The occurrence and continuance of the foregoing Termination Event triggered a Servicer Termination Event under section 4.02(a)(vii).  (Ex. A, p. 42).  Consequently, on August 2, 2007, SG sent a notice (the "Termination Notice") to AHMC and AHMS declaring the Termination Date to have occurred, and terminating AHMS' servicing rights under the Purchase Agreement based on the

4

occurrence and continuance of the Termination Event.  A true and correct copy of the

Termination Notice and the facsimile confirmation confirming delivery of the Termination

Notice on August 2, 2007 are attached to the Objection as <u>Exhibits C</u> and <u>D</u>, respectively.  In

addition, in the Termination Notice, SG demanded and declared that:

> (i)      All Collections be deposited into the Collection Account within two (2) business days;
>
> (ii)      AHMS' authority with respect to the Collection Account was revoked; and
>
> (iii)      AHMS' servicing rights with respect to the Mortgage Loans were terminated and that SG was assuming control over the disposition of the servicing rights, including the sale or transfer to a Successor Servicer.

8.      Despite having received the Termination Notice on August 2, 2007,

neither AHMC nor AHMS remitted the Collections in their possession to the Collection Account

within two (2) business days, as demanded in the Termination Notice.  In fact, to date, AHMC

and AHMS have not been remitting P&I Collections into the Collection Account within two (2)

business days of receipt, as required by section 5.02(a) of the Purchase Agreement.  Moreover,

on August 10, 2007, the Debtors failed to remit the P&I Collections into the Collection Account

as required under the Purchase Agreement, which remittance should have included P&I

Collections collected on SG's behalf since July 1, 2007.

## Defaults Incapable of Cure

9.      The Debtors are no longer capable of originating Mortgage Loans to sell

to SG under the Purchase Agreement.  This inability to perform constitutes a default under the

Purchase Agreement that the Debtors cannot cure.  (Ex. A, § 8.01(s)).  In addition, the Debtors

have been unable to perform their obligations in respect of the Takeout Commitments, or to

effectuate the sales of Mortgage Loans to Approved Takeout Investors.  Since late July 2007,

Approved Takeout Investors have been unwilling to honor their commitments to purchase the

Mortgage Loans.  In fact, there has not been a sale of any Mortgage Loans to an Approved

Takeout Investor since July 30, 2007, with perhaps the most glaring failed takeout being the

refusal of an Approved Takeout Investor to purchase approximately $172.6 million in Mortgage

Loans on July 31, 2007.  This inability of the Debtors to effectuate sales to Approved Takeout

Investors also constitutes a default under the Purchase Agreement that the Debtors cannot cure.

(Ex. A, § 8.01(s)).

        10.    The Purchase Agreement was designed for SG to hold ownership of the

Mortgage Loans for a limited period of time.  The Debtors inability to effectuate sales to

Approved Takeout Investors has resulted in the entire pool of outstanding Mortgage Loans

becoming Fall-Out Loans.  It is worth noting that several of the Termination Events provided for

under the Purchase Agreement were specifically crafted to protect SG from high rates of Fall-

Out Loans (Ex. A., §§ 8.01 (q), (y) & (ff), pp. 70-72).  Even more fundamental, however, the

Debtors are simply unable to perform the primary purpose of the Purchase Agreement – to

effectuate the sale Mortgage Loans.

## Cure Amounts

       *(i)*    *The P&I Cure*

       11.    In the absence of a Termination Event, the Purchase Agreement obligates

AHMS to remit to the Collection Account all P&I Collections on the 10th day of each month.

Upon occurrence of a Termination Event, the Purchase Agreement obligates AHMS to remit to

the Collection Account all P&I Collections within 2 business days of receipt. AHMS has failed

to remit any P&I Collections to the Collection Account collected on SG's behalf since July 1,

2007.  This failure constitutes a default under the Purchase Agreement.

*(ii)    Sale Proceeds Cure*

12.    The Purchase Agreement obligates AHMC and AHMS to direct all Approved Takeout Investors to deposit Mortgage Loan Sale Proceeds directly into the Collection Account.  To the extent Mortgage Loan Sale Proceeds are received by either AHMC or AHMS, AHMC and AHMS are required to deposit any such proceeds into the Collection Account within 2 business days of receipt.  To the extent either AHMC or AHMS has failed to comply with their obligations with respect to the remittance of Mortgage Loan Sale Proceeds, such failure would constitute a default.

*(iii)    Completion Fee Cure*

13.    The Purchase Agreement contemplates an allocation of Collections to AHMC as a Completion Fee.  This Completion Fee, however, is not payable (i) until the date of receipt by SG of the related Anticipated Takeout Amount for the Mortgage Loan being sold and (ii) if there are not sufficient funds to allocate to the Completion Fee pursuant to the Waterfalls. To the extent the Debtors sold Mortgage Loans since July 1, 2007, for amounts less than the Anticipated Takeout Amount for any such Mortgage Loan, no Completion Fee is payable.  To the extent AHMC or AHMS has retained a Completion Fee in connection with the sale of any such Mortgage Loan, such retention would constitute a default.

14.    Additionally, from and after the occurrence of a Termination Event, Collections which would otherwise be allocable to AHMC as a Completion Fee are to be retained in the Collection Account and utilized at future Remittance Dates to defray other

amounts owing under the Waterfalls.[5]  Since a Termination Event occurred on August 1, 2007,

AHMC has no right to any Completion Fee subsequent to August 1, 2007.  To the extent AHMC

has retained a Completion Fee subsequent to August 1, 2007, this would constitute a default.

>    (iv)    *Gain on Sale Cure*

15.    The Section 5.03 Waterfall provides that the Gain On Sale shall be

allocated to AHMS to hold in trust until the next Remittance Date.  On such Remittance Date,

the Gain On Sale is to be allocated through the Section 5.05 Waterfall, with any amounts

remaining to be available to allocate to AHMS as a portion of the Servicing Fee.  Section 5.05

provides that upon the occurrence of a Termination Event, amounts in the Collection Account,

including Gain On Sale, otherwise allocable to any Servicer Fee or Completion Fee arrearages

are to be retained in the Collection Account and made available on any subsequent Remittance

Date to pay all amounts owing under the Waterfalls except the Completion Fee and Servicer Fee.

A Termination Event occurred on August 1, 2007.  The next Remittance Date was August 10,

2007.  Because of the Termination Event, no Gain On Sale realized after July 10, 2007 (the prior

Remittance Date) could be retained by AHMS or AHMC as a Completion Fee or as a Servicer

Fee under the Section 5.05 Waterfall.  To the extent AHMS or AHMC has retained any Gain On

Sale since July 10, 2007, this would constitute a default.

>    (v)    *Deficiency Fee Cure*

16.    When a Takeout Failure occurs, SG is entitled to payment of the Takeout

Deficiency Fee related to each Mortgage Loan which is the subject of the Takeout Failure.

Many Mortgage Loans sold by the Debtors since July 1, 2007, are the subject of a Takeout

---

[5]    The Purchase Agreement provides a limitation on the retention of Completion Fees otherwise payable
to AHMC, which is not applicable under the present circumstances.

Failure. Therefore, AHMC is obligated to pay SG the Takeout Deficiency Fee with respect to such Mortgage Loans. The failure to pay such Takeout Deficiency Fee constitutes a default.

17.    The Debtors have continued to service the Mortgage Loans despite the valid pre-Petition Date termination of the Purchase Agreement. The Debtors have failed to provide SG with the full information and cooperation necessary for SG to determine the amounts collected on behalf of SG and the amounts that must be remitted to SG in order to cure the defaults under the Purchase Agreement. Therefore, SG is not in a position at this time to identify with specificity the exact amounts that are required to cure the defaults under the Purchase Agreement. However, SG estimates that the Cure Amounts may exceed $8 million.

_____

James F. Ahern

NOTARY:

MELISSA GOICOECHEA
Notary Public, State of New York
No. 01GO6101830
Qualified in Bronx County
Commission Expires November 17, 200_

CHI 3988441v.4