IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------------- x
In re:                                                                 :    Chapter 11
                                                                       :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,                                 :    Case No. 07-11047 (CSS)
a Delaware corporation, et al.,                                        :
                                                                       :    Jointly Administered
                                              Debtors.                 :
                                                                       :    Objection Deadline: Objections can be raised at the Hearing.
                                                                       :    Hearing Date: September 20, 2007 at 2:30 p.m.
---------------------------------------------------------------------- x

**DEBTORS' MOTION PURSUANT TO SECTION 105 OF THE BANKRUPTCY CODE
AND BANKRUPTCY RULES 4001(d) AND 9019(a) FOR AN ORDER APPROVING AND
AUTHORIZING STIPULATIONS WITH
<u>FREDDIE MAC AND BANK OF AMERICAN, N.A.</u>**

American Home Mortgage Holdings, Inc. ("<u>AHM Holdings</u>"), a Delaware corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors in possession in the above cases (collectively, "<u>AHM</u>" or the "<u>Debtors</u>"),[1] by this motion (the "<u>Motion</u>"), seek entry of an order pursuant to Rules 4001(d) and 9019(a) of the Federal Rules of Bankruptcy Procedure ("<u>Bankruptcy Rules</u>") and section 105(a) of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "<u>Bankruptcy Code</u>") approving two stipulations (the "<u>Stipulations</u>"), copies of which are attached to the proposed forms of Order annexed hereto (the "<u>Orders</u>"). The Stipulation of Settlement Between and Among the Debtors, Bank of America, N.A., and Federal Home Loan Mortgage Corporation Regarding Interim

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("<u>AHM Investment</u>"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("<u>AHM Acceptance</u>"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("<u>AHM Servicing</u>"), a Maryland corporation (7267); American Home Mortgage Corp. ("<u>AHM Corp.</u>"), a New York corporation (1558); American Home Mortgage Ventures LLC ("<u>AHM Ventures</u>"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("<u>Homegate</u>"), a New York corporation (7491); and Great Oak Abstract Corp. ("<u>Great Oak</u>"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

Servicing of Federal Home Loan Mortgage Corporation Loans (the Interim Servicing Stipulation") is attached to the Order annexed hereto as Exhibit A, and is in regard to the interim transfer of servicing of Federal Home Loan Mortgage Corporation's ("Freddie Mac") loans. The Stipulation of Settlement Between and Among the Debtors and Federal Home Loan Mortgage Corporation Regarding the Sale of Servicing of Federal Home Mortgage Corporation's Loans (the "Sale Stipulation") is attached to the Order annexed hereto as Exhibit B, and is in regard to the sale of the servicing rights relating to Freddie Mac's loans. In support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2. On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

4. On August 14, 2007, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "Committee"). No trustee or examiner has been appointed.

5.      On September 20, 2007, Federal Home Loan Mortgage Corporation filed a motion for an Order Granting Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362 (the "Freddie Mac Stay Relief Motion").

## THE DEBTORS' BUSINESS[2]

6.      Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

7.      As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

8.      A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments,

---

[2] The facts set forth herein are derived from the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief (the "First Day Declaration"), which is incorporated by reference.

administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

## EVENTS LEADING TO THE CHAPTER 11 FILING

9. Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

10. The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

11. In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders – the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

12. On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

13. The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors now employ approximately 1,000 persons who are absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

14. In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

15. Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## **RELEVANT BACKGROUND**

16. Prior to the Petition Date and at least through August 1, 2007, the Debtors serviced (the "Servicing Rights") a portfolio of mortgages (the "Freddie Mac Portfolio") owned by Freddie Mac, pursuant to the Freddie Mac Single Family Seller/Servicer Guide (the "Guide").

17. The Debtors estimate that the Freddie Mac Portfolio contains approximately 4,547 loans, with an aggregate unpaid principal balance of approximately $797 million.

18. Certain of the Debtors and Bank of America, N.A. ("BofA"), as administrative agent, are parties to a Security and Collateral Agency Agreement, dated August 30, 2004 (as amended, restated, modified, ratified or supplemented from time to time, the "Security Agreement") and a credit agreement dated August 10, 2006 (as amended and restated and together with all agreements, documents, notes and instruments delivered pursuant thereto or in connection therewith), pursuant to which Debtors granted BofA a security interest in, among other things, the right of the Debtors to service single-family mortgages for Freddie Mac (hereinafter the "Servicing Security Interest").

19. Freddie Mac asserts that pursuant to the Guide and effective August 1, 2007, (the "Termination Date"), it terminated the eligibility of the Debtors to sell mortgages to and service mortgages for Freddie Mac with "cause" (hereinafter, the "Termination"); the Debtors dispute the validity of such Termination.

20. Since the Petition Date, the Debtors have sought to sell their businesses and assets to financial and strategic investors. The Debtors' servicing business is one of the most valuable assets of these estates and, if the Debtors are to obtain the maximum return as a result of the planned sale of this business, it is desirable that they resolve any dispute with a counterparty to a servicing-related agreement without the need for litigation. The Debtors anticipate that

buyers for their servicing rights will be found; however, in order to avoid a costly dispute that could disrupt the sale, the Parties wish to compromise and settle the controversy between them on the terms and conditions set forth in the Stipulations.

## THE STIPULATIONS

### A.  The Interim Servicing Stipulation

21.  The effectiveness of the Interim Servicing Stipulation is conditioned upon approval of the Bankruptcy Court. The principal terms of the Interim Servicing Stipulation are set forth below:[3]

  a.  Debtors shall transmit the electronic servicing files as currently maintained in the Debtors' servicing system (in "LSAMS" or any other form, format or system readily available to Debtors) to BofA, on or before September 21, 2007 (hereinafter, the "Interim Electronic Servicing Transfer"). Upon transfer of such files, the Debtors shall have no liability with respect to the prospective usage of the data thereafter.

  b.  Debtors shall turn over the imaged, microfiche, hard copies and any other form of the Freddie Mac Files in their physical possession in their existing format, to BofA, which transfer shall begin no later than the date of the order approving the Interim Servicing Stipulation and be substantially complete on or before November 2, 2007; provided that, Debtors shall use their best efforts to make all available imaged documents available by September 30, 2007, and all available microfiche documents by October 11, 2007 (hereinafter, the "Interim Hard Copy Servicing Transfer" and together with the Interim Electronic Servicing Transfer, the "Interim Servicing Transfer").

  c.  BofA agrees to take possession of the Freddie Mac Files and to service the Freddie Mac Loans on an interim basis (i) subject to a separate agreement between Freddie Mac and BofA on terms acceptable to both parties (the "Interim Servicing Agreement"), a copy of which will be promptly provided to the Debtors upon execution, and (ii) pending the conduct, conclusion and closing of a sale of the right to service the Freddie Mac

---

[3] The terms of the Interim Servicing Stipulation set forth herein are a summary only, and all terms not defined herein shall be given the meanings ascribed to them in the Interim Servicing Stipulation. To the extent of any inconsistency between this summary and the Interim Servicing Stipulation, the terms of the Interim Servicing Stipulation shall govern.

Files (the "Servicing Sale") pursuant to a separate stipulation between the Debtors and Freddie Mac (the "Servicing Sale Stipulation").

d. Debtors agree to account for and turn over to BofA any payments received in connection with the Freddie Mac Loans on and subsequent to the Termination Date, which have not previously been disbursed or turned over to Freddie Mac.

e. Nothing in the Interim Servicing Stipulation shall affect or reduce the rights of BofA under the Acknowledgment Agreement, all of which are reserved, including the right of BofA to implement a Servicing Transfer with Assumption of Warranties, as provided in the Acknowledgment Agreement. All of the Debtors' rights are reserved regarding the consideration arising, if any, on account of a Servicing Transfer with Assumption of Warranties.

f. The Debtors agree to use their best efforts to cooperate fully with Freddie Mac and BofA in effectuating the Interim Servicing Transfer to BofA by performing, without limitation, the following additional acts:

　　i. P&I Account Reconciliation. Debtors shall provide written confirmation of final agreement on reconciliation of all P&I accounts.

　　ii. T&I Account Reconciliation. Debtors shall provide written confirmation of final agreement on reconciliation of all T&I accounts.

　　iii. MERS and Non-MERS Loans. Debtors shall execute (i) assignments to BofA of any loans not registered in MERS and (ii) release documents in recordable form for any non-MERS loans that have been paid off to date. Debtors shall execute a transfer of any loans on the MERS system to BofA.

　　iv. Forwarding Recorded Documents. To the extent that Debtors receive recorded documents on the Freddie Mac Loans or have received such documents which are still in their possession, Debtors shall promptly forward them to BofA.

　　v. Additional Acts. Debtors agree to take such other action and execute such other documents as reasonably necessary and requested by Freddie Mac and/or BofA to effectuate the Interim Servicing Transfer.

g. Upon execution of this Stipulation, Freddie Mac shall reimburse the Debtors from the T&I Escrows for all amounts paid by Debtors to

borrowers as a return of their escrow balances, because the borrowers' loans were paid in full.

    h.    Following execution of the Interim Servicing Stipulation, through and including the date of the Interim Servicing Transfer to BofA, the Debtors shall provide Freddie Mac with a detailed list of all necessary tax and insurance payments as such payments come due, whereupon Freddie Mac shall transfer to the Debtors from the T&I Escrows the applicable amounts needed to pay required real estate taxes, insurance and other applicable impound fund amounts on account of the loans covered by such T&I Escrows.

    i.    Freddie Mac shall assume all liabilities with respect to any loss incurred by the Debtors arising out of pecuniary losses of the borrowers of the Freddie Mac loans serviced by the Debtors, as a result of Freddie Mac having swept the T&I Escrows and the Debtors' failure to make timely required real estate tax, insurance and other applicable impound fund payments.

    j.    To the fullest extent required by law and consistent with and pursuant to the terms of the Interim Servicing Stipulation, Freddie Mac and BofA are granted relief from the automatic stay pursuant to 11 U.S.C. §362, in order to implement the terms of the Interim Servicing Stipulation.

    k.    Contemporaneously with the Interim Electronic Servicing Transfer, Freddie Mac shall reimburse the Debtors for any and all advances and fees of whatever type incurred or made on behalf of the Freddie Mac Loans since the Petition Date.

**B.**     <u>**The Sale Stipulation**</u>

    22.    The effectiveness of the Sale Stipulation is conditioned upon approval of the Bankruptcy Court. The principal terms of the Sale Stipulation are set forth below:[4]

    a.    The Debtors acknowledge and agree that Freddie Mac has a first priority right of payment from the proceeds (the "<u>Servicing Transfer Proceeds</u>") generated by the Auction Sale. The total amount of "Freddie Mac's Claims" and "Freddie Mac's Servicing Transfer Costs" (as such terms are defined in the Acknowledgement Agreement) to be deducted from the

---

[4] The terms of the Sale Stipulation set forth herein are a summary only, and all terms not defined herein shall be given the meanings ascribed to them in the Sale Stipulation. To the extent of any inconsistency between this summary and the Sale Stipulation, the terms of the Sale Stipulation shall govern.

        Servicing Transfer Proceeds are estimated as of September 20, 2007, to be $447,960.00 plus $2,056,296.19 related to required repurchases, and will be determined as of the date of the Permanent Serving Transfer in accordance with the Acknowledgment Agreement.

b.    The Debtors agree that a sale of the Servicing through an auction sale conducted by a broker agreed to by the parties and subject to a brokerage agreement approved by the parties (hereinafter, respectively, the "Auction Sale" and the "Broker") is acceptable to the Debtors.

c.    The Debtors acknowledge that the market value of the Servicing fluctuates and Freddie Mac does not represent, warrant or guaranty to the Debtors that there will be any Surplus Proceeds, as defined in the Acknowledgement Agreement, following the Auction Sale and the Permanent Servicing Transfer.

d.    Debtors acknowledge and agree that the transferee of the Servicing must meet the eligibility and performance requirements set forth in the Guide and the Acknowledgement Agreement in order to be acceptable to Freddie Mac.

e.    Nothing in the Sale Stipulation shall affect or reduce the rights of BofA under the Acknowledgment Agreement, all of which are reserved, including the right of BofA to implement a Servicing Transfer with Assumption of Warranties, as provided in the Acknowledgment Agreement. All of the Debtors' rights are reserved regarding the consideration arising, if any, on account of a Servicing Transfer with Assumption of Warranties.

f.    After receipt by Freddie Mac of the Servicing Transfer Proceeds, if any, of the Auction Sale, Freddie Mac will comply with the terms and provisions of Section 8(g) of the Acknowledgement Agreement.

g.    Debtors and Freddie Mac acknowledge and agree that provided (i) there is a Servicing Transfer With Assumption of Warranties and (ii) sufficient Servicing Transfer Proceeds are generated by the Auction Sale to pay the Freddie Mac Claims and the Freddie Mac Servicing Transfer Costs in full, then such claims and costs shall be paid from the Servicing Transfer Proceeds, and that thereafter the disbursement of Surplus Proceeds due to BofA to be applied in accordance with the Cash Collateral Order shall be made to BofA, with the remainder, if any, to the Debtors, and thereafter Freddie Mac shall not assert any additional claims or liabilities against the Debtors' estates arising out of or related to the Termination or any obligations of Debtors to Freddie Mac under the Guide or the Acknowledgement Agreement.

    h.    Upon the closing of the Auction Sale, Freddie Mac, on the one hand, and the Debtors, on the other hand, hereby release each other and their current and former directors, officers, employees and shareholders, from any and all claims, counterclaims, setoffs and causes of action including, which each may have against the other, whether known or unknown, as of the date hereof, including without limitation, claims, counterclaims, setoffs and causes of action arising out of or related to the Termination, the Guide, the Servicing relationship, the Security Agreement and the Acknowledgement Agreement, at law, in equity or otherwise.

    i.    To the fullest extent required by law and consistent with and pursuant to the terms of the Sale Stipulation, Freddie Mac is granted relief from the automatic stay pursuant to 11 U.S.C. §362, in order to implement the terms of the Sale Stipulation and to take all actions reasonably necessary to complete the Servicing Transfer Procedures and to enforce the terms of the Guide and the Sale Stipulation.

## RELIEF REQUESTED AND BASIS THEREFOR

23.    By this Motion, the Debtors are seeking this Court's approval of the Stipulations pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rules 4001(d) and 9019(a).

## STANDARDS FOR AGREEMENTS PURSUANT TO RULE 4001

24.    Rule 4001(d) of the Federal Rules of Bankruptcy Procedure provides that "[a] motion for approval of an agreement . . . to modify or terminate the stay provided for in § 362 . . . shall be served on any committee . . . appointed pursuant to § 1102 of the Code or its authorized agent and on such other entities as the court may direct. The motion shall be accompanied by a copy of the agreement." Rule 4001(d) goes on to further state that, "[i]f no objection is filed, the court may enter an order approving . . . the agreement without conducting a hearing."

25.    By this Motion, the Debtors seek approval of the Stipulations, copies which are attached hereto, in order to resolve the Freddie Mac Stay Relief Motion. Pursuant to the Stipulations, Freddie Mac is granted relief from the automatic stay pursuant to 11 U.S.C.

§ 362 to the fullest extent required by law and consistent with and pursuant to the terms of the Stipulations and pursuant to Rule 4001(d) the Debtors are required to serve such motion on the Committee and the Court may enter an order approving the Stipulation without conducting a hearing if no objection is filed. Here, the Committee has acknowledged and consented to the Stipulations and therefore, the Court may enter an order approving the Stipulations without conducting a hearing.

26. Accordingly, the Debtors request that the Court approve the Stipulations pursuant to Bankruptcy Rule 4001(d).

## STANDARDS FOR SETTLEMENTS PURSUANT TO RULE 9019

27. Rule 9019(a) of the Federal Rules of Bankruptcy Procedure provides that "on motion by the trustee and after a hearing, the Court may approve a compromise or settlement." The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged. In re Penn Central Transp. Co., 596 F.2d 1002 (3d Cir. 1979). The Supreme Court has recognized that "in administering a reorganization proceeding in an economical and practical manner, it will often be wise to arrange the settlement of claims in which there are substantial and reasonable doubts." In re Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. V. Anderson, 390 U.S. 414 (1986).

28. Approval of a proposed settlement is within the "sound discretion" of the Bankruptcy Court. In re Neshaminy Office Building Associates, 62 B.R. 798, 803 (Bankr. E.D. Pa. 1986). The court must determine whether the proposed settlement is in the "best interests of the estate." See In the Matter of Energy Cooperative, Inc., 886 F.2d 921, 927 (7th Cir. 1989). In determining whether to approve an motion to settle a controversy, a Bankruptcy Court must determine whether it is fair, reasonable and adequate by examining four factors:

> (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection: (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

Official Comm. of Unsec. Cred. Of Penn. Truck Lines, Inc., v. Penn Truck Lines, Inc. (In re Penn Truck Lines, Inc.), 150 B.R. 595, 598 (Bankr. E.D. Pa. 1992). The Court should not substitute its judgment for that of a trustee. Neshaminy Office Building Associates, 62 B.R. at 803. The Court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to see whether the settlement falls below the lowest point in the range of reasonableness. In re W.T. Grant and Co., 699 F.2d 599, 608 (2d Cir. 1983), cert. denied, 464 U.S. 22 (1983). In addition, "because the bankruptcy judge is unequally situated to consider the equities and reasonableness of a particular compromise, approval or denial of a compromise will not be disturbed on appeal absent a clear abuse of discretion." Neshaminy Office Building Assoc., 62 B.R. at 803 (citing, In re Patel, 43 B.R. 500, 505 (Bankr. N.D. Ill. 1984).

        29.     The Debtors believe that the terms of the Stipulations are reasonable and provide for a fair and practical resolution of (a) the litigation and claims with Freddie Mac and (b) the dispute with Freddie Mac regarding the servicing of its loans servicing. The Stipulations are in the best interest of the Debtors, their estates and creditors, as they clear an obstacle to the sale of the servicing of the Freddie Mac Loans by expeditiously resolving the Freddie Mac Stay Relief Motion as well as other disputes with Freddie Mac. Furthermore, the Stipulations were the product of significant and lengthy discussions and negotiations between the Debtors, Freddie Mac and BofA and fall well above the lowest point in the range of reasonableness. Absent the Stipulations, the disputes between the Debtors and Freddie Mac would have to be litigated before

the Court. Any litigation not only has inherent risks with no assurances of a favorable outcome, but would likely be a drawn-out and expensive process. Additionally, considering the many battles the Debtors are already being forced to wage to protect their servicing business, the resolution of this dispute with Freddie Mac, without the need for litigation, is a favorable outcome, because it will allow the Debtors to sell a portion of the servicing business without having to litigate over the process or form of the sale. Accordingly, a review of the four factors set forth above, clearly demonstrates that the Stipulation is reasonable, fair and equitable and in the best interest of the Debtors, the Debtors' estates and creditors.

30.     For the foregoing reasons, the Debtors submit that the approval of the settlements and compromises according to the terms of the Stipulations should be approved pursuant to Bankruptcy Rule 9019.

## NOTICE

31.     Notice of this Application will be provided to (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Bank of America, N.A.; (iv) Counsel to the Agent for the Debtors' Postpetition Lender; (v) counsel to Freddie Mac; and (vi) all parties entitled to notice under Del. Bankr. LR 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PREVIOUS REQUEST

32.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court issue and enter Orders (i) pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rules 4001 and 9019, approving the Stipulations, and (ii) granting such other and further relief as may be just and proper.

Dated:  Wilmington, Delaware
        September 18, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ EJK

Robert S. Brady (No. 2847)
John T. Dorsey (No. 2988)
Edward J. Kosmowski (No. 3849)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession