IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------- x
In re: : Chapter 11
:
AMERICAN HOME MORTGAGE HOLDINGS, INC., : Case No. 07-11047 (CSS)
a Delaware corporation, et al., :
: Jointly Administered
Debtors. :
: **Objection Deadline: September 27, 2007 at 12:00 p.m.**
: **Hearing Date:  October 1, 2007 at 10:00 a.m.**
-------------------------------------------------------------------- x

**DEBTORS' MOTION PURSUANT TO SECTIONS 105, 362, 363, 364 AND 503
OF THE BANKRUPTCY CODE, AND BANKRUPTCY RULES 4001 AND 9019, SEEKING
AN ORDER: (I) APPROVING AND AUTHORIZING THE TERM SHEET AND
INDEMNITY CONTRACT BY AND BETWEEN THE DEBTORS AND TRAVELERS
CASUALTY AND SURETY COMPANY OF AMERICA; (II) AUTHORIZING DEBTORS
TO OBTAIN POST-PETITION SURETY BONDS; (III) GRANTING
ADMINISTRATIVE CLAIMS; AND (IV) GRANTING RELATED RELIEF**

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and

debtors in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] by this motion

(the "Motion"), seek entry of an order pursuant to Rules 4001 and 9019(a) of the Federal Rules

of Bankruptcy Procedure ("Bankruptcy Rules") and sections 105(a), 362, 363(b), 364(c) and

503(b) of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"):

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation
(3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979);
American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home
Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC
("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc.
("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York
corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except
for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

(i) approving the Term Sheet (the "Term Sheet"),[2] a copy of which is attached as Exhibit A to the proposed form of Order annexed hereto, and Indemnity Contract (the "Indemnity Contract"), substantially in the form attached as Exhibit B to the proposed form of Order annexed hereto, by and between the Debtors and Travelers Casualty and Surety Company of America ("Travelers" and collectively with the Debtors, the "Parties"); (ii) authorizing the Debtors to obtain surety bonds (the "Post-Petition Bonds"); (iii) granting certain administrative claims; and (iv) granting related relief.  In support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2.      On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

4.      On August 14, 2007, the United States Trustee for the District of Delaware appointed The Official Committee of Unsecured Creditors (the "Committee").  No trustee or examiner has been appointed.

---

[2]  The Term Sheet has been distributed to the Committee, the DIP Lender, and Bank of America, N.A., with ample time to review, and all agreed comments received were integrated into the Term Sheet.  These parties have not expressed any objection with respect to the relief requested herein.

## THE DEBTORS' BUSINESS[3]

5.     Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

6.     As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

7.     A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing

---

[3] The facts set forth herein are derived from the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief (the "First Day Declaration") [Docket No. 2], which is incorporated by reference as if fully set forth herein at length.

serviced approximately 197,000 loans with an aggregate principal amount of approximately

$46.3 billion.  AHM continues to conduct its servicing business, which constitutes a valuable

asset of the Debtors' estates.

## EVENTS LEADING TO THE CHAPTER 11 FILING

8.     Beginning in late 2006, and continuing through 2007, the credit markets

became concerned over the quality of subprime mortgages and, specifically, the increasing

default rates on such mortgages.  These concerns became exacerbated by the failure of two major

hedge funds with concentrated investments in subprime loans.

9.     The concern in the credit markets has spread beyond the subprime market

and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury

issued securities and general corporate debt securities.  The surge in mortgage delinquencies for

subprime home loans also generated anxiety in the market about borrowers with adjustable rate

mortgages scheduled to reset with higher rates in 2007 and 2008.

10.     In the weeks prior to the Petition Date, this unprecedented disruption in

the credit markets caused major write-downs of the Debtors' loan and security portfolios and

consequently resulted in margin calls for hundreds of millions of dollars with respect to the

Debtors' loans.  During this time, certain of the Debtors' warehouse lenders – the financial

institutions that provide short term credit facilities needed to originate and purchase loans –

began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to

originate loans and threatening the company's continued viability.

11.     On July 27, 2007, AHM Investment announced that its Board of Directors

had decided to delay payment of its quarterly cash dividend on the Company's common stock

and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

12.     The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business.  As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees.  The Debtors now employ approximately 1000 persons who are absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

13.     In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions.  Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

14.     Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## RELEVANT BACKGROUND

### A.    The Debtors' Surety Bond Needs

15.    Since the Petition Date, the Debtors have sought to sell their businesses and assets to financial and strategic investors.  The Debtors' servicing business is an important asset of these estates and, in order to protect the going concern value, the Debtors must ensure that no business disruption occurs.  Accordingly, to keep their servicing business operational, the Debtors must maintain state licenses, and the majority of states within which the Debtors operate require the posting of surety bonds in order to maintain these licenses.

16.    Prior to the Petition Date, the Debtors utilized Travelers, Hartford Fire Insurance Company ("Hartford"), and Zurich North America Surety ("Zurich", and collectively with Travelers and Hartford, the "Sureties") to handle their bonding needs.  However, in the weeks preceding, and, with respect to certain of the Sureties, in the days subsequent to the commencement of these bankruptcy cases, in recognition of the Debtors' declining financial circumstances, the Sureties sent notices of cancellation that purport to cancel these surety bonds, pursuant to their terms, with dates ranging from mid-August through mid-October.  The state licensing agencies that regulate the Debtors' businesses take the position that the Debtors' licenses will terminate if the Debtors do not have surety bonds in place.  If these surety bonds were to lapse and the Debtors lose their licenses, the Debtors' efforts to market their servicing business would be severely and negatively impacted.

17.    Upon receiving the notices of cancellation from the Sureties, the Debtors analyzed their surety bonding requirements and significantly reduced the number and amounts of the surety bonds needed to preserve the value of these estates.  This resulted in the elimination of all bonds other than those pertaining to the servicing business, which decreased the number of

surety bonds the Debtors were required to obtain from approximately 170 surety bonds with a face amount of $16 million, to approximately 18 surety bonds with a face amount of $1.5 million.  These amounts represent the minimum bonding requirement to maintain the Debtors' servicing licenses and allow them to operate their loan servicing business pending its sale.

18.    After the Debtors determined the minimum bond requirements needed to be purchased to maintain their servicing business, they consulted with their financial advisors and attorneys to determine how to best meet these requirements with the minimum impact on the estates.  Although the premiums associated with surety bonds are relatively small, the surety bond companies additionally require collateral be posted equal to the face amount of the Bonds.  Accordingly, despite their best efforts to limit the expense to these estates, the Debtors estimated that they would be required to disburse over $1.5 million to satisfy their post-petition bonding requirements.

**B.    The Debtors' Negotiations With Travelers and Other Sureties**

19.    Prior to the Petition Date, Travelers approached the Debtors and requested that the Debtors post additional collateral with respect to the surety bonds that Travelers provided for or on behalf of the Debtors.  In connection therewith, Travelers satisfied the majority of the Debtors' bonding needs, providing approximately $10 million in bonds for the Debtors' various businesses.  After negotiations, on July 13, 2007, the parties agreed that the Debtors would post $5 million collateral (the "Prepetition Collateral") with Travelers as security for the entire portfolio of bonds issued or to be issued by Travelers.  Posting the Prepetition Collateral was necessary, because if the Travelers' bonds were cancelled, the Debtors would be forced to expend greater than $5 million to obtain replacement bonds, as common terms within the industry had shifted such that 100% collateral requirements were the norm.  Therefore,

supplying the Prepetition Collateral presented a potential $5 million savings versus other surety bond alternatives.

20.     In the weeks subsequent to the Petition Date, the Debtors worked with various bonding companies to determine the best approach for handling their post-petition bonding requirements.  Indeed, not only did they consult the Sureties with whom they had relationships prior to the Petition Date, but also they reached out to other bonding companies in their quest for the appropriate bonding arrangement for their servicing business – both in terms of pricing and coverage.  The bonding companies the Debtors approached either were not interested in providing them with surety bonds, or at the very least, required the posting of collateral in an amount equal to the face value of any issued surety bond.

21.     Eventually, Travelers approached the Debtors and presented them with the best proposal, under the circumstances, aimed at meeting the Debtors needs in an expedited timeframe.  As set forth in the Term Sheet, Travelers agreed to provide post-petition bonds for the Debtors' servicing business, in the aggregate amount of $1.5 million, without the need for further collateral; provided, however, the Debtors must waive any action against Travelers that arose prior to the Parties' entry into the Term Sheet.  The remaining terms set forth in the Term Sheet are either in accord with the parties prepetition dealings, or are terms commonly found in the bonding arrangements of companies operating under chapter 11.

## TERM SHEET[4]

22.     The effectiveness of the Term Sheet is conditioned upon approval of the Bankruptcy Court.  The principal terms of the Term Sheet are set forth below:[5]

---

[4] All terms not otherwise defined herein shall have the meanings ascribed to them in the Term Sheet.

i.      Travelers shall retain and hold the Prepetition Collateral to secure all prepetition and post-petition liabilities of any kind or nature associated with the prepetition bonds or Post-Petition Bonds.

ii.     Travelers shall issue bonds of a type historically written for the Debtors' servicing business, up to a maximum capacity of $1,500,000 (including bonds reinstated, increased or renewed), and will not require any additional collateral.

iii.    Pricing for the Post-Petition Bonds will be in accordance with general industry terms, and the Parties' prepetition relationship.

iv.     The Debtors shall sign a new indemnity agreement with respect to the Post-Petition Bonds.

v.      The Debtors shall waive any and all claims of any kind or nature against Travelers, which arose in whole or in part prior to the date the Debtors entered into the Term Sheet.

vi.     Travelers shall be granted relief from the automatic stay, to the extent necessary, to apply pre-petition collateral to any claims in connection with the pre-petition bonds and pre-petition indemnity agreements, and Post-Petition Bonds and post-petition indemnity agreements.

vii.    Travelers shall be granted an allowed administrative claim pursuant to Section 503(b) of the Bankruptcy Code (behind existing claims of the DIP Lender, the Pre-Petition Secured Parties, and the Carve Out, as each such term is defined in either the *Final Order (i) Authorizing Debtors' Limited Use of Cash Collateral and (ii) Granting Replacement Liens and Adequate Protection to Certain Pre-Petition Secured Parties* [Docket No. 554] (the "Final Cash Collateral Order") and/or the *Final Order Pursuant to Sections 105(A), 362, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (A) Approving Debtor-In-Possession Financing, (B) Granting Liens and Allowing Superpriority Administrative Claims, and (C) Granting Related Relief* [Docket No. 555] (the "Final DIP Order")) for any claim or loss, arising post-petition, sustained on account of any bonds written for the account post-petition (or reinstated, increased or renewed post-petition).

---

[5] The terms of the Term Sheet set forth herein are a summary only. To the extent of any inconsistency between the summary herein and the Term Sheet, the terms of the Term Sheet shall govern.

viii. Notwithstanding anything in the Term Sheet or elsewhere to the contrary, Travelers shall not seek to enforce, directly or indirectly, any administrative or priority claim in respect of any asset which constitutes collateral of the Administrative Agent, for the ratable benefit of the Pre-Petition Secured Parties, or the DIP Lender unless all of the Indebtedness and DIP Obligations have been (i) indefeasibly paid in full in cash, or (ii) otherwise authorized with the prior written consent of the Administrative Agent and the DIP Lender (as each such capitalized term is defined in either the Final Cash Collateral Order and/or the Final DIP Order) (either of the foregoing constituting a "Payoff Event"). Upon the occurrence of a Payoff Event and without the requirement of any further order of the Bankruptcy Court, Travelers shall be granted an allowed administrative claim pursuant to Section 364 of the Bankruptcy Code for any claim or loss, arising post-petition, sustained on account of any bonds written for the account post-petition (or reinstated, increased or renewed post-petition).

ix. The fees and costs for legal work of Travelers during the pendency of the Bankruptcy Case until confirmation, conversion and or dismissal, whichever comes first, (the "Legal Fees"), as set forth below, shall be subject to a review period (the "Review Period"). The Review Period shall be as follows: (i) Travelers shall send an invoice for Legal Fees to the Debtors and the Committee, which provides sufficient detail for such parties to review the request (subject in all respects to applicable privilege or work product doctrines); (ii) the Debtors and the Committee shall have five (5) business days to object to the Legal Fees by filing an objection with the Bankruptcy Court; (iii) if neither the Debtors or the Committee objects, the Debtors shall be required to pay such Legal Fees within five (5) business days thereafter, without Bankruptcy Court approval, and if either the Debtors or the Committee objects within the time permitted, the Debtors shall not pay the Legal Fees unless the objection is resolved or the Bankruptcy Court or any other court of competent jurisdiction approves such payment.

x. Subject to the Review Period, Debtors shall pay all reasonable fees and costs for all legal work of Travelers in connection with the Bankruptcy Case incurred through the date of the entry of a Order approving the bonding facility described in the Term Sheet, up to $30,000.00 (attributable to the post-petition bonding) including all fees and costs incurred by Travelers in preparing and obtaining the order approving the bond facility. Subject to the Review Period, any reasonable, additional fees and costs for legal work incurred by Travelers, associated with obtaining the order in the event such

proposed order meets with objection, otherwise payable in accordance with the terms of the indemnity agreements and/or incurred in enforcing the order approving the bond facility shall be paid within five (5) business days of receipt of an invoice and shall not be subject to the cap set forth in this paragraph.

xi.     The Debtors' rights to pursue an action seeking the release of the Prepetition Collateral based upon the argument that Travelers is over-secured as to the pre and post-Petition Date bonding exposure are preserved.

xii.    Debtors shall stipulate to the allowance of all claims associated with the existing indemnity agreements and prepetition bonds, subject to the Debtors review of a summary, to be provided by Travelers, which provides reasonable claim detail, and an estimate of all claims associated with the existing indemnity agreements and prepetition bonds existing as of the dates of the Term Sheet.

xiii.   Travelers shall not be required to file a proof of claim in the Debtors' bankruptcy cases and shall be granted an allowed claim in the bankruptcy cases equal to the amount Travelers pays to liquidate any claims under the prepetition bonds (inclusive of any fees and other expenses incurred in connection therewith, to the extent recoverable under the existing indemnity agreements), and, to the extent of the value of the Prepetition Collateral, an allowed secured claim within the meaning of section 506 of the Bankruptcy Code.

## RELIEF REQUESTED

23.     By this Motion, the Debtors respectfully request entry of an order, pursuant to Bankruptcy Rule 9019, and sections 105(a), 362, 363(b), 364(c) and 503(b) of the Bankruptcy Code: (i) approving the Term Sheet and Indemnity Contract; (ii) authorizing the Debtors to obtain the Post-Petition Bonds; (iii) granting certain administrative claims; and (iv) granting related relied.

**BASIS FOR RELIEF REQUESTED**

A.    **The Term Sheet is Fair, Reasonable, Adequate and in
the Best Interests of the Debtors' Estates and Creditors.**

24.    Section 105(a) provides, in pertinent part, that "[t]he court may issue any

order . . . necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." In

turn, Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after a hearing, the

Court may approve a compromise or settlement."[6] Fed. R. Bankr. P. 9019(a).

25.    Settlement of time-consuming and burdensome litigation, especially in the

bankruptcy context, is encouraged. *See In re Penn Cent. Transp. Co.*, 596 F.2d 1127, 1146 (3d

Cir. 1979); *In re Sassalos*, 160 B.R. 646, 653 (D. Or. 1993) (stating that "compromises are

favored in bankruptcy, and the decision of the bankruptcy judge to approve or disapprove a

compromise ... rests in the sound discretion of the judge"). The Supreme Court has recognized

that "in administering a reorganization proceeding in an economical and practical manner, it will

often be wise to arrange the settlement of claims in which there are substantial and reasonable

doubts." *In re Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,

390 U.S. 414, 424 (1968); *see In re Penn Cent. Transp. Co.*, 596 F.2d 1127, 1146. The district

court, as the intermediate bankruptcy appellate court, "has described the ultimate inquiry to be

whether 'the compromise is fair, reasonable, and in the interest of the estate.'" *In re Marvel*

*Entertainment Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998), *quoting In re Louise's, Inc.*, 211

B.R. 798, 801 (D. Del. 1997). Bankruptcy Rule 9019 thus empowers this Court to approve

compromises and settlements if they are in the "best interest[s] of the estate." *In re Marvel*

---

[6] A debtor-in-possession in a reorganization case has most of the rights of a trustee appointed under chapter 11 of
the Bankruptcy Code. *See* 11 U.S.C. §§ 1106 and 1107.

*Entertainment Group*, 222 B.R. at 249 (holding that proposed settlement was in the best interest of the estate); s*ee In the Matter of Energy Cooperative, Inc.*, 886 F.2d 921, 927 (7th Cir. 1989).

26.　　In determining whether to approve a motion or application to settle a controversy, a Bankruptcy Court must determine whether it is fair, reasonable and adequate by examining the following four factors: (i) the probability of success in the litigation; (ii) the complexity, expense and likely duration of the litigation; (iii) all other factors relevant to making a full and fair assessment of the wisdom of the proposed compromise; and (iv) whether the proposed compromise is fair and equitable to the debtors, their creditors, and other parties in interest. *See TMT Trailer Ferry, Inc.,* 390 U.S. at 424; *In re Martin*, 91 F.3d 389, 393 (3d. Cir. 1996) (stating that "[t]o minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy" and citing the criteria set forth above in determination of reasonableness of particular settlements) (internal quotation marks and citation omitted); *In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979) (relevant factor is "whether the terms of the proposed compromise fall within the reasonable range of litigation possibilities").

27.　　Basic to the process of evaluating proposed settlements, then, is "the need to compare the terms of the compromise with the likely rewards of litigation." *TMT Trailer Ferry, Inc.*, 390 U.S. at 425. However, "[t]he court is not supposed to have a 'mini-trial' on the merits, but should 'canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness.'" *In re Jasmine, Ltd.,* 258 B.R. 119, 123 (D.N.J. 2000) (*citing In re Neshaminy Office Bldg. Associates*, 62 B.R. 798, 803 (E.D. Pa. 1986); *see also In re Pennsylvania Truck Lines, Inc.*, 150 B.R. 595, 598 (E.D. Pa. 1992), *aff'd*, 8 F.3d 812 (3d Cir. 1993).

28.     Finally, "because the bankruptcy judge is uniquely situated to consider the equities and reasonableness of a particular compromise, approval or denial of a compromise will not be disturbed on appeal absent a clear abuse of discretion." *Neshaminy Office Building Assoc.*, 62 B.R. at 803 (*citing In re Patel*, 43 B.R. 500, 505 (Bankr. N.D. Ill. 1984)).

29.     The Term Sheet is fair, reasonable, adequate and in the best interests of the Debtors, their estates and creditors because the terms and conditions thereof, as well as the surrounding circumstances, satisfy the aforementioned factors.

30.     First and foremost, entry into the Term Sheet is vital to the Debtors' success in these chapter 11 cases because it will permit the Debtors to comply with the terms of their state licenses (as discussed above), as well as certain loan servicing agreements (the "Servicing Agreements"), thereby ensuring that the value of the servicing business is preserved as it is marketed and sold.  Any loss or disruption of the state licenses or the Servicing Agreements would be extremely detrimental to the Debtors' servicing business and consequently, to the sale process.

31.     The Servicing Agreements require the Debtors to maintain the appropriate licensing in various states.  If the Debtors are unable or perceived as being unable to satisfy any of their obligations under the Servicing Agreements in the ordinary course of business during these chapter 11 cases, including their ability to obtain the Post-Petition Bonds, then the sale process may be threatened.  In short, the adverse consequences to the Debtors for not satisfying all of their obligations under the Servicing Agreements could damage, perhaps irreparably, the Debtors' servicing business, thereby diminishing the return realized through the sale process.

32.     Second, by entering into the Term Sheet, the Debtors are able to obtain the necessary Post-Petition Bonds with no additional cost outlay to these estates.  Therefore, at the

very least, the Term Sheet represents a $1.5 million savings versus the available bonding alternatives, because this is the minimum amount an alternative bonding company would require as collateral. To receive this benefit, the Debtors only true concession beyond that normally associated with chapter 11 bonding arrangements, was the waiver of a potential $5 million preference action, which would be contested by Travelers. The Debtors submit that this is not a significant compromise because, under the Term Sheet, they retain the right to bring the Prepetition Collateral back into the estates after the underlying liabilities associated with the Travelers' bonds (both pre and post-petition) are no longer present. Moreover, to the extent the Debtors actually are conceding a right with respect to the preference waiver, this concession is greatly outweighed by the benefits derived from the Term Sheet.

33.     The Debtors have attempted to make alternate arrangements in an effort to replace or reinstate the bonds provided by Travelers, but in weighing their options, and considering their short time frame and needed terms, the Debtors were not able to find any arrangements that they deemed as appealing as those obtained by way of the Term Sheet. Moreover, given Travelers long history of transacting with the Debtors and its institutional knowledge of the Debtors' businesses, the Debtors believe that the Term Sheet presents the most efficient and cost effective manner by which to obtain the Post-Petition Bonds. In fact, in good faith reliance on the Term Sheet, Travelers has already begun performing under the Term Sheet and has commenced bonding efforts on an expedited basis on behalf of the Debtors.

34.     Finally, the Debtors submit that entry into the Term Sheet is in the best interests of the Debtors, their estates, and creditors because of the burdens, uncertainties, delay and expense associated with any preference action against Travelers. If the Debtors had decided not to enter into the Term Sheet, their likelihood of success with respect to the preference action

was debatable. Moreover, from a business, as well as a case management, standpoint commencing a preference action against Travelers at this stage in the Debtors' cases would not be appropriate. Accordingly, bypassing the opportunity presented by the Term Sheet would have required the Debtors to immediately incur the significant expense associated with the issuance of the Post-Petition Bonds, simply to preserve the ability to commence a preference dispute, which could not be pursued in the near future, was questionable on the merits, and likely unnecessary based upon Travelers' obligation to return the Prepetition Collateral after the underlying liability associated with the pre and Post-Petition Bonds no longer exists.

**B.**     **Allowance of an Administrative Expense Claim is Permitted Under Sections 503 and 364 of the Bankruptcy Code.**

35.     Bankruptcy Code section 503(b)(1)(A) provides, in relevant part, that "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including, the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A).

36.     To the extent claims are made pursuant to the Indemnity Contract that exceed the Prepetition Collateral, the Debtors seek to grant Travelers an allowed administrative claim pursuant to Section 503(b) of the Bankruptcy Code (behind existing claims of the DIP Lender, the Pre-Petition Secured Parties, and the Carve Out, as each such terms are defined in either the Final Cash Collateral Order and/or the Final DIP Order). However, should a Payoff Event occur, and without the requirement of any further order of the Bankruptcy Court, Travelers shall be granted an allowed administrative claim pursuant to Section 364 of the Bankruptcy Code for any such claims.

37.     Pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estate. *See, e.g., In re Sirr3asko Production Co.*, 47 B.R. 444, 448-49 (D. Colo.1985) (authorizing interim financing agreement where Debtors' best business judgment indicated financing was necessary and reasonable for benefit of estate); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y 1990) (with respect to postpetition credit, courts "permit Debtor in possession to exercise their basic business. judgment consistent with their fiduciary duties."); *See also* 3 *Collier on Bankruptcy* ¶ 364.03, at 364-7-18 (15th ed. rev. 1999).

38.     Bankruptcy Code § 364(c) provides, in pertinent part, that:

(c)     If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt

(1) w ith priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

11 U.S.C. §364(c).

39.     In satisfying the standards of section 364 of the Bankruptcy Code, a debtor need not seek credit form every available source, but should make a reasonable effort to seek other sources of credit available of the type set forth in sections 364(a) and (b) of the Bankruptcy Code. *See, e.g., In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated by good faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such

credit is unavailable"); *Ames*,115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing where debtors approached several lending institutions).

40.     The Debtors have attempted to make alternate arrangements in an effort to replace the terminated bonds, but the Debtors were not able to make any such arrangements on as competitive a basis as provided by Travelers, as set forth in the Term Sheet, within the short time frame and on the terms required by the Debtors.  Moreover, given its long history of transacting with the Debtors and its institutional knowledge of the Debtors' business, the Debtors believe that Travelers is ultimately the most efficient and cost effective source for the Post-Petition Bonds, as evidenced in large measure by Travelers' prompt effecting of the bonding needs of the Debtors after the execution of the Term Sheet.  Accordingly, the Debtors believe that the Term Sheet represents the best available alternative at this time

41.     Additionally, Travelers and the Debtors conducted extensive negotiations as to the terms set forth in the Term Sheet, and Travelers informed the Debtors that it was unwilling to extend postpetition credit unless all claims of Travelers in respect of amounts owed under or in connection with the Post-Petition Bonds are entitled to administrative status pursuant to sections 503(b) or 364(c)(1) of the Bankruptcy Code.  Such relief is commonly obtained by bonding companies that enter into agreements with chapter 11 debtors. *See, e.g., In re New Century*, Case No. 07-10416 (KJC) (Bankr. D. Del. May 21, 2007); *In re Kmart Corporation*, Case No. 02-02474 (SPS) (Bankr S.D. Ill. March 21, 2002); *E.Spire Communications, Inc.*, Case No. 01-0974 (WS) (Bankr. D. Del. May 16, 2001).

42.     The Debtors believe that purchasing the Post-Petition Bonds under the terms and conditions provided by the Term Sheet is in the best interests of the Debtors, their

estate and their creditors.  Accordingly, the Debtors should be granted the authority to enter into the Term Sheet to purchase the Post-Petition Bonds.

**C.    The Debtors Should be Permitted to Pay the Premiums and Other Fees Associated With the Surety Bonds as Set Forth in the Term Sheet Pursuant to Section 363(b) of the Bankruptcy Code.**

43.    Section 363(b) of the Bankruptcy Code permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing.  Additionally, Section 105(a) of the Bankruptcy Code allows the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  The purpose of section 105(a) is to ensure a bankruptcy court's power to take whatever action "is appropriate or necessary in aid of the exercise of [its] jurisdiction."  2 *Collier on Bankruptcy*, ¶ 105.01, at 105-5 (15th rev. ed. 1997) (footnote omitted).

44.    The Debtors should be permitted to pay the premiums for the Post-Petition Bonds and the other fees set forth in the Term Sheet, including Travelers' attorney's fees in connection with the bonding facility.  *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *see also In re Delaware Hudson Ry. Co.*, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

45.    Once a debtor articulates a valid business justification, the business judgment rule creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985). The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing.  *See, e.g., In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtors' management decisions.").

46.    As explained herein, obtaining the Post-Petition Bonds is necessary, even vital, to the preservation of value, and successful sale of the Debtors' servicing business. Moreover, the premiums for the Post-Petition Bonds and the requirement of the Debtors to pay Travelers' attorneys' fees is reasonable, and in accord with the industry standard for such bonding arrangements.  Indeed, bankruptcy courts frequently permit debtors to purchase surety bonds and pay related fees as required by the circumstances of their bankruptcy cases.  *See, e.g., In re In re New Century*, Case No. 07-10416 (KJC) (Bankr. D. Del. May 21, 2007); *In re Adelphia*. Case No. 02-41729 (REG) (Bankr. S.D.N.Y. Sept, 13, 2006); *In re Kmart Corporation*, Case No. 02-02474 (SPS) (Bankr S.D. Ill. March 21, 2002).  Accordingly, the Debtors should be authorized, pursuant to section 363(b) of the Bankruptcy Code to pay the costs associated with the entry into the Term Sheet.

## NOTICE

47.     Notice of this Application will be provided to (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Bank of America; (iv) Counsel to the Agent for the Debtors' Postpetition Lender; (v) counsel to Travelers; and (vi) all parties entitled to notice under Del. Bankr. LR 2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PREVIOUS REQUEST

48.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court issue and enter an order pursuant to sections 105(a), 362, 363(b), 364(c) and 503(b) of the Bankruptcy Code and Bankruptcy Rules 4001 and 9019: (i) approving the Term Sheet and Indemnity Contract; (ii) authorizing the Debtors to obtain the Post-Petition Bonds; (iii) granting Travelers an administrative claim with respect to any claim associated with the Post-Petition Bonds; and (iv) granting such other and further relief as may be just and proper.

Dated:   Wilmington, Delaware    YOUNG CONAWAY STARGATT & TAYLOR, LLP
      September 19, 2007

James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Kara Hammond Coyle (No. 4410)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession