# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| American Home Mortgage Holdings, Inc., a | ) | |
| Delaware corporation, *et al.*, | ) | Case No. 07-11047(CSS) |
| | ) | |
| Debtors. | ) | Jointly Administered |

## OBJECTION AND RESERVATION OF RIGHTS
## OF WELLS FARGO BANK, N.A. TO THE MOTION, ASSUMPTION
## NOTICE AND SALE OF THE LOAN SERVICING BUSINESS
### (D.I. 11, 12, 113, 403, 674, 746)

Wells Fargo Bank, National Association, as Master Servicer, Securities Administrator, Trust Administrator, and/or Indenture Trustee (*"Wells Fargo"*) for approximately 78 securitization transactions for which American Home Mortgage Servicing, Inc., (*"AHM Servicing"*) or one of the other Debtors serves as servicer, hereby files its Objection and Reservation of Rights to the Motion, Assumption Notice and the Sale of the Loan Servicing Business (the *"Objection"*). In support of this Objection, Wells Fargo states as follows:

## I.    SUMMARY OF OBJECTION

1.    Wells Fargo, as Master Servicer, Securities Administrator, Trust Administrator, and/or Indenture Trustee, files this Objection for, among other things, the following reasons:

      a.    The Debtors are in default under certain servicing agreements as a result of using certain funds belonging to the respective securitization trust to the extent a Rapid Amortization Event (as defined below) has occurred;

      b.    The cure amount of $0 contained in the Assumption Notice (as defined below) does not represent a good faith estimate of the amount necessary to cure defaults under the terms of the Servicing Agreements, and in any event, fails to consider latent defects or defaults under the terms of the Servicing Agreements which to a high degree of mathematical certainty exist in connection with the servicing of any portfolio of loans, including but not limited to any losses incurred in connection with the transfer of servicing;

c.      The identity of the purchaser (or purchasers) of the Loan Servicing Business is unknown and as a result it is impossible to determine whether such purchaser(s) will be able to provide adequate assurance of future performance of its obligations under the relevant Servicing Agreements;

d.      Certain servicing agreements may have been terminated pre-petition in accordance with the terms of such agreements and therefore cannot be assumed or assigned;

e.      The Debtors may attempt to amend or modify any of the servicing agreements in an impermissible manner; and

f.      Wells Fargo has not been provided with a reasonably final form of an asset purchase agreement(s) to review its consistency with the terms and obligations under the relevant Servicing Agreements.

## II.      BACKGROUND

### A.      PROCEDURAL BACKGROUND

1.      On August 6, 2007 (the *"Petition Date"*), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2.      On August 6, 2007, the Debtors filed their Emergency Motion of the Debtors for Orders:   (A)(I) Approving Sales Procedures; (II) Scheduling A Hearing to Consider Sale of Certain Assets Used in the Debtor's Loan Servicing Business; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief; and (B)(I) Authorizing the Sale of Such Assets Fee and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Purchase Agreement Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief (the *"Motion"*).   The Court approved the Motion on August 7, 2007, establishing certain auction and sales procedures with respect to the loan servicing business, establishing August 27, 2007 as the date upon which assumption notices were required to be filed.

3.      On or about August 27, 2007, the Debtors filed their Notice of (I) Possible Assumption and Assignment of Certain Leases, License Agreements, and Executory Contracts;

and (II) Proposed Cure Obligations (the *"Assumption Notice"*).[1]  The Debtors proposed a cure amount of "$0" for each of the servicing agreements listed on the schedule attached to the Assumption Notice.

4.    On August 31, 2007, the Debtors filed a Notice amending certain dates in the sale process.  Notably, the date upon which initial bids were due was moved to September 18, 2007, with an auction scheduled for September 24, 2007, and a hearing to approve the sale on October 1, 2007.

5.    The Debtors filed a Modified Notice of (I) Possible Assumption and Assignment of Certain Leases, License Agreements, and Executory Contracts; and (II) Proposed Cure Obligations, if Any, (the *"Modified Assumption Notice"*) which added additional contracts to the list of those contracts to be assumed and established an extended objection deadline to September 20, 2007.  Finally on September 14, 2007, the Debtors filed a further Notice rescheduling the auction, setting October 2, 2007 as the date on which bids must be received, establishing October 5, 2007 as the date of the auction, and setting a hearing to approve the sale for October 9, 2007.  An extended deadline of October 1, 2007 was established with respect to objections to the sale or "the relief requested in the Sale Motion."  As the Sale Motion sought authority to assume or assign certain executory contracts, it is unclear at best when objections to cure amounts and the assignment and assumption of executory contracts are required to be submitted.  Both objection deadlines are anomalous in that they require objections prior to the identification of potential purchasers who may be assuming the servicing rights that are being sold.

---

[1]    Wells Fargo understands that the Debtors attempted to include all of the various servicing agreements they are a party to in the Notice of Assumption as modified by the Modified Assumption Notice.  Wells Fargo has attempted to reconcile the list of Servicing Agreements and believes that some servicing agreements still may not be included and others may be mislabeled or misidentified.  Wells Fargo reserves its rights with respect to these deficiencies.

B.    **NATURE OF THE DEBTOR'S BUSINESS**

6.    Prior to the filing of these bankruptcy cases, American Home Mortgage, Inc.'s ("AHM") business primarily entailed the origination, servicing, and sale of mortgage loans. The servicing business is generally conducted through AHM Servicing.[2]  As described by the Debtors in a number of pleadings filed with this Court, loan servicing typically includes: (i) collecting and remitting loan payments received from the borrowers (in strict accordance with the terms of the relevant Servicing Agreement); (ii) making required advances; (iii) accounting for principal and interest; (iv) customer service; (v) holding in escrow payments received from borrowers for payment of taxes and insurance and using such funds to make payments to the relevant insurer or tax authority when due; and, if applicable, (vi) contacting delinquent borrowers and supervising foreclosures and property dispositions in the event of unremedied defaults. Proper servicing requires diligence and sensitivity to maximize collections, particularly on delinquent loans, while at the same time complying with applicable laws and regulations. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion.

7.    Under the terms of an Order entered on August 7, 2007, the Debtors were authorized and ordered to continue to service loans in accordance with the applicable securitization documents, and any post-petition defaults of the Debtors under the terms of the securitization documents were granted priority as an administrative expense.

8.    Wells Fargo serves as Master Servicer, Securities Administrator, Trust Administrator and/or Indenture Trustee under the terms of the Pooling and Servicing Agreements, Master Servicing Agreements or other similar agreements listed on *Exhibit A*

---

[2]    American Home Mortgage Acceptance, Inc. ("AHM Acceptance") is at least the nominal servicer of certain HELOC loans in some of the securitizations. Wells Fargo understands that the Debtors intend that the Motion include servicing assets owned by AHM Acceptance.

relating to the Debtors.[3]  In its capacity as Master Servicer, Wells Fargo generally monitors the servicing of AHM Servicing including but not limited to the servicer's compliance with the terms of the relevant Servicing Agreement.

C.    CERTAIN ALLEGED FACTS RELATING TO SECURITIZATIONS WITH HELOC LOANS

9.    Wells Fargo has been advised that on August 2, 2007, General Motors Acceptance Corp. ("GMAC"), at the instruction of Financial Guaranty Insurance Company ("FGIC"), terminated the servicing rights of AHM Servicing and AHM Acceptance under each HELOC Servicing Agreement.  FGIC asserts that the servicing rights of AHM Servicing and AHM Acceptance were subject to termination upon, among other things, the failure of American Home Mortgage Investment Corp. and its consolidated subsidiaries to have a Tangible Net Worth (as defined in the HELOC Servicing Agreements and related Indentures) of at least $530 million.

10.    FGIC alleges that AHM Servicing and AHM Acceptance were replaced as servicer of the HELOC Mortgage Loans upon their termination with GMAC by the terms of the GMAC back-up servicing agreements and the HELOC Servicing Agreements and without any further action.  FGIC further alleges that the termination and replacement of AHM Servicing and AHM Acceptance as servicer of the HELOC Mortgage Loans in the FGIC Securitizations occurred before the filing of the Debtors' bankruptcy cases.[4]

---

[3]    Wells Fargo is verifying this list and reserves the right to supplement this list at any time to include additional transactions and agreements.

[4]    FGIC has filed its own objection to the Sale in which it details its allegations in greater detail.

### III.    OBJECTION

#### A.    THE DEBTORS MAY NOT ASSUME AND ASSIGN ANY SERVICING AGREEMENT UNTIL ALL DEFAULTS ARE CURED

11.    The Debtors may not assume and assign any executory contract unless they have cured all existing defaults.  11 U.S.C. § 365(b)(1); *Metropolitan Airports Comm. v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)*, 6 F.3d 492, 496 (7th Cir. 1993); *In re Superior Toy & Mfg. Co.*, 78 F.3d 1169, 1174 (7th Cir. 1996) ("The language of § 365(b)(1) is unequivocal. A party to an executory contract must be paid all amounts due him under the contract before the contract may be assumed."); *see generally In re Burger Boys, Inc.*, 94 F.3d 755 (2d. Cir. 1996). In this case, the Debtors may be in default of certain obligations under certain HELOC Servicing Agreements as a result of their failure to use certain principal payments on HELOC loans to make distributions to holders of certain tranches of senior certificates after the occurrence of a Rapid Amortization Event.

12.    Rapid Amortization Event is defined under the relevant agreements to include, among other things, the "declaration of bankruptcy or insolvency by . . . the HELOC Servicer." *See, e.g.,* Section 3.08 of that certain Indenture (the *"Example Indenture"*), dated as of June 22, 2005, by and between American Home Mortgage Investment Trust 2005-2, as Issuer, Wells Fargo Bank, N.A., as Securities Administrator, and Deutsche Bank National Trust Company, as Indenture Trustee, at p. 43.  In this case, AHM Acceptance as the Servicer of the HELOC loans filed a voluntary petition for bankruptcy.[5]    Notice is not required to trigger the Rapid Amortization Event.  *See* Section 3.08 of the Example Indenture (a Rapid Amortization Event will occur without any notice or other action on the part of the Indenture Trustee, the Credit Enhancer or the Noteholders immediately on the occurrence of such event).

---

[5]    Other parties to the contract assert that other Rapid Amortization Events also exist, including but not limited to, the failure of American Home Acceptance Corp and/or other Debtors to meet a Tangible Net Worth test contained in the relevant agreement and assert that the Rapid Amortization Event may have predated the filing of the petition in these proceedings.

13.    A Rapid Amortization Event is important because it alters the manner in which the Servicer distributes the amounts it collects in the Collection Account.  Upon the occurrence of a Rapid Amortization Event, certain holders of certificates are entitled to an enhanced distribution. Once a Rapid Amortization Event has occurred, the Investor Principal Distribution Amount "is equal to all Principal Collections received during the related Due Period."  Appendix at p. 40 to the Example Indenture.  As a result of the definition of Investor Principal Distribution Amount, the AHM Acceptance, as Servicer, should be passing through the full amount of Principal Collections collected every month and not deducting amounts to fund draws by borrowers under the HELOCs.

14.    Wells Fargo believes that the following amounts were used to make advances on HELOC loans, rather than used to make distributions to holders of the certificates.  In other words, Wells Fargo has not received all Principal Collections received during the related Due Period.  The amount of Principal Collections that should have gone to the holders of certain certificates for the August payment period with respect to each individual transaction is broken down as follows:

| AHMIT 2005-1 | $228,915.80 |
| AHMIT 2005-2 | $464,156.91 |
| AHMIT 2005-4 | $400,630.10 |
| AHMIT 2006-2 | $290,877.79 |
| AHMIT 2007-A | $567,259.08 |

These amounts will increase for each payment period after August 2007 for each transaction (and if a Rapid Amortization Event occurred pre-petition additional amounts may likewise be due for these periods as well).  Until and unless the Debtors cure these defaults, Wells Fargo objects to any assumption and/or assignment of such servicing agreements.

**B.    WELLS FARGO OBJECTS TO THE CURE AMOUNT GIVEN THE RAPID AMORTIZATION EVENT DEFAULTS AND THE RELATIVE CERTAINTY OF OTHER DEFAULTS UNDER THE TERMS OF THE SERVICING AGREEMENTS**

15.    As set forth above, the Debtors are servicing nearly 200,000 mortgage loans.  While Wells Fargo cannot identify at this time servicing defaults with any particular loan, the rapidity of these proceedings has made an evaluation of defaults on a loan-by-loan basis impossible. Even the best servicers, however, make mistakes, and have less than a 100% rate of execution under the terms of their servicing agreements.

16.    By means of example (and by no means limiting any potential default under the terms of the Servicing Agreements), Wells Fargo has identified the following defaults that could have occurred with respect to any one of the nearly 150,000 loans that AHM Servicing services and for which Wells Fargo serves as Master Servicer or Securities Administrator:

A.    Misallocation of Deposits/Reconciliation Issues
   (a)   Failure to make appropriate deposits into the Protected Account or Custodial Account as appropriate
   (b)   Failure to make deposits into the Servicing Accounts
   (c)   Failure to timely reconcile Servicing Accounts

B.    Failure to make Servicer Advances when appropriate.

C.    Failure to make appropriate Liquidation Advances.

D.    Inappropriate reimbursement of Liquidation and Servicing Advances (i.e. recovery of advances from proceeds or payments on unrelated Mortgage Loans).

E.    Failure to remit Insurance Payments to Appropriate Insurer.

F.    Failure to remit Real Estate Taxes or other Taxes to the Appropriate Tax Authority.

G.    Failure to remit Other Assessments or Fees to Appropriate Payee (e.g. Association dues etc.)

H.    Inappropriate crediting of Mortgage Payments.

I.    Misappropriation of funds from Accounts or Lock Box for unauthorized purposes (e.g. using trust funds to cover Servicer or Depositor's obligations).

J.    Inappropriate handling of Loss Mitigation Issues (losses as a result of negligence in handling defaults).

K.      Any grant of inappropriate modifications to any Mortgage Loan or Mortgage File.

L.      Failure to perform Indemnification Obligations.

M.      Failure to Cooperate in Servicing Transition Issues.

N.      Claims arising out of any Violation of Law relating to Debt Collection Practices.

O.      Failure to properly maintain mortgage file and record payments and modification.

P.      Claims against the Servicer by virtue of permitting the assumption of a mortgage by a third party in violation of the standards set in the Servicing Agreement.

Q.      Claims arising out of any consent to a senior lien on the mortgage premises.

R.      Failure to maintain Primary Mortgage Insurance Policies where appropriate.

S.      Failure to Maintain Hazard Insurance.

T.      Failure to notify of known document exception that will adversely affect Certificateholders' interest including right to have a timely repurchase of the Mortgage Loan.

U.      Failure to maintain fidelity bond.

V.      Failure to maintain flood insurance (if applicable).

W.      Improper allocation of cash in accordance with the terms of the relevant agreements.

X.      Any other breach of the terms and conditions of the servicing agreement or related agreements.

Y.      Failure to pay the reasonable fees and expenses of the Master Servicer or Indenture Trustees including but not limited to the fees and expenses of their respective counsel in connection with the servicing transfer or otherwise..

17.     To the extent that any default is unliquidated, such defaults must be subject to an estimation hearing before this Court pursuant to Section 502(c) of the Bankruptcy Code.  The Debtors, therefore, must agree to establish adequate reserves to cure all defaults pending an estimation hearing or other resolution of these cure claims.

18.     Section 502(c) of the Bankruptcy Code provides:

        There shall be estimated for purpose of allowance under this section -

(1) any contingent or unliquidated claim, the fixing or liquidation
of which, as the case may be, would unduly delay the
administration of the case; or

(2) any right to payment arising from a right to an equitable
remedy for breach of performance.

11 U.S.C. § 502(c).  Courts have held that "the Bankruptcy Code requires an estimation in order
to prevent undue delay in the administration of the estate."  *Official Comm. Asbestos Claimants
v. Asbestos Prop. Damage Comm. (In re Federal-Mogul Global, Inc.*), 330 B.R. 133, 153 (D.
Del. 2005) (discussing need to estimate unliquidated claims).  *See also Owens Corning v. Credit
Suisse First Boston*, 322 B.R. 719, 725 (D. Del. 2005) (discussing need to estimate present and
future claims against debtor).  Wells Fargo believes the establishment of a reserve would be an
appropriate means of resolving these types of cure objections.  Through an appropriate reserve,
the Master Servicer and Trustees may make claims for actual damages incurred by the trusts,
while permitting the transaction to proceed.

19.    Reserves were established in cases such as *In re Conseco, Inc.*, Case No. 02-
49181, pending in the United States Bankruptcy Court for the Northern District of Illinois, and
*In re DVI, Inc.*, Case No. 03-12656 pending in this District to help cure defects in the loan files
and in connection with breaches of servicing obligations as they were discovered.  Upon
discovery of a breach, the Trustee filed a claim against an escrow in the amount of the damage
created by the breach providing a mechanism for curing the defect.  These reserves balanced the
need for a quick disposition of the serving business with the inability to quickly, accurately and
equitably identify all defaults under the relevant servicing agreements.  In *Conseco,* the reserve
was $37,000,000 for a portfolio of $24,000,000,000 in manufactured housing loans.  In *DVI*, the
reserve was a more modest amount of up to $9,250,000 for a much smaller portfolio.

20.    In the instant case, the Debtors' failure to estimate or establish reserves should be
fatal to the contemplated sale.  In order for the Debtors and the successful purchaser to

consummate the sale, all cure amounts must be liquidated or adequately reserved so that the Debtors place into escrow or a reserve a sufficient amount of funds to satisfy all of its cure obligations.  This is particularly true given the rapidity of these proceedings and the lack of an appropriate amount of time to evaluate potential claims against the Debtor.  Until and unless the Debtors provide such estimation and/or establish adequate reserves, Wells Fargo objects to the contemplated sale.

C.    **THE DEBTORS MAY NOT ASSUME AND ASSIGN ANY SERVICING AGREEMENT ABSENT ADEQUATE ASSURANCE OF FUTURE PERFORMANCE UNDER THE SERVICING AGREEMENTS**

21.    The assignee must provide adequate assurance of future performance of suchcontract, "whether or not there has been a default in such contract or lease."  11 U.S.C. §365(f)(2)(B). Although the term "adequate assurance of future performance" is not defined in the Bankruptcy Code,  adequate assurance of future performance "is to be given a practical, pragmatic construction based upon . . . the circumstances of [the] case."  *In re Texas Health Enter., Inc., 246 B.R. 832,* 834 (Bankr. E.D. Tex. 2000) (quoting *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D.Fla. 1994)).

22.    "Assurance of future performance is adequate 'if performance is likely (i.e., more probable than not)' and the degree of assurance necessary to be deemed adequate 'falls considerably short of an absolute guaranty.'"  *Id.* at 835 (quoting *In re PRK Enterprises, Inc.*, 235 B.R. 597, 603 (Bankr. S.D.Tex. 1999)).  Courts generally "evaluate the financial condition of the assignee and the likelihood that the non-debtor party will receive the benefit of its bargain from the assignee."  *Id.* (citing *In re Casual Male Corp.*, 120 B.R. 256, 264-65 (Bankr. D. Mass 1990)).  In particular, courts interpreting the requirement have focused on the assignee's "ability to fulfill the financial obligations" under the contract.  *In re Glycogenesys, Inc.*, 352 B.R. 568, 578 (Bankr. D. Mass. 2006) (citing *In re Martin Paint Stores*, 199 B.R. 258 (Bankr. S.D.N.Y.

1996)); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524 (Bankr. D.N.J. 1988)); *In re Old South Coors, Inc.*, 27 B.R. 923, 926 (Bankr. N.D. Miss. 1983) (court considered long and successful business experience and financial strength of each proposed assignee in evaluating assignment by debtor in possession of its rights under a beer distributorship agreement). *Cf. In re Pioneer Ford Sales, Inc.*, 729 F.2d 27, 28-30 (1st Cir. 1984) (in a case decided under Bankruptcy Code Section 365(c)(1)(A) and Rhode Island law, court held that the counterparty to a franchise contract acted reasonably in withholding consent to assignment of a contract where assignee could not meet working capital requirements of the franchise contract). The burden is on the movant-debtor. *Texas Health, 246 B.R. at 834.*

23.    It is impossible at this time to determine whether the purchaser will be able to provide adequate assurance of future performance since such purchaser is unknown. As a result, Wells Fargo reserves its rights with respect to the identity of the purchaser and such purchaser's ability to provide adequate assurance of future performance under the terms of the servicing agreements.

**D.    THE DEBTORS CANNOT ASSUME AND ASSIGN AGREEMENTS WHICH NO LONGER EXIST**

24.    It is axiomatic that the Debtors cannot assume and assign agreements that no longer exist. *See, e.g., Erickson v. Polk*, 921 F.2d 200 (8th Cir. 1990); *Vanderpark Props., Inc. v. Buchbinder (In re Windmill Farms, Inc.,)*, 841 F.2d 1467, 1469 (9th Cir. 1988). In this case, certain parties allege that certain servicing agreements were terminated pre-petition, and therefore may not be assumed and assigned by the Debtors. To the extent that certain servicing agreements are deemed by this Court to have terminated pre-petition, the Debtors have no right to assume and assign those agreements in the absence of the consent of all of the parties thereto.

E.  **THE DEBTORS ARE PROHIBITED FROM MODIFYING THE TERMS AND CONDITIONS OF ANY OF THE SERVICING AGREEMENTS**

25.    A decision to assume or reject an executory contract is "an all or nothing proposition." *Schlumberger Resource Management Serv., Inc. v. Cellnet Data Sys., Inc. (In re Cellnet Data Sys., Inc.),* 327 F.2d 242, 249 (3d Cir. 2003).  Thus, if a debtor assumes a contract, it must do so *cum onere*, with all the benefits as well as the burdens.  *Cinicola v. Scharffenberger*, 248 F.3d 110, 119-120 (3d Cir. 2001); *American Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 78 (3d Cir. 1999).  *See also In re Beverage Canners Int'l Corp.*, 255 B.R. 89, 95 (Bankr. S.D. Fla. 2000) ("It is black letter law that an executory contract must be either assumed in its entirety, *cum onere*, or completely rejected."); *In re Rigg*, 198 B.R. 681, 685 (Bankr. N.D. Tex. 1996) ("If a debtor chooses to assume . . . an executory contract or unexpired lease, he must assume them according to their terms.").  The assumption and assignment of an executory contract does not give the debtor or the assignee the ability or the right to modify the terms of the agreement being assumed and assigned.  *See, e.g., Medtronic Ave., Inc., v. Advanced Cardiovascular Sys., Inc.,* 247 F. 3d 44, 60 (3d Cir. 2001).   In the *Medtronic* case, the court explained that:

> [a]n assignment does not modify terms of the underlying contract. It is a separate agreement between the assignor and the assignee which merely transfers the assignor's contract rights, leaving them in full force and effect as to the party changed.  An assignment is intended to change only who performs an obligation, not the obligation to be performed.

*Id.  See also In re Federal-Mogul Global, Inc.,* No. 05-2423, 2007 U.S. App. LEXIS 6120, at *9 (3d Cir. Mar. 15, 2007) (explaining that debtor is not able to modify obligations in contract assumed and assigned pursuant to Section 365 of the Bankruptcy Code).

26.    In prior cases, the purchaser of servicing rights has required that certain modifications or amendments be made to the servicing agreements as a condition of their bid. Because of the anomaly that objections to the proposed sale are required before even bids for the

Loan Servicing Business are received, Wells Fargo does not know whether the purchaser will make modifications to the servicing agreements a condition of its bid. Wells Fargo objects to the extent that any accepted bid modifies the terms of any Servicing Agreement without the consent of the respective contract counterparties.

## RESERVATION OF RIGHTS

27.. Wells Fargo Bank as Master Servicer, on behalf of itself and any Trustee, reserves the right to assert cure claims for breaches of representations and warranties with respect to individual loan contracts and the adequacy of the mortgage file to the extent that the originator of the loans is likewise assuming the relevant agreements or to the extent that the obligations under the relevant transactional documents are not severable from those of the servicing agreements.

28. Wells Fargo also reserves its rights with respect to the terms and conditions set forth in the proposed Asset Purchase Agreement. The terms of the agreement must be consistent with the terms of the relevant Servicing Agreements. Wells Fargo has no ability to make this assessment until it is provided with a final form of such agreement.

29. Wells Fargo reserves the right to amend or supplement its objection at anytime prior to the hearing on any sale.

## CONCLUSION

WHEREFORE, Wells Fargo, as Master Servicer, Securities Administrator, Trust Administrator and/or Trustee respectfully requests that: (a) the proposed assumption and assignment of the Servicing Agreements be denied until (i) the breach with respect to the failure to pay to the Trustee (on account of the Rapid Amortization Event) all of the Principal collected with respect to certain HELOC Servicing Agreements is cured, and (ii) an appropriate reserve or escrow is established for the benefit of the securitization trusts to cure any latent or other defects or breaches under the terms of the Servicing Agreements; (b) all of its rights, remedies and

claims with respect to the identity of the purchaser or purchasers of the Loan Servicing Business, including but not limited to, the ability of such purchaser to provide adequate assurance of future performance, be reserved and preserved; and (c) all of its rights, remedies and claims with respect to the form of the asset purchase agreement be reserved and preserved pending the availability of such document in final form; and (d) the Court grant such other and further relief as it deems equitable, just and proper.

September 20, 2007

/S/ TODD C. SCHILTZ
**WOLF, BLOCK, SCHORR AND SOLIS-COHEN, LLP**
Todd C. Schiltz (#3253)
1100 North Market Street, Suite 1001
Wilmington, DE 19801
Telephone: (302) 777-0313
tschiltz@wolfblock.com


and


**CHAPMAN AND CUTLER LLP**
FRANKLIN H. TOP, III
111 WEST MONROE STREET
CHICAGO, IL 60603
TELEPHONE:  (312) 845-3824
top@chapman.com

*Attorneys for Wells Fargo Bank, National Association, as Master Servicer*