# EXHIBIT A

**EXECUTION COPY**

---

THIRD AMENDED AND RESTATED MASTER REPURCHASE AGREEMENT

Among

IXIS REAL ESTATE CAPITAL INC., as Buyer

and

AMERICAN HOME MORTGAGE CORP.,
AMERICAN HOME MORTGAGE INVESTMENT CORP.,
AMERICAN HOME MORTGAGE ACCEPTANCE, INC.
AMERICAN HOME MORTGAGE HOLDINGS, INC., and
AMERICAN HOME MORTGAGE SERVICING, INC. f/k/a COLUMBIA NATIONAL,
INCORPORATED, collectively, as Seller

Dated as of July 15, 2005

---

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 1. | APPLICABILITY | 1 |
| 2. | DEFINITIONS | 1 |
| 3. | INITIATION; TERMINATION | 23 |
| 4. | MARGIN AMOUNT MAINTENANCE | 31 |
| 5. | INCOME PAYMENTS | 32 |
| 6. | REQUIREMENTS OF LAW | 33 |
| 7. | SECURITY INTEREST | 34 |
| 8. | PAYMENT, TRANSFER AND CUSTODY | 35 |
| 9. | HYPOTHECATION OR PLEDGE OF PURCHASED ASSETS | 36 |
| 10. | SELLER REPRESENTATIONS | 36 |
| 11. | COVENANTS OF SELLER | 42 |
| 12. | EVENTS OF DEFAULT | 49 |
| 13. | REMEDIES | 51 |
| 14. | INDEMNIFICATION AND EXPENSES | 53 |
| 15. | RECORDING OF COMMUNICATIONS | 54 |
| 16. | SINGLE AGREEMENT | 55 |
| 17. | NOTICES AND OTHER COMMUNICATIONS | 55 |
| 18. | ENTIRE AGREEMENT; SEVERABILITY | 55 |
| 19. | NON-ASSIGNABILITY | 56 |
| 20. | TERMINABILITY | 56 |
| 21. | GOVERNING LAW | 56 |
| 22. | SUBMISSION TO JURISDICTION; WAIVERS | 57 |
| 23. | NO WAIVERS, ETC. | 57 |
| 24. | SERVICING | 58 |
| 25. | INTENT | 59 |
| 26. | PERIODIC DUE DILIGENCE REVIEW | 59 |
| 27. | BUYER'S APPOINTMENT AS ATTORNEY-IN-FACT | 60 |
| 28. | MISCELLANEOUS | 62 |
| 29. | CONFIDENTIALITY | 62 |

30.   CONFLICTS ................................................................................................................. 63
31.   SET-OFF ...................................................................................................................... 63
32.   OBLIGATIONS JOINT AND SEVERAL.......................................................................... 63

NYLIB5 837942.8

<u>SCHEDULES</u>

| | |
|---|---|
| SCHEDULE 1 | Representations and Warranties Re: Mortgage Loans |
| SCHEDULE 2 | [Reserved] |
| SCHEDULE 3 | Collateral Schedule |
| SCHEDULE 4 | Jurisdictions of Incorporation and Organizational Identification Numbers of Seller Entities |
| SCHEDULE 5 | Existing Financing Facilities |

<u>EXHIBITS</u>

| | |
|---|---|
| EXHIBIT I | Transaction Request |
| EXHIBIT II | Underwriting Guidelines |
| EXHIBIT III | Form of Opinion Letter |
| EXHIBIT IV | UCC Filing Jurisdictions |
| EXHIBIT V | Form of Account Agreement |
| EXHIBIT VI | Form of True Sale Certification |
| EXHIBIT VII | Form of Servicer Notice |
| EXHIBIT VIII | Form of Request for Additional Transactions For Excess Margin |
| EXHIBIT IX | Form of Compliance Report |

NYLIB5 837942 8

### THIRD AMENDED AND RESTATED MASTER REPURCHASE AGREEMENT

This is a THIRD AMENDED AND RESTATED MASTER REPURCHASE AGREEMENT, dated as of July 15, 2005, among AMERICAN HOME MORTGAGE CORP., a New York corporation ("AHMC"), AMERICAN HOME MORTGAGE INVESTMENT CORP., a Maryland corporation ("AHMIC"), AMERICAN HOME MORTGAGE ACCEPTANCE, INC., a Maryland corporation ("AHMA"), AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation ("AHMH"), AMERICAN HOME MORTGAGE SERVICING, INC. f/k/a COLUMBIA NATIONAL, INCORPORATED, a Maryland corporation ("AHMS" and, collectively with AHMC, AHMIC, AHMA and AHMH, the "Seller" and each a "Seller Entity") and IXIS REAL ESTATE CAPITAL INC. f/k/a CDC MORTGAGE CAPITAL INC., a New York corporation ("Buyer").

WHEREAS, Seller and Buyer are parties to that certain Second Amended and Restated Master Repurchase Agreement, dated as of June 1, 2004 (the "Second Amended and Restated Repurchase Agreement"), between Seller and Buyer; and

WHEREAS, Seller has requested Buyer to agree to amend certain provisions of the Second Amended and Restated Repurchase Agreement as set forth in this Third Amended and Restated Master Repurchase Agreement. Buyer is willing to agree to such amendments, but only on the terms and subject to the conditions set forth in this Third Amended and Restated Master Repurchase Agreement.

NOW, THEREFORE, in consideration of the premises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Seller and the Buyer hereby agree as follows:

1.    **APPLICABILITY**

From time to time the parties hereto may enter into transactions ("Committed Transactions") in which Seller agrees to transfer to Buyer Mortgage Loans against the transfer of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such Mortgage Loans on demand by Buyer against the transfer of funds by Seller. Additionally, from time to time the Buyer is prepared to consider entering into additional transactions ("Uncommitted Transactions") in which Seller agrees to transfer to Buyer Mortgage Loans against the transfer of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such Mortgage Loans on demand by Buyer, against the transfer of funds by Seller. Each such Committed Transaction and Uncommitted Transaction shall be referred to herein as a "Transaction" and shall be governed by this Agreement, unless otherwise agreed in writing.

2.    **DEFINITIONS**

As used herein, the following terms shall have the following meanings (all terms defined in this Section 2 or in other provisions of this Agreement in the singular to have the same meanings when used in the plural and vice versa). Terms otherwise not defined herein shall have the meanings assigned thereto in the Custodial and Disbursement Agreement.

"<u>Account Agreement</u>" shall mean a letter agreement among each Seller Entity, Buyer, and the Bank substantially in the form of <u>Exhibit V</u> attached hereto.

"<u>Act of Insolvency</u>" shall mean, with respect to any Person, (i) the filing of a petition, commencing, or authorizing the commencement of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, dissolution or similar law relating to the protection of creditors, or suffering any such petition or proceeding to be commenced by another which is consented to, not timely contested or results in entry of an order for relief; (ii) the seeking or consenting to the appointment of a receiver, trustee, custodian or similar official for such Person or any substantial part of the property of such Person; (iii) the appointment of a receiver, conservator, or manager for such Person by any governmental agency or authority having the jurisdiction to do so; (iv) the making or offering by such Person of a composition with its creditors or a general assignment for the benefit of creditors; (v) the admission by such Person of its inability to pay its debts or discharge its obligations as they become due or mature; or (vi) that any governmental authority or agency or any person, agency or entity acting or purporting to act under governmental authority shall have taken any action to condemn, seize or appropriate, or to assume custody or control of, all or any substantial part of the property of such Person, or shall have taken any action to displace the management of such Person or to curtail its authority in the conduct of the business of such Person.

"<u>Adjusted Consolidated Funded Debt</u>" shall mean, on any date of determination, the sum of (a) the Consolidated Funded Debt of AHMIC and any other Person which would be reflected on the consolidated balance sheet of AHMIC prepared in accordance with GAAP if such balance sheet were prepared as of such date of determination, less (b) 50% of any Subordinated Debt, less (c) the mortgage debt associated with the building and the land located at 538 Broadhollow Road, Melville, New York.

"<u>Affiliate</u>" shall mean with respect to any Person, any "affiliate" of such Person, as such term is defined in the Bankruptcy Code.

"<u>Aggregate Collateral Value</u>" shall mean an amount equal to the sum of the products of the book values (as determined in accordance with GAAP) of the consolidated assets of AHMIC and its Subsidiaries (such assets being categorized in the classes set forth on the calculation schedule that is part of Schedule 3 attached to this Agreement) times the percentage multiplier for each such class set forth on such calculation schedule.

"<u>Agreement</u>" shall mean this Third Amended and Restated Master Repurchase Agreement, as the same may be further amended, supplemented or otherwise modified in accordance with the terms hereof.

"<u>AHMA</u>" shall mean American Home Mortgage Acceptance, Inc., a Maryland corporation, and its successors in interest.

"<u>AHMC</u>" shall mean American Home Mortgage Corp., a New York corporation, and its successors in interest.

"AHMH" shall mean American Home Mortgage Holdings, Inc., a Delaware corporation, and its successors in interest.

"AHMIC" shall mean American Home Mortgage Investment Corp., a Maryland corporation, and its successors in interest.

"AHMS" shall mean American Home Mortgage Servicing, Inc. f/k/a Columbia National, Incorporated, a Maryland corporation, and its successors in interest.

"ALTA" shall mean the American Land Title Association.

"Alt-A Mortgage Loan" shall mean an Eligible Asset which is a Mortgage Loan made to a Mortgagor of "A" or "A-" credit quality, which is a secured by a lien on a single-family Residential Dwelling and for which the related Mortgagor has a FICO score of greater than 600.  In no event shall any Mortgage Loan be an "Alt-A Mortgage Loan" if the related Mortgagor does not have a FICO score of at least 600 as of the date of origination.

"Alt-A First Mortgage Loan" shall mean an Eligible Asset which is an Alt-A Mortgage Loan and a First Lien Mortgage Loan.

"Alt-A Second Mortgage Loan" shall mean an Eligible Asset which is an Alt-A Mortgage Loan and a Second Lien Mortgage Loan.

"Appraised Value" shall mean the value set forth in an appraisal made in connection with the origination of the related Mortgage Loan as the value of the Mortgaged Property (or the related residential dwelling unit in the Underlying Mortgaged Property, in the case of a Co-op Loan).

"Asset Schedule and Exception Report" shall have the meaning assigned thereto in the Custodial and Disbursement Agreement.

"Asset Value" shall mean as of any date of determination with respect to (A) each Eligible Asset that is not a Repurchased Mortgage Loan, a HELOC, an Alt-A Second Mortgage Loan or a Sub-Prime Second Mortgage Loan, the Purchase Percentage applicable to such Eligible Asset multiplied by the lesser of (a) the Market Value of such Mortgage Loan as of such date and (b) the outstanding principal balance of such Eligible Asset as of such date, (B) each Repurchased Mortgage Loan, 60% of the least of (a) 90% of the Market Value of such Mortgage Loan as of such date, (b) the outstanding principal balance of such Eligible Asset as of such date and (c) the Repurchased Appraised Value of such Mortgage Loan and (C) each Eligible Asset that is a HELOC, an Alt-A Second Mortgage Loan or a Sub-Prime Second Mortgage Loan, the Purchase Percentage applicable to such Eligible Asset multiplied by the lesser of (a) the Market Value of such Mortgage Loan as of such date and (b) the outstanding principal balance of such Eligible Asset as of such date; provided, that, the following additional limitations on Asset Value shall apply:

(1) after giving effect to any requested Transaction, the aggregate Asset Value of all Alt-A Mortgage Loans and Sub-Prime Mortgage Loans owned hereunder by Buyer as of such date of determination may not exceed the Non-Conforming Sub-Limit;

(2) after giving effect to any requested Transaction, the aggregate Asset Value of all Sub-Prime Mortgage Loans owned hereunder by Buyer as of such date of determination may not exceed the Sub-Prime Sub-Limit;

(3) after giving effect to any requested Transaction, the aggregate Asset Value of all Sub-Prime Second Lien Mortgage Loans owned hereunder by Buyer as of such date of determination may not exceed the Sub-Prime Second Lien Sub-Limit;

(4) after giving effect to any requested Transaction, the aggregate Asset Value of all Sub-Prime Mortgage Loans made to "C" or "D" credit quality Mortgagors owned hereunder by Buyer as of such date of determination may not exceed the Credit Sub-Limit;

(5) after giving effect to any requested Transaction, the aggregate Asset Value of all Mortgage Loans which are Manufactured Housing Mortgage Loans owned hereunder by Buyer as of such date of determination may not exceed the Manufactured Housing Sub-Limit;

(6) after giving effect to any requested Transaction, the aggregate Asset Value of all Mortgage Loans which are not occupied by the related Mortgagor as its primary residence (as determined on the origination date) owned hereunder by Buyer as of such date of determination may not exceed the N/O/O Sub-Limit;

(7) after giving effect to any requested Transaction, the aggregate Asset Value of all Repurchased Mortgage Loans owned hereunder by Buyer as of such date of determination may not exceed the Repurchased Mortgage Loan Sub-Limit;

(8) after giving effect to any requested Transaction, the aggregate Asset Value of all Co-op Loans owned hereunder by Buyer as of such date of determination may not exceed the Co-op Sub-Limit;

(9) after giving effect to any requested Transaction, the aggregate Asset Value of all Super Jumbo Mortgage Loans owned hereunder by Buyer as of such date of determination may not exceed the Super Jumbo Sub-Limit;

(10) after giving effect to any requested Transaction, the aggregate Asset Value of all Fannie Mae Flex 100 Mortgage Loans owned hereunder by Buyer as of such date of determination may not exceed the Fannie Mae Flex 100 Sub-Limit;

(11) after giving effect to any requested Transaction, the aggregate Asset Value of all Interest-Only Loans owned hereunder by Buyer as of such date of determination may not exceed the Interest-Only Sub-Limit;

(12) after giving effect to any requested Transaction, the aggregate Asset Value of all Wet-Ink Mortgage Loans owned hereunder by Buyer as of such date is determination may not exceed the Wet-Ink Sub-Limit;

(13) after giving effect to any requested Transaction, the aggregate Asset Value of all Co-op Loans that are Super Jumbo Mortgage Loans, Jumbo Mortgage Loans owned hereunder by Buyer as of such date of determination may not exceed the Co-op Jumbo Sub-Limit;

(14) with respect to each Check Funded Loan, the Asset Value shall be deemed zero until at least one check set forth on the related Check Funding Schedule has been presented for payment and paid in accordance with the procedures set forth in the Custodial and Disbursement Agreement and the Check Disbursement Agreement; provided that for purposes of Section 3(n) and Section 4 hereof, the Asset Value shall be equal to no more than amounts that have previously been paid in respect of checks with respect to such Check Funded Loan;

(15) with respect to each Official Check Funded Loan, the Asset Value shall be deemed zero until the official check set forth on the related Official Check Funding Schedule has been presented for payment and paid in accordance with the procedures set forth in the Custodial and Disbursement Agreement and the Official Check Disbursement Agreement; provided that for purposes of Section 3(n) and Section 4 hereof, the Asset Value shall be equal to no more than amounts that have previously been paid in respect of checks with respect to such Official Check Funded Loan;

(16) after giving effect to any requested Transaction, the aggregate Asset Value of all HELOCs owned hereunder by Buyer as of such date of determination may not exceed the HELOC Sub-Limit; and

(17) the Asset Value shall be deemed to be zero with respect to each Mortgage Loan (i) in respect of which there is a breach of a representation and warranty set forth in Schedule 1 (assuming each representation and warranty is made as of the date the Asset Value is determined), (ii) other than with respect to a Repurchased Loan, in respect of which there is a delinquency in the payment of principal and/or interest which continues for a period in excess of twenty-nine (29) calendar days (without regard to any applicable grace periods), (iii) which has not been repurchased by Seller by the earlier to occur of (A) the Termination Date and (B) except with respect to Repurchased Mortgage Loans, the 90th day after the date on which it is first purchased by Buyer, and with respect to Repurchased Mortgage Loans, the 180th day after the date on which such Mortgage Loan becomes a Repurchased Mortgage Loan, (iv) which has been released from the possession of Custodian under the Custodial and Disbursement Agreement to any Person other than Buyer for a period in excess of forty-five (45) calendar days with respect to releases pursuant to Section 5(c), (v) which has been released from the possession of Custodian under the Custodial and Disbursement Agreement to Seller for a period in excess of ten (10) calendar days with respect to releases pursuant to Sections 5(a) and 5(b), (vi) which exceed the Sub-Limit for the related Class or otherwise or (vii) which is

a Wet-Ink Mortgage Loan, for which Custodian has failed to receive the related Mortgage Documents by the tenth 10th Business Day following the applicable Purchase Date;

"Assignment of Mortgage" shall mean, with respect to any Mortgage, an assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the assignment of the Mortgage to Buyer.

"Bank" shall mean Deutsche Bank National Trust Company, a national banking association, and its successors in interest, or such other depository institution as may be acceptable to Buyer in its sole discretion, and their respective successors in interest.

"Bank Charter Event" shall mean the date on which AHMH acquires Valley Bancorp, Inc. and its wholly owned subsidiary, Valley Bank of Maryland.

"Bankruptcy Code" shall mean the United States Bankruptcy Code of 1978, as amended from time to time.

"Business Day" shall mean any day other than (i) a Saturday or Sunday or (ii) a day on which banks in the State of New York (or state in which any of Custodian, Disbursement Agent, Seller or Buyer is located) is authorized or obligated by law or executive order to be closed.

"Buyer" shall mean IXIS Real Estate Capital Inc., a New York corporation, and its successors in interest and assigns.

"Capital Lease Obligations" shall mean, for any Person, all obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) Property to the extent such obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP, and, for purposes of this Agreement, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP.

"Cash" shall mean all cash and Cash Equivalents, as shown on the consolidated balance sheet of AHMIC prepared in accordance with GAAP.

"Cash Equivalents" shall mean (a) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (b) certificates of deposit and eurodollar time deposits with maturities of 90 days or less from the date of acquisition and overnight bank deposits of any commercial bank having capital and surplus in excess of $500,000,000, (c) repurchase obligations of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than seven days with respect to securities issued or fully guaranteed or insured by the United States Government, (d) commercial paper of a domestic issuer rated at least A-1 or the equivalent thereof by Standard and Poor's Ratings Group ("S&P") or P-1 or the equivalent thereof by Moody's Investors Service, Inc. ("Moody's") and in either case maturing within 90 days after the day of acquisition, (e) securities with maturities of 90 days or less from the date of acquisition

issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's, (f) securities with maturities of 90 days or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the requirements of clause (b) of this definition or (g) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition.

"Check Disbursement Account" shall have the meaning specified in the Check Disbursement Agreement.

"Check Disbursement Agreement" shall mean the amended and restated Letter Agreement, dated as of the date hereof, among each Seller Entity, Buyer, Disbursement Agent, Deutsche Bank Trust Company Delaware and Deutsche Bank Trust Company Americas as may be amended from time to time.

"Check Funded Loan" shall mean an Eligible Asset funded pursuant to the Check Disbursement Agreement.

"Check Funding Schedule" shall have the meaning specified in the Check Disbursement Agreement.

"Class" shall mean each group of Mortgage Loans where each Mortgage Loan within such group qualifies as at least one of the following: "Conforming Mortgage Loan", "Jumbo Mortgage Loan", "Alt-A First Mortgage Loan", "Alt-A Second Mortgage Loan", "Sub-Prime First Mortgage Loan", "Sub-Prime Second Mortgage Loan", "Wet-Ink Mortgage Loan", "HELOC" or "Repurchased Mortgage Loan"; provided, that a Mortgage Loan may be within more than one Class as of any date of determination.

"Closed End Loan" shall mean a Mortgage Loan which is not a HELOC.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collection Account" shall mean the account established by the Bank subject to an Account Agreement, into which all Income shall be deposited.

"Combined Loan-to-Value Ratio or CLTV" shall mean with respect to any Second Lien Mortgage Loan, the sum of (a) the original principal balance of such Second Lien Mortgage Loan or, with respect to any HELOC, the original Credit Limit, and (b) the outstanding principal balance of any related first lien loan as of the date of origination of such Second Lien Mortgage Loan, divided by the lesser of (i) the Appraised Value of the related Mortgage Property as of the date of origination of such Second Lien Mortgage Loan and (ii) if the related Mortgaged Property was purchased within twelve (12) months of the origination of such Second Lien Mortgage Loan, the purchase price of such Mortgaged Property.

"Committed Transaction" as defined in the recitals hereto.

"Commitment Fee" shall mean the fee payable by Seller to Buyer pursuant to Section 3(a)(6) as set forth in the Side Letter.

"Commonly Controlled Entity" shall mean an entity, whether or not incorporated, which is under common control with Seller within the meaning of Section 4001 of ERISA or is part of a group which includes Seller and which is treated as a single employer under Section 414 of the Code.

"Confirmation" shall have the meaning specified in Section 3(c).

"Conforming Mortgage Loan" shall mean an Eligible Asset which is insured by, and meets all criteria of, Fannie Mae, Freddie Mac, the FHA or the VA which is secured by a first lien on the related Mortgaged Property.

"Consolidated Funded Debt" of any Person shall mean, on any date of determination, Indebtedness in any of the following categories:

      (a)     Indebtedness for borrowed money;

      (b)     Indebtedness constituting an obligation to pay the deferred purchase price of property;

      (c)     Indebtedness evidenced by a bond, debenture, note or similar instrument;

      (d)     Indebtedness constituting Capital Lease Obligations;

      (e)     Indebtedness constituting a non-contingent obligation to reimburse the issuer of any letter of credit or any guarantor or surety for payments made by such issuer, guarantor or surety; and

      (f)     Any obligation under any guaranty with respect to Indebtedness of any other Person of the types described in clauses (a) through (e) above.

"Co-op" shall mean a private, cooperative housing corporation, having only one class of stock outstanding, which owns or leases land and all or part of a building or buildings, including apartments, spaces used for commercial purposes and common areas therein and whose board of directors authorizes the sale of stock and the issuance of a Co-op Lease.

"Co-op Lease" shall mean with respect to a Co-op Loan, the lease with respect to a dwelling unit occupied by the Mortgagor and relating to the stock allocated to the related dwelling unit.

"Co-op Loan" shall mean an Eligible Asset that is a Conforming Mortgage Loan, except with respect to the outstanding principal balance at origination, secured by the pledge of

stock allocated to a dwelling unit in a Co-op and a collateral assignment of the related Co-op Lease.

"Co-op Security Agreement" shall mean the agreement creating a first lien security interest in the stock allocated to a dwelling unit in the residential cooperative housing corporation that was pledged to secure such Co-op Loan and the related Co-op Lease.

"Co-op Sub-Limit" shall mean $16,000,000.

"Co-op Jumbo Sub-Limit" shall mean $8,000,000.

"Credit Limit" shall mean, with respect to each HELOC, the maximum amount permitted under the terms of the related Credit Line Agreement.

"Credit Line Agreement" shall mean, with respect to each HELOC, the related home equity line of credit agreement, account agreement and promissory note (if any) executed by the related mortgagor and any amendment or modification thereof.

"Credit Sub-Limit" shall mean $3,000,000.

"Custodial and Disbursement Agreement" shall mean that amended and restated custodial and disbursement agreement, dated as of the date hereof, by and among Buyer, Seller, Disbursement Agent and Custodian, as the same shall be modified and supplemented and in effect from time to time.

"Custodial Identification Certificate" shall have the meaning assigned thereto in the Custodial and Disbursement Agreement.

"Custodian" shall mean Deutsche Bank National Trust Company, a national banking association, and its successors in interest, as custodian under the Custodial and Disbursement Agreement, and any successor Custodian under the Custodial and Disbursement Agreement.

"DDA Account" shall have the meaning specified in the Check Disbursement Agreement.

"Default" shall mean an Event of Default or an event that with notice or lapse of time or both would become an Event of Default.

"Disbursement Agent" shall mean Deutsche Bank National Trust Company, a national banking association, and its successors in interest, as disbursement agent under the Custodial and Disbursement Agreement, and any successor Disbursement Agent under the Custodial and Disbursement Agreement.

"Dollars" and "$" shall mean lawful money of the United States of America.

"Draw" shall mean, with respect to each HELOC, an additional borrowing by the Mortgagor subsequent to the Cut-off Date in accordance with the related Credit Line Agreement, which borrowing shall be funded by the Seller.

"Due Diligence Review" shall mean the performance by Buyer of any or all of the reviews permitted under Section 26 with respect to any or all of the Mortgage Loans, as desired by Buyer from time to time.

"Effective Date" shall mean the date upon which the conditions precedent set forth in Section 3(a) shall have been satisfied.

"Electronic Agent" shall mean MERSCORP, INC., and its successors in interest.

"Electronic Tracking Agreement" shall mean the Electronic Tracking Agreement, in a form substantially similar to the form set forth in Annex 19 to the Custodial and Disbursement Agreement, to be entered into among Buyer, each Seller Entity, Electronic Agent and MERS, if any, as the same shall be amended, supplemented or otherwise modified from time to time; provided that if no Mortgage Loans are or will be MERS Designated Mortgage Loans, all references herein to the Electronic Tracking Agreement shall be disregarded.

"Electronic Transmission" shall mean the delivery of information in an electronic format acceptable to the applicable recipient thereof. An Electronic Transmission shall be considered written notice for all purposes hereof (except when a request or notice by its terms requires execution). Any document that requires signature that is delivered by Electronic Transmission via email that includes the sender's name shall satisfy such signature requirement.

"Eligible Asset" shall mean a Mortgage Loan, including a Wet-Ink Mortgage Loan, (i) as to which the representations and warranties in Schedule 1 attached hereto are true and correct, (ii) which is underwritten strictly in accordance with Seller's Underwriting Guidelines, a copy of which is attached hereto as Exhibit II or with such exceptions as Buyer shall approve pursuant to Section 3(b)(9) or meets all underwriting criteria of Fannie Mae, Freddie Mac, the FHA or the VA, and (iii) which is secured by a Residential Dwelling.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" shall mean any corporation or trade or business that is a member of any group of organizations (i) described in Section 414(b) or (c) of the Code of which Seller is a member and (ii) solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the lien created under Section 302(f) of ERISA and Section 412(n) of the Code, described in Section 414(m) or (o) of the Code of which Seller is a member.

"Escrow Instruction Letter" shall have the meaning assigned thereto in the Custodial and Disbursement Agreement.

"Eurodollar Rate" shall mean, with respect to each day a Transaction is outstanding (and reset on each day a Transaction is outstanding), the rate per annum equal to the rate appearing at page 5 of the Telerate Screen as one-month LIBOR at or about 9:00 a.m., New York City time, on such date (and if such date is not a Business Day, the Eurodollar Rate in effect on the Business Day immediately preceding such date), and if such rate shall not be so quoted, the average rate per annum at which three mutually acceptable banks are offered Dollar deposits at or about 8:00 a.m., New York City time, on such date by prime banks in the interbank eurodollar market where the eurodollar and foreign currency exchange operations in respect of its Transactions are then being conducted for delivery on such day for a period of thirty (30) days and in an amount comparable to the amount of the Transactions to be outstanding on such day. The Eurodollar Rate shall be reset by Buyer as described above and Buyer's determination of Eurodollar Rate shall be conclusive upon the parties absent manifest error on the part of Buyer.

"Event of Default" has the meaning specified in Section 12.

"Excess Margin" has the meaning specified in Section 3(n).

"Existing Financing Facilities" shall mean the financing facilities of the Seller listed on Schedule 5 hereto, as may be amended from time to time.

"Fannie Mae" shall mean the Federal National Mortgage Association, and its successors in interest.

"Fannie Mae Flex 100 Mortgage Loan" shall mean an Eligible Asset which meets all criteria of the Fannie Mae Flex 100 program.

"Fannie Mae Flex 100 Sub-Limit" shall mean $2,000,000.

"Foreclosed Loan" shall mean a loan the property securing which has been foreclosed upon by Seller.

"Freddie Mac" shall mean the Federal Home Loan Mortgage Corporation, and its successors in interest.

"GAAP" shall mean generally accepted accounting principles as in effect from time to time in the United States.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any court or arbitrator having jurisdiction over Seller, any of its Subsidiaries or any of their properties.

"Guarantee" shall mean, as to any Person, any obligation of such Person directly or indirectly guaranteeing any Indebtedness of any other Person or in any manner providing for the payment of any Indebtedness of any other Person or otherwise protecting the holder of such Indebtedness against loss (whether by virtue of partnership arrangements, by agreement to keep-well another Person, to purchase assets, goods, securities or

services, or to agree to take-or-pay arrangement or otherwise); provided that the term "Guarantee" shall not include (i) endorsements for collection or deposit in the ordinary course of business, or (ii) obligations to make servicing advances for delinquent taxes and insurance, or other obligations in respect of a Mortgaged Property, or other principal and interest advances made in the ordinary course of servicing the Mortgage Loans. The amount of any Guarantee of a Person shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith. The terms "Guarantee" and "Guaranteed" used as verbs shall have correlative meanings.

"HELOC" shall mean a home equity revolving line of credit secured by a Mortgage, deed of trust or other instrument creating a second lien on the related Mortgaged Property, which lien secures the related Credit Line Agreement and which related first lien is also an Eligible Asset subject to an outstanding Transaction under this Agreement at any time that such HELOC is requested to be, or is, subject to an outstanding Transaction under this Agreement.

"HELOC Sub-Limit" shall mean $30,000,000.

"Income" shall mean, with respect to any Mortgage Loan at any time, all collections and proceeds on or in respect of the Mortgage Loans, including, without limitation, any principal thereof then payable and all interest or other distributions payable thereon less any related servicing fee(s) charged by Servicer.

"Indebtedness" shall mean, for any Person: (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, the issuance and sale of debt securities or the sale of Property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services, other than trade accounts payable (other than for borrowed money) arising, and accrued expenses incurred, in the ordinary course of business so long as such trade accounts payable are payable within 90 days of the date the respective goods are delivered or the respective services are rendered; (c) Indebtedness of others secured by a Lien on the Property of such Person, whether or not the respective Indebtedness so secured has been assumed by such Person; (d) obligations (contingent or otherwise) of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for account of such Person; (e) obligations of such Person under repurchase agreements, sale/buy-back agreements or like arrangements; (f) Indebtedness of others Guaranteed by such Person; (g) all obligations of such Person incurred in connection with the acquisition or carrying of fixed assets by such Person; (h) Indebtedness of general partnerships of which such Person is secondarily or contingently liable (other than by endorsement of instruments in the course of collection), whether by reason of any agreement to acquire such indebtedness to supply or advance sums or otherwise; and (i) Capital Lease Obligations of such Person.

"Interest-Only Loan" shall mean any Mortgage Loan as to which scheduled payments only include interest for an initial period of not more than 10 years, after which such Mortgage Loan will fully amortize to maturity.

"Interest-Only Sub-Limit" shall mean $90,000,000.

"Interest Rate Protection Agreement" shall mean, with respect to any or all of the Mortgage Loans, any short sale of US Treasury securities, or futures contract, or options related contract, or interest rate swap, cap or collar agreement or similar arrangement providing for protection against fluctuations in interest rates or the exchange of nominal interest obligations, either generally or under specific contingencies and acceptable to Buyer.

"Interim Funder" shall mean, with respect to each MERS Designated Mortgage Loan, the Person named on the MERS® System as the interim funder pursuant to the MERS Procedures Manual.

"Investor" shall mean, with respect to each MERS Designated Mortgage Loan, the Person named on the MERS® System as the investor pursuant to the MERS Procedures Manual.

"Jumbo Mortgage Loans" shall mean an Eligible Asset which meets all criteria of Fannie Mae or Freddie Mac except that the outstanding principal balance thereof at origination was in excess of Fannie Mae or Freddie Mac's guidelines which is secured by a first lien on the related Mortgaged Property.

"Late Payment Fee" has the meaning specified in Section 5(b).

"Lien" shall mean any mortgage, lien, pledge, charge, security interest or similar encumbrance.

"Loan-to-Value Ratio" or "LTV" means with respect to any Mortgage Loan, the ratio of the original outstanding principal amount (or with respect to a HELOC, the Credit Limit) of such Mortgage Loan at the time of origination to the lesser of (a) the Appraised Value of the related Mortgaged Property at origination of such Mortgage Loan and (b) if the related Mortgaged Property was purchased within twelve (12) months of the origination of such Mortgage Loan, the purchase price of the related Mortgaged Property.

"Manufactured Housing Sub-Limit" shall mean $2,000,000.

"Margin Base" shall mean the aggregate Asset Value of all Purchased Assets which are Eligible Assets.

"Margin Deficit" has the meaning specified in Section 4.

"Market Value" shall mean, as of any date in respect of any Mortgage Loan, the price at which such Mortgage Loan could readily be sold as determined by Buyer, which price

may be determined to be zero. Buyer's determination of Market Value shall be conclusive upon the parties absent manifest error on the part of Buyer.

"Material Adverse Effect" shall mean a material adverse effect on (a) the Property, business, operations or financial condition of any Seller Entity, (b) the ability of any Seller Entity to perform its respective obligations under any of the Repurchase Documents to which it is a party, (c) the validity or enforceability of any of the Repurchase Documents, (d) the rights and remedies of Buyer under any of the Repurchase Documents, (e) the timely payment of any amounts payable under the Repurchase Documents, or (f) the Asset Value of the Purchased Assets.

"Maximum Amount" shall mean $450,000,000.

"Maximum Committed Amount" shall mean $200,000,000.

"Maximum Uncommitted Amount" shall mean $250,000,000.

"MERS" shall mean Mortgage Electronic Registration Systems, Inc., and its successors in interest.

"MERS Designated Mortgage Loan" shall mean a Mortgage Loan for which the Seller has designated or will designate MERS as, and has taken or will take such action as is necessary to cause MERS to be, the mortgagee of record, as nominee for the Seller, in accordance with the MERS Procedure Manual.

"MERS Procedure Manual" shall mean the MERS Procedures Manual attached as Exhibit B to the Electronic Tracking Agreement, as it may be amended, supplemented or otherwise modified from time to time.

"MERS Report" shall mean the schedule listing MERS Designated Mortgage Loans and other information prepared by the Electronic Agent pursuant to the Electronic Tracking Agreement.

"MERS® System" shall mean the Electronic Agent's mortgage electronic registry system, as more particularly described in the MERS Procedures Manual.

"Mortgage" shall mean with respect to a Mortgage Loan that is not a Co-op Loan, the mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a first lien or second lien on a fee simple Residential Dwelling securing the Mortgage Note and with respect to a Co-op Loan, the Co-op Security Agreement.

"Mortgage File" shall have the meaning assigned thereto in the Custodial and Disbursement Agreement.

"Mortgage Loan" shall mean a mortgage loan or HELOC originated in accordance with the Underwriting Guidelines which Custodian has been instructed to hold for Buyer pursuant to the Custodial and Disbursement Agreement, including any Wet-Ink Mortgage Loan listed on a Transaction Request, and which Mortgage Loan includes, without

limitation, (i) a Mortgage Note and related Mortgage or Credit Line Agreement, and (ii) all right, title and interest of Seller in and to the Mortgaged Property covered by such Mortgage.

"Mortgage Note" shall mean the original executed promissory note or other evidence of the indebtedness of a Mortgagor with respect to a Mortgage Loan.

"Mortgaged Property" shall mean, with respect to a Mortgage Loan that is not a Co-op Loan, a fee simple interest in the real property (including all improvements, buildings, fixtures, building equipment and personal property thereon and all additions, alterations and replacements made at any time with respect to the foregoing) and all other collateral securing repayment of the debt evidenced by a Mortgage Note. With respect to a Co-op Loan, the stock allocated to a dwelling unit in the residential cooperative housing corporation that was pledged to secure such Co-op Loan and the related Co-op Lease.

"Mortgagee" shall mean the record holder of a Mortgage Note secured by a Mortgage.

"Mortgagor" shall mean the obligor or obligors on a Mortgage Note, including any person who has assumed or guaranteed the obligations of the obligor thereunder.

"Multiemployer Plan" shall mean a multiemployer plan defined as such in Section 3(37) of ERISA to which contributions have been or are required to be made by Seller or any ERISA Affiliate and that is covered by Title IV of ERISA.

"N/O/O Sub-Limit" shall mean $3,000,000.

"Net Income" shall mean, with respect to any Person for any period, the net income of such Person for such period as determined in accordance with GAAP.

"Non-Conforming Sub-Limit" shall mean $60,000,000.

"Official Check Disbursement Account" shall have the meaning specified in the Official Check Disbursement Agreement.

"Official Check Disbursement Agreement" shall mean the amended and restated Letter Agreement, dated as of the date hereof, among each Seller Entity, Buyer, Disbursement Agent, Deutsche Bank Trust Company Delaware and Deutsche Bank Trust Company Americas as may be amended from time to time relating to "official" or "certified" checks.

"Official Check Funded Loan" shall mean an Eligible Asset funded pursuant to the Official Check Disbursement Agreement.

"Official Check Funding Schedule" shall have the meaning specified in the Official Check Disbursement Agreement.

"Other Financial Covenant" shall mean any financial covenant in any Existing Financing Facility that is substantially similar to any of the financial covenants in Sections 11(l),

(m) and (n) with a formula that yields or would yield a similar result, but for the required ratio or trigger.

"<u>Payment Calculation Date</u>" shall mean the tenth (10th) day of each month.

"<u>Payment Date</u>" shall mean two (2) Business Days after the Payment Calculation Date.

"<u>PBGC</u>" shall mean the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"<u>Periodic Advance Repurchase Payment</u>" has the meaning specified in Section 5(b).

"<u>Person</u>" shall mean any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, unincorporated association or government (or any agency, instrumentality or political subdivision thereof).

"<u>Plan</u>" shall mean an employee benefit or other plan established or maintained by any Seller or any ERISA Affiliate and covered by Title IV of ERISA, other than a Multiemployer Plan.

"<u>Post-Default Rate</u>" shall mean, in respect of any day a Transaction is outstanding or any other amount under this Agreement or any other Repurchase Document that is not paid when due to Buyer at the stated Repurchase Date or otherwise when due (a "<u>Post-Default Day</u>"), a rate per annum on a 360 day per year basis during the period from and including the due date to but excluding the date on which such amount is paid in full equal to 4% per annum <u>plus</u> the Prime Rate on such Post-Default Day.

"<u>Price Differential</u>" means, with respect to any Transaction hereunder as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction on a 360 day per year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the Repurchase Date (reduced by any amount of such Price Differential previously paid by Seller to Buyer with respect to such Transaction).

"<u>Pricing Rate</u>" shall mean with respect to any Class of Mortgage Loans and any date of determination a rate per annum equal to the sum of (a) the Eurodollar Rate applicable on such date plus (b) the Pricing Spread for such Class applicable on such date.

"<u>Pricing Spread</u>" shall mean (a) with respect to each Committed Transaction with respect to any Class of Mortgage Loan, the rate per annum corresponding to such Class as set forth in the Side Letter.

"<u>Prime Rate</u>" shall mean the prime rate announced to be in effect from time to time, as published as the average rate in <u>The Wall Street Journal</u>.

"<u>Property</u>" shall mean any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Purchase Agreement" shall mean any purchase agreement by and between Seller and any third party, including without limitation, any Affiliate of Seller, pursuant to which Seller has purchased assets subsequently sold to Buyer hereunder.

"Purchase Date" shall mean the date on which Purchased Assets are transferred by Seller to Buyer or its designee (including Custodian).

"Purchase Percentage" shall mean, with respect to each Committed Transaction with respect to any Class of Mortgage Loan, the applicable percentage corresponding to such Class as set forth in the Side Letter.

"Purchase Price" shall mean on each Purchase Date, the price at which Purchased Assets are transferred by Seller to Buyer or its designee (including Custodian) which shall equal the Asset Value for such Purchased Assets on the Purchase Date.

"Purchased Assets" shall mean the Mortgage Loans sold by Seller to Buyer in a Transaction.

"Purchased Items" has the meaning specified in Section 7.

"Regulations T, U and X" shall mean Regulations T, U and X of the Board of Governors of the Federal Reserve System (or any successor), as the same may be modified and supplemented and in effect from time to time.

"REIT" shall mean a real estate investment trust, as defined in Section 856(a) of the Code.

"REIT Distribution Requirement" shall mean distributions reasonably necessary for AHMIC to maintain its REIT Status and not be subject to corporate level tax based on income or to excise tax under Section 4981 of the Code.

"REIT Status" shall mean, with respect to any Person, such Person's status as a real estate investment trust, as defined in Section 856(a) of the Code, that satisfies the conditions and limitations set forth in Section 856(b) and 856(c) of the Code.

"REO Property" shall mean real property acquired by Seller, including a Mortgaged Property acquired through foreclosure of a Mortgage Loan or by deed in lieu of such foreclosure.

"Reportable Event" shall mean any of the events set forth in Section 4043(b) of ERISA or a successor provision thereof, other than those events as to which the thirty day notice period is waived under subsections .13, .14, .16, .18, .19 or .20 of PBGC Reg. § 2615 or one or more successor provision thereof.

"Repurchase Date" shall mean the date on which Seller is to repurchase the Purchased Assets from Buyer as specified in the related Confirmation including any date determined by application of the provisions of Sections 3 or 13 which date shall be specified as "open" unless otherwise requested by Seller and agreed by Buyer; provided that in no

event shall the Repurchase Date be in excess of 364 days after the Purchase Date. If the Transaction is "open", the Repurchase Date shall be one (1) Business Day after the date upon which either Buyer (in its sole discretion) or the Seller (in its sole discretion) provides to the other written notice of its intention to sell or repurchase, as applicable, the applicable Mortgage Loans; provided that the Repurchase Date (with respect to any Committed Transaction) for a repurchase arising due to the failure of the Seller to satisfy the condition set forth in Section 3(b)(20) shall be no later than 30 days after the date upon which the Buyer provides notice of its intention to terminate this facility; and provided further that the Repurchase Date shall not, in any event, exceed 364 days from the date hereof.

"Repurchase Documents" shall mean this Agreement, the Custodial and Disbursement Agreement, the Account Agreement, the Check Disbursement Agreement and the Official Check Disbursement Agreement and all other documents or agreements executed connection therewith.

"Repurchase Obligations" shall have the meaning specified in Section 7(b).

"Repurchase Price" means the price at which Purchased Assets are to be transferred from Buyer or its designee (including Custodian) to Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price and the Price Differential as of the date of such determination decreased by all cash, Income and Periodic Advance Repurchase Payments (including Late Payment Fees, if any) actually received by Buyer pursuant to Sections 5(a) or 5(b), respectively.

"Repurchased Appraised Value" shall mean the value set forth in an appraisal made no earlier than 30 days prior to the Purchase Date of a Repurchased Mortgage Loan by an appraiser satisfactory to Buyer in its sole discretion, as the value of the Mortgaged Property.

"Repurchased Mortgage Loan" shall mean an Eligible Asset with a current outstanding principal balance not in excess of $750,000 which is a Conforming Mortgage Loan, a Jumbo Mortgage Loan, an Alt-A First Lien Mortgage Loan or a Sub-Prime First Mortgage Loan but in each case is not a Wet-Ink Mortgage Loan or a Second Lien Mortgage Loan, which has previously been sold to a warehouse lender under a gestation or similar facility and is required to be repurchased thereunder by the Seller for which Seller has obtained an appraisal by an appraiser satisfactory to Buyer in its sole discretion not earlier than 30 days prior to the requested Purchase Date for such Mortgage Loan. In no event shall Buyer be required to purchase a "Repurchased Mortgage Loan" (a) unless Seller has delivered to Buyer an appraisal meeting the criteria in the preceding sentence, (b) if such Mortgage Loan is the subject of a contested foreclosure, (c) if such Mortgage Loan has an obligor that has filed for bankruptcy relief, or (d) if such Mortgage Loan is the subject of any fraud or suspected fraud on the part of the obligor thereunder.

"Repurchased Mortgage Loan Sub-Limit" shall mean $4,000,000; provided however, that if the aggregate Purchase Price of all Transactions outstanding hereunder on such date of

determination is less than $75,000,000 after giving effect to any requested Transactions, then the Repurchased Mortgage Loan Sub-Limit shall mean 2% of the aggregate Purchase Price of all Transactions outstanding hereunder on such date of determination.

"Request for Additional Transactions for Excess Margin" shall have the meaning specified in Section 3(n)(1).

"Requirement of Law" shall mean as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Residential Dwelling" shall mean any one of the following: (i) a detached single family dwelling, (ii) a two-to-four family dwelling, (iii) a co-operative unit, (iv) a unit in a condominium project, or (v) a detached single family dwelling in a planned unit development. Mortgaged Properties that consist of the following property types are not Residential Dwellings: (a) log homes, (b) earthen homes, (c) underground homes, (d) mobile homes, (e) any dwelling situated on more than ten acres of property and (f) any dwelling situated on a leasehold estate.

"Responsible Officer" shall mean, as to any Person, the chief executive officer, the chief financial officer, the treasurer or the chief operating officer of such Person.

"Second Lien Mortgage Loan" shall mean an Eligible Asset secured by a lien on the Mortgaged Property, which is subject to one prior lien on such Mortgaged Property.

"Security Agreement" shall mean with respect to any Mortgage Loan, any contract, instrument or other document related to security for repayment thereof (other than the related Mortgage and Mortgage Note), executed by the Mortgagor and/or others in connection with such Mortgage Loan, including without limitation, any security agreement, guaranty, title insurance policy, hazard insurance policy, chattel mortgage, letter of credit or certificate of deposit or other pledged accounts, and any other documents and records relating to any of the foregoing.

"Seller" shall mean, collectively, AHMC, AHMIC, AHMA, AHMH and AHMS, and their respective successors in interest.

"Seller Asset Schedule" shall have the meaning assigned thereto in the Custodial and Disbursement Agreement.

"Seller-Related Obligations" shall mean any obligations, representations, warranties and covenants of Seller hereunder and under any other arrangement between Seller or an Affiliate of Seller on the one hand and Buyer or an Affiliate of Buyer on the other hand.

"Servicer" shall have the meaning specified in Section 24.

"Servicer Account" shall mean any account established by Servicer in connection with the servicing of the Mortgage Loans.

"Servicer Notice" shall mean the notice from each Seller Entity to Servicer, substantially in the form of Exhibit VII attached hereto.

"Servicing Agreement" has the meaning specified in Section 24.

"Servicing File" means with respect to each Mortgage Loan, the file retained by Seller consisting of originals of all documents in the Mortgage File which are not delivered to a Custodian and copies of all documents in the Mortgage File set forth in Section 2 of the Custodial and Disbursement Agreement.

"Servicing Records" has the meaning specified in Section 24.

"Settlement Agent" shall mean, with respect to any Transaction, the entity approved by Buyer, in its sole discretion, which may be a title company, escrow company or attorney in accordance with local law and practice in the jurisdiction where the related Wet-Ink Mortgage Loan is being originated, to which the proceeds of such Transaction are to be wired pursuant to Section 3.

"Side Letter" shall mean that certain letter agreement, dated as of the date hereof, by and between Buyer and Seller, as amended from time to time.

"Sub-Limit" shall mean each of the Non-Conforming Sub-Limit, the Sub-Prime Sub-Limit, the Sub-Prime Second Lien Sub-Limit, the Credit Sub-Limit, the Manufactured Housing Sub-Limit, the N/O/O Sub-Limit, the Co-op Sub-Limit, the Fannie Mae Flex 100 Sub-Limit, the Super Jumbo Sub-Limit, the HELOC Sub-Limit and the Repurchased Mortgage Loan Sub-Limit. For purpose of determining a violation of a Sub-Limit hereunder, (1) at no time shall the aggregate of the Asset Value of all Mortgage Loans subject to outstanding transactions hereunder violate any single Sub-Limit and (2) to the extent that there are both Committed Transactions and Uncommitted Transactions outstanding hereunder, at no time shall the aggregate Asset Value of Mortgage Loans subject to (a) a Committed Transaction be in excess of the applicable Sub-Limit Percentage or (b) an Uncommitted Transaction be in excess of the applicable Sub-Limit Percentage.

"Sub-Limit Percentage" shall mean the aggregate Asset Value multiplied by a percentage equal to the percentage of all outstanding Transactions which are Committed Transactions or Uncommitted Transactions, as applicable.

"Sub-Prime First Mortgage Loan" shall mean an Eligible Asset which is a Sub-Prime Mortgage Loan and a First Lien Mortgage Loan.

"Sub-Prime Mortgage Loan" shall mean an Eligible Asset which is a Mortgage Loan made to a Mortgagor of less than "A-" credit quality secured by a lien on a single-family Residential Dwelling.

"Sub-Prime Second Lien Sub-Limit" shall mean $5,000,000.

"Sub-Prime Second Mortgage Loan" shall mean an Eligible Asset which is a Sub-Prime Mortgage Loan and a Second Lien Mortgage Loan.

"Sub-Prime Sub-Limit" shall mean $30,000,000.

"Subsidiary" shall mean, with respect to any Person, any corporation, partnership, limited liability company or other entity of which at least a majority of the securities or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other persons performing similar functions of such corporation, partnership, limited liability company or other entity (irrespective of whether or not at the time securities or other ownership interests of any other class or classes of such corporation, partnership or other entity shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person.

"Super Jumbo Mortgage Loan" shall mean an Eligible Asset which is a Jumbo Mortgage Loan with an outstanding principal balance at origination of greater than or equal to $1,000,000 but less than or equal to $5,000,000.

"Super Jumbo Sub-Limit" shall mean $30,000,000.

"Tangible Net Worth" shall mean as to any Person, as of a particular date,

      (a)     all amounts which would be included under capital on a balance sheet of such Person at such date, determined in accordance with GAAP, less

      (b)     (i) amounts owing to such Person from Affiliates, or from officers, employees, partners, members, directors, shareholders or other Persons similarly affiliated with such Person or its respective Affiliates, (ii) intangible assets, and (iii) the value of REO Property and Foreclosed Loans.

"Termination Date" shall mean the date which is 364 days from the date hereof, which date shall be July 14, 2006 or such earlier date on which this Agreement shall terminate in accordance with the provisions hereof or by operation of law, as may be extended pursuant to Section 3(o).

"Termination Fee" shall mean a fee payable by Seller to Buyer in accordance with Section 20 hereof as set forth in the Side Letter.

"Test Period" shall have the meaning specified in Section 11(m).

"Total Indebtedness" shall mean with respect to any Person, for any period, the aggregate Indebtedness of such Person during such period less the amount of any nonspecific balance sheet reserves maintained in accordance with GAAP.

"Transaction" has the meaning specified in Section 1.

"Transaction Request" means a request from Seller to Buyer, in the form attached as Exhibit I hereto, to enter into a Transaction, which may be delivered via Electronic Transmission.

"True Sale Certification" shall mean a true sale certification in the form of Exhibit VI attached hereto.

"Trust Receipt" shall mean a trust receipt issued by Custodian to Buyer confirming Custodian's possession of certain Mortgage Files which are held by Custodian for the benefit of Buyer or the registered holder of such trust receipt.

"Uncommitted Transaction" as defined in the recitals hereto.

"Underlying Mortgaged Property" shall mean with respect to each Co-op Loan, the underlying real property owned by the related residential cooperative housing corporation.

"Underwriting Guidelines" shall mean (i) with respect to each Mortgage Loan other than a Conforming Mortgage Loan or a Jumbo Mortgage Loan, the underwriting guidelines delivered by Seller to Buyer on or prior to the Effective Date and as may be modified or supplemented from time to time thereafter as approved by Buyer in its sole discretion attached hereto as Exhibit II and (ii) with respect to each Conforming Mortgage Loan and Jumbo Mortgage Loan, the guidelines set forth in the applicable guide published by Fannie Mae, Freddie Mac, the FHA or the VA setting forth the requirements each Mortgage Loan needs to satisfy in order to be eligible for purchase or insurance by Fannie Mae, Freddie Mac, the FHA or the VA, as applicable, or any other set of criteria established by Fannie Mae, Freddie Mac, the FHA or the VA, as applicable, that a Mortgage Loan must satisfy in order to be eligible for purchase or insurance by Fannie Mae, Freddie Mac, the FHA or the VA, as applicable, in each case, except with respect to the outstanding principal balance of a Jumbo Mortgage Loan.

"Uniform Commercial Code" or "UCC" shall mean the Uniform Commercial Code as in effect on the date hereof in the State of New York; provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interest in any Purchased Items is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection.

"VA" shall mean the Veterans Administration, an agency of the United States of America, or any successor thereto including the Administrator of Veterans Affairs.

"Wet-Ink Mortgage Loan" shall mean an Eligible Asset which is sold to Buyer simultaneously with or one day prior to the origination thereof by Seller, which origination is in accordance with the Underwriting Guidelines and is funded in part or in

whole with proceeds of the sale of the Eligible Asset to Buyer advanced directly to a Settlement Agent or with respect to a Check Funded Loan, pursuant to the Custodial and Disbursement Agreement and Check Disbursement Agreement or Official Check Disbursement Agreement, as applicable.

"Wet-Ink Sub-Limit" shall mean with respect to (i) all Committed Transactions on any of the first five (5) Business Days and the last three (3) Business Days of each calendar month $100,000,000 and at all other times, $80,000,000 and (ii) Uncommitted Transactions on any of the first five (5) Business Days and the last three (3) Business Days of each calendar month $175,000,000 and at all other times $150,000,000.

3.    **INITIATION; TERMINATION**

(a)    Conditions Precedent to Effective Date.  It is a condition precedent to the Effective Date hereof, and Buyer's obligations hereunder are subject to the satisfaction of the condition precedent that Buyer shall have received from Seller any fees and expenses payable hereunder, and all of the following documents, each of which shall be satisfactory in form and substance to Buyer and its counsel:

   (1)    The following Repurchase Documents delivered to Buyer:

      (A)    Master Repurchase Agreement.  This Third Amended and Restated Master Repurchase Agreement duly completed and executed by the parties thereto.  In addition, Seller shall have taken such other action as Buyer shall have requested in order to perfect the security interests created pursuant to this Agreement, including filing of UCC financing statements in form and substance satisfactory to Buyer; and

      (B)    Consents and Waivers.  Any and all consents and waivers required under the Existing Financing Facilities.

   (2)    Opinions of Counsel.  An opinion or opinions of counsel to each Seller Entity, which may be an employee of such Seller Entity, substantially in the form of Exhibit III;

   (3)    Organizational Documents.  A good standing certificate and certified copies of the charter and by-laws (or equivalent documents) of each Seller Entity and of all corporate or other authority for each Seller Entity with respect to the execution, delivery and performance of the Repurchase Documents and each other document to be delivered by each Seller Entity from time to time in connection herewith (and Buyer may conclusively rely on such certificate until it receives notice in writing from such Seller Entity, as applicable, to the contrary);

   (4)    Underwriting Guidelines.  A copy of Seller's current Underwriting Guidelines, and any material changes to the Underwriting Guidelines made since the Underwriting Guidelines were last delivered to Buyer;

(5)     <u>Other Documents</u>.  Such other documents as Buyer may reasonably request, in form and substance reasonably acceptable to Buyer; and

(6)     <u>Commitment Fee</u>.  Seller shall have paid to Buyer the Commitment Fee.

(b)     <u>Conditions Precedent to all Transactions</u>.  Buyer's obligation to enter into each Committed Transaction (including the initial Transaction) and, in the event Buyer chooses, in its sole discretion, to enter into an Uncommitted Transaction pursuant to Section 3(c) below, Buyer's obligation to enter into each Uncommitted Transaction, is subject to the satisfaction of the following further conditions precedent, both immediately prior to entering into such Transaction and also after giving effect to the consummation thereof and the intended use of the proceeds of the sale:

(1)     Seller shall have delivered a Transaction Request via Electronic Transmission in accordance with the procedures set forth in Section 3(c).

(2)     no Default or Event of Default shall have occurred and be continuing under the Repurchase Documents;

(3)     after giving effect to the requested Transaction, the aggregate outstanding Purchase Price of the Transactions outstanding shall not exceed the Maximum Amount;

(4)     both immediately prior to the requested Transaction and also after giving effect thereto and to the intended use thereof, the representations and warranties made by Seller in Section 10 shall be true, correct and complete on and as of such Purchase Date in all material respects with the same force and effect as if made on and as of such date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date);

(5)     after giving effect to the requested Transaction, the aggregate outstanding Purchase Price of the Transactions outstanding shall not exceed the Asset Value of all the Purchased Assets subject to outstanding Transactions;

(6)     subject to Buyer's right to perform one or more Due Diligence Reviews pursuant to Section 26, Buyer shall have completed its due diligence review of the Mortgage File for each Purchased Asset, and such other documents, records, agreements, instruments, mortgaged properties or information relating to such Purchased Asset as Buyer in its sole discretion deems appropriate to review and such review shall be satisfactory to Buyer in its sole discretion;

(7)     with respect to any Eligible Asset to be purchased hereunder on the related Purchase Date which is not serviced by the Seller, Seller shall have provided to Buyer a copy of the related Servicing Agreement, certified as a true, correct and complete copy of the original, together with a Servicer Notice, fully executed by Seller and the Servicer;