IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------- x

In re:                                                    :    Chapter 11
                                                          :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,    :    Case No. 07-11047 (CSS)
a Delaware corporation, et al.,                           :
                                                          :    Jointly Administered
       Debtors.                                           :
                                                          :    **Objection Deadline:  October 10, 2007 at 4:00 p.m. (ET)**
                                                          :    **Hearing Date:  October 17, 2007 at 10:00 a.m. (ET)**
-------------------------------------------------------------- x

### DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105, 363(b) AND 507(a)(7) OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS TO REFUND ADVANCED FEES AND COSTS TO BORROWERS

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and

debtors in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] by this motion

(the "Motion"), seek entry of an order pursuant to sections 105(a), 363(b) and 507(a)(7) of Title

11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") to refund

advanced fees and costs to certain borrowers for loans that were not ultimately funded and/or for

which services were never received.  In support of the Motion, the Debtors respectfully represent

as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

## JURISDICTION AND STATUTORY PREDICATE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is sections 105(a), 363(b) and 507(a)(7) of the Bankruptcy Code.

## BACKGROUND

2.      On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

4.      On August 14, 2007, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "Committee"). No trustee or examiner has been appointed.

## THE DEBTORS' BUSINESS

5.      Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

6.      As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

7.      A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

## EVENTS LEADING TO THE CHAPTER 11 FILING

8.      Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

9.      The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury

issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

10.    In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders – the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

11.    On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

12.    The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors now employ approximately 1,000 persons who are absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

13.    In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

14.    Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## THE ADVANCED FEES AND COSTS

15.    In the ordinary course of the Debtors' operations prior to the Petition Date, the Debtors procured the origination of a substantial number of loans for their customers. As a part of this process, customers for whom the Debtors were in the process of originating loans would typically make advance payments to the Debtors of various anticipated costs and expenses including, but not limited to, appraisal fees, credit investigation fees, and application fees (the "Advanced Fees and Costs").

16.    Although state requirements governing the collection of Advance Fees and Costs vary from state to state, such monies were typically collected by the Debtors, and held until the time that the services were provided or the loans were consummated, as applicable.

17.    Prior to the Petition Date, the Debtors and their advisors took all necessary steps to preserve the value of their assets, which assets included the Debtors' loan origination business. Because of this need to preserve value, the Debtors continued to originate loans in the jurisdictions in which they operated in the period preceding their bankruptcy filings. As

discussed above, when the Debtors ceased their loan origination operations, many of the loans that were in process were never consummated or otherwise funded by the Debtors' warehouse lenders. However, because of the subsequent bankruptcy filing, certain customers never received a refund of the Advanced Fees and Costs.

18.    Since the Petition Date, the Debtors have either surrendered the licenses that the states formerly required for the operation of their loan origination business, or have given assurances to such states that they are no longer originating loans while they conduct the licensure surrender process. However, despite the surrender of the licenses and assurances that they are no longer originating loans, the Debtors are at risk of becoming the subject of actions, taken by state regulatory agencies, because of the fact that the Advanced Fees and Costs have not been refunded to the individuals who remitted such amounts. At least three states, Connecticut, Massachusetts, and Rhode Island, have issued orders that require Debtors to refund fees collected from prospective borrowers. Moreover, regulators in additional jurisdictions have informally advised Debtors' counsel that they expect the Debtors to refund all fees collected on loans that were not funded. If permitted to escalate, these issues could have significant ramifications for a number of the Debtors' current operations and liquidation efforts, including, *inter alia*, their good standing in these jurisdictions and the ability to maintain the licenses related to their servicing business.

19.    Therefore, to avoid the potential adverse consequences if the state regulatory entities are not satisfied by the manner in which the Debtors' wind down their operations, the Debtors require the authority that has been granted in similar chapter 11 cases to make refunds to borrowers on account of the Advanced Fees and Costs.

## **RELIEF REQUESTED**

20.    By this Motion, the Debtors respectfully request entry of an Order pursuant to sections 105(a), 363(b) and 507(a)(7) of the Bankruptcy Code, that authorizes, but does not direct, the Debtors, in their business judgment, to refund the Advanced Fees and Costs, up to an aggregate amount of $650,000, to any borrowers whose loans were not ultimately funded as a result of the Debtors' cessation of their loan origination operations immediately prior to the Petition Date.

21.    Specifically, the Debtors propose that immediately following the entry of the Order approving this Motion, they be authorized, but not directed, to issue refunds to all parties whose loans were never funded or who never received the benefits of the services to be procured by the Advanced Fees and Costs.  As set forth above, the Debtors request authority to make such refunds up to a cap of $650,000.  The Debtors believe that such a cap will enable them to make refunds to all those presently known to have claims for the Advanced Fees and Costs and will also enable the Debtors to work with the various state agencies to identify any additional parties who may assert valid claims.[2]

## **BASIS FOR THE RELIEF REQUESTED**

22.    The Debtors respectfully submit that the relief requested herein is critical to their liquidation efforts and the success of these cases, and that such relief is authorized by section 363(b) of the Bankruptcy Code.  That section provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1) (2004).  Under this section, a court may authorize a debtor to pay

---

[2] The Debtors are presently aware of at least 1,100 individuals that have paid Advanced Fees and Costs, in the aggregate amount of approximately $470,000, for loans that ultimately were not funded.

certain prepetition claims. *See Ionosphere Clubs*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (authorizing payment of prepetition claims where the debtors articulate "some business justification, other than the mere appeasement of major creditors"); *see also In re James A. Phillips, Inc.*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (authorizing, pursuant to section 363, a contractor to pay prepetition claims of some suppliers who were potential lien claimants, because the payments were necessary for the general contractors to release funds owed to the debtors).

23.    In addition, it is likely that the Advanced Fees and Costs would qualify for priority treatment under section 507(a)(7) of the Bankruptcy Code. Specifically, this section provides priority status for:

> [A]llowed unsecured claims of individuals, to the extent of $2,225 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal family or household use of such individuals, that were not delivered or provided.

11 U.S.C. § 507(a)(7). Given the nature of the Advanced Fees and Costs and the nature of the Debtors loan origination operations as a whole, it is likely that a significant portion of the Advanced Fees and Costs would be entitled to receive priority treatment with respect to any such claims.[3] Consequently, the approval of the relief requested herein would merely affect the timing, and not the ultimate amount, of payments to those individuals.

---

[3] The Debtors believe that only nine (9) individuals are entitled to reimbursement of greater than $2,225 with respect to the Advanced Fees and Costs. Indeed, less than two percent (2%) of the individuals listed have claims in excess of $1,000.

24.    Finally, the Court is also able to authorize the refund of the Advanced

Fees and Costs pursuant to section 105(a) of the Bankruptcy Code and the doctrine of necessity

of payment.  Section 105(a) of the Bankruptcy Code provides:

> The court may issue any order, process, or judgment that is
> necessary or appropriate to carry out the provisions of this title. No
> provision of this title providing for the raising of an issue by a
> party in interest shall be construed to preclude the court from, sua
> sponte, taking any action or making any determination necessary
> or appropriate to enforce or implement court orders or rules, or to
> prevent an abuse of process.

11 U.S.C. § 105(a).

25.    "The ability of the Bankruptcy Court to authorize the payment of

prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a

novel concept." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  This

equitable common law principle "was first articulated by the United States Supreme Court in

*Miltenberger v. Logansport, C & S.W.R. Co.*, 106 U.S. 286, 1 S. Ct. 140, 27 L.Ed 117 (1882) and

it is commonly referred to as either the 'doctrine of necessity' or the 'necessity of payment'

rule." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 176.  "The Supreme Court, the Third Circuit and

the District of Delaware all recognize the court's power to authorize payment of pre-petition

claims when such payment is necessary for the debtor's survival during chapter 11." *In re Just*

*for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999).  "The necessity of payment doctrine recognizes

that paying certain pre-petition claims may be necessary to realize the goal of chapter 11 – a

successful reorganization." *Id.* at 825-26.

26.    Under the doctrine of necessity, a bankruptcy court may exercise its

equitable power to authorize a debtor to pay certain critical prepetition claims, even though such

payment is not explicitly authorized under the Bankruptcy Code. *See In re Columbia Gas*

*System*, 136 B.R. 930, 939 (Bankr. D. Del. 1992) *citing In re Lehigh & New England Rwy Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (recognizing that "if payment of a prepetition claim 'is essential to the continued operation of [the debtor], payment may be authorized.'").

      27.     Since the beginning of these bankruptcy cases, the Debtors have been subject to various inquiries by state regulators because of the rapid decline in their financial position and the concomitant inability to originate loans for those customers who were caught in the various stages of the loan origination process when such decline occurred. The Debtors are engaging in ongoing discussions with state regulators regarding the impact their funding constraints had on their customers who were in various stages of the loan origination process. As stated above, the Debtors have in many instances already surrendered their loan origination licenses and in all other instances have advised the regulators that they have ceased accepting loan applications. In addition, the Debtors have advised these regulators that they are unable to fund any mortgage loans, including loans for those customers who were already in the loan origination process with the Debtors. The Debtors have been and will continue to work cooperatively with these regulators to mitigate the impact on the affected customers.

      28.     The Debtors, upon receiving authorization to make refunds on account of the Advanced Fees and Costs, expect that their discussions with the regulators will not escalate, but instead will be able to be resolved consensually, and with limited effect to these estates. This will permit the Debtors to avoid the time, distraction and considerable expense of litigating the merits of the multiple claims that would be brought by both the states and the affected customers if such actions are not taken. It will also minimize the risk of any additional impact that the failure to refund the Advanced Fees and Costs might have on the other aspects of the Debtors' operations, including their servicing business.

29.     This Court has authorized similar relief to the type requested herein. *See, e.g., In re ResMae Mortgage Corporation*, Case No. 07-10177 (KJC) (Bankr. D. Del. April 25, 2007) (authorizing debtor to reimburse customers for certain pre-petition overpayments); *In re New Century TRS Holdings, Inc.*, Case No. 07-10416 (KJC) (Bankr. D. Del. April 3, 2007) (authorizing debtor to continue certain prepetition programs that included the payment of restitution to customers who paid fees associated with mortgage loans that were never funded).

30.     Accordingly, for all the reasons stated above, the Debtors respectfully submit that the relief requested herein is appropriate, necessary and should be approved by this Court.

## NOTICE

31.     Notice of this Application will be provided to (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Bank of America; (iv) Counsel to the Agent for the Debtors' Postpetition Lender; and (v) all parties entitled to notice under Del. Bankr. LR 2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PREVIOUS REQUEST

32.    No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court issue and enter an order (i) pursuant to sections 105(a), 363(b) and 507(a)(7) of the Bankruptcy Code, and (ii) granting such other and further relief as may be just and proper.

Dated:    Wilmington, Delaware
          September 21, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Kara Hammond Coyle (No. 4410)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession