IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x
In re:                  :
                                  :
AMERICAN HOME MORTGAGE    :
HOLDINGS, INC.,             :
a Delaware corporation, et al.,     :
                                    :
       Debtors.              :
------------------------------------------------------------- x

Chapter 11

Case No. 07-11047 (CSS)

Jointly Administered

**Objection Deadline: September 26, 2007 at 4:00 p.m. (ET)**
**Hearing Date: October 1, 2007 at 10:00 a.m. (ET)**

## DEBTORS' MOTION PURSUANT TO SECTION 105 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR AN ORDER APPROVING AND AUTHORIZING STIPULATION BETWEEN CERTAIN DEBTORS AND ABN AMRO BANK N.V. REGARDING MARKETING AND SALE OF CERTAIN CONSTRUCTION LOANS AND SERVICING RIGHTS; AND ORDER THEREON

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and

debtors in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] by this motion

(the "Motion"), seek entry of an order pursuant to Rule 9019(a) of the Federal Rules of

Bankruptcy Procedure ("Bankruptcy Rules") and section 105(a) of Title 11 of the United States

Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") approving the Stipulation Between

Certain Debtor and ABN AMRO Bank N.V. Regarding Marketing and Sale of Certain

Construction Loans and Servicing Rights; and Order Thereon (the "Stipulation"), a copy of

which is attached as Exhibit A to the proposed form of Order annexed hereto, by and among the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation
(3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979);
American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home
Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC
("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc.
("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York
corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except
for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

certain Debtors, as identified in the Stipulation (the "ABN MRA Debtors"), and ABN AMRO

Bank N.V. ("ABN" and together with the ABN MRA Debtors, the "Parties"). In support of the

Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is

proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2.      On August 6, 2007 (the "Petition Date"), each of the Debtors filed with

this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Each Debtor

is continuing to operate its business and manage its properties as a debtor in possession pursuant

to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors' cases have been consolidated for procedural purposes only

and are being jointly administered pursuant to an order of this Court.

4.      On August 14, 2007, the United States Trustee for the District of Delaware

appointed The Official Committee of Unsecured Creditors (the "Committee"). No trustee or

examiner has been appointed.

## THE DEBTORS' BUSINESS[2]

5.      Prior to the filing of these bankruptcy cases, AHM's business primarily

entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage

loans and mortgage-backed securities resulting from the securitizations of residential mortgage

loans. AHM also invested in securitized mortgage loans originated by others and originated and

---

[2] The facts set forth herein are derived from the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief (the "First Day Declaration") [Docket No. 2], which is incorporated by reference as if fully set forth herein at length.

sold mortgage loans to institutional investors.  AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles.  Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

6.    As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion.  As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia.  Certain of the Debtors originated mortgages through a network of loan origination offices.  In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents.  AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

7.    A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing.  The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes.  As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion.  AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

## EVENTS LEADING TO THE CHAPTER 11 FILING

8.      Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages.  These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

9.      The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities.  The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

10.     In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans.  During this time, certain of the Debtors' warehouse lenders – the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

11.     On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

12.     The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business.  As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees.  The Debtors now employ approximately 1000 persons who are absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

13.     In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions.  Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

14.     Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

### RELEVANT BACKGROUND

15.     ABN asserts that the ABN MRA Debtors are parties to a Master Repurchase Agreement, dated February 28, 2007 (as such Agreement may have been supplemented and amended from time to time prior to the Petition Date, the "ABN MRA"), among the ABN MRA Debtors (defined as Sellers), AHM Servicing, Inc (defined as Servicer),

and ABN, in its capacity as Agent for the "Purchasers" under the ABN MRA, (defined as the "Buyer").

16.     ABN asserts that the ABN MRA Debtors, ABN, and others are parties or will become parties to a number of additional agreements related to the ABN MRA, which are more specifically set forth in the Stipulation and defined in the Stipulation as the ABN MRA Agreements.

17.     ABN has asserted, but the Debtors do not concede, that the ABN MRA Agreements are agreements and transactions of the kind described in section 101(47) of the Bankruptcy Code.

18.     ABN has additionally asserted that, but the Debtors do not concede, pursuant to the ABN MRA Agreements and during a five-month period prior to the Petition Date, ABN purchased from ABN MRA Debtors approximately four hundred and thirty (430) mortgage loans in the original aggregate principal amount of approximately $222 million (such mortgage loans, collectively with all documentation evidencing such loans, the "Mortgage Loans"). The Mortgage Loans are residential construction loans made by the ABN MRA Debtors to mortgagors (the "Mortgagors") who are constructing or renovating single-family homes pursuant to mortgage contracts (the "Mortgage Contracts") between the ABN MRA Debtors and the Mortgagors. ABN has further asserted that as of July 31, 2007: (a) the Mortgagors owed approximately $145 million in the aggregate in connection with advances made to the Mortgagors under the Mortgage Loans (the "Mortgagor Advances"); and (b) up to approximately $77 million in the aggregate in additional advances were, subject to the terms of the respective Mortgage Loans, available to be drawn by the Mortgagors in respect of the Mortgage Loans to fund the completion of the construction or renovation projects (the

"Additional Mortgagor Advances"). ABN has additionally asserted that under the Agreements the ABN MRA Debtors funded the Mortgagor Advances through the sale of the Mortgage Loans to ABN.

19.    ABN has asserted that, but the Debtors do not concede, prior to the commencement of the Bankruptcy Cases, on or about August 1, 2007 and August 3, 2007, ABN delivered to the ABN MRA Debtors what ABN asserts to have been notices of events of default under the ABN MRA Agreements (the "Default Notices"), pursuant to which Default Notices ABN asserts, but the Debtors do not concede, that the Termination Date and the Repurchase Date, as defined in the ABM MRA, occurred for each transaction under the ABN MRA Agreements and ABN designated AHMS to perform the duties of the Servicer until further notice pursuant to paragraph 13 of the Letter Agreement.

20.    The ABN MRA Debtors and ABN entered into that certain Stipulation Between Certain Debtors and ABN AMRO Bank N.V., dated August 21, 2007 (the "ABN Post-Petition Advances Stipulation"), for the purposes of, among other things: (a) permitting, but not obligating, ABN to fund certain Additional Mortgagor Advances by ABN MRA Debtors, including but not limited to any Additional Mortgagor Advances made pursuant to the Consent Letter (as that term is defined in paragraph 9 of the ABN Post-Petition Advances Stipulation); and (b) authorizing and directing ABN to make the Servicing Payments (as that term is defined in paragraph 17 of the ABN Post-Petition Advances Stipulation) to the Debtors for continued post-Petition Date servicing of the Mortgage Loans. The Court entered its order approving the Stipulation on August 22, 2007 (the "Advances Order").

## SALE OF THE CONSTRUCTION LOANS

21.     Since the Petition Date, the Debtors have sought to maximize the value of their estates for the benefit of their stakeholders. To that end, the Debtors contemporaneously herewith, have filed a motion for authority to establish sale procedures and approve the sale of construction loans and related servicing rights, and the construction loan platform (the "Assets"). If the Debtors are to obtain the maximum return as a result of the planned sale of the Assets, it is desirable that they resolve any dispute with a counterparty to a construction loan-related agreements without the need for litigation. The Debtors anticipate that a buyer for their construction loan assets will be found, and the Debtors will seek approval of a sale to the party presenting the highest or otherwise best bid for such assets free and clear of any liens, claims and encumbrances. To avoid a costly dispute that could impede the sale of the construction loans and related servicing to which ABN is a party, the Parties wish to compromise and settle the controversy between them on the terms and conditions set forth in the Stipulation.

## STIPULATION[3]

22.     As stated above, the Assets include construction loan portfolios with certain financial institutions. The largest construction loan portfolio of the Debtors is with ABN. In connection with the proposed sale of the Assets, ABN and the ABN MRA Debtors entered into extensive negotiations as to the sale process and sale of the ABN MRA. As a result of those negotiations, ABN and the ABN MRA Debtors entered into the Stipulation.

23.     Pursuant to the Stipulation, the Parties are agreeing to: (a) a process under which the Mortgage Loans and the rights to service such Mortgage Loans shall be marketed for sale and either sold pursuant to the highest and best bid or conveyed, transferred, quitclaimed,

---

[3] All terms not otherwise defined herein shall have the meanings ascribed to them in the Stipulation.

released and/or turned over and delivered to ABN for servicing, collection and disposition at

ABN's own expense; (b) the treatment to be accorded to the proceeds of such sale; and (c) the

consideration to be paid by ABN to the ABN MRA Debtors relating to disposition of Mortgages

Loans and related servicing rights to a third party to ABN.

24.      The principal terms of the Stipulation are set forth below:[4]

i. The Mortgage Loans and the rights to service such Mortgage Loans, including but not limited to the rights presently being exercised by the ABN MRA Debtors under paragraph 13 of the Letter Agreement (the "Servicing Rights"), shall be marketed by the ABN MRA Debtors and offered for sale pursuant to an auction process in conformity with Sale Procedures in the form attached as Exhibit A to the Stipulation.

ii. Upon entry of a final order approving the Stipulation that becomes non-appealable, ABN shall be obligated to pay the ABN MRA Debtors $700,000.00 (the "ABN Payment"), which shall thereupon be indefeasibly earned and shall not be subject to any setoff or other defense by ABN.

iii. In the event that the Successful Bid (as defined in the Sale Procedures) for purchase of the Mortgage Loans and Servicing Rights is in an amount that is equal to or less than the sum of (i) the ABN Payment, plus (ii) the Repurchase Price (as defined in the ABN MRA; defined hereinafter as the "Payoff Amount") with respect to the Mortgage Loans and Servicing Rights as of the anticipated closing date on such Successful Bid, as estimated in good faith by ABN in a Payoff Demand delivered by ABN to the ABN MRA Debtors immediately prior to the Bid Deadline (as defined in the Sale Procedures) (the "Payoff Demand," and together with the ABN Payment, the "Hurdle Amount"), then ABN shall have the right, to be exercised in its sole discretion and without any obligation to consult with the Debtors or any other party in interest, either: (a) to notify and instruct the ABN MRA Debtors to accept the bid that ABN determines to be the highest and best bid (the "Mandatory Sell Bid"); or (b) to notify and instruct the ABN MRA Debtors not to accept such bid (the "ABN Put Right").

iv. In the event that a Qualified Bid for the purchase of the Mortgage Loans and Servicing Rights, whether made prior to the Bid Deadline or at the Auction (as defined in the Bid Procedures), is in an amount

---

[4] The terms of the Stipulation set forth herein are a summary only.  To the extent of any inconsistency between the summary herein and the Stipulation, the terms of the Stipulation shall govern.

that is greater than the Hurdle Amount (a "Topping Bid"), then: (a) the ABN Put Option shall expire; and (b) the ABN MRA Debtors shall have the obligation to designate as the Successful Bid (or the Next Highest Bid, if applicable) the Topping Bid or, after consultation with the Consent Parties and ABN, such other Qualified Bid made at the Auction as may be higher than the Topping Bid.

v.  Upon consummation of a Mandatory Sell Bid in accordance with the paragraph 12(a) of the Stipulation: (a) the ABN MRA Debtors shall receive from the escrow account holding the Minimum Deposit (as defined in the Sale Procedures) the ABN Payment; and (b) ABN shall receive, if and only if the ABN Payment has been paid in full, (i) all funds remaining in such escrow account, plus (ii) payment directly from the purchaser by wire transfer of an amount equal to the difference between the purchase price in the Mandatory Sell Bid and the Minimum Deposit.

vi. Upon consummation of a Successful Bid (or a Next Highest Bid, if applicable) in accordance with paragraph 13 of the Stipulation: (a) the ABN MRA Debtors shall receive from the escrow account holding the Minimum Deposit the sum of (i) the ABN Payment, plus (ii) all funds, if any, remaining in such escrow account, but in an amount not to exceed the amount by which the purchase price in the Successful Bid (or the Next Highest Bid, if applicable) exceeds the Hurdle Amount; and (b) ABN shall receive the sum of (i) all funds, if any, remaining in such escrow account after distribution to the ABN MRA Debtors of the amounts identified in subsection (a) above, plus (ii) payment directly from the purchaser by wire transfer of an amount equal to the difference between the purchase price in the Successful Bid (or the Next Highest Bid, if applicable) and the Minimum Deposit (the aggregate of (b)(i) and (b)(ii), the "ABN Receipt"); and (c) ABN shall pay to the ABN MRA Debtors, within two business days after the close of escrow, the amount, if any, by which the ABN Receipt exceeds the Payoff Demand. At such time after the closing of escrow that ABN reconciles and determines the actual Repurchase Price, ABN shall pay to the ABN MRA Debtors, or the ABN MRA Debtors shall pay to ABN, whichever is appropriate, the difference, if any, between such actual Payoff Amount and the Payoff Demand.

vii. In no event shall the Stipulation be construed to permit ABN to recover on account of the ABN MRA Agreements and the ABN Post-Petition Advances Stipulation an amount in excess of the sum of (a) the ABN Payment, and (b) the Payoff Amount, whether from the proceeds of the sale of, or forfeiture of any Minimum Deposit related to, the Mortgage Loans and Servicing Rights or otherwise.

viii. In the event ABN exercises the ABN Put Right in accordance with paragraph 12(b) of the Stipulation, then, without further Court order: (a) within two business days after exercising such ABN Put Right, ABN shall deliver to the ABN MRA Debtors the ABN Payment; and (b) no later than 20 business days following exercise of such ABN Put Right, or such later date as may be agreed to by the Parties, the ABN MRA Debtors shall convey, transfer, quitclaim, release, and/or turnover and deliver to ABN all of the ABN MRA Debtors' rights to and possession of the Mortgage Loans and the Servicing Rights, free and clear of the claims or interests of the Debtors and any and all other parties in interest in the Bankruptcy Cases (other than any rights of Purchasers under the ABN MRA, but solely with respect to their interests as Purchasers).

ix. In the event that no Qualified Bid for the purchase of the Mortgage Loans and Servicing Rights is received on or before the Bid Deadline, then, without further Court order: (a) within two business days after the Bid Deadline, ABN shall deliver to the ABN MRA Debtors the ABN Payment; and (b) no later than 20 business days after the Bid Deadline, or such later date as may be agreed to by the Parties, the ABN MRA Debtors shall convey, transfer, quitclaim, release, and/or turnover and deliver to ABN all of the ABN MRA Debtors' rights to and possession of the Mortgage Loans and the Servicing Rights, free and clear of the claims or interests of the Debtors and any and all other parties in interest in the Bankruptcy Cases (other than any rights of Purchasers under the ABN MRA, but solely with respect to their interests as Purchasers).

x. Proceeds of the sale of Assets (as defined in the Sale Procedures) that are not proceeds of the Sale of the Mortgage Loans and Servicing Rights shall not be affected by the Stipulation.

xi. Upon consummation of a sale of the Mortgage Loans and the Servicing Rights to the prevailing bidder as determined pursuant to paragraph 12(a) or 13 of the Stipulation, or once the ABN MRA Debtors' convey, release, deliver, transfer to and deliver possession of the Mortgage Loans and the Servicing Rights to ABN pursuant to paragraphs 12(b) or 17 of the Stipulation, ABN shall have, and shall assert, no claim or interest of any kind against or in the Mortgage

Loans, the Servicing Rights, the Debtors or the Debtors' bankruptcy estates under or with respect to the ABN MRA Agreements, the Mortgage Loans, or the Servicing Rights; provided, however, that notwithstanding the foregoing, ABN shall retain the right to pursue recovery of any of the ABN Advances (but no including Servicing Payments earned by the ABN MRA Debtors but then remaining unpaid) applied or used by any of the Debtors in any manner inconsistent with the ABN MRA Agreements, the ABN Post-Petition Advances Stipulation, or the Advances Order, and the Debtors reserve the right to object to or contest the exercise of such retained right.

## RELIEF REQUESTED AND BASIS THEREFOR

25.    By this Motion, the Debtors are seeking approval of the Stipulation pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019. The Debtors have weighed the costs, risks and disruption that would arise from potential litigation with ABN concerning the Sale of the Assets against the compromises contained within the Stipulation. In addition, in entering into the Stipulation, the Debtors have considered the importance of selling assets that are free from risks to potential third-party purchasers. In the Debtors' judgment, the Stipulation is fair and reasonable and serves the best interests of the Debtors, their estates and creditors.

## STANDARDS FOR SETTLEMENTS

26.    Rule 9019(a) of the Federal Rules of Bankruptcy Procedure provides that "on motion by the trustee and after a hearing, the Court may approve a compromise or settlement." The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged. In re Penn Central Transp. Co., 596 F.2d 1002 (3d Cir. 1979). The Supreme Court has recognized that "in administering a reorganization proceeding in an economical and practical manner, it will often be wise to arrange the settlement of claims in which there are substantial and reasonable doubts." In re Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. V. Anderson, 390 U.S. 414 (1986).

27.    Approval of a proposed settlement is within the "sound discretion" of the

Bankruptcy Court.  In re Neshaminy Office Building Associates, 62 B.R. 798, 803 (Bankr. E.D.

Pa. 1986).  The court must determine whether the proposed settlement is in the "best interests of

the estate."  See In the Matter of Energy Cooperative, Inc., 886 F.2d 921, 927 (7th Cir. 1989).  In

determining whether to approve an motion to settle a controversy, a Bankruptcy Court must

determine whether it is fair, reasonable and adequate by examining four factors:

> (a) the probability of success in the litigation; (b) the difficulties, if
> any, to be encountered in the matter of collection: (c) the
> complexity of the litigation involved, and the expense,
> inconvenience and delay necessarily attending it; and (d) the
> paramount interest of the creditors and a proper deference to their
> reasonable views in the premises.

Official Comm. of Unsec. Cred. Of Penn. Truck Lines, Inc., v. Penn Truck Lines, Inc. (In re

Penn Truck Lines, Inc.), 150 B.R. 595, 598 (Bankr. E.D. Pa. 1992).  The Court should not

substitute its judgment for that of a trustee.  Neshaminy Office Building Associates, 62 B.R. at

803.  The Court is not to decide the numerous questions of law or fact raised by litigation, but

rather should canvas the issues to see whether the settlement falls below the lowest point in the

range of reasonableness.  In re W.T. Grant and Co., 699 F.2d 599, 608 (2d Cir. 1983), cert.

denied, 464 U.S. 22 (1983).  In addition, "because the bankruptcy judge is unequally situated to

consider the equities and reasonableness of a particular compromise, approval or denial of a

compromise will not be disturbed on appeal absent a clear abuse of discretion."  Neshaminy

Office Building Assoc., 62 B.R. at 803 (citing, In re Patel, 43 B.R. 500, 505 (Bankr. N.D. Ill.

1984).

28.    Initially, the Stipulation is in the best interest of the Debtors, their estates

and creditors, because it not only clears an obstacle on their path to a successful sale of the

Assets, but also provides the Debtors with $700,000 regardless of the outcome of the sale of the

Assets. The Debtors will be able to achieve significantly more value for their construction loans, and servicing rights related thereto, if the sale occurs quickly and without disruption. The Stipulation is an important step in the construction loan sale process because it presents an opportunity to expeditiously resolve a dispute with a counterparty to a significant agreement on favorable terms.

29.     Moreover, by agreeing to the terms of the Stipulation, the Debtors are able to avoid the commencement of yet another costly and contentious dispute. Considering the many battles the Debtors are already being forced to wage to protect their assets, the resolution of this dispute with ABN, without the need for litigation, is a favorable outcome, because it will preserve and ultimately increase the value of the Assets.

## NOTICE

30.     Notice of this Application will be provided to (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Bank of America; (iv) Counsel to the Agent for the Debtors' Postpetition Lender; (v) counsel to ABN; and (vi) all parties entitled to notice under Del. Bankr. LR 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PREVIOUS REQUEST

31.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court issue and enter an order (i) pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, approving the Stipulation, and (ii) granting such other and further relief as may be just and proper.

Dated:    Wilmington, Delaware          YOUNG CONAWAY STARGATT & TAYLOR, LLP
          September 21, 2007

                                        James L. Patton, Jr. (No. 2202)
                                        Pauline K. Morgan (No. 3650)
                                        M. Blake Cleary (No. 3614)
                                        Matthew B. Lunn (No. 4119)
                                        Margaret B. Whiteman (No. 4652)
                                        The Brandywine Building
                                        1000 West Street, 17th Floor
                                        Wilmington, Delaware 19801
                                        Telephone: (302) 571-6600
                                        Facsimile: (302) 571-1253

                                        Counsel for Debtors and
                                        Debtors in Possession