UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

In re:                                              :    Chapter 11
                                                    :
AMERICAN HOME MORTGAGE                              :    Case No. 07-11047 (CSS)
HOLDINGS, INC.,                                     :
a Delaware corporation, et al.,                    :    Jointly Administered
                                                    :
        Debtors.                                    :    **Sale Procedures Hearing Date: October 1, 2007 at 10:00 a.m.**
                                                    :    **Sale Procedures Objection Deadline: September 26, 2007 at 4:00 p.m.**
                                                    :    **Sale Motion Hearing Date: TBD**
                                                    :    **Sale Motion Objection Deadline: October 26, 2007 at 4:00 pm**

------------------------------------------------------- x

**MOTION OF THE DEBTORS FOR ORDERS:  (A)(I) APPROVING SALE PROCEDURES;
(II) SCHEDULING A HEARING TO CONSIDER SALE OF ASSETS RELATED TO THE
DEBTORS' CONSTRUCTION LOAN BUSINESS; (III) APPROVING FORM AND
MANNER OF NOTICE THEREOF; AND (IV) GRANTING RELATED RELIEF; AND
(B)(I) AUTHORIZING THE SALE OF SUCH ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) AUTHORIZING AND
APPROVING PURCHASE AGREEMENT THERETO; (III) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES RELATED THERETO; (IV) AUTHORIZING THE
DISTRIBUTION OF THE PROCEEDS OF THE CONSTRUCTION LOANS
TO; AND (V) GRANTING RELATED RELIEF**

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors

in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] hereby submit this

emergency motion (the "Motion"), pursuant to sections 105(a), 363, and 365 of title 11 of the

United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rules 2002, 6004,

6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation
(3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American
Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage
Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM
Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New
York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580).  The address
for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address
is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

of two orders: (A) one, substantially in the form annexed hereto as <u>Exhibit A</u> (the "<u>Sale Procedures Order</u>"), (i) approving procedures (the "<u>Sale Procedures</u>") substantially in the form annexed hereto as <u>Exhibit B</u> with respect to the proposed sale or sales (the "<u>Sale</u>") of the construction loans and related servicing rights (the "<u>Construction Loans</u>") and construction loan platform (the "<u>Construction Loan Platform</u>") related to the Debtors' construction loan business (collectively, the "<u>Assets</u>"), pursuant to the form Purchase and Sale Agreement (the "<u>Purchase Agreement</u>"), annexed hereto as <u>Exhibit D</u>; (ii) scheduling a hearing (the "<u>Sale Hearing</u>") on the Sale and setting objection and bidding deadlines with respect to the Sale, (iii) approving the form and manner of notice of an auction for the Assets (the "<u>Auction</u>") and the Sale Hearing, and (iv) granting related relief; and (B) the other, substantially in the form annexed hereto as <u>Exhibit E</u> (the "<u>Sale Order</u>"),[2] (i) authorizing the Sale free and clear of liens, claims, encumbrances, and interests, pursuant to the Purchase Agreement(s), (ii) authorizing and approving the Purchase Agreement(s) related thereto, (iii) approving the assumption and assignment of executory contracts and unexpired leases, as necessary in connection with the Sale of Construction Loan Platform, (iv) authorizing the distribution of the proceeds from the Sale of the (a) ABN Construction Loans (as defined below) to ABN AMRO Bank N.V. ("<u>ABN</u>") and (b) Administrative Agent Construction Loans to the Administrative Agent consistent with the Cash Collateral Order, and (iv) granting related relief. In support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

---

[2] If the terms of any agreement respecting the Sale require modification of the proposed Sale Order, the Debtors will provide notice of the modified proposed Sale Order to the Court and interested parties in advance of the Sale Hearing.

066585.1001

## STATUS OF CASE AND JURISDICTION

1.      On August 6, 2007 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in possession of their properties and have continued to operate their businesses as  debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      An official committee of unsecured creditors (the "Committee") was appointed on August 14, 2007.  No trustee or examiner has been appointed.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code, along with Bankruptcy Rules 6006, 6007, and 9014.

## GENERAL BACKGROUND

A.      The Debtors' Business

4.      Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans.  AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors.  AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles.  Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

3

5.      As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News

6.      A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

B.      Events Leading to the Chapter 11 Filing

7.      Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

4

8.      The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities.  The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

9.      In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans.  During this time, certain of the Debtors' warehouse lenders -- the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

10.     On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

11.     The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business.  As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees.  The Debtors now employ approximately 1000 persons who are absolutely essential to the Debtors' continued operations, although that number is expected to decline as

5

various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

12.    In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

13.    Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## THE CONSTRUCTION LOAN BUSINESS

14.    In July of 2004, AHM assembled a team of experienced construction lending and mortgage banking professionals to establish a residential construction to permanent mortgage business. The Debtors' construction loan business (the "Construction Loan Business") is a full-service construction and renovation lending operation, beginning from the point of closing on the construction loan through draw administration and to final permanent mortgage loan.

15.    In the first full year of origination, annual closing volume for the Construction Loan Business was approximately $113 million, which was followed by approximately $300 million in the second year. Through July 31, 2007, the construction loan closing volume was approximately $201 million.

16.    The Assets include approximately 575 construction loans with approximately $341 million in committed balances and approximately $217 million in outstanding balances. The Debtors' construction loan portfolios and agreements are with ABN, JPMorgan

6

Chase, and Bank of America N.A., Credit Suisse First Boston, Lehman Brothers, Inc., and American Home Mortgage Capital (each a "Construction Loan Portfolio"). Payments during the term of the construction loans are interest only based on the amount actually disbursed to the borrower.

17.    There are two categories of construction loans, "one-time close" and "two-time close." One-time close construction loans are designed to provide a single closing for the construction and permanent financing of a home and were offered by the Debtors for terms of 6, 9, 12 or 18 months. The specific construction loan agreement controls the borrower's obligations during the construction term, and the note and security instrument provides the terms of the permanent financing. Specifically, two-time close construction loans are designed to provide the borrower more options for permanent financing. Two-time close construction loans provide the borrowers with interim financing for a period of 6 to 20 months.

18.    Eighty-nine percent (89%) of the Construction Loan Portfolio are one-time close construction loans and the remainder are two-time close construction loans. The top five (5) states for the Construction Loan Business are New York, California, Illinois, Texas, and Florida. The properties subject to the construction loans are primarily owner occupied and "stick built" construction.

## THE SALE

19.    Faced with the issues discussed above, most notably the liquidity crises and subsequent shutdown of the loan origination business, the Debtors have determined that it is in the best interest of their estates, creditors and other constituents to sell the Assets pursuant to the proposed Sale Procedures. Accordingly, the Debtors, with the assistance of their financial

7

advisors, have investigated a potential sale of the Assets in whole or in part, as well as other

strategic transactions. The Debtors will be conducting separate auctions for each of the

Construction Loan Portfolios, as well as the Construction Loan Platform, in the event more than

one Qualified Bid is received for such Asset.

　　　　20.　　　Pursuant to a Purchase Agreement or such other agreement as the Debtors

may enter into with respect to the Sale, the Debtors propose to sell, assign and transfer the Assets

to a Successful Bidder or Successful Bidders,[3] free and clear of all liens, claims, interests and

encumbrances (collectively, the "Liens"), other than those expressly assumed by the Successful

Bidder(s). Any and all such Liens will attach to proceeds of such sale received by the Debtors with

the same validity, priority, force and effect such Liens had on the Assets immediately prior to the

sale. The Sale is subject to the Court's approval and the Auction process proposed herein.

　　　　21.　　　The Debtors believe that the Sale of the Assets contemplated by the Sale

Procedures on an expedited basis, will maximize the value of their estates for the benefit of their

creditors and other interested parties.

## THE STIPULATION WITH ABN

　　　　22.　　　The largest Construction Loan Portfolio of the Debtors is with ABN (the

"ABN Construction Loans"). ABN has asserted that certain of the Debtors – AHM Acceptance,

AHM Corp., AHM Investment, and AHM Servicing (collectively, the "ABN MRA Debtors") – are

parties to a Master Repurchase Agreement, dated as of February 28, 2007 (the "ABN MRA").

ABN has additionally asserted, but the Debtors do not concede, that prior to the commencement of

the Petition Date, on or about August 1, 2007 and August 3, 2007, ABN delivered to the ABN

---

[3] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Sale
Procedures annexed hereto as Exhibit B.

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　066585.1001

MRA Debtors what ABN asserts to have been notices of events of default under the ABN MRA Agreements (as defined in the Stipulation).

23.    On August 21, 2007, the ABN MRA Debtors and ABN entered into that certain Stipulation Between Certain Debtors and ABN AMRO Bank N.V., dated August 21, 2007 (the "ABN Post-Petition Advances Stipulation"), for the purposes of, among other things: (a) permitting, but not obligating, ABN to fund certain Additional Mortgagor Advances by ABN MRA Debtors, including but not limited to any Additional Mortgagor Advances made pursuant to the Consent Letter (as that term is defined in paragraph 9 of the ABN Post-Petition Advances Stipulation); and (b) authorizing and directing ABN to make the Servicing Payments (as that term is defined in paragraph 17 of the ABN Post-Petition Advances Stipulation) to the Debtors for continued post-Petition Date servicing of the Mortgage Loans.  By Order entered on August 22, 2007, the Court approved the ABN Post-Petition Advances Stipulation.

24.    Pursuant to the ABN MRA, ABN asserts, but the Debtors do not concede, that it is the owner of the ABN Construction Loans.  To avoid lengthy, time-consuming, disruptive and costly litigation relating to parties relative rights in the ABN MRA, ABN and the ABN MRA Debtors entered into extensive negotiations as to the process to sell the ABN Construction Loans.

25.    As a result of those negotiations, on September 21, 2007, ABN and the ABN MRA Debtors entered into that certain Stipulation Between Certain Debtors and ABN AMRO Bank N.V. Regarding Marketing and Sale of Certain Construction Loans and Servicing Rights; and Order Thereon (the "Stipulation").[4]  A copy of the Stipulation is annexed hereto as Exhibit F.  As more fully set forth in the Stipulation, the ABN MRA Debtors and ABN have agreed to:  (a) a

---

[4] Contemporaneously with the filing of this Motion, the Debtors have filed a motion pursuant to Bankruptcy Rule 9019 for approval of the Stipulation.

DB02:6215292.13                                                                                      066585.1001

process under which the ABN Construction Loans and the rights to service such ABN Construction

Loans shall be marketed for sale and either sold pursuant to the highest and best bid or conveyed,

transferred, quitclaimed, released and/or turned over and delivered to ABN for servicing, collection

and disposition at ABN's own expense; (b) the treatment to be accorded to the proceeds of such

sale; and (c) the consideration to be paid by ABN to the ABN MRA Debtors upon consummation

of such sale to a third party or such conveyance, transfer, quitclaim, release, and/or turnover and

delivery to ABN. Pursuant to the Stipulation, the Debtors will be able to transfer to a third party

the ABN Construction Loans free and clear of any liens, claims or encumbrances.

### RELIEF REQUESTED

26.     By this Motion, the Debtors seek entry of two orders of this Court:  (A) the

Sale Procedures Order (i) approving the Sale Procedures; (ii) scheduling the Sale Hearing; (iii)

approving the form and manner of notice of the Sale Procedures, including the Auction and Sale

Hearing; and (iv) granting such other and further relief as is just and proper; and (B) the Sale Order

(i) authorizing the Sale of each of the Assets free and clear of Liens to the highest or otherwise best

bid received at the Auction; (ii) authorizing and approving the form of Purchase Agreement; (iii)

approving the assumption and assignment of various executory contracts and unexpired leases

related to the Construction Loan Platform, if necessary; (iv) authorizing the distribution of the

proceeds from the Sale including the distribution of proceeds of (a) ABN Construction Loans (as

defined below) to ABN AMRO Bank N.V. ("ABN") and (b) Administrative Agent Construction

Loans to the Administrative Agent consistent with the Cash Collateral Order; and (v) granting

related relief.  It is anticipated that the Assets may be sold to multiple buyers. The Debtors seek

approval of the Sale of each of the Assets through separate Purchase Agreements with different

purchasers; provided that the Debtors reserve the right to seek approval of a combination bid in the

10

event that a bid for a combination of the Assets is determined by the Debtors, to obtain the highest value for the Assets.

A.    Sale Procedures

27.    The Debtors are proposing the Sale Procedures, in the form annexed hereto as Exhibit B and which are incorporated herein by reference, in an attempt to maximize the realizable value of the Assets for the benefit of the Debtors' estates, creditors and other interested parties. The Sale Procedures contemplate an Auction process pursuant to which bids for each of the Assets will be subject to higher or better offers. As described more fully in the Sale Procedures, only Qualified Bidders who timely submit Qualified Bids may be eligible to participate in the Auction.

B.    Notice of Auction and Sale Hearing

28.    Subject to the Court's calendar, the Debtors seek to have the Sale Hearing scheduled for a date during the week of November 5, 2007, with an objection deadline of October 26, 2007 at 4:00 p.m. (ET). Additional objections related to the identity of a Successful Bidder will be permitted following identification of such party.

29.    The Debtors further request, pursuant to Bankruptcy Rule 9014, that objections, if any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware; (c) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware the ("Bankruptcy Court"), 824 Market Street, 3rd Floor, Wilmington, Delaware 19801, by 4:00 p.m. (ET) on October 26, 2007; and (d) be served so as to be received by such date and time on: so as to be received by such date and time upon: (a) the Debtors; (b) counsel to the Debtors; (c) counsel to the Committee; (d) counsel to the Administrative Agent; (e)

11

counsel to the DIP Agent; (f) counsel for ABN; and (g) all parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Del. Bankr. L.R. 2002-1(b).

30.    Not later than two business days after the entry of the Sale Procedures Order, the Debtors will serve copies of the Notice of Auction and Sale Hearing, substantially in the form attached hereto as Exhibit C, (a) by mail, postage prepaid to: (i) all entities known to have expressed a *bona fide* interest in acquiring the Assets; (ii) counsel to the Administrative Agent; (iii) counsel to the DIP Agent, (iv) counsel to the Committee; (v) known entities holding or asserting a security interest in or lien against any of the Assets; (vi) taxing authorities whose rights may be affected by a sale of the Assets; (vii) all government agencies required to receive notice of proceedings under the Bankruptcy Rules; and (viii) the Office of the United States Trustee for the District of Delaware; and (b) by first-class mail, postage prepaid, to all parties that have requested notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Sale Procedures Order.

31.    Not later than ten business days after entry of the Sale Procedures Order, the Debtors will publish the Notice of Auction and Sale Hearing, substantially in the form attached hereto as Exhibit C in the national edition of *The Wall Street Journal*.

C.    Assumption and Assignment and Notice of Proposed Cure Payments

32.    In connection with the Sale of the Construction Loan Platform, the Debtors may sell, assume, and assign certain contracts related to the Construction Loan Business (the "Assumed Contracts"). To facilitate the Sale of the Construction Loan Business and the sale, assumption and assignment of the Assumed Contracts, the Debtors propose to serve on all non-debtor parties to the Assumed Contracts a cure notice (the "Cure Notice"), including the Debtors' calculation of the proposed cure payment (each a "Proposed Cure Payment" and, collectively, the "Proposed Cure Payments") with respect to each of the Contracts.

12

33.     The Debtors request that each non-debtor party to a Contract who wishes to file an objection (a "Cure Payment Objection") to its Proposed Cure Payment and/or be required to do so on or before 4:00 p.m. (Eastern Time) on October 26, 2007 (the "Cure Objection Deadline") and serve a copy of the Cure Payment Objection, so as to be received no later than 4:00 p.m. (Eastern Time) on the same day, upon the following parties: (a) the Debtors; (b) counsel to the Debtors; (c) counsel to the Committee; (d) counsel to the Administrative Agent; (e) counsel to the DIP Agent; and (f) all parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Del. Bankr. L.R. 2002-1(b).

34.     In the event a non-debtor party to a Contract fails to timely file and serve a Cure Payment Objection prior to the Cure Objection Deadline, such non-debtor party shall be forever barred and estopped (i) from objecting to the Proposed Cure Payment and from asserting any additional cure or other amounts with respect to such Contract and the Debtors shall be entitled to rely solely upon the Proposed Cure Payment, and (ii) from asserting or claiming against the Debtors, any other prevailing bidder, or any other assignee of the Contract that any additional amounts are due or defaults exist.

35.     In the event that a Cure Payment Objection is timely filed, the Cure Payment Objection must set forth (i) the basis for the objection, and (ii) the amount the party asserts as the Proposed Cure Payment.  After receipt of the Cure Payment Objection, the Debtors will attempt to reconcile any differences in the Proposed Cure Payment believed by the non-debtor party to exist. However, if the Debtors and the non-debtor party cannot consensually resolve the Cure Payment

Objection, the Cure Payment Objection shall be heard, to the extent practicable, at the Sale

Hearing.  The Debtors may seek authority to assume and assign the underlying Contract at the Sale

Hearing and continue adjudication on the related Cure Payment Objection to a separate hearing

following the Sale Hearing.

      36.     To permit parties to Assumed Contracts an opportunity to object to the

proposed purchaser's ability to provide adequate assurance of future performance under the

Assumed Contracts (the "Adequate Assurance of Future Performance Objections"), the Debtors

propose that Adequate Assurance of Future Performance Objections, if any, must be (a) in writing;

(b) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (c) be filed with the clerk

of the Bankruptcy Court for the District of Delaware, Third Floor, 824 Market Street, Wilmington,

Delaware 19801, on or before 4:00 p.m. (prevailing Eastern Time) on November __, 2007 (the

"Adequate Assurance of Future Performance Deadline"), or such later date and time as the Debtors

may agree, and (d) be served so as to be received no later than 4:00 p.m. (prevailing Eastern Time)

on the same day, upon the Notice Parties.

      37.     In the event a non-debtor party to an Assumed Contract fails to timely file

and serve an Adequate Assurance of Future Performance Objection prior to the Adequate

Assurance of Future Performance Deadline, the Debtors propose that such non-debtor party shall

be forever barred and estopped (i) from objecting to the purchaser's ability to provide adequate

assurance of future performance with respect to their Assumed Contract.

## AUTHORITY FOR REQUESTED RELIEF

A.     The Sale is Within the Sound Business
       Judgment of the Debtors and Should be Approved

      38.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a

debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary

14

course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Section 363 of the Bankruptcy

Code does not set forth a standard for determining when it is appropriate for a court to authorize

the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts in this

Circuit and others have required that the decision to sell assets outside the ordinary course of

business be based upon the sound business judgment of the debtors.  See In re Abbotts Dairies of

Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d

389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722

F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp.,

(In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware &

Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991).

　　　　　39.　　　The "sound business judgment" test requires a debtor to establish four

elements in order to justify the sale or lease of property outside the ordinary course of business,

namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course

of business, (b) that adequate and reasonable notice has been provided to interested persons, (c)

that the debtors have obtained a fair and reasonable price, and (d) good faith.  Abbotts Dairies, 788

F.2d 143; Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399

(Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).

In this case, the Debtors submit that the decision to proceed with the Sale of the Construction Loan

Business and the Sale Procedures related thereto are based upon their sound business judgment and

should be approved.  A debtor's showing of a sound business purpose need not be unduly

exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound

business reasons."  In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

Whether or not there are sufficient business reasons to justify a transaction depends upon the facts

and circumstances of each case. Lionel, 722 F.2d at 1071; Montgomery Ward, 242 B.R. at 155

(approving funding of employee incentive and severance program; business purpose requirement

fulfilled because stabilizing turnover rate and increasing morale were necessary to successful

reorganization).

      40.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy

court with broad powers in the administration of a case under the Bankruptcy Code. Section

105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided

that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated

by the Bankruptcy Code, the exercise of its section 105(a) power is proper. In re Fesco Plastics

Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R.

303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or

decree that helps preserve or protect the value of a debtor's assets. See, e.g., Chinichian v.

Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the

power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the

Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D.

Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect

whatever equities a debtor may have in property for the benefit of its creditors as long as that

protection is implemented in a manner consistent with the bankruptcy laws.").

      41.     The Debtors submit that more than ample business justification exists to sell

the Assets to the Successful Bidder(s) (or Next Highest Bidder[s]) pursuant to the Sale Procedures.

The Debtors believe that it is essential to sell the Assets on an expedited basis. The Debtors further

believe that a targeted sale process is most likely to achieve the highest and best price for the

16

     

Assets. Simply put, given the situation that the Debtors face generally, and particularly the facts specific to the Construction Loan Business, the Debtors believe that the relief sought by this Motion is not only reasonable, but necessary, to maximize the value of their estates for the benefit of their stakeholders.

42.     The notice of the Sale described herein and the Sale Procedures are designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Assets. Accordingly, the proposed Sale satisfies the second prong of the Abbotts Dairies standard.

43.     Moreover, the Sale Procedures are designed to maximize the value received for the Assets. The process proposed by the Debtors allows for a timely auction process, given the circumstances facing the Debtors, while providing bidders and consultants with ample time and information to submit a timely bid. The Sale Procedures are designed to ensure that the Assets will be sold for the highest or otherwise best possible purchase price. The Debtors are subjecting the value of the Assets to market testing and permitting prospective purchasers to bid on the Assets. The proposed Sale will be further subject to a market check through the solicitation of competing bids in a court-supervised Auction process as set forth in the Sale Procedures. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Assets will be fair and reasonable, and , therefore, the third prong of the Abbotts Dairies standard is satisfied. As discussed below, the "good faith" prong of the Abbotts Dairies standard is also satisfied here.

B.     The Sale is Proposed in "Good Faith"
       Under Section 363(m) of the Bankruptcy Code

44.     The Debtors request that the Court find that the Successful Bidder (or Next Highest Bidder) is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.

17

45.    Section 363(m) of the Bankruptcy Code provides, in pertinent part:

The reversal or modification on appeal of an authorization under
subsection (b) . . . of this section of a sale . . . of property does not
affect the validity of a sale . . . under such authorization to an entity
that purchased . . . such property in good faith, whether or not such
entity knew of the pendency of the appeal, unless such authorization
and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

46.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets

sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order allowing the sale is reversed on appeal.  By its terms, section 363(m)

of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Assets.

Additionally, the United States Court of Appeals for the Third Circuit (the "Third Circuit") has

indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's

interest in executory contracts under Bankruptcy Code section 365.  Krebs Chrysler-Plymouth, Inc.

v. Valley Motors, Inc., 141 F.3d 490, 497-98 (3d. Cir. 1998).  In Krebs, the Court considered

"whether assignments of [certain automobile dealership] franchises under section 365 are also sales

of estate property subject to section 363(m)."  Id. at 497.  Despite the absence of an explicit

reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the

Court in Krebs concluded that section 363(m) of the Bankruptcy Code protected an assignment of

a debtor's interest in certain automobile franchise agreements pursuant to an auction sale.  Like the

franchise agreements protected in Krebs, the Assumed Contracts (as defined below) are executory

contracts that may be assumed and assigned pursuant to section 365 of the Bankruptcy Code.  In

light of Krebs, the Debtors respectfully submit that section 363(m) applies to protect the Successful

Bidder (or Next Highest Bidder) with respect to both the Assumed Contracts (as defined and

described more fully below) and the Assets.

47.    As required by section 363(m) of the Bankruptcy Code, the Sale Procedures have been proposed in good faith and provide for both the Debtors and the potential purchaser to act in good faith in negotiating the Sale and the assignment of the Assumed Contracts. Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." Abbotts Dairies, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." Id. (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)). See also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1998 (7th Cir. 1978)).

48.    Here, the sale of the Assets and the assignment of the Assumed Contracts is in good faith. There is no evidence of fraud or collusion in the terms of the Sale and the assignment of the Assumed Contracts. To the contrary, as discussed throughout this Motion, and as will be further demonstrated at the Sale Hearing, the Sale Agreement will be the culmination of a solicitation and negotiation process in which all parties will be represented by sophisticated counsel and financial advisors. No known potential bidder is an insider of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code, and all negotiations have been and will continue to be conducted on an arm's length, good faith basis. With respect to the potential bidders, the Sale Procedures are designed to ensure that no party is able to exert undue influence

19

over the process. Under the circumstances, the Successful Bidder (or Next Highest Bidder) should

be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith

purchaser. Furthermore, the Sale Procedures are designed to prevent the Debtors or the Successful

Bidder (or Next Highest Bidder) from engaging in any conduct that would cause or permit the Sale

Agreement, or the Sale of the Assets to the Successful Bidder (or Next Highest Bidder) pursuant

thereto and hereto, to be avoided under section 363(n) of the Bankruptcy Code.

49.     All creditors and parties in interest will receive notice of the Sale and will be

provided with an opportunity to be heard. Additionally, all counterparties to Assumed Contracts

and Assumed Leases will be provided notice of assumption and assignment and an opportunity to

be heard. The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies

the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

C.     The Sale Satisfies the Requirements
       of Section 363(f) of the Bankruptcy Code

50.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may

sell all or any part of its property free and clear of any and all liens, claims or interests in such

property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party

asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the

purchase price for the property is greater than the aggregate amount of all liens on the property;

(iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim or

interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for

such interest. 11 U.S.C. § 363(f); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R.

343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the

disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the

subsections is met). Because the Debtors expect that they will satisfy, at minimum, the second and

20

fifth of these requirements, if not others as well, approving the sale of the Assets free and clear of

all adverse interests is warranted.  Furthermore, courts have held that they have the equitable

power to authorize sales free and clear of interests that are not specifically covered by section

363(f).  See, e.g., In re Trans World Airlines, Inc., 2001 WL 1820325 at *3, 6 (Bankr. D. Del.

March 27, 2001); Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor

Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

D.    Assumption and Assignment
      of Executory Contracts and Unexpired Leases Should be Approved

          51.    To facilitate and effect the sale of the Assets, the Debtors seek authority to

assume and assign various executory contracts and unexpired to the Successful Bidder (or the Next

Highest Bidder) to the extent required by such Successful Bidder (or Next Highest Bidder).

Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory

contracts and unexpired leases, subject to the approval of the Bankruptcy Court, provided that the

defaults under such contracts and leases are cured and adequate assurance of future performance is

provided.  A debtor's decision to assume or reject an executory contract or unexpired lease must

only satisfy the "business judgment rule" and will not be subject to review unless such decision is

clearly an unreasonable exercise of such judgment.  Group of Institutional Investors v. Chicago,

Milwaukee, St. Paul & Pacific Ry. Co., 318 U.S. 523 (1943) (applying Bankr. Act section 77

subsection (b), the predecessor to Bankruptcy Code Section 365) (rejecting the test of whether the

executory contract was burdensome in favor of whether rejection is within the debtor's business

judgment); Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1046-47 (4th

Cir. 1985).

          52.    The meaning of "adequate assurance of future performance" depends on the

facts and circumstances of each case, but should be given "practical, pragmatic construction."  See

21

Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. In re Bygaph, Inc., 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

53.     The Successful Bidder (or the Next Highest Bidder) may desire to take assignment of certain executory contracts and unexpired leases related to the acquisition of the Construction Loan Platform. To the extent Assumed Contracts are identified, the Debtors believe that they can and will demonstrate that all requirements for assumption and/or assignment of the Assumed Contracts will be satisfied at the Sale Hearing. The Debtors, as required by the Sale Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Construction Loan Business. Further, for the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that the Sale of the Construction Loan Platform and assuming and assigning to the Successful Bidder (or the Next Highest Bidder) the Assumed Contracts is in the best interests of their estates. Moreover, the Debtors will provide all parties to the Assumed Contracts an opportunity to be heard. Specifically, a notice identifying any Assumed Contracts will be provided to each non-Debtor party to an Assumed Contract and Lease on or before October 9, 2007. Such notice will, among other things, list the Debtors' Proposed Cure Payment. Each non-Debtor party to an Assumed Contract and Lease will receive notice as soon as reasonably practicable to object to such assignment and/or

22

cure amount. If no such objection is received on or before the Cure Objection Deadline, the assignment of the applicable Assumed Contract and Lease, and the Debtors' proposed cure amount, would be approved. Actual cure costs will be paid either by the purchaser of an Assumed Contract and Lease or by the Debtors at the expense of the appropriate estate.

54.    Thus, the Debtors respectfully submit that by the conclusion of the Sale Hearing, assumption and assignment of the Assumed Contracts should be approved.

E.    Relief from the Ten Day Waiting Periods
      Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

55.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

56.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an

23

objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  Id.

57.    The Debtors hereby request that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

58.    Notice of this Motion will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to the Administrative Agent; (iv) counsel to the DIP Agent; (v) all parties who are known to possess or assert a secured claim against the Assets; (vi) the Internal Revenue Service; (vii) the U.S. Securities and Exchange Commission; and (viii) all parties entitled to notice under Local Rule 2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

*Remainder of Page Left Blank By Intention*

24

## CONCLUSION

WHEREFORE, the Debtors respectfully request (A) entry of the proposed Sale

Procedures Order, substantially in the form attached hereto as Exhibit A, (B) entry of the proposed

Sale Order, substantially in the form attached hereto as Exhibit E, and (C) such other and further

relief as the Court deems just and proper.

Dated: September 21, 2007
      Wilmington, Delaware

                YOUNG CONAWAY STARGATT & TAYLOR, LLP

                James L. Patton, Jr. (No. 2202)
                Pauline K. Morgan (No. 3650)
                M. Blake Cleary (No. 3614)
                Sean M. Beach (No. 4070)
                Matthew B. Lunn (No. 4119)
                Margaret B. Whiteman (No. 4652)
                The Brandywine Building
                1000 West Street, 17th Floor
                Wilmington, Delaware 19801
                (302) 571-6600

                Counsel for the Debtors and
                Debtors in Possession

                066585.1001