UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| AMERICAN HOME MORTGAGE | . | Case No. 07-11047(CSS) |
| HOLDINGS, INC., a Delaware | . | (Jointly Administered) |
| corporation, *et al.*, | . | |
| | . | Sept. 17, 2007 (12:08 p.m.) |
| Debtors. | . | (Wilmington) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

INDEX

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Peter Principato | 16 | 32<br>35 | 41 | |
| Simon Sakamoto | 43 | 53 | | |

1          THE CLERK: All rise.

2          THE COURT: Please be seated.

3          MR. CLEARY: Good afternoon, Your Honor.  May it

4    please the Court, Blake Cleary of Young, Conaway, Stargatt &

5    Taylor on behalf of American Home Mortgage Holdings and its

6    affiliated debtors and debtors in possession.  Turning to

7    today's agenda, but before we get to that, if I may, Your

8    Honor, I would like to note for the record and for the Court

9    that on Friday we filed a notice of rescheduled dates with

10   respect to the sale of the servicing business.  It does

11   appear on the docket.  Those dates have been changed such

12   that the sale objection deadline is October 1st at 4 p.m.  The

13   deadline for submitting bids is October 2nd at 4 o'clock.  The

14   auction date is October 5th at 10 o'clock, and the sale

15   hearing date has been adjourned to October 9th at 2:30 p.m.,

16   Your Honor.  Again, that was with the consent and

17   consultation of Bank of America and the Committee.  Turning

18   back to the agenda, Your Honor -

19          THE COURT: When is the sale hearing, the 9th at

20   2:30?

21          MR. CLEARY: The 9th at 2:30.  A move that's been

22   scheduled with Your Honor's chambers.

23          THE COURT: Uh-huh.

24          MR. CLEARY: Your Honor, the first two agenda items

25   are agenda items with respect to the retention of Cadwalader

1    and the retention of Kekst and Company.  As reflected on the

2    agenda, we would like to adjourn those to October 1st.  With

3    respect to Cadwalader, there's some open issues with the

4    Trustee that Cadwalader is working out.  Your Honor, that

5    brings us to agenda item number 3, which is Docket No. 232

6    and it's an emergency motion of Impac Funding Corp.  On

7    Friday a certificate of counsel was filed submitting a form

8    of order which resolved that matter.  So, no hearing is

9    required unless Your Honor has any questions with that.

10         THE COURT: Well, I haven't seen the certificate of

11   cert.  I don't believe I've seen the certification, but I'll

12   look at it when it comes in.

13         MR. CLEARY: Thank you, Your Honor.

14         THE COURT: It's otherwise adjourned to October 1?

15         MR. CLEARY: Correct, Your Honor.

16         THE COURT: Okay.

17         MR. CLEARY: Your Honor, the next item is the Ginnie

18   Mae motion, and with that, if I would be permitted to turn

19   the podium over to Robert Brady to address that matter.

20         THE COURT: Yes.

21         MR. BRADY: For the record, Robert Brady on behalf

22   of the debtors.  Your Honor, we are in settlement discussions

23   with Ginnie Mae and they involve a third party.  We are

24   waiting word back now from the third party as to whether

25   they're prepared to proceed with the settlement we have been

1  negotiating.  If we have a settlement, we are going to seek

2  to file that and ask that it be heard on Thursday in lieu of

3  the contested hearing, but if we are unable to reach a final

4  settlement, then the contested matter that is scheduled for

5  Thursday at 2:30 would go forward.

6            THE COURT: Okay.

7            MR. CLEARY: Your Honor, that brings us back to

8  agenda item number 5, which is the debtors' 2004 motion, and

9  as set forth on the agenda, this matter has also been

10  adjourned by agreement of the parties to October 31st.  Agenda

11  item number 6, Your Honor, is the debtors' motion for an

12  order terminating their non-qualified deferred compensation

13  plans.  As reflected on the agenda, we received six

14  responses.  Several of those responses have requested

15  adjournment, and so we've agreed, and with Your Honor's

16  permission we'd adjourn that to the October 1, 2007 hearing

17  date as well.

18            THE COURT: All right.

19            MR. CLEARY: Your Honor, agenda item number 7 is the

20  debtors' motion to retain Quinn Emanuel.  For the record,

21  that order does appear on the docket.  Your Honor, the next

22  two agenda items are applications by the debtors to retain

23  investment bankers with the sale of its servicing business,

24  servicing rights, servicing platform in the American Home

25  Mortgage Home Bank.  Your Honor, I hoped to stand before you

1    and present a blackline form of order addressing the issues

2    and concerns raised by both the Committee and the Trustee.

3    Unfortunately we were unable to resolve the Trustee's

4    objections, and so, with Your Honor's permission, we would

5    like to adjourn both of those and submit them under

6    certification of counsel addressing those.  If not, adjourn

7    them to the next omnibus hearing date, which is October 1st.

8              THE COURT: All right.

9              MR. CLEARY: I didn't know if Your Honor -

10             THE COURT: No, no, that's fine, it can be adjourned

11   till October 1, and if they resolve it in the meantime,

12   submit it under certification of counsel, and if I approve of

13   that, I'll sign the order, and otherwise we'll go forward on

14   the 1st.

15             MR. CLEARY: Thanks.  With that, Your Honor, it

16   brings us to agenda item number 10, the contested matters.

17   This is the motion of DB Structured Products for relief from

18   the automatic stay, and with that I would cede the podium.

19             THE COURT: All right.

20             MR. BOWDEN: Good afternoon, Your Honor.  For the

21   record, Bill Bowden of Ashby & Geddes for DB Structured

22   Products.  Your Honor, I just want to take a moment to

23   introduce you to co-counsel, Steven Wilamowsky of Bingham

24   McCutchen.  I believe Mr. Wilamowsky's already been admitted

25   by Your Honor *pro hac vice*, and with Your Honor's permission,

1    I'll cede the podium to my co-counsel to present this matter.

2    THE COURT: All right.

3    MR. BOWDEN: Thank you.

4    MR. WILAMOWSKY: Good morning, Your Honor - or good

5    afternoon, Your Honor.  Steven Wilamowsky, Bingham McCutchen,

6    LLP, on behalf of DB Structured Products, Inc.  Your Honor,

7    DB Structured Products is moving today for relief from the

8    automatic stay that would allow it to continue with a

9    termination for cause under its loan and servicing agreement

10   with American Home Mortgage Corp. and Servicing.  That would

11   allow it to continue that and would therefore conclude in the

12   termination of the agreement pursuant to its terms.  Your

13   Honor, I think that everyone agrees that it is up to DB

14   Structured Products to make its *prima facie* case, and then if

15   it is successful in making its *prima facie* case, then it

16   would be up to the debtors to rebut that.  We're here with

17   evidence today, and we respectfully submit that we will be in

18   a - as we will present that we are well-positioned to make

19   our *prima facie* case, however, I also think that it's - we

20   can satisfy that burden simply as a matter of law and as a

21   matter of the facts, based on the facts that the Court can

22   take judicial notice of.  Your Honor, the key - There seems

23   to be two key bases for objection, and obviously they'll

24   characterize it, the Committee and the debtor will

25   characterize it, and so I don't want to put words in their

1    mouth, but reading their objections there seem to be two

2    underlying bases for objection.  First of all, that we

3    haven't made our *prima facie* case, and I would submit that

4    we're not doing that in the pleading.  We'll do that here

5    today in court, but second of all, that the alleged default,

6    based on the lack of servicing status (a) based on lack of

7    Fannie Mae approval, is not a continuing default.  Now, as

8    we've argued, it doesn't matter whether it's a continuing

9    default, but we also want to note that to the extent that it

10   does matter whether or not it's a continuing default,

11   notwithstanding what the Committee or the debtors say in

12   their pleading, it just isn't the case that that has been

13   remedied.  And two points that I would make in that regard,

14   Your Honor.  The first thing is that the settlement agreement

15   itself, which is a matter of public record and part of the

16   docket of this court with Fannie Mae, is that the status that

17   it does provide for - and I'll discuss that in a minute, but

18   the status that it does provide for the debtors is not for

19   all the debtors, but by the terms of the agreement, it is

20   between Fannie Mae, the settlement agreement is between

21   Fannie Mae and American Home Mortgage Corporation which is

22   not the same debtor entity that is required to have Fannie

23   Mae approval - or it's not the only entity that it's required

24   to have Fannie Mae approval under our loan servicing

25   agreement.  Second of all, Your Honor, the agreement itself

1    does not make servicing or any debtor entity a Fannie Mae

2    approved servicer by any definition with respect to the loans

3    that are at issue here today.  At best, the agreement gives

4    us very, kind of, limited interim approval or qualification

5    with respect only, by its terms, only to loans that American

6    Home owns as of the date of the settlement agreement.  It

7    doesn't apply to any new loans that American Home may

8    originate.  It doesn't apply to any loans that are being

9    serviced by American Home that may be owned by other parties,

10   and in fact, as the evidence will show, Fannie Mae is not

11   purchasing any loans from DB Structured Products that have -

12   where they have retained servicing, where American Home is a

13   servicer.  That is the fact.  It is also evident without

14   testimony, which we'll present, but without that, it's

15   evident from the very terms of the settlement stipulation

16   that there is the limited interim approval that it's giving

17   till October 31st, for whatever that's worth, is limited to a

18   very small subset of loans that are actually owned by

19   American Home.  So, for that reason alone, Your Honor, I

20   would respectfully submit that - and combined with the

21   undisputed fact that the requirement of Fannie Mae approval

22   was an expressed term of the agreement and is listed in the

23   agreement, in the preamble, as being a - as something that,

24   you know, the fact that the debtors were going to sell the -

25   the fact that DBSP was going to sell these loans was an

1  expressly recognized term of the loan and servicing

2  agreement.  We submit, respectfully, that that itself

3  establishes a *prima facie* case in favor of listing of the

4  stay, and that the evidence will show that DBSP continues to

5  suffer prejudice today that is ongoing and is continuing as a

6  result of the inability of the debtors to obtain through

7  Fannie Mae approval.  Second of all, Your Honor, when we're

8  looking at the other side of the equation, you're looking at

9  - Till now I've spoke about the injury or the breach, and

10  I'll present evidence as to the ongoing injury that DBSP is

11  suffering, but when you look to the corresponding benefit of

12  the stay to the debtors, there is nothing in the pleading

13  other than conclusory statements that there's value and, Your

14  Honor, we just don't understand, again, how it's even

15  disputable that there would be value here to the estate.  We

16  would be very happy if the debtors were to say, We're going

17  to assume the agreement and pay the cure based on the early

18  payment default, premium recaptures, the various claims that

19  we have under that agreement to the tune of $18 million.  If

20  they told us that they were going to assume that agreement,

21  you know, we'll take the ongoing risk that we're suffering in

22  terms of selling the portfolio, but we get a cure of $18

23  million, we know that's not going to happen as a practical

24  matter.  I assume the debtors are not going to tell us that

25  that realistically can possibly happen, that the agreement

1   could possibly be economical either at the $18 million cure

2   number or at any reasonable number because the debtors are

3   going to concede even if the debtors argue with us about the

4   early payment default, at the edges, they can't reasonably

5   dispute that these are early payment default claims that were

6   made pre-petition and that they are going to be substantial

7   early payment default claims out there -

8           THE COURT: I have no idea what you're arguing about

9   at this point.  I have no idea.

10          MR. WILAMOWSKY: Okay.

11          THE COURT: You need to give me some context.

12          MR. WILAMOWSKY: Okay.

13          THE COURT: None of that's in your papers, so I

14  don't know where you're coming from on that.  I believe your

15  argument in your papers was that the contracts were not

16  assume and assignable because the cure could not - It was a

17  non-curable default.  Now, you're telling me as an economic

18  matter, it's not going to happen.

19          MR. WILAMOWSKY: Your Honor -

20          THE COURT: That's not what's in your papers.

21          MR. WILAMOWSKY: Okay.  Your Honor, I think that

22  perhaps the best way to, and this is kind of - I think that -

23  and I apologize for this, Your Honor, but I think that in

24  terms of the solidifying - in terms of knowing what our cure

25  amount was under our agreement and, I mean, that was

1   something that we at the time that we had not crystalized at

2   the time that we had - and put into our motion at the time we

3   filed the motion.  It was subsequently, and I understand that

4   that's not the pleading in front of Your Honor today, but it

5   subsequently was in our cure objection, but be that as it

6   may, Your Honor, I would suggest that perhaps I go right into

7   my lead case and put my witness up on the stand.

8          THE COURT: Right, well, let me see if the other

9   side wants opening -

10          MR. WILAMOWSKY: Sure.

11          THE COURT: - and I'll take your comments in the

12   nature of opening.  Is there any response by the debtors or

13   the Committee in the nature of opening argument?

14          MR. DORSEY: Good afternoon, Your Honor.  John

15   Dorsey from Young, Conaway on behalf of the debtors.  This

16   case is a little different from the others that Your Honor

17   has had so far in this case from parties who are seeking

18   relief from the automatic stay to terminate agreements.

19   There's no allegation in this case that there was a pre-

20   petition termination.  DB Structured by its own papers admits

21   that it's filing this motion for purposes of completing the

22   process of terminating the debtors, and the reason they

23   haven't terminated the debtors yet is because under the terms

24   of the agreement, the purchase agreement that they were

25   speaking of, there's an obligation for them to identify a new

1    servicer before they can terminate.  They have not identified

2    a new servicer.  They have never identified a new servicer,

3    and therefore, the contract cannot be terminated.  In order

4    to lift the stay in this case, DB is going to have to show

5    that they have some harm.  The only harm that they refer to

6    in their papers is that they can't securitize these

7    mortgages, and I think Your Honor's going to hear testimony

8    today that given the nature of these particular types of

9    mortgages, they cannot be securitized in any event.  They

10   never could have been securitized and they never will be

11   securitized in the near future because of the nature of these

12   loans.  These are not just your everyday run-of-the-mill

13   mortgages.  These are mortgages that were issued to people

14   who are undocumented aliens.  They're called ITIN loans for

15   individual tax identification number because that's how the

16   IRS tracks these.  Those types of loans could not be

17   securitized even assuming that DB Structured was correct,

18   that the debtors were terminated by Fannie Mae and there

19   cannot be a cure of that termination.  It wouldn't matter.

20   There's still no harm to DB Structured.  They were buying

21   these loans from the debtors up to a year ago, and they have

22   never securitized any of them.  And we'll put on testimony to

23   that effect, Your Honor.  We believe, therefore, Your Honor,

24   they're not going to be able to prove their burden of showing

25   harm.  On the issue of whether we are Fannie Mae qualified

1    and how that affects DB Structured, there was a disputed

2    termination by Fannie Mae after the petition was filed.  We

3    negotiated with Fannie Mae and, as Your Honor is well aware,

4    there's a signed order on the docket approving the debtors as

5    interim Fannie Mae servicers.  Now, they've made some hay

6    with the fact that the agreement is between the parent

7    company and not AHM Servicing.  Well, that's a non-sequitur,

8    Your Honor.  Obviously, the only company that provided

9    servicing here was AHM Servicing, and if Fannie Mae wanted to

10   have them continue to provide that servicing, it was AHM

11   Servicing that was going to be continuing to provide that.

12   So, we don't believe that that has any bearing whatsoever.

13   They also - Let me find my notes here, Your Honor.  They also

14   say that Fannie Mae is - even if we weren't - even if we had

15   interim servicing agreement with Fannie Mae, we still can't

16   securitize loans through Fannie Mae, but that doesn't mean

17   they can't be securitized through someone else.  Fannie Mae

18   securitizes loans, Ginnie Mae securitizes loans, any number

19   of at least 15 different individual banking institutions

20   securitize loans.  Just because Fannie Mae doesn't securitize

21   these particular loans, even if they would, which again, we

22   will put on evidence to show that they wouldn't, there's no

23   reason to believe that they couldn't be securitized some

24   other way if in fact they could be securitized, which brings

25   up back to the whole theme here, Your Honor, which is, these

1   loans can't be securitized, and they're not going to be able

2   to prove their burden that they suffered any harm.  Thank

3   you, Your Honor.

4          THE COURT: All right, thank you.  You may proceed.

5          MR. WILAMOWSKY: Thank you, Your Honor.  I would

6   like to call up as a witness Mr. Peter Principato.

7          THE COURT: Take the stand, sir.  Please swear the

8   witness.  Please stand, sir.

9                      PETER PRINCIPATO

10  having been duly sworn testifies as follows:

11         THE CLERK: Would you please state your name and

12  spell your last name.

13         THE WITNESS: Peter Principato, that's spelled P-r-

14  I--c-I-p-a-t-o.

15         THE COURT: Mr. McMahon, do you wish to be heard?

16         MR. McMAHON: Your Honor, can I be excused?

17         THE COURT: Yes, of course.

18         MR. McMAHON: Thank you, excuse me.

19         MR. BOWDEN: Your Honor, Bill Bowden again for the

20  record.  I have binders of the three exhibits which DB

21  proposes to move into evidence today, if I might approach

22  with a copy for Your Honor and a copy for Your Honor's clerk?

23         THE COURT: Yes.  Does the witness have a copy?

24         MR. BOWDEN: I believe he does, Your Honor.

25         THE COURT: Okay.  Thank you.

1          MR. WILAMOWSKY: Your Honor, I believe the witness

2     left his copy back there.  Maybe Mr. Bowden -

3          MR. BOWDEN: Sure.

4          MR. WILAMOWSKY: Okay.  I can proceed -

5          THE COURT: Yes, please do.  You may approach, Mr.

6     Bowden.

7          MR. BOWDEN: Thank you, Your Honor . . . (microphone

8     not recording).

9          THE COURT: Thank you.

10                      DIRECT EXAMINATION

11    BY MR. WILAMOWSKY:

12    Q.  Mr. Principato, your relationship with DB Structured

13    Products, Inc.?

14    A.  I'm an authorized officer of DB Structured Products, Inc.

15    Q.  And what are your responsibilities in connection with

16    that role?

17    A.  In connection with that -

18          THE COURT: Can you move that microphone a little

19    closer to your mouth?

20          THE WITNESS: Sure.

21          THE COURT: There you go.

22          THE WITNESS: I manage the contract finance group,

23    who owned the business.

24    BY MR. WILAMOWSKY:

25    Q.  Okay, and what did that entail?

1   A.   That entails the supervision and management of all of the

2   whole loan purchases, sales, servicing sales and

3   acquisitions, also as it pertains to the contract

4   negotiations of the business terms of such.

5   Q.   Okay, so, and specifically the business terms, right,

6   you're not an attorney, you don't deal with the legal issues

7   that arise more and more on the business side.

8   A.   That is correct, I'm not an attorney.

9   Q.   Okay.  Are you - and if I can direct you to the binder,

10  Tab 1.

11  A.   Yes.

12  Q.   And can you just read the name of the document that is

13  referenced in Tab 1.

14  A.   It's the Master Mortgage Loan Purchase and Servicing

15  Agreement between American Home Mortgage Corp. as Seller,

16  American Home Mortgage Servicing, Inc., as servicer, and DB

17  Structured Products, Inc., as the initial purchaser.

18  Q.   And if you could just sort of flip through the agreement,

19  just very cursorily, are you generally - does that look to

20  you like an agreement that you have seen before and that

21  you're familiar with?

22  A.   Yes.

23  Q.   And is it an agreement that you were involved in the

24  negotiation of?

25  A.   Yes.

1          MR. WILAMOWSKY: Your Honor, I'd like to move DBSP

2     Exhibit 1 into evidence.

3          THE COURT: Any objection?

4          MR. DORSEY: No objection, Your Honor.

5          THE COURT: It's admitted without objection.

6          MR. WILAMOWSKY: Thank you, Your Honor.

7     BY MR. WILAMOWSKY:

8     Q.  Are you also, Mr. Principato, have you also - are you

9     familiar with the document that is in Tab 2 of the binder?

10    A.  Yes.

11    Q.  Okay.  And that is a letter dated August 1st, 2007?

12    A.  That's correct.

13    Q.  And it says, "Notice of default and termination"?

14    A.  Correct.

15    Q.  Okay, and is that your signature on the bottom?

16    A.  Yes.

17    Q.  Okay.  And this is - the best you can see now that's a

18    true copy of a letter that you sent out on August 1st?

19    A.  Yes.

20    Q.  Okay.

21         MR. WILAMOWSKY: Your Honor, can we - I'd like to

22    respectfully request that DBSP 2 is moved into evidence?

23         THE COURT: Any objection?

24         MR. DORSEY: No objection.

25         THE COURT: Admitted without objection.

1       MR. WILAMOWSKY: Thank you, and Your Honor, if we

2   could just - in order to just be done with the putting in of

3   the exhibits, I'd like to respectfully request that Your

4   Honor take judicial notice and accept DBSP 3, the tab that's

5   marked 3 into evidence.  It is simply a copy pulled from the

6   docket of the order approving the settlement and compromise

7   with Fannie Mae and the exhibit which was the actual

8   settlement letter that was attached.

9       THE COURT: Any objections?

10      MR. DORSEY: No objection, Your Honor.

11      THE COURT: All right admitted without objection.

12      MR. WILAMOWSKY: Thank you, Your Honor.

13  BY MR. WILAMOWSKY:

14  Q.  Mr. Principato, are there provisions in the loan and

15  servicing agreement regarding Fannie Mae qualifications?

16  A.  That's correct, yes.

17  Q.  And are these provisions - Is it a provision - Well,

18  what's your general understanding of the provision?

19  A.  General understanding of the provision is as it reads in

20  section 4.01 Romanette (phonetical) 6, that if the servicer

21  ceases to meet the qualifications of either Fannie Mae or

22  Freddie Mac as seller/servicer, in this case would be applied

23  to the servicing aspect, that they would be subject to

24  termination under the events of default.

25  Q.  And when you negotiated this agreement, do you consider

1   this to be - did you consider this and do you now - Well, let

2   me not ask two questions.  Did you consider it to be a

3   material term of the agreement that you were negotiating?

4   A.  Yes.

5   Q.  Why?

6   A.  The approval of Fannie and Freddie is viewed in the

7   secondary market as an industry standard of servicing for

8   which is the basis of confidence in the servicing behind

9   these loans as acknowledged by other investors in the market,

10  and mixed E-loans would make the loans, well, obviously

11  impossible to deliver to Fannie or Freddie either as whole

12  loans or getting a G-Fee assessed to take back securities,

13  but also to other investors would use that as a quality

14  standard.  So, if the servicing of the loans doesn't meet a

15  standard of Fannie or Freddie, then it's, you know, it's not

16  liquid.

17  Q.  Okay.  Are there loans within this portfolio that you

18  would be able - that absent a Fannie Mae approval issue, that

19  you would be able to sell to Fannie Mae in the ordinary

20  course?

21  A.  Are there loans in this - There are loans in this

22  portfolio that, yes, I would have been able to deliver to

23  Fannie or Freddie.

24  Q.  And you heard counsel's reference to the ITIN loans; is

25  that correct?

1   A.   Yeah, ITIN loans is a portion of this pool but it's not

2   the whole pool.

3   Q.   Okay, what is the remaining portion of the pool?

4   A.   There are roughly $10 million worth of loans that are

5   what we consider in the industry as Alt-A loans, that are not

6   backed by borrowers without social security numbers. These

7   are, you know, American borrowers with social security

8   numbers, and they are, you know, conventional mortgage loans

9   that would be acceptable to Fannie or Freddie Mae if they

10  were serviced by a servicer that was approved by such.

11  Q.   Has DB Structured Products since the filing of the

12  bankruptcy - since the filing of the Chapter 11 cases by

13  American Home, has DB Structured Products tried to sell or to

14  securitize the loans that are part of the portfolio that are

15  subjects to the agreement?

16  A.   Yes.

17  Q.   And have those efforts been successful?

18  A.   No.

19  Q.   Have you tried to sell loans that were otherwise

20  qualified to be sold to Fannie Mae, have you tried to sell to

21  Fannie Mae?

22  A.   That's correct, yes.

23  Q.   And what has the response been.

24  A.   No.  Any loans, we were told by both Fannie and Freddie

25  Mac that any loans serviced by American Home that will not be

1  acceptable for delivery.

2          MR. DORSEY: Objection, hearsay, Your Honor.

3          THE COURT: Why isn't that hearsay?

4          MR. WILAMOWSKY: Because it's -

5          THE COURT: Objection sustained.

6          MR. WILAMOWSKY: Okay.

7          THE COURT: Unless you were - I took it by your body

8  language you weren't responding.  I'll hear your response.  I

9  apologize.

10         MR. WILAMOWSKY: Okay, okay.

11         THE COURT: Do you have a response?

12         MR. WILAMOWSKY: Well, no, I'll accept the - Your

13 Honor's sustained the objection, and I'd like to rephrase the

14 question.

15         THE COURT: Very well.

16         MR. WILAMOWSKY: Okay.

17 BY MR. WILAMOWSKY:

18 Q.  Mr. Principato, do you have an understanding as to

19 whether or not Fannie Mae will accept loans for sale by DBSP

20 to Fannie Mae?

21 A.  The loans in question will not be accepted by Fannie Mae

22 or Freddie Mac.

23 Q.  Okay.

24 A.  And as stated on this stipulation, American Home has only

25 received an extended approval for the loans that have already

1  been delivered to Fannie/Freddie Mac prior to the bankruptcy.

2  Fannie maintains, and Freddie as well, they will not accept

3  any new loans to be delivered.

4  Q.  Okay.  Other than your reading of the stipulation, which

5  I gather you have read the stipulation, other than that is

6  there another basis on which you have come to your

7  understanding that the loans will not be accepted for sale?

8  A.  Yes.  Conversations with representatives from both Fannie

9  and Freddie.

10  Q.  And they said, We're not buying - they're refusing to

11  purchase them.

12           MR. DORSEY: Objection -

13           THE WITNESS:  They will not -

14           MR. DORSEY: - to leading and hearsay.

15           THE COURT: Please don't respond when there's a

16  pending objection.  Objection is leading and hearsay.

17           MR. WILAMOWSKY: Okay, I can rephrase as to leading

18  but if I can respond to the hearsay objection.

19           THE COURT: Yes.

20           MR. WILAMOWSKY: I'm merely - Mr. Principato is

21  testifying that he has asked them to purchase and that Fannie

22  Mae has said, No.  He's not testifying to the truth as to

23  whether Fannie Mae in fact, you know, secretly is hoping to

24  purchase these loans or anything else in terms of Fannie

25  Mae's state of mind.  It's simply whether or not - It's no

1   different than if I testified and I say, I go into a store

2   and I ask, you know, Can I get an extra cheese pie, and the

3   sales person says, No, you can't have one.  I can testify

4   that I was refused a pizza, and I think no differently, I

5   think that Mr. Principato is simply testifying that he's made

6   inquiries and that he's been told no.

7            THE COURT: Mr. Dorsey?

8            MR. DORSEY: I think it's still hearsay, Your Honor.

9   He wants to testify what he was told by someone else for the

10  purpose of admitting it into this hearing for the truth of

11  what was said.

12           THE COURT: I agree.

13           MR. WILAMOWSKY: But -

14           THE COURT:  I agree, sustained.  He can testified

15  what his belief is; okay?  But if you want to get into

16  evidence Fannie Mae and Ginnie Mac's position, you need to

17  put Fannie Mae or Ginnie Mac or Freddie Mac or whoever the

18  heck it is on the stand.

19           MR. WILAMOWSKY: No, that's fine, but all I'm saying

20  is that it should be - well, Your Honor will evaluate whether

21  to believe it, but it should be admitted for the purpose of -

22           THE COURT: No, he can say, Look I believe X because

23  Bob told me X.

24           MR. WILAMOWSKY: Right.  Okay.

25           THE COURT: All right?  But whether or not Bob - I

1   mean, the truth of whether or not Bob said that or not,

2   that's hearsay, and there's no way for the debtor to cross-

3   examine Bob on whether or not he said that or not, and if he

4   said it whether or not it's true.  That's what makes it

5   hearsay.  So he can say, Look, I believe X, and I believe it

6   based on what I was told, but I'm not going to let him

7   identify - I'm not going to let him testify as to what was

8   actually told him.

9           MR. WILAMOWSKY: Okay.

10          THE COURT: And that will make him vulnerable on

11  cross-examination as to the basis of his belief, but, you

12  know, the way to solve that is to have the person here who

13  said that.

14          MR. WILAMOWSKY: Okay, but, Your Honor, and I'll

15  just - if I can just say my last piece and that's it on this

16  point is, I'm not asking - hearsay is when somebody testifies

17  as to what somebody else said for the purpose of establishing

18  the truth of the statement made by that other person.  That's

19  not, respectfully, what I think I'm trying to do here.  I

20  think I'm trying to say that he has approached Fannie Mae and

21  he has been refused.  It's not the same thing as saying that

22  the other person - He, Mr. Principato, testifying today says,

23  I approached Fannie Mae and I was refused.  That's not,

24  respectfully, Your Honor, I don't believe that that's hearsay

25  because it's not being submitted for the truth of what the

1    guy at Fannie Mae said.

2              THE COURT: Look, I mean, the testimony that's going

3    to be admissible is, I tried to sell the loans to Fannie Mae

4    and I was unable to sell the loans to Fannie Mae.

5              MR. WILAMOWSKY: Okay.

6              THE COURT: All right, anything more is going to be

7    objectionable as hearsay.

8              MR. WILAMOWSKY: Okay.

9    BY MR. WILAMOWSKY:

10   Q.  All right.  Have you been unable to sell loans to Fannie

11   Mae - or the statement that you just made that you have been

12   unable to sell loans to Fannie Mae, is that true even - is

13   that only true based on information or based on your

14   understanding formed before the entry of the settlement

15   agreement between the debtors and Fannie Mae or is that after

16   the - does that hold true after that date as well?

17   A.  It was before the bankruptcy -

18   Q.  Not before the bankruptcy, before the settlement with

19   Fannie Mae.

20   A.  The settlement - which date are you referring to?

21   Q.  Okay.  Let me give you a specific date.  You're aware

22   there was a settlement agreement, I think as you have already

23   said, you're aware there was a settlement agreement between

24   Fannie Mae and the debtors; is that correct?

25   A.  Correct.

1   Q.   Okay.  And the exhibit shows that that - that had been

2   admitted into evidence shows that that was approved by this

3   Court on September 4th, 2007.

4   A.   Correct.

5   Q.   Does it remain your understanding post-September 4th, 2007

6   that you remain unable to sell loans to Fannie Mae?

7   A.   That's correct, yes.

8   Q.   Okay.  Is your inability to sell loans to Fannie Mae

9   affecting your ability to sell loans to third parties?

10  A.   The -

11  Q.   I'm sorry, I'll make it clearer.  Is your inability to

12  sell loans to Fannie Mae affecting your ability to sell loans

13  to third parties other than Fannie Mae?

14         MR. DORSEY: Objection, Your Honor.  I'm not sure

15  what loans he is referring to.

16         MR. WILAMOWSKY: Okay.

17         THE COURT: Why don't you rephrase, be a little bit

18  more specific.

19         MR. WILAMOWSKY: Yes, all right.

20  BY MR. WILAMOWSKY:

21  Q.   With respect to the loans that are part of the - that

22  were purchased as part of - from American Home as part of

23  this loan and sale and servicing agreement, there are two

24  categories of loans within that; right?  That can be

25  generally categorized, and correct me - well, there are ITIN

1    loans; right?  Okay.  There are other loans that you said was

2    - you testified approximately $10 million worth of loans that

3    are Alt-A or similarly within the category of people, parties

4    that have social security numbers that would not fall into

5    the ITIN category; correct?

6    A.  Correct.

7    Q.  Okay.  Now, with respect to all of those loans, the ITIN

8    loans and the non-ITIN loans, has the inability to sell to

9    Fannie Mae the piece - the non-ITIN piece, has the inability

10   to sell that piece, has that affected your ability to sell

11   any or all of the loans that are in the portfolio?

12   A.  Yeah, we have been unable to sell the loans because we

13   are not able to make the rep which is required that the loans

14   are serviced by a servicer who's approved by Fannie Mae or

15   Freddie Mac.

16   Q.  Why is it a - I take it that you - Is it a bad thing from

17   DBSP's perspective in terms of - Is it a bad thing from the

18   perspective of DB Structured Products that it has - it is

19   holding onto these loans and it has been unable to sell it?

20   A.  Yes.

21   Q.  Why is that a bad thing?

22   A.  Because the liquid assets and a market that due to

23   current market conditions is in constant fall.

24   Q.  Okay.  So what is it that DB Structured Products would

25   like to do that it cannot currently do as a result of the

1  current situation with American Home as a result of the

2  Fannie Mae approval situation with American Home?

3  A.   DBSP would like to deliver the mortgage loan products

4  that meet the Fannie Mae eligibilities as whole loans to

5  deliver to Fannie or Freddie respectively and the ITIN loans,

6  they would respectfully like to sell in the secondary market

7  and mitigate their losses.

8  Q.   Okay.  Now, in your experience, would you expect there to

9  be material change or difference in terms of what kind of

10  price you'd be able to lock in if you had to wait an

11  additional three or four weeks - if you had to wait an

12  additional number of week, let's just pick three weeks, as a

13  - and couldn't sell it during that period in terms of the

14  price that you might get then and the price that you might

15  get now?

16          MR. DORSEY: Objection, lack of foundation.

17          MR. WILAMOWSKY: Let me establish a foundation.

18          THE COURT: Lay a foundation.

19  BY MR. WILAMOWSKY:

20  Q.   Okay.  You've testified that you'd like to be able to

21  sell these loans - in fact, you would have liked to sell

22  these loans earlier.  It's also your testimony that if given

23  the opportunity, if given Fannie Mae approval or if you were

24  able to get the servicing back, you would be seeking to - you

25  would be making efforts to sell the portfolio now; is that

1    correct?

2    A.  That's correct.

3    Q.  Okay.

4         MR. DORSEY: Your Honor, it would be helpful if

5    counsel could identify whether when he asks the question

6    "you" he's speaking of DB Structured or this witness in

7    particular.  I don't know that he's established that this

8    particular witness has any foundational background to answer

9    these questions.

10        MR. WILAMOWSKY: Okay.

11   BY MR. WILAMOWSKY:

12   Q.  As an officer of DB Structured Products, can you testify

13   as to whether it would be DB Structured Products' intention

14   to sell these - to attempt to sell these loans, and by saying

15   these loans, I mean all of the loans in the American Home

16   that were purchased as part of this agreement, would it be DB

17   Structured Products' intent to sell these as soon as

18   possible?

19        MR. DORSEY: Objection -

20        THE WITNESS: Yes.

21        MR. DORSEY:  - lack of foundation.  Still hasn't

22   established what this particular witness's job is at the

23   company, what he does on a day-to-day basis.

24        THE COURT: I thought we had testimony as to - that

25   he managed the portfolio.

1       MR. DORSEY: He gave his job title, Your Honor, but

2  I don't believe he talked about what his day-to-day

3  responsibilities were.

4       MR. WILAMOWSKY: I think he did, Your Honor, but I'm

5  happy to remind counsel, I'm happy to refresh that

6  recollection for counsel and have the witness re-testify as

7  to that point.

8       THE COURT: All right, well, let's go into it.  Lay

9  the foundation as to why as an officer of the corporation, as

10 you stated, he would have that knowledge.

11      MR. WILAMOWSKY: Okay.

12 BY MR. WILAMOWSKY:

13 Q.  Mr. Principato, you've testified that you're an officer

14 of DB Structured Products.  How is it that you would know

15 what DB Structured Products' intentions are with respect to

16 the decision to either sell or not sell particular loans at

17 any particular time and - Well, after you answer that

18 question and then I'll get to my next question.

19 A.  I manage the contract finance group, which is responsible

20 for all the whole loan purchases and sales as well as all the

21 agency deliveries and support all the other activities of the

22 trading desk.  So how I would know is, the trading desk tells

23 me that they want to sell these loans, and I show the pullout

24 to people that market it for us to solicit bids.

25 Q.  Okay, and so, you - given your position with DB

1   Structured Products, you are in a position to know whether or

2   not - it's your testimony that you're in a position to know

3   whether or not DB Structured Products is or is not eager or

4   interested in selling the particular loan portfolio in

5   question today, meaning the portfolio subject to the sale and

6   servicing agreement?

7   A.   Yes, we are interested in selling these loans.

8   Q.   Okay, and why do you want to sell those loans today

9   rather than waiting for, let's say, three weeks?

10  A.   The answer would be that we do not want to gamble on what

11  the market may or may not do, and we'd like to lock in our

12  economics right now.

13  Q.   Okay.  And is it your testimony that what is preventing

14  you from doing that is your inability to either get the

15  servicing rights back from American Home or to have - for

16  American Home to be Fannie Mae approved?

17          MR. DORSEY: Objection, leading.

18          MR. WILAMOWSKY: Your Honor, actually, I think he's

19  actually answered that, so, in different words, so I have no

20  other questions for this witness.

21          THE COURT: All right.  Cross-examination.

22                    CROSS-EXAMINATION

23  BY MR. DORSEY:

24  Q.   Good afternoon, Mr. Principato.  You testified that of

25  the $189 million worth of loans in the portfolio that's at

1   issue here, roughly 10 million are Alt-A loans; is that

2   correct?

3   A.  Yes.

4   Q.  How many of those Alt-A loans are in foreclosure at this

5   time?

6   A.  How many are in foreclosure?

7   Q.  Yes.

8   A.  I don't know the exact percentage but there is a small

9   percentage of delinquent loans.

10  Q.  And what is your understanding as to what that percentage

11  is?

12  A.  I couldn't give you an accurate number.

13  Q.  How many of those -

14  A.  Less than five percent.

15  Q.  How many of those mortgage are REO mortgages.

16  A.  To my knowledge, I don't believe there are any.

17  Q.  And what is your understanding if a mortgage is in

18  foreclosure or is an REO mortgage is it possible to

19  securitize those mortgages?

20  A.  You could securitize almost any asset in the secondary

21  market and given normal business circumstances.

22  Q.  Is it your testimony that you can securitize ITIN loans?

23  A.  It is not my knowledge that you can't.

24  Q.  So, as far as you know, it is not possible to securitize

25  ITIN loans?

1   A.  I would say my answer, as far as my knowledge goes, I

2   don't know any reason why you cannot.

3   Q.  When did DB Structured first begin to purchase the loans

4   that are in this particular portfolio from the debtors?

5   A.  I believe it was December of 2000 - I believe it was in

6   December, either 2005 or early - I'm not quite sure, but I

7   believe it was in 2006.  Exactly what month, I'm not quite

8   sure.

9   Q.  And when was the last time that DB Structured purchased

10  loans from the debtors that are contained in this particular

11  portfolio?

12  A.  In the portfolio in question of the 189 million?

13  Q.  Yes.

14  A.  I would say sometime in 2007.  I'm not quite sure of the

15  exact month.

16  Q.  After the first quarter?

17  A.  That's correct.

18  Q.  How much mortgage insurances are on these particular

19  mortgages?

20  A.  Which ones?

21  Q.  The ones that are contained in the portfolio.

22  A.  The ITIN portion or the Alt-A portion?

23  Q.  Start with the ITIN portion.

24  A.  The ITIN portion of the loans are insured by a magic

25  policy, and I believe the coverage is 35 percent.

1   Q.  And that means that if in fact a loan went into

2   foreclosure the insurance would cover 35 percent of the value

3   of that loan?

4   A.  First 35 percent of the loss.

5   Q.  And what about the other non-ITIN loans, what's the

6   insurance coverage on those?

7   A.  There isn't any.

8   Q.  Are those Fannie Mae loans?

9   A.  Those loans are eligible by the nature of the product for

10  delivery to Fannie Mae and Freddie Mac.

11  Q.  But they weren't originally Fannie Mae or Freddie Mac

12  loans.

13  A.  Could you clarify -

14  Q.  I'll strike the question.  Are any of the ITIN loans

15  currently rated by any rating agency?

16  A.  No, they are not.

17          MR. DORSEY: May I have just one second, Your Honor?

18          THE COURT: Uh-huh.

19          MR. DORSEY: No further questions, Your Honor.

20          THE COURT: Any questions by the Committee?

21          MS. FATELL: Yes, Your Honor.

22                      CROSS-EXAMINATION

23  BY MS. FATELL:

24  Q.  Good afternoon.  Can you turn to section 15 of Exhibit -

25          THE CLERK: (Microphone not recording.)

1           MS. FATELL: I'm sorry, Bonnie Fatell for the

2    Creditors Committee.

3           THE COURT: We all know Ms. Fatell.

4    BY MS. FATELL:

5    Q.  In DB's exhibits, can you turn to Exhibit 1, page 59,

6    please, which is section 15.  Do you have that?

7    A.  Yes.

8    Q.  It's called the Termination Section.  If you go down

9    seven lines in the middle of the paragraph, the sentence

10   starts in the middle of the line, "The purchaser may

11   terminate"; do you see that?

12   A.  Yes.

13   Q.  Can you read that sentence for us, please.

14   A.  "The purchaser may terminate the servicer pursuant to

15   this section without cause if the purchaser pays to the

16   servicer a termination fee based on the fair market value of

17   the related servicing rights as mutually agreed to between

18   the servicer and the purchaser."

19   Q.  And reference here to purchaser is DB Structured

20   Products?

21   A.  Yes.

22   Q.  And servicer is the debtor.

23   A.  That's correct.

24   Q.  Okay.  And has there been a calculation made by the

25   servicer and the purchaser as to what the fair market value

1   would be?

2           MR. WILAMOWSKY: Objection, Your Honor, irrelevant.

3           THE COURT: Why is it relevant, Ms. Fatell?

4           MS. FATELL: Well, Your Honor, I think that there

5   are a couple of bases upon which DB believes that it - well,

6   asserts that it can seek relief from stay or terminate, and

7   one is without cause, and I think it would be important to

8   understand what they think that fee would be that they'd have

9   to pay if they went under the without cause aspect of the

10  agreement.

11          THE COURT: But they're not going under the without

12  cause provision.  And let me get an acknowledgment that

13  that's the case.

14          MR. DORSEY: Your Honor, if I may, I think it would

15  also be relevant given counsel's opening remarks here that

16  there was no evidence of any value to the debtors of the

17  servicing rights here.

18          THE COURT: Response.

19          MR. WILAMOWSKY: Yes.  When the debtor presents a

20  case on value, we would be happy to rebut that as

21  appropriate, but right now, it has nothing to do with the

22  scope on direct.

23          THE COURT: That's a different - now, the objection

24  is beyond the scope of direct as opposed to relevancy

25  objection.  I'm going to allow it because I don't want to get

1   into a situation where we have to recall Mr. Principato if we

2   can avoid it.  So, I'll allow the Committee some latitude

3   notwithstanding I believe the acknowledgment that you're not

4   proceeding under the without cause or - yes, the without

5   cause provision.  So, Ms. Fatell, I'll let you get into it a

6   bit.

7            MS. FATELL: Thank you, Your Honor.

8            THE COURT: Objection is overruled.

9   BY MS. FATELL:

10  Q.  Has there been a calculation made as to what the fair

11  market value would be of those servicing rights?

12  A.  On whose part?

13  Q.  On either part, either by Deutsche Bank or by the

14  servicer, the debtor.

15  A.  The servicing assets of the ITIN loans have no value as

16  evidenced by us discussing any interest with any parties that

17  are typically in the process or in the business practice of

18  purchasing servicing assets, and we were told from three

19  separate investors in such assets that they had no interest

20  in buying the servicing rights on ITIN loans.

21  Q.  I'm not sure that answered my question.  The question is,

22  has there been a fair market value determination made as to

23  those servicing rights?

24  A.  It's unable to determine a fair market value if the fair

25  market is not willing to pay anything for it.  So I would say

1  the calculation is zero.

2  Q.  Are you aware that the debtor is in the process of trying

3  to sell its servicing rights presently?

4  A.  Yes, I am.

5  Q.  And wouldn't it improve DB's position if the debtor were

6  able to sell those servicing rights, vis-a-vis the DB

7  portfolio of loans?

8          MR. WILAMOWSKY: Your Honor, Ms. Fatell is asking

9  the witness to speculate.

10         MS. FATELL: Your Honor, the witness testified that

11 he was an expert in this - well, not an expert, that he was

12 experienced in selling these portfolios.  It seems to me he

13 should be able to say whether having a new servicer would

14 improve the portfolio.

15         THE COURT: Yeah, overruled.

16         THE WITNESS: I can't answer that question because

17 there's not enough facts for me to make an intelligent

18 assessment of that.

19 BY MS. FATELL:

20 Q.  Wouldn't it be fair to say that the position of DB right

21 now is that the debtor is not an appropriate servicer, (a)

22 because it claims it's not, because DB claims it's no longer

23 qualified as a Fannie Mae servicer and for whatever other

24 reasons that you may have, therefore, isn't it fair to say

25 that if a new servicer took over this portfolio that was

1   qualified under Fannie Mae that that would improve the

2   quality of the portfolio for DB?

3   A.  Once again, that's not a very easily answered question.

4          MS. FATELL: Okay, Your Honor -

5          THE WITNESS: You could certainly try to find a

6   servicer, I would say, that has Fannie Mae approval, but I

7   don't know that it would undo the damage that's been done

8   thus far.

9   BY MS. FATELL:

10  Q.  And if DB gets stay relief and sells this portfolio it

11  was sell it and transfer servicing to a new servicer?

12  A.  It will transfer the servicing of this portfolio

13  immediately.

14  Q.  And that would -

15         THE COURT: It would what - I'm sorry.  It will do

16  what?  It will transfer -

17         THE WITNESS: It will transfer the servicing of this

18  portfolio immediately.

19  BY MS. FATELL:

20  Q.  So that servicing by a new servicer would be to DB's

21  advantage.

22  A.  Yes, absolutely.

23         MS. FATELL: I have no further questions.  Thank

24  you.

25         THE COURT: Redirect?

1          MR. WILAMOWSKY: Yes, well, just one question, Your

2     Honor.

3                    REDIRECT EXAMINATION

4     BY MR. WILAMOWSKY:

5     Q.  Mr. Principato, you testified on cross-examination that

6     you didn't know exactly what the default rates were with

7     respect to the Alt-A loans in the portfolio but that you

8     could testify that it was something under five percent; is

9     that correct?

10    A.  When I saw the numbers which was, you know, some time

11    ago, I believe that there were on the five percent, but the

12    fact of the matter is, I should have asked for more clarity

13    because I don't know what information debtors' counsel is

14    looking from and mortgage information is pulled on a daily

15    basis and it could change from day to day.  So, I would think

16    in order for me to answer questions clearly and concisely and

17    accurately, I would need to know exactly the date that we

18    were looking at the portfolio so we're all looking at the

19    same snapshot.

20    Q.  Okay.  Assuming that there was a default rate in that

21    range that you said, in that range, and just recognizing your

22    clarifying comment, would it still be in - would it still be

23    DB Structured Products' normal practice to attempt to be

24    selling or securitizing those loans?

25          MR. DORSEY: Objection, calls for speculation.  The

1  witness just testified he's not sure now whether it was five

2  percent or not.

3          MR. WILAMOWSKY: Okay, well, let me rephrase the

4  question then.

5  BY MR. WILAMOWSKY:

6  Q.  Regardless of what the particular default rate might be

7  on a portfolio of Alt-A loans, is it DB Structured Products'

8  normal practice to try to either sell or securitize those

9  loans?

10 A.  Yes.

11 Q.  Okay.  And why is that?

12 A.  DB Structured Products, Inc., is in the business of

13 purchasing and securitizing or selling and/or selling whole

14 loans.  We are not a portfolio buyer.  We don't buy loans to

15 hold them.

16 Q.  So it would be fair to say that - Well, that's fine.

17         MR. WILAMOWSKY: No further questions, Your Honor.

18         THE COURT: You may step down, sir.  Thank you.  Any

19 further witnesses?

20         UNIDENTIFIED SPEAKER: Your Honor, I don't believe

21 that the movant has any further witnesses.

22         THE COURT: All right.  Debtor or Committee have any

23 evidence?

24         MR. DORSEY: Yes, Your Honor.  The debtors would

25 call Simon Sakamoto to the stand.

1          THE COURT: Okay.  Please stand.

2                      SIMON SAKAMOTO

3     having been duly sworn testifies as follows:

4          THE CLERK: Please state your name and spell your

5     last name.

6          THE WITNESS: Simon Sakamoto, S-a-k-a-m-o-t-o.

7                    DIRECT EXAMINATION

8     BY MR. DORSEY:

9     Q.  Good afternoon, Mr. Sakamoto.  Could you please tell the

10    Court how you're currently employed.

11    A.  I work for American Home Mortgage Investment Corp.  I'm

12    the senior portfolio manager, managing the main MBS

13    portfolio.  I manage a team of traders and analysts who buy

14    and sell securities for our portfolio.  This strategy is

15    primarily to earn net interest income off the highly rated

16    securities that we hold for our portfolio.

17    Q.  How long have you been employed by American Home in that

18    capacity?

19    A.  Since September 2003.

20    Q.  Prior to coming to American Home, could you briefly

21    describe for the Court your educational and work background?

22    A.  Yes.  I've been employed at Lehman Brothers for about 13

23    years, and then prior to that I worked for CSFB for about 4

24    and a half years, and then I received my MBA from Columbia

25    and undergraduate from MIT.

1   Q.  Are you familiar with the loan portfolio that's at issue

2   in this particular case involving DB Structured?

3   A.  Yes, I am.

4   Q.  How did you become familiar with that particular loan

5   portfolio?

6   A.  Well, I had requested the assistance of the American Home

7   servicing team to identify exactly which loans these 189

8   million loans refer to since Deutsche Bank did not identify

9   it for us.  So what the servicing group did was to determine

10  which loans in their servicing portfolio were serviced on

11  behalf of Deutsche Bank Securities or DB Structured on a

12  retain basis and also which these loans had not been

13  securitized yet, and we were able to identify very closely

14  the 189 million.  These loans approximately at the current

15  balance there's total about 1,665 loans of which six loans

16  are not ITIN loans and the remainder are ITIN loans.

17  Q.  And you heard the testimony from Mr. Principato about

18  what ITIN loans are.  Is that your understanding of what ITIN

19  loans are as well?

20  A.  Yes.  I am very familiar with the product since we had

21  managed them into our portfolio in the past.

22  Q.  The six non-ITIN loans that are in this portfolio, what

23  kind of loans are they?

24  A.  These are Alt-A loans.  These are loans that are usually

25  given to less credit worthy borrowers.  They also may have

1  documentation where it's much lower than a full income type

2  loan.

3  Q.  And what is the current status of those six Alt-A loans?

4  A.  I believe all six loans are either in foreclosure or in

5  REO status.

6  Q.  And what's the total value of those six loans?

7  A.  To my understanding, it's about 2.17 million.

8  Q.  What does it mean to be - We know what foreclosure is,

9  it's in default, but what is an REO?

10  A.  REO is when a borrower goes into default eventually the

11  house is sold at an auction and the lender could potentially

12  buy the property, so it becomes real estate owned.  So it's

13  no longer a loan.

14  Q.  You also heard Mr. Principato's testimony about the

15  inability to securitize ITIN loans; do you agree with his

16  testimony?

17  A.  Absolutely.  The ITIN loans, first of all, cannot be sold

18  to the agencies because they're not part of the program.

19  Q.  When you say "agencies" -

20  A.  When I say "agencies", Freddie Mac, Fannie Mae, and

21  Ginnie Mae will not purchase them because they're not an

22  eligible set of loans to be securitized under their program,

23  however, you can try to conduct a securitization through a

24  private label program called a Non-Agency Securitization.  In

25  that situation, you have to obtain bond ratings from

1  recognized rating agencies such as Moody's, Standard &

2  Poor's, Fitch, Dominion Bond Rating Service.  Now from our

3  own experience in trying to securitize the ITINs, we were

4  unable to get ratings from Moody's or S&P, and from my

5  understanding to this day they will not rate these

6  transactions.  We also solicited Fitch to see whether they

7  would rate it, and so far they have not committed to either

8  way whether they will rate them or not.

9  Q.  Does AHM own its own portfolio of ITIN loans?

10  A.  I don't believe we own that much if we have any left.

11  Q.  In the past though they have?

12  A.  In the past we have and then we sold them to Deutsche

13  Bank through a series of trades.

14  Q.  When did Deutsche Bank first begin to purchase these

15  loans?

16  A.  They purchased about 125 million in September of '06.

17  They purchased another 30 million in December of '06, and

18  then the last trade they did was about 38 million on June 6th,

19  2007.

20  Q.  And of the loans that are in this portfolio, have any of

21  them ever been securitized?

22  A.  I don't believe so.  In fact that's how we were able to

23  determine what kind of loans these were because we were able

24  to identify that these loans were still being serviced for

25  Deutsche Bank and that were not securitized.  We have

1   specific investor codes that identify which loans are non-

2   securitized loans that we're still servicing on behalf of

3   other investors, such as Deutsche Bank.

4   Q.  What about the remaining non-ITIN loans, are they able to

5   be securitized?

6   A.  Well, generally, the loans that are in foreclosure or REO

7   or perhaps severely delinquent are generally not

8   securitizable especially most transactions are structured as

9   a real estate investment trust which means that those

10  transactions do not permit purchase of REOs or severely

11  delinquent loans.  It's not to say they couldn't, but it's

12  generally industry practice that they would not purchase

13  those type of loans into those securitization trusts.

14  Q.  And that's from your experience in working in this

15  industry for the last 20 years?

16  A.  Correct.

17  Q.  Other than the fact that these are ITIN loans, for the

18  most part, or the ones that are in default or REO loans, are

19  there any other reasons you're aware of which has made it

20  difficult to sell and/or securitize these loans in the last

21  30 days?

22  A.  Well, I think with respect of these loans, because they

23  are either ITINs or severely delinquent, it would make it

24  difficult to sell them into any securitization regardless who

25  the servicer was, but putting that aside, there's another

1   reason why securitization sales have been extremely

2   difficult, and the reason is, the liquidity for non-agency

3   loans, which we consider that any loans that cannot be

4   securitized into Freddie Mac, Fannie Mae, or Ginnie Mae, that

5   market basically has become severely disrupted and the reason

6   is the sub-prime contagion has spilled over the Alt-A and the

7   prime space and it's caused non-agency eligible loans not to

8   be securitized.  A couple of events that we've seen is we had

9   another rep that operated very similar to American Home,

10  Thornburgh, and they had to liquidate 20 billion of non-

11  agency mortgage facts securitizations because they could not

12  meet the margin calls.  Another example -

13            MR. WILAMOWSKY: Objection.

14            THE WITNESS:  - August is that -

15            THE COURT: There's an pending objection.

16            MR. WILAMOWSKY: I don't know what the basis is or

17  the witness's knowledge of that, and he hasn't -

18            THE COURT: Foundation.  Can you lay a foundation

19  for that kind of knowledge, Mr. Dorsey?

20            MR. DORSEY: Sure.

21  BY MR. DORSEY:

22  Q.  Based on your position at American Home Mortgage, do you

23  engage in activities to monitor what's going on in the

24  market?

25  A.  Yes, we do.  Since we manage a large portfolio of highly

1   rated securitizations, R&BS transactions, we receive deal

2   flow information from 15 recognized MBS securitization banks

3   including Deutsche Bank, and during the month of August and

4   September we've monitored the daily deal flow information

5   that we receive on a constant basis.  After reviewing all

6   those emails that we receive there was not a single new issue

7   that was done in the month of August.  We did see a couple of

8   new issues appear at the end of August, but I don't believe a

9   lot of those deals have really been consummated at this

10  point.  In fact, we received offerings from Deutsche Bank

11  from the two sales people that cover us, and the only new

12  issue that we received was a countrywide transaction that

13  closed in July, and obviously a lot of that inventory was

14  unsold because of the bad market conditions.

15  Q.  That was inventory from July you're referring to?

16  A.  Correct.  But it was still introduced in August.

17  Apparently they didn't sell much of that at all in August.

18  Q.  And what were the types of loans that were sold in those

19  August transactions - or July transactions, I should say?

20  A.  Well, all those loans were basically loans that could not

21  be sold into Fannie Mae, Freddie Mac, or Ginnie Mae

22  securitizations, what we deemed as non-agency transactions.

23  Q.  Would those include ITIN loans?

24  A.  If they could be securitized, I would consider them to be

25  a non-agency transaction, but since the rating agents, the

1   bond rating agencies, the recognized two, Moody's and S&P

2   will not rate them, it's highly unlikely that an

3   institutional - a US based institutional investor would buy

4   them at this point.

5   Q.  And based on your knowledge of what has been happening in

6   the industry, how does the recent history that you just

7   described compare to what was happening in say June of this

8   year?

9   A.  The main difference is that the securitization for non-

10  agency whole loans came to a standstill.  Basically, nobody

11  will, or I should say, not too many investors are buying

12  these securities because the turmoil, first of all, the

13  market, there's an excess inventory of secondary transactions

14  in the market.  Also there's a - I think a lot of investors

15  are - have lost faith in the bond rating agencies.  They have

16  not -

17             MR. WILAMOWSKY: Your Honor, speculation.  Previous

18  objection.

19             MR. DORSEY: It's based on his understanding of the

20  industry, Your Honor.

21             THE COURT: Well, when he starts to say, you know,

22  what the bond rating agencies' faith or lack of faith is in

23  the industry, I think he is starting to get a little far

24  afield.  He can certainly give his understanding of the

25  market conditions and what he thinks is going to happen or

1   not happen, but I don't want him to get too much into what

2   Moody's or Standard & Poor's is thinking unless he can

3   identify specifically how they're expressing it in ways that

4   aren't hearsay.

5          THE WITNESS: Well, I - Earlier this year in June, I

6   believe S&P and Moody's conducted a conference call when they

7   started downgrading the sub-prime transactions, and many

8   investors started asking the questions, Why didn't they

9   downgrade these securities earlier clearly when the evidence

10  was there that the credit conditions were deteriorating, and

11  I think a lot of people, a lot of investors in the audience

12  were frustrated by lack of their foresight -

13         MR. WILAMOWSKY: Objection, hearsay, Your Honor.

14         THE COURT: We're really getting - That's clearly

15  hearsay.

16         THE WITNESS: Okay.

17         THE COURT: Or it's beyond hearsay.  It not an out-

18  of-court statement, it's an out-of-court feeling for the

19  proof of the feeling asserted.

20         THE WITNESS: I think there is one factual event

21  that occurred.  In the month of August, Countrywide, the

22  largest originator in the industry, basically could not sell

23  their non-agency securitization loans, so they basically

24  stopped making loans that could not be securitized into

25  Fannie Mae or Ginnie Mae or Freddie Mac pools, and they had

1    to draw on the entire credit line.

2          MR. WILAMOWSKY: Your Honor, the witness -

3    Objection.  The witness has not established a foundation for

4    his knowledge of any of that.

5          THE COURT: No, I disagree.  I think he's - the

6    foundation that Mr. Dorsey laid earlier is sufficient based

7    on how he monitors the market.

8    BY MR. DORSEY:

9    Q.  You can continue.

10   A.  So, clearly, if the largest originator in the country

11   could not sell the non-agency whole loans into securitization

12   trusts, then they have to stop originating them because there

13   was no way for them to fund them.  They'd have to draw on

14   their entire bank line to fund their existing position.  So,

15   clearly that is evidence that the market has basically

16   stopped working.

17   Q.  Are you familiar with what the debtors are doing

18   currently in their attempts to sell the servicing rights that

19   are attached to this particular portfolio?

20   A.  Yes, I am.

21   Q.  Can you tell the Court, explain to the Court what's

22   happening in that regard without revealing any confidential

23   information?

24   A.  What we're trying to, I believe, we are trying to prepare

25   our servicing portfolio for sale to potential buyers.  We're

1    trying to maintain, as much as we can, the value of our

2    portfolio.  We clearly - one of the areas of American Home

3    that has not experienced severe layoffs is the servicing

4    businesses because it's a business that we want to continue

5    because we want to try to sell that portion of the business

6    to a third party.

7    Q.  And is this - the servicing of this particular portfolio,

8    is that a part of the marketing effort to sell the servicing?

9    A.  Yes, it is.

10          MR. DORSEY: Thank you, Your Honor, nothing further.

11          THE COURT: Ms. Fatell, do you have any questions?

12          MS. FATELL: (Microphone not recording.)

13          THE COURT: Okay, thank you.  Cross.

14          MR. WILAMOWSKY: Thank you, Your Honor.

15                    CROSS-EXAMINATION

16   BY MR. WILAMOWSKY:

17   Q.  Mr. Sakamoto, you testified that DB Structured Products

18   had never provided you with a list of the loans that were

19   within $189 million; is that correct?

20   A.  That's correct.

21   Q.  Did you ever ask DB Structured Products to identify those

22   loans for you?

23   A.  No.

24   Q.  Okay.  As of what date are you valuing the non-ITIN

25   loans?

1   A.  August 31st, 2007.

2   Q.  Mr. Sakamoto, is it correct, is it fair to say that your

3   testimony is that it would be difficult or let's just say, is

4   it your testimony that it would be extremely difficult for

5   the debtors, for DB Structured Products in this market to

6   securitize the loans that are part of this portfolio?

7   A.  It's my testimony that a lot of non-agency eligible or

8   non-eligible agency whole loans can be securitized easily in

9   this market.

10          MR. DORSEY: Your Honor, can I just ask the witness

11  to move closer to the microphone.  I'm having a hard time

12  hearing him.

13          THE COURT: You can also just move - If you want to

14  sit back that's fine, just move the mike closer to you,

15  however you want to do it.

16          THE WITNESS: Okay.  It's my testimony that it would

17  be difficult for any bank to securitize non-Fannie Mae,

18  Ginnie Mae, Freddie Mac eligible loans unless they're of the

19  highest quality.

20  BY MR. WILAMOWSKY:

21  Q.  But if something is not capable of being securitized,

22  does that necessarily mean that it's not capable of being

23  sold?

24  A.  No.

25  Q.  So, it's not your testimony that these loans are not

1   saleable, it's your testimony that they are not securitize-

2   able or it would be very difficult to sell into a

3   securitization specifically?

4   A.  From my understanding, the investors that would buy are

5   primarily banks that securitize these loans.

6   Q.  Is it your testimony that there aren't third-party buyers

7   that would be potentially out there that are interested in

8   buying loans that are not to be sold other than for sale into

9   a securitization?

10  A.  Could you -

11  Q.  Yeah, let me make be clear.

12  A.  (Microphone not recording.)

13  Q.  Yeah, no, fair enough.  Is it your testimony that there

14  are not third-party buyers to buy these loans except parties

15  that would be interested in securitizing these loans or loans

16  generally.

17  A.  I do not know who the other third-party buyers are other

18  than the securitization buyers.

19  Q.  Okay.  You testified that there is an excess inventory in

20  the market of the type of loans that are at issue here, the

21  type of loans that are part of this portfolio, servicing

22  portfolio; is that correct?

23  A.  No, my testimony is that there's an excess supply of

24  securities that are created out of securitizations.

25  Q.  And would that also suggest that there's an excess supply

1   of loans, meaning that there's a supply that's difficult to

2   find corresponding demand for?

3   A.  Well, I think, I believe there's probably excess supply

4   of non-agency eligible loans in the market today.

5   Q.  So, if you were a party selling such loans in the

6   difficult market, such as this one, would it be helpful or

7   hurtful to your effort to sell these loans if the loans were

8   being serviced by an entity that was not Fannie Mae approved?

9   A.  Perhaps, but I believe that -

10  Q.  Perhaps means, yes, it would be hurtful?

11  A.  It may be, but I believe most investors would look at the

12  type of loans like, for example, if they are lower quality

13  loans, borrows made to lower quality borrowers, or loans made

14  to undocumented aliens, I think that in and of itself would

15  make it difficult to sell regardless who the servicer is.

16  Q.  So, if a party was selling those loans into the market,

17  is it your testimony that there would be no buyer for those

18  loans at any price?

19  A.  No.

20  Q.  So if there is a party that is trying to sell those loans

21  into the market, would it help or hurt those efforts if the

22  loans that they were trying to sell were being serviced by a

23  non-Fannie Mae qualified servicer?

24  A.  I don't know the answer to that.

25  Q.  How long did you testify that you were working - have you

1    been working in this industry?

2    A.   In this industry since 1986.

3    Q.   Okay, and in your experience, it would not be - you have

4    no basis for believing or for having an understanding as to

5    whether or not Fannie Mae approval would make it easier or

6    more difficult to sell such loans into the market?

7              MR. DORSEY: Objection, argumentative, Your Honor.

8              THE COURT: Overruled.

9              THE WITNESS: I believe there might be some, but I

10   don't know the answer to that.

11   BY MR. WILAMOWSKY:

12   Q.   Isn't it in fact the case that typical third-party buyers

13   of loans in fact require Fannie Mae and Freddie Mac

14   qualification as a condition for purchase for the loans that

15   they purchase?

16   A.   Possibly.

17   Q.   Mr. Sakamoto, you testified, and I think I got these

18   words down right, that you were trying to prepare your

19   servicing for the debtors' servicing for sale and then you

20   also used the phrase you were trying to maintain the value of

21   the portfolios.  Is it your testimony that the retention of

22   these loans that are issued as part of this loan and sale and

23   servicing agreement are integral to the maintenance of the

24   value of the servicing portfolio that you're trying to sell?

25   A.   Yes.

1   Q.  And in arriving at that conclusion, did you evaluate the

2   quality of the loans that were being serviced specifically in

3   this portfolio?

4   A.  Yes.

5   Q.  And did you compare that to the servicing fee that is

6   being paid to the servicer pursuant to the loan sale and

7   servicing agreement for loans in this portfolio?

8   A.  I didn't look at the documents, but I am familiar with

9   the program.  I think it's - I believe it's three-eighths.

10          THE COURT: Sorry, three eights?

11          THE WITNESS: Yes, 37 ½ basis points.

12  BY MR. WILAMOWSKY:

13  Q.  And you compared that servicing fee of three-eighths

14  based on the cost that would typically be associated with

15  servicing a portfolio of this kind, and you've concluded that

16  there is value for the estates?

17  A.  There's more value than a typical Alt-A loan, and the

18  reason is, first, my familiarity with the ITINs.  The ITINs

19  typically have 35 percent mortgage pool insurance.  So the

20  delinquency of these loan types are usually lower than other

21  comparable loans made to US domiciled borrowers.  So the

22  servicing cost is much lower on these loans.  Secondly,

23  because these loans do not easily default, they also do not

24  prepay early because of the borrower's inability to refinance

25  to other loan types.  So the servicer value is actually worth

1   a lot more for this type of loan than with other comparable

2   type of loans.

3   Q.  So is it your testimony then that you have - you know

4   that these loans, the ITIN loans are insured?

5   A.  Yes.

6   Q.  And with respect to the Alt-A portion?

7   A.  I'm not familiar whether they have the insurance or not.

8        MR. WILAMOWSKY: Can I have a moment, Your Honor.

9   BY MR. WILAMOWSKY:

10  Q.  In determining the value of the portfolio at issue, have

11  you also taken into consideration costs of cure that would be

12  associated with the agreement?

13       MR. DORSEY: Objection.  Calls for a legal

14  conclusion, Your Honor.

15       MR. WILAMOWSKY: No, Your Honor, I'm not asking for

16  a legal conclusion.  I'm asking if he's taken into

17  consideration when coming to the value - if counsel -

18       THE COURT: Cure of what?

19       MR. WILAMOWSKY: The cost - If there's a value in

20  the agreement it would require then the debtors to assume the

21  agreement and assign it to a third party.  So all I'm asking

22  for is in evaluating whether or not - in coming to a

23  conclusion as to whether or not there's value under this -

24  market value to this agreement that would be valuable for

25  them to retain to sell, has the debtor considered the costs

1    involved in assuming and assigning the agreement, i.e., the

2    cost of cure?

3         THE COURT: Mr. Dorsey.

4         MR. DORSEY: It's not necessarily correct, Your

5    Honor, that we would have to assume and assign the entire

6    agreement.  Our position is that these agreements are

7    severable, that the purchase portion and the servicing

8    portion are two separate agreements, that they can be severed

9    and sold separately.

10        MR. WILAMOWSKY: Your Honor, all I'm asking for is

11   has the witness considered - If counsel is advising that

12   there's a zero dollar cure then I'm happy to argue as a

13   matter of law because I think the documents on their face

14   will show that, in fact the agreement is, on its face, very

15   clearly non-severable and in fact they've scheduled us in

16   their cure schedule as for assumption and assignment of the

17   loan sale and servicing agreement.

18        THE COURT: Let's stop oral argument.

19        MR. WILAMOWSKY: Okay.

20        THE COURT: And focus on the question we have in

21   front of us.

22        MR. WILAMOWSKY: You're correct, Your Honor, and I

23   apologize.  That is for closing argument.

24        THE COURT: So the question is -

25        MR. WILAMOWSKY: The question is, putting aside how

Sakamoto - Cross                                                    61

1    we got there and how his lawyers may have gotten there, in

2    evaluating whether or not there is value in this portfolio,

3    have you considered the cost of curing any default under the

4    loan, sale, and servicing agreement.

5           THE COURT: All right, I'm going to overrule the

6    objection.  You can answer it.

7           THE WITNESS: No.

8    BY MR. WILAMOWSKY:

9    Q.  So, no means - So just to be clear, so it means that your

10   assumptions of value assume that there would be no cost,

11   there would be no cost to the debtor in assuming the

12   agreements?

13   A.  No.  Whoever is servicing the cost and ongoing costs for

14   a servicer is the advances as well as trying to cure

15   delinquent loans, including foreclosure.  That's part of the

16   servicing valuation process.

17   Q.  But you have assumed that there would be no cost -

18   A.  No, I didn't assume that.  Now, I understand your

19   question.

20   Q.  Okay.

21   A.  In the overall valuation of mortgage servicing rights,

22   you assume the servicing fee, you assume certain delinquency,

23   the cost associated with delinquency, costs associated with

24   servicing.  So my answer is, in a qualitative valuation,

25   you'd have to include those costs.

1   Q.  But you had not assumed any other costs besides those;

2   right?  So if there are -

3   A.  I did not include any costs that are not part of ordinary

4   course costs of a servicer.

5   Q.  Regardless of whether the agreement says, you looked at

6   what typical cure costs would be; is that a fair statement?

7   A.  Yes.

8   Q.  Thank you.  Have you received any specific standalone

9   bids for the DB - Deutsche Bank portfolio for the DB

10  Structured Products portfolio?

11  A.  I don't believe so.

12  Q.  So you don't know whether or not any potential purchaser

13  values the DB Structured Products portfolio?

14  A.  I alone might not know the answer, but there are other

15  members of our liquidity committee, may have the answer.

16  Q.  You said that there was $2.17 million, I think that was

17  what you said, of non-ITIN loans?

18  A.  Yes.

19  Q.  How did you arrive at that calculation?  These are as of

20  August 31st; is that correct?

21  A.  Yes.

22  Q.  And how do you arrive at the calculation number.

23  A.  We asked the servicer to calculate those numbers.  So

24  there were six loans that were non-ITINs and the outstanding

25  principal amount was 52.17 million.

1          MR. WILAMOWSKY: Just a moment, Your Honor.  Your

2    Honor, can I have just a moment?

3          THE COURT: Yes.

4          MR. WILAMOWSKY: Not more than sixty seconds.

5    BY MR. WILAMOWSKY:

6    Q.  You've testified, Mr. Sakamoto, that all - and correct me

7    if I'm wrong, but you've testified that all of the non-ITIN

8    loans in the portfolio are either in foreclosure or are what

9    you described as REOs; is that correct?

10   A.  That's correct.

11   Q.  Given that, would you expect there to be any value for

12   the servicing rights in that portfolio?

13   A.  What -

14         MR. DORSEY: Objection, Your Honor, vague.  I'm not

15   sure if he's referring to the entire portfolio or just those

16   non-ITIN loans.

17         THE COURT: I took it to mean the non-ITIN loans,

18   but -

19         MR. WILAMOWSKY: Yes, that is correct, Your Honor.

20         THE WITNESS: Well, certainly, an impaired loan

21   would decrease the value of the servicing.

22   BY MR. WILAMOWSKY:

23   Q.  Would you expect it - in your experience, would you

24   expect a portfolio that is entirely consisted of loans in

25   foreclosure and REO loans to have any value to a third party,

1   to a third-party servicer?

2   A.  Well, they still may have value because they may by -

3   part of the servicing is the servicing advances which are

4   funds that have been advanced on behalf of the investor and

5   they typically buy them at a discount.

6   Q.  Have you ever seen a sale of a portfolio of servicing

7   rights to a portfolio consisting solely of mortgages that

8   were impaired in that way, in foreclosure or in REO?

9   A.  No.

10          MR. WILAMOWSKY: No further questions, Your Honor.

11          THE COURT: Redirect.

12          MR. DORSEY: No redirect, Your Honor.

13          THE COURT: You may step down, sir, thank you.  Any

14   further witnesses, Mr. Dorsey?

15          MR. DORSEY: No, Your Honor.

16          THE COURT: Any witnesses on behalf of the

17   Committee?

18          MS. FATELL: No, Your Honor.

19          THE COURT: All right.  Any documents or are we

20   done?

21          MR. DORSEY: We're done, Your Honor.

22          THE COURT: All right, we'll close the evidentiary

23   record.  Let's take - Before we get into argument, let's take

24   about a 10-minute recess, please.

25          (Whereupon at 1:39 p.m., a recess was taken in the

1    hearing in this matter.)

2           (Whereupon at 1:55 p.m., the hearing in this matter

3    reconvened and the following proceedings were had:)

4           THE CLERK: All rise.

5           THE COURT: Please be seated.  All right, I'll hear

6    argument.

7           MR. WILAMOWSKY: Thank you, Your Honor.  Good

8    afternoon again.  As I suggested in the beginning of this

9    hearing, everyone concedes the fact that it is DB Structured

10   Products' responsibility to make a *prima facie* showing of

11   cause for stay relief under § 362.  We respectfully believe

12   and submit to Your Honor that such a showing has been made

13   and on the following two bases.  First of all, Your Honor,

14   there is testimony by Mr Principato that has been

15   uncontroverted, notwithstanding the discussion and the

16   objections during direct testimony, it was uncontroverted on

17   cross that DB Structured Products has been unable to sell the

18   loans that have been - that are the subject of this portfolio

19   and that are part of this portfolio subject to the loan sale

20   and servicing agreement and that the failure of Fannie Mae

21   approval is impeding the sales of those loans.

22          THE COURT: So, let me just stop you right there.

23          MR. WILAMOWSKY: Yup.

24          THE COURT: Are those two points or one point?  In

25   other words, DB is unable to sell the loans - is it that DB

1   is unable to sell the loans as a result -

2            MR. WILAMOWSKY: Yes.

3            THE COURT:  - of the debtor not being a Fannie Mae

4   approved servicer?

5            MR. WILAMOWSKY: Yes, Your Honor.  Second of all,

6   Your Honor -and moreover, Your Honor, the debtors' witness

7   didn't deny the point and in fact conceded, reluctantly

8   albeit, that in a difficult market as is, the fact that

9   somebody was not Fannie Mae approved would make it yet more

10  difficult to sell the loans.

11           THE COURT: But his testimony was that in the

12  current market these loans are unsaleable even if you had a

13  Fannie Mae approved servicer.  Although it would certainly

14  help to have a Fannie Mae approved servicer, I believe the -

15  I mean, you can obviously disagree with it, but I believe his

16  testimony was that even if you have a Fannie Mae approved

17  servicer at least now, in this market, you can't sell these

18  loans.

19           MR. WILAMOWSKY: Your Honor, obviously the only take

20  on the witness's testimony that counts is Your Honor's but, I

21  recall -

22           THE COURT: I'm not saying I buy it, I'm just saying

23  that's what he said.

24           MR. WILAMOWSKY: No, but again, I think I asked

25  point blank whether or not the - whether the fact that they

1   were not susceptible to being held in securitization,

2   necessarily also meant that they were not saleable, and I

3   think that the witness conceded that that's not what it

4   meant.

5         THE COURT: Well, no, he said that he was unaware of

6   any other buyers in the market other than banks who would buy

7   them to put them into securitizations.

8         MR. WILAMOWSKY: Okay.  Moreover, Your Honor, I

9   think that the documents themselves exhibit an ongoing

10  continuing breach of the agreement, of the loan sale and

11  servicing agreement, that has not been cured and that is in

12  fact prejudicial to DB Structured Products.  The agreement by

13  its terms makes it very clear that the ability to sell the

14  loans is - was an expressly contemplated - and the fact that

15  DB was going to sell the loans, was an expressly contemplated

16  portion of the agreement, and to that end, the agreement

17  provides that the servicer be Fannie Mae qualified and in

18  good standing, actually.  A Fannie Mae qualified servicer in

19  good standing, and I don't mean to -

20        THE COURT: Before you get to that point, so this

21  point is not that it is a non-curable default, but even if

22  the Fannie Mae - not being an approved Fannie Mae servicer is

23  a curable default, it hasn't been cured because the

24  stipulation doesn't do enough to cure the default.

25        MR. WILAMOWSKY: Yes.  Your Honor, at the time - I

1    just want to, and I, Your Honor, I just trying to explain

2    where I am now versus where I am when we filed the motion.

3              THE COURT: Fine.

4              MR. WILAMOWSKY: At the time we filed the motion,

5    the Fannie Mae settlement had not yet occurred.  So, the

6    argument to the motion was frankly a little bit less strong

7    than it is standing here today because it's almost presumed

8    that there was, you know, there was word that there was

9    discussions with Fannie Mae and it's been presume that, you

10   know, or assumed the worst, I guess, is what I'm saying, from

11   the perspective of my stay motion, that Fannie Mae approval

12   would be obtained, and then, however, if you go ahead and you

13   actually look at the agreement that was actually done, it

14   becomes readily apparent that Fannie Mae approval was not

15   obtained.  I mean, the loan sale and servicing agreement

16   requires that the servicer be an approved seller/servicer -

17             THE COURT: Where are you?

18             MR. WILAMOWSKY: I apologize.  Page 22 in Exhibit -

19   Tab 1, which is -

20             THE COURT: Yeah.

21             MR. WILAMOWSKY: And it's - on that page there's

22   Romanette 5, and I will just read it into the record.  It

23   says, "The servicer is an approved seller/servicer for FNMA

24   and FHL&C," which is Fannie Mae and Freddie Mac, "in good

25   standing."  No event - and then it continues, talks about HUD

1    - but then it says, "No event having occurred which would

2    make - including but not limited to a change in insurance

3    coverage, which would make the servicer unable to comply with

4    Fannie Mae, Freddie Mac, or HUD eligibility requirements."

5    It cannot be argued, Your Honor, that the settlement

6    agreement has cured this default.  Your Honor -

7         THE COURT: Now, help me out.  Now, that's a rep in

8    warranty.

9         MR. WILAMOWSKY: Right.

10         THE COURT: Now show me the next provision that

11    indicates why that's a default.

12         MR. WILAMOWSKY: Okay.

13         THE COURT: Take me through it.

14         MR. WILAMOWSKY: Okay.  It's section - Your Honor,

15    give me a second, it's in the default section, and it is

16    section 14.01, Romanette 6, I believe, and I will get Your

17    Honor the page number.

18         MR. DORSEY: Page 58, Your Honor.

19         THE COURT: I was going to say 58, yeah.

20         MR. WILAMOWSKY: Okay.  And page 58 of the agreement

21    -

22         THE COURT: Which one, 6, Romanette 6 or -

23         MR. WILAMOWSKY: Yes.  And it is a default if the

24    servicer ceases to meet the qualification of either a Fannie

25    Mae or Freddie Mac seller/servicer.

```
 1          THE COURT: Now do those - Those sound like two

 2   different things.  One's a rep in warranty about being an

 3   approved seller/servicer in good standing, no event has

 4   occurred, et cetera, et cetera.  Six says, "Servicer ceases

 5   to meet the qualifications of either a Fannie Mae or Freddie

 6   Mac seller/servicer".

 7          MR. WILAMOWSKY: And, Your Honor, there is not

 8   question that that is exactly the situation that the debtor

 9   finds itself in today because it has - it is agreed, in fact,

10   contractually - I'm sorry, I apologize.

11          THE COURT: Let me ask this.

12          MR. WILAMOWSKY: Okay.

13          THE COURT: But is 6 - Here's my point, is 6

14   referencing - is the reference on page 58, Romanette 6,

15   referencing the rep warranty on page 22 and Romanette 5.  The

16   language doesn't seem to match up, so that's what I'm trying

17   to - You want to require that they be in good standing, that,

18   you know, all the things in the rights and warranty provision

19   are in place, and my question is, I don't see those in

20   Romanette 6.  I just see - I'm not sure what it means, but I

21   see qualifications of a Fannie Mae or a Freddie Mac

22   seller/servicer.

23          MR. WILAMOWSKY: I think, Your Honor -

24          THE COURT: Which is not a defined term, and I don't

25   know if it's a term of art.
```

1          MR. WILAMOWSKY: Your Honor, I think that the

2     references in the representations and warranties,

3     particularly given the absence of a defined term on page 58,

4     is somewhat informative, and it informs the reading of the

5     provision on page 58.  Your Honor can agree with that or not,

6     but in either event, if we just look at 58, even on a

7     standalone basis, the use of the word "ceases" I think is in

8     fact a helpful term in this section that's not even contained

9     in the other section on the rest of the warranties because

10    the fact that Fannie Mae has said, Okay, on this interim

11    basis for this particular set of loans that you yourself,

12    American Home, owned as of a particular date, we're going to

13    call you approved, but we're not going to accept, and by the

14    expressed terms of our settlement with you, we're not going

15    to accept and you will not even try to sell us any loans that

16    you originate on a going-forward basis.

17          THE COURT: Well, that's a different - Now, let's,

18    okay.  So let's assume that Romanette 6 means servicer ceases

19    to meet the qualifications, Fannie Mae or Freddie Mac

20    servicer, and what that really means is in good standing,

21    eligibility requirements, et cetera, et cetera, as set forth

22    in the reps and warranty section.

23          MR. WILAMOWSKY: Okay.

24          THE COURT: Okay, let's assume that, but you're

25    making a different argument, I think, which is a more refined

1   argument which is that because they are a Freddie Mae

2   approved servicer for X, Y, and Z portfolio that Freddie Mae

3   owns, that doesn't mean that they're an approved servicer for

4   A, B, C portfolios including your portfolio.  And where is

5   there anything in this document that indicates that they have

6   to be an approved servicer on your portfolio?  Because the

7   way I read this document, and it makes a lot of sense, is

8   that you're using Freddie Mae and Freddie Mac as a proxy for

9   determining whether or not the debtors are in fact servicing

10  correctly, and it's also a market condition that everyone

11  uses in order to, as a proxy for or a substitute for having

12  to go and actually doing a detailed investigation about

13  what's going into debtor, we assume that agencies like

14  Freddie Mae and Freddie Mac are doing that for us.  The

15  market assumes that, it makes a lot of sense, you know, the

16  cost of doing business goes down, but I don't see anything in

17  this document that says it has to be an approved Freddie Mac,

18  Freddie Mae servicer on your portfolio.

19          MR. WILAMOWSKY: It's not even the case that it is

20  approved on the debtors' going-forward portfolio.  It's a

21  specific that's not even in all the debtors' loans.  If, Your

22  Honor, there was one loan and with respect to that one loan,

23  Fannie Mae said that, Okay, we're going to call that, you

24  know, you're Fannie Mae approved as to the servicing of that

25  particular loan.  I don't think even the debtors would be up

1   here arguing that that - well, maybe they would, but I don't

2   think anybody could reasonably argue that that would

3   constitute Fannie Mae qualification, and for the very same

4   reasons in terms of - and for the reasons that were testified

5   to by the witnesses in terms of market benchmark, in terms of

6   what the witness testified, Mr. Principato testified in terms

7   of either selling to Fannie Mae or selling to other third

8   parties that look to Fannie Mae approval.  The fact that

9   Fannie Mae had said, Okay, on this interim basis, because

10  you're threatening, you know, because you say you have a

11  market process and you're promising to get rid of these

12  things by August 31st and because I'm going to have to fight

13  with you and you're already servicing these loans, I'm going

14  to give you interim Fannie Mae approval right now for that

15  portfolio of loans, but don't you dare try to put another

16  loan to me, and I'm going to put that express term into the

17  agreement with you.  By no stretch of the imagination it is

18  submitted could constitute - could that be said that the

19  servicer meets the qualifications of a Fannie Mae or a

20  Freddie Mac seller/servicer.  Don't forget the servicing

21  relationship, the servicing, Fannie Mae is - I'm sorry,

22  American Home is servicing both loans that it owns and both

23  loans that other people own, and with respect to - and the

24  settlement agreement nor this document doesn't distinguish

25  between loans that are owned by Fannie Mae and loans that are

1    - I'm sorry, these terms - Loans that are owned by American

2    Home and loans that are not owned by American Home, is the

3    servicer - Does the servicer meet the qualifications of

4    either a Fannie Mae or a Freddie Mac seller/servicer, and the

5    answer is, Well, if they originate any loans new to - any new

6    loans that they originate, can the sell those to Freddie Mac?

7    Are they Freddie Mac or Fannie Mae?  Are they Fannie Mae

8    approved?  No.

9         THE COURT: They're not originating.  They're not

10   originating any loans.  All right, whether they - so I'm not

11   sure that can be the test because if that's the test that

12   they've stopped originating loans, that would be, you know,

13   we wouldn't be arguing here.

14        MR. WILAMOWSKY: But Fannie Mae made the promise

15   that they're not going to put any new loans into Fannie Mae

16   that are being serviced by American Home.

17        THE COURT: Well, help me out - Show me where the -

18   Show me in the settlement agreement, Exhibit 3 -

19        MR. WILAMOWSKY: Okay.

20        THE COURT:  - where you think their weakness is.

21        MR. WILAMOWSKY: Okay.

22        THE COURT: It may be either in the order or the -

23        MR. WILAMOWSKY: Yeah, no, I believe actually it's

24   in the settlement agreement itself, Your Honor.  And it's in

25   paragraph (7) of the agreement itself.  And it provides that,

1    company - and again, the company is not actually the

2    servicer, so, I don't know why we're not respecting legal

3    formalities suddenly because the debtor says we shouldn't,

4    but, "Company acknowledges and agrees that", and then it says

5    "(b), Company shall not acquire servicing of additional

6    Fannie Mae loans, sell additional loans to Fannie Mae or seek

7    to assume the contract, i.e., their contract with Fannie

8    Mae."  That doesn't sound like Fannie Mae approval to me,

9    Your Honor.

10           THE COURT: Okay.

11           MR. WILAMOWSKY: Your Honor, that brings me to the

12    last part of my argument, and -

13           THE COURT: Well, let's go back on the - Let me talk

14    about the legal niceties.

15           MR. WILAMOWSKY: Okay.

16           THE COURT: The contract, the mortgage selling and

17    servicing contract with Fannie Mae, that's a contract between

18    the parent debtor and Fannie Mae - or is it a contract

19    between the servicing company and Fannie Mae?

20           MR. WILAMOWSKY: I believe it is a contract between

21    the parent company and Fannie Mae, Your Honor.

22           THE COURT: All right.  So, if I buy your argument

23    that, you know, it doesn't matter that they've cut a deal

24    with the parent contract, they can't cure the problem of not

25    being an approved Fannie Mae seller/servicer, they never

1   were.  So they've been in default since day one because the

2   servicing company has never been a party to a Fannie Mae

3   servicing contract.  They can only cure the contract that

4   they have with Fannie Mae, and if they've had a contract at

5   the parent company level for three years, and your company

6   has been okay with that, I really can't have you complain now

7   that they haven't cured a contract that never existed in the

8   first place.  Fair enough?

9        MR. WILAMOWSKY: Okay.

10       THE COURT: All right.  Go on to your next point.

11       MR. WILAMOWSKY: All right.  Your Honor, talk about

12   the countervailing benefit to the estate on having - because

13   I think, again, just to conclude on this section, I think

14   that the testimony is uncontroverted.  Mr. Principato's

15   testimony that he's unable to sell these loans and

16   furthermore his testimony that he was unable to sell these

17   loans because Fannie Mae won't buy these loans, specifically

18   loans that are serviced by American Home, because that's an

19   important distinction and important issue that Your Honor

20   raised, (a) it's supported by the settlement agreement.  It's

21   consistent with the settlement agreement, and therefore, one

22   would expect that to be the case and that kind of

23   corroborates Mr. Principato's testimony, and second of all,

24   again, notwithstanding the hearsay objections that we had on

25   direct, apparently, counsel didn't want to go there on cross

1   and probably for good reason, and that remains uncontroverted

2   that DB Structured Products is unable to sell these loans

3   specifically and specifically that Fannie Mae won't buy loans

4   that are being serviced by American Home.  In terms of

5   countervailing benefit to the estate, Your Honor, the

6   testimony supports and suggests nothing in terms of any value

7   - the testimony is not suggestive of any value in this

8   portfolio to the estate.  Ms. Fatell tried to take our

9   witness there in terms of some kind of secret calculations or

10  some kind of calculations that we may have as to value if we

11  tried to terminate which cause that we're - without cause

12  that we're trying to save ourselves by alleging, you know, by

13  getting the stay lifted so we can do a with cause

14  termination, in fact, Mr. Principato responded even though we

15  thought it was irrelevant, and Mr. Principato said, you know,

16  these ITIN loans, you know, the best he can tell is no market

17  value whatsoever - for the servicing, I'm sorry, you're

18  right.  No market value for the servicing of these ITIN loans

19  whatsoever.

20       THE COURT: Well, that begs the question of how is

21  he going to find a buyer for the servicing rights?  DB

22  Structured gets relief from the stay.

23       MR. WILAMOWSKY: Right.

24       THE COURT: And they say, Debtor, I hereby provide

25  you notice that ABC is now the servicer for all my loans.

1   Please transfer immediately, which is the next step.   How

2   does DB get ABC to agree to service the loans if there's no

3   value to the servicer?   I guess they pay more.   They pay a

4   premium?

5           MR. WILAMOWSKY: Your Honor, yes, they pay more.

6           THE COURT: So, as the contract exists today,

7   there's no value, but if - but there would be value for

8   someone at a premium.

9           MR. WILAMOWSKY: Yes, absolutely.   And -

10          THE COURT: And now I'm struggling to understand why

11  - because the only thing that's changed in connection with

12  the ITIN loans - is it ITEN or ITIN.

13          MR. WILAMOWSKY: ITIN.   It stands for individual tax

14  identification number which is the number that they get in

15  lieu, I believe, of a social security number.

16          THE COURT: Okay, so, ITIN.   The only thing that's

17  changed in connection with the ITIN loans, according to you,

18  is that the servicer is bad, and that otherwise they would be

19  freely saleable or securitable.

20          MR. WILAMOWSKY: I wouldn't say it would be freely -

21  I don't think the testimony was necessarily to be freely

22  securitizable, but yes, we believe that it would be saleable,

23  absolutely.

24          THE COURT: So, why did the debtor agree and maybe

25  this isn't the question for you, but why would the debtor

1  have agreed to a price of 37 and a half basis points to

2  service loans if that puts them out of the money from day

3  one?

4        MR. WILAMOWSKY: Because, Your Honor, we believe,

5  and I don't think it's relevant that I didn't want to recall

6  Mr. Principato, but we believe it is not 37 and a half cents.

7  We believe the witness got his testimony wrong.  I think it's

8  25 cents, actually.

9        THE COURT: All right, well then, why would they

10  agree to that?

11        MR. WILAMOWSKY: Why would who agree - Why would -

12        THE COURT: The debtor.  I mean, it's just a bad

13  business decision?

14        MR. WILAMOWSKY: Oh, market - servicing market has

15  changed.  It's changed significantly since the agreement was

16  first entered to it, the beginning of 2006, no question, Your

17  Honor.

18        THE COURT: All right.  Because of the higher

19  default rates -

20        MR. WILAMOWSKY: Because of the default rates.

21  Also, I have - it was a very competitive rate to start with

22  certainly at that time, and the market was different, but -

23  and to the extent -

24        THE COURT: It wouldn't be the first debtor I've had

25  in front of me that made bad business decisions.

1          MR. WILAMOWSKY: I don't think that it was

2     necessarily - that it's relevant to today, but if Your Honor

3     feels differently, I'd be happy to recall Mr. Principato.  He

4     can tell us the best on this, but I don't think it's

5     relevant, but to the extent Your Honor disagrees, we can talk

6     about what the pricing is.  So, we also have testimony that

7     there have been, as a matter of fact, no bids on the

8     portfolio, on this particular portfolio.

9          THE COURT: As a standalone.

10         MR. WILAMOWSKY: Right.  And we also have further

11    testimony, and this is, I think, Your Honor, this is - I

12    understand that this on its face would seem to go more

13    towards our ultimately to our cure objection, but I just feel

14    like I need to say it, because I do think it has some

15    relevance here too.  The witness is not assuming any cure

16    obligation and the reason stated by counsel is because

17    counsel is going to go and argue and say that the servicing

18    rights, the servicing obligations under this loan and

19    servicing agreement are severable from the servicing

20    obligations.  And, Your Honor, if we had to have a trial on

21    it I would agree a hundred percent this is a matter that we

22    have to save for the cure objection, and it can't help me

23    here, but, Your Honor, on it's face, on the plain face of the

24    agreement, there is just no way, I respectfully submit, and

25    Your Honor can obviously review the agreement for himself,

1   but there is just no way to construe this agreement as the

2   kind of an agreement that could be severable.  This is not

3   some kind of a vehicle scheduled where there's a separate

4   signature at some later date.  This is something that they

5   scheduled in their cure objection as a loan and servicing

6   agreement, cure amount, zero.  That's what they said.  They

7   called it the loan and servicing agreement.  They didn't call

8   it the schedule.  There was one signature on this agreement.

9   It's called a loan sale and servicing agreement.  It's

10  obviously an integral part of the agreement when you sell the

11  loans to servicing retained and who's going to do the

12  servicing and it's an important part -

13          THE COURT: But you can sell the loans that are

14  subject to this.

15          MR. WILAMOWSKY: We could sell loans that are

16  subject - yes.

17          THE COURT: With servicing rights retained.

18          MR. WILAMOWSKY: As long as the servicing rights,

19  yes, yes, absolutely.

20          THE COURT: All right.  And can they sell the

21  servicing rights?  Can they use a sub-servicer without your

22  consent?

23          MR. WILAMOWSKY: Can I - Give me just a second, Your

24  Honor, I don't want to answer incorrectly.

25          THE COURT: Okay.

1         MR. WILAMOWSKY: Typically they can't, Your Honor,

2    but I don't want to say it without actually seeing it.

3         THE COURT: Well, it's something that you can peruse

4    on.

5         MR. WILAMOWSKY: Okay.  Here, the default - If the

6    servicer attempts to assign its right to servicing - let's

7    see.  Oh, yes, It's a default if the servicer attempts to

8    assign it right - right under the Fannie Mae default, Your

9    Honor, and I apologize if it turns out that I'm misreading

10   it, because I'm just reading it kind of on the spot, but I

11   think this is exactly what you said.  "Servicer attempts to

12   assign its rights to servicing compensation hereunder or the

13   servicer attempts without consent to sell or otherwise

14   dispose of substantially all of its property or assets or to

15   assign this agreement or the re-servicing responsibilities

16   hereunder or to delegate its duties hereunder or any portion

17   thereof."

18        THE COURT: All right.

19        MR. WILAMOWSKY: So I think that answers the

20   question on that.  So, Your Honor, we would respectfully

21   submit that it's non-severable on its face, and therefore,

22   the fact that they're - it's a secure issue, true it's an

23   issue for the cure objection, but we would also believe that

24   it's got - submit that it has relevance right here today -

25        THE COURT: What are you damages for cure?

1          MR. WILAMOWSKY: Our damages to cure - In addition

2     to, obviously, litigable damages, and I'm not even going to

3     get into here relating to the fact that they weren't - Fannie

4     Mae qualified and any loss that we may have incurred, but in

5     terms of straight quantifiable, you know, measurable damages,

6     pre-petition the debtor made - I'm sorry, DB Structured

7     Products notified the debtors or what I'll refer to as EPDs,

8     early payment defaults, which are - I don't know how - The

9     early payment defaults, just for the record, is where a

10    purchaser buys whole loans from a mortgage originator.  The

11    concept is that the purchaser that's buying the whole loans

12    it's taking, assuming the risk of bad performance under the

13    loans down the road, it's really saying, Okay, I'll assume

14    the risks of buying these loans, but during - there's a sort

15    window period where if a guy defaults on day one or day

16    thirty or whatever the period is, three months or six months,

17    if a guy defaults during that initial period, one of the -

18    the underlying buyer of the house, the underlying mortgagor,

19    then there is something wrong with that loan in the first

20    place, and it kind of encourages responsible behavior on the

21    part of the mortgage originators that they can't just go

22    running around, because apparently it didn't work fully, but

23    they're not supposed to just go around originating loans that

24    are, you know, that are very questionable, that have title

25    issues, that have anything else.  If there's an early payment

1    default within the first thirty days, within the first sixty

2    days, I think, typically is three months is most common,

3    sometimes six months, then you get to put those loans back to

4    the seller and say, Okay, you've got to buy these back from

5    me.  Those are claims and those are big issues and usually

6    revolve around amount, but they are big claims in every one

7    of the big -

8         THE COURT: All right.  So DB asserted early payment

9    defaults against the debtor pre-petition.

10        MR. WILAMOWSKY: Absolutely.

11        THE COURT: All right.

12        MR. WILAMOWSKY: And furthermore, there are premium

13   recapture claims which are similar but they're sort of the

14   opposite extreme of the early payment default which said

15   that, I bought these loans relying on a particular payment

16   stream, and within some period of time, if there's an early

17   payoff because the mortgagor says, Okay, you know, refinances

18   or comes up with the cash and just takes down its entire

19   mortgage, now I've been deprived of the premium of the

20   interest flow, of the payment flow going forward because the

21   purchaser paid - the homeowner paid in full it's full

22   outstanding principal balance now and there was no interest

23   that's accruing anymore, and so that causes a premium

24   recapture claim, also called sometimes early payoff, early

25   payout, I don't remember, EPO which is another basis for a

1    claim.  We've got that as well here.

2            THE COURT: All right.  So, assuming all that, how

3    does that fit into your argument for stay relief?

4            MR. WILAMOWSKY: It distances the argument for stay

5    relief, Your Honor, because of those claims, the only way

6    that this even arguably, theoretically could have any value

7    to the estates, given the fact that nobody thinks that these

8    claims are worth, you know, that this contract is worth $18

9    million.  Could hardly get the witness to - Can't even get

10   the witness to say if there's any value, but certainly not

11   worth $18 million.  The fact that we got this $18 million

12   cure and the fact that the debtor is saying that the way it

13   eliminates that problem is by severing the agreement, we

14   respectfully submit that if Your Honor reviews the agreement

15   it will become readily apparent that this agreement on its

16   face is just not severable that way.  And therefore, anybody

17   who wants to assume the agreement and assign it to a third

18   party is going to have to come up with a cure.  At a minimum,

19   by the way, Your Honor, under their escrow procedures,

20   they're going to have to escrow the cure even if they want to

21   quibble with us about the exact number, they're going to have

22   to escrow $18 million pending resolution of the issue of the

23   cure, which to me suggests, again, that there's no way that

24   the debtors could argue that there's value under those

25   circumstances.

1        THE COURT: Okay, so how does that fit into your

2   stay relief request?  The fact that there is no value to the

3   servicing rights.

4        MR. WILAMOWSKY: If there is no value to the

5   servicing rights, then there is no benefit to the estates

6   that can even begin to be balanced that you can even use to

7   do the balancing test in order to balance the harm to DB

8   Structured Products versus the benefit to the estate, you've

9   got to have some benefit to the estate and what I'm

10  suggesting is that you don't even have the benefit because -

11  for all the reasons that I've said.

12       THE COURT: All right, but why do I balance the

13  harms?  I mean, where is that?  You either have cause - I

14  mean, this is what I'm struggling with.

15       MR. WILAMOWSKY: Right.

16       THE COURT: Why does it matter?  I mean, maybe it's

17  a lousy exercise of the debtors' business judgment, but why

18  does that matter in connection with whether you have

19  indicated you have cause for relief from the automatic stay?

20  Do you understand my problem?

21       MR. WILAMOWSKY: Yes, but -

22       THE COURT: Maybe I'm being thick, I don't know,

23  it's Monday, so - I always think better later in the week.

24       MR. WILAMOWSKY: No, no.  That's fine, Your Honor,

25  but, and I'm happy to discuss the point.  The fact that we

1    are being harmed, that I don't think anybody - not the fact,

2    but the question of whether we are being harmed, that is

3    clearly an issue that is relevant to the stay relief motion.

4    The issue as to whether or not we are protected, adequately

5    protected, or whether we are instead suffering a continuing

6    harm -

7        THE COURT: So it could be an adequate protection

8    argument.  In other words, there's no adequate protection of

9    your client's interest because there's no way that this

10   transaction results - Let me restate it.  You're not being

11   adequately protected because there's no way that the debtors

12   are going to be able to assume and assign these contracts in

13   a way that will generate sufficient funds to make your client

14   whole or less whole.

15       MR. WILAMOWSKY: Well, we know - I think that Your

16   Honor is saying that - but we know that - I think I said in

17   the beginning of the hearing, if we thought that there was

18   any chance that the debtors were going to assume and assign,

19   truly assume and assign the only way that you can under 365,

20   which is cum ownerae (phonetical) we wouldn't be here today

21   because we would be very excited of the prospect of getting

22   our $18 million claim paid in full when right now it looks

23   like we're just going to be able to get, you know, whatever

24   Ms. Fatell is capable of negotiating on behalf of her

25   constituency.  And so - and I don't underestimate her skills

1   at that, Your Honor, but it's probably not a hundred cents.

2   So, the fact that we are here today and the fact that we're

3   making this motion is only because we don't think that

4   there's any hope that that happens.  So, over the course of

5   our - over the course of our stay, while we're waiting for a

6   hearing that is now scheduled to take place on - What is it?

7   October 17th?  October 9th, and was originally scheduled to be

8   held today and was twice adjourned, while we wait, we have no

9   hope, no realistic hope of getting assumed, and we just sit

10  here hanging out there and are in a position where we just

11  are suffering the inability, putting aside even the economic

12  damages question, but the very inability, the very inability

13  to sell the loans and the incurrence of additional risk over

14  this period, the indefinite period, while the debtors kept

15  adjourning the sale motion, is itself a harm that is worthy

16  of relief under § 362(d).

17          THE COURT: Did you move under (d)(1) or (d)(2) or

18  both.  I know you moved under (d)(1), but did you move under

19  (d)(2), which is - Here's the question, I mean, I take it

20  that your argument really is, the debtor does not have any

21  equity in the property and the property is not necessary for

22  an effective reorganization, i.e., it's a non-curable

23  contract.  There's no way the debtor will ever make a dime

24  off of it, and since they can't assume and assign it, and

25  there's no money in it for them, I should give you a stay

1   relief under (d)(2), but I don't know if you made that

2   argument or not.

3          MR. WILAMOWSKY: Your Honor, if you'll just give me

4   a moment.

5          THE COURT: Uh-huh.

6          MR. WILAMOWSKY: Your Honor, the motion references -

7   in the text of the motion, the only reference is to

8   § 362(d)(1), but I would point to footnote 3, where we do

9   discuss, albeit in a slightly different context, but we do

10  talk about the debtors - the issue of the debtors' property

11  interests.

12         THE COURT: Okay.

13         MR. WILAMOWSKY: In any event, Your Honor, I just

14  want to conclude because I think I've said what I have to

15  say, so, in conclusion I would just say, in the absence of

16  any evidence on why it would be a bad thing for the estates

17  if the stay was lifted and in the absence of evidence that

18  has been presented to Your Honor that DB is being impeded

19  from exercising its rights that it would otherwise have

20  because of the presence of the automatic stay, Your Honor, we

21  would respectfully request and suggest that the cause has

22  been shown and that the Court should grant the relief that DB

23  Structured Products seeks.

24         THE COURT: Thank you, thank you very much.  I'll

25  hear from the debtor.

1          MR. DORSEY: Thank you, Your Honor.  I think I have

2     to state from the outset that the papers filed by DB

3     Structured in this case have very little relationship to the

4     arguments that they've made today as to why they think

5     they're entitled to stay relief.  In their papers they claim

6     that they were entitled to stay relief because the main

7     purpose of this agreement, of the sale agreement between the

8     debtors and them was so they could securitize these loans.

9     Never talked about selling the loans.  They talked about how

10    important it was that they could securitize them.  It was

11    only after finding out at this hearing, which they don't

12    point it out to the Court in their papers, that they could

13    never securitize these loans, that then it became an issue of

14    well, we can't sell them either.  But we were never put on

15    notice that that was even an issue here.  We still were able

16    to address it as best we could in the evidence today.  They

17    also claim in their paper that they're entitled to stay

18    relief because they're being harmed because they can't

19    securitize because we were not a Fannie Mae approved

20    servicer.  And I think Your Honor walked through with DB's

21    counsel the provisions of the agreement that are at issue,

22    the default provisions, which really says that it has to be a

23    qualified Fannie Mae or Freddie Mac servicer seller, and they

24    concede the only issue is whether we're a qualified servicer,

25    and we have the interim agreement with Fannie Mae to provide

1   servicing of their loans.  The only loans that Fannie Mae

2   could approve us for are their own loans.  They certainly

3   could not approve us to be a servicer for other people's

4   loans, it's only their loans.  So there's no issue about

5   whether or not we're qualified at the current time.

6          THE COURT: Well, show me exactly where in the

7   settlement agreement - show me what helps you there.

8          MR. DORSEY: My eyesight is getting worse as I get

9   older, Your Honor, so bear with me.

10          THE COURT: Right.  It's not the greatest copy.

11          MR. DORSEY: I can't even read it.

12          THE COURT: Mr. Beach has the youngest eyes, maybe

13   you should go with him.  It may be paragraph (1), it's what

14   you're pointing to.

15          MR. DORSEY: That's correct, Your Honor.

16          THE COURT: All right.  So, "Subject to and in

17   consideration of the company's strict compliance with all

18   obligations and requirements contained in the settlement

19   agreement if Fannie Mae agrees to allow a company to perform

20   the duties of a loan servicer with respect to the Fannie Mae

21   portfolio on an interim basis on behalf of Fannie Mae under

22   the terms set forth in the settlement agreement and the

23   provisions of the contract."

24          MR. DORSEY: I believe that that makes us Fannie Mae

25   approved, Your Honor, for purposes of providing servicing.

1   And the purpose of that provision of the agreement was, as

2   Your Honor pointed out -

3          THE COURT: Well, it even goes on.  I apologize.

4   Subparagraph (b), "Without prejudice to Fannie Mae's rights

5   in connection with its termination notice, the company shall

6   be deemed an approved Fannie Mae servicer on an interim basis

7   during the term of this agreement."  That's what you're

8   pointing to.

9          MR. DORSEY: Correct, Your Honor.

10          THE COURT: All right.

11          MR. DORSEY: That, I think, settles the issue of

12   whether or not we're a qualified Fannie Mae servicer at the

13   current time.  We are.  So there is no default.  Even if

14   there was, even if we weren't a qualified Fannie Mae

15   servicer, DB Structured still has not presented any evidence

16   to show that they were harmed as a result of that because,

17   again, they say they can't either securitize or sell these

18   loans.

19          THE COURT: Well, if there's a contract breach, do

20   they have to show harm?  I mean -

21          MR. DORSEY: For stay relief purposes, they do, Your

22   Honor.  Otherwise, we have the opportunity to cure any

23   default.

24          THE COURT: Well, if it's an executory contract.

25          MR. DORSEY: Correct.

1          THE COURT: You could cure a default in assumption

2    and assignment.

3          MR. DORSEY: Correct.

4          THE COURT: Which goes to your argument the stay

5    relief is inappropriate to being with, that they should be

6    filing a motion to shorten the time.

7          MR. DORSEY: Correct.  Which they have filed an

8    objection to the sale motion, which is going to be heard, and

9    they raise all of these same issues in connection with the

10   sale motion hearing.  They say that there's uncontroverted

11   evidence that the failure to be Fannie Mae approved is

12   impeding their ability to sell these loans, but that's simply

13   not the case.  Their witness could only testify that he asked

14   to sell the loans.  He didn't identify who he tried to sell

15   them to and he was told, no.  He could not testify because it

16   was hearsay as to why they told him he couldn't or they

17   wouldn't buy the loans.  The only testimony that's before the

18   Court right now is Mr. Sakamoto who testified that the market

19   conditions are such that you couldn't sell these loans right

20   now.  Nobody is buying these loans and certainly nobody is

21   securitizing these loans.  They never could be securitized.

22   So that's not an issue at all in this case.  Your Honor

23   raised questions about the value of the servicing rights in

24   this case, and there's no testimony as to what the value of

25   the servicing rights is other than DB Structureds' witness

1    who testified that they were worth nothing, but he gives no

2    basis for why he believes they're worth nothing, and if they

3    in fact thought they were nothing, Your Honor, then why don't

4    they just terminate without cause.  Under the terms of the

5    agreement they have the right to do that, although they have

6    to pay the fair market value of the servicing rights.  If

7    they felt they were valueless, they could have terminated

8    without a cause, but they chose not to do that because I

9    believe they know that there is value to these servicing

10   rights, and the reason they're only being serviced for

11   whether it's 375 bases points or 250 bases points, whatever

12   it might be, 37.5 or 25.0 basis points.  Mr. Sakamoto

13   testified that there's different ways to value the servicing

14   rights.  Part of them is how much you're getting paid on an

15   ongoing basis.  The other is the longevity of the particular

16   loans at issue, and Mr. Sakamoto testified that these

17   particular loans have a very low default rate.  They also

18   have a very low refinance rate, which means these loans are

19   going to be around for a long, long time, which makes them

20   more valuable to servicing than it would be for other types

21   of loans because other types of loans people, when the

22   interest rates drop, they refinance.  You've just lost the

23   servicing for that loan.  It might go to somebody else.  In

24   this case, whoever gets the servicing is going to be able to

25   them for a long period of time, and that's what gives them

1    value.  And the only other issue I believe to address at this

2    point, Your Honor, is the severability issue which is not

3    before the Court.  It's not in their papers.  It's not in our

4    papers.  We didn't address the issue.  We didn't think it

5    was an issue until it came up today at the hearing, and

6    that's something that can be addressed during the sale

7    objection process, and we believe that these two agreements

8    can be segregated.  This is not like CSFB, which Your Honor

9    heard the testimony on that one where the servicing was

10   imbedded into one contract.  In this case there are two

11   separate contracts.  The servicing contract has made an

12   addendum to the sale agreement, but it is, we believe, a

13   separate agreement that can be severed from the loan purchase

14   agreement.  Unless Your Honor has any questions, that's all I

15   have.

16            THE COURT: Thank you.  Committee?

17            MS. FATELL: Thank you, Your Honor.  Bonnie Fatell

18   for the Creditors Committee.  I'll try not to be repetitive

19   of what was already said by debtors' counsel, but the

20   Committee is very concerned that stay relief not be granted

21   in this instance for a number of reasons.  First of all, we

22   don't believe that a cause has been shown for stay relief.

23   It's been clear that there's been no showing that the debtor

24   is the reason that they've not been able to securitize those

25   loans.  In addition, Your Honor, we don't believe that

1    there's a showing of lack of adequate protection.  The debtor

2    is continuing to service these loans.  By the witness's own

3    testimony for Deutsche Bank, they're not able to sell the

4    loans, so, if they're able to continue to have them serviced

5    on the same basis that they've been serviced pre-petition,

6    then they're not harmed by the ongoing service, and the fact

7    that the debtor is undergoing a sale process on a very sort

8    timetable, we're not looking at six months or nine months,

9    we're looking at a sale within the next several weeks at the

10   outset, I believe, to sell the servicing rights.  What

11   Deutsche Bank says is that they're harmed because the debtor

12   is not a Fannie Mae approved servicer.  If you look at the

13   settlement agreement with Fannie Mae, Your Honor, at

14   paragraph (2)©), one of the conditions that Fannie Mae

15   required when entering into the agreement with the company

16   was that there be a sale process, that it occur quickly, and

17   in ©) it says that a binding agreement for the acquisition of

18   the servicing rights is by a Fannie Mae approved servicer.

19   So, Your Honor, the debtor does in fact have the ability to

20   cure what they're alleging is a default because if in fact

21   they are able to obtain a purchaser for these assets and they

22   complied with the agreement with Fannie Mae it will be a

23   Fannie Mae approved servicer, and the argument that's being

24   made by Deutsche Bank that that's the harm will now be cured.

25   In addition, Your Honor, we think that since, again, Deutsche

1   Bank has argued that they can't sell the loans or the

2   servicing rights, that they can only benefit by the debtors'

3   efforts to sell the servicing rights.  They again acknowledge

4   they can't sell the servicing rights as a standalone.  The

5   debtor is trying to sell all of its servicing rights

6   together.  The testimony from the debtors' witness are that

7   these loans have value because of the type of loans that they

8   are and the servicing that can be done for them and the

9   longevity of these loans.  So if they're bundled together

10  with all of the loans that the debtor is servicing and those

11  servicing rights are sold together, it may be that there is

12  value created for those loans despite the fact that Deutsche

13  Bank says there is none.  So we believe that there's no cause

14  for them to have relief from the stay.  There's no lack of

15  adequate protection.  The sale process in itself provides an

16  opportunity for those loans to be packaged and sold in a

17  manner that will benefit Deutsche Bank and that it will also

18  benefit the estate, and we don't think that there should be a

19  basis for them to obtain stay relief at this time.  Your

20  Honor, we think the one possible outcome here may be that

21  stay relief is denied, let the debtor go through with the

22  sale process, and it's denied without prejudice, and if

23  Deutsche Bank thinks at a later date that they are still

24  harmed by the debtor continuing to service these loans, then

25  they're without prejudice to bring on a motion at a later

1    time.

2           THE COURT: Thank you.

3           MS. FATELL: Thank you.

4           THE COURT: Rebuttal if you have any.

5           MR. WILAMOWSKY: Your Honor, very briefly.  First of

6    all, I think that any motion to lift the stay in the event it

7    would be denied would be without prejudice by its nature

8    because of the continuing default that we would be alleging,

9    but I appreciate Ms. Fatell's statement in any event.  Just

10   very briefly.  The fact that it says, well we recognize page

11   2 of the settlement and we recognize the fact that it says

12   that for performing such that the company shall be deemed and

13   approved a Fannie Mae servicer on an interim basis, but, Your

14   Honor, the fact that it says that, if it said that black is

15   white and up is down and we had an agreement with them that

16   said that, you know, black was black and up was up, the fact

17   that Fannie Mae in an agreement with the debtors -

18          THE COURT: That's not - no, no, see that's not

19   going to help you because you're agreeing in your agreement

20   to use Fannie Mae as a proxy.  I know that's what the market

21   says -

22          MR. WILAMOWSKY: Right.

23          THE COURT:  - you're putting your trust in Fannie

24   Mae, and if Fannie Mae wants to enter into an agreement that

25   says black is white -

1          MR. WILAMOWSKY: Well, but, I'm not sure, Your Honor

2    -

3          THE COURT: That's what you agreed to.

4          MR. WILAMOWSKY: No, because -

5          THE COURT: It's not my problem.

6          MR. WILAMOWSKY: No, because the - Well, first of

7    all, Your Honor, as co-counsel reminds me that doesn't -

8    Freddie Mac hasn't entered into any agreements, so that's

9    (a).

10         THE COURT: Do you have any evidence before me that

11   they're not a Freddie Mac approved servicer?  I didn't see

12   anything in your papers that talked about anything other than

13   Freddie Mac or Fannie Mae.

14         MR. WILAMOWSKY: We did submit into evidence the

15   termination letter which was based on lack of -

16         THE COURT: With Fannie Mae.

17         MR. WILAMOWSKY:  - Fannie Mae and Freddie Mac

18   approval.  I believe -

19         THE COURT: I've got to tell you, I think Mr. Dorsey

20   has a point.  Every time you get up here, you're presenting a

21   different case.  You need to, you know, let's pick some

22   facts, and let's stick to them.

23         MR. WILAMOWSKY: Okay, okay.  Your Honor, that's

24   fine -

25         THE COURT: We've been talking about Freddie Mae for

1   three hours.

2           MR. WILAMOWSKY: Okay, Your Honor -

3           THE COURT: With Fannie Mae, excuse me.

4           MR. WILAMOWSKY: Your Honor, I appreciate the point,

5   but I would just ask Your Honor to also recognize the fact

6   that the facts were not exactly the same when we filed the

7   motion as we are in court today.

8           THE COURT: Well, they are the same now as they were

9   three hours ago.

10          MR. WILAMOWSKY: That is correct, Your Honor, and,

11  well, yes.  And, Your Honor, the other point that I would

12  make is that - and also going to this issue of, you know,

13  saleable and whether securitizable or saleable, and again, I

14  don't think it's correct for the debtors to say that they,

15  you know, they had no notice that this was an issue.  In the

16  subsequent cure objection that we actually filed when we had

17  more facts because it was a later date in fact we said you

18  can't cure and in fact we said we can't sell and all those

19  things.  Now, I recognize that that's all in the cure

20  objection, however, that's precisely the issue that we're

21  struggling with over here today is that the debtor is saying,

22  No, all the these issues should be resolved in the context of

23  the sale, meanwhile the sale has moved twice already and it

24  kind of undermines the very type of - the reason we need the

25  relief and the very relief that we're seeking if we're just

1   tracking the sale, because we don't know how many more times

2   the sale may be moved.  We don't know if the lenders are

3   going to agree to extend beyond October 31st, and we're being

4   asked to track the sale, that's exactly what we're trying to

5   avoid, Your Honor.  That's all.

6            THE COURT: Okay.  Thank you.  All right.  I'm going

7   to deny the motion without prejudice.  The movant has gone

8   forward on two bases indicating that they have cause for

9   relief from the automatic stay, as I understand it.  One,

10  that they're unable to sell the loans in this portfolio as a

11  result of the fact that the debtor is not a Fannie Mae

12  approved servicer, and there was testimony to this effect by

13  the movant's witness.  However, there was also testimony by

14  the debtors' witness that even if - assuming arguendo whether

15  or not - we'll get to the point about whether or not they're

16  a Fannie Mae approved servicer or not in a minute, but even

17  sort of aside from whether or not the default has been cured,

18  even if the debtors were an approved Fannie Mae servicer, at

19  this time that these loans, first of all, were never subject

20  to securitization in the vast majority of the case over 1,659

21  loans to six, which gives you about .4 percent in connection

22  with the Alt-A loans and by value just a hair over one

23  percent.  The vast bulk of this portfolio was never

24  securitizable or subject to securitization, to use an actual

25  English word, and second, that regardless of that, even if

1   you look at it from a wholesale loan prospective, the current

2   market is such that these loans are simply not saleable, and

3   I find the debtors' witness to be more persuasive on these

4   points than I find the movant's witness, and as a result, the

5   Court finds that at least as the facts present themselves

6   right now, the aspect of whether or not the debtor is a

7   Fannie Mae approved servicer is having no affect on whether

8   or not the movant is able to sell or securitize these loans

9   so there's no cause for relief from the automatic stay in

10   that connection.  The second point is that there's an ongoing

11   continuing breach of the agreement that is not being cured

12   because Fannie Mae is in fact - excuse me, the debtors are in

13   fact not a Fannie Mae approved or Fannie Mae qualified

14   servicer.  And again, I reject that argument based on the

15   facts in front of me.  First, with regard to the fact that

16   the settlement agreement is between the parent company and

17   Fannie Mae as opposed to the servicing company and Fannie

18   Mae.  We dealt with this in argument but just to incorporate

19   my comments from there, the Fannie Mae agreement that's being

20   settled, i.e., the agreement under which the servicer is a

21   qualified Fannie Mae servicer is an agreement between the

22   parent company and Fannie Mae, is what the evidence is in

23   front of me today, so it's not at all surprising that the

24   settlement agreement is between the actual parties to the

25   contract.  And this has been the situation for the life of

1   the loan.  So, three years down the road, I'm not going to

2   hear - I think it rings hollow to complain that they haven't

3   cured a default when there was no default ever to cure and

4   that the servicer was never party to the contract.  So I

5   think the fact that it's an agreement between the parent

6   company and Fannie Mae as opposed to the servicer and Fannie

7   Mae is neither here nor there, so then the issue becomes

8   whether that agreement is sufficient to make the debtors a -

9   and let me get the language right.  "Whether the servicer has

10  ceased to meet the qualifications of either a Fannie Mae or a

11  Freddie Mac seller/servicer", which is on page 58 of the

12  underlying agreement.  If you look back at the settlement

13  agreement between the debtors and Freddie Mae, I think that's

14  taken care of quite plainly by paragraph (1) of the

15  settlement agreement that provides that the company shall be

16  deemed an approved Fannie Mae servicer on an interim basis

17  during the term of this agreement.  So it is subject to some

18  future termination, which is one of the many reasons that the

19  motion is being denied without prejudice, but as we sit here

20  today, the debtor is a qualified - or qualifies as a Fannie

21  Mae servicer.  So I don't think that the debtors - or excuse

22  me, the movants have established that there's an ongoing

23  continuing breach of the agreement that has not been cured. I

24  think there was, in all likelihood, a breach, at least for

25  some time, but that that has been cured by the settlement and

1   although it is subject to arising again in the event that the

2   interim agreement expires or the settlement agreement

3   expires, we're not here today at this point.  In addition, I

4   don't really believe I heard any evidence from the movant as

5   to how they're not being amicably protected, and I think for

6   many of the reasons that I previously found in connection

7   with the Credit Suisse matter that the movant is in fact

8   adequately protected, at least in the interim, with the

9   ongoing sales process, with the institution of cash

10  collateral and DIP financing motions that have been put in

11  place by the debtors, and the cash management system that's

12  in place, and the ongoing servicing of these loans. There's

13  been no evidence whatsoever that the servicer isn't doing

14  what it's actually contractually required to do, which is

15  service the agreement as opposed to what DB wants it to do,

16  which is somehow make sure that there's a market for DB to

17  sell these loans.  That is, obviously, the point of the

18  entire exercise, but I don't think it's fair to the debtors,

19  frankly, to put more on their plate than they're actually

20  contractually required to do, certainly in the context of

21  adequate protection.  They're servicing the loans.  There's

22  no indication that they're not servicing the loans.  So, for

23  those reasons I am denying the motion without prejudice.

24  Obviously, to the extent that the facts change, that Fannie

25  Mae terminates the debtor as a qualified servicer, to the

1    extent that the market actually improves and there becomes a

2    market to either sell or securitize these assets and the

3    debtors' bankruptcy is in some way impairing DB's rights to

4    do that, I think that would change the facts that are in

5    front of the Court, and I may be inclined to grant stay

6    relief or at least require adequate protection, but those

7    facts aren't in front of me for today's purposes.  And I ask,

8    could the debtor submit a form of order, please.

9           MR. DORSEY: Yes, Your Honor, thank you.

10          THE COURT: All right.

11          MR. BOWDEN: Your Honor, again for the record, Bill

12   Bowden for DB Structured Products.  Two things, Your Honor.

13   First, if I may ask Mr. Dorsey to send me a copy of the

14   proposed order he submits to Your Honor I'd be gratefully -

15          THE COURT: Yeah, circulate it amongst counsel and

16   then before you submit it under certification.

17          MR. DORSEY: We'll submit it with a certificate of

18   no objection, Your Honor.

19          MR. BOWDEN: Thank you, Your Honor, and thank you,

20   Mr. Dorsey.  And second, Your Honor, could we be excused for

21   the balance of the hearing.

22          THE COURT: Yes.

23          MR. BOWDEN: Thank you.

24          MR. WILAMOWSKY: Thank you, Your Honor.

25          THE COURT: Just give us a few seconds to allow - we

1    won't take a formal break but let's allow people to readjust

2    their location.  If we wait for Mr. Bowden, it could be a

3    long wait, so we'll just keep going.

4         MR. BEACH: Good afternoon, Your Honor.  May it

5    please the Court, Sean Beach from Young, Conaway, Stargatt &

6    Taylor on behalf of the debtors.  Your Honor, item number 11

7    on the agenda relates to objections to the notices of sale

8    under the sale procedures previously approved by Your Honor.

9    Your Honor, I believe all of the objections to these sales

10   have been mooted by virtue of the fact that the debtors have

11   removed the equipment from - I shouldn't say sales.  They

12   were assumption and assignments of those equipment leases,

13   and the debtors have removed those from those assumption and

14   assignments and certainly are not trying to sell those either

15   and have filed a motion to reject those equipment leases

16   September 13th.  That motion is to be heard on October 1st.

17   So, unless Your Honor has any questions regarding -

18        THE COURT: Well, I was confused, I mean, I was a

19   little confused as to why it's on the agenda at all, I guess,

20   so maybe you can explain to me - you're not actually seeking

21   relief.  Is this the time period?

22        MR. BEACH: Yeah, in the motion it said that the

23   hearing can be set within five days, I believe, after any

24   objections are received or something to that effect, Your

25   Honor.

1          THE COURT: So the order says - I have got the order

2    here.  So, this is the hearing on -

3          MR. BEACH: Given the fact that we -

4          THE COURT: This would have been the hearing on

5    cure?  Or -

6          MR. BEACH: Or any objections to those miscellaneous

7    asset sales.

8          THE COURT: At all.  Okay, so your point is, you've

9    got -

10          MR. BEACH: The objections were by three equipment

11   lessors, De Lage Landon, and GE Capital Information

12   Technology Solutions, Inc., and Bank of America Leasing &

13   Capital LLC, all equipment lessors and the equipment was

14   removed from those notices of assumption and assignment.

15          THE COURT: All right, so, you have carved out

16   everyone on Exhibit A.  You have carved out of the Exhibit A

17   to the agenda, you have carved out of the order for

18   assumption and assignment; correct?

19          MR. BEACH: There's not a formal order but the

20   sales, they've been carved out all of those -

21          THE COURT: Well, there is a formal of order.  It's

22   the order I entered on August 24th.

23          MR. BEACH: Well, I guess we could say that.  I mean

24   they've been carved out given the fact that we filed a motion

25   to reject all of them.

1         THE COURT: You're killing me here.  Does the order

2    that I entered on August 24th apply to any of the objectors?

3         MR. BEACH: Yes.

4         THE COURT: Okay. So how is it moot?

5         MR. BEACH: Because we filed notices of the sale of

6    certain FF&E and the assumption and assignment of certain

7    office leases and equipment leases.  We received objections

8    from these three equipment lessors.  We've since removed all

9    of those equipment from those proposed sales and assumption

10   and assignment of leases, and then subsequently filed a

11   motion to reject all of the equipment leases that would have

12   otherwise been subject to those sale notices.

13        THE COURT: All right.  Is there anyone here on

14   behalf of the objectors that has anything to add?

15        MS. LAWSON: Your Honor, Kim Lawson from Reed Smith

16   on behalf of GE Capital.  Our only concern is just at the

17   bottom.  We weren't one of the named lessors being assumed.

18   On the back of every notice, at the very bottom, is a

19   paragraph that says, "We are selling all furniture, fixtures,

20   and equipment located at these locations."  We don't know

21   whether that is our stuff or not, it's just generic

22   equipment, so our objection was just to preserve that they

23   can't sell equipment that they don't own that we own that's

24   subject to these leases.  Attached to our objection we did

25   provide a copy of a chart that has a list of every single

1   lease, including make and model number of ever piece of

2   equipment with the serial number and the last known location

3   that we had for that equipment.  I did receive from the

4   debtors last week, their counsel, a list of specific leases

5   that they were going to reject that are our leases, and

6   there's only five out of 24.  Based on that list they

7   provided, they have moved some of our equipment.  Our leases

8   say equipment needs to be located at X property.  If you move

9   it, you need to notify us and tell us.  They haven't done

10  that with at least one lease of this five that we know of,

11  and we're not talking about across the street.  They moved it

12  from Kenosha, Wisconsin all the way to Ohio.  I don't know

13  why, but transported if 400 miles away.  So, our concern is,

14  I don't know whether this is our stuff.  We've provided

15  serial numbers, makes and models, everything that we could

16  provide to them to identify it, and what I got back was a

17  list of these are the five leases we're rejecting.  Okay, I

18  have no problem with that.  They can reject them.  They have

19  a right do that, no problem.  But now I don't know if my

20  equipment is at this location that they're just going to

21  abandon or sell without our permission, and that for me, that

22  affects the rest of the items on the agenda.  So I won't

23  reargue each time.

24          THE COURT: All right, Mr. Beach, help me out here.

25  I need context.  It was focused, frankly on the stay relief

1    motion more than I am this motion.  So you're going to need

2    to back up and tell me why you're here, what I previously

3    did, how it affects people's rights, and what you're asking

4    me to do today.

5           MR. BEACH: Sure, Your Honor.

6           THE COURT: So I know what I'm doing.

7           MR. BEACH: The order that's the subject of item 11

8    on the agenda is an order that establishes procedures by

9    which the debtors can assume and assign office leases,

10   equipment leases that's located in those offices, and to sell

11   the FF&E that's located in those offices, and pursuant to

12   those procedures, we sent out, I believe, it was 42 notices

13   indicating that we intended to assume and assign those office

14   leases and in some cases the equipment that was located in

15   those office spaces and to sell the FF&E in those locations.

16   I believe Ms. Lawson's objections go primarily to the second

17   rejection motion, that's the last item on the agenda, as it's

18   my understanding that none of her clients' equipment was ever

19   the subject of these 42 sale and assumption notices.  But in

20   any event, even if it was, it's no longer a part of the

21   assumption and assignment, and it is now the subject of

22   rejection.  To the extent that that equipment is located - or

23   that Ms. Lawson has indicated the list that we provided to

24   her isn't satisfactory, we certainly will endeavor to get her

25   a better list of where the equipment might be located, but

1   the debtors will make its best efforts to do so, and, you

2   know, I can't promise her more than that.  To the extent

3   that, you know, we can't provide her with better information

4   than we have and her client's not satisfied with the

5   information that we've given her, then that seems to me a

6   rejection damages claim.  But again, Your Honor, I think this

7   is an argument for item number 13 on the agenda not item 11.

8            THE COURT: Well, all right.  So, let me see if I

9   get it.  We had the hearing back in August where we set up

10  the procedures, and under their procedures you were to

11  provide notice to parties if you were seeking to assume and

12  assign a real estate lease, assume and assign an equipment

13  lease, or sell FF&E; right?

14           MR. BEACH: Correct, Your Honor.

15           THE COURT: Okay.  And if you file objection you had

16  so long to file the objection.

17           MR. BEACH: Correct.

18           THE COURT: Okay, now if they file an objection,

19  obviously you can't sell the stuff without further order of

20  the Court.

21           MR. BEACH: Correct.

22           THE COURT:  All right, so, your argument is that no

23  further order of the Court is required because you have

24  carved out all of the objectors from the sale procedures

25  order that we already indicate, and they are subject to a

1    separate motion either to reject their equipment lease or

2    abandon their equipment or reject their non-residential real

3    property lease; correct?

4           MR. BEACH: That's correct, Your Honor.

5           THE COURT: Okay.  And you - I'm sorry, your name

6    is, I apologize -

7           MS. LAWSON: Kim Lawson.

8           THE COURT: Ms. Lawson, you're not satisfied they've

9    carved you out.

10          MS. LAWSON: If what they're saying they've removed

11   us from all this property, and that's the representation,

12   then I'm fine with this particular thing going forward as

13   long as we're carved out.

14          THE COURT: All right, well, we're trying to keep it

15   from going forward because I guess my point is, there's

16   nothing to go forward if they've carved you out because I've

17   already authorized sales procedures that authorize them to

18   sell it and if they've carved you out then there's no

19   standing objection.

20          MS. LAWSON: And that's fine, if they've carved us

21   out, I agree with that, that's fine.

22          THE COURT: All right, very well.  Mr. Rosner.

23          MR. ROSNER: Thank you, Your Honor.  For the record,

24   Your Honor, Fred Rosner, Duane Morris.  We stand in the same

25   shoes as previous counsel.  I represent De Lage Landen.

1    We're the lessor of approximately 250 leases of various

2    pieces of equipment to these debtors.  I just wanted counsel

3    to confirm that none of our leases and none of the equipment

4    that is subject to those leases is going to be assumed and

5    assigned or sold pursuant to agenda item 11 on the calendar

6    today.

7              MR. BEACH: That's correct, Your Honor.

8              THE COURT: Okay.  I've got it.  Anyone else on 11?

9    All right, we'll move onto 12.

10             MR. BEACH: Thank you, Your Honor.

11             THE COURT: Sorry for not being clear there, but

12   sometimes it's hard to switch gears.

13             MR. BEACH: And my apologies, Your Honor, I should

14   have given you more of summary.

15             THE COURT: That's all right.

16             MR. BEACH: Item number 12, Your Honor, relates to

17   cure objections related to the Indymac transaction.  The

18   Indymac transaction, Your Honor, was heard also on the August

19   24th hearing date.  That was a sale agreement with Indymac

20   where they would purchase FF&E in approximately 98 locations

21   and they would take an assumption and assignment of those 98

22   office leases.  Pursuant to the sale order, there was a

23   subsequent notice period for cure objections which ran on

24   September 7th, and we have received a number of cure

25   objections, I think approximately 17, Your Honor, all of

1    which have been resolved except for one, I believe.  The

2    debtors intend to submit a proposed form of order today that

3    fixes the cure amounts through September 30th, and the debtors

4    do intend to close the transaction prior to that time period.

5    Your Honor, what I'd like to do first is to run through the

6    objections that I believe are resolved or not necessarily

7    relevant to or not necessarily cure objections.  I think

8    there's only one of those or where I believe parties are

9    simply going to put reservation of rights on the record and

10   then get to the one contested matter which relates to

11   TPRF/THC HavenPark LLC which is - the cure amounts are agreed

12   with respect to that item and the dispute is with respect to

13   attorney's fees that are being asserted as a cure claim.

14            THE COURT: That's item g).

15            MR. BEACH: Yes, Your Honor.

16            THE COURT: All right.  Okay, go ahead.

17            MR. BEACH: Your Honor, item number 12(b) is an

18   objection of GE IKON.  We dealt with the issue of equipment

19   lessors during the Indymac sale, and as part of the

20   resolution of that sale, we made statements on the record and

21   perhaps it's even in the order that no equipment leases were

22   being assumed and assigned to Indymac under those sales.  We

23   have filed a motion to reject all of those equipment leases

24   which is the last item on the agenda for today.  So, I don't

25   believe that there's an appropriate standing objection with

1  regard to the cure amounts, but I'll cede the podium to GE

2  IKON if they have any comments.

3          THE COURT: So it's your position you're not

4  assuming and assigning these leases, and this is when she's

5  going to tell me what you already told me which is, she's got

6  24 and you've only got 5, so, why don't you answer that

7  question.

8          MR. BEACH: Well, again -

9          THE COURT: What happened to the other 19 leases?

10          MR. BEACH: Your Honor, again, I think this is

11  really an issue for the rejection motion which is the last

12  item on the agenda, but, Your Honor, we have provided a list

13  of where we believe the equipment is located.  To the extent

14  that that list is incomplete, Your Honor, I will certainly

15  commit to going back to the client and asking them to make

16  every effort to confirm that information or find out where

17  the equipment is located.  Your Honor, I'm not sure that

18  there's much more we can do.

19          THE COURT: It's hard to prove a negative, but your

20  representation to the Court and to counsel is that the

21  debtors are not seeking to assume and assign under this

22  agenda item any leases with GE Capital Information Technology

23  Solutions, Inc.

24          MR. BEACH: That's absolutely correct, Your Honor.

25          THE COURT: All right.  Ms. Lawson.

1          MS. LAWSON: Then the only other response I'd have

2     is that they're also not trying to sell or abandon our

3     underlying equipment regardless of what their position is on

4     the lease.

5          THE COURT: Well, that's a different motion.

6          MS. LAWSON: Well, this also seeks to sell equipment

7     including copiers and fax machines.

8          THE COURT: Oh, I beg your pardon.  Well, they can't

9     sell something they don't own.  I have this conversation a

10    lot.  They can't have something they don't own.  So if it's

11    subject to a lease, I'm not authorizing them to sell it.  If

12    they own it they can sell it and we'll fight at a later date

13    as to whether they owned your copier or it was really a

14    lease.

15         MS. LAWSON: Right.

16         THE COURT: All right?

17         MR. BEACH: Thank you, Your Honor.  We're not trying

18    to sell the leased equipment.  Twelve c), Your Honor, is

19    resolved, and I think with the remaining resolved objections,

20    what I'll do is just state the new cure amount and to the

21    extent I need to address any questions that the parties have,

22    I can do that.  Twelve c) is Caldwell Commercial LLC.  The

23    new cure amount for them is $8,337.08.  Twelve d) is American

24    Commercial Realty Corp., and the new cure amount is

25    $10,556.47.  Twelve f) is Highlands Properties and the new

1    cure amount is $14,344.40.  Twelve h) is RAM International

2    and the agreed cure amount is $14,430.33.  Twelve I) is SLO

3    L.L.C., and the agreed cure amount is $17,739.99.  Vintage

4    Park LLC, that's 12 j) is $12,039.23.  Twelve k), Waterson

5    and Zapolo (phonetical), $3,627.60.  Twelve l), Hazeltine

6    Gates, LLC, $16,739.43.

7              THE COURT: Can I have that one again.

8              MR. BEACH: Hazeltine Gates, that was 12 l),

9    $16,739.43.

10             THE COURT: Uh-huh.

11             MR. BEACH: Twelve m) One Main Plaza, that's

12   $4,319.48.  Twelve n), MVCC, $29,216.83.

13             THE COURT: $29,216.83?

14             MR. BEACH: Correct, Your Honor.  Twelve o), ICP

15   2700 LLC, $683.48.  Twelve p), Temecula Corporate Plaza

16   Center, $9,806.31.  We're getting there, Your Honor.  Twelve

17   q), $4,223.  Twelve r), $7,886, and 12 e), Your Honor, that

18   was resolved this morning, and that cure amount is $2,225.02.

19   Leaving, I believe, 12 g) is the only remaining matter, but

20   I'll cede the podium to any -

21             THE COURT: All right.  Does anyone wish to be heard

22   in connection with any of those resolutions?

23             MR. LEMISH: For the record, Your Honor, Ray Lemish,

24   Benesh Fredlender on behalf of DDR Southeast Fountains L.L.C.

25   The cure amount agreed to is correct.  We had a couple of

1  caveats.  As counsel said, the actual assignment isn't going

2  to occur probably for a couple of weeks, so we want to

3  reserve our right to come back before Your Honor if it turns

4  out that there are additional damages, cure, default issues

5  that arise from today until the end of the month.  I don't

6  know how we can be precluded from coming back anyway, but I

7  would like to put that on the record since they're trying to

8  fix the cure amount through the end of the month.

9          THE COURT: Mr. Beach.

10          MR. BEACH: I think that's appropriate, Your Honor.

11          THE COURT: All right.

12          MR. LEMISH: And I'd also like the debtor to confirm

13  on the record that he did in fact receive the notice from my

14  client prior to the filing of the bankruptcy of my client's

15  intent to relocate the debtor, but now I guess it would be

16  Indymac under the terms of the lease from his current

17  location at this shopping center.

18          THE COURT: Wait a minute.  Just so I understand.

19  You gave notice - Your client believes he gave notice pre-

20  petition to the debtor of its intent under the terms of the

21  lease agreement to move him to a different place in the mall.

22          MR. LEMISH: Correct.  The debtor had the - the

23  landlord had the right under the lease to do so, and he did

24  in fact do so prior to the filing of the bankruptcy, and we

25  just want to make sure that's clear on the record.

1        THE COURT: Mr. Beach, do you have knowledge of

2   that?

3        MR. BEACH: Your Honor, I know that we did receive

4   notice, and I believe I told Mr. Lemish that I would say that

5   we received it pre-petition.  I now am not sure, I kind of

6   appreciated that caveat earlier, so I don't know for sure

7   whether we did receive it pre-petition.  I'm not sure if

8   that's relevant to Mr. Lemish's concerns, but -

9        MR. LEMISH: Well, it is relevant because if they

10  didn't receive it pre-petition they would say that we

11  violated the automatic stay, which we didn't do because they

12  had received notice.

13       THE COURT: Yeah, but why is that relevant to

14  whether - to what your cure amount is or whether it's an

15  assumable or assignable lease?

16       MR. LEMISH: I think it goes to the issue of, I

17  guess, just notice for Indymac's purposes as much as anything

18  else, what they're assuming.  They're assuming an obligation.

19  The obligation that they're assuming under the lease is that

20  they're going to be relocated.  So it may not be a cure

21  issue, but I think it has to do with the assumption and

22  assignment.

23       MR. BEACH: Your Honor, I believe Indymac's counsel

24  is on the phone, and I do believe and perhaps only recently

25  we've advised them that the office space might be relocated

1   within those premises.

2          MR. HOLDEN (TELEPHONIC): Your Honor, this is

3   Frederick Holden on behalf of Indymac Bank.  We are aware

4   from Mr. Beach's office that - of this discussion.  We have

5   not seen the notice.  We do not know whether it was received

6   pre-petition, but we certainly are on notice that the

7   landlord asserts that there was a notice given pre-petition,

8   but that's all I can confirm right now.

9          THE COURT: All right.

10          MR. HOLDEN (TELEPHONIC): And that does seem to be

11   all that's relevant to this cure discussion.

12          THE COURT: So you understand you may be buying

13   litigation.

14          MR. HOLDEN (TELEPHONIC): Yes, Your Honor.

15          THE COURT: All right, very well.  Mr. Lemish?

16          MR. LEMISH: No, I mean, Your Honor, as I say, it is

17   what it is, and so I guess everyone's now on notice, so -

18          THE COURT: Very well.  Anyone else in connection

19   with the resolutions Mr. Beach read into the record on cure

20   amounts?  All right, that leaves us with TPRF/THC HavenPark,

21   LLC.

22          MR. BEACH: Thank you, Your Honor.  The debtors

23   originally listed this cure amount as zero based on their

24   books and records which indicated that rent of approximately

25   18,000 was paid for the month of August.  While the majority

1    of the August rent checks had cleared, the debtors had later

2    determined that this rent check had not cleared, and now

3    agree that they owe $18,187.38 for rent in the month of

4    August.  HavenPark is also in possession of a September rent

5    check issued by Indymac at the debtors' request pursuant to

6    the parties' agreement in connection with the license

7    agreement in the proper amount of $22,944.  I understand that

8    HavenPark has not yet cashed the September check, but

9    regardless, there is no dispute as to the cure amount owing

10   with the exception of their request for attorney's fees, and,

11   Your Honor, the proposed order today includes both the

12   $18,000 and $22,000 amounts and simply has the caveat that to

13   the extent the $22,000 rent check is cashed will reduce the

14   cure amount payable by that amount.  Your Honor, HavenPark is

15   asserting a cure claim, and the narrow issue before us today

16   is with regard to the portion of the cure claim attributable

17   to attorney's fees.  They're asserting attorney's fees in the

18   amount of $41,397.10 and by the time today - by this time

19   today, it's probably a couple of thousand dollars more, I'd

20   imagine.  This money is owed primarily - what HavenPark is

21   alleging is that this money is owed primarily as a result of

22   the default under the lease.  Your Honor, there is no default

23   under the lease.  They provided notice of the debtors' prior

24   to the petition date, I believe, on August 1st that there was

25   a default under the lease.  The provisions of the lease are

1   very clear, that an actual default doesn't occur until five

2   business days after that notice is served, and the five

3   business days ran after the filing of the bankruptcy, Your

4   Honor.  In addition -

5          MS. STANFIELD (TELEPHONIC): Your Honor, this is

6   Diane Stanfield of Weston, Benshoof in Los Angeles on behalf

7   of the lessor.

8          THE COURT: Could you let Mr. Beach finish his

9   argument?

10         MS. STANFIELD (TELEPHONIC): Oh, I'm sorry, Your

11  Honor.

12         THE COURT: I know it's hard on the phone.  That's

13  all right.  Ms. Harris will introduce you when it's time.

14         MS. STANFIELD (TELEPHONIC): Thank you.

15         MR. BEACH: In addition, Your Honor, from what I

16  understand there were two declarations that were filed

17  indicating what they believed their entitlement to attorney's

18  fees was, and one of the other arguments that they make is as

19  a result of the motions filed by the debtor, the Indymac

20  license motion, the Indymac sale motion, and then the cure

21  issues that we're dealing with today.  Your Honor, when

22  reviewing, as Your Honor is well aware, when reviewing a

23  request for reimbursement of attorney's fees in connection

24  with an assumed lease, there's a three-prong test that's used

25  to determine whether the expenses directly or indirectly

1   relate to a default under the lease, and if so, was the

2   expense necessary to cure the default, adequately protect the

3   landlord against future defaults, or indemnify the landlord

4   against loss, and if so, was the expense reasonable under the

5   circumstances.  Your Honor, to undergo this analysis, the

6   parties certainly need to be able to review the fee

7   statements of the party asserting the claim for entitlement

8   to the attorney's fees.  We made three pretty simple requests

9   to HavenPark that was for a copy of the engagement letter,

10   copies of the fee statements, and evidence that the actual

11   attorney's fees had been paid by their client.  Late in the

12   day on Friday, Your Honor, we saw a filing by HavenPark where

13   they supplemented their objection.  They included a redacted

14   version of the engagement letter and a redacted version of

15   the fee statements as well as a check that was apparently

16   issued that day for the payment of the attorney's fees.  Now,

17   Your Honor, the redacted fee statement is the biggest issue

18   that we have, and I'm not sure if Your Honor has had the

19   opportunity to take a look at it, but all it has, basically,

20   is dates and amounts that were owed, and they redacted every

21   piece of the description for those fee statements so there's

22   no way for us to be able to discern, first of all, if there

23   are attorney's fees that are - that were incurred in the

24   enforcement of the actual lease terms or if they're

25   reasonable, and I would submit that Your Honor would be

1    unable to tell whether these fees are reasonable either.

2    Now, they did have some vague statements in their declaration

3    which I suppose they're going to contend is evidence to

4    support that attorney's fees claim, but, Your Honor, I would

5    say that that's absolutely deficient for us to be able to

6    determine whether these are reasonable attorney's fees

7    claims.  And, Your Honor, I believe HavenPark has asserted

8    that the fee statements, the descriptions, and the redacted

9    portions of the engagement letter are attorney/client

10   privilege.  Your Honor, they put these attorney fees at issue

11   and we would be severely prejudiced if we aren't able to

12   review these fee statements prior to dealing with the issue,

13   and as a result of that, Your Honor, I believe the case law

14   is clear, if they put the attorney's fees at issue or any

15   attorney/client communication they're injecting the

16   attorney/client communication into the litigation or

17   injecting an issue into litigation that's a truthful

18   resolution of which requires an examination of the

19   attorney/client communication.  Your Honor, I believe that

20   they are not able to meet their burden today.  It is

21   HavenPark's burden to show that they're entitled to these

22   attorney's fees.  I believe that they will fail because the

23   declarations are not adequate.  The fee statements themselves

24   are devoid of any relevant information, and the engagement

25   letter doesn't even set forth the services that they've been

1    retained to be engaged for.  And, by virtue of that, Your

2    Honor, I would ask that the objection be overruled, and if I

3    can say this as well, Ms. Stanfield is one of the declarants.

4    It appears that maybe she's going to attempt to argue today.

5    If we're going to - If she's going to be a witness at some

6    point, I don't think she can be a witness over the phone, and

7    I'm not sure she should be the one arguing this point if she

8    is going to be an ultimate witness on this issue.

9              THE COURT: Ms. Harris.

10             MS. HARRIS: For the record, Donna Harris from

11   Pickney Harris & Poppiti on behalf of TPRF/THC HavenPark.  We

12   did - and Your Honor did approve the admission *pro hac* of

13   Diane Stanfield.  She is on the phone and she does wish to be

14   heard to the extent Your Honor make some ruling later on with

15   respect to her ability to be heard, we can address that at

16   that time, but I would request that Your Honor hear her

17   initially.

18             THE COURT: All right, Ms. Stanfield.

19             MS. STANFIELD (TELEPHONIC): Thank you, Your Honor,

20   good afternoon.  I agree with many things that counsel said

21   in terms of the rent issue.  I did want to clarify one thing

22   about the cure amount as to rent.  We had requested last week

23   whether the debtor objected in any way to our cashing the

24   check from Indymac because it's our understanding that since

25   the assignment hasn't actually occurred and the order

1  approving the licensing agreement really sets up that Indymac

2  will pay the debtor and the debtor will pay the landlords, we

3  didn't want to cash that check without knowing that the

4  debtors agree that we could.  If they're now saying that they

5  have no objection and the Court agrees that that's

6  appropriate then we would agree to reduce the cure amount

7  sought on the rent to 18,187.38 and just cash Indymac's

8  check, if that's agreeable.

9         THE COURT: Let's see what that preliminarily - Mr.

10  Beach, is that acceptable?

11         MR. BEACH: I have no objection to that, Your Honor.

12         THE COURT: All right.  I have no objection.

13         MS. STANFIELD (TELEPHONIC): Thank you, Your Honor.

14  That sort of sets up a little bit of the part about the

15  attorney's fees, and I'll get to the underlying matter in a

16  minute, but this is a pattern that unfortunately has been

17  happening a lot in this case where we could have worked that

18  out very simply last week with a statement from debtors'

19  counsel that they didn't have an objection, and instead we

20  had to file some additional supplement about the rent and the

21  check and so on where it's clear there really was no

22  objection, and so, I think there is a little bit of history

23  here that things could have been done more easily than they

24  have been.  As to the basis for our attorney's fees request,

25  the default is really a fairly minor part of the attorney's

1   fees or the request.  What the request is based on is the

2   provision in the lease, and we've cited this in our original

3   objections that were filed back, I think, on September 7th,

4   and that provision says that should landlords, without fault

5   on landlords' part, be made a party to any litigation

6   instituted by the tenants, then the landlord or - rather, the

7   tenants covenants to save and hold landlord harmless from any

8   judgment rendered and from all costs and expenses including

9   reasonable attorney's fees and costs incurred by landlord in

10  connection with such litigation.  So the attorney's fees that

11  we're seeking are really related to the litigation that's

12  been ongoing since the debtors' emergency motions were filed,

13  and I think that we have set out a fairly clear path of the

14  scope of those services which were in essence trying to

15  cooperate.  The very first thing we did was to contact the

16  debtor and Indymac and say, Can we stipulate to approve that

17  license agreement in the interim until the Court rules on it

18  so we can get Indymac in, get them in possession, and make

19  this whole thing much quicker and easier.  Everybody agreed

20  that was the right thing to do, but then we spent the next

21  ten days with, I have a stack of about 50 or 60 emails in my

22  hand here, going back and forth about the terms of the

23  stipulation, the cure amount which the debtor still couldn't

24  determine whether or not any rent was owed even though we

25  have the records for them, insurance certificates and the

1    like, and so we spent a good bit of time only to have the

2    debtor the day before the hearings on the emergency motions

3    drop out of the discussions after having essentially said

4    that the stipulation was fine.  So we spent a great deal of

5    time trying to negotiate things that we really could have

6    done more simply, and that's why the fees got to where they

7    did.  As far as the documents that we produced, we did

8    initially object to producing the documents the debtor

9    requested, and frankly, I thought there was more privilege

10   attached than there is on some research, which we cited to

11   the Court in our supplement we filed on Friday.  We find that

12   there is still some attorney/client privilege that attaches

13   to those documents, and the most clear explanation of it is

14   in the <u>Leach vs. Quality Health Services</u> case which says that

15   attorney billing statements and time records are protected by

16   the attorney/client privilege to the extent they reveal

17   litigation strategy and/or the nature of services performed.

18          THE COURT: So why did you redact every word in your

19   bill.  I refuse to believe that every word in your bill would

20   indicate a breach of attorney/client privilege.

21          MS. STANFIELD (TELEPHONIC): Well, they certainly

22   are the nature of the services performed in every single

23   case.  That's exactly what those entries indicate, and, you

24   know, Your Honor, the biggest problem is that you don't want

25   to take a chance of waiving an attorney/client privilege by

1   giving too much, and what that column of entries is for is

2   the description of services, and when I had a case in front

3   of me that says the nature of the services -

4            THE COURT: Right, but, you know, drafting a brief

5   re motion or drafting of objection 6.0 hours tells me what

6   you did.  It doesn't indicate - it doesn't give away anything

7   in the nature of attorney/client privilege.  It doesn't

8   describe what - you give away your work product.  It tells me

9   that six hours drafting an objection is a reasonable time.

10  Blank, six hours, I don't know what you did.  Surf the

11  internet, 6.0.  You know, is that reasonable?  There's no way

12  to judge the reasonableness of the fees and their

13  applicability to the ongoing litigation with just blanks.

14           MS. STANFIELD (TELEPHONIC): Well, Your Honor, we're

15  very willing to take another stab at it, and try and parse

16  out more carefully the things that we're most concerned about

17  being privilege.  As I said, my biggest concern was not

18  waiving the privilege by indicating anything about the nature

19  of the services.

20           THE COURT: Which I certainly understand.

21       MS. STANFIELD (TELEPHONIC): But if I can be more helpful

22  by trying to white-out and redact a little more selectively,

23  I'm certainly happy to do that.  I would like to have a

24  little understanding from the Court about the underlying

25  argument from debtor that their position that we're not

1   entitled to fees because there was no default, I want to be

2   sure we're not wasting time by going through that exercise,

3   but we're certainly happy to provide whatever information the

4   Court would like on what was done.

5          THE COURT: Well, what's the default you asserted

6   pre-petition?

7          MS. STANFIELD (TELEPHONIC): There was just a notice

8   of default, Your Honor.  The contract provides for a five-day

9   notice period.

10          THE COURT: All right so you're - so there was no

11   default.  So -

12          MS. STANFIELD (TELEPHONIC): There was not a default

13   at the time of the petition.

14          THE COURT: But your position is they've instituted

15   litigation by filing bankruptcy.

16          MS. STANFIELD (TELEPHONIC): Correct - Well, not by

17   filing the bankruptcy, but by filing the emergency motions

18   and then by the negotiations that transpired with Indymac and

19   others.

20          THE COURT: By starting a contested matter in

21   Bankruptcy Court, that's instituting litigation?

22          MS. STANFIELD (TELEPHONIC): I think it is, Your

23   Honor, filing an emergency motion that -

24          THE COURT: Do you have cases to - Do you have cases

25   to that effect or -

1          MS. STANFIELD (TELEPHONIC): I do not have an

2     authority to cite to the Court, but if it will be helpful,

3     I'll find one.  It certainly seems like litigation, filing

4     motions in oppositions and declarations.  I don't know how it

5     could not be, really.  Filing a petition I don't think is

6     litigation, but this is certainly litigation within the

7     bankruptcy.

8          MS. HARRIS: Your Honor, if I may help, Donna Harris

9     again, and just point Your Honor to the Bankruptcy Rule 7000

10    series which does indicate that in the bankruptcy context you

11    don't need an adversary proceeding as long as it's a

12    contested motion.

13         THE COURT: No, I understand.

14         MS. HARRIS: That's considered the same and so I

15    would think that litigation - because it's a contested motion

16    that that would constitute litigation.

17         THE COURT: Well, but I don't know.  I mean, I don't

18    know what the contact means without spending more time with

19    it, frankly, as to whether - I mean, I doubt that it

20    contemplates bankruptcy.  I expect it contemplates state

21    court or federal court A versus B litigation as opposed to a

22    motion to assume and assign, but, you know -

23         MS. STANFIELD (TELEPHONIC): And actually justify.

24         THE COURT: But let me just make a couple of

25    preliminary comments and, first of all, I try to be flexible,

1    especially in the context of these omnibus type motions that

2    the debtor puts on where they're seeking relief and we're

3    getting 20 or 30 people responding.  However, it is very

4    difficult to have a substantive legal argument with counsel

5    on the telephone, number one.

6         MS. STANFIELD (TELEPHONIC): I appreciate that, Your

7    Honor.

8         THE COURT: Number two is, I don't allow attorneys

9    to testify, and I don't allow or take attorney affidavits or

10   declarations as evidence.  Three, I haven't read your

11   supplemental declaration.  It wasn't sent to me.  There was

12   no amended agenda filed that sent it over.  I haven't seen

13   it, and I haven't read it.  I'm inclined to continue the

14   matter on for another hearing, but I'm also cognizant of the

15   fact that you don't want to spend more of your client's money

16   if I'm going to come out four weeks from now and tell you

17   that you were dead on arrival in the first instance.

18        MS. STANFIELD (TELEPHONIC): That's right.

19        THE COURT: So, let me -

20        MS. STANFIELD (TELEPHONIC): Well, Your Honor, I do

21   think that -

22        THE COURT: Can I do this?  Let me suggest

23   something.  When are we here next in this matter, Mr. Beach?

24   You guys get a hearing about every other day, so -

25        MR. BEACH: I know that we have an omnibus hearing

1   on October 1st, Your Honor.

2          THE COURT: Oh, no, you're here before that.  You've

3   got to be.

4          MR. CLEARY: Your Honor, I think there's a September

5   20th hearing date.

6          THE COURT: Yeah, Friday.  All right.  Here's what

7   I'd like to do.  I'm going to continue this - Can I continue

8   - My suggestion is to continue this matter to Friday as a

9   step and not require anyone - if we're going to hear it on a

10  contested basis as to what the documents mean, et cetera, et

11  cetera, whether the fee statements are sufficient or not,

12  we're not going to get into that on Friday.  I will in effect

13  accept the invitation as one to bifurcate the trial.  I'll

14  look at the supplemental filing, I'll look at this filing.

15  We'll have a status conference on Friday, and I'll indicate

16  where I stand on whether I think - assuming that the evidence

17  is supportive - Let me see if I can put this in English.

18  Assuming arguendo that the fee statements are completely

19  legitimate and totally related to litigation and we don't get

20  into any issues there, I'll be willing to provide a ruling as

21  to whether I think the movant or the objector, excuse me, is

22  entitled to attorney's fees.  If I rule that, we'll have to

23  address at a later date whether or not the fees - what amount

24  of fees are approved.  So, let's - My proposal is to, in

25  effect, bifurcate this, to continue the initial issue of

1    entitlement to attorney's fees to Friday, and if it turns out

2    that I rule there is at least a *prima facie* entitlement to

3    attorney's fees on the facts on Friday, we'll hear at a

4    different date the amount because even if I were to rule

5    today that I thought there was, you know, an entitlement to

6    attorney's fees there's no way that I'm prepared to approve a

7    blank check on attorney's fees with blank invoices, which is

8    just not going to happen.  Is that acceptable to counsel or

9    is that a terrible idea?

10          MS. STANFIELD (TELEPHONIC): Very definitely

11   acceptable, Your Honor.  We appreciate the suggestion.

12          THE COURT: Mr. Beach.

13          MR. BEACH: Your Honor, that's acceptable to the

14   debtors, but I do want to request that we do get full copies

15   of whatever fee statements these are without redactions to

16   them.  I think we're entitled to them.  They put the

17   attorney's fees - that's the only issue we're dealing with

18   and they should be required to give us copies of those.

19          THE COURT: Well, I'm not going to require them to

20   do that at this time, because I think we can have an

21   intelligent discussion on the entitlement assuming - let's

22   just assume they're all acceptable and if it turns out that -

23   Let's just be up front, I mean, generally speaking you don't

24   get attorney's fees in connection with the assumption and

25   assignment of a unexpired lease of non-residential real

1   property or executory contract.  So, they are and to a

2   certain extent asking for extraordinary relief, i.e., out of

3   the ordinary relief.  So, let's deal with that first and then

4   if I decide that they are indeed entitled to it, I think we

5   can hear on short order the amount of the fees, and you're

6   clearly going to need to give Mr. Beach and myself more

7   information than you've given in order to have the Court

8   decide that issue, and it may be a situation where you

9   present Mr. Beach with redacted copies albeit less redacted

10  and submit the full invoices in camera for my review, but I

11  don't think we need to get there until we decide the

12  preliminary issue and frankly I'm not in a position on the

13  fly to decide this issue.  We could take a recess.  I could

14  go back, I could read this stuff, we could come back in two

15  hours, I think that's not as productive as hearing this on

16  Friday.

17          MS. STANFIELD (TELEPHONIC): What time is the

18  hearing on Friday, Your Honor?

19          THE COURT: 2:30 Eastern.

20          MR. DORSEY: Your Honor, just - John Dorsey.  To

21  clarify, the next hearing is Thursday, the 20th, not Friday.

22          THE COURT: Sorry, Thursday.  Thank you, Mr. Dorsey.

23          MR. BEACH: Your Honor, two other points.  One is, I

24  think the Committee is entitled to review these fee

25  statements as well and to take a position on them, and also I

1  would like the opportunity to reply before this hearing date

2  -

3        THE COURT: That's fine.

4        MR. BEACH:  - so, I would like to get copies of

5  these tomorrow and then have the opportunity to reply if it's

6  acceptable to Your Honor.

7        THE COURT: Well, I just told you you're not getting

8  copies of them.  So, copies of what?

9        MR. BEACH: Of the fee statements?

10        THE COURT: No, no, no.  Not yet.  We're going to

11  hear the other matter first.

12        MR. BEACH: Oh, okay.

13        THE COURT: But you have the ability to reply.  I

14  don't have any issue with that.

15        MR. BEACH: Your Honor, then I'm a little confused -

16        THE COURT: Now, but I will say for Friday - We need

17  to work out this issue.  If - about witnesses, I'm not going

18  to accept attorney affidavits.  So -

19        MS. STANFIELD (TELEPHONIC): Your Honor, my

20  declaration was just to authenticate copies of the

21  statements.

22        THE COURT: Okay.

23        MS. STANFIELD (TELEPHONIC): It was not with respect

24  to any substantive issue, it was just telling what the

25  documents are.

1          THE COURT: I'm sure Mr. Beach will agree to - Well,

2     he may or he may not.  Why don't you try to work with him on

3     what you can agree or not agree to as the admission of

4     evidence.

5          MR. BEACH: All right, and, Your Honor, if we do

6     need to argue the legal point as to entitlement on Thursday,

7     then I think we do need at least some additional information

8     as to what their, you know, points of attorney - I mean if

9     it's the default and the motions that we filed and that's it,

10    then, you know, we can argue those points, but I would like

11    some clarification if there's any additional points that they

12    intend to argue entitlement to attorney's fees on.

13         MS. STANFIELD (TELEPHONIC): I think it was laid out

14    in our objections, Your Honor.  If there's additional

15    information counsel would like, I'd be happy to talk on the

16    phone or get on the email.

17         THE COURT: All right.

18         MS. HARRIS: Your Honor, if I may, with respect to

19    the supplemental objection, the supplemental objection dealt

20    with the issue of the rent that I think we dealt with already

21    today and that has been resolved and dealt with the redacted

22    fee statements.  The entitlement issue is actually in the

23    initial objection.  So, I have a copy and happy to hand Your

24    Honor a copy of the supplemental objection if you'd like, but

25    given Your Honor's ruling that we're not dealing with that

1    Thursday and we're going to have to include more information

2    on those redacted, I don't know that that will help Your

3    Honor, but I'm happy to hand it up if Your Honor would like.

4            THE COURT: No, you don't need to hand it up because

5    it will be on the agenda that Young, Conaway is going to

6    file, and it will be in the notebook.

7            MS. HARRIS: That's true, Your Honor, but I just

8    want to make it clear for Your Honor that the entitlement

9    issue has to deal with the lease language which is the

10   original objection not the supplemental.

11           THE COURT: I understand.  One last thing is, it

12   would help your case - I know it's expensive to come out, but

13   it would be more helpful to the objector's case to have

14   whoever is present in the courtroom make the argument.

15           MS. STANFIELD (TELEPHONIC): I appreciate that, Your

16   Honor.  It's always a judgment call when you're looking at -

17           THE COURT: No, no, no -

18           MS. STANFIELD (TELEPHONIC): I already argued about

19   attorney fees and trying not to incur more.

20           THE COURT: I understand.

21           MS. STANFIELD (TELEPHONIC): But I appreciate the

22   point.

23           MS. FATELL: Your Honor, Bonnie Fatell.  Just wanted

24   to confirm that the Committee can weigh in on this prior to

25   the hearing on Thursday.

1          THE COURT: Of course, of course.

2          MS. FATELL: Thank you.

3          THE COURT: Of course.  All right.  I think that

4    resolves all objections except the one that we're continuing.

5    It's resolved in part and not resolved in part and can we

6    enter an order in the interim and save that - carve that

7    issue out for a later order?

8          MR. BEACH: Yeah, Your Honor, it does include the

9    cure amount of the 18,000 plus the 22,000 in the order as

10   long as counsel's comfortable with Your Honor's ruling or the

11   reservations on the record about the attorney's fee issue.

12   It doesn't say anything specifically about that in the order.

13         THE COURT: Well, why don't we put something in the

14   order that says that, and you can work with Ms. Harris here

15   in the courtroom to try to come up with some appropriate

16   language and just hand it to the courtroom deputy or if you

17   want more time, you can negotiate it and just submit it under

18   certification of counsel.

19         MR. BEACH: Well, perhaps this would be acceptable.

20   It says, "Except as set forth on the record at the hearing on

21   this matter", that's just after the resolution of objections.

22         THE COURT: No, I don't like that.  Let's be clearer

23   that their issue is carved out.

24         MR. BEACH: Okay, Your Honor.

25         THE COURT: Okay?  Just - you can negotiated that

1     after we get offline.

2               MR. BEACH: We'll do that, Your Honor.

3               THE COURT: All right.  Item 13.

4               MS. STANFIELD (TELEPHONIC): Thank you, Your Honor.

5               THE COURT: You're welcome.  Good-by.

6               MR. BEACH: Your Honor, the last item on the agenda

7     today is the second motion of the debtors to reject certain

8     real property and equipment leases and to abandon certain

9     property.  Your Honor, I believe we have resolved a number of

10    these objections and there's still, perhaps, some

11    reservations of rights and maybe some objections outstanding.

12    I'll run through them as efficiently as I can given the hour.

13    With regard to items c), d), f), and h), that's Craven-

14    Shaffer, Bank of America Leasing, De Lage Landen, and

15    SunLife.

16              THE COURT: I'm sorry, c), e) and f)?

17              MR. BEACH: c), d), f), and h).

18              THE COURT: c), d), f), and h), all right.

19              MR. BEACH: I believe we have resolved with the

20    issues based on negotiations with these parties, Your Honor,

21    and with respect to De Lage Landen, we have made certain

22    representations in a revised form of order or we've added

23    some provisions in a revised form of order which I believe

24    satisfied the De Lage Landen.  Your Honor, what might be

25    helpful is if I could approach with a blackline.

1          THE COURT: Fine.  Thank you.

2          MR. BEACH: Your Honor, Mr. Rosner reminded me that

3   we also agreed to make a statement on the record that the

4   debtors will pay the administrative expenses of De Lage

5   Landen from the petition date to August 31st.

6          THE COURT: Okay.

7          MR. BEACH: Which I've learned recently had not been

8   paid.

9          MR. ROSNER: And, Your Honor, Fred Rosner with Duane

10  Morris for De Lage Landen.  With that representation, we're

11  fine with the form of order that counsel just presented.

12         THE COURT: Thank you.

13         MR. BEACH: And the last - the changes in the last

14  three so ordered paragraphs relate to De Lage Landen, Your

15  Honor.  The first is that - it's just a cooperation

16  provision.  The second is a reservation of rights of De Lage

17  Landen and the debtors, and the third relates to an agreement

18  that the parties have in principal subject to documentation

19  regarding the ability for the debtors to reject the equipment

20  under this rejection motion and exclude some other equipment

21  that they will be consensually using and entering into an

22  agreement with De Lage Landen for the price of that equipment

23  that will be paid for the use, and it will also confirm the

24  debtors' continuing ability to assume and assign and reject

25  those later on.  Your Honor, this attempts to resolve an

1   issue that De Lage Landen raised about our ability to reject

2   some of the leases or not be able to reject some of the

3   leases and assume and assign others.  So this attempts to

4   resolve that objection at the head.

5        THE COURT: Okay.

6        MR. BEACH: And so the parties are going to work on

7   a form of agreement, and we'll present that to Your Honor

8   either in the form of a motion or if it's acceptable under

9   certification of counsel.

10       THE COURT: I think you need a motion.

11       MR. BEACH: We'll do that, Your Honor.  Your Honor,

12  the next objection was by Liberty Property, and that has been

13  resolved pending documentation of an agreement between - in

14  principal between the parties.  That, Your Honor, is

15  primarily related to an issue of the rejection date and the

16  debtors' intent to submit a revised - Well, a separate form

17  of order to reject that contract, and hopefully we'll do that

18  over the next couple of days.  The same resolution was

19  reached by a landlord entitled Kingstown, that was an

20  informal objection that I was just advised about prior to the

21  hearing, but it is not on the agenda.  With respect to item

22  g), Your Honor, that's the limited objection of STWB.  We've

23  got a partial resolution to this item, Your Honor, and do

24  intend to submit a separate order rejecting the lease.  There

25  is a dispute as to what the proper date of rejection will be

1    and what the parties intend to do.  If it's acceptable to

2    Your Honor is to submit under certification of counsel an

3    order that says that the lease is rejected, setting forth the

4    parties' assertions as to what the appropriate date of

5    rejection will be and then the parties are going to try to

6    resolve their issues, but if we can't resolve them, then

7    we're going to have a contested hearing regarding some

8    factual issues related to when the proper date of rejection

9    will be.

10           THE COURT: Which item was that?

11           MR. BEACH: That was item number g) the limited

12   objection of STWB.

13           THE COURT: Okay.

14           MR. BEACH: Item number j), Your Honor, I believe

15   has been resolved.  The debtors agree to make a

16   representation that the September rent that will be received

17   from the subtenant will be returned to the subtenant upon

18   receipt.  I believe, Your Honor, that leaves two remaining

19   items, that's item b) and e).  Item e) -

20           THE COURT: Wait a minute.  Mr. Lemish wishes to be

21   heard.  Yes, sir.

22           MR. LEMISH: Thank you, Your Honor.  I thought I'd

23   weigh in because we're at item j).

24           THE COURT: Yup.

25           MR. LEMISH: Again, Ray Lemish, Benesch Fredlander

1    on behalf of DDRTC Southern Pines Marketplace LLC.  Mr. Beach

2    is correct upon his representation that he just made that the

3    money from the subtenant will be returned to the subtenant.

4    We're okay with the rejection.  The only thing I would put on

5    the record, which I'm only doing, frankly, because I see that

6    De Lage Landen has their own complete reservation of rights

7    and obviously - or not so obviously, we believe that we want

8    to reserve any rights we have to assert other claims,

9    administrative claims, and we recognize the debtor, of

10   course, reserve all of its defenses to any claims we may

11   make.

12           THE COURT: Okay.

13           MR. BEACH: Item number e), Your Honor, is resolved

14   in principal subject to documentation.  That's Inland US

15   Management LLC.  Well, actually, I should take that back,

16   Your Honor.  I believe that there may still be an open item

17   to address with regard to that, and I will cede the podium.

18           THE COURT: Ms. Thompson.  Good afternoon.

19           MS. THOMPSON: Good afternoon, Your Honor.

20   Christina Thompson on behalf of Inland US Management LLC.

21   Actually Mr. Beach has mis-spoken a little bit.  We filed an

22   objection basically on two main points.  The first was that

23   Inland had not received any notification other than a motion

24   that the lease was being rejected prior to the proposed

25   effective date of August the 31st, and we also had not

1  received the keys.  Coupled with that, after the motion was

2  filed, Inland began receiving phone calls from a moving

3  company on behalf of the debtors calling to make arrangements

4  to pick up the debtors' personal property.  So with that

5  respect we had objected to the proposed rejection date.  We

6  were able to reach a consensual resolution with that, that

7  basically the rejection date is going to be tied off when

8  Inland gets access to the premises and the debtors' moving

9  company comes to pick up their personal property, and we've

10  agreed that the rent will be - for September, will be

11  prorated and paid through that date.  We've resolved that in

12  writing, and I believe the proposed form of order has been

13  revised to reflect our agreement otherwise.

14          THE COURT: Yes, well, it says, "except as otherwise

15  agreed to in writing by the debtors and Inland US

16  Management".

17          MS. THOMPSON: And as I was just saying, there was

18  an email between counsel, and I think we had intended that

19  that writing would be the "otherwise agreed to".

20          THE COURT: Okay.

21          MS. THOMPSON: The remaining issue, however, relates

22  to the - on two fronts.  To any abandoned owned personal

23  property by the debtors at the premises, to the extent there

24  is any, and also to the equipment that remains at the

25  premises that is subject to equipment leases being rejected

1   by the debtors in this motion, Inland's concern is that (a)

2   the proposed form of order does not contain any language

3   regarding specifically that the personal property is actually

4   abandoned.  I believe the proposed form of order says that

5   they're authorized to abandon, and it lacks any of the other

6   typical abandonment language that would permit Inland to

7   dispose of it without any liability to third parties.

8          THE COURT: I'm not sure that's typical language,

9   frankly.

10         MS. THOMPSON: I guess typical from the standpoint

11  that we as landlords normally see it in the orders that come

12  around rejecting leases that any personal property that's

13  abandoned there, landlords are permitted to dispose of it.

14         THE COURT: Mr. Beach?

15         MS. THOMPSON: If I can raise one more point because

16  I think it ties in.

17         THE COURT: Yup.

18         MS. THOMPSON: The main concern and also with the

19  equipment is that Inland doesn't want to be left basically

20  storing this equipment for the benefit of either the debtors

21  or for the equipment lessors for an indefinite period of

22  time.  At the very least, we'd like the order to maybe put

23  the equipment lessors on notice that they have, you know, ten

24  days from the date of the order to make arrangements to come

25  get the stuff, otherwise the landlords can proceed to get rid

1   of it because otherwise Inland's hands are tied and they may

2   be left indefinitely storing copiers, postage equipment -

3        THE COURT: You'll have your state law rights.  I

4   mean, it's no longer property of the estate.  The lease has

5   been rejected.  The property has been abandoned.  Your lease

6   has been rejected.  So, if somebody leaves a copier behind,

7   you just have to deal with it under state law - I'm not sure,

8   frankly, I have jurisdiction to require anyone to do anything

9   with non-estate property.  Let me hear though on the

10  abandonment issue of - your response.

11       MR. BEACH: Your Honor, I thought that's what Your

12  Honor was just -

13       THE COURT: Well, that's the one piece, but the

14  other question was, it says "authorized" not -

15       MR. BEACH: Well, I'm happy to change the language

16  to say it's abandoned.  I mean, our intent certainly is to

17  abandon it, and if there's any - If the language may give

18  counsel any concern of ambiguity, then -

19       THE COURT: Well, why don't we say the debtors are

20  authorized - I think it's important to have it authorized but

21  I think her point is, you also need to actually do it.  So,

22  let's tweak the language to make it clear that not only are

23  the debtors authorized but they are actually deemed to have

24  abandoned the property.  How about that?  The debtors are

25  authorized and deemed pursuant to 11 U.S.C. 548 to have

1    abandoned any FF&E, et cetera, et cetera.  Something along

2    those lines.

3              MR. BEACH: I think that's appropriate, Your Honor.

4    I think there might be a few locations where we have under

5    our conversations with the SEC have been continuing to gather

6    consumer information that might be located at these premises,

7    so, we certainly are intending to abandon all the FF&E and

8    all of the equipment, but with respect to that consumer

9    information, I suspect that the reason that it was drafted

10   this way was to -

11             THE COURT: Well, let's see.  You're the only one

12   that raised this issue.  So can you reach a side agreement on

13   this?

14             MR. BEACH: Yeah, we'll do that, Your Honor.

15             THE COURT: All right.  That leaves GE?

16             MR. BEACH: Your Honor, I believe GE is the last

17   remaining objection.

18             THE COURT: We finish where we started.  Let me hear

19   from GE.  The circle of life.

20             MS. LAWSON: And honestly had - if discussions had

21   occurred, I probably could have avoided wasting a lot of time

22   and money today sitting here, but -

23             THE COURT: Well, there's only so much a debtor can

24   do in a case like this, and you're well aware of that.

25             MS. LAWSON: If they are proposing to reject every

1    single lease, every single equipment lease, that's fine.

2    Then we're rejected and I can go home.  I just want to make

3    sure because they accept certain property and as I spoke to

4    the Court earlier, I don't have a definitive location of all

5    of our equipment so I can't tell from the motion and all the

6    property locations listed if all of our leases are included.

7    Now, counsel did mention earlier that there's a third motion

8    that would affect us, that, again, I have read that and

9    reviewed it, and it lists property addresses at which all

10   equipment leases are being rejected.  It never names the

11   equipment.  It never names the equipment lessors.  It never -

12   it just names the real property address.  So I can't tell.

13   If they all represent on the record that they are rejecting

14   every single lease and I can go get everything that we own, I

15   have no problem with that, assuming they give me an accurate

16   location.  But similar to the previous argument, the order

17   does not actually have them - it says they are - For the

18   equipment leases the order says the debtors are authorized

19   but not required to reject.  So are they rejecting them or

20   are they not rejecting them?  What's the effective rejection

21   date?  When they decide to tell me it's rejected or is it

22   based on the date in this order?  Which of my leases are

23   being rejected in this motion and which ones are being

24   rejected in the third motion that they filed?  So, my issue

25   is I don't know what they're doing with our stuff and I just

1   need to know so that my client can go and pick up everything

2   and not violate the automatic stay or have other issues.

3          MR. BEACH: Your Honor, with respect to this motion,

4   the debtors are rejecting all of the GE IKON equipment

5   located in everyone of its office spaces except for the small

6   number of spaces that are included on Exhibit B to this

7   motion.

8          THE COURT: How is she supposed to know where her

9   equipment is?

10          MR. BEACH: We've provided her a list of where we

11   believe the equipment is.  I understand -

12          THE COURT: It's incomplete.

13          MR. BEACH: I understand that, that's her client's

14   position is that it's incomplete and I have agreed that I

15   will go back to my client and try to dig deeper and make our

16   best efforts to get the information.

17          THE COURT: Well, but here's the issue.  How many

18   locations did you have, 400?

19          MR. BEACH: About 600.

20          THE COURT: Six hundred.  So you want her to send

21   representatives of GE to 580 locations, knock on the door,

22   and see if there's any GE equipment there.  If there is, she

23   can take it.  That's not reasonable.

24          MR. BEACH: That's not what I'm suggesting.  I am

25   suggesting that we will, you know, we've provided her with a

1  list.  I haven't reviewed it myself.  I will review it

2  personally.  I will ask the client to dig deeper and try to

3  figure out where this equipment is, and -

4         THE COURT: Well, it's a little odd because usually

5  if you reject a lease, you know, you reject it by - and here,

6  you know, I don't know, is this a situation where you have a

7  master lease subject to a series of schedules.  If it's a

8  lease where you have a bunch of different leases.  So, you

9  know, usually you would say, you know, I reject schedule, you

10  know, the whole lease or I reject items on schedule B, et

11  cetera, et cetera.  This is a little odd because you're

12  basically trying to reject by location as opposed to by

13  contract.  So you're really putting the onus on the lessor to

14  sort of figure out where their stuff is.  I understand it's -

15  I assume that it is unbelievably difficult to try to handle

16  what's where and whose equipment is anywhere in connection

17  with 600 closed locations and your client was in a free-fall

18  Chapter 11 situation, but I guess my response to that is,

19  you're not going to accomplish what you're trying to

20  accomplish through the motion, i.e., cutting off

21  administrative expenses if you're not going to provide GE

22  with enough information to reasonably get its equipment back.

23         MR. BEACH: Well, Your Honor, I would submit that

24  again, it is very difficult.  Your Honor is right to - with

25  this number of locations and as quickly as the company shut

1    down these locations, it is quite difficult to figure out

2    exactly where all the equipment is.  We have made one effort.

3    We've been advised that that wasn't sufficient.  We will make

4    other efforts, but, Your Honor, I do believe that this -

5    while it would have been, I think, helpful if we could have

6    identified each of these leases and the precise locations, it

7    just wasn't something that we could do under these

8    circumstances.

9              THE COURT: Well, let me ask you this -

10             MR. BEACH: But I don't -

11             THE COURT: Let me ask you this.  Basically you're

12   rejecting everything except 16 locations.

13             MR. BEACH: That's right, Your Honor, and -

14             THE COURT: Now isn't it easier to do an audit of 16

15   locations than 600?  So, can we set a deadline by which you

16   will be required to identify whether there's any equipment,

17   any GE equipment in any of these locations?

18             MR. BEACH: I'm happy to do that, Your Honor.  I

19   think it's actually even smaller than 16 locations since we

20   did - Well, actually it probably still is the same 16

21   locations.

22             THE COURT: Yeah.

23             MR. BEACH: I was going to say with their rejection

24   motion, but that relates to other office leases.

25             THE COURT: Now, that doesn't solve your problem of

1    not knowing where your stuff is.

2              MS. LAWSON: Correct.

3              THE COURT: But, all they're seeking to do is

4    reject.  They're not waiving your right to assert any damages

5    for any violations.

6              MS. LAWSON: Right, and that's fine.  What I would

7    like to know is are they rejecting everything in this motion

8    whereby my rejection date is going to be August 31st for every

9    lease I have?  There is no master lease agreement.  They are

10   individual leases.  So -

11             THE COURT: Well, what I understand is, they're

12   rejecting everything, every lease they have with you unless

13   it's at one of these 16 locations on Exhibit B.  Is that

14   right?

15             MR. BEACH: That's correct, Your Honor, and we will

16   have someone look at those locations to the extent it hasn't

17   been done already.  I believe it may have been done already,

18   but I will follow up on that, and, Your Honor -

19             THE COURT: And if your stuff is not where it's

20   supposed to be, you have a claim, by you I mean, GE.

21             MS. THOMPSON: Yes.

22             THE COURT:  All right?

23             MR. BEACH: That's right, Your Honor.  I believe

24   that, you know, again, we will make efforts to cooperate and

25   to help out, but I believe the rejection damages claim is -

1     THE COURT: Well, I think you should set a - I'd

2   like the order to have a deadline for you to certify to GE -

3   your client to certify to GE or state to GE whether any of

4   its equipment is located in any of these - whether any of

5   GE's equipment is located on any of these locations on

6   Exhibit B, because if the answer is no, then she'll know, and

7   anything that's got GE on it, you can get it, and if the

8   answer is yes, and it's X, Y, and Z piece of equipment, GE

9   will know what they have left, and I think that will actually

10   help the process of them being in a position to file a

11   rejection claim.  So, is five business days enough or is that

12   too short?

13     MR. BEACH: Your Honor, it's hard for me to tell.

14   That seems reasonable, but I have to go back to the people

15   that -

16     THE COURT: How about 10 business days?  I know

17   that's reasonable.  Ten business day.

18     MR. BEACH: That's fine, Your Honor.

19     THE COURT: All right.  Okay.

20     MR. BEACH: Your Honor, I think then we need to make

21   two changes to the motion.  One, to specify the 10 business

22   days with regard to GE IKON that will review those 16 office

23   locations for any equipment, and the other being -

24     THE COURT: That's a side letter with Inland so that

25   doesn't except, that doesn't change your order.

1          MR. BEACH: Right.  I think there was one other

2    change with regard to the abandonment to specify.  I can't

3    recall exactly what it was.

4          THE COURT: You're tired, Mr. Beach.

5          MR. BEACH: But I believe we're going to -

6          THE COURT: The issue on abandonment is a side

7    letter with Inland.  It doesn't affect the order because the

8    order already provides as others that you're going to have a

9    side agreement, which is fine.

10          MR. BEACH: Good enough.

11          THE COURT: All right, Mr. Cleary, you look like you

12    have a revised order.  You may approach.

13          MR. CLEARY: Thank you, Your Honor.  Your Honor,

14    what I've handed the Court is a consensual form of order,

15    which knocks out agenda item number 12.  I worked with Donna

16    Harris in the break with regards to item 13 and so I think

17    we've carved out that attorney fee issue.

18          THE COURT: All right.

19          MR. BEACH: Your Honor, with regard to the rejection

20    motion, I'll just interlineate some language in this order

21    and, if I may have a few minutes and then just deliver it to

22    chambers?

23          THE COURT: That's fine.

24          MR. BEACH: Thank you, Your Honor.  I believe that

25    concludes the agenda.

1          THE COURT: Anything else?  No?  Thank you very

2   much, hearing is adjourned.

3          (Whereupon at 4:09 p.m., the hearing in this matter

4   was concluded for this date.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18          I, Elaine M. Ryan, approved transcriber for the

19   United States Courts, certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter.

22

23   /s/ Elaine M. Ryan                         September 20, 2007
     Elaine M. Ryan
     2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221