IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | Case No. 07-11047 (CSS) |
| HOLDINGS, INC., A Delaware | ) | |
| Corporation, et al., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | Hearing Date: October 17, 2007 at 10:00 a.m. (ET) |
| | ) | |
| | ) | Objection Deadline: October 1, 2007 at 4:00 p.m. (ET) |
| | ) | |

**MOTION OF VANTAGE POINTE CAPITAL, LLC FOR AN ORDER UNDER RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY AND RULE 2004 OF THE LOCAL BANKRUPTCY RULES FOR THE DISTRICT OF DELAWARE, DIRECTING EXAMINATION OF AND PRODUCTION OF DOCUMENTS BY THE DEBTORS**

Vantage Pointe Capital, LLC ("Vantage Pointe"), by its counsel, Arnold &Porter LLP and Bennesch, Friedlander, Coplan & Aronoff LLP, moves this Court for entry of an order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2004 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") directing the examination of, and production of documents by, American Home Mortgage Holdings, Inc., and its affiliated debtors-in-possession (collectively, "AHM," "Debtor" or the "Debtors"). In support of the Motion, Vantage Pointe states as follows:

**SUMMARY OF RELIEF REQUESTED**

1. By this motion ("Motion"), Vantage Pointe requests that the Court enter an order in the form attached hereto as Exhibit A (the "Proposed Order"), pursuant to Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004, authorizing the examination of, and production of documents by, the Debtors, in order that Vantage Pointe may, *inter*

*alia*, (1) more completely and accurately evaluate the impact of important relief being sought by the Debtors in these bankruptcy proceedings (including, without limitation, the sale of significant assets) and (2) analyze and make more informed judgments with respect to the value of its position as a preferred equity holder of the Debtors.

## JURISDICTION

2. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This Motion constitutes a core proceeding under 28 U.S.C. §157(b).

3. Vantage Pointe has abided by the Local Bankruptcy Rule 2004-1 and conferred with counsel for the Debtors prior to submitting this Motion. See Certification of Compliance with Local Bankruptcy Rule 2004-1, attached as Exhibit B.

## STATUS OF CASE AND ACTIONS TAKEN BY VANTAGE POINTE TO REQUEST INFORMATION

4. On August 6, 2007 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors' Chapter 11 cases are being jointly administered, but have not been substantively consolidated.

5. Each Debtor is operating its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. No Trustee or examiner has been appointed in these proceedings.

7. The Official Committee of Unsecured Creditors was appointed on August 14, 2007.

8. Vantage Pointe holds a significant preferred equity position in American Home Mortgage Investment Corp. ("American Home").

9. By letter dated August 13, 2007, counsel for Vantage Pointe requested that the Office of the United States Trustee (the "U.S. Trustee") appoint an Official Committee of Equity Security Holders to act on behalf of the equity holders in these cases. See attached Exhibit C, for a copy of said request. On August 28, 2007, after consultation with the Debtors, that request was denied by the U.S. Trustee. See attached Exhibit D, for a copy of the response by the U.S. Trustee.

10. On August 30, 2007, counsel for Vantage Pointe requested certain information from the Debtors' counsel that would be very helpful to Vantage Pointe in enabling it to better understand, among other things, the Debtors' financial condition, the value of their assets, and the impact of various proposed asset sales and other relief being pursued by the Debtors on the prospects for recovery by creditors and equity holders in these cases. See attached Exhibit E for a copy of this request. On information and belief, the information is readily available to the Debtors, and would impose little or no burden upon the Debtors to provide same to Vantage Pointe. Counsel for the Debtors responded on September 5, 2007, refusing to provide any of the requested information. See attached Exhibit F for a copy of the response by counsel for the Debtors. In effect, counsel for the Debtors advised Vantage Pointe that they are simply too busy to address the request for information. Quite frankly, this response is consistent with the position that the Debtors have generally taken with respect to preferred equity holders in these cases, which is to assume, without question or analysis, that there is simply no value available to equity and that their positions are thus without merit and should be ignored.

**RELIEF REQUESTED**

11. Vantage Pointe seeks an order compelling the Debtors (1) to provide Vantage Pointe with the documents and information listed on Exhibit G to this Motion, and (2) to provide a representative qualified to testify with respect to such documents and information at a Rule 2004 examination.

12. Vantage Pointe is mindful of the demands on the Debtors' time. For that reason, rather than asking for "everything under the sun" -- as litigants often do when making document requests -- Vantage Pointe's requests are quite limited in scope, and should therefore impose very little, if any, burden on the Debtors, as all of the information Vantage Pointe seeks should be readily available to the Debtors. Moreover, Vantage Pointe's requests seek only those documents and information that are essential for a determination of (1) whether, as Vantage Pointe believes, there exists substantial value for preferred equity that can be preserved and realized and (2) what the likely impact of the various sales and other transactions being proposed by the Debtors will be upon holders of preferred equity. Given the accelerated pace at which these cases are proceeding, and the numerous pending filings relating to sale motions, it is self-evident that access to this information must be made available quickly. If transactions disposing of the Debtors' assets are approved before Vantage Pointe has the information necessary to formulate judgments on the merits of such transactions, and, if appropriate, to file responses on behalf of preferred equity, there is a significant risk that any substantial equity value that might otherwise exist for Vantage Pointe and other similarly situated stakeholders may be eroded, if not lost altogether.

## RATIONALE FOR RELIEF REQUESTED

**A.     Preserve Value for Preferred Equity Holders**

13.     Based upon publicly available information, Vantage Pointe believes that there is substantial value for preferred equity in these cases.  The Debtors, however, appear to have completely discounted any prospect of value for equity, and, indeed, are operating under the assumption that preferred equity has no value at all.  Vantage Pointe believes, however, that if given access to the requested information it will likely become evident that the Debtors are wrong, and that a realization of value pursuant to an orderly, market-sensitive process will ultimately result in a meaningful recovery for equity.  Needless to say, this is an important issue in these cases.

14.     The principal of Vantage Pointe, Daniel Osborne, has many years of experience in the mortgage and mortgage-backed securities industry, and if given access to the relevant documents and information, he is well-positioned to quickly undertake a thorough analysis of the Debtors' assets so as to determine (1) the potential value available for preferred equity, and (2) the impact that various proposed transactions will likely have upon the realization of such value.  Nobody other than a preferred equity holder such as Vantage Pointe has an incentive to perform a rigorous analysis focused on preserving and maximizing value for preferred equity.  This incentive, coupled with Vantage Pointe's ability to undertake such an analysis because of Mr. Obsorne's expertise in the industry, makes the argument for providing the necessary documents and information even more compelling.

15.     Moreover, information already available to the public strongly suggests that there is, in fact, equity value in these Debtors.  Specifically, as of March 31, 2007,

American Home had approximately $1.2 billion of total stockholders' equity.[1] The company thereafter raised another $92 million on May 4, 2007 from the sale of shares of common stock,[2] which would have brought the total equity value of American Home at that time to approximately $1.3 billion.

16.     Further, on June 27, 2007, an institutional investor agreed to invest $125 million in American Home in the form of a convertible trust preferred security that was convertible into American Home common stock at a initial conversion price of over $25 per share.[3] In this regard, it is not credible that a knowledgeable institutional investor, active in the mortgage sector, would make such an equity investment without a high degree of confidence in the reported equity value of American Home.

17.     In summary, following the May and June capital infusions, American Home would have had to lose well over a billion dollars in equity value in the forty days prior to the bankruptcy filing in order for the shareholders not to recover significant value.  Once again, this stretches the bounds of credibility.

18.     While it is undeniable that there has been a severe interruption in the mortgage-backed securities market, it is a mistake to confuse a nearly-unprecedented short-term interruption with a fundamental, long-term loss in value.  Those who overreact to the interruption, and quickly dump their holdings in a distressed market, will suffer greatly, while those who resist the temptation to panic, and look at intrinsic value rather than day-to-day market events, can preserve and ultimately realize the full value of their assets for the benefit of all their creditors and shareholders.  This is particularly true for a

---

[1]  See American Home Mortgage Investment Corp. March 31, 2007 10-Q, pg. 1.

[2]  See American Home Mortgage Investment Corp. March 31, 2007 10-Q, pg. 31, Note 23.

[3]  See American Home Mortgage Investment Corp. 8-K, pg. 3, Item 1.01 (filed July 2, 2007).

company such as the Debtor, that demonstrably had such substantial equity value shortly before the bankruptcy filing.  This is the fundamental argument that Vantage Pointe wants to make for the benefit of all equity holders.  To do so, however, requires access to the critical information from the Debtors necessary for Vantage Pointe to complete its analysis and, if appropriate, to pursue the rights of equity holders before the Court.  The Court may ultimately agree or disagree with Vantage Pointe -- or perhaps the issues will be resolved through negotiations with the Debtors without reaching the Court -- but surely Vantage Pointe, and, indeed, equity as a class, should not be denied access to the essential information needed to analyze the extent to which value for equity exists and to evaluate the impact of the various transactions proposed by the Debtors.  To grant the relief sought by Vantage Pointe affords equity an opportunity to realize value, at no risk to the Debtors and its creditors.  To fail to do so could deprive equity of any hope of recovery in these cases.  Thus, the equities clearly lie with granting Vantage Pointe, and all equity holders, a chance to avoid a total loss.

**B.      Conflict of Interests**

19.     In evaluating the entitlement of equity holders to seek to protect their own interests through access to information, it should also be noted that the secured creditors in these cases may have inherent potential conflicts of interest with what is in the best interests of all constituencies of the Debtors.  Specifically, to the extent that creditors are both secured creditors (to the extent of the value of the securities they hold on account of the Debtors' obligations) and unsecured creditors (by reason of margin calls or of any shortfall in the value of such securities arising from foreclosures), such creditors may not be motivated to challenge aggressively the nature of the interest held in such securities or

the value of such securities. Indeed, by ascribing an artificial, short-term value to the securities that these creditors are holding as collateral for their claims against the Debtors, such creditors generate illusory unsecured claims when they foreclose on such securities, only to potentially recover the full value of the securities when the markets recover some time in the future. In this manner the recovery of other unsecured creditors and/or equity holders is depressed, if not destroyed. This inherent potential for conflict may also be exacerbated if any unsecured creditors, including members of the creditors' committee, are (or have affiliates that are) secured creditors, potentially giving them the same incentives, or at least dual-loyalties. In light of the potential for conflicts, Vantage Pointe believes that it is critically important that the voice of equity be heard by the Court in order to counterbalance the potentially conflicted voice of secured or partially secured creditors.

### C.    Limiting Creditor Claims to the Appropriate Debtor Entities

20.    As noted above, the Debtor's estates have not been substantively consolidated in these cases, nor are all claims against the Debtors cross collateralized or guaranteed. Thus, it may be extremely important to ensure the structural priority implicit in the separate bankruptcy estates of the Debtors so that the deficiencies in one Debtor are not satisfied by any available surpluses in other Debtors, absent an explicit contractual provision providing for such protection. This is another issue that may be of critical importance to the preferred equity holders, as the prospect and extent of any recovery from these proceedings may depend on limiting creditor claims to the appropriate Debtor entities.

21. Once again, in order to properly analyze the structural priorities applicable to these Debtors, the preferred equity holders require immediate access to the information they have sought regarding the Debtors' financials.[4] Only then will they be in a position to protect their interests with regard to ensuring the appropriate distribution of value to creditors and equity holders.

**D.    Protection Against Damages Caused by Forced Liquidation**

22. As noted above, the market for mortgage loans and mortgage-backed securities has been in nearly unprecedented disarray. Liquidity for the trading of such assets is virtually non-existent and large investment funds have even halted redemptions -- not due to realized losses but due to the lack of ability to value the mortgage related assets in the portfolio. The detrimental impact of liquidating American Home's assets in the current market would likely result in a complete loss of shareholders' value.

23. As of March 31, 2007, many of American Home's assets were performing as expected.[5] The unrealized loss in value that has caused much of the liquidity crisis for American Home is not due to any erosion of the long-term intrinsic value of its assets but is due to the artificial depression in the value of such assets as a result of current market conditions, which depression is, in all likelihood, short term. If an orderly liquidation or reorganization is effectuated, creditors may well be protected by the very nature of these

---

[4]    In their response to Vantage Pointe's request for information, the Debtors directed Vantage Pointe to look at the monthly operating reports and the Debtors' bankruptcy schedules, once they are filed. Although Vantage Pointe intends to do so, it is clear that these filings will not contain sufficient information to undertake the necessary analysis, thus requiring this request for additional information.

[5]    See American Home Mortgage Investment Corp. March 31, 2007 10-Q, pg. 13, Note 5. As of March 31, 2007, only 1.6% of the total mortgage loans held for investment were nonaccruing mortgage loans.

9

performing assets, while also enabling a recovery for shareholders. Once again, obtaining the information requested from the Debtors will enable Vantage Pointe to fully investigate this premise, and, if valid, to move persuasively before this Court to protect the interests of equity holders.

24. The preferred equity holders may also seek to ensure that certain unsecured creditors are not repaid prior to their contractual right to payment upon maturity. For example, upon information and belief, the Debtors have issued over $400 million of trust preferred securities that have an average maturity of approximately 29 years and an average yield of approximately 8%, while many of the Debtors' assets, including performing subordinated securities and residual interests in securitizations, also have long average maturities. In the current distressed market, such longer maturity securities would likely be sold at significant discounts. Accordingly, if the Debtors were forced to sell longer maturity assets to repay longer maturity creditors at par over the near term, the Debtors' estates would suffer losses of several hundred million dollars, which would significantly impair recovery that might otherwise be available to equity in these proceedings. Conversely, the holders of longer maturity securities would enjoy a windfall, as they would be repaid at par much earlier than they were contractually entitled to, enabling them to reinvest at much higher yields in today's distressed market. If, on the other hand, the Debtors are allowed to retain the longer maturity assets, such security holders will likely be repaid pursuant to their original terms, while value is preserved for the Debtor's estates.

## APPLICABILITY OF RULE 2004

25. Bankruptcy Rule 2004 provides for examination on motion and for production of documents, which relate to "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate . . . ."

26. The request herein is clearly within the scope and intent of Rule 2004. In this case, it appears the Debtors are attempting to liquidate assets in the near term at depressed prices for the benefit of creditors - many of which may have conflicts - while completely ignoring the interests of preferred equity, despite facts that strongly suggest the existence of substantial equity value in these Debtors.

27. Vantage Pointe attempted to protect its interests, and those of other equity holders, by requesting that the U.S. Trustee appoint an equity committee. With the apparent opposition of the Debtors, the U.S. Trustee declined Vantage Pointe's request.[6] Thereafter, Vantage Pointe requested information directly from the Debtors. The Debtors, however, refused to grant Vantage Pointe access to the requested information, essentially stonewalling Vantage Pointe and taking the position that preferred equity is irrelevant. This is not acceptable, as Vantage Pointe is entitled to have its voice heard and its interests protected. It is clear that no other party in these cases is looking out for the interests of equity. Under these circumstances, Vantage Pointe is entitled to information to help it analyze the Debtors' assets and prospects and to determine the best course of action to protect its interests.

---

[6] Vantage Pointe reserves the right to file a motion with this Court seeking appointment of an equity committee.

28. The moving party is a sophisticated equity investor, with substantial expertise in the mortgage industry. With access to information, it will be able to make intelligent and well-formulated decisions regarding, *inter alia*, the existence and extent of equity value and the impact of any proposed transactions on that value. With no equity committee appointed, and because many of the equity holders are retail investors with limited means and, presumably, limited understanding of this complex industry, it is particularly important that an equity holder who understands the industry be in the position to protect the rights of all equity holders. This is all the more true where the Debtors have consistently evidenced no interest or intention to preserve equity value.

29. Equity should be allowed to determine if the "liabilities and financial condition" of the Debtors are such that the equity value that existed shortly before the bankruptcy filing can be preserved. Rule 2004 of the Bankruptcy Rules is intended to be liberally construed to allow for discovering the financial picture of the Debtor. See In re PRS Ins. Group, Inc., 274 B.R. 381, 385 (Bankr. D. Del 2001) (citing to Rule 2004 and commenting that "[t]he Bankruptcy Code is designed to bring the Debtor's affairs to light, not to hide them"); In re McLaren 158 B.R. 655, 657 (Bankr. N.D. Ohio 1992) ("The purpose of a Rule 2004 examination is to allow the court to gain a clear picture of the condition and whereabouts of the bankrupt's estate.") (citations omitted); In re Fearn, 96 B.R. 135, 137-38 (Bankr. S.D. Ohio 1989) ("[A]n inquiry pursuant to Rule 2004 may 'cut a broad swath through the debtor's affairs, those associated with him, and those who might have had business dealings with him'") (citations omitted); In re Vantage Petroleum Corp., 34 B.R. 650, 651 (Bankr.E.D.N.Y.1983) (commenting that "it has been

well-established that the scope of such an investigation [under Rule 2004] is broad . . . . The exploration can be in the nature of a fishing expedition").

30. The information sought by Vantage Pointe pertains to the Debtors' property and their "liabilities and financial condition." The documents and examination requested are clearly within the bounds of Rule 2004 and the discovery sought is narrowly tailored to matters relating to the financial picture of the Debtors and preservation of value for equity.

31. Compliance with the Rule 2004 requests, attached as Exhibit G, can be achieved without undue hardship or burden on the Debtors, and any hardship that exists balances in favor of allowing equity an opportunity to determine whether value exists for the benefit of equity holders.

## **NOTICE**

32. Notice of this Motion will be provided to (i) Counsel to the Debtors; (ii) the United States Trustee of the District of Delaware; (iii) counsel to the Official Committee of Unsecured Creditors; and (iv) all parties entitled to notice under Del. Bankr. LR 2002-1(b). Vantage Pointe submits that no other or further notice is required.

WHEREFORE, Vantage Pointe respectfully requests entry of the Proposed Order, attached hereto as Exhibit A, granting relief requested and directing the Debtors to produce the documents requested and provide a representative who is qualified to testify with respect to such documents.

        Respectfully submitted,

        BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP

        /s/ Bradford J. Sandler
        Bradford J. Sandler, Esq. (No. 4142)
        222 Delaware Avenue, Suite 801
        Wilmington, DE 19801
        (302) 442-7010
        bsandler@bfca.com

        -and -

        ARNOLD & PORTER LLP
        Michael L. Bernstein, Esq.
        555 12th Street
        Washington, DC 20004
        (202) 942-5577
        Michael_Bernstein@aporter.com

        Michael J. Canning
        399 Park Avenue
        New York, New York 10022
        (212)715-1110
        Michael_Canning@aporter.com

        Counsel for Vantage Pointe Capital, LLC.

Dated: September 25, 2007