UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter 11 |
| AMERICAN HOME MORTGAGE HOLDINGS, INC., *et al.*, | Case No. 07-11047 (CSS) |
| Debtors. | (Jointly Administered) |
| | Related to Docket Nos. 11, 113, 403, 614, 865 and 924 |
| | Objection Deadline: October 2, 2007 at 4:00 p.m. (ET) |
| | Hearing Date: October 9, 2007 at 2:30 p.m. (ET) |

**SUPPLEMENTAL OBJECTION OF COUNTRYWIDE BANK, FSB AND COUNTRYWIDE HOME LOANS, INC. TO DEBTORS MOTION FOR AN ORDER APPROVING THE SALE OF THE DEBTORS' LOAN SERVICING BUSINESS**

Countrywide Bank, FSB, formerly Countrywide Bank, N.A. ("Countrywide Bank"), and Countrywide Home Loans, Inc. (collectively, "Countrywide"), by and through their undersigned counsel, and in accordance with section 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), hereby file this Supplemental Objection to the Debtors' Motion for an Order Approving the Sale of the Debtors' Loan Servicing Business (the "Sale Motion"), and respectfully represent as follows:

**BACKGROUND**

1. On August 6, 2007 (the "Petition Date"), AHM Corp. and certain affiliates (collectively, the "Debtors") commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Cases").

2. Prior to the Petition Date, Countrywide Bank and American Home Mortgage Corp. ("AHM Corp.") were parties to that certain "Mortgage Loan Purchase and Servicing Agreement," dated March 14, 2006 (as supplemented by the related Trade Confirmations and Purchase Confirmations, the "Agreement"). As of July 30, 2007,

Countrywide Bank owned approximately 1,350 loans with an unpaid principal balance of approximately $484 million that it purchased from AHM Corp. and serviced by American Home Mortgage Servicing, Inc. (the "Servicer") under the Agreement.

3.  Prior to the Petition Date, on August 3, 2007, Countrywide Bank terminated the Servicer's rights pursuant to Section 7.2 of the Agreement by providing written notice of termination without cause (the "Termination Notice"). The Termination Notice terminated the Agreement effective as of September 2, 2007.

4.  Notwithstanding this valid termination, on August 6, 2007, the Debtors' filed their Emergency Motion for the Sale of the Debtors' Loan Servicing Business, including the sale of the servicing rights under the Agreement (the "Sale Motion")[Docket No. 11]. On September 5, 2007, Countrywide filed an objection to the Sale Motion (the "Sale Objection")[Docket No. 614][1].

5.  On September 21, 2007, the Debtors filed a Motion for an Order (a) Approving Revised Procedures for the Sale of the Debtors' Mortgage Servicing Business; (b) Approving Certain Protections for the Purchaser in Such Sale; (c) Directing that Certain Notices of Such Sale and Deadline be Given; and (d) Authorizing, on an Interim Basis, the Debtors to Grant Certain Liens and Other Protections for the Purchaser's Collateral Effective after the Initial Closing (the "Revised Procedures Motion")[Docket No. 865]. On September 25, 2007, Countrywide filed its Reservation of Rights with respect to the Revised Procedures Motion ("Reservation")[Docket No. 924].

6.  On September 25, 2007, this Court approved the Revised Procedures Motion and recognized AH Mortgage Acquisition Co., Inc. as the stalking horse purchaser (the "Purchaser") for the Debtors' mortgage servicing business (the "Servicing Business") under that

certain Asset Purchase Agreement attached to the Revised Procedures Motion (the "APA"). The Purchaser is an affiliate of WLR Recovery Fund III, L.P. ("WLR"), the Debtors' post-petition lender.

7. On September 25, 2007, the Debtors filed their Notice of Filing of Executed Asset Purchase Agreement [Docket No. 931] listing the Agreement[2] on Schedule 1.1(j) of the APA, seeking to assume and assign, as of the Final Closing Date (as defined in the APA) only that portion of the Agreement constituting a part of the Servicing Business. The Debtors also acknowledge in the APA that Countrywide terminated the Servicer's rights pursuant to Section 7.2 of the Agreement, but without giving any reason, the Debtors dispute such termination was effective.

**SERVICERING OBLIGATIONS UNDER THE AGREEMENT**

8. The Agreement is a fully integrated loan purchase and servicing agreement which, in addition to the Repurchase Obligations and Premium Recapture Amounts detailed in Countrywide's Sale Objection, *requires* among many other things (collectively, the "Servicer Obligations"), AHM Corp. and/or Servicer to (*emphasis added*):

> (i) release custody of the contents of any Mortgage File[3] only in accordance with the written instructions from Countrywide. Agreement Section 2.1.

---

[1] Countrywide incorporates herein by reference the Sale Objection in its entirety.

[2] The Debtors also listed that certain Mortgage Loan Purchase and Servicing Agreement, dated as of May 1, 2007, by and between American Home Mortgage Corp. and Countrywide Home Loans, Inc., as Purchaser (the "2007 Agreement") on Schedule 1.1(j). Under the 2007 Agreement, Countrywide Home Loans, Inc. bought certain mortgage loans, sold them back to AHM Corp. who then securitized the loans and delivered mortgage pass-through certificates ("MBS") evidencing a 100% beneficial ownership interest (excluding the related servicing rights) in the loans to Countrywide's affiliate, Countrywide Securities Corp. Upon issuance of the MBS, the Servicer began servicing the related loans pursuant to the pooling and servicing agreement for the MBS rather than the 2007 Agreement. As such, the 2007 Agreement is of no value to the Debtors because Countrywide Home Loans, Inc. owns no loans that the Debtors are servicing under that agreement and Countrywide has no intention to buy any additional mortgage loans under the 2007 Agreement. The arguments made with respect to the Agreement, however, apply with equal force to the 2007 Agreement, and Countrywide Home Loans, Inc. reserves the right to assert these arguments at the Sale Hearing on its own behalf.

[3] All capitalized terms in this section that are not otherwise defined herein, shall have the meanings ascribed to them in the Agreement.

(ii) deliver or make available to Countrywide a complete Mortgage File for each Mortgage Loan on or before such date as may be reasonably requested by Countrywide. Agreement Section 2.4.

(iii) be an approved seller/servicer for both Fannie Mae and Freddie Mac, in good standing with each such agency, and is a mortgagee approved by the Secretary of HUD pursuant to sections 203 and 211 of the National Housing Act. Agreement Section 3.1(d).

(iv) be a member of MERS in good standing, and be current in the payment of all fees and assessments imposed by MERS and has complied in all respects with the rules and procedures of MERS. Agreement Section 3.1(d).

(v) defend and indemnify Countrywide and hold it harmless against any losses, damages, penalties, fines, forfeitures, judgments and any related costs including, without limitation, reasonable and necessary legal fees, resulting from any claim, demand, defense or liability based upon or arising out of originating, purchasing, receiving, processing, funding or *servicing* any Mortgage Loan, *serviced* by AHM Corp. or any Subservicer[4], or from any assertion based on, grounded upon or resulting from a breach or alleged breach of any of AHM Corp.'s representations and warranties contained in Article III of the Agreement. Agreement Section 3.4.

(vi) *service and administer the Mortgage Loans* in strict accordance with all federal, state and local laws, *and the terms of the Agreement*. Agreement Section 4.1.

(vii) *segregate and hold all funds collected and received pursuant to each Mortgage Loan in custodial accounts separate and apart from any of its own funds and general assets.* Agreement Section 4.4

(viii) maintain *Mortgage Loan fire and hazard insurance* with extended coverage as is customary in the area where the Mortgaged Property is located in the amounts set forth in the Agreement. Agreement Section 4.10.

---

[4] Subservicer is defined in Article 1 of the Agreement as: Any Person appointed by [AHM Corp.] who services Mortgage Loans on behalf of [AHM Corp.] or any Subservicer and is responsible for the performance (whether directly or through Subservicers or Subcontractors) of a substantial portion of the material servicing functions required to be performed by [AHM Corp.] under this Agreement or any Reconstitution Agreement that are identified in Item 1122(d) of Regulation AB.

(ix) maintain a blanket insurance policy insuring against hazard losses on all of the Mortgage Loans and in connection with its activities as *servicer* of the Mortgage Loans and prepare and present all claims in a timely manner under the terms of such policy. Agreement Section 4.11.

(x) maintain, at its own expense, a blanket *Fidelity Bond and an errors and omissions insurance policy*, with broad coverage provided by an insurer rated A or better by A.M. Best on all officers, employees or other persons acting in any capacity with regard to the Mortgage Loans in handling funds, money, documents and papers relating to the Mortgage Loans. Agreement Section 4.12.

(xi) *not hire or otherwise utilize the services of any Subservicer to fulfill any of the obligations of AHM Corp. as servicer under the Agreement* or any Reconstitution Agreement unless AHM Corp. complies with the provisions of Section 4.21 of the Agreement. Agreement Section 4.21.

(xii) *comply with and cause any Subservicer used by the AHM Corp. (or by any Subservicer) for the benefit of Countrywide to comply with the provisions of Sections 4.21 (Use of Subservicers and Subcontractors), 4.19(c)(iii) (information relating to Subservicer), 5.6 (Annual Compliance Statement), 5.12 (Report on Assessment of Compliance and Attestation), 6.1(b) (Indemnification and Third Party Claims), 6.2 (Merger or Consolidation of Seller), 6.5 (No Transfer of Servicing) and 6.6 (Confirmation of Certain Representations and Warranties) of the Agreement to the same extent as if such Subservicer were AHM Corp., and to provide the information required with respect to such Subservicer under Section 4.19(c)(iv) of the Agreement.* Agreement Section 4.21(a)

(xiii) obtain from each *Subservicer and deliver to Countrywide any servicer compliance statement required to be delivered by such Subservicer under Section 5.6 (Annual Compliance Statement), any assessment of compliance and attestation required to be delivered by such Subservicer under Section 5.12 (Report on Assessment of Compliance and Attestation), and any certification required to be delivered to the Person that will be responsible for signing the Sarbanes Certification under Section 5.12 as and when required to be delivered.* Agreement Section 4.21(a).

(xiv) allow Countrywide to *examine and audit* upon reasonable notice to AHM Corp., during business hours or at such other times as

might be reasonable under applicable circumstances, any and all of the books, records, documentation or other information of AHM Corp., or held by another for AHM Corp. or on its behalf or otherwise, which relates to the performance or observance by AHM Corp. of the terms, covenants or conditions of the Agreement. Agreement Section 5.8.

(xv) *furnish to Countrywide, such periodic, special or other reports*, information or documentation, whether or not provided for in the Agreement, as shall be necessary, reasonable or appropriate in respect to Countrywide, or otherwise in respect to the Mortgage Loans and the performance of AHM Corp. under the Agreement. Agreement Section 5.9.

## OBJECTIONS

9. It appears that the Debtors recognize they cannot assume and assign the Agreement to the Purchaser and have now structured the sale to delay any determination of the termination, and assumption and assignment issues through *September 30, 2008*, the Final Closing, and possibly beyond. See APA § 2.7(b). Countrywide and indeed the estates should not be held hostage for a year or more waiting for the Purchaser to become qualified as a servicer.

10. The APA is unclear on the Debtors' proposed treatment of the Agreement. By classifying the Agreement as a "Disputed Servicing Agreement" under the APA, the Debtors acknowledge that Countrywide terminated the Agreement. See APA §§ 1.1 (at p. 6), 4.4, and Schedule 1.1(k). The APA provides that the Debtors "shall use their commercially reasonable efforts to negotiate a settlement or have issued as soon as possible a Final Order determining whether such Disputed Servicing Agreement was terminated at or prior to the Petition Date...." APA at § 4.4. If a settlement is negotiated or the Court enters a Final Order determining the Agreement was not terminated prior to the Petition Date, then the APA proposes that the Agreement will be a Purchased Asset and an Assumed Contract. Id. §§ 4.4 and 2.1(b).

11.     The Debtors further propose in the APA that they may in their "reasonable discretion, determine . . . not seek to negotiate a settlement or have issued a Final Order" with respect to Countrywide's termination of the Agreement. Id. § 4.4. If by settlement or Court order, it is decided that the Agreement was terminated prior to the Petition Date or if the Debtors decide not to negotiate or litigate, electing instead to designate the Agreement as an Excluded Asset, then Countrywide's Agreement will be an Excluded Asset. Id. During the period between the Initial Closing and the Final Closing, the APA proposes that the Debtors will continue to service Countrywide's loans irrespective of whether they have the ability to service the loans and irrespective of whether they service Countrywide's loans in accordance with the terms of the Agreement. See id. §6.2(f) ("From the Initial Closing Date through the Final Closing Date, Sellers shall service the (i) Mortgage Loans serviced under the Disputed Servicing Agreements . . .."). However, the Debtors are already in material post-petition default of their obligations under the Agreement and should not be permitted to continue to service Countrywide's loans. See Notice of Default and Demand for Cure letter dated September 18, 2007 attached hereto as Exhibit A and incorporated herein by reference.

12.     If the Agreement has not become a Purchased Asset or an Excluded Asset by the later of (a) the Final Closing and (b) September 30, 2008, the APA permits the Purchaser to treat the Agreement as either an Excluded Asset or a Purchased Asset. See id. §4.4. Thus, in the Debtors' sole discretion, they can take no action with respect to the Agreement, which will then allow the Purchaser to designate the Agreement as either a Purchased Asset or an Excluded Asset. But, even if Countrywide's Agreement is designated as an Excluded Asset, the APA currently provides that the Purchaser will still service Countrywide's loans pursuant to a "Purchaser Subservicing Agreement." See APA § 6.10(f) ("Following the Final Closing Date,

pursuant to the terms of the Purchaser Subservicing Agreement, Purchaser or its designee shall serve as subservicer for (i) Mortgage Loans serviced under the Disputed Servicing Agreements that are treated as Excluded Assets . . .." which language appears to grant rights beyond the estates' interests in the Agreement).

13. Thus, the Debtors and the Purchaser have created a mechanism where the Purchaser can obtain the economic benefit of servicing the Agreement irrespective of whether they comply with the express terms of the Agreement or the Debtors assume the Agreement and assign it to Purchaser.

14. This attempted sale of Countrywide's servicing rights under section 363 avoids the protections afforded Countrywide under the Agreement and 11 U.S.C. § 365 and has been rejected by this Court. See In re Access Beyond Technologies, Inc., 237 B.R. 32, 47 (Bankr. D. Del. 1999) (because an executory contract does not become an asset of the estate until it is assumed, sale of a debtor's assets will not include any contract that is executory unless debtor first assumes the contract); citing In re Tleel, 876 F.2d 769, 770 (9th Cir.1989) ("Unless and until rights under an executory contract are timely and affirmatively assumed by the trustee, they do not become property of the debtor's estate"). The Debtors cannot avoid requirements of section 365 governing executory contracts and unexpired leases by saying it is "selling" a lease or executory contract, rather than assuming and assigning it. In re Access Beyond, 876 F.2d at 48. At a minimum, to the extent the Agreement has not been terminated, the Debtors should be required to decide as of the Initial Closing Date whether they are going to reject the Agreement or whether they are going to assume and assign it to the Purchaser. If the latter, then the Debtors must prove the Agreement was not terminated in which case Countrywide is entitled to have all existing defaults set forth herein and in its Sale Objection cured and is entitled to adequate

assurance of future performance, including without limitation that the entity servicing and responsible for servicing are licensed. If the Debtors cannot prove that the Agreement was not terminated, then it must be treated as an Excluded Asset and excluded totally from the APA.

### SPECIFIC OBJECTIONS TO THE TRANSACTION AND FORM OF ORDER

15.  Countrywide believes that this Court should not approve the APA or enter the form of order that was attached to the Revised Procedures Motion (the "Proposed Sale Order"). As set forth below, the Proposed Sale Order contains several factual findings and legal conclusions that are impossible for the Court to make and are inappropriate given the expedited nature of the relief requested.

16.  Paragraph J of the Proposed Sale Order provides as follows:

> Each item of the Purchased Assets constitutes alienable property of the estate of at least one Seller or one of its Affiliates, and the Sellers shall have authority to transfer such Purchased Assets as provided in the APA. The Servicing Agreements being transferred to the Purchaser pursuant to the APA *consist solely of enforceable contracts for providing servicing, subservicing or master servicing for Mortgage Loans.* The Servicing Agreements (a) *do not include any agreements ("Other Agreements") with respect to matters (including but not limited to mortgage origination or mortgage sales (other than providing servicing, subservicing or master servicing for Mortgage Loans, regardless of whether such Other Agreements arise from, or are memorialized in, the same writing as the Servicing Agreements, and (b) to the extent any Servicing Agreement arises from, or is memorialized in, one or more writings which include an Other Agreement, such Servicing Agreement is severable from any Other Agreements.* The Purchaser has no Liability under any Other Agreement. Nothing in the APA or this Order shall have any effect on any Other Agreement or any claims related thereto against the Debtors, and the rights, if any, of all parties against the Debtors in respect of Other Agreements are not the subject matter of the Sale Hearing and are expressly reserved.

Proposed Sale Order ¶ J. (*emphasis added*)

17.  Paragraph 24 of the Proposed Sale Order goes on to provide that "[a]ny Servicing Agreement memorialized in the same writing as an Other Agreement (such writing, a "Multi-Agreement Document") is hereby deemed reformed to become a separate, independently enforceable agreement." Proposed Sale Order ¶ 24.

9

18. Countrywide objects to any provision in the APA or Proposed Sale Order, which seeks declaratory relief relating to the severability of the servicing rights from the remainder of the rights and obligations contained in Countrywide's Agreement. As set forth above, the Agreement is a fully integrated loan purchase and servicing agreement, which cannot be severed. The failure of the Purchaser to assume the Agreement in its entirety, subject to all of the terms and provisions contained therein, would constitute an impermissible modification of the Agreement, to which Countrywide does not consent. Furthermore, in order for the Debtors to obtain this type of declaratory relief, they were required to file an adversary proceeding. See Fed. R. Bankr. Proc. 7001(2) and (9). Without the Debtors' providing evidence in a proper adversary proceeding, the Court cannot possibly determine on an expedited basis whether all or any of the Servicing Agreements: (i) consist solely of enforceable contracts for providing servicing, subservicing or master servicing for Mortgage Loans; (ii) do not include any Other Agreements; or (iii) are severable from any Other Agreements. Countrywide doubts that the Court has been provided with copies of all of the Servicing Agreements to make such a determination.

19. Paragraph N of the Proposed Sale Order impermissibly further rewrites the economic bargain Countrywide negotiated in the Agreement. Paragraph N of the Proposed Sale Order provides that "[a]ny provision in an Assumed Contract that allows any Person to terminate any such Assumed Contract due to the fact that one or more of the Sellers is not a qualified servicer under any FNMA guidelines shall be unenforceable and of no force and effect for so long as the Purchaser is using its best efforts to become a qualified servicer under FMNA guidelines." The Agreement expressly provides that it is an event of default if Seller [or any purchaser/subservicer] ceases to be an approved servicer for both Fannie Mae and Freddie Mac for more than thirty (30) days. Agreement Section 7.1(a)(vi). Such approval is consistant with

applicable public policy. If an approved servicer is not servicing the loans, the value of the Countrywide loans is less than if an approved servicer was servicing them. The Debtors, and the Purchaser if successful, must fully perform all of obligations under the Agreement and the APA and Proposed Sale Order should not be used as a means to rewrite the parties' economic bargain. In re TSW Stores of Nanuet, Inc., 34 B.R. 299, 304 (Bankr. S.D.N.Y. 1983) (debtor may not assume contract free from the burden that at some time in the future it might be subject to a claim that the debtor's conduct or inaction amounted to a default under the contract). Countrywide objects to any provision in the APA or the Proposed Sale Order that would impair Countrywide's ability to terminate the servicing rights under the Agreement for cause and without cause, especially with respect to any potential purchaser or subservicer, or permits servicing of Countrywide's loans by an entity that cannot comply with the minimum standards set forth in the Agreement.

20.     Countrywide objects to paragraph 18 of the Proposed Sale Order, which would grant the Purchaser a section 506(c) waiver. Given the structure of the proposed sale, it is impossible for Countrywide, or any other party-in-interest for that matter, to determine what losses the Debtors' estates will or could incur pending the Final Closing as a result of the Purchaser's actions. Given the expedited nature of the transaction, it is impossible for parties-in-interest to make an informed judgment as to the appropriateness of the section 506(c) waiver. At a very minimum, the section 506(c) waiver should only be approved if and when there is a Final Closing. Indeed such a waiver may act to negate the entire benefit of the APA or otherwise result in an unintended indemnity by the estates and its creditors for the benefit of the Purchaser.

21.     Countrywide objects to the injunction contained in paragraph 38 of the Proposed Sale Order enjoining Countrywide from being forever barred, estopped, and

permanently enjoined from asserting prosecuting or otherwise pursing any "Interests" (which Countrywide interprets as being limited to retrospective defaults) of any kind whatsoever against the Purchaser or its affiliates. Countrywide reserves it rights to pursue all rights or remedies it may have against the Purchaser and the estates under the Agreement. This type of injunction, if at all, should only be considered through the disclosure statement and plan process.

22. Countrywide objects to paragraph 29 of the Proposed Sale Order and the APA to the extent at the Initial Closing, the Debtors are not required to reserve from the Purchase Price and place into escrow cash equal to the amount necessary to cure of all outstanding obligations asserted to be owing to Countrywide under the Agreement, which amount on account of Repurchase Obligations and Premium Recapture Amounts is currently at least $9,436,230.75 and not the zero dollars proposed by the Debtors. It appears that the Debtors and Purchaser are seeking not to escrow any cure amounts for the "Other Agreements." The Debtors and Purchaser should make it clear in the Proposed Sale Order whether they propose to escrow **all** unpaid cure amounts due under the Servicing Agreements, including the need to escrow for all asserted defaults pending a final determination of the severability of the Agreement.

23. Countrywide objects to the provision in paragraph 40(d) of the Proposed Sale Order that exculpates the Purchaser from any liability under the Servicing Agreements in violation of section 365 of the Bankruptcy Code. As set forth above, the Debtors and/or the Purchaser cannot be relieved of their obligations under Section 365 of the Bankruptcy Code to cure all defaults as a condition to any assumption and assignment.

24.     As set forth more fully in Countrywide's Sale Objection, Countrywide's, loan files are held in express trust by the Debtors under Section 2.1 of the Agreement, which provides that:

> "Upon sale of the Mortgage Loans, the ownership of each Mortgage Loan, the Mortgage Loan Documents, and the Mortgage Files related to the Mortgage Loans shall be vested in [Countrywide Bank], and the ownership of all records and documents with respect to the Mortgage Loans prepared by or which come into the possession of [AHM Corp.] shall immediately vest in [Countrywide Bank] and shall be retained and maintained, **in trust,** by [AHM Corp.] at the will of [Countrywide Bank] in a custodial capacity only."

Agreement § 2.1 (emphasis added).

25.     Section 2.1(a) of the APA purports to convey to the Purchaser the Servicing Rights, which is defined in section 1.1 of the APA to include, the right of ownership, possession, control or use of any and all Servicing Files, and Mortgage Loan Documents pertaining to the servicing of the Mortgage Loans as provided in the Servicing Agreements. The Servicing Files and Mortgage Loan Documents subject to the Agreement are the property of Countrywide and cannot be sold or transferred to the Purchaser. Even if the Agreement had not been terminated, Countrywide's Servicing Files and Mortgage Loan Documents cannot be sold or transferred to the Purchaser and any substitute trustee must be approved by Countrywide. See Agreement Section 2.1,

26.     The APA and the Proposed Sale Order seek to grant the Purchaser liens in the Purchased Assets. Countrywide objects to any lien being granted at the Sale Hearing on any of Countrywide's assets, including without limitation, its Servicing Files, Mortgage Loan Documents or any funds being held in custodial accounts or otherwise for the benefit of Countrywide, whether with or without priority over Countrywide's interests.

## THE DEBTORS SHOULD SUBJECT THE PROPOSED TRANSACTION TO THE PLAN PROCESS

27. Countrywide further objects to the APA and Proposed Sale Order on the basis that the transaction contemplates an impermissible *sub rosa* plan. In considering a sale proposed under section 363(b) bankruptcy courts must carefully consider several factors to ensure that the debtor is not proposing a "creeping" or "*sub rosa*" plan; these factors include consideration of whether the proposed transaction specify terms for adoption of the reorganization plan and whether approval of the proposed transaction will effectuate a de facto reorganization in such a "fundamental fashion" as to render creditors' rights under the other provisions of chapter 11 meaningless. In re Work Recovery, Inc., 202 B.R. 301, 303-04 (Bankr. D. Ariz. 1996) (citing Pension Benefit Guaranty Corp. v.Braniff Airways, Inc. (In re Braniff Airways, Inc.), 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets . . . In any future attempts to specify the terms whereby a reorganization plan is to be adopted, the parties and the district court must scale the hurdles erected in Chapter 11. See e.g. 11 U.S.C. § 1125 (disclosure requirements); id. § 1126 (voting); id. § 1129(a)(7) (best interest of creditors test); id. § 1129(b)(2)(B) (absolute priority rule)."); In re Lionel Corp., 722 F.2d, 1063 (2d Cir. 1983); In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 983-84 (Bankr. N.D.N.Y. 1988) (nunc pro tunc approval of postpetition lease of substantially all of debtor's property); In re Public Serv. Co., 90 B.R. 575 (Bankr. D.N.H. 1988) (transaction in which debtor would transfer managerial and operational control of plant to separate corporation); In re Conroe Forge & Mfg. Corp., 82 B.R. 781, 784-85 (Bankr. W.D. Pa. 1988) (immediate distribution of proceeds of sale of collateral); In re DRW Property Co. 82, 54 B.R. 489, 497-98 (Bankr. N.D. Tex. 1985) (substantive

consolidation of debtor with 109 related nondebtor partnerships for all purposes, including federal taxation).

28. It is clear that this transaction will take up to one year to consummate and allow the Purchaser the ability to become a qualified servicer. The subject of the APA constitutes the remaining material assets of the Debtors' estates and since the transaction by its terms is not to be consummated in less time than plan procedures and confirmation would require, there is no justification for approving this transaction absent confirmation. Because: (i) the Final Closing will take up to one year; (ii) the Debtors are attempting to immediately transfer control of the servicing business to an unqualified Purchaser; (iii) the scope of the injunctions being sought; (iv) the liens being sought upon all of the Debtors' assets; (v) legal title to the servicing business will remain with the Debtors through the Final Closing; and (v) the other substantial assumption and assignment issues contemplated by this transaction, Countrywide believes the proposed transaction improperly and indirectly locks the estates into a particular plan mode prematurely, and without the protections afforded by the procedures surrounding a disclosure statement and confirmation hearing, in a plan of reorganization. See In re Public Service Co. of New Hampshire, 90 B.R. 575, 581 (Bankr. D.N.H. 1988).

## MOTION AND PROPOSED SALE ORDER VIOLATE SECTION 364

29. Furthermore, it appears from the APA that the transaction also involves the refinancing by the Purchaser of the WLR debtor in possession facility without disclosure or seeking a further order under section 364 of the Bankruptcy Code. It's not clear how much of the purchase price will be used to repay the WLR DIP facility.

## CONCLUSION

**WHEREFORE**, Countrywide Bank and Countrywide Home Loans, Inc. request that this Court prohibit the Debtors from selling their assets or assuming and assigning the Agreement or the 2007 Agreement and grant them such other and further relief as the Court deems appropriate.

Dated: Wilmington, Delaware
      October 5, 2007

                        Respectfully submitted,

                        EDWARDS ANGELL PALMER & DODGE LLP

                        _____
                        William E. Chipman, Jr. (No. 3818)
                        919 North Market Street
                        15th Floor
                        Wilmington, Delaware 19801
                        (302) 777-7770

                        *Counsel to Countrywide Bank, FSB and Countrywide Home Loans, Inc.*