### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | Case No. 07-11047-CSS |
| HOLDINGS, INC., a Delaware | ) | |
| corporation, *et al.*,[1] | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | Related to Doc. No. 11 |
| | ) | Hearing Date: 10.9.07 @ 2:30 p.m. EST |
| | ) | Auction Date: 10.5.07 |
| | ) | Bid Deadline: 10.2.07 |
| | ) | Objection Deadline:  10.1.07 |

**SUPPLEMENTAL OBJECTION OF GMAC MORTGAGE LLC TO
EMERGENCY MOTION OF THE DEBTORS FOR ORDERS: (A)(1) APPROVING SALE
PROCEDURES; (II) SCHEDULING A HEARING TO CONSIDER SALE OF CERTAIN
ASSETS USED IN DEBTORS' LOAN SERVICING BUSINESS; (III) APPROVING FORM
AND MANNER OF NOTICE THEREOF AND (IV) GRANTING RELATED RELIEF; AND
(B)(I) AUTHORIZING THE SALE OF SUCH ASSETS FREE AND CLEAR OF LIENS,
CLAIMS AND ENCUMBRANCES, AND OTHER INTERESTS; (II) AUTHORIZING AND
APPROVING PURCHASE AGREEMENT THERETO; (III) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES RELATED THERETO; AND (IV) GRANTING RELATED RELIEF**

GMAC Mortgage LLC, formerly known as GMAC Mortgage Corporation ("GMACM"), by

and through its counsel, Reed Smith LLP, files this Supplemental Objection (the "Objection") to the

Motion of the Debtors filed at Docket No. 11 (the "Sale Motion") seeking an Order of Court that, *inter*

*alia*, authorizes the sale (the "Sale") of the Debtors' servicing business (the "Servicing Business") free

and clear of liens, claims and encumbrances and approving the assumption and assignment of certain

executory contracts and unexpired leases, and to the Debtors' proposed cure amounts as set forth in its

Notice of (I) Possible Assumption and Assignment of Certain Leases, License Agreements, and

---

[1] The Debtors are:  American Home Mortgage Holdings, Inc.; American Home Mortgage Investment
Corp.; American Home Mortgage Acceptance, Inc. ("AHM Acceptance"); American Home Mortgage
Servicing, Inc. ("AHM Servicing"); American Home Mortgage Corp.; American Home Mortgage
Ventures LLC; Homegate Settlement Services, Inc.; and Great Oak Abstract Corp.

Executory Contracts; and (II) Proposed Cure Obligations, as amended by the Debtors on September 10, 2007 (collectively, the "Modified Notice of Assumed Contracts and Proposed Cure Amounts"), and in support of the Objection,[2] respectfully represents as follows:

## I. BACKGROUND OF PROPOSED SALE TRANSACTION

1.    On September 21, 2007, Debtors filed an Emergency Motion (D.N.865) for an Order (A) Approving Revised Procedures For The Sale Of The Debtors' Mortgage Servicing Business (the "Revised Bidding Procedures"); (B) Approving Certain Protections For The Stalking Horse Bidder In Such Sale; (C) Directing That Certain Notices Of Such Sale And Deadlines Be Given; And, (D) Authorizing, On An Interim Basis, The Debtors To Grant Certain Liens And Other Protections For The Purchaser's Collateral Effective After The Initial Closing ("Motion to Approve Revised Sale Procedures").

2.    A hearing was held before this Court on September 25, 2007 at which the Court entered an Order (D.N. 937) approving the Revised Bidding Procedures (the "Order Approving Bidding Procedures") and directing the Debtors to send certain notices regarding the Debtors proposed sale of its assets related to its mortgage servicing business (the "Assets"). Appended to the Order Approving Bidding Procedures are the approved bidding procedures and the form of notice to be provided to creditors and parties in interest regarding the proposed sale (the "Sale Notice").

3.    As permitted by the Order Approving Bidding Procedures, the Sale Notice was sent to various parties notifying them of (i) the entry of the Order Approving Bidding Procedures; (ii) the Debtors execution of an Asset Purchase Agreement (the "Stalking Horse APA") with AH Mortgage Acquisition Co., Inc. (the "Stalking Horse"), (iii) the approved bidding procedures pertaining to the

---

[2] GMACM hereby incorporates its Initial Objection dated September 20, 2007 herein. Any capitalized term contained herein without definition shall have the definition contained in the Initial Objection.

sale of the Assets (the "Bidding Procedures"), and (iv) the proposed form of sale approval order (the "Proposed Sale Order").

4.    The proposed form of asset purchase agreement pertaining to the sale of the Assets as well as the Proposed Sale Order are appended as exhibits to the Motion to Approve Revised Bidding Procedures. The Bidding Procedures provide, among other things, that objections to the proposed sale as described in the Stalking Horse APA and Proposed Sale Order must be filed on October 2, 2007.

## II. GMACM'S INITIAL OBJECTION TO THE SALE AND MODIFIED NOTICE OF ASSUMED CONTRACTS AND PROPOSED CURE AMOUNTS

5.    Prior to the filing of the Motion for Revised Bidding Procedures and in connection with the Debtors original emergency motion seeking to sell its assets pertaining to its mortgage servicing business (D.N. 11) and its Modified Notice of Assumed Contracts and Proposed Cure Amounts, GMACM filed the Initial Objection (D.N. 857) in which GMACM objected to certain components of the proposed sale as well as the proposed cure amounts, and reserved its rights to supplement its objection at a later date. This Objection supplements and is in addition to the Initial Objection.

6.    After reviewing the Proposed Sale Order and the Stalking Horse APA, GMACM has a myriad of additional concerns regarding the manner in which this proposed sale is being conducted, the types of assets which the Debtors are attempting to sell and the identity and qualifications of the Stalking Horse.

## III. GMACM'S SUPPLEMENTAL OBJECTIONS TO THE PROPOSED SALE

**A.    Any Contracts Which Are Assumed And Assigned Must Be Assumed And Assigned In Their Entirety. The Debtors Attempt To Modify Their Agreements Prior To Assigning Such Agreements Should Not Be Permitted.**

7.    GMACM does not believe that the sale, as proposed by the Debtors and as described in the Stalking Horse APA and the Proposed Sale Order are permissible under the Bankruptcy Code or prevailing case law because of the manner in which the assets are proposed to be sold.

8.      In the Stalking Horse APA and Proposed Sale Order, the Debtors purport to assume and assign certain of the Debtors' contracts, including many of their servicing agreements.[3]  However, when one analyzes the language of these two documents, it is apparent that the Debtors are attempting to assume and assign the rights, but not many of the material burdens, contained within the servicing agreements, even in instances where the rights and burdens are found in one agreement or series of agreements comprising a single transaction.  For example, the Proposed Sale Order includes a paragraph that essentially modifies the Assumed Contracts (as such term is defined in the Stalking Horse APA).  Paragraph P of the Sale Order provides as follows:

> "any provision in an Assumed Contract that prohibits or conditions the assignment of such Assumed Contract or allows any Person to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract, constitutes an unenforceable anti-assignment provision that is void and of no force and effect.  Any provision in an Assumed Contract that allows any Person to terminate any such Assumed Contract due to the fact that one or more of the Sellers is not a qualified servicer under any FNMA guidelines shall be unenforceable and of no force and effect for so long as the Purchaser is using its best efforts to become a qualified servicer under FMNA guidelines." *See* Proposed Order ¶ P.

9.      Further the Debtors attempt to rewrite the Servicing Agreements by eliminating from such agreements any provisions (regardless of whether they are contained in the Servicing Agreements themselves or in some separate but integral and related document) that restricts or conditions assignment thereof or that imposes upon the servicer obligations that the Stalking Horse cannot or

---

[3]      Under the Stalking Horse APA, the Servicing Agreements that are proposed to be assumed and assigned are listed on Schedule 1.1(j) to the Stalking Horse APA and include, among others, the following servicing and subservicing agreements related to securitizations for which GMACM is either the HELOC Master Servicer or the Back-Up Servicer: the 2004 Subservicing Agreement (1.1(j) dr); 2005-1 Servicing Agreement (1.1(j) dt); 2005-2 Servicing Agreement (1.1(j) dv); 2005-4A Servicing Agreement (1.1(j) ea); 2006-2 Servicing Agreement (1.1(j) eg); 2007-SD1 Servicing Agreement (1.1(j) el); and, 2007-A Servicing Agreement (1.1(j) en) (collectively, the "Servicing Agreements").

chooses not to comply with.[4]  In the Proposed Sale Order the Debtors purport to transfer servicing

agreements consisting "solely of enforceable contracts for providing servicing, subservicing or master

servicing for Mortgage Loans".  Proposed Order ¶ J.  Proposed Sale Order ¶ J further provides that the

Debtors are not assigning to the Stalking Horse or the successful bidder any agreement, whether

separate but related to the servicing agreements or whether embodied in the servicing agreements

(emphasis supplied) that are deemed Other Agreements.[5]

10.    While it is not clear from either the Proposed Sale Order or the Stalking Horse APA

what exactly qualifies as an "Other Agreement", it is presumably any covenant, condition or provision

of any servicing agreement or agreement related thereto which the Stalking Horse or the successful

bidder refuses to be bound by or with respect to which the Stalking Horse is incapable of complying.

---

[4]      Paragraph 24 of the Proposed Sale Order provides as follows:

> Any Servicing Agreement memorialized in the same writing as an Other
> Agreement (such writing, a "Multi-Agreement Document") is hereby *deemed
> reformed* to become a separate, independently enforceable agreement. *Any
> provision of a Multi-Agreement Document that would allow any Person to
> terminate, recapture, impose any penalty or modify any term or condition upon
> such reformation, is void and of no effect.*  All Persons entitled under a Multi-
> Agreement Document to consent to such reformation are hereby deemed to have
> consented.  Nothing in this Order or in such reformation shall affect any
> substantive provisions of an Other Agreement.

[5] Paragraph J of the Proposed Sale Order (which is a proposed finding of fact by the Court) provides as
follows:

> The Servicing Agreements being transferred to the Purchaser pursuant to the APA consist
> solely of enforceable contracts for providing servicing, subservicing or master servicing
> for Mortgage Loans. The Servicing Agreements (a) do not include any agreements
> ("Other Agreements") with respect to matters (including but not limited to mortgage
> origination or mortgage sales) other than providing servicing, subservicing, or master
> servicing for Mortgage Loans. The Servicing Agreements (a) do not include any
> agreements ("Other Agreements") with respect to matters (including but not limited to
> mortgage origination or mortgage sales) other than providing servicing, subservicing or
> master servicing for Mortgage Loans, regardless of whether such Other Agreements arise
> from, or are memorialized in, the same writing as the Servicing Agreements, and (b) to
> the extent any Servicing Agreement arises from or is memorialized in one or more
> writings which include an Other Agreement, such Servicing Agreement is severable from
> any Other Agreements.  The Purchaser has no liability under any Other Agreement.

GMACM objects to any provision of the Stalking Horse APA or the Proposed Sale Order to the extent that it attempts to rewrite the Servicing Agreements or change any material term that the counterparties to such Servicing Agreements relied upon in connection with the original transaction.

11.    GMACM also objects to the Debtors attempt to separate the servicing rights from any obligations of the servicer under the Servicing Agreements or the documents that are integrally related thereto.  The Servicing Agreements are executory contracts.[6]  Because they are executory contracts, they must be assumed and assigned in their entirety.  See Fleming Cos. v. PCT (In re Fleming Cos., Inc.), 2007 U.S. App. LEXIS 19927, *19-21 (3d Cir. Aug. 22, 2007) (stating that "the Third Circuit has broadly declared that the election to assume or reject under § 365(a) is an 'all-or-nothing' proposition".); Schlumberger Res. Mgmt. Servs. v. CellNet Data Sys. (In re CellNet Data Sys.), 327 F.3d 242, 249 (3d Cir. 2003); see also 3-365 COLLIER ON BANKRUPTCY-15th Edition Rev. § 365.03. The debtor must either assume the entire contract, *cum onere*, or reject the entire contract, shedding obligations as well as benefits.  Id.  This election is an all-or-nothing proposition--either the whole contract is assumed or the entire contract is rejected.  Id.  The Bankruptcy Code does not permit a debtor to "assume the benefits of a contract and reject the unfavorable aspects of the same contract." Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J.V., 209 F.3d 252, 255 (3d Cir. 2000) (denying Debtors' attempt to recharacterize contract rights as accounts receivable and sell them free and clear of the corresponding obligations); Lee v. Schweiker, 739 F.2d 870, 876 (3d Cir. 1984) (stating debtors cannot hand-pick provisions of a contract to assume and assign); In re Italian Cook Oil Corp., 190 F.2d 994, 996-97 (3d Cir. 1951) (same); Fleming Cos., 2007 U.S. Dist. LEXIS 18739 at * 19-21.  Thus, the

---

[6] In re Commonwealth Mortgage Company, Inc., 149 B.R. 4 (Bankr. Mass. E.D. 1992) (analyzing the transfer of a debtor's rights in servicing agreements under 11 U.S.C. § 365); see also Kimmelman v. Port Auth. of N.Y. & N.J. (In re Kiwi Int'l Air Lines, Inc.), 344 F.3d 311, 318 fn. 5 (3d Cir. 2003) (*citing* Sharon Steel Corp. v. National Fuel Gas Distribution Corp., 872 F.2d 36, 39 (3d Cir. 1989) (*quoting* Vern Countryman, Executory Contracts in Bankruptcy, Part 1, 57 Minn. L. Rev. 439, 460 (1973) and other cases adopting Countryman's definition).

Debtors may not use the bankruptcy process to cherry-pick only those portions of the documents that are most favorable to them and expect to strip the other parties to those agreements of the rights and obligations they bargained for as part of the original transaction.

12.     Likewise, § 365 of the Bankruptcy Code does not give the Debtors the right to disregard obligations which are contained in agreements that are integrally related to those agreements that they seek to assume and assign.  The Servicing Agreements are part of large securitization trusts which contain other documents that are integrally related to the Servicing Agreements.  For example, each securitization trust contains an Indenture.  The rights and obligations of the many parties to the securitization transactions (including the mortgage servicer) are located in not only the Servicing Agreements but in the Indenture and in other documents executed in connection therewith.  Many of these obligations were a material component of the transaction and should be assumed and assigned as part of the sale of the Servicing Agreements.

13.     In effect, the Debtors are utilizing the bankruptcy process to rewrite material parts of their servicing agreements in a manner that evidently suits the Stalking Horse, even though bankruptcy law clearly prohibits such an action, unless the non-debtor parties to such agreements consent to any such proposed revision.  Further, the Debtors are attempting to assign rights and benefits under the contracts rather than the contracts in their entirety even though they are purporting to do so under §365 of the Bankruptcy Code.  This attempt by the Debtors flies in the face of § 365 of the Bankruptcy Code and relevant case law in that an executory contract may not be assumed in part and rejected in part. Schlumberger Res. Mgmt. Servs., 327 F.3d at 249; see also 3-365 COLLIER ON BANKRUPTCY-15th Edition Rev. § 365.03.

**B.    The Language Of The Stalking Horse APA And The Proposed Sale Order Is Vague In That It Is Impossible To Determine Which Provisions Of Assumed Contracts Are Proposed To Be Included And Which Provisions Are Proposed To Be Eliminated.**

14.    Not only do the Debtors attempt to rewrite the Servicing Agreements in contravention of bankruptcy law and the language in the agreements, they also render it virtually impossible to determine those provisions that are being eliminated from the contracts purportedly being assumed and assigned. The Stalking Horse APA and the Proposed Sale Order fail to clearly identify those provisions of the Servicing Agreements which are not being assumed and assigned; rather, they leave it to the contract counterparties to guess as to those provisions being assumed and assigned and those being eliminated. They then attempt to permanently enjoin the non-Debtor parties to those agreements from enforcing the agreements. <u>See</u> paragraph 38 of the Proposed Sale Order. The Debtors' attempt to rewrite their executory contracts prior to assuming and assigning them is prohibited by Section 365 of the Bankruptcy Code and by prevailing case law on this issue. <u>Folger Adam Sec., Inc.</u>, 209 F.3d at 255; <u>Lee</u>, 739 F.2d at 876; <u>In re Italian Cook Oil Corp.</u>, 190 F.2d at 996-97; <u>Fleming Cos.</u>, 2007 U.S. Dist. LEXIS 18739 at * 19-21.

**C.    Debtors Cannot Use Section 363 Of The Bankruptcy Code As Means To Avoid Section 365**

15.    The Debtors imply that the Servicing Agreements or the rights under the Servicing Agreements are property of the estate and can be sold pursuant to section 363 of the Bankruptcy Code. This argument, however, does not give the Debtors a way around the requirements of section 365. There are no property rights existing outside of the four corners of the Servicing Agreements. Put another way, the only possible property rights that could be property of the estate as that term is defined in section 541, are the Servicing Agreements themselves. The case law in the Third Circuit is clear that the contracts must be assumed and assigned before they may be sold. "A debtor cannot avoid the requirements of section 365 by saying it is 'selling' a lease or executory contract, rather than

assuming and assigning it. To hold otherwise would lead to ludicrous results." In re Access Beyond Techs., Inc., 237 B.R. 32, 47 (Bankr. Del. 1999).

16.     Property of the bankruptcy estate encompasses 'all legal or equitable interests of the debtor,' and includes executory contracts. Cinicola v. Scharffenberger, 248 F.3d 110, 123 (3d Cir. 2001) (citing 11 U.S.C. § 541(a)(1)) (citations omitted). "The sale of an executory contract triggers the protections afforded sales of bankruptcy estate property but also requires satisfaction of the requirements for assuming and/or assigning the same executory contract." Id.; In re Rickel Home Ctrs., Inc., 209 F.3d 291, 302-03 (3d Cir. 2000).

17.     Thus while executory contract rights *are* a form of property that is salable free and clear of interests under section 363(f), such sale must comply with the "protections afforded the contract party under section 365 of the Bankruptcy Code". In re: The IT Group, Inc., 350 B.R. 166, 171 (Bankr. Del. 2006) (holding that leases and executory contracts, though property of the estate, must be assumed and assigned before they are sold,); see also Cinicola, 248 F.3d at 124 (concluding that sale of executory contract triggers protections afforded sales of bankruptcy estate property but also requires satisfaction of the requirements for assuming and/or assigning the same executory contract); Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 498 (3d Cir. 1998) (holding section 363 governs the sales of contracts and section 365 provides some limitations and conditions to assignments); In re Access Beyond Techs., Inc., 237 B.R. at 47 (stating that "debtor cannot avoid the requirements of section 365 by saying it is 'selling' a lease or executory contract, rather than assuming and assigning it").

18.     It is clear under Third Circuit law that in order for Debtors to "sell" the Servicing Agreements, they must first assume and assign the Servicing Agreements in their entirety. See Cinicola, 248 F.3d at 124.

19.    Accordingly, GMACM opposes the assignment of any Servicing Agreement (i) where the entire Servicing Agreement, including all rights *and* obligations thereunder, is not assumed and assigned; or, (ii) which the Debtors attempt to "sever" from Other Agreements to the extent that such Other Agreements are relevant to the securitization trust.

20.    For the foregoing reasons, and those set forth in its objection dated September 20, 2007, GMACM objects to the Sale Motion and the Modified Notice of Proposed Executory Contracts and Proposed Cure Amounts.

### D.    The Debtors Attempt To Assume And Assign Rights They No Longer Own And The Status Of Disputed Servicing Agreements Is Unclear And Vague.

21.    The Debtors have no rights under several of the Servicing Agreements that are nevertheless included within the schedule of contracts that the Debtors reserve the right to assume and assign. As stated in the Initial Objection, the FGIC Insured Trust Servicing Agreements were terminated prepetition and thus are not capable of being assumed and assigned by the Debtors.

22.    While the Debtors may have possession of various documents and information related to the FGIC Insured Trust Servicing Agreements, and while they may be servicing the loans under those agreements in violation of their terms, they have no rights under such agreements to convey to a third party. The Debtors have acknowledged receipt of the termination letter sent to them by GMACM prior to the Petition Date.

23.    The FGIC Insured Trust Servicing Agreements are included in Schedule 1.1 (k) of the Stalking Horse APA which is a list of "Disputed Servicing Agreements". Presumably, the Disputed Servicing Agreements are ones that the counterparties to those agreements claim to have terminated prepetition.

24.    The Stalking Horse APA is unclear, under Section 4.4 and other provisions, as to the status of Disputed Servicing Agreements, cure claims and the rights of non-Debtor counterparties and

other parties under such agreements. Further, the Stalking Horse APA provides the Stalking Horse (or the successful bidder, as the case may be) with almost a year to determine whether to purchase some or all of the Disputed Servicing Agreements, even though the Debtors may have no rights under those agreements. This one year time period for sorting out the rights of the parties under those Disputed Servicing Agreements is far too long and should be shortened considerably.

25.    Further, included in the Stalking Horse APA (Section 6.10(f)) is a provision which permits the Debtors to assign rights under Disputed Servicing Agreements even after the Court determines that they are Excluded Assets because they were terminated prepetition. Under Section 6.10(f), the Stalking Horse may nevertheless service those Disputed Servicing Agreements as a subservicer without the consent of other parties to those Disputed Servicing Agreements. Thus, even if the Debtors have no rights to assign, and even if the Court finds they have no rights to assign, they may nevertheless assign servicing rights!

26.    The status of Disputed Servicing Agreements should be determined as soon as possible following the auction of the Purchased Assets, and if the Court determines that the Debtors have no rights under such agreements or have only limited rights, all of the documentation, information and funds held by the Debtors which are related to the FGIC Insured Trust Servicing Agreements should be turned over to GMACM as servicer. The Debtors should have no ability to assign rights they do not own and the Stalking Horse should have no ability to subservice under agreements that have been terminated prepetition.

E.    **The Stalking Horse Is Not A Qualified Substitute Servicer Under The Servicing Agreements Or The Documents Related Thereto.**

27.    Another concern raised by the Stalking Horse APA and the Proposed Sale Order is the identity and qualifications (or lack thereof) of the Stalking Horse. The Stalking Horse is a virtual start-up company, which has no apparent experience in the mortgage loan servicing business. The Stalking

Horse is not licensed to engage in the servicing of mortgage loans and there is no assurance that the licenses will be forthcoming. Nor does the Stalking Horse meet some of the other material criteria for becoming a "substitute servicer" as set forth in the Servicing Agreements. These criteria are a material component of the Servicing Agreements and the Debtors should not be able to assume and assign the Servicing Agreements unless they can demonstrate that the successor servicing meets these criteria.

28.     The fact that the Stalking Horse is not licensed renders it incapable of becoming the successor servicer under the Servicing Agreements, unless the restrictions regarding assignment to an unlicensed entity are rendered unenforceable or the counterparties to the Servicing Agreements waive that restriction. Because the Stalking Horse is not yet licensed to perform mortgage loan servicing, the parties to the Stalking Horse APA are compelled to seek approval of a very unconventional sale process under Section 363 of the Bankruptcy Code whereby the sale (assuming the Stalking Horse is the successful bidder) will occur in two distinct parts. The first "closing" will convey the risks and rewards of ownership of the Assets to the buyer but legal title will remain with the seller. There could be a period of more than ten (10) months between the first closing and the final closing at which time legal title to the Assets will be conveyed to the buyer. There is a substantial risk that the sale will never officially close because the Stalking Horse may not be able to obtain needed licenses or approvals from governmental entities or quasi-governmental entities. This possibility presents the likelihood that the Debtors will be unable to meet their burden of showing that the non-Debtor counterparties to the Servicing Agreements are adequately protected as to future performance. In fact, if the Stalking Horse does not meet the conditions necessary for it to complete the transaction, it is unclear who will service the loans covered by the Servicing Agreements or whether there will be an interruption in the servicing of such loans.

29.    The Proposed Sale Order should provide that to the extent the Stalking Horse or the successful bidder is unable to complete the legal transfer of the Assets by a specific date (which should be within six months of the initial closing), the servicing rights and agreements should be returned or delivered to the servicers or subservicers thereunder, as the case may be, free and clear of all liens, claims and encumbrances (including the protective liens held by the Stalking Horse) and the party that is in possession of any documents, files or funds related to each servicing agreement, should be obligated to deliver such items to the successor servicer.

**F.    The Debtors Must Cure Existing Defaults Under The Servicing Agreements; The Cure Amounts As Stated By The Debtors Is Incorrect.**

30.    Because the Servicing Agreements are executory contracts, the Debtors or the proposed assignee must cure the existing defaults under the Servicing Agreements before the Servicing Agreements may be assumed and assigned, or sold, to a third party. *See* 11 U.S.C. §§ 365(b) & (f).

31.    Currently, the Debtors list $0.00 as the proposed cure amount for assuming and assigning the Servicing Agreements (the same amount that is listed for all of the contracts listed on the Debtors' Assumption Notice and Proposed Cure Amounts). This amount is incorrect.

32.    Pursuant to the Servicing Agreements, the Debtors and, in some instances, the proposed assignee, owe certain indemnification obligations to GMACM. *See* §5.06 of the Servicing Agreements, which are attached to the Initial Objection as Exhibits A, B, and C, respectively. GMACM has incurred certain costs, fees, and expenses arising out of the defaults under the Servicing Agreements which should be required to be paid under the indemnification provisions of the Servicing Agreements as damages prior to any assumption, in an amount to be determined. These damages continue to accrue and they must be fully cured prior to the sale or assumption of the servicing rights under the Servicing Agreements.

33.     Furthermore, GMACM must be given sufficient time to obtain information on the status of the Debtors' performance under the Servicing Agreements to determine the existence and extent of defaults thereunder.  Any determination that no monetary default exists under the Servicing Agreements is premature and incorrect.  Due to the expedited deadlines for objecting to the Sale Motion and proposed cure amounts, GMACM has thus far been unable to determine with any real accuracy the universe of existing monetary defaults that may exist under the Servicing Agreements and the documents related thereto.

34.     While GMACM undertakes efforts to assess the existence and extent of the Debtors' defaults under the Servicing Agreements, adequate reserves should be established before the Servicing Agreements may be assumed and assigned in order to protect against additional unknown present and future damages resulting from a breach of the Servicing Agreements.

35.     The Debtors' Revised Sale Procedures Motion purports to escrow only an amount sufficient to cover "Initial Cure Amounts", which amounts will be determined at the time this Court enters the Sale Order.  *See* Revised Sale Procedures Motion, ¶ 27, Proposed Sale Order, ¶¶ 29 & 33.  The Revised Sale Procedures Order, however, is silent on escrowing a cure amount.

36.     Further, the Debtors are purporting to retain responsibility for paying cure amounts only through the date of the Initial Closing, while the Debtors nonetheless continue to service the Loans through the Final Closing.  Accordingly, it appears that the Debtors intend to service the Loans without the concurrent obligation to remedy defaults or cure costs relating to the Loans during the interim period.  Moreover, the Debtors' servicing of the Loans without obligation to cure defects in the interim period may adversely affect GMACM's ability to assert its right of offset and recoupment against the Debtors.

37.    For the foregoing reasons, the Debtors' proposed cure amounts and payment of the cure amounts are inadequate.  Accordingly, GMACM objects to the Sale Motion and the Assumption Notice and Proposed Cure Amounts.

WHEREFORE, GMAC Mortgage LLC respectfully requests that the Court (i) deny the Sale Motion to the extent that it seeks to permit the Debtors to assume and assign the Servicing Agreements; and (ii) permit GMAC Mortgage LLC sufficient time and opportunity to determine the correct cure amounts under the Servicing Agreements to the extent that they are assumed and assigned; and (iii) grant GMAC Mortgage LLC such other and further relief as the Court deems appropriate or just.


Dated:  October 2, 2007
        Wilmington, Delaware

Respectfully submitted,

REED SMITH LLP

By:  /s/ Gaston P. Loomis II
     Gaston P. Loomis II (No. 4546)
     1201 North Market Street, Suite 1500
     Wilmington, DE 19801
     Telephone: (302) 778-7500
     Facsimile: (302) 778-7575
          and
     Robert P. Simons, Esquire
     435 Sixth Avenue
     Pittsburgh, PA 15219
     Telephone: (412) 288-7294
     Facsimile: (412) 288-3063
          and
     Claudia Z. Springer, Esquire
     2500 One Liberty Place
     1650 Market Street
     Philadelphia, PA 19103
     Telephone: (215) 851-8100
     Facsimile: (215) 851-1420

     Attorneys for GMAC Mortgage LLC