IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x   Chapter 11
In re:                                                           :
                                                                 :   Case No. 07-11047 (CSS)
AMERICAN HOME MORTGAGE                                           :
HOLDINGS, INC., a Delaware corporation, et al.,[1]               :   Jointly Administered
                                                                 :
                 Debtors.                                        :   Re: Docket No. 955
---------------------------------------------------------------- x
                                                                     Hearing Date: October 17, 2007 at 10:00 a.m.
                                                                     Objection Deadline: October 5, 2007[2]

**DEBTORS' OBJECTION TO MOTION OF VANTAGE POINTE CAPITAL, LLC
FOR AN ORDER UNDER RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY
AND RULE 2004 OF THE LOCAL BANKRUPTCY RULES FOR THE DISTRICT OF
DELAWARE, DIRECTING EXAMINATION OF AND PRODUCTION OF
DOCUMENTS BY THE DEBTORS**

The above-captioned debtors and debtors in possession (the "Debtors" or

"AHM"), hereby submit their objection to the motion of Vantage Pointe Capital, LLC ("Vantage

Pointe") seeking examination and production of documents by the Debtors (the "Rule 2004

Motion").

**PRELIMINARY STATEMENT**

1.    Vantage Pointe has failed to demonstrate good cause for its requested Rule

2004 examination of the Debtors' assets and liabilities. Vantage Pointe's Rule 2004 Motion

should be denied for at least four reasons:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

[2] Pursuant to an agreement among the parties, the Objection Deadline was extended from October 1, 2007 to October 5, 2007 for the Debtors.

a. *First*, there are numerous publicly available documents that both demonstrate the Debtors' decline in equity value and provide Vantage Pointe with the information it needs to conduct its analysis of: (i) any potential value for equity security holders and (ii) the impact of the Debtors' proposed transactions upon Vantage Pointe. Requiring the Debtors to comply with Vantage Pointe's broad requests to compile and particularly categorize information beyond what is publicly available would be unduly burdensome for these estates.

b. *Second*, the magnitude and scope of the document requests, given the current posture of the Debtors' chapter 11 cases, is unduly burdensome and prejudicial to the Debtors. The Debtors are in the midst of pursuing and obtaining approval of the sale of their mortgage loan servicing business (the "Sale"). Over eighty objections to the sale have been filed, parties in interest have served discovery requests, and the hearing to consider approval of the sale is scheduled for October 15, 2007 (with the initial closing of the Sale anticipated to occur on October 31, 2007). It is imperative that the Debtors' limited resources not be diverted from approval and consummation of the Sale. The Debtors limited resources are further stretched by the pending "multi-track trial" scheduled during the week of October 15, 2007 and further efforts to maximize the value of their estates for the benefit of their stakeholders.

c. *Third*, Vantage Pointe has failed to demonstrate that its requested examination is necessary. In general, a creditor's request for a Rule 2004 examination is permitted to establish the moving party's claim or when denial of the examination would cause the moving party injustice. Neither is present here. Essentially, Vantage Pointe does not believe that the Debtors actually lost as much value as has been widely reported. As explained more fully herein, the Debtors fell victim to a confluence of environmental factors that were

unprecedented in the company's experience. As of this time, there is no evidence to suggest that equity is likely to receive any recovery in these chapter 11 cases.

    d.  *Finally*, the interests of equity holders are already being represented to the extent necessary by the actions of the official committee of unsecured creditors (the "Committee") and its able team of legal and financial advisors. The interests of the Committee and the equity holders are aligned in seeking to maximize value to the estates. Moreover, no evidence has been presented establishing the presence of any conflicts that would preclude the Debtors' board of directors from adequately representing the interests of equity holders.

## STATUS OF THE CASE

  2.  On August 6, 2007 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in possession of their properties and have continued to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq*.

  3.  The Committee was appointed on August 14, 2007. No trustee or examiner has been appointed.

  4.  Vantage Pointe previously solicited the Office of the United States Trustee to form an official committee of equity security holders, which Vantage Pointe offered to chair. The United States Trustee declined to appoint another official committee.

## BACKGROUND OF DEBTORS

  5.  Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage

loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

6. As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents.

## EVENTS LEADING TO THE CHAPTER 11 FILING

7. Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

8. The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

9. In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the

Debtors' loans. During this time, certain of the Debtors' warehouse lenders -- the financial institutions that provide short term credit facilities needed to originate and purchase loans -- began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

10. On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

11. The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors now employ approximately 700 persons who are absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

12. As unprecedented events continue to send the subprime market into disarray, the Debtors' mortgage-backed securities and mortgage loan holdings continued to experience significant decline, which was primarily caused by falling real estate prices and a spike in consumer defaults on mortgage obligations. The downward pressure on loan and security values accelerated as more and more borrowers were forced to sell securities and loans in an effort to meet margin calls such that, for the few weeks preceding the Debtors' bankruptcy filing, the markets for these assets were disrupted to the point of dysfunction.

13. In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

14. Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## **RELEVANT BACKGROUND**

15. Two days after the United States Trustee declined to appoint an equity committee, counsel for Vantage Pointe sent Debtors' counsel an exhaustive document and information request. More specifically, Vantage Pointe requested that the Debtors compile data from various sources and separate by category information relating to the Debtors' loans, mortgage securities, servicing rights and fees, repurchase claims, secured claims, creditor information, and cash balances.

16. On September 5, 2007, the Debtors responded to Vantage Pointe's request and informed Vantage Pointe that that the Debtors would not provide the information. The Debtors declined to provide the information because, among other things, they could not divert valuable time and resources to compile the vast amounts of information Vantage Pointe sought. The Debtors further declined to provide information because Vantage Pointe sought information that (i) would otherwise be publicly available or (ii) would not even be available to Vantage Pointe under formal discovery.

17. On the same day Vantage Pointe filed its Rule 2004 Motion, the parties again discussed Vantage Pointe's request for information. The Debtors declined to provide Vantage Pointe with the information it requested, for the same reasons stated above.

**VANTAGE POINTE HAS FAILED TO DEMONSTRATE "GOOD CAUSE" FOR ITS RULE 2004 EXAMINATION**

18. Bankruptcy Rule 2004(a) provides that "[o]n motion of any party in interest, the court may order the examination of any entity." Fed. R. Bankr. P. 2004(a) (emphasis added). While it is often said that the scope of a Rule 2004 examination is "unfettered and broad," it is well recognized that Rule 2004 is not without limits. See, e.g., In re Duratech Indus., Inc., 241 B.R. 291, 296 (Bankr. E.D.N.Y. 1999) (stating that "[h]owever vigorous and broad discovery may be under a Rule 2004 examination, there are well-established limits even to this free-and-easy practice"); In re Express One Int'l, Inc., 217 B.R. 215, 217 (Bankr. E.D. Tex. 1998) (providing that "[a]lthough the scope of a Rule 2004 examination is very broad, there are important limits to the scope of the examination"); Texaco, 79 B.R. at 553 (stating that "the scope of the [Rule 2004] examination is not limitless"). A Rule 2004 examination cannot be so broad as to be more disruptive and costly to the debtor than beneficial to the would-be examiner. See Texaco, 79 B.R. at 552.

19. A Rule 2004 examination may not be used for purposes of abuse or harassment and should not "stray into maters which are not relevant to the basic inquiry." In re Mittco, Inc., 44 B.R. 35, 36 (Bankr. E.D. Wis. 1984). See also Duratech, 241 B.R. at 296 (noting that "case law is replete with holdings that resort to Rule 2004 cannot include discovery conducted in bad faith or for improper purposes"). The requested discovery "should not encompass matters that will be unduly burdensome to the debtor and duplicative of previously

furnished information or will not be required in order to evaluate or propose a plan of reorganization." Texaco, 79 B.R. at 553.

20.     The burden is upon Vantage Pointe to establish "good cause" for its Rule 2004 examination, and it has failed to meet its burden. See Express One, 217 B.R. at 217; In re Eagle-Picher Indus., Inc., 169 B.R. 130, 134 (Bankr. S.D. Ohio 1994) (finding that "one seeking to conduct a 2004 examination has the burden of showing good cause for the examination which it seeks").

21.     "Good cause" generally "requires a showing that the examination sought is necessary to establish the claim of the party seeking the examination, or the denial of such request would cause the proposed examiner undue hardship for injustice." Express One, 217 B.R. at 217 (citing In re Dinubilo, 177 B.R. 932, 943 (E.D. Ca. 1994)). The fact that the documents Vantage Pointe seeks may be relevant to its alleged claim is insufficient. See Drexel Burnham, 123 B.R. at 712 ("That the documents meet the requirement of relevance does not alone demonstrate that there is good cause for requiring their production."). Nor can Rule 2004 provide Vantage Pointe with confidential information for which they have yet to demonstrate a reasonable need. See In re Continental Forge Co., Inc., 73 B.R. 1005, 1006 (Bankr. W.D. Pa. 1987) (stating that Rule 2004 cannot "be used as a vehicle for gathering confidential information for which no reasonable need is shown.") Finally, when the information sought is either already well-known or within the would-be examiner's possession, it is likely that the "good cause" requirement is not satisfied. See In re Symington, 209 B.R. 678, 687-88 (Bankr. D. Md. 1997).

**A.   Documents publicly available are sufficient for Vantage Pointe to conduct its "analysis."**

22.     In its response to Vantage Pointe's informal document request, the Debtors advised Vantage Pointe that at least a portion of the information requested will be

available in the Schedules of Assets and Liabilities and Statement of Financial Affairs, which the Debtors intend to file today. Other information will be available in the Debtors' Initial and Monthly Operating Reports, the first of which was filed August 21, 2007 [D.I. 275], or in other publicly available documents. In fact, to substantiate its need for a Rule 2004 examination, Vantage Pointe relies upon publicly available documents. There is no suggestion in Vantage Pointe's motion whether it even considered the option of first conducting its analysis with information otherwise publicly available.

23. Rather, Vantage Pointe claims that its principal, Daniel Osborne, is "well-positioned to quickly undertake a thorough analysis of the Debtors' assets so as to determine (1) the potential value available for preferred equity, and (2) the impact that various proposed transactions will likely have upon the realization of such value." (Rule 2004 Motion ¶ 14.) Mr. Osborne's ability to quickly analyze mortgage information, is, quite frankly, beside the point. Instead, the burden placed upon the Debtors if ordered to respond to Vantage Pointe's massive document requests should be the Court's focus. By its motion, Vantage Pointe seeks not only to have the Debtors produce documents, but to provide Vantage Pointe with compilations of data particularly categorized. To require the Debtors to perform such a task is beyond the duties imposed upon a debtor in a formal discovery process, and in this instance is unduly burdensome.

B. **Vantage Pointe's document requests are unduly burdensome.**

24. The Debtors' chapter 11 cases are large and complex. The attention of the Debtors' limited resources should not be diverted from efforts to maximize the value of the Debtors' estates for the benefit of stakeholders. As stated above, the Debtors, shortly prior to the Petition Date, implemented a massive reduction in workforce resulting in the termination of over 6,500 employees. The remaining employees are actively involved in the Debtors' efforts in pursuing the immediate and orderly sales of their assets. To that end, and specifically with

respect to the Sale, on August 9, 2007, the Court entered an order approving, among other things, sale procedures for the sale assets related to the Debtors' mortgage loan servicing business (the "Sale Procedures Order") [Docket No. 113]. After entry of the Sale Procedures Order, the Debtors concluded, in the exercise of their business judgment, that having a stalking horse bidder for the Sale would be in the best interests of their estates, and commenced arduous good faith arm's length negotiations with AH Mortgage Acquisition Co., Inc. (the "Purchaser") with respect to a transaction whereby the Purchaser would agree to purchase the mortgage loan servicing business and become the stalking horse for the Sale process. By Order dated September 24, 2007, the Court approved, among other things, revised sale procedures for the Sale of the mortgage loan servicing business as a result of the Debtors' selection of the Purchaser, as the stalking horse bidder. Over eighty objections to the Sale have been filed and a number of parties have served informal and formal discovery requests in connection with the Sale. The hearing to consider approval of the Sale is currently scheduled for October 15, 2007 and the initial closing of the Sale is anticipated to occur on October 31, 2007. The Debtors' focus and limited resources should not be diverted from the Sale and matters necessary to consummate the Sale.

25.     Additionally, the Debtors have committed their limited resources to marketing the sale of construction loans and related servicing rights (the "Construction Loans") pursuant to an Order of the Court entered on October 4, 2007 [Docket No. 1175]. The auction for the sale of the Construction Loans is currently scheduled for October 29, 2007 and the hearing to consider the sale is currently scheduled for October 30, 2007.

26.     Aside from the sales of assets, the Debtors have been forced to divert resources and time to defend complex adversaries that have been "multi-tracked" for trial. The

DB02:6271191.6                                                                              066585.1001

trial is scheduled to commence on October 16, 2007, the day immediately after the hearing to consider approval of the Sale.

27. Without question, the Debtors are very busy with the proposed asset sales and what amounts to three simultaneous commercial trials. Moreover, the document requests are vague, ambiguous, and overly broad. For example: there are no relevant time periods for which Vantage Pointe seeks documents; it is unclear what "performing" and "non-performing" means, such that parties may interpret such terms in a variety of ways; and most of the document requests are compound inquiries. If order to respond to the vague, ambiguous, and overly broad requests, based on the time and manpower expended to complete the Debtors' schedules of assets and liabilities and statements of financial affairs, the Debtors estimate that it would take over one hundred hours to respond to Vantage Pointe's Rule 2004 requests. It is therefore unreasonable to further stretch the Debtors' limited resources by requiring the Debtors to respond to Vantage Pointe's Rule 2004 requests.

### C. Vantage Pointe has not demonstrated that its Rule 2004 examination is necessary.

28. Vantage Pointe generally alleges that its Rule 2004 examination is necessary so that Vantage Pointe can (i) more completely and accurately evaluate the impact of important relief sought by the Debtors in these bankruptcy cases, including the Debtors' proposed sale of assets, and (ii) analyze and make more informed judgments with respect to its position as one of the Debtors' equity security holders. (Rule 2004 Motion ¶ 1.) These general desires do not constitute good cause. Noticeably absent from Vantage Pointe's request is a claim that, as an equity holder, Vantage Pointe may be able to receive a meaningful distribution from any of the Debtors' estates. That is because, at this time, there is no evidence to suggest that equity is likely to receive any recovery in these cases. Indeed, any distribution to equity is

contingent upon a number of factors that cannot be definitively determined at this time, including, without limitation, the assessed market value and/or realizable "net" value of assets held by the Debtors and the total amount of "allowed" claims against the Debtors and their respective estates. Therefore, Vantage Pointe cannot, and so far has not, claimed that there is a significant likelihood of meaningful distribution for equity.

29.     The premise of Vantage Pointe's Rule 2004 Motion is that Vantage Pointe does not believe that the Debtors lost as much value as has been widely reported. The Debtors respectfully submit that they did loose significant value in the months preceding the Petition Date. In fact, the Debtors' stock fell from a high of $21 per share on June 28, 2007, to a low of $1.04 in the days leading up to the bankruptcy filing. The Debtors fell victim to a confluence of factors that were unprecedented in the company's experience. The devaluation of the Debtors' mortgage-backed securities and mortgage loan holdings were caused by, as previously stated, falling real estate prices and a spike in consumer defaults on mortgage obligations. In the end, the resulting disruption in the credit markets in the weeks before the Petition Date caused major write-downs of the Debtors' loan and security portfolios.

30.     In its motion Vantage Pointe relies heavily on the fact that an institutional investor made an equity investment in the Debtors on June 27, 2007. Vantage Pointe alleges that the investor would not have done so without full confidence of the Debtors' reported equity value. However, the Debtors submit that many accredited institutional investors did not, and could not, predict the events that preceded the Debtors' bankruptcy filing. The Debtors were not the only entities to be adversely affected by unprecedented events. In recent weeks, originators including Countrywide Financial Corp., Accredited Home Lenders Holding and IndyMac BancCorp, as well as mortgage investors C-Bass and certain Bear Sterns funds, have issued press

DB02:6271191.6                                                                                                                              066585.1001

releases concerning their lowered earnings and credit stress. It is unreasonable for Vantage Pointe to allege that somehow the Debtors were not severely impacted by recent events.

### D. Vantage Pointe's interests are adequately represented.

31. Vantage Pointe's contention that the interests of secured creditors are conflicted with what is in the bests interests of "all constituencies of the Debtors" is misguided. (Rule 2004 Motion ¶ 19.) Vantage Pointe goes so far as to state that certain creditors may not be motivated to challenge aggressively the value of their claims. (Id.) This allegation overlooks the fact that Vantage Pointe's interests are protected by the Debtors' board of directors' duty of loyalty and by the Committee.

32. First, the Debtors' board of directors has a fiduciary duty to consider and protect the interests of equity holders to the extent that the board concludes that there is value for equity holders. There is no evidence establishing the presence of any conflicts which would preclude the board form adequately representing the interests of equity holders. See In re Edison Bros. Stores, Inc., 1996 U.S. Dist. LEXIS 1376, *1 (D.Del. Sept. 17, 1996) (finding that without specific facts, management's dual loyalty to creditors and shareholders was sufficient to represent equity interests adequately).

33. Second, the interests of equity security holders are being represented to the extent necessary by the Committee and its able team of lawyers and financial advisors. The Committee's interest and the interests of equity holders are aligned in seeking to maximize value for the estates. See In re Williams, 281 B.R. at 222 (finding that the creditors' committee had sufficiently alleged or parallel interests with shareholders to preclude the need for a separate equity committee). By its motion, Vantage Pointe seeks the production of documents because it generally believes that the Debtors' intention to sell certain of its assets are too hasty. Vantage Pointe believes that the fallout from the collapse of the subprime market is a mere short term

disruption, and that it would be a mistake for the Debtors to pursue selling certain of their assets. It is Vantage Pointe's belief that if the Debtors hold onto their assets and essentially "ride out" the current market's "disarray," the Debtors will be able to preserve value for equity security holders. At bottom, Vantage Pointe seeks to ensure that the Debtors maximize their assets' value; the Committee's very same goal.

34. Vantage Pointe further contends that it needs "immediate access" to information regarding the "Debtors' financials" so that Vantage Pointe can somehow ensure the "structural priority implicit in the separate bankruptcy estates." (Rule 2004 Motion ¶ 20.) This contention is not a reasonable ground to permit a Rule 2004 examination. The Debtors have not sought to substantively consolidate their estates, so Vantage Pointe's fear that deficiencies in one Debtor will be satisfied by another is simply not relevant. A Rule 2004 examination must be both relevant and reasonable. See Symington, 209 B.R. at 684. At this juncture, an inquiry into possible substantive consolidation or the effects thereof is irrelevant.

## CONCLUSION

Vantage Pointe has failed to demonstrate good cause for its request to conduct a Rule 2004 examination. It is likely that Vantage Pointe can learn from publicly available documents, like the Debtor's Schedules of Assets and Liabilities, Statement of Financial Affairs and Monthly Operating Reports, all that it needs to perform analysis into any potential value for equity security holders and the impact of the Debtors' proposed transactions upon Vantage Pointe. The thrust of Vantage Pointe's motion is that it does not believe the Debtors were truly and severely impacted by recent and unprecedented events in the subprime market. Their disbelief does not equate to necessity. The Debtors submit that publicly available documents will illustrate for Vantage Pointe the dramatic decline in equity, such that at this time the Debtors do not anticipate any meaningful recovery for equity security holders. Finally, Vantage Pointe's

interests are adequately protected by both the Debtor's board of directors and the Committee. Therefore, Vantage Pointe's motion should be denied.

    WHEREFORE, the Debtors respectfully request that the Court enter an order denying Vantage Pointe's Rule 2004 Motion and granting the Debtors such other and further relief as may be necessary.

Dated:  October 5, 2007
         Wilmington, Delaware

                        YOUNG CONAWAY STARGATT & TAYLOR, LLP

                        /s/ *signature*

                        Robert S. Brady (No. 2847)
                        Pauline K. Morgan (No. 3650)
                        John T. Dorsey (No. 2988)
                        Sean M. Beach (No. 4070)
                        Matthew B. Lunn (No. 4119)
                        Kara Hammond Coyle (No. 4410)
                        The Brandywine Building
                        1000 West Street, 17th Floor
                        Wilmington, Delaware 19801
                        Telephone: (302) 571-6600
                        Facsimile: (302) 571-1253

                        Counsel for Debtors and Debtors in Possession