UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                  .    Chapter 11
                                        .
AMERICAN HOME MORTGAGE                  .    Case No. 07-11047(CSS)
HOLDINGS, INC., a Delaware              .    (Jointly Administered)
Corporation, *et al.*,                  .
                                        .    September 25, 2007
                                        .    10:00 a.m.
             Debtors.                   .    (Wilmington)
                                        .


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**<u>INDEX</u>**

|                          | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|--------------------------|:------:|:-----:|:--------:|:-------:|
| <u>WITNESS FOR DEBTORS</u>: |        |       |          |         |
| EUGENE WEIL              |   9    |  35   |    49    |         |
|                          |        |  37   |          |         |

|                          | <u>                ADMITTED</u> |
|--------------------------|:--------------------------------:|
| <u>EXHIBITS FOR THE DEBTORS:</u> |                        |
| EXHIBIT 1 - Schedule 4.1(a) to the Asset Purchase Agreement | 51 |

1            THE CLERK: All rise.

2            THE COURT: Please be seated.  Good morning.

3            MS. MORGAN: Good morning, Your Honor.  Pauline

4    Morgan from Young, Conaway, Stargatt, & Taylor on behalf of

5    the Debtors.  Your Honor, we're here today on the motion of

6    the Debtors for approval of revised sale procedures, and to

7    approve stalking horse bidder protections in connection with

8    an APA with AH Mortgage Acquisition Co., Inc., an affiliate

9    of WLR Recovery Fund, III, LP.  Your Honor, the Debtors have

10   been working closely with their primary creditor

11   constituencies, Bank of America as administrative agent for

12   the pre-petition lenders, as well as the Creditors Committee,

13   and with representatives and counsel for WLR, spending many

14   long days and nights together over the past few weeks.  And

15   we have been working diligently to negotiate and draft the

16   terms of the APA which was filed with the motion, and which

17   provides for the going concern sale of the Debtors' mortgage

18   servicing business and assets related thereto, subject to

19   higher and better offers at an auction.  The Debtors believe

20   that the bid submitted by the purchaser is a favorable, is a

21   favorable one, and will set the floor for bidding and serve

22   as the catalyst for what we hope will be a vigorous auction.

23   Since the filing of the motion, the sellers under the APA,

24   which are American Home Mortgage Investment Corp., American

25   Home Mortgage Corp., and American Home Mortgage Servicing,

1    Inc., and the purchaser have executed the APA.  We believe it

2    is, it's very voluminous, but it is being filed, we believe

3    right now.  Perhaps it is already filed with the Court.  And

4    we expect to receive very shortly a $15 million wire

5    representing the minimum deposit, or the good faith deposit,

6    rather, of the purchaser.  Your Honor, because of the

7    shortened notice of the motion, we set objections to be heard

8    at the hearing.  We have received several reservations of

9    rights and a limited objection or two, as indicated on the

10   agenda.  And in addition, I've been handed, as we've been

11   here in the courtroom, limited objections and/or reservations

12   of rights by JP Morgan Chase, CitiMortgage, and the US

13   Trustee.  And I'm not sure if Your Honor has copies of those,

14   or would like copies of those.

15           THE COURT: Well, I have the Office of the United

16   States Trustee objection, and I have, and I've read it.  And

17   I have the reservation of rights of CitiBank.

18           MS. MORGAN: Yes.  This one is CitiMortgage, Your

19   Honor.

20           THE COURT: All right.  I don't have that.  So let

21   me see CitiMortgage and JP Morgan Chase.  If you would.

22           MS. MORGAN: Yes.

23           THE COURT: Thank you.  Let me just look at them

24   really quickly.

25           MS. MORGAN: Sure.

1          THE COURT: Does the APA that's being filed contain

2     the schedules identifying the executory contracts that are

3     being assumed and assigned?

4          MS. MORGAN: It does, Your Honor.

5          THE COURT: All right.  All right.  Well, I think I

6     did read this one.  Sorry.

7          MS. MORGAN: That's okay.

8          THE COURT: Okay.

9          MS. MORGAN: Your Honor, before we proceed with the

10    testimony if I may ask, so that we can address anything we

11    need to address, if anyone else is objecting and may not have

12    filed a formal objection, if I may ask that they present at

13    least a summary of the objection so that we know what to deal

14    with.

15         THE COURT: All right.  Is there anyone present who

16    has not filed a written objection who wishes, or has any

17    objection to the revised sales procedures that are going

18    forward today?  Anyone on the phone or in court?  Mr. Taylor.

19         MR. TAYLOR: Good morning, Your Honor.  For the

20    record, Greg Taylor of Ashby & Geddes on behalf of Morgan

21    Stanley Mortgage Capital Holdings.  We have no objection to

22    the bid procedures as they proceed today, however like the

23    other parties, we just merely want to reserve our rights to

24    object to the sale on any basis, including the bases that

25    we've raised in our objection to the Debtors' notice of

1    assumption and assignment.

2          THE COURT: All right.

3          MR. TAYLOR: Thank you.

4          THE COURT: Thank you.  Certainly, and it goes

5    without saying, people can certainly make whatever record

6    they feel is appropriate to defend their client's interest,

7    but as far as I'm concerned, we're here on sales procedures,

8    not on the sale.  And all rights are reserved in connection

9    with the sale, and any issues in connection with the

10   purported ability to assume and assign executory contracts,

11   etcetera.  Ms. Springer, good morning.

12         MS. SPRINGER: Well, now that you said that, Your

13   Honor, I guess I can sit down.

14         THE COURT: No, it's - - everybody - -

15         MS. SPRINGER: But I'm here for GMAC and Residential

16   Funding.  Backup servicers and master servicers on many, many

17   of the loans that I believe the Debtor is anticipating or

18   expecting to assume and assign in connection with this or

19   whatever sale they ultimately enter into.  And we did file,

20   prior to the filing of this motion by the Debtor, we did file

21   objections and reservations of rights, and didn't think it

22   was necessary to essentially reiterate a reservation of

23   rights.  But in connection with this motion, we also reserve

24   rights to study the, the order that they have prepared,

25   because we do believe we will continue to have objections to

1    that form of order in connection with this sale.

2            THE COURT: The sale order.

3            MS. SPRINGER: The sale order.  We do not have any

4    real objections to the procedures that they expect to invoke

5    today.

6            THE COURT: Okay.

7            MS. SPRINGER: Thank you.

8            THE COURT: Thank you.  Anyone else?  All right.

9            MR. HARBOUR(Telephonic): Your Honor?

10            THE COURT: Anyone on the phone?  Yes.

11            MR. HARBOUR(Telephonic): For the record, Jason

12    Harbour of Hunton & Williams on behalf of Calyon New York

13    branch.  Based on communications we have had with the Debtor

14    over the past day, it is our understanding that the schedules

15    to the APA, that I still don't believe has been filed yet,

16    will indicate that whatever rights the Debtors have claimed

17    with respect to the servicing and relating assets under the

18    repurchase agreement with Calyon are not going to be sold in

19    this asset sale.  Nevertheless, I did just, we did just want

20    to make it clear that Calyon would object to any attempt to

21    sale such, sell such assets and that it's our understanding

22    that the parties intend to cooperate under the terms of the

23    stipulation that's been entered in an adversary proceeding,

24    which clearly provides that the Debtors will not be

25    transferring, selling, or which would include, of course,

1   putting any liens on any assets related to the repurchase

2   agreement, including the funds that the Debtors agreed to

3   segregate under the repurchase agreement.  And that those

4   funds are going to remain unencumbered.  Based on

5   conversations with the Debtor, that's our understanding, but

6   we did just want to make the record clear.  Thank you, Your

7   Honor.

8           THE COURT: Ms. Morgan.

9           MS. MORGAN: Your Honor, it is our intention to

10  abide by the stipulation in the Calyon adversary.  We also,

11  we did have communications with Calyon's counsel, and

12  informed, informed counsel, and we can inform other parties

13  in the courtroom that Schedule 1.1(j) to the asset purchase

14  agreement is the schedule that sets forth the servicing

15  agreements proposed to be assumed and assigned or transferred

16  to the buyer.  So for some parties who have been objecting,

17  they will find that they are not on that list.  So hopefully

18  we'll cut down the objections that way.

19          THE COURT: All right.

20          MS. MORGAN: But that's what we wanted to advise

21  people to look at today.

22          THE COURT: Thank you.

23          MS. MORGAN: Sorry.

24          MR. ROSNER: Good morning, Your Honor.  For the

25  record, Fred Rosner of Duane Morris on behalf of Bear Stearns

1    Mortgage Capital Corporation and EMC Mortgage Corporation.  I

2    believe I'm joined telephonically by my co-counsel from

3    Sidley Austin, Alex Rovira.  Just wanted to put our clients'

4    reservation of rights on the records, and defer to co-counsel

5    if he wants to add to the record.  Thank you.

6              THE COURT: You're welcome.  Mr. Rovira?

7              MR. ROVIRA(Telephonic): I'm okay.  Thank you.

8              THE COURT: All right.  Anyone else?  All right.  I

9    think we flushed out - -

10             MS. MORGAN: Thank you, Your Honor.

11             THE COURT:  - - what you have, what you have to

12   overcome.

13             MS. MORGAN: Your Honor, the Debtors would like to

14   call Eugene Weil to the stand.

15             THE COURT: All right.

16             **EUGENE WEIL, DEBTORS' WITNESS, SWORN**

17                       DIRECT EXAMINATION

18   BY MS. MORGAN:

19   Q.   Good morning, Mr. Weil.

20   A.   Good morning.

21   Q.   By whom are you employed?

22   A.   Milestone Advisors, LLC.

23   Q.   And what kind of business is Milestone in?

24   A.   Milestone is an investment banking firm that specializes

25   in financial services companies.  And in particular, mortgage

1   banking companies.

2   Q.   And what is Milestone's role in this bankruptcy case?

3   A.   We are serving as financial advisor to the Debtor.

4   Q.   And what is Milestone's experience with respect to sales

5   of mortgage origination or servicing assets, either under

6   §363 or outside of a bankruptcy scenario?

7   A.   Most recently we served as financial advisor to the

8   Debtor, Resmae Financial that was a pending case here in

9   Delaware.  In addition, we have served as financial advisor,

10   either in the sale or purchase of a very large number of

11   mortgage origination and servicing companies.

12   Q.   And what is your position with Milestone?

13   A.   I'm the Chief Executive Officer.

14   Q.   And how long have you held that position?

15   A.   Since founding the firm approximately 7½ years ago.

16   Q.   And what are, what are your responsibilities in that, in

17   that position?

18   A.   As the CEO I oversee the firm's, you know, day-to-day

19   operations as well as, you know, all the strategic moves that

20   the firm makes.  I guess most relevant, I oversee our

21   investment banking activities and, you know, all the

22   engagements that the firm enters into.

23   Q.   Could you briefly describe your educational background?

24   A.   Sure.  I received my Bachelor of Arts degree from the

25   University of Wisconsin, Madison, and a JD degree from the

1   Washington University in St. Louis.

2   Q.   And what is your professional experience prior to

3   Milestone?

4   A.   Prior to forming Milestone, I was a managing director at

5   a firm called Friedman, Billings, Ramsey & Company.  At FBR I

6   was responsible for the firm's mergers and acquisitions

7   practice as well as a large part of the firm's financial

8   services practice, which covered mortgage banking, among

9   other things.  Prior to my career at FBR, I was a senior vice

10  president and general counsel at a firm called Hub D

11  Financial (phonetic), which is also a investment banking firm

12  focused on the financial services industry.

13  Q.   Turning to this case, what are your duties in connection

14  with the AHM bankruptcy cases?

15  A.   As I said, we're financial advisor to the Debtor.  And

16  in that capacity, our role is to oversee the, the analysis,

17  first, of the financial assets of the Debtor, to determine

18  the best course of action with the Debtor in disposing of

19  those assets, and then once a decision is made to dispose of

20  those assets, to oversee the marketing and sale process of

21  those assets, including the servicing platform we're talking

22  about today.

23  Q.   And have you been personally involved in the process?

24  For instance, speaking to bidders?

25  A.   Yes I have.  I was actively involved in the preparation

1    of the offering memorandum that we put together for the sale.

2    Coming up with the buyer, potential buyer list as well as

3    talking to numerous of those potential buyers throughout the

4    course of the process.

5    Q.    Did Milestone coordinate a data room for this sale

6    process?

7    A.    We did.  We set up an electronic data room, populated

8    that data room with information that we've received from the

9    company, and continue to update that data room throughout the

10   process.

11   Q.    Did you have any personal involvement in the negotiation

12   of the, the APA with Wilbur Ross's affiliate?

13   A.    Yes I did.  I've been actively involved as part of this

14   negotiation from when discussions ensued with W.L. Ross in

15   mid-August.  You know, leading up to the extensive

16   negotiations, as you mentioned, over the past several weeks.

17   And particularly the almost endless negotiations last week,

18   was actively involved in it.

19   Q.    Okay.  When did the company start looking for a sale in

20   connection with the servicing business?  Or a purchaser, I

21   should say.

22   A.    We actually started immediately prior to the filing of

23   the bankruptcy petition.  We were working with the company in

24   July to look at alternative sources of liquidity.  Whether by

25   refinancing their existing debt or selling off various assets

1  of the company.  One of those assets was the servicing

2  platform.  While there was no formal process or offering

3  memorandum that was prepared, we did facilitate and host a

4  number of discussions with potential buyers of the platform

5  in late July.  And so once the filing occurred on August 6th,

6  you know, we, we had sort of pre-started, if you will, the

7  sale process of the servicing platform.  And so we were able

8  to get that prepared and in process immediately after the

9  filing.

10 Q.   Okay.  And why did the company determine that a sale was

11 appropriate rather than a restructuring?

12 A.   As probably most of the people and Your Honor know in

13 this room, throughout June and really accelerating into July

14 and August, we've seen a, you know, unprecedented break in

15 the mortgage banking business here in the U.S. and abroad.

16 In particular, it's led most originators of anything but

17 agency mortgages to cease those originations, or severely

18 curtail those originations.  American Home included.  They

19 basically stopped originating new mortgages in mid to late

20 July.  Because of that, the servicing platform, and more

21 importantly its portfolio, today at American Home is a static

22 portfolio that is only declining.  As a result of that, with

23 no new originations coming onto the platform, you know, it's

24 basically an asset that continues to diminish every day.  And

25 so we felt that time was particularly of the essence, and

1   which didn't allow for a reorganization, really prompted a

2   sale.  You add to that the fact that, you know, with the

3   break in the mortgage market the financing that's available

4   for servicing rights and advances has changed fairly

5   significantly over the past 60 days to 75 days.  And so, you

6   know, those factors combined really led us to the conclusion

7   that a sale made the most sense, rather than a

8   reorganization.

9   Q.    Thanks.  And once the motion was filed on the first day

10  of the case to, to seek approval of the sale of the servicing

11  business and the related assets, what specific steps did you

12  take to attract potential bidders?

13  A.    We did several things.  One, as I said, we had, we put

14  together a very extensive offering memorandum that described

15  the servicing business and the particular assets of the

16  servicing business.  Two, you know, we developed a fairly

17  extensive list of prospective acquirers.  As I mentioned, we

18  had been actively involved, together with our co-advisor on

19  this particular part of the case, Phoenix Capital, in buying

20  and selling numerous mortgage origination and servicing

21  platforms, and so we started off with a fairly good

22  understanding of who out there, both in the financial buyer

23  community, as well as strategic buyer community, might be

24  interested.  We compiled a list.  We, we then added to that

25  list any incoming inquiries that we got as a result of the

1   bankruptcy filing.  So we, we've tracked very carefully any

2   inbound calls and talked with those inbound callers about the

3   particular assets that they were interested in, added them to

4   the list.  And so we ended up, I believe, with a list of

5   approximately 55 prospective buyers of the platform.  30 of

6   which I would classify as financial buyers similar to W.L.

7   Ross, and 25 of those strategic buyers, namely interested

8   parties that were already in the servicing business in some

9   form or fashion.  So we had this list of 55 prospective

10  buyers.  That list has actually grown, you know, recently,

11  with some new inquiries and we've either just talked or met

12  with each one of those 55 parties.  We've taken them through

13  the opportunity.  A number of those have signed

14  confidentiality agreements, and received the offering

15  memorandum.  Some declined to do so.  We've hosted due

16  diligence sessions, either by phone or in person, with the

17  management team of the servicing platform, and continue those

18  discussions about a prospective transaction with various

19  parties.

20  Q.   When did WLR Recovery Fund, III, LP contact the company

21  about its purchase interest?

22  A.   I think the initial discussion we had with W.L. Ross

23  outside of, of discussions relating to their Debtor-in-

24  Possession financing and really focused on the servicing

25  platform began sometime around mid-August, where they

1   received, they signed a confidentiality agreement, received

2   the offering memorandum like other prospective buyers, and

3   then began sort of a, an extensive question and answer and

4   diligence process about the servicing platform.

5   Q.   What is WLR Recovery Fund?

6   A.   It is a fund that is sponsored and run by Wilbur Ross.

7   It's a, it's a private equity fund that particularly is

8   focused on acquiring distressed assets, and other assets in

9   and out of bankruptcy, but that are going through some kind

10  of a, generally some kind of a corporate reorganization.

11  Q.   Is WLR affiliated with any of the sellers or any of the

12  other Debtors?

13  A.   They are not.  Again, no affiliation, but as the Court

14  knows, they are the Debtor-in-Possession financier.

15  Q.   And did the assets of the servicing business serve as

16  collateral for the DIP financing?

17  A.   They do not.

18  Q.   Okay.  Did the company continue to conduct discussions

19  with other prospective bidders or purchasers after WLR came

20  into the picture?

21  A.   Sure.  We've not only, we not only continued to do that

22  after WLR came into the picture, as I said, in mid-August,

23  but we continue that today.  And it's an ongoing process.

24  We, on a daily basis, we're either meeting or talking to

25  prospective buyers, or as I said, hosting due diligence

1   sessions.  And that did continue, and does continue.

2   Q.   Did the company, through Milestone, approach anyone else

3   to potentially serve as a stalking horse?

4   A.   We did.  When it became clear to us that W.L. Ross was,

5   was not only interested in becoming the stalking horse, but

6   the discussions with WLR had progressed to a point that we

7   felt like it was likely to proceed, we went out to several of

8   the other bidders that we'd been talking to, both financial

9   as well as strategic, indicated to them that we thought there

10  was a likelihood that a stalking horse bidder would emerge,

11  and inquired whether they would be interested in being a

12  stalking horse themselves.  You know, my guess is we probably

13  talked to four or five other parties about being a stalking

14  horse.

15  Q.   And other than the transaction that's before the Court

16  today, has anyone else submitted an offer to the Debtors?

17  A.   They have not.

18  Q.   Okay.  Could you generally describe the negotiations

19  with WLR over the past several weeks?

20  A.   Sure.  You know, we proceeded from mid-August talking in

21  general terms about a transaction with W.L. Ross.  That led

22  to fairly definitive discussions on structure and pricing

23  late in August, early September.  I would say, I guess,

24  discussions and negotiations really ensued in earnest

25  following Labor Day, and over the past couple of weeks, and

1   in particular the last week, those, the negotiations ensued

2   in earnest through last week where it was not around the

3   clock negotiations, but pretty close to around the clock

4   negotiations.  And involved in those negotiations actively

5   last week were the Creditors Committee's representatives and

6   BofA's representatives as part of the syndicate.  And so that

7   led to the final negotiation and, of the agreement late

8   Thursday, early Friday morning of last week, and ultimately

9   the filing of the agreement on Friday of last week.

10  Q.    And did the company's Board of Directors approve the

11  transaction with WLR?

12  A.    They did.  They met Thursday night of last week.  Both

13  we, as financial advisor, and Young Conaway, as counsel,

14  walked them through the transaction.  You know, both the

15  pluses and minuses of the transaction as well as, you know,

16  the exact components of the agreement, and they approved the

17  transaction late Thursday evening of last week.

18  Q.    Okay.  Could you describe for the Court, in general, the

19  nature of the transaction?

20  A.    Sure.  What the APA envisions is an asset purchase by

21  W.L. Ross of the servicing business of American Home.  W.L.

22  Ross would be acquiring the platform, which is basically the,

23  the equipment, the technology, the people, you know, the

24  entity that actually does the servicing.  They would be

25  acquiring, or hiring, substantially all of the employees of

1   the servicing business, assuming certain liabilities, and

2   acquiring the servicing rights to the underlying mortgages,

3   as well as purchasing the advances related to those servicing

4   rights.

5   Q.    Okay.  And what is the structure - - let me back up.

6   The APA provides for a two tiered closing.  Is that correct?

7   A.    That's correct.

8   Q.    And can you explain why that is necessary?

9   A.    Yes.  W.L. Ross's acquisition vehicle that's party to

10   the APA today is not a licensed servicer.  So in order to be

11   a servicer, it needs to ultimately go out, acquire state

12   licenses to be a mortgage servicer, as well as, as most

13   likely to get licenses from the GSE's, you know, Fannie Mae,

14   as an example.  That takes time.  It's not a particularly

15   hard thing to do, but it does take time, and there is a

16   process that one needs to go through.  It's likely that that

17   process takes, you know, somewhere six, eight, ten months to

18   accomplish fully, so because of that, you know, we did not

19   want to take the operating or financial risk between the

20   signing of the APA and W.L. Ross getting, you know, their

21   final licenses.  And so what we did is we've designed a

22   process whereby there is an economic close that will happen

23   fairly quickly.  Right now that's targeted as the end of

24   October, for a few reasons which I'll get into in a second.

25   And then ultimately a final close once those licenses are

1   obtained.  At the economic close, W.L. Ross would, would pay

2   the Debtor the full purchase price and following that

3   economic close would effectively be the economic owner of the

4   business, where they would have responsibility for any losses

5   of the business, and the benefit of any profitability of the

6   business going forward.  We felt this allowed us to

7   facilitate a transaction with W.L. Ross, or somebody like

8   W.L. Ross that wasn't licensed, you know, namely a financial

9   buyer, but it took the economic risk away at the time of that

10  initial closing.

11  Q.   The motion before the Court asks that the Debtor, that

12  we be granted interim approval to grant liens to the, for the

13  purchaser's benefit after the initial closing.  Why is that a

14  part of this transaction?

15  A.   The reason it's a part of this transaction, and by the

16  way, it would be, I believe, part of any transaction with

17  another financial buyer like W.L. Ross.  I don't think this

18  is unique to this particular transaction.  It would also,

19  it's really a function that would occur, you know, after W.L.

20  Ross, or any other buyer, was approved as the successful

21  bidder, and after the economic close.  So what it

22  contemplates is the ability to put liens on these assets

23  after this economic close.  As I mentioned before, after this

24  economic close, W.L. Ross in this case, would be the economic

25  owner of these assets, having paid 100% of the purchase

1    price, but not the legal owner of these assets.  The legal

2    title wouldn't transfer until the final closing.  As such,

3    W.L. Ross needs the ability to get a lien on the assets that

4    they have effectively paid for, but which American Home still

5    owns.  And, you know, they plan to get financing in the

6    future.  This is not a financing contingency.  Again, this

7    all happens post-economic close, but it does facilitate their

8    ability, once they've paid 100% of the purchase price, to put

9    financing on these assets if they so choose.

10   Q.   And would the collateral for these new liens be anything

11   other than the purchased assets that WLR has already paid

12   for?

13   A.   It would not.  It's, it's specifically only recourse to

14   the assets that they've paid for that will ultimately

15   transfer as part of the transaction.

16   Q.   And those liens would only come into place if WLR is the

17   successful bidder at the auction?  Is that correct?

18   A.   That's correct.

19   Q.   And if this sale order is approved?

20   A.   Also correct.

21   Q.   And also conditional upon the initial closing occurring

22   and actually WLR paying the purchase price.  Is that correct?

23   A.   Yes.  All those things would have to occur before any of

24   these liens were put in place.

25   Q.   Okay.  You explained the assets that form the components

1    of this transaction.  Let's talk about the purchase price for

2    each of those.  Beginning with the platform, what does it

3    mean when you say the platform is being purchased?

4    A.   Again, you know, it really means the, both the physical

5    assets that comprise the servicing entity.  The, you know,

6    the equipment, the technology, the physical location which is

7    leased, as well as all the people that, that staff the

8    business.

9    Q.   And what does the, what does the APA provide as a

10   purchase price for the platform aspect of this deal?

11   A.   It provides that W.L. Ross would pay $6 million and

12   assume certain liabilities in connection with the platform.

13   Q.   And what about the advances that WLR is purchasing?

14   What is the price, how does the pricing work for that?

15   A.   Sure.  W.L. Ross would be acquiring all of the advances

16   related to the loans that were being serviced by the platform

17   at the time of the initial close, or economic close.  They

18   are paying 92% of what the net advances are at that time.

19   Q.   What is the Debtors' estimate for how much of the

20   advances will be purchased at closing?

21   A.   What the dollar value is?

22   Q.   Yeah.

23   A.   The dollar value of the advances in the schedules to the

24   agreement, which were done as of September 17th, is

25   approximately $93 million for the net advances.  We believe

1   those advances will grow somewhat between the signing of the

2   APA and the initial closing.  And so, you know, my guess is

3   that the net amount that they would pay for those advances,

4   at that 92% level, will be somewhere between 90 and $100

5   million.

6   Q.   Okay.

7            THE COURT: That, is that a payment, or is that an

8   assumption of liability?

9            THE WITNESS: It's actually a payment that W.L. Ross

10  will make, Your Honor.

11           MS. MORGAN: Your Honor, may I approach the witness

12  with an exhibit?

13           THE COURT: Any objection?  Yes you may.  Thank you.

14           MS. MORGAN: And Your Honor, I apologize.  I left my

15  folder full of many copies of that exhibit.  But what that

16  exhibit is is Schedule 4.1(a) to the asset purchase

17  agreement.  It was filed with the Court last Friday.  It

18  should be in your binder as well, Your Honor.

19  BY MS. MORGAN:

20  Q.   Mr. Weil, could you identify the document that you've

21  just received that's been marked Debtors Exhibit 1?

22  A.   Yes.  This is Schedule 4.1(a) to the asset purchase

23  agreement.

24  Q.   And what is, what does this exhibit show?

25  A.   What this exhibit shows is in addition to acquiring the

1    platform and the advances that I just talked about, the

2    primary asset that W.L. Ross is acquiring are the mortgage

3    servicing rights to mortgage loans that American Home

4    services today.  The way that we negotiated the transaction

5    is it's a sliding scale of what W.L. Ross will pay for these

6    assets, depending on the amount of these assets that are

7    ultimately delivered at the initial close.  And so what, what

8    this schedule illustrates is the pricing matrix for those

9    assets.  And the way that it works is the servicing rights on

10   up to $38 billion of unpaid principle balance of the

11   mortgages underlying those servicing rights Ross would pay 90

12   basis points on that amount of unpaid principle balance as

13   their purchase price.  So 90 basis points up to 38 billion.

14   From 38 billion to 41 billion of UPB, or unpaid principle

15   balance, it's a sliding scale from 90 basis points up to just

16   under 92 basis points at 41 billion.  And then anything over

17   41 billion of UPB, the price would be 92 basis points.  So

18   again, depending on the amount of UPB of underlying mortgage

19   loans that are delivered at closing, the more that's

20   delivered, the higher the pricing that W.L. Ross would pay.

21   Q.   And does the APA provide that the Debtors are to deliver

22   a minimum number of, amount I should say, of UPB?

23   A.   Yes.  The Debtors are required to deliver a minimum of

24   38 billion of UPB.

25   Q.   And you say required.  If we fail to hit that target,

1   does the purchaser have a right to terminate the agreement?

2   A.   They do.  It's a closing condition that must be met by

3   the Debtor, and if it's not met, the purchaser has the

4   ability to terminate the agreement.

5   Q.   Or the purchaser can waive that requirement, correct?

6   A.   That's correct.

7   Q.   Okay.  Can the Debtors estimate, provide a best estimate

8   of what they think the UPB will be at closing?  As of today?

9   A.   Sure.  As of today, it's, the amount of UPB that's

10  available for purchase, if you will, under the APA is

11  approximately 45.3 billion.  You know, that UPB, as I said

12  before, it's a declining asset.  There's no new loans coming

13  on, so it, it only moves in one direction, which is down, as

14  mortgage loans are prepaid or paid off.  Those pre-payment

15  speeds have slowed dramatically from where they have

16  historically been due to the lack of new mortgages that are

17  available at attractive terms for borrowers.  So while we

18  think there will be some runoff in the portfolio, we think it

19  will be, you know, fairly minimal.  And so my guess is, you

20  know, at closing, we would have somewhere in the neighborhood

21  of 45 or slightly under 45 billion available for sale.

22          THE COURT: Is the $38 billion requirement a, as of

23  the initial closing, or as of the final closing?

24          THE WITNESS: As of the initial closing.

25  BY MS. MORGAN:

1   Q.   And if you could describe, what would be the, if we were

2   to achieve let's say 43 billion, or a high number of UPB's,

3   what would be the approximate purchase price for the mortgage

4   servicing rights?  Under the formula.

5   A.   The approximate price would be probably just over $400

6   million.  For the servicing rights.  Again, you add to that 6

7   million for the platform premium and approximately $90

8   million on the servicing advances, and you get to an all in

9   consideration of approximately $500 million.

10  Q.   And what if the UPB's being delivered are at the low end

11  of the scale?  At the 38 billion mark rather than at the

12  higher end.  What would be the approximate price?

13  A.   Again, the aggregate price, if you will, of those three

14  assets, assuming we were to deliver, American Home was to

15  deliver 38 billion of UPB would be approximately $435

16  million.

17  Q.   Okay.  And in addition to the anticipated cash purchase

18  price, does the transaction provide any other benefit for the

19  sellers?

20  A.   It does.  As I said before, because W.L. Ross is

21  acquiring a platform, in addition to the $6 million, they're

22  assuming various real property and equipment leases, as well

23  as, most importantly, they're hiring substantially all of the

24  employees at the servicing operation.

25  Q.   And do you have an estimate of what kind of cost savings

1   that would entail?

2   A.    Yeah.  We've estimated that if you were to shut down the

3   platform, that it would probably cost somewhere in the

4   neighborhood of 4 to $5 million of priority claims, plus

5   additional claims in and above that.

6   Q.    Okay.  Mr. Weil, are you familiar with the revised

7   bidding procedures that the Debtors are seeking approval of

8   today?

9   A.    Yes I am.

10  Q.    And did you participate in formulating those procedures,

11  including the timing of the auction and the bid deadline?

12  A.    I did.

13  Q.    And do you believe that if those procedures are approved

14  today that interested parties will have adequate time to

15  digest the WLR bid and participate in an auction?

16  A.    I do.  You know, we had set the October 2nd bid date, you

17  know, probably ten days or two weeks ago.  So other

18  prospective bidders have known for some time that October 2nd

19  was going to be the new bid date.  We've had active

20  discussions with the prospective buyer community about that

21  bid date and about the fact that this stalking horse

22  negotiation was going on and it was likely to occur.  Once we

23  reached agreement with W.L. Ross last Thursday night, Friday

24  morning, and the documents were filed with the Court on

25  Friday, we began a round of discussions with these

1    prospective buyers.  Walking them through the new procedures,

2    walking them through the structure of the transaction, and

3    what all that meant to, to their future bid.  And so I think

4    the buyer community in general is well aware of it, and I

5    fell confident that they'll be able to meet the October 2nd

6    bid date.

7    Q.   Okay.  Do the bid procedures still permit the Debtors to

8    solicit bids on portions of the assets, as opposed to all of

9    the assets being purchased by WLR?

10   A.   They do.  And this was, this was something that was, you

11   know, intensely negotiated as part of this transaction with

12   W.L. Ross.  We wanted to retain the ability to accept bids

13   that were component parts of the servicing operation that we

14   could put together and hopefully achieve higher or better

15   value to the estate.

16   Q.   Speaking of higher or better, was the ability to accept

17   higher or better bids, as opposed to and better bids a

18   specific subject of negotiation with WLR?

19   A.   It was.  It was, it was probably one of the primary

20   areas of negotiation, and something that was very important

21   to, to the Debtor and its advisors.  You know, we wanted the

22   ability, because of the complicated nature of the W.L. Ross

23   two-step closing in particular, we wanted the ability to

24   accept bids that were not necessarily higher, but might be

25   better from a speed to final closing or other terms.  And so

1  that was something that was achieved through these

2  negotiations.

3  Q.   Are you familiar with the proposed breakup fee and

4  expense reimbursement provisions of the APA?

5  A.   I am.

6  Q.   And how much are the proposed breakup fee and expense

7  reimbursement?

8  A.   The expense reimbursement that's set forth in the APA is

9  up to $2 million, and the breakup fee is a $5 million breakup

10 fee.

11 Q.   And when are they payable?

12 A.   The expense reimbursement is payable if and when the

13 Court accepts and approves a competing bid.  And the breakup

14 fee is due and payable, assuming there's a competing bid,

15 when that competing bid actually closes.  When that competing

16 transaction either closes or the agreement that governs that

17 competing transaction is terminated.

18 Q.   And if it's terminated and the Debtors are holding a

19 deposit from the second bidder, but are not able to close, is

20 the breakup fee payable from the deposit?

21 A.   It is.  And in fact, I believe that unless the seller

22 actually has a deposit from a competing bid, that they would

23 not be required to pay the breakup fee.

24 Q.   Right.  Now there's also a request for payment of a

25 reconciliation payment and for super priority treatment for a

1    reconciliation payment in the APA.  Can you, can you explain

2    what the reconciliation is about?

3    A.   Yes.  Again, because of the nature of the two-step

4    close, you know, we are, we'll have a situation where W.L.

5    Ross will be the economic owner of the assets, but not the

6    operator of the business until the final, they're licensed

7    and the final close.  And so a couple different things are

8    happening.  As I said before, you know, any profit or loss in

9    the business after the initial close is for the benefit or

10   the burden of W.L. Ross.  Second of all, there is a provision

11   where certain servicing rights on loans that are sitting on

12   the Debtors' warehouse lines or repo lines or their interim

13   servicing that are being transferred off the system, those

14   are not being sold to W.L. Ross.  But we are having the

15   servicing entity continue to service those loans, and that

16   has some cost to, to the servicing entity, and thereby to

17   W.L. Ross.  So there is payments effectively going both ways

18   during that interim period, and what the reconciliation

19   arrangement does is allows us to true up any amounts that

20   would be owing to W.L. Ross, or conversely to the Debtor

21   after the final close.  I believe within 60 days of the final

22   close, the reconciliation would be done, and any payment

23   owing either way would be made.

24   Q.   And again, is the intent to make sure the Debtors are in

25   the same position that they would have been had an economic

1    closing been the final closing?

2    A.    That's correct.

3    Q.    Okay.  Mr. Weil in your opinion, are the breakup fee and

4    expense reimbursements proposed to be made here reasonable?

5    A.    I believe they are.

6    Q.    And why do you say that?

7    A.    Well, let's start with the breakup fee.  As I said, you

8    know, we think it's likely that the full consideration for

9    the transaction will be somewhere between 435 million and

10   $500 million.  At $500 million, a $5 million breakup fee is

11   1% of the consideration.  It would be slightly higher at the

12   $435 million level.  But at one percent, it's significantly

13   below what we typically see today as the size of a breakup

14   fee, which I would say more often than not these days, we're

15   seeing breakup fees in and around 3%.  So at 1% I think it's

16   quite reasonable.  As far as the expense reimbursement is

17   concerned, you know, this was a transaction that - - and I

18   guess this really goes both to the breakup fee and the

19   expense reimbursement - - you know, this is a transaction

20   that I believe has real tangible benefit to the estate.

21   It's, you know, very beneficial and necessary to, to create a

22   successful bid process and ultimate sale.  So there's real

23   tangible benefit there.  Ross has incurred expenses in

24   connection with negotiating and documenting what has become,

25   you know, a fairly complicated agreement, and as a result,

1  you know, I think the expense reimbursement is reasonable.

2  Q.   You mentioned the benefit.  Describe what the benefit is

3  to the estate, if you believe there is one, to approval of

4  the breakup fee and expense reimbursement.

5  A.   Sure.  I think having a stalking horse, and particularly

6  this stalking horse does a number of things, you know, for

7  the estate and the process, the sale process that we're in.

8  You know, number one, Wilbur Ross is a, you know, very well

9  recognized and respected financial buyer.  So the fact that,

10 that they've come in, have done their diligence, have

11 negotiated this agreement, and come up with a structure and

12 price that we feel is compelling I think sends a very strong

13 message to the broader buyer community.  Two, it obviously

14 sets a floor and expectation from a pricing standpoint, which

15 we think is very beneficial for the process.  Three, you

16 know, particularly for the other financial buyers, it really

17 sets forth a road map, you know, particularly this two-step

18 close, and how other financial buyers can acquire this asset

19 without having licensing at the time of the agreement.  And

20 fourth, you know, I guess which is quite important, is, you

21 know, this is a firm bid from Ross.  And, you know, to the

22 extent we don't get any other proposals, which I don't think

23 will be the case, but if that was the case, or none of those

24 proposals was as compelling as being higher or better than

25 the Ross bid, you know, that's a bid that I think makes sense

1   to go ahead and close on and realize the benefits of the

2   transaction.  And that's, you know, that gets established as

3   part of this agreement.

4   Q.   But you do believe that it will encourage additional

5   competitive bidding.

6   A.   I do.

7   Q.   Okay.  Do you have any reason to believe that it would

8   chill bidding?

9   A.   I really don't.  You know, the, the buyer universe that

10  we're speaking with today are by and large, you know, very

11  sophisticated and significant either private equity, asset

12  managers, or you know, financial services companies.  They

13  understand the complexities of a transaction like this.

14  They're familiar with what a stalking horse bid is, and the

15  procedures that come with it.  They recognize, you know,

16  based on discussions that we've had, you know, what higher or

17  better means.  And they've got the ability, you know, while,

18  while the APA we're discussing really sets the template, you

19  know, the do have the ability to mark that APA up in the form

20  that they deem to be, you know, most useful to the

21  transaction that they want to pursue.  And so, you know, I

22  think all those things together says that, you know, I don't

23  think that this will chill other bidders.  You know, I think,

24  again, it really kind of sets a road map up for these other

25  bidders.

1  Q.   Since the motion and the APA were filed last Friday, has

2  Milestone or the company received any either new or renewed

3  expressions of interest in the assets?

4  A.   We have.  I mean, we, as I've said before we've had

5  ongoing discussions with our most active prospective buyers.

6  In addition, a few prospective buyers that had kind of shown

7  less interest later in the process, that we had contacted

8  initially, have come back to the table and kind of re-engaged

9  in discussions, really trying to understand what this deal

10  looks like, and what it means to them to, to potentially be a

11  higher or better bidder.  And then finally, we have heard

12  from one or two new parties that, frankly, we hadn't

13  contacted as part of the sales process that have come to the

14  table based on the press that was generated from the filing.

15  Q.   Okay.  Were the breakup fee and expense reimbursement

16  provisions of the APA material inducements for WLR to enter

17  into this agreement?

18  A.   They were.  In fact, not only were they inducements, but

19  I think without the expense reimbursement and breakup fee,

20  both of which were negotiated fairly intensely, W.L. Ross

21  would not have proceeded with the transaction.

22  Q.   In your professional opinion, do you believe the revised

23  bidding procedures and the stalking horse protections that

24  we're seeking approval of today will maximize value for the

25  Debtors' estates?

1   A.   I believe it will.

2           MS. MORGAN: Your Honor, I have no further

3   questions.

4           THE COURT: All right.  Thank you.  Any cross

5   examination?  Mr. McMahon?

6           MR. McMAHON: Very briefly, Your Honor.

7                        CROSS EXAMINATION

8   BY MR. McMAHON:

9   Q.   Sir, good morning.

10  A.   Good morning.

11  Q.   If I heard your testimony correctly, you indicated that

12  the aggregate bundle of servicing rights, the unpaid

13  principle balance or UPB, is approximately 45 billion as of

14  today.  Is that correct?

15  A.   Yeah.  It's approximately 45.3 billion of the servicing

16  rights that would be envisioned by the sale.  There are other

17  servicing rights that are not being sold as part of the sale.

18  Q.   Now, the bid procedures, you testified, allow the

19  Debtors to proceed with the sale of the purchased assets in

20  more than one lot, or grouping.  Is that correct?

21  A.   That's correct.

22  Q.   And let's assume, for a moment, if we will, that the

23  sale does go in that direction, and there are two or more

24  lots that are the subject of the sale.  Is our proposed

25  purchaser entitled to a breakup fee if he's the successful

1    bidder of one of the lots, but not another, or more is my

2    question.

3    A.    Well, I believe that if, as long as it is part of this

4    process, we, we collectively, I guess, the Court approves a

5    competing sale, whether it's to one party or a couple of

6    parties in your example, the breakup fee would be due and

7    payable to, to Ross.

8    Q.    So, if I understand - -

9    A.    And assuming that competing transaction closes.

10   Q.    Okay.  So if I understand correctly, irrespective of the

11   size of the multiple lot sale that we're talking about, if

12   Ross loses, is not the successful bidder on any given lot,

13   then the entire $7 million is payable.  Under the APA.

14   A.    So, I'm sorry.  So is your, in your example, Ross would

15   actually be the successful bidder on some component of the

16   transaction, but not the successful bidder on other

17   components.

18   Q.    Correct.

19   A.    Is that your question?

20   Q.    Correct.

21   A.    I believe in that scenario, and I will have to probably

22   defer to counsel on that, but I believe in that scenario, if

23   Ross decided to move forward and acquire certain assets, but

24   didn't acquire other assets, that the breakup fee would most

25   likely not be payable in that circumstance.  But, you know, I

1    would probably have to go back to the APA and, and review it.

2    Q.   All right.

3    A.   So, because under your example, either, I assume either

4    one, we were able to deliver 38 billion of UPB to Ross, or

5    two, he waived that condition to closing, and agreed to

6    acquire less than 38 billion.  And so I, again, I suspect

7    that if he, if he moved forward on some part of the

8    acquisition that it would not be payable.

9             MR. McMAHON: Your Honor, no further questions for

10   the witness.

11            THE COURT: Redirect?  Or, I'm sorry, are there any

12   other - - I apologize.  Are there any other parties wishing

13   to ask any cross examination?  Ms. Springer.

14                          CROSS EXAMINATION

15   BY MS. SPRINGER:

16   Q.   Good morning, Mr. Weil.

17   A.   Good morning.

18   Q.   Just a few questions.  Are you aware that there are

19   parties that are claiming that they terminated the Debtors'

20   servicing rights pre-petition?

21   A.   Yes I am.

22   Q.   Okay.  And with respect to those servicing rights, did,

23   were they taken into account in terms of coming up with the

24   threshold number that I believe you said WLR wants to acquire

25   $38 billion?

1    A.    Yes they were.  You know, both in the APA as well as in

2    the sale hearing order.

3    Q.    So if this Court were to determine that in fact those

4    parties did terminate, effectively the Debtors' right to

5    service those agreements pre-petition, would there still be

6    $38 billion of loans that could be conceivably transferred to

7    WLR?

8    A.    Yes, I believe that, that's true.

9    Q.    Even if all of them were considered to be terminated?

10   A.    You know, again, if we're talking about terminations

11   that were done pre-petition, there is a provision in the

12   agreement that provides for an escrow of those amounts, and

13   they would be subtracted from the UPB that we would use to

14   measure the 38 billion, and there still would be sufficient

15   servicing rights to hit that condition.

16   Q.    Okay.  Now with respect to the cure costs, as you are

17   probably aware, originally the Debtor filed a schedule of

18   agreements that they were, that they were intending to assume

19   and assign.  And for many of those agreements, they estimated

20   the cure cost at zero.  Are you familiar with that document

21   that I'm talking about?

22   A.    I'm somewhat familiar, yes.

23   Q.    Okay.  And as you may also be aware, many of the non-

24   debtor parties to those agreements have challenged the

25   Debtors' view that the cure costs are zero.  Are you aware of

1    that as well?

2            MS. MORGAN: Objection, Your Honor.  Again, we seem

3    to be going towards sale and assumption and assignment

4    issues, which are not being heard today.

5            MS. SPRINGER: But, Your Honor, I'm talking about

6    precisely what the Debtor questioned the witness on in the

7    direct examination.  Which was the - -

8            THE COURT: Where are you headed?

9            MS. SPRINGER:  - - proposal to purchase.

10           THE COURT: Where are you headed with this line of

11   questioning.

12           MS. SPRINGER: I simply want to know - -

13           THE COURT: As to the amount of cure?

14           MS. SPRINGER: I simply want to know if the cure

15   costs that are, that are stated by the - -

16           THE COURT: Take into account the objections?

17           MS. SPRINGER:  - - non-debtor parties will be

18   escrowed as part of this sale.

19           THE COURT: How's that?

20           MS. MORGAN: That's fine, Your Honor.

21           THE COURT: All right.  Objection is withdrawn.

22   BY MS. SPRINGER:

23   A.   I'm sorry.  Can you repeat the question?

24   Q.   Yes.  Sure.  Various non-debtor parties to the servicing

25   agreements have stated that they do not agree that the cure

1    costs under their servicing agreement is zero.  Do you agree

2    with that?

3    A.   Yes.

4    Q.   Okay.  To the extent that those parties state that they

5    have a cure cost that is greater than zero, is it WLR's

6    intention to escrow the full amount of the cure costs pending

7    this Court's determination as to the correct amount of the

8    cure cost?

9    A.   I believe that the cure costs that are determined at and

10   after the sale hearing, there is a provision to escrow those

11   cure costs until they're resolved.

12   Q.   Okay.  Now the, is it WLR's intention to acquire, if

13   they're the successful bidder, all of the rights and

14   obligations under the servicing agreements that they intend

15   to have assigned to them?

16        MS. MORGAN: Objection again, Your Honor. We're

17   getting to the sale, I believe.

18        MS. SPRINGER: Again, Your Honor, I think there were

19   numerous questions asked on direct regarding the sale, and

20   the sale agreement.

21        MS. MORGAN: But Your Honor, we're not here today

22   for approval of the sale agreement, or for the assumption and

23   assignment of contracts.

24        MS. SPRINGER: But I think we are here today to

25   discuss what the terms of the stalking horse's bid are.  So

1    that we can compare it to other bids that may be generated in

2    the future.

3              THE COURT: All right.

4              MS. MORGAN: Well, Your Honor, I'm sorry again.

5    We'll be doing that, if there are other bids, at an auction

6    or at a sale hearing.  We don't have other bids to compare it

7    to today.

8              THE COURT: Well, no.  But I think it's relevant for

9    purposes of determining whether the Court should approve this

10   bidder as a stalking horse bidder, and these requested bid

11   protections in connection with that.  I think it's fair to

12   explore the terms of the bid.  So the objection is overruled.

13   BY MS. SPRINGER:

14   A.   Well, I guess I would start by saying I don't believe

15   there's anything unique in W.L. Ross's, in the rights under

16   the servicing agreements that W.L. Ross is seeking to acquire

17   that would be unique to any other acquirer - -

18   Q.   But that's not my question.

19             THE COURT: Whoa, whoa, whoa, whoa.

20             MS. SPRINGER: Excuse me.

21             THE COURT: Let him finish.

22   BY MS. SPRINGER:

23   A.   So again, I don't know that there's anything unique to

24   W.L. Ross's approach to the acquisition or the business going

25   forward after the transaction that would be unique to any

1   other potential acquirer, whether they be a financial buyer

2   or a strategic buyer.  You know, there are benefits that, as

3   I've mentioned before about buying the platform.  But when it

4   comes to the servicing rights, I can't really think of any

5   difference in what they would be seeking to acquire.  So I

6   know there are, there are procedures in the, for the sale

7   hearing and the sale order that will clarify, seek to clarify

8   what those rights are that W.L. Ross would be acquiring.  And

9   again, I think that would be, in my opinion, the same as any

10  other buyer would be seeking to acquire.

11  Q.   Mr. Weil, have you read the proposed form of sale order?

12  A.   I have.

13  Q.   Okay.  And you're familiar with it?

14  A.   Reasonably familiar, yes.

15  Q.   Okay.  So I'm going to ask the question again.  Is it

16  WLR's intention, if they are the successful bidder, to assume

17  all of the rights and obligations under the servicing

18  agreements which they are proposing to purchase?

19       MS. MORGAN: Objection, Your Honor, I don't think

20  the witness can say exactly what WLR's intention is.

21       THE COURT: Well, overruled.  I mean, you asked him

22  a number of questions as to what WLR's position was, and

23  albeit there were no objections, but I gave you a lot of

24  latitude, so I'll allow it on cross.  Answer if you can.

25  BY MS. SPRINGER:

1   A.   Yeah.  Again, I'm not sure I'm the best person to answer

2   this question, but I'll attempt to.  You know, I believe W.L.

3   Ross's intention is to acquire certain rights and obligations

4   under the servicing agreements, but not necessarily all of

5   the rights and obligations under those servicing agreements.

6   Q.   So are you saying that WLR has no intention of assuming

7   the servicing agreements in their entirety?

8   A.   I believe there are certain servicing agreements that

9   are defined as servicing agreements but that are in fact

10  broader agreements than relate solely to the servicing of

11  loans.  And as a result of that, W.L. Ross would be seeking,

12  in certain of those agreements, not to assume all of the

13  rights and obligations under those contracts.

14  Q.   Is there any intention, as far as you know, by W.L. Ross

15  to come forward and state exactly what rights and obligations

16  they intend to assume as part of their offer?

17  A.   I don't know the answer to that.

18  Q.   So as of today, you don't know whether they intend to do

19  that or not.

20  A.   I, you know, I think you'd have to ask them.

21  Q.   Okay.

22  A.   Sorry.

23  Q.   But you negotiated the terms of the asset purchase

24  agreement on behalf of the Debtors.  Is that correct?

25  A.   Yes I did.

1   Q.   Okay.  You mentioned that you are continuing to

2   negotiate with other prospective purchasers of the servicing

3   agreements and rights, did you not?

4   A.   Yes we are.

5   Q.   Okay.  Are those purchasers licensed to service loan

6   agreements of this nature?

7   A.   Several of them are currently licensed, and several of

8   them are not.  So, you know, certain of them are in a very

9   similar circumstance to Ross and others are active servicers

10  in the market today.

11  Q.   Okay.  And with respect to the active servicers, if it

12  turned out that they wanted to purchase these same assets,

13  would they need to do a two-step closing like WLR needs to

14  do?

15  A.   For those that are currently licensed in good standing,

16  they would not.  They could do a single close.

17  Q.   Okay.  And in your - - let me rephrase that.  Are you

18  familiar with how long it takes to get licensing rights in

19  the various states where these loans are, where the state's

20  laws govern these particular loans?

21  A.   I am at a high level.  It's not my core expertise.  But

22  I'm somewhat familiar with it, yes.

23  Q.   Well, how long does it generally take to get licenses in

24  those various states?

25  A.   Every state is different.  But when you look at all the

1   states in an aggregate, you know, I've been informed by

2   counsel that handles these types of things that it's probably

3   somewhere around six months, maybe a little bit longer than

4   six months.

5   Q.    And why is it that there needs to be a two-step closing?

6   Why wasn't the closing simply scheduled to occur when the

7   licenses were obtained by WLR?

8   A.    Well again, as I mentioned before, we've got a declining

9   asset in the servicing platform.  Because there's no new

10   originations that are effectively filling up the platform,

11   the underlying UPB continues to decline.  And as the UPB

12   continues to decline, you've got a lot of the overhead that

13   gets carried by a smaller base of servicing rights.  So the

14   cost to service, you know, each loan, effectively goes up.

15   Q.    Um-hum.

16   A.    As a result of that, we felt it was important to, you

17   know, have a, a quicker economic close that then shifted that

18   risk of higher costs and lower profitability, or potential

19   loss to the buyer.  And so rather than postpone the close for

20   six months, or potentially more, we felt it was more prudent

21   to, you know, get the economic, you know, benefit of the

22   transaction and the potential burden of the ongoing operating

23   business moved quickly, and really put this transaction on a

24   financial par with a bidder that was already licensed and

25   could do one close.

1   Q.   Will, as for the second closing, the, where legal title

2   will pass to WLR, does that occur only after WLR gets all of

3   the licenses that are required in order to service all of

4   these loans?

5   A.   I believe so, unless WLR chooses to waive that

6   condition.

7   Q.   And what happens if they don't get some of the licenses?

8   A.   You know, I think I'd, I would have to take a look at

9   the APA and see if there was a substantially complete

10  qualifier to this, so that they didn't have to get every

11  single license.  But if, if Ross was not able to get

12  licensed, again remember that at this point the buyer has

13  paid 100% of the purchase price, and to the extent the buyer

14  determines to postpone the final legal closing, there is a

15  drop dead date where at some point they can no longer

16  postpone it.  I believe it's September of '08.  And at that

17  point, Ross as the buyer could ask the Debtor to, to assist

18  him in selling the platform to somebody else.  But again,

19  from an economic standpoint, you know, the longer it takes

20  for Ross to get licensed and close, and, you know, the more,

21  the more potential risk he has, because at that point he

22  doesn't have control of, of the platform.  So we, we, I

23  believe he's, the acquisition entity is encouraged to get

24  these licenses as fast as possible and close.

25  Q.   Is there any circumstance under which the funds that

1   Ross has paid for the servicing rights are refundable to Ross

2   if in fact they can't have the second closing?

3   A.   I don't believe so.

4   Q.   So those funds don't get escrowed until the final

5   closing?

6   A.   Well, certain of those funds get escrowed, you know,

7   related to disputed agreements, cure amounts, things that

8   we've talked about before.  But the larger amount of those

9   funds, I believe, do not get escrowed.

10  Q.   And they can be distributed to creditors in accordance

11  with their priority, in accordance with the priority scheme

12  in the Bankruptcy Code?

13  A.   I believe so.  Subject to Bank of America's, you know,

14  lien on, on the assets and, and as syndicate lead on the

15  assets and other collateral under their credit agreement.

16  Q.   Okay.  And to the extent that the second closing does

17  not take place, and I think you mentioned that at that point

18  the Debtor and Ross would work together to try to sell the

19  servicing platform, what would be the amount that Ross would

20  be owed at that point?

21  A.   The only thing that he would be owed, the acquirer would

22  be owed would be the proceeds from whatever the sale of that,

23  of the platform generated at that time.  He would not, it

24  would not be owed any part of the original purchase price.

25  Q.   Okay.  Which presumably would be lower than the original

1  purchase price because of their reducing principle balance?

2  A.   That's correct.

3  Q.   Okay.

4        MS. SPRINGER: I have no further questions, Your

5  Honor.

6        THE COURT: Any other cross examination?

7        MR. WILAMOWSKY(Telephonic): Your Honor?

8  (Microphone not recording) to people on the phone, but it's

9  Steven Wilamowsky from Bingham McCutchen, LLC on behalf of DB

10  Structured Products, if I could just ask - -

11        THE COURT: No.

12        MR. WILAMOWSKY(Telephonic):  - - one or, two

13  questions, I think?

14        THE COURT: No, no.  You may not examine the witness

15  over the phone.

16        MR. WILAMOWSKY(Telephonic): Okay.  That's fine.  I

17  wasn't sure what the procedure was.

18        THE COURT: That's fine.  Anyone in court have any

19  questions for the witness?  All right.  I'll have redirect,

20  Ms. Morgan.

21        MS. MORGAN: Yes, Your Honor.  Bear with me, one

22  moment.

23        THE COURT: Do you want a break?

24        MS. MORGAN: Your Honor, could we have five minutes?

25        THE COURT: Yes.  Take a five minute recess.  During

1    the break you may not discuss the substance of your testimony

2    with counsel.

3         (Whereupon at 11:31 a.m. a recess was taken in the

4    hearing in this matter.)

5         (Whereupon at 11:46 a.m. the hearing in this matter

6    reconvened and the following proceedings were had:)

7              THE CLERK: All rise.

8              THE COURT: Please be seated.  Please be seated.

9    Redirect, Ms. Morgan.

10             MS. MORGAN: Thank you, Your Honor.  Just a few

11   questions.

12                        REDIRECT EXAMINATION

13   BY MS. MORGAN:

14   Q.   Mr. Weil, just to try to clarify a few things you

15   responded to on cross examination.  Servicing rights.  Under

16   the agreement, is WLR acquiring all of the seller's servicing

17   rights as that term is defined in the APA?

18   A.   I believe so.

19   Q.   Okay.  And is section, do you remember if §2.1 of the

20   agreement lists the various assets to be purchased by WLR

21   under the APA?

22   A.   Yes.

23   Q.   Okay.  Another point of clarification.  I believe when

24   we were talking about disputed agreements or contracts, those

25   for which a pre-petition termination was alleged, was it your

1    testimony that the $38 billion was calculated with or without

2    those disputed agreements?

3    A.   I believe it's without.

4    Q.   That's correct.  Thank you, thank you.  Sorry about

5    that.  Also, in response to questions from - -

6              THE COURT: You could just put you on the stand, Ms.

7    Morgan, if it would make the testimony go more quickly.

8              MS. MORGAN: It would go quicker, it would go

9    quicker.  Yes, Your Honor.

10             THE COURT: Yes, I know.

11   BY MS. MORGAN:

12   Q.   Under the APA before the Court today, WLR has committed

13   to purchase all of the assets, is that correct?

14   A.   That's correct.

15   Q.   Do you have any belief or indication that WLR would be

16   interested in only a small piece of the assets?

17   A.   I do not.

18   Q.   Okay.  There was also questioning from Mr. McMahon as to

19   how multiple bids might factor into a potential breakup fee.

20   Multiple bids, if they were grouped together, would still

21   have to be higher or better in the view of the Debtors in

22   consultation with BofA and the Committee.  Is that right?

23   A.   That's correct.

24   Q.   And do you recall, does a competing bid have to be for a

25   material portion of the assets?

1   A.   I believe it does.

2   Q.   Okay.

3          MS. MORGAN: No further questions, Your Honor.

4          THE COURT: Thank you.  You may step down.  Any

5   other witnesses?

6          MS. MORGAN: Your Honor, the Debtors would ask for

7   the Court's approval of the motion.  We believe the testimony

8   of Mr. Weil demonstrates that approval of the motion is in

9   the best interest of the estate.  That approval of the

10  stalking horse protections is necessary to preserve the value

11  of the Debtors' estates, and is in accordance, and that the

12  record before you is, satisfies the requirements of the

13  O'Brien Environmental case.  Your Honor, I've also been

14  reminded, before I get too far ahead, that I did not move for

15  the admission of my exhibit, Exhibit D1.

16         THE COURT: Any objection?

17         MS. MORGAN: So if I may do that.

18         THE COURT: Admitted without objection.  Any other

19  evidence?

20         MS. MORGAN: No other evidence, Your Honor.

21         THE COURT: Any evidence by any of the objectors?

22  All right.  We'll close the evidence.

23         MS. MORGAN: Your Honor, as Mr. Weil also testified,

24  the purchaser was unwilling to enter into this transaction

25  without the benefit of the expense reimbursement, breakup fee

1    protection, and other stalking horse protections set forth in

2    the agreement.  Approval of these, according to Mr. Weil's

3    testimony, confers a tangible benefit on the, on the estate.

4    It provides a floor for bidding.  It is instructive for other

5    bidders in that it establishes a, again, a floor and a

6    structure that other bidders may find attractive, while at

7    the same time committing the purchaser to this transaction,

8    which is a favorable bid from the Debtors' perspective,

9    again, in negotiation with its constituencies.  As indicated,

10   Your Honor, the APA was heavily negotiated, at arm's length,

11   by sophisticated parties, all represented by counsel.  And

12   importantly, the motion is supported by the Official

13   Committee, along with the Debtors' principle secured lenders,

14   through their agent, BofA.  And as you know, Your Honor,

15   BofA's collateral is what is being sold pursuant to this

16   motion.  The APA, the motion, the proposed bidding

17   procedures, the proposed bidding procedures order, all of

18   those reflect the the comments and input from the Committee

19   and BofA, as well as the Debtors and the purchaser.  Although

20   collecting all those comments didn't necessarily make for a

21   speedier process, the Debtors believe that it was certainly a

22   worthwhile process.  The input of all of those constituencies

23   was important to the result, which we believe is the best

24   possible agreement that we could negotiate with WLR.  The

25   breakup fee of $5 million, again approximately 1% or maybe

1    slightly more of the purchase price, constitutes a fair and

2    reasonable percentage.  Is well within the range of those

3    approved by this Court and other Courts for transactions of

4    this size.  As Mr. Weil also testified, the purchaser's

5    involvement and his standing has lent credibility to the

6    process.  WLR is a well-known investor and he's committed,

7    obviously, substantial time, effort, and money into this

8    process, and we believe this sends a positive message into

9    the marketplace, also conferring a benefit on the estate.

10   With respect to the request for super priority treatment for

11   a breakup fee and expense reimbursement, as well as the

12   seller APA obligations, we do have an objection from the

13   Creditors Committee.  I'm sorry.  From the US Trustee.  And a

14   limited objection from Assured Guarantee.  The Debtors

15   believe that super priority treatment in this case is

16   appropriate.  First, there, this is not unprecedented in this

17   jurisdiction.  Super priority treatment has been approved by

18   Judge Walrath in the Budget case, and these are just certain

19   cases for example, by Judge Walsh very recently in the

20   Nutritional Sourcing case, and that was over the US Trustee's

21   objection.  By Judge Gross in the Quaker Fabrics case, and by

22   Judge Carey both in Werner and New Century.  And in New

23   Century it was overruling the objection of the US Trustee on

24   this issue.  Having expended the time and effort in

25   negotiating the APA, and understanding the Debtors' financial

1    position, the purchaser was simply not willing to take the

2    risk of non-payment.  Even though the, it is anticipated that

3    any breakup fee and expense reimbursement would be paid upon

4    the closing of a competing transaction, again, WLR was not

5    prepared to take the risk, and the parties, again, the

6    Debtors, the Committee, BofA, in consideration for the other

7    provisions of the agreement, including several concessions

8    which we believe were important, such as the ability to

9    accept higher or better bids at an auction, we felt was

10   adequate consideration and warranted the grant of a super

11   priority claim for all of those provisions.  The expense

12   reimbursement, the breakup fee, as well as the seller APA

13   obligations.  With respect to the authority to grant liens on

14   an interim basis, the Debtors also believe this is reasonable

15   under the circumstances of this case.  This is a somewhat

16   unusual structure for a transaction.  It is a complicated

17   transaction.  And as Your Honor heard, it is not subject to a

18   financing contingency, however, the purchaser intends to

19   finance at least a portion of the purchase price.  It will

20   need the Debtors' assistance and the Court's assistance, if

21   we have the liens granted today, to facilitate that process,

22   because otherwise, as Mr. Weil testified, it will be seeking

23   financing on assets that it has paid for, but that the

24   Debtors still have legal title to.

25        THE COURT:  Well, let me ask you that.  Why, I

1    didn't hear any evidence, the evidence is that that financing

2    will occur, and the liens will be granted, at the earliest,

3    at the initial closing of the transaction, which is post-sale

4    hearing - -

5              MS. MORGAN: That's correct.

6              THE COURT:  - - and is probably in late October.

7    Now under Rule 4001, you can have a final hearing on 15 days

8    notice, but I can only grant you interim relief to avoid

9    immediate and irreparable harm to the estate pending a final

10   hearing.  What is the irreparable and immediate harm to the

11   estate that requires me to enter interim relief and liens

12   that aren't going to be granted for six weeks.

13             MS. MORGAN: Well, again, Your Honor is correct.

14   The liens would not be entered as of this point.  So this

15   would, it's almost a conditional, if you will, interim

16   approval.  It is necessary for WLR, and it, this was

17   something also heavily negotiated.  It's important to WLR so

18   that it can begin the process of the financing, and get that

19   in place, in position to have at the final hearing.

20             THE COURT: Yeah.  But I didn't hear any evidence to

21   that effect.  I mean, there's no evidence in the record that

22   indicates that they can't do that unless I authorize the

23   liens today.  I mean – -

24             MS. MORGAN: Your Honor, I believe Mr. Weil

25   testified of the need for Ross to, again, begin the process

1    now in order to obtain the financing.  I thought that was

2    part of the evidence.

3         THE COURT: Well, I understand that they need to - -

4    but what, what's missing in that is the granting of the liens

5    today.  The approving of the liens today being a condition

6    precedent to them being able to even start the process of

7    obtaining financing.  They don't have the sale approved

8    today.  They can go forward, you know, why is it that, that

9    even though the sale hasn't closed, or more importantly, the

10   sale hasn't been approved by the Court, that's not a

11   impediment to getting financing, but somehow the fact that

12   the liens that would be granted in connection with the sale

13   which has not yet been approved, nonetheless, the liens need

14   to be granted prior to the sale being approved in order for

15   them to get the financing?  It doesn't make any sense.

16        MS. MORGAN: Well, again, Your Honor, conditional

17   approval so that Ross can go to his lenders and say we have

18   interim approval - -

19        THE COURT: All right.

20        MS. MORGAN:  - - and we - -

21        THE COURT: I'm asking the wrong person.  I'll have

22   to ask Ross, because, you know, maybe they can answer me the

23   question.  Because I, I'm very uncomfortable with that piece

24   of it, I have to say.  I'm not saying I'm going to be

25   uncomfortable with it at the sale hearing, but I don't see

1    the need - -

2            MS. MORGAN: Your Honor - -

3            THE COURT:  - - for the Court to approve it today.

4            MS. MORGAN: Your Honor, one other thing to add.  It

5    is a condition to approval of the APA.  So if we don't

6    deliver that for WLR - -

7            THE COURT: Well, so is, so is Court approval of the

8    sale - -

9            MS. MORGAN: Exactly.

10           THE COURT:  - - after the auction.

11           MS. MORGAN: Exactly.

12           THE COURT: That's a condition to approval of the

13   APA.  And that's not going to happen until October 8th, at the

14   earliest.

15           MS. MORGAN: I understand, Your Honor.  Would you

16   like to hear from WLR's counsel now, or?

17           THE COURT: Well, I - - no, you can finish your

18   presentation.

19           MS. MORGAN: That's fine.

20           THE COURT: We can - -

21           MS. MORGAN: Again, with respect to the liens, Your

22   Honor, the estate should be neutral on this point because the

23   liens would only be granted on collateral that constitutes

24   the purchased collateral.  Which is collateral only belonging

25   to the servicing business that WLR has paid for.  So although

1   the Debtors at that time would be the legal title holders of

2   it, they in effect are running that business for the benefit

3   of WLR, and WLR has fully paid for it.  So there's no harm to

4   any creditor for the granting of this lien today or any other

5   day.

6          THE COURT: Right.  And I think that's an excellent

7   argument to be made at the sale hearing.  I mean, I think my

8   response to you is your response to Ms. Springer.  Which is

9   that's a sale hearing issue.  It's not a bid procedures

10  issue.

11         MS. MORGAN: Sounds - - you didn't find it very

12  compelling when I said it, as I recall.  But - -

13         THE COURT: No, no.

14         MS. MORGAN: But Your Honor is in a different

15  stature - -

16         THE COURT: Or, or, you know, maybe I was just

17  giving Ms. Springer enough rope to hang herself.  You never

18  know.  I like to keep it, you know, a little mystery.

19         MS. MORGAN: Your Honor, you know, the other thing

20  you heard in the testimony, again on the liens, is that it

21  could be beneficial for another bidder in this position.  We

22  have, we are talking to other bidders that do not have a

23  license, so they may also require a two-step closing.  And

24  this is not unique to Ross.  It would be for any purchaser

25  who is a successful bidder at the auction, and who's, who's

1   APA is approved by the Court.

2           THE COURT: Um-hum.

3           MS. MORGAN: So another benefit to the estate is if

4   it attracts and provides a template for another bidder in

5   similar circumstances.  And with that, I think I'll get off

6   the lien issue.  Your Honor, with respect to the revised

7   bidding procedures themselves, the Debtors submit, and we

8   believe that testimony shows that the, the dates proposed are

9   reasonable and provide adequate notice to interested bidders,

10  best serves the Debtors' need for a prompt sale of these

11  assets.  The procedures themselves are fairly standard.

12  Again, they were also negotiated at length among the

13  purchaser, the Debtors, BofA, and the Committee, and afford

14  all constituencies requisite protections to ensure a smooth

15  auction process, which we believe will provide maximum

16  flexibility to the estate, and allow us to determine the

17  higher, highest or otherwise best bid for the assets.  Your

18  Honor, we do have some changes to the bidding procedures.

19  I'm prepared to hand up a black line.  They are pretty minor.

20  They have been negotiated, again, with the constituents.

21          THE COURT: Do they resolve objections or are they

22  - -

23          MS. MORGAN:  I'm not sure there are any objections

24  that go to the procedures themselves.

25          THE COURT: Let's, let's, let's do that at the end.

1    Let's deal - - does anyone else have any further statements

2    in favor of the motion?

3         MR. INDELICATO: Your Honor, Mark Indelicato from

4    Hahn & Hessen on behalf of the Committee.  Your Honor, if I

5    could, I'd like to address the question that the Court wanted

6    to put to Wilbur Ross, because - - on the lien issue - -

7    because it really emanates from a concern the Committee had.

8    And the APA was negotiated and changed as a result of our

9    concerns.  Originally when we got involved in this

10   transaction, I think this will get into the immediate and

11   irreparable harm to the Debtor, at least from the Committee's

12   perspective.  What our concern was when we initially saw the

13   transaction, it was structured very much like the Court had

14   suggested it be structured.  That the issue with respect to

15   the liens be put off to the sale hearing.  However, Your

16   Honor, if those liens were not granted, it would have been a

17   condition to the sale.  Meaning that if those liens were not

18   granted, Ross would have been able to walk on the

19   transaction.  That would have been after the bidding

20   procedures would have been approved, and we would have

21   committed to a $2 million expense reimbursement and the $5

22   million breakup fee.  Your Honor, we viewed that, from the,

23   from the perspective of the Committee, as a financing

24   contingency.  And we told Ross that in fact that was not

25   acceptable to the Committee.  We wanted for him to be

1   involved in the transaction, we wanted him to be committed

2   before we would get behind and support the breakup fee and

3   the expense reimbursement.  As a result of our concern, Your

4   Honor, we renegotiated an amendment to the purchase agreement

5   and to the bidding procedures to come up with this structure.

6   And basically we looked at this structure and said the way we

7   were going to do this transaction is that Ross, or the Ross

8   affiliate, was going to pay the initial purchase price at

9   closing.  And in conjunction with that, his entity would get

10  a security interest in all of those assets to secure the

11  Debtors' obligations to perform.  So in fact, if there wasn't

12  a closing he would have the rights to sell these assets and

13  achieve the proceeds, but there would be no reduction in the

14  purchase price.  And we looked at that and we said, Well, how

15  do we get him the comfort that he needs to know that if in

16  fact he does do this transaction, and he does this two-step

17  closing, he will be, after the initial closing be able to go

18  out, with the Debtors' assistance, and get a "replacement",

19  quote unquote, non-recourse DIP financing to put some

20  additional liquidity in the company?  Because there are other

21  obligations that he will have in order to fund the servicing

22  business going forward.  So we came up with this structure,

23  Your Honor, and albeit we're asking the Court to approve his

24  ability to go out and get the liens prior to the sale being

25  approved, but we're also asking a lot of different things in

1   this structure that are not, let us say, kosher in a normal

2   type of transaction.

3          THE COURT: But wait a minute.  This is, this isn't

4   going to solve your problem.  Because even if I enter an

5   interim order today, you're going to have to get a final

6   order at the hearing.

7          MR. INDELICATO: That's correct, Your Honor.

8          THE COURT: At the sale hearing.  All right.

9   Between entry of the interim order and consideration of the

10   final order, there will be no financing - -

11          MR. INDELICATO: That's correct - -

12          THE COURT:  - - will go forward.  There will be no

13   lending.

14          MR. INDELICATO: That's correct.

15          THE COURT: All right.  So the only reason you - -

16   so there's no good faith reliance.

17          MR. INDELICATO: But - -

18          THE COURT: There's, there's nothing Wilbur Ross is

19   going to do.  If I disapprove it at the final order, you

20   haven't improved the situation in any way.  If - - so there's

21   no, he's getting no protection.  I'm still going to look - -

22   or, the buyer is getting no protection.  I'm still going to

23   look at the final order, at the sale hearing, and make a

24   judgment as to whether it's appropriate or not.  And if I

25   approve it, fine.  If I disapprove it, you're right back

1  where you were.  And there's nothing that's happened between

2  the two dates that has to happen.

3          MR. INDELICATO: Well - -

4          THE COURT: Other than making the Committee - -

5          MR. INDELICATO: Your Honor - -

6          THE COURT:  - - okay with the fact that he's

7  getting a breakup fee.

8          MR. INDELICATO: There are two, there are two things

9  that have happened.  One is there is no financing contingency

10  in the APA.  And that means when other parties in interest

11  bid on this APA, there will be no financing contingency.  So

12  that was one thing that we believe we have gotten out of

13  this, of this amendment to the, this - -

14          THE COURT: How?  How?  That's my question.  How?

15  Because there's no fine aid (phonetic).  You have it.

16          MR. INDELICATO: Because - -

17          THE COURT: Because interim approval - -

18          MR. INDELICATO: Because - -

19          THE COURT:  - - doesn't help you.

20          MR. INDELICATO: Because Ross took it, because Ross

21  took it out.  He has agreed that if the order is entered as

22  now, approving on an interim basis this financing - -

23          THE COURT: All right.

24          MR. INDELICATO:  - - that there is no financing

25  contingency.  And I believe, and his counsel will speak to it

1   when she gets up, you know, how he will deal with the issue

2   of that you ultimately don't approve it at the end of the day

3   in a final order, but that's not dealt with, and that's - -

4   we're not asking for final approval, and they understand the

5   issue.  Now, I don't believe, and I'd have to defer to the

6   gurus on the APA - -

7            THE COURT: But your argument is, your response to

8   my question is if I don't approve it on an interim basis,

9   they're going to build something back into the APA - -

10            MR. INDELICATO: I, I - -

11            THE COURT:  - - that makes it contingent on - -

12            MR. INDELICATO: I - -

13            THE COURT:  - - them being able to obtain

14   financing, or it makes it contingent upon them getting final

15   approval of - -

16            MR. INDELICATO: I think you're - -

17            THE COURT: - - of the liens.  Because it's already

18   contingent upon - -

19            MR. INDELICATO: Your Honor - -

20            THE COURT:  - - final approval of the liens.

21            MR. INDELICATO:  - - what will happen, and this is

22   my view, and Ross's counsel will get up, if the Court does

23   not approve the final financing at the sale hearing, we will

24   have a transaction where, where the entity will have funded

25   the purchase price, the entity that funded the purchase price

1    will have a lien of substantially or all of the servicing

2    assets, and then they will have to come back to the Court and

3    find a mechanism of either replacing that financing with

4    other DIP financing or - -

5            THE COURT: That's not the question.

6            MR. INDELICATO:  - - but we will have met - -

7            THE COURT: The question is what if I don't approve

8    the interim financing today, what happens?

9            MR. INDELICATO: They have the right to walk on the

10   transaction.

11           THE COURT: If I don't approve the interim - -

12           MR. INDELICATO: That's correct, Your Honor.

13           THE COURT:  - - financing today.

14           MR. INDELICATO: That's correct, Your Honor.  So

15   that, that was the negotiated transaction.  And we believe,

16   and quite honestly, Your Honor, we wanted to know they were

17   in for the $7 million or the $2 million and the $5 million

18   before we ultimately agreed to that amount.  And this was,

19   this was the only mechanism that we could come up with that

20   would satisfy everybody's concerns.  Obviously we may not

21   have satisfied the Court's concerns.  But there was a

22   reasoned business decision on all sides coming up with this.

23   And we believe that the estate would be irreparably harmed if

24   this provision of the order was not entered.  So I think to

25   the extent we can we've addressed some of the Court's

1    concerns.  Hopefully to your satisfaction.

2              THE COURT: All right.  Well can you point to me in

3    the APA where they have the right to walk in the event that I

4    don't approve the interim DIP order?

5              MR. INDELICATO: Since I don't have it in front of

6    me, I will defer to all the people turning the pages.  It's,

7    Your Honor, it's in §8.1(a) of the revised sales procedure

8    order.  It requires - -

9              THE COURT: Hang on.  Let me get there.

10             MR. INDELICATO: §8.1(a) of the APA provides the

11   provisions of what this revised sale procedure order must

12   require.

13             THE COURT: The revised sales procedure order - -

14             MR. INDELICATO: And it's - -

15             THE COURT:  - - shall have been entered by the

16   Court and not be subject to any stay, shall not have been

17   modified or amended adverse to the procedure unless agreed to

18   in writing, and shall have become a final order.

19             MR. INDELICATO: And it's a revised sale procedure

20   order that was submitted in conjunction with the APA attached

21   as an exhibit, which included the provision at section, I

22   don't remember the paragraph - -

23             THE COURT: All right.

24             MR. INDELICATO:  - - that provided that - -

25             THE COURT: Okay.  I understand.

1          MR. INDELICATO:  - - the interim liens are granted.

2    And 9.1(c)(3), Your Honor, provides their right to terminate

3    if, in fact, that revised sale procedure order has not been

4    entered by the Court.

5          THE COURT: Okay.

6          MR. INDELICATO: Your Honor, briefly I will deal

7    with the other issues that I think have come up in the

8    objection.  And that's the request for the super priority

9    expenses with respect to the breakup fee, the expense

10   reimbursement, and what is I believe titled under the APA the

11   reconciliation payment.  Your Honor, as this transaction is

12   structured, it is a little different from most transactions

13   you would normally see.  We did negotiate heavily with the

14   purchaser regarding a number of provisions including, as Ms.

15   Morgan pointed out, the ability to consider a higher or

16   better, instead of higher and better.  That was a big

17   concession, as Mr. Weil testified to, in the negotiations.

18   In exchange for that, this was one of the concessions given.

19   This is, this is a, this is a truncated Debtor, Your Honor,

20   where all of the servicing assets are subject to the liens of

21   BofA.  The other assets are subject to the DIP financing.

22   And when you look at the servicing assets, they said, Well,

23   how am I going to be assured, if I agree with this proposal,

24   that I will be paid?  And short of giving them a lien in the

25   assets, which BofA would not agree to, to the servicing

1  business, we believe this was the best way to protect them.

2  We believe it was reasonable under the circumstances, and

3  given the overall transaction.  With respect to the

4  reconciliation payment, which is the obligations under the

5  APA, Your Honor, we were not concerned about the super

6  priority as it related to that.  Because if you follow

7  through the APA and understand what the reconciliation

8  payment is, from the initial close to the final close, the

9  purchaser will have the economic responsibility of the

10  Debtor.  The reconciliation payment, if everything goes the

11  way it's supposed to be, and the Debtor has to pay the

12  purchaser, that means the company has met, well that

13  servicing business in that interim period has made money, and

14  the reconciliation payment was the way to take the profit out

15  of the business and return it to the purchaser before the

16  final closing.  Or after, I'm sorry, after the final closing

17  to make sure the cash went where it was supposed to go.  So

18  in essence we're paying them back with their own cash, and to

19  give them a super priority to do that, we were not offended,

20  Your Honor, in the light of the overall transaction.  So in,

21  in considering where we are, we do hope that there's going to

22  be spirited bidding.  We hope that we're standing here with

23  Wilbur Ross or some other purchaser at a much higher purchase

24  price.  We believe getting the stalking horse in there is

25  going to be the first step in achieving that objective.  We

1    hope Mr. Weil is going to be as successful as we've seen him

2    be in other cases, and bring a lot of people to the table and

3    increase the purchase price.  But we need to get the process

4    started.  As he said, this is a wasting asset, and we believe

5    these procedures are the, are the best mechanism for dealing

6    with a sale in this otherwise unorthodox industry for selling

7    assets.  So in that regard, the Committee supports the

8    bidding procedures and the breakup fee and the entry of the

9    bid procedures order.  Thank you.

10          THE COURT: Thank you.  Any other statements in

11   favor of the motion?

12          MR. TALMADGE: Good afternoon, Your Honor.  Scott

13   Talmadge from Kaye Scholer on behalf of Bank of America, the

14   administrative agent under the pre-petition credit facility.

15   As Your Honor knows, the administrative agent is the holder

16   of the liens on the assets that are subject of the sale.  The

17   administrative agent supports the existence of a stalking

18   horse bidder here.  We believe and hope that that will aid in

19   an increased value for the sale of these assets.  And the

20   administrative agent has consented to the breakup fee

21   provisions, the expense reimbursement provisions, and all of

22   the other auction protections that are provided for in both

23   the motion and the order approving the revised bidding

24   procedures.

25          THE COURT: Thank you.  Anyone else?  I'll hear from

1    the buyer.

2         MS. RYLAND: Good afternoon, Your Honor.  Erica

3    Ryland of Jones Day representing AH Mortgage Acquisition Co.,

4    Inc. and WLR.  I just wanted to point out, or certainly

5    answer any questions Your Honor has, but specifically in

6    §9.1(c)(3), that gives the purchaser the right to terminate

7    the agreement.  And that was very heavily negotiated.  And

8    the logic behind that, from our client's perspective, was

9    that if, the, the granting of these liens on a non-recourse

10   basis, on the final basis at the sale hearing, is probably as

11   unusual as the structure, and therefore wanted to have some

12   confidence that the Judge had considered the issue and had

13   approved them on an interim basis.  Which would give our

14   client some confidence, admittedly limited confidence, but

15   more confidence than if the issue was simply sprung at the

16   sale hearing.

17        THE COURT: Well, and I appreciate that, but I'm not

18   sure you're, you're going to get what you want.  Which is

19   even if I approve it on an interim basis, the argument that's

20   going to win you on the, at the final hearing is not going to

21   be that I've already approved it on an interim basis.  I'm

22   going to look at it with fresh eyes at the final hearing.

23        MS. RYLAND: We fully understand that, Your Honor.

24        THE COURT: And since there will be no lending going

25   on, no liens actually being granted in the interim period,

1    you won't even have sort of the usual backdrop of saying,

2    Look, Judge, you entered an interim order, I lent in good

3    faith, I have my good faith finding, and you know, as a

4    result you can't sort of undo the transaction that occurred

5    in the space.  So if I approve it, and I might because why

6    not?  I mean, you know, the irreparable harm to the estate

7    would be you would have the right to walk if I didn't.  And

8    if I approve it, nothing's going to happen between now and

9    the final hearing that will in any way adversely affect the

10   estate or give any teeth to your interim approval in any way.

11   So it's sort of easy to approve it on an interim basis to

12   avoid you walking away.  Now that may be as much as you get.

13   And I'm not sure how that helps you, but I guess if it

14   doesn't hurt the estate, why not do it?

15            MS. RYLAND: We're prepared to accept that, Your

16   Honor.

17            THE COURT: All right.

18            MS. RYLAND:  Are there any other questions, Your

19   Honor?

20            THE COURT: No, no, I don't have any questions.

21            MS. RYLAND: Thank you.

22            THE COURT: I'll hear objectors, if any.  I think

23   you're the last man standing Mr. McMahon.  I'll take, let's

24   take the last point first, which is I know you raised the

25   issue on the interim approval of the, of the liens.  Given

1    how the record has developed and the exchange, weighing the

2    one risk, you know, and I, albeit I think it's a slight risk,

3    but there's a risk that if I don't approve it, the buyer

4    could walk, versus the other side of granting it on a interim

5    basis, and in fact having no substantive adverse affect on

6    the Debtors' estate, why shouldn't I just approve that, the

7    lien issues on an interim basis?

8            MR. McMAHON: Your Honor, we filed our objection

9    with the expectation of coming to the hearing and getting

10   some understanding as to how the mechanics of this worked.

11   And I don't know, necessarily, if it's a harm, harm to the

12   estate issue as much as it is notice, and the fact that there

13   really isn't an evidentiary record that was established here.

14   I believe the point Your Honor made earlier is accurate.

15   That there is nothing here linking this provision with Ross's

16   ability, or need, or desire to obtain financing.  If he can

17   go out into the market, in the absence of that provision in

18   the order, Your Honor, and go ahead and search, you know,

19   seek out financing sources for what he wants to do with

20   respect to his bid, the thought that the, I guess provision

21   in the order is going to change/hamper/aid him in that

22   effort, there's just been no record established in that

23   regard.  And I think that is the point.  Typically, these

24   types of issues are resolved at the final hearing, and we're

25   here on a motion that was filed at 10 a.m. on Friday.  We're

1    talking about a very short period of time to address it.  We

2    just simply think from a notice perspective it's better

3    addressed, as it is typically done in this District, at the

4    final hearing.  And that provision should be excised from the

5    order.

6         THE COURT: I understand.

7         MR. McMAHON: All right.  With respect to the first

8    point we raised, Your Honor, I don't think that the Debtors

9    have adequately addressed it, which is the super priority

10   status point.  And I think our objection, I think, concisely

11   identifies the two code sections under which the Congress has

12   authorized the Court to grant super priority status to a

13   particular claim.  And neither of them, really, is applicable

14   here.  The Debtors - -

15        THE COURT: Well, couldn't you argue that the

16   stalking horse is, in effect, providing credit to the

17   Debtors' estate by taking actions in reliance on the, on the

18   entry into the APA and setting themselves up as the stalking

19   horse.  Ultimately if they are, if there's a competing bid,

20   and they're entitled to that fee, they'll get an allowed

21   administrative expense claim.  The allowed administrative

22   expense claim is for providing actual and necessary expenses

23   of preserving the estate.  I think you could argue that.

24   Because the alternative, I suppose, to require sort of some

25   advance payment, if you will, or some advance credit on the

1    purchase price, or a deposit, as opposed to in effect

2    providing credit.  The credit here being taking action,

3    servicing as the stalking horse, so that in the event that

4    they are ultimately the losing bidder, they will be entitled

5    to some sort of claim.  That claim is a credit.  So couldn't,

6    I mean, I understand it's a stretch, perhaps, of 364(c), but

7    isn't it possible to view it in that terms?  In effect they

8    are providing credit to the estate that the Debtor is not

9    otherwise able to receive, because no one will service a

10   stalking horse without a bid protection.  And as a result, I

11   am authorized under 364(c) to provide for a super priority

12   claim.

13        MR. McMAHON: Well, Your Honor, with respect to

14   364(c), if I may just have a moment - -

15        THE COURT: Sure.

16        MR. McMAHON:  - - to take a look at the Code

17   section.  Your Honor, I would suggest that we're dealing with

18   the proposed sale of assets, which is, you know, specifically

19   addressed under §363 of the Bankruptcy Code.  When you look

20   at the lead in to 364(c) it says, If the Trustee is unable to

21   obtain unsecured credit allowable under §503(b)(1) of this

22   title as an administrative expense.

23        THE COURT: Right.

24        MR. McMAHON: That is the, the threshold showing

25   that would have to be made.  I don't necessarily believe,

1   Your Honor, that as a matter of statutory construction that a

2   deal term in connection with a, what's essentially, you know,

3   close to a half billion dollar sale, where the Debtors agree

4   to provide a breakup fee or administrative expense as a bid

5   protection for a bidder, would be a situation where they

6   have, I guess, considered a landscape of possibilities of

7   obtaining unsecured credit, as that, you know, phrase is

8   defined in that subsection.  In other words, are the Debtors,

9   I guess, before as a condition to getting super priority

10  protection, forced to take a, a, I guess a offer that would

11  be less than what they considered to be highest and best just

12  to qualify themselves for the protection, I guess would be my

13  question.  There may well be, in fact, be bidders out there

14  who would be willing to proceed without a breakup fee or an

15  expense reimbursement.  I, that would essentially be, I

16  think, my response, Your Honor, because as a matter of

17  statutory interpretation I do not think that, you know,

18  reading the Code as it is that Congress intended for 364(c)

19  to be used for this purpose.  And I think we also, Your Honor

20  have to fall back on what is the controlling, I guess, case

21  law in the circuit, which is the Calpine case.  Which we

22  cited in our papers.  And it's fairly clear how the Circuit

23  views breakup fees and expense reimbursements as being bid

24  protections.  And the appropriate section being 503(b) of the

25  Bankruptcy Code.  I would further note that, Your Honor, that

1  certainly the Debtors, and not a single attorney that has got

2  up, gotten up here to the podium in support of the, of the

3  requested relief, has gone so far as to even, I think, cite

4  364(c), or to even cite a Code section in support of what it

5  is they're trying to do.  And so with that backdrop, Your

6  Honor, I would suggest that we, we really are dealing with

7  the 503(b) issue here, and the, I think the question for us

8  is in light of the fact that 364(c) and 507(b) are the only

9  Code sections under which Congress has authorized the

10  allowance of super priority administrative expenses, if you

11  will, the, the absence of specific authority for, I guess, in

12  503(b) or otherwise, for uses of this purpose should not be

13  allowed by this Court.

14          THE COURT: Okay.

15          MR. McMAHON: Your Honor, with respect to the second

16  point we raised, which is the definition of competing

17  transaction, I tried to explore the parameters of what might

18  occur in a situation where, you know, I guess a sale, the

19  sale was organized a certain, in a certain fashion, but I

20  want to come back to a key point here.  The, as the Debtors

21  clearly identified a condition of the sale is that Ross - -

22  I'm sorry - - that the Debtors be able to provide 38 billion

23  in UPB at the initial close.  Ross has the ability to, to

24  waive that condition if it sees fit.  But the key point

25  being, Your Honor, that today Ross is not committing to going

1    forward with the sale with the UPB below the 38 billion

2    shelf.  And if that is the case, Your Honor, then I think

3    that the point we make in our objection should be followed

4    insofar as defining the terms under which the breakup, the

5    breakup fee would be payable, which is if they're not

6    committing today to going forward with a sale below that

7    shelf, then the estate's not getting any benefit from that

8    lack of a commitment.  Therefore, if we're talking about

9    values below 38 billion, we believe an appropriate limitation

10   on the breakup fee authority would be to limit it such as to,

11   to bids provided that that condition has been met.  If Ross

12   wants to reserve in itself a right to walk, the estate should

13   be similarly protected.  It shouldn't have to commit itself

14   to paying a breakup fee and expense reimbursement for a sale

15   that Ross is not willing to commit itself to today.  Second,

16   Your Honor, with respect to the point we make about, I guess,

17   timing, we also think another appropriate limitation with

18   respect to the breakup fee would be to limit it temporally to

19   a sale that would, that has closed within a certain time

20   period of the sale hearing.  And Your Honor, I don't, you

21   know, I won't belabor the Court with, I guess, the range of

22   possibilities that could occur when a process breaks down.

23   The, anything from conversion to the appointment of a

24   trustee, what can happen in a bankruptcy case.  But I'm not,

25   I'm not convinced of the idea that anything and everything

1    that happens after Ross steps forward, it should be getting

2    credit for.  And I certainly, we certainly believe, Your

3    Honor, that an appropriate limitation with respect to the

4    payment of the breakup fee would be to limit it to a

5    transaction that would close within a certain time period

6    after the sale hearing.  Be that say 60 to 90 days would be a

7    reasonable proposal.  Your Honor has already addressed the

8    issue with respect to the sale order, unless Your - - I'm

9    sorry - - the financing provision in the bidding procedures

10   order.  Unless you have any further questions for me, those

11   are our points.

12           THE COURT: No.  Thank you, Mr. McMahon.

13           MR. McMAHON: Thank you.

14           THE COURT: Any further objections?  Good afternoon.

15           MR. BUTZ: Good afternoon, Your Honor.  Daniel Butz

16   from Morris, Nichols, Arsht, & Tunnell on behalf of Assured

17   Guarantee Corp.  We were the other party that objected to the

18   so called financing provisions.  The, the granting of the

19   liens in the sale procedures order, as well as the granting

20   of super priority status to the seller APA obligations.  We

21   took no position as to the expense reimbursement and the

22   breakup fee.  We were just concerned about the seller APA

23   obligations.  And in both cases our objection was purely

24   because this motion was filed on a Friday, we had less than

25   two days to figure out exactly what it meant to our client,

1    and it didn't seem that either of these provisions were

2    necessary until after a sale order, or with a sale order

3    being entered.  And because we had, we couldn't think through

4    the implications of these at that time, we request, we

5    requested in our objection, and we request now, that this

6    Court forego entering an order on either of those two

7    provisions, or at the very least preserve all objections to

8    either of those two provisions until the final hearing on an

9    actual sale order.

10           THE COURT: Okay.

11           MR. BUTZ: I have nothing further to add unless you

12    have any questions.

13           THE COURT: Thank you Mr. Butz.

14           MR. BUTZ: Thank you.

15           THE COURT: Anyone, anything further?  All right.  I

16    don't need, I'm going to overrule the two objections in their

17    entirety.  I know we need to go through the changes to the

18    order, but let's deal with the objections first.  In

19    connection with the, providing super priority claim for the

20    breakup fee and first of all, as an initial matter, I don't

21    think anyone objected to the breakup fee and the expense

22    reimbursement as a matter of amount or appropriateness under

23    the, under the appropriate standards.  And I agree.  I find,

24    I think the breakup fee is certainly well within the range of

25    reasonableness, given a transaction of $500 million, $7

1   million in total in expense reimbursement and breakup fee is

2   well within the range of reasonableness.  And the Debtors

3   made a, quite a strong case in the evidence that the O'Brien

4   standards were met.  With regard to providing it with super

5   priority status, I have a couple comments.  One, it is, I

6   won't say it's a usual course to give the breakup fee super

7   priority status, but it is, it happens with some regularity

8   in this Court.  I do read 364(c), respectfully, differently

9   than Mr. McMahon, and perhaps anyone else, as it wasn't cited

10  to the Court specifically.  But I think there's an argument

11  to be made, and it's important that 364(c) references 503(b),

12  that there is an argument to be made that under 503, under

13  364(c) the Court does have the authority to provide super

14  priority status for administrative expense claims, if the

15  party providing the credit, or doing the work that is going

16  to entitle it to that administrative expense claim, would not

17  do that status on the basis of a, simply an unsecured, or a

18  regular run of the mill administrative expense claim.  And I

19  think the evidence today is quite clear that it was a

20  condition precedent to the buyer's agreement to serve as a

21  stalking horse that that, that their breakup fee and expense

22  reimbursement be entitled to super priority status.  So at

23  least on the facts of this case, I'm not troubled by that,

24  and I'm going to overrule the objection on that basis.  With

25  regard to the financing piece of this, and the granting of

1   approval on and interim basis of the granting of the liens on

2   a, on a limited recourse basis, I was troubled by that.

3   That's obvious, probably fairly obvious from oral argument

4   that I was troubled by it.  And I was troubled by the timing

5   of it.  But I think that the Debtors have, with the

6   Committee's help, have clarified for the Court that there is

7   a risk of irreparable harm to the estate if I don't approve

8   it on an interim basis today, because the buyer could walk

9   away from the transaction in the event that the Court doesn't

10  include it.  Now, I hate those games of chicken with whether

11  the Court's going to approve something or not approve

12  something, and I didn't ask the buyer sort of point blank

13  whether they would in fact walk away from the transaction,

14  because I really didn't have to in that nothing's going to

15  happen between now and the final hearing on the relief

16  requested that will in any way affect or prejudice the rights

17  of anybody because the liens will not be granted unless the

18  sale is approved, and not until it goes to closing.  So

19  there's really sort of no downside to the estate, or any

20  creditors, or the Court with giving the interim approval

21  today.  And as a result, I think that since it could be

22  arguably an empty gesture, it's one the Court is willing to

23  make in order to preserve the very important aspect of this

24  case which is the sale.  We go to a final sale hearing, we go

25  to a sale hearing, and you're going to seek final approval of

1    the liens.  All rights are reserved with regard to any

2    objections that are filed, and you're going to need to make

3    an independent showing at that time that it's appropriate.

4    It very well may be.  I'm, you know, I'm not going to make

5    any comments sort of one way or the other in advance, but it

6    may very well be approved by the Court at that time, based on

7    a proper evidentiary record.  So I don't have a problem with

8    that issue.  I not also, I'm also not particularly troubled

9    by the, the issue raised by the Office of the United States

10   Trustee as to the definition of competing transaction.  I

11   think the evidence was more than sufficient to establish that

12   it's extremely unlikely that we're going to run into an issue

13   where at least this buyer will be a purchaser of a piece of

14   this business.  It may be that we have piecemeal bidders.  I

15   think it's unlikely.  I think you're either going to buy the

16   servicing business as a whole or not.  Clearly, if you're

17   going to support all of the employees, and the platform, and

18   the economics, it's hard to do that on $5 billion of unpaid

19   principle balance on loans.  You're going to need the full 38

20   to $45 billion of unpaid principle.  There is a risk that

21   this buyer could buy a piece of it, and still be entitled to

22   the breakup fee.  I think it's a remote risk, and I think

23   it's a risk that the Committee and the Debtors are more than

24   capable of taking into account when they conduct the auction

25   and in exercise of their fiduciary duty in consultation with

1    the various entities, decide whether or not that is, in

2    effect, a higher and better bid.  If it's a higher and better

3    bid, it's a higher and better bid.  And I think it would be

4    appropriate to pay the breakup fee in that instance.  I think

5    the evidence was also very clear that it's extremely unlikely

6    we're going to be in a situation where we have less than $38

7    billion in unpaid principle balance as of the initial closing

8    date.  They have over $45 billion today, if that number does

9    not include the disputed loans that are subject to at least

10   arguments that they have been terminated, and the runoff in

11   the industry has clearly slowed down.  The evidence was

12   before the Court on an uncontested basis, and it's just

13   common sense that the types of loans that we're talking

14   about, the likelihood of being able to refinance enough that

15   you're going to be below 38 billion is remote.  So I'm not

16   troubled by that.  So I'll overrule the objections, and we

17   can turn to the, turning the pages of the order.

18            MS. MORGAN: Thank you, Your Honor.  Your Honor,

19   actually the order did not change at all.  The procedures

20   attached to them changed slightly.  So if I may approach.

21            THE COURT: Thank you.  And this is a final order?

22            MS. MORGAN: Yes, Your Honor.

23            THE COURT: All right.

24            MS. MORGAN: Your Honor, the first page of the

25   revised sale procedures has a black line at the bottom

1  paragraph.  Again, this is meant to clarify that there are

2  other servicing rights held for sale, and that's a definition

3  in the APA, that are not being sold pursuant to this auction.

4         THE COURT: Right.

5         MS. MORGAN: So there's no suggestion that they have

6  to be sold in accordance with these procedures.  There will

7  be other motions before the Court with respect to those

8  assets.  I believe the next change, Your Honor, is in

9  paragraph 4, on page 4.  We've removed the letter of credit.

10  We do expect that the bids must be accompanied by a check or

11  wire.  We've also confirmed, at the tail end of that

12  provision, that the minimum deposit may be used to fund,

13  shall be used to fund a portion of the purchase price

14  provided for in the bid.  And again, Your Honor, that's a

15  protection for WLR in case that is needed to pay any breakup

16  fee, so that it does not come out of the estate.  We have

17  eliminated paragraph 5.

18         THE COURT: All right.

19         MS. MORGAN: That was, we thought, kind of

20  confusing, because obviously we're going to need cash

21  consideration well in advance of $7 million.  But again, this

22  was designed to make clear that we wanted at least enough

23  cash to pay the breakup fee so that the estate would not have

24  to bear that cost.  Again, Your Honor, that same issue, if

25  you will, is reiterated in the black lining near the bottom

1    of the page.  With respect to any credit bid.  They would

2    still have to provide cash consideration of at least $7

3    million - -

4              THE COURT: To pay the breakup fee.

5              MS. MORGAN:  - - again so that the estate is

6    bearing that cost.

7              THE COURT: Right.

8              MS. MORGAN: And I believe, Your Honor, that that is

9    it.

10             THE COURT: All right.

11             MS. MORGAN: Yes, Your Honor.  That, those are all

12    the changes.  And again, they have been signed off on by the

13    Committee and BofA.

14             THE COURT: Yes, ma'am.

15             MS. MORGAN: One more?

16             MS. RYLAND: One more.  It's actually just a typo.

17             MS. MORGAN: Oh.

18             MS. RYLAND: The earlier of, the earlier of.

19             MS. MORGAN: And this is where?  In the bid

20    procedures?

21             MS. RYLAND: Yes.  Bid requirements.

22             MS. MORGAN: Your Honor, yes.  It's on page 4 of the

23    black line.  And maybe I can ask Your Honor to strike one of

24    these phrases.  Near the bottom of that last full paragraph,

25    second to the last line.  It says "until the earlier of" and

1    then it says, "the earlier of" again.

2                THE COURT: Where?

3                MS. MORGAN: I'm sorry.

4                THE COURT: Oh, "until the earlier of the earlier

5    of"?

6                MS. MORGAN: Yes, yes.  If we could get rid of one

7    of those, Your Honor, that would be great.

8                THE COURT: Until the earlier of a closing?

9                MS. MORGAN: Correct.

10               THE COURT: Mr. Greer (phonetic) must have been

11   tired.  All right.  Anything else?

12               MS. MORGAN: No, Your Honor.

13               THE COURT: Do you want me to fill in these blanks

14   on the final order on page 1?  Substantially informed that

15   certain asset purchase agreement dated as of?

16               MS. MORGAN: Yes, Your Honor.  The filed version

17   today was dating it as of today.  So the 25th.

18               THE COURT: All right.  And then?  These were

19   approved by the order dated today as well.

20               MS. MORGAN: Yes.

21               THE COURT: All right.  I'm signing the order.

22   Anything else for today?

23               MS. MORGAN: Nothing for today, Your Honor.  Thank

24   you very much.

25               THE COURT: You're welcome.  Hearing is adjourned.

1          UNIDENTIFIED SPEAKER: Thank you.

2      (Whereupon at 12:41 p.m. the hearing in this matter was

3  concluded for this date.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          I, Jennifer Ryan Enslen, approved transcriber for

19  the United States Courts, certify that the foregoing is a

20  correct transcript from the electronic sound recording of the

21  proceedings in the above entitled matter.

22

23   _/s/Jennifer Ryan Enslen_                    ___10/08/07___
     Jennifer Ryan Enslen
24   43 Bay Boulevard
     Newark, DE 19702
25   (302)836-1905