UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                              .    Chapter 11
                                    .
AMERICAN HOME MORTGAGE              .    Case No. 07-11047(CSS)
HOLDINGS, INC., a Delaware         .    (Jointly Administered)
Corporation, *et al.*,             .
                                    .    October 1, 2007
                                    .    10:00 a.m.
            Debtors.               .    (Wilmington)
                                    .


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE CLERK: All rise.

2          THE COURT: Please be seated.  Good morning.

3          MR. BEACH: Good morning, Your Honor.  May it please

4  the Court, Sean Beach from Young, Conaway, Stargatt, & Taylor

5  on behalf of the Debtors.  Your Honor, the first five items

6  on the agenda have been adjourned by agreement of the

7  parties.  So unless Your Honor has any questions for me, I'll

8  move on to item no. 6.

9          THE COURT: No questions.

10          MR. BEACH: Item no. 6 is the motion of General Star

11  National Company for relief from the automatic stay for

12  cause.  Your Honor, the Debtors do not contest this motion

13  and a certification of counsel has been filed.

14          THE COURT: I signed this order about a half a hour

15  ago.

16          MR. BEACH: Thank you, Your Honor.  Your Honor, item

17  no. 7 on the agenda is the motion of the Debtors pursuant to

18  Bankruptcy Code §§105, 362, 363, 364, and 503, as well as

19  Bankruptcy Rules 4001 and 9019 approving a term sheet and an

20  indemnity contract with Travelers Casualty and Surety Company

21  of America authorizing the Debtors to obtain post-petition

22  surety bonds and granting administrative claims and related

23  relief.  Your Honor, no objections have been filed to this

24  motion.  I'm happy to run through some of the basic terms of

25  the term sheet, and give Your Honor a sense of why we think

1    it's so critical, but I just wanted to give Your Honor the

2    opportunity to let me know if you wanted the short cut

3    version or?

4            THE COURT: No, no.  Go ahead.

5            MR. BEACH: Your Honor, first and foremost, entry

6    into the term sheet is vital to the Debtors' success in these

7    Chapter 11 cases because the Debtors licenses require, in

8    certain states require that the Debtors maintain surety

9    bonds.  The Debtors, prior to the petition date, had three

10   sureties, Travelers being one of them, Hartford, and Zurich,

11   and prior to, just prior to the petition date and shortly

12   after the petition date, the Debtors received notices of

13   cancellation with respect to their surety bonds.  The Debtors

14   evaluated their surety bond requirements prior to the

15   petition date.  The Debtors had approximately 170 surety

16   bonds totaling about 60 million, 16 million in bonds, and

17   have evaluated those requirements and have determined that we

18   don't, don't need surety bonds related to the origination

19   business.  So what we're trying to do at this point is simply

20   make sure that we maintain appropriate surety bonds with

21   respect to the servicing business.  Your Honor, the Debtors

22   are very concerned, and have received some indications from

23   regulatory authorities that if we don't maintain these surety

24   bonds, the Debtors' licenses in these states with regard to

25   the servicing business might be in jeopardy.  And as Your

1    Honor is well aware, at the current status of these cases,

2    while we're trying to sell the servicing business, and

3    maintain it as a going concern until such a sale, it's

4    critical for us to maintain this business, maintain our

5    licenses, and maintain surety bonds which will prevent a

6    termination, or a potential termination of those licenses.

7         THE COURT: All right.  Thank you.  Does anyone have

8    any comments or statements on connection with the motion?

9         MS. FATELL: Good morning, Your Honor.  Bonnie

10   Fatell for the Unsecured Creditors Committee.  We worked

11   closely with the Debtors in evaluating the needs for the

12   surety bonds, and which ones needed to be maintained and

13   which ones the Debtors, specifically related to the

14   origination, they no longer needed.  We have regulatory

15   expertise in our firm, and they've worked closely with the

16   Debtors, and we support the motion.

17        THE COURT: Thank you.

18        MR. ALTER: Good morning, Your Honor.  For the

19   record, Jonathan Alter of Bingham McCutchen on behalf of

20   Travelers Casualty and Surety Company.  And we can also

21   attest to the fact that we've worked with all constituencies,

22   and we believe we've addressed all concerns of all parties,

23   so we would ask that you grant the motion.

24        THE COURT: All right.  Thank you.  Anyone else?

25   Any changes to the order, Mr. Beach?

1            MR. BEACH: No, Your Honor.

2            THE COURT: All right.  Do you have a form?

3            MR. BEACH: Yes I do.  May I approach?

4            THE COURT: Yes you may.  Thank you.  I will approve

5    the order without objection.

6            MR. BEACH: Thank you, Your Honor.

7            MR. ALTER: Thank you, Your Honor.

8            MR. BEACH: Your Honor, the next item on the agenda

9    is item no. 8, and I'd like to cede the podium to my

10   colleague Blake Cleary to address the Court with respect to

11   that motion.

12           THE COURT: All right.  Good morning.

13           MR. CLEARY: Good morning, Your Honor.  Blake Cleary

14   of Young, Conaway, Stargatt, & Taylor for, for the record.

15   Your Honor, agenda item no. 8 is a motion to approve a

16   stipulation and settlement with ABN AMRO Bank N.V.  The

17   stipulation really clears the path for the Debtors to sell

18   their interest in certain construction loans on which ABN is

19   a party.  As the Court is aware, the Debtor originates,

20   services mortgage loans.  One type of loan they do service

21   and originate formerly were construction loans, and they have

22   approximately 575 construction loans.  Approximately 430 of

23   those construction loans are with ABN, and they're the

24   subject of a repurchase with title to repurchase agreement.

25   So when the Debtors determined that they were going to sell

1    these construction loans, and entered into negotiations with

2    ABN over the issues that you probably have heard before and

3    are probably aware of with respect to whether the agreements

4    are the subject of 101, one zero one, 47 of the Bankruptcy

5    Code, and so parties reserved their rights, but entered into

6    a stipulation with respect to disposing of the Debtors'

7    interests in those ABN construction loans.  It also paved the

8    way for buyers to acquire those construction loans free and

9    clear of ABN's interests in those construction loans as well.

10   With that, Your Honor, the parties negotiated heavily over

11   the course of several days, and entered into the stipulation

12   that's attached to the pleading.  The principle parts of the

13   stipulation are that it provides for the marketing and sale,

14   free and clear, of the construction loans with respect to

15   ABN.  It provides for a guaranteed $700 thousand payment to

16   the ABN MRA Debtors, as defined in the motion, to dispose of

17   these construction loans regardless of the purchase price,

18   and regardless of whether they're actually sold to a third

19   party of they are put back to ABN.  In addition, it provides

20   for certain releases.  ABN's releases of claims against the

21   Debtors.  There is a reservation of rights with respect to

22   post-petition construction advances that's set forth.  And it

23   also, the stipulation also dictates the proceeds, dissolution

24   of the proceeds with respect to any disposition of the

25   Debtors' interests.  With that, Your Honor, I think the

1   stipulation, the Debtors would submit that the stipulation

2   avoids costly litigation which could be timely, and certainly

3   the outcome uncertain.  And so we would respectfully request

4   that the Court enter an order approving the stipulation.

5   Again, the stipulation was entered into in connection with

6   agenda item no. 9, which is the Debtors' motion to establish

7   sale procedures with respect to the disposition of its

8   construction loans.  That's the subject of, of my next

9   presentation.  We do have a slightly modified form of order.

10  It is in connection with the sale procedures motion, so what

11  I'd like to do is, I could hand up the modified form of

12  order, and walk Your Honor through the changes, unless

13  there's anybody else who'd like to make a presentation before

14  I do that.

15          THE COURT: Why don't you hand the order up, and

16  then before we walk through the changes let me hear from

17  anyone who has any comments about the motion.

18          MR. CLEARY: Thank you, Your Honor.

19          MR. INDELICATO: Your Honor, Mark Indelicato from

20  Hahn & Hessen on behalf of the Committee.  Your Honor, we

21  worked with the Debtor regarding the terms of the

22  stipulation.  We believe it's in the Debtors' best interest

23  to be able to sell the construction loans and potentially the

24  platform, and we believe this settlement makes sense, and is

25  on of the first steps in putting this process forward.  So we

1    would urge the Court to approve it.

2            THE COURT: All right.  Anyone else?  All right.  So

3    you, the black line basically says you're modifying the

4    procedures.

5            MR. CLEARY: That's correct, Your Honor.  And so I

6    would, I would propose to walk Your Honor through the sale

7    procedures - -

8            THE COURT: Which is item 9?

9            MR. CLEARY:  - - modifications, which is the

10   subject of - -

11           THE COURT: Okay.

12           MR. CLEARY:  - - of item 9.

13           THE COURT: All right.  Well, let's, yeah, let's

14   collapse the two, then.

15           MR. CLEARY: Okay.

16           THE COURT: And obviously there are no objections to

17   item 8, so it will in all likelihood be approved.  But let's

18   see what the sale procedures are that I'm approving before I

19   approve the settlement.

20           MR. CLEARY: Sure.  I guess that brings us right to

21   item no. 9, which I've already given the Court a kind of a

22   brief outline of how many construction loans, what we're

23   trying to do, and the, now let me walk through the time line,

24   because I think that's the most relevant of the, of the

25   issues before the Court.  There was an objection, I believe

1    we've resolved that objection with JPMorgan Chase with some

2    language changes to the form of order, as well as the sale

3    procedures.   There was an issue raised by the DIP agent, and

4    we've inserted some language to address that as well.   But I

5    don't believe there are any outstanding objections at this

6    point.   Again, item no. 9 is the motion to implement sale

7    procedures in connection with the construction loans that the

8    Debtor is a party to.   Your Honor, originally we had

9    requested a sale hearing with respect to this matter sometime

10   the week of November 9th.   November 5th, sorry.   And proposed

11   a, an auction for October 30th.   So October 30th was a Tuesday,

12   and that would carry us over until the next week, the Monday.

13   Your Honor has accommodated the, the numerous requests for

14   hearing in this case, and I guess what I would propose is

15   that we not burden the Court with an additional hearing date

16   the week of the 5th, but use the October 30th, October 31st

17   hearing date, which we currently have, which may require

18   pushing the auction to October 29th to accommodate that.   So

19   that would be a proposed change to the procedures, depending

20   on the Court's availability and calendar.

21          THE COURT: I'm sorry.   You want the hearing on

22   October 31?

23          MR. CLEARY: Correct.   And I believe we already have

24   an omnibus hearing date scheduled for that date.   Your Honor,

25   I think what we had proposed would be that objections would

1   be due October 26th.  Certainly we'll adjust the adequate

2   assurance of future performance objection deadline so that

3   it's subsequent to the auction, and we would propose to clean

4   up that form of, form of order with respect that issue.

5          THE COURT: When is the auction?

6          MR. CLEARY: The auction would then be October 29th.

7   Monday, October 29th.

8          THE COURT: Isn't that the week of the trial?

9          MR. CLEARY: Your Honor, I believe that's the week

10  of the 16th.

11         THE COURT: The 29th is the trial for the non-triple

12  tracked issue, one of the, one of the plaintiffs.  And the

13  only, the only reason I raise it is in connection with

14  scheduling on the 31st.  I - - just give me a minute.  That's

15  not right.  That's not the right number.  Which of the three,

16  which of the three plaintiffs, if you remember Mr. Cleary or

17  Ms. Morgan, reserved the right to have an expedited trial

18  later in October on issues that weren't involved in the

19  triple-tracked issues, as they were limited?  I don't have

20  any of the litigators here.

21         MS. MORGAN: And I'm sorry, Your Honor, I don't

22  know.

23         MR. INDELICATO: Your Honor, I believe it is Calyon

24  - -

25         THE COURT: It is Calyon.

1          MR. INDELICATO: - - Credit Suisse, and Bear

2     Stearns.

3          THE COURT: All right.  So it's Calyon that has a

4     trial the week of October 29.  Is there anyone present from

5     Calyon?  Either here or on the phone.  My hearing with them

6     is tomorrow.  All right.  I'll give you the 31st, but you're

7     going to have to work in with that trial to the extent it's

8     still going on.

9          MR. CLEARY: Okay, Your Honor.  Thank you.

10         THE COURT: They have sort of first dibs on the

11    time.

12         MR. CLEARY: Thank you, Your Honor.  If I may

13    approach, I do have a slightly revised sale procedures and

14    sale order.  We have not cleaned it up with respect to the

15    dates that we just discussed, but we would propose to do that

16    after the hearing, and submit it under - -

17         THE COURT:  And why are you - - help me.  Let's

18    back up just a second.  Why are you accelerating the dates?

19    They were originally going to be the first week in November,

20    correct?

21         MR. CLEARY: That's correct.  And it was really

22    simply to accommodate Your Honor.  Also, I think it probably

23    makes it a little easier to close the construction loans with

24    respect to any accrued interest issues if it's done - -

25         THE COURT: By the end of the month?

1          MR. CLEARY:  - - by the end of the month than the

2    first day of the month.  But no reason other than that, Your

3    Honor.  And certainly if Your Honor would prefer to do

4    November 5th, we could, we could stick with that date as well.

5          THE COURT: You know - -

6          MR. CLEARY: Or sometime that week.

7          THE COURT: - - I think that's going to make more

8    sense for a couple - - I'm out of the office the 1st and 2nd of

9    November at a conference, so I'm worried that to the extent

10   we've got slippage on the 31st, which is not unusual in a

11   sale, you're not going to be back here until the 5th anyway.

12   And I already had that trial scheduled for that week.  So I

13   have a lot of time the next week.  I think it makes more

14   sense to schedule it the week of the 5th.  Unless there's a

15   burning - - and I don't want to stand in the way of whatever

16   business reason the parties have decided on, but.  If you

17   need a minute to talk about it, that's fine.

18         MR. CLEARY: I was going to ask Your Honor if you

19   had time available on November 7th.

20         THE COURT: Yes.  Yes.  You can have all morning the

21   7th and early all afternoon except for whatever time it takes

22   for my Chapter 7 calender, which usually doesn't take very

23   long.

24         MR. CLEARY: Your Honor, what I would propose to do

25   is we would work with, obviously, your chambers, but also

1    with the parties to put dates in the form of order that make

2    sense, driven off of the November 7th hearing date, and submit

3    that under certificate of counsel.

4         THE COURT: All right.

5         MR. CLEARY: If I may approach, I do have a modified

6    sales procedures and form of order.

7         THE COURT: Yes.  If you need to say something, come

8    to the podium.  Happy to hear you.

9         MR. MOORE(Telephonic): Your Honor, this is Robert

10   Moore of Milbank Tweed on behalf of ABN.  And I'm obviously

11   not in the courtroom, although Mr. Collins is, together with

12   our client.  And I would simply ask the question if we leave

13   the auction on the 29th, but move the hearing into the end of

14   the first week in November, is that going to create a

15   problem?  In other words, does the auction need to occur in

16   the same month that the transactions are being approved and

17   then closed?

18        THE COURT: I don't, the Court doesn't have an

19   issue, but I think you're really asking more of a business

20   question.  Is the price going to move significantly, I

21   expect, is the basis of the question, if you have the auction

22   in October and a sale in November?

23        MR. MOORE(Telephonic): That is the question.  And

24   Your Honor, unfortunately I'm not there to consult with my

25   client, so perhaps Mr. Collins could address the Court if the

1   client has an issue with that, or if the Debtor has one.

2          THE COURT: Mr. Collins is speaking to the gentleman

3   who I presume is your client's representative right now.

4          MR. MOORE(Telephonic): Thank you, Your Honor.

5          MR. TALMADGE: Your Honor, this is Scott Talmadge

6   from Kaye Scholer on behalf of Bank of America.  We have

7   similar issues, and would like to consult with the Debtor

8   about this as well, if we have a minute or two.

9          THE COURT: Yeah.  That's fine.

10         MR. TALMADGE: Thank you, Your Honor.

11         MR. CLEARY: Your Honor, I think this guidance has

12   been helpful, and I think we should probably talk amongst the

13   parties to come up with time frames that work.  Obviously the

14   sooner the better for the Debtors, but recognizing

15   everybody's time constraint.  If I may approach and hand up a

16   proposed form of sale procedures and form of order to walk

17   the Court at least through the modifications - -

18         THE COURT: All right.

19         MR. CLEARY:  - - at this point.

20         THE COURT: Thank you.

21         MR. CLEARY: Your Honor, again, the sale procedures

22   were modified as a result of the JPMorgan Chase objection.

23   My understanding is they consented to these sale procedures.

24   There may be a slight reservation of rights on the record,

25   but otherwise I believe we, we've resolved that objection.

1    And what we've done in at least the first page is we've

2    clarified that JPMorgan Chase has consultation rights with

3    respect to the JPMC construction loans as well as the second

4    page, it deals with a bid with respect to the JPMC

5    construction loan, so it's limited to that component.

6    Qualified bidders, same thing in terms of consulting with

7    JPM, JPMC, it's with respect to the JPMC construction loan.

8    It does make clear that JPMC shall automatically be deemed a

9    qualified bidder on page 3 of the black line, with respect to

10   any bidding for the JPMC construction loans.  And they credit

11   bid for the JPMC construction loans in accordance with the

12   rights of the Bankruptcy Code and applicable law.  The next

13   paragraph, on paragraph 3, also addresses the consultation

14   rights of JPMorgan Chase.  There was one issue in the

15   obtaining due diligence access section which was language

16   which JPMorgan proposed that would deal, which would deal

17   with an issue that we faced in respect of the broad hollow

18   sale, and that's a certification from the custodian of

19   records with respect to these documents.  And I think we can

20   work through the parties, I've been, this language I think is

21   acceptable to the parties, but to the extent we can do more,

22   we'll attempt to do that in the process.  Page 5 also deals

23   with a consult right.  Page 6, the second full paragraph

24   there makes clear that a credit bid may be deemed an

25   acceptable starting qualified bid to the extent it's the

 1    highest or otherwise best qualified bid.  The next paragraph,

 2    again, deals with JPMorgan Chase's consult rights.  As well

 3    as the next two changes on paragraph, page 6.  Consultation

 4    rights on page 8, same concept.  JPMorgan Chase has consult

 5    rights to the extent they're not a bidder for those JPMC

 6    construction loans.  And reservation of rights, another

 7    consult right, with respect to the JPMC construction loans.

 8    Your Honor, so those were the changes with the sale

 9    procedures.  There may be one tweak to make clear that BofA

10    may also submit a credit bid and be deemed a qualified

11    bidder.  So we would propose to make that change in what's

12    going to come over under certificate of counsel.  Your Honor,

13    turning to the form of sale procedure order, there were a few

14    changes to that as well.  One of which was to add JPMorgan

15    Chase as a noticed party with respect to the changing of the

16    auction.  There was some clarification on the objections with

17    respect to the assumption and the assignment of the, of the

18    contracts that we may propose to assume and assign in

19    connection with the sale.  And those appear in paragraphs 11

20    and 12.  Paragraph 11 clarifies that the sale objection

21    deadline is with respect to the assumed contracts and any

22    proposed cure amounts.  Cleanup change in 14 and 15 and 16.

23    Added them a noticed party in 17.  And that's the bulk of the

24    changes, Your Honor.  Again, Your Honor, we would propose to

25    clean up the form of order, inserting the dates that the

1   parties would agree to, and embark on a process to sell the

2   construction loans, and hopefully achieve value for this

3   estate.

4           THE COURT: Okay.  Does anyone wish to be heard in

5   connection with the matter?

6           MR. MARCUS(Telephonic): Your Honor, this is

7   Christopher Marcus.  May I be heard?

8           THE COURT: Yes.  Who do you represent, sir?

9           MR. MARCUS(Telephonic): Again, for the record,

10  Christopher Marcus.  I represent Credit Suisse First Boston.

11  It is our understanding that there are, I believe, three

12  construction loans under the master repurchase agreement that

13  are at this time contemplated to be included in this.  Rather

14  than belabor the Court with the same, same type of the

15  Debtors can't sell our assets type of objections, we would

16  just like to reserve our rights, object to the substantive

17  relief when the sale hearing occurs.  But just for the record

18  wanted everybody to understand that the fact that we aren't

19  objecting to the procedures should not be, should not be read

20  as a non-objection to the substantive relief.

21          THE COURT: Okay.  Thank you, Mr. Marcus.

22          MR. INDELICATO: Your Honor, Mark Indelicato from

23  Hahn & Hessen on behalf of the Committee.  Your Honor, we had

24  requested that changes be made to the bidding procedures

25  which have been included which make clear that to the extent

1    JPMorgan Chase is going to be a bidder, that the consult

2    rights between the Debtor, the Committee, and JPMorgan cease

3    to the extent they're going to be treated as a bidder.  We

4    don't want the Debtor to be required to share with JPMorgan

5    their analysis of the bids, and what they and/or the

6    Committee are looking at.  That change has been made.  I

7    would only request that if, in fact, BofA is going become a

8    bidder that the same provision be included with them.  I

9    think it would be unfairly hindering the process if we not

10   only have them in the bidding, but as a secured lender, and

11   we have to discuss our analysis with them of how we're

12   valuing the bids.  So with, with that included on BofA, as

13   well as JPMorgan Chase, we support the procedures and would

14   suggest their approval by the Court.

15          THE COURT: All right.

16          MR. TALMADGE: Good morning, Your Honor.  Scott

17   Talmadge from Kaye Scholer on behalf of Bank of America.

18   Your Honor, we have one or two points we'd like you to know.

19   We are considering whether or not we're going to insert it,

20   and we'll decide in a few moments whether or not we're going

21   to put the credit bid language in.  The other point that I

22   have raised with the Debtors and the Committee was inserting

23   language into the procedures that in the event that the, the

24   Debtors come with the highest price that we don't think is

25   the right price, we want the ability to consult with the

1   Debtors and the Committee so that we can pull the

2   construction loans from the auction, so that we're not

3   selling them at a low price in satisfaction of what we're

4   owed in respect of our loans.  And we'll work out language

5   with them on that as well.  Your Honor, there's two other

6   things which are not here right now.  The Debtors, I

7   understand, are going to be submitting an APA, and asset

8   purchase agreement, under certification.  We will be

9   providing them with our comments to that.  We have an asset

10  purchase agreement that prospective bidders will all be

11  bidding on.  And lastly, as I'd mentioned to the Debtors and

12  the Committee, and it's not an issue for today, but there are

13  a couple of issues that we do have with the sale order

14  itself.  I think they're mainly language changes that need to

15  be cleaned up, and we'll work with them on that between now

16  and the sale.

17         THE COURT: All right.  Anything else?  Anything

18  further?  All right.  Well, I will preliminarily, I guess,

19  approve - - not I guess.  I will preliminarily approve the

20  sale procedures for the sale of the construction loans

21  subject to receiving a form of order under certification of

22  counsel.  On the scheduling, it sounds like there's a

23  business reason to do it all in October.  If that's what you

24  want to do, that's fine.  We'll fit that in.  So if you want

25  to do it, I'll do the sale hearing on the 31st.  That's

1   acceptable.  I have plenty of time on the 30th, except if the

2   Calyon trial continues over, goes forward and continues over

3   from the 29th.  But I can sort of fold you in any of those

4   days that week.  29th, 30th, 31st.  Just be cognizant of the

5   fact that I am unavailable after the 31st until the 5th.

6          MR. CLEARY: Thank you, Your Honor.  I think - -

7          THE COURT: And I'll approve the settlement with ABN

8   as well.

9          MR. CLEARY: Thank you, Your Honor.  We will work

10  within those dates and we may be calling your chambers for a

11  hearing on the 30th.  But let's, let me walk through with the

12  parties the language changes and the timing.  I did want to

13  make one clarification on the record.  I didn't anticipate

14  - - we did file on Friday a proposed form of purchase

15  agreement with respect to bids to be received.  Since we

16  don't have a stalking horse in this case, we did propose a

17  form of order that bidders would bid off of.  I did not

18  anticipate sending that over to counsel, because it was not,

19  or to chambers, because it was not an exhibit to the order.

20  That being said, there are - -

21          THE COURT: I have that.

22          MR. CLEARY:  - - part - -

23          THE COURT: Somebody sent it over.

24          MR. CLEARY: We sent it over because it was part of

25  the package with respect to the motion.

1          THE COURT: Okay.

2          MR. CLEARY: But in terms of sending it over with

3   the form of order, I didn't anticipate doing that.  With that

4   being said, there were parties in the courtroom, including

5   BofA, that wanted to address issues with respect to the APA,

6   and I wanted to make clear we will work with those parties to

7   accommodate those requests.  I think we're all on the same

8   page on those requests.

9          THE COURT: All right.

10         MR. CLEARY: As a result of the broad hollow

11  auction, to the extent we're not, obviously everybody would

12  reserve their rights to come back before Your Honor on the,

13  the form of purchase agreement.

14         THE COURT: Okay.

15         MR. CLEARY: But with that, thank you very, thank

16  you very much for that approval, and let me turn to the next

17  item on the agenda.

18         THE COURT: Well, do you have an order for ABN that

19  would work, or do you have to wait until you nail down - -

20         MR. CLEARY: I think, Your Honor, what I'd like to

21  do is nail down the sale procedures - -

22         THE COURT: All right.

23         MR. CLEARY:  - - and make sure that they don't

24  move.  And then submit both of those under certificate of

25  counsel.

1          THE COURT: Very well.

2          MR. CLEARY: Likely with respect to one

3    certification of counsel submitting both forms of order if

4    that's more convenient for Your Honor.

5          THE COURT: That's fine.

6          MR. CLEARY: Your Honor, that brings us to agenda

7    item no. 10, which is the Debtors' application to employ and

8    retain Kekst and Company.  Your Honor, with Your Honor's

9    permission, we would adjourn that matter, again, to October

10   17th.

11         THE COURT: Okay.

12         MR. CLEARY: With respect to item no. 11, this is

13   the Debtors' application to retain Milestone Advisors.  Your

14   Honor, as the agenda reflects, we're still continuing to work

15   with the United States Trustee.  I believe we're down to one

16   issue, and if we are able to come to a resolution with the

17   United States Trustee, what we would propose to do is submit

18   that under certificate of counsel as well.  If not, have that

19   pushed to the next omnibus hearing, which I believe is

20   October 17th.

21         THE COURT: Okay.

22         MR. CLEARY: Your Honor, if I may be permitted to

23   skip over one agenda item, because I think I can do it fairly

24   quickly.  It's agenda item no. 13.  Which is the application

25   to employ and retain Phoenix Capital.

 1            THE COURT: Okay.

 2            MR. CLEARY: As investment bankers with Milestone.

 3    If I may get the form of order.  Sorry, Your Honor.  Your

 4    Honor, this is a matter that was pushed from the last

 5    hearing.  This is a matter to retain investment bankers

 6    Phoenix Capital.  I do have a modified form of order with

 7    respect to this matter if I may approach and walk Your Honor

 8    through.  We did come to an accommodation and understanding

 9    with the United States Trustee.  The proposed changes are

10    embodied in the form of order.  If I may present - -

11            THE COURT: Yes.

12            MR. CLEARY:  - - hand it up, Your Honor.

13            THE COURT: Thank you.

14            MR. CLEARY: Your Honor, the first substantive

15    change appears on page 2.  We've struck language that talks

16    about the Debtors paying Phoenix as set forth in the

17    engagement letter.  This is to make clear that Phoenix

18    Capital is subject to the orders of the Court.  The

19    administrative orders.  And so payment will be consistent

20    with, with that process.  The next paragraph, we had

21    originally asked for a full waiver of Local Rule 2016-2 with

22    respect to keeping time records.  And what we've agreed to

23    with the United States Trustee is to, that Phoenix will

24    present time records in half hour increments.  And so there

25    is a limited waiver with respect to that local rule, Your

1    Honor.  And that is embodied in that paragraph.  Your Honor,

2    the next paragraph makes clear that the retention is being

3    approved under 328, and then the next paragraph makes clear

4    that the United States Trustee has 330 review with respect to

5    the core asset fee.

6            THE COURT: All right.  So the parties are agreeing

7    that if the United States Trustee raises an objection that

8    the standard, at least in dealing with that objection, will

9    be 330.  But for everyone else it's 328?

10            MR. CLEARY: Correct, Your Honor.

11            THE COURT: All right.

12            MR. CLEARY: Your Honor, the change, the additional

13    paragraph on, on page 4 of the black line was to modify the

14    engagement letter.  In the engagement letter it indicated

15    that all fees, disbursements and other reasonable charges of

16    one firm of counsel would be paid by the Debtors.  And what

17    this does is it strikes that language, but it reserves

18    Phoenix's rights, to the extent the Court approves payment of

19    attorneys' fees - - excuse me - - on a non-contractual basis,

20    they would be permitted to seek those, and the Court could

21    grant those.

22            THE COURT: All right.

23            MR. CLEARY: The next paragraph, Your Honor, makes

24    clear that if there is any fee earned within the 12 month

25    tail period that a, an application would be filed with this

1   Court and would be subject to Court approval.

2          THE COURT: All right.  Anyone have any comments in

3   connection with the changes?  Or the motion?

4          MR. INDELICATO: Your Honor, Mark Indelicato on

5   behalf of the Committee again.  I didn't expect to get up on

6   this one, but I just want the record to be clear.  When the

7   Committee considered the retention of Phoenix, it was

8   considered almost in tangent with the retention of Milestone.

9   If the Court will look at the application and the engagement

10  letter, they are intertwined with respect to the sale.  So

11  the Committee would just reserve its rights if for some

12  reason issues aren't resolved with Milestone.  But, but we

13  believe the two retentions are linked, and it would be, I'm

14  not sure exactly how Phoenix would get paid if the Milestone

15  retention went out.  But it's not, not an issue for today.

16  Just I, I just want to sort of alert the Court that from the

17  Committee's perspective these two retentions were linked.

18         THE COURT: What, what are you reserving?  The right

19  to, to do?

20         MR. INDELICATO: Well, Your Honor, I'm not sure, I'm

21  not sure how - - the retention of one, really, if you look at

22  Phoenix's retention, it's splitting a fee that's earned on a

23  sale that Milestone was retained to conduct.  They're

24  splitting the fee 60/40.  If there's an issue with

25  Milestone's ultimate retention, I'm not so sure how it

1  affects Phoenix.  I haven't thought through all of those

2  issues, Your Honor, and looked at the retention agreement and

3  see if, in fact, there's ultimately an issue with Milestone

4  how it affects Phoenix.  So I just wanted to put that on the

5  record.  It may, there may be no reservation, Your Honor,

6  when I go back and look at the engagement letter.  But I

7  just, I'm, as I stand here now, I hadn't looked at it with

8  that in mind, so I'm not sure what the issue is.

9       MR. CLEARY: Your Honor, I'm not sure I have a

10  response to that other than the engagements do mesh together,

11  but I think the retentions are independent.  But - -

12       THE COURT: Well, if they're splitting a fee that

13  depends on, is it Milestone?

14       MR. INDELICATO: Yes, Your Honor, Milestone.

15       THE COURT: Milestone being approved to receive that

16  fee, and Milestone doesn't get approved to receive that fee,

17  would Phoenix still be entitled to funds?  Or maybe more

18  importantly, if the structure of the Milestone engagement

19  changes, could it have a waterfall effect on what Phoenix

20  would be entitled to?  What's the status of the Milestone

21  negotiations?

22       MR. INDELICATO: I'm not aware, Your Honor.

23       THE COURT: Mr. Harrington.

24       MR. CLEARY: Your Honor, it might be helpful for me

25  to provide guidance on the issue with respect to Milestone.

1    Milestone - - there was an issue with the United States

2    Trustee about a component of the compensation that would be

3    provided to Milestone.  And that was with respect to the $500

4    thousand what's called non-refundable retainer payment.

5    There was, the US Trustee had questions on that.  We provided

6    clarification to what that fee was all about.  But we're

7    still working through that issue with the United States

8    Trustee, whether it requires filing a supplemental affidavit

9    with respect to that.  And if it does, then we would do that,

10   allow some time, and then file the certificate of counsel,

11   and reference that in the certificate of counsel.  I don't

12   think any issues with the US Trustee, and Mr. Harrington is

13   here to confirm, would relate to any of the other issues with

14   respect to the Milestone retention in terms of the other fees

15   that the Phoenix application would be, for lack of a better

16   word, interrelated to.  In terms of the sharing arrangement

17   between those fees.  I don't know if that assists Your Honor

18   in addressing the issue, but that is the status of, of the

19   pleadings.

20          THE COURT: Mr. Harrington?

21          MR. HARRINGTON: For the record, William Harrington

22   for the Office of the United States Trustee.  And I

23   apologize, Your Honor, I am pinch hitting today, so I am not

24   intimately familiar with the negotiations on Milestone, but I

25   do have general familiarity with those negotiations.  I think

1   that is correct.  There is still an issue with respect to the

2   $500, $500 thousand advisory fee that we have an issue with.

3   I'm not sure we'll be cured by a supplemental affidavit, we

4   may need further information beyond that.  But we are still

5   working through that issue.  I believe we've resolved all

6   other issues with respect to the application and other forms

7   of compensation for Milestone.

8          THE COURT: Okay.

9          MR. HARRINGTON: Thank you, Your Honor.

10         THE COURT: Thank you.  I guess it's a question for

11  the Committee whether you want me to sign the order or not.

12  It's up to you.

13         MR. INDELICATO: Your Honor, I raised the issue.  I

14  think we vetted the issue.  The Court raised a good concern

15  about whether or not as a result of settling with the US

16  Trustee Milestone needs to revise their fee application.  I'm

17  still not sure how it flows through, if it flows through at

18  all, but based on the representations of the Debtor, I think

19  we can go forward with entering this order, and to the extent

20  we need to deal with Milestone, we'll deal with Milestone in

21  its retention application.

22         THE COURT: All right.  Mr. Cleary do you have a

23  form ready to sign?

24         MR. CLEARY: Yes, Your Honor.  If I may approach, I

25  do have a clean form of order.

1          THE COURT: Yes.  Thank you.  All right, I'll sign

2     the order.  As modified.

3          MR. CLEARY: Thank you, Your Honor.  I believe if we

4     could work our way back to agenda item no. 12, and I would

5     yield the podium to Pauline Morgan from Young Conaway.

6          MS. MORGAN: Good morning, Your Honor.  Pauline

7     Morgan from Young, Conaway, Stargatt, & Taylor on behalf of

8     the Debtors.  Item 12 is the Debtors motion for an order

9     terminating their non-qualified deferred compensation plan

10    under §363 and, and directing the Trustee to release the

11    funds to the Debtors.  Your Honor, this was originally set

12    for hearing on September 17.  There were six objections filed

13    to the motion.  Some of them were letter objections by

14    individual participants, and two of them at that time had

15    requested an adjournment.  The Debtors did agree to adjourn

16    it to this hearing, which was the next omnibus hearing.  In

17    the meantime, last Wednesday we filed a reply in further

18    support and in an attempt to address the objections that were

19    filed.  And on Friday the Official Committee filed a joinder

20    in support of the Debtors' motion.  Your Honor, we do have a

21    witness here.  We're prepared to go forward.  We believe this

22    is largely a legal issue, but we do have a witness available

23    to testify as to the plan and the trust.  But we learned in

24    Court today that one of the objectors is requesting an

25    adjournment.  So I assume Your Honor would want to hear that

1    before we move forward.

2            THE COURT: Well - -

3            MS. MORGAN: Your Honor, I can add that there has

4    been no formal motion for an adjournment.  No request made to

5    Debtors' counsel for an adjournment.  No request for

6    discovery in the time that we have adjourned this matter to

7    today.

8            THE COURT: Well, the, the, I took the objection of

9    the participant group to be an objection, procedurally,

10   obviously, to the motion, as opposed to an adversary

11   proceeding.  But also, a standing sort of motion for

12   continuance to allow discovery to go forward.  I assume

13   discovery has not gone forward?

14           MS. MORGAN: That's correct, Your Honor.

15           THE COURT: All right.  Well, let me hear, let's

16   deal preliminarily with the issue of whether the hearing

17   should go forward today.  I don't want to hear arguments

18   about adversary proceeding versus motion, but if you, if we

19   have timing issues, let's hear them.

20           MS. MORGAN: All right.  Your Honor, briefly, before

21   I yield, the Debtors do believe they need this money the very

22   end of October, first week of November.  So we are prepared

23   to go forward.  We, we think it makes sense to go forward

24   because it is largely a legal issue.  But I will allow the

25   Court to hear from the objectors.

1          THE COURT: Thank you.  I'm going to start with the

2    people in the courtroom.  So if you're on the phone, wait

3    your turn.

4          MR. HUGGETT: Your Honor, good morning.  Jim Huggett

5    with Margolis Edelstein.  Your Honor, we were called in late

6    last week to represent the participant group as local counsel

7    with Sean Malloy from the McDonald Hopkins firm in Ohio.  You

8    may know Mr. Malloy from his time in, your time, before you

9    rose to the bench, we actually handled some cases, the three

10   of us, together.  His *pro hac* is obviously in transit at the

11   District Court, but I would ask that he be heard for purposes

12   of this proceeding.  And that is sub 12(f) on your agenda.

13         THE COURT: All right.

14         MR. HUGGETT: The objection that he filed.  Is that

15   acceptable?

16         THE COURT: Yes.

17         MR. HUGGETT: Thank you, Your Honor.

18         THE COURT: I will process the paper work when it

19   comes through, but otherwise you're welcome.  Good morning.

20         MR. MALLOY: Good morning, Your Honor.  Sean Malloy

21   from McDonald Hopkins on behalf of the participant group.

22   Preliminarily between the date that we filed our objection

23   and now we've gone from 43 members of this particular

24   participant group to about 110.  Your Honor, our, I can

25   address this any way Your Honor wants.  Our primary issues at

1    this hearing are two.  One is I'm happy to discuss the

2    issues.  I think it ought to be a preliminary hearing, rather

3    than a final evidentiary hearing.  Your Honor, we were hoping

4    to do informal discovery with the Debtors.  The Debtors'

5    reply to my phones calls were that they were simply going to

6    file the reply, and would deal with it in court, rather than

7    undergo any kind of discussion about the, the motion.

8    There's a couple of reasons for that.  And I actually agree

9    with Your Honor that we don't need to talk about whether it

10    should be by motion or by adversary proceeding.  Frankly it

11    doesn't really matter.  I think that there just needs to be a

12    reasonable time that we can look at the facts before we take

13    the irrevocable step of taking the money out of the trust.

14    We're not trying to be unreasonable.  We're not asking the

15    Court to take binding 3rd Circuit precedent and ignore it or

16    attempt to wrap a way around it.  And clearly on their face

17    this looks like a top hat plan.  And it looks like a rabbi

18    trust.  Your Honor, however, we haven't had the time, I don't

19    think it's a lot of time, but we haven't had the time to

20    investigate whether the plan was administered as a true top

21    hat plan.  And there's a provision in the plan that says that

22    based on your compensation in a prior year you could be a

23    participant in the plan.  So it's very possible that it could

24    be administered in a way so that people who are not highly

25    compensated at a time of making distributions were doing it.

1    Were, in which case it wouldn't be a top hat plan, and the

2    parties, and the participants would have substantive ERISA

3    rights instead of merely administrative ERISA rights.  That's

4    - -

5          THE COURT: In other words, at the time they're

6    making the contributions, they're no longer highly

7    compensated, but they qualify as highly compensated on

8    previous - -

9          MR. MALLOY: That's right, Your Honor.  There's also

10   the issue of the, the reasoning behind the top hat plans, and

11   the fact that they only get, only get administrative

12   protections rather than substantive protections is that

13   Congress believed the highly compensated parties could assess

14   the risk for themselves.  And it's simply not clear at what

15   level these risks were described to the parties.  It may be,

16   and the Debtors are going to be prepared to hand you a

17   document that has on page 18 a question and answer session

18   that says, subject to general creditors in the event of

19   insolvency.  And it may be that everybody got that.  It may

20   well be that they didn't and that people were simply given

21   forms by email throughout the Debtors' many offices

22   throughout the country to sign.  Your Honor, we just need a

23   little bit of time to look at that.  I think the balance of

24   harms on the timing issue is substantially in favor of the

25   participant group.  If the money leaves the trust, it's over.

1   The Debtors have won, it doesn't matter what facts come out

2   later.  If the money stays in the trust, on the other hand,

3   the Debtors' stated harm is that they might have to begin to

4   draw on their DIP financing facility.  And I understand that

5   that's potentially an interest cost to the estate, but Your

6   Honor, we have situation where the Debtors are saying they

7   have an absolute right under the trust document, which I

8   don't think exists, to take the money out.  And they're doing

9   it by motion, under only §105.  And whatever the procedural

10  mechanism is, it should be set up in a way so we have a time

11  to review the facts before making a final decision that would

12  be irrevocable and create irreparable harm for the

13  participant group.  There's, there's two other issues that go

14  with the timing as well, Your Honor.  One is our view that in

15  the event we do the due diligence, and either concede, or

16  argue and the Court concludes that this is in fact a top hat

17  plan, and the trusts are subject to the, the trust assets are

18  subject to the general creditors of the estate, we believe

19  they're only subject to the assets of the general creditors

20  of the AMH, or AHM Holdings estate.  What the Debtors are

21  asking to do is take the money, put it in the Debtors'

22  general funds for whatever use without any procedural

23  protections so that - - which is going to result in two

24  things.  One is, it's going to create some post-petition

25  commingling of assets that could later lead to issues that

1    implicate substantive consolidation.  I know they're not

2    asking for that, but part of what they're doing is, in a way,

3    potentially effecting a substantive consolidation.  So even

4    if Your Honor says the trust assets have to get distributed

5    to the Debtors' estate, there need to be some kind of

6    accounting record - -

7             THE COURT: How - -

8             MR. MALLOY:  - - with regard to a post-petition - -

9             THE COURT: How does that affect whether we should

10    go forward today or not?  Or is that - - I think you may be -

11    -

12             MR. MALLOY: Well, that's a - -

13             THE COURT:  - - slipping into issues of the

14    substance of the motion.

15             MR. MALLOY: Yeah, I guess, Your Honor, what I'm

16    saying is it's really more with regard to the issues related

17    to the financing.  If we go forward today and Your Honor

18    ultimately concludes that we should distribute it – - and I

19    don't know how we do that, Your Honor, because we haven't, we

20    don't have the facts in front of us - - then the assets are

21    going to potentially become subject to the liens of the DIP

22    lender, and I'm sure the Debtor and the DIP lender believe

23    that they already are.  And perhaps they become subject to

24    some of the adequate protection liens of the pre-petition

25    lenders.  And frankly it's - -

1      THE COURT: Well if it's property of the estate,

2  it's already subject to the liens.

3      MR. MALLOY: Your Honor, actually the 7th Circuit in

4  a case called <u>Bank of America vs Moglia</u> determined in a case

5  that a rabbi trust was property of the estate, and yet could

6  not be subject to the security interest of a pre-petition

7  creditor, because the Debtor didn't have the right to assign

8  those assets.  And it relied on both an anti-assignment

9  provision - -

10      THE COURT: Um-hum.

11      MR. MALLOY:  - - and the fact that the trust said

12  general creditors.  Judge Posner believes that there is no

13  authorization for the Debtor to assign that.  And that may or

14  may not be true of the DIP financing.  It's different.  That

15  was with regard to the pre-petition lien, and Your Honor's

16  order certainly says all of the assets.  But that's something

17  that hasn't been explored, and I think also has, needs to

18  have time to be explored with regard to what this trust, and

19  what the rights are under the trust.  This was a, this was

20  the Moglia case which was cited as affirming the <u>Outboard</u>

21  <u>Marine</u> case that the Debtors cited.

22      THE COURT: All right.  So you need time to take

23  discovery to figure out whether this is a top hat plan.  Any

24  issues, any fact issues in connection with whether it's a

25  rabbi trust or not?

1          MR. MALLOY: Your Honor, I think - -

2          THE COURT: I mean, I heard comment, I heard several

3    sort of factual issues with regard to how the plan was run,

4    how it was administered, whether people got full disclosure.

5    Whether they were in fact highly compensated employees.  Even

6    if they were, whether they had the ability to monitor the,

7    the situation at the Debtors' business sufficient to really,

8    you know, be able to look out for their own, for their own

9    - -

10          MR. MALLOY: Yeah.

11          THE COURT:  - - good.  Those seem to be issues with

12    how the, those seem to be plan issues, as opposed to trust

13    issues.  So the - -

14          MR. MALLOY: Your Honor, I - -

15          THE COURT:  - - focus of my question was whether

16    there were factual issues with regard to the trust?

17          MR. MALLOY: I don't think so.

18          THE COURT: That you've identified.

19          MR. MALLOY: I think it's, I think it's a rabbi

20    trust.

21          THE COURT: All right.  And how much time do you

22    need?  I mean, what are you proposing?

23          MR. MALLOY: Your Honor, I was going to suggest two

24    months.  I think it will be easy to get a fair bit of

25    information from the Debtors fairly quickly.  And I'm sure

1    that they will be happy to provide that information on an

2    expedited basis.

3        THE COURT: And you have, and you have about 120

4    clients.

5        MR. MALLOY: I've got about 110, and I need to get

6    information from all of them to see how the plan was

7    administered as to them.  Let me give you an example, Your

8    Honor.  One other issue that I didn't raise is that it's not

9    at all clear what the status of assets in the trust are.  In

10   a rabbi trust, if the assets were drawn from compensation, as

11   deferred compensation, at a time after the Debtor was already

12   insolvent, Ms. Scruggs, who's not a client of mine, filed a

13   reply, or an objection saying that she was terminated in June

14   and yet for two months didn't get her termination payment.

15   Now it may be that the company had determined at that time

16   that they were insolvent, and as a result she wouldn't have

17   been entitled to, to the extent that this is a top hat plan

18   and a rabbi trust.  It may be, if that's the case, though,

19   Your Honor, most of my clients who were terminated on August

20   3rd, were having their compensation, deferred compensation

21   withdrawn and put into the trust all the way up until that

22   paycheck on July 25th, eight days before the company filed for

23   bankruptcy.  So those are the kind of issues that we need to

24   explore.  And so, now I don't know if that's a fact issue as

25   to whether it's a rabbi trust, I don't think it is.  But it

1   may be a fact issue as to whether the trust assets are

2   properly trust assets.  And then that opens up the whole

3   issue as to what those, what those claims would be.  Maybe it

4   doesn't implicate the motion, maybe it does.  We have to, we

5   have to do sort of an internal discovery process.  It's

6   difficult when you have 110 people in 30 states from which

7   you're drawing information.

8          THE COURT: What - - you know, if it's not a top hat

9   plan, I mean what's, what is it?  How does it affect the

10  ultimate decision of the Court?

11         MR. MALLOY: If it's a top hat plan, it's not

12  property of the estate.  It's protected by the substantive

13  provision of ERISA.  And all of my clients have to go back

14  and amend their tax returns over previous years.  Because my

15  suspicion is that they, believing it to be non-taxable - -

16         THE COURT: It's 14(d), is it?  Or - -

17         MR. MALLOY:  - - were taking, were not reporting it

18  as income at that time.  I'm not saying that they get the

19  best of both worlds.  They don't get to not report it as

20  income, and then later - - and Your Honor, I'm not saying

21  it's not a top hat plan.  I'm saying we don't know if it's a

22  top plan.

23         THE COURT: No, I hear you.  All right.  Thank you,

24  Mr. Malloy.

25         MR. MALLOY: Thank you.

1          THE COURT: Anyone, before Ms. Morgan responds,

2     anyone else wish to be heard in connection with the issue of

3     whether the case should go forward or not today?  Anyone on

4     the phone?  All right.  Ms. Fatell.

5          MS. FATELL: Thank you, Your Honor.  Pardon me.

6     Bonnie Fatell from Blank Rome on behalf of the Creditors

7     Committee.  Your Honor, the Debtor while it didn't address it

8     in great detail does need these funds.  And we think that

9     this is not something that discovery and facts are going to

10    change the ultimate outcome.  This is a question of law.  The

11    documents are clear on their face.  There's been no argument

12    that they are ambiguous and that therefore parole evidence

13    should be allowed.  I think that the admission that this is a

14    rabbi trust, the rabbi trust says that upon insolvency the

15    monies are returned to the Debtor.  So I think that that's

16    clear.  Again, another question of law.  With respect to

17    Moglia, Your Honor, I think that that's somewhat of a

18    misstatement of how that case was interpreted.  Their, that

19    form was different form this plan in that it very

20    specifically said that those assets could not be pledged.  I

21    don't believe that's the language in this plan.  Your Honor,

22    in terms of whether they under, the employees understood what

23    they were signing up for, again, Your Honor, the documents

24    are extensive, there's a question and answer very plainly

25    written out in the plan documents in the plan summary.

1  Employees were not required, they were not induced, they

2  elected to sign the forms.

3      THE COURT: Those are all, those are all facts you

4  just told me.  You just testified that every employee got the

5  Q&A.  You just testified that every employee was not induced.

6  They weren't in any way pushed to do this.  Those are factual

7  issues, and while I have a lot of respect for you, and

8  generally take your representations to the Court to be true,

9  I don't think you're in a position to make them.

10     MS. FATELL: Your Honor, you're correct.  They are

11  factual statements.  And I probably - -

12     THE COURT: It may not matter.

13     MS. FATELL:  - - overstated what I needed to.  They

14  may not matter.  That's my point.  Those facts don't matter.

15  The fact is that this is, these are two documents.  The plan

16  and the trust agreement.  They were set up as legal

17  documents.  They were set up in accordance with IRS

18  guidelines.  And those are questions of law.  And the fact

19  that the employees said they understood the benefits, but the

20  didn't understand the burdens, again, I'm not sure that's

21  really relevant.  This is conceitedly a rabbi trust.  As a

22  matter of law a rabbi trust has funds that are put in by the

23  company for its own benefit to pay under the plan.  And if

24  the company is insolvent, those funds revert back to the

25  Debtor.

```
 1                THE COURT: All right.  So let's think about it this
 2     way.  What if, what if they're right?  What if, what if the
 3     objector is able to prove facts which indicate that maybe
 4     this was not a top hat pension plan?  And was entitled to
 5     certain protections under ERISA?  But I had nonetheless,
 6     because it's a rabbi trust, allowed the funds to be sent to
 7     the Debtors' estate, become subject to the DIP lenders, and
 8     the cash collateral lenders' liens as applicable, used to
 9     fund the general administration of the estate, and then it
10     turns out I was wrong, and these people in effect had the
11     first right to these funds.  Have I taken an action in that
12     instance that in effect puts them in a situation where
13     they'll never be able to recover on their rights fully?
14                MS. FATELL: You probably have, Your Honor.
15     However, I think that to leap from this is not a rabbi trust,
16     this is not a deferred comp plan, and therefore it's a
17     qualified plan entitled to all of the protections,
18     obligations, requirements of ERISA, is a huge leap.
19                THE COURT: Right.
20                MS. FATELL: And I don't think, I certainly haven't
21     found any cases that say, you know, as a matter of fact, if
22     it's not, if it doesn't properly qualify as a deferred comp
23     plan, it is automatically deemed - -
24                THE COURT: To be something else.
25                MS. FATELL:  - - a 401 plan.  Correct.
```

1          THE COURT: Right.

2          MS. FATELL: So again, I think that's another legal

3    question.

4          THE COURT: When do the Debtors need the money?

5          MS. MORGAN: Your Honor, I think we need it on or

6    about November 1st.  So - - I'm sorry.  Were you finished?

7    Okay.  To address briefly, Your Honor, the objectors did not

8    object to this as, as to whether it's a top hat plan or not.

9    And respectfully, if there is any discovery to be had, it

10   does not involve talking to 110 participants.  It involves

11   talking to someone at the Debtors to find out how this plan

12   was administered.  Again, we have a witness here today.  We

13   could have done that today, and we can do it today.  I think

14   it's pretty simple.  I also think it would be pretty simple

15   to have that information to Mr. Malloy in a very short time

16   period.  I think two months is, is really just an attempt to

17   delay, Your Honor, with what is purely a legal matter.  And

18   with respect to the questions you posed to Ms. Fatell, Your

19   Honor, I do think there are some protections for the, for the

20   participants should Your Honor make a wrong decision.  We do

21   have unencumbered assets in this case.  Significant ones.  We

22   have a bank that we think is worth approximately $50 million.

23   We have unencumbered loans.  We have a building that has

24   equity.  There's a timing issue in that the proceeds will not

25   be here by the time we need to start drawing on the money,

1   but there are other unsecured assets in this case.  We also

2   have a cash management order that allows Debtors to continue

3   to flow funds between Debtors and we have a capability of

4   monitoring and tracing where all the money goes.  So that's

5   not an issue either.

6          THE COURT: All right.  Well, I'm going to, I'm

7   satisfied that there's a possibility that the objectors can

8   discover facts which may be relevant to whether or not I

9   should grant the motion.  And I'm also satisfied that the

10  balance of harms in going forward today weighs against going

11  forward today.  In that once these funds are in the Debtors'

12  estate – – I mean, it may be that that egg is already broken,

13  in that if they're property of the estate, and in effect, in

14  effect if the Debtors are right, the Debtors are right.  But

15  if they're not, the funds are currently in the hands of a

16  third party and may be subject to some protections.  So I'm

17  not going to go forward today, but I'm not going to give you

18  two months, Mr. Malloy, because I'm also sensitive to the

19  fact that the Debtors have a legitimate business reason to

20  avoid drawing on the DIP loan.  And need the funds.  So I'm

21  going to continue the hearing, and I'm going to suggest the

22  day I offered Mr. Cleary earlier, of October 30th.  Because I

23  want to make sure that all the Young Conaway lawyers get a

24  good start on the new fiscal year.

25         MS. MORGAN: Thank you, Your Honor.

1        THE COURT: And, you know, I'm happy to, I'm happy

2   to help.  So let's do this.  Let's continue this matter until

3   October 30th at 10 a.m.  I'm going to direct the parties to

4   work together on discovery, and obviously the normal 30 day

5   rules don't apply.  If you're having trouble getting

6   documents either way, or you're having trouble getting

7   depositions either way, get me on the phone and get it, get

8   it solved.  I expect the parties to work cooperatively,

9   provide reasonable narrowly tailored discovery to the facts

10  about whether or not this is a true top hat pension plan.  I

11  think that's the issue that's sort of been presented.  You

12  also may get into issues, I think there are some relevant

13  issues as to, you know, what people, you know, people who

14  were terminated pre-petition and asked for money and they

15  didn't get it, whether or not that has any effect.  But broad

16  discovery won't be permitted.  This isn't a fishing

17  expedition.  And undue delay isn't going to be permitted.  So

18  work together, get it done.  Don't come to me on the 30th

19  asking for a continuance without consent, unless you've got a

20  really good reason.

21        MS. MORGAN: Your Honor, thanks.  We understand, and

22  we intend to comply with reasonable requests for discovery.

23        THE COURT: I'm sure you will.  And all objections

24  and rights are reserved, and will be heard at the hearing on

25  the 30th.  Including the objection that, you know, to the

1    extent it's still out there, that this should not proceed by

2    motion.  I'm not going to say what I think about that, but

3    other than to say, you know, I think focusing on more

4    substantive objections is going to be more - -

5          MS. MORGAN: Thanks, Your Honor.

6          THE COURT:  - - productive.

7          MS. MORGAN: Which is what we were planning to do.

8          THE COURT: All right.

9          MS. MORGAN: Thank you.  I think we covered - -

10         THE COURT: Someone wants to be heard.

11         MS. MORGAN: Oops.  Sorry.

12         MR. MALLOY: No.  I was going to say thank you for

13   hearing us, Your Honor.

14         THE COURT: You're welcome, Mr. Malloy.  Yes, sir.

15         MR. SHENWICK(Telephonic): Your Honor?

16         THE COURT: Yes.

17         MR. SHENWICK(Telephonic): James Shenwick, I

18   represent Ms. Scruggs.

19         THE COURT: Yes, sir.

20         MR. SHENWICK(Telephonic): I assume based on your

21   prior statement, Your Honor, that I'll be heard on October

22   30th.  My client was the one who was terminated 60 days prior

23   to the filing and wasn't paid her, her monies under the plan

24   and she's vested.

25         THE COURT: Well, I understand your position, Mr.

1   Shenwick, and yes, I'm going to hear all substantive

2   objections on the 30th of October.  And if - -

3          MR. SHENWICK(Telephonic): My rights are reserved.

4          THE COURT: Yes, sir.

5          MR. SHENWICK(Telephonic): For my client.

6          THE COURT: Yes, sir.  All rights are reserved.

7          MR. TOMS: Good morning, Your Honor.  May it please

8   the Court Chad Toms from Bifferato Gentilotti.  Your Honor, I

9   rose only to introduce Mr. Shenwick.  I am his Delaware

10  counsel.

11         THE COURT: All right.

12         MR. TOMS: Thank you, Your Honor.

13         THE COURT: Mr. Shenwick and I go way back.

14         MR. SHENWICK(Telephonic): Yes we do, Your Honor.

15         THE COURT: So I know Mr. Shenwick.  Ms. Fatell.

16         MS. FATELL: Your Honor, one last point.  Since we

17  believe that a lot of this is, we believe it is a legal

18  argument, might we ask that the Court set a deadline for both

19  sides to brief that argument?  So that we're, the Court can

20  have everything before it, and be able to make a decision - -

21         THE COURT: Yes.

22         MS. FATELL:  - - at the end of the month?

23         THE COURT: Are you thinking about simultaneous

24  briefing, or?  I mean, you've already filed, you've already

25  filed your replies.

1        MS. FATELL: That would be fine, Your Honor.

2        THE COURT: Yeah.  Any further written comments,

3   objections, briefs, etcetera, will be filed and served by 4

4   p.m. on October 25th.  And sent over to chambers.  That gives

5   you time to submit your briefing notebook the next day.

6        MS. MORGAN: Thank you, Your Honor.  Your Honor, I

7   think item 13 on the agenda we have already covered.

8        THE COURT: Anyone here who is just here, including

9   people on the phone, in connection with the pension matter,

10  if you wish to drop off or be excused, you are.

11       MR. SHENWICK(Telephonic): Thank you, Your Honor.

12       THE COURT: I'm sorry.  Number 13 we covered.

13       MS. MORGAN: Number 13 we covered, and number 14 is

14  the motion of Richard Horvath for relief from the stay.  So I

15  would yield the podium to the moving party.

16       MR. HORVATH: Your Honor, my name is Richard

17  Horvath, and I had filed the motion to lift the automatic

18  stay pro se.  I'm not an attorney.  Because I do have certain

19  medical problems, one of them being short term memory loss,

20  I've prepared a statement I would prefer to read, because it

21  will allow me to express everything that I meant to say

22  without forgetting it.

23       THE COURT: Yes.  That's fine.

24       MR. HORVATH: Okay.  All right.  Your Honor, I come

25  here today not of want but of need, requesting that you

1  approve my motion to lift the automatic stay on American Home

2  Mortgage bankruptcy.  American Home Mortgage have, by way of

3  their misrepresentation, fraud, outright lies, and deceit,

4  placed me in a position I cannot recover from financially or

5  physically without being properly compensated for the damage

6  done to me.  American Home Mortgage Corporation is a predator

7  lender.  I say this with 15 years experience in collection

8  and repossession experience.  Having dealt with predator

9  lenders in the past.  My wife and I have about $140 thousand

10  in equity in our home, and when I tried to get a equity loan,

11  a home equity loan not once, but several times, I was turned

12  down.  The first loan attempt was so that my wife could

13  invest some money into a business she has that - - sorry.

14  The first loan attempt was so my wife could invest more into

15  her online business on Ebay, thus increasing her income which

16  is used to help pay our day-to-day living expenses and some

17  of our other financial obligations.  Also, I had planned to

18  use some of the money to pay for my medications until my $2

19  thousand deductible was met because of the fraud, gross

20  mismanagement, negligence, intentional deceit, and outright

21  lies of American Home Mortgage, making it impossible for me

22  to obtain a loan.  Basically, Your Honor, I'm a diabetic, and

23  my medications, my three insulins that I take a course with

24  during the deductible period are $500.  I have a very bad

25  case of acid reflux, which the medication is three hundred

1   some odd dollars per month.  Just add those two together, and

2   it comes to quite some amount of money.  And I'm on

3   disability.  I've been disabled for two years.  Our

4   disability paycheck is $12 hundred.  Okay?  And intended to

5   pay all of my doctor bills that came in, but now my doctor

6   bills are piled up, and if I don't pay them soon, the

7   problem's going to be that they're going to be put into the

8   credit bureaus, and I've had a clean credit rating.  Except

9   for what American Home Mortgage had put down.  Even as I

10  stand here before you today, and for I don't know how long in

11  the future, I will be unable to secure a home equity loan.

12  This is because, number one, they falsely reported me as 60

13  days late on my mortgage loan.  Not only did they do that,

14  but they failed to file an affidavit of affixture for my

15  property.  I have a manufactured home on a piece of property

16  that I own.  And my property is still showing as valued at 89

17  thousand with a $62 thousand loan.  So I'm totally unable to

18  get a loan against about $140 thousand of equity I have.  One

19  of the other ones I tried before was to get legal

20  representation.  I did want to have an attorney in Phoenix in

21  my court suit, and I wanted to have an attorney represent me

22  here.  But I just don't have the money for it, and I can't

23  borrow against the equity of my home, because I'm tied up

24  because of this false reporting to the credit bureaus.  I

25  take eight medications, Your Honor, every day, and I'll take

1   them for the rest of my life.  Only because I can't afford

2   the ninth.  I have a medication for an enlarged prostate I

3   can't even afford to take that because of the other

4   medications I take.  Every day I fail to take the full dosage

5   because, like I said, the acid reflux I have is very severe.

6   I'm supposed to take 80mg of this medication, and it's like

7   three hundred some odd dollars for the one month's supply.  I

8   couldn't afford it, so I'm only taking half of the dosage,

9   40, and it's causing burning in my throat, because it's not

10  addressing the acid reflux.  So I am suffering physically in

11  this thing.  My credit rating has been completely damaged by

12  American Home Mortgage, because they falsely reported my

13  mortgage loan as being 60 days late.  And I disputed this.  I

14  disputed this in May, I believe it was, with Experian and the

15  other credit bureaus.  Now, when this happened, how they put

16  me down late, there were six people that promised us, No.

17  You're not going to be marked late, because I was never late.

18  On April 1st, my loan was supposed to have rolled over from a

19  construction loan to a regular 6% mortgage loan.  When I

20  didn't get a bill for the 6% mortgage loan that should have

21  rolled over, the bill was going to be 525, I called American

22  Home Mortgage on April 4th, and I said, Where is my bill?  I

23  want to pay my mortgage.  And the gentleman I spoke to, his

24  name was J.D., that's what he told me his name was.  And I

25  have the extension, and I believe we have the documentation

1   from the suit I filed in Phoenix.  Sir, it pretty basically

2   mentions all the extensions and names of people I spoke with.

3   He told me, Your not in our system.  I can't take your money.

4   And I said, Well, what do you mean I'm not in your system?

5   Can't, I want to pay me, you can't do it.  He says, Don't

6   worry about it.  He says, You have 60 days grace.  And I told

7   him, I don't want 60 days grace.  And I didn't know at the

8   time that he was probably referring to RESPA, which says that

9   when it's a roll over on a loan, you have 60 days grace

10  during that period.  He says, if you don't have anything in

11  20 days, call us back.  Two weeks later, I get notified, or I

12  get, what do you call it, a bill from the construction loan

13  department for interest for April and May.  Through the end

14  of May.  It was, I believe six hundred some odd dollars.  I

15  paid it.  But I asked the woman, I says, her name was Maureen

16  Birch (phonetic).  I said, Maureen, why haven't I received my

17  regular, you know, full mortgage payment, notice?  She says,

18  Your loan hasn't rolled over.  Now this is now near the end

19  of April.  So I paid the interest.  Three weeks later I get a

20  notice of default in the mail that I'm two months behind on

21  my mortgage.  I called and I said, What do you mean I'm two

22  months behind on my mortgage?  Well, you didn't pay, you

23  didn't pay April and May.  I said, I did pay April and May.

24  I said, I paid April and May interest payment.  That's what I

25  was told.  That the loan hadn't rolled over.  So to make a

1   long story short, I had, they said they'd call me back.  And

2   they called me.  Oh, sorry, Mr. Horvath.  We're so sorry.

3   All you have to do is pay the difference between what you

4   paid on the interest and the two full mortgage payments.  I

5   said, Now is this going to affect my credit?  Absolutely not.

6   No.  I was told that by six different people.  I filed a

7   complaint with the Consumer Credit Commissioner of Texas.

8   And I mentioned in my letter, I believe you have a copy of

9   that also in the documentation I sent into the Court, that

10  states that I was fearful that they were going to destroy my

11  credit.  They had no right to destroy my credit, 60 days

12  late, because I complied with everything.  Now when I made my

13  payment, the difference, I authorized the gentleman I spoke

14  to to take out eight hundred some odd dollars.  That was the

15  amount.  Instead of taking out $800, he takes out $17

16  hundred.  He overdrew us, our checking account.  My credit

17  card, which had some money left in it for my medications was

18  used as the overdraft protection and taken.  When I called

19  American Home Mortgage, I said, Look, you've got to reverse

20  that out.  Give me my money back.  I, you took the card that

21  I had.  He said, I can't do it.  It's going to take a month.

22  So I told him, I said, No.  I'll call Bank of America, and I

23  will place, what do you call it, a stop on it.  And as soon

24  as they refund my money, which was five days later, I'll send

25  you a check.  And that's what I did.  So as far as the 60

1  days lateness, it was something that I couldn't control, and

2  it was not my fault.  And I was assured six times that it

3  wasn't going to be marked.  And I believed them, so I never

4  checked my credit bureaus until I started getting my rates

5  running from 15% to 28%, and finding out that I couldn't get

6  mortgage loans, one reason because of the lateness reported

7  on my credit bureaus.  And in, in their response in the

8  Debtors' objection to my motion for the lift of stay, they

9  says that American Home Mortgage has no control over the

10  credit bureaus.  Well, they do.  They either report it or

11  they don't.  They also said they had no control over the

12  property values.  They do.  Had they filed the affidavit of

13  affixture, my home would have been listed properly, and all

14  the other internet websites that are used by potential

15  lenders to check to see how much equity you have in your

16  home.  So I, I've just been totally destroyed financially.

17  And of course, one of the other things that they mentioned,

18  excuse me, which it's probably, probably right in there is

19  that I filed my bankruptcy, I'm sorry.  I filed my civil suit

20  in Phoenix four days, I believe it was, after they filed

21  bankruptcy.  Your Honor, I have idiopathic hypersomnia, which

22  is a sleeping disorder, in addition to sleep apnea.  I have

23  the inability to help myself from falling asleep during the

24  day.  Anything I do redundant, typing, even driving, my

25  doctors won't let me drive at all.  They told me I can drive,

1    3 to 4 to 5 miles tops, before I start to get sleepy and I

2    have to stop driving.  So when all this came about, I started

3    filing my papers some time ago.  And because of this illness,

4    I mean, I sit at the typewriter, and then next thing you

5    know, I'm waking up, and I, because of my short term memory

6    loss, I have to look at everything I did and start all over

7    again.  So it took me an unusual amount of time to do it.

8    But it was something that I think that the Americans with

9    Disabilities Act would protect me from, Saying, well, yeah, I

10   have a disability, and I've been legally disabled since May

11   of 2005.  Had I been able to obtain a loan, which is what I

12   tried to do back then before they filed bankruptcy, I would

13   have had an attorney, who hopefully wouldn't have the same

14   afflictions as me, would have gotten it done in a proper

15   amount of time.  So I'm asking you again, Your Honor, in the

16   name of fairness and justice to lift the stay so that I can

17   proceed with my law suit in Phoenix.  And then I just want to

18   say one other thing.  I notice everybody here was negotiating

19   today.  They apparently believe that I have no cause for a

20   claim or whatever.  Nobody's called to even make an offer or

21   trying to do anything or work anything with me.  And I

22   understand in their thing they say, Oh, it's going to cost

23   money.  It's not going to interfere with the bankruptcy here,

24   because there going to have an attorney out in Phoenix

25   represent them.  But I mean, you know, I'm a reasonable

1    person.  I'm not looking to get rich, I'm looking to be

2    compensated for what was done wrong to me.  I don't want to

3    deal with predator lenders.  I don't want to deal with any

4    lenders anymore.  So I'm hoping that you'll allow me to go

5    forward in Phoenix with my civil suit.  Unless they want to

6    come up with some kind of an alternative plan that we can

7    agree on, maybe so here today.  The other thing I want to

8    mention is when I called last week to verify that, you know,

9    this was on the 10th, and everything else, I was trying to do

10   a telephonic appearance, and I was told I couldn't.  So I had

11   to fly in from, you know, Arizona.  I mean, this is how

12   important it is to me.  Because I'm 63 years old.  I mean,

13   I'm not going to get money, I can't go out and work.  And I

14   planned my life pretty well.  Had all this not happened, my

15   mortgage payment was $502 a month.  And my wife only works

16   part-time.  I mean, her internet business has helped us even

17   more financially.  I wouldn't have any problems.  We were

18   happy and content.  I mean, until the day I die, I was

19   satisfied.  But now, you know, I've got bills piled up and

20   everything else, because I couldn't take my good name, which

21   was destroyed, and borrow.

22           THE COURT: Thank you, sir.

23           MR. HORVATH: Thank you.

24           THE COURT: Debtors' response.

25           MS. EDWARDS: May it please the Court.  Erin Edwards

1    from Young, Conaway, Stargatt, & Taylor on behalf of the

2    Debtors.  Your Honor, Mr. Horvath has failed to establish

3    cause to lift the automatic stay, thus his burden has not

4    been met.  While cause is not defined under the Bankruptcy

5    Code, courts generally consider the policies underlying the

6    automatic stay, and in addition, the competing interests of

7    the Debtors and the movant.  The policies underlying

8    automatic stay weigh in favor of denying the relief requested

9    by Mr. Horvath.  The automatic stay provides the Debtor a

10   breathing spell from creditors by suspending collection

11   efforts, and thereby allowing the Debtors to focus on their

12   reorganization efforts.  Here, the Debtors' focus should

13   remain on maximizing the value of the bankruptcy estates

14   available for the distribution of all creditors, including

15   Mr. Horvath, through the sale of their valuable servicing

16   business, rather than diverting the attention and resources

17   of the Debtors' professionals and management to defending

18   litigation with individual creditors.  It would be a burden

19   on the estate to divert our attention at this time to go out

20   to Arizona to defend just one of what could be many actions.

21   Secondly, Mr. Horvath will not be prejudiced or suffer

22   irreparable harm if the stay is not lifted at this time.

23   Enforcing the stay will not deny him his legal remedies

24   against the Debtors.  He will be able to file a proof of

25   claim and the ability and the amount of his claim will be

1   determined during the claims reconciliation stage of the

2   bankruptcy cases.

3        THE COURT: All right.  Well, let me ask you a

4   question.

5        MS. EDWARDS: Yes.

6        THE COURT: Who's, who's, if I go that route, and we

7   get to a situation where we're going to have a trial on the

8   merits of the claim, where's that going to happen?  Is that

9   going to happen here?  Is that going to happen in Phoenix?

10  In front of the District Court?

11       MS. EDWARDS: I'm sorry.  Are you saying if you lift

12  the stay, or if you do not lift - -

13       THE COURT: No.  If I don't.  You want me to, you

14  want me to, you want me to keep the stay in place, tell this

15  gentleman to file a proof of claim, and then, you know, six

16  to nine months from now you're going to file an omnibus claim

17  objection, and you're going to value his claim at zero.

18       MS. EDWARDS: Correct.

19       THE COURT: Okay.  And then we're going to - -

20  that's what's going to happen.  So then we're going to have a

21  trial on whether his claim is for zero or worth $333

22  thousand.  The question is, where is that trial going to

23  happen?  Is that going to happen here in front of me?  Or is

24  that going to happen in front of a District Court judge in

25  Phoenix?

1          MS. EDWARDS: At that time, it might be proper to

2     lift the stay, and allow him to proceed with his action in

3     Arizona.  When the Debtors have more time to devote.

4          THE COURT: Well, here's the problem.  All of your

5     employees are gone.  You sold your servicing business.  The

6     records are now in the hands of a third party.  Okay.  How

7     does he get the discovery he needs in order to proceed with

8     his claim in Phoenix.  He's got to issue subpoenas and go

9     against parties that are no longer parties to the litigation,

10    no longer parties to the Debtors' estate.  Haven't we made it

11    harder for this gentleman to pursue his claim by waiting?

12    And if that's the case, what, how, how specifically is this

13    Debtor harmed by dealing with it now as opposed to making the

14    buyer deal with it in nine months?

15         MS. EDWARDS: You have to consider in the aggregate,

16    Your Honor.  We'll deal with many other creditors.  There

17    will be many, there may be many other creditors out there

18    similar to Mr. Horvath who want their claims dealt with now.

19    But we want to deal with all the claims through the orderly

20    process of the plan of reorganization, and the claims

21    reconciliation process.  So what we need is a breathing spell

22    at this time.

23         THE COURT: Well, but you've had a breathing spell.

24    I mean, you've had two months, you've done a lot of work in

25    those two months.  You sort of say there's a parade of

1   horribles, and there's going to be a revolving door of stay

2   relief motions.  I haven't seen it.  I mean, we have, this is

3   the only one like this that's been filed.  Certainly if it

4   gets out that I grant it, there is a risk that there will be

5   more.  And I understand that.  But at the same time, for

6   instance, if this were a personal injury lawsuit, there would

7   be no question that I didn't, I wouldn't have jurisdiction to

8   hear the merits of the underlying claim.  I think there's an

9   argument to be made that I do have, that this obviously isn't

10  a personal injury law suit, and this Court properly has

11  jurisdiction to hold this trial.  But if this was a slip and

12  fall claimant, I would probably lift the stay at this time.

13  And the *quid pro quo* would probably be an agreement not to

14  proceed against insurance coverage, or something along those

15  lines, and there would be insurance defense lawyers available

16  in Phoenix to handle the matter.  I take it that the Debtors

17  have entered an appearance in the Phoenix case, or maybe they

18  have not.  Do you know?

19         MS. EDWARDS: We have not, yet, Your Honor.

20         THE COURT: You have not.  Who, is this type of

21  claims handled by some sort of insurance policy?  Who

22  actually defends the lawsuit in Phoenix?  If you know.  The

23  client knows.

24         MS. EDWARDS: We have counsel in Arizona, Your

25  Honor.

1            THE COURT: Okay.

2            MS. EDWARDS: Who are ordinary course professionals

3   who could deal with this.

4            THE COURT: All right.  And how do they get paid?

5   Do they get paid out of the Debtors' estate, or do they get

6   paid by an insurance company?

7            MS. EDWARDS: They're ordinary course professionals.

8            THE COURT: Out of the estate.

9            MS. EDWARDS: Yes.

10           THE COURT: And they've been retained as ordinary

11   course professionals.  Or they're in the process.

12           MS. EDWARDS: We don't have anyone yet, Your Honor,

13   but we would, we would have to get them.  However, I believe

14   if you lift the stay, and he proceeds in Arizona it would

15   probably take longer than the claims resolution process under

16   the Bankruptcy Code.  He just filed his action less than two

17   months ago, so I'm not sure when it would be, actually

18   scheduled to be heard in Arizona.

19           MR. HORVATH: Your Honor?

20           THE COURT: Hang on.  Let me finish with her first.

21           MR. HORVATH: Okay.

22           THE COURT: You'll get your chance, and then the

23   Committee is going to want to chime in, I expect.  Or maybe

24   not.  Well, I'm troubled, I'm not troubled by the delay, I'm

25   not troubled, generally speaking, by making a claimant such

1    as this go through the claims process.  That's what proofs of

2    claim are all about.  I'm a little troubled by how does he

3    get his fact discovery when what the Debtors are really

4    asking me for is a delay to allow them to get organized.

5    What they're really asking for is a delay in order to sell

6    the asset.  Which is fine.  And the results of that delay is

7    going to actually make it harder for this gentleman to prove

8    up his claim.  Because the records will be gone.  I'm sure

9    the Debtors will have a right to them in some way.  Or the

10   reorganized estate, or trust, or whatever vehicle is used.

11   But that's the, that's the tension I see here.

12         MS. EDWARDS: Well, Your Honor - -

13         THE COURT: Which is I understand the point of

14   delay, but the delay could make it harder for this gentleman

15   to prove his case.

16         MS. EDWARDS: I would assume since it's an action

17   that is pending and known to exist that there is a duty of

18   the Debtors to preserve these books and records.  So I

19   believe that should be dealt with under the plan for actual

20   pending litigation that there is that preservation

21   obligation.

22         THE COURT: Um-hum.  All right.  Let me, I'm sorry,

23   do you have anything further?  Let me hear from anyone else

24   in opposition of the motion, sir, before you get your

25   opportunity to reply.  Does the Committee have a position?

1           MR. INDELICATO: Your Honor, while we certainly

2    sympathize with the plaintiff here, I think the issue, and I

3    think it was an issue the Court was alluding to, the fact

4    that these are ordinary course professionals, those are

5    professionals that the Debtor has retained after consultation

6    with the Committee to preserve the assets, to preserve the

7    servicing business, not to continue litigation regarding

8    claims, which will be dealt with in the claims resolution

9    process in the bankruptcy.  And I know this may be the first,

10   but the Court, I think, is right as to the extent there is,

11   this Court approves the relief from stay from, for this

12   action, I think the action, or there, there is not a

13   presumption, but there's going to be other similar type

14   relief from stay, not on the exact same motions, same facts,

15   but other issues that we'll have to deal with, and the cost

16   to the estate, that argument will be gone, because we've

17   already let it go in one instance.  And though it's not

18   tenable to the plaintiff, I think that this should be, the

19   motion should be denied, and we that we should allow the

20   claims resolution process to resolve the claim.

21           THE COURT: Where are we on a bar date in this case?

22   I just, I don't remember.

23           MS. MORGAN: Your Honor, the schedules are going to

24   be filed October 5th.  We intend to file a bar date motion

25   shortly thereafter.  So I think it would be before year end.

1           THE COURT: Round about year end.

2           MS. MORGAN: Probably in December.  Yes.

3           THE COURT: Yeah.

4           MR. INDELICATO: And Your Honor, just, they, the

5    APA, at least the present form of the APA, with the present

6    stalking horse bidder, does contain provisions for the

7    preservation of documents and the cooperation with the Debtor

8    and the purchaser.  So hopefully that issue, as it relates to

9    the documents, can be addressed.  As it relates to employees,

10   it may or may not, the people may or may not already have

11   been discharged from the Debtors.  So that horse may be out

12   of the barn.  So we would, we would suggest that the Court

13   deny the motion for relief from the stay.  And maybe in this

14   instance you do it without prejudice, and allow the plaintiff

15   to appear telephonically if he's not getting some resolution

16   in some period of time.  But I think in this instance, Your

17   Honor, I think that's probably the best way to go.

18          THE COURT: All right.  Does any, does either the

19   Committee or the Debtor object, assuming I deny the motion,

20   and I haven't said I'm going to one way or the other, but if

21   I deny the motion, I think it would be without prejudice.

22   But I, I think it would make some sense, given Mr. Horvath?

23   Is that how you pronounce it?

24          MR. HORVATH: Yes, sir.

25          THE COURT: Mr. Horvath's testimony at this, on

1   this, at the podium as to his - -

2          MR. HORVATH: Your Honor - -

3          THE COURT:  - - medical issues - - just a moment

4   sir - - that any such order provide a paragraph stating that

5   he has in effect filed, or deemed to have filed a proof of

6   claim in the amount asserted.  Obviously he could supplement

7   if he wanted.  But the motion with the attached petition, I

8   think, should, we could probably agree would be the assertion

9   of a proof of claim.  Although the amount - - what's the

10  amount?  I remember seeing three hundred something.

11  $363,959.

12         MR. HORVATH: I don't remember what I filed for, but

13  that's based on, you know, physical injury, credit worthy

14  damage.  But Your Honor, what I wanted to bring up is they

15  mentioned about timing and everything else.  The Phoenix

16  District Court has a fast track filing on me, or whatever.

17  It said that I have to have the file, the case completed in

18  two, within two years.  That's what they're doing out in

19  Arizona.  It's specific time tables for each, I understand,

20  and that they will throw it out.

21         THE COURT: Well - -

22         MR. HORVATH: For me it's - -

23         THE COURT:  - - sometimes bankruptcy is very slow,

24  Mr. Horvath.  But, and claims reconciliation is the slowest

25  process we have.  But I can tell you out of experience that

1    two years would be a very long time in this court.

2         MR. HORVATH: I - -

3         THE COURT: Here, here's - - let me just sort of lay

4    it out.  Here's the problem.  The Debtors are right in that

5    there's this thing called the automatic stay for a reason.

6    The automatic stay is an automatic injunction that's issued

7    by congressional granting of this right, automatically, upon

8    the filing of the case.  And it says, among other things, all

9    lawsuits stop.  And they can't go forward.  And they

10   shouldn't be commenced.  Even post-petition.  Without relief

11   from the Court.  One of the policy arguments behind, you

12   know, having this is to give the Debtors an opportunity to

13   get organized, have a breathing spell, to get their business

14   in order.  This Debtors' business was, for lack of a better

15   word, in free fall at the time of the filing.  Due to a

16   variety of factors.  We won't get into whether they were the

17   Debtors' fault or not the Debtors' fault, or they were the

18   credit, creditors' fault or not the creditors' fault, or the

19   government's fault, or whoever.  As part of, you know, what

20   has, I think, accurately been described as a worldwide credit

21   crisis, this Debtor fell into bankruptcy very, very quickly.

22   And as a result, they had to terminate approximately 7

23   thousand people.  They are in, they stopped their loan

24   origination business, and they are engaged in multifaceted

25   litigation over a variety of issues as they try to hold the

1    fort long enough to sell their assets as a going concern.

2    The hope, with the support of the Committee, the hope is that

3    that process will actually generate more funds for people

4    like you to get the relief that you need for any claims you

5    may have against the estate, than allowing for, for basically

6    a piecemeal liquidation of the company.  So that's a, that's

7    a reality, it's a business reality to the case.  Normally

8    speaking, the process would be you would file a proof of

9    claim, the Debtors would at some point object to that proof

10   of claim, you'd have to respond to that, and we'd have a

11   trial on what amount the claim should be at some time in the

12   future.  In this courtroom.  That won't happen tomorrow.

13   That's not going to happen next month.  That may happen next

14   year.  Certainly probably no later than late next year or

15   early 2009.  But it's going to take a little while.  However,

16   I balance that in most cases against, with persons like

17   yourself, usually a personal injury claimant, someone who's

18   had a slip and fall or some other case against the debtors,

19   and generally speaking I don't lift the automatic stay in

20   those types of cases, unless there's some additional fact.

21   Like trials going forward next week.  Discovery is about to

22   close.  They're about to tear down the building where I fell,

23   so I need to get in there, and be able to actually inspect

24   it.  I had a case just a month ago where they're selling,

25   they're selling the building and the machine, and they need

1  to take pictures of the machine before it gets sold.  And I

2  didn't lift the automatic stay in that case.  Notwithstanding

3  that, because there were other avenues for the person to get

4  the evidence they needed.  So this is a long way of saying

5  that I'm going to deny your motion without prejudice.

6  Because I think that the Debtors do need to focus their

7  attention on maximizing the value of the estates in this

8  case.  And there's only so many fires they can fight no

9  matter how competent they are.  And I don't think you're

10  going to be prejudiced by denying the motion, because I don't

11  think you'd get the trial in Phoenix in all likelihood any

12  sooner than you're going to get a hearing on your claim here

13  in Delaware.  Now you may ask, and this is all without

14  prejudice, if you want to have someone in Phoenix hear it,

15  you know, you have the right to ask, ask for that type of

16  relief.  It very well may be that the Debtors, at some point,

17  will consent to that.  I can't tell you today whether or not

18  I'm going to require you in court for the trial on the merits

19  of your claim objection, if that ever comes to be.  I

20  probably will.  And I understand that that is a burden.  But

21  I think that in this case, the balance of the harms,

22  notwithstanding your position, favors a delay, in effect, of

23  going forward with that lawsuit in Phoenix.  So I'm going to

24  deny the motion, without your, without prejudice to your

25  right to bring it at a later date.  However, I am going to

1    direct that you work with, the Debtors work with you and the

2    Committee to come up with a form of order denying the motion

3    which indicates that the motion is deemed to be the filing of

4    a proof of claim in an amount asserted, without prejudice to

5    anybody's rights to object to it.  But given your testimony

6    about your physical issues, and your short term memory loss,

7    which I take to be truthful, I think it would be appropriate,

8    you having taken the effort to come to court, that you not be

9    required to respond to a notice of bar date that you may not

10   be able to respond to for, for the reasons of your illness.

11   So I'll direct the Debtors to work with you on some

12   appropriate language in that order.  That's not a, the

13   substantive right, I'm not saying that you're going to get

14   paid on a claim in that amount.  All I'm saying is you will

15   be deemed to have filed a claim in that amount against the

16   Debtors.  All right.  Any questions, sir?

17         MR. HORVATH: No, I understand it, Your Honor.  It's

18   just that my feeling was is that you, as a bankruptcy judge,

19   you're encumbered by knowing what they, what they're

20   financial situation is, what's got to be doled out to people,

21   and a percentage of a claim that you're going to pay to each

22   one of the people that are going to get something out of this

23   claiming against the Debtors.  By me submitting something, I

24   feel, here, you know, it's not going to be given the same

25   unencumbered consideration that it would be by a District

1    Judge in Phoenix.  RESPA, §6 of RESPA, the Fair Credit

2    Reporting Act, and there are two Arizona revised statutes

3    that say I am entitled to full damages, as well as punitive

4    damages.  And again, you know, it's just, I'll put it this

5    way, to put it mildly, if I was to come in here to claim $10

6    you would give me a percentage of $10.  If I come in here

7    with a suit that was 100 thousand plus whatever in punitive

8    damages, you would give me a percentage of that.  I would

9    believe, because you're going to be prejudicial to me - -

10            THE COURT: I do two things.  There are two issues

11   to think about.  Claim amount and what you get paid on it.

12            MR. HORVATH: Uh-huh.

13            THE COURT: Okay?  Claim amount, claim amount is

14   claim amount.  I'm going to, I'm going to make a

15   determination as to a claim amount based on the facts and the

16   controlling law.  Okay?  And if the claim amount is a million

17   dollars, the claim amount is a million dollars.  Fortunately

18   the one person in the room that doesn't have to pay it is me.

19            MR. HORVATH: Um-hum.

20            THE COURT: Okay?  So the claim amount is what it

21   is.  Now if you have a case for having someone else determine

22   what that claim amount is, at the appropriate time, we'll

23   allow that other person, whether it's a, it's an Article 1,

24   excuse me Article 3 District Court Judge in Phoenix, in

25   District Court, so be it.  I don't, I'm not particularly

1   excited about, you know, taking cases away from anybody.

2   I'll decide what I have to decide, and if it's more

3   appropriate that someone else decide it, that's fine.  So I'm

4   going to totally reserve your right to seek to have whoever

5   you want to try this to file a motion at the appropriate time

6   and so be it.  The claim will be determined by that person.

7   The other thing I decide is ultimately they're going to do a

8   plan in this case.

9        MR. HORVATH: Um-hum.

10       THE COURT: And the plan is going to say, general

11  unsecured creditors get X percentage on the dollar.  That's a

12  different issue from what your claim is.  That's, we used to

13  talk about them in claim dollars and plan dollars.

14       MR. HORVATH: Um-hum.

15       THE COURT: The plan dollars are the money you're

16  actually going to receive.  That's something that only I can

17  decide.  I have exclusive jurisdiction over whether to

18  confirm the plan that says you're going to get 25, 30, 35¢ on

19  the dollar, or whatever it is.  But that, that has, that's a

20  different issue from the claim amount.  So when I decide what

21  your claim is, if I have to, if there's a dispute and I have

22  to decide it, it's not, it's going to be divorced from the

23  other issue, which is how much you're going to get on that

24  claim.  That's going to be determined by whatever plan is

25  confirmed.  And I understand your comments, and if you want

1   to put them in a motion at an appropriate time, that you

2   think I would in some way be prejudiced or more likely to

3   rule against you, based on what I think the Debtors can pay

4   or not pay, you're free to make that argument.

5          MR. HORVATH: Yeah, okay.  The only other question

6   is you're saying them to work along with me.  When and how?

7   Because, I mean, I'm only going to be here until tomorrow.  I

8   wasn't sure - -

9          THE COURT: Right now.  As soon as the hearing is

10  over.

11         MR. HORVATH: Okay.  Sure.

12         THE COURT: You're going to have a meeting.

13         MR. HORVATH: That's fine.

14         THE COURT: All right?  And again, I'm not, it's not

15  a meeting to decide how much you're going to get paid.  It's

16  a meeting to work on some appropriate language to forego your

17  requirement to file a formal proof of claim.  If you wish.

18  If you wish.  If you don't wish that assistance, that's fine.

19         MR. HORVATH: Again, I'm not an attorney, so I don't

20  know how to be putting things down that are going to be

21  detrimental to my case, or you know, to what I do here.

22         THE COURT: Well, I assume you want to get paid by

23  the Debtors at some point.

24         MR. HORVATH: I do.

25         THE COURT: All right.  Then the only way to get

1  paid by the Debtors, unless they schedule you at something

2  other than zero, which I, I guess is highly unlikely, is for

3  you to file a proof of claim.

4       MR. HORVATH: Um-hum.

5       THE COURT: And if you don't file a proof of claim

6  by the bar date, which will be the last day to file proofs of

7  claim, probably in late December of this year, you will be

8  deemed to have waived your right to get paid by the Debtors.

9  So I'm giving you something in that I'm, I'm not giving it to

10  you, but I think it would be appropriate for the order to

11  provide that you need not take this formal step of filing the

12  proof of claim.  Now, at the same time, by filing a proof of

13  claim in this case, you could be deemed to have waived your

14  right to a jury trial.  I don't know if you have a right to a

15  jury trial.  I don't know if you've asserted a right to a

16  jury trial.  If you don't want to make the decision today

17  whether or not that's appropriate, then the order doesn't

18  need to provide that, and you can wait for the bar date, and

19  I would suggest, I would suggest you consult someone with

20  regard to advice on whether you think that's appropriate or

21  not.

22       MR. HORVATH: Well, I'll talk with the Debtors today

23  and see what we can work out.

24       THE COURT: Okay.  All right.  Very well.  If you

25  have any problems, give me a call.  Thank you, sir.

1          MS. EDWARDS: Thank you, Your Honor.  We'll work

2     with Mr. Horvath.

3          THE COURT: Okay.  Mr. Horvath, you can have a seat.

4     They're probably going to want to finish the hearing before

5     they talk to you, but if, hopefully it won't be much longer.

6     Right Mr. Beach?

7          MR. BEACH: I think that's right, Your Honor.  Item

8     no. 15 on the agenda is the Debtors' third motion to reject

9     certain office leases and equipment leases, and to abandon

10    certain furniture, fixtures, and equipment.  Your Honor,

11    there were two objections to the motion.  One was filed by GE

12    Ikon.  The Debtors have confirmed that all of the GE Ikon

13    equipment has now been rejected under previous motions, and

14    so I believe their objection is moot.  With respect to the

15    other objection, it was from Bank of America Leasing.  I've

16    consulted with Mr. Weaver prior to the hearing, and we

17    interlineated in some language to the form of order which I

18    believe satisfies him and resolves his objection, his

19    client's objection.  So with that, Your Honor, may I approach

20    with a form of order?

21         THE COURT: Yes.  Thank you.  You're putting this

22    "and Bank of America" language in two places?

23         MR. BEACH: Correct, Your Honor.  The same places

24    where De Lage Landen.  So it will say De Lage Landen and Bank

25    of America.

1          THE COURT: Does anyone wish to be heard?  There you

2     are.

3          MR. WEAVER: Yes, Your Honor.  I just wanted to

4     state to the Court that what was represented is true, and

5     that's what we've agreed to do.

6          THE COURT: All right.  Thank you, sir.  Any other

7     further comments?  I'll grant the motion.

8          MR. WEAVER: Your Honor, that's my only matter here

9     today.  May I be excused?

10         THE COURT: Yes you may.

11         MR. WEAVER: Thank you.

12         MR. BEACH: Thank you, Your Honor.  The last item on

13    the agenda is item no. 16.  It's a pre-trial conference

14    regarding certain WARN Act litigation.  Your Honor, the

15    plaintiffs are a group of former AHM employees who initiated

16    this action against the defendants under the Workers

17    Adjustment and Retraining Notification Act.  Or the WARN Act.

18    Plaintiffs allege that defendants terminated their employment

19    in violation of the WARN Act, and seek damages including back

20    pay and benefits.  Plaintiffs have, plaintiffs also purport

21    to bring the action on behalf of a class of similarly

22    situated employees.  Defendants have filed an answer denying

23    that any violation of the WARN Act has occurred.  Your Honor,

24    the parties have consulted, they do have a consensual form of

25    scheduling order, which was filed under certification of

1   counsel, I believe on Friday.  It didn't make it into the

2   amended agenda.  But I do have a form of order to hand up to

3   Your Honor, if you want to take that.

4          THE COURT: I think I have it.  Has it changed since

5   - -

6          MR. BEACH: No.  The only thing I'll note for Your

7   Honor is in paragraph (g) there's a - - I'm sorry.  It's

8   paragraph (h), there's a spot for a - -

9          THE COURT: Status conference.

10         MR. BEACH:  - - status conference date.

11  Dispositive motions are due June 27, 2008, so I think the

12  status conference would be approximately, or at least the

13  Debtors would want the status conference date approximately

14  two months after that.  Otherwise, I mean, the stipulation

15  hasn't changed at all.  You just need to fill in that date.

16         THE COURT:  - - throw a curve ball for you, and I

17  expect you're not the one handling the litigation, but maybe

18  I'll ask Mr. Huggett.  Have the parties talked about e-

19  discovery in any way, and how that's going to be handled?

20         MR. BEACH: Your Honor, I don't know the answer to

21  that.

22         MR. HUGGETT: You know what, Your Honor, Jim Huggett

23  from Margolis Edelstein for the plaintiffs.  E-discovery is

24  not mine in this case.  We do have two people who hopefully

25  are still on the line, Ms. Olsen and Mr. McCrary.  They were

1   here at the beginning, before Your Honor came in.

2          MS. OLSEN(Telephonic): We're here.  This is Mary

3   Olsen on behalf of the plaintiffs.  And no we have not

4   discussed e-discovery with the defendants at this point.

5          MR. HUGGETT: We certainly will, Your Honor.  I mean

6   - -

7          THE COURT: Yeah.  I understand.  Well, here's what

8   I'm, here's what I'm thinking about doing.  The, our District

9   Court has adopted a default standard for discovery of

10  electronic documents.  It hasn't been specifically

11  incorporated by the Bankruptcy Court, although as a judicial

12  unit of the Bankruptcy Court I think you could take the

13  argument that it's already applicable.  And I don't want to

14  sort of throw it at you without you having an opportunity to

15  think about it.  But basically the default standard, as it

16  works in the District Court is it's applicable unless the

17  parties agree otherwise.  I'm not sure it makes sense in a

18  little, you know, preference case.  But in a case like this,

19  it may make some sense.  So I was contemplating adding a

20  provision to the scheduling order saying that, you know, the

21  default standard was applicable in this case.  But I, I think

22  I'd like to give the parties an opportunity to actually think

23  about that before, you know, it may be, it may be the

24  plaintiffs like it, or maybe they don't like it.  It may be

25  the defendants like it, or they don't like it.  And it's kind

1   of unfair to spring it on you without any notice.  So the

2   dates are fine in the order, and I'm happy to give you a

3   trial date next summer.  But, but maybe I should, maybe we

4   should do that, and then give the parties an opportunity to

5   actually think about whether they want me to build that

6   default standard into it or not.  Is that acceptable?

7            MS. OLSEN(Telephonic): Yes.  That would be fine

8   with us, Your Honor.

9            THE COURT: All right.

10           MR. BEACH: May I have a second?

11           THE COURT: Yes.

12           MR. BEACH: Your Honor, I think that approach is

13  sensible.  And I believe the parties will be able to work out

14  this issue, and we'll submit the stipulation under

15  certification of counsel if that's appropriate with Your

16  Honor.  To the extent we can't resolve the issue, then we'll,

17  we'll file a certification of counsel telling Your Honor

18  what's open.

19           THE COURT: All right.  Well, let's pick a date

20  then.

21           MR. BEACH: We do have the October 17th I expect - -

22           THE COURT: No, no.  For the - -

23           MR. BEACH: Oh, I'm sorry.

24           THE COURT: They want a date for the pre-trial

25  sometime in - -

1          MR. BEACH: I think - -

2          THE COURT:  - - late August, early September next

3    year.  So we're going to make it early September, I can tell

4    you that right now.  Let's do - - okay.  Good.  Monday

5    September 8, 2008 at 10 a.m.  That should be okay.  That's

6    the Monday after Labor Day, so we don't run into any issues

7    there.  It's not a, it's not a holiday.  And I know no one

8    knows whether they're available then or not, but we'll put it

9    down.

10         MR. BEACH: Thank you, Your Honor.  So unless Your

11   Honor has any other questions about this that I can't answer,

12   we'll submit this under certification of counsel.

13         THE COURT: I have a, here take these.  I have a

14   couple copies of the default standard that will save you

15   looking for it.  Just sort of a general chambers comment.  I

16   think that, that this is probably going to be formally

17   incorporated in adversary proceedings in this court at some

18   point in the next couple of months.  But, I'm not in a

19   particular hurry to do it necessarily, except for cases like

20   this, which given the size of the case and the issues

21   involved, I think it would be appropriate.

22         MR. INDELICATO: Your Honor, Mark Indelicato from

23   Hahn & Hessen on behalf of the Committee.  Just so the record

24   is clear on this matter, we have a stipulation that's

25   circulating.  I have it now signed by the plaintiffs, and

1    we've signed it.  I will give it to Debtors' counsel for the

2    Committee to intervene.  It's our hope that by the summer

3    that the creditors are the true parties in interest here, and

4    so we think it only appropriate that the Committee intervene

5    in this action.

6              THE COURT: Very well.

7              MR. INDELICATO: We will get the Debtors' sign off

8    on the stip, and then we will get it submitted to Your Honor.

9              THE COURT: That's fine.

10             MR. BEACH: Thank you, Your Honor.  I believe that

11   concludes the hearing.

12             THE COURT: All right.  Thank you very much.

13   Hearing is adjourned.

14        (Whereupon at 12:02 p.m. the hearing in this matter was

15   concluded for this date.)

16

17

18             I, Jennifer Ryan Enslen, approved transcriber for

19   the United States Courts, certify that the foregoing is a

20   correct transcript from the electronic sound recording of the

21   proceedings in the above entitled matter.

22

23    _/s/Jennifer Ryan Enslen_                _10/08/07_
     Jennifer Ryan Enslen
24   43 Bay Boulevard
     Newark, DE 19702
25   (302)836-1905