IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------ x

| | |
|---|---|
| In re: | Chapter 11 |
| AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation, et al.,* | Case No. 07-11047 (CSS) |
| Debtors. | Jointly Administered |

**Ref. Dkt. Nos. 11, 113, 403, 614, 615, 660, 674, 675, 718, 720, 723, 724, 730, 740, 800, 813, 815, 823, 824, 825, 826, 829, 830, 831, 832, 836, 838, 840, 841, 845, 850, 851, 855, 857, 859, 911, 995, 1029, 1034, 1036, 1041, 1043, 1046, 1047, 1048, 1051, 1053, 1054, 1056, 1057, 1058, 1061, 1065, 1067, 1071, 1108, 1113, 1117, 1118, 1121, and 1123 Hrg. Date: Oct. 15, 2007 at 12:00 p.m.**

------------------------------------------------------------------ x


# DEBTORS' OMNIBUS RESPONSE TO CERTAIN OBJECTIONS TO THE SALE OF CERTAIN ASSETS AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS RELATING TO THE DEBTORS' LOAN SERVICING BUSINESS

---

\*      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... I

INTRODUCTION ................................................................................................... 1

PRELIMINARY STATEMENT ............................................................................. 2

BACKGROUND ..................................................................................................... 4

I. THE LOAN ORIGINATION/SALE BUSINESS AND THE LOAN SERVICING
BUSINESS ........................................................................................................ 4

    A.    *MLPSAs* ........................................................................................... *5*

        1.    Embedded Servicing Agreements ................................................. 6

        2.    Third-Party Securitizations and AARs ......................................... 7

    B.    *Stand-Alone Servicing Agreements* ............................................... *8*

        1.    AHM Securitizations ..................................................................... 8

        2.    Non-Securitized Mortgage Loans ................................................ 10

II. PROCEDURAL HISTORY ............................................................................. 10

III.    THE APA AND THE BUYER ....................................................................... 12

IV.    THE OBJECTIONS ...................................................................................... 14

    A.    *Objections Based on the Cum Onere Principle* ........................ *15*

    B.    *Objections Relating to Allegedly Incurable Defaults* .............. *15*

    C.    *Objections to the Proposed Cure Amount* ............................... *15*

    D.    *Objections Asserting Prohibitions Against Assignment* .......... *16*

    E.    *Objections Regarding Adequate Assurance of Future Performance* ........ *16*

    F.    *Objections Based on Alleged Termination of the Servicing Agreements* . *16*

ARGUMENT ......................................................................................................... 17

I. THE SERVICING AGREEMENTS ARE NOT EXECUTORY CONTRACTS; THE
DEBTORS CAN SELL THE SERVICING RIGHTS UNDER § 363 OF THE
BANKRUPTCY CODE IRRESPECTIVE OF THE REQUIREMENTS OF § 365 .......... 17

    A.    *The Servicing Rights are property of the Debtors' estates, which can be
sold free and clear of various claims under § 363 of the Bankruptcy Code* ........ *17*

        1.    The Debtors may sell their Servicing Rights free and clear of
"claims" arising under the Servicing Agreements ........................ 18

        2.    The Debtors may sell their Servicing Rights notwithstanding any
*ipso facto* defaults under the Servicing Agreements .................... 19

    B.    *The Servicing Agreements are not executory contracts* ........................... *21*

1.  The Servicing Agreements impose obligations on AHM Servicing to perform all necessary tasks but impose no substantive obligations on the non-debtor parties ........................................... 22

2.  The limited obligations of non-debtor parties under the Servicing Agreements are not material, and therefore do not render the Servicing Agreements executory ................................................. 26

    a.  *Ministerial obligations under the Servicing Agreements are not material* .............................................................................. 26

    b.  *Ancillary obligations under the Servicing Agreements are not material* .............................................................................. 27

II. TO THE EXTENT THE SERVICING AGREEMENTS ARE EXECUTORY CONTRACTS, THEIR ASSUMPTION AND ASSIGNMENT ON THE TERMS PROPOSED IN THE SALE MOTION AND THE APA IS CONSISTENT WITH THE REQUIREMENTS OF § 365 OF THE BANKRUPTCY CODE ...................................... 29

A.  *The Court has the discretion to refuse enforcement of contractual terms that, if enforced, would prevent the Debtors from realizing the intrinsic value of the Servicing Agreements via assumption and assignment* .................................. 30

B.  *The Servicing Agreements are severable from the Other Agreements and may be assumed and assigned independently consistent with the cum onere principle* ......................................................................................... 35

    1.  The Servicing Agreements and Other Agreements are not economically interdependent and are therefore severable under federal bankruptcy law ................................................................. 37

    2.  Applicable state law supports the conclusion that the Servicing Agreements are severable from the Other Agreements ................ 41

C.  *The Debtors will cure any "material and economically significant" defaults under the Servicing Agreements; other alleged defaults are irrelevant* . 44

    1.  The Debtors are in fact Fannie Mae-qualified; any default relating to the alleged loss of such qualification has been cured ............... 45

    2.  Section 365(b)(1)(A) does not require the Debtors to undo historical facts; any and all material and economically significant defaults under the Servicing Agreements are curable ................... 46

    3.  Section 365(b)(2) of the Bankruptcy Code excuses the cure of any *ipso facto* defaults ......................................................................... 49

    4.  The Debtors need not cure defaults under the Other Agreements 50

D.  *The only condition for assignment of the Servicing Agreements is compliance with § 365(f)(2) of the Bankruptcy Code.* ......................................... 51

    1.  Servicing Agreements are not "financial accommodations" contracts and may be assumed and assigned without the Objecting Parties' consent .......................................................................... 51

2.  Express and *de facto* anti-assignment provisions are unenforceable under § 365(f)(1) of the Bankruptcy Code ................................... 53

3.  The Form APA did not require the Debtors to obtain the Objecting Parties' consent as a prerequisite to assignment of the Servicing Agreements ................................................................................. 53

E.  *The Adequate Assurance Objections are without merit; the Buyer need only comply with material and economically significant terms of the Servicing Agreements*........................................................................................... 55

III.  THE COURT NEED NOT DETERMINE AT THE SALE HEARING WHETHER ANY SERVICING AGREEMENTS WERE VALIDLY TERMINATED PREPETITION ........................................................................................... 58

IV.  THE PURPORTED POSTPETITION TERMINATION OF THE EMC EMBEDDED SERVICING AGREEMENT VIOLATED THE AUTOMATIC STAY AND WAS INVALID AS A MATTER OF LAW BECAUSE IT WAS PREMISED UPON AN UNENFORCEABLE *IPSO FACTO* DEFAULT PROVISION ......................................... 58

CONCLUSION ........................................................................................................... 63

RESERVATION OF RIGHTS ................................................................................... 64

# TABLE OF AUTHORITIES

Page

**Cases**

### *Unites States Supreme Court*

Butner v. United States,
  440 U.S. 48 (1979)..................................................................................................... 39

### *United States Circuit Courts of Appeals*

In re Fleming Cos., No. 05-2365,
  2007 App. LEXIS 19927 (3d Cir. Aug. 22, 2007)............................................. passim

In re Gen'l Datacomm Indus., Inc.,
  407 F.3d 616 (3d Cir. 2005) ......................................................................................... 21

United Airlines, Inc. v. HSBC Bank U.S.A., N.A.,
  416 F.3d 609 (7th Cir. 2005) ....................................................................................... 40

Lifemark Hospitals, Inc. v. Liljeberg Enters. (In re Liljeberg Enters.),
  304 F.3d 410 (5th Cir. 2002) ....................................................................................... 34

Cinicola v. Scharffenberger,
  248 F.3d 110 (3d Cir. 2001) ................................................................................. 34, 53

In re Rickel Home Ctrs., Inc.,
  209 F.3d 291 (3d Cir. 2000) .............................................................. 17, 34, 47, 50

Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.,
  141 F.3d 490 (3d Cir. 1998) ....................................................................................... 17

Integrated Solutions v. Serv. Support Specialties,
  124 F.3d 487 (3d Cir. 1997) ....................................................................................... 19

Worthington v. General Motors Corporation (In re Claremont Acquisition Corp.),
  113 F.3d 1029 (9th Cir. 1997) ..................................................................................... 45

Atlantic Mut. Ins. Co. v. Balfour MacLaine Int'l (In re Balfour MacLaine Int'l),
  85 F.3d 68 (2d Cir. 1996) ............................................................................................ 40

Stewart Title v. Old Republic Nat. Title,
  83 F.3d 735 (5th Cir. 1996) ......................................................................................... 36

In re Columbia Gas Sys., Inc.,
        50 F.3d 233 (3d Cir. 1995) ....................................................................... 21, 25, 26

Maritime Elec. Co. v. United Jersey Bank,
        959 F.2d 1194 (3d Cir. 1991) ............................................................................. 56

In re Wolverine Radio Co.,
        930 F.2d 1132 (6th Cir. 1991) ........................................................................... 18

In re Joshua Slocum, Ltd.,
        922 F.2d 1081 (3d Cir. 1990) ...................................................................... 31, 47

Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer S&L Ass'n.
        (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.),
        878 F.2d 742 (3d Cir. 1989) ............................................................................... 57

In re Munple, Ltd.,
        868 F.2d 1129 (9th Cir. 1989) ........................................................................... 20

In re Moreggia & Sons, Inc.,
        852 F.2d 1179 (9th Cir. 1988) ........................................................................... 40

In re Stringer,
        847 F.2d 549 (9th Cir. 1988) ............................................................................. 58

Fed'l Dep. Ins. Co. v. Air Florida, Inc.,
        822 F.2d 833 (9th Cir. 1987) ............................................................................. 21

In re Gardinier, Inc.,
        831 F.2d 974 (11th Cir. 1987) ..................................................................... 35, 36

In re PCH Assocs.,
        804 F.2d 193 (2d Cir. 1986) ............................................................................. 40

Pristas v. Landaus of Plymouth, Inc.,
        742 F.2d 797 (3d Cir. 1984) ............................................................................. 59

Lipsky v. Commonwealth United Corp.,
        551 F.2d 887 (2d Cir. 1976) ............................................................................. 21

In re Italian Cook Oil Corp.,
        190 F.2d 994 (3d Cir. 1951) ............................................................................. 33

### United States District Courts

In re USA Commercial Mortgage Co., Case No. 2:07-CV-00072-RCJ-GWF,
        2007 U.S. Dist. LEXIS 65264 (D. Nev. Aug. 29, 2007) ........................ 18, 23, 24, 26

Aceituno v. KBI Norcal, Inc., Case No. 2:06-cv-2273-GEB-DAD,
  2007 U.S. Dist. LEXIS 43890 (E.D. Cal. June 4, 2007) ........................................ 21

In re Fleming Cos.,
  Civ. No. 371-SLR, D.I. 20 (D. Del. Mar. 30, 2005) ................................................ 30

Certain Underwriters at Lloyd's v. McDermott Int'l, Inc.
  (In re The Babcock & Wilcox Co.), Case No. 01-912 c/w 01-1187,
  2002 U.S. Dist. LEXIS 874 (E.D. La. Jan. 4, 2002) .............................................. 27

In re Bradlees Stores, Inc., Case No. 01-CV-3934 (SAS),
  2001 U.S. Dist. LEXIS 14755 (S.D.N.Y. Sept. 20, 2001) ...................................... 21

In re Golden Books Family Entm't, Inc.,
  269 B.R. 311 (D. Del. 2001) .................................................................................. 21

Foothill Capital Corp. v. Official Unsecured Creditors' Comm. of Midcom Communs., Inc.,
  246 B.R. 296 (E.D. Mich. 2000) ............................................................................ 49

Kopel v. Campanile (In re Kopel),
  232 B.R. 57 (E.D.N.Y. 1999) ........................................................................... 34, 35

In re James Cable Partners, L.P.,
  154 B.R. 813 (M.D. Ga. 1993) .............................................................................. 19

In re Indian River Homes, Inc.,
  108 B.R. 46 (D. Del. 1989) .................................................................................... 20

### United States Bankruptcy Courts

In re Integrated Health Serv., Inc., Case No. 00-389(MFW),
  2000 Bankr. LEXIS 1310 (Bankr. D. Del. July 7, 2007) .................................... 36, 37

In re USA Commercial Mortgage Co.,
  Case No. 06-10725 (LBR), D.I. 2377 (Bankr. D. Nev. Jan. 8, 2007) ...................... 23

Shaw Group, Inc., v. Bechtel Jacobs Co., LLC (In re The IT Group, Inc.),
  350 B.R. 166 (Bankr. D. Del. 2006) ................................................................. passim

In re L.G. Philips Displays USA Inc., Case No. 06-10245 (BLS),
  2006 Bankr. LEXIS 1092 (Bankr. D. Del. June 21, 2006) .............................. 26, 27

EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.),
  356 B.R. 631 (Bankr. D. Del. 2006) ...................................................................... 19

United Air Lines, Inc. v. U.S. Bank Trust Nat'l Ass'n (In re UAL Corp.),
  346 B.R. 456 (Bankr. N.D. Ill. 2006) .................................................................... 34

Kipperman v. Circle Trust (In re Grafton Partners, L.P.),
321 B.R. 527 (B.A.P. 9th Cir. 2005) ............................................................ 57

Ready Prods., Inc. v. Jarvis (In re Jarvis), Case No. 04-10806-JMD,
2005 Bankr. LEXIS 536 (Bankr. D.N.H. Mar. 28, 2005).............................. 26

In re Fleming Cos.,
Case No. 03-10945 (MFW), D.I. 6916 (Bankr. D. Del. Feb. 27, 2004) ................ 30

In re Enron Corp., Case No. 01 B 16034 (AJG),
2003 Bankr. LEXIS 2263 (Bankr. S.D.N.Y. Dec. 1, 2003)........................... 54

In re ANC Rental Corp.,
277 B.R. 226 (Bankr. D. Del. 2002) ........................................................ 50

Bank of America, N.A. v. Garcia (In re Garcia),
276 B.R. 627 (Bankr. D. Ariz. 2002)................................................ 11, 45, 46

In re UAL Corp.,
293 B.R. 183 (Bankr. N.D. Ill. 2003) ................................................ 34, 49

In re Valley Media, Inc.,
279 B.R. 105 (Bankr. D. Del. 2002) ........................................................ 56

In re Waste Systems Int'l, Inc.,
280 B.R. 824 (Bankr. D. Del. 2002) ........................................................ 17

In re Neuhoff Farms, Inc.,
258 B.R. 343 (Bankr. E.D.N.C. 2000)...................................................... 50

In re Vitanza, Case No. 98-19611,
1998 Bankr. LEXIS 1497 (Bankr. E.D. Pa. Nov. 13, 1998)........................ 44, 45, 46

Anchor Resolution Corp. v. State St. Bank & Trust Co. of Am.
(In re Anchor Resolution Corp.),
221 B.R. 330 (Bankr. D. Del. 1998) ........................................................ 26

Bridgeport Jai Alai v. Autotote Sys. (In re Bridgeport Jai Alai),
215 B.R. 651 (Bankr. D. Conn. 1997) ................................................ 37, 39

In re C.A.F. Bindery,
199 B.R. 828 (Bankr. S.D.N.Y. 1996)...................................................... 19

In re Spectrum Info. Techs.,
190 B.R. 741 (Bankr. E.D.N.Y. 1996)...................................................... 26

In re Lee West Enters.,
179 B.R. 204 (Bankr. C.D. Cal. 1995)...................................................... 45

Central City South Assocs. v. Spirit Holding Company, Inc.
   (In re Spirit Holding Company, Inc.),
      166 B.R. 371 (Bankr. E.D. Mo. 1994) .......................................................... 46

In re Dundee Equity Corp., Case No. 89-B-10233,
      1992 Bankr. LEXIS 436 (Bankr. S.D.N.Y. Mar. 6, 1992) ........................... 18

DiCello v. United States (In re Railway Reorganization Estate, Inc.),
      133 B.R. 578 (Bankr. D. Del. 1991) ............................................................ 19

In re Brendlinger,
      116 B.R. 42 (Bankr. W.D. Pa. 1990) ........................................................... 59

In re Hutchins,
      99 B.R. 56 (Bankr. D. Colo. 1989) .............................................................. 19

In re Joshua Slocum, Ltd.,
      99 B.R. 250 (Bankr. E.D. Pa. 1989) ....................................................... 31, 32

In re Residential Resources Mortgage Inv. Corp.,
      98 B.R. 2 (Bankr. D. Ariz. 1989) ................................................................. 57

In re Precision Carwash Corp.,
      90 B.R. 34 (Bankr. E.D.N.Y. 1988) ............................................................. 17

Madisonview Towers v. Yardley (In re Yardley),
      77 B.R. 643 (Bankr. M.D. Tenn. 1987) .................................................. 44, 46

In re Bygaph, Inc.,
      56 B.R. 596 (Bankr. S.D.N.Y. 1986) ........................................................... 18

In re Compass Van & Storage Corp.,
      65 B.R. 1007 (Bankr. E.D.N.Y. 1986) ......................................................... 20

Hatoff v. Lemons & Assocs., Inc. (In re Lemons & Assocs., Inc.),
      67 B.R. 198 (Bankr. D. Nev. 1986) .................................................. 22, 23, 26

In re Haute Cuisine, Inc.,
      58 B.R. 390 (Bankr. M.D. Fla. 1986) ........................................................... 46

In re Bon Ton Restaurant and Pastry Shop, Inc.,
      53 B.R. 789 (Bankr. N.D. Ill. 1985) ............................................................. 46

In re Waldron,
      36 B.R. 633 (Bankr. S.D. Fla. 1984) ............................................................ 39

In re Adolphsen,
      38 B.R. 776 (Bankr. D. Minn. 1983) ............................................................ 25

Harper v. Victor Motors (In re Victor Motors), Adv. No. 83P-0325,
    1983 Bankr. LEXIS 6131 (Bankr. D. Utah May 27, 1983) ....................................... 49

Chera v. 991 Boulevard Realty Corp. (In re National Shoes, Inc.),
    20 B.R. 55 (Bankr. S.D.N.Y. 1982) ............................................................................. 20

In re J.M. Fields, Inc.,
    22 B.R. 861 (Bankr. S.D.N.Y. 1982) ........................................................................... 17

In re U.L. Radio Corp.,
    19 B.R. 537 (Bankr. S.D.N.Y. 1982) ..................................................................... 53, 54

In re Sapolin Paints, Inc.,
    5 B.R. 412 (Bankr. E.D.N.Y. 1980) ............................................................................. 53


*California*

Lowy v. United Pac. Ins. Co.,
    429 P.2d 577 (Cal. 1967) ............................................................................................. 41

Simmons v. California Institute of Tech.,
    34 209 P.2d 581 (Cal. 1949) ........................................................................................ 41

Los Angeles Gas & Elec. Co. v. Amalgamated Oil Co.,
    156 Cal. 776 (Cal. 1909) ............................................................................................. 41

Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.,
    116 Cal. App. 4th 1375 (Cal. Ct. App. 2004) .............................................................. 41


*Minnesota*

Skogberg v. Huisman, Case No. C7-02-2059,
    2003 Minn. App. LEXIS 1043 (Minn. Ct. App. Aug. 19, 2003) ................................. 21

Cloverdale Foods v. Pioneer Snacks,
    580 N.W.2d 46 (Minn. Ct. App. 1998) ........................................................................ 21


*New York*

In re Estate of Wilson,
    405 N.E.2d 220 (N.Y. 1980) ........................................................................................ 40

Christian v. Christian,
    365 N.E.2d 849 (N.Y. 1977) ........................................................................................ 40

First Savings & Loan Ass'n of Jersey City, N.J. v. Am. Home Assurance Co.,
  29 N.Y.2d 297 N.Y.S.2d 609 (1971) ...................................................................... 41

Ming v. Corbin,
  37 N.E. 105 (N.Y. 1894) ...................................................................................... 41

**Statutes**

11 U.S.C. § 101(5) ............................................................................................ 18

11 U.S.C. § 105(a) ............................................................................................ 18

11 U.S.C. § 362(a)(3) ........................................................................................ 56

11 U.S.C. § 363 .......................................................................... 3, 13, 16, 17

11 U.S.C. § 363(b) ...................................................................................... 20, 47

11 U.S.C. § 363(f) ............................................................................................ 18

11 U.S.C. § 363(l) .................................................................................. 19, 20, 56

11 U.S.C. § 365 ...................................................................................... passim

11 U.S.C. § 365(b)(1) ...................................................................................... 29

11 U.S.C. § 365(b)(1)(A) ............................................................................ 15, 33

11 U.S.C. § 365(b)(1)(B) ............................................................................ 15, 45

11 U.S.C. § 365(b)(1)(C) .................................................................................. 16

11 U.S.C. § 365(b)(2) ...................................................................................... 47

11 U.S.C. § 365(b)(2)(A) .................................................................................. 47

11 U.S.C. § 365(c) ............................................................................................ 48

11 U.S.C. § 365(c)(2) ........................................................................ 15, 48, 49, 56

11 U.S.C. § 365(e)(1) ........................................................................................ 56

11 U.S.C. § 365(e)(2)(B) .............................................................................. 48, 56

11 U.S.C. § 365(f)(2) ...................................................................... 29, 48, 50, 53

11 U.S.C. § 365(f)(2)(A) .................................................................................. 15

11 U.S.C. § 365(f)(2)(B) .............................................................................. 16, 30

11 U.S.C. § 541(a)(1) ............................................................................................. 16

11 U.S.C. § 541(c) ................................................................................................. 19

11 U.S.C. § 555 ...................................................................................... 3, 56, 58, 59

11 U.S.C. § 559 ..................................................................................................... 57

11 U.S.C. § 741(7)(A)(viii) .............................................................................. 57, 58

U.C.C. § 2-609 cmt. 3 (1972) ............................................................................... 53

U.C.C. § 2-609 cmt. 4 ........................................................................................... 53

**Other Authorities**

3 <u>Collier on Bankruptcy</u> ¶ 365.05[4] ....................................................................... 47

Fannie Mae Guide for Mortgage Selling and Servicing Contracts .......................... 45, 57

Freddie Mac Single-Family Seller/Servicer Guide ....................................................... 54

H. R. Rep. No. 595, 95th Cong., 1st Sess. 348 (1977) ................................................. 19

S. Rep. No. 989, 95th Cong., 2d Sess. 59 (1978) ........................................................ 19

## INTRODUCTION

AHM Holdings and certain of its direct and indirect affiliates and subsidiaries, the

debtors and debtors in possession in the above cases (collectively, "AHM" or the "Debtors"),

hereby respond (the "Omnibus Response") to certain objections (each an "Objection" and

collectively, the "Objections") filed by various non-debtor parties (each an "Objecting Party"

and collectively, the "Objecting Parties")[1] to:

    (i)      the Emergency Motion of the Debtors for Orders: (A)(I) Approving Sale Procedures; (II) Scheduling a Hearing to Consider Sale of Certain Assets Used in the Debtors' Loan Servicing Business; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief; and (B)(I) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreement [Related] Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief, D.I. 11, filed August 6, 2007 (the "Sale Motion");

    (ii)     the Notice of (I) Possible Assumption and Assignment of Certain Leases, License Agreements, and Executory Contracts; and (II) Proposed Cure Obligations, if Any, D.I. 403, filed August 27, 2007 (the "Initial Cure Notice");

    (iii)    the *Modified* Notice of (I) Possible Assumption and Assignment of Certain Leases, License Agreements, and Executory Contracts; and (II) Proposed Cure

---

[1]    The Objections identified on Exhibits A-F of this Omnibus Response (concerning the sale of servicing rights) are as follows, listed by Objecting Party and docket number(s) only: Countrywide Bank, FSB and/or Countrywide Home Loans, Inc., D.I. 614 & 1056; DB Structured Products, Inc., D.I. 675 & 1108; Financial Guaranty Insurance Co., D.I. 718 & 1036; Citibank, N.A., D.I. 723, 724 & 1047; CitiMortgage, Inc., D.I. 740, 855 & 1058; Deutsche Bank National Trust Co., D.I. 800 & 832; Connecticut Housing Finance Authority, D.I. 813; Wells Fargo Bank, N.A., D.I. 824 & 1053; The Bank of New York, D.I. 826; Duke University Federal Credit Union, D.I. 831; U.S. Bank, N.A., D.I. 836, 1067 & 1117; CIFG Assurance North America, Inc., D.I. 838 & 1053; HSI Asset Securitization Corp. and HSBC Bank USA, N.A., D.I. 840 & 1113; Credit Suisse First Boston Mortgage Capital LLC, D.I. 1034; Goldman Sachs Mortgage Co. and GS Mortgage Securities Corp., D.I. 845 & 1118; EMC Mortgage Corp., D.I. 850 & 1057; JPMorgan Chase Bank, N.A. and certain affiliates, D.I. 730 & 1048; Morgan Stanley Mortgage Capital Holdings LLC; Wells Fargo Funding, Inc., D.I. 851 & 1053; GMAC Mortgage LLC, D.I. 857 & 1071; Residential Funding Co. LLC, D.I. 859 & 1061; UBS Real Estate Securities, Inc., D.I. 1029 & 1123; Morgan Stanley Mortgage Loans, D.I. 1054; and Assured Guaranty Corp., D.I. 1065.

    The Objections identified on Exhibit G of this Omnibus Response (unrelated to the sale of servicing rights) are as follows, listed by Objecting Party and docket number(s) only: Tuscaloosa County, Alabama, D.I. 615; De Lage Landen Financial Services, Inc., D.I. 660, 841 & 1041; FNC, Inc., D.I. 720; Iron Mountain Information Management, Inc., D.I. 815; Security Connections, Inc., D.I. 823 & 1046; Experian Information Solutions, Inc., D.I. 825; Qwest Communications Corp., D.I. 829; ZC Real Estate Tax Solutions, D.I. 830; Travis County, Texas, D.I. 911; Banc of America Leasing & Capital, LLC, D.I. 995 & 1051; DRI Management Systems, Inc. (informal); and SoftLanding Systems, Inc. (informal).

Obligations, if Any, D.I. 674, filed September 10, 2007 (the "<u>Modified Cure Notice</u>"); and/or

(iv)     the Supplemental Notice of (I) Possible Assumption and Assignment of Certain Leases, License Agreements, and Executory Contracts; and (II) Proposed Cure Obligations, if Any, D.I. 962, filed September 26, 2007 (the "<u>Supplemental Cure Notice</u>").

On information and belief, all timely filed Objections that are not addressed by this Omnibus Response[2] were resolved by the Notice of Contracts Excluded from (I) Possible Assumption and Assignment of Certain Leases, License Agreements, and Executory Contracts; and (II) Proposed Cure Obligations, if Any, D.I. 979, filed September 27, 2007 (the "<u>Exclusion Notice</u>"), which withdrew the Sale Motion as to certain Potential Executory Contracts (as defined in the Exclusion Notice) that were previously identified in the Initial Cure Notice and/or Modified Cure Notice.

In support of this Omnibus Response, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

Before the Court is a proposed sale of the Debtors' servicing business as a going concern which, if approved, could bring between $400-500 million into the Debtors' bankruptcy estates and provide for the continued employment of the Debtors' remaining work force. Most vocally opposed to such sale are a host of institutional investors and lenders which, despite voluntarily purchasing mortgage loans from the Debtors *without* the accompanying Servicing Rights (as hereinafter defined)—and paying accordingly—now seek to *improve* their original

---

[2]     Such Objections are as follows (listed by Objecting Party and docket number(s) only): EMC Mortgage Corp., D.I. 728 & 846; Liquid Funding, Ltd., D.I. 729 & 847; Bear Stearns Mortgage Capital Corp. and EMC Mortgage Corp., D.I. 732; Bear Stearns Mortgage Capital Corp., D.I. 848; Societe Generale, D.I. 733; Credit Suisse First Boston Mortgage Capital LLC, D.I. 844; ABN AMRO Bank N.V., D.I. 852; Nexis Real Estate Capital Inc., D.I. 853; Merill Lynch Mortgage Lending, Inc., D.I. 858; Federal Home Loan Mortgage Corp., D.I. 893; and Calyon New York Branch, D.I. 1031.

bargain by wresting control of such servicing rights from the Debtors' estates for no additional consideration.

These Objecting Parties advance various legal theories to undermine the proposed sale, almost all of which proceed from the following, fundamentally flawed premises: first, that the contracts giving rise to the Debtors' Servicing Rights (the Servicing Agreements, as hereinafter defined) are inextricably intertwined with contracts relating to the sale and/or securitization of the underlying mortgage loans (the Other Agreements, as hereinafter defined); and second, that such Servicing Agreements are executory contracts governed by § 365 of the Bankruptcy Code.  To preclude assumption and assignment of the Servicing Agreements, some Objecting Parties invoke allegedly incurable defaults or the Debtors' alleged inability to provide adequate assurance of future performance under the Servicing Agreements.  Other Objecting Parties characterize the Servicing Agreements as "financial accommodations" contracts that may not be assumed or assigned, and/or as "securities contracts" that may be terminated on account of an *ipso facto* default and without relief from the automatic stay by virtue of the safe harbor provision of § 555 of the Bankruptcy Code.  Finally, almost all of the Objecting Parties assert that a necessary condition to assumption and assignment of any of the Servicing Agreements is the payment of claims arising under the Other Agreements.

The mountain of paper created by the Objecting Parties is daunting, but deceptively so.  The vast majority of the Objections will be resolved if the Court determines (as it should) that the Debtors are seeking not the assumption and assignment of executory Servicing Agreements pursuant to § 365 of the Bankruptcy Code, but rather, the sale of vested contractual rights pursuant to § 363.  And even if the Servicing Agreements are executory contracts, most of the Objections will still be resolved if the Court determines (again, as it should) that the

Servicing Agreements are severable from the Other Agreements.  In so ruling, the Court would merely be confirming what is obvious within the mortgage industry, namely that (i) mortgage loans and servicing rights constitute separate and distinct *property* interests and (ii) the origination and sale of mortgage loans and the servicing of mortgage loans are completely different functions that are capable of being (and indeed, routinely are) performed by different entities.

 *To be absolutely clear,* in approving the sale, the Court would *not* be ruling that the underlying mortgage loans, servicing files, and/or unremitted P&I or T&I escrows (as hereinafter defined) constitute property of the estate—they are not, and the Debtors have never contended otherwise.[3]  Nor would the Court be ruling that the MLPSAs or Securitization-Related Agreements (as hereinafter defined) do not qualify as "financial accommodations" contracts or "securities contracts" under the Bankruptcy Code—they may or may not, but the Court need not reach the issue because *the Servicing Agreements* clearly do not qualify as either.  Finally, the Court need not pass upon the validity of any alleged termination of a Servicing Agreement prepetition—those issues will be litigated, if at all, at a later time.

## BACKGROUND

### I. THE LOAN ORIGINATION/SALE BUSINESS AND THE LOAN SERVICING BUSINESS

 Prior to the closing of the Debtors' loan origination business, AHM Corp. and AHM Acceptance originated mortgage loans that they then either securitized or sold outright to the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage

---

[3] Where the Debtors have refused to turn over servicing-related files and/or P&I or T&I escrows belonging to the Objecting Parties (or, in the case of T&I escrows, belonging to the mortgagor-borrowers), the Debtors have had a colorable claim to lawful *possession* of such property due to a dispute over the validity of the non-debtor party's purported termination of the Servicing Agreement at issue.  *The Debtors have never asserted more than a possessory interest in this property.*

Corp. ("Freddie Mac"), large national banks, thrifts and smaller banks, securities dealers, real estate investment trusts or other institutional loan buyers. Mortgage loans were typically sold with limited recourse, subject to continuing representations and warranties requiring AHM Corp./Acceptance, e.g., (i) to repurchase loans for which there was a payment default within a specified period of time after the initial sale (an "Early Payment Default" or "EPD") or which did not comply with the underwriting standards of the ultimate investor, or (ii) to pay a yield maintenance premium (a "Premium Recapture Payment" or "PRP") with respect to loans that were paid off prior to maturity.

The Debtors' loan servicing business has continued to operate during these chapter 11 cases and is conducted through AHM Servicing. Loans are serviced primarily for the trusts of AHM Securitizations (as hereinafter defined) and for Fannie Mae, the Government National Mortgage Association ("Ginnie Mae") and other third-party purchasers of mortgage loans. Historically, the Debtors' loan servicing business provided the Debtors with a countercyclical source of revenue and a stable cash flow, as net income from servicing activities generally tends to increase during periods of rising interest rates when revenue from originations generally tends to diminish. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans having an aggregate unpaid principal balance ("UPB") of approximately $46.3 billion.

### A.    MLPSAs

AHM Corp./Acceptance, as Seller, and AHM Servicing, as Servicer, are parties to a number of Mortgage Loan Purchase and Servicing Agreements ("MLPSAs") with institutional investors and lenders, as Purchasers (the "Third-Party Purchasers"), whereby AHM Corp./Acceptance sold mortgage loans on either a "servicing-retained" or "servicing-released"

basis.[4] The MLPSAs operated as an ongoing sale program under which the Third-Party Purchasers stood ready to purchase mortgage loans so long as the loans offered for sale satisfied certain underwriting standards.

### 1.    Embedded Servicing Agreements

With respect to mortgage loans sold on a servicing-retained basis, AHM Servicing retained the right to service such mortgages (the "Servicing Rights") on the terms and consistent with the obligations set forth in relevant subsection(s) and other provisions of the MLPSAs (such subsection(s) and provisions of each MLPSA, an "Embedded Servicing Agreement"). With respect to mortgage loans sold on a servicing-released basis, the Third-Party Purchaser acquired all rights, including the Servicing Rights.

Under MLPSAs where Servicing Rights were retained, AHM Servicing is entitled to receive fees for the servicing duties performed. Mortgagors generally make payments to AHM Servicing, in its capacity as Servicer, and AHM Servicing, in turn, processes the payments received. Typically, the payments received will consist of two components: (i) principal and interest ("P&I"), and (ii) tax and insurance escrows ("T&I"). AHM Servicing, as Servicer, retains a portion of the P&I component as compensation for servicing, and the balance of the P&I is paid to the owner of the mortgage loan (i.e., the Third-Party Purchaser). The T&I component is set aside in separate escrows until payment of the applicable real estate taxes or homeowner's insurance and private mortgage insurance premiums are payable. This arrangement is much the same under MLPSAs where Servicing Rights are not retained, except

---

[4]    AHM Corp./Acceptance is also a party to certain MLPSAs to which AHM Servicing is not a direct party. Often such MLPSAs directly reference AHM Servicing (e.g., by defining it as the "Servicer"). And in all instances, AHM Servicing does the actual servicing on AHM Corp./Acceptance's behalf.

that the Third-Party Purchaser has the option of transferring servicing of the mortgage loans to another servicer.

As discussed in detail below, embedding Servicing Rights in MLPSAs was a simple matter of drafting convenience for the parties. Practically and economically speaking, the duties, conditions, and obligations associated with the Embedded Servicing Agreements, and the consideration underlying them, are no different from those associated with Stand-Alone Servicing Agreements (as hereinafter defined) and, at any rate, are readily severable from the MLPSAs. Indeed, some of the Objecting Parties utilize both Embedded and Stand-Alone Servicing Agreements and, from a business standpoint, would be hard-pressed to make any distinction between them.

## 2.    Third-Party Securitizations and AARs

In certain instances (the "Third-Party Securitizations"), MLPSAs were structured as master agreements whereby the Third-Party Purchaser would purchase, pool, and resell mortgage loans to successive securitization trusts. Along with each pool of loans resold to a securitization trust, the Third-Party Purchaser, and the trustee of the securitization trust would enter into an Assignment, Assumption and Recognition Agreement (an "AAR") with AHM Servicing, Inc. The execution of the AAR, in effect, assigned to the trustee of the securitization trust the Third-Party Purchaser's right to AHM Servicing's performance of its mortgage loan servicing functions. Put another way, the AAR made the trustee of the securitization trust an obligee of AHM Servicing's obligations under the Embedded Servicing Agreement. Thus, where mortgage loans were sold to the Third-Party Purchaser on a servicing-retained basis and later securitized, AHM Servicing would continue to own the Servicing Rights with respect to

such loans after execution of the AAR and transfer of the subject mortgage loans to the securitization trust.

**B.      Stand-Alone Servicing Agreements**

The Debtors (usually, AHM Servicing) are also parties to several servicing agreements that are independently documented (the "Stand-Alone Servicing Agreements").

**1.      AHM Securitizations**

A number of the Stand-Alone Servicing Agreements relate to securitization transactions (the "AHM Securitizations") involving residential mortgage loans and/or home equity lines of credit ("HELOCs") originated by commercial lenders (the "Lenders") and purchased by an AHM entity.  HELOCs differ from residential mortgage loans primarily in that the Lenders, in addition to loaning some amount of money at the outset of the transactions, commit to honor future draws requested by the borrowers.

A typical AHM Securitization began with a Lender originating a critical mass of residential mortgage loans and/or HELOCs and entering into a Mortgage Loan Purchase Agreement ("MLPA") or similar agreement, as Seller, with an AHM entity as Purchaser (the "AHM Purchaser").  Under the MLPA, the AHM Purchaser purchased a pool of residential mortgage loans and/or the current balances of a given pool of HELOCs and, with respect to the HELOCs, agreed to purchase any additional balances created upon the funding by the Lender-Seller of subsequent draws requested by the borrower.  The obligation to fund draws under the HELOCs remained with the Lender-Seller.

Contemporaneously with the execution of the MLPA, the AHM Purchaser created

a securitization trust[5] and conveyed to it (i) a nominal sum of money to fund the trust corpus, and

(ii) the residential mortgage loans and HELOCs acquired via the MLPA, along with associated

rights under the MLPA (e.g., the continuing representations and warranties of Lender-Seller with

respect to the mortgage loans and HELOCs sold to the AHM Purchaser). Because the AHM

Purchaser was not obligated under the MLPA to fund future draws under the HELOCs, no such

obligation was assumed by the securitization trust.

The securitization trust, as Issuer, entered into an Indenture with an Indenture

Trustee and Securities Administrator, whereby it issued notes or trust certificates to investors and

pledged the residential mortgage loans and/or HELOCs it received from the AHM entity as

collateral. The Indenture Trustee holds the mortgages and HELOCs to secure the rights of those

investing in the Issuer's notes/certificates.

To provide for the servicing of securitized residential mortgage loans and

HELOCs, the Issuer and Indenture Trustee enter into a Backup or Master Servicing Agreement

with a non-AHM servicer (typically, Wells Fargo for residential mortgage loans and GMAC for

HELOCs) (the "Backup/Master Servicer").[6] The Issuer, Indenture Trustee, Backup/Master

Servicer, and Lender-Seller also enter into separate agreements with AHM Servicing (or other

AHM entity that is *not* the AHM Purchaser) for the servicing of residential mortgage loans (a

"Residential Mortgage-Backed Securities ('RMBS') Servicing Agreement") and HELOCs (a

"HELOC Servicing Agreement"). Under these agreements, AHM Servicing collects payments

---

[5]     Such trusts are either American Home Mortgage Asset Trusts ("AHMATs") or American Home Mortgage Investment Trust ("AHMITs").

[6]     AHM Acceptance is the Back-Up/Master Servicer with respect to at least one AHMIT. Typically, however, the Back-Up/Master Servicer is a non-AHM party.

from the borrowers and remits such payments (net of servicing fees) to the Securities

Administrator for distribution to investors pursuant to the Indenture.

The RMBS and HELOC Servicing Agreements are typically cross-defaulted with

the MLPAs, the Trust Agreements, the Indentures, the Backup/Master Servicing Agreements,

and/or other agreements executed in connection with the AHM Securitizations (collectively, the

"Securitization-Related Agreements").  Other events of default under the RMBS and HELOC

Servicing Agreements include charge-offs or payment defaults in excess of certain thresholds

and failure of AHM Investment to meet certain net worth requirements.

As discussed below, the Objecting Parties cannot satisfy their burden of proving

that these separate and distinct RMBS and HELOC Servicing Agreements with AHM Servicing

are somehow integrated with and indivisible from Securitization-Related Agreements to which

AHM Servicing is not a party.

### 2. Non-Securitized Mortgage Loans

The Debtors are parties to several Stand-Alone Servicing Agreements concerning

non-securitized mortgage loans, usually with credit unions and other investors having discrete

mortgage portfolios.  Few Objections were filed with respect to these agreements.

## II. PROCEDURAL HISTORY

A detailed description of the background of these cases and the Sale of the

Servicing Business is set forth in the Sale Motion.[7]  On August 6, 2007 (the "Petition Date"),

following the cessation of the Debtors' loan origination operations, the Debtors filed these

chapter 11 cases to, *inter alia*, preserve the going concern value of their loan servicing operations

---

[7]      Capitalized terms not otherwise defined in this section shall have the meaning ascribed to them in the Sale
Motion.

while effecting an orderly liquidation of their business for the benefit of their stakeholders. On the Petition Date, the Debtors filed the Sale Motion, seeking authority, *inter alia*, to sell substantially all assets relating to the Debtors' mortgage loan servicing business on substantially the same terms as set forth in a form asset purchase agreement (the "Form APA") attached to the Sale Motion.

By Order dated August 9, 2007, D.I. 113 (the "Original Procedures Order"), the Court granted the Sale Motion to the extent it requested the establishment of sale procedures (the "Sale Procedures") relating to the sale of the Servicing Business and set certain deadlines for the sale process. The Original Procedures Order also authorized the Debtors to extend the deadlines set forth in the Sale Motion and the Sale Procedures, after consultation with Bank of America, N.A., in its capacity as the administrative agent under the Second Amended and Restated Credit Agreement, dated August 10, 2006 (the "Administrative Agent") and the Official Committee of Unsecured Creditors (the "Committee"), without further order of the Court. In the Sale Motion, the Debtors reserved the right to modify the Sale Procedures if they determined that a modification would be in the best interests of their estates.

The Original Procedures Order provided that an auction for the sale of the servicing business (the "Auction") was to be held on September 10, 2007, with a hearing on the Sale Motion (the "Sale Hearing") to be held on September 17, 2007. Through the Initial Cure Notice, the Modified Cure Notice and the Supplemental Cure Notice (collectively, the "Cure Notices"), the Debtors notified non-debtor parties to the various agreements that might be transferred to a buyer through the sale process of the potential transfer of the Debtors' rights under those agreements, as well as the proposed cure amounts (the "Proposed Cure Amounts") to

11

be paid if such agreements were to be assumed and assigned under § 365 of the Bankruptcy Code.

## III.   THE APA AND THE BUYER

After the entry of the Original Procedures Order, the Debtors concluded, in the exercise of their business judgment, that having a stalking horse bidder for the sale of the Servicing Business would be in the best interests of their estates.  The Debtors commenced good-faith, arm's-length negotiations with AH Mortgage Acquisition Co., Inc. (the "Buyer") with respect to a transaction whereby the Buyer would agree to purchase the Servicing Business and become the stalking horse bidder for the sale process.  To afford time to conduct those negotiations, on August 31, 2007, the Debtors filed a notice, D.I. 540, advising all interested parties that the bid deadline had been extended to September 18, 2007, the Auction had been rescheduled to September 24, 2007, and the Sale Hearing had been rescheduled to October 1, 2007.  To allow further time to finalize those negotiations, on September 14, 2007, the Debtors filed another notice, D.I. 746, advising all interested parties that the bid deadline had been further extended to October 2, 2007, the Auction had been rescheduled for October 5, 2007, and the Sale Hearing had been rescheduled for October 9, 2007.[8]

The Debtors and the Buyer ultimately reached an agreement, as embodied in that certain Asset Purchase Agreement (together with all exhibits and schedules thereto, the "APA").[9] Pursuant to the APA, the Buyer agreed to acquire the Purchased Assets.  The Buyer has also agreed to offer continuing employment to substantially all the employees of the Servicing

---

[8]     The Sale Hearing was further continued to, and is currently scheduled for, October 15, 2007.

[9]     Capitalized terms not defined in this section shall have the meanings provided in the APA.  The description of the terms of the APA herein is for descriptive purposes only.  To the extent this description and the terms of the APA vary, the APA shall control.

Business as of the Final Closing Date. Additionally, the Buyer agreed to serve as the stalking

horse bidder for the Sale, conditioned upon approval of certain revised sale procedures (the

"Revised Sale Procedures") and certain auction protections, which were approved by the Court

by Order dated September 25, 2007, D.I. 937 (the "Revised Procedures Order"). Upon review of

the bids received and after consultation with the Administrative Agent and the Committee, the

Debtors determined that, aside from the offer set forth in the APA, there were no other bids for

substantially all of the Purchased Assets. Accordingly, the Auction was canceled, and parties in

interest were notified that the Debtors intended to seek Bankruptcy Court approval for the

transaction described in the APA.

      The APA contemplates that the Sale will be closed in two steps. At the Initial

Closing, anticipated to take place on or about October 31, 2007, the Buyer will pay the Purchase

Price, as provided in section 4.1(a) of the APA, by depositing (i) an amount equal to the Dispute

Amount in the Dispute Escrow; (ii) an amount equal to the necessary direct costs the Debtors

incurred in connection with the APA reasonably acceptable to the Administrative Agent; (iii) an

aggregate amount equal to the Initial Cure Amount for each Assumed Contract in the Cure

Escrow; and (iv) the Net Proceeds (as defined in section 4.1(a)(iv) of the APA) payable to the

Administrative Agent by depositing such Net Proceeds directly into an account specified by the

Administrative Agent in writing, which Net Proceeds will be paid and applied in accordance

with the Cash Collateral Order. Upon payment to the Administrative Agent, the liens and

security interests on the Purchased Assets will be released. Once the Buyer has completed its

licensing process, the parties will then consummate the Sale at the Final Closing.

      After the Initial Closing and through the Final Closing (the "Interim Period"), the

Debtors will operate the Servicing Business with their existing work force and in accordance

with applicable legal and contractual obligations, as provided in the APA.  All profits and losses of the Servicing Business during the Interim Period will accrue for the account of the Buyer.

As a condition to the obligations of the Buyer under the APA, the Sale Approval Order must be entered by the Bankruptcy Court and become a final order (which is not subject to any stay of effectiveness) which, among other things: (i) orders that each Servicing Agreement can be assumed and assigned pursuant to § 365 of the Bankruptcy Code or sold pursuant to § 363 of the Bankruptcy Code, provided all other requirements of §§ 365 or 363, as applicable, have been satisfied; (ii) determines that the Buyer and its designees take the Purchased Assets free and clear of all Interests; and (iii) permanently enjoins any person from asserting an Interest (by way of direct claim, counterclaim, offset or otherwise) with respect to a Servicing Agreement.

The Buyer has not agreed to assume any liabilities of the Debtors, other than (a) those obligations arising after the Initial Closing under the Servicing Agreements and other contracts which the Buyer is acquiring, (b) liabilities for Losses incurred by the Servicing Business during the Interim Period, and (c) certain other liabilities specifically scheduled in the APA.

## IV.    THE OBJECTIONS

Several parties objected to the Sale Motion, the Cure Notice, the Modified Cure Notice, and/or the Supplemental Cure Notice prior to the October 2, 2007 objection deadline. Objections relating to the sale of the Debtors' rights under the Embedded Servicing Agreements, AARs, and Stand-Alone Servicing Agreements (collectively, the "Servicing Agreements") assert common grounds for objection that fall within one or more of the six categories discussed below.

The remaining Objections that are subject to this Omnibus Response, which do not relate to the Servicing Agreements, are identified on Exhibit G hereto, along with a brief

statement of the nature of each Objection, the Debtors' response thereto (if any), and the

Objection's current status.  Hereinafter, the terms "Objection" and "Objecting Party" shall refer

only to those Objections and Objecting Parties challenging the sale of the Servicing Rights.

### A.    Objections Based on the *Cum Onere* Principle

The Objections identified on <u>Exhibit A</u> hereto (the "<u>Severability Objections</u>")

assert that the Debtors' proposed assumption and assignment of (i) the Embedded Servicing

Agreements without the remaining portions of the MLPSAs, (ii) an AAR without the underlying

MLPSA and/or other AARs derived from such MLPSA, or (iii) the RMBS or HELOC Servicing

Agreements without all Securitization-Related Agreements, violates the *cum onere* principle, i.e.,

that a debtor must assume the burdens along with the benefits of an executory contract.[10]

### B.    Objections Relating to Allegedly Incurable Defaults

The Objections identified on <u>Exhibit B</u> hereto (the "<u>Incurable Default</u>

<u>Objections</u>") assert prior defaults under the Servicing Agreements that are historical facts

allegedly incapable of cure.  Accordingly, the Objecting Parties argue, the Debtors are unable to

comply with § 365(b)(1)(A) of the Bankruptcy Code and thus cannot assume the Servicing

Agreements or assign them pursuant to § 365(f)(2)(A).

### C.    Objections to the Proposed Cure Amount

The Objections identified on <u>Exhibit C</u> hereto (the "<u>Cure Objections</u>")[11] assert

defaults (or the possibility of defaults) for which the Proposed Cure Amount is an insufficient

---

[10]    Objections asserting that the Sale Motion and APA contemplate impermissible "carve outs" from the
liabilities assumed by the Buyer are included in this category.

[11]    <u>Exhibit C</u> includes Objections that merely reserve the right to assert a Cure Objection at some later time.

cure and/or does not adequately compensate the Objecting Parties for their actual pecuniary losses resulting from such defaults as required by § 365(b)(1)(A) & (B) of the Bankruptcy Code.

### D.    Objections Asserting Prohibitions Against Assignment

The Objections identified on Exhibit D hereto (the "Anti-Assignment Objections") assert that the proposed assignment of the Servicing Agreements to the Buyer is prohibited by (i) § 365(c)(2) of the Bankruptcy Code (precluding assumption and assignment of any contract to extend "financial accommodations" to or for the benefit of the debtor), (ii) the Servicing Agreements themselves, and/or (iii) the Sale Procedures and/or Form APA.

### E.    Objections Regarding Adequate Assurance of Future Performance

The Objections identified on Exhibit E hereto (the "Adequate Assurance Objections") assert that the Debtors have not established (or cannot establish, as a matter of law) "adequate assurance of future performance" by the Buyer under the Servicing Agreements as required by § 365(b)(1)(C) and/or § 365(f)(2)(B) of the Bankruptcy Code.[12]

### F.    Objections Based on Alleged Termination of the Servicing Agreements

The Objections identified on Exhibit F hereto (the "Termination Objections") assert that the Servicing Agreements at issue were validly terminated and, accordingly, that the Debtors no longer have any Servicing Rights they can sell to the Buyer.

---

[12]    Exhibit E includes Objections that merely reserve the right to raise an Adequate Assurance Objection at some later time.

**ARGUMENT**

I.    **The Servicing Agreements are not executory contracts; the Debtors can sell the Servicing Rights under § 363 of the Bankruptcy Code irrespective of the requirements of § 365**

The overwhelming majority of the Objections presuppose that the Servicing

Agreements are executory contracts and attack the sale of the Debtors' Servicing Rights as

failing to satisfy the requirements for assumption and assignment set forth in § 365of the

Bankruptcy Code. The Court need not reach any of these arguments, however, because the

Servicing Agreements are not executory contracts.[13]

A.    **The Servicing Rights are property of the Debtors' estates, which can be sold free and clear of various claims under § 363 of the Bankruptcy Code**

A debtor's rights under a contract constitute "property" interests that become

property of the estate pursuant to § 541(a)(1) of the Bankruptcy Code, and which are saleable

pursuant to § 363. <u>Shaw Group, Inc., v. Bechtel Jacobs Co., LLC (In re The IT Group, Inc.)</u>, 350

B.R. 166, 171 (Bankr. D. Del. 2006) (citing <u>In re Rickel Home Ctrs., Inc.</u>, 209 F.3d 291, 302 (3d

Cir. 2000); <u>Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.</u>, 141 F.3d 490, 498 (3d Cir.

1998)). Section 365 of the Bankruptcy Code places certain burdens on a debtor as a prerequisite

to a sale of rights under an *executory* contract, including the cure of prior defaults and the

provision of adequate assurance of future performance under that contract. <u>Shaw Group</u>, 350

B.R. at 172. If a contract is *not* executory, however, a debtor need not cure any prior defaults as

---

[13]    The Debtors stated in their Modified and Supplemental Cure Notices that "the designation of any agreement as a Potential Executory Contract shall not constitute or be deemed to be a determination or admission by the Debtors that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code(all rights with respect thereto being expressly reserved)." (<u>Id.</u> at 5.) To remove all doubt, the Debtors also included the following language: "***BY LISTING A POTENTIAL EXECUTORY CONTRACT ON EXHIBIT B OR EXHIBIT C, THE DEBTORS DO NOT CONCEDE THAT ANY SUCH CONTRACT IS EXECUTORY***" (Modified Cure Notice at 2 (emphasis in original); <u>see</u> Supplemental Cure Notice at 2 (substantially identical language).) Accordingly, all parties were on notice that the Debtors could argue that the Servicing Agreements are not executory contracts subject to § 365 of the Bankruptcy Code.

a prerequisite to the sale of rights under such contract—claims arising from a prior breach of that contract are simply general unsecured claims. In re Waste Systems Int'l, Inc., 280 B.R. 824, 827 (Bankr. D. Del. 2002). As other bankruptcy courts have noted

> [i]t would run contrary to the fundamental policies underlying the Bankruptcy Act to extend the statutory option . . . to reject or assume executory contracts to situations where the debtor has already received the contractual benefits and where the sole effect of assuming the contract would be to prefer one general creditor over others whose contracts have not been assumed. Assumption of such a contract would convert the breach of contract claim of the nonbankruptcy party into an expense of administration without providing any further benefit to the estate.

In re J.M. Fields, Inc., 22 B.R. 861, 864 (Bankr. S.D.N.Y. 1982) (citations omitted); accord In re Precision Carwash Corp., 90 B.R. 34, 38-39 (Bankr. E.D.N.Y. 1988).

As discussed below, the Servicing Agreements are not executory contracts. Accordingly, the Servicing Rights can be sold pursuant to § 363 of the Bankruptcy Code, and any objections to the sale of the Servicing Rights which are premised upon § 365 should be overruled.

> **1.    The Debtors may sell their Servicing Rights free and clear of "claims" arising under the Servicing Agreements**

Section 363(f) of the Bankruptcy Code permits the debtor to sell property of the estate "free and clear of any interest in such property of an entity other than the estate" (including liens, claims, and encumbrances) if:

> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

> (2)    such entity consents;

> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

> (4)    such interest is in bona fide dispute; or

18

(5)    such entity could be compelled, in a legal or equitable proceeding to accept a money satisfaction of such interest.

11 U.S.C. §§ 363(f). Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

Because § 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of assets "free and clear" of liens and interests. In re Dundee Equity Corp., Case No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); see In re Wolverine Radio Co., 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same).

The alleged defaults under the Servicing Agreements, if proven, give rise to nothing more than unsecured claims that can be liquidated and allowed against the Debtors. Section 363(f)(5) permits the sale of the Servicing Rights free and clear of any claimed defaults under the Servicing Agreements that can be reduced to a monetary claim.

**2.    The Debtors may sell their Servicing Rights notwithstanding any *ipso facto* defaults under the Servicing Agreements**

The Court's approval of the sale of the Servicing Rights should preempt any provision in the Servicing Agreements that purports to terminate or modify the Debtors' rights under the Servicing Agreements on the basis of the Debtors' financial condition. Section 363(l) of the Bankruptcy Code states, in pertinent part, that "the trustee may use, sell, or lease property under subsection (b) or (c) of this section . . . notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor

. . . and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property." 11 U.S.C. §363(l). Section 363(l) thus preempts state-law or contractual restrictions on the transfer of property of the estate that are based upon or conditioned on the insolvency or financial condition of the debtor. Integrated Solutions v. Serv. Support Specialties, 124 F.3d 487, 493 (3d Cir. 1997). Much like analogous provisions of the Bankruptcy Code, i.e., §§ 365(f)(1) and 541(c), § 363(l) preserves valuable property rights of a debtor's estate, notwithstanding so-called "*ipso facto*" clauses that purport to permit a non-debtor party to terminate the debtor's rights. EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.), 356 B.R. 631, 640 (Bankr. D. Del. 2006) (citing In re James Cable Partners, L.P., 154 B.R. 813, 816 (M.D. Ga. 1993); In re Hutchins, 99 B.R. 56, 57 (Bankr. D. Colo. 1989)).

The Bankruptcy Code preempts *ipso facto* clauses "because they lead to the forfeiture of valuable assets and hamper the debtor's rehabilitation or liquidation. Hence, they are construed broadly to effectuate the Bankruptcy Code's policy against forfeiture." In re C.A.F. Bindery, 199 B.R. 828, 833 (Bankr. S.D.N.Y. 1996) (citing H. R. Rep. No. 595, 95th Cong., 1st Sess. 348 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 59 (1978); DiCello v. United States (In re Railway Reorganization Estate, Inc.), 133 B.R. 578, 583 (Bankr. D. Del. 1991); In re Compass Van & Storage Corp., 65 B.R. 1007, 1013 (Bankr. E.D.N.Y. 1986); Chera v. 991 Boulevard Realty Corp. (In re National Shoes, Inc.), 20 B.R. 55, 58 (Bankr. S.D.N.Y. 1982)).

Certainly the Objections contesting the Debtors' sale of the Servicing Rights that are expressly based upon the Debtors' financial condition immediately prior to the Petition Date are inconsistent with the statutory language of § 363(l). So too are the Objections based on AHM Servicing's alleged loss of Fannie Mae- and/or Freddie Mac-qualification. As discussed further below, a Fannie Mae- and Freddie Mac-qualification requirement in a Servicing

Agreement merely serves as a proxy for financial wherewithal and has no independent significance apart from establishing an industry baseline for the solvency of a mortgage loan servicer. Indeed, Fannie Mae's and Freddie Mac's purported termination of the Debtors' qualified servicer status prepetition was based upon the deterioration of the Debtors' financial condition immediately prior to the Petition Date. Permitting the Objecting Parties to effect a forfeiture of the Debtors' Servicing Rights based on Fannie Mae's or Freddie Mac's declaration of an *ipso facto* default would eviscerate the protections of § 363(l) of the Bankruptcy Code.

Accordingly, the Court should approve the sale of the Servicing Rights pursuant to § 363(b), notwithstanding any provisions of the Servicing Agreements that purport to terminate the Debtors' rights on the basis of their financial condition and notwithstanding the Debtors' alleged loss of Fannie Mae- and/or Freddie Mac-qualified servicer status.

### B. The Servicing Agreements are not executory contracts

"[W]hether a contract is executory within the meaning of the Bankruptcy Code is a question of federal law." In re Indian River Homes, Inc., 108 B.R. 46, 49 (D. Del. 1989) (citing In re Munple, Ltd., 868 F.2d 1129, 1130 (9th Cir. 1989)). Courts, including the Third Circuit, have widely held that the test to be applied to determine whether a contract is executory is the "Countryman" definition, which provides that a contract is executory when the obligations of "both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." See In re Golden Books Family Entm't, Inc., 269 B.R. 311, 314 (D. Del. 2001).

Conversely, a contract is not executory when one party has no obligations which, if unperformed, would constitute a material breach.  Columbia Gas Sys., 50 F.3d at 239. [14]

For purposes of § 365, whether any material obligations remain unperformed by the parties to an agreement, therefore making that agreement an executory contract, is to be evaluated as of the filing of the bankruptcy petition.  In re Gen'l Datacomm Indus., Inc., 407 F.3d 616, 623 (3d Cir. 2005); see also In re Columbia Gas Sys., Inc., 50 F.3d 233, 239 (3d Cir. 1995).

### 1.    The Servicing Agreements impose obligations on AHM Servicing to perform all necessary tasks but impose no substantive obligations on the non-debtor parties

With some minor variations, the Servicing Agreements constitute agreements between the Debtors (most typically AHM Servicing), on one hand, and a non-debtor party (e.g., a Third-Party Purchaser of loans from various sellers), on the other hand.  The Servicing Agreements set forth the terms by which AHM Servicing undertakes the servicing of the non-debtor party's loans.  Under the terms of the Servicing Agreements, AHM Servicing undertakes numerous obligations in fulfillment of its duties to the non-debtor parties, including: collecting P&I and T&I payments from mortgagors; affording the non-debtor parties access to documents; providing the non-debtor parties with remittance reports; making any necessary T&I advances on account of delinquent borrowers to preserve the non-debtor parties' rights with respect to the

---

[14]    Under applicable state law, a breach is material if it excuses the non-breaching party from performing its obligations under the contract or is so substantial that it defeats the purpose of the contract.  Lipsky v. Commonwealth United Corp., 551 F.2d 887, 895 (2d Cir. 1976) (New York law);  Fed'l Dep. Ins. Co. v. Air Florida, Inc., 822 F.2d 833, 840 (9th Cir. 1987) (California law); Skogberg v. Huisman, Case No. C7-02-2059, 2003 Minn. App. LEXIS 1043, at *6-7 (Minn. Ct. App. Aug. 19, 2003) (Minnesota law).  Each of those states hold that the materiality of a breach is a question of fact.  In re Bradlees Stores, Inc., Case No. 01-CV-3934 (SAS), 2001 U.S. Dist. LEXIS 14755, at *25 (S.D.N.Y. Sept. 20, 2001) (applying New York law under the Countryman test); Aceituno v. KBI Norcal, Inc., Case No. 2:06-cv-2273-GEB-DAD, 2007 U.S. Dist. LEXIS 43890, at *4 (E.D. Cal. June 4, 2007) (applying California law under the Countryman test); Cloverdale Foods v. Pioneer Snacks, 580 N.W.2d 46, 49 (Minn. Ct. App. 1998).

collateral securing the mortgage loans; enforcing due-on-sale clauses upon demand; foreclosing on properties secured by defaulted mortgage loans; maintaining insurance policies such as hazard insurance and mortgage protection insurance; retaining compensation from payments of accrued interest on mortgage loans or otherwise; paying any subservicer; delivering statements of compliance; obtaining reports from certified public accountants; preparing and delivering any information reports required under applicable state or federal tax laws; and furnishing information to reporting agencies pursuant to the Fair Credit Reporting Act.

Even payment obligations under the Servicing Agreements do not fall on the non-debtor parties. AHM Servicing is paid for servicing the mortgage loans by retaining a portion of the P&I it collects from the mortgagors. The non-debtor parties to the Servicing Agreements never make payments to AHM Servicing; indeed, the non-debtor parties never even have possession of funds by which AHM Servicing is compensated.

Accordingly, the non-debtor parties literally cannot breach the agreement by refusing to pay AHM Servicing, as AHM Servicing is collecting its payment on its own. Thus, the payment terms and obligations under the Servicing Agreements do not and cannot render such agreements executory; AHM Servicing's compensation is paid from the collections it receives and not from a payment obligation of the non-debtor parties whose loans are serviced.

At least three courts have held, precisely as the Debtors argue here, that agreements between a servicer of loans and an investor party were not executory contracts. Additionally, the Debtors are not aware of any cases holding that servicing agreements such as those at issue here are executory contracts. In Hatoff v. Lemons & Associates, Inc. (In re Lemons & Associates, Inc.), 67 B.R. 198 (Bankr. D. Nev. 1986), the debtor originated loans on behalf of investors and also entered into agreements with investors which gave the debtor the

right to provide all collection and foreclosure services to the investors. Id. at 201. The court held that the loan servicing agreement between the debtor and the investor was not an executory contract under § 365 because all that remained for the investors to do was "await repayment," and thus the investor's obligations were complete. Id. at 211 (applying the Countryman test). Further, the court stated in dicta that "an obligation to convey title or to surrender a promissory note upon satisfaction of the underlying debt is insufficient to render an agreement executory." Id.

Similarly, in In re USA Commercial Mortgage Co., Case No. 2:07-CV-00072-RCJ-GWF, 2007 U.S. Dist. LEXIS 65264 (D. Nev. Aug. 29, 2007), the Nevada District Court affirmed another bankruptcy court ruling that a servicing agreement was not an executory contract and that the servicing rights thereunder could be transferred without assumption, assignment and cure of any defaults under the servicing agreement. The debtor, USACM, underwrote, originated, brokered, funded, and serviced commercial loans on behalf of various lenders. Id. at *5. USACM proposed a plan of reorganization, which provided for, among other things, the auction and sale of its rights to service loans pursuant to loan servicing agreements (referred to as the LSAs), free and clear of all liens, claims, encumbrances, rights of third parties and interests. Id. at *9-10. The debtor asserted that the LSAs were non-executory contracts, contending that it was not obligated to comply with the assumption, assignment, and cure requirements of § 365 of the Bankruptcy Code to transfer, which position was opposed by the lenders. Id. at *42-46. Over the lenders' objections, the bankruptcy court confirmed the plan and authorized the sale of USACM's loan servicing rights free and clear of claims against USACM

under the LSAs.  Findings of Fact ¶ LL, In re USA Commercial Mortgage Co., Case No. 06-10725 (LBR), D.I. 2377 (Bankr. D. Nev. Jan. 8, 2007).[15]

The district court dismissed the lenders' appeal of the confirmation order because the plan had been substantially consummated, thereby equitably mooting the appeal.  In re USA Commercial Mortgage Co., 2007 U.S. Dist. LEXIS 65264 at *33-34.  However, the district court proceeded to analyze the substantive issues raised by the parties, and determined that even if not mooted, the plan would have been upheld.  Id. at *35.

Regarding the debtor's sale of the LSAs, the district court ruled:

> At the time Debtors filed the petition for bankruptcy, Appellants could not evade the requirement to pay USACM servicing fees because, under the LSAs, USACM collected its fees through holding back a percentage of payments USACM collected from borrowers.  USACM acquired its fees as the money passed through its hands from borrowers to lenders. Consequently, the Direct Lenders had no opportunity to deny USACM its fees, and thus they could not materially breach the LSAs by refusing to pay servicing fees.  Likewise, the Direct Lenders could not breach the LSAs by refusing to pay foreclosure costs because in the event of such a refusal, USACM was contractually entitled to recover its costs by deducting costs from the foreclosure proceeds.  Further, no evidence in the record suggests any outstanding demand for payment of foreclosure costs existed at the time the petition was filed.

Id. at *45.  So too here, the compensation provisions of the Servicing Agreements leave to AHM Servicing the burden of collecting proceeds from the mortgage loans, making payments to the non-debtor parties, and retaining a portion of the proceeds for its efforts.  The non-debtor parties have no obligation to AHM Servicing; the terms of the Servicing Agreements are quite intentionally structured so that the non-debtor parties (most of whom are lenders) must only sit back and await payments from AHM Servicing.  The non-debtor parties owe no substantive, affirmative obligations to AHM Servicing; thus, the Servicing Agreements are not executory.

---

[15]    The Findings of Fact are attached hereto as Exhibit H-1.

2. **The limited obligations of non-debtor parties under the Servicing Agreements are not material, and therefore do not render the Servicing Agreements executory**

Under the various Servicing Agreements, there are certain obligations of the non-debtor parties that remain as of the Petition Date; however, such obligations are truly ministerial in nature, or are not fundamental to the bargain reflected in the Servicing Agreements. In either case, none of the limited obligations of the non-debtor parties to AHM Servicing constitutes a material obligation that would render the Servicing Agreements executory.

a. *Ministerial obligations under the Servicing Agreements are not material*

The Third Circuit stated in <u>Columbia Gas</u> that "ministerial acts are analogous to the execution of the release to be found in the settlement of any case," and do not have the requisite materiality to render a contract "executory" under § 365 of the Bankruptcy Code. 50 F.3d at 243. Any obligations imposed on non-debtor parties in the Servicing Agreements are indeed ministerial.

For example, various Servicing Agreements require that the non-debtor party: (i) provide AHM Servicing with notice of any transfer in ownership of any mortgage loan; (ii) release and transfer files and documents evidencing mortgage loans related to the loans being serviced; (iii) appoint parties to receive title to real estate owned properties; (iv) execute any power of attorney or other necessary documents to effectuate the purposes of the Servicing Agreement; (v) and provide procedures for compliance with the Securities and Exchange Commission rules and regulations. None of these acts or duties under the Servicing Agreements make the Servicing Agreements executory. Obligations to convey title documents under the terms of a contract do not render the contract executory. See <u>In re Adolphsen</u>, 38 B.R. 776, 778 (Bankr. D. Minn. 1983) (holding that "[t]he fact that [a party in possession of a document of

title] holds legal title and must at some point convey it to the debtors does not render the contract executory any more than the duty of the holder of promissory note to return the note when the debt is satisfied makes it executory"); accord Lemons & Assocs., 67 B.R. at 216.  Similarly, obligations to execute a power of attorney or other documents to allow AHM Servicing to undertake its servicing obligations are also ministerial in nature and are not a material obligation under the Servicing Agreements.  In re USA Commercial Mortgage Co., 2007 U.S. Dist. LEXIS 65264 at *45-46 (citing Columbia Gas, 50 F.3d at 243; Lemons & Assocs., 67 B.R. at 216).

> b.    *Ancillary obligations under the Servicing Agreements are not material*

The Servicing Agreements contain certain general obligations on the part of the non-debtor party, but even those provisions, when viewed in the context of the Servicing Agreements, do not constitute material provisions that would deem the Servicing Agreements executory.

For example, the Servicing Agreements include provisions requiring the parties to maintain confidentiality of customer information,[16] or the terms of the agreements themselves. See In re L.G. Philips Displays USA Inc., Case No. 06-10245 (BLS), 2006 Bankr. LEXIS 1092, at *14-15 (Bankr. D. Del. June 21, 2006) (holding that future performance of confidentiality provision would "not rise to a level of material performance" and thus did not render contract executory); see also Anchor Resolution Corp. v. State St. Bank & Trust Co. of Am. (In re Anchor Resolution Corp.), 221 B.R. 330, 337 (Bankr. D. Del. 1998) (Walsh, J.) (holding that a

---

[16] The confidentiality provisions are intended to protect the disclosure of information about the individual mortgagors, and any such disclosure would constitute a violation of consumer privacy laws.  Thus, the confidentiality provisions are intended to benefit the non-debtor party by protecting it from liability that could arise from disclosure, which simply tracks the parties' legal obligations outside the terms of the Servicing Agreement in any event.  Further, just because a provision provides for mutual obligation does not render the agreement executory.  "The mere fact a passive restriction on future activity is mutual does not render the Agreement executory under the material breach test."  Ready Prods., Inc. v. Jarvis (In re Jarvis), Case No. 04-10806-JMD, 2005 Bankr. LEXIS 536, at *13 (Bankr. D.N.H. Mar. 28, 2005).

confidentiality provision included in an agreement providing for the restructuring of notes was not a material obligation rendering the agreement executory); In re Spectrum Info. Technologies, 190 B.R. 741, 748 (Bankr. E.D.N.Y. 1996) (holding that a confidentiality provision in an employment separation agreement did not rise to a level of material future performance rendering the agreement executory); Certain Underwriters at Lloyd's v. McDermott Int'l, Inc.(In re The Babcock and Wilcox Co.), Case No. 01-912 c/w 01-1187, 2002 U.S. Dist. LEXIS 874, at *16-17 (E.D. La. Jan. 4, 2002) (finding that "[a]lthough [the parties to the contract] may have considered confidentiality important, the need for confidentiality was not the 'root' of the agreement").

The confidentiality of the information under the Servicing Agreements is not at the heart of the agreements themselves, as it would be in the case of, for example, an intellectual property license, for which the confidentiality of the information being licensed was fundamental to the value of the agreement to the contracting parties. The confidentiality obligations of the non-debtor parties are not material provisions of the Servicing Agreements and do not render the Servicing Agreements executory. "To decide otherwise, and conclude that the parties' ongoing confidentiality commitments automatically give rise to an executory contract, would vitiate the Countryman Definition: any contract with routine confidentiality provisions would be forever executory." L.G. Philips, 2006 Bankr. LEXIS 1092 at *14.

Certain of the Servicing Agreements also provide for *de minimis* obligations on the part of the non-debtor party. For example, certain Servicing Agreements require the non-debtor to maintain the custodial account into which AHM Servicing deposits P&I payments collected from mortgagors or to appoint a replacement servicer upon a termination event. Neither such "obligation," if breached, would deprive AHM Servicing of its rights under the

Servicing Agreements; accordingly, neither constitutes a material obligation that would render the Servicing Agreements executory.  For example, if a non-debtor party failed to maintain a custodial account into which AHM Servicing was to deposit the non-debtor party's funds, such failure would certainly not deprive AHM Servicing of its right to continue to service the mortgage loans and retain its fee under the Servicing Agreement.  The non-debtor parties' compliance with these terms inure to the non-debtor parties' benefit and are intended to protect the non-debtor parties' rights in the event of a default.

This Court has held that contract rights constitute property rights of a debtor, see Shaw Group, 350 B.R. at 171, and the Servicing Rights here represent significant value to the Debtors' estates.  The non-debtor parties to the Servicing Agreements cannot make the requisite showing under the Countryman definition for the Servicing Agreements to be deemed executory contracts; thus, the Debtors are not required to meet the further requirements set forth in § 365 of the Bankruptcy Code before realizing the value of the Servicing Rights through the sale to the Buyer, and the Objections based on the Debtors' alleged obligation to do so should be denied.

## II.    TO THE EXTENT THE SERVICING AGREEMENTS ARE EXECUTORY CONTRACTS, THEIR ASSUMPTION AND ASSIGNMENT ON THE TERMS PROPOSED IN THE SALE MOTION AND THE APA IS CONSISTENT WITH THE REQUIREMENTS OF § 365 OF THE BANKRUPTCY CODE

Even if the Servicing Agreements were executory (which, as discussed above, they are not), assumption and assignment of such agreements on the terms set forth in the Sale Motion and the APA would satisfy the requirements of § 365 of the Bankruptcy Code.  The Objections premised upon § 365 are legion, but their resolution turns primarily upon a single issue: *whether the Objecting Parties will be deprived of the benefit of their bargain.*  Clearly they will not.

In connection with the proposed assumption and assignment of the Servicing Agreements, the Debtors will cure any and all material defaults under the Servicing Agreements by compensating the Objecting Parties for any pecuniary losses resulting therefrom. Mortgage loans that have been serviced by the Debtors without incident during the pendency of these chapter 11 cases will continue to be serviced, first by the Debtors (until the Final Closing) and then by the Buyer, which will be found by this Court to have the financial wherewithal to perform all material obligations under the Servicing Agreements. *This is all that is required by § 365 of the Bankruptcy Code.* See 11 U.S.C. § 365(b)(1) & (f)(2). To the extent the Objections seek to impose any additional conditions on the assumption and assignment of the Servicing Agreements (e.g., the assumption of contracts and payment of claims relating to the Debtors' defunct loan origination business, the cure of historical or immaterial defaults, and compliance with express or *de facto* anti-assignment provisions), they should be overruled.

A.    **The Court has the discretion to refuse enforcement of contractual terms that, if enforced, would prevent the Debtors from realizing the intrinsic value of the Servicing Agreements via assumption and assignment**

As a threshold matter, a number of the Objections premised upon § 365 direct the Court to the Third Circuit's recent decision in In re Fleming Companies, Inc., No. 05-2365, 2007 Bankr. LEXIS 19927 (3d Cir. Aug. 22, 2007), which, they assert, confirms a "long-standing prohibition" against the modification of the terms of an executory contract. The Debtors agree that Fleming is germane to many of the issues presented by the Objections. But a fair reading of the opinion actually confirms the bankruptcy court's power to modify an executory contract— *including material terms thereof*—in appropriate circumstances, when necessary to accomplish the purposes of § 365.

The debtor in <u>Fleming</u>, a wholesale supplier of supermarkets, sought to assume and assign a long-term supply agreement with a national supermarket chain ("Albertson's") to a cooperative of grocery wholesalers ("<u>AWG</u>"). The agreement was executed in connection with the debtor's acquisition of Albertson's Tulsa, Oklahoma warehouse (the "<u>Tulsa Facility</u>") as a going concern. By its terms, the agreement required the debtor to supply Albertson's Oklahoma stores "from the Tulsa Facility," which, in addition to being staffed largely with former Albertson's employees, utilized the electronic ordering system and ordering codes Albertson's had developed to gather data from which marketing and pricing decisions would be made. When the debtor was unable to perform under the agreement, Albertson's switched its source of supply for its Oklahoma stores to its own warehouse in Fort Worth, Texas. The debtor subsequently filed for chapter 11 relief and, at the direction of AWG, rejected the lease for the Tulsa Facility. AWG, which maintained its own warehouse facilities in the Midwest and operated retail stores that directly competed with Albertson's in Oklahoma, planned to supply Albertson's from its own warehouses at the prices and on the terms required by the supply agreement.

Albertson's objected to assumption and assignment of the supply agreement, arguing that the debtor and AWG could not establish "adequate assurance of future performance" unless Albertson's would be supplied from the Tulsa Facility. <u>See</u> 11 U.S.C. § 365(f)(2)(B). In response, the debtor and AWG argued that the contractual provision requiring shipment from the Tulsa Facility was not material and, even if it were, amounted to a *de facto* anti-assignment provision because compliance was no longer commercially practicable. The bankruptcy court sided with Albertson's, holding that "assumption and assignment *cannot* modify an agreement's express terms," Opinion at 6, <u>In re Fleming Cos.</u>, Case No. 03-10945

(MFW), D.I. 6916 (Bankr. D. Del. Feb. 27, 2004) (emphasis added), [17] and concluding that

AWG's undisputed inability to ship from the Tulsa Facility prevented it from providing adequate

assurance of future performance. The district court affirmed. Order, In re Fleming Cos., Civ.

No. 04-371-SLR, D.I. 20 (D. Del. Mar. 30, 2005). [18]

        Although the Third Circuit ultimately affirmed the bankruptcy and district courts,

it disagreed with their legal analysis. For instance, in stark contrast to the bankruptcy court's

narrow and absolutist view of its power under § 365 of the Bankruptcy Code, the Third Circuit

began its analysis by *confirming* that "the bankruptcy court has *discretion* to excise or waive a

bargained-for element of a contract" and "*can refuse enforcement* of terms of a contract in order

to permit assignment" so long as doing so does not deprive the non-debtor party of the "full

benefit of its bargain." Fleming, 2007 U.S. App. LEXIS 19927 at *11-12 (emphasis added).

The threshold question in determining whether the exercise of such discretion is appropriate in a

given case, the court concluded, is whether the contractual term at issue is "material and

economically significant." Id. at *12-13 (citing In re Joshua Slocum, Ltd., 922 F.2d 1081 (3d

Cir. 1990)).

        The "materially and economically significant" standard "was derived from a

review of case law interpreting § 365 of the Bankruptcy Code which focused on balancing twin

concerns: preventing substantial economic detriment to the nondebtor contracting party and

permitting the bankruptcy estate's realization of the intrinsic value of its assets." Id. at *13.

Accordingly, application of the standard requires a *two-part inquiry*. First, the court must focus

on "the importance of the term to the overall bargained-for exchange; that is, whether the term is

integral to the bargain struck between the parties (its materiality) and whether performance of

---

[17]      The Court's opinion is attached hereto as Exhibit H-3.

[18]      The District Court's order affirming the Court's ruling is attached hereto as Exhibit H-4.

that term gives a party the full benefit of his bargain (its economic significance)." Id. at *15.

Then, the court must balance the countervailing rights of the debtor, the proposed assignee, and

the debtor's creditors "to get the benefit of the bargain [the debtor] struck with [the non-debtor

party]." Id. at *17-18.

Applying this standard, the Third Circuit concluded that requiring delivery from

the Tulsa Facility was an integral part of the supply agreement and that noncompliance with this

condition would burden Albertson's in an "economically significant" way because Albertson's

had "bargained for the benefits of expedience, of a trained staff, a consistent supply of products,

and a proven electronic system of record-keeping which furthered Albertson's marketing a

pricing plans, all of which were only available from 'the Tulsa Facility.'" Id. at *18. The court

then considered the rights of the debtor, AWG, and creditors to realize the benefits of the supply

agreement, but concluded that, on balance, "the scale tip[ped] in favor of Albertson's." Id. at

*19. In reaching this conclusion, the court found it significant that AWG had brought about its

own inability to fulfill the terms of the supply agreement by ordering the debtor to reject the

lease for the Tulsa Facility. Id. at *19 ("AWG, by its own actions, cannot give adequate

assurance of performance."), *21 ("AWG rejected the Tulsa Facility lease, and now complains

that it is impossible to comply with an integral term of the contract. This term could have been

performed by some party. It is not now an anti-assignment provision simply because AWG

made the decision not to take on a necessary burden.").

As discussed more fully below, the Debtors believe that any provisions of the

Servicing Agreements that may be modified in connection with the proposed assumption and

assignment thereof are immaterial and/or economically insignificant. The Debtors leave the

Objecting Parties to their burden of proving otherwise at the Sale Hearing. In re Joshua Slocum,

Ltd., 99 B.R. 250, 257 (Bankr. E.D. Pa. 1989) ("[T]he enforcement of a particular lease provision is dependent on the landlord's proving that the provision substantially serves the economic benefit of the landlord and/or his other tenants."), aff'd in relevant part, 922 F.2d 1081, 1091-92 (3d Cir. 1990).

Alternatively, should the Court determine that any provisions at issue are material and economically significant, the Debtors submit that, on balance, the Debtors' and their creditors' rights to realize the intrinsic value of the Servicing Agreements outweighs any detriment to the Objecting Parties that would result from assignment of the Servicing Agreements to the Buyer. See Fleming, 2007 U.S. App. LEXIS 19927 at *17-18.[19]  In this connection, there are at least two key differences between the Fleming case and this case.

First, in Fleming, permitting assignment of the Supply Contract to AWG would have required Albertson's to re-transition its supply source from its own warehouse facilities, which utilized its custom electronic ordering system, to AWG's facilities, which did not.  In addition, the Tulsa Facility was staffed with Albertson's former employees, who were familiar with Albertson's business, while AWG's warehouse facilities were staffed with its own employees, who were not.  Here, the transition of servicing from the Debtors to the Buyer will require nothing from the Objecting Parties and will in no way impact the continued remittance of P&I, first from the Debtors and then from the Buyer.  In addition, the Buyer will be staffed by the Debtors' former employees.  Accordingly, the Objecting Parties quite literally will receive the benefit they bargained for, i.e., the uninterrupted servicing of the mortgage loans by the Debtors' employees.

---

[19]    The Objecting Parties read Fleming as prohibiting the modification of material terms of a contract.  This reading is flawed, however, because if there were a per se rule against modification of material terms of a contract, the Third Circuit's analysis would have ended upon finding that shipment from the Tulsa Facility was "material and economically significant" to Albertson's.  The analysis did not end, however, and the court proceeded to balance the equities.

Second, in <u>Fleming</u>, AWG inflicted its own wound by directing Fleming to reject the Tulsa Facility lease.  Here, the Buyer has done nothing to impair its ability to perform under the Servicing Agreements.  Indeed, as discussed below, the Buyer is fully capable of performing under the Servicing Agreements and intends to do so.  The Objecting Parties, however, insist on the performance of obligations (i.e., the payment of claims) essentially unrelated to the servicing of mortgage loans.  Unlike Albertson's objection in <u>Fleming</u>, which was based on its commercially reasonable expectations of the bargain it struck with Fleming for the supply of its Oklahoma stores, the Objections here are a rather transparent attempt to improve the bargain the Objecting Parties' struck with AHM Servicing for the servicing of mortgage loans, by imposing requirements on the Buyer that would not be imposed upon a replacement servicer chosen by the Objecting Parties.

**B.      The Servicing Agreements are severable from the Other Agreements and may be assumed and assigned independently consistent with the *cum onere* principle**

The Severability Objections, citing the familiar principle that a debtor must assume an executory contract *cum onere* (i.e., with the burdens as well as the benefits), <u>In re Italian Cook Oil Corp.</u>, 190 F.2d 994, 997 (3d Cir. 1951), assert that the proposed assumption of the Servicing Agreements is a "partial" assumption that amounts to impermissible "cherry picking" by the Debtors.  To assume an Embedded Servicing Agreement, the Objecting Parties contend, the Debtors must assume the underlying MLPSA *en toto* .  To assume an AAR, they contend, the Debtors must assume the underlying MLPSA and/or all other AARs derived from such MLPSA.  And to assume an RMBS Servicing Agreement or HELOC Servicing Agreement, they argue, the Debtors must assume all Securitization-Related Agreements (such agreements, together with any non-servicing related provisions of the MLPSAs, AARs, and any other of the

Assumed Contracts (as defined in the APA), the "Other Agreements"). To assume the Other

Agreements, of course, the Objecting Parties assert that the Debtors would be required to cure

alleged defaults thereunder, see 11 U.S.C. § 365(b)(1)(A), including unpaid EPDs and PRPs that,

in the aggregate, are alleged to be in the tens of millions of dollars. Accordingly, most of the

Objecting Parties raising Severability Objections also raise Cure Objections.

      The Severability Objections overlook the necessary corollary to the *cum onere*

principle, i.e., "that 'in order to assume a particular executory contract . . . , the debtor is *only*

required to perform under that discrete contract . . . , not under other, substantially unrelated

agreements.'" Shaw Group, Inc. v. Bechtel Jacobs Co. (In re IT Group, Inc.), 350 B.R. 166, 177

(Bankr. D. Del. 2006) (emphasis in original) (quoting United Air Lines, Inc. v. U.S. Bank Trust

Nat'l Ass'n (In re UAL Corp.), 346 B.R. 456, 467 (Bankr. N.D. Ill. 2006)). "This principle

applies where distinct agreements are set out in the same document." Id. And it applies

especially where contracts set out in different documents are linked via provisions that triggering

a loss of rights under one contract if the other contract is breached. See id. at 179 (noting that

cross-default provisions are "inherently suspect" for purposes of assumption under § 365 of the

Bankruptcy Code) (quoting Kopel v. Campanile (In re Kopel), 232 B.R. 57, 64 (E.D.N.Y.

1999)). See also Lifemark Hospitals, Inc. v. Liljeberg Enters. (In re Liljeberg Enters.), 304 F.3d

410, 444-45 (5th Cir. 2002) (same).

      The Servicing Agreements are separate and distinct from the Other Agreements.

Accordingly, the Objecting Parties cannot be heard to complain about "cherry picking" by the

Debtors—the Bankruptcy Code expressly permits it, and federal bankruptcy policy favors it as a

means of maximizing the value of the estate for the benefit of all creditors. See Shaw Group,

350 B.R. at 177-79; see also In re Rickel Home Ctrs., 209 F.3d 291, 298 (3d Cir. 2000) (§ 365

authorizes the trustee to "maximize the value of the debtor's estate by assuming executory contracts . . . that benefit the estate and rejecting those that do not"); Cinicola v. Scharffenberger, 248 F.3d 110, 119 (3d Cir. 2001) (same).

The real issue before the Court is whether the Bankruptcy Code and federal bankruptcy policy countenance the Objecting Parties' attempt to leverage their position in the Debtors' Servicing Business into payment in full, in cash of their claims relating to the Debtors' defunct loan origination business. The Debtors contend that they do not. The Debtors' bankruptcy estates should not be required to shoulder burdens under the Other Agreements as a prerequisite to realizing any value under the Servicing Agreements. Such a requirement would offend the letter and the spirit of the Bankruptcy Code, both by frustrating the Debtors' rejection power and by allowing some creditors, based on the happenstance of having multiple contracts with the Debtors, to receive dollar-for-dollar distributions on what would otherwise be general unsecured claims. See Shaw Group, 350 B.R. at 179. See also Kopel, 232 B.R. at 66 ("A creditor cannot use the protections afforded it by section 365(b) . . . in order to maximize its returns by treating unrelated unsecured debt as a *de facto* priority obligation.").

1.    **The Servicing Agreements and Other Agreements are not economically interdependent and are therefore severable under federal bankruptcy law**

It is well-established that a debtor's obligations under a number of allegedly integrated agreements must be *economically interdependent* in order to implicate the *cum onere* principle. See Shaw Group, 350 B.R. at 179-80 (collecting cases, holding that contracts are indivisible only where they are economically interdependent such that piecemeal assumption and assignment would thwart the non-debtor party's bargain). This is so whether the agreements are separately documented or contained in the same document. Id. at 180.

37

For example, in In re Gardinier, Inc., 831 F.2d 974 (11th Cir. 1987), a seller contracted to sell real property to a buyer and to pay a broker a commission for his services. The contract stated that if the buyer failed to perform, the seller and the broker would divide the deposit, and if the seller failed to perform, he was responsible for the full commission to the broker. The seller filed for bankruptcy and sought to assume the contract. The bankruptcy court approved the seller's assumption of the contract and sale of the real property to the buyer, but blocked the commission, holding that the seller's agreement with the broker was a separate, fully executed agreement. Affirming the bankruptcy court, the Eleventh Circuit identified the following factors that supported the bankruptcy court's holding:

> First, *the nature and purpose of the agreements are different.* One agreement addresses the sale of property and the other contemplates an employment contract related to the sale of the property. Second, *the consideration for each agreement is separate and distinct.* [The buyer] agreed to pay [the seller] in excess of $ 5 million in consideration for the [property]. [The seller] separately agreed to pay [the broker] a commission as consideration for services rendered in making the sale of the property. There was no consideration flowing between [the broker] and [the buyer]. Finally, *the obligations of each party to the instrument are not interrelated.*

Gardinier, 831 F.2d at 976 (emphasis added, citations omitted).

In Stewart Title v. Old Republic Nat. Title, 83 F.3d 735 (5th Cir. 1996), the court concluded that a single lease instrument permitting a company (i) to lease an abstract plant and make use of records contained therein and (ii) upon lease termination, copy all property records relating to matters filed since 1960 was divisible into two separate agreements because, *inter alia*, (i) the reproduction rights survived breach and termination of the lease, (ii) the two agreements encompassed a different subject matter, and (iii) the parties' conduct (specifically, their method of payment), suggested implied consideration apportionment—i.e., the lease directed two types of payment for "use" (monthly rent) and reproduction (the ability to copy day-

to-day title additions).  Id. at 739-40.  Accordingly, rejection of the "use" lease did not affect the

debtor's reproduction rights, which were assets that could be sold separately by the estate.  Id. at

741-42.

           Courts have applied similar reasoning in cases involving multiple, allegedly

integrated contracts.  For example, in In re Integrated Health Serv., Inc., Case No. 00-

389(MFW), 2000 Bankr. LEXIS 1310 (Bankr. D. Del. July 7, 2007), Judge Walrath concluded

that three leases executed by a health care provider were severable from a non-compete

agreement executed by the provider's executive that, among other things, prevented him from

leasing premises to other healthcare providers for 10 years post-execution.  In reaching this

conclusion, Judge Walrath found relevant that (i) the consideration supporting each agreement

was apportionable (i.e., monthly lease payments versus annual executive salary), (ii) the

agreements covered different subject matter and had different objectives (i.e., a lease of real

property versus a personal contract to refrain from competitive conduct), and (iii) the agreements

at issue obligated different parties.  Id. at *10-15; accord Bridgeport Jai Alai v. Autotote Sys. (In

re Bridgeport Jai Alai), 215 B.R. 651, 658 (Bankr. D. Conn. 1997) (finding significant that the

parties to each allegedly integrated agreement were different).

           The foregoing authorities confirm that the Servicing Agreements and the Other

Agreements are severable under federal bankruptcy law.  First, the nature and purpose of the

Servicing Agreements and Other Agreements are different—the former concern the servicing of

an existing, identified body or pool of mortgage loans, and the latter concern the initial sale

and/or packaging of such loans into securitization pools.

           Second, the consideration underlying the servicing of the mortgage loans (i.e., the

servicing fees deducted from the borrowers' P&I payments) is separate and distinct from that

underlying the initial sale and/or packaging of the mortgage loans (i.e., the cash purchase price paid for the mortgage loans). This is nowhere more apparent than in the very real economic distinction between the sale of loans on a servicing-retained basis versus a servicing-released basis. In a servicing-released transaction, the seller realizes the value of the loan servicing rights as an element of the sale price for the loans; in a servicing-retained transaction, the seller realizes the value of the servicing rights as fee income from the actual servicing of the loans.[20]  As such, the consideration flowing to the seller for any sale of mortgage loans is easily apportioned between the mortgage loans themselves and the associated servicing rights.

Finally, with very few exceptions, the Servicing Agreements and the Other Agreements obligate different parties, which reflects the real practical economic distinction between the Debtors' loan origination/sale business and the Debtors' servicing business. For instance, in a typical MLPSA with an Embedded Servicing Agreement, *AHM Corp./Acceptance* is the Seller (i.e., the actual owner of the mortgage loans who sells them to the Third-Party Purchaser subject to representations and warranties concerning EPDs and PRPs) and *AHM Servicing* is the Servicer. Similarly, in an AHM Securitization, the only contracts to which AHM Servicing is a party are the RMBS and HELOC Servicing Agreements.

In sum, the structure of the Servicing Agreements and the Other Agreements confirms the practical reality of the market place, where the origination and sale of mortgage loans is separate and distinct from the servicing of mortgage loans. Some entities specialize in

---

[20]    The distinction is captured succinctly by the advertising materials on the Freddie Mac website, which describe sales to Freddie Mac on a servicing-released basis as follows: "With the servicing-released execution, you sell your mortgage asset and servicing asset in one transaction, and receive an *all-in cash price that includes the servicing-released premium.*" Freddie Mac: Cash, Servicing-Released Execution, http://www.freddiemac.com/sell/factsheets/cash_servicing.html (emphasis added) (last visited Oct. 9, 2007). Sales on a servicing-retained basis, on the other hand are described as follows: "This cash execution helps you increase your profitability for fixed-rate and balloon/reset mortgages, *while maintaining your servicing asset.*" Freddie Mac: Cash, Servicing Retained Execution, http://www.freddiemac.com/sell/factsheets/cash_retained.html (emphasis added) (last visited Oct. 9, 2007).

one or the other.  Until recently, AHM specialized in both.  That the Objecting Parties contracted

with one AHM entity for the purchase or securitization of mortgage loans and another AHM

entity for the servicing of such loans does not render such contracts *economically interdependent*

so as to implicate the *cum onere* rule in bankruptcy.[21]

> **2.    Applicable state law supports the conclusion that the**
> **Servicing Agreements are severable from the Other**
> **Agreements**

The rights provided by § 365 of the Bankruptcy Code are sufficiently unique, and

the policies underlying them sufficiently compelling, to overcome rote deference to state contract

law on the issue of severability.  See Butner v. United States, 440 U.S. 48, 55 (1979) ("Property

interests are created and defined by state law.  *Unless some federal interest requires a different*

*result*, there is no reason why such interests should be analyzed differently simply because an

interested party is involved in a bankruptcy proceeding." (emphasis added)); Bridgeport Jai Alai

v. Autotote Sys. (In re Bridgeport Jai Alai), 215 B.R. 651, 656-58 (Bankr. D. Conn. 1997)

(applying Butner, holding that federal law would compel conclusion that contracts at issue were

severable even if Connecticut law did not, due to the "overriding federal interest" embodied in

§ 365 of the Bankruptcy Code).  Accord Shaw Group, 350 B.R. 177-81 (applying federal case

law to determine whether cross-defaulted contracts were integrated or severable for purposes of

assumption and assignment under § 365).

---

[21]    By way of example, had the Objecting Parties purchased loans from AHM Corp. on a servicing-released basis and obtained servicing from a non-AHM servicer, that servicer would *not* assume AHM Corp.'s representations and warranties (i.e., liability for EPDs and PRPs) with respect to the serviced loans.  Similarly, if the Objecting Parties had purchased loans on a servicing-retained basis from AHM Corp. and had terminated AHM Servicing's rights to service the mortgage loans, any successor servicer the Objecting Parties might select would *not* undertake to make the Objecting Parties whole for the EPDs and PRPs.  In other words, outside of bankruptcy, EPDs and PRPs are sunk costs for which the Objecting Parties would only have claims against AHM Corp.  Now that AHM Corp. is in bankruptcy, the Objecting Parties seek to alter this bargained-for allocation of risk by surcharging the Buyer (and indirectly, the bankruptcy estates) for EPDs and PRPs that no successor servicer *outside* of bankruptcy would be willing to pay.

The Third Circuit's recent <u>Fleming</u> decision confirms the importance of the policies underlying § 365 of the Bankruptcy Code. <u>See</u> 2007 U.S. App. LEXIS 19927 at *11-12 (confirming the bankruptcy court's power "to excise or waive a bargained-for element of a contract" in order to effectuate the policies underlying § 365). Accordingly, the federal law discussed above should control whether or not the Servicing Agreements and Other Agreements are severable. <u>Cf.</u> <u>In re Waldron</u>, 36 B.R. 633, 636 n.2 (Bankr. S.D. Fla. 1984) ("Where possible, the Code should be given federal meaning. This permits uniformity in a national system; it promotes exegesis in line with bankruptcy policies. . . . [C]haracterization of the contract under state law should not control under bankruptcy law. Moreover, interpretation of an executory contract under state law serves purposes which are unrelated to the purposes served under Sec. 365.").

Nevertheless, to the extent that state law is relevant, it supports the conclusion that the Servicing Agreements are severable from the Other Agreements. The Servicing Agreements and Other Agreements are governed by either New York or California law. While there is no precise state-law analogue to assumption and rejection of executory contracts, New York and California contract cases concerning severability in other contexts generally support the conclusion that the Servicing Agreements are severable from the Other Agreements.

In New York, the severability of a contract is a question of the parties' intent, "to be determined from the language employed by the parties, viewed in the light of the circumstances surrounding them at the time they contracted." <u>Atlantic Mut. Ins. Co. v. Balfour MacLaine Int'l (In re Balfour MacLaine Int'l)</u>, 85 F.3d 68, 81 (2d Cir. 1996) (quoting <u>Christian v. Christian</u>, 365 N.E.2d 849 (N.Y. 1977)); <u>see</u> <u>In re Estate of Wilson</u>, 405 N.E.2d 220, 223 (N.Y. 1980) (holding that "the intent of the parties as reflected in the language they employ and

the particular circumstantial milieu in which the agreement came into being" controls).[22]  As a

general rule, a contract is entire when "by its terms, nature, and purpose, it contemplates and

intends that each and all of its parts, and the consideration therefore, shall be common each to the

other and interdependent." First Savings & Loan Ass'n of Jersey City, N.J. v. Am. Home

Assurance Co., 29 N.Y.2d 297, 300, 327 N.Y.S.2d 609, 611 (1971); see Ming v. Corbin, 37 N.E.

105, 107 (N.Y. 1894) (holding that contract is severable "when the part to be performed by one

party consists of several distinct and separate items, and the price to be paid by the other is

apportioned to each item . . .").

Similarly, in California, the severability of a contract is a question of the parties'

intent, "to be ascertained from a consideration of the language employed and the subject-matter

of the contract." Los Angeles Gas & Elec. Co. v. Amalgamated Oil Co., 156 Cal. 776, 779 (Cal.

1909).  "[W]hen the price is expressly apportioned by the contract, or the apportionment may be

implied by law, to each item to be performed, the contract will generally be held to be

severable." Id.; see Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co., 116 Cal. App. 4th

1375 (Cal. Ct. App. 2004) (applying Amalgamated Oil analysis).  Accord Lowy v. United Pac.

Ins. Co., 429 P.2d 577, 580 (Cal. 1967); Simmons v. California Institute of Tech., 34 209 P.2d

---

[22]    By focusing on the parties' intent, state law permits (indeed, *invites*) parties to contract around bankruptcy by artful drafting. However, as observed by the Second Circuit:

> While the parties to a contract may intend that, between themselves, their relationship is to be governed by the label they affix, that label neither governs the rights of third parties nor affects the legal consequences of the parties' agreement.  This is especially so under the statutory scheme controlling bankruptcy proceedings, where Congress has defined the legal consequences of commercial relationships.  Moreover, it would be inherently inequitable to allow the parties' choice of label to affect the rights of third party creditors.

In re PCH Assocs., 804 F.2d 193, 198 (2d Cir. 1986); Cf. United Airlines, Inc. v. HSBC Bank U.S.A., N.A., 416 F.3d 609, 612 (7th Cir. 2005) ("It is unlikely that the [Bankruptcy] Code makes big economic effects turn on the parties' choice of language rather than the substance of their transaction; why bother to distinguish transactions if these distinctions can be obliterated at the drafters' will?") (Easterbrook, J.); In re Moreggia & Sons, Inc., 852 F.2d 1179, 1183-1184 (9th Cir. 1988) ("Simply meeting the state law definition of a lease will not necessarily mandate the mindless application of section 365.  Rather, the substance of the agreement must properly fall within the scope of the type of agreement anticipated by Congress in enacting section 365.").

581, 587-88 (Cal. 1949) ("Generally speaking, the test of whether a contract is divisible is that if the consideration is single, the contract is entire, but if the consideration is apportioned, the contract may be regarded as severable. And a contract may be severable as to some of its terms, or for certain purposes, but indivisible as to other terms, or for other purposes." (citations omitted)).

As discussed above, the Servicing Agreements and the Other Agreements (i) have different purposes and/or subject matter, (ii) are between different parties, (iii) entail different obligations, (iv) have separate and distinct consideration underlying such obligations, (v) are not economically interdependent, and/or (vi) expressly contemplate the servicing of loans by an entity other than AHM Servicing, which entity does not assume any EPD or PRP obligations at the time of the transfer. Accordingly, to the extent that state contract law is relevant to the question of severability for the purposes of assumption under § 365 of the Bankruptcy Code, the language of the contracts themselves and the circumstances of their execution indicate that the parties intended the Servicing Agreements to be severable from the Other Agreements.

C.    **The Debtors will cure any "material and economically significant" defaults under the Servicing Agreements; other alleged defaults are irrelevant**

The Debtors are investigating the alleged defaults raised in the Incurable Default Objections and the Cure Objections and reserve the right to challenge the existence, materiality, and/or economic significance of any such default at the Sale Hearing. What follows is a response to the legal issues raised in such Objections.

1.    **The Debtors are in fact Fannie Mae-qualified; any
default relating to the alleged loss of such qualification
has been cured**

The Debtors service certain mortgages on behalf of Fannie Mae.  On July 31,

2007, Fannie Mae sent the Debtors a written notice purporting to terminate their qualified

servicer status.  The Debtors dispute whether such termination was valid or effective prior to the

Petition Date.  In an effort to resolve this dispute, Fannie Mae and the Debtors negotiated a

settlement agreement (the "Stipulation"), which was approved by the Court on September 4,

2007, D.I. 611.

Among other things, the Stipulation permits the Debtors to continue servicing the

Fannie Mae mortgage portfolio on an interim basis in accordance with the Stipulation and the

Fannie Mae Guide for Mortgage Selling and Servicing Contracts (the "Fannie Mae Guide"),

available at http://www.allregs.com/enfma (last visited Oct. 9, 2007).  In exchange for such

interim servicing, the Debtors are authorized to collect the same fees as were payable in

connection with servicing of the Fannie Mae portfolio prior to the purported termination of their

approved servicer status.  The Stipulation also provides that, without prejudice to Fannie Mae's

rights in connection with its July 31, 2007, notice, the Debtors shall be deemed a qualified

Fannie Mae servicer on an interim basis during the term of the Stipulation.  The Stipulation

requires the Debtors to negotiate and close a sale of their rights to service Fannie Mae mortgages

on or before October 31, 2007.[23]

On August 17, 2007, DB Structured Products, Inc. ("DB Structured") moved for

relief from the automatic stay [D.I. 229] to terminate a Servicing Agreement with the Debtors on

the basis of an allegedly incurable and continuing default of a contractual provision requiring the

---

[23]    The Debtors and the Buyer are currently working with Fannie Mae to (i) extend the Debtors' interim
qualification past October 31, 2007, and (ii) obtain qualification for the Buyer.

Debtors to meet the qualifications of either a Fannie Mae or Freddie Mac servicer. At the hearing on such motion on September 17, 2007, DB Structured argued that the Stipulation did not provide the Debtors "actual" Fannie Mae-qualified servicer status within the meaning of the default provision in the Servicing Agreement. The Court disagreed, stating:

> [A]s we sit here today, the debtor is a qualified – or qualifies as a Fannie Mae servicer. So I don't think that the . . . movants have established that there's an ongoing continuing breach of the agreement that has not been cured. I think there was, in all likelihood, a breach, at least for some time, but that . . . has been cured by the settlement . . . .

(9/17/07 Hr'g Tr. 103:19-25.)[24]

To the extent that the Incurable Default Objections are based on the Debtors' purported loss of their Fannie Mae-qualified status, they should be overruled for the reasons stated on the record at the September 17, 2007, hearing.[25]

**2.    Section 365(b)(1)(A) does not require the Debtors to undo historical facts; any and all material and economically significant defaults under the Servicing Agreements are curable**

The Incurable Default Objections invoke a variety of historical, nonmonetary defaults as talismans to ward off assumption of the Servicing Agreements, on the theory that the Debtors' inability to change the past renders "cure" impossible within the meaning of § 365(b)(1)(A) of the Bankruptcy Code. To cure any default, however, the Debtors need only (i) cease any continuing violation of the Servicing Agreements and (ii) restore the Objecting Party *economically* to the position it would have been in but for such default. With the possible exception of unenforceable *ipso facto* provisions (discussed below), the Debtors are currently in

---

[24]        Portions of the September 17 hearing transcript [D.I. 908] cited herein are attached hereto as <u>Exhibit H-2</u>.

[25]        The Debtors do not concede that they ceased to be Fannie Mae-qualified as a result of Fannie Mae's July 31, 2007, letter (or otherwise) and, to the extent necessary, reserve the right to challenge this at the Sale Hearing.

compliance with all provisions of the Servicing Agreements and there is no "continuing

violation." The Objecting Parties will have an opportunity at the Sale Hearing to put on

evidence of any losses resulting from the Debtors' alleged non-monetary defaults. To the extent

the Incurable Default Objections assert that something more is required, they should be

overruled.

At least one court in this circuit has recognized the absurdity of reading

§ 365(b)(1)(A) to require literal "cure" of a historical, nonmonetary default:

> Most non-monetary defaults (e.g., failure to maintain the premises in a
> certain condition, failure to seek approval; failure to provide reasonable
> consent) are "historical facts." Consequently, if [the] "historical fact"
> theory were applied to all non-monetary defaults, it would, in effect,
> eliminate the right to assume a lease for which non-monetary defaults
> exist. If Congress had intended to limit the right to assume to leases
> involving only monetary defaults, it could have so stated in § 365.

In re Vitanza, Case No. 98-19611, 1998 Bankr. LEXIS 1497, at *87 n.51 (Bankr. E.D. Pa. Nov.

13, 1998). Accord Madisonview Towers v. Yardley (In re Yardley), 77 B.R. 643, 645 (Bankr.

M.D. Tenn. 1987) ("Congress contemplated that non-monetary defaults would be curable under

§ 365. Section 365(b)(1) begins with a general power to assume or reject an executory contract

or unexpired lease. 'If there has been a default,' the trustee cannot assume the contract or lease

without curing 'such default' or providing adequate assurance of a prompt cure. There are no

words of limitation indicating that the nature of the prepetition default restricts the general power

to assume or reject.").

The debtor in Vitanza sought to assume a commercial lease for premises on which

he operated his restaurant prepetition. The lessor objected to the proposed assumption on the

basis that the debtor's prior use of the sidewalk outside the premises for café seating violated a

use provision in the lease and constituted a historical default not susceptible of cure. The lessor

relied primarily on Worthington v. General Motors Corporation (In re Claremont Acquisition

47

Corp.), 113 F.3d 1029, 1033 (9th Cir. 1997), wherein the Ninth Circuit concluded that a debtor auto dealership's failure to operate prepetition in default of a "going dark" provision in its GMC franchise agreement "is a 'historical fact' and, by definition, cannot be cured." Id. at 1033 (citing In re Lee West Enters., 179 B.R. 204, 208 (Bankr. C.D. Cal. 1995).) The Vitanza court agreed with the Ninth Circuit's view that the Bankruptcy Code relieves debtors of their obligation to pay penalties but does not relieve them of their obligation to cure non-monetary defaults.[26] 1998 Bankr. LEXIS 1497 at *75. It criticized the conclusion that a "historical fact" is per se incurable, however, noting that the Ninth Circuit "did not provide any further explanation or discussion of this point" and merely cited another case involving a franchise agreement. Id. at *83. The court declined to extend the Claremont holding beyond franchise agreements:

> I find no relevant similarity between the cessation of business operations under a franchise agreement and Debtor's intermittent use of the sidewalk for a purpose not allowed under the Lease. . . . [T]here are statutory provisions which specifically permit franchisers to terminate a franchise which ceases to operate; no comparable statutory provision is at issue here. In addition, *[Lessor] has not presented any evidence that Debtor's use of the sidewalk affected its good will or caused it any economic or other harm.*

1998 Bankr. LEXIS 1497 at *75 (emphasis added).

Assuming arguendo that the defaults raised by the Incurable Default Objections are actual, material and economically significant so as to require cure under § 365(b)(1)(A), the statute is more reasonably understood to permit the "cure" of such defaults by (i) ceasing any ongoing violation and (ii) restoring the non-debtor party to the *status quo ante* by compensating it for any pecuniary loss occasioned by the defaults. Bank of America, N.A. v. Garcia (In re

---

[26]    This was the narrow issue in Claremont. See Bank of America, N.A. v. Garcia (In re Garcia), 276 B.R. 627, 638 (Bankr. D. Ariz. 2002) ("[T]he key issue in Claremont was not whether the default was curable, but rather whether the Code excused cure."). Congress recently codified *the* narrow holding of Claremont by amending § 365(b)(1)(B) of the Bankruptcy Code to clarify that the debtor is only excused from curing non-monetary defaults resulting from application of a "penalty provision" in an executory contract. Congress did not codify Claremont's other holding, i.e., that historical nonmonetary defaults are incapable of cure.

Garcia), 276 B.R. 627, 637-41 (Bankr. D. Ariz. 2002). See Vitanza, 1998 Bankr. LEXIS 1497 at *90 n.52 ("As an alternative basis for permitting Debtor to assume the Lease, I accept Debtor's representation that he will cease using the sidewalk for purposes of a cafe as a cure of his default of . . . the Lease."); Central City South Assocs. v. Spirit Holding Company, Inc. (In re Spirit Holding Company, Inc.), 166 B.R. 371, 379-80 (Bankr. E.D. Mo. 1994) (permitting debtor which defaulted on lease by withholding consent to construction of outlets to cure default by consenting to one of the outlets); Madisonview Towers, 77 B.R. at 645-46 (cure requirement of § 365(b)(1)(A) deemed satisfied where no party suggested that anything more could be done by the debtor, who violated his lease by engaging in an altercation with a security guard, to cure his default); In re Haute Cuisine, Inc., 58 B.R. 390, 392-393 (Bankr. M.D. Fla. 1986) (where debtor proposed to re-open restaurant and obtain the necessary alcoholic beverage license within sixty days, its assumption of lease was conditionally granted even though it defaulted under lease by failing to have an open restaurant and allowing its alcoholic beverage license to lapse); In re Bon Ton Restaurant and Pastry Shop, Inc., 53 B.R. 789, 801-02 (Bankr. N.D. Ill. 1985) (where debtor defaulted on lease provisions requiring it to maintain the premises in good and proper condition, debtor was permitted ninety day period to cure defaults by taking specific steps to eliminate fire hazards that existed in the premises).

### 3.    Section 365(b)(2) of the Bankruptcy Code excuses the cure of any *ipso facto* defaults

Section 365(b)(2) of the Bankruptcy Code provides that § 365(b)(1)'s cure requirement "does not apply to a default that is a breach of a provision relating to (A) the insolvency or financial condition of the debtor at any time before the closing of the case; [or] (B) the commencement of a case under this title . . . ." 11 U.S.C. § 365(b)(2)(A) & (B).

> The scope of section 365(b)(2) is broad. It applies not only to defaults triggered by a bankruptcy filing, but also to defaults triggered by events or conditions that are likely to occur or exist around the time that a case is commenced. For example, a default measured by the debtor's financial condition need not be cured, whether the default is related directly to the bankruptcy filing or merely occurred on the road to bankruptcy.

3 Collier on Bankruptcy ¶ 365.05[4]; see In re Rickel Home Ctrs., Inc., 209 F.3d 291, 298 (3d Cir. 2000) ("The Code . . . prevents enforcement of so-called *ipso facto* clauses that trigger a default upon a bankruptcy filing or upon 'events or conditions that are likely to occur or exist around the time that a case is commenced.'" (quoting Collier)). See also In re Joshua Slocum Ltd., 922 F.2d 1081, 1090 (3d Cir. 1991) ("Section 365(b)(2) on its face permits the court to ignore so-called ipso facto and forfeiture clauses.")[27] In light of the foregoing, to the extent the Incurable Default Objections and Cure Objections assert that the cure of *ipso facto* defaults is required, they should be overruled.

### 4.    The Debtors need not cure defaults under the Other Agreements

As discussed above, because the Servicing Agreements and the Other Agreements are severable, the Debtors may assume the Servicing Agreements without curing defaults under the Other Agreements. Accordingly, to the extent the Incurable Default Objections and the Cure Objections assert defaults relating to the Other Agreements as "cure" obligations with respect to the Servicing Agreements, they should be overruled.

---

[27]    Because a Fannie Mae-qualification requirement in a Servicing Agreement serves as a proxy for financial wherewithal (as discussed below), and because Fannie Mae's purported termination of the Debtors' qualified servicer status based on the Debtors' financial condition immediately prior to the Petition Date, any alleged default under the Servicing Agreement premised upon the Debtors' loss of Fannie Mae-qualified servicer status is properly characterized as an *ipso facto* default. Accordingly, even if the Court were inclined to reconsider its prior reasoning with respect to the Fannie Mae-qualification requirement, the loss of such qualification (whether prior to the Petition Date or upon expiration of the Stipulation) would not constitute an event of default. To the extent it is relevant, the same reasoning applies with equal force to a provision of a Servicing Agreement requiring Freddie Mac qualification.

**D.    The only condition for assignment of the Servicing Agreements
is compliance with § 365(f)(2) of the Bankruptcy Code.**

The Anti-Assignment Objections identified on <u>Exhibit E</u> assert a variety of

"necessary" conditions to assignment of the Servicing Agreements other than those specified in

§ 365(f)(2) of the Bankruptcy Code.

**1.    Servicing Agreements are not "financial
accommodations" contracts and may be assumed and
assigned without the Objecting Parties' consent**

Several Anti-Assignment Objections assert that the Servicing Agreements are

"financial accommodations" contracts within the meaning of § 365(c)(2) of the Bankruptcy Code

and, accordingly, cannot be assumed or assigned without the Objecting Parties' consent. This

argument is without merit.

Section 365(c) of the Bankruptcy Code provides that the debtor may not assume

or assign an executory contract if "such contract is a contract to make a loan, or extend other

debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a

security of the debtor." 11 U.S.C. § 365(c)(2). Section 365(e)(2)(B) of the Bankruptcy Code

provides that the general rule invalidating *ipso facto* defaults does not apply to an executory

"financial accommodations" contract.

The term "financial accommodations" is not defined in the Bankruptcy Code.

However, the legislative history of § 365(c)(2) makes clear that

> [t]he purpose of this subsection, at least in part, is to prevent the trustee
> from requiring new advances of money or other property. The section
> permits the trustee to use and pay for the property already advanced, but is
> not designed to permit the trustee to demand new loans or additional
> transfers of property under lease commitments.

<u>Harper v. Victor Motors (In re Victor Motors)</u>, Adv. No. 83P-0325, 1983 Bankr. LEXIS 6131, at

*2-3 (Bankr. D. Utah May 27, 1983) (citation omitted).

The premise of the subsection is that, "where the loan or other transaction was based in the main or solely upon the financial strength of the debtor, there ought not be a requirement to extend new credit, whether in the form of new loans, lease financings or the purchase of discount notes" during the bankruptcy case. Id. at *5. "[C]haracterization of contracts to make a loan, or extend other debt financing or financial accommodations, is limited to the extension of cash or a line of credit and is not intended to embrace ordinary leases or contracts to provide goods or services with payments to be made over time." Id. at 6. Accordingly, § 365(c)(2) has generally been held to apply to "agreements that have extensions of credit as their *primary purpose*." In re UAL Corp., 293 B.R. 183, 187 (Bankr. N.D. Ill. 2003) (emphasis added); see Foothill Capital Corp. v. Official Unsecured Creditors' Comm. of Midcom Communs., Inc., 246 B.R. 296, 301 (E.D. Mich. 2000) (noting that, in the absence of the financial accommodations rule, revolving lines of credit would leave a creditor "exposed to demands by the debtor for additional advances of money" and "legally obligated to forward sums of money to a debtor whose creditworthiness has substantially changed").

Conversely, courts have not found a "financial accommodations" contract where extensions of credit to the debtor were *not* the primary purpose of the agreement. See, e.g., In re UAL Corp., 293 B.R. 183 (Bankr. N.D. Ill. 2003) (credit card processing agreements were not financial accommodations because, whatever the degree of credit risk relating to chargebacks, the principal purpose is to allow the debtor to make credit card sales of tickets); In re Neuhoff Farms, Inc., 258 B.R. 343 (Bankr. E.D.N.C. 2000) (supply contract with initial above-market payments to the debtor not a financial accommodation).

The primary purpose of the Servicing Agreements (as distinct from the Other Agreements) is obviously the servicing of existing mortgage loans, not the provision of credit to

the Debtors. Accordingly, the Servicing Agreements are not "financial accommodations" contracts and may be assumed and assigned by the Debtors.

> **2.      Express and *de facto* anti-assignment provisions are unenforceable under § 365(f)(1) of the Bankruptcy Code**

Section 365(f)(1) of the Bankruptcy Code provides that assignment under § 365(f)(2) is permissible "notwithstanding a provision in an executory contract . . . , or in applicable law, that prohibits, restricts, or conditions the assignment of such contract." 11 U.S.C. § 365(f)(1). The scope of this section is broad—it invalidates not only express anti-assignment provisions, but also provisions of a contract that are so restrictive that they constitute *de facto* anti-assignment provisions. In re Rickel Home Ctrs., Inc., 240 B.R. 826, 831-32 (D. Del. 1999), appeal dismissed, L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.), 209 F.3d 291 (3d Cir.), cert denied, 531 U.S. 873 (2000); see In re ANC Rental Corp., 277 B.R. 226, 239-40 (Bankr. D. Del. 2002).

The vast majority of the contractual provisions cited in the Anti-Assignment Objections are express prohibitions, restrictions, and/or conditions on assignment. The remaining provisions are immaterial and/or economically insignificant and, if enforced, would interfere with the Debtors' ability to realize the intrinsic value of the Servicing Agreements by assigning them to the Buyer. Accordingly, the Anti-Assignment Objections should be overruled.

> **3.      The Form APA did not require the Debtors to obtain the Objecting Parties' consent as a prerequisite to assignment of the Servicing Agreements**

Certain of the Anti-Assignment Objections assert that, although the Bankruptcy Code relieves the Debtors from any obligation to obtain the Objecting Parties' consent to assignment of the Servicing Agreements, sections 2.4(a), 6.3(c)(ii), and 6(d) of the Form APA

53

require the Debtors to obtain such consent in order to assign the Servicing Agreements. Putting

aside for the moment the absurdity of the Debtors' drafting a Form APA with assignment

provisions *more* restrictive than those of the Bankruptcy Code, the provisions cited do not

reasonably admit of such an interpretation.

Section 2.4(a) of the Form APA simply provides that, to the extent that any

contract included in the purchased assets cannot be assigned without the consent of a third party,

the Form APA shall not constitute an assignment or transfer of any contract unless such consent

is obtained prior to closing. Obviously, that provision does not require the Debtors to obtain

consent; it merely provides that the Form APA shall not constitute an assignment where a

consent is needed.[28]

Section 6.3(c)(ii) of the Form APA states that Sellers shall use

their commercially reasonable efforts to obtain, prior to the Closing, all
*requisite* approvals, including . . . (ii) the Consent to the Closing and the
transactions contemplated hereby of each other party to each Contract to
which it is a party or to which the Purchased Assets or Assumed
Liabilities are subject with a Seller or any Affiliate of a Seller . . . in each
case if required by the terms of such loan, mortgage, lease, insurance
policy or contract.

---

[28]     Perhaps more importantly, section 2.4 of the APA largely moots this issue. It provides, among other
things, that where a consent cannot be obtained, the

Seller and Purchaser will cooperate in a mutually agreeable arrangement under which
Purchaser would obtain the benefits and assume the obligations thereunder in accordance
with this Agreement, including, to the extent that such an arrangement would be
permitted by Law and the related Contract, subcontracting, sub-licensing, or sub-leasing
to Purchaser, or under which such Seller would enforce for the benefit of Purchaser, with
Purchaser assuming such Seller's obligations, any and all rights of such Seller against a
third party thereto.

(APA § 2.4.) This language reflects what the parties will do if a necessary consent cannot be obtained; it does not
confer additional consent rights.

(Form APA § 6.3(c)(ii) (emphasis added).)  At most, this provision requires the Debtors to use commercially reasonable efforts to obtain consents to assignment.  It does not confer a consent right on a third party under some third-party beneficiary theory.[29]

Finally, section 6.3(d) of the Form APA provides, in pertinent part, that "Sellers shall use their commercially reasonable best efforts to obtain, prior to the Closing Date, all approvals and consents *necessary* under all Servicing Agreements *in order to consummate the transactions contemplated hereby,* including executing all such documents as required by the Servicing Agreements and reasonably required by any trustee . . . provided, that such agreements and documents do not materially increase the duties or obligations of the servicer under the related Servicing Agreements . . . ."  (Form APA § 6.3(d) (emphasis added).)  Consents "necessary . . . in order to consummate the transactions" obviously does not include any consents rendered unnecessary by operation of § 365(f)(1) of the Bankruptcy Code.

### E.    The Adequate Assurance Objections are without merit; the Buyer need only comply with material and economically significant terms of the Servicing Agreements

At the time the Adequate Assurance Objections were filed, the Buyer had not been identified.  Given that the Buyer has now been identified, most of the Adequate Assurance Objections are either moot or will be addressed by the evidence at the Sale Hearing.  Nevertheless, several Adequate Assurance Objections asserted that the Buyer's lack of Fannie

---

[29]    The analogue to this section in the APA appears in Section 6.4(c), which provides that, to the extent not covered in the Court's sale order, the Debtors "shall use their commercially reasonable efforts to obtain, prior to the Initial Closing, all requisite approvals, including the Consent to the transactions contemplated hereby of each other party to each Contract (other than a Servicing Agreement) to which it is a party or to which the Purchased Assets or Assumed Liabilities are subject with a Seller or any Affiliate of a Seller (including under any Software Contract or Contract relating to the Transferred Intellectual Property and IT Assets), if required by the terms of such Contract."  This provision obviously moots the arguments posited under Section 6.3(c)(ii) of the Form APA.  First, it specifically carves out obtaining consents for Servicing Agreements.  Second, it obviously contemplates consents for licensing agreements and the like, not the Servicing Agreements.  Third, it is subservient to Section 2.4 of the APA, which requires that the parties use commercially reasonable efforts to obtain consents and, where they cannot, attempt to work around it.  This provision cannot be viewed as creating or confirming a consent right.

Mae-qualified servicer status would, as a matter of law, prevent the Debtors from establishing

"adequate assurance of future performance" as required by § 365(f)(2) of the Bankruptcy Code.

This is not the case.

The phrase "adequate assurance of future performance" is not defined in the

Bankruptcy Code. The legislative history, however, indicates it was intended to be given a

"practical, pragmatic construction." Cinicola v. Scharffenberger, 248 F.3d 110, 120 n. 10

(quoting In re Sapolin Paints, Inc., 5 B.R. 412, 421 (Bankr. E.D.N.Y. 1980)); see Fleming, 2007

U.S. App. LEXIS at *12.

> Section 2-609 of the Uniform Commercial Code [(the "U.C.C.")], from
> which the bankruptcy statute borrows its critical language, provides that
> "when reasonable grounds for insecurity arise with respect to the
> performance of either party, the other may in writing demand adequate
> assurance of future performance . . . ." The Commentaries to the [U.C.C.]
> note that "'adequate" assurance is to be "defined by commercial rather
> than legal standards.'" [U.C.C. § 2-609 cmt. 3 (1972).] What constitutes
> "adequate assurance" is to be determined by factual conditions; the seller
> must exercise good faith and observe commercial standards; his
> satisfaction must be based upon reason and must not be arbitrary and
> capricious.

Id. The commentary to the U.C.C. also indicates that adequate assurance "focuses on the

financial condition of a contracting party and his ability to meet his financial obligations." In re

U.L. Radio Corp., 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982) (citing U.C.C. § 2-609 cmt. 4).

Adequate assurance under § 365(f)(2) of the Bankruptcy Code does not require

"literal fulfillment by the [assignee] of each and every term of the bargain." Id. at 543; see

Fleming, 2007 U.S. App. LEXIS at *12 ("It is clear that adequate assurances need not be given

for every term of an executory contract."). Indeed, given the broad policy of § 365 favoring

assumption and assignment, a party seeking to compel strict performance with a particular term

of an executory contract "must show that actual and substantial detriment would be incurred" as

a result of nonperformance. In re U.L. Radio Corp., 19 B.R. at 544. Cf. Fleming, 2007 U.S.

56

App. LEXIS 19927 at *11-12 (holding that the bankruptcy court has the discretion to "excise" or "waive" immaterial or economically insignificant provisions of a contract in order to facilitate assignment).

As this Court noted in connection with the DB Structured stay relief motion, the Servicing Agreements use Fannie Mae qualification "as a proxy for determining whether or not the debtors are in fact servicing correctly." (9/17/07 Hr'g Tr. 72:8-10.) This conclusion is borne out by the Fannie Mae Guide itself, which requires a servicer, *inter alia*, (i) to have employees who are "well trained and qualified" to perform the functions required, (ii) to maintain facilities that are adequate to perform such functions, (iii) to maintain a fidelity bond and errors and omissions insurance, at its own expense, in an amount specified by Fannie Mae (Fannie Mae Guide Part II, A); and (iv) to meet current net worth requirements and maintain such net worth in the form of assets acceptable to Fannie Mae (Fannie Mae Guide Part II, C).[30]

At the Sale Hearing, evidence will be presented that (i) the Buyer meets the financial and operational qualifications[31] of a Fannie Mae servicer as set forth in the Guide; (ii) the Buyer is in the process of obtaining (and is likely to obtain) necessary licensure from the various states in which it will do business; (iii) the Buyer is in the process of obtaining (and is likely to obtain) qualification from Fannie Mae; and (iv) until the Buyer obtains all necessary

---

[30]    To the extent they are relevant, the Freddie Mac qualification requirements are substantially identical. For example, Freddie Mac requires a seller-servicer: (i) has made and continues to make to Freddie Mac certain financial disclosures, (ii) meets minimum net worth requirements, (iii) maintains minimum levels of errors and omissions and fidelity insurance, (iv) maintains a quality control program that is acceptable to Freddie Mac, (v) was and is "able to demonstrate to Freddie Mac's satisfaction . . . sufficient capitalization, profitability, liquidity and funding sources to support its ongoing operations and its commitments to Freddie Mac," (vi) and has and is "complying with any additional requirements, as deemed appropriate by Freddie Mac in its sole discretion." Freddie Mac Single-Family Seller/Servicer Guide § 4.02, available at http:www.freddiemac.com/sell/guide (last visited Oct. 9, 2007).

[31]    Indeed, the Buyer will have a quality workforce because it will hire the Debtors' former employees. See In re Enron Corp., Case No. 01 B 16034 (AJG), 2003 Bankr. LEXIS 2263, at *14-16 (Bankr. S.D.N.Y. Dec. 1, 2003) (finding adequate assurance where debtor's employees would continue to work for assignee post-assignment).

licenses and qualifications (i.e., in the interim period between approval of the sale and Final

Closing), the Debtors will continue servicing the mortgage loans in the ordinary course of their

business, as they have done at all times in these chapter 11 proceedings.  In light of the

foregoing, it is difficult to imagine what, if any, harm (economic or otherwise) the Objecting

Parties can demonstrate they will suffer as a result of the Buyer's lack of Fannie Mae

qualification as of the date of the Sale Hearing  And at any rate, even if the Objecting Parties

would be harmed in some way, such harm is not sufficient to overcome the Debtors' and their

estates' right to realize the intrinsic value of the Servicing Agreements via assumption and

assignment.

### III.    THE COURT NEED NOT DETERMINE AT THE SALE HEARING WHETHER ANY SERVICING AGREEMENTS WERE VALIDLY TERMINATED PREPETITION

The majority of the Termination Objections identified on Exhibit F assert that the

Servicing Agreements were validly terminated prior to the Petition Date and, accordingly, may

not be assumed or assigned by the Debtors.  The APA, however, establishes a Dispute Escrow

and specifically preserves both the Objecting Parties' right to assert the validity of any alleged

termination, and the Debtors' and/or the Buyer's rights to challenge the same, at a later date.

(APA § 4.4.)  Accordingly, the Court need not rule at this time on questions raised in the

Termination Objections asserting prepetition termination.

### IV.    THE PURPORTED POSTPETITION TERMINATION OF THE EMC EMBEDDED SERVICING AGREEMENT VIOLATED THE AUTOMATIC STAY AND WAS INVALID AS A MATTER OF LAW BECAUSE IT WAS PREMISED UPON AN UNENFORCEABLE *IPSO FACTO* DEFAULT PROVISION

EMC Mortgage Corp. ("EMC"), which is party to an MLPSA and an Embedded

Servicing Agreement with AHM Corp. and AHM Servicing, respectively, asserts that the filing

of these chapter 11 cases constituted an event of default under the MLPSA, on account of which it validly terminated the Embedded Servicing Agreement, for cause, on August 14, 2007. EMC does not appear to dispute (nor could it) that (i) default provisions conditioned on the commencement of a bankruptcy case are generally unenforceable in bankruptcy, see 11 U.S.C. §§ 363(l) & 365(e)(1); (ii) the automatic stay prohibits the termination of a debtor's contract rights post-petition without leave from the bankruptcy court to do so, 11 U.S.C. § 362(a)(3); In re Valley Media, Inc., 279 B.R. 105, 137 (Bankr. D. Del. 2002); and (iii) actions taken in violation of the automatic stay are void ab initio, Maritime Elec. Co. v. United Jersey Bank, 959 F.2d 1194, 1206 (3d Cir. 1991). Rather, EMC argues that the Embedded Servicing Agreement is a "securities contract" within the meaning of § 555 of the Bankruptcy Code and, as such, may be terminated notwithstanding both the automatic stay and the *ipso facto* rule.[32] This argument is without merit, a point that is perhaps underscored by the fact that, with but one exception,[33] other, similarly situated Objecting Parties have not raised it.

Section 555 of the Bankruptcy Code provides, in relevant part, that "[t]he exercise of a contractual right of a stockbroker, financial institution, financial participant, or securities clearing agency to cause the liquidation, termination or acceleration of a securities contract, as defined in section 741 of this title, because of a condition of the kind specified in section 365(e)(1) of this title shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court . . . in any proceeding under this title . . . ." 11 U.S.C. § 555.

---

[32]    Alternatively, EMC argues that the Embedded Servicing Agreement is a "financial accommodations" contract within the meaning of §§ 365(e)(2)(B) and 365(c)(2), and, accordingly (i) is exempt from the *ipso facto* rule and (ii) may not be assumed or assigned. This argument is unavailing for the reasons set forth above.

[33]    Residential Funding Co. LLC, which asserts prepetition termination of the MLPSA and Embedded Servicing Agreement at issue, raises § 555 as an alternative argument in its supplemental Objection, D.I. 1061.

The Third Circuit has held that the "safe harbor" provisions of the Bankruptcy Code must be construed precisely and with a close eye to the literal meaning of the statute. Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer S&L Ass'n. (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.), 878 F.2d 742, 751 (3d Cir. 1989) (construing 11 U.S.C. § 559). The purpose of the safe harbor is limited to "enhanc[ing] enforcement of securities laws and rules assuring the integrity of securities markets."  Kipperman v. Circle Trust (In re Grafton Partners, L.P.), 321 B.R. 527, 535 (B.A.P. 9th Cir. 2005).  Courts therefore closely examine the nature of the transactions at issue to determine whether a contract before it is a securities contract.  See In re Residential Resources Mortgage Inv. Corp., 98 B.R. 2, 23 (Bankr. D. Ariz. 1989); cf. Bevill, Bresler & Schulman, 878 F.2d at 745 (determining whether a contract was a purchase and sale agreement as opposed to a "repurchase agreement").

Many participants in the securities markets incorporate "securities contracts" *and* ancillary agreements into one operative master agreement.  The 2005 Bankruptcy Code amendments recognized this practice and refined the definition of the term "securities contract" to include master agreements that provide for the transfer of certain securities among other related agreements between the parties.  11 U.S.C. § 741(7)(A)(viii).[34]  The fact that a discrete agreement or transaction is embedded within a master agreement, however, does not enhance or diminish the rights of any party with respect to the components of that master agreement.  The master agreement is only a "securities contract" to the extent that the individual agreements or

---

[34]     11 U.S.C. § 741(7)(A)(viii) states that the term "securities contract" includes:

> A master agreement that provides for an agreement or transaction referred to in clause (i), (ii), (iii), (iv), (v), (vi), or (vii), together with all supplements to any such master agreement, without regard to whether the master agreement provides for an agreement or transaction that is not a securities contract under this subparagraph, except that such master agreement shall be considered to be a securities contract under this paragraph only with respect to each agreement or transaction under such master agreement that is referred to in clause (i), (ii), (iii), (iv), (v), (vi), or (vii) . . . .

transactions embodied therein qualify *on their own* as securities contracts.  11 U.S.C. §
741(7)(A)(viii).

The master agreements between the Debtors and non-debtor parties contemplate
separate and distinct transactions, namely: a Purchase and Sale Agreement (whereby the non-
debtor purchases the mortgage loans from the originator) and a Servicing Agreement (whereby
the servicer contracts to service the mortgage loan on behalf of the non-debtor).[35]  The Purchase
and Sale Agreement may or may not constitute a "securities contract" within the meaning of
§ 555.[36]  Even if it does, however, the Servicing Agreement is not automatically entitled to the
protections of § 555 of the Bankruptcy Code simply by virtue of being bundled with another
contract that is entitled to such protections.  "Congress clearly intended the automatic stay to be
quite broad.  Exemptions to the stay, on the other hand, should be read narrowly to secure the
broad grant of relief to the debtor."  In re Stringer, 847 F.2d 549, 552 (9th Cir. 1988) (footnotes
omitted).

Expanding the definitions of "securities contract" to include agreements not
enumerated in § 741(7) of the Bankruptcy Code would impermissibly expand the scope of the
precisely-worded, limited exception to the automatic stay provided by § 555, and would
potentially strip the Debtors' estates of valuable, bargained-for rights related to the Servicing
Agreement or other portions of the master agreement, where Congress's intent (as expressed in
the statutory language) was clearly not to do so.  See 11 U.S.C. § 741(7)(A)(viii).  Such a result
would openly invite parties to securities contracts to "bankruptcy-proof" their other transactions

---

[35]    Whether or not the Purchase and Sale Agreement portion of a master agreement constitutes a "securities contract" within the meaning of §§ 555 and 741(7) of the Bankruptcy Code is irrelevant for purposes of the Motion, since all the Debtors seek to transfer by the Motion are the Servicing Agreements.  The Debtors reserve their rights to argue that the Purchase and Sale Agreement portion of the various master agreements may not constitute "securities contracts," but do not do so here; nor must the Court rule on this issue now.

[36] The Debtors make no admission and reserve the right to challenge in this or any other proceeding whether a given contract constitutes a "securities contract" subject to §§ 555 or 741(7).

with the debtor by including them within a "master" agreement for the purchase and sale of securities. Such a result would also likely erode the ability of mortgage loan servicers, particularly those in bankruptcy, to access capital markets. Lenders would not be inclined to extend credit to debtor-servicers and accept a pledge of rights under Servicing Agreements as collateral, as such collateral could be eviscerated by another financial institution or financial participant under § 555 of the Bankruptcy Code without regard for the automatic stay or the *ipso facto* rule.

EMC will likely argue that a ruling from this Court recognizing the Embedded Servicing Agreement for what it is (i.e., *not* a "securities contract") would send shockwaves through the securities markets by calling into question the applicability of the § 555 safe harbor to *any* and *all* contracts purporting to be a "securities contract."

The Court should not countenance such scare tactics. Recognizing EMC's overreaching with respect to the Embedded Servicing Agreement will not vitiate the protections of § 555 for those contracts that legitimately fall within the statutory definition of a securities contract. For example, the Third Circuit has recognized, in the context of alleged purchase money security interests ("PMSIs") under the Uniform Commercial Code, that a security instrument purporting to create a PMSI in specific collateral securing both purchase-money and non-purchase money obligations can have a "dual status" such that the existence of non-purchase money obligations does not render the PMSI ineffective as to the actual purchase-money obligations. Pristas v. Landaus of Plymouth, Inc., 742 F.2d 797, 800 (3d Cir. 1984). The holding in Pristas is consistent with the definition of "securities contract" in § 741(7), in that the non-debtor party will not lose any rights it may have under § 555 respecting a legitimate "securities contract" that is embedded within a master agreement; but the "securities contract"

designation and associated rights will extend only so far as any agreements within the master agreement that legitimately qualify as "securities contracts" on their own. See, e.g., In re Brendlinger, 116 B.R. 42, 43-44 (Bankr. W.D. Pa. 1990) (applying Pristas and holding that secured creditor was entitled to relief from automatic stay for property secured by PMSI, but was not entitled to relief from stay for other items listed on a related security agreement pursuant to a refinancing of the original debt).

## CONCLUSION

The Debtors, the Objecting Parties, and the broader mortgage industry consider Servicing Rights to be *property* interests which are bought and sold separately from the underlying mortgage loans. The Objecting Parties did not purchase the Servicing Rights from the Debtors. They did not pay a servicing-released premium to the Debtors. Yet now, they seek to exercise control over the Servicing Rights as if they had paid for them. The Servicing Rights are property of the Debtors' bankruptcy estates that may be sold under § 363 of the Bankruptcy Code (i) free and clear of any claims that are unrelated to the servicing of the underlying mortgage loans and (ii) notwithstanding any provision of the Servicing Agreements that would effect a forfeiture based on the Debtors' financial condition.

The Objecting Parties try to avoid the foregoing conclusion by calling the Servicing Agreements "executory contracts." Invoking various provisions of § 365 of the Bankruptcy Code and blurring the practical and legal distinction between the origination and servicing of mortgage loans, on the one hand, and the servicing of mortgage loans, on the other, the Objecting Parties baldly assert that they will be deprived of the benefit of their bargain by the assumption and assignment of the Servicing Agreements to the Buyer. The evidence at the Sale Hearing will show that the Objecting Parties will not be harmed by the Debtors' gradual and

63

seamless transition of their servicing operations to a new, fully-capitalized entity staffed by the same experienced and skilled employees who have serviced the Objecting Parties' mortgage loans without incident prior to and during these chapter 11 cases. But the *servicing* of the loans is not the Objecting Parties' real concern—they want payment in full for claims arising from the *purchase* of the loans, and they seek to extract it from the Buyer (and indirectly, the Debtors' bankruptcy estates). Outside of bankruptcy, however, the Objecting Parties could have had no reasonable commercial expectation of payment from a replacement servicer of mortgage loans for claims against the seller of such loans. Thus, treating EPD and PRP claims against AHM Corp./Acceptance as cure obligations of AHM Servicing under the Servicing Agreements would actually *better* the Objecting Parties' bargain, at the expense of the Debtors' bankruptcy estates and their other creditors. Nothing in the Bankruptcy Code requires (or indeed, would countenance) such a result.

Some Objecting Parties try to avoid the foregoing conclusion by calling the Servicing Agreements "financial accommodations" or "securities contracts" entitled to special protection under the Bankruptcy Code. As discussed above, however, the Servicing Agreements are garden-variety contracts. The Objecting Parties are not entitled to any special treatment under the Bankruptcy Code, and should not be permitted to derail a sale of the Servicing Business that has the full support of the Administrative Agent and the Committee and which, if approved, could bring between $400-500 million into the Debtors' bankruptcy estates.

## RESERVATION OF RIGHTS

The Debtors reserve the right to amend, modify, or supplement this Omnibus Response based on additional information obtained from the Objecting Parties or otherwise, or to

respond to any objections that are not the subject of this Omnibus Response, at any time prior to the Sale Hearing.

WHEREFORE, the Debtors respectfully request that the Court enter an Order overruling the Objections, granting the Sale Motion, and granting the Debtors such other and further relief as is just and proper.

Dated:     Wilmington, Delaware
           October 10, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Pauline K. Morgan (No. 3650)
James P. Hughes, Jr. (No. 3102)
Sean T. Greecher (No. 4484)
Patrick A. Jackson (No. 4976)**
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession

---

** District bar admission pending October 15, 2007.