## EXHIBIT H-1

**Findings of Fact, <u>In re USA Commercial Mortgage Co.</u>**

Case No. 06-10725 (LBR), D.I. 2377 (Bankr. D. Nev. Jan. 8, 2007)

**Entered on Docket**
**January 08, 2007**

Hon. Linda B. Riegle
United States Bankruptcy Judge

~~Annette W. Jarvis, Utah Bar No. 1649~~
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com
and

Lenard E. Schwartzer, NV Bar No. 0399
Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada  89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
E-Mail: bkfilings@s-mlaw.com
Attorneys for Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br><br>Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br><br>Debtor. | Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br><br>Debtor. | Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br><br>Debtor. | **[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THE "ORDER CONFIRMING THE "DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION, AS MODIFIED HEREIN"** |
| In re:<br>USA SECURITIES, LLC,<br><br>Debtor. | |
| Affects:<br>☒ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA First Trust Deed Fund, LLC | <u>**Confirmation Hearing**</u><br>Date:  December 19, 2006<br>Time:  10:00 a.m. |

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1

1    Commencing on December 19, 2006 at 10:00 a.m., the Court held a hearing (the

2    "Confirmation Hearing") on the confirmation of the "Debtors' Third Amended Joint Chapter 11

3    Plan of Reorganization") (as modified by the Confirmation Order (as defined below), the

4    "Plan"[1]) proposed by USA Commercial Mortgage Company ("USACM"), USA Securities,

5    LLC ("USA Securities"), USA Capital Realty Advisors, LLC ("USA Realty"), USA Capital

6    Diversified Trust Deed Fund, LLC ("DTDF") and USA Capital First Trust Deed Fund, LLC

7    ("FTDF"), debtors and debtors in possession in the above-captioned chapter 11 cases (the

8    "Debtors"). Appearances were made as indicated on the record at the Confirmation Hearing.

9    The Court considered the pleadings and documents filed by the Debtors and other

10    interested parties in connection with confirmation of the Plan, including the following:

11    (a)    the Plan and all accompanying exhibits, including, without limitation, the

12    Plan Documents Supplement, the Revised Schedule of Executory Contracts and Unexpired

13    Leases, the forms of Disbursing Agent Agreements for USACM and FTDF filed by the Debtors

14    and the Direct Lender Supplement;

15    (b)    the "Debtors' First Amended Disclosure Statement to Debtors' Third

16    Amended Joint Plan of Reorganization" (the "Disclosure Statement") previously approved by the

17    Court;

18    (c)    the "Memorandum of Points and Authorities in Support of Confirmation of

19    the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization" (the "Confirmation

20    Memorandum");

21    (d)    the Declaration of Thomas J. Allison filed in support of confirmation of the

22    Plan (the "Allison Declaration");

23    (e)    the Affidavit of Balloting Agent Regarding Solicitation and Tabulation of

24    Votes in Connection with the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization,

25    regarding compliance with the "Solicitation Procedures" approved in the Disclosure Statement

26    Order ("BMC Declaration");

27

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

---

[1]    All terms not otherwise defined in these Findings of Fact and Conclusions of Law (the "Findings") shall have the meanings assigned to them in the Plan.

2

1        (f)    the Declaration of David Blatt of Compass Partners LLC in Support of

2   Confirmation of Debtors' Third Amended Joint Plan of Reorganization ("Compass Declaration");

3        (g)    the "Affidavit of Balloting Agent Regarding Solicitation and Tabulation of

4   Votes in Connection with the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization"

5   and the Ballot Tabulation Report attached as Exhibit A thereto [Docket No. 2165] and

6   "Supplemental Affidavit of Balloting Agent Regarding Solicitation and Tabulation of Votes in

7   Connection with the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization" and the

8   Revised Ballot Tabulation Report attached as Exhibit B thereto [Docket No. 2243], which detail

9   the tabulation of Ballots cast for or against the Plan;

10        (h)    the "Partial Opposition to Debtors' Third Amended Joint Plan of

11   Reorganization," filed by Erna D. Grundman and Joanne M. Grundman;

12        (i)    the "Partial Opposition to Debtors' Third Amended Joint Plan of

13   Reorganization," filed by Joanne M. Grundman;

14        (j)    the "Objection of The Pension Benefit Guaranty Corporation to Debtors'

15   Third Amended Joint Plan of Reorganization," filed by the Pension Benefit Guaranty Corporation

16   ("PBGC");

17        (k)    the "Objection to Confirmation of Debtors' Third Amended Joint

18   Chapter 11 Plan of Reorganization," filed by Edward Burgess;

19        (l)    "Liberty Bank's Limited Objection to Confirmation of Debtors' Third

20   Amended Joint Chapter 11 Plan of Reorganization," filed by Liberty Bank;

21        (m)    "Standard Property Company, LLC's Limited Objection to the Debtors'

22   Third Amended Joint Plan of Reorganization," filed by Standard Property, LLC;

23        (n)    "Joinder in Standard Property Company, LLC's Limited Objection to the

24   Debtors' Third Amended Joint Plan of Reorganization on Behalf of Copper Sage Commerce

25   Center LLC, " filed by Copper Sage Commercial Center;

26        (o)    "Joinder in Standard Property Company, LLC's Limited Objection to the

27   Debtors' Third Amended Joint Plan of Reorganization on Behalf of Binford Medical Developers,"

28   filed by Binford Medical Developers;

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

3

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1       (p)    "Memorandum of Points and Authorities in Opposition to Confirmation of

2  Debtor's Plan," filed by Debt Acquisition Company of America V and the Declaration of Howard

3  Justus [Docket No. 2032] filed in support thereof;

4       (q)    "Limited Objection to Plan," filed by Gregory Walch and Shauna Walch,

5  etc.;

6       (r)    the "Objection of USA Investment Partners, LLC, Joseph Milanowski and

7  Thomas Hantges to Confirmation of the Debtors' Third Amended Joint Chapter 11 Plan of

8  Reorganization," filed by Joseph Milanowski and Thomas Hantges (the "H&M Objection") and

9  the Declaration of Victoria Loob filed in support thereof (the "Loob Declaration");

10       (s)    the "Objection to Confirmation of Debtors' Third Amended Joint

11  Chapter 11 Plan of Reorganization as it Applies to Debtor USA Commercial Mortgage Company,"

12  filed by The Lenders Protection Group (the "LPG Objection");

13       (t)    the Declaration of Donna Cangelosi filed in support of the LPG Objection

14  (the "Cangelosi Declaration");

15       (u)    Multiple joinders to objections to confirmation of the Plan filed by

16  Objecting JV Creditors [Docket nos. 2040, 2099, 2179, 2180, 2182, 2184, and 2191];

17       (v)    "Limited Objection to Pecos Professional Park Limited Partnership and

18  Haspinov, LLC, to Debtors' Proposed Plan of Reorganization," filed by USA Commercial Real

19  Estate Group;

20       (w)    "Joinder in Limited Opposition to Plan," filed by Direct Lenders Alexander

21  and others as shown in the Second Amended Statement of Robert C. LePome, Esq. and Nancy

22  Allf, Esq. Pursuant to Rule 2019;

23       (x)    "Errata to Limited Objection to Plan," filed by Gregory J. Walch and

24  Shauna M. Walch, Trustees of the Gregory J. and Shauna M. Walch Family Trust;

25       (y)    the "Opposition and Joinder of Sierra Liquidity Fund, L.L.C. in Oppositions

26  [sic] to Confirmation of Debtors' Third Amended Joint Plan of Reorganization" ( the "Sierra

27  Liquidity Objection" and, collectively with the objections to the Plan listed in (h)-(x) above, the

28  "Objections");

4

1    (z)    the "Debtors' Combined Motion In Limine And Memorandum In Support

2 Regarding The Objection Of USA Investment Partners, LLC, Joseph Milanowski And Thomas

3 Hantges To The Confirmation Of The Debtors' Third Amended Joint Chapter 11 Plan Of

4 Reorganization," filed by the Debtors; and

5    (aa)    all other pleadings, affidavits and documents filed in connection with this

6 matter.

7    The Court has heard the statements, arguments, representations and offers of proof

8 of counsel regarding confirmation of the Plan at the Confirmation Hearing, and has considered the

9 record of these Chapter 11 Cases and all testimony and evidence admitted at or before the

10 Confirmation Hearing.

11    These findings of fact and conclusions of law are in support of the "Order

12 Confirming the 'Debtors' Third Amended Joint Chapter 11 Plan Of Reorganization,' As Modified

13 Herein" (the "Confirmation Order"), entered concurrently herewith.

14    Based on the foregoing, the Court makes the following findings of fact and

15 conclusions of law, as supplemented by the findings of fact and conclusions of law stated orally

16 and reported in open court on the record at the Confirmation Hearing (which are incorporated

17 herein) pursuant to Bankruptcy Rule 7052:[2]

### FINDINGS OF FACTS AND CONCLUSIONS OF LAW

18

19    A.    This matter is a core proceeding over which the Court has jurisdiction

20 pursuant to 28 U.S.C. §§ 157(b) and 1334(a).  Venue of this proceeding is proper under 28 U.S.C.

21 §§ 1408 and 1409.

22    B.    The Debtors provided notice of the Confirmation Hearing and of the time

23 fixed for balloting and filing objections to confirmation of the Plan to all entities entitled to

24 receive such notice, including all known holders of Claims and Equity Interests of the Debtors.

25 The notice by the Debtors of such matters fully and adequately described the relief requested at the

26

27

28

---

[2]    This document constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rules 7052 and 9014.  Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, when appropriate.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  Confirmation Hearing and was reasonable, appropriate, and complied in all regards with due

2  process and the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules (including

3  Bankruptcy Rules 2002, 3017, 3018, and 3019), and the Local Bankruptcy Rules and orders of the

4  Court, including this Court's "Order Approving: (A) Debtors' Disclosure Statement; (B) Proposed

5  Notice of Confirmation Hearing; (C) Proposed Solicitation and Notice Procedures; and (D)

6  Proposed Form of Ballots" (the "Disclosure Statement Order").

7          C.    Pursuant to the Disclosure Statement Order, all objections to confirmation

8  of the Plan, including all evidence in support thereof, were required to be filed by December 11,

9  2006 and, therefore, the Cangelosi Declaration filed on December 18, 2006 and the Sierra

10  Liquidity Objection filed on December 15, 2006 were not timely filed and were stricken from the

11  record and/or overruled.

12          D.    The only evidence submitted in support of the H&M Objection was the

13  Loob Declaration.  On December 18, 2006, the Debtors undertook an examination of Ms. Loob

14  pursuant to Bankruptcy Rule 2004 where Ms. Loob asserted her rights under the Fifth Amendment

15  of the United States Constitution in connection with questions concerning the H&M Objection and

16  her declaration in support thereof.  Additionally, USA Investment Partners ("USAIP") and Joseph

17  Milanowski each failed to appear at Court-ordered examinations to be conducted pursuant to Rule

18  2004 of the Federal Rules of Bankruptcy Procedure.  Upon consideration of Ms. Loob's assertion

19  of her Fifth Amendment rights, the failure of USAIP and Mr. Milanowski to appear at their

20  respective Rule 2004 examinations, and the Motion in Limine, the H&M Objection and Loob

21  Declaration were stricken from the record.

22          E.    None of the Objections, including the LPG Objection, raised any objection

23  with respect to the classification of the Classes of Claims and/or Equity Interests as set forth in the

24  Plan or use of a Class to meet cramdown requirements.  Further, Class A-5 consists of holders of

25  "claims" within the meaning of Bankruptcy Code section § 101(5).

26          F.    The Debtors conducted the solicitation of acceptances or rejections of the

27  Plan, and the related distribution and tabulation of ballots with respect thereto, in good faith and in

28  compliance with the Disclosure Statement Order, all applicable provisions of the Bankruptcy

1  Rules (including Bankruptcy Rules 3017 and 3018), all applicable provisions of the Bankruptcy

2  Code (including sections 1125 and 1126), and all other applicable laws, rules, and regulations.

3  Among other things, the Debtors transmitted the Plan, the Disclosure Statement, and the

4  applicable ballot to all known holders of Claims and Equity Interests of the Debtors that are

5  impaired under, and therefore entitled to vote on, the Plan.

6        G.    The Plan satisfies all of the requirements of Bankruptcy Code

7  section 1129(a) as follows:

8        1.    11 U.S.C. § 1129(a)(1):  the Plan complies with all of the applicable

9  provisions of the Bankruptcy Code, including Bankruptcy Code sections 1122 and 1123.

10       The classification structure is proper and in accordance with Section 1122 of the

11  Bankruptcy Code.  Each Class under the Plan differs in legal character or nature.  All Claims and

12  Equity Interests within each Class are substantially similar to the other Claims or Equity Interests

13  in that Class because they are similar in legal character to the other Claims against or Equity

14  Interests in Debtors in such class.

15       Article II Section C of the Plan designates Classes of Claims and Equity Interests

16  for each of the Debtors, other than those specified in Sections 507(a)(2), (a)(3) and (a)(8) of the

17  Bankruptcy Code, and states the treatment of each Class under the Plan in accordance with

18  Sections 1123(a)(1), (2) and (3).  The Plan also provides for the same treatment of each Claim and

19  Equity Interest within a particular Class in accordance with Section 1123(a)(4).

20       Article IV of the Plan provides adequate means for its implementation in a manner

21  that is consistent with Section 1123(a)(5) and (b).

22       2.    11 U.S.C. § 1129(a)(2):  the Debtors have complied with all of the

23  applicable provisions of the Bankruptcy Code, including Bankruptcy Code section 1125.

24       3.    11 U.S.C. § 1129(a)(3):  the Debtors have proposed the Plan in good faith

25  and not by any means forbidden by law.  Moreover, the Plan itself, and the negotiated process

26  leading to its formulation, along with all four Committees, provide independent evidence of the

27  good faith of the Debtors.

28       4.    11 U.S.C. § 1129(a)(4): Article II Section B.1 and Article VII Section A of

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    the Plan, provides for the appropriate review and determination of the fees and expenses incurred

2    through the Effective Date.

3          5.    11 U.S.C. § 1129(a)(5): the Plan, the Disclosure Statement, the exhibits to

4    the Plan, the Confirmation Memorandum, the Plan Documents Supplement, the Direct Lender

5    Supplement, and the disclosures at the Confirmation Hearing disclose the identity, qualifications,

6    method of election, and/or compensation of the DTDF Administrator, the DTDF Post-Effective

7    Date Committee, USACM Trustee, the USACM Trust Committee, the Disbursing Agents for

8    FTDF, USA Realty and USA Securities, respectively.  The appointment of such persons is

9    consistent with the interests of creditors and shareholders and with public policy.

10          6.    11 U.S.C. §§1129(a)(6): the requirements of Bankruptcy Code

11    section 1129(a)(6) are not applicable to the Plan.

12          7.    11 U.S.C. § 1129(a)(7):  each holder of a Claim or Equity Interest in a Class

13    that is impaired under the Plan will receive or retain under the Plan property of a value, as of the

14    Effective Date, that is not less than such holder would so receive or retain if the Debtors were

15    liquidated under chapter 7 of the Bankruptcy Code on such date.

16          8.    11 U.S.C. § 1129(a)(8), (10):  In the Chapter 11 Cases of FTDF, DTDF,

17    USA Realty, and USA Securities, Classes, B-1 through B-4, C-1 through C-4, D-1 through D-3

18    and E-1 through E-3 are unimpaired, and Classes B-5, C-5, D-4 and E-4, though impaired, have

19    accepted the Plan.  The Plan, with respect to the Chapter 11 Cases of FTDF, DTDF, USA Realty,

20    and USA Securities, thus satisfies the requirement of Bankruptcy Code section 1129(a)(8).

21          In the Chapter 11 case of USACM, Classes A-1 through A-3 are unimpaired,

22    and classes A-4 through A-8 are impaired under the Plan.  Classes A-6 through A-8 will receive

23    no distribution under the Plan and are deemed to reject the Plan. Impaired Class A-5 has voted to

24    accept the Plan, and based on the Revised Ballot Tabulation Report, impaired Class A-4 also has

25    voted to accept the Plan. Accordingly, Section 1129 (a)(8) has been satisfied with respect to

26    USACM's Chapter 11 Case.  Based on the acceptance of the Plan by Class A-5, Section

27    1129(a)(10) has been met with regard to USACM's Chapter 11 Case even if Class A-4 had not

28    accepted the Plan as a result of the Del Bunch Rule 3018 contested matter.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Section 1129(a)(10) does not apply to FTDF or DTDF because there is no impaired

2  class of Claims in their respective Chapter 11 Cases

3    In USA Realty's case, Classes D-4, the only voting impaired Class of Claims, has

4  voted to accept the Plan. Section 1129(a)(10) is met in USA Realty's Chapter 11 Case.

5    In USA Securities' case, Class E-4, the only voting impaired Class of Claims, has

6  voted to accept the Plan. Section 1129(a)(10) is met with regard to USA Securities' Chapter 11

7  Case.

8    9.    11 U.S.C. § 1129(a)(9):  the treatment of Allowed Administrative Expense

9  Claims, Allowed Priority Unsecured Claims, Allowed Priority Tax Claims and Allowed Secured

10  Tax Claims as set forth in Article II, Sections B. and C. of the Plan satisfies the requirements of

11  Bankruptcy Code section 1129(a)(9) in that holders of such Administrative Expense Claims,

12  Priority Unsecured Claims, Priority Tax Claims and Secured Tax Claims will be paid in full on the

13  Effective Date, or as soon as such expenses or claims become Allowed under the terms of the

14  Plan, except where the holder of such Claim agrees to a different treatment.

15    10.    11 U.S.C. § 1129(a)(11):  the Plan satisfies the requirements of Bankruptcy

16  Code section 1129(a)(11) as the evidence submitted by the Debtors shows that each of the Debtors

17  has sufficient funds on the Effective Date to make all of the distributions required to be made

18  under the Plan and that the Plan, including all of the documents incorporated therein, has adequate

19  provisions for the creation and management of the USACM Trust, the retention of assets by and

20  the management of Post-Effective Date DTDF, for making distributions to holders of Allowed

21  Claims or Equity Interests classified in Classes A-4 (Allowed General Unsecured Claims against

22  USACM), B-4 (Allowed General Unsecured Claims against FTDF), B-5 (Equity Interests in

23  FTDF), C-4 (Allowed General Unsecured Claims against DTDF), C-5 (Equity Interests in DTDF),

24  D-4 (Allowed General Unsecured Claims against USA Realty) and E-4 (Allowed General

25  Unsecured Claims against USA Securities), which are the only Classes that will receive a

26  distribution under the Plan, and to implement the provisions of the settlement with the holders of

27  Class A-5 (Direct Lender Compromise Claims).

28    11.    11 U.S.C. § 1129(a)(12): the Plan's provision for the payment of statutory

1  fees to the Office of the United States Trustee, satisfies the requirements of Bankruptcy Code

2  section 1129(a)(12).

3     12. 11 U.S.C. § 1129(a)(13):  the Plan satisfies the requirements of Bankruptcy

4  Code section 1129(a)(13) because the Debtors are not subject to any retiree benefits as defined in

5  Bankruptcy Code section 1144.

6     13. 11 U.S.C. § 1129(a)(14):  the requirements of Bankruptcy Code

7  section 1129(a)(14), which mandate the payment of domestic obligations, are inapplicable to these

8  business Debtors.

9     14. 11 U.S.C. § 1129(a)(15):  the requirements of Bankruptcy Code

10  section 1129(a)(15), which only applies to cases where the debtor is an individual, are inapplicable

11  to these business Debtors.

12     15. 11 U.S.C. § 1129(a)(16):  the requirements of Bankruptcy Code

13  section 1129(a)(16), which only applies to "the transfer of property by a corporation or trust that is

14  not a moneyed, business, or commercial corporation or trust", are inapplicable because each of the

15  Debtors is a moneyed business or commercial corporation.

16     16. 11 U.S.C. § 1129(b)(1) and (2):  With respect to Classes A-6, A-7, A-8, D-5

17  and E-5, which have not accepted the Plan, and Class A-4, to the extent such Class has not

18  accepted the Plan, the Plan satisfies the requirements of Bankruptcy Code sections 1129(b)(1) and

19  1129(b)(2) because the Plan does not discriminate unfairly against, and provides fair and equitable

20  treatment with respect to, the Allowed Claims in Classes A-4, A-6 and A-7 and Allowed Equity

21  Interests in Classes A-8, D-5 and E-5 in that the Plan provides for no distribution to any junior

22  Class in a Debtor's Estate and does not discriminate unfairly among such Classes.

23     H. The Plan satisfies the requirements of Bankruptcy Code section 1129(b) as

24  follows:

25     1. All of the applicable requirements of Bankruptcy Code section 1129(a)

26  other than paragraph (8) are met with respect to the Plan.

27     2. The Plan does not discriminate unfairly with respect to Classes A-4 (to the

28  extent such Class has not accepted the Plan), A-6, A-7, A-8, D-5 and E-5.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 • Fax: (702) 892-0122

3.    The Plan is "fair and equitable" as to Classes A-4 (to the extent such Class has not accepted the Plan) and A-6 because holders of junior Claims or Equity Interests will not receive or retain under the Plan on account of such junior Claim or Equity Interest any property.

4.    The only Classes of Claims and Equity Interests that are junior to Class A-4 Claims are Claims in Classes A-6 through A-8. Holders of Class A-6 Claims will not receive or retain any property unless holders of Allowed Class A-4 Claims are paid in full, plus interest. Holders of Class A-7 Claims will not receive or retain under the Plan on account of their Claim any property unless holders of Class A-4 and Class A-6 Claims are paid in full, plus interest. Furthermore, holders of Equity Interests in USACM, classified in Class A-8, will receive no distribution and retain no property under the Plan.

5.    The only Classes of Claims and Equity Interests that are junior to Class A-6 Claims are Claims in Classes A-7 through A-8. Holders of Class A-7 Claims will not receive or retain under the Plan on account of their Claim any property unless holders of Class A-6 Claims are paid in full, plus interest. Furthermore, holders of Equity Interests in USACM, classified in Class A-8, will receive no distribution and retain no property under the Plan

6.    The Plan is "fair and equitable" as to Class A-7 because holders of junior Claims or Equity Interests will not receive or retain under the Plan on account of such junior Claim or Equity Interest any property. The only Class that is junior to Class A-7 Claims is Class A-8, which is comprised as Equity Interests in USACM. Holders of Equity Interests in USACM will receive no distribution or retain any property under the Plan.

7.    The Plan is "fair and equitable" within the meaning of section 1129(b)(2)(C)(ii) as to Class A-8, which is comprised of Equity Interests in USACM, Class D-5, which is comprised of Equity Interests in USA Realty, and Class E-5, which is comprised of Equity Interests in USA Securities because no holder of any interest that is junior to the Equity Interests treated in these Classes will receive or retain any property under the Plan.

I.    Article V of the Plan governing the assumption and rejection of executory contracts and unexpired leases satisfies the requirements of sections 365 and 1123(b)(2) of the Bankruptcy Code. As provided in the Debtors' Revised Schedule of Executory Contracts And

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  Unexpired Leases In Connection With Debtors' Third Amended Joint Chapter 11 Plan Of

2  Reorganization, filed on December 18, 2006 (docket no. 2162), the Debtors have elected to reject

3  all executory contracts and unexpired leases.

4        J.    The principal purpose of the Plan is not the avoidance of taxes or the

5  avoidance of the application of section 5 of the Securities Act of 1933 (15 U.S.C. § 77e).

6        K.    All modifications to the Plan filed or announced prior to the conclusion

7  of the Confirmation Hearing constitute technical changes and/or changes that have either been

8  consented to by affected constituents or which do not adversely affect or change the treatment

9  of any other Claims or Equity Interests. Accordingly, pursuant to Bankruptcy Rule 3019, these

10  modifications do not require additional disclosure under Bankruptcy Code section 1125 or

11  1127(a), or resolicitation of votes under Bankruptcy Code section 1126, nor do they require that

12  holders of Claims or Equity Interests be afforded an opportunity to change previously cast

13  acceptances or rejections of the Plan. The Plan as so modified meets the requirements of

14  Bankruptcy Code sections 1122 and 1123. Such modifications shall be deemed accepted by

15  each holder of a Claim or Equity Interest who has previously voted to accept the Plan.

16        L.    The form of documents in the Plan Documents Supplement, including

17  the USACM Liquidating Trust Agreement, the DTDF Amended Operating Agreement, the

18  Direct Lender Supplement, and the Disbursing Agent Agreements for USACM and FTDF

19  substantially in the form filed by the Debtors are appropriate.

20        M.    The appointment of Michael Tucker of FTI Consulting to serve as the

21  DTDF Administrator and to perform the duties specified under the Plan and the DTDF

22  Amended Operating Agreement is appropriate and consistent with the best interests of DTDF's

23  creditors, Equity Interest holders, and the interests of public policy.

24        N.    The appointment of Geoffrey L. Berman of Development Specialists,

25  Inc. to serve as the USACM Trustee and to perform the duties specified under the Plan and the

26  USACM Trust Agreement is appropriate and consistent with the best interests of USACM's

27  creditors and the interests of public policy.

28        O.    The parties identified to the Court to serve as members of the USACM

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  Trust Committee and the DTDF Post-Effective Date Committee are appropriate to serve in such

2  roles.

3        P.      All of the conditions precedent to Confirmation of the Plan described in

4  Article VI Section A of the Plan have been satisfied.

5        Q.      The agreements, transactions and transfers authorized by the Confirmation

6  Order, including, without limitation, the USACM Trust Agreement and the DTDF Amended

7  Operating Agreement, are fair, equitable and reasonable, are entered into in good faith, are in the

8  best interests of the USACM and DTDF, their respective creditors and Estates (and with respect to

9  DTDF, its Equity Interest holders), and help provide adequate means for implementing the Plan.

10        R.      Pursuant to Bankruptcy Code section 1125(e), Persons, including the

11  Debtors, the Committees, and their respective attorneys, agents, directors, officers and

12  representatives, have acted in good faith with respect to the solicitation of votes on the Plan and

13  thus are entitled to all the protections of Bankruptcy Code section 1125(e).

14        S.      The injunctions, releases and limitations on liability contained in the Plan

15  are fair and equitable, are given for valuable consideration, were properly noticed to holders of

16  Claims and Equity Interests and other interested parties in accordance with the requirements of

17  due process and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules, and are

18  in the best interests of the Debtors and their Estates.

19        T.      Each term and provision of the Plan is valid and enforceable pursuant to its

20  terms.

21        U.      The Plan satisfies the requirements for confirmation set forth in

22  section 1129 of the Bankruptcy Code.

23        V.      The Court's retention of jurisdiction as set forth in Article VIII Section D of

24  the Plan is appropriate and comports with the parameters contained in 28 U.S.C. § 157.

25        W.      The provisions of the Plan, these Findings and the Confirmation Order

26  shall bind the Debtors, their respective Estates, the Asset Purchaser, the USACM Trustee, the

27  DTDF Administrator, and all holders of Claims against, and Equity Interests in the Debtors,

28  whether or not the Claims or Equity Interests of such entities are Allowed under the Plan or

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

13

1  impaired under the Plan, whether or not such entities have voted to accept or reject the Plan,

2  and whether or not such entities have filed or are deemed to have filed proofs of Claim or

3  Equity Interests in these Chapter 11 Cases.

4          X.      The transfer of the Acquired Assets (including, without limitation, both

5  real and personal property) to the Asset Purchaser is a transfer in accordance with Bankruptcy

6  Code section 1146(c) and, therefore the making, delivery, filing or recording of any mortgages,

7  deeds of trust, leasehold mortgages, leases (whether recorded or unrecorded), and/or the various

8  instruments and documents of transfer as specified in or contemplated by the Asset Purchase

9  Agreement or the Plan (collectively, "Instruments of Transfer"), and/or the exhibits thereto are

10  hereby exempt from taxation under any law imposing a recording tax, stamp tax, sales tax,

11  transfer tax, use tax or any similar tax or any so-called "bulk-sale". The appropriate federal,

12  state or local government filing and recording officers are hereby directed to accept for filing or

13  recording all Instruments of Transfer or other documents of transfer to be filed and recorded in

14  accordance with the Plan or the Asset Sale Transaction, without payment of any such tax or

15  government assessment, and without the presentation of any affidavits, instruments, or returns

16  otherwise required for recording, other than the Confirmation Order. The Court retains

17  jurisdiction to enforce the foregoing direction, by contempt proceedings or otherwise.

18          Y.      All DTDF Litigation Claims and FTDF Transferred Assets accruing to

19  DTDF or FTDF, or their Estates, shall remain assets of the Post-Effective Date DTDF, whether

20  or not litigation relating thereto is pending on the Effective Date and whether or not any such

21  right or cause of action has been listed or referred to in the Plan, the Disclosure Statement or

22  any schedule, exhibit or other document filed in connection therewith.

23          Z.      All USACM Litigation Claims and the FTDF Litigation Claims (transferred

24  to USACM pursuant to section E.2.j of Art. IV of the Plan) accruing to USACM or FTDF,

25  respectively, or their respective Estates shall remain assets of and vest in the USACM Trust,

26  whether or not litigation relating thereto is pending on the Effective Date and whether or not any

27  such right or cause of action has been listed or referred to in the Plan, the Disclosure Statement or

28  any schedule, exhibit or other document filed in connection therewith.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

14

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1        AA.    As set forth in Article IV, Section E.1. of the Plan, the compromise between

2    USACM and the Direct Lenders is fair and reasonable and is in the best interests of the USACM

3    Estate and the Direct Lenders, respectively.

4        BB.    As set forth in Article IV, Section E.2. of the Plan, the compromise between

5    USACM and FTDF is fair and reasonable and is in the best interests of the USACM Estate and

6    FTDF Estate, respectively.

7        CC.    As set forth in Article IV, Section E.3. of the Plan, the compromise between

8    FTDF and DTDF is fair and reasonable and is in the best interests of the FTDF Estate and DTDF

9    Estate, respectively.

10        DD.    As set forth in Article IV, Section E.4. of the Plan, the compromise between

11    FTDF and USA Realty is fair and reasonable and is in the best interests of the FTDF Estate and

12    USA Realty Estate, respectively.

13        EE.    As set forth in Article IV, Section E.5. of the Plan, the compromise

14    between DTDF and USA Realty is fair and reasonable and is in the best interests of the DTDF

15    Estate and USA Realty Estate, respectively.

16        FF.    The Asset Purchase Agreement and the transactions contemplated by the

17    Asset Purchase Agreement were negotiated and have been and are undertaken by USACM and

18    FTDF (FTDF together with USACM, the "Sellers") and Asset Purchaser at arm's length,

19    without collusion or fraud, and in good faith within the meaning of section 363(m) of the

20    Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization

21    provided herein to consummate the Asset Sale Transaction shall not affect the validity of the

22    transfer of the Acquired Assets to the Asset Purchaser unless such authorization is duly stayed

23    pending such appeal.

24        GG.    The Auction conducted in accordance with the Bid Procedures Order on

25    December 7, 2006, at which Asset Purchaser was declared the highest and best bidder, was

26    conducted in good faith within the meaning of section 363(m) of the Bankruptcy Code. The

27    Asset Purchaser is a purchaser in good faith of the Acquired Assets. As a result of the

28    foregoing, the Sellers and Asset Purchaser entitled to the protections of section 363(m) of the

15

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Bankruptcy Code.

2          HH.    The Asset Purchase Agreement was negotiated, proposed and entered

3    into by the Debtors and the Asset Purchaser without collusion, in good faith, and from arm's-

4    length bargaining positions.

5          II.    There were no brokers involved in the Asset Sale Transaction, and no

6    brokers' commissions are due with respect to the Asset Sale Transaction.

7          JJ.    The Asset Purchaser is not an "insider" of any of the Debtors, as that

8    term is defined in section 101 of the Bankruptcy Code.

9          KK.    The transfer of the Acquired Assets to the Asset Purchaser will be a

10   legal, valid, and effective transfer of the Acquired Assets, and will vest the Asset Purchaser

11   with all right, title, and interest of the Sellers to the Acquired Assets free and clear of all liens,

12   claims, interests, obligations and encumbrances whatsoever, including, but not limited to, (A)

13   all monetary and non-monetary defaults and rights that purport to give to any party a right or

14   option to effect any forfeiture, modification, right of first refusal, or termination of the Sellers'

15   or the Asset Purchaser's interest in, or rights in or under, the Acquired Assets, or any similar

16   rights, based in any way on any action taken (or failed to be taken) by any of the Debtors or any

17   other matter or occurrence relating to the period prior to the Closing (other than any right that

18   existed and was matured and exercisable, as of the Petition Date, to effect a substitution of

19   USACM as loan servicer under Section 3 of any Loan Servicing Agreement, as well as any

20   defenses of the loan servicer thereto (a "Surviving Section 3 Right")); (B) taxes arising under or

21   out of, in connection with, or in any way relating to the existence, ownership, management or

22   servicing of the Acquired Assets prior to the Closing; and (C) (i) all mortgages, deeds of trust,

23   security interests, conditional sale or other title retention agreements, pledges, liens, judgments,

24   demands, encumbrances, rights of first refusal or charges of any kind or nature, if any,

25   including, but not limited to, any restriction on the use, voting, transfer, receipt of income or

26   other exercise of any attributes of ownership and (ii) all debts arising in any way in connection

27   with any agreements, acts, or failures to act, of any of the Sellers or any of the Sellers'

28   predecessors or affiliates; all claims (as that term is defined in the Bankruptcy Code),

1    obligations, liabilities, rights of recoupment or setoff, demands, guaranties, options, rights,

2    restrictions, interest and matters of any kind and nature in any way relating to the existence,

3    ownership, management or servicing of the Acquired Assets prior to Closing, whether known

4    or unknown, contingent or otherwise, whether arising prior to or subsequent to the

5    commencement of these cases pursuant to chapter 11 of the Bankruptcy Code, and whether

6    imposed by agreement, understanding, law, equity or otherwise, including but not limited to

7    claims otherwise arising under doctrines of successor liability (collectively, "Interests");

8    provided, however, that, in connection with any attempted post-Closing exercise of a Surviving

9    Section 3 Right: (a) the Direct Lenders must provide Compass at least thirty (30) days prior

10   written notice of the intended exercise of such right in accordance with section 8 of the Loan

11   Servicing Agreement, (b) Compass shall have the right to challenge the exercise of such

12   Surviving Section 3 Right by filing a motion with this Court prior to the expiration of such

13   thirty (30) day period to determine whether such Surviving Section 3 Right has been properly

14   and validly exercised (the "Compass Motion") and the Court shall retain jurisdiction to

15   adjudicate any such disputes, (c) in the event Compass timely files such Compass Motion, the

16   effectiveness of the attempted exercise of such Surviving Section 3 Right shall be stayed

17   pending this Court's entry of an order in respect of the Compass Motion, and (d) the post-

18   Closing survival of such Surviving Section 3 Right shall not impair in any respect any rights or

19   interests of Compass under the Loan Servicing Agreements, including, without limitation, its

20   rights under-Section 2(c)(iii) of the Loan Servicing Agreement.  In the event of a proper

21   exercise of remedies under Section 3 of the Loan Servicing Agreement, (i) neither the Direct

22   Lenders nor any replacement servicer selected by such Direct Lender shall have the right or

23   ability to compromise, subordinate, or impair, in any respect, any claims purchased by Compass

24   from the Estates for default interest, accrued servicing fees, late charges, success fees, or other

25   amounts under the Loan Servicing Agreement, and (ii) the Confirmation Order shall be binding

26   upon such replacement servicer regardless of whether such replacement servicer actually

27   received such copy of the Confirmation Order.

28              LL.     The Loan Servicing Agreements are not executory contracts under

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Bankruptcy Code section 365 and can be transferred to the Asset Purchaser under Bankruptcy

2    Code sections 1123 and 363(b) without being assumed and assigned to the Asset Purchaser

3    under Bankruptcy Code section 365.

4    MM.    The Asset Purchaser would not have entered into the Asset Purchase

5    Agreement and would not consummate the transactions contemplated thereby, thus adversely

6    affecting the Sellers, their Estates, their creditors, and, with respect to FTDF, its Equity Interest

7    holders, if the sale of the Acquired Assets to the Asset Purchaser was not free and clear of all

8    Interests of any kind or nature whatsoever, or if the Asset Purchaser would, or in the future

9    could, be liable for any of the Interests, including, without limitation, any liabilities not

10    expressly assumed by the Asset Purchaser.

11    NN.    The consideration provided by Asset Purchaser pursuant to the Asset

12    Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired

13    Assets, (iii) will provide a greater recovery to the Sellers' Estates than would be provided by

14    any other available alternative, and (iv) constitutes reasonably equivalent value and fair

15    consideration under the Bankruptcy Code and under the laws of the United States, any State

16    (including Nevada), territory, possession, or the District of Columbia.

17    OO.    Unless otherwise provided by law, the reversal or modification of the

18    Confirmation Order and these Findings on appeal shall not affect the validity of the Plan, or any

19    agreement or action authorized by the Confirmation Order or under the Plan with respect to any

20    entity acting in good faith, whether or not that entity knows of the appeal, unless the

21    Confirmation Order is stayed pending appeal.

22    PP.    Based on the foregoing findings and conclusions, the Debtors are entitled to

23    entry by this Court of the Confirmation Order.

24    Submitted by:                                            Approved / Disapproved by:
     RAY QUINNEY & NEBEKER P.C.                              OFFICE OF THE U.S. TRUSTEE
25    and SCHWARTZER & MCPHERSON LAW FIRM

26    By:  /s/ Jeanette E. McPherson                         By: _____
     LENARD E. SCHWARTZER, ESQ.                                 August B. Landis
27    JEANETTE E. MCPHERSON, ESQ.
     ANNETTE W. JARVIS, ESQ.
28    STEVEN STRONG, ESQ.
     *Counsel for Debtors*

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THE "ORDER CONFIRMING THE "DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION, AS MODIFIED HEREIN"**

**Approved**/Disapproved by:
LEWIS AND ROCA, LLP

By: /s/ Rob Charles
    SUSAN M. FREEMAN, ESQ.
    ROB CHARLES, ESQ.
    *Counsel for the Official Committee of*
    *Unsecured Creditors of USA Commercial*
    *Mortgage Company*

**Approved**/Disapproved by:
GORDON & SILVER, LTD.

By: /s/ Gregory Garman
    GERALD M. GORDON, ESQ.
    GREGORY E. GARMAN, ESQ.
    *Counsel for the Official Committee of*
    *Holders of Executory Contract Rights of*
    *USA Commercial Mortgage Company*

**Approved**/Disapproved by:
ORRICK, HERRINGTON & SUTCLIFFE LLP
and BECKLEY SINGLETON, CHTD.

By: /s/ Marc A. Levinson
    MARC A. LEVINSON, ESQ.
    JEFFERY HERMANN ESQ.
    BOB L. OLSON, ESQ.
    ANNE M. LORADITCH, ESQ.
    *Counsel for the Official Committee of*
    *Equity Security Holders of USA Capital*
    *Diversified Trust Deed Fund, LLC*

**Approved**/Disapproved by:
STUTMAN TREISTER & GLATT, P.C. and
SHEA & CARLYON, LTD.

By: /s/ Christine Pajak
    FRANK A. MEROLA, ESQ.
    EVE KARASIK, ESQ.
    CHRISTINE PAJAK, ESQ.
    CANDACE C. CARLYON, ESQ.
    *Counsel for the Official Committee of*
    *Equity Security Holders of USA Capital*
    *First Trust Deed Fund LLC*

Approved/**Disapproved** by:

By: /s/ Kevin Darby for
    ALAN SMITH, ESQ.
    *Counsel for Lenders Protection Group*

Approved/Disapproved by:

By:
    DEAN KIRBY, ESQ.
    *Counsel for Debt Acquisition*
    *Company of America*

Approved/Disapproved by:

By:
    ERIC FIELD, ESQ.
    *Counsel for Pension Benefit Guarantee*
    *Corporation*

Approved/Disapproved by:

By:
    NANCY ALLF, ESQ.
    ROBERT LEPOME, ESQ.
    *Counsel for The Alexander Group*

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THE "ORDER
   CONFIRMING THE "DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN OF
2  REORGANIZATION, AS MODIFIED HEREIN"

3

4  Approved/Disapproved by:                    Approved/**Disapproved** by:

5

6  By: _____                By: _/s/ Janet Chubb_____
       MICHAEL SCHMAHL, ESQ.                        JANET CHUBB, ESQ.
7      *Counsel for Dr. Gary Kantor, Mrs. Kantor*    *Counsel for Jones Vargas Direct Lenders*
       *and Kantor Nephrology 401K plan*

8  **Approved**/Disapproved by:                Approved/Disapproved by:

9

10 By: _/s/ George Davis_____                By: _____
       GEORGE DAVIS ESQ.                            DAVID COHEN, ESQ.
11     *Counsel for Compass Partners*               *Counsel for Sierra Liquidity Fund*

12

13 Approved/Disapproved by:                    Approved/Disapproved by:

14

15 By: _____                By: _____
       GREGORY J. WALCH ESQ.                        JEFFREY SYLVESTER, ESQ.
16     *Counsel for Gregory J. Walch and Shauna*    *Counsel for USA Commercial Real Estate*
   *M. Walch, Trustees of the Gregory J. and*   *Group*
17 *Shauna M. Walch Family Trust*

18

19 Approved/Disapproved by:                    Approved/Disapproved by:

20

21 By: _____                By: _____
       RUSSELL WALKER, ESQ.                         SUSAN SCANN, ESQ.
22     *Counsel for USA Investment Partners, LLC,*  *Counsel for Copper Sage Commercial*
   *Joseph Milanowski and Thomas Hantges*       *Center and Binford Medical Developers, LLC*

23

24 **Approved**/Disapproved by:                Approved/Disapproved by:

25 By: _/s/ Andrew Brumby_____               By: _____
       ANDREW BRUMBY, ESQ.                          WADE GOCHNOUR, ESQ.
26     R. VAUGHN GOURLEY, ESQ.                      ARYN M. FITZWATER, ESQ.
       *Counsel for Standard Property Development*  *Counsel for Liberty Bank*
27

28 / / /

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

In accordance with LR 9021, counsel submitting this document certifies as follows (check one):

\_\_\_ The court has waived the requirement of approval under LR 9021.

\_\_\_ No parties appeared or filed written objections, and there is no trustee appointed in the case.

_X_ I have delivered a copy of this proposed order to all counsel who appeared at the hearing, any unrepresented parties who appeared at the hearing, and any trustee appointed in this case, and each has approved or disapproved the order, or failed to respond, as indicated below [list each party and whether the party has approved, disapproved, or failed to respond to the document]:

**Failed to respond:**

WADE GOCHNOUR, ESQ.
SUSAN SCANN, ESQ.
RUSSELL WALKER, ESQ.
GREGORY J. WALCH ESQ.
JEFFREY SYLVESTER, ESQ.
DAVID COHEN, ESQ.
MICHAEL SCHMAHL, ESQ.
ROBERT LEPOME, ESQ.
ERIC FIELD, ESQ.
DEAN KIRBY, ESQ.
August B. Landis, Esq.

# # #

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

## EXHIBIT H-2

**Excerpts, Transcript of September 17, 2007 Hearing [D.I. 908]**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Chapter 11
                                    .
AMERICAN HOME MORTGAGE              .    Case No. 07-11047(CSS)
HOLDINGS, INC., a Delaware          .    (Jointly Administered)
corporation, et al.,                .
                                    .    Sept. 17, 2007 (12:08 p.m.)
          Debtors.                  .    (Wilmington)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          MR. WILAMOWSKY: Your Honor, I think that the

2     references in the representations and warranties,

3     particularly given the absence of a defined term on page 58,

4     is somewhat informative, and it informs the reading of the

5     provision on page 58.  Your Honor can agree with that or not,

6     but in either event, if we just look at 58, even on a

7     standalone basis, the use of the word "ceases" I think is in

8     fact a helpful term in this section that's not even contained

9     in the other section on the rest of the warranties because

10    the fact that Fannie Mae has said, Okay, on this interim

11    basis for this particular set of loans that you yourself,

12    American Home, owned as of a particular date, we're going to

13    call you approved, but we're not going to accept, and by the

14    expressed terms of our settlement with you, we're not going

15    to accept and you will not even try to sell us any loans that

16    you originate on a going-forward basis.

17          THE COURT: Well, that's a different - Now, let's,

18    okay.  So let's assume that Romanette 6 means servicer ceases

19    to meet the qualifications, Fannie Mae or Freddie Mac

20    servicer, and what that really means is in good standing,

21    eligibility requirements, et cetera, et cetera, as set forth

22    in the reps and warranty section.

23          MR. WILAMOWSKY: Okay.

24          THE COURT: Okay, let's assume that, but you're

25    making a different argument, I think, which is a more refined

1    argument which is that because they are a Freddie Mae
2    approved servicer for X, Y, and Z portfolio that Freddie Mae
3    owns, that doesn't mean that they're an approved servicer for
4    A, B, C portfolios including your portfolio.  And where is
5    there anything in this document that indicates that they have
6    to be an approved servicer on your portfolio?  Because the
7    way I read this document, and it makes a lot of sense, is
8    that you're using Freddie Mae and Freddie Mac as a proxy for
9    determining whether or not the debtors are in fact servicing
10   correctly, and it's also a market condition that everyone
11   uses in order to, as a proxy for or a substitute for having
12   to go and actually doing a detailed investigation about
13   what's going into debtor, we assume that agencies like
14   Freddie Mae and Freddie Mac are doing that for us.  The
15   market assumes that, it makes a lot of sense, you know, the
16   cost of doing business goes down, but I don't see anything in
17   this document that says it has to be an approved Freddie Mac,
18   Freddie Mae servicer on your portfolio.

19            MR. WILAMOWSKY: It's not even the case that it is
20   approved on the debtors' going-forward portfolio.  It's a
21   specific that's not even in all the debtors' loans.  If, Your
22   Honor, there was one loan and with respect to that one loan,
23   Fannie Mae said that, Okay, we're going to call that, you
24   know, you're Fannie Mae approved as to the servicing of that
25   particular loan.  I don't think even the debtors would be up

1    tracking the sale, because we don't know how many more times

2    the sale may be moved.  We don't know if the lenders are

3    going to agree to extend beyond October 31st, and we're being

4    asked to track the sale, that's exactly what we're trying to

5    avoid, Your Honor.  That's all.

6            THE COURT: Okay.  Thank you.  All right.  I'm going

7    to deny the motion without prejudice.  The movant has gone

8    forward on two bases indicating that they have cause for

9    relief from the automatic stay, as I understand it.  One,

10   that they're unable to sell the loans in this portfolio as a

11   result of the fact that the debtor is not a Fannie Mae

12   approved servicer, and there was testimony to this effect by

13   the movant's witness.  However, there was also testimony by

14   the debtors' witness that even if - assuming arguendo whether

15   or not - we'll get to the point about whether or not they're

16   a Fannie Mae approved servicer or not in a minute, but even

17   sort of aside from whether or not the default has been cured,

18   even if the debtors were an approved Fannie Mae servicer, at

19   this time that these loans, first of all, were never subject

20   to securitization in the vast majority of the case over 1,659

21   loans to six, which gives you about .4 percent in connection

22   with the Alt-A loans and by value just a hair over one

23   percent.  The vast bulk of this portfolio was never

24   securitizable or subject to securitization, to use an actual

25   English word, and second, that regardless of that, even if

1    you look at it from a wholesale loan prospective, the current

2    market is such that these loans are simply not saleable, and

3    I find the debtors' witness to be more persuasive on these

4    points than I find the movant's witness, and as a result, the

5    Court finds that at least as the facts present themselves

6    right now, the aspect of whether or not the debtor is a

7    Fannie Mae approved servicer is having no affect on whether

8    or not the movant is able to sell or securitize these loans

9    so there's no cause for relief from the automatic stay in

10   that connection.  The second point is that there's an ongoing

11   continuing breach of the agreement that is not being cured

12   because Fannie Mae is in fact - excuse me, the debtors are in

13   fact not a Fannie Mae approved or Fannie Mae qualified

14   servicer.  And again, I reject that argument based on the

15   facts in front of me.  First, with regard to the fact that

16   the settlement agreement is between the parent company and

17   Fannie Mae as opposed to the servicing company and Fannie

18   Mae.  We dealt with this in argument but just to incorporate

19   my comments from there, the Fannie Mae agreement that's being

20   settled, i.e., the agreement under which the servicer is a

21   qualified Fannie Mae servicer is an agreement between the

22   parent company and Fannie Mae, is what the evidence is in

23   front of me today, so it's not at all surprising that the

24   settlement agreement is between the actual parties to the

25   contract.  And this has been the situation for the life of

1    the loan. So, three years down the road, I'm not going to

2    hear - I think it rings hollow to complain that they haven't

3    cured a default when there was no default ever to cure and

4    that the servicer was never party to the contract. So I

5    think the fact that it's an agreement between the parent

6    company and Fannie Mae as opposed to the servicer and Fannie

7    Mae is neither here nor there, so then the issue becomes

8    whether that agreement is sufficient to make the debtors a -

9    and let me get the language right. "Whether the servicer has

10   ceased to meet the qualifications of either a Fannie Mae or a

11   Freddie Mac seller/servicer", which is on page 58 of the

12   underlying agreement. If you look back at the settlement

13   agreement between the debtors and Freddie Mae, I think that's

14   taken care of quite plainly by paragraph (1) of the

15   settlement agreement that provides that the company shall be

16   deemed an approved Fannie Mae servicer on an interim basis

17   during the term of this agreement. So it is subject to some

18   future termination, which is one of the many reasons that the

19   motion is being denied without prejudice, but as we sit here

20   today, the debtor is a qualified - or qualifies as a Fannie

21   Mae servicer. So I don't think that the debtors - or excuse

22   me, the movants have established that there's an ongoing

23   continuing breach of the agreement that has not been cured. I

24   think there was, in all likelihood, a breach, at least for

25   some time, but that that has been cured by the settlement and

1    although it is subject to arising again in the event that the

2    interim agreement expires or the settlement agreement

3    expires, we're not here today at this point.  In addition, I

4    don't really believe I heard any evidence from the movant as

5    to how they're not being amicably protected, and I think for

6    many of the reasons that I previously found in connection

7    with the Credit Suisse matter that the movant is in fact

8    adequately protected, at least in the interim, with the

9    ongoing sales process, with the institution of cash

10   collateral and DIP financing motions that have been put in

11   place by the debtors, and the cash management system that's

12   in place, and the ongoing servicing of these loans. There's

13   been no evidence whatsoever that the servicer isn't doing

14   what it's actually contractually required to do, which is

15   service the agreement as opposed to what DB wants it to do,

16   which is somehow make sure that there's a market for DB to

17   sell these loans.  That is, obviously, the point of the

18   entire exercise, but I don't think it's fair to the debtors,

19   frankly, to put more on their plate than they're actually

20   contractually required to do, certainly in the context of

21   adequate protection.  They're servicing the loans.  There's

22   no indication that they're not servicing the loans.  So, for

23   those reasons I am denying the motion without prejudice.

24   Obviously, to the extent that the facts change, that Fannie

25   Mae terminates the debtor as a qualified servicer, to the

```
1    extent that the market actually improves and there becomes a

2    market to either sell or securitize these assets and the

3    debtors' bankruptcy is in some way impairing DB's rights to

4    do that, I think that would change the facts that are in

5    front of the Court, and I may be inclined to grant stay

6    relief or at least require adequate protection, but those

7    facts aren't in front of me for today's purposes.  And I ask,

8    could the debtor submit a form of order, please.

9           MR. DORSEY: Yes, Your Honor, thank you.

10          THE COURT: All right.

11          MR. BOWDEN: Your Honor, again for the record, Bill

12   Bowden for DB Structured Products.  Two things, Your Honor.

13   First, if I may ask Mr. Dorsey to send me a copy of the

14   proposed order he submits to Your Honor I'd be gratefully -

15          THE COURT: Yeah, circulate it amongst counsel and

16   then before you submit it under certification.

17          MR. DORSEY: We'll submit it with a certificate of

18   no objection, Your Honor.

19          MR. BOWDEN: Thank you, Your Honor, and thank you,

20   Mr. Dorsey.  And second, Your Honor, could we be excused for

21   the balance of the hearing.

22          THE COURT: Yes.

23          MR. BOWDEN: Thank you.

24          MR. WILAMOWSKY: Thank you, Your Honor.

25          THE COURT: Just give us a few seconds to allow - we
```

## EXHIBIT H-3

## Opinion, In re Fleming Cos.

Case No. 03-10945 (MFW), D.I. 6916 (Bankr. D. Del. Feb. 27, 2004)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FLEMING COMPANIES, INC., et al. | ) | Case No. 03-10945 (MFW) |
| Debtors. | ) | |
| | ) | |
| | ) | |

### OPINION[1]

Before the Court is the Debtors' Motion to assume and assign two Facility Standby Agreements ("the FSAs") it has with Albertson's, Inc., to Associated Wholesale Grocers, Inc. ("AWG"). Albertson's opposes the Motion. For the reasons set forth below, we deny the Motion with respect to the Tulsa FSA and grant the Motion with respect to the Lincoln FSA.

I.    FACTUAL BACKGROUND

On April 1, 2003, Fleming Companies, Inc., and several of its affiliates ("the Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code. At that time, the Debtors were in the wholesale grocery distribution business, the retail

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

1

grocery business and the convenience store distribution business.
Shortly after filing the petition, the Debtors consummated a sale
of their retail grocery business.

Prior to and subsequent to the filing of their petitions,
the Debtors had severe financial difficulties and, as a result,
were unable to fully perform their wholesale grocery distribution
supply agreements with their customers.  Consequently, numerous
customers, including Albertson's, filed motions seeking relief
from the stay to terminate those agreements.  A hearing was held
on the Albertson's Motion on August 13, 2003, at which time we
denied the motion conditioned on the Debtors deciding to assume
or reject the FSAs within thirty days.

In the interim, the Debtors marketed their wholesale grocery
distribution business.  On July 11, 2003, the Debtors filed a
Motion for authority to sell that business to C&S Wholesale
Grocers, Inc., and C&S Acquisition LLC (collectively "C&S").
After bidding procedures were approved and an auction conducted,
C&S was approved as the purchaser of the Debtors' wholesale
grocery distribution business assets.  Pursuant to the sale, C&S
was permitted to designate another purchaser for certain assets.
C&S designated AWG as the purchaser of the Albertson's FSAs.  On
September 3, 2003, the Debtors filed a motion to assume and
assign the FSAs to AWG.  Albertson's opposed that motion and a

2

hearing was held on December 4, 2003.  The parties have filed post-trial briefs.


## II.   JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(A), (G), (M), (N), and (O).


## III. DISCUSSION

The decision to assume or reject an executory contract is a matter within the sound business judgment of the debtor.  See, e.g., In re Taylor, 913 F.2d 102 (3d Cir. 1990).  Once the debtor has established a sound business reason to assume the contract, however, the debtor must comply with the requirements of section 365.  Section 365 provides, in relevant part:

> (a) [T]he trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.
> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

3

> (C) provides adequate assurance of future
> performance under such contract or lease.
>
>                            . . .
>
> (f)(2) The trustee may assign an executory contract or
> unexpired lease of the debtor only if –
>> (A) the trustee assumes such contract or lease in
>> accordance with the provisions of this section;
>> and
>> (B) adequate assurance of future performance by
>> the assignee of such contract or lease is
>> provided, whether or not there has been a default
>> in such contract or lease.

11 U.S.C. § 365. Here, the Debtors and AWG seek a determination

that the Debtors' assumption and assignment of the FSAs complies

with the requirements of section 365. Albertson's contends that

the FSAs cannot be assumed and assigned because the Debtors and

AWG cannot comply with the requirements of section 365.

Before an executory contract may be assigned, the debtor

must first assume the contract and provide adequate assurance of

future performance. See 11 U.S.C. §§ 365 (b)(1)(A) & (f)(2)(A).

Adequate assurance provides the non-debtor party with needed

protection because assignment relieves the debtor and the

bankruptcy estate from liability for breaches that occur after

the assignment. Determining whether an assignee has provided

adequate assurance is a fact-based inquiry that focuses on the

specific facts of the proposed assignment. See Cinicola v.

Scharffenberger, 248 F.3d 110 (3d Cir. 2001).

4

A.   <u>Tulsa FSA</u>

Albertson's asserts that the Debtors cannot assume and assign the Tulsa FSA because that would result in a modification of material provisions of the FSA.   Section 365 requires that when a debtor assumes and assigns a contract the express terms of that contract cannot be modified.   <u>Cinicola</u>, 248 F.3d at 119-20.

> An assignment does not modify the terms of the underlying contract.   It is a separate agreement between the assignor and the assignee which merely transfers the assignor's contract rights, leaving them in full force and effect as to the party changed.   An assignment is intended to change only who performs an obligation, not the obligation to be performed.

<u>Medtronic Ave., Inc. v. Advanced Cardiovascular Sys., Inc.</u>, 247 F.3d 44, 60 (3d Cir. 2001) (citations omitted).

Albertson's contends that AWG cannot satisfy the express terms of the Tulsa FSA because AWG cannot supply Albertson's Oklahoma stores from the Tulsa Facility.   In fact, Albertson's asserts that AWG's decision to direct the Debtor to reject the Tulsa Facility lease makes it impossible for AWG to fulfill the express requirements of the Tulsa FSA.   Thus, allowing assumption and assignment would impermissibly modify the terms of the Tulsa FSA.

AWG asserts that Albertson's position is without merit because fulfilling the Tulsa FSA from another warehouse will not

5

have an adverse effect on Albertson's nor impact AWG's ability to perform the Tulsa FSA.  AWG contends that the "important feature of the bargain" is "the timely delivery of virtually all of its food and related products," which will not be affected by the closing of the Tulsa Facility.  Albertson's disagrees with AWG's assertions.  AWG proposes to supply Albertson's Oklahoma stores from its Oklahoma City warehouse.  Albertson's argues that this warehouse is further away from the Debtor's Tulsa Facility and, since the FSA provides that Albertson's pays the freight costs from the warehouse to its stores, this will increase Albertson's costs.  AWG argues, however, that utilizing its Oklahoma City warehouse will not increase Albertson's freight costs.  Since Albertson's has approximately the same number of stores in Oklahoma City and Tulsa, AWG contends that any increase in the freight costs associated with supplying Albertson's Tulsa stores will be offset by a reduction in the freight costs associated with supplying Albertson's Oklahoma City stores.

We disagree with AWG's assertion that this should be the focus of our analysis.  Section 365 provides that a debtor's assumption and assignment cannot modify an agreement's express terms; it does not require the other party to the contract to agree to changes, even if the overall impact lowers its costs.

6

Nor should the court consider only the "important feature of a bargain" or determine whether the parties will be adversely impacted by an assignment. See 11 U.S.C. § 365. The contract must be assigned and enforced according to its terms. Cinicola, 248 F.3d at 119-20.

We must look to Oklahoma law to interpret the Tulsa FSA.[2] Oklahoma law provides that a contract must be considered as a whole so as to give effect to all of its provisions. Mercury Inv. Co. v. F.W. Woolworth Co., 706 P.2d 523, 529 (Okl. 1985) (citing 15 O.S. 1981 §157). Although the court must interpret a contract so as to give effect to the intent of the parties at the time the contract was formed, parol evidence cannot be used unless fraud or mistake is involved in pre-contract negotiations. Mercury, 706 P.2d at 529. Therefore, where a contract is complete and unambiguous, its express language is the only legitimate evidence of the parties' intent. Id.

After reviewing the Tulsa FSA, we conclude that fulfillment from the Tulsa Facility is an essential element of the agreement. In fact, the Tulsa FSA references this requirement on five separate occasions. Since AWG cannot fulfill these provisions, this Motion cannot be granted.

---

[2]   Both FSAs provide that they are to be governed by and construed in accordance with the laws of Oklahoma.

7

AWG contends that section 2-614 of the Oklahoma Commercial Code excuses the requirement that it fulfill the Tulsa FSA from the Tulsa Facility.  12A Okla. Stat. Ann. § 2-614(1). Specifically, AWG asserts that section 2-614 provides that where a commercially reasonable substitute is available, failure to ship from a particular location cannot constitute a material breach of an agreement.  (Post Hearing Brief of AWG in Support of Debtors' Motion to Assume and Assign at 10.)  However, AWG refers to only part of section 2-614, ignoring a crucial detail. Section 2-614 provides that "[w]here <u>without fault of either party</u> the agreed berthing, loading, or unloading facilities fail . . . but a commercially reasonable substitute is available, such substitute performance must be tendered and accepted."  12A Okla. Stat. Ann. § 2-614(1) (emphasis added).  Here, the Tulsa Facility did not become unavailable without fault of either party. Pursuant to the sale, AWG (through C&S) could choose which contracts the Debtors would assume and assign to it.  AWG could have directed the Debtors to assume and assign the Tulsa Facility to it.  Instead, AWG chose not to acquire the rights to the Tulsa Facility and directed the Debtors to reject that lease.  Thus, even if there is a "reasonable substitute," we conclude that AWG is not "without fault."  Section 2-614 does not excuse AWG from

8

fulfilling the Tulsa FSA from the Tulsa Facility.  Since AWG is
not able to perform the Tulsa FSA according to its terms, we
conclude that the Motion to assume and assign the Tulsa FSA must
be denied.

B.   Lincoln FSA

AWG presented significant evidence to establish adequate
assurance of its ability to satisfy the Lincoln FSA.  First, AWG
established that it has the size, expertise and experience in the
wholesale grocery distribution business.  AWG is the fourth
largest grocery wholesaler in the United States, serving over
1,300 individual supermarkets.  Through the course of this
bankruptcy case, AWG has already begun serving approximately 490
stores previously serviced by the Debtors, including a 16 store
Nebraska chain with annual sales over $175 million.  Second, AWG
has the capacity to service Albertson's eleven Nebraska stores.
Mr. Rand of AWG testified about AWG's capacity levels and its
ability to maintain the contractual service levels required by
the Lincoln FSA from its Kansas City warehouse.

In its brief, Albertson's contends that AWG cannot assume
and assign the FSAs because AWG cannot provide adequate assurance
of its ability to purchase, stock and ship Albertson's private
label merchandise.  AWG argues (and Albertson's concedes),

9

however, that the Lincoln FSA does not require the Debtors to purchase, stock and ship its private label goods. Therefore, that does not preclude the assumption and assignment of the Lincoln FSA to AWG. Nonetheless, AWG presented evidence that it was able to supply Albertson's with its private label goods.

Albertson's contends, however, that AWG cannot provide adequate assurance because it does not intend to fulfill the Lincoln FSA. To support this position, Albertson's asserts that AWG has not really assumed any of the other facility standby agreements that it purchased from the Debtors, but has instead required that each grocer execute new supply agreements on different terms.

Although AWG has apparently renegotiated every contract it was assigned, this does not establish its inability to satisfy the requirements of the Lincoln FSA in this case. As discussed in depth above, section 365 requires the assignee to assume all contractual obligations. By assuming the Lincoln FSA, AWG is bound by its terms. AWG will not be able to supply Albertson's under different terms unless Albertson's itself agrees to a new wholesale grocery distribution agreement. Despite Albertson's contention, we find that AWG has established that it is ready, willing and able to satisfy the Lincoln FSA as written and has

10

established its ability to fulfill all of its obligations.
Accordingly, we conclude that AWG has provided adequate assurance
of future performance of the Lincoln FSA.

C.   Ability to Cure

Albertson's also contends that the Debtors cannot assume and
assign the FSAs because they are unable to cure the material,
non-monetary defaults under the agreements.  While the parties
have agreed that the Court should not reach a determination on
the actual cure amount at this time, we must determine whether
the Debtors' default under the Lincoln FSA is curable to conclude
that the contract may be assumed and assigned.

Albertson's asserts that the Debtors' prior failure to
fulfill their contractual obligations caused Albertson's to
suffer considerable harm that cannot be compensated.  Section 365
provides that a debtor cannot assume an executory contract on
which there has been a default unless it cures or provides
adequate assurance that it will promptly cure such default.  11
U.S.C. §365(b)(1)(A).  Despite disagreement regarding when the
Debtors originally breached the FSAs, and the extent of that
breach, the parties do not dispute that the Debtors did breach
the FSAs.

11

Albertson's contends that the Debtors' failure to satisfy the service levels and product dating requirements caused Albertson's to suffer irreparable harm including: an erosion of customer support, a drop in employee morale, a disruption in the Albertson's Ft. Worth Facility and corporate headquarters, and lower sales and profits. While Albertson's originally filed a proof of claim to estimate the damages, it now contends that the damages cannot be quantified with certainty because these were incurable non-monetary damages. AWG disagrees with Albertson's assertion that the Debtors' breach is incurable. Specifically, AWG contends that the asserted damages are curable by the payment of money damages.

We agree with AWG that Albertson's alleged damages are curable. Our conclusion is supported by the fact that Albertson's originally filed a proof of claim estimating in damages suffered as a result of the Debtors' breach at approximately $4 million. Although Albertson's no longer asserts that claim, because it could not quantify the damages with "exacting certainty," it continues to assert that the Debtors' defaults have caused it serious economic harm. We find that there is nothing unique about Albertson's damages that render them incurable. They are normal damages arising from the breach

12

of a supply agreement.  Our conclusion is bolstered by Albertson's conduct following the Debtors' breach.  When Albertson's began self-supplying its stores, thereby incurring the asserted damages, Albertson's deducted the costs associated with its self-supplying from monies it owed to the Debtors.  This confirms its ability to calculate the damages caused by the Debtors' breach.  Accordingly, we conclude that the alleged damages can be quantified and cured by prompt payment.

IV.  CONCLUSION

For the foregoing reasons we grant in part and deny in part the Debtors' Motion to Assume and Assign the FSAs.

An appropriate Order is attached.

BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

Dated: February 27, 2004

13

**EXHIBIT H-4**

**Order, In re Fleming Cos.,**

Civ. No. 04-371-SLR, D.I. 20 (D. Del. Mar. 30, 2005)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:                                ) | |
|                                       ) | Chapter 11 |
| FLEMING COMPANIES, INC., et al.,      ) | |
|                                       ) | Case No. 03-10945-MFW |
|          Debtors.                     ) | |
| _____) | |
|                                       ) | |
| AWG ACQUISITION, LLC, et al.,         ) | |
|                                       ) | |
|          Appellants,                  ) | |
|                                       ) | |
|      v.                               ) | Civ. No. 04-371-SLR |
|                                       ) | |
| FLEMING COMPANIES, INC. and           ) | |
| ALBERTSON'S INC.,                     ) | |
|                                       ) | |
|          Appellees.                   ) | |

**O R D E R**

At Wilmington this 30th day of March, 2005, having reviewed the appeal filed by AWG Acquisition, LLC, and the papers filed in connection therewith;

IT IS ORDERED that said appeal is denied and the decision of the bankruptcy court dated February 27, 2004 is affirmed, for the reasons that follow.

1.    **Standard of review.** This court has jurisdiction to hear an appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a). In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions. See Am. Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76, 80 (3d Cir. 1999). With mixed

questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 642 (3d Cir. 1991) (citing Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir. 1981)). The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a de novo basis bankruptcy court opinions. In re Hechinger, 298 F.3d 219, 224 (3d Cir. 2002); In re Telegroup, 281 F.3d 133, 136 (3d Cir. 2002).

2. **Question presented.** Did the bankruptcy court err when it denied the debtors' motion to assume and assign the Tulsa Facility Standby Agreement ("Tulsa FSA")?

3. **Background facts.** In July 2003, debtors at bar sold their wholesale grocery distribution business assets to C&S Wholesale Grocers, Inc. and C&S Acquisition LLC (collectively, "C&S"). Pursuant to the sale, C&S was permitted to designate another purchaser for certain assets. C&S designated AWG as the purchaser of the Tulsa FSA. In September 2003, the debtors filed a motion to assume and assign the Tulsa FSA to AWG. Albertson's Inc., a customer of debtors and a party to the Tulsa FSA,

2

objected.

4.   By the Tulsa FSA, debtors committed to "supply to Albertson's a certain amount of food, grocery, and related products". Debtors committed to do so through "certain resources, including capital, employees, inventory, equipment, and facilities".[1]   (D.I. 14, ex. 1, ¶ (iv))  Specifically, debtors committed to supply "food, grocery, meat, perishables and other related products, supplies and merchandise . . . as provided in the Special Fleming FlexPro/FlexStar Marketing Plan described below to Albertson's in quantities sufficient to allow Albertson's to purchase the Estimated Purchase Level described in Section 3 of this Agreement **from the Tulsa Facility.**"  (D.I. 14, ex. 1, ¶ 1)(emphasis added)  Moreover, the products sold to Albertson's pursuant to the Tulsa FSA were to be "priced, and other terms of sale [were to] be established, in accordance with the Special Fleming FlexPro/FlexStar Marketing Plan for Albertson's Stores Supplied **by the Tulsa Facility**".  (D.I. 14, ex. 1, ¶ 2)(emphasis added)  The term of the Tulsa FSA was to continue "until the later of (i) five (5) years following the Effective Date; or (ii) the date upon which Albertson's has purchased one billion one hundred fifty five million dollars ($1,155,000,000) of Products **from the Tulsa Facility**".  (D.I. 14,

---

[1]By a concurrent transaction, debtors acquired Albertson's Tulsa, Oklahoma warehouse, designated as "the Tulsa Facility". (D.I. 14, ex. 1, ¶ (iii))

3

ex. 1, ¶ 4)    The "Special Fleming FlexPro/FlexStar Marketing Plan for Albertson's Stores Supplied by Tulsa" ("the Plan") was attached to the Tulsa FSA as Exhibit B.    Attachment A to the Plan set forth the charges associated with the Plan.    The "Fixed Charge" included property rent and property tax payable by debtors for the Tulsa Facility.    (D.I. 14, ex. 1)

5.    **Analysis.**    As correctly noted by the bankruptcy court, once a debtor has established a sound business reason to assume an executory contract, the debtor must comply with the requirements of 11 U.S.C. § 365.    Among those requirements is that the debtor provide adequate assurance of future performance. See 11 U.S.C. §§ 365(b)(1)(A) and (f)(2)(A).    Determining whether a debtor has provided adequate assurance is a fact-based inquiry that focuses on the specific facts of the proposed assignment. See Cinicola v. Scharffenberger, 248 F.3d 110 (3d Cir. 2001).

6.    The bankruptcy court, therefore, started with the premise that a contract must be assigned and enforced according to its terms.    See Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 60 (3d Cir. 2001).    The court determined, through its fact-based inquiry, that use of the Tulsa Facility was an essential provision of the Tulsa FSA.    The court then reasoned that AWG, which had directed the debtors to reject the Tulsa Facility lease, could not fulfill the express requirements of the Tulsa FSA.    The court concluded that

permitting permit AWG to supply Albertson's through its own channels of supply would impermissibly modify the terms of the Tulsa FSA.

    7.   I see no error in this reasoning.[2]


                                         _____
                                         United States District Judge

---

[2]I note, as did the bankruptcy court, that Oklahoma law (the law governing the Tulsa FSA) is consistent with this reasoning, as it provides:

> (1)   Where without fault of either party the agreed berthing, loading, or unloading facilities fail or an agreed type of carrier becomes unavailable or the agreed manner of delivery otherwise becomes commercially impracticable but a commercially reasonable substitute is available, such substitute performance must be tendered and accepted.

12A Okla.St.Ann. § 2-614(1).  The annotation to this statute explains that "Oklahoma has previously been very strict in holding that the parties are bound by the terms of the agreement."  Therefore, "[t]here must . . . be a true commercial impracticability to excuse the agreed to performance and justify a substituted performance."  Here, the agreed to facility is not available only because debtors, a party to the Tulsa FSA, made the Tulsa Facility unavailable by rejecting the lease.  I agree with the bankruptcy court that these circumstances do not justify the substituted performance requested by debtors.