UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------x
In re                                                                                    Chapter 11

AMERICAN HOME MORTGAGE HOLDINGS,              Case No. 07-11047 (CSS)
INC., *et al.*,[1]                                                             (Jointly Administered)

                                                   Debtors.
-------------------------------------------------------------------x

### RESPONSE AND JOINDER OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' OMNIBUS RESPONSE TO CERTAIN OBJECTIONS TO THE SALE OF THE DEBTORS' LOAN SERVICING BUSINESS

The Official Committee of Unsecured Creditors (the "*Committee*") of the above-captioned debtors and debtors-in-possession (the "*Debtors*"), by and through its counsel, hereby responds and joins in the Debtors' omnibus response (the "*Omnibus Response*") to certain objections (the "*Objections*") to the sale of the Debtors' loan servicing business, and in support thereof respectfully states as follows:

### JOINDER AND RESPONSE

1.       The Committee hereby adopts and incorporates herein substantially all the arguments and assertions set forth in the Omnibus Response and reserves all rights to be heard before this Court with regard to the Omnibus Response and the Objections.  For purposes of brevity, the Committee will not repeat in this Joinder and Response each of the arguments raised in the Omnibus Response, but instead will focus on and provide additional support for the Debtors' argument that the Court should sever the provisions and agreements relating to loan servicing from those related to loan sales.  Assuming this Court concludes that the contracts

---

[1] The Debtors in these cases are: AHM Holdings; American Home Mortgage Investment Corp.; American Home Mortgage Acceptance, Inc.  ("*AHM Acceptance*"); American Home Mortgage Servicing, Inc.  ("*AHM Servicing*"); American Home Mortgage Corp.  ("*AHM Corp.*"); American Home Mortgage Ventures LLC; Homegate Settlement Services, Inc.; and Great Oak Abstract Corp.

giving rise to the Debtors' mortgage servicing rights (the "Servicing Agreements")[2] are considered executory contracts, the Committee respectfully supplements the Omnibus Reply and submits that the Servicing Agreements can be severed from all other agreements relating to the sale and/or securitization of the underlying mortgage loans (the "Other Agreements")[3] and thus be assumed and assigned free and clear of any obligations under such Other Agreements.

        2.        As explained in the Omnibus Reply, "in order to assume a particular executory contract . . . , the debtor is *only* required to perform under that discrete contract . . . , not under other, substantially unrelated agreements." United Air Lines, Inc. v. U.S. Bank Trust Nat'l Ass'n (In re UAL Corp.), 346 B.R. 456, 467 (Bankr. N.D. Ill. 2006); see also Shaw Group, Inc. v. Bechtel Jacobs Co. (In re IT Group, Inc.), 350 B.R. 166, 177 (Bankr. D. Del. 2006). The Bankruptcy Courts in both UAL Corp. and IT Group, Inc., elucidated that this principle applies where "distinct agreements are set out in the same document" (Stewart Title Guaranty Co. v. Old Republic Nat. Title Insurance Co., 83 F.3d 735, 741 (5th Cir. 1996)), as well as "where distinct agreements are linked by a cross-default clause" (Lifemark Hospitals, Inc. v. Liljeberg Enters. (In re Liljeberg Enters.), 304 F.3d 410, 444-45 (5th Cir. 2002)). Hence, regardless of whether the Servicing Agreements are Embedded Servicing Agreements or Stand-Alone Servicing

---

[2] As defined in the Omnibus Response, the Servicing Agreements are comprised of the Embedded Servicing Agreements and Stand-Alone Servicing Agreements. The Embedded Servicing Agreements are servicing agreements embedded in other documents and arise from mortgage loans sold by AHM Corp./AHM Acceptance on a servicing-retained basis whereby AHM Servicing retained the right to service such mortgages on the terms set forth in relevant subsection(s) of the Mortgage Loan Purchase and Servicing Agreements ("MLPSAs"). The Stand-Alone Servicing Agreements are traditional independently documented servicing agreements. A number of the Stand-Alone Servicing Agreements relate to securitization transactions; this type of servicing agreement is typically cross-defaulted with other agreements executed in connection with the securitizations (collectively, the "Securitization-Related Agreements").

[3] As defined in the Omnibus Response, the Other Agreements are the Securitization-Related Agreements and non-servicing related provisions of the MLPSAs and related agreements.

Agreements, the Debtors need only cure defaults arising from the underlying Servicing Agreements, not the Other Agreements.[4]

      3.      Applicable case law holds that in determining whether an agreement is severable or whether two agreements are economically interdependent such that the agreements must be assumed in whole, a court should examine whether (i) the consideration supporting each agreement is apportionable, (ii) the agreements address different subject matters and have different objectives, and (iii) the agreements obligate different parties.  See In re Integrated Health Serv., Inc., 2000 Bankr. Lexis 1310, at *9-15 (Bankr. D. Del. July 7, 2000); see also Monument Square Associates, Inc. v. The Resolution Trust Corp., 792 F. Supp. 874 (D. Mass. 1991).

      4.      Application of the three Integrated Health Serv. factors to the facts presented here inexorably leads to the conclusion that the Servicing Agreements are severable and independent from the Other Agreements.  First, the consideration received by the Debtors for servicing mortgage loans under the Servicing Agreements, i.e., the monthly fees owed for servicing of the underlying mortgage loans, is separate and distinct from the proceeds received by the Debtors from the sale, packaging, and/or securitization of the mortgage loans under the Other Agreements.  Second, the subject matter and objectives of the Servicing Agreements, i.e., the servicing of mortgage loans, are separate and distinct from those of the Other Agreements, which address the sale, packaging, and/or securitization of such underlying loans.  Finally, while AHM Corp. was typically the seller of the loans in the Other Agreements, AHM Servicing, a separate entity, was the servicer of the loans in a typical Servicing Agreement.  Thus, all three factors for severability in Integrated Health Serv. are satisfied here.

---

[4] The Committee reserves its rights to assert that any such cure obligations must be paid from the proceeds of the sale, and not be borne by the Debtors' estates.

5.      Indeed, the Committee submits that severability of the Servicing

Agreements to permit their assignment and assumption pursuant to Section 365 of the

Bankruptcy Code (assuming the Court first finds they are executory contracts), separate and

apart from the loan purchasing and financing components of the transaction, is the only

reasonable conclusion that the Court can make.  Such a conclusion would be consistent with both

(i) the public policy behind the Bankruptcy Code's grant of a breathing spell for debtors and

preservation of assets of the estate through the imposition of the automatic stay and (ii) the

competing public policy underlying the recent amendments to the Bankruptcy Code to protect

the liquidity of the financial markets by extending safe-harbor protection to cover very specific

transactions, such as the transfer of mortgage loans, under enumerated agreements, including

repurchase agreements and securities contracts.  Since the"[e]xemptions to the stay, … should be

read narrowly to secure the broad grant of relief to the debtor" (Stringer v. Huet (In re Stringer),

847 F.2d 549, 552 (9th Cir. 1988)), and the protections afforded by the safe-harbor provisions of

Bankruptcy Code § 555 should be narrowly construed as well, denying the severability of the

Servicing Agreements, as advocated by certain counter-parties, could destroy the very

protections that the Objectors seek to preserve.  See Equibank, N.A. v. Wheeling-Pittsburgh

Steel Corp., 884 F.2d 80, 85 (3[d] Cir. 1989) (denying safe-harbor protection under Bankruptcy

Code § 546 for post-petition perfection of a lien in an interest that was not created prior to

bankruptcy, stating that the legislative history makes it clear that the safe-harbor provision

"should be narrowly construed").

6.      As the Servicing Agreements themselves do not qualify as a "securities

contract" under the definition of Bankruptcy Code § 741(7), the other portions of the MLPSAs

may lose the protection under the safe-harbor provisions of section 555 of the Bankruptcy Code

absent severability.[5]  Cf. Kipperman v. Circle Trust (In re Grafton Partners, L.P.), 321 B.R. 527 (B.A.P. 9th Cir. 2005) (where the transaction at issue did not meet the clear statutory definition of a "settlement payment" under Bankruptcy Code § 741(8), it was not entitled to protection from the avoiding powers of the trustee under Bankruptcy Code § 546(e)).  The position espoused by certain Objectors that the Servicing Agreements should somehow be shoe-horned into the definition of a securities contract could substantially eliminate the protections provided for securities contracts because, if the Objectors are correct, the Court would have to carefully analyze each agreement to determine if, taken as a whole, the agreement meets the narrowly-construed Bankruptcy Code § 741(7) definition before allowing the relief provided under the "safe-harbor" provisions.  This potentially could eviscerate the protections sought to be afforded securities contracts under the recent amendments to the Bankruptcy Code.  In contrast, if the Court were to find that the Servicing Agreements are severable[6], the non-debtor parties may be entitled to seek the benefits provided under the "safe-harbor" provisions for those portions of the agreements that specifically qualify as a "securities contract" under the express language in the section 741(7) definition, while the severable portions of the agreements that do not fall within the section 741(7) definition of a "securities contract" would be subject to the same treatment under the Bankruptcy Code as any other contract.

---

[5] Section 555 of the Bankruptcy Code provides a safe-harbor exception to the automatic stay for certain qualified parties to a securities contract as defined by section 741(7) of the Bankruptcy Code.  Notwithstanding the provisions in Bankruptcy Code § 365(e)(1), section 555 allows such qualified parties to exercise their contractual rights against a debtor party to cause the liquidation, termination or acceleration of the securities contract in the event of a default.  Servicing mortgage loans is not one of the subjects listed under the definition of a "securities contract."  See Bankruptcy Code § 741(7).

[6] Given Congress' awareness of servicing agreements (see Bankruptcy Code § 541(d)), the fact that servicing of a mortgage is not included within the definition of "securities contract" in section 741 (or any of the sections 555-561 safe-harbor provisions) is a clear indication that Congress did not intend for servicing agreements to be included in any of the safe-harbor provisions, whether individually or a part of some master agreement.  This result also dictates that this Court should reject any assertion that a servicing agreement was terminated post-petition due to the filing of the Debtors' Chapter 11 Cases, as any provision in a servicing agreement triggering a default based on the commencement of a bankruptcy case is unenforceable.

7. Bankruptcy Code § 541(d) provides further support for the argument that Congress did not intend to exempt the servicing of mortgage loans from the provisions of the automatic stay. There, Congress explicitly recognized the existence of agreements to "service or supervise the servicing of [] mortgage[s]" and specifically addressed whether such interests are considered property of the estate. The fact that Congress specifically identified and addressed servicing agreements, no different from the Servicing Agreements here, but decided not to include loan servicing or servicing agreements in the safe-harbor provisions of sections 555 and 741 clearly demonstrates Congress' intention to decline to grant safe-harbor protection to the **servicing** of mortgage loans, as opposed to the "**purchase, sale or loan** of … a mortgage loan or any interest in a mortgage loan …." Bankruptcy Code § 741(7) (**emphasis added**). See Jama v. Immigration and Customs Enforcement, 543 U.S. 335, 341 (2005) ("[w]e do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest").

8. Concluding that these are single integrated documents could subject each of the agreements to the automatic stay and render any *ipso facto* clauses in such agreements unenforceable. This cannot be the result the Objectors are seeking, as it could potentially have a devastating affect on the financial markets by essentially neutering the safe-harbor protections embodied in the Bankruptcy Code with respect to the purchase, sale or financing of a mortgage loan on a servicing-retained basis. However, the significant public policy of protecting the financial markets in a manner consistent with the equally important policy underlying the automatic stay can be furthered by a finding that the Servicing Agreements are severable.[7]

---

[7] The legislative intent in incorporating the original version of section 555 and the other safe harbor provisions in the Bankruptcy Code was to "minimize the displacement caused in the commodities and securities markets in the

9. Bankruptcy Code § 741(7)(A) is an example of the principle of severability being codified. While Bankruptcy Code § 741(7)(A) lists various types of agreements that can qualify as a "securities contract," including a master agreement that includes securities contracts and non-securities contracts, section 741(7)(A)(viii) specifically notes that "such master agreement shall be considered to be a securities contract under this subparagraph **only** with respect to each agreement or transaction under such master agreement that is referred to in clause (i), (ii), (iii), (iv), (v), (vi), or (vii) …." Bankruptcy Code § 741(7)(A)(viii) (**emphasis added**). Section 741(7)(A) makes clear that an agreement does not become a "securities contract" solely because it is part of a master agreement that contains some components of a genuine "securities contract." Rather, to qualify as a securities contract, the specific contractual components must meet one of the definitions in section 741(7)(A)(i)-(vii), regardless of whether such agreement is contained within a master agreement or a stand-alone agreement.

10. This in turn has significant ramifications on the safe-harbor protections under section 555 of the Bankruptcy Code. While section 555 of the Bankruptcy Code permits the liquidation, termination or acceleration of a "securities contract" based on the triggering of an *ipso facto* clause, which is otherwise unenforceable under section 365(e)(1), this exemption does not protect non-securities contracts that happen to be within a master agreement that contains actual "securities contracts."[8]

---

event of a major bankruptcy affecting those industries." H.R. Rep. No. 97-420, 97th Cong. (1982). Similarly, the legislative history for the enactment of the amendments to section 555 pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 provides that "[t]hese provisions are intended to reduce 'systemic risk' in the banking system and financial marketplace…when parties to these transactions become bankrupt or insolvent…[by] allow[ing] the expeditious termination or netting of certain types of financial transactions." H.R. Rep. No. 109-31, 109th Cong. (2005).

[8] Noting that the Bankruptcy Code now includes master agreements as part of the protected securities contracts, Collier states:

11.     Severability is also supported by the Bankruptcy Code's treatment of master netting agreements under section 561.  While Bankruptcy Code § 561(a) provides that master netting agreements may be exempt from the 365(e)(1) prohibition on *ipso facto* clauses, section 561(b)(1) clarifies that a party may exercise such a contractual right "**only to the extent** that such party could exercise such a right under sections 555, 556, 559, or 560 for each individual contract covered by the master netting agreement in issue."  Bankruptcy Code § 561(b)(1) (**emphasis added**).  Hence, section 561 provides for a master netting agreement to be severed into individual contracts, those entitled to safe-harbor protection under section 555, 556, 559 or 560, and those that are not.[9]

12.     Accordingly, both the express provisions of the Bankruptcy Code and the public policies underlying sections 365(e)(1) and 555 of the Bankruptcy Code support the severability and separate treatment of the Servicing Agreements in this case, where the Other Agreements and the Servicing Agreements can easily be separated and the interests associated with them are apportionable.

---

> a master agreement governing transactions only some of which qualify as securities contracts is itself a securities contract **only with respect to the transactions which qualify as securities contracts**.  Thus, a protected party cannot obtain protection for a non-securities contract simply by documenting it under a master agreement which governs securities contracts.

COLLIER ON BANKRUPTCY, § 555.02(1) (15th ed. rev. 2007) (**emphasis added**).

[9] The concept of severability is analogous to the "dual status" approach courts utilize in addressing how a non-purchase money portion of a security interest that is otherwise a purchase money security interest ("PMSI") affects the purchase money character of the security interest.  See, e.g., Pristas v. Landaus of Plymouth, Inc., 742 F.2d 797 (3d Cir. 1984).  In such a situation, courts have held that an agreement can have a "dual status," and the fact that one security interest has a PMSI component and a non-PMSI component does not render the PMSI ineffective.  Pristas, 742 F.2d at 800; see also In re Brendlinger, 116 B.R. 42, 43-44 (Bankr. W.D. Pa. 1990) (applying Pristas and holding that secured creditor was entitled to relief from automatic stay for property secured by PMSI, but was not entitled to relief from stay for other items listed on a related security agreement pursuant to a refinancing of the original debt).

**WHEREFORE**, the Committee respectfully requests that the Court (i) deny the Objections in their entirety and (ii) grant such other and further relief as the Court deems appropriate.

**BLANK ROME LLP**

*/s/ Bonnie Glantz Fatell*
Bonnie Glantz Fatell (No. 3809)
Regina Stango Kelbon
David W. Carickhoff, Jr. (No. 3715)
1201 Market Street, Suite 800
Wilmington, DE  19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464

- and -

**HAHN & HESSEN LLP**
Jeffrey L. Schwartz
Mark S. Indelicato
Mark T. Power
Don D. Grubman
Edward L. Schnitzer

488 Madison Avenue
New York, NY 10022
Telephone: (212) 478-7200
Facsimile: (212) 478-7400

Proposed Co-Counsel to the Official Committee of Unsecured Creditors of American Home Mortgage Holdings, Inc., *et al*.