# Exhibit A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN HOME MORTGAGE | ) Case No. 07-11047 |
| HOLDINGS, INC., a Delaware corporation, et. al. | ) Jointly Administered |
| | ) Sale Hearing: October 15, 2007 at 12:00 p.m. |
| | ) Related Docket Nos. 11, 113, 403, 674, 746, 850, 865, |
| Debtors. | ) 931, 979, 1057 and 1443 |

**SUR-REPLY MEMORANDUM OF LAW IN FURTHER OPPOSITION TO THE EMERGENCY MOTION OF THE DEBTORS FOR ORDERS: (A) (I) APPROVING SALE PROCEDURES; (II) SCHEDULING A HEARING TO CONSIDER SALE OF CERTAIN ASSETS USED IN THE DEBTORS LOAN SERVICING BUSINESS; (III) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (IV) GRANTING RELATED RELIEF; AND (B) (I) AUTHORIZING THE SALE OF SUCH ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) AUTHORIZING AND APPROVING ASSET PURCHASE AGREEMENT RELATED THERETO; (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (IV) GRANTING RELATED RELIEF AND TO THE NOTICES OF (I) POSSIBLE ASSUMPTION AND ASSIGNMENT OF CERTAIN LEASES, LICENSE AGREEMENTS AND EXECUTORY CONTRACTS; AND (II) PROPOSED CURE OBLIGATIONS, IF ANY**

EMC Mortgage Corporation ("EMC"), by its undersigned attorneys, hereby submits this Sur-Reply Memorandum of Law in Support of its Objections to the (i) Motion of the above captioned debtors (the "Debtors") pursuant to sections 105(a), 363, 365, 503 and 507 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") for entry of an order authorizing, among other things, the sale of the Debtors' mortgage loan serving business free and clear of liens, claims, encumbrances, and other interests filed on August 6, 2007 [Docket No. 11] (the "Motion"), and (ii) notice of proposed cure amounts filed on September 10,

2007 [Docket No. 674] (the "Cure Notice"), and in support hereof, respectfully represents as follows:

## PRELIMINARY STATEMENT

This Sur-reply is filed for the limited purpose of addressing arguments and assertions made by the Debtors' for the first time in their Omnibus Response to Certain Objections to the Sale of Certain Assets and the Assumption and Assignment of Executory Contracts Relating to the Debtors' Loan Servicing Business (the "Response"), filed at the close of business on October 10, 2007, (and only three business days prior to the hearing of this matter). Prior arguments are not repeated except where necessary to establish context. As a threshold matter, the Debtors have not listed EMC as a party objecting on the basis that the servicing arrangements are not severable. (Debtors' Resp. at 15, Ex. A.) EMC has objected and continues to object to Debtors' proposed sale on that basis. (EMC Suppl. Obj. at 12, Docket No. 1047; infra.)

The central question presented on this Motion is whether the Debtors may assume, assign, or sell certain "servicing rights" which are embodied in a Purchase, Warranties and Servicing Agreement dated March 1, 2006 (the "PWSA"). EMC's objection establishes that the PWSA is a protected contract under Bankruptcy Code §555, that it was properly terminated by its express terms, and that there is no longer any contract rights which may be assumed or assigned.

The Debtors now contends in their Response (again, for the first time) that despite the express prohibition in Code § 555 on a bankruptcy court issuing any order that "stay[s], avoid[s], or otherwise limit[s]" the right to terminate a protected contract, that the PWSA should be split into two parts, a servicing part and a sales part in manifest disregard of the parties'

2

DM3\574272.1

intentions in order for the Debtors to be permitted to assign a portion of the PWSA. In effect, the Debtors ask this Court to be the first court (a) to essentially abrogate the safe harbor provisions of Section 555 by ruling that a court may split a securities contract and thereby "limit" and deny the right to terminate and (b) to ignore the legion of precedent that an executory contract must be assumed in total.

This Court should deny the Debtors' Motion for two fundamental reasons: (1) the PWSA and all of its component parts, including servicing, is a securities contract under 11 U.S.C. § 741(7)(A) that may be terminated by EMC pursuant to 11 U.S.C. § 555; and (2) the servicing component of the PWSA is not severable under New York law.

### The PWSA, Including Servicing, Is A Securities Contract.

1. The Debtors fundamentally fail to grasp that the PWSA as a whole constitutes a securities contract as defined in 11 U.S.C. § 741(7)(A)(i) as a "contract for the purchase, sale, or loan of a . . . mortgage loan or any interest in a mortgage loan, . . . or mortgage loans or interests therein (including an interest therein or based on the value thereof)".

2. In 2005, Congress greatly expanded the definition of "Securities Contract" to "help prevent systemic impact upon the markets from a single failure." H.R. Rep. No. 109-31 pt. 1 at 131 (2005). Congress explained that "[f]or the purposes of Bankruptcy Code section[] 555, . . . it is intended that the normal business practice in the event of a default of a party based on bankruptcy or insolvency is to terminate, liquidate[,] or accelerate securities contracts . . . with the bankrupt or insolvent party." Id. at 133. The Code's instruction that "[t]he exercise of the contractual right" of a financial institution such as EMC to "cause the liquidation, termination, or acceleration of a securities contract . . . shall not be stayed, avoided, or otherwise limited" is a clear directive to the Court that the Debtors' Motion should be denied. See 11 U.S.C. § 555; 11 U.S.C. § 362(b)(6).

3

3.  The Debtors now argue that despite the direction of Congress, a securities contract should be severed, and one portion treated as if it were not a securities contract. No case law is offered for such a watershed argument. (See Debtors' Resp. at 61.)

4.  Under the plain terms of the Code, the servicing aspect of the PWSA is an essential component of the PWSA, which can neither be severed nor considered as a contract separate and apart from the rest of the PWSA. The Code expressly states that a securities contract includes an "interest in a mortgage loan." The servicing component is, among other things, an interest in the mortgage loans that is based on the value of the loans. See PWSA § 1.01 ("Servicing Fee: With respect to each Mortgage Loan, the amount of the annual fee the Purchaser shall pay to the Servicer, which shall, for a period of one full month, be equal to one-twelfth of the product of (a) the Servicing Fee Rate and (b) the outstanding principal balance of such Mortgage Loan.").

5.  The notion that the servicing aspect is outside of the core notion of a securities contract is not only inconsistent with the Bankruptcy Code, but is inconsistent with the body of case law under the Securities Act of 1933. The definition of securities contract under the Code is broader than the definition under the Securities Act and this Court is not asked to find that the sale of mortgage loans would or would not be such a security. Compare 11 U.S.C. § 741(7) with Section 2(a)(1), 15 U.S.C. § 77b(a)(1). However, under well recognized securities' concepts, a sale of an asset which is managed by the seller or its affiliate, including real estate interests, has been held to be a security. See, e.g., Hocking v. Dubois, 885 F.2d 1449, 1459-60 (9th Cir. 1989) (holding that sale of condominium units along with offer to manage units in a rental pool could be a security). Under the traditional view, a security is an investment in a common enterprise, where profits result substantially from the efforts of the promoter or a third

party. S.E.C. v. W.J. Howey Co., 328 U.S. 293, 298-99 (1946). In Howey, when a citrus orchard owner sold portions of citrus groves along with service contracts to farm and market the produce, the Supreme Court held that this arrangement was the sale of securities, subject to securities laws. Id. at 295-96, 300 ("This conclusion is unaffected by the fact that some purchasers choose not to accept the full offer of an investment contract by declining to enter into a service contract. . . .").

6. The Second Circuit has held that the sale of a pool of mortgage loans made and serviced by a mortgage lending company were securities, particularly noting that the seller "was raising funds for its general business activities of making and servicing mortgages." Pollack v. Laidlaw Holdings, Inc., 27 F.3d 808, 812-15 (2d Cir. 1994).

7. The servicing component is not a severable part of this transaction because the PWSA's servicing component establishes that the purchasers are relying on the skill and managerial judgment of the sellers to generate a profit. The discretionary powers of the servicer in managing the mortgage loans is central to whether the loans will produce the profit or loss in the common enterprise of the management and ownership of the loans. See e.g., PWSA § 4.01, page 42 ("The Servicer may waive, modify or vary any term of any Mortgage Loan or consent to the postponement of any such term. . ."). Under the PWSA, "a significant portion of the customer's investment depends on [the seller's] managerial and financial expertise" in servicing the mortgage loans, a key feature of investment contracts. See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, 756 F.2d 230, 240-41 (2d Cir. 1985).

8. Therefore, the PWSA and all of its components are a securities contract for purposes of Section 555, were lawfully terminated, and may not be assumed, assigned or otherwise sold.

DM3\574272.1

## The PWSA is not Severable; the Servicing Rights are an Integral Part of the Bargain.

9.     The Debtors cannot defeat the express congressional mandate of Section 555 by seeking to rewrite the PWSA as two separate agreements. By seeking to artificially separate servicing from the sale of the loans, the Debtors are seeking to impair the right of termination in the PWSA. As this Court has already stated in the context of a similar matter, "[i]f the servicing issues, such as those in the MRA were sufficient to make an agreement such as the MRA not a repurchase agreement, Congress' amendment would have had little or no effect on virtually all mortgage-related purchase agreements." (Tr. of Proceedings, Aug. 17, 2007, Docket No. 411 at 102.)

10.    EMC disputes that this Court should reach the question of severability under state law, and that the Code expresses the mandate that a court not limit the power to terminate. As noted, this is reflected in the express statement that the "safe harbor" applies to both the securities contract and <u>any interest</u> in the contract.

11.    Alternatively, and only if this Court proceeds to examine severability, then EMC recognizes that severability in other contexts has been held to be a question of state law. <u>United Air Lines v. HSBC Bank USA (In re United Air Lines, Inc.)</u>, 453 F.3d 463, 469 (7th Cir. 2006).[1] The PWSA states that New York law shall apply.[2] Nevertheless, in the context of applying 11 U.S.C. § 555, Congress has declared that the termination rights apply to both the mortgage loans, the contract embracing the sale, and "any interest" and that a court is not to issue any order which "limits" the right to terminate. Furthermore, Congress listed master agreements

---

[1]   See also, e.g., In re Payless Cashways, 203 F.3d 1081, 1084-85 (8th Cir. 2000); Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co., 83 F.3d 735, 739 (5th Cir. 1996); In re Qintex Entm't, Inc., 950 F.2d 1492, 1496 (9th Cir. 1991); In re Gardinier, Inc., 831 F.2d 974, 975-76 (11th Cir. 1987).

[2]   But cf., In re Plitt, 233 B.R. 837, 846 n.10 (Bankr. C.D. Cal. 1999) ("No federal case has specifically held that state law governs whether multiple obligations in a transaction are severable. Rather the cases that have applied state law to the severability issue have done so incidentally to their holdings.").

6

that include securities contracts along with all supplements to be themselves securities contracts, which acts as a non-severability clause because the whole transaction realizes the benefit of the termination rights in § 555. See 11 U.S.C. § 741(7)(A)(viii). Thus Congress has restricted judicial discretion and has pre-empted or highly circumscribed the relevancy, if any, of the notion of "severance."

12. Alternatively, if state law applies, severance would still be wrongful. There is a heavy burden on the party seeking to sever a contract. See, e.g., In re United Air Lines, 453 F.3d at 468 (applying Colorado law). Under New York law, contract severability is a matter of the manifested intent of the parties, "to be determined from the language employed by the parties. . . ." Atl. Mut. Ins. Co. v. Balfour MacLaine Int'l Ltd. (In re Balfour MacLaine Int'l Ltd.), 85 F.3d 68, 81 (2d Cir. 1996) (internal quotation omitted); Rudman v. Cowles Commc'ns, Inc., 280 N.E. 2d 867, 873 (N.Y. 1972); 15 Richard A. Lord, WILLISTON ON CONTRACTS § 45:5 (4th ed. 1990). The parties' intent is determined through a fair construction of the language employed by the parties and should be "viewed in the light of the [surrounding] circumstances." See Am. Sur. Co. v. Rosenthal, 133 N.Y.S. 2d 870, 873 (N.Y. Spec. Term 1954); F & K Supply Inc. v. Willowbrook Dev. Co., 732 N.Y.S. 2d 734, 738 (N.Y. App. Div. 2001) (quoting Christian v. Christian, 365 N.E. 2d 849, 856 (N.Y. 1977)).[3] New Era Homes Corp. v. Forster, 86 N.E. 2d 757, 758-59 (N.Y. 1949) ("We would, in short, be writing a new contract for these people if we broke this single promise up into separate deals; and the new contract so written by us might be, for all we know, most unjust to one or the other party.").

---

[3] These "surrounding circumstances" include the interdependence of the contract parts, the similarity of subject matter among those parts, the number of agreements comprising the contract, and the timing of the signing of the agreements. Mun. Capital Appreciation Partners I, L.P. v. Page, 181 F.Supp.2d 379, 394 (S.D.N.Y. 2002); Williams v. Mobil Oil Corp., 445 N.Y.S. 2d 172, 175 (N.Y. App. Div. 1981); 15 Williston §§ 45:5-12.

13.     A contract is presumptively non-severable absent an express contrary statement in the contract itself. 15 WILLISTON ON CONTRACTS § 45:4. The decision to employ one agreement with one single assent and to utilize singular nouns and pronouns demonstrates a non-severable intent. Ginett v. Computer Task Group, Inc., 962 F.2d 1085, 1098-99 (2d Cir. 1992); accord In re United Air Lines, 453 F.3d at 470 (finding agreement non-severable when "the parties cemented their deal into one document" and the term sought to be severed was dependent on the remainder); Rudman, 280 N.E.2d at 873 (holding that the use of different agreements, signed on different dates, involving different parties meant separate contracts).

14.     In Ginett, an employer argued that the provisions of an employee's compensation package were severable into compensation and severance provisions. The Second Circuit disagreed holding that the use of one agreement instead of two and consistently referring to the instrument as "this agreement" in all of the provisions demonstrated that the parties intended an "inseparable whole." Like the parties in Ginett, EMC, AHMC, and AHMS used one agreement, the PWSA, to cover both the mortgage loan sale and the servicing rights. See PWSA §§ 2.01-2.03. The parties also referred to the PWSA as "this Agreement" throughout all of the provisions, and unlike in Rudman, all signed the same agreement on the same day. See id. §§ 3.01, 5.01.

15.     Often non-severable intent is shown through the use of an "Entire Agreement" clause, which "evidence the parties' intention to include all covenants, contracts, and promises as inseparable parts of the [] Agreement." In re Philips Servs., Inc., 284 B.R. 541, 546 (D. Del. 2002); see also In re Mirant Corp., 318 B.R. 100, 106 (N.D. Tex. 2004) (finding that "Entire Agreement" clause encompassing all "contemplated" agreements showed that parties did not intend agreements to be severable); In re Teligent, Inc., 268 B.R. 723, 728-29 (Bankr.

8

S.D.N.Y. 2001) (finding that specification in merger agreement that the agreement and a separate non-compete agreement as "the final and complete contract of the parties" was dispositive). The PWSA likewise has an "Entire Agreement" clause, specifying that "[t]he Confirmation and this Agreement and the related Term Sheet sets forth the entire understanding between the parties. . . ." PWSA § 11.15.

16. Any apparent apportionment of consideration in the PWSA does not affect this non-severable intent. See In re United Air Lines, 453 F.3d at 470 ("The existence of apportionable sums alone is not dispositive."). Apportionment can indicate severability only if there are "such identifiable lines of demarcation that it becomes apparent the parties assented separately to several things." First Sav. & Loan Ass'n v. Am. Home Assur. Co., 316 N.Y.S.2d 233, 234 (N.Y. App. Div. 1970); see also In re Philips Serv., Inc., 303 B.R. 574, 576 (D. Del. 2003) (merger agreement and promissory note were inseverable due to the intentions of the parties that the promissory note be an inseparable part of the merger agreement); In re Progressive Rest. Sys., Inc., 1997 WL 251508, *3 (W.D.N.Y. 1997) (restructuring agreement, franchise agreement, promissory note and leases found to be inseverable agreements despite compensation being exchanged under franchise agreement, promissory note and leases).

17. In Prospero Assocs. v. Burroughs Corp., the Tenth Circuit, applying New York law, held that while a bill of sale signed two years after an original agreement could be viewed as a separate transaction with separate consideration, since the purchase price in the bill of sale was determined by reference to the original agreement, they were not severable. 714 F.2d 1022, 1027 (10th Cir. 1983). The bill of sale was dependent on the original agreement and "ma[de] no sense as a separate contract." Id. Like the contract in Prospero, the PWSA appears to have apportioned consideration because the purchase price for the mortgage loans is separated

9

from the servicing fees calculation. PWSA §§ 1.10, 2.01. But, like in Prospero, the servicing fees are calculated based on the "outstanding principal balance" of each mortgage loan – an amount that can be determined only by reference to the mortgage loan provisions. Id. Thus, the consideration for the servicing rights is dependent on the rest of the PWSA and "makes no sense" as a separate contract.

18.  The sale of whole mortgage loans is integrally related to the servicing of such loans. The transaction of selling mortgages is unified with the servicing of such mortgages. This unitary nature is reflected in numerous provisions, including the core structure, under which EMC acquired title to the mortgages (Section 2.04) but that the Servicer and Company, hold both records and proceeds from the Mortgages "in trust for the benefit of the Purchaser as the owner of the Mortgage Loans." PWSA § 2.04. Just as in In re United Air Lines, where the court held that a leasehold coupled with a bond arrangement to improve the property, 453 F.3d at 470, in this case where the agreement comprises a purchase of mortgage loans coupled with a servicing arrangement to manage the loans, the term sought to be severed is dependent on the remainder, as there would be no need to provide for servicing if there were no purchase of mortgage loans.

19.  The existence of the standard severability clause, as here, is also not significant. "This clause, however, does not manifest an intent to single out any particular division of the agreement. . . Rather, this clause simply shows that the parties had the general and customary intent to have as much of their agreement survive adverse judicial intervention as possible. Without more, this clause does not support [severance]." United Air Lines, 453 F.3d at 471. See also Christian v. Christian, 365 N.E.2d 849 (N.Y. 1977) (holding the severability clause in separation agreement meant only that separation provisions were enforceable if property division provisions were void).

10

20.     A severability clause cannot "render specific provisions independently enforceable when an agreement itself, rather than any of its components, is brought to an end." Sanford Redmond, Inc. v. Mid-Am. Dairymen, Inc., No. 85 Civ. 4574, 1992 WL 57090 at *7 (S.D.N.Y. 1992) (quoting Turner v. Wilson, 427 N.E.2d 220, 223 (N.Y. 1980)); 15 WILLISTON ON CONTRACTS § 45:6 (a severability clause cannot apply to a breach and thus "the presence of a severability clause in a contract does not affect the determination whether the parties intended to create a divisible contract."). In Sanford Redmond, when plaintiff's patent term ended, a lease contract for the patented item was cancelled. Over plaintiff's objections, the Southern District of New York held that a severability clause could not make the no-copying provisions of the contract still enforceable. Instead, the whole contract, including the severability clause, was terminated and the only remaining obligation under the contract was the return of the leased item to the owner.

21.     As in Sanford Redmond, once AHMC and AHMS filed for bankruptcy, the PWSA, and its severability clause, were terminated. PWSA §§ 9.01, 11.06. Unlike Christian v. Christian, this is not a case where a portion of the agreement was "prohibited or . . . held to be void or unenforceable." PWSA § 11.06. Instead, the debtor's bankruptcy filing triggered § 9.01(v) of the PWSA and the entire PWSA terminated as per its terms. Like in Sanford Redmond, the only remaining obligation under the PWSA is for AHMS to "prepare, execute and deliver" to EMC all of the mortgage files that it has held "at the will" of EMC since the PWSA was created. PWSA §§ 9.01(ix); 2.04.

22.     Here, with its interdependent provisions, the PWSA and the related servicing rights constitute a single, inseverable whole in that there would have been no bargain

whatsoever had the servicing rights been absent from the deal. See United Airlines, 45 F.3d at 471-72.

### The Debtors Have Not Provided Adequate Assurances of Future Performance.

23. The Sale Motion should be denied because the Debtors have not, and cannot establish adequate assurance of future performance. Such assurance is required whether the Debtors purport to sell rights under Section 363, (see Debtors' Resp. at 17-18), or assume an executory contract under Section 365. See 11 U.S.C. § 363(e) ("Notwithstanding any other provision of this section, . . . the court [] shall prohibit or condition [any] use, sale, or lease as is necessary to provide adequate protection of [the non-debtor's] interest.") (emphasis added); 11 U.S.C. § 365(b)(1)(C). Adequate assurance requires "good faith" and the "observance of commercial standards" on the part of the assignee. See Cinicola v. Scharffenberger, 248 F.3d 110, 120 n.10 (3d Cir. 2001). The phrase must be "given a practical, pragmatic construction based upon the facts," but it should not allow "any non-debtor party [to] acquire greater rights in a case under the act than he has outside the act." Id.

24. In order to assume the PWSA, the Debtors must establish that the Purchaser has and will comply with all terms of the PWSA. See, e.g., In re Grudoski, 33 B.R. 154, (Bankr. Haw. 1983) (failure to provide adequate financial statement and a financial guarantee by a responsible officer meant inadequate assurance). In re Luce Indus., Inc., 14 B.R. 529, 532 (S.D.N.Y., 1981) (Debtor's failure ensure continued performance by assignee under licensing agreement meant inadequate assurance). No such evidence has been offered nor tendered as of this date.

25. Section 3.01(a) of the PWSA requires that the Servicer have "all licenses necessary to carry out their respective business as now being conducted, and is licensed and

12

qualified to transaction business in and is in good standing under the laws of each state in which any Mortgage Property is located. . ." First, the current servicer may not be meeting these requirements since published reports indicate that American Home Mortgage Investement "bounced 546 property tax checks" and has yet to make good on some of them. See Stephen Bernard, Lender Bounces Md. Tax Checks: AHM Shifts Blame to Other Financial Firms, WASH. POST, Sept. 27, 2007, at D04 (noting that missing tax payments can lead to foreclosure). Second, Purchaser is not a licensed servicer. (See Tr. of Proceedings of Sept. 25, 2007 at 19, Docket No. 1376.) And the process of obtaining proper licenses, even if successful, can take up to ten months. See id.

26. The Purchaser does not intend to assume all liabilities upon an assumption, in apparent violation of the Code. (See APA, definition of "Assumed Liabilities," at 3.) Adequate assurances are intended to provide the non-debtor party "with needed protection because assignment relieves the debtor and the bankruptcy estate from liability for breaches that occur after the assignment." In re Fleming Cos., No. 03-10945(MFW), 2004 WL 385517, *2 (Bankr. D.Del. Feb. 27, 2004). Without assuming all liabilities, the purchaser cannot meet this standard.

27. The purchaser does not intend to set aside sufficient funds for a cure but only such amounts as are unilaterally determined by agreement with the Debtors. (See APA at 6.) This does not meet the standards of § 365 under which the purchaser must demonstrate a "firm commitment to make all payments and at least a reasonably demonstrable capability to do so." In re Uniq Shoes Corp., 316 B.R. 748, 752 (Bankr. S.D. Fla. 2004) (emphasis added).

## CONCLUSION

For the foregoing reasons and those listed in EMC's Objection and Supplemental Objection, the Court should deny the Debtors' Motion.

Dated: October 11, 2007

Respectfully submitted,

DUANE MORRIS LLP

Frederick B. Rosner (DE 3995)
Richard W. Riley (DE 4052)
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
Telephone: (302) 657-4943
Facsimile: (302) 657-4901

and

SIDLEY AUSTIN LLP
William M. Goldman
Geoffrey T. Raicht
Alex R. Rovira
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

SIDLEY AUSTIN LLP
David R. Kuney
1501 K. St. N.W.
Washington, D.C. 20005
Telephone: (202) 736-8650
Facsimile: (202) 736-8711

DM3\574272.1