## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | **Chapter 11** |
| | : | |
| **American Home Mortgage** | : | **Jointly Administered** |
| **Holdings, Inc. et al.,** | : | **Under Case No. 07-11047 (CSS)** |
| | : | |
| | : | |
| **Debtors** | : | |
| | : | |

**MOTION  FOR DISCLOSURE UNDER U.S.C. § 363, § 1106,
AND BANKRUPTCY RULE 2004, DIRECTING EXAMINATION OF,
AND PRODUCTION OF DOCUMENTS BY DEBTORS
AND
LIMITED OBJECTION TO ASSET PURCHASE AGREEMENT
COMPLAINT FOR INJUNCTION AGAINST SALE OF MORTGAGE NOTES
FREE AND CLEAR OF LIENS OR LIABILITIES
AND
REQUEST FOR APPOINTMENT OF
CONSUMER PRIVACY OMBUDSMAN PURSUANT TO U.S.C. § 332
<u>AND TRUSTEE OR EXAMINER PURSUANT TO U.S.C. § 1104</u>**

Paula Rush, pro se, moves this Court for entry of an order pursuant to U.S.C.

§323, and U.S.C. §1106 of title 11 of the United States Code, 11 U.S.C. § § 101, et seq. (the

"Bankruptcy Code") and rule 2004 ("Rule 2004") of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), directing the examination of, an production of documents by,

---

1.   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number
are: American Home Mortgage Holdings, Inc.("AHM Holdings") (6303); American Home Mortgage Investment
Corp. ( "AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM
Investment"), a Maryland corporation (1979);  American Home Mortgage Servicing, Inc.( "AHM Servicing"),
aMaryland corporation(7257); American Home Mortgage Corp. ("AHM Corp"), a New York corporation (1558);
American Home Mortgage Ventures LLC ( "AHM Ventures"), a Delaware limited liability company (1407);
Homegate Settlement Services, Inc. ( "Homegate"), a New York corporation (7491); and Great Oak Abstract Corp.
 ( "Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road,
Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving,
Texas 75063.

American Home Mortgage, et al ("Debtors").  Plaintiff moves this court for an appointment of Consumer Privacy Ombudsman pursuant to U.S.C. §332 and Trustee or Examiner pursuant to U.S.C. §1104.  In support of the Motion, the Plaintiff states as follows:

This petition is in reference to the security interest held on property 2651 Peery Drive Churchville Md. 21028, loan number # 1001222336, originated by American Home Mortgage 538 Broadhollow Rd. Melville NY 11747 through The Loan Corporation 4890 W Kennedy Blvd. #260 Tampa FL 33609 and American Brokers Conduit, 5160 Parkstone  Drive Suite 190A Chantilly VA 20151.  American Home or "unknown" related financing partner holds security interest in 2651 Peery Drive Churchville Md. 21028, The  loan was settled on April 3, 2006. Ms. Rush sent a letter on December 29, 2006 to Attorney's representing Debtors, Cohn Goldberg & Deutsch in reference to her issues and it was ignored. On April 3, 2007 Ms. Rush sent a RESPA Qualified written request and a loan rescission letter which was not answered as required under federal law (RESPA)  and to date has never been answered by American Home Mortgage.

Ms. Rush filed a lawsuit on April 3, 2007,  in Greenbelt Md. Federal court before the Honorable Judge Willam Nickerson, case WMN-07-CV-854, against American Home Mortgage Servicing, American Brokers Conduit, ServiceLink/Chicago Title, The Loan Corporation, and Trust Appraisers.  American Home filed a suggestion of Bankruptcy and the action is now stayed.

American Home Mortgage, through counsel, Nancy Hunt of  Weiner, Brodsky Kidman, asked for three extensions which were granted under the disguise of negotiating a settlement. American Home did not negotiate in good faith and in fact were simply wasting time before filing for bankruptcy. American Home counsel asked Plaintiff to dismiss the suit just weeks before the bankruptcy stating they wished to negotiate.

This was false, misleading, and just another example of the total disregard for any principles of good faith or fair dealing.  To date American Home has failed to assert any affirmative defense.

The property which is the subject of this complaint may or not be held in one of the bankrupt entities. Although some litigation information has been filed under Docket # 931, Exhibit Part 9, Ms. Rush's property and litigation is not listed. The issue of who is the holder in due course of Ms. Rush's note is now key to determining whether the bankruptcy estate, or some other unknown entity is the party of interest associated with this loan.  Before Plaintiff can request a "Motion for Relief From Stay" the preliminary matter of who is the "holder in due course" of Ms. Rush mortgage note needs to be resolved.

Plaintiff's documents, which were submitted in with the original complaint differ substantially to the later documents which American Home put on record through counsel, Nancy Hunt, and therefore preservation of documents is crucial to Plaintiff's interests. The Deed, the HUD-1, and the URAR all demonstrate the serious discrepancies between documents Amercian Home is claiming as the loan documents and the set of documents provided to Ms. Rush.

The disadvantage that Plaintiff and other borrowers face is the ability for American Home through American Home Servicing to control the loans and prevent borrower's from identifying the true parties of interest in the notes. These unknown entities must be revealed to ensure documents are correct, documents are preserved, and true parties of interest make important decisions about the valuable assets. This issue also brings important questions to the surface of how Plaintiff's loan may not be part of the bankrupt entities, but bankrupt entity money may have been used to defend the lawsuit. It is very odd that Plaintiff's litigation is omitted in the bankruptcy disclosure documents.

This filing will serve as notice to any and all prospective purchasers of this note of the issues regarding this loan, to the bankruptcy Trustee if the true owner is one of the American Home Mortgage bankrupt entities, or to the true owner of the note which has yet to be revealed.  This filing also serves as notice to nay parties of interest or creditors American Home has failed to engage in loss mitigation, has repeatedly ignored and failed to address  issues presented by Ms. Rush, and has repeatedly threatened her with foreclosure. American Home has failed to answer the RESPA Qualified Written Requests. American Home has repeatedly failed to employ principle of good faith and fair dealing thereby negligently managing either an asset of the estate or an asset of the true owner of the note.

Of equal importance is the pending sale of American Home Servicing business and Melville and  Broadhollow loans. These loans may be sold without any liabilities attached and Plaintiff strongly objects if her loan is included in any of these transactions. Debtors are using the bankruptcy court to relieve them of liabilities due to legal complaints that sound in Fraud. This is not allowed under the bankruptcy code. Plaintiff, Paula Rush, appears in this matter, pro se, in accordance with 11 USC §1109 and Bankruptcy Rule 2004, and requests a hearing on this urgent matter for cause:

### JURISDICTION

1.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §157, and §§§1334, 1135 and 1357. This matter is a core proceeding pursuant to 28 U.S.C. §157 (b)(2)(A)(O). Venue is proper in this Court pursuant to 28 U.S.C. §§1408 and 1409.

## STATUS OF THIS CASE

2.   On August 6, 2007 ( the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.   Each Debtor is continuing to operate its business an manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.   The Debtors' chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

## THE DEBTORS' BUSINESS

**5.**   Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizatons of residential mortgage loans. AHM also invested in securitzed mortgage loans originated by others and sold mortgage loans to institutional investors. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of various quality.

6.   A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal balance of approximately $46.3 Billion. AHM continues to conduct its servicing business, which constitutes an asset of the Debtors' estate.

## **RELIEF REQUESTED**

7.   By this motion ("Motion"), the Plaintiff request that this Court enter an order, pursuant to Rule 2004, substantially in the form attached as <u>Exhibit A</u> ( the "<u>Proposed Order</u>") authorizing the examination of, and production of documents by, Debtors, so that the Plaintiff can ascertain the appropriate parties of interest and true holders in due course of the note held on Plaintiff's property.

8.    Plaintiff seeks authorization to obtain the production of documents from AHM Concerning (i) the property of the Debtors, including interests in such property;(ii) matters that may affect the administration of the Debtors' estate; and (iii) the identification of certain note holders, and loan insurers, in reference to Plaintiffs loan.

9.    The Plaintiff seeks entry of the Proposed Order, which includes an initial examination through document discovery and, subsequent to such document discovery, depositions of the entities named herein. The Plaintiffs' initial examination is currently limited to discrete issues involving the true owner of Ms. Rush's  mortgage note and mortgage related securities, other financing partners of interest, credit enhancement providers  and loan insurers for Ms. Rush's loan.

9.   The Plaintiff hereby asserts an objection and request an injunction to any sale of her loan as part of any transaction through this bankruptcy court which relieves the purchaser of liability in any  Purchase Agreement of the Servicing business, loan pools, or other unknown transfers of loans held by American Home Debtor entities. Plaintiff request to hereby enjoin all parties who may hold or may purchase interest in her loan.

10. Plaintiff request this court  appointment a Consumer Privacy Ombudsman pursuant to U.S.C. §332 and Trustee or Examiner pursuant to U.S.C. §1104.

11.   The Plaintiff expressly reserves the right to serve supplemental and additional document requests that are within the scope of Rule 2004, and the Plaintiff will schedule depositions in an efficient manner following the substantial completion of document discovery in order to minimize the burden on the Debtors. The Plaintiff also expressly reserves the right to seek examination of entities other than the Debtors on similar or other areas of direct correlation to this issue.

**A.  Entities From Whom Examination Is Sought**

12.     The Plaintiff seeks authority to serve a document request and deposition notice on all AHM Debtors including Broadhollow LLC, Melville LLC,  and related financing partners if necessary, including by subpoena if necessary, to determine the true owner of Plaintiffs note.

13.     Debtors are now in control Ms. Rush's loan through the now bankrupt entity Amercian Home Mortgage Servicing, which is scheduled to be sold and Ms. Rush seeks preservation of documents relating to servicing issues of her loan.

14.     Upon revelation of the true parties of interest in the note, the Plaintiff seeks authority to serve a document request and deposition on any affiliated counterparties with an interest in Ms. Rush's loan; including credit default swap partners, credit enhancement partners, financing partners, or any insurer and the true holder of the note.

**B.  Areas of Requested Discovery**

15.     Plaintiff seeks the right to determine if certain lender documents, loan approval processes complied with the financing agreements with investors, and the requirements of third party credit insurers.

16.     Plaintiff seeks the right to discover the true owner of the note and have direct dialogue with that party in reference to possible loss mitigation and pending litigation against the parties of interest in reference to mortgage fraud, Federal and state law claims.

17.     Plaintiff seeks the right to ensure that documents in reference to her mortgage origination and servicing account are preserved and protected for future legal action against the AHM Debtor entities.

## C. Need and Narrow Scope

18.     The Rule 2004 discovery requested in this Motion will provide Plaintiff with information required from those uniquely positioned to have it. The Plaintiff must obtain such information to protect and preserve the plaintiffs' rights and the possible interest of the Debtor's estate in her property which is an asset to the estate valued at over $600,000. The Plaintiff is entitled to seek and obtain discovery regarding these and other matter relating to the acts, conduct, property, and potential liabilities of the Debtor's and their estate. The Plaintiff requires the requested information to assess fully the Plaintiff's potential claims against third parties – including, among other parties, some or all of the Debtors.

19.     The discovery sought herein is narrowly tailored to the factual matters raised or implicated by certain issues contained throughout this document. Compliance with the annexed Rule 2004 subpoenas and document requests by the Debtors will not be burdensome and can be achieved without undue hardship in the time period requested.

## C.  Entry of Omnibus Order

20.     To facilitate the necessary discovery, Plaintiff requests that the Court enter the Proposed Order granting the Motion, and requiring the Debtors to produce documents responsive to schedules to be served by Plaintiff substantially in the form of the schedule annexed to the

Proposed Order. Plaintiff requests that the Court order that such production be made on or before the date that is twenty (5) days after entry of the Proposed Order.

## APPLICABLE AUTHORITY

21.    Bankruptcy Rule 2004 provides, in relevant part, as follows:

(a) <u>Examination on Motion.</u> On motion of any party of interest, the court may order the examination of any entity.

(b) <u>Scope of Examination.</u> The examination of an entity under this rule or of the debtor under §343 of the Code may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge…

(c) <u>Compelling Attendance and Production of Documentary Evidence.</u> The attendance of an entity for examination and the production of documentary evidence may be compelled in the manner provided in Rule 9016 for the attendance of witnesses at a hearing or trial.

22.    Examinations under Bankruptcy Rules 2004(a) and (c) may include within their scope, among many other things: any matter which may relate to the property and assets of the estate; the financial condition of the debtor; any matter which may affect the administration of the debtor's estate; and, in a chapter 11 case, any matter relevant to the case or to the formulation of a plan.

23.    A Rule 2004 examination is "designed to bring the Debtor's affairs to light, not to hide them." <u>In re PRS Ins. Group. Inc</u>. 274 B.R. 381, 385 ( Bankr. D. Del. 2001). "The purpose of Rule 2004 examination is 'to show the condition of the estate and to enable the court to discover its extent and whereabouts and to come into possession of it that the rights of creditors may be preserved.'" <u>In re Coffee Cupboard, Inc.,</u> 128 B.R. 509, 514 ( Bankr. E.D.N.Y. 1991) (citing <u>Cameron v. United States</u>, 231 U.S. 710, 717 (1914)). <u>See also</u> <u>In red Ionosphere Clubs.</u> <u>Inc.,</u> 156 B.R. 414, 432 ( S.D.N.Y. 1993) ( "Because the purpose of the Rule 2004 investigation

is to aid in the discovery of assets, any third party who can be shown to have a relationship with the debtor can be made subject to a Rule 2004 investigation."), aff'd, 17 F. 3d 600 (2d Cir. 1994). The scope of inquiry permitted under a Rule 2004 investigation is generally very broad and can "legitimately be in the nature of a fishing expedition." In re Wilcher, 56 B.R. 428, 433 ( Bankr. N.D. Ill. 1985). See also In re Bakalis, 199 B.R. 443, 447 ( Bankr. E.D.N.Y. 1996)(same); In re Johns-Manville Corp., 42 B.R. 362, 364 (S.D.N.Y. 1984)(same).

24.    The information sought by Plaintiff concerns the Debtors' "acts, conduct, or property" or "liabilities and financial condition." Bankruptcy Rule 2004. Consequently, the documents sought by Plaintiff are clearly within the scope of a Rule 2004 examination.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 2004-1

25.    Plaintiff has discussed with counsel for the Debtors whether the Debtor would agree to voluntarily produce documents and make witnesses available consistent with this Motion. Plaintiff has attempted to obtain consent before filing of this motion. As of the filing of this Motion, Debtors have not indicated a willingness to proceed voluntarily. In order to prevent unnecessary delay arising from disputes concerning, among other things, the entitlement to the information requested and claims of confidentiality,  the Plaintiff seeks to put this Motion on for a hearing and thereby ensure a fair and expeditious resolution. Prior to the hearing on this Motion, the Plaintiff  will continue discussing the relief sought herein and attempt to resolve any legitimate objections raised by the Debtors.

## TRUSTEE OR EXAMINER

25.    Plaintiff moves this court pursuant to §1104(a)(1)(2) for an appointment of

Trustee or Examiner  (1) for cause, including fraud, dishonesty, incompetence, or gross

mismanagement of the affairs of the debtor by current management, either before or after the

commencement of the case, or similar cause; (2) such appointment is in the interest of creditors,

equity security holders, and other interests of the estate, known and unknown parties of interest.

26.    Plaintiff moves this court pursuant to pursuant to §1106 (3) and requests this court

to appoint an independent examiner to investigate the acts, conduct,  assets, liabilities, the

operation of the debtor's business and the desirability of the continuance of  such business, and

any other matter relevant to the formation of a plan. Under  §1106 (4)(A)(B) Plaintiff moves this

court to file a statement of any investigation conducted under paragraph (3), including an fact

ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or

irregularity in the management of the affairs of the debtor, or to a cause of action available to the

estate and transmit a summary of any such statement pursuant to §1106 (4)(B).

27. Although American Home was informed that unless  specific  issues could be

resolved directly with Plaintiff, in reference to the origination of her loan transaction, they could

be facing a class action lawsuit for loan rescission of potentially thousands of Pay Option Arm

loans, they negligently failed to address Plaintiff's assertions.  Counsel

negotiating for Plaintiff informed American Home through counsel of the recent case of Chevy

Chase Bank, in which the Judge ruled for summary judgement against the bank. The court ruled

that the Truth and Lending disclosure was unclear and confusing and  the loan must be

rescinded. Federal District Court Judge, Lynn Adelman, ruled in a putative class action, on

January 16, 2007 that Chevy Chase Bank must rescind certain option adjustable-rate mortgages

because they violate the Truth in Lending Act. The case is currently on appeal.

"A suit filed by Susan and Bryan Andrews against Chevy Chase Bank claimed they
thought the 1.95% introductory rate on their option ARM was fixed for the first

five years. Two months after the mortgage was originated, the interest rate
increased to 4.375%.

The judge determined disclosures about the loan were "unclear and confusing," according to the
Wall Street Journal. The mortgage was also confusing because, while payments were fixed for
five years, the interest rate was not."

Based on the ruling, Chevy Chase will have to rescind all the loans that have similar language in
the disclosure forms. An exact number of how many customers this involves was not
immediately known, but Chevy Chase originated more than $7 billion in mortgages in 2006, the
majority of them option ARMs."

The choices that American Home made as a loan servicer and loan originator, they

made of behalf of all financing partners, who did not have the opportunity to participate in

Amercian Home's decisions. Decisions which could affect loans already securitized and sold as

well as new loans investors might purchase with the same issues attached. A class action for full

loan rescission of thousands of Pay Option Arms would expose financing partners to hundreds of

millions of dollars of liabilities. Just weeks before the bankruptcy, American Home did not

negotiate in good faith to resolve Plaintiff's complaints and has failed to address issues brought

to their attention both through individual Plaintiff's and government regulatory actions.

28. American Home was aware through Plaintiff's complaint and issues in reference to

how Pay Option Arms were advertised in contradiction to FTC guidelines. The Federal

Reserve and the FTC recently did an investigation into the illegal advertising practices of

various lenders. The Federal Reserve is also looking at how loans are structured to avoid

HOEPA triggers and the Pay Option Arms is a perfect example of that.

29. The YSP is another issue that has come under fire under RESPA and has been found

to be a "unearned fee" or "kickback" if it is based on an incentive rate sheet. Yet American

Home willfully continued to employ this practice in the ordinary course of business.

30. American Home was made aware that brokers are pressuring appraisers to inflate

appraisals to collect exhorbitant YSP's.  American Home had no incentive to investigate and

take prudent steps to protect against this practice as they used the loan to value ratio's to sell off

the risk to a third party.

31. If Amercian Home continued to accept loans from The Loan Corporation and Trust

Appraisers after notification from Plaintiff of issues of fraud, and failed to take appropriated

precautions to protect investors, they would be negligent in selling those loans to a third party

investor.

32. Recently Plaintiff, helping  another borrower, Ms. Dobben, attempted to contact

American Home in reference to a mortgage fraud ring to alert them and prevent any more

loans from this group from going through without additional precautions. Plaintiff was

transferred six times, hung up on twice, and a person at extension 516-396-7700 refused to even

give his name. This isssue affects many lenders and Plaintiff is working with EMC/ Bear

Stearns  fraud investigator John Gray working under Tom Marano on this matter. This is an

urgent matter  of paramount importance to many investors and yet American Home negligently r

refused to address this issue or even take the time to investigate the issue,  possibly to the

detriment of investors and other financing partners.

33. On American Home own investment statements, American Home states that:

"Finally, our size has made it possible for us to profitably enter businesses ancillary to mortgage
lending, such as mortgage reinsurance, title brokerage and vendor management. Regulators,
increasingly, are calling this practice predatory."

American Home is well aware that HUD has found the practice to viiolate RESPA. They also

are aware of  known multi-million dollar settlements that have been issued after investigations by

various federal and state regulators.

34. On American Home own investment statements, American Home states:

" We may, at some point borrower funds from one or more of our TRS. Although any such intercompany borrowings will be structured so as to constitute indebtedness for all tax purposes, the Internal Revenue Service may challenge such arrangements, in which case the borrowings may be characterized as a dividend distribution to us by our TRS. Any such characterization may cause us to fail one or more of our REIT requirements."

An investigation needs to take place concerning inter-company borrowings and where funds

and/or mortgage notes flowed from and flowed to.

35. On American Home own investment statements, American Home states:

" In connection with those loans we securitize other than through guaranteed performance swaps and similar transactions with Fannie Mae, Freddie Mac, Ginnie Mae and the Federal Home Loan Banks, we plan to provide credit enhancement for a portion of the securities that we sell, called "senior securities," to improve the price at which we sell them. Our current expectation is that this credit enhancement for the senior securities will be primarily in the form of either designating another portion of the securities we issue as "subordinate securities" (on which the credit risk from the loans is concentrated), paying for **financial guaranty insurance policies** for the loans, or both."

It is unclear and doubtful if American Home is employing guidelines set forth by Mortgage

insurers, investment financing partners, or the "Statement of Principles" set forth by Senator

Dodd. Due to financial guaranty insurance policies, American Home may be negligent in

servicing loans which may lead to non payment of credit insurance policies which will severely

adversely affect investors in these notes. It is also unclear if loans were misrepresented to begin

with to obtain the insurance policies.

36. On American Home own investment statements, American Home states:

*"If warehouse lenders and securitization underwriters face exposure stemming from legal violations committed by the companies to whom they provide financing or underwriting services, this could increase our borrowing costs and harm the market for whole loans and mortgage-backed securities.*
In June of 2003, a California jury found a warehouse lender and securitization underwriter liable in part for fraud on consumers committed by a lender to whom it provided financing and underwriting services. The jury found that the investment bank was aware of the fraud and substantially assisted the lender in perpetrating the fraud by providing financing and underwriting services that allowed the lender to continue to operate, and held the bank liable for 10% of the plaintiff's damages. This is the first case we know of in which an investment bank was held partly responsible for violations committed by the bank's mortgage lender customer. If

other courts or regulators adopt this theory, investment banks may face increased litigation as they are named as defendants in lawsuits and regulatory actions against the mortgage companies with which they do business. Some investment banks may exit the business, charge more for warehouse lending or reduce the prices they pay for whole loans in order to build in the costs of this potential litigation. This could, in turn, harm our results of operations, financial condition and business prospects."

American Home is aware of the exposure and risk to their financing partners, which may be

incurred as a result of their negligence.

    37. On American Home own investment statements, American Home states:

**"We are subject to losses due to fraudulent and negligent acts on the part of loan applicants, mortgage brokers, other vendors and our employees.**
When we originate mortgage loans, we rely heavily upon information supplied by third parties, including the information contained in the loan application, property appraisal, title information and employment and income documentation. If any of this information is intentionally or negligently misrepresented and such misrepresentation is not detected prior to loan funding, the value of the loan may be significantly lower than expected. Whether a misrepresentation is made by the loan applicant, the mortgage broker, another third party or one of our employees, we generally bear the risk of loss associated with the misrepresentation. A loan subject to a material misrepresentation is typically unsaleable or subject to repurchase if it is sold prior to detection of the misrepresentation, the persons and entities involved are often difficult to locate and it is often difficult to collect any monetary losses that we have suffered from the misrepresentation.
We have controls and processes designed to help us identify misrepresented information in our loan origination operations, but, we may not detect all misrepresented information in our loan originations."

Although American Home states they have controls and processes designed to help identify

misrepresented information, plaintiff found them to be inadequate both in the issues which arose

in her lawsuit of broker misconduct, settlement misconduct, and appraiser misconduct, but also

in attempting to alert them to a very large mortgage fraud ring operating in CA. If someone is

presenting the evidence of fraudulent practices and American Home does nothing to address

them, what controls could they possibly have in place?

    38. On American Home own investment statements, American Home states:

**"We may suffer credit losses with respect to, and be required to repurchase, loans that we originate and sell, regardless of credit enhancements that we purchase.**

Although we typically purchase credit enhancements from Fannie Mae and Freddie Mac with respect to the agency-eligible ARM loans that we originate and sell, we may nevertheless suffer credit losses with respect to these loans if we do not originate the loans correctly. We also may be required to repurchase the loans under these circumstances. In addition, we may suffer credit losses on non-agency eligible securities to the extent that they do not have, or have only limited, credit enhancements. Credit enhancements will not protect us from such credit losses or repurchase obligations."

Loan insurers, both private and government, are increasingly looking for answers and looking at the origination and servicing practices of lenders. These origination and servicing practices could expose investors to risk associated with loans in which the insurance is found to be invalid after a foreclosure. As American Home goes out of business it will be the solely the owners of the notes which will suffer the losses. Funds, which in many cases, were the retirement funds of millions of Americans.

## AMERICAN HOME MORTGAGE BANKRUPTCY

39.    Upon the filing of this bankruptcy case, the estate was created. The property known as 2651 Peery Drive Churchville Md. 21028 , loan number #1001222336 became property of the estate, or is the subject of other assets which numerous banks and government entities are in the process petitioning the court to regain control of. This includes, but is not limited to, all of the debtor's legal or equitable property interests, servicing rights, escrow accounts, loan modification rights, as well as interests in property either recovered by a trustee, preserved for the benefit of the estate, or ordered transferred to the estate, such as avoidable preferences and fraudulent transfers. See 11 U.S.C. §541 (aX1-7).

40.    The property known as 2651 Peery Drive Churchville MD 21028 ,  is an ASSET or potential liability pending outcome of litigation, of  the estate or the true owner of the note. American Home is negligently handling this asset valued at more than $600,000.

## BANKRUPTCY DOES NOT PROTECT AGAINST FRAUD

41.    The Bankruptcy Code has long prohibited debtors from discharging liabilities

incurred on account of their fraud, carrying forth a basic policy of affording relief only to an

"honest but unfortunate debtor." Congress did not favor giving perpetrators of fraud a fresh start

(by allowing them to wipe out their debts in bankruptcy) over the interest in protecting victims of

fraud when it wrote the Bankruptcy Laws. Accordingly, Section 523(a)(2)(A) of the Bankruptcy

Code excepts from discharge in bankruptcy "any debt …. for money, property, services, or an

extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false

representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A).

42.    It is not only the actual value of the "money, property, services, or . . . credit" the

debtor obtained through fraud that is non-dischargeable in bankruptcy, but also treble

"punitive" damages and attorneys fees and costs related to the fraud. This was made clear

in a March 25, 1998 decision of the Supreme Court of the United States in <u>Cohen v. de la Cruz</u>.

Debts which can't be discharged in bankruptcy….(8) Debts incurred due to false statements

made with the intent to deceive (9) Fraud committed in a fiduciary capacity, such as

embezzlement or larceny (10) Punitive damage claims for "willful and malicious" acts

## CONSUMER PRIVACY OMBUDSMAN

43.    Upon information and belief borrowers personal information is at risk, and is

being shared with a variety of other entities and potential bidders for the American Home

Servicing business and loan pools such as Broadhollow LLC and Melville LLC. In addition,

The Debtors may attempt to transfer loans to purchasers free and clear of pending litigation or

any liabilities incurred by the Debtors. American Brokers Conduit provided this information to

Plaintiff with the loan application:

"At American Brokers Conduit your privacy is important to us. That is why we
work hard to uphold your privacy. The information that you provide us is always kept in the
strictest of confidence. We have no intentions of selling your nonpublic personal information to
any nonaffiliated third parties. We make this commitment to you with pride, because your trust is
the foundation of our business. ("See Exhibit "B")

44.    The trustee pursuant to U.S.C. § 363 (b)(1) is required to protect the personally

identifiable information about individuals to persons that are not affiliated with the

debtor and if such policy is in effect on the date of the commencement of the case, then the

trustee may not sell personally identifiable information to any person unless(A) such sale or such

lease is consistent with such policy; or (B) after appointment of a consumer privacy ombudsman

in accordance with section 332, and after notice and a hearing, the court approves such sale (I)

giving due consideration to the facts, circumstances, and conditions of such sale; and(ii) finding

that no showing was made that such sale would violate applicable nonbankruptcy law. (2) If

notification is required under subsection of section 7A of the Clayton Act in the case of a

transaction under this subsection, then, (A) notwithstanding subsection (a) of such section, the

notification required by such subsection to be given by the debtor shall be given by the trustee;

and not disclose to an individual Consumer's have the right to know that personal information is

being protected, loan files are being protected, documents related to potential claims are being

secured and protected, and private information is not transferred to unknown entities.

.    33.    Plaintiff further moves this court to appoint a Consumer privacy ombudsman

pursuant to U.S.C. § 332 et seq. in order to protect personal information and property rights

pursuant to U.S.C. §363 et seq. of all borrowers whose loans are now part of American Home

Mortgage Servicing to protect the interest of all borrowers in reference to currently pending

sales of negotiable instruments, documents of title, deposit accounts, and other assets of

the estate under 363(a)(b)(1), which may or may not include Ms. Rush's property.

34.    Plaintiff moves this court, for the bankruptcy trustee as the representative of the

estate, pursuant to U.S.C. §323 (a) and U.S.C. §363 (a) to protect all  negotiable instruments,

documents of title, securities, deposit accounts, whenever acquired in which the estate and an

entity other than the estate have an interest and includes the proceeds, or profits of property and

the fees, charges, accounts or other payments for the use or occupancy, whether existing before

or after the commencement of a case.

35.    In this capacity the bankruptcy trustee pursuant to §323 (b) has the capacity to sue

and to be sued. The relief requested will protect the Debtor's estate from further legal action due

to the negligent actions of American Home Mortgage Servicing during the Chapter 11

liquidation process.

## INJUNCTION AGAINST TRANSFER OF DEEDS OF TRUST AND  MORTGAGE NOTES FREE OF LIENS AND LIABILITIES

36.    Plaintiff  moves this court to issue an injunction against any transfers of loans

until such time borrowers can ascertain the true owners of their notes, and parties of interest who

have rights and responsibilities,  now or in the future to address legal issues,  can be identified.

These parties may regain control or be forced to maintain control of the loan assets, and

borrowers can assert claims therein. If the Debtor's estate is the true owner of the note, then the

bankruptcy trustee is responsible pursuant  to §323 (a) for preserving the assets of the estate of

American Home or any of it's affiliated bankrupt entities. The trustee is also required to

ascertain the conduct of Debtors in reference to fraudulent transfer of assets leading up to or through the bankruptcy proceedings.

37.  All borrowers, including but not limited to Ms. Rush,  have the right to know the true owner of the note as defined under U.S.C. §741(2)(A) et seq; and any entity that has a claim as defined under U.S.C. §741(2)(B)et seq.

38. Secured Claims. Secured claims are defined as including "liens," 11 U.S.C. § 101(37), "security," 11 U.S.C. § 101(49), "security interest," 11 U.S.C. § 101(51), "security agreement" 11 U.S.C. § 101(50), and "secured claim," 11 U.S.C. § 506(a). An allowed claim secured by a lien on property in which the estate has an interest, or that is subject to setoff, is a "secured claim" to the extent of the value of the creditor's interest in the estate's interest in the property, or the amount subject to setoff. 11 U.S.C. § 506(a). A secured claim carries the right to "adequate protection" of collateral. 11 U.S.C. §§ 361-364; see United Sav. Ass'n v. Timbers of Inwood Forest Assocs., 484 U.S. 365 (1988).

39.  If the note is to be sold to another entity, borrowers have the right to protection of what personally identifiable information as defined in U.S.C. §741(3)  may be provided to that entity in the process. Borrowers also have the right to assert claims and preserve claims against any entity who purchases the note.

40.  Important issues need to be addressed concerning "customer property" as defined under U.S.C. §741(4)et seq.,  including the security, and proceeds of such security, property, received, acquired, or held by or for the account of the debtor, from or for the securities account of a customer. Property such as deed of trust, securities, and escrow accounts which may have been unlawfully converted that is the lawful property of the estate.

41.   Borrowers have the right to disclosure of any known and unknown parties of interest in their notes, including but not limited to any and all loan financing partners, credit default swap partners, guarantors, master loan servicer, credit insurers, credit enhancement providers, whether that party insures an individual loan or an entire loan pool, including any party who as defined under 741 (7) (A)(i) which owns a security interests or provides insurance associated with a particular loan or loan pool that carries any credit enhancements, or any guarantee as defined under 741 (A)(ix).

42.   Upon information and belief, very specific requirements exist in relation to loan workouts, modifications, and procedures lenders must employ, before the lender can initiate foreclosure proceedings and collect payment on insured loans.  Failure to employ these guidelines may result in forfeiture of insurance and losses to investors or the Debtors estate.

43.   These guidelines should be available to the borrowers to protect their interest, the interest of the insurer of the loan, the true owner of the note, and the interest of the Debtor's estate.

44.   The Debtor's estate, and other known and unknown parties of interest are being unreasonably exposed to losses due to fraudulent and negligent acts on the part of, mortgage brokers, other vendors such as foreclosure attorneys, and remaining "AHM" employees. Current employees, which are being paid a 40% premium from the Debtor's estate for their continued services, employed by "AHM" Servicing Center are not conducting themselves with honesty, integrity or within the legal guidelines required by the investors, or insures of the loans in which they are servicing. This court is protecting the Servicing unit at the expense of the best interest of the Debtor's estate and the borrower's who are severely disadvantaged with no voice in this matter.

45.  "AHM" origination of loans, relied heavily upon information supplied by third parties, including the information contained in the loan applications, property appraisal, title information and employment and income documentation. In many cases, which the investors are unaware of, this information was intentionally or negligently misrepresented and such misrepresentations were not detected through lack of due diligence prior to loan funding, and the value of the loan may be significantly lower than expected. In some cases, information was intentionally altered and/or misrepresented and now these practices are being revealed openly and publicly by former employees. These employees have given their names and in what specific department in American Home they worked and this court should compel testimony to bring to light the fraudulent activities and how that activity may expose the Debtor's estate, borrowers, loan insurers, known and unknown parties, to known and unknown risks. This testimony will also bring to light whether the current court protection of the Debtor's Servicing unit and control of loans thereof is prudent and reasonable.

46.  Whether a misrepresentation is made by the loan applicant, the mortgage broker, another third party or an "AHM" employee, "AHM" generally bears the risk of loss associated with the misrepresentation. Due to American Home bankruptcy filing, it is the Debtor's estate, the Trustee of the Debtor's estate, the secured and unsecured creditor's, loan insurers, and potential loan purchasers or asset purchasers, who will bear the losses of any fraudulent activities or mismanagement of the assets before or during the bankruptcy proceedings.

47. Any loan subject to a material misrepresentation is typically unsaleable or subject to repurchase if it is sold prior to detection of the misrepresentation. The persons and entities involved are often difficult to locate and it is often difficult to collect any monetary losses that "AHM" or other financing partners have suffered, or the Debtor's estate, from the

misrepresentation. Time is of the essence for loans to be returned to the rightful owner therefore

minimizing damages to the borrowers, the creditor's of the Debtor's estate and the investors.

## **BROADHOLLOW LLC AND MELVILLE LLC LOAN POOLS**

48.    Borrowers loans, such as Ms. Rush's, may or may not be a part of the

Broadhollow LLC and Melville LLC loan pools which are being incorporated into the

bankruptcy proceeding. It is urgent that this Court on behalf of all borrowers, including Ms.

Rush, facilitate disclosure of the true parties of interest or true owners of the mortgage notes.

This court, is participating in the sale of Broadhollow and Melville assets for the protection of a

potential benefit of the 26 million dollar guarantee fund flowing back to the Debtor's estate, and

the estate is participating in this transaction with little information or clarity about the structure

of the loan pools, credit enhancements, the LLC's partners known and unknown, and the true

value of the loans in these loan pools and with no regard to the borrowers whose loans may be in

these loan pools, therefore exposing the Debtor's estate to known and unknown litigation risks.

49.    This Court, the Trustee, and the Unsecured Creditors Committee, is not protecting

the most important assets in this case, the approximately 197,000 loans with an aggregate

principal balance of approximately $46.3 Billion. Loans owned by American Home Mortgage

entities or serviced for others by American Home Mortgage Servicing, whose value is wholly

dependent on borrower ability to pay, willingness to pay, and ability to contact the real parties

of interest for a multitude of important legal issues surrounding their loans. Including but not

limited to, escrow accounts, ARM adjustments, mortgage fraud, loan origination RESPA or

TILA violations, YSP induced fraud, appraisal fraud, personal privacy issues, loss mitigation,

foreclosure, broker misconduct, servicing issues, etc.

50.     AHM continues to conduct its servicing business, which constitutes an asset of the Debtors' estate. The court is protecting this asset at the expense of, and to the detriment of, investors, and potential third party insurers, who will be exposed to mounting legal damages as borrower issues are not being addressed.

50.     On Aug 8, 2007 it was reported by Bloomberg News that Units of American Home Mortgage Investment Corp., facing margin calls from lenders, exercised an option allowing them to delay repaying the debt on Broadhollow Funding LLC extended maturities on commercial paper after being unable to roll over $150 million of the debt. Broadhollow had $138 million of subordinated notes cut to Ba1, the highest speculative grade, from Baa2.

51. Upon information and belief the Broadhollow's SLNs have significant credit enhancement available relative to various loss assumptions. The SLNs issued by Broadhollow benefit from market value swaps provided by Calyon (AA-/Positive/A-1+), ABN AMRO Bank N.V. (AA-/Watch Pos/A-1+), Bank of America N.A. (AA+/Stable/A-1+), and Citibank N.A. (AA+/Stable/A-1+), which cover the risk of any market value declines on performing loans and any non-credit-related market value declines on delinquent loans. Based on the most current information made available to Standard & Poor's, the 'A-1+' rated SLNs also benefit from credit enhancement consisting of subordinated notes and a cash reserve account (the 26 Million Account). This enhancement should be available to cover any credit-related deterioration in the price of delinquent and defaulted loans that are not covered by the market value swaps. According to the most recent servicing report, the total credit enhancement available to the 'A-1+' rated SLNs represents over five times the percentage of loans reported as 30 or more days delinquent, which Standard & Poor's believes will adequately cover what it considers to be a

severe stressed case liquidation scenario for the underlying assets. Broadhollow does not rely on traditional third-party liquidity, if the SLNs cannot be refinanced, then the notes' maturity can be extended up to 120 days. During the extension period, the extended SLNs may be repaid through a successful remarketing of the notes or through the liquidation of the underlying collateral. In a liquidation scenario, the notes will be repaid from sale proceeds, swap payments, and available credit enhancement. AHM's bankruptcy filing is a termination event under the Broadhollow transaction documents. Consequently, Broadhollow is no longer permitted to purchase additional mortgage loans, and all collections and sales proceeds, along with swap payments on any of the assets, will be held to pay off Broadhollow's SLNs as they mature. Under certain program termination events, the servicer, on behalf of the conduit, may also sell all nondelinquent and nondefaulted loans within 30 days of the related  program termination event. Any assets not sold would then be auctioned off no later than 45 days after the related termination event.

52.   The inclusion and participation in the Broadhollow and Melville loan pools could expose the Bankruptcy estate to litigation pending against any loans in these loan pools.  The Debtor's estate has already advanced $500,000 on the assertions of the Debtor that these loan pools would sell for a sufficient amount to protect the $26 million dollar guarantee fund. The first sale deadline came and was extended with no successful bidder. The Plaintiff's loan may or may not be a part of these loan pools.

53.   Upon information and belief the Court has not sufficiently inquired as to the financing structure of,  partners of, or other parties of interest in the Broadhollow LLC or Melville LLC's loan pools. Unless and until the Trustee or this Court can determine the benefits and risks to the borrowers, guarantors and partners associated with these loans, then the Debtor's

estate is exposing itself to known and unknown risks without all the facts surrounding these loan

pools, including but not limited to the funds already advanced of $500,000 for stalking horse

bidder compensation, and an additional $500,000 advance to the winning bidder. The LLC

structure may give known and unknown entities a personal pass through tax write off, or may

offer some other insured benefit on the entire loan pool, if in fact the loan pools do not bring the

amount required to facilitate any of the $26 million dollar guarantee fund flowing back to the

Debtor's estate. The unclear mix of the LLC structure and potential personal benefits of the

LLC's, mixed with the bankruptcy filing of American Home entities without the personal

association of Michael Strauss is of concern and should be clarified with the court to ensure this

involvement is not passing known and unknown associated problems with these loan pools to

deflect any personal liability of the owners and associated swap partners of these loan pools.

## SERVICING NEGLIGENCE

54.   On Ms. Rush's loan, mortgage fraud was committed and  American Home is

negligent in the processing and servicing and the investor or Debtor's estate stands to lose a

substantial amount due to American Home Mortgage's negligence. Ms. Rush has

alerted American Home to this issue and has been met with a total lack of regard, and she had

no recourse without cooperation except to initiate costly litigation and incur further damages.

55.   AHM Debtors estate may be held negligent to known and unknown  third

parties who may purchase this loan through this bankruptcy proceeding. American Home may

represent Ms. Rush's loan as having no pending legal issues as it was not included in the docket

#931 filing.  This would be a gross misrepresentation. AHM Debtors may be attempting a quick

sale of Plaintiff's note without the purchaser accepting the liability associated with the loan.

56.   This filing will serve as notice to all parties of interest,  Ms. Rush will be seeking

Relief from stay, to continue the case currently stayed in Greenbelt Md. Federal court before the

Honorable Judge Willam Nickerson, case WMN-07-CV-854.  American Home Mortgage will be

negligent if they fail to communicate this to the true owner of the note or any potential buyer

through the bankruptcy court as they could be exposing them to unknown risk.

## FRAUD IN LOAN ORIGINATION

57.    The loan was originally acquired through fraud and deception, due to a YSP

based incentive to induce Fraud by asserting certain detrimental terms in the loan contract. The

broker earned a YSP of $19,794 for asserting certain terms based on an incentive based rate

sheet provided by American Home Mortgage through American Brokers Conduit. American

Home used this practice as a part of the ordinary course of business. Plaintiff asserts that

American Home conduct was at all times was unconscionable. Unconscionability occurs when

meaningful choice is absent on the part of one party to a transaction and the contract terms are

unreasonably favorable to one of the parties.

12 U.S.C. §2607(a); 24 C.F.R. § 3500.14(b). RESPA prohibits the giving or receiving of any fee,
kickback or other thing of value for the referral of a "settlement service" (defined at 12 U.S.C. §
2602(3) and 24 C.F.R. § 3500.2).

 "An agreement or understanding for the referral of business incident to or part of a settlement
service need not be written or verbalized but may be established by a practice, pattern or course
of conduct." 24 C.F.R. § 3500.14(e).

58.    American Home negligently processed this loan offering a 1% interest rate ( not

payment rate), in those exact terms on the Uniform Residential Loan Application,  knowing they

did not offer such a loan.

59. This loan was illegally presented in contradiction to specific mortgage advertising requirements which the FTC has set forth in the publication, How to Advertise Consumer Credit & Lease Terms. I recently contributed to a joint investigation between the FTC and Federal Reserve to identify illegal practices of false advertising mortgage terms. The deception of the offer of an 1% interest rate continued on the Uniform Loan Application, and throughout the final loan documents.

60. An American Home direct Senior loan officer, Seth Harris, advertised heavily on Craigslist using this exact same "bait & switch" advertising, offering a 1% interest rate (using those exact terms) misrepresenting loan terms. American Home participated and encouraged brokers, and direct loan officers, to misrepresent loan terms.

61. American Home accepted an inflated appraisal without question, with the wrong home SF and a basement recorded as finished when it was not, questionable comps, and even the wrong bathroom count. American Home did not care because the only issue of interest to them was did this transaction contain a LTV ratio they could sell off to investors.

62. American Home either accepted documents which were altered or altered them, which is clear in the documents which have been put on record in the lawsuit pending in Federal Court. Plaintiff's documents contain consistent information and time date fax stamp from when the documents were faxed to the closing provider. American Home's documents don't contain any date stamps to prove timeframe of creation, nor do they contain consistent information within to date them in the transaction. For instance the Good Faith contained a different "promised" loan amount ( Bait) and estimated tax and escrows. The final documents had the "final" loan amount ( Switch) and the exact tax and escrows. On American Home's docs these figures are mixed up. The document contain the final loan amount but the earlier escrow

estimates. Dates throughout the documents on when they were signed is also not consistent.

63.   American Home Mortgage steered Plaintiff into using  several affiliated business

partners, including  ServiceLink/Chicago Title due to a Reinsurance Agreement in which

American Home received financial benefit from overcharges and title insurance. ServiceLink

filed a Deed which was altered after signature and then filed that Deed, a Deed Plaintiff did not

sign to hide an overcharge of $966 in recordation tax. Plaintiff found, ServiceLink would

have known of the overcharge on the day the Deed was recorded as the County only excepts

"checks" for the exact amount of taxes due. American Home and ServiceLink had no intention of

returning the funds until Plaintiff found this error one year later.  ServiceLink

then refunded the $966, but that didn't change the error on the original transaction or explain the

intent of and concealment of this amount. For full loan rescission under TILA and RESPA, only

a $35 error is necessary. This $966 was an amount which Plaintiff would have paid back with

interest over the life of the loan thereby enriching further American Home or true

owner of the note, a continuing tort to steal funds from Plaintiff.

Taxes and fees "prescribed by law that are or will be paid to public officials," such as for a release of lien. 12 C.F.R. 226.4(e).

The APR tolerance is .125% for regular loans and .25% for irregular (variable-rate) loans. 12 C.F.R. 226.22(a).

The finance charge tolerance for defendants in foreclosure actions is $35 (for rescission), 12 C.F.R. 226.23(h), and $100 (for monetary damages), 12 C.F.R. 226.18(d)(1).

The extended right of rescission lasts 3 years from the date of the closing of the loan. 12 C.F.R. 226.23(a)(3). *Semar v. Platte Valley Fed. S&L. Assn.*, 791 F.2d 699 (9th Cir. 1986)

The rescission remedy runs against any assignee: "Any consumer who has the right to rescind a transaction under section 1635 of this title may rescind the transaction as against any assignee of the obligation." 15 U.S.C. § 1641(c). *Mount v. LaSalle Bank Lake View*, 926 F.Supp. 759 (N.D.Ill. 1996); *Stone v. Mehlberg*, 728 F.Supp. 1341 (W.D.Mich. 1989).

64. Under Equitable estoppel principles, Plaintiff asserts that when a person has induced another person to act in a particular manner, the doctrine prohibits a person, upon principles of honesty and fair and open dealing, from asserting rights, the enforcement of which would, through his omissions or commissions, work fraud and injustice.

65. Plaintiff asserts that the Deed of Trust did not have the legal description of the land, and did not have the grantor's signature. The Deed was altered after signature to hide an overcharge of $966 in recordation tax which may or may not have been fee split with American Home.

Statute of Frauds: No matter what type of deed is used, it must be in writing, unless the specific jurisdiction has an exception to the writing requirement.

The writing MUST INCLUDE:
    a.  The grantor's and grantee's names
    b.  <u>Legal description of the land</u>
    c.  Words reflecting the grantor's intent to convey the property
    d.  <u>Grantor's signature</u>

An unsigned deed, even if recorded, does not impart constructive notice because it is not properly executed.

66. The laws of bankruptcy are clear that a debtor can not hide behind the bankruptcy Court to avoid allegations of fraud. American Home Mortgage has not only engaged in fraud and negligence in the origination of Ms. Rush's loan but continues the fraud and negligence in the servicing of this loan and failure to address a myriad of issue with borrowers.

## THE DEBTORS ESTATE

67. The loans in which American Home Mortgage owns are now the part of the Debtor's estate and represents the assets of the estate or assets of the true owner of the note.

While the bankruptcy court is distracted by the multitude of claims and issues in this matter, the

borrowers and the ASSETS to the Debtor's estate they represent are not being protected.

American Home Mortgage is mismanaging the Assets at the expense of all the

Creditors, borrowers, and note holders.

68.    AHM is using funds acquired from property tax accounts, employee accounts,

questionable stock offerings, loans created through fraud, and other unclear sources to hire an

army of attorneys to protect them. This army of attorneys is "fast tracking" liquidation of assets

and creating a fast escape of liabilities. American Home borrowers have not even had time to

file for Relief From Stay, and Debtors are liquidating assets including possibly their loans. This

Debtor has proven contracts and agreements, legal principles of good faith and fair dealing, mean

absolutely nothing to them and American Home egregiously is being allowed to use the "ill

gotten" gains to hire an army of attorneys to fight any and all claims against them, including

turning over servicing of loans that they don't own. At this point it is impossible for any

borrower to enter into any safe, meaningful, or enforceable agreement without the protection of

this court.

69.    Upon thorough investigations and information being disseminated publicly by

employees of "AHM" and others, Ms. Rush is aware that American Home has defaulted

on many agreements, and conducted many fraudulent and negligent acts in the ordinary course of

business.

### TRUE OWNER OF THE NOTE

70.    It is impossible for Ms. Rush to ascertain if her loan is owned by

American Home Mortgage, an affiliate, or financing partner. Notes are pledged, sold, bifurcated,

and traded in various derivative transactions like bubblegum baseball cards and their transfers,

sales, pledges etc., are not publicly recorded. As such, only possession of the actual original note

can prove the actual owner and holder in due course of the note and whom Ms. Rush can

discuss the very serious issues of mortgage fraud and loss mitigation and pending litigation.

All borrowers have the right to know the rightful owner of the note and the rightful owner of the

note has the right to direct communication with the borrower to address this very serious loss

exposure of over $600,000.  If the note has been pledged and encumbered, then that party must

be made aware of the potential losses associated with these issues, and Ms. Rush has the

right to secure release of the note, before further damage is done to all parties of interest. Those

parties, if the court upholds the continued control of loans through American Home Mortgage

Servicing may be left unaware of pending litigation in which they will be held ultimately

responsible for defending therefore making transfer of documents an urgent matter.

71.  Ms. Rush's Note may be in the Servicing Purchase Asset Purchase deal, the

Broadhollow LLC,  Melville LLC, or a wide  variety of other LLC's or loan pools. It is

imperative and legally required that this court reveal the true owner of the note as Ms. Rush and

other borrowers have no recourse without court intervention, to obtain this information through

American Home Mortgage Servicing or MERS.

72.  Borrowers need to be assured that all rights and remedies under TILA and

RESPA and personal information as required is protected and preserved in the American Home

bankrutpcy  proceedings.  Any assignee or purchaser of loan notes and Deeds of Trust and loan

servicing rights must be informed of any potential liability which attaches with the transfer of

those notes.  All borrower rights need to be protected under:

TRUTH IN LENDING ACT (TILA) 15 USC 1601-1667f
Sec. 1607 - Administrative enforcement
Sec. 1640. - Civil liability
Sec. 1641. - Liability of assignees;
Sec. 1635. - Right of rescission.
Any consumer who has the right to rescind a transaction under section 1635 of this title may
rescind the transaction as against any assignee of the obligation.

**(d)** Rights upon assignment of certain mortgages

(f) Treatment of servicer
(2) Servicer not treated as owner on basis of assignment for administrative convenience A
servicer of a consumer obligation arising from a consumer credit transaction shall not be treated
as the owner of the obligation for purposes of this section on the basis of an assignment of the
obligation from the creditor or another assignee to the servicer solely for the administrative
convenience of the servicer in servicing the obligation. **Upon written request by the obligor,
the servicer shall provide the obligor, to the best knowledge of the servicer, with the name,
address, and telephone number of the owner of the obligation or the master servicer of the
obligation. ( emphasis added)**
(3) "Servicer" defined
For purposes of this subsection, the term "servicer" has the same meaning as in section 2605(i)(2)
of title 12.

73.  When asked, American Home Mortgage refuses to provide and such information as

to the true owners of mortgage notes, and in some cases claims to own the notes. They refuse to

provide any agreements they may have with lenders whom loans they service. Ms. Rush

demands to know the entire chain of title to her property and the true owner of her note.

## THIRD PARTY LIABILITY

74.  When American Home Mortgage sells a loan to an investor, they are required to

make representations and warranties regarding the loan, the borrower and the property. These

representations are made based in part on our due diligence and related information provided to

us by the borrower and others. If any of these representations or warranties is later determined

not to be true, American Home Mortgage may be required to repurchase the loan, including

principal and interest, from the investor and/or indemnify the investor for any damages or losses caused by the breach of such representation or warranty. In connection with some non-prime loan sales, American Home may be required to return a portion of the premium paid by the investor if the loan is prepaid within the first year after its sale. If, American Home was found to be negligent and required to repurchase loans, indemnify investors or return loan premiums, it would have a material adverse effect on their business. This conflict of interest combined with the extreme control American Home has due to servicing the loans, has created a wall between borrowers and investors, thereby making it impossible for either to communicate the true nature of the loan origination or servicing issues. The end result however is the investor, the Debtors estate creditors and the borrowers will bear the brunt of the consequences. American Home can only hide the true nature of these loans if they can maintain control and keep that wall firmly in place. This can not be allowed to continue. Liability for common law fraud can be extended, from the lender, to a third party purchaser if the purchaser knowingly accepts the "fruits of the fraud.

75.    American Home may also be found to be negligent to other parties who provide credit enhancements on American Home Mortgage loans.  In connection with the loans American Home securitizes other than through guaranteed performance swaps and similar transactions with Fannie Mae, Freddie Mac, Ginnie Mae and the Federal Home Loan Banks, American Home provides credit enhancements for a portion of the securities, called "senior securities," to improve the price at which they sell them. This credit enhancements for the senior securities is primarily in the form of either designating another portion of the securities we issue as "subordinate securities" (on which the credit risk from the loans is concentrated), paying for financial guaranty insurance policies for the loans, or both. American Homes' use of credit

enhancement features to aid securitizations subject those insurers to losses for American Home's negligent acts.

76.    American Home Mortgage warehouse lenders and securitization underwriters face exposure stemming from legal violations committed by American Home Mortgage in reference to the financing or underwriting services. In June of 2003, a California jury found Lehman Brothers, a warehouse lender and securitization underwriter liable in part for fraud on consumers committed by FAMCO, a lender, to whom it provided financing and underwriting services. The jury found that the investment bank was aware of the fraud and substantially assisted the lender in perpetrating the fraud by providing financing and underwriting services that allowed the lender to continue to operate, and held the bank liable for 10% of the plaintiff's damages.

77.    American Home Mortgage under the protection of the bankruptcy court is subjecting investors to legal actions and mounting damages as a result of the continued control the bankruptcy court is allowing them over the servicing of the loans. These investors are facing both known and unknown risks associated with the loans American Home is servicing. Honest communication has not been forthcoming about the status of loans or the communications with borrowers on loans. Ms. Rush is an example of that breakdown.

78.    Investment banks are facing increased litigation as they are named as defendants in lawsuits and regulatory actions against the mortgage companies with which they do business, and are being investigated by investors who are demanding to know why the investments they made are now worthless. Credit enhancement providers, including  government sponsored entities Fannie Mae, Freddie Mac, Ginnie Mae and the Federal Home Loan Banks, and the private companies of Radian and MGIC, have ongoing investigations as everyone has to answer for the losses they have suffered due to the foreclosure epidemic.

79.  The issue of risk of associated third party damages all comes back to the control

the lenders who originate the loans are left to continue through servicing and foreclosure of the

loans. No one speaks directly to the borrower except for the lender.

80.  American Home has a responsibility, which in some cases is clearly spelled out

by these counterparties, and yet they negligently ignore the agreements. One such agreement was

that loans would be turned over immediately upon bankruptcy filing to protect the true owners of

the notes and insurers.

81.  Insurers have set forth very specific rules of loss mitigation a lender is required to

enlist before submitting a claim. However the only reports of exactly what the lender did are

generated from the lender. No one speaks to the borrower.

In May of 2006, an $800,000 settlement was reached with the government in reference to loans
originated under Columbia National, Inc., and required reforms in review procedures of loan
transactions for fraud. Civil allegations were made that the company submitted false and
fraudulent claims to the Department of Housing and Urban Development. The claims were to
reimburse the company for losses arising from foreclosures on government insured mortgage
loans written by the company. American Home Mortgage Holdings, Inc. purchased Columbia
National, Inc. in 2002, and subsequently renamed the company American Home Mortgage
Servicing, Inc.

The government has alleged that former employees of Columbia National Inc. created false and
fraudulent documents in association with the origination of government insured and government
guaranteed loans. According to the allegations, these former employees, working out of the
company's Bensalem branch office, created false and fraudulent verification of employment
documents, gift letters, credit references, and income documents. These false and fraudulent
documents were used to qualify certain individuals for loans; these individuals were unable to
pay back the loans, causing losses to the company, which losses were passed on to the
government.

"The company is now taking extra steps to ensure that loans originated at the company's
former office in Bensalem are legitimate. Before it submits any insurance claim on defaulted
loans from the Bensalem office, the company will undertake a targeted review of those loans
using a checklist of fraud "red flags." If there are indications of fraud in a loan, the company will
not seek reimbursement from the government for that loan."

The civil settlement resolves claims of the United States against Columbia National, Inc., now known as American Home Mortgage Servicing, Inc., under, among other things, the False Claims Act, 31 U.S.C. §§ 3729-3733. Under the terms of the agreement, Columbia National, Inc. will (1) pay $800,000 to the United States, (2) will indemnify the government against losses that may arise from the foreclosure on two specified loans, and (3) will employ an audit checklist, looking for indications of fraud, before submitting claims on loans originated by its former office in Bensalem.

82.    Former employees of American home have alleged a pattern and practice of rampant fraud taking place within various branches of American Home Mortgage. As long as the control of the documents remain with American Home Mortgage, fraud yet to be discovered is hidden. For this court to continue to protect American Home Mortgage and prevent the true owners of the notes from seizing the loans, is not acceptable considering the potential damage to borrowers, investors, and loan insurers. Fraud can not be protected under the bankruptcy code.

## FAILURE TO ENGAGE IN LOSS MITIGATION

83.    This filing will serve as notice to any and all prospective purchasers of Ms. Rush's note, of the issues regarding this loan, including but not limited to; the bankruptcy Trustee, the true owner of the note, one of the American Home Mortgage bankrupt or non bankrupt entities, all other American Home affiliated LLC's, or silently owned other Michael Strauss companies, or the true owner of the note which has yet to be revealed.

84.    American Home has failed to engage in loss mitigation, or provide any assistance to borrowers with very serious issues of mortgage fraud, Federal and state law violations and foreclosure. American Home refused to negotiate in good faith after stating they would do so and negligently refused a fair and reasonable settlement offer.

85.    AHM fails to answer RESPA Qualified Written Requests within the time period

Allowed as required by Federal law.

86.   Further AHM has refused to provide the identity of the true owner of the note and upon information and belief may has lied when they stated they were the true owner of the note.


## CREDIT ENHANCEMENTS

87.   AHM assets, including Ms. Rush's loan are the property of investors or the Debtor's estate, and these entities may suffer losses with respect to, loans that AHM originated and sold, regardless of credit enhancements. These credit enhancements are now coming under intense scrutiny and may or may not pay out claims. If negligence and fraud are found in respect to the origination of the loans or the servicing of the loans, companies who provided these credit enhancements will contest the legitimacy of the representations made by AHM.

88.   AHM purchases credit enhancements from Fannie Mae and Freddie Mac with respect to the agency-eligible ARM loans that they originate and sell, and may suffer credit losses with respect to these loans if they were not originated correctly. AHM now the Debtor's estate, may be required to repurchase the loans under these circumstances. The Debtor's estate may also suffer losses on non-agency eligible securities to the extent that they do not have, or have only limited, credit enhancements. Credit enhancements do not protect AHM from credit losses or repurchase obligations.


## FRAUD, RICO, TILA, RESPA, DBPA, ECOA VIOLATIONS

89.   Ms.Rush was the victim of a RICO civil conspiracy AHM participated in In the creation of a loan, in exchange for a YSP based incentive, a broker fraudulently coerced

Ms. Rush and misrepresented the property value and the loan terms. The YSP included an incentive for the prepayment penalty, the higher interest rate, the margin over the index to base future rate increases on, and the "pay option arm" loan. The broker premium YSP of $19,794 was paid through American Brokers Conduit to the broker, The Loan Corporation, for negligently and fraudulently creating Plaintiff's loans.

90.   Ms. Rush did not receive proper disclosures under TILA, an appraisal or even a accurate set of loan documents, including her important right of rescission. Ms. Rush settlement did not take place within RESPA guidelines and Ms. Rush did not understand what type of loan or agreements were being executed in her name. She was forced under severe duress to sign documents, and a notary by the name of Larry Provencal, hired by the American Home, through ServiceLink/Chicago Title, an entity in which American Home has a Captive Reinsurance agreement, did not explain any of the documents Ms. Rush was signing. Federal laws and many state laws were broken in the creation of this loan.

91.   Numerous entities including American Brokers Conduit, American Home Mortgage Acceptance, The Loan Corporation, Trust Appraisers, ServiceLink and Chicago Title and other known and unknown entities did engage in civil RICO conspiracy with AHM and did exact fraud on the Plaintiff for the purpose of pecuniary gain. The damage of which is now negatively affecting Ms. Rush and damages have continued to mount as these serious issues have been ignored.

92.   Mortgage brokers, through whom AHM originates wholesale loans have parallel and separate legal obligations to which they are subject. However, federal and state agencies and numerous lawsuits have increasingly imposed liability on Lenders and even the investors, for the legal violations of mortgage brokers. The United States Department of Justice in the past has

sought to hold mortgage lenders responsible for the pricing practices of mortgage brokers, alleging that the mortgage lender is directly responsible for the total fees and charges paid by the borrower under the Fair Housing Act even if the lender neither dictated what the mortgage broker could charge nor kept the money for its own account.

93.    AHM has acknowledged in the their investment statements they understand they may be subject to claims for fines or other penalties based upon the conduct of our independent mortgage brokers. In reality, the YSP is the "Kickback FEE" based on incentives AHM offered to mortgage brokers on rate sheets to commit fraudulent acts on borrowers.

94.    AHM lax underwriting and internal corporate culture allowed and facilitated additional misrepresentations to pass the loan to the next level of securitization and credit enhancement insurance. AHM was negligent in the origination underwriting and monitoring of vendors it controlled, negligent in the securitization and insuring of the loans, and negligent in the subsequent servicing and in some cases foreclosure of the loans.

95.    Ms. Rush's mortgage loan represents an asset to the Debtor's estate or an asset of an investor or financing partner of AHM and may also be a liability to an insurer. These parties will suffer losses due to AHM negligence.

96.    If AHM is the true owner of the note, the Debtor's estate and AHM creditors will be losing a valuable asset and potentially facing $600,000 or more in losses and litigation costs associated with this mortgage loan. Losses already include the cost of litigation, and the loss of payments for over one year already, and going forward these cost may include the cost of litigation from third parties of interest.

97. American Home Mortgage acts contained herein at all times were in violation

of Deceptive Business Practices Act and caused substantial injury to consumers. Under DBPA

commercial deceptive and unfair business practice is prohibited.

Where a conduct is within the definition of Uniform Deceptive Trade Practice Act, it is unlawful

whether a person has, in fact, been misled, deceived, or damaged. DBPA prohibits commercial

unfairness, requiring proof that: (1) the challenged practice offends public policy; (2) is immoral,

unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers.

98.   If  Broadhollow or Melville LLC pools include Ms. Rush's note, then another

third party is exposed to risk associated with this loan. If no bidders come forward at the

now extended deadline auction, the Debtor's estate may have to bear the costs of the litigation. .

99.    Although it is impossible for Ms. Rush to determine the true owner of the note

AHM  knows the true owner and knows the risks it is exposing that party to,  yet AHM is failing

to address this issue with the parties of interest. This is the protection that this Court is providing

to the Debtor at the expense of the borrowers and the true owners of the notes.

100.    AHM has demonstrated through the bankruptcy proceeding the total disregard

for all former loan funding banks and peers in this industry including, private and government

sponsored entities whose loans are serviced by American Home Servicing. This court needs to

understand this wedge, which it is upholding, between the true note owners and the borrowers by

the servicer, American Home for the control of the notes, needs to be urgently addressed.

101.    This court is allowing AHM to use "ill gotten gains" from investors,

questionable stock offerings just months before bankruptcy, employee deferred compensation

plans, tax escrow accounts, failure to pay appraisers, brokers, and many other vendors, landlords,

and business tax entities, to fight the demands of investors attempting to gain control of the

investments they rightfully own. These investors have the right and borrowers need the direct

access to the investors and true owners of the note. This filing and request for appointment of a

Consumer Privacy Ombudsman under U.S.C. §332 and Trustee or Examiner under U.S.C. §1104

is intended to pierce the veil of secrecy that AHM is maintaining between the borrowers and the

investors, the court, and the creditors of the Debtors estate.

102.     Borrowers, like Ms. Rush are attempting to communicate and solve urgent

problems are met with many Federal and State laws being broken in the process. The effect

of which will bring hardships on the true owners of the notes, and the Debtor's estate, as

borrowers have no choice but to file lawsuits to address the issues they face. AHM is not

engaging in any rules of loss mitigation, or any other specific rules  set forth by loan insurers,

investors and others.

103.     Investors in these notes, the true owners of these notes, and the Debtor's estate,

have the absolute right to know the truth and to review issues and  decide if they wish to engage

in loss mitigation and avoidance of litigation. The true owners of the notes will be facing the

litigation from negligent handling of the servicing of the loans.

## NOTICE

104.     Notice of this Motion will be provided to (i) the United States Trustee of

the District of Delaware;(ii) counsel to the Official Committee of Unsecured Creditors; (iii) and

Counsel for the Debtors.  In light of the nature of the relief requested herein, the Plaintiff's

submit that no other or further notice is required.

## NO PRIOR REQUEST

105.     No prior Application for the relief requested herein has been made to this or

any other court.

**WHEREFORE**, the Plaintiff respectfully requests entry of the Proposed Order, in the form attached hereto, granting relief requested herein directing each of the Debtors to produce the documents requested and appear for depositions, including by subpoena, to be served on each of the Debtors.

Paula Rush
Pro Se
2651 Peery Drive
Churchville MD 21028
443-676-3509
410-914-5315

## CERTIFICATE OF SERVICE

I hereby certify that on this 4nd day of October, 2007, a copy of the foregoing Motion was mailed by first class mail, postage prepaid to:


Counsel for Debtors:
Pauline K. Morgan, Esquire
Young, Conaway, Stargatt & Taylor, LLP
1000 West Street, 17th Floor
P.O. Box. 391
Wilmington DE 19899-0391
Phone: 302-571-6600
Fax: 302-571-0453


Joseph  M. McMahon Esq.
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Wilmington, DE 19801
Phone: 302-573-6491
Fax: 302-573-6497

By Fax to:
Senator Schumer
Phone: 202-224-7391
Fax 202-228-3027
and
Senator Dodd
Phone: 202-224-6542
Fax 202-224-5137


_____ Date: 10/4/07
Paula Rush pro se
2651 Peery Drive
Churchville MD 21028
443-676-3509
410-914-5315