```
1               IN THE UNITED STATES BANKRUPTCY COURT
2                   FOR THE DISTRICT OF DELAWARE
3      IN RE:                         ) Chapter 11
                                      )
4      AMERICAN HOME MORTGAGE         )
       HOLDINGS, INC., et al.,        ) Case No. 07-11047 (CSS)
5                                     )
                    Debtors.          ) Jointly Administered
6
7         Deposition of JAMES H. ARONOFF taken pursuant to
       notice at the law offices of Young Conaway Stargatt &
8      Taylor, LLP, The Brandywine Building, 1000 West Street,
       17th Floor, Wilmington, Delaware, beginning at 11:05
9      a.m., on Thursday, October 12, 2007, before Debra A.
       Donnelly, Registered Professional Reporter and Notary
10     Public.
11     APPEARANCES:
12         JOHN DORSEY, ESQUIRE
           YOUNG CONAWAY STARGATT & TAYLOR
13             1000 West Street, 17th Floor
               Wilmington, Delaware  19801
14             for Debtors
15         KURT F. GWYNNE, ESQUIRE
           REED SMITH, LLP
16             1201 Market Street, Suite 1500
               Wilmington, Delaware  19801
17             for GMAC Mortgage and Residential
               Funding Corporation
18
19
       - - - - - - - - - - - - - - - - - - - - - - - - - - - -
20                       CORBETT & WILCOX
                REGISTERED PROFESSIONAL REPORTERS
21       230 N. MARKET STREET   WILMINGTON, DELAWARE   19801
                         (302) 571-0510
22            Corbett & Wilcox is not affiliated
               with Wilcox & Fetzer, Court Reporters
23
24
```

1  there was six different binders and they all had
2  different tabs, AB, AC.
3              MR. DORSEY:  It was probably the same
4  binders that were sent to you.
5              THE WITNESS:  I got three boxes of
6  binders as well.  I don't know if they were what you got.
7              MR. GALLO:  Okay.  Those are the same.
8  Right?
9              MR. DORSEY:  Yes.
10 BY MR. GALLO:
11     Q.   So did you review each of those contracts in
12 coming to your opinion?
13     A.   I reviewed a significant portion, a
14 significant sampling of those agreements, yes.
15     Q.   Did you review each and every one of those
16 agreements?
17     A.   No.
18     Q.   When you say "significant portion,"
19 approximately how many -- how many of those agreements
20 did you review?
21     A.   I didn't count them.  I would say probably 80
22 to 85 percent of the agreements.  If agreements were
23 duplicative, which I could figure out pretty early on, I
24 didn't read the same standard form with different dates

1                   As you start to deconstruct the
2    functions related to the origination, collection,
3    servicing, remittance of the cash flow related to
4    mortgage loans, it's a critical part of creating REMIC
5    and other mortgage-backed security structures to identify
6    who is doing what to whom to make sure that if in any one
7    party is unable to perform the functions that it was
8    originally intended to perform, another party can come in
9    and replace them.  And the investors will, in that way,
10   continue to get the benefit of their bargain.
11                  The strength of structured finance was
12   that the whole of the parts is greater than any
13   individual, and so that, in order to make sure that
14   investors get their money, you have to clearly define
15   what each party to the transaction is responsible for.  A
16   critical function is servicing.  That's why you have
17   backup servicers, hot servicers, master servicers.  And
18   in order for those parties to understand what their
19   obligations are vis-a-vis the trust, you have to identify
20   and articulate very specifically, apart from taking
21   credit risk, i.e. being a guarantor or a deep pocket for
22   the investors, you have to identify specifically what the
23   servicing responsibilities are.
24        Q.   And is it your understanding, then, that

1                MR. DORSEY:  MLPAs.

2    BY MR. GALLO:

3        Q.   All right.  Let's call them MLPAs.

4                Do you understand what I'm talking about

5    when I talk about MLPAs?

6        A.   Yes.

7        Q.   So the issue which you just described, which

8    is an issue of similarity among different agreements.  Is

9    that fair to say?

10       A.   No, it's a little different.  It's the desire

11   of any large investor who is a securitizer to find a

12   standard form of agreement that would be executed by all

13   of their sellers.

14       Q.   And the fact that they want a standard form of

15   agreement, why is that, how does that relate to having

16   sale and servicing functions clearly delineated in the

17   agreement?

18       A.   Because -- because you know that the servicing

19   issue is an important issue for purposes of the level of

20   credit enhancement, the rating agency inquiry, depending

21   upon the riskiness of the collateral, it's an issue that

22   some investors might care about.  It's very important to

23   the investor community who the servicer is and what their

24   capabilities are, and that is a separate and distinct

1    Home Corp and American Home Mortgaging, I'm sorry,

2    Servicing as parties to an MLPA where they are both

3    liable for the reps and warranties related to the sale,

4    if you are going to transfer that servicing to somebody

5    else, you would need to either modify that agreement or

6    you would need a new agreement that would separate the

7    reps and warranties relating to the sale from the

8    servicing.  It's the same situation, right?

9         A.   No, it's not.

10        Q.   Why not?

11        A.   Because in my reading of the master purchase

12   and sale agreements in this case, it's clear that the

13   servicing rights are separate and distinct from the

14   obligations of the seller to make good on the reps and

15   warranties.

16        Q.   You are bucking my hypothetical again.

17             My hypothetical is I want you to assume

18   for me that there is a master, an MLPA in this case in

19   which both American Home Servicing and American Home Corp

20   have each indemnified the purchaser for the reps and

21   warranties associated with the sale.

22             Can you assume that for me?

23        A.   Yes.

24        Q.   If American Home wanted to sell those

1      A.   Once.

2      Q.   Do you know the name of the article and the
3 publication?

4      A.   No, it was so long ago.  It was when I was at
5 FSA, I coauthored an article on the value and importance
6 of credit enhancement.  I don't even know where it was
7 published.

8      Q.   No problem.

9          So never published anything on
10 securities contracts or mortgage loans, purchase of
11 re-mortgaged loans, servicing rights?

12     A.   That's correct.

13     Q.   I think your earlier testimony mentioned that,
14 and you can correct what year, the last time you drafted
15 or negotiated MLPA was, I think, '94 or '97?  Something
16 like that?

17     A.   I think I said 2004.

18     Q.   2004.  Sorry.

19          And do you recall, is that servicing
20 released, servicing retained, both?

21     A.   At Recon, we did both, we looked at
22 transactions that were both released and retained.

23     Q.   Okay.  You said it was in 2004, so that was
24 prior to the bankruptcy amendments in 2005?

1          Q.   Have you ever done any studies or reports on
2     the industry, and "the industry" being the purchase of
3     mortgage loans for servicing rights?
4                    MR. DORSEY:   Objection to form.  Studies
5     of what?
6     BY MR. ROVIRA:
7          Q.   Have you ever done any studies in the industry
8     that considers the purchase of mortgage loans as a
9     securities contract?
10         A.   No.
11         Q.   Have you ever had discussions or did any kind
12    of panel discussions with market participants concerning
13    the business of purchasing home mortgage loans on the
14    servicing retained or servicing released basis?
15         A.   Not specifically that I can recall, but I had
16    been a frequent speaker at industry conferences and was
17    on the board of directors of the national home equity
18    mortgage association for some period of time.
19         Q.   In your speaker capacities, have you lectured
20    on, specifically on mortgage loans?
21         A.   Among other things, yes.
22         Q.   And is that typically in the subprime mortgage
23    market or in some other capacity?
24         A.   It would be regarding various aspects of

1        A.    Exhibit 1 is a consulting services agreement.
2        Q.    Thank you.
3              Do you see the paragraph that's headed
4    "Consulting Fees"?
5        A.    Yes.
6        Q.    And do you see that for -- Young, Conaway
7    shall compensate, and about three or four lines down, it
8    says, "For tasks performed under this agreement
9    including," and you go down to the third line, it says,
10   "Preparation of reports"?
11       A.    I see that, yes.
12       Q.    And have you written any reports or prepared
13   any reports in your representation, in your engagement?
14       A.    No.  I just told you that that's not part of
15   this engagement.
16       Q.    Were you specifically asked not to do a
17   report?
18       A.    No.  I was told a report wasn't necessary in
19   this instance.
20       Q.    In your prior retentions, do you generally
21   prepare a written report?
22       A.    I have never been an expert witness before.
23       Q.    Do you have any notes or worksheets or any
24   documents that you've started preparing in your review of

1    the documents?

2         A.   No.

3         Q.   Can you describe to me the steps you followed

4    in forming your opinion?  And I am talking your opinion

5    regarding the severability.

6              MR. DORSEY:  Object to form.

7              THE WITNESS:  Yeah.  I formulated an

8    opinion based on my experience and knowledge of the

9    industry and transactions I was personally involved in,

10   and then looked at the documents I was sent in this case

11   to see if they in any way changed or dissuaded me of that

12   opinion.  And I concluded that my initial understanding

13   of market convention was confirmed upon my review of the

14   three boxes of documents I received.

15   BY MR. GALLO:

16        Q.   Did you take any notes on your review of those

17   documents?

18        A.   No, I read them.

19        Q.   Can we mark as Exhibit 4, this is a Purchase

20   Warranties and Servicing Agreement with my client, EMC.

21             Can you just read the title to me for

22   Exhibit 4?

23             (Aronoff Deposition Exhibit No. 4, which

24   is entitled, "Purchase, Warranties and Servicing

1    Agreement," was marked for identification.)

2                    THE WITNESS:  I'm sorry, what was the

3    question?

4    BY MR. ROVIRA:

5         Q.    Can you just verify Exhibit 4, what you have

6    in front of you?

7         A.    Verify as what?

8         Q.    What's the title of it?

9         A.    "Purchase Warranties and Servicing Agreement."

10        Q.    And it's between which parties?

11        A.    EMC Mortgage Corporation, Purchaser, American

12   Home Mortgage Corp, Company, American Home Mortgage

13   Servicing, Inc., Servicer.

14        Q.    And in preparation of your opinion, did you

15   review this contract?

16        A.    Quite honestly, I don't recall whether this

17   was the ones I looked at.

18        Q.    Okay.  Can you take a couple of minutes and

19   review it and see if it refreshes your recollection

20   whether you looked at it or not?

21        A.    Sure.

22        Q.    If you can tell me it's not part of what

23   you've reviewed, then that's fine.

24        A.    I don't have any specific recollection of this

```
 1   document.
 2         Q.   As part of your opinion, are you going to
 3   provide an opinion on this specific agreement?
 4         A.   No.
 5         Q.   This agreement was a part of the agreements
 6   that was given to you in the binders that Young, Conaway
 7   prepared for you.  Is that correct?
 8         A.   I don't know.  I don't recall it.
 9         Q.   The binders that were provided to you gave you
10   a list and various agreements and contracts.  Is that
11   correct?
12         A.   No.  It was just the binders that were sent to
13   me.
14         Q.   And what was in those binders?
15         A.   Various contracts.
16         Q.   What opinion are you going to provide on those
17   various contracts?
18         A.   None.
19              MR. DORSEY:  I think we've already been
20   through this.
21   BY MR. ROVIRA:
22         Q.   So, what is the opinion that you will be
23   providing on severability?
24         A.   That mortgage loan servicing rights, the
```

1   severability of mortgage loan servicing rights is -- we

2   have been through this and I'm tired.  I apologize.

3               I'm opining as to the severability of

4   mortgage loan servicing rights in the context of mortgage

5   loan purchase and servicing agreements and related

6   security documents, and that the creation of servicing

7   rights is in no way impaired or diminished based on the

8   fact that they are created in the context of a document

9   that does a number of other things unrelated to the

10  servicing of it.

11      Q.   In your review of the various agreements,

12  because I think you have not reviewed this specific

13  agreement, were there any specific provisions or sections

14  in the agreements that were central to your conclusion?

15      A.   No.  I tested it entirely the opposite way.  I

16  found nothing in any of the documents I reviewed that was

17  inconsistent with my opinion.

18      Q.   Bear with me for one second.

19              In your review, did you try to determine

20  if any of the factors weighed in favor of the agreement

21  being considered one single agreement, servicing rights

22  and mortgage loans as one agreement?

23              MR. DORSEY:  I'm sorry, could you read

24  that back.

1  factors is the intent of the parties in creating such an
2  agreement?  Did the parties intend to have one agreement
3  with severable parts or did they intend to have two
4  agreements?  Is the intent of the parties one of the main
5  factors that you considered?
6      A.  I had no way of knowing the intent of the
7  parties, so all I could do is put these agreements in the
8  context of how mortgage loan originators sell mortgage
9  loans and large institutional buyers buy loans, and went
10  through these agreements to make sure that they comported
11  with my understanding of how business is transacted in
12  this industry.
13      I have no way of knowing what the intent
14  of the parties were.  All I have is, is my view and
15  experience of how business is done on a reasonable basis
16  and to see if any of the documents reflected a desire on
17  the part of the parties to the transaction to act
18  unreasonably and out of conformity with what my
19  understanding of the market is.
20      I did not find that.  I found them
21  acting as I would have expected them to act and I felt
22  that the documents reflected my view of how these
23  transactions are conducted.
24      Q.  Can you turn to Section 901, which is on page,

1   about how this works in more detail, because I had never
2   been an expert witness before and I wanted to know if
3   that prevented me from going any further with them.
4        Q.   Did you talk to them about your compensation
5   on that initial call?
6        A.   I don't recall whether that was the first or
7   second call, but early on, they asked how I got paid, and
8   I said, For my consulting practice, I generally get paid
9   hourly.  There is no franchise -- or on a transaction
10  basis, but there is no franchise here, there is no stock
11  or anything being issued, so it would be on an hourly
12  basis.
13       Q.   In your consulting business, you are talking
14  about the work you do through MTGX?
15       A.   Almost all of my work through MTGX is more
16  advisory related, consulting related.
17       Q.   Do you charge different hourly rates for the
18  work you do through MTGX?
19       A.   This is probably the low end of what I charge.
20       Q.   What are the rates that you charge?
21       A.   Anywhere from 5 to 750, $500 to $750 an hour.
22       Q.   What clients do you charge $750 an hour to?
23            MR. DORSEY:  To the extent that's
24  confidential information --