IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | ) Chapter 11 |
| | ) |
| AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation, et al., | ) Case No. 07-11047 (CSS) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) Related Docket Item Nos. 11, 113, 403, 674, 675, 865, 937, 1443 |
| | ) Sale Hearing Date: October 15, 2007 @ 12:00 noon |

## REPLY OF DB STRUCTURED PRODUCTS, INC. TO DEBTORS' OMNIBUS RESPONSE TO CERTAIN OBJECTIONS TO THE SALE OF CERTAIN ASSETS AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS RELATING TO THE DEBTORS' LOAN SERVICING BUSINESS

DB Structured Products, Inc. ("DBSP"), by and through its undersigned counsel, as and for its reply (the "Reply") to the *Debtors' Omnibus Response to Certain Objections to the Sale of Certain Assets and the Assumption and Assignment of Executory Contracts Relating to the Debtors' Loan Servicing Business* [Doc. No. 1443] (the "Debtors' Response"), and in further support of its objection to the Sale Motion and Assumption Notice [Doc. No. 675] (the "DBSP Sale Objection"), and its supplemental objection to the Sale Motion and Assumption Notice [Doc. No. 1108] (the "DBSP Supplemental Objection") respectfully submits as follows:[1]

### REPLY

A. **Executory Nature of Loan Sale and Servicing Agreement**

1. DBSP questions whether the Agreement can reasonably be considered non-executory just because the mechanism by which the Debtors receive their servicing fee involves a withholding of proceeds of loans owned by DBSP rather than a physical act of

payment by DBSP. Indeed, the Agreement specifically defines "Servicing Fee" as "... the amount of the annual servicing fee the Purchaser *shall pay* to the Servicer...." (emphasis added).

2. However, DBSP need not challenge the Debtors' characterization of the Agreement, because it is not one that advances the Debtors' cause. By calling the Agreement non-executory, the Debtors hope to assign its benefits to the proposed purchaser (the "Buyer"), while leaving behind substantial monetary obligations. See Debtors' Response at 18-19.

3. Unfortunately for the Debtors, what they propose is not permitted by law. First, DBSP's rights under the Agreement, which include the right to terminate for cause if certain obligations are not satisfied, are not of the type that can be non-consensually reduced to a "money satisfaction of such interest" so as to satisfy section 363(f)(5).[2] Second, although the term "interest" as used in section 363(f) of the Bankruptcy Code has been broadened in some jurisdictions to extend beyond *in rem* interests in property, under sections 541(a) and 363(f) of the Bankruptcy Code, a debtor may only sell contractual rights subject to whatever defenses are available to the non-debtor party. See Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV, 209 F.3d 252, 264 (3d Cir. 2000) (contract not sold free and clear of recoupment defense); In re Trans World Airlines, Inc., 275 B.R. 712, 718-19 (Bankr. D. Del. 2002) (same). To construe section 363(f) differently "would run counter to the 'fundamental principle[of the Code] that the estate succeeds only to the nature and rights of the property interest that the debtor possessed pre-petition,' and that the estate should not receive a 'windfall merely by reason of the happenstance of bankruptcy.'" Folger, 209 F.3d at 267 (Stapleton, J., concurring) (citations

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the DBSP Supplemental Objection.

[2] The Debtors do not claim that any other provision of section 363(f) could be satisfied here.

omitted). Thus, the Debtors cannot assign the Agreement free and clear of DBSP's claims under the Agreement.

4.  Moreover, if the Debtors could, somehow, sell "the Servicing Rights free and clear of any claimed defaults under the Servicing Agreements that can be reduced to a monetary claim," Debtors' Response at 19, DBSP would then be entitled to adequate protection of that claim pursuant to section 363(e) of the Bankruptcy Code. See 11 U.S.C. § 363(e) ("Notwithstanding any other provision of this section... the court... shall prohibit or condition such sale... as is necessary to provide adequate protection of such interest."). Therefore, even if the Court were to authorize sale of the Agreement, the debtor would have to "provide adequate protection, such [as] by providing for the interest to attach to proceeds of the sale." 3 COLLIER ON BANKRUPTCY (15th Ed. Rev.) p. 363.06[1], p. 363-49; In re DVI, Inc., 306 B.R. 496, 504-05 (Bankr. D. Del. 2004) (permitting sale free and clear of disputed constructive trust provided interest attaches to sale proceeds and proceeds are escrowed pending determination of interest); Trans World Airlines, 275 B.R. at 719 (sale was free and clear of setoff rights which attached to proceeds of sale); Folger, 209 F.3d at 259 ("[T]he holdings of the courts suggest that any interest in property that can be reduced to a money satisfaction constitutes a claim for purposes of section 363(f) and, therefore, attaches to the proceeds of the sale.").[3]

5.  Finally, DBSP notes that there is no precedent of which it is aware that would allow this Court to consider "severing" a *non-executory* contract into multiple parts. All the cases the Debtors rely upon arise only in the context of assumption and assignment under section 365 of the Bankruptcy Code, which, according to the Debtors, does not apply here.

---

[3] To the extent that the Debtors' adequate protection obligation must be preceded by a request for same by the non-debtor party, see 11 U.S.C. 363(e), DBSP hereby makes that request, which may be made "at any time." Id.

**B.**     *Fleming*

6.     The Debtors' Response argues that the Proposed Sale is consistent with In re Fleming Companies, Inc., 2007 WL 2390776 (3d Cir. 2007). See Debtors' Response at pp. 31-35. However, at least with respect to the Agreement, it is not so. The Court in Fleming expressly found that the assignee in that case was misconstruing applicable law by focusing on whether the provision sought to be excised was "an economically material term." See Fleming, 2007 WL 2390776 at *5-6. Indeed, the Third Circuit found that even where the supply provision at issue there did not have "manifest material and economic significance[,]" it was "economically significant" in that without it, the non-debtor party "would not reap the benefit of its bargain." Id. at *6.

7.     Here, by trying to assign only what they deem to be the "servicing related" provisions of the Agreement, the Debtors are seeking to deprive DBSP of the benefit of its bargain by deleting integral portions of the Agreement, including provisions that obligate the Servicer for the performance of the Seller. The transaction the Debtors propose would essentially create a new servicing agreement, between DBSP and the proposed purchaser of the servicing business (the "Buyer"), pursuant to which none of the servicing obligations would be linked to the representations and warranties in the Agreement relating to the sale of the mortgage loans. This new agreement would be fundamentally different from the existing DBSP Agreement and would deprive DBSP of many of the benefits of its initial bargain.

8.     The problem with what the Debtors propose to do to the Agreement is best illustrated in connection with the indemnity provision of the Agreement. That section reads, in pertinent part, as follows:

> In addition to the indemnification provided in Subsection 7.04, the Seller *and the Servicer* shall indemnify the Purchaser and hold the Purchaser harmless against

any and all claims, losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and any other costs, fees and expenses that the Purchaser may sustain in any way related to *the failure of the Seller* to perform its obligations under this Agreement . . . .

Agreement § 13.01 (emphasis added).

9. The plain language of this section of the Agreement establishes, as a matter of law, that DBSP bargained for and received an indemnity from the Servicer of all obligations owed by the Seller under the Agreement, including Early Payment Default claims ("EPDs") and premium recapture obligations ("PRPs").[4] Such an indemnification provision makes sense where, as here, the Seller and the Servicer are related parties and their financial health is interdependent. To assume and assign the "servicing related" provisions of the Agreement without curing the existing EPD and PRP defaults, and without obligating the new servicer with respect to such claims going forward, would eviscerate the deal and is precisely the type of cherry picking prohibited by the Third Circuit in Fleming.

10. The Debtors' proposed expert, James Aronoff, admitted as much in his deposition when he testified that a party to an agreement where the loan servicer indemnified the loan purchaser for representations and warranties relating to the sale would have to modify that agreement, or enter into an entirely new servicing agreement, if it wanted to sell the servicing rights. See October 14, 2007 Deposition of James Aronoff at 48:17 - 49:15.[5] Absent a subsequent agreement that would clarify that the servicing rights were being severed from the initial servicer's obligation to indemnify for the sale representations and warranties, Mr. Aronoff

---

[4] The Debtors claim, in footnote 21 of their Opposition, that "EPDs and PRPs are sunk costs for which the Objecting Parties would only have claims against AHM Corp." is simply untrue with respect to DBSP's Agreement.

[5] Relevant pages of the deposition transcript are annexed as Exhibit "A" hereto.

testified that the servicing rights would not be able to be sold. See id. The Debtors, however, cannot modify or alter the rights as they exist in the Agreement - they must assume *cum onere.*

11. Presumably,[6] other provisions of the Agreement that link the Servicer's obligations to those of the Seller would also be extinguished by the transaction proposed by the Debtors. By way of example, section 14.01(i) of the Agreement makes it an event of default, allowing DBSP to terminate the servicing for cause, if the Servicer fails "to remit to the Purchaser *any payment* required to be made under the terms of this Agreement" (emphasis added). "Any payment" would include EPDs and PRPs, which the Debtors now seek to leave behind. The new servicing agreement with DBSP that the Debtors propose to create through the sale transaction would, no doubt, not include a provision allowing DBSP to terminate the servicing if EPD and PRP claims remain unpaid.

12. Furthermore, other provisions of the Agreement require that certain repurchase obligations be satisfied prior to the Servicer's right to receive reimbursement for expenses related to servicing (§ 11.09(ii)) or for "Monthly Advances" made by the Servicer to account for delinquent payments by borrowers under the mortgage loans (§ 11.09(vi)). Assigning the servicing rights without cure of the repurchase obligations, and allowing the assignee to receive the reimbursements in the future prior to the repayment of these obligations, deprives DBSP of the benefit of its bargain,

13. In addition, DBSP guesses that the Debtors may seek to substitute the Servicer for the Seller in numerous provisions of the Agreement. See e.g., Agreement, Section 1

---

[6] DBSP cannot be sure precisely which provisions of the Agreement consider to be "servicing related" and which are otherwise, because the Debtors have refused (and, upon information and belief, have made no effort) to identify those provisions. For this reason, in addition to all its other defects, the Proposed Order, if signed, would likely result in immediate litigation over its meaning.

(Definitions), definition of "Nonrecoverable Monthly Advance." (definition based upon "good faith business judgment of the Seller"). The extensive surgery that would need to be undertaken to attempt to separate the servicing functions from the other obligations under the Agreement speaks for itself: The servicing obligations can not be non-consensually severed from the Agreement without depriving DBSP of the material benefit of its bargain.[7]

### C. Fannie Mae/Freddie Mac Approval Requirements Are Not *Ipso Facto* Clauses

14. The Bankruptcy Code renders unenforceable in certain circumstances provisions conditioned on "the insolvency or financial condition of the debtor . . . ." 11 U.S.C. § 365(e)(1)(A); see also §§ 363(l), 541(c)(1). The Event of Default in the Agreement relating to Fannie Mae qualification is not an unenforceable *ipso facto* clause because it is not conditioned on the insolvency or financial condition of the Servicer. It simply provides that it shall be an Event of Default if "the Servicer ceases to meet the qualifications of either a FNMA or FHLMC seller/servicer." Agreement § 14.01(vi). This provision is not a proxy for solvency, as the Debtors claim. See Debtors' Response at 21. In fact, the Agreement contains separate Events of Default that are expressly conditioned on the insolvency and financial condition of the Servicer. See Agreement § 14.01(iii) - (v). Moreover, the Fannie Mae Seller/Servicer Guides contain hundreds of pages of requirements and guidelines that servicers must follow, most of which have nothing to do with the solvency of the servicer. See e.g., Fannie Mae Single Family Servicer

---

[7] The Debtors would be hard-pressed to deny that the Agreement would need to be substantially rewritten to accomplish the Proposed Sale with respect to the Agreement, because there is a transaction history that demonstrates this. When, with respect to certain loans not subject to the Proposed Sale, certain servicing related rights under the Agreement were assigned by DBSP to third parties in the past, these transactions could only be done with the parties' consent and through the use of subsequent agreements between DBSP and the Debtors (the so-called Assignment, Assumption and Recognition Agreements ("AARs")) that substantially *modified* the terms of the Agreement so that the servicing rights could be assigned. The AARs executed by

Guide 2006 Part II (Mortgage and Property Insurance), Part III (General Servicing Functions); Parti IX (Custodial and Remittance Accounting). (The Freddie Mac Servicer Guide is similarly voluminous and comprehensive.). Once approved, in order to maintain its eligibility as seller/servicer of mortgage loans to or for Fannie Mae, a servicer has to comply with the terms of its Mortgage Selling and Servicing Contract with Fannie Mae and with the provisions of the Fannie Mae Single Family Selling and Servicing Guides. See Fannie Mae Single Family Seller Guide 2007, Part I, ch. 3, Maintaining Eligibility ("After we approve a lender to sell mortgages to us, we require it to maintain its eligibility. To do this, the lender must comply with the terms of the Mortgage Selling and Servicing Contract, any separate agreements we have executed, and the provisions of this Guide. If it does not, we have the right to terminate the contractual relationship for cause.").

   15. In addition, whether the financial condition of the Servicer caused or contributed to the loss of Fannie Mae or Freddie Mac qualification in this case is irrelevant. "Contractual obligations integral to an agreement that a debtor seeks to assume cannot be evaded merely because the debtor's failure to fulfill them was a result of the debtor's insolvency or bankruptcy filing. Only provisions that directly invoke insolvency, bankruptcy filing, or appointment of a trustee or custodian are invalidated by § 365(b)(2) and (e)(1)." In re UAL Corp., 346 B.R. 456, 471 (Bankr.N.D. Ill. 2006) (internal citations omitted) (denying enforcement of cross default upon assumption on other grounds); see also, In re Margulis, 323 B.R. 130 (Bankr. S.D.N.Y. 2005) (fact that insolvency makes it more difficult for debtor to satisfy payment obligation does not turn contract provision into a prohibited *ipso facto* clause).

---

DBSP in relation to the Agreement each contain modifications that span three pages of the AARs and relate to *over 25 provisions* of the Agreement.

Because Fannie Mae and Freddie Mac qualification is an accepted standard in the secondary markets, it is no wonder that the Agreement requires the Debtors to maintain such qualification, even with respect to loans that may not currently be eligible for purchase by Fannie Mae or Freddie Mac. And while the Debtors at the hearing on DBSP's stay relief motion may have led the Court to believe that there was no market for "ITIN" loans, and that there was therefore no continuing prejudice to DBSP associated with any absence of Fannie Mae qualification, this is demonstrably not the case at all. Miriam Jordan, Unlikely Mortgage Winner: Illegal-Immigrant Loans Have Been Solid Bets, Wall St. J., Oct. 9, 2007, at C1.[8] Thus, the Fannie Mae/Freddie Mac approval requirements contained in the Agreement were and continue to be indispensable provisions of the Agreement and are fully enforceable.

D. **Burden of Proof**

16. The Debtors conclusorily assert that "any provisions of the Servicing Agreements that may be modified in connection with the proposed assumption and assignment thereof are immaterial and/or economically insignificant." Debtors' Response at p. 33. The Debtors then glibly "leave the Objecting Parties to their burden of proving otherwise at the Sale Hearing[,]" citing to "In re Joshua Slocum, Ltd., 99 B.R. 250, 257 (Bankr. E.D. Pa. 1989)… aff'd in relevant part, 922 F.2d 1081, 1091-1092 (3d. Cir. 1992)" in alleged support of the remarkable notion that it is DBSP's burden to prove that particular provisions should *not* be excised from the Agreement.

17. As this Court may be aware, not only was the lower court decision in In re Joshua Slocum not "affirmed in relevant part," it was not affirmed in *any part at all*. Moreover, the law is well settled that "[u]nder section 365, the debtor, as the moving party, has the burden

---

[8]   A copy of this article is annexed as Exhibit "B" hereto.

of persuasion to establish a right to assume." Beckett v. Coatsville Housing Associates, 2001 WL 767601 at *4 (E. D. Pa. July 5, 2001), citing In re Vitanza, 1998 WL 808629, at *14 (Bankr. E. D. Pa. Nov. 13, 1998) and In re Mack, 1993 WL 722255, at *4 (Bankr. E. D. Pa. Nov.10, 1993); see also In re Rachel's Industries, Inc., 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990) (debtor bears burden of proof with respect to adequate assurance of future performance.).

### E.   Applicability of State Law to Severance Analysis

18.   The Debtors encourage the Court to "overcome rote deference to state contract law on the issue of severability." Debtors' Response at p. 41. The Debtors' desire to have the Court ignore governing state law is not surprising, given that under New York law (which controls the Agreement), contract severability is "a question of intention, to be determined from the language employed by the parties, viewed in the light of the circumstances surrounding them at the time they contracted." Chiarizia v. Xtreme Rydz Custom Cycles, --- N.Y.S.2d.----, 2007 WL 2812549 at *1 (N.Y. App. Div. 4th 2007) (citations omitted). Because here, the Agreement is, on its face, a single, integrated, unambiguous agreement,[9] with a single set of signatures, that binds all of the Seller, the Servicer, and DBSP in numerous interrelated ways, the Debtors are eager to question the applicability of relevant state law.

19.   However, the Court should decline the Debtors' invitation to devise a new federal common law of contract severability. "Contract severability... is a question of state law." United Air Lines, Inc., v. HSBC Bank USA (In re United Air Lines, Inc.), 453 F.3d 463, 467 (7th Cir. 2006) (citing cases); see also In re Integrated Health Services, Inc., 2000 WL 33712484, *3 (Bankr. D. Del. July 7, 2000) (same); In re Universal Medical Services, Inc., 460

---

[9] See, e.g., United Air Lines, Inc., v. HSBC Bank USA (In re United Air Lines, Inc.), 453 F.3d 463, 467 (7th Cir. 2006) ("While the cases share similarities, a *critical distinction* is the fact that the parties in the present case cemented their deal into one document.").

F.2d 524, 526 (3rd Cir. 1972) ("The District Court held, and we agree, that this contract was a construction contract, and not a severable contract to deliver certain materials and then to install those materials. The law in Pennsylvania is quite clear.").

### F.     "Cherry Picking"

20.     The Debtors concede that they seek to "cherry pick" to eliminate provisions of contracts that they are unwilling to assume (conveniently defined by the Debtors as the "Other Agreements"), but argue that there is nothing the Objecting Parties can do about it. According to the Debtors, "the Bankruptcy Code expressly permits it, and federal bankruptcy policy favors it as a means of maximizing the value of the estate for the benefit of all creditors." Debtors' Response at p. 36.[10]

21.     The Bankruptcy Code permits no such thing. While it may behoove a debtor to carefully review its various contracts and assume only those that will maximize the value of its assets, it is also true that the filing of a chapter 11 petition cannot serve to create assets where none existed before. "Although the estate is construed broadly, Congress expressly cautioned that the Bankruptcy Code 'is not intended to expand the debtor's rights against others more than they exist at the commencement of the case.... [The trustee] could take no greater rights than the debtor himself had.'" See In re Witko, 374 F.3d 1040, 1043 (11th Cir. 2004) (quoting United States v. Whiting Pools, Inc., 462 U.S. 198, 205, 103 S.Ct. 2309, 2313 (1983)).

22.     Here, the Debtors are attempting to use the happenstance of their bankruptcy to turn the Agreement, which, given the Debtors' substantial outstanding obligations

---

[10]     Given that, upon information and belief, every dollar of proceeds of the Proposed Sale would go exclusively to partially repay the Debtors' secured lenders, it is not clear in any event why any policy to benefit "all creditors" should be aggressively pursued for the benefit of particular secured creditors at the expense of DBSP.

thereunder, is a net liability to their estates, into an asset, by stripping out only those portions of the Agreement that are acceptable to the Buyer, and leaving all other obligations behind. There is nothing in the Bankruptcy Code or federal bankruptcy policy that permits or promotes this result.

23. Moreover, even if the Agreement was somehow susceptible to being "severed" between sale-related obligations and servicing-related obligations as the Debtors suggest, the Debtors cannot get around the fact that under the Agreement, the *Servicer* expressly agreed to indemnify DBSP for the Seller's obligation, and agreed to permit the *servicing rights* to be terminated in the event of a breach by the Seller. See ¶¶ 8-12, *supra*. These provisions also belie the Debtors' claim that the Agreement consists of two distinct agreements that were combined into a single document purely as "a simple matter of drafting convenience for the parties." Debtors Response at p. 7. In any event, "just because the parties *could have* entered two contracts at the outset is not the test. [The parties] entered one contract, and that contract cannot be divided after the fact simply because one party later finds that it would have been more advantageous to have entered two contracts instead of one." In re United Air Lines, Inc., 453 F.3d 470-71.[11]

---

[11] The Debtors' Response also includes argument regarding the unenforceability of provisions in "different documents... triggering loss of rights under one contract if the other is breached." See Debtors Response at 36.. DBSP assumes that those arguments are not directed at the Agreement, given that it is only *one* document and does not cross-default with any other. However, to the extent that the Debtors mean to include DBSP, DBSP notes that "cross-default provisions that have been found to be unenforceable involved two or more separate, unrelated leases." United Air Lines, Inc. v. HSBC Bank USA, 322 B.R. 347, 352-53 (N.D. Ill. 2005), affirmed, 453 B.R. 463 (7th Cir. 2006).

## CONCLUSION

WHEREFORE, the DBSP respectfully requests that the Court: (a) deny the Proposed Sale with respect to the Agreement; (b) sustain the DBSP Sale Objection and the DBSP Supplemental Objection; and (c) grant such other and further relief as is just.

Dated: October 14, 2007

**BINGHAM McCUTCHEN LLP**
Steven Wilamowsky
399 Park Avenue
New York, NY 10022
(212) 705-7000

**BINGHAM McCUTCHEN LLP**
Andrew J. Gallo
150 Federal Street
Boston, MA 02110
(617) 951-8000

- and -

**ASHBY & GEDDES, P.A.**

*/s/ Am Winfree*
William P. Bowden (I.D. #2553)
Don A. Beskrone (I.D. #4380)
Gregory A. Taylor (I.D. #4008)
Amanda M. Winfree (I.D. #4615)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Counsel to DB Structured Products, Inc.*