## UNREPORTED CASES                                                    TAB

In re Fleming Companies, Inc.
    2007 WL 2390776 (3d Cir. 2007)................................................................. 1


Beckett v. Coatsville Housing Associates
    2001 WL 767601 (E. D. Pa. July 5, 2001)................................................... 2


In re Vitanza
    1998 WL 808629 (Bankr. E. D. Pa. Nov. 13, 1998)....................................3


In re Mack
    1993 WL 722255 (Bankr. E. D. Pa. Nov. 10, 1993)................................... 4


Chiarizia v. Xtreme Rydz Custom Cycles
    2007 WL 2812549 (N.Y. App. Div. 4th Sept. 28, 2007)............................. 5


In re Integrated Health Services, Inc.
    2000 WL 33712484 (Bankr. D. Del. July 7, 2000)....................................6

# **TAB 1**

## Westlaw.

--- F.3d ----                                                                                          Page 1

--- F.3d ----, 2007 WL 2390776 (C.A.3 (Del.)), 48 Bankr.Ct.Dec. 188, Bankr. L. Rep. P 80,996
**(Cite as: --- F.3d ----)**

**H**

In re Fleming Companies, Inc.
C.A.3 (Del.),2007.

United States Court of Appeals,Third Circuit.
IN RE: FLEMING COMPANIES, INC., et al.,
Debtors,
AWG Acquisition LLC; Associated Wholesale
Grocers, Inc., Appellants.
**No. 05-2365.**

Argued: Dec. 12, 2006.
Filed Aug. 22, 2007.

**Background:** Chapter 11 trustee moved for
assumption and assignment of executory supply
agreements. The United States Bankruptcy Court
for the District of Delaware, 2004 WL 385517,Sue
L. Robinson, J., denied motion. Trustee appealed.
The United States District Court for the District of
Delaware, Sue L. Robinson, Chief Judge, affirmed.
Trustee again appealed.

**Holding:** The Court of Appeals, Chagares, Circuit
Judge, held that assignment was not permitted,
where material and significant term of agreement
could not be performed by prospective assignee.

Affirmed.

**[1] Bankruptcy 51 ☞3782**

51 Bankruptcy
  51XIX Review
    51XIX(B) Review of Bankruptcy Court
      51k3782 k. Conclusions of Law; De
Novo Review. Most Cited Cases

**Bankruptcy 51 ☞3786**

51 Bankruptcy

51XIX Review
  51XIX(B) Review of Bankruptcy Court
    51k3785 Findings of Fact
      51k3786 k. Clear Error. Most Cited
Cases
The Court of Appeals reviews the bankruptcy
court's findings of fact for clear error, and exercises
plenary review over its conclusions of law. 28
U.S.C.A. § 158(a).

**[2] Bankruptcy 51 ☞3779**

51 Bankruptcy
  51XIX Review
    51XIX(B) Review of Bankruptcy Court
      51k3779 k. Scope of Review in General.
Most Cited Cases
Because the district court sits as an appellate court
in bankruptcy cases, the review by the court of
appeals of its decision is plenary. 28 U.S.C.A. §
158(a).

**[3] Bankruptcy 51 ☞3102.1**

51 Bankruptcy
  51IX Administration
    51IX(C) Debtor's Contracts and Leases
      51k3102 Assumption, Rejection, or
Assignment
        51k3102.1 k. In General. Most Cited
Cases
Provision of Bankruptcy Code allowing trustee to
assume or reject any executory contract of debtor
permits the trustee to maximize the value of the
debtor's bankruptcy estate by assuming executory
contracts that benefit the estate and rejecting those
that do not. 11 U.S.C.A. § 365(a).

**[4] Bankruptcy 51 ☞3110.1**

51 Bankruptcy
  51IX Administration
    51IX(C) Debtor's Contracts and Leases
      51k3110 Grounds for and Objections to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----

Page 2

--- F.3d ----, 2007 WL 2390776 (C.A.3 (Del.)), 48 Bankr.Ct.Dec. 188, Bankr. L. Rep. P 80,996
**(Cite as: --- F.3d ----)**

Assumption, Rejection, or Assignment
      51k3110.1 k. In General. Most Cited
Cases
In determining whether to allow assignment of a
debtor's executory contract, the bankruptcy court
must be sensitive to the rights of the non-debtor
contracting party and the policy requiring that the
non-debtor receive the full benefit of his or her
bargain. 11 U.S.C.A. § 365(k).

**[5] Bankruptcy 51 ☞3102.1**

51 Bankruptcy
   51IX Administration
      51IX(C) Debtor's Contracts and Leases
         51k3102 Assumption, Rejection, or
Assignment
         51k3102.1 k. In General. Most Cited
Cases
The bankruptcy court can excise or refuse
enforcement of terms of an executory contract in
order to permit assignment. 11 U.S.C.A. §
365(f)(2)(B), (k).

**[6] Bankruptcy 51 ☞3110.1**

51 Bankruptcy
   51IX Administration
      51IX(C) Debtor's Contracts and Leases
         51k3110 Grounds for and Objections to
Assumption, Rejection, or Assignment
         51k3110.1 k. In General. Most Cited
Cases
In determining whether a term of debtor's executory
contract is material and significant, for purpose of
motion for assignment of the contract, the focus is
placed on the importance of the term within the
overall bargained-for exchange; that is, whether the
term is integral to the bargain struck between the
parties, and whether performance of that term gives
the non-debtor party the full benefit of his bargain.
11 U.S.C.A. § 365(a), (f)(2)(B), (k).

**[7] Bankruptcy 51 ☞3114**

51 Bankruptcy
   51IX Administration
      51IX(C) Debtor's Contracts and Leases
         51k3114 k. Curing Defaults; Adequate

Assurance. Most Cited Cases
What constitutes "adequate assurance of future
performance" of an executory contract must be
determined by consideration of the facts of the
proposed assumption and assignment of the
contract. 11 U.S.C.A. § 365(k).

**[8] Bankruptcy 51 ☞3114**

51 Bankruptcy
   51IX Administration
      51IX(C) Debtor's Contracts and Leases
         51k3114 k. Curing Defaults; Adequate
Assurance. Most Cited Cases
Provision in executory supply agreement, stating
that Chapter 11 debtor would supply wholesale
groceries to non-debtor grocery retailer "from its
Tulsa Facility" was "material and significant term"
of the executory contract, and thus, debtor's
rejection of the Tulsa Facility lease at the request of
debtor's prospective assignee precluded adequate
assurance of future performance by prospective
assignee, as required for assignment of the contract;
the non-debtor retailer not only bargained for timely
delivery and agreed-upon prices, it also bargained
for the benefits of expedience of a trained staff, and
a proven electronic system of record-keeping,
which were only available "from the Tulsa Facility."
11 U.S.C.A. § 365(a, f, k).

**[9] Bankruptcy 51 ☞3109**

51 Bankruptcy
   51IX Administration
      51IX(C) Debtor's Contracts and Leases
         51k3105 Contracts Assumable;
Assignability
         51k3109 k. "Ipso Facto" Clauses. Most
Cited Cases
Provisions in executory contracts which are so
restrictive that they constitute de facto
anti-assignment provisions are rendered
unenforceable by bankruptcy provision permitting
liberal assignment of executory contracts. 11
U.S.C.A. § 365(f)(1).

**[10] Bankruptcy 51 ☞3116**

51 Bankruptcy

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                    Page 3

--- F.3d ----, 2007 WL 2390776 (C.A.3 (Del.)), 48 Bankr.Ct.Dec. 188, Bankr. L. Rep. P 80,996
**(Cite as: --- F.3d ----)**

51IX Administration
    51IX(C) Debtor's Contracts and Leases
      51k3115 Effect of Acceptance or Rejection
        51k3116   k.   Partial   Assumption;
Burdens and Benefits. Most Cited Cases
If a debtor accepts an executory contract he accepts
it cum onere, subject to both the benefits and
burdens thereunder. 11 U.S.C.A. § 365(f).

**[11] Bankruptcy 51 ⇌3115.1**

51 Bankruptcy
    51IX Administration
      51IX(C) Debtor's Contracts and Leases
        51k3115 Effect of Acceptance or Rejection
          51k3115.1 k. In General. Most Cited
Cases
An assignment of a debtor's executory contract is
intended to change only who performs an
obligation, not the obligation to be performed. 11
U.S.C.A. § 365(f)(1).

Mark T. Benedict, Esq. (Argued), Leonard L.
Wagner, Esq., Eric J. Howe, Esq., Husch &
Eppenberger, LLC, Kansas City, MO, Selinda A.
Melnik, Esq., Denise Kraft, Esq., Edwards Angell
Palmer & Dodge, LLP, Wilmington, DE, Counsel
for Appellants.
Richard A. Chesley, Esq. (Argued), Paul, Hastings,
Janofsky & Walker LLP, Chicago, IL, Daniel B.
Prieto, Esq., Michelle L. Dama, Esq., Jones Day,
Chicago, IL, Daniel J. DeFranceschi, Esq.,
Kimberly D. Newmarch, Esq., Richards, Layton &
Finger, Wilmington, DE, Counsel for Appellee.

Before: FISHER, CHAGARES, Circuit Judges, and
BUCKWALTER,[FN*] Senior District Judge.

OPINION OF THE COURT
CHAGARES, Circuit Judge.
*1 This appeal arises out of a bankruptcy involving
grocery wholesalers and retailers in the Oklahoma
marketplace. The Bankruptcy Court denied a
motion for assumption and assignment of an
executory contract in favor of Albertson's, Inc.
(Albertson's), the nondebtor contracting party. The
Bankruptcy Court determined that the proposed
assignee, appellants AWG Acquisition LLC and

Associated Wholesale Grocers, Inc., (collectively,
AWG), could not provide adequate assurance of
future performance of the contract because an
essential term of the contract could not be fulfilled.
The District Court affirmed.

We are called upon to decide the narrow question of
whether a term relating to the use of a specific
facility is material and economically significant to a
contract and, if it is, whether AWG's undisputed
inability to fulfill the term prevented the assumption
and assignment of that contract under § 365(f) of
the Bankruptcy Code, 11 U.S.C. § 365. We will
affirm.

I.

The debtor, Fleming Companies, Inc. (Fleming), is
a wholesale supplier of grocery products to
supermarkets. Albertson's, a supermarket chain,
operates more than 2,300 retail grocery stores in the
United States. In most cases, Albertson's stores are
supplied by warehouse distribution centers that
Albertson's owns and operates. In Oklahoma, for
example, Albertson's constructed a large
distribution facility (the "Tulsa Facility") to supply
its stores throughout the Midwest, including those
in Oklahoma. After operating at only 60% capacity,
however, Albertson's decided to sell the Tulsa
Facility. In 2002, Fleming purchased the Tulsa
Facility as part of an integrated transaction for
approximately $78 million in cash. In return,
Fleming received the warehouse, the inventory in
the warehouse, and Albertson's agreement to a
long-term supply arrangement for its Oklahoma and
Nebraska stores.

The supply arrangement was embodied in two
independent written contracts executed on June 28,
2002: the Lincoln Facility Standby Agreement
(Lincoln FSA) and the Tulsa Facility Standby
Agreement (Tulsa FSA). The FSAs set forth the
terms and conditions under which Albertson's
agreed to purchase groceries and supermarket
products from Fleming for its twenty-eight
Oklahoma and eleven Nebraska grocery stores.
Although the two agreements were nearly identical,
Section 1 differed in one important respect pertinent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                    Page 4

--- F.3d ----, 2007 WL 2390776 (C.A.3 (Del.)), 48 Bankr.Ct.Dec. 188, Bankr. L. Rep. P 80,996
**(Cite as: --- F.3d ----)**

to this appeal. Section 1 of the Lincoln FSA stated:

*Section 1: Fleming's Commitment to Supply*

Throughout the Term (as defined below) of this Agreement, Fleming will maintain capital, employees, inventory, equipment, and facilities sufficient to supply food, grocery, meat, perishables and other related products, supplies and merchandise ("Products") as provided in the Special Fleming FlexPro/FlexStar Marketing Plan described below to Albertson's in quantities sufficient to allow Albertson's to purchase the Estimated Purchase Level described in Section 3 of this Agreement.
**\*2** Appendix (App.) 806. In contrast, Section 1 of the Tulsa FSA read:

*Section 1: Fleming's Commitment to Supply*

Throughout the Term (as defined below) of this Agreement, Fleming will maintain capital, employees, inventory, equipment, and facilities sufficient to supply food, grocery, meat, perishables and other related products, supplies and merchandise ("Products") as provided in the Special Fleming FlexPro/FlexStar Marketing Plan described below to Albertson's in quantities sufficient to allow Albertson's to purchase the Estimated Purchase Level described in Section 3 of this Agreement *from the Tulsa Facility.*
App. 836 (emphasis added.)

According to Albertson's, the Tulsa Facility was a key element in the bargain between Albertson's and Fleming. The Tulsa FSA emphasized the importance of a supply of products "from the Tulsa Facility" because the Tulsa Facility contained not only many of its former employees but also the infrastructure created by Albertson's. This allowed Albertson's to continue using its electronic ordering systems and ordering codes for the products supplied under the Tulsa Agreement. The electronic ordering system in place at the Tulsa Facility permitted Albertson's to gather data which it then used to make marketing and pricing decisions. At the time of the agreement, Albertson's envisioned,

and the contract reflects, a seamless supply of products to Albertson's stores. In other words, the parties contracted to limit the economic damage of any disruption in service, recognizing the critical importance of consistency in the competitive grocery industry.

Fleming and Albertson's operated under the FSAs for less than one year before Fleming filed for bankruptcy on April 1, 2003. Throughout that time, Fleming was unable to meet the required service levels. The Tulsa FSA obligated Fleming to maintain a service level of 96% on each category of product, or otherwise be in material breach of the agreement. There were eight categories of products: (1) warehouse grocery; (2) dairy; (3) frozen food products; (4) produce; (5) meat; (6) bakery; (7) deli; and (8) grocery, dairy and frozen warehouse supplies. Within these broad categories, Fleming supplied more than 2,500 private label products to Albertson's stores. On Albertson's part, the Tulsa FSA required Albertson's to pay Fleming a fixed weekly payment of $210,113 to help Fleming defray the costs of running the Tulsa Facility.

By August 2003, Albertson's stopped ordering grocery products from Fleming and stopped paying the weekly charge. Albertson's switched its source of supply for the Oklahoma market from the Tulsa Facility to its own warehouse in Fort Worth, Texas.

On August 15, 2003, the Bankruptcy Court entered an Order approving the sale of Fleming's assets to C & S Wholesale Grocers, Inc. and C & S Acquisition LLC (collectively, C & S). The Order authorized C & S to designate third-party purchasers for certain assets, included among them the right to acquire Fleming's executory contracts with Albertson's. C & S designated AWG. AWG is a cooperative of independent grocery wholesalers operating in the Midwest from distribution centers in Kansas City, Missouri; Oklahoma City, Oklahoma; Springfield, Missouri; and Ft. Scott, Kansas. In addition, AWG operates retail supermarkets in Tulsa and Oklahoma City through a wholly-owned subsidiary called Homeland Stores, Inc. (Homeland). In some places, Homeland markets are located directly across the street from Albertson's stores. Homeland carries similar products.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 5

--- F.3d ----, 2007 WL 2390776 (C.A.3 (Del.)), 48 Bankr.Ct.Dec. 188, Bankr. L. Rep. P 80,996
**(Cite as: --- F.3d ----)**

*3 On August 23, 2003, Fleming closed the Tulsa Facility and the Lincoln Facility. At about the same time, Fleming rejected its lease for the Tulsa Facility at the direction of AWG. The Bankruptcy Court approved the rejection on September 17, 2003.

On September 3, 2003, Fleming filed a motion to assume and assign the Lincoln FSA and the Tulsa FSA to AWG pursuant to 11 U.S.C. § 365. AWG proposed to supply Albertson's Oklahoma stores from AWG's Oklahoma City distribution center and to supply Albertson's Nebraska stores from AWG's Kansas City warehouse. Albertson's opposed the motion for a variety of reasons, among them that AWG's electronic ordering, billing and inventory systems were not compatible with Albertson's and switching to AWG's system would have been costly and inefficient for Albertson's. According to Albertson's, AWG's deliberate decision *not* to acquire the Tulsa Facility created a real and cognizable economic detriment that contravened the essence of the contract embodied in the term " supply ... from the Tulsa Facility."

The Bankruptcy Court conducted a hearing on the motion for assumption and assignment.FN1 At the hearing, AWG's representatives testified that it was capable of fully performing both the Tulsa FSA and the Lincoln FSA: Albertson's would be able to purchase its products from AWG at the same price and on the same terms that Albertson's expected to receive from Fleming, pursuant to the FSAs, including freight charges.

The Bankruptcy Court granted Fleming's assumption motion as to the Lincoln FSA, but denied the motion as to the Tulsa FSA. The decision regarding the Lincoln FSA is not the subject of this appeal. As for the Tulsa FSA, the Bankruptcy Court held that "fulfillment from the Tulsa Facility is an essential element of the agreement."App. 9. On motion for reconsideration, the Bankruptcy Court reiterated "that shipment from the Tulsa Facility was a material term of the Tulsa Agreement and that adequate assurance of performance of that term had not been proven." App. 18. Fleming and AWG appealed.

The District Court affirmed the decision to deny Fleming's motion for assumption and assignment of the Tulsa FSA. The District Court found no error in the Bankruptcy Court's conclusion that "use of the Tulsa Facility was an essential provision of the Tulsa FSA."App. 47. The District Court also upheld the Bankruptcy Court's determination that "AWG, which had directed the debtors to reject the Tulsa Facility lease, could not fulfill the express requirements of the Tulsa FSA."*Id.* Thus, the District Court concluded that permitting "AWG to supply Albertson's through its own channels of supply would impermissibly modify the terms of the Tulsa FSA."App. 47-48.

This appeal followed.

II.

The Bankruptcy Court exercised jurisdiction over the underlying motion for assumption and assignment of the Tulsa FSA pursuant to 28 U.S.C. § 157(a). The District Court had subject matter jurisdiction over the appeal of the bankruptcy order under 28 U.S.C. § 158(a). We have jurisdiction pursuant to 28 U.S.C. § 158(d).

*4 [1][2] We review the Bankruptcy Court's findings of fact for clear error, and we exercise plenary review over its conclusions of law. *Cinicola v. Scharffenberger,* 248 F.3d 110, 115 n. 1 (3d Cir.2001)."Because the district court sits as an appellate court in bankruptcy cases, our review of its decision is plenary."*Id.* (citing *In re Lan Assocs. XI, L.P.,* 192 F.3d 109, 114 (3d Cir.1999)).

III.

A.

[3][4]Section 365 of the Bankruptcy Code generally permits the trustee to assume or reject any executory contract of the debtor. 11 U.S.C. § 365(a) . This allows " 'the trustee to maximize the value of the debtor's estate by assuming executory contracts .. . that benefit the estate and rejecting those that do

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2007 WL 2390776 (C.A.3 (Del.)), 48 Bankr.Ct.Dec. 188, Bankr. L. Rep. P 80,996
**(Cite as: --- F.3d ----)**

not.'"*Cinicola,* 248 F.3d at 119 (quoting *L.R.S.C. Co. v. Rickel Home Ctrs. (In re Rickel Home Ctrs., Inc.),* 209 F.3d 291, 298 (3d Cir.2000)). Upon assuming an executory contract, the trustee is likewise authorized to assign the executory contract. Section 365 provides in pertinent part:

(f)(1) Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

(2) The trustee may assign an executory contract or unexpired lease of the debtor only if–

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) *adequate assurance of future performance by the assignee* of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f) (emphasis added). The statutory requirement of "adequate assurance of future performance by the assignee" affords "needed protection to the non-debtor party because the assignment relieves the trustee and the bankruptcy estate from liability for breaches arising after the assignment."*Cinicola,* 248 F.3d at 120;11 U.S.C. § 365(k). While the bankruptcy court has discretion to excise or waive a bargained-for element of a contract, "Congress has suggested that the modification of a contracting party's rights is not to be taken lightly. Rather, a bankruptcy court ... must be sensitive to the rights of the non-debtor contracting party ... and the policy requiring that the non-debtor receive the full benefit of his or her bargain."*In re Joshua Slocum Ltd.,* 922 F.2d 1081, 1091 (3d Cir.1990).

The text of § 365(f)(2)(B) employs the phrase "adequate assurance of future performance" of the contract, but that phrase is not defined in the Bankruptcy Code. As we noted in *Cinicola,* however, the Bankruptcy Code adopted the phrase "adequate assurance of future performance" from Uniform Commercial Code § 2-609(1), which provides that "when reasonable grounds for insecurity arise with respect to the performance of

either party, the other may in writing demand adequate assurance of future performance ...." *Cinicola,* 248 F.3d at 120 n. 10 (quoting UCC § 2-609(1)).

**\*5** [5] It is clear that adequate assurances need not be given for every term of an executory contract. Because the bankruptcy court can excise or refuse enforcement of terms of a contract in order to permit assignment, we must determine what standard applies to evaluate whether excising "supply ... from the Tulsa Facility" would deny Albertson's the full benefit of its bargain. In *Joshua Slocum,* we applied a "material and economically significant" standard to determine whether the Bankruptcy Court had the authority to excise an "average sales" clause in a lease agreement, and then assign the lease to the designated third-party assignee. We concluded there that the clause was "a material and economically significant clause in the leasehold at issue."922 F.2d at 1092.We found that the Bankruptcy Court did not have authority to excise the relevant provision because the "particular clause [was] of financial import to the debtor in insuring occupancy by high volume sales, viable businesses, thus increasing the rent received under the percentage rent clause."*Id.* As a result, we held that the Bankruptcy Court erred in assigning the lease without the "average sales" clause.

The "material and economically significant" standard we employed in *Joshua Slocum* was derived from a review of case law interpreting § 365 of the Bankruptcy Code which focused on balancing twin concerns: preventing substantial economic detriment to the nondebtor contracting party and permitting the bankruptcy estate's realization of the intrinsic value of its assets. *See id.* (citing *In re Mr. Grocer, Inc.,* 77 B.R. 349, 354 (Bankr.D.N.H.1987)); *see also In re Carlisle Homes, Inc.,* 103 B.R. 524, 538 (Bankr.D.N.J.1988) (recognizing § 365's attempt "to strike a balance between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain. Nowhere is the tension between these interests, and the difficulty in striking the balance, more apparent than in trying to determine whether

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                                Page 7

--- F.3d ----, 2007 WL 2390776 (C.A.3 (Del.)), 48 Bankr.Ct.Dec. 188, Bankr. L. Rep. P 80,996
**(Cite as: --- F.3d ----)**

there is the requisite adequate assurance of future performance.") (quotation marks and alterations omitted).

Neither AWG nor Albertson's disputes the essence of the "material and economically significant" standard or its applicability in this context. Under AWG's understanding of *Joshua Slocum*, however, an assignee must only give adequate assurance of future performance of the "economically material" terms of the contract. AWG argues that shipment " from the Tulsa Facility" is not such a term given that AWG can supply groceries to Albertson's at the same price and on the same payment terms as had Fleming. According to AWG, the Tulsa Facility is merely a warehouse with nothing unique about it. Albertson's bargained to buy $1.155 billion of groceries and supermarket products (of a type and quality) for a certain price (including freight) to be timely delivered to Albertson's Oklahoma stores. As long as Albertson's receives groceries on those bargained-for terms, AWG contends, it does not matter from where those groceries are supplied. Finally, AWG argues that Albertson's failed to provide any evidence that it would suffer economic harm if supplied from AWG's Oklahoma City facility. Therefore, AWG argues that "supply ... from the Tulsa Facility" is not an economically material term, and AWG's performance from its Oklahoma City facility should not preclude assignment of the Tulsa FSA to AWG.

***6 [6]** We disagree. AWG misconstrues the *Joshua Slocum* standard. The resolution of this dispute does not depend on whether a term is "economically material." Rather, the focus is rightly placed on the importance of the term within the overall bargained-for exchange; that is, whether the term is integral to the bargain struck between the parties (its materiality) and whether performance of that term gives a party the full benefit of his bargain (its economic significance).*See Joshua Slocum,* 922 F.2d at 1092 (concluding that "average sales" provision of lease which permits either landlord or tenant to terminate the lease after either three or six years if annual sales are below a certain level is " material in the sense that it goes to the very essence of the contract, i.e., the bargained for exchange"); *In re E-Z Convenience Stores, Inc.,* 289 B.R. 45,

51-52 (Bankr.M.D.N.C.2003) (holding that right of first refusal is a material and bargained-for element of the lease which is economically significant to nondebtor party to lease); *In re New Breed Realty Enter. Inc.,* 278 B.R. 314, 324-25 (Bankr.E.D.N.Y.2002) (holding breached "time is of the essence" clause is material aspect of agreement based upon agreement's unequivocal statement and state law); *In re Southern Biotech, Inc.,* 37 B.R. 311, 317 (Bankr.M.D.Fla.1983) (barring assumption of contract by trustee, involving sale of plasma from blood collected by inmates, where contract required that collection be conducted in accordance with "good and sound medical practice" and trustee could not provide such adequate assurance).

A "time is of the essence" clause is similar to " supply ... from the Tulsa Facility" in the sense that it is not inherently material or obviously economic, but such a term can be integral to a contract, and certainly, delay can cause economic detriment. *See New Breed,* 278 B.R. at 322-25 (noting that a party's failure to perform by the date specified is a material breach of an agreement where both parties agreed to include "time is of the essence" provision in the contract). Likewise, "supply ... from the Tulsa Facility" does not have manifest material and economic significance. However, because the Tulsa FSA arose from Fleming's acquisition of the Tulsa Facility, it is clear that the parties considered supply from that facility to be "material" in the sense that the express condition was an integral part of the agreement. Moreover, not utilizing the Tulsa Facility would burden Albertson's in an " economically significant" way-that is, Albertson's would not reap the benefit of its bargain. Not only did Albertson's expect timely delivery of foodstuffs at agreed-upon prices no matter where product was purchased or shipped, but it also bargained for the benefits of expedience, of a trained staff, a consistent supply of products, and a proven electronic system of record-keeping which furthered Albertson's marketing and pricing plans, all of which were only available "from the Tulsa Facility."

***7 [7]** Our analysis does not end here. We must also consider the rights of AWG and Fleming's creditors to get the benefit of the bargain Fleming struck with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2007 WL 2390776 (C.A.3 (Del.)), 48 Bankr.Ct.Dec. 188, Bankr. L. Rep. P 80,996
**(Cite as: --- F.3d ----)**

Albertson's. *See Joshua Slocum*, 922 F.2d at 1092." 'Adequate assurance of future performance' are not words of art; the legislative history of the [Bankruptcy] Code shows that they were intended to be given a practical, pragmatic construction.... What constitutes 'adequate assurance of future performance' must be determined by consideration of the facts of the proposed assumption."*Cinicola*, 248 F.3d at 120 n. 10 (quotation marks and alterations omitted). Here, the record reflects and our review confirms that AWG could not provide the same benefits to Albertson's as were available from Fleming, due to the fact that Fleming rejected the Tulsa Facility lease at AWG's behest. AWG has not pointed to any evidence on appeal that would lead to an opposite conclusion. On balance, considering the right of Albertson's to expect their foodstuffs to be "suppl[ied] ... from the Tulsa Facility" and the rights of AWG and Fleming's creditors to get the benefit of a supply contract, we conclude that the scale tips in favor of Albertson's.

[8] Accordingly, we hold that "supply ... from the Tulsa Facility" is both a material and an economically significant term of the contract, and AWG, by its own actions, cannot give adequate assurance of performance.

### B.

[9] AWG further argues that designating "from the Tulsa Facility" as a material term effectively transforms the term into a *de facto* anti-assignment provision. The Bankruptcy Code expressly permits assignment of executory contracts even when contracts prohibit such assignment. 11 U.S.C. § 365(f)(1).Section 365(f)(1) is not limited to explicit anti-assignment provisions. Provisions which are so restrictive that they constitute *de facto* anti-assignment provisions are also rendered unenforceable. *See In re Rickel Home Ctrs.*, 240 B.R. 826, 831-32 (D.Del.1999) (citing *Joshua Slocum*, 922 F.2d at 1090). Neither Albertson's nor Fleming could operate the Tulsa Facility profitably. According to AWG, reading the Tulsa FSA to require a buyer to acquire the Tulsa Facility limits the scope of potential buyers in that sale to either an existing wholesaler in the region who does not have

its own distribution center or to a new entrant into the marketplace seeking to acquire both the Tulsa FSA and the distribution center. C & S, the high bidder on Fleming's assets, was unwilling to commit to taking the Tulsa Facility, in part because both Albertson's and Fleming were unable to operate the facility successfully. Therefore, AWG contends that to require shipment from the Tulsa Facility is to burden an assignee with a heavy economic obligation, thus constituting a *de facto* anti-assignment provision.

[10]Section 365(f) requires a debtor to assume a contract subject to the benefits and burdens thereunder. *In re ANC Rental Corp.*, 277 B.R. 226, 238 (Bankr.D.Del.2002)."The [debtor] ... may not blow hot and cold. If he accepts the contract he accepts it *cum onere*.If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other."*In re Italian Cook Oil Corp.*, 190 F.2d 994, 997 (3d Cir.1951). The *cum onere* rule " prevents the [bankruptcy] estate from avoiding obligations that are an integral part of an assumed agreement."*United Air Lines, Inc v. U.S. Bank Trust Nat'l Ass'n (In re UAL Corp.)*, 346 B.R. 456, 468 n. 11 (Bankr.N.D.Ill.2006).

**\*8** [11] Applying this precept to our determination above that "supply ... from the Tulsa Facility" is a material term of the contract, we reject AWG's argument that the term operates as a *de facto* anti-assignment provision. We recognize that a fine line exists between reading a contractual term as a burdensome obligation or as a *de facto* restriction on assignment. However, we draw the line where a party refuses to accept part of the contract's obligations, and as a result it cannot perform a material bargained-for term of the contract. Here, AWG rejected the Tulsa Facility lease, and now complains that it is impossible to comply with an integral term of the contract. This term could have been performed by some party. It is not now an anti-assignment provision simply because AWG made the decision not to take on a necessary burden. As we have previously expressed, "[a]n assignment is intended to change only who performs an obligation, not the obligation to be performed."*Medtronic AVE., Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 60 (3d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                              Page 9

--- F.3d ----, 2007 WL 2390776 (C.A.3 (Del.)), 48 Bankr.Ct.Dec. 188, Bankr. L. Rep. P 80,996
**(Cite as: --- F.3d ----)**

Cir.2001) (quotation marks omitted).

IV.

We conclude that "supply ... from the Tulsa Facility
" is a material and economically significant term
which AWG cannot perform because it has rejected
the lease for the Tulsa Facility. The inability to
perform this aspect of the agreement precludes the
assignment of the Tulsa FSA to AWG. Accordingly,
we will affirm the District Court's judgment.

> FN* The Honorable Ronald L.
> Buckwalter, United States District Judge
> for the Eastern District of Pennsylvania,
> sitting by designation.

> FN1. Albertson's filed a cure claim against
> Fleming as a result of Fleming's purported
> material breaches of the Tulsa and Lincoln
> FSAs. However, at a hearing before the
> Bankruptcy Court on December 4, 2003,
> Albertson's voluntarily withdrew the cure
> claim with prejudice and agreed to proceed
> solely on the issue of whether, as a matter
> of law, the Tulsa and Lincoln FSAs could
> be assumed and assigned.

C.A.3 (Del.),2007.
In re Fleming Companies, Inc.
--- F.3d ----, 2007 WL 2390776 (C.A.3 (Del.)), 48
Bankr.Ct.Dec. 188, Bankr. L. Rep. P 80,996

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2001 WL 767601 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

C
Beckett v. Coatesville Housing Associates
E.D.Pa.,2001.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Dasha L. BECKETT, Appellant,
v.
COATESVILLE HOUSING ASSOCIATES, t/d/b/a
Regency Park Apartments, Appellee.
**No. CIV.A. 00-5337.**

July 5, 2001.

YOHN.

*1 Dasha L. Beckett ("Beckett" or "debtor" or " tenant") appeals from a final order of the bankruptcy court in favor of Coatesville Housing Associates ("CHA" or "landlord") and against debtor Beckett granting CHA's motion for relief from the automatic stay of bankruptcy. The order authorized CHA to enforce a state court landlord-tenant judgment for possession against Beckett requiring her eviction from a CHA rental property. The parties have set forth three issues for the court's consideration: (1) whether the bankruptcy court erred by according issue preclusive effect to CHA's state court judgment of possession; (2) whether 11 U.S.C. § 365(b) allows Beckett to cure a non-monetary default of her residential lease with CHA and to assume the lease agreement as part of confirmation of her Chapter 13 plan; and (3) whether CHA's judgment of possession constitutes a "claim" within the meaning of 11 U.S.C. § 101(5).[FN1] After considering Beckett's appeal and reply briefs and the brief in opposition filed by CHA, I conclude that the bankruptcy court's order should be affirmed.

> FN1. At oral argument, debtor agreed that CHA's judgment of possession is not a claim within the meaning of the

bankruptcy code. Nevertheless, debtor contends that such a determination is not needed. I agree. As such, there remain only two issues on appeal.

I. Factual and Procedural Background

On November 12, 1999, debtor and landlord entered into a lease agreement regarding residential rental property located at 503 Victoria Drive, Coatesville, Pennsylvania. The lease agreement provided for monthly rent to be subsidized by the United States Department of Housing and Urban Development. Paragraph 10 of the lease agreement requires the tenant, *inter alia*, to keep the premises in a "clean, orderly and safe condition." Paragraph 23 of the lease agreement states that the landlord may terminate the agreement for, among other things, "1. the Tenant's material noncompliance with the terms of this Agreement" or for "other good cause." The agreement defines material noncompliance to include "(1) one or more substantial violations of the lease; (2) repeated minor violations of the lease that: (a) disrupt the livability of the project, (b) adversely affect the health or safety of any person ... [and] (d) have an adverse effect on the project."

On March 8, 2000, CHA brought an action for possession in a Pennsylvania District Court sitting in Chester County, Pennsylvania. CHA argued for possession based upon Beckett's failure to maintain the interior of the premises in a clean, orderly and safe condition, an alleged non-monetary and material default under paragraphs 10.b and 23.b of the lease agreement. A review of CHA's complaint further reveals that the landlord sought only possession of the leased premises and not monetary damages as the alleged breach implicated health and safety issues which did not give rise to a right to payment. After a hearing on March 21, 2000, the state court entered judgment for possession in favor of CHA and against Beckett. This order was not appealed and became final. CHA initiated eviction

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 767601 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

proceedings against Beckett as authorized by the state court judgment.[FN2]

> FN2. Rule 514 of the Pennsylvania Rules of District Justices provides that when judgment is rendered with respect to the complaint for possession, notice of the judgment shall be given. Such notice also shall advise the parties of the right to appeal. Under Rule 515, if judgment for possession is entered in favor of the landlord, the landlord "may, after fifteen (15) days after the date of the judgment, file with the district justice a request for an order of possession."Rule 516 requires the district justice to issue the order of possession and deliver it to the sheriff or constable. Rule 517 authorizes the sheriff or constable to serve the order and grants the occupant fifteen (15) days to vacate the premises before the use of force. If the alleged default is based solely on the tenant's failure to pay rent, Rule 518 provides that the tenant may cure the default.
>
> In the instant case, a judgement of possession was rendered in favor of CHA and against Beckett. CHA applied for and was granted an order of possession. Beckett also had been served with that order of possession. Beckett filed her bankruptcy petition just prior to the expiration of the 15 days provided for in Rule 517. Rule 518 is inapplicable as Beckett's alleged default concerned her failure to keep her apartment in a "clean, orderly and safe condition," a health and safety issue that did not give rise to a right to the payment of money damages.

On June 25, 2000, Beckett filed a petition for relief under Chapter 13 of the Bankruptcy Code. In the re-organization plan accompanying debtor's bankruptcy petition, Beckett sought to assume the residential lease agreement pursuant to 11 U.S.C. §§ 365 and 1322(b)(7) and cure the default underlying the pending eviction by proposing to thereafter maintain her premises in a clean, safe and orderly

fashion. On August 17, 2000, CHA filed a motion seeking relief from the automatic stay which the bankruptcy court granted at a September 14th hearing. At the hearing, debtor's counsel argued that because Beckett appeared in state court unrepresented, she did not have a full and fair opportunity to litigate CHA's complaint for possession. The bankruptcy judge, however, determined that the argument was precluded because the tenant could have appealed the judgment for possession in state court, but did not. *See* 9/14/00 N.T. at 12-13. Ultimately, the bankruptcy court held that, as a matter of law, Beckett lacked the ability under the bankruptcy code to cure the non-monetary lease violation that resulted in the state court judgment. *See id.* at 21-22. This appeal followed.

## II. Standard of Review

**\*2** The district court, sitting as an appellate tribunal, applies a clearly erroneous standard to review the bankruptcy court's factual findings and a de novo standard to review its conclusions of law. *See In re Siciliano,* 13 F.3d 748, 750 (3d Cir.1994). A finding of fact is clearly erroneous if a reviewing court has a "definite and firm conviction that a mistake has been committed."*Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (quotation omitted). Mixed questions of fact and law require a mixed standard of review, under which the court reviews findings of historical or narrative fact for clear error but exercises plenary review over the bankruptcy court's "choice and interpretation of legal precepts and its application of those precepts to the historical facts." *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 642 (3d Cir.1991) (quotation omitted), *cert. denied, Comm. of Unsecured Creditors v. Mellon Bank, N.A.,* 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992); *see Chemetron Corp. v. Jones,* 72 F.3d 341, 345 (3d Cir.1995), *cert. denied,*517 U.S. 1137, 116 S.Ct. 1424, 134 L.Ed.2d 548 (1996). When reviewing a decision that falls within the bankruptcy court's discretionary authority, the district court may only determine whether or not the lower court abused its discretion. *See In re Top Grade Sausage,* 227 F.3d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 767601 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

123, 125 (3d Cir.2000)."An abuse of discretion exists where the [lower] court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact."*Int'l Union, UAW v. Mack Trucks, Inc.,* 820 F.2d 91, 95 (3d Cir.1987).

### III. Discussion

**\*3** To determine the preclusive effect of a state court judgment, this court must look to the law of the adjudicating state. *See Greenleaf v. Garlock, Inc.,* 174 F.3d 352, 357 (3d Cir.1999) (citations omitted). Under Pennsylvania law, issue preclusion applies where the following four elements are met: (1) the issue decided in the prior adjudication was identical with the one presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action.

*Id.* (citations omitted). Beckett's only argument is that she did not have a full and fair opportunity to litigate because she lacked sophistication and legal representation at the hearing before the Pennsylvania District Justice. Beckett, however, has failed to cite any case law requiring legal representation at a hearing before a district justice. Moreover, the court has not found any. As such, I conclude that the bankruptcy court was correct in its determination that the state court judgment has preclusive effect.

The court must now determine the effect of that state court judgment upon the instant bankruptcy action. By the terms of Beckett's lease agreement with CHA, the landlord could terminate the agreement by showing, *inter alia,* "the Tenant's material noncompliance with the terms of this Agreement" or for "other good cause." In state court, CHA argued that Beckett's failure to keep her apartment in a "clean, orderly and safe condition" constituted such a material breach. Ultimately, the state court entered a judgment of possession in favor of CHA and against Beckett. As such, it found

a material breach. Moreover, because the elements of issue preclusion have been satisfied, this court is bound by the state court's determination of materiality. Therefore, I find that the bankruptcy court properly accorded the state court judgment preclusive effect that there has been a material breach of the lease by Beckett for failure to keep her apartment in a "clean, orderly and safe condition."

This leads to the court to determine whether Beckett may now avail herself of section 365 of the bankruptcy code in an attempt to cure her lease default and assume her lease. Section 365 governs a bankruptcy trustee's ability to assume executory contracts and unexpired leases of a debtor. Section 365, in relevant part, provides that:

(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

**\*4** (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

(2) Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to -

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title;

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement; or

(D) the satisfaction of any penalty rate or provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4

Not Reported in F.Supp.2d, 2001 WL 767601 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Under § 365, the debtor, as the moving party, has the burden of persuasion to establish a right to assume. *See, e.g., In re Vitanza,* No. 98-19611DWS, 1998 WL 808629, at *14 (Bankr.E.D.Pa. Nov.13, 1998); *In re Mack,* No. 93-13116F, 1993 WL 722255, at *4 (Bankr.E.D.Pa. Nov.10, 1993). In the instant case, debtor asserts that § 365 affords her the right to assume her lease because she has cured the alleged lease default, *i.e.,* she has cleaned up her apartment, and will continue to maintain her apartment in a "clean, orderly and safe condition." Conversely, CHA argues that the bankruptcy court was correct when it ruled that § 365 does not permit a debtor to cure non-monetary lease defaults.

Few courts have considered the issue whether § 365 may be used to cure non-monetary defaults and assume a residential lease. Nevertheless, some courts that have considered the issue have determined that § 365 applies both to monetary and non-monetary defaults. *See, e.g., In re Gilmore,* 261 B.R. 175, 180-81 (Bankr.W.D.Pa.2001) (agreeing that certain non-monetary breaches can be cured); *In re Whitsett,* 163 B.R. 752, 753-55 (Bankr.E.D.Pa.1994) (finding that non-material, non-monetary breaches of a residential lease do not preclude assumption pursuant to § 365); *In re Yardley,* 77 B.R. 643, 645 (Bankr.M.D.Tenn.1987) ( "It is implicit in the structure of § 365 that Congress contemplated the curing of non-monetary defaults." ); *see also In re Claremont Acquisition Corp., Inc.,* 113 F.3d 1029, 1033 (9th Cir.1997) (stating that all defaults, both monetary and non-monetary, must be cured before a lease can be assumed under § 365); *In re Ruffin,* No. 91-14195S, 1991 WL 173331, at *1 (Bankr.E.D.Pa. Sept.6, 1991) (permitting, under § 365, the cure of a non-monetary breach). A number of courts in this circuit, however, have limited a debtor's ability to assume a lease to those cases where the non-monetary breaches were not material, on the basis that material breaches could not be cured. *See generally, e.g., In re Gilmore,* 261 B.R. at 180-81 (stating that debtor can cure "certain " non-monetary breaches and that, for example, satisfaction of criminal penalties cannot cure the civil consequences of that criminal breach); *In re Sweeney,* 215 B.R. 97, 103 (Bankr.E.D.Pa.1997) (citing *In re Whitsett* and finding that debtor's

failure to report her income or the residency status of her husband and two oldest children were not sufficiently material to support the termination of debtor's Section 8 leasing benefits); *In re Whitsett,* 163 B.R. at 753-55 (permitting cure and assumption because the debtor's failure to promptly report a change in income relevant to her Section 8 housing benefits was not sufficiently material).

In support of its position that non-monetary breaches cannot be cured under section 365, CHA relies heavily on *In re Mack.* In *Mack,* the Philadelphia Housing Authority ("PHA") sought relief from the automatic stay in order to commence eviction proceedings against the debtor. PHA sought to evict the debtor due to an alleged non-monetary breach of her lease: the sale of drugs from her apartment by her nephew. *See In re Mack,* 1993 WL 722255, at *1. After acknowledging that " [a] number of courts have held that a debtor has the right under section 365(b) to cure non-monetary defaults as well as monetary defaults," the bankruptcy court in *Mack* held that "[i]f the non-monetary default creates a 'claim', so that it may be cured by payment of money, section 365(b) permits the debtor to assume the lease." *Id.* at *6, 7. *Cf. In re Gilmore,* 261 B.R. at 180 (interpreting *Mack* as holding that cures of non-monetary breaches are permitted but that the state court is the proper forum to consider the issue).

*5 The *Mack* court, observing that statutory construction is a "holistic endeavor," looked to other sections of the bankruptcy code to inform its interpretation of section 365. Specifically, the court noted that section 524 enjoins the collection or recovery of a discharged debt. Moreover, the court continued, the code defines a "debt" as a liability on a "claim," which the code in turn defines to include the "right to an equitable remedy for breach of performance if such breach gives rise to a right of payment...." *See id.* at *7 (citing 11 U.S.C. § 101(12), (5)(B)). As such, the court concluded that if there is no right to payment, then a debtor may not cure under section 365(b). *See id.* In other words, despite the fact that section 365 makes no mention of a "claim," and only speaks to lease and executory contract "defaults," the *Mack* court nevertheless required that the defaults constitute a claim under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 5

Not Reported in F.Supp.2d, 2001 WL 767601 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

the code before section 365 could apply.

Besides the court's effort to construe the code holistically, it appears that the *Mack* court's decision was influenced by a greater public policy: to prevent debtors from using the bankruptcy code "to free them from non-monetary obligations imposed by agreements or by state court orders."*Id.* Debtor attempts to distinguish her case on the ground that she is not attempting to discharge her lease obligation, but is, in fact, seeking to assume said obligations. Debtor's argument, however, misses the point of this policy argument. Debtor *is* attempting to use the bankruptcy code to escape a state court judgment of possession based upon her failure to live up to her non-monetary obligations under the lease, and her ultimate eviction.

In any event, after reviewing the bankruptcy code and the limited case law interpreting section 365, I am persuaded that section 365 permits the cure of some non-monetary residential lease defaults, even if they do not constitute a "claim" under the code. It is clear on the face of the statute that Congress intended § 365 to apply to non-monetary defaults. Section 365(a) begins with a bankruptcy trustee's general power to assume or reject an unexpired lease. Subsection (b)(1) then conditions that right to assume on a prompt cure or adequate assurance thereof. Nowhere in this section does Congress assign this right exclusively to monetary defaults. Moreover, elsewhere in section 365, Congress determined that a trustee need not cure certain non-monetary defaults, such as a default relating to insolvency. *See In re Yardley,* 77 B.R. at 645 (citing 11 U.S.C. § 365(b)(2)) (additional citations omitted). If Congress intended that all non-monetary defaults be incurable under section 365, subsection (b)(2) would be rendered superfluous. As such, I conclude that Congress intended section 365 to apply both to monetary and non-monetary defaults.

**\*6** Nevertheless, I am also cognizant of the public policy argument acknowledged by the bankruptcy court in *Mack.*Indeed, it is likely that the *Mack* court was not the only court considering this issue to recognize that bankruptcy law is not intended to be used to escape the implications of state court judgments. Perhaps this is one reason several courts have determined that material non-monetary defaults cannot be cured under section 365. *See generally, e.g., In re Gilmore,* 261 B.R. at 180-81; *In re Sweeney,* 215 B.R. at 103;*In re Whitsett,* 163 B.R. at 753-55. In any event, I am persuaded that the equities surrounding this issue require this result. Accordingly, I conclude that material breaches of a non-monetary nature are not curable under § 365. Moreover, because the state court has already found Beckett's non-monetary breach to be material, her default is incurable under section 365 so that although section 365 applies, Beckett cannot meet the requirements of § 365(b)(1)(A). Therefore, the bankruptcy court's decision to lift the automatic stay so that CHA may proceed to enforce its order of possession against Beckett will be affirmed.

AND NOW, this    day of July, 2001, upon consideration of appellant, Dasha L. Beckett's, appeal and reply briefs (Doc. Nos.3, 5) and Coatesville Housing Associate's brief in opposition thereto (Doc. No. 4), IT IS HEREBY ORDERED that the bankruptcy court's Order dated September 14, 2000 is AFFIRMED.

E.D.Pa.,2001.
Beckett v. Coatesville Housing Associates
Not Reported in F.Supp.2d, 2001 WL 767601 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **TAB 3**

Westlaw.

Not Reported in B.R.                                                            Page 1

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
(Cite as: Not Reported in B.R.)

▷
In re Vitanza
Bkrtcy.E.D.Pa.,1998.
Only the Westlaw citation is currently available.
United States Bankruptcy Court, E.D. Pennsylvania.
In re Christopher VITANZA, Debtor.
**No. 98-19611DWS.**

Nov. 13, 1998.

Albert Ciardi, III, Ciardi, Maschmeyer & Karalis, P.C., Philadelphia, PA, for Debtor.
Andrew J. Flame, Drinker, Biddle & Reath, Philadelphia, PA, for 209-211 Chestnut St. Assoc.
Edward Sparkman, Philadelphia, PA, for Chapter 13 Trustee.
Dave P. Adams, Philadelphia, PA, for United States Trustee.

SIGMUND, Bankruptcy J.
*1 Before the Court is the motion ("Motion") of debtor, Christopher Vitanza ("Debtor") to assume his unexpired non-residential lease agreement with 209-211 Chestnut Street Associates ("CSA") for the first and second floors of 209-211 Chestnut Street, Philadelphia, Pennsylvania (the "Premises"). Debtor is a co-lessee on this lease agreement with KMDA Corporation, of which Debtor is the sole shareholder and officer. In the first floor of the Premises, KMDA operates a restaurant called the Painted Parrot Cafe. In the second floor of the Premises, Debtor maintains a business office from which he operates several businesses,[FN1] including KMDA.

> FN1. In addition to KMDA, Debtor operates a wholesale pastry shop, a retail bakery and a consulting firm which provides services to other restaurants.

CSA objects to the Motion. *See* Objections of 209-211 Chestnut Street Associates to Debtor's Motion to Assume Unexpired Non-Residential Lease Agreement ("Objection"). The primary thrust of its Objection is that the lease agreement was terminated pre-petition for both monetary and non-monetary defaults and cannot be redeemed under state law.[FN2] A hearing on the Motion was held on October 8, 1998. Upon consideration, the Motion is granted conditioned on Debtor's compliance with certain requirements which are set forth below.

> FN2. The Objection contains approximately six grounds for challenging the Motion. *See infra* at 33 & n.34 (identifying other grounds of Objection). However, at the hearing on the Motion, the parties focused almost exclusively on the issue of whether the lease agreement was terminated pre-petition.

BACKGROUND [FN3]

> FN3. The facts set forth in this section are based upon the record from the hearing on October 8, 1998. Incorporated in that record is the record from the preliminary and final hearings on CSA's motion for relief from the automatic stay ("Stay Motion").

*The Lease*

On or about November 12, 1996, CSA, Debtor and KMDA Corporation executed an Agreement of Lease and Lease Modification Agreement (collectively referred to as the "Lease") for the Premises. Exhibit P-1. Debtor signed the Lease in his individual capacity and as the President of KMDA.[FN4] *Id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN4. KMDA was formed in the fall of 1996.

Previously, in 1993, CSA's predecessor, WHR Properties, entered into a lease agreement with the Painted Parrot Cafe', Inc., which Debtor operated, for the first floor of 209-211 Chestnut Street. The Painted Parrot Cafe', Inc. subsequently filed for bankruptcy. According to CSA's general partner, Maury Rosenberg ("Rosenberg"), the terms of WHR Properties' lease with the Painted Parrot Cafe', Inc. (the "Painted Parrot Lease") are identical to the terms of the Lease with two exceptions: (i) Debtor was not included as a co-obligor on the Painted Parrot Lease; and (ii) the Painted Parrot Lease did not contain the Lease Modification Agreement which expanded the definition of the leased premises to include the second floor.

According to the terms of the Lease, the first floor of the Premises is to be used "by Tenant for purpose of a cafe with retail sales of baked goods with seating and for no other purpose."*Id.* ¶ 1. Paragraph 8 of the Lease, entitled "Care of the Demised Premises, states, in pertinent part:
Tenant agrees, on behalf of itself, its employees and agents, that it shall:
(a) Comply at all times with any and all federal, state and local statutes, regulations, ordinances, and other requirements of any of the constituted public authorities relating to its use and occupancy of the Demised Premises.

(f) Not overload, damage or deface the Demised Premises or do any act which might made [sic] void or voidable any insurance on the Demised Premises or the Building or which may render an increased or extra premium payable for insurance (and without prejudice to any right or remedy of Landlord regarding this subparagraph, Landlord shall have the right to collect from Tenant, upon demand, any such increase or extra premium).
**\*2** (g) Not make any alteration of or addition to the Demised Premises without prior written approval of Landlord (except for work of a decorative nature), which approval shall be granted for all reasonable alterations. Tenant shall have all contractors or

tradesmen secure or execute the following documents prior to construction work being performed within the Demised Premises: (1) Waiver of Lien, (2) Certificate of Insurance, (3) Building permits; "copies of all these documents will be furnished to Landlord five (5) business days prior to the commencement of any construction."

*Id.* ¶ 8(f) & (g). Paragraph 1 of Exhibit "C" to the Lease, states in relevant part:The sidewalks, entryways, passages, corridors, stairways and elevators shall not be obstructed by any of the tenants, their employees or agents, or used by them for purposes other than ingress or egress to and from their respective suites.

*Id.* Exhibit "C" at ¶ 1. Moreover, paragraph 2 of the Lease Modification Agreement provides:KMDA will make all improvements necessary for the conduct of its business. Plans will be submitted to Ownership for approval prior to the commencement of any work. All permits required by any governmental authority whatsoever will be obtained prior to the commencement of any work.

*Id.* ¶ 2 of Lease Modification Agreement.

### *Alterations to the Premises*

At the commencement of the Lease term in November of 1996, there was no gas service connected to the first floor of the Premises.[FN5] Nevertheless, there was gas service in the building. Both the basement, which was leased by another tenant, and the second floor had gas heat.[FN6]

FN5. Debtor believes that a closet on the first floor of the Premises had gas service, but that none of the other areas of the floor had it.

FN6. According to Rosenberg, when CSA's predecessor, WHR Properties, originally purchased the building in 1986, the decision was made to renovate the entire property. Transcript, dated 9/14/98 ("Transcript") at 118-19. The plan was to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                    Page 3

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

separate each floor so that each tenant would have its own meters for gas and electricity for heat and air conditioning.*Id.* at 119.However, because of the fire regulations which existed for the City of Philadelphia at the time, WHR Properties concluded that it would not be cost effective to put in a separate gas meter for the first floor. *Id.* Instead, it opted to have both the heat and air conditioning systems for the first floor powered by electricity. *Id.* at 119-20.

According to the Debtor, his reason for agreeing to broaden the Lease to include not only the first but the second floor was so that he could expand the second floor's gas service to the first floor and, thereby, operate the Painted Parrot Cafe' as a restaurant.FN7Debtor testified that he advised Rosenberg of this intention when the Lease was executed and Rosenberg said "okay." Debtor also testified that while he never submitted plans outlining his proposed changes to CSA for its approval, he discussed the plans with Rosenberg when he was on the Premises and that Rosenberg's only response was "Is the rent going to be paid on time?"Rosenberg denies that these discussions occurred.

> FN7. Apparently gas service to the first floor was needed in order to install a kitchen for the restaurant.

In November of 1996, Debtor proceeded with his plan to have gas service connected to the first floor. He arranged to have the gas company trace the gas lines from the second floor and certify the lines to be used for the gas connection, which the gas company did. He then employed a plumber to perform the hook-up. According to Debtor, permits were obtained for this work and were supplied to CSA by the attorney he had at the time.

Approximately one month after the gas service was installed to the first floor, the tenant from the basement mentioned to Debtor that his gas bill for the month had dramatically increased. Assuming that this increase may have been caused by the gas

hook-up to the first floor, Debtor had the gas company return to the Premises and re-check the gas lines. The gas company eventually discovered a mix-up with the lines, and that gas service to the basement and first floor were connected to the same meter. Debtor and the basement tenant resolved the situation by agreeing that Debtor would pay the overage on the basement tenant's monthly gas bills. FN8

> FN8. Debtor receives a separate gas bill for the second floor since the gas service to that floor is connected to its own meter. Thus, each month, Debtor pays the gas bill for the second floor and also the overage on the basement tenant's gas bill.

*3 When the basement tenant's gas bill increased, he also apprised Ronsenberg of the fact. Transcript at 115. According to Rosenberg, this was how he discovered that Debtor had connected gas service to the first floor. *Id.* Rosenberg immediately contacted Debtor about the faulty installation and claims he was assured that it would be corrected.FN9*Id.* at 115-16.It was not until approximately six months ago, he states, that he found out that Debtor had dealt with the situation, not by having gas service properly installed for the first floor, but by arranging with the basement tenant to pay the overage on his gas bill. *Id.* at 120-21.

> FN9. It is unclear from Rosenberg's testimony whether he claims that, during their initial conversation about the mix-up in the gas lines, Debtor told him how he intended to "correct" the problem. However, it is clear from Rosenberg's testimony that, at some point in 1997, Debtor represented that he intended to resolve the mix-up by installing a separate gas line for the first floor.

In addition to connecting gas service to the first floor, Debtor also had changes made to the electrical system of that floor.FN10These changes were made by a certified electrician whom, Debtor believes, obtained permits for the work. However,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

Page 4

Debtor never supplied the permits to CSA and does not have them now.[FN11]

> FN10. While the testimony is vague as to the specific changes that were made to the electrical system, there are references in the record to the electrical wiring of the second floor being extended to the first floor.

> FN11. At the conclusion of the preliminary hearing on CSA's motion for relief from the stay, I ordered the Debtor to obtain from the Department of Licenses and Inspection ("L & I") in Philadelphia copies of the permits and licenses which he was issued and to provide copies of them to the Court and CSA. Transcript, dated August 17, 1998, at 12, 15-16. I ruled that, to the extent the Debtor failed to produce any required permits or licenses, I would draw a negative inference therefrom. *Id.* at 16. At the hearing on the assumption motion on October 8, 1998, Debtor testified that while he had submitted a request to L & I for copies of the relevant permits and licenses, he was advised by L & I that since the department was in the process of moving to another location, his request would not be processed for six to eight weeks. I find Debtor's testimony on this matter credible and, for that reason, will not draw a negative inference from Debtor's failure to produce the aforementioned permits and licenses. I note that, if it indeed took L & I eight weeks to process Debtor's request, then even assuming that he submitted his request to L & I promptly after the hearing on August 17, 1998, the eight week period would not have expired before the hearing on October 8th.

For the past two years, with the addition of gas service to the first floor and the changes to the electrical system, Debtor has operated the Painted Parrot Cafe' as a restaurant, preparing and serving hot food on the premises. Debtor has never hidden this fact from CSA. The existence of the restaurant has been publicized and the restaurant has been the recipient of various awards and accolades, including several "Best of Philly" awards for its food.

### Payment of Rent

From the commencement of the Lease through October of 1997, CSA received the monthly rent due under the Lease on a timely basis.[FN12] However, as of December 10, 1997, the rent for November and December had not been paid. By letter dated December 10, 1997, CSA advised Debtor and KMDA that the Lease was in default for failure to pay the rent due for November and December and that late fees were due and owing. Exhibit P-7. The rent for these months was subsequently paid.[FN13] Again, in February, 1998, the rent was not timely paid. By letter dated February 4, 1998, CSA advised Debtor and KMDA that the lease was in default because of "your chronic failure to pay rent when due, as well as not paying the rent for February[.]" Exhibit P-8. Apparently, although a check was submitted for the February rent, it was rejected for insufficient funds when CSA presented it for deposit.[FN14] The same situation occurred with the March rent check.

> FN12. According to Debtor, his customary practice for the past five years was to provide CSA with twelve checks at the beginning of the year with one check made out for each month's rent. As the rent became due for each month, Rosenberg would deposit that check.

> FN13. The November rent was paid in cash in December. A check was submitted for the December rent but the bank rejected it on two occasions for insufficient funds. The December rent was finally paid in January.

> FN14. The checks which Debtor and KMDA submitted to CSA for rent were drawn on KMDA's bank account at Commerce Bank. According to Debtor, he

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

letter of March 10, 1998 that a response was made.

[A]s a result of the uncured non-monetary defaults, you are hereby given notice of the landlord's election to terminate the lease effective five days after the date of this notice ... Demand is hereby made ... for possession of the premises forthwith upon termination of the lease[.]
*Id.*

Thereafter, Debtor contacted Rosenberg and suggested that they meet without their attorneys which they did. They discussed a settlement of their disputes which Rosenberg memorialized in a letter dated April 22, 1998. Exhibit P-12. This letter states, in relevant part:
This letter will confirm our meeting of April 21, 1998 during which I, on behalf of 209-211 Chestnut Street Associates, agreed to reinstate the lease agreement provided this letter is executed before the close of business today and all of the following defaults are cured within the time frames indicated below:
1. The charges for excess water and sewer, invoiced April 20, 1998, in the amount of $6,594.40 are paid prior to May 1, 1998.
*5 2. The monies advanced by us for Business Use and Occupancy Tax, previously invoiced, in the amount of $1,008.34, are paid prior to May 15, 1998.
3. Within the next 30 days KMDA Corp. will provide us with plans and permits to provide separate gas service to the first floor. This work will be completed 45 days from our approval of said plans.
4. With 45 days of notice from us, all License and Inspection Violations to the building, resulting from your improvements, construction and/or operation, will be corrected and the violations will be removed from the record.
5. KMDA Corp. will, within 15 days from invoicing, reimburse us for any additional cost of insuring the building and/or maintaining liability insurance resulting from gas cooking.
6. KMDA Corp. will, within 15 days from invoicing, reimburse us for any additional cost of insuring the building and/or maintaining liability insurance resulting from serving alcoholic

beverages on the premises.

*Id.* Vitanza responded in writing to Rosenberg's letter with comments to and changes which he wanted made to the agreement. For example, he wanted to pay the amounts due for the water and sewer bills and for the Business Use and Occupancy Tax in installments instead of lump sums. With regard to paragraphs 3 and 4 of the proposed agreement, which involved separating the gas service between the first and second floors and L & I violations, respectively, he stated the following:#
3 Will make changes through gas co. to take over basement meter. Then install new meter and gas piping to (Bill in basement)
# 4 Get all violations from L & I addressed. As of now, I know of none, so please supply me with list & I will correct them. I will stay in contact with you regarding any problems.

Exhibit P-12. On or about May 1, 1998, Rosenberg responded with a memorandum, stating, in relevant part:This memorandum will confirm the resolution of the counteroffer you faxed to us today.
1. All plans, for any construction whatsoever, will be submitted to us for approval. If the City waives any permit requirements, that waiver along with the contractor's certificate of insurance and waiver of liens, must be provided to us, after we approve the plans and prior to commencing any construction whatsoever.
2. You may inspect the water bills at anytime. However, the monies must be paid, in three equal payments, prior to the 5th of May, June and July.
3. The outstanding BU & O Tax may be paid in 4 equal installments commencing with the May 1998 rent.
4. The gas service must be separated, by floor. I have no problem with your suggestion provided all the conditions of paragraph numbered 1, in this memorandum, are complied with.
5. This afternoon, I provided you with a copy of one outstanding L & I violation. All outstanding violations, if any, must be corrected, within the time frame established by the governing authority. I will provide you with copies of notice when received.
*6 The above comments, when combined with my letter dated April 22, 1998, unchanged, constitutes the agreement between us.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

Exhibit P-13. Debtor signed this memorandum (hereinafter Rosenberg's letters of April 22, 1998 and Memorandum of May 1, 1998 will be referred to as the "Reinstatement Agreement") and returned it to Rosenberg as requested.

Thereafter, Debtor and KMDA submitted three checks to CSA, dated May 4, 1998, in the amounts of $2,000, $250 and $1,700 as payment for or towards: (i) the water bills; (ii) the Business Use and Occupancy Tax; and (iii) the May rent. However, when these checks were presented to the bank for deposit, they were rejected for insufficient funds.

*Confession of Judgment for Possession*

CSA subsequently filed for and obtained a Confession of Judgment for Possession of the Premises ("Confessed Judgment") in the Court of Common Pleas of Philadelphia County ("State Court") against Debtor and KMDA. Exhibit D-2. On June 18, 1998, CSA obtained a Writ of Possession for the Premises. Exhibit D-3. Shortly thereafter, Debtor and KMDA filed a petition to strike or open the Confessed Judgment. Exhibit P-14 at ¶ 7(a). On July 29, 1998, CSA, KMDA and Debtor entered into a Consent Order in State Court. Exhibit P-14. Pursuant to the Consent Order, KMDA and Debtor were required to make certain payments to CSA and its escrow agent by certain dates. In the event such payments were not made, then the Consent Order provided that the aforementioned petition to strike or open the confessed judgment would be dismissed without prejudice and CSA would be permitted to immediately exercise its right to have the Writ of Possession for the Premises executed by the sheriff. KMDA and Debtor failed to make the payments required under the Consent Order.[FN17]On July 30, 1998, Debtor filed his Petition for Voluntary Relief under Chapter 13 of the Bankruptcy Code, thereby staying any action by CSA to take possession of the Premises.

FN17. In September, 1998, despite the fact that Debtor and KMDA had defaulted under the Consent Order, the State Court

granted KMDA's petition to open the Confessed Judgment. Because of the automatic stay, the State Court refrained from ruling on Debtor's petition to open.

*CSA's Stay Motion and the Hearings Thereon*

Four days later, on August 3, 1998, CSA filed its Stay Motion seeking relief from the automatic stay to pursue its remedies in State Court for possession of the Premises. A preliminary hearing on the Stay Motion was held on August 17, 1998 and the final hearing was held on September 14, 1998. Testimonial evidence was presented at both hearings.[FN18]The testimony presented at the final hearing concerned the issue of whether any dangerous conditions exist at the Premises.

FN18. Even though Debtor consented to the Stay Motion, I permitted CSA to present its witnesses at the final hearing since: (i) they were in court; and (ii) their testimony would be relevant to this Motion. Transcript at 21-23. Rather than requiring them to re-appear in court for hearing on the assumption motion, it seemed more efficient to allow them to testify at the final hearing on the Stay Motion and incorporate that record into the record of this hearing. *Id.* The parties concurred.

At the final hearing, the parties advised the Court that all monetary defaults under the Lease, other than a potential issue with regard to attorneys' fees, [FN19] had been cured so that the only issue before the Court was whether there are any non-monetary defaults under the Lease. Transcript at 2-3. Significantly, Debtor also advised the Court that it consented to CSA's request for relief from the stay, but also mentioned that it had filed a motion to assume the Lease upon which a hearing was scheduled for the beginning of October. In light of this information, it became apparent that, even if relief from the stay was granted, this Court would, in all likelihood, be the first court to address whether non-monetary defaults exist under the Lease and whether the Lease was terminated.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                      Page 8

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
(Cite as: Not Reported in B.R.)

Accordingly, I entered an Order, dated September 14, 1998, granting CSA relief from the stay to exercise its state law remedies with respect to the Premises provided that no action be commenced until I decided the assumption motion. However, because CSA was also contending that certain health and safety issues exist with regard to the Premises, I granted CSA "immediately relief from the stay to commence any action for injunctive relief based on hazardous conditions, if any, that require immediate attention."To my knowledge, none was ever filed.[FN20]

FN19. At the hearing on the Motion on October 8, 1998, CSA presented testimony regarding the amount of attorney's fees which it has incurred to date in seeking to evict Debtor from the Premises. However, since the parties advised the Court at the final hearing on CSA's Stay Motion that the only issue before me was whether non-monetary defaults occurred under the Lease, I consider this testimony to be irrelevant and will not recount it here. I further note that: (i) no evidence was presented that, after the final hearing on the Stay Motion, CSA presented Debtor with a demand for attorney's fees which might indicate that CSA had changed its position and considered the issue of attorney's fees to be before me; and (ii) CSA has never identified the provision in the Lease which it contends obligates the Debtor to pay such fees and in my review of the Lease no such provision was identified.

FN20. At the hearing on the Motion on October 8, 1998, no mention was made by either party of any request for injunctive relief having been filed in State Court.

*7 The witnesses whom CSA presented at the final hearing on CSA's Stay Motion included: James Terrace ("Terrace") whom the parties stipulated was qualified as an expert in the field of general contracting, including the construction of fire wall partitions, Transcript at 35; Frank Nucifore (" Nucifore"), whom the parties stipulated was qualified as an expert in the field of electrical service installation and renovation, as well as safety requirements relating thereto, *id.* at 71; Charles Hutnick ("Hutnick"), whom the parties stipulated is qualified as an expert in gas utility service installation, *id.* at 87; and Rosenberg.

Terrace, an employee of Lane Real Estate which is a company related to CSA, testified that on Tuesday, August 25, 1998, he inspected the first and second floors of the Premises to determine the general building condition. He discovered that water had seeped through the floor of the first floor of the Premises, causing the wood floor and joists to rot and the tiles on the ceiling of the basement to deteriorate. *Id.* at 37-43.He attributes this water damage to: (i) "improper priming and gluing of the joint connections of the piping"; and (ii) holes that were drilled into the floor to accommodate newly installed pipes and never sealed. *Id.* In his view, the water seepage has affected the structural integrity of the floor joists and the ceiling. He estimated that, assuming the least amount of damage to the damaged portion of the basement ceiling and the first flooring, it would require two knowledgeable carpenters approximately ten days to repair or replace it. *Id.* at 43.He further testified that on the second floor, there are two freezer or refrigeration units without proper drainage. *Id.* at 44-45.The carpet upon which one of the units rests was totally saturated with water; the floor upon which the other unit rests had about an 1/8 inch of water on it with brown and green algae growing on the floor. *Id.* Without removing the freezer/refrigeration units and the carpeting underneath them, and conducting an intensive examination of the ceiling of the first floor, he was unable to assess the damage caused by the water. *Id.* at 44-45, 67.Moreover, he did not know how long the refrigerator unit had been in that location. However, he estimated that it would require two carpenters approximately five days to complete the inspection and repair the damage caused by the water. *Id.* at 44-45.He also examined the wall between the kitchen and dining room, concluding that while the wall was intended to be a fire barrier wall, it was nothing more than a partition wall. He estimated that it would require two carpenters approximately ten days to convert

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

this wall into a fire wall. *Id.* at 47-48.

On cross-examination, Terrace admitted that he was not familiar with Philadelphia's building code. *Id.* at 52.He testified that, assuming that an exhibition kitchen is permitted under Philadelphia's building code and that the kitchen at issue qualified as such which he did not think it did, he did not know whether the wall between the kitchen and dining room was sufficient.*Id.* at 52, 70.He further admitted that, approximately two months before he performed his inspection, he had noticed the damage about which he was testifying while doing other repairs in the building and reported the damage to his immediate supervisor. *Id.* at 52-53.At that time, he considered the damage and the need for it to be repaired as substantial and important as he does now. He also testified that, regardless of whether the Premises were leased to a new tenant, the repairs would still have to be done. *Id.* at 56-57.When pressed on cross-examination, Terrace admitted that because he is not familiar with the building code or the health and safety code of Philadelphia, he could not render an opinion on whether any of the conditions he observed during his inspection of the Premises on August 15, 1998 violate such codes.*Id.* at 64.

**\*8** Nucifore testified that he is employed as a supervisor and estimator for All-Pro Electric, Inc. *Id.* at 71.Like Terrace, he inspected the Premises on August 25, 1998. Except for the electrical panel which he opened on the second floor, the inspection which he performed was solely a visual inspection. *Id.* at 72.During his inspection, he observed only one underwriting inspection sticker. This sticker was located in the basement area on the main service and was dated 1987. *Id.* at 72-73.According to Nucifore, an inspection is required any time a modification or addition is made to an electrical system. As part of the inspection process, the inspecting agency typically places a sticker on the subject of his or her inspection, showing if it was approved and the date upon which the inspection was made. *Id.* at 73.If a piece of permanent electrical equipment or portable equipment requiring special circuitry was installed, Nucifore stated he would expect to find an underwriting inspection sticker on it indicating that an inspection

had been performed. *Id.* However, Nucifore admitted that the absence of an inspection sticker was not a code violation so long as the inspection was performed.*Id.* at 82.

On the first floor of the Premises, Nucifore noticed a piece of kitchen equipment with an armored cable attached to it. *Id.* at 73.According to Nucifore, this type of cable is normally attached to a permanent wiring system such as a junction box, but in this case the cable was attached to a plug which was designed to fit a rubber cord. *Id.* at 73-74.Because of this wiring method, the piece of kitchen equipment was not grounded [FN21] and did not satisfy code requirements. *Id.* at 74.Nucifore also noticed a "residential grade extension cord coming out of the ceiling grid in the rear of the kitchen area" with a multiple outlet assembly attached to it. *Id.* at 74-75.Three pieces of equipment, including a fan, were plugged into the assembly. *Id.* at 75-76.According to Nucifore, the use of this extension cord, above the drop ceiling, constitutes a code violation. *Id.* at 76.On the second floor, Nucifore noticed a permanent piece of refrigeration equipment improperly connected to an extension cord and plugged into an outlet instead of connected to a permanent wiring system as required by the code. *Id.* at 76-77.He also inspected the panel box located on the second floor. In the box, he noticed two open spaces on the left hand side from which breakers had been removed. In his opinion, because "no one had placed any kind of closures over there," a shock hazard existed and if a fire erupted in the panel, the situation could "tend to create a hazard there."*Id.* at 77.He estimated that it would require two electricians working two days at a cost of approximately $2,000 to eliminate the hazards and violations which he observed. *Id.* at 79-80.However, he admitted that the only item presenting an imminent danger in the Premises was the piece of kitchen equipment which he observed on the first floor that is connected to the armored cable and attached to a plug. He estimated that it would cost about $500 to correct this problem. *Id.* at 84-85.

FN21. According to Nicofore, a piece of equipment that is not grounded may

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

constitute a shock hazard. Moreover, it may fail to trigger the circuit breaker to open when needed which could possibly cause a fire.*Id.* at 74.

**\*9** Hutnick, an employee of Phillips McDade Controls, Inc. which is a heating and air conditioning contractor, testified that he also inspected the Premises on August 25, 1998. *Id.* at 86-87.During the inspection, he observed a " manifold with a bank of gas meters on it in the basement area."*Id.* at 89.One of the meters, which was labeled 209 Chestnut, was "locked off with a gas company lock."*Id.* Two of the other meters were labeled "two" and "BSE" which he assumed meant "basement." *Id.* He believed that the meter labeled "209 Chestnut" was originally intended to provide gas service to the first floor. *Id.* at 90.However, when he traced the piping from the meter labeled "BSE," he discovered that it was providing gas service to the first floor. *Id.* at 90-91.After performing a test referred to as " clocking the meter," he determined that gas service was being provided from the meter labeled "BSE" to the six burner range in the kitchen of the Painted Parrot on the first floor.[FN22]*Id.* at 91.Based on the volume of gas usage for this range, he concluded that the size of the piping from the meter marked " BSE" was undersized which could cause improper combustion and result in the production of hazardous gases. *Id.* at 93.However, on cross-examination, Hutnick admitted that he had not performed any of the tests that determine whether improper combustion is occurring and could not state whether such a problem actually exists. *Id.* at 106-107.

FN22. Hutnick also testified that he inspected the gas service on the second floor and found a newly installed "T" with piping going down through the floor to the area of the Painted Parrot kitchen on the first floor. Based on his inspection, he surmised that the gas service was going either to the char grille or the broiler unit in the kitchen. *Id.* at 95.While I assume that this testimony relates to the problem of undersized gas piping, its relevance was never fully explained.

During his inspection, Hutnick also noticed that the gas piping passing from one floor to another was not properly "sleeved." Explaining this term, he stated:

There should have been what's been called sleeving, which normally takes a larger diameter pipe and is sealed into the penetration wherever the penetration goes through a floor, a bulkhead, a wall or anything like that. And then the gas piping itself, is passed through that sleeving. And then the fire protection, the fire caulking or fireproof material is --- is put around those fittings.

*Id.* at 96-97.According to Hutnick, "sleeving" acts as fire protection by making it more difficult for a fire to transmit through the pipe openings.*Id.* at 97.On cross-examination, Hutnick admitted that there are only two gas lines and one vent pipe in need of sleeving and that the "sealing work is probably minimal in cost and time consumption."*Id.* at 104.

Testifying about what he labeled as a few other " safety hazards," Hutnick explained that he observed a gas fired water heater in a closet in the restaurant. *Id.* at 98.According to him, the pipe connecting the water heater vent to the chimney was uninsulated. *Id.* at 98-99.Since such pipes can exceed 200 degrees while the appliance is in operation, he considered the pipe to be a safety hazard because of its proximity to some wooden shelving and accessibility to anyone opening the closet doors. *Id.* at 99.In the closet, he also noticed a double wall insulated pipe which, at above three feet above the ground, changed to a single wall uninsulated pipe. *Id.* at 98-100.He also considered this a safety hazard. Lastly, he mentioned that several covers were missing on the mechanism which activates the fire suppression system in the event of a fire. Since these covers protect the mechanism from being damaged, he viewed their absence as a safety hazard. *Id.* at 101.

**\*10** Hutnick estimated that it would cost approximately \$5,500 to \$7,000 to rectify the safety hazards which he described. *Id.* at 103.When asked what problems he thought should be rectified

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

immediately, he named two: (i) the undersized piping; and (ii) the lack of sleeving. *Id.* at 103-04.He estimated that these repairs would cost between $4,000 to $6,000. *Id.*

Rosenberg was the final witness to testify at the hearing on CSA's Stay Motion. He testified that the reason CSA had not sought to evict Debtor for installing gas service to the first floor when such installation was discovered over a year and a half ago was that Debtor had assured him that the problem with the gas service being connected to the basement tenant's meter would be, and subsequently was, remedied by properly installing gas service to the first floor with all the necessary permits for such installation having been obtained. *Id.* at 120-22.According to Rosenberg, so long as gas service was properly installed to the first floor and all necessary permits were obtained, the installation was "acceptable" and that it was not economically practicable to CSA to attempt to evict Debtor on that basis. *Id.* at 121-22.

*The Hearing on Debtor's Motion*

At the beginning of the hearing on the Motion on October 8, 1998, I informed the parties of my view that if the Confessed Judgment was based solely on non-monetary defaults or a combination of monetary or non-monetary defaults, [FN23] then the judgment against Debtor presented an obstacle to my moving forward to determine whether he could assume the Lease.[FN24]I further advised the parties that I wanted the record supplemented to include all documents relating to the Confessed Judgment so that I could ascertain whether it was based on non-monetary defaults and/or monetary defaults. Based on this information and after discussing the matter with its counsel, CSA advised the Court that it wanted to proceed with the Motion and that it would promptly proceed in State Court to have the Confessed Judgment vacated as to the Debtor so that it would not present an obstacle to me deciding the Motion.[FN25]With that matter resolved, the parties presented testimony on the Motion. Only two witnesses testified at this hearing: Debtor and Rosenberg. Much of their testimony focused on events that have already been described above, but

included more details regarding them. The most glaring observation regarding their testimony is that it is conflicting on several key factual issues, such as whether Rosenberg was aware that a hot kitchen was installed in the Premises in 1997.

FN23. Under the law of Pennsylvania, a tenant has the right to cure monetary defaults under a lease until actual execution of the writ of possession. *See Rainey v. Philadephia Housing Authority,* 832 F.Supp. 127, 128 n. 2 (E.D.Pa.1993), *reconsiderationgrantedinpartonother grounds,* 1994 WL 13828 (E.D.Pa. Jan.19, 1994); *In re Karfakis,* 162 B.R. 719, 727 (Bankr.E.D.Pa.1993) (Raslavich, J.); *Econo-Inn, Inc. v. BWY, Inc. (In re BWY, Inc.),* 1990 WL 76672 at *2 (Bankr.W.D. Pa. June 1, 1990) (Fitzgerald, J.); *In re C & C TV & Appliance, Inc.,* 97 B.R. 782, 787 (Bankr.E.D.Pa.1989) (Scholl, J.), *aff'd,* 103 B.R. 590 (E.D.Pa.1989); *In re Borbidge,* 66 B.R. 998, 1003 n. 11 (Bankr.E.D.Pa.1986) (Fox, J.). Because of this right, a lease is not terminated when such termination is based solely on monetary defaults until actual execution of the writ of possession. *Seee.g.,In re Karfakis,* 162 B.R. at 727. However, this right to redeem is limited to monetary defaults. *SeeIn re Telephonics, Inc.,* 85 B.R. 312, (Bankr.E.D.Pa.1988) (recognizing that "[t]here is no provision in .... the applicable law of ... Pennsylvania allowing any pre-judgment (or post-judgment) cures of any but a monetary, rental delinquency."). Therefore, assuming the Confessed Judgment against Debtor was based solely on non-monetary defaults or a combination of monetary and non-monetary defaults, the right to redeem would not apply and the Confessed Judgment would represent the Court of Common Pleas' determination that the lease was terminated.

FN24. The Full Faith and Credit statute requires federal courts, including

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bankruptcy courts, to give the acts and judicial proceedings of any state court the " same full faith and credit ... as they have by law or usage in the courts of such State[,]"28 U.S .C. § 1738. *SeealsoKeene Corp. v. Acstar Insurance Co.(In re Keene Corp.),* 162 B.R. 935, 946 (Bankr.S.D.N.Y.1994) ("Section 1738 applies to Bankruptcy Courts"); *In re Holiday Interval, Inc.,* 114 B.R. 177, 180 (Bankr.W.D.Mo.1989) ("As part of the federal system, the mandate of 1738 applies to bankruptcy courts."). Under Pennsylvania law, a judgment by confession "is a final judgment 'on the merits' which operates as *res judicata* to bar a collateral challenge to that judgment or any claim arising out of the same underlying transaction or nucleus of events. *"Zhang v. Southeastern Financial Group, Inc.,* 980 F.Supp. 787, 792 (E.D.Pa.1997) (citing to Pennsylvania cases). Even a confessed judgment which is still subject to attack by a timely petition to open or strike "operates as res judicata unless and until such petition is filed and granted."*Id.* SeealsoOkan's Foods, Inc. v. Windsor Associates Limited Partnership (In re Okan's Foods, Inc.),* 217 B.R. 739, 751 (Bankr.E.D.Pa.1998) ("Under Pennsylvania law a judgment by confession is an act of court that, until set aside or reversed in an appropriate proceeding instituted for that purpose, *e.g.,* petition to open or strike brought pursuant to Pa.R.Civ.P. 2959, has all the qualities and effect of a judgment entered upon a verdict."). Thus, under Pennsylvania law, the Confessed Judgment constitutes a final judgment on the merits and, under the Full, Faith and Credit statute, I am obligated to treat it as such.

FN25. Upon being advised of my view of the effect of the Confessed Judgment, CSA's counsel immediately made plans to have the documents relating to the judgment hand-delivered to Court so that they could be entered into evidence.

Comments made thereafter by both parties' counsels suggested that the documents would reveal that the Confessed Judgment was based on both monetary and non-monetary defaults. However, as the matter was further discussed, CSA's counsel asked for permission to speak to his client which was granted. It was immediately after this interlude that CSA's counsel informed me of its client's willingness to vacate the State Court judgment against the Debtor so that I could rule upon the assumption motion.

According to Debtor's version of events, Rosenberg approached him in 1996 with the idea of modifying the original lease to include the second floor of the building. While Debtor believed he could not support the additional rent for the second floor simply by serving pastries, he thought he would be able to afford the additional rent if he expanded the menu of the Painted Parrot Cafe to include hot foods. Before he executed the Lease, he discussed his plan to install a hot-food kitchen in the premises with Rosenberg who, as Debtor explains it, voiced no objection, merely responding that he was concerned only that the rent be paid on time.

**\*11** After executing the Lease, Debtor proceeded with plans to have a kitchen installed in the Premises. One of the issues which arose was the need to have a ventilation system installed in the kitchen. Because of the particular ventilation system which Debtor wanted to use, he needed to obtain approval for the system from the zoning board. Debtor apprised Rosenberg of this situation and the need for zoning approval. On at least three occasions, Rosenberg asked Debtor about the status of the zoning request. In or about December, 1996, the zoning board granted the approval and construction on the kitchen commenced.

In January of 1997, the restaurant had a "dry run," meaning that a private party was hosted for guests in the restaurant so that any problems with the food or service could be discovered and resolved before the restaurant opened to the public. Debtor believes that Rosenberg was invited to this event. Later the same month, the restaurant opened and it has served

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

hot food ever since.

According to Debtor's recollection, Rosenberg patronized the restaurant in 1997 on about four occasions; ordering dinner on one of the occasions and dessert on the others. Debtor also recalled one occasion when Rosenberg visited the restaurant to talk to him. Because Debtor was working in the kitchen, Rosenberg stood in the alcove to the kitchen while they had their discussion.

According to Debtor, from the time the restaurant was installed through 1997, Rosenberg never requested that Debtor submit plans for the restaurant and never complained when none were submitted. Also, during 1997, Rosenberg never advised Debtor that the installation of the kitchen or the gas line constituted an event of default under the Lease.

During his testimony, Debtor also commented on the inspections and expert reports rendered by Terrace, Nucifore and McDade. As for Terrace's observations of water damage in the basement which he attributed to leakage from the first floor, Debtor offered another explanation for the water damage. He explained that water had been leaking into the basement from a gap in the building along the alley way and that while the landlord had made repairs to the building in an attempt to stop it, the leak continued to be an on-going problem. He also offered another explanation for the damage to the wood in the basement, namely termites. He explained that he knew the basement had termite infestation because about two times a year, the restaurant had "swarmers" in it that came up from the basement and that a termite inspector had been to the Premises.

Turning to the problems which Nucifore raised in the restaurant's electrical system, Debtor explained that prior to receiving a copy of Nucifore's report, he had never been informed by CSA of any of the problems which Nucifore had observed. However, since receiving the report, he had employed an electrician to address the problems raised therein dealing with the first and second floor.[FN26] The electrician concluded that some of the "problems" raised by Nucifore were unfounded; [FN27] the other problems he resolved.[FN28]

FN26. According to Debtor, he does not have access to the basement so he could not have the problems listed for the basement resolved.

FN27. During his inspection, Nucifore observed a permanent piece of refrigeration equipment on the second floor connected to an extension cord and plugged into an outlet instead of connected to a permanent wiring system. He considered this a code violation. Debtor disagreed, explaining that this piece of equipment is a 110 unit and that it is properly plugged into a 110 outlet. Nucifore had also observed "two (2) open junction boxes above the ceiling."Debtor's electrician could not determine what Nucifore was referring to.

FN28. Debtor's electrician performed the following repairs: (i) he installed a metal cord and ground interruption unit for the electrical supply to the piece of equipment to which Nucifore had referred as the " steam table" on the first floor; (ii) he installed closures in the open spaces in the bottom of the electrical panel on the second floor; and (iii) he removed the remains of a piece of ground wire from the same panel. In addition, Debtor stopped using a fan in the kitchen and thereby eliminated the extension cord which Nucifore testified constituted a code violation.

**\*12** As for the problems which McDade raised regarding gas service in the building, Debtor explained that prior to receiving a copy of McDade's report, he had never been informed by Rosenberg of any of the problems listed therein and never told that they constituted a default of the Lease. However, after receiving the report, he retained a plumber and instructed him to correct any of the items that were questionable.[FN29]With regard to the lack of "sleeving," he testified that he

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                    Page 14

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

is prepared to have it installed. Insofar as the issue of undersized piping, he reviewed the BTU measurements obtained by McDade and found them to be faulty. In calculating his measurements, McDade assumed a connection between the gas pipe in the basement and the range in the kitchen whereas, according to Debtor, the pipe is actually attached to the char grille. Unlike the range which measured in excess of 200,000 BTU, the maximum rating for the char grille is 35,000 BTU. Thus, Debtor claims, the size of the piping is not a problem.

> FN29. Debtor did not state whether the plumber actually corrected any of the problems which McDade identified.

He further testified that the restaurant is inspected two or three times a year by a health inspector and that the restaurant has always received all necessary permits and licenses to operate. Except for one code violation, *see* Exhibit P-29, which was brought to his attention by Rosenberg and simply required the payment of an $80.00 fee,[FN30] Debtor testified he is unaware of any outstanding License and Inspection violations for the restaurant. He also explained that plans have been drawn up to have the gas service to the first floor separated from the basement meter and that a permit for such work is being sought. Assuming that a permit for the work is obtained, he intends to submit the plans for the work to CSA. He also testified that all contractors who have completed work for him on the building have been paid and that none of the contractors have ever filed a lien.

> FN30. The above-mentioned Code violation reads, in pertinent part: Exhibit P-29. Neither party could definitively explain the basis of this violation. While CSA suggested that the violation was issued because the Painted Parrot Cafe was providing outside seating, neither the wording of the notice nor its date support this interpretation. According to Debtor's testimony, when he received this notice, he contacted L & I and was

told that the notice was issued as a result of a new law that was recently enacted requiring him to pay an $80.00 fee to operate which he did. After that, he did not hear anything further about the violation which suggests that the $80.00 payment cured it.

Insofar as CSA's complaint that a sign for the Painted Parrot Cafe was installed on the Chestnut Street side of the building without CSA's approval, he explained that the sign was a canvas banner that advertised that lunch and dinner were being served and that an all-you-can-eat dessert buffet is featured on Wednesday nights.[FN31] According to Debtor, the sign was up for twelve to fourteen months without any complaint from CSA, but that he took it down when he was advised by his attorney in March of 1998 that CSA considered it to be a default under the Lease.

> FN31. Apparently, there is some lighting on the building near where the sign was located. Debtor testified that he did not install this lighting, does not pay the electricity for it and cannot control it.

On cross-examination, Debtor admitted that he never submitted any of the documents identified in paragraph 8(g) of the Lease in conjunction with the improvements that were made to the Premises and never obtained written consent from CSA for the improvements. He further admitted that he is in the process of seeking a liquor license to serve alcoholic beverages at the restaurant, but stated on re-direct that he would decline to serve such beverages if it was a violation of the Lease.[FN32] He also admitted the Painted Parrot Cafe has continued to provide outdoor seating on the sidewalk for its patrons and that the waiters and waitresses use the lobby area in the building for trays, but testified on re-direct that he would also stop providing outdoor seating if it constitutes a violation of the Lease.

> FN32. The applicant for the liquor license is FDD, Inc., the shareholders of which are Debtor and the individuals who loaned him

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                                    Page 15

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

the money to apply for the license. When questioned whether Debtor and KMDA intended to sublet the Premises to FDD, Inc. so that it could serve liquor at the Premises, Debtor replied that, once obtained, the liquor license could be easily transferred to KMDA.

**\*13** Rosenberg testified next. According to him, it was Debtor who approached him about executing a new lease for the Premises and substituting KMDA for the Painted Parrot Cafe', Inc.[FN33] As for the reason Debtor wanted to lease the second floor, Rosenberg claims he never asked him about it and Debtor never told him. According to Rosenberg, he never had any conversations with Debtor about the installation of a hot-food kitchen in the Premises and never had any knowledge before 1998 that such a kitchen had been installed. While he was aware in 1997 of Debtor's installation of gas service to the first floor, he never asked and did not give any thought to the reason for the installation. His sole concern after having been informed of the installation by the basement tenant was to ensure that a separate gas meter was installed for the first floor, that proper permits for such installation were obtained and that the work regarding the installation was properly performed which, he claims, Debtor assured him was the case. Rosenberg admitted that although he knew in 1997 that Debtor had installed gas service to the first floor, he did not notify Debtor at any time during that year that he considered such installation to be a violation of the lease nor did he ever refuse to accept rent from him.

> FN33. Rosenberg further testified at the hearing on October 8, 1998, that the prior lease with the Painted Parrot Cafe', Inc. included a lease modification agreement of identical language and that the second floor was originally leased at that time. However, this testimony is inconsistent with the testimony which Rosenberg gave at the preliminary hearing on CSA's Stay Motion on August 17, 1998. *Seesupra* at 3.

Rosenberg also admitted to having had dessert " many times" in the Painted Parrot Cafe and testified

that he would not be surprised if he did so in 1997; however, he denied ever eating a hot meal (*i .e.,* lunch or dinner) there and claimed that he was not aware that hot food was being served. He also did not recall having any discussion with Debtor in 1997 in the alcove to the kitchen.

## DISCUSSION

Debtor seeks to assume the Lease pursuant to § 365(a). This provision states, in pertinent part:
Except as provided in ... subsections (b), (c) and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a). CSA's Objection raises the following challenges to Debtor's Motion: (i) the Lease was terminated pre-petition; (ii) Debtor has failed to cure or provide adequate assurance that he will promptly cure all defaults under the Lease as required by 11 U.S.C. § 365(b)(1)(A); and (iii) Debtor has failed to provide adequate assurance of future performance under the Lease as required by 11 U.S.C. § 365(b)(1)(C).[FN34] I address each of these grounds below.

> FN34. In its Objection, CSA also asserted that the Motion should not be granted because: (i) Debtor is a co-obligor under the Lease and has no right to use or occupy the Premises; (ii) Debtor owes additional rent under the Lease for attorney's fees and costs in an amount in excess of $10,000; (iii) the Premises are not necessary to the Debtor. At the final hearing on the Stay Motion on September 14, 1998, I rejected CSA's argument that Debtor is only a co-obligor and not a tenant under the Lease reasoning that neither the language of the Lease nor CSA's conduct supported the argument. Transcript at 26. As for the issue of attorney's fees, I have already addressed that above. *Seesupra* at n. 19.With regard to the third argument, Debtor testified at the hearing on the Motion that KMDA is his primary source

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

of income. If Debtor is not permitted to assume the Lease, then KMDA will have no location in which to operate the Painted Parrot. Accordingly, I reject CSA's argument that the Premises are not necessary to the Debtor.

### A. *The Termination Issue*

CSA contends that the Lease was terminated pre-petition. If this contention is correct, then Debtor is prohibited from assuming the Lease by § 365(c)(3) which states, in relevant part: "The Trustee may not assume .. any ... unexpired lease of the debtor ... if ... such lease is of nonresidential real property and has been terminated under applicable non-bankruptcy law prior to the order for relief[.]" 11 U.S.C. § 365(c)(3).*See also Vanderpark Properties, Inc. v. Buchbinder (In re Windmill Farms, Inc.),* 841 F.2d 1467, 1469 (9th Cir.1988) (" Simply put, if a lease of nonresidential real property has been terminated under state law before the filing of a bankruptcy petition, there is nothing left for the trustee to assume."); *Walling Crate Company, Inc. v. Hickory Point Industries, Inc. (In re Hickory Point Industries, Inc.),* 83 B.R. 805, 806 (M.D.Fla.1988) ("A lease contract that is validly terminated pursuant to state law may not be resurrected by the filing of a bankruptcy petition."); *In re DiCamillo,* 206 B.R. 64, 69 (Bankr.D.N.J.1997) ("[A] nonresidential tenant/debtor may assume an unexpired lease, but only if the lease has not been terminated pre-petition under state law.").

*\*14* Under § 365, Debtor, as the moving party, bears the ultimate burden of production and persuasion that the Lease is subject to assumption and that all requirements for assumption have been met. *In re Rachels Industries, Inc.,* 109 B.R. 797, 802 (Bankr.W.D.Tenn.1990). As part of this burden, he must show that the Lease was not terminated pre-petition. *Pyramid Operating Authority, Inc. v. City of Memphis (In re Pyramid Operating Authority, Inc.),* 144 B.R. 795, 809 (Bankr.W.D.Tenn.1992). However, CSA, as the objecting party, bears the initial burden of showing defaults under the Lease. *In re F.W. Restaurant Associates, Inc.,* 190 B.R. 143, 147

(Bankr.D.Conn.1995); *Georgia Ports Authority v. Diamond Manufacturing Company, Inc. (In re Diamond Manufacturing Company, Inc.),* 164 B.R. 189, 199 (Bankr.S.D.Ga.1994); *Pyramid Operating Authority, Inc. v. City of Memphis (In re Pyramid Operating Authority, Inc.),* 144 B.R. at 809.

The letter advising Debtor of CSA's election to terminate the Lease states that the termination was based on the non-monetary defaults listed in CSA's counsel's letter of March 5, 1998. According to the March 5th letter and the memorandum attached thereto, these non-monetary defaults consisted of the following Lease violations:

1. Violation of ¶ 8(a) as a result of outstanding L & I violations due to "rewiring the electrical power without Landlord permission or permits," and improper connection of gas service to basement tenant's meter.

2. Violation of ¶ 8(e) as a result of (i) installing one Landlord-approved sign without obtaining the proper permits from both L & I and the historical commission; and (ii) placing other signs on Chestnut Street side of building without Landlord's consent resulting in damage to facade of the building and restriction of pedestrian access to the property.

3. Violation of ¶ 8(f) as a result of applying "for a liquor license which, if approved, will cause the building to be less insurable."

4. Violation of ¶ 8(g) as a result of making alterations to the Premises without CSA's approval and not providing "waiver of liens or certificates of insurance as called for in this section."[FN35]

> FN35. At the bottom of the memorandum attached to Haines' March 5th letter, there is a handwritten note which states: "Also see Exhibit "C", page 16, # 2." Exhibit P-9. Paragraph 2 of Exhibit "C," which is titled "Building Rules and Regulations," provides as follows:
> Each tenant will refer all contractors, contractor's representatives and installation technique rendering any service on or to the leased premises for the tenant to Landlord for Landlord's approval and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                    Page 17

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
(Cite as: Not Reported in B.R.)

supervision before performance of any contractual service. This provision shall apply to all work performed in the Building, including installation of telephone, telegraph equipment, electrical devices and attachments and installations of any nature affecting floors, walls, woodwork, trim, windows, ceilings, equipment or any other physical portion of the Building. Landlord shall not unreasonably withhold approval for work proposed to be done by tenant or its agents. Exhibit P-1. While there is no description in the aforementioned memorandum of the conduct which CSA contends violated this provision of the Lease, the memorandum of law which CSA filed on the issue of whether there was a prepetition termination of the Lease fills in this gap. According to CSA's memorandum of law, this lease provision was violated by the same conduct which violated Paragraph 8(g) of the Lease. *See* 209-211 Chestnut Street Associates' Memorandum Regarding Pre-Petition Termination of Lease ("CSA's Memorandum on Pre-Petition Termination) at 2-3. That conduct consists of installing a kitchen in the Premises, installing gas service to first floor and connecting the electrical service from the second floor to the first floor. Since my conclusion that Debtor's violations of paragraph 8(g) of the Lease did not constitute grounds for CSA's termination of the Lease, *see*infra at 40-50, applies equally to Debtor's violations of paragraph 2 of Exhibit "C" to the Lease, I will not discuss this provision separately.

*See* Exhibit P-9 (Letter dated March 5, 1998 from Haines to Abel, with attached memorandum). In order to determine whether the Lease was effectively terminated prepetition, I must examine each of these alleged violations to decide if they constituted valid grounds for termination of the Lease.[FN36]

FN36. In CSA's Memorandum on

Pre-Petition Termination, CSA includes additional defaults in its "list of the non-monetary defaults upon which termination was based" that were not referenced in its termination letter of April 7, 1998. CSA's Memorandum on Pre-Petition Termination at ¶ B(2)(g) (operating an outdoor cafe') & (i) (operating a full-service restaurant in violation of the use clause of the Lease). Since these additional defaults were not mentioned in CSA's termination letter, they were obviously not a basis for its termination of the Lease, and they will not be addressed in this context.

#### (i) L & I Violations

In Paragraph 8(a) of the Lease, Debtor agreed to " [c]omply at all times with any and all federal, state and local statutes, regulations, ordinances, and other requirements of any of the constituted public authorities relating to its use and occupancy of the Demised Premises."Exhibit P-1. CSA contends that Debtor violated this provision by causing "many outstanding L & I violations" to be lodged against the Premises. However, there is no evidence in the record that any, let alone "many," outstanding L & I violations exist against the Premises. To the contrary, the evidence shows that when Debtor notified CSA that he was unaware of any outstanding L & I violations, CSA provided him with a copy of one such violation notice which he promptly addressed. Accordingly, I find no evidence which supports CSA's assertion of an uncured default based on paragraph 8(a) of the Lease.

#### (ii) Installation of Signs

*15 Paragraph 8(e) states:
Tenant agrees ... that it shall ... [n]ot place signs on the exterior of the Demised Premises, except on doors; and except on the exterior of the building of which the Demised Premises are a part, as follows: an exterior sign with lights may be affixed to the Strawberry Street side of the Building...."The location, design, and size of said sign must be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

approved in writing, by Landlord not to be unreasonably withheld prior to installation by Tenant and must be approved by all appropriate state and municipal agencies. Five business days prior to installing same copies of all required permits must be delivered to Landlord."

*Id.* According to CSA, Debtor violated this provision by: (i) installing a sign (the "Permanent Sign") on the building with CSA's approval but not obtaining approval for the sign from L & I or the historical commission; (ii) installing a banner on the building without CSA's approval; and (iii) installing new signs to replace the aforementioned ones when CSA removed them and thereby damaging the facade of the building and restricting pedestrian access to the building."

With regard to the banner which Debtor installed without CSA's approval, the evidence in the record reveals that Debtor removed the banner from the building when notified that CSA objected to it, thereby curing any breach. *See supra* discussion at 30. There is no evidence that he replaced it with another sign.

As for the Permanent Sign, the only reference to it in the record,[FN37] other than in the memorandum listing Debtor's purported non-monetary defaults, is a letter dated March 5, 1998 which Abel sent to Haines responding to the aforementioned memorandum. On the subject of CSA's complaints about the signs, Abel stated:

> FN37. At the hearings on August 17, September 14 and October 8, 1998, CSA's counsel never questioned Rosenberg, Debtor or any other witness about the Permanent Sign.

My client advises that he has obtained appropriate permits for the one existing permanent sign. These permits are from both L & I and the Historical Commission. The only other sign is a temporary banner strung between two windows. If your client wishes, mine will remove the banner. No sign restricts pedestrian access-that would be bad for my client's business.

Exhibit P-21. CSA's attorney responded to this letter, but the response refers only to the banner, or "cloth signs" as CSA's attorney called them, and makes no mention of the Permanent Sign. *See* Exhibit P-10. Furthermore, the Reinstatement Agreement which the parties subsequently negotiated does not mention the Permanent Sign. These facts indicate to me that CSA accepted Debtor's representation that he had obtained approval for the Permanent Sign from L & I and the Historical Commission, and elected not to pursue the issue further.

As for the complaint that Debtor caused damage to the facade of the Building by his installation of signs, there is no evidence in the record to that effect. I therefore reject CSA's assertion that Debtor's violation of paragraph 8(e) of the Lease constituted grounds for termination of the Lease.

### (iii) Application for Liquor License

***16** Paragraph 8(f) of the Lease states, in pertinent part:
Tenant agrees ... that it shall ... [n]ot ... do any act which might made [*sic* ] void or voidable any insurance on the Demised Premises or the Building or which may render an increased or extra premium payable for insurance (and without prejudice to any right or remedy of Landlord regarding this subparagraph, Landlord shall have the right to collect from Tenant, upon demand, any such increase or extra premium).

Exhibit P-1. CSA contends Debtor violated this provision by applying for a liquor license for the Premises since "if approved[, it] will cause the building to be less insurable."Exhibit P-9 (Memorandum listing non-monetary defaults). However, CSA failed to introduce any evidence to support the conclusion that approval of the liquor license application will make the building less insurable or, as the language of the contract states, " might make void or voidable any insurance ... on the Building."Absent such evidence, I cannot reach that conclusion. Indeed, even if the act of serving alcohol at the Premises would render CSA's insurance on the building void, merely applying for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                                     Page 19

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

or obtaining a liquor license for the Premises would not. Thus, at a minimum, it is premature for CSA to be asserting a violation of paragraph 8(f) based on Debtor's submission of the liquor license application. In short, CSA has not met its burden of proving a default under paragraph 8(f).[FN38]

> FN38. While CSA has not met its burden of proof in this proceeding regarding the liquor license, that does not mean that it cannot renew its objection should Debtor continue its pursuit of licensing for the service of alcohol at the Premises without regard to the Lease. Accordingly, it would be in Debtor's interest to take appropriate steps to ensure that his activities *vis-a-vis* the liquor license do not violate the Lease.

### (iv) Alterations to the Premises

Paragraph 8(g) of the Lease provides, in pertinent part:

Tenant agrees ... that it shall ... [n]ot make any alteration or addition to the Demised Premises without the prior written approval of Landlord (except for work of a decorative nature), ... Tenant shall have all contractors or tradesmen secure or execute the following documents prior to construction work being performed within the Demised Premises: (1) Waiver of Lien, (2) Certificate of Insurance, (3) Building permits; " copies of all these documents shall be furnished to Landlord five (5) business days prior to the commencement of any construction."

Exhibit P-1. CSA contends that Debtor violated this provision of the Lease by installing a kitchen in the Premises, installing gas service to the first floor and connecting the electrical service from the second floor to the first floor without: (i) obtaining CSA's prior approval and the necessary permits; and (ii) providing CSA with copies of the permits, waivers of liens and certificates of insurance. *See* CSA's Memorandum on Pre-Petition Termination at 2-3.

Debtor does not dispute that he made the complained of improvements to the Premises without obtaining CSA's prior written approval and

without providing CSA with copies of the applicable permits, waivers of liens and certificates of insurance. However, he contends that because CSA knew of the improvements for nearly eighteen months before asserting violations based on them and continued accepting rent from him during such time, CSA waived the defaults and was not entitled to terminate the Lease based thereon. In support of this position, Debtor relies heavily upon *Cleveland v. Salwen,* 292 Pa. 427, 141 A. 155 (1928).[FN39]

> FN39. He also cites *Entrepreneur, Ltd. v. Yasuna,* 498 A.2d 1151, 1160-64 (D.C.1985) (*citingCleveland v. Salwen, supra* and discussing at length the law regarding waiver and forfeiture) (holding that landlord was estopped from claiming a forfeiture of lease based on tenant's failure to obtain a certificate of occupancy for his use of the property since landlord had " acquiesced for a long period of time in the breach of the lease covenant with full knowledge of the breach"); *Owens-Illinois, Inc. v. Lake Shore Land Co.,* 457 F.Supp. 896, 905 (W.D.Pa.1978) (applying Pennsylvania law and holding that lessor waived right to declare a forfeiture of lease by continuing to accept rent and to recognize the relationship between the parties), *aff'd,*610 F.2d 1185 (3d Cir.1979) ; *United States v. Ravitz,* 93 F.Supp. 913 (E.D.Pa.1950) (concluding that landlord waived right to enforce provision in lease against subletting since she not only acquiesced in subletting but it was done at her suggestion and tenant changed his position in reliance on the landlord's conduct); *Sferra v. Urling,* 328 Pa. 161, 195 A. 422 (1937) ("[B]y recognizing appellee as assignee and accepting rent from him as tenant, [lessor] waived the stipulation in the lease requiring written consent to an assignment.").*SeealsoMyers v. Ohio-Penn Gas & Oil Co.,* 294 Pa. 212, 144 A. 93 (1928) (concluding that breach of covenant preventing lessees from drilling well near lessors' buildings did not constitute grounds for forfeiture of lease

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.