Not Reported in B.R.                                                                                         Page 20

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

since lessors originally consented to location of well and delayed voicing any objection to the location of the well until it was almost completed).

**\*17** In *Cleveland v. Salwen,* the tenants leased a store building for a five year term with a renewal clause for an additional five years. 292 Pa. at 429, 141 A. at 155. The tenants conducted business both in this building and in an adjoining building. For business purposes, the tenants desired to connect the two buildings by installing a doorway between them. The lessors consented to this request and a provision was included in the lease stating that " [s]hould tenants cut doors into adjoining building, they shall put up a bond for $500, conditioned to restore premises to present condition."*Id.* The tenants installed the desired doorway shortly after the date of the lease but never furnished the $500 bond. Although the lessors were aware that the doorway had been installed and periodically reminded the tenants about the bond requirement, the lessors never insisted that the bond be furnished. *Id.* at 431-432, 141 A. at 156. Shortly before the expiration of the original five year term, tenants notified the lessors of their intent to exercise their right under the renewal clause to renew the lease for an additional five years. Lessors refused and filed an action to have the tenants ejected from the premises. *Id.* at 429-30, 141 A. at 155-56. As cause for forfeiture of the lease, lessors raised the tenants' failure to post the bond.

The Supreme Court of Pennsylvania found in favor of the tenants, ruling that, as a result of their conduct, lessors had waived their right to declare a forfeiture of the lease based on the tenants' obligation to post a bond. The supreme court found it particularly relevant that the lessors had known for years about the tenants' failure to abide by the lease covenant and taken no action to enforce it. Explaining its ruling, the supreme court stated:
It will not be denied that a forfeiture could accrue from [the failure to furnish the $500 bond]. But the forfeiture of a lease, such as the one in question here, whereby a well-established business would be disorganized, subjected to expensive and burdensome removal of goods and fixtures and perhaps a serious loss of patrons and diminution of

income, is no light affair; particularly, as in this case, when, through an entire lease term of 5 years, a failure to perform a covenant is known to lessors and continually regarded by them with actual indifference, with no insistence upon performance and with no notice whatever demanding the full observance of the covenant. The rule undoubtedly is that the right to declare a forfeiture must be distinctly reserved; that the proof of the happening of the event on which the right is to be exercised must be clear; that the party entitled to do so must exercise his right promptly; and that the result of enforcing the forfeiture must not be unconscionable. The right to declare a forfeiture is reserved in this lease, and yet during the entire term of 5 years with lessees in constant possession, and with full knowledge of the fact that the doorway had been cut between the stores and that no bond was forthcoming, lessors at no time made any practicable attempt, or gave notice of intention, to exercise the right of forfeiture.

**\*18** The extent of the extreme and continued indifference of the owners of the property with respect to the bond is shown by the testimony of one of lessors, who was the usual recipient of the rent, who, when asked whether demand had ever been made for the bond, replied:
"When it came to my mind I would drop in, or when the rent was due I might drop in for the check, and would then mention the matter ."

*Id.* at 430-431, 141 A. at 156.

The supreme court had an additional basis for its holding. It concluded that the lessors were not acting in good faith in declaring a forfeiture of the lease. Elaborating on this point, the supreme court stated:
[T]here is another important aspect to the present case as denoted by the words of the learned court below in its opinion confirming the referee's report:
The issue turned on the question of lessors' good faith in attempting to escape from the covenant of renewal. That being found against them, the adverse award necessarily followed.
The real purpose to obtain forfeiture was made

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

emphatically manifest by the admission of one lessor that:

> We talked about selling the place at the expiration of the lease, and thought we could get a better price for it without a tenant in it.

Here certainly was no good faith on the part of the property owners in their efforts to oust their tenants.

292 Pa. at 433, 141 A. at 157.

In the instant case, the record strongly suggests that had Debtor and KMDA continued making timely rent payments, CSA would not have declared that their installation of the kitchen and gas service constituted defaults under the Lease. According to the record, the aforementioned improvements were made in January, 1997. Yet, CSA never advised Debtor (or KMDA) that it considered such improvements to be defaults under the Lease until February of 1998 which was approximately three months after the problems began concerning the Debtor's (and KMDA's) rent payments. Had CSA truly objected to the improvements which Debtor made to the Premises, then it would have voiced its objection even while it was receiving timely rent payments. Adding further support to this view is the evidence that CSA prepared a lease agreement for the Premises for another entity's execution providing for higher rent and allowing the entity to conduct a full service restaurant in the Premises and provide outside seating.

While *Cleveland* was decided seventy years ago, CSA has offered no reason why the supreme court's ruling and rationale therein are not still valid.[FN40] Accordingly, I must examine the evidence in the record and determine whether the holding of *Cleveland* is applicable hereto.

> FN40. CSA did not cite any case law or statute overruling or modifying the supreme court's holding in *Cleveland.*

According to Debtor's testimony, he advised Rosenberg of his plans to install a kitchen in the Premises before the Lease was executed and had several discussions with him subsequent thereto about the progress of those plans. Rosenberg denies

these discussions ever took place. He also denies that he had any knowledge until after 1997 that a kitchen had been installed in the Premises. I find Rosenberg's testimony in this regard unconvincing. He admits that he knew that Debtor had connected gas service to the first floor but claims that he never wondered or asked Debtor why. For a person of Rosenberg's obvious intelligence and given his position at CSA, that seems highly doubtful. Rosenberg also admits that on several occasions he had dessert in the Painted Parrot and that some of these occasions probably occurred in 1997. It seems inconceivable that Rosenberg would not have noticed the hot food being served around him. Moreover, according to Debtor, the Painted Parrot was featured in several articles and received numerous awards, including a couple of Best of Philly awards, for its food. Again, I find it unlikely that Rosenberg was oblivious to all of this. Accordingly, I am persuaded by Debtor's version of these events and find that Rosenberg knew as of the beginning of 1997 that Debtor had installed a kitchen in the Premises.

**\*19** My review of the record also convinces me that, until approximately February of 1998, CSA never complained to Debtor that his failure to obtain its prior written consent to install the kitchen in the Premises and failure to provide CSA with copies of the applicable permits, waiver of liens and certificates of insurance for the kitchen installation constituted violations of the Lease. Moreover, CSA continued to collect rent during this time and continued treating Debtor and KMDA as tenants. In light of these findings, I conclude that under the ruling of *Cleveland,supra,* CSA waived the right to claim that Debtor's installation of the kitchen constitutes a default under, and therefore grounds for terminating, the Lease.

As for Debtor's installation of gas service to the first floor, Rosenberg admits that he was aware of the installation in 1997. He further admits that CSA did not notify Debtor until 1998 that it considered such installation to be a violation of the Lease. However, he contends that the reason CSA did not press the issue until 1998 was that Debtor represented to him in 1997 that he intended to, and ultimately had taken care of, having the gas service for the first

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

floor separated from the gas service to the basement and that all necessary permits for the gas installation had been obtained. Along the same line, Rosenberg testified that in 1997, so long as the gas service to the first floor had been properly installed, then the installation was "acceptable" to CSA. The parties' Reinstatement Agreement further indicates that even after Rosenberg discovered that the gas service to the first floor had not been separated from the basement tenant's meter, CSA was still willing to allow Debtor to utilize gas service on the first floor so long as: (i) it was separated from the basement's gas service; and (ii) Debtor complied with the terms of the Lease requiring him to obtain prior written approval for any alterations from CSA and provide CSA with copies of all applicable permits, waivers of liens and certificates of insurance for the work.

As for Debtor, his testimony indicates that until he received the memorandum from CSA in 1998 listing his alleged non-monetary defaults of the Lease, he believed that the problem with the gas service installation to the first floor had been resolved through his agreement with the basement tenant to pay the overage on his gas bill. However, since being notified by CSA of its demand that the gas service to the first and second floors be separated, he has had plans drawn up for that purpose and is currently in the process of seeking a permit to have the alterations made.

In light of the aforementioned evidence, I conclude that CSA waived the right to claim a default under the Lease based on the installation of gas service to the first floor. The evidence reveals that it is not the installation of gas service to the first floor, but the fact that the basement and first floors share a gas meter which concerns CSA. Why this is so was not made clear. In any event, Debtor has made plans to have the gas service between these floors separated and is in the process of seeking a permit for the same. So long as Debtor follows through with these plans and complies with the Lease terms requiring him to obtain CSA's prior written approval for such plans and to submit certain documents (*i.e.,* applicable permits, waivers of liens and certificates of insurance) to CSA before undertaking the work, CSA's concerns will be addressed.

**\*20** The third and final basis of CSA's contention that paragraph 8(g) was violated is Debtor's rewiring of the electrical system. My review of the record indicates that the rewiring was done after the Lease was executed but before the Painted Parrot began serving hot food in late January of 1997. Although Debtor contends that he obtained all of the required permits for the rewiring, it appears undisputed that he did not obtain CSA's prior written approval to have it done. Arguably, Debtor's failure to obtain such prior written approval constitutes a violation of paragraph 8(g) the Lease . [FN41]Nevertheless, his failure to obtain CSA's approval is consistent with the parties' course of conduct at the time. As discussed above, Debtor did not obtain CSA's prior written approval to install a hot kitchen in the Premises or connect gas service to first floor. Despite having knowledge that these alterations had been made to the Premises without its prior written approval, CSA did not complain for over a year (while the rent was being paid on time) that Debtor's actions violated the Lease. Furthermore, Rosenberg's response to Debtor when originally informed of his plans to install a hot kitchen in the Premises (*i.e.,* is the rent going to be paid on time?) suggests, and could have reasonably been interpreted by Debtor to mean, that CSA was not concerned and, indeed, did not want to be bothered with details about Debtor's plans for the Premises so long as the rent was paid on time.

> FN41. If not included within the scope of paragraph 8(g), then Debtor's rewiring of the eletrical system would fall within the scope of paragraph 2 of Exhibit "C" to the Lease. *Seesupra* n. 35.

Moreover, based on my review of the record, I find that while CSA relied upon Debtor's rewiring as a basis for terminating the Lease, it constituted a pretext for the termination rather than an issue of genuine concern to CSA. This conclusion is supported by the fact that although CSA's counsel strenuously demanded in his letter of March 10, 1998 that Debtor's rewiring of the electrical system had to be undone, *see* Exhibit P-10,[FN42] the parties' Reinstatement Agreement, which was executed approximately one month later, makes no

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

mention whatsoever of the issue. The logical explanation for this omission is that CSA was not overly concerned about the rewiring and was willing to overlook Debtor's failure to obtain its prior approval before having it done. I also note that in stark contrast to the abundance of detail in the record regarding Debtor's alleged transgressions in installing a kitchen in the Premises and connecting gas service to the first floor, the record contains scant evidence regarding Debtor's rewiring of the electrical system. The obvious explanation for this difference is that the parties consider the issue of rewiring to be minor compared to Debtor's installation of the kitchen and the gas service. Accordingly, based on this record, Debtor's rewiring of the electrical system did not constitute a legitimate basis for CSA's termination of the Lease.

> FN42. This letter of March 10, 1998 states: "[W]hen my client renovated the building, each floor was designed and constructed with separate electrical service. What your client has done violates the Lease in that the Landlord's permission to rewire was never granted. Accordingly, that work needs to be undone and the property put in the same condition as it was." Exhibit P-10.

(v) Conclusion

In sum, I conclude that under the circumstances described above, none of the non-monetary defaults upon which CSA relied in terminating the Lease in April of 1997 effected its termination. As the Lease was not terminated pre-petition, Debtor is not barred from assuming the Lease under § 365(c)(3).

B. *Obligation to Cure*

**\*21** The next ground asserted by CSA in opposition to Debtor's assumption of the Lease is that he "has failed to cure, or provide adequate assurance that he will promptly cure, all defaults under the Lease" as required by 11 U.S.C. § 365(b)(1)(A).[FN43] CSA's Objection ¶ 4. This subsection of § 365 states, in relevant part:

> FN43. While CSA contends that Debtor has not complied with the cure requirement of § 365(b)(1)(A) and that Debtor cannot comply with the requirement because some of the non-monetary defaults at issue are " now historic facts," CSA does not argue that non-monetary defaults can never be cured or that the right to cure is limited to non-monetary defaults which create " claims," *seeIn re Mack,* 1993 WL 722255, at *7-8 [Bankr.E.D.Pa. Nov. 10, 1993).*See* Memorandum of Law Regarding Debtor's Right to Cure Non-Monetary Defaults (arguing that Debtor cannot meet the cure requirement of § 365(b)(1) because: (i) the Lease was terminated pre-petition; (ii) Pennsylvania law does not permit a tenant to redeem a terminated lease by curing non-monetary defaults; and (iii) Debtor's defaults are historic facts which are not capable of being cured.)

If there has been a default in an ... unexpired lease of the debtor, the trustee may not assume such ... lease unless, at the time of assumption of such ... lease, the trustee ... cures, or provides adequate assurance that the trustee will promptly cure such default[.]
11 U.S.C. § 365(b)(1)(A).[FN44] As for the defaults which CSA contends must be cured, I discussed several of them above (*i.e.,* various alterations made to the Premises in violation of the Lease and payment of attorney's fees and costs) and ruled that they do not constitute defaults under the Lease or the defaults were waived. However, CSA alleges the following additional defaults which I have not discussed: [FN45]

> FN44. Some courts have construed § 365(b)(2)(D) to mean that debtors are not required to cure non-monetary defaults. *See e.g.,In re GP Express Airlines, Inc.,* 200 B.R. 222, 233-234 (Bankr.D.Neb.1996). Section 365(b)(2)(D) states: Paragraph (1) of this section does not apply to a default that is a breach of a provision relating to ... the satisfaction of any penalty rate or provision relating to a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

default arising from any failure by the debtor to perform non-monetary obligations under the executory contract or unexpired lease.

11 U.S.C. § 365(b)(2)(D). Neither party raised this issue. In any event, as this provision currently reads, I agree with the Ninth Circuit's view in *Worthington v. General Motors Corporation (In re Claremont Acquisition Corporation, Inc.),* 113 F.3d 1029, 1033-1035 (9th Cir.1997), that it only relieves debtors of their obligation to pay penalties and not of their obligation to cure non-monetary defaults. *Seealso In re Ernst Home Center, Inc.,* 209 B.R. 955, 963 n. 6 (Bankr.W.D.Wash.1997) (term "penalty" in § 365(b)(2)(D) applies to both words " rate" and "provision" with respect to non-monetary defaults). This provision, however, has been the subject of legislative efforts to clarify a debtor's obligation with respect to the cure of non-monetary defaults.

FN45. CSA also alleges that Debtor defaulted under the Lease by using the Premises in violation of the use clause of the Lease. See Objection ¶ 4(e). However, based on my finding that CSA knew that Debtor had installed a hot kitchen in the Premises and was serving hot food, I conclude that CSA waived this default.

(i) Debtor has neither corrected nor provided within his Chapter 13 Plan for the costs of correcting alterations to the building that are ... substandard and/or pose a risk to the health and safety of other tenants and visitors to the building;[FN46] and

FN46. I have already concluded that while Debtor may have violated the Lease by making alterations to the building (installation of a hot kitchen in the Premises, installation of gas service to the first floor and rewiring of the electrical system) without CSA's prior written

approval and without providing CSA with the documents required under paragraph 8(g) of the Lease, CSA waived the right to declare defaults based thereon. I have also found that no L & I violations exist against the Premises. However, I have not addressed CSA's contention that substandard conditions or health and safety risks exist in the building as a result of the alterations.

(ii) The sidewalk outside of the leased premises continues to be used as a sidewalk cafe' with tables and chairs obstructing the sidewalk in violation of the Lease and despite citations from [L & I].
Objection ¶ 4(b) & (f).

As noted above, *seesupra* at 16-23, at the hearing on the Stay Motion on September 14, 1998, CSA's experts, namely Terrace, Nucifore and Hutnick, identified hazardous and/or unsafe conditions which they believe exist in the building. However, CSA failed to show that these conditions violate the Lease. There is no evidence that L & I issued any notices relating to these conditions and CSA has not cited any "federal, state [or] local statutes, regulations, ordinances [or] other requirements of any of the constituted public authorities" which it contends these conditions violate. *See* Lease ¶ 8(a). Similarly, CSA has not presented any evidence that the conditions conflict with any specific laws relating to fire prevention and safety, or with any regulations of the fire department, or with any insurance policy on the Building or any part thereof, or conflict with any rules or ordinances of any Board of Health and other governing bodies having jurisdiction over the Building." Lease, Exhibit "C," ¶ 4. Nevertheless, if the alterations which Debtor made to the building in violation of the Lease created conditions which are endangering the health and safety of the other tenants in, and visitors to, the building or causing damage to the building, then I conclude that it is incumbent on Debtor to correct them in order to assume the Lease.

The evidence which Debtor presented at the hearing on October 8, 1998 suggests that some of the problems which CSA's experts identified are baseless or were created by the conditions other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                    Page 25

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
(Cite as: Not Reported in B.R.)

than the alterations which Debtor made to the Premises. The evidence also indicates that Debtor has taken steps to cure some of the problems and that he is in the process of curing some others.

**\*22** For example, Debtor testified that he hired an electrician to address the problems which Nucifore raised in the electrical system. According to Debtor, this electrician concluded that some of the problems were unfounded, *see supra* 28 & n. 27, and cured the others, *see supra* n. 28. Debtor also testified that he: (i) hired a plumber to correct any "questionable" problems identified in McDade's report;[FN47] (ii) is prepared to remedy the lack of "sleeving" by having it installed; and (ii) has had plans drawn up to have the gas service separated between the basement and the first floor, and applied for a permit for this work. Debtor also claims that McDade's BTU measurements (and therefore his conclusion that the piping in the Premises is undersized) are erroneous. As for the problems which Terrace raised regarding water damage in the building and to the floor joists, Debtor testified that this damage was caused, not by the alterations which he made to the Premises, but by a leak in the Building and termites in the basement.

> FN47. As noted above, see supra n. 29, Debtor did not specify which, if any, problems had been cured by the plumber.

Based on the evidence in the record, I conclude that Debtor has met the requirement of § 365(b)(1)(A) as to those problems in the electrical system which he specifically testified have been cured. Debtor has also indicated a willingness to install "sleeving" around the pipes which need it and to have the gas service between the first and second floors separated. However, in order to satisfy the requirement of § 365(b)(1)(A), Debtor will be required to meet a definite timetable for promptly performing these repairs.[FN48] As for the remaining problems which McDade raised regarding the heating and ventilation systems, Debtor's testimony failed to specify which of these problems have been addressed. Accordingly, I cannot find that any of them have been cured. Debtor will be required to remedy this deficiency (as to any problems the

existence of which he did not dispute) as a condition to assuming the Lease. *See In re Bon Ton Restaurant and Pastry Shop, Inc.,* 53 B.R. 789, 801-802 (Bankr.N.D.Ill.1985) (requiring debtor to cure "fire hazards which in fact exist on the premises " as a condition to assuming lease). Finally, as to the problems which CSA's experts identified but Debtor disputed, it is impossible for me to ascertain based on this record whether or not these problems in fact exist.[FN49] Since the evidence is inadequate in this regard, CSA, which has the initial burden to show that defaults exist, has not carried its burden.

> FN48. The Reinstatement Agreement required Debtor to submit to CSA by May 31, 1998, plans and permits for separating gas service for the first floor. CSA contends that Debtor's failure to comply with this obligation constitutes a historical fact which is incapable of cure. However, since I have concluded that the Lease was never validly terminated, the Reinstatement Agreement is rendered moot.

> FN49. For example, McDade concluded that the piping in the Premises is undersized based on his BTU measurements. Debtor asserts that these measurements are wrong because in calculating the measurements, McDade assumed a connection between the gas pipe in the basement and the range in the kitchen whereas the pipe is actually attached to the char grille. On this record, I cannot conclude whether McDade was right or wrong. Similarly, there is inadequate evidence in the record for me to determine whether the water damage which Terrace identified was caused by Debtor's alterations and use of the Premises as Terrace's testimony suggests, by a leak as Debtor claims, or by a combination thereof.

Turning to the other default listed above, Debtor admits that during the warm weather, he used the sidewalk outside of the Leased Premises as a sidewalk cafe. However, he claims that the tables

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

and chairs for the cafe were arranged to ensure that pedestrian traffic on the sidewalk was not obstructed and the entranceway to the building was not affected. Nevertheless, I find that Debtor's use of the sidewalk constituted a default under the Lease. Paragraph 1 of Exhibit "C" to the Lease states:

**\*23** The sidewalks, entrance ways, passages, corridors, stairways and elevators shall not be obstructed by any of the tenants, their employees or agents, or used by them for purposes other than ingress and egress to and from their respective suites.

Exhibit P-1. This provision clearly prohibits the Debtor from using the sidewalk for any purpose other than entering and exiting the building. Accordingly, his operation of a cafe on the sidewalk constituted a default under the Lease.

CSA contends that Debtor cannot cure this default because it is a historical fact which is not capable of being cured under § 365(b)(1)(A). In support of this assertion, CSA cites to *Worthington v. General Motors Corporation (In re Claremont Acquisition Corporation, Inc.),* 113 F.3d 1029, 1034-35 (9th Cir.1997).[FN50] In this case, the debtor sought to assume and assign a car dealership franchise agreement which permitted the other contracting party, GM, to "terminate the franchise for the failure to operate the business for seven consecutive business days."*Id.* at 1033.The Court of Appeals for the Ninth Circuit held that the debtor's failure to operate the dealership during the two week period before it filed for bankruptcy constituted a non-monetary default of the agreement and that such default was a "historical fact" which, by definition, could not be cured. *Id.* at 1033.The Ninth Circuit did not provide any further explanation or discussion of this point but supported its holding by citing to *Lee West Enterprises,* 179 B.R. 204, 208 (Bankr.C.D.Cal.1995), which also involved a franchise agreement.

FN50. This Ninth Circuit case was the only authority which CSA cited to support its " historical fact" argument.

In *Lee West Enterprises,* the Chapter 7 trustee moved to assume and assign several franchise agreements permitting the debtor to operate certain car dealerships. Approximately two months before he filed the motion, the debtor's business operations were suspended. The terms of the franchise agreements authorized the franchisers to terminate the agreements if the debtor failed or ceased to operate the dealerships. In addition, California statutory law specifically recognized the right of a motor vehicle franchiser to terminate a franchisee for failure to operate for seven consecutive days. *Id.* at 206.The franchisers argued that the debtor's failure to operate the dealerships constituted a " historical fact" which could not be overcome and, consequently, that the trustee could not meet the requirement of § 365(b)(1). The bankruptcy court agreed with this argument. In so holding, it relied upon the fact that the California Vehicle Code specifically recognized the significance of a franchisee's failure to maintain operations; in addition, it relied upon two cases cited by the franchisers, namely *In re Deppe,* 110 B.R. 898 (Bankr.D.Minn.1990) and *In re Toyota of Yonkers, Inc.,* 135 B.R. 471 (Bankr.S.D.N.Y.1992). The former case involved a gas station franchise; the latter case involved another car dealership franchise. In both cases, the franchise agreements at issue contained clauses permitting their termination in the event the businesses ceased operating. In addition, in both cases, the franchisees were authorized by statutory law to terminate the agreements if business operations were not maintained. Both decisions hold that the debtor's failure to operate its business constituted an incurable default. Discussing this point, the *In re Deppe* court stated:

**\*24** The lapse in operations took place. The estate simply cannot overcome that historical fact. Neither can it deny the significance given to such a lapse of time under the agreements, and under the [Federal Petroleum Marketing Practices Act]; as two courts have noted, the steady maintenance of gasoline station operations during the days and hours fixed by franchise agreements is a key goodwill value to the refiner/distributor, which is given special deference in franchise litigation involving such businesses. The estate cannot "undo" the historical event at this point.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

110 B.R. at 904 (citations omitted). Similarly, the *In re Toyota of Yonkers, Inc.* court reasoned:Toyota relies on its termination notice ... which is based on the debtor's alleged failure to operate its dealership for seven consecutive days[.] This is a ground for termination pursuant to New York Vehicle and Traffic Law Section 463(2)(d)(2)(ii) and Section XX(B)(1)(a) of the Toyota dealership agreement. If this default occurred, it is incapable of cure or remedy because the debtor cannot undo this historical fact.

135 B.R. at 477.

Notably, all four cases mentioned above involved franchisees. The only other case I found applying this "historical fact" theory is *In re GP Express Airlines, Inc.,* 200 B.R. 222, (Bankr.D.Neb.1996). In this case, the debtor was not a franchisee, but a passenger airline which sought to assume its contracts with another passenger airline. Without any discussion of the issue and without citing any authority, the court concluded that the debtor's defaults under the subject contracts constituted historical breaches which could not be cured. The court's comments on this issue are brief:
On the facts of the case before me it is clear that [the debtor] is in default of several non-monetary obligations under the Contracts and that cure is impossible. For example, [the debtor] has failed to meet performance standards relating to the completion of flights, the timely arrival of flights, and the utilization of the Airline Clearing House accounting services. These breaches are historical and, by definition, cannot be cured.

*Id.* at 233.Significantly, the court never analyzed whether the "historical fact" theory should be applied outside of the context of franchisees. CSA has offered no rationale for so expanding the theory.

I am unwilling to apply the "historical fact" theory to the default at issue here.[FN51] I find no relevant similarity between the cessation of business operations under a franchise agreement and Debtor's intermittent use of the sidewalk for a purpose not allowed under the Lease. As the courts recognized in *In Lee West Enterprises,In re Toyota of Yonkers, Inc.,* and *In re Deppe,* there are

statutory provisions which specifically permit f ranchisers to terminate a franchise which ceases to operate; no comparable statutory provision is at issue here. In addition, CSA has not presented any evidence that Debtor's use of the sidewalk affected its good will or caused it any economic or other harm.

> FN51. Most non-monetary defaults (*e.g.,* failure to maintain the premises in a certain condition, failure to seek approval; failure to provide reasonable consent) are " historical facts." Consequently, if CSA's " historical fact" theory were applied to all non-monetary defaults, it would, in effect, eliminate the right to assume a lease for which non-monetary defaults exist. If Congress had intended to limit the right to assume to leases involving only monetary defaults, it could have so stated in § 365.

**\*25** Furthermore, as the Third Circuit recognized in *In re Joshua Slocum,* 922 F.2d 1081, 1090-91 & n. 8 (3d Cir.1990), the bankruptcy court has "some latitude," particularly in non-shopping center cases such as this one, to waive strict enforcement of lease provisions in the assumption process. *Seealso Vanderpark Properties, Inc. v. Buchbinder (In re Windmill Farms, Inc.),* 841 F.2d 1467, 1473 (9th Cir.1988) (bankruptcy court did not act erroneously in finding that alleged non-monetary defaults, including the failure to maintain insurance and make repairs, were "not of sufficient substance to preclude assumption of the lease."). According to the Third Circuit, the relevant factors in determining whether to exercise this discretion and refuse to enforce a lease provision are the materiality of the default at issue and whether the default caused "substantial economic detriment" to the landlord.*In re Joshua Slocum,supra,* 922 F.2d at 1092. *Seealso In re Whitsett,* 163 B.R. 752, 754 (Bankr.E.D.Pa.1994) (in deciding whether debtor's compliance with provisions in a debtor-tenant lease should be deemed insignificant in the assumption process, "the determining 'factor' appears to be the 'materiality' of the default.").

Under the circumstances of this case, I do not view

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

Debtor's failure to abide by the use restriction provision for the sidewalk as a material default of the Lease. Debtor testified that the tables and chairs for the sidewalk cafe were arranged so that access to the building and pedestrian traffic remained unobstructed. No evidence was presented that any tenants in the building were affected by or objected to Debtor's use of the sidewalk, or that anyone entering or exiting the building or traversing the sidewalk was harmed or even annoyed by the use. Furthermore, Rosenberg admitted at the hearing on the Motion that a lease agreement which CSA prepared for another entity's execution allowed it to provide outside seating on the sidewalk of the Premises in a specific area. This evidence leads me to conclude that while CSA is concerned with limiting the particular area of the sidewalk devoted to outside seating, it is not opposed to permitting such use under certain circumstances. As for the other relevant factor (*i.e.*, whether the default caused substantial economic detriment to the landlord), as I noted above, the record contains no evidence that CSA sustained any economic harm as a result of the Debtor's default. Accordingly, in the exercise of my discretion and for purposes of this assumption process, Debtor's previous default of the use restriction clause in paragraph 1 of Exhibit "C" to the Lease will not be enforced.

Debtor is warned not to view my decision to overlook his past transgressions of the aforementioned provision as a signal that he may continue to use the sidewalk as he pleases. At the hearing on the Motion, Debtor represented that if his use of the sidewalk for a sidewalk cafe was deemed a violation of the Lease, he would stop using the sidewalk for that purpose. Debtor will be held to this representation.[FN52] While Debtor's past defaults of the aforementioned provision are being overlooked, he will be held strictly accountable for any future infractions thereof.

> FN52. As an alternative basis for permitting Debtor to assume the Lease, I accept Debtor's representation that he will cease using the sidewalk for purposes of a cafe as a cure of his default of ¶ 1 of Exhibit "C" to the Lease. See *Central City*

*South Associates v. Spirit Holding Company, Inc. (In re Spirit Holding Company, Inc.)*, 166 B.R. 371, 379-80 (Bankr.E.D.Mo.1994) (permitting debtor which defaulted on lease by withholding consent to construction of outlets to cure default by consenting to one of the outlets); *Madisonview Towers v. Yardley (In re Yardley)*, 77 B.R. 643, 645-46 (Bankr.M.D.Tenn.1987) (cure requirement of § 365(b)(1)(A) deemed satisfied where no party suggested that anything more could be done by the debtor, who violated his lease by engaging in an altercation with a security guard, to cure his default); *In re Haute Cuisine, Inc.*, 58 B.R. 390, 392-393 (Bankr.M.D.Fla.1986) (where debtor proposed to re-open restaurant and obtain the necessary alcoholic beverage license within sixty days, its assumption of lease was conditionally granted even though it defaulted under lease by failing to have an open restaurant and allowing its alcoholic beverage license to lapse); *In re Bon Ton Restaurant and Pastry Shop, Inc.,supra*, 53 B.R. at 801-802 (where debtor defaulted on lease provisions requiring it to maintain the premises in good and proper condition, debtor was permitted ninety day period to cure defaults by taking specific steps to eliminate fire hazards that existed in the premises).

### C. *Adequate Assurance of Future Performance*

**\*26** The final challenge raised by CSA is that Debtor has failed to provide adequate assurance of future performance under the Lease as required by § 365(b)(1)(C). This provision states, in pertinent part: "If there has been a default in an ... unexpired lease ... the trustee may not assume ... such lease unless, at the time of assumption of such ... lease, the trustee-provides adequate assurance of future performance under such ... lease."11 U.S.C. § 365(b)(1)(C).

In support of its contention that Debtor has failed to meet the requirement of § 365(b)(1)(C), CSA alleges the following:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                  Page 29

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

(i) "Debtor has not provided within his Plan for the payment of monthly base rent due under the Lease";
(ii) "Debtor has not provided within his Plan for the payment or reimbursement of water and sewer charges as required under the Lease";
(iii) "Debtor has not provided within his Plan for the payment of Business Use and Occupancy Tax"; and
(iv) "Debtor's and KMDA's repeated defaults, both monetary and non-monetary, both pre-petition and post-petition, demonstrate Debtor's and KMDA's inability to perform under the lease and inability to provide adequate assurance of such performance." FN53

FN53. As a basis for its contention that Debtor has not complied with § 365(b)(1)(C), CSA also alleges that:
Debtor has not withdrawn his and/or his company's application for a liquor license for the leased premises despite the fact that serving alcohol on the leased premises would violate the Lease; and
[T]he leased premises continue to be used in violation of the use clause of the Lease and Debtor has not stated an intent to conform the use of the leased premises to the use clause of the Lease.
Objection at ¶ 5(d) & (e). As discussed above, Debtor is not currently serving liquor on the Premises, and CSA did not prove that Debtor's act of applying for a liquor license for the Premises is a violation of the Lease. Furthermore, I concluded above that since CSA was aware of Debtor's use of the Premises to serve hot food, CSA waived Debtor's default of the use clause in the Lease.

Objection ¶ 5(a)-(c) & (f). The reasons provided in paragraphs (i), (ii) and (iii) all relate to Debtor's monetary obligations under the Lease. CSA implies that unless Debtor's Plan provides for the monetary payments required under the Lease, Debtor has not provided adequate assurance that he will perform his monetary obligations in the future. CSA failed to cite any authority for this proposition and I do not

agree with it. A Chapter 13 plan is intended to provide for payment of claims. Since Debtor is current on his monetary obligations under the Lease, there is no claim against him based on such obligations and the Code does not require him to provide for the payment of future obligations in his plan. Nevertheless, Debtor is required to provide CSA with adequate assurance that he will perform in the future on his monetary obligations under the Lease.

Commenting upon the meaning of the phrase " adequate assurance of future performance," one court explained:
"What constitutes adequate assurance is a factual question to be determined on a case-by-case basis with due regard to the nature [of] the parties, their past dealings and present commercial realities."*In re General Oil Distributors, Inc.,* 18 B.R. 654, 658, 8 Bankr.Ct.Dec. (CRR) 1174, 1176 (Bankr.E.D.N.Y.1982); ..."[T]he required assurance will fall considerably short of an absolute guarantee of performance."*In re Bon Ton Restaurant and Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr.N.D.Ill.1985).

*Madison View Towers v. Yardley (In re Yardley),* 77 B.R. 643, 646 (Bankr.M.D.Tenn.1987). Elaborating further upon the phrase, another court stated:The words "adequate assurance of future performance" are not words of art but were intended by Congress to be given a practical, pragmatic construction.*In re Sapolin Paints, Inc.,* 5 B.R. 412, 420-21 (Bankr.E.D.N.Y.1980)."As designed by Congress, the phrase does not mean absolute insurance that the debtor will thrive and make a profit."*In re Natco Industries, Inc.,* 54 B.R. 436, 440 (Bankr.S.D.N.Y.1985), citing *In re Alipat, Inc.,* 36 B.R. 274, 278 (Bankr.E.D.Mo.1984). The test is not one of guaranty but simply whether it appears that the rent will be paid and other lease obligations met. *Natco,* 54 B.R. at 440;*seeIn re Evelyn Byrnes, Inc.,* 32 B.R. 825, 829 (Bankr.S.D.N.Y.1983); *In re U.L. Radio Corp.,* 19 B.R. 537, 542 (Bankr.S.D.N.Y.1982).
**\*27** Some protection of the landlord, rather than improvement of its position, is the key to an understanding of the aims of section 365. Judge Buschman of this district aptly explained those aims:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

It is only on default that a landlord is entitled to adequate assurance, § 365(b)(1), and the obvious purpose of this section, particularly in light of the statutory voiding of bankruptcy default clauses contained in § 365(e)(1), is to afford landlords with a measure of protection from having to be saddled with a debtor that may continue to default and return to bankruptcy.

The emphasis is on protection. Section 365 gives no indication that a landlord ... is to improve its position upon the bankruptcy of a tenant. The statute affords no relief to a landlord simply because it might have the opportunity to rent the premises to others at a higher base or percentage rent and would otherwise seek to escape the bargain it made.

*Natco,* 54 B.R. at 440-41 (citation omitted).

In determining whether the rent reserved in a lease will be paid, in addition to considering the source of payment the court must pay particular attention to the extent and history of defaults and the record of making prior payments. *SeeNatco,* 54 B.R. at 440.

*In re Westview 74th Street Drug Corp.,* 59 B.R. 747, 754-55 (Bankr.S.D.N.Y.1986).

The only evidence in the record that Debtor has the financial ability and intent to comply in the future with his monetary obligations under the Lease is his track record to date in this bankruptcy case. All of the monetary defaults under the Lease have been cured. While this fact is significant, it does not provide CSA with adequate assurance that, in the future, Debtor will be able to satisfy his monetary obligations under the Lease. CSA suffered six months of dishonored checks and late payments before Debtor filed his case. Given these circumstances, CSA is entitled to adequate assurance, even though not a guarantee, that Debtor's financial situation will enable him to satisfy his future monetary obligations under the Lease.[FN54]Accordingly, I will require as a condition to Debtor's assumption of the Lease that he provide "adequate assurance of his future performance" with regard to his monetary defaults under the Lease.

FN54. Debtor's Schedule I and Schedule J

reveal a monthly net income of $1,824 and monthly expenses of $1,205, leaving him with a monthly excess income of $619. His Schedule J does not include his monetary obligations under the Lease. The obvious reason for this omission is that the rent and other obligations are being paid from KMDA's operating accounts. Assuming this is correct, then Debtor will have to show that KMDA's financial condition and future income will be adequate to satisfy the monetary obligations under the Lease.

CSA also contends that Debtor's repeated defaults, both monetary and non-monetary, and both pre-petition and post-petition, demonstrate his inability to perform under the Lease and inability to provide adequate assurance of such performance. I disagree. Even if a debtor repeatedly defaults on his monetary obligations, that does not mean that his situation cannot change and he cannot provide adequate assurance that he will comply with such obligations in the future.

Furthermore, while Debtor has, in the past, not rigidly conformed to his obligations under the Lease, CSA never demanded such performance. It was not until Debtor began making late payments and falling behind thereon that CSA started demanding strict compliance with the Lease terms. Now, Debtor is on notice that CSA intends to strictly apply the Lease terms. I am giving Debtor an opportunity to comply with such terms going forward;[FN55] it would behoove the Debtor to make certain that he does.

FN55. I caution Debtor to comply with the Lease terms requiring him to obtain CSA's approval and submit documents thereto before making any changes or having any work performed in the Premises. *See* Lease ¶ 8(g) & Exhibit "C" thereto at ¶ 2.

**\*28** Section 365(b)(1)(C) does not entitle CSA to a guarantee that Debtor will comply with all conditions of the Lease. That would provide CSA with greater rights than it had pre-petition. *In re Bon Ton Restaurant and Pastry Shop, Inc.,supra,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

53 B.R. at 803-804. As long as CSA has the right to terminate the Lease upon default, "a right which will in no way be diminished by assumption, [it] would seem to have all that [it] has bargained for, which is all the Code intended to provide."*Id.* at 804.Should Debtor not comply with the terms of the Lease, CSA will be entitled to apply to this Court for relief and it will be swiftly granted.

### D. *Conclusion*

Debtor's Motion shall be granted conditioned on his compliance with the following:
(a) Within seven (7) days hereof, Debtor shall submit to CSA his plans for separating the gas service between the basement and first floor.
(b) Within thirty (30) days from receiving the necessary permit to separate the gas service between the basement and first floors and obtaining CSA's written approval of his plans for the same which shall not be unreasonably withheld, Debtor shall complete the work.[FN56]

> FN56. Prior to commencing the work, Debtor will need to provide CSA with the documents listed in paragraph 8(g) of the Lease.

(c) Within seven (7) days hereof, Debtor shall file a certification (and serve a copy on CSA) stating the following with respect to the problems raised in the reports by Terrace, Nucifore and Hutnick: [FN57]

> FN57. Debtor shall address all of the problems raised in these reports except for those problems for which Debtor presented evidence at the hearing disputing their existence.

(i) identifying the problems that have been addressed and the measures that have been taken to address them; and
(ii) setting forth a time schedule not longer than thirty days hereof for addressing other problems identified in the reports and describing the scope of

the repairs that will taken to address the problems.
(d) Within seven (7) days after receiving the certification to which paragraph (c) refers, CSA shall file a certification (and serve a copy on Debtor) identifying: (i) any undisputed problems which it contends are not being, or not being adequately, addressed; and if any problems are listed (ii) the measures or additional measures which it contends should be taken to address or adequately address the problem.
(e) If CSA files a certification as noted in paragraph (d) above, the parties shall confer and seek to resolve their differences. If the parties are unable to resolve their differences, then CSA shall file a motion seeking a hearing on Debtor's compliance with 11 U.S.C. § 365(b)(1)(A).
(f) Within ten (10) days hereof, Debtor shall submit a certification with supporting documentation providing adequate assurance of his future performance of monetary obligations under the Lease. If CSA is not satisfied with such certification, within ten (10) days after receipt of the same, CSA shall file a motion seeking a hearing on Debtor's compliance with § 365(b)(1)(C).

An Order consistent with the foregoing Memorandum Opinion will be entered.

AND NOW, this 13th day of November, 1998, upon consideration of he Motion to Assume Unexpired Non-Residential Lease Agreement With 209-211 Chestnut Street Associates ("Motion") filed by Debtor, Christopher Vitanza ("Debtor") and the objection thereto of 209-211 Chestnut Street Associates ("CSA"), and after hearing with notice, and for the reasons stated in the accompanying Memorandum Opinion;

**\*29** It is hereby ORDERED that the Motion is GRANTED conditioned on Debtor's compliance with the following:
(a) Within seven (7) days hereof, Debtor shall submit to CSA his plans for separating the gas service between the basement and first floor.
(b) Within thirty (30) days from receiving the necessary permit to separate the gas service

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                              Page 32

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

between the basement and first floors and obtaining CSA's written approval of his plans for the same which shall not be unreasonably withheld, Debtor shall complete the work.

(c) Within seven (7) days hereof, Debtor shall file a certification (and serve a copy on CSA) stating the following with respect to the problems raised in the reports by Terrace, Nucifore and Hutnick: [FN58]

> FN58. Debtor shall address all of the problems raised in these reports except for those problems for which Debtor presented evidence at the hearing disputing their existence.

(i) identifying the problems that have been addressed and the measures that have been taken to address them; and

(ii) setting forth a time schedule not longer than thirty days hereof for addressing other problems identified in the reports and describing the scope of the repairs that will taken to address the problems.

(d) Within seven (7) days after receiving the certification to which paragraph (c) refers, CSA shall file a certification (and serve a copy on Debtor) identifying: (i) any undisputed problems which it contends are not being, or not being adequately, addressed; and if any problems are listed (ii) the measures or additional measures which it contends should be taken to address or adequately address the problem.

(e) If CSA files a certification as noted in paragraph (d) above, the parties shall confer and seek to resolve their differences. If the parties are unable to resolve their differences, then CSA shall file a motion seeking a hearing on Debtor's compliance with 11 U.S.C. § 365(b)(1)(A).

(f) Within ten (10) days hereof, Debtor shall submit a certification with supporting documentation providing adequate assurance of his future performance of monetary obligations under the Lease. If CSA is not satisfied with such certification, within ten (10) days after receipt of the same, CSA shall file a motion seeking a hearing on Debtor's compliance with § 365(b)(1)(C).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

| DESCRIPTION OF VIOLATION | | |
|---|---|---|
| *A REINSPECTION WILL BE MADE IN 30 DAYS FAILURE TO COMPLY MAY RESULT IN THE INITIATION OF PROSECUTION AGAINST THE OWNER* | | |
| TITLE 11 | ZRO2 | CEASE MAINTAINING AND/OR OPERATING AN INDOOR OR OUTDOOR RESTAURANT OR CAFE WITHOUT A "ZONING AND/OR USE REGISTRATION |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.

Not Reported in B.R., 1998 WL 808629 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

PERMIT"
-
CORRECT
IN 30
DAYS

Bkrtcy.E.D.Pa.,1998.
In re Vitanza
Not Reported in B.R., 1998 WL 808629
(Bkrtcy.E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **<u>TAB 4</u>**

Westlaw.

Not Reported in B.R.    Page 1

Not Reported in B.R., 1993 WL 722255 (Bkrtcy.E.D.Pa.), 30 Collier Bankr.Cas.2d 298
**(Cite as: Not Reported in B.R.)**

**c**
In re Mack
Bkrtcy.E.D.Pa.,1993.

United States Bankruptcy Court, E.D. Pennsylvania.
In re Ann MACK, Debtor.
**Bankruptcy No. 93-13116F.**

Nov. 10, 1993.

Deborah S. Griffin, Philadelphia, PA.
Michael Pileggi, Philadelphia, PA.

MEMORANDUM
BRUCE FOX, Bankruptcy Judge:
**\*1** The instant contested matter arises from the motion of the Philadelphia Housing Authority (" PHA") for relief from the automatic stay, pursuant to 11 U.S.C. § 362(d), "to commence PHA's state court remedies/proceedings" against the debtor. The debtor filed an answer in opposition to PHA's motion, and, on June 22, 1993, I held a preliminary hearing at which time I continued the stay in accordance with section 362(e). On August 9, 1993, I held a final hearing on PHA's motion.[FN1]

As the parties recognized, this dispute is unusual in that the movant/lessor seeks relief from the bankruptcy stay to enforce an alleged non-monetary breach of the lease: the sale of drugs from the leasehold by an individual other than the debtor.

The proven facts are as follows.

I.

On January 7, 1987, the debtor executed a lease agreement with PHA for the unit located at 1312 Fitzwater Street, Apartment 4C, Philadelphia, PA. *See* PHA's Motion at ¶¶ 2-3; Debtor's Answer at ¶¶ 2-3. The debtor resided there with her three minor age children; no other individual was listed on the residential lease with PHA.

An officer with the Philadelphia Housing Narcotics Task Force, Kevin Givens, testified on behalf of PHA. He stated that he served a search and seizure warrant at the debtor's apartment on September 15, 1992. The bases for the warrant (which was not introduced in evidence) were: a "long-term investigation;" the fact that two "controlled buys" (drug purchases made under the covert supervision of law enforcement officers) had occurred at that apartment; and information from a confidential informant. N.T. at 7.

The search and seizure warrant was executed at approximately 7:05 A.M. on the morning of September 15, 1992. The debtor was present when the police served the search warrant, but did not answer the door when the officers knocked and identified themselves. N.T. at 8. The debtor testified that she was in a back bedroom and did not hear the police knocking on the front door.

Upon the lack of response to their knock and announcement, the police "gained entry by force," *id.,* and secured the apartment without further incident. The officers then searched the apartment unit, and in the course of executing the warrant discovered 279 clear plastic vials, each containing cocaine base (crack cocaine) in a bureau drawer located in a front bedroom of the debtor's apartment. PHA's Motion at ¶ 5; Debtor's Answer at ¶ 5; N.T. at 8. The police confiscated the crack cocaine vials. Also in that bureau drawer the police found, and then seized, $200 in currency.

Further, the officers discovered and seized approximately 2,000 empty clear plastic vials in a box in that same bedroom. Officer Givens testified that the box containing these vials was discovered open, making the empty vials visible without resort to opening the box. N.T. at 25. Also found in that bedroom were letters addressed to Montez Burke at 1312 Fitzwater, Apartment 4C. N.T. at 9.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                                Page 2

Not Reported in B.R., 1993 WL 722255 (Bkrtcy.E.D.Pa.), 30 Collier Bankr.Cas.2d 298
**(Cite as: Not Reported in B.R.)**

**\*2** Finally, the officer testified that the bedroom door was open at the time the warrant was executed, and that there was no lock on that door. The debtor was arrested and charged with the possession of cocaine with intent to deliver and possession of drug paraphernalia.

The debtor's adult nephew, Montez Burke, had been residing with her for "a couple of months" at the time the debtor was arrested. N.T. at 22. The debtor admits that Burke, who was not in the apartment when the warrant was executed, occupied the front bedroom where the vials and currency were found.

The debtor and Burke were held for trial, and at the conclusion of the trial in the Pennsylvania Court of Common Pleas the debtor was found not guilty of all criminal charges. Prior to the trial, however, Burke pled guilty to various charges and was sentenced to a prison term of, apparently, two to four years. He is presently incarcerated.

On May 21, 1993, the debtor filed a voluntary chapter 13 bankruptcy petition. PHA now seeks relief from the stay, pursuant to section 362(d)(1), to commence eviction proceedings against the debtor.

As "cause" for relief from the stay, PHA alleges that the debtor violated the terms of her lease in that she permitted illegal drug activities to take place in the leasehold. *See* 24 C.F.R. § 966.4(1)(2)(ii)(B) (" Either of the following types of criminal activity by the tenant, any member of the household, a guest, or another person under the tenant's control, shall be cause for termination of tenancy ... (b) Any drug-related criminal activity on or near such premises"); 68 P.S. § 250.555(a)(3) ("The following acts relating to illegal drugs shall be a breach of condition of the lease and shall be grounds for removal of the tenant ... (3) The seizure by law enforcement officials of any illegal drugs on the leased-premises").[FN2] PHA maintains that this lease violation is incorrectable in this bankruptcy proceeding and warrants the termination of the bankruptcy stay.[FN3]

II.

A.

At the outset, I requested that the parties address the proper role of this bankruptcy court in the context of the instant motion.

As a general principle, whether to modify, condition, or annul the bankruptcy stay under section 362(d) is committed to bankruptcy court discretion, *see Matter of Holtkamp,* 669 F.2d 505 (7th Cir.1982); *In re Shariyf,* 68 B.R. 604 (E.D.Pa.1986), and is to be determined by examining the totality of the circumstances. *Accord Matter of Baptist Medical Center of New York, Inc.,* 52 B.R. 417, 425 (E.D.N.Y.1985), *aff'd,* 781 F.2d 973 (2d Cir.1986). In this contested matter, the ultimate issue is whether the Bankruptcy Code insulates the debtor from defending an eviction action based upon the conduct of her nephew, which conduct took place in the debtor's leasehold.

In deciding whether to terminate the stay so as to permit PHA to attempt to evict, it would be inappropriate to hold an eviction hearing in the guise of a lift stay motion. While I recognize that there is no dispute that Burke admitted guilt in selling illegal drugs, and that illegal drugs were found in the debtor's apartment, whether these facts alone justify the debtor's eviction under the above-cited nonbankruptcy law is not for me to determine in this contested matter.

**\*3** To some extent both parties may be suggesting that whether the stay should be lifted is dependent upon whether the debtor knew or should have known of Burke's drug-related criminal conduct. *See Memphis Housing Authority v. Henry,* 1989 Tenn.App. Lexis 344 (1989) (parent lessee had been "warned" previously that her child was suspected of illegal activities). *See also In re Wright,* Bankr. No. 93-11618S (Bankr.E.D.Pa. April 30, 1993) (Scholl, B.J.). Indeed, the debtor may go further and imply that if she could be evicted even without knowledge of Burke's conduct such action would be unconstitutional as violative

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1993 WL 722255 (Bkrtcy.E.D.Pa.), 30 Collier Bankr.Cas.2d 298
**(Cite as: Not Reported in B.R.)**

of the due process clause of the Fourteenth Amendment. *See generally Chavez v. Housing Authority of El Paso,* 973 F.2d 1245 (5th Cir.1992) (due process may not be violated); *Turner v. Chicago Housing Authority,* 760 F.Supp. 1299 (N.D.Ill.1991) (due process may be violated); *Tyson v. New York City Housing Authority,* 369 F.Supp. 513 (S.D.N.Y.1974) (same). *Cf. Chicago Housing Authority v. Rose,* 203 Ill.App.3d 208 (1st Dist.1990) (the court declines to address the due process issue because it construes the lease as requiring that the tenant knew or should have known of the offending conduct).

While these suggestions are not unreasonable, at bottom I disagree. Instead, my role as bankruptcy judge in this contested matter is more limited. I shall defer to nonbankruptcy courts of competent jurisdiction the proper interpretation of 68 P.S. § 250.555(a)(3) and 24 C.F.R. § 966.4(1)(2)(ii)(B), the former of which has not been construed in a reported decision and the latter of which has been construed in few decisions, none from a court within Pennsylvania. *Cf. In re Stephen Smith Home for the Aged, Inc.,* 80 B.R. 678, 685 (E.D.Pa.1987) (bankruptcy court properly abstained from interpreting unsettled state law issue which affected state policy).

Although their positions may have been more clearly articulated, both parties also address the reported decision, *In re Yardley,* 77 B.R. 643 (Bankr.M.D.Tenn.1987), which discussed the right of a subsidized housing tenant to cure a prepetition non-monetary lease default in a chapter 13 case. Implicitly, therefore, they both posit that the bankruptcy stay can be terminated if it appears likely that this debtor will be unable to "assume" her prepetition lease agreement with the movant under 11 U.S.C. § 365(b). *Accord, e.g., Matter of Udell,* 149 B.R. 898 (Bankr.N.D.Ind.1992); *In re Deppe,* 110 B.R. 898 (Bankr.D.Minn.1980); *In re Roxse Homes, Inc.,* 74 B.R. 810 (Bankr.D.Mass.1987), *aff'd,*83 B.R. 185 (D.Mass.), *aff'd without op.,*860 F.2d 1072 (1st Cir.1988); *In re Pribonic,* 70 B.R. 596 (Bankr.W.D.Pa.1987).

For purposes of determining this motion, I shall accept this analysis in part. That is, if the record in

this dispute makes it unclear that the lease can be assumed, then on these facts PHA should be permitted to seek eviction in the state court system, with the state court determining whether the debtor has breached her lease. *Accord In re Watson,* Bankr. No. 93-03718S (Bankr.E.D.Pa. July 27, 1993) (Scholl, B.J.). Conversely, if assumption is likely, then the stay should remain. *Accord In re Wright,* Bankr. No. 93-11618S (Bankr.E.D.Pa. April 30, 1993) (Scholl, B.J.); *In re Ruffin,* 1991 WL 173331 (Bankr.E.D.Pa. Sept. 6, 1991) (Scholl, B.J.). Therefore, I now turn to the issue of this debtor's ability to assume her lease with PHA.

B.

**\*4** Section 365 governs a trustee's right to assume executory contracts and leases in bankruptcy cases. *Accord In re University Medical Center,* 973 F.2d 1065, 1075 & n. 12 (3d Cir.1992). Section 365(a), in relevant part, provides that "[e]xcept as provided in ... subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). In chapter 13 cases, a debtor's chapter 13 plan may, "subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section." 11 U.S.C. § 1322(b)(7). Thus, a chapter 13 debtor may exercise a trustee's lease assumption powers.

PHA has not contended that subsection (c) or (d) of section 365 provides any relevant restriction on this debtor's right to assume her lease agreement with it; therefore, I need not address those subsections. *See generally, e.g., Matter of West Electronics Inc.,* 852 F.2d 79 (3d Cir.1988). Accordingly, I shall consider only subsection (b).

Section 365(b), in relevant part, provides that:
(1) [i]f there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee-
(A) cures, or provides adequate assurance that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.

Not Reported in B.R., 1993 WL 722255 (Bkrtcy.E.D.Pa.), 30 Collier Bankr.Cas.2d 298
(Cite as: Not Reported in B.R.)

trustee will promptly cure such default;
(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1)(A)-(C). The burden of persuasion is on the debtor, under § 365(b)(1), to establish a right to assume. *E.g., In re Memphis-Friday's Associates,* 88 B.R. 830, 840-41 (Bankr.W.D.Tenn.1988).

PHA contends that the prior illegal drug activity occurring in the debtor's apartment unit automatically precludes the debtor's assumption of the lease. In addition, it posits that even if the prior illegal activity does not prevent the debtor from assuming the lease, the debtor failed to provide PHA with "adequate assurance" under 11 U.S.C. § 365(b)(1)(C) that such activity will not reoccur, thereby precluding the debtor from assuming the lease.

III.

A.

PHA's first position, in essence, is that the prior illegal drug activity at the debtor's leasehold constitutes a non-monetary breach of the parties' lease agreement which is, by nature, an historical fact incapable of being cured pursuant to section 365(b)(1)(A). *See generally In re Deppe,* 110 B.R. at 904-05 (franchisee's prepetition violation of the executory franchise agreement could not be cured under section 365). Before I can determine whether this prepetition conduct represents a noncurable "non-monetary" breach of the lease, I must first decide whether the right to "cure" is governed by nonbankruptcy (federal or state) law or by the Bankruptcy Code.

*5 Although I found no case law explicitly discussing whether the right to "cure" under section

365(b) is a question of bankruptcy or nonbankruptcy law, several courts, including the Third Circuit Court of Appeals, have analyzed whether the right to "cure" a prepetition default through a chapter 13 plan under 11 U.S.C. § 1322(b)(3) and (5) is a question of bankruptcy or nonbankruptcy law.[FN4] The Third Circuit has instructed that section 1322(b)(3) and (b)(5) establish rights defined by federal bankruptcy law. Specifically, in *Matter of Roach,* 824 F.2d 1370, 1379 (3d Cir.1987), the Court of Appeals explained that "federal law controls the scope of § 1322(b)'s authorization to cure defaults." [FN5] *See First Nat. Fidelity Corp. v. Perry,* 945 F.2d 61, 62-63 (3d Cir.1991) ("[In *Matter of Roach,*] we concluded that § 1322(b)(5) preempts state law to the extent of authorizing debtors to 'cure' mortgage defaults after acceleration and before foreclosure").

Similarly, in *In re Thompson,* 894 F.2d 1227, 1228 (10th Cir.1990), the Tenth Circuit considered "at what point during this state mortgage foreclosure process the federal bankruptcy right to cure terminates." The court held "that this issue is ... one of federal law." *Id.,* at 1230. *Accord In re Tucker,* 131 B.R. 245, 246 (D.Me.1991) ("[t]he determination of whether a Chapter 13 debtor has a [ section 1322] right to cure is controlled by the Bankruptcy Code, not state law"); *In re Hollins,* 150 B.R. 53, 54 (Bankr.D.Ore.1993) (section 1322(b)(3) right to cure is a "federal bankruptcy law" right that preempts contrary state law).

As the Supreme Court has instructed, "[s]tatutory construction ... is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme-because the same terminology is used elsewhere in a context that makes its meaning clear." *United Sav. Ass'n v. Timbers of Inwood Forest,* 484 U.S. 365, 371 (1988). *Accord Patterson v. Shumate,* 504 U.S. 753, 112 S.Ct. 2242, 2247 n. 2 (1992). *See also In re St. Laurent,* 991 F.2d 672, 680 (11th Cir.1993) ("It is a basic canon of statutory construction that identical terms within an Act bear the same meaning").

Thus, those decisions declaring that the section 1322(b) right to "cure" is a matter of federal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                 Page 5

Not Reported in B.R., 1993 WL 722255 (Bkrtcy.E.D.Pa.), 30 Collier Bankr.Cas.2d 298
**(Cite as: Not Reported in B.R.)**

bankruptcy law support the premise that the section 365 right to "cure" is also determined by federal bankruptcy law. *See generally In re Talley,* 69 B.R. 219, 224 (Bankr.M.D.Tenn.1986) (drawing analogy between section 1322 cases concerning right to cure and the section 365 right to cure). Accordingly, I need not determine whether the debtor has any Pennsylvania or federal nonbankruptcy law right to cure non-monetary defaults of her lease. *See generally In re Telephonics, Inc.,* 85 B.R. 312, 317 (Bankr.E.D.Pa.1988) ("There is no provision in ... the applicable law of ... Pennsylvania allowing ... cures of any but a monetary, rental delinquency").

B.

*6 A number of courts have held that a debtor has the right under section 365(b) to cure nonmonetary defaults as well as monetary defaults. The decision *In re Yardley,* 77 B.R. 643 (Bankr.M.D.Tenn.1987) provides the most detailed analysis of this issue. In that case the debtor was involved in a prepetition altercation, during which he brandished a knife against a security guard at a subsidized apartment complex in which the debtor resided. *Id.,* at 644. The next day, November 12, 1986, the debtor was served by the lessor with a 30-day notice to quit the apartment. *Id.* Thereafter, on December 18, 1986, the debtor filed a voluntary chapter 13 bankruptcy petition. *Id.* He later was prosecuted, found guilty, and fined $25.00 for his conduct. *Id.,* at 646.

In his chapter 13 reorganization plan, the *Yardley* debtor proposed to assume the apartment lease. The lessor objected on the grounds, *inter alia,* that " a nonmonetary default cannot be cured under 11 U.S.C. § 365." *Id.,* at 644.[FN6] However, the bankruptcy court concluded that the lessor's " argument that 'nonmonetary' defaults cannot be cured under § 365 is refuted by the Code." *Id.,* at 64-65.

The bankruptcy court reasoned that "[o]n the face of the statute, Congress contemplated that non-monetary defaults would be curable under § 365 ." *Id.,* at 645. The court relied upon the language in section 365(b)(1) to the effect that " '[i]f there

has been a default' ", the debtor cannot assume the contract or lease without curing " 'such default.' " *Id.;* 11 U.S.C. § 365(b)(1) & (b)(1)(A). The court emphasized that "[t]here are no words of limitation indicating that the nature of the prepetition default restricts the general power to assume or reject." *Id. Accord In re Carterhouse, Inc.,* 94 B.R. 271 (Bankr.D.Conn.1988); *In re Bon Ton Restaurant & Pastry Shop, Inc.,* 53 B.R. 789, 801 (Bankr.N.D.Ill.1985) ("The language of section 365(b)(1) does not distinguish between monetary and non-monetary defaults"). *But see In re Toyota of Yonkers, Inc.,* 135 B.R. 471, 477 (Bankr.S.D.N.Y.1992) (prepetition violations of a franchise agreement may not be cured); *In re Deppe* (same).

The *Yardley* court noted that section 365(b)(2) provides that a debtor need not cure a default that relates to insolvency, financial condition, the commencement of a bankruptcy case or the appointment of a receiver or custodian. The court added that "[i]f Congress intended that non-monetary defaults be incurable under § 365, it would be unnecessary if not inconsistent for Congress to exempt the laundry list of non-monetary defaults in § 365(b)(2)." *In re Yardley,* 77 B.R. at 645.[FN7]

Furthermore, the *Yardley* court recognized that "[a] power to cure only monetary defaults would be of little practical utility" as "[a]lmost every lease contains provisions that are not monetary or compensatory ... [such as] [p]rovisions relating to use, access, behavior, etc." *Id.,* at 645. Therefore, the court concluded that "[i]t is implicit in the structure of § 365 that Congress contemplated the curing of non-monetary defaults." *Id. Accord In re Carterhouse, Inc.,* 94 B.R. at 273; *Matter of Haute Cuisine, Inc.,* 58 B.R. 390, 392-93 (Bankr.M.D.Fla.1986). *See In re Qintex Entertainment, Inc.,* 950 F.2d 1492, 1497 (9th Cir.1991) (failure to "colorize" two movies and to provide accounting were material breaches of contract which can be cured); *In re Windmill Farms, Inc.,* 841 F.2d 1467, 1473 (9th Cir.1988) (" the bankruptcy court found the alleged nonmonetary defaults were not of sufficient substance to preclude assumption of the lease"). *See also In re Masnorth*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1993 WL 722255 (Bkrtcy.E.D.Pa.), 30 Collier Bankr.Cas.2d 298
**(Cite as: Not Reported in B.R.)**

*Corp.,* 36 B.R. 335, 340 (Bankr.N.D.Ga.1984) (" Section 1124(2)(A) contemplates the cure of all defaults, including non-monetary defaults").

### C.

**\*7** While the legal analysis in *Yardley* is persuasive in some respects, at bottom I cannot accept its conclusions completely. In analyzing section 365(b), the court failed to consider a related issue involving the definition of a bankruptcy "claim."

Section 524 of the Code enjoins the collection or recovery of a discharged "debt." A "debt" is a liability on a "claim." 11 U.S.C. § 101(12). A " claim" is defined, in part, as the
right to an equitable remedy for breach of performance if such breach gives rise to a right to payment ...

11 U.S.C. § 101(5)(B).

Courts have been faced with attempts by debtors to utilize the Bankruptcy Code to free them from non-monetary obligations imposed by agreements or by state court orders. Based upon a detailed review of legislative history, most courts have interpreted the definition of a claim to include:
a right to an equity remedy for breach of performance *if the breach gives rise to an alternative right to payment.* If the *only* remedy allowed by law is non-monetary, the equitable remedy is not transformed into a claim and it survives rejection of the executory contract.

*In re Aslan,* 65 B.R. 826, 830-31 (Bankr.C.D.Cal.1986), *rev'd in part on other grounds,*909 F.2d 367 (9th Cir.1990) (emphasis in original). *Accord, e.g., Matter of Davis,* 3 F.3d 113, 116 (5th Cir.1993) (the bankruptcy discharge does not apply to "the equitable remedies of resulting trust, partition in kind, deed reformation, appointment of a receiver, and dissolution of a partnership ordered by the state court"); *Matter of Udell,* 149 B.R. at 905 (noncompetition provision of a contract cannot be satisfied under state law by the alternative payment of damages, and thus is nondischargeable); *In re Pribonic,* 70 B.R. at

601-02 (a real estate sales agreement which was enforced prepetition by a state court order for specific performance is not a claim because state law does not permit satisfaction by payment of damages; since the non-debtor has no claim, the agreement cannot be an executory contract).

Does the federal bankruptcy concept under section 365(b) of "curing" a prepetition default apply to non-monetary defaults which are not "claims" and would not be discharged were the lease or executory contract rejected under section 365?

### IV.

To the extent that the bankruptcy court in *Yardley* suggests that such non-monetary defaults may be cured under section 365(b), I disagree in part. If the non-monetary default creates a "claim", so that it may be cured by payment of money, section 365(b) permits the debtor to assume the lease (if she meets the requirements of section 365(b)).[FN8] But if there is no right to pay money, then there is no right to cure under section 365(b) unless nonbankruptcy law permits the debtor to cure the default with future performance of some sort. *See Matter of Luce Industries, Inc.,* 8 B.R. 100, 107-08 (Bankr.S.D.N.Y.1980) (debtor "has further committed itself to rectify curable nonfinancial defaults"), *rev'd on other grounds,*14 B.R. 529 (S.D.N.Y.1981).[FN9]

**\*8** If so, then the issue under section 365(b) becomes an analysis of the debtor's ability to perform and likelihood of such performance in the future. But if not, then I do not construe the bankruptcy law right to cure as trumping relevant nonbankruptcy law. Thus, for example, if a lessee commits an arson in the leasehold, or if she assaults the lessor, and if state law permits the lessor to evict regardless of the lessee's offer of compensation and willingness to refrain from such conduct in the future, section 365(b) does not give the lessee the right to compel the lessor to accept this offer of money and future good behavior. *See generally Burke v. Bryant,* 283 Pa. 114 (1925) (a default of the lease occurred, warranting eviction, by an occupant's violation of the Volstead Act).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1993 WL 722255 (Bkrtcy.E.D.Pa.), 30 Collier Bankr.Cas.2d 298
**(Cite as: Not Reported in B.R.)**

V.

Based upon the literal language of the statute and regulation, Burke's drug activity may constitute a breach of the debtor's lease. 24 C.F.R. § 966.4(1)(2)(ii)(B); 68 P.S. § 250.555(a)(3). However, as I noted earlier, there have been few reported decisions construing these provisions. Accordingly, it is unclear whether the lessor's right to evict is dependent upon what the debtor knew or should have known, or whether the debtor has the right to cure the default by future conduct, *compare Matter of Blanco*, 593 N.Y.S.2d 504 (App.Div.1993) (lease default for conduct of the lessee or an occupant may be cured if the tenant proves "that the offender has permanently moved out by the time of the hearing"), or whether monetary damages may be an alternative remedy.

Therefore, the better exercise of discretion is to terminate the stay and permit the state court to interpret these non-bankruptcy law provisions. If the state court's analysis results in the debtor's right to avoid eviction by future performance or by the payment of funds, then the debtor will be free to file and prosecute a motion to assume this lease.

An appropriate order shall be entered.

ORDER

AND NOW, this 10th day of November, 1993, for the reasons stated in the accompanying memorandum, it is hereby ordered that the motion of the Philadelphia Housing Authority for relief from the stay pursuant to section 362(d) is granted.

FN1. The parties orally agreed in open court to waive their right to a final hearing and to a decision within 30 days. *See*11 U.S.C. § 362(e).

FN2. In addition, the present version of 42 U.S.C. § 1437d(l) contains the following provision:
Each public housing agency shall utilize leases which- ...

(5) provide that any ... drug-related criminal activity on or near such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy....
For purposes of paragraph (5), the term " drug-related criminal activity" means the illegal manufacture, sale, distribution, use or possession with intent to manufacture, sell distribute, or use, of a controlled substance (as defined in section 802 of Title 21).
The lease between the debtor and PHA offered in evidence as Ex. 1 predates this statutory provision and does not contain this clause. However, the state statute and the federal regulation cited above do not require that the lease contain any particular provision for a default to occur. Accordingly, the debtor does not contend that illegal drug activity if undertaken by a lessee would not constitute a breach of the lease. *See Housing Authority of the City of New Britain v. Boria*, 1990 WL 279580, 1990 Conn.Super. Lexis 1626 (1990).

FN3. The movant also seeks to evict the debtor because she permitted her nephew to reside with her, although her public housing lease does not so permit. Public housing rental charges are based upon the occupants' income and their number. The debtor's lease, Ex. M-1, para. 10, permits " only those persons listed on the approved application for occupancy and or continued occupancy to occupy the dwelling unit." As stated above, Burke was not listed upon the certificate of occupancy for that apartment. There are a few reported decisions holding that a public housing tenant may be evicted for violating this provision. *See Roanoke Chowan Regional Housing Authority v. Vaughn*, 81 N.C.App. 354 (1986). *See generally Gallatin Housing Authority v. Gifford*, 1989 WL 100268, 1989 Tenn.App. Lexis 572 (1989).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                        Page 8

Not Reported in B.R., 1993 WL 722255 (Bkrtcy.E.D.Pa.), 30 Collier Bankr.Cas.2d 298
(Cite as: Not Reported in B.R.)

Given my resolution of this dispute, the debtor's present compliance with this occupancy provision, and the parties' focus upon the drug activity aspect, I do not now decide whether this lease violation by itself would warrant the termination of the bankruptcy stay.

FN4. The case law concerning section 70(b) of the Bankruptcy Act of 1898, former 11 U.S.C. § 110(b) (repealed 1978), is not illuminating. That statutory provision authorized the trustee or debtor in possession to assume or reject executory contracts and leases, but did not contain any provision similar to section 365(b). Moreover, under the former Act, a debtor's right to assume or reject an executory contract did not affect a creditor's right to terminate the contract or lease in accordance with some provision in that contract or lease. *See* 8 *Collier on Bankruptcy,* ¶ 313(1)[4] at 202 (14th ed. 1978). Therefore, my construction of present section 365(b) cannot be aided by pre-Code analysis.

FN5. The Third Circuit held that the federal bankruptcy right to cure a default survives acceleration, but does not survive a New Jersey foreclosure judgment, if the nonmodification provisions of section 1322(b)(2) apply. *Id.,* at 1377, 1379. As section 1322(b)(2) applies to "security interests" only, which is defined in 11 U.S.C. § 101(51) as a "lien created by an agreement", its non-modification provisions are inapplicable to lease assumption issues under section 365(b).

FN6. The *Yardley* debtor's lease was not terminated for purposes of section 365 even though the 30-day notice period had elapsed because, as required by Tennessee law, the debtor was not served with a writ of possession prior to filing and because no preliminary process for unlawful detainer had been completed. *Id.,* at 644. *See also In re DeSantis,* 66 B.R. 998, 1003

& n. 11 (Bankr.E.D.Pa.1986).

FN7. Furthermore, the *Yardley* court, in construing section 365(b)(1), also considered the language of sections 365(b)(3)(A) and (B), which deal with monetary defaults relating to rent under a shopping center lease, as an indication that Congress knew how to limit a phrase to non-monetary defaults when it intended to do so. In comparison, section 365(b)(3)(C), which discusses non-monetary provisions of a shopping center lease, was viewed as further evidence that Congress was aware of the possibility of non-monetary lease defaults and would have limited section 365(b)(1) to the cure of monetary defaults had Congress so intended. *Id. See generally Patterson v. Shumate,* 504 U.S. 753, 112 S.Ct. 2242, 2246 (Congress knew how to limit the scope of a phrase when Congress desired to do so); *Union Bank v. Wolas,* 502 U.S. 151, 112 S.Ct. 527, 523 (noting absence of statutory language distinguishing between long-term and short-term debt); *In re Pelkowski,* 990 F.2d 737 (3d Cir.1993) (if Congress sought to limit student loan nondischargeability to debtor students only, it would have so stated in section 523(a)(8)).

FN8. However, it is accepted that a debtor cannot assume a lease which has expired prepetition, *Matter of Triangle Laboratories, Inc.,* 663 F.2d 463, 467 (3d Cir.1981), or a lease which has expired postpetition, *Counties Contracting & Const. v. Constitution Life,* 855 F.2d 1054, 1061 (3d Cir.1988). Therefore, a debtor could not cure a nonmonetary (or a monetary) default and assume a lease that had terminated. *See In re Toyota of Yonkers, Inc.,* 135 B.R. 471, 477 (Bankr.S.D.N.Y.1992); *In re Club 99, Inc.,* 82 B.R. 166, 169 (D.D.C.1987). In this dispute, PHA has not asserted that the debtor's leasehold had been terminated at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1993 WL 722255 (Bkrtcy.E.D.Pa.), 30 Collier Bankr.Cas.2d 298
**(Cite as: Not Reported in B.R.)**

the time of her bankruptcy filing. *See generally In re DeSantis,* 66 B.R. 998 (Bankr.E.D.Pa.1986).

FN9. I am assuming also that the non-monetary breach is material and the lease requirement has a valid purpose for the lessor (*i.e.,* is not a disguised anti-bankruptcy or anti-assigment provision). *See* Epstein, 1 *Bankruptcy,* § 5-20c (1992). *See generally In re Joshua Slocum Ltd.,* 922 F.2d 1081, 1090 (3d Cir.1990). Given the provisions of federal and state law, the debtor does not dispute both the materiality and significance of the alleged lease default in this instance.

Bkrtcy.E.D.Pa.,1993.
In re Mack
Not Reported in B.R., 1993 WL 722255 (Bkrtcy.E.D.Pa.), 30 Collier Bankr.Cas.2d 298

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5

Westlaw.

--- N.Y.S.2d ----

Page 1

--- N.Y.S.2d ----, 2007 WL 2812549 (N.Y.A.D. 4 Dept.), 2007 N.Y. Slip Op. 07160
**(Cite as: --- N.Y.S.2d ----)**

Chiarizia v. Xtreme Rydz Custom Cycles
N.Y.A.D. 4 Dept.,2007.

Supreme Court, Appellate Division, Fourth
Department, New York.
Richard CHIARIZIA, Plaintiff-Appellant,
v.
XTREME RYDZ CUSTOM CYCLES, et al.,
Defendants,
andFournier's Automotive, Inc., Doing Business as
Xtreme Rydz of Orlando, Defendant-Respondent.
Sept. 28, 2007.

**Background:** Purchaser of motorcycle brought
action against seller for personal injuries incurred
when handlebars of motorcycle broke off while he
was riding it. The Supreme Court, Onondaga
County, Thomas J. Murphy, J., granted seller's
motion to dismiss. Purchaser appealed.

**Holding:** The Supreme Court, Appellate Division,
held that allegation of considerable economic
hardship if compelled to bring action in Florida did
not show that enforcement of forum selection clause
would be unreasonable or unjust.

Affirmed.

**[1] Contracts 95 ☞127(4)**

95 Contracts
   95I Requisites and Validity
     95I(F) Legality of Object and of
Consideration
       95k127 Ousting Jurisdiction or Limiting
Powers of Court
        95k127(4) k. Agreement as to Place of
Bringing Suit; Forum Selection Clauses. Most
Cited Cases
A contractual forum selection clause is prima facie

valid and enforceable unless it is shown by the
challenging party to be unreasonable, unjust, in
contravention of public policy, invalid due to fraud
or overreaching, or it is shown that a trial in the
selected forum would be so gravely difficult that the
challenging party would, for all practical purposes,
be deprived of its day in court.

**[2] Contracts 95 ☞93(2)**

95 Contracts
   95I Requisites and Validity
     95I(E) Validity of Assent
      95k93 Mistake
       95k93(2) k. Signing in Ignorance of
Contents in General. Most Cited Cases
A person who signs a document is conclusively
bound by its terms absent a valid excuse for having
failed to read it.

**[3] Contracts 95 ☞127(4)**

95 Contracts
   95I Requisites and Validity
     95I(F) Legality of Object and of
Consideration
       95k127 Ousting Jurisdiction or Limiting
Powers of Court
        95k127(4) k. Agreement as to Place of
Bringing Suit; Forum Selection Clauses. Most
Cited Cases
Purchaser's allegation of considerable economic
hardship if compelled to bring personal injury
action in Florida pursuant to forum selection clause
in purchase agreement for motorcycle did not show
that enforcement of clause would be unreasonable
or unjust, and thus, clause had to be enforced absent
allegation of fraud or overreaching.

**[4] Contracts 95 ☞171(1)**

95 Contracts
   95II Construction and Operation
     95II(A) General Rules of Construction

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.Y.S.2d ----, 2007 WL 2812549 (N.Y.A.D. 4 Dept.), 2007 N.Y. Slip Op. 07160
**(Cite as: --- N.Y.S.2d ----)**

95k171 Entire or Severable Contracts
95k171(1) k. In General. Most Cited Cases

Whether a contract is entire or severable generally is a question of intention, to be determined from the language employed by the parties, viewed in the light of the circumstances surrounding them at the time they contracted,.

**[5] Contracts 95 ☞127(4)**

95 Contracts
95I Requisites and Validity
95I(F) Legality of Object and of Consideration
95k127 Ousting Jurisdiction or Limiting Powers of Court
95k127(4) k. Agreement as to Place of Bringing Suit; Forum Selection Clauses. Most Cited Cases

**Contracts 95 ☞137(3)**

95 Contracts
95I Requisites and Validity
95I(F) Legality of Object and of Consideration
95k135 Effect of Illegality
95k137 Partial Illegality
95k137(3) k. Against Public Policy in General. Most Cited Cases

Even if waiver of liability provision of disclaimer in purchase agreement for motorcycle was not enforceable as against public policy, forum selection clause in agreement remained viable, since agreement contained several discrete provisions that were not intertwined and therefore provisions were severable.

Knych & Whritenour, LLC, Syracuse (Matthew E. Whritenour of Counsel), for Plaintiff-Appellant.
Stanley Law Offices, Syracuse (Robert A. Quattrocci of Counsel), for Defendant-Respondent.

PRESENT: HURLBUTT, J.P., MARTOCHE, SMITH, LUNN, AND PERADOTTO, JJ.
MEMORANDUM:
*1 Plaintiff commenced this action seeking

damages for injuries he sustained when the handlebars of his motorcycle broke off while he was riding it. Plaintiff purchased the motorcycle in Florida from Fournier's Automotive, Inc., doing business as Xtreme Rydz of Orlando (defendant), and at that time he signed a document entitled " Disclaimer of Safety and Waiver of Liability."That document provides in relevant part that "[p]urchaser agrees that any legal action or litigation against Fournier's Automotive Inc. or Xtreme Rydz of Orlando, will be submitted only in Orange County, Florida."We conclude that Supreme Court properly granted the motion of defendant seeking dismissal of the complaint against it based upon that forum selection clause.

[1][2] A contractual forum selection clause is " prima facie valid and enforceable unless it is shown by the challenging party to be unreasonable, unjust, in contravention of public policy, invalid due to fraud or overreaching, or it is shown that a trial in the selected forum would be so gravely difficult that the challenging party would, for all practical purposes, be deprived of its day in court"(*Premium Risk Group v. Legion Ins. Co.,* 294 A.D.2d 345, 346, 741 N.Y.S.2d 563;*see Bell Constructors v. Evergreen Caissons,* 236 A.D.2d 859, 860, 654 N.Y.S.2d 80). We note in addition that a person who " 'signs a document is conclusively bound by its terms absent a valid excuse for having failed to read it' "(*Fleet Capital Leasing/Global Vendor Fin. v. Angiuli Motors, Inc.,* 15 A.D.3d 535, 536, 790 N.Y.S.2d 684).

[3][4][5] Here, plaintiff's sole challenge to the forum selection clause was that New York was the more convenient forum because all of the witnesses and the motorcycle itself are located in New York, and it would be a great economic hardship on him to pay for all of the witnesses to travel to Florida for a trial of this action. That challenge is insufficient, however, because plaintiff has failed to demonstrate that enforcement of the forum selection clause would, in effect, deny him his day in court, and he has failed to allege that the clause was the result of fraud or overreaching (*see Bell Constructors,* 236 A.D.2d at 860, 654 N.Y.S.2d 80). The fact that New York may be a more convenient forum is immaterial because defendant's motion is based on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.Y.S.2d ----, 2007 WL 2812549 (N.Y.A.D. 4 Dept.), 2007 N.Y. Slip Op. 07160
**(Cite as: --- N.Y.S.2d ----)**

the parties' contract and not on the doctrine of forum non conveniens (*cf. Islamic Republic of Iran v. Pahlavi,* 62 N.Y.2d 474, 477, 478 N.Y.S.2d 597, 467 N.E.2d 245,*cert. denied*469 U.S. 1108, 105 S.Ct. 783, 83 L.Ed.2d 778;*Allen v. Marais, S.A.,* 307 A.D.2d 613, 762 N.Y.S.2d 188). Plaintiff contends for the first time on appeal that, pursuant to the General Business Law and the Uniform Commercial Code, the document at issue is void as against public policy and thus that the forum selection clause is also unenforceable. That contention is not preserved for our review (*see Earley v. Town of Allegany,* 298 A.D.2d 906, 907, 748 N.Y.S.2d 197,*lv. denied*7 N.Y.3d 713, 824 N.Y.S.2d 605, 857 N.E.2d 1136) and, in any event, it is without merit. " 'Whether a contract is entire or severable generally is a question of intention, to be determined from the language employed by the parties, viewed in the light of the circumstances surrounding them at the time they contracted' "( *Barden & Robeson Corp. v. Timmerman,* 116 A.D.2d 814, 815-816, 497 N.Y.S.2d 196, quoting *Christian v. Christian,* 42 N.Y.2d 63, 73, 396 N.Y.S.2d 817, 365 N.E.2d 849). The document at issue contains several discrete provisions that are not intertwined, and we conclude therefrom that the parties intended that each of those provisions is severable. Thus, even if the waiver of liability provision of the disclaimer is unenforceable, the forum selection clause remains viable (*see Scavenger, Inc. v. GT Interactive Software,* 273 A.D.2d 60, 61, 708 N.Y.S.2d 405).

**\*2** Plaintiff's remaining contention is not preserved for our review and is, in any event, without merit.

It is hereby ORDERED that the order so appealed from be and the same hereby is unanimously affirmed without costs.

N.Y.A.D. 4 Dept.,2007.
Chiarizia v. Xtreme Rydz Custom Cycles
--- N.Y.S.2d ----, 2007 WL 2812549 (N.Y.A.D. 4 Dept.), 2007 N.Y. Slip Op. 07160

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **TAB 6**

Westlaw.

Not Reported in B.R.                                                      Page 1

Not Reported in B.R., 2000 WL 33712484 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

**H**
In re Integrated Health Services, Inc.
Bkrtcy.D.Del.,2000.
Only the Westlaw citation is currently available.
United States Bankruptcy Court, D. Delaware.
In re: INTEGRATED HEALTH SERVICES, INC.,
et al., Debtors.
**No. 00-389 (MFW), 00-390(MFW),
00-391(MFW), 00-392(MFW), 00-393(MFW),
00-394(MFW), 00-395(MFW), 00-825(MFW).**

July 7, 2000.

James A. Patton, Esquire, Robert S. Brady, Esquire, Joel A. Waite, Esquire, Edmon L. Morton, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Counsel for Debtors.
Michael J. Crames, Esquire, Arthur Steinberg, Esquire, Marc D. Rosenberg, Esquire, Kaye Scholer Fierman Hays & Handler, LLP, New York, NY, Counsel for Debtors.
Joanne B. Wills, Esquire, Steven K. Kortanek, Ewsquire, Maria Aprile Sawczuk, Esquire, Klehr Harrison Harvey Branzburg & Ellers LLP, Wilmington, Counsel for the Official Committee of Unsecured Creditors.
Glenn Rice, Esquire, William Silverman, Esquire, Otterbourg Steindler Houston & Rosen, PC, New York, NY, Counsel for the Official Committee of Unsecured Creditors.
Neil Levitsky, Esquire, Agostini Levitsky, Isaacs & Kuleska, Wilmington, Counsel for Stanley L. Stein, Greensboro Health Care, Inc., South Gate Village, Inc. and Midwest Health Enterprise of Bessemer, Inc.
Kevin J. Carey, Esquire, Samuel E. Cohen, Esquire, Fox Rothschild O'Brien & Frankel, LLP, Philadelphia, PA, Counsel for Stanley L. Stein, Greensboro Health Care, Inc., South Gate Village, Inc. and Midwest Health Enterprise of Bessemer, Inc.
John D. McLaughlin, Jr., Esquire, Daniel K. Astin, Esquire, Maria Giannarakis, Esquire, Office of U.S.

Trustee, Philadelphia, PA.

OPINION

FN1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is applicable to contested matters pursuant to Rule 9014. WALRATH, Bankruptcy J.

I. *INTRODUCTION*

*1 This matter is before the Court on the Motion of Integrated Health Services, Inc. ("Integrated") and its affiliates (collectively "the Debtors") for an order extending the time within which the Debtors must assume or reject unexpired leases of non-residential real property and the response of Stanley Stein ("Mr.Stein") thereto. After a hearing and briefing by the parties, we grant the Debtors' motion.

II. *JURISDICTION*

This Court has jurisdiction over this matter, which is a core proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(1), (b)(2)(A), (B), (M) and (O).

III. *PROCEDURAL AND FACTUAL
BACKGROUND*

On February 2, 2000, the Debtors, including Community Care of America of Alabama ("CCAA"), filed for relief under chapter 11 of the Bankruptcy Code. As of the filing date, the Debtors were lessees or sub-lessees under more than 1500 unexpired leases of nonresidential real property. CCAA is the lessee under three facility leases (collectively, the "CCAA Leases") which were executed on June 21, 1995, with the following lessors: 1) Greensboro

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.    Page 2

Not Reported in B.R., 2000 WL 33712484 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

Health Care Inc.; 2) South Gate Village, Inc.; and 3) Midwest Health Enterprise of Bessemer, Inc.

On the same day the CCAA Leases were executed (June 21, 1995), Mr. Stein, who is an executive of the parent company of the three landlords, executed a Non-Competition Agreement with CCAA and its affiliate, Community Care of America ("CCA") [FN2]. The Agreement provides, inter alia, that Mr. Stein shall refrain from engaging in competitive activity, such as leasing premises to other health care providers or divulging confidential information of the Debtors, for a period of ten years from execution of the Non-Competition Agreement. In return for such undertaking, CCAA was required to pay Mr. Stein $50,000 per year for the first three years of Mr. Stein's ten year obligation. CCAA's obligations under the Non-Competition Agreement were guaranteed by CCA.

> FN2. CCA is also one of the Debtors filing a bankruptcy petition on February 2, 2000.

In April 1999, the CCAA Leases and the Non-Competition Agreement were amended. The Non Competition Agreement was amended to include Integrated and all of its subsidiaries. The Amendment also modified the original ten year term of the Non-Competition Agreement so that it expires on the last day of the term of the CCAA Leases or in the event that one or more of the CCAA Leases is terminated prior to the end of its term, the last day on which the last of the CCAA Leases expires. Further, the Amendment provided that CCAA would pay Mr. Stein $50,000 per year in equal monthly installments during the entire term of the Non-Competition Agreement. The CCAA Leases were also amended to reduce the rental payments in total by the amount of the monthly installment payments to Mr. Stein under the Non-Competition Agreement.

On March 24, 2000, the Debtors filed this motion by which they sought an extension until October 2, 2000, of the time under section 365(d)(4) of the Bankruptcy Code within which to assume or reject all unexpired leases to which the Debtors were parties, including the CCAA Leases. On April 10,

2000, an objection to the Debtors' motion was filed by the three CCAA lessors and Mr. Stein.

*2 On April 17, 2000, we granted the Debtors' motion to extend the date to assume the nonresidential real property leases with respect to all but the CCAA Leases. We reserved ruling on the extension as to the CCAA Leases.

### IV. *DISCUSSION*

Mr. Stein and the CCAA lessors argue that the parties intended at the time of execution that the CCAA Leases and the Non-Competition Agreement constitute a single, indivisible contract, such that the Debtors may not assume the CCAA Leases while rejecting the Non-Competition Agreement. Because the Non-Competition Agreement and the CCAA Leases are a single integrated agreement, Mr. Stein and the lessors insist that the Debtors' motion should be denied unless the Debtors become, and remain, current under the CCAA Leases and the Non-Competition Agreement pursuant to section 365(d)(3).[FN3]

> FN3. Mr. Stein and the CCAA lessors also assert that the Debtors are required by section 365 to cure any arrearage on the Non-Competition Agreement as well as the unexpired CCAA Leases before the Debtors may assume the CCAA Leases. Since the Debtors have not made a decision to assume or reject the CCAA Leases, that issue is not before me. However, our decision on the extension motion clearly affects the assumption/rejection decision the Debtors may make.

The Debtors, on the other hand, argue that the Non-Competition Agreement and the CCAA Leases are four separate agreements which, in accordance with section 365, may be assumed or rejected separately. Further, the Debtors argue that because they are current on the CCAA Leases, the Court may grant their extension motion.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                          Page 3

Not Reported in B.R., 2000 WL 33712484 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

Therefore, the threshold issue before this Court is whether the Non-Competition Agreement and the CCAA Leases are sufficiently integrated so as to constitute a single contract.

Section 365(b)(1) states in relevant part:
If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at time of assumption of such contract or lease, the trustee -
(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

However, the decision of which leases to assume is left to the discretion of the debtor. *Metropolitan Airports Comm'n v. Northwest Airlines, Inc.,* 6 F.3d 492, 494 (7th Cir.1993) (section 365 permits trustee or debtor in possession to pick and choose among debtor's executory contracts and unexpired leases and to assume those which benefit the estate and reject those which do not); *In re Plitt Amusement Co. of Washington, Inc.,* 233 B.R. 837, 840 (Bankr.C.D.Cal.1999) (same).

Pending that decision, the debtor must timely perform all obligations under the lease. 11 U.S.C. § 365(d)(3). In this case, there is a question as to whether that duty includes a duty to perform the obligations under the Non-Competition Agreement. If the Non-Competition Agreement and the CCAA Leases represent one single integrated agreement, the Debtor would be required to assume or reject them in toto and, therefore, would be obligated to timely perform any duties under the Non-Competition Agreement, pending its decision to assume or reject.

**\*3** An unexpired lease must be assumed or rejected in its entirety. *See Stewart Title Guarantee Company v. Old Republic National Title Insurance,*

83 F.3d 735, 741 (5th Cir.1996). Therefore, a debtor may not assume less than all unexpired leases or executory contracts in an integrated group unless they are severable. Whether the leases are severable is determined by the intent and actions of the contracting parties. *Plitt,* 233 B.R. at 845. Severability requires a determination of whether a part of a contract or lease, or part performance thereunder, can be separated and treated as an independent legal obligation. *Id.*

In *Plitt,* the debtor had purchased three theaters, executing one purchase agreement, one note, one security agreement, and three leases. 233 B.R. at 839. The Court held that, for purposes of section 365, each lease was a separate contract, which stood on its own; independent of the purchase agreement and other agreements. *Id.* at 844.The Court so held, noting that the lease term extended far beyond the due date on the note and that the lease was for the use of the real estate, while the note and purchase agreement contemplated payment for the entire business and all assets, only one of which was the lease. *Id.* at 844-45.While there were integration clauses in each agreement, there were also severability clauses. *Id.* at 845.

Similarly, in *In re Pollock,* the Court concluded that a note issued in payment of a business and all its assets (including a sublease) was a separate contract from the sublease and did not have to be assumed with the sublease. 139 B.R. 938, 941 (9th Cir. BAP1992).

Thus so long as the CCAA Leases and the Non-Competition Agreement are capable of being severed from one another, they do not constitute a single integrated agreement and the Debtors may separately assume or reject any of the four agreements. The question of severability, however, is a question of state law. In the instant case, the agreements state that Alabama law is to be applied. Under Alabama state law, "divisibility of a contract depends on the parties' intent as evidenced by apportionability of the consideration, the subject matter and the object of the entire contract."*Village Inn Pancake House of Mobile, Inc. v. Higdon,* 318 So.2d 245, 249 (Ala.1975).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                 Page 4

Not Reported in B.R., 2000 WL 33712484 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

In the instant case, we agree with the Debtors that the four agreements are severable because the CCAA Leases and the Non-Competition Agreement are supported by separate consideration, cover different subject matter, involve different parties and, taken together, the object of the agreements is different.

### A. *Separate Consideration*

The CCAA Leases and the Non-Competition Agreement constitute four separate agreements because the consideration supporting each agreement is apportionable. Mr. Stein's argument that the agreements are integrated because the Amendment contemplated reductions in the monthly rental payments in an amount equal to the monthly installment payments under the Non-Competition Agreement is not sufficient to convince us that the agreements are, therefore, a single integrated agreement. Each lease has a separate rental payment obligation and the Non-Competition Agreement has its own payment obligation ($50,000 per year in monthly installments). These separate agreements are not transformed into a single integrated contract merely because the lease agreements reference the payment obligation in the Non-Competition Agreement or because, at the same time the lease payments were reduced, the Debtors also agreed to pay Mr. Stein installment payments under the Non-Competition Agreement in an amount equal to the reduction in the lease payments. *See Plitt,* 233 B.R. at 845;*In re Wheeling-Pittsburgh,* 54 B.R. 772, 780-81 (concluding that, in spite of cross default provisions, five insurance policies were separate agreements because they had separate policy periods, different premiums and separate policy numbers); *In re Sambo's,* 24 B.R. 755, 756-58 (Bankr.C.D.Cal.1982) (refusing to enforce cross-default provisions among ten admittedly separate leases).

### B. *Separate Subject Matter*

*4 Further, the CCAA Leases and the Non-Competition Agreement cover different subject

matter because each Lease covers a different property location and the Non-Competition Agreement governs a personal contract between Mr. Stein and the Debtors. The Non-Competition Agreement encompasses Mr. Stein's duty not to engage in certain competitive practices in exchange for the monthly installment payments.

Because each of the CCAA Leases covers separate and distinct real estate, there is evidence that the parties intended that the obligations under each of the Leases be separate and severable not only from each other but from the Non-Competition Agreement as well. Consequently, performance under the Leases is not inextricably tied to performance under the Non-Competition Agreement and is, therefore, capable of being severed from the Non-Competition Agreement without destroying the significance of the individual agreements. *Plitt,* 233 B.R. at 845.

### C. *Separate Objectives/Separate Parties*

Moreover, each of the four agreements have different objectives and different parties. The objective of the CCAA Leases was to enter into three separate rental agreements for three separate property locations, owned by three different landlords. In contrast, the objective of the Non-Competition Agreement was to prevent Mr. Stein from engaging in certain competitive practices for a specified period of time.

Further evidence of the parties' intent to enter separate agreements is manifested by the fact that each agreement obligates separate parties. Each Lease obligates a different lessor and the Non-Competition Agreement obligates Mr. Stein only and not the lessors. We conclude from this that the parties did not intend for the agreements to be one.

Mr. Stein, however, insists that, despite the different parties, because the Non-Competition Agreement covers the territory of the three Leases, the four agreements are inseparable. He supports his argument by citing to a case in which the Court refused to allow the debtor to assume an executory

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 2000 WL 33712484 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

contract while not assuming a franchise agreement. *In re Kafarkis,* 162 B.R. 719 (Bankr.E.D.Pa.1993). However, the *Kafarkis* case is distinguishable on one important point, the parties to the lease and the franchise agreement in that case were identical. Here there are three different Leases, naming three different lessors and a separate Non-Competition Agreement naming a fourth party, Mr. Stein. The fact that Mr. Stein signed all of the Leases (as agent for the lessors), as well as the Non-Competition Agreement is irrelevant. Indeed, the reason entities incorporate is so that officers such as Mr. Stein will not be liable for actions taken on behalf of the corporation. Basic corporate law principles provide that merely signing an agreement as the agent of a corporation does not make Mr. Stein a party to the Leases.[FN4]

> FN4. Mr. Stein does not suggest that simply because he signed the Leases as agent for the lessors that he is personally liable for any breach of those Leases by the lessors.

Because there is no evidence from the four corners of the documents that it was the parties' intent that these agreements be one, we cannot agree that they are a single integrated agreement. *See Ryan Warranty Service, Inc. v. Welch,* 694 So.2d 1271, 1273 (Ala.1997) ("general rules of contract interpretation require that the intent of the parties be derived from the words of the contract, unless an ambiguity exists."); *Knight v. Hired Hand Green, Inc.,* 1999 WL 1207038, \*2 (Ala.Civ.App. Dec. 17, 1999) (same). Even if they were ambiguous, the testimony of Mr. Stein does not convince us that the four agreements were intended to be one inseparable contract.

## VI. *CONCLUSION*

\*5 In light of the foregoing, we grant the Debtors' motion to extend the time to assume or reject the unexpired CCAA Leases.

An appropriate Order is attached.

## ORDER

AND NOW, this 7TH day of JULY, 2000, upon consideration of the Debtors' Motion for an Order Extending the Time Within Which the Debtors Must Assume or Reject Unexpired Leases of Non-Residential Real Property and the Response of Stanley Stein thereto, and after briefing by the parties and a hearing, it is hereby

ORDERED that the Debtors' Motion GRANTED; and it is further

ORDERED that the time period within which the Debtors may decide whether to assume or reject the unexpired CCAA Leases is extended to October 2, 2000.

Bkrtcy.D.Del.,2000.
In re Integrated Health Services, Inc.
Not Reported in B.R., 2000 WL 33712484 (Bkrtcy.D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.