# **<u>EXHIBIT B</u>**

James H. Aronoff

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| AMERICAN HOME MORTGAGE | ) |
| HOLDINGS, INC., et al., | ) Case No. 07-11047 (CSS) |
| | ) |
| Debtors. | ) Jointly Administered |

Deposition of JAMES H. ARONOFF taken pursuant to notice at the law offices of Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware, beginning at 11:05 a.m., on Thursday, October 12, 2007, before Debra A. Donnelly, Registered Professional Reporter and Notary Public.

APPEARANCES:

    JOHN DORSEY, ESQUIRE
    YOUNG CONAWAY STARGATT & TAYLOR
        1000 West Street, 17th Floor
        Wilmington, Delaware  19801
        for Debtors

    KURT F. GWYNNE, ESQUIRE
    REED SMITH, LLP
        1201 Market Street, Suite 1500
        Wilmington, Delaware  19801
        for GMAC Mortgage and Residential
        Funding Corporation

- - - - - - - - - - - - - - - - - - - - - - - -

CORBETT & WILCOX
REGISTERED PROFESSIONAL REPORTERS
230 N. MARKET STREET   WILMINGTON, DELAWARE   19801
(302) 571-0510
Corbett & Wilcox is not affiliated
with Wilcox & Fetzer, Court Reporters

1  Q. Could you describe for me, please, what the
2  expert testimony is that you're going to offer at the
3  hearing in this matter?
4  A. Yes. I'm going to provide expert testimony in
5  two areas. The first relates to the severability of
6  servicing rights in master loan purchase agreements and
7  related security documents. And the second opinion goes
8  to the relevance of a servicer being qualified as a
9  Fannie or Freddie Mac servicer as that designation
10 relates to private label mortgage backed securities
11 transactions.
12       MR. GALLO: Can you read back that last
13 answer for me, please.
14       (The reporter read back as requested.)
15 BY MR. GALLO:
16 Q. Let's take the second one first.
17       What opinion are you going to offer with
18 respect to the relevance of a servicer being qualified as
19 a Fannie, Freddie servicer as it relates to private label
20 mortgage-backed security transactions?
21 A. That it's not very relevant to the quality of
22 a servicer either in servicing the assets or that, or as
23 it relates to the ability of a servicer to comply with
24 the terms of any related servicing agreement, and that

James H. Aronoff

1    it's merely a proxy for the sophistication, size, and
2    financial strength of any servicer.
3                   MR. GALLO:  Can you read that answer
4    back for me, please?
5                   (The reporter read back as requested.)
6                   MR. DORSEY:  Let me just interrupt for
7    one second.  Is someone on the phone recording this?  I
8    hear a beeping noise like a tape recording device.  Okay.
9    I don't know what that beep is.
10                  MR. ABBOTT:  Mute button, maybe.  Can
11   they respond to you if it's listen only?
12                  MR. DORSEY:  I think so.
13                  MS. ZIEG:  I have it set up for listen
14   only.  I can come down and set it that way if you would
15   like.
16                  MR. DORSEY:  No, that's fine.
17                  (Discussion held off the record.)
18   BY MR. GALLO:
19       Q.   I apologize.  Can you read back the last
20   response again.
21                  (The reporter read back as requested.)
22   BY MR. GALLO:
23       Q.   Okay.  And then with respect to the opinion
24   you are going to offer with regards to severability, what

James H. Aronoff

Page 53

1  never seen, worked on, or been aware of a transaction
2  where the servicing was sold without the consent of the
3  investor to the MLPA?
4      A.  Yeah.  I just don't know if consent was asked
5  for and granted.  I have no idea.  That's correct.
6      Q.  Okay.  I want to move over to your opinion
7  with respect to Freddie Mae and Fannie Mae.
8          What does it mean to you where a
9  service, for a servicer to meet the qualifications of a
10 Fannie Mae servicer?  What does that mean?
11     A.  It means that they have met certain standards
12 set by the agencies with respect to the quality of their
13 personnel, the quality of their facilities and systems,
14 insurance coverages and financial strength.
15          MR. GALLO:  Can you read that back for
16 me, please.
17          (The reporter read back as requested.)
18 BY MR. GALLO:
19     Q.  And these qualifications, are these published
20 by Fannie Mae?
21     A.  Yes.
22     Q.  So if one wanted to see precisely what these
23 qualifications were, they could get a copy of the Fannie
24 Mae qualifications and they would be listed there.  Is

James H. Aronoff

Page 54

1  that correct?
2       A.   I would imagine so.  I haven't looked at the
3  Fannie Mae guide for a long time.
4       Q.   So, do you know what the -- do you know what
5  the specific qualifications are?
6       A.   No.
7       Q.   And in preparation for your expert testimony
8  in this case -- so, in preparation for your expert
9  testimony in this case, you have not reviewed the Fannie
10 Mae qualifications book.  Is that correct?
11      A.   The Fannie Mae guide, that's correct.
12      Q.   And if I understand you correctly, the Fannie
13 Mae guide is what contains the qualifications.  Right?
14      A.   The specific standards that can go to the
15 things I mentioned, correct.
16      Q.   So, as you sit here today, you can't tell me
17 what the specific standards, Fannie Mae standards are
18 with respect to quality of personnel.  Right?
19      A.   That's correct.
20      Q.   You can't tell me what the specific Fannie Mae
21 standards are with respect to the quality of facilities
22 and systems.  Right?
23      A.   Yes.
24      Q.   Is that right?

James H. Aronoff

1  Q. I'm not sure I understood your answer. When
2  is the last time that you specifically looked at the
3  Freddie guidelines?
4  A. Ten years ago.
5  Q. So, you did not, in preparation for the
6  opinion you are giving, going to give on Monday and
7  Tuesday, you did not review specifically the Freddie
8  guidelines?
9  A. That's correct.
10 Q. Would you agree with the statement that where
11 an investor holds loans that are serviced by a Freddie or
12 Fannie qualified servicer, those loans are more liquid or
13 easier to sell than if the servicer does not have that
14 qualification or approval?
15 A. I think it depends on the type of collateral.
16 Q. Can you expand upon that for me?
17 A. Yeah. I think to the extent you -- the more
18 you move away from agency-quality collateral, I think the
19 Freddie/Fannie designation would be more relevant in
20 analysis by an investor. To the extent you are talking
21 about collateral that requires significantly different
22 skills, the fact that your servicer is a Fannie Mae
23 approved servicer may reduce liquidity as opposed to the
24 other way around.

James H. Aronoff

Page 150

1  the documents?
2      A.   No.
3      Q.   Can you describe to me the steps you followed
4  in forming your opinion?  And I am talking your opinion
5  regarding the severability.
6           MR. DORSEY:  Object to form.
7           THE WITNESS:  Yeah.  I formulated an
8  opinion based on my experience and knowledge of the
9  industry and transactions I was personally involved in,
10 and then looked at the documents I was sent in this case
11 to see if they in any way changed or dissuaded me of that
12 opinion.  And I concluded that my initial understanding
13 of market convention was confirmed upon my review of the
14 three boxes of documents I received.
15 BY MR. GALLO:
16     Q.   Did you take any notes on your review of those
17 documents?
18     A.   No, I read them.
19     Q.   Can we mark as Exhibit 4, this is a Purchase
20 Warranties and Servicing Agreement with my client, EMC.
21          Can you just read the title to me for
22 Exhibit 4?
23          (Aronoff Deposition Exhibit No. 4, which
24 is entitled, "Purchase, Warranties and Servicing

```
 1   sell their service, servicing rights and obligations
 2   separate from other obligations that the debtors may
 3   have?
 4        A.   Yes.
 5        Q.   So you knew when you were being retained what
 6   opinion they wanted you to reach?
 7        A.   Yes.
 8        Q.   And that is, in fact, the opinions that you've
 9   given here today.  Correct?
10        A.   I think my opinions concur with what they
11   originally expressed would be the opinions that they were
12   looking for, yes.
13        Q.   At any time in your discussions with Young,
14   Conaway attorneys, did they talk to you about your
15   opinions or how you say things or whether you should say
16   things differently?
17        A.   No.
18        Q.   In your discussions with Young, Conaway
19   attorneys, was there ever anybody from American Home on
20   those calls?
21        A.   On the -- no.
22        Q.   I believe you said earlier, correct me if I'm
23   wrong, I think you said earlier you didn't have any
24   discussions with anyone at American Home, any business
```