**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **AMERICAN HOME MORTGAGE** | ) | Case No. 07-11047-CSS |
| **HOLDINGS, INC., et al.,** | ) | Jointly Administered |
| | ) | |
| Debtors | ) | Related to Doc. Nos. 11, 857, 859, 1061, 1071, 1216, |
| | ) | 1243, 1449, 1522 & 1526 |
| | ) | |

**ASSURED GUARANTY CORP.'S (A) JOINDER IN EMERGENCY MOTION
OF GMAC MORTGAGE LLC AND RESIDENTIAL FUNDING COMPANY
LLC TO CONTINUE THE OCTOBER 15, 2007 HEARING, (B) EMERGENCY
MOTION TO CONTINUE THE OCTOBER 15, 2007 HEARING AND
(C) REPLY TO THE OBJECTIONS OF THE DEBTORS AND
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE
MOTION TO CONTINUE THE OCTOBER 15, 2007 HEARING**

Assured Guaranty Corp. ("Assured"), by and through its undersigned counsel, hereby files this emergency motion, joinder and reply (collectively, the "Motion") to continue the October 15, 2007 hearing regarding (I) The Emergency Motion of the Debtors for Orders: (A)(I) Approving Sale Procedures; (II) Scheduling a Hearing to Consider Sale of Certain Assets Used in Debtors' Loan Servicing Business; (III) Approving Form and Manner of Notice Thereof and (IV) Granting Related Relief; and (B)(I) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims and Encumbrances, and Other Interests; (II) Authorizing and Approving Purchase Agreement Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief; and (II) the Modified Notice of (I) Possible Assumption and Assignment of Certain Leases, License Agreements, and Executory Contracts; and (II) Proposed Cure Obligations, If Any (the "Sale Motion"). By this Motion, Assured joins the Emergency Motion of GMAC Mortgage LLC, Formerly Known as GMAC Mortgage Corporation and Residential Funding Company

LLC, Formerly Known As Residential Funding Corporation (collectively, "GMAC") to Continue the October 15, 2007 Hearing Regarding (I) The Emergency Motion of the Debtors for Orders: (A)(I) Approving Sale Procedures; (II) Scheduling a Hearing to Consider Sale of Certain Assets Used in Debtors' Loan Servicing Business; (III) Approving Form and Manner of Notice Thereof and (IV) Granting Related Relief; and (B)(I) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims and Encumbrances, and Other Interests; (II) Authorizing and Approving Purchase Agreement Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief; and (II) the Modified Notice of (I) Possible Assumption and Assignment of Certain Leases, License Agreements, and Executory Contracts; and (II) Proposed Cure Obligations, If Any (D.I. 1449) (the "GMAC Motion"). Assured hereby adopts and incorporates by reference the arguments and authorities cited in the GMAC Motion, to the extent they apply to Assured. In further support of the Motion, Assured respectfully states as follows:

1. On October 4, 2007, the Debtors cancelled the hearing scheduled for October 9, 2007 to approve the proposed sale of their loan servicing business, cancelled the proposed auction and gave notice that the Debtors would move forward with the proposed sale to the stalking-horse bidder (the "Proposed Purchaser"). The Debtors noticed the rescheduled sale hearing for October 15, 2007.

2. Also on October 4, 2007, and in connection with objections pending to the Debtors' proposed sale of their loan servicing business, GMAC filed notices of deposition pursuant to Rule 30(b)(6) of the Federal Rule of Civil Procedure (the "Federal Rules") for representatives of the Debtors and of the Debtors' investment bankers, Milestone Advisors, LLC ("Milestone"). Shortly thereafter, Assured and approximately eight other parties-in-interest in

these bankruptcy cases filed notices of deposition joining in depositions originally noticed by GMAC.

3.      On October 10, 2007, the Debtors filed objections (the "<u>Deposition Objections</u>") to the notices of deposition filed by GMAC, Assured and the other parties who filed notices. In these Deposition Objections, the Debtors identified certain persons who would be made available to testify on the topics set forth in the notices of deposition. The individuals designated were employees of the Debtors, Milestone and the Proposed Purchaser.

4.      Shortly after the conclusion of the first deposition on October 10, 2007, GMAC filed the GMAC Motion. As stated in the GMAC Motion, the Debtors failed to identify exactly what assets are being sold and what contracts are being assumed in the proposed asset purchase agreement (the "<u>APA</u>") pursuant to the Sale Motion. As stated in the GMAC Motion, the first deposition taken did not clarify this fundamental issue.

5.      As of the date of this Motion, the depositions have concluded. However, none of the depositions have shed light on what assets are being sold and what contracts are being assumed. In fact, the depositions have only created more confusion. In addition, the depositions so far have failed to illuminate the issues surrounding the proposed Cure Amounts and Cure Escrow Agreement (both as defined in the APA).

6.      First, the depositions have not clarified exactly what assets and contracts of the Debtors are being transferred to the Proposed Purchaser. No witness was able to give a complete answer, and the answers that were given conflict with the answers of other witnesses.

7.      For example, during his deposition, Robert Love, an employee of the Debtors, stated:

> A: As it pertains to – to my understanding of the HELOC servicing agreements, I believe that they would be transferred intact, but, you know, I qualify that with I am not the legal expert with respect to the APA.

(Love Dep. 30:4-8, Oct. 10, 2007).  Robert Johnston, an officer of the Debtors, also testified that all of the rights under the HELOC agreement were being transferred to the purchaser:

> Q: Now, can you tell what the debtors' intention is regarding the assumption and assignment of the HELOC servicing agreements, the HELCO backup agreements, basically the transactions involving FGIC?
>
> * * *
>
> A: Can you break it down a little bit, I guess?
>
> * * *
>
> Q: Let's go through each one of the documents.  Do you know how many transactions had [] FGIC Insurance?
>
> A: I believe three.
>
> Q: Okay.  What is the debtors' intention with respect to those three transactions? What is being sold to the purchaser?
>
> A: The servicing rights.
>
> Q: Okay. Let's grab those agreements… Can you flip page by page and tell me what is being transferred to the purchaser?
>
> A: It is my understanding the whole thing.
>
> Q: The whole thing?
>
> A: Yes.
>
> Q: There is nothing that it being left behind?
>
> A: That is my understanding.

(Johnson Dep. 135:12-137:8, Oct. 11, 2007)

However, Eugene Weil, the chief executive officer of Milestone, testified quite differently:

> Q: So, as you sit here today, you can't say whether the purchaser is taking all of the rights under that agreement that relate to the debtor entities or only some of them.  Is that right?

4

* * *

A: I cannot say that as I sit here today.

* * *

Q: Okay. But you couldn't look at any particular servicing agreement covered by the APA and distinguish which rights and obligations are going to purchaser and which are remaining with the debtor as you sit here today. Is that right?

A: Without going into a review of each agreement.

* * *

Q: Last question on this line here. I'm just going to turn it around. You are a counter-party to one of these agreements with the debtor regarding a securitization deal in trying to figure out what the debtors are transferring to the purchaser and what they're not. How would you do that?

A: Well, I would first look and see if I could find a provision in the APA or its schedules that picked this up. To the extent it was not picked up specifically in the APA . . . I think you would have to go back to the debtor and ask them what the intention was vis-a-vis this agreement."

Q: I just asked you that question.

A: I know you did.

Q: Who else would I ask to get that answer?

A: Again, you know, I think you could ask . . . Mr. Love or Mr. Johnson.

(Weil Dep. 167:24-181:21, Oct. 11, 2007). And David Storper, a representative of the Proposed Purchaser, when asked about exactly what is being sold testified:

Q: In negotiations with the purchaser regarding [a particular servicing agreement] has the debtor ever specified what portion it contends are servicing and which are not?

* * *

A: I don't know.

Q: . . . To the purchaser's knowledge, does the purchaser intend to comply with and assume all of the provisions of the agreement?

* * *

5

A: Yes. Our intent is to comply.

(Storper Dep. 60:23-61:13, Oct. 12, 2007).    But Mr. Storper's testimony later on in the same deposition seemed to contradict this:

> Q: Is it correct to say you did not review the servicing agreements?
>
> A: Correct.
>
> Q: How can you tell me what duties and obligations you are going to perform if you haven't reviewed the agreements?
>
> A: We are planning on complying with the terms of the APA and all other terms necessary to close the transaction.

(Storper Dep. 85:4-9, Oct. 12, 2007).   And once again later in the deposition Mr. Storper did not seem to understand how the purchasing of "servicing rights" would work under the APA:

> Q: Do you know through this transaction are you acquiring HELOC loans?
>
> * * *
>
> A: I don't know.
>
> * * *
>
> Q: Would it surprise you to tell you that the three FGIC transactions involve HELOCs and they are on a list where the purchaser would like them transferred?
>
> A: I wasn't aware.
>
> * * *
>
> Q: You understand, a HELOC loan is a home equity loan, correct?
>
> A: Correct.
>
> Q: And the borrower makes draws from time to time within the context of the loan document that they have. Is that your understanding?
>
> A: That's my understanding.
>
> * * *
>
> Q: . . . [A]ssume the transaction closes and you obtain the servicing rights for HELOC servicing loans -- you can object to form. Assume you acquire those

6

servicing rights. Do you have an understanding of whether it is the purchaser who will be funding the next loan request made by the borrower?

\* \* \*

A: I defer to compliance with the Asset Purchase Agreement and all other relevant documents.

Q: But sitting here today you don't have an understanding mechanically whether that's an obligation the purchaser has agreed to perform?

A: Correct.

(Storper Dep. 98:14-101:11, Oct. 12, 2007).

8. As can be seen from the above selections of testimony, there is no consistency or certainty regarding exactly what servicing rights and obligations are being transferred pursuant to the APA – the entire servicing agreements or just certain rights and obligations thereunder. None of the witnesses could state with any specificity what the "servicing rights" being transferred encompass or where such rights are described. Some of the witnesses believed the entire servicing agreements are being assumed and assigned. One witness believed that only the servicing rights under those agreements were being transferred. The witness from the Proposed Purchaser seemed to initially agree that all rights and obligations under the servicing agreements would be performed, but then began to reference the terms of the APA only. In fact, at one point, the Proposed Purchaser's witness was not even aware that the Proposed Purchaser is buying the servicing rights to HELOC loans.

9. Given that none of the witnesses deposed was able to give a clear, concise or straight answer concerning exactly what is being transferred, Assured is entirely unable to determine if any of its rights under the servicing agreements to which it is an express third-party beneficiary, or the insurance agreements to which it is a signatory, are being affected. Not even the representative of the Proposed Purchaser, when asked directly to describe what rights are

"servicing rights" and which are not, could give a clear answer. Assured should not be forced to participate in a sale process when it is not entirely clear what is being sold and what rights are being affected. For this reason, Assured respectfully requests that the hearing on the Sale Motion scheduled for October 15, 2007 be postponed.

10. Second, Mr. Weil and Robert Love were both designated by the Debtors to testify concerning "[t]he Debtors' proposed cure claims and the bases therefore and the Cure Amount and the Cure Escrow Agreement (as defined in the APA)." However, while Mr. Weil indicated that he was prepared to testify concerning the Cure Escrow Agreement, he was unable to testify concerning the Debtors efforts to identify any cure amounts due under the servicing agreements. First, Mr. Weil testified that:

> A: However, it is my understanding that, on the servicing agreements, I don't believe there are any cure amounts that would be necessary.

(Weil Dep. 79:1-3, Oct. 11, 2007). But later, during the same deposition, Mr. Weil indicated that he does not know what the Debtors have done to determine that the cure amount for the servicing agreements is zero:

> Q: I'm trying to understand whether the company investigated, with respect to the servicing agreements that are the subject of the Asset Purchase Agreement, whether there were any cure payments that would be payable?
>
> * * *
>
> A: I can't say whether they diligenced that particular question relative to the servicing agreements or not. You know, again, I'm generally aware of the issues.

(Weil Dep. 150:1-11, Oct. 11, 2007).

11. Additionally, during his deposition Mr. Love, who was proffered by the Debtors to testify concerning "defaults under the Assured Agreements" and "[t]he Debtors' proposed cure claims and the bases therefore and the Cure Amount", demonstrated that he did not have

8

sufficient knowledge to testify about those issues. In fact, Mr. Love testified that: "I guess I'm not familiar with the term "cure," what it would mean." (Love Dep. 48:24-49:1, Oct. 10, 2007).

12. Given that neither of the people designated by the Debtors to testify regarding cure claims was able to testify as to cure issues other than the Cure Escrow Agreement, absent a continuance of the Sale Hearing, Assured cannot accurately determine the extent of the cure costs due and owing under the agreements.

13. Finally, contrary to the assertions in the Debtors' response to the GMAC Motion (D.I. 1522) and the Official Committee of Unsecured Creditors' response to the GMAC Motion (D.I. 1526), GMAC and Assured have not squandered their opportunity to obtain relevant facts and, Assured submits, have not had sufficient notice of the proposed sale of servicing assets. As described above, no one has been able to state with specificity to Assured what rights and obligations under the servicing agreements to which Assured is a third-party beneficiary are being transferred. How can Assured be to blame when the Debtors, the Debtors' investment advisors and the Proposed Purchaser cannot articulate what is being sold *one business day* before the hearing on the Sale Motion. In these circumstances, and given that the Proposed Purchaser's witness has indicated that it was the Debtors, and not the Proposed Purchaser, who suggested the structure and the timing of the closing (*See* Storper Dep. 105:5-21, Oct. 12, 2007), and that the Proposed Purchaser very likely would not refuse to close if the sale hearing were adjourned for two to four weeks (*See* Storper Dep. 115:25-116:6, Oct. 12, 2007), the Debtors' suggestion that they would be somehow prejudiced as a result of a short delay in the proceedings rings hollow.

14. Accordingly, Assured joins in, and adopts the grounds set forth in, the GMAC Motion and requests that the Court enter an order continuing the hearing on the Sale Motion

currently scheduled for October 15, 2007, to a date that would allow Assured time to conduct the necessary discovery that they are entitled to under the Bankruptcy Rules.

WHEREFORE, Assured respectfully requests that the Court enter an order (i) continuing the October 15, 2007 hearing and (ii) granting such other relief as is appropriate.

Dated: Wilmington, Delaware
      October 14, 2007

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

 /s/ Daniel B. Butz
Robert J. Dehney (No. 3578)
Donna L. Culver (No. 2983)
Daniel B. Butz (No. 4227)
Chase Manhattan Centre, 18th Floor
1201 North Market Street
Wilmington, Delaware 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: rdehney@mnat.com
Email: dculver@mnat.com

Counsel to Assured Guaranty Corp.

1265644.2