UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x
In re:                                                        : Chapter 11
                                                              :
AMERICAN HOME MORTGAGE                                        : Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,[1]            :
                                                              : Jointly Administered
      Debtors.                                                :
                                                              : Hearing Date: October 23, 2007 at 2:00 p.m. (ET)
                                                              :              (requested)
                                                              : Objection Deadline: October 19, 2007 at 5:00 p.m. (ET)
                                                              :              (requested)
------------------------------------------------------------- x

**DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105 AND 363
OF THE BANKRUPTCY CODE: (A) APPROVING THE MORTGAGE SERVICING
PURCHASE AGREEMENT; AND (B) AUTHORIZING THE DEBTORS TO SELL
CERTAIN PROPERTY FREE AND CLEAR OF LIENS, INTERESTS, AND
ENCUMBRANCES, AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, "AHM" or the "Debtors"), in the above-captioned jointly administered cases by and through their undersigned attorneys, hereby submit this motion (the "Motion") pursuant to Sections 105 and 363(b) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking an order approving (i) the terms of that certain Mortgage Servicing Purchase Agreement (the "Purchase Agreement") by and among AHM Servicing, as seller thereunder, and MidFirst Bank ("MidFirst" or the "Buyer"), a federally chartered savings association, with its principal office in

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

DB02:6278938.4                                                                              066585.1001

Oklahoma, as buyer thereunder, substantially in the form annexed hereto as Exhibit A, (ii) the sale of the Debtors' right, title and interest in and to the Property (as defined below), on an "as is, where is" basis, free and clear of all liens, claims, security interests, pledges and other encumbrances, without any representations or warranties of any kind other than expressly set forth in the Purchase Agreement, substantially on the terms and conditions of the Purchase Agreement, and (iii) granting related relief. In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105 and 363 of the Bankruptcy Code and Rule 6004 of the Bankruptcy Rules.

## BACKGROUND

### A.  The Debtors' Bankruptcy Filing

2. On August 6, 2007 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in possession of their respective properties and have continued to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. No request has been made for the appointment of a trustee or examiner.

**B.    The Debtors' Business**

4.    Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

5.    As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

6.    A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over the collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately

$46.3 billion. AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

C.   **Events Leading to the Chapter 11 Filing**

7.   Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

8.   The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

9.   In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders – the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

10.   On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

11. The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees.

12. In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

13. Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

D. **Sale Background**

14. As noted above, since the sudden and dramatic upheaval in the Debtors' business, the Debtors have sought to sell their businesses and assets to financial and strategic investors. On August 6, 2007, the Debtors filed a motion for approval of procedures for the sale of certain assets used in the Debtors' loan servicing business (the "Servicing Sale Procedures"), and ultimately the approval of a sale of such assets [Docket No. 11] (the "Servicing Sale Motion"), which was approved by order dated August 9, 2007 [Docket No. 113] (the "Servicing Sale Order").

DB02:6278938.4

15. The Servicing Sale Procedures expressly provide that the Debtors may seek approval of portions of the servicing business with different purchasers to allow for the highest and best value for the servicing assets. Such procedures also provide that the Debtors may waive the Servicing Sale Procedures to the extent such waiver is in the best interest of the Debtors' estates. In sum, interested parties and potential purchasers were noticed with (i) the Debtors' intent to sell the servicing business, including the servicing rights related to the Property, in connection with the Servicing Sale Motion and Order; (ii) the Servicing Sale Procedures, which provided for the Debtors' rights to waive such procedures and to sell certain servicing assets separately; and (iii) with the instant Motion.

16. The Debtors anticipate that a buyer for the bulk of its loan servicing business will be found, and the Debtors will seek approval of a sale of the business to the party presenting the highest or otherwise best bid for such assets. On September 21, 2007, the Debtors filed a Motion to Approve a Stalking Horse bidder for the bulk of its loan servicing business, which motion is set for a hearing on September 25, 2007.

17. Faced with the issues discussed above, most notably the liquidity crisis and subsequent shutdown of certain businesses, the Debtors determined that it was in the best interest of their estates, creditors and other constituents to attempt to sell their businesses and residual assets. Accordingly, in the recent weeks, the Debtors, with the assistance of their financial advisors, have investigated sales of portions of their assets or other strategic transactions.

18. Several of the loans that the Debtors service were issued in conjunction with the Government National Mortgage Association ("GNMA"). AHM Servicing was approved as a GNMA mortgage-backed securities issuer and was a signatory and subject to

certain guaranty agreements with GNMA whereby AHM Servicing assigned ownership of certain first lien, adjustable-rate residential mortgage loans on a servicing retained basis to GNMA (the "GNMA Portfolio").

19. On August 3, 2007, GNMA gave notice to AHM Servicing that AHM Servicing had defaulted under the terms of the guaranty agreements and that all rights, title and interest of the Debtors in the GNMA Portfolio terminated, and GNMA became the owner of the loans. The Debtors disputed the purported termination and did not turn over the GNMA Portfolio to GNMA.

20. On August 20, 2007, GNMA filed with this Court a *Motion of the United States for an Order (I) Requiring Turn-Over of Non-Estate Property Belonging to the Government National Mortgage Association and (II) Declaring that the Government National Mortgagee Association Is Not Subject to the Automatic Stay*, (the "Turn-Over Motion") [D.I. 243], and the Debtors filed an objection thereto [D.I. 600].

21. On September 20, 2007, at the request of the Debtors and GNMA, this Court entered a *Stipulation and Order Resolving Motion of United States for an Order (I) Requiring Turnover of Non-Estate Property Belonging to the Government National Mortgage Association and (II) Declaring that the Government National Mortgage Association Is Not Subject to the Automatic Stay* (the "Stipulation") wherein, *inter alia*, the Debtors and GNMA agreed to allow the Debtors to have until October 9, 2007 to execute a binding contract to sell the GNMA Portfolio to a GNMA approved issuer/servicer in good standing, and until November 1, 2007 to close such a sale [D.I. 863].

22. On October 9, 2007, the Debtors and MidFirst entered into the Purchase Agreement, pursuant to which MidFirst is to purchase certain servicing rights.

## SUMMARY OF PROPOSED TERMS OF THE SALE[2]

23. As set forth in the Purchase Agreement, the material terms of the Purchase Agreement are as follows:

    a.   <u>Purchase and Sale</u>. Subject to the terms and provisions set forth in the Purchase Agreement, on the Sale Date Buyer shall purchase the Property from Seller, and Seller shall sell, transfer, assign and convey the Property to Buyer pursuant to an executed assignment of Seller's rights and obligations as servicer of each Mortgage Pool and other Property in the form of Exhibit B, attached to the Purchase Agreement, which shall be delivered to Buyer on or before the Sale Date. On the Transfer Date, Buyer shall commence the servicing of the Loans and Seller shall cease servicing the Loans.

    b.   <u>Property</u> shall mean all of the following rights, property, documents, agreements and funds related to the Mortgage Pools described on Exhibit A to the Purchase Agreement:

(i) All rights and benefits as servicer of each Mortgage Pool, including (without limitation) all rights, interests and responsibilities under the Servicing Contract for servicing each Loan and all rights to receive and retain all servicing fees, late fees, assumption fees, insurance commissions and other amounts in connection therewith;

(ii) All right, title and interest, as GNMA Servicer and Issuer, to each Loan, Mortgage, Mortgage Note, Custodial File, Mortgage Pool, and Insurance Proceeds;

(iii) All right, title and interest in all funds in the Custodial Accounts; all accrued and uncollected late fees or other amounts due and unpaid by the Mortgagor and all unreimbursed Advances with respect to each Loan and the right to collect, recover or be reimbursed for the same; and

(iv) All right, title and interest in and to the servicing/credit, foreclosure, bankruptcy, and insurance files relating to each Loan and the closing and servicing thereof, all payment histories of each Loan reflecting payments received and Advances made and all other books, records, files and the contents thereof held or maintained by or for the servicer or GNMA with respect to the Mortgage Pool or Custodial File (subsections i-iv, collectively, the "<u>Property</u>").

---

[2] This summary of the terms of the Purchase Agreement is only provided as a convenience. To the extent that the summary differs in any way from the terms of the Purchase Agreement, the terms of the Purchase Agreement shall control.

c. <u>Purchase Price</u> paid by the Buyer for the Property shall be the sum of:

(i) The Purchase Price Percentage multiplied by the aggregate unpaid principal balances as of the Sale Date of all Loans that are not Three Month Mortgages; minus

(ii) An amount equal to One Thousand Five Hundred Dollars ($1,500) for each Loan which, as of the Sale Date, is (i) ninety (90) days or more past due under the terms of the Mortgage Note, (ii) In Bankruptcy and thirty (30) days or more past due, (iii) In Foreclosure, or (iv) In Litigation. For purposes of the Purchase Agreement, a Loan will be considered thirty (30) days or more past due if, as of the close of business on October 31, 2007, the respective Mortgagor has not paid the full amount of all principal, interest and escrow payments which were due on or before October 1, 2007; minus

(iii) The Reduction Amount in the amount of $300,000.00 for costs associated with loans that cannot be transferred to HUD, all claims for mortgagee neglect, any claims for post-foreclosure curtailments, and all claims for late foreclosure referrals.

d. <u>Payment of Purchase Price</u>: The Purchase Price shall be paid by bank wire in immediately available funds as follows:

(i) On the Sale Date an initial installment to Seller in the amount equal to the greater of (a) Twenty Percent (20%) of the Purchase Price contemplated in paragraph 20(c); and (b) the amounts payable by Sellers to GNMA pursuant to the Stipulation and Order, provided that Seller has performed its obligations under Section 9 of the Purchase Agreement and delivered to Buyer the assignment required in Section 4.1 of the Purchase Agreement.

(ii) Buyer shall on the Settlement Date and upon (a) Seller's complete satisfaction of all conditions required to be satisfied by Seller pursuant to Sections 4.2.4, 4.2.7, 7 and 8.8 of the Purchase Agreement prior to the Settlement Date, and (b) Seller's substantial satisfaction of all other conditions required to be satisfied by Seller prior to the Settlement Date, pay a second installment in an amount equal to: (i) Eighty Percent (80%) of the purchase price contemplated in paragraph 20(c)(i); minus (ii) One Hundred Percent (100%) of the amounts contemplated in paragraph 20(c)(ii); minus (iii) the initial installment described in paragraph 20(d)(i); minus (v) the Assignment Holdback; minus (vi) the Custodian Holdback; minus (vii) the Tax Contract Holdback; plus (viii) interest described in Section 3.2.8 of the Purchase Agreement.

(iii) An amount equal to Fifteen Percent (15%) of the Purchase Price contemplated in paragraph 20(c)(i), plus the interest described in Section 3.2.8 of the Purchase Agreement, shall be paid in subsequent installments on a pro rata basis based on the unpaid principal balances of the Mortgage

DB02:6278938.4

066585.1001

Pools, as of the Sale Date, once the Custodial File related to each Loan which is included in such Mortgage Pool as of the Sale Date is complete and in compliance with the GNMA Requirements, Insurer Requirements and the requirements of federal, state and local laws, with each such installment being paid on the fifteenth (15th) Business Day of the month immediately following the month each Loan related to a Mortgage Pool as of the Sale Date becomes in compliance with GNMA Requirements, Insurer Requirements and the requirements of federal, state and local laws.

(iv) The balance of the Purchase Price contemplated in paragraph 20(c)(i), plus the interest described in Section 3.2.8 of the Purchase Agreement, shall be paid on a date which is fifteen (15) Business Days following the date on which all Loans included in each Mortgage Pool as of the Sale Date are in compliance with the requirements for certification or recertification by Buyer's custodian in accordance with GNMA Requirements related to documentation.

e.  Three Month Mortgage: Three Month Mortgage shall mean any Loan:

(i) Which, as of the Sale Date, is ninety (90) days or more past due under the terms of the Mortgage Note for any payment due; for the purposes of the Purchase Agreement, a Loan will be considered ninety (90) days or more past due if, as of the close of business on October 31, 2007, the respective Mortgagor has not paid the full amount of all principal, interest and escrow payments which were due on or before August 1, 2007; or

(ii) Which, as of the Sale Date, is (a) In Foreclosure, (b) In Litigation, or (c) In Bankruptcy.

f.  Sale Date: Sale Date shall mean the close of business on October 31, 2007, or such other time as may be mutually agreed upon in writing by Buyer and Seller that is no later than the close of business on November 1, 2007; at which time the entire economic benefit of the Property (including without limitation, all rights, titles, interests, obligations and benefits associated therewith) will be transferred to Buyer.

g.  Settlement Date: Settlement Date shall mean a date which is fifteen (15) Business Days after the Transfer Date.

h.  Transfer Date: Transfer Date shall mean the close of business on October 31, 2007, or a date mutually acceptable to Buyer and Seller that is no later than the close of business on November 1, 2007, which shall be the day after the date which Seller closed the books of account with respect to each Mortgage Pool in order to transfer the servicing responsibilities under the Servicing Contract to Buyer.

DB02:6278938.4

066585.1001

24. The Debtors have agreed to relinquish their servicing obligations with respect to the Property and MidFirst has agreed to assume these servicing obligations after close of business on November 1, 2007 or a later date mutually acceptable to MidFirst, GNMA and the Debtors.

## RELIEF REQUESTED

25. By this Motion, the Debtors seek entry of an order pursuant to Sections 105 and 363(b) of the Bankruptcy Code and Bankruptcy Rule 6004 approving the Purchase Agreement and authorizing the Debtors to sell the Property to the Buyer on an "as is, where is" basis, free and clear of all encumbrances without any representations or warranties of any kind other than expressly set forth in the Purchase Agreement, and granting related relief.

## BASIS FOR RELIEF

26. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Such estate property may be sold free and clear of liens, claims, security interests, pledges and other interests in the property, so long as one of the provisions of section 363(f) of the Bankruptcy Code is satisfied. 11 U.S.C. § 363(f).

27. Whether a sale of assets pursuant to section 363(b) of the Bankruptcy Code should be approved in a particular case is a matter addressed to the Court's discretion, giving due consideration to the sound business judgment of the proponent of the sale. See Stephens Indus., Inc. v. McClung, 789 F.2d 386, 388 (6th Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1066 (2d Cir. 1983); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991).

28. Generally, courts have applied four (4) factors in determining whether a sale of a debtor's assets should be approved: (a) whether a sound business reason exists for the

proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is provided. See Lionel, 722 F.2d at 1071 (setting forth the "sound business purpose" test); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 145-47 (3d Cir. 1986) (implicitly adopting the articulated business justification test and adding the "good faith" requirement); Del. & Hudson Ry., 124 B.R. at 176 ("Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith.").

29. This fundamental analysis does not change if the proposed sale is private, rather than public. See, e.g., In re Ancor Exploration Co., 30 B.R. 802, 808 (Bankr. N.D. Okla. 1983) ("[T]he bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b)."). The bankruptcy court "has ample discretion to administer the estate, including authority to conduct public or private sales of estate property." In re WPRV-TV, Inc., 143 B.R. 315, 319 (D.P.R. 1991), vacated on other grounds, 165 B.R. 1 (D.P.R. 1992); accord, In re Canyon Partnership, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985).

30. This Court may additionally grant the relief requested herein under section 105(a) of the Bankruptcy Code. Section 105(a) grants broad authority to bankruptcy courts to enforce the provisions of the Bankruptcy Code under equitable common law doctrines, providing, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

### A. The Sale is Justified and is a Sound Exercise of the Debtors' Business Judgment

31. There are sound business reasons to justify the sale of the Property under the terms set forth in the Purchase Agreement. As noted above, the Debtors' ability to sell the Property was restricted by the terms of the Stipulation. Under the Stipulation the Debtors were required to sell the Property to a GNMA approved issuer/servicer on or before October 9, 2007 and to close on such a sale on or before November 1, 2007. These requirements significantly restricted the potential purchasers interested in the Property.

32. If the timeline under the Stipulation is not met, GNMA would be entitled to demand turnover of the Property, thereby potentially eliminating any value to the estates relative to the Property. Therefore, in arranging a sale of the Property on the basis of sound business reasons, promptness played a large role in the Debtors' considerations.

33. Under the constraints of the abbreviated schedule in which the Debtors were required to sell the Property, the Debtors undertook significant efforts to find a purchaser. The Debtors were compelled to find a purchaser that is not only GNMA approved, but that is also willing to agree to close on a sale within the timeline provided for in the Stipulation. The Debtors exercised diligence in seeking out and negotiating with potential purchasers. The Debtors contacted three separate parties each of whom had previously expressed an interest in purchasing the Property. One of the parties informed the Debtors that it was no longer interested in the Property. Another party declined to make an offer after conducting its subsequent due diligence. As a result, MidFirst's bid was the highest and best offer received for the Property and they were willing to comply with the schedule laid out in the Stipulation.

34. The Debtors believe that there are many sound business reasons for agreeing to the Purchase Agreement including the following: (1) the consideration that MidFirst

has agreed to provide is fair and reasonable; (2) the consideration is the highest and best offer for the Property; (3) the Property has no value in excess of the purchase price agreed to in the Purchase Agreement; and (4) the Debtors are in the process of liquidating their residual estates and winding down their business affairs and, accordingly, have no use for the Property.

35. In light of the constraints of the Stipulation and the severe depression in the Debtors' business sector, the Debtors believe that MidFirst currently represents the best possible offer for the purchase of the Property at this time. Accordingly, the Debtors submit that the sale proposed herein is in good faith, constitutes an exercise of the Debtors' sound business judgment and is in the best interests of the Debtors' estates and creditors.

**B.** **The Buyer Should Be Granted the Protections of a Good Faith Purchaser**

36. The Buyer should be granted the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code. That section reads, in pertinent part, as follows:

> The reversal or modification on appeal of an authorization under [section 363(b) or (c)] of a sale or lease of property does not affect the validity of the sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

37. Although the Bankruptcy Code does not define "good faith purchaser," the United States Court of Appeals for the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" In re Abbotts Dairies, 788 F.2d 143, 147 (3d Cir. 1986); see also Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490 (3d Cir. 1998). To constitute a lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly

unfair advantage of other bidders." In re Abbots Dairies, 788 F.2d at 147 (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)). See also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); Matter of Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct in the course of the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting Rock Indus. Mach., 572 F.2d at 1198).

38. The terms of the Purchase Agreement were negotiated at arms' length, without collusion, in good faith, and with the parties being represented by counsel. There is no relationship between the Debtors and the Buyer nor any of their officers and directors. Neither the Debtors nor the Buyer has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under section 363(m). Accordingly, the Debtors request that the Court determine the Buyer to have negotiated and acted at all times in good faith and, as a result, be entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code. See generally Marin v. Coated Sales, Inc. (In re Coated Sales, Inc.), No. 89 Civ. 3704 (KMW), 1990 WL 212899 (S.D.N.Y.) (holding that to show lack of good faith, a party must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); see also generally In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting In re Bel Air Assocs., Ltd., 706 F.2d 301, 305 (10th Cir. 1983)); In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings" (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978))).

C. **Adequate and Reasonable Notice of the Sale Has Been Provided**

39. The Debtors have provided adequate notice of the proposed Sale, under the exigent circumstances here, to all parties-in-interest as required by the applicable procedural rules. See Fed. R. Bankr. P. 2002(c)(1) (notice must contain "the terms and conditions of any private sale and the time fixed for filing objections."); see also, Del. & Hudson Ry., 124 B.R. at 180 (the disclosures necessary in such a sale notice need only include the terms of the sale and the reasons why such a sale is in the best interests of the estate and do not need to include the functional equivalent of a disclosure statement).

40. As stated previously, the Stipulation provides that the Debtors must sell the Property on or before November 1, 2007 (the "Sale Deadline"). Therefore, if the Debtors do not sell the Property by the Sale Deadline, the Debtors will lose their able to do so pursuant to the Stipulation. Under these exigent circumstances here, the Debtors have made efforts to notify all parties that could potentially be interested in purchasing the Property of the sale to MidFirst.

D. **The Sale Should Be Free and Clear of All Liens, Claims, Security Interests, Pledges and Other Encumbrances**

41. In accordance with section 363(f) of the Bankruptcy Code, a debtor may sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" provided that at least one of the following conditions is satisfied:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

§ 363(f)(1)-(5); see also In re General Bearing Corp., 136 B.R. 361, 366 (Bankr. S.D.N.Y. 1992); In re Collins, 180 B.R. 447, 449-50 (Bankr. E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only *one* of the enumerated conditions must be met in order for the Court to approve the proposed sale.") (emphasis in original); In re P.K.R. Convalescent Centers, Inc., 189 B.R. 90, 93-94 (Bankr. E. D. Va. 1995) ("[Section] 363 covers more situations than just sales involving liens. Section 363(f) addresses sales free and clear of *any interest*.") (emphasis in original) (citations omitted). Furthermore, the Court's ability to authorize a sale of a debtor's assets free and clear of any claims is also supported by section 105 of the Bankruptcy Code. Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

42. Section 363(f) of the Bankruptcy Code requires only that the Debtors meet one of the articulated factors to sell assets free and clear of all liens, claims and encumbrances. Nevertheless, the Debtors believe that several of these factors will be met. For instance, considering that any objections to this Motion must be resolved by consent of the objecting party or by the Court, the Debtors expect that they can satisfy at least the second and fifth subsections of Section 363(f). The Debtors will seek to obtain the consent of the primary parties in interest to the Purchase Agreement. Accordingly, they request that the sale of the Property be approved "free and clear," with any liens, claims, encumbrances, and interests to attach to the proceeds of the sale.

**E.    Waiver of Stay of Order Under Bankruptcy Rule 6004(h)**

43. Pursuant to Bankruptcy Rule 6004(h), an order authorizing the sale of property or assumption of contracts is stayed for ten days after the entry of the order unless the

court orders otherwise. The Debtors request that the Court order that such stay not apply with respect to the sale. Such a stay would cause a further delay the closing of Purchase Agreement and cause further costs to the estate, thus reducing the overall benefit and value of the sale.

44. The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes. Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy, ¶ 6064.09 (L. King, 15th rev. ed. 1988).

45. The Debtors hereby request that the Court waive the ten-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

46. The Debtors will serve this Motion on the following Parties: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) the Administrative Agent; (iv) counsel to the DIP Lender; (v) counsel to the MidFirst; (vi) counsel to Government National Mortgage Association ("GNMA"); (vii) the U.S. Securities and Exchange Commission; (viii) any creditor known by the Debtors to be asserting a Lien on the Property; (ix) all parties known to have expressed an interest in purchasing the Property; (x) local, state and federal taxing authorities and (xi) all parties entitled to notice under Local Rule 2002-1(b).

47. The Debtors have filed a motion to shorten the time for notice of this Motion contemporaneously herewith (the "Motion to Shorten"). As noted herein and in the Motion to Shorten, the Debtors submit that based on the enhanced value available through an

immediate private sale, the fact that the private sale will not interfere with the sale of the remainder of the Debtors' servicing assets and the resolution of certain disputes with GNMA, the Debtors submit that no other or further notice is appropriate or required.

WHEREFORE, the Debtors respectfully request that the Court enter an order substantially in the form annexed hereto (i) approving the Purchase Agreement and the sale of the Property on the terms and conditions of the Purchase Agreement and (ii) granting the Debtors such other and further relief as the Court may deem just and proper.

Dated: Wilmington, Delaware
October 15, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Donald J. Bowman, Jr. (No. 4383)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors-in-Possession

DB02:6278938.4

066585.1001