UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x
In re:                                                       :  Chapter 11
                                                             :
AMERICAN HOME MORTGAGE                                       :  Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,[1]           :
                                                             :  Jointly Administered
    Debtors.                                                 :
                                                             :  Hearing Date: October 23, 2007 at 2:00 p.m. (ET)
                                                             :              (requested)
                                                             :  Objection Deadline: October 19, 2007 at 5:00 p.m. (ET)
                                                             :              (requested)
------------------------------------------------------------- x

**DEBTORS' MOTION PURSUANT TO SECTION 107(b) OF THE BANKRUPTCY CODE FOR AN ORDER (1) AUTHORIZING THE DEBTORS TO FILE, UNDER SEAL, AN UNREDACTED DEBTORS' MOTION FOR ORDER PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE: (A) APPROVING THE MORTGAGE SERVICING PURCHASE AGREEMENT; (B) AUTHORIZING THE DEBTORS TO SELL CERTAIN PROPERTY FREE AND CLEAR OF LIENS, INTERESTS, AND ENCUMBRANCES, AND (C) GRANTING RELATED RELIEF AND (2) DIRECTING PARTIES FILING RESPONSIVE PLEADINGS TO FILE UNREDACTED PLEADINGS UNDER SEAL**

The above-captioned debtors and debtors-in-possession (collectively, "AHM" or the "Debtors"), by and through their undersigned attorneys, hereby submit this motion (the "Motion to File Under Seal") for entry of an order pursuant to section 107(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), Rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 9018-1(b) and (c) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

066585.1001

DB02:6291848.3

District of Delaware (the "Local Rules"), (i) authorizing the Debtors to file under seal an unredacted Debtors' Motion for Order Pursuant to Sections 105 and 363 of the Bankruptcy Code: (a) Approving the Mortgage Servicing Purchase Agreement; (b) Authorizing the Debtors to Sell Certain Property Free and Clear of Liens, Interests, and Encumbrances, and (c) Granting Related Relief (the "Sale Motion") and (ii) directing parties filing responsive pleadings to the Sale Motion to file unredacted pleadings under seal. In support of the Motion to File Under Seal, the Debtors respectfully represent as follows:

## STATUS OF THE CASE AND JURISDICTION

1.  On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases are being jointly administered pursuant to Rule 1005(b) of the Federal Rules of Bankruptcy Procedure. Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.  On August 14, 2007, the United States Trustee for the District of Delaware appointed The Official Committee of Unsecured Creditors (the "Committee"). No trustee or examiner has been appointed.

3.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief requested are sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9014, and 9019.

## GENERAL BACKGROUND

A. **The Debtors' Business**

4. Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

5. As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

6. A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately

$46.3 billion. AHM continues to conduct its servicing business, which constitutes an important asset of the Debtors' estates.

**B.    Events Leading to the Chapter 11 Filing**

7.    Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

8.    The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

9.    In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders -- the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening AHM's continued viability.

10.    On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

11. The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors now employ approximately 1000 persons who are absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

12. In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and "scratch and dent" loans, to financial and strategic investors.

13. Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## RELEVANT BACKGROUND

14. On August 6, 2007, the Debtors filed a motion for approval of procedures for the sale of certain assets used in the Debtors' loan servicing business, and ultimately the approval of a sale of such assets [Docket No. 11] (the "Servicing Sale Motion"), which was approved by order dated August 9, 2007 [D.I. 113] (the "Servicing Sale Order").

15. Several of the loans that the Debtors service were issued in conjunction with the Government National Mortgage Association ("GNMA"). AHM Servicing was approved as a GNMA mortgage-backed securities issuer and was a signatory and subject to certain guaranty agreements with GNMA whereby AHM Servicing assigned ownership of certain first lien, adjustable-rate residential mortgage loans on a servicing retained basis to GNMA (the "GNMA Portfolio").

16. On August 3, 2007, GNMA gave notice to AHM Servicing that AHM Servicing had defaulted under the terms of the guaranty agreements and that all rights, title and interest of the Debtors in the GNMA Portfolio terminated, and GNMA became the owner of the loans. The Debtors disputed the purported termination and did not turn over the GNMA Portfolio to GNMA.

17. On August 20, 2007, GNMA filed with this Court a Motion of the United States for an Order (I) Requiring Turn-Over of Non-Estate Property Belonging to the Government National Mortgage Association and (II) Declaring that the Government National Mortgagee Association Is Not Subject to the Automatic Stay, (the "Turn-Over Motion") [D.I. 243], and the Debtors filed an objection thereto [D.I. 600].

18. On September 20, 2007, at the request of the Debtors and GNMA, this Court entered a Stipulation and Order Resolving Motion of United States for an Order (I) Requiring Turnover of Non-Estate Property Belonging to the Government National Mortgage Association and (II) Declaring that the Government National Mortgage Association Is Not Subject to the Automatic Stay (the "Stipulation") wherein, inter alia, the Debtors and GNMA agreed to allow the Debtors to have until October 9, 2007 to execute a binding contract to sell the

GNMA Portfolio to a GNMA approved issuer/servicer in good standing, and until November 1, 2007 (the "Sale Deadline") to close such a sale [D.I. 863].

19. On October 9, 2007, the Debtors and MidFirst Bank reached an agreement for the sale of the GNMA Portfolio. The motion to approve the sale is currently before the Court.

## RELIEF REQUESTED

20. The Debtors have redacted portions of Purchase Agreement (the "Purchase Agreement"), attached to the Sale Motion as Exhibit A that reveal the purchase price percentage of the total aggregate outstanding principal balance of the Loans (as defined in the Purchase Agreement) that will be paid to the Debtors under the Purchase Agreement (the "Purchase Price Percentage"). By this Motion, the Debtors respectfully request that the Court enter an order (1) authorizing the Debtors to file an unredacted version of the Sale Motion under seal and directing that the unredacted Sale Motion shall remain under seal, confidential and not be made available to anyone, except to counsel to (a) the U.S. Trustee, (b) counsel to the Committee, (c) Bank of America, N.A., as Administrative Agent for the lenders under that certain Credit Agreement dated August 10, 2006, (the "Administrative Agent") or (d) others (i) at the discretion of the Debtors or (ii) upon further order of the Bankruptcy Court and (2) directing parties filing responsive pleadings to the Sale Motion file unredacted pleadings under seal.[2]

---

[2] An unredacted copy of the Sale Motion will be submitted to the Court in a separate prominently marked envelope as directed by Local Rule 9018-1(b).

## BASIS FOR RELIEF

21. Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the authority to issue orders that will protect entities from potential harm that may result from the disclosure of certain confidential information. This section provides in part that:

> On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may --
>
> (1) protect an entity with respect to a trade secret or confidential research, development, or commercial information; or
>
> (2) protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

11 U.S.C. § 107(b).

22. Bankruptcy Rule 9018 sets forth the procedures by which a party may move for relief under Bankruptcy Code section 107(b), and provides that "[o]n motion, or on its own initiative, with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information...." Fed. R. Bankr. P. 9018. Local Rule 9018-1(b) additionally provides, in relevant part, that "[a]ny party who seeks to file documents under seal must file a motion to that effect." Del. Bankr. L.R. 9018-1(b).

23. Unlike its counterpart in Rule 26(c) of the Federal Rules of Civil Procedure, section 107(b) of the Bankruptcy Code does not require an entity seeking such protection to demonstrate "good cause." See, e.g., Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.), 21 F.3d 24, 28 (2d Cir. 1994); Phar-Mor, Inc. v. Defendants Named Under Seal (In re Phar-Mor, Inc.), 191 B.R. 675, 679 (Bankr. N.D. Ohio 1995). Rather, if the material sought to be protected satisfies one of the categories identified in

section 107(b), "the court is required to protect a requesting party and has no discretion to deny the application." In re Orion Pictures Corp., 21 F.3d at 27.

24. The Debtors submit that the information contained in the publicly filed Purchase Agreement satisfies one of the categories in section 107(b). The Debtors submit that the Purchase Price Percentage constitutes confidential commercial information. Commercial information has been defined as information that would cause "an unfair advantage to competitors by providing them information as to the commercial operations of the debtor." In re Orion Pictures Corp., 21 F.3d at 27.

25. On August 6, 2007, the Debtors filed a motion for approval of procedures for the sale of certain assets used in the Debtors' loan servicing business, and ultimately the approval of a sale of such assets [Docket No. 11] (the "Servicing Sale Motion"), which was approved by order dated August 9, 2007 [Docket No. 113] (the "Servicing Sale Order").

26. On August 31, 2007, the Debtors provided notice of rescheduled dates of the deadline to submit bids, auction date, and hearing date in connection with the Servicing Sale Motion. As set forth more fully in the Sale Motion, the Debtors have determined that it is in its best interest to sell the Property (as defined in the Purchase Agreement) separately and immediately.

27. The Debtors and MidFirst Bank ("MidFirst") have agreed to the terms embodied in the Purchase Agreement which provides for MidFirst to buy the Property from the Debtors and the Debtors to sell, transfer, assign and convey the Property to MidFirst free and clear of all interests, including liens, claims, security interests, pledges and other encumbrances without any representations or warranties of any kind. In addition, the Debtors have agreed to relinquish their servicing obligations with respect to the Property and MidFirst has agreed to

assume these servicing obligations after close of business on November 1, 2007, or a later date mutually acceptable to MidFirst, GNMA and the Debtors.

28. Further, the Debtors have determined that the private sale of the Property will not hinder or diminish the value of the bulk of the loan servicing assets to be sold pursuant to the Servicing Sale Motion. However, in order to ensure that the Debtors can maximize the value of the remaining servicing assets, filing certain portions of the Sale Motion under seal that disclose the Purchase Price Percentage is necessary to allow the Debtors to negotiate the best possible terms of agreements for other servicing assets, either with a purchaser of the Debtors' servicing assets in bulk, or with parties who are similarly situated to MidFirst. Disclosure of the Purchase Price Percentage would harm and prejudice the Debtors by enabling other potential buyers access to confidential sale information. Such potential buyers may use the Purchase Price Percentage contained in the unredacted Sale Motion as leverage against the Debtors and/or MidFirst as they negotiate the terms of other servicing asset sales with the Debtors.

29. In order to safeguard the Debtors' ability to negotiate even more advantageous agreements with other potential buyers, the Debtors respectfully request that this Court grant the relief requested herein. Based on the circumstances described above, the Debtors believe that they have provided sufficient evidence to show that filing certain portions of the Sale Motion under seal outweighs the presumption of public access to court records and the settlements. See In re Muma Services, Inc. et al., 279 B.R. 478, 485 (Bankr. D. Del. 2002). Permitting the Debtors to file certain unredacted portions of the Sale Motion under seal will serve the purpose of maximizing value for the Debtors' creditors, as well as to assist the Debtors in furtherance of the servicing asset sale process. Id.

30. To ensure that the key constituencies in these cases receive adequate disclosure, the Debtors will provide copies of the unredacted Sale Motion to counsel to (i) the U.S. Trustee, (ii) counsel to the Committee, and (iii) the Administrative Agent, which parties shall be required to keep the Sale Motion confidential. The Debtors submit that such disclosure will provide sufficient safeguards to ensure that the relief requested in this Motion to File Under Seal will not adversely affect the interests of parties to these chapter 11 proceedings.

### NOTICE

31. The Debtors will serve this Motion on the following Parties: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) the Administrative Agent; (iv) counsel to the DIP Lender; (v) counsel to the MidFirst; (vi) counsel to Government National Mortgage Association ("GNMA"); (vii) the U.S. Securities and Exchange Commission; (viii) any creditor known by the Debtors to be asserting a Lien on the Property; (ix) all parties known to have expressed an interest in purchasing the Property; (x) local, state and federal taxing authorities; and (xi) all parties entitled to notice under Local Rule 2002-1(b).

32. The Debtors have filed a motion to shorten the time for notice of this Motion contemporaneously herewith (the "Motion to Shorten"). As noted herein and in the Motion to Shorten, the Debtors submit that based on the enhanced value available through an immediate private sale, the fact that the private sale will not interfere with the sale of the remainder of the Debtors' servicing assets and the resolution of certain disputes with GNMA, the Debtors submit that no other or further notice is appropriate or required.

WHEREFORE, the Debtors respectfully request that this Court enter an order substantially in the form attached hereto authorizing the Debtors to file an unredacted version of the Sale Motion under seal and grant such other relief as the Court deems just and proper.

Dated: Wilmington, Delaware
October 15, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Donald J. Bowman, Jr. (No. 4383)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors-in-Possession