# **EXHIBIT A**

## EMC MORTGAGE CORPORATION

## SERVICING RIGHTS PURCHASE AND SALE AGREEMENT

**THIS SERVICING RIGHTS PURCHASE AND SALE AGREEMENT**, dated as of the ____ day of October, 2007, is hereby mutually agreed upon and entered into by and between EMC MORTGAGE CORPORATION, a Delaware corporation ("EMC" or "Purchaser"), and AMERICAN HOME MORTGAGE SERVICING, INC., a Maryland corporation ("Servicer" or "Seller"). Servicer and certain of its affiliates are each a debtor and debtor-in-possession under Title 11 of the United States Code (11 U.S.C. §101 et seq.), as amended (the "Bankruptcy Code").

## WITNESSETH:

**WHEREAS**, EMC, American Home Mortgage Corp., a New York corporation ("AHM") and Servicer, entered into a Purchase, Warranties and Servicing Agreement dated as of March 1, 2006 (as may have been amended from time to time, the "Servicing Agreement"), pursuant to which EMC has purchased from AHM certain first lien, adjustable-rate residential mortgage loans on a servicing retained basis;

**WHEREAS**, Servicer has serviced and administered the Mortgage Loans (as hereinafter defined) on behalf of EMC pursuant to the Servicing Agreement;

**WHEREAS**, on August 6, 2007 Servicer and certain of its affiliates filed for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, in the bankruptcy case captioned *In re American Home Mortgage Holdings, Inc., a Delaware Corporation, et al.*, Case No.07-11047 (CSS) Jointly Administered (the "Bankruptcy Case"), and Servicer remains in possession and control of its assets as of the date hereof; and

**WHEREAS**, Purchaser and Servicer desire to set forth the terms and conditions pursuant to which Servicer will sell, transfer and assign to Purchaser all of Servicer's right, title and interest in and to the Servicing Rights, and Purchaser will purchase and assume all right, title and interest in and to the Servicing Rights.

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and conditions and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and upon the terms and subject to the conditions set forth herein, the Parties hereto agree as follows:

## ARTICLE I.

### DEFINITIONS

As used in this Agreement, the following terms shall have the meanings specified below.

"Accepted Servicing Practices" means, with respect to any Mortgage Loan, those mortgage servicing practices of prudent mortgage lending institutions that service

mortgage loans of the same type as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located.

"Advances" means, with respect to the Mortgage Loans, all customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) advanced by the Servicer in the performance of its servicing obligations, including, but not limited to, the cost of (a) the preservation, restoration and protection of the Mortgaged Property, (b) any enforcement or judicial proceedings, including foreclosures, (c) the management and liquidation of the Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage, and (d) compliance with the obligations under the Servicing Agreement (except with respect to any expenses incurred in connection with procuring or transferring Tax Service Contracts as provided therein).

"Agency" or "Agencies" means Fannie Mae or Freddie Mac, as applicable.

"Agreement" means this Servicing Rights Purchase and Sale Agreement, including all amendments, supplements, and Exhibits hereto.

"Ancillary Income" means all late charges, assumption fees, reinstatement fees, and escrow account benefits or similar types of fees arising from or in connection with any Mortgage Loan, to the extent not otherwise payable to the Mortgagor under applicable law or pursuant to the terms of the related Mortgage Note.

"Applicable Requirements" means, as of the time of reference, (i) the Accepted Servicing Practices; (ii) all contractual obligations of Servicer with respect to the Servicing Rights, including without limitation those contractual obligations contained herein, in the Servicing Agreement or in the Mortgage Loan Documents; (iii) all applicable federal, state, and local laws, statutes, rules, regulations, and ordinances applicable to Servicer or to the Servicing Rights; and (iv) all other judicial and administrative judgments, orders, approvals, stipulations, awards, writs, and injunctions applicable to Servicer, the Servicing Rights, or the related Mortgage Loans.

"Assignments of Mortgage Instruments" means an assignment of Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction where the related Mortgaged Property is located to reflect the transfer of the Mortgage to the party indicated therein or if the related Mortgage has been recorded in the name of MERS or its designee, such actions as are necessary to cause the designee to be shown as the owner of the related Mortgage on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS.

"Bankruptcy Code" has the meaning set forth in the introductory paragraph of this Agreement.

"Bankruptcy Loan" means a Mortgage Loan with respect to which, as of the Transfer Date, the Mortgagor thereon has sought relief under or has otherwise been subjected to the federal bankruptcy laws under the Bankruptcy Code or any other similar federal or

state laws of general application for the relief of debtors, through the institution of appropriate proceedings, and such proceedings are continuing.

"Business Day" shall mean any day other than a Saturday, Sunday, or other day on which banking institutions in the State of New York are required or authorized by law or by executive order to be closed.

"Claim" has the meaning set for in Section 101(5) of the Bankruptcy Code, including any third-party claim, demand or litigation.

"Custodial Accounts" means the accounts in which Custodial Funds are deposited and held by Servicer pursuant to the Servicing Agreement.

"Custodial Funds" means all funds held by Servicer with respect to the related Mortgage Loans including, but not limited to, all principal and interest funds and any other funds due to the Investor that are maintained by Servicer relating to the Mortgage Loans.

"Custodian" means an entity acting as a mortgage loan document custodian under any custodial agreement or pursuant to Applicable Requirements.

"Cut-off Date" means the close of business one Business Day prior to the Sale Date.

"Encumbrance" means any security interest, pledge, hypothecation, mortgage, lien (including environmental and tax liens), violation, charge, lease, license, encumbrance, servient easement, adverse claim, reversion, reverter, preferential arrangement, restrictive covenant, condition, or restriction of any kind, including any restriction on the use, voting, transfer, receipt of income, or other exercise of any attributes of legal ownership.

"Escrow Account" means the accounts in which Escrow Funds are deposited and held by a Servicer pursuant to the Servicing Agreement.

"Escrow Funds" means funds held by the Servicer with respect to the Mortgage Loans for the payment of taxes, assessments, insurance premiums, ground rents, funds from hazard insurance loss drafts, other mortgage escrow and impound items, and similar charges (including interest accrued thereon for the benefit of the Mortgagors under the Mortgage Loans, if applicable), maintained by Servicer relating to the Mortgage Loans.

"Exhibit" means an exhibit attached hereto or delivered or to be delivered pursuant to this Agreement.

"Flood Contract Deduction" shall have the meaning ascribed to it in section 2.09(b)(ii) of this Agreement.

"HUD" means United States Department of Housing and Urban Development or any successor thereto.

"Insurer" or "Insurers" means any Person providing any standard hazard insurance policy, any federal flood insurance policy, any title insurance policy, any earthquake insurance policy, or any other insurance policy applicable to a Mortgage Loan and any

3

successor thereto, including, without limitation, as applicable, an Agency, private mortgage insurer, or other insurer or guarantor under such policies.

"Investor" means with respect to each Mortgage Loan, EMC, in its capacity as the owner of such Mortgage Loan, and any successor or assigns as an owner thereof.

"Litigation Loan" means a Mortgage Loan with respect to which, as of the Transfer Date, any litigation is pending relating to the Mortgage Loan and materially and adversely affecting the value of the related Servicing Rights or subjecting the Servicer to potential liability or cost (excluding class action lawsuits or loan level lawsuits that do not affect the value of the Servicing Rights).

"Loss" or "Losses" means any and all direct, actual and out-of-pocket losses, damages, deficiencies, claims, costs, or expenses, including without limitation, reasonable attorneys' fees and disbursements.

"MERS" means the Mortgage Electronic Registration System that enables members to execute and deliver an Assignment of Mortgage Instrument with respect to a Mortgage Loan to MERS for recording in the office of the appropriate local jurisdiction.

"MERS Deduction" shall have the meaning ascribed to it in section 2.06 of this Agreement.

"Missing Document Deduction" shall have the meaning ascribed to it in section 2.07 of this Agreement.

"Mortgage Escrow Payments" means the portion, if any, of the Mortgage Loan Payment in connection with a Mortgage Loan that will, upon receipt by Servicer, become part of the Escrow Funds.

"Mortgage File" means the file containing copies in the form set forth in Section 2.07, and original documents to the extent required by the Applicable Requirements, of the Mortgage Loan Documents with respect to a Mortgage Loan, as well as the related credit and closing packages, disclosures, custodial documents, and all other files, books, records and documents necessary, as applicable, to (i) establish the eligibility of the Mortgage Loan for insurance by an Insurer, (ii) service the Mortgage Loan in accordance with Applicable Requirements, and (iii) comply with Applicable Requirements regarding the Mortgage Loan documentation to be maintained by servicer of the Mortgage Loan or document custodian with respect to such Mortgage Loan.

"Mortgage Instrument" means any deed of trust, security deed, mortgage, security agreement, or any other instrument that constitutes a first lien on real estate securing payment by a Mortgagor of a Mortgage Note.

"Mortgage Loan" means the one-to-four family residential mortgage loans listed on the Mortgage Loan Schedule as to which Servicer is the owner of the Servicing Rights under the Servicing Agreement.

"Mortgage Loan Documents" means (a) with respect to any Mortgage Loan (i) the original Mortgage Note or a copy of the Mortgage Note, with a lost note affidavit, (ii) the original Mortgage Instrument, (iii) a mortgagee title insurance policy (or other evidence of title acceptable under Applicable Requirements), (iv) any private mortgage insurance policy, and (v) the original, recorded Assignments of Mortgage Instrument(s), along with such other documents or instruments, or substitutes therefor, as are required to be retained by the Custodian pursuant to Applicable Requirements.

"Mortgage Loan Payment" means, with respect to a Mortgage Loan, the amount of each monthly installment on such Mortgage Loan, whether principal and interest or interest alone or escrow or other payment, required to be paid by the Mortgagor in accordance with the terms of the Mortgage Loan Documents.

"Mortgage Loan Schedule" means the schedule of the related Mortgage Loans to be attached hereto as Exhibit B or provided in electronic form by Servicer to Purchaser setting forth information with respect to such Mortgage Loans.

"Mortgage Note" means the promissory note executed by a Mortgagor and secured by a Mortgage Instrument evidencing the indebtedness of the Mortgagor under a Mortgage Loan.

"Mortgaged Property" means the fully constructed one-to-four family residential real property that is encumbered by a Mortgage Instrument, including all buildings and fixtures thereon and all accessions thereto, including installations of mechanical, electrical, plumbing, heating, and air conditioning systems located in or affixed to such buildings, and all alterations, additions, and replacements.

"Mortgagor" means any obligor under a Mortgage Note or a Mortgage Instrument.

"Order" means any order or ruling issued by the United States Bankruptcy Court for the District of Delaware and such other Court having jurisdiction over Servicer's Bankruptcy Case that is applicable to the Agreement and the rights and obligations of the parties hereto.

"Parties" means Servicer and Purchaser.

"Payment Date" means the thirty (30) days from the date on which Servicer has delivered to Purchaser or Purchaser's sub-servicer or Purchaser's other designee all related Escrow Funds, Custodial Funds and Mortgage Files in conformity with the Servicing Transfer Instructions and this Agreement.

"Person" means an individual, a corporation, a partnership, a limited liability company, a joint venture, a trust, an unincorporated association or organization, or a government body, agency or instrumentality, rather than the meaning set forth in Section 101(41) of the Bankruptcy Code.

"Prepayment Charge" means with respect to any Mortgage Loan, the charges or premiums, if any, due in connection with a Principal Prepayment of such Mortgage Loan,

in accordance with the terms of the related Mortgage Note or Mortgage Instrument, and in accordance with applicable state and federal laws.

"Principal Prepayment" means any recovery of principal on a Mortgage Loan that is received in advance of such principal's scheduled due date and that is not accompanied by an amount of interest representing scheduled interest due on any date subsequent to the month of prepayment.

"Purchase Price" means, with respect to Servicing Rights to be sold to Purchaser hereunder, the total amount to be paid by Purchaser to Servicer pursuant to Article III to acquire the Servicing Rights.

"Purchase Price Percentage" means ███

"Purchaser" has the meaning set forth in the introductory paragraph of this Agreement.

"Sale Date" means the same date as the Transfer Date.

"Servicer" has the meaning set forth in the introductory paragraph of this Agreement.

"Servicing Agreement" has the meaning set forth in the recitals of this Agreement.

"Servicing Fee" means the amount payable to Servicer under the Servicing Agreement related to a Mortgage Loan, as consideration for servicing the Mortgage Loan.

"Servicing Rights" means the rights and obligations of Servicer to administer, collect the payments for the reduction of principal and application of interest, collect payments on account of taxes and insurance, pay taxes and insurance, remit collected payments, provide foreclosure services, provide full escrow administration and any other obligations and rights required for or in connection with, the Mortgage Loans pursuant to the Servicing Agreement, together with the right to receive the Servicing Fee, Prepayment Charges, if any, reimbursement for Advances and any Ancillary Income arising from or connected to the Mortgage Loans, and all rights, powers, and privileges incident to any of the foregoing.

"Servicing Transfer Instructions" means the instructions detailing the procedures pursuant to which Servicer shall effect the transfer of Servicing Rights, Mortgage Files and Servicing Agreements to Purchaser, which instructions are attached hereto as Exhibit A.

"Tax Contract Deduction" shall have the meaning ascribed to it in section 2.09(a)(ii) of this Agreement.

"Tax Service Contract" means a paid in full, fully assignable, life of loan real estate tax service contract with respect to a Mortgage Loan.

"Transfer Date" means November 7, 2007.

6

## ARTICLE II.

### TRANSFER OF SERVICING RIGHTS

Section 2.01.  Conveyance of Servicing Rights.

(a)  Upon the terms and subject to the conditions of this Agreement, and subject to the Applicable Requirements, Servicer shall, on the Sale Date, sell, and on the Transfer Date, transfer and assign to Purchaser, and Purchaser shall, on the Sale Date, purchase, and on the Transfer Date, assume from Servicer, all right, title, interest and obligation of Servicer in and to: (i) the Servicing Rights, and all rights related thereto, (ii) the Advances, (iii) the Custodial Funds and Escrow Funds, (iv) the Mortgage Files, (v) the exclusive right to enter into arrangements that generate, or to otherwise receive, Ancillary Income with respect to the Mortgage Loans, (vi) the right to collect and retain Prepayment Charges, and (vii) the Tax Service Contracts, provided however, that any Ancillary Income accrued prior to the Sale Date shall be retained by the Servicer.  The Servicing Rights that are being sold as of the Sale Date and transferred by Servicer on the Transfer Date shall be transferred and assigned to and accepted by Purchaser on an "as is" "where is" and "with all faults" conditions, free of any warranties or representations whatsoever, whether express or implied, except as expressly set forth in this Agreement.

(b)  On the Transfer Date, the Servicer shall deliver to Purchaser such other instruments of assignment, transfer and conveyance, and do such other acts as are reasonably necessary to effectuate the transfer, assignment and delivery to Purchaser of the right, title and interest of the Servicer in and to the Servicing Rights to be sold, transferred, assigned and delivered to Purchaser on such date pursuant to Article II free and clear of any Encumbrances.

(c)  This Agreement shall terminate the Servicing Agreement, provided however that this Agreement shall not affect any party's rights pursuant to any assumption assignment and recognition agreements (the "AARs").  To the extent any AARs incorporate terms of the Servicing Agreement, such terms remain in effect and survive the termination of the Servicing Agreement with respect to the AARs.  Purchaser hereby releases and waives any and all claims or causes of action arising prior to the Transfer Date that Purchaser may have against: (1) the Servicer arising under or in connection with the Servicing Agreement, and (2) AHM related to the servicing of the Mortgage Loans by the Servicer pursuant to the Servicing Agreement; provided, however, that this termination and release shall not affect (i) any other claims that Purchaser may have against AHM under the Servicing Agreement (it being acknowledged that any such claims against AHM would not relate to the servicing of the Mortgage Loans by the Servicer pursuant to the Servicing Agreement); (ii) any claims that Purchaser may have against Servicer with respect to the servicing by Servicer of mortgage loans (other than the Mortgage Loans) purchased from AHM by Purchaser under the Servicing Agreement; and (iii) any claims that Purchaser may have against Servicer and/or AHM not pertaining to the Servicing Agreement.

Section 2.02.  Assumption of Liabilities.

Upon the terms and subject to the conditions of this Agreement, and subject to the Applicable Requirements, Purchaser shall, on the Transfer Date, accept the appointment to service the Mortgage Loans and become fully vested with all the rights, powers, duties,

7

responsibilities, obligations and liabilities of the Servicer, with like effect as if named as of the Transfer Date as the successor to the Servicer under the Servicing Agreement and the Custodial Agreement with respect to any Servicing Rights and related assets described in Section 2.01, pursuant to the Servicing Agreement, and any other liabilities as are expressly assumed by Purchaser under this Agreement.

Section 2.03.  Evidence of Transfer.

Pursuant to this Agreement, as of the Sale Date, Seller and Purchaser agree that as of the Transfer Date, Seller hereby assigns and Purchaser hereby assumes the Servicing Rights and the servicing for the Mortgage Loans, in which such servicing by Seller under the Servicing Agreement will be terminated for the Mortgage Loans and servicing by Purchaser will commence for the Mortgage Loans.

On or prior to the Transfer Date, Purchaser and Servicer shall execute and deliver the documents required to be executed and delivered under this Agreement, in form and substance reasonably satisfactory to Purchaser and Servicer, and shall execute and deliver such other instruments or documents as Purchaser and Servicer shall reasonably determine are necessary or appropriate to effectuate or evidence the transactions contemplated hereby.

Section 2.04.  Servicing Transfer Instructions.

In connection with the transfer of Servicing Rights from Servicer to Purchaser or any sub-servicer designated by Purchaser pursuant to this Agreement, Servicer and Purchaser shall follow the Servicing Transfer Instructions, attached hereto as Exhibit A.  The Servicing Transfer Instructions may be modified by mutual agreement between Purchaser and Seller.

Section 2.05.  Delivery of Mortgage Loan Data and Files.

(a)    Transfer Date Data Tapes.  No later than five (5) days before the Transfer Date hereunder, Servicer shall provide Purchaser with a preliminary tape(s) containing the information necessary to transfer the Servicing Rights to be sold on the Transfer Date and within one business day after the Transfer Date, Servicer shall deliver to the Purchaser the final data tapes.

(b)    Delivery of Mortgage Loan Files.  No later than two (2) Business Days prior to the Transfer Date, Servicer shall, in accordance with the Servicing Transfer Instructions, provide Purchaser, Purchaser's sub-servicer or Purchaser's other designee with the data, information and materials reasonably necessary for Purchaser, Purchaser's sub-servicer or Purchaser's other designee to service the Mortgage Loans, including, but not limited to, Mortgage Notes (including e-Notes), riders, loan modification documents, and servicing files, but excluding the final data tapes, in accordance with the Applicable Requirements.  Servicer shall, at Servicer's sole expense and in accordance with the Servicing Transfer Instructions, package and ship to Purchaser or Purchaser's sub-servicer or Purchaser's other designee for inside delivery, to be received by Purchaser or Purchaser's sub-servicer or Purchaser's other designee no later than five (5) Business Days after the Transfer Date, all Mortgage Files pertaining to the Mortgage Loans and the related servicing records in Servicer's possession.  Servicer shall provide Purchaser with prior written notice of the carrier, shipping arrangements, and insurance arrangements with respect to the delivery of the Mortgage Files.

8

(c)     Power of Attorney.   As of the date of this Agreement, Seller hereby irrevocably constitutes and appoints Purchaser and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full power and authority in the place and stead of Seller, and in the name of Seller or in its own name, from time to time, for the purpose of carrying out the terms of this Agreement (including the transfer of the Servicing Rights and servicing functions for the Mortgage Loans hereunder) and complying with the terms of the related Mortgage Loan Documents as the Servicer thereof, and to take any and all appropriate action and execute any and all documents and instruments which may be necessary or appropriate to accomplish the purpose of this Agreement (including without limitation the transfer of the Servicing Rights and servicing functions for the Mortgage Loans to the Purchaser hereunder) and comply with the terms of the Mortgage Loan Documents as the Servicer thereof, including without limitation the preparation and mailing or other distribution of goodbye letters to the related Mortgagors.  Seller shall distribute the goodbye letters to the related Mortgagors, provided that Purchaser shall reimburse all reasonable documented expenses with respect to the same.  Without limiting the generality of the foregoing, as of the Sale Date, Seller hereby grants Purchaser, as its true and lawful attorney-in-fact, the power and authority on behalf of Seller, without notice to or assent by Seller, to do and perform the following: (a) endorse, negotiate, deliver and deposit any checks, draft, money order or other form of payment on the Mortgage Loans; and (b) execute, endorse, seal, acknowledge, deliver and file any documents or instruments that (i) endorse or transfer any Mortgage Note to the Investor or its assignees, (ii) assign or transfer any Mortgage to the Investor or its assignees, and (iii) maintain and protect the validity, priority or value of the lien created by any Mortgage.  On or before the Sale Date, Seller shall deliver to Purchaser thirty-five (35) originals of a special and limited power of attorney in the form of Exhibit C attached hereto, which will be dated and effective as of the Sale Date. From time to time, if requested by Purchaser, Seller shall execute and deliver additional originals of such special and limited power of attorney to facilitate the foregoing appointment and grant in this Section.

Section 2.06.   Recordation of Assignments of Mortgage.

Servicer shall take all such actions as may be necessary to transfer or record all right, title and interest in the Mortgage Loans to Purchaser and the Servicing Rights with respect to the Mortgage Loans to Purchaser, consisting of: (i) assigning nominal title to the related Mortgage Loans to Purchaser; (ii) preparing or causing to be prepared all prior intervening Assignments of Mortgage Instruments, and recording such Assignments of Mortgage Instruments if required under Applicable Requirements; and (iii) endorsing or causing to be endorsed the related Mortgage Notes in accordance with Applicable Requirements.  Servicer shall bear all costs associated with the preparation and recording of the Assignments of Mortgage Instruments described in (i) and (ii) above, and the preparation of the endorsements described in (iii) above.  Servicer shall forward to the Custodian the original recorded Assignments of Mortgage Instruments upon return from the recording office on a weekly basis and forward to Purchaser a report of all original recorded Assignments delivered to Custodian. Servicer shall (X) provide or assist Purchaser in the procurement or execution of such affidavits, land court orders or other documents as it currently uses to evidence Servicer's ownership of such Servicing Rights, and (Y) prepare such endorsements or prepare and record such intervening Assignments of Mortgage Instruments as may be required to reflect of record Servicer's ownership of such Servicing Rights in any jurisdiction or recording office that refuses to accept the documents

described in clause (X) as proof of Servicer's ownership of such Servicing Rights, and Servicer shall in each case bear all reasonable costs associated therewith.

Notwithstanding the foregoing provisions of this Section 2.06, if a Mortgage Loan already is registered with MERS, Servicer shall follow the requirement of MERS to reflect in the records of MERS the transfer of the Servicing Rights to the Mortgage Loan from Servicer to Purchaser. Servicer shall continue the transmission of recording information of the Mortgage Instruments to MERS after the Transfer Date, until all such recording information is received and transmitted to MERS and Purchaser, which in any event and under all circumstances shall be completed not later than three (3) days after the Transfer Date. Servicer shall bear all costs and all responsibility associated with the registration of a Mortgage Loan with MERS, to the extent done before the Transfer Date, including, without limitation, the related preparation and recordation of an Assignment of Mortgage Instrument, and all costs and responsibility associated with the reflection of the transfer of Servicing to the Mortgage Loan in the records of MERS. For each Mortgage Loan registered with MERS, Servicer shall provide Purchaser with the MERS mortgage loan identification number in an electronic format acceptable to the parties.

Notwithstanding the first paragraph of this Section 2.06, if a Mortgage Loan is not registered with MERS as of the Cut-off Date, then Seller shall pay Purchaser a processing and assignment recording fee of thirty-five dollars ($35.00) per Mortgage Instrument, which payment will be made by deduction from the Purchase Price payment to Seller (the "MERS Deduction").

Section 2.07.    Transfer of Mortgage Loan Files.

Servicer shall be responsible for ensuring all documents comprising the Mortgage File held by or on behalf of Servicer, related to the Mortgage Loans and that are not already held by the Custodian, are transferred to Purchaser in a timely manner including, but not limited to, Mortgage Notes (including e-Notes), riders, loan modification documents and servicing files. In the event the required Mortgage Loan files and documents other than recorded mortgages, interim assignments and title policies are not received within ten (10) days following the Transfer Date, then Servicer shall pay Purchaser for Purchaser's reasonable costs associated with creating or obtaining any required missing Mortgage Loan Documents, which payment will be made by deduction from the Purchase Price payment to Seller (the "Missing Documents Deduction").

Section 2.08.    Transfer of Escrows Funds, Custodial Funds, Advances and Reconciliation.

Within two (2) Business Days after the Transfer Date, the Servicer shall remit and deliver to Purchaser, or Purchaser's sub-servicer or Purchaser's other designee, Escrow Funds Custodial Funds and all other funds and collections, the legal, right, title, and interest to which were transferred to Purchaser on the Transfer Date and shall reconcile such amounts with Purchaser in accordance with the Servicing Transfer Instructions.

Section 2.09.    Transfer of Tax and Flood Contracts.

(a)    No later than five (5) days prior to the related Transfer Date, Seller shall provide Purchaser with an electronic file of the Mortgage Loans which shall set forth whether each Mortgage Loan is or is not covered by a Tax Service Contract as of the Cut-off

Date.  Based on the existence of and/or type of Tax Service Contract in place, the following shall apply:

(i)      If a Mortgage Loan is covered by a Tax Service Contract issued by Fidelity as of the Cut-off Date, then Seller shall assign and transfer such contract to Purchaser, without further cost to Purchaser, on or before the Transfer Date.

(ii)     If a Mortgage Loan is <u>not</u> covered by a Tax Service Contract issued by Fidelity as of the Cut-off Date, then Seller shall pay Purchaser forty-six dollars ($46.00) for each such Mortgage Loan, which payment will be made by deduction from the Purchase Price payment to Seller (the "<u>Tax Contract Deduction</u>").

(b)  No later than fifteen (15) days prior to the Transfer Date, Seller shall provide Purchaser with an electronic file of the related Mortgage Loans which shall set forth whether each Mortgage Loan is or is not covered by fully transferable life-of-loan flood contract issued by First American as of the Cut-off Date.

(i)      If a Mortgage Loan is covered by a transferable life-of-loan flood contract issued by First American as of the Cut-off Date, then Seller shall assign and transfer such contract to Purchaser, without further cost to Purchaser, on or before the Transfer Date.  Within five (5) days following the Transfer Date, Seller shall assign and transfer, in an electronic file format, the transferable life-of-loan flood certifications and contract information to Purchaser.

(ii)     If a Mortgage Loan is <u>not</u> covered by a transferable life-of-loan flood contract issued by First American as of the Cut-off Date, then Seller shall pay Purchaser ten dollars ($10.00)  for each such Mortgage Loan, which payment will be made by deduction from the Purchase Price payment to Seller (the "<u>Flood Contract Deduction</u>").

Section 2.10.  <u>Costs of Transfer.</u>

Except as otherwise provided herein, (i) Seller shall be responsible for all transfer and recording fees, costs and expenses with respect to the transfer of Servicing Rights, the delivery of Mortgage Loan Files and related documents, the remittance of Custodial Funds, and all other fees, costs and expenses incurred by Servicer in Servicer's performance of Servicer's obligations under this Agreement, including without limitation the fees, costs and expenses of Servicer's document custodian, attorneys and accountants and (ii) Purchaser shall be responsible for the fees, costs and expenses of the Purchaser in its performance of its obligations under this Agreement, including without limitation the fees of the Purchaser's attorneys and accountants.

Section 2.11.  <u>Statements.</u>

For the period beginning on January 1, 2007 and ending on the Transfer Date, Seller shall provide, and for the period beginning on the Transfer Date and ending on December 31, 2007, Purchaser shall provide each Mortgagor with an annual year-end statement in accordance with reasonable requirements of the Investor, and in accordance with Internal Revenue Service and/or Treasury Department regulations.  Seller shall not have any responsibility for providing such information for the period of time the Mortgage Loan was

11

serviced by Purchaser, and Purchaser shall not have any responsibility for providing such information for the period of time the Mortgage Loan was serviced by Seller.

Section 2.12.   Notice to Borrowers.

As soon as practicable but no later than 10 days prior to the Transfer Date, Purchaser shall, on behalf of the Servicer and the Purchaser, deliver to each borrower under a Mortgage Loan a letter advising the borrower of the transfer of Servicing Rights contemplated herein. Such letter shall be mutually agreeable to the parties and shall comply with all Applicable Requirements, including, without limitation, the federal Real Estate Settlement Procedures Act, as amended, and Regulation X, as amended. Purchaser shall pay all costs of such letter.

Section 2.13.   Servicing Prior to Transfer Date.

On and prior to the Transfer Date, the Servicer shall discharge such duties and responsibilities during the period from the date hereof until the Transfer Date with the same degree of diligence and prudence that Servicer is obligated to exercise under the Servicing Agreement.

Section 2.14.   Servicing Following Transfer Date.

Purchaser shall assume responsibility for servicing the Mortgage Loans for which it has purchased the Servicing Rights effective as of the Transfer Date. Following such transfer of servicing, Purchaser shall be responsible for servicing each such Mortgage Loan in accordance with Applicable Requirements. Each of Purchaser and Seller hereby agrees and acknowledges that Seller shall not be responsible for monitoring any of the obligations of Purchaser to service the Mortgage Loans. In addition, each of Seller and Purchaser hereby agrees and acknowledges (i) that Seller shall not have any liability for the administration or servicing by Purchaser of the Mortgage Loans or the manner in which Purchaser services the Mortgage Loans for the benefit of the Investor on and after the Transfer Date, and (ii) that Purchaser shall not have any liability for the administration or servicing by Seller of the Mortgage Loans or the manner in which Seller has serviced the Mortgage Loans for the benefit of the Investor prior to the Transfer Date.

Section 2.15.   Forwarding Post-Transfer Date Items.

Servicer shall forward, within two (2) Business Days of receipt thereof, to Purchaser, Purchaser's sub-servicer, or Purchaser's other designee, all Mortgagor correspondence, insurance notices, tax bills, or any other correspondence or documentation related to the transferred Servicing Rights and the Advances that are received by Servicer after the Transfer Date. Without limiting the generality of the forgoing, Servicer shall forward to Purchaser, by first class mail, within one (1) Business Day after the date on which such payments are received by Servicer, any Mortgage Loan payments due Purchaser that are received by Servicer after the Transfer Date.

12

## ARTICLE III.

### TRANSFER OF SERVICING RIGHTS

Section 3.01.  Purchase Price.

In full consideration for the transfer and sale of Servicing Rights as of the Transfer Date, Purchaser shall pay to Servicer in the manner provided in Section 3.03, and subject to the adjustments provided for in this agreement, an amount equal to (i) the Purchase Price Percentage multiplied by the aggregate unpaid principal balance of the Mortgage Loans as of the Cut-off Date, excluding the aggregate unpaid principal balances of Litigation Loans as of the Cut-off Date, Bankruptcy Loans as of the Cut-off Date and Mortgage Loans that are ninety (90) or more days past due as of the Cut-off Date, plus (ii) all outstanding documented Advances funded by Servicer in accordance with the terms of the Servicing Agreement, less (iii) the MERS Deduction, the Tax Contract Deduction, the Flood Contract Deduction and the Missing Documents Deduction, if any.

Section 3.02.  Verification of Purchase Price Items.

Within five (5) Business Days prior to the Transfer Date, Seller shall provide Purchaser with a preliminary Mortgage Loan Schedule that sets forth the Mortgage Loans as of the Cut-off Date, the aggregate actual unpaid principal balance of each such Mortgage Loan as of the related Cut-off Date, and all other mortgage loan data reasonably required by Purchaser at such time. If Purchaser notifies Seller that the preliminary Mortgage Loan Schedule is acceptable, then the Mortgage Loan Schedule shall become final, subject to an updated schedule being provided by Seller for all Mortgage Loan collections and payment activity as of the close of business on the Business Day immediately preceding the Transfer Date. If, however, after reviewing the preliminary Mortgage Loan Schedule, Purchaser reasonably believes that there is an error in the preliminary Mortgage Loan Schedule, Purchaser may so notify Seller and in such event the Parties shall cooperate in connection with resolving the matter. Upon resolution of the matter, the Mortgage Loan Schedule shall be finalized, after any applicable revisions to the preliminary Mortgage Loan Schedule are made.

Section 3.03.  Payment of Purchase Price by Purchaser.

The Purchase Price for the Servicing Rights shall be paid by Purchaser to Servicer as follows:

(a)  Sale Date.  On the Sale Date, Purchaser shall pay to Servicer by wire transfer of immediately available funds (i) eighty percent (80%) of the estimated portion of the Purchase Price attributable to Section 3.01(i) hereof, as adjusted for any unpaid amounts due Purchaser attributable to Section 3.01(iii) and (ii) one hundred percent (100%) of the portion of the Purchase Price attributable to the outstanding and unreimbursed Advances of the Servicer pursuant to Section 3.01(ii). To the extent the Purchase Price Percentage, unpaid principal balance of the Mortgage Loans, or amount of Advances as of the Transfer Date cannot be definitively determined, the forgoing calculations shall be based on such figures and amounts most recently available, and the amount of the Purchase Price paid as a result adjusted to reflect

the Sale Date figures and amounts by an addition or subtraction to the amount paid pursuant to Section 3.03(b), as appropriate.

(b)     Payment Date. Subject to the adjustments set forth in Section 3.03(a), on the Payment Date, Purchaser shall pay to Servicer by wire transfer of immediately available funds twenty percent (20%) of the portion of the Purchase Price attributable to Section 3.01(i) hereof applicable to the Servicing Rights transferred on the Transfer Date, as adjusted for any unpaid amounts due Purchaser attributable to Section 3.01(iii).

(c)     Adjustments. If within sixty (60) days after the payment of all or any portion of the Purchase Price, transfer of the Custodial Funds, payment for the Advances or the payment or transfer of any other amounts due under this Agreement to either Party, an error is discovered with respect to the calculation of the payment or amount transferred, within five (5) Business Days after the receipt of information sufficient to provide notice that payment is due, the Party benefiting from the error shall pay an amount sufficient to correct and reconcile the error and shall provide a reconciliation statement and such other documentation sufficient to satisfy the other Party (in such other Party's exercise of its reasonable discretion), concerning the accuracy of such reconciliation.

## ARTICLE IV.

### REPRESENTATIONS AND WARRANTIES: REMEDIES FOR BREACH

Section 4.01.    Representations and Warranties of the Servicer.

Servicer hereby makes the following representations and warranties as of the Sale Date and the Transfer Date:

(a)     Due Organization and Authority.    The Servicer is a Maryland corporation, validly existing under the laws of its jurisdiction of incorporation or formation and is licensed to conduct business of the type conducted by the Servicer. Subject only to entry of an Order in the Bankruptcy Case approving this Agreement: (i) the Servicer has the full corporate power and authority to execute and deliver this Agreement and to perform in accordance herewith; (ii) the execution, delivery and performance of this Agreement (including all instruments or transfer to be delivered pursuant to this Agreement) by the Servicer, and the consummation by the Servicer of the transactions contemplated hereby, have been duly and validly authorized; (iii) this Agreement has been duly authorized, executed and delivered by the Servicer; (iv) this Agreement evidences the valid, binding, and enforceable obligation of the Servicer, subject to bankruptcy laws and other similar laws of general application affecting the rights of creditors; and (v) all requisite corporate action has been taken by the Servicer to make this Agreement valid and binding upon the Servicer in accordance with its terms.

(b)     No Conflicts. Upon entry of an Order in the Bankruptcy Case approving this Agreement, neither the execution and delivery of this Agreement, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of the Servicer's charter, by laws or other organizational documents or any legal restriction or any material agreement or instrument to which the Servicer is now a party or by which it is bound, or constitute a default or result in an

14

acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Servicer or its property is subject.

(c)    No Litigation Pending.  Except for the pending Bankruptcy Case and the Servicer's request for entry of an Order approving this Agreement, there is no action, suit, proceeding or investigation pending or, to the best of Servicer's knowledge, threatened against the Servicer, before any court, administrative agency or other tribunal regarding the invalidity of this Agreement, which would draw into question the validity of this Agreement or the Mortgage Loans or of any action taken or to be taken in connection with the obligations of the Servicer contemplated herein.

(d)    No Consent Required.  Other than entry of an Order in the Bankruptcy Case approving this Agreement, no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Servicer of or compliance by the Servicer with this Agreement as evidenced by the consummation of the transactions contemplated by this Agreement.

(e)    Brokers Fees.  If Servicer has utilized a broker or other financial or other advisor(s) for which a fee or commission may be due, Servicer represents and warrants that such fee or commission shall be the sole responsibility of the Servicer.

(f)    Tax Service Contracts.  All Mortgage Loans have Tax Service Contracts, except as set forth on the Mortgage Loan Schedule.

(g)    Mortgage Loan Schedule.  The information set forth on the Mortgage Loan Schedule is true, accurate and complete in all material respects.

Section 4.02.    Representations and Warranties Of Purchaser.

Purchaser hereby makes the following representations and warranties to the Servicer as of each of the Sale Date and the Transfer Date:

(a)    Due Incorporation and Good Standing.  Purchaser is a corporation, duly organized, validly existing, and in good standing under the laws of Delaware.  Purchaser has in full force and effect (without notice of possible suspension, revocation or impairment) all required qualifications, permits, approvals, licenses, and registrations to conduct all activities in all states in which its activities with respect to the Mortgage Loans or the Servicing Rights require it to be qualified or licensed, except where the failure of Purchaser to possess such adverse qualifications, licenses, permits, approvals and registrations would not have a material effect on Purchaser.

(b)    Authority and Capacity.  The execution, delivery, and performance by Purchaser of this Agreement have been duly and validly authorized by all necessary corporate action.  Subject only to entry of an Order in the Bankruptcy Case approving Servicer's participation in and compliance with this Agreement, this Agreement constitutes a legal, valid, and enforceable obligation of Purchaser and its affiliates to the extent necessary for Purchaser to perform hereunder.

15

(c)  No Conflicts.  Upon entry of an Order in the Bankruptcy Case approving this Agreement, neither the execution and delivery of this Agreement, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions, or provisions of Purchaser's charter, by laws or other organizational documents or any legal restriction or any agreement or instrument to which Purchaser is now a party or by which it is bound, or constitute a default, or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment, or decree to which the Purchaser or its property is subject.

(d)  No Litigation Pending.  Except for the pending Bankruptcy Case and the Servicer's request for entry of an Order approving this Agreement, there is no action, suit, proceeding or investigation pending or, to the best of Purchaser's knowledge, threatened against Purchaser, before any court, administrative agency or other tribunal regarding the invalidity of this Agreement, that would draw into question the validity of this Agreement or the Mortgage Loans or of any action taken or to be taken in connection with the obligations of Purchaser contemplated herein.

(e)  No Consent Required.  Other than entry of an Order in the Bankruptcy Case approving this Agreement, no consent, approval, authorization, or order of any court or governmental agency or body is required for the execution, delivery, and performance by Purchaser of or compliance by Purchaser with this Agreement as evidenced by the consummation of the transactions contemplated by this Agreement.

(f)  Brokers Fees.  If Purchaser has utilized a broker or other financial or other advisor(s) for which a fee or commission may be due, Purchaser represents and warrants that such fee or commission shall be the sole responsibility of Purchaser.

(g)  Financing.  Purchaser has available sufficient funding to enable Purchaser to consummate the purchase of the Servicing Rights from Servicer and otherwise to perform all of Purchaser's obligations under this Agreement.

## ARTICLE V.

### CONDITIONS PRECEDENT

Section 5.01.  Conditions Precedent to the Obligations of Purchaser and Servicer.

The obligations of each of Purchaser and Servicer under this Agreement are subject to the satisfaction in all material respects, at or prior to the Transfer Date, of each of the following conditions, any or all of which in subsections (a) and (b) below may be waived in writing by Purchaser and/or Servicer:

(a)  Correctness of Representations and Warranties.  The representations and warranties made by each of Purchaser and Servicer in this Agreement are true and correct in all material respects as of each of the Sale Date and the Transfer Date;

(b)  Compliance with Conditions.  All material terms, covenants and conditions of this Agreement required to be complied with and performed by each of Purchaser

16

and Servicer at or prior to the Transfer Date shall have been duly complied with and performed by such party in all material respects; and

        (c)   <u>Bankruptcy Court Order.</u>  Entry of an Order in the Bankruptcy Case in form and substance reasonably acceptable to Purchaser approving this Agreement.

17

## ARTICLE VI.

### MISCELLANEOUS

Section 6.01.  Supplementary Information.

From time to time prior to and after the Transfer Date, Servicer shall furnish to Purchaser such information supplementary to the information contained in the documents and schedules delivered pursuant hereto which is reasonably available to Servicer as Purchaser may reasonably request or which may be reasonably necessary to enable Purchaser to file any reports due to any investors in connection with the related Mortgage Loans or Servicing Rights.

Section 6.02.  Access to Information.

Servicer shall allow Purchaser and its counsel, accountants, and other representatives, reasonable access, during normal business hours, to all of Servicer's files, books and records directly relating to the Servicing Rights and the related Mortgage Loans, Custodial Accounts, and Advances.  Purchaser and its representatives and affiliates shall treat all information obtained in such investigation, not otherwise in the public domain, as confidential and shall not use any such information for its own benefit, unless Purchaser acquires the related Servicing Rights hereunder.

Section 6.03.  Further Assurances.

Subject to Bankruptcy Court approval, Purchaser and the Servicer each agree to execute and deliver to the other such additional documents, instruments or agreements as may be necessary to effectuate the purposes of this Agreement.  Purchaser and Servicer shall cooperate in good faith to consummate the transactions contemplated by this Agreement.

Section 6.04.  Survival.

Notwithstanding anything to the contrary herein, no warranties or representations of the Parties set forth herein shall survive the Transfer Date.

Section 6.05.  Assignment.

Neither Party shall assign, sub-license, sub-contract, charge or otherwise subject to any Encumbrance any of its rights or obligations under this Agreement without the prior written consent of the other Party.

Section 6.06.  Notices.

All demands, notices and communications hereunder shall be in writing and shall be given via e-mail, facsimile transmission or registered or certified mail to the person at the address set forth below:

18

i.    if to the Servicer:

American Home Mortgage Servicing, Inc.
4600 Regent Blvd, Suite 200
Irving, Texas 75063
Attention: David Friedman
Fax: (866) 841-2568
E-mail: David.Friedman@Americanhm.com

with a copy (which shall not constitute notice) to:

American Home Mortgage Servicing, Inc.
538 Broadhollow Road
Melville, NY 11747
Attention: Alan Horn, General Counsel
Fax: (800) 209-7276
E-mail: Alan.Horn@Americanhm.com

And

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Attention: Craig D. Grear
Fax: (302) 571-1253
E-mail: cgrear@ycst.com

ii.    if to Purchaser:

EMC Mortgage Corporation
2780 Lake Vista Drive
Lewisville, Texas 75067
Attn: General Counsel
Facsimile: (214) 626-4714

with a copy to:

Bear, Stearns & Co. Inc.
383 Madison Avenue, 3rd Floor
New, York, NY 10179
Attention: Global Credit Administration
Facsimile: (212) 272-6564

or such other address as may hereafter be furnished to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

Section 6.07.  Entire Agreement; Amendment.

This Agreement constitutes the entire agreement between the Parties with respect to the sale of the servicing rights of the Mortgage Loans. This Agreement may be amended and any provision hereof waived, but, only in writing signed by the Party against whom such enforcement is sought.

Section 6.08.  Execution; Binding Effect.

This Agreement may be executed in one or more counterparts and by the different Parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same agreement.  This Agreement shall inure to the benefit of and be binding upon the Servicer and Purchaser and their respective successors and assigns.

Section 6.09.  Governing Law Jurisdiction; Consent to Service of Process.

THIS AGREEMENT SHALL BE DEEMED IN EFFECT WHEN A FULLY EXECUTED COUNTERPART THEREOF IS RECEIVED BY PURCHASER IN THE STATE OF NEW YORK AND SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK. THIS AGREEMENT SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ITS CHOICE OF LAW RULES AND PRINCIPLES.

PURCHASER AND SERVICER FURTHER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (A) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT. PURCHASER CONSENTS TO AND EXPRESSLY AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION; *PROVIDED, HOWEVER,* THAT IF THE BANKRUPTCY COURT REFUSES TO ACCEPT JURISDICTION OVER ANY SUCH DISPUTE, EACH OF PURCHASER AND THE SERVICER IRREVOCABLY (I) SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK FOR THE PURPOSE OF ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT; (II) WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT; (III) AGREES THAT A FINAL JUDGMENT IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW; AND (IV) CONSENTS TO SERVICE OF PROCESS UPON IT BY MAILING A COPY THEREOF BY CERTIFIED MAIL ADDRESSED TO IT AS PROVIDED FOR NOTICES HEREUNDER.

Section 6.10.  Waiver of Trial by Jury.

THE SERVICER AND PURCHASER EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY

20

DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 6.11.  Counterparts.

This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

Section 6.12.  Time of Essence.

The Parties acknowledge that time is of the essence in occurrence of the Transfer Date and the performance of the obligations stated in this Agreement.

Section 6.13.  No Remedy Exclusive.

Except as otherwise set forth in this Agreement, no remedy under this Agreement is intended to be exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to any remedies given under this Agreement or existing at law or in equity.

Section 6.14.  Construction.

This Agreement shall be construed and interpreted fairly as to both Parties and not in favor or against either Party, regardless of which Party prepared this Agreement.

Section 6.15.  Waivers.

Except for the requirement of entry of an Order in the Bankruptcy Case in form and substance acceptable to Purchaser approving this Agreement, either the Servicer or Purchaser may upon consent of all parties, by written notice to the others:

(a)    Waive compliance with any of the terms, conditions or covenants required to be complied with by the others hereunder; and

(b)    Waive or modify performance of any of the obligations of the others hereunder.

The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other subsequent breach.

Section 6.16.  Announcements.

Neither Party shall issue press releases or announcements regarding, or otherwise disclose to the general public or mortgage servicing industry, the existence or terms of this Agreement without the prior written approval of the other Party, except to the extent required by any court, tribunal, regulatory authority or law.

Section 6.17.  No Solicitation.

21

From and after the Transfer Date, the Servicer agrees that it will not take any action or permit or cause any action to be taken by any of its agents or Affiliates, or by any independent contractors on the Servicer's behalf, to personally, by telephone or mail (via electronic means or otherwise), solicit a Mortgagor under any Mortgage Loan for the purpose of refinancing a Mortgage Loan, in whole or in part, without the prior written consent of Purchaser. Notwithstanding the foregoing, it is understood and agreed that promotions undertaken by the Servicer or by any Affiliate of the Servicer which are directed to the general public at large (including, without limitation, mass mailing based on commercially acquired mailing lists, newspaper, radio and television advertisements), shall not constitute solicitation under this Section.

Section 6.18.  Relationship of Parties.

Nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties. The duties and responsibilities of the Servicer shall be rendered by it as an independent contractor and not as an agent of Purchaser.

Section 6.19.  Severability of Provisions.

Any part, provision representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.

Section 6.20.  Exhibits.

The exhibits to this Agreement are hereby incorporated and made a part hereof and are integral parts of this Agreement.

Section 6.21.  General Interpretive Principles.

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    Terms used in this Agreement have the meanings assigned to them in this Agreement (as defined herein), and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender.

(b)    Accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles.

(c)    References herein to a "Section," shall be to the specified section(s) of this Agreement and shall include all subsections of such section(s).

(d)    The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provisions.

22

(c)     Headings of the Articles and Sections in this Agreement are for reference purposes only and shall not be deemed to have any substantive effect.

(f)     Each reference to any federal, state or local statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder.

*[Signature Page Follows]*

066585.1001

IN WITNESS WHEREOF, each of the undersigned parties to this Agreement has caused this Agreement to be duly executed in its name by one of its duly authorized officers, all as of the date first above written.

Servicer:

**AMERICAN HOME MORTGAGE SERVICING, INC., DEBTOR AND DEBTOR IN POSSESSION**

By: _____

Name: _____

Title: _____


Purchaser:

**EMC MORTGAGE CORPORATION**

By: _____

Name: _____

Title: _____

## Exhibit A

**Servicing Transfer Instructions**

## Exhibit B

**Mortgage Loan Schedule**

## Exhibit C

### Power of Attorney