## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------------------x
In re:

AMERICAN HOME MORTGAGE
HOLDINGS, INC., a Delaware corporation, *et al.*,[1]

                                     Debtors.

--------------------------------------------------------------------x

Chapter 11

Case No. 07-11047 (CSS)
(Jointly Administered)

Hearing Date:     October 23, 2007 at 2:00 p.m.
Objection Deadline: October 19, 2007 at 5:00 p.m.

**LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO THE DEBTORS' MOTION FOR AN ORDER PURSUANT TO
SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE: (A) APPROVING THE
MORTGAGE SERVICING PURCHASE AGREEMENT; AND (B) AUTHORIZING THE
DEBTORS TO SELL CERTAIN PROPERTY FREE AND CLEAR OF LIENS,
INTERESTS, AND ENCUMBRANCES, AND (C) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "*Committee*")[2] of American Home Mortgage Holdings, Inc., *et al*. (the "*Debtors*"), by its proposed co-counsel, Hahn & Hessen LLP and Blank Rome LLP, hereby files this limited objection (the "*Limited Objection*") to the *Debtors' Motion for an Order Pursuant to Sections 105 and 363 of the Bankruptcy Code: (A) Approving the Mortgage Servicing Purchase Agreement; and (B) Authorizing the Debtors to Sell Certain Property Free and Clear of Liens, Interests, and Encumbrances, and (C) Granting Related Relief* (the "*Motion*") [Docket No. 1553], and in support thereof respectfully states as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("*AHM Investment*"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("*AHM Acceptance*"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("*AHM Servicing*"), a Maryland corporation (7267); American Home Mortgage Corp. ("*AHM Corp.*"), a New York corporation (1558); American Home Mortgage Ventures LLC ("*AHM Ventures*"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("*Homegate*"), a New York corporation (7491); and Great Oak Abstract Corp. ("*Great Oak*"), a New York corporation (8580).

[2] The Committee presently consists of the following members: Wilmington Trust Company, The Bank of New York Trust Company, N.A., Deutsche Bank National Trust Co., Nomura Credit & Capital, Inc., Impac Funding Corporation, Waldners Business Environments, Inc., and United Parcel Service.

**SUMMARY**

1.  The Debtors seek approval of a proposed sale transaction (the "*Sale Transaction*") whereby Debtor AHM Servicing ("*Seller*") would sell all rights, title and interests as servicer of a pool of mortgage loans (the "*Property*") to MidFirst Bank ("*MidFirst*" or "*Purchaser*") pursuant to the terms and conditions of that certain Asset Purchase Agreement, dated as of October 9, 2007 (the "*APA*").  The Committee files this Limited Objection because certain provisions of the APA could (i) have a material adverse effect on the values realized by the Debtors' estates, (ii) severely hamper the ability of the Debtors to confirm a plan in these chapter 11 cases and make a distribution to creditors, and (iii) make it extremely difficult to evaluate properly the consideration that the Debtors would receive from the sale of the Property.

**BACKGROUND**

2.  On August 6, 2007 (the "*Petition Date*"), the Debtors commenced voluntary cases (the "*Cases*") under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") with this Court.  Since the Petition Date, the Debtors have continued in the operation of their businesses and the management of their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

3.  On August 9, 2007, the Court entered an order [Docket No. 113] establishing procedures for the sale of certain assets used in the Debtors' loan servicing business.

4.  Several of the loans that the Debtors service in connection with their servicing business were issued in conjunction with the Government National Mortgage Association ("*GNMA*").  AHM Servicing was approved as a GNMA mortgage-backed securities issuer and was a signatory and subject to certain guaranty agreements with GNMA whereby AHM Servicing assigned ownership of certain first lien, adjustable-rate residential mortgage loans on a

servicing retained basis to GNMA (the "*GNMA Portfolio*").

5. Just prior to the Petition Date, GNMA gave notice to AHM Servicing asserting purported defaults under the terms of the guaranty agreements and a termination of the Debtors' rights, title and interests in the GNMA Portfolio. The Debtors dispute the validity of the termination.

6. On August 20, 2007, GNMA filed a motion seeking an order declaring that it was not subject to the automatic stay and requiring the Debtors to immediately turn-over the GNMA Portfolio (the "*Turn-Over Motion*") [Docket No. 600].

7. On September 20, 2007, the Court entered an Order approving and authorizing a settlement agreement by and among the Debtors and GNMA resolving the Turn-Over Motion (the "*GNMA Stipulation*") [Docket No. 863] which provides, *inter alia*, that the Debtors are required to execute a binding contract to sell the GNMA Portfolio to a GNMA approved issuer/servicer by October 9, 2007, to close such a sale by November 1, 2007, and to direct the proceeds from such a sale in the first instance to GNMA to satisfaction of certain GNMA claims.

8. On October 9, 2007, the Debtors and MidFirst entered into the APA pursuant to which MidFirst is purchasing the servicing rights to the GNMA Portfolio. As discussed more fully below, given the monies required to be set aside pursuant to the GNMA Stipulation and net of deductions pursuant to the APA in return for transferring the servicing rights on GNMA Portfolio (with an aggregate unpaid balance of approximately $450 million), this purchase price may be at best illusory. Based on information provided by the Debtors in the Motion, the estates are scheduled to receive just $58,000 on the initial installment of the purchase price. It is imperative to ensure that the terms of the APA are set forth with clarity so that the subsequent installment payments are made to the Debtors' estates as more particularly set forth in the

Motion.

9. On October 15, 2007, the Debtors filed the instant Motion.

**LIMITED OBJECTION**

**A. The Provisions of the APA Expose the Estates
to Unlimited Damages for an Extended Period**

10. The APA provides no ceiling on the amount of damages that the Purchaser can assert against the Seller for breaches of the APA and no time limit within which to bring claims under the APA. *See* APA ¶¶ 3.2.7 and 5. This combination of (i) unlimited liability and (ii) an extended survival period for Purchaser claims is virtually unheard of in the bankruptcy context, and for good reason. Since there is no ceiling on Seller's liability, the minimum value to the estates of the proposed Sale Transaction is impossible to ascertain. Moreover, allowing the Purchaser to assert claims for a lengthy period of time after the closing could severely hamper the ability of the Debtors to confirm a plan of liquidation and make distributions to creditors.

11. Accordingly, the Committee submits that the APA must be amended to provide that claims against the Seller in connection with the APA (i) be limited to the twenty percent (20%) holdback provided for in the APA, and (ii) must be brought within ninety (90) days after the Settlement Date.[3] Moreover, the APA should provide for the holdback to be placed in escrow.

**B. APA Lacks Clarity as to What
"Property" is Being Sold to the Purchaser**

12. There is a lack of clarity as to what "Property" is being sold to the Purchaser which creates potential breaches of several provisions of the APA. *See* ¶¶ 1 (definition of "Property"), 2.1, 2.2, 5.5 and 5.7. The Seller, as servicer, does not own the funds in the

---

[3] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the APA.

- 4 -

128189/01600/40171744v1

Custodial Accounts nor the files related to each Loan and cannot "convey the Property" or "good and marketable title" other than the rights, title and interests that it has *as servicer*. Therefore, subsections (iii) and (iv) of the definition of Property in ¶ 1 of the APA should be amended to clarify that the Seller is conveying all right, title and interest it may have "*as servicer*" in all funds in the Custodial Accounts and files relating to each Loan.

C.  **Unrealistic Standards and Stringent Requirements Make it Unclear Whether the Seller will Receive any Subsequent Installment Payments**

13.   Unrealistic standards for the delivery of documents and other requirements make it unclear what payments, if any, the Seller will receive after the initial installment of the purchase price (which, as noted above, will only result in approximately $58,000 in proceeds to the Seller). *See, e.g.,* ¶¶ 1, "Custodial File" ("*all* documents … related to a Loan[.]") (emphasis added), 3.2.4 (pro rata installment paid "once the Custodial File related to *each* Loan … is complete[.]") (emphasis added), and 4.2.10 (requiring deliver of "*all* servicing/credit files and Custodial Files") (emphasis added).  A literal reading of the terms of the APA would require the Debtors to produce every single document related to every single Loan before they will be able to satisfy the requirements set forth in the APA entitling the Debtors to receive the subsequent installment payments.  Clearly, withholding the total payment for potential nominal breaches represents a total lack of proportionality between the breach and corresponding penalty.  Indeed, given the unlimited damages noted in paragraph 10 above and the uncertainty as to whether the Seller will ever be able to satisfy the requirements for subsequent installment payments, the Debtors' estates may be in a worse position by selling the Property than if the Debtors had simply turned the Property over to GNMA.

14.   Additionally, there are temporal requirements in the APA which are impossible for the Seller to comply with and, if left unchanged, will result in the Seller being in default of

- 5 -

the APA the moment the sale closes. Section 4.2.13 requires the Seller to deliver certain things to Purchaser according to a delivery schedule described in Exhibit E to the APA. However, compliance with the delivery schedule set forth therein is impossible as it requires that a multitude of items be delivered by certain dates which range from fifteen (15) to sixty (60) business days *prior to* the Transfer Date of October 31, 2007. *See* APA, Exhibit E. Accordingly, Exhibit E must be amended to set forth a reasonable and achievable delivery schedule. Moreover, with respect to files not within the Debtors' possession but maintained in off-site storage facilities, the temporal requirements set forth for delivery in section 4 of the APA are equally unrealistic and must be amended to provide the Debtors with a reasonable amount of time to transfer such files.

15.    The APA also appears to transfer the servicing rights for certain mortgages that are "in default" without any consideration and providing for a reduction in the purchase price of $1,500 for each such loan. In order to determine what loans are in default for purposes of this provision, a loan will be considered in default if payment has not been made within thirty (30) days of the due date without regard to any grace period, historical analysis of the loan or collateral valuation. Given the potential economic impact such classification will have on the purchase price, such classification does not appear to be realistic given the nature of the loans and the status of the servicer.

16.    If the changes set forth above are not made, there is an unacceptable lack of clarity with respect to significant issues in the APA, which could significantly reduce the value to be received by these estates from the APA. The Committee respectfully submits that the APA must be amended as requested to reduce the risk that the assets of the Debtors' estates will be dissipated in costly disputes with the Purchaser over these issues and to permit the appropriate

management of these Cases.

## Conclusion

17.     While the Committee does not oppose the sale of the Property, any such sale must be on terms and conditions designed to maximize the value to the Debtors' estates.  In order to do so, it is important that the terms of the APA sets forth with certainty and clarity the essential terms of the Sale Transaction, including conditions of payment, the potential claims the Purchaser may have against the Debtors' estates and a cap on such claims.  Because of the flaws noted above, the APA exposes the estates to unacceptable uncertainties regarding the actual value that will be generated from the Sale Transaction.  Accordingly, the APA must be modified to meet these concerns in order to permit the Committee and this Court to determine whether the proposed sale is in the best interests of the Debtors' estates.

- 7 -
128189/01600/40171744v1

WHEREFORE, the Committee respectfully requests that this Court deny the Motion unless the APA is modified in accordance with this Limited Objection.

Dated:    October 19, 2007

                    **BLANK ROME LLP**

                    By: */s/ David W. Carickhoff*
                    Bonnie Glantz Fatell (No. 3809)
                    David W. Carickhoff (No. 3715)
                    1201 Market Street, Suite 800
                    Wilmington, DE  19801
                    Telephone: (302) 425-6400
                    Facsimile: (302) 425-6464

                    - and -

                    **HAHN & HESSEN LLP**
                    Mark S. Indelicato
                    Mark T. Power
                    488 Madison Avenue
                    New York, NY 10022
                    Telephone: (212) 478-7200
                    Facsimile: (212) 478-7400

                    *Proposed Counsel to the Official Committee of Unsecured Creditors of American Home Mortgage Holdings, Inc., et al.*