1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case No. 07-11047-css

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


AMERICAN HOME MORTGAGE HOLDINGS, INC.,


          Debtor.


- - - - - - - - - - - - - - - - - - - -x

                    United States Bankruptcy Court

                    824 North Market Street

                    5th Floor

                    Wilmington, Delaware


                    October 16, 2007

                    9:45 AM


B E F O R E:

HON. CHRISTOPHER S. SONTCHI

U.S. BANKRUPTCY JUDGE

2

APPEARANCES:

YOUNG CONAWAY STARGATT & TAYLOR, LLP

      Attorneys for Debtor

      The Brandywine Building

      1000 West Street

      17th Floor

      Wilmington, DE 19801

BY:   PAULINE K. MORGAN, ESQ.

      ROBERT S. BRADY, ESQ.

      JAMES L. PATTON, JR.

      JOHN T. DORSEY, ESQ.

      M. BLAKE CLEARY, ESQ.

HAHN & HESSEN LLP

      Attorneys for Official Committee of Unsecured Creditors

      488 Madison Avenue

      New York, NY 10022

BY:   MARK S. INDELICATO, ESQ.

      MARK T. POWER, ESQ.

3

BLANK ROME LLP

      Attorneys for Official Committee of Unsecured Creditors

      Chase Manhattan Centre

      1201 Market Street

      Suite 800

      Wilmington, DE 19801


BY:   BONNIE GLANTZ FARELL, ESQ.


KAYE SCHOLER LLP

      Attorneys for Bank of America, N.A.

      425 Park Avenue

      New York, NY 10022


BY:   SCOTT D. TALMADGE, ESQ.

      MARK F. LISCIO, ESQ.

      ANA M. ALFONSO, ESQ.

      MARGOT SCHONHOLTZ, ESQ. (TELEPHONICALLY)

4

POTTER ANDERSON & CARSON LLP

        Attorneys for Bank of America, N.A.

        Hercules Plaza

        1313 North Market Street

        Wilmington, DE 19801


BY:   LAURIE SELBER SILVERSTEIN, ESQ.


SIDLEY AUSTIN LLP

        Attorneys for Bear Stearns & EMC

        787 Seventh Avenue

        New York, NY 10019


BY:   ALEX R. ROVIRA, ESQ.

        ANDREW W. STERN, ESQ.

        (TELEPHONICALLY)


SIDLEY AUSTIN LLP

        Attorneys for Bear Stearns & EMC

        1501 K Street, N.W.

        Washington, D.C. 20005


BY:   DAVID R. KUNEY, ESQ.

        NOAH CLEMENTS, ESQ.

5

DUANE MORRIS LLP

      Attorneys for Bear Stearns & EMC

      1100 North Market Street

      Suite 1200

      Wilmington DE 19801


BY:   FREDERICK B. ROSNER, ESQ.


MORRIS, NICHOLS, ARSHT & TUNNELL LLP

      Attorneys for Assured

      Chase Manhattan Centre

      18th Floor

      1201 North Market Street

      Wilmington, DE 19899


BY:   ROBERT J. DEHNY, ESQ.


ECKERT SEAMANS CHERIN & MELLOTT, LLC

      Attorneys for Calyon New York Branch

      300 Delaware Avenue, Suite 1210

      Wilmington, DE 19801


BY:   MICHAEL BUSENKELL, ESQ.

6

MILBANK, TWEED, HADLEY & MCCLOY LLP

    Attorneys for Creditor ABN AMRO

    610 South Figueroa Street

    30th Floor

    Los Angeles, CA 90017

BY:   ROBERT J. MOORE, ESQ.

    FRED NEUFELD, ESQ.

    (TELEPHONICALLY)

WOMBLE CARLYLE SANDRIDGE & RICE, PLLC

    Attorneys for CSFB Mortgage Capital/Duke

    222 Delaware Avenue, 15th Floor

    Wilmington, DE 19801

BY:   STEVEN K. KORTANEK, ESQ.

EDWARDS ANGELL PALMER & DODGE LLP

    Attorneys for Countrywide

    919 North Market Street

    15th Floor

    Wilmington, DE 19801

BY:   WILLIAM CHIPMAN, ESQ.

7

1

2    DORSEY & WHITNEY LLP

3          Attorneys for U.S. Bank as Trustee

4          1105 North Market Street

5          Suite 1600

6          Wilmington, DE 19801

7

8    BY:   ERIC LOPEZ SCHNABEL, ESQ.

9

10   DORSEY & WHITNEY LLP

11          Attorneys for U.S. Bank as Trustee

12          250 Park Avenue

13          New York, NY 10177

14

15   BY:   STEVEN R. SCHOENFELD, ESQ.

16

17   DORSEY & WHITNEY LLP

18          Attorneys for U.S. Bank as Trustee

19          Suite 1500

20          50 South Sixth Street

21          Minneapolis, MN 55402

22

23   BY:   PATRICK J. MCLAUGHLIN, ESQ.

24

25

8

LANDIS RATH & COBB LLP

    Attorneys for JP Morgan Chase

    919 Market Street

    Suite 600

    Wilmington, DE 19899


BY:   ADAM G. LANDIS, ESQ.


WOLF, BLOCK, SCHORR, SOLIS-COHEN, LLP

    Attorneys for Wells Fargo, N.A.

    Wilmington Trust Center

    1101 North Market Street

    Suite 1001

    Wilmington, DE 19801


BY:   TODD C. SCHILTZ, ESQ.


CHAPMAN & CUTLER, LLP

    Attorneys for Wells Fargo, N.A.

    111 West Monroe Street

    Chicago, IL 60603


BY:   FRANKLIN H. TOP, III

9

CONNOLLY BOVE LODGE & HUTZ LLP

      Attorneys for Wells Fargo Funding, Inc.

      The Nemours Building

      1007 North Orange Street

      Wilmington, DE 19899

BY:   CHRISTINA M. THOMPSON, ESQ.

RICHARDS LAYTON & FINGER, P.A.

      Attorneys for Bank of New York

      One Rodney Square

      920 North King Street

      Wilmington, DE 19801

BY:   CHRISTOPHER M. SAMIS, ESQ.

SEWARD & KISSEL LLP

      Attorneys for Citibank, N.A.

      One Battery Park Plaza

      New York, NY 10004

BY:   ARLENE R. ALVES, ESQ.

      JEFF DINE, ESQ.

10

COZEN O'CONNOR

 Attorneys for Citibank

 Suite 1400

 Chase Manhattan Centre

 1201 North Market Street

 Wilmington, DE 19801

BY: JEFFREY R. WAXMAN, ESQ.

JONES DAY LLP

 Attorneys for ATT Mortgage Acquisition Co.

 North Point

 901 Lakeside Avenue

 Cleveland, OH 44114

BY: DAVID HEIMAN, ESQ.

11

1

2  GREENBERG TRAURIG, LLP

3        Attorneys for ATT Mortgage Acquisition Co.

4        The Nemours Building

5        1007 North Orange Street

6        Suite 1200

7        Wilmington, DE 19801

8

9  BY:  VICTORIA W. CONNIHAN, ESQ.

10

11  REED SMITH LLP

12        Attorneys for GMAC and Res. Funding

13        2500 One Liberty Place

14        1600 Market Street

15        Philadelphia, PA 19103

16

17  BY:  CLAUDIA Z. SPRINGER, ESQ.

18

19  REED SMITH LLP

20        Attorneys for GMAC and Res. Funding

21        1201 Market Street

22        Suite 1500

23        Wilmington, DE 19801

24

25  BY:  KIMBERLY E.C. LAWSON, ESQ.

12

1

2   MORRIS JAMES LLP

3          Attorneys for CitiMortgage, Inc.

4          500 Delaware Avenue

5          Suite 1500

6          Wilmington, DE 19801

7

8   BY:   BRETT D. FALLON, ESQ.

9

10  BINGHAM MCCUTCHEN, LLP

11         Attorneys for Deutsche Bank Structured Products

12         150 Federal Street

13         Boston, MA 02110

14

15  BY:   ANDREW J. GALLO, ESQ.

16

17  BINGHAM MCCUTCHEN, LLP

18         Attorneys for Deutsche Bank Structured Products

19         399 Park Avenue

20         New York, NY 10022

21

22  BY:   STEVE WILAMOWSKY, ESQ.

23

24

25

13

1

2  NIXON PEABODY LLP

3        Attorneys for Deutsch Bank NTC

4        437 Madison Avenue

5        New York, NY 10022

6

7  BY:   DENNIS J. DREBSKY, ESQ.

8

9  SAUL EWING LLP

10        Attorneys for Security Connections

11        222 Delaware Avenue

12        Suite 1200

13        Wilmington, DE 19899

14

15  BY:   PATRICK J. REILLEY, ESQ.

16

17  KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS, LLP

18        Attorneys for Goldman Sachs

19        919 Market Street

20        Suite 1000

21        Wilmington, DE 19801

22

23  BY:   CHRISTOPHER A. WARD, ESQ.

24

25

14

LOEB & LOEB LLP

      Attorneys for Merrill Lynch

      345 Park Avenue

      New York, NY 10154

BY:   VADIM J. RUBENSTEIN, ESQ.

      (TELEPHONICALLY)

UNITED STATES DEPARTMENT OF JUSTICE

      Office of the United States Trustee

      J. Caleb Boggs Federal Building

      844 King Street

      Suite 2207

      Wilmington, DE 19801

BY:   JOSEPH M. MCMAHON, ESQ.

ALSO APPEARING:

PAULA RUSH, PRO SE

15

                 **P R O C E E D I N G S**

1                                  

2        THE CLERK:  All rise.

3        THE COURT:  Please be seated.

4        MS. MORGAN:  Good morning, Your Honor.

5        THE COURT:  We're at capacity, huh?  Good morning.

6        MS. MORGAN:  Your Honor, Pauline Morgan from Young

7  Conaway Stargatt & Taylor on behalf of the debtors.  I would

8  like to proceed with our next witness.

9        THE COURT:  Go right ahead.

10       MS. MORGAN:  I'd like to call David Storper to the

11  stand.

12       THE COURT:  Please rise, sir.

13       (Witness duly sworn)

14       THE CLERK:  You may be seated.  Please state your

15  name for the name record and spell your last name.

16       THE WITNESS:  David H. Storper, S-T-O-R-P-E-R.

17  DIRECT EXAMINATION BY

18  MS. MORGAN:

19  Q.   Good morning, Mr. Storper.  By whom are you employed?

20  A.   WL Ross & Co. LLC.

21  Q.   And what kind of business does WLR engage in?

22  A.   We're a private equity investment firm.

23  Q.   And -- I'm sorry.  Could you pull the microphone to you a

24  little bit closer?  Thank you.  And what is your position with

25  WLR?

1   A.   I'm a senior managing director, a member of the investment

2   committee and the head of research and trading.

3   Q.   And how long have you held those positions?

4   A.   I've been with WL Ross for eleven years working with

5   Wilbur Ross for eleven years.  I was a founding member of WL

6   Ross in April 2000 when I was a senior managing director.

7   Q.   Okay.  And briefly describe your duties and

8   responsibilities in those positions.

9   A.   I source product for private equity funds.  I manage the

10   investment team that analyzes the situations that we will be

11   investing in.  I source and trade the names that we want to get

12   involved in.

13   Q.   And could you briefly describe your educational

14   background?

15   A.   I'm an undergraduate -- I have an undergraduate Bachelor

16   of Science from Columbia University School of Engineering and

17   Applied Science and I have an MBA from Columbia Business

18   School.

19   Q.   And could you describe your professional history prior to

20   joining WLR?

21   A.   I started at Wells Fargo Bank in 1989 in the credit

22   training program, subsequently moved to the corporate banking

23   group as well as to the workout group.  Following that, I

24   started at Leber Investments, distressed and high yield broker

25   dealer, and then moved to First Boston's distressed group.

17

Q.   Mr. Storper, do you have any experience in the residential

mortgage servicing industry?

A.   I do not.

Q.   Does WLR have a prior history in this industry?

A.   We do not.

Q.   Has WLR ever in the past acquired businesses in which it

had no prior experience?

A.   Yes, we have and that would include in the steel industry,

the textile industry, the coal industry, the automotive parts

industry, demand insurance industry.

Q.   And how did WLR identify and choose those industries to

become involved in notwithstanding its lack of experience?

A.   We studied the industry -- any industry that is undergoing

some sort of distress, we look at certain companies in those

industries and myself or any of the analyst team -- we do the

platform work and incubation work to see if its an area that we

want to be involved in.

Q.   And have any of those ventures been successful for WLR?

A.   I think so.

Q.   Could you expand, for instance, on, let's say, the steel

industry.

A.   On the steel industry, we got involved going back to -- in

mid-2001.  You know, at the time, I think practically every

steel company in the United States was suffering from flood of

imports as well as the escalating, you know, health care and

18

1  post retirement liabilities.  You know, we brought a couple of

2  companies out of bankruptcy including LTV and Bethlehem Steel

3  and we subsequently infused about 160 million dollars of equity

4  and, you know, following working with management, took the

5  company public within two years of our investment and then

6  subsequently sold it to Mittal Steel of India which is now the

7  largest steel company in the world.

8  Q.    Turning back to this case, American Home Mortgage, were

9  you a principle negotiator in connection with the APA?

10  A.    I was not.

11  Q.    Okay.  And did you have responsibility for reviewing the

12  various contracts for servicing rights that you heard about in

13  yesterday's testimony?

14  A.    I did not.

15  Q.    So what do you consider your role here today?  Why were

16  you selected by WLR to serve as a witness for today's hearing?

17  A.    To really show and provide adequate assurance that, you

18  know, we have the funding.  We have also additional funding to

19  fund any working capital needs as well as any potential losses

20  after the interim close and to ensure that we'll have a

21  seamless transition of this company through the bankruptcy as

22  well as after the final close process.

23  Q.    The purchaser here, AH Mortgage Acquisition Co., this is a

24  newly formed company, is that right?

25  A.    Correct.

1  Q.   And who will be the owners of AH Mortgage?

2  A.   The WLR Investment Funds.

3  Q.   And how will the company be capitalized?

4  A.   With all equity, with capital from our investment funds.

5  Q.   And do you have cash resources available in those funds/

6  A.   It's all cash at this point, sure.

7  Q.   Could you explain the funds in question and what their

8  capabilities are in connection with providing capital for the

9  purchaser here?

10  A.   Sure.  As of the end of September, we had cash available

11  to fund this purchase in excess of 2.5 billion dollars.  At the

12  end of October, we're closing on an additional investment fund.

13  We will have cash in excess of four billion dollars.

14  Q.   And are those cash -- is that cash committed somewhere

15  else or will it be available, if necessary, for AH Mortgage?

16  A.   This cash is available for AH Mortgage.  You know, as we

17  know the purchase price will be between, say, 450 and 500

18  million dollars so it's obviously more than adequate.

19  Q.   And it's the intention to pay cash at closing?

20  A.   Yes.

21  Q.   Okay.  Has WLR considered whether the company may have

22  additional working capital needs?

23  A.   Yes.

24  Q.   And what do you think those needs might be?

25  A.   Our estimate is between, say, twenty and thirty million

1   dollars post the initial close.  You know, we obviously have a

2   fair amount more of liquidity available to fund that.

3   Q.   How can you be sure sitting here today that the funds in

4   question would be willing to provide the capital necessary?

5   A.   Our investment approval process is throughout our

6   investment committee.  Wilbur Ross is the chairman of the

7   committee.  I've been a member of the committee since the start

8   of WL Ross and prior to that at Rothschild, Inc. with him.

9   There are six members of the committee.  We need a simple

10  majority, which out of six people would be four.  And from our

11  standpoint, approval process would take minutes.

12  Q.   WLR and the purchaser in this case are not currently

13  licensed to service residential mortgages, is that right?

14  A.   Correct.

15  Q.   What steps are being taken to obtain licensure prior to

16  the final closing?

17  A.   We've already taken many necessary steps.  I should add

18  that we got conditional approval from Fannie May on Friday.  We

19  had also received the no downgrade letters from all three

20  rating agencies as of today.  And we have hired McGlinchey &

21  Stafford to assist us on the licensing process.

22        THE COURT:  You say you what?  Hired who?

23        THE WITNESS:  McGlinchey & Stafford.

24  Q.   And what does McGlinchey & Stafford doing for you?

25  A.   They are working on the licensing procedures throughout

21

1    all these jurisdictions.

2    Q.   And you mentioned the rating agencies.  Which rating

3    agencies and why -- what kind of downgrade letters are you

4    referring to?

5    A.   We referred no downgrade letters from Moody, Standard &

6    Poor's and Fitch.

7              MR. CROWLEY:  Objection to hearsay, Your Honor.  Are

8    the text of the letters going to be offered in evidence?

9              MS. MORGAN:  No, Your Honor.  We don't have the

10   letters with us today but this witness can testify that we do

11   have those approvals.

12             MR. DEHNY:  Your Honor, Robert Dehny on behalf of

13   Assured.  We had asked at the deposition on Friday whether they

14   existed and we've asked for copies.

15             MS. MORGAN:  It did not exist --

16             THE COURT:  He said today, Mr. Dehny.  He said today.

17             MS. MORGAN:  It did not exist, yeah.

18             THE COURT:  He said today.

19             MR. DEHNY:  I understand, Your Honor.  I'm simply

20   noting that the parties have asked for it and it is a hearsay

21   objection.

22             THE COURT:  All right.  Very well.

23             MR. CROWLEY:  If I could be heard for one moment?

24             THE COURT:  Yes.

25             MR. CROWLEY:  The debtors diligently posted them to

1   the website which I read this morning.  In my opinion, two out

2   of the three are as characterized but the third one, I think we

3   need the real letter.  I think we need the real letter for all

4   three.

5              THE COURT:  Why isn't it hearsay, Ms. Morgan?  It's

6   an out of court statement, right?

7              MS. MORGAN:  Your Honor, we will introduce those

8   through another witness, if we can.  But we'll move on --

9              THE COURT:  All right.  Hearsay objection is

10  sustained.  Sir, I'm sorry.  If you could just slide the

11  microphone or yourself a little closer and maybe even push it

12  down a little bit.  It's a little hard to hear you.  Thank you.

13  BY MS. MORGAN?

14  Q.   Mr. Storper, in connection with the state licenses that

15  you testified that hired a law firm to assist you with, what is

16  the process and how long do you think it will take?

17  A.   We understood the process to be a few months.  I think

18  clearly with regard to Fannie Mae, for instances, it was a

19  matter of days when we got additional approval, so I'm hoping

20  we can do it in a quicker time frame from that.

21  Q.   Mr. Storper, you should have in front of you a binder of

22  exhibits that was with the witness at yesterday's hearing.  If

23  you could turn to Exhibit number 106 in the binder.  It should

24  be at the very back.  And let me know when you have it.

25  A.   I have it.

23

1  Q.   Okay.  Can you identify that document, sir?

2  A.   This is the conditional approval letter from Fannie Mae.

3  Q.   Okay.  And do you foresee any problems with satisfying the

4  conditions that Fannie Mae is requiring before final approval?

5  A.   I do not.

6  Q.   Do you see the fact that WLR has not been involved in the

7  residential mortgage business as an impediment in any way to

8  operating the business on a day to day basis?

9  A.   Absolutely not.  Other industries, as I mentioned, we have

10  had no prior operating experience and we've been quite

11  successful in them.

12  Q.   And what is the purchaser's intention with respect to how

13  the day to day business will be managed?

14  A.   We look forward to working with current management.  We

15  like management.  You know, nobody at our firm has ever

16  operated a business including Mr. Ross.

17  Q.   Okay.  So you don't foresee that the management team will

18  be replaced by WLR representatives?

19  A.   I do not.

20  Q.   What are the purchasers' intentions as to the various

21  servicing agreements that are to be transferred pursuant to

22  this sale?

23  A.   We will continue to operate the business in the normal

24  course.

25  Q.   Including complying with servicing agreements?

24

1   A.   All compliances, yes.

2   Q.   Mr. Storper, why should the Court and creditors be

3   comfortable with WLR as the purchaser here?

4   A.   We certainly bring a lot of capital to the situation.  We

5   have cash available to purchase the assets.  We have more than

6   substantial liquidity to fund working capital.  We think this

7   will be and we're sure this will be a seamless transition going

8   forward.

9   Q.   And have -- what is your view of the mortgage industry in

10  general and whether it will be a profitable enterprise for you

11  going forward?

12  A.   We spent a fair amount of time studying this industry

13  going back around eighteen months.  And, you know, our industry

14  expertise again is something where we've spend a lot of time

15  talking to other consultants.  And, you know, whereas we don't

16  take operating duties in any company, you know, we are

17  committing a substantial amount of money, in excess of 450

18  million dollars, so we have confidence that we will be

19  successful.

20          MS. MORGAN:  No further questions, Your Honor.

21          THE COURT:  All right.  Let me hear cross of anyone

22  in favor of the motion.

23          MR. POWER:  Your Honor, I just have one question

24  since we're not going to do cross.  Mark Power from Hahn &

25  Hessen, counsel for the committee.

25

1   CROSS-EXAMINATION BY

2   MR. POWER:

3   Q.   Sir, you mentioned before the purchaser was in discussion

4   with the credit rating agencies, is that correct?

5   A.   Correct.

6   Q.   What is your understanding of what those negotiations

7   entail?

8   A.   You know, we're looking to be in compliance with the terms

9   of the ATA as well as all agreements and we were looking for a

10  no downgrading from the rating agencies.

11  Q.   And what is the purchaser's understanding of what it

12  received from the credit rating agencies?

13  A.   We received letters substantiating --

14          MR. CROWLEY:  Objection, Your Honor.  It's hearsay

15  again.

16          MR. POWER:  Your Honor, I'm asking what his

17  understanding of what he got was.  That's all.  I'm not --

18          THE COURT:  I don't care.  You still can't ask what

19  his understanding of an out of court statement is.

20          MR. POWER:  Yes -- I can ask what he negotiated and

21  what he was attempting to get.  And I can ask him what his

22  understanding of what he got was.  I'm not asking to -- Your

23  Honor --

24          THE COURT:  That's fine.  But it's not evidence of

25  what he got.

26

1          MR. POWER:  I agree with that, Your Honor.  But --

2          THE COURT:  You can ask him what his understanding

3   that, you know, the sky is blue but that's not going to be

4   evidence that the sky is blue.  So I'll allow that limited to

5   the extent it's helpful.

6   BY MR. POWER:

7   Q.   Sir, what is your understanding of what the purchaser

8   received from the credit ratings?

9   A.   I understand it and I believe it to be a no downgrade --

10  grading.

11  Q.   Of what -- what does that mean exactly?  A no downgrade

12  rating?

13         MR. CROWLEY:  Same objection, Your Honor.

14         THE COURT:  Same limitation.  You can answer.

15  A.   That given that we are purchasing the assets that in the

16  interim we're not going to have any downgrade from the rating

17  agency.

18  Q.   And the rating agencies are the ones that are rating the

19  securities that are backed by the trust that you'll be

20  servicing the loans on, is that correct?  Or the debtor will be

21  servicing the loans on?

22  A.   The rating agency is rating the servicer's financial

23  condition.

24  Q.   And therefore -- the rating agency is rating the

25  securities that are being serviced by the --

1    A.   No, no.

2    Q.   That's not correct?

3    A.   No.  It's rating the servicer.

4    Q.   Okay.  And there will be no downgrading in connection with

5    the servicer in the interim period?

6    A.   That's correct.

7         MR. CROWLEY:  I have a standing objection, Your

8    Honor.

9    Q.   Thank you.

10        MR. POWER:  I'm trying to understand what he's --

11        THE COURT:  I'm going to strike that last question

12   and answer.

13        MR. POWER:  Okay, Your Honor.

14        THE COURT:  All right?

15        MR. POWER:  Thank you.

16        THE COURT:  I think I made it pretty clear what my

17   ruling was on the hearsay.  Is there any further cross by

18   anyone in favor of the motion?  All right, I'll hear cross from

19   any objectors.  Here they come.  I know it's tight quarters.

20   Please remember to identify yourself when you speak on the

21   record for the purpose of a complete record.

22        MR. CLEMENTS:  Good morning, Your Honor.  Noah

23   Clements of Sidley Austin for EMC.  First off, I have not made

24   an appearance.  I believe Mr. Rosner would like to move for my

25   admission pro hac vice.

1      THE COURT:  That's fine.  You're admitted.  That's

2  okay, Mr. Rosner.  Thank you.  Just follow it up with a written

3  motion, Mr. Rosner.

4      MR. ROSNER:  I will, Your Honor.  Thank you.

5      THE COURT:  Thank you.  For EMC, sir?

6  CROSS-EXAMINATION BY

7  MR. CLEMENTS:

8  Q.   Mr. Storper, you just testified that under the APA, the

9  purchasing agreement, you're undertaking to assume all

10  servicing obligations?

11      MS. MORGAN:  Objection, Your Honor.  I don't think he

12  used the word "assume".  He said he was going to perform.

13      THE COURT:  What's the basis of the objection, Ms.

14  Morgan?

15      MS. MORGAN:  I think it mischaracterizes the

16  testimony, Your Honor.

17      THE COURT:  All right.  Why don't you restate?

18  BY MR. CLEMENTS:

19  Q.   Did you just testify that you were undertaking to perform

20  all servicing obligations?

21  A.   We will assume all contractual obligations under the --

22  under the APA.

23  Q.   Does that include the obligation to make servicing

24  advances?

25  A.   It's all contractual obligations under the APA.  I would

29

1   have to work with counsel on that.

2   Q.   Do you understand that as part of the financial commitment

3   that WLR is making that you will be making servicing advances

4   to the owners of the loans?

5           MS. MORGAN:  Objection, Your Honor.  Again, it goes

6   beyond the scope of this witness' testimony.  He testified he

7   had nothing to do with management.  He was here to talk about

8   the financial wherewithal of the purchaser and its steps.

9           THE COURT:  Mr. Clements, I think you're getting

10  beyond the scope of direct, don't you think?

11          MR. CLEMENTS:  Your Honor, this goes straight to the

12  financing that he's intending to undertake.  If he's not making

13  the servicing advances under the financial arrangement that

14  he's making then we need to understand what the financial

15  arrangements of this deal are.  He is saying the financial

16  commitments that they are making -- and part of those financial

17  commitments are servicing the advances.

18          THE COURT:  I didn't understand your response.  Maybe

19  you should clarify.

20          MR. CLEMENTS:  I'm sorry, Your Honor.  I'll try to

21  make it clearer.  Your Honor, Mr. Storper testified that WLR is

22  committing certain financial assets to the operations of this.

23  I'm wondering if they understood that some of the financial

24  commitments that they were undertaking were servicing advances.

25          THE COURT:  Why is that relevant?

1      MR. CLEMENTS:  That's part of the purchasing

2  agreement.  That is part of the deal.  That's part of the sale

3  and if there's no financing for that then we need to know that

4  whether WLR is committing to making that financing available.

5      THE COURT:  Ms. Morgan?

6      MS. MORGAN:  Your Honor, he's committing to make

7  financing available but he is not responsible for the operation

8  of the business including the advances and he knows nothing

9  about that.  He has testified that he is not involved in

10  management and will not be.

11      MR. CLEMENTS:  Your Honor, he testified to how much

12  working capital they would be undertaking.

13      THE COURT:  All right.  I'll allow the question.  The

14  witness can answer to the extent he can.  And if he can't, he

15  can't.  So why don't you rephrase because I'm sure he's lost

16  the question.

17  BY MR. CLEMENTS:

18  Q.   Well, my client wants to know what arrangements the AHM

19  Acquisition Corp. WLR is making for financing the servicing

20  advances that you're undertaking under this purchase agreement?

21  A.   You know, we are purchasing a servicing business.  I could

22  say we're going to be in compliance with all terms of the asset

23  purchase agreement that's been executed.  And at this point,

24  you know, we're going to be putting at least 450 million

25  dollars into this business.  You know, I'm not a lawyer.  I

1   refer to my lawyers and defer to my lawyers to read long

2   documents.  You know, I source products to this firm and I can

3   certainly attest to the adequate assurance of WLR, you know,

4   with the prior investment track record, we're moving forward to

5   close this transaction.

6   Q.   What capital have you currently committed to making

7   available for these advances

8   A.   Well, we have capital that's right now in excess of two

9   and a half of business that will be put towards this

10  investment.

11  Q.   Have you written a binding commitment letter to AHM

12  Acquisition Corp?

13  A.   I don't know.  I'd have to ask my lawyers where we are in

14  this process.

15  Q.   You don't know if you have -- you don't have a binding

16  commitment?

17  A.   We have an executed asset purchase agreement.  If all of

18  the terms of that agreement are going to be met and are met

19  then we're moving forward with the investment.

20  Q.   For right now, AHM Acquisition Company is a company with

21  zero net worth, is that correct?

22  A.   I don't know what it's been capitalized with.  It's a

23  formed legal entity.

24          MR. CLEMENTS:  Your Honor, may I approach the

25  witness?

32

1        THE COURT:  Yes.

2        MR. CLEMENTS:  Your Honor, may I approach the bench?

3        THE COURT:  Yes.  Thank you.

4        MR. CLEMENTS:  Your Honor, could we have Tab 1 marked

5   as EMC Exhibit 1?

6   (EMC's Exhibit 1, Purchasing Warranties & Service Agreement

7   dated 3/1/06, was hereby marked as for identification, as of

8   this date.)

9   Q.   Could you please turn to Tab 1 in Volume 1?  And could you

10  please turn to page 49?  Excuse me.  First, could you please

11  turn to page 21?

12  A.   Got it.

13  Q.   Okay.  This Exhibit 1, is this the Purchasing Warranties

14  and Service Agreement dated March 1st, 2006?

15  A.   Yes.

16  Q.   On page 21, there's a Section 2.09, Year Term Principal

17  Payments and Year Term Payment Defaults.  You see that section?

18  A.   Yes.

19  Q.   Are you aware of any early payment defaults owing to the

20  EMC Mortgage Company?

21        MS. MORGAN:  Objection, Your Honor.  Beyond the scope

22  of the direct.  Beyond the scope of this witness' knowledge.

23        THE COURT:  How is this remotely within the scope of

24  the direct examination, sir?

25        MR. CLEMENTS:  He testified that he was going to

1    comply with all servicing obligations.  One of the servicing

2    obligations is early payment default which we're going to ask

3    him if these are his understanding of the obligations he's

4    undertaking?

5            THE COURT:  He said he hadn't read any of these

6    things.  All right.  Go ahead.  I'll allow it.

7    A.   Could you just read the --

8    Q.   Excuse me.  Are you aware that there are twenty-four

9    million dollars in early payment defaults to EMC Mortgage

10   Company?

11           MS. MORGAN:  Your Honor, same objection.

12   A.   I'm not aware.

13           THE COURT:  Overruled.

14   Q.   You're not aware?  In doing the diligence for this deal,

15   you weren't aware of any outstanding defaults that the

16   servicing organization that you are purchasing might have?

17           MR. POWER:  Objection, Your Honor.  Your Honor,

18   there's a distinction there between the default of the

19   purchasing obligations of the service agreement.  The debtor

20   and the committee and even the bank argue that these defaults

21   do not relate to the servicing business.  So the question

22   assumes facts that actually aren't accurate from our position.

23           THE COURT:  Well, but they take a position that

24   you're wrong --

25           MR. POWER:  Right, Your Honor, but he's asking --

1          THE COURT:  -- and no one's decided that yet.

2          MR. POWER:  He's asking when it's assumed that this

3    service defaults.  If he wants to rephrase it, that's fine.

4    The way he set it up, it's deemed to be a service default,

5    therefore he's obligated to pick it up.

6          THE COURT:  All right.  Well, it's a little vague.

7    So I'll sustain the objection on that it's a little not precise

8    and maybe try to be a little more precise with the question.

9    BY MR. CLEMENTS:

10   Q.   In doing the diligence for purchasing the servicing

11   organization, you were not made aware of twenty-four million in

12   early payment defaults that may or may not accrue to the

13   servicing organization?

14   A.   I can't answer that.  You know, I look at these situations

15   or any company on more of a global basis.  Other people are

16   doing work on this.  I defer to the professionals that have

17   issues like this, you know, arise.

18   Q.   Twenty-four million dollars wasn't important enough for

19   you to become aware of or --

20   A.   I don't know.

21   Q.   Will you please look at page 21 on the Year to Term

22   Payment Defaults?  Do you see -- the second paragraph, do you

23   see that this paragraph -- do you understand that this

24   paragraph provides for -- excuse me.  Let me -- are you aware

25   that under the servicing agreement that you are undertaking to

1   perform the obligations of there is a repurchase obligation if

2   there is an early payment default?

3           MS. MORGAN:  Objection, Your Honor.  The objection

4   speaks for itself and this witness has no knowledge of this

5   agreement.

6           THE COURT:  Overruled.

7   A.   Could you restate that?

8   Q.   Excuse me?

9   A.   Could you restate that?

10  Q.   Yes.  Are you aware that there exists an early payment

11  default, a repurchase obligation, in the event of early payment

12  default whether or not they accrue to the service or the

13  originator?

14  A.   I can't answer that.

15  Q.   Is that because you're not aware?

16  A.   I've just been looking at this document really for the

17  first time other than if it were brought in at Friday's

18  deposition.  So I do need more time to look at this.

19  Q.   Will you look at the second paragraph for me please?

20  Under 2.09.  Do you see the second to last line where it says

21  the company shall repurchase such mortgage loan from the

22  purchaser pursuant to the repurchase provisions contained in

23  Section 3.03?

24  A.   I see that line.

25  Q.   Could you please turn to page 49 in the same agreement?

36

1    Is this part of Section 4.05 permitted?  Withdrawals from the

2    custodial account?  Part 2.

3    A.   Section 4.05 begins on page 48?  And you're referring

4    to --

5    Q.   Part little 2(i).

6    A.   Little 2(i) on page 49, right?

7    Q.   That's correct.

8    A.   I see that.

9    Q.   Do you see -- in this clause, do you see that the normal

10   waterfall of payments to the servicer might be modified by

11   repurchase obligations?

12        MS. MORGAN:  Your Honor, objection.  And I have a

13   continuing objection to the extent the witness is being asked

14   to interpret and analyze this document.  It speaks for itself.

15        THE COURT:  I think you're asking -- I think that's a

16   fair objection.  You're asking -- first of all, I'm not sure,

17   frankly, your summary of what this says is true or not.

18   Second, you're asking him to agree or not agree with your legal

19   conclusion.  Third, he told you that this is the first time

20   he's read the document.  So how can he have an understanding

21   one way or the other?  Fourth, why is this relevant?

22        MR. CLEMENTS:  Your Honor, I can withdraw this

23   question but the line of questioning is relevant to whether he

24   understands the servicing advances, whether they might be --

25        THE COURT:  I understand.  It's relevant to whether

1    or not he understands that it's not just 500 million, it's 500

2    billion that he's getting himself into or some such number.  I

3    mean, that's your point?

4            MR. CLEMENTS:  He's testified that he intends to

5    perform --

6            THE COURT:  Honor the deal.

7            MR. CLEMENTS:  -- all obligations.

8            THE COURT:  Right.

9            MR. CLEMENTS:  And I'm wondering where the line of

10   the obligations that he's intending to perform lies.  He's

11   testified to that -- perform all obligations under the

12   agreement and I'm --

13           THE COURT:  Under the asset purchase agreement.

14           MR. CLEMENTS:  No.  He said servicing agreements

15   under the direct testimony.

16           THE COURT:  Yeah, fair enough.

17           MR. CLEMENTS:  I'm sorry.

18           THE COURT:  No.  Fair enough.  All right.  I mean --

19   all right.  I'll overrule the objection.  And, Ms. Morgan, you

20   have a continuing objection to, frankly, the scope of these

21   questions and the relevance of these questions that I'll

22           MS. MORGAN:  Thank you, Your Honor.

23           THE COURT:  -- so you need not rise every time.

24           MS. MORGAN:  Thank you.

25           THE COURT:  I'll allow you to continue.

1   BY MR. CLEMENTS:

2   Q.   If under these agreements there is an obligation to repay

3   the owners of the loans a repurchase price prior to being

4   reimbursed servicing advances, is the AHM Mortgage Acquisition

5   intent to honor that change in priority?

6   A.   If counsel advises us of anything that we have to honor,

7   we will honor that.

8   Q.   Is it your understanding going into this deal that if

9   there are repurchase obligations that your reimbursement of

10  servicing advances would be postponed until all repurchases

11  were made?

12  A.   I would talk with counsel on that but again if they tell

13  us what our contractual obligations are, we're going to meet

14  them.

15  Q.   Is the twenty-four million dollars in EMC early payment

16  default accounted for in that twenty to thirty million dollar

17  operational capital that you testified to earlier?

18  A.   The twenty to thirty million dollars post the initial

19  close and prior to the final close is something that was, you

20  know, worked on in our office.  And I don't know if that

21  twenty-four is included in that twenty to thirty but, you know,

22  I can tell you that if our contractual obligations are a lot

23  larger, we're going to fund that.  We're putting 450 million at

24  a minimum into this transaction.  We're not going to be in any

25  ways whatsoever negligent on our investment.  And in many

1   situations we've put more capital into situations and it's been

2   a lot larger than twenty-four to thirty million at a smaller

3   investment base.

4   Q.    Well, yesterday we heard Mr. Weill testify that you aren't

5   intending to honor the change in payment waterfall.  I believe

6   he testified that to a number of different witnesses.  Is your

7   understanding different than Mr. Weill's?

8   A.    You know, my goal here today was to provide adequate

9   assurance.  Okay?  I don't think I'm here to discuss anything

10   else other than to say that, you know, we are going to be

11   contractually in line with everything that we're supposed to do

12   per the APA and, you know, I'm not quite sure in terms of --

13   you know, I haven't read documents.  I'm not going to speculate

14   on documents.  And I do refer to both our legal advisors as

15   well as the operating personnel at the company right now who we

16   like and who we think are doing a good job.

17   Q.    In running the numbers for the financing of the

18   Acquisition Corp. did you determine what the maximum and

19   servicing advances you might be exposed to would be?

20   A.    We've run different scenarios in our modeling.  So we have

21   downside cases, we have upside cases and, sure, we're very

22   conservative in where we feel that we're going to be.  So when

23   I tell you twenty to thirty million, I think that's a very good

24   estimate of the money that's going to be used for working

25   capital and the advances in the interim period.

1   Q.   What's the maximum that you've determined was this maximum

2   amount of servicing event that you might be exposed to?

3   A.   We're in that ball park of twenty to thirty million

4   dollars.  And that discussions that our people in New York have

5   had with the company.

6   Q.   Now, Mr. Weill testified yesterday that one of the things

7   you were purchasing was net servicing advances.  What are net

8   servicing advances?

9   A.   The current advances out to the company which I know he

10  said were in the neighborhood of a hundred million dollars.

11  Okay?  And those are, you know, funded for loans that are

12  being -- that are late payment.  It's for taxes, principal,

13  interest, et cetera.

14  Q.   What are the servicing advances net of?  What's the amount

15  that's subtracted?

16  A.   I don't know.  I would refer to the APA.

17       MR. CLEMENTS:  Your Honor, may I approach the bench?

18  We have another volume.

19       THE COURT:  Yeah.  Thank you.

20       MR. CLEMENTS:  Your Honor, I'd like to move into

21  evidence Exhibit 1, the Purchase Warranties and Service

22  Agreement that we had marked as EMC 1.

23       THE COURT:  Any objection?

24       MS. MORGAN:  No objection, Your Honor.  No objection.

25       THE COURT:  All right.  EMC 1 is admitted into

41

1    evidence without objection.

2    (Exhibit EMC 1, Purchase Warranties and Services Agreement, was

3    hereby received into evidence, as of this date.)

4    Q.   Could you please turn to page -- to Tab 12?  Exhibit A.

5    Is this the asset purchase agreement that your company's

6    entered into?

7    A.   Yes.

8    Q.   Can you please turn to Schedule 5.6-D(2)(i)?

9         MS. MORGAN:  Your Honor, if I may, this is already

10   admitted as 105.  And 105 has some nice handy tabs for the

11   witness rather than thumbing through all these pages.

12        MR. CLEMENTS:  I don't have --

13        MS. MORGAN:  The APA was already admitted as Exhibit

14   105.

15        MR. CLEMENTS:  Okay.

16        MS. MORGAN:  If you use the other binder, you'll have

17   some ease in finding that schedule.

18        THE COURT:  What's the tab, please?

19        MS. MORGAN:  105.  Oh, Schedule 5?

20        MR. CLEMENTS:  Schedule 5.6-D(2)(i), page 2 of 3.

21        THE WITNESS:  This book is falling apart.

22        THE COURT:  Somebody help the witness.  Thank you.

23   Thank you.  Which schedule are we on, sir?

24        MR. CLEMENTS:  I apologize.  This is up to line 5.18.

25   I apologize, this is very small numbers here.

42

1        THE COURT:  What schedule, though?

2        MR. CLEMENTS:  Schedule 5.6-D2 and it's page 2 of 3.

3        THE COURT:  Okay.

4   BY MR. CLEMENTS:

5   A.   Can you just read the title so I know --

6   Q.   Excuse me.  The title of this is Advances and the title of

7   the spreadsheet says American Home Mortgage Servicing Investor

8   Summary.

9   A.   What -- I'm sorry.  I'm just on the wrong -- what was the

10  --

11  Q.   It's the schedule 5.6-D little 2(i).  It says Advances.

12  A.   Yep, got it.  Got it.  I'm sorry.  What was the --

13  Q.   Page 2 of 3, line 518.  You may need to bring out the

14  glasses for this.  Magnifying glass.

15  A.   All right.  I have the spreadsheet.  What was the --

16        THE COURT:  Line 518, sir.  Page 2 of 3.  It's titled

17  EMC/Bear Stearns.

18        THE WITNESS:  Got it.  Got it.

19        THE COURT:  All right.  You have a question?

20        MR. CLEMENTS:  Yes.

21  Q.   Do you see the column titled UPB?  Does that stand for

22  unpaid balance?

23  A.   Yes.

24  Q.   Is the amount for unpaid balance for EMC/Bear Stearns 1.2

25  billion dollars?

43

1   A.   Yes.

2   Q.   The next column says Cumulative Gross PI Advanced.  Is

3   that the servicing advance?

4   A.   It's the principal and interest advance.

5   Q.   Is that amount 430,187 dollars?

6   A.   Yes.

7   Q.   The next column says Cumulative Net Principal Interest

8   Advance, is that right?

9   A.   Yes.

10  Q.   The amount listed there is zero, is that correct?

11  A.   Yes.

12  Q.   The next column is Borrowing on Pre-Payments, Principal

13  and Interest, is that correct?

14  A.   Yes.

15  Q.   And the amount if 430,187?

16  A.   Yes.

17  Q.   What is that borrowing on pre-payments?

18  A.   I don't know.  I haven't seen the schedule.

19  Q.   Is it your understanding that amounts scheduled for

20  payment of early payment default might be netted with the

21  servicing advances to help financing this deal?

22          MS. MORGAN:  Objection, Your Honor.  I'm just not

23  even sure I understand the question.

24          THE COURT:  I didn't either.

25          THE WITNESS:  I didn't either.

1      MR. CLEMENTS:  I'm wondering what this -- Your Honor,

2  I'm asking what this Cumulative -- this Borrowing on Pre-

3  Payments number is --

4      THE COURT:  And he said he didn't know.

5      MR. CLEMENTS:  -- for servicing advances -- we're

6  wondering where this net servicing advance is.  What's the

7  overall --

8      THE COURT:  Hang on.  Mr. Power, you're going to

9  need -- if you're going to talk you need to move away from the

10  microphone.

11     MR. POWER:  Sorry, Your Honor.

12     THE COURT:  I can't hear counsel.

13     MR. CLEMENTS:  To understand the financing of this

14  deal, we need to know what this net servicing advance is.  If

15  the overall servicing advance that they're purchasing is 500

16  million and they're netting it with amounts that are due to my

17  client, we need to know that going into this deal.  That's

18  the -- I'm trying to get out if he's not the person who can

19  testify to this, who is in his company?  We would --

20     THE COURT:  Ms. Morgan?

21     MS. MORGAN:  Your Honor, I don't know if this goes

22  past my standing objection.  This witness testified he did not

23  have significant involvement in the APA.  It is definitely

24  beyond the scope of both his knowledge and the direct.  And

25  this document says what it says.  It's already in evidence.

45

1    THE COURT:  All right.  See if you can restate the

2  question again.

3  BY MR. CLEMENTS:

4  Q.   What is your understanding of what is subtracted from the

5  servicing advances to make this net amount that you're

6  financing?

7  A.   I -- I don't know.  I can read a spreadsheet but I'm not

8  going to speculate at this point.

9  Q.   Is there anyone in your company who you can identify who

10  would be able to testify to the amount that goes into the net

11  servicing advances?

12  A.   I can't speculate at this point if other people have

13  looked at this spreadsheet either.

14  Q.   Okay.  Now under -- this part of the purchase price, have

15  you set aside certain amounts for cures for any contracts that

16  the Court decides needs to be cured?

17  A.   We have over four billion dollars in liquidity.  And

18  again, going back to what's required under the APA, we will be

19  in full compliance for any funding.

20  Q.   Who's making that commitment?  WLR Funds, have they signed

21  on a commitment or has AHM Mortgage Acquisition Company signed?

22  A.   The company will be capitalized.  AH Mortgage Acquisition

23  Co. will be capitalized with funds from the WLR recovery funds.

24  The capital from WLR recovery funds will be approved by the

25  investment committee which it already has been, you know, by

1    Wilbur Ross, myself and the other members.  And it's been

2    approved unanimously by the investment company so the money is

3    there.

4    Q.   Is there a limit to how much money you've determined is

5    available to this company?

6    A.   No.

7    Q.   You don't have a maximum amount set?

8    A.   Well, we have approval for up to a certain amount and that

9    money that will fund the terms of the -- you know, per the

10   terms of the APA is available as well as additional capital

11   that we might need in the interim.

12   Q.   Can you tell us what that amount you have approval for is?

13   A.   No.  That's privy to the investment committee.  But it

14   shouldn't be a concern.

15   Q.   Can you tell us what the unpaid principal balance of the

16   loans you're purchasing is as of today?

17   A.   Given that we got conditional approval from Fannie Mae, it

18   looks like we'll probably be, I would say, ball park, you know,

19   forty-one billion or so.

20   Q.   And is thirty-eight billion the minimum amount that you

21   committed to purchase?

22   A.   Correct.

23   Q.   Why is thirty-eight billion the minimum amount?

24   A.   I don't recall how that number came up?

25   Q.   Is there some industry standard that you're aware of that

47

1    makes thirty-eight billion --

2    A.   I'm not sure.  There could have been another conversation.

3    Q.   Okay.

4         MR. CLEMENTS:  Excuse me.  Bear with me, please, Your

5    Honor.

6    Q.   If the Court decides that the EMC loan amount is one

7    contract, do you intend to pay the cure amount as part of this

8    purchasing agreement?

9    A.   I would, you know, talk to my lawyers about what needs to

10   get paid or what shouldn't be paid.  But again, if it's a

11   matter of us being in compliance which is our obvious intent --

12   Q.   Can you show me in the agreement or anywhere where you've

13   established a procedure for determining what amounts would need

14   to be cured for EMC or this --

15   A.   I can't recall where that's been --

16   Q.   Do you understand as part of your purchasing that there

17   are things called disputed contracts which may not be part of

18   the purchase?

19   A.   Yes.  I've seen that in the APA?

20   Q.   From a business perspective, why isn't EMC on that list?

21   A.   I don't know.

22   Q.   Would WL Ross still go through with this deal if EMC was

23   on the disputed amount list?

24   A.   I -- I mean, we're in -- if everything is in compliance

25   with the APA, I think we're moving forward.

48

1    MR. CLEMENTS:  Thank you, Your Honor.  No further

2  questions.

3    MR. GALLO:  Good morning, Your Honor.  Good morning,

4  sir.  For the record, Andrew Gallo, from Bingham McCutchen for

5  DB Structured Products, Inc.

6  CROSS-EXAMINATION BY

7  MR. GALLO:

8  Q.   Mr. Storper, we established yesterday that my clients' May

9  1st, 2006 Master Loan Purchase and Servicing Agreement is among

10  the agreements that are going to be transferred pursuant to the

11  transaction that we're dealing with here today.  I can assume

12  that you have not read my clients' agreement, correct?

13  A.   Correct.

14  Q.   And so, when you testified on direct examination that your

15  client was prepared to fulfill the obligations under the

16  servicing agreements, that was without personal knowledge of

17  the specific provisions of my clients' agreement, correct?

18  A.   I mean, I am the client, I guess, in terms of being part

19  of WL Ross and the Investment Funds.  But again, you know, I

20  just defer that we're going to be in compliance with all terms

21  under the asset purchase agreement.

22  Q.   My question, though, is that when you testified on direct

23  examination that the purchaser was prepared to satisfy all the

24  terms of the servicing agreements, that was without personal

25  knowledge of the specific provisions of my clients' agreement,

1    correct?

2    A.    That's correct.

3    Q.    And Mr. Weill testified yesterday that the UPB of the

4    transaction -- of the loans that are going to be serviced

5    pursuant to this transaction is, with the Fannie Mae loans,

6    will be approximately forty to forty-four billion dollars.  Is

7    that consistent with your understanding?

8    A.    Correct.

9    Q.    And are you aware that the UPB of the loans that are

10   serviced pursuant to my clients' agreement is approximately 180

11   million dollars or .5 percent of the UPB of the transaction?

12   A.    I'll take your word but, no, I was not personally.

13   Q.    You indicated that the purchaser has received conditional

14   approval pursuant to the conditional approval letter from

15   Fannie Mae.  Is that correct?

16   A.    Correct.

17   Q.    Has the purchaser received conditional approval from

18   Freddie Mac?

19   A.    No.

20   Q.    Are you attempting to receive the same type of approval

21   from Freddie Mac?

22   A.    I don't think so.  I'm not sure if we need it.  It was

23   either/or from our understanding.

24   Q.    So your understanding of the servicing agreements is that

25   you need either Fannie or Freddie but you don't need both?

1   A.   I -- you know, I believe so.

2   Q.   You testified earlier on cross that there was a limit that

3   your investment committee has placed on the amount that you can

4   invest in this particular deal, is that correct?

5   A.   No.  There really is no limit.  I just can't really

6   discuss what our internal procedure is on investment committee

7   limits and limits on investment or that's privy and that's not

8   something that we discuss with even our limited partners.

9   Q.   So let me under -- I'm trying to understand then.  Is

10  there a limit or is there not a limit?

11  A.   I think by saying if there's not a limit that's the same

12  thing as giving a limit.  I'm saying that, you know, we have

13  obviously by, you know, having over four billion dollars at the

14  end of this month available that there is no concern about any

15  funding issues on this transaction, both for the purchase

16  price, working capital as well as any potential to have to fund

17  operating losses if they occur.

18  Q.   I still don't understand.  Is there a limit to how much

19  Ross is willing to invest in this particular transaction?

20  A.   Then, you know -- no.

21          MR. GALLO:  All right. I have nothing further, Your

22  Honor.

23          THE COURT:  Thank you.  Any further questions on

24  cross?  Hearing none, I'm going to re --

25          MR. CROWLEY:  Your Honor, I --

1    THE COURT:  Well, come on.  Don't be slow.  We got

2  three more witnesses.  Let's just -- let me have a show of

3  hands of anyone other than Mr. Crowley who intends to ask

4  questions.  Okay.  Mr. Fallon.  No one else.  All right.  Thank

5  you.  Go ahead, Mr. Crowley.

6  CROSS-EXAMINATION BY

7  MR. CROWLEY:

8  Q.   Mr. Storper, good morning.

9  A.   Good morning.

10  Q.   Am I correct that it is, as of today, the purchaser's

11  intention ultimately to include within the purchased assets the

12  Fannie Mae mortgages?

13  A.   Yes.

14  Q.   Okay.  To your knowledge, is the purchaser obligating

15  itself to do that or is that in effect an option on the part of

16  the purchaser?

17  A.   It's our intent to service the Fannie Mae mortgages.

18  Q.   Okay.  Is the transaction for which court approval is

19  being sought from the purchaser's standpoint dependent upon

20  including the Fannie Mae mortgages?

21  A.   It was not.  We had other terms to meet but, clearly,

22  we're wanting to service the Fannie Mae mortgages.

23  Q.   Okay.  Let me ask a slightly different question.  Can you

24  hit the thirty-eight billion dollar minimum without the Fannie

25  Mae mortgages?

52

1    A.   I don't know.  You'd have to talk with the company about

2    that.

3    Q.   Okay.

4            MR. CROWLEY:  Your Honor, if I can approach?  I want

5    to hand him his deposition.

6            THE COURT:  Okay.  Thank you.

7    Q.         I've got a couple more copies I need to -- okay.  Mr.

8    Storper, I want to direct your attention to pages 19 and 20 of

9    your deposition testimony on the subject of the Fannie Mae

10   mortgages.

11           MR. CROWLEY:  And if I may, Your Honor, what I'd like

12   to do is simply I'll read the questions and ask Mr. Storper to

13   read the answers.

14           THE COURT:  Are you on -- I'm sorry, page what?

15           MR. CROWLEY:  Beginning on page 19, line 6.

16           THE COURT:  Is it -- page numbers at the bottom?

17           MR. CROWLEY:  I realize I have a copy that I printed

18   off of a text file.  I think maybe the relevant page number if

19   it were an official transcript would be in the right margin,

20   which would be --

21           THE COURT:  Okay.

22           MR. CROWLEY:  -- 19 but on this -- if you look at

23   page 17 at the bottom --

24           THE COURT:  Okay.  Thank you.

25           MR. CROWLEY:  -- beginning on line which is under --

53

1    on page 19.

2    BY MR. CROWLEY:

3    Q.   Do you see where I'm referring, Mr. Storper?

4

5         THE COURT:  Actually, Mr. Crowley, you can read the

6    questions and answers yourself.

7         MR. CROWLEY:  Okay.  Sure.

8         THE COURT:  You don't to get the witness involved.

9         MR. CROWLEY:  "Question:  What is the total volume of

10   mortgage loans expected to be included within the servicing

11   contracts that you expect to assume or acquire in connection

12   with the purchase of the servicing business of American Home?

13        "A.  The minimal amount is thirty-eight billion.

14        "Q.  Do you how many of those are Fannie Mae mortgages or

15   Freddie Mac mortgages?

16        "A.  That does not include Fannie Mae.

17        "Q.  Question --

18        "A.  The thirty-eight billion excludes Fannie Mae and I

19   can't recall exactly the Freddie Mac number.

20        "Q.  Do you expect to eventually include the servicing

21   contracts for Fannie Mae mortgages as well?

22        "A.  If we get approval, we will include that.

23        "Q.  What is the approximate volume of the Fannie Mae

24   mortgages which you would pick up?

25        "A.  Approximately five billion."  And then I'll skip down

1  to page 20, a few lines further down, beginning on line 8.

2       "Q.  Is the servicing business that you were trying to

3  purchase, is it buyable without the Fannie Mae mortgages.

4       "A.  We believe it is.

5       "Q.  Have you run any pro forma business plans showing the

6  business without the Fannie Mae mortgages in it?

7       "A.  We've run models.

8       "Q.  What do those models show?

9       "A.  We have run various scenarios.

10      "Q.  What specifically do they show about the viability of

11  the servicing business without the Fannie Mae mortgages

12  included?

13      "A.  Our bid is for without.  We also have a bid with a

14  minimum number of mortgages without Fannie Mae shows it's

15  viable."  Okay.  Do you recall giving that testimony on Friday

16  when you gave deposition testimony?

17  A.   Yes.

18  Q.   Okay.  So is it fair to say then that the purchase that

19  you'[re proposing to make of the servicing business would be

20  economically viable from the purchaser's standpoint without the

21  Fannie Mae mortgages?

22  A.   Yes.  I mean, we're looking at thirty-eight billion as the

23  minimum balance that didn't include the Fannie Mae balance, if

24  I could make myself more clear.  But our goal was to purchase

25  more MSRs and Fannie Mae was -- you know, was obviously a --

1    you know, a piece of that business.

2    Q.   And the purchaser certainly has a preference indeed, would

3    it be fair to say, a strong preference to include the Fannie

4    Mae mortgages?

5    A.   Yes.  We're looking to be a larger player in this business

6    than smaller.

7    Q.   Okay.  And do you understand the role the Bank of New York

8    plays in some of these servicing and mortgage-backed securities

9    transactions?

10   A.   Maybe you can repeat that.

11   Q.   Okay.  Do you understand that one of the roles my client

12   has here is that it is indenture trustee for mortgage-backed

13   securities, the underlying loans for which are serviced by

14   American Home Mortgage?

15   A.   Yes.

16   Q.   Okay.  And do you understand that it's my client's

17   position in this case that final Fannie Mae approval is

18   required before servicing contracts can be assigned to your

19   company?

20   A.   I believe that's what you're telling me.

21   Q.   Okay.  Could you turn to Debtor Exhibit 106, please, which

22   is the Fannie Mae letter?

23        MR. CROWLEY:  Your Honor, I don't think this was

24   offered in evidence.  I'm prepared to stipulate it in.

25        THE COURT:  Any objection?

1    MS. MORGAN:  No, Your Honor.

2    THE COURT:  All right.  106 is admitted without

3  objection.

4  (Debtor's Exhibit 106, the Fannie Mae letter, was hereby

5  received into evidence, as of this date.)

6    THE COURT:  While he's looking for that, somebody

7  just used that door to exit, Mr. Dorsey?

8    MR. DORSEY:  I apologize, Your Honor.

9    THE COURT:  Don't do that again.  You get me in a lot

10  of trouble when you do that.  You have to exit through the

11  back.  Otherwise, you know, the CSOs get upset.

12    MR. DORSEY:  They looked at me very strange.

13    THE COURT:  I'm sure they did.

14    MR. CROWLEY:  May I proceed, Your Honor.

15  BY MR. CROWLEY:

16  Q.   Look at Exhibit 106, please.  Is that the -- what's been

17  characterized as a conditional approval letter from Fannie Mae?

18  A.   Yes.

19  Q.   And that's addressed to your organization?

20  A.   Yes.

21  Q.   Okay.  I want to just go through the conditions in here

22  for a minute.

23    MR. CROWLEY:  Your Honor, do you have a copy in front

24  of you?

25    THE COURT:  Yes.

57

1        MR. CROWLEY:  Okay, thanks.

2    Q.   I'm going to propose that we skip the first one because

3    that's the condition that the Court enter an order which is

4    obviously under the Court's control and no one else's.  Let me

5    look at the second condition which says "By October 19, 2007,

6    AH Acquisition shall provide to Fannie Mae executed

7    authorization for verification of credit and business reference

8    forms (Fannie Mae Form 1001) for AH Acquisition, WLR Recovery

9    Funds 3LP and WLR Recovery Funds 4LP."  Just to be clear, the

10   two WRL (sic) Recovery Funds that are listed here are the

11   anticipated owners of the purchaser, is that correct?

12   A.   Correct.

13   Q.   Okay.  And does your organization intend to provide the

14   information described in that bullet point?

15   A.   Absolutely.

16   Q.   Okay.  Is there any doubt in your mind that that's going

17   to be provided?

18   A.   Absolutely not.

19   Q.   Okay.  Could we turn to the next bullet?  "By October 31,

20   2007, AH Acquisition must obtain and provide Fannie Mae with

21   proof of the Fidelity bond and errors in omissions coverage

22   required by Part 1, Sections 305, 305.1, and 305.2 of Fannie

23   Mae's servicing guide."  Does AH Acquisition intend to obtain

24   and provide that information?

25   A.   Absolutely.

1    Q.   Any doubt in your mind about that?

2    A.   No.

3    Q.   Let me look down to the third bullet for a minute.  And

4    this one I'm going to have a slightly more complicated question

5    about but it reads "Within thirty days of the initial closing

6    date (as defined in the APA) AH Acquisition must provide Fannie

7    Mae with an audited balance sheet of AH Acquisition which

8    balance sheet must reflect net worth in the amount required by

9    Part 1, Section 302 of Fannie Mae Servicing Guide, i.e., at

10   least 250,000 dollars plus a dollar amount that represents two-

11   tenths percent of the outstanding principal balance of its

12   portfolio of mortgages serviced for Fannie Mae.  Do you see

13   that?

14   A.   Yes.

15   Q.   Okay.  And does your organization intend to provide that

16   as well?

17   A.   Absolutely.

18   Q.   Any doubt about that at all?

19   A.   No.

20   Q.   I do have one question which is on the audited balance

21   sheet point and -- you're not an accountant, are you?

22   A.   I'm not.

23   Q.   All right.  I'm not either.  So I'll ask the question and

24   if you can answer it, fine, and if not then we'll move on.  But

25   as I understand it, at the initial closing, you're going to pay

1    hundreds of millions of dollars, correct?

2    A.    Correct.

3    Q.    But at that point in time, what are you going to own?

4    A.    We're -- well, economically, we've, I guess, closed at the

5    initial closing.  We don't have a legal close.

6    Q.    So, I mean, you won't actually own the purchased assets at

7    that point, will you?

8    A.    I -- I, you know, I'd have to defer to the lawyers for the

9    exact way to describe that, but, you know, for all intents and

10   purposes, we have an economic close.  Legal close is --

11   Q.    Yeah.

12   A.    -- subsequent.

13   Q.    The -- and let's, just to be clear about the net worth

14   we're talking about, the Fannie Mae mortgages are roughly five

15   billion?

16   A.    Correct.

17   Q.    Okay.  Correct me if I'm wrong but I calculated the

18   contemplated net worth described in this paragraph as being

19   approximately ten million dollars.  Does that sound about

20   right?  Two-tenths of one percent of five billion -- I don't

21   have my calculator with me but --

22   A.    I -- I guess that's --

23   Q.    Okay.  There was testimony yesterday from Mr. Weill that

24   this two-stage closing was somewhat unusual.  In fact, it had

25   only been used in one other circumstance.  And what I'm trying

60

1   to find out is whether anybody's considered the accounting

2   implications of paying hundreds of millions of dollars but not

3   actually owning anything other than a contractual right to

4   future delivery and whether that's going to impact your ability

5   to procure an audited balance sheet showing the minimum net

6   worth.

7   A.    I can't answer that.  But I think -- you know, we're

8   putting up a lot of money in this situation --

9   Q.    Yeah.

10  A.    -- so, you know, we expect to comply with everything.  I

11  mean, that's our goal.  You know, that's putting a lot of money

12  at risk.

13  Q.    Presumably you would do whatever you needed to do to show

14  legitimately show, the minimum network necessary, correct?

15  A.    Absolutely.

16  Q.    Okay.  And we can count on that?

17  A.    Absolutely.

18  Q.    Okay.  Next bullet says "Substantially all of the

19  management team and servicing policies and procedures presently

20  in place in American Home Mortgage Corp. shall remain in

21  place."  And is that the purchaser's intent?

22  A.    Yes.

23  Q.    Any doubt about that at all?

24  A.    No.

25  Q.    Okay.  Final bullet:  "The occurrence of the final closing

1  date as defined in the APA."  Now that one is obviously --

2  well, let me ask.  I mean, from your standpoint, once the Court

3  enters an order -- if the Court --

4          MR. CROWLEY:  I'm sorry, Your Honor.

5  Q.   If the Court enters an order approving this transaction as

6  substantially the form presented and if you reach initial

7  closing and you've paid the hundreds of millions of dollars, is

8  there any realistic doubt in your mind that you'll get to the

9  point of final closing?

10 A.   No.  I would tell you we're going to do everything to get

11 to our final closing.  That's a lot of money to have at risk in

12 any investment no matter how much money that you've earned as

13 an investment firm.  And as I think you can see, I mean, we've

14 worked very quickly with the rating agencies.  We've worked

15 very quickly with Fannie Mae.  And our goal is to also leverage

16 off of this investment and expand our platform and the space.

17 Q.   Yeah.  I mean, just to be clear, I mean, you're highly,

18 highly incentivized because you've already put your money up to

19 get to final closing?

20 A.   Correct.

21 Q.   Okay.

22 A.   We'd have a lot of explaining to do if it --

23          MR. CROWLEY:  No further questions, Your Honor.

24          THE COURT:  Thank you.  Mr. Fallon?

25 CROSS-EXAMINATION BY

62

1   MR. FALLON:

2   Q.   Good morning, Mr. Storper.  My name is Brett Fallon from

3   CitiMortgage.  I just had a few questions.  Is AHM Mortgage

4   Acquisition Co. intending to be licensed and qualified to

5   transact business in every state in the union?

6   A.   I believe it's moving forward on the licensing process.  I

7   don't know if it's every single state but, you know, I haven't

8   worked on that aspect of --

9   Q.   Do you know one way or the other?

10  A.   I do not.

11  Q.   Does AHM Mortgage Acquisition intend to become a HUD-

12  approved mortgagee?

13  A.   I guess if that's what's required, if that's what the

14  business is currently operating as, then, yes.

15  Q.   But do you know one way or the other?

16  A.   I do not.

17  Q.   Does AHM Mortgage Acquisition anticipate having any

18  relationship with the FDIC?

19  A.   Again, I have not worked on this aspect.  I would have to

20  talk with counsel and our other advisors on this.

21  Q.   So you don't know?

22  A.   I don't know.

23  Q.   I take it from your prior testimony that AHM Acquisition

24  will have a net worth of greater than twenty-five million

25  dollars, is that fair?

1    A.    That's fair.

2    Q.    Okay.  Let me just move forward in time and let's assume

3    that the Court grants your sale motion that's requested and we

4    have an initial closing.  And my question is really going to be

5    directed to that gap period.  Is it your understanding that AHM

6    Mortgage Acquisition would retain the right to not assume a

7    contract after the initial closing and before the final

8    closing?

9    A.    I don't believe that we're assuming any obligations or

10   liabilities past the initial close but I would also talk with

11   my attorneys on that.

12   Q.    So that if there's a servicing contract and we all agree

13   on what that servicing obligation is, is it your testimony that

14   AHM Mortgage Acquisition does not have any obligations to

15   comply with that servicing obligation in this interim period?

16   A.    I can tell you we're going to comply with everything that

17   needs to be complied with.  And -- you know, I can't answer

18   that.

19   Q.    Well, what I'm trying to figure out is, let's assume that

20   we have a contract, it's on the list of assumed contracts and

21   for whatever reason AHM Mortgage Acquisition decides that it

22   doesn't want to assume that contract or that it's more of a

23   liability that an asset.  Is that something -- is it your

24   understanding that you can say "I no longer want that contract;

25   it's out of the deal"?

1          MS. MORGAN:  Your Honor, objection.  Again, goes

2     beyond the scope of this witness' direct and his knowledge.

3     This goes to the mechanics of the APA which this witness

4     testified he's not intimately familiar with.

5          MR. FALLON:  Well, Your Honor, I'm trying to find

6     out, he's been put forward as the witness for adequate

7     assurance of future performance.  So I'm trying to figure out

8     if his company will perform under the contract or if he's not

9     going to perform.

10          THE COURT:  Well, there's a difference between

11     adequate assurance of future performance on an assumed contract

12     and whether or not someone is going to assume a contract.

13          MR. FALLON:  And we're trying to figure out if

14     they're going to initially assume it and then no longer perform

15     under it.

16          THE COURT:  All right.  I'll allow the question.

17     BY MR. FALLON:

18     A.   You know, I'm not -- you know, and none of us at the firm

19     are the operating team on this and, you know, I can't answer

20     that other than to say, again, if everything is -- anything

21     that's required of us, we're -- you know, we will comply.

22     Q.   All right.  Let me move on to -- regardless of whether

23     it's before or after the final closing.  Do you have any

24     understanding as to whether AHM Mortgage Acquisition retains

25     the right to assign or sell the servicing obligations to

65

1   anybody else?

2   A.   I do not know.

3   Q.   Okay.

4           MR. FALLON:  Your Honor, I don't have any further

5   questions.

6           THE COURT:  Thank you, Mr. Fallon.  Mr. Dehny?

7           MR. DEHNY:  I apologize, Your Honor.  I understand

8   you asked --

9           THE COURT:  That's fine.

10          MR. DEHNY:  I was out with Mr. Cleary.

11          THE COURT:  That's fine.

12          MR. DEHNY:  Just a couple of questions, if I can, to

13  confirm.

14          THE COURT:  Identify yourself for the record and your

15  client, please.

16          MR. DEHNY:  I'm sorry.  Robert Dehny from Morris

17  Nichols Arsht & Tunnell here on behalf of Assured Guaranty.

18  CROSS-EXAMINATION BY

19  MR. DEHNY:

20  Q.   Good morning, sir.

21  A.   Good morning.

22  Q.   This will be shorter than Friday.  Sitting here today as

23  the representative of the purchaser, it is correct that there

24  is no committed working capital funding to operate the business

25  post final closing, correct?

1    A.   No.  I think -- I think to elaborate on that, you know, we

2    understand that there are going to be some funding requirements

3    and that the money is available on, again, a minute's notice.

4    Q.   Okay.  When I asked you on Friday whether there was any

5    committed financing available, you said "That is correct.  It

6    is too early in the process."  Has something happened between

7    Friday and today where there's a firm commitment?

8    A.   No.  I think I can articulate more.  You know, our

9    investment funds obviously have more than enough liquidity and,

10   you know, maybe I wasn't clear on Friday, but when we have

11   400 -- at least 450 million dollars at risk, you know, we

12   understand that, you know, we would have to add at times

13   additional liquidity and it's available.  We're not going to

14   put that kind of money at risk, you know, for what can be

15   deemed as somewhat more of a diminimus amount.

16   Q.   I appreciate that you're paying cash for the purchase

17   price.  The question is much more narrow.  And that is, at the

18   final closing, is there a committed loan or source of cash

19   where there can be a draw that day to fund PNI advances?  Is

20   that in place today for the Court and the counterparties to

21   see?

22   A.   Well, I could say we have nothing lined up from an

23   external source of capital but internally, I can say, yes,

24   there's capital available.

25   Q.   Well, internally, I understood that there are a couple of

1   different funds and as to each fund there would have to be a

2   presentation and then an approval process.  Has that been done

3   today -- as of today?

4   A.   For --

5   Q.   For the additional liquidity or working capital that would

6   be needed from and after the final closing.

7   A.   No, but it's been talked about, about investment size and,

8   you know, the whole committee understands what it is.

9   Q.   But it's not done today, correct?

10  A.   I will have to check with my office to see if there's been

11  something prepared.

12  Q.   Okay.  And I think you said at least in earlier

13  questioning there was a committee comprised of six members.

14  You and Mr. Ross are two and that leaves four others whose

15  approval -- or I guess, it's a majority so you would need two

16  more of the votes.  Who are the four members, the other four

17  members?

18  A.   My colleagues, David Wax, Stephen Toy, Pam Wilson and

19  Wendy Teramoto.

20  Q.   Has there ever been a situation where there's been a

21  disagreement about how money should be deployed among the six

22  of you?

23  A.   No.  In fact, every decision that we've made is unanimous

24  decision.

25  Q.   Okay.

1   A.   Though that's not required.

2   Q.   Okay.  So between now and the final closing, is it your

3   expectation that you would obtain that approval and would have

4   that committed funding in place by the final closing?

5   A.   I could go back today to the investment committee and get

6   a commitment approval today.

7   Q.   Okay.  That would help people if they knew it was fully

8   committed.  The next -- so from adequate assurance, we

9   understand that the first prong of your perspective adequate

10  assurances, you have the money to write the check and now

11  you're going to go back and confirm that it is committed for

12  post closing.  The second point, I think, from your perspective

13  was you like the management and you intend to hire them.  On

14  Friday, you had indicated that you had no knowledge whether any

15  offers had been made.  Have any offers been made to hire these

16  people?

17  A.   I can't confirm that but I think discussions have

18  occurred.

19  Q.   Okay.  So we don't know today whether any offers have been

20  made.  Do you know whether any of them have accepted and agreed

21  to work for the purchaser from and after the final closing?

22  A.   You know, there have been conversations.  I think that

23  given what's going on in the mortgage industry right now, I

24  think people are excited about working in this opportunity

25  going forward.

69

1   Q.   There was a list -- there was an adequate assurance

2   package that was provided to people and a list of individuals

3   identified as key for going forward.  Do you recall that?

4   A.   Correct.

5   Q.   Okay.  And on Friday I asked whether you were familiar

6   with any of the individuals and the importance of their role

7   going forward.  Do you remember that?

8   A.   Yes.

9   Q.   And you were unfamiliar with whether Mr. Friedman, the

10  executive VP, whether his failure to work for the purchaser

11  would have some material adverse affect on servicing.  Is that

12  still your understanding today?

13  A.   I don't, you know -- you know, I think Mr. Friedman is

14  quite experienced.  I think we like him, we like what he's been

15  doing there.  Our intent is to have him and his team move

16  forward again.  You know, we're not operators at WL Ross.  You

17  know, I think we're very good at selecting good operators and,

18  you know, our goal is to transition the situation in a seamless

19  fashion.  And obviously management right now are people that we

20  want on board.

21  Q.   What is your alternative B or game plan if you're unable

22  to retain the services of the people that you've identified as

23  key going forward employees?

24  A.   Well, as I mentioned, I mean, there's a lot of change

25  going on in the mortgage industry.  I think, you know, there's

1    a lot of people looking for jobs at this point.  I think -- you

2    know, we've certainly had inquiry from quite experienced

3    people.  So I -- you know, I don't think there would be a lack

4    of ready, willing and able personnel to work in this situation.

5    Q.    So you'll address it when you get to the final closing,

6    basically?

7    A.    We address it all the time.  I mean, we always -- you

8    know, if we see somebody that's good that's looking for a job

9    that -- you know, you always find a place for a good person.

10   It's the same thing at our firm.

11   Q.    Okay.  But on the counterparty side, the concern is that

12   you are not operators and you are acquiring the business with

13   the intention of having knowledgeable personnel running the

14   company.  So am I to understand that on the final closing you

15   will either have hired substantially all of these individuals

16   or you would have hired comparably skilled people?

17   A.    Absolutely.

18   Q.    Okay.  And what was your in -- if you're unable to do that

19   at final closing, then what?  Are you going to defer final

20   closing or close and look to fill slots?

21   A.    You know -- I mean, that's a bit of a ways away.  I could

22   tell you, we have this kind of money at risk and -- you know.

23   I don't anticipate this is going to be an issue that surrounds

24   the final close.  I think this will be wrapped up a lot sooner.

25   Q.    You mentioned it is a bit away.  How far after, you think,

1   the final closing will be?

2   A.   I mean, I guess from -- you know, in terms of getting all

3   the other necessary conditions, a few months.

4   Q.   So, we're asking the Court to find adequate assurance

5   today but you're not going to be in a position to close for

6   several months.  If there's a change in the ability to hire

7   people, what does that mean?

8   A.   I'm not sure that that's something that lets us out of our

9   obligations.  We're going to be in compliance with the APA and

10  all of the conditions, you know, for this transaction and, you

11  know, our goal is to obviously transition this, as I said, in a

12  seamless way, and so far, I think we're doing a pretty good job

13  in terms of getting Fannie conditional approval as well as the

14  no downgrade letters from the three rating agencies.

15  Q.   Is it fair to say that my questions about who you're going

16  to hire are asking you to speculate?

17  A.   I -- I can't answer that.  I can tell you who -- you know,

18  right now we're happy.  We like management and we're trying to

19  move forward with them.  And I think things right now are

20  indicative of their wanting to work with us.

21  Q.   But as we sit here today, we don't know who's going to be

22  there four months from now at closing, correct?

23  A.   Well, I guess -- I guess there is some truth to that but I

24  can tell you with our other investments, it's -- you know, we

25  have a closing but, you know, you never know.  So --

1   Q.   Lastly, you indicated on Friday that WLR's intention was

2   to use this as a platform to add additional servicing loans.

3   Do you recall that?

4   A.   Yes.

5   Q.   When do you anticipate that's going to occur?

6   A.   I think there's other opportunities in the market right

7   now that we're looking at.  As in any of the industries we've

8   been involved in, you know, we like to -- we like to grow the

9   business.

10  Q.   Specifically, I think you're looking at Northrock,

11  correct?

12  A.   I can't say what we're looking at or --

13  Q.   What impact is that going to have on the current servicing

14  for the existing American Home loans?  Do you have an

15  understanding of whether there will be disruption integrating

16  them?

17          MS. MORGAN:  Objection, Your Honor.  I don't know

18  what would have an impact.  Question's vague, I think.

19          THE COURT:  Could you be a little more specific, Mr.

20  Dehny?

21          MR. DEHNY:  Sure.

22  Q.   You indicated that you're going to use this as a rollup

23  and add additional loans.  How is that going to impact the

24  servicing of the existing American Home loans today?

25  A.   Well, I can say that there is additional capacity at the

1   American Home platform.  We're not going to stress the business

2   and when there are opportunities, you know, we will look at

3   them closely and see if it makes sense.

4          MR. DEHNY:  I have nothing else, Your Honor.

5          THE COURT:  Thank you.  Any further cross-

6   examination?

7   CROSS-EXAMINATION BY

8   MS. LAWSON:

9   Q.   Good afternoon, Mr. Storper.  I'm Kim Lawson from Reed

10  Smith.  I'm actually here today on behalf of GMAC Mortgage but

11  I also do have to ask some questions about RFC Residential

12  Funding as well.  From previous testimony, I'm going to ask you

13  if I presented you with copies of the actual servicing

14  agreements or you wouldn't be familiar with the agreements

15  themselves or the obligations or rights relating to servicing

16  under those agreements, is that correct?

17  A.   Correct.

18  Q.   Earlier today, I believed you testified that the purchaser

19  is not planning on obtaining Freddie Mac approval?

20  A.   We needed, I think, as per counsel, I think it was either

21  Freddie or Fannie.  I think we're in compliance with that.

22  Q.   Okay.  But are you -- did you testify today that you're

23  not going to do that?

24  A.   I don't think we are but I will check to verify that.

25  Q.   Okay.  Do you know if the purchaser is going to try to

1   become a member of the MURR system?

2   A.    Again, I think -- you know, I think per advice of counsel

3   and operating management, we're going to do whatever we should

4   do.

5   Q.    Okay.  And I believe someone asked a related question.

6   I'm going to ask just a more specific question.  They had asked

7   if you were going to become a member related with the FDIC.  Do

8   you know if the purchaser is currently applying to become a

9   member of either the Banking Insurance Fund, the Savings

10  Association Insurance Fund or the Deposit Insurance Fund

11  associated with the FDIC?

12  A.    I don't know.

13  Q.    Okay.  Do you know what a HELOC loan is?

14  A.    Yes, I understand the nomenclature.

15  Q.    Okay.  And what does a borrower do under that loan?  How

16  do they obtain money under a HELOC?

17  A.    When you say "borrower", you mean an individual that has a

18  HELOC loan, a home equity line of credit?

19  Q.    Correct.  Yes.  So if I went to the bank and got a HELOC

20  loan, how would I get money out of that loan?

21  A.    I don't have a HELOC loan but I think it's essentially

22  like a line of credit.  You can request to borrow.

23  Q.    Okay.  Let's just, for purposes of our examination, you

24  would write a check.

25          THE COURT:  I expect he could get a HELOC loan.  As a

1   matter of fact, I expect there are several banks who would loan

2   you a HELOC loan.  Even some objectors.  But we'll leave that

3   for another time.

4   Q.   Let's assume for purposes of this that you would write a

5   check.

6   A.   Okay.

7   Q.   Okay?  So me, as borrower, Kim would go to the -- write a

8   check.  I'm going to pay my contractor.  Then I'm going to say,

9   Joe Contractor, here's your check, thank you for building my

10  addition.  Here's my check.  And it's going to be presented to

11  a bank and somebody's going to have to fund that loan or pay

12  that check.  Do you know if the purchaser is assuming that

13  obligation or buying that obligation to fund that HELOC loan?

14  A.   I don't know.

15  Q.   Okay.  Are you aware of anything in the APA that addresses

16  that issue?

17  A.   I -- I think I've seen the term in there but I haven't

18  looked at it closely.

19  Q.   Do you know that one of the agreements that it's

20  specifically listed as being sold to the purchaser contains

21  HELOC loans?

22  A.   No.  You'd have to talk with counsel on that.

23  Q.   Okay.

24        MS. LAWSON:  I don't believe I have any further

25  questions, Your Honor.

1      THE COURT:  Thank you, Ms. Lawson.  Anyone else?

2  Last call.  All right.  No more cross.  Redirect?

3      MS. MORGAN:  None, Your Honor.

4      THE COURT:  None?

5      MS. MORGAN:  None.

6      THE COURT:  All right.  Thank you, sir.  You may step

7  down.  Let's take a five minute recess before we call the next

8  witness.

9      (Recess from 11:08 a.m. until 11:20 a.m.)

10      THE CLERK:  All rise.

11      THE COURT:  Please be seated.

12      MR. BRADY:  Good morning, Your Honor.  Robert Brady

13  on behalf of the debtors.  We'd like to call our next witness,

14  Mr. Love.

15      (Witness is sworn)

16      THE WITNESS:  Robert L. Love, Jr.  Last name is L-O-

17  V-E.

18  DIRECT EXAMINATION

19  BY MR. BRADY:

20  Q.   Good morning, Mr. Love.

21  A.   Good morning.

22  Q.   By whom are you employed?

23  A.   American Home Mortgage Servicing.

24  Q.   And what is your title at American Home Mortgage

25  Servicing?

77

1   A.   I'm the Vice President of Loan Sales and New Product

2   Lines.

3   Q.   What are your responsibilities for the company?

4   A.   I'm a member of the senior management staff at American

5   Home Mortgage Servicing.  The areas that I directly manage

6   involve groups that facilitate the transfer of servicing both

7   onto the platform at AHM Servicing and transfer servicing off

8   the platform to other services.  We also, from the servicing

9   side, manage the service and retain transactions as it relates

10  to setting those deals up on the servicing system, trying them

11  out and commenting on the -- on the related docs for servicing

12  business terms.

13  Q.   And how long have you worked for AHM Servicing?

14  A.   I worked for AHM Servicing since June 2002 when AHM

15  purchased Columbia National Inc. which is the company where the

16  servicing platform originated from.

17  Q.   And how long did you work for Columbia National?

18  A.   I started with Columbia National in September of 2001.

19  Q.   Can you describe for the Court the debtors' business pre-

20  bankruptcy and how it worked?

21  A.   Pre-bankruptcy the debtors' business from a global

22  perspective was one that was involved in the origination,

23  selling, investing in, and servicing of mortgage loans.

24  Q.   You used the term before servicing retainer are you also

25  familiar with the term servicing released?

1  A.   I am familiar with the terms servicing release.

2  Q.   Can you explain to us the difference of those terms?

3  A.   Sure.  The way that -- the way those two terms relate to

4  us in the normal course is AHM will package up and sell newly

5  originated loans.  Each of those packages of loan are pools of

6  loans we put out to bid.  And the bids could come back either

7  servicing released or servicing retained.  Based on how those

8  bids came back then determines what type of interaction my

9  group would have and what would ultimately happen with the

10  servicing of those loans.  If the bid that comes back is one

11  that is servicing retained the concept in that trade is that

12  the investor purchased the underlying mortgage loans but AHM

13  retained the servicing rights on those loans and AHM servicing

14  them would be servicing those loans only to the future for that

15  investor.  In a servicing release transaction the purchaser of

16  that pool of loans would have purchased the mortgage loans and

17  they would have also purchased the servicing rights to those

18  loans.  The involvement of AHM Servicing in that perspective

19  usually just related to interim servicing period which

20  typically would have been designated at the time of the trade

21  and was normal that it went on for anywhere from thirty to

22  ninety days after the closing date until we effectuated a

23  transfer of servicing to the new servicer under those trades.

24  Q.   Generally, who are the parties for which AHM Servicing

25  services loans?

A.   AHM services loans for a number of many different parties.
The easiest way to look at it is to break it down into four
different types of groups that AHM services for.  The first
group would be the securitization trust that AHM services
for -- that were deals which AHM's parent reformed and the
securitization was created off of one of their securitization
shelves.

The second group is one that we would term as private
investors.  And really what that is that's the situation where
investors purchase the loan on a service and retain trade and
we now service directly for those investors.

The third group is really a combination of the first two
if you will.  And its what we refer to as third party
securitizations.  And the way that those transactions develop
is we would have sold loans to the purchaser through a service
and retain trade where AHM would have retained the servicing.
The investor then at some point after they purchase them would
end up moving the loans into a securitization and AHM Servicing
would then move from servicing directly for that investor and
now servicing those same loans for the securitization trust
instead.

And the fourth grouping was the -- or is the agency's --
we service for Fannie, Freddie and Jennie.

Q.   Where are the servicing rights and obligations set forth
with respect to servicing loans for AHM securitization trusts?

1   A.   Typically speaking to the AHM securitization trust, there

2   are individual servicing agreements for each one of those

3   securitizations that specifically just addresses the servicing

4   portions or the servicing obligations that the servicer has to

5   the trust and the related master servicers.

6   Q.   Where are the servicing rights and obligations set forth

7   with respect to servicing loans for the private investors?

8   A.   Typically speaking for the private investors there would

9   be what we refer to as a mortgage loan purchase and servicing

10  agreement, which as part of that would contain the servicing

11  provisions which would relate to the servicing of the mortgage

12  loans.

13  Q.   And where are the servicing rights and obligations set

14  forth with respect to servicing loans for the third party

15  securitization trusts?

16  A.   Generally speaking for the third party securitization

17  trust the loans that the investor purchase from AHM under the

18  service and retain MLPSA.  When the individual loans are

19  transferred into securitizations typically what would happen is

20  the servicing portions of the servicing provisions in those

21  agreements would get transferred to the trust either through an

22  AAR, which is an assignment assumption and recognition

23  agreement or also sometimes referred to as reconstituted

24  servicing agreements.  And that's where we would then shift

25  from servicing those loans pursuant to the servicing provisions

1   and the underlying MLPSA as the servicing provision may be

2   amended through that AAR, reconstituted servicing agreement and

3   now that would be what we would service under for the trust.

4   Q.   So in that situation is a separate stand alone servicing

5   agreement negotiated with the trust now?

6   A.   Typically speaking we don't negotiate a separate stand

7   alone servicing agreement with the trust the way that -- the

8   way that this has really happened or come about over the

9   past -- really since the beginning of 2006 is where this part

10  of the business model of AHM picked up and became much more

11  prevalent.  But the way that this went about in the industry is

12  those original underlying MLPSAs; the terms of the servicing

13  had already been negotiated.  So the way it came to us is the

14  easiest way that the lawyers could quickly get those assigned

15  over and get the obligations to the trust would be just through

16  the AARs and it just amended those pieces and then we service

17  from there.

18  Q.   Do you have an understanding why generally speaking in

19  some situations there's a stand alone servicing agreement and

20  in other situations the servicing agreements are included in a

21  larger agreement?

22  A.   You mean from -- from our perspective in servicing the way

23  that a lot of those agreements develop just throughout the

24  course of time is in many instances we already had mortgage

25  loan purchase and interim servicing agreements in place with

1  the parties.  Where we previously would have sold post to them

2  on servicing release trades.  Then when a lot more of these

3  trades started to come back and the service and retain bids

4  were accepted in many instances, you know, what we experienced

5  was that the MLPISA, or the mortgage loan purchase and interim

6  servicing agreement really was -- that agreement we already

7  negotiated was marked up and the servicing pieces were amended

8  to contemplate a servicing retained agreement going forward.

9  Q.   So to make sure I understand under an MLPSA initially the

10 servicing obligations of AHM Servicing run to the purchaser of

11 the loans.  And that at some point when they securitize it the

12 servicing obligations switch to the trust?

13 A.   That's correct.  I mean, typically the way that those

14 agreements are structured is that the first time that we would

15 enter into an MLPSA with a counterparty that would be really

16 the first time that we would have traded a pool of mortgage

17 loans to that purchaser under -- and their winning bid was a

18 service and retained bid.  So the contracts really were set up

19 more as master contracts.  So that we can have that one

20 contract in place, it has the purchase and the servicing

21 provisions in it.  Each time that that counterparty would

22 submit a winning bid for a pool of loans and their winning bid

23 was a servicing retained pool those loans would then close

24 under that existing contract.  The only piece that would differ

25 from deal to deal is what they refer to as either a trade

1   confirmation or purchase price and terms letter which would lay

2   out the details of each individual trade.  How that -- the

3   numbers and the number of loans and some other specifics that

4   are changed -- that would change deal to deal.

5   Q.   Prior to the bankruptcy filing how was AHM Servicing

6   structured?

7   A.   Prior to the bankruptcy filing AHM Servicing was

8   structured really in eight functional groups that I would refer

9   to to look at the overall structure.

10       The first would be the collections group, which you know,

11  handles the -- all of the loans that we're collecting on our

12  dialer technology.  Which really includes loans that are zero

13  to eighty-nine days delinquent.  Plus it also includes our lost

14  mitigation group.  And what a lost mitigation group is it's

15  really -- a lot of times referred to as a long workout group

16  and their goal is to try to work with homeowners with the idea

17  of trying to be able to avoid foreclosure or further default on

18  the loan prior to getting to that -- prior to getting to that

19  point.

20       The next functional group customer service who handles the

21  inbound customer inquiries.

22       The third group would be our REO and valuations group.

23  And REO is the real estate owned.  And what that is is that

24  group is managing the disposition of real estate properties

25  which AHM Servicing would come to acquire on behalf of the

1    investors through foreclosure sales.

2        The next group would be our default management group.  And

3    that includes -- that group manages the processes for

4    foreclosure, bankruptcy and the related claims that go along --

5    the claims filing process that goes along with those two items.

6        The next group would be referred to as the transaction

7    management group which is my area which I described a little

8    bit earlier on.

9        The next group would be our servicing analytics and

10   process improvement group.  And that group really does -- I

11   mean a lot of what it stands for.  They do a lot of internal

12   reporting, a lot of analytics work, a lot of modeling for us

13   and they also take a look at a lot of internal processes and

14   try to streamline and improve processes.

15       The next group would be our investor reporting cash

16   management and bank reconciliation area.  That group manages

17   the compiling of reports months and reporting out to each of

18   the investors of securitization trust that we're servicing for.

19   They also ensure that the required remittances are sent on to

20   the investors or the securitization trust.  The cash management

21   group is a group that is managing the collection -- or the

22   application of payments and posting of payments to the system

23   And the bank reconciliation area is really is a lot of what it

24   sounds like, they're reconciling all the bank accounts that we

25   have set up for all the investors and securitizations that we

1   service for.

2        Each investor or securitization that we service for we

3   have two individual bank accounts set up for each one.  One of

4   the bank accounts is tied to the PMI collections that relate to

5   the loans that are owned by that investor or securitization.

6   And the other is to house the tax and insurance portions, or

7   the escrow portions, of the payments that are collected on

8   behalf of the homeowners and held in those accounts until the

9   time that we need to disburse items out of those accounts for

10  them.

11       The next group, and I believe it's the last group, is our

12  loan administration group.  They handle a broad number of

13  functions but included within that is escrow administration.

14  Our research group which is a piece that adds onto customer

15  service.  They also handle special loans that would include

16  insuring that arm changes and rate changes are done properly

17  and according to the different notes.  They also handle

18  presently new loan boarding and audit functional new loan

19  boarding as well as a -- they run the file room and mail room

20  and some of our collateral management piece.

21  Q.   Does AHM Servicing have the same structures with groups

22  today?

23  A.   AHM Servicing has the same exact structure in groups

24  today.

25  Q.   You mentioned you were the head of one of those groups so

1   all eight groups have a leader?

2   A.   Yes.  Each one of the eight functional groups has a -- has

3   a department head.

4   Q.   How many people were employed by AHM Servicing immediately

5   prior to the bankruptcy filing?

6   A.   Immediately prior to the bankruptcy filing there were

7   approximately 425 employees directly related to servicing.

8   Q.   And immediately prior to filing both in terms of number of

9   loans and the unpaid principal balance how many loans were AHM

10  Servicing servicing?

11  A.   For the entire portfolio we were servicing approximately

12  fifty-nine billion dollars worth of outstanding UPBs which

13  amounted to somewhere around 250,000 accounts.

14  Q.   How many people are employed by AHM Servicing today?

15  A.   As of the most recent head count report that I saw at the

16  end of last week the number was 412 employees that are directly

17  related to servicing.

18  Q.   And approximately how many loans are serviced today both

19  in terms of number and unpaid principal balance?

20  A.   As of today we're servicing approximately fifty-one

21  billion dollars worth of outstanding UPBs which amounts to

22  around 210,000 active accounts.

23  Q.   Why did the numbers go down since the filing?

24  A.   There's a couple of -- a couple of reasons why the numbers

25  would have gone down.  The first would be normal runoff which

1   would be loans that are paying off either in the normal course

2   or paying off early because those loans pre-financed or where

3   the homeowners simply move to a new property and pay off their

4   existing loan.

5          The second reason would have been some of the loans that

6   were comprised in that fifty-nine billion dollars of

7   outstanding UPB prior to the filing represented loans that we

8   were servicing on an interim servicing basis and we since

9   transferred servicing in the normal course of business to the

10  new servicers.

11         The third reason is just that AHM -- AHM as a global

12  company is no longer originated loans.  So we haven't had any

13  new loans bordering our system that we're servicing from that

14  end.

15  Q.   How many individuals in your opinion make up the senior

16  management team of AHM Servicing?

17  A.   In my opinion the senior management team really consists

18  of a group of about nine employees which are the heads of the

19  eight functional groups that I described before plus David

20  Friedman who is the executive vice president in charge of

21  servicing.

22  Q.   Are the group leaders still with the company today?

23  A.   All of the group leaders are still with the company today.

24  Q.   Is Mr. Friedman still with the company today?

25  A.   Mr. Friedman is still with the company today.

88

1   Q.   Of those who left, the approximately thirteen people who

2   left, are any of those considered managers of the business?

3   A.   None of those employees would be considered managers or

4   management.  There have been no employees that have left since

5   the filing of the bankruptcy that would have titles of either

6   manager, AVP, VP, SVP or EVP.

7   Q.   In your opinion is the current workforce sufficient to

8   service the loans?

9   A.   Yes, it is.

10  Q.   Mr. Love, were you involved in any of the bankruptcy

11  filing preparations?

12  A.   I was involved in some respects in helping to prepare some

13  of the day 1 motions that were filed with the Court.  The

14  particular ones that I was most heavily involved with was one,

15  the critical vendor motion and a second was portions of the

16  cash management order.

17  Q.   Was there a retention plan put in place?

18  A.   There was a retention plan put in place.  I believe it was

19  referred to as the non-insider employee retention plan.

20  Q.   Do you have an understanding of what the goal of getting

21  these court orders was to the company?

22  A.   Sure.  Part of the big strategy with the day 1 orders was

23  to be able to allow, in large part, the servicing business to

24  continue uninterrupted and to be able to retain the servicing

25  employees as a large part of that.

1   Q.   Do you have an opinion of whether that relief has assisted

2   in achieving that goal?

3   A.   I think that that goal has been very successful in being

4   achieved.

5   Q.   Can you describe for the Court how AHM Servicing services

6   loans on a day-to-day basis, again, both prior to the

7   bankruptcy and I'll ask you at some point since the bankruptcy?

8   A.   On a day-to-day basis the easiest way I think to look at

9   the overall process of how AHM Servicing services loans is try

10  to break it down into two different categories.  The first

11  level is going to be the individual loan level that ties back

12  to the homeowners.  And that really comes down to breaking into

13  those -- the pieces of those functional groups that I mentioned

14  earlier that apply with the interaction with the customer at

15  the loan level.  And that's going to involve the pieces where

16  on a daily basis we're collecting payments, we're insuring that

17  the application of those payments are being a designated

18  properly to the customers' account to give them appropriate

19  credit for the different items that their payments go to.

20  Managing any loans that are not paying, managing the default

21  process.  You know, fielding customer inquiries, sending out

22  billing statements, sending out any other required arm change

23  notices or any other types of notices that will be required.

24  All the normal day-to-day servicing functions that would apply

25  to that level.

1    The next level really is the investor loan.  And when you

2    take the aggregation of all the -- all the functions

3    interactions that we're having with the homeowners.  The

4    biggest piece ties into the payments that come in and then how

5    that information aggregates up to which of all those loans that

6    we're collecting payments and information that belong to each

7    investor.  And there's the process of compiling monthly all of

8    the information that needs to be sent to each of the investors

9    or securitizations with respect to the loans which they own and

10   then remitting on those funds to those investors.

11   Q.   Does the company maintain a quality control function?

12   A.   The company does maintain a quality control function.  The

13   quality control function has been one that's designed to

14   monitor all of the -- all of the critical functions at AHM and

15   ensure compliance with regulations that -- and really just

16   make -- ensuring that we're servicing in accordance with or

17   accepted service and practices.

18   Q.   Has any of this changed since the petition was filed?

19   A.   None of this has changed since the petition was filed.

20   Q.   Have there been any disruptions in servicing since the

21   bankruptcy was filed?

22   A.   Really since the bankruptcy was filed there are two items

23   that have come up that I would consider out of the normal

24   course that we've had to deal with in servicing.  The first one

25   of those items relates to a group of, you know, approximately

1   550 or so insurance disbursement checks, which had been issued

2   by AHM Servicing or by our outsource taxing vendor to pay taxes

3   on behalf of homeowners.  Those checks would have been cut out

4   of an escrow disbursement clearing account that we have.  The

5   item or the issue that came up is that -- the independent third

6   party banking institution that runs that disbursement account

7   for us made the decision not to honor the checks that were

8   presented if the presentment date on the checks was prior to

9   August 6th.  So what that did was it created a group -- a

10  grouping of 550 or so checks which when the different taxing

11  authorities received them and tried to deposit them they

12  received them back that said referred to maker.  The funds for

13  the -- the homeowners' funds that would represent the money

14  that was being used to pay those amounts was always available

15  to be paid.  But because of that decision the checks were not

16  honored.  So the issue that we had to go through was to reach

17  out to each of the taxing authorities, determine from them what

18  needed to be done to ensure that we could get payment to them.

19  In a lot of cases if -- you know, they have procedures that if

20  a check is -- if a check is bounced or dishonored or however

21  you want to look at what happened there, they won't just accept

22  another check back from that entity.  One, they're most likely

23  going to include a fee for having a return check.  And two,

24  they either want to receive the funds by an electronic wire at

25  that point or certified funds, you know, certified check.  So

1  we had to go through the process to reach out to all the

2  different taxing authorities to determine what their

3  requirement would be to make sure that those payments were

4  satisfied.  And at this point all of those items have been

5  cleared.

6  Q.   You mentioned there were two, can you describe the other

7  situation?

8  A.   The second issue that we had to deal with was one that

9  centered solely with respect to the loans that we were

10 servicing for Freddie Mac and Jenny Mae.  I think very shortly,

11 immediately prior to this filing, both of those -- both of

12 those agencies seized control of the funds which made them

13 deposit in the TNI for taxing insurance bank accounts.  Which

14 left us unable to be able to pay the tax insurance items that

15 were coming due for the different homeowners.  AHM expended

16 corporate funds for a period of time to try to advance payment

17 for those items on behalf of the homeowners and the agencies.

18 When it got to a point where we realized we couldn't continue

19 to expense funds on an ongoing undetermined basis we had to --

20 we notified each of the agencies that we would be unable to

21 continue to do that.  And shortly thereafter we were able to

22 reach agreements with both of them and we've been able to --

23 since that time work with both of them and they would send us

24 funds that we need, we've been making the required

25 disbursements that are coming due in the normal course.

1   Q.   Can you describe for the Court what precisely happens when

2   AHM Servicing receives a payment from the mortgager?

3   A.   As far as the way that you would track the flow of funds

4   when AHM Servicing receives a payment from the homeowner,

5   whether -- no matter what method they use to make that payment

6   to us, which there -- which there are many, the simplest

7   example that we can run through is lets just say that the

8   homeowner writes a check and whether that check comes directly

9   to our cash processing area in our -- you know, in our

10  servicing group or if it goes to our lock box provider when

11  that payment comes in it gets deposited to the payment clearing

12  account.  From there the information for that particular loan

13  and the amount of cash that was received is entered into --

14  either entered directly into the system or if -- it's entered

15  directly into the system if the check came to our cash

16  processing area.  If the check came to our lock box provider

17  they entered it onto a file which gets delivered electronically

18  to us several times a day.  With that information the payment

19  application program within a servicing system is going to know

20  basically the underlying information of that loan, how that

21  payment should get applied.  So if the payment was for 1,000

22  dollars the servicing system then is able to determine that

23  what portion of that loan goes to principal, what is supposed

24  to go to interest and what amounts are supposed to go to escrow

25  or any other items.  From there -- now the cash is in the

1    payment clearing account and the loan the servicing system

2    knows how much money came out of that loan and how that payment

3    should have been broken up.  From there the banking system

4    knows that that particular loan is owned by whatever particular

5    investor or securitization trust is owned by.  So the banking

6    system is then going to initiate a transaction to move the

7    money from the payment clearing account and split it between

8    the PNI and TNI account per the applicable breakup that is set

9    up for that particular investor's securitization that each loan

10   is owned by.

11   Q.   From a business perspective are you aware of any

12   obligation on the part of counterparty to a servicing

13   agreement?  If that party failed to perform an obligation AHM

14   Servicing could stop making tax statements?

15   A.   I really can't come up with any -- any type of a clause or

16   just practical application where I can see where that would

17   come up.  To the extent that the counterparties have any

18   obligations in the agreements or things that they need to do or

19   perform we in servicing don't really ever have an option where

20   we can just stop servicing.  We have to continue -- we have to

21   always continue to service the loans even if -- even if there

22   was a dispute that we had with -- with that counterparty.

23   Q.   You explained earlier what constituted servicing release

24   versus servicing retained, are loans that are serviced under a

25   servicing release agreement serviced differently than those on

1   a servicing retained?

2   A.   Generally speaking they are not.  I think mentioned

3   earlier that there was the -- a lot of times the mortgage loan

4   purchase an interim servicing agreement.  Structurally the

5   servicing functions there are really the same.  I mean, the

6   day-to-day servicing operations would be -- would be unchanged.

7   We're still collecting payments, we're still paying taxes on

8   insurance as they come due.  The main differences are usually

9   twofold.  Usually the type of remittance obligation that we

10  have to the investor is different.  Where we're not usually

11  required on a servicing release agreement to have to advance

12  any delinquent PNI payments to the investors.  The second

13  release is really just the nature of the defined or short-term

14  period that we are servicing those loans for.  It usually -- I

15  think I mentioned before that usually its known at the time of

16  that deal closing that we're going to service the loans for

17  ninety days and only have a transfer date.  So we're going to

18  be facilitating that transfer of servicing to the new servicer

19  during that period of time.  So to the extent that there are

20  certain normal course obligations that wouldn't come up during

21  that time period, say for a particular homeowner taxes aren't

22  due until eight months later, that wouldn't come up in the

23  normal course.  But if taxes were due during that period we

24  would have the obligation to pay.  So really its related to

25  those pieces.  The only other -- the only other difference

1   really is that what we -- in servicing we get paid for

2   servicing loans on an interim servicing basis is usually very

3   different.  The reason behind that is that in that type of

4   scenario the purchaser has bought no only the loan but also the

5   servicing rights.  So usually rather than getting the servicing

6   fee for those loans, we would get usually just a very nominal

7   flat fee of -- generally it was between five and seven dollars

8   a loan per month.  And again, the main reason behind that is we

9   do not on those loans own the servicing rights even though for

10  the interim period we would have the same basic service and

11  obligations.

12  Q.   Mr. Love, how is AHM Servicing compensated for servicing

13  loans that were sold servicing retained?

14  A.   For loans that were sold service and retained the

15  compensation for AHM Servicing comes in two basic forms.

16       The first would be in the form of the servicing fee which

17  usually is expressed as a number of basis points or as a

18  percentage.  And the way that that would work is say for

19  example that the interest rate on a loan is six and a half

20  percent and the servicing fee is one quarter of one percent.

21  As a servicer you're entitled to retain that quarter of a

22  percent servicing fee from the interest portions of the

23  collections as your fee.  So we would then turn around and

24  remit to that investor, we would be sending them interest

25  collections that would be at a net six and a quarter percent in

1    that example.

2        The second type of compensation really is what's typically

3    referred to as ancillary fees.  And those are items that the

4    servicer is entitled to keep which comes up within the normal

5    course of business.  The most typical example of that that I

6    can give to you would be in the form of late fees.  Each of the

7    individual notes that a homeowner signs it would lay out one,

8    what their due date is each month, and two, how many -- what

9    the number of grace days they have.  So a common example would

10   be that most mortgage payments are due on the first of the

11   month, they have a fifteen day grace period and it would lay

12   out that after the expiration of that fifteen days, at the

13   close of business on the sixteenth day of the month, if their

14   payment has not been received how their late charge is

15   calculated.  And that's a fee that the servicer is entitled to

16   keep.  There's also -- you know, a few other -- a few other

17   types of ancillary fees which are usually -- you know much more

18   minimal, but another example would be if a customer wanted to

19   use a service to call and pay over the phone, there could be a

20   small charge associated with that that the servicer may be able

21   to retain.

22   Q.   So you don't send the owners of these loans an invoice to

23   be paid?

24   A.   We don't send any invoices to get paid for the servicing

25   fees.

Q.   Are you familiar with the asset purchase agreement with AH

Mortgage Acquisition Co.?

A.   I am generally familiar with the asset purchase agreement.

Q.   Have you read it?

A.   I have read through -- I would say skim through all of it,

keyed in on certain portions which I was asked to help comment

which related specifically to some of the administration of the

servicing pieces.  As well as I assisted in comparing some of

the -- some of the exhibits in the back that related directly

to servicing.

Q.   What is you understanding of what the debtors selling

under the API?

A.   My understanding of what the debtors are selling is one,

the servicing platform which would consist of the physical plan

instructors of the servicing business.  The desk, computers,

software systems, servicing system, and RD fault system, our

phone technologies, all of those types of pieces that are

directly related to the platform.

     The second piece is the servicing rights with respect to

the -- I'll call it the fore sale population.  But it's the

group of loans that are -- they're related to the servicing --

I guess the servicing agreements or contracts that are listed

in Exhibit 1.1-J which should tie back to the individual loans

that are listed on the Schedule 5.6-A which represents a trial

balance of the loan level information of the loans that are

1   being put forth as part of the for sale population.

2       The third piece has to do with the advances, the

3   outstanding advances on the loans which really -- I mean, just

4   ties very directly to the core of the heart of servicing those

5   loans.

6   Q.   Are you familiar with the closing process described in the

7   APA?

8   A.   I am generally familiar with the proposed two-step closing

9   process.

10  Q.   Do you have an understanding of why there is a two-step

11  close?

12  A.   From our perspective the two-step close really from a

13  business standpoint is to allow the opportunity from the time

14  between the initial close and the final close for the purchaser

15  to be able to obtain all of their necessary licensing and other

16  legal requirements which they do not have presently in place.

17  And during that period of time the company will continue to

18  operate the business using all of our existing licenses in the

19  same manner that we do -- same manner that we do today.  The

20  only difference is from the initial close forward the operation

21  of that business will be for the financial gain or loss of the

22  purchaser during that interim period.

23  Q.   Do you have an understanding of who will service the loans

24  after the economic close that you described?

25  A.   After the economic closing the company would -- the

1    company being AHM Servicing would continue to service those

2    loans really the same way that we are today and the same way

3    that we were several months ago prior to us filing bankruptcy.

4    Q.    Is AHM Servicing still licensed to service in all the

5    required jurisdictions?

6    A.    To my knowledge, yes, AHM Servicing is still licensed.

7    Q.    Is AHM Servicing a MERS member?

8    A.    Yes, AHM Servicing is a MERS member.

9    Q.    To your knowledge is AHM Servicing servicing the loans in

10   accordance of all federal, state and local laws?

11   A.    To my knowledge, yes, they are.

12   Q.    Do you have an understanding of whether AHM Servicing is

13   Fannie Mae qualified?

14   A.    Yes, I believe that, you know, first we are -- we are

15   currently Fannie Mae qualified.  There's also -- there's also I

16   think which was laid forth this morning that the purchaser has

17   been approved as an -- I guess an interim basis or condition

18   basis based upon the few items that they need to obtain it,

19   they would be approved for Fannie Mae as well.

20   Q.    Are you aware whether Fannie Mae has evaluated the

21   debtors' servicing operations since the bankruptcy filing?

22   A.    Fannie Mae has been on site at our servicing operation on

23   an almost continual basis since the filing of the bankruptcy.

24   They have been there -- really they come in -- at least check

25   in at this point almost daily and they are there as part of

1    their -- as part of their agreement they're really just there

2    to oversee and ensure that from their perspective that we're

3    doing everything that we should be.  And there have not been

4    any issues coming out of that that I'm aware of.

5    Q.    You indicated you were familiar with the agreements on

6    1.1-J, are there any securitizations part of 1.1-J?

7    A.    There are -- there's a very large number of

8    securitizations on 1.1-J.  They would relate back to two of the

9    four groups that I talked about earlier that we service loans

10   for.  The first would be a number of securitizations that

11   were -- that were built off of AHM shelves and the other ones

12   are the third party securitizations.

13   Q.    Are you aware if there are any bond rating issues

14   associated with the securitizations?

15   A.    Its very typical within some of the agreements for the

16   securitization that at the times of the securitizations are

17   formed usually at least two rating agencies will rate the bonds

18   which will be comprised of the mortgage loans that are put into

19   those securitizations.  One of the requirements that is

20   necessary for a transfer of servicing under those agreements is

21   that the rating agencies issue what they refer to as a no

22   downgrade letter.  And what that means is that solely with

23   respect to the concept of the transfer of servicing to a new

24   entity that the rating agencies will not downgrade any of those

25   underlying bonds as solely for -- solely for the reason of that

1    servicing transfer or the service being transferred to a new

2    proposed entity.

3    Q.    Who are the rating agencies?

4    A.    The rating agencies I'm referring to would be Moodys, S&P

5    and Fitch in this case.

6    Q.    At some point did you become involved in the process in

7    dealing with the rating agencies?

8    A.    Last week after I returned back to Texas for my

9    depositions here I did become involved in what was then an

10    ongoing process working with the rating agencies to achieve

11    those letters.

12    Q.    Are you aware of the status of dealing with the rating

13    agencies on this issue?

14    A.    As of last yesterday letters from all three of the rating

15    agencies had been received.

16            MR. BRADY:  Your Honor, I'm going to mark the

17    letters -- I do need to find the hearsay exception.

18            THE COURT:  Well, you don't need that to mark them.

19            MR. BRADY:  I had it open and now it's closed.

20            THE COURT:  Mr. Dorsey will help you.

21            THE COURT:  I have marked, Your Honor, as Debtors'

22    Exhibit 107, 108 and 109 which I'll represent are letters from

23    Fitch Ratings, Moody's Investor Services and Standard & Poor's.

24    I think as indicated earlier we did receive these yesterday and

25    we posted them on the discovery website that we had set up in

1   connection with discovery requests by a number of objectors for

2   documents we may rely upon at the hearing.  And they were

3   posted yesterday evening.  So I'll mark these.  I would show

4   the witness but I'm assuming there's going to be a hearsay

5   objection.

6   (Debtors' Exhibit 107, 108 and 109, letters from Fitch Ratings,

7   Moodys and S&P, were hereby marked as for identification, as of

8   this date.)

9            THE COURT:  Any objection?  All right.

10           MR. BRADY:  I did all that work for nothing, Your

11  Honor.

12           THE COURT:  Well, it's proper preparation prevents

13  poor performance.

14           MR. BRADY:  May I approach both the bench and the

15  witness?

16           THE COURT:  Yes, you may.  Thank you.

17  Q.   Mr. Love, are those the letters to which you refer to a

18  few moments ago?

19  A.   Yes, these are the letters.

20  Q.   Would you describe those as no downgrade letters?

21  A.   I would describe these as no downgrade letters.

22           MR. BRADY:  I think the witness, Your Honor,

23  testified that he received copies of these letters in

24  connection with his duties for the company of being one of the

25  people involved in attempting to obtain them.

1          THE COURT:  I think -- look, the requirement of --

2     I'll read from the roll, "the requirement of authentication or

3     indemnification is condition precedent to admissibility

4     satisfied by evidence sufficient to support a finding that the

5     matter in question is what if the purported claims had to be.

6     I find that that testimony fills that.  These are what they are

7     purported to be, letters from the rating agencies.  So to the

8     extent -- I think it was withdrawn but if it wasn't it's over

9     with.

10    Q.   Mr. Love, does the APA provide a process for the purchaser

11    to hire AHM Servicing's existing workforce?

12    A.   The APA does provide a process for that.  I believe that

13    the goal as laid forth in the APA is to provide continued

14    employment to substantially all of the employees that are

15    currently with the servicing company.

16    Q.   Are you familiar with the schedules that were filed with

17    the Court dealing with the possible arrearages that may be owed

18    to third parties under agreements that are to be transferred to

19    the buyer under the APA?

20    A.   I am generally familiar with the schedule that was sent

21    out.  One of the things that the senior management group in

22    servicing was asked to do was to try to come up with and

23    research to the best of our knowledge if there were any amounts

24    that we knew to be outstanding or owed as it related to our

25    obligations in the administration of servicing of loans in the

1  normal course of business.  The only items that the report back

2  from the group that we were able to come up with that

3  historically in the last three years we've had to pay as a

4  result of anything of that nature would be solely with respect

5  to one item.  And that item relates to the collection of

6  prepaying the penalties.  Now a prepayment of penalty is -- on

7  some loans that originated there could be a prepayment loan

8  that's associated with.  And with that we lay forward say the

9  prepayment penalty term was two years, it would say that if the

10  homeowner paid off their loan within the first two years of

11  closing there was a defined amount of a penalty, usually its

12  some calculation of a number of -- amount of time worth of

13  interest value from the loan that needs to be paid by the

14  homeowner in connection with that payoff.  Generally speaking,

15  those prepayment penalty collections are the right to receive

16  the payment of those is transferred or usually bought or owned

17  by the investors of the securitizations.  So its typical in the

18  servicing agreements that if the servicer fails to collect a

19  penalty which truly was owing and due the servicer has to pay

20  from its own funds to pay for the amounts that should have been

21  collected but were not.  But with respect to that particular

22  item over the last three years in 2005 the servicing company

23  had to pay approximately 50,000 dollars for that item.  In 2006

24  that amounted to about 15,000 dollars.  And year to date at

25  that time the amount had totaled approximately 8500 dollars.

<sup>1</sup> And all of those amounts had been presently paid and fulfilled

<sup>2</sup> and we're unaware of any present amounts for that which are

<sup>3</sup> owned.  We're normally aware of any amounts for any other items

<sup>4</sup> which would have been outstanding owed.

<sup>5</sup> Q.   So AHM Servicing's management team looked at any potential

<sup>6</sup> claims that a counterparty to a servicing agreement could have

<sup>7</sup> against servicing for servicing related issues and that is the

<sup>8</sup> only thing that the management team could discovery?

<sup>9</sup> A.   That is correct.  Our discovery really was limited to what

<sup>10</sup> as a servicing management team we have available to us to be

<sup>11</sup> able to research and that would be as items that relate to the

<sup>12</sup> administration of servicing of the loans.

<sup>13</sup> Q.   Did you also look at vendor claims?

<sup>14</sup> A.   Part of that process for a separate group did have to deal

<sup>15</sup> with -- with vendors.  And in that process there was an

<sup>16</sup> individual that reports directly to me that did help a

<sup>17</sup> coordinative process on our side as it would relate to

<sup>18</sup> servicing vendors.  And there were -- I should point out there

<sup>19</sup> were two different -- from my opinion there's two different

<sup>20</sup> types of vendors that are listed -- that would have been listed

<sup>21</sup> on that schedule.  The first would be servicing relating

<sup>22</sup> vendors and the second is the IT related vendors.  So the

<sup>23</sup> individual that worked on this for me helped to coordinate with

<sup>24</sup> our accounts payable group in accounting for the servicing

<sup>25</sup> related vendors to determine what amounts our accounting group

1    showed as being outstanding and owing with respect to any

2    invoices unpaid that would relate to those vendors.  There was

3    a similar exercise that I believe are IT group coordinated with

4    respect to the contracts that relate to IT related vendors.

5    But we did not directly have any involvement with that piece.

6    But I do know that the process was similar.

7    Q.    Are you familiar with the term early payment default?

8    A.    I am familiar with the term early payment default.  From

9    the way that that term would come up in the normal course of

10   business from our contacts is when loans are sold to

11   counterparties which I pointed out AHM Servicing is -- as a

12   global entity did often be the seller of those loans or the

13   originator of those loans, typically would have an early

14   payment default rep.  The most typical form of that rep that

15   I'm used to seeing is that if anyone of the first three

16   payments are received late the purchaser has the ability to be

17   able to request repurchase from the seller of those mortgage

18   loans pursuant to that clause.

19   Q.    To your knowledge did anyone at AHM Servicing attempt to

20   calculate potential early payment default claims in connection

21   with looking for the amounts due to servicing parties?

22   A.    No one at AHM Servicing looked at anything related to

23   early payment default claims.  As from our side that's never an

24   item that one, we have any information on ongoing.  Or that

25   two, during the normal course we would ever be involved with

108

1  from a practical business side unless the situation would come

2  up where the seller agreed to purchase a loan from the

3  purchaser and either AHM Servicing was designated as the new

4  servicer and we would facilitate a transfer of servicing back

5  to AHM Servicing.  Or if the loan was in a tray that was

6  servicing retained AHM Servicing could be pass funds from the

7  seller or sent funds from the seller that would need to be

8  passed through in the normal course of the remittance process,

9  and then need to change on our books and records to reflect

10  that that loan is no longer owned by the investor and is now

11  owned by the seller who repurchased that loan.

12  Q.    So in your experience Ends are paid by the seller either

13  directly or through servicing?

14  A.    That is correct.  Ends have always been paid -- have

15  always been paid by the seller.

16  Q.    Are you familiar with the term premium recapture?

17  A.    I am familiar with the term premium recapture.  Again,

18  it's a concept very similar to the EPD.  The seller when they

19  sell loans its very typical again to see a ref or a clause that

20  would state if the loan -- any of the loans that were sold to

21  the purchaser if they pay off within a designator, pay in full,

22  within a designated period of time after the closing date, the

23  purchaser can be entitled to request reimbursement from the

24  seller for the amount of the above par price that was paid on

25  that loan to the seller.

1    Q.    To your knowledge did anyone at AHM Servicing look at

2    potential premium recapture claims in attempting to calculate

3    amounts that may be due to servicing parties?

4    A.    No one at AHM Servicing looked at or investigated that

5    item because we do not have any information that relates to

6    early premium recapture payments.  That's an item that was

7    always paid by the seller and there's not any practical

8    business application where we would need to get involved

9    because there's never a transcript servicing or anything of

10   that nature that I mentioned which would be -- which would have

11   been similar.  Or really in this case would be different from

12   the EPD repurchase obligation of the seller.

13   Q.    To your knowledge does AHM Servicing maintain any error

14   and admissions insurance?

15   A.    AHM Servicing to my knowledge does maintain that errs and

16   admission insurance.

17   Q.    To your knowledge is the company current on all its

18   reporting and remittances to the loans that are subject of 1.1-

19   J on the APA?

20   A.    To my knowledge, yes.  AHM Servicing is up to date and

21   current with all reporting or remittances with respect to the

22   loans that would underlie the contracts in 1.1-J.  And I had

23   our investor reporting confirm that for me late last week

24   again.

25              MR. BRADY:  Just a moment, Your Honor?

1    Q.   In your experience in the industry is the manner in which

2    Ends and premium recapture payments are paid by the seller, is

3    that standard from your perspective?

4    A.   From my perspective that is standard that those claims are

5    always paid by the seller and they are an obligation of the

6    seller of those mortgage loans.  AHM Servicing has never -- has

7    never been involved with those claims from that perspective.

8             MR. GALLO:  Your Honor, move to strike the answer

9    with respect to whose obligations it is.  I think that's a

10   legal conclusion that's not in the documents.

11            THE COURT:  I overrule that.  I think he made it

12   clear that it was based on his understanding of the way the

13   business operates.

14            MR. BRADY:  Your Honor, with that I have no further

15   questions on direct.  I do have exhibits I'd like to move into

16   evidence through this witness.  We have Exhibits 1 through 103

17   which I think we'll be handing out but I can explain.  Those

18   are the contracts that are on 1.1-J to which an objection has

19   been filed.  So they are contracts that are subject of an

20   objection and our attempt to transfer those to the buyer.

21            THE COURT:  Do I have those?  I'm about to get them?

22            MR. BRADY:  I would note for the record that there

23   are four agreements on 1.1 --

24            THE COURT:  I was so hopeful that 101 didn't really

25   mean that there were 100 more in front of them.  That there was

1    some sort of clever -- no, okay.  I'm sorry, 1 through what?

2         MR. BRADY:  1 through 103.  There are four agreements

3    that appear on 1.1-J that the debtor just simply cannot locate.

4    It's an assignment assumption and recognition agreement made as

5    of January 30, 2007 among EMC Mortgage Corporation, U.S. Bank

6    National Association, not individually but solely for the

7    holders of Bear Stearns Asset Backed Securities One Trust,

8    2007 AC-1 Asset Backed Certificates, series 2007 AC-1, American

9    Home Mortgage Corp., and American Home Mortgage Servicing Inc.

10   Trust me the other three names are a lot shorter.  The second

11   is Loan Sale and Servicing Agreement with Citi Mortgage Inc.

12   The third is Loan Sale and Servicing Agreement with Connecticut

13   Housing Finance.  And the fourth is Loan Sale and Servicing

14   Contract with Merrill Lynch.

15        THE COURT:  Do you have references numbers like, you

16   know, 101.J, you know CD, DB?

17        MR. BRADY:  We could provide them.

18        THE COURT:  I would just like my notes -- because I

19   didn't write down everything you said there, Mr. Brady.

20        MR. BRADY:  So I would move in 1 through 103, again

21   the agreements which are subject of an objection as well as --

22   we are going to get that information for Your Honor.

23        THE COURT:  Thank you.

24        MR. BRADY:  I just don't have it.

25        THE COURT:  All right.  You may approach with the

1    binders.

2            MR. BRADY:  I would also move into evidence 107, 108,

3    and 109, which are the three rating agency letters.  And I'm

4    advised, Your Honor, as well as a result of removing a number

5    of the hillocks yesterday from the contracts that would be

6    transferred those tabs still appear in the binders but behind

7    them there's now a blue sheet that says intentionally omitted.

8    So we'll -- I'll get better numbers of exactly what of the 1

9    through 103 are going in and I'll get the cross-reference to

10   the four that were missing from 101-J and I'll be able to put

11   that on the record.

12           THE COURT:  All right.  We'll hold the admission then

13   of the -- of 1 through 103 sort of in abeyance until you can be

14   more specific.  Because I suspect people who have resolve loans

15   would rather their loans not be admitted into evidence.  Is

16   there any objection to the admission of Exhibits 107, 108 and

17   109.

18           MR. SCHNABEL:  Your Honor, Eric Schnabel on behalf of

19   U.S. Bank.  I don't know whether we object but we would like to

20   see the documents that they're purporting to be our agreement

21   before they're admitted into evidence.  So maybe --

22           THE COURT:  107, 108, or 109?

23           MR. SCHNABEL:  I'm sorry.  I thought you were --

24           THE COURT:  No.  Let's deal one step at a time.  I

25   hear your coming, you want to see their binder before its

1    admitted into evidence?

2            MR. SCHNABEL:  Correct.

3            THE COURT:  Fair enough.  Is there any objection to

4    the admission of 107, 108 and 109 which are the rating no

5    downgrade letters?  Hearing none, they're admitted without

6    objection.  And like I said we're going to hold in abeyance the

7    admission of Exhibits 1 to 103.  And I think the lunch hour

8    would be a good time for people to sort of get comfortable with

9    where they are on the admission of that evidence.  But their

10   moved into evidence and I'll hold in abeyance whether anyone

11   needs to object.  All right.

12   (Debtors' Exhibits 107, 108 and 109, letters from Fitch

13   Ratings, Moodys and S&P, were hereby received into evidence, as

14   of this date.)

15           MR. BRADY:  Thank you.

16           THE COURT:  Can I ask you to -- because frankly I

17   missed it, ask your witness to explain premium recapture again

18   for the Court.

19   BY MR. BRADY:

20   Q.   Mr. Love, would you explain your understanding of the term

21   premium recapture?

22   A.   Sure.  Premium recapture relates to the concept that when

23   the seller sells a loan to a purchaser it's a typical

24   requirement to see that -- lets just say that the closing date

25   or the date that that -- let's just take one loan for example.

1    The date the one loan was sold was today, the early -- the

2    premium recapture would say -- let's just say the period is

3    ninety days.  So if that particular mortgage loan that the

4    homeowners pays that loan in full within the next ninety days

5    the seller would have to refund -- or could be requested to

6    refund the amount that they were paid above par for that loan

7    by the purchaser.  So if the loan was 100,000 dollar loan and

8    they got paid, let's just say a price of 101 percent, there

9    would be a 1,000 dollar premium that was paid on that loan

10   which could be requested to be returned to the purchaser under

11   that -- under that item.

12          THE COURT:  Thank you.  Any cross-examine -- I'm

13   sorry, Mr. Brady, anything further?

14          MR. BRADY:  That is the end of my direct, Your Honor.

15          THE COURT:  Any cross-examination or anyone in favor

16   of the motion?  All right.  Hearing none -- let me just get a

17   rough idea I expect there's a lot of people who intend to ask

18   cross-examination of this witness?  All right, yeah.  I'll tell

19   you what, I think now would be a good time to take lunch and we

20   will reconvene as close as possible to 1:30.  And if people

21   have an opportunity during that period, feel free to continue

22   to use the courtroom during that period to try to work out any

23   of the evidence issues.  If you need some further time let my

24   office know.  But the longer we take for lunch the later we

25   have to go this evening.  Mr. Love, you're the luckiest man in

1  the world you're not allowed to talk to anybody about anything

2  that has anything to do with the case during the break, so

3  enjoy your lunch.

4          THE WITNESS:  Thank you very much.

5          (Recess from 12:27 p.m. to 1:37 p.m.)

6          THE COURT:  Please be seated.  Should we go straight

7  to cross, or do we want to deal with the admission of the

8  exhibits?

9          MR. BRADY:  Your Honor, let's do cross.

10         THE COURT:  All right.

11         MR. BRADY:  We're still working through them.

12         THE COURT:  Very well.  You may proceed.

13         MR. GALLO:  Good afternoon, Your Honor, Mr. Love.

14  Andrew Gallo from Bingham McCutchen for DB Structured Products,

15  Inc.  Your Honor, before I proceed with cross, I did have an

16  opportunity to talk to some of the other creditors on the lunch

17  break, and there is some curiosity as to what the schedule will

18  be going forward, given that some creditors may have witnesses

19  that they need to fly in, and there's travel arrangements that

20  are involved in that.  So we were wondering what Your Honor's

21  plan was over the next few days regarding this hearing, if you

22  have one.

23         THE COURT:  I always have a plan.

24         MR. DORSEY:  Your Honor, John Dorsey on behalf of the

25  debtors.  We would appreciate if those who are bringing in

1    witnesses could identify who they are so we can have some

2    understanding of how many witnesses, and who we need to prepare

3    for.

4              THE COURT:  Well, that's a separate issue, and I

5    think that's a fair issue that if you're going to have a

6    witness it should be identified ahead of time to counsel for

7    the debtors.  My plan was to proceed basically day to day until

8    finished and go as late as reasonable, and some point in the

9    evening I'm, frankly, sufficiently tired that the hearing is

10   meaningless if I'm not able to pay attention.  So I can't

11   imagine we'd go much later than, say, 7 or 8 o'clock on any

12   given night, certainly as late as 6.  That's usually a pretty

13   good stopping time.

14              All that said, tomorrow I have to work around a

15   couple of hearings, including an omnibus hearing in this

16   matter, which is at 10.  I also have my Chapter 7 day in the

17   afternoon, and it's a bit of a wild card as to how long that

18   lasts.  I don't know until I get here.  It's either five

19   minutes or five hours.  And there's really no way to know ahead

20   of time.  So tomorrow would probably be the shortest day, and

21   then you have all day Thursday.  And we were just going to keep

22   plugging away, hopefully get as much done as quickly as

23   possible.

24              I didn't realize -- I never asked, but I didn't

25   realize there would be additional witnesses in excess of the

117

1   five debtor witnesses, but obviously the objectors have the

2   right to bring their witnesses, and we'll deal with it as we

3   go.  So, long story short, we'll go as long as we can today,

4   maybe 7, 8 o'clock tonight, at the latest.  Tomorrow we'll

5   probably either skip or be a more abbreviated schedule.  And

6   then I have all day Thursday, and I do have another hearing on

7   Friday I have to work around, and I haven't read the agenda

8   yet, so I'm not sure how long that will take.  I'm pretty sure

9   it's uncontested.  It's Nelson Intraceuticals (ph.), and if

10  anyone knows the answer they can tell me.  But if you don't,

11  don't worry about.  No one knows.  All right.  So --

12          MR. GALLO:  Your Honor, thank you.  May I ask, the

13  Chapter 7 hearings, what time do those begin tomorrow?

14          THE COURT:  2:00.

15          MR. GALLO:  2:00.

16          THE COURT:  There are two.

17          MR. GALLO:  Okay.  So there's a 10:00 omnibus and

18  then at 2:00 Chapter 7 hearings.  Is that right?

19          THE COURT:  Correct.  And, oh, 3:00 Delta Mills.  Mr.

20  Dehny, are you here?  I haven't read your agenda either.  Is

21  that a lengthy hearing or a short hearing?

22          MR. DEHNY:  I believe it's a short hearing, Your

23  Honor.

24          THE COURT:  All right.  So it's possible we could

25  continue tomorrow afternoon, but it's unlikely.  We'll probably

1    have to basically start at 10 o'clock with the omnibus hearing.

2    If we get done, we can continue along with this case, the sale

3    hearing, if necessary. But we'll have to probably stop at 2 in

4    order to hear the consumer matters.  And it probably doesn't

5    make any sense to reconvene, since I have another 11 after the

6    consumer matters.  So I don't think there are going to be any

7    creditor witnesses before Thursday.  I think that's safe to

8    assume.

9              MR. GALLO:  But, you will -- if you can, you will try

10   to fit in testimony tomorrow on this hearing?

11             THE COURT:  Yes, sir.

12             MR. GALLO:  Okay.  So I shouldn't go back to Boston

13   today?

14             THE COURT:  No, don't leave.

15             MR. SPEAKER:  Your Honor, I was wondering --

16             THE COURT:  If the Red Sox are in Cleveland, there is

17   no reason to go to Boston.

18             MR. GALLO:  As long as you promise I'm out by 8.

19             MR. SPEAKER:  Your Honor, I was just wondering if we

20   could get the creditors' witnesses identified by the end of the

21   day today so that we could prepare?

22             THE COURT:  Well, I think that's -- if you can do

23   that, that's fine.  Certainly by tomorrow morning you should be

24   able to let the debtors know; if you need to finalize over the

25   night I think that may be fair.

1          MR. SPEAKER:  Thank you, Your Honor.

2          THE COURT:  If you're going to call a witness as an

3   objector, please inform the debtors by no later than tomorrow

4   morning, preferably this evening.

5          MR. GALLO:  Thank you, Your Honor.

6   CROSS-EXAMINATION

7   BY MR. GALLO:

8   Q.   Good afternoon, Mr. Love.

9   A.   Good afternoon.

10  Q.   I want to talk a little bit about the EPD claims and

11  premium recapture claims that you discussed in your direct

12  testimony, okay?

13  A.   Sure.

14  Q.   My understanding of an EPD claim, or early payment default

15  claim, is that it's a claim for repurchase of a loan because

16  that loan has gone into default within a particular period.  I

17  believe you testified it's typically within ninety days of the

18  loan origination.  Is that right?

19  A.   It's typically, if any one of the first three payments

20  owed to the purchaser are received late.

21  Q.   And for loans that American Home Mortgage Servicing

22  services, the underlying data that would be necessary to verify

23  whether an EPD claim is valid would, in part, be maintained by

24  your group, right?

25  A.   In part.  The information about the current due dates on

120

1    loans at particular dates in time would be maintained on the

2    servicing system.

3    Q.   So if the basis of an EPD claim is whether or not somebody

4    has made their payment for March, that would be -- American

5    Home would look to your department to determine whether in fact

6    that person had made the payment, correct?

7    A.   That would not quite be correct as far as the flow of how

8    I've seen that process work.  Typically, I think you're right

9    in the point that the data may come from the servicing system.

10   But it's usually the purchaser that is making the request for

11   an EPD repurchase claim.

12   Q.   And my client, DB Structured Products, they're a

13   purchaser, right?

14   A.   That is correct.

15   Q.   And whether or not my client knows if a loan has gone into

16   default, that's based upon information that you provide to

17   them, right?

18   A.   That's correct.  They would typically receive that

19   information in the form of the remittance reports that the

20   servicer would send to the investor, or if the investor has

21   designated a master servicer, to the master servicer.

22   Q.   So the flow of information really is you send reports to

23   my client as to which of my loans are compliant or which of my

24   loans are in default, correct?

25   A.   Not on a specific report for that.  We send a standard

1    investor reporting template that's laid out in the agreement.

2    A very typical field is going to be "due date".  So it's as of

3    the cutoff date for each reporting cycle, there's a specific

4    amount of information that the investment reporting department

5    in servicing is required to report to the investor or to their

6    designee.  And, you know, that's where the purchaser would

7    receive that type of information.

8    Q.    Let me say it differently then.  Your department sends the

9    information to my client by which my client can see whether or

10   not our loans are in default, right?

11   A.    I think that would be accurate.

12   Q.    And then if my client, based upon its review of that

13   information, perceives that it may have an EPD claim, because

14   there's a loan that's gone into early default, it will notify

15   American Home of that claim, correct?

16   A.    If the purchaser determines through their evaluation that

17   a loan has potentially tripped an EPD claim, they would -- and

18   it was on an AHM loan -- and in this case if it's under this

19   scenario, if it was a loan that AHM was servicing, because

20   there are also loans that Deutsche Bank  would make -- in this

21   case could make claims on, that another servicer is servicing,

22   that AHM sold to Deutsche Bank servicing released, where that

23   information, that same information I described would not come

24   from AHM Servicing, it would come for the present servicer of

25   that loan.  But if it's just under that scenario, then if

122

1  Deutsche Bank determined that a loan met that criteria, they

2  would then send the request back to the seller, which in this

3  case if it was American Home Mortgage Corp.; they would send

4  the request back to American Home Mortgage Corp.

5  Q.   And once American Home Mortgage Corp. receives the

6  request, they then go about an effort to verify whether or not

7  that request is valid, right?

8  A.   That is my understanding.

9  Q.   And that would be something that Mr. Johnston does, right?

10 A.   It's Johnson.

11 Q.   Johnson, excuse me.

12 A.   I believe that one of the groups that, you know, works

13 under him managed that process for American Home Mortgage Corp.

14 Q.   And part of the process that that group will go through in

15 order to verify the validity of the EPD claim is to contact

16 your group and determine whether or not the loan actually is in

17 early default.  Is that right?

18 A.   They would, in evaluating any type of EPD repurchase

19 claim, I would typically expect that they would reach out in an

20 effort to whoever the current servicer is.  To the extent the

21 current servicer is American Home Mortgage Servicing, they

22 would want to reach out to them to try to obtain information.

23 If it was a third party servicer, typically, I believe they

24 would request that information from the party that was

25 requesting them to repurchase the loan so that they can have a

1    basis to make a determination of whether a seller they agree

2    (audio cut out) you don't have involvement from that side of

3    things.

4    Q.    Who sends the letters?

5    A.    Who sends the billing statements?

6    Q.    Yes.

7    A.    The billing statements are sent by Servicing.

8    Q.    And so if there were any solicitation materials contained

9    with the letters, they would be provided to Servicing and

10   Servicing would then send out the letters.  Is that right?

11   A.    I think that the billing statements are actually generated

12   and mailed out from a third party vendor that we use.  And I

13   believe that those types of items which you're referring to,

14   along with solicitations for, you know -- maybe optional

15   products would be another typical thing, those types of items

16   or additional inserts, as we'll try to call them, would

17   typically be coordinated directly from either the optional

18   products group or somehow the origination channel.  But I don't

19   know that -- to my knowledge, Servicing didn't have any direct

20   involvement in those types of arrangements.

21   Q.    I want to turn now to this concept of purchasing release

22   versus purchasing retained.  Is it your understanding that my

23   client also had an agreement with American Home for the sale of

24   loans purchasing released?

25   A.    Yes, Deutsche Bank Structured Products did buy pools of

1   loans from American Home in both fashions.

2           MR. GALLO:  And I'd like to -- I want to mark that.

3   Your Honor, may I approach?  We've actually created a binder

4   with the exhibits that we intend to offer at the hearing.

5           THE COURT:  Okay.  Thank you.

6           MR. GALLO:  May I proceed, Your Honor?

7           THE COURT:  Yes.

8           MR. GALLO:  Thank you.

9   Q.   Mr. Love, I place in front of you an agreement dated

10  November 1, 2005 between my client and American Home Mortgage

11  and American Home Servicing that's entitled "Master Mortgage

12  Loan Purchase and Interim Servicing Agreement."  Do you

13  recognize this agreement to be the agreement that governed the

14  sale of loans Servicing released between my client and American

15  Home?

16  A.   This would appear to be that agreement to me.

17  Q.   And just so we're on the same page, if you'd turn to page

18  1 and you look under the title "Witness F", and the first

19  clause is a whereas clause that says "The seller desires to

20  sell from time to time to the purchaser and the purchaser

21  desires to purchase from time to time from the seller certain

22  conventional fixed and adjustable rate residential first and

23  second lien mortgage loans, as described herein on a servicing

24  released basis."  And then it goes on.  So that would indicate

25  that this is an agreement servicing released, right?

1  A.    That's correct.

2  Q.    And I believe you testified on direct that where you sell

3  loans servicing released, there is still a servicing component,

4  an interim servicing component where American Home Servicing

5  would service the loans on an interim basis until the buyer, in

6  this case that would be client, identifies and the loans are

7  transferred to its own servicer, correct?

8  A.    Typically, at the time of the trade, that would be an item

9  that would be identified and agreed upon between the seller and

10  the purchaser.  So usually at the time the trade settled, when

11  we found out about the terms of the trade, we would know then

12  how long we were going to service the loans for and who the new

13  servicer was going to be.

14  Q.    But I'm correct that there's an interim servicing

15  component in this agreement, right?

16  A.    That is correct.

17  Q.    And that governs the servicing of the loans by American

18  Home Servicing from the date that the trade closes until the

19  time that the servicing is transferred to another servicer,

20  right?

21  A.    That's correct.

22        THE COURT:  I'm sorry, where are you, Mr. Gallo?

23  Which document?

24        MR. GALLO:  What number is this in the binder,

25  Amanda?  Yeah, this is -- this is number 6.

126

1          THE COURT:  Oh, number 6, right.

2          MR. GALLO:  I'm sorry, Your Honor.  This is the

3    Servicing Released Agreement.

4          THE COURT:  Okay.  I'm sorry.

5          MR. GALLO:  November 1, 2005.

6    Q.   So, again, this agreement relates to the sale of mortgage

7    loans servicing released to my client.  And it also contains

8    the provisions pursuant to which American Home Servicing will

9    service the loans on an interim basis until that servicing is

10   transferred to the servicer that my client has chosen, right?

11   A.   That's correct.

12   Q.   And if you -- I want to now take a look at the May 1, 2006

13   agreement, which is DB-1, and that is the Servicing Retained

14   Agreement.  Now, this agreement governs the sale of loans

15   servicing retained.  So, in other words, the loans will be sold

16   to my client, the servicing will be retained by American Home

17   Servicing, correct?

18   A.   That's correct.

19   Q.   And the provisions in this agreement relate to both the

20   sale of the loans, and they also govern how you were to service

21   the loans, correct?

22   A.   That's correct.

23   Q.   And this agreement was specifically drafted for this deal,

24   right?

25   A.   Well, it was -- this document here would have been

127

1  specifically drafted the first time that Deutsche Bank

2  Structured Products bought a pool of loans from American Home

3  Mortgage Servicing, where the winning bid was a servicing

4  retained bid.  So the first transaction, based on the date,

5  would have taken place some time in May of 2001.

6       So that just would have been the first trade that settled

7  under that.  From that time forward, any trade that American

8  Home Mortgage Corp. offered, as seller, and Deutsche Bank

9  Structured Products won the bid on a servicing retained bid,

10  then would have closed under this document.  And the piece that

11  would change from trade to trade is what would typically be

12  referred to as a purchase price, in terms letter or a trade

13  confirm, which then would just specify the differences from

14  trade to trade.

15       So if the first trade was for one hundred loans and that

16  was ten million dollars of UPB, it would show that on the

17  purchase price for that particular trade.  And there's usually

18  some other pieces that are different from trade to trade.  But

19  this document would have been used for Deutsche Bank to buy

20  multiple pools of loans for multiple deals from AHM that were

21  servicing retained trades.

22  Q.   And each of the purchases, my client -- are you familiar

23  with the term commitment letter?

24  A.   Yeah, that's what I refer to as the purchase pricing terms

25  that are the trade confirm.

1   Q.   And I appreciate your answer.  Mine was a little bit more

2   general.  My question was a little bit more general, which is

3   simply that this agreement was specifically drafted and

4   negotiated between Deutsche Bank and American Home to govern

5   the terms of the relationship between those two parties,

6   pursuant to which my client would buy loans servicing retained.

7   Is that right?

8          MR. BRADY:  Objection, Your Honor.  I don't think

9   he's established with this witness he was involved in the

10  negotiation of this particular agreement.

11          THE COURT:  Response, Mr. Gallo?

12  Q.   Mr. Love, were you involved in the negotiation of this

13  agreement?

14  A.   I would not have been involved in the direct negotiation

15  of the agreement.  Typically, my role in these types of

16  agreements would be to review servicing portions of the

17  agreement and provide comments back to our internal counsel,

18  who would be the group primarily in charge of negotiating the

19  agreements, as I would, I guess, phrase it.

20  Q.   So when you were asked at your deposition, "Q. Were you

21  involved in the negotiations of this document?"  And you

22  answered "I was involved with the negotiations from the side of

23  the servicing points that are listed within the document,

24  review and comment to our internal counsel to reply to try to

25  ensure that the provisions with AHM servicing was being asked

1    to service on 1) made sense with operationally how those

2    functions happen in the normal course of business, and that 2)

3    we were able to synch them up with what our normal servicing

4    procedures are for each of the different servicing topics

5    listed."  That's page 214 of the deposition.  I should have

6    said that before.  And is that accurate, your testimony at the

7    deposition there?

8    A.    I think that that would be consistent with my previous

9    statement.

10   Q.    Okay.  So I believe my question was, and I don't know if

11   there's still an objection, but was that this particular

12   agreement, this May 2006 agreement, was negotiated between

13   American Home and my client, specifically to govern their

14   relationship regarding the purchase of loans servicing

15   retained, correct?

16          MR. BRADY:  Your Honor, I still have an objection.

17   One, I think that question was vague, because it speaks of

18   American Home generally, and there are different debtors here.

19   And two, I think Mr. Love's testimony is he provided comments

20   to his side, but I don't believe that means he negotiated with

21   Deutsche Bank in this agreement.

22          THE COURT:  Well, why don't you ask him a more

23   specific question, as opposed to American Home.  Try to be

24   specific about which entity you're talking about.  To the

25   extent you want to talk about more than one entity, say more

1   than one entity.  And the witness can answer, to the best of

2   his knowledge, in connection with what is asked.  So why don't

3   you try again, Mr. Gallo?

4   Q.   Okay.  So in the first instance I'll ask, generally, is it

5   your understanding that this agreement was specifically

6   negotiated by American Home with my client to establish the

7   relationship between American Home and my client, under which

8   my client would purchase loans servicing retained by American

9   Home?

10          MR. BRADY:  Your Honor, same ob --

11          THE COURT:  And when you say American Home, who do

12   you mean?

13          MR. GALLO:  Well, I'm asking him generally, Your

14   Honor.  I mean --

15          THE COURT:  Well, no, but -- no.

16          MR. GALLO:  If --

17          THE COURT:  I'm not letting you ask him generally.  I

18   want you to be more specific.

19   Q.   Okay.  So, first of all, I understood --

20          THE COURT:  And if you just specify.  If you want to

21   say American Home Mortgage Corp. and/or Amer -- you know, let's

22   just lay out who you're talking about.

23   Q.   Okay.  Do you know if this agreement was specifically

24   negotiated by American Home Corp. to govern the relationship

25   between my client and Deutsche Bank?

1   A.   I believe that this agreement would have been negotiated

2   by American Home Mortgage Corp. as seller to sell loans to

3   Deutsche Bank Structured Products, where the trade would be

4   such that the servicing rights would be released and American

5   Home Mortgage Servicing would act as servicer for those loans.

6   Q.   And, you, on behalf of American Home Mortgage Servicing

7   were involved in the negotiation of the agreement to the extent

8   it related to the provisions of the agreement that deal with

9   servicers, is that right?

10  A.   I would have been involved in reviewing and providing

11  comment on servicing related -- administration of servicing

12  related topics.

13  Q.   Now, I believe you testified on your direct that your

14  memory was in many instances the way that you would get to an

15  agreement for servicing retained sales was to take an existing

16  agreement for servicing released sales and then change that

17  agreement to reflect the new servicing retained relationship.

18  Is that true?

19        MR. BRADY:  Objection, Your Honor.  I have no

20  recollection of that on direct.

21        THE COURT:  Well, I think the witness can say the

22  same, if that's the witness' recollection, or the witness can

23  respond accordingly.  So objection overruled.

24  A.   Can you just repeat the question for me?

25  Q.   Yeah.  I mean, I thought that I heard on direct -- maybe

1    I'm wrong -- you testify that many times the way that you would

2    get to a Servicing Retained Agreement would be if you had an

3    existing Servicing Released Agreement  with a party, to edit

4    that agreement to reflect the differences between servicing

5    released and servicing retained, and that would the produce the

6    servicing retained agreement.  Correct?

7    A.    I do recall, I think, mentioning or talking about that

8    topic.  It wasn't -- it was more just pointing out that from an

9    evolution standpoint.  In a lot of instances it wouldn't

10   necessarily have been by choice from our side in servicing, but

11   that it would appear to me, more from a convenience sake, the

12   quickest way to get to a servicing retained MLPSA where the

13   parties already had a servicing retained MLPISA, was that at

14   times they would take that agreement and they would try to make

15   changes to provisions to the servicing pieces to end up with

16   the MLPSA.

17   Q.    Thank you.  I think you're agreeing with me.  But I think

18   you said servicing retained MLPISA.  And MLPISA is a Servicing

19   Released Agreement , right?

20   A.    That's correct.  If I said that, I misspoke.

21   Q.    Thank you.

22          MR. GALLO:  Okay.  Let's do the two black lines now,

23   Amanda.  May I approach the witness, Your Honor?

24          THE COURT:  Um-hum.

25          MR. GALLO:  Thank you.  Your Honor, I've just placed

1    two documents in front of the witness.  For your reference,

2    there's a black lined agreement that I believe is behind Tab 8

3    of your binder.  And there is also an e-mail that has an

4    attachment to it, a black lined agreement that is behind Tab 7

5    of your binder.  I'm going to start with the black line that's

6    behind Tab 8.

7    Q.    Mr. Love, I'm looking at the agreement now that doesn't

8    have the e-mail on top.

9    A.    Okay.

10   Q.    Do you have that one?

11   A.    I got it.

12   Q.    And looking at this agreement, is it your understanding

13   that this agreement was part of that negotiation process and is

14   a black line of my client's Servicing Released Agreement  that

15   was part of the negotiating effort to turn that servicing

16   released MLPISA into a servicing retained MLPSA?

17   A.    Just looking quickly on the surface of the documents, I

18   don't know that that would completely be apparent to me.  If

19   you look at the black line on the front page, the document

20   that's black lined is dated as of April 2005.  I think that the

21   interim servicing agreement that you handed me before that was

22   the final document, was dated as of November 1, 2005.

23   Q.    Can you turn to the page that's marked page 1 of the black

24   line?

25   A.    Okay.

1  Q.   And you see in the second line there's a black line that

2  changes the date from November of '05 to May of '06?

3  A.   Yes, I do.

4  Q.   And do you see in the first "whereas" clause there's a

5  black line to change the agreement from servicing released to

6  servicing retained?

7  A.   Yes, I see that word being changed.

8  Q.   So do the changes here indicate to you that this was a

9  black line from that original November 1, 2005 agreement to the

10 May 1, 2006 agreement?

11 A.   It would seem to be more consistent to me that that would

12 be the case.  I just don't know that I can say, having looked

13 at it for a few seconds, that it's really a black line of the

14 final agreed version of the document.

15 Q.   Well, let's look at the black line with the e-mail.

16        MR. GALLO:  And, Your Honor, again, that's behind Tab

17 7 of your binder.

18        THE COURT:  Um-hum.

19 Q.   If you know -- this appears to be a string of e-mails.

20        MR. GALLO:  And I'll just note for the record that

21 both of these documents were produced to us from the debtor,

22 both the black line and then this e-mail with the attachment.

23 Q.   The bottom appears to be an e-mail from Jody -- is it

24 Galagos?

25 A.   I believe it's Gallagos.

135

1   Q.   Gallagos to Katherine Allan.  And it appears as if you are

2   cc'd on that e-mail.  Is that correct?

3   A.   That is correct.

4   Q.   Do you know who Jody Gallagos is?

5   A.   Jody was a member of the internal legal department at AHM.

6   Q.   Do you have a memory of Jody Gallagos being involved in

7   the negotiation of the May 1, 2006 agreement?

8   A.   Not for this particular agreement, but that would be a

9   typical role that Jody filled.

10  Q.   And would Jody, or Ms. Gallagos, would she --

11  A.   It's a he.

12  Q.   Oh, I'm sorry.  Excuse me.

13  A.   Jody might be upset, you know, to have that on the record.

14  Q.   Would he negotiate these agreements on behalf of both

15  Servicing and Corp?

16  A.   He would -- I believe that would be accurate.  He would be

17  one -- in many instances he would be one of the lead people

18  negotiating between legal counsels on these items.

19  Q.   And Katherine Allan, do you know who -- I'm assuming

20  that's a she -- do you know who she is?

21  A.   I don't know who she is.

22  Q.   If you look at the e-mail above that, which appears to be

23  a return e-mail from Ms. Allan, it indicates that her address

24  is at Thacher, Proffitt & Wood.  Are you familiar with Thacher,

25  Proffitt & Wood?

136

A.   I am familiar with the law firm.  We used them on -- for

most of our AHM securitizations to produce the securitization

docs as outside legal counsel.

Q.   And is it also your understanding that they do work for my

client?

A.   I don't know that for a fact or not.

Q.   Do you have any memory of them being involved in the

negotiation of this May 2006 agreement?

A.   Not for this particular contract, I do not.  I'm sorry.

Q.   Does looking at this e-mail refresh your memory at all

that you were at least copied on e-mails between Ms. Allan and

Mr. Gallagos that related to the negotiation of this May 2006

agreement?

Q.   I don't specifically recall this exchange.  I mean, we

would enter into a lot of agreements throughout the course,

through the normal course.  But I don't have any specific

recollection of her being involved.  Jody would be involved in

many deals, but I don't have any recollection of her or,

specifically, you know, what transpired for this particular

deal.

Q.   You have no reason to believe, though, that you didn't

receive this e-mail, right?

A.   I do not have any reason to believe that.

Q.   And if you look at the top e-mail from Ms. Allan, it reads

"Attached please find a copy of the revised agreement and black

137

line against the previously distributed draft, changed pages

only.  In the interest of time, the document is being

simultaneously distributed to both American Home and DB and

remains subject to DB's review and comment."  Does that refresh

your memory at all that this document, or the attachment to

this e-mail, was a further draft working off of the black line

that we saw previously, which is Tab 8 in the Judge's binder?

A.   Again, it doesn't specifically refresh my memory of how

the negotiations for this particular contract back in '06 went

forward.  It wouldn't be unreasonable for that to happen, but I

don't have any specific recollection.

Q.   Let's look at -- let's turn back to the Servicing Released

Agreement .

          MR. GALLO:  And, again, that's Tab 6, Your Honor, in

your binder.  That's the November 1, 2005 Servicing Released

Agreement.

Q.   And I want to specifically look at page 45 of that

agreement, which contains the indemnification provision.  Are

you there, Mr. Love?

A.   Yes, I am.

Q.   And I'm referring to sub -- I want to specifically refer

to subsection 13.01, which is labeled "Additional

Indemnification by the Seller."  Do you see that provision?

A.   Yes.

Q.   Please review it and let me know when you're done.

1   A.   I reviewed the section.

2   Q.   Okay.  The first half of the section deals with an

3   indemnification that's going to be provided to my client, the

4   purchaser, is that fair?

5   A.   That appears to be correct.

6   Q.   And the only party that is providing that indemnification

7   in this agreement is the seller.  Is that right?

8   A.   It appears to be, although part of the wording seems a

9   little bit ambiguous to me.

10  Q.   But, nonetheless, their interim servicer is not listed at

11  all in the first sentence of that agreement, right?

12  A.   The interim servicer is not, but the piece that doesn't

13  make sense to me, from a business perspective, is that it talks

14  about the seller performing its obligation to service, which

15  doesn't quite make sense.

16  Q.   Right.  The obligation to service, that comes after the

17  language "including but not limited to its obligation to

18  service," right?

19  A.   That's correct.

20  Q.   And, in any event, in that first sentence that deals with

21  the indemnification that is going to be provided to my client,

22  the indemnification in this agreement is coming from the

23  seller; the interim servicer is not mentioned, right?

24  A.   They're not mentioned.  I just don't know if that's by

25  design or not.

139

1    Q.   Correct.  And then the second half of this paragraph deals

2    with indemnification that the purchaser is going to provide to

3    parties under the contract.  Is that right?

4    A.   It mentions the purchaser indemnifying both the seller and

5    the interim servicer.

6    Q.   So there is an indemnification under this provision,

7    flowing from my client to both the seller, which would be

8    American Home Corp. and the interim servicer, which would be

9    under this agreement American Home Servicing.

10            MR. BRADY:  Objection, Your Honor.  That calls for a

11   legal conclusion.

12            THE COURT:  Mr. Gallo?

13   Q.   Is that your business understanding as to how this

14   agreement works?

15            MR. BRADY:  Well, Your Honor, I don't think you can

16   fix a request for a legal conclusion by saying you're asking

17   for the business understanding of a legal conclusion.

18            MR. GALLO:  Your Honor, that's precisely the

19   objection that I made when they asked this witness what certain

20   provisions of agreements mean, and it was overruled on the

21   basis that it was his business understanding.

22            THE COURT:  Um-hum.  If you have an understanding as

23   to the transaction as it was designed by this paragraph, you

24   can answer it.  If you don't, you don't.

25   A.   I mean, this paragraph, as I mentioned when I read through

1   it, it doesn't make clear sense to me.  This is a type of

2   provision that, when I mentioned we would from my side go

3   through and mark up agreements to comment on the servicing

4   related provisions, this is the type of paragraph that we would

5   mark legal review, that we would always be looking to our legal

6   counsel to review this type of piece.

7   Q.   And so it's your understanding that your legal counsel

8   would review and comment on, and either make changes or not

9   make changes, to provisions like this indemnification

10  provision?

11  A.   I would expect them to.  But, again, I don't have any

12  particular knowledge for exactly what transpired for this

13  agreement or the timing surrounding it.

14  Q.   I just want to look then, just to see if it will refresh

15  your memory.  But I want to look at the evolution of this

16  provision as it goes from that agreement to the May agreement.

17  So let's start with the black line that does not have the

18  e-mail in front of it.

19              MR. GALLO:  And, again, Your Honor, that's Tab 8 in

20  your binder.

21  Q.   And, specifically, look at page 56.

22  A.   I've got that page.

23  Q.   And at subsection 13.01, I'll represent to you that this

24  paragraph, you can compare it if you want, but if you were to

25  eliminate the black line, this paragraph would be identical in

1   wording to the paragraph that is contained in the November 1,

2   2005 agreement, the indemnification provision.  And then if you

3   look at the black line, what has been changed is that in the

4   first sentence, where previously it said the seller shall

5   indemnify, it now says the seller and the servicer shall

6   indemnify.  And in the last sentence, where it says -- the

7   servicer is added again, where there's references to

8   indemnification obligation in the second sentence.  And then in

9   the third sentence when they're talking about the purchaser's

10  obligation to indemnify, interim has been crossed out in front

11  of servicers, so now it just relates to servicer.

12      Now, do you have any independent memory of the changes of

13  this particular provision as it related to the evolution from

14  the Servicing Released Agreement to the servicing retained?

15  A.   I do not have any specific recollection of this section.

16  And then, again, it appears the section, in general, doesn't

17  make much sense to me from a business perspective.  And a

18  couple of points: one is the same, where it talks about the

19  seller to perform as servicer.  And two would be that the title

20  of this section is still "Additional Indemnification by the

21  Seller."  So, I mean, just from a broad perspective, if you're

22  asking me, to me the whole paragraph could relate to seller.

23  Q.   But, nonetheless, there was, specifically, the addition,

24  as you transitioned from the May -- I'm sorry, the November of

25  2005 agreement to the May 2006 agreement of the term "the

142

1   servicer" to this paragraph as reflected in this black line,

2   right?

3   A.   Those changes are made, but I couldn't tell you if they're

4   intentional or what the thought behind that was or not.  I

5   mean, it's not something I really feel, from a business

6   perspective, I can make that conclusion.

7   Q.   Understood.  This was something, again, that you think you

8   believe that the people that would have been focused on this

9   provision of the agreement would have been the lawyers, right?

10  A.   I would think that they would.

11  Q.   And, from your standpoint, with respect to this agreement,

12  that would have likely included Mr. Gallagos, right?

13  A.   Based on the e-mail, it would seem as though Jody would

14  have been involved.

15  Q.   And just to close the loop in this topic, if we turn to

16  the e-mail --

17        MR. GALLO:  Which, again, Your Honor, is Tab 7 in

18  your binder.

19  Q.   -- and let's look at the indemnification provision there,

20  which you can find on page 55 of the black line.  It's not the

21  actual -- I think there's less than 55 pages, because, again,

22  the e-mail indicates that only the pages that were being

23  changed were exchanged between the lawyers.  But if you look at

24  page 55 -- are you with me there, subsection 13.01?

25  A.   Yes, there is.

143

1    Q.    And I'll represent to you that if you were to eliminate

2    the black lined portion you see here, this indemnification

3    provision would read identical to the black lined

4    indemnification provision that we looked at in the previous

5    exhibit, and this black line, which as we can see from the e-

6    mails, appears to have been exchanged between your lawyer and

7    the lawyer at Thacher Proffitt.  The only change to the

8    provision that relates to indemnification is the elimination of

9    the last sentence, which concerns the purchaser indemnifying

10   the seller and the servicer, so that the changes in the last

11   black line, where "the seller and the servicer shall indemnify

12   the purchaser," those remain the same.

13            MR. BRADY:  Objection, Your Honor.  That question is

14   vague.

15            THE COURT:  I didn't hear a question, actually.  I

16   heard an excellent summary of the change.  But I didn't

17   actually hear a question.

18            MR. GALLO:  I apologize, Your Honor.

19   Q.    Does looking at this agreement and this black line, again,

20   refresh your recollection as to the fact that the

21   indemnification obligations were commented on by your attorneys

22   and were not changed in the various iterations of the black

23   lines that we see?

24   A.    One, I guess it does not refresh my recollection.  I don't

25   have any specific recollection of this section or the

144

1  negotiation thereof.  Secondly, I don't know that I can

2  represent that this would be the only black line.  And, in

3  general, the section, again, still doesn't make sense to me.  I

4  can see from a practical standpoint why you might want to

5  remove indemnifications of the purchaser in a section that's

6  only titled "Additional Indemnification by the Seller."  But,

7  in general, I don't recall, and it's not a topic that I would

8  think that I'm necessarily qualified to make any conclusions

9  on.

10 Q.   I understand.  I'll move on then off this topic.  I want

11 to focus on the 2006 agreement, and that's an agreement that

12 you're familiar with, right, Mr. Love?

13         MR. BRADY:  Does that have a number?

14         MR. GALLO:  It's DB-1.  It's number 1 in the binder.

15 A.   Was that a question?  Are you just asking me if I have the

16 agreement?

17         THE COURT:  Are you familiar with the 2006 agreement

18 was the question.

19 A.   I would be familiar with this agreement from the servicing

20 perspective.

21 Q.   And, again, it's your understanding that the servicing

22 related provisions of this agreement are what are being

23 transferred, pursuant to the sale that is the issue of this

24 hearing, right?

25 A.   I don't know how exactly you necessarily get there if

145

you're asking me from a real document perspective or just

generally speaking.  To me it would be the servicing related

provisions that relate to the servicing rights that would be

transferring in this transaction.

Q.   And I thank you for that clarification.  I didn't want you

to give me a legal conclusion.  Your understanding, from a

business standpoint, as potentially someone who's going to be

working for the purchaser, is that what this transaction is

going to do is going to be, with respect to this agreement,

transferring the rights and obligations that relate to the

servicing under this agreement to the purchaser, right?

A.   As they relate to the servicing provisions, that would be

my understanding.

Q.   And if you'll look at that same indemnification provision

that we've been looking at in those black lines and in the 2005

agreement -- that would be on page 55 of this agreement.  And,

again, we've read this before --

A.   Hang on one second.

Q.   Do you have the wrong --

A.   Page 55 for me is not that same section.

      THE COURT:  Do you have -- you may have the wrong

document.  Ms. Winfrey, can you help him?

A.   Is it the black line or the clean?  I'm sorry.

Q.   I'm looking at the clean May 1, 2006 agreement.

A.   I think I had a black line.

146

1   Q.   My apologies.  You can put the black lines aside.  We're

2   done with the black lines.

3   A.   Super.  Okay.  Let me get to it.  You said 55?

4   Q.   Yes.

5   A.   Okay.  I'm there.

6   Q.   And this reads "In addition to the indemnification

7   provided in subsection 7.05, the seller and the servicer shall

8   indemnify the purchaser and hold the purchaser harmless against

9   any and all claims, losses, damages, penalties, fines,

10  forfeitures, etcetera, that the purchaser may sustain, in any

11  way related to the failure of the seller to perform its

12  obligations under this agreement, including but not limited to

13  its obligation to service and administer the mortgage loans in

14  strict compliance with the terms of this agreement, or any

15  reconstitution agreement," etcetera.  Is this a provision that

16  you dealt with from the servicing side?

17  A.   I guess, could you be a little bit more specific about

18  what you mean by "dealt with"?

19  Q.   Let me put it a little bit differently.  Is this a

20  provision of the agreement that relates to servicing that is

21  going to be transferred, pursuant to the sale?

22            MR. BRADY:  Your Honor, I object to that question.

23            THE COURT:  It is sustained.  That is a legal

24  conclusion.

25            MR. GALLO:  Your Honor, I believe what I'm looking

1  for is his business understanding.

2          THE COURT:  No, no, no.  Objection sustained.

3  Q.   Mr. Love, do you have an understanding, from a business

4  perspective, as to which provisions of this contract are

5  servicing related provisions and will be transferred, pursuant

6  to this sale, and which provisions of this contract are not

7  servicing related provisions and will not be transferred as

8  part of the sale?

9          MR. BRADY:  Your Honor, I would object to the second

10 part of that question.  The first one, I think the witness

11 could answer from a business perspective, but the transferred

12 as part of the sale is the same legal conclusion of what would

13 go and what would stay.

14         THE COURT:  Aren't they flip sides of the same coin,

15 Mr. Brady?  The way I understood the question -- I mean, the

16 question was really -- I suppose it was somewhat redundant, but

17 the question was does he have a business understanding of what

18 sections and pieces of this agreement are being transferred and

19 what sections and pieces aren't being transferred?

20         MR. BRADY:  Well, I think --

21         THE COURT:  And, one, you know --

22         MR. BRADY:  -- it was a compound question in the

23 sense that the first, I think was what parts of this agreement

24 are servicing related.  I think the witness is clearly

25 competent to answer that.

1      THE COURT:  All right.  That's fair enough.  Ask that

2  question.

3  Q.   Is this provision, this Section 13.01 of the agreement, a

4  servicing related provision?

5  A.   I guess from a business perspective, I would not consider

6  it a servicing related provision.  I guess maybe I should

7  qualify that.  When I look at servicing related provisions,

8  there's probably two different sides of that.  One is going to

9  be what relates to the administration of the servicing loans.

10  So, functionally, for us to be able to perform and do all the

11  core servicing functions, this particular section is not going

12  to impact how we're supposed to collect payments, how we're

13  supposed to pay escrows, any of those types of items.

14      The other side I guess, is I'm sure that there are legal

15  pieces of the agreement which would be beyond my skills to

16  necessarily comprehend or go through exactly what the sections

17  mean.  To me, again, in general, when I look at this section, I

18  wouldn't think it's part of the servicer, merely from the

19  title, that it's "Additional Indemnification by the Seller."

20  The servicer is not the seller to me, so it wouldn't go, if

21  you're asking me, if I was going to go through that and try to

22  decide, I would not.  But I don't know that you'd want me to be

23  the one to make the decision on that section.

24  Q.   The fact that the servicer -- despite the title, the fact

25  that the servicer is mentioned in the section, that doesn't

149

1    indicate to you one way or the other whether or not this is a

2    servicing related provision of the agreement?

3    A.    Again, to me it's ambiguous.  I couldn't tell you exactly

4    what the servicer, based upon reading this, would be asked to

5    indemnify for.

6    Q.    From your business perspective, prior to the bankruptcy

7    when you were operating and servicing loans under this

8    agreement, did you understand, from a business perspective,

9    that if there was a failure by the seller to perform any of its

10   obligations under this agreement, that would be an event that

11   might allow my client to terminate the servicing under this

12   agreement?

13         MR. BRADY:  I would object, Your Honor, calls for a

14   legal conclusion.

15         THE COURT:  Sustained.  I'm not going to let you

16   delve into areas of, you know, legal rights of termination or

17   not, with this witness.

18         MR. GALLO:  Your Honor, and I don't intend to do

19   that, and if that's the way my question came out, I apologize.

20   Simply what I'm asking him is whether or not when he was

21   operating the servicing of this agreement, did he understand,

22   as from a business perspective, that if the other guys failed

23   to pay, he could lose his servicing and he could lose whatever

24   he was doing under this agreement.  That's all I'm trying to

25   understand.

1          THE COURT:  All right.  You understand that question?

2          THE WITNESS:  I think I understand the question.

3          MR. BRADY:  Well, Your Honor, I would ask that it be

4     rephrased since I don't understand who the other guys are.

5          THE COURT:  All right.  Let's try to be a little more

6     specific.

7          MR. GALLO:  Well, let me --

8          THE COURT:  I got it, but, you know, I'm smarter than

9     Mr. Brady.

10         MR. GALLO:  No comment, Your Honor, on Mr. Brady.

11         THE COURT:  Try it again.

12         MR. GALLO:  Well, let me back up.  Let me just back

13    up a second.

14    Q.   You understood with respect to this agreement that your

15    right to continue servicing the loans and to continue to

16    receive a servicing fee, required you to do certain things like

17    to service the loans, right?

18    A.   Broadly speaking, yes.

19    Q.   And if you did not comply with the terms of the servicing

20    provisions of this agreement, there was a risk that my client

21    could terminate the agreement and American Home would lose the

22    servicing rights, is that right?

23    A.   I guess if the servicer were to default for nonperformance

24    on the servicing provisions, is that what you're asking?

25    Q.   Yes.

1   A.   I mean, from a broad business perspective, it would make

2   sense to me that if we are signing up to service the loans in a

3   competent fashion, that we would meet that obligation.

4   Q.   Right.  You don't have an indelible right to receive the

5   servicing fee for the rest of time.  You have to live up to

6   your obligations under this agreement to service the loans in

7   order to receive that fee, right?

8   A.   I would say that it would be fair that in order to receive

9   the fee we need to perform the service and the obligations.

10  Q.   And that was part of your job with servicing, was to

11  ensure that your department serviced the loans in a manner

12  consistent with this agreement so that you wouldn't be in

13  default of the servicing provisions of this agreement, right?

14  A.   As it relates to the provisions that would apply to the

15  administration of the servicing the loans, I believe that would

16  be correct.

17  Q.   And you understood that under this agreement, if you did

18  certain things that would rise to a level of default, that you

19  could lose the servicing, is that right?

20  A.   Generally, that concept would make sense to me.

21  Q.   If one month you forgot or you didn't send out any of the

22  letters and collect any of the PNI on my loans and you refused

23  to advance that PNI, as required under the agreement, that

24  would be a default and we could terminate servicing, right?

25          MR. BRADY:  I object now, Your Honor.  I think he

152

1   went too far.

2           THE COURT:  Yep, he went -- yeah, Mr. Gallo --

3           MR. GALLO:  Okay, Your Honor.

4           THE COURT:  Sustained.  I mean, I think you got the

5   concept.

6           MR. GALLO:  Right.

7   Q.   So I guess while you were operating this agreement from a

8   business perspective, did you conceive that one of the defaults

9   that could lead to your not being able to service the loans on

10  a going forward basis, would be the failure of American Home to

11  pay claims relating to the sale, such as repurchase claims or

12  premium recapture claims.

13          MR. BRADY:  Objection, Your Honor, both vague and

14  calls for a legal conclusion.

15          THE COURT:  I'll allow him to answer that question;

16  overruled.

17  A.   From a business perspective, that is not a concept that I

18  can say that we were focused on in servicing.  It's not -- you

19  know, when you mention it now would be the first time that

20  anyone would have mentioned to me that failure for American

21  Home Mortgage Corp. to pay repurchase claims could potentially

22  affect the rights of the servicer.  So it's not something that

23  we would have been looking for or that would be part of what we

24  were trying to ensure managing to make sure that the servicing

25  function is being performed in the best way possible.

153

1    Q.    If you could turn to page 57 of the agreement.

2            MR. GALLO:    And this is number 1 in your binder, Your

3    Honor.    I'm still talking about the May 2006 agreement.

4    Q.    Subsection 14.01 governs the events of default.    And if

5    you turn to page 57, you'll see that the last paragraph of this

6    section indicates that these are the events of defaults that if

7    they were to happen, they would be, as we had previously

8    discussed, those defaults that would allow my client to

9    terminate the servicing rights.

10           And 14.01(i), which is contained on page 57 says that "In

11   case of one or more of the following events of default by the

12   servicer shall occur and be continuing, that is to say," (i)

13   reads "Any failure by the servicer to remit to the purchaser

14   any payment required to be made under the terms of this

15   agreement."    Is that a provision that you considered when you

16   were performing your duties as servicer, to make sure that you

17   didn't run afoul of that provision and lose the servicing

18   rights?

19   A.    When I read this provision, the concept is familiar to me.

20   The only way that it makes any sense to me, relating to the

21   servicer, is the payment that is required under the normal

22   remittance, which would be the payment that associates to the

23   monthly PMI remittance that is scheduled and due on the

24   remittance date.

25           So, typically, the way that that piece is set up, the

1    remittance date for most of these types of transactions is the

2    18th of the month.  The servicer has to make that PMI

3    remittance on the 18th.  And, basically, you've got a one day

4    grace period if you don't make it.  So that's the only way,

5    from a servicer perspective, from the business perspective,

6    that that concept makes sense to me.

7    Q.   So the indemnification provision says that the seller and

8    the servicer indemnify for all claims.  And the default

9    provision says that the servicer -- it's an event of default

10   for the servicer to fail to make any payment under this

11   agreement.  But you don't read -- it was not your business

12   understanding, under the terms of this agreement, that if the

13   seller failed to make EPD or premium recapture claims, that

14   would be an event of default that would allow my client to

15   terminate services.  Is that correct?

16            MR. BRADY:  Your Honor, I object to the question.  It

17   was very complicated to begin with in multiple parts.  But I

18   think he mischaracterized the section on indemnification.  He

19   gave his view of it --

20            THE COURT:  Um-hum.

21            MR. BRADY:  -- and intended that the witness agreed

22   with him, and I don't think that's the case.

23            THE COURT:  Right.  Sustained.

24            MR. GALLO:  I'll withdraw the question, Your Honor.

25   Q.   I want to talk briefly about the concept of custodial

1    accounts as it relates to this agreement.  Do you understand

2    the term custodial account?

3    A.    Generally speaking, yes, I do.

4    Q.    And I believe on direct you testified that with respect to

5    loans that you service, you typically maintain two accounts,

6    one that contains principal and interest and an escrow account

7    that will contain taxes and other things.  Is that right?

8    A.    That's correct.

9    Q.    And is it fair to say that under this agreement those

10   accounts are called custodial accounts?

11   A.    I don't know if both are called custodial accounts.

12   Sometimes one is referred to as a slightly different verbiage.

13   But, I mean, generally speaking, I mean, for sake of argument,

14   we could consider both custodial accounts.

15   Q.    And with respect to my client, you maintained two separate

16   segregated accounts to collect payments on the loans that you

17   were servicing, pursuant to the terms of this MLPSA, right?

18   A.    That's correct, and we still do today.

19   Q.    And those accounts, per the terms of the agreement, that

20   the money in those accounts is held in trust for my client.  Is

21   that right?

22   A.    The PNI funds, I believe, are held in trust for your

23   client.  The TNI funds, I believe are held in trust in part for

24   the individual homeowners.

25   Q.    And let's talk about the PNI account then.  American Home

156

1    Mortgage Servicing has the ability to control disbursements

2    from that account, right?

3    A.    That would be correct.  We have the ability to deposit

4    funds in and to withdraw funds from the custodial account.

5    Q.    And if there was an event of default under the agreement

6    that allowed Deutsche Bank to terminate servicing, we would

7    then be able to transfer -- after an interim period, we would

8    be able to transfer our servicing to a third party servicer,

9    right?

10   A.    I don't know exactly how the mechanics under the agreement

11   would work, but I think, generally speaking, if there was a --

12   I guess I'd say a valid event of termination and what the

13   agreement contemplated was that the servicing was terminated,

14   and that's the premise, it would be common that the servicing

15   could be transferred.  Is that your question?

16   Q.    Yes.  So, in other words -- and, again, I'm not looking

17   for a legal conclusion, I'm just saying that if a default arose

18   under the agreement that allowed my client to terminate

19   servicing, somehow the agreement would provide that we could

20   then terminate that servicing and transfer the servicing to a

21   third party, out of American Home, right?

22   A.    Yeah.  I don't know that this agreement, how it provides,

23   but the concept makes sense from a business perspective.

24   Q.    And if the servicing was transferred, by necessity the

25   custodial accounts would also be transferred, right?

A.    I don't know about the physical custodial accounts, but

the funds within them would make sense to transfer at a

servicing transfer.

Q.    If there had been an event of default and my client were

to determine that it wanted to terminate servicing and transfer

the servicing to, say, Akwan (ph.), then after the transfer, it

would be Akwan who maintained the accounts that contained the

principal and interest that was generated by the loans that my

client owns, and not American Home, right?

A.    If they were the current servicer, that would make sense.

Q.    And so, given the custodial accounts and how that works

with servicing, can you see from a business perspective why it

would make sense for my client to have a right to terminate the

agreement if the seller, American Home Corp. was in such

financial distress that it couldn't make the payments for

premium recapture and Ends?

            MR. BRADY:  Your Honor, I object.  That calls for

speculation to determine what his client would think.

            THE COURT:  Response?

            MR. GALLO:  Your Honor, again, I'm asking -- he has

testified -- he testified on direct not only about what

servicing does but about how Ends work, how premium recapture

works.  I'm asking for his business understanding on this

particular point.

            THE COURT:  Well, no, I disagree.  I think you're

1    asking him to tell you -- I think you're asking him to pass on

2    the reasonableness of your client's position that the two

3    things are linked, as opposed to his understanding of whether

4    or not the two items are linked.

5              MR. GALLO:  And I presume you won't let me ask that?

6              THE COURT:  Yeah, sorry.  What I should have said is

7    sustained.

8              MR. GALLO:  All right.

9    Q.   Mr. Love, are you aware of any claims that my client made

10   against American Home Corp. for the payment of premium

11   recapture and/or repurchase obligations for early payment

12   defaults?

13   A.   Premium recapture, I don't have any specific recollection.

14   I believe that something was mentioned during the deposition --

15   my deposition last week, if I recall.  I don't have any

16   independent validation of that information.

17   Q.   Separate and apart from the deposition now, going back to

18   when this agreement was in operation, and prior to the

19   bankruptcy, did it ever come to your attention that my client

20   had made EPD repayment claims against American Home Corp.?

21   A.   I don't have any specific recollection of DB Structured

22   Products having done that.  It's not an unreasonable thing to

23   think that would have happened.  The only time that I would

24   have had knowledge of that happening on our side would be if

25   American Home Mortgage Corp., as seller, actually repurchased

1  loans from Deutsche Bank under this agreement, because we would

2  have to transfer the loans so that it would no longer reflect

3  that Deutsche Bank is the owner and that now American Home

4  Mortgage Corp. is the owner.

5  Q.   So you didn't really personally have any exposure at the

6  point at which the claims were made, so you can't testify today

7  as to whether my client made claims and they weren't fulfilled,

8  right?

9  A.   I couldn't tell you if there are any unfulfilled claims.

10  Q.   So you don't know, prior to bankruptcy, whether the fact

11  that there were no defaults declared under the agreement, was

12  the result of maybe the fact that there were never any claims

13  made or if claims were made they were satisfied?

14  A.   I don't think I can't answer that question.

15          MR. GALLO:  Can I have the letter?  What number is

16  this?  May I approach the witness, Your Honor?

17          THE COURT:  Yes.

18          MR. GALLO:  I'm on document number 4 in your binder,

19  Your Honor.

20  Q.   Document number 4 is a letter dated July 26, 2007 and it's

21  entitled "Notice of Payment Default," and the letter is

22  addressed to American Home Mortgage Corp., attention Robert

23  Johnson, and also to American Home Mortgage Servicing, Inc.

24  attention David Friedman.  First, before we get into it, who is

25  David Friedman?

160

1   A.   David Friedman is the executive vice president in charge

2   of Servicing.

3   Q.   So is he your boss?

4   A.   Yes, he is.

5   Q.   And this letter purports to be a demand for the payment of

6   repurchase obligations associated with early payment defaults.

7   Have you seen this letter before today?

8   A.   I do not recall having ever seen this letter.

9   Q.   The address that's with Mr. Friedman's name, that is

10  American Home Mortgage Servicing, Inc. in Irving, Texas.  Is

11  that where the servicing business is located?

12  A.   This is where the servicing business is located.  There

13  are two buildings, but this is the address that David resides

14  at.

15  Q.   And then American Home Mortgage Corp., its headquarters

16  are in Melville, New York where this is also addressed?

17  A.   Yes, I believe that is correct.

18  Q.   But you haven't seen this letter before today, correct?

19  A.   I have not seen this letter.

20  Q.   Mr. Love, do you have an understanding as to the total UPB

21  of the loans that are serviced by American Home, pursuant to my

22  client's master loan purchase and servicing agreement?

23  A.   Only the loans that are serviced directly for Deutsche

24  Bank and not subsequent securitizations?  Is that your

25  question?

1  Q.   Yes.

2  A.   I believe it's somewhere around 189 million dollars of

3  outstanding UPB.

4  Q.   I want to turn now to the issue of -- you spoke on direct

5  on the issue of Fannie Mae approval.  Do you recall that?

6  A.   Yes, I do.

7  Q.   And American Home is a Fannie Mae approved servicer, is

8  that correct?

9  A.   Yes, I believe that to be correct.

10  Q.   And there's also been an agreement entered where the

11  purchaser under this sale transaction is going to -- may

12  potentially get Fannie Mae approval.  Are you familiar with

13  that?

14  A.   Yeah, conditional approval, yes.

15  Q.   Are you familiar with the qualifications that a servicer

16  must meet in order to become Fannie Mae approved?

17  A.   I am generally familiar with the qualifications, yes.

18  Q.   Are those published by Fannie Mae?

19  A.   Yes, they are.

20  Q.   And have you reviewed those qualifications recently?

21  A.   I have reviewed them briefly, prior to my deposition.

22  Q.   Are you also aware of an entity called Freddie Mac?

23  A.   I am.

24  Q.   And is American Home Mortgage Servicing, Freddie Mac

25  approved?

162

1   A.   I honestly don't know the technical status of the Freddie

2   Mac relationship.

3   Q.   You understand, though, that a servicer can be approved by

4   Freddie Mac, correct?

5   A.   Yes, I do.

6   Q.   And Freddie Mac has a set of qualifications that a

7   servicer must meet in order to obtain that approval.  Is that

8   right?

9   A.   Yes, and they're substantially similar to the Fannie Mae

10  requirements.

11  Q.   Are they identical?

12  A.   I don't believe that they would be identical word for

13  word, but I believe the concepts are substantially similar.

14  Q.   Do you know whether or not the purchaser is seeking

15  Freddie Mac approval?

16  A.   I don't know if they are seeking Freddie Mac or not.

17          MR. GALLO:  Your Honor, I have no further questions

18  for this witness.  I would move into evidence the 2005

19  agreement.

20          THE COURT:  Any objection?

21          MR. BRADY:  Which tab?

22          MR. GALLO:  The 2005 agreement, it's Tab 6.

23          THE COURT:  All right.  We're going to call that

24  DB-6.  So I'll be able to find it.  I know only DB-1 is already

25  in evidence, but if we don't call it by that I won't be able to

1    find it.

2              MR. GALLO:  I appreciate it, Your Honor.

3              THE COURT:  Any objection to the admission of DB-6?

4              MR. BRADY:  No objection to DB-6.

5              THE COURT:  All right.

6    (Deutsche Bank's Exhibit DB-6, 2005 agreement, was hereby

7    received into evidence, as of this date.)

8              MR. GALLO:  I'd also move into evidence what would be

9    DB-7, which is the e-mail and the black line; DB-8, which is

10   the other black lined agreement, and DB-4, which is the default

11   letter.

12             THE COURT:  Any objection?

13             MR. BRADY:  One second, Your Honor, please.  All

14   right.  Your Honor, no objection to DB-7.  We would object to

15   DB-8, because there was no evidence this witness had ever seen

16   that document.

17             THE COURT:  So what is the objection?

18             MR. BRADY:  The objection is there is no foundation

19   that this is an actual black line that was exchanged between

20   the parties, I think is what you want --

21             MR. GALLO:  Your Honor, this document was produced by

22   the debtors.  Mr. Dorsey did indicate to me that all

23   documents -- I know you can't hold him to this -- Mr. Dorsey

24   did indicate to me that all documents that were produced by the

25   debtors, they would not object to their admission.  I believe

1   that the document itself contains enough indicia of

2   authenticity that there is substantial foundation for its

3   admittance into evidence.  I mean, if you look at the document,

4   it's clearly a black line against the other document.  You can

5   look at the footer, which will show you that this document is

6   version 3, and the subsequent black line, which has not been

7   objected to and has been admitted, is version 4.  And the final

8   agreement, the May 2006 agreement, is version 5.

9           So I think, based upon the exhibits that are already

10  in evidence, and the witness' testimony, that it would not have

11  been uncommon for the negotiation of this agreement to have

12  more from the 2005 agreement to the 2006 agreement.  Taking all

13  that together, I believe there's enough indicia of authenticity

14  that the proper foundation has been laid for this document and

15  it can be admitted into evidence.

16          MR. BRADY:  Your Honor, we'll withdraw our objection

17  to admission of that document.

18          THE COURT:  All right.  So DB-6 was already admitted

19  without objection.  DB-7 is admitted without objection.

20  (Deutsche Bank's Exhibit DB-7, e-mail with black line, was

21  hereby received into evidence, as of this date.)

22          THE COURT:  DB-8 is admitted without objection, Mr.

23  Brady?

24          MR. BRADY:  To the --

25          THE COURT:  DB-8.

1          MR. BRADY:  Correct.

2          THE COURT:  Yeah, all right.

3          THE COURT:  So that leaves DB-4.  Any objection to

4    the admission of the default letter?

5          MR. BRADY:  No objection, Your Honor.

6    (Deutsche Bank 's Exhibit DB-4, notice of payment default

7    letter, was hereby received into evidence, as of this date.)

8          THE COURT:  All right.  It's admitted without

9    objection.

10         MR. GALLO:  Your Honor, there's also -- I didn't use

11   these exhibits with this witness, but do you guys have any

12   objection, while I'm here, any objection to the AARs being in

13   evidence, which are part of Mr. Aronoff's binders?

14         MR. BRADY:  I believe the AARs are part of the

15   documents we admitted.

16         THE COURT:  Well, you guys contended about that off

17   line.

18         MR. GALLO:  I apologize, Your Honor.

19         THE COURT:  That's all right.

20         MR. GALLO:  Thank you.

21         THE COURT:  You're welcome.  Mr. Love, do you need a

22   break or are you all right?

23         THE WITNESS:  I'm doing good.  Thanks.

24         THE COURT:  Okay.  Next?

25         MR. SPEAKER:  Are you sure the Court doesn't need a

166

1      break, Your Honor?

2              THE COURT:  Actually, I'll tell you what, we will

3      take five minutes.

4              MR. SPEAKER:  Thank you, Your Honor.  You looked like

5      you were getting ready to do a lot.

6              MR. SPEAKER:  That's very subtle.

7              (Recess from 3:03 p.m. until 3:11 p.m.)

8              THE COURT:  Please be seated.

9              MR. BRADY:  Your Honor, for the record, Robert Brady

10         on behalf of the debtors.  If I may, just to put a

11         settlement on the record that would eliminate the need for

12         one of the objectors to cross-examine this witness.

13         This --

14              THE COURT:  Just one, huh?  You can come back when

15         you got six.  Go ahead, Mr. Brady.

16              MR. BRADY:  Well it's technically three agreements,

17         so we're halfway there.  This relates to JPMorgan Chase's

18         sale objection.  The debtors and the purchaser have agreed

19         that the following agreements can be removed from Section

20         1.1(j).  These are three JPMorgan Chase agreements.  One,

21         JPMorgan treasury services form dated 10/31/05.  The

22         mortgage loan sale agreement dated 4/1/06.  That's

23         Debtors' Exhibit 29.  That will be coming out of the

24         binder.  And Flo Mortgage Interim Servicing Agreement.

25         That is Exhibit 30.  That will be coming out of the

1      binder.  So those three agreements are removed from

2      1.1(j).  And with that representation it's my

3      understanding JP Morgan Chase has withdrawn their sale

4      objection.

5          THE COURT:  All right.  So is someone here from

6      JPMorgan?

7          MR. MAGUIRE:  Your Honor, Matthew Maguire from Landis

8      Rath and Cobb on behalf of JPMorgan.  I can confirm the

9      representation --

10         THE COURT:  THE COURT:  You can or can't?

11         MR. MAGUIRE:  Can.  Confirm, sorry.  The

12     representation by Mr. Brady resolves our objection in its

13     entirety.

14         THE COURT:  All right.  Thank you.

15         MR. MAGUIRE:  Thank you.

16         MR. KUNEY:  All right.  Thank you, Your Honor.  David

17     Kuney for EMC.

18  EXAMINATION BY

19  MR. KUNEY:

20  Q.   Mr. Love, good afternoon.

21  A.   Good afternoon.

22  Q.   Let me go back in my mind to the March, 2006 -- well,

23  first let me direct your attention, if I might, to the one

24  contract that is relevant to EMC in this case, which is the

25  agreement of March ,2006.  And I believe that is an exhibit put

1   in by the debtors who just so have a clean record.  If you'll

2   look, please, at the Debtors' Exhibit 28.

3   A.   I don't think I have that up here.

4   Q.   Did the debtors buy mutual exhibits?  You don't?  All

5   right.  Then you can --

6           MR. KUNEY:  Your Honor, I was trying to avoid

7   duplicating exhibits.

8           MR. PATTON:  May I approach, Your Honor?

9           THE COURT:  Yes.

10          MR. SPEAKER:  I'm sorry.  What number did you say?

11          MR. KUNEY:  28.

12          THE COURT:  Mr. Patton, is there an EMC Mortgage

13  Corporation Exhibit binder?  Something entitled that out there?

14          MR. PATTON:  Yes.  We've got --

15          THE COURT:  Volume one of two.

16          MR. PATTON:  Yes.

17          THE COURT:  It's the first document in the volume,

18  and it's been admitted into evidence --

19          MR. SPEAKER:  No.

20          THE COURT: -- as EMC 1, I believe.

21          MR. KUNEY:  All right.

22  Q.   So I've already -- unless -- let me ask you to refer to

23  EMC Exhibit 1, please.  And my questions for you for this

24  afternoon are going to pertain to EMC Exhibit 1.  Now, as far

25  as you know, when that document was being negotiated you did

1    not personally sit down at the table with anybody from EFC or

2    their counsel to negotiate it, did you?

3    A.    My involvement was --

4    Q.    No.    Just answer my question.    Did you sit down with the

5    people from EFC and negotiate this contract?

6              MR. BRADY:    Your Honor, I object.    I think the

7    witness should be allowed to answer the question as he sees

8    fit.

9              THE COURT:    I have to say I agree, Mr. Kuney.    Let

10   the witness answer the question.    If you think it's

11   nonresponsive you can move to strike or you can ask for a

12   clarification.

13             MR. KUNEY:    All right.

14   A.    My involvement would have been very similar to what I

15   described about the Deutsche Bank Agreement.    Would have

16   provided comments up to counsel.    They would have, I guess,

17   negotiated the agreement.    The only time that I would have

18   intentionally gotten on the phone with people from EMC would be

19   if there was a business point which the legal folks could not

20   understand or work out, and they needed to get business folks

21   from AHM Servicing and a servicing representative from the

22   counterparty to discuss and talk about the business logistics

23   of the point being debated.

24   Q.    And do you recall at your deposition you told me you don't

25   recall any particular comments you may have made on this

1    agreement when it was being negotiated?

2    A.   I don't recall, at this moment, what the specific comments

3    would have been.

4    Q.   And you told me you didn't make any notes of any comments

5    you may or may not have made.

6    A.   I didn't have a recollection of any notes from March of

7    2006.  No.

8    Q.   In fact, you told me as far as you know this document was

9    not drafted by the debtor but was drafted by EMC.  Is that

10   correct?

11   A.   It's typical for these agreements that the actual law firm

12   that is drafting them is the law firm representing the

13   purchaser.

14   Q.   And did I understand you to say that the law firm that

15   American Home used was Thatcher Proffitt?

16   A.   No, it's -- that would not be accurate as it relates to

17   this agreement.

18   Q.   Okay.

19   A.   Thatcher Proffitt and Wood is an external law firm which

20   AHM utilized specifically for the securitizations of the AHMIT

21   and AHMA shelves.  I did not mean to represent that Thatcher

22   Proffitt and Wood would have been used or would not have been

23   used as external counsel as it relates to this agreement.

24   Q.   Now, during the negotiation of this contract, am I correct

25   that you did not have any negotiations with anyone from EMC

1  about whether the contract would be a single contract or two

2  separate contracts?

3  A.    I don't recall having any such discussion.

4  Q.    And other than, perhaps, counsel during the past several

5  months, including after this bankruptcy began, you have not had

6  any internal discussions with anyone about whether the EMC

7  contract is a single contract or two contracts?

8  A.    That's correct.  And that concept --

9  Q.    Never came up, did it?

10 A.    It did.  The concept itself of -- is not one that I recall

11 having discussed.

12 Q.    Right.  First time you heard it was when the lawyer

13 suggested it during the advocacy of this case.

14 A.    I guess if you could just -- you lost me a little bit in

15 some of the legal terms there.  Technical terms.

16 Q.    First time you heard it was when the pleadings were

17 generated with respect to the sale motion.

18 A.    I'm just not sure what you're referring to as far as

19 pleadings, so --

20 Q.    All right.  Pleadings would be things like motions,

21 orders.  Are you familiar with motions being filed in this

22 case?

23 A.    Sure.  And I would say it's accurate to represent that the

24 first time any such discussion would have taken place would

25 have been in relation with -- that I recall - in relation with

172

1    counsel, sense the filing of the bankruptcy.

2    Q.   With respect to those, there's two documents or one

3    document?

4    A.   I don't actually recall having any specific conversation

5    regarding this document.

6    Q.   Now, Mr. Friedman is your boss.  Is that correct?

7    A.   That is correct.

8    Q.   Is he in the courtroom today?

9    A.   He is not in the courtroom today.

10   Q.   Is he going to testify as to whether or not when this

11   document was negotiated it was intended to be one document or

12   two documents?

13   A.   I have no idea.

14   Q.   Now when this agreement was being drafted -- I believe you

15   testified earlier -- you were not aware about whether or not

16   the contract was or was not intended to be what is called a

17   securities contract under Bankruptcy Code Section 555.

18   A.   That's correct.  I don't know what that concept is.

19   Q.   You told me you had no knowledge about how Section 555

20   works.

21   A.   That's correct.

22   Q.   Were you even aware that in 2005 Congress amended the

23   bankruptcy code and made the sale of home mortgage loans what's

24   called a protected contract?

25   A.   I have no knowledge of that concept.

1  Q.    You didn't participate in any seminars or anything on that

2  fact?

3  A.    I had not.

4  Q.    So if the parties drafted this agreement -- or if EMC

5  drafted this agreement to protect its rights under 555 -- you

6  would not have been sensitive to that, would you?

7           MR. BRADY:  Objection, Your Honor.  Calls for

8  speculation as to what EMC was doing.

9           MR. KUNEY:  I asked him if he was sensitive to their

10 purpose and intent.

11          THE COURT:  Well, you're asking, or in effect asking

12 him a hypothetical question --

13          MR. KUNEY:  Oh.  Okay.

14          THE COURT: -- or assuming facts not evidence.

15 Sustained.

16          MR. KUNEY:  I'll withdraw the question, Your Honor.

17 Q.    Now you said that when you reviewed the document or

18 commented on it -- I believe you said it was with respect to

19 what you called servicing related provisions.  Is that correct?

20 A.    We would comment on business terms that would relate to

21 the administration of the servicing of the mortgage loans.

22 Q.    So did that include looking at those sections that dealt

23 with when the servicing right could be terminated?

24 A.    In some part of it.

25 Q.    Would you direct your attention to Section 9.01 of Exhibit

1   1, please?

2   A.   Okay.

3   Q.   Now do you see that there's a provision in there that

4   provides that the agreement -- in the event of default is that

5   the servicer files for bankruptcy?

6   A.   Do you have the letter reference?

7            THE COURT:  What page are you on, Mr. Kuney?  I'm

8   sorry.

9            MR. KUNEY:  It's 71 in the binder that I have.

10           THE COURT:  Thank you.

11  Q.   All right.  So Mr. Love, let me direct your attention in i

12  note 1.  Little iii.

13  A.   Okay.

14  Q.   And it says that if there is a bankruptcy proceeding for

15  the company or the servicer.  Do you see that?

16  A.   The -- I mean the wording is a little bit different than

17  that.  It starts out for me:  A decree or order.

18  Q.   Right.

19  A.   Okay.

20  Q.   Fair enough.

21  A.   But involving an insolvency, bankruptcy, readjustment

22  etcetera.  Do you see that?

23  Q.   Yes, I see that point.

24  A.   And do you see that pertains to both company or the

25  servicer?

175

1            MR. BRADY:  Your Honor, I object.  It calls for a

2  legal conclusion.

3            MR. KUNEY:  I'm just asking if he sees the words in

4  there.

5            THE COURT:  Overruled.

6            MR. KUNEY:  Okay.

7  Q.   I just -- do you see the words?

8  A.   I do see both of those words.

9  Q.   All right.  So now when you commented, or provided

10  comments on the drafting of this agreement, were you aware that

11  the filing of bankruptcy by the servicer was an event of

12  default?

13            MR. BRADY:  Objection, Your Honor.  Calls for a legal

14  conclusion.

15            THE COURT: Sustained.

16  Q.   Did you read that provision?

17  A.   I may have -- I may have read this provision.  This is not

18  the type of provision that we would have keyed it on.  This is

19  the type of provision that we would have relied on counsel for.

20  Q.   So, when you reviewed the agreement in March of 2006, did

21  anybody bring it to your attention that if the servicer filed

22  bankruptcy there might be an automatic right of termination?

23  A.   It was not a specific topic I recall discussing with

24  anyone.

25  Q.   So when you prepared the various lists and schedules of

176

1   contracts to be assumed in this case, is it fair to say you

2   were then unaware of the automatic termination provision in

3   Section 9.01?

4           MR. BRADY:  Your Honor, I object to the use of term

5   assume.  It's a legal term.  Legal significance.

6           MR. KUNEY:  Well, Your Honor, the word assume appears

7   about twenty times in the debtors' own motion that's been filed

8   in this case to seek the relief they are seeking.

9           MR. BRADY:  That was filed by lawyers, Your Honor.

10  He's asking a fact witness a question using the term assume,

11  which has a clear bankruptcy meaning.

12          THE COURT:  Just try to rephrase the questions.

13          MR. KUNEY:  Sure.

14  Q.  I'll back up one step.  You testified earlier that you

15  assisted in preparing some of the first day motions.  Do you

16  recall that?

17  A.  Yes, I do.

18  Q.  Okay.  And some of the things that you assisted in

19  preparing were schedules that list what are called cure

20  amounts.  Is that correct?

21  A.  I do not believe that to be part of the first day motions.

22  The first day motions I worked on was the critical banner

23  motion and parts of the cash management order.

24  Q.  Okay.  But there came a time later when you assisted with

25  preparing the charge that showed the applicable cure amounts,

1   did there not?

2   A.   There was a point in time that I described where we were

3   asked to find any amounts that we may know as being owed under

4   any of the servicing contracts.

5   Q.   And did you participate in the preparation of the

6   contracts to be assumed which are now called Schedule 1.1(j)?

7   A.   I assisted in preparation of helping to identify -- I

8   guess the piece where I was involved was helping to take the

9   total population of the loans that are being serviced on the

10  servicing system and to be able to help explain or delineate

11  which of those loans are loans where AHM would own the

12  servicing rights in the service and retain fashion versus which

13  portions would be interim service loans or loans that would

14  potentially be on warehouse lines to help the group that was

15  trying to determine what to include for sale.  How to break

16  that out and make sure that everyone in the servicing system

17  was included in the analysis to end up one place or another.

18  Q.   And were you responsible for putting the EMC contract on

19  Schedule 1.1(j)?

20  A.   I would have identified that the group of law that's being

21  serviced under this contract are laws that are being serviced

22  in a service and retain fashion.

23  Q.   Would it be fair to say that you, or the people in your

24  department, put the EMC contract on Schedule 1.1(j) without any

25  consideration to whether or not that contract had terminated

1    under Section 9.01?

2    A.   That was not part of the analysis.

3    Q.   Right.  In your department.  In the servicing department.

4    A.   That is correct.

5    Q.   And you didn't have that discussion or perform that

6    analysis with anybody else, did you?

7    A.   About the EMC contract?  No.

8    Q.   Let me ask you please to look at what's been marked for

9    identification as EMC Exhibit 2 in the binder.  It's the letter

10   of August 14, 2007.  Do you have that in front of you?

11   A.   Yes, I do.

12            MR. BRADY:  Your Honor, I need just a moment to track

13   that down.

14            MR. KUNEY:  Tracked it down?

15            MR. BRADY:  I have it.  Sorry.  Thank you.

16            THE COURT:  Thank you.

17   Q.   All right.  Mr. Love, this is a letter purportedly sent to

18   EMC on August 14, 2007.  Have you seen this notice before

19   today?

20   A.   I have a vague recollection of the notice, but it -- I

21   don't recall if it may have come up during depositions last

22   week or not.

23   Q.   So when you assisted in preparing the list of contracts to

24   be sold to WLR, were you unaware that a notice of termination

25   had been sent on or about August 14, 2007.

1    A.    I believe that that is correct.

2    Q.    Now, did you also participate in the preparation of what

3    have been a disputed schedule or disputed contract schedule?

4    A.    I did participate in helping to create that schedule from

5    the perspective of -- I was provided a list of, I guess,

6    contracts that would fall into that exhibit, and trying to

7    identify how those particular contracts tied back to the loans

8    that are being serviced on the servicing system.

9    Q.    Thank you.  Did you look -- take a look at 1.1(k) --

10   Schedule 1.1(k).  That would be exhibit -- that would be the

11   Asset Purchase Agreement -- that is the debtors exhibit is 105.

12             THE COURT:  Which schedule?

13             MR. KUNEY:  1.1(k), Your Honor.

14   Q.    Mr. Love, had a chance to find it?

15   A.    Almost.

16   Q.    Right, you have that in front of you?

17   A.    I have the schedule.

18   Q.    Now, is it your understanding that with respect to the

19   transaction with WLR, on those contracts WLR will pay a

20   purchase price of -- that money will be held in escrow until

21   there is some determination as to whether the terminations of

22   those agreements was valid.  Is that your understanding?

23   A.    That's generally my understanding.  Yes.

24   Q.    And did you assist, in any way, in preparing 1.1(k)?

25   A.    Again, I assisted from the perspective of we were provided

1  a list of contracts and then asked to be able to identify how

2  those specific contracts relate back to the servicing system.

3  So the production of the numbers here would have come out of

4  information from the servicing system that I would have, in

5  part, assisted to tie back the agreements to how they relate to

6  the individual loans.

7  Q.   Now, am I correct that a contract that is listed on 1.1(k)

8  is one in which the purchaser -- the debtors in this room gave

9  notice of termination pre-petition?

10  A.   It's my general understanding that the criteria for a

11  contract to get listed on 1.1(k) was one that there is some

12  dispute over whether there is a valid -- there was a valid pre-

13  petition termination notice sent.

14  Q.   Right.  Okay.  I think that's what I asked.  So the answer

15  is yet.

16  A.   We believe that to be correct.  Yes.

17  Q.   So, just to help me understand the distinction here.  If a

18  creditor sent a notice of termination a week before the

19  bankruptcy, and there's a dispute over the validity of that

20  termination -- if they're listed on 1.1(k) -- as to EMC, which

21  contends their contract terminated automatically the day of the

22  filing, you didn't list them on 1.1(k), did you?

23        MR. BRADY:  Objection, Your Honor.  I don't think

24  this witness listed anything on 1.1(k) other than the numbers

25  was his testimony.

1          THE COURT:  We'll bag with you.

2   Q.   Well the debtor did not list EMC on 1.1(k), did it?

3   A.   I would say that the EMC agreement was not one of the ones

4   that I was asked to -- was not provided to me as the list that

5   would be eligible for 1.1(k).

6   Q.   Well, can you explain, as a business matter, why, in this

7   structure, as to those folks that terminated or claim to have

8   terminated pre-petition the purchase price will not be tendered

9   until this Court can rule on the validity of the termination?

10  But EMC is not included in that group, for some reason.

11  A.   I don't know the significance of why the termination was

12  made from my perspective.

13  Q.   It makes no sense?

14  A.   I wouldn't say that it makes no sense, but from my

15  perspective I would imagine that it has something to do with

16  either more technical legal terms than I know or something

17  related to the bankruptcy code which I would not know.

18  Q.   But from a business perspective, you certainly didn't say

19  to anyone let's keep the EMC contract off of the disputed

20  contract list.

21  A.   I would have never made that statement.

22  Q.   Can you take a look, please, at Exhibit 6, EMC Exhibit 6?

23  A.   Okay.

24  Q.   Okay.  All right.  That's a debtor pleading dated August

25  27, 2007.  Notice of Possible Assumption and Assignment.  Was

1    that correct?

2    A.    That appears to be the title.

3    Q.    And that's to solve -- represents in the Court and to the

4    witness -- that's docket number 674.  Do refer to Exhibit C,

5    please in that.

6            MR. KUNEY:  And also, Your Honor, for the witness,

7    could you locate -- the pages aren't numbered, I believe -- the

8    reference to EMC that is on that list?

9            THE COURT:  Can you get us a little help here?

10           MR. KUNEY:  Your Honor, it falls twenty-two pages

11   from the back.

12           THE COURT:  Twenty-two from the back.  That's

13   helpful.  Thank you.

14           MR. KUNEY:  Your Honor, I had the same problem.

15           MR. SPEAKER:  Right now I'm close to eighteen pages

16   here.

17           MR. KUNEY:  Has everybody had a chance to find it?

18   We didn't do the non numbering.  I apologize.

19           THE COURT:  That's all right.

20           THE WITNESS:  I believe I've found the page.

21           MR. KUNEY:  All right.  Your Honor, have you had a

22   chance to?

23           THE COURT:  Yeah, I have.

24           MR. KUNEY:  Okay.

25   Q.    Now, we just agreed, just to get off on the same page

1  here, that this chart purports to show what is the proposed

2  cure amount that the debtor intends to pay or have paid in

3  connection with the proposed transaction.  Is that correct?

4  The right hand column?

5  A.   There is a -- the heading of that column does say proposed

6  cure amount.

7  Q.   And do you recall you told me at your deposition that you

8  helped to identify or designate the servicing contracts that

9  would go in that chart?

10 A.   I believe what I recall having testified was that there

11 were portions of this that looked familiar and that my group

12 would have had some involvement with legal trying to identify

13 what contracts make up the servicing portfolio.  In other

14 words, who owns which portions of the loans that we're

15 servicing.

16 Q.   Weren't you asked to see if there were any indemnification

17 or other liabilities that were due and owing under the

18 servicing agreements?

19 A.   Yes, I think I described that process that we went through

20 from the servicing side.  It wasn't the only group involved in

21 the process.  I think I did describe that process earlier.

22 Q.   No one asked you to look at the EMC contract in it's

23 entirely and advise them whether things that you had had

24 knowledge of might give rise to a claim.  A claim against the

25 servicer or the purchaser.  Or the seller, excuse me.

184

1   A.    I'm sorry.  Could you just repeat the question?

2   Q.    Sure.  Did anybody ask you to look at the EMC agreement in

3   its entirety to see if there are any payment obligations that

4   were then in default or likely to be in default?

5   A.    No one made that specific request to us.

6   Q.    Now you are familiar -- you testified with others so far

7   today -- that you are familiar with the knowledgeable

8   abatements that now have been called several times early

9   payment default.  Correct?

10  A.    That is correct.

11  Q.    And you also testified as part of your regular jobs you

12  do, in fact, track the delinquencies on each and every one of

13  the loans under the EMC agreement.

14  A.    The service agreement does do a very normal course

15  delinquency reporting.  One of the types of reporting we do is

16  broken up by investor code, and the EMC loans are specific to

17  one investor code.

18  Q.    So it's your understanding that if there are early payment

19  defaults under this agreement that may, in fact, trigger what

20  we've been calling a repurchase obligation under the EMC

21  agreement.

22  A.    The potential could exist.  Yes.

23  Q.    Now, if there is such a number, and the cure amount was

24  calculated as zero, I take it that's because no one asked you

25  or anybody else to come up with an estimation or calculation of

1    what the repurchase obligation amount might be.

2    A.   I would say that no one asked us from a servicing side to

3    look at that piece.  I don't know -- I can't speak to anyone

4    else's involvement that would fall outside the servicing piece

5    as to what their intentions or thoughts or efforts would have

6    been.

7    Q.   All right.  So as far as you know the zero number was done

8    without any regard to the possibility that there could be a

9    monetary payment due under the repurchase obligation.

10   A.   From the group in servicing that would be correct.

11   Q.   So if this Court decides that the single agreement is, in

12   fact, a single agreement and can only be assumed or assigned if

13   there's a cure of all defaults, would you agree that the zero

14   number on this chart -- it's not correct?

15           MR. BRADY:  Objection, Your Honor.  One, he didn't

16   look at anything else.  And two, this calls for a legal

17   conclusion.

18           MR. KUNEY:  I'm not asking for a legal conclusion,

19   Your Honor.  It's a hypothetical that if this Court rules it's

20   a unitary contract do we have all of the potential liabilities

21   calculated?

22           THE COURT:  You're assuming facts on evidence, which

23   is -- they're facts that there are any -- asked for early

24   payments defaults in connection with your client.

25           MR. KUNEY:  Thank you, Your Honor.  And I would go

186

1   back, so let me retrace their steps.

2           THE COURT:  If there are they -- whether he's aware

3   of them.

4           MR. KUNEY:  Oh.

5   Q.   Mr. Love, I believe you went over this in your deposition,

6   but I'll just go back over it carefully.  Are you aware that,

7   in fact, there are any early payment defaults under the EMC

8   agreement?

9   A.   I believe I recall that when I testified in my deposition

10  that when you provided a number, that was the first time that I

11  was specifically aware of any outstanding repurchase requests

12  for AMC.

13  Q.   Then you're aware that at your deposition, not sooner, you

14  were advised that EMC contended that because of the early

15  payment defaults they had calculated the repurchase obligation

16  as approximately 24 million dollars.

17  A.   That is the number that seems familiar to me from that

18  deposition.  Yes.

19  Q.   And you heard that at the deposition last week.  Correct?

20  A.   That's correct.

21  Q.   Now between the time of the deposition and today, did you

22  go back to confirm or calculate or check that number?

23  A.   No, I did not.

24  Q.   Did anybody tell you that amount was wrong or incorrect?

25  A.   I did not have any discussions regarding that amount.

1  Q.   As you sit here today, do you note a single fact to

2  suggest that that calculation was incorrect?

3  A.   I don't know of anything to suggest one way or another on

4  that number.

5  Q.   Now, are you aware -- I think you testified earlier that

6  you didn't pay attention to the repurchase obligation because

7  it wasn't -- didn't touch any of the servicing duties or

8  rights.  Is that correct?

9  A.   I think my testimony was -- it was more that one, the

10  repurchase claims are not one that falls under the influence of

11  servicing.  And that two, it did not fall under the scope of

12  what, as a servicing team, we were asked to look at in the

13  exercise that I described that we went through.

14  Q.   But would you agree with me that, in fact, the failure of

15  the company -- the American Home Mortgage Corp. -- to pay the

16  repurchase obligation does, in fact, directly affect the rights

17  of the servicer?

18       MR. BRADY:  Objection, Your Honor.  Calls for a legal

19  conclusion.

20       THE COURT:  Overruled.

21  A.   From my business perspective and from the practical

22  applications that we've gone through, there's nothing that I've

23  been involved with to date that would suggest that.  >From a

24  practical matter.

25  Q.   Well let's just talk about a practical matter.  Are you

1  aware that there's -- let's call it what's been referred to in

2  here as a waterfall that -- how advances -- how servicing

3  advances are repaid to the servicer.  That there's a certain

4  waterfall that's set forth in the EMC agreement.

5  A.   I heard the term come up describing this.  The description

6  of it yesterday didn't necessarily make sense to me.

7  Q.   All right.  Then let's try another approach.  If you look

8  at Section 4.05, little 2, of the EFC agreement.

9  A.   Is that number one?

10 Q.   Yes.  All right.  Mr. Love, it's on page -- 405 begins on

11 48 and carries over to 49.

12 A.   I've got it.

13 Q.   All right.  Now, I'm talking here -- I'm trying to focus

14 on the practicality of the servicing issues.  And there's a

15 section here now permitted withdrawals for custodial accounts.

16 Do you see that?

17 A.   Yeah.  This section will relate to the P&I custodial

18 account.

19 Q.   Okay.  Now in the event that the servicer has made

20 advances --- am I correct that ordinarily it can pay itself

21 back prior to disbursing money to the owners of the loans of

22 P&I?

23 A.   It would depend on the scenario, exactly how that would

24 work.  If this type of deal was set up as a scheduled schedule

25 remittance type.  So with respect to P&I -- that this section

1   would relate to.  If the buyer remains delinquent one month

2   AHM, as servicer, would advance that P&I payment to EMC as

3   purchaser.  The -- typically speaking, the next month if the

4   buyer were -- if the buyer were to make one payment so that

5   there's still one payment down, but they made one payment --

6   AHM would still have to advance one payment to EMC, because

7   they have to send a payment that month whether or not the

8   borrower sends one in.  But they could also potentially recover

9   the penalties that they paid out the last month if they're

10  still advancing another payment.  So from a normal course piece

11  I don't know that that's exactly the direct correlation to what

12  you're saying.

13  Q.   Let me try a simpler question.  From a business

14  perspective, is it your understanding that the right of the

15  servicer to reimburse itself for servicing and advances is

16  subordinated or lost in the event that there's an unpaid

17  repurchase obligation as set forth in 4.052?

18  A.   If you give me a second to re -- term of speaking, that

19  is -- that is not my -- any experience or not, but if you'd

20  like to look at section on it.

21  Q.   Look at that.  Yeah, I'm not as far as they are in terms

22  of how you operate the group.  You'll find the expression five

23  lines down.  It says:  except that when the company is required

24  to repurchase a mortgage loan the servicer's right to such

25  reimbursement shall be subsequent to the payment to the

1    purchaser.  Do you see that language?

2    A.    I do see the language.

3    Q.    So now, in terms of operating the servicing business, if

4    there's a repurchase obligation doesn't this change the

5    entitlement of the servicer to pay itself back for servicing

6    advances?

7    A.    I guess I'm not quite sure --

8             MR. BRADY:  I'm going to object.  That calls for a

9    legal conclusion.

10            THE COURT:  Mr. Kuney, I -- sustained.  I think I'm

11   sensitive to what you're trying to get to.  I think the last

12   piece of your -- what you and what every other party is trying

13   to argue that last piece -- you've laid the foundation, but

14   that last piece is the argument that you're going to make in

15   front of me at the closing, frankly.  And it may be a great

16   argument.  But I'm not sure it's what this witness is qualified

17   to testify about.

18   Q.    All right.  But before I lay this to rest, the reason I'm

19   enquiring, Mr. Love, among others, is in terms of whatever role

20   you had in the first day motions, the schedules and all of

21   that, did you bring to anybody's attention that the obligation

22   to repay -- the ability to take back servicing advances or

23   reimburse -- could be subordinated if there was a repurchase

24   obligation?

25            MR. BRADY:  Your Honor, I object.  Assumes facts not

1   in evidence.

2          MR. KUNEY:  I'm just asking if there was any

3   discussion or if he brought that to anybody's attention.

4          THE COURT:  Overruled.

5   A.   That is not something that I specifically brought to

6   anyone's attention.

7   Q.   Now, are you familiar with the fact that there is a --

8   what's been called an escrow cure under the APA -- the Asset

9   Purchase Agreement?

10  A.   I'm vaguely familiar with the concept.  I know it came up

11  in the deposition, and that was really one of the first times

12  that I had been involved with it.

13  Q.   Would you take a look, please, on page 26 of the Asset

14  Purchase Agreement, Section 4.1?

15  A.   Did you say Section 4.1?

16  Q.   Yes, I did. Page 26.

17  A.   Okay.  I'm there.

18  Q.   All right.  Would you look, please, down to about the

19  fifth line from the bottom, iii?  The document is describing,

20  or appears to be describing, or at least I'll state that it

21  is -- the purchase price is to include the amount equal to what

22  is called in initial caps the Initial Cure Amount.  Do you see

23  that?

24  A.   I do see that.

25  Q.   Now, do you know whether the initial cure amount was

1    intended to or relates to that column that I showed you on

2    Exhibit C that had cure amounts in it?

3    A.    I don't know for a fact if that's what this is referring

4    to.

5    Q.    So, if I was a creditor, hypothetically, that wanted to

6    know what the debtors' -- what the purchasers' intention was by

7    reading this agreement, where would I learn what the initial

8    cure amount is?

9    A.    It appears to be a defined term.

10   Q.    All right.  And is it a defined term if you go back to

11   page 8?  Is it defined as the maximum amount that the sellers

12   may have to pay for cure amounts?

13   A.    Yeah.  The definition is several lines long.

14   Q.    But does the first line include that we're the maximum

15   amount that may be payable?

16   A.    It does start and means the maximum amount payable.

17   Q.    So from EMC's perspective, am I correct that the way this

18   agreement works the purchase price includes the initial cure

19   amount.  Initial cure amount is the maximum amount.  And right

20   now EMC is slated as zero for the maximum cure payment.

21   A.    I just don't know if this schedule that we looked at

22   earlier relates back to this concept.  I don't know if those

23   two are the same things or not.  I wasn't involved in the

24   drafting of this piece from that level of detail.

25   Q.    Well, if you don't know, Mr. Love, and I don't know, and

1    my client doesn't know, how are we supposed to figure that out?

2    How is a threader supposed to determine what their rights are

3    if you, as the senior person in servicing today, can't tell us

4    at its worse?

5    A.    Again, as far as drafting the APA, I would think that the

6    agreement speaks for itself.  I haven't read through the

7    detail, nor do I purport to be the expert on the APA.  And I

8    was not involved in the -- this cure escrow concept or schedule

9    which you were mentioning in the back.  I just don't know what

10   that concept is supposed to represent in detail.

11   Q.    That concept being the initial cure amount?

12   A.    The initial cure amount that we were just talking about.

13   Q.    Even though the document speaks for itself, you don't know

14   what it means?

15          THE COURT:  All right, Mr. Kuney, that's enough.

16   Move on.

17   Q.    In your experience in operating the servicing department

18   have you had -- what I'm going to call for lack of a better

19   word -- operational disputes with some of the owners?  And by

20   that I mean that you've gone to them for information,

21   assistance or cooperation and they've declined to give it to

22   you?  Does that come up from time to time?

23   A.    Pre-petition, I don't recall any.  Any specific instances

24   where that was a problem.

25   Q.    Are you aware of whether or not there's any

194

1    indemnification obligations running from the purchasers to the

2    servicers under the EMC contract?

3    A.    I'm not specifically aware.

4    Q.    One final question.  There was some discussion today about

5    the 38 million dollar minimum amount of -- 38 billion.  You

6    remember that testimony?

7    A.    Yes, I do.

8    Q.    Now, I'm still a little confused.  With respect to the

9    Fannie Mae 5.1 billion dollar mortgage amount or loan amount.

10   Does the 38 billion include or not include that 5.1 billion?

11   A.    As I understand the 38 billion it's a minimum amount of

12   unpaid principal balance that needs to be delivered.

13   Q.    Okay.  And therefore, here's a simple question.  The

14   Fannie Mae is 5.1 billion.  Would that be included in reaching

15   the 38 billion dollar amount?

16   A.    In my opinion it could be, but I don't know.  Without

17   reviewing the specific section in detail I don't know if that's

18   exactly the case or not.

19          MR. KUNEY:  All right.  Thank you, Your Honor.

20          THE COURT:  You're welcome.  Mr. Dehny, you may

21   proceed.

22          MR. DEHNY:  Good afternoon.  Robert Dehny on behalf

23   of Assured Guarantee.  Your Honor, yesterday Mr. Abbott marked

24   and moved into admission Assured number 1.  I'm not really sure

25   where those documents are right now.

1    THE COURT:  I have my copy.  They should be behind

2    the witness.  You may approach.  It's not there.  Let's take a

3    short recess.

4        (Recess from 3:59 p.m. until 4:05 p.m.

5        THE COURT:  These are actually all of them from

6    yesterday.  Just give them to the witness.  Sorry about that

7    we -- we cleared them and there was a little miscommunication

8    as to where they were supposed to go.

9        MR. DEHNY:  The debtor's had a copy in their binders

10   at Exhibit 76, Your Honor.

11       THE COURT:  All right.  Okay.  Let's go, it's late.

12   BY MR. DEHNY:

13   Q.   Mr. Love, can you describe for the Court the role of the

14   credit enhancer in the securitization transactions?

15   A.   The -- generally speaking the role of the creditor

16   enhancer in a securitization transaction would be to provide

17   some sort of an insurance policy, usually, as we would see it,

18   it would relate to a group of loans.  In this case, sir,

19   typically those loans are second lien mortgages in some fashion

20   is the way that I'm most familiar to seeing them come up in a

21   securitization transaction.

22   Q.   And in your deposition last week I think you indicated the

23   person with the most knowledge about that would be the two

24   individuals in your securitization group, you'd spoken to

25   before your deposition?

1    A.    As it would relate to the interaction of the credit

2    enhancer from the deal side, yes, that would be correct.

3    Q.    Okay.  And to the extent I had additional questions; I

4    think you referred me to Mr. Johnson, correct?

5    A.    I don't recall that specifically but I'll take your word

6    for it.

7    Q.    Okay.  But in your deposition you said that you are

8    familiar with the operating parts of the servicing agreement,

9    is that correct?

10   A.    That's correct.  The pieces of the servicing agreement

11   that would relate to the administration of the servicing of the

12   loans.

13   Q.    Okay.  Can you look at Assured number 1, please?  Can you

14   tell me, are you familiar with that document as the person

15   supervising the servicing?

16   A.    Yes, I am generally familiar with this document.

17   Q.    And can you turn to page 10.  The middle of the page it

18   says Article 3, Administration and Servicing of Mortgage Loans,

19   do you see that?

20   A.    Yes, I do.

21   Q.    Would you say that within this document, this section

22   would fall within the purview of your job duties and

23   descriptions understanding this, the administration and

24   servicing of mortgage loans on behalf of the servicer?

25   A.    Typically speaking I would say that's correct.

1  Q.   Okay.  Isn't it correct that in the context of servicing

2  loans the servicer may be empowered to modify any mortgage loan

3  under certain circumstances?

4  A.   That is correct.

5  Q.   And to understand the guidelines under which you could

6  make those modifications, would you have to resort to looking

7  to some document or could you just do that on a whim?

8  A.   Typically speaking you'd have to go and look at a document

9  with -- with respect to the fact that these loans -- this --

10  this agreement here relates to a securitization, there's going

11  to be many, very standard, guidelines that would really be

12  industry prudent standards that would apply to the

13  modifications.  Many of the deals do have specific requirements

14  that would relate to the modification.  Usually the biggest --

15  the biggest piece that may vary -- vary from deal to deal in a

16  securitization is actually the percentage -- the overall

17  percentage of the original population of the loans, which

18  you're allowed to modify for any particular securitization

19  transaction.

20  Q.   So the answer is, your understanding as the servicer is

21  you can't just make it up as you go along you have to look to

22  something, right?

23  A.   I mean --

24       THE COURT:  Answer as you -- I mean, you don't need

25  to answer yes or no.

1   Q.   Let's turn to page --

2           THE COURT:  Can you answer?

3           THE WITNESS:  I mean, typically speaking there's most

4   of the -- most of the provisions are going to be standard from

5   deal to deal to deal.

6   Q.   Let's turn to page 12, paragraph E.  If you would for me,

7   review the first half of that paragraph?

8   A.   E?

9   Q.   Yes, E, page 12.  You made -- agreed to modifications and

10  then about sixteen lines down there's a provided however, this

11  five percent limit may be increased with the consent of the

12  rating agencies and the credit enhancer.  Let me know when you

13  get to that.

14  A.   Okay.  I've reached that part.

15  Q.   Okay.  Is it fair to say that there are specific

16  provisions within the four corners of this document that you

17  would have to look to to see whether you could make a

18  modification of the loans that are part of the servicing

19  agreement before you?

20  A.   I would say these are -- these are the standard

21  requirements that we're used to seeing.

22  Q.   Okay.  It says subject to the -- it can be increased with

23  the consent of the rating agencies and the credit enhancer.

24  Where do I look to find out who the rating agencies and credit

25  enhancer are in this document?

1    A.    I don't know if they're relayed -- if they're mentioned in

2    this document or not.

3    Q.    Well, turn to page 6, section 1.1.

4    A.    Okay.

5    Q.    Would you review that?

6            MR. BRADY:  Is that 1.01?

7            MR. DEHNY:  1.01, yes, on page 6.

8    A.    Okay.

9    Q.    Okay.  Would you agree with me that the term agreement is

10   a different document than this servicing agreement?  I'll help

11   you.  If you go up to the third whereas clause above it, it

12   will show you that it is a different document.

13   A.    I would agree with you.

14   Q.    Okay.  So in the ordinary course of your operation of the

15   servicing business you have occasion to deal with mortgage

16   loans that may or may not need to be modified, correct?

17   A.    That is correct.

18   Q.    All right.  And in order to do that you actually need to

19   obtain consent of the credit enhancer, is that correct?

20   A.    Not to do the modification.  The -- the only time where

21   the credit enhancer would come in in this arrangement is if

22   throughout the course of time -- if the total number or the

23   total outstanding UPB of loans that are currently active that

24   have been modified, if we need to exceed that amount beyond the

25   five percent threshold of the original UPB of the entire deal

200

1    that the deal structure originally contemplated.  So this would

2    be if we need -- if the original structure of the

3    securitization needed to be changed to allow for a larger

4    percentage of modifications, that's where that would come in.

5    Not just to do a modification.

6    Q.   And under that scenario you need the credit enhancer's

7    consent?

8    A.   Under that scenario, in order to increase the cap limit

9    you would need that consent as it appears in any way to me

10   reading that sentence.

11   Q.   And how would you go about obtaining that consent?

12   A.   I would imagine that in a practical setting we would

13   probably have counsel reach out in an effort to -- to help

14   coordinate that type of a thing.

15   Q.   Let me ask you to turn to page 44 and 45, the notice

16   provisions.

17   A.   Okay.

18   Q.   Page 45, I guess, says in the case of having to provide

19   something or give notice to the credit enhancer, do you agree

20   with me it says you have to go to the insurance agreement?

21   A.   Letter G does state that.

22   Q.   Okay.  In terms of the duties and obligations of the

23   servicer under this agreement, there are a number of counsel

24   who asked whether you investigated whether, in fact, you had

25   complied with the applicable terms of the servicing agreements

1   to see if there were any defaults that would have to be "cured"

2   do you remember all of that testimony?

3   A.   Yes, I do.

4   Q.   Do you recall, with respect to this servicing agreement,

5   did you undertake any investigation to see whether there were

6   any defaults or obligations?

7   A.   Again, I think as I testified earlier I described the

8   exercise that we went through from a -- from a practical

9   standpoint.  And I don't believe I recall having represented

10  that -- that we went to any specific agreement to -- to run

11  through -- let me rephrase that.

12       We went through an investigation to try to come up with

13  any amounts that we knew as being outstanding or owing.  We

14  approached it, practically, from more of a global level which

15  then would have, upon discovery of any of the items, would

16  have -- we could have filtered down to the specific agreements.

17  But it was not a -- it was not a bottom up exercise, agreement

18  by agreement, that then became the basis of a total of what we

19  would have discovered, if that makes sense.

20  Q.   So if I asked you to turn to page 16, D in the hole, and

21  asked whether in fact the servicer created the protected

22  account and deposited all sums required pursuant to that

23  section, do you know, one way or the other whether you did that

24  on the servicer side?  And whether you confirmed that that, in

25  fact, had been done?

202

1   A.   This is a very standard clause that is something that has

2   to be addressed at the time of closing before -- before the

3   deal closes we have to open up the segregated accounts.

4   Q.   Uh-huh.

5   A.   Which again would be the PNI and TNI accounts.

6   Q.   And you've confirmed, you're sitting here today you've

7   confirmed that that was done and all monies were deposited

8   there pursuant to this section?  That was the -- that's the

9   question.  As you sit here today, do you know whether the

10  accounts were set up and every dollar that's required to be

11  deposited, pursuant to the servicing provisions, has been done?

12  A.   We definitely know -- would know for a fact without having

13  to go back and -- and check anything if the accounts were set

14  up and that they would be in effect today because we're

15  depositing money to the accounts every day.  To the best of our

16  knowledge and ability all amounts collected from the mortgage

17  loans that would be required to be deposited would have been

18  deposited during the normal course.

19  Q.   I think in your deposition you had indicated that the

20  servicer never has to come out of pocket for servicing

21  obligations, is that correct on its own account?  Do you recall

22  that?

23  A.   I don't believe that that would be correct.

24  Q.   So there are occasions where the servicer would be

25  required to expend its own funds in servicing an account,

1  correct?

2  A.   That's correct.

3  Q.   Okay.  And in evaluating what the -- did you have any role

4  in --

5          MR. DEHNY:  -- strike that.

6  Q.   We also talked about the importance of senior management,

7  including yourself, continuing to work with the purchaser, do

8  you recall that?

9  A.   I do recall that.

10 Q.   There was a list of fourteen or fifteen executives, I

11 think you'd spoken of them earlier today.

12 A.   I think it was more along the lines of nine, but --

13 Q.   Okay.

14 A.   -- yes.

15 Q.   And you had indicated Mr. Friedman is one of those whose

16 transition over to the purchaser would be significant to the

17 uninterrupted operation of the business, correct?

18 A.   I believe that -- as I recall the testimony it was that if

19 Mr. Friedman were not to join that you would want to replace

20 him with someone of capable -- of similar capabilities.

21 Q.   And you had indicated that -- is it fair to say you have

22 that view for everyone who is a -- a head, such as yourself and

23 I think there were seven or eight others?

24 A.   Yes, I have very high regard for all of the senior

25 management team at AHM Servicing.  And it would be, still, my

1  personal belief that if any of them were to not join that you

2  would want to replace them with someone of similar capabilities

3  and knowledge, yes.

4  Q.   As the person who is running the servicing on a day to day

5  business, do you believe you have the capabilities to absorb

6  another fifty or a hundred billion of loans to service today?

7  A.   Are you asking to be able to bring on fifty or a hundred

8  million dollars worth of loans to the platform and service?

9  Q.   Yes.

10 A.   Absolutely.

11 Q.   Okay.  Last question, post-closing, the final closing, how

12 do I know what obligations you're going to continue to perform

13 going forward?

14 A.   I guess -- could you be a little more specific on the

15 question of what you're looking for?

16 Q.   Sure.  We talked about what was being proposed under the

17 sale transaction and do you have an understanding as to the

18 servicing agreement whether the purchaser is undertaking to

19 assume the duties and obligations under this document of the

20 servicer?  Because you're going to be the servicer so I want to

21 understand what your thinking is going to be.

22 A.   From a -- from a practical matter I wouldn't expect there

23 to be any change in the day to day functional servicing of the

24 loans.

25 Q.   So to the extent that you're providing reports to parties

1   under this agreement, Article 4, Section 4 deals with reports,

2   you're going to continue to provide that on a going forward

3   basis?

4   A.    I would definitely expect that to be the case.

5   Q.    And the same thing with performing the duties under

6   Section 3 and elsewhere throughout the document?

7   A.    As long as the sections relate to the administration of

8   servicing the loans, I would expect that to continue unchanged.

9   Q.    So, okay.  I think that's fine.

10             MR. DEHNY:  Your Honor, I have nothing else.

11             THE COURT:  All right.  Any further questions?

12  Ms. Lawson?

13  EXAMINATION BY

14  MS. LAWSON:

15  Q.    Good afternoon, Kim Lawson from Reed Smith on behalf of

16  GMAC and Residential Funding.  I just want to clarify your

17  awareness first.  Are you aware that all of the GMAC HELOC

18  Servicing Agreements, except for one, are removed from the

19  sale?

20  A.    Yes, I am.

21  Q.    Because when I refer to, like, a GMAC servicing agreement

22  I'm only going to be referring to that particular one that is

23  still the issue of this sale.

24  A.    Okay.

25  Q.    Okay.  I believe that it is in the debtor's exhibits, a

1    copy of that.

2              THE COURT:  They're loose as well.

3    Q.   Yeah, it's as Exhibit 3 or you have a loose copy of it at

4    GMAC 1.  So whichever version you prefer is fine.

5              THE COURT:  I think it's stapled.

6              MS. LAWSON:  It's also fairly small.

7              THE COURT:  Let's just go to debt -- what is it,

8    Debtor 1?

9              MS. LAWSON:  It is Debtor 63, I believe.

10             THE COURT:  Debtor 63, I don't know if he has that

11   notebook.

12             THE WITNESS:  I don't have those binders yes.

13             THE COURT:  Would someone hand him the binder

14   containing Debtor 63, please?  I know your thirsty.  All right.

15   You can approach Mr. Patton.

16             MR. PATTON:  May I approach, Your Honor?

17             THE COURT:  Get some exercise.  All right.  Debtor

18   63.

19             THE WITNESS:  Okay.  I'm there.

20   BY MS. LAWSON:

21   Q.   You're there.  I mean at the bottom, just to make sure

22   we're all on the same page, it should say American Home

23   Mortgage Investment Trust 2007-SD-1.

24   A.   That's correct.

25   Q.   Okay.  Earlier, on your direct, you testified about the

1    difference between, like, a stand alone agreement and an

2    agreement that is somehow otherwise entwined with other

3    agreements?

4    A.    That's correct.

5    Q.    Okay.  When you look at this document, are you familiar

6    with this document at all?

7    A.    I am familiar with this document.

8    Q.    Okay.  When you look at this document, would this qualify

9    under your description of a stand alone servicing agreement or

10   would this fit in with the more integrated agreements?

11   A.    This would be more of the stand alone servicing agreement.

12   This is a servicing agreement that applies to an American Home

13   Mortgage Investment Trust Securitization.

14   Q.    Okay.  So when you say this is more of a stand alone

15   agreement, are there any other provisions in here that -- do

16   you expect this agreement to contain any provisions other than

17   servicing rights and obligations?

18   A.    I guess the -- the difference that I would point out as it

19   related to their type of agreement; this agreement would not

20   include any type of seller sections.  It would -- it should

21   almost, substantially if not all, be attributed to servicing of

22   the mortgage loans.

23   Q.    Okay.  And do you know if GMAC is a backup servicer on

24   this agreement -- under this agreement?

25   A.    Yes, I do believe that GMAC is a backup HELOC servicer on

208

1    the HELOC portion of the securitization.

2    Q.   Okay.  And what does that mean to you?

3    A.   From a practical standpoint it means that on a monthly

4    basis GMAC is copied on the remittance report that is sent to

5    the master servicer with respect to only the HELOC portion of

6    this deal.  That GMAC has responsibilities to monitor the

7    remittances if they -- if they see any issues they are supposed

8    to -- they are supposed to raise them.  If -- in the event that

9    if the HELOC servicer was ever terminated for cause under the

10   deal, GMAC has an obligation to step in and take over the

11   servicing as one of their functions as backup HELOC servicer.

12   Q.   Okay.  You mentioned if the servicer, meaning American

13   Home Mortgage Servicing was ever terminated, what if for some

14   reason they didn't qualify?  So say they lost their license in,

15   you know, all the states that the mortgages that underlying

16   this agreement were somehow revoked or expired, would that also

17   be a reason that GMAC would have to be a backup servicer?

18   A.   I don't recall for a fact but to the extent that AHM

19   servicing was somehow precluded by law from being able to

20   service the loans, I believe that from a practical matter

21   GMAC's responsibility to the trust would step in at that point

22   to insure adequate servicing of the loans.

23   Q.   And are you familiar with the portfolio that underlies

24   this agreement?  What types of loans are contained within that

25   portfolio?

209

A.    Generally speaking, yes.

Q.    Okay.  Do you know whether there are any HELOC loans currently existing underneath this agreement?

A.    Yes.  The only -- the only loans that would be existing under this particular agreement would be HELOC loans.

Q.    Okay.  And do you know whether this portfolio is referred to -- was referred to as a scratch and dent portfolio?

A.    The securitization is referred to as a scratch and dent securitization.  There could be a mixture of, you know, asset types in there.  There's a pretty broad definition of what can qualify for scratch and dent.

Q.    Can you explain to us what types of loans would qualify?

A.    Typically speaking scratch and dent loans, from a securitization fashion, would either relate to loans that -- I mean, they're usually scratched or dented from a -- from a number of different perspectives.  It could be that the loans are delinquent and couldn't qualify to be put into a regular, normal securitization.  There could also just be issues with actually being able to sell those loans.  Some of them could be age -- they could just be age loans or could be document deficiencies in some of the loans.  It's a number of types of things like that where, from a normal perspective or without -- without the passing of a longer period of time then you'd want to hold on to the asset without being able to securitize it, you can securitize it and get some type of credit from a

1  financing perspective so you're not holding these types of

2  loans for cash through a scratch and dent securitization.

3  Q.   Okay.  So are there loans under this portfolio that

4  people, borrowers -- the underlying homeowners and borrowers

5  could still draw on their home equity line?

6  A.   I believe -- I believe that there could be, to the extent

7  that the borrowers are current.  There's a -- there's a normal

8  shut off that if a loan is delinquent you cannot make a draw.

9  But to the extent that the homeowners are current, I believe

10 that under this deal they may be allowed to make draws.

11 Q.   And do you know if there are any loans under this where

12 people are current and can make draws, say tomorrow or today or

13 next month?

14 A.   I don't know for a fact sitting here today.

15 Q.   Okay.  And when someone does draw on a home equity line,

16 does that check get presented to you as the servicer?

17 A.   Directly it does not.  If -- if a homeowner wants to draw

18 on their HELOC, they would write a check.  When they send the

19 check -- when they write the check to whomever they're writing

20 the check to, say a contractor for an addition, for example,

21 when the contractor goes to cash that check the check will go

22 to the Bank of New York, who is our presentment agent for our

23 HELOC draws.  They have on file HELOC signature cards which the

24 homeowners sign at closing.  The Bank of New York's obligation

25 is to validate that the homeowner's signature is accurate and

1  correct.  Once they do that they would send a presentment file

2  over to AHM Servicing to validate that the homeowner has the

3  adequate line amount to cover that draw.  So they'll know

4  whether or not Bank of New York can honor the check.

5  Q.   Okay.  And is that action that you just described that

6  American Home Servicing would take, do you believe that would

7  still be a function after the sale of the purchaser?

8  A.   I believe that that -- that portion of the function would

9  still be a normal servicing -- would be a normal servicing

10  function to -- to do those -- to do those pieces of it to the

11  extent that there were draws taking place.

12  Q.   Okay.  Okay.

13       MS. LAWSON:  I'm going to move off of that and if I

14  may approach I have some other exhibits.  Do you guys need a

15  copy?  That's fine, I have one.

16  Q.   Mr. Love, if you can just turn to Exhibit 1 in that

17  binder.

18  A.   Okay.

19  Q.   I believe that the debtors have identified, on their

20  exhibit list, a contract of residential funding at their

21  Exhibit number 24, but it does state that the agreement is

22  missing.  Do you recognize this document at all, Exhibit 1?

23  A.   I don't recognize this document other than, I believe, it

24  was presented to me at my deposition last week.

25  Q.   Okay.  And are you familiar with the Fanny Mae and the

1    Freddie Mack guidelines for servicing?

2    A.    Generally speaking, yes.

3    Q.    Okay.  And when you have a loan that you're servicing that

4    is subject to that guide, what governs the servicing?  Is it

5    those guides or is there a separate servicing agreement that

6    would govern?

7    A.    I'm sorry.  Could you repeat the statement?

8    Q.    Sure.  Knowing what you were supposed to do, in terms of

9    your obligations to service a Freddie Mack or a Fanny Mae loan,

10    what do you refer to to know what your obligations are?

11    A.    If you're servicing directly for one of those two they

12    have an extensive servicing guide which covers all the -- all

13    the specific -- all the specific sections of servicing and how

14    different portions of that are supposed to be carried out.

15    It's really -- it's really very -- a lot of times it's used as

16    an industry standard for accepted servicing practices.

17    Q.    Are you aware of whether residential funding has a guide

18    similar to the Freddie Mack or Fannie Mae guide?

19    A.    I'm not specifically aware for RSC.

20    Q.    Okay.  And can you turn to Tab 2 in that binder?

21    A.    Okay.

22    Q.    Is that document familiar to you?

23    A.    I can tell you from looking at it off the top; it's not a

24    document that's familiar to me.

25    Q.    Okay.  So you don't know when you're servicing loans for

213

1    Residential Funding whether you follow these guidelines or are

2    required to even follow these guidelines?

3    A.    The -- the pool of loans that I recall that we're

4    servicing for RFC is really -- it's an older pool of mortgage

5    loans that AHM, and I believe Columbia National before that,

6    has been servicing for a number of years.  So that relationship

7    really has been around for a number of years and I don't

8    believe there's any changes to it.  So we've been servicing --

9    I mean, we've been servicing without -- without any known

10   issues to that for a long period of time.  The -- you know

11   they  -- I guess that's all that I could really -- that's all

12   that I could really offer that -- that I recall about the

13   specific portfolio for RFC.

14   Q.   But you don't know of any document that you file -- that

15   you follow in terms of what your rights and obligations are, in

16   terms of the servicing of Residential Funding's loans, is that

17   correct?

18   A.    I don't know specifically with respect to the -- to the

19   small RFC private investor population that we service.  I

20   mean -- I mean typically speaking we're -- I mean we're

21   following normal servicing procedures.  But I don't know

22   anything more specific about this population of loans.

23   Q.    Okay.

24            MS. LAWSON:  I have no further questions.

25            MS. RUSH:  Good afternoon, Your Honor.  My name is

214

1   Paula Rush and I'm here pro se on behalf of borrowers.  And I

2   would have a few questions that I would like to ask today, if

3   that would be okay.

4           THE COURT:  Any objection, Mr. Brady?

5           MR. BRADY:  Your Honor, if I can check with -- one

6   moment.

7           THE COURT:  Uh-huh.

8           MR. BRADY:  Your Honor, it's my understanding that

9   Ms. Rush filed a motion that's on the calendar for October 31st

10  but she did not file an objection to the motion that's on for

11  today.

12          THE COURT:  Do you -- Ms. Rush, I take it you have a

13  home that you did a mortgage through American Home Mortgage, is

14  that correct?

15          MS. RUSH:  Yes, and I represent some other borrowers

16  as well.

17          THE COURT:  Are you an attorney at law?

18          MS. RUSH:  No, I am not.

19          THE COURT:  Well, I'm not going to allow you to

20  represent anyone other than yourself.

21          MS. RUSH:  Okay.

22          THE COURT:  Because --

23          MS. RUSH:  I promise a very --

24          THE COURT:  -- I wouldn't want you to get in trouble

25  about the unauthorized practice of law.

1        MS. RUSH:  I have very specific questions and I

2   promise you I'm not being paid 500 dollars an hour to be here

3   like everyone else so I will make it short.

4        THE COURT:  Unfortunately my days of being paid 500

5   an hour, Ms. Rush, have passed as well.  I'll allow you some

6   latitude.

7        MS. RUSH:  Thank you.

8   CROSS-EXAMINATION BY

9   MS. RUSH:

10  Q.   I would like to continue -- well, good afternoon, Mr.

11  Love.

12  A.   Good afternoon.

13  Q.   I would like to continue on the vein on some of the

14  conversation that has been taking place in your testimony in

15  reference to individual mortgage companies and their guidelines

16  about servicing loan modifications.

17       When it comes to certain mortgage companies, do each one

18  of them have their own specific guidelines if a borrower calls

19  in and says I have an issue that needs to be addressed with my

20  loan?

21  A.   Are you asking, specifically about load modifications?

22  Q.   We'll start with that, loan modifications.

23  A.   Many of the different servicing agreements do have

24  different sections about loan modifications and whether the

25  investors will or will not allow loan modifications to take

1    place.  And what the specific requirements are that have to be

2    met in order for the investor to accept the loan modification.

3    Q.   So you're saying that you understand each individual's in

4    your group of loans that you service -- you understand because

5    it seemed like when you were answering the question for some

6    other people that you were confused about what their specific

7    requirements were, you kept saying general requirements?

8    A.   I'm sorry; I think you're losing me a little bit on the

9    question.

10   Q.   Okay.  GMAC has a pool of loans and they have specific

11   guidelines that they would like you to follow if a borrower

12   calls in and says they have a problem with their loan, is that

13   correct or not correct?

14   A.   If we're going back and relating it to a loan modification

15   and GMAC is the owner of that mortgage loan, there would be a -

16   - a servicing contract that one of the sections in it would

17   govern what steps and requirements would need to be fulfilled

18   in order to allow a loan modification to occur.

19   Q.   So if a borrower calls in and they say I'm having a

20   problem with my loan, you have to find out who the owner of the

21   loan is so that you can then figure out what their specific

22   guidelines might be, whether that pool has already reached a

23   five percent max modification before you can answer that

24   borrowers question about whether or not they could get a loan

25   modification, correct?

217

1  A.   Not -- not in order to begin speaking to a customer or to

2  try to help -- to try to help understand what avenues might be

3  available.  But in order -- in many cases, in order to get

4  final approval for a loan modification either the investor or

5  the master servicer does have to approve the terms of that loan

6  modification.

7  Q.   At what point when the borrower begins this conversation

8  with you do you determine that you need to get to the owner of

9  that note and make a determination whether that borrower would

10  be entitled to that loan modification?

11         MR. BRADY:  Your Honor, I recognize that Ms. Rush is

12  not a lawyer but could we, at least, have some guidelines that

13  the questioning of this witness needs to relate to the sale?

14  I'm not sure where this line of questioning has any relevance

15  to the matter that's before the court.

16         THE COURT:  Ms. Rush, what point are you trying to

17  make?

18         MS. RUSH:  Okay.

19         THE COURT:  Tell me.

20         MS. RUSH:  If the loans become a servicing obligation

21  that are going to be transferred to the new servicer, it seems

22  to me that the servicing issues that borrowers may be having

23  with the servicing department are the servicers that are going

24  to continue to service the loans going to be working within the

25  guidelines of what the banks would ask of them.  Some of the

1    attorneys have questioned him about specific guidelines, their

2    specific guidelines and I didn't hear the answer that they do

3    even understand that each bank has specific guidelines that

4    they have to follow when they're servicing their loans.

5              THE COURT:  All right.  I'll allow her to explore it.

6    I think it may be possibly relevant, at least with regard to

7    adequate assurance issues in connection with the assignment of

8    loans and the servicing that's going to occur post -- post

9    transaction.  So I'll allow Ms. Rush some latitude.  I don't

10   know if you have a pending question or not, though.

11   BY MS. RUSH:

12   Q.   Is there a process that you go through -- at what point?

13   A borrower calls in and they say I have a problem with my loan

14   I need to talk to somebody about modification.  At what point

15   do you go and find out who the owner of the note is and what

16   you could possibly do for them?

17   A.   If -- generally speaking if a borrower calls in and says

18   I'm having -- I'm having problems with the ability to make

19   payments on my loan and I need to talk to somebody about a loan

20   modification that call would get transferred over to our loss

21   mitigation group.  Which that is what that group is designed to

22   -- to deal with those types of issues.  They should send out to

23   the homeowner, under that case, what -- what we refer to as a

24   loss mitigation packet or -- it's a packet of information that

25   they would request the homeowner to fill out and send in back

1  to that group.  There's going to be -- from a high level it's

2  going to be information to allow us as servicer to understand

3  your current financial situation so that we can then make a

4  determination of how that would -- how that would apply back to

5  the situation with your loan and the different types of lost

6  mitigation options that might be available.

7  Q.    So you're saying there's a general procedure, it's not

8  specific to an individual's owner of their note?

9  A.    For -- for that portion of the procedure, that particular

10  piece is up to that point is not really governed piece by piece

11  by different documents.  Typically speaking we would be

12  following Fanny Mae guidelines for that piece of the issue.  If

13  it comes that after the packet comes in, the lost mitigation

14  group is working with the homeowner and they determine that

15  they believe that a loan modification is the right -- is the

16  right option, before -- before that group can finalize the loan

17  modification they would prepare the -- they would prepare the

18  paperwork for it.  They would go and then they would seek

19  approval from the individual -- from the individual investor or

20  master servicer before they could complete the loan

21  modification.

22  Q.    So it's a long process between the time that borrower

23  first calls in and says I may need until the time that the

24  actual owner of the note may find out that there's an issue.

25  How long would that process normally take?

220

A.    It would -- it -- it really is a process that would vary

case by case.  It would -- there would be a lot of factors.  It

would depend on how quickly the paperwork back and forth could

get finished and then the items submitted to the investor for

approval.  Typically the agreements, you know, do lay out, at

last as it relates to the master servicer or the -- or the

agencies, a timeline that they would normally respond in if a

response was required from them.  But I -- I can't give you too

many specifics as to what the average time on lost mitigation

workouts take.  I just don't -- I just don't have enough

specifics on that to provide you a normal average.

Q.    Okay.  Let's get to RSPA, qualified written request.  If

somebody sends you a RESPA Qualified Written Request, as the

servicer you -- do you know the guidelines on the timelines

that you have to respond?

A.    Yes.  And we have a group that is specifically -- one of

their specific goals is to track and respond to all qualified

written requests.  That's part of what -- that's part of what

that group -- part of what that particular group does.

Q.    And it's your understanding that that's done within the

guidelines?

A.    It's my understanding that yes it is.  And that's not an

investor by investor item.  That is the one RESPA guideline

that would govern that particular process as it would relate to

whomever the individual investor in the loan is.

221

1   Q.   Would it surprise you if I told you that my RESPA Written

2   Request was never answered --

3   A.   It definitely --

4   Q.   -- by American Home.

5   A.   It definitely would surprise me to hear if that was the

6   case.

7   Q.   Would you understand that if RESPA Qualified Written

8   Requests or loan modification requests were not answered in an

9   appropriate and timely fashion that borrowers would have no

10  alternative but to file litigation?  Which, if American Home

11  Servicing is going out of business would come back to the owner

12  of the note?

13  A.   RESPA does provide for certain relief for the homeowners

14  should the obligations of the servicer, under RESPA, not be

15  fulfilled.  One of those -- one of the avenues for the

16  homeowners to seek relief could be through -- could be through

17  litigation if necessary.  That -- from that piece forward it

18  would be -- I mean, it would be a -- a legal matter, I guess,

19  to determine exactly the facts of the case and the outcome.

20  Q.   During the process of the bankruptcy and now the

21  subsequent fighting over the loans, is there good communication

22  right now between the servicing unit and the owners of the note

23  in reference to borrowers who may be having problems or issues

24  with their loans?

25  A.   I would say that yes, that relationship has been unchanged

222

1    from the servicer perspective.

2    Q.    Have you called any of the banks to ask them about loan

3    modifications recently?

4    A.    I have not personally, but --

5    Q.    Has the servicing unit?

6    A.    That is a function that -- that the lost mitigation group

7    in our servicing division would do on a very regular basis.

8    Q.    Okay.  If the borrower asked to know the true owner of

9    their note, would American Home give them that information?

10    And do you know if that's required?

11    A.    I don't know if that's required or not.

12    Q.    You don't know if there's a law or not that says that if

13    the borrower requests that information you have to provide it?

14    A.    I don't know.  Typically that would come up either through

15    customer service or through our research group to be responding

16    directly to the customers and we should have procedures that

17    would address that particular topic.

18    Q.    The MI insurance, the mortgage insurers, do they have

19    specific guidelines for you to follow?

20    A.    The mortgage insurers do have specific guidelines that do

21    need to be followed if there is mortgage insurance on an

22    individual loan.

23    Q.    And you know what those -- you do -- you have several MI

24    companies, different right?

25    A.    That's correct.  We do have loans that have mortgage

1    insurance policies from a number of different MI carriers.

2    Q.    And you employ all of their guidelines when there's issues

3    that come up?  Before you foreclose you go through their

4    process?

5    A.    Yes, we do.  And the main reason for that is as a servicer

6    you -- the main obligation is you need to obtain approval from

7    the MI carrier before you -- before you continue or carry

8    through to the end of the resolution of a defaulted mortgage

9    loan issue.  Because if there is a default on the mortgage loan

10   and there is a loss taken on that loan, the MI carrier is --

11   that's where the mortgage insurance policy kicks in and when

12   they're supposed to make a payment.  But in order for them to

13   make a payment they do have guidelines that need to be followed

14   or else they have the ability to deny payment of that insurance

15   claim if the proper procedures have not been followed.

16   Q.    And you fill out reports and send them to the MI insurer?

17   A.    Defaulting reporting is a required piece to the MI

18   companies.  Monthly we have to send data tapes to each of the

19   MI carriers about all of the loans which we are servicing that

20   they have mortgage insurance policies on, that would lay out

21   for them which loans are in a certain defaulted status that

22   they would -- that they would designate meets the

23   qualifications that they want to have information on.

24   Q.    Do you offer borrowers the servicing unit to refinance

25   them as an option instead of loan modification?

224

A.    Presently, today, the servicing group themselves have

never been able -- never offered the option of refinance.

AHM Servicing does not originate loans so we don't have the

ability to do a refinance.

Q.    So your testimony is that you have never asked a borrower

to refinance when they call in and say that they have an issue

that they may need a modification?

A.    AHM Servicing would not have -- would not have made that

request.

Q.    Would you request that a borrower put 3,000 dollars in a

suspense account and not tell them what that's for?  Would you

require a suspense account?  What is a suspense account for?

A.    The only -- the only way that I know the term suspense

account is typically speaking if we receive funds from a

borrower that either does not equal a full payment or many

times if they're on a repayment plan money can go to a suspense

account.  And the suspense account designates that one, that

money is borrower money.  That the borrower has sent in those

funds and it has not been applied as a payment yet.  But the

system stores that separately to notate that its -- the most

common case, it's unapplied borrower funds but it designates

that that's the borrower that sent in the suspense funds so

it's not -- it wouldn't be legally owned by the investor yet.

Because it would be -- if there was a PNI payment then that

would, in the normal course, flow through to the investor but

1    it -- I mean, that's the -- that's how I know the term.

2    Q.    Okay.   That's what I'm confused about.   A borrower that's

3    not making a mortgage payment, you ask them to make a 3,000

4    dollar payment into a suspense account but that money's not

5    going to the investor for the payment, what is that money for?

6    A.    The only -- the waiver that, again, maybe I'm losing a

7    little bit on the example, but a common example of how that

8    would make sense is if -- if a homeowner that was having

9    trouble making payments if they were put on a repayment plan

10   were being allowed to make partial payments, the partial

11   payments would go to a suspense account until the partial

12   payments equaled a whole -- a whole payment.   At which point

13   they would drop out of the suspense account and apply as a

14   regular payment on the loan.   I don't know if that's the --

15   Q.    So the investor wouldn't even get the partial payment, you

16   would hold that and then at some point what would happen with

17   that money if they didn't fulfill their payments and catch up?

18   A.    If the homeowner defaulted on the loan and never -- and

19   never made another full payment required.   In other words, if -

20   - if the money that they sent in represented a partial payment,

21   and the partial payment was sitting in a suspense account

22   pending receipt of the rest of the funds needed to make a whole

23   payment so that a payment could be applied on the loan, and if

24   the borrower never fulfilled their obligation one, to continue

25   to make payments according to the repayment plan and never can

1    make payments again, the loan would transition out of the lost

2    mitigation and continue further down the default path.  The

3    next logical steps could be either bankruptcy or foreclosure

4    depending on what happens with that particular loan.

5              THE COURT:  Ms. Rush, I've given you a lot of

6    latitude here.

7              MS. RUSH:  Okay.

8              THE COURT:  And you need to -- I don't know how many

9    more questions you have but you --

10             MS. RUSH:  One more.

11             THE COURT:  Okay.

12             MS. RUSH:  Then I'm done.

13   Q.   These agreements that are being debated about taking parts

14   of them and leaving other parts behind or leaving behind the

15   liability parts, which in some cases are consumer protection

16   type of parts.  When these agreements are transferred and

17   American Home now has the servicing rights but they no longer

18   have any of the origination liabilities that came with them,

19   then if the banks have -- or get hit with liabilities it's

20   going to come back to the debtor's estate, correct?

21             MR. BRADY:  Your Honor, just -- I'm not objecting to

22   her asking the question but objecting to the characterization

23   of leaving behind consumer protections.

24             THE COURT:  Very well.  You can answer.  The question

25   -- let me ask it.  The question is that to the extent there are

227

1    claims of the banks that are relating to the origination piece

2    those claims are going to stay with the debtor, they're not

3    being transferred or assumed or bought by the purchaser.  The

4    purchaser is only buying the service related liabilities and

5    the service related rights.  So if Deutsche Bank or Bank of New

6    York has a claim related to origination, that claim is going to

7    stay at the debtors, is that your understanding?

8               THE WITNESS:  I believe that that would be correct.

9               THE COURT:  I think that was your question, Ms. Rush.

10              MS. RUSH:  Right.  So the -- any consumer oriented

11   protections that would have been one entity are now going to be

12   broken up into this part is going here and this part is going

13   there, that's just the point that I wanted to make.

14              THE COURT:  Okay.  Well, I'm not sure that's a

15   question.  Thank you for your time.

16              MS. RUSH:  Thank you.

17              THE COURT:  Any further questions?  Cross

18   Examination?

19              MR. TOP:  Good afternoon, Your Honor.

20   CROSS-EXAMINATION BY

21   MR. TOP:

22   Q.        Mr. Love, my name is Frank Top.  I'm with Chapman and

23   Cutler.  I'm here on behalf of Wells Fargo Bank as master

24   servicer and I have a very few questions that I wanted to ask

25   you today.

228

1      First of all, are you familiar with the concept of a

2  master servicer?

3  A.   Yes, I am.

4  Q.   And can you explain for the Court what a master servicer

5  is?

6  A.   Typically speaking the role that a master servicer would

7  fulfill most commonly comes up in the form of a securitization

8  setting.  The role of the master servicer would be one, to

9  receive remittance reports from the servicer or if there's

10  multiple servicers, multiple servicers to aggregate their

11  reporting and then to the extent the master servicer also

12  fulfills some type of a securities administrator role, they

13  would be responsible for disbursing the funds received from the

14  servicer appropriately as they would be paid out to the

15  bondholders.

16      The other -- the other common role that the master

17  servicer performs is one of a servicer oversight responsibility

18  with respect to the servicers that are reporting and remitting

19  to them.

20  Q.   And can you expound upon the servicer oversight

21  responsibilities?

22  A.   In their role as master servicer, typically speaking the

23  master servicer has an obligation to the trust to insure that

24  servicing is being performed adequately.  I'm not sure if you

25  want -- maybe you could ask me any other questions about that.

229

1   Q.   That's fine.  Why don't we turn to Debtor's Exhibit 70,

2   which I hope is the same document that I'm looking at here?

3   I'm looking at a servicing agreement for American Home Mortgage

4   Assets Trusts 2006-3.

5   A.   You said 70?

6   Q.   I believe it was 70, at least it was on the index.

7   A.   Jim, I think I've got up to 67 on this one.

8        THE COURT:  You said 70, correct?

9        MR. TOP:  I hope so.

10  Q.   Can you identify that document for me?

11  A.   Yes, I can.  This is the servicing agreement for AHMA

12  2006-3 Securitization Trust.

13  Q.   Thank you.  Can you turn to article 3 of this agreement?

14  I believe it's on page 6.

15  A.   Okay, I'm there.

16  Q.   Can you describe, generally, what's contained in article 3

17  of this agreement?

18  A.   Generally speaking article 3 would contain servicing

19  related provisions that the servicer should be following and

20  employing with relationship to the administration of servicing

21  of loans for this particular securitization.

22  Q.   So it's -- this particular article contains the

23  obligations and responsibilities of the -- of the servicer, is

24  that correct?

25  A.   Generally speaking, yes.

1    Q.    And so turning to section 3.06 which is on page 11, this

2    is the provision that obligates the servicer to collect

3    mortgage payments from the borrowers of the individual mortgage

4    loans, is that correct?

5    A.    That is correct.

6    Q.    And can you describe the various methods in which payments

7    from borrowers are received by the servicer?

8    A.    At AHM Servicing we receive payments through a direct

9    check from the homeowners that would write a check out of their

10   checkbook and mail it to us.  We receive payments online from

11   customers where -- in two fashions.  One, where I believe they

12   can go directly to our website and make a payment.  Two would

13   be where they could go into their own banking institution and

14   through an online bill pay service they can set up a payment to

15   pay to AHM.  The online bill pay services, to the extent that

16   that online bill pay service is run by Check Free, which is one

17   of the larger online bill pay services in the country, we do

18   get an automatic direct feed from Check Free daily that would

19   include payments from that fashion.  If there are other online

20   bill pay services, they would actually take the money out of

21   the homeowners account and send us checks that we would then

22   cash.

23       The homeowners also have the ability to pay via phone,

24   through a service that we -- that would provide, in conjunction

25   with Western Union, helps to provide the interface for that.

1   And there's also the ability to do a payment through the web

2   that is facilitated by Western Union as well.

3   Q.   And approximately how many payments do you receive in a

4   given month?

5   A.   If we use the example that we have approximately 210,000

6   active accounts today, ballpark, we would receive around

7   210,000 or so payments in a month.

8   Q.   And is it true at your deposition you described some of

9   the mortgage payment collection activities as being

10  administrative in nature?

11  A.   Yes, I did.

12  Q.   And that, you know, from time to time mistakes are made in

13  the manner in which those mortgage payments are credit?

14  A.   That is correct.  From time to time there can be mistakes,

15  especially to the extent with the number of items being

16  processed and the fact that humans are involved in the

17  processing.

18  Q.   And then at some point in time in the future those are

19  somehow trued up or settled up?

20  A.   That is correct.

21  Q.   I want you to turn, next then, to page 19, section 3.13.

22  A.   Okay.

23  Q.   And can you briefly -- are you familiar with the term lost

24  mitigation?

25  A.   Yes, I am.

232

1    Q.    Can you describe, generally, what that term means to you?

2    A.    Generally speaking lost mitigation is an effort that runs

3    both prior to a loan entering a -- a deeper stage of default

4    and also concurrent.  And I guess by deeper stage of default I

5    would mean bankruptcy or foreclosure.

6          The purpose in lost mitigation is, if possible, to avoid

7    foreclosure on the loan.

8    Q.    Are there instances where you have to pursue foreclosure

9    as a servicer?

10   A.    There definitely are instances where we do have to pursue

11   foreclosure.

12   Q.    Are you aware, at this time, how many loans are in

13   foreclosure in the portfolios?

14   A.    I'm not -- I don't specifically recall the total number of

15   outstanding foreclosures.

16   Q.    Now are you aware, in any of those foreclosure

17   proceedings, whether or not any of the borrowers in those

18   proceedings have asserted any claims against the servicer for

19   the manner in which they service the loans?

20   A.    I'm not aware, sitting here today, of that item.

21   Q.    So it would be fair to say that you didn't take that into

22   consideration in your efforts into determining what would be an

23   appropriate number to cure any defaults that might exist under

24   a particular servicing agreement, if any?

25   A.    It's not an item where I specifically would have looked

233

1  into that piece.  Since I don't directly manage the -- the

2  default function.  That's probably about as far as I could

3  characterize that for you.

4  Q.    Fair enough.  Now you mentioned that the master servicer

5  is in charge of overseeing the servicing of the loans by the

6  servicer itself, is that correct?

7  A.    that's correct.

8  Q.    Do you have an understanding as to what rights the master

9  servicer has in terms of enforcement in the event that the

10  servicer does not comply with the terms of the servicing

11  agreement?

12  A.    To the extent that the servicer does not comply with the

13  terms of the servicing agreement and the non-compliance would

14  constitute an event of default that, if unable to be cured,

15  would result in the termination of the service or the master

16  servicer does have a responsibility to either assume the

17  servicing responsibilities or appoint a successor servicer.

18  Q.    So, outside of a bankruptcy proceeding, for example, in

19  the event that the master servicer found one of those events

20  that were uncurable and in fact terminated a servicing

21  agreement, what would happen to the servicer's fee in that

22  situation?

23  A.    If that situation came up, one, I think there would be a

24  lot of lawyers involved.  Two, if that played all the way out

25  according to the example and at the end the servicing had to be

1    transferred to either the master servicer or another successor

2    servicer, that entity that was then performing those functions,

3    I believe, would be entitled to the servicing fee.

4    Q.    And AHM as servicer, or whoever the servicer would be

5    under the particular services -- it could be anyone -- they

6    would no longer be entitled to that servicing fee, is that

7    correct?

8    A.    I believe that that would be correct if they were

9    ultimately terminated as servicer and the servicing had to

10   transfer away as a result of that.

11   Q.    I'm going to ask you to turn quickly to, I believe, it's

12   Schedule 5.8, Section 2 of the Asset Purchase Agreement.

13         MR. BRADY:  Could we have that page designation again

14   that you're directing the witness?

15         MR. TOP:  I believe it's Schedule -- well, let me

16   just double-check this.  I believe it was Schedule 5.8.

17         MR. BRADY:  It's the litigation?

18         MR. TOP:  That's correct.

19         THE COURT:  Exhibit 105.

20         THE WITNESS:  Thank you.

21         THE COURT:  You're welcome.

22         THE WITNESS:  I'm sorry, what page did you say you're

23   on?

24         MR. TOP:  Well, it's not marked unfortunately but

25   it's in Schedule 5.8.  There's a Section 2; looks to be just a

235

1    three-page section to that particular schedule.

2              THE WITNESS:  You said 5.8, right?

3              MR. TOP:  Yes, Schedule 5.8.

4              THE WITNESS:  Okay.

5              MR. TOP:  And there's a Section 2.

6              THE WITNESS:  Section 2.  Okay.

7    Q.   Mr. Love, the question's simple:  did you have any role in

8    putting this schedule together?

9    A.   I did not.

10   Q.   In your analysis as to what would be required to cure any

11   breaches under the servicing agreements, did you consider the

12   outcome or any allegations in these complaints in developing

13   that number?

14   A.   From the servicing perspective I do not believe that we

15   did.  This schedule would have been prepared by our legal

16   group.

17   Q.   Okay.  And do you have any knowledge as to whether or not

18   this is a complete listing of pending pre-petition litigation

19   with respect to the servicing business?

20   A.   I don't have any personal knowledge of that or not.

21             MR. TOP:  Okay.  Thank you.  No further questions,

22   Your Honor.

23             THE COURT:  All right.  Who's left?  Mr. Chipman, Mr.

24   Fallon, Mr. Crowley, are you the remaining three?  Okay.  Make

25   up your mind or we going to get a redirect.

236

1          MR. CHIPMAN:  I was trying to be polite, Your Honor.

2          THE COURT:  Oh.  That's an effort for you, Mr.

3   Chipman.

4          MR. CHIPMAN:  Thank you, Your Honor.  Good afternoon.

5   For the record, William Chipman, Edwards, Angell, Palmer &

6   Dodge on behalf of Countrywide.  Good afternoon, Mr. Love.

7          THE WITNESS:  Good afternoon.

8          MR. CHIPMAN:  I'll try not to cover ground that's

9   been gone over extensively already. I believe that

10  Countrywide's agreements are in the debtor's binders at 33 and

11  37.  I do have a copy of our agreement if that would help.

12  Yeah.

13         THE WITNESS:  Yeah, I don't have that section in the

14  binders.

15         MR. CHIPMAN:  You don't have it?  Okay.

16         MR. PATTON:  May I approach, Your Honor?

17         THE WITNESS:  Thank you.

18         THE COURT:  Yes.

19         MR. CHIPMAN:  Does Your Honor need a copy?

20         THE COURT:  No, I have it.  Thank you.

21  CROSS-EXAMINATION BY

22  MR. CHIPMAN:

23  Q.   Mr. Love, do you have a copy of the agreement?

24         THE COURT:  Hit the button, yeah.  Just a sec.  I'm

25  sorry.  It gets hot in here in a hurry and the eight-track goes

237

1    off.  Go ahead, sir.

2    A.    You said number 33?

3    Q.    Yeah.  Why don't we start with 33?

4    A.    I've got that one up.

5    Q.    I believe number 33 is a mortgage loan purchase and

6    servicing agreement, dated effective as of March 14, 2006

7    between American Home Mortgage Corp. and Countrywide Bank,

8    N.A., is that correct?

9    A.    That's correct.

10   Q.    Do you remember your testimony where you talked about

11   there's four different types of servicing agreements?

12   A.    Yes, I do.

13   Q.    Can you tell me what type of servicing -- what bucket this

14   servicing agreement falls within?

15   A.    To me, this would have fallen under the group that I had

16   termed as private investor or hold-on private investor.

17   Q.    Okay.  And can you tell me again what that means to you?

18   A.    It means that AHM is servicing loans that are owned

19   directly by the investor.

20   Q.    Okay.  So this agreement represents loans that you're

21   servicing on behalf of Countrywide?

22   A.    That's correct.

23   Q.    Okay.  Are there any other service agreements or is this

24   it?

25   A.    I don't know if this is the only servicing agreement for a

1   fact.  I know that we're servicing one pool of mortgage loans

2   for Countrywide that would amount to -- it's somewhere north of

3   $400 million that we're servicing for them.  I don't know if

4   all the loans in that group were for a fact funded just under

5   this agreement or if any of them could have been funded under

6   another agreement.  I know that we have -- I think we have a

7   few service area retained agreements with Countrywide, that

8   they may have purchased loans under multiple agreements, but

9   I'm not sure as a fact if all the loans in the pool that I'm

10  talking about were all purchased under this contract or not.

11  Q.   Okay.  My understanding is this is the only agreement on

12  your Schedule 1.1-J where Countrywide actually owns loans that

13  are being serviced by AHM.  You may know something I don't.

14  A.   Yeah.  I just can't confirm off the top of my head right

15  this second.

16  Q.   So, this is a private -- what did you call it again?  A

17  private --

18  A.   I called it a private investor.

19  Q.   Okay.  This would be different than an agreement, an AHM

20  resecuritization trust, where the third party's secured as

21  agent of the Freddie and Fannie Mae type agreements?

22  A.   As far as how I categorize the investors, this would be --

23  the relationship would be slightly different than those other

24  three.

25  Q.   Okay.  So this is a different type of an arrangement than

1   those.  Do those have typically separate servicing agreements?

2   A.   All of the other three arrangements do not have separate

3   servicing agreements.  Some of them do and some of them don't.

4   Q.   All right.  Is it common for those types of agreements to

5   have separate servicing agreements?

6   A.   From our experience, the way the deals that we've been

7   involved with have been structured it is common except with

8   respect to the third party securitization types of deals.

9   Q.   Okay.  I believe you testified that AHM is up to date on

10  all of its servicing requirements under the agreements.  Would

11  that be true with regard to this agreement?

12  A.   To the best of my knowledge, yes.

13  Q.   Okay.  You're not aware of any deficiencies or defaults on

14  your servicing related to this agreement?

15  A.   Yeah, I am not aware of any.

16  Q.   Okay.  If I could direct your attention to -- let's turn

17  first to Section 7.2 of the agreement.  It's on page 52.

18  A.   Okay.  I've got it.

19  Q.   Okay.  Can you read that section to yourself and then once

20  you've had a chance to read it, can you tell me what your

21  business understanding of that provision provides for?

22  A.   So, just for the record, this was the section titled

23  "Termination without Cause"?

24  Q.   That's correct.

25  A.   My understanding of this section from a business side is

240

1    that this section would allow Countrywide to end the servicing

2    relationship without there having been any for cause reason,

3    but the servicer would be terminated.  As a requirement of

4    that, there would have to be a mutual agreement for the current

5    market value of the servicing rights which, in a sense,

6    Countrywide would just be purchasing the servicing rights back

7    on those loans.

8    Q.    Are you aware whether or not Countrywide has attempted to

9    terminate pursuant to Section 7.2?

10   A.    I'm not specifically aware.  I know that there have been

11   some types of issues with the Countrywide -- or not really

12   issues but I believe that Countrywide is listed on the Exhibit

13   1.1-K which is the disputed agreements which, again, as I

14   recall, the criteria for if a contract is listed on 1.1-K is if

15   there is a disputed termination notice that was sent pre-

16   petition.  That's my recollection.  I don't know for a fact

17   what the termination -- the purported termination was for, if

18   it was for this clause or not.

19   Q.    Okay.  But you do know it's listed on Schedule 1.1-K?

20   A.    I believe that to be correct.  I could verify it if you

21   want me to.

22   Q.    I'll represent to you that it is.  That's fine.  I'd like

23   to talk a little bit now about -- or I'd like to walk through

24   this agreement and just understand what servicing rights the

25   debtor is attempting to sell in this agreement.  Can you turn

1    to page 28?  I believe it's Article 4.  It starts with Section

2    4.1 and I believe it runs through page --

3    A.   Okay.  So starting with Section 4.1?

4    Q.   Correct.  What is Article 4 entitled?

5    A.   The global title for Article 4 is "Servicing of the

6    Mortgage Loans".

7    Q.   Did you review this section when you were helping compile

8    the lists of servicing agreements to be sold to the purchaser?

9    A.    I would not have reviewed this section at that time.  The

10   way that I was involved in that process was to identify --

11   again, if you take the portfolio on a whole, everything that

12   we're servicing -- to identify what of that is related to

13   servicing retained loans and what of that is not servicing

14   retained loans.  This -- the pool of loans that would be

15   serviced under this agreement would relate to servicing

16   retained loans.  From that perspective, then, the legal group

17   would have worked on helping to determine which contract tied

18   to that pool of mortgage loans.

19   Q.   Well, let's go through this.  I don't know any other way

20   to do this.  Let's go through the sections.  Section 4.1 -- The

21   Seller's Act to Servicer.  That provision would be assumed and

22   assigned or purchased by the purchaser?

23            MR. BRADY:  Your Honor, I would object to that.

24   Again, this calls for a legal conclusion.

25            THE COURT:  Mr. Chipman, do you have a response?

242

1        MR. CHIPMAN:  Your Honor, I'm just trying to

2   understand what his business unders -- I'll rephrase the

3   question.  I'm trying to understand what his business --

4        THE COURT:  Oh, I think he's articulated it but I

5   think he told you what he did as a matter of business and what

6   his role in the matter was.  You know, do you what you'd like

7   to do but --

8        MR. CHIPMAN:  Well, I'll --

9        THE COURT:  -- if you're going to go section by

10  section and ask him, you know, does the APA provide that this

11  section is assumed or not assumed, I think that's a legal

12  question and they're all going to be objected to and the

13  objections are going to be sustained.

14        MR. CHIPMAN:  I understand, Your Honor.  I'll

15  rephrase the question more generally.

16  Q.   Is your business understanding that all of the servicing

17  obligations under this agreement are being transferred to the

18  purchaser?

19  A.   I would say that the provisions of the contract that

20  relate to the administration of the servicing of the loans

21  would go.

22  Q.   Are you familiar with annual compliance statements?

23  A.   Yeah, I am generally familiar with that term.

24  Q.   Is the servicer required to provide those generally under

25  servicing agreements?

243

1   A.   Generally speaking, the servicer is.

2   Q.   And during the interim period before final closing, if an

3   annual compliance statement is due, that would be provided by

4   AHM?

5   A.   I would expect it to be.  It would be my expectation it

6   would be produced by AHM who's operating the business in the

7   normal course.

8   Q.   If Countrywide had the ability under this agreement to

9   examine and audit on reasonable notice your servicing records,

10  what that be afforded to them?

11  A.   In between the initial and final closes, is that what

12  you're talking about?

13  Q.   From this point until the final close and thereafter.

14  A.   I would expect that through the normal course it would,

15  but it would be a reasonable request.

16  Q.   If, under this agreement, Countrywide was entitled to

17  periodic and special reports, you, as part of your servicing

18  obligations -- you'd have no problem continuing to provide

19  those?

20  A.   Through the normal course I would expect that that would

21  continue.

22  Q.   Are you aware, did you do any analysis -- and I know this

23  has been asked with other agreements but I'll ask it with

24  regard to ours -- are you aware of any repurchase obligations

25  due under this agreement?

1    A.    I'm not personally aware of any repurchase obligations.

2    Q.    Are you aware of any premium recapture amounts due under

3    this agreement?

4    A.    I am not.

5    Q.    Did anyone ask you to perform an analysis to determine

6    those amounts?

7    A.    No one asked me to do that analysis.

8    Q.    Does part of your servicing duties require you to

9    calculate those amounts in the ordinary course?

10    A.    It does not.

11    Q.    So how would, in your servicing, you send reports to the

12    owner, Countrywide?

13    A.    In the normal course, the investor reporting department,

14    American Home Mortgage Servicing, would monthly send a

15    remittance report, a set of reports to Countrywide as owner of

16    those loans.

17    Q.    Okay.  And those reports do not include, in the ordinary

18    course, early payment defaults or premium recapture amounts at

19    all?

20    A.    They do not include that information.

21    Q.    How does Countrywide normally get that information from

22    AHM?

23    A.    Country -- I believe in the normal course how I've seen it

24    come up, Countrywide would calculate that information based

25    upon -- they would in large part base it on the information

245

1    that, to the extent that we're servicing the loans for them,

2    the information that we send them in the monthly reports.  For

3    example, if every month we're telling you the current status of

4    every loan, so one of those statuses would be if the loan paid

5    off.  So if it paid off, Countrywide would know what day the

6    loan paid off.  They would then seemingly have the ability to

7    determine if, according to their agreement, if that loan paid

8    off in a time that's less than or within the time window for an

9    early payoff premium recapture, for example.

10   Q.   So you are providing information in your servicing

11   function that aids the investor or the owner to determine Ends

12   and premium recapture amounts?

13   A.   The purpose of AHM sending it is not to aid them in that

14   process; it's part of the required reporting under the

15   obligations of the servicer and the contract.  I was just

16   pointing out that as the normal course of flow how it would

17   work.  It would make sense to me that that's where Countrywide

18   would -- it would make sense for them to use that information

19   to try to calculate the numbers.  I think, in my opinion, any

20   purchaser that would be trying to calculate those amounts,

21   that's the type of information that they would use or where

22   they would most commonly come into the data that would allow

23   them to calculate those types of things.

24   Q.   Well, if you're servicing the loans that's the only say

25   they would know, right?

246

1    A.    Typically speaking, yes.

2    Q.    Okay.  So, they get the information from you and then

3    they're able to shoot back some kind of report to you saying

4    these are the Ends and these are the premium recapture amounts?

5    A.    They would send that report to the seller of the loans,

6    not back to AHM Servicing, in my experience.

7    Q.    So the seller being who under this agreement?

8    A.    Under this agreement it appears to be American Home

9    Mortgage Corp.

10   Q.    Okay.  And then, if you know, what would American Home

11   Mortgage Corp. do with that information?  Would they contact

12   you at all?

13   A.    If American Home Mortgage Corp. received a request to

14   repurchase loans from Countrywide, they would next set out in

15   an effort to try to investigate the validity -- what they would

16   believe to be the validity -- of the repurchase request.  It

17   would be common for them to request information from the

18   servicer to aid them in trying to determine the validity of

19   those claims on a loan level.

20   Q.    And nobody has come to you in the context of this

21   transaction to determine that amount?

22   A.    Sorry, to determine what amount?

23   Q.    To determine the amount of the Ends or the premium

24   recapture amounts on this particular agreement.

25   A.    They have not.

247

1        MR. CHIPMAN:  Okay.  Your Honor, may I have one

2  minute?

3        THE COURT:  Yes.

4        MR. CHIPMAN:  Thank you.

5        THE WITNESS:  Is it possible to go get more water?

6        THE COURT:  I'm sorry?

7        THE WITNESS:  Is it possible to get some more water?

8        THE COURT:  Yes, of course.  He can get -- that's

9  fine.  The debtor provides a bottle of water.  The government

10  provides Wilmington's finest.

11        MR. CHIPMAN:  Your Honor, thank you.  That's all the

12  questions I have.

13        THE COURT:  Mr. Fallon or Mr. Crowley, whichever of

14  you would like to proceed next?

15  CROSS-EXAMINATION BY

16  MR. FALLON:

17  Q.   Mr. Love, Brett Fallon for City Mortgage for the record.

18  I'm going to be referring to debtor's exhibit number 27, so if

19  you'd like to get that out.  I don't think I'll be long.  And I

20  believe Exhibit 27 is the Master Mortgage Loan Purchasing and

21  Servicing Agreement dated as of June 21, 2006.  Do you see

22  that?

23  A.   Yes, I do.

24  Q.   And you testified before of the various buckets.  Which

25  bucket would that agreement be a part of?

1  A.   Any loans that were being serviced directly under this

2  agreement would fall under the private investor grouping.

3  Q.   Okay.  So, this would be a private investor grouping?

4  A.   Yes, that's correct.

5  Q.   Okay.  And what's the difference between that and a third

6  party securitization?

7  A.   The difference between that is that, typically speaking,

8  any loans that are -- that I would have categorized as being

9  serviced for a third party securitization would have originally

10  started or originally been closed under one of these

11  agreements.  So the purchaser would buy loans AHM Servicing

12  retained, where AHM was servicing.  After the investor owned

13  the loans, they would then transfer the loans to a

14  securitization trust that they would form most commonly off of

15  one of their securitization shelves.  The most common way that

16  the servicing was transferred from a document perspective is

17  that there would be an AAR agreement that would assign over the

18  servicing provisions and this agreement to the trust so that,

19  from that point forward, and that point being the formation of

20  the securitization, AHM Servicing would then stop servicing for

21  the original investor and begin servicing those same loans

22  directly for the securitization.

23  Q.   Okay.  And if you turn to Exhibit 11 --

24          MR. BRADY:  Is that Exhibit 11 or Section 11?

25          MR. FALLON:  Exhibit 11.

249

1    THE WITNESS:  Of this agreement?

2    MR. FALLON:  No, no.  I'm sorry.  Debtor's Exhibit

3    11.  Sorry about that.

4    THE WITNESS:  I don't think I have the low, low

5    numbers.  On that number 11.

6    Q.   Okay.  And is that the AAR type of agreement that would

7    turn it into essentially a third party securitization?

8    A.   This is that type of AAR agreement.

9    Q.   Okay.  And that AAR agreement typically has exhibits

10   attached and, in fact, wouldn't it usually attach documents

11   like the Master Mortgage Loan Purchase and Servicing Agreement?

12   A.   I believe that it would be common to have the original

13   agreement included as well as a mortgage loan schedule of the

14   individual loans going into that trust.  It would be another

15   typical exhibit.

16   Q.   Okay.  And do know what the exhibit that is supposed to be

17   attached to that AAR agreement is?

18   A.   Which exhibit?

19   Q.   I'm sorry.  Do you know what is supposed to be attached or

20   if there's supposed to be anything that's supposed to be

21   attached to Exhibit 11?  The point I'm trying to get to is the

22   AAR agreement.  People just don't enter into that on its own;

23   it's typically in connection with a Master Mortgage Loan

24   Purchase and Servicing Agreement.

25   A.   Yeah.  Generally speaking, that would be correct.

250

1   Q.   Okay.  And, then, which Master Mortgage Loan Purchase and

2   Servicing Agreement goes with Exhibit 11?

3   A.   For this particular one it would be the agreement titled

4   "The Master Mortgage Loan Purchase and Servicing Agreement"

5   dated as of June 21, 2006 between assignor servicer and the

6   company.

7   Q.   And is that debtor's Exhibit 27?

8   A.   I believe that to be the case.

9   Q.   Okay.  So, now that we have both documents, which bucket

10   would you put this under?

11   A.   To the extent that the mortgage loans in question were

12   being serviced for the securitization trust that is labeled

13   "HSI Asset Loan Obligation Trust 2007-AR1", those loans I would

14   have categorized the investor as being a third party

15   securitization because those loans would be in a

16   securitization.

17   Q.   Okay.  Let me talk about, briefly, the payments as they

18   come in and you service the payments.  You testified a little

19   bit about that.  Do you have any understanding as to who owns

20   those payments when they come in?

21   A.   And, again, are we saying that these loans are in the

22   securitization trust that I mentioned?

23   Q.   Yes.

24   A.   Okay.  As I understand it, I mean, from a business

25   perspective, the PNI payments as they would come in would be

251

1    owned or owed to the underlying owners or investors that have

2    bought into the securitization trust and the related bonds and

3    classes of bonds.

4    Q.   Okay.  So those aren't funds that are owned by AHM

5    Servicing?

6    A.   No, they're not.  And can I just defer to your point to

7    make it a little bit clearer?  The bank account that we would

8    set up to collect the PNI funds in would be titled -- usually

9    typically be titled "American Home Mortgage Servicing Inc. in

10   Trust for", and it would reference the securitization name.

11   Q.   Okay.  And then how would AHM Servicing be paid its fee?

12   A.   AHM Servicing would be allowed to retain from the interest

13   collections the servicing fee.  So, I think I gave an example

14   earlier where the mortgage loan had a six and a half percent

15   interest rate and the servicing fee was a quarter percent.  If

16   that example was the same and there were no other -- and there

17   was nothing else with that loan that would subtract from the

18   interest rate, AHM Servicing -- when we remit to the master

19   servicer -- would be remitting the interest at a six and a

20   quarter percent interest rate.

21   Q.   Okay.  But in the first instance when the payments come

22   in, do they all get deposited into that escrow account you

23   spoke about?

24   A.   When the --

25   Q.   Well, let me rephrase it.  In other words, when the

252

1  payments come in you put them in those segregated escrow

2  accounts for the benefit of the investors, is that correct?

3  A.   To the extent that they represent the PNI funds, that's

4  correct.  The payment that came in from the mortgager would

5  need to be split as it related to the various different buckets

6  to the extent that it related -- the portions of the payment

7  that related to PNI collections that were obligated to be

8  deposited into that account, and that's where it'd end up from

9  a PNI perspective there.

10 Q.   Okay.  And, then, does AHM Servicing get paid out of those

11 amounts in the PNI account?

12 A.   I guess I don't know the specific technical mechanism of

13 how that works.

14 Q.   Okay.  Fair enough.  Do you know if the servicer's rights

15 to be paid the amounts -- well, let me ask you to turn to

16 Exhibit 27.  Turn to Exhibit 9, Subsection 1105.

17             THE COURT:  Sorry, what exhibit?  27?

18             MR. FALLON:  Yeah.  Debtor's Exhibit 27, Exhibit 9.

19             THE COURT:  Okay.  Sorry, Mr. Fallon.  Which section

20 of that?  Exhibit 9 but what section?

21             MR. FALLON:  Exhibit 9, Section 1105 at page 9-6.

22             THE COURT:  Okay.

23 Q.   Do you see that section?

24 A.   I do.

25 Q.   Okay.  And this section talks about the withdrawals that a

1    servicer may make from time to time from the custodial account?

2    A.    Yes, and that's the title of the section.

3    Q.    Okay.  And is that custodial account that they're

4    referring to there?  Is that the account where the PNI is held

5    for the benefit of the investor in this case?

6    A.    In this agreement it appears that that would relate to the

7    PNI account.

8    Q.    Okay.  Now, generally speaking -- or we could use it in

9    this case -- do you know if the servicer's rights to be paid

10   amounts out of these custodial accounts are ever subject to the

11   obligation to repurchase a mortgage loan?

12   A.    I don't know if that's a fact or not.

13   Q.    Okay.  You haven't run into that in the course of your

14   experience?

15   A.    It has not ever come up in the normal course of business.

16   Q.    Okay.  And do you know if that's a fact in this particular

17   case?

18   A.    I don't know if that's a fact or not.

19   Q.    Do you have the APA in front of you?  Asset Purchase

20   Agreement.

21   A.    I think I have it next to me.

22   Q.    Okay.

23   A.    Can I put any of these other ones away?

24   Q.    Yes.  I'm sorry.

25   A.    Okay.  And was there a particular section?

1  Q.   Yeah.   Turn to Schedule 2.1-B, two little i's.

2  A.   Okay.   I've got that schedule.

3  Q.   Okay.   Fifth line down or fifth entry down is a reference

4  to a City Mortgage servicing agreement --

5  A.   Okay.

6  Q.   -- called "Loan Sale and Servicing Agreement with City

7  Mortgage, Inc."  Have you seen a copy of that contract?

8  A.   I don't believe that I have.  I believe that this contract

9  relates to a handful, and I think I mean literally a handful of

10  loans, less than five, that AHM Servicing is servicing that --

11  I believe, for City Mortgage.  They're very old loans to the

12  best of my recollection.

13  Q.   Do you know who the parties to that contract are?

14  A.   I don't know off the top of my head.  It could have

15  been -- it may have been Columbia National, Inc. or a

16  predecessor company of that.  It may have been one of the

17  original parties; I don't know for a fact what they would be,

18  though.

19  Q.   Among those buckets or categories that you spoke about, do

20  you know what category this would be in?

21  A.   I believe that that would fall under the private investor

22  category but, again, I'm not a hundred percent certain sitting

23  here today exactly what that --

24  Q.   Okay.  So, without having a copy of it, you're not

25  prepared to testify to what the terms of that contract are?

255

1    A.    I believe that that would be accurate.

2    Q.    Okay.  You can put that away.  I just had just a few more

3    questions.  You testified on direct that the debtors have an

4    errors and omissions insurance policy?

5    A.    That's correct.

6    Q.    Okay.  And what's your understanding of what that

7    insurance policy covers in general terms?

8    A.    In general terms, errors and omissions policies cover --

9    it's an insurance policy that's taken out that would come into

10   effect if there were, I guess, material breaches on the part of

11   the company in performance of its, I believe, in a regular

12   course, obligations that would fall under the insurance policy.

13   Q.    Okay.  And have you seen a copy of that policy?  Are you

14   involved in obtaining that policy?

15   A.    I was not involved with directly obtaining that policy,

16   no.

17   Q.    Okay.  All right.  Do you know if parties such as my

18   clients, City Mortgage, would be able to make a claim directly

19   against that policy or if that is only to protect your client,

20   your employer?

21   A.    I don't know exactly how the mechanism for those types of

22   policies work.

23        MR. CHIPMAN:  Okay.  I have no further questions,

24   Your Honor.

25        THE COURT:  All right.  Okay.  Mr. Crowley, we're

1    going to take a brief recess before we turn to you.  I believe

2    you're the last party with any cross-examination but if that's

3    not true --

4              MR. SPEAKER:  Looks like it's true.

5              THE COURT:  Mr. Dehny, you have --

6              MR. DEHNY:  Actually, Your Honor --

7              MR. CARUSO:  Your Honor, this is Paul Caruso at

8    Sidley Austin in Chicago.  My co-counsel, Karen Bifurado (ph.)

9    had to leave the hearing early.  I was wondering if you'd allow

10   me to ask Mr. Love a couple of questions although I'm not

11   present in the courtroom.

12             THE COURT:  I'll think about it --

13             MR. CARUSO:  Okay.  Thank you.

14             THE COURT:  -- during the recess.

15             MR. DEHNY:  And Your Honor, it is a somewhat similar

16   reason that I rise.  We're also co-counsel for Merrill Lynch

17   with Loeb & Loeb and they are on the phone, and up until the

18   debtors ended their direct and identified the missing Merrill

19   Lynch documents, we were not aware what it is they were

20   proposing to transfer.  The debtors are making copies of the

21   agreement they intend to list on the schedule and we have one

22   or two questions about that for this witness.  So, either Mr.

23   Rubinstein can ask questions over the phone -- he has a

24   couple -- or I would.  But it's only, I think, two or three

25   questions.

1        THE COURT:  All right.  Okay.  All right.  So that's

2   the universe?  All right, we'll take a very brief recess and

3   reconvene and I'll let you know, sir -- well, we'll talk about

4   the phone issue when I would get back.

5        (Recess from 5:46 p.m. until 5:51 p.m.)

6        THE CLERK:  All rise.

7        THE COURT:  Please be seated.  Please be seated.

8   Just a public announcement.  We're going to finish with this

9   witness and that will be it for the day.  So we will finish

10  with cross-examination of -- oh, my goodness --

11        MR. SPEAKER:  Mr. Love.

12        THE COURT:  -- Mr. Love.  I'm sorry.  I apologize.

13  I've only heard the name how many times today.  This is why

14  we're not going any later.  We'll finish with cross-examination

15  and any redirect of Mr. Love, and then we'll reconvene tomorrow

16  at 10 AM, after the omnibus hearing.  We'll hear the omnibus

17  hearing matters, and then we'll move on to continuation of the

18  sale here.  Mr. Crowley?

19        MR. CROWLEY:  Okay.  Thank you.

20        THE COURT:  Oh.  And I will allow the people on the

21  phone to ask questions.

22        SPEAKER ON PHONE:  Thank you, Your Honor.

23        THE COURT:  You're welcome.

24  CROSS-EXAMINATION BY

25  MR. CROWLEY:

258

1    Q.    Mr. Love, good afternoon, or perhaps I should say good

2    evening.  My name is Leo Crowley.  I represent the Bank of New

3    York in a couple of different capacities in this case, as

4    indenture trustee and as master servicer.  And just to indicate

5    what those are, could you turn to Exhibit 105, the Asset

6    Purchase Agreement, for a minute?  And if I could ask you to

7    turn to Schedule 1.1(j) which is the list of servicing

8    agreements?  Have you got that?

9    A.    Not quite yet.

10   Q.    Okay.

11   A.    Okay.  I'm at 1.1(j)

12   Q.    Okay.  Thanks.  If you turn to pages 2 and 3 of Schedule

13   1.1(j), and if you look at item I and item M, which are two AAR

14   agreements, and those at the bottom relate to J.P. Morgan Chase

15   Bank as master servicer.  That's now the Bank of New York,

16   correct, a successor?

17   A.    Yes.  I do understand that to be the case.

18   Q.    And that's -- am I correct that those agreements in

19   general are the type of master servicer responsibilities the

20   Bank of New York has that you testified about when Mr. Top

21   asked you about what a master servicer does?

22   A.    Yes, I believe that is correct.

23   Q.    Okay.  And now I want to direct your attention to page 16

24   of the schedule.

25   A.    Okay.

1   Q.   And your attention to item 101 point -- I'm sorry, 1.1

2   (j)(DP), which is a servicing agreement between American Home

3   Mortgage Servicing as RMBS Master Servicer, American Home

4   Mortgage Investment Trust 2004-4 as issuer, and the Bank of New

5   York as indenture trustee.   Now, am I correct, even though that

6   says American Home Mortgage Servicing as RMBS Master Servicer,

7   that in fact, under that document, as a general matter, it has

8   the obligations of a servicer and not the very limited

9   obligations you testified about?

10   A.   As a general matter, yes, that is correct.

11   Q.   Okay.   And then the last question on the schedules is, I'd

12   like to just get, for the Court's benefit, a sense of the

13   volume of mortgages that are in the 2004-4 transaction.   Could

14   you turn to Schedule 5.6, 5.6(a) to be precise.   Okay.   Have

15   you got that handy?

16   A.   Sorry, actually I think I'm on 5.6(d).   Give me one

17   second.

18   Q.   That's all right, 5.6(a).

19   A.   Okay.

20   Q.   And if I look at 5 point -- page 3 of 3, do you see that?

21   A.   Yes.

22   Q.   All right.   And then if I look at the third, fourth and

23   fifth rows in that, do those rows show the number of

24   outstanding loans and the outstanding principal balance on

25   those loans that are in the 2004-4 securitization?

1    A.    In the securitization as a whole, yes.  With respect to

2    the one document that we just referenced, only the first two

3    would comprise that.  There's another document below that that

4    was the HELOC portion.

5    Q.    And the HELOC portion is the third one that's about --

6    shows about 49 million dollars -- 49 million in unpaid --

7    A.    Yeah.  The investment number 598 is the HELOC portion.

8    Q.    Okay.  So the other two are the non-HELOC that are subject

9    to the Bank of New York servicing agreement, correct?

10   A.    That would be correct.

11   Q.    Okay.  And the total principal balance on those loans as

12   of September 17th was -- it looks to be about a billion three,

13   correct.

14   A.    Roughly, yes.

15   Q.    And it's fair to say, therefore, that there's probably a

16   billion dollars or more of mortgage backed securities

17   outstanding in the marketplace that are looking to these loans

18   for repayment?

19   A.    I would think that that would be accurate.

20   Q.    Okay.  Now, with respect to the transaction involving the

21   purchaser that we're in court on, am I correct that it's your

22   general understanding that the servicing agreements will be, as

23   a general matter, assumed and assigned at or around the time of

24   the final closing?

25            MR. BRADY:  Objection, Your Honor, to the term assume

261

1    and assign.  I think that calls for a legal conclusion.

2            THE COURT:  Sustained.

3    Q.   Well, am I correct that they'll be assumed at or around

4    the time of the final closing?

5            MR. BRADY:  Same objection, Your Honor.  I think --

6            MR. CROWLEY:  Well, Your Honor, the term assumed,

7    that's an interesting point, the term assumed contract appears

8    in the asset purchase agreement.  And I think I'm using it as

9    the term is used in the asset purchase agreement.  Now, it

10   happens that when they drafted it, they chose to use the term

11   to assume contract.  They may or not may not have meant within

12   the meaning of Section 365, but I mean it as it's used in the

13   asset purchase agreement.

14           THE COURT:  You ask this witness?

15           MR. CROWLEY:  Yes, sir.

16           THE COURT:  All right.  Did you understand the

17   question?

18           THE WITNESS:  Could you just restate it for me one

19   more time?

20   BY MR. CROWLEY:

21   Q.   Yeah, let me rephrase it a little bit.  I mean, you

22   understand as a conceptual matter that there is an initial

23   closing and a final closing?

24   A.   That's correct.

25   Q.   And that as a general -- were you in court yesterday, by

262

1    the way?

2    A.   Yes, I was.

3    Q.   Oh, okay.  So, I mean, you heard me ask some questions of

4    Mr. Weil (ph.) about the logistics of the initial closing and

5    the final closing?

6    A.   Yes.  I think I vaguely recall that at this point.

7    Q.   Okay.  And as a general matter, the initial closing, legal

8    rights don't get transferred to the purchaser, do they?

9    A.   As I understand the two-step close, at the initial

10   close -- from the time -- from the initial close to the final

11   close, the company, being the debtors, would continue to

12   operate the business in the normal course for the financial

13   benefit or loss of the purchaser.  But the second close is

14   referred to as the legal close  Exactly, you know, how the

15   mechanics work from a purely legal side, I don't know, but I

16   hope that explains my understanding of it to you.

17   Q.   Without -- without -- I don't want to get into legalisms

18   about assumed contracts versus property under 363 or anything

19   like that, but as a general matter, whatever servicing rights

20   and obligations under the contracts that are going to the

21   purchaser, when do they go to the purchaser?

22   A.   The purchaser would, I guess, fully be taking over after

23   the final close, as I understand it.

24   Q.   Okay.  And that's probably 2008?

25   A.   I don't know.  There were a -- you know, times and months

1   that was mentioned by different witnesses, but I don't have a

2   firm understanding.

3   Q.   Could you look at Debtor's Exhibit 41, please?

4   A.   My 41 is actually empty.

5   Q.   Okay.

6         THE COURT:  The debtor will help him out.  Thank you.

7   A.   Okay.  I've got it up.

8   Q.   Okay.  Could you turn to Section 5.2 which -- I think it's

9   5.02 actually, which in the pagination in the way this one is

10  printed would start on page 30.  It's the top of 30.

11  A.   Okay.  I'm there.

12  Q.   Okay.  The section I'm going to direct your attention to

13  is Section 5.02, that's titled A Merger or Consolidation of or

14  Assumption of the Obligations of the RMBS Master Servicer.

15  A.   Okay.

16  Q.   And I want to direct your attention, actually, to the

17  second paragraph of that section, and in particular I'm going

18  to ask you a couple of questions about the very last part.

19  Could you take a moment and just read that to yourself before I

20  ask you any questions?

21  A.   The whole section, or just the last part?

22  Q.   I think to answer my questions, you'll only need to read

23  at most the second paragraph of the section, but if you'd like

24  read the whole thing, do that.

25  A.   (Reading).  Okay.

Q.   Okay.  I think you testified this morning, if I remember

correctly, more or less that a lot of servicing agreements have

requirements that -- in connection with the transfer of the

servicing rights or the servicing agreement, that somebody had

to get a no downgrade letter from a rating agency?

A.   To the extent that that servicing agreement relates to a

securitization.

Q.   Okay.

A.   That would have been the context that came up under.

Q.   And is this servicing agreement in the context of a

securitization?

A.   Yes, it is.

Q.   And is the clause you just read the type of clause you had

in mind when you gave that testimony?

A.   That would be the type of clause.

Q.   Okay.  In light of that, could you read the proviso into

the record at the beginning of five lines up from the bottom of

the second paragraph, where it begins "Provided further"?

A.   Provided further that each rating agency's rating of the

applicable notes in effect immediately prior to such assignment

and delegation will not be qualified, reduced or withdrawn as a

result of such assignment and delegation, as evidenced by a

letter to such effect from each rating agency or considered to

below investment grade.

Q.   Are the rating agencies -- this is a defined term, the

265

1    rating agencies for this purpose, Moody's and Standard and

2    Poor's?

3    A.    I don't know specifically with this deal of the top of my

4    head which of the three rated the bonds in this deal.

5         MR. CROWLEY:    Your Honor, if I may address the Court,

6    for a moment just to clear this up?  We're going to bring

7    tomorrow with us the indenture that relates to this transaction

8    and offer the definition section in evidence.  And we'll deal

9    with it at that time, but we'll clear that up if we can't do it

10   through the witness.

11        THE COURT:    Okay.

12   Q.    Would you turn to Exhibit 108, please?

13   A.    I have 108.

14   Q.    All right.  And then -

15        MR. BRADY:    Would you give me just one moment to

16   track that one down?  Thank you.  Okay, thanks.

17   Q.    Do you have 108 in front of you?

18   A.    Yes, I do.

19   Q.    All right.  And that's the letter you identified this

20   morning as being from Moody's?

21   A.    That's correct.

22   Q.    Just read that in the record, please?

23   A.    Dear Sir, As of this date, Moody's is not downgrading or

24   withdrawing it's current ratings on all of the Moody's rated

25   certificates that remain outstanding as of the date first

266

1   written above, solely on account of the execution and delivery

2   of the agreement for purchase and sale of servicing dated

3   October 15, 2007.

4   Q.   Okay.  And then this date is obviously a reference to the

5   date of the letter October 15, 2007?

6   A.   I believe that to be the case.

7   Q.   That's fair.  Okay.  And then the final closing again, is

8   going to be when?

9   A.   At the point in time in which the purchaser has fulfilled

10  all of its legal requirements necessary to obtain licensing and

11  whatever other legal requirements are set forth in the APA as

12  the condition of final closing.

13  Q.   Okay.

14          MR. CROWLEY:  No further questions.

15          THE COURT:  Thank you, Mr. Crowley.  All right.

16  Who's on the phone that's co-counsel to Mr. Ferraro?  I

17  apologize.

18          MR. CARUSO:  Your Honor, this is Paul Caruso at

19  Sidley Austin.

20          THE COURT:  All right.  We'll take you first, Mr.

21  Caruso.

22          MR. CARUSO:  Thank you, Your Honor.

23  CROSS-EXAMINATION BY

24  MR. CARUSO:

25  Q.   Mr. Love, I'm sorry, I don't have these debtor's binders

267

1   in front of me, but I'm referring to Schedule 1.1(j) to the

2   asset purchase agreement.

3   A.   Give me just one second and I can locate that.

4   Q.   And it's page 13 of that schedule, item CJ which is the --

5   A.   If you could slow down --

6   Q.   -- agreement from the bottom of that page?

7   A.   -- if you can slow down for just one second, for me.

8   Q.   Sure.

9           THE COURT:   Which item, Mr. Caruso?

10          MR. CARUSO:   Your Honor, it's on Schedule 1.1(j),

11  item CJ, which is on page 13 of that schedule.

12          THE COURT:   B as in boy, J?

13          MR. CARUSO:   Charlie, Juliet.

14          THE COURT:   All right.  Thank you.  It's page 13.

15          THE WITNESS:   Okay.  I have that.

16  Q.   That refers to a master mortgage loan purchase and interim

17  service agreement between American Home and Wells Fargo

18  Funding.  The schedule has it dated as of January 25, 2007, but

19  I believe the correct date is January 25, 2006.  And under that

20  contract, Wells Fargo Funding has agreed to purchase mortgage

21  loans from American Home on a servicing release basis.  My

22  question for you is, to your knowledge in connection with the

23  debtor's contract assumption analysis, was any determination

24  made whether there are any pending servicing transfers under

25  that agreement?

A.   I don't recall having that designation come up during

that -- during that specific exercise.  I can tell you that to

the best of my knowledge today, I do not believe that there

would be any loans that we would be servicing under this

agreement so long as -- so long as it purports to be what it

really is, an interim servicing agreement between AHM and

Wells.  I do have, you know, general knowledge of the pools of

loans which are pending for transfer, and to the best of my

knowledge, there would not be any loans under this agreement

that would be proposed as part of the for sale portfolio that

would tie back to anything on Exhibit 5.6A.

          MR. CARUSO:  Thank you.  That's the only question I

have.

          THE COURT:  Okay.  Thank you.  Mr. Dehny, would you

rather proceed with co-counsel or yourself?  However you wish

to proceed is fine with the Court.

          MR. RUBENSTEIN:  I could proceed, Your Honor.  This

is Vadim Rubenstein of Loeb & Loeb.

          THE COURT:  Is that okay?

          MR. DEHNY:  Vadim, this is Rob Dehny.  That's fine.

We are going to reference the new Exhibit 85 that the debtors

added to the list today, which is the Merrill Lynch agreement.

So I know the witness has the Schedule 1J in front of him, but

for purposes of the couple of questions, I think he's going to

need 85 from the binder.

269

1          MR. RUBENSTEIN:  I believe it's 84.

2          THE COURT:  Eighty-four.  All right.

3          MR. DEHNY:  We actually have a couple of copies, so

4  I'll hand one to the judge and one to the witness.

5          THE COURT:  All right.  Thank you Mr. Dehny.

6          THE COURT:  This is new.  It's not in the notebooks.

7          MR. BRADY:  Just for clarification, Your Honor.  This

8  is Robert Brady.  It was all on 1.1(j).  We just could not

9  locate a copy of it.

10         THE COURT:  Fair enough.  All right.  So you may

11  proceed.  Try to speak up if you would.

12  CROSS-EXAMINATION BY

13  MR. RUBENSTEIN:

14  Q.   Good afternoon, Mr. Love.  This is Vadim Rubenstein of

15  Loeb & Loeb, appearing on behalf of Merrill Lynch Mortgage

16  Lending.  I just have a few questions for you.  If you could

17  look at Exhibit 1J please, and turn to page 23.

18  A.   Give me just one second, please.

19  Q.   Sure.

20  A.   Okay.  You can go ahead.

21  Q.   Okay.  If you look at the entry second from the top.  Do

22  you see that loan sale and servicing agreement with Merrill

23  Lynch?

24  A.   Yes, I do.

25  Q.   Missing contract?  When was the contract that is currently

270

1    before you located?

2    A.    Did you say when was it located?

3    Q.    Yes.

4    A.    I'm not specifically aware of that.

5    Q.    Have you had a chance -- had you ever seen this contract

6    before this -- that's currently in front of you?

7    A.    This one does not ring a bell off the top of my head.

8    Q.    Well, can you identify in what bucket this kind of an

9    agreement -- loans purchased under this agreement would fall?

10   You mentioned four different buckets.

11   A.    This particular one is actually a little bit -- a little

12   bit difficult to identify, just because there's the reference

13   down on the bottom to this nomenclature, MLMCI 2003.  I can't

14   tell from looking at that, off the top of my head, if that is

15   intended to be or if it relates to any type of a securitization

16   shelf or not.  That piece withstanding, it would look to be, on

17   its surface, that if it was not in a securitization, it would

18   look to be a -- what I would have termed as a private investor

19   grouping.

20   Q.    And with a private investor, how would the process work

21   with servicing these loans?

22   A.    I guess -- could you be a little bit more specific about

23   what you're looking for?

24   Q.    Well, these -- when the loans are purchased pursuant to

25   this agreement, at what point would the servicing cease under

271

1   this agreement, and perhaps commence under a pooling and

2   servicing agreement?

3   A.    If the loans were placed into a securitization trust, it

4   would happen simultaneous with the closing of the

5   securitization.

6   Q.    So if the loans that were purchased pursuant to this

7   agreement now reside in a securitization, would those loans be

8   serviced pursuant to this particular agreement?

9   A.    It would depend if at the formation of the securitization,

10  if HM Servicing would have been a party to a separate pooling

11  and servicing agreement for the securitization, or if this

12  document would have possibly been transferred to the trust

13  through a AAR document.

14  Q.    Okay.  I'll ask you to turn to page 35 of the agreement.

15  A.    Okay.

16  Q.    And if you could look at the text appearing after the

17  first two numbered paragraphs.  If you could read that for me?

18  A.    I'm sorry.  Did you say after the first two numbers.

19  Q.    Let me read it.  With respect to --

20        THE COURT:  Why don't you read it, yeah.

21        MR. RUBENSTEIN:    -- full vote transfer or pass

22  through transfer as the case may be, and to (indiscernible) the

23  initial purchasers, the seller agrees.

24  Q.    And then if you look at page -- the next page in paragraph

25  8.  Do you see that text?

272

1    A.    Yes, I do.

2    Q.    Can you just read that first, I would say, first three or

3    four lines?

4    A.    In connection with any securitization of any mortgage

5    loans to execute a pooling and servicing agreement which

6    pooling and servicing agreement may, at the purchaser's

7    discretion, contain contractual provisions including but not

8    limited to, a twenty-four day certificate payment delay.

9    Q.    Thank you.  So based on this provision, you -- would you

10   expect that in the event that these loans aren't a

11   securitization, that they would be serviced pursuant to the

12   pooling and servicing agreement?

13   A.    Not necessarily, just because this language falls into --

14   I can recall seeing very similar language to this in a number

15   of these types of agreements, which, instead of a pooling and

16   servicing agreement, there ends up being an AAR document

17   instead.  So it --

18   Q.    And what is an AAR document?

19   A.    It's an assignment assumption and recognition agreement.

20   Q.    And what is your understanding that that agreement

21   accomplishes?

22   A.    My understanding is that essentially what that agreement

23   accomplishes is to transfer the servicing related provisions of

24   the underlying original whole loan agreement, over to the trust

25   through that document, so that the servicer then begins

1    servicing those loans that are deposited into the

2    securitization on behalf of the trust instead of the initial

3    purchaser.

4    Q.   And do you know whether any of the loans purchased

5    pursuant to this agreement have been transferred into

6    securitization trusts?

7    A.   I don't know for a fact, sitting here today, if that's the

8    case or not.

9    Q.   Well, if they were transferred into securitization trusts,

10   would you know of any particular securitization trust in which

11   these loans would reside?

12   A.   I can't answer off the top of my head, if they were

13   transferred, what it would be into.

14   Q.   Are you aware of any other agreements between the debtors

15   and a Merrill Lynch entity pursuant to which American Home is

16   alleging it has servicing rights?

17   A.   On a servicing retained basis, I am not.

18   Q.   So if I were to tell you that none of the loans purchased

19   pursuant to this agreement are outside of securitization

20   trusts, would there be any reason for you to doubt me?

21   A.   As long as you could help provide us proof of that, I

22   would not have any reason to doubt you.

23   Q.   Well, when you were initially preparing these schedules, I

24   believe it's schedule 5.6(a) that's a purchase agreement.  It

25   identifies on page 2, approximately 17 million worth of Merrill

1  Lynch loans that are being serviced by AHM.  Where did you get

2  those numbers from?

3  A.   Hang on just one second for me.

4  Q.   Sure.

5  A.   Okay.  I've got to the schedule.  I'm sorry, if you could

6  repeat your question for me.

7  Q.   Sure.  The question was, if you look at page 2 of that

8  schedule, investor number 518 -- I'm sorry, 515.

9  A.   Yes.

10 Q.   It lists a forty-one loan count with a 17.758 million UPB?

11 A.   Okay.

12 Q.   And the question is, how did you derive those numbers?

13 A.   The numbers here represent the loans that are in our

14 investor code 515 on the servicing system.  The -- actually,

15 now that -- looking at this -- looking at the schedule now --

16 Q.   Yes.

17 A.   -- I do actually recall on Friday afternoon, Friday some

18 time of last week, that there was some additional research

19 going on with respect to this particular investor code.

20 Q.   Uh-huh.

21 A.   And I believe that we did receive some sort of information

22 from Wells Fargo, who is master servicer, that these loans --

23 that these loans may in fact be in a securitization and not

24 actually directly serviced from Merrill Lynch.  But I would

25 need to confirm that information.

1   Q.   Do you -- you know whether you provided Wells Fargo notice

2   of your intention to transfer these servicing rights, these

3   particular, Merrill Lynch servicing rights that you've

4   designated?

5   A.   I don't know that for a fact.

6          MR. RUBENSTEIN:  Thank you, Your Honor.  I have

7   nothing further.

8          THE COURT:  Thank you.  Any further questions on

9   cross-examination.  All right.  Hearing none, any re-direct?

10  Mr. Brady?

11         MR. BRADY:  Your Honor, I do have some re-direct.  If

12  we could take a -- I realize the hour's late, just a short

13  recess.  I have to check on the status of some of the exhibits

14  we want to admit and just gather some of them --

15         THE COURT:  Okay.

16         MR. BRADY:  -- for --

17         THE COURT:  Ten minutes?

18         MR. BRADY:  Yeah.  That should be --

19         THE COURT:  Ten, fifteen minutes?

20         MR. BRADY:  -- that should be sufficient.

21         THE COURT:  All right.  We'll take a ten or fifteen

22  minute break.

23         MR. DORSAY:  Your Honor?

24         THE COURT:  Yes, Mr. Dorsey?

25         MR. DORSAY:  I'm sorry, Your Honor.  John Dorsey for

1    the debtors.  One housekeeping matter.  It seems tomorrow is

2    going to be fairly short day, if we're starting at 10, and then

3    the Court is not going to reconvene this hearing until after 2.

4    We still have two witnesses left, Mr. Johnson, who will be

5    relatively short on direct examination, but given that Mr. Love

6    has been going for six and a half hours on cross, I doubt we

7    will get through Mr. Johnson.  And then we have our expert

8    witness.  I'd like to be able to allow our expert to go home

9    today and come back on Thursday rather than stay here all day

10   on Wednesday.

11             THE COURT:  That's fine.

12             MR. DORSAY:  Thank you, Your Honor.

13             THE COURT:  That's fine.  We may try to reconvene in

14   the afternoon tomorrow, but I doubt we will, and it's probably

15   better that I tell you one way or the other.  So we won't.  As

16   I'm saying it, I'm realizing that's not helpful to anybody.  So

17   there's -- I doubt very much, given we have an omnibus hearing,

18   that we'll finish more than one witness tomorrow.  So that's

19   fine.  All right.  So we'll take a ten, fifteen minute break.

20   We'll convene no later than a quarter to the hour.

21             (Recess from 6:26 p.m. until 6:42 p.m.)

22             THE COURT:  Please be seated.

23             MR. BRADY:  Thank you, Your Honor.  Robert Brady for

24   the record.  Your Honor, with respect to the documents I sought

25   to move into evidence, I think we've made a lot of progress.

1   What I would like to do -- we're working back at the office now

2   to come up with an exact list of the documents that would go

3   in, counting those that we've taken off the list.  But I would

4   ask if there's anyone in the courtroom or on the phone that has

5   an issue with any of the documents that we would seek to admit.

6   If they do, we would work with them tonight or tomorrow morning

7   and then be able to actually formally move the admission

8   tomorrow morning, Your Honor, when we get started.

9              THE COURT:  All right.  I think that makes a lot of

10  sense.  Mr. Chipman, do you have some comment?  Mr. Schnabel?

11             MR. SCHNABEL:  Your Honor, I can fill the void with

12  something very simple.  Eric Lopez Schnabel, on behalf of US

13  Bank in its capacity as a trustee.  Your Honor, we have no

14  issues in the admission of any of these exhibits, which

15  specifically there are a number of them that US Bank is

16  involved with.   The only exception, which there is no

17  objection, then, I believe on their end, is that Exhibit 51 and

18  52, which are HELCO agreements have been removed from -- HELA

19  have been removed from the binder.  In the binder I saw they

20  were removed.  And I assume that the one there didn't admit

21  into evidence they would be removed as well.

22             THE COURT:  Okay.

23             MR. CHIPMAN:  We --

24             THE COURT:  Go ahead, Mr. Chipman.  That's fine.

25  Yes, sir.

278

1          MR. CHIPMAN:  I'm sorry, Your Honor.  For the record

2  William Chipman.  For the record, Countrywide.  I believe there

3  are debtors' exhibits 33 and 37 -- there are confidentiality

4  provisions.  I think it's Section 8.15 in both agreements that

5  preclude the debtor -- they require of the debtor keep the

6  agreements confidential.  We don't have a problem with

7  submitting to the Court having, you know, have Your Honor read

8  the documents, but we do want to keep this confidential.

9          THE COURT:  Well, you are going to need to file a

10  motion.  I mean --

11          MR. CHIPMAN:  Well, in --

12          THE COURT: -- I'm required under 107(b).

13          MR. CHIPMAN: -- 107(b), Your Honor.

14          THE COURT:  I understand, but I need a formal motion.

15          MR. CHIPMAN:  Okay.

16          THE COURT:  Okay.  So --

17          MR. CHIPMAN:  And we can --

18          THE COURT:  I'll hold them in abeyance if this -- I

19  mean there no one's going to see them --

20          MR. CHIPMAN:  Correct.

21          THE COURT: -- until --

22          MR. CHIPMAN:  If we reach an agreement with the

23  debtors to provide them --

24          THE COURT:  On a motion.

25          MR. CHIPMAN:  On a motion.

1          THE COURT:  And an order.  I've gotten in trouble in

2     the past about ceiling documents without a motion and an order.

3     It can be a short motion.  It can be on a short notice.  I want

4     a motion and an order.

5          MR. CHIPMAN:  Your Honor, we'll do that.  Thank you.

6          THE COURT:  Just to preserve the record.

7          MR. KUNEY:  Your Honor, David Kuney.  As long as

8     we're doing exhibits, when Mr. Love was on the stand he was

9     examined about two exhibits I neglected to move in.  With the

10    Court's permission I'd like to move in what was marked as

11    Exhibit 2 and 6.  EMC Exhibit 2 and 6 during his cross-

12    examination.

13         THE COURT:  Any objection?

14         MR. BRADY:  You Honor, I have to remember what they

15    are.

16         MR. SPEAKER:  It was the letters --

17         MR. BRADY:  I'm sorry.  August 14th notice of your

18    pleading.  August 27th --

19         MR. SPEAKER:  No objection to 6, because it's of

20    record.  It's on the docket.

21         MR. SPEAKER:  That was her notice of termination.

22         MR. SPEAKER:  No objection.

23         THE COURT:  All right.  EMC 2 and 6 are admitted

24    without objection.

25    (EMC's Exhibit 2, notice of termination letter, dated

280

1    8/14/2007, was hereby received into evidence, as of this date.)

2    (EMC's Exhibit 6, debtor pleading agreement, dated 8/27/2007,

3    was hereby received into evidence, as of this date.)

4          MR. KUNEY:  Thank you.

5          THE COURT:  With all due respect, we could have this

6    conversation about, sort of, what's going to go in and not go

7    in tomorrow off line.  I think it would be a lot more

8    efficient.  So unless there's something that really requires

9    the Court's time, until you've had an opportunity to work it

10   out with Mr. Brady let's do that.  Otherwise we'll have, you

11   know, sort of a parade of statements on the record.  And it's a

12   little late in the day for that.  I apologize, but --

13         MR. BRADY:  Thank you, Your Honor.  That was hard.

14         THE COURT:  And we have so much energy.

15         MR. BRADY:  That was our intention.  Was to identify

16   who we needed to talk to tonight and tomorrow and move these in

17   tomorrow at the hearing.

18         THE COURT:  All right.

19   REDIRECT EXAMINATION BY

20   MR. BRADY:

21   Q.   Mr. Love, I'm going to refer you to two exhibits -- Debtor

22   27, which is an agreement with HSBC.  It's an agreement Mr.

23   Fallon asked you about.  And also Debtors' 35.  That is a

24   Deutsche Bank agreement Mr. Gallo asked you about what seems

25   like days ago.

1    A.   I've got 27 of them.

2         THE COURT:  It's in the same notebook, actually, so

3    he should have it.

4         MR. BRADY:  It may help if you take them out so you

5    can look at them side by side.  That's you.

6    A.   Okay.

7    Q.   Can you tell me the date of Debtors' 27?

8    A.   The date of the agreement is June 21, 2006.

9    Q.   And the date of Debtors' 35?

10   A.   The date on 35 is -- the contract is dated as of May 1,

11   2006.

12   Q.   Can you look at the footer that appears down in the bottom

13   left hand corner of both agreements?  Do you see any

14   similarities to those two footers?

15   A.   Both of the footers are labeled TPW, which to me would

16   represent Thatcher Proffitt and Wood.

17   Q.   So it looks like these may have come from the same

18   drafter?

19   A.   It looks like that definitely could be the case.

20   Q.   Do you recall when Mr. Gallo walked through some black

21   lined agreements that showed, in his view, the evolution of

22   Section 1301?

23   A.   Yes, I do recall that.

24   Q.   Can you turn to Sections 13.01 for both of these?

25        THE COURT:  Page number?

1    MR. BRADY:  Page 55 on Debtors' 35, the Deutsche

2    Bank.  Page 48 on Debtors' 27.

3    A.   Okay.

4    Q.   Do you see a difference in the title for Section 13

5    between the two documents?

6    A.   I do see a difference.

7    Q.   The addition of the words and the servicer.

8    A.   That's correct.  In Exhibit 27 the title is Additional

9    Indemnification by the Seller and the Servicer.

10   Q.   Okay.  So you actually picked it up in the second place.

11   But there are two places there.  Both Section 13 and Subsection

12   13.01 where the words and the servicer are added.

13   A.   That is correct.

14   Q.   And they're added on the later dated one.  More recent.

15   A.   Yes, it is added on the later dated contract.

16   Q.   And if you look about four lines up from the bottom on

17   both of them, and it talks on how based upon the failure of the

18   seller or the servicer, and then on the -- on Debtors' 27 HSBC

19   the words as applicable is contained in that sentence, and it's

20   not in the Section 13.01 of the Deutsche Bank.

21   A.   Yes, I do see that.

22   Q.   I think your testimony in response to the questions by Mr.

23   Gallo on the Deutsche Bank one was the Section 13.01.  Didn't

24   make a lot of sense to you.  Is that correct?

25   A.   That is correct.

1  Q.   Does Section 13.01 of the HSBC agreement make a lot more

2  sense to you?

3            MR. GALLO:  Objection, Your Honor.

4            THE COURT:  Basis?

5            MR. GALLO:  Calls for a legal conclusion, as David

6  said in the Asian agreement.

7            THE COURT:  Overruled.  Which one are we reading?

8            MR. BRADY:  Your Honor, we're looking at 13.01 in the

9  HSBC agreement, which is Debtors' 27.

10            THE COURT:  Go ahead.

11  A.   I can say that Subsection 13.01 on Exhibit 27 does make a

12  lot more sense conceptually to me.  It seems to flow in a

13  manner that makes logical sense.

14  Q.   Okay.  You can you put those away and we'll look at

15  Debtors' 11.

16  A.   I have 11.

17  Q.   I believe Mr. Fallon asked you about that.  Number 11.  Is

18  that correct?

19  A.   Yes.  I do recall that.

20  Q.   You're familiar with this document?

21  A.   I am generally familiar with this document.

22  Q.   In your earlier testimony today you described what an AAR

23  is.  Is this a fairly typical AAR?

24  A.   To me, yes, this would be a fairly typical AAR that I

25  would be used to seeing.

284

1    Q.   And could you just briefly -- since it's been a while --

2    describe to the Court when an AAR comes into being.

3    A.   From my perspective, an AAR document comes into being when

4    there's a pool of mortgage loans that was purchased where the

5    servicing rights were retained.  And the purchaser of those

6    loans subsequently transfers or sells those loans or moves them

7    into a securitization trust.  And in order to effectuate

8    transferring of the servicing from the servicer perspective to

9    the trusts, so that the servicer now begins to service the

10   mortgage loans for the securitization trust as opposed to the

11   investor, this document is typically, in my experience, used to

12   transfer the servicing provisions of the original underlying

13   agreement to the securitization trust so that as the servicer

14   can then service the loans pursuant to the servicing provisions

15   of the original agreement as they may be amended in this

16   agreement.

17   Q.   And so would you look at Section 1 on the first page?

18   A.   Okay.  I've read the section.

19   Q.   Okay.  The last sentence reads:  The servicer shall

20   service the assigned loans in accordance with the purchase

21   agreement as modified by this AAR agreement.  You could page

22   through this document, but are the servicing terms included in

23   this AAR?

24   A.   All of the servicing terms would not be included in this

25   AAR.

285

1    Q.    They're included in the purchase agreement?

2    A.    They would be included in the original purchase agreement.

3    That is correct.

4    Q.    So the parties can understand from this what the servicing

5    rights are even though they're not set out paragraph by

6    paragraph from the purchase agreement?

7    A.    I believe that from a practical matter that would be

8    correct.

9    Q.    And this is a fairly typical AAR?

10   A.    This would appear to be -- yes, a fairly typical AAR from

11   my experience.

12            MR. BRADY:  I have nothing further, Your Honor.

13            THE COURT:  And you may step down, sir.

14            THE WITNESS:  Thank you.

15            THE COURT:  All right.  We're going to recess until

16   tomorrow at 10.  We'll take the omnibus hearing first.  Then

17   we'll turn back to the sale hearing, and probably after a short

18   recess -- I don't have anything before that, so if you want to

19   leave your documents in the Court that's fine.  Although we'll

20   probably need to clean up a little bit for the 2 o'clock

21   consumer hearing.  All right?  Anything further for today?

22   Nothing?  All right.  Have a pleasant evening.  Hearing is

23   adjourned until tomorrow at 10 am.

24            (Whereupon these proceedings were concluded at 6:57

25   p.m.)

286

**I N D E X**

**T E S T I M O N Y**

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| David Storper | Ms. Morgan | 15 |
| David Storper | Mr. Power | 25 |
| David Storper | Mr. Clements | 28 |
| David Storper | Mr. Gallo | 48 |
| David Storper | Mr. Crowley | 51 |
| David Storper | Mr. Fallon | 62 |
| David Storper | Mr. Dehny | 65 |
| David Storper | Ms. Lawson | 73 |
| Robert Love | Mr. Brady | 76 |
| Robert Love | Mr. Gallo | 119 |
| Robert Love | Mr. Kuney | 167 |
| Robert Love | Ms. Lawson | 205 |
| Robert Love | Ms. Rush | 215 |
| Robert Love | Mr. Top | 227 |
| Robert Love | Mr. Chipman | 236 |
| Robert Love | Mr. Fallon | 247 |
| Robert Love | Mr. Crowley | 257 |
| Robert Love | Mr. Caruso | 266 |
| Robert Love | Mr. Rubenstein | 269 |
| Robert Love | Mr. Brady | 280 |

287

I N D E X, cont'd

E X H I B I T S

| NUMBER | DESCRIPTION | ID. | EVID. |
|--------|-------------|-----|-------|
| EMC-1 | Purchasing Warranties & Service Agreement dated 3/1/06 | 32,6 | 41,2 |
| DEBTOR'S 106 | Fannie Mae letter | | 56,4 |
| DEBTOR'S 107, 108, 109 | Letters from Fitch Ratings, Moodys and S&P | 103,6 | 113,12 |
| DB-6 | 2005 agreement | | 163,6 |
| DB-7 | E-mail (blacklined version) | | 164,20 |
| DB-4 | Notice of payment default letter | | 165,6 |
| EMC-2 | Letter dated 8/14/07 | | 279,25 |
| EMC-6 | Debtor pleading agreement dated 8/27/07 | | 280,2 |

288

1

2                          C E R T I F I C A T I O N

3

4       I, Lisa Bar-Leib, court-approved transcriber, certify that the

5       foregoing is a correct transcript from the official electronic

6       sound recording of the proceedings in the above-entitled

7       matter.

8

9       _____          October 22, 2007

10      Signature of Transcriber                  Date

11

12      Lisa Bar-Leib

13      typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25

**A**

**AAR** 80:22 81:2
  248:17 249:6,8,9
  249:17,22 258:13
  271:13 272:16,18
  283:22,23,24
  284:2,3,21,23,25
  285:9,10
**AARs** 81:16 165:12
  165:14
**abatements** 184:8
**Abbott** 194:23
**abbreviated** 117:5
**abeyance** 112:13
  113:6,10 278:18
**ability** 60:4 71:6
  107:16 156:1,3
  190:22 202:16
  218:18 223:14
  224:4 230:23
  231:1 243:8 245:6
**able** 45:10 70:4
  83:17 88:23,24
  92:14,21,22 93:22
  97:20 99:15 105:2
  106:11 107:17
  112:10 116:10
  118:24 129:3
  148:10 152:9
  156:7,8 162:24,25
  177:10 180:1
  204:7 208:19
  209:19,24 224:2
  246:3 255:18
  276:8 277:7
**ABN** 6:3
**above-entitled**
  288:6
**Absolutely** 23:9
  57:15,18,25 58:17
  60:15,17 70:17
  204:10
**absorb** 204:5
**accept** 91:21 216:2
**accepted** 68:20
  82:4 90:17 212:16

**accomplishes**
  272:21,23
**account** 36:2 89:18
  91:4,6 93:12 94:1
  94:7,8 155:2,6,25
  156:2,4 188:18
  201:22 202:21,25
  224:11,12,12,14
  224:17,17 225:4
  225:11,13,21
  230:21 251:7,22
  252:8,11 253:1,3
  253:4,7 266:1
**accountant** 58:21
**accounted** 38:16
**accounting** 60:1
  106:24,25
**accounts** 84:24
  85:3,4,8,9 86:13
  86:22 92:13
  106:24 155:1,5,10
  155:10,11,14,16
  155:19,20 156:25
  157:1,7,11 188:15
  202:3,5,10,13,15
  231:6 252:2
  253:10
**accrue** 34:12 35:12
**accurate** 33:22
  121:11 129:6
  135:16 170:16
  171:23 210:25
  255:1 260:19
**achieve** 102:10
**achieved** 89:4
**achieving** 89:2
**acquire** 53:11
  83:25
**acquired** 17:6
**acquiring** 70:12
**Acquisition** 10:12
  11:3 18:23 30:19
  31:12,20 38:4
  39:18 45:21,22
  57:6,8,20,23 58:6
  58:7 62:4,11,17
  62:23 63:6,14,21

**accomplishes**
  64:24 98:2
**act** 131:5 241:21
**action** 211:5
**active** 86:22 199:23
  231:6
**activities** 231:9
**actual** 73:13
  142:21 163:19
  170:11 219:24
**AC-1** 111:8,8
**ADAM** 8:8
**add** 20:17 66:12
  72:2,23
**added** 141:7
  268:22 282:12,14
  282:15
**addition** 75:10
  141:23 146:6
  210:20 282:7
**additional** 18:18
  19:12,22 22:19
  46:10 66:13 67:5
  72:2,23,25 116:25
  123:16 137:22
  141:20 144:6
  148:19 196:3
  274:18 282:8
**address** 70:5,7
  135:23 160:9,13
  222:17 265:5
**addressed** 56:19
  159:22 160:16
  202:2 215:19
**addresses** 75:15
  80:3
**adds** 85:14
**adequate** 18:17
  19:18 31:3 39:8
  64:6,11 68:8,9
  69:1 71:4 208:22
  211:3 218:7
**adequately** 228:24
**adjourned** 285:23
**adjustable** 124:22
**administer** 146:15
**administration**
  85:12,13 98:7

**administrative**
  104:25 106:12
  131:11 148:9
  151:15 173:21
  196:11,18,23
  205:7 229:20
  242:20
**administrative**
  231:10
**administrator**
  228:12
**admissibility** 104:3
**admission** 27:25
  109:16 112:12,16
  113:4,7,9 115:7
  163:3,25 164:17
  165:4 194:24
  277:7,14
**admissions** 109:14
**admit** 275:14 277:5
  277:20
**admittance** 164:3
**admitted** 28:1
  40:25 41:10,13
  56:2 112:15,21
  113:1,5 164:7,15
  164:18,19,22
  165:8,15 168:18
  279:23
**advance** 43:3,4,8
  44:6,14,15 92:16
  95:11 151:23
  189:2,6
**Advanced** 43:2
**advances** 28:24
  29:3,13,17,24
  30:8,20 31:7
  36:24 38:4,10
  39:19,25 40:7,8,9
  40:14 42:6,11
  43:21 44:5 45:5
  45:11 66:19 99:2
  99:3 188:2,3,20
  189:15 190:6,22
**advancing** 189:10
**adverse** 69:11
**advice** 74:2
**advise** 183:23

**advised** 112:4
  186:14
**advises** 38:6
**advisors** 39:14
  62:20
**advocacy** 171:13
**affect** 69:11 152:22
  187:16
**afforded** 243:10
**afoul** 153:17
**afternoon** 73:9
  115:13 116:17
  117:25 119:8,9
  167:20,21 168:24
  194:22 205:15
  213:25 215:10,12
  227:19 236:4,6,7
  258:1 269:14
  274:17 276:14
**age** 209:20,20
**agencies** 20:20 21:2
  21:3 25:4,10,12
  26:18 61:14 71:14
  92:12,17,20
  101:17,21,24
  102:3,4,7,10,13
  102:15 104:7
  198:12,23,24
  220:7 264:25
  265:1
**agency** 26:17,22,24
  112:3 264:5,23
**agency's** 79:22
  264:19
**agenda** 117:7,20
**agent** 210:22
  238:21
**aggregate** 228:10
**aggregates** 90:5
**aggregation** 90:2
**ago** 100:3 103:18
  280:25
**agree** 26:1 36:18,18
  63:12 123:1 169:9
  185:13 187:14
  199:9,13 200:19
**agreed** 68:20 108:2

125:9 134:14
154:21 166:18
182:25 198:9
267:20
**agreeing** 132:17
**agreement** 28:9
30:2,20,23 31:17
31:18 32:6,14
33:19 34:25 35:5
35:25 37:12,13
40:22 41:2,5 47:8
47:12 48:9,12,17
48:21,25 49:10
80:10,23 81:2,5,7
81:19,21 82:6,6,8
94:13,25 95:4,11
98:1,3 101:1
106:6 111:4,11,12
112:20 121:1
123:23 124:9,12
124:13,13,16,25
125:15 126:3,6,13
126:14,14,19,23
128:3,10,13,15,17
129:12,12,21
130:5,23 131:1,7
131:8,15,16,17
132:2,3,4,6,14,19
133:2,4,7,12,13
133:14,21 134:5,9
134:10 135:7,8
136:8,13,25
137:13,16,18
138:7,11,22 139:9
139:14 140:13,16
140:16 141:2,14
141:25,25 142:9
142:11 143:19
144:11,11,16,17
144:19,22 145:9
145:11,16,16,24
146:12,14,15,20
147:18,23 148:3
148:15 149:2,8,10
149:12,21,24
150:14,20,21
151:6,12,13,17,23

152:7 153:1,3,15
154:11,12 155:1,9
155:19 156:5,10
156:13,18,19,22
157:14 158:18
159:1,11 160:22
161:10 162:19,22
163:6,10 164:8,8
164:11,12,12
166:22,24 167:25
169:15,17 170:1
170:17,23 172:14
173:4,5 174:4
175:10,20 179:11
181:3 184:2,13,14
184:19,21 185:11
185:12 186:8
188:4,8 191:9,14
192:7,18 193:6
196:8,10 197:10
198:19 199:9,10
200:20,23 201:4
201:10,17,18
204:18 205:1,21
207:1,2,9,11,12
207:15,16,19,19
207:24,24 208:16
208:24 209:3,5
211:21 212:5
229:3,11,13,17
232:24 233:11,13
233:21 234:12
236:11,23 237:6
237:14,20,25
238:5,6,11,19
239:11,14,17
240:4,24,25
241:15 242:17
243:8,16,25 244:3
245:7 246:7,8,24
247:21,25 248:2
248:17,18 249:1,6
249:8,9,11,13,17
249:22,24 250:2,3
250:4 253:6,20
254:4,6 256:21
258:6 259:2 260:9

261:8,9,13 264:4
264:6,10 266:2
267:2,6,17,25
268:5,6,9,22
269:22 270:9,9,25
271:1,2,7,8,11,14
272:5,6,12,16,19
272:20,22,24
273:5,19,24
278:22 280:2,22
280:22,24 281:8
283:1,6,9 284:13
284:15,16,21,21
285:1,2,6 287:7
287:11,15
**agreements** 23:21
23:25 25:9 37:14
38:2 48:10,16,24
49:24 73:14,14,16
75:19 80:2,21,24
81:20,23,25 82:14
92:22 94:18 98:22
101:5,15,20
104:18 105:18
110:23 111:2,21
128:16,19 135:14
136:15 139:20
140:3 166:16,19
166:20 167:1
170:11 179:22
180:5 183:18
200:25 201:16
205:18 207:3,10
215:23 220:5
226:13,16 235:11
236:10 237:11,23
238:7,8,21 239:1
239:3,4,5,10
240:13 241:8
242:25 243:23
248:11 258:8,14
258:18 260:22
264:2 272:15
273:14 277:18
278:4,6 281:13,21
**agrees** 271:23
**AH** 18:23 19:1,15

19:16 45:22 57:6
57:8,20,23 58:6,7
98:1
**ahead** 15:9 33:6
51:5 116:6,19
166:15 237:1
269:20 277:24
283:10
**AHM** 30:18 31:11
31:20 38:4 45:21
62:3,11,17,23
63:5,14,21 64:14
77:7,13,14,14
78:4,12,13,18,24
79:1,3,4,16,18,25
80:1,17 81:10
82:10 83:5,7,25
85:21,23 86:4,9
86:14 87:11,11,16
89:5,9 90:14 91:2
92:15 93:2,4
94:13 96:12,15
100:1,4,6,7,8,9,12
101:11 104:11
106:5 107:11,19
107:22 108:3,5,6
109:1,4,13,15,20
110:6 121:18,19
121:22,24 127:20
128:25 135:5
136:2 169:21
170:20 177:1
189:2,6 203:25
208:18 211:2
213:5 224:3,8
230:8,15 234:4
237:18 238:13,19
239:9 243:4,6
244:22 245:13
246:6 248:11,12
248:20 251:4,11
251:12,18 252:10
254:10 268:6
274:1
**AHMA** 170:21
229:11
**AHMIT** 170:20

**AHM's** 79:5
**aid** 245:13 246:18
**aids** 245:11
**Akwan** 157:6,7
**ALEX** 4:15
**ALFONSO** 3:18
**Allan** 135:1,19,23
136:11,24
**allegations** 235:12
**alleging** 273:16
**allow** 26:4 30:13
33:6 37:25 64:16
88:23 99:13
149:11 152:15
153:8 154:14
200:3 214:19
215:5,25 216:18
218:5,9 219:2
240:1 245:22
256:9 257:20
276:8
**allowed** 115:1
156:6,18 169:7
197:18 210:10
225:10 251:12
**alternative** 69:21
221:10
**ALVES** 9:23
**Amanda** 125:25
132:23
**ambiguous** 138:9
149:3
**AMC** 186:12
**amended** 81:2,16
82:7 172:22
284:15
**Amer** 130:21
**America** 3:12 4:3
**American** 1:8 18:8
42:7 53:12 55:14
60:20 72:14,24
73:1 76:23,24
77:4 111:8,9
119:21 120:4
121:15 122:3,4,5
122:13,21 123:23
124:1,10,11,14

125:4,17 126:8,16
127:2,7 128:4
129:13,18,23
130:6,7,8,11,21
130:24 131:2,4,6
137:3 139:8,9
150:21 152:10,20
155:25 156:21
157:9,14 158:10
158:20,25 159:3
159:22,23 160:10
160:15,21 161:7
161:24 170:15
187:15 206:22
207:12 208:12
211:6 214:13
221:4,10 222:9
226:17 229:3
237:7 244:14
246:8,10,13 251:9
259:2,3,6 267:17
267:21 273:15
**amount** 20:2 24:12
24:17 40:2,14
42:24 43:5,10,15
45:5,10 46:7,8,12
46:20,23 47:6,7
47:23 50:3 53:13
58:8,10 66:15
93:13 105:11,12
105:25 108:24
114:6 121:4 183:2
183:6 184:23
185:1 186:24,25
191:21,22,25
192:8,11,15,16,19
192:19,19 193:11
193:12 194:5,9,9
194:11,15 199:24
211:3 238:2
246:21,22,23
**amounted** 86:13
105:24
**amounts** 43:19
44:16 45:15 47:13
86:21 91:14 93:24
104:23 105:20

106:1,2,3,25
107:21 109:3
176:20,25 177:3
192:2,12 201:13
202:16 244:2,6,9
244:18 245:12,20
246:4,24 252:11
252:15 253:10
**AMRO** 6:3
**ANA** 3:18
**analysis** 177:17
178:2,6 235:10
243:22 244:5,7
267:23
**analyst** 17:15
**analytics** 84:9,12
**analyze** 36:14
**analyzes** 16:10
**ancillary** 97:3,17
**ANDERSON** 4:2
**Andrew** 4:16 12:15
48:4 115:14
**and/or** 130:21
158:11
**Angeles** 6:6
**Angell** 6:19 236:5
**announcement**
257:8
**annual** 242:22
243:3
**answer** 26:14 27:12
30:14 34:14 35:14
58:24 60:7 63:17
64:19 71:17 110:8
117:10 128:1
130:1 139:24
147:11,25 152:15
159:14 169:4,7,10
180:14 197:20,24
197:25 198:2
216:23 218:2
226:24 263:22
273:12
**answered** 128:22
221:2,8
**answering** 216:5
**answers** 52:13 53:6

**anticipate** 62:17
70:23 72:5
**anticipated** 57:11
**anybody** 65:1
115:1 169:1
175:21 178:6
184:2,25 186:24
276:16
**anybody's** 60:1
190:21 191:3
**anyone's** 191:6
**APA** 18:9 28:8,22
28:25 39:12 40:16
41:13 44:23 45:18
46:10 47:19,25
58:6 61:1 64:3
71:9 75:15 99:7
104:10,12,13,19
109:19 191:8
193:5,7 242:10
253:19 266:11
**apart** 41:21 158:17
**API** 98:12
**apologies** 146:1
**apologize** 41:24,25
56:8 65:7 143:18
149:19 165:18
182:18 257:12
266:17 280:12
**apparent** 133:18
**appear** 111:3 112:6
124:16 132:11
285:10
**appearance** 27:24
**appearing** 14:19
269:15 271:16
**appears** 134:19,23
135:1,22 138:5,8
141:16 143:6
176:6 182:2
191:20 192:9
200:9 246:8 253:6
261:7 281:12
**applicable** 94:8
176:25 200:25
264:20 282:19
**application** 84:22

89:17 93:19 94:16
109:8
**applications**
187:22
**applied** 16:17
93:21 224:19
225:23
**applies** 207:12
**apply** 89:14,24
151:14 197:12
219:4 225:13
**applying** 74:8
**appoint** 233:17
**appreciate** 66:16
115:25 128:1
163:2
**approach** 31:24
32:2 40:17 52:4
103:14 111:25
124:3 132:23
159:16 168:8
188:7 195:2
206:15,16 211:14
236:16
**approached** 201:14
**appropriate** 89:18
221:9 232:23
**appropriately**
228:14
**approval** 20:5,11
20:18 22:19 23:2
23:4 46:8,12,17
49:14,14,17,20
51:18 53:22 55:17
56:17 67:2,15
68:3,6 71:13
73:19 161:5,12,14
162:7,15 217:4
219:19 220:5
223:6
**approvals** 21:11
**approve** 217:5
**approved** 45:24
46:2 62:12 100:17
100:19 161:7,16
161:25 162:3
**approving** 61:5

**approximate** 53:23
**approximately**
49:6,10 53:25
59:19 86:7,11,18
86:20 88:1 90:25
105:23,25 186:16
231:3,5 273:25
**April** 16:6 133:20
**area** 17:16 84:7,16
84:23 93:9,16
238:7
**areas** 77:5 149:16
**argue** 33:20 190:13
**argument** 155:13
190:14,16
**ARLENE** 9:23
**arm** 85:16 89:22
**Aronoff's** 165:13
**arose** 156:17
**arrangement** 29:13
199:21 238:25
**arrangements**
29:15 30:18
115:19 123:20
239:2
**arrearages** 104:17
**Arsht** 5:10 65:17
**article** 196:18
205:1 229:13,16
229:18,22 241:1,4
241:5
**articulate** 66:8
**articulated** 242:4
**Asian** 283:6
**aside** 45:15 146:1
**asked** 21:13,14,20
36:13 65:8 66:4
69:5 74:5,6 98:6
104:22 116:24
128:20,25 130:2
139:19 149:4
173:9 177:3 180:1
180:14 181:4
183:16,22 184:24
185:2,23 187:12
200:24 201:20,21
222:8 224:5

243:23 244:7
258:21 280:23,24
283:17
**asking** 25:16,22
33:25 34:2 36:15
36:16,18 44:2
71:4,16 130:13
139:16 141:22
144:15 145:1
148:21 149:20
150:24 157:20,23
158:1,1 173:11,11
175:3 176:10
185:18 191:2
204:7 215:21
226:22
**aspect** 62:8,19
**asserted** 232:18
**asset** 30:22 31:17
37:13 41:5 48:21
63:23 98:1,3
111:7,8 179:11
191:8,13 209:9,24
234:12 250:13
253:19 258:5
261:8,9,13 267:2
**assets** 24:5 26:15
29:22 51:11 59:6
229:4
**assign** 64:25
248:17 261:1
**assigned** 55:18
81:14 185:12
241:22 260:23
284:20
**assignment** 80:22
111:4 181:25
218:7 264:20,22
272:19
**assignor** 250:5
**assist** 20:21 22:15
179:24
**assistance** 193:21
**assisted** 89:1 98:8
176:15,18,24
177:7 178:23
179:25 180:5

**associated** 74:11
97:20 101:14
105:8 160:6
**associates** 153:22
**Association** 74:10
111:6
**assume** 28:9,12,21
48:11 53:11 63:2
63:6,19,22 64:12
64:14 75:4 118:8
176:5,6,10 204:19
233:16 260:25
261:11 277:20
**assumed** 34:2
63:20 64:11 176:1
177:6 185:12
227:3 241:21
242:11,11 260:23
261:3,6,7 262:18
**assumes** 33:22
190:25
**assuming** 63:9
75:12 103:4
135:19 173:14
185:22
**assumption** 80:22
111:4 181:25
263:14 267:23
272:19
**assurance** 18:17
31:3 39:9 64:7,11
68:8 69:1 71:4
218:7
**assurances** 68:10
**Assured** 5:11 21:13
65:17 194:23,24
196:13
**ATA** 25:9
**ATT** 10:12 11:3
**attach** 249:10
**attached** 136:25
249:10,17,19,21
**attachment** 133:4
134:22 137:5
**attempt** 107:19
110:20
**attempted** 240:8

**attempting** 25:21
49:20 103:25
109:2 240:25
**attention** 52:8
116:10 158:19
159:22,24 167:23
173:25 174:11
175:21 187:6
190:21 191:3,6
239:16 258:23
259:1 263:12,16
**attest** 31:3
**attorney** 214:17
**attorneys** 2:4,17
3:3,12 4:3,11,20
5:3,11,20 6:3,13
6:20 7:3,11,18 8:3
8:11,20 9:3,11,19
10:3,12 11:3,12
11:20 12:3,11,18
13:3,10,18 14:3
63:11 143:21
218:1
**attributed** 207:21
**audio** 123:2
**audit** 85:18 243:9
**audited** 58:7,20
60:5
**August** 91:9 178:10
178:18,25 181:24
279:17,18
**Austin** 4:10,19
27:23 256:8
266:19
**authentication**
104:2
**authenticity** 164:2
164:13
**authorities** 91:11
91:17 92:2
**authorization** 57:7
**automatic** 175:22
176:2 230:18
**automatically**
180:21
**automotive** 17:9
**available** 19:5,10

19:15,16 20:2
24:5 30:4,7 31:7
46:5,10 50:14
66:3,5,13,24
91:14 106:10
217:3 219:6
**Avenue** 2:18 3:13
4:12 5:21 6:14
7:12 10:14 12:4
12:19 13:4,11
14:4
**avenues** 217:2
221:15
**average** 220:9,11
**avoid** 83:17 168:6
232:6
**AVP** 88:6
**aware** 32:19 33:8
33:12,14,15 34:11
34:19,24 35:10,15
46:25 49:9 75:15
94:11 100:20
101:4,13 102:12
106:3 158:9
161:22 172:15,22
175:10 186:2,6,11
186:13 187:5
188:1 193:25
194:3 205:17
212:17,19 232:12
232:16,20 239:13
239:15 240:8,10
243:22,24 244:1,2
256:19 270:4
273:14
**awareness** 205:17
**a.m** 76:9,9

**———B———**
**B** 1:22 5:8 69:21
267:12 287:4
**Bachelor** 16:15
**back** 17:22 18:8
22:24 24:13 45:18
56:11 68:5,11
78:6,8,10 82:3
89:11 91:12,22

98:9,23 101:8
102:8 105:1 108:4
118:12 122:2,4
128:17 137:9,12
150:12,12 158:17
166:14 167:22
176:14 179:7
180:2,5 182:11,12
186:1,6,22 188:21
190:5,22 192:10
192:22 193:9
202:13 216:14
218:25 219:4
220:3 221:11
226:20 240:6
246:3,6 257:4
268:11 276:9
277:1 285:17
**backed** 26:19 111:7
111:8 260:16
**background** 16:14
**backup** 207:23,25
208:11,17
**bag** 181:1
**balance** 42:22,24
46:15 54:23,23
58:7,8,11,20 60:5
86:9,19 98:25
194:12 259:24
260:11
**ball** 40:3 46:18
**ballpark** 231:6
**bank** 3:12 4:3 7:3
7:11,18 9:11
12:11,18 13:3
16:21 33:20 55:7
74:19 75:11 84:16
84:23,24 85:3,4
92:13 111:5
112:19 121:20,22
122:1 123:25
127:1,8,19 128:4
129:21 130:25
131:3 156:6 159:1
159:3 160:24
165:6 169:15
210:22,24 211:4

218:3 227:5,5,23
237:7 251:7 258:2
258:15,15,20
259:4 260:9
277:13,15 280:24
282:2,20,23
**banking** 16:22 74:9
91:6 94:3,5
230:13
**bankruptcy** 1:2,14
1:24 18:2,21
77:20 83:5,7 84:4
86:5,6 88:5,10
89:7,7 90:21,22
100:3,21,23 149:6
158:19 159:10
171:5 172:1,17,23
174:5,14,21
175:11,22 176:11
180:19 181:17
221:20 226:3
232:5 233:18
**banks** 75:1 217:25
222:2 226:19
227:1
**Bank's** 163:6
164:20
**banner** 176:22
**Bar-Leib** 288:4,12
**base** 39:3 244:25
**based** 78:7 100:18
110:12 120:16
121:12 127:4
142:13 149:4
164:9 244:24
272:9 282:17
**basic** 96:10,15
**basically** 70:6
93:20 116:7 118:1
154:3
**basis** 23:8 28:13
34:15 87:8 89:6,8
89:16 92:19 96:2
96:17 100:17,18
100:23 120:3
123:1 124:24
125:5 126:9

139:21 152:10
201:18 205:3
208:4 222:7
267:21 273:17
283:4
**Battery** 9:20
**Bear** 4:11,20 5:3
47:4 111:7
**began** 171:5
**beginning** 52:15,25
54:1 81:9 264:17
**begins** 36:3 188:10
217:7 264:18
272:25 284:9
**behalf** 15:7 21:12
65:17 73:10 76:13
83:25 85:8 91:3
92:17 112:18
115:24 131:6
135:14 166:10
167:8 194:22
196:24 205:15
214:1 227:23
236:6 237:21
269:15 273:2
277:12
**belief** 204:1
**believe** 26:9 27:24
39:5 50:1 54:4
55:20 62:6 63:9
74:5 75:24 85:11
88:18 100:14
104:12 107:3
117:22 119:17
122:12,23 123:13
125:2 129:10,20
131:1,13 133:2
134:25 135:16
136:21,23 142:8
146:25 151:15
155:4,22,23
158:14 160:17
161:2,9 162:12,13
163:25 164:13
165:14 167:25
168:20 172:14
173:18 176:21

179:1 180:16
182:7,20 183:10
186:5,9 201:9
202:23 203:18
204:5 205:25
206:9 207:25
208:20 210:6,6,9
211:6,8,19,23
213:5,8 219:15
227:8 229:6,14
230:11 234:3,8,11
234:15,16 235:14
236:9 237:5 239:9
240:12,20 241:1,2
244:23 246:16
247:20 249:12
250:8 254:8,8,11
254:21 255:1,11
256:1 258:22
266:6 267:19
268:3 269:1
273:24 274:21
277:17 278:2
283:17 285:7
**believed** 73:18
**bell** 270:7
**belong** 90:6
**bench** 32:2 40:17
103:14
**benefit** 252:2 253:5
259:12 262:13
**best** 104:23 130:1
152:25 202:15
239:12 254:12
268:3,8
**Bethlehem** 18:2
**better** 112:8 193:18
276:15
**beyond** 29:6,10
32:21,22 44:24
64:2 148:15
199:24
**bid** 54:13,13 78:6
78:10 82:17,18,22
82:22 127:3,4,9,9
**bids** 78:6,8 82:3
**Bifurado** 256:8

**big** 88:22
**biggest** 90:4 197:14
197:15
**bill** 230:14,15,16
230:17,20
**billing** 89:22 123:5
123:7,11
**billion** 19:11,13
37:2 42:25 45:17
46:19,20,23 47:1
49:6 50:13 51:24
53:13,18,25 54:22
59:15,20 86:12,21
87:6 194:5,9,10
194:10,11,14,15
204:6 260:12,16
**binder** 22:21,23
41:16 112:25
124:3 125:24
133:3,5 134:17
137:7,15 140:20
142:18 144:14
153:2 159:18
166:24 167:1
168:13 174:9
178:9 206:13
211:17 212:20
268:25 277:19,19
**binders** 112:1,6
165:13 195:9
206:12 236:10,14
266:25
**binding** 31:11,15
**Bingham** 12:10,17
48:4 115:14
**bit** 15:24 22:12
70:21,25 84:8
116:17 119:10
128:1,2 138:9
146:17,19 171:14
174:16 216:8
225:7 240:23
250:19 251:7
261:21 270:11,12
270:22 285:20
**black** 132:22 133:2
133:4,5,14,19,20

133:23 134:1,5,9
134:13,15,22
136:25 137:6
140:17,25 141:3
142:1,20 143:2,3
143:5,11,19,22
144:2 145:15,23
145:25 146:1,2
163:9,10,19 164:4
164:6,20 281:20
**blacklined** 287:12
**BLAKE** 2:14
**BLANK** 3:2
**BLOCK** 8:10
**blue** 26:3,4 112:7
**board** 69:20
**boarding** 85:18,19
**Boggs** 14:12
**bond** 57:21 101:13
**bondholders**
228:15
**bonds** 101:17,25
251:2,3 265:4
**BONNIE** 3:9
**book** 41:21
**books** 108:9
**bordering** 87:13
**borrow** 74:22
**borrower** 74:15,17
75:7 189:8 215:18
216:11,19 217:7,9
218:13,17 219:22
222:8,13 224:5,10
224:15,18,18,21
224:22 225:2,24
**borrowers** 210:4,4
210:7 214:1,15
216:24 217:22
221:9,23 223:24
230:3,7 232:17
**borrowing** 43:12
43:17 44:2
**boss** 160:3 172:6
**Boston** 12:13
118:12,17
**Boston's** 16:25
**bottle** 247:9

**bottom** 52:16,23
134:23 191:19
201:17 206:21
258:14 264:17
267:6 270:13
281:12 282:16
**bought** 96:4 105:16
127:2 227:3 251:2
**bounced** 91:20
**BOVE** 9:2
**box** 93:10,16
**boy** 267:12
**Brady** 2:11 76:12
76:12,19 102:16
102:19 103:10,14
103:22 109:25
110:14,22 111:2
111:17,19,20,24
112:2 113:15,19
114:13,14 115:9
115:11 128:8
129:16 130:10
131:19 139:10,15
143:13 144:13
146:22 147:9,15
147:20,22 149:13
150:3,9,10 151:25
152:13 154:16,21
157:17 162:21
163:4,13,18
164:16,23,24
165:1,5,14 166:9
166:9,15,16
167:12 169:6
173:7 175:1,13
176:4,9 178:12,15
180:23 185:15
187:18 190:8,25
199:6 214:4,5,8
217:11 226:21
234:13,17 241:23
248:24 260:25
261:5 265:15
269:7,8 275:10,11
275:16,18,20
276:23,23 279:14
279:17 280:10,13

280:15,20 281:4
282:1 283:8
285:12 286:14,25
**Branch** 5:20
**Brandywine** 2:5
**BRANZBURG**
13:17
**breaches** 235:11
255:10
**break** 79:2 89:10
115:2,17 165:22
166:1 177:15
275:22 276:19
**breaking** 89:12
**breakup** 94:8
**Brett** 12:8 62:2
247:17
**brief** 256:1 257:2
**briefly** 16:7,13
154:25 161:21
231:23 250:17
284:1
**bring** 24:4 42:13
117:2 175:21
190:21 204:7
265:6
**bringing** 115:25
**broad** 85:12 141:21
151:1 209:10
**Broadly** 150:18
**broken** 94:3 184:16
227:12
**broker** 16:24
**brought** 18:1 35:17
191:3,5
**bucket** 237:13
247:25 250:9
270:8
**buckets** 247:24
252:5 254:19
270:10
**building** 2:5 9:4
11:4 14:12 75:9
**buildings** 160:13
**built** 101:11
**bullet** 57:14,19
58:3 60:18,25

**BUSENKELL** 5:24
**business** 15:21
16:17 23:7,8,13
23:16,23 30:8,21
30:25 31:9 33:21
47:20 53:12 54:2
54:5,6,11,19 55:1
55:5 57:7 62:5,14
65:24 70:12 72:9
73:1 77:12,19,21
81:10 87:9 88:2
88:23 94:11 97:5
97:13 98:15 99:13
99:18,21 105:1
107:10 108:1
109:8 110:13
129:2 138:13
139:13,17,21
141:17 142:5
145:7 147:1,3,11
147:17 148:5
149:6,8,22 151:1
152:8,17 154:5,11
156:23 157:12,23
160:11,12 169:19
169:20,22 173:20
181:6,18 187:21
189:13 190:3
199:15 203:17
204:5 221:11
235:19 239:21,25
242:2,3,5,16
243:6 250:24
253:15 262:12
**businesses** 17:6
**button** 236:24
**buy** 123:25 127:19
128:6 168:4
248:11
**buyable** 54:3
**buyer** 104:19
110:20 125:5
189:1,4,4
**buying** 75:13 227:4

––––––––––
**C**
––––––––––
**C** 2:2 8:17 15:1

182:4 192:2 288:2
288:2
**CA** 6:6
**calculate** 107:20
109:2 186:22
244:9,24 245:19
245:20,23
**calculated** 59:17
97:15 184:24
185:21 186:15
**calculation** 105:12
184:25 187:2
**calculator** 59:21
**Caleb** 14:12
**calendar** 214:9
**call** 15:10 76:2,7,13
97:19 98:20 119:2
123:16 162:23,25
188:1 193:18
218:20 224:6
238:16
**called** 47:17 155:10
155:11 161:22
172:16,24 173:19
176:19 177:6
184:8 191:8,22
222:2 238:18
254:6
**calling** 184:20
**calls** 139:10 149:13
152:14 157:17
173:7 175:1,13
185:16 187:18
190:8 215:18
216:12,19 218:13
218:17 219:23
241:24 261:1
283:5
**Calyon** 5:20
**cap** 200:8
**capabilities** 19:8
203:20 204:2,5
**capable** 203:20
**capacities** 258:3
**capacity** 15:5 72:25
277:13
**capital** 18:19 19:4

19:8,22 20:4 24:4
24:6 30:12 31:6,8
38:17 39:1,25
45:24 46:10 50:16
65:24 66:23,24
67:5
**capitalized** 19:3
31:22 45:22,23
**Capital/Duke** 6:13
**caps** 191:22
**card** 116:17
**cards** 210:23
**care** 17:25 25:18
**carefully** 186:6
**CARLYLE** 6:12
**carried** 212:14
**carrier** 223:7,10
**carriers** 223:1,19
**carries** 188:11
**carry** 223:7
**CARSON** 4:2
**Caruso** 256:7,7,13
266:18,18,21,22
266:24 267:9,10
267:13 268:12
286:23
**case** 1:4 18:8 20:12
55:17 102:5
109:11 115:2
118:2 121:18,21
122:3 125:6
134:12 153:11
154:22 167:24
171:13,22 176:1,8
194:18 195:18
200:18 205:4
218:23 220:2,2
221:6,19 224:21
250:8 253:5,9,17
258:3,17 266:6
271:22 273:8
281:19
**cases** 39:21,21
91:19 217:3
226:15
**cash** 19:5,6,10,13
19:14,14,16,19

24:5 66:16,18
84:15,20 88:16
93:9,13,15,25
176:23 210:2,21
230:22
catch 225:17
categories 89:10
254:19
categorize 238:22
categorized 248:8
250:14
category 254:20,22
cause 208:9 239:23
240:2
cc'd 135:2
CD 111:16
cease 270:25
ceiling 279:2
Center 8:12
centered 92:9
Centre 3:4 5:12
10:5
certain 17:14 29:22
45:15 46:8 95:20
98:6 124:21
139:19 150:16
151:18 188:3
197:3 215:17
221:13 223:21
254:22
certainly 24:4 31:3
55:2 70:2 116:12
118:23 181:18
certificate 272:8
certificates 111:8
265:25
certified 91:25,25
certify 288:4
cetera 40:13
chairman 20:6
chance 179:14
182:17,22 239:20
270:5
change 38:5 39:5
69:24 71:6 83:4
89:22 108:9
127:11 131:16

134:5 143:7,16
190:4 204:23
changed 83:4 90:18
90:19 134:7 137:1
141:3 142:23
143:22 200:3
changes 85:16,16
132:15 134:2,8
140:8,9 141:12
142:3 143:10
213:8
channel 123:18
Chapman 8:19
227:22
Chapter 116:16
117:13,18
characterization
226:22
characterize 233:3
characterized 22:2
56:17
charge 87:20 97:14
97:20 128:18
160:1 176:25
233:5
Charlie 267:13
chart 183:1,9
185:14
Chase 3:4 5:12 8:3
10:5 166:20 167:3
258:14
Chase's 166:17
check 67:10 68:10
73:24 74:24 75:5
75:8,9,10,12
91:20,20,22,23,25
93:8,8,15,16
100:24 186:22
202:13 210:16,18
210:19,19,20,21
210:21 211:4
214:5 230:9,9,16
230:18 275:13
checkbook 230:10
checks 91:1,3,7,8
91:10,15 230:21
CHERIN 5:19

Chicago 8:22 256:8
Chipman 6:25
235:23 236:1,3,4
236:5,8,15,19,22
241:25 242:1,8,14
247:1,4,11 255:23
277:10,23,24
278:1,2,11,13,15
278:17,20,22,25
279:5 286:20
choice 132:10
choose 17:11
chose 261:10
chosen 126:10
CHRISTINA 9:8
CHRISTOPHER
1:23 9:16 13:23
circumstance
59:25
circumstances
197:3
Citi 111:11
Citibank 9:19 10:3
CitiMortgage 12:3
62:3
City 247:17 254:4,6
254:11 255:18
CJ 267:4,11
claim 119:14,15,15
119:23 120:3,11
121:13,15,17
122:15,19 181:7
183:24,24 223:15
227:6,6 255:18
claims 84:4,5 104:5
106:6,13 107:20
107:23 109:2
110:4,7 119:10,11
121:21 146:9
152:11,11,12,21
154:8,13 158:9,20
159:6,7,9,12,13
187:10 227:1,2
232:18 246:19
clarification 145:5
169:12 269:7
clarify 29:19

205:16
classes 251:3
CLAUDIA 11:17
clause 36:9 94:15
107:18 108:19
124:19,19 134:4
199:11 202:1
240:18 264:13,13
264:15
clean 145:23,24
168:1 285:20
clear 27:16 54:24
57:9 59:13 61:17
66:10 110:12
140:1 176:11
265:6,9
cleared 92:5 195:7
clearer 29:21 251:7
clearing 91:4 93:11
94:1,7
clearly 22:18 51:21
147:24 164:4
Cleary 2:14 65:10
Clements 4:25
27:22,23 28:7,18
29:9,11,20 30:1
30:11,17 31:24
32:2,4,25 34:9
36:22 37:4,7,9,14
37:17 38:1 40:17
40:20 41:12,15,20
41:24 42:2,4,20
44:1,5,13 45:3
47:4 48:1 286:8
CLERK 15:2,14
76:10 257:6
Cleveland 10:15
118:16
clever 111:1
client 30:18 44:17
48:15,18 55:11
65:15 120:12,15
120:23 121:9,9,12
123:23 124:10,14
125:6 126:7,10,16
127:22 128:6
129:13 130:6,7,8

130:25 136:5
138:3,21 139:7
149:11 150:20
153:8 154:14
155:15,20,23
156:18 157:4,9,13
157:18 158:9,19
159:7 185:24
193:1 255:19
clients 48:8,12,17
48:25 49:10
255:18
client's 55:16
133:14 158:2
160:22
close 18:20,22 20:1
31:5 38:19,19
59:5,10,10 63:10
70:20,24 71:5
82:23 97:13 99:11
99:12,14,14,20,24
114:20 142:15
182:15 243:13
262:9,10,10,11,13
262:14,23
closed 59:4 102:19
127:10 248:10
closely 73:3 75:18
closer 15:24 22:11
closes 125:18 202:3
243:11
closing 19:12,19
20:16 58:5,25
59:5,24 60:25
61:7,9,11,19 63:4
63:7,8 64:23
65:25 66:18 67:6
68:2,4,12,21 70:5
70:14,19,20 71:1
71:22,25 78:22
95:16 99:6,8,25
105:11 108:22
113:24 190:15
202:2 204:11
210:24 243:2
260:24 261:4,23
261:23 262:4,5,7

266:7,12 271:4
coal 17:9
Cobb 8:2 167:8
code 172:17,23
    181:17 184:16,17
    274:14,19
coin 147:14
collateral 85:20
colleagues 67:18
collect 105:18
    148:12 151:22
    155:16 230:2
    251:8
collected 85:7
    105:21 202:16
collecting 83:11
    89:16 90:6 95:7
collection 84:21
    105:5 231:9
collections 83:10
    85:4 96:23,25
    105:15 251:13
    252:7
Columbia 16:16,17
    77:15,17,18 213:5
    254:15
column 42:21 43:2
    43:7,12 183:4,5
    192:1
combination 79:12
come 27:19 51:1
    78:6 81:8 82:3
    83:25 90:4,23
    94:15,17 95:8,20
    95:22 100:24
    104:22 105:2
    107:9 108:1 120:9
    121:23,24 158:19
    166:14 178:21
    180:3 184:25
    188:5 193:22
    195:20 199:21
    200:4 201:12
    202:20 221:11
    222:14 223:3
    226:20 244:24
    245:22 246:20

250:18,20,25
251:21 252:1
253:15 255:9
268:1 276:9 277:2
281:17
comes 78:10 89:12
    93:8,11 96:15
    97:4 138:16
    215:17 219:13,13
    228:7 284:2,3
comfortable 24:3
    113:8
coming 92:15,25
    101:4 112:25
    138:22 166:23,25
commence 271:1
comment 98:6
    128:24 131:11
    137:4 140:3,8
    150:10 173:20
    277:10
commented 143:21
    173:18 175:9
commenting 77:11
comments 128:17
    129:19 169:16,25
    170:2,4 175:10
commitment 29:2
    31:11,16 45:20,21
    66:7 68:6 127:23
commitments
    29:16,17,24
committed 19:14
    31:6 46:21 65:24
    66:5,18 68:4,8,11
committee 2:17 3:3
    16:2 20:6,7,7,9
    24:25 33:20 45:25
    46:13 50:3,6 67:8
    67:13 68:5
committing 24:17
    29:22 30:4,6
common 97:9
    156:14 224:21
    225:7 228:16
    239:4,7 246:17
    248:15 249:12

commonly 228:7
    245:22 248:14
communication
    221:21
companies 17:14
    18:2 215:15,17
    222:24 223:18
company 17:24
    18:5,7,21,24 19:3
    19:21 24:16 31:20
    31:20 32:20 33:10
    34:15 35:21 39:15
    40:5,9 44:19 45:9
    45:21,22 46:2,5
    52:1 55:19 64:8
    70:14 77:3,15
    87:12,22,23,24,25
    88:21 90:11,12
    99:17,25 100:1
    103:24 104:15
    105:22 109:17
    174:15,24 187:15
    189:23 250:6
    254:16 255:11
    262:11
company's 41:5
comparably 70:16
compare 140:24
comparing 98:8
compensated 96:12
compensation
    96:15 97:2
competent 147:25
    151:3
compile 241:7
compiling 84:17
    90:7
complaints 235:12
complete 27:21
    219:20 235:18
completely 133:18
compliance 25:8
    30:22 45:19 47:11
    47:24 48:20 71:9
    73:21 90:15
    146:14 242:22
    243:3

compliances 24:1
compliant 120:23
complicated 58:4
    154:17
complied 63:17
    200:25
comply 33:1 60:10
    63:15,16 64:21
    150:19 233:10,12
complying 23:25
component 125:3,4
    125:15
compound 147:22
comprehend
    148:16
comprise 260:3
comprised 67:13
    87:6 101:18
computers 98:15
Conaway 2:3 15:7
conceive 152:8
concept 78:11
    101:23 108:18
    113:22 123:21
    151:20 152:5,17
    153:19 154:6,25
    156:23 171:8,10
    172:18,25 191:10
    192:22 193:8,10
    193:11 228:1
concepts 162:13
conceptual 261:22
conceptually
    283:12
concern 46:14
    50:14 70:11
concerns 143:9
concluded 285:24
conclusion 36:19
    110:10 139:11,16
    139:17 142:6
    145:6 146:24
    147:12 149:14
    152:14 156:17
    175:2,14 185:17
    185:18 187:19
    190:9 241:24

261:1 283:5
conclusions 144:8
concurrent 232:4
condition 26:23
    57:3,5 100:17
    104:3 266:12
conditional 20:18
    23:2 46:17 49:13
    49:14,17 56:17
    71:13 161:14
conditions 23:4
    56:21 71:3,10
confidence 24:18
confidential 278:6
    278:8
confidentiality
    278:3
confirm 65:13
    68:11,17 109:23
    127:13,25 167:8
    167:11 186:22
    238:14 274:25
confirmation 83:1
confirmed 201:24
    202:6,7
confused 194:8
    216:6 225:2
Congress 172:22
conjunction 230:24
Connecticut
    111:12
connection 18:9
    19:8 22:14 27:4
    53:11 103:1,24
    105:14 107:20
    130:2 183:3
    185:24 218:7
    249:23 264:3
    267:22 272:4
Connections 13:10
CONNIHAN 11:9
CONNOLLY 9:2
consent 198:11,23
    199:19 200:7,9,11
conservative 39:22
consider 18:15
    90:23 148:5

consideration 23:23
**consideration**
    177:25 232:22
**considered** 19:21
    60:1 88:2,3
    153:15 264:23
**consist** 98:14
**consistent** 49:7
    129:8 134:11
    151:12
**consists** 87:17
**Consolidation**
    263:13
**constitute** 233:14
**constituted** 94:23
**consultants** 24:15
**consumer** 118:4,6
    226:15,23 227:10
    285:21
**contact** 122:15
    246:11
**contacts** 107:10
**contain** 80:10
    155:7 207:16
    229:18 272:7
**contained** 35:22
    123:8 141:1
    153:10 157:7
    208:24 229:16
    282:19
**containing** 206:14
**contains** 75:20
    126:7 137:18
    155:6 164:1
    229:22
**contemplate** 82:8
**contemplated**
    59:18 156:13
    200:1
**contended** 165:16
    186:14
**contends** 180:21
**context** 197:1
    246:20 264:9,10
**continual** 100:23
**continuation**
    257:17

**continue** 23:23
    37:25 88:24 92:18
    92:21 94:20,21
    99:17 100:1
    114:21 117:25
    118:2 150:15,15
    204:12 205:2,8
    215:10,13 217:24
    223:7 225:24
    226:2 243:21
    262:11
**continued** 104:13
**continuing** 36:13
    37:20 153:12
    203:7 243:18
**contract** 47:7 63:7
    63:12,20,22,24
    64:8,11,12 82:20
    82:24 111:14
    136:9 137:9 139:3
    147:4,6 167:24
    169:5 170:24
    171:1,1,7,7
    172:16,17,24
    177:18,21,24,25
    178:7 179:3 180:7
    180:11,21 181:19
    181:20 183:22
    185:20 194:2
    211:20 216:16
    238:10 240:14
    241:17 242:19
    245:15 254:7,8,13
    254:25 261:7,11
    267:20,23 269:25
    269:25 270:5
    281:10 282:15
**contractor** 75:8,9
    210:20,21
**contracts** 18:12
    45:15 47:17 53:11
    53:21 55:18 63:20
    82:18,19 98:22
    107:4 109:22
    110:18,19 112:5
    171:2,7 176:1
    177:4,6 178:23

179:6,7,19 180:1
    180:2 183:8,13
    262:18,20
**contractual** 28:21
    28:25 38:13,22
    60:3 272:7
**contractually**
    39:11
**control** 57:4 90:11
    90:12,13 92:12
    156:1
**cont'd** 287:2
**convene** 276:20
**convenience**
    132:11
**conventional**
    124:22
**conversation** 47:2
    172:4 215:14
    217:7 280:6
**conversations**
    68:22
**cooperation** 193:21
**coordinate** 106:23
    200:14
**coordinated** 107:3
    123:17
**coordinative**
    106:17
**copied** 136:11
    208:4
**copies** 21:14 52:7
    73:13 103:23
    256:20 269:3
**copy** 52:17 56:23
    136:25 195:1,9
    206:1,3 211:15
    236:11,19,23
    254:7,24 255:13
    269:9
**core** 99:4 148:11
**corner** 281:13
**corners** 198:16
**Corp** 30:19 31:12
    39:18 60:20 111:9
    122:3,4,5,13
    127:8 130:21,24

131:2 135:15
    139:8 152:21
    157:14 158:10,20
    158:25 159:4,22
    160:15 187:15
    237:7 246:9,11,13
**corporate** 16:22
    92:16
**Corporation** 111:5
    168:13
**correct** 18:25 20:14
    25:4,5 26:20 27:2
    27:6 31:21 36:7
    43:10,13 46:22
    48:12,13,17 49:1
    49:2,8,15,16 50:4
    51:10 57:11,12
    59:1,2,16,17
    60:14 61:20 65:23
    65:25 66:5 67:9
    69:4 71:22 72:11
    73:16,17 74:19
    82:13 106:9
    108:14 113:2
    117:19 120:6,7,14
    120:18,24 121:15
    125:1,7,14,16,21
    126:11,17,18,21
    126:22 129:15
    132:6,20 135:2,3
    138:5,19 139:1
    151:16 154:15
    155:8,18 156:3
    160:17,18 161:8,9
    162:4 165:1
    170:10,24 171:8
    172:6,7,18,21
    173:19 176:20
    178:4 179:1 180:7
    180:16 182:1
    183:3 184:9,10
    185:10,14 186:19
    186:20 187:8
    188:20 192:17
    196:2,4,9,10,25
    197:1,4 199:16,17
    199:19 202:21,23

203:1,2,17 206:24
    207:4 211:1
    213:17 214:14
    216:13,13,25
    222:25 226:20
    227:8 229:8,24
    230:4,5 231:14,20
    233:6,7 234:7,8
    234:18 237:8,9,22
    239:24 240:20
    241:4 248:4
    249:25 252:2,4
    255:5 258:16,18
    258:22 259:5,10
    260:9,10,13,21
    261:3,24 265:21
    267:19 278:20
    282:8,13,24,25
    283:18 285:3,8
    288:5
**correctly** 264:2
**correlation** 189:11
**counsel** 24:25 29:1
    38:6,12 44:12
    62:20 73:20 74:2
    75:22 116:6
    128:17,24 136:3
    140:6,7 169:2,16
    170:23 171:4
    172:1 175:19
    200:13,23
**counsels** 135:18
**count** 60:16 86:15
    274:10
**counterparties**
    66:20 94:17
    107:11
**counterparty** 70:11
    82:15,21 94:12,22
    106:6 169:22
**counting** 277:3
**country** 230:17
    244:23
**Countrywide** 6:20
    236:6 237:7,21
    238:2,7,12 240:1
    240:6,8,11,12

243:8,16 244:12
244:15,21,24
245:5,17 246:14
278:2
**Countrywide's**
236:10
**couple** 18:1 52:7
65:12 66:25 86:24
86:24 116:15
141:18 256:10,24
258:3 263:18
268:24 269:3
**course** 23:24 78:4
81:24 87:1,9
90:24 92:25 95:20
95:23 97:5 105:1
107:9,25 108:8
129:2 136:15,16
184:14 189:10
199:14,22 202:18
224:25 243:7,14
243:20 244:9,13
244:18,23 245:16
247:8 253:13,15
255:12 262:12
**court** 1:2,14 15:3,5
15:9,12 20:22
21:16,18,22,24
22:5,6,9 24:2,21
25:18,19,24 26:2
26:14 27:11,14,16
28:1,5,13,17 29:9
29:18,25 30:5,13
32:1,3,23 33:5,13
33:23 34:1,6 35:6
36:15,25 37:6,8
37:13,16,18,23,25
40:19,23,25 41:18
41:22 42:1,3,16
42:19 43:24 44:4
44:8,12,20 45:1
45:16 47:6 50:23
51:1,18 52:6,14
52:16,21,24 53:5
53:8 55:25 56:2,6
56:9,13,25 57:3
61:2,3,5,24 63:3

64:10,16 65:6,9
65:11,14 66:20
71:4 72:19 73:5
74:25 76:1,4,6,11
77:19 88:13,21
89:5 93:1 102:18
102:20,21 103:9
103:12,16 104:1
104:17 110:11,21
110:24 111:15,18
111:23,25 112:12
112:22,24 113:3
113:16,18 114:12
114:15 115:6,10
115:12,23 116:4
117:14,16,19,24
118:11,14,16,22
119:2 124:5,7
125:22 126:1,4
128:11 129:22
130:11,15,17,20
131:21 132:24
134:18 139:12,22
143:15 144:17
145:21 146:23
147:2,14,21 148:1
149:15 150:1,5,8
150:11 152:2,4,15
154:20,23 157:19
157:25 158:6
159:17 162:20,23
163:3,5,12,17
164:18,22,25
165:2,3,8,16,19
165:21,24,25
166:2,8,14 167:5
167:10,10,14
168:9,12,15,17,20
169:9 173:11,14
174:7,10 175:5,15
176:12 178:16
179:12 181:1,9
182:3,9,12,19,23
185:11,19,22
186:2 187:20
190:10 191:4
193:15 194:20

195:1,5,11,13
197:24 198:2
205:11 206:2,5,7
206:10,13,17
214:4,7,12,17,19
214:22,24 215:4
217:15,16,19
218:5 226:5,8,11
226:24 227:9,14
227:17 228:4
229:8 234:19,21
235:23 236:2,18
236:20,24 241:25
242:4,9 247:3,6,8
247:13 252:17,19
252:22 255:25
256:5,12,14 257:1
257:7,12,20,23
260:21 261:2,14
261:16,25 263:6
265:5,11 266:15
266:20 267:9,12
267:14 268:14,16
268:19 269:2,5,6
269:10 271:20
275:8,15,17,19,21
275:24 276:3,11
276:13,22 277:9
277:22,24 278:7,9
278:12,14,16,18
278:21,24 279:1,6
279:13,23 280:5
280:14,18 281:2
281:25 283:4,7,10
284:2 285:13,15
285:19
**courtroom** 114:22
172:8,9 256:11
277:4
**Court's** 57:4
259:12 279:10
280:9
**court-approved**
288:4
**cover** 211:3 236:8
255:8
**coverage** 57:21

**covers** 212:12
255:7
**COZEN** 10:2
**co-counsel** 256:8
256:16 266:16
268:15
**create** 179:4
**created** 79:6 91:9
124:3 201:21
**credit** 16:21 25:4
25:12 26:8 57:7
74:18,22 89:19
195:14 196:1
198:12,23,24
199:19,21 200:6
200:19 209:25
231:13
**creditor** 6:3 118:7
180:18 192:5
195:15
**creditors** 2:17 3:3
24:2 115:16,18
118:20
**criteria** 122:1
180:10 240:14
**critical** 88:15 90:14
176:22
**cross** 24:21,24
27:17,18 50:2,24
73:5 76:2 115:7,9
115:15 227:17
276:6 279:11
**crossed** 141:10
**cross-examination**
25:1 28:6 48:6
51:6 61:25 65:18
73:7 114:15,18
119:6 215:8
227:20 236:21
247:15 256:2
257:10,14,24
266:23 269:12
275:9
**cross-examine**
114:12 166:12
**cross-reference**
112:9

**Crowley** 21:7,23,25
25:14 26:13 27:7
50:25 51:3,5,7
52:4,11,15,17,22
52:25 53:2,5,7,9
55:23 56:14,15,23
57:1 61:4,23
235:24 247:13
255:25 257:18,19
257:25 258:2
261:6,15,20 265:5
266:14,15 286:10
286:22
**CSFB** 6:13
**CSOs** 56:11
**Cumulative** 43:2,7
44:2
**cure** 47:7 176:19
176:25 183:2,6
184:23 185:13
191:8,22,25 192:2
192:8,12,18,19,20
193:8,11,12
232:23 235:10
**cured** 45:16 47:14
201:1 233:14
**cures** 45:15
**curiosity** 115:17
**current** 23:14 40:9
72:13 88:7 109:17
109:21 119:25
122:20,21 157:10
210:7,9,12 219:3
240:4 245:3
265:24
**currently** 20:12
31:6 62:14 74:8
100:15 104:15
199:23 209:3
269:25 270:6
**custodial** 36:2
154:25 155:2,10
155:11,14 156:4
156:25 157:1,11
188:15,17 253:1,3
253:10
**customer** 83:20,21

85:14 89:14,21
97:18 217:1
222:15
**customers** 89:18
222:16 230:11
**cut** 91:3 123:2
**Cutler** 8:19 227:23
**cutoff** 121:3
**cycle** 121:3

**D**

**D** 3:16 12:8 15:1
201:20 286:2
287:2
**daily** 89:16 100:25
230:18
**damages** 146:9
**data** 119:22 120:9
223:18 245:22
**date** 32:8 41:3 56:5
58:6 61:1 78:22
91:8 95:17 97:8
103:8 105:24
108:22 109:20
113:14,24,25
114:1 121:2,3
125:18 127:4
134:2 153:24
154:1 163:7
164:21 165:7
187:23 239:9
265:23,25 266:4,5
267:19 280:1,3
281:7,8,9,10
288:10
**dated** 32:7,14
124:9 133:20,22
159:20 166:21,22
181:24 237:6
247:21 250:5
266:2 267:18
279:25 280:2
281:10 282:14,15
287:7,14,15
**dates** 119:25 120:1
**David** 4:24 10:17
15:10,16 67:18

87:19 159:24,25
160:1,13 167:16
279:7 283:5 286:6
286:7,8,9,10,11
286:12,13
**day** 10:11 23:8,8,13
23:13 66:19 88:13
88:22 93:18 97:11
97:13 116:7,7,16
118:21 154:3
176:15,21,22
180:21 190:20
202:15 204:4,4,23
204:23 245:5
257:9 272:8 276:2
276:9 280:12
**days** 22:19 58:5
78:22 83:13 95:17
97:9,12 114:3,4
115:21 119:17
215:4 280:25
**day-to-day** 89:6,8
89:24 95:6
**DB** 48:5 111:16
115:14 120:12
137:3 158:21
**DB's** 137:4
**DB-1** 126:13
144:14 162:24
**DB-4** 163:10 165:3
165:6 287:13
**DB-6** 162:24 163:3
163:4,6 164:18
287:11
**DB-7** 163:9,14
164:19,20 287:12
**DB-8** 163:9,15
164:22,25
**DE** 2:8 3:7 4:6 5:6
5:15,22 6:15,23
7:6 8:6,15 9:6,14
10:7 11:7,23 12:6
13:13,21 14:15
**deal** 29:15 30:2
33:14 37:6 38:8
43:21 44:14,17

47:22 50:4 63:25
82:25,25 83:4,4
90:24 92:8 95:16
106:14 112:24
115:7 117:2
126:23 131:8
136:20 188:24
196:2 197:15,15
198:5,5,5 199:15
199:25 200:1
202:3 208:6,10
210:10 218:22
265:3,4,8
**dealer** 16:25
**dealing** 48:11
102:7,12 104:17
**deals** 77:10 79:5
127:20 136:18
138:2,20 139:1
197:13 205:1
239:6,8
**dealt** 146:16,18
173:22
**Dear** 265:23
**debated** 169:23
226:13
**debt** 206:7
**debtor** 1:10 2:4
26:20 33:19 55:21
111:3 117:1
134:21 170:9
181:2,24 183:2
206:8,9,10,14,17
227:2 240:25
247:9 263:6 278:5
278:5 280:2,21
287:15
**debtors** 15:7 21:25
76:13 77:19,21
98:11,13 100:21
102:21 103:6
113:12 115:25
116:7 118:24
119:3 129:18
163:22,25 166:10
166:18,23 168:1,2
168:4 176:7

179:11 180:8
192:6 211:19
227:7 255:3
256:18,20 262:11
268:21 273:14
276:1 278:3,23
280:23 281:7,9
282:1,2,18 283:9
283:15
**debtor's** 56:4 195:9
205:25 226:20
229:1 236:10
247:18 249:2
250:7 252:18
263:3 266:25
267:23 287:8,9
**decide** 148:22
**decided** 34:1
**decides** 45:16 47:6
63:21 185:11
**decision** 67:23,24
91:7,15 148:23
**declared** 159:11
**declined** 193:21
**decree** 174:17
**deemed** 34:4 66:15
**deeper** 232:3,4
**default** 33:2,18
34:4 35:2,11,12
38:16 43:20 83:17
84:2 89:20 107:7
107:8,14,20,23
119:14,16 120:16
120:24 121:10,14
122:17 150:23
151:13,18,24
153:4,11 154:8,9
154:14 156:5,17
157:4 159:21
163:10 165:4,6
174:4 175:12
184:4,4,9 223:9
226:2 232:3,4
233:2,14 287:13
**defaulted** 223:8,21
225:18
**Defaulting** 223:17

**defaults** 32:17,19
33:9,15,20 34:3
34:12,22 152:8
153:6,8 158:12
159:11 160:6
184:19 185:13,24
186:7,15 201:1,6
232:23 239:13
244:18
**defer** 31:1 34:16
48:20 59:8 70:19
251:6
**deficiencies** 209:21
239:13
**defined** 58:6 61:1
95:13 105:11
192:9,10,11
264:25
**definitely** 44:23
202:12 205:4
221:3,5 232:10
281:19
**definition** 192:13
209:10 265:8
**Dehny** 5:17 21:12
21:12,16,19 65:6
65:7,10,12,16,16
65:19 72:20,21
73:4 117:20,22
194:20,22,22
195:9,12 199:7
203:5 205:10
256:5,6,15 268:14
268:20,20 269:3,5
286:12
**Delaware** 1:3,17
5:21 6:14 12:4
13:11
**delay** 272:8
**delegation** 264:21
264:22
**delineate** 177:10
**delinquencies**
184:12
**delinquency**
184:15
**delinquent** 83:13

95:12 189:1
209:17 210:8
**delivered** 93:17
194:12
**delivery** 60:4 266:1
**Delta** 117:19
**delve** 149:16
**demand** 17:10
160:5
**DENNIS** 13:7
**dent** 209:7,8,11,13
210:2
**dented** 209:15
**deny** 223:14
**department** 14:10
86:3 120:5 121:4
121:8 135:5
151:11 177:24
178:3,3 193:17
217:23 244:13
**depend** 188:23
220:3 271:9
**dependent** 51:19
**depending** 226:4
**deployed** 67:21
**deposit** 74:10 91:11
92:13 156:3
**deposited** 93:11
201:22 202:7,11
202:17,18 251:22
252:8 273:1
**depositing** 202:15
**deposition** 21:13
35:18 52:5,9
54:16 128:20
129:5,7 158:14,15
158:17 161:21
169:24 183:7
186:5,9,13,18,19
186:21 191:11
195:22,25 196:7
202:19 211:24
231:8
**depositions** 102:9
178:21
**derive** 274:12
**describe** 16:7,13,19

59:9 77:19 89:5
92:6 93:1 103:20
103:21 183:21
195:13 229:16
230:6 232:1 284:2
**described** 57:14
59:18 84:7 87:19
99:6,24 121:23
124:23 169:15
177:2 183:19
187:13 201:7
211:5 231:8
283:22
**describing** 188:5
191:19,20
**description** 188:5
207:9 287:5
**descriptions**
196:23
**design** 138:25
**designate** 183:8
223:22
**designated** 78:20
89:17 108:3,22
120:21 275:4
**designates** 224:17
224:21
**designation** 234:13
268:1
**designator** 108:21
**designed** 90:13
139:23 218:21
**designee** 121:6
**desires** 124:19,21
**desk** 98:15
**despite** 148:24
**detail** 192:24 193:7
193:10 194:17
**details** 83:2
**determination**
123:1 179:21
217:9 219:4
267:23
**determine** 39:18
91:17 92:2 93:22
106:25 120:5
122:16 157:5,18

177:15 193:2
217:8 219:14
221:19 241:17
244:5 245:7,11
246:18,21,22,23
**determined** 40:1
46:4 122:1
**determines** 78:8
121:16
**determining** 47:13
232:22
**Deutsch** 13:3
**Deutsche** 12:11,18
121:20,22 122:1
123:25 127:1,8,19
128:4 129:21
130:25 131:3
156:6 159:1,3
160:23 163:6
164:20 165:6
169:15 227:5
280:24 282:1,20
282:23
**develop** 79:14
81:23
**developing** 235:12
**dialer** 83:12
**differ** 82:24
**difference** 64:10
78:2 95:25 99:20
207:1,18 248:5,7
282:4,6
**differences** 95:8
127:13 132:4
**different** 39:6,7,20
51:23 67:1 79:1,3
85:17 89:10,19
91:10 92:2,15
95:10 96:3 106:19
106:19 109:11
127:18 129:4,18
148:8 155:12
174:16 199:10,12
209:16 212:14
215:23,24 219:5
219:11 222:24
223:1 237:11

238:19,23,25
252:5 258:3 263:1
270:10
**differently** 94:25
121:8 146:19
**difficult** 270:12
**diligence** 33:14
34:10
**diligently** 21:25
**diminimus** 66:15
**DINE** 9:24
**direct** 15:17 29:10
32:22,24 37:15
44:24 48:14,22
52:8 64:2 76:18
110:15 114:14
119:11 123:19
125:2 128:14
131:13,20,25
155:4 157:21
161:4 167:23
173:25 174:11
189:11 206:25
230:8,18 239:16
255:3 256:18
258:23 263:12,16
276:5
**directed** 63:5
**directing** 234:14
**directly** 77:5 79:11
79:19 86:7,16
93:8,14,15 98:9
98:18 99:4 106:16
107:5 108:13
123:17 160:23
187:16 210:17
212:11 222:16
230:12 233:1
237:19 248:1,22
255:15,18 274:24
**director** 16:1,6
**disagree** 157:25
**disagreement**
67:21
**disburse** 85:9
**disbursement** 91:1
91:4,6

**disbursements**
92:25 156:1
**disbursing** 188:21
228:13
**discovered** 201:19
**discovery** 102:25
103:1 106:8,9
201:15
**discretion** 272:7
**discuss** 39:9 50:6,8
169:22
**discussed** 119:11
153:8 171:11
**discussing** 175:23
**discussion** 25:3
171:3,24 178:5
191:3 194:4
**discussions** 40:4
68:17 171:6
186:25
**dishonored** 91:20
**disposition** 83:24
**dispute** 94:22
180:12,19
**disputed** 47:17,23
179:3,3 181:19
240:13,15
**disputes** 193:19
**disruption** 72:15
**disruptions** 90:20
**distinction** 33:18
180:17
**distress** 17:14
157:15
**distressed** 16:24,25
**distributed** 137:1,3
**DISTRICT** 1:3
**division** 222:7
**docket** 182:4
279:20
**docs** 77:11 136:3
**document** 23:1
35:16 36:14,20
44:25 125:23
126:25 127:10,19
128:21,23 133:19
133:22 134:14

137:2,5 145:1,22
159:18,20 163:16
163:21 164:1,3,4
164:5,14,17
168:17,25 170:8
172:3,5,11,11
173:17 191:19
193:13 196:14,16
196:21 197:7,8
198:16,25 199:2
199:10,12 204:19
205:6 207:5,6,7,8
209:20 211:22,23
212:22,24 213:14
229:2,10 248:16
259:7 260:2,3
271:12,13 272:16
272:18,25 283:20
283:21 284:3,11
284:22
**documents** 31:2
39:13,14 103:2
110:10 112:20
133:1,17 134:21
163:23,24 165:15
172:2,12 194:25
219:11 249:10
250:9 256:19
276:24 277:2,5
278:8 279:2 282:5
285:19
**Dodge** 6:19 236:6
**doing** 20:24 33:14
34:10,16 39:16
69:15 71:12 101:3
149:24 165:23
173:8 279:8
**dollar** 38:16 51:24
58:10 114:7,9
194:5,9,15 202:10
225:4
**dollars** 18:3 19:11
19:13,18 20:1
24:18 30:25 33:9
34:18 38:15,18
40:4,10 42:25
43:5 45:17 49:6

49:11 50:13 58:10
59:1,19 60:2 61:7
62:25 66:11 86:12
86:21 87:6 93:22
96:7 105:23,24,25
127:16 161:2
186:16 204:8
215:2 224:10
260:6,16
**door** 56:7
**DORSAY** 275:23
275:25 276:12
**Dorsey** 2:13 7:2,10
7:17 56:7,8,12
102:20 115:24,24
163:22,23 275:24
275:25
**double-check**
234:16
**doubt** 57:16 58:1
58:18 60:23 61:8
273:20,22 276:6
276:14,17
**downgrade** 20:19
21:3,5 26:9,11,16
71:14 101:22,24
103:20,21 113:5
264:5
**downgrading**
25:10 27:4 265:23
**downside** 39:21
**DP** 259:2
**draft** 137:1,6
**drafted** 126:23
127:1 128:3 170:9
170:9 172:14
173:4,5 261:10
**drafter** 281:18
**drafting** 170:12
175:10 192:24
193:5
**draw** 66:19 210:5,8
210:15,17 211:3
**draws** 210:10,12,23
211:11
**DREBSKY** 13:7
**drop** 225:13

**DUANE** 5:2
**due** 44:16 92:15,25
95:8,22,23 97:8
97:10 105:19
107:21 109:3
119:25 121:2
153:23 183:17
185:9 243:3,25
244:2 280:5
**duly** 15:13
**duplicating** 168:7
**duties** 16:7 24:16
103:24 153:16
187:7 196:22
200:22 204:19
205:5 244:8
**D.C** 4:22

**E**

**e** 1:22,22 2:2,2 15:1
15:1 143:5 198:6
198:8,9 286:2,4
287:2,4 288:2
**earlier** 38:17 50:2
67:12 73:18 84:8
89:14 94:23 95:3
101:9 102:24
172:15 176:14
183:21 187:5
192:22 201:7
203:11 206:25
251:14 283:22
**early** 32:19 33:2,9
34:12 35:2,10,11
38:15 43:20 66:6
87:2 107:7,8,13
107:20,23 109:6
114:1 119:14
121:14 122:17
158:11 160:6
184:8,18 185:23
186:7,14 244:18
245:9 256:9
**earned** 61:12
**ease** 41:17
**easiest** 79:2 81:14
89:8

**ECKERT** 5:19
**economic** 59:10
99:24,25
**economically** 54:20
59:4
**edit** 132:3
**educational** 16:13
**Edwards** 6:19
236:5
**EFC** 169:1,5 188:8
**effect** 51:15 173:11
202:14 255:10
264:20,23
**effective** 237:6
**effectuate** 284:7
**effectuated** 78:22
**efficient** 280:8
**effort** 122:6,20
133:15 200:13
232:2 236:2
246:15
**efforts** 185:5
232:22
**eight** 83:8 86:1,2
87:19 95:22
203:23
**eighteen** 24:13
182:15
**Eighty-four** 269:2
**eighty-nine** 83:13
**eight-track** 236:25
**either** 43:24,25
45:13 49:25 58:23
70:15 73:20 74:9
78:6 80:21 82:25
87:1 88:5 91:24
93:14 108:3,12
116:18 117:5,20
123:17 140:8
181:16 209:14
217:4 222:14
224:15 226:3
233:16 234:1
256:22
**either/or** 49:23
**elaborate** 66:1
**electronic** 91:24

288:5
**electronically**
93:17
**eleven** 16:4,5
**eligible** 181:5
**eliminate** 140:25
143:1 166:11
**elimination** 143:8
**ELLERS** 13:17
**else's** 57:4 185:4
**EMC** 4:11,20 5:3
27:23 28:5 32:5
32:20 33:9 38:15
40:22,25 41:2
47:6,14,20,22
111:5 167:17,24
168:12,20,23,24
169:18 170:9,25
171:6 173:4,8
177:18,24 178:7,9
178:18 180:20
181:2,3,10,19,22
182:8 183:22
184:2,13,16,20
186:7,14 188:4
189:2,6 192:20
194:2 279:11,23
**EMC's** 32:6 192:17
279:25 280:2
**EMC-1** 287:6
**EMC-2** 287:14
**EMC-6** 287:15
**EMC/Bear** 42:17
42:24
**employ** 223:2
**employed** 15:19
76:22 86:4,14
**employee** 88:19
**employees** 69:23
86:7,16 87:18
88:3,4,25 104:14
**employer** 255:20
**employing** 229:20
**employment**
104:14
**empowered** 197:2
**empty** 263:4

**ended** 256:18
**ends** 108:12,14
  110:2 157:16,22
  245:11 246:4,23
  272:16
**energy** 280:14
**enforcement** 233:9
**engage** 15:21
**Engineering** 16:16
**enhancer** 195:14
  195:16 196:2
  198:12,23,25
  199:19,21 200:19
**enhancer's** 200:6
**enjoy** 115:3
**enquiring** 190:19
**ensure** 18:20 84:19
  90:15 91:18 101:2
  128:25 151:11
  152:24
**ensuring** 90:16
**entail** 25:7
**enter** 57:3 82:15
  136:15 249:22
**entered** 41:6 93:13
  93:14,14,17
  161:10
**entering** 232:3
**enterprise** 24:10
**enters** 61:3,5
**entire** 86:11 199:25
**entirely** 183:23
**entirety** 167:13
  184:3
**entitled** 96:21 97:4
  97:15 108:23
  124:11 159:21
  168:13 217:10
  234:3,6 241:4
  243:16
**entitlement** 190:5
**entity** 31:23 91:22
  101:24 102:2
  107:12 129:24,25
  130:1 161:22
  227:11 234:2
  273:15

**entry** 254:3 269:21
**entwined** 207:2
**EPD** 108:18 109:12
  119:10,14,23
  120:3,11 121:13
  121:17 122:15,18
  154:13 158:20
**equal** 191:21
  224:15
**equaled** 225:12
**equity** 15:22 16:9
  18:3 19:4 74:18
  210:5,15
**Eric** 7:8 112:18
  277:12
**error** 109:13
**errors** 57:21 255:4
  255:8
**errs** 109:15
**escalating** 17:25
**escrow** 85:7,13
  91:4 93:24 155:6
  179:20 191:8
  193:8 251:22
  252:1
**escrows** 148:13
**especially** 231:15
**ESQ** 2:10,11,13,14
  2:21,22 3:9,16,17
  3:18,19 4:8,15,16
  4:24,25 5:8,17,24
  6:8,9,17,25 7:8,15
  7:23 8:8,17 9:8,16
  9:23,24 10:9,17
  11:9,17,25 12:8
  12:15,22 13:7,15
  13:23 14:7,17
**essentially** 74:21
  249:7 272:22
**establish** 130:6
**established** 47:13
  48:8 128:9
**estate** 83:23,24
  226:20
**estimate** 19:25
  39:24
**estimation** 184:25

**et** 40:13
**etcetera** 146:10,15
  174:22
**evaluated** 100:20
**evaluating** 122:18
  203:3
**evaluation** 121:16
**evening** 103:3
  114:25 116:9
  119:4 258:2
  285:22
**event** 35:11 40:2
  138:20 149:10
  154:9,14 156:5,12
  157:4 174:4
  175:11 188:19
  189:16 208:8
  233:9,14,19
  272:10
**events** 153:4,6,11
  233:19
**eventually** 53:20
**everybody** 182:17
**EVID** 287:5
**evidence** 21:8
  25:24 26:4 40:21
  41:1,3 44:25
  55:24 56:5 104:4
  110:16 112:2,15
  112:21 113:1,9,10
  113:13 114:23
  162:18,25 163:7,8
  163:15 164:3,10
  164:15,21 165:7
  165:13 168:18
  173:14 185:22
  191:1 265:8
  276:25 277:21
  280:1,3
**evidenced** 264:22
**evolution** 132:9
  140:15 141:13
  281:21
**EVP** 88:6
**EWING** 13:9
**exact** 59:9 85:23
  277:2

**exactly** 26:11 53:19
  112:8 140:12
  144:25 148:16
  149:3 156:10
  188:23 189:11
  194:18 221:19
  254:23 255:21
  262:14
**examination** 15:17
  32:24 48:14,23
  73:6 74:23 76:18
  167:18 205:13
  227:18 276:5
  279:12 280:19
  286:5
**examine** 243:9
**examined** 279:9
**example** 93:7 96:19
  97:1,5,9,18
  113:25 210:20
  225:7,7 231:5
  233:18,25 245:3,9
  251:13,16
**exceed** 199:24
**excellent** 143:16
**exception** 102:17
  277:16
**excess** 19:11,13
  24:17 31:8 116:25
**exchange** 136:14
**exchanged** 142:23
  143:6 163:19
**excited** 68:24
**excludes** 53:18
**excuse** 32:10 33:8
  34:24 35:8 42:6
  47:4 122:11
  135:12 183:25
**execute** 272:5
**executed** 30:23
  31:17 57:6
**execution** 266:1
**executive** 69:10
  87:20 160:1
**executives** 203:10
**exercise** 107:3
  187:13 201:8,17

206:17 268:2
**exhibit** 22:23 32:5
  32:6,13 40:21
  41:2,4,13 55:21
  56:4,16 98:23
  102:22 103:6
  143:5 163:6
  164:20 165:6
  166:23,25 167:25
  168:2,13,23,24
  173:25 178:9
  179:6,10,11
  181:22,22 182:4
  192:2 195:10
  206:3 211:16,20
  211:21,22 229:1
  234:19 240:12
  247:18,20 248:23
  248:24,25 249:2
  249:15,16,18,21
  250:2,7 252:16,16
  252:17,18,20,20
  252:21 258:5
  263:3 265:12
  268:11,21 269:17
  277:17 279:11,11
  279:25 280:2
  282:8 283:11
**exhibits** 22:22 98:9
  110:15,16 112:16
  113:7,12 115:8
  124:4 164:9
  165:11 168:4,7
  205:25 211:14
  249:9 275:13
  277:14 278:3
  279:8,9 280:21
**exist** 21:15,17
  184:22 232:23
**existed** 21:14
**existing** 72:14,24
  82:24 87:4 99:18
  104:11 131:15
  132:3 209:3,4
**exists** 35:10
**exit** 56:7,10
**expand** 17:20

61:16
**expect** 53:11,20
  60:10 74:25 75:1
  114:17 122:19
  140:11 204:22
  205:4,8 207:16
  243:5,14,20
  272:10
**expectation** 68:3
  243:5
**expected** 53:10
**expend** 202:25
**expended** 92:15
**expense** 92:19
**experience** 17:1,7
  17:12 23:10
  108:12 110:1
  189:19 193:17
  239:6 246:6
  253:14 284:11
  285:11
**experienced** 69:14
  70:2 82:4
**expert** 193:7 276:7
  276:8
**expertise** 24:14
**expiration** 97:12
**expired** 208:16
**explain** 19:7 78:2
  110:17 113:17,20
  177:10 181:6
  209:12 228:4
**explained** 94:23
**explaining** 61:22
**explains** 262:16
**explore** 218:5
**exposed** 39:19 40:2
**exposure** 159:5
**expound** 228:20
**expressed** 96:17
**expression** 189:22
**extensive** 212:12
**extensively** 236:9
**extent** 26:5 30:14
  36:13 94:17 95:19
  104:8 122:20
  129:25 131:7

196:3 204:25
  208:18 210:6,9
  211:11 226:25
  228:11 230:15
  231:15 233:12
  245:1 250:11
  252:3,6 264:6
**external** 66:23
  170:19,23
**e-mail** 133:3,8
  134:15,22,23
  135:2,22,23
  136:10,22,24
  137:6 140:18
  142:13,16,22
  163:9 164:20
  287:12
**e-mails** 134:19
  136:11
**E.C** 11:25

---

**F**

**F** 1:22 3:17 124:18
  288:2
**facilitate** 77:6
  108:4
**facilitated** 231:2
**facilitating** 95:18
**fact** 23:6 59:24
  67:23 75:1 120:5
  136:6 143:20
  148:24,24 159:10
  159:12 170:8
  173:2 176:10
  184:12,19 185:12
  186:7 187:1,14,16
  191:7 192:3 197:9
  200:24 201:21,25
  202:12 208:18
  210:14 231:16
  233:20 238:1,4,9
  240:16 249:10
  253:12,16,18
  254:17 259:7
  273:7 274:23
  275:5
**factors** 220:2

**facts** 33:22 173:14
  185:22,23 190:25
  221:19
**fail** 154:10
**failed** 94:13 149:22
  154:13
**fails** 105:18
**failure** 69:10
  146:11 149:9
  152:10,20 153:13
  187:14 282:17
**fair** 20:2 24:12
  36:16 37:16,18
  54:18 55:3 62:25
  63:1 71:15 113:3
  116:5 118:25
  138:4 148:1 151:8
  155:9 174:20
  176:1 177:23
  198:15 203:21
  232:21 233:4
  252:14 260:15
  266:7 269:10
**fairly** 206:6 276:2
  283:23,24 285:9
  285:10
**fall** 179:6 185:4
  187:11 196:22
  248:2 254:21
  255:12 270:9
**fallen** 237:15
**falling** 41:21
**Fallon** 12:8 51:4
  61:24 62:1,2 64:5
  64:13,17 65:4,6
  235:24 247:13,16
  247:17 248:25
  249:2 252:18,19
  252:21 280:23
  283:17 286:11,21
**falls** 182:10 187:10
  237:14 272:13
**familiar** 64:4 69:5
  73:14 77:25 78:1
  98:1,3 99:6,8
  101:5 104:16,20
  107:7,8 108:16,17

127:22 135:24
  136:1 144:12,17
  144:19 153:19
  161:12,15,17
  171:21 183:11
  184:6,7 186:17
  191:7,10 195:20
  196:8,14,16 207:5
  207:7 208:23
  211:25 212:22,24
  228:1 231:23
  242:22,23 283:20
  283:21
**Fannie** 20:18 22:18
  23:2,4 46:17 49:5
  49:15,25 51:12,17
  51:20,22,24 52:9
  53:14,16,18,21,23
  54:3,6,11,14,21
  54:23,25 55:3,17
  55:22 56:4,17
  57:6,8,20,22 58:6
  58:9,12 59:14
  61:15 71:13 73:21
  79:23 100:13,15
  100:19,20,22
  161:5,7,12,16,18
  162:9 194:9,14
  212:18 238:21
  287:8
**Fanny** 211:25
  212:9 219:12
**far** 70:25 71:12
  93:3 120:7 152:1
  168:24 170:8
  171:18 184:6
  185:7 189:21
  193:5 233:2
  238:22
**FARELL** 3:9
**Fargo** 8:11,20 9:3
  16:21 227:23
  267:17,20 274:22
  275:1
**fashion** 69:19
  151:3 177:12,22
  195:19 209:14

221:9 230:19
**fashions** 124:1
  230:11
**fault** 98:16
**favor** 24:22 27:18
  114:15
**FDIC** 62:18 74:7
  74:11
**federal** 12:12 14:12
  100:10
**fee** 91:23 96:6,7,16
  96:20,22,23 97:15
  150:16 151:5,7,9
  233:21 234:3,6
  251:11,13,15
**feed** 230:18
**feel** 39:22 114:21
  142:5
**fees** 97:3,6,17,25
**Ferraro** 266:16
**Fidelity** 57:21
**field** 121:2
**fielding** 89:21
**fifteen** 97:11,12
  203:10 275:19,21
  276:19
**fifth** 191:19 254:3,3
  259:23
**fifty** 204:6,7
**fifty-nine** 86:12
  87:6
**fifty-one** 86:20
**fighting** 221:21
**Figueroa** 6:4
**figure** 63:19 64:7
  64:13 193:1
  216:21
**file** 52:18 85:19
  93:17 210:23
  211:1 213:14
  214:10 221:10
  278:9
**filed** 88:13 90:18
  90:19,21,22
  104:16 110:19
  171:21 175:21
  176:7,9 214:9

files 174:5
filing 83:5,7 84:5
  86:5,6,8,23 87:7
  88:5,11 92:11
  100:3,21,23 172:1
  175:11 180:22
fill 70:20 218:25
  223:16 277:11
filled 135:9
fills 104:6
filtered 201:16
final 18:22 20:16
  23:4 38:19 55:17
  60:25,25 61:9,11
  61:19 63:7 64:23
  65:25 66:18 67:6
  68:2,4,21 70:5,14
  70:19,19,24 71:1
  99:14 133:22
  134:14 164:7
  194:4 204:11
  217:4 243:2,11,13
  260:24 261:4,23
  262:5,10,23 266:7
  266:12
finalize 118:24
  219:16
Finance 111:13
financial 26:22
  29:2,8,13,14,15
  29:16,22,23 99:21
  157:15 219:3
  262:12
financing 29:12
  30:3,4,7,19 39:17
  43:21 44:13 45:6
  66:5 210:1
find 60:1 64:5 70:9
  71:4 102:17 104:6
  136:25 142:20
  162:24 163:1
  177:3 179:14
  182:17 189:22
  198:24 216:20
  218:15 219:24
finding 41:17 104:4
fine 25:24 28:1

34:3 58:24 65:9
  65:11 118:23
  205:9 206:4
  211:15 229:1
  240:22 247:9
  268:16,20 276:11
  276:13,19 277:24
  285:19
fines 146:9
finest 247:10
FINGER 9:10
finish 257:8,9,14
  276:18
finished 116:8
  220:4
firm 15:22 22:15
  23:15 31:2 61:13
  64:18 66:7 70:10
  136:1 170:11,12
  170:14,19 263:2
first 16:25 27:23
  32:10 35:17 36:16
  36:19 57:2 68:9
  79:3,12 82:14,16
  83:10 86:25 89:10
  90:24 96:16 97:10
  100:14 101:10
  105:10 106:21
  107:15 119:19
  124:18,22 127:1,4
  127:6,15 130:4,19
  134:4 138:2,11,20
  141:4 147:10,23
  152:19 159:24
  167:23 168:17
  171:12,16,24
  176:15,21,22
  186:10 190:20
  191:11 192:14
  198:7 205:17
  219:23 228:1
  239:17 251:21
  260:2 265:25
  266:20 271:17,18
  272:2,2 284:17
  285:16
fit 118:10 169:8

207:10
Fitch 21:6 102:5,23
  103:6 113:12
  287:9
five 53:25 59:14,20
  76:7 96:7 116:18
  116:19 117:1
  166:3 189:22
  198:11 199:25
  216:23 254:10
  264:17
fix 139:16
fixed 124:22
flat 96:7
flip 147:14
Flo 166:24
flood 17:24
Floor 1:16 2:7 5:13
  6:5,14,22
flow 93:3 120:7,22
  224:25 245:16
  283:12
flowing 139:7
fly 115:19
focus 144:11
  188:13
focused 142:8
  152:18
folks 169:19,20
  181:7
follow 28:2 213:1,2
  213:15 216:11
  218:4 222:19
followed 222:21
  223:13,15
following 16:23
  18:4 153:11
  166:19 213:21
  219:12 229:19
footer 164:5 281:12
footers 281:14,15
fore 98:20
foreclose 223:3
foreclosure 83:17
  84:1,4 226:3
  232:5,7,8,11,13
  232:16

foreclosures
  232:15
foregoing 288:5
foresee 23:3,17
forfeitures 146:10
forgot 151:21
form 57:8 61:6
  96:16 97:6 107:14
  120:19 166:21
  228:7 248:14
forma 54:5
formal 278:14
formally 277:7
formation 248:19
  271:9
formed 18:24
  31:23 101:17
forms 57:8 96:15
forth 79:24 80:6,14
  99:1 100:16
  104:13 188:4
  189:17 220:3
  266:11
forty 49:6
forty-four 49:6
forty-one 46:19
  274:10
forward 23:14 24:8
  24:11 31:4,19
  47:25 62:6 63:2
  64:6 68:25 69:3,7
  69:16,23 71:19
  82:8 99:20 105:8
  115:18 127:7
  137:10 152:10
  204:13 205:2
  221:17 248:19
found 125:11
  182:20 233:19
foundation 163:18
  164:2,14 190:13
founding 16:5
four 19:13 20:10
  45:17 50:13 67:14
  67:16,16 71:22
  79:2 101:9 110:23
  111:2 112:10

198:16 237:11
  270:10 272:3
  282:16
fourteen 203:10
fourth 36:21 79:22
  111:13 259:22
frame 22:20
Frank 227:22
FRANKLIN 8:24
frankly 36:17
  37:20 113:16
  116:9 190:15
FRED 6:9
Freddie 49:18,21
  49:25 53:15,19
  73:19,21 79:23
  92:10 161:22,24
  162:1,4,6,15,16
  212:1,9,18 238:21
FREDERICK 5:8
free 114:21 230:16
  230:18
Friday 20:18 21:13
  54:15 65:22 66:4
  66:7,10 68:14
  69:5 72:1 117:7
  274:17,17
Friday's 35:17
Friedman 69:9,13
  87:20,24,25
  159:24,25 160:1
  172:6 203:15,19
Friedman's 160:9
front 22:21 56:23
  110:25 124:9
  133:1,19 140:18
  141:10 178:10
  179:16 190:15
  253:19 265:17
  267:1 268:23
  270:6
fulfill 48:15 225:17
  228:7
fulfilled 106:1
  159:7 216:17
  221:15 225:24
  266:9

fulfills 228:12
full 45:19 108:21
  114:4 224:15
  225:19 271:21
fully 68:7 262:22
function 90:11,12
  90:13 152:25
  211:7,8,10 222:6
  233:2 245:11
functional 83:8,20
  85:18 86:2 87:19
  89:13 204:23
functionally 148:10
functions 85:13
  89:24 90:2,14
  95:5 129:2 148:11
  208:11 234:2
fund 18:19 19:11
  19:12 20:2 24:6
  38:23 46:9 50:16
  66:19 67:1 74:9
  74:10,10 75:11,13
funded 40:11 238:4
  238:5
funding 9:3 11:12
  11:20 18:18,18
  45:19 50:15 65:24
  66:2 68:4 73:12
  205:16 211:20
  212:17 213:1
  267:18,20
Funding's 213:16
funds 16:9 19:2,4,5
  19:7 20:3 45:20
  45:23,23,24 48:19
  57:9,9,10 66:9
  67:1 90:10 91:12
  91:13,24,25 92:12
  92:16,19,24 93:3
  105:20 108:6,7
  155:22,23 156:4,4
  157:2 202:25
  224:14,19,21,22
  225:22 228:13
  251:4,8 252:3
further 24:20
  27:17 48:1 50:21

50:23 54:1 61:23
65:4 73:5 75:24
83:17 110:14
114:13,23 137:6
162:17 205:11
213:24 226:2
227:17 235:21
255:23 264:18,19
266:14 275:7,8
285:12,21
future 60:4 64:7,11
78:14 231:18

---
**G**
---

G 8:8 15:1 200:21
gain 99:21
Galagos 134:24
Gallagos 134:25
  135:1,4,6,10
  136:12 142:12
Gallo 12:15 48:3,4
  48:7 50:21 110:8
  115:13,14 117:12
  117:15,17 118:9
  118:12,18 119:5,7
  124:2,6,8 125:22
  125:24 126:2,5
  128:11 130:3,13
  130:16 132:22,25
  134:16,20 137:14
  139:12,18 140:19
  142:17 143:18
  144:14 146:25
  149:18 150:7,10
  150:12 152:2,3,6
  153:2 154:24
  157:20 158:5,8
  159:15,18 162:17
  162:22 163:2,8,21
  165:10,18,20
  280:24 281:20
  282:23 283:3,5
  286:9,15
game 69:21
gap 63:5
gather 275:14
general 24:10

128:2,2 141:16
144:3,7 148:17
180:10 216:7
219:7 255:7,8
258:19 259:7,10
260:22,23 261:25
262:7,19 268:7
generally 78:24
  80:16 81:18 95:2
  96:7 98:3 99:8
  104:20 105:14
  129:18 130:4,13
  130:17 145:2
  151:20 155:3,13
  156:11 161:17
  179:23 195:15
  196:16 209:1
  212:2 218:17
  229:16,18,25
  232:1,2 242:15,23
  242:24 243:1
  249:25 253:8
  283:21
generated 123:11
  157:8 171:17
getting 29:9 37:2
  71:2,13 83:18,18
  88:20 96:5 166:5
give 89:18 97:6
  145:6 183:24
  189:18 193:21
  195:6 200:19
  220:8 222:9
  259:16 265:15
  267:3 269:18
given 26:15 46:17
  68:23 115:18
  116:12 157:11
  226:5 231:4 276:5
  276:17
giving 50:12 54:15
GLANTZ 3:9
glass 42:14
glasses 42:14
global 34:15 77:21
  87:11 107:12
  201:14 241:5

GMAC 11:12,20
  73:10 205:16,17
  205:21 206:4
  207:23,25 208:4,6
  208:10,17 216:10
  216:15
GMAC's 208:21
go 15:9 33:6 47:22
  51:5 56:21 68:5
  68:11 75:7 84:4
  86:23 89:19 91:16
  92:1 93:24,24
  114:25 115:6
  116:8,11 117:3,3
  118:12,17 122:6
  122:14 140:2
  147:13 148:16,20
  148:21 166:15
  167:22 183:9
  185:25 186:6,22
  192:10 195:8,11
  197:8,21 199:11
  200:11,20 202:13
  206:7 210:21
  218:12,15 219:18
  223:3 224:16
  225:11 230:12,13
  237:1 241:19,20
  242:9,21 247:5
  262:21 269:20
  276:8 277:2,24
  280:6,6 283:10
goal 39:8 54:24
  60:11 61:15 69:18
  71:11 83:16 88:20
  89:2,3 104:13
goals 220:17
goes 29:5,11 44:21
  45:10 64:1,3 84:5
  93:10,23 124:24
  140:16 210:21
  236:25 250:2
going 17:22 21:8
  24:7,11,13,24
  26:3,16 27:11
  28:12 30:22,24
  31:18 32:25 33:2

38:8,13,23,24
39:10,13,22,24
44:8,9,17 45:8,18
48:10,20 49:4
50:24 57:2,16
58:4,25 59:3 60:4
61:10 63:4,16
64:9,12,14 66:2
66:13 68:11,23,25
69:3,7,23,25
70:19,23 71:5,9
71:15,21 72:5,13
72:22,23 73:1,12
73:23,25 74:3,6,7
75:8,8,10,11 82:8
89:11,15 91:23
93:19 94:6 95:16
95:17 102:16
103:4 111:22
112:9 113:6
115:18 116:5,21
118:6 119:2 121:2
125:12,13 133:5
138:3,21 139:2
145:7,9,9 146:21
148:8,11,21
149:15 152:10
158:17 161:11
162:23 168:24
172:10 190:8,14
193:18 197:10
198:4 204:12,13
204:20,21 205:2,2
205:22 211:13
214:19 216:14
217:21,23,24
218:8 219:1,2
221:11 225:5
226:20 227:2,6,11
227:12,12 234:11
235:25 242:9,12
242:13 247:18
249:14 256:1
257:8,14 262:20
263:12,17 265:6
266:8 268:21,24
274:19 276:2,3,6

---

278:9,19 280:6,21
285:15
**Goldman** 13:18
**good** 15:4,5,19
27:22 39:16,23
48:3,3 51:8,9 62:2
65:20,21 69:17,17
70:8,9 71:12 73:9
76:12,20,21 113:8
114:19 115:13
116:13 119:8,9
165:23 167:20,21
194:22 205:15
213:25 215:10,12
221:21 227:19
236:4,6,7 258:1,1
269:14
**goodness** 257:10
**gotten** 169:18
279:1
**govern** 126:20
128:4 129:13
130:24 212:6
216:17 220:24
**governed** 124:13
219:10
**government** 247:9
**governs** 125:17
126:14 153:4
212:4
**grace** 97:9,11 154:4
**grade** 264:24
**grading** 26:10
**grants** 63:3
**great** 190:15
**greater** 62:24
**GREENBERG**
11:2
**Gross** 43:2
**ground** 236:8
**group** 16:23,23,25
78:9 79:4,8,12
83:10,14,14,15,20
83:22,22,24 84:2
84:2,3,6,7,9,10,10
84:15,16,21,21
85:11,11,12,14

87:18,22,23 90:25
91:9 93:10 98:21
104:21 105:2
106:14,24,25
107:3 119:24
122:14,16 123:18
128:18 177:14,20
181:10 183:11,20
185:10 189:22
195:18,24 216:4
218:21,21 219:1
219:14,16 220:16
220:19,19 222:6
222:15 224:1
235:16 237:15
238:4 241:16
**grouping** 79:22
91:10 248:2,3
270:19
**groups** 77:6 79:3
83:8 85:21,23,25
86:1,2 87:19
89:13 101:9
122:12
**grow** 72:8
**Guarantee** 194:23
**Guaranty** 65:17
**guess** 48:18 59:4,22
62:13 67:15 71:2
71:23,23 98:22
100:17 128:19
143:24 146:17
148:5,6,14 150:23
152:7 156:12
169:16 171:14
177:8 179:5 190:7
200:18 204:14
207:18 213:11
221:18 232:4
252:12 255:10
262:22 270:22
**guide** 57:23 58:9
212:4,12,17,18
**guideline** 220:23
**guidelines** 197:5,11
212:1 213:1,2
215:15,18 216:11

216:22 217:12,25
218:1,2,3 219:12
220:14,21 222:19
222:20 223:2,13
**guides** 212:5
**guys** 149:22 150:4
165:11,16 211:14

---

### H

**H** 8:24 15:16 287:4
**hac** 27:25
**HADLEY** 6:2
**Hahn** 2:16 24:24
**half** 31:9 96:19
138:2 139:1 198:7
251:14 276:6
**halfway** 166:17
**hand** 52:5 183:4
206:13 269:4
281:13
**handed** 133:21
**handful** 254:9,9
**handing** 110:17
**handle** 85:12,15,17
**handles** 83:11,20
**hands** 51:3
**handy** 41:10
259:15
**Hang** 44:8 145:18
274:3
**happen** 78:9 80:19
129:2 137:10
153:7 225:16
233:21 271:4
**happened** 66:6
81:8 91:21 158:23
**happening** 158:24
**happens** 93:1 226:4
261:10
**happy** 71:18
**hard** 22:12 280:13
**harmless** 146:8
**HARRISON** 13:17
**HARVEY** 13:17
**head** 16:2 85:25
86:3,15 203:22
238:14 254:14

265:4 270:7,14
273:12
**heading** 183:5
**headquarters**
160:15
**heads** 87:18
**health** 17:25
**hear** 22:12 24:21
27:18 44:12
112:25 118:4
143:15,17 218:2
221:5 257:16
**heard** 18:12 21:23
39:4 131:25
143:16 171:12,16
186:19 188:5
257:13 262:3
**hearing** 18:16
22:22 50:24 103:2
113:5 114:16
115:21 116:9,15
117:6,21,21,22
118:1,3,10 124:4
144:24 256:9
257:16,17 275:9
276:3,17 280:17
285:16,17,21,22
**hearings** 116:15
117:13,18
**hearsay** 21:7,20
22:5,9 25:14
27:17 102:17
103:4
**heart** 99:4
**heavily** 88:14
**HEIMAN** 10:17
**HELA** 277:18
**HELCO** 277:18
**held** 16:3 85:8
155:20,22,23
179:20 253:4
**HELOC** 74:13,16
74:18,19,21,25
75:2,13,21 205:17
207:25 208:1,5,9
208:11 209:2,5
210:18,23,23

260:4,5,7
**help** 41:22 43:21
68:7 98:6 102:20
106:16 145:22
177:10,14 180:17
182:9 199:10
200:13 217:2,2
236:11 263:6
273:21 281:4
**helped** 106:23
183:8
**helpful** 26:5 182:13
276:16
**helping** 88:12
177:7,8 179:4
241:7,17
**helps** 230:25
**Hercules** 4:4
**Hessen** 2:16 24:25
**high** 16:24 203:24
219:1
**highly** 61:17,18
**hillocks** 112:5
**hire** 68:13,15 71:6
71:16 104:11
**hired** 20:20,22
22:15 70:15,16
**historically** 105:3
**history** 16:19 17:4
**hit** 51:24 226:19
236:24
**HM** 271:10
**hold** 112:12 113:6
113:10 146:8
163:23 209:24
225:16 278:18
**holders** 111:7
**holding** 210:1
**HOLDINGS** 1:8
**hold-on** 237:16
**hole** 201:20
**home** 1:8 18:8 42:7
53:12 55:14 60:20
72:14,24 73:1
74:18 76:23,24
77:5 111:9,9
119:21 120:5

121:15 122:3,4,5
122:13,21 123:23
124:1,10,11,15
125:4,18 126:8,16
127:2,8 128:4
129:13,18,23
130:6,7,9,11,21
130:24 131:2,5,6
137:3 139:8,9
150:21 152:10,21
155:25 156:21
157:9,14 158:10
158:20,25 159:3
159:22,23 160:10
160:15,21 161:7
161:24 170:15
172:23 187:15
206:22 207:12
208:13 210:5,15
211:6 214:13,13
221:4,10 222:9
226:17 229:3
237:7 244:14
246:8,10,13 251:9
259:2,3,6 267:17
267:21 273:15
276:8
homeowner 93:4,8
95:21 97:7 105:10
105:14 210:17
211:2 218:23,25
219:14 225:8,18
homeowners 83:16
85:8 87:3 89:12
90:3 91:3,13
92:15,17 114:4
155:24 210:4,9,24
221:13,16 230:9
230:21,23
homeowner's
210:25
HON 1:23
honestly 162:1
honor 15:4,6 21:7,9
21:12,19 22:7
24:20,23 25:14,16
25:23 26:1,13

27:8,13,22 28:4
28:11,16 29:5,11
29:20,21 30:6,11
31:24 32:2,4,21
33:11,17,17,25
35:3 36:12,22
37:6,22 38:5,6,7
39:5 40:17,20,24
41:9 43:22 44:1
44:11,21 47:5
48:1,3 50:22,25
52:4,11 55:23
56:1,8,14,23 61:4
61:23 64:1,5 65:4
65:7 72:17 73:4
75:25 76:3,12
91:7 102:16,21
103:11,22 109:25
110:8,14 111:22
112:4,18 114:14
115:9,13,15,24
117:12,23 118:15
118:19 119:1,5
124:3,6 126:2
128:8 129:16
130:10,14 131:19
132:23,25 134:16
137:14 139:10,15
139:18 140:19
142:17 143:13,18
146:22,25 147:9
149:13,18 150:3
150:10 151:25
152:3,13 153:3
154:16,24 157:17
157:20 159:16,19
162:17 163:2,13
163:14,21 164:16
165:5,10,18 166:1
166:4,9 167:7,16
168:6,8 169:6
173:7,16 175:1,13
176:4,6,9 178:12
179:13 180:23
182:6,10,14,21
185:15,19,25
187:18 190:25

194:19,23 195:10
205:10 206:16
211:4 213:25
214:5,8 217:11
226:21 227:19
235:22 236:1,4,16
236:19 241:23
242:1,14 247:1,11
255:24 256:6,7,15
257:22 260:25
261:5,6 265:5
266:18,22 267:10
268:17 269:7
275:6,11,23,25
276:12,23,24
277:8,11,13 278:1
278:7,13 279:5,7
279:14 280:13
283:3,8 285:12
honored 91:16
Honor's 115:20
hope 229:2,9
262:16
hopeful 110:24
hopefully 116:22
hoping 22:19
hot 236:25
hour 113:7 215:2,5
276:20
hours 116:19 276:6
hour's 275:12
house 85:6
housekeeping
276:1
Housing 111:13
HSBC 280:22
282:18 283:1,9
HSI 250:13
HUD 62:11
huh 15:5 166:14
humans 231:16
hundred 40:10
127:15 204:6,7
254:22
hundreds 59:1 60:2
61:7
hurry 236:25

HUTZ 9:2
hypothetical
173:12 185:19
hypothetically
192:5

_____

**I**

ID 287:5
idea 83:16 114:17
172:13
identical 140:25
143:3 162:11,12
identification 32:7
103:7 178:9
identified 69:3,22
116:6 118:20
125:9 177:20
211:19 256:18
265:19
identifies 125:6
273:25
identify 17:11 23:1
27:20 45:9 65:14
116:1 177:7 179:7
180:1 183:8,12
229:10 241:10,12
270:8,12 280:15
iii 8:24 174:12
191:19
IL 8:22
imagine 116:11
181:15 200:12
immediately 86:4,6
86:8 92:11 264:20
impact 60:4 72:13
72:18,23 148:12
impediment 23:7
implications 60:2
importance 69:6
203:6
important 34:18
imports 17:25
improve 84:14
improvement
84:10
inbound 83:21
incentivized 61:18

include 17:8 28:23
51:11 53:16,20,22
54:23 55:3 85:15
91:23 173:22
177:15 191:21
192:14 194:10,10
207:20 230:19
244:17,20
included 38:21
53:10 54:12 81:20
85:13 142:12
177:17 181:10
194:14 249:13
284:22,24 285:1,2
includes 83:12,13
84:3 192:18
including 18:2
23:16,25 30:8
51:20 116:15
138:17 146:12
171:5 203:7 272:7
incorrect 186:24
187:2
increase 200:8
increased 198:11
198:22
incubation 17:16
indelible 151:4
INDELICATO
2:21
indemnification
104:3 137:18,23
138:3,6,21,22
139:2,6 140:9
141:2,8,20 142:19
143:2,4,8,21
144:6 145:14
146:6 148:19
154:7,18 183:16
194:1 282:9
indemnifications
144:5
indemnify 141:5,6
141:10 143:11
146:8 149:5 154:8
indemnifying
139:4 143:9

**indenture** 55:12
258:4 259:5 265:7
**independent** 91:5
141:12 158:16
**index** 229:6
**India** 18:6
**indicate** 124:24
134:8 149:1
163:22,24 258:4
**indicated** 49:13
68:14 72:1,22
101:5 102:24
195:22 202:19
203:15,21
**indicates** 135:23
142:22 153:6
**indicative** 71:20
**indicia** 164:1,13
**indiscernible**
271:22
**individual** 74:17
80:2,18 83:2 85:3
89:11 97:7 98:23
106:16,23 155:24
180:6 215:15
219:19,19 220:25
222:22 230:3
249:14
**individually** 111:6
**individuals** 69:2,6
70:15 87:15
195:24
**individual's** 216:3
219:8
**industries** 17:11,15
23:9 72:7
**industry** 17:2,4,8,9
17:9,10,10,13,13
17:21,22 24:9,12
24:13 46:25 68:23
69:25 81:11 110:1
197:12 212:16
**influence** 187:10
**inform** 119:3
**information** 57:14
57:24 90:5,6,8
93:12,18,20 98:25

107:24 109:5
111:22 119:25
120:16,19,22
121:4,7,9,13,23
121:23 122:22,24
158:16 180:4
193:20 218:24
219:2 222:9,13
223:23 244:20,21
244:24,25 245:2
245:10,18,21
246:2,11,17
274:21,25
**infused** 18:3
**initial** 20:1 38:18
58:5,25 59:5 61:6
63:4,7,10 99:14
99:20 191:22,22
191:25 192:7,18
192:19 193:11,12
243:11 261:22
262:4,7,9,10
271:23 273:2
**initially** 64:14 82:9
273:23
**initiate** 94:6
**inquiries** 83:21
89:21
**inquiry** 70:2
**inserts** 123:16
**insolvency** 174:21
**instance** 17:20
130:4 251:21
**instances** 22:18
81:24 82:4 131:14
132:9 135:17
193:23 232:8,10
**institution** 91:6
230:13
**instructors** 98:15
**insurance** 17:10
74:9,10,10 85:6
91:1 92:13,14
95:8 109:14,16
195:17 200:20
222:18,21 223:1
223:11,14,20

255:4,7,9,12
**insure** 208:22
228:23
**insurer** 223:16
**insurers** 222:18,20
**insuring** 85:16
89:16
**integrated** 207:10
**integrating** 72:15
**intend** 47:7 57:13
57:23 58:15 62:11
68:13 114:17
124:4 149:18
256:21
**intended** 154:21
172:11,16 192:1
270:15
**intending** 29:12
37:10 39:5 62:4
**intends** 37:4 51:3
183:2
**intent** 38:5 47:11
51:17 60:21 69:15
173:10
**intention** 19:19
23:12 51:11 70:13
72:1 192:6 275:2
280:15
**intentional** 142:4
**intentionally** 112:7
169:18
**intentions** 23:20
185:5
**intents** 59:9
**interaction** 78:8
89:14 196:1
**interactions** 90:3
**interest** 40:13 43:4
43:7,13 93:24
96:19,22,24
105:13 137:2
155:6 157:8
251:12,15,18,19
251:20
**interesting** 261:7
**interface** 230:25
**interim** 18:20

26:16 27:5 39:25
46:11 63:15 78:19
81:25 82:5 87:8
95:4 96:2,10
99:22 100:17
124:12 125:4,5,14
126:9 133:21
138:10,12,23
139:5,8 141:10
156:7 166:24
177:13 243:2
267:16 268:6
**internal** 50:6 84:11
84:13 128:17,24
135:5 171:6
**internally** 66:23,25
**interpret** 36:14
**intimately** 64:4
**Intraceuticals**
117:9
**introduce** 22:7
**invest** 50:4,19
**investigate** 246:15
**investigated** 109:4
200:24
**investigation** 201:5
201:12
**investing** 16:11
77:23
**investment** 15:22
16:1,10 18:5 19:2
19:4,12 20:5,6
31:4,10,19 38:25
39:3 45:25 46:2
46:13 48:19 50:3
50:6,7 61:12,13
61:16 66:9 67:7
68:5 121:4 206:23
207:13 259:4
260:7 264:24
**investments** 16:24
71:24
**investor** 42:7 78:12
78:15 79:17,19
80:17 84:15 85:2
85:5 90:1,7 94:5
95:10 96:24

102:23 108:10
109:23 120:20,20
121:1,5 184:16,17
213:19 216:2
217:4 219:19
220:4,23,23,25
224:23,25 225:5
225:15 237:16,16
237:19 238:18
244:13 245:11
248:2,3,12,21
250:14 253:5
254:21 270:18,20
274:8,14,19
284:11
**investors** 79:9,10
79:11 80:7,8 84:1
84:18,20,25 90:8
90:10 95:12
105:17 215:25
238:22 251:1
252:2
**investor's** 94:9
**invoice** 97:22
**invoices** 97:24
107:2
**involve** 77:6 89:15
**involved** 16:12
17:12,17,22 23:6
30:9 53:8 72:8
77:22 88:10,12,14
102:6,9 103:25
107:25 109:8
110:7 115:20
128:9,12,14,21,22
131:7,10 135:6
136:7,17,17
142:14 177:8
183:20 187:23
191:12 192:23
193:8 231:16
233:24 239:7
241:10 255:14,15
277:16
**involvement** 44:23
78:18 107:5 123:2
123:20 169:3,14

183:12 185:4
**involving** 174:21
260:20
**Irving** 160:10
**issue** 70:23 75:16
91:5,16 92:8
101:21 102:13
116:4,5 144:23
161:4,5 205:23
215:19 219:12,24
223:9 224:6 257:4
277:5
**issued** 91:1
**issuer** 259:4
**issues** 34:17 50:15
101:4,13 106:7
114:23 188:14
208:7 209:18
213:10 217:22
218:7,22 221:23
223:2 240:11,12
277:14
**item** 91:5 105:5,5
105:22,23 107:24
109:5,6 114:11
125:8 220:23
232:20,25 258:13
258:13 259:1
267:4,9,11
**items** 84:5 85:9
89:19 90:22,25
92:4,14,17 93:25
97:3 100:18 105:1
106:3,11 123:13
123:15 135:18
148:13 158:4
201:15 220:4
231:15
**iterations** 143:22
**it'd** 252:8
**i's** 254:1
**i.e** 58:9

---

**J**

**j** 5:17 6:8 7:23
12:15 13:7,15
14:7,12 109:19

259:2 267:12
**JAMES** 2:12 12:2
**January** 111:5
267:18,19
**JEFF** 9:24
**JEFFREY** 10:9
**Jennie** 79:23
**Jenny** 92:10
**Jim** 229:7
**job** 39:16 70:8
71:12 151:10
196:22
**jobs** 70:1 184:11
**Jody** 134:23 135:4
135:5,6,9,10,13
136:17 142:13
**Joe** 75:9
**John** 2:13 115:24
275:25
**Johnson** 122:10,11
159:23 196:4
276:4,7
**Johnston** 122:9
**join** 203:19 204:1
**joining** 16:20
**JONES** 10:11
**JOSEPH** 14:17
**JP** 8:3 167:3
**JPMorgan** 166:17
166:20,21 167:6,8
**Jr** 2:12 76:16
**judge** 1:24 269:4
**Judge's** 137:7
**Juliet** 267:13
**July** 159:20
**June** 77:14 247:21
250:5 281:8
**jurisdictions** 21:1
100:5
**JUSTICE** 14:10
**J.P** 258:14

---

**K**

**K** 2:10 4:21 6:17
**Karen** 256:8
**Katherine** 135:1,19
**KAYE** 3:11

**keep** 97:4,16
116:21 181:19
278:5,8
**kept** 216:7
**key** 69:3,23
**keyed** 98:6 175:18
**kicks** 223:11
**Kim** 73:9 75:7
205:15
**KIMBERLY** 11:25
**kind** 15:21 21:3
66:14 70:22 246:3
270:8
**King** 9:13 14:13
**KISSEL** 9:18
**KLEHR** 13:17
**knew** 68:7 104:24
201:13
**know** 17:23,25 18:1
18:4,18 19:16,17
20:1 22:24 23:15
24:13,15,16 25:8
26:3 27:19 30:3
30:18,21,24,25
31:2,3,13,15,22
34:14,17,20 38:20
38:20,21 39:8,10
39:12,13 40:9,11
40:16 42:5 43:18
44:4,14,17,21
45:7,25 46:9,18
47:9,21 48:19
50:1,12,13,20
52:1 54:25 55:1
56:11 59:8,9 60:7
60:10,11 62:7,7,9
62:15,21,22 63:17
64:18,18,19,21
65:2 66:1,8,10,11
66:12,14 67:8
68:19,20,22 69:13
69:13,16,17,18,25
70:2,3,8,9,21,22
71:2,10,11,17,21
71:24,25,25 72:8
72:17 73:2,25
74:2,8,12,13

75:12,14,19 82:4
83:10 89:21 90:25
91:19,25 93:9,19
97:16,17 100:14
107:6 111:16,16
112:19 114:24
116:18,19 118:24
121:6 122:12
123:14,19 125:11
129:10 130:21,23
133:18 134:12,19
135:4,13,19,20,21
136:6,19 137:25
138:24 144:1,25
147:21 148:22
149:16 150:8
152:19 155:11
156:10,22 157:1
159:10 162:1,14
162:16,24 163:23
168:25 170:8
172:18 177:3
181:11,16,17
185:3,7 187:3
189:11 191:10,25
192:3,6,21,22,25
192:25 193:1,9,13
194:16,17 198:12
199:1 201:23
202:9,12,12
204:12 206:10,14
207:23 208:15
209:2,6,9 210:11
210:14 211:3
212:10,25 213:10
213:14,18,21
218:10 220:5,14
222:8,10,11,12,14
222:23 224:13
225:1,14 226:8
231:12 237:25
238:1,3,6,13
240:10,16,19
241:19 242:6,10
243:22 245:5,25
246:10 249:16,19
252:12,14 253:9

253:12,16,18
254:13,14,17,20
255:17,21 257:3
262:14,15,25,25
265:3 268:7,23
273:4,7,10 275:1
275:5 278:7
280:11
**Knowing** 212:8
**knowledge** 32:22
35:4 44:24 48:16
48:25 51:14 64:2
68:14 100:6,9,11
104:23 107:19
109:1,13,15,17,20
123:19 130:2
140:12 158:24
172:19,25 183:24
195:23 202:16
204:3 235:17,20
239:12 267:22
268:3,7,9
**knowledgeable**
70:13 184:7
**known** 95:15 213:9
**knows** 30:8 94:2,4
117:10,11 120:15
**KORTANEK** 6:17
**Kuney** 4:24 167:16
167:17,19 168:6
168:11,21 169:9
169:13 173:9,13
173:16 174:7,9
175:3,6 176:6,13
178:14 179:13
182:6,10,14,17,21
182:24 185:18,25
186:4 190:10
191:2 193:15
194:19 279:7,7
280:4 286:16

---

**L**

**L** 2:12 76:16
**labeled** 137:22
250:12 281:15
**lack** 17:12 70:3

193:18
**laid** 100:16 104:13
121:1 164:14
190:13
**Lakeside** 10:14
**Landis** 8:2,8 167:7
**language** 138:17
190:1,2 272:13,14
**large** 88:23,25
101:7 244:25
**larger** 38:23 39:2
55:5 81:21 200:3
230:17
**largest** 18:7
**Lastly** 72:1
**lasts** 116:18
**late** 40:12 97:6,14
107:16 109:23
116:8,12 119:20
195:11 275:12
280:12
**latest** 117:4
**latitude** 215:6
218:9 226:6
**LAURIE** 4:8
**law** 22:15 136:1
170:11,12,14,19
177:20 208:19
214:17,25 222:12
**laws** 100:10 177:21
**Lawson** 11:25 73:8
73:9 75:24 76:1
205:12,14,15
206:6,9,20 211:13
213:24 286:13,17
**lawyer** 30:25 143:6
143:7 171:12
217:12
**lawyers** 31:1,1,13
47:9 59:8 81:14
142:9,23 176:9
233:24
**lay** 83:1 97:7,11
105:8 130:22
190:18 220:5
223:20
**LAYTON** 9:10

**lead** 135:17 152:9
**leader** 86:1
**leaders** 87:22,23
**learn** 192:7
**leave** 75:2 118:14
256:9 285:19
**leaves** 67:14 165:3
**leaving** 226:14,14
226:23
**Leber** 16:24
**left** 88:1,2,4 92:14
235:23 276:4
281:13
**legal** 31:23 36:18
39:14 59:5,10
99:16 110:10
135:5,18 136:3
139:11,16,17
140:5,5,7 145:6
146:23 147:12
148:14 149:14,16
152:14 156:17
169:19 171:15
175:2,13 176:5,5
181:16 183:12
185:16,18 187:18
190:9 221:18
235:15 241:16,24
242:11 261:1
262:7,14,15
266:10,11 283:5
**legalisms** 262:17
**legally** 224:23
**legitimately** 60:14
**Lending** 269:16
**lengthy** 117:21
**Leo** 258:2
**letter** 22:3,3 23:2
31:11 49:14 55:22
56:4,17 83:1
101:22 127:12,23
159:15,20,21
160:5,7,8,18,19
163:11 165:4,7
174:6 178:9,17
200:21 264:5,23
265:19 266:5

279:25 287:8,13
287:14
**letters** 20:19 21:3,5
21:8,10 25:13
71:14 102:11,14
102:17,22 103:6
103:17,19,20,21
103:23 104:7
112:3 113:5,12
123:4,9,10 151:22
279:16 287:9
**letting** 130:17
**let's** 17:20 51:2
59:13 63:2,19
74:23 75:4 76:7
112:24 113:25
114:2,8 115:9
130:21 132:22
134:15 137:12,12
140:17 142:19
150:5 155:25
181:19 187:25
188:1,7 195:2,11
198:1,6 206:7
220:12 239:16
241:19,20 280:10
**level** 89:11,11,15
89:25 90:1 98:25
151:18 192:24
201:14 219:1
246:19
**leverage** 61:15
**liabilities** 18:1
63:10 183:17
185:20 226:18,19
227:4
**liability** 63:23
226:15
**Liberty** 11:13
**license** 208:14
**licensed** 20:13 62:4
100:4,6
**licenses** 22:14
99:18
**licensing** 20:21,25
62:6 99:15 266:10
**licensure** 20:15

**lien** 124:23 195:19
**lies** 37:10
**light** 264:16
**limit** 46:4 50:2,5,10
50:10,11,12,18
198:11 200:8
**limitation** 26:14
**limited** 26:4 50:8
106:9 138:17
146:12 259:8
272:8
**limits** 50:7,7
**line** 35:20,24 36:23
37:9 39:11 41:24
42:13,16 52:15,25
54:1 74:18,22
133:5,14,19,24
134:1,1,5,9,13,15
134:22 137:1,6
140:17,25 141:3
142:1,20 143:5,11
143:19 144:2
145:23,25 163:9
163:19 164:4,6,20
165:17 191:19
192:14 210:5,15
211:3 217:14
254:3 280:7
**lined** 66:22 133:2,4
133:20 143:2,3
163:10 281:21
**lines** 54:1 77:2
132:22 143:23
145:15 146:1,2
177:14 189:23
192:13 198:10
203:12 264:17
272:3 282:16
**linked** 158:3,4
**liquidity** 20:2 24:6
45:17 66:9,13
67:5
**Lisa** 288:4,12
**LISCIO** 3:17
**list** 47:20,23 63:20
69:1,2 176:19
178:23 179:5

180:1,22 181:2,4
181:20 182:8
203:10 211:20
256:21 258:7
268:22 277:2,3
**listed** 43:10 57:10
75:20 98:22,24
106:20,20 128:23
129:5 138:10
180:7,11,20,24
240:12,14,19
**listing** 235:18
**lists** 175:25 241:8
274:10
**literally** 254:9
**litigation** 221:10,17
234:17 235:18
**little** 15:24 22:11
22:12,12 34:6,7,8
36:5,6 42:11
72:19 84:7 119:10
128:1,2 138:9
146:17,19 150:5
171:14 174:12,16
182:9 188:8 194:8
195:7 204:14
216:8 225:7
240:23 250:18
251:7 254:1
261:21 270:11,11
270:22 280:12
285:20
**live** 151:5
**LLC** 5:19 15:20
**LLP** 2:3,16 3:2,11
4:2,10,19 5:2,10
6:2,19 7:2,10,17
8:2,10,19 9:2,18
10:11 11:2,11,19
12:2,10,17 13:2,9
13:17 14:2
**load** 215:21
**loan** 35:21 47:6
48:9 66:18 74:13
74:15,18,20,20,21
74:25 75:1,2,11
75:13 77:1 78:5

79:10 80:9 81:25
82:5 83:18 85:12
85:18,18 87:4
89:11,15 90:1
93:12,20,23 94:1
94:2,4,9 95:3 96:4
96:8,19 98:25
105:7,10,13 108:2
108:5,10,11,20,25
111:11,12,13
113:23,25 114:1,3
114:4,6,7,7,9
119:15,16,18
120:15 121:14,17
121:18,19,25
122:1,16,25
124:12 160:22
166:22 189:24
194:9 197:2 210:8
212:3,9 215:16,20
215:22,24,25
216:2,12,14,15,18
216:20,21,24
217:4,5,10 218:13
218:19,19 219:5
219:15,16,20
220:25 221:8
222:2,22 223:9,9
223:10,25 225:14
225:18,23 226:1,4
232:3,7 237:5
245:4,4,6,7
246:19 247:20
249:11,13,23
250:1,4,13 251:14
251:17 253:11
254:6 267:16
269:22 272:24
274:10
**loans** 26:20,21 29:4
38:3 40:11 46:16
49:4,5,9 53:10
55:13 72:2,14,23
72:24 75:21 77:23
78:5,6,10,12,13
78:14,16,16,18,25
79:1,15,18,20,25

80:7,12,14,17,18
80:25 82:11,17,22
82:23 83:3,11,12
85:5,15 86:9,9,18
87:1,2,5,7,12,13
88:8 89:6,9,20
90:5,9 92:9 94:21
94:24 95:14,16
96:2,6,9,13,14
97:22 98:21,23,25
99:3,5,23 100:2,9
101:9,18 104:25
105:7 106:12
107:10,12,13,18
108:19,20 109:18
109:22 110:6
112:14,15 119:21
120:1,23,24
121:10,20 123:24
124:1,14,23 125:3
125:5,6,12,17
126:7,9,14,15,20
126:21 127:2,15
127:20 128:6
129:14 130:8
131:2,5 146:13
148:9 149:7
150:15,17 151:2,6
151:11,15,22
152:9 155:5,16
157:8 159:1,2
160:21,23 172:23
173:21 177:9,11
177:11,13,13
179:7 180:6
183:14 184:13,16
188:21 195:18,19
196:12,18,24
197:2,9,17 198:18
199:16,23 202:17
204:6,8,24 205:8
207:22 208:20,22
208:24 209:2,4,5
209:12,13,14,16
209:19,20,21
210:2,3,11 212:25
213:3,5,16,22

216:4,10 217:20
217:24 218:4,8
221:21,24 222:25
223:19,21 224:3
229:21 230:4
232:12,19 233:5
237:18,20 238:1,4
238:8,9,12 240:7
241:6,13,14,14,16
241:18 242:20
244:16 245:1,24
246:5,14 248:1,8
248:11,13,13,21
249:14 250:11,13
250:15,21 254:10
254:11 259:24,25
260:11,17 267:21
268:4,8,9 270:9
270:21,24 271:3,6
271:7 272:5,10
273:1,4,11,18
274:1,13,22,23
284:4,6,6,10,14
284:20
**local** 100:10
**locate** 111:3 182:7
267:3 269:9
**located** 160:11,12
270:1,2
**lock** 93:10,16
**LODGE** 9:2
**Loeb** 14:2,2 256:17
256:17 268:18,18
269:15,15
**logical** 226:3
283:13
**logistics** 169:22
262:4
**long** 16:3 22:16
31:1 77:13,17
83:15 116:17
117:3,3,8 118:18
125:12 192:13
205:7 213:10
219:22,25 247:19
268:5,5 273:21
279:7

**longer** 63:24 64:14
87:12 108:10
114:24 159:2
209:23 226:17
234:6
**look** 17:14 23:14
34:14,21 35:18,19
52:22 56:16 57:5
58:3 70:20 73:2
79:2 83:9 84:13
89:8 91:21 104:1
106:13 109:1
120:5 124:18
126:12 133:19
134:15 135:22
136:24 137:12,17
140:14,15,21
141:3 142:19,23
145:14 148:7,17
164:3,5 168:2
178:8 179:9,9
181:22 183:22
184:2 185:3,16
187:12 188:7
189:20,21 191:13
191:18 196:13
197:8,21 198:17
198:24 207:5,8
258:13 259:20,22
263:3 269:17,21
270:16,18 271:16
271:24 274:7
281:5,12 282:16
283:14 284:17
**looked** 45:13 56:12
75:18 106:5
107:22 109:4
134:12 143:4
166:4 183:11
192:21 232:25
**looking** 25:8,9
35:16 54:22 55:5
56:6 70:1,8 72:7
72:10,12 107:21
133:7,12,17
136:10 140:5
143:19 145:15,24

146:25 152:23
156:16 173:22
197:6 204:15
212:23 229:2,3
260:17 270:14,23
274:15,15 283:8
**looks** 46:18 234:25
256:4 260:12
281:17,19
**loop** 142:15
**loose** 206:2,3
**Lopez** 7:8 277:12
**Los** 6:6
**lose** 149:23,23
150:21 151:19
153:17
**losing** 216:8 225:6
**loss** 99:21 218:20
218:24 223:10
262:13
**losses** 18:19 50:17
146:9
**lost** 30:15 83:13,14
171:14 189:16
208:14 219:5,13
220:9 222:6 226:1
231:23 232:2,6
**lot** 24:4,14 38:22
39:2 56:9 60:8,11
61:11,22 69:24
70:1,24 81:23
82:2 83:15 84:11
84:11,12,12,13,23
91:19 95:3 111:10
114:17 132:9
136:15 166:5
212:15 220:2
226:5 233:24
264:2 276:25
277:9 280:7
282:24 283:1,12
**Love** 76:14,16,20
88:10 96:12
103:17 104:10
113:20 114:25
115:13 119:8
124:9 128:12

133:7 137:19
144:12 147:3
158:19 160:20
165:21 167:20
174:11 178:17
179:14 186:5
188:10 190:19
192:25 195:13
211:16 215:11
227:22 235:7
236:6,23 247:17
256:10 257:11,12
257:15 258:1
266:25 269:14
276:5 279:8
280:21 286:14,15
286:16,17,18,19
286:20,21,22,23
286:24,25
**Love's** 129:19
**low** 249:4,4
**LTV** 18:2
**luckiest** 114:25
**lunch** 113:7 114:19
114:24 115:3,16
**Lynch** 14:3 111:14
256:16,19 268:22
269:15,23 273:15
274:1,24 275:3
**L-O** 76:16

**M**

**M** 2:14 3:18 9:8,16
14:17 258:13
286:4
**MA** 12:13
**Mac** 49:18,21
53:15,19 73:19
92:10 161:22,24
162:2,4,6,15,16
**Mack** 212:1,9,18
**Madison** 2:18 13:4
**Mae** 22:18 23:2,4
46:17 49:5,15
51:12,17,20,22,25
52:9 53:14,16,18
53:21,23 54:3,6

54:11,14,21,23,25
55:4,17,22 56:4
56:17 57:6,8,20
58:7,9,12 59:14
61:15 92:10
100:13,15,19,20
100:22 161:5,7,12
161:16,18 162:9
194:9,14 211:25
212:9,18 219:12
238:21 287:8
**Mae's** 57:23
**Magnifying** 42:14
**Maguire** 167:7,7
167:11,15
**mail** 85:19 230:10
**mailed** 123:12
**mails** 143:6
**main** 95:8 96:8
223:5,6
**maintain** 90:11,12
109:13,15 155:5
**maintained** 119:23
120:1 155:15
157:7
**majority** 20:10
67:15
**maker** 91:12
**making** 29:3,3,12
29:14,16 30:4,19
31:6 45:20 92:24
94:14 120:10
225:3,9 256:20
**man** 114:25
**manage** 16:9 77:5,9
233:1
**managed** 23:13
122:13
**management** 18:4
23:14,15,17 29:7
30:10 60:19 68:13
69:19 71:18 74:3
77:4 84:2,7,16,20
85:20 87:16,17
88:4,16 104:21
106:5,8,10 176:23
203:6,25

**manager** 88:6
**managers** 88:2,3
**manages** 84:3,16
**managing** 16:1,6
83:24 84:21 89:20
89:20 152:24
**Manhattan** 3:4
5:12 10:5
**manner** 99:19,19
110:1 151:11
231:13 232:19
283:13
**March** 32:14 120:4
167:22,25 170:6
175:20 237:6
**margin** 52:19
**MARGOT** 3:19
**mark** 2:21,22 3:17
24:24 102:16,18
103:3 124:2 140:3
140:5
**marked** 32:4,7
40:22 82:7 102:21
103:7 133:23
178:8 194:23
234:24 279:10
**market** 1:15 3:5
4:5 5:4,14 6:21
7:4 8:4,13 10:6
11:14,21 13:19
72:6 240:5
**marketplace**
260:17
**master** 48:9 80:5
82:19 120:21,21
124:11 160:22
208:5 217:5
219:20 220:6
227:23 228:2,4,6
228:8,11,16,22,23
233:4,8,15,19
234:1 247:20
249:11,23 250:1,4
251:18 258:4,15
258:19,21 259:3,6
263:14 267:16
274:22

**material** 69:11
255:10
**materials** 123:8
**matter** 1:6 22:19
47:11 61:12 75:1
93:5 104:5 116:16
181:6 187:24,25
204:22 208:20
217:15 221:18
242:5,6 259:7,10
260:23 261:22
262:7,19 276:1
285:7 288:7
**matters** 118:4,6
257:17
**Matthew** 167:7
**max** 216:23
**maximum** 39:18
40:1,1 46:7
192:11,14,16,19
192:20
**MBA** 16:17
**MCCLOY** 6:2
**McCutchen** 12:10
12:17 48:4 115:14
**McGlinchey** 20:20
20:23,24
**MCLAUGHLIN**
7:23
**MCMAHON** 14:17
**mean** 26:11 37:3,18
47:24 48:18 54:22
59:6 60:11 61:2
61:13,17,17 69:24
70:7,21 71:2,7
74:17 81:22 82:13
84:11 95:5 99:3
110:25 130:12,14
131:25 136:14
139:20,25 141:21
142:5 146:18
147:15 148:17
151:1 152:4
155:13,13 164:3
170:21 174:16
193:20 197:23,24
198:3 206:21

208:2 209:15
213:9,20,20,20
221:18 225:1
232:5 250:24
254:9 261:12,21
262:3 278:10,19
**meaning** 176:11
208:12 261:12
**meaningless**
116:10
**means** 101:22
129:20 192:16
193:14 208:3
232:1 237:17,18
**meant** 261:11
**mechanics** 64:3
156:10 262:15
**mechanism** 252:12
255:21
**meet** 38:13 51:21
151:3 161:16
162:7
**meets** 223:22
**MELLOTT** 5:19
**Melville** 160:16
**member** 16:1,5
20:7 74:1,7,9 77:4
100:7,8 135:5
**members** 20:9 46:1
67:13,16,17
**memory** 131:14
135:6 136:7,10
137:5,8 140:15
141:12
**mention** 152:19
**mentioned** 21:2
23:9 25:3 69:24
70:25 85:25 89:13
92:6 95:2,15
109:10 138:23,24
139:25 140:2
148:25 152:20
158:14 199:1
208:12 233:4
250:22 263:1
270:10
**mentioning** 132:7

193:9
**mentions** 139:4
**merely** 148:18
**Merger** 263:13
**Merrill** 14:3
111:14 256:16,18
268:22 269:15,22
273:15,25 274:24
275:3
**MERS** 100:7,8
**met** 31:18,18 122:1
216:2
**method** 93:5
**methods** 230:6
**MI** 222:18,23 223:1
223:7,10,16,17,19
**MICHAEL** 5:24
**microphone** 15:23
22:11 44:10
**middle** 196:17
**mid-2001** 17:23
**MILBANK** 6:2
**million** 18:3 19:18
19:25 24:18 30:24
33:9 34:11,18
37:1 38:15,16,18
38:23 39:2,23
40:3,10 44:16
49:11 59:19 62:24
66:11 127:16
161:2 186:16
194:5 204:8 238:3
260:6,6 273:25
274:10
**millions** 59:1 60:2
61:7
**Mills** 117:19
**mind** 57:16 58:1
61:8 167:22
235:25 264:14
**Mine** 128:1
**minimal** 53:13
97:18
**minimum** 38:24
46:20,23 51:24
54:14,23 60:5,14
194:5,11

**Minneapolis** 7:21
**minute** 56:22 58:3
76:7 247:2 258:6
275:22 276:19
**minutes** 20:11
116:19 166:3
275:17,19
**minute's** 66:3
**mischaracterized**
154:18
**mischaracterizes**
28:15
**miscommunicati...**
195:7
**missed** 113:17
**missing** 112:10
211:22 256:18
269:25
**misspoke** 132:20
**mistakes** 231:12,14
**mitigation** 83:14
83:14 218:21,24
219:6,13 220:9
222:6 226:2
231:24 232:2,6
**Mittal** 18:6
**mixture** 209:9
**MLMCI** 270:13
**MLPISA** 82:5
132:13,18,18
133:16
**MLPSA** 80:18 81:1
82:9,15 132:12,16
133:16 155:17
**MLPSAs** 81:12
**MN** 7:21
**model** 81:10
**modeling** 39:20
84:12
**models** 54:7,8
**modification**
197:14 198:18
199:20 200:5
216:2,14,18,23,25
217:4,6,10 218:14
218:20 219:15,17
219:21 221:8

223:25 224:7
**modifications**
197:6,13 198:9
200:4 215:16,21
215:22,24,25
222:3
**modified** 36:10
199:16,24 284:21
**modify** 197:2,18
**moment** 21:23
109:25 170:2
178:12 214:6
263:19 265:6,15
**moments** 103:18
**monetary** 185:9
**money** 24:17 39:24
46:2,4,9 60:8,11
61:11,12,18 66:3
66:14 67:21 68:10
70:22 74:16,20
91:13 94:2,7
155:20 179:20
188:21 202:15
224:16,18,18
225:5,17,20
230:20
**money's** 225:4
**monies** 202:7
**monitor** 90:14
208:6
**Monroe** 8:21
**month** 50:14 96:8
97:8,11,13 151:21
154:2 189:1,3,7,9
210:13 231:4,7
245:3
**monthly** 90:7
153:23 208:3
223:18 244:14
245:2
**months** 22:17
24:13 71:3,6,22
84:17 95:22 100:3
171:5 262:25
**Moody** 21:5
**Moodys** 102:4
103:7 113:13

287:10
**Moody's** 102:23
265:1,20,23,24
**MOORE** 6:8
**Morgan** 2:10 8:3
15:4,6,6,10,18
21:9,15,17 22:5,7
22:13 24:20 28:11
28:14,15 29:5
30:5,6 32:21
33:11 35:3 36:12
37:19,22,24 40:24
41:9,13,16,19
43:22 44:20,21
56:1 64:1 72:17
76:3,5 167:3
258:14 286:6
**morning** 15:4,5,19
22:1 27:22 48:3,3
51:8,9 62:2 65:20
65:21 76:12,20,21
100:16 118:23
119:4 264:1
265:20 277:6,8
**Morris** 5:2,10 12:2
65:16
**mortgage** 1:8 6:13
10:12 11:3 17:2
18:8,23 19:1,15
19:16 23:7 24:9
32:20 33:9 35:21
38:4 42:7 45:21
45:22 53:10 55:14
60:20 62:3,11,17
63:6,14,21 64:24
68:23 69:25 73:10
76:23,24 77:5,23
78:12,16 80:9,11
81:24 82:5,16
95:3 97:10 98:2
101:18 107:17
110:6 111:5,9,9
111:11 114:3
119:21 122:3,4,5
122:13,21 124:10
124:11,23 126:6
127:3,8 130:21

131:2,5,6 146:13
152:21 156:1
158:25 159:4,22
159:23 160:10,15
161:24 166:22,24
168:12 172:23
173:21 187:15
189:24 194:9
196:18,24 197:2
199:15 202:16
206:23 207:13,22
208:13 213:4
214:13,13 215:15
215:17 216:15
222:18,20,21,25
223:8,9,11,20
225:3 229:3 230:3
230:3 231:9,13
237:5,7 238:1
241:6,18 244:14
246:9,11,13
247:17,20 249:11
249:13,23 250:1,4
250:11 251:9,14
253:11 254:4,7,11
255:18 259:3,4,6
260:16 267:16,20
269:15 272:4
284:4,10
**mortgagee** 62:12
**mortgager** 93:2
252:4
**mortgages** 20:13
51:12,17,20,22,25
52:10 53:14,15,21
53:24 54:3,6,11
54:14,21 55:4
58:12 59:14
195:19 208:15
259:13
**mortgage-backed**
55:8,12
**motion** 24:22 27:18
28:3 63:3 88:15
114:16 171:17
176:7,23 214:9,10
278:10,14,24,25

279:2,3,4
**motions** 88:13
171:20,21 176:15
176:21,22 190:20
**move** 22:8 27:24
40:20 44:9 58:24
63:2 64:22 69:15
71:19 79:19 87:3
94:6 110:8,15
111:20 112:2
144:10 162:18
163:8 169:11
193:16 211:13
257:17 276:25
277:7 279:9,10
280:16
**moved** 16:22,25
113:10 194:24
**moves** 284:6
**moving** 31:4,19
47:25 62:6 79:18
**MSRs** 54:25
**multiple** 127:20,20
154:17 228:10,10
238:8
**MURR** 74:1
**mutual** 168:4 240:4

**N**

**N** 2:2 15:1 286:2,4
287:2 288:2
**name** 15:15,15,15
62:2 76:16 160:9
213:25 227:22
251:10 257:13
258:2 288:13
**names** 16:11
111:10
**narrow** 66:17
**National** 77:15,17
77:18 111:6 213:5
254:15
**nature** 95:13 105:4
109:10 231:10
**necessarily** 132:10
144:8,25 148:16
188:6 272:13

**necessary** 19:15
20:4,17 60:14
71:3 99:15 101:20
118:3 119:22
221:17 266:10
**necessity** 156:24
**need** 20:9 22:3,3
29:14 30:3 35:18
37:23 42:13 44:9
44:9,14,17 46:11
47:13 49:22,25,25
52:7 67:15 85:9
92:24 94:18
100:18 102:17,18
108:7,9 109:8
114:23 115:19
116:2 118:24
151:9 165:21,25
166:11 178:12
197:24 199:16,18
199:24 200:2,6,9
211:14 216:17
217:8 218:14,19
219:23 222:21
223:6,13 224:7
226:8 236:19
252:5 263:22
268:25 274:25
278:9,14 285:20
**needed** 60:13 67:6
73:20 91:18
169:20 200:3
225:22 280:16
**needs** 18:19 19:22
19:24 45:16 47:9
63:17 90:8 105:13
113:11 194:12
215:19 217:13
**neglected** 279:9
**negligent** 38:25
**negotiate** 81:6
135:14 169:2,5
**negotiated** 25:20
81:5,13 82:7
128:4 129:12,20
130:6,24 131:1
168:25 169:17

170:1 172:11
**negotiating** 128:18
133:15 135:18
**negotiation** 128:10
128:12,14 131:7
133:13 135:7
136:8,12 144:1
164:11 170:24
**negotiations** 25:6
128:21,22 137:9
170:25
**negotiator** 18:9
**neighborhood**
40:10
**Nelson** 117:9
**Nemours** 9:4 11:4
**net** 31:21 40:7,7,14
43:7 44:6,14 45:5
45:10 58:8 59:13
59:18 60:5 62:24
96:25
**netted** 43:20
**netting** 44:16
**network** 60:14
**NEUFELD** 6:9
**never** 71:25 107:23
109:9 110:6,7
116:24 159:12
171:9 181:21
202:20 221:2
224:2,2,5 225:18
225:19,24,25
**new** 2:19 3:14 4:13
5:20 7:13 9:11,21
12:20 13:5 14:5
40:4 55:7 77:1
78:23 85:18,18
87:3,10,13 95:18
101:23 102:1
108:3 125:12
131:17 160:16
210:22,24 211:4
217:21 227:5
258:2,15,20 259:4
260:9 268:21
269:6
**newly** 18:24 78:4

**nice** 41:10
**Nichols** 5:10 65:17
**night** 116:12
118:25
**nine** 87:18 203:12
**ninety** 78:22 95:17
114:3,4 119:17
**NIXON** 13:2
**Noah** 4:25 27:22
**nomenclature**
74:14 270:13
**nominal** 96:6
**non** 182:18
**nonperformance**
150:23
**nonresponsive**
169:11
**non-compliance**
233:13
**non-HELOC** 260:8
**non-insider** 88:19
**normal** 23:23 36:9
78:4,21 86:25
87:1,9 89:24
90:23 92:25 95:20
95:23 97:4 105:1
107:9,25 108:8
129:2,3 136:16
153:21 184:14
189:10 202:18
209:18,22 210:7
211:9,9 213:21
220:11 224:25
243:7,14,20
244:13,23 245:16
253:15 262:12
**normally** 106:3
219:25 220:7
244:21
**north** 1:15 4:5 5:4
5:14 6:21 7:4
8:13 9:5,13 10:6
10:13 11:5 238:2
**Northrock** 72:10
**notate** 224:20
**note** 110:22 134:20
174:12 187:1

217:9 218:15
219:8,24 221:12
221:22 222:9
**notebook** 206:11
281:2
**notebooks** 269:6
**notes** 85:17 97:7
111:18 170:4,6
264:20
**notice** 66:3 159:21
165:6 178:18,20
178:24 180:9,13
180:18 181:25
200:15,19 240:15
243:9 275:1 279:3
279:17,21,25
287:13
**notices** 89:23,23
**notified** 92:20
**notify** 121:14
**noting** 21:20
**notwithstanding**
17:12
**November** 124:10
126:5 133:22
134:2,9 137:15
141:1,24
**NTC** 13:3
**number** 22:23 37:2
39:6 44:3 46:24
52:18 53:19 54:14
79:1 83:3 85:12
86:8,16,19 96:17
97:9 101:7,10
103:1 105:12
112:4 125:24,25
126:1 144:13,14
153:2 159:15,18
159:20 168:10
182:4 184:23
185:7,14 186:10
186:17,22 187:4
188:9 194:24
196:13 199:22
200:23 209:16,21
211:21 213:6,7
223:1 231:15

232:14,23 235:13
237:2,5 247:18
249:5 259:23
260:7 272:14
274:8 277:15
281:25 283:17
287:5
**numbered** 182:7
271:17
**numbering** 182:18
**numbers** 39:17
41:25 52:16 83:3
86:23,24 111:15
112:8 180:3,24
245:19 249:5
271:18 274:2,12
274:13
**NY** 2:19 3:14 4:13
7:13 9:21 12:20
13:5 14:5
**N.A** 3:12 4:3 8:11
8:20 9:19 237:8
**N.W** 4:21

_____

**O**

**O** 1:22 15:1 286:4
288:2
**ob** 130:10
**object** 112:19
113:11 146:22
147:9 149:13
151:25 154:16
157:17 163:14,25
169:6 175:1 176:4
190:8,25 241:23
**objected** 164:7
242:12
**objecting** 226:21
226:22
**objection** 21:7,21
22:9 25:14 26:13
27:7 28:11,13
29:5 32:21 33:11
33:17 34:7 35:3,3
36:12,13,16 37:19
37:20 40:23,24,24
41:1 43:22 44:22

55:25 56:3 64:1
72:17 103:5,9
110:18,20 111:21
112:16 113:3,6
128:8 129:11,16
131:19,23 139:10
139:19 143:13
147:2 152:13
162:20 163:3,4,12
163:14,17,18
164:16,19,19,22
165:3,5,9,12,12
166:18 167:4,12
173:7 175:13
180:23 185:15
187:18 214:4,10
260:25 261:5
277:17 279:13,19
279:22,24 283:3
**objections** 242:13
**objector** 119:3
**objectors** 27:19
75:2 103:1 117:1
166:12
**obligated** 34:5
252:7
**obligates** 230:2
**obligating** 51:14
**obligation** 28:23
35:1,11 38:2
63:13,15 75:13,13
94:12,13 95:9,24
109:12 110:5
138:14,16,17
141:8,10 146:13
151:3 184:20
185:1,9 186:15
187:6,16 189:17
190:4,21,24
208:10 210:24
217:20 223:6
225:24 228:23
250:13 253:11
**obligations** 28:10
28:20,21,25 33:1
33:2,3,19 35:1
36:11 37:7,10,11

38:9,13,22 48:15
63:9,14 64:25
71:9 73:15 79:24
80:4,6,13 81:15
82:10,12 94:18
95:20 96:11
104:25 110:9
143:21 145:10
146:12 149:10
151:6,9 158:11
160:6 184:3 194:1
200:22 201:6
202:21 204:12,19
207:17 212:9,10
213:15 221:14
229:23 242:17
243:18,24 244:1
245:15 255:12
259:8,9 262:20
263:14
**obtain** 20:15 57:20
57:23 68:3 74:16
99:15 100:18
103:25 122:22
162:7 199:19
223:6 266:10
**obtaining** 73:19
200:11 255:14,15
**obvious** 47:11
**obviously** 19:18
20:1 50:13 54:25
57:4 61:1 66:9
69:19 71:11 117:1
266:4
**occasion** 199:15
**occasions** 202:24
**occur** 50:17 72:5
153:12 216:18
218:8
**occurred** 68:18
**occurrence** 60:25
**October** 1:19 19:12
57:5,19 214:9
266:3,5 288:9
**offer** 124:4 213:12
223:24 265:8
**offered** 21:8 55:24

127:8 224:2
**offers** 68:15,15,19
**office** 14:11 38:20
67:10 114:24
277:1
**official** 2:17 3:3
52:19 288:5
**oh** 10:15 41:19
117:19 126:1
135:12 173:13
186:4 236:2 242:4
257:10,20 262:3
**okay** 16:7 18:11
19:21 23:1,3,17
27:4,13 28:2
32:13 39:9 40:11
41:15 42:3 45:14
47:3 51:4,14,18
51:23 52:3,6,7,21
52:24 53:7 54:15
54:18 55:7,11,16
55:21 56:21 57:1
57:13,16,19 58:15
59:17,23 60:16,18
60:25 61:21 63:2
65:3 66:4 67:12
67:25 68:2,7,19
69:5 70:11,18
73:22,25 74:5,13
74:15,23 75:6,7
75:15,23 111:1
117:17 118:12
119:12 124:5
126:4 129:10
130:4,19,23
132:22 133:9,25
138:2 146:3,5
152:3 165:24
170:18 173:13
174:2,13,19 175:6
176:18,24 180:14
181:23,24 182:24
188:19 191:17
194:13 195:11
196:3,7,13 197:1
198:14,15,22
199:4,8,9,14

200:17,22 203:3
203:13 204:11
205:9,24,25
206:19,25 207:5,8
207:14,23 208:2
208:12 209:2,6
210:3,15 211:5,12
211:12,18,25
212:3,20,21,25
213:23 214:3,21
216:10 217:18
220:12 222:8
225:2 226:7,11
227:14 229:15
231:22 235:4,6,17
235:21,24 236:15
237:17,20,23
238:11,19,25
239:9,13,16,18,19
240:19 241:3
244:17 246:2,10
247:1 248:3,5,23
249:6,9,16 250:1
250:9,17,24 251:4
251:11,21 252:10
252:14,19,22,25
253:3,8,13,16,22
253:25 254:2,3,5
254:24 255:2,6,13
255:17,23,25
256:13 257:1,19
258:10,11,12,23
258:25 259:11,14
259:19 260:8,11
260:20 262:3,7,24
263:5,7,8,11,12
263:15,25 264:1,8
264:16 265:11,16
266:4,7,13 267:15
268:14,19 269:20
269:21 271:14,15
274:5,11 275:15
277:22 278:15,16
281:6 282:3,10
283:16 284:18,19
**old** 254:11
**older** 213:4

omissions 57:21
255:4,8
omitted 112:7
omnibus 116:15
117:17 118:1
257:16,16 276:17
285:16
once 61:2 122:5
211:1 239:19
ones 26:18 88:14
101:11 181:3
253:23
one's 34:1 278:19
ongoing 92:19
102:10 107:24
online 230:10,14,15
230:16,17,19
open 102:19 202:3
operate 23:23
65:24 99:18
189:22 262:12
operated 23:16
operates 110:13
operating 23:8,10
24:16 39:15 50:17
62:14 64:19 74:3
149:7,21 152:7
190:3 193:17
196:8 243:6
operation 30:7
99:20 100:22
158:18 199:14
203:17
operational 38:17
193:19
operationally
129:1
operations 29:22
95:6 100:21
operators 69:16,17
70:12
opinion 22:1 87:15
87:17 88:7 89:1
106:19 194:16
245:19
opportunities 72:6
73:2

opportunity 68:24
99:13 114:21
115:16 280:9
opposed 129:23
158:3 284:10
option 51:15 94:19
219:16 223:25
224:2
optional 123:14,17
options 219:6
Orange 9:5 11:5
order 57:3 61:3,5
88:16 118:4
122:15 151:7,8
161:16 162:7
174:17 176:23
199:18 200:8
216:2,18 217:1,3
217:3 223:12
279:1,2,4 284:7
orders 88:21,22
171:21
ordinarily 188:20
ordinary 199:14
244:9,17
organization 33:16
34:11,13 56:19
57:13 58:15
oriented 227:10
original 81:12
134:9 197:17
199:25 200:2
248:21 249:12
254:17 272:24
284:12,15 285:2
originally 200:1
248:9,10
originate 224:3
originated 77:16
78:5 87:12 105:7
origination 77:22
119:18 123:18
226:18 227:1,6
originator 35:13
107:13
outcome 221:19
235:12

outside 136:3 185:4
233:18 273:19
outsource 91:2
outstanding 33:15
58:11 86:12,21
87:7 99:3 104:24
106:4 107:1 161:3
186:11 199:23
201:13 232:15
259:24,24 260:17
265:25
overall 44:7,15
83:9 89:9 197:16
overrule 37:19
110:11
overruled 33:13
35:6 131:23
139:20 152:16
175:5 187:20
191:4 283:7
oversee 101:2
overseeing 233:5
oversight 228:17
228:20
owed 104:17,24
106:4 119:20
177:3 251:1
owing 32:19 105:19
107:1 183:17
201:13
owned 83:23 85:5
94:4,5,10 105:16
106:3 108:10,11
224:23 237:18
248:12 251:1,4
owner 159:3,4
216:15,20 217:8
218:15 219:8,24
221:11 222:8
244:12,15 245:11
owners 19:1 29:4
38:3 57:11 97:22
188:21 193:19
221:22 251:1
owning 60:3
owns 157:9 183:14
238:12 250:19

o'clock 116:11
117:4 118:1
285:20
O'CONNOR 10:2

**P**

P 2:2,2 15:1
PA 11:15
package 69:2 78:4
packages 78:5
packet 218:24,24
219:13
page 32:10,11,16
34:21 35:25 36:3
36:6 41:4,20 42:2
42:13,16 52:14,15
52:16,18,23 53:1
54:1 124:17,17
129:5 133:19,23
133:23 137:17
140:21,22 142:20
142:24 145:16,20
153:1,5,10 174:7
182:20,25 188:10
191:13,16 192:11
196:17,17 198:1,6
198:9 199:3,7
200:15,18 201:20
206:22 229:14
230:1 231:21
234:13,22 239:17
241:1,2 252:21
258:23 259:20
263:10 267:4,6,11
267:14 269:17
271:14,24,24
273:25 274:7
281:25 282:1,2
284:17,21 286:5
pages 41:11 52:8
137:1 142:21,22
182:7,10,15
258:12
pagination 263:9
paid 47:10,10 61:7
91:15 96:1 97:23
97:24 105:10,13

106:1 108:12,14
108:15,24 109:7
110:2,5 114:6,8,9
183:2 189:9 215:2
215:4 228:14
245:4,5,6,7
251:11 252:10,15
253:9
Palmer 6:19 236:5
Pam 67:18
paperwork 219:18
220:3
par 108:24 114:6
parade 280:11
paragraph 34:22
34:23,24 35:19
59:18 139:1,23,25
140:4,24,25 141:1
141:22 142:1
153:5 198:6,7
263:17,23 264:18
271:24 285:5,6
paragraphs 271:17
parent 79:5
park 3:13 7:12 9:20
12:19 14:4 40:3
46:18
part 29:2,16 30:1,2
30:2 36:1,2,5
45:14 47:7,16,17
48:18 51:15 57:22
58:9 80:10 81:9
88:22,23,25 94:12
99:1 100:25 101:1
101:6 106:14
119:23,25 122:14
133:13,15 138:8
147:8,10,12
148:18 151:10
152:23 155:23
165:13,14 173:24
176:21 178:2
180:5 184:11
198:14,18 220:18
220:18,19 227:12
227:12 243:17
244:8,25 245:14

247:25 255:10
263:18,21 268:10
**partial** 225:10,10
225:11,15,20,21
**participate** 173:1
177:5 179:2,4
**particular** 50:4,19
88:14 93:12 94:4
94:4,9 95:21
105:21 114:3
119:16 120:1
127:17 128:10
129:11 135:8
136:9,19 137:9
140:12 141:13
148:11 157:24
169:25 179:7
197:18 205:22
209:5 219:9
220:19,24 222:17
226:4 229:21,22
232:24 234:5
235:1 246:24
250:3 253:16,25
263:17 270:11
271:8 273:10
274:19 275:3
**parties** 21:20 78:24
79:1 82:1 104:18
107:21 109:3
128:5 132:13
139:3 163:20
173:4 204:25
254:13,17 255:17
285:4
**partners** 50:8
**parts** 17:9 147:23
154:17 176:23
196:8 226:13,14
226:15,16
**party** 79:13 80:14
80:16 91:6 94:13
101:12 122:23,24
123:12 132:3
138:6 156:8,21
190:12 239:8
248:6,9 249:7

250:14 256:2
271:10
**party's** 238:20
**pass** 108:6 158:1
271:21
**passed** 108:8 215:5
**passing** 209:23
**path** 226:2
**PATRICK** 7:23
13:15
**Patton** 2:12 168:8
168:12,14,16
206:15,16 236:16
**Paul** 256:7 266:18
**Paula** 14:20 214:1
**Pauline** 2:10 15:6
**pay** 19:19 47:7
58:25 75:8,11
87:3 91:2,14
92:14 95:24 97:19
105:3,19,20,23
108:21,21 116:10
148:13 149:23
152:11,21 179:19
183:2 187:6,15
188:20 190:5
192:12 230:14,15
230:15,16,17,20
230:23
**payable** 106:24
192:15,16
**paying** 60:2 66:16
87:1,2 89:20 95:7
**payment** 32:17,19
33:2,9 34:12,22
35:2,10,11 38:15
39:5 40:12 43:20
43:20 91:18 92:16
93:2,4,5,11,11,18
93:21,21 94:1,2,7
97:14 105:16
107:7,8,14,20,23
119:14 120:4,6
153:14,21,22
154:10 158:10,11
159:21 160:5,6
165:6 184:3,9,18

185:9 186:7,15
189:2,4,5,5,6,7,10
189:25 192:20
223:12,13,14
224:15,19,24
225:3,4,5,12,14
225:15,19,20,21
225:23,23 230:12
230:14 231:1,9
244:18 252:4,6
272:8 287:13
**payments** 32:17
36:10 44:3 84:22
84:22 85:7 89:16
89:17,19 90:4,6
92:3 95:7,12
97:10 107:16
109:6 110:2
119:19 148:12
155:16 157:15
185:24 218:19
225:9,10,11,12,17
225:25 226:1
230:3,6,8,10,19
231:3,7,13 250:17
250:18,20,25
251:21 252:1
**payoff** 105:14
245:9
**pays** 114:4
**PEABODY** 13:2
**penalties** 105:6
146:9 189:9
**penalty** 105:6,9,11
105:15,19
**pending** 218:10
225:22 235:18
267:24 268:8
**people** 20:10 34:15
40:4 45:12 68:7
68:16,24 69:2,19
69:22 70:1,3,16
71:7 86:4,14 88:1
103:25 112:14
113:8 114:17,20
135:17 142:8
169:5,18 177:23

210:4,12 216:6
249:22 257:20
**perceives** 121:13
**percent** 49:11
58:11 59:20 96:20
96:20,22,25 114:8
198:11 199:25
216:23 251:14,15
251:20 254:22
**percentage** 96:18
197:16,17 200:4
**perform** 28:12,19
35:1 37:5,10,11
64:8,9,14 94:13
94:19 141:19
146:11 148:10
149:9 151:9 178:5
204:12 244:5
**performance** 64:7
64:11 103:13
255:11
**performed** 152:25
228:24
**performing** 138:14
153:16 205:5
234:2
**performs** 228:17
**period** 27:5 39:25
63:5,15 78:19
92:16 95:14,19,21
95:23 96:10 97:11
99:17,22 108:22
114:2,21,22
119:16 154:4
156:7 209:23
213:10 243:2
**periodic** 243:17
**permission** 279:10
**permitted** 36:1
188:15
**person** 44:18 70:9
120:6 193:3
195:23 196:14
204:4
**personal** 48:16,24
204:1 235:20
**personally** 49:12

159:5 169:1 222:4
244:1
**personnel** 39:15
70:4,13
**perspective** 47:20
68:9,12 77:22
78:18 81:22 94:11
99:12 101:2 110:3
110:4,7 138:13
141:17,21 142:6
144:20 145:1
147:4,11 148:5
149:6,8,22 151:1
152:8,17 154:5,5
156:23 157:12
179:5,25 181:12
181:15,18 187:21
189:14 192:17
209:22 210:1
222:1 235:14
241:16 248:16
250:25 252:9
284:3,8
**perspectives**
209:16
**pertain** 168:24
**pertains** 174:24
**petition** 90:18,19
180:13 240:16
**ph** 117:9 157:6
256:8 262:4
**Philadelphia** 11:15
**phone** 97:19 98:17
169:18 230:23
256:17,23 257:4
257:21,22 266:16
277:4
**phrase** 128:19
**physical** 98:14
157:1
**PI** 43:2
**pick** 34:5 53:24
**picked** 81:10
282:10
**piece** 55:1 82:24
85:14,20 90:4
98:19 99:2 107:5

127:10 138:12
140:6 153:25
177:8 185:3,4
189:10 190:12,13
190:14 192:24
197:15 219:10,10
219:10,12 221:17
223:17 227:1
233:1 270:16
**pieces** 81:16 82:7
89:13,15 95:25
98:8,17 127:18
132:15 147:18,19
148:15 196:10
211:10
**place** 11:13 60:20
60:21 66:20 68:4
70:9 81:25 82:20
88:17,18 99:16
124:9 127:5
171:24 177:17
211:11 215:14
216:1 282:10
**placed** 50:3 132:25
271:3
**places** 282:11
**plan** 69:21 88:17
88:18,19 98:14
115:21,23 116:7
224:16 225:9,25
**planning** 73:19
**plans** 54:5
**platform** 17:16
61:16 72:2 73:1
77:7,8,16 98:14
98:18 204:8
**played** 233:24
**player** 55:5
**plays** 55:8
**Plaza** 4:4 9:20
**pleading** 181:24
279:18 280:2
287:15
**pleadings** 171:16
171:19,20
**pleasant** 285:22
**please** 15:3,12,14

27:20 32:9,10,10
34:21 35:19,25
41:4,8,18 47:4
55:21 56:16 65:15
76:11 115:6 119:3
136:25 137:25
163:13 166:8
168:2,23 174:1
178:8 181:22
182:5 191:13,18
196:13 206:14
257:7,7 263:3
265:12,22 269:17
269:18 276:22
**PLLC** 6:12
**plugging** 116:22
**plus** 58:10 83:13
87:19
**PMI** 85:4 153:23
154:2
**PNI** 66:19 94:8
95:12 151:22,23
155:22,25 202:5
224:24 250:25
251:8 252:3,7,9
252:11 253:4,7
**pocket** 202:20
**point** 10:13 19:6
30:23 37:3 45:8
45:12 57:14 58:21
59:3,7 61:9 68:12
70:1 79:17 82:11
83:19 89:7 91:25
92:4,18 100:25
102:6 106:18
116:8 120:9
157:24 159:6
169:19,23 174:23
177:2 207:18
208:21 217:7,16
218:12,14 219:10
225:12,16 227:13
231:18 243:13
248:19,19 249:21
251:6 259:1,20
261:7 262:6 266:9
270:25

**pointed** 107:11
**pointing** 132:8
245:16
**points** 96:17
128:23 141:18
**policies** 60:19
223:1,20 255:8,22
**policy** 195:17
223:11 255:4,7,9
255:12,13,14,15
255:19
**polite** 236:1
**pool** 78:16 82:16,22
82:23 127:2 213:3
213:4 216:10,22
238:1,9 241:14,18
284:4
**pooling** 271:1,10
272:5,6,12,15
**pools** 78:5 123:25
127:20 268:7
**poor** 103:13
**Poor's** 21:6 102:23
265:2
**population** 98:20
99:1 177:9 197:17
213:19,22
**portfolio** 58:12
86:11 183:13
208:23,25 209:6,7
210:3 213:13
241:11 268:10
**portfolios** 232:13
**portion** 93:23
143:2 208:1,5
211:8 219:9 260:4
260:5,7
**portions** 80:4,20
85:6,7 88:15
96:22 98:6 128:16
177:13 183:11,14
212:14 252:6
**position** 15:24
33:22,23 55:17
71:5 158:2
**positions** 16:3,8
**possibility** 185:8

**possible** 104:17
114:20 116:23
117:24 152:25
181:25 232:6
247:5,7
**possibly** 218:6,16
271:12
**post** 18:1 20:1
38:18 65:25 68:12
82:1 218:8,8
**posted** 21:25
102:25 103:3
**posting** 84:22
**postponed** 38:10
**post-closing** 204:11
**potential** 18:19
50:16 106:5
107:20 109:2
184:22 185:20
**potentially** 121:17
145:7 152:21
161:12 177:14
189:8
**POTTER** 4:2
**Power** 2:22 24:23
24:24 25:2,16,20
26:1,6 27:10,13
27:15 33:17,25
34:2 44:8,11
286:7
**practical** 94:16
108:1 109:7 144:4
187:21,24,25
200:12 201:8
204:22 208:3,20
285:7
**practicality** 188:14
**practically** 17:23
201:14
**practice** 214:25
**practices** 90:17
212:16
**pre** 44:2 77:19
180:12 240:15
**precedent** 104:3
**precise** 34:7,8
259:14

**precisely** 93:1
139:18
**preclude** 278:5
**precluded** 208:19
**predecessor** 254:16
**prefer** 206:4
**preferably** 119:4
**preference** 55:2,3
**premise** 156:14
**premium** 108:16
108:17 109:2,6
110:2 113:17,21
113:22 114:2,9
119:11 152:12
154:13 157:16,22
158:10,13 244:2
244:18 245:9,12
246:4,23
**preparation** 103:12
177:5,7 179:2
**preparations** 88:11
**prepare** 88:12
116:2 118:21
219:17,17
**prepared** 48:15,23
55:24 67:11
175:25 235:15
254:25
**preparing** 176:15
176:19,25 178:23
179:24 273:23
**prepaying** 105:6
**prepayment** 105:6
105:7,9,15
**present** 106:2
121:24 256:11
**presentation** 67:2
**presented** 61:6
73:13 75:10 91:8
210:16 211:24
**presently** 60:19
85:18 99:16 106:1
224:1
**presentment** 91:8
210:22 211:1
**preserve** 279:6
**president** 77:1

87:20 160:1
**Presumably** 60:13
**presume** 158:5
**pretty** 27:16 71:12
116:12 117:8
209:10
**prevalent** 81:11
**prevents** 103:12
**previous** 73:12
129:8 143:4
**previously** 82:1
137:1,7 141:4
153:7
**Pre-bankruptcy**
77:21
**pre-financed** 87:2
**pre-payments**
43:12,17
**pre-petition** 180:9
181:8 193:23
235:18
**price** 19:17 38:3
45:14 50:16 66:17
83:1 108:24 114:8
127:12,17 179:20
181:8 191:21
192:18
**pricing** 127:24
**primarily** 128:18
**principal** 32:16
40:12 43:4,7,12
46:15 58:11 86:9
86:19 93:23 155:6
157:8 194:12
259:24 260:11
**principle** 18:9
**printed** 52:17
263:10 288:13
**prior** 16:19 17:4,7
20:8,15 23:10
31:4 38:3,19
62:23 83:5,7,18
83:18 86:5,6,8
87:7 89:6 91:8
92:11 100:3 149:6
158:18 159:10
161:21 188:21

232:3 264:20
**priority** 38:5
**private** 15:22 16:9
79:8 80:7,8
213:19 237:16,16
238:16,17,18
248:2,3 254:21
270:18,20
**privy** 46:13 50:7
**pro** 14:20 27:25
54:5 214:1
**probably** 46:18
116:20 117:5,25
118:3,4 148:8
200:13 233:2
260:15 262:24
276:14 285:17,20
**problem** 182:14
193:24 216:12,20
218:13 243:18
278:6
**problems** 23:3
218:18 221:23
**procedure** 47:13
50:6 219:7,9
**procedures** 20:25
60:19 91:19 129:4
213:21 222:16
223:15
**proceed** 15:8 56:14
115:12,15 116:7
124:6 194:21
247:14 268:15,16
268:17 269:11
**proceeding** 174:14
233:18
**proceedings** 232:17
232:18 285:24
288:6
**process** 18:22 20:5
20:11,21 22:16,17
31:14 62:6 66:6
67:2 84:5,10 89:9
89:21 90:7 92:1
99:6,9 102:6,10
104:10,12 106:14
106:15,17 107:6

108:8 120:8
122:13,14 133:13
183:19,21,21
218:12 219:22,25
220:1,24 221:20
223:4 241:10
245:14 270:20
**processed** 231:16
**processes** 84:3,13
84:14
**processing** 93:9,16
231:17
**procure** 60:5
**produce** 132:5
136:2
**produced** 134:21
163:21,24 243:6
**product** 16:9 77:1
**production** 180:3
**products** 12:11,16
31:2 48:5 115:14
120:12 123:15,18
123:25 127:2,9
131:3 158:22
**professional** 16:19
**professionals** 34:16
**Proffitt** 135:24,25
143:7 170:15,19
170:22 281:16
**profitable** 24:10
**program** 16:22
93:19
**progress** 276:25
**promise** 118:18
214:23 215:2
**prong** 68:9
**proof** 57:21 273:21
**proper** 103:12
164:14 223:15
**properly** 85:16
89:18
**properties** 83:24
**property** 87:3
262:18
**propose** 57:2
**proposed** 99:8
102:2 183:1,3,5

204:16 268:10
**proposing** 54:19
256:20
**protect** 173:5
255:19
**protected** 172:24
201:21
**protection** 226:15
**protections** 226:23
227:11
**provide** 18:17 20:4
39:8 57:6,13,20
57:24 58:6,15
104:10,12,13
111:17 120:16
128:17 139:2
156:19 195:16
200:18 205:2
220:11 221:13
222:13 230:24,25
242:10,24 243:18
273:21 278:23
**provided** 57:17
69:2 123:9 129:19
138:3,21 146:7
169:16 175:9
179:5,25 181:4
186:10 198:10
243:3 264:18,19
275:1
**provider** 93:10,16
**provides** 34:24
156:22 174:4
239:21 247:9,10
**providing** 19:8
131:10 138:6
204:25 245:10
**provision** 81:1
137:18,23 139:6
140:2,10,16 141:2
141:13 142:9,19
143:3,4,8 145:14
146:15,20 148:3,4
148:6 149:2
153:15,17,19
154:7,9 174:3
175:16,17,18,19

176:2 230:2
239:21 241:21
272:9
**provisions** 35:22
48:17,25 80:11,20
80:25 82:21 126:8
126:19 128:25
131:8 132:15
139:20 140:4,9
144:22 145:3,12
147:4,5,6,7 148:7
150:20,24 151:13
151:14 173:19
198:4,16 200:16
202:11 207:15,16
229:19 242:19
248:18 272:7,23
278:4 284:12,14
**proviso** 264:16
**prudent** 197:12
**public** 18:5 257:8
**published** 161:18
**pull** 15:23
**purchase** 19:11,17
24:5 30:20,23
31:17 37:13 40:21
41:2,5 45:14
46:21 47:18 48:9
48:21 50:15 53:12
54:3,18,24 66:16
79:10,17 80:9,17
81:25 82:5,20
83:1 95:4 98:1,3
108:2 124:12,21
127:12,17,24
129:14 130:8
160:22 179:11,20
181:8 191:9,14,21
192:18 234:12
237:5 249:11,24
250:1,4 253:19
258:6 261:8,9,13
266:2 267:2,16,20
273:24 284:20
285:1,2,6
**purchased** 51:11
59:6 77:15 78:12

78:16,17 238:8,10
241:22 270:9,24
271:6 273:4,18
284:4
**purchaser** 18:23
19:9 20:12 24:3
25:3 26:7 29:8
35:22 48:23 49:13
49:17 51:14,16
55:2 57:11 65:23
68:21 69:10 73:18
73:25 74:8 75:12
75:20 78:15 79:15
82:10,17 96:4
99:14,22 100:16
104:10 107:16
108:3,21,23
113:23 114:7,10
119:20 120:10,13
121:6,16 124:20
124:20 125:10
138:4 139:2,4
143:9,12 144:5
145:8,11 146:8,8
146:10 153:13
161:11 162:14
166:18 170:13
180:8 183:25
189:3 190:1 203:7
203:16 204:18
211:7 227:3,4
241:8,22 242:18
245:20 248:11
260:21 262:8,13
262:21,21,22
266:9 273:3 284:5
**purchasers** 23:20
192:6 194:1
271:23
**purchaser's** 23:12
25:11 51:10,19
54:20 60:21 141:9
272:6
**purchases** 127:22
**purchasing** 26:15
28:9 30:1,21 32:6
32:13 33:16,19

34:10 40:7 44:15
46:16 47:8,16
123:21,22,24
240:6 247:20
287:6
**purely** 262:15
**purport** 193:7
**purported** 104:5,7
240:17
**purportedly**
178:17
**purporting** 112:20
**purports** 160:5
183:1 268:5
**purpose** 27:21
173:10 232:6
245:13 265:1
**purposes** 59:10
74:23 75:4 268:24
**pursuant** 23:21
35:22 48:10 49:5
49:10,14 80:25
107:18 126:8
128:6 144:23
146:21 147:5
155:17 160:21
201:22 202:8,11
240:9 270:24
271:6,8 272:11
273:5,15,19
284:14
**pursue** 232:8,10
**purview** 196:22
**push** 22:11
**put** 31:9 39:1 61:18
64:6 66:14 78:6
88:17,18 99:1
101:18 112:10
146:1,19 166:10
167:25 177:24
209:17 224:10
225:9 250:10
252:1 253:23
255:2 283:14
**putting** 30:24
38:23 60:8,11
177:18 235:8

**P&I** 188:17,22,25
189:2
**P.A** 9:10
**p.m** 115:5,5 166:7
166:7 195:4,4
257:5,5 276:21,21
285:25

_____

**Q**

**qualifications**
161:15,17,20
162:6 223:23
**qualified** 62:4
100:13,15 144:8
190:16 220:12,13
220:17 221:7
264:21
**qualify** 148:7 207:8
208:14 209:11,12
209:17
**quality** 90:11,12,13
**quarter** 96:20,21
96:25 251:15,20
276:20
**quarters** 27:19
**question** 19:7 20:4
24:23 27:11 30:13
30:16 33:21 34:8
36:23 42:19 43:23
45:2 48:22 51:23
53:9,17 58:4,20
58:23 63:4 64:16
66:17 74:5,6
104:5 128:2
129:10,17,23
131:24 143:13,15
143:17 144:15,18
146:22 147:10,15
147:16,17,22
148:2 149:19
150:1,2 152:15
154:16,24 156:15
159:14 160:25
169:4,7,10 173:12
173:16 176:10
184:1 189:13
194:4,13 202:9

204:11,15 216:5,9
216:24 218:10
226:22,24,25
227:9,15 242:3,12
242:15 250:11
259:11 261:17
267:22 268:12
274:6,7,12
**questioned** 218:1
**questioning** 36:23
67:13 217:13,14
**questions** 24:20
37:21,21 48:2
50:23 51:4 52:12
53:6 61:23 62:3
65:5,12 71:15
73:11 75:25
110:15 162:17
168:23 176:12
196:3 205:11
213:24 214:2
215:1 226:9
227:17,24 228:25
235:21 247:12
255:3,23 256:10
256:22,23,25
257:21 262:3
263:18,20,22
266:14 268:24
269:16 275:8
282:22
**question's** 72:18
235:7
**quicker** 22:20
**quickest** 132:12
**quickly** 61:14,15
81:14 116:22
133:17 220:3
234:11
**quite** 23:10 39:12
69:14 70:2 120:7
138:15 190:7
258:9

_____

**R**

**R** 1:22 2:2 4:15,24
7:15 9:23 10:9

15:1 288:2
**raise** 208:8
**rate** 85:16 96:19
101:17 124:22
251:15,18,20
**rated** 265:4,24
**Rath** 8:2 167:8
**rating** 20:20 21:2,2
25:4,10,12 26:12
26:16,18,18,22,22
26:24,24 27:3
61:14 71:14
101:13,17,21,24
102:3,4,7,10,12
102:14 104:7
112:3 113:4
198:12,23,24
264:5,19,19,23,25
265:1
**ratings** 26:8 102:23
103:6 113:13
265:24 287:9
**RD** 98:16
**reach** 61:6 91:16
92:1,22 122:19,22
200:13 278:22
**reached** 198:14
216:22
**reaching** 194:14
**read** 22:1 31:1 33:5
33:7 36:20 39:13
42:5 45:7 48:12
52:12,13 53:5
98:4,5 104:2
117:7,20 139:25
143:3 145:17
153:19 154:11
175:16,17 193:6
239:19,20 263:19
263:22,24 264:13
264:16 265:22
271:17,19,20
272:2 278:7
284:18
**reading** 149:4
192:7 200:10
263:25 283:7

**readjustment**
174:21
**reads** 58:5 136:24
146:6 153:13
284:19
**ready** 70:4 166:5
**real** 22:3,3 83:23
83:24 145:1
**realistic** 61:8
**realize** 52:17
116:24,25 275:12
**realized** 92:18
**realizing** 276:16
**really** 18:17 35:16
50:5,5 63:4 79:9
79:12 81:8,9 82:6
82:15,18 83:8,12
83:15 84:10,23
87:17 89:12 90:1
90:15,22 94:15,19
95:5,13,24 96:1
97:2 99:3,12
100:2,24 101:1
106:9 109:11
110:24 116:19
120:22 134:13
142:5 147:16
159:5 191:11
194:24 197:11
212:15,15 213:4,7
213:11,12 219:10
220:1 240:11
268:6 280:8
**reason** 63:21 87:5
87:11 96:3,8
101:25 118:17
136:21,23 181:10
190:18 208:14,17
223:5 240:2
256:16 273:20,22
**reasonable** 116:8
243:9,15
**reasonableness**
158:2
**reasons** 86:24
**recall** 46:24 47:15
53:19 54:15 69:3

72:3 132:7 136:14
144:7 158:15
160:8 161:5
169:24,25 170:2
171:3,10,25 172:4
175:23 176:16
178:21 183:7,10
186:9 193:23
196:5 201:4,9
202:21 203:8,9,18
208:18 213:3,12
232:14 240:14
262:6 268:1
272:14 274:17
281:20,23 283:19
**recapture** 108:16
108:17 109:2,6
110:2 113:17,21
113:22 114:2
119:11 152:12
154:13 157:16,22
158:11,13 244:2
244:18 245:9,12
246:4,24
**receipt** 225:22
**receive** 49:20 91:24
102:24 105:15
120:18 121:7
136:22 150:16
151:4,7,8 224:14
228:9 230:8,10
231:3,6 274:21
**received** 20:19
25:12,13 26:8
41:3 49:13,17
56:5 91:11,12
93:13 97:14
102:15 103:23
107:16 113:13
119:20 163:7
164:21 165:7
228:13 230:7
246:13 280:1,3
**receives** 93:2,4
122:5
**recess** 76:7,9 115:5
166:7 195:3,4

256:1,14 257:2,5
275:13 276:21
285:15,18
**recognition** 80:22
111:4 272:19
**recognize** 124:13
211:22,23 217:11
**recollection** 131:20
131:22 136:17,18
137:11 141:15
143:20,24,25
158:13,21 170:6
178:20 240:16
254:12
**reconciliation**
84:16,23
**reconciling** 84:24
**reconstituted** 80:23
81:2
**reconstitution**
146:15
**reconvene** 114:20
118:5 257:3,15
276:3,13
**record** 15:15 27:21
27:21 31:4 48:4
65:14 110:22
112:11 134:20
135:13 166:9,11
168:1 236:5
239:22 247:17
264:17 265:22
276:24 278:1,2
279:6,20 280:11
**recording** 288:6
**records** 108:9
243:9
**recover** 189:8
**recovery** 45:23,24
57:8,9,10
**Red** 118:16
**redirect** 76:2
235:25 257:15
280:19
**reduced** 264:21
**redundant** 147:16
**Reed** 11:11,19 73:9

205:15
**ref** 108:19
**refer** 31:1 39:14
40:16 79:13 80:9
82:25 83:8 101:21
103:17 127:24
137:21 168:22
182:4 205:21
212:10 218:23
280:21
**reference** 57:7
133:1 174:6 182:8
215:15 221:23
251:10 254:3
266:4 268:21
270:12
**referenced** 260:2
**references** 111:15
141:7
**referred** 21:5 80:23
83:15 84:6 88:19
91:12 97:3 127:12
155:12 188:1
196:4 209:6,7,8
262:14
**referring** 21:4 36:3
53:3 102:4 123:13
137:21 171:18
192:3 205:22
247:18 253:4
267:1
**refers** 267:16
**refinance** 223:24
224:2,4,6
**reflect** 58:8 108:9
131:17 132:4
159:2
**reflected** 142:1
**reformed** 79:5
**refresh** 136:10
137:4,8 140:14
143:20,24
**refund** 114:5,6
**refused** 151:22
**regard** 22:18 185:8
203:24 218:6
239:11 243:24

**regarding** 115:21
129:14 172:5
186:25
**regardless** 64:22
**regular** 184:11
209:17 222:7
225:14 255:11
**regulations** 90:15
**REILLEY** 13:15
**reimburse** 189:15
190:23
**reimbursed** 38:4
**reimbursement**
38:9 108:23
189:25
**relate** 33:21 78:3
80:11 85:4 101:8
106:11,17 107:2,4
126:19 141:22
145:3,10,12
173:20 180:2,5
188:17 189:1
195:18 196:1,11
197:14 205:7
209:14 217:13
220:24 241:15
242:20 253:6
258:14
**related** 74:5,7
77:11 78:19 80:5
84:4 86:7,17
95:24 98:7,9,18
98:21 104:24
106:7,22,25 107:4
107:22 131:8,11
131:12 136:12
140:4 141:13
144:22 145:2
146:11 147:5,7,24
148:4,6,7 149:2
173:19 181:17
207:19 227:4,5,6
229:19 239:14
241:12 251:2
252:5,6,7 272:23
**relates** 77:9 90:25
105:5 109:5

113:22 126:6
141:11 143:8
146:20 148:9
151:14 155:1
166:17 170:16,23
192:1,22 197:10
220:6 254:9 264:6
265:7 270:15
**relating** 73:15
106:21 152:11
153:20 216:14
227:1
**relation** 171:25,25
**relationship** 62:18
128:5 129:14
130:7,24 131:17
162:2 213:6
221:25 229:20
238:23 240:2
**relatively** 276:5
**relayed** 199:1
**release** 78:1,15
82:2 94:23,25
95:11,13 123:21
267:21
**released** 77:25 78:7
121:22 123:24
124:14,24,25
125:3 126:3,7
131:4,16 132:3,5
132:19 133:14,16
134:5 137:12,15
141:14
**relevance** 37:21
217:14
**relevant** 29:25
36:21,23,25 52:18
167:24 218:6
**relied** 175:19
**relief** 89:1 176:8
221:13,16
**rely** 103:2
**remain** 60:20
143:12 265:25
**remaining** 235:24
**remains** 137:4
189:1

**remember** 27:20
69:7 194:6 201:2
237:10 264:1
279:14
**remit** 96:24 153:13
251:18
**remittance** 95:9
108:8 120:19
153:22,23,24
154:1,3 188:25
208:4 228:9
244:15
**remittances** 84:19
109:18,21 208:7
**remitting** 90:10
228:18 251:19
**remotely** 32:23
**remove** 144:5
**removed** 166:19
167:1 205:18
277:18,19,20,21
**removing** 112:4
**REO** 83:22,23
**rep** 107:14,14
**repaid** 188:3
**repay** 38:2 190:22
**repayment** 158:20
224:16 225:9,25
260:18
**repeat** 55:10
131:24 184:1
212:7 274:6
**rephrase** 30:15
34:3 176:12
201:11 242:2,15
251:25 261:21
**rephrased** 150:4
**replace** 203:19
204:2
**replaced** 23:18
**reply** 128:24
**report** 86:15 105:1
120:25 121:5
208:4 244:15
246:3,5
**reporting** 84:12,15
84:17 109:18,21

109:23 121:1,3,4
184:15,15 223:17
228:11,18 244:13
245:14
**reports** 84:17
106:16 120:19,22
204:25 205:1
223:16 228:9
243:17 244:11,15
244:17 245:2
**represent** 91:13
102:22 140:23
143:1 144:2
170:21 171:23
193:10 214:15,20
240:22 252:3
258:2 274:13
281:16
**representation**
167:2,9,12
**representative**
65:23 169:21
**representatives**
23:18
**represented** 87:7
201:9 225:20
**representing**
170:12
**represents** 58:10
98:24 182:3
237:20
**repurchase** 35:1,11
35:21,22 36:11
38:3,9 107:17
109:12 119:15
120:11 122:18,25
152:11,21 158:11
160:6 184:20
185:1,9 186:11,15
187:6,10,16
189:17,24 190:4
190:23 243:24
244:1 246:14,16
253:11
**repurchased**
108:11 158:25
**repurchases** 38:10

**request** 74:22
107:17 108:23
120:10 122:2,4,6
122:7,24 139:16
184:5 218:25
220:12,13 221:2
224:9,10 243:15
246:13,16,17
**requested** 63:3
114:5,10
**requesting** 122:25
**requests** 103:1
186:11 220:18
221:8,8 222:13
**require** 224:12
244:8 278:5
**required** 45:18
55:18 57:22 58:8
62:13 64:21 68:1
84:19 89:22,23
92:24 95:11 100:5
121:5 150:16
151:23 153:14,21
189:23 201:22
202:10,17,25
213:2 220:8
222:10,11 223:17
225:19 235:10
242:24 245:14
278:12
**requirement** 92:3
104:1,2 113:24
240:3
**requirements** 66:2
99:16 101:19
162:10 197:13
198:21 216:1,7,7
216:17 239:10
264:3 266:10,11
**requires** 280:8
**requiring** 23:4
**Res** 11:12,20
**research** 16:2
85:14 104:23
106:11 222:15
274:18
**resecuritization**

238:20
**reside** 271:7 273:11
**residential** 17:1
20:13 23:7 73:11
124:22 205:16
211:20 212:17
213:1,16
**resides** 160:13
**resolution** 223:8
**resolve** 112:14
**resolves** 167:12
**resort** 197:6
**resources** 19:5
**RESPA** 220:13,23
221:1,7,13,14
**respect** 23:12 79:25
80:7,14 90:9 92:9
98:19 101:23
105:4,21 107:1,4
109:21 110:9
142:11 145:9
150:14 155:4,15
171:17 172:2
173:18 179:18
188:25 194:8
197:9 201:4 208:5
213:18 228:18
235:19 239:8
260:1,20 271:19
274:19 276:24
280:5
**respects** 88:12
**respond** 131:23
220:7,15,17
**responding** 222:15
**response** 29:18
128:11 157:19
220:8 241:25
282:22
**responsibilities**
16:8 77:3 208:6
228:21 229:23
233:17 258:19
**responsibility**
18:11 208:21
228:17 233:16
**responsible** 30:7

177:18 228:13
**rest** 151:5 190:18
225:22
**restate** 28:17 35:7
35:9 45:1 261:18
**result** 105:4 112:4
159:12 233:15
234:10 264:22
**retain** 63:6 69:22
77:9 79:10,16
80:18 82:3 88:24
96:21 97:21
177:12,22 251:12
**retained** 78:7,11,13
79:16 82:8,18,23
94:24 95:1 96:13
96:14 108:6
123:22 126:13,15
126:16 127:4,9,21
128:6 129:15
130:8 131:15,17
132:2,5,6,12,13
132:18 133:16
134:6 141:14
238:7 241:13,14
241:16 248:12
273:17 284:5
**retainer** 77:24
**retains** 64:24
**retention** 88:17,18
88:19
**retirement** 18:1
**retrace** 186:1
**return** 91:23
135:23
**returned** 102:8
114:10
**review** 121:12
128:16,24 137:4
137:25 140:5,6,8
198:7 199:5 241:7
**reviewed** 138:1
161:20,21 173:17
175:20 241:9
**reviewing** 18:11
131:10 194:17
**revised** 136:25

**revoked** 208:16
**re-direct** 275:9,11
**RFC** 73:11 213:4
213:13,19
**RICE** 6:12
**RICHARDS** 9:10
**right** 15:9 18:24
20:13 21:22 22:6
22:9 24:21 27:14
27:18 28:17 30:13
31:8,20 33:6,25
34:6 36:6 37:8,18
37:19 39:15 40:25
42:15,19 43:8
45:1 50:21 51:4
52:19 56:2 58:23
59:20 60:3 63:6
64:16,22,25 68:23
69:19 71:18,19
72:6 76:2,6 103:9
105:15 111:25
112:12 113:11
114:16,18 115:10
117:2,11,18,24
119:18,24 120:8
120:13,17 121:10
122:7,9,17 123:10
124:25 125:15,20
126:1,10,24 128:7
131:9 132:19
136:22 138:7,11
138:16,18,23
139:3 142:2,9,12
144:12,24 145:11
148:1 150:1,5,15
150:17,22 151:4,4
151:7,13,19,24
152:6 154:23
155:7,17,21 156:2
156:9,21,25 157:9
157:13 158:8
159:8 162:8,23
163:5,14 164:18
165:2,8,19,22
167:5,14,16 168:5
168:21 169:13
171:12,20 173:23

174:11,18 175:9
175:22 178:3,17
179:16 180:14
181:24 182:15,19
182:21 183:4
185:7 188:7,10,13
189:14,24 190:18
191:18 192:10,19
193:15 194:19,25
195:11 197:22
199:18 205:11
206:14,17 218:5
219:15,16 221:22
222:24 227:10
235:2,23 238:14
239:4 245:25
255:17,25 257:1,1
257:2 259:18,22
261:16 265:14,19
266:15,20 267:14
269:2,5,10 275:9
275:21 276:19
277:9 279:23
280:18 285:15,21
285:22
**rights** 18:12 73:15
78:13,17 79:24
80:6,13 96:5,9
98:19 131:4 145:3
145:10 149:16
150:22 152:22
153:9,18 173:5
177:12 187:8,16
193:2 207:17
213:15 226:17
227:5 233:8 240:5
240:6,24 252:14
253:9 262:8,19
264:4 273:16
275:2,3 284:5
285:5
**ring** 270:7
**rise** 15:2,12 37:23
76:10 151:18
183:24 256:16
257:6
**risk** 60:12 61:11

66:11,14 70:22
150:20
**RMBS** 259:3,6
263:14
**Rob** 268:20
**Robert** 2:11 5:17
6:8 21:12 65:16
76:12,16 159:22
166:9 194:22
269:8 276:23
286:14,15,16,17
286:18,19,20,21
286:22,23,24,25
**Rodney** 9:12
**role** 18:15 55:7
69:6 128:15 135:9
190:19 195:13,15
203:3 228:6,8,12
228:16,22 235:7
242:6
**roles** 55:11
**roll** 104:2
**rollup** 72:22
**ROME** 3:2
**room** 85:19,19
180:8
**Rosner** 5:8 27:24
28:2,3,4
**Ross** 15:20 16:4,5,6
20:6,8 23:16 46:1
47:22 48:19 50:19
67:14 69:16
**Rothschild** 20:8
**rough** 114:17
**roughly** 59:14
260:14
**ROVIRA** 4:15
**rows** 259:23,23
**RSC** 212:19
**RSPA** 220:12
**Rubenstein** 14:7
268:17,18 269:1
269:13,14 271:21
275:6 286:24
**Rubinstein** 256:23
**rule** 181:9
**rules** 185:19

**ruling** 27:17
**run** 39:20 54:5,7,9
82:10 85:19 93:7
153:17 201:10
230:16 253:13
**running** 39:17
70:13 194:1 204:4
**runoff** 86:25
**runs** 91:6 232:2
241:2
**Rush** 14:20 213:25
214:1,9,12,15,18
214:21,23 215:1,5
215:7,9 217:11,16
217:18,20 218:9
218:11 226:5,7,10
226:12 227:9,10
227:16 286:18

———

**S**

**s** 1:23 2:2,11,21
15:1 165:6 286:4
287:4
**Sachs** 13:18
**safe** 118:7
**sake** 132:11 155:13
**sale** 23:22 30:2
63:3 98:20 99:1
111:11,12,13
118:2 123:23
124:14 126:6,14
126:20 144:23
146:21 147:6,8,12
152:11 161:11
166:18,22 167:3
171:17 172:23
177:15 204:17
205:19,23 211:7
217:13 254:6
257:18 266:2
268:10 269:22
285:17
**sales** 77:1 84:1
131:15,16
**SAMIS** 9:16
**SANDRIDGE** 6:12
**satisfied** 92:4 104:4

159:13
**satisfy** 48:23
**satisfying** 23:3
**SAUL** 13:9
**Savings** 74:9
**saw** 86:15 137:7
277:19
**saying** 29:15 50:11
50:12 139:16
156:17 189:12
216:3,7 219:7
246:3 250:21
276:16
**says** 35:20 36:17
42:7,11 43:2,7
44:25,25 57:5
60:18 112:7
124:19 141:5,6
153:10 154:7,9
174:14 189:23
196:18 198:22
200:18,20 215:19
216:12 218:17
219:23 222:12
259:6
**scenario** 96:4
121:19,25 188:23
200:6,8
**scenarios** 39:20
54:9
**schedule** 41:8,17
41:19,20,23 42:1
42:2,11 43:18
98:24 104:20
106:21 115:17
117:5 177:6,19,24
179:3,3,4,10,12
179:17 188:24
192:21 193:8
234:12,15,16,25
235:1,3,8,15
238:12 240:19
249:13 254:1,2
256:21 258:7,12
258:24 259:14
267:1,4,10,11,18
268:23 273:24

274:5,8,15
**scheduled** 43:19
153:23 188:24
**schedules** 104:16
175:25 176:19
190:20 259:11
273:23
**SCHILTZ** 8:17
**Schnabel** 7:8
112:18,18,23
113:2 277:10,11
277:12
**SCHOENFELD**
7:15
**SCHOLER** 3:11
**SCHONHOLTZ**
3:19
**School** 16:16,18
**SCHORR** 8:10
**Science** 16:16,17
**scope** 29:6,10 32:21
32:22,23 37:20
44:24 64:2 187:11
**SCOTT** 3:16
**scratch** 209:7,8,11
209:13 210:2
**scratched** 209:15
**se** 14:20 214:1
**SEAMANS** 5:19
**seamless** 18:21
24:7 69:18 71:12
**seated** 15:3,14
76:11 115:6 166:8
257:7,7 276:22
**sec** 236:24
**second** 34:22 35:19
35:20 36:18 57:5
68:12 79:8 87:5
88:15 92:8 95:12
97:2 98:19 106:22
111:10 124:23
134:1 139:1 141:8
145:18 147:9
150:13 163:13
189:18 195:19
238:15 259:17
262:13 263:17,23

264:18 267:3,7
269:18,21 274:3
282:10
**Secondly** 144:1
**seconds** 134:13
**section** 32:16,17
35:23 36:1,3 58:9
138:1,2 141:15,16
141:20 143:25
144:3,5 145:20
148:3,11,17,23,25
153:6 154:18
166:19 172:17,19
173:25 176:3
178:1 188:8,15,17
188:25 189:20
191:14,15 194:17
196:21 199:3
201:23 202:8
205:1,6 230:1
231:21 234:12,25
235:1,5,6 236:13
239:17,19,22,25
240:1,9 241:1,3,7
241:9,20 242:9,10
242:11 248:24
252:19,20,21,23
252:25 253:2,25
261:12 263:8,12
263:13,17,21,23
265:8 278:4
281:22 282:4,11
282:20,23 283:1
284:17,18
**sections** 57:22
147:18,19 148:16
173:22 205:7
207:20 212:13
215:24 216:16
241:20 281:24
**secured** 238:20
**securities** 26:19,25
55:8,13 111:7
172:17 228:12
260:16
**securitization** 79:4
79:6,6,18,20,25

80:1,15,16 84:18
84:20 85:2,5 94:5
94:9 101:16 136:2
195:14,16,21,24
197:10,16,18
200:3 207:13
208:1 209:8,9,14
209:18 210:2
228:7 229:12,21
239:8 248:6,9,14
248:15,20,22
249:7 250:12,15
250:16,22 251:2
251:10 259:25
260:1 264:7,11
270:15,17 271:3,5
271:7,9,11 272:4
272:11 273:2,6,9
273:10,19 274:23
284:7,10,13
**securitizations**
79:14 80:3,19
84:25 90:9 101:6
101:8,10,12,14,16
101:19 105:17
136:2 160:24
170:20
**securitize** 82:11
209:24,25
**Security** 13:10
**see** 17:16 23:6
32:17 34:22,23
35:20,24 36:8,9,9
42:21 45:1 53:3
58:12 61:13 66:21
67:10 70:8 73:3
94:16 108:19
112:20,25 113:24
121:9 134:1,4,7
137:23 140:14
143:2,5,23 144:4
153:5 157:12
174:3,15,22,23,24
175:7,8 183:16
184:3 188:16
190:1,2 191:22,24
195:17 196:19

198:17 201:1,5
208:7 247:21
252:23 259:20
269:22 271:25
278:19 281:13
282:4,6,21
**seeing** 107:15
195:20 198:21
272:14 283:25
**seek** 176:8 219:18
221:16 277:5
**seeking** 162:14,16
176:8
**seemingly** 245:6
**seen** 43:18 47:19
75:17 120:8 160:7
160:8,18,19
163:15 178:18
244:23 254:7
255:13 270:5
**sees** 169:7 175:3
**segregated** 155:16
202:3 252:1
**seized** 92:12
**SELBER** 4:8
**selected** 18:16
**selecting** 69:17
**sell** 64:25 78:4
108:19 124:20
125:2 131:2
209:19 240:25
**seller** 107:12,17
108:2,7,7,11,12
108:15,18,24,25
109:7,12 110:2,5
110:6 113:23
114:5 122:2 123:1
124:19,21 125:9
127:8 131:2
137:23 138:7,14
138:23 139:4,7
141:4,5,19,21,22
143:10,11 144:6
146:7,11 148:19
148:20 149:9
154:7,13 157:14
158:25 183:25

207:20 246:5,7
271:23 282:9,18
**sellers** 192:11
**Seller's** 241:21
**selling** 77:23 98:11
98:13
**sells** 113:23 284:6
**seminars** 173:1
**send** 92:23 97:22
97:24 120:20,22
120:25 122:2,3
123:10 151:21
189:7 210:18
211:1 218:22,25
223:16,18 230:21
244:11,14 245:2
246:5
**sending** 89:21,22
96:24 245:13
**sends** 121:8 123:4,5
189:8 220:13
**senior** 16:1,6 77:4
87:15,17 104:21
193:3 203:6,24
**sense** 73:3 118:5
129:1 138:13,15
140:1 141:17
144:3 147:23
151:2,20 153:20
154:6 156:23
157:2,10,13 172:1
181:13,14 188:6
201:19 225:8
240:5 245:17,18
259:12 277:10
282:24 283:2,12
283:13
**sensitive** 173:6,9
190:11
**sent** 84:19 90:8
104:20 108:7
123:7 178:17,25
180:13,18 208:4
224:18,22 225:20
240:15
**sentence** 138:11,20
141:4,6,8,9 143:9

200:10 282:19
284:19
**separate** 81:4,6
106:14 116:4
155:15 158:17
171:2 212:5 239:1
239:2,5 271:10
**separately** 224:20
**September** 19:10
77:18 260:12
**series** 111:8
**serve** 18:16
**service** 20:13 32:6
32:14 33:19 34:3
34:4 35:12 40:21
51:17,22 77:9
79:10,11,15,23
80:18 81:3,16
82:3,18 83:20
85:1,2,15 88:8
90:17 94:21 95:16
96:10,14 97:19
99:23 100:1,4
101:9 102:1 125:5
125:12 126:9,20
129:1 138:14,16
138:18 146:13
150:17 151:2,6,9
152:9 155:5
177:12,13,22
184:14 204:6,8
208:20 212:9
213:19 216:4
217:24 222:15
227:4,5 230:14,16
230:24 232:19
233:15 237:23
238:7 250:18
267:17 284:9,14
284:20 287:6
**serviced** 26:25 49:4
49:10 55:13 58:12
86:18 94:24,25
151:11 160:21,23
177:9,21,21 179:8
238:13 241:15
248:1,9 250:12

271:8 272:11
274:1,24
**servicer** 27:3,5
36:10 78:23 80:4
95:18 96:21 97:4
97:15,20 105:18
105:19 108:4
120:20,21,21
121:21,24 122:20
122:21,23 125:7
125:13,19 126:10
131:5 138:10,12
138:23 139:5,8
141:5,7,11,19
142:1 143:10,11
146:7 148:18,20
148:24,25 149:4
150:23 152:22
153:12,13,16,21
154:2,5,8,9,10
156:8 157:10
161:7,15 162:3,7
174:5,15,25
175:11,21 183:25
187:17 188:3,19
189:2,15 190:5
196:24 197:2,20
200:23 201:21,24
202:20,24 204:20
204:20 207:23,25
208:5,9,11,12,17
210:16 217:5,21
219:2,20 220:6,14
221:14 222:1
223:5 227:24
228:2,4,6,8,9,11
228:14,17,17,20
228:22,23 229:19
229:23 230:2,7
232:9,18 233:4,6
233:9,10,12,16,17
233:19 234:1,2,4
234:4,9 240:3
241:21 242:24
243:1 245:15
246:18 250:5
251:19 253:1

258:4,15,19,21
259:3,6,8 263:14
272:25 274:22
282:7,9,12,18
284:8,9,13,19
**servicers** 80:5
87:10 131:9
141:11 194:2
217:23 228:10,10
228:18
**servicer's** 26:22
189:24 233:21
252:14 253:9
**services** 41:2 69:22
77:8 78:25 79:1,3
79:4 89:5,9
102:23 119:22
154:15 166:21
230:15,17,20
234:5
**servicing** 17:2
18:12 23:21,25
26:20,21 28:10,20
28:23 29:3,13,17
29:24 30:19,21
33:1,1,16,21
34:10,13,25 36:24
37:14 38:4,10
39:19 40:2,7,8,14
42:7 43:3,21 44:5
44:6,14,15 45:5
45:11 48:9,16,24
49:24 53:10,12,20
54:2,11,19 55:8
55:18 57:23 58:9
60:19 63:12,13,15
64:25 69:11 72:2
72:13,24 73:13,15
76:23,25 77:5,6,7
77:7,8,10,11,13
77:14,16,23,24,25
78:1,7,7,10,11,13
78:13,14,15,17,18
78:19,23,24 79:16
79:18,19,20,24,25
80:2,3,4,6,7,9,10
80:11,13,14,20,20

80:24,25,25 81:1
81:2,4,7,12,19,20
81:22,25 82:2,6,7
82:8,10,10,12,20
82:23 83:5,7,25
84:9,18 85:21,23
86:4,7,10,10,11
86:14,17,20 87:8
87:8,9,13,16,21
88:23,24 89:5,9
89:24 90:16,20,24
91:2 92:10 93:2,4
93:10,19,22 94:1
94:12,14,19,20,23
94:24,25 95:1,4,5
95:6,11,14,18
96:1,2,2,5,5,9,12
96:12,13,15,16,20
96:22 97:24 98:8
98:10,14,15,16,19
98:21,22 99:4
100:1,4,6,7,8,9,9
100:12,21,22
101:20,23 102:1
104:15,22,25
105:18,22 106:6,7
106:7,10,12,18,21
106:24 107:11,19
107:21,22 108:3,4
108:5,6,6,13
109:1,3,4,9,13,15
109:20 110:6
111:9,11,12,13
119:21 120:2,9
121:5,19,21,22,24
122:21 123:7,9,10
123:19 124:11,12
124:14,23,25
125:3,3,4,4,14,17
125:18,19 126:3,7
126:8,9,13,15,16
126:17 127:3,3,9
127:21 128:6,16
128:23,25 129:3,4
129:14 130:8
131:4,5,6,11,11
131:15,16,17

132:2,3,4,5,6,10
132:12,13,15,18
132:18 133:14,15
133:16,21 134:5,6
135:15 137:12,15
139:9 140:3
141:14,14 144:19
144:21 145:2,3,11
145:12 146:16,20
147:5,7,24 148:4
148:6,7,9,11
149:2,7,11,21,23
150:15,16,19,22
150:24 151:5,10
151:13,15,19,24
152:18,24 153:9
153:17 155:17
156:1,6,8,13,14
156:19,20,20,24
157:3,5,6,12,22
159:23 160:2,10
160:11,12,22
161:24 166:24
169:21,21 173:19
173:21,23 177:4
177:10,12,16
178:3 179:8 180:2
180:4 183:8,13,15
183:18,20 185:2,4
185:10 187:7,11
187:12 188:2,14
189:15 190:3,5,22
193:3,17 196:8,10
196:11,15,18,24
197:1 198:18
199:10,15 200:25
201:4 202:11,20
202:25 203:25
204:4,18,23 205:8
205:18,21 207:9
207:11,12,17,21
208:11,13,19,22
211:2,6,9,9 212:1
212:3,4,5,11,12
212:13,16,25
213:4,6,8,9,16,21
215:16,23 216:16

217:20,22,23
218:4,8 221:11,22
222:5,7 223:19,24
224:1,3,8 226:17
228:24 229:3,11
229:18,20 230:8
232:24 233:5,10
233:13,17,20,25
234:3,6,9 235:11
235:14,19 237:6
237:11,13,14,18
237:21,25 238:1,3
239:1,3,5,10,14
240:1,5,6,24
241:5,8,12,13,13
241:15 242:16,20
242:25 243:9,17
244:8,11,14 245:1
245:10,24 246:6
247:21 248:11,12
248:16,18,20,20
248:21 249:11,24
250:2,4 251:5,9
251:11,12,13,15
251:18 252:10
254:4,6,10,10
258:7 259:2,3,6
260:9,22 262:19
264:2,4,4,6,10
266:2 267:21,24
268:4,6 269:22
270:21,25 271:2
271:10,11 272:5,6
272:12,16,23
273:1,16,17
274:14 275:2,3
284:5,8,12,14,22
284:24 285:4
**Servicing's** 104:11
   106:5
**set** 34:4 45:15 46:7
   79:24 80:6,13
   82:18 84:25 85:3
   94:8 102:25
   153:25 162:6
   188:4,24 189:17
   202:10,13 230:14

244:15 246:14
251:8 266:11
285:5
**setting** 77:10
   200:12 228:8
**settled** 125:10
   127:6 231:19
**settlement** 166:11
**seven** 96:7 203:23
**Seventh** 4:12
**SEWARD** 9:18
**sheet** 58:7,8,21
   60:5 112:7
**shelf** 270:16
**shelves** 79:7 101:11
   170:21 248:15
**shift** 80:24
**shoot** 246:3
**short** 117:3,21,22
   195:3 215:3
   275:12 276:2,5
   279:3,3 285:17
**shorter** 65:22
   111:10
**shortest** 116:20
**shortly** 92:10,21
**short-term** 95:13
**show** 18:17 47:12
   51:2 54:8,10
   60:13,14 103:3
   127:16 164:5
   183:1 199:12
   259:23
**showed** 107:1
   176:25 192:1
   281:21
**showing** 54:5 60:5
**shows** 54:14 260:6
**shut** 210:8
**sic** 57:10
**side** 70:11 77:9
   106:17 107:23
   108:1 123:2
   128:22 129:20
   132:10 140:2
   146:16 148:14
   158:24 183:20

185:2 196:2
201:24 239:25
262:15 281:5,5
**sides** 147:14 148:8
**Sidley** 4:10,19
   27:23 256:8
   266:19
**sign** 210:24
**signature** 210:23
   210:25 288:10
**signed** 45:20,21
**significance** 176:5
   181:11
**significant** 44:23
   203:16
**signing** 151:2
**signs** 97:7
**SILVERSTEIN**
   4:8
**similar** 107:3,6
   108:18 109:11
   162:9,13 169:14
   203:20 204:2
   212:18 256:15
   272:14
**similarities** 281:14
**simple** 20:9 194:13
   235:7 277:12
**simpler** 189:13
**simplest** 93:6
**simply** 21:19 52:12
   87:3 111:3 128:3
   149:20
**simultaneous** 271:4
**simultaneously**
   137:3
**single** 62:7 171:1,7
   185:11,12 187:1
**sir** 15:12 22:10
   23:1 25:3 26:7
   28:5 32:24 41:23
   42:16 48:4 65:20
   76:6 118:11
   195:18 237:1
   257:3 261:15
   265:23 277:25
   285:13

**sit** 71:21 169:1,4
   187:1 202:9
**site** 100:22
**sitting** 20:3 65:22
   202:6 210:14
   225:21 232:20
   254:22 273:7
**situation** 24:4 60:8
   67:20 69:18 70:4
   79:9 81:4 92:7
   108:1 219:3,5
   233:22,23
**situations** 16:10
   34:14 39:1,1
   81:19,20
**six** 20:9,10 67:13
   67:21 96:19,25
   166:15 251:14,19
   276:6
**sixteen** 198:10
**sixteenth** 97:13
**Sixth** 7:20
**size** 67:7
**skilled** 70:16
**skills** 148:15
**skim** 98:5
**skip** 53:25 57:2
   117:5
**sky** 26:3,4
**slated** 192:20
**slide** 22:10
**slightly** 51:23 58:4
   155:12 238:23
**slots** 70:20
**slow** 51:1 267:5,7
**small** 41:25 97:20
   206:6 213:19
**smaller** 39:2 55:6
**smarter** 150:8
**Smith** 11:11,19
   73:10 205:15
**software** 98:16
**sold** 18:6 75:20
   79:15 82:1 96:13
   96:14 107:10
   108:20 114:1
   121:22 126:15

178:24 241:8
**solely** 92:9 101:22
101:25,25 105:4
111:6 266:1
**solicitation** 123:8
**solicitations** 123:14
**SOLIS-COHEN**
8:10
**solve** 182:3
**somebody** 41:22
56:6 70:8 120:3
218:14,19 220:13
264:4
**somebody's** 75:11
**somewhat** 59:24
66:15 147:16
256:15
**SONTCHI** 1:23
**sooner** 70:24
186:13
**sorry** 15:23 22:10
29:20 37:17 42:9
42:12 44:11 52:14
61:4 65:16 111:1
112:23 114:13
125:22 126:2,4
135:12 136:9
141:24 145:23
158:6 167:11
168:10 174:8
178:15 184:1
195:6 212:7 216:8
234:22 236:25
246:22 247:6
249:2,3,19 252:17
252:19 253:24
257:12 259:1,16
266:25 271:18
274:5,8 275:25
278:1 279:17
**sort** 17:14 111:1
112:13 113:8
195:17 274:21
280:6,11
**sought** 51:19
276:24
**sound** 59:19 288:6

**sounds** 84:24
**source** 16:9,11 31:2
66:18,23
**South** 6:4 7:20
**Sox** 118:16
**space** 61:16
**speak** 27:20 185:3
269:11
**SPEAKER** 118:15
118:19 119:1
165:25 166:4,6
168:10,19 182:15
256:4 257:11,22
279:16,19,21,22
**speaking** 80:1,8,16
81:6,18 95:2
105:14 145:2
150:18 155:3,13
156:11 189:3,18
195:15 196:25
197:8 198:3 209:1
209:13 212:2
213:20 217:1
218:17 219:11
224:14 228:6,22
229:18,25 232:2
243:1 246:1 248:7
249:25 253:8
**speaks** 35:4 36:14
129:17 193:6,13
**special** 85:15
243:17
**specific** 48:17,25
72:19 74:6 112:14
120:25 121:3
129:23,24 130:18
136:16 137:11
141:15 143:25
146:17 150:6
158:13,21 170:2
172:4 175:23
180:2 184:5,16
193:23 194:17
197:13 198:15
201:10,16 204:14
212:13,13 213:13
213:22 215:1,18

216:1,6,10,21
218:1,2,3 219:8
220:17 222:19,20
252:12 268:2
270:22
**specifically** 54:10
72:10 75:20 80:3
98:7 126:23 127:1
128:3 129:13
130:5,23 136:14
136:19 137:8,17
137:21 140:21
141:23 170:20
186:11 191:5
194:3 196:5
212:19 213:18
215:21 220:16
232:14,25 240:10
265:3 270:4
277:15
**specifics** 83:3 220:9
220:11
**specify** 127:13
130:20
**speculate** 39:13
45:8,12 71:16
**speculation** 157:18
173:8
**spell** 15:15
**spend** 24:14
**spent** 24:12
**split** 94:7 252:5
**spoke** 161:4 251:23
254:19
**spoken** 195:24
203:11
**spreadsheet** 42:7
42:15 45:7,13
**SPRINGER** 11:17
**Square** 9:12
**staff** 77:4
**Stafford** 20:21,23
20:24
**stage** 232:3,4
**stand** 15:11 42:21
81:4,6,19 207:1,9
207:11,14 279:8

**standard** 21:5
46:25 102:23
110:3,4 120:25
197:11 198:4,20
202:1 212:16
265:1
**standards** 197:12
**standing** 27:7
44:22
**standpoint** 20:11
51:19 54:20 61:2
99:13 132:9
142:11 144:4
145:7 201:9 208:3
**stands** 84:11
**stapled** 206:5
**Stargatt** 2:3 15:7
**start** 20:7 118:1
133:5 140:17
192:16 215:22
237:3 263:10
**started** 16:21,24
77:18 82:3 248:10
277:8
**starting** 241:3
276:2
**starts** 174:17 241:1
**state** 15:14 22:14
62:5,7 100:10
108:20 191:20
200:21 211:21
**statement** 22:6
25:19 129:9
181:21 212:7
243:3
**statements** 89:22
94:14 123:5,7,11
242:22 280:11
**states** 1:2,14 14:10
14:11 17:24
208:15
**status** 102:12 162:1
223:21 245:3
275:13
**statuses** 245:4
**stay** 147:13 227:2,7
276:9

**Stearns** 4:11,20 5:3
42:17,24 111:7
**steel** 17:8,20,22,24
18:2,6,7
**step** 76:6 112:24
176:14 208:10,21
285:13
**Stephen** 67:18
**steps** 20:15,17 29:8
186:1 216:17
226:3
**STERN** 4:16
**STEVE** 12:22
**STEVEN** 6:17 7:15
**stipulate** 55:24
**stop** 94:14,20 118:3
248:20
**stopping** 116:13
**stores** 224:20
**Storper** 15:10,16
15:19 17:1 22:14
22:21 24:2 28:8
29:21 48:8 51:8
52:8,12 53:3 62:2
73:9 286:6,7,8,9
286:10,11,12,13
**story** 117:3
**straight** 29:11
115:6
**strange** 56:12
**strategy** 88:22
**streamline** 84:14
**Street** 1:15 2:6 3:5
4:5,21 5:4,14 6:4
6:21 7:4,20 8:4,13
8:21 9:5,13 10:6
11:5,14,21 12:12
13:19 14:13
**stress** 73:1
**strict** 146:14
**strike** 27:11 110:8
169:11 203:5
**string** 134:19
**strong** 55:3
**Structurally** 95:4
**structure** 83:9
85:23 181:7 200:1

200:2
**structured** 12:11
    12:18 48:5 82:14
    83:6,8 115:14
    120:12 123:25
    127:2,9 131:3
    158:21 239:7
**structures** 85:21
**studied** 17:13
**studying** 24:12
**sub** 137:21
**subject** 52:9 109:18
    110:19 111:21
    137:4 198:22
    212:4 253:10
    260:8
**submit** 82:22
**submitted** 220:4
**submitting** 278:7
**subordinated**
    189:16 190:23
**subsection** 137:22
    140:23 142:24
    146:7 153:4
    252:16 282:11
    283:11
**subsequent** 59:12
    160:24 164:6
    189:25 221:21
**subsequently** 16:22
    18:3,6 284:6
**substantial** 24:6,17
    164:2
**substantially** 60:18
    61:6 70:15 104:14
    162:9,13 207:21
**substantiating**
    25:13
**subtle** 166:6
**subtract** 251:17
**subtracted** 40:15
    45:4
**successful** 17:18
    23:11 24:19 89:3
**successor** 233:17
    234:1 258:16
**suffering** 17:24

**sufficient** 88:7
    104:4 275:20
**sufficiently** 116:9
**suggest** 187:2,3,23
**suggested** 171:13
**Suite** 3:6 5:5,21 7:5
    7:19 8:5,14 10:4
    11:6,22 12:5
    13:12,20 14:14
**summary** 36:17
    42:8 143:16
**sums** 201:22
**Super** 146:3
**supervising** 196:15
**support** 104:4
**suppose** 147:16
**supposed** 39:11
    93:23,24 148:12
    148:13 193:1,2,10
    195:8 208:7,8
    212:8,14 223:12
    249:16,19,20,20
**sure** 19:6,10 20:3
    24:7 30:15 36:16
    39:12,21 43:23
    47:2 49:22 53:7
    56:13 71:8 72:21
    78:3 82:9 88:22
    92:3 113:22 117:8
    117:8 119:13
    148:14 152:24
    153:16 165:25
    171:18,23 176:13
    177:16 184:2
    190:7,16 194:24
    204:16 206:21
    212:8 217:14
    227:14 228:24
    238:9 267:8
    269:19 274:4,7
**surface** 133:17
    270:17
**surprise** 221:1,5
**surrounding**
    140:13
**surrounds** 70:23
**suspect** 112:14

**suspense** 224:11,12
    224:12,13,16,17
    224:22 225:4,11
    225:13,21
**sustain** 34:7 146:10
**sustained** 22:10
    146:23 147:2
    149:15 152:4
    154:23 158:7
    173:15 175:15
    190:10 242:13
    261:2
**SVP** 88:6
**switch** 82:12
**sworn** 15:13 76:15
**synch** 129:3
**system** 74:1 77:10
    84:22 87:13 93:14
    93:15,19,22 94:1
    94:3,6 98:16,16
    120:2,9 177:10,16
    179:8 180:2,4
    224:20 274:14
**systems** 98:16
**S&P** 102:4 103:7
    113:13 287:10
**S-T-O-R-P-E-R**
    15:16

---

**T**

**T** 2:13,22 286:4,4
    287:4 288:2,2
**tab** 32:4,9 41:4,18
    133:2,4,6 134:16
    137:7,14 140:19
    142:17 162:21,22
    212:20
**table** 169:1
**tabs** 41:10 112:6
**take** 20:11 22:16
    24:16 33:23 49:12
    62:23 76:7 84:13
    90:2 113:25
    114:19,24 117:8
    126:12 131:15
    132:14 166:3
    177:8 179:9

181:22 184:24
    190:22 191:13
    195:2 196:5
    208:10 211:6
    214:12 215:25
    219:25 220:10
    230:20 232:21
    241:11 256:1
    257:2 263:19
    266:20 275:12,21
    276:19 281:4
    285:16
**taken** 20:15,17
    127:5 171:24
    223:10 255:9
    277:3
**talk** 29:7 38:12
    44:9 47:9 52:1
    62:20 63:10 75:22
    115:1,16 119:10
    129:25 154:25
    155:25 169:22
    187:25 218:14,19
    240:23 250:17
    257:3 280:16
**talked** 67:7 101:9
    203:6 204:16
    237:10
**talking** 24:15 59:14
    129:24 130:22
    132:7 141:9 153:3
    188:13 193:12
    238:10 243:12
**talks** 138:13 141:18
    252:25 282:17
**TALMADGE** 3:16
**tapes** 223:18
**tax** 85:6 92:14
    94:14
**taxes** 40:12 91:2
    95:7,21,23 155:7
**taxing** 91:2,10,17
    92:2,13
**Taylor** 2:3 15:7
**team** 16:10 17:15
    23:17 60:19 64:19
    69:15 87:16,17

106:5,8,10 187:12
    203:25
**technical** 162:1
    171:15 181:16
    252:12
**technically** 166:16
**technologies** 98:17
**technology** 83:12
**TELEPHONIC...**
    3:19 4:17 6:10
    14:8
**tell** 38:12,22 39:23
    46:12,15 61:10
    63:16 70:22 71:17
    71:24 114:18
    117:10 142:3
    149:3 158:1 159:9
    166:2 186:24
    193:3 196:14
    212:23 217:19
    224:11 237:13,17
    239:20 268:2
    270:14 273:18
    276:15 281:7
**telling** 55:20 245:3
**template** 121:1
**ten** 59:19 127:16
    275:17,19,21
    276:19
**tendered** 181:8
**tenths** 58:11
**Teramoto** 67:19
**term** 32:16,17
    34:21 75:17 77:24
    77:25 79:8 105:9
    107:7,8,9 108:16
    108:17 113:20
    127:23 141:25
    155:2 176:4,5,10
    188:5 189:18
    192:9,10 199:9
    224:13 225:1
    231:23 232:1
    242:23 260:25
    261:6,7,9,10
    264:25
**termed** 237:16

270:18
**terminate** 149:11
150:21 151:24
153:9 154:15
156:6,18,20 157:5
157:13 240:9
**terminated** 156:13
173:23 177:25
180:21 181:7,8
208:9,13 233:20
234:9 240:3
**termination** 149:16
156:12 175:22
176:2 178:24
180:9,13,18,20
181:9,11 233:15
239:23 240:15,17
240:17 279:21,25
**terminations**
179:21
**terms** 25:8 30:22
31:18 39:12 46:9
46:10 48:18,20,24
51:21 71:21,23
77:12 78:1,2,3
81:12 83:1 86:8
86:19 125:11
127:12,24 128:5
146:14 150:19
153:14 154:12
155:17,19 171:15
171:15 173:20
181:16 189:21
190:3,19 200:22
200:25 212:8
213:15,16 217:5
233:9,10,13
254:25 255:7,8
284:22,24
**testified** 22:15 28:8
29:6,21 30:9,11
32:25 37:4,11
38:17 39:6 40:6
44:22 48:14,22
49:3 50:2 64:4
73:18 103:23
119:17 125:2

131:13 155:4
157:21,21 172:15
176:14 183:10
184:6,11 186:9
187:5 201:7
206:25 239:9
247:24 250:18
255:3 258:20
259:9 264:1
**testify** 21:10 28:19
39:4 44:19 45:10
73:22 132:1 159:6
172:10 190:17
254:25
**testimony** 18:13
28:16 29:6 37:15
52:9 54:15,16
59:23 62:23 63:13
73:12 104:6
118:10 119:12
129:6,19 164:10
180:25 187:9
194:6 201:2
203:18 215:14
224:5 237:10
264:14 282:22
283:22
**Texas** 102:8 160:10
**text** 21:8 52:18
271:16,25
**textile** 17:9
**Thacher** 135:24,24
143:7
**thank** 15:24 22:12
27:9,15 28:2,4,5
32:3 37:22,24
40:19 41:22,23
48:1 50:23 51:4
52:6,24 61:24
65:6 73:5 75:9
76:1,6 103:16
111:23 113:15
114:12 115:4
117:12 119:1,5
124:5,8 132:17,21
132:25 145:5
165:20 166:4

167:14,15,16
174:10 178:15,16
179:9 182:13
185:25 194:19
215:7 227:15,16
229:13 234:20
235:21 236:4,17
236:20 247:4,11
256:13 257:19,22
263:6 265:16
266:15,22 267:14
268:12,14 269:5
272:9 275:6,8
276:12,23 279:5
280:4,13 285:14
**thanks** 57:1 165:23
258:12 265:16
**Thatcher** 170:15
170:19,21 281:16
**thereof** 144:1
**thing** 50:12 70:10
106:8 123:15
158:22 200:14
205:5 263:24
**things** 33:6 40:6
47:17 71:19 94:18
104:21 123:3
150:16 151:18
155:7 158:3
171:20 176:18
183:23 192:23
209:22 245:23
**think** 17:19,23
19:24 22:2,3,16
22:17 24:6 27:16
28:11,15 29:9,10
36:15,15 39:9,16
39:23 47:25 49:22
50:11 52:18 55:23
60:7 61:13 66:1,1
66:8 67:12 68:12
68:17,22,24 69:13
69:14,17,25 70:1
70:3,24,25 71:12
71:19 72:6,10,18
73:20,20,21,24
74:2,2,21 75:17

89:3,8 92:10 95:2
95:15 100:16
102:24 103:22
104:1,8 110:9,11
110:17 113:7
114:19 116:5
118:6,7,22,25
120:8 121:11
123:11 128:8
129:8,17,19
131:21 132:7,17
132:17 133:20
139:15 142:7,10
142:21 144:8
145:25 147:10,20
147:23,24 148:18
150:2 151:25
152:4 154:18,22
156:11 157:18,25
158:1,23 159:14
163:20 164:9
168:3 169:6,10
180:14,23 183:19
183:21 187:5,9
190:10,11 193:5
195:22 196:4
201:7 202:19
203:11,12,23
205:9 206:5 216:8
218:6 227:9 229:7
233:23 238:6
242:4,5,11 245:19
247:19 249:4
251:13 253:21
254:9 256:12,24
259:16 260:19
261:1,5,8 262:6
263:8,22 264:1
268:24 276:25
277:9 278:4 280:7
282:22
**thinking** 204:21
**third** 22:2 36:19
58:3 79:12,13
80:14,16 83:22
87:11 91:5 99:2
101:12 104:18

111:12 122:23
123:12 141:9
156:8,21 199:11
238:20 239:8
248:5,9 249:7
250:14 259:22
260:5
**thirsty** 206:14
**thirteen** 88:1
**thirty** 19:25 38:16
38:18,21 39:2,23
40:3 58:5 78:21
**thirty-eight** 46:20
46:23 47:1 51:24
53:13,18 54:22
**THOMPSON** 9:8
**thought** 112:23
131:25 142:4
**thoughts** 185:5
**threader** 193:2
**three** 20:19 22:2,4
51:2 71:14 102:14
105:3,22 107:15
111:10 112:3
119:19 166:16,20
167:1 235:24
238:24 239:2
256:24 260:12
265:4 272:2
**three-page** 235:1
**threshold** 199:25
**thumbing** 41:11
**Thursday** 116:21
117:6 118:7 276:9
**tie** 98:23 180:5
268:11
**tied** 85:4 179:7
241:17
**ties** 89:11 90:4 99:4
**tight** 27:19
**time** 17:23 22:20
24:12,14 35:17,18
36:19 37:23 59:3
63:2 70:7 75:3
78:20 81:24 82:14
82:16,21 85:9
92:16,23 95:15,19

95:21 99:13,17
105:12,25 108:22
112:24 113:8
114:19,23 116:6
116:13,20 117:13
120:1 124:20,20
124:21,21 125:8
125:10,19 127:1,5
127:7 137:2 151:5
152:19 158:23
169:17 171:12,16
171:24 176:24
177:2 186:10,21
193:22,22 199:20
199:22 202:2
209:23 213:10
219:22,23 220:9
227:15 231:12,12
231:14,14,18
232:12 241:9
245:8,8 253:1,1
260:23 261:4,19
262:10 265:9
266:9 274:18
280:9
**timeline** 220:7
**timelines** 220:14
**timely** 221:9
**times** 66:12 83:15
93:18 95:3 101:16
132:1,14 176:7
184:8 191:11
212:15 224:16
257:13 262:25
**timing** 140:13
**tired** 116:9
**title** 42:5,6,6 76:24
124:18 141:19
148:19,24 182:2
241:5 253:2 282:4
282:8
**titled** 42:16,21
144:6 239:22
250:3 251:8,9
263:13
**titles** 88:5
**TNI** 92:13 94:8

155:23 202:5
**today** 18:15 20:3
20:20 21:10,16,16
21:18 39:8 46:16
48:11 51:10 65:22
66:7,20 67:3,3,9
68:5,6,19 69:12
71:5,21 72:24
73:10,18,22 85:22
85:24 86:14,18,20
87:22,23,24,25
99:19 100:2 114:1
117:3 118:13,21
155:18 159:6
160:7,18 172:8,9
178:19 184:7
186:21 187:1
193:3 194:4 202:6
202:9,14 203:11
204:6 210:12,14
214:2,11 224:1
227:25 231:6
232:20 254:23
257:13 268:3,22
273:7 276:9
283:22 285:21
**today's** 18:16
**TODD** 8:17
**told** 36:19 169:24
170:4,8 172:19
183:7 221:1 242:5
**tomorrow** 116:14
116:20 117:4,13
117:25 118:10,23
119:3 210:12
257:15 265:7
276:1,14,18 277:6
277:8 280:7,16,17
285:16,23
**tonight** 117:4 277:6
280:16
**top** 8:24 133:8
136:24 212:23
227:19,21,22
229:9 234:15,18
234:24 235:3,5,21
238:14 254:14

258:20 263:10
265:3 269:21
270:7,14 273:12
286:19
**topic** 132:8 142:15
144:7,10 175:23
222:17
**topics** 129:4 131:12
**total** 53:9 160:20
177:9 199:22,23
201:18 232:14
260:11
**totaled** 105:25
**touch** 187:7
**Toy** 67:18
**TPW** 281:15
**track** 31:4 93:3
178:12 184:12
220:17 265:16
**Tracked** 178:14
**trade** 16:11 78:11
78:20 79:10,16
82:25 83:2 125:8
125:10,11,18
127:6,7,11,11,12
127:14,14,15,17
127:18,18,25
131:3
**traded** 82:16
**trades** 78:23 82:2,3
127:21
**trading** 16:2
**training** 16:22
**transact** 62:5
**transaction** 31:5
38:24 48:11 49:4
49:5,11 50:15,19
51:18 61:5 71:10
78:15 84:6 94:6
127:4 139:23
145:4,8 161:11
179:19 183:3
195:16,21 197:19
204:17 218:9
246:21 259:13
260:20 265:7
**transactions** 55:9

77:9 79:14 154:1
195:14
**transcriber** 288:4
288:10
**transcript** 52:19
109:9 288:5
**transfer** 77:6,7
78:23 95:17,18
101:20,23 102:1
108:4 110:20
156:7,8,20 157:2
157:3,5,6 159:2
234:10 248:13
256:20 264:3
268:8 271:21,22
272:23 275:2
284:12
**transferred** 23:21
48:10 80:19,21
87:9 102:1 104:18
105:16 112:6
125:7,19 126:10
144:23 146:21
147:5,7,11,18,19
156:15,24,25
217:21 218:20
226:16 227:3
234:1 242:17
248:16 262:8
271:12 273:5,9,13
**transferring** 145:4
145:10 284:8
**transfers** 267:24
284:6
**transition** 18:21
24:7 69:18 71:11
203:16 226:1
**transitioned**
141:24
**transpired** 136:19
140:12
**TRAURIG** 11:2
**travel** 115:19
**tray** 108:5
**treasury** 166:21
**trial** 98:24
**tried** 91:11

**trigger** 184:19
**tripped** 121:17
**trouble** 56:10
214:24 225:9
279:1
**true** 36:17 131:18
222:8 231:8
239:11 256:3,4
**trued** 231:19
**truly** 105:19
**trust** 8:12 26:19
79:4,20 80:1,5,17
80:21 81:3,5,7,15
82:12 84:18,20
94:5 111:7,10
155:20,22,23
206:23 207:13
208:21 228:23
229:12 238:20
248:14,18 249:14
250:12,13,22
251:2,10 259:4
271:3,12 272:24
273:2,10 284:7,10
284:13
**trustee** 7:3,11,18
14:11 55:12 258:4
259:5 277:13
**trusts** 79:25 80:15
229:4 273:6,9,20
284:9
**truth** 71:23
**try** 29:20 34:8
73:25 83:16 84:14
89:9 92:16 104:22
114:22 118:9
122:22 123:16
128:24 129:23
130:3 132:14
148:21 150:5,11
176:12 188:7
189:13 201:12
217:2,2 236:8
245:19 246:15
269:11 276:13
**trying** 27:10 44:18
50:9 54:2 59:25

63:19 64:5,7,13
71:18 77:10 83:17
149:24 152:24
168:6 177:15
179:6 183:12
188:13 190:11,12
217:16 236:1
242:1,3 245:20
246:18 249:21
**Tunnell** 5:10 65:17
**turn** 22:23 32:9,10
32:11 35:25 41:4
41:8 55:21 57:19
96:23 123:21
124:17 133:15,23
137:12 142:15
153:1,5 161:4
196:17 198:1,6
199:3 200:15
201:20 211:16
212:20 229:1,13
231:21 234:11
239:16 240:25
248:23 249:7
252:15,16 254:1
256:1 258:5,7,12
259:14 263:8
265:12 269:17
271:14 281:24
285:17
**turning** 18:8 230:1
**TWEED** 6:2
**twenty** 19:25 38:16
38:18,21 39:23
40:3 176:7
**twenty-five** 62:24
**twenty-four** 33:8
34:11,18 38:15,21
39:2 272:8
**twenty-two** 182:10
182:12
**two** 18:5 22:1 31:8
57:10 58:10 67:14
67:15 78:3 79:12
84:5 85:3 89:10
90:22 91:23 92:6
96:15 97:8 101:8

101:17 105:9,10
106:19,19 107:25
117:16 128:5
129:19 132:22
133:1 141:19
148:8 155:5,15
158:2,4 160:13
168:15 171:1,7
172:2,12 185:16
187:11 192:23
195:23 212:11
230:11,12 233:24
254:1 256:22,24
258:13 260:2,8
271:17,18 276:4
279:9 280:21
281:14 282:5,11
**twofold** 95:9
**two-stage** 59:24
**two-step** 99:8,10,12
262:9
**Two-tenths** 59:20
**type** 49:20 78:8
94:15 95:9 96:3
97:2 121:7 122:18
140:1,4,6 175:18
175:19 188:24,25
200:14 207:19,20
209:25 226:16
228:12 237:13
238:21,25 245:21
249:6,8 258:19
264:13,15 270:15
**typed** 288:13
**types** 79:3 89:23
97:17 98:17
106:20 123:13,15
123:20 128:15
148:13 154:1
184:15 208:24
209:10,12,21
210:1 218:22
219:5 237:11
239:4,8 240:11
245:23 255:21
272:15
**typical** 97:5 101:15

105:17 107:14
108:19 113:23
121:2 123:15
135:9 170:11
249:15 283:23,24
285:9,10
**typically** 78:20
80:1,8,19 81:6
82:13 97:2 107:13
119:17,19 120:8
120:18 122:19,23
123:17 125:8
127:11 128:15
153:25 155:5
189:3 195:19
196:25 197:8
198:3 209:13
213:20 219:11
220:5 222:14
224:14 228:6,22
239:1 246:1 248:7
249:9,23 251:9
284:11

──────────
**U**
──────────
**Uh-huh** 202:4
214:7 274:20
**ultimately** 51:11
78:9 234:9
**Um-hum** 132:24
134:18 139:22
154:20
**unable** 69:21 70:18
92:14,20 233:14
**unanimous** 67:23
**unanimously** 46:2
**unapplied** 224:21
**unauthorized**
214:25
**unaware** 106:2
176:2 178:24
**unchanged** 95:6
205:8 221:25
**uncommon** 164:11
**uncontested** 117:9
**uncurable** 233:20
**undergoing** 17:13

**undergraduate**
16:15,15
**underlie** 109:22
**underlies** 208:23
**underlying** 55:13
78:12 81:1,12
93:20 101:25
119:22 208:15
210:4 251:1
272:24 284:12
**underneath** 209:3
**unders** 242:2
**understand** 21:19
26:9 27:10 29:2
29:14,18 34:23
36:25 43:23 44:13
47:16 50:9,18
55:7,11,16 58:25
65:7 66:2,12 68:9
70:14 74:14 82:9
144:10 149:8,21
149:25 150:1,2,4
155:1 162:3
169:20 170:14
180:17 194:11
197:5 204:21
216:3,4 217:2
218:3 219:2 221:7
240:24 242:2,3,14
250:24 258:17
261:16,22 262:9
262:23 278:14
285:4
**understanding**
25:6,11,17,19,22
26:2,7 33:3 36:20
38:8 39:7 43:19
45:4 49:7,23,24
63:5,24 64:24
69:12 72:15 81:18
88:20 98:11,13
99:10,23 100:12
110:12 113:20
116:2 119:14
122:8 123:22
130:5 133:12
136:4 139:13,17

139:21,22 140:7
144:21 145:6,13
147:1,3,17 154:12
157:23 158:3
160:20 167:3
179:18,22,23
180:10 184:18
189:14 196:23
197:20 204:17
214:8 220:20,22
227:7 233:8
238:11 239:21,25
242:16 250:19
255:6 260:22
262:16 263:2
272:20,22
**understands** 36:24
37:1 67:8
**understood** 22:17
29:23 66:25
130:19 142:7
147:15 150:14
151:17
**undertake** 29:12
201:5
**undertaking** 28:9
28:19 29:24 30:12
30:20 33:4 34:25
204:18
**undetermined**
92:19
**unfamiliar** 69:9
**unfortunately**
215:4 234:24
**unfulfilled** 159:9
**uninterrupted**
88:24 203:17
**union** 62:5 230:25
231:2
**unit** 221:22 222:5
223:24
**unitary** 185:20
**United** 1:2,14
14:10,11 17:24
**universe** 257:2
**University** 16:16
**unpaid** 42:22,24

46:15 86:9,19
107:2 189:16
194:12 260:6
**unreasonable**
137:10 158:22
**Unsecured** 2:17 3:3
**unusual** 59:24
**UPB** 42:21 49:3,9
49:11 87:7 127:16
160:20 161:3
199:23,25 274:10
**UPBs** 86:12,21
**upset** 56:11 135:13
**upside** 39:21
**use** 41:16 72:2,22
93:5 97:19 114:22
123:12 165:10
176:4 231:5
245:18,21 253:8
261:10
**usually** 78:19 95:8
95:9,10,14,15
96:2,5,6,17 97:17
101:17 105:11,16
116:12 120:10
125:10 127:17
195:17 197:14
209:15 249:10
251:8
**utilized** 170:20
**U.S** 1:24 7:3,11,18
111:5 112:19

**V**

**Vadim** 14:7 268:18
268:20 269:14
**vague** 34:6 72:18
129:17 143:14
152:13 178:20
**vaguely** 191:10
262:6
**valid** 119:23 122:7
156:12 179:22
180:12,12
**validate** 210:25
211:2
**validation** 158:16

**validity** 122:15
180:19 181:9
246:15,16,18
**valuations** 83:22
**value** 105:13 240:5
**various** 18:12
23:20 54:9 143:22
175:25 230:6
247:24 252:5
**vary** 197:15,15
220:1
**vein** 215:13
**vendor** 88:15 91:2
106:13 123:12
**vendors** 106:15,18
106:20,22,22,25
107:2,4
**ventures** 17:18
**verbiage** 155:12
**verification** 57:7
**verify** 73:24 119:22
122:6,15 240:20
**version** 134:14
164:6,7,8 206:4
287:12
**versus** 94:24
123:22 177:12
262:18
**viability** 54:10
**viable** 54:15,20
**vice** 27:25 77:1
87:20 160:1
**VICTORIA** 11:9
**view** 24:9 154:19
203:22 281:21
**void** 277:11
**volume** 32:9 40:18
53:9,23 168:15,17
259:13
**vote** 271:21
**votes** 67:16
**VP** 69:10 88:6
**V-E** 76:17

**W**

**W** 4:16 11:9
**waiver** 225:6

**walk** 240:23
**walked** 281:20
**want** 16:11 17:17
52:4,8 56:21
63:22,24 69:20
91:21,24 112:25
115:7 119:10
122:22 123:21
124:2 126:12
129:25 130:18,20
137:17,21 140:14
140:15,24 144:4
144:10 145:5
148:22 154:25
161:4 163:20
203:19 204:2,20
205:16 209:23
214:24 223:23
228:25 231:21
240:21 258:23
262:17 263:16
275:14 278:8
279:3 285:18
**wanted** 97:18 157:5
192:5 227:13,24
**wanting** 51:22
71:20
**wants** 30:18 34:3
210:17
**WARD** 13:23
**warehouse** 177:14
**Warranties** 32:6
32:13 40:21 41:2
287:6
**Washington** 4:22
**wasn't** 34:18 66:10
104:8 132:8
183:20 187:7
192:23
**water** 247:5,7,9
**waterfall** 36:10
39:5 188:2,4
**Wax** 67:18
**WAXMAN** 10:9
**way** 23:7 34:4
36:21 59:9 62:9
62:15 71:12 78:3

78:3 79:2,14 81:7
81:8,11,13,14,22
82:13 89:8 93:3
96:18 100:2,2
107:9 110:12
116:19 131:14
132:1,12 146:11
147:15 149:1,19
152:25 153:20,25
154:4 179:24
187:3 192:17
195:20 200:9
201:23 224:13
233:24 239:6
241:10,19 248:15
262:1 263:9
276:15
**ways** 38:25 70:21
**web** 231:1
**website** 22:1
102:25 230:12
**Wednesday** 276:10
**week** 86:16 102:8
109:23 158:15
178:22 180:18
186:19 195:22
211:24 274:18
**Weil** 262:4
**Weill** 39:4 40:6
49:3 59:23
**Weill's** 39:7
**welcome** 165:21
194:20 234:21
257:23
**Wells** 8:11,20 9:3
16:21 227:23
267:17,20 268:7
274:22 275:1
**Wendy** 67:19
**went** 74:19 78:21
81:11 137:9 152:1
152:2 183:19
186:5 187:13
201:8,10,12
**weren't** 33:15
159:7 183:16
**West** 2:6 8:21

**Western** 230:25
231:2
**we'll** 18:20 22:8
46:18 58:24 75:2
110:17 112:8,12
117:2,3,4,25
118:3 123:16
164:16 181:1
215:22 257:2,3,14
257:15,16,17
265:8,9 266:20
275:21 276:18,19
276:20 279:5
280:10 283:14
285:16,17,19
**we're** 15:5,22 19:12
24:7,24 25:8
26:16 30:22,24
31:4,19 33:2
38:13,23,23,24
39:11,21,22 40:3
44:5 47:24,25
48:11,20 51:22
54:22 55:5 59:4
59:14 60:7 61:10
63:9,16 64:13,21
66:13 69:16,17
71:4,9,12,18,18
72:7,12 73:1,21
74:3 83:11 84:18
86:20 87:13 89:16
89:16 90:3,6,16
95:7,7,10,16,17
101:2 106:2,3
113:6 115:11
124:17 146:1
148:12,12 162:23
166:17 183:14
192:14 198:21
202:14 206:22
213:3,20,20
216:14 238:1,3
241:12 245:1,3
255:25 256:16
257:8,14 260:21
265:6 276:2 277:1
279:8 283:8

285:15
**we've** 20:17 21:14
23:10 24:14 39:1
39:20 54:7 59:4
61:13,14 67:23
70:2 72:7 90:24
92:22,24 105:3
124:3 145:15,17
168:14 184:20
187:22 213:8,9
239:6 276:25
277:3
**whatsoever** 38:25
**wherewithal** 29:8
**whichever** 206:4
247:13
**whim** 197:7
**WHITNEY** 7:2,10
7:17
**WILAMOWSKY**
12:22
**Wilbur** 16:5 20:6
46:1
**wild** 116:17
**William** 6:25 236:5
278:2
**willing** 20:4 50:19
70:4
**Wilmington** 1:17
2:8 3:7 4:6 5:6,15
5:22 6:15,23 7:6
8:6,12,15 9:6,14
10:7 11:7,23 12:6
13:13,21 14:15
**Wilmington's**
247:10
**Wilson** 67:18
**window** 245:8
**Winfrey** 145:22
**winning** 82:17,22
82:22 127:3
**wire** 91:24
**wish** 268:15
**withdraw** 36:22
154:24 156:4
164:16 173:16
**withdrawals** 36:1

**withdrawing**
265:24
**withdrawn** 104:8
167:3 264:21
**withstanding**
270:16
**witness** 15:8,13,16
18:16 20:23 21:10
22:8,22 29:6
30:14 31:25 32:22
35:4 36:13 41:11
41:21,22 42:18
43:25 44:22 53:8
64:2,3,6 76:8,13
76:15,16 103:4,15
103:22 110:16
113:17 114:18
115:4 116:6 119:2
124:18 128:9
130:1 131:21,22
131:22 132:23
133:1 139:19
147:10,24 149:17
150:2 154:21
159:16 162:18
163:15 164:10
165:11,23 166:12
169:7,10 176:10
180:24 182:4,6,20
190:16 195:2,6
198:3 206:12,19
217:13 227:8
234:14,20,22
235:2,4,6 236:7
236:13,17 247:5,7
249:1,4 256:22
257:9 261:14,18
265:10 267:15
268:23 269:4
276:8,18 285:14
286:5
**witnesses** 39:6 51:2
115:18 116:1,2,25
117:1,2 118:7,20
263:1 276:4
**WL** 15:20 16:4,5

20:8 47:22 48:19
69:16
**WLR** 15:21,25
16:20 17:4,6,11
17:18 18:16 19:2
19:21 20:12 23:6
23:18 24:3 29:3
29:21 30:4,19
31:3 45:20,23,24
57:8,9 178:24
179:19,19
**WLR's** 72:1
**WOLF** 8:10
**WOMBLE** 6:12
**won** 127:9
**wondering** 29:23
37:9 44:1,6
115:20 118:15,19
256:9
**Wood** 135:24,25
170:19,22 281:16
**word** 28:12 49:12
134:7 162:12,13
176:6 193:19
196:5
**wording** 138:8
141:1 174:16
**words** 126:15
156:16 175:3,7,8
183:14 225:19
251:25 282:7,12
282:19
**work** 17:16,16 29:1
34:16 68:21 69:10
70:4 71:20 77:17
83:16 84:12 92:23
96:18 103:10
114:22 116:14
117:7 120:8 136:4
156:11 157:22
169:20 188:24
203:7 245:17
255:22 262:15
270:20 277:6
280:9
**worked** 38:20
61:14,14 62:8,19

77:13,14,20
106:23 176:22
241:17
**workforce** 88:7
104:11
**working** 16:4 18:4
18:19 19:22 20:25
23:14 24:6 30:12
39:24 50:16 65:24
67:5 68:24 102:10
115:11 137:6
145:8 217:24
219:14 277:1
**workout** 16:23
83:15
**workouts** 220:10
**works** 122:12
139:14 157:11,23
172:20 192:18
252:13
**world** 18:7 115:1
**worry** 117:11
**worse** 193:4
**worth** 31:21 58:8
59:13,18 60:6
62:24 86:12,21
105:12 204:8
273:25
**wouldn't** 73:14
95:20,22 132:9
137:10 148:18,20
151:12 181:14
204:22 214:24
224:23 225:15
249:10
**wrapped** 70:24
**write** 68:10 74:24
75:4,7 111:19
210:18,19 230:9
**writes** 93:8
**writing** 210:19
**written** 28:2 31:11
220:12,13,18
221:1,7 266:1
**WRL** 57:10
**wrong** 33:24 42:9
59:17 132:1

145:19,21 186:24

———————————
**X**
**x** 1:5,12 286:2
287:2,4

———————————
**Y**
**Y** 286:4
**yeah** 21:17 37:16
40:19 59:11 60:9
61:17 114:18
125:25 127:24
131:25 152:2
156:22 158:6
161:14 165:2
182:23 188:17
189:21 192:13
206:3 236:12,13
236:24 237:3
238:14 239:15
242:23 249:25
252:18 254:1
260:7 261:21
271:20 275:18
**year** 32:16,17
34:21 105:24
**years** 16:4,5 18:5
105:3,9,10,22
213:6,7
**Yep** 42:12 152:2
**yesterday** 39:4
40:6 48:8 49:3
59:23 102:14,24
103:3 112:5 188:6
194:23 195:6
261:25
**yesterday's** 18:13
22:22
**yield** 16:24
**York** 2:19 3:14
4:13 5:20 7:13
9:11,21 12:20
13:5 14:5 40:4
55:7 160:16
210:22 211:4
227:6 258:3,15,20
259:5 260:9

**York's** 210:24
**Young** 2:3 15:6

**Z**

**Z** 11:17
**zero** 31:21 43:10
83:12 184:24
185:7,13 192:20

**$**

**$400** 238:3

**0**

**02110** 12:13
**05** 134:2
**06** 134:2 137:9
**07-11047-css** 1:4

**1**

**1** 32:4,5,6,9,9,13
40:21,22,25 41:2
57:22 58:9 88:13
88:22 110:16
111:1,2,20 112:8
112:13 113:7
124:10,18 126:5
126:12 129:1
133:22,23 134:9
134:10 135:7
137:15 141:1
144:14 145:24
153:2 168:20,23
168:24 174:1,12
194:24 196:13
206:4,8 211:16,22
281:10 284:17
**1J** 268:23 269:17
**1st** 32:14 48:9
**1,000** 93:21 114:9
**1.01** 199:6,7
**1.1** 109:18 110:23
199:3 259:1
**1.1(j)** 166:20 167:2
177:6,19,24 258:7
258:11,13 267:1
267:10 269:8
**1.1(k)** 179:9,10,13

179:24 180:7,11
180:20,22,24
181:2,5
**1.1-J** 98:23 101:6,6
101:8 109:22
110:18 111:3
238:12
**1.1-K** 240:13,14,19
**1.2** 42:24
**1:30** 114:20
**1:37** 115:5
**10** 116:16 118:1
196:17 257:16
276:2 285:16,23
**10/31/05** 166:21
**10:00** 117:17
**100** 110:25
**100,000** 114:7
**1000** 2:6 13:20
**10004** 9:21
**1001** 8:14 57:8
**10019** 4:13
**10022** 2:19 3:14
12:20 13:5
**1007** 9:5 11:5
**101** 110:24 114:8
259:1
**101-J** 112:10
**101.J** 111:16
**10154** 14:5
**10177** 7:13
**103** 110:16 111:2
111:20 112:9,13
113:7
**103,6** 287:9
**105** 41:10,10,14,19
179:11 234:19
258:5
**106** 22:23 55:21
56:2,4,16 287:8
**107** 102:22 103:6
112:2,16,22 113:4
113:12 287:9
**107(b)** 278:12,13
**108** 102:22 103:6
112:2,16,22 113:4
113:12 265:12,13

265:17 287:10
**109** 102:22 103:6
112:3,17,22 113:4
113:12 287:10
**11** 118:5 230:1
248:23,24,24,25
249:3,5,21 250:2
283:15,16,17
**11:08** 76:9
**11:20** 76:9
**1100** 5:4
**1101** 8:13
**1105** 7:4 252:16,21
**111** 8:21
**113,12** 287:9
**119** 286:15
**12** 41:4 198:6,9
**12:27** 115:5
**1200** 5:5 11:6 13:12
**1201** 3:5 5:14 10:6
11:21
**1210** 5:21
**13** 267:4,11,14
282:4,11
**13.01** 137:22
140:23 142:24
148:3 281:24
282:12,20,23
283:1,8,11
**1301** 281:22
**1313** 4:5
**14** 178:10,18,25
237:6
**14th** 279:17
**14.01** 153:4
**14.01(i)** 153:10
**1400** 10:4
**15** 266:3,5 286:6
**15th** 6:14,22
**15,000** 105:24
**150** 12:12
**1500** 7:19 11:22
12:5
**1501** 4:21
**16** 1:19 201:20
258:23
**160** 18:3

**1600** 7:5 11:14
**163,6** 287:11
**164,20** 287:12
**165,6** 287:13
**167** 286:16
**17** 52:23 273:25
**17th** 2:7 260:12
**17.758** 274:10
**18th** 5:13 154:2,3
**180** 49:10
**189** 161:2
**19** 52:8,15,22 53:1
57:5 231:21
**19103** 11:15
**19801** 2:8 3:7 4:6
5:6,22 6:15,23 7:6
8:15 9:14 10:7
11:7,23 12:6
13:21 14:15
**1989** 16:21
**19899** 5:15 8:6 9:6
13:13

**2**

**2** 36:2 41:20 42:2
42:13,16 118:3
129:2 178:9 188:8
212:20 234:12,25
235:5,6 258:12
273:25 274:7
276:3 279:11,11
279:23,25 285:20
**2(i)** 36:5,6 42:11
**2.09** 32:16 35:20
**2.1-B** 254:1
**2.5** 19:11
**2:00** 117:14,15,18
**20** 52:8 54:1
**2000** 16:6
**20005** 4:22
**2001** 77:18 127:5
**2002** 77:14
**2003** 270:13
**2004-4** 259:4,13,25
**2005** 105:22 124:10
126:5 133:20,22
134:9 137:15

**141**:2,25 145:15
162:18,22 163:6
164:12 172:22
287:11
**2006** 32:14 48:9
81:9 105:23
126:12 129:12
134:10 135:7
136:8,12 141:25
144:11,17 145:24
153:3 164:8,12
167:22,25 170:7
175:20 237:6
247:21 250:5
267:19 281:8,11
**2006-3** 229:4,12
**2007** 1:19 57:5,20
111:5,8,8 159:20
178:10,18,25
181:25 266:3,5
267:18 288:9
**2007-AR1** 250:13
**2007-SD-1** 206:23
**2008** 262:24
**205** 286:17
**21** 32:11,16 34:21
247:21 250:5
281:8
**210,000** 86:22
231:5,7
**214** 129:5
**215** 286:18
**22** 288:9
**2207** 14:14
**222** 6:14 13:11
**227** 286:19
**23** 269:17
**236** 286:20
**24** 186:16 211:21
**247** 286:21
**25** 267:18,19 286:7
**250** 7:12
**250,000** 58:10
86:13
**2500** 11:13
**257** 286:22
**26** 159:20 191:13

191:16
**266** 286:23
**269** 286:24
**27** 181:25 247:18
247:20 250:7
252:16,17,18
280:22 281:1,7
282:2,8,18 283:9
283:11
**27th** 279:18
**279,25** 287:14
**28** 168:2,11 241:1
286:8
**280** 286:25
**280,2** 287:15
**29** 166:23

**3**

**3** 41:20 42:2,13,16
164:6 196:18
205:6 206:3
229:13,16,18
258:12 259:20,20
**3LP** 57:9
**3,000** 224:10 225:3
**3.03** 35:23
**3.06** 230:1
**3.13** 231:21
**3/1/06** 32:7 287:7
**3:00** 117:19
**3:03** 166:7
**3:11** 166:7
**3:59** 195:4
**30** 111:5 166:25
263:10,10
**30th** 6:5
**300** 5:21
**302** 58:9
**305** 57:22
**305.1** 57:22
**305.2** 57:22
**31** 57:19
**31st** 214:9
**32,6** 287:6
**33** 236:10 237:2,3,5
278:3
**345** 14:4

**35** 271:14 280:23
281:9,10 282:1
**363** 262:18
**365** 261:12
**37** 236:11 278:3
**38** 194:5,5,10,11,15
**399** 12:19

**4**

**4** 159:18,20 164:7
205:1,1 241:1,4,5
**4LP** 57:9
**4.05** 36:1,3 188:8
**4.052** 189:17
**4.1** 191:14,15 241:2
241:3,20
**4/1/06** 166:22
**4:05** 195:4
**400** 66:11
**405** 188:10
**41** 263:3,4
**41,2** 287:6
**412** 86:16
**425** 3:13 86:7
**430,187** 43:5,15
**437** 13:4
**44** 200:15
**44114** 10:15
**45** 137:17 200:15
200:18
**450** 19:17 24:17
30:24 38:23 66:11
**48** 36:3 188:11
282:2 286:9
**488** 2:18
**49** 32:10 35:25 36:6
188:11 260:6,6

**5**

**5** 41:19 49:11 164:8
259:20
**5th** 1:16
**5.02** 263:9,13
**5.1** 194:9,10,14
**5.18** 41:24
**5.2** 263:8
**5.6** 259:14

**5.6A** 268:11
**5.6(a)** 259:14,18
273:24
**5.6(d)** 259:16
**5.6-A** 98:24
**5.6-D** 42:11
**5.6-D(2)(i)** 41:8,20
**5.6-D2** 42:2
**5.8** 234:12,16,25
235:2,3
**5:46** 257:5
**5:51** 257:5
**50** 7:20
**50,000** 105:23
**500** 12:4 19:17 37:1
37:1 44:15 215:2
215:4
**51** 277:17 286:10
**515** 274:8,14
**518** 42:13,16 274:8
**52** 239:17 277:18
**55** 142:20,21,24
145:16,20 146:3
282:1
**550** 91:1,10
**55402** 7:21
**555** 172:17,19
173:5
**56** 140:21
**56,4** 287:8
**57** 153:1,5,10
**598** 260:7

**6**

**6** 52:15 116:12
125:25 126:1
137:14 162:22
181:22,22 199:3,7
229:14 279:11,11
279:19,23 280:2
**6th** 91:9
**6:26** 276:21
**6:42** 276:21
**6:57** 285:24
**600** 8:5
**60603** 8:22
**610** 6:4

**62** 286:11
**63** 206:9,10,14,18
**65** 286:12
**67** 229:7
**674** 182:4

**7**

**7** 116:11,16 117:4
117:13,18 133:4
134:17 142:17
**7.05** 146:7
**7.2** 239:17 240:9
**70** 229:1,5,6,8
**71** 174:9
**73** 286:13
**76** 195:10 286:14
**787** 4:12

**8**

**8** 54:1 116:11 117:4
118:18 133:2,6
137:7 140:19
192:11 271:25
**8.15** 278:4
**8/14/07** 287:14
**8/14/2007** 280:1
**8/27/07** 287:16
**8/27/2007** 280:2
**800** 3:6
**824** 1:15
**84** 269:1
**844** 14:13
**85** 268:21,25
**8500** 105:25

**9**

**9** 252:16,18,20,21
**9-6** 252:21
**9.01** 173:25 176:3
178:1
**9:45** 1:20
**90017** 6:6
**901** 10:14
**919** 6:21 8:4 13:19
**920** 9:13