IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- X

In re:                                              :    Chapter 11
                                                    :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,              :    Case No. 07-11047 (CSS)
a Delaware corporation, et al.,                     :
                                                    :    Jointly Administered
        Debtors.                                    :
                                                    :    **Objection Deadline: November 7, 2007 at 4:00 p.m. (ET)**
                                                    :    **Hearing Date: November 14, 2007 at 10:00 a.m. (ET)**
---------------------------------------------------------------- X

## NOTICE OF MOTION

TO:   THE UNITED STATES TRUSTEE FOR THE DISTRICT OF DELAWARE; (II)
      COUNSEL TO THE COMMITTEE; (III) COUNSEL TO BANK OF AMERICA; (IV)
      COUNSEL TO THE AGENT FOR THE DEBTORS' POSTPETITION LENDER; AND
      (VI) ALL PARTIES ENTITLED TO NOTICE UNDER DEL. BANKR. LR 2002-1(B)

        The above-captioned debtors and debtors-in-possession (the "Debtors") have filed
the **MOTION OF THE DEBTORS FOR APPROVAL OF A STIPULATED ORDER
CONFIRMING THE DEBTORS' AUTHORITY TO MAKE CERTAIN PAYMENTS
FOR PENALTIES, INTEREST AND RELATED CHARGES, SOLELY IN
CONNECTION WITH CERTAIN TAX AND INSURANCE REMITTANCES** (the
"Motion").

        Responses to the Motion, if any, must be filed on or before **November 7, 2007 at
4:00 p.m. (ET)** (the "Objection Deadline") with the United States Bankruptcy Court for the
District of Delaware, 3rd Floor, 824 N. Market Street, Wilmington, Delaware 19801.

        At the same time, you must also serve a copy of the response upon the
undersigned counsel to the Debtors so that the response is received on or before the Objection
Deadline.

        A HEARING ON THE MOTION WILL BE HELD ON **NOVEMBER 14, 2007
AT 10:00 A.M. (ET)** BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI, UNITED
STATES BANKRUPTCY COURT, 6th FLOOR, 824 N. MARKET STREET, WILMINGTON,
DELAWARE 19801.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED BY THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated:    Wilmington, Delaware          YOUNG CONAWAY STARGATT & TAYLOR, LLP
          October 22, 2007

_____
James L. Patton, Jr. (No. 2202)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Kara Hammond Coyle (No. 4410)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------------- x
In re:                                              :    Chapter 11
                                                    :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,              :    Case No. 07-11047 (CSS)
a Delaware corporation, et al.,                     :
                                                    :    Jointly Administered
        Debtors.                                    :
                                                    :    **Objection Deadline: November 7, 2007 at 4:00 p.m. (ET)**
                                                    :    **Hearing Date: November 14, 2007 at 10:00 a.m. (ET)**
--------------------------------------------------------------- x

### MOTION OF THE DEBTORS FOR APPROVAL OF A STIPULATED ORDER CONFIRMING THEIR AUTHORITY TO MAKE CERTAIN PAYMENTS FOR PENALTIES, INTEREST AND RELATED CHARGES, SOLELY IN CONNECTION WITH CERTAIN TAX AND INSURANCE REMITTANCES

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and

debtors in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] by this motion

(the "Motion"), seek approval of a stipulated order pursuant to section 363 of title 11 of the

United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), confirming the Debtors'

authority to make certain payments for penalties, interest and related charges, solely in

connection with certain tax and insurance remittances that were not timely paid to taxing

authorities and insurance companies. In support of the Motion, the Debtors respectfully

represent as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

## JURISDICTION AND STATUTORY PREDICATE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is section 363(b) of the Bankruptcy Code.

## BACKGROUND

2.      On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

4.      On August 14, 2007, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "Committee"). No trustee or examiner has been appointed.

## THE DEBTORS' BUSINESS[2]

5.      Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and

---

[2] The facts set forth herein are derived from the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief (the "First Day Declaration") [Docket No. 2], which is incorporated by reference as if fully set forth herein at length.

primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

6.     As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006. For the third quarter of 2006, AHM was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

7.     A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion.

8.     In the weeks prior to the Petition Date, an unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

9.      The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees.

10.      Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## THE UNPAID PENALTIES, INTEREST AND RELATED CHARGES

A.      *Federal Home Loan Mortgage Corporation Loans*

11.      Prior to the Petition Date, the Debtors serviced mortgage loans (the "Freddie Mac Loans") owned by the Federal Home Loan Mortgage Corporation ("Freddie Mac"). As a mortgage loan servicer, the Debtors receive tax and insurance payments directly from homeowners and hold such payments in escrow until the Debtors transfer such payments to the relevant taxing authorities or insurers.

12.      On August 1, 2007, Freddie Mac took possession of certain funds the Debtors had escrowed for taxes and insurance ("Freddie Mac Escrow") related to the Freddie Mac Loans. Without access to the Freddie Mac Escrow, the Debtors were unable to make certain real estate tax, insurance and other applicable impound fund payments[3] for the Freddie Mac Loans (the "Unpaid Freddie Mac T&I").

---

[3] "Other applicable impound fund payments" include ground rents and miscellaneous types of insurance.

13.     On September 18, 2007, the Debtors entered into the Stipulation of Settlement between and among the Debtors, Bank of America, N.A., and Federal Home Loan Mortgage Corporation Regarding Interim Servicing of Federal Home Loan Mortgage Corporation Loans (the "Freddie Mac Settlement Agreement"). The Freddie Mac Settlement Agreement, which was approved by the Court on September 20, 2007 [Docket No. 861], provides that Freddie Mac shall reimburse the Debtors from the Freddie Mac Escrow for all amounts paid by Debtors to borrowers as a return of their escrow balances where the borrowers' loans were paid in full. Additionally, the Freddie Mac Settlement Agreement further states that the Debtors shall provide Freddie Mac with a detailed list of all necessary tax and insurance payments as such payments become due, whereupon Freddie Mac shall transfer to the Debtors from the Freddie Mac Escrow the applicable amounts needed to pay required real estate taxes, insurance and other applicable impound fund amounts on account of the loans covered by such Freddie Mac Escrow.

14.     Moreover, pursuant to the Freddie Mac Settlement Agreement, Freddie Mac agreed to assume all liabilities with respect to any loss incurred by the Debtors arising out of pecuniary losses of the borrowers of the Freddie Mac Loans, as a result of Freddie Mac having swept the Freddie Mac Escrow and the Debtors' failure to make timely required real estate tax, insurance and other applicable impound fund payments.

B.    *Government National Mortgage Association Loans*

15.     In addition to servicing loans for Freddie Mac, the Debtors also serviced loans (the "Ginnie Mae Loans") owned by the Government National Mortgage Association ("Ginnie Mae"). And like Freddie Mac, Ginnie Mae also swept the escrow account (the "Ginnie Mae Escrow") which held tax and insurance payments the Debtors had received from the

homeowners. As a result of Ginnie Mae's sweeping of the Ginnie Mae Escrow, the Debtors were unable to make certain real estate tax, insurance and other applicable impound fund payments (the "Unpaid Ginnie Mae T&I").

16.    Following Ginnie Mae's sweeping of the Ginnie Mae Escrow, the Debtors entered into settlement negotiations with Ginnie Mae. As a result of those negotiations, Ginnie Mae agreed to make available the funds in the Ginnie Mae Escrow so that Debtors can pay, on behalf of the homeowners, all Unpaid Ginnie Mae T&I. To date, Ginnie Mae has not agreed to assume the liabilities, including penalties and interest, associated with the Unpaid Ginnie Mae T&I.

C.    *Dishonored Property Tax Checks*

17.    In early August 2007, a tax and insurance escrow account maintained by the Debtors for the purpose of paying tax and insurance payments received from homeowners was erroneously frozen (the "Escrow Account"). As a result of the Escrow Account being frozen, property tax checks issued to relevant taxing authorities were dishonored (the "Dishonored Checks," and together with the Unpaid Freddie Mac T&I and the Unpaid Ginnie Mae T&I, the "Unpaid T&I").[4] As soon as the Debtors became aware that checks were being dishonored, the Debtors actively worked to reopen the Escrow Account. Once the Debtors received confirmation that the Escrow Account was reopened, the Debtors began the process of replacing the Dishonored Checks.

---

[4] While the Escrow Account was maintained for both tax and insurance payments, only tax payments were dishonored as the insurance payments were previously wired to a separate account and paid.

*Debtors' Efforts To Resolve Unpaid T&I Issue*

18.    Since becoming aware of the Unpaid T&I, the Debtors have been actively and diligently working to resolve the issue. The process to remit the Unpaid T&I first required the Debtors to make efforts to re-open the Escrow Account and obtain information from the bank to determine the extent of the problem. In addition, the Debtors engaged in lengthy negotiations with Freddie Mac and Ginnie Mae to release the funds for payment. The Debtors were then required to contact each and every taxing authority and insurance carrier and verify whether payments were made. If payments were not made, the Debtors had to verify whether any penalties and fees were due and, thereafter, to have the checks reissued. In most cases, the taxing authorities required certified replacement checks, which caused an additional cost and delay. To address the issue expeditiously, the Debtors devoted a significant amount of resources and personnel to complete the task.

19.    In addition to the payment of the Unpaid T&I, the Debtors were, in many instances, required to pay the above-referenced penalties, interest and related charges, such as certified check fees, associated with the Unpaid T&I (the "Penalties, Interest and Related Charges"). By contacting each taxing authority and insurer, the Debtors were able to gain an estimate of the total amount needed to pay the Penalties, Interest and Related Charges. The Debtors estimate that the total liability for Penalties, Interest and Related Charges will likely not exceed $200,000.00. To date, the Debtors have (i) reissued 100% of the Dishonored Checks, (ii) paid 100% of the insurance portion of the Unpaid T&I, and (iii) paid 98% of the tax portion of the Unpaid T&I.

20.    As the funds held in the Freddie Mac Escrow, the Ginnie Mae Escrow and the Escrow Account are not property of the Debtors' estates;[5] payment of the Unpaid T&I does not implicate the use of the Debtors' assets.  As such, the Debtors are not seeking authority to pay the Unpaid T&I.  Additionally, the Debtors are reserving their rights to seek reimbursement of any amounts they spend on the Penalties, Interest and Related Charges, as well as the Debtors' rights to pursue damages, since the Debtors believe that the Unpaid T&I was primarily, if not solely, the result of actions by third parties.

### RELIEF REQUESTED

21.    Prior to the Petition Date, where tax and insurance payments were made late, the Debtors would pay the associated late charges, including related penalties and interest payments, in the ordinary course of their business without the incurrence of any liability by the homeowners.  As such, the Debtors respectfully submit that payment of the Penalties, Interest and Related Charges are ordinary course transactions.  While the United States Trustee believes that, in the mortgage servicing industry, a significant increase in a Debtor-servicer's payments for late charges, related penalties, and interest (when measured against the entity's historical practices and/or an industry standard) may raise a question as to whether such payments are ordinary course transactions, the Debtors have agreed with the U.S. Trustee that the better practice is to file this Motion to provide notice of the circumstances surrounding the Unpaid T&I.  The U.S. Trustee supports the Debtors' request for Court confirmation of their authority to pay the Penalties, Interest and Related Charges.

---

[5] In some circumstances, where the homeowner has not remitted payment for taxes and insurance applicable to its loan, the Debtors may be required to advance the taxes and insurance in order to comply with the Debtors' servicing obligations.  To the extent that the Debtors advanced any tax and insurance payments related to the Freddie Mac Loans, the Ginnie Mae Loans or Dishonored Checks, the Debtors will seek reimbursement of any and all such advances from the owners of the loans at issue.

22.    The Debtors and the U.S. Trustee agree that affected homeowners should be spared all expense (in the form of Penalties, Interest and Related Charges) and any further inconvenience associated with the Unpaid T&I. As part of their discussions with the U.S. Trustee, the Debtors have agreed to send a letter to each affected homeowner notifying him/her of the late payments and advising that homeowners will not be liable for any Penalties, Interest or Related Charges associated with the Debtors' late payment of taxes and insurance. The letter will advise affected homeowners of a toll-free number they can call to obtain further information on the status of Unpaid T&I. Accordingly, the Debtors seek entry of an order, pursuant to section 363 of the Bankruptcy Code, confirming their authority to pay the Penalties, Interest and Related Charges.

### BASIS FOR THE RELIEF REQUESTED

23.    Section 363(c) of the Bankruptcy Code authorizes a debtor in possession to use, sell or lease property of the estate in the ordinary course of its business. 11 U.S.C. § 363(c). Section 363(c), in relevant part, provides:

> (c)(1)  If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204 or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1). The ordinary course standard was intended to allow the debtor in possession the flexibility required to run its business and respond quickly to changes in the business environment. See In re James A. Phillips, Inc., 29 B.R. 391, 394 (S.D.N.Y. 1983); In re HMH Motor Service., 259 B.R. 440, 448-49 (Bankr. S.D. Ga. 2000). A debtor in possession

thus may use, sell or lease property of the estate without need for prior court approval if the transaction is in the ordinary course. See In re Johns Mansville, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (holding that ordinary course uses of estate property do not require a prior hearing); In re James A. Phillips, Inc., 29 B.R. at 394 (holding that where a debtor in possession is merely exercising the privileges of his status, there is no general right to notice and hearing concerning particular transactions conducted in the ordinary course of the business).

24.    Courts broadly interpret the term "ordinary course." See In re Berkley Multi-Units, Inc., 88 B.R. 394, 396 (Bankr. M.D. Fla. 1988). In determining whether a transaction is in the ordinary course of business under section 363 of the Bankruptcy Code, the courts generally engage in a two step test: (1) the objective horizontal test, and (2) the subjective vertical test. See In re Roth American, Inc., 975 F.2d 949, 952 (3d Cir. 1992); In re Vision Metals, Inc., 325 B.R. 138, 143 (Bankr. D. Del. 2005).

25.    The horizontal test is a factual analysis as to whether the transaction in question is of the sort commonly undertaken by companies in that industry. See In re Roth American, Inc., 975 F.2d at 952-53. That is, the horizontal test focuses on whether the transaction is usual or abnormal for the industry. See In re Dant & Russell, Inc., 853 F.2d 700, 704 (9th Cir. 1988). The vertical test is an analysis conducted from the perspective of a hypothetical creditor and analyzes whether the transaction subjects the creditor to an economic risk of a nature different from that it accepted when it decided to extend credit. See In re Roth American, Inc., 975 F.2d at 952-53; United States ex rel. Harrison v. Estate of Deutscher, 115 B.R. 592, 598 (M.D. Tenn. 1990) (holding that the vertical test focuses on debtor's internal operations, comparing the debtor's prepetition business with its postpetition conduct and considers factors such as the size, nature and type of business and the size and nature of the

transaction in question in assessing whether the transaction has subjected the creditor to economic risks of nature different from those accepted when credit was extended).

26.     Here, the payment of the Penalties, Interest and Related Charges satisfies the horizontal and vertical tests.  It is without question that mortgage loan servicers have the obligation to transfer certain tax and insurance payments received from homeowners to the relevant taxing authority or insurer.  Consistent therewith, mortgage loan servicers ordinarily pay any fees associated with the servicers' late payment of tax and insurance monies.[6]  In fact, as stated earlier, prior to the Petition Date, in the limited number of circumstances where the Debtors made late tax and insurance payments, the Debtors did not seek to foist that liability on an affected homeowner, but paid the associated penalties and interest in the ordinary course of the Debtors' business.  Thus, the horizontal test is satisfied.

27.     Similarly, a hypothetical creditor should expect that the Debtors, as mortgage loan servicers, would make payments to relevant taxing authorities and insurers, including the payment of related penalties and interest.  A hypothetical creditor should have this expectation because the homeowners transferred such payments to the Debtors with the understanding that the Debtors would hold such funds in escrow prior to transferring the funds to the relevant taxing authority or insurer.  Similarly, a hypothetical creditor would reasonably expect that there is some risk that some tax and insurance payments will not be made on time and that the Debtors may have to pay certain amounts relating to late payments.  Granting the relief requested herein would not subject creditors to economic risks that would not have been contemplated by the creditor.  Therefore, the vertical test is also satisfied.

---

[6] In the instant cases, while the Debtors were late in submitting certain tax and insurance payments on behalf of homeowners, the Debtors submit that the late payments were primarily, if not solely, the result of actions taken by third parties.

28.     As both the horizontal and vertical tests are satisfied, the Debtors submit that payment of the Penalties, Interest and Related Charges is within the ordinary course of the Debtors' business.

29.     The Debtors further request that all applicable banks and other financial institutions be authorized and directed to receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors related to the Penalties, Interest and Related Charges, whether such checks were presented or fund transfer requests were submitted prior to or after the Petition Date.

### RESERVATION OF RIGHTS

30.     The Debtors expressly reserve any and all of their rights, claims and causes of action associated with the Unpaid T&I issue, including, without limitation, the right to seek reimbursement of any direct or indirect costs for payment of the Penalties, Interest and Related Charges, the right to seek attorneys' fees and expenses and additional personnel costs, and the right to pursue any and all damages claims.

### NOTICE

31.     Notice of this Motion will be provided to (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Bank of America; (iv) Counsel to the Agent for the Debtors' Postpetition Lender; and (v) all parties entitled to notice under Del. Bankr. LR 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

### NO PREVIOUS REQUEST

32.     No prior request for the relief sought in this Motion has been made to this or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully seek entry of the stipulated order, in substantially the form attached hereto as Exhibit A, (i) confirming the Debtors' authority to pay the Penalties, Interest and Related Charges; and (ii) authorizing and directing applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtors' accounts to make the payments.

Dated:    Wilmington, Delaware
          October 22, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
James L. Patton, Jr. (No. 2202)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Kara Hammond Coyle (No. 4410)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession