IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---

| | |
|---|---|
| In re:<br><br>AMERICAN HOME<br>MORTGAGE HOLDINGS, INC., et al.,<br><br>Debtors. | Chapter 11<br>Case No. 07-11047 (CSS)<br>(Jointly Administered) |
| BROADHOLLOW FUNDING, LLC; MELVILLE FUNDING, LLC; and AMERICAN HOME MORTGAGE SERVICING, INC. (f/k/a COLUMBIA NATIONAL INCORPORATED),<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA, N.A.,<br><br>Defendant. | Adversary Proceeding<br>Case No. __-_____ (CSS) |

---

**COMPLAINT**

Plaintiffs Broadhollow Funding, LLC ("**Broadhollow**"), Melville Funding, LLC ("**Melville**"), and American Home Mortgage Servicing, Inc. (f/k/a Columbia National Incorporated) ("**AHMSI**") (collectively, "**Plaintiffs**"), as and for their Complaint against Bank of America, N.A. ("**BofA**"), state as follows:

**PRELIMINARY STATEMENT**

1. This is an action for breach of contract brought on behalf of two special purposes entities ("**SPEs**") formed by the American Home Parties in 2004. The SPEs, Broadhollow and Melville (each as defined below), acquired mortgage loans originated by the American Home Parties with the proceeds of, among other things, the issuance of subordinated notes. In order to enhance the stability of the notes, Broadhollow and Melville entered into swap agreements with a consortium of highly-rated financial institutions. Now that events giving rise to payment obligations under the swap agreements have come, BofA has reneged on its

- 1 -

contractual obligations, depriving Broadhollow and Melville of their bargained-for protection against price degradation of the underlying mortgage loans.

2. Prior to their bankruptcy filings, the American Home Parties (as defined below) funded a portion of their mortgage origination through structured financing techniques. Specifically, the American Home Parties sold mortgage loans to various SPEs (including Broadhollow and Melville), and the SPEs financed the acquisition through the issuance of highly-rated (i.e., "A-1+" by Standard & Poor's) commercial paper and lower-rated subordinated notes. To mitigate against interest rate risks and risks not related to homeowner delinquencies and defaults, and to enhance the quality of the commercial paper and securities, the SPEs, in turn, entered into swap agreements with highly-rated financial institutions. Among other things, each swap counterparty agreed to provide payments to the SPEs upon the sale of any mortgage loans by the SPEs at a price less than what the SPEs paid the American Home Parties.

3. At all times relevant to this Complaint, the American Home Parties sold certain Mortgage Loans (as defined below) to Broadhollow and Melville pursuant to two purchase and sale agreements, the MLPSAs (as defined below). BofA is one of several Broadhollow-Melville Swap Counterparties (as defined below) under two swap agreements entered into in connection with Broadhollow's and Melville's mortgage loan purchases. Following the occurrence of a termination event under the MLPSAs, the Mortgage Loans purchased by Broadhollow and Melville were sold at auction for less than the price paid by those SPEs. This deficiency triggered the Swap Counterparties' obligations under the Swap Agreements to pay Broadhollow and Melville payments known as Partial Termination Payments (as defined below). Among the Swap Counterparties that are contractually bound to Broadhollow and Melville (specifically, ABN Amro, Calyon New York Branch, and Citibank, N.A. (collectively, with BofA, the "**Broadhollow-Melville Swap Counterparties**")), BofA is the only counterparty to have repudiated its contractual commitments under those agreements.

This action seeks recovery of Partial Termination Payments totaling approximately $23.7 million from BofA and certain interest payments (the "Interest Related Payments," as defined below) also owing to Broadhollow and Melville under the swap agreements totaling approximately $1.640 million.

## PARTIES

4. Plaintiff AHMSI is a Maryland corporation with its principal place of business in Melville, New York that is the successor to Columbia National Incorporated ("**Columbia**"). AHMSI is a debtor and debtor in possession in the Chapter 11 Cases.

5. Plaintiff Broadhollow is a special purpose Delaware limited liability company having its principal place of business in Melville, New York. Broadhollow is not a debtor in the Chapter 11 Cases.

6. Plaintiff Melville is a special purpose Delaware limited liability company having its principal place of business in Melville, New York. Melville is not a debtor in the Chapter 11 Cases.

7. Defendant BofA is a national banking association organized under the laws of the United States having its principal place of business in Charlotte, North Carolina.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408, 1409. This proceeding is a core proceeding under 28 U.S.C. § 157(b), arising in a case under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**").

9. AHMIC is entitled to the residual value (after payment of the repurchase price) with respect to approximately $84 million of the Subordinated Notes (as defined below) issued by Broadhollow. As such, it is a beneficiary of the Swap Agreements as the ultimate recipient of the payments from the Broadhollow-Melville Swap Counterparties. In addition,

BofA has asserted claims against one or more of the American Home Parties pursuant to or in connection with (a) its obligations under the BofA Swap Agreements (as defined below), (b) three International Swap Dealers Association, Inc. ISDA Master Agreements entered into among BofA and certain American Home Parties, specifically Columbia (dated May 27, 2004), AHMIC (dated May 27, 2004), and AHMSI (June 7, 2005 and May 27, 2007) (collectively, the "**Back Swap Agreements**"), and (c) the MLPSAs.

## FACTUAL BACKGROUND

### A. Warehouse Securitization Programs Generally

10. The American Home Parties funded a portion of their mortgage origination through warehouse securitizations. Coupled with swap agreements, securitizations provided an attractive alternative to traditional warehouse financing facilities because they mitigated certain risks (including interest rate, non-credit related value impairments, and prepayment risks). To that end, the securitization structure involved both (a) a master loan purchase and service agreement among the American Home Parties and one or more SPEs and (b) swap agreements among the SPEs and certain highly rated financial institutions (the "**Swap Counterparties**").

11. Under a master loan and purchase agreement, the "seller" (i.e., the mortgage originator) would sell the "issuer" (i.e., the SPE) newly originated residential first mortgage loans. The SPE would fund its acquisition of the mortgage loans by issuing highly-rated commercial paper, specifically (a) "asset backed" short-term notes expected to have a high rating by Standard & Poor's and Moody's (i.e., "A-1+" by Standard & Poor's, and "P-1" by Moody's) and (b) subordinated notes with a commensurately lower rating (i.e., "BBB" by Standard & Poor's and "Baa2" by Moody's).

12.     To hedge interest rate risk and risks that are not related to homeowner delinquencies and defaults, the SPE would enter into swaps with one or more Swap Counterparties that have received high ratings from Standard & Poor's and Moody's (i.e., at least "AA-" and "Aa3" (long-term, respectively) and "A-1+" and "P-1" (short-term, respectively)).

13.     On a monthly basis, the SPE would pay the Swap Counterparty interest it would receive on the mortgage loans (net of servicing fees received during the period) and would receive from the Swap Counterparty a floating rate payment equal to the SPE's cost of funds (i.e., interest owing on the commercial paper and subordinated notes issued by the SPE).

14.     In connection with the SPE's subsequent sale or securitization of the mortgage loans it acquired from the seller, the SPE would either (a) pay the Swap Counterparty gains realized in excess of the SPE's cost of the mortgage loans or (b) receive payment from the Swap Counterparties of any shortfalls that are not related to homeowner non-payment if the price received by the SPE is less than the original cost of the mortgage loans. The original cost would be adjusted for any principal pay-downs on the mortgage loans since the acquisition. Lastly, under a typical "back" swap agreement between the Swap Counterparty and an entity other than the seller of the mortgage loans, the back swap party would be obligated to reimburse the Swap Counterparty for any payments made to the SPE.

### B.     Broadhollow & Melville Agreements

15.     As of September 26, 2007, Broadhollow and Melville owned approximately 5,700 mortgage loans with an aggregate unpaid principal balance of approximately $1,620,000,000 (the "**Mortgage Loans**") that they previously purchased from American Home Mortgage Acceptance, Inc. ("**AHMA**") and American Home Mortgage Corp. ("**AHMC**").

DB02:6316466.1                                                                                                                    066585.1001

16.     Broadhollow and Melville consummated their respective acquisitions of the Mortgage Loans through the (a) Mortgage Loan Purchase And Servicing Agreement among Broadhollow (as Purchaser), AHMC (as Seller), Columbia National (as Servicer), and American Home Mortgage Investment Corp. (as Performance Guarantor) ("**AHMIC,**" and, with AHMSI, AHMA, and AHMC, the "**American Home Parties**"), dated May 27, 2004 (the "**Broadhollow MLPSA**") and (b) Master Loan Purchase And Servicing Agreement among Melville (as Purchaser), AHMA (as Seller), Columbia National (as Servicer) and AHMIC (as Performance Guarantor), dated May 27, 2004 (the "**Melville MLPSA**," and, with the Broadhollow MLPSA, the "**MLPSAs**").  Copies of the Broadhollow MLPSA and the Melville MLPSA are attached hereto as Exhibit A and Exhibit B, respectively.

17.     Pursuant to the Base Indenture dated as of May 27, 2004 among Melville and Deutsche Bank Trust Company Americans (and various Supplements (as defined in the MLPSAs) executed in connection therewith) (the "**Melville Indenture**"), Melville issued a single variable funding note (the "**Melville Variable Funding Note**") to Broadhollow in exchange for a loan extended from Broadhollow to Melville in the original principal amount of approximately $168,000,000.  Melville used the proceeds of the Melville Variable Funding Note to purchase Mortgage Loans from AHMIC.

18.     In order to finance their acquisition of the Mortgage Loans, Broadhollow issued commercial paper in the form of secured liquidity notes (the "**Senior Notes**").  Broadhollow's obligations with respect to the Senior Notes are secured by liens on the Mortgage Loans.  Broadhollow also issued certain subordinated notes (the "**Subordinated Notes**"), which are likewise secured by the Mortgage Loans.

19.     The Senior Notes and Subordinated Notes were issued pursuant to the Base Indenture dated as of May 27, 2004 among Broadhollow and Deutsche Bank Trust Company Americas (and various Supplements (as defined in the MLPSAs) executed in connection therewith) (the "**Broadhollow Indenture**," and, with the Melville Indenture, the "**Indentures**").

20.     Broadhollow and Melville also entered into certain swap agreements with BofA, specifically the (a) the International Swap Dealers Association, Inc. ISDA Master Agreement among Broadhollow and BofA dated as of May 27, 2004 (including the Confirmation attached thereto as Exhibit A) (the "**Broadhollow-BofA Swap Agreement**") and (b) International Swap Dealers Association, Inc. ISDA Master Agreement among Melville and BofA dated as of May 27, 2004 (including the Confirmation attached thereto as Exhibit A) (the "**Melville-BofA Swap Agreement**," and, with the Broadhollow-BofA Swap Agreement, the "**BofA Swap Agreements**").  Copies of the Broadhollow-BofA Swap Agreement and the Melville-BofA Swap Agreement are attached hereto as Exhibit C and Exhibit D, respectively, and a diagram of the securitization structure appears below:[1]

---

[1]     This chart initially was extracted from the document entitled "Lehman Brothers:  American Home Mortgage Investment Corp. Warehouse Securitization Program:  Summary Of Terms," dated January 26, 2004 at p.1.



**(i).    MLPSAs**

*Purchase And Sale Of Mortgage Loans*

21.     AHMC was the "Seller" under the Broadhollow MLPSA, and AHMA was the "Seller" under the Melville MLPSA.  Under the MLPSAs, "[f]rom time to time, pursuant to any Transfer Supplement, the Seller may sell, transfer, assign, set over and convey to the Purchaser and the Purchaser shall purchase, without recourse, but subject to the terms hereof, all right title and interest of the Seller in and to each Mortgage Loan identified on the Transfer Supplement, originated or purchased by the Seller."  Ex. A (Broadhollow MLPSA, p. 19 (§ 2.1)); Ex. B (Melville MLPSA, p. 17 (§ 2.1)).

22.     Each MLPSA defines "Mortgage Loan" to mean "*any mortgage loan purchased by the Purchaser pursuant to any Transfer Supplement* and subsequently not repurchased by the Seller or the Servicer or sold, securitized, or otherwise transferred by the

Purchaser pursuant to the terms hereof." Ex. A (Broadhollow MLPSA, p. 10 ("Mortgage Loan" definition)); Ex. B (Melville MLPSA, p. 10 ("Mortgage Loan" definition)) (emphasis added).

23. The MLPSAs expressly authorize AHMSI to "undertake any such action which it may deem necessary or desirable with respect to this Purchase Agreement and the rights and duties of the parties hereto. In such event, the Servicer shall be entitled to reimbursement from the Purchaser of the reasonable legal expenses and costs of such action." Ex. A (Broadhollow MLPSA, p. 59 (§ 9.3)); Ex. B (Melville MLPSA, p. 56 (§ 9.3)).

### *Representations And Warranties Of Sellers*

24. Among other things, "[w]ith respect to each Mortgage Loan sold by Seller to the Purchaser, the Seller … represents and warrants to the Purchaser (and for the benefit of the … the Secured Parties [defined therein to include the Broadhollow-Melville Swap Counterparties]) that as of the applicable Closing Date for each Mortgage Loan … [(a)] the Mortgage Loan is an Eligible Mortgage Loan …" Ex. A (Broadhollow MLPSA, p. 29 (§ 3.2(a)); Ex. B (Melville MLPSA, p. 27 (§ 3.2(a)). The MLPSAs define an "Eligible Mortgage Loan" as one satisfying certain eligibility criteria set forth therein. See Ex. A (Broadhollow MLPSA, p. 6 ("Eligible Loan" definition)); Ex. B (Melville MLPSA, p. 6 ("Eligible Loan" definition)).

25. In the event of a breach of the representations and warranties set forth therein, the MLPSAs identify and expressly enumerate the remedies available:

> The party discovering such breach shall give prompt written notice to the other. Within forty-five (45) days, the Seller shall use commercially reasonable efforts promptly to cure such breach in all material respects and, if such breach cannot be cured, or is not cured, within such forty-five (45) day time period, the Seller shall repurchase such Mortgage Loan at the Repurchase Price ….
>
> In addition to such repurchase obligation, the Seller shall indemnify … the Secured Parties [(defined to include the Swap Counterparties)], and hold them harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments and other costs and expenses resulting from any third-party claim, demand [and] defense.

Ex. A Broadhollow MLPSA, p. 37 (§ 3.3); Ex. B Melville MLPSA, pp. 34-35 (§ 3.3)).

*Termination Events*

26. The MLPSAs identify certain "termination events," including, without limitation:

> (o) One (1) or more Swap Counterparties fail to agree to any extension of any Interest Rate Swap, and a replacement Swap Counterparty or Swap Counterparties shall not have been obtained at least one (1) year prior to the scheduled termination date in a maximum notational amount at least equal to the lesser of (x) the maximum notational amount of the Interest Rate Swap or Interest Rate Swaps represented by the non-extending Swap Counterparty or Swap Counterparties or (y) if the Program Size has been modified, an amount equal to (i) the then-current program size less (ii) the maximum notational amount of all effective (as of such scheduled termination date) Interest Rate Swaps, or ….

Ex. A Broadhollow MLPSA, pp. 62-65 (§ 11.2); Ex. B Melville MLPSA, pp. 59-62 (§ 11.2) (emphasis added).

*Sale Of Mortgage Loans Upon Occurrence Of Termination Event*

27. The MLPSAs also direct that the Mortgage Loans be sold upon the occurrence of certain termination events:

> Upon the declaration of a Termination Event by the Purchaser of the occurrence of an automatic Termination Event, the Purchaser will no longer be permitted to purchase additional Eligible Loans and principal payments on the Mortgage Loans, principal proceeds of sales and Securitizations of Mortgage Loans and amounts received from the Swap Counterparty will be retained under the Security Agreement and used to pay the outstanding obligations of the Purchaser pursuant to the terms thereof.  If a Termination Event described in clauses (l) through (o) above occurs or an Indenture Event of Default described in clause (f), (k), (l), (o), (p), (q) or (r) of Section 9.1 of the Indenture occurs, ***(x) the Servicer shall use commercially reasonable efforts to sell or Securitize all non-Delinquent Loans and non-Defaulted Loans within thirty (30) days of the date on which such Termination Event or Indenture Event of Default occurred*** and (y) the Servicer or the Seller, as the case may be, shall assign any Forward Trades and any Forward Whole Loan Trades to the Purchaser relating to the Mortgage Loans that have not been previously assigned to the Purchaser.  In the event that all non-Delinquent Loans and non-Defaulted Loans have not been sold or Securitized, on such thirtieth (30th) day the Collateral Agent shall hold an auction (a "Termination Event Auction") of the remaining non-Delinquent Loans and non-Defaulted Loans for settlement not later than the forty-fifth (45th) day following the date on which such Termination Event or Indenture Event of Default occurred.

<u>Ex. A</u> Broadhollow MLPSA, pp. 62-65 (§ 11.2); <u>Ex. B</u> Melville MLPSA, pp. 59-62 (§ 11.2) (emphasis added).

    **(ii)**    <u>**BofA Swap Agreements**</u>

    28.    The BofA Swap Agreements ascribe the same definition to the term "Mortgage Loan" found in the MLPSAs. <u>See</u> <u>Ex. C</u> (Broadhollow BofA Swap Agreement, Ex. A, p. 1); <u>Ex. D</u> (Melville BofA Swap Agreement, Ex. A, p. 1) ("Unless otherwise defined in this Confirmation or in the Definitions, capitalized terms used herein have the meanings ascribed to such terms in the [MLPSAs or the Security Documents]"). The BofA Swap Agreements also define "Terminated Loan" as "each Mortgage Loan which is sold , securitized or prepaid in full … " <u>Ex. C</u> (BofA-Broadhollow Swap Agreement, p. A-3); <u>Ex. D</u> (BofA-Melville Swap Agreement, at A-3).

    *Partial Termination Payments For Terminated Loans*

    29.    When a Mortgage Loan becomes a "Terminated Loan" (the "<u>**Loan Termination Date**</u>,") the BofA Swap Agreements direct the payment of "Partial Termination Payments" between BofA (Party A) and the Issuer/SPE (Party B). Notably, Partial Termination Payments are owing with respect to any Mortgage Loan that becomes a Terminated Loan -- irrespective of whether that loan is or was an "eligible" mortgage loan when purchased under the MLPSAs:

> <u>Partial Termination Payment</u>' means an amount, which may be positive or negative, calculated with respect to each Terminated Loan (I) which is sold by Party B to a third party or securitized equal to the difference between (i) the Outstanding Purchase Price of such Terminated Loan and (ii) (A) if the Partial Termination occurs with respect to a non-Delinquent Loan or non-Defaulted Loan … the sales proceeds (net of any accrued interest if determinable on such date) of the Mortgage Loan to which the Partial Termination relates … or (B) if the Partial Termination occurs with respect to a Delinquent Loan or Defaulted Loan, the Credit-Adjusted Price or (II) which results from a prepayment in full of such Mortgage Loan equal to (i) the Outstanding Purchase Price of such Mortgage Loan *less* (ii) the principal payments that were deposited in the Collateral Account on such date. To the extent that the Partial Termination Payment is a positive number, Party A [BofA] shall pay such amount to Party B [Broadhollow or

Melville] and to the extent that it is a negative number, Party B shall pay to Party A an amount equal to the absolute value thereof.

Ex. C (BofA-Broadhollow Swap Agreement, p. A-10); Ex. D (BofA-Melville Swap Agreement, at A-10).

30.     Under the BofA Swap Agreements, "Outstanding Purchase Price" means "with respect to any Mortgage Loan … (i) the Original Purchase Price of such Mortgage Loan … less (ii) … the amounts of any payments received by Party B in respect of Acquisition Date Accrued Interest, less (iii) … all previous principal payments made on such Mortgage Loan …" Ex. C (BofA-Broadhollow Swap Agreement, p. A-9); Ex. D (BofA-Melville Swap Agreement, p. A-9).

*Interest Related Payments*

31.     The BofA Swap Agreements also include payments relating to fixed interest earned on the Mortgage Loans and floating payments relating to the Broadhollow's and Melville's "cost of funds," including, without limitation, the "Party A Floating Amount" and the "Party A Accrued Interest Payment" (collectively, the "**Interest Related Payments**").  See Ex. C (BofA-Broadhollow Swap Agreement, p.4); Ex. D (BofA-Melville Swap Agreement, p. A-4).

**C.     Termination Event Compelled Sale Of Mortgage Loans**

32.     Prior to the commencement of the Chapter 11 Cases, at least one "termination event" occurred under the MLPSAs, specifically, the failure to have in place the requisite amount of swap agreements within at least one (1) year prior to the scheduled termination date thereof.  See Ex. A (Broadhollow MLPSA, p. 64 (§ 11.2(o)); Ex. B (Melville MLPSA, pp. 60-61 (§ 11.2(o)).

33.     Upon the occurrence of a Termination Event, the MLPSAs required that the Mortgage Loans be sold by the Servicer, absent which any unsold loans are will be sold at auction by the collateral agent.  See Ex. A Broadhollow MLPSA, pp. 62-65 (§ 11.2); Ex. B Melville MLPSA, pp. 59-62 (§ 11.2).

34.     The American Home Parties conducted the sale process from mid-August 2007 until late September 2007. An auction for the Mortgage Loans took place on September 26, 2007. The following bids (as a percentage of par value) constituted the "highest and best" offers for the respective Mortgage Loans:

- Broadhollow Non-Agency Performing Loans: 90.8%
- Broadhollow Agency Performing Loans: 89.25%
- Melville Non-Agency Performing Loans: 85%
- Melville Agency Performing Loans: 80.0%
- Broadhollow Non-Performing Loans: 58.71%
- Melville Non-Performing Loans: 53.63%

35.     As a consequence of the Mortgage Loans being sold at less than par value, Partial Termination Payments (from BofA to Broadhollow and Melville) became due and owing under the BofA Swap Agreements. The payments were requested of BofA on October 1, 2007 and October 3, 2007:

- On October 1, 2007, BofA was notified that under the Broadhollow BofA Swap Agreement, BofA owes Broadhollow a Partial Termination Payment totaling $34,145,665.30 (payable on October 4, 2007).

- On October 1, 2007, BofA was notified that under the Melville BofA Swap Agreement, BofA owes Melville a Partial Termination Payment totaling $713,643.48 (payable on October 4, 2007).

- On October 3, 2007, BofA was notified that under the Broadhollow BofA Swap Agreement, BofA owes Broadhollow a Partial Termination Payment totaling $3,028,688.10 (payable on October 10, 2007).

- On October 3, 2007, BofA was notified that under the Melville BofA Swap Agreement, BofA owes Melville a Partial Termination Payment totaling $62,764.54 (payable on October 10, 2007).

36.     On October 4, 2007, BofA advised the American Home Parties of its position that it would not pay the Partial Termination Payments due in respect of certain Mortgage Loans sold at the auction because those Mortgage Loans purportedly did not comply with the American Home Parties' representations and warranties to Broadhollow and Melville under the MLPSAs.

37. On October 9, 2007, in a letter addressed to the American Home Parties (and not the notice parties under the BofA Swap Agreements), BofA advised of its belief that (a) the Mortgage Loans sold in the auction failed to meet "eligibility" requirements outlined under the MLPSAs, (b) certain Mortgage Loans were missing documentation, and (c) the purported failure to separately "bucket" certain "ineligible" loans at the auction resulted in artificially low prices. BofA also stated the Partial Termination Payments owing under the BofA Swap Agreement, which purportedly represent "the market value loss on the Terminated Loans *eligible* under the Program Documents," total only $13,791,184.

38. Contrary to BofA's reading of the BofA Swap Agreements, the Partial Termination Payments owing under the BofA Swap Agreements total not less than $23.6 million.

39. On October 19, 2007, BofA was notified that (a) under the Broadhollow BofA Swap Agreement, BofA owes Broadhollow Interest Related Payments totaling $1,623,153.08 (payable on October 22, 2007) and (b) under the Melville BofA Swap Agreement, BofA owes Melville Interest Related Payments totaling $13,035.95 (payable on October 22, 2007). On October 22, 2007, BofA failed to make the Interest Related Payments that are due and owing under the BofA Swap Agreements.

40. BofA's obligation to make the Partial Termination Payments and Interest Related Payments under the BofA Swap Agreements is not qualified in any way (or excused) by any breach of representations or warranties by AHMC or AHMIC, as Sellers, under the MLPSAs. Payment is unconditional, due and owing to Broadhollow or Melville, as the case may be, under the BofA Swap Agreements in the event ***any*** Mortgage Loan becomes a Terminated Loan.

41. Among the Broadhollow-Melville Swap Counterparties, BofA is the only party to have repudiated its contractual commitments to Broadhollow and Melville.

42. Indeed, Banc of America Securities LLC, a BofA affiliate which "made a market" in the Senior Notes issued by Broadhollow, recognized these straightforward provisions in its private placement memorandum. See Banc of America Securities, LLC, Private Placement Memorandum, Broadhollow Funding, LLC U.S. $3,111,875,000 Short Term Notes, p. 82 ("Banc of America Securities, LLC and/or its affiliated companies may make a market or a deal as principal in the securities mentioned or in options or other derivative instruments based thereon"), p. 41 ("On each Loan Termination Date, (i) the Issuer will pay the Swap Counterparty an amount equal to the sum of the absolute value of all negative Partial Termination Payments for any loan termination effected on such date and (ii) the Swap Counterparty shall pay the Issuer an amount equal to the sum of the positive value of all Partial Termination Payments for any loan termination effect on such date").

43. On October 16, 2007, Plaintiffs received a request from Deutsche Bank Trust Company Americas, as Collateral Agent to pursue any unpaid Partial Termination Payments for the benefit of the holders of the Subordinated Notes.

## COUNT I
**(Breach Of BofA Swap Agreements)**

44. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 43 of the Complaint herein.

45. BofA is party to the BofA Swap Agreements.

46. Broadhollow and Melville have performed their obligations under the BofA Swap Agreements.

47. BofA has not paid Broadhollow or Melville the Partial Termination Payments or the Interest Related Payments due under the BofA Swap Agreements.

48. Broadhollow and Melville have demanded payment of the Partial Termination Payments and the Interest Related Payments from BofA, and BofA has indicated it does not intend to make such payments in full and otherwise honor its obligations under the BofA Swap Agreements.

49. BofA's failure to pay Broadhollow and Melville the Partial Termination Payments and the Interest Related Payments owing under the BofA Swap Agreements constitutes a breach of those agreements.

50. BofA's breach of the BofA Swap Agreements has damaged Plaintiffs in an amount not less than $23.7 million with respect to the Partial Termination Payments and $1.640 million, with respect to the Interest Related Payments, plus costs and attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

(a) directing BofA to make all payments owing under the BofA Swap Agreements, in an amount not less than $23.7 million with respect to the Partial Termination Payments and not less than $1.640 million with respect to the Interest Related Payments;

(b) directing judgment in favor of Plaintiffs on the claim set forth herein;

(c) directing judgment awarding Plaintiffs' costs and attorneys' fees; and

Any other, further relief the Court deems just and appropriate.

Dated: October 22, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Erin Edwards*
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Pauline K. Morgan (No. 3650)
Erin D. Edwards (No. 4392)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-AND-

QUINN EMANUEL URQUHART
OLIVER & HEDGES LLP
Susheel Kirpalani
James C. Tecce
51 Madison Avenue
New York, New York 10010
Telephone: (212) 849-7000

Counsel for Debtors and
Debtors in Possession