# EXHIBIT C

**(Multicurrency—Cross Border)**



International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of May 27, 2004

**BANK OF AMERICA, N.A.**          and          **BROADHOLLOW FUNDING, LLC**

have entered and/or anticipate entering into one or more transactions (each a "Transaction")  that are or will be governed by this Master Agreement, which includes the schedule  (the "Schedule"), and  the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.      **Interpretation**

(a)      *Definitions*.  The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.*  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)      *Single Agreement.*  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      General Conditions.

 (i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to  (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b)    **Change of Account**. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    **Netting**. If on any date amounts would otherwise be payable:—

　　(i)    in the same currency; and

　　(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    **Deduction or Withholding for Tax.**

　　(i)    **Gross-Up**. All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

　　　　(1)    promptly notify the other party ("Y") of such requirement;

　　　　(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

　　　　(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

　　　　(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

　　　　　　(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

　　　　　　(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

2

**ISDA® 1992**

(ii)  *Liability*. If: —

(1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)  X does not so deduct or withhold; and

(3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)  *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)  *Basic Representations*.

(i)  *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)  *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)  *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)  *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)  *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

**ISDA® 1992**

(b)     *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)     *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)     *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)     *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)     *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.     Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)     *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

> (i)     any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

> (ii)    any other documents specified in the Schedule or any Confirmation; and

> (iii)   upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)     *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)     *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)     *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)     *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.    Events of Default and Termination Events**

(a)    *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default*.

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)      *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i) *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v) *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

**6.    Early Termination**

(a)    *Right to Terminate Following Event of Default*. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event*.

(i)    *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event*. If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties*. If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate*. If: —

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    **Effect of Designation.**

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    **Calculations.**

(i)    **Statement.** On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    **Payment Date.** An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    **Payments on Early Termination.** If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    **Events of Default.** If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

**ISDA® 1992**

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  *Termination Events*. If the Early Termination Date results from a Termination Event: —

(1)  *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

**7.      Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)      a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)      a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.      Contractual Currency**

(a)      *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)      *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)      *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)      *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**9.    Miscellaneous**

(a)    ***Entire Agreement***. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes  all oral communication and prior writings with respect thereto.

(b)    ***Amendments***. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    ***Survival of Obligations***. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    ***Remedies Cumulative***. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    ***Counterparts and Confirmations***.

    (i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

    (ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall he entered into as soon as practicable and may he executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    ***No Waiver of Rights***. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    ***Headings***. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

**ISDA® 1992**

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

**ISDA® 1992**

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)      *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**14.    Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)      in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)      in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)      in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)      in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

**ISDA® 1992**

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

**ISDA® 1992**

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been  but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed.  The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.


**BANK OF AMERICA, N.A.**

(Name of Party)

**BROADHOLLOW FUNDING, LLC**

(Name of Party)

By:    **American Home Mortgage Corp.,**
        **as Manager**

By: _____

Name: **Roger H. Heintzelman**
Title:
Date: **Principal**

By: _____

Name:
Title:
Date:

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**BANK OF AMERICA, N.A.**
(Name of Party)

**BROADHOLLOW FUNDING, LLC**
(Name of Party)

**By:**    **American Home Mortgage Corp., as Manager**

By: _____

By: _____

Name:

Name:

Title:

Title:

Date:

Date:

**SCHEDULE**
**to the**
**MASTER AGREEMENT**
dated as of May 27, 2004

between

**BANK OF AMERICA, N.A.**
("<u>Party A</u>"),
a national banking association organized under the laws of the United States

and

**BROADHOLLOW FUNDING, LLC**
("<u>Party B</u>"),
a limited liability company organized under the laws of Delaware

## Part 1.  Termination Provisions.

In this Agreement:

(a)      "***Specified Entity***" means in relation to Party A for the purpose of:

| | |
|---|---|
| <u>Section 5(a)(v)</u> | Not Applicable. |
| <u>Section 5(a)(vi)</u> | Not Applicable. |
| <u>Section 5(a)(vii)</u> | Not Applicable. |
| <u>Section 5(b)(iv)</u> | Not Applicable. |

and in relation to Party B for the purpose of:

| | |
|---|---|
| <u>Section 5(a)(v)</u> | Not Applicable. |
| <u>Section 5(a)(vi)</u> | Not Applicable. |
| <u>Section 5(a)(vii)</u> | Not Applicable. |
| <u>Section 5(b)(iv)</u> | Not Applicable. |

(b)      "***Specified Transaction***" will have the meaning specified in <u>Section 14</u> of this Agreement; *provided*, *however*, that no account established by Party B (if any) with Party A shall be part of this definition.

(c)      The provisions of <u>Section 5(a)</u> and <u>Section 5(b)</u> (as modified by <u>(g)</u> below) will apply to Party A and to Party B as follows:

The designation below of an Event of Default as being "Applicable" to a specific party means that upon the occurrence of such an Event of Default with respect to such party, the other party shall have the rights of a Non-defaulting Party under <u>Section 6</u> of the

Agreement, and conversely, the designation of such an event as being "Not Applicable" means that such other party shall not have such right.

| Section 5(a) | | Party A | Party B |
|---|---|---|---|
| (i) | "Failure to Pay or Deliver" | Applicable. | Applicable |
| (ii) | "Breach of Agreement" | Applicable. | Not Applicable. |
| (iii) | "Credit Support Default" | Not Applicable. | Not Applicable. |
| (iv) | "Misrepresentation" | Applicable. | Not Applicable. |
| (v) | "Default under Specified Transaction" | Not Applicable. | Not Applicable. |
| (vi) | "Cross Default" | Not Applicable. | Not Applicable. |
| (vii) | "Bankruptcy" | Applicable. | Applicable. |
| (viii) | "Merger Without Assumption" | Applicable. | Applicable. |

*provided* that Section (5)(a)(i) of this Agreement is amended to read as follows:

> **Failure to Pay or Deliver**.  Failure by the party to make, on the date when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party; *provided, however*, that if the due date for such payment is a Payment Date, the Final Maturity for any Extended Note or Non-Called Note, or any other day that interest is due and payable on any Extended Note, Callable Note or Non-Called Note, failure by Party A to make, on the date when due, any payment under this Agreement shall be an Event of Default, without giving effect to any grace period, unless Party A used commercially reasonable efforts to make such payment on the date when due, and the failure of Party B to receive such payment was the result of a technical operations failure or force majeure.  Capitalized terms used in this paragraph shall have the meanings ascribed to such terms in the Indenture, dated as of the date hereof, between Party B and Deutsche Bank Trust Company Americas, as Indenture Trustee, as amended, modified or supplemented from time to time.

The designation below of a Termination Event as being "Applicable" to a specific party means that upon the occurrence of such a Termination Event, such party, as the case may be, shall have the right to terminate the Transaction in accordance with Section 6 of the Agreement, and conversely, the designation of such an event as being "Not Applicable" means that such party shall not have such right.

| Section 5(b) | | Party A | Party B |
|---|---|---|---|
| (i) | "Illegality" | Applicable. | Applicable. |
| (ii) | "Tax Event" | Not Applicable | Not Applicable. |
| (iii) | "Tax Event upon Merger" | Not Applicable. | Applicable. |
| (iv) | "Credit Event upon Merger" | Not Applicable. | Applicable. |
| (v) | "Additional Termination Event" | Applicable. | Applicable. |

(d)     **Payments on Early Termination**.

(i)     Market Quotation will apply.

(ii)    The Second Method will apply.

(e)     "**Termination Currency**" means United States Dollars ("<u>USD</u>").

(f)     The "**Automatic Early Termination**" provisions of <u>Section 6(a)</u> will not apply to Party A or Party B.

(g)     The following shall be specified as an "Additional Termination Event" pursuant to <u>Section 5(b)(v)</u>:

**Party A Downgrade**.  The occurrence and continuation (following the expiration of all applicable notice, grace and/or cure periods) of a Termination Event pursuant to <u>Part 5(p)</u> herein, in which case, the Early Termination Date for the Transaction shall be the date designated by Party B.  For purposes of the foregoing Additional Termination Event, Party A shall be the Affected Party.

**Amendments Made Without Consent of Party A**.  It shall be an Additional Termination Event if (x) any amendment and/or supplement to the Indenture, the Security Agreement or any other Facility Document is made without the prior written consent of Party A, and (y) Party A's consent is required under the Facility Documents for such amendment and/or supplement.  In connection with such Additional Termination Event, Party B shall be the sole Affected Party.

**Part 2.  Tax Representations.**

(a)     **Payer Tax Representations**.  For the purpose of <u>Section 3(e)</u> of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under <u>Section 2(e)</u>, <u>6(d)(ii)</u> or <u>6(e)</u> of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to <u>Section 3(f)</u> of this Agreement, (ii) the satisfaction of the agreement of the other party contained in <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement and (iii) the satisfaction of the agreement of the other party contained in <u>Section 4(d)</u> of this Agreement; provided, that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)    **Payee Tax Representations**.  For the purpose of <u>Section 3(f)</u> of this Agreement, Party A and Party B will make the following representations specified below, if any:

None.

**Part 3.  Agreement to Deliver Documents.**

Section 4(a) of this Agreement is amended by deleting the following in the first sentence thereof:

, in certain cases under subparagraph (iii) below,

Section 4(a)(iii) of this Agreement is amended to read as follows:

any forms, documents or certificates that may be required or reasonably requested in order to allow such other party to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax, or with such deduction or withholding at a reduced rate, with any such forms, documents or certificates to be accurate and completed in a manner reasonably satisfactory to such other party, and to be executed and to be delivered with any required certification to such other party (or to such government or taxing authority as such other party reasonably, directs), promptly upon the earlier of (A) reasonable demand by such other party and (B) learning that any such forms, documents or certificates are required:

For the purpose of <u>Section 4(a)(i)</u> and <u>Section 4(a)(ii)</u> of this Agreement.  Party A and Party B each agree to deliver the following documents, as applicable:

(a)    Documents to be delivered are:

| Party required to deliver document | Form, Document or Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A | An opinion of counsel to Party A acceptable to counsel of Party B (which may be an opinion of in-house counsel to Party A). | Upon execution of this Agreement. | No |
| Party A | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |
| Party B | An opinion of counsel to Party B acceptable to counsel of Party A. | Upon execution of this Agreement. | No |
| Party B | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |
| Party B | Executed copies of each | Upon execution of this | Yes |

Schedule - 4

| | Facility Document (including the Mortgage Loan Purchase and Servicing Agreement, Indenture and Security Agreement) and each amendment thereof. | Agreement and on the date of each amendment thereof. | |
|---|---|---|---|
| Party A and Party B | An executed U.S. Internal Revenue Service Form W-9 (or any successor thereto). | (i) Before the first Payment Date under this Agreement, (ii) promptly upon reasonable demand by either party and (iii) promptly upon learning that any such form previously provided by such party has become obsolete or incorrect. | Yes |
| Party B | Copy of each notice and/or report received or delivered by Party B pursuant to the Facility Documents when required by the Facility Documents or requested by Party A or if material (as determined by Party A and noticed to Party B by Party A) to Party A. | Within five (5) Local Business Days of Party B's receipt or delivery of any such notice or report or notice from Party A to Party B. | Yes |

**Part 4.  Miscellaneous.**

(a)      **Addresses for Notices.**  For the purpose of <u>Section 12(a)</u>:

Address for notices or communications to Party A:

Address:

Bank of America, N.A.
Sears Tower
233 South Wacker Drive, Suite 2800
Chicago, IL 60606
Attention:  Swap Operations
Telex: 49663210   Answerback: NATIONSBANK CHA
Reuters Dealing Code: NBCH

with a copy to:

Bank of America, N.A.
100 N. Tryon St., NC1-007-13-01
Charlotte, North Carolina 28255
Attention: Capital Markets Documentation
(Telex No.: 9663210; Answerback: NATIONSBANK CHA)
Facsimile: 704-386-4113

Address for notices or communications to Party B:

Address:

Broadhollow Funding, LLC
c/o American Home Mortgage Corp.
520 Broadhollow Road (through September 30, 2004)
538 Broadhollow Road (beginning October 1, 2004)
Melville, New York 11747
Attention:  Thomas McDonagh
Telephone:  516-949-3942
Facsimile No:  516-622-8960

Address for notices or communications to Moody's:

Address:

Moody's Investors Service, Inc.
99 Church Street
New York, New York 10007
Attention:  Asset-Backed Commercial Paper Group
Facsimile No:  (212) 553-0300

Address for notices or communications to S&P:

Standard & Poor's,
a division of The McGraw-Hill Companies, Inc.
55 Water Street
New York, New York 10041
Attention:  Asset-Backed Surveillance Group
Facsimile No:  (212) 438-2647

Notices under this Agreement and the Transaction shall be sent to Moody's and S&P only to the extent specifically required in the transaction confirmation.

(b)    **Process Agent**.  For the purpose of <u>Section 13(c)</u>:

Party A appoints as its Process Agent:  Not Applicable.

Party B appoints as its Process Agent:  Not Applicable.

(c)     **Offices.**   The provisions of <u>Section 10(a)</u> will apply to Party A and will not apply to Party B.

(d)     **Multibranch Party**:  For the purpose of <u>Section 10(c)</u> of this Agreement:

Party A is a Multibranch Party and may act through its Charlotte, North Carolina, Chicago, Illinois, San Francisco, California, New York, New York or London, England Office, or such other Office as may be agreed to by the parties in connection with a Transaction.

Party B is not a Multibranch Party.

(e)     **Calculation Agent**.  The Calculation Agent shall be the Servicer.  All calculations made by the Calculation Agent shall be binding absent manifest error subject to Party A's right to dispute any calculation under Section 2 of the Confirmation; *provided, however*, that after the occurrence of any event described in clause (p) of Section 11.2 of the Mortgage Loan Purchase and Servicing Agreement, the Credit-Adjusted Price shall be confirmed by calculations of the Mortgage Industry Advisory Company.

(f)     **Credit Support Document**.  Details of any Credit Support Document:

In the case of Party A:  Not Applicable.
In the case of Party B:  The Security Agreement and the Base Indenture. Notwithstanding the foregoing, each party hereto acknowledges and agrees that "Credit Support Default" (Section 5(a)(iii) of this Agreement) shall not constitute an Event of Default applicable to Party B.

(g)     **Credit Support Provider**.

Credit Support Provider means in relation to Party A:  Not Applicable.
Credit Support Provider means in relation to Party B:  Not Applicable.

(h)     "*Affiliate*" will have the meaning specified in <u>Section 14</u> of this Agreement.

(i)     **GOVERNING LAW.    THIS AGREEMENT WILL BE GOVERNED BY, CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAWS PROVISIONS THEREOF, OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).  EACH PARTY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION.**

(j)     **Netting of Payments**.  <u>Section 2(c)(ii)</u> will apply with respect to all payments under this Agreement.

(k)     **Account Detail**:

Payments to Party A:  The Account described in the related Confirmation.

Payments to Party B:  The Collateral Account under the Security Agreement.

**Part 5.  Other Provisions.**

(a)    **Confirmation**.  Each Confirmation, as amended and supplemented from time to time, supplements, forms part of, and will be read and construed as one with the Agreement.  A form of Confirmation is set forth as <u>Exhibit A</u> attached hereto.  The parties hereby agree and acknowledge that the Transactions of the type contemplated by such Confirmation shall constitute the sole type of Transaction under this Agreement.

(b)    **Early Termination**.

    (i)    <u>Section 6(b)(ii)</u> is hereby amended by adding at the end of the first paragraph the following:

        ", provided that the party seeking to make the transfer to avoid a Termination Event shall deliver to the Servicer and Party B (in the case of transfers by Party A) or to Party A (in the case of transfers by Party B) written confirmation from each Rating Agency that such transfer will not result in the then-current rating of any series of Notes outstanding being withdrawn or lowered."

    (ii)    <u>Section 6(d)(i)</u> is hereby amended and restated in its entirety as follows:

        "(i)    **Statement.**    On or as soon as reasonably practicable following the occurrence of an Early Termination Date, the Calculation Agent shall make computations of the amounts owing pursuant to <u>Section 6(e)</u> and will provide each party a statement showing in reasonable detail such calculations and specifying the amount payable by each party pursuant to <u>Section 6(e)</u>.  Party A shall have the right to request a certified statement showing in reasonable detail such calculations, specifying the source of such calculations and providing copies of all material documents and information relied upon by the Calculation Agent in performing its obligations hereunder.  Party A acting in good faith may dispute any calculations of the Calculation Agent and the parties shall use reasonable efforts to resolve any disputes concerning such computations or calculations."

    (iii)    If Party A is the Defaulting Party or Affected Party, then <u>Section 6(d)(ii)</u> is hereby deleted in its entirety.

    (iv)    If Party A is the Defaulting Party or Affected Party, then <u>Section 6(e)(ii)</u> is hereby amended and restated in its entirety as follows:

        (e)    <u>Payments on Early Termination</u>.  If notice is given designating an Early Termination Date or an Early Termination Date is deemed to occur, Party A and Party B shall make or cause to be made such payments in the

amount and manner and shall have such rights and obligations as are specified in the Confirmation.

(c) **No Bankruptcy Petition**.  Prior to the date that is one year and one day after the payment in full of any Note issued by Party B (or such longer preference period as may be in effect at such time), Party A, in its capacity as Swap Counterparty, shall not institute against, or join any other person in instituting against, Party B, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law.

(d) **Transfer**.  Section 7 is hereby amended by:

(i)     (x) adding the words "(and notice of the transferee to)" after the word "of" in the third line thereof, and (y) adding the words "(subject to providing three Business Days prior written notice of the transferee to the other party and to each Rating Agency)" after the word "transfer" in the fourth and seventh line thereof.

(ii)    adding at the end thereof:

"Any party making any such transfer shall deliver to the other party and the Servicer written confirmation from each Rating Agency that such transfer will not result in the then-current rating of any series of Notes outstanding being withdrawn or lowered.  Notwithstanding the foregoing, nothing in this section shall be deemed to prohibit any party from making a transfer as expressly permitted herein."

(iii)   adding a new paragraph 7(c) reading as follows:

"(c) Notwithstanding anything to the contrary set forth in the Agreement, Party A agrees to the assignment to Deutsche Bank Trust Company Americas, as Collateral Agent (the "Collateral Agent") under the Security Agreement, dated as of the date hereof (as amended, modified and supplemented from time to time, the "Security Agreement"), among Party B, the Indenture Trustee and the Collateral Agent for the benefit of the Secured Parties under the Security Agreement of, and the grant to the Collateral Agent for the benefit of each Secured Party of a security interest in, the rights of Party B under this Agreement and the Confirmation.  Party A further consents to and agrees that in connection with the realization of any of the Secured Parties' rights (including Party A's rights) under the Security Agreement, that the Collateral Agent, on behalf of the Secured Parties (including Party A) is entitled to and shall have, all rights of Party B hereunder."

(e) **Swap Exemption**.

(i)     The parties agree that this Agreement and the Transaction are intended to constitute a "swap agreement" within the meaning of Commodity Futures Trading Commission ("CFTC") Regulations Section 35.l(b)(1) and Section 101(53B) of the U.S. Bankruptcy Code;

(ii)      Each party represents to the other that it is an "eligible contract participant" within the meaning of the Section 1(a)(12) of the Commodity Exchange Act, as amended;

(iii)      The parties agree that neither this Agreement nor the Transaction is one of a fungible class of agreements that are standardized as to their material economic terms, within the meaning of CFTC Regulations Section 35.2(b) and neither this Agreement nor any Transaction will be executed or traded on a "trading facility" within the meaning of Section 1a(33) of the Commodity Exchange Act, as amended; and

(iv)      Each party represents to the other that the creditworthiness of the other party was or will be a material consideration in entering into or determining the terms of this Agreement and the Transaction, including pricing, cost or credit enhancement terms of the Agreement or the Transaction, within the meaning of CFTC Regulations Section 35.2(c).

(f)      **WAIVER OF RIGHT TO TRIAL BY JURY. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION.**

(g)      **Amendments**.    <u>Section 9(b)</u> of this Agreement is hereby amended by adding the following after the word "system" in the last line thereof:

", *provided*, *however*, that each Rating Agency shall receive prior written notice of all such amendments, modifications or waivers; *provided, further,* that each material amendment, modification or waiver shall require, prior to its effectiveness, the written confirmation of each Rating Agency that such material amendment, modification or waiver shall not result in the then-current rating of any series of Notes outstanding being withdrawn or lowered."

(h)      **Section 2**.    <u>Section 2(e)</u> of the Agreement shall not apply to Party B.

(i)      **Section 5**.    <u>Section 5(a)(i)</u> of the Agreement is hereby amended by deleting the word "party" in the last line thereof and replacing such language with the following:

"the Indenture Trustee and the party, provided that any payment default may be cured prior to designation of an Early Termination Date on behalf of Party B by the Indenture Trustee (but the Indenture Trustee shall have no obligation to do so)"

(j)      **Expenses**.    <u>Section 11</u> of the Agreement is hereby amended by deleting the words "A Defaulting Party" in the first line thereof and "the Defaulting Party" in the fourth line thereof and replacing such language with the following:

"Party A, to the extent that it is a Defaulting Party,"

(k)      **Relationship between Parties**.

(i)  <u>Non-Reliance</u>.  Each party represents and warrants that it is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it is based upon its own judgment and upon advice from such advisors as it has deemed necessary.  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction.  It has not received from the other party any assurance or guarantee as to the expected results of that Transaction.

(ii)  <u>Evaluation and Understanding</u>.  It is capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms, conditions and risks of that Transaction.  It is also capable of assuming, and assumes, the financial and other risks of that Transaction.

(iii)  <u>Status of Parties</u>.  The other party is not acting as a fiduciary or an advisor for it in respect of that Transaction.

(l)  **Amendment of the Facility Documents**.  Party B agrees that it shall not make any amendment to the Facility Documents that would materially and adversely affect the interests of Party A without the prior written consent of Party A when required under the Facility Documents.

(m)  **Limited Recourse to Party B**.  Notwithstanding anything to the contrary contained herein, all obligations of Party B shall be payable by Party B under <u>Section 2(a)(i)</u> of the Agreement only on a Party B Payment Date or Party B Interim Payment Date (each as defined in the related Confirmation of the Transaction) and only to the extent of funds available therefor in the Collateral Account as provided in <u>Section 5.03</u> of the Security Agreement and, to the extent such funds are not available or are insufficient for the payment thereof, shall not constitute a claim against Party B to the extent of such unavailability or insufficiency until such time as Party B has assets sufficient to pay such prior deficiency; *provided, however,* that any termination payment in respect of the termination of this Agreement in whole may be made on any date from amounts available under <u>Section 2.01</u> of the Security Agreement.  This paragraph shall survive the termination of this Agreement but in all cases shall expire concurrently with the restriction specified in <u>Part 5(c)</u>.

(n)  **No Recourse**.  Capitalized terms used in this paragraph shall have the meanings ascribed to such terms in the Mortgage Loan Purchase and Servicing Agreement.  The obligations of Party B hereunder are solely the obligations of Party B and no recourse shall be had with respect to this Agreement, any of the obligations of Party B hereunder or for the payment of any fee or other amount payable hereunder or for any claim based on, arising out of or relating to any provision of this Agreement against any member, stockholder, employee, officer, director, incorporator, trustee, affiliate, agent or servant of Party B except to the extent that any such claim arises as a result of the intentional misconduct,

fraud, bad faith and/or gross negligence of such persons. The provisions of this paragraph shall survive the termination of this Agreement.

(o)     **Notice of Payment Amounts**. The Calculation Agent shall provide (via email or facsimile) Party A with estimates of payments to be made by each of Party A and Party B (including a breakdown of the components of each payment) under the Agreement on the next following payment date. Such estimates shall be provided by noon (eastern standard time) of the second Business Day prior to each such payment date. Final confirmation of the actual amounts to be wired shall be provided (via e-mail or facsimile and confirmed by telephone) by no later than 9:00 a.m. (eastern standard time) on each such payment date.

(p)     **Reduction of Swap Counterparty's Rating**. In the event that Party A's short-term debt rating is withdrawn or reduced below "A-l+" by S&P or "P-l" by Moody's, Party A is obligated to immediately provide written notice thereof to Party B and, within 30 days after such rating withdrawal or reduction (if such withdrawal or reduction is continuing), to either, in its discretion (i) establish any arrangement with Moody's or S&P, as the case may be, including obtaining a backup swap counterparty, (ii) obtain replacement interest rate swap agreements with terms substantially the same as this Agreement, or (iii) post collateral (including USD) to secure the obligations of Party A, in any such case such that Party A shall receive written confirmation that the rating of each series of Notes outstanding by the applicable rating agency will not be withdrawn or reduced below the applicable rating of each series of Notes outstanding existing immediately prior to such downgrade, as applicable; *provided, however*, that the preceding provisions may be modified, without the consent of the holders of any of the Notes if the Manager and the Indenture Trustee shall have been provided with a letter from Moody's and S&P to the effect that any such modification will not adversely affect the ratings on all series of Notes outstanding. Any costs associated with obtaining a replacement swap agreement or establishing any other arrangement satisfactory to the applicable rating agency will be borne by Party A. No failure on the part of Party A to effect any of the alternatives specified above within the said 30-day period shall constitute an Event of Default with respect to Party A. Rather, a Termination Event shall be deemed to have occurred with Party A as the Affected Party. Notwithstanding Section 6(a)(iii) of the Confirmation, following the failure on the part of Party A to effect any of the alternatives specified above within such 30-day period, Party B may designate an Early Termination Date without a Successor Counterparty upon satisfaction of the following conditions: (x) Party B shall have received Rating Agency Confirmation, (y) the excess of (i) the then-current Program Size (before giving effect to any reduction made in connection with the designation of such Early Termination Date) over (ii) the sum of the aggregate outstanding principal amount of the Notes is greater than or equal to the Maximum Notional Amount of the related Transaction and (z) before designation of such Early Termination Date, the Program Size shall be reduced by an amount equal to or greater than such Maximum Notional Amount. Notwithstanding Section 6(e) of the Agreement, upon the designation of an Early Termination Date pursuant to this Part 5(p), no termination payments shall be payable under Section 6(e) by either party, except (A) each party shall make all payments pursuant to the Confirmation through and including such Early Termination Date; and (B) without duplication of the amounts payable pursuant to

the foregoing clause (A), Party A shall pay to Party B the Unpaid Amounts owing to Party B by Party A as of the Early Termination Date and Party B shall pay to Party A the Unpaid Amounts owing to Party A by Party B as of the Early Termination Date, and neither party shall have any further liability in respect of the termination of this Agreement.

(q)     **Additional Swap Counterparties**.   To the extent that Party B enters into interest rate swap agreements similar to this Transaction with other additional swap counterparties, such swap counterparties will be required to maintain short-term credit ratings of "A-l+" from S&P and "P-1" from Moody's and long-term credit ratings of at least "AA-" from S&P and "Aa3" from Moody's.

(r)     **Additional Definitions**.   Capitalized terms used in this Schedule shall have the meaning set forth in the Confirmation and the Mortgage Loan Purchase and Servicing Agreement and, if not defined therein, in the Security Agreement.   Additionally, the capitalized terms set forth below shall have the following meanings:

> "Accounting Treatment Change" shall mean the determination by auditors for Party A that the Mortgage Loans and other assets of Party B should be included on the consolidated balance sheet of Party A.

> "Indenture" shall mean that certain Base Indenture, dated as of the date hereof, between Deutsche Bank Trust Company Americas, as Indenture Trustee and Broadhollow Funding, LLC, as Issuer, together with any supplements thereto.

> "Security Agreement" shall mean that certain Security Agreement, dated as of the date hereof, among Broadhollow Funding, LLC, as Issuer, Deutsche Bank Trust Company Americas, as Indenture Trustee, and Deutsche Bank Trust Company Americas, as Collateral Agent.

(s)     **Accounting Treatment Change**.   Notwithstanding Section 6(a)(iii) of the Confirmation, following the occurrence of an Accounting Treatment Change (as defined above) and notice thereof by Party A, Party B may designate an Early Termination Date without a Successor Counterparty upon satisfaction of the following conditions: (x) Party B shall have received Rating Agency Confirmation, (y) the excess of (i) the then-current Program Size (before giving effect to any reduction made in connection with the designation of such Early Termination Date) over (ii) the sum of the aggregate outstanding principal amount of the Secured Liquidity Notes, the Extended Notes, the Senior Term Notes and the Subordinated Notes is greater than or equal to the Maximum Notional Amount of the related Transaction and (z) before designation of such Early Termination Date, the Program Size shall be reduced by an amount equal to or greater than such Maximum Notional Amount.   Notwithstanding Section 6(e) of the Agreement, upon the designation of an Early Termination Date pursuant to this Part 5(s), no termination payments shall be payable under Section 6(e) by either party, except (A) each party shall make all payments pursuant to the Confirmation through and including such Early Termination Date; and (B) without duplication of the amounts payable pursuant to the foregoing clause (A), Party A shall pay to Party B the Unpaid Amounts owing to

Party B by Party A as of the Early Termination Date and Party B shall pay to Party A the Unpaid Amounts owing to Party A by Party B as of the Early Termination Date, and neither party shall have any further liability in respect of the termination of this Agreement.

(t)    **Consent to Recording**.    The parties agree that each may electronically record all telephonic conversations between marketing and trading personnel in connection with this Agreement and that any such recordings may be submitted in evidence in any Proceedings related to this Agreement.

(u)    **Acknowledgement of the Parties**.    For the avoidance of doubt, each Party hereto acknowledges and agrees, notwithstanding Section 1(c) of the Agreement, that each of the Interest Rate Swaps between Party B and each Swap Counterparty shall constitute separate agreements between Party B and such Swap Counterparty.

(v)    **No Set-off**.    Other than as provided in Section 2(c) of this Agreement, all payments hereunder shall be made without set-off or counterclaim.    Section 6(e) of the Agreement is amended by the deletion of the following sentence:    "The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off."

(w)    **Further Representations of Party B**.

(i)    Assuming the due authorization, execution and delivery thereof by the other parties thereto, each of the Indenture and the other Facility Documents to which Party B is a party constitutes the legal, valid and binding obligations of Party B, enforceable against Party B in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws or legal principles affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law).

(ii)    To the best of its knowledge, no event of default (or event which would, with the passage of time or the giving of notice or both, constitute an event of default) has occurred under any of the Facility Documents to which Party B is a party.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

BANK OF AMERICA, N.A.

By: _____

    Name: **Roger H. Heintzelman**
    Title: **Principal**

BROADHOLLOW FUNDING, LLC

By: American Home Mortgage Corp., as
    Manager

By: _____

    Name:
    Title:

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

**BANK OF AMERICA, N.A.**

By:_____
    Name:
    Title:

**BROADHOLLOW FUNDING, LLC**

By:  American Home Mortgage Corp., as
    Manager

By:_____
    Name:
    Title:

EXHIBIT A

**CONFIRMATION**

Dated: May 27, 2004

To:     Broadhollow Funding, LLC
        520 Broadhollow Road (through September 30, 2004)
        538 Broadhollow Road (beginning October 1, 2004)
        Melville, New York 11747
        Attention:  Thomas McDonagh
        Telephone:  516-949-3942
        Fax:  516-622-8960

From:  Bank of America, N.A.
        Sears Tower
        233 South Wacker Drive, Suite 2800
        Chicago, IL 60606

        Re:     <u>Swap Transaction (Reference No. 7715083)</u>

Ladies and Gentlemen:

        The purpose of this letter agreement is to set forth the terms and conditions of the Swap Transaction entered into between Bank of America, N.A. ("<u>Party A</u>") and Broadhollow Funding, LLC ("<u>Party B</u>") on the Trade Date referred to below (the "<u>Transaction</u>").  It constitutes a "Confirmation" as referred to in the Master Agreement specified below.

        The definitions and provisions contained in the 2000 ISDA Definitions (the "<u>Definitions</u>") are incorporated into this Confirmation.  In the event of any inconsistency between those definitions and provisions and this Confirmation, this Confirmation will govern.

        1.     This Confirmation supplements, forms part of, and is subject to, the Master Agreement, dated as of the date hereof, as amended and supplemented from time to time (the "<u>Agreement</u>"), between you  and us.  All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.  Unless otherwise defined in this Confirmation or in the Definitions, capitalized terms used herein have the meanings ascribed to such terms in the Mortgage Loan Purchase and Servicing Agreement and, if not defined therein, in the Security Agreement.

        2.     The terms of the Transaction to which this Confirmation relates are as follows:

Trade Date:                  May 27, 2004

Effective Date:           May 27, 2004

Termination Date:

May 29, 2007, subject to annual extension upon agreement of Party B and Party A.

Business Day:

Any day other than (i) Saturday and Sunday or (ii) a day on which banking institutions or foreign exchange markets in New York City, Melville, New York or any other cities in which the Servicer, the Indenture Trustee or the Paying Agent conducts servicing, trust or similar activities are authorized or required by law, regulation or executive order to be closed for business.

Business Day Convention:

Modified Following.

Notional Amount:

With respect to any Payment Date, the aggregate notional amount of this Swap Transaction will equal the product of (i) the Sharing Percentage multiplied by (ii) the sum of (x) the weighted average of the Outstanding Purchase Price of the Mortgage Loans and Securitization Securities owned by Party B on each day during the related Calculation Period and (y) the weighted average of any cash, Eligible Investments and the principal balance of the Melville Variable Funding Note held by Party B on each day during the related Calculation Period. The notional amount will increase as Mortgage Loans, Securitization Securities, cash and/or Eligible Investments are acquired by Party B (or as the principal balance of the Melville Variable Funding Note is increased) and will reduce as Mortgage Loans are securitized or sold to third parties, Securitization Securities are sold to third parties and/or the amount of cash and/or Eligible Investments held by Party B is reduced (or as the principal balance of the Melville Variable Funding Note is reduced). In connection with any such reduction, a Partial Termination Payment may be payable by Party B or Party A.

Maximum Notional
  Amount:

In no event will the aggregate notional amount of this Swap Transaction exceed $750,000,000, or such other amount as to which the parties hereto may consent and as may be provided in a written agreement between the parties hereto; *provided, however*, that such agreement may not reduce the aggregate maximum notional amount of the Interest Rate Swap to an amount less than the Program Size on the date of such agreement.

| | |
|---|---|
| Sharing Percentage: | The percentage expressed as a fraction, the numerator of which is the Maximum Notional Amount and the denominator of which is the Program Size. |
| Calculation Period: | With respect to each Payment Date, the calendar month immediately preceding such Payment Date; *provided*, *however*, solely for purposes of calculating Issuer Funding Cost and accrued interest received on sales of Non-Conforming Loans and Securitization Securities with respect to each Payment Date, "Calculation Period" shall mean the period from and including the prior Payment Date to but excluding such Payment Date, except that in each case (a) the initial Calculation Period will commence on, and include, the Effective Date and (b) the final Calculation Period will end on and include the Termination Date. |
| Payment Dates: | The 20th day of each month (or, if any such day is not a Business Day, the next following Business Day). |
| Interim Payment Dates: | Each day on which a deposit is made into the Collateral Account in respect of:  (1) proceeds from the sale or securitization of a Mortgage Loan or the sale of a Securitization Security; or (2) a prepayment in full of a Mortgage Loan (each such date, a "Loan Termination Date"; and each Mortgage Loan which is sold, securitized or prepaid in full or each Securitization Security which is sold is referred to as a "Terminated Loan"); *provided*, *however*, if the Servicer is not notified at least one Business Day in advance that a deposit in respect of (1) and (2) above is going to be made, such deposit shall be deemed to occur on the Business Day immediately following the day on which such deposit was made, and the Mortgage Loan or Securitization Security in respect of which such deposit was made shall be deemed to be a Terminated Loan on the Business Day immediately following the day on which such deposit was made. |
| Calculation Agent: | The Servicer.   Party B shall ensure that the Calculation Agent will perform its obligations in good faith and shall, upon the reasonable request of Party A, provide a certified statement to Party A showing in reasonable detail such calculations, specifying the source of such calculations and providing copies of all material documents and information relied upon by the Calculation Agent in performing its obligations hereunder.   In addition, upon request of Party A, Party B or the Servicer shall provide a report to Party A, no less frequently than monthly, which shall |

include for (a) each Mortgage Loan:  (i) the loan number, (ii) the loan category or type, (iii) the loan coupon net of servicing fees, (iv) the loan amount, (v) the Original Purchase Price and (vi) the Mark to Market Price and (b) the Melville Variable Funding Note: the principal balance of the Melville Variable Funding Note (and any unreimbursed Principal Amount Charge-Offs (as defined in the Melville Base Indenture).  Party A acting in good faith may dispute any calculation of the Calculation Agent and the parties shall use reasonable efforts to resolve any disputes concerning such calculations.

3. Party A Floating
   Amount:

On each Payment Date, Party A will pay Party B an amount equal to the product of (i) the Sharing Percentage and (ii) the Issuer Funding Cost for the related Calculation Period (net of any amounts previously paid by Party A in respect of payments for accrued interest on Extended Notes or Non-Called Notes for such Calculation Period), *provided* that with respect to any Calculation Period in which Delinquent Loans (for which no Servicer Monthly Advances of interest have been made) or Defaulted Loans exist, the Issuer Funding Cost for the related Calculation Period shall be multiplied by the Credit Reduction Factor for such Payment Date.

Party A Interim
   Floating Amount:

With respect to any Interim Payment Date, Party A will pay Party B an amount equal to the product of (i) the Sharing Percentage and (ii) the sum of all Partial Termination Payments with a positive value for all Partial Terminations effected on such date.

Party A Accrued
   Interest Payment:

On any day (other than a Payment Date) on which any Extended Notes or Non-Called Notes are paid in full, Party A will pay Party B an amount equal to the product of (i) the Sharing Percentage and (ii) the accrued and unpaid interest on such Extended Notes or Non-Called Notes.

4. Party B Floating
   Amount:

On each Payment Date, Party B will pay Party A an amount equal to the product of (i) the Sharing Percentage and (ii) (A) minus (B) where (A) equals the sum of (i) the interest on the Mortgage Loans and the Melville Variable Funding Note received with respect to the related Calculation Period and deposited into the Collateral

Account on such Payment Date, (ii) reinvestment income received on amounts on deposit in the Reserve Fund during the related Calculation Period (but only to the extent that the amount on deposit in the Reserve Fund exceeds the Required Reserve Fund Amount) and (iii) reinvestment income received during the related Calculation Period on amounts on deposit in the Collateral Account and where (B) equals the sum of (i) Excluded Accrued Interest, (ii) the Allocated Expenses payable on such Payment Date, (iii) the Acquisition Date Accrued Interest for the related Calculation Period and (iv) the Holdback Amount for such Payment Date.

Party B Interim:
   Floating Amount:

With respect to any Interim Payment Date Party B will pay Party A by 1:00 P.M. eastern standard time an amount equal to the product of (i) the Sharing Percentage and (ii) the sum of the absolute value of all negative Partial Termination Payments for all Partial Terminations effected on such date.

5. Partial Termination:

Any termination of this Transaction in part and not in whole shall in no way affect the remaining portion of this Transaction. Payment of the Partial Termination Payment shall be made on the Interim Payment Date occurring on or next following the effective date of the relevant reduction, Party B shall provide Party A written notice of the amount of each Partial Termination Payment by 9:00 A.M., eastern standard time on the related Interim Payment Date.

6. Early Termination:

(a)    Except as provided in the Agreement and this Confirmation, nothing herein shall affect the rights of Party A if Party B is the Defaulting Party. In the event that an Event of Default or Termination Event has occurred and Party A is the Defaulting Party or Affected Party, Party A and Party B agree as follows:

(i)    Party A shall give immediate written notice of such Event of Default or Termination Event to Party B, the Servicer, the Indenture Trustee, Moody's and S&P.

(ii)    Commencing with the date of such Event of Default or Termination Event, Party A shall use its reasonable efforts to cooperate with Party B and the Servicer to transfer Party A's rights and duties hereunder to (or otherwise procure a replacement transaction with terms substantially similar to this Transaction with) a successor to

Party A having a short-term unsecured and unguaranteed debt rating of "A-l+" by S&P and "P-1" by Moody's and a long-term debt rating of at least "AA-" by S&P and "Aa3" by Moody's (a "<u>Successor Counterparty</u>"), such that the ratings of each series of Notes by each Rating Agency will not be withdrawn or reduced below the ratings of such Notes prior to such Event of Default or Termination Event.

(iii)    Subject to Part 5(p) and Part 5(s) of the Schedule, Party B shall not designate an Early Termination Date unless a Successor Counterparty is appointed and the requirements of <u>Section 6(a)(ii)</u> of this Confirmation are otherwise satisfied upon designation of such Early Termination Date.

(iv)    Party A shall bear or otherwise reimburse Party B and the Servicer for all reasonable costs (excluding any assignment fee or termination fee) associated with the actions required by <u>Section 6(a)(ii)</u> of this Confirmation.

(b)    Upon the transfer of Party A's rights and obligations hereunder as a result of the Event of Default or Termination Event specified in <u>Section 6(a)</u> of this Confirmation to a Successor Counterparty or the replacement of this Transaction with a substantially similar transaction with a Successor Counterparty:

(i)    The Calculation Agent shall calculate an amount that would be payable to (or by) Party B assuming (i) that Section 6(e)(i)(3) of the 1992 ISDA Multicurrency Cross Border Master Agreement were applicable, (ii) that Party A was the Defaulting Party or the Affected Party (as the case may be) and (iii) that the Early Termination Date was the date the Successor Counterparty entered into or assumed such replacement transaction.

(ii)    To the extent that the Calculation Agent determines in <u>Section 6(b)(i)</u> of this Confirmation that Party B would be required to make a payment to Party A, Party B and Party A agree to cause the Successor Counterparty to pay such amount to Party A and such amount shall constitute satisfaction in full of the obligations of Party B to Party A in respect of the assignment of this Transaction to the Successor Counterparty.

(iii)    To the extent that the Calculation Agent determines in <u>Section 6(b)(i)</u> of this Confirmation that Party B would

be entitled to receive a payment from Party A, Party A and Party B agree that Party A will pay such amount to the Successor Counterparty and such amount shall constitute satisfaction in full of the obligations of Party A to Party B in respect of the assignment of the Transaction to the Successor Counterparty.

7.  Definitions:

In this Confirmation,

"<u>Acquisition Date Accrued Interest</u>" means with respect to any Mortgage Loan, the amount of interest, if any, accrued and unpaid on the date of acquisition of such Mortgage Loan by Party B.

"<u>Allocated Expenses</u>" means Party B's expenses, including, without limitation, Indenture Trustee fees, rating agencies fees, Manager fees, Depositary fees, Servicing Fees (not including any excess servicing fees), Collateral Agent fees, Custodian fees and other anticipated costs and fees; *provided, however*, that in no event may the cumulative amount of Allocated Expenses in any year exceed twenty-five (25) basis points on the then-current Program Size (or such other amount as Party A and Party B may agree to in writing).

"<u>Credit-Adjusted Price</u>" with respect to a Terminated Loan which is a Delinquent Loan or a Defaulted Loan shall mean the hypothetical sales proceeds, as determined in good faith by the Calculation Agent, that would be received in connection with the sale of a Reference Mortgage Loan to a Qualified Purchaser on the date such Delinquent Loan or Defaulted Loan, as the case may be, becomes a Terminated Loan.

"<u>Credit Reduction Factor</u>" shall mean as of any Payment Date, a fraction equal to (i) the sum of (A) the average aggregate Outstanding Purchase Price of the Mortgage Loans and Securitization Securities owned by Party B on each day during the related Calculation Period exclusive of Defaulted Loans and Delinquent Loans (other than Delinquent Loans for which the Servicer has made Servicer Monthly Advances) (prior to giving effect to distributions and allocations on such date) and (B) the average aggregate outstanding   principal balance (excluding any Principal Amount Charge-Offs (as defined in the Melville Base Indenture) which have not been reinstated) of the Melville Variable Funding Note held by Party B on each day during

the related Calculation Period (prior to giving effect to distributions and allocations on such date) divided by (ii) the sum of (A) the aggregate outstanding principal amount of the Notes (except with respect to all non-interest bearing Secured Liquidity Notes and Callable Notes outstanding as of the end of the related Calculation Period, which shall equal an amount equal to the aggregate face amount (less the discount component) of such Secured Liquidity Notes and Callable Notes) and (B) the aggregate principal amount of the Subordinated Notes.

"Defaulted Loan" means any Mortgage Loan where (i) the obligor thereon has failed to make a required payment for 90 days or more past its contractual due date, (ii) such Mortgage Loan is a Delinquent Loan for which the Servicer has not made a Servicer Monthly Advance of interest thereon and the Servicer has delivered a certificate pursuant to Section 5.1 of the Mortgage Loan Purchase and Servicing Agreement or (iii) any other event has occurred of which the Servicer has knowledge and which gives the holder the right to accelerate payment and/or take steps to foreclose on the mortgage securing the Mortgage Loan under the mortgage loan documentation.

"Delinquent Loan" means any Mortgage Loan which has a payment which is thirty (30) days or more past its Due Date without giving effect to any Servicer Monthly Advance.

"Excess Spread" means, with respect to any Payment Date, the amount by which (i) the sum of (A) the interest in respect of the Mortgage Loans (including Servicer Monthly Advances and any other amounts allocated as interest by Party B) deposited into the Collateral Account for such Payment Date pursuant to Section 4.6(d) of the Mortgage Loan Purchase and Servicing Agreement, (B) the interest due on the Melville Variable Funding Note received during the related Calculation Period, (C) reinvestment income received during the related Calculation Period on amounts on deposit in the Collateral Account and (D) reinvestment income received on amounts on deposit in the Reserve Fund during the related Calculation Period (but only to the extent that the amount on deposit in the Reserve Fund exceeds the Required Reserve Fund Amount) and any other amount on deposit in the Reserve Fund in excess of the Required Reserve Fund Amount, exceeds (ii) the sum of (A) the Issuer Funding Cost for such Payment Date and (B) the Allocated Expenses for such Payment Date.

"Excluded Accrued Interest" means any accrued interest not identified on the date of a Partial Termination Payment and included in the determination of sales price for the related sold or securitized Mortgage Loan or Securitization Security.

"Holdback Amount" means, with respect to any Payment Date, an amount equal to the lesser of (i) the Excess Spread for such Payment Date and (ii) (x) any amounts required to reimburse Party B for the aggregate amount by which the cash sales proceeds received from the sale of Defaulted Loans and Delinquent Loans since the immediately preceding Payment Date is less than the Credit-Adjusted Price of such Mortgage Loans and (y) to the extent not paid in (x) above, such additional amount required to cause the Reserve Fund Available Amount to equal the Required Reserve Fund Amount but only to the extent of unreimbursed Required Draw Amounts (excluding Required Draw Amounts made pursuant to Section 5.05(g) of the Security Agreement).

"Interest Rate Swap" has the meaning set forth in the Indenture as amended.

"Issuer Funding Cost" shall mean with respect to any Calculation Period, an amount equal to the sum of (i) with respect to a Calculation Period in which interest-bearing Short Term Notes matured, the amount of accrued interest on such Short Term Notes, (ii) with respect to a Calculation Period in which non-interest bearing Short Term Notes matured, the accrued discount in respect of such Short Term Notes, (iii) with respect to any Calculation Period immediately preceding a Payment Date for the Extended Notes, Non-Called Notes or Term Notes, the amount of accrued and unpaid interest payable in respect of the Extended Notes, Non-Called Notes or Term Notes on such Payment Date and (iv) with respect to any Calculation Period immediately preceding a Payment Date for the Subordinated Notes, the amount of accrued and unpaid distributions payable in respect of the Subordinated Notes on such following Payment Date.

"Loan Termination Date" has the meaning set forth in the section entitled "Interim Payment Dates."

"Mark to Market Price" shall have the meaning set forth in the Mortgage Loan Purchase and Servicing Agreement.

"Melville Base Indenture" shall mean the Base Indenture, dated as of the date hereof, between Melville Funding, LLC and the Indenture Trustee, as amended, modified or supplemented from time to time, exclusive of supplements creating a new series of notes.

"Mortgage Loan Purchase and Servicing Agreement" shall mean the Mortgage Loan Purchase and Servicing Agreement, dated as of the date hereof, by and between American Home Mortgage Corp., as Seller, Columbia National, Incorporated, as Servicer, American Home Mortgage Investment Corp., as Performance Guarantor, and Broadhollow Funding, LLC, as Purchaser, as such agreement may be amended, modified or supplemented from time to time.

"Non-Conforming Loans" shall mean Mortgage Loans which substantially conform to the Guidelines except (i) the principal amount thereof may exceed the principal amount of loans which conform to the Guidelines or (ii) for other specified exceptions to the Guidelines which are consistent with the Seller's Non-Conforming Loan underwriting standards. Non-Conforming Loans do not include Mortgage Loans made to borrowers that are generally referred to as "sub-prime" borrowers.

"Original Principal Purchase Price" shall mean with respect to each Mortgage Loan, the Mark to Market Price at the close of business on the Business Day prior to the closing date of sale of such Mortgage Loan by the Seller to Party B.

"Original Purchase Price" means (i) with respect to a Mortgage Loan, the Original Principal Purchase Price of such Mortgage Loan plus the Acquisition Date Accrued Interest and (ii) with respect to a Securitization Security, the aggregate of the Outstanding Purchase Prices of all Mortgage Loans backing such Securitization Security.

"Outstanding Purchase Price" means, with respect to any Mortgage Loan or Securitization Security and any date of determination, (i) the Original Purchase Price of such Mortgage Loan or Securitization Security, *less* (ii) in the case of a Mortgage Loan, the amounts of any payments received by Party B in respect of Acquisition Date Accrued Interest, *less* (iii) in the case of any Mortgage Loan or Securitization Security, all previous principal payments

made on such Mortgage Loan or Securitization Security, as the case may be, and received by the Servicer prior to such date of determination; *provided*, *however*, that the Outstanding Purchase Price of a Mortgage Loan or Securitization Security (other than a Terminated Loan or a repurchased loan) shall only be reduced on a Due Date and the Outstanding Purchase Price of a Terminated Loan or repurchased loan shall be reduced on the related Loan Termination Date or date such loan is repurchased, as applicable; *provided*, *further*, that after any Loan Termination Date or any date a loan is repurchased the Outstanding Purchase Price of a Terminated Loan or a repurchased loan shall be zero.

"Partial Termination" means the termination of a portion of this Transaction in accordance with Section 5 of this Confirmation.

"Partial Termination Payment" means an amount, which may be positive or negative, calculated with respect to each Terminated Loan (I) which is sold by Party B to a third party or securitized equal to the difference between (i) the Outstanding Purchase Price of such Terminated Loan and (ii) (A) if the Partial Termination occurs with respect to a non-Delinquent Loan or non-Defaulted Loan or a Securitization Security, the sales proceeds (net of any accrued interest if determinable on such date) of the Mortgage Loan to which the Partial Termination relates (which sales proceeds in the case of a bundled whole loan sale or a securitization shall equal the sales proceeds for the related bundle of loans or securitization) or (B) if the Partial Termination occurs with respect to a Delinquent Loan or Defaulted Loan, the Credit-Adjusted Price or (II) which results from a prepayment in full of such Mortgage Loan equal to (i) the Outstanding Purchase Price of such Mortgage Loan *less* (ii) the principal payments that were deposited in the Collateral Account on such date. To the extent that the Partial Termination Payment is a positive number, Party A shall pay such amount to Party B and to the extent that it is a negative number, Party B shall pay to Party A an amount equal to the absolute value thereof.

"Qualified Purchaser" shall mean a leading purchaser in the market for mortgage loans having the highest credit standing which satisfy all the criteria that the Calculation Agent would apply generally at such time in determining whether to offer or make an extension of credit thereto.

"Reference Mortgage Loan" shall mean a hypothetical mortgage loan used by the Calculation Agent for the purposes of determining the Credit-Adjusted Price which is otherwise identical to the Delinquent Loan or Defaulted Loan in all respects, including interest rate, principal balance, cash flows and all other payment characteristics except that such mortgage loan is not a Delinquent Loan or Defaulted Loan, as the case may be.

"Required Reserve Fund Amount" shall mean an amount equal to 0.70% of the Program Size.

"Reserve Fund" means the segregated trust account established by Party B and maintained by, the Collateral Agent for the benefit of the Secured Parties, pursuant to the Security Agreement.

"Securitization Security" means any note, bond or pass-through certificate that is, directly or indirectly, secured by or representing an interest in each Mortgage Loan or pool of Mortgage Loans.

"Servicer Monthly Advance" means, with respect to each Mortgage Loan, the portion of the monthly payment of principal and interest on such Mortgage Loan which is delinquent and advanced by the Servicer pursuant to the Mortgage Loan Purchase and Servicing Agreement.

"Servicing Fee" has the meaning set forth in the Mortgage Loan Purchase and Servicing Agreement.

"Terminated Loan" has the meaning set forth in the section entitled "Interim Payment Dates."

8. Payment Instructions:        **Party A**

Bank of America, N.A.
New York, NY 10048
ABA#:  026009593
Account:  Interest Rate Derivatives
Acct#:  6550 219386

**Party B**

Broadhollow Funding, LLC
Deutsche Bank
ABA#:  021-001-033
Acct #: 01-419-647
Account:  Corporate Trust Account
FFC Account : 41307 ( Broadhollow Funding LLC )

Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by returning an executed copy of this Confirmation to us.

Yours sincerely,

BANK OF AMERICA, N.A.

By:_____

    Name:   **Roger H. Heintzelman**
    Title:    **Principal**

Confirmed as of the date first written:

**BROADHOLLOW FUNDING, LLC**

By:  American Home Mortgage Corp., as
      Manager

By:_____

    Name:
    Title:

Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by returning an executed copy of this Confirmation to us.

Yours sincerely,

**BANK OF AMERICA, N.A.**

By:_____
    Name:
    Title:

Confirmed as of the date first written:

**BROADHOLLOW FUNDING, LLC**

By:  American Home Mortgage Corp., as
    Manager

By:_____
    Name:
    Title: