UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| AMERICAN HOME MORTGAGE | . | Case No. 07-11047(CSS) |
| HOLDINGS, INC., a Delaware | . | (Jointly Administered) |
| corporation, *et al.*, | . | |
| | . | Oct. 15, 2007 (12:19 p.m.) |
| Debtors. | . | (Wilmington) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

INDEX

<u>DEBTORS' EVIDENCE</u>

|                   | Direct | Cross | Redirect | Recross |
|-------------------|--------|-------|----------|---------|
| WITNESS:          |        |       |          |         |
| Eugene S. Weil    | 37     | 61    | 144      |         |
|                   |        | 83    |          |         |
|                   |        | 89    |          |         |
|                   |        | 95    |          |         |
|                   |        | 105   |          |         |
|                   |        | 117   |          |         |
|                   |        | 139   |          |         |

1           THE CLERK: All rise.

2           THE COURT: Please be seated.  Good afternoon.

3           MR. PATTON: Good afternoon, Your Honor.  Thank you

4    very much for giving us time to come before you in connection

5    with our sale motion.  I, just as a matter of housekeeping,

6    will note that on the docket we have as the very first item a

7    motion to extend 365(d)(4) which was covered under a CNO a

8    few days ago.

9           THE COURT: I signed that this morning.

10          MR. PATTON: Thank you, Your Honor.  In connection

11   with the sale motion there are a few procedural matters that

12   I think are preliminary and need to be addressed.  We have a

13   motion - well, now, two motions, I believe, for a continuance

14   that had been filed.  One was just received a few moments

15   ago, maybe an hour ago.  We also have some motions in limine,

16   and I have some suggestions about how to structure today's

17   hearing, but I'm looking, obviously, for guidance from Your

18   Honor with respect to the motions for continuance and how to

19   proceed with those.

20          THE COURT: Well, do you have any suggestions on how

21   you'd like to proceed?

22          MR. PATTON: Well, Your Honor, with respect to the

23   motions for continuance, obviously we oppose them, and I

24   think we should get them out of the way.  I would suggest

25   once we move through that, and assuming, of course, that we

1    prevail in our proceeding with the hearing, that we do a

2    couple of things.  One, I have several announcements with

3    respect to resolutions and changes that will - and a

4    presentation that will address quite a few of the objections.

5    For example, last night, we filed a stipulation that

6    represents and reflects a resolution of our issues with

7    Fannie Mae and reflects that Fannie Mae has agreed to allow

8    and certify the purchaser as a Fannie Mae approved servicer.

9    That stipulation, obviously, resolves our issues with respect

10   to Fannie Mae, but it also, as well, goes to the heart of a

11   number of the objections, and I want to take that up.  I also

12   want to talk about a change in what's being requested of the

13   Court.  We filed just a few moments ago a revised list of

14   excluded contracts.  We will not be asking the Court to

15   approve a sale of the HELOC contracts, and that will affect

16   quite a number of objections, and I can walk the Court

17   through that and the implications of that change.  And then,

18   Your Honor, I would suggest that we proceed directly into

19   testimony.  From my point of view, given the number of

20   parties at issue, given the number of conversations that we

21   have going on in the background that may resolve disputes as

22   this hearing proceeds, given that this is a fairly complex

23   set of transactions, and I think that in this case all

24   objection argument will be far more digestible after a

25   factual record has been laid, that the appropriate course,

1    once we've cleared out the preliminary issues, would be to

2    simply proceed directly to testimony.  We have five witnesses

3    that will be presenting.  To some extent the order of the

4    witnesses is not ideal simply because we're trying to

5    accommodate some complicated schedules.  It's not ideal from

6    my point of view, from the point of view of how I would most

7    like to structure the hearing, but you'll be hearing from,

8    first, Gene Weil, who's with Milestone.  He's the one who has

9    been in charge of this sale process and has orchestrated the

10   sale, conducted the auction.  He will tell you all about his

11   efforts to find a buyer and how the auction process unfolded,

12   the way the bids came in, and the ultimate decision to choose

13   the purchaser, the Wilbur Ross entities, and following his

14   testimony we will present David Storeber from the Wilbur Ross

15   group to talk about that group's financial wherewithal with

16   respect to this deal, with respect to this transaction and

17   provide the aspect of adequate assurance testimony that goes

18   to Wilbur Ross' ability to provide the financial commitment

19   that this deal requires.  Our next witness would be Bobby

20   Love who's from the servicing side of our business, and he'll

21   provide some very extensive testimony describing the

22   servicing business, describing how it works, essentially

23   describing the asset that's being sold here.  He will talk

24   about how, from his point of view, the servicing contracts

25   are, to the extent they're imbedded in a larger contract, the

1    servicing components are standalone, that they are

2    transferred.  He will go into that kind of factual testimony

3    that will be relevant to some of the objections, and he will

4    also provide testimony that will be germane to the adequate

5    assurance evaluation simply because the Ross entity is buying

6    an ongoing business, and that's going to remain intact.  Our

7    fourth witness will be Bob Johnson who's at the parent level.

8    He'll testify, as well, about the way servicing interrelates

9    and works in conjunction with, but in many ways in isolation

10    from the origination aspect of the business, and he will

11    confirm once you will have heard from Bobby Love about -

12            THE COURT: I'm sorry, what was his name again?

13            MR. PATTON: His name is Bob Johnson.  Too many Bobs

14    in this.

15            THE COURT: Mr. Brady.

16            MR. PATTON: And so, you'll hear from that side of

17    the business confirmatory testimony about how the servicing

18    contracts are discrete and distinct and transferrable. And

19    then finally we have an expert witness, Jim Aerinoff

20    (phonetical) who will talk about - to the extent it remains

21    and it does to some extent that the inclusion of or a

22    requirement that a servicer be Fannie Mae or Freddie Mac

23    qualified as a shorthand or a proxy for financial strength

24    health and sound business practices.  Mind you, this

25    settlement with Fannie Mae largely resolves that issue.  His

1   second area of focus will be on the way the business works in

2   terms of transferring servicing, whether the servicing rights

3   are imbedded in a larger mortgage loan sale and purchase

4   agreement or whether the servicing rights are contained

5   within a single standalone agreement.  And that's our case,

6   but I think that if we can simply move into the testimony and

7   then take up argument at the end of the hearing, the whole

8   process will make a lot more sense in what you hear from us

9   in terms of legal arguments about the merits of these issues

10  will be a lot more digestible, as I said, at the outset.

11          THE COURT: All right.

12          MR. PATTON: So, I'd suggest we take up the

13  continuance.  I think they're entitled to have that answered

14  before we start, otherwise, they get a pocket veto and then

15  move on.

16          THE COURT: All right, thank you.  I understand

17  we've got GMAC, Mr. Dehney, your client which is Assured

18  Guarantee, and I just received US Bank National Association's

19  motion.  So, let me hear from the movants.

20          MR. DEHNEY: Good morning, Your Honor.  Robert

21  Dehney from Morris, Nichols, Arsht & Tunnell.  First, we are

22  counsel to Fgic & Assured, and on the Fgic side, the three

23  transactions in which they're involved, involve HELOCs, and

24  we learned from counsel today that nothing that is going to

25  transpire in connection with the sale hearing today is in any

1    way going to affect those three HELOC transactions. They're

2    not on a list to be assumed.  They're not on a disputed list,

3    which means they can be subsequently assumed, and therefore,

4    testimony concerning adequate assurance, all of that, none of

5    that is going to be applicable to them if they sometime

6    decide down the road to do a transaction involving them.  So,

7    I wanted to make sure we were all clear with the debtors that

8    on those three HELOC transactions and Assured has a HELOC

9    transaction, that we're all operating on the same page, and I

10   believe Mr. Cleary can confirm that.

11        MR. PATTON: Your Honor, that's right.  We're not -

12   the HELOC contract represent a relatively small portion of

13   this portfolio, about 330 million in unpaid balance, which

14   translates into about 3 million of purchase price and roughly

15   200 of that was on the so-called Schedule K, and over the

16   course of the weekend and into last night as we were

17   valuating the HELOC contracts, the ultimate conclusion was

18   that for purposes of trying to sell them in this context, or

19   any kind of contested context, it just didn't make sense, and

20   so, in that regard, we're not going to hold the counter-

21   parties to HELOC related servicing contracts to any aspect of

22   this hearing.  If they ultimately get sold, it will be

23   through some process that generates a consensual transfer,

24   and we'll come back to Your Honor with a stipulation to that

25   effect, I'm sure.

1          THE COURT: All right.

2          MR. DEHNEY: Thank you, Your Honor.  What that does

3    is leave me representing Assured in connection with a June

4    transaction which is not a HELOC transaction, and, Your

5    Honor, we did file a motion for a continuance, and Mr. Patton

6    said that they executed a stipulation with Fannie Mae

7    extending out a time to resolve things with Fannie Mae until

8    December 31.  The purchase agreement provides that the first

9    closing doesn't have to occur until the end of October, and

10   at the Friday deposition of the purchaser's representative,

11   he was unfamiliar with pretty much anything, but he was

12   comfortable saying that the sale hearing did not have to

13   occur today and could be adjourned for a week or two without

14   any problem on the purchaser's side.  So I let Your Honor

15   know that just by way of background and where we, and I

16   believe others, are coming from in connection with the

17   hearing today.  We know there's going to be a sale hearing,

18   and we know that Mr. Ross appears to be the only bidder for

19   these assets.  Understood.  What none of us have an

20   understanding of is what exactly they're asking the Court to

21   approve and how they are affecting our rights.  Now, I did

22   three of the four depositions last week, and there wasn't any

23   consistency among any of the witnesses on precisely what the

24   debtors are doing.  Are they assuming and assigning

25   agreements under 365?  If they are, that leads to one set of

1   issues.  Are they simply trying to transfer a bear right to

2   service separate and apart from the four corners of the

3   document denominated Servicing Agreement?  The debtors still

4   have not articulate that, Judge, and we are all here today

5   trying to figure out what it is they're doing.  If they

6   clearly articulate what it is they are asking Your Honor to

7   approve, and we have an opportunity to then figure out how

8   that affects us, that may resolve a number of issues, but

9   right now, the way it's teed up, Mr. Patton said, We're going

10  to ask the Court to listen to a number of witnesses.  We're

11  going to ask the Court to hear about adequate assurance of

12  future performance.  Well, if it's going to be a sale

13  transaction 363 then there are issues about the agreement

14  itself and what it is they're trying to do and whether 363(f)

15  can even be implicated.  If it's 365, well then we have

16  adequate assurance of future performance and we have cure and

17  other issues to address.  Sitting here today, the purchaser

18  doesn't know what the purchaser is taking.  The purchaser

19  doesn't know how he's going to perform the obligations, and

20  the purchaser doesn't know whether he's taking the whole

21  agreement and will be performing the obligations or not.  So,

22  we're asking for a continuance to allow the debtors to

23  articulate or provide a schedule, something to frame the

24  issues that we are then going to proceed with in court so

25  that we can identify for the Court and our clients what is

1   happening.

2         THE COURT: Well, isn't - two things: One, I thought

3   it was somewhat clearer than you're making it out in the

4   debtors' response, omnibus response to the objections, which

5   was that their first primary argument is that these aren't

6   executory contracts, that they're proceeding under 363 and

7   they're selling bear contract rights, to put it in your term,

8   but in the alternative, to the extent that I decide that if

9   they are executory contracts, they're seeking to assume and

10  assign them.  So, to me, that's not unclear at all.

11        MR. DEHNEY: Well, Your Honor, if I may, just on the

12  first part, doesn't the debtor need to articulate as to each

13  transaction and each agreement what right is being affected

14  under 363?  They haven't done that yet.  Remember, every

15  securitization transaction consists of a number of documents.

16        THE COURT: Uh-huh.

17        MR. DEHNEY: There's a servicer agreement, there are

18  a number of other agreements, they haven't articulated - Just

19  take whether they're arguing -

20        THE COURT: I think they've made it abundantly clear

21  what they're doing.  The servicing rights is what they're

22  selling.  Why do they have to break it down paragraph by

23  paragraph by contract by contract?

24        MR. DEHNEY: Well, Your Honor, the servicing rights,

25  they haven't articulated what their understanding of what

1   that means, and more importantly, the purchaser hasn't agreed

2   - the purchaser understands what that means, but are they

3   contemplating - again, this is really, we believe they

4   haven't articulated through any of their witnesses -

5        THE COURT: And that leaves me to my second problem

6   - or my second response is, you basically want a continuance

7   to fix their case.  If they're at risk at not being clear as

8   to what they're seeking this Court to do, and they're not

9   going to put on a case that makes it clear, they're going to

10  lose.  So, what do you care?

11       MR. DEHNEY: Well, actually, Your Honor, 363 and 365

12  and asset sales happen all the time.  But the notice

13  provisions behind it are to alert parties on how their rights

14  are going to be affected, and the discovery devises are so

15  that we can actually understand how they're being affected

16  and how we can defend, and sitting here today, there's no one

17  on the objecting side who can say they have an understanding

18  from an articulation by the debtor and the purchaser on

19  exactly what it is they're doing and to whom.  And that's

20  really what we're saying.  We're not saying it's not going to

21  happen.  We're not saying you may rule against us or you may

22  find support, but at least on the threshold issues of what is

23  going forward, again, the investment banker in deposition

24  didn't know.  Mr. Love testified.  I was only asked to look

25  at this piece of an agreement, I don't know.  Mr. Johnson

1    said, We are transferring or assuming and assigning all four

2    corners of the document denominated Servicing Agreement.

3    That's great.  The purchaser says, I don't know that's true.

4    I haven't agreed to undertake that obligation.  So there's a

5    disconnect there.  And as to the adequate future performance,

6    Your Honor, if you get to the point where you're going to

7    consider that today or tomorrow, Your Honor, the deposition

8    that we had in New York on Friday, I've never been to a

9    deposition with a witness who didn't know anything.  I mean,

10   here's the purchaser who says, It's a Newco.  We have no

11   working capital.  We have no permits, licenses, or approvals.

12   We don't know.  He says it's too early in the process to know

13   any of that.  Again, if it's too early in the process for the

14   purchaser's representative to have that information, we

15   submit a continuance is appropriate so that then we can

16   gather information.  We would ask that - we would suggest

17   there is no prejudice to continuing this and requiring the

18   debtor to articulate what we believe is required under the

19   Bankruptcy Rules.

20        THE COURT: Let me hear from all the movants first

21   before the debtor responds.

22        MR. McLAUGHLIN: Thank you, Your Honor.  Patrick

23   McLauglin from Dorsey & Whitney for U.S. Bank National

24   Association as Trustee.  We filed this morning a joinder in

25   the existing motions to continue, and I won't repeat the

1    arguments that counsel have made in connection with the

2    request to continue, I'll only say that, Your Honor, from a

3    Trustee's perspective, we want to give our bondholders notice

4    of the proposed transaction, and we really haven't been able

5    to meaningfully do that because the transaction keeps

6    changing.  I mean it changed in two material ways in the last

7    24 hours.  There was apparently an arrangement with Fannie

8    Mae, and this morning we learned that the APA had been

9    modified in a significant way, in a way that the Trustees are

10   supportive of, but it's still, the deal has kept changing.

11   Our bondholders are entitled to be, you know, advised of

12   what's going on.  If they want to direct us to support it, to

13   oppose it, that process can take place, but it can't until we

14   have a deal to describe to them, and we haven't so far.  If

15   we have a brief continuance in this hearing, perhaps the

16   parties can reach consensual agreement that would spare the

17   Court the trouble of hearing any of this testimony, but we'll

18   have the time to do that if there is a brief continuance.  I

19   would add that in order to give the Trustees an opportunity

20   to give meaningful notice to their holders, that even if the

21   Court does go forward that the Court consider not overriding

22   the automatic 10-day stay under Rule 6004 and 6006 so that if

23   the Court does approve, the bondholders could have notice at

24   that time.  Thank you, Your Honor.

25             THE COURT: Thank you.

1          MS. LAWSEN: Good afternoon, Your Honor.  Kim Lawsen

2     from Reed Smith on behalf of GMAC Mortgage and Residential

3     Funding Company.  Based on the representations of the debtors

4     withdrawing all of the GMAC HELOC servicing agreements from

5     the asset purchase agreements, we will not be proceeding with

6     our motion to continue for those contracts.  I have not

7     actually seen the actual withdrawal, but their

8     representations are sufficient.  In terms of Residential

9     Funding, we will not be proceeding with the motion for a

10    continuance based on our understanding that we have an

11    agreement in principal with the debtors subject to

12    documentation satisfactory to both parties, and if the

13    debtors would confirm that, I would be happy to not proceed

14    with the motion to continue.

15          MR. CLEARY: Your Honor, for the record, Blake

16    Cleary of Young, Conaway, Stargatt & Taylor on behalf of the

17    debtor entities.  With respect to the RFC, we did have some

18    discussions in negotiations.  At this point I'm kind of

19    unclear.  I think we have an agreement, but certainly I don't

20    want to prejudice our rights because we haven't put it in a

21    specific email.  I think we've got general terms.  As long as

22    my understanding is consistent with what their understanding

23    is then we're okay, but it was not real clear on the last

24    emails what -

25          THE COURT: Well, why don't you take a second and

1   make sure it is.

2          MR. CLEARY: Okay.  Your Honor, Ms. Lawsen doesn't

3   know the deal either, so, I don't know where that leaves us,

4   but it was a deal with Mr. Simons who's not in the courtroom

5   today, so -

6          MS. LAWSEN: Your Honor, if I may propose something

7   because this could affect how the rest of the hearing goes,

8   is maybe at least if you could rule on these motions we could

9   start with a certain issue or we could just take a two to

10  five-minute break to see if I can reach our partner, Mr.

11  Simons, on the phone and see if we can straighten this out

12  quickly.

13         THE COURT: All right, well, let's do this: Let's

14  pass without prejudice your client's motion for a

15  continuance.  I don't - There probably aren't any independent

16  facts really other than those articulated by the two previous

17  counsel.  I mean, I read it in detail, so, let's hold it off

18  for now.  Let me hear the debtors' response.

19         MS. LAWSEN: Okay.

20         THE COURT: And to the extent it becomes necessary

21  to deal with, we'll do so at that time.  Mr. Patton, first of

22  all and primarily, I read the Fannie Mae stipulation this

23  morning.  I approved it as modified.  I understand that you

24  have until December 31, 2007 to do the initial closing with

25  Fannie Mae, so, let's address Mr. Dehney's first argument

1   first, which is, What's the hurry?

2          MR. PATTON: What's the hurry?  Well, with respect

3   to that, Your Honor, when I was here on the first day, I

4   talked about what this asset consists of, and it's

5   fundamentally a wasting asset.  Our transaction with the Ross

6   entities and regardless of who the winning bidder would have

7   been, the same problem or the same issue would have been

8   imbedded in the transaction, the transaction with the Ross

9   entities is based on a minimal amount of unpaid principal

10  balance of loans under servicing contract with the servicing

11  business that's being transferred to him, because that tells

12  him how much flow of cash is going through the business and

13  how much in terms of fees the business is going to be able to

14  generate and that affects his price.  This is a business that

15  requires scale to be profitable.  Our minimum in the deal of

16  38 billion is kind of tight.  We turned down an offer to sell

17  over a billion dollars of that unpaid principal balance on a

18  one-off basis for a price higher than we're offering - that

19  we're going to be getting from the Wilbur Ross entities

20  because we're very anxious about making sure that we've got

21  the ability to meet that $38 million threshold.  As each week

22  goes by, the value of the unpaid principal balance is being -

23  is available for transfers diminishing.  Explain this -

24          THE COURT: Is the minimum as of the initial closing

25  date?

1          MR. PATTON: It's minimum as of the initial closing

2    date so that as that date moves out, we - it becomes harder

3    and harder and harder for us to reach that.  Once - and it

4    makes a lot of sense that this matters to the purchaser as

5    well, although, until you hit the 38, all the purchaser does

6    is gets an opportunity to pay us less money.  From our point

7    of view, the paying us less money matters as well, obviously,

8    because it's just value that's evaporating as time goes by,

9    and we then hit the tipping point at the 38 billion.

10          THE COURT: Well, you're making money on - as your

11    unpaid principal goes down, you're still receiving funds for

12    servicing.

13          MR. PATTON: That is true.  We are collecting that

14    and it's essentially running to the credit of BofA and so is

15    the purchase price, but it's not a one for one correlation,

16    and otherwise a very effective strategy here would be to

17    maintain this business for, you know, a fairly healthy length

18    of time and milk it.  It also has a certain fragility

19    associated with simply keeping a business like this in tact

20    during the course of a bankruptcy proceeding, and that has

21    been something that we've been quite successful at doing, I'd

22    have to say, but it's not been without some cost, and it's

23    not been without a fair amount of effort focusing employees

24    on the process and explaining to them exactly what we're

25    pursuing here and what we hope to achieve, but the key here

1   is that we've been at this process of trying to sell this

2   business since August 6th.  When we appeared before Your Honor

3   on the 9th, I believe it was, I advertised and Your Honor

4   approved the initiation of a sale process to sell these

5   assets.  All that has happened in the meantime is - all that

6   has happened, is that the universe of assets being sold has

7   become smaller and more focused.  From the beginning, we

8   knew, anyone who is a counter party to this, knew that their

9   assets were up for grabs to be sold if they were assets

10  associated with our servicing business.  In fact, one of the

11  comments you just heard was that the deal hasn't settled,

12  that is, it keeps changing, and it will continue to change, I

13  hope, because all of the changes that we've just heard about

14  are changes that reflect resolutions of disputes that we have

15  with counter parties who are opposing the transaction, and

16  I'm hopeful there will be more changes as the deal with

17  continue to evolve, but in any event, all that has happened

18  is, the size of the universe of parties who are being

19  affected has diminished.  Further time is not going to

20  clarify anything.  We're not going to change our case.  We're

21  not going to change our presentation.  We know exactly what

22  it is that we have to sell.  The only thing that's going to

23  happen with a continuance is that we're going to ultimately

24  lose value for the creditors of the estate, potentially lose

25  the sale if we bump up against that $38 million threshold,

1  and we will undoubtedly be back here before Your Honor with

2  some subset of unresolved objections where the objectors will

3  be raising the very same issues that you've heard today, that

4  is, you know, with just a little more time, we can knock

5  those objections off.  Your Honor, we really don't have that

6  luxury.  The parties have had an enormous amount of time to

7  learn about what's going on.  One of the ironies of what

8  we're confronting here is that we've had - on September 10th a

9  modified cure notice was sent specifically identifying the

10 GMAC servicing entities.  That followed, by the way, the

11 August 9th approval of this sale process.  On September 14th,

12 we sent out a notice extending the objection deadlines to

13 October 1st, extending the bids to October 2nd, and the auction

14 to October 5th.  On September 20th, GMAC filed and GMAC RFC

15 filed its first objection.  It filed a supplement on October

16 2nd, and we did not receive deposition notices from GMAC until

17 October 4th.  Now, Your Honor, we've had this information

18 available in one form or another for well over two months at

19 this point, and I certainly understand the parties being

20 eager to see exactly what the shape of the deal will be, who

21 the winning bidder is, what the details of the transaction

22 might be before they decide whether or not they like the deal

23 or don't like the deal, but in terms of whether or not they

24 needed to protect their rights and learn what was being sold

25 and what we intended, they've had more than enough time to

1    figure that out.  We've had, in the context of this

2    transaction, nothing except an opportunity to lose money for

3    the creditors if we delay this process, and a continuance of

4    one week or three weeks or four weeks isn't going to change

5    the ultimate picture that is going to be presented to Your

6    Honor.  Mr. Dehney's argument, as you pointed out, is

7    essentially, he doesn't like the way we're presenting our

8    case, and we're either going to win or lose, but we're not

9    going to change it because a couple of weeks have gone by,

10   and it's also the case that with respect to the morale of the

11   employees, in terms of the underlying business, that we keep

12   this process moving forward.  In any event, since I don't

13   understand how, from Mr. Dehney's point of view, further time

14   is going to help him learn anything more than he's already

15   learned since we're not in a position to tell him that we're

16   going to change the way we're going to approach this case,

17   which seems to be what he would like us to do, and since my

18   view of this is that it's merely - this request is, that it's

19   merely an opportunity to cost the estate money, a continuance

20   seems entirely inappropriate particularly given how much time

21   all of the parties have had to take whatever discovery they

22   wanted to take and to inquire of the debtor and determine

23   what it is that we were hoping to sell.  The arguments about,

24   as I said, the arguments about our ability to deliver in this

25   courtroom a compelling case are arguments that don't go to a

1  continuance, they go to whether or not we win or lose.  One

2  other point, there was a discussion about the - or reference

3  to the 10-day periods under 6004 and 6006 that are implicated

4  by the proposed order.  That doesn't seem particularly

5  germane to a continuance motion.  We'll take that up at the

6  end of the hearing when we're presenting argument and a

7  proposed order to Your Honor, assuming we convince Your Honor

8  that an order should be presented.

9        THE COURT: Let me hear from the Committee.

10        MR. INDELICATO: Thank you, Your Honor.  Mark

11  Indelicato from Hahn & Hessen on behalf of the Committee.

12  Your Honor, I think I'm going to try not to repeat what's

13  been said, otherwise these hearings can go on forever.  But I

14  think one point that the Court focused on, which is really

15  germane to the argument is, how is the estate harmed?

16  Debtors' counsel intimated that the fact that in fact

17  collections are going to continue but what they left out is

18  an important part and that those are the payments in full.

19  To the extent that there are refinancings in this portfolio,

20  the amount of the UPBs could drop precipitously, and while

21  that may or may not happen over the next two or three weeks,

22  it's a possibility, and to the extent there's a diminution in

23  the value of the portfolio that reduces the purchase price,

24  and that hurts the creditors.  It's going to hurt the secured

25  lenders and ultimately it's going to hurt the unsecured

1    creditors.  Your Honor, this case has been structured on a

2    format that this sale is the most important thing that

3    happens and it must happen quickly.  That was said on the

4    first day and it's been said thereafter, and I think, as Mr.

5    Patton has laid out, the objectors have had an opportunity to

6    conduct their discovery in an appropriate fashion.  If the

7    Court will look at the dating, their notices of discovery at

8    least from GMAC, which is the one we focused on initially,

9    since theirs was the first motion, didn't happen until

10   October 4th.  Your Honor, at that point in time, the hearing

11   was still scheduled for October 9th.  It wasn't either

12   immediately before or immediately thereafter there was a

13   notice that that was adjourned until today.  So, in fact,

14   they waited until the last minute to file their notices for

15   depositions, and they had every right to do that, Your Honor,

16   but their strategy as to when they believe the best point to

17   take the discovery should not be a reason to adjourn this

18   hearing to the detriment of all creditors.  We believe that

19   the hearing is necessary to go forward.  As the Court has

20   pointed out, the debtor will either make their case or not.

21   That's not going to change in the next week or so.  The

22   issues are going to keep changing.  You know, even as we

23   speak, there are issues that need to address in the sale

24   order that may resolve some of the objections, may not.

25   There will always be objections to resolve until this Court

1  enters an order.  I think it's important that we go forward

2  with the sale hearing.  All of the parties are here.  A lot

3  of work has been put into it, and I think to not only stop

4  the administrative burn on the debtors and the other

5  professional side, also to preserve the UPB, I think we need

6  to go forward with the sale hearing, Your Honor.  Thank you.

7          THE COURT: Yes, sir.

8          MR. TALMADGE: Good afternoon, Your Honor.  Scott

9  Talmadge from Kaye Scholer on behalf of Bank of America, the

10  secured lender here.  I'm not going to repeat any of the

11  arguments.  We join in the objections made by the debtor and

12  the Committee, and we believe the hearing should go forward

13  today to maximize value here for these estates and our

14  client.

15          THE COURT: All right.  Anyone else in opposition?

16  Mr. Dehney, before I hear from you, Ms. Larsen, are you

17  resolved?  No, you're not, okay.  Defeat out of the jaws of

18  victory.  It's like watching the Eagles play.

19          MS. LAWSEN: We are not resolved with this, but I'm

20  trying to reach the person but I haven't been able to do so

21  right now, so I'm hopeful that we will in the next few

22  minutes, but I can't guarantee that.

23          THE COURT: Okay, thank you.  Mr. Dehney.

24          MR. DEHNEY: Your Honor, just a couple of points.

25  One, we actually asked the witnesses what would happen if

1   there was a prejudice to putting it off a week or two, and I

2   heard Mr. Patton say it's a wasting ice cube, but the

3   witnesses said, it depends on the interest rates.   So, the

4   purchase price could actually go up based on the purchase

5   price calculation and the range in the purchase agreement.

6   So that's what the testimony said in the deposition.   Just

7   thought we would like to have that.   Second, I keep hearing

8   people say, We all waited too long to propound discovery.

9   That's not the point.   We served discovery.   We took

10   depositions.   Friday - this is the point, and it's - "Sitting

11   here today as my witness on this topic, you are not in a

12   position to talk about the duties and obligations under the

13   servicer agreement.   Answer: Correct.   It is that we did file

14   discovery and we took the depositions Wednesday, Thursday,

15   and Friday into Friday night, and they didn't have the

16   stories straight.   It's not that I don't know how to take

17   discovery.   I don't know how to prepare for a case when they

18   can't articulate what the case is."   That's the deposition

19   testimony of the purchaser.   How are they going to perform

20   their duties and obligations, adequate assurance?   I don't

21   know.   Haven't read the agreement, no personal knowledge, not

22   even secondhand knowledge, Your Honor.   So, it's not do we

23   not know how to propound discovery or to take a deposition.

24   And then to suggest that it's our delay that leads us here,

25   and that they're not going to change their tactic and how

1   they proceed.  Your Honor, there are lots of objections.  The

2   goal was usually to resolve them.  We've all said, if there

3   are ways to get people comfortable then there's something to

4   talk about.  But we're sitting here today saying after a

5   Friday night deposition of the purchaser, it's not there.

6          THE COURT: All right.  Thank you.  Ms. Lawsen.

7          MS. LAWSEN: The only thing that I would add, just

8   in case we have to preserve any types of rights, is that part

9   of the response to our motion suggests that, you know,

10  there's a lot of time wasting, et cetera, of taking

11  depositions.  So, the minute we knew who the actual purchaser

12  was, who could provide us with information on what they were

13  going to purchase, assume, and assign, whatever the

14  terminology is, whatever they were going to do, the minute we

15  received that we sent out our notices of deposition.  I'm not

16  sure we could have gotten some information prior to that, but

17  I'm not sure it would have been as fruitful, and we would

18  have had to have repeated the deposition process and wasted

19  even more time had we done discovery earlier and then waited

20  until the purchaser came along and then do it again.  So we

21  tried to do it in a more efficient way and do it all at once.

22         THE COURT: Yeah, I understand that, and I'm not

23  critical of your timing, but didn't you have more time than

24  you usually have in a 363 sale context?  I mean, I've done

25  lots of these, both in private practice and this was nice.

1    The auction actually - well, if an auction had occurred it

2    would have been over a week ago not 24 hours ago.

3        MS. LAWSEN: And I agree.  I think some of the

4    issues for us is that the witnesses who were identified by

5    the debtors in their 30(b)(6) as having knowledge of certain

6    topics had no knowledge.  It's not even what degree of

7    knowledge did they have, they had none.  Mr. Love was

8    designated, testified about termination.

9        THE COURT: Well, I mean, don't you have everything

10   you need though to impeach him?  I mean, they're putting the

11   same witness on the stand today, and if today all of a sudden

12   he's got knowledge of something he didn't have knowledge of

13   when you took his deposition, you can impeach him as to his

14   credibility.

15       MS. LAWSEN: Absolutely.

16       THE COURT: So, hasn't the discovery process worked?

17       MS. LAWSEN: It has to the extent that we can

18   impeach someone.  I'm not sure we clearly understand the line

19   that they're drawing in terms of what's going and what's not

20   going, and I think to parcel through that in a hearing is

21   going to take a lot of time that's not necessary.  If we

22   could sit down and go through, what are these issues, it

23   would eliminate a lot of hearing time and testimony time to

24   drag people through 45 agreements.

25       THE COURT: All right, I understand.  Thank you.

1    Anything further on this, on these motions for a continuance?

2         MR. PATTON: No, Your Honor.

3         THE COURT: All right.  I'm going to deny the

4    motions and allow the debtors to go forward with their case.

5    It's really an issue, I think, of due process, whether the

6    objectors or the movants in this instance have the ability -

7    whether basically their ability to participate in this

8    hearing has been prejudiced or somehow harmed to their

9    detriment to the point where they're really deprived of due

10   process, and I find that they're not.  In deciding what

11   notice and discovery is required or fair prior to a hearing,

12   the Court has to balance obviously the objector and the

13   movant's rights to access the information, an ability to take

14   discovery, to understand exactly how their rights are going

15   to be affected.  Mr. Dehney is correct in that manner.  To

16   have to balance that against the potential harm to the

17   debtors from not being allowed to proceed at this time, after

18   having responded to discovery propounded by the objectors,

19   and I'm extremely concerned about the wasting nature of the

20   asset here, extremely concerned about the debtors' ability to

21   continue to keep its employees and its business together.

22   I've had recent personal experience with companies where I've

23   been the judge on that have lost monumental amounts of value

24   based on an inability to get out of bankruptcy in a timely

25   fashion, and I think it is paramount that that not be

1   underestimated.  In this instance, this case is now over two

2   months old.  It was a sale case from day one.  It was a first

3   day motion.  Bid procedures were approved three days after

4   the case was filed.  The auction and the sale dates have

5   moved back as the issues have become more concrete and

6   narrowed over time.  I don't think that's harmed anyone, if

7   anything it's helped narrow the issues.  I may be naive.  It

8   may be untrue once I actually hear the testimony, but sitting

9   here, I think I have a pretty fair idea of exactly what it is

10  the debtors are going to try to prove and what the issues are

11  based on the numerous objections, and I can tell you all,

12  I've read them all, and the omnibus responses and the sur-

13  replies.  I've read all of this stuff.  So, I think, frankly,

14  given the quality of the briefing, the quality of some of the

15  responses at the podium in connection with the motion to

16  continue, for instance, that Mr. Dehney gave, I think that

17  there's been an adequate opportunity for the objectors to

18  prepare for this case.  I don't think their due process

19  rights balanced against the debtors' interest in having the

20  case go forward to preserve value have been harmed, so, I'm

21  going to overrule Assured Guarantee's, US Bank's and GMAC's,

22  Residential Funding's motions to the extent the latter are

23  not withdrawn, and I'm going to hold in abeyance the issue

24  about whether it would be appropriate to waive the 10-day

25  stay in connection with whatever sale order, assuming I enter

1   one, is entered.  I'll address it at that time without

2   prejudice to the right to anyone to argue it doesn't belong

3   in the order.

4          UNIDENTIFIED SPEAKER: Thank you, Your Honor.

5          THE COURT: You're welcome.

6          MR. PATTON: Thank you, Your Honor.  Let me just

7   take a minute to elaborate a bit more fully on the topic of

8   issues resolved.  I believe I heard Your Honor say that with

9   respect to the Fannie Mae stipulation, that not only has Your

10  Honor seen it, but you've also signed it.  Did I -

11         THE COURT: Yes.

12         MR. PATTON: Yes, okay, so -

13         THE COURT: It was submitted under certification of

14  counsel.

15         MR. PATTON: That's right.  And what that

16  stipulation provides, just broadly for those in the courtroom

17  who haven't picked it up, is that among other things but most

18  importantly for this proceeding, Fannie Mae has agreed that

19  we will remain an interim servicer subject to some conditions

20  that would abide in any event, and that we will remain in

21  that status until the final closing under the sale to the

22  Wilbur Ross entity.  It also provides that it will approve

23  Wilbur Ross as a Fannie Mae approved servicer, subject to

24  conditions that are set forth in a letter that's attached to

25  this stipulation and those conditions are, again, conditions

1   that are the kinds of things that might be relatively

2   ministerial.  One of them, for example, is Your Honor enters

3   an order approving the sale to the Wilbur Ross entity.

4   Another is the Wilbur Ross entity obtains the appropriate

5   evidence of bonding and that sort of thing.  In any event,

6   that resolution with Fannie Mae not only resolves the

7   objection that Fannie Mae presented but also resolves, in my

8   view, the objection that has been lodged by a number of the

9   objectors to the sale or transfer of servicing to a non-

10  Fannie Mae approved purchaser.  We also have a number of

11  settlements that have been identified in the agenda at the

12  end of the catalog of objections.  Many or most of those

13  represent settlements with entities with respect to cure

14  amounts, and most of those are non-financial party entities

15  that are not involved directly in the servicing contract

16  aspect of this dispute, parties who have equipment leases and

17  that sort of thing that are being assumed and assigned, and

18  we've resolved many if not all of those types of objections.

19  We also have resolved an objection by an entity called

20  Security Connections, Inc., and in connection with that we've

21  been asked to read into the record the understanding between

22  the parties, and in order to fulfill our commitment to SCI,

23  I'll take a moment and do what we've been asked to do, and

24  that is to state that SCI and the debtors are parties to an

25  agreement pursuant to which SCI provides certain release and

1   mortgage satisfaction services to the debtor as described in

2   SCI's sale objection and cure claim objection.  To resolve

3   SCI's cure claim objection and sale objection, the debtors

4   and SCI have agreed that SCI may recoup, or to the extent

5   necessary, setoff any amount due for services against the

6   amount of prepaid third-party expenses, that term "third-

7   party expenses" is a defined term, through the date of the

8   closing.  The debtors and SCI are reconciling their accounts

9   and will document this resolution in a stipulation to be

10  presented to the Court prior to closing.  In the unlikely

11  event that the parties are unable to document the agreement

12  in a stipulation or the stipulation is not approved by the

13  Court, SCI's sale objection and cure objection would be

14  preserved and presented to the Court prior to closing, but

15  they represent a contract that's not at the main or the heart

16  of this dispute.

17          THE COURT: All right.

18          MR. PATTON: Your Honor, with respect to the

19  resolution of the objections by parties who are objecting to

20  the transfer of servicing associated with HELOCs, home equity

21  lines of credit, as I indicated earlier, we have just filed a

22  notice to the Court that we are adding - a notice with the

23  Court that we are adding to the list of excluded contracts

24  those HELOC contracts.  In any event, Your Honor, attached to

25  the - Oh, here it is.  Attached to the notice that we filed,

1   is a catalog of the contracts cross-referenced with the

2   contracts on Exhibit A, so that folks who receive this will

3   be able to identify the contract that's being withdrawn based

4   on its reference to Exhibit A to the sales agreement.  We

5   have also in the pleading that we filed at a footnote, I

6   believe it's footnote 3 on page 3, the specific objectors

7   whose objections are affected by this withdrawal of the HELOC

8   contracts, and I want to point out to the Court that some of

9   the objectors have filed objections that address issues

10  beyond the issues that are being resolved by the withdrawal

11  of the HELOC contracts -

12          THE COURT: Understood.

13          MR. PATTON:  - but we've attempted to identify for

14  all of the parties both the objection that has been either

15  resolved or partially resolved by the withdrawal of the HELOC

16  contracts and also identified in connection with the APA the

17  specific contracts that are being withdrawn.

18          THE COURT: Hang on, Mr. Patton.

19          MR. PATTON: Uh-huh.

20          THE COURT: Are you handing out that right now?

21          MR. PATTON: Yes, I will.

22          THE COURT: Just give him a second to get it.  I

23  think your colleagues may be handing it out.

24          MR. PATTON: Okay.  Your Honor, if I may approach

25  the bench, I have one for Your Honor.

1            THE COURT: I have it up on the screen.   Does

2     everybody have a copy that wants one?  Okay.

3            MR. PATTON: In any event, I'll just repeat what I

4     said now they have the paper.  Take a look - I direct

5     everyone's attention to footnote 3, and -

6            THE COURT: There are no page numbers, but I think

7     it's the second page.  Is it?  Third page.

8            MR. PATTON: Third page, on the third page, which

9     identifies by reference to the docket number the objection

10    that's implicated by the withdrawal of the HELOC contracts,

11    and then attached as Exhibit A - I think I misspoke earlier

12    about - attached as Exhibit A to this pleading is a list of

13    the contracts that appear on Schedule 1.1(J) of the asset

14    purchase agreement that are being withdrawn as a result of

15    this change and a withdrawal of the HELOC contracts.  Your

16    Honor, I also have a -

17           THE COURT: Why don't we, just so that the record's

18    clear, I'm going to read them into the record -

19           MR. PATTON: That's fine.

20           THE COURT:   - because it won't appear on the

21    transcript.  So, the footnote Mr. Patton just referred to

22    reads:  "That the parties objecting to the transfer of the

23    HELOC are: Assured Guaranty Corp., docket item 1065; US Bank

24    National Association, docket item 836, 1050, 1067, 1117;

25    Financial Guarantee Insurance Company, docket item 718 and

1   1036; CIFG Assurance North America, Inc., docket item 818 and

2   1121; Deutsche Bank National Trust Company, docket items 800

3   and 832; Wells Fargo Funding, Inc., docket items 824, 851,

4   and 1053; Bank of New York, docket item 826; and GMAC

5   Mortgage, LLC, docket item 857, 1071, and 1449, and so the

6   record's clear just because - that's the HELOCs only and

7   there are probably good pieces of each of those objections

8   that are unresolved by the withdrawal of the HELOC and I'm

9   not trying to prejudice anybody's rights to make those

10   further arguments.  I just want to list them for the record.

11          MR. PATTON: Your Honor, I also have - it's a bit of

12   a work in process, and I want to suggest, perhaps, that I do

13   this at the end of the hearing, but I have a growing list of

14   objections identified on the agenda that have been resolved

15   or partially resolved, but it seems to me that particularly

16   if Your Honor takes me up on my suggestion that we proceed

17   now to testimony, that it would be more fruitful at the end

18   of the testimony to walk through the agenda and identify

19   which of the objections have been resolved completely and

20   which portions have been resolved partially because I think

21   this will be a growing list.

22          THE COURT: All right, that's fine.

23          MR. PATTON: With that, Your Honor, if you're -

24          THE COURT: You're going to dispense with any kind -

25   I mean, you've done your opening, so we're going to go

1    straight to witnesses?

2              MR. PATTON: Yes.

3              THE COURT: All right, before we do that, we're

4    going to take just - and we're going to make it short, just a

5    five-minutes recess, and then we'll turn to your first

6    witness, which will be -

7              MR. PATTON: My first witness will be Gene Weil -

8              THE COURT: Gene Weil.

9              MR. PATTON: And Ms. Morgan in my office will

10   present the testimony.

11             THE COURT: All right.

12             MR. PATTON: Thank you.

13             THE COURT: Well, before we take that break, for the

14   3 o'clock pretrial, my proposal would be to actually do that

15   in my courtroom since the universe of people who care about

16   that is hopefully much smaller than the universe of people

17   who care about this, and we're going to take that, I think,

18   right around 3 o'clock.  I don't know if that will be helpful

19   or not helpful, but I do have that on the calendar, and I

20   think the thing that would make the most sense would be to do

21   that into my courtroom, all right?  So very brief recess.

22             MR. PATTON: Thank you, Your Honor.

23             (Whereupon at 1:13 p.m., a recess was taken in the

24   hearing in this matter.)

25             (Whereupon at 1:26 p.m., the hearing in this matter

1   reconvened and the following proceedings were had:)

2           THE CLERK: All rise.

3           THE COURT: Please be seated.  Call your first

4   witness.

5           MS. MORGAN: Yes, Your Honor.  The debtors would

6   like to call Eugene Weil.

7                           EUGENE WEIL

8   having been duly sworn testifies as follows:

9           THE CLERK: State your name spelling your last name.

10          THE WITNESS: Eugene S. Weil, W-e-I-l.

11          THE COURT: Thank you.  Before we proceed, here's

12  how I'd like to go with the examination of the witnesses.

13  The debtors will obviously do direct and then if there are

14  any parties in favor of the motion who want to cross -

15  really, probably, further direct, they'll have the

16  opportunity, and then we'll hear from any objectors, then

17  we'll go to redirect and that will be it.  There will be no

18  recross.  So we're going to do direct, cross, redirect.

19          MS. MORGAN: But my helpers have to come up early.

20          THE COURT: Right.

21          MS. MORGAN: Thank you, I understand, Your Honor.

22                      DIRECT EXAMINATION

23  BY MS. MORGAN:

24  Q.  Mr. Weil, by whom are you employed?

25  A.  Milestone Advisors.

1   Q.  And what business is Milestone engaged in?

2   A.  Milestone is an investment banking firm that specializes

3   in providing services to the financial services industry and

4   particularly the mortgage origination and servicing

5   businesses.

6   Q.  And what is Milestone's role in this case?

7   A.  We're financial advisor to the debtor.

8   Q.  Briefly describe Milestone's experience in connection

9   with the sales of mortgage origination and servicing assets

10  either in or outside of the Chapter 11 proceeding?

11  A.  Milestone has been a very active advisor to the mortgage

12  banking sector over the last, say, five years.  We've

13  probably done 25 transactions during that time with

14  origination and/or servicing companies in the sector.  For

15  the last four years, Milestone has been the number one ranked

16  financial advisor to the specialty finance industry as well

17  as the mortgage industry measured by number of transactions.

18  So, we have quite a bit of experience in the field.

19  Q.  And what is your position with Milestone?

20  A.  I'm the chief executive officer.

21  Q.  And how long have you held that position?

22  A.  Since founding the firm, approximately six and a half

23  years ago.

24  Q.  Could you briefly describe your educational background.

25  A.  Sure.  I received a BA degree from the University of

1   Wisconsin, Madison, in political science and economics and

2   received a JD degree from Washington University in St. Louis,

3   Missouri.

4   Q.  And could you also briefly describe your professional

5   background before joining Milestone.

6   A.   Sure.  Prior to founding Milestone, I was a managing

7   director at Freedman, Billings, Ramsey & Company, an

8   investment banking firm that among other things specializes

9   in the financial services sector and the mortgage read

10  sector.  At FBR I was responsible for founding and overseeing

11  the firm's merger and acquisition practice as well as a large

12  part of the financial services practice.  Prior to joining

13  Freedman, Billings, I was a senior vice president and general

14  counsel of Huffy (phonetical) Financial.  Huffy is a boutique

15  investment banking firm that also specializes in the

16  financial services sector, and prior to joining Huffy I was

17  an associate at a law firm, Kennedy & Barris, and prior to

18  that, for a number of years, was an associate at Akin Gump

19  Strauss Hauer & Feld.

20  Q.  Mr. Weil, turning to this case, what are your duties in

21  connection with the sale of the servicing business that's

22  pending before the Court today?

23  A.   As I said, we are, Milestone's the financial advisor to

24  the debtor.  I am in charge of the team at Milestone working

25  on the American Home matter.  We are engaged in the sale of

1   the servicing business with a co-advisor, Phoenix Capital,

2   and I oversee that entire team both Milestone and Phoenix.

3   Our role with respect to the servicing platform, servicing

4   business, has been to evaluate the business and conduct the

5   sale of the business, which led us to the hearing today.

6   Q.  How long has the company been looking for a sale or other

7   transaction involving the servicing business?

8   A.  Pretty much since the filing on August 6th.  Immediately

9   prior to the filing, a determination was made that the

10  servicing business was one of the most likely assets that

11  ought to be sold as part of the bankruptcy.  So, right around

12  the time of the filing, we began to conduct our own internal

13  due diligence of the servicing business.  Following that due

14  diligence, we put together an offering memorandum describing

15  the servicing business and the acquisition opportunity as was

16  testified or I think Mr. Patton spoke before about the fact

17  that the sale was approved and the procedures were approved

18  early on in the case.  So, we worked on those prior to

19  filing, and since the time that we distributed the offering

20  memorandum, pursuant to confidentiality agreements, we've

21  been actively engaged in dealing with prospective acquirers

22  of the business, answering questions in their due diligence

23  sessions, and proceeding toward a sale.  So, I would say

24  we've been very actively involved since August 6, so, about

25  two and a half months.

1   Q.  In connection with your efforts, did Milestone or Phoenix

2   prepare a data room for due diligence materials?

3   A.  We did.  We -

4   Q.  And how was that populated?

5   A.  We populated an online data room with various materials

6   describing the business, including servicing agreements,

7   vendor contracts, performance data, et cetera, that we made

8   available to perspective acquirers after they had signed a

9   confidentiality agreement.

10  Q.  Why did the company determine that a sale was necessary

11  rather than a restructuring?

12  A.  As Mr. Patton indicated earlier, the servicing business

13  as it exists today is a declining asset.  American Home

14  stopped originating new mortgages sometime in the middle of

15  July of this year, and once that activity ended, no new

16  mortgages have come onto the servicing system to be serviced.

17  As a result, the ongoing prepayment of existing mortgages

18  that are on the system means that there's less and less

19  mortgages that are being serviced, and so, we felt that it

20  was important, one, to get through a quick process, but given

21  the fact that it was a wasting asset combined with the fact

22  that the financing markets and the mortgage industry changed

23  very significantly during July which made, in our opinion,

24  the reorganization of the mortgage servicing business very

25  difficult both with respect to getting financing for the

1    servicing rights or MSRs themselves as well as advances.  For

2    both reasons, the state of the financing markets as well as

3    the fact that this was a declining asset lead us to the

4    conclusion that this ought to be a sale of this asset rather

5    than a reorganization or restructuring of this asset.

6    Q.  And once that determination was made, what specific steps

7    did Milestone and the company take to identify and attract

8    potential purchasers for the business?

9    A.  As I said before, Milestone has been extremely active in

10   the mortgage merger and acquisition environment over the last

11   number of years.  Our co-advisor, Phoenix Capital, has as

12   well, particularly with respect to the sale of mortgage

13   servicing rights, and so, just between the two firms we had a

14   very strong idea of who were the likely both financial

15   purchasers and strategic purchasers of this business and took

16   that industry knowledge and constructed a list of possible

17   acquirers.  In addition to that, once American Home filed for

18   bankruptcy in early August, it became widely known that this

19   asset would be available for sale, and incoming calls began

20   to come into American Home expressing interest about

21   acquiring the servicing business.  Milestone was tasked with

22   handling those inbound calls, and where there was interest

23   for the servicing business, putting those parties on a list

24   of prospective acquirers as well.  And so, I think, we ended

25   up with a list of approximately 60 prospective acquirers of

1   the business.  A little over half of those were what I would

2   call financial buyers, you know, similar to the Ross folks,

3   and then a little under half were strategic buyers or people

4   that were already in the mortgage servicing business.

5   Approximately 25 to 30 of those parties executed

6   confidentiality agreements and received the offering

7   memorandum and then took the next step to begin due diligence

8   of the opportunity.

9   Q.  And were any of those prospective purchasers interested

10  in only portions of the servicing business?

11  A.  Yes.

12  Q.  Did Milestone entertain those -

13  A.  We did.

14  Q.  - expressions as well?

15  A.  Some of the purchasers, a great number, were interested

16  in the entire platform, but some of the prospective

17  purchasers were just interested in buying discrete mortgage

18  servicing rights, and we entertained all areas of interest.

19  Q.  Mr. Weil, what is WLR Recovery Fund III, LP?

20  A.  It is a fund managed by Wilbur Ross and his associates.

21  It's one of a number of large investment funds that Mr. Ross

22  and his associates manage.  They have particular expertise in

23  acquiring businesses that are in some type of financial

24  distress, that need to be restructured either through in-

25  court bankruptcy or out of court.  I believe their funds have

1    invested in a great number of industries but all with a

2    common theme of industries that are in transition or

3    distress.

4    Q.  And when did WLR contact the company to express a

5    purchase interest in this business?

6    A.  Well, the WLR Fund that you just mentioned is also the

7    debtor in possession for the debtor and so, early on, had

8    familiarity with the debtors' various businesses.  After

9    structuring the DIP, they had indicated that they were

10   interested in looking at assets that were to be sold as part

11   of the bankruptcy, and so, they were put on the list of

12   prospective acquirers of the servicing business, signed a

13   confidentiality agreement, received the offering memoranda

14   just like other prospective bidders sometime around the

15   middle of August and that began a series of discussions that

16   lead to their interest in becoming a stalking horse bidder

17   and ultimately the purchaser of this asset.

18   Q.  You mentioned that WLR was involved in providing DIP

19   financing for the company.  Were the assets of the servicing

20   business collateral for the DIP facility?

21   A.  They were not.

22   Q.  Okay.  And once WLR contacted the company and began its

23   discussions, did Milestone, the company, continue discussions

24   with other prospective purchasers?

25   A.  We did.  We had an active dialogue with a fair number of

1   prospective purchasers.  Really, kind of late August and

2   early September, there were a number of parties that

3   continued to perform various stages of due diligence on the

4   servicing business both with respect to in-person meetings,

5   visits to the servicing platform in Dallas, and ongoing

6   dialogue both with the outside advisors, like Milestone, as

7   well as the management team at the servicing business.

8   Q.  Did you have personal involvement in the negotiation of

9   the APA with the WLR affiliate AH Mortgage Acquisition Co.?

10  A.  Yes, I did.

11  Q.  And could you briefly describe the negotiations with WLR

12  that led to the execution of the APA?

13  A.  Sure.  As I said, I guess, beginning in mid-August, WLR

14  started to focus more and more on the opportunity to acquire

15  the servicing business.  That led to a fairly constant set of

16  discussions late in August to early September.  During that

17  time, WLR had indicated that they were interested in becoming

18  the stalking horse bidder and put forth a proposal both with

19  respect to structure and with respect to valuation regarding

20  a purchase of the servicing business.  That proposal, which

21  was negotiated back and forth, led to further negotiations

22  the second week of September into the third week of September

23  that became very concerted over the documents themselves,

24  over the APA and the related documents culminating, I guess,

25  in a series of almost constant negotiations the third week of

1  September that both the debtor was involved with, their

2  outside advisors, myself included, and also during that final

3  week of negotiations, both BofA and the Creditors Committee

4  and their advisors were actively involved in the negotiations

5  as well, which led to the finalization of the APA on the 21st

6  of September.

7          MS. MORGAN: Your Honor, may I approach the witness

8  and the Court with a binder of exhibits, not all of which

9  will be used - very few of which will be used by this

10 witness?

11          THE COURT: Fine, yes.  Thank you.

12 BY MS. MORGAN:

13 Q.  Mr. Weil, would you turn to number 105 in that binder.

14 A.  Okay.

15 Q.  Could you identify that document?

16 A.  Yes.  This is the asset purchase agreement by and among

17 AH Mortgage Acquisition Co., American Home Mortgage

18 Investment Corp., American Home Mortgage Corp., and American

19 Home Mortgage Servicing, Inc., dated as of September 25th,

20 2007.

21 Q.  And that's the transaction that we're seeking court

22 approval of today.

23 A.  That's correct.

24 Q.  Okay.  Describe in general the nature of the transaction

25 that's contemplated by the APA.

1   A.  In the APA, AH Mortgage Acquisition Co., which is the

2   affiliate of WL Ross that would be actually making the

3   acquisition, is acquiring the servicing business of American

4   Home through an asset sale, asset purchase.  In connection

5   with that asset purchase, AH Mortgage Acquisition Co. is

6   essentially purchasing three buckets of assets, if you will,

7   the platform itself, so the physical location, the equipment,

8   the technology, and the processes that are used by American

9   Home to conduct their servicing business.  Second, the

10  advances that are related to the servicing rights, and then,

11  third, the mortgage servicing rights themselves.  In addition

12  to purchasing these assets, the purchaser is doing a couple

13  of other things.  It's assuming certain specific liability to

14  the company as well as hiring substantially all the employees

15  of the company.

16  Q.  The structure of the transaction provides for a two-

17  tiered closing.  Can you describe why that is necessary or

18  what that's provided for in the APA?

19  A.  Yes.  What the APA provides for is an initial or economic

20  closing that would take place sometime at the end of this

21  month or early next month whereby the Ross affiliate would

22  take on all of the economic benefits and burdens of owning

23  the American Home servicing business.  The second closing,

24  which would be a final or a legal closing, would take place

25  sometime in the future after the WL Ross affiliate obtained

1   all of its necessary licenses and that legal closing would

2   occur most likely six to ten months from the initial closing.

3   The reason that it was structured as such is because

4   currently AH Mortgage Acquisition Co., the purchaser, is not

5   licensed to conduct the servicing business that American Home

6   conducts today.  It needs various state license as well as

7   other prospective licenses that it may need to conduct its

8   business.  It takes time to apply for and receive those

9   licenses.  It's not particularly burdensome, but it does take

10  time.  So, in light of that, we wanted to structure a deal

11  that gave the estate as quick of an economic benefit as

12  possible.  Again, because this is a declining asset and

13  because there's other pressures within the mortgage industry

14  today, we felt that it was important to shift that burden as

15  quickly to a purchaser as possible, and because the Ross

16  affiliate couldn't do one close quickly, we elected to

17  construct this two-step closing process.  But I think it's

18  important to note that the document has been designed at the

19  initial closing to take into account all profits and losses

20  for the benefit of the Ross affiliate forward.  So, after the

21  initial closing, while the business will still be legally

22  owned by American Home, the debtor, it will be operated on

23  behalf of the purchaser until the final closing.

24  Q.  Mr. Weil, as part of the sale order, the debtors are

25  seeking authority to grant certain liens for the purchaser's

1   benefit after the initial closing.  Why is that being sought?

2   A.  First, I want to make it clear there are no financing

3   contingencies as part of this acquisition by the Ross

4   affiliate.  What the Ross affiliate has made us aware of,

5   however, is the fact that after the initial close, so after

6   the sale hearing, after the transaction's been approved, and

7   after the initial closing has occurred and all the

8   consideration has been paid to the estate or BofA, as the

9   administrative agent, they do intend in the future to put

10  some type of financing on this business.  In light of that,

11  they had asked for the ability post-initial closing to be

12  able to put liens on effectively the collateral that they

13  purchased at the initial close, and so that's what is

14  occurring under the agreement.  Subject to the Court's

15  approval, they've got the right to put those liens on

16  collateral that they in essence, while they don't own from a

17  legal standpoint yet, they paid for in full.

18  Q.  So, the liens would only come into place after that

19  purchase price was paid.

20  A.  That's correct.

21  Q.  Okay.  What are what has been defined as the purchased

22  assets under the APA?

23  A.  As I started to say before, there are really three

24  buckets of assets.  The first is the actual platform that

25  operates the servicing business.  It's comprised of the

1  servicing business's facilities down in Irving, Texas, the

2  equipment that the business uses, the technology that the

3  business uses, all of the intellectual property rights that

4  go into conducting the business, together with the people

5  that actually populate the business and provide the

6  servicing.  The second asset are the servicing rights

7  themselves, the right to provide the servicing on the

8  underlying mortgages, together with the right to receive

9  servicing fees and other ancillary fees, and then the third

10 asset that the Ross affiliate is acquiring are the related

11 advances that are part and parcel to those servicing rights.

12 Q.  Where in the APA is the purchase price explained for each

13 of those buckets of assets?

14 A.  It's in Article IV, Section 4.1.

15 Q.  And starting with the platform, what is the purchase

16 price for the platform?

17 A.  Six million dollars.

18 Q.  Okay.  And how about the advances?

19 A.  What the purchaser is paying for the advances is 92

20 percent of the net advances at the time of the initial close.

21 Q.  And what is the debtors' estimate for how much of the

22 advances will be purchased at closing?

23 A.  Those advances move up and down throughout the month, any

24 particular month.  Our estimate currently is that the net

25 advances at the initial close should be somewhere in the

1  neighborhood of a hundred million dollars.

2  Q.  And does that assume a closing in the next - initial

3  closing in the next few weeks?

4  A.  Yes.  The end of October, you know, very early November.

5  Q.  And how is the -

6          THE COURT: So - I'm sorry.

7          MS. MORGAN: I'm sorry.

8          THE COURT: So, is it 92 percent of a hundred

9  million or is the hundred million 92 percent?

10          THE WITNESS: No, Your Honor, 92 percent of a

11  hundred million or $92 million, approximately.

12  BY MS. MORGAN:

13  Q.  How is the purchase price for the mortgage servicing

14  rights calculated?

15  A.  It is calculated under a formula that provides for a

16  purchase price of 90 bases points on the unpaid principal

17  balance or UPB up to 38 billion.  From 38 billion to 41

18  billion, there's an escalating scale that goes from 90 bases

19  points to 92 bases points, and then above 41 billion of UPB,

20  it's 92 bases points.

21  Q.  And is the 38 billion a minimum delivery requirement

22  under the APA?

23  A.  Yes, it is.  There's a provision in the closing

24  conditions.  I believe it's Section 8.3 that requires the

25  debtor to provide at least 38 billion of UPB to the purchaser

1   at the initial closing.

2   Q.  Are you generally familiar with Schedule 1.1(J) to the

3   APA?

4   A.  Yes, I am.

5   Q.  What's the purpose of that schedule?

6   A.  Schedule 1.1(J) sets forth the various servicing

7   agreements that contain the servicing rights which the

8   purchaser is actually acquiring under the APA.

9   Q.  And does the APA contemplate that all of the debtors'

10  mortgage servicing rights are being transferred under this

11  document?

12  A.  No, it does not.

13  Q.  What types of mortgage servicing rights are not included?

14  A.  There essentially are three types of servicing rights

15  that may not be included in the purchase, and those are as

16  follows: Under the agreement, there's a concept of disputed

17  servicing rights which relate to servicing rights under

18  servicing agreements that are in dispute that arguably were

19  terminated prior to the bankruptcy filing, and as such, the

20  purchaser is actually paying the purchase price for those

21  disputed servicing rights into escrow, and so they will

22  actually pay that part of the purchase price into escrow

23  until those are resolved.  Once they're resolved, they'll

24  either become purchase assets or excluded assets, but for

25  purposes of the $38 billion minimum, they will not count

 1    toward the 38 billion.  The second pool of assets that may or

 2    may not be included in the purchase are servicing rights that

 3    are held for sale, and those are set forth, I believe, on

 4    Schedule 6.1(A), and what we did there is we took certain

 5    servicing rights that we wanted to preserve to potentially

 6    sell to third parties at higher prices than the purchaser is

 7    paying under the APA and have the opportunity if we were able

 8    to achieve the $38 billion minimum without the servicing

 9    rights to sell those to a third party.  So, those particular

10    rights that would be carved out of the deal prior to the

11    initial closing would not obviously count toward the 38

12    billion, and the purchaser wouldn't be paying for those, but

13    it's at the debtors' election.  So, today, they're included

14    until they're specifically excluded.  The third bucket of

15    servicing rights that are not included are servicing rights

16    that are excluded assets and these typically are servicing

17    rights that either are interim servicing rights that will be

18    quickly transferred off of the servicing platform because the

19    underlying mortgages were sold to somebody else or the

20    servicing rights were sold to somebody else or servicing

21    rights related to assets in the debtors' warehouse or other

22    financing arrangements.  So, kind of short term assets that

23    the purchaser would not be paying for, and they would be

24    excluded.  We do have a provision, however, for the purchaser

25    to service those assets going forward, just not the only

1    underlying servicing rights.

2    Q.  In addition to those three pools, and I assume you heard

3    the statements earlier in the courtroom, there's been another

4    pool of loans excluded, and that's the HELOC loans; is that

5    correct?

6    A.  That is correct.

7    Q.  Okay.

8    A.  And so, really, there's two other assets that were sort

9    of part of these pools that now have changed their status, if

10   you will.  One is the HELOC loans which based on the

11   agreement, I believe, that was reached today, would be

12   excluded assets, but would continue to be serviced for the

13   time being by the debtor and ultimately the purchaser.  The

14   second set of assets revolves around the Fannie Mae

15   servicing, and, as a result of the stipulation and the

16   agreement that was reached and the purchaser getting

17   contingent Fannie Mae approval or conditional Fannie Mae

18   approval, those Fannie Mae-related servicing rights had been

19   both on the disputed servicing agreement schedule as well on

20   the schedule of servicing rights available for sale.  I

21   believe that will now be off of both of those schedules and

22   the Fannie Mae servicing rights will be a purchased asset

23   under the APA.

24   Q.  And approximately how much in unpaid principal balance is

25   comprised by the Fannie Mae portfolio?

1   A.   It's approximately 5.2 billion of UPB.

2   Q.   Again, assuming an initial closing in the next couple of

3   weeks, what is the debtors' best estimate of the unpaid

4   principal balance to be delivered at closing to Ross or to

5   WLR?

6   A.   Yeah, now that the Fannie Mae portfolio will be included,

7   our estimate is that the final UPB should be somewhere

8   between 40 billion and 44.5 billion.  Again, depending on

9   what happens with these servicing rights that are available

10  for sale under Article 6.1.

11  Q.   And so how does that translate into purchase price if the

12  mortgage servicing rights are in that range of 40 to 44 ½

13  billion?

14  A.   The associated value of the servicing rights based on

15  that range of 40 to 44.5 billion should be between 360

16  million and 400 million, again, just for the MSRs.

17  Q.   And then you would add to that the 92 million in advances

18  and the 6 for the platform.

19  A.   That's correct.

20  Q.   Okay.

21  A.   And so, my estimate is, given where we are on the unpaid

22  principal balance, that the total purchase price, I believe,

23  will be somewhere between 460 million and $500 million.

24  Q.   In addition to the anticipated cash purchase price, does

25  the transaction provide any other benefits for the debtors?

1  A.  It does.  As I mentioned before, there are some nice

2  intangibles that accompany the cash consideration and the

3  transaction.  One is because the purchaser is acquiring a

4  platform and taking on certain contractual lease and vendor

5  arrangements, those are all potential claims that might have

6  come into the estate as unsecured claims that will not as a

7  result of the purchase, and probably most importantly, as I

8  mentioned, the purchaser has agreed to hire substantially all

9  the employees of the debtors' servicing business, and that

10  also will take away a potentially large claim on the

11  bankruptcy estate that we now don't have to deal with.

12  Q.  As a whole, would you characterize the purchase price as

13  a fair price for these assets?

14  A.  Actually more than a fair price.  I think it's a

15  particularly good price for these assets, and I think the

16  process that we went through, including the ability to

17  receive proposals from third parties, have underscored just

18  how good of a purchase price this is.

19  Q.  And the negotiation of the CPA, including the purchase

20  price, in your view, was it conducted at arm's length and in

21  good faith?

22  A.  Yes, it was.

23  Q.  Mr. Weil, are you familiar with the revised bidding

24  procedures approved by the Court on September 25th?

25  A.  Yes, I am.

1   Q.  In fact, you testified in support of them; is that right?

2   A.  I did.

3   Q.  Okay.  After that hearing, what did you and Milestone and

4   Phoenix do to continue marketing the purchased assets?

5   A.  Following the hearing on the 25th, we distributed a new

6   set of materials to prospective bidders that included a very

7   detailed process letter that explained to prospective buyers

8   what was going on in the case, what the opportunity continued

9   to be, and effectively, you know, what the revised bidding

10  procedures outlined.  We included with those materials a bid

11  matrix that we asked prospective acquirers to fill out as

12  part of their bid as well as this APA for their consideration

13  and markup.  Following the distribution of these materials,

14  we continued to have very numerous phone calls with probably

15  10 or 12 prospective bidders.  We met in person with a number

16  of these prospective bidders.  These prospective bidders

17  continued to conduct and finalize their due diligence

18  including additional visits to the debtors' servicing

19  business in Irving and telephone conversations and meetings

20  with the senior management team that lasted all the way

21  through the bid date.

22  Q.  And did the revised bidding procedures permit the company

23  to solicit bids for portions of the assets?

24  A.  It did.

25  Q.  And did the company entertain any such expressions of

1   interest after the receipt of the WLR proposal?

2   A.  We did.  In fact a number of the parties that we

3   continued to talk to expressed interest in just a part of the

4   servicing rights or a component part of the servicing rights,

5   and in fact, the bids that we received on October 2nd were

6   both bids for part of the servicing rights portfolio but not

7   the whole thing.

8   Q.  October 7 was the bid deadline under the procedures?

9   A.  Yes, it was.

10  Q.  Okay.  So you received bids that were for a partial

11  portion of the assets.  How did the company evaluate those

12  bids in comparison to the Ross bid?

13  A.  We received two bids for, as I said, part of the

14  servicing rights portfolio.  It actually turned out that both

15  of those bids were for almost an identical set of assets.

16  What we had hoped for was that if bids were going to come in

17  for partial components of the servicing portfolio that they

18  would allow us to combine them so that they ultimately would

19  be for all or substantially all of the servicing rights that

20  were available for sale.  It turned out not to be the case.

21  So once we received these two bids, we continued to discuss

22  issues related to those bids with the bidders, namely that

23  they were not for all or substantially all of the assets that

24  were being sold and inquired on whether they would be able to

25  expand their bid and actually take on more of these servicing

1   rights.

2   Q.  And what was their reaction?

3   A.  You know, I think they thought about it, and in fact, one

4   of the two parties was trying to get there and even contacted

5   a third party that actually hadn't bid, but they thought they

6   had a third party that might come in for additional

7   components of the servicing rights.  That did not

8   materialize, and so, at the end of the day we were left with

9   two bids, neither of which, again, was for all or

10  substantially all the assets.

11  Q.  And after consulting with BofA and the Committee about

12  those bids, what was the debtors' determination as to whether

13  those were qualified bids and whether an auction should be

14  conducted?

15  A.  We spent a lot of time going through the process and the

16  bids both with BofA and the Creditors Committee and

17  ultimately made a determination that while these were

18  qualified bids, so to speak, because they did not constitute

19  a bid for all or substantially all the assets, they did not

20  allow us to select these bids as a competing transaction.

21  And as a result of that, both that fact and for the fact that

22  even the bids themselves were lower in value for the

23  particular assets than the Ross bid and the APA provided for

24  made a determination to cancel the auction and move forward

25  with the Ross bid as the highest or better bid that was

1    received.

2    Q.   And the auction was then canceled?

3    A.   Yes, it was.

4    Q.   Has the APA been modified or have there been discussions

5    with respect to any modification to the APA between the time

6    of its execution and today?

7    A.   Yes, I believe there's been one amendment thus far.

8    Q.   And are you familiar with the nature of that amendment?

9    A.   I am.

10   Q.   And could you explain it to the Court.

11   A.   Yeah, the amendment that has been agreed to of the APA

12   really is more of a clarification and kind of underscoring

13   something that had already in my view been provided for in

14   the agreement, and it really revolves around a question that

15   had come up from some of the objecting parties concerning the

16   responsibilities of the purchaser following the final close.

17   You know, in the event there were certain underlying

18   mortgages that were in foreclosure or other sorts of

19   processes that were kind of ongoing in the servicing

20   business, I think everybody wanted to just make it very clear

21   that the purchaser was taking on those obligations going

22   forward, and so, the amendment really clarifies that

23   underlying principle that, as I said, arguably was already in

24   the APA.

25   Q.   If the Court does not approve the sale of the servicing

1    business pursuant to the APA, what alternatives are available

2    to the company for the sale of this business?

3    A.   Not any particularly good ones.  As I said a number of

4    times, this is an asset that continues to decline in size

5    and, therefore, in value.  We've gone through a very

6    concerted sales process, and it ended up where we are here

7    today.  In the event this transaction is not approved and

8    we're forced to go out and, you know, resell and re-auction

9    the business, obviously we're able to do that, and I believe

10   there are people out there, entities out there that will look

11   at the asset, if not in whole, certainly in part, but I

12   believe it will be at a value substantially less than what

13   we're achieving in this sale.

14         MS. MORGAN: Your Honor, I have no further questions

15   at this time.

16         THE COURT: Thank you.  Any questions by anyone in

17   favor of the motion for this witness?  Hearing none, any

18   cross-examination by any objectors.  You may approach.  Good

19   afternoon.

20         MR. KUNEY: Good afternoon, Your Honor.  David

21   Kuney, Sidley Austin, representing EMC.

22         THE COURT: EMC, sir?

23         MR. KUNEY: Yes, Your Honor.

24         THE COURT: You may proceed.

25                         CROSS-EXAMINATION

1   BY MR. KUNEY:

2   Q.  Mr. Weil, good afternoon.

3   A.  Good afternoon.

4   Q.  Are you familiar with the fact that there's an agreement

5   dated March 1st, 2006 that is listed as one of the agreements

6   that is included on the list of assets to be sold?

7   A.  I have a general understanding of the agreements that are

8   scheduled in the APA.  I don't know that I'm particularly

9   familiar with that agreement, but I can look and see if it's

10  on Schedule 1.1(J).

11  Q.  Okay.  Could you look at 1.1(J).  I will stipulate to

12  speed things up that it is one of the contracts, but if you'd

13  like to confirm that, please go ahead and do so.  If the

14  pages were numbered, I'd give it to you, but I think they're

15  unnumbered in that exhibit.

16  A.  I believe Schedule 1.1(J) has identifiers on it, and if

17  you can -

18           MR. KUNEY: Your Honor, I call it cd,(cd).

19           THE COURT: CD?

20           MR. KUNEY: Yes, Your Honor.

21           THE COURT: Okay.

22           THE WITNESS: Okay.

23  BY MR. KUNEY:

24  Q.  Have you found it?

25  A.  I have.

1    Q.  All right, and it is listed, is it not, on Schedule

2    1.1(J) as one of the contracts, one of the servicing rights

3    the debtor intends to sell?

4    A.  That's correct.

5    Q.  Now, there's also an annotation, I believe, about this is

6    - there's an asterisk about servicing rights held for sale;

7    is that correct?

8    A.  That is also correct.

9    Q.  So that just to set the stage, if I understand this,

10   that, you mentioned that there were three, now four buckets

11   of assets that are being sold.  On my client's contract, the

12   EMC contract, that's one where the debtor has certain rights;

13   does it not?  To go back to the purchaser and designate this

14   contract as one that it intends to sell to another party?

15   A.  Well, actually, the way the APA provides for this

16   particular servicing right is, as of today, it is included in

17   the sale to the purchaser.

18   Q.  Right.

19   A.  And what the APA provides for is the right of the debtor

20   to elect to remove this agreement as part of the rights it is

21   selling to the purchaser, but as constructed today, it is a

22   purchased asset.

23   Q.  Right.  And the right that the debtor has to remove it

24   under the terms of the document that you worked on, is until

25   any sale order that this Court might enter becomes what's

1   called a final order; is that correct?

2   A.  Actually, no.  I believe - Is it okay to go to a

3   provision in the agreement, Your Honor?

4           THE COURT: If Mr. Kuney doesn't object.

5           MR. KUNEY: Your Honor, I don't object.  I would

6   like to hear his answer.  I think he's incorrect, but let's

7   find out.

8           THE WITNESS: This is provided for, I believe, in

9   Section 6.1 -

10  BY MR. KUNEY:

11  Q.  Correct.

12  A.   - of the agreement.

13  Q.  Let me suggest the following and then you tell me if I'm

14  wrong, just to move it along.  Under 6.1 which I think is the

15  section that you're looking at.

16  A.  6.1(A).

17  Q.  6.1(A).  The debtors can deliver a notice to the

18  purchaser describing that these servicing rights - which

19  servicing rights if any they intend to remove from the list;

20  is that correct?

21  A.  Yeah.  So my reading of 6.1(A) says that prior to the

22  initial closing date, which I think is the applicable timing

23  here not the sale hearing -

24  Q.  Right, okay, so the -

25  A.  Prior to the initial closing date, the sellers may

1   deliver a written notice to the purchaser describing which

2   servicing rights set forth on Schedule 6.1(A), which this

3   particular agreement is, sellers intend to sell to third

4   parties.

5   Q.  So, if I'm correct then, that until the initial closing

6   date the debtors would have the right to go to - I'm going to

7   say to Mr Ross or his entity and remove the EMC contract;

8   would they not?

9   A.  Yes, they would.

10  Q.  And the initial closing date is defined on page 21,

11  Section 2.7; is it not?

12  A.  I'm sorry, tell me the page again?

13  Q.  I believe it's page 21.

14  A.  Yes, it is.

15  Q.  All right.  And the initial closing date occurs when all

16  of the conditions in Section 8.1 through 8.3 are satisfied;

17  does it not?

18  A.  That's correct.

19  Q.  And one of the conditions is that there be a final sale

20  order as defined on page 7 of the APA; is that correct?

21  A.  I believe that is also correct.

22  Q.  So that if any party to this proceeding or otherwise

23  files a notice of appeal should the Court enter a sale order,

24  that the debtor would have until all those appeals were

25  resolved to remove from the list of sold assets any contract

1   that had been designated as subject to the sale right.

2           MS. MORGAN: Objection, Your Honor.  It calls for a

3   legal conclusion.

4           MR. KUNEY: I'm just trying for his understanding

5   of, as the draft person, how he understands the mechanics

6   will work.  It's just his understanding.

7           THE COURT: Well, I think your question went beyond

8   that, sir.  I think you asked him, you know, what effect an

9   appeal would have on whether or not it was a final order of

10  the Court, and I think that goes beyond his understanding as

11  to a legal conclusion.  So objection's sustained.  You may

12  rephrase if you -

13          MR. KUNEY: I will, thank you, Your Honor.

14  BY MR. KUNEY:

15  Q.  Mr. Weil, do you have an understanding as to how long the

16  debtors have with respect to any filed appeals to remove a

17  contract from the list of assets sold?

18  A.  I do not have a good understanding of the appeals process

19  that's available here.  I do know there are certain dates set

20  forth in the agreement that are required to be met, but I

21  can't really speak to the appeals process.

22  Q.  Do you know, just as a general business matter, was it

23  contemplated that the debtor would have until all appeals

24  were final in order to remove a contract from the sales list?

25  A.  In negotiating and preparing the APA, I was a member of a

1   team that really worked on the transaction, negotiating and

2   documenting the transaction, and it involved myself, other

3   representatives of American Home, the debtor, as well as

4   legal counsel.  I personally don't recall a discussion about

5   the impact of an appeal on the final order, but there may be

6   others that were part of the drafting that do.

7   Q.  All right.  Is it true that the face amount, roughly of

8   the mortgages under EMC contract, is 1.2 billion?

9   A.  I believe that's correct, yes.

10  Q.  And the minimum amount that Mr. Ross has to receive in

11  order to go forward is 38 billion?

12  A.  Correct.  That is the minimum in order to meet the

13  closing condition.  I think his hope is and the purchaser's,

14  I think, objective is to try to buy more servicing rights

15  than that, but the debtor is able to go ahead and close if

16  it's 38 or more.

17  Q.  All right, and right now, your best estimate is you have

18  anywhere from 40 and 44.5 billion; is that correct?

19  A.  That's correct.  Again, because of the Fannie Mae

20  resolution.

21  Q.  So, for example, if the Court rules that the EMC contract

22  terminated as a matter of law, if that ruling should happen,

23  and this contract was excluded, as far as you know today, Mr.

24  Ross would still go forward with this contract?

25          MS. MORGAN: Objection, Your Honor, calls for

1   speculation.

2   BY MR. KUNEY:

3   Q.  Well, as far as you know, the minimum amount would still

4   be met in terms of purchased mortgages.

5        MS. MORGAN: Your Honor, I think it still calls for

6   speculation.

7        THE COURT: I don't believe so.  I think it calls

8   for simple math, overruled.

9        THE WITNESS: I agree, Your Honor.

10       THE COURT: Is 40 billion minus 1.1 billion more

11   than 38 billion?

12       THE WITNESS: Yes, it is.

13       MR. KUNEY: Your Honor, sometimes it's hard to get a

14   witness to say even that.  Thank you, Mr. Weil.

15   BY MR. KUNEY:

16   Q.  Let me go back, if I might, to when you first started

17   your assignment.  When you set up - or at the outset, when

18   you set up your data room, was this assignment initially

19   stated to you to be an effort to get purchasers to assume -

20   to take an - excuse me, let me back up and restate that.  Did

21   the debtor initially indicate to you they intended to assume

22   and then assign the servicing rights under Bankruptcy Code

23   § 365?  Did you have any such initial discussions with the

24   debtor?

25   A.  I personally did not.  I mean, this was always set up to

1  be, as I mentioned before, a sale of these three buckets of

2  assets: the servicing rights, the advances, and ideally, the

3  platform.  I mean, we had a number of prospective buyers that

4  were not interested in the platform, but certain - like the

5  Ross affiliate that were.

6  Q.  But am I correct that in the notices that the debtor sent

7  out, some of those notices included what is called a cure

8  amount.  Are you familiar with what that term means

9  generally?

10  A.  Generally, I am, yes.

11  Q.  And did you participate in any discussions about how or

12  what the cure amounts would be?

13  A.  Yes, I did.

14  Q.  And did you understand that to be something that's only

15  required if there's an assumption and assignment under § 365?

16  A.  My understanding, really - I'm not really sure it related

17  to a particular section of the Bankruptcy Code.  I think the

18  discussions that I've been involved in regarding cure amounts

19  and the need for cure payments, primarily involved vendor

20  type contracts.

21  Q.  Well, let's just talk about servicing.  Did somebody

22  bring to your attention that in order to proceed on this

23  transaction, you or your team had to help determine the

24  amount that was required to cure any defaults under the

25  servicing agreements?

1  A.  There were numerous discussions regarding cure amounts.

2  As I said before, the negotiation and documentation of the

3  APA really was a team effort.  I, myself, and other members

4  of my investment banking team were not the members of this

5  sort of global team that were working on the transaction that

6  dealt with a determination of cure amounts.  There were a

7  number of representatives of American Home, both from a

8  corporate standpoint and with respect to the senior

9  management of the servicing business, that worked on

10  determining those cure amounts.

11  Q.  Excuse me, would that be Mr. Love who worked on the cure

12  amounts as far as you know?

13  A.  I believe Mr. Love was involved in that.  It also - there

14  were a number of outside counsel that looked at these

15  agreements as well.

16  Q.  As a business matter, as a business term, does the APA

17  provide that part of the purchase price is to be allocated to

18  what are called cure amounts?

19  A.  There is a provision in the APA that provides an escrow

20  for cure payments and a mechanism that holds those cure

21  payments until they're resolved.  As I said, in the drafting

22  of the APA and in constructing this mechanism to handle cure

23  amounts, it was my understanding that it was primarily and

24  almost exclusively there to deal with vendor -

25  Q.  But what - Excuse me.  What investigation if any did you

1   make as the investment banking firm as to whether or not

2   under the servicing agreements there were any monetary

3   defaults that had to be cured before they could be assumed,

4   assigned, or sold?

5   A.  As part of the investment banking team, we did have

6   discussions with both counsel and internal members at

7   American Home.  We were told numerous times that the team

8   that had been looking at this cure issue in respect of cure

9   amounts that they did not believe that there would be any

10  cure payments necessary to transfer the servicing rights as

11  part of this agreement.

12  Q.  Did your team make any due diligence confirmation of that

13  fact, that there would be no cure amount?

14  A.  Other than, as I said, these numerous discussions with

15  other components of the team that were working on the

16  transaction, I don't believe that we did.

17  Q.  Did your business team determine whether or not under the

18  EMC contract, and just the EMC contract, there was any

19  monetary liability due and owing under what are called the

20  early payment default sections?

21  A.  Again - and I shouldn't say "again", but the EMC

22  agreement, to my knowledge in this transaction, was an

23  agreement that involved both components of American Home as

24  originator as well as American Home as servicer, and I think

25  those are very distinct parties that have distinct

1    responsibilities.

2         MR. KUNEY: Your Honor, I move to strike that as

3    non-responsive.  I only asked him if he examined the contract

4    to see if there's any monetary obligation under an early

5    payment default.  I don't want to have the record with his

6    expert testimony or opinion testimony within it.

7         THE COURT: Ms. Morgan.

8         MS. MORGAN: Well, he asked for his understanding

9    and he gave it.

10        MR. KUNEY: But -

11        THE COURT: Well, he asked whether - No, I'm going

12   to - I'll overrule the objection.  The question was what

13   analysis had been done with regard to liability and early

14   payment default sections, and I think the witness's response

15   was he considered that not to be a servicing-related issue.

16   BY MR. KUNEY:

17   Q.  Right.  Did you consider that to be an obligation of the

18   company as that term is used in the EMC agreement?

19   A.  I was aware that there were claims from EPDs related to

20   the company, if you will, as the originator.

21   Q.  Well, without debating whether the contracts are one or

22   two contracts, just as a matter of facts for the Court's

23   clarity and understanding, would you at least agree that

24   under the contract where the servicing rights are located,

25   the EMC contract, there is a monetary liability that needs to

1    be calculated with respect to the early payment defaults?

2              MS. MORGAN: Your Honor, objection.  No foundation

3    for this witness for this question, and it calls for a legal

4    conclusion.

5              THE COURT: Say more about no foundation.  Why isn't

6    there a foundation laid here?

7              MS. MORGAN: Your Honor, this isn't the witness that

8    is testifying about this aspect of - he doesn't have

9    familiarity with this individual contract.  He was not

10   responsible.  There were others on the team that were

11   discussing cures as well as obligations, if any, under the

12   several contracts.

13             THE COURT: All right.  I'll overrule the foundation

14   aspect.  What was the other aspect, Ms. Morgan?

15             MS. MORGAN: I don't remember.

16             MR. KUNEY: That's an easy issue to overrule.

17             THE COURT: Legal conclusion.  No, I don't think it

18   calls for a legal conclusion.  It's overruled as well.  You

19   can respond.

20             THE WITNESS: As I said before, I had general

21   familiarity with this agreement.  I did understand that there

22   was a pending EPD matter between Bear Stearns or EMC and

23   American Home.  You know, my understanding was that this

24   related, as is typical in the industry, to the origination of

25   the loans not the servicing rights.

1   BY MR. KUNEY:

2   Q.  Right.  So your understanding was, as you understood it,

3   there's no relationship between failure to pay the early

4   payment default obligation and any servicing obligation or

5   right.  Is that what you understood?

6   A.  My understanding was that we would, as part of this

7   transaction, have the ability for the purchaser to acquire

8   the servicing rights and that any obligations that might be

9   owing between the debtor as an originator and counter

10  parties, like Bear Stearns, would remain as part of the

11  debtor.

12  Q.  In fact, there's a term, is there not, in the asset

13  purchase agreement called "retained liabilities".  Are you

14  familiar with that defined term?

15  A.  I am familiar with that.

16  Q.  And am I correct that defined term includes any

17  liabilities that may arise under what are called early

18  payment defaults?

19  A.  If I may go to the definition.  I believe you're correct.

20  But let me just take a look.

21  Q.  Page 13.  I believe it refers to a repurchase obligation

22  to which I will ask you, is it now your understanding that

23  ties into the early payment default?  I'll let you review it.

24  A.  Yes, it is contemplating under retained liabilities.

25  Q.  So just so the factual record is clear, the way this

1    contract is proposed to work, if under the EMC contract, and

2    there's only one physical contract; correct?

3    A.   Again, you know, I see the one that you've pointed me to

4    and 1.1(J), and I don't know that I can sit here and say

5    that's the only contract with Bear or not.

6    Q.   But that's the contract that we're discussing right now.

7    A.   Okay.

8    Q.   If in that contract there isn't a monetary obligation

9    called a repurchase obligation flowing from the non-payment

10   of early payment default liability, this contract provides

11   that is a retained liability, meaning it stays with the

12   debtor; is that correct?

13   A.   I believe that's correct.

14   Q.   So when you testified that Mr. Ross was taking all the

15   economic loss and benefit going forward, whether that's fully

16   accurate or not, he's not taking on any liability that may

17   arise from the early payment default section; is that

18   correct?

19   A.   Mr. Ross, and I think I stated this correctly before, is

20   taking on purchasing certain assets and taking on certain

21   liabilities related to the servicing business of American

22   Home.  This prospective or potential obligation relates to,

23   in my opinion, American Homes' business as originator when

24   the loans were originated and ultimately sold to Bear.  The

25   purchaser is not taking on those prospective obligations as

1   part of this agreement.

2   Q.  So, if the Court later determines that there's a $24

3   million obligation under this one contract, the repurchase

4   obligation, it's clear in your mind Mr. Ross is not taking on

5   that liability; correct?

6   A.  That's correct.

7   Q.  You said you thought in your mind there was no

8   relationship between the non-payment of the repurchase

9   obligation, what you called an origination obligation, and

10  servicing; correct?

11  A.  I'm sorry, can you repeat that?

12  Q.  Yeah, I'll actually try to get more to the point.

13  A.  All right.

14  Q.  In the event that the repurchase obligation is not paid,

15  do you know under the EMC contract whether or not the

16  servicer is entitled to be repaid for what are called

17  "servicing advances"?

18  A.  I would have to look at the agreement.  I don't know

19  offhand.

20  Q.  Are you familiar with the concept of what are called

21  "servicing advances"?

22  A.  Yes, I am.

23  Q.  Are those advances that the servicer makes if a loan goes

24  into default?

25  A.  Well, there's a number of reasons you make servicing

1  advances, one of which might be if the loan is in default and

2  principal and interest are not being paid by the borrower,

3  the servicer might make those advances, yes.

4  Q.  So it's your understanding that if there's a servicing

5  advance that's required to be made between what you call the

6  interim closing and the final or legal closing, is that a

7  monetary obligation of the purchaser under the APA?

8  A.  It is in certain circumstances.  There is a provision in

9  here that provides that the purchaser will acquire the

10  servicing advances, as I said before.  Certain of the

11  advances going forward between the initial close and the

12  final close for certain of the disputed agreements, the

13  excluded agreements, and prospectively the servicing rights

14  held for sale like this is one of those, as we talked about

15  before, those advances between the initial close and the

16  final close would actually be made by the debtor not by the

17  purchaser.

18  Q.  And have you run an economic model to show whether or not

19  the debtor's going to have sufficient capital to fund the

20  servicing advances that will be required during the next

21  eight to ten months while we're waiting for the final or

22  legal closing?

23  A.  Well, we did provide in the agreement for a mechanism

24  either for the debtor to use their available funds to do this

25  or to borrow potentially under the DIP facility to fund

1    these.

2    Q.  Did you do a mathematical calculation of what that number

3    might be?

4    A.  Did I do one?

5    Q.  Yes.

6    A.  Well, we looked at what we believed were the likely

7    advances.  Again, I was not the primary person that looked at

8    what that number might be, but given the small level of net

9    advances that we're talking about with respect to these

10   agreements that the debtor has responsibility for, I believe

11   that the debtor either through other funds or under the DIP

12   facility would have sufficient liquidity to take care of

13   these advances.

14   Q.  I'm sorry, does that mean you ran the numbers or you

15   didn't run the numbers?

16   A.  We discussed - I, my team discussed with senior members

17   of the servicing business's management team what the likely

18   advances would need to be during the interim period under

19   this very discreet amount of advances that might need to be

20   funded by the debtor.  We did not - we, Milestone, did not

21   actually run that analysis, but we're aware of it.

22   Q.  Okay.  So, just to be clear on this one point, and then

23   I'll move on, if the repurchase obligation is not paid and if

24   Mr. Ross makes an application for a reimbursement of

25   servicing advances and that's subordinated until the

1   repurchase is paid, that was not considered in the business

2   transaction, in the negotiation under this APA?

3   A.  I'm not sure I follow your question.  I apologize.

4   Q.  It wasn't as clear as it should have been.  In

5   structuring this deal, I take it neither you nor your counter

6   parties on the other side focused on the fact that if the

7   debtor is left with the repurchase obligation and doesn't pay

8   it because it's in bankruptcy, for example, and if Mr. Ross

9   seeks reimbursement of servicing advances, that entity is not

10  entitled to those reimbursements?

11  A.  I'm still having a hard time with the question.  Again,

12  the advances on - certain of the advances that Mr. Ross is

13  responsible for financing between the initial close and the

14  final close, other of the advances are the responsibilities

15  of the debtor.  So, there's prospectively two different

16  entities funding those advances in that interim period.

17  Q.  On the ones that Mr. Ross - I'm saying "Mr. Ross", I mean

18  his entity, WLR -

19  A.  Yeah, the purchaser.

20  Q.  Just with respect to the purchaser's advances, was there

21  any consideration given to how it would work if the purchaser

22  was not able to be reimbursed for its advances because the

23  debtor, the originator, had failed to make or honor the

24  repurchase obligation?

25  A.  Well, I think there was a mechanism put in place which

1    provided the ability to borrow under the DIP facility to fund

2    these advances.  That mechanism, if you will, was not tied

3    specifically to the debtors' inability or refusal to pay

4    early payment defaults.  It's solely related to the ability

5    to either fund advances that it was required to fund under

6    the APA or to repurchase certain advances that it's required

7    to do under the APA.

8    Q.  Just one final question then on this point.  If this

9    Court rules that the contract, the EMC contract is an

10   executory contract and if the Court rules that all defaults

11   under that contract have to be cured, would you at least

12   agree with me that the contract as currently drafted does not

13   have a provision for paying the repurchase obligation?

14   A.  I'd have to consult with counsel.  I mean, there is a

15   provision, and I apologize for my unfamiliarity with the law.

16   I mean there is a provision that in the event it was

17   determined to be a cure amount that provides for the

18   escrowing of cure amounts.

19   Q.  So that escrow -

20   A.  Outside of that, there is not a provision that would

21   compensate.

22   Q.  So, if there's insufficient money in the escrow account

23   then there will be no payment under an assumption and

24   assignment theory for this cure obligation?  The escrow is

25   intended to be the maximum liability of Mr. Ross; is it not?

1  A.  For cure related matters, right, that's correct.  Other

2  than, I'm sorry, there is a provision in the agreement that

3  provides that it is the purchaser's obligation for cure

4  amounts that would arise for actions between the initial

5  closing and the final closing that would be Mr. Ross's or the

6  purchaser's responsibility.

7  Q.  Well, then, maybe you can answer this: If the Court rules

8  that the sale is under - it's not an assumption and

9  assignment but a sale.  Is it the business understanding that

10  you have that this sale is free and clear of the repurchase

11  obligation or it goes with the assets?

12  A.  My understanding is that the purchaser would be acquiring

13  the servicing rights free and clear of these repurchase

14  obligations.

15  Q.  Now, one final question, I think.  When the EMC contract

16  was put on the schedule of 1.1(J)(cd), were you personally

17  aware that there was a provision that said the contract

18  terminated automatically on the filing of the servicer's

19  bankruptcy?

20  A.  I was not.

21  Q.  In your experience, do you have any knowledge whatsoever

22  of what are called the "protected contracts" under § 555 of

23  the Bankruptcy Code?

24  A.  I do not.

25  Q.  As part of your due diligence, did you make any inquiry

1   of the debtor to say, Are any of these contracts securities

2   contracts that may have terminated as a matter of law?

3   A.   Not particularly, no.

4   Q.   So that issue is simply essentially disregarded in

5   creating a list of contracts to be sold?

6           MS. MORGAN: Objection, Your Honor.  He asked if

7   "he".  He didn't ask whether anyone considered these items.

8           THE COURT: Sustained.

9   BY MR. KUNEY:

10  Q.   Anybody on your team?

11  A.   Again, as I said before, the team broader sense that was

12  working on analyzing the servicing agreements and determining

13  which of these agreements went on which schedules and what

14  issues we might have with - we, the debtor, might have with

15  respect to the agreements was not something that the

16  Milestone team had direct responsibility for.

17  Q.   Just as a matter of ordinary due diligence, why wouldn't

18  an investment banking firm, familiar with the capital

19  markets, ask a debtor, Are any of these contracts, what are

20  called protected contracts under the Bankruptcy Code;

21  wouldn't that be a normal part of your due diligence?

22  A.   Again, part of our diligence was working with counsel,

23  both internal and external counsel, as well as senior members

24  of the management team at the servicing operation and asking

25  them, you know, Are any - Do any of these agreements have

1   provisions that we need to deal with other than we're already

2   dealing with them in the way the agreement is structured?

3   And beyond that, you know, we relied on, on both inside and

4   outside counsel to look at those agreements.

5        MR. KUNEY: Thank you, Your Honor.

6        THE COURT: You're welcome.  Tell you what, we're

7   going to take five minutes.  During the break, since you're

8   under cross-examination, you may not discuss the substance of

9   your testimony with counsel for the debtors; all right?

10       THE WITNESS: Thank you, Your Honor.

11       THE COURT: Just a short break.

12       (Whereupon at 2:45 p.m., a recess was taken in the

13  hearing in this matter.)

14       (Whereupon at 3:59 p.m., the hearing in this matter

15  reconvened and the following proceedings were had:)

16       THE CLERK: All rise.

17       THE COURT: Please be seated.  All right, who's

18  next?  No one?  Is there no further cross-examination of this

19  witness?  There were like five people before the break.  Is

20  Mr. Cleary do that good of a job?

21       MR. McLAUGHLIN: Thank you, Your Honor.

22       THE COURT: You're welcome.

23       MR. McLAUGHLIN: Patrick McLaughlin for US Bank as

24  Trustee.

25                    CROSS-EXAMINATION

Weil - Cross

1   BY MR. McLAUGHLIN:

2   Q.  I have just have - my client is Trustee in connection

3   with some of the transactions that are the subject of the

4   sale agreement.  You're generally aware of that?

5   A.  Yes, I am.

6   Q.  I just wanted to ask a few follow-up questions with

7   respect to the matter of servicing advances.  Are you aware

8   that in a number of these transactions, the servicer is

9   obligated to make advances for, say, taxes and insurance to

10  the extent that a borrower's escrow account is insufficient

11  to pay taxes and insurance when due?

12  A.  Yes, I am.

13  Q.  And in connection with your due diligence in evaluating

14  this purchaser, did you have occasion to consider or examine

15  the financial capacity of the purchaser to make those

16  servicing advances?

17  A.  We did.  Obviously the purchaser in this matter is a new

18  entity.

19  Q.  Yes.

20  A.  And effectively needs to be capitalized prior to making

21  the acquisition as well as having liquidity available, if

22  necessary, to fund advances and deal with other working

23  capital needs going forward.  The affiliate of the purchaser,

24  WL Ross and their related funds, have more than sufficient

25  equity to capitalize the business for the entire amount of

1    the purchase price which is in fact what it said it plans to

2    do.  They've also said that they plan to make available to

3    the purchaser working capital lines that would be sufficient

4    to fund any necessary advances that were required to be

5    funded by third parties as well as to provide the working

6    capital, and in my view, given who the purchaser is, the

7    affiliate to the purchaser being the WL Ross recovery funds,

8    I think it's several funds, they do have sufficient capital

9    to do that.

10   Q.  And generally speaking, are you aware of what the average

11   outstanding un-reimbursed servicing advance balance for the

12   debtor was in the year prior to filing the bankruptcy?

13   A.  I don't know that I'm aware of it in the year prior to

14   filing, but around the filing and since the filing, I am

15   quite aware of what that net advance would be, because

16   there's a concept of a gross advance and then a net advance.

17   Q.  What do you understand to be a gross advance?

18   A.  The gross advance are the amount of advances that are

19   necessary under the principal and interest component of the

20   advances.  Early repayment or prepayment of loans, the

21   amounts that come in to a particular account for a particular

22   investor are used to themselves fund the advances, and so

23   there is a netting effect between the gross P&I advances -

24   excuse me, amounts that come in, in the normal course of the

25   business, that are used to then net against that amount.

1    Q.   So in a number of these transactions then it is the

2    servicer's obligation not only to advance taxes and insurance

3    in the event that an individual borrower hasn't paid that,

4    but also put principal and interest on that loan?

5    A.   That's correct.

6    Q.   And that's a gross advance that's netted against an early

7    payment?

8    A.   Yeah, against prepayments and other payments that come

9    into the same account.

10   Q.   Do the tax and insurance advances that a servicer is

11   obligated to make also net against the early payment?

12   A.   I don't believe that they do.

13   Q.   So what is - what's your general understanding of the

14   total amount outstanding and un-reimbursed for principal and

15   interest and tax and insurance advances say on the eve of

16   bankruptcy?

17   A.   You know, my recollection is that that number was

18   somewhere in the 50 or $60 million range, but I really don't

19   recall exactly what it was.

20   Q.   So a servicer would have to have a liquidity capacity in

21   the range of 50 to 60 to $70,000 because it might be out that

22   much at any given point in time; right?   In terms of

23   advances.

24   A.   Yeah.   It's millions of dollars.

25   Q.   Yes.

1   A.   And as I testified to before, that net amount on the date

2   that we provided the schedules or prepared the schedules to

3   the APA for the MSRs that are available to be purchased by

4   the Ross affiliate was somewhere in the neighborhood of 81 or

5   82 million.  I testified before that I thought the total net

6   amount that would need to be purchased by the purchaser at

7   the initial close would be somewhere in the neighborhood of

8   $100 million, and again, some of that is for the purchased

9   assets and some of that is for the - either the excluded

10  assets or the rights available for sale or the disputed

11  servicing rights.

12  Q.   Now, in connection with the contemplated sale, the

13  purchaser then is assuming all obligations and servicing

14  agreements to make advances for principal, interest, taxes,

15  and insurance; is that right?

16  A.   Again, with respect to the servicing rights that are

17  being acquired by the purchaser -

18  Q.   Yes.

19  A.   - they are taking on the related obligations to fund

20  those servicing advances.  With respect to certain other

21  advances that they're acquiring at the initial close, you

22  know, for those other three buckets that I mentioned before,

23  the ongoing obligation to fund those advances is being

24  retained by the debtor.

25  Q.   But with respect to those matters in which it is assuming

Weil - Cross

1   the obligation to make servicing advances, is the purchaser

2   also then succeeding to the servicer's rights to be

3   reimbursed for those servicing advances that it makes?

4   A.  Yes, it is.

5   Q.  Is it also succeeding to any limitations on the right to

6   be reimbursed for servicing advances made, say, limitations

7   pertaining to outstanding repurchase obligations that might

8   be paid first from, say, the proceeds of foreclosure sale; is

9   that part of what the purchaser is succeeding to or not?

10  A.  You're asking me the same question that the gentleman

11  before you was asking -

12  Q.  I was inspired by that question.

13  A.  You know, to the extent there are priorities over those

14  servicing advances or the repayment of those servicing

15  advances, which I think the gentleman before you was trying

16  to indicate, in that particular agreement there may be

17  provisions that would require the payment of early payment

18  defaults or other premium recapture type provisions before

19  servicing advances are recouped or repaid, and I testified

20  before that it's my understanding that the purchaser is not

21  purchasing these servicing advances subject to what may be a

22  priority over their advance repayment, but I think it has to

23  be looked at on a case-by-case basis.

24  Q.  Right.  But there would then be cases in which that

25  particular limitation on the right of a servicer to recover

1    advances presently exists in the serving agreements wouldn't

2    be operative with respect to the purchaser after the

3    contemplated sales are completed; correct?

4    A.   Would you mind restating that a little differently?

5    Q.   There are then instances in which a limitation, such as a

6    limitation for the application of a waterfall to repay

7    repurchase obligations, but that limitation, which presently

8    exists with respect to a servicer's right to be reimbursed in

9    an existing agreement isn't going to exist at least vis-a-vis

10   the purchaser going forward in connection with its exercise

11   of its rights and obligations as a servicer; is that correct?

12   A.   Yeah, I don't know that I can say that it currently or

13   presently exists under those agreements but the - my

14   understanding is that the purchaser is purchasing these

15   advances without some type of waterfall priority above those

16   advances.

17           MR. McLAUGHLIN: All right.  I have no further

18   questions, thank you.

19           THE COURT: Thank you.  Mr. Landis.

20           MR. LANDIS: Thank you, Your Honor.  For the record,

21   Adam Landis on behalf of JP Morgan Chase here from Landis

22   Rath & Cobb.

23                     CROSS-EXAMINATION

24   BY MR. LANDIS:

25   Q.   Mr. Weil, I'm going to have a couple of questions for

1   you, hopefully not too many and too taxing.  Do you recall

2   when Mr. Gallo, who represents DB Structured Finance asked

3   you a couple of question, I don't know, about half an hour

4   ago?

5   A.  Yes, I do.

6   Q.  Okay, and when he asked you to describe the difference

7   between service released and service related loans, you

8   answered that question?

9   A.  Yeah, I believe it's service release or servicing

10  retained.

11  Q.  Okay, retained, excuse me.  And in a servicing release

12  transaction, is it fair to say that the servicing essentially

13  moves through AHM to a permanent servicer?

14  A.  Yeah, I think that's fair to say.

15  Q.  Okay.  And if that servicing already has been transferred

16  to a permanent servicer in connection with the securitization

17  of a loan or otherwise, is it true that there's nothing now

18  for the debtors to transfer or assume or assign in connection

19  with that servicing?

20  A.  Yes.  If the servicing rights, the servicing itself has

21  already been transferred off of the AHM servicing system, and

22  therefore, there are no servicing fees or other ancillary

23  fees that are being paid, there is no longer any right to be

24  transferred related thereto.

25  Q.  It seems pretty obviously it's already gone so you can't

1   then sell it again.

2   A.   Correct.

3   Q.   Okay.  And as I understand the transaction, some of the

4   assumption, assignment, and recognition agreements had been

5   removed from the list of contracts to be sold or transferred

6   or pursuant to which there were servicing rights that would

7   be sold or transferred; isn't that correct?

8   A.   When you say removed from the list -

9   Q.   Well, I believe that there were some AARs, those

10  agreements, that are not included on the list that may be

11  agreements that servicing has with some of the lender

12  parties.

13  A.   Yes.  I mean, there are a number of servicing agreements

14  or relationships that were excluded and put on a different

15  schedule, and there is a provision in the agreement for the

16  purchaser to sub-service those, if need be, for some period

17  of time, but they're not included as purchased assets.

18  Q.   In some instances, is it fair to say that they're not

19  included as purchased assets because the servicing rights

20  have also moved off the platform?

21  A.   Yes, it is.

22  Q.   Okay.  So, after all that great buildup, if there are

23  some contracts on Schedule 1.1(J) that relate to servicing

24  rights for loans that have been securitized or the servicing

25  rights have been transferred out, those contracts shouldn't

Weil - Cross

1   be listed on 1.1(J); is that fair to say?

2   A.   Yes.  I mean I believe there was a few agreements that

3   were put on 1.1(J) in error, and that they related to

4   servicing that was either interim servicing to begin with or

5   to servicing that had already been sold or transferred off,

6   and I believe there's a process going on to slightly amend

7   the agreement and remove those servicing agreements from

8   1.1(J).

9   Q.   Thrilled to hear that there's a process going on because

10  that's important.  I want to draw your attention, if I could,

11  to 1.1(J)(ch) and 1.1(J)(ci), it's on page 13, I believe, of

12  the executed 1.1(J) contract, schedule.  Just tell me when

13  you're there.

14  A.   I'm there.

15  Q.   Okay.  Are you aware that these contracts designated

16  1.1(J)(ch) and 1.1(J)(ci) are servicing related - released -

17  excuse me?

18  A.   You know, I'm not - just by looking at these and, you

19  know, I'm probably not the best witness to attest to it, but

20  certainly 1.1(J)(ci) looks like it may be.

21  Q.   Uh-huh.

22  A.   And it's - with respect to 1.1(J)(ch), it's a little

23  harder to tell, just from the description here.

24  Q.   Okay, I'll ask Mr. Love too, probably, if I have to,

25  although I'd like to avoid it, but as long as I have you on

1    the stand - If it were true that they were servicing

2    released, these contracts would be erroneously listed on

3    Schedule 1.1(J); is that correct?

4    A.   Most likely that is correct.

5    Q.   Okay.  And it's not the intent; is it?  For the debtors

6    to have a schedule that lists a contract that shouldn't be on

7    there.  Is that correct?

8    A.   That is correct.

9    Q.   Okay.  You testified to a process ongoing pursuant to

10   which there will be some modifications to the contract.  Is

11   that happening right now as you're testifying or can you tell

12   me what that process is and how it's happening?

13   A.   I know there was some discussions amongst the parties to

14   the APA over the agreement that we're continuing into this

15   morning to identify any and all servicing agreements that

16   were listed on 1.1(J) in error.  Presumably, that will be

17   completed sometime today, but I'm not really sure.

18   Q.   Okay.  Let me now call your attention, if I might, to

19   Schedule 2.1(B)(I).  It's the list of vendor contracts.

20   A.   Okay.

21   Q.   Page 2 at the bottom of that list, you might notice a

22   listing for JP Morgan Chase Bank NA, if you can take a look

23   at that and the nature of the agreement and let me know when

24   you're finished.

25   A.   Ah, yes, I've got it.

1   Q.  Okay.  Are you familiar in general with what an ACH

2   agreement is?

3   A.  Generally, yes.

4   Q.  Okay.  And within your being generally familiar with an

5   ACH agreement, are you aware that the last - second last

6   listing on at 2.1(B)(I) on page 2, the JP Morgan Chase Bank

7   agreement, are you aware that that's an ACH agreement?

8   A.  Again, it may be.  You know, it sounds like it is based

9   on the title of the agreement, but, you know, honestly I

10  think you'd have to ask Mr. Love.

11  Q.  Okay, well, I certainly will do that.  Are you aware that

12  the debtors have specific tax identification numbers that are

13  associated with certain bank accounts and agreements that

14  those agreements are specific to the debtors and the lending

15  institution?

16  A.  Yes, I believe so.

17  Q.  Okay.  And you don't believe, do you, that the purchaser

18  would be precluded from getting his - its own ACH agreement

19  in order to service or do whatever it needs to do in

20  connection with the transferred assets?

21  A.  No, I don't think that would be a problem.

22  Q.  Okay.

23  A.  Once the - again, once the purchaser has the appropriate

24  licenses and can accomplish the final close.

25  Q.  Sure, and prior to the final close, it would be the

1   debtors, I believe, that would be using their accounts and

2   their ACH agreement with JP Morgan Chase; is that correct?

3   A.  I believe that is correct.

4   Q.  Okay.  So, because it would be the debtors that would be

5   using its accounts, is it fair to say that there is no reason

6   for the transfer of this ACH agreement to the purchaser on an

7   interim basis?

8   A.  I think that's fair to say.  I mean, these agreements are

9   not, to my knowledge, being transferred until the final

10  close, so, I guess by nature, it would not need to be done at

11  the initial closing.

12  Q.  Okay.  Thank you.  I have no further questions.

13          THE COURT: Thank you, Mr. Landis.  Any further

14  questions?

15                        CROSS-EXAMINATION

16  BY MR. CROWLEY:

17  Q.  Good afternoon.  My name is Leo Crowley.  I represent the

18  Bank of New York in its capacity as Indenture Trustee for One

19  Mortgage-Backed Securities transaction and master servicer in

20  connection with two others, and I just have a few questions.

21  Starting with the due diligence process, were all of the

22  servicing agreements to your knowledge in the data room?

23  A.  I believe they were.  You know, I'm not sure they were

24  all there for the entire process, but I think we continue to

25  make some additions to the online data room throughout the

1    process, and I believe by the completion of the process or

2    sometime prior thereto they were all online.

3    Q.   And so that the purchaser had access to all of them

4    including the ones that my client is party to?

5    A.   Yes.

6    Q.   Okay.  You used the term "servicing rights" which is a

7    term I've heard off and on throughout this case.  Tell me

8    what that means, please?

9    A.   Servicing rights, I could read you the definition in the

10   agreement, but generally they relate to the right to service

11   the underlying mortgage loans, perform that servicing, and as

12   a result of the performance of that servicing, receive

13   servicing fees and other ancillary fees.

14   Q.   Okay.  Those - what you're describing as servicing

15   rights, actually have obligations in them; do they not?

16   A.   They do with respect to the performance of the actual

17   servicing.

18   Q.   Okay.  And in whose favor does the performance of those

19   obligations run?

20   A.   Well, you have an investor or some type of entity that

21   you're providing those servicing functions to, you know, the

22   ultimate owner of the underlying mortgages.

23   Q.   Uh-huh.

24   A.   So, presumably the obligations run to that party.

25   Q.   Okay, so, just to put a little more flesh on the bones,

1   could you turn to page 16 of Schedule 1.1(J) to the APA.

2   Okay, have you got that - Not yet?

3   A.  Yes, I do.

4   Q.  Okay.  If you look just over halfway down there's the

5   servicing agreement that's one of the ones that's involved in

6   a transaction that the Bank of New York is involved in titled

7   Servicing Agreement, dated as of December 21, 2004, among

8   American Home Mortgage servicing as R&BS Master Servicer,

9   American Home Mortgage Investment Trust, 2004-4 as issuer,

10  and the Bank of New York as Indenture Trustee; right?

11  A.  Yes, I've got it.

12  Q.  And what does R&BS stand for?  I'll give you a leading

13  question.  Does it stand for Residential Mortgage Fact

14  Securities?

15  A.  Yes.

16  Q.  Okay.  And does that tell you that this particular

17  servicing contract is in connection with mortgage loans that

18  have been deposited into a securitization trust?

19  A.  Yes, it does.

20  Q.  And interest in those securities representing interest in

21  those underlying mortgage loans have been sold to investors;

22  correct?

23  A.  That's correct.

24  Q.  And how do those investors get cashflow to satisfy the

25  securities that they hold?

1    A.   The principal and interest payments on the underlying

2    mortgages.

3    Q.   Okay.  And is there any other source of cashflow for

4    those investors other than principal and interest?

5    A.   Well, I'd have to look at how this was particularly

6    structured.

7    Q.   Let me withdraw that.  If a loan defaults, who's

8    responsible for foreclosing and realizing on the collateral?

9    A.   The servicer is responsible for the foreclosure process.

10   Q.   And if the collateral is disposed of for cash, does that

11   contribute cashflow to satisfy the obligations to the holders

12   of the mortgage-backed securities?

13   A.   I believe it does.

14   Q.   Okay.  Do the holders of the securities, therefore, have

15   some interest in who is actually functioning as servicer?

16   A.   Yes, I think they do.

17   Q.   Now, I think you testified early in your testimony today

18   about your prior experience as an advisor and investment

19   banker in connection with transactions involving servicing

20   businesses; did I hear that correctly?

21   A.   That is correct.

22   Q.   Okay.  How many prior transactions that you've worked on

23   involved an initial closing and a final closing comparable to

24   what we have here?

25   A.   Only really one that related to a transaction that I

1    worked on whereby the entity that was being acquired had an

2    interim servicing business but not a, kind of a full-service

3    servicing business, if you will.

4    Q.  Let me make sure I understand it correctly.  You're

5    telling me in that situation, the target did not have a full

6    servicing business?

7    A.  Correct.  It was only an interim servicing business.

8    Q.  Where as here the target has a fully functioning up and

9    running servicing business; correct?

10   A.  Yeah, I mean, in the other one they had a fully

11   functioning servicing business, but they only serviced for

12   that interim period that I talked about earlier, not on a

13   long-term basis.

14   Q.  And how many of the previous transactions you've been

15   involved in entailed a financial buyer purchasing a servicing

16   business?

17   A.  Well, that one that I just mentioned did.

18   Q.  Okay.

19   A.  I don't think we worked on another transaction that

20   involved a financial buyer other than the one I just

21   mentioned acquiring a servicing business.

22   Q.  And just to be clear on the terminology, I mean I

23   understand, but could you just give the Court your

24   understanding of the terms "financial buyer" and "strategic

25   buyer"?

1  A.  Sure.  When I say financial buyer, I'm referring to an

2  institutional money manager like WL Ross that manages funds

3  and makes investments with those funds, but that prior to

4  their investments are not in any particular business, and

5  they are doing so purely as a financial transaction versus a

6  strategic buyer which I would characterize as someone that

7  was already in the existing business that's being acquired,

8  and it's added to what they've already done in the business

9  or in a related business.

10  Q.  Okay.  You're familiar with the concept of execution

11  risk?

12  A.  Yes, I am.

13  Q.  And what does that mean to you?

14  A.  Execution risk generally refers to whether in a

15  transaction a particular deal can be accomplished through the

16  closing and whether either by nature of the transaction, by

17  nature of the purchaser, by nature of the particular assets,

18  whether there's a particular risk that a closing would not

19  occur.

20  Q.  Okay.  In the context of the servicing business of

21  American Home Mortgage, all other things being equal, is

22  there more execution risk or less execution risk with a

23  financial buyer as distinguished from a strategic buyer?

24  A.  I think it depends on the structure of the transaction.

25  I think here, because of the two-step closing that's been

1    created and set forth in the APA whereby a hundred percent of

2    the purchase price is being paid at the initial closing,

3    which because the existing business will continue to be

4    legally owned by American Home and operated by the existing

5    management team on the existing servicing platform, we're

6    able to accomplish that closing, that economic closing,

7    actually quicker than I think a strategic buyer that would

8    not be taking a platform would be able to acquire the

9    servicing, and so, in some ways, because of the structure,

10   I'd say there's less risk here than with a strategic buyer.

11   Q.  Less risk to who?

12   A.  Less risk to the estate.

13   Q.  Right.  Okay, and not necessarily to other parties

14   though?

15   A.  I think it would depend on, you know, how they were

16   situated.

17   Q.  You used the terms earlier, I think you characterized the

18   initial closing as a legal closing - I'm sorry, I got it

19   backwards.  The initial closing you characterized as an

20   economic closing, and the final closing as a legal closing;

21   is that correct?

22   A.  Yes, that is.

23   Q.  Okay.  Are those terms "economic closing" and "legal

24   closing" do those terms have any independent meaning in the

25   world of servicing of mortgages?

1    A.  I'm not sure I'm following you.

2    Q.  Okay.  Are those terms of art in the mortgage servicing

3    business?

4    A.  In my experience, not exactly how it's set forth in this

5    transaction.  You know, there is a concept in the servicing

6    business where certain payments are made at the initial

7    closing, if you will, and future payments are made as

8    servicing comes off of the seller system and goes onto the

9    buyer system -

10   Q.  Uh-huh.

11   A.  - as documents are provided from the seller to the buyer.

12   So there is a concept of, you know, an economic or partial

13   payment in servicing but not exactly as this deal is

14   structured.

15   Q.  Okay.  I want to focus a little bit on the final closing

16   or legal closing in the context of servicing contracts.  When

17   is it contemplated that servicing agreements, such as the

18   Bank of New York one that I directed your attention to, when

19   is it contemplated that they would actually be assumed by the

20   debtor and assigned to the purchaser?

21   A.  Again, I don't really want to speak to the assumption and

22   assignment but the servicing rights will be purchased and

23   actually legal title, if you will, to the transfer of those

24   servicing rights will occur at the time of the final closing.

25   Q.  Can you direct me to where in the APA it says that?

1  A.  Well, again, as I - I'll take a look, but as I discussed,

2  the initial closing is purely one of an economic closing

3  without the transfer of title.

4  Q.  Uh-huh.  You know, let me simplify this because I want to

5  push back a little bit on your statement.

6  A.  All right.

7  Q.  And direct your attention to §§ 2.9 and 2.10.  And if you

8  just take a minute and read 2.9(B) and 2. -

9          THE COURT: Do you have a page number, counsel?

10          MR. CROWLEY: I'm sorry?  Page 23 and 24, Your

11  Honor.

12          THE COURT: Okay.

13          THE WITNESS: Okay, I've read it.

14  BY MR. CROWLEY:

15  Q.  Okay.  Is it intended that the purchaser have the right

16  to direct that a servicing contract be assumed and assigned

17  to it in advance of the final closing rather than at the

18  final closing?

19  A.  It does have a parenthetical in both provisions that

20  talks about an earlier date after the initial closing in

21  which the purchaser desires to have a purchased asset

22  conveyed pursuant to this agreement.  I believe that the

23  intent here was, to the extent it made sense for the

24  purchaser to take some kind of an actual - what's the word I

25  want to use - If they were going to purchase certain assets

1    prior to the final close that would facilitate the

2    transaction being completed, this gave the purchaser that

3    ability.  I do not believe that the intent of this was to

4    allow them to do so with a servicing agreement or related

5    servicing right.

6    Q.  That may be so, but servicing contracts - if you look at

7    2.10(B), subclause (ii).  Do you see the reference to

8    assignment of assumed contracts?

9    A.  I do.

10   Q.  And doesn't assumed contracts comprehend within it

11   assumed servicing agreements?

12   A.  Well, I think it may.  I think purchased assets does pick

13   up -

14   Q.  Okay.

15   A.  - that concept, but as I said, I think the intent here

16   was not that they were likely to take on those servicing

17   rights principally because prior to the final close, the

18   purchaser would not be licensed to operate that servicing

19   business.

20   Q.  Okay, well, let me turn it around a little bit then.  I

21   mean, from the standpoint of the business deal that you

22   helped structure in here, would it make any difference from a

23   standpoint of successfully executing this business

24   transaction if the assumption and assignment of servicing

25   contracts was required to occur at final closing or

1    approximately final closing instead of earlier?

2    A.   Can you restate that for me, please?

3    Q.   Yeah.  From a standpoint of the business deal that the

4    APA seeks to implement -

5    A.   Yeah.

6    Q.   - in view of the testimony you've just given, would it

7    make any difference at all if the assumption and assignment

8    of servicing contracts was formally deferred officially until

9    final closing?

10   A.   If the purchaser is not able to acquire the servicing

11   rights till the final closing but continues to have the

12   economic benefits and burdens of those rights after the

13   initial close, I'm not aware that it would have a detrimental

14   effect to the transaction, but I would have to confer with

15   counsel on the exact interpretation and rationale for this

16   provision, but because the final closing is set forth as

17   occurring after the purchaser is fully licensed, and I'm not

18   a license expert, but I think, in general, the purchaser

19   would need to be licensed to conduct the servicing business

20   and own these servicing rights.  I don't see that it would be

21   a problem.

22   Q.   Okay.

23            MR. CROWLEY: No further questions, thank you.

24            THE COURT: Thank you, Mr. Crowley.  Mr. Chipman?

25                        CROSS-EXAMINATION

1   BY MR. CHIPMAN:

2   Q.  Good afternoon, Mr. Weil.  My name is William Chipman for

3   the record, Edwards, Angel, Palmer & Dodge on behalf of

4   Countrywide.

5   A.  Hello.

6   Q.  Are you familiar with Countrywide's mortgage loan

7   purchase and servicing agreement.  It's listed on Schedule

8   1.1(J).

9   A.  Generally, I'm aware of it, not with respect to the

10  specific terms of the agreement.

11  Q.  Maybe I can point you to it.  I think it's at 1.1(J)(dc)

12  on page 15, and there's another Countrywide agreement which I

13  don't think has any economic significance here, but I'll

14  point you to it also.  It's 1.1(J)(dk) on page 16.

15  A.  Okay.  Which was the one on page 15, I'm sorry?

16  Q.  I think 15 is the mortgage loan purchase and servicing

17  agreement, 2006 agreement.

18  A.  What's the - after the 1.1(J), what are the letters?

19  Q.  I'm sorry, 1.1(J)(dc) I believe it should be.  Maybe I

20  have the page number - Maybe my schedule doesn't -

21  A.  I've got it.

22  Q.  Okay.  Can you tell me whether or not you know if that

23  agreement has been allegedly terminated pre-petition or not?

24  Is there any way for you to tell that from your agreement?

25  A.  There is not.

1   Q.  If I tell you that it's listed on 1.1(K), would that

2   help?

3   A.  It may.

4   Q.  Is the Countrywide agreement listed in Schedule 1.1(K)?

5   A.  Yes, you know, at least a Countrywide agreement is listed

6   on 1.1(K), and if you'll recall my prior testimony, these

7   relate to agreements that arguably were terminated pre-

8   petition but that have not yet been resolved on whether that

9   termination is effective or not.

10  Q.  So under the APA, if it's listed on Section 1.1(K), it

11  would be designated as a disputed service agreement; is that

12  correct?

13  A.  That is correct.

14  Q.  Okay.  I'm having trouble understanding exactly how the

15  disputed service agreements procedure works with regard to

16  the interim closing and a final closing, so I was hoping

17  maybe you could walk me through it.

18  A.  Sure.

19  Q.  And I believe that Section 4.4 of the agreement details

20  how disputed servicing agreements are traded and maybe you

21  could walk me through in your business terms, what's going to

22  happen to disputed servicing agreements?

23  A.  Well, it is provided for, I do believe, in - both in -

24  it's referred to in Section 4.1.  It then is also provided

25  for in Section 4.4, and then further, under the dispute

1    escrow agreement.  So, all those provisions and documents

2    were in concert with each other.  Essentially, the purchaser

3    will pay 92 bases points of the UPB on these servicing rights

4    into escrow under the dispute escrow agreement, and that

5    pursuant to that agreement, either the dispute will be

6    resolved by agreement of the parties and once that dispute is

7    resolved by the parties, it will either become - the

8    servicing rights will either become a purchased asset or an

9    excluded asset or, I believe, there's a provision that

10   provides for the Court to resolve it, and same thing, once

11   there's a resolution, it will either become a purchased asset

12   or an excluded asset.  And if you go to the dispute escrow

13   agreement, and you look under Distributions -

14            THE COURT: Which exhibit is that?

15            THE WITNESS: Sorry, Your Honor.  It's Exhibit C.

16            THE COURT: Thank you.

17            THE WITNESS: You can see - Give me one minute,

18   please.  If you look at - both in 2(B) and 2©), and I guess

19   really throughout Section 2, you can see that either there is

20   a final order that has been issued determining that a

21   disputed servicing agreement was terminated at or prior to

22   the petition date or they've determined that there's a

23   negotiated settlement or not.  And so, through one of those

24   two means, again, either the disputed servicing agreement

25   will become a purchased asset and if that's the case, the

1    purchased proceeds that are now sitting in escrow will be

2    distributed to Bank of America as administrative agent or the

3    disputed servicing agreement will become an excluded asset in

4    which case the purchase price will be refunded to the

5    purchaser.

6    BY MR. CHIPMAN:

7    Q.  Okay, that's not - on the excluded asset part that's not

8    my understanding of what the agreement says.  If you turn to

9    Section 6.1(F) of the APA.  It says that the purchaser can

10   service basically Countrywide's or any disputed service

11   agreement's loans under a purchaser sub-servicing agreement

12   even if it is an excluded asset, and I'm not sure how that

13   ties into what you just testified to.

14   A.  Yeah, I think - I'm sorry, what section -

15   Q.  Section 6.1(F) of the APA.

16   A.  Yeah.

17   Q.  I believe the exact language starts with "following with

18   the final closing date" - or sorry, "following the final

19   closing date".

20           THE COURT: You've got the wrong section.

21           THE WITNESS: Yeah, I think you're not in the right

22   section.

23           MR. CHIPMAN: I may have an old version, Your Honor,

24   of the APA.

25           THE COURT: I've got covenants.  Article VI is

1    covenants.  What Article are you in?

2            THE WITNESS: Your Honor, I believe it's 6.2(F).

3            THE COURT: Oh, okay.

4            MR. CHIPMAN: I'm sorry, 6.10(F).  Did I say 6.1?  I

5    apologize.

6            THE COURT: That's all right.

7            THE WITNESS: 6.10(F).  Well, I think what you've

8    got to understand is, there's a difference between the

9    servicing rights that are being purchased by the purchaser

10   under the APA and the ongoing obligations of the purchaser to

11   service loans that are being excluded from the transaction.

12   So, if in fact there's a determination that one of the

13   disputed servicing agreements becomes an excluded asset, the

14   purchaser is not paying consideration for those servicing

15   rights, nor will the purchaser own those servicing rights

16   going forward; okay?  What we wanted to provide in this

17   provision is that there was a mechanism, to the extent

18   necessary, for the purchaser to continue servicing mortgages

19   that it did not have the servicing rights to, so, other

20   excluded assets.  We wanted to make sure there was a

21   mechanism so that the servicing of those excluded assets

22   didn't stop immediately, that there was time to transfer

23   those assets off the system and onto another buyer's system

24   or onto the system of the entity that owned the servicing

25   rights or the underlying mortgages, and so what we provided

1   for in 6.10(F) is the mechanism for the purchaser to get

2   reimbursed by the debtor for their ongoing servicing of those

3   excluded assets.  So, you're kind of mixing apples and

4   oranges a little bit.  It's - Under the dispute escrow

5   arrangement, you determine whether there is a - it's a

6   purchase asset or an excluded asset, and as such, where the

7   escrow purchase price proceeds go to, but 6.10(F) provides a

8   mechanism to make sure that even those excluded assets

9   continue to be serviced so that there's no break in the

10  service until such time as they are moved off the system.

11  BY MR. CHIPMAN:

12  Q.  Where does it say "until such time as they're moved off

13  the system" or do you know or is there a sample purchase sub-

14  servicing agreement that the parties can look at?

15  A.  Well, what it says, it says, "Following the final closing

16  date," and again, remember that during the interim period

17  American Home continues to own the servicing platform and

18  will continue to service these loans, but, "Following the

19  final closing date, pursuant to the terms of the purchaser's

20  sub-servicing agreement, purchaser or its designee shall

21  serve as the sub-servicer for these loans from the disputed

22  agreements that become excluded assets prior to the sale to a

23  third party" -

24  Q.  It doesn't seem to have any end.  That's my point.  Is

25  there any limitation on that or is there a purchaser sub-

Weil - Cross

1    service agreement we can take a look at?

2    A.   Hang on one second. Yeah, what purchaser/sub-servicing

3    agreement contemplates is a servicing agreement that will be

4    executed on behalf of the sellers and purchasers in the

5    future in form and substance reasonably satisfactory to both

6    parties under which the purchaser will, after the final

7    closing, serve as the sub-servicer for certain mortgage

8    loans.  So this is an agreement that has not been prepared as

9    of yet.  However, the purchaser is acquiring the platform.

10   The more scale that that purchaser has as far as the size of

11   the platform and the amount of underlying, unpaid principal

12   balances that it's servicing, the better the economic return

13   will be to the purchaser.  So, you know, I believe that an

14   agreement will be put in place and that, you know, the

15   economic terms are set forth in 6.10(F) and that the

16   purchaser will be happy or accommodating to the debtor to go

17   ahead and continue to service these loans.  Now, the

18   expectation is that these loans are not going to be on the

19   system for an extended period of time, that ultimately these

20   loans will be either sold to - or the servicing rights will

21   be sold to a third party or transferred to the underlying

22   owner of the mortgages.  So, I don't think it's contemplated

23   that these will remain on the existing servicing platform for

24   an extended period of time.

25   Q.   In a purchasing sub-service agreement though, the actual

1  owner of the loans doesn't get to participate in deciding

2  what the terms of that sub-servicing agreement are; is that

3  correct?  Just between the debtor and the purchaser - the

4  seller and the purchaser.

5  A.  Correct.  I mean the underlying - the investor, the owner

6  of the underlying mortgages has already agreed to what the

7  servicing arrangement would be, and, you know, what the term

8  would be, what the cost would be, et cetera.

9  Q.  So you would - in theory, they would be sub-serviced

10  pursuant to the terms of the existing agreement that was

11  terminated?  Because it would be terminated to be an excluded

12  asset; correct?

13  A.  No.  When it becomes an excluded asset, it does not - the

14  underlying servicing arrangement is not terminated; okay?  It

15  becomes an asset that the purchaser is not acquiring; okay?

16  And so, the servicing arrangement still exists between the

17  underlying - under the underlying servicing agreement between

18  the debtor and the third party who owns those mortgage loans.

19  Q.  Let me stop you there because I don't think I was clear

20  enough in my question.  We are listed on - Countrywide is

21  listed on Schedule 1.1(K) because it alleges its terminated

22  its servicing agreement pre-petition.  Between the interim

23  closing and the final closing, there's going to be either an

24  agreement between the parties or the Judge is going to enter

25  an order saying, This agreement was terminated, you have no

Weil - Cross

1   rights in it; okay?  That becomes then an excluded asset, and
2   what I'm trying to figure out is what happens then, and what
3   you're telling me is it gets serviced by the purchaser after
4   a final closing pursuant to some future agreement that hasn't
5   been agreed to yet.  I'm trying to understand whether or not
6   - what terms are going to - the terms that were terminated or
7   is there going to be a whole new agreement?
8   A.  Yeah, well, I think what you have to look at is if in
9   fact there was a determination made that the agreement was
10  effectively terminated; okay?  And it became an excluded
11  asset because of that.  We'd have to go - I'd have to go look
12  at the provisions of the underlying agreement that's listed
13  on 1.1(J) that says, Here's what happens on a termination of
14  the agreement.  Here's how long you have to transfer the
15  servicing off the system.  Here's what you get paid during
16  that period where that underlying servicing is transferred
17  off and presumably that - those provisions would govern this
18  relationship.
19  Q.  Okay, thank you.  I want to turn now just to - I'll be
20  brief, a couple of questions relating to the actual loan
21  purchase servicing agreement with Countrywide.  My
22  understanding from your prior testimony is, the purchasers
23  are only taking the servicing obligations.  It's not taking
24  any obligations under that agreement that relate to the loan
25  purchase early payment defaults, premium recapture, any of

1  those obligations, they're not being taken by the purchaser;

2  is that correct with regard to Countrywide's agreement as

3  well?

4  A.  I would have to look at Countrywide's agreement, but

5  again, the purchaser's acquiring the servicing rights and

6  related rights to receive fees and related obligations to

7  provide the servicing in accordance with standards that are

8  set forth.  What I said before is, obligations that arise by

9  virtue of the origination of the loans or other components of

10  American Home that are not the servicer are not being taken

11  on by the purchaser.

12  Q.  Okay.  Let's talk a little bit about the servicing

13  obligations in general under the Countrywide agreement.

14  Assuming that the agreement provided that a seller or

15  servicer must be both a Fannie Mae and a Freddie Mac servicer

16  in good standing.  During the interim period, is that the

17  debtor's obligation?  Or the debtor's not intending to comply

18  with that obligation.  That's a servicing obligation, not a

19  loan origination obligation.

20  A.  Well, the debtor, as we speak today, is in good standing

21  under the Fannie Mae -

22  Q.  What about Freddie Mac?

23  A.  Freddie Mac, I'm not sure of, but my understanding is

24  that, you know, certain of those obligations during the

25  pendency of the bankruptcy are stayed or may be stayed.

1  Q.  Is the debtor a member of M-E-R-S, MERS, I guess, it's

2  MERS in good standing?

3  A.  You know, I don't think I can answer that, sorry.

4  Q.  The agreement provides that the servicer must service and

5  administer the mortgage loans in strict accordance with all

6  federal, state, and local laws and the terms of the

7  agreement.  I understand your argument that certain

8  obligations are not going with the purchaser, but is it the

9  debtors' intent, the business intent of the debtors to

10 service the loans during the interim period till a final

11 closing, from the interim closing to the final closing,

12 pursuant to the expressed terms of the servicing agreement?

13 A.  Yes, you know, my understanding is that it is their

14 intent to continue to service these loans in accordance with

15 the required standards, that they have been doing so, and

16 continue to anticipate that they will do so.

17 Q.  Okay.  To the extent that a party doesn't believe that

18 they're servicing loans pursuant to the terms of the

19 servicing agreement, I want to talk about while the debtors

20 are servicing, what does the APA provide by way of a

21 procedure to get that issue resolved?  And then, post-final

22 closing, after the purchaser has taken the servicing rights,

23 is there a procedure in the APA to deal with disputes over

24 whether or not the purchaser is in compliance with the terms

25 of the servicing rights?

Weil - Cross

1  A.  Well, I believe the way that they are handled is, the

2  purchaser is acquiring the servicing rights and taking on

3  certain obligations to perform those servicing rights.  And

4  as such, the existing process, if you will, that exists

5  between the investor and the servicer would continue to be

6  honored or adhered to by the purchaser going forward - both

7  between the initial and the final close and going forward.

8  Q.  So, after the final closing, if there's a dispute as to

9  whether or not an obligation under a servicing agreement is a

10 servicing obligation or, I think what you call is another

11 agreement or other obligation, who makes that determination?

12 Do we bring that dispute to this Court?  Or is there a

13 procedure -

14      MS. MORGAN: Your Honor, that calls for a legal

15 conclusion.

16      MR. CHIPMAN: I'll rephrase the question.

17 BY MR. CHIPMAN:

18 Q.  Is there a procedure in the agreement to deal with that?

19 A.  I don't believe there's a procedure in the APA that deals

20 with that specific issue.  Again, I think you would refer

21 back to the related servicing agreement to make that

22 determination.

23      MR. CHIPMAN: I have no further questions, Your

24 Honor.  Thank you.

25      THE COURT: Thank you, Mr. Chipman.  Mr. Abbott.

1                    CROSS-EXAMINATION

2   BY MR. ABBOTT:

3   Q.  Good afternoon, Mr. Weil.

4   A.  Good afternoon.

5   Q.  My name is Derrick Abbott, I represent Assured which is

6   party to a number of agreements with the debtors.  As I

7   understand some of the changes that have been announced

8   today, they remain a party to only one agreement, and I just

9   wanted to mark that agreement and -

10          MR. ABBOTT: May I approach, Your Honor, and do

11  that?

12          THE COURT: Yes.  Call it Assured 1.

13  BY MR. ABBOTT:

14  Q.  That document is going to be marked as Assured 1, Mr.

15  Weil.  Can you tell me if that agreement appears on Schedule

16  1.1(J) and to ease that approach I'm going to suggest you

17  look on page 21 at item 1.1(J)(ey)?

18          THE COURT: I'm sure Ms. Morgan would stipulate to

19  that.  Will you stipulate to that?

20          MS. MORGAN: Yes, Your Honor.

21          THE COURT: Okay.  Debtors stipulate to that.

22          MR. ABBOTT: Okay.  As the day goes on people's

23  voices seem to be getting lower and lower and I missed that.

24          THE COURT: Is the mike on?

25          THE WITNESS: It does appear to be here on the

Weil - Cross

1   schedule.

2   BY MR. ABBOTT:

3   Q.  I believe it was stipulated, but thank you.  Now, there's

4   been a lot of talk today about servicing rights, and I

5   understood them to mean both rights and obligations of the

6   debtors as servicer under various agreements that are, among

7   other places, scheduled on Schedule 1.1(J); is that correct?

8   A.  That's correct.

9   Q.  And if you look at the first page of that document,

10  you'll see that there are a couple of debtor entities that

11  are party to that agreement; do you see that?

12  A.  I do.

13  Q.  And am I correct that there are two debtor entities

14  party to that agreement?

15  A.  Yes, there are.  American Home Mortgage Corp., as

16  sponsor, and American Home Mortgage Servicing, Inc., as

17  servicer.

18  Q.  And are each of those debtors transferring all their

19  rights under this agreement?

20  A.  They are not.

21  Q.  And which debtor is transferring rights under this

22  agreement?

23  A.  Well, I believe there are a number of debtor parties that

24  are parties to the APA, American Home Mortgage Investment

25  Corp., American Home Mortgage Corp., and American Home

1   Mortgage Servicing, Inc., that are all parties to the APA.

2   As I said before, what's being transferred are the servicing

3   rights and certain related obligations that are deemed to be

4   assumed liabilities under the APA.

5   Q.  Okay, but that doesn't answer my question.  My question

6   was, which debtor entity is transferring rights under this

7   agreement?

8   A.  Under this agreement or the APA?

9   Q.  Under this agreement - By this agreement, I mean, Assured

10  1.

11          THE COURT: Mr. Abbott, I think you misspoke.

12          MR. ABBOTT: Perhaps I did.  Let me rephrase the

13  question.

14          THE COURT: Transferring to whom?  I don't

15  understand.

16          MR. ABBOTT: I apologize.  I believe I did mis-

17  speak.

18          THE COURT: That's okay.

19  BY MR. ABBOTT:

20  Q.  Mr. Weil, what I'm trying to understand is which debtor

21  under Assured 1 is transferring its rights under Assured 1 to

22  the purchaser under the asset purchase agreement?

23  A.  Well, you know, I'd have to look at this agreement, which

24  I have not done in any detail, but presumably the - as I said

25  before, because rights are being transferred as servicer, I

1  believe the American Home Mortgage Servicing, Inc., is

2  transferring certain rights under this agreement.  Whether

3  there are any associated rights under this agreement with

4  American Home Mortgage Corp. that relate to the servicing of

5  the assets and the ability to receive fees and both servicing

6  fees and ancillary fees under the agreement, I would have to

7  read the agreement to see if that was the case.

8  Q.  So, it's not as simple as just looking at Assured 1, for

9  instance, and seeing where the word "servicer" is used to

10  define a right or an obligation and us all knowing that those

11  are the rights being transferred by the debtors to the

12  purchaser under the APA?

13  A.  No, I think you'd have to read the agreement.

14  Q.  So the servicing rights being transferred could include

15  rights of American Home Mortgage Corp. as sponsor under

16  Assure 1; is that your testimony?

17  A.  Well, my testimony is, and I testified to this before,

18  that other members of the team that were working on this

19  transaction have gone through these agreements and have

20  recognized what are purchased assets under the agreement or

21  not.  I've not gone through this, and so, I don't know that I

22  could say whether there are certain rights owned by American

23  Home Mortgage Corp. as sponsor or not.

24  Q.  So as the primary negotiator of - one of the primary

25  negotiators of this asset purchase agreement and the

1   investment bank who represented the company in those

2   negotiations and informed their view on the pricing value and

3   whether this was the right transaction for them to engage in,

4   you can't tell us which rights or obligations are being

5   transferred under this agreement; correct?

6   A.  Again, I would have to look at this particular agreement.

7   In general, what are being transferred are the servicing

8   rights under these agreements; okay?  This being one that's

9   listed on Schedule 1.1(J), and with those servicing rights,

10  come the right to receive fees and the obligation to provide

11  service.  That's what we're looking at when we structured the

12  transaction, when we looked at the relevant value of the

13  transaction, and as I've said, while I was one of the primary

14  negotiators of the transaction, there were others, and other

15  members of the team had a responsibility for looking at these

16  agreements, creating the schedules, and helping draft what's

17  in the APA.

18  Q.  So that's a no?

19  A.  Why don't you restate the question -

20        THE COURT: Mr. Abbott, I think you've asked him now

21  five times this question and every time he said, he has to

22  look at the document, and he hasn't looked at the document.

23  Now that may be a point - It's a good point.  He didn't look

24  at the document.

25        MR. ABBOTT: I'll move on, Your Honor.

Weil - Cross

1          THE COURT: Yeah, I get it.  He didn't look at the

2     document.

3          MR. ABBOTT: I'll move on.

4          THE COURT: And your point is well made.

5     BY MR. ABBOTT:

6     Q.  Mr. Weil, is it your understanding that after the final

7     close of this transaction, counter parties to agreements that

8     are - the servicing rights under which are being transferred

9     to the purchaser, we'll be able to look to the purchaser for

10    the performance of the obligations related to the various

11    agreements?

12    A.  The obligations that the purchaser is taking on under the

13    APA as assumed liabilities that relate to the servicing

14    business, yes, counter parties would be able to look to the

15    purchaser to provide that servicing.

16    Q.  Do you understand that the terms of the agreements that

17    are listed on Schedule 1.1(J) will continue to govern the

18    parties to those agreements rights and obligations with

19    respect to the servicing rights that are being transferred to

20    the purchaser?

21    A.  I believe that's correct.

22    Q.  Now, if you look at Assured 1 - let me give you a page

23    direction if I may.  Would you turn to page 6 of Assured 1.

24    A.  Okay.

25    Q.  Would you just read to yourself, quickly, Section 1.01,

1  the definition section.

2  A.  Okay.

3  Q.  Would you agree with me that Section 1.01 references as,

4  among other things, the place to find certain definitions

5  that govern this agreement, another agreement called in this

6  document, the Capital A agreement.

7  A.  That's what it appears to be saying, yes.

8  Q.  Okay.  Is it true that Assured 1 is one agreement that

9  governs a broader transaction that includes other agreements

10  related to the various rights and obligations of the parties

11  to Assured 1?

12        MS. MORGAN: Objection, Your Honor, calls for a

13  legal conclusion.

14        THE COURT: I don't think so.  Overruled.

15        THE WITNESS: Can you please restate the question.

16  BY MR. ABBOTT:

17  Q.  Yeah.  Is it true that Assured 1 is but one of a number

18  of agreements that govern the rights and obligations of

19  various parties to Assured 1?

20  A.  It would appear to be the case.  Again, I have not read

21  this in any detail or seen what the agreement as defined in

22  Section 1.10 - 1.01 refers to, but it would appear to be the

23  case.

24  Q.  And if there were servicing rights, as you've defined

25  them today, included in any of those other ancillary

Weil - Cross

1   agreements that's not listed on Schedule 1.1(J), are they

2   being transferred to the purchaser or not?

3   A.   If this agreement is listed on 1.1(J) and by virtue of

4   this agreement being on 1.1(J) it references other agreements

5   that contain rights and obligations between the parties, and

6   those parties - and it relates to servicing rights, I'm

7   sorry, I would expect that it would be picked up by virtue of

8   this reference to this agreement, but, you know, again,

9   somebody else looked at these agreements in detail and, you

10  know, made the determination that if this agreement is listed

11  on 1.1(J) that the servicing rights related to this agreement

12  that may flow through to other agreements, I have no idea,

13  since I haven't seen them, are picked in the definition of

14  purchased assets, but again, I've not read this agreement in

15  any detail or the related other agreements.

16  Q.   Thank you.  Now, there's been some talk today about the

17  purchaser's ability to service in connection with the various

18  licenses and other regulatory approvals that are required

19  that currently govern the debtors' business.  Do you recall

20  that testimony?

21  A.   Yes, I do.

22  Q.   And I'm going to try not to be repetitive although we've

23  been here a long afternoon, and I don't want to miss

24  something.  Do you know if today the purchaser is fully

25  licensed to carry on that business?

1  A.  I do not know, but I believe, and I'm fairly certain that

2  the purchaser today is not fully licensed, hence the reason

3  for the two-part close.

4  Q.  And if they are not fully licensed at the time that the

5  final closing is supposed to occur, they don't have to close;

6  right?

7  A.  It's set forth, I believe, in Section 6.14 or 6.15 of the

8  agreement, and - I'm sorry.  Give me just a second and I will

9  refer you to the appropriate section.

10         MR. ABBOTT: Your Honor, I'll withdraw the question.

11         THE COURT: All right.

12         MR. ABBOTT: No further questions.

13         THE COURT: Thank you.  Does anyone have any

14  further questions?  Mr. Fallon - Oh, Mr. Abbott?

15         MR. ABBOTT: Your Honor, I -

16         THE COURT: Do you want to ask Mr Fallon's question?

17         MR. ABBOTT: No, I just wanted to move Assured 1

18  into evidence.

19         THE COURT: All right, any objection?

20         MS. MORGAN: No objection.

21         THE COURT: It's admitted without objection.  Mr.

22  Fallon, I believe.  Is there anyone else after - anybody else

23  has any more - All right.

24         THE COURT: Come on up to the on-deck circle.  Do

25  you need a break - Are you doing all right, Mr. Weil?

1       THE WITNESS: I'm doing okay, Your Honor, thank you.

2       THE COURT: You're welcome.

3                       CROSS-EXAMINATION

4  BY MR. FALLON:

5  Q.  Good afternoon, Mr. Weil.  I'm Brett Fallon and I

6  represent CitiMortgage, Inc.  Are you familiar with the

7  third-party securitization referred to in Schedule 1.1(J) as

8  Halo (phonetical) 2007 AR-1?

9  A.  Generally familiar with it, not in any great detail.

10      MR. FALLON: Your Honor, may I approach the witness.

11      THE COURT: Yes.  Do you have a reference number?

12  Oh, thank you.

13      MR. PATTON: Your Honor, can I interrupt for just

14  one second?

15      THE COURT: Yes.

16      MR. PATTON: And this is in terms of managing the

17  witnesses.  The question is, what's your tolerance for -

18  What's your endurance this evening, and you know, we'll

19  manage ourselves accordingly.  I just don't know how far you

20  want to try to go.

21      THE COURT: Well -

22      UNIDENTIFIED SPEAKER: Your Honor, those of us in

23  the back of the Court could not hear Mr. Patton.

24      THE COURT: Yeah, you have to speak into the

25  microphone here.  Push Mr. Fallon out of the way.  There you

1    go.

2           MR. PATTON: Yeah, no problem.

3           THE COURT: The question was, how late is the Court

4    going to go today.

5           MR. PATTON: Yeah.

6           THE COURT: The Court's going to finish this

7    witness.

8           MR. PATTON: Okay.

9           THE COURT: And then figure out where we're going to

10   go, but I don't know how much redirect the debtors may have,

11   if any.  But because we have all day tomorrow, we will

12   probably not go overly late tonight.

13          MR. PATTON: All right.

14          THE COURT: Who's your next witness?  Is there -

15          MR. PATTON: It's Mr. Strawburn (phonetical), and I

16   guess what I was trying to decide is whether to cut him loose

17   or not, whether we would start a fresh witness.  I mean,

18   assuming we wrap up at -

19          THE COURT: Well, do you have redirect?

20          MS. MORGAN: Maybe a little, Your Honor.

21          MR. PATTON: Not much.

22          THE COURT: Well, I hate to do this to you, but I

23   can't answer your question yet so don't let him go yet.

24          MR. PATTON: That's your prerogative.

25          THE COURT: All right.

1         MR. PATTON:  Thank you.  By the way, Your Honor, at

2    least that lets me off the hook with his counsel, so -

3         THE COURT: Okay.

4    BY MR. FALLON:

5    Q.  Mr. Weil, is this the document that is referred to as

6    Halo 2007 AR1 in the debtors' schedule 1.1(J)?

7    A.  Can you please refer me to which section of 1.1(J)?

8    Q.  Yes, it's index number 1.1(J)(am), as in Mary, at page 8.

9    And I also will just point out, this has two attachments.  We

10   didn't attach Attachment 1 which is a listing of the

11   individual loans but it does have Attachment 2.

12   A.  It appears to be that servicing agreement.

13   Q.  Okay, and the debtor parties of this contract include

14   American Home Mortgage Corp. and American Home Mortgage

15   Servicing, Inc.; is that correct?

16   A.  You know, it may.  I'm not sure they're listed on the

17   agreement unless I'm missing it or on the schedule, but -

18   Q.  Well, the first paragraph talks about this is an

19   assumption - I'm sorry, assignment, assumption, recognition

20   agreement, and then it lists the parties, which would include

21   HSCB -

22   A.  Oh, yes, I'm sorry.  I missed it before.  It is here.

23   Q.  Okay, and so, to answer my question American Home

24   Mortgage Corp. and American Home Mortgage Servicing, Inc.,

25   are both parties to the contract?

1   A.   That's correct.

2   Q.   And I take it from your prior testimony that you can't

3   state with any certainty that only the obligations of

4   servicer are being transferred pursuant to the APA; is that

5   fair?

6   A.   Well, again, I can say that I haven't read this agreement

7   but that as part of the APA the purchaser is acquiring

8   servicing rights and the related rights and obligations.

9   Q.   Okay.  And so that may include only some of the

10   obligations of American Home Mortgage Servicing under this

11   contract.

12   A.   Perhaps, again, I have not read it.

13   Q.   Okay, and it may include some or none of the obligations

14   of American Home Mortgage Corporation; is that fair?

15   A.   That's fair.

16   Q.   Okay.  Let me ask you to turn to page 11 of Attachment 1

17   which is section - I'm sorry, section 11, page 40.

18   A.   Titled Servicer's Servicing Obligations?

19   Q.   That's correct.  I believe it's a one-paragraph

20   provision.

21   A.   Okay.

22   Q.   Okay.  Would you be able to testify - Can you at least

23   testify that if the Court grants the motion that your client

24   is seeking here, that the buyer under the APA would be

25   succeeding to all of the obligations under section 11 and

1    Exhibit 9, which that incorporates?

2            MS. MORGAN: Your Honor, objection, calls for a

3    legal conclusion.

4            THE COURT: Mr. Fallon, why isn't that a legal

5    question?

6            MR. FALLON: I'm asking for his understanding of

7    what the buyer's buying and what he's selling, not a legal

8    conclusion.

9            MS. MORGAN: Your Honor, I think he's asking him how

10   this agreement works, which he hasn't read.

11           MR. FALLON: Well -

12           THE COURT: Yeah, I - If you're going to ask him

13   whether obligations under specific provisions of the asset

14   purchase agreement are being assumed or assigned, his

15   response is going to be, you have to read the agreement,

16   which means, you have to figure out what the law means based

17   on what the agreement says, and that's a legal question.

18           MR. FALLON: Okay.

19   BY MR. FALLON:

20   Q.   Well, from your understanding, then, what I'm trying to

21   understand is the servicing obligations which you're seeking

22   to sell to the buyer here, and so, if there's a section

23   entitled Servicer's Servicing Obligations, are those the

24   obligations you're seeking to sell or is it conceivable that

25   you're not seeking to sell some of those obligations?

1  A.  Well, as I said before, the obligations related to

2  servicing the underlying loans are being purchased and taken

3  on by the purchaser.  You know, what I would have to look at

4  here is, as we've seen in other agreements, sometimes the

5  servicer, quote/unquote, has arguable obligations that may

6  relate to something other than providing that servicing, such

7  as, obligations that arise from origination or other

8  obligations that I've testified are not being acquired by the

9  purchaser.  So, in order to make that determination, again, I

10  would have to read this agreement, look at Exhibit 9, and

11  determine, you know, are those specifically related to the

12  servicing function itself or something else.

13  Q.  Okay.  So even where the contract calls its servicer

14  servicing obligations, you cannot state that you are seeking

15  to transfer those obligations; is that fair?

16  A.  Well, again, where it incorporates another document that

17  I haven't read, I haven't had the opportunity to discuss this

18  provision with the senior executives of the servicing

19  business or with counsel, and so, I'm probably not the best

20  person to make that judgment.

21  Q.  Okay.  Let me move onto a slightly different topic.  What

22  is your understanding of the buyer's obligation, in this case

23  WL Ross, with respect to their servicing obligations?  Let me

24  rephrase that.  In other words, does the buyer have all the

25  servicing obligations that the servicer, in this case

Weil - Cross

1  American Home Servicing, has?

2  A.   Again, the buyer is purchasing specified servicing rights

3  that relate to certain servicing agreements and relate to

4  specific underlying loans that are set forth, I believe on

5  Schedule 5.6(A); all right?  The buyer's taking on - or the

6  purchaser is taking on the obligations to provide servicing

7  for those loans.  Given the kind of provisions that we've

8  been going over today, I can't sit here and tell you that

9  every obligation of the servicer, regardless of whether it

10  relates to the servicing or some other division, are being

11  taken on by the purchaser.  They're taking on servicing

12  rights and the obligations related to those specified

13  servicing rights under the definition of assumed liabilities.

14  Q.   Okay, well, let me ask you generally, and I can be more

15  specific, but for example, restrictions on assignability of

16  the servicing agreement, is it your understanding that the

17  buyer is restricted from assigning the servicing agreements

18  in accordance with the applicable underlying agreements?

19          MS. MORGAN: Objection, Your Honor, calls for a

20  legal conclusion.

21          THE COURT: No, I think that that's a sufficiently

22  negative question as to his business understanding, so

23  overruled.

24          THE WITNESS: My understanding would be that items

25  that relate directly to those servicing rights as servicer

1   and providing that servicing, you know, those obligations are

2   being taken on by the purchaser.   Again, arguably, certain

3   restrictions that related to those servicing rights, directly

4   related to the servicing that's being provided, I believe

5   that would arguably be part of the assumed liabilities, but

6   again, having not read the agreement with that provision, I

7   would have to refer to counsel and refer to the executives at

8   American Home Servicing to really understand how they would

9   interpret the provision.

10  Q.  Tell you what, I'm not sure I understood the answer, so

11  they would be restricted by any such subsequent restrictions

12  or they wouldn't?

13  A.  Well, what I said is, if they relate directly to the

14  servicing rights that are being purchased by the purchaser

15  and having not read that provision, it's hard to say, or

16  consulted with anybody, it's hard to say, but if they came

17  under the definition of assumed liabilities because of the

18  ongoing role as servicer, special servicer, or master

19  servicer of the purchaser, they might be part of the

20  obligations that are being assumed, but without looking

21  specifically at that agreement, I can't sit here and tell you

22  yes or no.

23  Q.  Okay.  Let me ask you a quick question about Schedule

24  5.6(B)(1) of the APA, and that lists other agreements

25  containing material servicing provisions -

1    A.   Okay.

2    Q.   - and at page 8 of that schedule includes the pooling and

3    service agreement for the Halo 2007 AR1, and just a shortcut,

4    if I can summarize your previous testimony.  As I understand

5    it, to the extent that that pooling and servicing agreement

6    contains servicing provisions, that's what's being assumed

7    and assigned or sold in this case and not any other provision

8    of that agreement; is that fair?

9    A.   Again, you know, I'm aware of the agreement.  I haven't

10   read it in any detail, but arguably the provisions of this

11   agreement that relate specifically to the servicing of the

12   underlying loans are being purchased by the purchaser, and

13   the obligations to provide that servicing are being taken on

14   by the purchaser.

15   Q.   Okay, and not the other provisions of the pooling and

16   servicing agreement.

17   A.   Again, as far as provisions that relate to something

18   other than servicing, the purchaser is not taking on those

19   obligations.

20   Q.   Okay. Let me move to another subject.  We won't belabor

21   that.  Schedule 2.1(B)(ii), this is of the APA, this is a

22   schedule which lists contracts not provided by the debtor but

23   as I read the contract for seeking to assume and assign or

24   sell them, but my question is - Well, first of all, is it

25   true that the contracts listed in Schedule 2.1(B)(ii) were

1  not provided to the buyer?

2  A.  That's correct.

3  Q.  Do you know why they were not provided?

4  A.  I believe that these were - these agreements were known

5  but not necessarily available to be provided to the buyer,

6  but if you give me just a second, I'll let you know.  I

7  believe these were agreements that were not available to be

8  provided and therefore were not provided to the purchaser.

9  Q.  Okay, and so, is it fair to say that the debtor does not

10 have a copy or cannot locate a copy of those contracts?

11 A.  Again, you know, I did not prepare this schedule, so I'm

12 not sure I can say with certainty to that, but I think that's

13 probably a fair statement.

14 Q.  The fifth entry down on that schedule lists a contract

15 that's called a Loan Sale and Servicing Agreement with

16 CitiMortgage; do you see that?

17 A.  Yes, I do.

18 Q.  Do you know what debtors are parties to that contract?

19 A.  I do not by virtue of reading it.

20 Q.  Do you know if that contract provides duties -

21 A.  But presumably the servicer is a party to that agreement,

22 potentially among other debtors.

23 Q.  Okay, but you don't know for sure?

24 A.  I do not.

25 Q.  And do you know if that contract provides duties and

1   obligations other than servicing obligations?

2   A.  Without looking at it, I don't.  The fact that it is a

3   loan sale agreement, arguably it probably does.

4   Q.  Okay, and if I can refer to your earlier testimony and

5   summarize that, I imagine that your testimony would be that

6   you need to review that contract in order to determine which

7   obligations are servicing obligations and which obligations

8   are not; is that fair?

9   A.  It's fair.  I believe with the number of these agreements

10  that are listed on Schedule 2.1(B)(2), you know, there are

11  various writings and historical relationships between the

12  debtors and these counter parties that do establish what's

13  being serviced, what the related servicing fees are, what the

14  standards of conduct are, et cetera, and as a result, while

15  you don't have the specific agreement, you know, I think

16  there generally is an understanding between the investors and

17  the servicer as to what the underlying assets are.

18  Q.  But - I'm sorry, were you finished?

19  A.  But I have not, obviously, seen this agreement.

20  Q.  And you don't know for sure until you actually see a copy

21  of the agreement; is that fair?

22  A.  Either that or the opportunity to discuss the missing

23  agreement with the executive team at the servicer.

24  Q.  Okay.  Is there any further information you have that

25  would help CitiMortgage identify what contract this refers

1    to?

2    A.  I do not, but I believe some of the other witnesses may.

3              MR. FALLON: Your Honor, I'd move into evidence

4    CitiMortgage 1, which I handed to the witness.

5              THE COURT: Any objection?

6              MS. MORGAN: No objection, Your Honor.

7              THE COURT: It's admitted without objection.

8              MR. FALLON: I have no further questions, Your

9    Honor.

10             THE COURT: Thank you, Mr. Fallon.  I'm sorry, we're

11   going to have to take a five-minute break.

12             (Whereupon at 5:37 p.m., a recess was taken in the

13   hearing in this matter.)

14             (Whereupon at 5:43 p.m., the hearing in this matter

15   reconvened and the following proceedings were had:)

16             THE COURT: Let's reconvene.  Take your seats,

17   please.  Mr. Patton, this is going to be the last witness for

18   today.  We are going to reconvene tomorrow morning at either

19   9:30 or 10 in my chambers.

20             MR. PATTON: In chambers?

21             THE COURT: In my courtroom, sorry.  Whichever you

22   prefer.

23             MR. PATTON: 9:30 would be preferable.

24             THE COURT: 9:30, all right.  So this will be the

25   last witness.  We're going to reconvene tomorrow at 9:30.

1        MR. PATTON: Thank you, Your Honor.

2        THE COURT: In Courtroom 6, across the hall, but we

3   will finish with Mr. Weil.

4        THE WITNESS: Thank you, Your Honor, I appreciate

5   that.

6        MS. LAWSEN: And on that note, Mr. Weil, Kim Lawsen

7   from Reed Smith, and I will try to be extremely brief, and I

8   will start with entering one of the agreements into - hand up

9   the agreements to you to review.  May I approach, Your Honor?

10       THE COURT: Yes.  Which client's hat are you wearing

11  for this one?

12       MS. LAWSEN: This is for GMAC Mortgage.

13       THE COURT: Okay.

14       MS. LAWSEN: And I don't know whether the debtor is

15  willing to stipulate that this agreement - I'll give them a

16  copy, is one that is listed on Schedule 1.1(J) at (ek).

17       THE COURT: (bk) or (ek)?

18       MS. LAWSEN: (ek).

19       THE COURT: (ek).

20       MS. LAWSEN: No, I'm sorry, it's at (el).

21       MS. MORGAN: Your Honor, we'll stipulate.

22       THE COURT: Okay.

23                        CROSS-EXAMINATION

24  BY MS. LAWSEN:

25  Q.  Mr. Weil, are you familiar with this agreement?

1  A.  Generally, I am.  I've not read it in detail, but yes.

2  Q.  So any questions I would ask you about specific

3  provisions you would say you'd have to review the agreement

4  and the asset purchase agreement to make a determination as

5  to whether they would be part of the sale; is that correct?

6  A.  Well, certainly this agreement, I'm quite familiar with

7  the asset purchase agreement.

8  Q.  Okay, then I won't get into all of that.  Are you aware

9  that the debtors have removed all of the other GMAC HELOC

10  servicing agreements from the sale this morning?

11  A.  Yes, that is my understanding.

12  Q.  Do you happen to know why they were removed?  Without

13  disclosing any legal conversations or advice of counsel

14  issues, just from a business perspective, why were they

15  removed?

16  A.  Well, they account for a very small amount of the

17  servicing rights underlying unpaid principal balance that the

18  purchaser is looking to acquire.  Given that it is such a

19  small component of the universe of servicing rights and the

20  fact that these are complicated servicing rights to fulfill,

21  if you will, or provide servicing under, determination was

22  made to remove certain of these servicing agreements from the

23  sale, and I believe that there would be additional

24  negotiations involving these servicing agreements between the

25  counter parties, the debtor, and potentially the purchaser.

Weil - Cross

1   Q.  And do you know why this particular servicing agreement

2   was not removed?

3   A.  I do not, offhand, you know, sitting up here.  I really

4   haven't had the chance to confer with counsel as to the exact

5   details of the removal of these servicing agreements.

6   Q.  Okay.

7   A.  Certain of these servicing agreements.

8   Q.  Do you know if the loans that are subject to this

9   servicing agreement include what is called a HELOC loan?

10  A.  I don't know.  I mean, it would appear from the title

11  that this is a HELOC servicing agreement, that it might, but

12  I have not looked at this in any detail.

13  Q.  And are you familiar with the phrase "scratch and dent"?

14  A.  Yes, I am.

15  Q.  Can you explain what that is?

16  A.  Yes.  Scratch and dent refers to a loan that is - has

17  some issues with it, either with respect to - generally with

18  respect to documentation or other characteristics of the

19  loan, making it less than an ideal loan to sell into the

20  secondary market.

21  Q.  Would that include like a borrower default under that

22  loan or is it only related to a specific default with the

23  documentation of the loan itself?

24  A.  I believe it generally refers to documentation and

25  completeness of the file, less with respect to the

Weil - Cross

1  delinquency of the underlying borrower.

2  Q.  Okay.  And do you know, in terms of - First of all, can

3  you explain what a HELOC loan is?

4  A.  Yeah, HELOC refers to a home equity line of credit, and

5  it is a loan that essentially enables the borrower to draw

6  down - make draws on the loan as necessary subject to an

7  ultimate cap on the amount of those borrowings under the

8  HELOC.

9  Q.  And do you know what the typical mechanism is for a

10  borrower to draw down, as you refer to it, on a loan?

11  A.  Under a HELOC?

12  Q.  Yes.

13  A.  You know, general understanding, yes.

14  Q.  Okay.  Would that sometimes involve the writing of a

15  check?

16  A.  From the borrower?

17  Q.  Yes.

18  A.  Yes.

19  Q.  Okay.  Do you know under the asset purchase agreement if

20  there's any contemplation as to if checks under HELOCs are

21  presented to, let's say the debtors, after the economic

22  closing and prior to the final closing, how those checks will

23  be honored or if they will be honored?

24  A.  Well, I know that the debtor will continue to own the

25  servicing platform after the initial close and will continue

1    to operate the servicing platform in accordance with the

2    standards that it currently does.  The exact mechanism

3    related to this agreement and, you know, what is the

4    procedure, if you will, relevant to this agreement, I do not

5    have specific knowledge of.

6    Q.  And do you know what the servicer's role is in dealing

7    with home equity line requests for withdrawals?

8    A.  Again, generally.  I'm probably not the best person to

9    ask, but generally.

10   Q.  Okay.  To the extent that you have some knowledge, can

11   you explain that to me?

12   A.  Yeah.  The servicer typically, just like it services any

13   other agreement, continues to take payments of principal and

14   interest under these agreements and apply those to the

15   investor or the trust.  In certain circumstances, and I'm not

16   sure under this one, the servicer is required to fund

17   advances under a PELOC (phonetical) as well.

18   Q.  And - let me - I want to make sure I understand your

19   testimony correctly.  And during that interim period between

20   economic closing and final closing the debtor will continue

21   to do that part of the servicing, will fund those advances

22   under the HELOC - under this agreement.

23   A.  Yeah, I think what I said is, they're going to - my

24   understanding is the debtor is going to continue to provide,

25   to service the agreements that it services today under

1    standards of service that remain relatively constant.  You

2    know, I don't know the exact status of this agreement and

3    what the current procedure or methodology that the servicer

4    is using with respect to these underlying HELOCs.

5    Q.  Okay.  When the borrower writes a check and tries to take

6    a draw on their loan, do you know who - which entity they

7    would know to contact if there was a problem with the draw

8    request?

9    A.  I do not know.

10   Q.  Okay.  After the final closing, do you know what the

11   asset purchase agreement contemplates in terms of a business

12   perspective, what would happen to those draws?  Do you know

13   who would pay them?  Who the servicer would go to?  How they

14   would handle those types of draws?

15   A.  You know, again, I think I would have to get a better

16   understanding of this particular agreement and confer with

17   certain of the management team at the servicer to see how

18   they're handling it, and what is contemplated post-final

19   closing.  So, offhand, I would say, no.

20   Q.  Is there any particular provision of the asset purchase

21   agreement though that addresses specifically that potential

22   problem with the sale?

23   A.  Under HELOC?

24   Q.  Yes.

25   A.  I don't believe there is.

1   Q.  Okay.

2            MS. LAWSEN: I have no further questions.  I would

3   just like to move that servicing agreement into evidence if

4   there are no objections.

5            MS. MORGAN: No objections, Your Honor.

6            THE COURT: GMAC 1 is admitted into evidence.  Any

7   further cross-examination?  All right, hearing none,

8   redirect?

9                      REDIRECT EXAMINATION

10  BY MS. MORGAN:

11  Q.  Mr. Weil, you recall you were questioned by counsel for

12  EMC, I believe, regarding loans listed on Schedule 6.1(A)

13  MSRs able to be sold prior to initial closing; do you recall

14  that testimony?

15  A.  Yes, I do.

16  Q.  And EMC appeared on that schedule; is that correct?

17  A.  That's correct.

18  Q.  And - go ahead.

19  A.  Both Bear/EMC, yes.

20  Q.  For loans totaling approximately 1.2 billion; is that

21  correct?

22  A.  That is correct.

23  Q.  Okay.  And do you recall your testimony also that your

24  estimate is that the UPBs at closing, as you sit here right

25  now, you believe could be between 40 and 44 billion?

Weil - Redirect

1    A.  Yes, I did - or do.

2    Q.  And EMC suggested then that you had an appropriate

3    cushion perhaps to sell the EMC/Bear loans; do you recall

4    that testimony?

5    A.  I do.

6    Q.  Doesn't whether there was a cushion depend in large part

7    on what happens at the conclusion of this hearing?

8    A.  Yes, it does.

9    Q.  So, can we tell, sitting here today, whether we are going

10   to have room or an opportunity to give up on potentially a

11   billion of UPBs and still make the 38 billion minimum?

12   A.  No, we don't know exactly which servicing rights will

13   ultimately be purchased, when the closing will occur, and

14   what runoff there is between non-closing, and it's something

15   that we don't know.

16   Q.  And you were asked a lot of questions this afternoon and

17   early evening about various specific contracts with counter

18   parties that were listed on various schedules to the APA.

19   A.  Yeah, I recall a number of questions like that.

20   Q.  Can you explain in general terms the various teams of

21   people that were in place on behalf of both the debtors and

22   the purchaser and who were responsible for compiling the APA,

23   the exhibits, and the schedules thereto?

24   A.  Sure.  It was a team that was comprised of myself, you

25   know, other folks that work with me either at Milestone or

1    Phoenix, various representatives of the debtor - or I should

2    say employees of the debtor, both with respect to the

3    corporate entity and their internal legal team as well as

4    various representatives at their servicing business down in

5    Irving, outside counsel from both Young, Conaway and

6    Cadwalader, as well as in the final stages of the agreement,

7    as I mentioned before, input from BofA and the Creditors

8    Committee and their advisors.  So, it was quite a large

9    number of folks.

10   Q.  Okay.  And it wasn't your responsibility to review these

11   individual agreements; is that correct?

12   A.  That is correct.

13   Q.  Okay.  Assuming that at some point we would get to a

14   final closing, do you believe the debtors have the

15   appropriate personnel in place to determine exactly what

16   servicing rights are being transferred to the buyer under the

17   APA?

18   A.  Yes, I do.

19         MS. MORGAN: No further questions, Your Honor.

20         THE COURT: You may step down.  Thank you.  And I

21   have the unfortunate statement that you may speak to counsel

22   again.  You thought you were going to get off, but no,

23   they're going to plug you during dinner.  Anything further,

24   Ms. Morgan?

25         MS. MORGAN: Your Honor, I would like to move into

1    admission Debtors Exhibit 105, which was the APA.

2         THE COURT: Any objection?  It's admitted without

3    objection.

4         MS. MORGAN: Thank you, Your Honor.  I think that's

5    all for today, and we'll see you tomorrow at 9:30.

6         THE COURT: Yes, we're going to reconvene tomorrow

7    at 9:30 in courtroom 6.  We were the guests of Judge Carey

8    today, so I'd really appreciate it if you'd leave the

9    courtroom in as good a condition as you can so that I'm

10   allowed to use this courtroom again if I need to in the

11   future.  All right, anything -

12        MS. MORGAN: Thank you, Your Honor, we will.

13        THE COURT: You're welcome.  Hearing's adjourned.

14        (Whereupon at 5:58 p.m., the hearing in this matter

15   was concluded for this date.)

16

17

18        I, Elaine M. Ryan, approved transcriber for the

19   United States Courts, certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter.

22

23   /s/ Elaine M. Ryan                        October 19, 2007
     Elaine M. Ryan
     2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221P