# EMPLOYMENT AGREEMENT

This Employment Agreement, dated as of June 15, 2004 (this "Agreement"), is by and between American Home Mortgage Corp., a New York corporation having a place of business at 520 Broadhollow Road, Melville, NY 11747 (the "Company"), and Karen C. Gowins, 5244 Meadow Brook Road, Birmingham, Alabama 35242 (the "Executive").

Whereas the Company wishes to assure itself of the services of the Executive, and the Executive desires to be employed by the Company, upon the terms and conditions hereinafter set forth.

Now, Therefore, the Company and the Executive agree as follows:

1. **Employment**. The Company agrees to employ the Executive, and the Executive hereby accepts such employment by the Company during the term set forth in Section 2 and on the other terms and conditions of this Agreement.

2. **Term**. The term of this Agreement shall commence on or about July 6, 2004, and shall continue until four weeks after the resignation or discharge of the Executive. Commencement of this Agreement is subject to the Executive's satisfactory completion of the Company's customary Human Resources pre-employment procedures

3. **Position, Duties and Responsibilities, Rights**.

(a) During the term of this Agreement, the Executive shall serve as Senior Vice President, Director of Construction Lending. The Executive shall report to the Executive Vice President, Operations. As such, the Executive shall have all of the powers and duties usually incident to such office.

(b) The Executive will be responsible for developing and managing the Company's Construction Lending Center (the "Construction Lending Center"). The Executive's responsibilities will include the consolidation of all existing construction lending functions, and the organization and launching of a new construction lending initiative which will have as it primary focus a construction-to-permanent loan product to be introduced first to the Company's Retail Lending Group and then to the Company's Wholesale Lending Group.

(c) During the term of this Agreement, the Executive agrees to devote substantially all the Executive's time, efforts and skills to the affairs of the Company during the Company's normal business hours, except for vacations, illness and incapacity, but nothing in this Agreement shall preclude the Executive from devoting reasonable periods to (i) manage the Executive's personal investments, (ii) participate in professional, educational, public interest, charitable, civic or community activities, including activities sponsored by trade organizations, (iii) serve as a director or member of an advisory committee of any corporation not in competition with the Company or any of its subsidiaries, or as an officer, trustee or director of any charitable, educational, philanthropic, civic, social or industry organizations, or as a speaker; *provided, however*, that the performance of the Executive's duties or responsibilities in any of such capacities does not materially interfere with the regular performance of the Executive's duties and responsibilities hereunder.

4. <u>Compensation</u>.

(a) During the term of this Agreement, the Company shall pay the Executive, and the Executive agrees to accept a base salary at the rate of not less than $200,000.00 per year (the annual base salary as increased from time to time during the term of this Agreement being hereinafter referred to as the "Base Salary"). The Base Salary shall be paid in installments no less frequently than semi-monthly. Any increase in Base Salary or other compensation shall not limit or reduce any other obligation of the Company hereunder, and once established at an increased specified rate, the Executive's Base Salary hereunder shall not thereafter be reduced.

(b) For each month during the term of this Agreement, the Company will pay the Executive a monthly profitability bonus, payable by the end of the following month, and calculated as follows:

(i) Ten percent (10%) of the Pre-Tax Net Income (as defined below) of the Construction Lending Center if Delinquencies (as defined below) are less than sixty-five one hundredths of one percent (0.65%);

(ii) Seven and one-half percent (7.5%) of the Pre-Tax Net Income of the Construction Lending Center if Delinquencies are equal to or greater than sixty-five one hundredths of one percent (0.65%) but less than eighty-five one hundredths of one percent (0.85%);

(iii) Zero percent (0%) of the Pre-Tax Net Income of the Construction Lending Center if Delinquencies are equal to or greater than eighty-five one hundredths of one percent (0.85%).

For purposes of this calculation:

"Pre-tax Net Income" shall be determined by the Company in its sole discretion in accordance with the Company's usual and customary policies and practices as may be in effect from time to time. Without limiting the foregoing, revenue credited to the Construction Lending Center will include net interest income on construction loan balances (including construction to permanent loans that are in their construction phase) and fees charged to borrowers by the Construction Lending Center for construction loans, but will not include revenues associated with permanent financing such as take-out loans or the permanent portion of financing in a construction to permanent loan; while expenses charged to the Construction Lending Center will include commissions associated with construction loans (including the construction portion of construction to permanent loans), the salaries and other direct expenses of the Construction Lending Center including compensation paid to the Executive, and a corporate overhead charge.

"Delinquencies" shall be equal to the unpaid principal balance of construction loans approved by the Construction Lending Center (including the construction portion of construction to permanent loans) which are 30 days or more past due *divided by* the unpaid principal balance of all construction loans approved by the Construction Lending Center (including the construction portion of construction to permanent loans), provided however, that the computation of Delinquencies shall exclude FHA 203(k) loans.

(c) During each of the first five months of this agreement, if the total amount due the Executive under paragraphs 4(a) (Base Salary) and 4(b) (Monthly Profitability Bonus) is less than $25,000.00, then in lieu of amounts due the Executive under paragraphs 4(A) and 4(B), the Company will pay the Executive $25,000.00. Beginning in the ~~fifth~~ sixth [KCG] month of this Agreement, this paragraph 4(c) will be null and void.

(d) Notwithstanding anything to the contrary, the Executive will not be entitled to any unpaid Monthly Profitability Bonus if she ceases to be employed by the Company, for any reason, prior to the Company paying such bonus, and any potential bonus will be forfeited.

(e) The Executive will be eligible to participate in the Company's stock option plan. Upon the Executive commencing employment, the Executive shall receive an option award for 3,000 shares of the existing class of the common stock of the Company. One-half of the award (1,500 shares) shall vest and be exercisable three years following the date the Executive commences employment hereunder. The remainder of the award (1,500 shares) shall vest and be exercisable four years following the date the Executive commences employment. The complete terms of the option award and stock grant will be governed by the Company's omnibus stock option plan.

(f) During the term of this Agreement, the Executive shall be entitled to three weeks paid vacation in the first year of employment, four weeks paid vacation in the second year of employment, and five weeks paid vacation per year beginning in the third year of employment.

(g) During the term of this Agreement, the Executive shall receive a car allowance of $500.00 per month.

(h) The Executive will be eligible to participate in the Company's medical and dental benefits programs after 30 days of employment, and the Company's 401(k) program after 90 days of employment. During the term of this Agreement, the Executive shall be entitled to such other fringe benefits, in each case at least equal to and on the same terms and conditions as those attached to the Executive's office on the date hereof, as the same may be improved from time to time during the term of this Agreement, as well as to reimbursement, upon proper accounting, of all reasonable business expenses and disbursements incurred by the Executive in the performance of Executive's duties.

5. **Termination of Employment.** The employment created hereby is at will. The Company may terminate this Agreement by discharging the Executive. The Executive may terminate this Agreement by resigning with four weeks notice to the Company. Discharge or resignation may be for any reason or for no reason. If the Company chooses to discharge the Executive, it will deliver a letter of discharge pursuant to the notice provisions of section 8. If the Executive chooses to resign, the Executive will deliver a letter of resignation pursuant to the notice provisions of section 8.

6. **Entire Agreement; Amendment.**

(a) This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersedes any and all other agreements between the parties, their predecessors and affiliates.

(b) Any amendment of this Agreement shall not be binding unless in writing and signed by the Executive and the Company's Chief Executive Officer.

7. *Enforceability*. In the event that any provision of this Agreement is determined to be invalid or unenforceable, the remaining terms and conditions of this Agreement shall be unaffected and shall remain in full force and effect, and any such determination of invalidity or enforceability shall not affect the validity or enforceability of any other provision of this Agreement.

8. *Notices*. All notices which may be necessary or proper for either the Company or the Executive to give to the other shall be in writing and shall be sent by hand delivery, registered or certified mail, return receipt requested or overnight courier, if to the Executive, to her at 5244 Meadow Brook Road, Birmingham, Alabama 35242 and, if to the Company, to it at its principal executive offices at 520 Broadhollow Road, Melville, NY 11747, Attention: Chief Executive Officer with a copy to the Company's General Counsel at the same address. Either party may by like notice to the other party change the address at which it is to receive notices hereunder.

9. *Non-Disparagement, Non-Solicitation, Confidential Information*. The Company and the Executive agree that neither will disparage the other and that their representatives will not disparage either party hereto. The Executive agrees that for a period of one year following the termination of this Agreement, the Executive will not directly or indirectly solicit any employee of the Company to leave the Company or hire any employee of the Company. The Company and the Executive agree to keep the terms of this Agreement confidential except that the Executive may divulge the terms of this Agreement to the Executive's spouse, attorney, financial advisor and accountant provided they agree to keep the terms of this Agreement confidential. The Executive agrees to protect, not disclose, and not use for the Executive's benefit any confidential information or trade secrets belonging to the Company, including information regarding proprietary procedures and techniques, accounts, or personnel (excepting information that was already disclosed by the Company or otherwise was made public other than by breach of this Agreement by the Executive). The preceding two sentences shall not apply to disclosures required due to the laws or regulations of governments, or the orders of courts having jurisdiction over the Company and the Executive. This section 9 shall survive the termination of this Agreement.

10. *Governing Law*. THIS AGREEMENT SHALL BE GOVERNED BY, AND BE ENFORCEABLE IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

AMERICAN HOME MORTGAGE CORP.

By: _____
Name: Michael Strauss
Title: President

_____
Karen C. Gowins