# Exhibit A



# Master Repurchase Agreement

September 1996 Version

Dated as of   **November 4, 2003**

Between:   **Lehman Brothers Inc. and Lehman Commercial Paper Inc.**

and   **American Home Mortgage Investment Corp.**

## 1. Applicability

From time to time the parties hereto may enter into transactions in which one party ("Seller") agrees to transfer to the other ("Buyer") securities or other assets ("Securities") against the transfer of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such Securities at a date certain or on demand, against the transfer of funds by Seller. Each such transaction shall be referred to herein as a "Transaction" and, unless otherwise agreed in writing, shall be governed by this Agreement, including any supplemental terms or conditions contained in Annex I hereto and in any other annexes identified herein or therein as applicable hereunder.

## 2. Definitions

(a) "Act of Insolvency", with respect to any party, (i) the commencement by such party as debtor of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency or similar law, or such party seeking the appointment or election of a receiver, conservator, trustee, custodian or similar official for such party or any substantial part of its property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the commencement of any such case or proceeding against such party, or another seeking such an appointment or election, or the filing against a party of an application for a protective decree under the provisions of the Securities Investor Protection Act of 1970, which (A) is consented to or not timely contested by such party, (B) results in the entry of an order for relief, such an appointment or election, the issuance of such a protective decree or the entry of an order having a similar effect, or (C) is not dismissed within 15 days, (iii) the making by such party of a general assignment for the benefit of creditors, or (iv) the admission in writing by such party of such party's inability to pay such party's debts as they become due;

(b) "Additional Purchased Securities", Securities provided by Seller to Buyer pursuant to Paragraph 4(a) hereof;

(c) "Buyer's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(d) "Buyer's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Seller's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction;

(e) "Confirmation", the meaning specified in Paragraph 3(b) hereof;

(f) "Income", with respect to any Security at any time, any principal thereof and all interest, dividends or other distributions thereon;

(g) "Margin Deficit", the meaning specified in Paragraph 4(a) hereof;

(h) "Margin Excess", the meaning specified in Paragraph 4(b) hereof;

(i) "Margin Notice Deadline", the time agreed to by the parties in the relevant Confirmation, Annex I hereto or otherwise as the deadline for giving notice requiring same-day satisfaction of margin maintenance obligations as provided in Paragraph 4 hereof (or, in the absence of any such agreement, the deadline for such purposes established in accordance with market practice);

(j) "Market Value", with respect to any Securities as of any date, the price for such Securities on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein (other than any Income credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) as of such date (unless contrary to market practice for such Securities);

(k) "Price Differential", with respect to any Transaction as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction on a 360 day per year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the date of determination (reduced by any amount of such Price Differential previously paid by Seller to Buyer with respect to such Transaction);

(l) "Pricing Rate", the per annum percentage rate for determination of the Price Differential;

(m) "Prime Rate", the prime rate of U.S. commercial banks as published in The Wall Street Journal (or, if more than one such rate is published, the average of such rates);

(n) "Purchase Date", the date on which Purchased Securities are to be transferred by Seller to Buyer;

(o) "Purchase Price", (i) on the Purchase Date, the price at which Purchased Securities are transferred by Seller to Buyer, and (ii) thereafter, except where Buyer and Seller agree otherwise, such price increased by the amount of any cash transferred by Buyer to Seller pursuant to Paragraph 4(b) hereof and decreased by the amount of any cash transferred by Seller to Buyer pursuant to Paragraph 4(a) hereof or applied to reduce Seller's obligations under clause (ii) of Paragraph 5 hereof;

(p) "Purchased Securities", the Securities transferred by Seller to Buyer in a Transaction hereunder, and any Securities substituted therefor in accordance with Paragraph 9 hereof. The term "Purchased Securities" with respect to any Transaction at any time also shall include Additional Purchased Securities delivered pursuant to Paragraph 4(a) hereof and shall exclude Securities returned pursuant to Paragraph 4(b) hereof;

(q) "Repurchase Date", the date on which Seller is to repurchase the Purchased Securities from Buyer, including any date determined by application of the provisions of Paragraph 3(c) or 11 hereof;

(r) "Repurchase Price", the price at which Purchased Securities are to be transferred from Buyer to Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price and the Price Differential as of the date of such determination;

(s) "Seller's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Seller's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(t) "Seller's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Buyer's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction.

## 3. Initiation; Confirmation; Termination

(a) An agreement to enter into a Transaction may be made orally or in writing at the initiation of either Buyer or Seller. On the Purchase Date for the Transaction, the Purchased Securities shall be transferred to Buyer or its agent against the transfer of the Purchase Price to an account of Seller.

(b) Upon agreeing to enter into a Transaction hereunder, Buyer or Seller (or both), as shall be agreed, shall promptly deliver to the other party a written confirmation of each Transaction (a "Confirmation"). The Confirmation shall describe the Purchased Securities (including CUSIP number, if any), identify Buyer and Seller and set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date, unless the Transaction is to be terminable on demand, (iv) the Pricing Rate or Repurchase Price applicable to the Transaction, and (v) any additional terms or conditions of the Transaction not inconsistent with this Agreement. The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and Seller with respect to the Transaction to which the Confirmation relates, unless with

respect to the Confirmation specific objection is made promptly after receipt thereof. In the event of any conflict between the terms of such Confirmation and this Agreement, this Agreement shall prevail.

(c) In the case of Transactions terminable upon demand, such demand shall be made by Buyer or Seller, no later than such time as is customary in accordance with market practice, by telephone or otherwise on or prior to the business day on which such termination will be effective. On the date specified in such demand, or on the date fixed for termination in the case of Transactions having a fixed term, termination of the Transaction will be effected by transfer to Seller or its agent of the Purchased Securities and any Income in respect thereof received by Buyer (and not previously credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) against the transfer of the Repurchase Price to an account of Buyer.

## 4. Margin Maintenance

(a) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer is less than the aggregate Buyer's Margin Amount for all such Transactions (a "Margin Deficit"), then Buyer may by notice to Seller require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional Securities reasonably acceptable to Buyer ("Additional Purchased Securities"), so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller).

(b) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Seller exceeds the aggregate Seller's Margin Amount for all such Transactions at such time (a "Margin Excess"), then Seller may by notice to Buyer require Buyer in such Transactions, at Buyer's option, to transfer cash or Purchased Securities to Seller, so that the aggregate Market Value of the Purchased Securities, after deduction of any such cash or any Purchased Securities so transferred, will thereupon not exceed such aggregate Seller's Margin Amount (increased by the amount of any Margin Excess as of such date arising from any Transactions in which such Seller is acting as Buyer).

(c) If any notice is given by Buyer or Seller under subparagraph (a) or (b) of this Paragraph at or before the Margin Notice Deadline on any business day, the party receiving such notice shall transfer cash or Additional Purchased Securities as provided in such subparagraph no later than the close of business in the relevant market on such day. If any such notice is given after the Margin Notice Deadline, the party receiving such notice shall transfer such cash or Securities no later than the close of business in the relevant market on the next business day following such notice.

(d) Any cash transferred pursuant to this Paragraph shall be attributed to such Transactions as shall be agreed upon by Buyer and Seller.

(e) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer or Seller (or both) under subparagraphs (a) and (b) of this Paragraph may be exercised only where a Margin Deficit or Margin Excess, as the case may be, exceeds a specified dollar amount or a specified percentage of the Repurchase Prices for such Transactions (which amount or percentage shall be agreed to by Buyer and Seller prior to entering into any such Transactions).

(f) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer and Seller under subparagraphs (a) and (b) of this Paragraph to require the elimination of a Margin Deficit or a Margin Excess, as the case may be, may be exercised whenever such a Margin Deficit or Margin Excess exists with respect to any single Transaction hereunder (calculated without regard to any other Transaction outstanding under this Agreement).

## 5. Income Payments

Seller shall be entitled to receive an amount equal to all Income paid or distributed on or in respect of the Securities that is not otherwise received by Seller, to the full extent it would be so entitled if the Securities had not been sold to Buyer. Buyer shall, as the parties may agree with respect to any Transaction (or, in the absence of any such agreement, as Buyer shall reasonably determine in its discretion), on the date such Income is paid or distributed either (i) transfer to or credit to the account of Seller such Income with respect to any Purchased Securities subject to such Transaction or (ii) with respect to Income paid in cash, apply the Income payment or payments to reduce the amount, if any, to be transferred to Buyer by Seller upon termination of such Transaction. Buyer shall not be obligated to take any action pursuant to the preceding sentence (A) to the extent that such action would result in the creation of a Margin Deficit, unless prior thereto or simultaneously therewith Seller transfers to Buyer cash or Additional Purchased Securities sufficient to eliminate such Margin Deficit, or (B) if an Event of Default with respect to Seller has occurred and is then continuing at the time such Income is paid or distributed.

## 6. Security Interest

Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, Seller shall be deemed to have pledged to Buyer as security for the performance by Seller of its obligations under each such Transaction, and shall be deemed to have granted to Buyer a security interest in, all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof.

## 7. Payment and Transfer

Unless otherwise mutually agreed, all transfers of funds hereunder shall be in immediately available funds. All Securities transferred by one party hereto to the other party (i) shall be in suitable form for transfer or shall be accompanied by duly executed instruments of transfer or assignment in blank and such other documentation as the party receiving possession may reasonably request, (ii) shall be transferred on the book-entry system of a Federal Reserve Bank, or (iii) shall be transferred by any other method mutually acceptable to Seller and Buyer.

## 8. Segregation of Purchased Securities

To the extent required by applicable law, all Purchased Securities in the possession of Seller shall be segregated from other securities in its possession and shall be identified as subject to this Agreement. Segregation may be accomplished by appropriate identification on the books and records of the holder, including a financial or securities intermediary or a clearing corporation. All of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities, but no such transaction shall relieve Buyer of its obligations to transfer Purchased Securities to Seller pursuant to Paragraph 3, 4 or 11 hereof, or of Buyer's obligation to credit or pay Income to, or apply Income to the obligations of, Seller pursuant to Paragraph 5 hereof.

---

### Required Disclosure for Transactions in Which the Seller Retains Custody of the Purchased Securities

Seller is not permitted to substitute other securities for those subject to this Agreement and therefore must keep Buyer's securities segregated at all times, unless in this Agreement Buyer grants Seller the right to substitute other securities. If Buyer grants the right to substitute, this means that Buyer's securities will likely be commingled with Seller's own securities during the trading day. Buyer is advised that, during any trading day that Buyer's securities are commingled with Seller's securities, they [will]* [may]** be subject to liens granted by Seller to [its clearing bank]* [third parties]** and may be used by Seller for deliveries on other securities transactions. Whenever the securities are commingled, Seller's ability to resegregate substitute securities for Buyer will be subject to Seller's ability to satisfy [the clearing]* [any]** lien or to obtain substitute securities.

* Language to be used under 17 C.F.R. ß403.4(e) if Seller is a government securities broker or dealer other than a financial institution.
** Language to be used under 17 C.F.R. ß403.5(d) if Seller is a financial institution.

---

## 9. Substitution

(a) Seller may, subject to agreement with and acceptance by Buyer, substitute other Securities for any Purchased Securities. Such substitution shall be made by transfer to Buyer of such other Securities and transfer to Seller of such Purchased Securities. After substitution, the substituted Securities shall be deemed to be Purchased Securities.

(b) In Transactions in which Seller retains custody of Purchased Securities, the parties expressly agree that Buyer shall be deemed, for purposes of subparagraph (a) of this Paragraph, to have agreed to and accepted in this Agreement substitution by Seller of other Securities for Purchased Securities; provided, however, that such other Securities shall have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.

## 10. Representations

Each of Buyer and Seller represents and warrants to the other that (i) it is duly authorized to execute and deliver this Agreement, to enter into Transactions contemplated hereunder and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery and performance, (ii) it will engage in such Transactions as principal (or, if agreed in writing, in the form of an annex hereto or otherwise, in advance of any Transaction by the other party hereto, as agent for a disclosed principal), (iii) the person signing this Agreement on its behalf is duly authorized to do so on its behalf (or on behalf of any such disclosed principal), (iv) it has obtained all authorizations of any governmental body required in connection with this Agreement and the Transactions hereunder and such authorizations are in full force and effect and (v) the execution, delivery and performance of this Agreement and the Transactions hereunder will not violate any law, ordinance, charter, by-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected. On the Purchase Date for any Transaction Buyer and Seller shall each be deemed to repeat all the foregoing representations made by it.

## 11. Events of Default

In the event that (i) Seller fails to transfer or Buyer fails to purchase Purchased Securities upon the applicable Purchase Date, (ii) Seller fails to repurchase or Buyer fails to transfer Purchased Securities upon the applicable Repurchase Date, (iii) Seller or Buyer fails to comply with Paragraph 4 hereof, (iv) Buyer fails, after one business day's notice, to comply with Paragraph 5 hereof, (v) an Act of Insolvency occurs with respect to Seller or Buyer, (vi) any representation made by Seller or Buyer shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, or (vii) Seller or Buyer shall admit to the other its inability to, or its intention not to, perform any of its obligations hereunder (each an "Event of Default"):

(a)  The nondefaulting party may, at its option (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), declare an Event of Default to have occurred hereunder and, upon the exercise or deemed exercise of such option, the Repurchase Date for each Transaction hereunder shall, if it has not already occurred, be deemed immediately to occur (except that, in the event that the Purchase Date for any Transaction has not yet occurred as of the date of such exercise or deemed exercise, such Transaction shall be deemed immediately canceled). The nondefaulting party shall (except upon the occurrence of an Act of Insolvency) give notice to the defaulting party of the exercise of such option as promptly as practicable.

(b)  In all Transactions in which the defaulting party is acting as Seller, if the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, (i) the defaulting party's obligations in such Transactions to repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase Date determined in accordance with subparagraph (a) of this Paragraph, shall thereupon become immediately due and payable, (ii) all Income paid after such exercise or deemed exercise shall be retained by the nondefaulting party and applied to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder, and (iii) the defaulting party shall immediately deliver to the nondefaulting party any Purchased Securities subject to such Transactions then in the defaulting party's possession or control.

(c) In all Transactions in which the defaulting party is acting as Buyer, upon tender by the nondefaulting party of payment of the aggregate Repurchase Prices for all such Transactions, all right, title and interest in and entitlement to all Purchased Securities subject to such Transactions shall be deemed transferred to the nondefaulting party, and the defaulting party shall deliver all such Purchased Securities to the nondefaulting party.

(d) If the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, the nondefaulting party, without prior notice to the defaulting party, may:

  (i) as to Transactions in which the defaulting party is acting as Seller, (A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source, against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder; and

  (ii) as to Transactions in which the defaulting party is acting as Buyer, (A) immediately purchase, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, securities ("Replacement Securities") of the same class and amount as any Purchased Securities that are not delivered by the defaulting party to the nondefaulting party as required hereunder or (B) in its sole discretion elect, in lieu of purchasing Replacement Securities, to be deemed to have purchased Replacement Securities at the price therefor on such date, obtained from a generally recognized source or the most recent closing offer quotation from such a source.

Unless otherwise provided in Annex I, the parties acknowledge and agree that (1) the Securities subject to any Transaction hereunder are instruments traded in a recognized market, (2) in the absence of a generally recognized source for prices or bid or offer quotations for any Security, the nondefaulting party may establish the source therefor in its sole discretion and (3) all prices, bids and offers shall be determined together with accrued Income (except to the extent contrary to market practice with respect to the relevant Securities).

(e) As to Transactions in which the defaulting party is acting as Buyer, the defaulting party shall be liable to the nondefaulting party for any excess of the price paid (or deemed paid) by the nondefaulting party for Replacement Securities over the Repurchase Price for the Purchased Securities replaced thereby and for any amounts payable by the defaulting party under Paragraph 5 hereof or otherwise hereunder.

(f) For purposes of this Paragraph 11, the Repurchase Price for each Transaction hereunder in respect of which the defaulting party is acting as Buyer shall not increase above the

amount of such Repurchase Price for such Transaction determined as of the date of the exercise or deemed exercise by the nondefaulting party of the option referred to in sub-paragraph (a) of this Paragraph.

(g) The defaulting party shall be liable to the nondefaulting party for (i) the amount of all reasonable legal or other expenses incurred by the nondefaulting party in connection with or as a result of an Event of Default, (ii) damages in an amount equal to the cost (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of an Event of Default, and (iii) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default in respect of a Transaction.

(h) To the extent permitted by applicable law, the defaulting party shall be liable to the non-defaulting party for interest on any amounts owing by the defaulting party hereunder, from the date the defaulting party becomes liable for such amounts hereunder until such amounts are (i) paid in full by the defaulting party or (ii) satisfied in full by the exercise of the nondefaulting party's rights hereunder. Interest on any sum payable by the default-ing party to the nondefaulting party under this Paragraph 11(h) shall be at a rate equal to the greater of the Pricing Rate for the relevant Transaction or the Prime Rate.

(i) The nondefaulting party shall have, in addition to its rights hereunder, any rights other-wise available to it under any other agreement or applicable law.

## 12. Single Agreement

Buyer and Seller acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, each of Buyer and Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the perfor-mance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder and (iii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.

## 13. Notices and Other Communications

Any and all notices, statements, demands or other communications hereunder may be given by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the address specified in Annex II hereto, or so sent to such party at any other place specified in a notice of change of address hereafter received by the other. All notices, demands and requests hereun-der may be made orally, to be confirmed promptly in writing, or by other communication as specified in the preceding sentence.

## 14. Entire Agreement; Severability

This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions. Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

## 15. Non-assignability; Termination

(a) The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by either party without the prior written consent of the other party, and any such assignment without the prior written consent of the other party shall be null and void. Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. This Agreement may be terminated by either party upon giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

(b) Subparagraph (a) of this Paragraph 15 shall not preclude a party from assigning, charging or otherwise dealing with all or any part of its interest in any sum payable to it under Paragraph 11 hereof.

## 16. Governing Law

This Agreement shall be governed by the laws of the State of New York without giving effect to the conflict of law principles thereof.

## 17. No Waivers, Etc.

No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure herefrom shall be effective unless and until such shall be in writing and duly executed by both of the parties hereto. Without limitation on any of the foregoing, the failure to give a notice pursuant to Paragraph 4(a) or 4(b) hereof will not constitute a waiver of any right to do so at a later date.

## 18. Use of Employee Plan Assets

(a) If assets of an employee benefit plan subject to any provision of the Employee Retirement Income Security Act of 1974 ("ERISA") are intended to be used by either party hereto (the "Plan Party") in a Transaction, the Plan Party shall so notify the other party prior to the Transaction. The Plan Party shall represent in writing to the other party that the Transaction does not constitute a prohibited transaction under ERISA or is otherwise exempt therefrom, and the other party may proceed in reliance thereon but shall not be required so to proceed.

(b) Subject to the last sentence of subparagraph (a) of this Paragraph, any such Transaction shall proceed only if Seller furnishes or has furnished to Buyer its most recent available audited statement of its financial condition and its most recent subsequent unaudited statement of its financial condition.

(c) By entering into a Transaction pursuant to this Paragraph, Seller shall be deemed (i) to represent to Buyer that since the date of Seller's latest such financial statements, there has been no material adverse change in Seller's financial condition which Seller has not disclosed to Buyer, and (ii) to agree to provide Buyer with future audited and unaudited statements of its financial condition as they are issued, so long as it is a Seller in any outstanding Transaction involving a Plan Party.

## 19. Intent

(a) The parties recognize that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Securities subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(b) It is understood that either party's right to liquidate Securities delivered to it in connection with Transactions hereunder or to exercise any other remedies pursuant to Paragraph 11 hereof is a contractual right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as amended.

(c) The parties agree and acknowledge that if a party hereto is an "insured depository institution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract," as that term is defined in FDIA and any rules, orders or policy statements thereunder (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(d) It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation", respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA).

## 20. Disclosure Relating to Certain Federal Protections

The parties acknowledge that they have been advised that:

(a) in the case of Transactions in which one of the parties is a broker or dealer registered with the Securities and Exchange Commission ("SEC") under Section 15 of the Securities Exchange Act of 1934 ("1934 Act"), the Securities Investor Protection Corporation has

taken the position that the provisions of the Securities Investor Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(b) in the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(c) in the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.

**Lehman Brothers Inc.**

By: _____

Name: _____

Title: _____

Date: _____

**American Home Mortgage Investment Corp.**

By: _____

Name: ___Thomas McDonagh___

Title: ___Chief Investment Officer___

Date: _____

**Lehman Commercial Paper Inc.**

By: _____

Name: _____

Title: ___ROBERT E. GUGLIELMO___

Date: ___SENIOR VICE PRESIDENT___

## ANNEX I
## Supplemental Terms and Conditions

This Annex forms a part of the Master Repurchase Agreement dated as of November 4, 2003 (the "Agreement") between Lehman Brothers Inc., Lehman Commercial Paper Inc., and American Home Mortgage Investment Corp.

Capitalized terms used but not defined in this Annex I shall have the meanings ascribed to them in the Agreement.

1.  In addition to this Annex I, Annex II shall be deemed executed by the parties hereto and shall also form a part of the Agreement.

2.  With respect to individual repurchase transactions, this Agreement shall only apply to the Lehman Brothers entity (i.e. Lehman Brothers Inc., Lehman Commercial Paper Inc.) printed in the confirmation (as described in Section 3(b) herein) provided to the counterparty of the Lehman Brothers entity.

3.  Definitions. For purposes of the Agreement, the following terms shall have the following meanings:

    (a) "Margin Notice Deadline", 10:00 am New York City time.

    (b) "Business Day" or "business day", with respect to any Transaction hereunder, a day on which regular trading may occur in the principal market for the Purchased Securities subject to such Transaction. In no event shall a Saturday or Sunday be considered a business day.

4.  Purchase Price Maintenance.

    (a) Unless otherwise expressly agreed by the parties hereto, the parties agree that in any Transaction hereunder whose term extends over an Income payment date for the Securities subject to such Transaction, Buyer shall on the date such Income is paid transfer to or credit to the account of Seller an amount equal to such Income payment or payments pursuant to Paragraph 5(i) and shall not apply the Income payment or payments to reduce the amount to be transferred to Buyer or Seller upon termination of the Transaction pursuant to Paragraph 5(ii) of the Agreement.

    (b) Unless otherwise expressly agreed by the parties hereto, notwithstanding the definition of Purchase Price in Paragraph 2 of the Agreement and the provisions of Paragraph 4 of the Agreement, the parties agree (i) that the Purchase Price will not be increased or decreased by the amount of any cash transferred by one party to the other pursuant to Paragraph 4 of the Agreement and (ii) that transfer of cash shall be treated as if it constituted a transfer of Securities (with a Market Value equal to the U.S. dollar amount of such cash) pursuant to Paragraph 4(a) or (b), as the case may be (including for purposes of the definition of "Additional Purchased Securities").

5.  Submission to Jurisdiction; Waiver of Immunity; Waiver of Jury Trial.

    (a) Each party irrevocably and unconditionally (i) submits to the non-exclusive jurisdiction of any United States Federal or New York State court sitting in Manhattan, and any appellate court from any such court, solely for the purpose of any suit, action or proceeding brought to enforce its obligations under the Agreement and (ii) waives, to the fullest extent it may effectively do so, any defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right of jurisdiction on account of its place of residence or domicile.

    (b) To the extent that either party has or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit, or proceeding, from jurisdiction of any court or from set off or any legal process (whether service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) with respect to itself or any of its property, such party hereby irrevocably waives and agrees not to plead or claim such immunity in respect of any action brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement.

    (c) Each party hereto hereby irrevocably waives any right that it may have to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or the Transactions contemplated hereby.

**Annex II**
**Names and Addresses for Communications Between Parties**

**LEHMAN BROTHERS**
745 Seventh Avenue, 28th Floor
New York, New York 10019

Attn.: Robert Guglielmo, Senior Vice President
Transaction Management
(212) 526-7121  phone
(212) 526-7672 fax

**Legal/Documentation Information:**

Name of Firm: _____

Address: _____

_____

_____

Attn: _____

Tel #: _____

Fax #: _____

**Business/Trading Information:**

Name of Firm: American Home Mortgage Holdings, Inc.

Address: 520 Broadhollow Road

Melville, NY 11747

tmcdonagh@americanhm.com

Attn: Thomas McDonagh

Tel #: 516-622-8960

Fax #: 516-620-1031

**ANNEX :.1**
**Supplemental Terms and Conditions**

The parties hereto agree that the following Supplemental Terms and Conditions are hereby incorporated in the Master Repurchase Agreement dated as of November 4, 2003 (the "Agreement") by and between Lehman Brothers Inc. ("Lehman") and American Home Mortgage Investment Corp. ("Client") and this Annex I.1 shall supplement the terms and conditions and be a part of the Agreement.

A    **Financial Statement Reporting Requirement**
If not publicly available to Lehman, Client agrees to supply, or cause to be supplied, to Lehman the following:

(i)   Within 90 days after the expiration of each fiscal year, audited annual financial statements of the Client,

(ii)  Within 45 days after the end of each of the first three quarters in each fiscal year, equivalent financial information to that required by Subparagraph B.

(iii) Prompt written notice of any material adverse change in Client's business, asset, prospects, operations, financial condition or in Client's ability to discharge its obligations under this Agreement.

B    **Covenants of Client**
Client shall deliver to Lehman upon execution of this Annex I.1. a copy of a resolution of the Board of Directors or other appropriate committee of Client authorizing Client to enter into Long-Term Transactions (as defined below)

Client shall not be responsible for filing any financing documents required to create a perfected security interest in the Purchased Securities, provided however the Client will execute any financing documents required in order to create the perfected security interest in the Purchased Securities.

C.   **Events of Default**
In addition to Events of Default defined in Paragraph 11 hereto,

(i) an Event of Default by Client shall occur if:

(a) Client shall fail to perform or observe any term, covenant or agreement contained in this Agreement (including, without limitation the failure to make any payment when due pursuant to the Agreement or any applicable Confirmation); (b) Client shall fail to pay any debt for borrowed money or other similar obligation or liability in excess of the lesser of $40,000,000 or two percent of Client's stockholder's equity ("Material Indebtedness") (excluding indebtedness evidenced by this Agreement) of Client, or any interest or premium thereon, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Material Indebtedness, or any other default under any agreement or instrument relating to any such Material Indebtedness, or any other event, shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Material Indebtedness; or any such Material Indebtedness of Client shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), prior to the stated maturity thereof; (c) any provision of this Agreement or any Confirmation shall at any time for any reason be declared to be null and void by a court of competent jurisdiction, or the validity or enforceability thereof shall be contested by Client, or any other person, or a proceeding

shall be commenced by Client or any other person, seeking to establish the invalidity or unenforceability thereof, or Client shall deny that it has any liability or obligation hereunder or there under; or (d) the Seller shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof, first priority lien on or security interest in any of the Purchased Securities purported to be covered hereby in favor of Buyer.

(ii)  an Event of Default by Seller shall occur if Seller shall fail to pay Price Differential when due pursuant to the Agreement or any applicable Confirmation

D    **Non-Assignability: Termination**
Paragraph 15(a) of the Agreement is amended by deleting the last sentence thereof and adding at the end of Paragraph 15(a) the following:

Notwithstanding the foregoing, Lehman shall have the right to assign this Agreement, and any of its rights, obligations (including its obligations to pay Replacement Value) and benefits hereunder, under any Confirmation and under any Transaction to any subsidiary or affiliate of Lehman, so long as such entity remains a direct or indirect wholly-owned subsidiary of Lehman Brothers Holdings Inc.("LBHI") and (x) the obligations of such entity generally or with respect to any such Transaction are guaranteed by LBHI or (y) such affiliated entity has a long term senior unsecured debt ratings that is equal to or better than those of LBHI (a "Permitted Lehman Assignee"). In the event of an assignment of Lehman's obligations hereunder to a Permitted Lehman Assignee, such assignee shall succeed to, and shall be responsible for the performance of, all of Lehman's-covenants and obligations hereunder to the extent assigned, and Lehman shall be released from such covenants and obligations to the extent assigned and Lehman shall remain responsible for any covenants and obligations that were not assigned.  Except as may be otherwise agreed in writing by the parties, this Agreement may be canceled by either party upon its giving written notice of cancellation to the other; provided, however, that this Agreement shall, notwithstanding such notice, remain applicable to any Transaction then outstanding and any forward or successive Transaction or Long-Term Transaction agreed to by the parties prior to the cancellation of this Agreement

E.    **Further Rights to Terminate Transactions**
In each of the following applicable instances, upon Lehman's written notice to Client ("Termination Notice"), Lehman shall have the right in its sole discretion to accelerate the Repurchase Date for all outstanding Transaction and to no longer be obligated to enter into any additional Transactions pursuant to any outstanding Confirmation, such accelerated Repurchase Date to occur on a Business Day designated by Lehman that shall not be earlier than the  effective date of  the Termination Notice is delivered to Client

(i)  applicable Federal or state bankruptcy, insolvency or similar laws, or any other  laws, including regulations or interpretations issued hereunder by appropriate courts or regulatory agencies, in existence on the date hereof, are altered or interpreted, or such laws, regulations or interpretations are enacted, adopted or issued after the date hereof, in either case in a manner which, with respect to an outstanding Transaction, either materially (x) limits the ability of Seller to pledge or grant to Buyer an effective first priority perfected security interest in Purchased Securities or limits the ability of Seller to transfer to Buyer all rights, title and interest herein and thereto, free and clear of any claim or interest of any other party, or (y) impairs the right of Lehman to exercise any of its remedies hereunder in a timely manner in accordance with this Agreement and obtain or transfer sole right, title and interest in and to the Purchased Securities.

(ii)  changes in applicable law or regulations prohibit Client or Lehman from participating in repurchase agreements, as contemplated by this Agreement or any Confirmation, and such prohibition would be applicable to any outstanding Transactions including Long-Term Transactions.

(iii) if, during the term of any outstanding Transaction, quotations for repurchase (or reverse repurchase) transactions in securities of the same type as any Purchased Security subject to any such outstanding Transaction are not available to Lehman, Client and market participants generally from at least one of the primary government securities dealers (other than Lehman), designated from time to time by the Federal Reserve Bank of New York, after good faith efforts on the part of Lehman and Client to obtain such quotations over a continuous period of thirty (30) days; provided, however, that Lehman as a precondition to its terminating a Transaction pursuant to this Subparagraph E(iii), shall deliver to the other party an Officer's Certificate certifying the occurrence of the events hereinabove described.

(iv) On any day during the term hereof the Client (1) has experienced a decline in its Equity Capital (as determined in accordance with generally accepted accounting principals (GAAP)) during any consecutive three-month period preceding such date of 15 percent or more, or (2) has experienced a decline in its Equity Capital during any consecutive twelve-month period preceding such date of 30 percent or more. "Equity Capital" means the total of perpetual preferred stock, common stock, surplus, undivided profits and capital reserves (net), and cumulative foreign currency translation adjustments.

(v) on any day during the term hereof (but only after the consummation of the transactions contemplated by that certain Agreement and Plan of Merger dated July 12, 2003, among Client, American Home Mortgage Holdings Inc and Apex Mortgage Capital, Inc.), Lehman in its sole discretion determines (based on GAAP) that Client has failed to maintain minimum Equity Capital in an amount equal to at least $200,000,000.

(vi) an Act of Insolvency with respect to the Client

(vii) if, during the term of any outstanding Transaction, Client has experienced or is experiencing a material adverse change, determined by Lehman in Lehman's sole discretion, in its business, assets, operations or financial condition.

**F.      Set-off**
In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default or an event described in Paragraph F herein, with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation.) For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date.

**G.      Additional Terms and Conditions with respect to Long-Term Transactions**
From time to time Lehman and Client may enter into a Transaction or a series of consecutive Transactions with a scheduled final Repurchase Date (the "Scheduled Final Repurchase Date") that is at least one year after the initial Purchase Date with a fixed, floating, capped or floored Pricing Rate (each a "Long-Term Transaction").

In connection with such Long-Term Transactions, the following additional terms and conditions shall apply

(i) **Provision with respect to Event of Default or Termination of Long-Term Transaction:**
Upon the occurrence of an Event of Default or delivery of a Termination Notice pursuant to Section E above, the Non-Affected Party (as defined below) shall attempt to obtain quotations from at least four (4) dealers identified in good faith (each a "Dealer") for the purpose of determining such

party's loss or gain associated with terminating each Long-Term Transaction. Each quotation will be for an amount, if any, that would be paid to the Non-Affected Party, or by the Non-Affected Party, in consideration of an agreement between the Non-Affected Party and the quoting Dealer to enter into a replacement transaction or transactions that would have the effect of preserving for the Non-Affected Party the remaining economic terms of the relevant Long-Term Transaction from the date of the quotation to the Scheduled Final Repurchase Date. The Non-Affected Party shall obtain the quotations on the date the Event of Default is declared or Termination Notice is delivered or as soon thereafter as reasonably practicable. If more than three (3) quotations are provided, the gain or loss will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three (3) such quotations are provided, the quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest or lowest value, then one of such quotations shall be disregarded. If fewer than three (3) quotations are obtained, then the Non-Affected Party shall determine its damages and losses (or gains and benefits) associated with terminating the Long-Term Transactions in good faith and in a commercially reasonable manner. If as a result of this calculation, the Non-Affected Party determines that it would incur a loss or cost as a result of entering into a replacement transaction or transactions, and where applicable, such amount shall be added to any other amounts payable by the other party to the Non-Affected Party or netted against any amounts payable by the Non-Affected Party to the other party pursuant to this Agreement. If as a result of the calculation, the Non-Affected Party determines that it would incur a gain as a result of entering into a replacement transaction, the Non-Affected Party shall owe such amount to the other party and where applicable such gain shall be netted against any amounts payable by the other party to the Non-Affected Party or added to any other amounts payable by the Non-Affected Party to the other party pursuant to the Agreement.

The "Non-Affected Party" means (a) Lehman with respect to an event described in Section E above or the occurrence of an Event of Default (other than an Event of Default resulting from Act of Insolvency of Lehman) and (b) Client, with respect to an Event of Default resulting from an Act of Insolvency of Lehman.

(ii) **Provision with Respect to Margin Maintenance:**
The Buyer's Margin Percentage shall equal the Seller's Margin Percentage and each shall be known herein as the "Margin Percentage", provided, that, in the event (1) the margin percentage required by legal or regulatory authorities, including without limitation the New York Stock Exchange, the NASD, the SEC or the Federal Reserve Board, for the Purchased Securities, as determined by Lehman and applied in the ordinary course of its securities repo business, is increased, or (2) the Purchased Securities constituting U.S. Agency Securities no longer have the implicit or explicit guarantee of the U.S. government or are not treated by Lehman in the ordinary course of its securities repo business as "exempted securities" (either (1) or (2), a "Regulatory Change"), the Margin Percentage shall be increased by Lehman to the extent reasonably necessary to account for such Regulatory Change.

Notwithstanding the terms of the Agreement, with respect to a Long-Term Transaction as of any date, the Buyer's Margin Amount and the Seller's Margin Amount shall each equal the sum of (i) the amount obtained by application of the Margin Percentage to the Repurchase Price and (ii) the Replacement Value (as of the most recent date of determination) if positive.

The "Replacement Value" as of any date of determination for a Long-Term Transaction shall be an amount, as reasonably determined by Lehman, that would be Lehman's net cost or net gain if such Long-Term Transaction was terminated as a result of an Event of Default with respect to Client under the Agreement or an early termination of such Long-Term Transaction by Lehman pursuant to the Agreement. The Replacement Value shall be a positive amount if Lehman would incur a net cost or loss and a negative amount if Lehman would incur a net gain in connection with any such termination.

**H.    Counterparts**

This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original and such counterparts, taken together, shall constitute one and the same instrument.

Agreed and Accepted as of the date first written above.

**AMERICAN HOME MORTGAGE INVESTMENT CORP.**
**("Client")**

By: _____

Name: Thomas McDonagh

Title: Chief Investment Officer

**LEHMAN BROTHERS INC.**
**("Lehman")**

By: _____

Name:    Robert E. Guglielmo

Title:    Senior Vice President