1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case No. 07-11047-css

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


AMERICAN HOME MORTGAGE HOLDINGS, INC.,


      Debtor.


- - - - - - - - - - - - - - - - - - - -x


         United States Bankruptcy Court

         824 North Market Street

         5th Floor

         Wilmington, Delaware


         October 18, 2007

         9:10 AM


B E F O R E:

HON. CHRISTOPHER S. SONTCHI

U.S. BANKRUPTCY JUDGE

TRIAL

2

1

2    Joinder of the Bank of New York to (1) EMC Mortgage

3    Corporation's Motion in Limine to Preclude James Aronoff from

4    Testifying as an Expert Witness and to (2) Motion in Limine of

5    DB Structured Products, Ind. to Preclude Expert Testimony of

6    James Aronoff Filed by the Bank of New York

7

8    Motion to File Under Seal and Directing that Debtors' Exhibits

9    Containing Certain Confidential Servicing Agreements be Entered

10   into Evidence Under Seal Filed by American Home Mortgage

11   Holdings, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

3

1

2   A P P E A R A N C E S :

3   YOUNG CONAWAY STARGATT & TAYLOR, LLP

4        Attorneys for Debtor

5        The Brandywine Building

6        1000 West Street

7        17th Floor

8        Wilmington, DE 19801

9

10  BY:   PAULINE K. MORGAN, ESQ.

11        ROBERT S. BRADY, ESQ.

12        JAMES L. PATTON, JR.

13        JOHN T. DORSEY, ESQ.

14        MARGARET B. WHITEMAN, ESQ. (TELEPHONICALLY)

15

16  HAHN & HESSEN LLP

17        Attorneys for Official Committee of Unsecured Creditors

18        488 Madison Avenue

19        New York, NY 10022

20

21  BY:   MARK S. INDELICATO, ESQ.

22        MARK T. POWER, ESQ.

23

24

25

4

BLANK ROME LLP

     Attorneys for Official Committee of Unsecured Creditors

     Chase Manhattan Centre

     1201 Market Street

     Suite 800

     Wilmington, DE 19801


BY:   BONNIE GLANTZ FARELL, ESQ.


PILLSBURY WINTHROP SHAW PITTMAN LLP

     Attorneys for The Bank of New York as Trustee

     1540 Broadway

     New York, NY 10036


BY:   LEO T. CROWLEY, ESQ.

     MARGOT P. ERLICH, ESQ.


POTTER ANDERSON & CARSON LLP

     Attorneys for Bank of America, N.A.

     Hercules Plaza

     1313 North Market Street

     Wilmington, DE 19801


BY:   LAURIE SELBER SILVERSTEIN, ESQ.

**KAYE SCHOLER LLP**

     **Attorneys for Bank of America, N.A.**

     **425 Park Avenue**

     **New York, NY 10022**

**BY:    SCOTT D. TALMADGE, ESQ.**

     **MARK F. LISCIO, ESQ.**

     **ANA M. ALFONSO, ESQ.**

**SIDLEY AUSTIN LLP**

     **Attorneys for Bear Stearns & EMC**

     **787 Seventh Avenue**

     **New York, NY 10019**

**BY:    KAREN C. BIFFERATO, ESQ.**

     **ALEX R. ROVIRA, ESQ.**

     **LORI A. KUJAWSKI, ESQ.**

     **ANDREW W. STERN, ESQ.**

     **(TELEPHONICALLY)**

6

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

     Attorneys for Assured

     Chase Manhattan Centre

     18th Floor

     1201 North Market Street

     Wilmington, DE 19899

BY:   DANIEL B. BUTZ, ESQ.

SIDLEY AUSTIN LLP

     Attorneys for Bear Stearns & EMC

     1501 K Street, N.W.

     Washington, D.C. 20005

BY:   DAVID R. KUNEY, ESQ.

EDWARDS ANGELL PALMER & DODGE LLP

     Attorneys for Countrywide

     919 North Market Street

     15th Floor

     Wilmington, DE 19801

BY:   WILLIAM CHIPMAN, ESQ.

7

MILBANK, TWEED, HADLEY & MCCLOY LLP

    Attorneys for Creditor ABN AMRO

    610 South Figueroa Street

    30th Floor

    Los Angeles, CA 90017

BY:   ROBERT J. MOORE, ESQ.

    FRED NEUFELD, ESQ.

    (TELEPHONICALLY)

DORSEY & WHITNEY LLP

    Attorneys for U.S. Bank as Trustee

    1105 North Market Street

    Suite 1600

    Wilmington, DE 19801

BY:   ERIC LOPEZ SCHNABEL, ESQ.

CHAPMAN & CUTLER, LLP

    Attorneys for Wells Fargo, N.A.

    111 West Monroe Street

    Chicago, IL 60603

BY:   FRANKLIN H. TOP, III

8

SEWARD & KISSEL LLP

      Attorneys for Citibank, N.A.

      One Battery Park Plaza

      New York, NY 10004

BY:   JEFF DINE, ESQ.

      (TELEPHONICALLY)

GREENBERG TRAURIG, LLP

      Attorneys for WRL Recovery Fund

      The Nemours Building

      1007 North Orange Street

      Suite 1200

      Wilmington, DE 19801

BY:   SANDRA G. M. SELZER, ESQ.

REED SMITH LLP

      Attorneys for GMAC and Res. Funding

      1201 Market Street

      Suite 1500

      Wilmington, DE 19801

BY:   KIMBERLY E.C. LAWSON, ESQ.

9

BINGHAM MCCUTCHEN, LLP

      Attorneys for Deutsche Bank Structured Products

      150 Federal Street

      Boston, MA 02110

BY:   ANDREW J. GALLO, ESQ.

BINGHAM MCCUTCHEN, LLP

      Attorneys for Deutsche Bank Structured Products

      399 Park Avenue

      New York, NY 10022

BY:   STEVE WILAMOWSKY, ESQ.

NIXON PEABODY LLP

      Attorneys for Deutsch Bank NTC

      437 Madison Avenue

      New York, NY 10022

BY:   DENNIS J. DREBSKY, ESQ.

10

ASHBY & GEDDES, P.A.

    Attorneys for

    500 Delaware Avenue

    Wilmington, DE 19899

BY:   WILLIAM P. BOWDEN, ESQ.

LOEB & LOEB LLP

    Attorneys for Merrill Lynch

    345 Park Avenue

    New York, NY 10154

BY:   VADIM J. RUBENSTEIN, ESQ.

    (TELEPHONICALLY)

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning.  Oh now,

4    come on.  Good morning.  We could have started at 10.  Believe

5    me, I would have been happier about it.

6              MR. DORSEY:  It's been a long week, Your Honor.

7              THE COURT:  Yeah, I know.  Good morning, Mr. Dorsey.

8              MR. DORSEY:  Good morning, Your Honor.  Our first

9    witness this morning, Your Honor, is James Aronoff, the expert

10   witness.  I don't know if Your Honor wants to hear the motions

11   in limine in connection with that first before we put him on or

12   if you'd like to just proceed with testimony.

13             THE COURT:  Well, let me hear from the movants on the

14   motion in limine.  My thought is -- I mean, I read the motions

15   and I understand their basis.  It's a little hard to sort of

16   decide before I've actually heard the testimony as to whether

17   your allegations are correct or not.  And I understand that

18   there was no extra report.  But let me hear from the movants.

19             MR. KUNEY:  Well, Your Honor, without going through

20   all of it, I think it is extremely both important and useful to

21   the Court to hear the motions argued first.  I understand

22   there's a certain efficiency tension but I feel so strongly

23   that the Court should not hear it and I think the reasons are

24   so valid.  And I think it will help frame a lot of what is in

25   front of the Court that, with Your Honor's permission, I would

12

1    like to address the motion.

2             THE COURT:  Very well.  That's fine.

3             MR. KUNEY:  All right.  Your Honor, I think the --

4    I'd like to suggest that the motion in limine goes really to

5    the very heart of what is before this Court and I'd also like

6    to suggest that what is before this Court is very important and

7    very large and a lot of eyes are upon it.  I think Your Honor

8    is going to be one of the first Courts, at least that I'm

9    aware, to address what did Congress mean in 2005 when it

10   amended the Code and said that a securities contract includes

11   the sale of whole mortgage loans and that, and this is really

12   what we're talking about this morning, a Court shall neither

13   stay nor limit the power to terminate.  And I would like to tie

14   my motion into that congressional text, "limit the power to

15   terminate."

16            Now, we contend that the testimony about severance,

17   the argument about severance is code for limiting the right to

18   terminate.  And we suggest that because based on the evidence

19   you've already heard, I think the Court can now tell, in these

20   contracts that are before Your Honor, the purchase is done by

21   separate trades and can stop immediately.  So when Congress

22   said that a sale of whole mortgage loans can be terminated upon

23   the filing of a bankruptcy, it must have included the servicing

24   component.  In any event -- in any event -- because that was

25   the heart.  If you can terminate only your right to purchase

1    and you're not obligated to purchase, there is no meaningful

2    right to terminate and the amendment was a nullity.  This case,

3    therefore, Your Honor, is about 555, in large measure and from

4    my client's perspective, almost about nothing else.

5          All of this relates intimately to why Mr. Aronoff

6    should not be permitted to testify.  First and foremost, Your

7    Honor, that issue about what 555 means is for this Court and

8    not for any witness.  It is a purely legal question.  In fact,

9    I recall sitting here now for -- it does feel like a month, I

10   admit -- and listening to the debtors object to every witness

11   who was asked tell me which contract provisions go and which

12   contract provisions stay and the debtor said that's a legal

13   question.  Well, Your Honor, they're right.  It is a legal

14   question.  Whether any of that contract can or should be

15   severed whether severance means limiting the right to terminate

16   is for Your Honor, not for Mr. Aronoff.

17         Secondly, Your Honor, Mr. Aronoff, and we've attached

18   the pages, is not familiar with Section 555.  We asked him

19   specifically at his deposition do you have any knowledge or

20   experience under Section 555 or 741.  And I'd ask the Court to

21   look at pages 144 and 135.  Mr. Aronoff said I'm not familiar

22   with what a securities contract is.  I'm not familiar with the

23   fact of the amendments in 2005.  And therefore, on the core

24   issue before this Court, not only is it legal but if you wanted

25   an industry representative to come in and help aid the Court,

1   Mr. Aronoff cannot aid the Court because he is unknowledgeable

2   about the core issue before this Court.  He was candid and I

3   appreciated his candor but he is simply not qualified.

4           Secondly, if Your Honor does get into the state law

5   questions of intent, we submit the Court should not.  Congress

6   has preempted; Congress has spoken.  No limit on the right to

7   terminate.  Severance is a limitation.  If you ask Mr. Aronoff

8   what about the parties' intent, that, Your Honor, is also a

9   judicial function.  What does the contract say?  What do the

10  words mean?  How is intent manifested in the unambiguous

11  language of the contract?  Mr. Aronoff cannot help the Court

12  without judicial function.

13          And thirdly, Mr. Aronoff testified and I will - I

14  have in fact submitted it to the Court in our motion, he has no

15  idea what the parties actually intended.  He is substituting

16  his view of what parties might intend for what the parties to

17  this transaction actually intended.  In fact, with respect to

18  EMC, he said I never read their contract.  I don't know what

19  they intended.  I don't even intend to offer an opinion about

20  EMC's contract.  I don't know how that aids the Court.  I don't

21  know how that isn't a legal issue for Your Honor.

22          Lastly, Your Honor, in terms of his general

23  qualifications, he's never been admitted as an expert, never

24  published a single word.  Other than one in-house seminar to a

25  law firm, never taught a single course, won no awards, no

1    prizes, no special accommodations.  He is not, in fairness to

2    Mr. Aronoff, and I mean him no disrespect, he is not an

3    industry expert that's going to help this Court solve one of

4    the most important precedent-setting cases what did Congress in

5    2005 when it said do not limit the right to terminate.

6              So for those reasons, your Honor, I think the

7    debtors' case is over.  We do not need Mr. Aronoff.  He will

8    not aid this Court and he should not be permitted to testify.

9              THE COURT:  Thank you, Mr. Kuney.  Mr. Gallo?

10             MR. GALLO:  Thank you, Your Honor.  I'll be brief but

11   I do approach this from a slightly different position than Mr.

12   Kuney.  I do agree with Mr. Kuney, with everything that he

13   said, and also agree that this issue of severability as Your

14   Honor has ruled on the many objections from both sides in this

15   trial concerning questions that seek legal opinions, is a legal

16   issue.  And if it's not a legal issue and what Mr. Aronoff is

17   offering is not a legal opinion, then I question as to how

18   relevant or how reliable will be for Your Honor in the analysis

19   that you need to do regarding his expert testimony.

20             Mr. Aronoff testified at his deposition that his

21   opinion as to the rights underneath these contracts he

22   developed before he even read a word of any of the contracts

23   that are at issue.  And I think that's consistent with the way

24   the debtors want you to look at this case.  They don't want you

25   to look contract by contract.  They want you to group all of

1   these contracts together and make a sweeping proclamation that

2   where you have a contract of this nature, the servicing is

3   separate from the selling.

4           You cannot do that, Your Honor.  The issue that's

5   before you is a legal issue.  It requires -- as we've seen from

6   the testimony that's been offered by Mr. Johnson and others,

7   these contracts differ in significant ways, contract to

8   contract.  They're not identical.  And we've seen that in the

9   documents and the contracts and the provisions that we have

10  reviewed with the witnesses before Your Honor.  So given these

11  differences, I see no way for Your Honor to decide this case

12  other than by looking on a contract by contract basis.  Given

13  the provisions of these individual agreements, is this

14  agreement severable?  And that's not the opinion that Mr.

15  Aronoff is going to give you.  He will testify that he did not

16  consider these on a contract by contract basis.

17          Your Honor, you did mention the expert report issue.

18  I do think that's an important issue.  Federal and Civil

19  Procedure 26 incorporated into these proceedings by Bankruptcy

20  Rule Civil Procedure 7026(a)(2) requires a written report from

21  an expert.  It requires that that report be signed.  It

22  requires that that report contain a complete statement of all

23  of the experts' opinions.  It requires that that report contain

24  the basis and the reasons for those opinions.  It requires that

25  that report contain the data and information considered by the

1   expert to give those opinions.  Why is the report required?  I

2   think it's important for an expert, a witness, to memorialize

3   his findings in a written document that he signs so that he has

4   a report that is on record that he gave in a particular case.

5   I think it makes it more reliable.

6           I also think an expert report is important because it

7   keeps the opinion from being a moving target during the

8   proceedings.  You have something that has been put up there as

9   this is my opinion and the expert cannot change that opinion

10  going forward.  I also think it's very important for the

11  parties, the opposing parties, to have the expert report

12  because it's very difficult to prepare, to cross-examine an

13  expert when you have no report.  Now, granted we had a

14  deposition on Friday but at the deposition, my first question

15  to this witness had to be what is your opinion because I had no

16  idea what the opinion was going to be before the deposition.

17          THE COURT:  The problem there is 9014(c) which says

18  that the expert report requirement is not applicable on

19  contested matters unless otherwise ordered by the Court which

20  there is no such order in this case.

21          MR. GALLO:  I understand, Your Honor.  I would urge

22  the Court for the reasons that I stated to require such a

23  report.

24          THE COURT:  Well, it's a little late, isn't it?  I

25  mean, the horse is out of the barn.

1          MR. GALLO:  Fair enough, Your Honor.  The final

2     issue, Your Honor, and Mr. Aronoff was going to offer two

3     opinions and he testified at his deposition that he was

4     prepared to offer two opinions.  One was on the severability

5     issue, one was on the issue of Freddie/Fannie Mae

6     qualifications.  And he was going to testify as to what those

7     qualifications meant in the industry.  When I questioned him as

8     to whether he had read the Fannie or Freddie qualifications, he

9     testified that he had not read the Fannie qualifications in

10    quite a long time and he had not read the Freddie

11    qualifications in over ten years.  I don't know whether given

12    the Fannie Mae settlement whether the debtors are still

13    pressing forward with that portion of Mr. Aronoff's opinion,

14    but I would submit that clearly an opinion on the meaning of

15    the Fannie and Freddie qualifications and what they mean in the

16    industry is not a reliable opinion from an expert who has not

17    read those qualifications in the last decade.

18          Thank you, Your Honor.

19          THE COURT:  Thank you, Mr. Gallo.  Mr. Crowley?  Did

20    you file a motion in limine?

21          MR. CROWLEY:  Your Honor, we filed a one-page joinder

22    last night because we wanted to be heard in case Your Honor was

23    going to hear this as a motion in limine.

24          THE COURT:  Very well.

25          MR. CROWLEY:  I'm here on a somewhat narrower point,

1  Your Honor, which is just the part of his opinion to the

2  effect -- or his proposed opinion to the effect that having

3  been a Fannie Mae qualified servicer is not particularly

4  relevant in the industry.  The problem we have with that

5  proposed testimony is that it flunks the reliability test under

6  Daubert.  Your Honor, I think, has probably more familiarity

7  than most obviously with the case law and not having written

8  the comprehensive opinion in the Nelson Neutraceuticals case.

9  But even beyond that, in other cases which I can hand up to the

10  Court if you'd like to discuss the case law now or I can deal

11  with it later, it's been generally held that an expert who

12  simply relies on industry experience and expertise and nothing

13  more than that, in other words, there's no study and no

14  analysis, doesn't meet the reliability standard under Daubert.

15  And at his deposition, when Mr. Aronoff was asked what did he

16  actually do to prepare to testify in this case, at page 13

17  beginning on line 9, the question was "Other than reviewing the

18  contracts that were provided to you and drawing on your

19  experience in the industry, did you do anything else to

20  formulate the opinions that you're going to give at the sale

21  hearing?"  His answer, "The only other thing I can think of is

22  conversations with the Young Conaway attorneys regarding the

23  scope of the engagement, the schedule and the like."

24         Now, in the 2004-4 certificates, Your Honor, for

25  which the Bank of New York is the indenture trustee and

1   American Home Mortgage is the servicer, we developed testimony

2   yesterday through Mr. Love that there is probably a billion

3   dollars or more of mortgage-backed securities on those.  Your

4   Honor also has -- I don't think it's been formally moved into

5   evidence yet but you will have the text of the servicing

6   agreement which includes an expressed requirement that a

7   successor servicer be Fannie Mae-qualified.

8           So we're going to have somebody get on the witness

9   stand without having talked to a single investor who owns any

10  of that billion dollars worth of mortgage-backed securities and

11  without having talked to any other investor who owns mortgage-

12  backed securities, without having studied the market place and

13  yields and pricing or anything like that.  In short, he's just

14  going to say I've been in this industry for a long time and

15  this is how I think people in this industry would view this.

16  And under Daubert, that's not enough.

17          THE COURT:  Okay.  Thank you.

18          MR. BRADY:  Good morning, Your Honor.

19          THE COURT:  Good morning.

20          MR. BRADY:  Robert Brady on behalf of the debtors.

21  Let me take the 9014 issue first because Your Honor hit that

22  nail right on the head.  As Your Honor indicated 9014(c)

23  provides that 7026(a)(2) is not applicable in a contested

24  matter unless Your Honor says it is.  The last sentence of that

25  says that "The Court shall give the parties notice of any order

1   issued under this paragraph to afford them a reasonable

2   opportunity to comply with the procedures prescribed by the

3   order."  Deutsche Bank, Your Honor, issued discovery probably

4   about two weeks ago now and asked us if we had an expert and we

5   told them yes, we did.  They had plenty of opportunity to come

6   before the Court and demand the report.  They didn't do it.  So

7   we would be severely prejudiced if Your Honor were to rule

8   today that our expert had to have a report.

9           Turning now to the motions in limine, Your Honor, we

10  all know the standards in the third circuit, qualification,

11  reliability and fit.  Your Honor is the gatekeeper with respect

12  to expert testimony.  This is a bench trial so to some extent

13  you're acting as a gatekeeper to yourself.  We ask the Court to

14  approach this in one of two ways both of which I think will be

15  familiar to Your Honor.  One, as you did in Nelson, that you

16  heard the witness, you qualified them during the hearing and

17  then waited until after the witness was on the stand to hear

18  argument on reliability and fit and then issued your opinion.

19  The second is an approach by Judge Walrath in the IHM case.

20  She denied the motion in limine.  I believe the arguments went

21  to weight, heard the witness and then ultimately assigned the

22  witness no weight in her opinion.  We're confident, Your Honor,

23  that Mr. Aronoff will satisfy all the criteria necessary in the

24  third circuit.

25          He's really speaking on two distinct areas.  One is

1   that the origination and sale of mortgages and the servicing of

2   mortgages are practically and economically distinct in the

3   industry.  And that the rights and obligations are clearly

4   delineated within the industry and they're not economically

5   interdependent.

6          And with respect to the Fannie and Freddie

7   requirements, he will inform the Court that these are used as a

8   mere proxy in the industry as a proxy for financial

9   wherewithal.

10          Now the arguments in the motion in limine really beg

11   the ultimate questions presented.  What the movants really

12   argue is that they're right on the legal issues so Mr.

13   Aronoff's testimony can't be relevant.  Well, that can't be the

14   test, Your Honor.  The question is qualification.  You will

15   hear that he's been in this industry for twenty-five years.

16   he's been on all sides of the equation.  We think he represents

17   a very unbiased and global view of how this industry works.

18   There is no requirement, Your Honor, that he have written or

19   taught on the topic to be an expert witness.  There's a third

20   circuit case, Waldorf v. Shut, "the basis of a witness'

21   specialized knowledge can be practical experience as well as

22   academic training and credentials."  We submit Mr. Aronoff has

23   those credentials.

24          The real question is will Mr. Aronoff assist the

25   Court in making its determination here.  We believe you can

only make that decision after you hear what Mr. Aronoff has to

say.  You've heard some of what Mr. Aronoff said in his

deposition by the movants.  We disagree with their

characterizations of his testimony but we urge Your Honor to

hear it all and make an informed view.

     With respect to the gatekeeper function, Your Honor,

realistically, we're going to ask that you hear Mr. Aronoff in

any event.  If Your Honor were to exclude him, we would ask to

put him on for telepurposes, to create a record.  So for

efficiency, and because we think Your Honor is going to hear

his testimony in any event, we urge you to either deny the

motions in limine and consider the weight of Mr. Aronoff's

testimony in reaching your conclusion or defer the motions in

limine, hear Mr. Aronoff and we can argue about the reliability

and the relevancy of his testimony after you've heard the whole

story.

     THE COURT:  Anyone else?  Mr. Power?  I'm sorry.  I'd

just like to remind everyone for purposes of the court

reporters to identify yourself before you speak.  I know who

you are but we have people who rotate in and out of this

position and aren't as lucky as I am to be familiar with you.

     MR. POWER:  Thank you, Your Honor.  Mark Power from

Hahn & Hessen, counsel for the committee.  Your Honor, I just

rise to support the debtors' position in this case.  We also

support the admission of this expert and urge Your Honor to

24

1    listen to the testimony.

2            If you look at the standards for severability, one of

3    the standards is for the Court to determine whether the

4    origination sale business is a separate subject matter than the

5    servicing business.  And it seems to us as a practical matter,

6    Your Honor has to understand the industry that we're talking

7    about and the way in which these transactions occur.  The

8    testimony is pretty clear here, Your Honor, that this business

9    was conducted in the ordinary course and they conducted it

10   typically with the purchase and sale of loans and with the

11   separate servicing.  And we think this expert will aid the

12   Court in determining and making a decision of whether the

13   subject matter that is relevant and the same for all of these

14   agreements can be severable whether the servicing is different

15   from the origination.  And that to us is crucial for Your Honor

16   to decide and we think Your Honor will be aided by this expert

17   in understanding how the industry views it and how to make a

18   decision under the legal standards.  And what Your Honor is

19   going to be asked to do even tomorrow or the next day or

20   Monday, which is make a decision on the legal standard, are

21   these two different subject matters both in the industry and

22   under these agreements.  And are the economic considerations

23   different.  And we think this expert deals specifically with

24   those two issues and we'd urge Your Honor to hear him.

25           THE COURT:  Thank you.  Anyone else?  Well, I think

1   the points raised by the movants may very well be valid.

2   Unfortunately, Mr. Brady is correct that 9014(c) does not

3   require the filing of an expert report unless otherwise ordered

4   by the Court.  I did not otherwise order that.  No one asked me

5   to otherwise order that, at least prior to the filing of

6   motions in limine.  And one of the disadvantages of having not

7   required that is no one in this courtroom knows less about what

8   this expert's going to testify than I do.  And it very well may

9   be that he is going to offer opinions which can be only fairly

10   designated as legal opinions as opposed to factual opinions and

11   that's, I think, under the law fairly clearly not admissible.

12   But I really don't know and I won't know until I hear the

13   testimony and the records develop.  And a deposition is an

14   inexact way to get to what that's going to look like.

15        The other thing is with regard to the gatekeeper

16   function, I expect what'll happen, again, without knowing, is

17   that, like many things in life, it'll be a mixed bag.  There

18   may be some factual opinions, there may be some legal opinions

19   and I may have to parse through what I can consider and what I

20   won't consider.  And again, until I actually hear the

21   testimony, I'm not going to be in a position to do that.

22        This is a bench trial and nonetheless I take the

23   Daubert requirement seriously.  I've previously, as mentioned

24   during argument, I previously excluded witnesses on the basis

25   of failure to meet the reliability and fit requirement as set

1    forth by the third circuit.  But in that case, even though

2    there was an expert report, even though there was a pre-hearing

3    deposition, I still heard the testimony and took the motions in

4    limine under advisement in effect and at a later time issued

5    the opinion excluding the testimony.  And I think that,

6    although its' not the fastest way, I think that is the most

7    practical way to deal with the issues here.

8              So I'm not overruling the motions in limine.  I'm

9    going to hold them in abeyance and hear the testimony and at

10   the conclusion of the testimony, including cross-examination

11   and redirect, I'll hear further argument on the motions in

12   limine.

13             One other point is that certain of the arguments

14   appear to be, I think, fairly characterized as Mr. Brady did

15   which is this testimony should be excluded because it doesn't

16   fit the objector's legal theory of the case.  Well, that hasn't

17   been -- we haven't gotten there yet.  I'm not saying the

18   objector's legal theory is more persuasive than the debtors'

19   legal theory or vice versa.  But I think the debtors have a

20   right to present their case including facts that support their

21   legal theory of the case.  And if it turns out that, for

22   instance, Mr. Kuney's legal theory is the correct theory, a lot

23   of what I've heard, if not all of what I've heard for the last

24   several days would be irrelevant.  But we don't know that until

25   we get there and we're not there yet.

1    So I'm going to allow the debtors to present their

2  witness.  I'm going to hold in abeyance all pending motions in

3  limine.  I'm not denying them and I'll hear renewed argument at

4  the conclusion of the testimony.

5    So, I don't know who's doing the witness but -- Mr.

6  Dorsey?  Call your witness.

7    MR. DORSEY:  Thank you, Your Honor.  John Dorsey on

8  behalf of the debtors.  The debtors call James Aronoff to the

9  stand.

10    (Witness duly sworn)

11    THE CLERK:  Please state your name for the record and

12  spell your last name.

13    THE WITNESS:  James H. Aronoff, A-R-O-N-O-F-F.

14  DIRECT EXAMINATION BY

15  MR. DORSEY:

16  Q.   Good morning, Mr. Aronoff.  Could you please describe for

17  the Court very briefly the two areas in which you are providing

18  expert testimony?

19  A.   Yes.  The first subject of testimony concerns the

20  relevance of a Fannie Mae/Freddie Mac servicer designation as

21  that relates to private labeled mortgage-backed securities.

22  The second opinion, from a business perspective, is that

23  servicing rights should not be limited or altered or diminished

24  merely because the servicer obtains those rights in the context

25  of a master loan purchase agreement -- servicing agreement or

1   similar agreements.

2   Q.   Thank you.  Before we discuss your opinions in detail, I'd

3   like to talk a little bit about your background.

4          MR. DORSEY:  In order to do that, Your Honor, may I

5   approach the witness and Your Honor with a copy of Mr.

6   Aronoff's CV?

7          THE COURT:  Yes, sir.

8          MR. DORSEY:  This has been marked for identification,

9   Your Honor, as Debtor's Exhibit number 110.

10  Q.   Could you please describe for the Court your educational

11  background, Mr. Aronoff?

12  A.   Yes.  I attended Yale College and graduated there with a

13  degree in economics and political science.  And from there

14  attended Cornell Law School where I received my JD with a

15  specialization in international law.

16  Q.   After completion of law school, what was your first job?

17  A.   My first job was at Thacher Proffitt and Wood in New York

18  City.

19  Q.   What did you do at Thacher Proffitt?

20  A.   I was a transactional associate and drafted and negotiated

21  agreements for primarily investment bank clients who acquired

22  whole loans and securitizing.

23  Q.   Would that be similar to the MLPSAs we've been talking

24  about in this case so far?

25  A.   A much, much earlier version of those documents, that's

1    correct.

2    Q.   Was that the beginning of the period of time when MLPSAs

3    started to come into fashion in the industry?

4    A.   Yes.  That was -- those were the forerunners to the

5    current documents.  At that time, it was at the very beginning

6    what I'll refer to as private label securitizations.  Back in

7    the early 80s the primary for of securitization was agency

8    securitization.  That is, securities issued by Fannie Mae and

9    Freddie Mac and those were all issued pursuant to voluminous

10   guides.  The other form of whole loan trading that was going on

11   at the time was among, primarily California thrift

12   institutions, and they use their own form called the U.S.

13   League Form.  But there really was no template at that time for

14   private investors who intended to create their own securities,

15   their own mortgage-backed securities to use.  So Thacher, along

16   with a few other firms in New York, created what became known

17   as the Thacher form of document to enable large institutions to

18   buy whole loans on a regular basis from multiple sellers and

19   aggregate those loans into private and public securities.

20   Q.   What period of time did you work at Thacher?

21   A.   From 1983 to 1987.

22   Q.   And when you left Thacher, where did you go next?

23   A.   I was fortunate enough to have a client who started the

24   mortgage desk at Kidder Peabody, may they rest in peace.  Asked

25   me to go over and perform a similar function, no longer as an

30

1    attorney but as a transaction manager at Kidder Peabody where

2    my function was essentially the same, although in addition to

3    negotiating and drafting the documents, I also had some

4    business discretion as to determine how the transaction should

5    occur.

6    Q.   What kind of business discretion are you talking about?

7    A.   Well, I worked with the attorneys.  And so within a

8    limited area that had nothing to do with pricing 'cause the

9    traders handle the pricing, I would make sure that the

10   documents that were signed conformed with the terms of the

11   trade as well as the operational requirements that were

12   necessary for us to finally close a trade.

13   Q.   And how long did you stay at Kidder Peabody?

14   A.   I was at Kidder Peabody for two years.  I left -- from '87

15   to '89.

16   Q.   And after Kidder Peabody, where did you go next?

17   A.   I went to a financial guaranty insurance company called

18   Financial Security Assurance.  At that time, they were the new

19   kid on the block among bond insurers.  Previously, bond

20   insurers had only provided insurance with respect to municipal

21   bonds.  And FSA was the first bond insurer to actually provide

22   credit enhancement and financial guaranties in connection with

23   other fixing some securities, such as mortgage-backed

24   securities.

25   Q.   And what kind of job responsibilities did you at Financial

1   Security Assurance?

2   A.   They were much broader.  I was a managing director in the

3   residential group.  And my responsibilities ranged from

4   sourcing and marketing transactions to underwriting

5   transactions.  And for a bond insurer, that means primarily

6   qualifying the clients, looking at the risks embedded in the

7   financial transaction from both a collateral performance

8   standpoint and an operational risk standpoint.  That is,

9   whether the parties in the transaction can perform the

10  functions if they are required to as well as negotiating the

11  transactions internally, working with the rating agencies, the

12  investment banker because when you're at a bond insurer, you're

13  insuring bonds so there's always an offering, either public or

14  private as well as being responsible for presenting any

15  particular transaction to our internal credit committee to get

16  it approved.

17  Q.   How long did you stay at FSA?

18  A.   I was at FSA from 1989 to 1993.

19  Q.   And after you left FSA, where did you go next?

20  A.   I was employed by Nemora Securities which is a large

21  securities firm.  Initially I was engaged to help build a

22  residential and consumer trading desk and ultimately succeeded

23  to a position where I was the managing director responsible for

24  what was called the fixed income structured finance area.

25  Q.   What kind of job responsibilities did you have at Nemora?

1    A.   At Nemora, I was responsible for the management and I had

2    ultimate P&L responsibility, trading responsibility for a

3    number of desks which included the whole loan trading desk.

4    The whole loan trading desk bought loans from sellers of --

5    originators of mortgage product, sold loans as well as

6    securitized loans.

7    Q.   And what were your specific responsibilities with regard

8    to those particular areas?

9    A.   My specific responsibilities were to manage the trading

10   desk where the transactions were priced and hedged, was to

11   manage a group of transaction managers who actually closed the

12   deals, to manage an operations group which monitored the

13   positions we held in loans dealing with servicers, making sure

14   we received our payments, making sure that all our documents

15   were in the proper places.  So I had overall managerial

16   responsibility for the whole loan business at Nemora.

17        In addition, another business was to finance whole loan

18   positions for originators.  And many of the responsibilities

19   involved in our purchase and sale of those loans overlapped

20   with our financing business with respect to those loans.

21   Q.   And how long did you stay at Nemora?

22   A.   I was at Nemora until 1997.  From '93 to '97.

23   Q.   And after you left Nemora, where did you go?

24   A.   I, along with a partner of mine from Nemora, raised equity

25   and set -- and founded a sub-prime residential conduit.  That

1    is, a company that acquired mortgage loans from correspondence

2    and securitized them.  So we -- in essence, we issued our own

3    securities.

4    Q.    And how long did that business stay in operation?

5    A.    We sold the company in 2000.  So from 1997 to 2000.

6    Q.    And during that period of time, how many loans did you

7    purchase and securitize?

8    A.    We acquired somewhere in the neighborhood of 700 to 750

9    million dollars worth of loans and issued two securities with

10   an aggregate total of approximately half a billion dollars.

11   Q.    And after you sold FC Capital, what did you do next?

12   A.    I set up a consulting firm where I was in the business of

13   advising specialty finance companies including residential

14   mortgage originators with various aspects of the business.

15   Q.    And what's the name of that?

16   A.    MTGX.

17   Q.    And MTGX, is that still in operation today?

18   A.    Yes.  This is where the resume gets a little interesting

19   if you look at it chronologically.  After the company was sold,

20   I really worked full time in the consulting business on various

21   engagements as well as looking to perhaps start other related

22   businesses.  And around the latter part of 2002, early part of

23   2003, we had some interest in a business plan to build a

24   company that would actually provide transaction oversight

25   services for investors in mortgage-backed securities and other

34

asset-backed securities.  And in around March, the end of the

first quarter of 2003, together with another company, we formed

Portfolio Reconnaissance Services which engage in that

business, the oversight and credit risk management of asset-

backed deals for the benefit of investors.

Q.   And what kind of work does that company actually do on a

day to day basis?  Or did it do on a day to day basis?

A.   No.  It's -- it's still around.  It's been merging to

another company and exists today as Clayton Fixed Income

Services.  But that company monitors for the benefit of

investors in asset-backed, mortgage-backed and commercial

mortgage-backed securities -- it monitors the collateral

performance based against certain assumed performance criteria

as well as monitors the compliance of various parties to the

transaction, including the servicer, as to whether or not they

comport with the strict requirements of the deal.

Q.   How long did you stay at Portfolio Reconnaissance

Services?

A.   In December of 2004, Clayton, which was the parent company

of Portfolio Reconnaissance Services, was acquired by a private

equity investor and the company was sold.

Q.   Turning to the -- turning to the -- well, let me go back

to your resume.  You also have on here Garnett Capital

Advisors?

A.   Yes.

Q.   Can you describe what that is?

A.   Sure.  Garnett is a -- primarily a firm that brokers'
distressed consumer debt charge off credit cards and I got to
know many of the principals there.  When I was at Nemora,
another business that we managed at Nemora, and I was very
involved in, was the management of a significant distressed
asset portfolio that we had acquired from the RTC and the FDIC.
And the principals of Garnett at a predecessor firm worked with
us to help sell some of our nonperforming unsecured consumer
assets.  Garnett was about a six month old company when we
started talking about potentially adding on a new division that
would engage in the brokerage and possible investment in
charged open nonperforming residential assets.  So we kind of
engaged in a try and buy to see if I enjoyed the corporate
culture there and they enjoyed the residential business.  And
after about fifteen to eighteen month period, we decided that
they were very good brokers to charge up credit cards and that
was something that I had no interest in doing.

Q.   And could you describe for the Court that work that you do
at MPGX, your consulting firm?

A.   Yes.  As I said, it was really more of a -- of a full time
business forming immediately after selling FC Capital.  In the
interim, it's been a platform that I've used to get involved in
interesting transactions while giving myself flexibility to
work on other initiatives that I would invest in and get

1    involved in privately.

2    Q.   Is it fair to say that you are familiar given your twenty-

3    five years of experience that we've just gone over with the

4    industry standard and practices with regards to MLPSAs?

5    A.   I'm very familiar with the standards and practice in the

6    industry and acquired most of this grey hair having been around

7    while those industry practices were being developed.  There are

8    reasons that the documents work the way they work in the

9    context of a larger marketplace.

10   Q.   And we'll get to that in a moment.

11        MR. DORSEY:  Your Honor, at this point I would

12   ordinarily move to have Mr. Aronoff qualified as an expert

13   witness but I understand there are motions in limine that Your

14   Honor has taken under advisement.  So if you would prefer to

15   pass until you've heard all of Mr. Aronoff's testimony?

16        THE COURT:  No, no.  Let's deal with the threshold

17   issue first, the qualification.  'Cause I've heard the

18   testimony and that would normally be the first step.  So why

19   don't you make your motion to qualify and then we'll make him

20   available for voir dire.

21        MR. DORSEY:  Thank you, Your Honor.  At this point, I

22   would move to have Mr. Aronoff qualified as an expert witness

23   in the area of mortgage-backed security industry particularly

24   as it relates to MLPSAs, the sale and servicing of mortgage

25   loans.

1          THE COURT:  All right. Voir dire?  Mr. Gallo?

2          MR. GALLO:  Thank you, Your Honor.  I just need to

3   grab Mr. Aronoff's deposition.

4          THE WITNESS:  May I get some water, please?

5          THE COURT:  There should be a pitcher there, isn't

6   it?

7          THE WITNESS:  Oh.

8          THE COURT:  You can use the bottle if you wish.

9   Whatever you --

10          THE WITNESS:  That's fine.

11          MR. GALLO:  For the record, Andrew Gallo from Bingham

12   McCutchen for DB Structured Products, Inc.  May I proceed, Your

13   Honor?

14          THE COURT:  Yes.

15   VOIR DIRE EXAMINATION BY

16   MR. GALLO:

17   Q.   Good morning, Mr. Aronoff.

18   A.   Good morning.

19   Q.   Mr. Aronoff, you have not negotiated an MLPSA from either

20   the standpoint of the buyer or the seller for eight years now,

21   correct?

22   A.   From the perspective of either the buyer or the seller,

23   that's correct.  I've advised buyers and sellers with respect

24   to the negotiation of those documents in my capacity as a

25   consultant.

1   Q.   But in terms of being -- negotiating as either a buyer or

2   a seller, the last time you did that with respect to MLPSA

3   would have been 2000, correct?

4   A.   As a buyer or seller, that's correct.

5   Q.   I want to walk through briefly some of the various stops

6   that you've had on your resume.  You worked at FC Capital Corp

7   from approximately 1997 to 2000, is that correct?

8   A.   Yes.

9   Q.   And did I hear correctly on your testimony that you

10  indicated that you engaged in transactions while at FC Capital

11  of approximately -- sales of approximately a billion dollars

12  worth of mortgage loans?

13  A.   No.  I said 700 to 750 million.

14  Q.   And the bulk of that was two transactions that were

15  related to the securitization of 500 million dollars worth of

16  loans, is that right?

17  A.   On the securitization side actually, we were a small

18  mortgage loan originator, not like your client now, and to

19  accumulate that large amount of product, we engaged in hundreds

20  of transactions buying loans from smaller originators than we

21  were.  So on the front end, it was hundreds of transactions.

22  And on the back end, there were two large securitizations as

23  well as a handful of whole loan sales to other institutions.

24  Q.   On the front end, what kind of documentation is used to

25  document the hundreds of transactions that you've indicated you

1   worked on at FC Capital.

2   A.   We had our own form of mortgage loan purchase agreement

3   that we required our sellers to use?

4   Q.   So it was one form agreement that you used for all the

5   transactions?

6   A.   We tried to.  Efficiency is very important in managing

7   your risk in this business.

8   Q.   From a securitization standpoint, you securitized 500

9   million dollars worth of mortgage loans in two transactions,

10  right?

11  A.   That's correct.

12  Q.   After you left from FC Capital Corp, you moved to

13  Portfolio Reconnaissance Services and you spent approximately a

14  year -- between a year and two years there, right?

15  A.   Actually, after FC Capital, I set up MGTX and was

16  consulting for about twenty-seven months.

17  Q.   And we'll get to your MGTX experience.  I want to

18  specifically address your experience at Portfolio Recon

19  Services.  You were not directly involved in the negotiation of

20  any MLPSAs while at Recon, correct?

21  A.   Actually, not as a buyer or seller but we were involved as

22  the transaction oversight or credit risk manager.

23  Q.   Right.  But in that role, you were not actively involved

24  in the negotiation of the provisions of the contract, correct?

25  A.   That's correct.

1    Q.   And then the year or so that you spent at Garnett, you

2    were involved in four or five transactions on behalf of

3    trustees of securitization trusts who were selling distressed

4    residential loans, correct?

5    A.   Yes.

6    Q.   But other than those four or five transactions that you

7    were involved in in that year, you weren't involved in any

8    other transactions that actually closed in relation to the sale

9    of residential mortgage securities, is that right?

10   A.   At that point in time, I was not buying or selling

11   mortgage loans, that's correct.

12   Q.   And you had no involvement when you were at Garnett with

13   respect to MLPSAs that are like the ones we are considering in

14   this case, is that correct?

15   A.   Other than -- other than as a -- as a potential broker of

16   loans that are -- were in deals that were purchased that way,

17   that's correct.

18   Q.   Now you formed MTGX in 2000, correct?

19   A.   Yes.

20   Q.   And I believe that your testimony is, or correct me if I'm

21   wrong, but if you look at your resume, there are some stops on

22   the way from the time that you formed MTGX to today.  When you

23   were working, for example, at Garnett or, for example, at

24   Portfolio Recon, it was typically you did not have projects

25   going at that same time for MTGX, correct?

A.    That's correct.  Both Recon and Garnett were full time
engagements.  Full time jobs.

Q.    And in between those stops, you worked at MTGX but you
can't say that it was really a full time job?  When the work
was there, you worked.  But it wasn't necessarily a forty hour
work week every week, correct?

A.    Oh, it was well in excess of a forty hour work week.  It's
just that much of the time I wasn't getting paid by a client.
I was working on a private initiative.

Q.    Now MTGX presently has -- you're the only employee of
MTGX, correct?

A.    That's correct.

Q.    And MTGX offices are maintained out of your home, is that
right?

A.    That's right.

Q.    And in the -- since you left Garnett in 2006 to today,
you've engaged in, including this transaction, in approximately
five different consulting arrangements?

A.    Yes.

Q.    And other than this one -- this consulting arrangement
that you have for MTGX is the only consulting arrangement in
that time that deals with MLPSAs for residential mortgage
loans.  Isn't that correct?

A.    Yes.

          MR. GALLO:  Your Honor, I have nothing further on

42

1    voir dire.

2                THE COURT:  Thank you.  Anyone else?  Mr. Kuney?

3                MR. KUNEY:  Your Honor, David Kuney for EMC.

4    VOIR DIRE EXAMINATION BY

5    MR. KUNEY:

6    Q.    Mr. Aronoff, good morning.

7    A.    Good morning.

8    Q.    Just a few questions on your qualifications, please.  I

9    take it you've never been retained as an expert before this

10   case?

11   A.    That's correct.

12   Q.    Never been qualified as an expert before this case?

13   A.    That's correct.

14   Q.    Never done any publishing in the field other than perhaps

15   when you were a lawyer at Thacher Proffitt twenty-seven years

16   ago?

17   A.    I stated in my deposition I don't recall where it was

18   published but at FSA I did publish one article.  So that's

19   primarily correct.

20   Q.    Never taught any courses in whole loan mortgages or any

21   other related topic?

22   A.    Not formally, no.

23   Q.    Would you say that your industry experience has in almost

24   every case been based on buying, servicing released

25   transactions in terms of the purchasing whole loan mortgages?

43

1    A.   At both Nemora and FC Capital we bought most of our loans

2    servicing released because most of those loans were sub-prime

3    and we felt the control of the servicing rights were important.

4    But I would, if I had to calculate a percentage, would guess

5    that the number of transactions I worked at at Thacher and

6    Kidder probably were sixty/forty retained/released.

7    Q.   And Thacher was twenty-five years ago?

8    A.   1983 to 1987.

9    Q.   Kidder was right after Thacher?

10   A.   Correct.

11   Q.   So I take it then, as you testified at your deposition,

12   you're not familiar with the fact that Congress significantly

13   changed the bankruptcy laws as they pertain to the sale and

14   purchase of whole loan mortgages in 2005?

15   A.   As I testified in my deposition, I'm not aware of that.

16   Q.   And you're also not aware of the definition or the

17   operation of what it means to be a securities contract under

18   the Bankruptcy Code?

19       MR. DORSEY:  Objection, Your Honor.  Mr. Aronoff

20   testified what the two opinions that he's going to be giving.

21   It has nothing to do with Section 555 of the Bankruptcy Code.

22       THE COURT:  Overruled.  I think Mr. Kuney is allowed

23   to explore this in the context of his broader qualifications as

24   an industry expert.  Mr. Kuney's position is going to be the

25   industry changed two years ago and he's testing whether or not

44

1   this witness is aware of that change.

2           THE WITNESS:  Can you please restate the question?

3   BY MR. KUNEY:

4   Q.   Sure.  I take it you're not aware of the fact as you

5   testified that Congress changed the Bankruptcy Code in 2005 as

6   it pertains to what are called securities contracts?

7   A.   That's correct.

8   Q.   You're also not familiar with Fannie Mae qualifications?

9   A.   No.  I'm very familiar with Fannie Mae qualifications.  I

10  just was honest when I said I hadn't looked at the guide in

11  quite some time.

12  Q.   You've never had any prior involvement in a transaction

13  where servicing rights were purchased and sold in a bankruptcy

14  case?

15  A.   In a bankruptcy case, no, that's correct.

16  Q.   You've never done any studies in the industry that

17  consider the purchases of mortgaged whole loans as security

18  contracts?

19  A.   No, I have not.

20  Q.   You had no discussions or panel discussions with market

21  participants concerning the business of purchasing mortgage

22  loans?

23  A.   Actually, I have.  I was a frequent speaker at industry

24  conferences during my tenure at FC Capital and Nemora and

25  served on the board of directors of the National Home Equity

45

1   Mortgage Association from 1996 to 1998 and was frequently asked

2   to speak on topics related to the buying and selling of

3   mortgage loans and the securitization thereof.

4   Q.   Do you recall having given testimony differently at your

5   deposition?

6   A.   I recall at my deposition there was the proviso regarding

7   the purchase and sale of mortgage loans in connection with a

8   bankruptcy.

9   Q.   Let me ask you -- or I'll ask counsel.

10          MR. KUNEY:  Your Honor, you have a copy of the --

11          THE COURT:  Nope, nope, I don't.

12          MR. KUNEY:  Your Honor, may I approach?

13          THE COURT:  Yes, you may.  Does the witness have it?

14          THE WITNESS:  Not in front of me, Your Honor.

15          THE COURT:  Ms. Winfrey, would you hand the witness a

16   copy?  Thank you.  Thank you, Mr. Kuney.

17   Q.   Do you have a copy in front of you?

18   A.   Yes.

19   Q.   Let me ask you.  Look, please, at page 140, line 11.  The

20   following question and answer were given.  "Have you had

21   discussions of any kind" --

22          MR. DORSEY:  Excuse me, Your Honor.  May I have a

23   second to get there?

24          THE COURT:  Yes.  Okay.

25          MR. DORSEY:  Thank you.

1    Q.   You have it, Mr. Aronoff?

2    A.   Yes, I do.   Thank you.

3    Q.   Okay.   The question there at line 11 was "Have you ever

4    had discussions or did any kind of panel discussions with

5    market participants concerning the business of purchasing home

6    mortgage loans on the servicing retained or servicing released

7    basis?  Answer:  Not specifically that I can recall, but I had

8    been a frequent speaker at industry conferences.  I was on the

9    board of directors of the National Home Equity Mortgage

10   Association for some period of time."  Does that refresh your

11   recollection that you've not had discussions or panel

12   discussions with market participants?

13            MR. DORSEY:  Objection, Your Honor.  I think that

14   testimony is completely consistent with what the witness just

15   said.

16            THE COURT:  Well, I'll overrule the objection and

17   allow the witness to answer.

18   A.   I think I said what you just read.

19   Q.   Okay.  Let me ask you to clarify one thing I did not

20   understand your -- in your direct on your qualifications.  Have

21   you ever owned a company as a principal, not as a broker which

22   originated and sold whole loan mortgages?

23   A.   Yes.  FC Capital was my company.  I owned a ten percent

24   equity interest in FC Capital.

25   Q.   Currently?  Or you did in the past?  You're a current

1    owner --

2    A.   I'm not currently the owner of a mortgage company, that's

3    correct.

4    Q.   And how long ago was that?

5    A.   I sold the company in 2000.

6    Q.   Okay.  Have you ever bought -- and you sold whole loan

7    mortgages?

8    A.   We acquired, originated, sold and securitized residential

9    whole loans.

10   Q.   All right.

11           MR. KUNEY:  Thank you, Your Honor.

12           THE COURT:  Any further?

13           MR. GALLO:  Your Honor, Andrew Gallo.  I apologize.

14   I just have two questions that I neglected to ask on the first

15   go around.

16           THE COURT:  Mr. Dorsey, any objection?

17           MR. DORSEY:  No objection.

18           THE COURT:  All right.  Keep it to two questions.

19   VOIR DIRE EXAMINATION BY

20   MR. GALLO:

21   Q.   Mr. Aronoff, you have not read the Fannie Mae guidelines

22   for some time, correct?

23   A.   I actually read them after my deposition.

24   Q.   Prior to your deposition and prior to giving your opinion

25   at your deposition regarding Fannie Mae guidelines, you had not

48

1   read them in quite some time, right?

2   A.   No.   But I felt familiar enough with them when I was

3   retained for this engagement to understand what they say and

4   why they exist.

5   Q.   And prior to your deposition, you had not --

6        THE COURT:   I know.   We're up to three now.

7        MR. DORSEY:   I think we're past three questions, Your

8   Honor.

9        THE COURT:   And you meant two areas of inquiries, not

10   two questions?

11        MR. GALLO:   Your Honor, I just wanted to establish

12   when the last time was that he read the Fannie Mae and Freddie

13   Mac guidelines.   That's it.

14        THE COURT:   All right.

15   Q.   And prior to your deposition, you had not read the Freddie

16   Mac guidelines in -- I think you testified approximately ten

17   years.

18   A.   I was trying to be honest in my deposition, yes.

19   Q.   Thank you.

20   A.   But I consider them to be essentially the same.

21        MR. GALLO:   Okay.   Thank you, Your Honor.

22        THE COURT:   You're welcome.   Okay, thank you.   Any

23   redirect on qualification, Mr. Dorsey?

24        MR. DORSEY:   No, Your Honor.

25        THE COURT:   All right.   All right.   The Court is

1    satisfied that under Rule of Evidence 7000 -- excuse me, 702,

2    that Mr. Aronoff is sufficiently qualified based on his

3    knowledge, experience, training in the mortgage-backed

4    securities industry to provide expert testimony on mortgage-

5    backed security industry.  And I'll overrule the objection as

6    it pertains to qualification.  He's qualified as an expert.

7              MR. DORSEY:  Thank you, Your Honor.

8    CONTINUED DIRECT EXAMINATION BY

9    MR. DORSEY:

10   Q.   Mr. Aronoff, I'd like to turn to your opinions now.  You

11   recall at the beginning of your testimony you described two

12   areas.  The first was your opinion regarding the need to be

13   Fannie and Freddie qualified in the context of an MLPSA as it's

14   viewed in the industry.  Could you please tell the Court what

15   your opinion is in that regard?

16   A.   Yes.  I think that the Fannie Mae/Freddie Mac

17   qualification, for purposes of this discussion, and in saving

18   whatever time I can, I'll call them the agency qualification,

19   the qualification could be agency-approved as well as the

20   references in a lot of these documents to agency standards.

21   Really to understand that, it has to be placed in historical

22   context.  When private label transactions, as I described

23   before, were first being brought to the market by broker deals

24   and invest banks, there was no other reference point for

25   investors in mortgage-backed securities.  And so it was --

¹ there were three primary reasons that the creators of these

² private label bonds look to the agency guidelines to help them

³ bridge the gap and get fixed income investors interested in

⁴ this new type of investment vehicle.  The first had to do with

⁵ convenience in that at that time all the sellers of mortgage

⁶ loans, if you were a seller into mortgage-backed securities,

⁷ were selling to the agencies.  So for the most part, all of the

⁸ possible sellers of loans into private label deals were already

⁹ agency-approved.  So it worked from the sellers' perspective

¹⁰ that that was the qualification for them to engage in these

¹¹ transactions as opposed to referring to the analysis on the

¹² corporate debt side where they would have had to engage in a

¹³ laundry list of material adverse change clauses and financial

¹⁴ covenants.  The industry had already evolved with respect to

¹⁵ agency security so investors and issuers were comfortable as

¹⁶ well as the servicers.  And sellers were comfortable agreeing

¹⁷ that the Fan -- that the agency guidelines would be the

¹⁸ standard.

¹⁹     Similarly, the servicers took great comfort in

²⁰ incorporating the agency guides into their servicing agreements

²¹ because they knew how to service and were set up to service in

²² accordance with those guidelines.

²³     And interestingly, I was here for Mr. Love's testimony.

²⁴ At one point, he mentioned a transaction where they didn't have

²⁵ a contract and he said they felt comfortable because they were

51

1   servicing in accordance with the guidelines.  So the

2   Fannie/Freddie guidelines typically work as a standard of care

3   that absent other agreements servicers are comfortable

4   servicing under.

5       The third most important aspect of agency qualification

6   and the one we'll look at a little bit in more detail is with

7   respect to the marketing aspects of that.  And that is,

8   investors in asset-backed and mortgage-backed securities

9   primarily bought agency securities based on the guarantee of

10  what they deemed to be a federal agency.  They -- because the

11  agencies guaranteed performance in those mortgage-backed

12  securities.  They typically look no farther than that

13  guarantee.  But on private label deals, they didn't have a

14  guarantee so they needed some guidance as to how assess

15  servicer quality.  And again, for the other reasons as well as

16  this reason, they went to agency qualification as an indicator

17  of the ability of a servicer to meet the needs of the deal, to

18  service the type of collateral in question and in terms of

19  financial strength.

20  Q.   How has that evolved over the years in the industry?

21  A.   Subsequently, as the private label industry has grown, the

22  market has determined that that was not sufficient to give

23  investors what they needed in terms of the transparency of the

24  servicer.  And so some years later, the rating agencies, who

25  typically rate bonds as we discussed in other testimony, came

1    out with their own servicer ratings where they went in and

2    looked at exactly the same things that the agency

3    qualifications purported to measure.  That is, the quality of

4    facilities, the quality of personnel, whether the reg --

5    appropriate insurances were involved, the financial viability,

6    but they also went beyond and looked at things as technology,

7    capacity, other important aspects that investors required

8    because the agency standards were lacking.

9         Similarly, in the last few years, the FCC adopted what's

10   known as Reg AB and that's a very detailed reporting scheme

11   that now requires both issuers and servicers to provide

12   significant amounts of data on a recurring basis about the

13   performance of their portfolio so that investors can compare

14   one servicer to another servicer in the rest of the industry

15   based on reams of data that investors feel they need to assess

16   the quality of the servicer given the fact that there are very

17   different types of mortgage assets being securitized now and

18   the structures overlaid on top of those pools are very complex.

19        So, in my analysis, the investors are getting information,

20   much better information, about servicer quality from these

21   various other sources that have evolved as the market has

22   grown.  And to the extent the agency qualification continues to

23   exist in the documents that it's in, it really provides simply

24   a bright red line that yes, this company is in the servicing

25   business.  I mean, the minimum financial qualification for an

1    agency servicer is 250,000 dollars.  So I -- I don't think that

2    that in and of itself -- and then there's a sliding scale based

3    on the size of the portfolio.  But given the demands on

4    servicers in these transactions today, although the

5    qualifications look at the right types of areas they don't go

6    nearly far enough for the purposes of an investors reasonable

7    of servicer quality today.

8    Q.    So why do you think these Freddie Mac/Fannie Mae

9    qualification provisions still appear in some of these

10   agreements?

11   A.    As I said, I think it was important at some point in time.

12   It's of less importance now.  I think it works as another box

13   that has to be checked in the unlikely event you have to

14   transfer servicing from one entity to another.  And I was --

15   someone asked me in my deposition if it was meaningless.  It's

16   clearly not meaningless.  It has some meaning.  I think it's

17   just of limited importance in the determination of the quality

18   of the servicer.

19        In fact, it was interesting as I perused  the -- reviewed

20   the documents in connection with this hearing, I'd say about

21   half of the MLPSAs still had Fannie Mae/Freddie Mac

22   qualification requirements and included references to them and

23   accepted services practices and the failure to have it was an

24   event of default and required that emerged -- that a successor

25   had those requirements.  And about half of them took out that

54

1    standard in its entirety.  And just looked to a normal -- they

2    established their own standard of care for servicers engaged in

3    the business of servicing the type of assets that they were

4    engaged to service.

5    Q.    Just so the Court is aware, what are the documents that

6    you reviewed in connection with getting your opinions?

7    A.    Oh, I'm sorry.  I received three boxes of binders with

8    documents.  I'm not sure how they were selected but they've

9    been referred to as Aronoff exhibit binders or Aronoff document

10   binders.

11   Q.    And how many of the MLPSAs were included in those binders

12   that had issue in this case?

13   A.    I think there were six or seven that were actually called

14   MLPSAs and there were three others with different names.  But

15   upon reading, they fulfilled the same purpose.  So, nine or

16   ten.

17   Q.    Turning to your second opinion regarding the MSLPAs

18   containing servicing rights within an integrated document.

19   Could you explain to the Court what your opinion is regarding

20   the industry standard and practice as it relates to servicing

21   rights as contained in MLPSAs?

22   A.    Yes.  My opinion, from a business perspective, is that the

23   nature of the servicing rights should not be changed or

24   diminished or limited merely because the servicer obtained

25   those servicing rights in the context of a MLPSA.

1  Q.   How does the industry view of transferability of servicing

2  rights?

3  A.   The transferability of servicing rights?  Mortgage

4  servicing rights are traded regularly and it's a multi-billion

5  dollar industry.

6  Q.   And does the fact that servicing rights are contained in

7  an MPLSA in any way affect the transferability of those rights

8  as far as the industry is concerned?

9  A.   It should not.

10  Q.   Why?

11  A.   There is a -- in order -- in order to trade and value

12  mortgage servicing rights, there is a need for conformity and

13  understanding in the industry about what those bundles of

14  rights and obligations are.  When you're valuing a portfolio

15  servicing rights, the moving parts are the characteristics of

16  the specific mortgage loan pool.  To the extent that you had to

17  fully analyze not only the dynamics of the underlying mortgage

18  loan pool, that is, maturity, coupon and other aspects related

19  to the loans and how they will pay and perform but also

20  investigate the specific rights and obligations in every small

21  pool of servicing would bring the securities -- would bring

22  securities trading to a place it's not in now.  There's a --

23  there's a basic assumption within the market as to that bundle

24  of rights and obligations that constitute the administration

25  servicing of loans.  And I -- and if you were changing those

56

1  and adding other responsibilities that radically change the

2  cost of providing those services, it would change the way

3  mortgage servicing is valued and traded currently.

4  Q.   Does the industry have an understanding of what servicing

5  rights are.

6  A.   I think it has a very good understanding and I think it

7  was articulated very clearly by Mr. Love at his deposition.

8  Q.   His deposition or his testimony?

9  A.   I'm sorry.  His testimony.  I wasn't at his deposition.

10  Q.   Could you briefly describe your understanding of the

11  industry's view of what servicing rights are?

12  A.   Yes.  Generally, the servicing rights in connection with

13  the residential mortgage loan required a servicer to collect

14  payments from the borrower, remit those payments through to the

15  beneficial owner of the loans, provide the information and

16  reports in connection with those collections and remittances as

17  well as engage in the activity necessary to protect and

18  preserve the collateral to that loan.  And, finally, in the

19  event of a default, work and manage that default or ultimately,

20  if that default can't be managed, foreclose the property.

21  Q.   When you say default, you mean a default of the underlying

22  mortgagor?

23  A.   Correct.  The borrower obligation.

24  Q.   Now you mentioned that servicing rights are traded.  What

25  did you mean by that?

1   A.    They're bought and sold among institutions that own them.

2   Q.    Can you describe kind of the background in the industry as

3   to how those rights get traded and the volume of trading that

4   goes on?

5   A.    Not in any specific detail but as I said there were

6   billions of dollars of mortgage servicing rights that are

7   traded.   The institutions from time to time will decide that

8   the value of servicing rights are worth more to another

9   institution than to them and they will sell them.   Mortgage

10  companies also use them as another hedge against times when

11  mortgage loan originations have slowed down because the value

12  of mortgage servicing right generally increase in a rising rate

13  environment which is the same time that mortgage originations

14  generally slow down.

15  Q.    Why does it rise?

16  A.    Why does the value rise?

17  Q.    Why does the value rise when mortgage rates are rising?

18  A.    Typically, when mortgage rates are rising, borrowers will

19  retain their current loans and not refinance because they have

20  a loan lower than at the current rate.   But at the same time

21  because borrowers are not refinancing and prepaying their

22  loans, the cash flow stream associated with a servicing right

23  strip will stay out longer and thus in terms of real dollars,

24  the service will collect more.

25  Q.    Is there a way to value what servicing rights are in a

58

1  particular context?

2  A.   Yes.   There's a lot of discussion and a lot of specialty

3  firms that do precisely that.   That engage in valuation

4  methodologies using OAS and Monte Carlo simulation models.

5  Basically, the value of a servicing right or a servicing strip

6  is the present value of a defined cash flow over a defined

7  period of time at some discount rate.   So, although the formula

8  is simple, the computer models used to determine what's the

9  appropriate time frame, what's the probability of that time

10  frame occurring, what's the right discount rate and -- are what

11  makes it a very complicated analysis in most cases.

12  Q.   Do companies provide servicing for mortgage loan value

13  those loans for their own purposes on a regular basis?

14  A.   In my experience, they do and should do, yes.

15  Q.   Why?  Why should they?

16  A.   Because the servicing asset is a very, very valuable asset

17  of a mortgage company.

18  Q.   Is there an industry practice in pricing the value of

19  servicing rights in the context of a trade of mortgage loans?

20  A.   As I said, there is -- there is a -- an assumption and a

21  conformity of understanding among industry participants that

22  the obligations of the servicer are primarily the same.   On the

23  margin, there may be some differences but once you go outside

24  the scope of the normal administration of servicing the loans,

25  those kinds of costs or potential obligations of the servicer

1   go outside the normal valuation methodology.

2   Q.   How are servicing rights priced in the industry on the

3   servicing released versus a servicing retained transaction?

4   A.   Generally, it's the other way around.  Generally, the

5   purchaser of the loans will provide the seller with a servicing

6   retained or a servicing released bid.  And based on how the

7   seller values that servicing strip, they'll make a

8   determination whether the aggregate price being paid by the

9   purchaser on a servicing release basis, that is, the sum of the

10  price they're paying for the servicing and the price they're

11  paying for the loan is greater than their similar math with

12  respect to the servicing rights on the loan.

13       And they'll also compare that to the servicing release

14  bid.  And if the value of the loan in a servicing release

15  context and their value of the servicing strip is greater than

16  the servicing release strip, they'll retain the servicer.

17  Q.   You testified that in the industry it's well known what

18  servicing rights are.  And why is it important for sellers in

19  the industry to understand what servicing rights are?

20  A.   Yeah, again, it's -- it's important that the sellers who

21  have sold on a servicing retained basis and servicers who've

22  obtained those rights in the context of a servicing retained

23  sale don't lose certain benefits of owning those servicing

24  rights simply because other things are going on in the

25  documents.  You have to remember that the context in which

1   these master loan purchase and sale agreements were created was

2   based on a business desire and an industry desire to make the

3   mortgage loan purchasing activity as efficient as possible.

4   There's a tendency to get very focused on the specific

5   transaction in front of us or the transactions between the

6   purchasers and the debtor in this case.  But at the same time,

7   you have to remember that the seller is engaged in multiple

8   transactions with various purchasers and the purchasers are

9   engaged in multiple, sometimes hundreds of transactions with

10  multiple sellers.  And So there's a strong business reason why

11  neither the seller nor the purchaser want the servicing asset

12  to be limited in any way.

13  Q.   Why is that?

14  A.   Well, as I said, the servicer doesn't want it limited

15  because that would impair the liquidity of the asset and

16  necessarily impair the value.  So to limit the servicing from

17  the servicer's standpoint would not only impair the value but

18  it would start to make the administration of that servicing

19  unmanageable.  It's in the servicer's interest on every single

20  transaction to have those servicing rights that they've just

21  created in connection with a smaller trade to conform with

22  everything else in their portfolio.  So, in this example, it

23  would be in the interest of the debtor to make sure that the

24  next hundred or two hundred million dollar trade conformed with

25  the billions of dollars of other servicing rights in their

1  portfolio because if every deal was subject to custom

2  negotiations and changes in the bundle of rights and

3  obligations, it would be unmanageable for any servicer to

4  specifically comply with the terms of those vary specific

5  transactions.

6  Q.    Is it important for purchasers in the industry to

7  understand what servicing rights are?

8  A.    Absolutely.  And similarly, I think it's important for

9  service -- well, for purchasers not to limit the

10 transferability of servicing rights nor engage in activity that

11 substantially changes the nature of those rights and

12 obligations.  Because ultimately, when they put the loans they

13 purchased into a securitization, it's important to the

14 participants in that securitization that they have a common

15 understanding of what servicing rights are.

16 Q.    Why is that?

17 A.    One of the fundamental tenets of a structured deal is that

18 to the extent any one party to the transaction, like a

19 servicer, cannot perform its functions that you can bring in

20 another suitable party to perform those obligations and

21 functions.  Again, if there were very different individually

22 negotiated bundles of rights on hundreds of different

23 transactions, it would be unmanageable for any third party

24 servicer to ever say I'll step in and take over servicing

25 without looking at every one of those specific contracts and

62

1   understanding what their potential liability or potential for

2   losing that cash flow stream is.

3   Q.   Is it important for the industry as a whole to have an

4   understanding of what servicing rights are?

5   A.   Yes.  And I believe they do.

6   Q.   Why is it important that the industry to have an

7   understanding?

8   A.   As I said, servicing as well as the loans needs to

9   transfer freely from the origination side to the capital

10   markets in order for the securitization of those assets to

11   work.

12   Q.   What would happen if the line began to blur between what

13   the sellers' obligations are under an MLPSA versus a servicer's

14   obligations under an MLPSA in the industry?

15   A.   I think to the extent it started blurring into the branch

16   of the tree where the servicer was asked to become a guarantor

17   of seller obligations, you would see the price of servicing

18   change dramatically.

19   Q.   In what way?

20   A.   In that servicers would not only have to make sure that

21   the servicing fee covered the cost of providing the

22   administration servicing on the loans plus a reasonable margin

23   for them but they'd have to make sure that the price they were

24   receiving for taking on those additional obligations was

25   sufficient to make them whole in the unlikely event those

63

1   obligations came to pass.

2   Q.   So the cost of servicing would significantly increase?

3   A.   The required servicing fee demanded by servicers to take

4   on these other obligations would be much higher, that's

5   correct.

6            MR. DORSEY:  May I have just one moment, Your Honor?

7            THE COURT:  Yes.

8   Q.   I'd like to pick up a little bit on our last line of

9   discussion, Mr. Aronoff, and ask you in the bidding process

10  when a purchaser is looking to buy mortgage loans on a

11  servicing retained basis, what goes into the process of

12  determining or who decides what the price is going to be paid

13  for the servicing strip in that kind of a transaction?

14  A.   As I said, the bidder will -- the purchaser will submit a

15  price to the seller for retained bid or a retained and a

16  released bid or a retained bid.  So unless you have both in

17  front of you, you can't really discern on any given portfolio

18  what the price that the purchaser is paying for the servicing.

19  Q.   Is there an understanding in the industry as to what the

20  cost of servicing is going to be based on the type of portfolio

21  that's being sought?

22  A.   Oh, absolutely, the other way around.  You say price of

23  servicing is a little different from the amount of the

24  servicing fee.  The servicing fee is very well understood and

25  defined with certain exceptions for portfolios that by

1   definition were a higher cost.  But for the most part, a fixed

2   rate loan will be serviced at twenty-five basis quanta.  An

3   adjustable rate loan will be services at three-eighths.  And to

4   the extent -- three-eighths of a percentage point.  And to the

5   extent you start to slide down the credit spectrum and get into

6   the realm of sub-prime or scratching then which by definition

7   require a higher level of attention and therefore a higher

8   cost, the servicing fee is generally around fifty basis points.

9   Q.   When valuing servicing rights, are EPD claims or other

10   obligations of the seller included in determining what that

11   value is?

12   A.   They should not be.

13   Q.   Why not?

14   A.   When you look at a master loan purchase and sale --

15   servicing agreement or similar documents, there really lay out

16   a framework for three important functions for both the buyer

17   and the seller.  The first function is to articulate the terms

18   of the trade:  the quantity, the delivery date, the price and

19   whether it's a servicing released or retained trade.

20      The second important function is to talk about the closing

21   mechanics and the delivery mechanics.  And then to the extent

22   it's a servicing retained trade, it lays out the loan

23   administration and servicing requirements related to that

24   trade.

25      The fact that those important functions are handled by the

1  parties in one document, in my experience, in no way is done to

2  turn the servicer into a guarantor for what are seller

3  obligations.  That is, the seller is getting the benefit of the

4  bargain and the consideration for the sale of the loan whether

5  it's retained or released.  As -- in exchange for receiving

6  that consideration, they make certain reps and warranties as to

7  the quality of those loans.

8      Let's talk about EPDs for a minute.  EPDs are in a sense

9  recourse but because the accountants want to view this and

10  everyone wants to view this as a true sale these are non-

11  recourse transactions.  That is, the seller's not responsible

12  for taking credit risk.  If a loan defaults in a typical

13  situation, the seller doesn't have to buy it back and make

14  good.  They're non-recourse sales.  The EPD element of these

15  transactions and its very limited time frame is really viewed

16  as a proxy for a breach of a rep and warranty.  If a borrower

17  can't make their payment in the first three months of getting

18  that loan, that's agreed upon by the industry that that's a

19  proxy for -- I don't have to point to the specific rep but you

20  made a bad loan and now you have to buy it back.  So let's

21  include EPDs in our discussion with all representations and

22  warranties of the seller.  That's just a special one that's

23  easy to prove because he either made his payment or he didn't.

24      But whereas it makes perfect sense for the seller to have

25  to buy back a loan that wasn't as represented to the purchaser

1  and whereas it makes perfect sense for a seller to provide the

2  purchaser with that portion of premium they paid back if the

3  loan is not outstanding for as long a period as the party

4  discern -- originally assumed, i.e., premium recapture, it

5  makes perfect sense for the seller to stand behind those

6  obligations as the party that received the consideration for

7  the loans.  It makes no sense for a servicer to have to simply

8  because their servicing rights were created in the same

9  document all of a sudden become a guarantor or indemnifying

10  party for the seller in the unlikely event the seller doesn't

11  perform its obligations.

12  Q.   Thank you.

13          MR. DORSEY:  Thank you, Your Honor.  Nothing further.

14          THE COURT:  Let's take a short recess before we

15  reconvene for cross-examination.  And during the break, sir,

16  you may not discuss the substance of your testimony with

17  counsel.

18          (Recess from 10:38 a.m. until 10:55 a.m.)

19          THE COURT:  Please be seated.  Let me see if I can

20  get it.  I know, Mr. Gallo, you probably have questions and Mr.

21  Kuney and Mr. Crowley, I assume you have questions for the

22  witness?

23          UNIDENTIFIED ATTORNEY:  I will, Your Honor.

24          THE COURT:  All right.  Anyone else?  Okay.  All

25  right.  Okay.  Proceed.

67

1      MR. GALLO:  Thank you, Your Honor.  For the record,

2  Andrew Gallo from Bingham McCutchen for DB Structured Products,

3  Inc.

4  CROSS-EXAMINATION BY

5  MR. GALLO:

6  Q.    Good morning again, Mr. Aronoff.

7  A.    Good morning.

8  Q.    Mr. Aronoff, in your twenty-five years of experience, have

9  you ever seen an MLPSA in which the seller and the servicer

10  were the same party?

11  A.    Yes.

12  Q.    That happens quite often, does it not?

13  A.    No, I think most large origination companies currently

14  divide the servicing functions and the origination and loan

15  sale functions.  And it was much more common, say, fifteen,

16  twenty years ago.

17  Q.    But in that agreement where the seller and the servicer

18  are the same entity under the MLPSA, you would agree with me

19  that one entity would have all of the obligations under the

20  MLPSA with respect to sale and service, right?

21  A.    By definition it's the same entity.

22  Q.    So you would agree with my statement, right?

23  A.    Can you restate it, please?  I'm sorry.

24  Q.    Yes.  In an MLPSA in which the same party is both the

25  seller and the servicer, that one party would have all

1  obligations with respect to both sale and servicing of the

2  loans under that agreement, right?

3  A.   That's correct.  But I think if they transferred the

4  servicing, there would be a separate distinction among what

5  rights traveled as servicing rights, and what rights were

6  retained by that single entity seller as the seller.

7  Q.   Right.  You'd have to --

8           THE COURT:  I'm sorry, Mr. Gallo, to interrupt.  Can

9  you lower your microphone just a touch?  Can you lower it just

10  a bit?  Just push -- yeah, there you go.

11           MR. GALLO:  Thank you.

12  Q.   Right.  And that distinction would have to be accomplished

13  by a separate agreement which would indicate that what was

14  being transferred was the servicing rights and not the rights

15  relating to the sale.  Isn't that correct?

16  A.   No, not necessarily.  You could, in the context of an

17  agreement where you had a single entity acting as both seller

18  and servicer -- in fact, that's the way I'm most familiar with

19  it being done -- is you refer to them as seller when you're

20  referring to typical servicer obligations, and you refer to

21  them as servicer when there are servicing obligations.

22  Q.   So have you ever seen in your career servicing obligations

23  under an MLPSA transferred to another party without a

24  subsequent agreement?

25  A.   I don't know if it was an MLPSA, but it would be a loan to

1   convey mortgage loans.  Without a subsequent agreement, no.

2   Q.   Now, I'm going to show you what's been admitted as DB-1,

3   Deutsche Bank-1 in this action, which is a master Mortgage Loan

4   Purchase and Servicing Agreement with American Home Corp. as

5   seller, American Home Servicing, Inc. as servicer, and my

6   client, DB Structured Products, Inc., as initial purchaser,

7   dated as of May 1, 2006.  You have seen this agreement before,

8   right, Mr. Aronoff?

9   A.   Yes.

10  Q.   But the opinions you've offered today are not specifically

11  related to this agreement.  Isn't that correct?

12  A.   That's correct.

13  Q.   And you're not offering any opinion as to how one should

14  interpret the specific provisions of this agreement, is that

15  correct?

16  A.   That's correct.  My opinion goes to industry practice.

17  Q.   And what your opinion essentially boils down to, isn't it,

18  Mr. Aronoff, is that any agreement that is a servicing retained

19  MLPSA contains severable servicing rights, regardless of the

20  terms of the agreement?

21  A.   I don't think I used the word severable, and I'm

22  uncomfortable doing that because, as I've learned over the past

23  few days, that's a word packed with all kinds of legal

24  ammunition.  And I'm uncomfortable -- that's not my opinion.

25  My opinion was as I stated.

1   Q.   And your opinion as stated, which is that servicing rights

2   should not be limited or diminished by the fact that they

3   appear in an MLPSA.  You're offering that opinion regardless of

4   what the terms of the MLPSA say.  Isn't that correct?

5   A.   In general, yes.

6   Q.   Because you formed your opinion as to severability of

7   servicing rights prior to reviewing any of the agreements in

8   this case, correct?

9   A.   I understood how the industry operates outside of the

10  documents in this case, that's correct.

11  Q.   I think -- okay, so you agree with me then that your

12  opinion with respect to these MLPSAs in this case was

13  formulated prior to reviewing any of the MLPSAs, correct?

14          MR. BRADY:  Objection, Your Honor.  He's not giving

15  an opinion on any of the MLPSAs in this case.

16          THE COURT:  Sustained.

17          MR. GALLO:  I apologize for the characterization.

18  Q.   Your opinion as to servicing rights was formulated prior

19  to reviewing any of the MLPSAs in this case, correct?

20  A.   My opinion on this specific matter didn't exist until this

21  case.  But my understanding of how the market works and what

22  the general business purposes behind agreements like this and

23  the understanding of participants in this market are, of course

24  I understood and agreed with before I formulated the opinion in

25  this case.

71

Q.   Okay.  I'll ask it once more.  Your opinion on the issue

of severability, you reached that opinion prior to reviewing

any of the agreements that are at issue in this case, correct?

        MR. BRADY:  Objection, asked and answered, Your

Honor.

        MR. GALLO:  I don't think I've received an answer to

that question, Your Honor.

        THE COURT:  Overruled.

        MR. POWER:  I also object.  The witness said he's not

comfortable with the word severability, clearly.

        MR. GALLO:  Your Honor, can --

        THE COURT:  That was Mr. Power.

        MR. GALLO:  Your Honor, I'm happy to agree to

whatever the debtors want to agree to as a shorthand for the

opinion that Mr. Aronoff offered with respect to whatever the

opinion was, the non-Fannie/Freddie opinion.  Whatever they

want to call it, I'll call it that as a shorthand.  What do you

want to call it?

        THE COURT:  Mr. Dorsey, do you have a preference?

        MR. DORSEY:  Well, I think it's whatever the witness

feels comfortable with, Your Honor.  I think it would be up to

him to come up with a shorthand version that he feels

comfortable with.

        MR. GALLO:  It's not my intent to trick the witness

with my questioning.  I just want to understand what he did.

72

1          MR. DORSEY:  What would you feel comfortable, Mr.

2    Aronoff, as a moniker for your opinion that doesn't relate to

3    Fannie and Freddie, your other opinion?

4          THE COURT:  It may not be -- I mean, the answer, sir,

5    may be it's not easily -- you can't come up with an acronym for

6    your opinion.  I mean, that's --

7          THE WITNESS:  I was going to say if you want me to

8    name it --

9          MR. GALLO:  How about if I call it the other opinion,

10   okay?  If I call it the other opinion, will you understand that

11   I'm talking about your opinion that does not relate to Fannie

12   and Freddie qualifications, okay?

13         THE WITNESS:  Yes.

14         MR. GALLO:  Okay.

15         THE COURT:  I'm not sure the appellate court's going

16   to like that, frankly.  And I don't say that lightly.  It could

17   make the transcript difficult.

18         MR. GALLO:  Understood, Your Honor.

19         THE COURT:  Let me see if I can come through this.

20         MR. GALLO:  Maybe the servicing rights opinion, Your

21   Honor?

22         THE COURT:  Yeah.  Let's call it that, the servicing

23   rights opinion.  And we all understand that's distinct from the

24   opinion regarding Fannie Mae and Freddie Mac.

25         MR. GALLO:  Do you understand that, Mr. Aronoff?

1          THE WITNESS:  Yes, I do.

2          MR. GALLO:  Okay.

3   BY MR. GALLO:

4   Q.   So my question is you formulated your servicing rights

5   opinion prior to reviewing any of the contracts that are at

6   issue in this case, correct?

7   A.   No.  That's not entirely correct.

8          THE COURT:  You should have it.

9          UNIDENTIFIED ATTORNEY:  I do have it over here.

10          UNIDENTIFIED ATTORNEY:  I got it.

11          MR. GALLO:  I'm on page 150 of the deposition, Your

12   Honor.

13          THE COURT:  All right.

14          MR. GALLO:  And I apologize, but we didn't have a

15   nickname at the deposition, so it was referred to as different

16   things.

17          THE COURT:  All right.

18   Q.   I'm starting at line 3, "Question: Can you describe to me

19   the steps you followed in forming your opinion?" and I'm

20   talking about your opinion regarding the severability.  And

21   there was an objection as to form by Mr. Dorsey.  And you

22   answered "Yeah, I formulated an opinion based upon my

23   experience and knowledge of the industry and transaction I was

24   personally involved in and then looked at the documents I was

25   sent in this case to see if they in any way changed or

74

1    dissuaded me of that opinion.  And I concluded that my initial

2    understanding of market convention was confirmed upon my review

3    of the three boxes of documents I received."  So isn't it

4    correct that your opinion was formulated prior to your review

5    of the documents, and your review of the documents only

6    confirmed the initial opinion that you had made?

7    A.    No.

8    Q.    So are you disagreeing with what you testified to in your

9    deposition?

10   A.    It says what it says, and I agree with you.  As I look at

11   this now, opinion -- really by opinion I meant hypothesis.  I

12   developed a hypothesis related to how I believed, outside of

13   anything related to this case, the market worked.  And then, as

14   I stated here, I read the related documents to see if anything

15   in those documents was inconsistent with my opinion, which I'm

16   testifying as to today.  I probably should have chosen my words

17   more carefully.  I've never done this before.

18   Q.    Isn't it true that you had a conversation with debtors'

19   counsel about the opinion that they wanted you to reach, prior

20   to being retained to give that opinion?

21            MR. DORSEY:  Objection to the characterization of the

22   conversation, Your Honor.

23            THE COURT:  Overruled.

24   A.    Again, as I told you at the deposition, we talked about

25   the subject matter that I would be asked to provide an opinion

1   with respect to.

2   Q.   And prior to reviewing the agreements, you told the

3   debtors' counsel that you would be comfortable giving them the

4   opinion that they wanted.  Isn't that right?

5   A.   Not in those words.  But the subject matter comported with

6   my view of how the industry operated.

7   Q.   Let's look at page 174 of your deposition, starting at

8   line 14.  This is a line -- if you want to read back to get

9   context, but I'll tell you that this is a line of questioning

10  that we went into at the deposition that related to your

11  initial conversation with the debtors.  And the question is

12  "What were you told?"  I'm starting at line 14 on page 178.

13  "Answer:  I was told that they needed an expert opinion with

14  respect to two specific areas.  One was the severability of

15  servicing rights, and the other was the opinion with respect to

16  Fannie Mae/Freddie Mac qualification."  Did I read that

17  correctly?

18  A.   You read it correctly, yes.

19  Q.   And are you disagreeing with that particular testimony

20  that you had in your deposition?

21  A.   No.  I think I just testified that we discussed the

22  subject matter regarding which I'd been asked to opine.  They

23  didn't instruct me what my opinion should be.

24  Q.   So are you now comfortable with me calling it the

25  severability opinion?

1    A.    No.  You asked me if it was what you read.  You read

2    severability of servicing rights.  I thought we were calling it

3    the servicing rights opinion.

4    Q.    When you were asked "What were you told?" you answered

5    that one of my opinions was with respect to the severability of

6    servicing rights, correct?

7              MR. DORSEY:  Objection, mischaracterizes the

8    deposition testimony.

9              THE COURT:  Overruled.

10   A.    Can you restate the question, please?

11   Q.    Can I have it read back, Your Honor?  If that's difficult

12   I'll say it again.

13             THE COURT:  No, that's not difficult now that we have

14   a live court reporter.  Can you read back the last question,

15   please?  It's hard to play it back on the tape, but it's --

16             THE REPORTER:  "Question:  So are you now comfortable

17   with me calling it the severability opinion?"

18   A.    No.

19   Q.    And reading on further in the deposition you said -- the

20   question was asked "What did you tell them when they told you

21   that the subject matter of the expert testimony they needed?"

22   And you said "Answer:  I said I'm certainly comfortable

23   discussing those matters and when we could get together to talk

24   about how this works in more detail, because I had never been

25   an expert witness before and I wanted to know if that prevented

1    me from going any further with them."  Did I read that

2    correctly?

3    A.    Yes.

4    Q.    So isn't it true in that first conversation you had with

5    debtors' counsel, they told you that they wanted an opinion

6    with regard to the severability of servicing rights and you

7    told them yes, I'm comfortable giving that opinion?

8    A.    Absolutely not.

9    Q.    Let's turn to page 190 of your deposition.

10           THE COURT:  I'm sorry, what page?

11           MR. GALLO:  190.

12   Q.    Starting at line 5, the question "So you knew when you

13   were being retained what opinion they wanted you to reach?

14   Answer:  Yes.  Question:  And is that, in fact, the opinion

15   that you've given here today, correct?  Answer:  I think my

16   opinions concur with what they originally expressed would be

17   the opinions that they were looking for, yes."  Did I read that

18   correctly?

19   A.    Yes, you did.

20   Q.    So the debtors told you what opinion they were looking

21   for, prior to reading any of the documents you told them you

22   could give them that opinion, and you're giving them that

23   opinion here today.  Isn't that correct?

24           MR. DORSEY:  Objection, Your Honor.  I think he's

25   taking it -- there's another portion and the next question, I

78

1    think, should be read in the record.

2          THE COURT:  Overruled, you can get into that in

3    redirect.  Would you read back the question, please?  Could we

4    have the mike for her?  Do you have the handheld mike?  You

5    need to use the mike when you read it back into the record

6    because otherwise the official transcript won't pick up what

7    you're saying.

8          THE REPORTER:  Sure.  "Question:  And starting at

9    line 5, the question "So you knew when you were being retained

10   what opinion they wanted you to reach?  Answer:  Yes.

11   Question:  And is that, in fact, the opinion that you've given

12   here today, correct?  Answer:  I think my opinions concur with

13   what they originally expressed would be the opinions that they

14   were looking for, yes.  Did I read that correctly?  Answer:

15   Yes, you did."

16         THE COURT:  Now the next question.

17         THE REPORTER:  The next -- I'm sorry.  "Question:  So

18   the debtors told you what opinion they were looking for, prior

19   to reading any of the documents you told them you could give

20   them that opinion, and you're giving them that opinion here

21   today.  Isn't that correct?"

22   A.   No, that's not correct.  What we discussed was the subject

23   matter of the opinion.  And I apologize that my deposition is

24   not precise in that matter.

25   Q.   Didn't you tell debtors' counsel, before you reviewed any

1    of the agreements in this case, that you could provide your

2    servicing rights opinion, the one that you're giving here

3    today?

4    A.    No.

5    Q.    Now, after you formulated your opinion, your servicing

6    rights opinion, you reviewed approximately 80 to 85 percent of

7    the contracts in this case, right?

8    A.    I've now looked at -- that's correct.

9    Q.    And the fact that the terms -- those contracts are not all

10   identical, correct?

11   A.    No.  They're not all identical, that's correct.

12   Q.    Some contracts contain terms that are different than

13   others, right?

14   A.    That's correct.

15   Q.    And the fact that certain contracts contain terms that

16   were different than other contracts, that did not affect the

17   opinion that you had originally formulated prior to reviewing

18   the documents, correct?

19   A.    That's correct.

20   Q.    Now, you would agree with me, would you not, that if there

21   was an indemnification provision in an MLPSA that bound the

22   servicer for the seller's obligations with respect to sale, in

23   order to transfer those servicing rights, a new servicing

24   agreement would have to be entered or you'd need to eliminate

25   that indemnity.  Isn't that correct?

1   A.   If we're talking about the DB agreement, which we

2   discussed at length, I would normally agree with you.  But in

3   the context of that agreement, that indemnification provision

4   seemed to me to be inconsistent, from a business standpoint,

5   with other passages in the document.  It also seemed

6   inconsistent to me from an industry standpoint to be an

7   indemnification provision you'd find in a servicing retained

8   master purchase and servicing agreement.  And it was my

9   understanding that both the debtor and DB Structured were

10  treating that transaction as a servicing retained provision.

11  So in your hypothetical the answer is yes.

12          MR. GALLO:  Your Honor, I move to strike the portion

13  of the answer that deals with his interpretation of my

14  agreement.  He's testified that that's outside the scope of his

15  expert testimony.

16          THE COURT:  Overruled.  He was explaining his answer.

17  Q.   So, again, if I understand you correctly, and I'm not

18  talking specifically about my agreement now, I'm offering you a

19  hypothetical, hypothetically, if there was an MLPSA in which

20  the servicer indemnified the seller for the revs and warrantees

21  related to the sale, you would agree with me that in order to

22  transfer those servicing rights you would either need to enter

23  into a new agreement or you would need to modify this servicing

24  agreement to allow that indemnity, correct?

25  A.   You wouldn't need to do that.  It would be appropriate to

1   do that, because if there was a bundle of servicing rights that

2   included an indemnification provision for actions other than

3   those related to servicing, it would specifically affect the

4   value of those rights to any transferee.  So before you found

5   someone to acquire those rights, assuming they were normal

6   servicing rights, you would have to carve that unusual

7   servicing provision out of the servicing rights and

8   obligations.  So that's correct.

9   Q.   So I believe your answer to my question is yes,

10  hypothetically, if there was an MLPSA in which the servicer

11  indemnified the seller for the sale refs and warrantees, you

12  would have to eliminate that provision prior to transferring

13  the servicing rights, correct?

14          MR. BRADY:  Objection, asked and answered.  Your

15  Honor, it's the same question he just asked.

16          THE COURT:  Sustained.  He answered your question,

17  Mr. Gallo.

18          MR. GALLO:  I appreciate that, Your Honor.  Thank

19  you.

20  Q.   Now, Mr. Aronoff, you're aware that these MLPSAs are often

21  used to govern the trades of hundreds of millions, sometimes

22  billions of dollars worth of mortgage loans, correct?

23  A.   I understand that.

24  Q.   And, particularly, with a client such as my size or some

25  of the other creditors that are here, they may typically trade

82

1    billions of dollars of loans, right?

2    A.    Yes.

3    Q.    And is it your testimony that one of the prime purposes

4    for these agreements is to make it clear that the servicing

5    rights and the sale rights are separate?

6    A.    I think that's important.  I think from time to time

7    efficiency of getting deals done gets in the way of perfect

8    clarity.

9    Q.    So is it your testimony here today that based upon your

10   twenty-five years of experience, if my client was going to

11   enter into a contract in which it was going to trade billions

12   of dollars of mortgage loans, and it wanted the sale rights and

13   the servicing rights to be clear and distinct, for convenience

14   sake, it would put those in one document, as opposed to putting

15   them in two?

16   A.    No, on the contrary.  I think for convenience sake they

17   would put it in one.

18   Q.    So you think that it is easier and clearer that these

19   rights are distinct when they're put in one document, versus

20   putting them in two?

21   A.    No.  As I said, the creation of the master loan purchase

22   and servicing agreements was to provide a framework for parties

23   trading loans to do a number of things in the most efficient

24   fashion for both parties.  Whether it's better or not to

25   articulate and describe and negotiate each separate set of

1    rights and obligations in multiple documents, I guess it

2    depends on the parties to the transaction.

3        But remember, it's not only your client doing business,

4    and lots of dollars worth of business with the debtor.  It's

5    that your client is also buying loans from hundreds of other

6    sellers.  And as a business management objective, they need to

7    make sure that not only all of their acquisitions from the

8    debtor are consistent but that their acquisitions from these

9    hundreds of different sellers conform, in some large respect,

10   to each and every other trade, because they don't know at the

11   time that he's acquired those loans which of those loans are

12   going to be aggregated in one securitization.  And without the

13   conformity and identity among those different deals, your

14   client would be at a significant operating disadvantage to

15   other competitor firms of theirs.

16   Q.   If I understand your opinion correctly, it's that the sale

17   rights and the servicing rights are two separate and distinct

18   bundles of rights, right?

19   A.   At the time they're created, yes.

20   Q.   And is it also your opinion then that it's easier to

21   articulate that fact by including both sets of rights in one

22   document?

23   A.   No.

24   Q.   So if the primary concern would be sale and servicing

25   separate rights, why not use two different documents?

A.   Because it's more efficient for all of the parties to use one master loan purchase and interim servicing agreement for released sales and one master purchase and servicing agreement for retained sales.  I think as the relationships between mortgage purchasers and mortgage sellers developed, as was testified by Mr. Love the other day, in the heat of getting a deal done -- and remember a lot of this stuff is done simply to get loans as quickly as possible, hot off the presses from the origination source, into the capital markets, into securities so they can be sold to investors.  That's how everyone gets paid.

So there's a tremendous amount of pressure at all points of the food chain to get loans out of the seller and into the deals as quickly as possible.  And we could talk about which theoretically might be better.  All I can talk about is where the industry has evolved and why they do things, in my opinion, the way they do them currently.

Q.   But it's your opinion then that even though my client is going to be trading hundreds of millions, if not billions of dollars of loans through this agreement, and even though American Home, in your opinion, is going to be retaining the servicing rights which are extremely key to its business, and even though both parties are interested and it's necessary for the industry that these rights be segregated and separately, for efficiency's sake they're willing to put it all in the same

85

1    agreement?

2    A.    It's my opinion that the fact that they were handled in

3    the same agreement should not limit the servicing rights of the

4    holder of those rights.

5    Q.    Regardless of what the agreement says?

6    A.    No.  Any specific agreement will define the specific

7    bundle of rights.  I'm talking about general industry practice.

8    Q.    Now, one of the -- I think one of the reasons you

9    stated --

10                 MR. GALLO:  Strike that.

11    Q.    You stated that oftentimes these servicing rights are

12    treated as an asset onto themselves that are traded.  You

13    remember that testimony on direct?

14    A.    Yes.

15    Q.    Now, you don't know whether American Home ever traded in

16    servicing rights, correct?

17    A.    That's correct.

18    Q.    So you have no idea as to whether when American Home was

19    negotiating these contracts that was an issue that they

20    considered, right?

21    A.    I have no idea what the debtor was thinking at any point

22    in these transactions, that's correct.

23    Q.    Now, would you agree with me that a servicer's size is

24    important to its ability to perform its servicing functions?

25    A.    No.

1   Q.   All right.  Let me give you a hypothetical.  If I, Andrew

2   J. Gallo, was to go tomorrow and open up Andrew J. Gallo's

3   mortgage servicing out of my house with two employees, would I

4   have the same ability to service mortgage loans as Countrywide?

5   A.   No, but you wouldn't be a small servicing company.  You

6   would be Andrew J. Gallo servicing loans.

7   Q.   You would agree with me that the size of a company can

8   impact the quality and how much of mortgage loan servicing it

9   can handle, right?

10  A.   Yes.  Generally, servicing has significant economies of

11  scale, so the larger your servicing portfolio, the more

12  efficiently and at a lower cost you can service the asset,

13  that's correct.

14  Q.   And you would agree that if my client has an MLPSA

15  pursuant to which -- or any creditor in this case has a MLPSA

16  pursuant to which it owns billions of dollars of mortgage

17  loans, there are certain companies that can handle that

18  capacity to service those loans and there are other servicing

19  companies that wouldn't be able to handle that capacity, right?

20  A.   I don't know.

21  Q.   Do you think that every servicing company out there,

22  including the small servicing companies, can handle servicing

23  billions of dollars worth of loans?

24  A.   There are certain companies that would not be qualified to

25  service in a rated security.

1   Q.   You would also agree with me that a servicing company's

2   sophistication, the sophistication of its systems, the quality

3   of its systems, that will have an impact on its ability to

4   service loans, correct?

5   A.   Yes.

6   Q.   And you also agree with me that a company's financial

7   strength, that will have an impact on how it can service loans,

8   right?

9   A.   It could to the extent that it's important that the

10  servicer is viable for some meaningful period of time.

11  Financial strength is important.  Financial strength doesn't

12  necessarily correlate to the quality of servicing, however.

13  Q.   You understand that the amount -- that oftentimes it's

14  important for an owner of mortgage loans to know that its

15  servicer has a certain level of insurance coverage, right?

16  A.   Yes.

17  Q.   And you'd want to be secure on the fact that your servicer

18  has enough insurance to be able to cover any problems there

19  might be with servicing your loans, right?

20  A.   Yes, you do.

21  Q.   Now, when you were deposed, you indicated you hadn't read

22  the Fannie Mae guidelines in some time.  Is that right?

23  A.   I think it was the Freddie Mac guidelines.

24  Q.   You want me to get the deposi --

25  A.   I think I said I hadn't looked at the Fannie Mae

88

1    guidelines recently and you reminded me that I hadn't looked at

2    the Freddie Mac guidelines in ten years.

3           MR. GALLO:  I apologize, Your Honor.  I'm just trying

4    to find that deposition reference.

5           THE COURT:  Take your time.

6    Q.   So if you would turn to page 53 of your deposition, line

7    22 at the bottom.

8           THE COURT:  I'm sorry, which page?

9           MR. GALLO:  I'm sorry, Your Honor, page 53, and I'm

10   starting on line 22, which is a question by me.

11          THE COURT:  Thank you.

12   Q.   I asked you "So if one wanted to see precisely what these

13   qualifications were, they could get a copy of the Fannie Mae

14   qualifications and they would be listed there.  Is that

15   correct?"  And you answered "I would imagine so.  I haven't

16   looked at the Fannie Mae guide for a long time."  Is that

17   right?

18   A.   Yes.

19   Q.   And so it's correct that you have not -- as of your

20   deposition, you hadn't looked at the Fannie Mae guide for quite

21   some time, right?

22   A.   That's correct.

23   Q.   And as of your deposition, you hadn't looked at the

24   Freddie Mac guide for at least ten years, right?

25   A.   That's correct.

1  Q.   But you did look at those guidelines over the weekend,

2  right?

3  A.   Yes, I did.

4  Q.   Prompted by my questioning and your counsel's advice that

5  you should really look at these guidelines before you give this

6  opinion, right?

7        MR. DORSEY:  Objection, Your Honor.  I'm not his

8  counsel.

9        MR. GALLO:  I wasn't intimating that Mr. Dorsey gave

10  the advice, but if he did --

11        THE COURT:  Well, it assumes facts not in evidence

12  that he has counsel, and I'll let you rephrase the question,

13  Mr. Gallo.

14  Q.   You read the guidelines this weekend after I questioned

15  you about it and after Mr. Dorsey instructed you that if you're

16  going to give this opinion, it's a good idea to read the

17  guidelines, right?

18  A.   That's not correct.

19  Q.   It's not correct that you read them over the weekend?  Did

20  you read the guidelines over the weekend, Mr. Aronoff?

21  A.   I said I read them over the weekend.

22  Q.   And you hadn't read them prior to your deposition in at

23  least ten years, right?

24  A.   I think I answered that question.  That's correct.

25  Q.   Now, the Fannie Mae guidelines provide standards with

1   respect to the quality of the facilities of a mortgage loan

2   servicer, right?

3   A.   In part that's correct.

4   Q.   The Fannie Mae guidelines outline standards with respect

5   to the amount insurance coverage that a servicer needs to

6   maintain.  Is that correct?

7   A.   Yes.

8          MR. DORSEY:  Objection, Your Honor, to the line of

9   questioning.  Mr. Aronoff is not giving an opinion about

10  whether or not AHM servicing is a qualified servicer.  His

11  opinion relates to the transferability and the tradability of

12  servicing rights.  It has nothing to do with the quality of the

13  underlying servicer.

14         THE COURT:  What's the relevance of this testimony,

15  Mr. Gallo?

16         MR. GALLO:  I thought I heard that Mr. Aronoff's

17  testimony is as to the relevancy of the -- this is on the

18  Fannie Mae/Freddie Mac opinion, Your Honor.  And so Mr.

19  Aronoff's opinion is as to whether or not a qualification in a

20  servicing agreement, as to whether someone is qualified for

21  Freddie Mac or qualified for Fannie Mae is relevant to the

22  agreement.  So I'm asking him about the Fannie/Freddie

23  qualifications.

24         THE COURT:  Fair enough.  I'll allow the line of

25  questioning.  Objection's overruled.

1        MR. GALLO:  I lost --

2        THE COURT:  You jump around so much you lost me, you

3    see?  I thought we were still back on the servicing opinion.

4        MR. GALLO:  I'm off the servicing opinion.  I'm on

5    the Fannie Mae opinion.

6        THE COURT:  It's good cross-examination, but not if

7    you lose the judge.

8        MR. GALLO:  I apologize, Your Honor.

9        THE COURT:  Could we have the question read back,

10   please?

11       MR. GALLO:  That's okay.  I'll re-ask the question.

12   Q.   Part of the Fannie Mae guidelines provide standards as to

13   the quality of a mortgage servicing's facilities, right?

14   A.   Yes, as I stated in my deposition, the four areas of

15   Fannie Mae qualification relate to facilities, personnel,

16   insurance and financial strength.  And all of those areas of

17   inquiry are the right areas of inquiry for an investor to think

18   about.  However, there are far better methods of determining

19   whether or not a servicing is qualified or competent with

20   respect to any particular asset type or compliant with any

21   particular agreement than mere Fannie Mae qualification.  As I

22   stated earlier, a servicing rating goes into much greater

23   specific detail about the qualifications of the servicing, as

24   does the information provided by a servicing in accordance with

25   Reg AB.  So my point was that Fannie Mae/Freddie Mac

92

1  qualifications, in the way they're described, look in the right

2  places.  They just don't provide enough guidance with respect

3  to those topics for an investor to make a decision as to

4  whether a servicing's qualified or not to service the specific

5  transaction in question.

6  Q.  You would agree with me, though, that they're valuable as

7  a baseline, right?

8  A.  They have some relevance in this market, and I stated

9  that.

10  Q.  Turn to page 72 of your deposition.  We were talking about

11  the Fannie/Freddie guidelines.  It's on line 4.

12  A.  I'm sorry, what page?

13  Q.  72.

14  A.  Okay.  I'm there.

15  Q.  And on line 4 I asked you with respect to Fannie/Freddie

16  guidelines "You would agree with me, though, that it's at least

17  a baseline." And you answered "Yes."  Did I read that

18  correctly?

19  A.  Yes, you read it correctly.

20      MR. GALLO:  I have no more questions, Your Honor.

21      THE COURT:  Okay.  Thank you.  Mr. Kuney, should we

22  go with you next?

23  CROSS-EXAMINATION BY

24  MR. KUNEY:

25  Q.  I was tempted to ask you if you read the Bankruptcy Code

1   over the weekend, but perhaps I better not.  Did you by any

2   chance read Section 555 over the weekend?

3   A.   No, I didn't.

4        THE COURT:  Mr. Kuney, for the purpose of the record,

5   could you identify yourself?

6        MR. KUNEY:  Yes, I'm sorry, Your Honor.

7        THE COURT:  Okay.

8        MR. KUNEY:  David Kuney for EMC.

9   Q.   Mr. Aronoff, I've been listening to your opinion with

10  respect to what I'm going to call the servicing component.  It

11  seems to me that what you're saying is that merely because the

12  rights of the servicer and the seller are in one document, that

13  should not, what you call diminish the rights with respect to

14  transferability or diminish the rights to the servicer.  Is

15  that correct?

16  A.   Yes.

17  Q.   Now, that opinion relates, does it not, and in fact what

18  your opinion focuses on is the transferability of servicing

19  rights which are not then in default, and which the servicer

20  has experienced, for example, a credit crisis.

21  A.   That's correct.

22  Q.   So that would be a wholly separate opinion which you

23  weren't even asked to give in this case.  Isn't that correct?

24  A.   Yes.

25  Q.   So when I asked you if you had looked at, for example --

94

1          MR. KUNEY:  Let me rephrase that.

2    Q.   You didn't look at the industry standard with respect to

3    whether or not servicing rights are typically terminated when

4    there's a credit problem such as insolvency, with a servicer,

5    did you?

6    A.   No.

7    Q.   So we're not here to talk about how the industry typically

8    views the termination rights of a purchaser when there's a

9    problem with the servicer?

10   A.   You might be, but I'm not.

11   Q.   So if the contracts are drafted with respect to protecting

12   the termination rights of the owners of the loans, you didn't

13   opine on that, did you?

14   A.   I'm not sure I understand the question.  I'm sorry.

15   Q.   Your opinion didn't go to the industry standard on how

16   these agreements that are before the Court are drafted with

17   respect to protecting the termination rights of the owners of

18   the mortgages?

19   A.   That's correct.  My opinion did not go to that.

20   Q.   In fact, you testified a few moments ago -- and I wrote it

21   down because I thought it was an important comment -- that it's

22   a, what you called a fundamental tenant that if a servicer

23   cannot perform, that they must be able to bring in some other

24   party in a securitized transaction."  Do you remember saying

25   that?

95

A.    Yes, I do.

Q.    So you would agree with me then that if the servicer has a credit problem such as bankruptcy, it's a fundamental tenant of your industry that we must be able to bring in another servicer?

A.    No, I think you went too far. If a servicer can no longer perform the functions it's required to, then it's critically important to bring in a servicer that can, as servicing performance is intimately tied to the performance of the collateral pool, and ultimately the ability of the investors to get their payments.

Q.    Well, can you agree with me that if you're an owner of a group of home mortgage loans and you're attempting to securitize them and your servicer is in bankruptcy, you're not likely to be able to put them into the securitization trust? Wouldn't you agree with that?

A.    I don't know.

        MR. DORSEY:  Objection, Your Honor, it's outside the scope of his opinions.

        THE COURT:  Well, no, I'll allow the question which was already answered.  So the objection's overruled.  I believe the answer was "I don't know."

Q.    I think you also testified that all the transactions where servicing is assigned or sold, the ones that you've been involved in, were with the consent of the owner of the home

1  mortgages, correct?

2  A.   With the -- no.

3  Q.   You don't remember testifying at your deposition that the

4  transactions that you're aware of where there was an assignment

5  of servicing was always with the consent of the owner of the

6  mortgages?

7  A.   No, I don't remember that.

8         MR. KUNEY:  May I have a moment, Your Honor?

9         THE COURT:  Yes.

10  Q.   Let me ask you to look at page 52, please?

11  A.   Of my deposition?

12  Q.   Yes, please.  I'm sorry.  It's 51, line 15.  Everybody

13  have it?  All right.  The question on line 15 "Separate and

14  apart from that, prior to the loans being securitized until the

15  loans are wholly owned by the investor, have you ever seen that

16  the sale, the servicing being separated and sold absent the

17  consent of the investor?  No, I can't give you the name of a

18  situation where that happened, but theoretically it's certainly

19  possible and it's probable that it's happened.  I'm just not

20  aware of the specific instance."

21  A.   That's correct.  In a whole loan context, that's correct.

22  Q.   So you have not personally ever seen it?

23  A.   In a whole loan context.  I have in the case of loans and

24  securitization.

25  Q.   And EMC transactions are whole loan transactions, are they

1   not?

2   A.   To the extent EMC still owns loans and hasn't put them

3   into security, that's correct.

4   Q.   Now, you testified at your deposition that in order to

5   determine whether sale and servicing are severable, one has to

6   consider the terms of the agreement between the parties.  Is

7   that correct?

8   A.   Yes.

9   Q.   And would you also agree that with respect to the terms of

10  the agreement between the parties, you never looked at the

11  contract between EMC and the debtor?

12  A.   I didn't recall looking at it.

13  Q.   And you also testified at your deposition that you had no

14  opinion and did not intend to give an opinion as to the

15  transactions between EMC and the debtor?

16  A.   That's correct.

17  Q.   Now, you've previously testified, I think, you did not

18  form an opinion on what the actual intent of the parties to the

19  transactions in this courtroom where.  That is the debtor and

20  the various creditors, you don't have an opinion about what

21  their actual intent was when they entered into the contracts

22  that are at issue here?

23  A.   That's also correct.

24  Q.   And you didn't read the documents with an eye towards

25  opining on how they would work or how they were intended to

98

1  work or what the parties intended them to do.  Isn't that

2  correct?

3  A.   Yes.

4  Q.   And you would agree with me that you have no way of

5  knowing what the intent of the parties were to these

6  transactions?

7  A.   Not as I sit here today.  That's right.

8  Q.   I believe you said you also testified that typically the

9  parties in the industry do put servicing and sale into one

10  agreement, and that would be your preference.

11  A.   As a purchaser or a seller that would be my preference,

12  that's correct.

13  Q.   Now, would you agree with me that servicing is critical to

14  make sure investors get their money?

15  A.   It's a critical aspect in loan performance.  It's one

16  factor in assuring whether investors get their money, yes.

17  Q.   Well, I'd like to use the word critical.  Can we agree

18  that servicing is critical to the investors getting their

19  money?

20  A.   I can't make that connection.  It's critical on the loans

21  performing properly, yes.

22  Q.   And the loans performing properly is critical to the

23  owners, the investors getting their money, getting their

24  return?

25  A.   Getting the promise that was made to them, yes.

1    Q.   Would you agree that servicing performance is a

2    significant factor in whether the loans continue to pay or

3    perform properly?

4    A.   It's a factor.  Depending upon the type of loan, it may be

5    more of a factor than not.

6    Q.   Now, you were describing at your deposition how servicing

7    is priced.  Do you recall that, generally?

8    A.   I don't, but I'm sure we did.

9    Q.   Okay.  You gave me an example and you said I believe -- or

10   you gave the folks at the deposition -- that if group of loans

11   are sold -- let's say there's, I think the example you gave

12   there's an eight and a half percent coupon on the mortgage.  Do

13   you remember that example?

14   A.   Yeah.  Should I be looking at a specific section of the

15   deposition?

16   Q.   I'm going to come to that in just a minute.

17   A.   Okay.

18   Q.   I don't think you need it just yet.

19   A.   Okay.

20   Q.   And you said that if you sell a mortgage, a group of

21   mortgages with an eight and a half percent coupon and fifty

22   basis points are retained, that in your view the servicer owns

23   that strip.  Do you recall that testimony?

24   A.   In the context of a -- I don't recall that testimony.

25   Q.   All right.  You want to look at page 34, line 5 of your

1   deposition?  Now just to refresh your recollection, it's a long

2   answer.  I'm referring -- everybody has it?  Top of page 34.

3   It begins "That interest component belongs to the seller.  I

4   have an eight and a half percent coupon loan, I buy it

5   servicing retained or I sell it servicing retained at a fifty

6   basis point servicing fee.  I just sold you an eight percent

7   coupon loan, I own fifty basis points out of that cash flow."

8   And the "I" you're referring to there is the servicer, correct?

9   A.   Yes.

10  Q.   So is your concept of how this works, is that the owner

11  and the servicer have a common interest and they both own a

12  piece of the same cash flow?

13  A.   You lost me.

14  Q.   Isn't that exactly what you just said?  Didn't you say

15  that the servicer and the owner each own a piece of the very

16  same cash flow?

17  A.   The -- yes.

18  Q.   So wouldn't you agree, sir, that since they both own a

19  piece of the same cash flow, the relationship is very

20  interdependent upon each other?

21  A.   It's interdependent upon the borrower performing on its

22  obligation to pay, that's right.

23  Q.   And is it interdependent on the skill of the servicer to

24  make sure that the borrower performs and pays timely?

25  A.   Servicer quality is important to the performance of the

1    loans, that's correct.

2    Q.   Okay.

3            MR. KUNEY:   Thank you, Your Honor.

4            THE COURT:   Thank you, Mr. Kuney.  Mr. Crowley?  Like

5    the Price is Right.  Come on down.  Unfortunately, I look more

6    like Drew Carey than Bob Barker.

7            UNIDENTIFIED ATTORNEY:   I was about to say that job

8    was just filled, Your Honor, it's no longer available.

9    CROSS-EXAMINATION BY

10   MR. CROWLEY:

11   Q.   Mr. Aronoff, good morning.  My name is Leo Crowley.  I

12   represent the Bank of New York as indentured trustee and as

13   master servicer on certain transactions.  And my questions,

14   just to be clear, only relate to the Fannie Mae aspect of your

15   opinion.  Okay?  Do you have a list of the contracts that you

16   reviewed in connection with preparing to give your opinion?

17   A.   I don't have a list with me, but I think the binders were

18   available as Aronoff binders.  I know some people referred to

19   them like that.  I don't have a list with me, no.

20           MR. DORSEY:   For the record, Your Honor, all of the

21   documents reviewed by Mr. Aronoff were made available to the

22   parties on the FTP website for discovery purposes.

23           THE COURT:   Were they designated as such, Mr. Dorsey?

24           MR. DORSEY:   Yes, Your Honor.  They're segregated by

25   documents reviewed by the expert.

102

1          THE COURT:  Okay.

2    Q.   Is your Fannie Mae opinion limited to the MLPSAs?

3    A.   No.  I was speaking generally with respect to investor

4    perceptions and the relevancy of that designation to investors

5    in the marketplace.

6    Q.   Okay.  What did you do to prepare to give your opinion on

7    the Fannie Mae issue today?

8          THE COURT:  You may just need to get a little closer.

9          MR. CROWLEY:  Oh, I'm sorry, Your Honor.

10         THE COURT:  That's okay.

11   Q.   What did you prepare -- what did you do in order to

12   prepare to give your opinion on the Fannie Mae issue?

13   A.   I thought about, based on my experience and knowledge, why

14   the Fannie Mae qualifications exist in the first place and then

15   what their relevancy is in the current marketplace, because I

16   was surprised, I must tell you, when I looked at some of the

17   documents prepared by very sophisticated institutions where

18   there was no reference to Fannie Mae at all.  That's not to say

19   that there were not a number of documents where you would find

20   references to the agencies in the appropriate places, which led

21   me to the other part of my opinion that it's not a meaningless

22   designation, by any means, and that in certain contexts it's

23   very important in defining a bright red line between an entity

24   that's actually in the servicing business and one that isn't.

25   Q.   Okay.  And, actually, the purchaser today is not in the

103

1    servicing business, is it?

2    A.    I don't know.

3    Q.    Okay.  In connection with preparing to give the opinion

4    you've rendered today on the Fannie Mae issue, did you

5    interview any investors in mortgage backed securities?

6    A.    No, I did not.

7    Q.    In connection with preparing to deliver the opinion that

8    you've rendered today, did you look at the trading values of

9    any mortgage backed securities?

10   A.    No.

11   Q.    And is it fair to say that your opinion today on the

12   Fannie Mae issue is based solely on your knowledge and

13   experience?

14   A.    That's correct.

15           MR. CROWLEY:  No further questions, Your Honor.

16           THE COURT:  Thank you.  Ms. Bifferato?

17           MS. BIFFERATO:  Good afternoon, Your Honor.

18   CROSS-EXAMINATION BY

19   MS. BIFFERATO:

20   Q.    Good afternoon, Mr. Aronoff.  I'm Karen Bifferato.  I

21   represent Wells Fargo Funding.  And I just have a question or

22   two for you.  You testified earlier about your experience with

23   MLPSAs in this industry.  And so I have a hypothetical I was

24   hoping you could answer.  Under circumstances where there are

25   no loans being originated or purchased and where there are no

1   pending service transfers, under a master loan purchase and

2   interim servicing agreement, could there be anything left of

3   value that could be assigned to another servicer?

4   A.   If I heard you correctly, the agreement is in place solely

5   with respect to prospective transactions?  There are no loans

6   that are the subject of that agreement, that's how you started,

7   did I hear you properly?

8   Q.   That's correct.  And there's no -- it's I guess what

9   everyone's been calling the servicing released and there's no

10  pending service transfers under loans that were already

11  purchased previously and there's no current loans being

12  purchased.

13  A.   My analysis regarding the limitation on servicing rights

14  related to a situation where those rights were acquired by the

15  servicer in a servicing retained context.  So my opinion with

16  resp -- so in your hypothetical, if the seller sold the

17  servicing along with the loans, there would be no interest of

18  the servicer in that scenario.

19  Q.   Okay.

20          MS. BIFFERATO:  Thank you very much.

21          THE COURT:  Thank you.  Mr. Chipman?  Do you need a

22  break?  Chipman.

23          MR. CHIPMAN:  Good morning, Your Honor.

24  CROSS-EXAMINATION BY

25  MR. CHIPMAN:

1   Q.   Good morning, Mr. Aronoff.

2   A.   Hi.

3   Q.   For the record, William Chipman, Edwards Angell Palmer &

4   Dodge on behalf of Countrywide.  A lot of ground has already

5   been hoed here, so I'm going to try and limit my questions to a

6   few specific hypotheticals.  You testified that you're an

7   expert and you've had twenty-five years of experience

8   negotiating and working in the mortgage industry, and you have

9   been qualified as an expert on MLPSAs.  Is that correct?

10  A.   Prior to today I've never testified or been qualified as

11  an expert.

12  Q.   All right.  For purposes of this hearing you're an expert

13  on MLPSAs, correct?

14  A.   Not specifically, on documents of those types, that's

15  correct.

16  Q.   In your twenty-five years of experience, have you ever had

17  occasion to know of a purchaser of whole loans that was

18  purchasing under an MLPSA servicing retained by the seller

19  where the purchaser wanted to restrict a subsequent transfer of

20  those servicing rights to a third party?

21  A.   Yes.  That would make sense.  I think consent is a normal

22  aspect of the rights of a whole loan investor, subject to

23  someone else's servicing consent prior to transfer.

24  Q.   Okay.  In addition to consent, have you ever had

25  experience with whole loan purchasers that actually wanted to

1  obtain the servicing rights back from the seller under certain

2  circumstances?

3  A.   Yes.  And in some of the agreements that I reviewed, there

4  were situations where, based on a set of facts, subject to

5  certain agreements and conditions between the parties, the

6  servicer and the current investor, the investor was able to

7  acquire those servicing rights.

8  Q.   Okay.  Are you familiar with termination provisions

9  without cause in any of these agreements?

10 A.   Yes.  Many of them had them.

11 Q.   Can you describe for the Court what those entitle the loan

12 purchaser to do?

13 A.   The standard way the termination without cause provision

14 in these documents functioned was that the investor or

15 purchaser would notify the servicer that they were terminating

16 without cause.  And that termination would be effected upon the

17 completion of certain specific requirements.

18 Q.   And what are the typical requirements?

19 A.   Typically, agreement and payment of a fee for that

20 servicing, the appointment or naming of a successor to that

21 servicing, and the acceptance by that successor servicer or the

22 purchaser of that servicing at which point the servicer is

23 required to transfer servicing to the new servicer.

24 Q.   Are these typical provisions in MLPSAs where the purchaser

25 has bargained to get its servicing rights back?

107

A.   It really runs the gamut.  It depends on whether -- like,
Countrywide is a big mortgage firm, a big servicer, they
typically would include provisions whereby they could take the
servicing.  In other instances, there are entities that are not
capable of servicing, so they do everything they can to make
sure they're never in a position to be called by a borrower on
the phone.

Q.   Okay.

A.   So it varies.

Q.   So in Countrywide's -- it sounds like you're familiar with
Countrywide?

A.   I'm very familiar with Countrywide.

Q.   Are you familiar with Countrywide's agreements?

A.   I looked at them in the context of this transaction for
purposes of seeing whether they conflicted with my limited
opinion in this case.

Q.   And if the Countrywide agreements contained,
hypothetically, these types of provisions that allow them to
terminate without cause, restrict transferability of service
rights, does that affect your opinion in any way about the
transferability of these servicing rights to a third party?

A.   In that specific case, those restrictions would be part of
the bundle of rights.  My opinion went to a business and
industry understanding of what's typically included in loan
administration and servicing rights.  That's not to say that in

1   any given situation the parties could negotiate as to how they

2   would limit or expand those rights.

3   Q.   So if Countrywide negotiated those provisions in their

4   agreement with the debtor, those provisions should be

5   enforceable, correct?

6   A.   Again, I'm not an attorney --

7        MR. DORSEY:  Objection, calls for a legal conclusion,

8   Your Honor.

9   A.   I'm not an attorney.

10       THE COURT:  Wait, wait a minute.  There's a pending

11  objection.  Can you reread the question to me?  I'm sorry.

12       THE REPORTER:  "Question:  So if Countrywide

13  negotiated those provisions in their agreement with the debtor,

14  those provisions should be enforceable, correct?"

15       THE COURT:  Objection sustained.

16       MR. CROWLEY:  Let me try and rephrase the question,

17  Your Honor.

18       THE COURT:  Okay.

19  Q.   If Countrywide bargained for certain limitations on

20  transferability of servicing rights, you had testified earlier

21  that those provisions would transfer to a subsequent servicer

22  as part of the bundle of servicing rights.  Is that correct?

23       MR. DORSEY:  Objection, Your Honor.  He didn't refer

24  to Countrywide.  He said as a general industry practice.

25       MR. CROWLEY:  I'll re --

1          THE COURT:  That's okay.  No, I think that the

2   question was -- I mean, basically, it's a hypothetical.  So

3   I'll allow the question.  You can answer if you understand it.

4   A.    I think I understand.  My opinion relates to the

5   limitations or changes or disruption of servicing rights merely

6   because they're part of a master loan purchase and sale

7   agreement or other document that is a multifunctional document.

8   I don't believe that to the extent parties provide

9   consideration to one another to change the normal bundle of

10  servicing rights that those servicing rights shouldn't be

11  assumed as they were agreed.

12       It's where the benefit of the bargain is blurred between

13  the seller and the purchaser to include the servicer as a

14  guarantor of the purchaser's obligations -- of the seller's

15  obligations, I'm sorry -- that I had a view was outside of the

16  industry's understanding of how those deals worked.  That's not

17  to say that parties can't define and describe for adequate

18  consideration how they want servicing to be defined vis-a-vis

19  the two of them.  That is what it is.

20  Q.    So if I understand your answer, which was fairly long, is

21  just because the industry does something doesn't mean two

22  parties contracting freely can't change what the industry does?

23  A.    That's correct.  But it would significantly change what

24  those rights are with respect to how the rest of the industry

25  understands servicing rights.

Q.   Okay.  And I have one final hypothetical for you.  If somebody were to draft a mortgage loan purchase and servicing agreement between the debtors and a third party that only had two parties to it, a purchaser and a seller, and the seller was obligated to perform all of the servicing obligations, and then the debtor wanted to transfer those servicing obligations, I believe you had testified earlier -- I just want to be clear on this point -- that you would need a separate agreement to memorialize the transfer of the servicing rights.  Is that correct?

A.   I don't recall saying that.  And I'm not sure I understand the question.

Q.   Let me ask you that question.  Let me rephrase the question.  If you had a mortgage loan purchase servicing agreement where the seller was obligated to perform all the servicing obligations, to transfer just the servicing obligations outside of the bankruptcy court, would you need some other form of agreement to memorialize just the servicing obligations?

        MR. DORSEY:  Objection.  I think that's calling for a legal conclusion, Your Honor.

        THE COURT:  Overruled.  I think we actually -- we had this testimony previously.  So --

A.   Yeah.  I don't know if I said -- it's not theoretically impossible.  I just think it would be prudent to memorialize

1    what you were doing in an agreement.  Yes.

2              MR. CROWLEY:  Thank you, Your Honor.  I have no

3    further questions.

4              THE COURT:  All right.  Let's see.  Anyone else?  Mr.

5    Fallon?

6              THE WITNESS:  Your Honor, I apologize.  I don't know

7    how much longer we have to go, but could we take a five minute

8    recess?

9              THE COURT:  Yes, we may.

10             THE WITNESS:  Thank you.

11             THE COURT:  I think we have Mr. Fallon and probably

12   Ms. Lawson.  Is that it?  That's going to be it?  Okay.  Yeah,

13   we'll take a five minute recess.

14             UNIDENTIFIED ATTORNEY:  Thank you.

15             (Recess from 12:00 p.m. until 12:09 p.m.)

16             THE CLERK:  All rise.

17             THE COURT:  Please be seated.  Mr. Fallon?

18   CROSS-EXAMINATION BY

19   MR. FALLON:

20   Q.   Good afternoon, Mr. Aronoff.  I am Brett Fallon,

21   representing City Mortgaging.  I just have a couple questions

22   for you.  With respect to individual negotiations, the parties

23   are free to negotiate the amount that a servicer gets paid.  Is

24   that fair?

25   A.   Yes.

1   Q.   Okay.  And the parties can define and describe what the

2   servicing that has to be done in the MLPSAs?

3   A.   The parties can define and decide whatever they want.

4   That's correct.

5   Q.   And the parties are free to negotiate the conditions or

6   restrictions on when the servicer would get paid?

7   A.   Yes.

8          MR. FALLON:  I have no further questions.

9          THE COURT:  Thank you.  Ms. Lawson?

10  CROSS-EXAMINATION BY

11  MS. LAWSON:

12  Q.   Good afternoon, Mr. Aronoff.  I'm Kim Lawson from Reed

13  Smith on behalf of GMAC Mortgage.  And hopefully I will be as

14  short as the previous person, but that's my goal.  Most of your

15  testimony today has been around the MLPSA.  Is that correct --

16  situation -- agreements?

17  A.   Yes.

18  Q.   Okay.  I believe someone previously had asked you if your

19  testimony would also apply in the context of a stand-alone

20  servicing agreement.  Is that correct?

21  A.   It does, but in that case it's much -- much -- from a

22  general perspective, it's a much easier analysis.  All that's

23  being done there is a description of servicing rights.

24  Q.   Okay.

25  A.   All that's being done is a description of servicing

1    rights, I'm sorry.  I have to get this properly located.

2    Q.    So in terms of identifying the bundle of rights that is

3    going, it would -- in the industry, it's typical that it would

4    be all contained within the stand-alone servicing agreement?

5    A.    Well, that understanding among industry participants as to

6    what generally constitutes servicing rights, it shouldn't

7    matter what the document is contained in.  It's mortgage

8    servicing rights.  And I think that's the flip side of my

9    point, merely because those generally understood bundle of

10   mortgage servicing rights happens to be in an MLPSA doesn't

11   change what they are, and shouldn't limit them -- shouldn't

12   limit the ability of the owner of those rights to enjoy them.

13   Q.    Correct.  But would the owner of those rights have to

14   comply with -- would they have to also consider the obligations

15   in those agreements?

16   A.    Absolutely.  Servicing rights are defined in the context

17   of documents and legal agreement.  So yes, absolutely.

18           MS. LAWSON:  Okay.  Let me just make sure, but I

19   think I may actually be done.  Yeah.  I have no further

20   questions.

21           THE COURT:  Thank you, Ms. Lawson.  Any further

22   cross-examination of this witness?  All right, hearing none,

23   redirect Mr. Dorsey?

24           MR. DORSEY:  I think the committee has a few

25   questions, Your Honor.

114

1      THE COURT:  I asked that the committee ask questions

2  before we got to the objectors.

3      MR. POWER:  It's in connection --

4      THE COURT:  Mr. Power, I made that very clear.  What

5  are your questions?

6      MR. POWER:  They relate to the cross-examination

7  testimony, Your Honor.

8      THE COURT:  Well, that's redirect.  Do you want to do

9  Mr. Dorsey's redirect?  Look.  You guys are aligned.  It's

10  unfair to the people who asked cross-examination to now allow

11  you to basically cross on their cross.  So I'm not going to

12  allow you to ask these questions.  If you want to take a break

13  and talk to Mr. Dorsey about what he needs to put in his

14  redirect, that's fine.  But I made it clear at the beginning of

15  the hearing that your questions were to be asked before we got

16  to the objectors.

17      MR. POWER:  Yes, Your Honor.

18      MR. DORSEY:  That's fine, Your Honor.

19      THE COURT:  So if you want to take a break and talk

20  about redirect, that's fine.

21      MR. POWER:  I'd appreciate that, Your Honor.

22      THE COURT:  All right.  Take a recess.

23      (Recess from 12:13 p.m. to 12:27 p.m.)

24      THE COURT:  Please be seated.  Mr. Dorsey?

25      MR. DORSEY:  Thank you, Your Honor.  I apologize for

1    the confusion earlier.

2            THE COURT:  No problem.

3            MR. DORSEY:  We were just trying to shorthand things

4    without having to spend more time.

5            THE COURT:  That's fine.  I just -- I mean, I'm going

6    to hold to the same structure in the reverse with the

7    objectors.  I'm going to have them cross before I turn it over

8    to those in favor of the motion.  Otherwise the hearing

9    loses -- it's unfair, it's fundamentally unfair.

10           MR. DORSEY:  I understand, Your Honor.

11   REDIRECT EXAMINATION BY

12   MR. DORSEY:

13   Q.   Mr. Aronoff, I'd like to take you back to some of the

14   questions you were asked on cross-examination relating to the

15   transfer -- transferability of servicing rights versus the

16   transferability of the loans themselves.  And particularly in

17   the context of an MLPSA where servicing has been retained.

18   Okay?

19   A.   (No verbal response).

20   Q.   In that situation, once the sale -- initial sale has

21   occurred under an MLPSA, and the purchaser, investor, buys the

22   mortgage loans, the servicing stays with the servicer, does the

23   investor then have the opportunity to sell those loans,

24   subsequent?

25   A.   Yes, they do.

1  Q.   And can they sell those loans subsequently without having

2  to also transfer the servicing rights?

3  A.   The new investor would probably want to be in some form of

4  contact with the servicer, but they will sell the loans, and

5  they can't transfer the servicing lines.

6  Q.   Are you familiar with -- in the context of selling loans,

7  are you familiar with the term, using a tape?

8  A.   Sure.

9  Q.   And what -- can you describe for the Court what that

10  means?

11  A.   It has varied meanings.  Initially a tape would be sent

12  from the seller to the potential purchasers, so that they can

13  look at the individual loan characteristics to determine how

14  they're going to price that portfolio.  It could also be used

15  with respect to servicers providing information about the

16  portfolio at any point in time.  But a tape is really a very

17  detailed description of the portfolio at any point in time.

18  Q.   Is that something that's used by investors to sell loans,

19  subsequent, after they've already bought the loans pursuant to

20  an MLPSA?

21  A.   Yes, it would be that the tapes of various sales or the

22  mortgage loan bids.  It's an electronic version of the mortgage

23  loan schedule with more fields.  So yes, in order to define

24  what the pool being securitized, or the pool being transferred

25  would be, a tape or a mortgage loan schedule would have to be

1    sent to the new owner of the loans.

2    Q.    And in the context of an investor selling after they've

3    purchased under an MLPSA, how quickly could that process be

4    done to sell them to some other investor or into a securitized

5    trust?

6    A.    Very quickly.

7    Q.    When you -- how can you --

8    A.    It could be done simultaneously with the acquisition if

9    you really wanted to push it.

10   Q.    Okay.  So an investor who buys loans under an MLPSA is

11   capable of simultaneously selling them to some other third

12   party almost at the exact same time?

13   A.    Theoretically, you can -- you can assign your interest

14   immediately.  That's correct.

15   Q.    Now, what would happen in the context of having to

16   transfer servicing to a new servicer?  What kind of -- what's

17   involved in that process of transferring to a new servicer?

18   A.    Oh, I -- servicing transfer typically takes a longer

19   period of time and is done in stages, if for no other reason

20   then there're federal laws that talk about how you have to

21   notify and treat the borrowers in connection with a servicing

22   transfer.  There are hello letters -- or the sequence is good-

23   bye letters by the old servicer and hello letters by the new

24   servicer, as well as the information and documentation related

25   to a servicing transfer is more cumbersome and typically takes

1   significantly longer than if you were just going to sell a pool

2   of loans on a tape.  So the servicing transfer would typically

3   take considerably longer than a whole loan sale.

4   Q.   You were also asked some questions on cross-examination

5   about conversations you had with attorneys at Young Conaway and

6   whether you were told what your opinion was going to be?  Do

7   you recall that?

8   A.   I do recall that.

9   Q.   Did anyone at Young Conaway tell you what your opinion was

10  going to be?

11  A.   No.

12  Q.   Could you describe, kind of, generally, for the Court what

13  the conversation was you had when you talked with Young Conaway

14  attorneys initially about what was being asked of you?

15  A.   Yeah.  Initially, the conversations were a lot of

16  questions about who I was, and what I've done and where I've

17  been.  And then the questions were generally about the subject

18  matter as I -- as described in my deposition.  And then, when I

19  was asked if I was interested in participating, the -- most of

20  the conversations were about logistics.

21  Q.   I want to go back one moment.  You testified during your

22  direct, and you were asked about it on cross, about how -- how

23  the servicing fee that the servicer gets paid is calculated.

24  And I believe you testified that depending on the type of

25  transaction or type of loans involved in the sale, you either

1   get twenty-five basis points or three eighths or fifty basis

2   points, whatever -- depending on the type of loans involved in

3   the transaction.  Do you recall that testimony?

4   A.   Yes, I do.

5   Q.   What happens to that servicing fee after the loans have

6   been transferred to a third party under an MLPSA?  So the

7   initial purchaser buys under the MLPSA, sells the loans to

8   someone else, how does that servicing feed continue to get

9   paid?

10  A.   So the initial purchaser -- just so I make sure I

11  understand it.  The initial purchaser under the MLPSA

12  subsequently transfers the loans to another beneficial owner of

13  the loans?

14  Q.   Correct.

15  A.   It gets paid the same way it's paid when the purchaser has

16  it, which is the servicer nets it out of the interest coupon

17  component they receive from the borrower.

18  Q.   So the servicer, in collecting the PNI payments before

19  transmitting to the owner of the loans those PNI payments,

20  takes out whatever its service fee is and then transfers the

21  rest.  Is that how it works?

22  A.   Correct.  And generally the servicer, the only thing that

23  would change on the servicer system with respect to a

24  subsequent loan transfer in its servicing retained context,

25  would be they would put a new investor code in their computer

120

1    so they would know who they were servicing on behalf of and

2    know where to forward those payments.  The relationship with

3    the borrower wouldn't change in any way, typically.

4    Q.    Thank you.

5              MR. DORSEY:  Could I just have one moment, Your

6    Honor?

7    Q.    I believe you were asked on cross-examination about the

8    payment of that service fee and whether it was a piece of the

9    interest strip that related to the securitization of those

10   loans.  Do you recall that?

11   A.    Yes, I recall the question.

12   Q.    I just want to get some clarification on that.  Is that

13   actually that the servicer owns that piece of the interest

14   strip, or are they just getting their fee by taking it out of

15   the PNI payments that are subsequently transmitted to the

16   purchaser?

17   A.    No, the servicer owns the right to that cash flow payment.

18   Q.    Okay.

19   A.    It's an intangible asset just like a license or a patent

20   or a -- or any other ownership of the cash flow stream.

21   Q.    So the fee itself is an ownership?

22             MR. GALLO:  Objection, Your Honor.  Legal conclusion.

23             MR. DORSEY:  I'll withdraw the question.

24             THE COURT:  Yeah.  Thank you.  Is that it?

25             MR. DORSEY:  That's all, Your Honor.  Thank you.

1    THE COURT:  Thank you.  Mr. Aronoff, you can step

2    down.

3    THE WITNESS:  Thank you.

4    THE COURT:  Mr. Dorsey, we need to -- I think that's

5    your case, except we have to deal with the admission of

6    exhibits.

7    MR. DORSEY:  Correct, Your Honor.

8    THE COURT:  And we should probably discuss further

9    the motion in limine now that we've had the testimony.

10   MR. DORSEY:  Okay, Your Honor.

11   THE COURT:  And then we'll turn to EMC.  But it's the

12   lunch hour, so unless, Mr. Brady, you're ready to do the

13   exhibits right now -- however you want to proceed.  I mean, it

14   may make more sense to break for lunch and deal with these

15   after lunch, and then we'll turn to the other evidence.  Is

16   that all right?

17   MR. PATTON:  That's fine, Your Honor.  We'll deal

18   with it after lunch.  And I think you're right.  All we have --

19   sorry.  All we have is the motion in limine and the documents,

20   and then we're finished with our case in chief.  We may have

21   rebuttal --

22   THE COURT:  Of course.

23   MR. PATTON:  -- but.

24   THE COURT:  All right.  Let's break.  What time is

25   it?  1:30 is too short.  Let's break until about 1:45 for

122

1    lunch.  All right.  Shoot for 1:45 and no later than 2.

2            (Recess from 12:36 p.m. until 1:55 p.m.)

3            THE COURT:  Please be seated.  All right.  Do we want

4    to deal with the motion in limine or the exhibits?  Whichever

5    anyone prefers.  Let's deal with the motion in limine.  How

6    about that?  Since every -- fresh in everyone's minds.

7            MR. KUNEY:  Good afternoon, Your Honor.  David Kuney

8    for EMC.  On the motion in limine I'm not going to reargue.

9    I'm going to renew my request that the Court grant the motion

10   in limine.  And just to be procedurally as precise as I might

11   have to be, I'm also going to move and ask the Court to strike

12   the testimony of Mr. Aronoff for the same reasons, such that I

13   argued and that were set forth in the motion in limine.  I

14   think I need to preserve and make a specific request to strike

15   the testimony.

16           THE COURT:  That's fine.

17           MR. KUNEY:  Thank you.

18           MR. CROWLEY:  Leo Crowley for the Bank of New York,

19   Your Honor.  Your Honor, I've made almost no -- very few

20   comments at the outset, so I'd like to elaborate a little bit

21   on --

22           THE COURT:  That's fine.

23           MR. CROWLEY:  -- for our motion in limine.  Your

24   Honor, may I approach to hand out copies of two cases, please?

25           THE COURT:  Is that Gun and Tyson Seafood?

1          MR. CROWLEY:  I'm sorry?

2          THE COURT:  Gun and Tyson Seafood.

3          MR. CROWLEY:  No.

4          THE COURT:  Two extra ones.  These the ones -- I'm

5     sorry.  Are these the ones you cited in your -- I'm sorry,

6     Kemp.

7          MR. CROWLEY:  Kemp and Koppel.  Yes.

8          THE COURT:  Koppel.  Okay.

9          MR. CROWLEY:  Right.  Maybe you don't want them then.

10    I --

11         THE COURT:  I read them, so --

12         MR. CROWLEY:  Okay.

13         THE COURT:  I'm sorry.  I cited it incorrectly,

14    though.

15         MR. CROWLEY:  Okay.  Your Honor, our motion, first of

16    all, is directed only to the Fannie Mae portion of the

17    testimony because that's the portion we're interested in.

18         THE COURT:  Actually, I beg your pardon.  Can you --

19    I printed the wrong one.  I read it off the computer, but I

20    printed the wrong one.  Can you hand me the Koppel v. New York

21    State Board of Elections, please?

22         UNIDENTIFIED ATTORNEY:  Do you need a copy, counsel?

23         UNIDENTIFIED ATTORNEY:  No, we don't.

24         THE COURT:  Thank you.  I did read them during the

25    break.

1          MR. CROWLEY:  Your Honor, the premise of our motion

2     is pretty simple.  Which is even an expert, who is an expert by

3     reason of industry experience and -- we did not challenge the

4     industry expertise of the witness.  I think he might have been,

5     and may be, qualified as an expert.  The prong of the no bear

6     test that he flunks is the reliability prong.  Because there

7     was no methodology associated with his testimony.  And I think

8     both of these cases quite clearly stand for the proposition

9     that an expert who is purporting to be an expert by reason of

10    general industry knowledge and expertise still must base his

11    testimony on repeatable methodology.  Something that I could go

12    out and replicate and test.

13          For example, the testimony he gave was, in effect,

14    testimony as to the purported state of minds of the people who

15    are investors in mortgage bank securities.  Now, if he had

16    conducted a survey I could quibble with the survey and say

17    maybe you didn't survey enough people.  Maybe it's not

18    statistically valid.  Maybe you didn't ask the right questions.

19    I could out and do a better survey of my own.  But he didn't do

20    a survey.

21          Or he could have gone and tested the market and said

22    okay, I've test how these securities trade in the market.  And

23    I've done a study of trading values.  And that study shows that

24    there's no difference in how a mortgage bank security trades

25    that could be traced to whether or not there's a requirement

125

that a successor servicer be Fannie Mae qualified.  So again,

if he had done that there would be a methodology to it.  But

all he's done, in essence, is said I've been in this industry

for a long time.  And this is what a lot of people think.  And

the long and the short of it is under Joe bear and under these

two specific cases.  I think Koppel is extremely compelling,

because there's an interesting sort of comparison between the

two experts in questions, because both sides' experts were

challenged under Joe Bear.  And the first expert -- the

plaintiff's expert -- was permitted to testify because he

had -- I'll get the copy of the right case here.  I'm sorry.

This is beginning on the right column of page 4 here on the

bottom of the slip opinion.  It says in the paragraph that

begins Dane measures position bias.  Or effect in two ways.

First he compares each candidate's percentage of the total vote

in the ballots on which he or she appeared in the first place

with the candidate's percentage of the vote in all of the

election districts over ballots.  Then it goes on to say the

second method measures the overall ballots candidates received

for being in the first position.  The issue in that case being

whether it's unconstitutional to assign the first position on

the ballot by lottery.  Then the defendant's expert was

stricken, because the defendant's expert -- and this is the

discussions on page 5.  And if Your Honor read it I don't want

to belabor it.  But the defendant's expert hadn't done any

126

1    study.  He just came in and said, you know, I'm generally

2    familiar with the outcomes of all of the elections in New York

3    for the last umpteen years.  And based on that general

4    familiarity, and I'm a smart guy, and I'm a political

5    scientist, my opinion is that there is positional bias

6    associated with being first on the ballot.  And I think Mr.

7    Aronoff's testimony, frankly, wasn't even that good.  Because

8    Mr. Aronoff just said I've been in this industry for a while

9    and this is what I think.  And, Your Honor, that's just not

10   good enough.

11          THE COURT:  Okay.  Thank you.  Let's see.  Mr.

12   Schnabel?

13          MR. SCHNABEL:  Your Honor, Eric Lopez Schnabel on

14   behalf of U.S. Bank, National Association, in its capacity as a

15   trustee.  Judge, after hearing the testimony we move to join in

16   the motions in limine and the motion to strike the testimony in

17   its admission as evidence.

18          THE COURT:  All right.  Thank you.  Mr. Gallo, do you

19   have anything further?

20          MR. GALLO:  Just for the record, Your Honor.  We

21   would also renew our motion -- or we are continuing to press

22   our motion that -- a motion in limine.  We would also move to

23   strike -- and I won't repeat Mr. Crowley's arguments -- but I

24   would just say that they are as equally as applicable to the

25   servicing rights opinion as they are with his Fannie Mae

1    opinion.  And, you know, we rate those arguments with respect

2    to both aspects of Mr. Aronoff's opinion.  Thank you, Your

3    Honor.

4            THE COURT:  Any response?

5            MR. BRADY:  Good afternoon, Your Honor.  Robert Brady

6    on behalf of the debtors.  I think it's important, Your Honor,

7    that we not lose sight of what the debtors are seeking to

8    accomplish by their sale motion.  I think it's a natural

9    byproduct of a case like this that the Court and the parties

10   fixated on three or four agreements.  The debtors are seeking

11   to transfer servicing rights to well over a hundred agreements

12   to the buyer in exchange for between 450 and 500 million

13   dollars in value.

14           Your Honor, the Supreme Court in Kumho Tire addressed

15   this nonscientific expert testimony.  Quoting from Kumho Tire,

16   which Your Honor quoted in the Nelson opinion, "where such

17   testimony's factual basis, data, principles, methods, or their

18   application are called sufficiently into question, the trial

19   judge must determine whether the testimony has a reliable basis

20   in the knowledge and experience of the relevant discipline."

21   The knowledge and experience, Your Honor.  And that's what Mr.

22   Aronoff has.

23           The Third Circuit has cautioned that the standard for

24   determining reliability in an expert is not that high.  That's

25   the in re TMI litigation.  The Court made it clear that the

1    proponent does not have to prove its case twice.  In other

2    words, the evidentiary requirement of reliability is lower than

3    the merits standard of correctness.  The grounds for the

4    expert's opinion merely have to be good enough.  They don't

5    have to be perfect.

6            Your Honor, I've also previously cited that a witness

7    may be qualified as an expert in a certain field if he has

8    specialized knowledge in that field.  Quote from Waldorf v.

9    Shuta.  Third Circuit case.  Basis of this specialized

10   knowledge can be practical experience as well as academic

11   training and credentials.  The Daubert case as cited by the

12   movants, Your Honor, largely go to scientific or technical

13   evidence.  Here the industry is the subject.  The business

14   practices, the business conditions of the industry.  So we have

15   taken one more step out of the proverbial Daubert lab to look

16   at an industry.  Now what would be the alternative to bringing

17   a participant in the industry?  As one of the movants has

18   suggested, perhaps a researcher who would conduct a survey of

19   what other industry participants think.  Or a statistical

20   analysis of industry views.

21           Your Honor, the debtors submit that the views of a

22   participant in the industry are more compelling than what a

23   researcher might think the industry believes.  Now Your Honor

24   has appropriately qualified Mr. Aronoff as an expert.  And in

25   this type of opinion testimony I would submit that

1   qualification and reliability are very closely aligned.  Mr.

2   Aronoff is a participant in this industry and has been for

3   twenty-five years.  His views are derived from working in a

4   wide cross section of the industry.  Clearly his views are

5   unbiased.  And he's able to provide the Court with a global

6   view of the industry.

7            The next factor is relevance, Your Honor.  And the

8   Court really needs to consider relevance in the context of the

9   debtors' theory of the case.  That theory of the case was in

10  our brief, and it will be summarized by Mr. Patton in the

11  closings.  But at a high level, the debtors' case is about the

12  fact that the industry transfers servicing rights all the time.

13  You can do it other than on a contract by contract basis.  But

14  as the witness testified, there may be instances when you're

15  required by the counterparty to look at the individual terms of

16  a contract.  Generally, Your Honor, the debtors assert that

17  federal bankruptcy law provides for the transfer of these

18  servicing rights.  And a factor the Court should consider are

19  the economic and practical realities of these agreements.  Mr.

20  Aronoff provides an industry view of that issue.  He told the

21  Court that an originator or seller and servicer obligations are

22  practically and economically distinct.  That servicing rights

23  are clearly delineated.  And that the rights and obligations of

24  a servicer and a seller are not economically interdependent.

25  Servicing rights are well defined.  They're freely traded in an

1    active market.  And they're viewed as a property right.  A

2    property interest.  It's the debtors' legal theory that the

3    economics of all these transactions are economically

4    independent.  On the Fannie and Freddie opinion the debtors'

5    theory is that that must be viewed in the context of an

6    impermissible restriction on transfer under the bankruptcy

7    code.  Mr. Aronoff gave views that the industry looks at these

8    provisions as a proxy for financial health.  That the

9    provisions do not provide anything material or economically

10   significant beyond serving as that proxy.

11         The admissibility -- and that's what we're here to

12   talk about today, Your Honor.  Not weight but admissibility.

13   And that bar is low.  The cross-examination questions of the

14   movants really goes to weight.  If Your Honor will consider the

15   weight of this testimony after you've heard all of the

16   evidence, including any evidence from the objectors.  And after

17   you've heard all of the argument, that's when Your Honor should

18   assign weight to Mr. Aronoff's testimony.  As far as

19   admissibility, Your Honor, he clearly meets all three

20   standards.  Your Honor has already found he's qualified.  We

21   submit he's reliable.  And his testimony is relevant to the

22   debtors' theory of the case.

23         THE COURT:  All right.  I'm going to overrule the

24   motions in limine and the motions to strike and admit Mr.

25   Aronoff's testimony.  First, in connection with his testimony

131

1    as an expert, based on the -- as I previously ruled -- based on

2    the direct exam and tempered by the cross-examinational voir

3    dire.  I believe that Mr. Aronoff is qualified as an expert in

4    the fields for which he offered his opinion in this case.

5            The other issues with regard to its admissibility, as

6    Mr. Brady talked about, are reliability and relevance.  And I

7    don't think there's any -- well, I'm going to take relevance

8    first.  Bear Stearns or EMC, I think, makes basically the

9    relevance argument about Section 555 of the bankruptcy code.

10   It also goes to qualifications, but I do believe that

11   notwithstanding Mr. Aronoff's unfamiliarity with Section 555 of

12   the bankruptcy code he was qualified as an expert in the areas

13   for which he was proffered.  I think it goes to relevance as

14   well.  And I think it's important in focusing on that to focus

15   on what he opined about and what he didn't opine about.  And

16   notwithstanding the statements and the motions in limine, which

17   albeit were based, again, prior to the hearing and without an

18   expert report.  I'm certainly not being at all critical of any

19   one filing them.  I really don't believe that the sort of worst

20   case scenario as envisioned in the motions in limine was

21   actually the opinion testimony that was proffered in this case.

22   I think the opinion testimony was not a legalist -- an

23   opinion -- excuse me, a legal opinion.  I think it was more

24   testimony as to what the industry standards were.  I think that

25   is relevant to the debtors' legal theory in the case.  And I

132

1    found it helpful, if for no other reason in giving some

2    background to the issues before the Court.

3         I find the reliability issue, frankly, a little -- to

4    be a closer issue.  I think Mr. Crowley raises an interesting

5    point.  And it is a close issue.  I am going to allow it under

6    the concept of the Kumho Tire case and its progeny about

7    nonscientific evidence.  Partly going to allow it because even

8    if I were to disallow it as expert opinion testimony under Rule

9    702, if it's not expert opinion testimony, I think, frankly, it

10   was factual testimony.  It was factual testimony as to what

11   this person's experience is in connection with the industry.

12   And it very well may be in that context -- it may have been

13   admissible -- the opinions that he offered may have been

14   admissible under 701 as the opinions by a lay witness.

15   Rationally based on the perception of the witness.  Helpful to

16   a clear understanding of the testimony.  And not based on

17   scientific, technical or specialized industry knowledge.  So if

18   you sort of grant Mr. Crowley's motion to strike under 702

19   you're almost, in this situation, granting or allowing the

20   testimony under 701.  And I think that's significant because

21   the bulk of the testimony Mr. Aronoff was -- and the bulk of

22   what was helpful was the background.  And the factual piece

23   upon which he relied in ultimately giving his opinion.  But

24   again, because the opinion was rather narrowly focused on --

25   the industry was not specific, it was not a legal conclusion,

1    and was relevant to what's before the Court.  I think even

2    if -- were I not to admit it as expert testimony under Rule

3    702, in all likelihood I would have still admitted the bulk, if

4    not all, of the testimony as relevant factual testimony and any

5    opinions, as admissible under Rule 70, as lay opinion

6    testimony.  So I am basing my ruling on Mr. Aronoff's testimony

7    meeting the three criteria as qualified, reliable and relevant.

8    In the alternative I would allow the testimony as meeting the

9    tests of Rule 701 for opinion by a lay witness.  So for those

10   reason, I'm going to deny all three motions -- four motions --

11   or five motions in limine.  And all the motions to strike his

12   testimony.  Did you miss that brilliant --

13           THE REPORTER:  I got it.

14           THE COURT:  Don't ask me to repeat it.

15           (Judge gave court reporter some time to address

16   technical issues)

17           MR. BRADY:  Your Honor, then before we close the

18   debtors' case in chief, I wanted to seek to admit the documents

19   into evidence.  We did file last night a motion to put under

20   seal any agreements that contained a confidentiality provision.

21   Once, one of the counterparties raised, and we thought it

22   prudent to go through, and we did check all that have

23   confidentiality provisions and then determined if they were

24   otherwise publicly available.  Had them -- the objector put --

25   attached them to their pleading.  Were they available in EDGAR?

1    We did the best we could.  We may have missed one or two in

2    that respect.  But we tried to narrow the under seal request as

3    much as possible.  I am advised the US Trustee's office has no

4    objection to our motion to put these under seal.  So if I could

5    move these into evidence, what we've done is I would list those

6    that we would move into evidence publicly.  Those that we would

7    seek to move into evidence under seal.  And those that we're

8    excluding from the original binders.

9            So moving into evidence on a public basis are

10   Debtors' Exhibits 1 through 15, 17 through 20, 24 through 28,

11   31 and 32, 35 and 36, 38 through 41, 44, 46, 48 through 50, 53

12   through 57, 59 through 64, 66 through 85, 87 through 103.  The

13   debtors' exhibits that we would seek to introduce under seal

14   are 16, 22, 33, 34, 37 and 86.  And the exhibits that we

15   introduced that we would not seek to admit into evidence,

16   because we're excluding them from the sale -- these relate to

17   the HELOCS -- are 29, 30, 42, 43, 45, 47, 51, 52, 58 and 65.

18            THE COURT:  Okay.

19            MR. BRADY:  And one last issue.  We were contacted by

20   counsel to UBS.  Apparently they did file a limited objection

21   or reservation of rights that did not make it into our binders.

22   They would like their agreements admitted.  We have no

23   objection.  So we will seek afterwards to consensually admit

24   their documents with them if that's acceptable to the Court.

25            THE COURT:  Yes.

1          MR. BRADY:  And we do have a clean set for Your

2  Honor, so get rid of the old notebooks and now have the

3  notebooks of only those documents being admitted.  If that's

4  acceptable.

5          THE COURT:  That would be great.  We previously

6  admitted 105 and some others.  Is that correct?

7          MR. BRADY:  That is correct.  The no downgrade

8  letters were previously admitted.

9          THE COURT:  Okay.  We can switch out the notebooks on

10  a break.

11          MR. BRADY:  Very well.

12          THE COURT:  I will -- I haven't read the motion to

13  file under seal.  I will accept the exhibits under seal at this

14  time subject to actually having an opportunity to read and

15  decide the underlying motion.

16          MR. BRADY:  I should note, Your Honor, there was one

17  document included on the exhibit on the under seal motion that

18  was included in error.  It's 52.  It won't be in your

19  documents.  52 is --

20          THE COURT:  Excluded.

21          MR. BRADY: -- excluded from the sale, so it's not

22  being filed under seal.  So we could even, on the

23  certification, submit a new order with a new schedule number

24  who is 52.  If that --

25          THE COURT:  All right.  That will be fine.  But --

136

1    okay.  Is there any objection or comment in connection with the

2    motion to admit those exhibits?

3            MR. SCHNABEL:  Your Honor, Eric Lopez Schnabel on

4    behalf of US Bank.  I only rose with respect to Exhibit 52,

5    which having the debtor now represent that it would remove that

6    from the motion to file it under seal, since it is an excluded

7    contract not included.  And it's actually also a public

8    document, anyway.  But it's been pulled.

9            THE COURT:  Understood.

10           MR. SCHNABEL:  I just want the record to be clear.

11           THE COURT:  Okay.  Thank you.  Any objection?

12           MR. BRADY:  Just for clarity of the record, the other

13   exhibits that we previously moved and admitted were Debtors'

14   104 through 110.

15           THE COURT:  Thank you.  Mr. Fallon?

16           MR. FALLON:  Your Honor, just that -- a statement of

17   clarification for the record.  Exhibit 11 was our assumption

18   agreement, and Exhibit 27 was the MLPSA, and Exhibit 27 is an

19   exhibit to Exhibit 11.  And so I requested the debtors combine

20   them into one exhibit, which they have done so -- just for

21   clarity of the record it wasn't that way during the hearing and

22   so there are separate references to Exhibit 11 and 27.  I just

23   state that for clarification of the record.

24           THE COURT:  Very well.  Any other comment?  Mr.

25   Kuney?

1          MR. KUNEY:  Your Honor, I don't object, but I'm told

2     that EMC -- there's a confidentiality provision.  I haven't had

3     a chance to study it closely, but if it's not, we would prefer

4     to have it under seal as well.

5          THE COURT:  Is it publicly --

6          UNIDENTIFIED ATTORNEY:  I think they already admitted

7     it themselves into evidence, Your Honor.

8          MR. KUNEY:  Well, I guess we did.  But that doesn't

9     mean we still can't have it -- I don't believe.

10         THE COURT:  Well, I will take it under seal as

11    admitted by you pending your ability to file a motion.

12         MR. KUNEY:  Okay.

13         THE COURT:  You need to file a motion, though.  All

14    right.  Then subject to what I just said in connection with

15    EMC -- and I'm not sure which debtor exhibit that is --

16         MR. BRADY:  Well, I was going to say -- we did not

17    put it under seal because it was already of record.  So I guess

18    we could add it.

19         THE COURT:  Well, they're going to need to file a

20    motion, so don't worry about it.  All right.  So subject to the

21    EMC exhibit number, which is -- I don't know it off the top of

22    my head shockingly enough.  All right.  I will admit without

23    objection Debtors' Exhibits 1 to 15, 17 to 20, 24 to 28, 31 to

24    32, 35 to 36, 38 to 41, 44, 46, 48 to 50, 53 to 57, 59 to 64,

25    66 to 85, 87 to 103 and 104 to 110 publicly, without objection,

138

1  except to the extent EMC's exhibit is included in that list is

2  is temporarily being kept under seal.  I will also admit into

3  evidence, under seal, pending a review and decision on the

4  motion filed under seal Debtors' Exhibits 16, 22, 33, 34, 37

5  and 86.  All right.  New thing.  Anything further from the

6  debtor?

7  (Debtors' Exhibits 1 to 15, 17 to 20, 24 to 28, 31 to 32, 35 to

8  36, 38 to 41, 44, 46, 48 to 50, 53 to 57, 59 to 64, 66 to 85,

9  87 to 103 and 104 to 110 were hereby received into evidence, as

10  of this date.)

11  (***Debtors' Exhibits 16, 22, 33, 34, 37 and 86, were hereby

12  received into evidence under seal***, as of this date.)

13            MR. BRADY:  Thank you, Your Honor.  Apart from any

14  rebuttals, that concludes our case in chief.

15            THE COURT:  All right.  Thank you.  Yes, Mr. Power?

16            MR. POWER:  Your Honor, very briefly I rise to

17  confirm debtors' counsel's representation regarding our

18  position on the motion to seal.  Obviously to the extent that

19  the Court has any questions I'd be happy to answer them when

20  the Court is ready to review.

21            THE COURT:  Thank you, Mr. Power.

22            MR. POWER:  Thank you.

23            THE COURT:  All right.  That closes the debtors'

24  evidence, except for any rebuttal case, and now we return to

25  any evidence by the objectors.  As in connection with the case

139

1   in chief of the debtors', the way I'd like to proceed is by

2   direct testimony, obviously.  Cross-examination will be

3   preliminary -- I don't imagine any of the fellow objectors will

4   cross.  But they may.  Anyone who -- I want to hear first

5   from -- any cross-examination of anyone objecting to the relief

6   before we turn to cross-examination of those in favor of the

7   relief being requested.  And then we'll have redirect.  All

8   right.

9           MR. KUNEY:  Your Honor, David Kuney for EMC.  I'd

10  like to call Mr. Steven Golden to the stand, please.

11          THE CLERK:  Please state and spell your name.

12          THE WITNESS:  Stephen.  S-T-E-P-H-E-N L. Golden.

13          THE COURT:  How do you spell your last name, sir?

14          THE WITNESS:  Golden.  G-O-L-D-E-N.

15          THE COURT:  Thank you.

16          MR. KUNEY:  Mr. Golden, I'm going to put the mike

17  down so you can --

18          THE WITNESS:  Yeah.  I -- so I can be heard.

19  DIRECT EXAMINATION BY

20  MR. KUNEY:

21  Q.   Mr. Golden, by whom are you currently employed?

22  A.   EMC Residential.

23  Q.   And what is your title, please?

24  A.   I'm the president.

25  Q.   And are you also employed in any capacity for Bear Stearns

1    or at any of its affiliates?

2    A.    Yes, I'm an officer of Bear Stearns and Companies.

3    Q.    And what is your title of Bear Stearns?

4    A.    A managing director principle.

5    Q.    Just very briefly, what's your educational background?

6    A.    I have a BS in economics from Ohio State University.

7    Q.    Briefly, what is your work experience, please?

8    A.    My most recent experience is with Bear Stearns.  I am the

9    risk manager of the whole loan mortgage department.

10              MR. KUNEY:  Step a little closer to the mike, please.

11              THE WITNESS:  Sure.

12              MR. KUNEY:  Let me pull the mike towards you as well.

13    Either way you want to go.  It doesn't matter.

14    Q.    To make this easier, why don't you just give us your work

15    experience, please, starting from college and moving forward as

16    briefly as you can.

17    A.    Sure.  My first job was with Bank One, where I was a money

18    market trader.  Was the senior money market trader at the bank.

19    Worked on the first credit card securitization ever done.

20    Worked on the first CMO transaction ever done.  And several

21    others, as well as provided funding for the bank.  From there I

22    went to Huntington National Bank where I --

23              THE COURT:  Slow down.

24              THE WITNESS:  Sorry.

25              THE COURT:  It's just -- the tape will get it every

141

1   time, but the people won't, so you need to slow it down just a

2   little.

3           THE WITNESS:  And I'm known to speak quickly.

4           THE COURT:  It's all right.

5           UNIDENTIFIED ATTORNEY:  Your counsel has instructed

6   you to do it.

7           THE WITNESS:  To speak slowly?

8           UNIDENTIFIED ATTORNEY:  I'm agreeing with the Judge

9   100 percent

10          THE WITNESS:  Oh, I'm sorry.  All right.

11  A.   I was with Huntington National Bank, where we introduced

12  the bank to asset backed securities.  Huntington National Bank

13  in Columbus, Ohio.

14  Q.   Columbus, Ohio.  And following that?

15  A.   Okay.  At US Central Credit Union, where I managed the

16  trading group, which invested about 45 billion dollars,

17  primarily in asset backed securities.  Structure and profit

18  placement 600.  And that's in Overland Park, Kansas.

19  Q.   All right.  Now, when did you first start work at at EMC

20  or Bear Stearns?

21  A.   About three and a half years ago.

22  Q.   All right.  And what are your current responsibilities?

23  That is what do you actually do at EMC as the President of

24  the -- you said of the residential area?

25  A.   Correct.  It's not an area.  It's a separate company from

142

1   EMC, of which I'm an authorized signatory of -- before I get

2   there, but at EMC residential I am responsible for the

3   warehouse group, the quality control process which looks at the

4   quality of the loans that are on a post-purchases basis that we

5   purchase.  Also responsible for the quality assurance, which is

6   a pre-purchase review of the loans to ensure that the loans

7   coming through are the quality we're looking for for our

8   prevention.  The appraisal group.  Basically all the aspects

9   that have some independence from the production area.  And the

10  servicing area to ensure the loan quality coming through is

11  what we're expecting.  The servicing and production area --

12          THE REPORTER:  If you can, please slow down.

13          THE WITNESS:  I'm sorry.

14  A.   To ensure that the loans we're purchasing are the loan

15  quality that we were expecting.

16  Q.   Now the loans you're referring to -- are these loans which

17  are -- are these individual residential loans which are then

18  subsequently pooled as sold into securitization trust?

19  A.   At EMC, primarily yes.

20  Q.   So when you're saying warehouse, does that relate to the

21  sale and purchase of whole loan mortgages?

22  A.   It does.  What happens typically is what would be referred

23  to as a seller who sell -- originates loans in their own name.

24  We send money to the closing table that allows that loan to

25  close.  It goes onto a warehouse line.  Is then ultimately sold

143

1    to a purchaser such as American Home when they were purchasing

2    loans or EMC or other market participants.

3    Q.   All right.  And then are you also involved in what has

4    been called the securitization of those loans?

5    A.   I'm involved in the securitization.  Yes and no.  I mean

6    from the perspective of, you know, I talk to investors about,

7    you know, the activities that we perform.  I'm not involved in

8    the actual securitization process, no.  But I'm very familiar

9    with it.

10   Q.   Let me ask you.  There's a series of binders that are

11   about to bury you there.  One is the Exhibit 1.  The March,

12   2006 exhibit.  Could you try to locate that, please?

13              THE COURT:  Sorry.  EMC-1?

14              MR. KUNEY:  EMC-1, Your Honor.

15              THE WITNESS:  Okay.

16   Q.   Mr. Golden, do you have EMC-1 in front of you?

17   A.   Yes.

18              THE COURT:  I got it.

19   Q.   All right.  Mr. Golden, are you familiar with Exhibit 1?

20   A.   Yes, I am.

21   Q.   Is that a -- or to what extent is this a standard form of

22   a whole loan for sale agreement that is used by your company?

23   A.   Since 2006 with purchases of retained loans this is

24   generally the formats used.

25   Q.   Is this a form that you work with on a daily or a routine

144

1   basis?

2   A.   It is a form that I work with and several members of my

3   staff.  Yes.

4   Q.   And on a daily and regular basis.

5   A.   That's correct.

6   Q.   And why do you have need to work on this or work with this

7   form on a daily and regular basis?

8   A.   One of the other groups that I'm responsible for is the

9   reps and warrants, or is also known in the industry as a claims

10   group.  And what we do is in effect enforce the reps and

11   warrants in this contract.

12   Q.   Okay.  Now, pursuant to this agreement -- Exhibit 1,

13   EMC-1 -- did, in fact, EMC purchase whole loans from American

14   Home?

15   A.   We did.

16   Q.   And do you know what the dollar amount of the mortgage

17   loans purchased was?

18   A.   In June of 2006 it was about 1.2 billion.

19   Q.   All right.  Let me ask you to take a look.  We're going to

20   come back to Exhibit 1 again, but look, please, at Exhibit 3 in

21   that same binder.

22   A.   I have it.

23   Q.   All right.  Can you just explain to the Court what is

24   Exhibit 3, and how is it related to Exhibit 1?

25   A.   Yes.  Exhibit 1 is the general terms of that guide,

1    transactions.   Exhibit 3 is the specific terms or any terms

2    that alter the primary document.

3    Q.   So if there's a trade or a sale between EMC and the debtor

4    are they evidenced by something like Exhibit 3?

5    A.   Always.

6    Q.   In fact, is Exhibit 3 the last trade between the debtor

7    and EMC?

8    A.   The wrap or the last trade consummated.  Yes.

9    Q.   Okay.  Now, you didn't actually negotiate Exhibit 1 with

10   the debtor, did you?

11   A.   No, I did not.

12   Q.   Now, the exhibits -- go back to Exhibit 1 for a moment.

13   The March, 2006 contract is a single agreement, even though

14   there are two parties, a seller and a servicer.  What is the

15   business reason why EMC uses this form of agreement, that is a

16   unitary agreement, even though there's a seller and a servicer?

17   A.   It is Bear Stearns intention to take advantage of the safe

18   harbor that was created by Congress in 2005.

19              MR. POWER:  You Honor, I'm going to move to object to

20   this type of testimony.

21              THE COURT:  Basis?

22              MR. POWER:  Basis parol evidence rule, Your Honor.

23   I'm going to quote the movants own words.  This basically said

24   at this contract let him be used in the motion in limine.  So

25   any testimony related to the intention of the party with

146

1    connection to contract is inadmissible under the parol evidence

2    rule.  The agreement is governed by the New York law, and the

3    Court of Appeals of New York said definitively that -- and I'll

4    quote from a case -- Muldoon versus Deline, 135 N.Y. 150.

5    Where the agreement is not in paper as parol evidence is not

6    admissible to prove intent.  As intent must be ascertained from

7    language contained in the document itself.  So when the witness

8    speaks of what the intent of this document is, or the parties

9    intended, that's impermissible in the pro evidence rule, Your

10   Honor.

11            THE COURT:  Mr. Kuney?

12            MR. KUNEY:  All right.  It seems to me that's

13   entirely inconsistent with the positions we've been hearing so

14   far.  I agree that intent is, and can be, a question of law.

15   But we just had admitted an expert who's going to help the

16   Court determine what parties intend when they enter into these

17   agreements.  And the rationale -- this is a witness who is

18   going to explain to the Court the background of the context of

19   these agreements and the party's intention with respect to

20   entering into them.  It's consistent with, and a further

21   elaboration, in part, of Mr. Aronoff.  Except this gentleman

22   actually does the deals.

23            THE COURT:  All right.  I'm going to overrule the

24   objection for current purposes.  I'm actually going to hold it

25   in abeyance for argument at a later time, because I'm going to

147

1    want a further elaboration on EMC's position as to the terms in

2    the contract whether they're ambiguous or not.  I haven't had

3    an opportunity to read the case.  So your objection is noted.

4    And I'll let the testimony in for present purposes.  And I may

5    strike it at a later time.  But certainly not without notice to

6    EMC.

7            MR. POWER:  That's fine, Your Honor.  Maybe I wasn't

8    clear.  EMC in its pleading stated -- in its own pleading --

9    that this is not a thing it was going to --

10           THE COURT:  I understood your own argument, Mr.

11   Power.

12           MR. KUNEY:  Your Honor, and I understand that we're

13   not retreating from that position.  But we've been told by the

14   Court and the other parties that the Court's going to look at

15   and consider the industry practice and intent.  And therefore

16   we think in fairness we ought to put on our version with the

17   industry practice of that.

18           THE COURT:  Well, the Court hasn't told you that I'm

19   going to look at intent, necessarily.  The Court allowed -- and

20   frankly, I don't think that if you parse back through the

21   testimony of Mr. Aronoff -- I don't think he opined best of

22   intent.  He opined as to industry practice and how it affected

23   documents such as the contract it kept play.  All that said,

24   I'm going to allow the testimony for present purposes subject

25   to a renewed motion to strike at a later day.

1          MR. POWER:  Could then I ask -- Your Honor, one

2    thing.  Can the witness break -- can the questioner break the

3    foundation of the witness if it knows what 555 is?

4          MR. KUNEY:  Your Honor, if I could have a chance to

5    examine the witness, maybe I'll take care of some of these

6    issues.

7          MR. POWER:  Just don't stop it.

8          THE COURT:  Well, I don't think there's -- at this

9    point, I forgot what the question is, so we'll start back.  The

10   objection of that parol evidence is preserved and I'll let Mr.

11   Kuney ask his questions.

12         MR. KUNEY:  All right.  Thank you.

13         THE COURT:  But lay a foundation, if you will.

14         MR. KUNEY:  All right.  I'm going to.

15   BY MR. KUNEY:

16   Q.   Mr. Golden -- and I think I'll -- let's take the -- in the

17   conduct of your regular business duties -- that's what you do

18   day to day -- have you, for some reason, had occasion to become

19   familiar with what are called the safe harbor provisions that

20   is Bankruptcy Code Section 555 in 741.

21   A.   From a business perspective, yes.

22   Q.   And why is it or how is it that you came to have some

23   awareness of those provisions?

24   A.   Because of my duties.  I've been involved in the warehouse

25   business for over seven years now.  And in negotiating Bear

1    Stearns acted as, in a sense, a wrap for the program before we

2    were part of Bear Stearns.  And as a part of the negotiations

3    we spent more time than I would care to with bankruptcy lawyers

4    trying to get a bankruptcy remote structure.  And Bear acquired

5    us, and shortly after that time the Bankruptcy Code 555 was put

6    in place as well as 741.  And we were all called over to the

7    home office to have outside counsel go through with us the safe

8    harbor issues, because prior to that there was no safe harbor

9    for whole loan mortgages, which always brought it into question

10   this whole stay issue.  Which was, you know, it drove -- it

11   drove a lot of the decisions at Bear Stearns and many of the

12   other Wall Street firms as far as their concern about funding

13   whole loan mortgage.

14           MR. DORSEY:  Objection, Your Honor.  Move to strike

15   as to other whole loan mortgage purchases other than Bear

16   Stearns he hasn't established he has any knowledge of any other

17   Wall Street firms practices.

18           THE COURT:  Mr. Kuney?

19           MR. KUNEY:  Your Honor, I'm happy to lay a

20   foundation.  I mean, I'll ask him to the extent of his

21   knowledge.  What other firms he knew.

22           THE COURT:  Well, I think it's a minor portion of the

23   answer.  And, well, lay the foundation if you wish.

24           MR. KUNEY:  All right.

25   Q.   Well, Mr. Golden, have you had occasion to learn what

1  other Wall Street firms do with respect to the safe harbor

2  discussion we were having?

3  A.   Yes.  I would say I've looked at no less than fifteen to

4  twenty of the various Wall Street and large financial

5  institution agreements.  It's commonplace in our industry to

6  see what other people -- you know, the changes that they're

7  making to their agreements.  So I've seen various iterations of

8  them over the last seven years and discussed both those with

9  counsel.

10       MR. DORSEY:  Objection, Your Honor.  He's giving an

11  opinion based on his review of documents, which would be a

12  legal opinion, which he's not qualified to give.

13       MR. KUNEY:  Your Honor, he's given a lay opinion

14  based on his view of what occurs in the industry.  Not a legal

15  opinion.  And that's all he's giving.

16       THE COURT:  Overruled.

17  Q.   I'm asking you to what extent, if any, does the use of a

18  single document that you referred to a few minutes ago relate

19  to the bankruptcy safe harbor provisions.  And I'm speaking --

20  I just want you to address the business practice of your

21  company, EMC and/or Bear Stearns.

22  A.   It's our business practice to have a single contract close

23  back finding in 2005.

24  Q.   And what is the reason for that?

25  A.   The reason for that is that that single contract -- my

1  understanding of the reason for that is that the single

2  contract provides a safe harbor, which, you know, it allows us

3  to automatically terminate agreements and to liquidate the

4  positions.

5  Q.   And why is the automatic termination liquidation important

6  to Bear Stearns in the conduct of this business?

7  A.   Because being stayed in any aspect of our business --

8  whether it be warehouse or on the purchase side of the

9  transaction of the loans themselves or the servicing -- it's

10  absolutely critical that we can continue or we can act under

11  the terms of our agreement to protect the interest of the firm

12  and its shareholders.

13  Q.   So if you were going to take action -- if you were able to

14  liquidate and terminate immediately with respect to the

15  American Home, what would you do with the servicing rights and

16  the pools of loans?

17  A.   Upon -- are you speaking in general or specifically

18  related to this?

19  Q.   Well, speak generally first.

20  A.   Okay.  Generally, what we would do would be to exercise

21  our rights as they're written under the contract, and that

22  would allow us to assume the servicing of those loans.  In this

23  particular case and warehouse it would allow us to assume the

24  assets and sell them, and as a purchaser, you know, if there

25  was any loans, you know, we would then be able to take

152

1   ownership of those and then liquidate the loans.

2   Q.   Now, to what extent, if any, is it important that EMC and

3   Bear Stearns be able to terminate the servicing of a company

4   like American Home if it goes into bankruptcy?  Why, if at all,

5   is that important to a company like Bear Stearns?

6   A.   For Bear Stearns, basically what, you know, what we do are

7   we're in the business of purchasing mortgage secure -- are

8   mortgage whole loans and securitizing those.  And it's critical

9   for us that the period between which we lock the price on which

10  we're going to do it and the time frame under which we

11  securitize the loans is as short as humanly possible, to take

12  away, you know, the various types of risk including the basis

13  risk.

14  Q.   What is the basis risk?

15  A.   The basis risk is the spread at which securitizations

16  trade?  And -- or the spread -- it's the spread at which you

17  can execute your securitization.  So your price on one side is

18  directly driven by where you could exit the loans on the other.

19  Q.   Would you please refer to Exhibit 2, which is in the

20  binder in front of you?

21  A.   Sure.

22  Q.   I'm sorry, let me -- would you go back and look at Section

23  9.01 of Exhibit 1 and page 71?  Those are called events of

24  default.  Do you have that in front of you?

25  A.   I do.

1  Q.   All right.  And do you notice that in little 3 and little

2  5 there's reference to insolvency and bankruptcy as being

3  events of default?

4  A.   Yes.  Yes, I'm sorry.

5  Q.   Now, if you turn the page there's reference in the next

6  full paragraph that upon an event of default there's reference

7  to what's called a termination automatically without notice.

8  Do you see that?

9  A.   What section is that in?  I'm sorry.

10 Q.   It's on the page following 90 -- that's page 72.  It's the

11 first full paragraph.

12 A.   Okay.  Let me find it.  I'm sorry.  Oh, I got it.  Okay.

13 Section 5.  Plus 802.

14 Q.   Do you see the reference to the automatic termination

15 without notice?

16 A.   I do.

17 Q.   Okay.  What's the business reasons why Bear Stearns has an

18 automatic termination provision in its purchase and sale

19 agreement?

20 A.   Frankly, because we don't want to be in the position we

21 are today.

22 Q.   And what is that position?

23 A.   Sitting in court several months later trying to get

24 moments that we have in positions sold.

25 Q.   Sold into a what?

1    A.    Well, look, sold into a securitization.  The whole loan

2    mortgage itself.

3    Q.    All right.  Let me ask you to look, please, now at Exhibit

4    2.

5    A.    Okay.

6    Q.    Now, can you identify what exhibit -- it's a letter of

7    August 14, 2007.  Can you -- is that an authentic copy of that

8    letter that you actually signed?

9    A.    Yes, it is.

10   Q.    All right.  Did you ever receive a response to that notice

11   from the debtor?

12   A.    I did not.

13   Q.    Did the debtor ever object to that letter in any form as

14   far as you know?

15   A.    Not that I'm aware of.  No.

16   Q.    Okay.  Let me ask you to turn, please, to page 21 of

17   Section 2.09.

18   A.    I'm sorry.  Are we back in the first agreement again?

19   Q.    Yes.

20   A.    Okay.

21   Q.    EMC-1.

22   A.    All right.  On page --

23   Q.    It's page 21, Section 2.09.

24   A.    Okay.

25   Q.    Now, do you see there's a reference there to what's been

1   called throughout these proceedings an early payment default?

2   A.   Yes.

3   Q.   And are you familiar with what an early payment default is

4   as that term is used with your company?

5   A.   Yes.  It means one of up to the first three payments of

6   the loan is not made -- in which the first three payments due

7   EMC are not made in the month in which they are due.

8   Q.   Then does EMC receive what are called remittance reports

9   from American Home in the ordinary course of their business?

10  A.   We do.

11  Q.   And do those remittance reports describe to what extent,

12  if any, mortgage payers have failed to make their payments the

13  first three months?

14  A.   Well, my entire funding lasts is -- we receive remittance

15  reports on loans that they service retain.  That's what I

16  declare.  Yes.

17  Q.   Okay.

18  A.   Okay.

19  Q.   And from those remittance reports are you able to

20  determine by reviewing those reports whether, in fact, there

21  has been an early payment default?

22  A.   We can.

23  Q.   And based on that information that you've received from

24  the debtor how do you determine whether or not there are any

25  early payment defaults?

156

1    A.    Are you specifically referring to the transaction that we

2    were talking about earlier?

3    Q.    Yes.  Would you look, please, at Section 2.0 -- I'm sorry,

4    look at 3.03, page 38.  And that deals with repurchase

5    obligations.  Do you see that?

6    A.    I do.

7    Q.    Now, what is the business purpose that your company -- for

8    having a repurchase obligation that is triggered in the event

9    that there are early payment defaults?

10   A.    Well, there's -- the reason why there -- do you want me to

11   tell you why there are EPDs as opposed to reps and warrants or

12   do you want me just to explain?

13   Q.    Explain how the repurchase obligation works.

14   A.    Okay.  The repurchase obligation, basically -- what

15   happens is in this case we would look at their remittance

16   reports, which would be attached to the loans, and then we

17   would look at the performance of those loans.  If it's clear

18   that the borrower didn't make the payment on a timely basis,

19   and it wasn't a result of any kind of service transfer issues

20   or any other issues beyond the borrower's control then we would

21   file what we call a claim with the seller of the loans, and in

22   this case the servicer for the loans that didn't make their

23   payments within the expected time frame.  Or the legal time

24   frame, I guess.

25         MR. KUNEY:  Excuse me, one second.  All right.

157

1    Q.   Mr. Golden, could you look at Exhibit 13, please.

2          UNIDENTIFIED ATTORNEY:  What book?

3          UNIDENTIFIED ATTORNEY:  Is it book 2?

4    A.   EMC Volume 2 of 2. Is that correct?  Okay.

5    Q.   Yes.

6          MR. DORSEY:  May I have one moment, Your Honor.

7          THE COURT:  Yes.

8          MR. DORSEY:  Thank you, Your Honor.

9    Q.   Did you ever find it?

10   A.   Yes.

11   Q.   Okay.  So you have Exhibit 13 in front of you?

12   A.   I do.

13   Q.   All right.  Can you explain to the Court what is Exhibit

14   13?

15   A.   Exhibit 13 are -- represents the EPDs determined to date

16   for the 1.2 billion dollar transaction that is the --

17   whatever -- Exhibit 3 in the first binder.  I'm sorry.

18   Q.   Was that a report that was prepared under your supervision

19   and direction?

20   A.   Yes.

21   Q.   And was it prepared based on the remittance reports that

22   were received from American Home, the debtor?

23   A.   It was.

24   Q.   And were you in a position to confirm the reliability of

25   that summary?

1    A.    Yes.  It's accurate.

2    Q.    And what -- in terms of calculating a dollar amount, what

3    is the dollar sum that's been calculated, and what does it

4    mean?

5    A.    The 24,508,000 represents the total amount outstanding and

6    due EMC.  The first one is the -- we call monetary claims,

7    which has been referred to in court earlier as premium

8    recapture claims.  Do I need to explain that again, or --

9    Q.    No.  Go ahead.  You're good.

10   A.    Okay.  Right.  That's 251,000.  And then the repurchase

11   claims are EPD claims, in this case, and that's 24,256,000.

12   And that includes the UPD plus accrued interest plus fees

13   etcetera.

14   Q.    And what are UPDs?

15   A.    Unpaid principal balance.  That's the amount outstanding

16   on the loan.

17          THE WITNESS:  Am I going too fast still?

18          MR. PATTON:  Your Honor, I'm going to interrupt for

19   just a moment.  The debtor is prepared to stipulate to a fair

20   amount of this for purposes of today's hearing.  And I don't

21   know where this is going, but EPD cure amounts are not at

22   issue.  As you know, the theory of our case is that we are

23   going to ask Your Honor to either approve our sale of servicing

24   as property of the estate under 363 exclusively, or 365 applies

25   to allow us to separate the servicing from the origination.

1  And, in that context, of course, we have asserted that there

2  are no cures associated with the servicing.  And the

3  origination cures are left behind where they -- those are not,

4  simply not, an issue.  If Your Honor were to rule that we can't

5  sever we'll either not have an approved sale or we'll regroup

6  and see if there's a way to come back to the Court with a

7  revised application, but in the context of this motion EPD

8  cures could be, you know, a billion dollars.  And it's largely

9  of no consequence.  So if the point is trying to approve a cure

10  in the context of an application where it's a road, I'm

11  prepared to stipulate to any number they want to put on the

12  table for purposes of getting between here and the moment you

13  rule.

14          THE COURT:  Mr. Kuney?

15          MR. KUNEY:  Well, Your Honor, I'll accept the

16  stipulation.  It would seem to me, in terms of both fairness to

17  the Court and any review in court, we want to have some clarity

18  in the record.  There's been a lot of discussion about EPDs

19  going to be purchase obligations.  I don't know if anybody ever

20  tried to more or les walk through the documentation and show

21  the calculation.  I'm willing to accept the stipulation.  It

22  seems to me the testimony is in.  I trust it's helpful to the

23  Court.  We understand there's some potential other claim.  It

24  seems to me it's agreed it's not included in the cure amount.

25  And as debtors' counsel says, it leaves open an issue as to

160

1   whether it should or should not have been included.  So I don't

2   know that I need any more from this witness on that point.

3           THE COURT:  Yeah.  Thank you.  I don't think it's

4   necessarily redundant or, you know.  And it's certainly not

5   irrelevant until I decide whether or not I agree -- whose

6   theory of the case I agree to.  So --

7           MR. PATTON:  That's absolutely right, Your Honor.

8   It's just that if we were going down the path of trying to

9   prove a cure amount of this nature it would be very complicated

10  and time consuming.

11          THE COURT:  Right.

12          MR. PATTON:  If that's what the purpose was.  If it's

13  for context --

14          MR. KUNEY:  Well --

15          MR. PATTON: -- and thus --

16          MR. KUNEY:  Your Honor, the -- I'm sorry.

17          MR. PATTON:  No, that's all right.  If for purposes

18  of context and background then obviously this is no moment

19  to --

20          MR. KUNEY:  Your Honor, just to highlight the --

21  it's, I guess, a useful digression here for a moment.  The

22  mollified notice that I read to a witness the other day -- part

23  of their concern here is that there appears to be an evidence

24  to preclude anybody from seeking a claim.

25          THE COURT:  Let me tell you right now.  If I'm not

1 approving assumption and assignment of a contract, and the

2 claim is not related to what's being assumed and assigned

3 nobody is going to be precluded from anything.

4          MR. PATTON:  Yeah and that --

5          THE COURT:  Period.

6          MR. PATTON:  We have and had no intention of

7 attempting to cut off --

8          THE COURT:  I don't care what they put in your

9 notice.  It's not going to be in my order.

10          MR. KUNEY:  Okay.  Well, I -- Your Honor, thank you.

11 I mean there was some concern.

12          THE COURT:  No, I -- fair enough.

13          MR. KUNEY:  All right.  Well then let's change focus

14 here and just go over slightly.

15 BY MR. KUNEY:

16 Q.   As part of your responsibilities, to what extent, if any

17 do you --

18          THE COURT:  I'm sorry, Mr. Kuney.  We're having

19 technical difficulties.

20          MR. KUNEY:  I'm sorry?  Off the record.

21          (Off the record)

22          (On the record)

23 BY MR. KUNEY:

24 Q.   Mr. Golden, as part of your official responsibilities do

25 you participate or help determine which company will act as a

1    servicer for any of the pools of loans that EMC acquires?

2    A.    I help determine whether or not the company selling us the

3    loans can act or can retain the servicing.  Yes.

4    Q.    So is the -- to what extent, if any, is the servicer

5    function important in terms of protecting the return that EMC

6    makes on the loans that it purchases?

7    A.    I mean, obviously next to the bar we're, you know,

8    fulfilling its responsibility.  It's the most important thing

9    once the loans are purchased.

10   Q.    Does the skill of the servicer have an effect on the

11   profits, or in turn to EMC as owner of the mortgages?

12   A.    I'm sorry.  Would you repeat the question?

13   Q.    Sure.  Does the skill of the servicer -- the way they

14   perform their duties -- have an effect on the profits or return

15   to EMC as the owner of the mortgages?

16   A.    Without question.

17   Q.    Pardon?

18   A.    Without question.

19            (Indiscernible discussion in background with court

20   reporter)

21            THE COURT:  All right.  Yes.  We'll take a five

22   minute recess.  Let's see if we can fix this, otherwise we're

23   just going to have to proceed without it.  I'm sorry.  Take a

24   five minute recess.  During the recess, sir, you may not

25   discuss the substance of your testimony with counsel.

1          (Recess from 2:56 p.m. until 3:09 p.m.)

2          THE CLERK:  All rise.

3          THE COURT:  Please be seated.  You may proceed.

4          MR. KUNEY:  Thank you, Your Honor.

5          THE COURT:  Sorry for the interruption.

6   BY MR. KUNEY:

7   Q.   Mr. Golden, when we left off we were talking I think about

8   the effect the servicers -- performance of the securities have

9   on the return to the owner or at least to EMC as owner of the

10  mortgages.  To put a little flush on that would you please look

11  at EMC's Exhibit 1, page 46.

12  A.   Okay.

13  Q.   If you don't mind let me direct your attention to the

14  first sentence.  And to simply make it easier for everyone it

15  begins with "the servicer shall use its best efforts to assist

16  in the procedures that the servicer would use in servicing

17  loans for its own account" -- and I'm skipping down "to

18  foreclose upon or otherwise comparably convert the ownership of

19  properties, secure in such mortgage," and then it continues.

20  My question to you is using that as one example explain to the

21  Court what the servicer does at the foreclosure stage, as

22  example, affect the return to EMC on its loans?

23  A.   The servicer's required to advance principal and interest

24  on the transaction.  And so what the servicer would do in this

25  case prior to foreclosure they would be working the borrower

1   through the foreclosure process or obviously trying to resolve

2   any outstanding delinquency if possible.  And then what they

3   would do at that foreclosure stage -- I'm sorry, I don't

4   understand your question.

5   Q.   How is what the servicer does at the foreclosure stage

6   affect the return, protect the interest of the owner of the

7   mortgage?

8   A.   They foreclose on the property.

9   Q.   All right.  And the procedures they follow is that

10  important to EMC in terms of its return as well?

11  A.   It is.

12  Q.   In what sense?

13  A.   Because it's very important that they foreclose as quickly

14  as possible under the law of course.  And get the highest value

15  possible for the foreclosed property.

16  Q.   And work with the borrower as well?

17  A.   Correct.

18  Q.   Well, as of today with respect to the loans that American

19  Home sold EMC are they still on the balance sheet of EMC?

20  A.   Yes.  What hasn't paid in full of the 1.2 billion dollar

21  transaction in June still is on the balance sheet -- it's still

22  owned by EMC.

23  Q.   All right.  And typically in your business model would EMC

24  continue to own those loans or would it seek to do something

25  else with them?

165

1    A.    As a general course of business we would try to either

2    securitize or sell -- resell the loans in a very quick order.

3    Q.    Now, you've heard through sitting through these several

4    days of hearings that there's going to be some period of time

5    between what's been called the initial close and a legal or

6    final close, correct?

7    A.    Yes.

8    Q.    What affect if any has delay in determining who's going to

9    be, if anyone, going to be the owner of those servicing rights.

10   What affect does that have on the ability of Bear Stearns or

11   EMC to transfer these mortgage loans?

12            MR. POWER:  Your Honor, I'm going to object.  That

13   kind of calls for speculation.  I mean, unless the witness has

14   some experience with this type of transaction.

15            MR. KUNEY:  Well, I think he's lived with it, Your

16   Honor.

17            MR. POWER:  If the witness is being asked to testify

18   that if Wilbur Ross basically purchases a company that's

19   operating out of bankruptcy until it becomes fully licensed,

20   bonded and credit, and he's going to say that affects these

21   bonds, that's fine.  But otherwise you're asking to speculate

22   what will this contract mean in connection with these loans

23   several months from now.  It's a very unique situation from our

24   perspective.

25            THE COURT:  I don't think its speculation.  I'll

166

1    overrule the objection based on speculation.

2    Q.    Do you understand the question?

3    A.    Would you repeat it?

4    Q.    Sure.   I think I actually asked a different question than

5    the objection referred to.   Let me restate it.   Is EMC able

6    today in your judgment to deal with this -- with the American

7    Home loans what it ordinarily would have done in view of the

8    proposed sale transaction?

9    A.    We cannot, no.

10   Q.    And why is that?

11   A.    Because there's a difference between what the affirmation

12   that occurred by Moodys and S&P and Fitch where you already

13   have a rated deal if you have a master servicer in place and

14   operating and then getting a new transaction with American Home

15   as the servicer with these economic close.   And then that

16   period of time before the legal close, I believe was the

17   terminology used this week.   You know, we have been unable to

18   get a rating agency even post this event to agree to rate a

19   deal with those loans.   So we continue to bear the economic

20   risk of owning those loans.

21   Q.    And you say post this event, are you referring to the

22   three no downgrade letters that were introduced into evidence

23   in this proceeding?

24   A.    Yes.   And a Fannie Mae conditional approval of Wilbur

25   Ross, yes.

1    Q.   All right.  Thank you, Mr. Golden.

2             MR. KUNEY:  I finished my direct.

3             THE COURT:  All right.  Any cross examination by any

4    objectors?  All right.  Hearing none I'll hear cross from

5    anyone in favor of the motion.

6             MR. DORSEY:  Your Honor, I realize we just took a

7    recess but given that I'm operating on flying here can I have a

8    short recess to collect my thoughts before I do cross.

9             THE COURT:  All right.  Well, who's going to do

10   cross, you're going to do cross, Mr. Dorsey.  Is the committee

11   going to have cross, Mr. Power?

12            MR. POWER:  Yes, Your Honor.  But I may not, I don't

13   know.

14            THE COURT:  Is there anyone else who's going to cross

15   examine the witness?  All right.  We'll take yet another break.

16   Let's reconvene say in five minutes.

17            MR. DORSEY:  Thank you, Your Honor.

18            THE COURT:  You're welcome.

19            (Recess from 3:15 p.m. until 3:23 p.m.)

20            THE COURT:  Please be seated.

21            MR. DORSEY:  John Dorsey on behalf of the debtors',

22   Your Honor.

23   CROSS-EXAMINATION BY

24   MR. DORSEY:

25   Q.   Good afternoon, Mr. Golden.

A.    Good afternoon.

Q.    You testified on direct testimony that, in reference to Exhibit 3, that that was a document that was prepared when you were purchasing the loans that are at issue that are still owned by Bear Stearns under the MSL -- MLPSA in this case?

A.    Yes.

Q.    And under the terms of that -- is that term sheet?  Is that what you call it?

A.    That's correct.

Q.    And under that term sheet it lays out specifically what the service -- what's being paid for the servicing rights, correct?

A.    It does.

Q.    And you mentioned, also, that you became aware of the provisions of 555 of the Bankruptcy Code and made your business determination about how to create the MLPSA in this case based on your conversations with bankruptcy counsel?

A.    The firm made the decision.  The legal department drafts the documents but yes, it was in combination between 555 and 741 that pulled in -- hold all mortgages, that's correct.

Q.    Did you participate in those conversations yourself?

A.    I participated -- yes, I participated in some of the conversations.

Q.    Okay.  What did the lawyers tell you about the obligation of 555 and how it relates to your MLPSA?

1    MR. KUNEY:  Objection, Your Honor, I think that is

2  attorney/client privilege.

3    MR. DORSEY:  No, I think he waived it by saying he

4  relied on it, Your Honor.

5    THE COURT:  I agree, it's waived.  Objection is

6  overruled.

7  A.   Would you ask the question again, please?

8  Q.   Yes.  What did your lawyers tell you about how 555 applied

9  to the MLPSA which is at issue in this case?

10  A.   What they told us or what I understand about the MLPA is

11  that -- that by -- or by having a unitary agreement or a single

12  agreement that that makes the entire agreement a -- a -- or

13  basically puts the entire agreement or makes it a safe harbor

14  under the Bankruptcy Code and that we would be able to affect

15  the contract accordingly.

16  Q.   Was that all they told you, that just because it's in a

17  single contract that it's now under the safe harbor of the

18  Bankruptcy Code?

19  A.   As I said, I wasn't -- I wasn't involved in all of the

20  discussions regarding how that was arrived at but that was my

21  take-away, yes.

22  Q.   So it's your testimony that prior to 2005 Bear Stearns

23  never entered into an MLPSA that included both the sale of

24  loans and a servicing provision?

25  A.   Not to my knowledge, no.

170

1    Q.    You've never entered into one prior to 2005?

2    A.    I'm not saying the firm never did, I'm saying I don't

3    remember seeing an agreement for retained servicing that had

4    both of the components or had the servicing and the -- and the

5    sale side of the contract, the MLPA together.

6    Q.    Now, under the terms of the MLPSA which is at issue in

7    this case, there were other loan purchases other than the 1.2

8    billion that's still being services under the terms of that

9    MLPSA, correct?

10    A.    You're saying we purchased other loans under this

11    agreement?

12    Q.    Yes.

13    A.    Yes.

14    Q.    And when you did that you entered into what's called an

15    assign and assumption and recognition agreement, correct?

16    A.    When we entered into the transaction?

17    Q.    Once you bought loans, other than the 1.2 billion that

18    still exists under the MLPSA that's at issue today --

19    A.    Uh-huh.

20    Q.    -- there were other loans that you purchased under this

21    MLPSA and then you securitized them, correct?

22    A.    Yes.

23    Q.    And when you securitized them you entered into an assign

24    and assumption and recognition agreement with the trust who was

25    purchasing those loans, correct?

1    A.    Correct.

2    Q.    And when you did that you were assigning to the trust the

3    rights to the servicing under the terms of the MLPSA, correct?

4    A.    Correct.  The rights to receive the principle -- yes.

5    Q.    So are you -- you're not testifying today that

6    Bear Stearns would not be able to securitize these loans

7    because they can't transfer the servicing rights, correct?

8    A.    Actually, I would need to talk to counsel about that.

9    Q.    Okay.  Mr. Golden, could you turn to Debtor's Exhibit 83.

10   They're in the binders there somewhere in front of you.

11             THE COURT:  Somebody can help him out.

12             MR. DORSEY:  May I approach?

13             THE COURT:  Yes, of course.

14   Q.    Do you have that in front of you, sir?

15   A.    I do.

16   Q.    Is this a sale and servicing agreement between Columbia

17   National Incorporated and EMC Mortgage Corporation?

18   A.    It's the first time I've seen this contract.

19   Q.    You are an employee of EMC Mortgage, correct?

20   A.    No.

21   Q.    You're not an employee of EMC Mortgage?

22   A.    No.

23   Q.    Who are you employed by?

24   A.    EMC Residential.

25   Q.    Are they a subsidiary of EMC Mortgage Corporation?

172

1    A.    They are not.

2    Q.    Are they related in any way to EMC Mortgage Corporation?

3    A.    We're both owned by Bear Stearns and Companies, Inc.

4    Q.    Okay.  So at least in -- you would agree with me that this

5    agreement is a sale and servicing agreement that's contained in

6    one document, correct?

7    A.    I would have to read the entire agreement.

8    Q.    You could take the time and review what portions of it you

9    think you need to to answer that question.

10    A.    Okay.  I mean, without speaking with counsel, you know, on

11    the face of it it appears to be a sale and servicing agreement,

12    yes.

13    Q.    And that's dated as of February 1, 2003, correct?

14    A.    It is.

15    Q.    When was EMC Residential formed?

16    A.    In 2005, I believe.

17    Q.    Yes.

18    A.    No, 2004, I'm sorry.

19    Q.    Thank --

20    A.    Wait a minute now.  EMC --

21    Q.    The company that you work for, EMC Residential?

22    A.    Yeah, it was formed well before.  The name was changed.  I

23    don't know when the company was founded but the name was

24    changed when we -- it was changed in 2005.

25    Q.    Thank you.  Would you turn to the termination letter which

1    is in EMC binder in front of you?  I believe its Exhibit 3, no

2    that was the -- that was the term sheet.

3    A.   I'm sorry, EMC document?

4    Q.   EMC document, yes.

5    A.   Okay.

6    Q.   Exhibit number 2.

7    A.   Okay.

8    Q.   Is there any mention in that letter that there were any

9    breaches by the servicer of any servicing provisions of the

10   MLPSA?

11   A.   This is a cancellation to our trades.  It's a cancellation

12   of the trades it says regarding August 14th of 2007.  So I

13   guess the answer is no.

14   Q.   Are you aware whether the mortgages that are owned by EMC

15   are currently being serviced the same way they were before the

16   debtors entered into bankruptcy?

17   A.   I have no idea about the servicing practices at

18   American Home at this point.

19   Q.   So you don't know whether the loans are still being

20   serviced the same way they always have been?

21   A.   I wouldn't have any way of knowing.  I mean, the

22   remittance reports -- I think it would be hard to judge.  I

23   mean, I could get the facts together and give you an answer but

24   not on the stand.

25   Q.   Okay.  You mentioned, on your direct testimony, that prior

174

1   to the no-downgrades letter having been provided to the debtors

2   in connection with the proposed transfer to WL Ross, that you

3   were unable to securitize the loans, correct?

4   A.   I'm sorry, would you repeat your question?

5   Q.   Yes.  I believe you testified that prior to the no-

6   downgrade letters received by the rating agencies; it was your

7   testimony that prior to that time you had been unable to

8   securitize the remaining 1.2 billion dollars of loans under the

9   MLPSA because of some uncertainty in the market?

10  A.   I believe my statement was prior to and post the no-

11  downgrade letters that we're unable to sell the loans.

12  Q.   Does EMC or Bear Stearns ever purchase or bid for the

13  purchase of servicing rights in other bankruptcy cases?

14  A.   We have recently, yes.

15  Q.   And when you bid on those servicing rights are you bidding

16  on them to take them free and clear of any liens, claims and

17  other interests?

18          MR. KUNEY:   Objection, Your Honor, that does call for

19  a legal conclusion.

20          THE COURT:   Sustained.

21  Q.   When you bid on those proceeds, did you believe that

22  you're going to be taking on the obligations of the sellers

23  under any other MLPSA?

24  A.   I haven't read -- I haven't -- we haven't won any and I

25  haven't read any of the documents associated with it.

175

Q.   Okay.  Now EMC also has a servicing division, correct?

A.   Yes.

Q.   So if the Court ruled in favor of EMC and determined that

the servicing rights were somehow terminated, EMC would take

those rights and begin to service those loans without having to

pay for them, correct?

A.   I don't -- I don't know how I would judge that.

Q.   Well, do you --

A.   I mean, I think he's going to -- that's what he's going to

do, right?  I don't know how that would work.

Q.   Well, let's take it outside --

          THE COURT:  I'm not servicing the loans.

          THE WITNESS:  You're going to decide who services

them and how it -- how that transaction -- I think that's what

we're here for today.

Q.   Well, let's take it outside of the Judge's decision.  If

the debtors suddenly agreed with you that you had properly

terminated the servicing rights, would it be EMC's position

that they could take those rights and begin servicing the loans

without having to pay for them?

A.   Well, I think in the terms of our agreement right it's an

automatic event so I don't know how you can properly do it.

But yeah, we would assume the servicing, correct.

Q.   And not pay for it?

A.   I would -- I could refer to the agreement, I'm not sure

1  how it's structured, that particular aspect of the payment.  I

2  hadn't thought about it.

3  Q.   But EMC would stand to obtain the servicing rights to 1.2

4  billion dollars worth of loans, correct?

5  A.   Yes, I think our primary concern is to insure that the

6  loans are serviced properly and in a way that we could get a

7  rating and then follow through with a securitization

8  transaction.

9  Q.   By the way, you said you couldn't securitize them, have

10  you tried to sell them to anybody else?

11  A.   I'm not aware that we have tried to sell them.  That would

12  be -- our typical takeout would be a securitization transaction

13  but since most parties you would sell loans to would be under

14  the same terms I would find it highly unlikely if you can't

15  securitize them that you could sell them.

16  Q.   But you haven't tried to do that?

17  A.   They may have, I'm not aware of it.

18  Q.   Okay.  Thank you.

19         MR. DORSEY:  I have nothing further, Your Honor.

20         THE COURT:  Mr. Power?

21         MR. POWER:  Your Honor, just a few questions.

22  CROSS-EXAMINATION BY

23  MR. POWER:

24  Q.   Mr. Golden, how long have you been in this business before

25  EMC, approximately?

A.    How long have I --

Q.    Been in your current role?

A.    In my current role for three years and three months.

Q.    Were you here for the prior testimony of the last few

days?  Have you been here?

A.    Yeah, for most of it.

Q.    So there was discussions about the fees that are paid for

the types of loans that are serviced.  And the discussion

related to, you know, there's twenty-five basis points for

fixed loans, three-eighths for adjustables and sub-prime you

get close to a half a point, are you familiar with that --

those kind of fee arrangers?

A.    Well, it varies -- it varies with time.  But I mean

that's -- I think in this agreement it was contemplated to be

three-eighths for these type of loans.

Q.    Three-eighths.  And is that a typical fee arrangement that

you've seen?

A.    Oh, I've seen the fees, you know, vary based on the type

of collateral.  So it would be a range of, you know, a quarter

of a point and I've seen as high as three quarters.

Q.    So when EMC is deciding to buy loans and deciding whether

to take them on the service retained/service release basis,

does EMC look at the fee that would be charged in connection

with the service of that loan to determine whether it makes

sense to either leave them with the seller or take the rights

1   with them?

2   A.    It would be part of the negotiation.

3   Q.    And what does EMC look into to determine whether that

4   price makes sense to them?

5   A.    It's looking at the composition of the portfolio, how

6   much -- how much in funds at any one time that you would

7   typically advance as there's a cost associated with that and

8   the -- the underlying credit quality of the loans which

9   determines, you know, how much special servicing you would have

10  to do associated with the loans.

11  Q.    And is that basically the only models that you have

12  internally that, kind of, price those areas?

13  A.    I think everybody has models but the -- the fact is

14  basically the market dries where the prices are.

15  Q.    And have you, in your experience in the last three years,

16  has that changed basically the way that works in terms of

17  driving those prices or determining what those price mechanisms

18  would be?

19  A.    Yeah, it's changed at different times for different -- do

20  you mean the pricing -- you mean the mech -- or how the

21  pricing --

22  Q.    EMC's values whether or not the --

23  A.    No, I would say the market always dictates where these

24  things are going to trade.

25  Q.    So pretty much the -- EMC's decision as to whether to try

179

purchase the loans on a service and release basis or -- or

leave the loans with the seller as a service and retain basis,

in large parts depends on the market values and price and other

factors, is that right?

A.    Yes, and coupled with, you know, some -- some people won't

sell you the loans unless they are servicing, retained or

released.  I mean, depending upon whether they want to service

the loans or not.  So it also has -- it's a factor in the

transaction.

Q.    So sometimes sellers dictate that I'm only going to sell

you this on a service and retain basis, is that what you just

said?

A.    Well --

Q.    And you'll decide whether or not --

A.    -- I mean, they -- they could -- yes, that could be part

of the negotiation, yes.

Q.    Okay.  When you were talking about a securities contract

and the fact that you had spoken to your counsel about these

contracts being unified and you were trying to get -- and EMC

was trying to get in the safe harbor provisions just a few

years ago, now are you aware, sir, that the Bankruptcy Code and

the definition of securities (indiscernible) doesn't include

the term servicing of mortgage loans, are you aware of that?

MR. KUNEY:  Objection, Your Honor.

THE COURT:  Basis?

1          MR. KUNEY:  It doesn't prove the term mortgage loans.

2          MR. POWER:  No, I said servicing of mortgage loans,

3    I'm sorry.

4          MR. KUNEY:  Well, then the question needs to be

5    clearer.  If it means "servicing and mortgage loans" I'll

6    stipulate that phrase doesn't --

7          MR. POWER:  Your Honor, the witness was put on for

8    his knowledge of this code provision not for counsel's

9    knowledge.

10          THE COURT:  I followed the question, so the

11    objection's overruled.  You can restate it just so the record's

12    clear.

13    Q.   Are you aware, sir, that the definition of security

14    contract does not include the term servicing in connection with

15    mortgage loans?

16    A.   Yes.

17    Q.   Okay.  Have you ever spoken to your counsel about the fact

18    that servicing is not included in the definition of securities

19    contracts?

20    A.   Specifically, I -- I -- no.  No, I don't think I have.

21    Q.   When you -- when EMC decided to create this form contract

22    to try to get into the safe harbor, did EMC get an opinion of

23    counsel saying that this would qualify as a safe harbor

24    contract?

25    A.   I don't -- I don't know.

1    Q.    You have know knowledge if they got a --

2    A.    I have know knowledge if they have an opinion.

3    Q.    Has EMC ever litigated that issue before any court, to

4    your knowledge, and prevailed on that position?

5    A.    I don't know if EMC's litigated it at all.

6    Q.    So you have no knowledge whether that's actually been

7    upheld, that attempt?

8    A.    No.

9    Q.    When you determine -- you were saying that the price for

10   whether you keep the servicing -- excuse me.

11            MR. POWER:   Strike that.

12   Q.    When you were talking about the market in a large way

13   dictates the price of whether the loan -- whether the loans are

14   sold service retained or service released, you didn't mention

15   at all the fact that you had changed your contract and

16   therefore you think it's a valuable way to do business.  You

17   didn't mention that at all in terms of how you value the

18   servicing rights?

19   A.    No, I believe I was answering -- you said specific things

20   related to it.  But I mean, whether a loan servicing retained

21   or released not only changes the price, but I -- it may change

22   the -- it may change the contractual terms.  I mean, all of

23   them are, you know, contrary to some of the testimony of EMC

24   anyways, the contracts are large -- they may be, in some form,

25   the same but they're always negotiated, especially with the

1    longer -- the bigger transactions.

2    Q.    I understand sir, but when you -- when you just testified

3    about how you determined whether or not to pay more for a

4    service release loan than a service retain loan, you didn't

5    mention the fact that you now have a contract that

6    (indiscernible) safe harbor and that falls within that equation

7    of how you value the -- you did not mention that you think you

8    have a safe harbored contract which would fall on the economic

9    benefits of EMC, is that correct?

10   A.    We were talking about -- that's correct.  We were talking

11   about the economics of the transaction not how it was going to

12   be document.

13   Q.    Right, sir.  So basically the documentation, the contract,

14   is unrelated to the economics.  The economics is driven by

15   market conditions and negotiations of price.

16   A.    I wouldn't say it's unrelated, right.  I mean, if

17   you're -- if you're going to -- I guess it's a cause and

18   effect, right.  But that's fine.  I mean, if you're going to

19   have a retained transaction then you're going to document the

20   transaction as if it were retained.  If you're going to have a

21   release it's released, right?  And those are both going to have

22   different prices associated with them.

23   Q.    Yes, sir.  Well, we agree that prices vary on whether

24   servicing rights are retained and released.  We spent three

25   days educating the Court on that.  The issue is, EMC, you've

1   stated, has put a contract in that it believes is now safe

2   harbored.  And based on your prior testimony you've indicated

3   that's not part of the economic equation when you're pricing

4   service release --

5   A.   No, that's not what I said.

6           MR. KUNEY:  Your Honor, I object.

7           MR. POWER:  Your Honor, I'll move on from the

8   questions, that's fine.

9           THE COURT:  Objection -- question is withdrawn.

10          MR. POWER:  Thank you.

11  Q.   Sir, have you ever involved in a transaction where

12  servicing was actually transferred?

13  A.   Yes.

14  Q.   Okay.  And that's a long -- that's a lengthy process,

15  isn't it?

16  A.   Define lengthy.

17  Q.   Weeks?

18  A.   Yes.

19  Q.   It takes weeks, basically, to change the owner of the loan

20  and to transfer the loan files, to move -- could be tens or

21  hundreds of thousands of loans off of one services records and

22  computer system on to another, isn't that correct?

23  A.   That -- that process occurs pretty quickly.  It is --

24  there are guidelines under RESPA on giving notice to borrowers

25  it takes thirty days.  That -- you know, it's something that's

184

1    done fairly regularly and -- and, you know, two big or two

2    large servicers could affect that transaction fairly easily.

3    Q.    I understand that sir.  Now let's -- I was going to get to

4    that next.  There's also federal regulations that basically

5    dictate the amount of time it takes to notify borrowers that

6    you're changing servicers and where to send the payments, is

7    that correct?

8    A.    Right.

9    Q.    And it's a lengthy period of time to get that completely

10   accomplished and done, isn't that correct?

11   A.    It allows the borrower -- it allows the borrower thirty

12   days, correct.

13   Q.    Okay.  But the servicing takes longer than thirty days to

14   basically accomplish and fully transfer off of one service's

15   platform onto another, isn't that correct?

16   A.    I've seen it done in shorter periods of time and them

17   people have made decisions to go to longer periods of time.

18   Q.    But basically it takes weeks, do we agree on that?

19   A.    Yes, if you mean weeks it could take two to three weeks or

20   one more than that.

21   Q.    Okay.  That's fine.  Loan sales, have you been involved in

22   any loan sales?

23   A.    Sure.

24   Q.    How long would it take -- how quickly can EMC do a loan

25   sale, can it do it in a day?

185

1   A.   The sell itself?

2   Q.   Sell or buy.

3   A.   Yeah, you could do it in a day but typically it would take

4   a week or so.  Yes, I mean, to get the tape -- I mean, if you

5   get a -- yeah, to get a high level price --

6   Q.   Let me ask a different question.  Is it normal for a --

7           THE COURT:  Mr. Power -- Mr. Power, let the man

8   answer the questions.

9           MR. POWER:  I thought he was.

10          THE COURT:  Well, you didn't -- just starting to

11  speak while he's still speaking doesn't mean you think he

12  finished answer the question, it means you want to say

13  something.

14          MR. POWER:  I can hope, Your Honor.

15          THE COURT:  All right.

16          MR. POWER:  I'm sorry.

17          THE COURT:  So let him answer the question.

18  Q.   Do you want me to re-ask the question or are you --

19  A.   Yeah, would you.  Which question do you want me to answer?

20  Q.   To your knowledge has EMC ever sold loans in a period of a

21  few days?

22  A.   In your mind what's a sale?  What constitutes a sale?

23  Q.   Entering into --

24  A.   I just don't want to --

25  Q.   Entering into a binding agreement --

1  A.    Yes.

2  Q.    -- to sell whole loans to a buyer.

3  A.    Yes.

4  Q.    And the transaction can take, roughly, a few days, is that

5  correct?

6  A.    Yes.

7  Q.    Okay.  You were talking before about how you're -- EMC is

8  currently holding these loans and is unable to put them in a

9  securitization, is that correct?

10 A.    That's correct.

11 Q.    And part of that was because of your concern about the

12 fluctuation of interest rates and how the value of the

13 portfolio may adjust given the market conditions, is that

14 correct?

15 A.    No, what I was saying is that -- is we continue to bear

16 the risk of that -- those events known as spreads widening,

17 interest rate moves, etcetera.

18 Q.    Right.  Has EMC hedged the interest rates in connection

19 with these loans?

20 A.    I don't know.  There used to be an old Solomon Brothers

21 line that was the only true hedge is the one in your front

22 yard.  So, I mean, you attempt to put directional hedges on but

23 as far as the basis risk goes, the spread over which mortgages

24 trade over treasuries it's nearly impossible to hedge that risk

25 and as time goes on it gets continually more difficult.

187

1   Q.   I'm sorry, sir.

2           MR. POWER:   Your Honor, I'm going to strike that

3   answer.

4   Q.   I asked you, had EMC hedged this -- these loan portfolios.

5           THE COURT:   Overruled.   Overruled.   He explained his

6   answer.

7   Q.   Let me repeat the question.   Has -- to your knowledge, has

8   EMC hedged these loans?   And I mean to a hedge in connection

9   with these loans.

10  A.   Yes.

11  Q.   Oh, I'm sorry, then I misheard the answer.   I thought you

12  were speaking generally.   Okay.

13          MR. POWER:   Your Honor, may I have one second?

14          THE COURT:   Uh-huh.

15          MR. POWER:   Your Honor, just a couple more questions.

16  Q.   Sir, going back to the securities contract definition, I

17  think your testimony was that a combined -- by unifying the

18  servicing and the loan purchase aspects you've created a safe

19  harbor contract, is that in essence --

20  A.   I'm saying, that's my understanding, yes.

21  Q.   That's your understanding of this contract.   Now, is it --

22  the fact that its put together in one document that puts it in

23  the safe harbor, is that your understanding?

24  A.   I think that, among other things, yes.

25  Q.   Well, what are the other things?

188

A.   Well, the -- the fact that the servicer is -- you know, we
get the net out our EPD claims against the servicing advances
and there are other clauses in the contract, I think, that I
think that -- that pool the servicer and the originator at
American Home the two individual companies, that pulled them
together.

Q.   So is it your testimony that if there was a separate
service agreement here and a separate loan purchase agreement
that the service agreement would not be a safe harbor contract?

A.   A lawyer would -- I don't know.

Q.   Well, I'm -- you testified what your understanding of
these provisions are?

A.   I'm just saying, my understanding that the way our
contract is drafted that it is.  I don't know if those two
standing independently would be or not.  I guess it depends on
who they were written, right?  I mean if they referred to each
other or they somehow tie -- I'm sure, you know, lawyers are --
some lawyers are very clever and could figure out a way to pull
them together.

Q.   Thank you.

        MR. POWER:  Your Honor, no more questions.

        THE COURT:  Redirect?

        MR. KUNEY:  Nothing, Your Honor.  Thank you.

        THE COURT:  Thank you, Mr. Golden, you may step down.

        THE WITNESS:  Thank you.

1          THE COURT:  Any further evidence from EMC?

2          MR. KUNEY:  No, Your Honor.  I'm sorry, Your Honor.

3    We would like to move in as evidence --

4          THE COURT:  Come to the mike please, sir.

5          MR. KUNEY:  Sorry.  I'd like to move into evidence

6    all of the exhibits.  I think there are -- let me check my

7    list.  I think we previously moved into evidence 2 and 7, I

8    believe.  And I think we may have moved in 1 which is our basic

9    contract.  The witness referred to the term sheet, 3.  So here,

10   to be more precise, I'd like to move into evidence, if not

11   already, Exhibit 1, 2, 3, 6, 7 and 13.

12         THE COURT:  And you want 1 under seal?

13         MR. KUNEY:  Yes, Your Honor.

14         THE COURT:  Pending --

15         MR. KUNEY:  If I have to file -- I'll file --

16         THE COURT:  -- pending filing a motion?

17         MR. KUNEY:  Right.

18         THE COURT:  Any of the others?

19         MR. KUNEY:  I don't believe there was any discussion,

20   Your Honor, so no at this point.

21         THE COURT:  No, I meant under seal.  Any of the

22   others under seal?  All right.  So I think you can assume 1 is

23   already in but to the extent it's not, EMC is moving for the

24   admission of 1, 2, 3, 6, 7 and 13 with 1 under seal temporarily

25   pending submission of a motion and ruling by the Court.  Any

190

1    objection?

2            MR. DORSEY:  I don't think it's necessary to move in

3    6 and 7 as pleadings, Your Honor, but if they want to do that,

4    that's fine.

5            MR. KUNEY:  Your Honor, it makes the record easier, I

6    think.

7            THE COURT:  That's fine.  Mr. Power, any objection?

8            MR. POWER:  No objection, Your Honor.

9            THE COURT:  All right.  They're admitted without

10   objection.

11   (EMC'S Exhibits 1, 2, 3, 6, 7 and 13 were hereby received into

12   evidence, as of this date.)

13           MR. KUNEY:  Thank you, Your Honor.

14           THE COURT:  Any further evidence?

15           MR. KUNEY:  No, Your Honor.

16           THE COURT:  Okay.  That'll close EMC's case.

17   Mr. Gallo are you prepared to go forward with a witness?

18           MR. GALLO:  Your Honor, for the record Andre Gallo

19   from Bingham McCutchen for DB Structured Products, Inc.  We

20   would call Peter Principato.

21           THE COURT:  All right.

22           (Witness duly sworn)

23           THE CLERK:  Please state and spell your name for the

24   record.

25           THE WITNESS:  Peter Principato, spelled P-E-T-E-R

1   P-R-I-N-C-I-P-A-T-O.

2           THE CLERK:  You may be seated.  Thank you.

3           THE COURT:  Sir, you can move those notebooks over to

4   the side.  I think Ms. Winfrey will probably just be handing

5   you individual documents.  There we go.

6   DIRECT EXAMINATION BY

7   MR. GALLO:

8   Q.   Good afternoon, Mr. Principato.

9   A.   Good afternoon.

10  Q.   Move -- move the microphone close to you to make sure

11  everyone can hear you.  Mr. Principato, by whom are you

12  employed?

13  A.   Deutsche Bank.

14  Q.   And what is your position with Deutsche Bank?

15  A.   I'm a director and manager of the contract finance group

16  within the residential mortgage trading group.

17  Q.   Before we talk specifically about your duties at Deutsche

18  Bank, I'd like to briefly go through your work history.  When

19  did you graduate from college?

20  A.   1990.

21  Q.   And where did you work immediately following your

22  graduation from college?

23  A.   Crosslands Savings Bank.

24  Q.   And what was your position at Crosslands?

25  A.   I was an officer in the consumer lending department.

1   Q.   And can you just briefly describe what your job duties

2   were as an officer in the consumer lending department?

3   A.   Initially, after graduation, my responsibilities included

4   the origination of residential mortgage loans but quickly

5   changed when the banks are going through some capital

6   restriction issues -- it quickly changed to selling -- taking

7   part in spearheading the sale of residential mortgage

8   portfolios in the secondary market.

9   Q.   After you left Crosslands -- you left Crosslands in 2003?

10  I'm sorry; you left Crosslands in '93, is that correct?

11  A.   In 1993, correct.

12  Q.   Where'd you go from there?

13  A.   City Corp Securities.

14  Q.   Do you recall what your title was at Citicorp?

15  A.   It was assistant vice president.

16  Q.   And what was your job at Citicorp?

17  A.   I managed the document control and securitization group.

18  Q.   And can you just describe for the Court what that was?

19  A.   Basically the group was to support the whole loan

20  purchases and sale and securitization of residential mortgage

21  loans.

22  Q.   When you say whole loan, those are mortgage loans?

23  A.   Yes, mortgage loans.

24  Q.   And how long did you work at Citicorp?

25  A.   I worked at Citicorp for two years.

193

1    Q.    And where did you go from there?

2    A.    Nomura Securities.

3    Q.    So that would have been in 1995?

4    A.    1995, correct.

5    Q.    And what was your job at Nomura Securities?

6    A.    At Nomura Securities I was hired to be responsible for all

7    the home loan acquisitions and to help establish a relationship

8    with servicer and a custodian that would support our

9    acquisition process of purchasing whole loans.  And from there

10   that goes into being more of a transaction manager and

11   coordinating the efforts from not only a due diligence and

12   operational perspective but also taking part in the contract

13   negotiations for the purchase and sale of residential whole

14   loans.

15   Q.    And how long were you at Nomura?

16   A.    I was at Nomura from 1995 -- actually Feb -- yeah, it was

17   about February 1995 to August of 2000.

18   Q.    Did your time there overlap with Mr. Aronoff?

19   A.    Yes, it did.

20   Q.    And did you work with Mr. Aronoff there?

21   A.    Yes, I did.

22   Q.    Were you in the same department?

23   A.    Yes.

24   Q.    Were you at Nomura after Mr. Aronoff left?

25   A.    Yes.

194

1    Q.    And you left Nomura at approximately the year 2000?

2    A.    That's correct, August 2000.

3    Q.    And where did you go from there?

4    A.    I went to DLJ Mortgage Capital.

5    Q.    and what was your job at DLJ Mortgage Capital?

6    A.    I was vice president and transaction manager responsible

7    for the purchase of residential mortgages and sales as well as

8    the securitization of such.

9    Q.    At DLJ were you involved in the negotiation of purchase

10   and sale agreements for whole loan -- home mortgage loans?

11   A.    Yes, I was -- I was involved intimately with the

12   negotiation of residential mortgage whole loan purchase

13   agreements, sale agreements, pulling in servicing agreements,

14   prospectuses and other documents that we used in support of the

15   business of buying, selling and securitizing whole loans.

16   Q.    You've heard -- you've been present for much of the

17   testimony this week, correct?

18   A.    Yes.

19   Q.    You heard the use of the term MLPSA?

20   A.    That's correct, yes.

21   Q.    Master Mortgage Loan Purchase and Sale Agreement?

22   A.    Yes.

23   Q.    When you were at DLJ were you involved in the negotiation

24   of those types of agreements?

25   A.    Yes.

1  Q.   And was that -- when did you leave DLJ?

2  A.   Actually, just -- DLJ after I started, quickly merged with

3  Credit Suisse First Boston.  So within, like, six weeks I

4  became a Credit Suisse employee.  So I worked from, I believe

5  it was August 2000 to July 2004.

6  Q.   And were your responsibilities the same throughout that

7  time period?

8  A.   Yes, they were.

9  Q.   And throughout that time period were you negotiating and

10  working with MILPSAs (sic)?

11  A.   Yes.

12  Q.   And what did you do in 2004?

13  A.   In 2004 I took a job at Deutsche Bank.

14  Q.   What was your title when you first started working at

15  Deutsche Bank?

16  A.   I was vice president and senior transaction manager

17  responsible for purchase and sale of residential mortgage whole

18  loans which included the negotiation of the residential

19  mortgage loan purchase agreements and sale agreements as well

20  as any standalone servicing agreements, custodial agreements

21  and other documents used to support the -- the business

22  transactions of the trading group.

23  Q.   And the trading group, that's the group that trades in

24  residential mortgage loans?

25  A.   Residential mortgage loans, yes.

196

1   Q.   And so was your job, essentially, very similar to what you

2   did at DLJ?

3   A.   Yes.

4   Q.   And Credit Suisse?

5   A.   That's correct.

6   Q.   And were you involved in the negotiation of MILPSAs while

7   at Deutsche Bank?

8   A.   Yes.

9   Q.   At some point in time did you get promoted?

10  A.   Yes, I did.

11  Q.   And that's your current job?

12  A.   Yeah, correct.

13  Q.   And what is your current job?

14  A.   I am director and manager of the contract finance group

15  which is responsible for the negotiation of mortgage loan

16  purchase/sale, servicing agreements, servicing sales all

17  transactions conducted in the mortgage trading group.

18  Q.   Approximately how many people are in that group?

19  A.   Six.

20  Q.   And do they all work for you?

21  A.   Yes.

22  Q.   And are those six people also involved in negotiation of

23  MILPSAs?

24  A.   Yes.

25  Q.   Is that a regular part of their duties?

197

1    A.    Absolutely.

2    Q.    Was that a regular part of your duties?

3    A.    Yes.

4    Q.    Can you estimate for the Court approximately how many

5    MILPSAs you've personally been involved in the negotiation of

6    since 2000 when you started work in DLJ?

7    A.    Conservatively, 250, 300.

8    Q.    While you've been -- since you've been at Deutsche Bank in

9    2004, can you estimate in order of magnitude approximately how

10   many MILPSAs you've negotiated on behalf of Deutsche Bank?

11   A.    In excess of a hundred.

12   Q.    And would that include -- are you including in that those

13   amounts -- mortgage loan purchase and sale agreements for

14   released transactions as well as retained transactions?

15   A.    Yes.

16   Q.    Okay.  And do you know approximately how many of those --

17   how its split up between released and retained?

18   A.    Most of the agreements are released.  Most people sell

19   whole loans on a released basis.

20   Q.    But you have been involved in the negotiation of MILPSAs

21   for retained sales, right?

22   A.    Yes.

23   Q.    And in fact were you involved in the negotiation of the

24   MILPSA that is at issue in this case, the May 1, 2006?

25   A.    Yes.

198

Q.   Now Mr. Principato, does Deutsche Bank enter into MILPSAs where the same party acts as the seller and the servicer?

A.   Yes.

Q.   Approximately, if you can, can you estimate how many of the MILPSAs you do fall under that category, again where there's one party who's the seller and the servicer?

A.   I would say conservatively seventy to seventy-five percent of the time it's one entity that's acting as seller and servicer.

Q.   And is it your business understanding that in those MILPSAs that counterparty is responsible for both the obligations relating to the sale and the obligations relating to the servicing of the mortgage loans?

A.   Yes.

Q.   And by obligations relating to the sale, what are those obligations?

A.   I'm sorry, could you clarify that question?

Q.   Yeah.  The -- are you familiar with the term EPD?

A.   Yes.

Q.   And what is an -- and are you familiar with the term bring and recapture?

A.   Yes.

Q.   And I don't think we need to go back through that with the Court but in those agreements where there's one party that's both the seller and the servicer that party is responsible for

199

1   the EPD claims?

2   A.   Yes.

3   Q.   And that party is responsible for the premium recapture

4   claims?

5   A.   Yes.

6   Q.   That party is also responsible for performing the

7   servicing of the loans when it retains the servicing?

8   A.   Yes, the party is typically responsible for all reps and

9   warranties whether they be on a loan level basis or whether

10  they pertain to the servicing activities.

11  Q.   Now, does Deutsche Bank also enter into MILPSAs where

12  there are two separate entities one being the seller and one

13  being the servicer?

14  A.   Occasionally, yes.

15  Q.   First of all, who makes the determination as to whether

16  there's one entity or two entities on those types of

17  agreements?

18  A.   It's usually the seller.

19  Q.   With respect to the obligations under the agreement, where

20  there's both a seller and a servicer, is it typical that the

21  servicer is liable for the seller's obligations as well?

22  A.   I would say in most of the documents that I've negotiated,

23  yes.

24  Q.   And if the servicer is unable to perform its obligations

25  under the MILPSA what is the result from a business standpoint?

200

1    A.    We would look to the seller.

2    Q.    With respect to the servicing, if the servicer could not

3    perform -- is not performing its obligations under the -- under

4    MILPSA, is it your understanding that you can terminate

5    servicing on most agreements?

6    A.    If in fact they've triggered an event to default or breach

7    their rep or warranty that went unremedied, absolutely.

8    Q.    Is it important for Deutsche Bank to have the servicer on

9    this MILPSAs obligated for the reps and warranties relating to

10   the sale?

11          MR. POWER:  Your Honor, it's a little bit of a

12   leading question, I object.

13          THE COURT:  Don't lead the witness.

14          MR. GALLO:  I won't, Your Honor.

15   A.    I would say that, as a practice, we always tried to get as

16   many entities to be obligated under the reps and warranties

17   section and the indemnity section as we can.

18   Q.    And why is that?

19   A.    Because it insures that we will be paid in the event of a

20   repurchase request.  The more people obligated the better your

21   chances are of getting performance under the document.

22   Q.    Is there any other reason why Deutsche Bank might want the

23   servicer obligated to the sale reps?

24   A.    Well, in a retained trade you -- you would -- the traders

25   view it as its one transaction.  I'm not only buying whole

1   loans from you but if you're going to keep the servicing rights

2   I need to make sure -- I need to have provisions in there that

3   you're going to do your best to service those loans properly

4   and insure that the cash flow that I anticipated to get I will

5   get.

6       So if the servicer doesn't -- you know, breaches his reps,

7   you know, you would look to terminate it under that.  If the

8   seller didn't, you know -- if there was non-performance under

9   the provisions of the document you would have two entities.

10  You would have more leverage.

11  Q.   With respect -- would -- would it be important for you to

12  be able to terminate servicing if the seller is not making its

13  payments on EPDs and premium recapture?

14  A.   Yes, it would

15  Q.   And why is that?

16  A.   Because if one entity is having financial hardship or

17  stress it would be perceived that a related entity would be in

18  that same predicament.  That it would spread and that would

19  have an adverse effect on the servicing of our loans.

20  Q.   Is it your understanding that the term -- are you familiar

21  with the term custodial account?

22  A.   Yes.

23  Q.   And are you familiar with that terms as it's used in the

24  MILPSA that is the Exhibit -- DBSP Exhibit 1?

25  A.   Yes.

1  Q.    And what is your understanding of a custodial account?

2  A.    The understanding of a custodial account is an account

3  that is administered by the servicer but it's the account that

4  actually holds the principle and interest payments that the

5  borrowers make for the benefit of the owner of the loans.

6  Q.    And that account is held by whom?

7  A.    The account is held by the servicer but once again it's

8  held for the benefit of the investor.  So when the payments go

9  in there they're supposed to segregate the -- actually when

10  they collect the payments they're supposed to take those

11  payments and segregate them away from the other funds that the

12  servicer has and hold it for our benefit and remit it to us

13  every month.

14  Q.    If -- taking the American Home contract as an example, if

15  you were to terminate servicing under that contract what would

16  happen to the custodial accounts?

17  A.    Once the servicing transferred to the successor servicer

18  the money in that custodial account would transfer to that

19  servicer as well.

20  Q.    Does DB -- does Deutsche Bank do mortgage loan servicing?

21  A.    No, we do not.

22  Q.    So if the debtors were to stop servicing your loans in

23  this case, what would happen to the servicing?

24  A.    It would have to get transferred to a third party

25  servicer.

1    Q.    And would you pay that third party servicer a servicing

2    fee?

3    A.    The third party servicer would be entitled to receive the

4    servicing fee that's being paid now, if not more.

5    Q.    I believe you indicated before that you were involved in

6    the negotiation of the May 1, 2006 agreement?

7    A.    Yes.

8    Q.    Did you speak to anyone from American Home about the

9    negotiation of that agreement?

10   A.    Yes, I did.

11   Q.    Do you recall who was involved from American Home in the

12   negotiation of that agreement?

13   A.    Yes, it was Marissa Norelli (ph.) predominantly.  She was

14   the lead at American Home in the negotiations.  And there was

15   Jody -- and please forgive me if I pronounce his name wrong,

16   Gallegos (ph.)

17   Q.    Did Deutsche Bank use an outside law firm in the

18   negotiation of this agreement?

19   A.    Yes, we did.

20   Q.    Who was that?

21   A.    Thacher Proffitt.

22   Q.    Do you typically use Thacher Proffitt to negotiate

23   agreements of this kind?

24   A.    Yes.

25   Q.    Do you recall how those negotiations were done, and that's

1    the negotiations with respect to this May 1, 2006 agreement?

2    A.    Yeah.  It started out that -- we started out with a 2005

3    servicing release agreement and we marked it up and sent them

4    the black line changes to show all the changes we made to turn

5    that document into a release document.  And that was forwarded

6    over to American Home.

7    Q.    And do you recall whether or not there were any specific

8    changes to the indemnity provision that were made between the

9    2005 agreement and the 2006 agreement?

10   A.    Yes.

11   Q.    And what -- do you --

12   A.    We added the servicer.

13   Q.    And was that intentional on your part?

14            MR. POWER:  Your Honor, I'm going to object to this

15   on the parole evidence rule.  Again, we're -- I mean the

16   agreement speaks for itself whether or not the service is

17   included, the issue of what they think the intent was in terms

18   of including it is a different issue.

19            MR. GALLO:  Your Honor, I'd be happy to stipulate

20   that my agreement is unambiguous as written.  I've had -- if

21   you're -- and argue that point right now.  But until Your Honor

22   rules that it's unambiguous, I think that we have to present

23   all the evidence and then Your Honor can consider it later on

24   and make that ruling.

25            THE COURT:  I'll -- I'm going to allow, again as with

1    the last witness.  I'm not sure the intent is at all relevant

2    but I'm frankly not in a position in the middle of testimony,

3    at least at this point, to make the -- to make the ruling.  So

4    I'll allow the testimony for present purposes subject to

5    striking it at a later date as parole evidence.

6              MR. POWER:  Your Honor, can I have a standing

7    objection then as to the testimony or I can rise each time.

8              THE COURT:  You can have a standing objection to any

9    testimony as to the intent of the contract parties.

10             MR. POWER:  Yes, Your Honor.  That'd be fine.  Thank

11   you.

12             MR. GALLO:  Your Honor, may I have the last question

13   read and answer read because I forgot where I was.

14             THE COURT:  Don't forget the mike.

15             THE REPORTER:  Question, what were they?  Answer, we

16   added the servicer.  Question, was that intentional on your

17   part?  Answer, yes.  And then there was the objection.

18   Q.   And why was it important for you to add the servicer?

19   A.   It was important for us to add the servicer because they

20   were retaining the servicing rights and we wanted to make

21   sure -- and plus -- let me back up.  It was important because

22   the servicer was a separate entity than the seller and as I

23   stated previously, in most of the agreements we do retain, the

24   seller and servicer are one entity.  So we clearly had to add

25   the servicer in to make sure that we encumbered both the seller

206

1    and the servicing -- seller entity and servicing entity under

2    the indemnification section.

3    Q.   Mr. Principato, were you present during most of

4    Mr. Aronoff's testimony, today?

5    A.   Yes.

6    Q.   And did you -- were you present when he gave his opinion

7    that in his opinion the obligations of the seller and the

8    obligations of a servicer under an MILPSA must be separate?

9    A.   Well, I don't -- I didn't agree with that.

10   Q.   You were there for that opinion, right?

11   A.   Yes, I was.

12   Q.   And do you agree with that?

13   A.   No.

14   Q.   In your opinion, do they have to be separated as

15   Mr. Aronoff stated?

16   A.   No.

17   Q.   Did you also hear Mr. Aronoff's opinion as to the

18   importance of Fanny/Freddie qualifications?

19   A.   Yes, I did.

20   Q.   Do you agree with his opinion on that?

21   A.   I don't agree with his entire opinion.  I did agree that

22   part of the Fannie/Freddie standards that have to do with

23   financial metrics but it's clearly a huge guide that deals with

24   every aspect of servicing and the care of servicing.  So I --

25   in short I think that it was extremely summarized.

1  Q.   Do most of the MILPSAs that you negotiate for Deutsche

2  Bank contain a requirement that the servicer be Fannie and

3  Freddie qualified?

4  A.   Yes.

5  Q.   Is that an important provision for you in negotiating

6  these agreements?

7  A.   Yes, it is.

8  Q.   Why is that?

9  A.   Two reasons.  First and foremost it's an industry -- it's

10 an industry recognized standard and care of servicing.  Number

11 two, a lot of the purchase agreements that we negotiate are for

12 the purchase of loans that we're going to deliver to Fannie and

13 Freddie so it would be a requirement of us to deliver to Fannie

14 and Freddie that the servicer be approved by Fannie and

15 Freddie.

16 Q.   Are any of the loans that you currently hold under the

17 May 1, 2006 agreement loans that could be sold to Fannie or

18 Freddie?

19 A.   I would say that there were some that were but are now

20 delinquent.  And the ones that remain it's -- it's hard to tell

21 at this point.

22       MR. GALLO:  Your Honor, subject -- I assume that the

23 debtors will offer me the same stipulation that they offered to

24 EMC with respect to that we have an EPD claim.

25       MR. BRADY:  Same stipulation is offered.

208

1          THE COURT:  All right.

2          MR. GALLO:  With that stipulation, Your Honor, I have

3     no further questions.

4          THE COURT:  Okay.

5          MR. GALLO:  Subject to redirect.

6          THE COURT:  Yeah.  Any cross by any objectors?  All

7     right.  Hearing none, I'll hear cross from anyone in favor of

8     the motion.

9          MR. DORSEY:  Again, Your Honor, can we take a short

10    recess while I gather my thoughts?

11         THE COURT:  Yes, we may.

12         MR. DORSEY:  Thank you.

13         THE COURT:  During the recess, sir, you cannot

14    discuss the substance of your testimony with counsel.

15         (Recess from 4:18 p.m. until 4:29 p.m.)

16    CROSS-EXAMINATION BY

17    MR. DORSEY:

18    Q.   Good afternoon, Mr. Principato.  I'm John Dorsey on behalf

19    of the debtors.  Your counsel knew during your direct

20    examination talked a lot about something called an MLPSA, what

21    is that?

22    A.    Mortgage Loan Purchase and Servicing Agreement.

23    Q.   So there's no I in there is there?

24    A.   There doesn't seem to be.

25    Q.   Is it MLPSA?  Okay.  And I believe early in your testimony

1    you referred to an ML --

2            MR. DORSEY:  Strike that.  I think we've got it

3    straightened out now.

4    Q.   You testified that you began working with MLPSAs back in

5    as early as 2000, is that correct?

6    A.   Yes.

7    Q.   And those were MLPSAs where the selling and the servicing

8    were part of one agreement, is that correct?

9    A.   That's correct.

10   Q.   And you also testified that you were involved directly in

11   the negotiations of what's been marked as Deutsche Bank Exhibit

12   Number 1, correct?

13   A.   Yes.

14   Q.   And I assume that you negotiated this agreement, you also

15   testified you took what was a servicing release agreement and

16   changed it into a servicing retain agreement?

17   A.   That's what the law firm Thacher Profitt did.

18   Q.   And I assume that since you were involved in the

19   negotiations you read this document carefully to make sure that

20   Thacher Profitt had done exactly what you wanted them to do in

21   this agreement?

22   A.   At the time to the best of my ability, yes.

23   Q.   Okay.  And if you would open that document please,

24   Deutsche Bank Exhibit 1?

25           THE COURT:  You know, he doesn't have a Deutsche Bank

210

1    notebook so someone needs to -- we lost Mr. McFrey.

2              MR. DORSEY:  I'm sorry, Your Honor.  I'm going to use

3    debtors' exhibit of Deutsche Bank.

4              THE COURT:  All right.  Which exhibit.

5              MR. DORSEY:  It's Debtor's Exhibit 35.

6              THE COURT:  Okay.

7              THE WITNESS:  Where is that?

8              THE COURT:  It should be in there somewhere, Debtor's

9    Exhibit 35, sir.

10   Q.   Do you have that in front of you, sir?

11   A.   Yes.

12   Q.   I assume when you were working with the attorneys and the

13   debtors in negotiating this agreement if you found errors in

14   here you would have brought them to the attention of your

15   counsel?

16   A.   Yes.

17   Q.   In the first witnesses clause, first whereas clause, could

18   you read that to yourself?

19   A.   What page is that off?

20   Q.   It's on page 1.

21   A.   Okay.

22   Q.   Was it the intent -- excuse me.  That clause makes it

23   clear that what you were trying to do here was create a

24   servicing retain agreement, correct?

25   A.   That is correct.

1  Q.    Would you turn to Section 2 of the agreement, please,

2  which appears on page 15?  Do you have that in front of you?

3  A.    No yet.

4  Q.    And this Section 2 is entitled to agreement to purchase

5  and it states "the seller agrees to sell and the purchaser

6  agrees to purchase from time to time mortgage loans including

7  the servicing rights thereof."  That's a mistake, isn't it sir?

8  A.    To be perfectly honest with you I do not know that this

9  was the final execution version.  So I would just say this that

10  if it was in the final executed version then that would be a

11  mistake.

12  Q.    Okay.  And I'll point out to you that this appears in the

13  same version of the document that your counsel has admitted

14  into evidence as Deutsche Bank Exhibit 1.  Would you turn

15  please to Section 7.04, which appears on page 36 of the

16  agreement?  Actually the section begins on 35 but I want to

17  draw your attention to the second paragraph of that section.

18  A.    The second paragraph 7.04.

19  Q.    Yes.  It begins within sixty days, do you see that?

20  A.    Yes.

21  Q.    And I'm going to read that section for you as well.  It

22  says "within sixty days or with respect to a breach of

23  subsection 7.03(LXX) within ten days or the earlier of either

24  discovery by a notice to the seller and breach of your

25  representation of warranty, breach material and materially and

1  adversely affects the value of the mortgage loans -- the

2  mortgage loan or the mortgage loans.  The seller shall use his

3  best efforts promptly to cure such breach in all material

4  respects.  And if such breach cannot be cured the seller shall

5  at the purchaser's option repurchase such mortgage loans and

6  the retained servicing rights."  Do you see that?  Excuse me

7  related service agreements, do you see that?

8  A.    I see the sentence.

9  Q.    It wouldn't be repurchasing the related servicing rights

10  because they're being sold under this agreement, aren't they?

11  A.    Once again, I cannot -- I cannot give any definitive

12  answer on this agreement because I don't know it to be the

13  authentic executed version.

14       MR. GALLO:  We'll stipulate that this is the

15  version -- this is the executed version of the agreement.

16  A.    Did you pick that up?

17  Q.    So that's another error in this agreement where there was

18  a mistake between trying to transcribe this from a servicing

19  release transaction to a servicing retain transaction?

20  A.    There's definitely an inconsistency.

21  Q.    Would you turn next to Section 6.01 which appears on page

22  70?  Do you have that?

23  A.    Yes.

24  Q.    And in Section 6.01 it says "conveyance of mortgage loans

25  possession of servicing files."  Do you see that?

213

1    A.   You're talking about the sentence that begins "the

2    servicing file retained by seller."

3    Q.   No.  The seller simultaneously and with payment of

4    purchase price, Section 6.01.  Do you see that?

5    A.   Okay.

6    Q.   And that refers you to Exhibit 4 which is to be executed

7    for purposes of completing a transaction under this particular

8    MLPSA, correct?

9    A.   Yes.

10   Q.   Would you turn to Exhibit 4?  And Exhibit 4 -- do you have

11   that in front of you?

12   A.   Not yet.

13           THE COURT:  Which debtor exhibit is this, Mr. Dorsey?

14           MR. DORSEY:  In Exhibit 35.

15   A.   Okay, I'm here.

16           MR. DORSEY:  I'll wait, the Court's still finding it.

17           THE COURT:  Okay.

18   Q.   Exhibit 4 is the assignment and assumption conveyance, you

19   see that?

20   A.   Yes.

21   Q.   And if you read the first part of this paragraph can you

22   confirm for me that this is in fact a consignment and

23   conveyance to sell both the mortgage loans and the servicing

24   right?

25   A.   I see that, I see the language.

1  Q.   So that again is another error in this document?

2  A.   It's an inconsistency.

3  Q.   And next would you turn please to Section 7.03 on page 35.

4  I'm looking at Subsection LXVIII.

5  A.   Did you say page 33?

6  Q.   35.

7  A.   LXV triple I?

8  Q.   Yes.

9  A.   Okay, I'm there.

10  Q.   If you look down the third line it refers to statuses each

11  month until the related servicing transfer date, do you see

12  that?

13  A.   Okay.

14  Q.   And related servicing -- the servicing transfer date is a

15  defined term in the agreement?

16  A.   Did you say servicing transfer term is a defined term in

17  the agreement?

18  Q.   I'm asking you -- it's capitalized in this particular

19  paragraph so I'm asking you if it is a defined term in this

20  agreement?

21  A.   It's not listed here in the definitions.

22  Q.   Isn't it a fact servicing transfer date is something

23  that's used in the context of a servicing release transaction

24  as opposed to servicing retain transaction?

25  A.   That's not necessarily true.

215

1    Q.    When would it be used in a servicing retain transaction?

2    A.    If the documents drafted as such that it contemplated the

3    termination without cause or a termination for cause, they

4    would be effective on a specified transfer date.  That might be

5    a defined term included in a document.

6    Q.    But that term is not defined in this agreement?

7    A.    That is not in this agreement that I'm looking at right

8    now.

9    Q.    And finally can we turn to Section 13, please, which his

10   on page 55?  Do you have that open in front of you?

11   A.    Yes.

12   Q.    And this section is title the seller, you see that?

13   A.    That's correct.

14   Q.    And Section 13.01 says additional indemnifications by the

15   seller, is the title of that section, correct?

16   A.    That's what it says.

17   Q.    It doesn't say service or any title does it?

18   A.    It does not.

19   Q.    But it refers to the servicer in the body of that

20   paragraphs?

21   A.    Yes, it does.

22   Q.    Okay.  And if you look at part of the information that

23   begins on the fifth line down, the line that begins anyway

24   related to the failure of the seller, do you see that?

25   A.    Yes.

1  Q.   It says "anyway related to the failure of the seller to

2  perform its obligations under this agreement including but not

3  limited to its obligations to service and administer the

4  mortgage loans.  Under this agreement does the seller service

5  and administer the mortgage loans, or is the seller -- excuse

6  me, the servicer servicing and administering the mortgage

7  loans?

8  A.   The seller and the servicer in this agreement are defined

9  as -- can I just check the definition real quick?

10 Q.   Sure.

11       THE COURT:  I'm sorry, Mr. Dorsey, what page are we

12 on?

13       MR. DORSEY:  Page 55, Your Honor.

14       THE COURT:  Section 13.01?

15       MR. DORSEY:  Correct.

16 A.   Seller and servicer are defined as two separate entities.

17 Q.   So that section -- that provision of this agreement

18 doesn't make any sense in the context of that provision does

19 have to say --

20 A.   I disagree.

21       MR. GALLO:  Objection, Your Honor.

22       THE COURT:  Basis for the objection?

23       MR. GALLO:  It's a vague question, he's saying that

24 provision of the agreement and I don't know if he's talking

25 about the entire provision or if he's just talking about the

217

1    words that he was focused on.

2                MR. DORSEY:  I'll restate the question, Your Honor.

3                THE COURT:  Thank you, Mr. Dorsey.

4    Q.   The way those words are written it appears that the seller

5    is going to be -- excuse me, the servicer is going to be

6    indemnifying the seller for the service and administration of

7    the mortgage loans?

8    A.   I don't know if I see that it says that.

9    Q.   Okay.  So you disagree with the interpretation of that

10   agreement.

11   A.   I disagree with your interpretation of that paragraph.

12   Q.   Let's focus on something else for a moment.  Assuming that

13   the servicing rights under this agreement were terminated would

14   the -- you testified that Deutsche Bank would transfer these

15   servicing rights to some other servicer to service the loans,

16   correct?

17   A.   Yes.

18   Q.   Because Deutsche Bank doesn't have its own servicing arm,

19   correct?

20   A.   That's correct.

21   Q.   And if you transfer this to another servicer are you going

22   to expect that servicer to assume the obligations of the seller

23   under Section 13.01 that we just read?

24   A.   If it transfer to another servicer that servicer is not in

25   fact -- they're not going to be assigning this agreement to

218

1    them.

2    Q.    So you would come up with a new agreement?

3    A.    You would have to.

4    Q.    Okay.

5           MR. DORSEY:  May I have just one moment, Your Honor?

6    I have no further questions, Your Honor.

7           THE COURT:  Mr. Power, any questions?

8           MR. POWER:  Your Honor, just a couple.

9    CROSS-EXAMINATION BY

10   MR. POWER:

11   Q.    Sir, you've been involved in drafting contracts for

12   Deutsche for how many years -- in negotiating contracts?

13   A.    For Deutsche Bank?

14   Q.    Yes, Deutsche Bank?

15   A.    A little over three.

16   Q.    Now, over that tenure you said you used contracts that

17   were both separate servicing agreements and loan purchase

18   agreements, is that right?

19   A.    No, I didn't say that.

20   Q.    So all of Deutsche's contracts are unified contracts that

21   involve service agreements?

22   A.    In the purchase of loans servicing retained and released

23   they're both one agreement.

24   Q.    And they're all imbedded in a single agreement?

25   A.    Yes.

219

1    Q.    How long has Deutsche had that form of agreement?

2    A.    Longer than I've been there.

3    Q.    So more than three years they've had that same unified

4    agreement, is that correct?

5    A.    Yes.

6    Q.    And over the tenure of your professional career in this

7    industry have you seen unified agreements like that with other

8    loan purchasers in this deal?

9    A.    Yes.

10   Q.    So it's a common to have a unified agreement, is that

11   correct?

12   A.    Yes, it is.

13   Q.    Okay.

14             MR. POWER:   Thank you, Your Honor.   No more

15   questions.

16             THE COURT:   Redirect?

17   REDIRECT EXAMINATION BY

18   MR. GALLO:

19   Q.    Mr. Principato, when I mistakenly used the term MILPSA

20   through all my direct did you understand me to be referring to

21   MLPSAs?

22   A.    Yes.

23   Q.    And if I had asked all my questions again using the term

24   MLPSA, would your answers be the same?

25   A.    Yes.

220

1          MR. GALLO:  Nothing further, Your Honor.

2          THE COURT:  You may step down.

3          THE WITNESS:  Thank you, Your Honor.

4          THE COURT:  Do you have another witness, Mr. Gallo?

5          MR. GALLO:  Your Honor, no, we don't have another

6     witness.

7          THE COURT:  All right.  Do you happen to have other

8     evidence?

9          MR. GALLO:  Other than documents, no.

10         THE COURT:  Okay.  Let's move to the documents.

11         MR. GALLO:  We would -- I think that all of the

12    exhibits in our binder that we want to offer and entered have

13    already been offered and entered.  Exhibit 2 is a consulting

14    agreement between Mr. Aronoff and the debtors we don't -- we're

15    not seeking the admission of that exhibit.  There's Bank

16    Exhibit 3, is the curriculum vitae of Mr. Aronoff and we're not

17    seeking the admission of that exhibit.  I believe that all the

18    other exhibits have already been offered and entered which is

19    DBSP-1 which is our master mortgage loan May 2006 agreement.

20    Exhibit 4 which is the July 26, '07 default letter.  Exhibit 5

21    which is the AARs for Deutsche Bank.  Exhibit 6 is the November

22    '05 release ML -- that is actually an MLPISA in my belief.

23    Exhibit 7 is an e-mail with a black line.  Exhibit 8 is the

24    black line alone.  Exhibit 9 is EMCs agreement.  And Exhibit 10

25    is the agreement with Greenwich.

1          THE COURT:  All right.  So you're not making any

2   further motions at this time?

3          MR. GALLO:  No.  I believe all those exhibits are

4   already in.  Is that correct?

5          UNIDENTIFIED SPEAKER:  I believe they were moved in

6   yesterday without objection.

7          THE COURT:  All right.

8          MR. GALLO:  Thank you, Your Honor.

9          THE COURT:  Well, to the extent they were not,

10  they're now readmitted again, Exhibits 1, 4, 5, 6, 7, 8, 9 and

11  10 of the Deutsche Bank are admitted without objection.  Ms.

12  Lawson, do you have a witness?  No, yes, not present?

13         MS. LAWSON:  Your Honor, Kim Lawson from Reed Smith

14  on behalf of GMAC and RFC.  Based on what's currently going on

15  in terms of the status of the order we've decided not to put a

16  witness on for this.

17         THE COURT:  All right.  Is there any further

18  witnesses by any party in opposition of the motion?  All right

19  hearing none does the debtor wish to present a rebuttal case?

20         MR. BRADY:  Your Honor, can we just take a few

21  minutes?

22         THE COURT:  Sure.  Here's what we're going -- if

23  we're done with the evidence for today, we're going to be done

24  for today and we'll do oral argument when everyone is fresh

25  tomorrow at 11:30.  But what I'd like to do is make sure we

222

1    have all the evidence in and closed and we're ready to go to a

2    position of oral argument.  And a gentleman has something to

3    say.  I didn't think that would be controversial but you never

4    know.

5              MR. BUTZ:  I apologize, Your Honor.  Daniel Butz from

6    Morris Nichols Arsht & Tunnell on behalf of Assured Guarantee.

7    I just wanted to make sure that the three agreements related to

8    Assured are moved into evidence.  The debtors have agreed to

9    stipulate to their admissibility.

10             MR. DORSEY:  That's correct, Your Honor.  We have

11   agreed to stipulate to the admissibility of these documents.  I

12   believe one of them is already admitted.

13             MR. BUTZ:  The first document, the servicing

14   agreement dated as of June 6, 2007 is admitted as Assured 1.

15   There's also an insurance indemnity agreement dated June 6,

16   2007.  And a Pooling and Servicing Agreement dated as of May 1,

17   2007.

18             THE COURT:  Any objection?

19             MR. DORSEY:  No objection, Your Honor.  They were not

20   a part of debtors' exhibits.  So I think if counsel wants to

21   move them in we'll have to get copies made and marked and put

22   in.

23             THE COURT:  Yes.  All right.  So they'll be admitted

24   into evidence without objection.  If you need to make copies --

25   I don't have them so if you need to -- I have Assured Loan but

223

1   I don't really have the 2 or 3.  So if you want me to actually

2   see them you need to make copies of them to the Court.

3            MR. BUTZ:  Actually, the Court can have these copies.

4            MR. DORSEY:  You want to mark those for

5   identification, Your Honor?

6            THE COURT:  Yes, I will do so.  Your giving me all

7   three or just two.

8            MR. DORSEY:  The one we just gave you is Assured 2

9   and 3, I can give you Assured 1.

10            THE COURT:  No, I have it, but which one is which.

11            MR. DORSEY:  The short one is number 2.

12            THE COURT:  All right.  Assured 2 and 3 are admitted

13   without objections.

14   (Assured's Exhibit 2, Insurance Indemnity Agreement of 6/6/07,

15   was hereby received into evidence, as of this date.)

16   (Assured's Exhibit 3, Pooling and Servicing Agreement of

17   5/1/07, was hereby received into evidence, as of this date.)

18            MR. DORSEY:  Thank you, Your Honor.

19            THE COURT:  Yes, Mr. Bowden?

20            MR. BOWDEN:  Your Honor, Bill Bowden on Ashby &

21   Geddes on behalf of UBS Real Estate Securities.  This is in

22   connection with the matter that was alluded to regarding the

23   UBS documents I think at the beginning and this afternoon.  I

24   spoke with Mr. Brady about how to get those before Your Honor

25   during the break and we agreed Mr. Brady was going to have them

224

1    inserted into the exhibit binder tomorrow morning.  But now it

2    appears that the record may be closed and I just wanted to ask

3    Your Honor perhaps help us to deal with that.

4              THE COURT:  Can we leave the record open, Mr. Brady,

5    to allow for the submission of the UBS documents?

6              MR. BRADY:  That's fine with us, Your Honor.

7              THE COURT:  Okay.  We'll leave the record open for

8    that end.  Mr. Fallon?

9              MR. FALLON:  Your Honor, two matters.  We wanted to

10   enter into evidence the Pooling and Servicing Agreement.  I

11   hadn't had a chance to talk to debtors about that and I'm happy

12   to provide them a copy, it's listed in Exhibit 5.6-I in the APA

13   and referred to in Section 5.6 in the contract.

14             THE COURT:  Do want to discuss that all during the

15   break or --

16             MR. FALLON:  That's fine, Your Honor.  The second

17   item was as I was paging through CitiMortgage 1 which was

18   previously admitted my copy it turns out had -- when the copies

19   were made page 16 was missing.  And so if that's also true of

20   the Court's copy I wanted to hand up a copy of page 16.

21             MR. DORSEY:  Your Honor, just to clarify what page

22   that document was from?

23             MR. FALLON:  That is the AAR Agreement and it's

24   attachment 2 to the AAR Agreement.  So that's the MP --

25             THE COURT:  My page 16 is missing.

225

1          MR. FALLON:  Okay.  May I approach with page 16?

2          THE COURT:  Yes.  This was previously admitted

3     without objection, Mr. Dorsey, so I don't think there's --

4          MR. DORSEY:  I have no objection I just want to make

5     sure we get it in the right exhibit.

6          THE COURT:  Yeah.  The actual document is -- the AAR

7     is quite short but this is an attachment to it.  Anything

8     further?  All right.  So subject to the supplement to the

9     record on the UBS documents I believe that closes the

10    evidentiary record.

11         MR. FALLON:  And CitiMortgage too.

12         THE COURT:  Oh, and the CitiMortgage document, I beg

13    your pardon.

14         MR. BRADY:  We were going to huddle about rebuttal?

15         THE COURT:  No.  Closes the objector's record.

16         MR. BRADY:  Your Honor, we have nothing.

17         THE COURT:  All right.  We'll take recess.

18         (Recess from 4:56 p.m. to 5:06 p.m.)

19         THE CLERK:  All rise.

20         MR. BRADY:  Your Honor we've completed our rebuttal

21    huddle and concluded that we have no rebuttal.  So apart from

22    that one documentary piece we're finished.

23         THE COURT:  Okay.  Are we still looking at Mr.

24    Fallon's document.

25         MR. DORSEY:  We've agreed that that can be admitted

226

1    as CitiMortgage Exhibit 2, Your Honor, without objection.

2           THE COURT:  All right.  Do we have it, I don't have

3    it?  We can admit it but if I don't have it it doesn't exist.

4    All right.  So CitiMortgage 2 is admitted without objection.

5    All right.

6    (CitiMortgage's Exhibit 2, Pooling and Servicing Agreement, was

7    hereby received into evidence, as of this date.)

8           THE COURT:  Subject only to the UBS documents that

9    will close the evidentiary record in connection with the case.

10   Anything before tomorrow before we break?  All right.  Okay.

11   We'll reconvene tomorrow morning at 11:30 and I'd like to

12   compliment all counsel on an excellent development and

13   submission of an evidentiary record.  When I was in private

14   practice my litigation partners liked to tell me that

15   bankruptcy lawyers couldn't do evidentiary hearings.  And I

16   think they really mean I couldn't do evidentiary hearings.  In

17   any event except for Mr. Bowden everyone did a wonderful job.

18   So thank you very much.

19          (Whereupon these proceedings were concluded at 5:07

20   p.m.)

21

22

23

24

25

227

1

2                           **I N D E X**

3

4                       **T E S T I M O N Y**

5    **WITNESS**              **EXAMINATION BY**              **PAGE**

6    James Aronoff           Mr. Dorsey (direct)              27

7    James Aronoff           Mr. Gallo (voir dire)            37

8    James Aronoff           Mr. Kuney (voir dire)            42

9    James Aronoff           Mr. Gallo (voir dire)            47

10   James Aronoff           Mr. Dorsey (resume direct)       49

11   James Aronoff           Mr. Gallo (cross)                67

12   James Aronoff           Mr. Kuney (cross)                92

13   James Aronoff           Mr. Crowley (cross)             101

14   James Aronoff           Ms. Bifferato (cross)           103

15   James Aronoff           Mr. Chipman (cross)             104

16   James Aronoff           Mr. Fallon (cross)              111

17   James Aronoff           Ms. Lawson (cross)              112

18   James Aronoff           Mr. Dorsey (redirect)           115

19   Stephen Golden          Mr. Kuney (direct)              129

20   Stephen Golden          Mr. Dorsey (cross)              167

21   Stephen Golden          Mr. Power (cross)               176

22   Peter Principato        Mr. Gallo (direct)              191

23   Peter Principato        Mr. Dorsey (cross)              208

24   Peter Principato        Mr. Power (cross)               218

25   Peter Principato1       Mr. Gallo (redirect)            219

228

I N D E X, cont'd

E X H I B I T S

| OTHER | DESCRIPTION | ID. | EVID. |
|---|---|---|---|
| Debtors' | 1-15, 17-20, 24-28, 31, 32, 35, | | 138, 7 |
| | 36, 38-41, 44, 46, 48-50, 53-57, | | |
| | 59-64, 66-85, 87-103, 104-110 | | |
| Debtors' | ***UNDER SEAL*** | | 138,11 |
| | 16, 22, 33, 34, 37, 86 | | |
| EMC's | 1-3, 6, 7, 13 | | 190,10 |
| Assured's 2 | Insurance Indemnity Agreement, | | 223,13 |
| | dated 6/6/07 | | |
| Assured's 3 | Pooling & Servicing Agreement | | 223,15 |
| CitiMortgage 2 | | | |
| | Pooling & Servicing Agreement | | 226, 5 |

R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Motion in limine to preclude Mr. Aronoff's | 49 | 5 |
| testimony with respect to his qualifications | | |
| as an expert overruled | | |
| Motion in limine and motions to strike Mr. | 130 | 23 |
| Aronoff's testimony overruled | | |

229

**C E R T I F I C A T I O N**

I, Lisa Bar-Leib, court-approved transcriber, certify that the

foregoing is a correct transcript from the official electronic

sound recording of the proceedings in the above-entitled

matter.

_____        October 23, 2007

Signature of Transcriber              Date


Lisa Bar-Leib

typed or printed name

**A**

**AAR** 224:23,24
  225:6
**AARs** 220:21
**AB** 52:10 91:25
**abeyance** 26:9 27:2
  146:25
**ability** 51:17 85:24
  86:4 87:3 95:10
  113:12 137:11
  165:10 209:22
**able** 86:19 87:18
  94:23 95:4,15
  106:6 129:5
  151:13,25 152:3
  155:19 166:5
  169:14 171:6
  201:12
**ABN** 7:3
**above-entitled**
  229:6
**absent** 51:3 96:16
**absolutely** 61:8
  63:22 77:8 113:16
  113:17 151:10
  160:7 197:1 200:7
**academic** 22:22
  128:10
**accept** 135:13
  159:15,21
**acceptable** 134:24
  135:4
**acceptance** 106:21
**accepted** 53:23
**accommodations**
  15:1
**accomplish** 127:8
  184:14
**accomplished**
  68:12 184:10
**account** 163:17
  201:21 202:1,2,2
  202:3,6,7,18
**accountants** 65:9
**accounts** 202:16
**accrued** 158:12

**accumulate** 38:19
**accurate** 158:1
**acquire** 81:5 106:7
**acquired** 28:21
  33:1,8 34:20 35:7
  36:6 47:8 83:11
  104:14 149:4
**acquires** 162:1
**acquisition** 117:8
  193:9
**acquisitions** 83:7,8
  193:7
**acronym** 72:5
**act** 151:10 161:25
  162:3
**acted** 149:1
**acting** 21:13 68:17
  198:8
**action** 69:3 151:13
**actions** 81:2
**active** 130:1
**actively** 39:23
**activities** 143:7
  199:10
**activity** 56:17 60:3
  61:10
**acts** 198:2
**actual** 97:18,21
  143:8 225:6
**add** 137:18 205:18
  205:19,24
**added** 204:12
  205:16
**adding** 35:11 56:1
**addition** 30:2 32:17
  105:24
**additional** 62:24
  215:14
**address** 12:1,9
  39:18 133:15
  150:20
**addressed** 127:14
**adequate** 109:17
**adjust** 186:13
**adjustable** 64:3
**adjustables** 177:10
**administer** 216:3,5

**administered** 202:3
**administering**
  216:6
**administration**
  55:24 58:24 60:18
  62:22 64:23
  107:25 217:6
**admissibility**
  130:11,12,19
  131:5 222:9,11
**admissible** 25:11
  132:13,14 133:5
  146:6
**admission** 23:25
  121:5 126:17
  189:24 220:15,17
**admit** 13:10 130:24
  133:2,18 134:15
  134:23 136:2
  137:22 138:2
  226:3
**admitted** 14:23
  69:2 133:3 134:22
  135:3,6,8 136:13
  137:6,11 146:15
  190:9 211:13
  221:11 222:12,14
  222:23 223:12
  224:18 225:2,25
  226:4
**adopted** 52:9
**advance** 163:23
  178:7
**advances** 188:2
**advantage** 145:17
**adverse** 50:13
  201:19
**adversely** 212:1
**advice** 89:4,10
**advised** 37:23
  134:3
**advisement** 26:4
  36:14
**advising** 33:13
**Advisors** 34:24
**affect** 55:7 79:16
  81:3 107:20

163:22 164:6
  165:8,10 169:14
  184:2
**affiliates** 140:1
**affirmation** 166:11
**afford** 21:1
**afternoon** 103:17
  103:20 111:20
  112:12 122:7
  127:5 167:25
  168:1 191:8,9
  208:18 223:23
**agencies** 31:11 50:7
  51:11,24 102:20
  174:6
**agency** 29:7 49:18
  49:20 50:2,15,17
  50:20 51:5,9,10
  51:16 52:2,8,22
  53:1 166:18
**agency-approved**
  49:19 50:9
**aggregate** 29:19
  33:10 59:8
**aggregated** 83:12
**ago** 21:4 42:16 43:7
  43:25 47:4 67:16
  94:20 141:21
  150:18 179:21
**agree** 15:12,13
  67:18,22 70:11
  71:13,14 74:10
  79:20 80:2,21
  85:23 86:7,14
  87:1,6 92:6,16
  95:2,12,16 97:9
  98:4,13,17 99:1
  100:18 146:14
  160:5,6 166:18
  169:5 172:4
  182:23 184:18
  206:9,12,20,21,21
**agreed** 65:18 70:24
  109:11 159:24
  175:17 222:8,11
  223:25 225:25
**agreeing** 50:16

141:8
**agreement** 16:14
  20:6 27:25,25
  39:2,4 64:15
  67:17 68:2,13,17
  68:24 69:1,4,7,11
  69:14,18,20 79:24
  80:1,3,8,14,18,23
  80:24 84:2,3,20
  85:1,3,5,6 90:20
  90:22 91:21 97:6
  97:10 98:10 104:2
  104:4,6 106:19
  108:4,13 109:7
  110:3,8,15,18
  111:1 112:20
  113:4,17 136:18
  143:22 144:12
  145:13,15,16
  146:2,5 151:11
  153:19 154:18
  169:11,12,12,13
  170:3,11,15,24
  171:16 172:5,5,7
  172:11 175:21,25
  177:14 185:25
  188:8,8,9 194:21
  199:19 203:6,9,12
  203:18 204:1,3,9
  204:9,16,20
  207:17 208:22
  209:8,14,15,16,21
  210:13,24 211:1,4
  211:16 212:10,12
  212:15,17 214:15
  214:17,20 215:6,7
  216:2,4,8,17,24
  217:10,13,25
  218:2,23,24 219:1
  219:4,10 220:14
  220:19,24,25
  222:14,15,16
  223:14,16 224:10
  224:23,24 226:6
  228:12,14,15
**agreements** 2:9
  16:13 24:14,22

28:1,21 50:20
51:3 53:10 60:1
70:7,22 71:3 75:2
79:1 82:4,22
94:16 106:3,5,9
107:13,17 112:16
113:15 127:10,11
129:19 133:20
134:22 146:17,19
150:5,7 151:3
194:10,13,13,13
194:24 195:19,19
195:20,20 196:16
197:13,18 198:24
199:17 200:5
203:23 205:23
207:6,11 212:7
218:17,18,21
219:7 222:7
**agrees** 211:5,6
**ahead** 158:9
**AHM** 90:10
**aid** 13:25 14:1 15:8
24:11
**aided** 24:16
**aids** 14:20
**albeit** 131:17
**ALEX** 5:17
**ALFONSO** 5:9
**aligned** 114:9
129:1
**allegations** 11:17
**allow** 27:1 46:17
80:24 90:24 95:20
107:18 109:3
114:10,12 132:5,7
133:8 147:24
151:22,23 158:25
204:25 205:4
224:5
**allowed** 43:22
147:19
**allowing** 132:19
**allows** 142:24
151:2 184:11,11
**alluded** 223:22
**alter** 145:2

**altered** 27:23
**alternative** 128:16
133:8
**ambiguous** 147:2
**amended** 12:10
**amendment** 13:2
**amendments** 13:23
**America** 4:20 5:3
**American** 1:8 2:10
20:1 69:4,5 84:21
85:15,18 143:1
144:13 151:15
152:4 155:9
157:22 164:18
166:6,14 173:18
188:5 202:14
203:8,11,14 204:6
**ammunition** 69:24
**amount** 38:19
63:23 84:12 87:13
90:5 111:23
144:16 158:2,5,15
158:20 159:24
160:9 184:5
**amounts** 52:12
158:21 197:13
**AMRO** 7:3
**ANA** 5:9
**analysis** 15:18
19:14 50:11 52:19
58:11 104:13
112:22 128:20
**analyze** 55:17
**ANDERSON** 4:19
**Andre** 190:18
**Andrew** 5:19 9:7
37:11 47:13 67:2
86:1,2,6
**and/or** 150:21
**Angeles** 7:6
**Angell** 6:18 105:3
**answer** 19:21 45:20
46:7,17 71:6 72:4
75:13 76:22 77:14
77:15 78:10,12,14
80:11,13,16 81:9
95:22 100:2

103:24 109:3,20
138:19 149:23
172:9 173:13,23
185:8,12,17,19
187:3,6,11 205:13
205:15,17 212:12
**answered** 71:4
73:22 76:4 81:14
81:16 88:15 89:24
92:17 95:21
**answering** 181:19
**answers** 219:24
**anticipated** 201:4
**anybody** 159:19
160:24 176:10
**anyway** 136:8
215:23 216:1
**anyways** 181:24
**APA** 224:12
**apart** 96:14 138:13
225:21
**apologize** 47:13
70:17 73:14 78:23
88:3 91:8 111:6
114:25 222:5
**Apparently** 134:20
**Appeals** 146:3
**appear** 26:14 53:9
70:3
**appeared** 125:16
**appears** 160:23
172:11 211:2,12
211:15 212:21
217:4 224:2
**appellate** 72:15
**applicable** 17:18
20:23 126:24
**application** 127:18
159:7,10
**applied** 169:8
**applies** 158:24
**apply** 112:19
**appointment**
106:20
**appraisal** 142:8
**appreciate** 81:18
114:21

**appreciated** 14:3
**approach** 15:11
21:14,19 28:5
45:12 122:24
171:12 225:1
**appropriate** 52:5
58:9 80:25 102:20
**appropriately**
128:24
**approval** 166:24
**approve** 158:23
159:9
**approved** 31:16
159:5 207:14
**approving** 161:1
**approximately**
33:10 38:7,11,11
39:13 41:17 48:16
79:6 176:25 194:1
196:18 197:4,9,16
198:4
**area** 30:8 31:24
36:23 141:24,25
142:9,10,11
**areas** 21:25 27:17
32:8 48:9 49:12
53:5 75:14 91:14
91:16,17 131:12
178:12
**argue** 22:12 23:14
204:21
**argued** 11:21
122:13
**argument** 12:17
21:18 25:24 26:11
27:3 130:17 131:9
146:25 147:10
221:24 222:2
**arguments** 21:20
22:10 26:13
126:23 127:1
**arm** 217:18
**Aronoff** 2:3,6 11:9
13:5,16,17,21
14:1,7,11,13 15:2
15:7,16,20 16:15
18:2 19:15 21:23

22:22,24 23:1,2,7
23:14 27:8,13,16
28:11 36:12,22
37:17,19 42:6
43:19 46:1 47:21
49:2,10 54:9,9
63:9 67:6,8 69:8
69:18 71:15 72:2
72:25 81:20 89:20
90:9 93:9 101:11
101:18,21 103:20
105:1 111:20
112:12 115:13
121:1 122:12
126:8 127:22
128:24 129:2,20
130:7 131:3
132:21 146:21
147:21 193:18,20
193:24 206:15
220:14,16 227:6,7
227:8,9,10,11,12
227:13,14,15,16
227:17,18
**Aronoff's** 18:13
22:13 23:12 28:6
36:15 37:3 90:16
90:19 126:7 127:2
130:18,25 131:11
133:6 206:4,17
228:19,23
**arrangement** 41:20
41:21 177:16
**arrangements**
41:18
**arrangers** 177:12
**arrived** 169:20
**Arsht** 6:2 222:6
**article** 42:18
**articulate** 64:17
82:25 83:21
**articulated** 56:7
**ascertained** 146:6
**Ashby** 10:2 223:20
**asked** 13:11,18
19:15 21:4 24:19
25:4 29:24 45:1

53:15 62:16 71:4
74:25 75:22 76:1
76:4,20 81:14,15
88:12 92:15 93:23
93:25 112:18
114:1,10,15
115:14 118:4,14
118:19,22 120:7
165:17 166:4
187:4 219:23
**asking** 90:22
150:17 165:21
214:18,19
**aspect** 51:5 98:15
101:14 105:22
151:7 176:1
206:24
**aspects** 33:14 51:7
52:7 55:18 127:2
142:8 187:18
**assert** 129:16
**asserted** 159:1
**assess** 51:14 52:15
**asset** 34:4 35:7
58:16,16 60:11,15
85:12 86:12 91:20
120:19 141:12,17
**assets** 35:10,13
52:17 54:3 62:10
151:24
**asset-backed** 34:1
34:11 51:8
**assign** 117:13
125:21 130:18
170:15,23
**assigned** 21:21
95:24 104:3 161:2
**assigning** 171:2
217:25
**assignment** 96:4
161:1 213:18
**assist** 22:24 163:15
**assistant** 192:15
**associate** 28:20
**associated** 57:22
124:7 126:6 159:2
174:25 178:7,10

182:22
**Association** 45:1
46:10 126:14
**assume** 66:21
151:22,23 175:23
189:22 207:22
209:14,18 210:12
217:22
**assumed** 34:13
66:4 109:11 161:2
**assumes** 89:11
**assuming** 81:5
217:12
**assumption** 55:23
58:20 136:17
161:1 170:15,24
213:18
**assurance** 30:18
31:1 142:5
**Assured** 6:3 222:6
222:8,14,25 223:8
223:9,12
**Assured's** 223:14
223:16 228:12,14
**assuring** 98:16
**attached** 13:17
133:25 156:16
**attachment** 224:24
225:7
**attempt** 181:7
186:22
**attempting** 95:13
161:7
**attended** 28:12,14
**attention** 64:7
163:13 210:14
211:17
**attorney** 30:1
66:23 73:9,10
101:7 108:6,9
111:14 123:22,23
137:6 141:5,8
157:2,3
**attorneys** 3:4,17
4:3,12,20 5:3,12
6:3,12,19 7:3,13
7:21 8:3,11,20 9:3

9:10,17 10:3,10
19:22 30:7 118:5
118:14 210:12
**attorney/client**
169:2
**August** 154:7
173:12 193:17
194:2 195:5
**AUSTIN** 5:11 6:11
**authentic** 154:7
212:13
**authorized** 142:1
**automatic** 151:5
153:14,18 175:22
**automatically**
151:3 153:7
**available** 36:20
101:8,18,21
133:24,25
**Avenue** 3:18 5:4,13
9:11,18 10:4,11
**awards** 14:25
**aware** 12:9 43:15
43:16 44:1,4 54:5
81:20 96:4,20
154:15 168:14
173:14 176:11,17
179:21,23 180:13
**awareness** 148:23
**A-R-O-N-O-F-F**
27:13
**a.m** 66:18,18

**B**

**B** 1:22 3:14 6:9
228:4
**back** 29:6 34:22
38:22 65:13,20,25
66:2 75:8 76:11
76:14,15 78:3,5
91:3,9 106:1,25
115:13 118:21
144:20 145:12
147:20 148:9
150:23 152:22
154:18 159:6
187:16 198:23

205:21 209:4
**backed** 20:12 34:5
49:5 103:5,9
141:12,17
**background** 28:3
28:11 57:2 132:2
132:22 140:5
146:18 160:18
162:19
**bad** 65:20
**bag** 25:17
**balance** 158:15
164:19,21
**ballot** 125:22 126:6
**ballots** 125:16,18
125:19
**bank** 2:2,6 4:12,20
5:3 7:13 9:3,10,17
19:25 21:3 28:21
101:12 122:18
124:15,24 126:14
136:4 140:17,18
140:21,22 141:11
141:12,12 191:13
191:14,18,23
195:13,15 196:7
197:8,10 198:1
199:11 200:8,22
202:20 203:17
207:2 209:11,24
209:25 210:3
211:14 217:14,18
218:13,14 220:15
220:21 221:11
**banker** 31:12
**bankruptcy** 1:2,14
1:24 12:23 16:19
43:13,18,21 44:5
44:13,15 45:8
92:25 95:3,14
110:17 129:17
130:6 131:9,12
148:20 149:3,4,5
150:19 152:4
153:2 165:19
168:15,17 169:14
169:18 173:16

174:13 179:21
226:15
**banks** 49:24 192:5
**Bank-1** 69:3
**bar** 130:13 162:7
**bargain** 65:4
109:12
**bargained** 106:25
108:19
**Barker** 101:6
**barn** 17:25
**Bar-Leib** 2:25
229:4,12
**base** 124:10
**based** 12:18 34:13
42:24 49:2 51:9
52:15 53:2 59:6
60:2 63:20 73:22
82:9 102:13
103:12 106:4
126:3 131:1,1,17
132:15,16 150:11
150:14 155:23
157:21 166:1
168:16 177:18
183:2 221:14
**baseline** 92:7,17
**basic** 55:23 189:8
**basically** 58:5
109:2 114:11
131:8 142:8
145:23 152:6
156:14 165:18
169:13 178:11,14
178:16 182:13
183:19 184:4,14
184:18 192:19
**basing** 133:6
**basis** 11:15 16:12
16:16,24 22:20
25:24 29:18 34:7
34:7 46:7 52:12
58:13 59:9,21
63:11 64:2,8
99:22 100:6,7
119:1,1 127:17,19
128:9 129:13

134:9 142:4 144:1
144:4,7 145:21,22
152:12,14,15
156:18 177:9,22
179:1,2,11,25
186:23 197:19
199:9 216:22
**Battery** 8:4
**bear** 5:12 6:12
124:5 125:5,9
131:8 139:25
140:2,3,8 141:20
145:17 148:25
149:2,4,11,15
150:21 151:6
152:3,5,6 153:17
165:10 166:19
168:5 169:22
171:6 172:3
174:12 186:15
**beg** 22:10 123:18
225:12
**began** 62:12 209:4
**beginning** 19:17
29:2,5 49:11
114:14 125:12
223:23
**begins** 100:3
125:14 163:15
211:16,19 213:1
215:23,23
**behalf** 20:20 27:8
40:2 105:4 112:13
120:1 126:14
127:6 136:4
167:21 197:10
208:18 221:14
222:6 223:21
**belabor** 125:25
**belief** 220:22
**believe** 11:4 21:20
22:25 40:20 62:5
81:9 95:21 98:8
99:9 109:8 110:7
112:18 118:24
120:7 131:3,10,19
137:9 166:16

172:16 173:1
174:5,10,21
181:19 189:8,19
195:4 203:5
208:25 220:17
221:3,5 222:12
225:9
**believed** 74:12
**believes** 128:23
183:1
**belongs** 100:3
**bench** 21:12 25:22
**beneficial** 56:15
119:12
**benefit** 34:5,10
65:3 109:12 202:5
202:8,12
**benefits** 59:23
182:9
**best** 134:1 147:21
163:15 201:3
209:22 212:3
**better** 52:20 82:24
84:15 91:18 93:1
124:19 200:20
**beyond** 19:9 52:6
130:10 156:20
**bias** 125:14 126:5
**bid** 59:6,14 63:15
63:16,16 174:12
174:15,21
**bidder** 63:14
**bidding** 63:9
174:15
**bids** 116:22
**Bifferato** 5:16
103:16,17,19,20
104:20 227:14
**big** 107:2,2 184:1
**bigger** 182:1
**Bill** 223:20
**billion** 20:2,10
33:10 38:11
141:16 144:18
157:16 159:8
164:20 170:8,17
174:8 176:4

**billions** 57:6 60:25
81:22 82:1,11
84:19 86:16,23
**binder** 144:21
152:20 157:17
173:1 220:12
224:1
**binders** 54:7,9,10
54:11 101:17,18
134:8,21 143:10
171:10
**binding** 185:25
**Bingham** 9:2,9
37:11 67:2 190:19
**bit** 28:3 51:6 63:8
68:10 122:20
200:11
**black** 204:4 220:23
220:24
**BLANK** 4:2
**block** 30:19
**blur** 62:12
**blurred** 109:12
**blurring** 62:15
**board** 44:25 46:9
123:21
**Bob** 101:6
**body** 215:19
**boils** 69:17
**bond** 30:19,19,21
31:5,12
**bonded** 165:20
**bonds** 30:21 31:13
50:2 51:25 165:21
**BONNIE** 4:9
**book** 157:2,3
**borrower** 56:14,23
65:16 100:21,24
107:6 119:17
120:3 156:18
163:25 164:16
184:11,11
**borrowers** 57:18
57:21 117:21
183:24 184:5
202:5
**borrower's** 156:20

**Boston** 9:5 195:3
**bottle** 37:8
**bottom** 88:7 125:13
**bought** 32:4 43:1
47:6 51:9 57:1
116:19 170:17
**bound** 79:21
**Bowden** 10:7
223:19,20,20
226:17
**box** 53:12
**boxes** 54:7 74:3
**Brady** 3:11 20:18
20:20,20 25:2
26:14 70:14 71:4
81:14 121:12
127:5,5 131:6
133:17 134:19
135:1,7,11,16,21
136:12 137:16
138:13 207:25
221:20 223:24,25
224:4,6 225:14,16
225:20
**branch** 62:15
**Brandywine** 3:5
**breach** 65:16 200:6
211:22,24,25
212:3,4
**breaches** 173:9
201:6
**break** 66:15 104:22
114:12,19 121:14
121:24,25 123:25
135:10 148:2,2
167:15 223:25
224:15 226:10
**Brett** 111:20
**bridge** 50:3
**brief** 15:10 129:10
**briefly** 27:17 38:5
56:10 138:16
140:5,7,16 191:18
192:1
**bright** 52:24
102:23
**brilliant** 133:12

**bring** 55:21,21
61:19 94:23 95:4
95:8 198:20
**bringing** 128:16
**broader** 31:2 43:23
**Broadway** 4:13
**broker** 40:15 46:21
49:23
**brokerage** 35:12
**brokers** 35:2,17
**Brothers** 186:20
**brought** 49:23
149:9 210:14
**BS** 140:6
**build** 31:21 33:23
**Building** 3:5 8:12
**bulk** 38:14 132:21
132:21 133:3
**bundle** 55:23 61:2
81:1 85:7 107:23
108:22 109:9
113:2,9
**bundles** 55:13
61:22 83:18
**bury** 143:11
**business** 24:4,5,8
27:22 30:4,6
32:16,17,20 33:4
33:12,14,20,23
34:4 35:5,15,22
39:7 44:21 46:5
52:25 54:3,22
60:2,10 70:22
80:4 83:3,4,6
84:22 102:24
103:1 107:23
128:13,14 145:15
148:17,21,25
150:20,22 151:6,7
152:7 153:17
155:9 156:7
164:23 165:1
168:15 176:24
181:16 194:15
195:21 198:10
199:25
**businesses** 33:22

**Butz** 6:9 222:5,5,13
223:3
**buy** 29:18 35:14
63:10 65:13,20,25
100:4 177:21
185:2
**buyer** 37:20,22
38:1,4 39:21
64:16 127:12
186:2
**buyers** 37:23
**buying** 38:20 40:10
42:24 45:2 83:5
194:15 200:25
**buys** 115:21 117:10
119:7
**bye** 117:23
**byproduct** 127:9

**C**

**C** 3:2 5:16 11:1
229:2,2
**CA** 7:6
**calculate** 43:4
**calculated** 118:23
158:3
**calculating** 158:2
**calculation** 159:21
**California** 29:11
**call** 27:6,8 49:18
71:7,17,18 72:9
72:10,22 93:10,13
139:10 156:21
158:6 168:8
174:18 190:20
**called** 29:12 30:17
31:24 44:6 54:13
94:22 107:6
127:18 143:4
148:19 149:6
152:23 153:7
155:1,8 165:5
170:14 208:20
**calling** 75:24 76:2
76:17 104:9
110:20
**calls** 108:7 165:13

**cancellation** 173:11
173:11
**candid** 14:2
**candidates** 125:19
**candidate's** 125:15
125:17
**candor** 14:3
**capable** 107:5
117:11
**capacity** 37:24 52:7
86:18,19 126:14
139:25
**capital** 33:11 34:23
35:22 38:6,10
39:1,12,15 43:1
44:24 46:23,24
62:9 84:9 192:5
194:4,5
**capitalized** 214:18
**card** 140:19
**cards** 35:3,17
**care** 51:2 54:2
148:5 149:3 161:8
206:24 207:10
**career** 68:22 219:6
**carefully** 74:17
209:19
**Carey** 101:6
**Carlo** 58:4
**CARSON** 4:19
**carve** 81:6
**case** 1:4 13:2 15:7
15:24 16:11 17:4
17:20 18:22 19:7
19:8,10,16 21:19
22:20 23:24 26:1
26:16,20,21 28:24
40:14 42:10,12,24
44:14,15 54:12
60:6 70:8,10,12
70:15,19,21,25
71:3 73:6,25
74:13 79:1,7
86:15 93:23 96:23
107:16,22 112:21
121:5,20 125:11
125:20 127:9

**128:1,9,11 129:9**
129:9,11 130:22
131:4,20,21,25
132:6 133:18
138:14,24,25
146:4 147:3
151:23 156:15,22
158:11,22 160:6
163:25 168:5,16
169:9 170:7
190:16 197:24
202:23 221:19
226:9
**cases** 15:4 19:9
58:11 122:24
124:8 125:6
174:13
**cash** 57:22 58:6
62:2 100:7,12,16
100:19 120:17,20
201:4
**category** 198:5
**cause** 30:8 36:17
106:9,13,16
107:19 182:17
215:3,3
**cautioned** 127:23
**Central** 141:15
**Centre** 4:4 6:4
**certain** 2:9 11:22
26:13 34:13 59:23
63:25 65:6 79:15
86:17,24 87:15
101:13 102:22
106:1,5,17 108:19
128:7
**certainly** 76:22
96:18 131:18
147:5 160:4
**certificates** 19:24
**certification**
135:23
**certify** 229:4
**chain** 84:13
**challenge** 124:3
**challenged** 125:9
**chance** 93:2 137:3

**148:4 224:11**
**chances** 200:21
**change** 17:9 44:1
50:13 56:1,2
62:18 109:9,22,23
113:11 119:23
120:3 161:13
181:21,22 183:19
**changed** 43:13,25
44:5 54:23 73:25
172:22,24,24
178:16,19 181:15
192:5,6 209:16
**changes** 61:2,11
109:5 150:6
181:21 204:4,4,8
**changing** 55:25
184:6
**CHAPMAN** 7:20
**characteristics**
55:15 116:13
**characterization**
70:17 74:21
**characterizations**
23:4
**characterized**
26:14
**charge** 35:3,17
**charged** 35:13
177:23
**Chase** 4:4 6:4
**check** 133:22 189:6
216:9
**checked** 53:13
**Chicago** 7:23
**chief** 121:20 133:18
138:14 139:1
**Chipman** 6:24
104:21,22,23,25
105:3 227:15
**chosen** 74:16
**CHRISTOPHER**
1:23
**chronologically**
33:19
**circuit** 21:10,24
22:20 26:1 127:23

**128:9**
**circumstances**
103:24 106:2
**cited** 123:5,13
128:6,11
**Citibank** 8:3
**Citicorp** 192:14,16
192:24,25
**CitiMortgage**
224:17 225:11,12
226:1,4 228:15
**CitiMortgage's**
226:6
**City** 28:18 111:21
192:13
**Civil** 16:18,20
**claim** 156:21
159:23 160:24
161:2 207:24
**claims** 64:9 144:9
158:6,8,11,11
174:16 188:2
199:1,4
**clarification**
120:12 136:17,23
**clarify** 46:19
198:17 224:21
**clarity** 82:8 136:12
136:21 159:17
**clause** 210:17,17,22
**clauses** 50:13 188:3
**Clayton** 34:9,19
**clean** 135:1
**clear** 24:8 82:4,13
101:14 110:7
114:4,14 127:25
132:16 136:10
147:8 156:17
174:16 180:12
210:23
**clearer** 82:18 180:5
**clearly** 18:14 22:3
25:11 53:16 56:7
71:10 124:8 129:4
129:23 130:19
205:24 206:23
**CLERK** 11:2 27:11

111:16 139:11
163:2 190:23
191:2 225:19
**clever** 188:18
**client** 29:23 38:18
41:8 69:6 81:24
82:10 83:3,5,14
84:18 86:14
**clients** 28:21 31:6
**client's** 13:4
**close** 30:12 132:5
133:17 142:25
150:22 165:5,6
166:15,16 177:11
190:16 191:10
226:9
**closed** 32:11 40:8
222:1 224:2
**closely** 129:1 137:3
**closer** 102:8 132:4
140:10
**closes** 138:23 225:9
225:15
**closing** 64:20
142:24
**closings** 129:11
**CMO** 140:20
**code** 12:10,17
43:18,21 44:5
92:25 119:25
130:7 131:9,12
148:20 149:5
168:15 169:14,18
179:21 180:8
**collateral** 31:7
34:12 51:18 56:18
95:10 177:19
**collect** 56:13 57:24
167:8 202:10
**collecting** 119:18
**collections** 56:16
**college** 28:12
140:15 191:19,22
**Columbia** 171:16
**Columbus** 141:13
141:14
**column** 125:12

**combination**
168:19
**combine** 136:19
**combined** 187:17
**come** 11:4 13:25
21:5 29:3 71:22
72:5,19 99:16
101:5 144:20
159:6 189:4 218:2
**comfort** 50:19
**comfortable** 50:15
50:16,25 51:3
71:10,21,23 72:1
75:3,24 76:16,22
77:7
**coming** 142:7,10
**comment** 94:21
136:1,24
**comments** 122:20
**commercial** 34:11
**committee** 3:17 4:3
23:23 31:15
113:24 114:1
167:10
**common** 61:14
67:15 100:11
219:10
**commonplace**
150:5
**companies** 33:13
57:10 58:12 67:13
86:17,19,22,24
140:2 172:3 188:5
**company** 30:17
33:1,5,19,24 34:2
34:6,9,10,19,21
35:10 46:21,23
47:2,5 52:24
58:17 86:5,7,21
141:25 143:22
150:21 152:3,5
155:4 156:7
161:25 162:2
165:18 172:21,23
**company's** 87:1,6
**comparably** 163:18
**compare** 52:13

59:13
**compares** 125:15
**comparison** 125:7
**compelling** 125:6
128:22
**competent** 91:19
**competitor** 83:15
**complete** 16:22
**completed** 225:20
**completely** 46:14
184:9
**completing** 213:7
**completion** 28:16
106:17
**complex** 52:18
**compliance** 34:14
**compliant** 91:20
**complicated** 58:11
160:9
**compliment** 226:12
**comply** 21:2 61:4
113:14
**component** 12:24
93:10 100:3
119:17
**components** 170:4
**comport** 34:16
**comported** 75:5
**composition** 178:5
**comprehensive**
19:8
**computer** 58:8
119:25 123:19
183:22
**Conaway** 3:3 19:22
118:5,9,13
**concept** 100:10
132:6
**concern** 83:24
149:12 160:23
161:11 176:5
186:11
**concerned** 55:8
**concerning** 15:15
44:21 46:5
**concerns** 27:19
**concluded** 74:1

225:21 226:19
**concludes** 138:14
**conclusion** 23:13
26:10 27:4 108:7
110:21 120:22
132:25 174:19
**concur** 77:16 78:12
**conditional** 166:24
**conditions** 106:5
112:5 128:14
182:15 186:13
**conduct** 128:18
148:17 151:6
**conducted** 24:9,9
124:16 196:17
**conduit** 32:25
**conferences** 44:24
46:8
**confident** 21:22
**Confidential** 2:9
**confidentiality**
133:20,23 137:2
**confirm** 138:17
157:24 213:22
**confirmed** 74:2,6
**conflicted** 107:15
**conform** 60:21
83:9
**conformed** 30:10
60:24
**conformity** 55:12
58:21 83:13
**confusion** 115:1
**Congress** 12:9,21
14:5,6 15:4 43:12
44:5 145:18
**congressional**
12:14
**connection** 11:11
30:22 45:7 53:20
54:6 56:12,16
60:21 98:20
101:16 103:3,7
114:3 117:21
130:25 132:11
136:1 137:14
138:25 146:1

165:22 174:2
177:23 180:14
186:18 187:8
223:22 226:9
**consensually**
134:23
**consent** 95:25 96:5
96:17 105:21,23
105:24
**consequence** 159:9
**conservatively**
197:7 198:7
**consider** 16:16
23:12 25:19,20
44:17 48:20 97:6
113:14 129:8,18
130:14 147:15
204:23
**considerably** 118:3
**consideration** 65:4
65:6 66:6 109:9
109:18
**considerations**
24:22
**considered** 16:25
85:20
**considering** 40:13
**consignment**
213:22
**consistent** 15:23
46:14 83:8 146:20
**constitute** 55:24
**constitutes** 113:6
185:22
**consultant** 37:25
**consulting** 33:12
33:20 35:20 39:16
41:18,20,21
220:13
**consumer** 31:22
35:3,9 191:25
192:2
**consuming** 160:10
**consummated**
145:8
**contact** 116:4
**contacted** 134:19

**contain** 16:22,23
  16:25 79:12,15
  207:2
**contained** 54:21
  55:6 107:17 113:4
  113:7 133:20
  146:7 172:5
**containing** 2:9
  54:18
**contains** 69:19
**contemplated**
  177:14 215:2
**contend** 12:16
**contested** 17:19
  20:23
**context** 27:24 36:9
  43:23 49:13,22
  54:25 58:1,19
  59:15,22,25 68:16
  75:9 80:3 96:21
  96:23 99:24
  104:15 107:14
  112:19 113:16
  115:17 116:6
  117:2,15 119:24
  129:8 130:5
  132:12 146:18
  159:1,7,10 160:13
  160:18 214:23
  216:18
**contexts** 102:22
**continually** 186:25
**continue** 99:2
  119:8 151:10
  164:24 166:19
  186:15
**CONTINUED** 49:8
**continues** 52:22
  163:19
**continuing** 126:21
**contract** 12:10
  13:11,12,14,22
  14:9,11,18,20
  15:25,25 16:2,7,8
  16:12,12,16,16
  39:24 43:17 50:25
  82:11 97:11

129:13,13,16
  136:7 144:11
  145:13,24 146:1
  147:2,23 150:22
  150:25 151:2,21
  161:1 165:22
  169:15,17 170:5
  171:18 179:17
  180:14,21,24
  181:15 182:5,8,13
  183:1 187:16,19
  187:21 188:3,9,14
  189:9 191:15
  193:12 196:14
  202:14,15 205:9
  224:13
**contracting** 109:22
**contracts** 12:20
  15:21,22 16:1,7,9
  19:18 44:6,18
  61:25 73:5 79:7,9
  79:12,15,16 85:19
  94:11 97:21
  101:15 179:19
  180:19 181:24
  218:11,12,16,20
  218:20
**contractual** 181:22
**contrary** 82:16
  181:23
**control** 43:3 142:3
  156:20 192:17
**controversial** 222:3
**cont'd** 228:2
**convenience** 50:5
  82:13,16
**convention** 74:2
**conversation** 74:18
  74:22 75:11 77:4
  118:13
**conversations**
  19:22 118:5,15,20
  168:17,21,23
**convert** 163:18
**convey** 69:1
**conveyance** 212:24
  213:18,23

**coordinating**
  193:11
**copies** 122:24
  222:21,24 223:2,3
  224:18
**copy** 28:5 45:10,16
  45:17 88:13
  123:22 125:11
  154:7 224:12,18
  224:20,20
**core** 13:23 14:2
**Cornell** 28:14
**Corp** 38:6 39:12
  69:4 192:13
**corporate** 35:14
  50:12
**Corporation**
  171:17,25 172:2
**Corporation's** 2:3
**correct** 11:17 25:2
  26:22 29:1 37:21
  37:23 38:3,4,7
  39:11,20,24,25
  40:4,11,14,17,18
  40:20,25 41:1,6
  41:11,12,23 42:11
  42:13,19 43:10
  44:7,15 47:3,22
  56:23 63:5 68:3
  68:15 69:11,12,15
  69:16 70:4,8,10
  70:13,19 71:3
  73:6,7 74:4 76:6
  77:15,23 78:12,21
  78:22 79:8,10,11
  79:14,18,19,25
  80:24 81:8,13,22
  85:16,17,22 86:13
  87:4 88:15,19,22
  88:25 89:18,19,24
  90:3,6 93:15,21
  93:23 94:19 96:1
  96:21,21 97:3,7
  97:16,23 98:2,12
  100:8 101:1
  103:14 104:8
  105:9,13,15 108:5

108:14,22 109:23
  110:10 112:4,15
  112:20 113:13
  117:14 119:14,22
  121:7 135:6,7
  141:25 144:5
  157:4 164:17
  165:6 168:9,12,20
  170:9,15,21,25
  171:1,3,4,7,19
  172:6,13 174:3
  175:1,6,23 176:4
  182:9,10 183:22
  184:7,10,12,15
  186:5,9,10,14
  192:10,11 193:4
  194:2,17,20 196:5
  196:12 209:5,8,9
  209:12 210:24,25
  213:8 215:13,15
  216:15 217:16,19
  217:20 219:4,11
  221:4 222:10
  229:5
**correctly** 38:9
  75:17,18 77:2,18
  78:14 80:17 83:16
  92:18,19 104:4
**correctness** 128:3
**correlate** 87:12
**correspondence**
  33:1
**cost** 56:2 62:21
  63:2,20 64:1,8
  86:12 178:7
**costs** 58:25
**counsel** 23:23 45:9
  66:17 74:19 75:3
  77:5 78:25 89:8
  89:12 123:22
  134:20 141:5
  149:7 150:9
  159:25 162:25
  168:17 171:8
  172:10 179:18
  180:17,23 208:14
  208:19 210:15

211:13 222:20
  226:12
**counsel's** 89:4
  138:17 180:8
**counterparties**
  133:21
**counterparty**
  129:15 198:11
**Countrywide** 6:19
  86:4 105:4 107:2
  107:11,12,17
  108:3,12,19,24
**Countrywide's**
  107:10,13
**couple** 111:21
  187:15 218:8
**coupled** 179:5
**coupon** 55:18
  99:12,21 100:4,7
  119:16
**course** 14:25 24:9
  70:23 121:22
  155:9 159:1
  164:14 165:1
  171:13
**courses** 42:20
**court** 1:2,14 11:3,7
  11:13,21,23,25
  12:2,5,6,12,19
  13:7,20,24,25
  14:1,2,5,11,14,20
  15:3,8,9 17:17,19
  17:22,24 18:19,24
  19:10 20:17,19,25
  21:6,13 22:7,25
  23:17,18 24:3,12
  24:25 25:4 27:17
  28:7,10 35:19
  36:16 37:1,5,8,14
  42:2 43:22 45:11
  45:13,15,24 46:16
  47:12,16,18 48:6
  48:9,14,22,25,25
  49:14 54:5,19
  63:7 66:14,19,24
  68:8 70:16 71:8
  71:12,19 72:4,15

72:19,22 73:8,13
73:17 74:23 76:9
76:13,14 77:10
78:2,16 80:16
81:16 88:5,8,11
89:11 90:14,24
91:2,6,9 92:21
93:4,7 94:16
95:20 96:9 101:4
101:23 102:1,8,10
103:16 104:21
106:11 108:10,15
108:18 109:1
110:17,22 111:4,9
111:11,17 112:9
113:21 114:1,4,8
114:19,22,24
115:2,5 116:9
118:12 120:24
121:1,4,8,11,22
121:24 122:3,9,11
122:16,22,25
123:2,4,8,11,13
123:18,24 126:11
126:18 127:4,9,14
127:25 129:5,8,18
129:21 130:23
132:2 133:1,14,15
134:18,24,25
135:5,9,12,20,25
136:9,11,15,24
137:5,10,13,19
138:15,19,20,21
138:23 139:13,15
140:23,25 141:4
143:13,18 144:23
145:21 146:3,11
146:16,18,23
147:10,14,18,18
147:19 148:8,13
149:18,22 150:16
153:23 157:7,13
158:7 159:6,14,17
159:17,23 160:3
160:11,25 161:5,8
161:12,18 162:19
162:21 163:3,5,21

165:25 167:3,9,14
167:18,20 169:5
171:11,13 174:20
175:3,12 176:20
179:25 180:10
181:3 182:25
183:9 185:7,10,15
185:17 187:5,14
188:22,24 189:1,4
189:12,14,16,18
189:21,25 190:7,9
190:14,16,21
191:3 192:18
197:4 198:24
200:13 204:25
205:8,14 208:1,4
208:6,11,13
209:25 210:4,6,8
213:13,17 216:11
216:14,22 217:3
218:7 219:16
220:2,4,7,10
221:1,7,9,17,22
222:18,23 223:2,3
223:6,10,12,19
224:4,7,14,25
225:2,6,12,15,17
225:23 226:2,8
**courtroom** 25:7
97:19
**Courts** 12:8
**court's** 72:15
147:14 213:16
224:20
**court-approved**
229:4
**covenants** 50:14
**cover** 87:18
**coverage** 87:15
90:5
**covered** 62:21
**create** 23:9 29:14
168:16 180:21
210:23
**created** 29:16 60:1
60:21 66:8 83:19
145:18 187:18

**creation** 82:21
**creators** 50:1
**credentials** 22:22
22:23 128:11
**credit** 30:22 31:15
34:4 35:3,17
39:22 64:5 65:12
93:20 94:4 95:3
140:19 141:15
165:20 178:8
195:3,4 196:4
**creditor** 7:3 86:15
**creditors** 3:17 4:3
81:25 97:20
**crisis** 93:20
**criteria** 21:23
34:13 133:7
**critical** 98:13,15,17
98:18,20,22
131:18 151:10
152:8
**critically** 95:7
**cross** 114:11,11
115:7 118:22
129:4 139:4 167:3
167:4,8,10,10,11
167:14 208:6,7
227:11,12,13,14
227:15,16,17,20
227:21,23,24
**Crosslands** 191:23
191:24 192:9,9,10
**cross-examination**
26:10 66:15 67:4
91:6 92:23 101:9
103:18 104:24
111:18 112:10
113:22 114:6,10
115:14 118:4
120:7 130:13
139:2,5,6 167:23
176:22 208:16
218:9
**cross-examinatio...**
131:2
**cross-examine**
17:12

**Crowley** 4:16 18:19
18:21,25 66:21
101:4,10,11 102:9
103:15 108:16,25
111:2 122:18,18
122:23 123:1,3,7
123:9,12,15 124:1
132:4 227:13
**Crowley's** 126:23
132:18
**crucial** 24:15
**culture** 35:15
**cumbersome**
117:25
**cure** 158:21 159:9
159:24 160:9
212:3
**cured** 212:4
**cures** 159:2,3,8
**current** 29:5 46:25
57:19,20 102:15
104:11 106:6
141:22 146:24
177:2,3 196:11,13
**currently** 46:25
47:2 56:3 67:13
84:17 139:21
173:15 186:8
207:16 221:14
**curriculum** 220:16
**custodial** 195:20
201:21 202:1,2,16
202:18
**custodian** 193:8
**custom** 61:1
**cut** 161:7
**CUTLER** 7:20
**CV** 28:6

**— D —**
**D** 5:7 11:1 227:2
228:2
**daily** 143:25 144:4
144:7
**Dane** 125:14
**Daniel** 6:9 222:5
**data** 16:25 52:12

52:15 127:17
**date** 64:18 138:10
138:12 157:15
190:12 205:5
214:11,14,22
215:4 223:15,17
226:7 229:10
**dated** 69:7 172:13
222:14,15,16
228:13
**Daubert** 19:6,14
20:16 25:23
128:11,15
**David** 6:16 42:3
93:8 122:7 139:9
**day** 24:19 34:7,7,7
34:7 84:6 147:25
148:18,18 160:22
184:25 185:3
**days** 26:24 69:23
165:4 177:5
182:25 183:25
184:12,13 185:21
186:4 211:19,22
211:23
**DB** 2:5 37:12 67:2
69:6 80:1,9
190:19 202:20
**DBSP** 201:24
**DBSP-1** 220:19
**DB-1** 69:2
**DE** 3:8 4:7,23 6:7
6:22 7:16 8:15,23
10:5
**deal** 19:10 26:7
34:16 36:16 51:17
61:1,17 84:7
121:5,14,17 122:4
122:5 166:6,13,19
219:8 224:3
**dealing** 32:13
**deals** 24:23 32:12
34:5 40:16 41:22
49:23 50:8 51:13
80:13 82:7 83:13
84:14 109:16
146:22 156:4

206:23
**debt** 35:3 50:12
**debtor** 1:10 3:4
13:12 60:6,23
80:9 83:4,8 85:21
97:11,15,19 108:4
108:13 110:6
136:5 137:15
138:6 145:3,6,10
154:11,13 155:24
157:22 158:19
213:13 221:19
**debtors** 2:8 13:10
15:7,24 18:12
20:20 23:24 26:18
26:19 27:1,8,8
71:14 74:18 75:3
75:11 77:5,20
78:18,25 110:3
127:6,7,10 128:21
129:9,11,16 130:2
130:4,22 131:25
133:18 134:10,13
136:13,19 137:23
138:4,7,11,17,23
139:1 159:25
167:21 173:16
174:1 175:17
202:22 207:23
208:19 210:3,13
220:14 222:8,20
224:11 228:6,9
**Debtor's** 28:9
171:9 210:5,8
**decade** 18:17
**December** 34:19
**decide** 11:16 16:11
24:16 57:7 112:3
135:15 160:5
175:13 179:14
**decided** 35:16
180:21 221:15
**decides** 63:12
**deciding** 177:21,21
**decision** 23:1 24:12
24:18,20 92:3
138:3 168:18

175:16 178:25
**decisions** 149:11
184:17
**declare** 155:16
**deemed** 51:10
**default** 53:24 56:19
56:19,20,21,21
93:19 152:24
153:3,6 155:1,3
155:21 200:6
220:20
**defaults** 65:12
155:25 156:9
**defendant's** 125:22
125:23,25
**defer** 23:13
**define** 85:6 109:17
112:1,3 116:23
183:16
**defined** 58:6,6
63:25 109:18
113:16 129:25
214:15,16,19
215:5,6 216:8,16
**defining** 102:23
**definitely** 212:20
**definition** 43:16
64:1,6 67:21
179:22 180:13,18
187:16 216:9
**definitions** 214:21
**definitive** 212:11
**definitively** 146:3
**degree** 28:13
**Delaware** 1:3,17
10:4
**delay** 165:8
**Deline** 146:4
**delineated** 22:4
129:23
**delinquency** 164:2
**delinquent** 207:20
**deliver** 103:7
207:12,13
**delivery** 64:18,21
**demand** 21:6
**demanded** 63:3

**demands** 53:3
**denied** 21:20
**DENNIS** 9:21
**deny** 23:11 133:10
**denying** 27:3
**department** 140:9
168:18 191:25
192:2 193:22
**depending** 99:4
118:24 119:2
179:7
**depends** 83:2 107:1
179:3 188:15
**deposed** 87:21
**deposi** 87:24
**deposition** 13:19
15:20 17:14,14,16
18:3 19:15 23:3
25:13 26:3 37:3
42:17 43:11,15
45:5,6 47:23,24
47:25 48:5,15,18
53:15 56:7,8,9
73:11,15 74:9,24
75:7,10,20 76:8
76:19 77:9 78:23
88:4,6,20,23
89:22 91:14 92:10
96:3,11 97:4,13
99:6,10,15 100:1
118:18
**derived** 129:3
**describe** 27:16
28:10 35:1,19
56:10 57:2 73:18
82:25 106:11
109:17 112:1
116:9 118:12
155:11 192:1,18
**described** 49:11,22
92:1 118:18
**describing** 99:6
**description** 112:23
112:25 116:17
228:5,18
**designated** 25:10
101:23

**designation** 27:20
102:4,22
**desire** 60:2,2
**desk** 29:24 31:22
32:3,4,10
**desks** 32:3
**detail** 28:2 51:6
57:5 76:24 91:23
**detailed** 52:10
116:17
**determination**
22:25 53:17 59:8
168:16 199:15
**determine** 24:3
30:4 58:8 97:5
116:13 127:19
146:16 155:20,24
161:25 162:2
177:24 178:3
181:9
**determined** 51:22
133:23 157:15
175:3 182:3
**determines** 178:9
**determining** 24:12
63:12 64:10 91:18
127:24 165:8
178:17
**Deutsch** 9:17
**Deutsche** 9:3,10
21:3 69:3 191:13
191:14,17 195:13
195:15 196:7
197:8,10 198:1
199:11 200:8,22
202:20 203:17
207:1 209:11,24
209:25 210:3
211:14 217:14,18
218:12,13,14
219:1 220:21
221:11
**Deutsche's** 218:20
**develop** 25:13
**developed** 15:22
20:1 36:7 74:12
84:5

**development**
226:12
**dictate** 179:10
184:5
**dictates** 178:23
181:13
**differ** 16:7
**difference** 124:24
166:11
**differences** 16:11
58:23
**different** 15:11
24:14,21,23 41:18
52:17 54:14 61:21
61:22 63:23 73:15
79:12,16 83:9,13
83:25 166:4
178:19,19 182:22
185:6 204:18
**differently** 45:4
**difficult** 17:12
72:17 76:11,13
186:25
**difficulties** 161:19
**digression** 160:21
**diligence** 193:11
**diminish** 93:13,14
**diminished** 27:23
54:24 70:2
**DINE** 8:7
**dire** 36:20 37:1,15
42:1,4 47:19
131:3 227:7,8,9
**direct** 27:14 46:20
49:8 85:13 118:22
131:2 139:2,19
163:13 167:2
168:2 173:25
191:6 208:19
219:20 227:6,10
227:19,22
**directed** 123:16
**Directing** 2:8
**direction** 157:19
**directional** 186:22
**directly** 39:19
152:18 209:10

**director** 31:2,23
140:4 191:15
196:14
**directors** 44:25
46:9
**disadvantage** 83:14
**disadvantages** 25:6
**disagree** 23:3
216:20 217:9,11
**disagreeing** 74:8
75:19
**disallow** 132:8
**discern** 63:17 66:4
**discipline** 127:20
**discount** 58:7,10
**discovery** 21:3
101:22 211:24
**discretion** 30:4,6
**discuss** 19:10 28:2
66:16 121:8
162:25 208:14
224:14
**discussed** 51:25
75:21 78:22 80:2
150:8
**discussing** 76:23
**discussion** 49:17
58:2 63:9 65:21
150:2 159:18
162:19 177:8
189:19
**discussions** 44:20
44:20 45:21 46:4
46:4,11,12 125:24
169:20 177:7
**disrespect** 15:2
**disruption** 109:5
**dissuaded** 74:1
**distinct** 21:25 22:2
72:23 82:13,19
83:17 129:22
**distinction** 68:4,12
**distressed** 35:3,6
40:3
**DISTRICT** 1:3
**districts** 125:18
**divide** 67:14

**division** 35:11
175:1
**DLJ** 194:4,5,9,23
195:1,2 196:2
197:6
**document** 17:3
29:17 38:25 54:9
54:18 65:1 66:9
80:5 82:14,19
83:22 93:12 109:7
109:7 113:7
135:17 136:8
145:2 146:7,8
150:18 168:3
172:6 173:3,4
182:12,19 187:22
192:17 200:21
201:9 204:5,5
209:19,23 211:13
214:1 215:5
222:13 224:22
225:6,12,24
**documentary**
225:22
**documentation**
38:24 117:24
159:20 182:13
**documents** 16:9
28:25 29:5 30:3
30:10 32:14 36:8
37:24 49:20 52:23
53:20 54:5,8
59:25 64:15 70:10
73:24 74:3,5,5,14
74:15 77:21 78:19
79:18 83:1,25
97:24 101:21,25
102:17,19 105:14
106:14 113:17
121:19 133:18
134:24 135:3,19
147:23 150:11
168:19 174:25
191:5 194:14
195:21 199:22
215:2 220:9,10
222:11 223:23

224:5 225:9 226:8
**Dodge** 6:18 105:4
**doing** 27:5 35:18
69:22 83:3 111:1
**dollar** 55:5 60:24
144:16 157:16
158:2,3 164:20
**dollars** 20:3,10
33:9,10 38:11,15
39:9 53:1 57:6,23
60:25 81:22 82:1
82:12 83:4 84:20
86:16,23 127:13
141:16 159:8
174:8 176:4
**Dorsey** 3:13 7:12
11:6,7,8 27:6,7,7
27:15 28:4,8
36:11,21 43:19
45:22,25 46:13
47:16,17 48:7,23
48:24 49:7,9 63:6
66:13 71:19,20
72:1 73:21 74:21
76:7 77:24 89:7,9
89:15 90:8 95:18
101:20,23,24
108:7,23 110:20
113:23,24 114:13
114:18,24,25
115:3,10,12 120:5
120:23,25 121:4,7
121:10 149:14
150:10 157:6,8
167:6,10,17,21,21
167:24 169:3
171:12 176:19
190:2 208:9,12,17
208:18 209:2
210:2,5 213:13,14
213:16 216:11,13
216:15 217:2,3
218:5 222:10,19
223:4,8,11,18
224:21 225:3,4,25
227:6,10,18,20,23
**Dorsey's** 114:9

**downgrade** 135:7
166:22 174:6,11
**draft** 110:2
**drafted** 28:20
94:11,16 188:14
215:2
**drafting** 30:3
218:11
**drafts** 168:18
**dramatically** 62:18
**draw** 211:17
**drawing** 19:18
**DREBSKY** 9:21
**Drew** 101:6
**dries** 178:14
**driven** 152:18
182:14
**driving** 178:17
**drove** 149:10,11
**due** 155:6,7 158:6
193:11
**duly** 27:10 190:22
**duties** 148:17,24
162:14 191:17
192:1 196:25
197:2
**dynamics** 55:17
**D.C** 6:14

**E**

**E** 1:22,22 3:2,2
11:1,1 227:2,4
228:2,4 229:2
**earlier** 28:25 91:22
103:22 108:20
110:7 115:1 156:2
158:7 211:23
**early** 29:7 33:22
155:1,3,21,25
156:9 208:25
209:5
**easier** 82:18 83:20
112:22 140:14
163:14 190:5
**easily** 72:5 184:2
**easy** 65:23
**economic** 24:22

129:19 166:15,19
182:8 183:3
**economically** 22:2
22:4 129:22,24
130:3,9
**economics** 28:13
130:3 140:6
182:11,14,14
**economies** 86:10
**EDGAR** 133:25
**educating** 182:25
**educational** 28:10
140:5
**Edwards** 6:18
105:3
**effect** 19:2,2 26:4
124:13 125:14
144:10 162:10,14
163:8 182:18
201:19
**effected** 106:16
**effective** 215:4
**efficiency** 11:22
23:10 39:6 82:7
**efficiency's** 84:25
**efficient** 60:3 82:23
84:1
**efficiently** 86:12
**efforts** 163:15
193:11 212:3
**eight** 37:20 99:12
99:21 100:4,6
**eighteen** 35:16
**eighths** 119:1
**either** 23:11 31:13
37:19,22 38:1
65:23 80:22
118:25 140:13
158:23 159:5
165:1 177:25
211:23
**elaborate** 122:20
**elaboration** 146:21
147:1
**election** 125:18
**elections** 123:21
126:2

electronic 116:22
229:5
element 65:14
eliminate 79:24
81:12
else's 105:23
embedded 31:6
EMC 2:2 5:12 6:12
14:18 42:3 93:8
96:25 97:2,11,15
121:11 122:8
131:8 137:2,15,21
139:9,22 141:19
141:23 142:1,2,19
143:2 144:13
145:3,7,15 147:6
147:8 150:21
152:2 155:7,8
157:4 158:6 162:1
162:5,11,15 163:9
163:22 164:10,19
164:19,22,23
165:11 166:5
171:17,19,21,24
171:25 172:2,15
172:20,21 173:1,3
173:4,14 174:12
175:1,3,4 176:3
176:25 177:21,23
178:3 179:19
180:21,22 181:3
181:23 182:9,25
184:24 185:20
186:7,18 187:4,8
189:1,23 207:24
EMCs 220:24
EMC's 14:20 138:1
147:1 163:11
175:18 178:22,25
181:5 190:11,16
228:11
EMC-1 143:13,14
143:16 144:13
154:21
emerged 53:24
employed 31:20
139:21,25 171:23

191:12
employee 41:10
171:19,21 195:4
employees 86:3
enable 29:17
encumbered
205:25
enforce 144:10
enforceable 108:5
108:14
engage 34:3 35:12
50:10,12 56:17
58:3 61:10
engaged 31:21
35:14 38:10,19
41:17 54:2,4 60:7
60:9
engagement 19:23
48:3
engagements 33:21
41:2
enhancement
30:22
enjoy 113:12
enjoyed 35:14,15
ensure 142:6,10,14
enter 80:22 82:11
146:16 198:1
199:11 224:10
entered 2:9 79:24
97:21 169:23
170:1,14,16,23
173:16 220:12,13
220:18
entering 146:20
185:23,25
entire 155:14
169:12,13 172:7
206:21 216:25
entirely 73:7
146:13
entirety 54:1
entities 107:4
199:12,16 200:16
201:9 216:16
entitle 106:11
entitled 203:3

211:4
entity 53:14 67:18
67:19,21 68:6,17
102:23 198:8
199:16 201:16,17
205:22,24 206:1,1
environment 57:13
envisioned 131:20
EPD 64:9 65:14
158:11,21 159:7
188:2 198:18
199:1 207:24
EPDs 65:8,8,21
156:11 157:15
159:18 201:13
equally 126:24
equation 22:16
182:6 183:3
equity 32:24 34:21
44:25 46:9,24
Eric 7:18 126:13
136:3
ERLICH 4:17
error 135:18
212:17 214:1
errors 210:13
especially 181:25
ESQ 3:10,11,13,14
3:21,22 4:9,16,17
4:25 5:7,8,9,16,17
5:18,19 6:9,16,24
7:8,9,18 8:7,17,25
9:7,14,21 10:7,14
essence 33:2 125:3
187:19
essentially 30:2
48:20 69:17 196:1
establish 48:11
193:7
established 54:2
149:16
estate 158:24
223:21
estimate 197:4,9
198:4
etcetera 158:13
186:17

event 12:24,24 23:8
23:11 53:13,24
56:19 62:25 66:10
153:6 156:8
166:18,21 175:22
200:6,19 226:17
events 152:23
153:3 186:16
everybody 96:12
100:2 178:13
everyone's 104:9
122:6
EVID 228:5
evidence 2:10
12:18 20:5 49:1
89:11 121:15
126:17 128:13
130:16,16 132:7
133:19 134:5,6,7
134:9,15 137:7
138:3,9,12,24,25
145:22 146:1,5,9
148:10 160:23
166:22 189:1,3,5
189:7,10 190:12
190:14 204:15,23
205:5 211:14
220:8 221:23
222:1,8,24 223:15
223:17 224:10
226:7
evidenced 145:4
evidentiary 128:2
225:10 226:9,13
226:15,16
evolved 50:14
51:20 52:21 84:16
exact 117:12
exactly 52:2 100:14
209:20
exam 131:2
examination 27:14
37:15 42:4 47:19
49:8 115:11
139:19 167:3
191:6 208:20
219:17 227:5

examine 148:5
167:15
example 40:23,23
60:22 93:20,25
99:9,11,13 124:13
163:20,22 202:14
excellent 226:12
exceptions 63:25
excess 41:7 197:11
exchange 65:5
127:12
exclude 23:8
excluded 25:24
26:15 135:20,21
136:6
excluding 26:5
134:8,16
exclusively 158:24
excuse 45:22 49:1
131:23 156:25
181:10 210:22
212:6 216:5 217:5
execute 152:17
executed 211:10
212:13,15 213:6
execution 211:9
exercise 151:20
exhibit 28:9 54:9
135:17 136:4,17
136:18,18,19,19
136:20,22 137:15
137:21 138:1
143:11,12,19
144:12,20,20,24
144:24,25 145:1,4
145:6,9,12 152:19
152:23 154:3,6
157:1,1,11,13,15,17
163:11 168:3
171:9 173:1,6
189:11 201:24,24
209:11,24 210:3,4
210:5,9 211:14
213:6,10,10,13,14
213:18 220:13,15
220:16,17,20,20
220:21,23,23,24

220:24 223:14,16
224:1,12 225:5
226:1,6
**exhibits** 2:8 121:6
121:13 122:4
134:10,13,14
135:13 136:2,13
137:23 138:4,7,11
145:12 189:6
190:11 220:12,18
221:3,10 222:20
**exist** 48:4 52:23
70:20 102:14
226:3
**exists** 34:9 170:18
**exit** 152:18
**expand** 108:2
**expect** 25:16
217:22
**expected** 156:23
**expecting** 142:11
142:15
**experience** 13:20
19:12,19 22:21
36:3 39:17,18
42:23 49:3 58:14
65:1 67:8 73:23
82:10 102:13
103:13,22 105:7
105:16,25 124:3
127:20,21 128:10
132:11 140:7,8,15
165:14 178:15
**experienced** 93:20
**expert** 2:4,5 11:9
14:23 15:3,19
16:17,21 17:1,2,6
17:9,11,13,18
18:16 19:11 21:4
21:8,12 22:19
23:25 24:11,16,23
25:3 26:2 27:18
36:12,22 42:9,12
43:24 49:4,6
75:13 76:21,25
80:15 101:25
105:7,9,11,12

124:2,2,5,9,9
125:9,10,22,23,25
127:15,24 128:7
128:24 131:1,3,12
131:18 132:8,9
133:2 146:15
228:21
**expertise** 19:12
124:4,10
**experts** 16:23
125:8,8
**expert's** 25:8 128:4
**explain** 54:19
144:23 146:18
156:12,13 157:13
158:8 163:20
**explained** 187:5
**explaining** 80:16
**explore** 43:23
**expressed** 20:6
77:16 78:13
**extent** 21:12 52:22
55:16 61:18 62:15
64:4,5,21 87:9
97:2 109:8 138:1
138:18 143:21
149:20 150:17
152:2 155:11
161:16 162:4
189:23 221:9
**extra** 11:18 123:4
**extremely** 11:20
84:22 125:6
206:25
**eye** 97:24
**eyes** 12:7
**e-mail** 220:23
**E.C** 8:25

——————
**F**
**F** 1:22 5:8 229:2
**face** 172:11
**facilities** 52:4 90:1
91:13,15
**fact** 13:8,23 14:14
14:17 43:12 44:4
52:16 53:19 55:6

64:25 68:18 70:2
77:14 78:11 79:9
79:15 83:21 85:2
87:17 93:17 94:20
129:12 144:13
145:6 155:20
178:13 179:18
180:17 181:15
182:5 187:22
188:1 197:23
200:6 213:22
214:22 217:25
**factor** 98:16 99:2,4
99:5 129:7,18
179:8
**factors** 179:4
**facts** 26:20 89:11
106:4 173:23
**factual** 25:10,18
127:17 132:10,10
132:22 133:4
**failed** 155:12
**failure** 25:25 53:23
215:24 216:1
**fair** 18:1 36:2 90:24
103:11 111:24
158:19 161:12
**fairly** 25:9,11 26:14
109:20 184:1,2
**fairness** 15:1
147:16 159:16
**fall** 182:8 198:5
**Fallon** 111:5,11,17
111:19,20 112:8
136:15,16 224:8,9
224:16,23 225:1
225:11 227:16
**Fallon's** 225:24
**falls** 182:6
**familiar** 13:18,21
13:22 21:15 23:21
36:2,5 43:12 44:8
44:9 48:2 68:18
106:8 107:10,12
107:13 116:6,7
126:2 143:8,19
148:19 155:3

177:11 198:18,20
201:20,23
**familiarity** 19:6
126:4
**Fan** 50:17
**Fannie** 18:8,9,12
18:15 19:3 20:7
22:6 27:20 29:8
44:8,9 47:21,25
48:12 49:13,16
53:21 72:3,11,24
75:16 87:22,25
88:13,16,20 89:25
90:4,18,21 91:5
91:12,15,21,25
101:14 102:2,7,12
102:14,18 103:4
103:12 123:16
125:1 126:25
130:4 166:24
207:2,12,13,14,17
**Fannie/Freddie**
51:2 90:22 92:11
92:15 206:22
**Fanny/Freddie**
206:18
**far** 28:24 53:6 55:8
91:18 95:6 130:18
146:14 149:12
154:14 186:23
**FARELL** 4:9
**Fargo** 7:21 103:21
**farther** 51:12
**fashion** 29:3 82:24
**fast** 158:17
**fastest** 26:6
**favor** 115:8 139:6
167:5 175:3 208:7
**FC** 33:11 35:22
38:6,10 39:1,12
39:15 43:1 44:24
46:23,24
**FCC** 52:9
**FDIC** 35:7
**Feb** 193:16
**February** 172:13
193:17

**federal** 9:4 16:18
51:10 117:20
129:17 184:4
**fee** 62:21 63:3,24
63:24 64:8 100:6
106:19 118:23
119:5,20 120:8,14
120:21 177:12,16
177:23 203:2,4
**feed** 119:8
**feel** 11:22 13:9
52:15 72:1
**feels** 71:21,22
**fees** 158:12 177:7
177:18
**fellow** 139:3
**felt** 43:3 48:2 50:25
**field** 42:14 128:7,8
**fields** 116:23 131:4
**fifteen** 35:16 67:15
150:3
**fifth** 215:23
**fifty** 64:8 99:21
100:5,7 119:1
**Figueroa** 7:4
**figure** 188:18
**file** 2:8 18:20
133:19 134:20
135:13 136:6
137:11,13,19
156:21 189:15,15
213:2
**filed** 2:6,10 18:21
135:22 138:4
**files** 183:20 212:25
**filing** 12:23 25:3,5
131:19 189:16
**filled** 101:8
**final** 18:1 110:1
165:6 211:9,10
**finally** 30:12 56:18
215:9
**finance** 31:24
32:17 33:13
191:15 196:14
**financial** 22:8
30:17,18,22,25

31:7 50:13 51:19
52:5,25 87:6,11
87:11 91:16 130:8
150:4 201:16
206:23
**financing** 32:20
**find** 80:7 88:4
102:19 132:3
153:12 157:9
176:14
**finding** 150:23
213:16
**findings** 17:3
**fine** 12:2 37:10
114:14,18,20
115:5 121:17
122:16,22 135:25
147:7 165:21
182:18 183:8
184:21 190:4,7
205:10 224:6,16
**finished** 121:20
167:2 185:12
225:22
**firm** 14:25 31:21
33:12 35:2,8,20
107:2 151:11
168:18 170:2
203:17 209:17
**firms** 29:16 58:3
83:15 149:12,17
149:21 150:1
**first** 11:8,11,21
12:8 13:6 17:14
20:21 27:19 28:16
28:17 30:21 34:2
36:17,18 47:14
49:12,23 50:4
64:17 65:17 77:4
102:14 123:15
125:9,15,16,20,21
126:6 130:25
131:8 139:4
140:17,19,20
141:19 151:19
153:11 154:18
155:5,6,13 157:17

158:6 163:14
171:18 195:3,14
199:15 207:9
210:17,17 213:21
222:13
**fit** 21:11,18 25:25
26:16
**Fitch** 166:12
**five** 36:3 40:2,6
41:18 111:7,13
133:11 162:21,24
167:16
**fix** 162:22
**fixated** 127:10
**fixed** 31:24 34:9
50:3 64:1 177:10
**fixing** 30:23
**flexibility** 35:24
**flip** 113:8
**Floor** 1:16 3:7 6:5
6:21 7:5
**flow** 57:22 58:6
62:2 100:7,12,16
100:19 120:17,20
201:4
**fluctuation** 186:12
**flunks** 19:5 124:6
**flush** 163:10
**flying** 167:7
**focus** 131:14
161:13 217:12
**focused** 60:4
132:24 217:1
**focuses** 93:18
**focusing** 131:14
**folks** 99:10
**follow** 164:9 176:7
**followed** 73:19
180:10
**following** 45:20
141:14 153:10
191:21
**food** 84:13
**foreclose** 56:20
163:18 164:8,13
**foreclosed** 164:15
**foreclosure** 163:21

163:25 164:1,3,5
**foregoing** 229:5
**foremost** 13:6
207:9
**forerunners** 29:4
**forget** 205:14
**forgive** 203:15
**forgot** 148:9
205:13
**form** 29:10,12,13
29:17 39:2,4
73:21 97:18
110:18 116:3
143:21,25 144:2,7
145:15 154:13
180:21 181:24
219:1
**formally** 20:4
42:22
**formats** 143:24
**formed** 34:2 40:18
40:22 70:6 172:15
172:22
**forming** 35:22
73:19
**formula** 58:7
**formulate** 19:20
**formulated** 70:13
70:18,24 73:4,22
74:4 79:5,17
**forth** 26:1 122:13
**fortunate** 29:23
**forty** 41:5,7
**forward** 17:10
18:13 120:2
140:15 190:17
**forwarded** 204:5
**found** 81:4 130:20
132:1 210:13
**foundation** 148:3
148:13 149:20,23
**founded** 32:25
172:23
**four** 40:2,6 91:14
127:10 133:10
**frame** 11:24 58:9
58:10 65:15

152:10 156:23,24
**framework** 64:16
82:22
**FRANKLIN** 7:25
**frankly** 72:16
126:7 132:3,9
147:20 153:20
205:2
**FRED** 7:9
**Freddie** 18:8,10,15
22:6 29:9 48:12
48:15 49:13 53:8
72:3,12,24 87:23
88:2,24 90:21
130:4 207:3,13,14
207:15,18
**Freddie/Fannie**
18:5
**free** 111:23 112:5
174:16
**freely** 62:9 109:22
129:25
**frequent** 44:23
46:8
**frequently** 45:1
**fresh** 122:6 221:24
**Friday** 17:14
**front** 11:25 38:21
38:24 45:14,17
60:5 63:17 143:16
152:20,24 157:11
171:10,14 173:1
186:21 210:10
211:2 213:11
215:10
**FSA** 30:21 31:17
31:18,19 42:18
**FTP** 101:22
**fulfilled** 54:15
**fulfilling** 162:8
**full** 33:20 35:21
41:1,2,4 153:6,11
164:20
**fully** 55:17 165:19
184:14
**function** 14:9,12
23:6 25:16 29:25

30:2 64:17,20
162:5
**functioned** 106:14
**functions** 31:10
61:19,21 64:16,25
67:14,15 85:24
95:7
**Fund** 8:11
**fundamental** 61:17
94:22 95:3
**fundamentally**
115:9
**funding** 8:20
103:21 140:21
149:12 155:14
**funds** 178:6 202:11
**further** 26:11
41:25 47:12 66:13
76:19 77:1 103:15
111:3 112:8
113:19,21 121:8
126:19 138:5
146:20 147:1
176:19 189:1
190:14 208:3
218:6 220:1 221:2
221:17 225:8

### G

**G** 8:17 11:1 228:17
**Gallegos** 203:16
**Gallo** 9:7 15:9,10
17:21 18:1,19
37:1,2,11,11,16
41:25 47:13,13,20
48:11,21 66:20
67:1,2,5 68:8,11
70:17 71:6,11,13
71:24 72:9,14,18
72:20,25 73:2,3
73:11,14 77:11
80:12 81:17,18
85:10 86:2,6 88:3
88:9 89:9,13
90:15,16 91:1,4,8
91:11 92:20
120:22 126:18,20

190:17,18,18
191:7 200:14
204:19 205:12
207:22 208:2,5
212:14 216:21,23
219:18 220:1,4,5
220:9,11 221:3,8
227:7,9,11,22,25
**Gallo's** 86:2
**gamut** 107:1
**gap** 50:3
**Garnett** 34:23 35:2
35:8,10 40:1,12
40:23 41:1,16
**gatekeeper** 21:11
21:13 23:6 25:15
**gather** 208:10
**Geddes** 10:2
223:21
**general** 14:22 70:5
70:22 85:7 108:24
112:22 124:10
126:3 144:25
151:17 165:1
**generally** 19:11
56:12 57:12,14
59:4,4 64:8 86:10
99:7 102:3 113:6
113:9 118:12,17
119:22 126:1
129:16 143:24
151:19,20 187:12
**gentleman** 146:21
222:2
**getting** 41:8 52:19
54:6 65:3,17 82:7
84:6 98:18,23,23
98:25 120:14
159:12 166:14
200:21
**give** 16:15 17:1
19:20 20:25 51:22
74:20 77:22 78:19
86:1 89:5,16
93:23 96:17 97:14
101:16 102:6,12
103:3 140:14

150:12 173:23
212:11 223:9
**given** 16:10,12
18:11 36:2 45:4
45:20 52:16 53:3
63:17 77:15 78:11
108:1 150:13
167:7 186:13
**giving** 35:24 43:20
47:24 70:14 75:3
77:7,22 78:20
79:2 90:9 132:1
132:23 150:10,15
183:24 223:6
**GLANTZ** 4:9
**global** 22:17 129:5
**GMAC** 8:20
112:13 221:14
**go** 13:11 29:22,25
30:16 31:19 32:23
34:22 47:15 53:5
58:23 59:1 68:10
86:2 92:22 94:15
94:19 111:7
118:21 124:11
128:12 133:22
140:13 145:12
149:7 152:22
158:9 161:14
184:17 190:17
191:5,18 192:12
193:1 194:3
198:23 202:8
222:1
**goal** 112:14
**goes** 12:4 57:4
63:11 69:16 91:22
125:18 130:14
131:10,13 142:25
152:4 186:23,25
193:10
**going** 11:19 12:8
15:3 16:15 17:10
17:16 18:2,6,23
19:20 20:8,14
23:7,10 24:19
25:8,9,14,21 26:9

27:1,2 29:10
40:25 43:20,24
59:24 63:12,20
69:2 72:7,15 77:1
82:10,11 83:12
84:19,21 89:16
93:10 99:16 105:5
111:12 113:3
114:11 115:5,7
116:14 118:1,6,10
122:8,9,11 130:23
131:7 132:5,7
133:10 137:16,19
139:16 144:19
145:19,23 146:15
146:18,23,24,25
147:9,14,19,24
148:14 151:13
152:10 158:17,18
158:21,23 159:19
160:8 161:3,9
162:23 165:4,8,9
165:12,20 167:9
167:10,11,14
174:22 175:9,9,13
178:24 179:10
182:11,17,18,19
182:20,21 184:3
187:2,16 192:5
201:1,3 204:14,25
207:12 210:2
211:21 217:5,5,21
217:25 221:14,22
221:23 223:25
225:14
**Golden** 139:10,12
139:14,16,21
143:16,19 148:16
149:25 157:1
161:24 163:7
167:1,25 171:9
176:24 188:24
227:19,20,21
**good** 11:3,4,7,8
20:18,19 27:16
35:17 37:17,18
42:6,7 56:6 65:14

67:6,7 89:16 91:6
101:11 103:17,20
104:23 105:1
111:20 112:12
117:22 122:7
126:7,10 127:5
128:4 158:9
167:25 168:1
191:8,9 208:18
**gotten** 26:17
**govern** 81:21
**governed** 146:2
**grab** 37:3
**graduate** 191:19
**graduated** 28:12
**graduation** 191:22
192:3
**grant** 122:9 132:18
**granted** 17:13
**granting** 132:19
**great** 50:19 135:5
**greater** 59:11,15
91:22
**GREENBERG**
8:10
**Greenwich** 220:25
**grey** 36:6
**ground** 105:4
**grounds** 128:3
**group** 15:25 31:3
32:11,12 95:13
99:10,20 141:16
142:3,8 144:10
191:15,16 192:17
192:19 195:22,23
195:23 196:14,17
196:18
**groups** 144:8
**grown** 51:21 52:22
**guarantee** 51:9,13
51:14 222:6
**guaranteed** 51:11
**guaranties** 30:22
**guarantor** 62:16
65:2 66:9 109:14
**guaranty** 30:17
**guess** 43:4 83:1

104:8 137:8,17
156:24 160:21
173:13 182:17
188:15
**guidance** 51:14
92:2
**guide** 44:10 88:16
88:20,24 144:25
206:23
**guidelines** 47:21,25
48:13,16 50:2,17
50:22 51:1,2
87:22,23 88:1,2
89:1,5,14,17,20
89:25 90:4 91:12
92:11,16 183:24
**guides** 29:10 50:20
**Gun** 122:25 123:2
**guy** 126:4
**guys** 114:9
**G-O-L-D-E-N**
139:14

**H**

**H** 7:25 27:13 228:4
**HADLEY** 7:2
**Hahn** 3:16 23:23
**hair** 36:6
**half** 33:10 53:21,25
99:12,21 100:4
141:21 177:11
**hand** 19:9 45:15
122:24 123:20
224:20
**handful** 38:23
**handheld** 78:4
**handing** 191:4
**handle** 30:9 86:9
86:17,19,22
**handled** 64:25 85:2
**happen** 25:16
62:12 117:15
202:16,23 220:7
**happened** 96:18,19
**happens** 67:12
113:10 119:5
142:22 156:15

**happier** 11:5
**happy** 71:13
  138:19 149:19
  204:19 224:11
**harbor** 145:18
  148:19 149:8,8
  150:1,19 151:2
  169:13,17 179:20
  180:22,23 182:6
  187:19,23 188:9
**harbored** 182:8
  183:2
**hard** 11:15 76:15
  173:22 207:20
**hardship** 201:16
**head** 20:22 137:22
**health** 130:8
**hear** 11:10,13,18
  11:21,23 18:23
  21:17 22:15 23:1
  23:5,7,10,14
  24:24 25:12,20
  26:9,11 27:3 38:9
  104:7 139:4 167:4
  191:11 206:17
  208:7
**heard** 11:16 12:19
  18:22 21:16,21
  23:2,15 26:3,23
  26:23 36:15,17
  90:16 104:4
  130:15,17 139:18
  165:3 194:16,19
**hearing** 19:21
  21:16 53:20
  105:12 113:22
  114:15 115:8
  126:15 131:17
  136:21 146:13
  158:20 167:4
  208:7 221:19
**hearings** 165:4
  226:15,16
**heart** 12:5,25
**heat** 84:6
**hedge** 57:10 186:21
  186:24 187:8

**hedged** 32:10
  186:18 187:4,8
**hedges** 186:22
**held** 19:11 32:13
  202:6,7,8
**hello** 117:22,23
**HELOCS** 134:17
**help** 11:24 13:25
  14:11 15:3 31:21
  35:9 50:2 146:15
  161:25 162:2
  171:11 193:7
  224:3
**helpful** 132:1,15,22
  159:22
**Hercules** 4:21
**Hessen** 3:16 23:23
**Hi** 105:2
**high** 127:24 129:11
  177:20 185:5
**higher** 63:4 64:1,7
  64:7
**highest** 164:14
**highlight** 160:20
**highly** 176:14
**hired** 193:6
**historical** 49:21
**history** 191:18
**hit** 20:21
**hoed** 105:5
**hold** 26:9 27:2
  115:6 146:24
  168:20 202:12
  207:16
**holder** 85:4
**holding** 186:8
**Holdings** 1:8 2:11
**holds** 202:4
**home** 1:8 2:10 20:1
  41:13 44:25 46:5
  46:9 69:4,5 84:21
  85:15,18 95:13,25
  143:1 144:14
  149:7 151:15
  152:4 155:9
  157:22 164:19
  166:7,14 173:18

**188:**5 193:7
  194:10 202:14
  203:8,11,14 204:6
**HON** 1:23
**honest** 44:10 48:18
  211:8
**Honor** 11:6,8,9,10
  11:19 12:3,7,20
  13:3,7,13,16,17
  14:4,8,21,22 15:6
  15:10,14,18 16:4
  16:10,11,17 17:21
  18:1,2,18,21,22
  19:1,6,24 20:4,18
  20:21,22,24 21:3
  21:7,9,11,15,22
  22:14,18 23:4,6,8
  23:10,22,23,25
  24:6,8,15,16,18
  24:24 27:7 28:4,5
  28:9 36:11,14,21
  37:2,13 41:25
  42:3 43:19 45:10
  45:12,14,22 46:13
  47:11,13 48:8,11
  48:21,24 49:7
  63:6 66:13,23
  67:1 70:14 71:5,7
  71:11,13,21 72:18
  72:21 73:12 74:22
  76:11 77:24 80:12
  81:15,18 88:3,9
  89:7 90:8,18 91:8
  92:20 93:6 95:18
  96:8 101:3,8,20
  101:24 102:9
  103:15,17 104:23
  108:8,17,23
  110:21 111:2,6
  113:25 114:7,17
  114:18,21,25
  115:10 120:6,22
  120:25 121:7,10
  121:17 122:7,19
  122:19,24 123:15
  124:1 125:24
  126:9,13,20 127:3

**127:**5,6,14,16,21
  128:6,12,21,23
  129:7,16 130:12
  130:14,17,19,20
  133:17 135:2,16
  136:3,16 137:1,7
  138:13,16 139:9
  143:14 145:19,22
  146:10 147:7,12
  148:1,4 149:14,19
  150:10,13 157:6,8
  158:18,23 159:4
  159:15 160:7,16
  160:20 161:10
  163:4 165:12,16
  167:6,12,17,22
  169:1,4 174:18
  176:19,21 179:24
  180:7 183:6,7
  185:14 187:2,13
  187:15 188:21,23
  189:2,2,13,20
  190:3,5,8,13,15
  190:18 200:11,14
  204:14,19,21,23
  205:6,10,12
  207:22 208:2,9
  210:2 216:13,21
  217:2 218:5,6,8
  219:14 220:1,3,5
  221:8,13,20 222:5
  222:10,19 223:5
  223:18,20,24
  224:3,6,9,16,21
  225:16,20 226:1
**Honor's** 11:25
**hope** 185:14
**hopefully** 112:13
**hoping** 103:24
**horse** 17:25
**hot** 84:8
**hour** 41:5,7 121:12
**house** 86:3
**huddle** 225:14,21
**huge** 206:23
**humanly** 152:11
**hundred** 60:24,24

**127:**11 197:11
**hundreds** 38:19,21
  38:25 60:9 61:22
  81:21 83:5,9
  84:19 183:21
**Huntington** 140:22
  141:11,12
**hypothesis** 74:11
  74:12
**hypothetical** 80:11
  80:19 86:1 103:23
  104:16 109:2
  110:1
**hypothetically**
  80:19 81:10
  107:18
**hypotheticals**
  105:6

_____

**I**

**ID** 228:5
**idea** 14:15 17:16
  85:18,21 89:16
  173:17
**identical** 16:8
  79:10,11
**identification** 28:8
  223:5
**identify** 23:19 93:5
  154:6
**identifying** 113:2
**identity** 83:13
**IHM** 21:19
**III** 7:25
**IL** 7:23
**imagine** 88:15
  139:3
**imbedded** 218:24
**immediately** 12:21
  35:22 117:14
  151:14 191:21
**impact** 86:8 87:3,7
**impair** 60:15,16,17
**impermissible**
  130:6 146:9
**importance** 53:12
  53:17 206:18

**important** 11:20
12:6 15:4 16:18
17:2,6,10 39:6
43:3 51:5 52:7
53:11 59:18,20
61:6,8,13 62:3,6
64:16,20,25 82:6
85:24 87:9,11,14
94:21 95:8 100:25
102:23 127:6
131:14 151:5
152:2,5 162:5,8
164:10,13 200:8
201:11 205:18,19
205:21 207:5
**impossible** 110:25
186:24
**inadmissible** 146:1
**include** 65:21
107:3 109:13
179:22 180:14
197:12
**included** 12:23
32:3 53:22 54:11
64:10 81:2 107:24
135:17,18 136:7
138:1 159:24
160:1 169:23
180:18 192:3
195:18 204:17
215:5
**includes** 12:10 20:6
158:12
**including** 26:10,20
33:13 34:15 41:17
83:21 86:22
130:16 152:12
197:12 204:18
211:6 216:2
**income** 31:24 34:9
50:3
**inconsistency**
212:20 214:2
**inconsistent** 74:15
80:4,6 146:13
**incorporated** 16:19
171:17

**incorporating**
50:20
**incorrectly** 123:13
**increase** 57:12 63:2
**Ind** 2:5
**INDELICATO**
3:21
**indemnification**
79:21 80:3,7 81:2
206:2
**indemnifications**
215:14
**indemnified** 80:20
81:11
**indemnifying** 66:9
217:6
**indemnity** 79:25
80:24 200:17
204:8 222:15
223:14 228:12
**indenture** 19:25
**indentured** 101:12
**independence**
142:9
**independent** 130:4
**independently**
188:15
**indicate** 68:13
**indicated** 20:22
38:10,25 87:21
183:2 203:5
**indicator** 51:16
**indiscernible**
162:19 179:22
182:6
**individual** 16:13
111:22 116:13
129:15 142:17
188:5 191:5
**individually** 61:21
**industry** 13:25
15:3 18:7,16 19:4
19:12,19 20:14,15
22:3,4,8,15,17
24:6,17,21 29:3
36:4,6,7,23 42:23
43:24,25 44:16,23

46:8 49:4,5,14
50:14 51:20,21
52:14 54:20 55:1
55:5,8,13 56:4
57:2 58:18,21
59:2,17,19 60:2
61:6 62:3,6,14
63:19 65:18 69:16
70:9 73:23 75:6
80:6 84:16,24
85:7 94:2,7,15
95:4 98:9 103:23
105:8 107:24
108:24 109:21,22
109:24 113:3,5
124:3,4,10 125:3
126:8 128:13,14
128:16,17,19,20
128:22,23 129:2,4
129:6,12,20 130:7
131:24 132:11,17
132:25 144:9
147:15,17,22
150:5,14 207:9,10
219:7
**industry's** 56:11
109:16
**inexact** 25:14
**inform** 22:7
**information** 16:25
52:19,20 56:15
91:24 116:15
117:24 155:23
215:22
**informed** 23:5
**initial** 69:6 74:1,6
75:11 115:20
119:7,10,11 165:5
**initially** 31:21
116:11 118:14,15
192:3
**initiative** 41:9
**initiatives** 35:25
**inquiries** 48:9
**inquiry** 91:17,17
**inserted** 224:1
**insolvency** 94:4

153:2
**instance** 26:22
96:20
**instances** 107:4
129:14
**institution** 57:9
150:5
**institutions** 29:12
29:17 38:23 57:1
57:7 102:17
**instruct** 75:23
**instructed** 89:15
141:5
**insurance** 30:17,20
87:15,18 90:5
91:16 222:15
223:14 228:12
**insurances** 52:5
**insure** 176:5 201:4
**insurer** 30:21 31:5
31:12
**insurers** 30:19,20
**insures** 200:19
**insuring** 31:13
**intangible** 120:19
**integrated** 54:18
**intend** 14:16,19
97:14 146:16
**intended** 14:15,17
14:19 29:14 97:25
98:1 146:9
**intent** 14:5,8,10
71:24 97:18,21
98:5 146:6,6,8,14
147:15,19,22
204:17 205:1,9
210:22
**intention** 145:17,25
146:19 161:6
**intentional** 204:13
205:16
**interdependent**
22:5 100:20,21,23
129:24
**interest** 33:23
35:18 46:24 60:19
60:23 100:3,11

104:17 117:13
119:16 120:9,13
130:2 151:11
158:12 163:23
164:6 186:12,17
186:18 202:4
**interested** 50:3
84:23 118:19
123:17
**interesting** 33:18
35:24 53:19 125:7
132:4
**interestingly** 50:23
**interests** 174:17
**interim** 35:23 84:2
104:2
**internal** 31:15
**internally** 31:11
178:12
**international** 28:15
**interpret** 69:14
**interpretation**
80:13 217:9,11
**interrupt** 68:8
158:18
**interruption** 163:5
**interview** 103:5
**intimately** 13:5
95:9 194:11
**intimating** 89:9
**introduce** 134:13
**introduced** 134:15
141:11 166:22
**invest** 35:25 49:24
**invested** 141:16
**investigate** 55:20
**investment** 28:21
31:12 35:12 50:4
**investor** 20:9,11
34:21 91:17 92:3
96:15,17 102:3
105:22 106:6,6,14
115:21,23 116:3
117:2,4,10 119:25
202:8
**investors** 29:14
33:25 34:5,11

49:25 50:3,15
51:8,23 52:7,13
52:15,19 53:6
84:10 95:10 98:14
98:16,18,23 102:4
103:5 116:18
124:15 143:6
**involve** 218:21
**involved** 32:19
35:6,23 36:1
39:19,21,23 40:2
40:7,7 52:5 73:24
95:25 117:17
118:25 119:2
143:3,5,7 148:24
169:19 183:11
184:21 194:9,11
194:23 196:6,22
197:5,20,23 203:5
203:11 209:10,18
218:11
**involvement** 40:12
44:12
**in-house** 14:24
**irrelevant** 26:24
160:5
**issue** 13:7,24 14:2
14:21 15:13,16,16
15:23 16:4,5,17
16:18 18:2,5,5
20:21 36:17 54:12
71:1,3 73:6 85:19
97:22 102:7,12
103:4,12 125:20
129:20 132:3,4,5
134:19 149:10
158:22 159:4,25
168:4 169:9 170:6
170:18 181:3
182:25 197:24
204:17,18
**issued** 21:1,3,18
26:4 29:8,9 33:2,9
**issuers** 50:15 52:11
**issues** 22:12 24:24
26:7 131:5 132:2
133:16 148:6

149:8 156:19,20
192:6
**item** 224:17
**iterations** 150:7
**it'll** 25:17
**i.e** 66:4

_____
**J**

**J** 7:8 9:7,21 10:14
86:2,2,6
**James** 2:3,6 3:12
11:9 27:8,13
227:6,7,8,9,10,11
227:12,13,14,15
227:16,17,18
**JD** 28:14
**JEFF** 8:7
**job** 28:16,17 30:25
31:25 41:4 101:7
140:17 192:1,16
193:5 194:5
195:13 196:1,11
196:13 226:17
**jobs** 41:2
**Jody** 203:15
**Joe** 125:5,9
**John** 3:13 27:7
167:21 208:18
**Johnson** 16:6
**join** 126:15
**joinder** 2:2 18:21
**JR** 3:12
**judge** 1:24 21:19
91:7 126:15
127:19 133:15
141:8 173:22
175:7
**Judge's** 175:16
**judgment** 166:6
**judicial** 14:9,12
**July** 195:5 220:20
**jump** 91:2
**June** 144:18 164:21
222:14,15

_____
**K**

**K** 3:10 6:13

**Kansas** 141:18
**Karen** 5:16 103:20
**KAYE** 5:2
**keep** 47:18 181:10
201:1
**keeps** 17:7
**Kemp** 123:6,7
**kept** 138:2 147:23
**key** 84:22
**kid** 30:19
**Kidder** 29:24 30:1
30:13,14,16 43:6
43:9
**Kim** 112:12 221:13
**KIMBERLY** 8:25
**kind** 30:6,25 31:25
34:6 35:13 38:24
45:21 46:4 57:2
63:13 117:16
118:12 156:19
165:13 177:12
178:12 203:23
**kinds** 58:25 69:23
**KISSEL** 8:2
**knew** 50:21 77:12
78:9 149:21
208:19
**know** 11:7,10 14:18
14:20,21 18:11
21:10 23:19 25:12
25:12 26:24 27:5
35:4 48:6 66:20
68:25 76:25 83:10
85:15 86:20 87:14
95:17,22 101:18
103:2 105:17
110:24 111:6
120:1,2 126:1
127:1 137:21
143:6,7 144:16
149:10 150:6
151:2,24,25 152:6
152:12 154:14
158:21,22 159:8
159:19 160:2,4
162:7 166:17
167:13 172:10,23

173:19 175:7,10
175:22 177:9,18
177:19 178:9
179:5 180:25
181:1,2,5,23
183:25 184:1
186:20 188:1,10
188:14,17 197:16
201:6,7,8 209:25
211:8 212:12
216:24 217:8
222:4
**knowing** 25:16
98:5 173:21
**knowledge** 13:19
22:21 49:3 73:23
102:13 103:12
124:10 127:20,21
128:8,10 132:17
149:16,21 169:25
180:8,9 181:1,2,4
181:6 185:20
187:7
**known** 29:16 52:10
59:17 141:3 144:9
186:16
**knows** 25:7 148:3
**Koppel** 123:7,8,20
125:6
**KUJAWSKI** 5:18
**Kumho** 127:14,15
132:6
**Kuney** 6:16 11:19
12:3 15:9,12,12
42:2,3,3,5 43:22
44:3 45:10,12,16
47:11 66:21 92:21
92:24 93:4,6,8,8
94:1 96:8 101:3,4
122:7,7,17 136:25
137:1,8,12 139:9
139:9,16,20
140:10,12 143:14
146:11,12 147:12
148:4,11,12,14,15
149:18,19,24
150:13 156:25

159:14,15 160:14
160:16,20 161:10
161:13,15,18,20
161:23 163:4,6
165:15 167:2
169:1 174:18
179:24 180:1,4
183:6 188:23
189:2,5,13,15,17
189:19 190:5,13
190:15 227:8,12
227:19
**Kuney's** 26:22
43:24

_____
**L**

**L** 3:12 139:12
228:17
**lab** 128:15
**label** 29:6 49:22
50:2,8 51:13,21
**labeled** 27:21
**lacking** 52:8
**language** 14:11
146:7 213:25
**large** 12:7 13:3
29:17 31:20 38:19
38:22 67:13 83:9
150:4 179:3
181:12,24 184:2
**largely** 128:12
159:8
**larger** 36:9 86:11
**Lastly** 14:22
**lasts** 155:14
**late** 17:24
**laundry** 50:13
**LAURIE** 4:25
**law** 14:4,25 19:7,10
25:11 28:14,15,16
129:17 146:2,14
164:14 203:17
209:17
**laws** 43:13 117:20
**Lawson** 8:25
111:12 112:9,11
112:12 113:18,21

221:12,13,13 227:17
**lawyer** 42:15 188:10
**lawyers** 149:3 168:24 169:8 188:17,18 226:15
**lay** 64:15 132:14 133:5,9 148:13 149:19,23 150:13
**lays** 64:22 168:10
**lead** 200:13 203:14
**leading** 200:12
**League** 29:13
**learn** 149:25
**learned** 69:22
**leave** 177:25 179:2 195:1 224:4,7
**leaves** 159:25
**led** 102:20
**left** 29:22 30:14 31:19 32:23 39:12 41:16 104:2 159:3 163:7 192:9,9,10 193:24 194:1
**legal** 13:8,12,13,24 14:21 15:15,15,16 15:17 16:5 22:12 24:18,20 25:10,18 26:16,18,19,21,22 69:23 108:7 110:21 113:17 120:22 130:2 131:23,25 132:25 150:12,14 156:23 165:5 166:16 168:18 174:19
**legalist** 131:22
**lending** 191:25 192:2
**length** 80:2
**lengthy** 183:14,16 184:9
**Leo** 4:16 101:11 122:18
**les** 159:20
**letter** 154:6,8,13

172:25 173:8 174:1 220:20
**letters** 117:22,23 117:23 135:8 166:22 174:6,11
**let's** 36:16 65:8,20 66:14 72:22 75:7 77:9 99:11 111:4 121:24,25 122:5 126:11 148:16 161:13 162:22 167:16 175:11,16 184:3 217:12 220:10
**level** 64:7 87:15 129:11 185:5 199:9
**leverage** 201:10
**liability** 62:1
**liable** 199:21
**license** 120:19
**licensed** 165:19
**liens** 174:16
**life** 25:17
**lightly** 72:16
**liked** 226:14
**likelihood** 133:3
**limine** 2:3,4 11:11 11:14 12:4 18:20 18:23 21:9,20 22:10 23:12,14 25:6 26:4,8,12 27:3 36:13 121:9 121:19 122:4,5,8 122:10,13,23 126:16,22 130:24 131:16,20 133:11 145:24 228:19,22
**limit** 12:13,14 14:6 15:5 60:16 61:9 85:3 105:5 108:2 113:11,12
**limitation** 14:7 104:13
**limitations** 108:19 109:5
**limited** 27:23 30:8

53:17 54:24 60:12 60:14 65:15 70:2 102:2 107:15 134:20 216:3
**limiting** 12:17 13:15
**line** 19:17 45:19 46:3 52:24 62:12 63:8 73:18 75:8,8 75:9,12 77:12 78:9 88:6,10 90:8 90:24 92:11,15 96:12,13 99:25 102:23 142:25 186:21 204:4 214:10 215:23,23 220:23,24 228:18
**lines** 116:5
**liquidate** 151:3,14 152:1
**liquidation** 151:5
**liquidity** 60:15
**Lisa** 2:25 229:4,12
**LISCIO** 5:8
**list** 50:13 101:15,17 101:19 134:5 138:1 189:7
**listed** 88:14 214:21 224:12
**listen** 24:1
**listening** 13:10 93:9
**litigated** 181:3,5
**litigation** 127:25 226:14
**little** 11:15 17:24 28:3 33:18 51:6 63:8,23 102:8 122:20 132:3 140:10 141:2 153:1,1 163:10 200:11 218:15
**live** 76:14
**lived** 165:15
**LLP** 3:3,16 4:2,11 4:19 5:2,11 6:2,11 6:18 7:2,12,20 8:2

8:10,19 9:2,9,16 10:9
**loan** 27:25 29:10 32:3,4,16,17 38:18,23 39:2 42:20,25 43:14 46:22 47:6 55:16 55:18 56:13,18 57:11,20 58:12 59:11,12,14 60:1 60:3 64:2,3,14,22 65:4,12,18,20,25 66:3 67:14 68:25 69:3 82:21 84:2 86:8 90:1 96:21 96:23,25 98:15 99:4 100:4,7 104:1 105:22,25 106:11 107:24 109:6 110:2,14 116:13,22,23,25 118:3 119:24 140:9 142:10,14 142:21,24 143:22 149:9,13,15 154:1 155:6 158:16 170:7 177:24 181:13,20 182:4,4 183:19,20 184:21 184:22,24 187:4 187:18 188:8 192:19,22 193:7 194:10,12,21 195:19 196:15 197:13 199:9 202:20 208:22 212:2 218:17 219:8 220:19 222:25
**loans** 12:11,22 24:10 28:22 29:18 29:19 32:4,5,6,13 32:19,20 33:1,6,9 36:25 38:12,16,20 39:9 40:4,11,16 41:23 43:1,2 44:17,22 45:3,7

46:6 47:9 50:6,8 55:19,25 56:15 57:19,22 58:13,19 58:24 59:5 61:12 62:8,22 63:10 65:7 66:7 68:2 69:1 81:22 82:1 82:12,23 83:5,11 83:11 84:8,13,20 86:4,6,17,18,23 87:4,7,14,19 94:12 95:13 96:14 96:15,23 97:2 98:20,22 99:2,10 101:1 103:25 104:5,10,11,17 105:17 115:16,22 115:23 116:1,4,6 116:18,19 117:1 117:10 118:2,25 119:2,5,7,12,13 119:19 120:10 142:4,6,6,14,16 142:16,17,23 143:2,4,23 144:13 144:17 151:9,16 151:22,25 152:1,8 152:11,18 155:15 156:16,17,21,22 162:1,3,6,9 163:17,22 164:18 164:24 165:2,11 165:22 166:7,19 166:20 168:4 169:24 170:10,17 170:20,25 171:6 173:19 174:3,8,11 175:5,12,19 176:4 176:6,13 177:8,10 177:15,21 178:8 178:10 179:1,2,6 179:8,23 180:1,2 180:5,15 181:13 183:21 185:20 186:2,8,19 187:8 187:9 192:4,21,22 192:23 193:9,14

194:10,15 195:18
195:24,25 197:19
198:13 199:7
201:1,3,19 202:5
202:22 207:12,16
207:17 211:6
212:1,2,5,24
213:23 216:4,5,7
217:7,15 218:22
**locate** 143:12
**located** 113:1
**lock** 152:9
**LOEB** 10:9,9
**logistics** 118:20
**long** 11:6 18:10
20:14 30:13 31:17
32:14 33:4 34:17
47:4 66:3 88:16
100:1 109:20
125:4,5 176:24
177:1 183:14
184:24 192:24
193:15 219:1
**longer** 29:25 57:23
95:6 101:8 111:7
117:18 118:1,3
182:1 184:13,17
219:2
**look** 13:21 15:24,25
24:2 25:14 33:19
40:21 45:19 50:2
51:6,12 53:5
64:14 74:10 75:7
89:1,5 92:1 94:2
96:10 99:25 101:5
103:8 114:9
116:13 128:15
129:15 144:19,20
147:14,19 152:22
154:1,3 156:3,4
156:15,17 157:1
163:10 177:23
178:3 200:1 201:7
214:10 215:22
**looked** 44:10 52:2,6
54:1 73:24 79:8
87:25 88:1,16,20

88:23 93:25 97:10
102:16 107:14
150:3
**looking** 16:12 31:6
33:21 61:25 63:10
77:17,20 78:14,18
97:12 99:14 142:7
178:5 214:4 215:7
225:23
**looks** 130:7 142:3
**Lopez** 7:18 126:13
136:3
**LORI** 5:18
**Los** 7:6
**lose** 59:23 91:7
127:7
**loses** 115:9
**losing** 62:2
**lost** 91:1,2 100:13
210:1
**lot** 11:24 12:7
26:22 49:20 58:2
58:2 84:7 105:4
118:15 125:4
149:11 159:18
207:11 208:20
**lots** 83:4
**lottery** 125:22
**Love** 20:2 56:7
84:6
**Love's** 50:23
**low** 130:13
**lower** 57:20 68:9,9
86:12 128:2
**lucky** 23:21
**lunch** 121:12,14,15
121:18 122:1
**LXV** 214:7
**LXVIII** 214:4
**Lynch** 10:10

---

**M**

**M** 5:9 8:17 227:4
**MA** 9:5
**Mac** 27:20 29:9
48:13,16 49:16
53:21 72:24 75:16

87:23 88:2,24
90:18,21 91:25
**Mac/Fannie** 53:8
**Madison** 3:18 9:18
**Mae** 18:5,12 19:3
29:8 44:8,9 47:21
47:25 48:12 53:8
72:24 87:22,25
88:13,16,20 89:25
90:4,21 91:5,12
91:15,21 101:14
102:2,7,12,14,18
103:4,12 123:16
125:1 126:25
166:24
**Mae-qualified** 20:7
**Mae/Freddie** 27:20
49:16 53:21 75:16
90:18 91:25
**magnitude** 197:9
**maintain** 90:6
**maintained** 41:13
**making** 22:25
24:12 32:13,14
150:7 201:12
221:1
**man** 185:7
**manage** 32:9,11,12
56:19
**managed** 35:5
56:20 141:15
192:17
**management** 32:1
34:4 35:6 83:6
**manager** 30:1
39:22 140:9
191:15 193:10
194:6 195:16
196:14
**managerial** 32:15
**managers** 32:11
**managing** 31:2,23
39:6 140:4
**Manhattan** 4:4 6:4
**manifested** 14:10
**March** 34:1 143:11
145:13

**MARGARET** 3:14
**margin** 58:23
62:22
**MARGOT** 4:17
**Marissa** 203:13
**mark** 3:21,22 5:8
23:22 223:4
**marked** 28:8 204:3
209:11 222:21
**market** 1:15 4:5,22
6:6,20 7:14 8:21
20:12 44:20 46:5
46:12 49:23 51:22
52:21 55:23 70:21
70:23 74:2,13
92:8 124:21,22
130:1 140:18,18
143:2 174:9
178:14,23 179:3
181:12 182:15
186:13 192:8
**marketing** 31:4
51:7
**marketplace** 36:9
102:5,15
**markets** 62:10 84:9
**master** 27:25 60:1
64:14 69:3 80:8
82:21 84:2,3
101:13 104:1
109:6 166:13
194:21 220:19
**material** 50:13
130:9 211:25
212:3
**materially** 211:25
**math** 59:11
**matter** 1:6 20:24
24:4,5,13 70:20
74:25 75:5,22
76:21 78:23,24
113:7 118:18
140:13 223:22
229:7
**matters** 17:19
24:21 76:23 224:9
**maturity** 55:18

**MCCLOY** 7:2
**McCutchen** 9:2,9
37:12 67:2 190:19
**McFrey** 210:1
**mean** 11:14 12:9
14:10 15:2 17:25
18:15 52:25 56:21
56:25 72:4,6
109:2,21 115:5
121:13 137:9
143:5 149:20
158:4 161:11
162:7 165:13,22
172:10 173:21,23
175:9 177:13
178:20,20 179:7
179:15 181:20,22
182:16,18 184:19
185:4,4,11 186:22
187:8 188:16
204:15 226:16
**meaning** 18:14
53:16
**meaningful** 13:1
87:10
**meaningless** 53:15
53:16 102:21
**meanings** 116:11
**means** 13:7,15 31:5
43:17 102:22
116:10 155:5
180:5 185:12
**meant** 18:7 48:9
74:11 189:21
**measure** 13:3 52:3
**measures** 125:14
125:19
**mech** 178:20
**mechanics** 64:21
64:21
**mechanisms**
178:17
**meet** 19:14 25:25
51:17
**meeting** 133:7,8
**meets** 130:19
**members** 144:2

**memorialize** 17:2
110:9,18,25
**mention** 16:17
173:8 181:14,17
182:5,7
**mentioned** 25:23
50:24 56:24
168:14 173:25
**mere** 22:8 91:21
**merely** 27:24 54:24
93:11 109:5 113:9
128:4
**merged** 195:2
**merging** 34:8
**merits** 128:3
**Merrill** 10:10
**method** 125:19
**methodologies** 58:4
**methodology** 59:1
124:7,11 125:2
**methods** 91:18
127:17
**metrics** 206:23
**MGTX** 39:15,17
**microphone** 68:9
191:10
**middle** 205:2
**mike** 78:4,4,5
139:16 140:10,12
189:4 205:14
**MILBANK** 7:2
**million** 33:9 38:13
38:15 39:9 60:24
127:12
**millions** 81:21
84:19
**MILPSA** 197:24
199:25 200:4
201:24 206:8
219:19
**MILPSAs** 195:10
196:6,23 197:5,10
197:20 198:1,5,11
199:11 200:9
207:1
**mind** 163:13
185:22

**minds** 122:6
124:14
**mine** 32:24
**minimum** 52:25
**minor** 149:22
**minute** 65:8 99:16
108:10 111:7,13
162:22,24 172:20
**minutes** 150:18
167:16 221:21
**mischaracterizes**
76:7
**misheard** 187:11
**missed** 134:1
**missing** 224:19,25
**mistake** 211:7,11
212:18
**mistakenly** 219:19
**mixed** 25:17
**ML** 209:1 220:22
**MLPA** 169:10
170:5
**MLPISA** 220:22
**MLPSA** 37:19 38:2
49:13 54:25 62:13
62:14 67:9,18,20
67:24 68:23,25
69:19 70:3,4
79:21 80:19 81:10
86:14,15 105:18
112:15 113:10
115:17,21 116:20
117:3,10 119:6,7
119:11 136:18
168:5,16,25 169:9
169:23 170:6,9,18
170:21 171:3
173:10 174:9,23
194:19 208:20,25
213:8 219:24
**MLPSAs** 28:23
29:2 36:4,24
39:20 40:13 41:22
53:21 54:11,14,21
70:12,13,15,19
81:20 102:2
103:23 105:9,13

106:24 112:2
209:4,7 219:21
**model** 164:23
**models** 58:4,8
178:11,13
**modify** 80:23
**mollified** 160:22
**moment** 36:10 63:6
96:8 118:21 120:5
145:12 157:6
158:19 159:12
160:18,21 217:12
218:5
**moments** 94:20
153:24
**Monday** 24:20
**monetary** 158:6
**money** 98:14,16,19
98:23 140:17,18
142:24 202:18
**moniker** 72:2
**monitored** 32:12
**monitors** 34:10,12
34:14
**Monroe** 7:22
**Monte** 58:4
**month** 13:9 35:10
35:16 155:7
202:13 214:11
**months** 39:16
65:17 153:23
155:13 165:23
177:3
**Moodys** 166:12
**MOORE** 7:8
**MORGAN** 3:10
**morning** 11:3,4,7,8
11:9 12:12 20:18
20:19 27:16 37:17
37:18 42:6,7 67:6
67:7 101:11
104:23 105:1
224:1 226:11
**Morris** 6:2 222:6
**mortgage** 1:8 2:2
2:10 12:11,22
20:1,11 29:24

32:5 33:1,14
36:24 38:12,18
39:2,9 40:9,11
41:22 44:21 45:1
45:3,7 46:6,9 47:2
49:4 50:5 52:17
55:3,12,16,17
56:3,13 57:6,9,11
57:12,13,17,18
58:12,17,19 60:3
63:10 69:1,3
81:22 82:12 84:5
84:5 86:3,4,8,16
87:14 90:1 91:13
95:13 99:12,20
103:5,9 105:8
107:2 110:2,14
112:13 113:7,10
115:22 116:22,22
116:25 124:15,24
140:9 144:16
149:13,15 152:7,8
154:2 155:12
163:19 164:7
165:11 171:17,19
171:21,25 172:2
179:23 180:1,2,5
180:15 191:16
192:4,7,20,22,23
194:4,5,10,12,21
195:17,19,24,25
196:15,17 197:13
198:13 202:20
208:22 211:6
212:1,2,2,5,24
213:23 216:4,5,6
217:7 220:19
**mortgaged** 44:17
**mortgages** 22:1,2
42:20,25 43:14
46:22 47:7 94:18
96:1,6 99:21
142:21 149:9
162:11,15 163:10
168:20 173:14
186:23 194:7
**mortgage-backed**

20:3,10 27:21
29:15 30:23 33:25
34:11,12 36:23
49:3,25 50:6 51:8
51:11
**Mortgaging** 111:21
**mortgagor** 56:22
**motion** 2:3,4,8
11:14 12:1,4,14
14:14 18:20,23
21:20 22:10 36:19
115:8 121:9,19
122:4,5,8,9,13,23
123:15 124:1
126:16,21,22,22
127:8 132:18
133:19 134:4
135:12,15,17
136:2,6 137:11,13
137:20 138:4,18
145:24 147:25
159:7 167:5
189:16,25 208:8
221:18 228:19,22
**motions** 11:10,14
11:21 21:9 23:12
23:13 25:6 26:3,8
26:11 27:2 36:13
126:16 130:24,24
131:16,20 133:10
133:10,11,11
221:2 228:22
**movants** 11:13,18
22:11 23:3 25:1
128:12,17 130:14
145:23
**move** 36:12,22
80:12 122:11
126:15,22 134:5,6
134:7 145:19
149:14 183:7,20
189:3,5,10 190:2
191:3,10,10
220:10 222:21
**moved** 20:4 39:12
136:13 189:7,8
221:5 222:8

moves 186:17
moving 17:7 55:15
  134:9 140:15
  189:23
MP 224:24
MPGX 35:20
MPLSA 55:7
MSL 168:5
MSLPAs 54:17
MTGX 33:16,17
  40:18,22,25 41:3
  41:10,11,13,21
Muldoon 146:4
multifunctional
  109:7
multiple 29:18 60:7
  60:9,10 83:1
multi-billion 55:4
municipal 30:20

**N**

N 3:2 11:1 227:2,4
  228:2,17 229:2
nail 20:22
name 27:11,12
  33:15 72:8 96:17
  101:11 139:11,13
  142:23 172:22,23
  190:23 203:15
  229:13
names 54:14
naming 106:20
narrow 134:2
narrower 18:25
narrowly 132:24
National 44:25
  46:9 126:14
  140:22 141:11,12
  171:17
natural 127:8
nature 16:2 54:23
  61:11 160:9
nearly 53:6 186:24
necessarily 41:5
  60:16 68:16 87:12
  147:19 160:4
  214:25

necessary 21:23
  30:12 56:17 84:23
  190:2
need 15:7,19 37:2
  49:12 52:15 55:12
  78:5 79:24 80:22
  80:23,25 83:6
  99:18 102:8
  104:21 110:8,17
  121:4 122:14
  123:22 137:13,19
  141:1 144:6 158:8
  160:2 171:8 172:9
  198:23 201:2,2
  222:24,25 223:2
needed 51:14,23
  75:13 76:21
needs 51:17 62:8
  90:5 114:13 129:8
  180:4 210:1
neglected 47:14
negotiate 82:25
  108:1 111:23
  112:5 145:9
  203:22 207:1,11
negotiated 28:20
  37:19 61:22 108:3
  108:13 181:25
  197:10 199:22
  209:14
negotiating 30:3
  31:10 38:1 85:19
  105:8 148:25
  195:9 207:5
  210:13 218:12
negotiation 37:24
  39:19,24 178:2
  179:16 194:9,12
  194:23 195:18
  196:6,15,22 197:5
  197:20,23 203:6,9
  203:12,18
negotiations 61:2
  111:22 149:2
  182:15 193:13
  203:14,25 204:1
  209:11,19

neighborhood 33:8
neither 12:12 60:11
Nelson 19:8 21:15
  127:16
Nemora 31:20,25
  32:1,16,21,22,23
  32:24 35:4,5 43:1
  44:24
Nemours 8:12
net 188:2
nets 119:16
NEUFELD 7:9
Neutraceuticals
  19:8
never 14:18,23,23
  14:25 42:9,12,14
  42:20 44:12,16
  74:17 76:24 97:10
  105:10 107:6
  169:23 170:1,2
  222:3
new 2:2,6 3:19 4:12
  4:14 5:5,14 8:5
  9:12,19 10:12
  19:25 28:17 29:16
  30:18 35:11 50:4
  79:23 80:23
  101:12 106:23
  116:3 117:1,16,17
  117:23 119:25
  122:18 123:20
  126:2 135:23,23
  138:5 146:2,3
  166:14 218:2
Nichols 6:2 222:6
nickname 73:15
night 18:22 133:19
nine 54:15
NIXON 9:16
Nomura 193:2,5,6
  193:15,16,24
  194:1
non 65:10
nonperforming
  35:9,13
nonscientific
  127:15 132:7

non-Fannie/Fred...
  71:16
non-performance
  201:8
non-recourse 65:14
nope 45:11,11
Norelli 203:13
normal 54:1 58:24
  59:1 81:5 105:21
  109:9 185:6
normally 36:18
  80:2
North 1:15 4:22 6:6
  6:20 7:14 8:13
note 135:16
notebook 210:1
notebooks 135:2,3
  135:9 191:3
noted 147:3
notice 20:25 147:5
  153:1,7,15 154:10
  160:22 161:9
  183:24 211:24
notify 106:15
  117:21 184:5
notwithstanding
  131:11,16
November 220:21
no-downgrades
  174:1
NTC 9:17
nullity 13:2
number 28:9 32:3
  43:5 82:23 102:19
  135:23 137:21
  159:11 173:6
  207:10 209:12
  223:11
NY 3:19 4:14 5:5
  5:14 8:5 9:12,19
  10:12
N.A 4:20 5:3 7:21
  8:3
N.W 6:13
N.Y 146:4

**O**

O 1:22 11:1 227:4
  229:2
OAS 58:4
object 13:10 71:9
  137:1 145:19
  154:13 165:12
  183:6 200:12
  204:14
objecting 139:5
objection 43:19
  46:13,16 47:16,17
  49:5 70:14 71:4
  73:21 74:21 76:7
  77:24 81:14 89:7
  90:8 95:18 108:7
  108:11,15,23
  110:20 120:22
  134:4,20,23 136:1
  136:11 137:23,25
  146:24 147:3
  148:10 149:14
  150:10 166:1,5
  169:1,5 174:18
  179:24 183:9
  190:1,7,8,10
  205:7,8,17 216:21
  216:22 221:6,11
  222:18,19,24
  225:3,4 226:1,4
objections 15:14
  223:13
objection's 90:25
  95:21 180:11
objective 83:6
objector 133:24
objectors 114:2,16
  115:7 130:16
  138:25 139:3
  167:4 208:6
objector's 26:16,18
  225:15
obligated 13:1
  110:5,15 200:9,16
  200:20,23
obligation 56:23
  100:22 156:8,13
  156:14 168:24

obligations 22:3
55:14,20,24 58:22
58:25 61:3,12,20
62:13,14,17,24
63:1,4 64:10 65:3
66:6,11 67:19
68:1,20,21,22
79:22 81:8 83:1
109:14,15 110:5,6
110:16,17,19
113:14 129:21,23
156:5 159:19
174:22 198:12,12
198:15,16 199:19
199:21,24 200:3
206:7,8 216:2,3
217:22
obtain 106:1 176:3
obtained 54:24
59:22
obtains 27:24
obviously 19:7
138:18 139:2
160:18 162:7
164:1
occasion 105:17
148:18 149:25
Occasionally
199:14
occur 24:7 30:5
occurred 115:21
166:12
occurring 58:10
occurs 150:14
183:23
October 1:19 229:9
offer 14:19 18:2,4
25:9 207:23
220:12
offered 16:6 69:10
71:15 131:4
132:13 207:23,25
220:13,18
offering 15:17
31:13 69:13 70:3
80:18
office 134:3 149:7

officer 140:2
191:25 192:2
offices 41:13
official 3:17 4:3
78:6 161:24 229:5
oftentimes 85:11
87:13
Oh 11:3 37:7 41:7
54:7 63:22 102:9
117:18 141:10
153:12 177:18
187:11 225:12
Ohio 140:6 141:13
141:14
okay 20:17 45:24
46:3,19 47:6
48:21,22 66:24,25
70:11 71:1 72:10
72:12,14 73:2
91:11 92:14,21
93:7 99:9,17,19
101:2,15 102:1,6
102:10,25 103:3
104:19 105:24
106:8 107:8
108:18 109:1
110:1 111:12
112:1,18,24
113:18 115:18
117:10 120:18
121:10 123:8,12
123:15 124:22
126:11 134:18
135:9 136:1,11
137:12 141:15
143:15 144:12
145:9 151:20
153:12,12,17
154:5,16,20,24
155:17,18 156:14
157:4,11 158:10
161:10 163:12
168:24 171:9
172:4,10 173:5,7
173:25 175:1
176:18 179:17
180:17 183:14

184:13,21 186:7
187:12 190:16
197:16 208:4,25
209:23 210:6,21
211:12 213:5,15
213:17 214:9,13
215:22 217:9
218:4 219:13
220:10 224:7
225:1,23 226:10
old 35:10 117:23
135:2 186:20
once 58:23 71:1
115:20 133:21
162:9 170:17
202:7,17 212:11
ones 40:13 95:24
123:4,4,5 207:20
one-page 18:21
open 35:13 86:2
159:25 209:23
215:10 224:4,7
operated 75:6
operates 70:9
operating 83:14
165:19 166:14
167:7
operation 33:4,17
43:17
operational 30:11
31:8 193:12
operations 32:12
opine 75:22 94:13
131:15
opined 131:15
147:21,22
opining 97:25
opinion 14:19
15:17,21 16:14
17:7,9,9,15,16
18:13,14,16 19:1
19:2,8 21:18,22
26:5 27:22 47:24
49:12,15 54:17,19
54:22 69:13,16,17
69:24,25 70:1,3,6
70:12,15,18,20,24

71:1,2,15,16,16
72:2,3,6,9,10,11
72:20,23,24 73:5
73:19,20,22 74:1
74:4,6,11,11,15
74:19,20,25 75:4
75:13,15,23,25
76:3,17 77:5,7,13
77:14,20,22,23
78:10,11,18,20,20
78:23 79:2,5,6,17
83:16,20 84:16,18
84:21 85:2 89:6
89:16 90:9,11,18
90:19 91:3,4,5
93:9,17,18,22
94:15,19 97:14,14
97:18,20 101:15
101:16 102:2,6,12
102:21 103:3,7,11
104:15 107:16,20
107:23 109:4
118:6,9 125:13
126:5,25 127:1,2
127:16 128:4,25
130:4 131:4,21,22
131:23,23 132:8,9
132:23,24 133:5,9
150:11,12,13,15
180:22 181:2
206:6,7,10,14,17
206:20,21
opinions 15:15
16:23,24 17:1
18:3,4 19:20 25:9
25:10,10,18,18
28:2 43:20 49:10
54:6 69:10 76:5
77:16,17 78:12,13
95:19 132:13,14
133:5
opportunity 21:2,5
115:23 135:14
147:3
opposed 25:10
50:11 82:14
156:11 214:24

opposing 17:11
opposition 221:18
option 212:5
oral 221:24 222:2
Orange 8:13
order 17:20 20:25
21:3 25:4,5 28:4
55:11,11 62:10
79:23 80:21 97:4
102:11 116:23
135:23 161:9
165:2 197:9
221:15
ordered 17:19 25:3
ordinarily 36:12
166:7
ordinary 24:9
155:9
original 134:8
originally 66:4
77:16 78:13 79:17
originated 46:22
47:8 103:25
originates 142:23
origination 22:1
24:4,15 62:9
67:13,14 84:9
158:25 159:3
192:4
originations 57:11
57:13
originator 38:18
129:21 188:4
originators 32:5,18
33:14 38:20
ought 147:16
outcomes 126:2
outline 90:4
outset 122:20
outside 58:23 59:1
70:9 74:12 80:14
95:18 109:15
110:17 149:7
175:11,16 203:17
outstanding 66:3
158:5,15 164:2
overall 32:15

125:19
**overlaid** 52:18
**Overland** 141:18
**overlap** 193:18
**overlapped** 32:19
**overrule** 46:16
49:5 130:23
146:23 166:1
**overruled** 43:22
71:8 74:23 76:9
78:2 80:16 90:25
95:21 110:22
150:16 169:6
180:11 187:5,5
228:21,23
**overruling** 26:8
**oversight** 33:24
34:4 39:22
**owned** 46:21,23
96:15 164:22
168:5 172:3
173:14
**owner** 47:1,2 56:15
87:14 95:12,25
96:5 100:10,15
113:12,13 117:1
119:12,19 162:11
162:15 163:9,9
164:6 165:9
183:19 202:5
**owners** 94:12,17
98:23
**ownership** 120:20
120:21 152:1
163:18
**owning** 59:23
166:20
**owns** 20:9,11 86:16
97:2 99:22 120:13
120:17

**P**

**P** 3:2,2 4:17 10:7
11:1
**packed** 69:23
**page** 19:16 45:19
73:11 75:7,12

77:9,10 88:6,8,9
92:10,12 96:10
99:25 100:2
125:12,24 152:23
153:5,10,10
154:16,22,23
156:4 163:11
210:19,20 211:2
211:15 212:21
214:3,5 215:10
216:11,13 224:19
224:20,21,25
225:1 227:5
228:18
**pages** 13:18,21
**paging** 224:17
**paid** 41:8 59:8
63:12 66:2 84:11
111:23 112:6
118:23 119:9,15
119:15 164:20
168:11 177:7
200:19 203:4
**Palmer** 6:18 105:3
**panel** 44:20 46:4,11
**paper** 146:5
**paragraph** 21:1
125:13 153:6,11
211:17,18 213:21
214:19 217:11
**paragraphs** 215:20
**pardon** 123:18
162:17 225:13
**parent** 34:19
**Park** 5:4 8:4 9:11
10:11 141:18
**parol** 145:22 146:1
146:5 148:10
**parole** 204:15
205:5
**parse** 25:19 147:20
**part** 19:1 33:22,22
50:7 64:1 90:3
91:12 102:21
107:22 108:22
109:6 146:21
149:2,2 160:22

161:16,24 178:2
179:15 183:3
186:11 192:7
193:12 196:25
197:2 204:13
205:17 206:22
209:8 213:21
215:22 222:20
**participant** 128:17
128:22 129:2
**participants** 44:21
46:5,12 58:21
61:14 70:23 113:5
128:19 143:2
**participate** 161:25
168:21
**participated**
168:22,22
**participating**
118:19
**particular** 17:4
31:15 32:8 58:1
75:19 91:20,21
151:23 176:1
213:7 214:18
**particularly** 19:3
36:23 81:24
115:16
**parties** 14:8,15,16
14:16 17:11,11
20:25 31:9 34:14
65:1 82:22,24
83:2 84:1,23 97:6
97:10,18 98:1,5,9
101:22 106:5
108:1 109:8,17,22
110:4 111:22
112:1,3,5 127:9
145:14 146:8,16
147:14 176:13
205:9
**Partly** 132:7
**partner** 32:24
**partners** 226:14
**parts** 55:15 179:3
**party** 61:18,20,23
66:3,6,10 67:10

67:24,25 68:23
94:24 105:20
107:21 110:3
117:12 119:6
145:25 198:2,6,24
198:25 199:3,6,8
202:24 203:1,3
221:18
**party's** 146:19
**pass** 36:15 63:1
**passages** 80:5
**patent** 120:19
**path** 160:8
**Patton** 3:12 121:17
121:23 129:10
158:18 160:7,12
160:15,17 161:4,6
**PAULINE** 3:10
**pay** 55:19 99:2
100:22 175:6,20
175:24 182:3
203:1
**payers** 155:12
**paying** 59:10,11
63:18
**payment** 65:17,23
106:19 120:8,17
155:1,3,21,25
156:9,18 176:1
213:3
**payments** 32:14
56:14,14 95:11
119:18,19 120:2
120:15 155:5,6,12
156:23 184:6
201:13 202:4,8,10
202:11
**pays** 100:24
**Peabody** 9:16
29:24 30:1,13,14
30:16
**peace** 29:24
**pending** 27:2 104:1
104:10 108:10
137:11 138:3
189:14,16,25
**people** 20:15 23:20

101:18 114:10
124:14,17 125:4
141:1 150:6 179:5
184:17 196:18,22
197:18 200:20
**perceived** 201:17
**percent** 46:23 79:6
99:12,21 100:4,6
141:9 198:7
**percentage** 43:4
64:4 125:15,17
**perception** 132:15
**perceptions** 102:4
**perfect** 65:24 66:1
66:5 82:7 128:5
**perfectly** 211:8
**perform** 29:25 31:9
55:19 61:19,20
66:11 85:24 94:23
95:7 99:3 110:5
110:15 143:7
162:14 199:24
200:3 216:2
**performance** 31:7
34:13,13 51:11
52:13 95:9,9
98:15 99:1 100:25
156:17 163:8
200:21
**performing** 98:21
98:22 100:21
199:6 200:3
**performs** 100:24
**period** 29:2,20 33:6
35:16 46:10 58:7
66:3 87:10 117:19
152:9 161:5 165:4
166:16 184:9
185:20 195:7,9
**periods** 184:16,17
**permission** 11:25
**permitted** 13:6
15:8 125:10
**person** 112:14
**personally** 73:24
96:22 197:5
**personnel** 52:4

91:15
**person's** 132:11
**perspective** 13:4
  27:22 37:22 50:9
  54:22 112:22
  143:6 148:21
  165:24 193:12
**persuasive** 26:18
**pertain** 43:13
  199:10
**pertains** 44:6 49:6
**perused** 53:19
**Peter** 190:20,25
  227:22,23,24,25
**ph** 203:13,16
**phone** 107:7
**phrase** 180:6
**pick** 63:8 78:6
  212:16
**piece** 100:12,15,19
  120:8,13 132:22
  225:22
**PILLSBURY** 4:11
**pitcher** 37:5
**PITTMAN** 4:11
**place** 20:12 55:22
  102:14 104:4
  125:16 149:6
  166:13
**placed** 49:21
**placement** 141:18
**places** 32:15 92:2
  102:20
**plaintiff's** 125:10
**plan** 33:23
**platform** 35:23
  184:15
**play** 76:15 147:23
**Plaza** 4:21 8:4
**pleading** 133:25
  147:8,8
**pleadings** 190:3
**please** 11:3 27:11
  27:16 28:10 37:4
  42:8 44:2 45:19
  49:14 66:19 67:23
  76:10,15 78:3

91:10 96:10,12
  111:17 114:24
  122:3,24 123:21
  139:10,11,23
  140:7,10,15
  142:12 143:12
  144:20 152:19
  154:3,16 156:3
  157:1 163:3,10
  167:20 169:7
  189:4 190:23
  203:15 209:23
  211:1,15 214:3
  215:9
**plenty** 21:5
**plus** 62:22 153:13
  158:12,12 205:21
**PNI** 119:18,19
  120:15
**point** 18:25 26:13
  36:11,21 40:10
  49:24 50:24 53:11
  64:4 65:19 85:21
  91:25 100:6
  106:22 110:8
  113:9 116:16,17
  132:5 148:9 159:9
  160:2 173:18
  177:11,20 189:20
  196:9 204:21
  205:3 207:21
  211:12
**points** 25:1 64:8
  84:12 99:22 100:7
  119:1,2 177:9
**political** 28:13
  126:4
**pool** 55:16,18,21
  95:10 116:24,24
  118:1 188:4
**pooled** 142:18
**Pooling** 222:16
  223:16 224:10
  226:6 228:14,15
**pools** 52:18 151:16
  162:1
**portfolio** 34:3,17

34:20 35:7 39:13
  39:18 40:24 52:13
  53:3 55:14 60:22
  61:1 63:17,20
  86:11 116:14,16
  116:17 178:5
  186:13
**portfolios** 63:25
  187:4 192:8
**portion** 18:13 66:2
  77:25 80:12
  123:16,17 149:22
**portions** 172:8
**position** 15:11
  23:21,24 25:21
  31:23 43:24 107:6
  125:14,20,21
  138:18 147:1,13
  153:20,22 157:24
  175:18 181:4
  191:14,24 205:2
  222:2
**positional** 126:5
**positions** 32:13,18
  146:13 151:4
  153:24
**possession** 212:25
**possible** 35:12 50:8
  60:3 84:8,14
  96:19 134:3
  152:11 164:2,14
  164:15
**post** 166:18,21
  174:10
**post-purchases**
  142:4
**potential** 40:15
  58:25 62:1,1
  116:12 159:23
**potentially** 35:11
**POTTER** 4:19
**power** 3:22 12:13
  12:14 23:17,22,22
  71:9,12 114:3,4,6
  114:17,21 138:15
  138:16,21,22
  145:19,22 147:7

147:11 148:1,7
  165:12,17 167:11
  167:12 176:20,21
  176:23 180:2,7
  181:11 183:7,10
  185:7,7,9,14,16
  187:2,13,15
  188:21 190:7,8
  200:11 204:14
  205:6,10 218:7,8
  218:10 219:14
  227:21,24
**practical** 22:21
  24:5 26:7 128:10
  129:19
**practically** 22:2
  129:22
**practice** 36:5 54:20
  58:18 69:16 85:7
  108:24 147:15,17
  147:22 150:20,22
  200:15 226:14
**practices** 36:4,7
  53:23 128:14
  149:17 173:17
**precedent-setting**
  15:4
**precise** 78:24
  122:10 189:10
**precisely** 58:3
  88:12
**preclude** 2:3,5
  160:24 228:19
**precluded** 161:3
**predecessor** 35:8
**predicament**
  201:18
**predominantly**
  203:13
**preempted** 14:6
**prefer** 36:14 137:3
**preference** 71:19
  98:10,11
**prefers** 122:5
**prejudiced** 21:7
**preliminary** 139:3
**premise** 124:1

**premium** 66:2,4
  158:7 199:3
  201:13
**prepare** 17:12
  19:16 102:6,11,12
**prepared** 18:4
  102:17 157:18,21
  158:19 159:11
  168:3 190:17
**preparing** 101:16
  103:3,7
**prepaying** 57:21
**prescribed** 21:2
**present** 26:20 27:1
  58:6 147:4,24
  194:16 204:22
  205:4 206:3,6
  221:12,19
**presented** 22:11
**presenting** 31:14
**presently** 41:10
**preserve** 56:18
  122:14
**preserved** 148:10
**president** 139:24
  141:23 192:15
  194:6 195:16
**press** 126:21
**presses** 84:8
**pressing** 18:13
**pressure** 84:12
**pretty** 24:8 124:2
  178:25 183:23
**prevailed** 181:4
**prevented** 76:25
**prevention** 142:8
**previous** 112:14
**previously** 25:23
  25:24 30:19 97:17
  104:11 110:23
  112:18 128:6
  131:1 135:5,8
  136:13 189:7
  205:23 224:18
  225:2
**pre-hearing** 26:2
**pre-purchase**

142:6
**price** 59:8,10,10
62:17,23 63:12,15
63:18,22 64:18
101:5 116:14
152:9,17 178:4,12
178:17 179:3
181:9,13,21
182:15 185:5
213:4
**priced** 32:10 59:2
99:7
**prices** 178:14,17
182:22,23
**pricing** 20:13 30:8
30:9 58:18 178:20
178:21 183:3
**primarily** 28:21
29:11 31:5 35:2
42:19 51:9 58:22
141:17 142:19
**primary** 29:7 50:1
83:24 145:2 176:5
**prime** 82:3
**principal** 46:21
158:15 163:23
**principals** 35:4,8
**Principato** 190:20
190:25 191:8,11
198:1 206:3
208:18 219:19
227:22,23,24
**Principato1** 227:25
**principle** 140:4
171:4 202:4
**principles** 127:17
**printed** 123:19,20
229:13
**prior** 25:5 44:12
47:24,24 48:5,15
70:7,13,18 71:2
73:5 74:4,19 75:2
77:21 78:18 79:17
81:12 89:22 96:14
105:10,23 131:17
149:8 163:25
169:22 170:1

173:25 174:5,7,10
177:4 183:2
**private** 27:21 29:6
29:14,19 31:14
34:20 41:9 49:22
50:2,8 51:13,21
226:13
**privately** 36:1
**privilege** 169:2
**prizes** 15:1
**pro** 146:9
**probability** 58:9
**probable** 96:19
**probably** 19:6 20:2
21:3 43:6 66:20
74:16 111:11
116:3 121:8 191:4
**problem** 17:17
19:4 94:4,9 95:3
115:2
**problems** 87:18
**procedurally**
122:10
**Procedure** 16:19
16:20
**procedures** 21:2
163:16 164:9
**proceed** 11:12
37:12 66:25
121:13 139:1
162:23 163:3
**proceeding** 166:23
**proceedings** 16:19
17:8 155:1 226:19
229:6
**proceeds** 174:21
**process** 63:9,11
117:3,17 142:3
143:8 164:1
183:14,23 193:9
**proclamation** 16:1
**product** 32:5 38:19
**production** 142:9
142:11
**Products** 2:5 9:3,10
37:12 67:2 69:6
190:19

**professional** 219:6
**proffered** 131:13
131:21
**Proffitt** 28:17,19
42:15 203:21,22
**profit** 141:17
**profits** 162:11,14
**Profitt** 209:17,20
**progeny** 132:6
**program** 149:1
**projects** 40:24
**promise** 98:25
**promoted** 196:9
**Prompted** 89:4
**promptly** 212:3
**prong** 124:5,6
**pronounce** 203:15
**proper** 32:15
**properly** 98:21,22
99:3 104:7 113:1
175:17,22 176:6
201:3
**properties** 163:19
**property** 56:20
130:1,2 158:24
164:8,15
**proponent** 128:1
**proposed** 19:2,5
166:8 174:2
**proposition** 124:8
**prospective** 104:5
**prospectuses**
194:14
**protect** 56:17
151:11 164:6
**protecting** 94:11
94:17 162:5
**prove** 65:23 128:1
146:6 160:9 180:1
**proverbial** 128:15
**provide** 30:21
33:24 49:4 52:11
56:15 58:12 59:5
66:1 74:25 79:1
82:22 89:25 91:12
92:2 109:8 129:5
130:9 224:12

**provided** 19:18
30:20 91:24
140:21 174:1
**provides** 20:23
52:23 129:17,20
151:2
**providing** 27:17
56:2 62:21 116:15
**provision** 79:21
80:3,7,10 81:2,7
81:12 106:13
133:20 137:2
153:18 169:24
180:8 204:8 207:5
216:17,18,24,25
**provisions** 13:11
13:12 16:9,13
39:24 53:9 69:14
106:8,24 107:3,18
108:3,4,13,14,21
130:8,9 133:23
148:19,23 150:19
168:15 173:9
179:20 188:12
201:2,9
**proviso** 45:6
**proxy** 22:8,8 65:16
65:19 130:8,10
**prudent** 110:25
133:22
**public** 29:19 31:13
134:9 136:7
**publicly** 133:24
134:6 137:5,25
**publish** 42:18
**published** 14:24
42:18
**publishing** 42:14
**pull** 140:12 188:18
**pulled** 136:8
168:20 188:5
**pulling** 194:13
**purchase** 12:20,25
13:1 24:10 27:25
32:19 33:7 39:2
43:14 45:7 60:1
64:14 69:4 80:8

82:21 84:2,3
104:1 109:6 110:2
110:14 142:5,21
144:13 151:8
153:18 159:19
174:12,13 179:1
187:18 188:8
193:13 194:7,9,12
194:21 195:17,19
197:13 207:11,12
208:22 211:4,6
213:4 218:17,22
**purchased** 40:16
44:13 61:13
103:25 104:11,12
117:3 144:17
162:9 170:10,20
**purchaser** 59:5,9
60:11 63:10,14,18
65:25 66:2 69:6
94:8 98:11 102:25
105:17,19 106:12
106:15,22,24
109:13 110:4
115:21 119:7,10
119:11,15 120:16
143:1 151:24
211:5
**purchasers** 60:6,8
60:8 61:6,9 84:5
105:25 116:12
219:8
**purchaser's** 109:14
212:5
**purchases** 44:17
143:23 149:15
162:6 165:18
170:7 192:20
**purchase/sale**
196:16
**purchasing** 42:25
44:21 46:5 60:3
105:18 142:14
143:1 152:7 168:4
170:25 193:9
**purely** 13:8
**purported** 52:3

**purporting** 124:9
**purpose** 54:15 93:4
  156:7 160:12
**purposes** 23:18
  49:17 53:6 58:13
  70:22 82:3 101:22
  105:12 107:15
  146:24 147:4,24
  158:20 159:12
  160:17 205:4
  213:7
**pursuant** 29:9
  86:15,16 116:19
  144:12
**push** 68:10 117:9
**put** 11:11 17:8 23:9
  61:12 82:14,17,19
  84:25 95:15 97:2
  98:9 114:13
  119:25 133:19,24
  134:4 137:17
  139:16 147:16
  149:5 159:11
  161:8 163:10
  180:7 183:1 186:8
  186:22 187:22
  221:15 222:21
**puts** 169:13 187:22
**putting** 82:14,20
**P&L** 32:2
**P-E-T-E-R** 190:25
**P-R-I-N-C-I-P-A...**
  191:1
**P.A** 10:2
**p.m** 111:15,15
  114:23,23 122:2,2
  163:1,1 167:19,19
  208:15,15 225:18
  225:18 226:20

**Q**

**qualification** 21:10
  22:14 36:17 48:23
  49:6,17,18,19
  50:10 51:5,16
  52:22,25 53:9,22
  75:16 90:19 91:15

91:21 129:1
**qualifications**
  14:23 18:6,7,8,9
  18:11,15,17 42:8
  43:23 44:8,9
  46:20 52:3 53:5
  72:12 88:13,14
  90:23 91:23 92:1
  102:14 131:10
  206:18 228:20
**qualified** 14:3 19:3
  21:16 36:12,22
  42:12 49:2,6,13
  86:24 90:10,20,21
  91:19 92:4 105:9
  105:10 124:5
  125:1 128:7,24
  130:20 131:3,12
  133:7 150:12
  207:3
**qualify** 36:19
  180:23
**qualifying** 31:6
**quality** 51:15 52:3
  52:4,16,20 53:7
  53:17 65:7 86:8
  87:2,12 90:1,12
  91:13 100:25
  142:3,4,5,7,10,15
  178:8
**quanta** 64:2
**quantity** 64:18
**quarter** 34:2
  177:19
**quarters** 177:20
**question** 13:8,13,14
  15:17 17:14 19:17
  22:14,24 44:2
  45:20 46:3 51:18
  71:7 73:4,18
  75:11 76:10,14,16
  76:20 77:12,14,25
  78:3,8,9,11,16,17
  81:9,15,16 88:10
  89:12,24 91:9,11
  92:5 94:14 95:20
  96:13 103:21

108:11,12,16
  109:2,3 110:12,13
  110:14 120:11,23
  127:18 146:14
  148:9 149:9
  162:12,16,18
  163:20 164:4
  166:2,4 169:7
  172:9 174:4 180:4
  180:10 183:9
  185:6,12,17,18,19
  187:7 198:17
  200:12 205:12,15
  205:16 216:23
  217:2
**questioned** 18:7
  89:14
**questioner** 148:2
**questioning** 71:25
  75:9 89:4 90:9,25
**questions** 14:5
  15:15 22:11 42:8
  47:14,18 48:7,10
  66:20,21 92:20
  101:13 103:15
  105:5 111:3,21
  112:8 113:20,25
  114:1,5,12,15
  115:14 118:4,16
  118:17 124:18
  125:8 130:13
  138:19 148:11
  176:21 183:8
  185:8 187:15
  188:21 208:3
  218:6,7 219:15,23
**quibble** 124:16
**quick** 165:2 216:9
**quickly** 84:8,14
  117:3,6 141:3
  164:13 183:23
  184:24 192:4,6
  195:2
**quite** 18:10 44:11
  48:1 67:12 88:20
  124:8 225:7
**quote** 128:8 145:23

146:4
**quoted** 127:16
**Quoting** 127:15

**R**

**R** 1:22 3:2 5:17
  6:16 11:1 228:17
  229:2
**radically** 56:1
**raised** 25:1 32:24
  133:21
**raises** 132:4
**range** 177:19
**ranged** 31:3
**rate** 51:25 57:12,20
  58:7,10 64:2,3
  127:1 166:18
  186:17
**rated** 86:25 166:13
**rates** 57:17,18
  186:12,18
**rating** 31:11 51:24
  91:22 166:18
  174:6 176:7
**ratings** 52:1
**rationale** 146:17
**Rationally** 132:15
**reach** 74:19 77:13
  78:10
**reached** 71:2
**reaching** 23:13
**read** 11:14 14:18
  15:22 18:8,9,10
  18:17 46:18 47:21
  47:23 48:1,12,15
  74:14 75:8,16,18
  76:1,1,11,14 77:1
  77:17 78:1,3,5,14
  87:21 89:14,16,19
  89:20,21,22 91:9
  92:17,19,25 93:2
  97:24 123:11,19
  123:24 125:24
  135:12,14 147:3
  160:22 172:7
  174:24,25 205:13
  205:13 209:19

210:18 211:21
  213:21 217:23
**reading** 54:15
  76:19 77:21 78:19
**readmitted** 221:10
**ready** 121:12
  138:20 222:1
**real** 22:24 57:23
  216:9 223:21
**realistically** 23:7
**realities** 129:19
**realize** 167:6
**really** 12:4,11
  21:25 22:10,11
  25:12 29:13 33:20
  35:21 41:4 49:21
  52:23 63:17 64:15
  65:15 74:11 89:5
  107:1 116:16
  117:9 129:8
  130:14 131:19
  223:1 226:16
**realm** 64:6
**reams** 52:15
**reargue** 122:8
**reason** 51:16 60:10
  117:19 124:3,9
  132:1 133:10
  145:15 148:18
  150:24,25 151:1
  156:10 200:22
**reasonable** 21:1
  53:6 62:22
**reasons** 11:23 15:6
  16:24 17:22 36:8
  50:1 51:15 85:8
  122:12 153:17
  207:9
**rebuttal** 121:21
  138:24 221:19
  225:14,20,21
**rebuttals** 138:14
**recall** 13:9 42:17
  45:4,6 46:7 49:11
  97:12 99:7,23,24
  110:11 118:7,8
  119:3 120:10,11

192:14 203:11,25
204:7
**recapture** 66:4
158:8 198:21
199:3 201:13
**receive** 119:17
154:10 155:8,14
171:4 203:3
**received** 28:14
32:14 54:7 66:6
71:6 74:3 125:19
138:9,12 155:23
157:22 174:6
190:11 223:15,17
226:7
**receiving** 62:24
65:5
**recess** 66:14,18
111:8,13,15
114:22,23 122:2
162:22,24,24
163:1 167:7,8,19
208:10,13,15
225:17,18
**recognition** 170:15
170:24
**recognized** 207:10
**recollection** 46:11
100:1
**Recon** 39:18,20
40:24 41:1
**Reconnaissance**
34:3,17,20 39:13
**reconvene** 66:15
167:16 226:11
**record** 17:4 23:9
27:11 37:11 67:1
78:1,5 93:4
101:20 105:3
126:20 136:10,12
136:17,21,23
137:17 159:18
161:20,21,22
190:5,18,24 224:2
224:4,7 225:9,10
225:15 226:9,13
**recording** 229:6

**records** 25:13
183:21
**record's** 180:11
**recourse** 65:9,11
**Recovery** 8:11
**recurring** 52:12
**red** 52:24 102:23
**redirect** 26:11
48:23 78:3 113:23
114:8,9,14,20
115:11 139:7
188:22 208:5
219:16,17 227:18
227:25
**redundant** 160:4
**Reed** 8:19 112:12
221:13
**refer** 29:6 68:19,20
108:23 152:19
175:25
**reference** 49:24
88:4 102:18 153:2
153:5,6,14 154:25
168:2
**references** 49:20
53:22 102:20
136:22
**referred** 54:9 73:15
101:18 142:22
150:18 158:7
166:5 188:16
189:9 209:1
224:13
**referring** 50:11
68:20 100:2,8
142:16 156:1
166:21 219:20
**refers** 213:6 214:10
215:19
**refinance** 57:19
**refinancing** 57:21
**refresh** 46:10 100:1
**refs** 81:11
**reg** 52:4,10 91:25
**regard** 25:15 32:7
49:15 77:6 131:5
**regarding** 15:19

19:22 45:6 47:25
49:12 54:17,19
72:24 73:20 75:22
104:13 138:17
169:20 173:12
223:22
**regardless** 69:19
70:3 85:5
**regards** 36:4
**regroup** 159:5
**regular** 29:18
58:13 144:4,7
148:17 196:25
197:2
**regularly** 55:4
184:1
**regulations** 184:4
**relate** 72:2,11
91:15 101:14
114:6 134:16
142:20 150:18
**related** 33:21 38:15
42:21 45:2 55:18
64:23 69:11 74:12
74:13,14 75:10
80:21 81:3 104:14
117:24 120:9
144:24 145:25
151:18 161:2
172:2 177:9
181:20 201:17
212:7,9 214:11,14
215:24 216:1
222:7
**relates** 13:5 27:21
36:24 54:20 90:11
93:17 109:4
168:25
**relating** 68:15
115:14 198:12,12
198:15 200:9
**relation** 40:8
**relationship** 100:19
120:2 193:7
**relationships** 84:4
**release** 59:9,13,14
59:16 177:22

179:1 182:4,21
183:4 204:3,5
209:15 212:19
214:23 220:22
**released** 42:24 43:2
46:6 59:3,6 63:16
64:19 65:5 84:3
104:9 179:7
181:14,21 182:21
182:24 197:14,17
197:18,19 218:22
**relevance** 27:20
90:14 92:8 129:7
129:8 131:6,7,9
131:13
**relevancy** 23:15
90:17 102:4,15
**relevant** 15:18 19:4
22:13 24:13 90:21
127:20 130:21
131:25 133:1,4,7
205:1
**reliability** 19:5,14
21:11,18 23:14
25:25 124:6
127:24 128:2
129:1 131:6 132:3
157:24
**reliable** 15:18 17:5
18:16 127:19
130:21 133:7
**relied** 132:23 169:4
**relief** 139:5,7
**relies** 19:12
**remain** 207:20
**remaining** 174:8
**remember** 59:25
60:7 83:3 84:7
85:13 94:24 96:3
96:7 99:13 170:3
**remind** 23:18
**reminded** 88:1
**remit** 56:14 202:12
**remittance** 155:8
155:11,14,19
156:15 157:21
173:22

**remittances** 56:16
**remote** 149:4
**remove** 136:5
**rendered** 103:4,8
**renew** 122:9 126:21
**renewed** 27:3
147:25
**rep** 65:16,19 200:7
**repeat** 126:23
133:14 162:12
166:3 174:4 187:7
**repeatable** 124:11
**rephrase** 89:12
94:1 108:16
110:13
**replicate** 124:12
**report** 11:18 16:17
16:20,21,22,23,25
17:1,4,6,11,13,18
17:23 21:6,8 25:3
26:2 131:18
157:18
**reporter** 76:14,16
78:8,17 108:12
133:13,15 142:12
162:20 205:15
**reporters** 23:19
**reporting** 52:10
**reports** 56:16
155:8,11,15,19,20
156:16 157:21
173:22
**represent** 101:12
103:21 136:5
**representation**
138:17 211:25
**representations**
65:21
**representative**
13:25
**represented** 65:25
**representing**
111:21
**represents** 22:16
157:15 158:5
**reps** 65:6 144:9,10
156:11 199:8

200:9,16,23 201:6
**repurchase** 156:4,8
  156:13,14 158:10
  200:20 212:5
**repurchasing**
  212:9
**request** 122:9,14
  134:2 200:20
**requested** 136:19
  139:7
**require** 17:22 25:3
  64:7
**required** 17:1 25:7
  31:10 39:3 52:7
  53:24 56:13 63:3
  95:7 106:23
  129:15 163:23
**requirement** 17:18
  20:6 22:18 25:23
  25:25 124:25
  128:2 207:2,13
**requirements** 22:7
  30:11 34:16 53:22
  53:25 64:23
  106:17,18
**requires** 16:5,20,21
  16:22,23,24 52:11
**reread** 108:11
**Res** 8:20
**researcher** 128:18
  128:23
**resell** 165:2
**reservation** 134:21
**residential** 31:3,22
  32:25 33:13 35:13
  35:15 40:4,9
  41:22 47:8 56:13
  139:22 141:24
  142:2,17 171:24
  172:15,21 191:16
  192:4,7,20 193:13
  194:7,12 195:17
  195:18,24,25
**resolve** 164:1
**resp** 104:16
**RESPA** 183:24
**respect** 14:17 21:11

22:6 23:6 30:20
32:20 37:23 38:2
40:13 50:14 51:7
59:12 67:20 68:1
70:12 71:15 75:1
75:14,15 76:5
79:22 83:9 90:1,4
91:20 92:2,15
93:10,13 94:2,11
94:17 97:9 102:3
104:5 109:24
111:22 116:15
119:23 127:1
134:2 136:4
146:19 150:1
151:14 164:18
199:19 200:2
201:11 204:1
207:24 211:22
228:20
**respects** 212:4
**response** 115:19
  127:4 154:10
**responsibilities**
  30:25 31:3,25
  32:7,9,18 56:1
  141:22 161:16,24
  192:3 195:6
**responsibility** 32:2
  32:2,16 162:8
**responsible** 31:14
  31:23 32:1 65:11
  142:2,5 144:8
  193:6 194:6
  195:17 196:15
  198:11,25 199:3,6
  199:8
**rest** 29:24 52:14
  109:24 119:21
**restate** 44:2 67:23
  76:10 166:5
  180:11 217:2
**restrict** 105:19
  107:19
**restriction** 130:6
  192:6
**restrictions** 107:22

112:6
**result** 156:19
  199:25
**resume** 33:18
  34:23 38:6 40:21
  227:10
**retain** 57:19 59:16
  155:15 162:3
  179:2,11 182:4
  205:23 209:16
  210:24 212:19
  214:24 215:1
**retained** 42:9 46:6
  48:3 59:3,6,21,22
  63:11,15,15,16
  64:19,22 65:5
  68:6 69:18 74:20
  77:13 78:9 80:7
  80:10 84:4 99:22
  100:5,5 104:15
  105:18 115:17
  119:24 143:23
  170:3 179:6
  181:14,20 182:19
  182:20,24 197:14
  197:17,21 200:24
  212:6 213:2
  218:22
**retained/released**
  43:6
**retained/service**
  177:22
**retaining** 84:21
  205:20
**retains** 199:7
**retreating** 147:13
**return** 98:24
  138:24 162:5,14
  163:9,22 164:6,10
**reverse** 115:6
**review** 74:2,4,5
  138:3,20 142:6
  150:11 159:17
  172:8
**reviewed** 16:10
  53:19 54:6 78:25
  79:6 101:16,21,25

106:3
**reviewing** 19:17
  70:7,13,19 71:2
  73:5 75:2 79:17
  155:20
**revised** 159:7
**revs** 80:20
**re-ask** 91:11
  185:18
**RFC** 221:14
**rid** 135:2
**right** 12:3,17,25
  13:2,13,15 14:6
  15:5 20:22 22:12
  26:20 37:1 38:16
  39:10,14,23 40:9
  41:14,15 43:9
  47:10,18 48:1,14
  48:25,25 53:5
  57:12,22 58:5,10
  66:24,25 67:20,22
  68:2,7,12 69:8
  73:13,17 75:4
  79:7,13 82:1
  83:18 85:20 86:1
  86:9,19 87:8,15
  87:19,22 88:17,21
  88:24 89:2,6,17
  89:23 90:2 91:13
  91:17 92:1,7
  96:13 98:7 99:25
  100:22 101:5
  105:12 111:4
  113:22 114:22
  120:17 121:13,16
  121:18,24 122:1,3
  123:9 124:18
  125:11,12 126:18
  130:1,23 135:25
  137:14,20,22
  138:5,15,23 139:8
  141:4,10,19,22
  143:3,19 144:19
  144:23 146:12,23
  148:12,14 149:24
  153:1 154:3,10,22
  156:25 157:13

158:10 160:7,11
160:17,25 161:13
162:21 164:9,23
167:1,3,4,9,15
175:10,21 179:4
182:13,16,18,21
184:8 185:15
186:18 188:16
189:17,22 190:9
190:21 197:21
204:21 206:10
208:1,7 210:4
213:24 215:7
221:1,7,17,18
222:23 223:12
225:5,8,17 226:2
226:4,5,10
**rights** 15:21 22:3
  27:23,24 43:3
  44:13 54:18,21,23
  54:25 55:2,3,4,6,7
  55:12,14,15,20,24
  56:5,11,12,24
  57:3,6,8,25 58:19
  59:2,12,18,19,22
  59:24 60:20,25
  61:2,7,10,11,15
  61:22 62:4 64:9
  66:8 68:5,5,5,14
  68:14 69:19 70:1
  70:7,18 72:20,23
  73:4 75:15 76:2,3
  76:6 77:6 79:2,6
  79:23 80:22 81:1
  81:4,5,6,7,13 82:5
  82:5,12,13,19
  83:1,17,17,18,21
  83:25 84:22,24
  85:3,4,7,11,16
  90:12 93:12,13,14
  93:19 94:3,8,12
  94:17 104:13,14
  105:20,22 106:1,7
  106:25 107:20,21
  107:23,25 108:2
  108:20,22 109:5

109:10,10,24,25
110:9 112:23
113:1,2,6,8,10,12
113:13,16 115:15
116:2 126:25
127:11 129:12,18
129:22,23,25
134:21 151:15,21
165:9 168:11
171:3,4,7 174:13
174:15 175:4,5,18
175:19 176:3
177:25 181:18
182:24 201:1
205:20 211:7
212:6,9 217:13,15
**rise** 11:2 23:24
57:15,16,17
111:16 138:16
163:2 205:7
225:19
**rising** 57:12,17,18
**risk** 31:8 34:4 39:7
39:22 65:12 140:9
152:12,13,14,15
166:20 186:16,23
186:24
**risks** 31:6
**road** 159:10
**Robert** 3:11 7:8
20:20 127:5
**role** 39:23 177:2,3
**ROME** 4:2
**rose** 136:4
**Ross** 165:18 166:25
174:2
**rotate** 23:20
**roughly** 186:4
**routine** 143:25
**ROVIRA** 5:17
**RTC** 35:7
**RUBENSTEIN**
10:14
**rule** 16:20 21:7
49:1 132:8 133:2
133:5,9 145:22
146:2,9 159:4,13

204:15
**ruled** 15:14 131:1
175:3
**rules** 204:22
**ruling** 133:6
189:25 204:24
205:3
**runs** 107:1

### S

**S** 1:23 3:2,11,21
11:1 227:4 228:4
228:17
**safe** 145:17 148:19
149:7,8 150:1,19
151:2 169:13,17
179:20 180:22,23
182:6,8 183:1
187:18,23 188:9
**sake** 82:14,16
84:25
**sale** 12:11,22 19:20
22:1 24:4,10
32:19 36:24 40:8
43:13 45:7 59:23
60:1 64:14 65:4
65:10 67:15,20
68:1,15 79:22
80:21 81:11 82:5
82:12 83:16,24
96:16 97:5 98:9
109:6 115:20,20
118:3,25 127:8
134:16 135:21
142:21 143:22
145:3 153:18
158:23 159:5
166:8 169:23
170:5 171:16
172:5,11 184:25
185:22,22 192:7
192:20 193:13
194:10,13,21
195:17,19 197:13
198:12,15 200:10
200:23
**sales** 38:11,23

65:14 84:3,4
116:21 184:21,22
194:7 196:16
197:21
**SANDRA** 8:17
**satisfied** 49:1
**satisfy** 21:23
**saving** 49:17
**Savings** 191:23
**saying** 26:17 78:7
93:11 94:24
110:11 142:20
169:3 170:2,2,10
180:23 181:9
186:15 187:20
188:13 216:23
**says** 17:17 20:24,25
74:10,10 85:5
125:13 159:25
173:12 211:22
212:24 215:14,16
216:1 217:8
**scale** 53:2 86:11
**scenario** 104:18
131:20
**schedule** 19:23
116:23,25 135:23
**scheme** 52:10
**Schnabel** 7:18
126:12,13,13
136:3,3,10
**SCHOLER** 5:2
**school** 28:14,16
**science** 28:13
**scientific** 128:12
132:17
**scientist** 126:5
**scope** 19:23 58:24
80:14 95:19
**SCOTT** 5:7
**scratching** 64:6
**Seafood** 122:25
123:2
**seal** 2:8,10 133:20
134:2,4,7,13
135:13,13,17,22
136:6 137:4,10,17

138:2,3,4,12,18
189:12,21,22,24
228:9
**seated** 11:3 66:19
111:17 114:24
122:3 163:3
167:20 191:2
**second** 21:19 27:22
45:23 54:17 64:20
125:19 156:25
187:13 211:17,18
224:16
**secondary** 192:8
**Secondly** 13:17
14:4
**section** 13:18,20
43:21 93:2 99:14
129:4 131:9,11
148:20 152:22
153:9,13 154:17
154:23 156:3
200:17,17 206:2
211:1,4,15,16,17
211:21 212:21,24
213:4 214:3 215:9
215:12,14,15
216:14,17 217:23
224:13
**secure** 87:17 152:7
163:19
**securities** 12:10
13:22 20:3,10,12
27:21 29:8,14,15
29:19 30:23,24
31:20,21 33:3,9
33:25 34:1,12
40:9 43:17 44:6
49:4,25 50:6 51:8
51:9,12 55:21,22
84:9 103:5,9
124:15,22 141:12
141:17 163:8
179:17,22 180:18
187:16 192:13
193:2,5,6 223:21
**securitization** 29:7
29:8 38:15,17

39:8 40:3 45:3
61:13,14 62:10
83:12 95:15 96:24
120:9 140:19
142:18 143:4,5,8
152:17 154:1
176:7,12 186:9
192:17,20 194:8
**securitizations**
29:6 38:22 152:15
**securitize** 33:7
95:14 152:11
165:2 171:6 174:3
174:8 176:9,15
**securitized** 32:6
33:2 39:8 47:8
52:17 94:24 96:14
116:24 117:4
170:21,23
**securitizing** 28:22
152:8 194:15
**security** 30:18 31:1
36:23 44:17 49:5
50:15 86:25 97:3
124:24 180:13
**see** 16:11 35:14
62:17 66:19 72:19
73:25 74:14 88:12
91:3 111:4 126:11
150:6 153:8,14
154:25 156:5
159:6 162:22
211:19 212:6,7,8
212:25 213:4,19
213:25,25 214:11
215:12,24 217:8
223:2
**seeing** 107:15
170:3
**seek** 15:15 133:18
134:7,13,15,23
164:24
**seeking** 127:7,10
160:24 220:15,17
**seen** 16:5,8 67:9
68:22 69:7 96:15
96:22 150:7

171:18 177:17,18
177:20 184:16
219:7
**segregate** 202:9,11
**segregated** 84:24
101:24
**SELBER** 4:25
**selected** 54:8
**sell** 35:9 57:9 99:20
100:5 115:23
116:1,4,18 117:4
118:1 142:23
151:24 165:2
174:11 176:10,11
176:13,15 179:6
179:10 185:1,2
186:2 197:18
211:5 213:23
**seller** 37:20,22 38:2
38:4 39:21 50:6
59:5,7 60:7,11
62:17 63:15 64:10
64:17 65:2,3,13
65:22,24 66:1,5
66:10,10 67:9,17
67:25 68:6,6,17
68:19 69:5 80:20
81:11 84:13 93:12
98:11 100:3
104:16 105:18
106:1 109:13
110:4,4,15 116:12
129:21,24 142:23
145:14,16 156:21
177:25 179:2
198:2,6,8,25
199:12,18,20
200:1 201:8,12
205:22,24,25
206:1,7 211:5,24
212:2,4 213:2,3
215:12,15,24
216:1,4,5,8,16
217:4,6,22
**sellers** 29:18 32:4
37:23 39:3 50:5,8
50:9,16 59:18,20

60:10 62:13 83:6
83:9 84:5 174:22
179:10
**seller's** 65:11 79:22
109:14 199:21
**selling** 16:3 35:22
40:3,10 45:2 50:7
116:6 117:2,11
162:2 192:6
194:15 209:7
**sells** 119:7
**SELZER** 8:17
**seminar** 14:24
**send** 142:24 184:6
**senior** 140:18
195:16
**sense** 65:8,24 66:1
66:5,7 105:21
121:14 149:1
164:12 177:25
178:4 216:18
**sent** 73:25 116:11
117:1 204:3
**sentence** 20:24
163:14 212:8
213:1
**separate** 12:21
16:3 24:4,11 68:4
68:13 82:5,25
83:17,25 93:22
96:13 110:8
136:22 141:25
158:25 188:7,8
199:12 205:22
206:8 216:16
218:17
**separated** 96:16
206:14
**separately** 84:24
**sequence** 117:22
**series** 143:10
**seriously** 25:23
**served** 44:25
**service** 50:21,21
51:18 54:4 57:24
61:9 67:20 86:4
86:12,18,25 87:4

87:7 92:4 104:1
104:10 107:19
119:20 120:8
155:15 156:19
168:11 175:5
177:22,24 179:1,2
179:7,11 181:14
181:14 182:4,4
183:4 188:8,9
201:3 204:16
212:7 215:17
216:3,4 217:6,15
218:21
**serviced** 64:2
173:15,20 176:6
177:8
**servicer** 19:3 20:1
20:7 27:20,24
34:15 51:15,17,24
52:1,14,14,16,20
53:1,7,18 54:24
56:13 58:22,25
59:16 60:14 61:3
61:19,24 62:16
65:2 66:7 67:9,17
67:25 68:18,20,21
69:5 79:22 80:20
81:10 87:10,15,17
90:2,5,10,13
93:12,14,19 94:4
94:9,22 95:2,5,6,8
95:14 99:22 100:8
100:11,15,23,25
101:13 104:3,15
104:18 106:6,15
106:21,22,23
107:2 108:21
109:13 111:23
112:6 115:22
116:4 117:16,17
117:23,24 118:23
119:16,18,22,23
120:13,17 125:1
129:21,24 145:14
145:16 156:22
162:1,4,10,13
163:15,16,21,24

164:5 166:13,15
173:9 188:1,4
193:8 198:2,6,9
198:25 199:13,20
199:21,24 200:2,8
200:23 201:6
202:3,7,12,17,19
202:25 203:1,3
204:12 205:16,18
205:19,22,24,25
206:8 207:2,14
215:19 216:6,8,16
217:5,15,21,22,24
217:24
**servicers** 32:13
50:16,19 51:3
52:11 53:4 54:2
59:21 62:20 63:3
116:15 163:8
184:2,6
**servicer's** 60:17,19
62:13 85:23
163:23
**services** 33:25 34:3
34:10,18,20 39:13
39:19 53:23 56:2
64:3 170:8 175:13
183:21
**service's** 184:14
**servicing** 2:9 12:23
16:2 20:5 22:1
24:5,11,14 27:23
27:25 36:24 42:24
43:2,3 44:13 46:6
46:6 50:20 51:1,4
52:24 53:14 54:3
54:18,20,23,25
55:1,3,4,6,12,15
55:21,25 56:3,4
56:11,12,24 57:6
57:8,12,22,25
58:5,5,12,16,19
58:24 59:2,3,3,5,6
59:7,9,10,12,13
59:14,15,16,18,19
59:21,22,23 60:11
60:16,18,20,25

61:7,10,15,24
62:4,8,17,21,22
63:2,3,11,13,18
63:20,23,24,24
64:8,9,15,19,22
64:23 66:8 67:14
68:1,4,5,14,21,22
69:4,5,18,19 70:1
70:7,18 72:20,22
73:4 75:15 76:2,3
76:6 77:6 79:2,5
79:23,23 80:7,8
80:10,22,23 81:1
81:3,6,7,7,13 82:4
82:13,22 83:17,24
84:2,3,22 85:3,11
85:16,24 86:3,5,6
86:8,10,11,18,21
86:22,22 87:1,12
87:19 90:10,12,20
91:3,4,19,22,23
91:24 93:10,18
94:3 95:8,24 96:5
96:16 97:5 98:9
98:13,18 99:1,6
100:5,5,6 102:24
103:1 104:2,9,13
105:20,23 106:1,7
106:20,21,22,23
106:25 107:4,5,21
107:25 108:20,22
109:5,10,10,18,25
110:2,5,6,9,14,16
110:16,18 112:2
112:20,23,25
113:4,6,8,10,16
115:15,17,22
116:2,5 117:16,18
117:21,25 118:2
118:23 119:5,8,24
120:1 126:25
127:11 129:12,18
129:22,25 142:10
142:11 151:9,15
151:22 152:3
158:23,25 159:2

162:3 163:16
165:9 168:11
169:24 170:3,4
171:3,7,16 172:5
172:11 173:9,17
174:13,15 175:1,4
175:12,18,19,23
176:3 178:9 179:6
179:23 180:2,5,14
180:18 181:10,18
181:20 182:24
183:12 184:13
187:18 188:2
194:13 195:20
196:16,16 198:13
199:7,7,10 200:2
200:5 201:1,12,19
202:15,17,20,22
202:23 203:1,4
204:3 205:20
206:1,1,24,24
207:10 208:22
209:7,15,16
210:24 211:7
212:6,9,18,19,25
213:2,23 214:11
214:14,14,16,22
214:23,24 215:1
216:6 217:13,15
217:18 218:17,22
222:13,16 223:16
224:10 226:6
228:14,15
**servicing's** 91:13
92:4
**serving** 130:10
**set** 25:25 32:25
33:12 39:15 50:21
82:25 106:4
122:13 135:1
**sets** 83:21
**settlement** 18:12
**seven** 54:13 148:25
150:8
**Seventh** 5:13
**seventy** 198:7
**seventy-five** 198:7

**sever** 159:5
**severability** 15:13
18:4 24:2 70:6
71:2,10 73:20
75:14,25 76:2,5
76:17 77:6
**severable** 16:14
24:14 69:19,21
97:5
**severance** 12:16,17
13:15 14:7
**severed** 13:15
**severely** 21:7
**SEWARD** 8:2
**shareholders**
151:12
**SHAW** 4:11
**sheet** 164:19,21
168:7,10 173:2
189:9
**shockingly** 137:22
**Shoot** 122:1
**short** 20:13 66:14
112:14 121:25
125:5 152:11
167:8 206:25
208:9 223:11
225:7
**shorter** 184:16
**shorthand** 71:14
71:17,22 115:3
**shortly** 149:5
**show** 69:2 159:20
204:4
**shows** 124:23
**Shut** 22:20
**Shuta** 128:9
**sic** 195:10
**side** 38:17 50:12
62:9 113:8 151:8
152:17 170:5
191:4
**sides** 15:14 22:16
125:8
**SIDLEY** 5:11 6:11
**sight** 127:7
**signatory** 142:1

**Signature** 229:10
**signed** 16:21 30:10
154:8
**significant** 16:7
35:6 52:12 83:14
86:10 99:2 130:10
132:20
**significantly** 43:12
63:2 109:23 118:1
**signs** 17:3
**SILVERSTEIN**
4:25
**similar** 28:1,23
29:25 59:11 64:15
196:1
**similarly** 50:19
52:9 61:8
**simple** 58:8 124:2
**simply** 14:3 19:12
52:23 59:24 66:7
84:7 159:4 163:14
**simulation** 58:4
**simultaneously**
117:8,11 213:3
**single** 14:24,25
20:9 60:19 68:6
68:17 145:13
150:18,22,25
151:1 169:11,17
218:24
**sir** 28:7 66:15 72:4
100:18 139:13
162:24 171:14
179:21 180:13
182:2,13,23
183:11 184:3
187:1,16 189:4
191:3 208:13
210:9,10 211:7
218:11
**sit** 98:7
**sitting** 13:9 153:23
165:3
**situation** 65:13
96:18 104:14
108:1 112:16
115:20 132:19

165:23
**situations** 106:4
**six** 35:10 54:13
195:3 196:19,22
**sixty** 211:19,22
**sixty/forty** 43:6
**size** 53:3 81:24
85:23 86:7
**skill** 100:23 162:10
162:13
**skipping** 163:17
**slide** 64:5
**sliding** 53:2
**slightly** 15:11
161:14
**slip** 125:13
**slow** 57:14 140:23
141:1 142:12
**slowed** 57:11
**slowly** 141:7
**small** 38:17 55:20
86:5,22
**smaller** 38:20
60:21
**smart** 126:4
**Smith** 8:19 112:13
221:13
**sold** 32:5 33:5,11
33:19 34:21 44:13
46:22 47:5,6,8
57:1 59:21 84:10
95:24 96:16 99:11
100:6 104:16
142:18,25 153:24
153:25 154:1
164:19 181:14
185:20 207:17
212:10
**solely** 103:12 104:4
**Solomon** 186:20
**solve** 15:3
**somebody** 20:8
110:2 171:11
**somewhat** 18:25
**SONTCHI** 1:23
**sophisticated**
102:17

**sophistication** 87:2
87:2
**sorry** 23:17 54:7
56:9 67:23 68:8
77:10 78:17 88:8
88:9 92:12 93:6
94:14 96:12 102:9
108:11 109:15
113:1 121:19
123:1,5,5,13
125:11 140:24
141:10 142:13
143:13 152:22
153:4,9,12 154:18
156:3 157:17
160:16 161:18,20
162:12,23 163:5
164:3 172:18
173:3 174:4 180:3
185:16 187:1,11
189:2,5 192:10
198:17 210:2
216:11
**sort** 11:15 125:7
131:19 132:18
**sought** 63:21
**sound** 229:6
**sounds** 107:10
**source** 84:9
**sources** 52:21
**sourcing** 31:4
**South** 7:4
**speak** 23:19 45:2
141:3,7 151:19
185:11 203:8
**speaker** 44:23 46:8
221:5
**speaking** 21:25
102:3 150:19
151:17 172:10
185:11 187:12
**speaks** 146:8
204:16
**spearheading**
192:7
**special** 15:1 65:22
178:9

specialization 28:15
specialized 22:21 128:8,9 132:17
specialty 33:13 58:2
specific 32:7,9 55:16,20 57:5 60:4 61:4,25 65:19 69:14 70:20 75:14 85:6,6 91:23 92:4 96:20 99:14 105:6 106:17 107:22 122:14 125:6 132:25 145:1 181:19 204:7
specifically 13:19 24:23 39:18 46:7 61:4 69:10 80:18 81:3 105:14 151:17 156:1 168:10 180:20 191:17
specified 215:4
spectrum 64:5
speculate 165:21
speculation 165:13 165:25 166:1
spell 27:12 139:11 139:13 190:23
spelled 190:25
spend 115:4
spent 39:13 40:1 149:3 182:24
split 197:17
spoke 223:24
spoken 14:6 179:18 180:17
spread 152:15,16 152:16 186:23 201:18
spreads 186:16
staff 144:3
stage 163:21 164:3 164:5
stages 117:19

stand 20:9 21:17 27:9 66:5 124:8 139:10 173:24 176:3
standalone 195:20
standard 19:14 24:20 36:4 50:18 51:2 54:1,2,20 94:2,15 106:13 127:23 128:3 143:21 207:10
standards 21:10 24:2,3,18 36:5 49:20 52:8 89:25 90:4 91:12 130:20 131:24 206:22
standing 188:15 205:6,8
standpoint 31:8,8 37:20 39:8 60:17 80:4,6 199:25
stand-alone 112:19 113:4
STARGATT 3:3
start 33:21 60:18 64:5 141:19 148:9
started 11:4 29:3 29:23 35:11 62:15 104:6 195:2,14 197:6 204:2,2
starting 73:18 75:7 75:12 77:12 78:8 88:10 140:15 185:10
state 14:4 27:11 123:21 124:14 136:23 139:11 140:6 190:23
stated 17:22 42:17 69:25 70:1 74:14 85:9,11 91:14,22 92:8 147:8 183:1 205:23 206:15
statement 16:22 67:22 136:16 174:10
statements 131:16

states 1:2,14 211:5
statistical 128:19
statistically 124:18
status 221:15
statuses 214:10
stay 12:13 13:12 30:13 31:17 32:21 33:4 34:17 57:23 149:10
stayed 151:7
stays 115:22
Stearns 5:12 6:12 131:8 139:25 140:2,3,8 141:20 145:17 149:1,2,11 149:16 150:21 151:6 152:3,5,6 153:17 165:10 168:5 169:22 171:6 172:3 174:12
step 36:18 61:24 121:1 128:15 140:10 188:24 220:2
Stephen 139:12 227:19,20,21
steps 73:19
STERN 5:19
STEVE 9:14
Steven 139:10
stipulate 158:19 159:11 180:6 204:19 212:14 222:9,11
stipulation 159:16 159:21 207:23,25 208:2
stop 12:21 148:7 202:22
stops 38:5 40:21 41:3
story 23:16
straightened 209:3
stream 57:22 62:2 120:20
Street 1:15 3:6 4:5

4:22 6:6,13,20 7:4 7:14,22 8:13,21 9:4 149:12,17 150:1,4
strength 51:19 87:7 87:11,11 91:16
stress 201:17
stricken 125:23
strict 34:16
strike 80:12 85:10 122:11,14 126:16 126:23 130:24 132:18 133:11 147:5,25 149:14 181:11 187:2 209:2 228:22
striking 205:5
strip 57:23 58:5 59:7,15,16 63:13 99:23 120:9,14
strong 60:10
strongly 11:22
structure 115:6 141:17 149:4
structured 2:5 9:3 9:10 31:24 37:12 61:17 67:2 69:6 80:9 176:1 190:19
structures 52:18
studied 20:12
studies 44:16
study 19:13 124:23 124:23 126:1 137:3
stuff 84:7
subject 24:4,13,21 27:19 61:1 74:25 75:5,22 76:21 78:22 104:6 105:22 106:4 118:17 128:13 135:14 137:14,20 147:24 205:4 207:22 208:5 225:8 226:8
submission 189:25 224:5 226:13

submit 14:5 18:14 22:22 63:14 128:21,25 130:21 135:23
submitted 14:14
subsection 211:23 214:4
subsequent 68:24 69:1 105:19 108:21 115:24 116:19 119:24
subsequently 51:21 116:1 119:12 120:15 142:18
subsidiary 171:25
substance 66:16 162:25 208:14
substantially 61:11
substituting 14:15
sub-prime 32:25 43:2 64:6 177:10
succeeded 31:22
successor 20:7 53:24 106:20,21 125:1 202:17
sudden 66:9
suddenly 175:17
sufficient 51:22 62:25
sufficiently 49:2 127:18
suggest 12:4,6,18
suggested 128:18
Suisse 195:3,4 196:4
suitable 61:20
Suite 4:6 7:15 8:14 8:22
sum 59:9 158:3
summarized 129:10 206:25
summary 157:25
supervision 157:18
supplement 225:8
support 23:24,25 26:20 192:19 193:8 194:14

195:21
**supposed** 202:9,10
**Supreme** 127:14
**sure** 30:9 32:13,14
  35:2 44:4 54:8
  60:23 62:20,23
  72:15 78:8 83:7
  94:14 98:14 99:8
  100:24 107:6
  110:11 113:18
  116:8 119:10
  137:15 140:11,17
  152:21 162:13
  166:4 175:25
  184:23 188:17
  191:10 201:2
  205:1,21,25
  209:19 216:10
  221:22,25 222:7
  225:5
**surprised** 102:16
**survey** 124:16,16
  124:17,19,20
  128:18
**sustained** 70:16
  81:16 108:15
  174:20
**sweeping** 16:1
**switch** 135:9
**sworn** 27:10 190:22
**system** 119:23
  183:22
**systems** 87:2,3
**S&P** 166:12
**S-T-E-P-H-E-N**
  139:12

**T**

**T** 3:13,22 4:16
  227:4,4 228:4
  229:2,2
**table** 142:24
  159:12
**take** 20:21 25:22
  42:9 43:11 44:4
  61:24 63:3 66:14
  88:5 107:3 111:7

111:13 114:12,19
  114:22 115:13
  118:3 131:7
  137:10 144:19
  145:17 148:5,16
  151:13,25 152:11
  162:21,23 167:15
  172:8 174:16
  175:4,11,16,19
  177:22,25 184:19
  184:24 185:3
  186:4 202:10
  208:9 221:20
  225:17
**taken** 36:14 128:15
**takeout** 176:12
**takes** 117:18,25
  119:20 183:19,25
  184:5,13,18
**take-away** 169:21
**talk** 28:3 64:20
  65:8 76:23 84:14
  84:15 94:7 114:13
  114:19 117:20
  130:12 143:6
  171:8 191:17
  224:11
**talked** 20:9,11
  74:24 118:13
  131:6 208:20
**talking** 12:12 24:6
  28:23 30:6 35:11
  72:11 73:20 80:1
  80:18 85:7 92:10
  156:2 163:7
  179:17 181:12
  182:10,10 186:7
  213:1 216:24,25
**TALMADGE** 5:7
**tape** 76:15 116:7,11
  116:16,25 118:2
  140:25 185:4
**tapes** 116:21
**target** 17:7
**taught** 14:25 22:19
  42:20
**TAYLOR** 3:3

**technical** 128:12
  132:17 133:16
  161:19
**technology** 52:6
**TELEPHONIC...**
  3:14 5:20 7:10
  8:8 10:15
**telepurposes** 23:9
**tell** 12:19 13:11
  49:14 75:9 76:20
  78:25 102:16
  118:9 156:11
  160:25 168:24
  169:8 207:20
  226:14
**tempered** 131:2
**template** 29:13
**temporarily** 138:2
  189:24
**tempted** 92:25
**ten** 18:11 46:23
  48:16 54:16 88:2
  88:24 89:23
  211:23
**tenant** 94:22 95:3
**tendency** 60:4
**tenets** 61:17
**tens** 183:20
**tension** 11:22
**tenure** 44:24
  218:16 219:6
**term** 116:7 155:4
  168:7,10 173:2
  179:23 180:1,14
  189:9 194:19
  198:18,20 201:20
  201:21 214:15,16
  214:16,19 215:5,6
  219:19,23
**terminate** 12:13,15
  12:18,25 13:2,15
  14:7 15:5 107:19
  151:3,14 152:3
  200:4 201:7,12
  202:15
**terminated** 12:22
  94:3 175:4,18

217:13
**terminating** 106:15
**termination** 94:8
  94:12,17 106:8,13
  106:16 151:5
  153:7,14,18
  172:25 215:3,3
**terminology**
  166:17
**terms** 14:22 30:10
  38:1 42:25 51:18
  51:23 57:23 61:4
  64:17 69:20 70:4
  79:9,12,15 97:6,9
  113:2 129:15
  144:25 145:1,1
  147:1 151:11
  158:2 159:16
  162:5 164:10
  168:7 170:6,8
  171:3 175:21
  176:14 178:16
  181:17,22 201:23
  204:17 221:15
**test** 19:5 22:14
  124:6,12,22
**tested** 124:21
**testified** 14:13
  15:20 18:3,9
  43:11,15,20 44:5
  48:16 59:17 74:8
  75:21 80:14 84:6
  94:20 95:23 97:4
  97:13,17 98:8
  103:22 105:6,10
  108:20 110:7
  118:21,24 129:14
  168:2 174:5 182:2
  188:11 209:4,10
  209:15 217:14
**testify** 13:6 15:8
  16:15 18:6 19:16
  25:8 125:10
  165:17
**testifying** 2:4 74:16
  96:3 171:5
**testimony** 2:5

11:12,16 12:16
  15:19 16:6 19:5
  20:1 21:12 22:13
  23:4,11,13,15
  24:1,8 25:13,21
  26:3,5,9,10,15
  27:4,18,19 36:15
  36:18 38:9 40:20
  45:4 46:14 49:4
  49:11 50:23 51:25
  56:8,9 66:16
  75:19 76:8,21
  80:15 82:3,9
  85:13 90:14,17
  99:23,24 110:23
  112:15,19 114:7
  119:3 121:9
  122:12,15 123:17
  124:7,11,13,14
  126:7,15,16
  127:15,19 128:25
  130:15,18,21,25
  130:25 131:21,22
  131:24 132:8,9,10
  132:10,16,20,21
  133:2,4,4,6,6,8,12
  139:2 145:20,25
  147:4,21,24
  159:22 162:25
  168:2 169:22
  173:25 174:7
  177:4 181:23
  183:2 187:17
  188:7 194:17
  205:2,4,7,9 206:4
  208:14,25 228:20
  228:23
**testimony's** 127:17
**testing** 43:25
**tests** 133:9
**text** 12:14 20:5
**Thacher** 28:17,19
  29:15,17,20,22
  42:15 43:5,7,9
  203:21,22 209:17
  209:20
**thank** 15:9,10

| | | | | |
|---|---|---|---|---|
| 18:18,19 20:17 | 84:16 115:3 | 198:23 204:17,22 | 46:10 47:22 48:1 | **told** 21:5 74:24 |
| 23:22 24:25 27:7 | 178:24 181:19 | 206:25 209:2 | 48:12 49:18 50:5 | 75:2,12,13 76:4 |
| 28:2 36:21 37:2 | 187:24,25 | 220:11 222:3,20 | 53:11 57:7,7,13 | 76:20 77:5,7,20 |
| 42:2 45:16,16,25 | **think** 11:20,23,24 | 223:23 225:3 | 57:20 58:7,9,9 | 77:21 78:18,19 |
| 46:2 47:11 48:19 | 12:3,7,19 15:6,23 | 226:16 | 60:6 65:15 82:6,6 | 118:6 129:20 |
| 48:21,22 49:7 | 16:18 17:2,5,6,10 | **thinking** 85:21 | 83:11,19 87:10,22 | 137:1 147:13,18 |
| 66:12,13 67:1 | 19:6,21 20:4,15 | **third** 21:10,24 | 88:5,16,21 115:4 | 169:10,16 |
| 68:11 81:18 88:11 | 21:14 22:16 23:10 | 22:19 26:1 51:5 | 116:16,17 117:12 | **tomorrow** 24:19 |
| 92:21 101:3,4 | 24:11,16,23,25 | 61:23 105:20 | 117:19 121:24 | 86:2 221:25 224:1 |
| 103:16 104:20,21 | 25:11 26:5,6,14 | 107:21 110:3 | 125:4 129:12 | 226:10,11 |
| 111:2,10,14 112:9 | 26:19 43:22 46:13 | 117:11 119:6 | 133:15 135:14 | **top** 7:25 52:18 |
| 113:21 114:25 | 46:18 48:7,16 | 127:23 128:9 | 141:1 146:25 | 100:2 137:21 |
| 120:4,24,25 121:1 | 49:16 53:1,8,11 | 202:24 203:1,3 | 147:5 149:3,5 | **topic** 22:19 42:21 |
| 121:3 122:17 | 53:12,16 54:13 | 214:10 | 152:10 156:23,23 | **topics** 45:2 92:3 |
| 123:24 126:11,18 | 56:6,6 61:8 62:15 | **thirdly** 14:13 | 160:10 165:4 | **total** 33:10 125:15 |
| 127:2 136:11,15 | 67:13 68:3 69:21 | **thirty** 183:25 | 166:16 171:18 | 158:5 |
| 138:13,15,21,22 | 70:11 71:6,20,21 | 184:11,13 | 172:8 174:7 | **touch** 68:9 |
| 139:15 148:12 | 75:21 77:15,24 | **thought** 11:14 76:2 | 177:13 178:6 | **traced** 124:25 |
| 157:8 160:3 | 78:1,12 82:6,6,16 | 90:16 91:3 94:21 | 184:5,9,16,17 | **tradability** 90:11 |
| 161:10 163:4 | 82:18 84:4 85:8 | 102:13 133:21 | 186:25 193:18 | **trade** 30:11,12 |
| 167:1,17 172:19 | 86:21 87:23,25 | 176:2 185:9 | 195:7,9 196:9 | 55:11 58:19 60:21 |
| 172:25 176:18 | 89:24 91:17 95:6 | 187:11 | 198:8 205:7 | 60:24 64:18,19,22 |
| 183:10 188:20,23 | 95:23 97:17 99:11 | **thoughts** 167:8 | 209:22 211:6,6 | 64:24 81:25 82:11 |
| 188:24,25 190:13 | 99:18 101:17 | 208:10 | 221:2 | 83:10 124:22 |
| 191:2 205:10 | 105:21 109:1,4 | **thousands** 183:21 | **timely** 100:24 | 145:3,6,8 152:16 |
| 208:12 217:3 | 110:20,22,25 | **three** 48:6,7 50:1 | 156:18 | 178:24 186:24 |
| 219:14 220:3 | 111:11 113:8,19 | 54:7,14 64:16 | **times** 57:10 178:19 | 200:24 |
| 221:8 223:18 | 113:24 121:4,18 | 65:17 74:3 119:1 | **Tire** 127:14,15 | **traded** 55:4 56:3,24 |
| 226:18 | 122:14 124:4,7 | 127:10 130:19 | 132:6 | 57:3,7 85:12,15 |
| **That'd** 205:10 | 125:4,6 126:6,9 | 133:7,10 141:21 | **title** 139:23 140:3 | 129:25 |
| **theirs** 83:15 | 127:6,8 128:19,23 | 155:5,6,13 166:22 | 192:14 195:14 | **trader** 140:18,18 |
| **theoretically** 84:15 | 131:7,8,13,14,22 | 177:3,3,20 178:15 | 215:12,15,17 | **traders** 30:9 |
| 96:18 110:24 | 131:23,24 132:4,9 | 182:24 184:19 | **TMI** 127:25 | 200:24 |
| 117:13 | 132:20 133:1 | 218:15 219:3 | **today** 21:8 33:17 | **trades** 12:21 81:21 |
| **theory** 26:16,18,19 | 137:6 147:16,20 | 222:7 223:7 | 34:9 40:22 41:16 | 124:24 173:11,12 |
| 26:21,22,22 129:9 | 147:21 148:8,16 | **three-eighths** 64:3 | 53:4,7 69:10 | 195:23 |
| 129:9 130:2,5,22 | 149:22 160:3 | 64:4 177:10,15,16 | 74:16 77:15,23 | **trading** 29:10 |
| 131:25 158:22 | 163:7 165:15,25 | **threshold** 36:16 | 78:12,21 79:3 | 31:22 32:2,3,4,9 |
| 160:6 | 166:4 169:1,3 | **thrift** 29:11 | 82:9 98:7 102:7 | 55:22 57:3 82:23 |
| **thereof** 45:3 211:7 | 172:9 173:22 | **tie** 12:13 188:17 | 102:25 103:4,8,11 | 84:19 103:8 |
| **they'd** 62:23 | 175:9,14,21 176:5 | **tied** 95:9 | 105:10 112:15 | 124:23 141:16 |
| **thing** 19:21 25:15 | 177:14 178:13 | **time** 18:10 20:14 | 130:12 153:21 | 191:16 195:22,23 |
| 46:19 119:22 | 180:20 181:16 | 26:4 29:2,5,11,13 | 164:18 166:6 | 196:17 |
| 138:5 147:9 148:2 | 182:7 185:11 | 29:20 30:18 33:6 | 170:18 171:5 | **training** 22:22 49:3 |
| 162:8 | 187:17,24 188:3,4 | 33:20 35:21 38:2 | 175:15 206:4 | 128:11 |
| **things** 25:17 52:2,6 | 189:6,7,8,22 | 40:10,22,25 41:1 | 221:23,24 | **transaction** 14:17 |
| 59:24 73:16 82:23 | 190:2,6 191:4 | 41:2,4,8,22 44:11 | **today's** 158:20 | 30:1,4 31:7,9,15 |

32:11 33:24 34:15
39:22 41:17 44:12
50:24 59:3 60:5
60:20 61:18 63:13
73:23 80:10 83:2
92:5 94:24 107:14
118:25 119:3
140:20 151:9
156:1 157:16
163:24 164:21
165:14 166:8,14
170:16 175:14
176:8,12 179:9
182:11,19,20
183:11 184:2
186:4 193:10
194:6 195:16
200:25 212:19,19
213:7 214:23,24
215:1
**transactional** 28:20
**transactions** 24:7
31:4,5,11 32:10
35:24 38:10,14,20
38:21,25 39:5,9
40:2,6,8 42:25
43:5 49:22 50:11
53:4 60:5,8,9 61:5
61:23 65:11,15
85:22 95:23 96:4
96:25,25 97:15,19
98:6 101:13 104:5
130:3 145:1 182:1
195:22 196:17
197:14,14
**transcribe** 212:18
**Transcribed** 2:25
**transcriber** 229:4
229:10
**transcript** 72:17
78:6 229:5
**transfer** 53:14 62:9
79:23 80:22
105:19,23 106:23
108:21 110:6,9,16
115:15 116:2,5
117:16,18,22,25

118:2 119:24
127:11 129:17
130:6 156:19
165:11 171:7
174:2 183:20
184:14 202:18
214:11,14,16,22
215:4 217:14,21
217:24
**transferability**
55:1,3,7 61:10
90:11 93:14,18
107:19,21 108:20
115:15,16
**transferee** 81:4
**transferred** 68:3
68:14,23 116:24
119:6 183:12
202:17,24
**transferring** 81:12
117:17
**transfers** 104:1,10
119:12,20 129:12
**transmitted** 120:15
**transmitting**
119:19
**transparency**
51:23
**TRAURIG** 8:10
**traveled** 68:5
**treasuries** 186:24
**treat** 117:21
**treated** 85:12
**treating** 80:10
**tree** 62:16
**tremendous** 84:12
**trial** 1:25 15:15
21:12 25:22
127:18
**trick** 71:24
**tried** 39:6 134:2
159:20 176:10,11
176:16 200:15
**triggered** 156:8
200:6
**triple** 214:7
**true** 65:10 74:18

77:4 186:21
214:25 224:19
**trust** 95:15 117:5
142:18 159:22
170:24 171:2
**trustee** 4:12 7:13
19:25 101:12
126:15
**trustees** 40:3
**Trustee's** 134:3
**trusts** 40:3
**try** 35:14 105:5
108:16 143:12
165:1 178:25
180:22
**trying** 48:18 88:3
115:3 149:4
153:23 159:9
160:8 164:1
179:19,20 210:23
212:18
**Tunnell** 6:2 222:6
**turn** 49:10 65:2
77:9 88:6 92:10
115:7 121:11,15
139:6 153:5
154:16 162:11
171:9 172:25
204:4 211:1,14
212:21 213:10
214:3 215:9
**turning** 21:9 34:22
34:22 54:17
**turns** 26:21 224:18
**TWEED** 7:2
**twenty** 36:2 67:16
150:4
**twenty-five** 22:15
43:7 64:2 67:8
82:10 105:7,16
119:1 129:3 177:9
**twenty-seven** 39:16
42:15
**twice** 128:1
**two** 18:2,4 21:4,14
21:25 24:21,24
27:17 30:14 33:9

38:14,22 39:9,14
43:20,25 47:14,18
48:9,10 49:11
60:24 75:14 82:15
82:20 83:17,25
86:3 103:22
109:19,21 110:4
122:24 123:4
125:6,8,14 134:1
145:14 184:1,1,19
188:5,14 192:25
199:12,16 201:9
207:9,11 216:16
223:7 224:9
**type** 50:4 51:18
54:3 63:20 91:20
99:4 118:24,25
119:2 128:25
145:20 165:14
177:15,18
**typed** 229:13
**types** 52:17 53:5
105:14 107:18
152:12 177:8
194:24 199:16
**typical** 65:12 68:20
106:18,24 113:3
176:12 177:16
199:20
**typically** 24:10
40:24 51:2,12,25
57:18 81:25 94:3
94:7 98:8 106:19
107:3,24 117:18
117:25 118:2
120:3 142:22
164:23 178:7
185:3 199:8
203:22
**Tyson** 122:25
123:2

_____

**U**

**U** 228:17
**UBS** 134:20 223:21
223:23 224:5
225:9 226:8

**Uh-huh** 170:19
187:14
**ultimate** 22:11 32:2
**ultimately** 21:21
31:22 56:19 61:12
95:10 132:23
142:25
**umpteen** 126:3
**unable** 166:17
174:3,7,11 186:8
199:24
**unambiguous**
14:10 204:20,22
**unbiased** 22:17
129:5
**uncertainty** 174:9
**uncomfortable**
69:22,24
**unconstitutional**
125:21
**underlying** 55:17
56:21 90:13
135:15 178:8
**underneath** 15:21
**understand** 11:15
11:17,21 17:21
24:6 36:13 46:20
48:3 49:21 59:19
61:7 71:25 72:10
72:23,25 80:17
81:23 83:16 87:13
94:14 109:3,4,20
110:11 115:10
119:11 147:12
159:23 164:4
166:2 169:10
182:2 184:3
219:20
**understanding**
24:17 55:13 56:4
56:6,10 58:21
61:15 62:1,4,7
63:19 70:21,23
74:2 80:9 107:24
109:16 113:5
132:16 151:1
187:20,21,23

188:11,13 198:10
200:4 201:20
202:1,2
**understands**
109:25
**understood** 63:24
70:9,24 72:18
113:9 136:9
147:10
**underwriting** 31:4
**unfair** 114:10
115:9,9
**unfamiliarity**
131:11
**Unfortunately** 25:2
101:5
**UNIDENTIFIED**
66:23 73:9,10
101:7 111:14
123:22,23 137:6
141:5,8 157:2,3
221:5
**unified** 179:19
218:20 219:3,7,10
219:9,9
**unifying** 187:17
**Union** 141:15
**unique** 165:23
**unitary** 145:16
169:11
**United** 1:2,14
**University** 140:6
**unknowledgeable**
14:1
**unmanageable**
60:19 61:3,23
**Unpaid** 158:15
**unrelated** 182:14
182:16
**unremedied** 200:7
**unsecured** 3:17 4:3
35:9
**unusual** 81:6
**UPD** 158:12
**UPDs** 158:14
**upheld** 181:7
**urge** 17:21 23:4,11
23:25 24:24

**use** 29:12,15 37:8
39:3 57:10 78:5
83:25 84:1 98:17
150:17 163:15,16
194:19 203:17,22
210:2 212:2
**useful** 11:20 160:21
**uses** 145:15
**usually** 199:18
**U.S** 1:24 7:13 29:12
126:14

--------

### V

**v** 22:20 123:20
128:8
**VADIM** 10:14
**vague** 216:23
**valid** 11:24 25:1
124:18
**valuable** 58:16
92:6 181:16
**valuation** 58:3 59:1
**value** 55:11 57:8,11
57:16,17,25 58:5
58:6,12,18 59:14
59:15 60:16,17
64:11 81:4 104:3
127:13 164:14
181:17 182:7
186:12 212:1
**valued** 56:3
**values** 59:7 103:8
124:23 178:22
179:3
**valuing** 55:14 64:9
**varied** 116:11
**varies** 107:9 177:13
177:13
**various** 33:14,20
34:14 38:5 52:21
60:8 97:20 116:21
150:4,7 152:12
**vary** 61:4 177:18
182:23
**vehicle** 50:4
**verbal** 115:19
**versa** 26:19

**version** 28:25
71:22 116:22
147:16 211:9,10
211:13 212:13,15
212:15
**versus** 59:3 62:13
82:19 115:15
146:4
**viability** 52:5
**viable** 87:10
**vice** 26:19 192:15
194:6 195:16
**view** 14:16 20:15
22:17 23:5 55:1
56:11 65:9,10
75:6 99:22 109:15
129:6,20 150:14
166:7 200:25
**viewed** 49:14 65:15
130:1,5
**views** 24:17 94:8
128:20,21 129:3,4
130:7
**vis-a-vis** 109:18
**vitae** 220:16
**voir** 36:20 37:1,15
42:1,4 47:19
131:2 227:7,8,9
**volume** 57:3 157:4
**voluminous** 29:9
**vote** 125:15,17

--------

### W

**W** 5:19
**wait** 108:10,10
172:20 213:16
**waited** 21:17
**waived** 169:3,5
**Waldorf** 22:20
128:8
**walk** 38:5 159:20
**Wall** 149:12,17
150:1,4
**Walrath** 21:19
**want** 15:24,24,25
38:5 39:17 60:11
60:14 65:9 71:14

71:17,18,25 72:7
75:8 87:17,24
99:25 109:18
110:7 112:3 114:8
114:12,19 116:3
118:21 120:12
121:13 122:3
123:9 125:24
136:10 139:4
140:13 147:1
150:20 153:20
156:10,12 159:11
159:17 179:7
185:12,18,19,24
189:12 190:3
200:22 211:16
220:12 223:1,4
224:14 225:4
**wanted** 13:24 18:22
48:11 74:19 75:4
76:25 77:5,13
78:10 82:12 88:12
105:19,25 110:6
117:9 133:18
205:20 209:20
222:7 224:2,9,20
**wants** 11:10 65:10
222:20
**warehouse** 142:3
142:20,25 148:24
151:8,23
**warrantees** 80:20
81:11
**warranties** 65:6,22
199:9 200:9,16
**warrants** 144:9,11
156:11
**warranty** 65:16
200:7 211:25
**Washington** 6:14
**wasn't** 41:5,8 56:9
65:25 89:9 126:7
136:21 147:7
156:19 169:19,19
**water** 37:4
**way** 15:23 16:11
24:7 25:14 26:6,7

36:8 40:16,22
55:7 56:2 57:25
59:4 60:12 62:19
63:22 65:1 68:18
73:25 82:7 84:17
92:1 98:4 106:13
107:20 119:15
120:3 136:21
139:1 140:13
159:6 162:13
172:2 173:15,20
173:21 176:6,9
178:16 181:12,16
188:13,18 217:4
**ways** 16:7 21:14
125:14
**website** 101:22
**week** 11:6 41:6,6,7
166:17 185:4
194:17
**weekend** 89:1,14
89:19,20,21 93:1
93:2
**weeks** 21:4 183:17
183:19 184:18,19
184:19 195:3
**weight** 21:21,22
23:12 130:12,14
130:15,18
**welcome** 48:22
167:18
**Wells** 7:21 103:21
**went** 21:20 30:17
51:16 52:1,6
75:10 95:6 107:23
140:22 194:4
200:7
**weren't** 40:7 93:23
**West** 3:6 7:22
**we'll** 36:10,19
39:17 51:6 111:13
121:11,15,17
139:7 148:9 159:5
159:5 162:21
167:15 212:14
221:24 222:21
224:7 225:17

226:11
**we're** 12:12 20:8
  21:22 23:7 24:6
  26:25 48:6,7 80:1
  94:7 121:20
  123:17 130:11
  134:7,16 142:7,11
  142:14 144:19
  147:12 152:7,10
  161:18 162:7,22
  172:3 174:11
  175:15 204:15
  207:12 220:14,16
  221:22,23,23
  222:1 225:22
**we've** 13:17 16:5,8
  28:23 36:3 121:9
  134:5 146:13
  147:13 209:2
  221:15 225:20,25
**wherewithal** 22:9
**Where'd** 192:12
**Whichever** 122:4
**WHITEMAN** 3:14
**WHITNEY** 7:12
**wholly** 93:22 96:15
**who've** 59:21
**wide** 129:4
**widening** 186:16
**WILAMOWSKY**
  9:14
**Wilbur** 165:18
  166:24
**William** 6:24 10:7
  105:3
**willing** 84:25
  159:21
**Wilmington** 1:17
  3:8 4:7,23 6:7,22
  7:16 8:15,23 10:5
**Winfrey** 45:15
  191:4
**WINTHROP** 4:11
**wish** 37:8 149:23
  221:19
**withdraw** 120:23
**withdrawn** 183:9

**witness** 2:4 11:9,10
  13:8,10 17:2,15
  20:8 21:16,17,21
  21:22 22:19,20
  27:2,5,6,10,13
  28:5 36:13,22
  37:4,7,10 44:1,2
  45:13,14,15 46:14
  46:17 66:22 71:9
  71:20,24 72:7,13
  73:1 76:25 111:6
  111:10 113:22
  121:3 124:4 128:6
  129:14 132:14,15
  133:9 139:12,14
  139:18 140:11,24
  141:3,7,10 142:13
  143:15 146:7,17
  148:2,3,5 158:17
  160:2,22 165:13
  165:17 167:15
  175:13 180:7
  188:25 189:9
  190:17,22,25
  200:13 205:1
  210:7 220:3,4,6
  221:12,16 227:5
**witnesses** 16:11
  25:24 210:17
  221:18
**WL** 174:2
**won** 14:25 174:24
**wonderful** 226:17
**Wood** 28:17
**word** 14:24 15:22
  69:21,23 71:10
  98:17
**words** 14:10 19:13
  74:16 75:5 128:2
  145:23 217:1,4
**work** 29:20 34:6
  35:19,25 36:8,8
  41:4,6,7 51:2
  56:19 62:11 97:25
  98:1 140:7,14
  141:19 143:25
  144:2,6,6 164:16

172:21 175:10
  191:18,21 192:24
  193:20 196:20
  197:6
**worked** 30:7 33:20
  35:8 38:6 39:1
  41:3,5 43:5 50:9
  74:13 109:16
  140:19,20 192:25
  195:4
**working** 31:11
  40:23 41:9 105:8
  129:3 163:25
  195:10,14 209:4
  210:12
**works** 22:17 53:12
  70:21 76:24
  100:10 119:21
  156:13 178:16
**worry** 137:20
**worst** 131:19
**worth** 20:10 33:9
  38:12,15 39:9
  57:8 81:22 83:4
  86:23 176:4
**wouldn't** 80:25
  86:5,19 95:16
  100:18 120:3
  173:21 182:16
  212:9
**wrap** 145:8 149:1
**written** 16:20 17:3
  19:7 22:18 151:21
  188:16 204:20
  217:4
**WRL** 8:11
**wrong** 40:21
  123:19,20 203:15
**wrote** 94:20

**——— X ———**
**x** 1:5,12 227:2
  228:2,4

**——— Y ———**
**Y** 227:4
**Yale** 28:12

**yard** 186:22
**yeah** 11:7 59:20
  68:10 72:22 73:22
  99:14 110:24
  111:12 113:19
  118:15 120:24
  139:18 160:3
  161:4 172:22
  175:23 177:6
  178:19 185:3,5,19
  193:16 196:12
  198:18 204:2
  208:6 225:6
**year** 39:14,14 40:1
  40:7 194:1
**years** 18:11 22:15
  30:14 36:3 37:20
  39:14 42:15 43:7
  43:25 48:17 51:20
  51:24 52:9 67:8
  67:16 82:10 88:2
  88:24 89:23 105:7
  105:16 126:3
  129:3 141:21
  148:25 150:8
  177:3 178:15
  179:21 192:25
  218:12 219:3
**yesterday** 20:2
  221:6
**yields** 20:13
**York** 2:2,6 3:19
  4:12,14 5:5,14 8:5
  9:12,19 10:12
  19:25 28:17 29:16
  101:12 122:18
  123:20 126:2
  146:2,3
**Young** 3:3 19:22
  118:5,9,13

**——— 0 ———**
**02110** 9:5
**05** 220:22
**07** 220:20
**07-11047-css** 1:4

**——— 1 ———**
**1** 2:2 69:7 134:10
  137:23 138:7
  143:11,19 144:12
  144:20,24,25
  145:9,12 152:23
  163:11 172:13
  189:8,11,12,22,24
  189:24 190:11
  197:24 201:24
  203:6 204:1
  207:17 209:12,24
  210:20 211:14
  221:10 222:14,16
  223:9 224:17
**1-15** 228:6
**1-3** 228:11
**1.2** 144:18 157:16
  164:20 170:7,17
  174:8 176:3
**1:30** 121:25
**1:45** 121:25 122:1
**1:55** 122:2
**10** 11:4 220:24
  221:11
**10:38** 66:18
**10:55** 66:18
**100** 141:9
**1000** 3:6
**10004** 8:5
**10019** 5:14
**10022** 3:19 5:5 9:12
  9:19
**10036** 4:14
**1007** 8:13
**101** 227:13
**10154** 10:12
**103** 134:12 137:25
  138:9 227:14
**104** 136:14 137:25
  138:9 227:15
**104-110** 228:8
**105** 135:6
**11** 45:19 46:3
  136:17,19,22
**11:30** 221:25

226:11
**110** 28:9 136:14
137:25 138:9
**1105** 7:14
**111** 7:22 227:16
**112** 227:17
**115** 227:18
**12:00** 111:15
**12:09** 111:15
**12:13** 114:23
**12:27** 114:23
**12:36** 122:2
**1200** 8:14
**1201** 4:5 6:6 8:21
**129** 227:19
**13** 19:16 157:1,11
157:14,15 189:11
189:24 190:11
215:9 228:11
**13.01** 215:14
216:14 217:23
**130** 228:22
**1313** 4:22
**135** 13:21 146:4
**138** 228:6
**138,11** 228:9
**14** 75:8,12 154:7
**14th** 173:12
**140** 45:19
**144** 13:21
**15** 96:12,13 134:10
137:23 138:7
211:2
**15th** 6:21
**150** 9:4 73:11 146:4
**1500** 8:22
**1501** 6:13
**1540** 4:13
**16** 134:14 138:4,11
224:19,20,25
225:1 228:10
**1600** 7:15
**167** 227:20
**17** 134:10 137:23
138:7
**17th** 3:7
**17-20** 228:6

**174** 75:7
**176** 227:21
**178** 75:12
**18** 1:19
**18th** 6:5
**190** 77:9,11
**190,10** 228:11
**191** 227:22
**19801** 3:8 4:7,23
6:22 7:16 8:15,23
**1983** 29:21 43:8
**1987** 29:21 43:8
**1989** 31:18
**19899** 6:7 10:5
**1990** 191:20
**1993** 31:18 192:11
**1995** 193:3,4,16,17
**1996** 45:1
**1997** 32:22 33:5
38:7
**1998** 45:1

———————
**2**

**2** 2:4 122:1 152:19
154:4 157:3,4,4
173:6 189:7,11,24
190:11 211:1,4
220:13 223:1,8,11
223:12,14 224:24
226:1,4,6 228:12
228:15
**2.0** 156:3
**2.09** 154:17,23
**2:56** 163:1
**20** 134:10 137:23
138:7
**2000** 33:5,5 38:3,7
40:18 47:5 193:17
194:1,2 195:5
197:6 209:5
**20005** 6:14
**2002** 33:22
**2003** 33:23 34:2
172:13 192:9
**2004** 34:19 172:18
195:5,12,13 197:9
**2004-4** 19:24

**2005** 12:9 13:23
15:5 43:14 44:5
145:18 150:23
169:22 170:1
172:16,24 204:2,9
**2006** 41:16 69:7
143:12,23 144:18
145:13 197:24
203:6 204:1,9
207:17 220:19
**2007** 1:19 154:7
173:12 222:14,16
222:17 229:9
**208** 227:23
**21** 154:16,23
**218** 227:24
**219** 227:25
**22** 88:7,10 134:14
138:4,11 228:10
**223,13** 228:12
**223,15** 228:14
**226** 228:15
**23** 228:22 229:9
**24** 134:10 137:23
138:7
**24,256,000** 158:11
**24,508,000** 158:5
**24-28** 228:6
**250** 197:7
**250,000** 53:1
**251,000** 158:10
**26** 16:19 220:20
**27** 136:18,18,22
227:6
**28** 134:10 137:23
138:7
**29** 134:17

———————
**3**

**3** 73:18 144:20,24
145:1,4,6 153:1
157:17 168:3
173:1 189:9,11,24
190:11 220:16
223:1,9,12,16
228:14
**3.03** 156:4

**3:09** 163:1
**3:15** 167:19
**3:23** 167:19
**30** 134:17
**30th** 7:5
**300** 197:7
**31** 134:11 137:23
138:7 228:6
**32** 134:11 137:24
138:7 228:6
**33** 134:14 138:4,11
214:5 228:10
**34** 99:25 100:2
134:14 138:4,11
228:10
**345** 10:11
**35** 134:11 137:24
138:7 210:5,9
211:16 213:14
214:3,6 228:6
**36** 134:11 137:24
138:8 211:15
228:7
**363** 158:24
**365** 158:24
**37** 134:14 138:4,11
227:7 228:10
**38** 134:11 137:20
138:8 156:4
**38-41** 228:7
**399** 9:11

———————
**4**

**4** 92:11,15 125:12
213:6,10,10,18
220:20 221:10
**4:18** 208:15
**4:29** 208:15
**4:56** 225:18
**41** 134:11 137:24
138:8
**42** 134:17 227:8
**425** 5:4
**43** 134:17
**437** 9:18
**44** 134:11 137:24
138:8 228:7

**45** 134:17 141:16
**450** 127:12
**46** 134:11 137:24
138:8 163:11
228:7
**47** 134:17 227:9
**48** 134:11 137:24
138:8
**48-50** 228:7
**488** 3:18
**49** 227:10 228:19

———————
**5**

**5** 77:12 78:9 99:25
125:24 153:2,13
220:20 221:10
228:15,19
**5th** 1:16
**5.6** 224:13
**5.6-I** 224:12
**5/1/07** 223:17
**5:06** 225:18
**5:07** 226:19
**50** 134:11 137:24
138:8
**500** 10:4 38:15 39:8
127:12
**51** 96:12 134:17
**52** 96:10 134:17
135:18,19,24
136:4
**53** 88:6,9 134:11
137:24 138:8
**53-57** 228:7
**55** 215:10 216:13
**555** 13:3,7,18,20
43:21 93:2 131:9
131:11 148:3,20
149:5 168:15,19
168:25 169:8
**57** 134:12 137:24
138:8
**58** 134:17
**59** 134:12 137:24
138:8
**59-64** 228:8

**6**

**6** 189:11,24 190:3
190:11 220:21
221:10 222:14,15
228:11
**6.01** 212:21,24
213:4
**6/6/07** 223:14
228:13
**600** 141:18
**60603** 7:23
**610** 7:4
**64** 134:12 137:24
138:8
**65** 134:17
**66** 134:12 137:25
138:8
**66-85** 228:8
**67** 227:11

**7**

**7** 189:7,11,24 190:3
190:11 220:23
221:10 228:6,11
**7.03** 214:3
**7.03(LXX)** 211:23
**7.04** 211:15,18
**70** 133:5 212:22
**700** 33:8 38:13
**7000** 49:1
**701** 132:14,20
133:9
**702** 49:1 132:9,18
133:3
**7026(a)(2)** 16:20
20:23
**71** 152:23
**72** 92:10,13 153:10
**741** 13:20 148:20
149:6 168:20
**750** 33:8 38:13
**787** 5:13

**8**

**8** 220:23 221:10
**80** 79:6
**80s** 29:7

**800** 4:6
**802** 153:13
**824** 1:15
**83** 171:9
**85** 79:6 134:12
137:25 138:8
**86** 134:14 138:5,11
228:10
**87** 30:14 134:12
137:25 138:9
**87-103** 228:8
**89** 30:15

**9**

**9** 19:17 220:24
221:10
**9.01** 152:23
**9:10** 1:20
**90** 153:10
**90017** 7:6
**9014** 20:21
**9014(c)** 17:17
20:22 25:2
**919** 6:20
**92** 227:12
**93** 32:22 192:10
**97** 32:22