1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case No. 07-11047-css

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


AMERICAN HOME MORTGAGE HOLDINGS, INC.,


     Debtor.


- - - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        824 North Market Street

        5th Floor

        Wilmington, Delaware


        October 19, 2007

        2:10 PM


B E F O R E:

HON. CHRISTOPHER S. SONTCHI

U.S. BANKRUPTCY JUDGE

2

1

2   HEARING re Limited Objection to the Debtors Motion for an Order

3   Pursuant to Sections 105 and 363 of the Bankruptcy Code: (A)

4   Approving the Mortgage Servicing Purchase Agreement; and (B)

5   Authorizing the Debtors to Sell Certain Property Free and Clear

6   of Liens, Interests, and Encumbrances, and (C) Granting Related

7   Relief Filed by Official Committee of Unsecured Creditors

8

9   HEARING re Limited Objection to /Limited Objection of Bank of

10  America, N.A., as Administrative Agent, to Debtors Motion for

11  an Order Pursuant to Sections 105 and 363 of the Bankruptcy

12  Code: (A) Approving the Mortgage Servicing Purchase Agreement;

13  (B) Authorizing the Debtors to Sell Certain Property Free and

14  Clear of Liens, Interests, and Encumbrances, and (C) Granting

15  Related Relief Filed by Bank of America, N.A. as Administrative

16  Agent under that certain Second Amended and Restated Credit

17  Agreement, dated as of August 10, 2006

18

19

20

21

22

23

24

25

3

1

2    A P P E A R A N C E S :

3    YOUNG CONAWAY STARGATT & TAYLOR, LLP

4         Attorneys for Debtor

5         The Brandywine Building

6         1000 West Street

7         17th Floor

8         Wilmington, DE 19801

9

10   BY:   PAULINE K. MORGAN, ESQ.

11        ROBERT S. BRADY, ESQ.

12        JAMES L. PATTON, JR.

13        JOHN T. DORSEY, ESQ.

14        MARGARET B. WHITEMAN, ESQ. (TELEPHONICALLY)

15

16   HAHN & HESSEN LLP

17        Attorneys for Official Committee of Unsecured Creditors

18        488 Madison Avenue

19        New York, NY 10022

20

21   BY:   MARK S. INDELICATO, ESQ.

22        MARK T. POWER, ESQ.

23

24

25

4

1

2 BLANK ROME LLP

3          Attorneys for Official Committee of Unsecured Creditors

4          Chase Manhattan Centre

5          1201 Market Street

6          Suite 800

7          Wilmington, DE 19801

8

9 BY:   BONNIE GLANTZ FATELL, ESQ.

10

11 PILLSBURY WINTHROP SHAW PITTMAN LLP

12          Attorneys for The Bank of New York as Trustee

13          1540 Broadway

14          New York, NY 10036

15

16 BY:   LEO T. CROWLEY, ESQ.

17          RICK B. ANTONOFF, ESQ.

18          BRANDON R. JOHNSON, ESQ.

19          MARGOT ERLICH, ESQ.

20          (TELEPHONICALLY)

21

22

23

24

25

5

1

2  POTTER ANDERSON & CARSON LLP

3         Attorneys for Bank of America, N.A.

4         Hercules Plaza

5         1313 North Market Street

6         Wilmington, DE 19801

7

8  BY:   LAURIE SELBER SILVERSTEIN, ESQ.

9

10  KAYE SCHOLER LLP

11         Attorneys for Bank of America, N.A.

12         425 Park Avenue

13         New York, NY 10022

14

15  BY:   SCOTT D. TALMADGE, ESQ.

16         MARK F. LISCIO, ESQ.

17         ANA M. ALFONSO, ESQ.

18

19  SIDLEY AUSTIN LLP

20         Attorneys for Bear Stearns & EMC

21         787 Seventh Avenue

22         New York, NY 10019

23

24  BY:   ALEX R. ROVIRA, ESQ.

25         ANDREW W. STERN, ESQ. (TELEPHONICALLY)

6

SIDLEY AUSTIN LLP

     Attorneys for Bear Stearns & EMC

     1501 K Street, N.W.

     Washington, D.C. 20005

BY:   DAVID R. KUNEY, ESQ.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

     Attorneys for Assured Guaranty and FGIC

     Chase Manhattan Centre

     18th Floor

     1201 North Market Street

     Wilmington, DE 19899

BY:   ROBERT J. DEHNEY, ESQ.

     DANIEL B. BUTZ, ESQ.

EDWARDS ANGELL PALMER & DODGE LLP

     Attorneys for Countrywide

     919 North Market Street

     15th Floor

     Wilmington, DE 19801

BY:   WILLIAM CHIPMAN, ESQ.

7

DORSEY & WHITNEY LLP

      Attorneys for U.S. Bank as Trustee

      1105 North Market Street

      Suite 1600

      Wilmington, DE 19801

BY:   ERIC LOPEZ SCHNABEL, ESQ.

CHAPMAN & CUTLER, LLP

      Attorneys for Wells Fargo, N.A.

      111 West Monroe Street

      Chicago, IL 60603

BY:   FRANKLIN H. TOP, III

SEWARD & KISSEL LLP

      Attorneys for Citibank, N.A.

      One Battery Park Plaza

      New York, NY 10004

BY:   ARELENE ALVES, ESQ.

      JEFF DINE, ESQ.

8

MORRIS JAMES LLP

 Attorneys for CitiMortgage, Inc.

 500 Delaware Avenue

 Suite 1500

 Wilmington, DE 19801


BY: BRETT D. FALLON, ESQ.

 DOUGLAS N. CANDEUB, ESQ.


GREENBERG TRAURIG, LLP

 Attorneys for AH Mortgage Acquisition Co.

 The Nemours Building

 1007 North Orange Street

 Suite 1200

 Wilmington, DE 19801


BY: VICTORIA W. COUNIHAN, ESQ.

9

JONES DAY LLP

      Attorneys for ATT Mortgage Acquisition Co.

      North Point

      901 Lakeside Avenue

      Cleveland, OH 44114


BY:   DAVE G. HEIMAN, ESQ.


JONES DAY LLP

      Attorneys for ATT Mortgage Acquisition Co.

      222 East 41st Street

      New York, NY 10017


BY:   SCOTT J. FRIEDMAN, ESQ.


REED SMITH LLP

      Attorneys for GMAC and Residential Funding

      1201 Market Street

      Suite 1500

      Wilmington, DE 19801


BY:   KIMBERLY E.C. LAWSON, ESQ.

      CLAUDIA Z. SPRINGER, ESQ.

10

BINGHAM MCCUTCHEN, LLP

      Attorneys for Deutsche Bank Structured Products

      150 Federal Street

      Boston, MA 02110

BY:   ANDREW J. GALLO, ESQ.

BINGHAM MCCUTCHEN, LLP

      Attorneys for Deutsche Bank Structured Products

      399 Park Avenue

      New York, NY 10022

BY:   STEVE WILAMOWSKY, ESQ.

ASHBY & GEDDES, P.A.

      Attorneys for Morgan Stanley Mortgage Capital;

      UBS Real Estate Securities; DB Structured Products

      500 Delaware Avenue

      Wilmington, DE 19899

BY:   WILLIAM P. BOWDEN, ESQ.

      AMANDA M. WINFREE, ESQ.

11

1

2  LANDIS RATH & COBB LLP

3        Attorneys for JP Morgan Chase

4        919 Market Street

5        Suite 600

6        Wilmington, DE 19899

7

8  BY:   JOHN STROCK, ESQ.

9

10  NIXON PEABODY LLP

11        Attorneys for Deutsch Bank NTC

12        437 Madison Avenue

13        New York, NY 10022

14

15  BY:   DENNIS J. DREBSKY, ESQ.

16

17  DUANE MORRIS LLP

18        Attorneys for Bear Stearns/EMC

19        1100 North Market Street

20        Suite 1200

21        Wilmington, DE 19801

22

23  BY:   FREDERICK B. ROSNER, ESQ.

24

25

12

1

2   THE BAYARD FIRM

3        Attorneys for CHFA

4        222 Delaware Avenue

5        Suite 900

6        Wilmington, DE 19899

7

8   BY:   KATHRYN D. SALLIE, ESQ.

9

10  MORGAN, LEWIS & BOCKIUS LLP

11       Attorneys for MERS

12       1701 Market Street

13       Philadelphia, PA 19103

14

15  BY:   REBECCA L. BOOTH, ESQ.

16

17  LOEB & LOEB LLP

18       Attorneys for Merrill Lynch

19       345 Park Avenue

20       New York, NY 10154

21

22  BY:   VADIM J. RUBENSTEIN, ESQ.

23       (TELEPHONICALLY)

24

25

13

P R O C E E D I N G S

1    THE CLERK:  All rise.

2    THE COURT:  Please be seated.

3    MR. PATTON:  Good afternoon, Your Honor. Thank you
very, very, very much for your patience.  I really appreciate
it.  I think we've got one last little bit of housekeeping
before we get into closing arguments proper because we have
that holdover introduction of documents issue.  Mr. Brady of my
office wants to wrap that up and we'll go straight in --

10   THE COURT:  All right.

11   MR. PATTON:  -- to closing arguments.  And I'll
report on settlements.

13   THE COURT:  Okay.

14   MR. BRADY:  Good afternoon, Your Honor.  Robert Brady
on behalf of the debtors.  Yesterday, Your Honor, we admitted
Debtors' 20 which was the UBS MLPSA.  With the consent of UBS
we would seek to admit today Exhibits 111 through 116 which are
amendments and related documents to the UBS and MLPSA.  And
that is within consent.

20   THE COURT:  All right.  Admitted without objection.
(Debtors' Exhibits 111 through 116, amendments and related
documents to UBS and MLPSA, were hereby received into evidence,
as of this date.)

24   THE COURT:  Thank you.  Any further documents?  Mr.
Gallo?

1          MR. GALLO:  Your Honor, Andrew Gallo for DB

2    Structured Products, Inc.  We have one document issue, too,

3    that I had just spoke to Mr. Brady about and I'd want to get it

4    out of the way before closing arguments.

5          We admitted a document which has been marked as DB-4

6    which is a default letter, a three-page default letter.  And

7    then there's an attachment to that letter that actually lists

8    the loans that are in default.  And there's last names on that

9    page with respect to borrowers.  We would like to just

10   eliminate those two pages from that exhibit, so just take those

11   pages out of the exhibit.  We're not seeking a protective

12   order; we just don't want those pages to be part of the record.

13   I don't think any part is relying on it and I think the debtors

14   have consented that we can do that.

15         So DB-4 would consist solely of the first three pages

16   of that letter.

17         THE COURT:  Any objection?

18         MR. PATTON:  No objection from the debtors.

19         THE COURT:  I destroyed my copy.

20         MR. GALLO:  Thank you, Your Honor.

21         MR. DEHNEY:  Good afternoon, Your Honor.  Robert

22   Dehney from Morris Nichols Arsht and Tunnell.  I rise now to

23   deal with the Merrill Lynch agreement.  As Your Honor will

24   recall, you were kind enough to let our co-counsel appear by

25   phone and ask some questions about the document ultimately

1    added as Exhibit 84.

2            Your Honor, as counsel had indicated before, in prior

3    notices it was not on the schedule that was going to be

4    transferred on the 26th.  They filed their supplemental notice

5    of possible contracts and they had not identified that

6    contract.  The debtors didn't address the objection that

7    Merrill Lynch had filed in their reply.  But sitting here

8    today, we just want the record to be clear, that it is only the

9    September 1, 2003 introduced as Exhibit 84.  That is the only

10   agreement that pertains to Merrill Lynch servicing rights and

11   that is the only thing they're proposing to transfer.  And if

12   that's the case that they're simply transferring their

13   servicing rights, whole loans that are subject to that

14   agreement, that's fine.  But we just want to make sure that was

15   clear given the way the papers had moved back and forth.

16            THE COURT:  Mr. Patton?

17            MR. PATTON:  Yes, Your Honor, we agree.

18            THE COURT:  Okay.

19            MR. PATTON:  As far as I can tell.

20            THE COURT:  And that resolves Merrill Lynch's

21   objection?  Yes, yes.  Anything further in connection with the

22   evidentiary record?  All right.  Hearing nothing, the

23   evidentiary record is closed.

24            MR. PATTON:  Your Honor, in just a moment I'm going

25   to walk you through some settlements.  There's one settlement

1    in particular we're going to address first and that's a

2    settlement with EMC Mortgage Corp. but in preparation for

3    discussing the settlements, I would like to hand up to you and

4    then circulate to the Court really what consists of a cheat

5    sheet, I would say of a catalogue of all of the objections and

6    what the current status is.  I could tell you what I'm handing

7    up already requires some editing and I'll tell you what that

8    consists of.  And it's a -- just for your benefit and for

9    everybody's benefit, we'll pass this out.  We have a very short

10   form that collects all of the objectors in three categories

11   going forward pending resolution and resolved, moot or

12   withdrawn.  And as I said, this -- I'll announce the changes to

13   this but -- exists.  We also have a catalogue really of the

14   same information but organized according to the order.  The

15   items appeared on the agenda letter that we -- the amended

16   agenda that we submitted at the hearing -- or immediately prior

17   to the hearing when we started at the beginning of the week.

18   We also have a summary of the objections and their various

19   status in even more detail.  But all of this will hopefully

20   allow us to keep score as we work through the objections.

21           THE COURT:  All right.

22           MR. PATTON:  Your Honor, may I approach?

23           THE COURT:  Yes.  Thank you.  And we'll take a --

24   won't take a break but take a few moments to distribute to the

25   people in attendance.

1          (Pause)

2          THE COURT:  Mr. Patton, I take it that the number on

3     the shorter version indi -- like, for instance, Assured

4     Guaranty Corp. 69.  The 69 refers to the agenda item number?

5          MR. PATTON:  Yes.  Yes, Your Honor.  I'm sorry, yes.

6     That's exactly right.

7          THE COURT:  Can we have a copy for my clerk, please?

8          (Pause)

9          THE COURT:  Oh, he has one.  You have one?

10          (Pause)

11          MR. PATTON:  Your Honor, just let me take a minute to

12     tell you where we are with respect to -- I'll work off of this

13     two-pager, 'cause this, as I said, has changed yet again.  With

14     respect to the items going forward catalogued on this, we will

15     be announcing in just a moment a settlement with EMC Mortgage

16     Corp.  We have the document -- the deal -- the order is about

17     to walk in the door.  We have a settlement with Countrywide.

18     The Goldman Sachs objection has also been resolved.  We had

19     inadvertently placed on to the list of resolved, moot and

20     withdrawn, on page 2, the objection by Morgan Stanley Mortgage

21     Capital Holdings and so that objection properly belongs in the

22     category of "Going forward" on "Resolved".  We also have

23     resolved in the category of "Resolution Pending" both the Bank

24     of New York objection and the Deutsche Bank National Trust

25     Company objection which is separate and distinct from the DB

1   Structured Products objection which is going forward.  And I

2   guess what I'd like to do is find out from those in the crowd

3   whether we've captured the state of play accurately with

4   respect to all of the objectors.  I will tell you that with

5   respect to the status of these objections, some of them have

6   been resolved through some minor amendments to the asset

7   purchase agreement that we'll be submitting to the Court if

8   Your Honor grants our motion.  We have also resolved some of

9   these objections through amendments and revisions to the form

10  of order that had been circulated with our motion to approve

11  the Ross entities as the stalking horse bidder.  And so

12  ultimately, the documentation of those objections will gel once

13  that order is presented to Your Honor if Your Honor ultimately

14  grants our motion.

15          But with those two caveats, I think we fairly

16  captured the state of play among the various parties who've

17  objected and with whom we've been negotiating.  But I want to

18  sort of take a -- the temperature of the crowd and make sure

19  I've got them.

20          So the question for everyone is having had a chance

21  to review the American Home Mortgage Status of Objection sheet

22  and having heard the amendments that I just announced to it

23  whether there are any parties who believe they should be moved

24  to the Going Forward category or, God willing, move from the

25  Going Forward category to the Resolved, Moot, Withdrawn

19

1    category.

2            THE COURT:  All right.

3            MR. CROWLEY:  Your Honor, Mr. Patton is correct.  We

4    should be --

5            THE REPORTER:  Sir?

6            THE COURT:  You need to speak into the microphone and

7    identify yourself.

8            MR. CROWLEY:  Leo T. Crowley for the Bank of New

9    York, Your Honor.  Just to confirm, Mr. Patton is correct.  We

10   are in the Resolved, Moot, Withdrawn category --

11           THE COURT:  All right.

12           MR. CROWLEY:  -- based on the form of order that I

13   saw a little while ago.

14           THE COURT:  Very well.  Thank you.  Yeah, I don't --

15   if you agree with what Mr. Patton said, you don't need to say

16   anything.

17           MR. BOWDEN:  Your Honor, for the record, Bill Bowden

18   of Ashby & Geddes.  I believe on the Going Forward, if you

19   would, side of the ledger, should be included the limited

20   objection of UBS Real Estate Securities.

21           THE COURT:  Which -- which --

22           MR. BOWDEN:  It's UBS Real Estate Securities.

23   Unfortunately, Your Honor, I don't have a docket number for

24   you.

25           THE COURT:  Well, I have --

1          MR. BOWDEN:  Oh, it is.  I apologize.  It is on the

2    Going Forward side of the sheet.  Didn't see it.

3          THE COURT:  All right.  Thank you.

4          MR. BOWDEN:  The other -- with respect to the

5    Resolved, Moot, Withdrawn category, I'm also representing CIFG

6    Assurance North America.  We agree -- this is the -- one, two,

7    three --

8          THE COURT:  I see it.

9          MR. BOWDEN:  Agree that it's resolved, moot,

10   withdrawn but we do have, and we're happy to discuss with Your

11   Honor at the appropriate time, a concern with the proposed form

12   of order that's circulating assuming we get that far today.

13         THE COURT:  So it's resolved pending -- I --

14         MR. PATTON:  Your Honor --

15         THE COURT:  I'm confused.  What's the -- it's either

16   --

17         MR. PATTON:  Go ahead.

18         MR. BOWDEN:  Okay.  Your Honor -- I am.  Your Honor,

19   the CIFG objection, as well as the objection of some others was

20   addressed early on, on Monday's hearing, when Mr. Patton

21   announced that the HELOC so-called deals were going to be

22   excluded from the sale.

23         THE COURT:  All right.

24         MR. BOWDEN:  There was a second amended notice of

25   contracts excluded from the sale file.  We'd like some language

1    added to any order that Your Honor might submit and I have some

2    proposed language that I can read to Your Honor, if Your Honor

3    would like, confirming that that is in fact the case, that

4    nothing is going to happen here today in connection with the

5    sale is going to have any affect whatsoever on these

6    agreements.

7              THE COURT:  And the debtor has not agreed to that

8    language?

9              MR. BOWDEN:  Correct.

10             THE COURT:  We'll deal with that at that time then.

11             MR. DEHNEY:  Robert Dehney from Morris Nichols.  That

12   was the only comment I was going to make on behalf of Assured

13   and FGIC.  On the Moot and Withdrawn.  And I would note that

14   Assured had both a HELOC and a regular securitization.  The

15   regular is going forward at the top.  We're not listed under

16   Resolved, Moot or Withdrawn on the bottom so that HELOC

17   transaction is also resolved subject to the inclusion of the

18   language as described by Mr. Bowden.

19             THE COURT:  Okay.

20             MR. SCHNABEL:  Your Honor, Eric Lopez Schnabel,

21   Dorsey & Whitney on behalf of U.S. Bank.  Your Honor, two

22   questions or two points.  One, the sheet -- the two-page sheet

23   does correctly note that U.S. Bank has an open issue with

24   regards to the sale order.  And there's some other language and

25   schedules and so forth that we obviously like to look at.  And

22

1   I think that's all for when we get -- if we get to that point.

2   So just to -- the second point is we'd like this -- these two

3   documents not to be part of the record and so to the extent

4   that it's just a cheat sheet for illustrative purposes, that's

5   fine.

6           THE COURT:  Why?

7           MR. SCHNABEL:  Well, Your Honor, as a -- in the

8   capacity of the trustee, we can only -- we can't

9   unconditionally withdraw or resolve our objections.  We can

10  only provisionally do it subject to further direction by our

11  holders.  So, I don't want to get technical into what we should

12  characterize ourselves in terms of being resolved or moot and

13  so forth.

14          THE COURT:  All right.  So --

15          MR. SCHNABEL:  So we'd ask it not to be part of the

16  record.  I don't think it necessarily really needs to be.

17          THE COURT:  Okay.  So, U.S. Bank, you're -- I won't

18  say you're withdrawn or subject to whatever language you choose

19  to use in connection with the resolution of your objection but

20  you have issues with regard to the order?

21          MR. SCHNABEL:  Yes.

22          THE COURT:  Okay.  Is this the ten-day appeal period

23  issue?

24          MR. SCHNABEL:  Correct, that we highlighted at the

25  outset.

1          THE COURT:  Is that the only issue with the order?

2          MR. SCHNABEL:  Potentially.  But again, drafts are in

3   flux so --

4          THE COURT:  All right.

5          MR. SCHNABEL:  -- I think that'll be it.  We hope so.

6          THE COURT:  Ms. Springer?

7          MS. SPRINGER:  Good afternoon, Your Honor.  We

8   represent GMAC Mortgage Corporation.  We are resolved with

9   respect to the contracts that are remaining as assumed

10  contracts.  With respect to all the others that were originally

11  on that list but were taken off that list, we are moot.  Just

12  wanted to make that clear.

13         THE COURT:  What -- I'm sorry.  Your client is --

14         MS. SPRINGER:  GMAC Mortgage Corp.

15         THE COURT:  All right.  So you're Withdrawn/Moot

16  depending on --

17         MS. SPRINGER:  We're either resolved on the one or

18  moot on the other.

19         THE COURT:  All right.  Very well.

20         MS. SPRINGER:  Thank you.

21         THE REPORTER:  Sorry.  Could I get your name?

22         MS. SPRINGER:  Claudia Springer.

23         THE COURT:  Ms. Springer is with Reed Smith.  Mr.

24  Brady?

25         MR. BRADY:  Your Honor, Robert Brady on behalf of the

1    debtors.  Two representations I agreed to make in connection

2    with matters that are withdrawn.  One is Freddie Mac.  Their

3    withdrawal of their objection is based upon the approval of the

4    stipulation that Your Honor approved between the debtors and

5    Freddie Mac and the specific exclusion by the debtors of the

6    Freddie Mac Sale and Servicing Agreement and Early Indicator

7    License Agreement from the scope of the sale.

8              THE COURT:  That all happened, right?

9              MR. BRADY:  That all happened.  And on page 2, Wells

10   Fargo Funding, we agreed to move the Wells Fargo Funding

11   agreement from Schedule 1.1J.  They also wanted a

12   representation on the record that the debtors are in possession

13   of documents that are owned by Wells Fargo both at the Texas

14   facility and New York facility.  Those documents will not be

15   sold to or transferred to the purchaser.

16             THE COURT:  All right.  Ms. Lawson?

17             MS. LAWSON:  Good afternoon, Your Honor.  Kim Lawson

18   from Reed Smith and I'm up here today on behalf of ZC Real

19   Estate Tax Solutions.  And there's a sort of a glitch in the

20   terms of the order because ZC Real Estate has sent out an

21   invoice after the cure objection -- cure amount was set but it

22   hasn't yet been paid but the check's in the mail.  So what

23   we're doing is just reserving our right.  If that isn't

24   actually paid, we can add that amount to our cure amount.

25             THE COURT:  Any objection?  Mr. Patton?

1          MR. PATTON:  I'm sorry.  I apologize.

2          THE COURT:  It's all right.  ZC Real Estate wants to

3    reserve the right to amend their cure amount.

4          MR. PATTON:  I apologize, Your Honor.  That's fine

5    with us.  I'm so sorry.

6          THE COURT:  All right.  So subject to the statements

7    on the record, most of which dealt with issues with the order,

8    my understanding is that the following objections are still in

9    play:  Assured Guaranty Corp, agenda item 69, Connecticut

10   Housing Financing Authority, agenda item 18, DB Structured

11   Products, agenda item 4 and 73, Duke University Federal Credit

12   Union, number 27, Morgan Stanley, number 38, Merrill Lynch

13   Mortgage Lending, number 45 and 62, MERS, number 68, Travis

14   County, number 48 and UBS Real Estate Securities, 24, 50 and

15   79.  All right.

16         MR. PATTON:  Your Honor, what I'd like to do now is

17   turn to the settlement we reached with EMC.  What we've done,

18   and I have a proposed order to present to Your Honor to reflect

19   this, EMC, as Your Honor will recall, was both an objector to

20   these sale proceedings.  Also, its contract was listed on our

21   Held to be Sold list.  We have negotiated a settlement of the

22   EMC objection that consists of our selling the underlying

23   portfolio which represented, I believe, it was 1. -- I'm sorry.

24   Just one second, Your Honor.

25         THE COURT:  Can you repeat it again, Mr. Patton?

1          MR. PATTON:  Yes.  The --

2          THE COURT:  All right.

3          MR. PATTON:  I just was told we're instructed to

4    abandon all assets to -- the -- yeah, the only nuance was the

5    actual price is to be included in a filing under seal.  But I

6    can represent to you that it is a much more favorable price

7    than we're obtaining from the -- that we would obtain from the

8    sale of these assets as a component part of the sale to the

9    Wilbur Ross entity.  So from the point of view of the estate,

10   we are accomplishing everything we would have accomplished had

11   we sold these assets to the Ross entities and then some, both

12   in terms of economic benefit to the estate and obviously the

13   elimination of the risk and turmoil attendant to having the EMC

14   objection wrestled with by this Court.

15          What I'd like to do, Your Honor, if I may, is hand up

16   a proposed order.  We'll be filing a motion for the filing of

17   the contract under seal but I'll hand that up as well if Your

18   Honor is prepared to take it pending our submission of that

19   motion.  All of this came together, I must say, very, very

20   quickly.

21          THE COURT:  Yes.

22          MR. PATTON:  Thank you.

23          (Pause)

24          THE COURT:  Thank you.

25          MR. PATTON:  Your Honor, as you'll see, the order

1    itself is -- I mean, it's got a few pages but functionally,

2    it's relatively short and sweet.  What it provides for is

3    rather than having these assets be sold to the Ross entities,

4    they're going to be sold to EMC.  EMC is withdrawing its

5    objection.  The approval of this transaction obviously proceeds

6    under 9019 and so in the context of this application, we're

7    seeking from a procedural point of view some extraordinary

8    relief.

9         On the other hand, the sale of this has been

10   noticed -- the sale of this asset has been on notice for quite

11   some time since the beginning of the case, frankly.

12   Additionally, as I said, this was scheduled as one of the

13   assets to be held for sale by the debtors and all this

14   accomplishes is the transfer of the asset off of that schedule

15   and into the hands of EMC.  We've negotiated this at length

16   with the committee.  They are on board.  I'll let them speak

17   for themselves.  B of A as well who has a lien in the servicing

18   rights associated with this asset -- with the underlying

19   portfolio of mortgages.  They are on board as well.  They've

20   been an active participant in these negotiations.

21        It's important for the purposes this hearing and for

22   purposes of the way these proceedings are going to unfold that

23   the transfer be approved today.  Part of that is a by-product

24   of EMC's particular issues with respect to this entire

25   proceeding and with respect to the potential on its assets.

1   From the estate's point of view, regardless of how Your Honor

2   were to rule on the asset purchase agreement and our

3   application associated with its approval, the entry of an order

4   authorizing the sale of these assets, the servicing rights to

5   EMC for the price in the contract is nevertheless a very

6   favorable outcome.  Frankly, if Your Honor were to rule against

7   our application for approval of the sale to the Ross entities

8   under the APA, the contract that you're approving, if you were

9   to enter this order, is only rendered more favorable rather

10  than less.

11       So what we would ask Your Honor to do is to grant my

12  oral motion to authorize -- to enter this order and to

13  authorize the transfer to EMC.  And I'll let other parties

14  speak as they may wish.

15       MR. POWER:  Your Honor, Mark Power from Hahn &

16  Hessen, counsel to the creditors' committee.  Your Honor, the

17  creditors' committee has been involved in the negotiations with

18  EMC in this sale and we wholeheartedly support the sale and Mr.

19  Patton's oral motion to approve it.

20       MR. TALMADGE:  Good afternoon, Your Honor.  Scott

21  Talmadge from Kaye Scholer on behalf of Bank of America.  We,

22  too, have had an opportunity to review the agreement and the

23  form of order and we have consented to the sale as proposed and

24  would ask that you approve the debtors' oral motion today.

25       MS. BOOTH:  Your Honor, if I may, Rebecca Booth of

29

1    Morgan, Lewis & Bockius on behalf of MERS.  I apologize for

2    throwing in an apparent monkey wrench into this settlement,

3    however, the MERS objection may very well be one of the only

4    objections on this list.  It does not go to the main issues

5    that the Court has been addressing.  Instead, the MERS

6    objection goes to procedural matters with regard to payment of

7    a MERS fee and transferring of the servicing rights of a loan

8    on MERS system.  This is the first I've heard of this

9    particular transaction and while we don't have any objection to

10   it in principle, there are some pieces of information that we

11   would need before we could consent and there is language that

12   we have proposed for inclusion in the more global order that we

13   would also like to see included in this order and I think that

14   would resolve any objection we have.  So I don't object to the

15   concept but MERS needs more information before we could allow

16   this to go forward.

17            THE COURT:  Very well.  All right.  Well, I'm not

18   going to sit on the bench and read the asset purchase agreement

19   so I don't know how you'd like me to proceed.

20            MR. KUNEY:  I think this is important, too.  Well,

21   Your Honor, I appreciate the Court considering it.  My

22   instructions are --

23            THE COURT:  Either I approve it or you go forward

24   with your objection.

25            MR. KUNEY:  Essentially.  And I'm not trying to be

1    difficult but my client would just like the comfort of Your

2    Honor's blessing before I leave the courtroom.

3         THE COURT:  Frankly, I don't get to bless anything

4    but I might approve it.  But I'm going to read it before I sign

5    anything.  So you do have a pending issue with MERS.  So we'll

6    have to deal with that one way or the other even if I approve

7    it.  I may overrule it; I may -- you know, I don't know.  Ms.

8    Booth is obviously being assaulted over there in the corner.

9         MS. BOOTH:  Your Honor, I'm advised that my problem

10   is addressed in the asset purchase agreement that I've never

11   seen.  So if I could just take a few minutes --

12        THE COURT:  Why don't we all take a break and

13   actually read the document.

14        MR. KUNEY:  Good idea.  Thank you, Your Honor.

15        THE COURT:  All right.  Take a recess.

16        (Recess from 2:40 p.m. until 3:03 p.m.)

17        THE CLERK:  All rise.

18        THE COURT:  All right.  I won't say I read it in

19   great detail but I reviewed the asset purchase agreement.  I

20   read the revised order.  I also went back and looked at the

21   revised order -- or the order approving the revised bidding

22   procedures.  So I don't think an oral motion, Mr. Patton, is

23   necessary.  I think you have the order and I think you have the

24   authority under the order approving the revised procedures to

25   in effect bifurcate out different pieces.  And I assume you're

1    relying on the record you've already made in connection with

2    the sale hearing, in connection with this motion.

3              MR. PATTON:  Yes.  That would be correct, Your Honor.

4              THE COURT:  With regard to confidentiality, the way I

5    read this document, this one definition is all you care about

6    that needs to be confidential, is that correct?  The purchase

7    price percentage?

8              MR. KUNEY:  Yes, Your Honor.

9              THE COURT:  It contemplates that this agreement would

10   be attached as an exhibit to the order.  So if we could -- I

11   think, how ever you want to proceed, I would propose attaching

12   a copy of the asset purchase agreement with the sensitive

13   information redacted and you can follow up with a motion to

14   file under seal.

15             MR. KUNEY:  Okay.  Thank you, Your Honor.

16             THE COURT:  All right?  I didn't have any issues with

17   the order but I want to hear from Ms. Booth.

18             MS. BOOTH:  I'm sure the only one, Your Honor.

19             MR. PATTON:  You want me to see if I can solve --

20             MS. BOOTH:  Go right ahead.

21             MR. PATTON:  I'll see if I can solve Ms. Booth's

22   problem.  Your Honor, I think it's very simple.  2.06 of the

23   agreement addresses MERS payments.  It says that the MERS

24   payments, whatever they are, are to be paid as part of this

25   transaction.  So she's in there.  We can't do the transaction

32

1    without the MERS payments being paid.  And once Your Honor

2    approves this order, approves the contract, we're either going

3    to obey the order and perform the contract and the MERS

4    payments will be paid or not, in which case we've got a whole

5    host of problems on our hands.  But, going through --

6            THE COURT:  Well, who pays the MERS payments?

7            MR. PATTON:  Well, according to this it says

8    "Servicer shall obey all responsibilities", blah, blah, blah.

9    I think if you take a look at the paragraph on page 10 --

10           THE COURT:  Who's "servicer"?

11           MR. PATTON:  Servicer is AHM Servicing.

12           THE COURT:  So she has an unsecured claim?

13           MR. PATTON:  No, no.  It would be administrative.

14           THE COURT:  Administrative claim.

15           MR. PATTON:  In order to accom -- I mean, every

16   closing cost associated with the transaction that Your Honor

17   approves is --

18           THE COURT:  And there's sufficient funds available to

19   make that payment?

20           MR. PATTON:  Yes, there are.

21           THE COURT:  All right.  Ms. Booth?

22           MS. BOOTH:  Your Honor, if the debtors'

23   representation is that there are sufficient funds available to

24   make the payment of my client's administrative claim as and

25   when it comes due and that is on this Court's record then I

1    have no problem with the entry of the order.

2              THE COURT:  All right.

3              MS. BOOTH:  Thank you.

4              MR. PATTON:  Your Honor, if I may approach with the

5    redacted version?

6              THE COURT:  Yes.

7              MR. PATTON:  I just quickly -- just crossed out the

8    number.

9              THE COURT:  Thank you.

10             MR. PATTON:  We used a very sophisticated

11   computerized redaction process.

12             THE COURT:  All right.

13             MR. PATTON:  I have one more representation to make

14   with respect to EMC to clean up this aspect of the hearing.

15   And that is to put on the record that the agreement between EMC

16   and Columbia National dated 2 -- February 1st, 2002 is going to

17   be removed from 1.1J as one of the contracts being delivered.

18   I believe the issue here is that this is an annulled set.  Is

19   that what we concluded?  It's a contract with no assets

20   associated with it.  And with that, Your Honor, I believe --

21             THE COURT:  Is any --

22             MR. PATTON:  I'm sorry.

23             THE COURT:  Go ahead.

24             MR. PATTON:  No.  I was just going to say with that,

25   I think it's time to start working our way through --

1          THE COURT:  Well, let's finish with EMS first then --

2     or EMC, excuse me.  Does anyone else wish to be heard in

3     connection with the resolution of the EMC objection and the

4     proposed order selling the servicing rights relating to the EMC

5     loans to EMC?  All right.  Hearing none, the Court will approve

6     the order based on the record of the sale hearing under the

7     authority, under the revised bidding procedures.  Do you need

8     this docketed right away?

9          MR. KUNEY:  Yes, Your Honor.  I believe it is --

10          THE COURT:  All right.  You wouldn't happen to have a

11     blank piece of paper that says Exhibit A on it, would you?

12          MR. PATTON:  May I approach, Your Honor?

13          THE COURT:  Yes, you may.  It's all right.  It's all

14     just going to get scanned in.  Robin, could you have this

15     docketed right away, please?

16          MR. KUNEY:  Your Honor, David Kuney.  Just two brief

17     things.  First off, my thanks to the Court for its cooperation

18     and patience.  And secondly, now that we're settled, may I be

19     excused?

20          THE COURT:  Yes, you may.

21          MR. KUNEY:  Thank you, Your Honor.

22          MR. PATTON:  Your Honor, we also have a settlement

23     with Countrywide that has been reached.  We probably ought to

24     spend a little bit of time just talking about that as well.

25     I'll turn the podium over to Mr. Brady.

1          MR. BRADY:  Your Honor, Robert Brady on behalf of the

2    debtors.  We have reached agreement with respect to

3    Countrywide's agreement that appears on the disputed agreement

4    schedule.  This is an agreement where Countrywide alleges a

5    pre-petition termination.

6          This morning a term sheet was circulated to Bank of

7    America, the committee, the debtors and Countrywide that would

8    provide for Countrywide purchasing back the servicing rights

9    with respect to the loans the subject of that contract.  I'm

10   not sure how much of the agreement Countrywide wants to put on

11   the record.  We're not asking the Court to approve it today.

12   The parties have agreed that it's subject to ordinary,

13   customary and final documentation.  We'll go do that. We'll

14   file an appropriate motion with the Court an put that on all

15   notice.  But based on our agreement to in effect sell the

16   servicing rights back to Countrywide, it's my understand they

17   are withdrawing their objection to the sale.

18          THE COURT:  Mr. Chipman?

19          MR. CHIPMAN:  Good morning, Your Honor.  Oh, I'm

20   sorry.  Good afternoon.  Losing track of the days here.  Your

21   Honor, Mr. Brady's correct.  I'm not sure how much my client

22   wants to put on the record but we have circulated a term sheet

23   that the bank, the committee -- counsel for the committee and

24   the debtors and Countrywide have signed off on basically

25   allowing Countrywide to obtain back its servicing rights.  And

1    it will be subject to final documentation and we'll submit a

2    motion and a form of order with the --

3              THE COURT:  All right.

4              MR. CHIPMAN:  -- for approval later on.  With that,

5    we'll withdraw our objection, Your Honor.  The only other thing

6    I'd like to note is that I believe this would remove -- I think

7    it's Debtors' Exhibits 33 and 37 from the sale in the sale

8    order if --

9              THE COURT:  Well, they're not exhibits to the sale

10   order.  They're exhibits --

11             MR. CHIPMAN:  Well, they're exhibits in evidence.

12   They're the two Countrywide agreements, Your Honor.  Just want

13   confirmation.

14             THE COURT:  I'm sorry.  You want me to revoke

15   admission of the evidence?

16             MR. CHIPMAN:  No, Your Honor.  I just want to make it

17   clear that those two agreements are not being sold today.

18             MR. BRADY:  The one agreement appears on the disputed

19   list.  That's definitely the one we're contemplating doing a

20   separate sale order on.  I believe the other one appears on

21   1.1J.  It's Countrywide's position that there are no loans

22   being serviced under that agreement.  I just don't believe

23   we've agreed to that yet because I don't think we checked,

24   frankly.

25             THE COURT:  Ms. Booth, while they're talking, was the

1    representation Mr. Patton made in connection with the EMC sale,

2    if he makes the same representation in connection with the

3    other sale, assuming its approved, does that resolve your

4    objection as well or are there other issues?

5              MS. BOOTH:  The other sale is slightly different,

6    Your Honor.

7              THE COURT:  Okay.  That's fine.  Just trying to

8    figure out what there is.

9              MS. BOOTH:  It's still a very simple resolution but

10   it does have a slight nuance.

11             THE COURT:  All right.  That's fine.  Mr. Chipman,

12   I'm sorry.

13             MR. CHIPMAN:  Your Honor, I think all the parties --

14   if everybody goes back and verifies that there's no loans being

15   serviced under that agreement then I think everybody's okay

16   with removing it.  If there are, I guess that's an issue.  But

17   I don't think it's going to -- I'm not going to press my

18   objection based on that, Your Honor.

19             THE COURT:  Very well.

20             MR. CHIPMAN:  Thank you.

21             MR. TALMADGE:  Your Honor, Scott Talmadge again from

22   Bank of America.  We did want to confirm that we did see a

23   summary of terms.  It's a half page document and it is subject

24   to our agreement to the final documentation of the transaction.

25             THE COURT:  But you agree to the terms subject to

38

1  documentation?

2         MR. TALMADGE:  Oh, yes.  Subject to documentation, we

3  agree to the basic economic terms, yes, Your Honor.

4         THE COURT:  All right.  Good.

5         THE REPORTER:  (Inaudible)

6         MR. TALMADGE:  That's Scott Talmadge, T-A-L-M-A-D-G-

7  E.

8         THE COURT:  Okay.

9         MR. PATTON:  At last.  Your Honor, I think we're now

10 at the point of really moving forward into a closing

11 presentation.  We have -- and I really do repeat what I've said

12 earlier about thanking you and your patience.  We've managed to

13 resolve a lot of issues and a lot of objections.  We have

14 objectors who have raised most of the issues that are embedded

15 in the objections but I think we have as a result of the

16 resolutions eliminated a number of the issues that will be --

17 the number of issues that will be pushed with vigor in the

18 context of this hearing.  And I will be touching on many of the

19 issues.  There are many that I will simply rely on my papers,

20 for Your Honor's reference.  And I think we've addressed all of

21 the objections at one point or another but there are some that

22 I don't think you're going to hear about today.  I think

23 they're covered in our papers and in other places in the

24 record.  But I am going to spend some time talking about all of

25 the major issues.

1          I really see my job today, Your Honor, as an exercise

2     in helping weave for the Court the facts that we've heard over

3     the last several days together with the law as it's reflected

4     in our pleadings and in other places in the record.  And that's

5     exactly what I'm going to try to do.

6          I think there's only -- there is one issue that has

7     been resolved as a result of these objections.  EMC Mortgage

8     Corp. was the only party that raised and aggressively and fully

9     briefed the 555 issue.  A few other parties filed pleadings

10    that joined in but we've reached settlements with all of those

11    parties.  So, Your Honor, the 555 issue is off the table at

12    this point in terms of these proceedings.

13         I think again by setting the table with a little bit

14    of background some of this is material that we're all familiar

15    with, some of it is not.  As I've said several times in the

16    course of these proceedings and certainly emphasized on the

17    first day this is a case that's a liquidating 11.  It's a case

18    where, as with all liquidating 11s and even more so in this

19    case speed is at issue; it's a very serious consideration here,

20    particularly, with respect to the asset we're seeking to sell

21    because of the wasting nature of the asset.  And there really

22    hasn't been any dispute raised to that issue other than request

23    for continuances.  But the need to get this asset off of our

24    books and into the hands of a purchaser as quickly as possible

25    is largely unchallenged.

1    What we're selling, Your Honor, was described at

2    length by Mr. Weill.  As he explained it, we've got three

3    buckets of assets that we're selling.  It's the platform.  It's

4    the mortgage service rights and it's the advances that we are

5    holding in connection with servicing our mortgages.  Mr. Weill,

6    when he was testifying talked about the auction process.  He

7    explained that he had received as many as thirty

8    confidentiality agreements.  He negotiated with a number of

9    parties.  He participated in a due diligence process with even

10   more parties and ultimately received several bids but in the

11   end concluded that while those bids were qualifying bids, none

12   of them were sufficient to either a loan or a combination to

13   call for an auction.  So we had a non-auction.  Prior to that

14   process, of course, the Ross entity had been selected as the

15   stalking horse.  And the decision to not hold an auction

16   anointed the Ross entity as the winning bidder.  And the asset

17   purchase agreement that reflects the sale of the Ross entity

18   has been on the record for some time now.  As Your Honor is

19   well aware, the purchaser is buying all three buckets of assets

20   I just described.  The platform is being purchased for six

21   million dollars.  The advances are being purchased for ninety-

22   two percent of face and the mortgage servicing rights are being

23   purchased at a price that escalates.  The starting point is

24   ninety basis points on thirty-eight billion dollars of unpaid

25   principal balance of loans transferred.  And it escalates to

1    ninety-two basis points on forty-one billion dollars of unpaid

2    principal balance sold.  The escalators applied only to the

3    incremental amount not to the total amount.  And then all

4    amounts that are delivered and sold to the purchaser in excess

5    of forty-one billion dollars of unpaid principal balance will

6    be purchased at the ninety-two basis point price.  And we are

7    estimating that at closing, we will generate between 460 and

8    500 million dollars in cash.

9           Additionally, the purchaser will be assuming certain

10    liabilities associated with the operation of the servicing

11    business and will be taking on substantially all of the

12    employees.

13           You've heard a little bit about the closing process

14    that's contemplated in the connection -- in context of a sale.

15    We have a two-closing process, a two-step closing process, and

16    this is a by-product of selling our business to a financial

17    buyer instead of a strategic buyer.  The Ross entity is not

18    licensed in this industry.  As a result of that, we're facing a

19    problem because licensure in all of the states can take months,

20    sometimes many months to accomplish.  The estates' need, as I

21    indicated, is to get this asset out of our hands and into the

22    hands of a purchaser as quickly as possible.  The purchaser's

23    need in this case was to obtain licensure.  And the solution

24    was to have an economic close as quickly as possible following

25    any approval of the sale, if Your Honor ultimately approves it,

42

1   and at some later date have a final legal close when the assets

2   are finally delivered to the purchaser.  And it was a tough

3   battle among the negotiating groups to determine exactly where

4   the boundary lines were going to be drawn between the estate's

5   desire for cash and closure as quickly as possible and the need

6   to preserve the flexibility that the purchaser acquired in

7   order to find the time and the mechanism to get to the point

8   where the purchaser could get the license approvals that it

9   needed from the various states in order to take these assets on

10  as their own.  Ultimately, we struck a deal ad a balance

11  between those two competing forces.  We believe it was a very

12  favorable balance to the estate.  We get paid in full in cash

13  on the economic closing date, including assets that are

14  considered disputed assets.  Those dollars associated with the

15  disputed assets go into a reserve but the cash is delivered.

16          Mr. Weill testified that the price in his view was

17  more than a fair price.  He testified that the negotiations

18  were at arms length and in good faith.  And as a participant in

19  those, I can tell you they were certainly at arms length and in

20  good faith and quite strenuous.

21          As an aside, I want to put out that for purposes of

22  today's hearing, I asked Mr. Greer from my office to attend.

23  And if there's anyone who could attest to the arms length and

24  good faith and painful aspect of these negotiations, it would

25  be he.  I'm not bringing him here to be a witness to the pain

43

1    and suffering component of this but he is perhaps one of two or

2    three in the country who could answer almost any question Your

3    Honor or anyone else may have about the asset purchase

4    agreement and the way it works.  So he will be available if

5    there are issues that come up about the interstices of this

6    document.

7              Interestingly, Mr. Weill was asked by one of the

8    cross-examiners about deal risk or execution risk with respect

9    to selling to the Ross entity and having a two-step closing.

10   And his conclusion was that from the estate's point of view, we

11   actually -- we're taking on less risk than we would had we sold

12   to a strategic buyer.  And his logic was that because a

13   strategic would be one that could insist on a single closing

14   but with respect to which we would have to accomplish a

15   transfer of our servicing rights from our platform to his

16   platform, the closing would not take place for quite some time

17   and that by selling to the Ross entity in a context where we

18   are able to have an economic close as quickly as this Court

19   will allow, we are able to get to the point of reaping the

20   economic benefit of this transaction much more promptly and

21   much more certainly than we would if we had sold to a strategic

22   buyer.  That analysis would have been much more important had

23   we had a strategic buyer competing in an auction but I think

24   it's telling that we found the sale to a financial buyer an

25   advantage in this context.

44

1          Something I think is also important to note in the

2     context of this transaction for purposes of today's hearing is

3     that the transaction does establish an escrow for cure amounts

4     that will be available to satisfy all cure amounts that accrue

5     up to the point of an entry of an order approving the sale.

6     And I'll come back to cure amounts in just a moment but the

7     testimony we heard from Mr. Love is that the cure amounts are

8     quite small or expected to be quite small and everything we

9     have in terms of a record both in terms of internal business

10    records and in terms of our discussions with parties who have

11    raised issues in response to our notices about cure amounts

12    suggest that the cure amount reserve is more than ample to

13    handle our cure obligations.  I'm putting to one side,

14    obviously, any question about EPDs and premium recapture and

15    our entire argument about what happens with an argument about

16    severability.

17          Your Honor, we also heard testimony from Mr. Love who

18    put some flesh on the bones of these three buckets of assets,

19    the platform, the advances and the mortgage servicing rights

20    that are being sold to the Ross entities.  And Mr. Love

21    described this business at length.  He talked about the eight

22    functional groups and the hundreds of employees who are working

23    at the company.  He emphasized that there has been very low

24    turnover since the bankruptcy, that the work group is very

25    stable; indeed, all of the top thirteen employees who are

45

1    critical to the operation of the business are there today.  He

2    fully expects that they'll be there tomorrow and the days

3    after.  He also emphasized that there's been -- that there have

4    been only two instances of disruption of service since the

5    filing, both of those were in one way or another a by-product

6    of the entry in the bankruptcy and they've both been corrected.

7    And since then, the company has been operating very

8    effectively, very smoothly with very little disruption or

9    interruption and very few complaints.

10          He emphasized in that regard that Fannie Mae has

11   approved -- or we have a stipulation that provides that Fannie

12   Mae has put us -- or returned to us or left us, depending upon

13   you interpret it, on the improved status.  More to the point,

14   Fannie Mae has been on-site in almost continuous basis and has

15   been fully satisfied with our operations and our status.

16          Mr. Love described the assets that are -- the types

17   of assets that are being serviced by the servicing business as

18   falling into four buckets.  And we spent a fair amount of time

19   talking about issues surrounding those assets during the

20   testimony over the last several days.  But just to remind the

21   Court, from the point of view of Mr. Love, the servicing

22   business involves servicing mortgage loans that are held by

23   securitization trusts that were established by American Home

24   Mortgage or its affiliate entities other than servicing

25   however.  It also services loans that are held by private

1   investors.  It also services loans that are held by third party

2   securitizations, many of those are securitizations that were

3   set up by the private investors that purchased loans that are

4   serviced by American Home Servicing.  And then the fourth

5   category consists of the government entities, Fannie Mae,

6   Freddie Mac and Jennie Mae that it services although at this

7   point it's only servicing primarily for Fannie Mae.

8          Mr. Love also confirmed that servicing has all of the

9   necessary licenses it needs from the various states to do

10  business, is a member of MERS, and that it is fully in

11  compliance with all of the applicable state and federal laws

12  and regulations.  And in the context of the Fannie Mae and

13  other agency approvals, he -- his testimony was that from his

14  point of view and from his experience, those are all

15  substantially the same and that they are in fact compliant with

16  the Fannie Mae.

17         To give Your Honor a sense of the magnitude of this

18  business, he actually had a throw-away response to a question

19  on cross-examination that caught my attention because I don't

20  think I'd ever focused on the number but they are processing

21  210,000 payments each month.  There are 210,000 mortgages and

22  they are handling all of the associated principal and interest

23  and tax and insurance payments from all of those mortgages on a

24  continuous basis.

25         Mr. Love spent a little bit of time beginning the

1   process of educating Your Honor and all of us in the courtroom

2   about the characteristics and distinctions of and between

3   servicing retained and servicing released transactions

4   involving the sales of mortgages.  And in that context he

5   explained that the servicing that's being done by American Home

6   Mortgage Servicing is servicing largely derived out servicing

7   retained sales where American Home Mortgage has sold on a

8   servicing retained basis.  That is, it owns mortgages that it

9   has originated.  And when it sells the mortgages, it sells

10  off -- and at that point, of course, it owns both the mortgage

11  and the servicing rights to it and it sells off the mortgage

12  and keeps the servicing rights for itself.  Once that happens,

13  servicing then is servicing for the purchaser.  And Mr. Love

14  explained that in that context the way servicing is paid is

15  it's paid by taking a percentage of the collections from the

16  mortgagor and it pays itself from those collections.  Mr. Love

17  testified that in his experience he had never seen an event

18  where an early payment default or a premium recapture was ever

19  paid by servicing.  And he was of a view that it was not a

20  servicing obligation to pay premium recapture or early payment

21  defaults.  I think Your Honor took a pass on the last time the

22  opportunity was presented to have an explanation presented on

23  the definition of early payment defaults and premium recapture.

24  And I won't go into that here but the point was made that those

25  are sale related reps and warranties and obligations and are

1  not servicing related in nature.  And Mr. Love's view was that

2  they did not belong to servicing.  And he was unaware of any

3  contractual obligations that would have made them servicing

4  obligations.

5          THE COURT:  Well, that's not a particularly

6  significant fact, is it, given that until now the company was

7  not insolvent and the only issue was whether an early payment

8  default or premium recapture payment was actually due and owing

9  and not source of funds to pay it.

10         MR. PATTON:  That's absolutely correct.  The

11  significance, I think, is that it's a part of a larger mosaic

12  of the views and attitudes of all of the parties to these

13  transactions with respect to that particular issue.  One can

14  always argue that default-related provisions are of no

15  consequence and not attended to by business people because they

16  never arise but this was something that not only never arose

17  but seemed to have caught everyone by surprise.

18         THE COURT:  I understand.  My only point is it's not

19  particularly significant one way or the other that he had --

20  since he had no experience with it.

21         MR. PATTON:  I'll grant you that.  I'm offering it

22  for no more than another indication of the degree to which

23  anyone on our side understood that others viewed it as a

24  significant component of a contract.

25         With respect to the other kinds of defaults, though,

1    under these contracts, Mr. Love provided testimony describing

2    how he went about the process of trying to identify the

3    defaults that were attendant to the servicing related business

4    so that we could prepare our schedule.  It was attached to the

5    application -- or to the contract identifying cure amounts that

6    would need to be addressed in the context of this sale

7    associated with the assumption and assignment of contracts.

8    And he explained that he approached it by cataloguing the

9    default experience of the company over time.  At least in part,

10   that's how he approached it, and concluded that the default

11   experience was a very minimal default to experience.  I think

12   his testimony was that in 2005 they had 50,000 dollars and in

13   '06, it was 15,000 dollars.  And I believe it was 85 to date.

14   In looking at my notes, I'd have to say I wasn't entirely sure

15   that those were the numbers but I do recall that they were

16   essentially in that range and it was a very modest -- a very

17   modest amount.

18          He also participated extensively in the preparation

19   of the vendor schedule of defaults.  And as far as we can tell,

20   any issues that have been raised with respect to our assessment

21   of those default and cure amounts have been resolved.  I don't

22   believe there's anyone here today pressing that issue.

23          Your Honor, we got another look at the industry from

24   Mr. Aronoff when he was testifying.  One thing he did that I

25   found interesting was that he readily echoed Mr. Love's

1   description of the servicing business and how servicing rights

2   are transferred.  But he went on to explain that there's a need

3   for uniformity and coherence in the market with respect to what

4   servicing is all about and what parties are getting.  His view,

5   based on his experience as both a drafts person and user of

6   contracts associated with the sale of mortgages and the

7   servicing of mortgages, is that the contracts are fairly

8   uniform in terms of their operative provisions, that to the

9   extent there are differences, they tend to be at the margins.

10  And he explained that this is almost how it has to be because

11  any given servicer, if they're sizeable, and any given

12  investor, if they're sizeable, are involved in numerous

13  relationships and numerous transactions with numerous parties.

14  A servicer such as American Home is servicing mortgages for --

15  well, we'll see this in a moment, but a large list of investor

16  counterparties.  Each of those counterparties may, and many do,

17  have mortgage loans that are being serviced by other servicers.

18  And the transferability of those underlying mortgages and pools

19  of mortgages is dependent upon a sense in the marketplace that

20  the servicing aspect of this is a fairly uniform and

21  predictable and easily understood component of the value that's

22  being traded in terms of the value that's derived from the flow

23  of cash off of a residential mortgage or mortgage-backed

24  security.  He suggested that it would be something of an

25  absurdity and perhaps a futile act were the counterparties to

1    MLPSAs to begin in any concerted way -- to begin piling seller

2    obligations, seller reps and warranties onto the shoulders of

3    the servicers.  His view was that it's critical for the

4    servicing aspect of the business to be exactly what appears to

5    be both in terms of his operations and his balance sheet.  And

6    as an aside, I was listening to the witness from Deutsche Bank

7    explaining that it was their policy and their desire to attempt

8    to burden as many parties as possible in their transactions in

9    the MLPSA environment with the seller side obligations through

10   reps and warranties.  And the thought that crossed my mind is I

11   wonder if other investors who are doing business with the same

12   servicers that Deutsche Bank is doing business are aware of

13   that, how they feel about that or, frankly, if they are now

14   interested in pursuing the same agenda.  But ultimately, it

15   strikes me as odd that it isn't the case as Aronoff suggests.

16   That it's in the interest of the business as a whole to keep

17   the servicer side of this business pure, prevent it from being

18   infected with seller obligations.

19          THE COURT:  Well, but a key fact here is that until

20   today, this company never sold servicing rights.

21          MR. PATTON:  That's true.

22          THE COURT:  I mean, there are servicers out there

23   that -- I mean, Mr. Aronoff's testimony was there are many

24   servicing companies out there that buy and sell servicing

25   rights.  I've had more than one servicer on my home mortgage

1    and I expect other people have as well.  But this company

2    didn't do that.  And is it -- sort of limit the utility of Mr.

3    Aronoff's testimony because of that critical factual

4    distinction.  And maybe parties were negotiating with American

5    Home Mortgage buying and selling -- buying loans from American

6    Home Mortgage knowing that the servicing wasn't going to go

7    anywhere.  And is that a difference that makes a difference?

8    Or a distinction that makes a difference?

9              MR. PATTON:  Well, I suppose it might except that

10   there was also an awful lot of emphasis placed on the notion

11   that it was important for the parties to know that it could go

12   somewhere.  In fact, that seemed to be one of the key points

13   that our objectors, that the transferability of servicing was

14   an important component.  They needed to get it out of the hands

15   of a servicer that wasn't performing as quickly as possible in

16   their view.  In fact, the -- some argued that that was a

17   critical component of the entire bundle of rights under an

18   MLPSA.  And the -- I think the suggestion that our

19   counterparties were negotiating for servicing rights in a

20   context where they expected them to sit still is both

21   inconsistent with the kinds of testimony we've heard with

22   respect to the way the marketplace works and the desire of the

23   parties to be able to move servicing readily.  And with respect

24   to the way this market in general works.

25              I took from the testimony that we've heard from the

53

1    Deutsche Bank witness and from our witnesses the following

2    picture of the way these documents work and the way the

3    servicing business works.  That suggests that there really

4    isn't the kind of entity by entity deal by deal focus on the

5    nuances of a particular transaction that, for example, Deutsche

6    Bank would suggest.  And here's what I heard.  We heard from

7    Aronoff about the evolution of these documents from the days

8    when Thacher Proffitt gave birth to this idea and began

9    developing the documents to allow this market to emerge.  We

10   also heard interestingly, by the way, that -- I think it was

11   Mr. Love who was on the stand when this came up, that the

12   Thacher Proffitt firm was doing work for both Deutsche Bank and

13   HSBC.  We saw some of those in MLPSAs prepared by the Thacher

14   Proffitt firm in very close time frame.  And we also heard that

15   the Thacher Proffitt firm was used by many in the industry and

16   we're not only perhaps at the source of this but continue to be

17   perhaps the dean of this particular industry.

18           And we've heard from Mr. Principato from Deutsche

19   Bank that he keeps an eye on what other businesses are doing.

20   He keeps an eye on how their deal documents are evolving and

21   what they look like.  And what emerged in my mind as a picture

22   of what we've seen in other industries and other marketplaces

23   where there is at its core a highly marketable and valuable

24   asset where a business that involves or requires a high degree

25   of predictability and reliability.  If there's a variation

1    among these documents or an evolution among these documents,

2    it's not by investor by investor.  It's by law firm by law

3    firm.  It's the Thacher Proffitt document.  It's the -- who

4    else does this -- Sidley Austin document.  And we're very

5    familiar with that.  We have the Richards Leyton & Finger

6    opinion in the alternate entity business and there may be a

7    Young Conaway opinion but I'm not sure it's competing at any

8    meaningful level with the Richards Leyton opinion, but this is

9    a business that -- although I wish it would.  This is a

10   business that grew up around an idea that was based on

11   maximizing liquidity and it grew up around a set of documents

12   that were borne by the collaboration of the Thacher Proffitt

13   law firm with a group of investors.  And in looking at the

14   documents that are in the record, and we've taken some time to

15   look at them rather carefully, the pattern that emerges isn't a

16   Deutsche Bank versus HSBC pattern.  It's a law firm by law firm

17   pattern.  Which suggests to me, by the way that it's not the

18   case that we're seeing careful runoff negotiations between an

19   entity like Deutsche Bank and an entity like American Home.

20   And I'll come back to some of the facts that shed even more

21   light on that when I get into the document itself in just a

22   moment.

23           One of the things, too, by the way, that we did hear

24   in terms of testimony was about the question of whether or not

25   from the point of view of American Home there was this

1    understanding that the servicer side of the business was taking

2    on cross-default obligations for the seller's side of the

3    business, was that both from the point of view of Mr. Aronoff

4    and Bob Johnson, their view was that the pricing for the sale

5    of servicing did not include a provision for nor a component

6    that would be attributable to the notion that servicing was

7    taking on seller side warranties and obligations.

8            When Bob Johnson -- when Mr. Johnson got on the

9    stand, he told us some more about selling loans and about the

10   creation of MLPSAs and MLPAs.  He explained how trading occurs

11   and he explained how pricing occurs when servicing is sold and

12   when servicing is retained.  And in that context, he allowed us

13   how he was at least partly if not completely surprised at the

14   cross-default.  And with respect to pricing, he explained that

15   when they price the servicing fee, it's fairly formulated.  For

16   example, with respect to, say, a fee for -- I think it was for

17   a pool that included fixed mortgage loans at a -- of a

18   particular quality.  It would be a standard fee of twenty-five

19   basis points.

20           In the context of selling the loans and possibly the

21   servicing at the auction that Mr. Johnson would conduct,

22   knowing what the fee was the servicing would obtain on the

23   servicing of those mortgages if servicing were to keep the

24   servicing rights enable him to figure out whether to sell

25   servicing along with the mortgages or sell -- or to keep

1   servicing.  But in terms of the -- and he assumed and believed

2   that his counterparties were making similar calculations with

3   whatever assumptions they would choose to make with respect to

4   the future of that cash flow stream.  But once the servicing

5   rights were delivered to American Home Servicing, the fee that

6   Servicing collected represented a fee that was a flat fee

7   collected off of the receipts from the underlying mortgages.

8           Your Honor, I want to take just a minute to show you

9   a couple of charts that I've created that collect information

10  from the record.  I've tried to organize the parties in a way

11  that at least makes sense to me and hopefully will make sense

12  to the Court.  The first is a chart that catalogues -- that

13  shows you how 1.1J is populated in terms of where all these

14  contracts come from.  And, if I may, approach the bench?

15          THE COURT:  Yeah.  Do you have copies for everybody?

16          MR. PATTON:  I have a lot of copies.

17          THE COURT:  All right.  These are demonstrative.

18  They're not going into evidence so don't get excited.

19          MR. PATTON:  Yeah.  There's nothing in here that's

20  not just straight off of one of our exhibits.

21          THE COURT:  Thank you.  Can you give one to Robin,

22  please?

23          MR. PATTON:  Your Honor, what I've attempted to do

24  here -- and I had this done largely for my own benefit at one

25  point and I won't belabor it, but what I've done is I've worked

1   with -- these are -- this is a truncated version of Mr. Love's

2   four buckets.  On page 1, what I've started with is a simple

3   chart that reflects the American Home Mortgage originated

4   loans.  They are sold to governmental agencies.  They are sold

5   to -- into securitizations that American Home sets up.  And

6   they are sold to private party purchasers.

7         Now, the fourth bucket is securitizations established

8   by this private party's purchasers.  And these -- each of these

9   entries on this entire exhibit represents one of the contracts

10  on 1.1J.  And as you page through, you'll see the next page

11  catalogues all of the American Home securitizations.  The third

12  page -- these aren't numbered but the next page catalogues the

13  American Home Mortgage securitization trust documents and their

14  parties which begins to tie back into the objections.  But the

15  next two -- sorry, the next three pages reflect that

16  information -- sorry, the next four pages.

17        And then I took the same information and resorted it

18  based on the parties.  And as you'll see, despite the

19  significant number of trusts that have been created by American

20  Home Mortgage through its securitizations ultimately the

21  counterparties are relatively few, the Wells Fargo Trust, the

22  Deutsche Bank Trust.  And each trust has at least two, some

23  three, counterparties associated with the trust.  And to some

24  extent, this explains why we have objections coming from a

25  number of parties all related to the same trust and why some of

1    the objections related to the same trust take slightly

2    different points of view.  Because each of these parties has a

3    slightly different stake in the underlying trust.

4         The next page simply catalogues all of the third

5    party nonsecuritizing purchasers and then the third party

6    securitizers -- so, in other words, these folks have purchased

7    whole loans.  And we continue to service the mortgages for

8    these whole loan purchasers.  And as you can see, there are

9    relatively few of these folks who filed objections or remained

10   active objectors in these proceedings.

11        The next page collects the third party securitizing

12   purchasers and this is, to a large degree, where the heat comes

13   in the context of this hearing.  And the balance of this

14   presentation simply takes each of those third party entities,

15   catalogues the securitizations and identifies the

16   counterparties to those securitizations.

17        I'm not going to spend any more time on that, Your

18   Honor, but I simply offer this as something of a guide book

19   that I've used in an effort to try to understand where these

20   objectors fall within the hierarchy of contracts that we're

21   trying to sell and what their relationships with respect to the

22   debtor and, in that regard, what their interests are in the

23   context of these proceedings.

24        Turning -- and this will have some connection to the

25   next demonstrative I want to show you that talks about the

59

1    objections.  But let's turn to the -- let's turn to the

2    objections.  There are essentially, in our view, as we've

3    highlighted in our brief, six -- what I call major objections.

4    Those are the ones that were raised by parties who believed

5    that we're violating the principle that we must assume a

6    contract with all of its burdens.  There are those who believe

7    that we are burdened by incurable defaults and we simply cannot

8    assume and assign that contract.  There are those who assert

9    that there are cure amounts that are in excess of what we

10   scheduled.  That's very often a dispute about -- at bottom, a

11   dispute about severability and EPD and premium recapture claims

12   and the like.

13        The fourth type of objection that we've identified

14   seems fairly popular, is the anti-assignment objection that

15   argues that the contracts are not assignable for one of several

16   reasons.

17        There are as well several adequate assurance

18   objections that are relatively mild in nature.  I view those by

19   and large as show-me objections in the sense the objection was

20   designed by many of the objectors to put us to the task of

21   presenting to the Court the evidence necessary to establish

22   that there is adequate assurance of future performance.

23        And then the sixth category on the objections that

24   challenge whether the contract has been terminated and whether

25   or not it's even property of the estate for purposes of these

1    proceedings.  And, Your Honor, in that regard, I have another

2    demonstrative, if I may show Your Honor.

3            THE COURT:  Um-hmm.

4            MR. PATTON:  Your Honor, may I approach?

5            THE COURT:  Thank you.

6            MR. PATTON:  Your Honor, this, admittedly, for anyone

7    who's concerned that I'm being -- using too much shorthand, I

8    will confess that I've attempted to simplify the presentation

9    with respect to the objections and don't represent to anyone in

10   the court that this captures in full the content of the various

11   objections.  But what I've attempted to do with respect to this

12   is capture -- we'll actually capture the information on the

13   demonstrative I handed up just a moment ago but consolidate it

14   and match it up with the objections that we've received.  And

15   the first page describes in a categorical way the parties that

16   we've identified on the first demonstrative and how they relate

17   to the American Home Servicing business in an operational way

18   or a conceptual way.

19           The next page identifies those whose objections are

20   what I would call objections that are more -- more show-me

21   objections.  These are parties who want us to establish that

22   we've provided adequate assurance of future performance, that

23   cure exists with respect to defaults arising strictly from

24   servicing and that we have in fact effectively transferred over

25   to the buyer all of the servicing related obligations.

1          And as you can see, in this context, almost everybody

2     who's in this structural chart had concerns or at least there's

3     somebody and several somebodies in many cases in each category

4     who had concerns of this nature, of this character, this sort

5     of show-me category.

6          The next page captures those who in addition to

7     raising the earlier category of objections have raised the more

8     serious objections about -- I've used the shorthand of the

9     repurchased obligations.  But these are folks who are

10    challenging severability and assignability at a fundamental

11    level.

12         THE COURT:  Let me ask you that -- on that.  You've

13    got under Private Party Purchasers DB Structured Products,

14    EMC's result, Morgan Stanley -- I think -- is Residential

15    Funding resolved?  Yes?

16         MR. PATTON:  Yes.

17         THE COURT:  UBS Real Estate Securities.  For UBS,

18    Morgan Stanley, DB Structured, are those all MLPSAs or are they

19    independent servicing agreements?

20         MR. PATTON:  Certainly, DB Structured is an MLPSA.  I

21    believe they all are.  Yes, they all are.

22         THE COURT:  Are there any outstanding objections?

23    Any party who's not -- is just -- looking at the dichotomy of

24    MLPSA versus servicing agreement, are there any outstanding

25    objections where the objector is a party to a servicing

62

1    agreement as opposed to an MLPSA?

2              MR. PATTON:  At this point --

3              THE COURT:  I know Mr. Dehney -- Assured Guaranty?

4              MR. DEHNEY:  The debtor identifies us as stand alone,

5    not in any other category, Your Honor.  And they don't address

6    us actually in any of what they've handed up so far.

7              THE COURT:  All right.  Yeah, your document says

8    servicing agreement.

9              MR. DEHNEY:  But it's under a service agreement, yes.

10             THE COURT:  Yeah, I got you.

11             MR. DEHNEY:  Robert Dehney from Morris Nichols on

12   behalf of Assured.

13             MR. PATTON:  But you're a stand alone.

14             MR. DEHNEY:  That's how you characterized, yes.

15             THE COURT:  Okay.

16             MR. PATTON:  Your Honor --

17             THE COURT:  And Connecticut, you said so?  Let me ask

18   you a question about that?  Mr. Weill testified that it was his

19   understanding of the APA that notwithstanding something being

20   called a servicing agreement as opposed to a MLPSA that the APA

21   did not provide for a sale of all the rights and obligations

22   under the servicing agreement but that there may be provisions,

23   unidentified provisions, that aren't being assumed -- I won't

24   say assumed and assigned -- aren't being sold pursuant to the

25   APA even though it's not an MLPSA but it's just something

1    called a servicing agreement.  Is that the debtors' position?

2         MR. PATTON:  Well, I think the answer is this.  What

3    he was responding to was the same -- he was hedging his best in

4    the same way that I'm hedging my best.  And it's this:  there

5    are with respect -- with respect to and in connection with a

6    number of the -- I guess they're MLSAs cross-default provisions

7    to unrelated -- or related but not integrated contracts.  And

8    in that context we are pursuing the route that you would expect

9    us to pursue and that is asking that the cross-defaults not be

10   honored.  I'm not sure you actually need an order to do that in

11   the context of a sale.  But that's the only sense in which

12   there are provisions of a stand alone that are not being, if we

13   assume and assign, assumed and assigned or if we sell that are

14   not being sold.

15         THE COURT:  Well, he also said that it was his

16   understanding that in that connection that rights and other

17   agreements referenced in the listed agreement but not

18   specifically being identified were being transferred.  That's

19   what I -- I wrote that down.

20         MR. PATTON:  Yeah, I know.  I heard him say that.

21         THE COURT:  But that seems inconsistent with what you

22   just said.

23         MR. PATTON:  It is.  And it's not what we're doing.

24         THE COURT:  Okay.

25         MR. PATTON:  We've identified the agreements that

64

1    we're transferring.  We've identified -- and with respect to

2    those --

3             THE COURT:  So if there's a -- you've got an

4    agreement with Assured Guaranty, for instance, that references

5    another document and there are cross-defaults in connection

6    with that --

7             MR. PATTON:  Right.

8             THE COURT:  -- or cross --

9             MR. PATTON:  Either indemnities or defaults but --

10            THE COURT:  I don't know if they're cross-defaults

11   but, say, indemnities of obligations that are under another

12   agreement that isn't identified and isn't being transferred,

13   it's your position that you can assume or sell the obligations

14   under that contract independent of those indemnification

15   obligations --

16            MR. PATTON:  That's exactly --

17            THE COURT:  -- even though it's not an MLPSA?

18   It's --

19            MR. PATTON:  That's correct.  It's just -- I mean,

20   this is -- and in that context, we're dealing with

21   straightforward 365 cross-default rule analysis.

22            THE COURT:  All right.

23            MR. PATTON:  And you touched on one of the --

24            THE COURT:  So you're assuming and assigning those

25   contracts, not selling them?

1    MR. PATTON:  Let me get to that because I'm about to

2    turn to that.

3    THE COURT:  Well, you just said you were relying on a

4    Section 365, cross-default section.

5    MR. PATTON:  I didn't mean to -- I was assuming -- I

6    apologize.  I thought we were assuming as an underlying

7    component of the conversation we were just having that we were

8    in 365 land.

9    With respect to the stand alones --

10   THE COURT:  Wait a minute.  I'm sorry to bother you.

11   MR. PATTON:  Yes?

12   THE COURT:  If it's under Section 363, if you're

13   selling the debtors' rights and obligations under the contract,

14   you're selling the debtors' rights and obligations under the

15   contract.  You're not -- unless it's severable --

16   MR. PATTON:  That's right.

17   THE COURT:  Like your argument about the MLPSA --

18   MR. PATTON:  That's right.

19   THE COURT:  -- you're in the same land.  You're

20   still -- although it's not called a preliminary principle, it's

21   the same issue, isn't it?

22   MR. PATTON:  That's exactly what I meant.

23   THE COURT:  Okay.

24   MR. PATTON:  I'm not being coy.  I'm just -- and I --

25   well, what we're struggling with is what I want to focus on for

1    a minute before we start talking about some of the legal

2    principles and how the facts apply to them.

3            It's a by-product of the way the Bankruptcy Code

4    works and the way the law is structured around the Bankruptcy

5    Code and the way transactions work, that in this context we

6    have opposing approaches to how to accomplish the transaction.

7    You've seen in our brief and I'm going to talk today in a way

8    that pursues the legal theories through 541, 363, 365 and talks

9    about the question of executory versus nonexecutory as you work

10   your way through that in an analytically straightforward

11   process.  What we're going to be asking the Court to do and

12   what the proposed order will do if Your Honor is ultimately

13   granting our motion is finding in the alternative rather like

14   Your Honor's evidentiary ruling.  And the alternative is

15   reversed.  From the point of view of the business parties in

16   these transactions, the desired outcome ultimately is for a --

17   well, the desired outcome is to obtain these assets and to

18   transfer them from the debtor to the purchaser.

19           But the --

20           THE COURT:  The --

21           MR. PATTON:  I'm sorry.

22           THE COURT:  Go ahead.  No, no.

23           MR. PATTON:  I was just going to say but the

24   preferred pathway for a transfer if it's available would be to

25   transfer these assets under 365.  There are several reasons for

1    that but the one that's the most compelling to me is the body

2    of law surrounding 365 transfers the effect on both the

3    purchaser and the seller and third parties is much more robust

4    and well developed than the body of law surrounding the

5    transfer of a contract that's not considered executory.  And

6    it's -- I guess, for the reason the preference is to -- is for

7    pursuing 365 versus 363 is the preferred vehicle is rather like

8    why you incorporate in Delaware or why you make New York the

9    law that governs your contract.  There's a greater sense of

10   confidence that issues that may arise in the future are issues

11   that have been resolved and dealt with if we are accomplishing

12   the transfer under 365.  Now that of course means that we will

13   have convinced Your Honor that under 365 the MLPSAs are

14   severable, for example --

15            THE COURT:  Right.  You got to do that no matter

16   what.  I mean, you -- if you don't convince me that it's

17   severable -- contract -- the contract's severable then you're

18   in the same problem whether it's 363 or 365.  You still --

19            MR. PATTON:  Well, I'm not so sure.  And I'll -- my

20   argument with respect to that is this, if we have -- let's take

21   a -- the most common form of contract that could be sold under

22   363 that wouldn't be sold under 365, and that's a note.  Or

23   it's a note payable to the debtor.  Where it's an asset of the

24   estate.  All that -- I mean, that consists simply on the part

25   of -- of the estate of a property right -- right to receive

1    money.  That gets transferred under 365 -- I'm sorry, under 363

2    rather readily.  And 365 never really gets implicated.  If

3    you -- if you now expand the concept to reverse the arrangement

4    one where -- where you have here a situation where the debtor

5    is collecting money and performing a variety of services.  It's

6    part of a larger -- a larger contract that creates a larger

7    bundle of rights and responsibilities that touch on a variety

8    of topics.  If what we have in the way of our interest in the

9    servicing business is a property right, al be it it's captured

10   in a contract.  If we sell it in a 363 we don't have to assume

11   it.  Which avoids the -- take it with the burdens problem that

12   imbedded in 365.  And if we -- if we sell it in the 363 we

13   don't have to assign it which avoids the various rules

14   associated with assigned a contract together with this burdens

15   in the 365.  If the -- if the contract contains --

16            THE COURT:  If you sell the contract -- let's see --

17            MR. PATTON:  Well, no.  I'm not selling the contract.

18            THE COURT:  Well you're selling the rights under the

19   contract.

20            MR. PATTON:  Yes.

21            THE COURT:  It's a safe -- get a note with an

22   indemnity obligation to a third party.  And assume that it's

23   not severable as a matter of law.  Can you sell the right to

24   receive the payment under the note without the obligation to

25   pay the indemnity?

1          MR. PATTON:  Well, you've put a bit of a hat trick in

2     there by saying it's not severable as a matter of law.

3          THE COURT:  But the -- no, no.  Well, on the facts --

4     I -- here's my -- my point was simply to respond to your point,

5     responding to my point.  Which was that you got severance

6     issues regardless of whether I'm under 363 or 365.

7          MR. PATTON:  That is --

8          THE COURT:  Because if you can't se -- Deutsch Bank,

9     with its indemnity obligation assuming -- assuming that

10    provision is alive and well and, you know, if you're going

11    to -- if you can't sever that contract you're not going to be

12    able to assume and assign it.  Because you don't want to pay

13    the however many million dollars secure for the EPD default.

14    And even if you're trying -- if you can't sever that contract,

15    there's no point in selling the contract rights.  'Cause the

16    contract rights would include all of the contract rights and

17    obligations under the contract.

18         MR. PATTON:  Well, I'm not sure that's right.  I

19    think if you -- if what you have under the contract, if what

20    you've done in essence is -- is purchased servicing.  Although,

21    hypotheticals become difficult because we already -- we own

22    servicing in the first place and kept servicing under an MLPSA

23    and sold the underlying loans.  But putting aside the

24    complexity of -- that that injects into trying to match it up

25    perfectly with a hypothetical.  If I have a contract, a single

1    contract pursuant to which I buy a variety of assets to the

2    extent that under 3 -- and I own them to the extent that under

3    363 I can identify the -- a discrete bundle of rights and

4    assets, cognomen rights and assets.  I can sell that.  I'm not

5    transferring a contract.  I'm -- all I'm doing is selling an

6    asset that I own.  And if you can identify the as the ones as a

7    discrete bundle of right --

8              THE COURT:  But the asset is a contract right.

9    You're not selling a rock or a, you know, some -- you know, a

10   piece of property that's readily identifiable, personal

11   property.  You're selling -- the property you're selling is a

12   contract right.

13             MR. PATTON:  Right.

14             THE COURT:  So it doesn't, sort of, really exist

15   other than the fact that it exists as defined in the contract.

16             MR. PATTON:  That's true.  That is true.

17             THE COURT:  So --

18             MR. PATTON:  But if you got -- it's easy to have to a

19   contract --let's take a -- let's assume -- well, let's take the

20   MLPSA for a moment.  And imagine that it -- that it was crystal

21   clear in the context of a MLPSA that the two functions were --

22   were discrete.  That there was no overlap and no intersection.

23   In that content -- or -- and the contract could in fact contain

24   a variety of other obligations.  It could provide an obligation

25   where what the -- we were providing insurance through some

1    other entity for purposes of -- of back stopping any losses

2    associated with -- with these loans.  It could provide yet

3    another obligation.  And, you know, that would be both a right

4    and a set of responsibilities.  We would be obligated to

5    provide the insurance and would be collecting a fee.  All of

6    that could be captured as single document.  The question is,

7    can you tease out of that document discrete bundles of rights

8    and responsibilities.  It's just a question of whether what

9    you're engaging in is an analysis that a severability analysis

10   under 365 or an analysis under 362 of identifying the property

11   rights that have been purchased under our contract, be they one

12   or many.  And remember, the law that is -- has emerged under

13   365 that deals with severability doesn't emerge from an

14   underlying 365 principle per say.  It really emerges from a

15   tension between two principles in the bankruptcy code.  One

16   is -- and when you go back to the core cases the principle on

17   the part of the -- the principle on the one hand is the

18   bankruptcy principle to maximize the estate's interest in value

19   and whatever property that it owns against the principle that

20   in that context when you're dealing with the contract, you do

21   so with the minimum damage.  I'm not stating it perfectly, but

22   with the minimum damage to the counterparty to the contract.

23   And that body of law is not 365 specific.  And I submit that

24   when you work your way through the cases that talk about

25   severability.  What they're really talking about is what do you

1    do when you've got an asset that's entangled with other assets.

2    And the debtor is trying to extricate that asset and capitalize

3    on the value that that asset represents to the estate.  What

4    principles do you apply.  Fundamentally it's not a 365 issue.

5    Well, that's the context in which it almost always arises.  So,

6    whether you call it a severability challenge or whether you

7    call it an identification problem.  Which is what I've been

8    using in my didactic for purposes of this argument.  It's -- it

9    all emerges out of that core bankruptcy principle.  And -- and

10   ultimately you will end up running the same analysis and ending

11   up in the same place.  Can you identify discrete bundle of

12   rights.  Can you identify separate parties.  Can you identify

13   separate consideration.  Is there an indicia of independence

14   and identifiably that's sufficiently strong to allow you to

15   separate out and transfer that bundle of rights and

16   responsibilities to a third party.  And how much damage are

17   causing to the party whose potentially being adversely affected

18   by that.  How much of a stake -- which is the reciprocal of

19   those three components of the test.  How big of a stake,

20   economically, did they have in the combination of -- of these

21   rights and responsibilities into a cohesive hole instead of

22   independent parts.

23          So I think the -- the arguments that we've laid out

24   in our memo and the cases behind them support the analytical

25   work that needs to be done to accomplish a separate of the

73

assets whether it's assets in an executory contact or

nonexecutory contract.  The analysis is fundamentally the same.

The -- and of course we only have to worry about this --

probably been talking about with respect to what do you do if

it's not an executory contact, if it's not an executory

contract.  The -- to state the obvious, I don't think anyone

challenges except with respect to the pre-petition of the

default folks that the contracts are property of the estate.

And that 541 applies.  And, of course, if 541 applies 541C1

applies which talks about how property of the debtor or in

interest of the property in debtor becomes property of the

estate, notwithstanding any condition on the insolvency or

financial condition -- sorry, notwithstanding any provision in

an agreement, a transfer instrument or applicable non

bankruptcy law that is conditioned on the insolvency or

financial condition of the debtor or on the commencement of a

case under title 11.  And the -- and that affects or gives them

option to affect the forfeiture or modification or termination

of the debtors' interest in property.  And I pause on that

section simply because with respect to some of the more minor

objections that are out there, this addresses some of the

issues.  But with respect to parties who've raised questions

with respect to some pre-petition default notices that have

been delivered but delivered in a faulty manner.  But with

respect to property that is property of the estate, as we've

74

1    discussed one has to confront 363 whether it's an executory

2    contract or not.  And, of course, 363 allows parties to sell

3    free and clear of claims and 363F and 363L invalidates the ipso

4    facto clause as they're applicable under 363.  Whether or not

5    the MLPSAs are executory in this jurisdiction as governed by

6    the Countrymen test.  I think that's relatively

7    noncontroversial.  And in our memorandum we talked at length

8    about the law and the facts surrounding that proposition and

9    that test.  And stated simply, in this context we argue that

10   the MLPSAs are not executory if Your Honor concludes that

11   there's no performance due from our counterparties, such that

12   its nonperformance would excuse the debtors' performance.  When

13   Mr. Love was on the stand he testified that he could think of

14   no event that would be occasioned by nonperformance of our

15   counterparties that would let servicing off the hook for

16   purposes of performing servicing obligations.  Mr. Johnson

17   explained the process of selling loans and in the context of

18   selling those loans once the sale is completed.  He's done

19   until we started talking to him about the -- the cross-

20   examiners perhaps started talking to him about the EPD

21   defaults.  But his -- his understanding of the transaction also

22   is that once the sales is completed the performance is due if

23   any from the counterparties is exhausted.  And there's

24   certainly no surprise to me that when one begins analyzing

25   these contracts in some detail, looking at them in the context

of the business in which they arise.  That one begins to

suspect that they are not truly executory contracts.  First of

all, our counterparties are banks and investors who are the

parties.  We've learned from both Mr. Love and Mr. Johnson who

are the parties who take the first crack at drafting these

documents and putting these documents together.  But what

they're doing when they draft these documents is creating a set

of instruments that will allow them to trade freely in the

mortgages that they've purchased.  And to obtain servicing

rights for those mortgages and to allow those servicing rights

to be performed in connection with the mortgages in the hands

of our purchasers and their subsequent purchasers.  And in that

context it makes perfect sense to make that these would be

created in such a way that there would be no obligations owed

to either American Home Mortgage or American Home Servicing

from our counterparties.  It would simply complicate and

detract from the servicing -- salability of those underlying

mortgages.  And as we scoured the documents we really find no

provisions that impose a substantial or meaningful obligations

on the part of our counterparties   that -- and certainly no

obligation that would give rise to the ability of American --

of AHM Servicing to stop performing.  The only ones that

surfaced are confidentiality provisions and cooperation

provisions with respect to delivering certain -- certain kinds

of documents that are necessary to accomplish certain kinds of

1    transactions associated with the servicing of the business.

2         THE COURT:  But aren't those confidentiality

3    provisions a little more -- they're a little more unusual then,

4    sort of, the run of the mill confidentiality provisions.  Like,

5    you see the LG Phillips case or Judge Shannon rules that, you

6    know, they're sort of run of the mill type of confidentiality

7    agreements.  These are in effect consumer protection --

8         MR. PATTON:  Well, I mean --

9         THE COURT:  -- provisions and --

10         MR. PATTON:  They actually don't need to be in the

11    contract.  I'm not sure that the parties have an option under

12    our laws.  I'm making that a little by the seat of my pants in

13    the sense that I haven't actually done the research.  But with

14    the respect to the state of the laws I understand that I don't

15    know that the parties have any choice but to bind each other to

16    these confidentiality provisions to protect their consumers to

17    avoid trouble themselves.  And it may be the case that if you

18    are in possession of this obligation you're obligated to -- to

19    preserve that information.  But -- but if say --

20         THE COURT:  Well, how does that help you then?

21         MR. PATTON:  I think -- well, I think the reason it

22    helps me is that it's -- it's in an intended component of doing

23    business in this market.  It's an obligation that is the price

24    of entry.  It's not a negotiated for obligation between the

25    parties.  It's not -- it's not a component that is critical to

1    any particular transaction.  It's in essence part of the air

2    that they breathe.  They much keep this consumer information

3    confidential in order for these parties to assure each other

4    that they're not getting each other into trouble with the

5    various regulatory authorities that oversee the consumer

6    protection laws.  So in that sense while these may be

7    significant and important in the larger social scheme of

8    things, they are not particularly tailored to any transaction

9    or specifically negotiated between the parties.

10            Your Honor, we've already talked about the question

11   of severability and in the context of how it might apply if a

12   contract is not executory.  And alluded to the Gardenia case

13   and the three part test.  And as I said, even in a context

14   where we're not dealing with 365, where the contract is deemed

15   to be nonexecutory.  That test provides structural illumination

16   and guidance to how you would identify and separate the assets

17   for sale.  If we are in a context where we find ourselves with

18   an executory contract, of course, the applicability of the

19   Gardenia test is non controversial at least in it's -- in the

20   concept -- at least in the context of the question whether or

21   not it's applicable to the analysis of whether a contract is

22   severable if it's -- if it's a contract with potentially two

23   component parts.  The -- and again, we've talked about this at

24   length in our -- in our memorandum and I won't burden the

25   record with more than other -- with any more than identify the

1    component parts of the test.  And I think I said this earlier,

2    but it's a fairly straight forward three part test.  It asks

3    the Court and the parties to analyze whether or not the

4    component parts of the contract involve independent -- an

5    independent nature or purpose.  Whether or not there is

6    identifiable and separate consideration for the -- for the

7    parts of the contract.  And whether or not there are separate

8    parties with separate obligations.  And -- and as one court has

9    it that -- that unless the two component parts of the contract

10   are economically interdependent then they can be separated.

11           I want to take a minute to hand up another

12   demonstrative -- demonstrative exhibit, another packet of

13   slides that I'm taking from the Deutsche Bank, MLPSA.  May I

14   approach, Your Honor?

15           THE COURT:  Yes.  Thank you.

16           MR. PATTON:  Your Honor, I don't -- I don't want Your

17   Honor or anyone in the courtroom to think that what I've done

18   here is an attempt to capture every paragraph in its -- in its

19   full context and content.  And I've not attempted to do a

20   complete catalog of every potentially relevant provision.  But

21   what I have attempted to do is to give the Court a sense of the

22   ease with which one can parse through an MLPSA.  And I'm

23   picking on the Deutsche Bank's structure products and MLPSA.

24   To identify which portions of the agreement are seller related

25   and which portions of the agreement are servicer related.  And

1    I -- and I will step through this quickly and lightly.  But the

2    first exercise -- or the first page, simply, points out that

3    there are two parties which tags one of the bases in the

4    Gardenia test.  The second page, catalogs the paragraphs that

5    identify and discreetly referenced the seller within the

6    agreement.  And if you go through the MLPSA you'll see that

7    there are seller paragraphs that are exclusively seller

8    paragraphs.  I do the same thing with respect to the servicer

9    paragraphs.  And it's very easy to parse through this document

10   and identify what is seller and what is servicer in terms of

11   the --

12             THE COURT:  All that said is it possible for one

13   section, 13.07 to --

14             MR. PATTON:  It is.

15             THE COURT:  -- to defeat all of that?

16             MR. PATTON:  It is possible.  And we'll come to that.

17             THE COURT:  All right.

18             MR. PATTON:  I promise.  But I do want to make sure

19   we tag the Gardenia test first.  The -- we also identify the

20   ways in which pricing is separate and distinct within the

21   MLPSA --

22             THE COURT:  Let me --

23             MR. PATTON:  -- especially with DB.

24             THE COURT:  Is there a waterfall in the DB or just

25   the indemnification?

1          MR. PATTON:  There is.

2          THE COURT:  There is.  Okay.

3          MR. PATTON:  And I --

4          THE COURT:  You know -- directly it -- I agree with

5    you, it's very, very easy until you get to those two

6    provisions.  That's the complicated part.

7          MR. PATTON:  Well why don't we step along.  Because I

8    think what the testimony shows is that -- certainly from the

9    point of view of the parties involved in this transaction.

10   There -- you know, they viewed the separateness of these two

11   components of the transaction to be easily -- easily

12   established and demonstrated.  And they lived with it day in

13   and day out.  And, in fact, we also saw that with respect to

14   the transfer of servicing, not among servicers but on the other

15   side between investors that the transfer of the servicing

16   rights there can often be as simple as a single line in an AAR.

17   Some of the AARs are more complicated.  But some where as

18   simple as the servicing rights in the MLPSA HL apply going

19   forward, while the loans are in the hands of the new purchaser.

20          With respect to the 13.01 provision of the DDNLPSA --

21   I'll come back -- let me take that up and then I'll take up the

22   waterfall second.  With respect to 13.01, I'm going to begin by

23   pointing out that I think that this is resolved in part by an

24   analysis of the document.  But also in large part by analysis

25   of the so called cross default rule and the law that's most

81

1    recently articulated in the Shaw decision.  But focusing on

2    the -- on the document itself.  The -- there are a couple of

3    things that jump out at one.  One is that 13.01 as written is

4    not entirely comprehensible.  The debate about it

5    notwithstanding, I mean, it says that the seller and the

6    servicer is to indemnify the purchaser for the failure of the

7    seller to perform its obligation to service and administer the

8    mortgage loans.  Which frankly, doesn't make any sense to me.

9    And we heard some interesting testimony about that.  I mean, we

10   heard that this -- this provision which seems to be very

11   important to Mr. Principato from the Deutsche Bank.  What

12   was -- well, he said it was very important.  He said that from

13   the point of view of Deutsche Bank one of their policies was to

14   try to create as much of a -- of a cross default opportunity as

15   possible to obtain the support and commitment of as many

16   parties in these transactions as possible.  I mean, as he put

17   it, the way I wrote it down, he tried to get as many parties as

18   he could.  And yet, he also indicated that -- that he could

19   identify no particular price.  There was no bargain for

20   component of the purchase price in exchange for that.  In fact,

21   he said that the reason for including this in the agreement was

22   to make sure that he would be paid for the EPDs or the premium

23   enhancements.  What he said, Your Honor, is that from his point

24   of view this is a credit enhancement.

25            I'd like to take a moment to take a look at the

1    bankruptcy court's decision in the Shaw Group versus Bechtel

2    case.  Which was decided in September of '06 by Judge Walrath.

3    And one of the more interesting aspect of that case for

4    purposes of our case is that the briefing and ultimate decision

5    in the Shaw case arose as the -- as the Judge says in her

6    opinion.  It arose because of the following passage in the

7    Bechtel reply brief in support of its motion.  And I quote,

8    "the cross-offset provisions of the contracts with the debtor

9    were specifically sought as additional credit protection for

10   Bechtel to insure that the debtor would fulfill it's

11   obligations under all of its contract with Bechtel.  Not merely

12   its obligations under those contracts that the debtor found

13   advantageous."  The Court then went on to explain that it is

14   specifically this type of credit enhancement provision that is

15   volatize a cross default rule.  Says that you cannot burden the

16   debtor and a subsequent assignee with the obligations of an

17   unrelated contract through a cross default that is designed to

18   be a credit enhancement.  And the testimony from Deutsche Bank

19   was that this specifically was in his view included and

20   negotiated for as a credit enhancement.

21        I need to pause for a minute because we're dealing

22   with something I've been calling a cross default but it's part

23   of single contract.  If you -- if you stop for a minute and

24   analyze this from a -- from the point of view of conducting a

25   thought experiment, I think you'll see why I call this a cross

1  default.  We've argued that this is a severable document.  And

2  there are two questions one can ask.  One is, does the

3  existence of this kind of provision defeat severability.  And

4  the next question is, if it doesn't in and of itself defeat

5  severability does -- how do you treat it after you've severed

6  the contact.  From my point of view, Your Honor, the -- the

7  distinction is purely analytical and has not impact on the

8  outcome because the ana -- the process you get to, to resolving

9  the question is identical in either case.  And it's a process

10 of evaluating and analyzing the significance from an economic

11 point of view.  And from the point of view of the Gardenia test

12 and from the point of view of the Shaw analysis of whether or

13 not the provision gets imbedded.  And the imbedded contract of

14 the provision that's provided in the separate stand alone

15 contract is designed to be, in this case, a credit enhancement

16 type cross default.  I think the analysis one goes through when

17 you find a provision like this in an imbedded contract is you

18 ask yourself, all right, if I separate the contract -- first of

19 all, is it easily separable.  And this one clearly is.  The

20 next step is to properly analyze it as if the provision appears

21 in both of the contracts.  Reading these new two separate

22 contracts with this provision in them, do you now read the

23 contract with that provision as a time track containing a cross

24 default provision or a provision that's designed to provide

25 credit enhancement that violates the cross default rule.  Or do

1    you read it as a contract that includes the provision.  And if

2    it integrates a separate stand along contract that's so

3    integral to the contract at hand that you cannot ignore or

4    excise the cross default provision.  I submit, Your Honor, that

5    in the context of this case and in context of the testimony we

6    heard from, Mr. Principato, because this is designed

7    specifically to be a credit enhancement, because it does not

8    have any economic bearing on the -- on the subject matter or

9    purpose of the servicing contract, because it has no specific

10   identifiable sought and paid for independent consideration

11   coming from the servicer side of this side or from the seller

12   side of this transaction, that if this is nothing more than a

13   Shaw type credit enhancement, forbidden cross default

14   provision.

15          And so, in that context, Your Honor, the existence of

16   a provision like 13.01 has no impact on our ability to both

17   sever the contract and ultimately excise the resulting cross

18   default.  And eliminate it's applicability to this stand along

19   servicing contract.  That's the by product of the severing

20   process.  Additionally, I think one does have to take into

21   account in analyzing this the -- the way in which the Deutsche

22   Bank contract was put together.  We -- we certainly understand

23   from Deutsche Bank's approach to this case and Mr. Principato's

24   testimony that he viewed this as a very important provision

25   that he believed that these contracts were tailored to the

1   individual transactions.  That he -- he thought that they were

2   quite important documents.  And we fairly easily demonstrated

3   that while they may have been important documents in his mind

4   they were rather sloppily prepared.  There were numerous

5   provisions in them that rendered them absurd in some places.

6   And in fact, with respect to the provision 13.01 itself,

7   rendered it meaningless in some respect.  I will point out also

8   that with respect to that particular MLPSA it's governed by New

9   York law and it contained no provision that prohibits the --

10  that prohibits the interpretation of headings as component

11  parts of the -- of the contract itself.  And Your Honor, under

12  New York law when a contract does not include a provision that

13  prohibits that application of headings to the -- to the

14  interpretation of the contract, the headings do count and they

15  are included.  In 13.01 --

16          THE COURT:  I didn't think you wanted me to look at

17  the state law in the severability issue.

18          MR. PATTON:  This isn't a question of severability,

19  Your Honor.  State law always applies.  It's a question of

20  whether it's both necessary and sufficient or just necessary.

21          THE COURT:  Okay.

22          MR. PATTON:  We don't have a contract if it doesn't

23  exist in the first instance.  But here what we're talking about

24  is how you read the contract.  And in that context state law

25  certainly applies.

86

1          THE COURT:  Okay.

2          MR. PATTON:  And -- so, having said that, I -- I

3   think what -- one can say a couple of things about 13.01.  One

4   is that by itself it doesn't read right, that there are

5   problems with it.  Two, is that it appears in a contract under

6   a heading that has relevance to how you interpret it.  And the

7   headings all reference the seller and not the servicer.  That

8   it is apart from the waterfall, that I'll come to in a minute,

9   the only provision of the contract that ties the two halves of

10  the contract together.  And that it's a provision that was not

11  separately bargained or paid for.  That it was admittedly

12  included as a credit enhancement which violates the rule in

13  Shaw.  And for all of those reasons it both does not prevent

14  severance of the two.  And it certainly, after severance

15  constitutes a impermissible, unenforceable, cross default.  Now

16  with respect to the waterfall --

17          THE COURT:  You know what, Mr. Patton, we're going to

18  take a short break.

19          MR. PATTON:  Sure.

20          (Recess from 4:45 p.m. until 4:57 p.m.)

21          THE COURT:  Please be seated.

22          MR. PATTON:  Your Honor, it was a mistake to take a

23  break.  I remembered two things that I wanted to add.  I was

24  reminded of both of them, actually.  One was that the perfect

25  example that I was struggling for with respect to the question

87

1   of severability in a non-365 context, is found in the Folger

2   Adams case.  It was cited in the Deutsche Bank brief.  But they

3   talk about what happens.  It was a sale of accounts.  A party

4   was challenging whether or not the accounts that were sold were

5   subject to a setoff or recoupment and argued that there was a

6   debate about whether the contracts were executory or not and

7   whether they could be severable.  And the Court said whether

8   they're executory or not and then went to analyze the question

9   of the ability to sever the accounts that had been sold from

10  the underlying right of recoupment or setoff by analyzing

11  whether the underlying right was one of recoupment or setoff in

12  the original contract.  And if it were setoff, it was simply a

13  claim left behind.  And if it were recoupment, it traveled with

14  the assets.

15          Let me turn to the waterfall, which is the other

16  provision of the Deutsche Bank contract that connects,

17  arguably, the servicing portion of the contract and the sale

18  portion of the creditor.  And I, you know -- may I approach, I

19  have another demonstrative to hand up.

20          THE COURT:  Okay.  Thank you.

21          MR. PATTON:  I've simply clipped or referenced three

22  provisions of the Deutsche Bank MLPSA.  The first simply

23  identifies the provision that describes what happens, what the

24  custodial account is, and I'll tell you that what goes on is

25  that accounts that are received by the servicer and go into and

88

1    are held in the custodial account.  The waterfall provision

2    provides that if there is an outstanding unpaid EPD, the

3    servicer is not permitted to withdraw funds from the custodial

4    account to repay its servicer advances until the unpaid EDP is

5    paid.

6           And if you take a look at this provision that we've

7    quoted here on the second page, there are a couple of things

8    that I want to point out. One is that in these provisions and

9    throughout the document one of the odd byproducts of the way

10   the waterfall works in the DB contract, and in the others that

11   we've found with the waterfall, is that it isn't the case that

12   the servicer advance repayments go to pay down the EDP.

13          What happens under the waterfall is if there is an

14   outstanding unpaid EDP the servicer advances that -- or the

15   funds that would otherwise be available to pay the servicer

16   advances, that are trapped in the waterfall -- and you'll

17   recall that those funds consist of funds such as advanced

18   payments that come in, or accelerated payments that come in

19   from borrowers and other ancillary payments that's included in

20   the custodial account.  Those funds are available to repay

21   servicer advances.

22          But if there's an outstanding EDP, they cannot be

23   used for the outstanding servicer advance.  But that's where

24   the trail ends.  The funds are not used to repay the EDP.  The

25   funds are not used to do anything else.  They simply sit there

1   idle in the custodial account until the question with respect

2   to the EDP is ultimately resolved.

3          And, Your Honor, what this consists of is nothing

4   other than yet another form of credit enhancement or sort of an

5   extortionary provision.  It doesn't tie the economics of the

6   servicing agreement to the economics of the sales side of the

7   agreement in the sense that the cash that is generated from

8   servicing is used to satisfy obligations by the seller.  It

9   simply ties up the cash of the servicing until the seller

10  performs.  It's designed simply to encourage and enforce and

11  enhance the performance of the seller to the investor.

12         Additionally, this provision which captures -- and it

13  sets forth the rule that says that in the DB Structured

14  Products MLPSA, the servicer -- or purports to say that the

15  servicer is not permitted to repay itself until the EDPs are

16  repaid -- once again contains a pretty significant screw-up,

17  because the reference to the provision that would otherwise

18  tell you that it's the EDPs that must be repaid before the

19  servicer advances can be repaid is described in subsection

20  7.03.  The problem is --

21         THE COURT:  Help me on this.  Who drafted the DB EDP?

22  Was Thacher Proffitt & Wood --

23         MR. PATTON:  It's another Thacher Proffitt document.

24         THE COURT:  And representing whom, DB or --

25         MR. PATTON:  DB.  And the -- well, you stole my

90

1    thunder.

2              THE COURT:  Sorry.

3              MR. PATTON:  That's all right.  You knocked me off my

4    stride.  I'm sorry.  Anyway --

5              THE COURT:  The ambiguity is against the draft.

6              MR. PATTON:  That's right.  In any event, 7.03 is not

7    where the EDP is referenced.  7.03 is a reps and warrantee.  I

8    think the EDP appears in 7.05.  In any event, even if it

9    referenced the proper provision, it's still nothing more than

10   the creation of a black hole over on the servicer side where

11   money sits idle and unused, forcing the seller to pay the EDP

12   if the seller wants the servicer to get the money that's tied

13   up in the custodial accounts.

14             So, again, our argument is almost identical to our

15   argument with respect to the previous discussion, with respect

16   to the previous paragraph.  And that is first of all, this

17   cannot have been a heavily negotiated, hotly contested,

18   terribly important provision of the document.  They couldn't

19   even get it right.  Second, it is, again, badly drafted.  These

20   two most important provisions that purport to tie the servicer

21   and the seller inextricably together, not only fail to do that

22   in a legal sense, they actually fail to make sense.

23             So we argue that the documents are -- the two

24   components of the MLPSA in the DB case, and in all of these

25   generally, ought to be treated as severable.  They function in

a way that's consistent with two severable documents.  The

Gardenia tests are easily satisfied with respect to all of

them.  It's only these two provisions, and they don't all

appear in all of the documents, but it's only these two

provisions in nature that appear in any of the documents that

attempt to link the two together.  And it's only the waterfall

that we find in the other documents, frankly.  I don't know

that there -- well, I don't want to say there aren't any, but

the seller rep and warranty cross default seems to be unique to

this DB contract, but it may not be.  In any event, they are in

the nature and character of credit enhancement.  In the DB case

they are faulty ones at that.

          Your Honor, just two more topics.  And these, I

think, I just want to touch on them briefly.  One, I want to

touch just briefly with respect to curers and incurable

defaults.  We talk about that at some length in our brief.  And

from a factual point of view, the incurable defaults provision

comes up the most often in the context of a loss of Fannie Mae

approval.  And we make the point in our brief that not only is

the legal theory of an incurable default, we believe, flawed,

because we don't believe that Congress intended to create the

concept of a default that couldn't be cured with money and a

change in performance.

          But to the extent that we find that the

Fannie/Freddie performance component is a component of the

92

1    contract that's in the nature of a provision that can be

2    satisfied by other performance, so it's a disguised anti-

3    assignment provision, then in the same sense it's not a

4    material default that could not be otherwise cured.  But as a

5    legal matter we, believe that the concept of an incurable

6    default is simply not the law.

7            Finally, adequate assurance.  I think this was clear

8    by the end of the hearing, and it was certainly clear in our

9    minds when we started.  But from our point of view, adequate

10   assurance in this case is 80 percent American Home Mortgage

11   Servicing and 20 percent the Ross entity.  And that's because

12   what's being evaluated in the context of adequate assurance of

13   future performance is in large part, for purposes of these

14   parties, the question of the performance of the entity on the

15   other side of the transaction.

16           Here what you have is a financial buyer who's buying,

17   not a strategic buyer.  So what the financial buyer brings to

18   the table is two things, one, a continuation and hopefully an

19   enhancement of the business that's being purchased and the

20   financial wherewithal to support the business going forward.

21   Additionally, the financial buyer obviously is going to be in a

22   position to control the destiny and decision making of the new

23   business -- or of the business on the other side of the

24   transaction.  And so, to some extent, and perhaps to a large

25   extent, the motives and intent and expected vision of the

1    purchaser is relevant.

2           But here what we've learned, both from the Ross

3    entity's witness and from our own witnesses, is that the

4    expectation is that the American Home Mortgage business is

5    going to remain intact.  The employees are going to be hired by

6    the Ross entity that's purchasing this asset, that the existing

7    management is viewed very favorably by the Ross entity and

8    there's every expectation that they will continue to be

9    employed.

10          And, in fact, it's in large part because this

11   business was so well run, because its management team and its

12   employees were so effective, and because the Ross entity was

13   looking for a business that it could purchase and a management

14   team it could rely on, that the satisfaction of the adequate

15   assurance of future performance is so dependant on the analysis

16   of how this business is operating today and will operate in the

17   hands of the Ross entity.  And the financial contribution of

18   the Ross entity, is as I said, in my view is 20 percent of this

19   adequate assurance of future performance analysis.

20          And I think we heard through the testimony, and there

21   was no contrary testimony, that the American Home Mortgage

22   Servicing business operationally is really meeting the gold

23   standard.  We've got Fannie Mae there daily monitoring what's

24   happening.  And we remain Fannie Mae certified.  No one raised

25   concerns in the context of the evidence we've heard, about the

1   servicing.  And, in fact the testimony from our witnesses was

2   that servicing has been running very smoothly and the entry

3   into bankruptcy, from my point of view, was remarkably smooth.

4   And from the company's point of view, the two disruptions that

5   they identified were quickly addressed and remedied.

6          All that's really going on here is that a successful,

7   well run, thriving business is getting a fancy, new, and

8   vigorous and committed corporate support and structure and

9   financial backer.  Fannie Mae has approved AHM.  Fannie Mae has

10  conditionally approved the purchaser.  We are licensed.  We are

11  insured.  We have all of our necessary state and regulatory

12  approvals.  And the purchaser is in the process of ensuring

13  that we'll get those that it needs.

14         As Mr. Storper testified, the funds behind the

15  purchaser have available to them something in excess of four

16  billion dollars and that they've already started down the road

17  of getting the necessary stay licenses and other approvals that

18  they need to close the transaction and that they've done

19  considerable work to try to identify what the near term capital

20  requirements are.  And they've committed, I think it was twenty

21  to thirty million dollars for that purpose.  And it's important

22  to remember that adequate assurance is not premised on

23  perfection.  And it's not a requirement to satisfy adequate

24  assurance that there's a promise that every term will be

25  fulfilled.

1          But here what we've got is perhaps not a promise of

2    perfection.  But given the quality of American Home servicing

3    and the quality of the Ross entity and its financial backing, I

4    think we've got the closest thing to the promise of perfection

5    that you're ever going to find an a bankruptcy sale

6    transaction.

7          And so, Your Honor, we ask the Court to grant our

8    motion and authorize the sale and allow us to proceed to close.

9    I may have some rebuttal after other parties have argued, but

10   that completes my closing.

11         THE COURT:  Okay.  Thank you.  Does the committee

12   have any comment?

13         MR. INDELICATO:  Thank you, Your Honor.  Mark

14   Indelicato from Hahn & Hessen on behalf of the committee.  Your

15   Honor, first I would like to take the opportunity to echo

16   sentiments made by others and thank the Court for its patience

17   and indulgence over the last five days in sticking with us

18   through this arduous task.

19         Your Honor, we don't intend to repeat a lot of the

20   things that we've said in our papers or a lot of things

21   debtors' counsel has said.  As we indicated, we enjoined and

22   adopted many of the arguments that they made.  We would like to

23   point out a little different tact that we took at looking at.

24   And we wanted to focus our attention at least on what we

25   considered one of the crucial points in this analysis, and that

1    was the severability of the contracts.

2           Your Honor, I think we've heard in the testimony from

3    the debtors' witnesses, as well as the witnesses from the

4    counterparties, that this is a unique industry in a lot of

5    different ways.  The counterparties, and I think the witness

6    from DB, indicated that for a long time, at least as long as he

7    remembered, and even before he got there, DB had a form of

8    contract that had not only the purchasing aspects of it but the

9    servicing aspects included in one integrated agreement.

10          So when you look at that and then you also consider

11   the fact that what is normal in this industry is that you can

12   enter into that part of the agreement you enter into -- and I'm

13   not going to say the letters because I will get them wrong --

14   it's an MLSP or whatever the letters are.  But you get the

15   contract and what will happen then is they will determine when

16   it's in their economic interest to separate the contracts and

17   enter into the AAR -- those letters I can get right -- and

18   transfer out one portion of it, the loan portion of it, and the

19   servicing may stay where it is.

20          So when it's economically beneficial to them, they

21   know how to sever a contract.  What they're trying to do, Your

22   Honor, is -- and I think it was very clear from the testimony

23   by the counterparties, they were looking for credit

24   enhancements, as Mr. Patton said.  They're looking for

25   guarantees from other parties to ensure their rate of return

1    stays the same.

2         So when you look at it from that perspective, you say

3    what we have here is the counterparties attempting to achieve

4    an objective, a legitimate objective of approving their rights.

5    I want to take that back a little, Your Honor, and look at some

6    of the provisions that we have in the code, because we think

7    really looking at Section 541(3) and 741, it shows that not

8    only does the industry contemplate that these contracts can be

9    severed, but also Congress indicated that as well when they

10   looked at how they were going to define the agreement.

11        If you look at 741, Your Honor, 741 (7)(a) 7 or 8, it

12   talks about a master repurchase agreement entitled to be

13   classified as a securities contract.  But it talks about it

14   only being classified as a securities contract for those

15   elements of it that qualify under that section for a securities

16   contract.  But there may be other pieces.  So there will be a

17   part of the contract that's entitled to the protections under

18   the safe harbor provisions, and parts of the contract that are

19   not.

20        Your Honor, when we look at that, when you come into

21   in the context of a bankruptcy, 541 tells us that the servicing

22   rights of these types of entities are property of the estate.

23   Well, if you look at 541(d) in conjunction with 741, what we're

24   saying is Congress looked at it and said we're going to give

25   them special protections under 741 for these types of

98

1    securities contracts because we want to preserve the liquidity

2    of the mortgage.  That was the primary purpose for putting

3    these provisions in.  They wanted to give these parties the

4    ability to exercise their rights without interference with the

5    stay so they can preserve the liquidity of the mortgages. It

6    wasn't a provision that was entered into to guarantee a return.

7    It wasn't a provision put in to guarantee a recovery.  It was

8    provided to give them the liquidity for these types of

9    investments.

10            If we were going to accept the proposition of some of

11   the parties here today, what would happen would be they would

12   be eviscerating the property rights of the debtor, because all

13   they need to do is combine these agreements in one, having

14   these cross defaults -- and I won't go through all of the

15   severability issues, I think Mr. Patton has covered that

16   well -- but what they would be doing is eviscerating the

17   provision in 541 that says this is a property right of the

18   estate.  And by combining it into one agreement saying well,

19   yes, I only have the protections for the portion that's a

20   securities contract, but you can't do anything else with the

21   other because I have a cross default.  And they themselves have

22   entered into agreements that provide for these types of

23   servicing.

24            So when you look at that analysis and you step back

25   and you say these agreements, by their very nature, are subject

1   to severability, that when it suits the counterparty, it can be

2   severed.  And I believe that these are valuable rights to this

3   estate.  And when you look at it and you say okay, in that

4   perspective, I think the estate -- you need to analyze that the

5   fundamental purposes behind the Bankruptcy Code, behind 363,

6   541, and some of the other provisions.  And the way we look at

7   it, Your Honor, we say these contracts, almost by their very

8   nature, given the special protections they've been provided and

9   given the nature of the agreement, calls for it to be

10  severable.

11          If it's not severable, Your Honor, I looked at it

12  this way and I said well, if it's not severable, does the Court

13  have to get into another analysis?  Does the Court have to look

14  at it and say because it's not severable, do I then go look at

15  some of the provisions in 541, some of the provisions in 741

16  and say what kind of an agreement it is?  I don't think that's

17  the answer anybody wants to come up with.  I think what we're

18  saying, Your Honor, is that when we look at the contracts we

19  think 541 and 741 are illustrative and tell us that these

20  contracts can be severed.

21          Your Honor, we also believe that, as Mr. Patton had

22  indicated, the three part severability test is met.  We think

23  when you look at the nature of these contracts, the

24  consideration in most of them -- I think every one that's

25  before Your Honor today clearly is separate for the purchase of

1    the mortgages and for the servicing.

2         We also believe in most of them, I think there may be

3    one or two differences, where the servicer is a party as well

4    as mortgage co.  And they're certainly different subject

5    matters.  So we believe all of this fundamental fact for

6    severability exists.  And we believe that it really -- looking

7    at the transaction, looking at the nature of the contracts,

8    that these contracts should be severed.

9         Your Honor, the only other point I wanted to make,

10   and again, given the late hour I do want to make this brief --

11   is, again, Congress knew how to make these changes to the code.

12   It knew how to deal with servicing provisions when it wanted

13   to.  And I think if this Court were to hold that combining the

14   contracts, entering into cross defaults, make these contracts

15   not severable, I think it would be eliminating, in many cases,

16   a valuable asset to this estate.  And, in fact, it could have

17   the effect of transferring value that might otherwise be

18   available for unsecured creditors, which are the parties I

19   represent, and transferring it to benefit the counterparties,

20   contrary to the fundamental premises of the code.  Congress

21   understood what the issue was and they addressed it when it

22   gave them the safe harbor protections.

23        But I think that to say these contracts are not

24   severable, given all of the factors that have been met, I think

25   would have a potentially devastating effect on unsecured

1    creditors.  So we support the debtor.  We join in their brief

2    and the statements made by Mr. Patton today, and we would urge

3    the Court to find that these contracts are severable and

4    approve the sale in its entirety.  Thank you.

5              THE COURT:  Let me -- before you go --

6              MR. INDELICATO:  Go ahead.

7              THE COURT:  Who has the burden of proof on

8    severability?

9              MR. INDELICATO:  I believe, Your Honor, the debtor

10   has the burden of proof of severability.

11             THE COURT:  All right.  You said detrimental to

12   unsecured creditors.  Isn't Bank of America getting the

13   proceeds of the sale?

14             MR. INDELICATO:  Yes, Your Honor.  And that's a good

15   point.  You know, this is a transaction which the committee has

16   been involved in from its very inception.  And the committee

17   has been involved not because this estate is going to see one

18   iota of value from this sale, except for the fact that the

19   quicker we can get B of A out the quicker we can get money to

20   unsecured creditors.  And we view this as the single largest

21   asset to sell that we can generate additional value.

22             THE COURT:  The B of A is at what, like, 1.1 billion,

23   right?

24             MR. INDELICATO:  Yes, Your Honor.  I have been called

25   many things, an optimist is not one of them.  But in this

1    instance we are optimistic that we can get B of A paid out and

2    that they will be, based on the other assets of the estate, a

3    recovery for unsecured creditors.  If we're not able to sell

4    this asset for the maximum value, then unfortunately B of A may

5    not get out and unsecured creditors will be hurt.

6              THE COURT:  All right.  Thank you.

7              MR. INDELICATO:  Thank you, Your Honor.

8              THE COURT:  Speak of the devil.

9              MR. TALMADGE:  I'm sorry.

10             THE COURT:  Haven't ever you heard the tort of

11   lending money?

12             MR. TALMADGE:  Only when people want it back.

13             THE COURT:  Yeah.

14             MR. TALMADGE:  Yeah.  Scott Talmadge from Kaye

15   Scholer for Bank of America.  Your Honor, I am not going to

16   repeat any of the arguments.  I'm just obviously standing up

17   here to let you know that the bank and its professionals and

18   representatives were involved in the process that has led us to

19   where we are today and that the bank fully supports the sale of

20   the assets as contemplated by the Asset Purchase Agreement.

21             THE COURT:  Thank you.  Anyone else in favor of the

22   motion wish to be heard?  All right.  I'll hear the objectors.

23   I don't know which order we want to go in.  Mr. Gallo, you're

24   first to rise, so we'll give you the honor.

25             MR. GALLO:  Thank you, Your Honor.  Your Honor,

1    Andrew Gallo from Bingham McCutchen for DB Structured Products,

2    Inc.  First, of course, Your Honor, I'd like to thank you for

3    your patience and your attention throughout these proceedings.

4    I'd also like to thank the debtors' counsel, and I have a great

5    deal of respect for their firm.  I think they did a fine job.

6    Even though I don't agree with them, I think they did a great

7    job.  Last but not least, I would like to thank my co-counsel,

8    Ms. Winfrey, who was invaluable to me both in court and out of

9    court and did a fantastic job with me on this case.

10          Your Honor, I wanted to first just kind of outline my

11   remarks for you so it would make it easier for you to follow

12   along.  I don't have demonstratives, but hopefully this will

13   suffice.  I want to first address the issue of what happens if

14   you don't find these contracts are severable.  I want to then

15   next address the issue of some specific legal arguments under

16   363 that are applicable even if these contracts are severable.

17   I then want to address the severability issue, which I think is

18   obviously the main issue in the case.

19          I disagree on the first issue with respect to if you

20   were to find, as my clients assert, that these contracts --

21   that my contract -- I'm talking about my contract, that DB-1 is

22   an integrated agreement that is one document that includes the

23   reps and warranties related to the sale, including the EDPs and

24   includes all of the servicing rights and obligations, I think

25   it's clear under Fleming that you would not be able to -- under

104

1    365 you would not be able to do what the debtors want you to

2    do.  You would have to take out the EDPs.  You would have to

3    take out premium recapture.  Those are material, economic

4    provisions of the contract, the contract could not be assigned.

5    Similarly, under 363, I think that if you were to find that

6    this was one agreement and all those obligations were there, I

7    disagree with Mr. Patton, I think the debtor would have to sell

8    and assign the entire contract, with all the rights and

9    obligations on all sides of the contract going to the borrower.

10   So I really think the debtors' whole case --

11            THE COURT:  Do you have cases for that proposition?

12   Is that in your reply?

13            MR. GALLO:  We did address that in our reply, Your

14   Honor.  We think Folger supports that position for us.  The

15   Folger case from the third circuit.

16            THE COURT:  Okay.

17            MR. GALLO:  It supports the point that if the debtor

18   is going to sell a contract, it has to sell that contract with

19   all of its rights and obligations intact.

20            THE COURT:  And the TWA case as well?

21            MR. GALLO:  Yes.  From our brief?

22            THE COURT:  Yeah.

23            MR. GALLO:  Yeah.  So, as I was saying, Your Honor, I

24   believe that the severability is the issue the debtors have to

25   prove in order to do whatever they want to do under 363 and

1   under 365.  Now, backing up a second, even if they can prove

2   severability, I think they've got some issues under 363.  This

3   argument is also addressed in our reply brief.  So, again, I'm

4   talking now if you find severability, you find the contracts

5   are nonexecutory.  The debtors need to approve the sale under

6   363.  First of all, 365(f) allows the debtors to assume and

7   assign a contract and to excise from that contract any anti-

8   assignment provisions for purposes of the assumption and

9   assignment.  There's no such provision in Section 363.  Our

10  contract, DB-1, Section 13.05, contains an anti-assignment

11  provision.  The debtors cannot assign the servicing rights

12  under the contract absent our approval.  There's nothing in 363

13  that would allow them to excise that contract.  There's nothing

14  in 363 that allows them to sell and assign a contract and wipe

15  out that assignment provision.

16         And I think these previous cases were also set in our

17  reply.  If not, I will cite them for you now.  There's the

18  Integrated Solutions case, which is a third circuit case at 124

19  F.3d 487.  That involved the assignment of a tort right.  But

20  the third circuit specifically stated in that case, and I will

21  quote "Without explicit federal preemption, the trustee does

22  not have greater rights in the property of the estate than the

23  debtor had before filing for bankruptcy."  So they do not have

24  greater rights in these 363 contract rights than they had

25  previously.  Therefore, if they want to sell and assign, even

1   if it is severable, if they want to sell and assign the

2   servicing rights under Section 363, then our anti-assignment

3   provision would be applicable and we would need to approve that

4   sale pursuant to the terms of that provision, which is 13.05.

5           Second, the debtors have to overcome -- even if the

6   contract is severable, in order to sell the contract rights

7   under 363, the debtors have to overcome 363(f).  The only

8   argument they make with respect to 363(f) is 363(f)(5).  But we

9   made the argument in our surreply, Your Honor, and I'll make it

10  again here today, that the rights that are within -- if you're

11  going to severe the contract, the rights that are within the

12  servicing part of the contract cannot be reduced to a monetary

13  judgment.  It's the right of termination.  It's the right of

14  the waterfall.

15          Even if it could be reduced to a monetary judgment,

16  Your Honor, we would posit that either under 363(e) they have

17  to provide us with adequate protection, or our rights and

18  obligations have to attach to the proceeds of the sale.  And

19  this becomes apparent in the sale order when you see that the

20  sale order contains the standard paragraph that says "All

21  parties, liens, claims, interests, attach to the proceeds of

22  the sale."  All parties except for my client.

23          THE COURT:  You said surreply.  You meant your reply,

24  right?

25          MR. GALLO:  I'm sorry.

1          THE COURT:  There was a surreply.  I want to make

2     sure I'm reading the right document.  The surreply was the EMC

3     people.

4          MR. GALLO:  We filed a brief over the weekend.

5          THE COURT:  This weekend?

6          MR. GALLO:  No, not -- yeah, this past weekend, just

7     before the hearing.

8          THE COURT:  No, last weekend.  Yeah, yeah.  October

9     15, 2007, docket item 1533, right?

10          MR. GALLO:  Correct.

11          THE COURT:  Okay.  I just want to --

12          MR. GALLO:  That confused me there.  I'm sorry, Your

13     Honor.

14          THE COURT:   Between surreplies and MLPSAs, you're

15     trying to confuse me.  I know.  Now it's easy to do.

16          MR. GALLO:  Your Honor, I've been wearing the same

17     suit for five days straight.  I'm confused myself.

18          THE COURT:  All right.  No comment.

19          MR. GALLO:  So, Your Honor, with respect to that --

20          THE COURT:  No, let me back up a little bit on that

21     (f)(5)-- I want you to go through the (f)(5) provision again.

22     "Cannot be compelled to accept money satisfaction of such

23     interest."  Which provision are you talking about?  Just

24     reiterate that point for me.

25          MR. GALLO:  Yes.  Again, we're in the world where you

1    find the contract is severable --

2            THE COURT:  Right.

3            MR. GALLO:  -- so that this one integrated agreement

4    is a sale agreement and is a servicing agreement.  And the

5    debtors are arguing that they can transfer the servicing rights

6    under Section 363.  As part of those servicing rights is

7    Section 13.05 which says we have the right to approve the

8    assignment of our servicing rights.

9            THE COURT:  All right.

10           MR. GALLO:  That is not a right that can be reduced

11   to a monetary claim.  They can't satisfy that by reducing that

12   right to monetary claim.

13           THE COURT:  All right.  I got you.

14           MR. GALLO:  We also have the waterfall rights, and

15   I'll get into those in more detail later in my severability

16   argument.  I don't believe with the way Mr. Patton

17   characterized those in his closing is correct.  But those

18   waterfall rights which say we get money in front of somebody

19   else, those are definitely part of the servicing rights, and

20   those definitely cannot be satisfied by monetary judgment.

21           THE COURT:  Why not?  Priority of payment.  I mean,

22   you're saying the priority of payment --

23           MR. GALLO:  The priority of payment has to --

24           THE COURT:  -- can't be satisfied by payment?

25           MR. GALLO:  Well, it has to be preserved going

1    forward in the agreement.  They would seek to eliminate that

2    provision from the agreement going forward.  So, yes, today --

3    whatever claims exist today can be satisfied, but going forward

4    that is not something that can be satisfied if there are any

5    repurchase obligations that arise in the future.

6           So I don't think 363 works even if they think it's

7    severable, even if you find the contracts are severable.  But

8    then again, Your Honor, I don't think you can find these

9    contracts are severable.  And I want to address the

10   severability argument next.

11          THE COURT:  Sure.  That's what the case is really

12   about, isn't it?

13          MR. GALLO:  I think it is, Your Honor.  And as you

14   saw from -- I hope you saw from the evidence that we presented,

15   that I focused the case on this -- I tried to focus the

16   evidence on this issue, because I do think it is the key issue

17   in the case.

18          I think first we need to start with what's the legal

19   standard that Your Honor must apply.  The debtors, in their

20   brief, vacillate between whether state court should apply or

21   whether federal -- there's a federal common law of severance.

22   I think they argue that there's a federal common law of

23   severance.  We would, Your Honor, argue that under the United

24   Airlines case in the 7th circuit, it's fairly clear that state

25   law should apply in this particular instance.  But I think when

1   I went back and reviewed the briefs and I looked at the case

2   law again, I'm not sure it really matters because under both

3   federal law and state law, I think it all boils down to the

4   same thing.  It all boils down to what you must find with

5   respect to this particular agreement is, are the provisions

6   necessarily interrelated and are the obligations of the two

7   parties on the debtors' side of the agreement economically

8   interdependent?

9           If you look at the Gardenia case, it talks about the

10  obligations of each party to the agreement, are they

11  interrelated.  Look at the Integrated Health case.  "Are

12  different parties obligated to the same obligations under the

13  agreement?"  Look at the Shaw Group case.  They use the terms

14  "economically interdependent."  The New York State cases may

15  state it differently.  They talk about the intent of the

16  parties.  And in New York when they talk about intent of the

17  parties, they usually mean the intent of the parties based upon

18  the words, as Your Honor sees them in the contract.

19          But even under those cases when they're talking about

20  intent, if you read those cases I tell you what they're saying

21  is are the provisions in the contract economically

22  interdependent?  Are they necessarily interrelated?  Did the

23  parties economically view this as one deal?  And if there are

24  two parties on one side of the agreement, right, like we have

25  right now, are each obligated for the rights and obligations of

1  the other?  Now, as a preliminary matter, Your Honor, with that

2  legal framework in mind, I do not see how Your Honor can make a

3  decision as to severability where you have objecting parties

4  asserting that their contract is inseverable by focusing

5  specifically on that contract.  I mean, did the -- the legal

6  framework is that you have to look at the provisions of that

7  specific agreement to determine what the intent of the parties

8  is, to determine whether those obligations are economically

9  interdependent.  It's a contract by contract analysis.  And I

10  think I even heard Mr. Aronoff admit that that was the case.

11        So with that in mind, Your Honor, let's take a look

12  specifically at Deutsche Bank's contract, which is DB-1.  And

13  let's talk specifically about the terms of that contract that I

14  believe make that contract -- the obligations of both debtor

15  parties under that contract economically interdependent.

16        Now -- I'm just reaching for Mr. Patton's

17  demonstratives, Your Honor, and -- there's that one that has

18  all these separate provisions of the contract that he says

19  makes the contract -- that shows that the contract is not --

20  that the rights of each party are specifically set out in the

21  contract.  I posit, Your Honor -- as you asked Mr. Patton --

22  all it takes is one provision to make the obligations of the

23  parties economically interdependent.  All it takes is the

24  indemnification provision.  If we thought when we negotiated

25  the agreement that we had an indemnification provision, like we

1    did think, that obligated both parties, why would I need to

2    state it more than once?  You only need to have it once in the

3    agreement.  So I would posit that that's all you need.  But we

4    have more than one provision, Your Honor.  You talked about --

5    I want to talk about the waterfall.  And I want to talk about

6    Section 13.01.  But what was not talked about -- those aren't

7    the only two provisions that make this -- the obligations of

8    the seller and the servicer under this agreement interrelated.

9    There's also the default provisions, Your Honor.  And I think

10   that is the most important provision of this contract.  The

11   default provision, which is Section 14.01, allows my client --

12            THE COURT:  What page?  What page?

13            MR. GALLO:  I'm sorry.  It's on page -- begins on

14   page 57 of DB-1, Your Honor.

15            THE COURT:  All right.

16            MR. GALLO:  And it goes on to page 58.  I'll ask you

17   to start at the end after you go through all of the i, ii to --

18   down to x.  After that, it tells -- it basically says what

19   happens if one of these events of default exists and

20   continuing.  It allows my client to terminate the servicing.

21   Now, we've heard about these servicing rights as a property

22   right throughout this case.  There's the arguments on the

23   executory contract point.  What you can't dispute is that if

24   the debtors don't service my loans or if the debtors default

25   under these default provisions in this contract and do not cure

1    that default, my client has the right to terminate these

2    servicing rights and put the servicing up elsewhere.  That is a

3    fundamental right of my client under this agreement.

4           So now let's look at Section -- let's look at the

5    first event of default under this agreement.  That is

6    Subsection 14.01, Events of Default, Section (i).  That states

7    clearly and unambiguously "any failure by the servicer to remit

8    to the purchaser any payment required to be made under the

9    terms of this agreement."  It couldn't be more plain and

10   unambiguous language.  It doesn't say any failure by the

11   servicer to remit amounts owed by the servicer.  It doesn't say

12   any failure by the servicer to remit amounts owed in relation

13   to the servicing.  It says "ny failure by the servicer to remit

14   to the purchaser any payment required to be made under the

15   terms of this agreement."  I would say that that not only

16   covers its servicer --

17          THE COURT:  Well, what payments would the servicer

18   have to make to your client other than payments related to the

19   custodial accounts?  In other words, the PNI and TNI.

20          MR. GALLO:  Well, there's -- the way I read this

21   provision, Your Honor, is that it says any payment under the

22   terms of the agreement.  The term payment isn't modified by

23   servicer.  So --

24          THE COURT:  But it says by the servicer to remit any

25   payment to be made.  Why would the servicer -- how is the

1   servicer obligated to make any payments to the purchaser?

2           MR. GALLO:  By provision.  This provision obligates

3   the servicer to make any payment under the agreement.

4           THE COURT:  So even though the servicer doesn't have

5   a contractual obligation to pay you x dollars, if it fails to

6   do so you can terminate the agreement?  Does that make any

7   sense?

8           MR. GALLO:  That's not what I'm saying.  I'm -- first

9   of all, two arguments, Your Honor.  First, I would say that

10  this provision right here obligates the servicer to make the

11  payment.  But, Your Honor, I would also argue that this

12  provision works in conjunction with Section 13.01, which is the

13  indemnity provision, which provides that the servicer shall

14  indemnify and pay to my client for any claims that are

15  obligated by the seller.  So if you read the default provision

16  not as a -- if you -- so if you read the default provision in

17  connection with Section 13.01 then the -- 13.01 obligates the

18  servicer for payments to be made by the seller, such as the

19  EPDs and the premium recapture payments.  And Section 14.01(i)

20  makes the servicer's failure to remit those payments an event

21  of default under the agreement that allows my client to

22  terminate servicing.  I think that is what my client bargained

23  for under the terms of this agreement.

24          I want to come back to the indemnity provision,

25  because there's been a lot of -- there's been a lot -- I have a

1   lot on that.  But I want to briefly touch upon the waterfall

2   before I do.  And the waterfall is contained in Section 11.09

3   of the agreement, but it's in the servicing addendum so it's in

4   Exhibit 8, and it begins on page 8-7.  And I'm looking at --

5   also at Mr. Patton's demonstrative on this.  The one thing

6   about his demonstrative is that there's two provisions that

7   contain a waterfall.  Mr. Patton focused on Section 2, sub 2 of

8   11.09, which I will address.  But first I want to talk about

9   Section (v)(i) of Section 11.09.  And just --

10              THE COURT:  I can't.  Which -- because DB-1 doesn't

11  have the service addendum attached to it.  Which is the

12  debtors' exhibit number?

13              MR. PATTON:  35.

14              THE COURT:  Thank you.

15              MR. GALLO:  I apologize, Your Honor.

16              THE COURT:  8-what?

17              MR. GALLO:  If you go to the servicing addendum,

18  which is Exhibit 8, it's 8-7, where Section 11.09 starts.

19              THE COURT:  Okay.

20              MR. GALLO:  Now, Section 2 deals with servicing

21  advances and Section (v)(i) deals with monthly advances.  Let

22  me just briefly explain what each of those -- what I understand

23  each of those to be under the terms of this agreement, as

24  defined.  Monthly advances consist of those advances that the

25  servicer makes for principal and interest.  So the agreement

1    requires that if any given month a borrower is late or a

2    borrower doesn't make a payment at the date in the month where

3    all PNI is due to be remitted to my client, the servicer needs

4    to make up the difference.  So it needs to do these monthly

5    advances that'll make up the difference for these lost

6    payments.  This provision, 11.09 (v)(i), governs the servicer's

7    right to receive reimbursement for those advances.  Now, I

8    think that's a pretty important right.  If you have to make me

9    whole, and then being able to get reimbursement for those make

10   whole payments.  This makes that -- this Section (v)(i) makes

11   those payments -- enforces a waterfall that makes those

12   payments subordinate to any repurchase obligations under

13   Section 7.04, which relate to loan level reps and warranties.

14          So again, you have repurchase obligations coming.

15   You have economic interrelation.  "The servicer cannot receive

16   repayment for its advances until" somebody, either the servicer

17   or the seller, pays the repurchase obligations.

18          And that's the same for Section 11.09(2).  7.03

19   contains the reps.  7.04 says that if any of the reps in 7.03

20   are violated you have an obligation to either replace loans, or

21   if you can't provide suitable replacement loans, you have an

22   obligation to repurchase.

23          So again, you have economic interrelation here.

24   Seller cannot receive key and critical reimbursement for

25   advances until payments are made for obligations related to the

1    sale of the loans.

2            Now, let's look at the indemnity provision.  And

3    that's on page 55 of the agreement.  Your Honor, since this --

4    a contract is governed by New York law, and since you're going

5    to be asked to, I think, interpret this provision of the

6    agreement by both parties, I do believe that New York law

7    principles of contract interpretation apply.  New York law is

8    very strict on parol evidence.  If you find a provision to be

9    unambiguous you must enforce the provision as written.  I would

10   submit that when this agreement says "In addition to the

11   indemnification provided in Subsection 7.04, the seller and the

12   servicer shall indemnify the purchaser and hold the purchaser

13   harmless against any and all claims, losses, et cetera that the

14   purchaser may sustain in any way related to the failure of the

15   seller to perform its obligations under this agreement."  I

16   think that is very clear and unambiguous.  Now, the debtors

17   have pointed to the next clause --

18           THE COURT:  Yeah.  It's not actually a clause.

19   It's -- there's no comma there.  I mean it's --

20           MR. GALLO:  There's no comma there, but there is an

21   "including but not limited to" which Mr. Patton didn't read

22   when he read this section into the record in his closing.  I

23   think that's very important.  That is just a descriptive

24   clause, including but not limited to.  That doesn't, in any

25   way, limit the -- as it -- in a plain reading of this provision

1    that including but not limited to clause cannot in anyway limit

2    the obligations of -- it's -- the cost, fees and expenses in

3    anyway related to the failure of the seller to perform its

4    obligations under this agreement.  It does not limit that.  And

5    I say, unambiguously, under New York contract law --

6              THE COURT:  Do you have cases that say that?

7              MR. GALLO:  That say that New York law is the --

8              THE COURT:  No, no.  That say that, you know, if I've

9    got a provision that says, you know, obligations, you know, of

10   the seller including but not limited to something that's

11   clearly not an obligation of the seller, that that's

12   illustrative and not limiting.

13             MR. GALLO:  I don't have a specific case for that,

14   Your Honor.  I could find one if you want.  I would posit

15   that the term including but not limited to is, you know, is a

16   term that we all know, is all used in contracts.  And anytime

17   it's ever used in a contact it's used illustratively and it is

18   not used as in anyway limiting.  That's what the not limited

19   to, I would posit, unambiguously means.

20             THE COURT:  So you want me to accept parol evidence

21   of your interpretation of how people use that.

22             MR. GALLO:  No, Your Honor.  I don't.  I want you to

23   read including but not limited to and I want you to determine,

24   as a matter of law, is that unambiguous.  Can you unambiguously

25   say that the phrase including but not limited to is

1    illustrative?  I think that you can.

2          Now, the debtors have pointed to lots of mistakes in

3    the agreement.  And the case law in New York is legion that

4    mistakes in an agreement do not create an ambiguity.  I could

5    cite to you the Schmidt case which is a -- it's 97A 2d 151.

6    That's an intermediate level appellate case.  I can also cite

7    to you the Reese case, I believe it is, which is 97 N.Y. 2d

8    195.  That's an appeals court case.  Those court cases say that

9    mistakes don't make an agreement ambiguous.  And what --

10          THE COURT:  They can make the provision in which the

11    mistake occurs ambiguous.

12          MR. GALLO:  They certainly --

13          THE COURT:  Or nonsensical --

14          MR. GALLO:  They certain --

15          THE COURT:  -- or whatever.

16          MR. GALLO:  They can, Your Honor.  I don't think that

17    there's any mistakes in this provision that make the key

18    provision that I'm asking you to enforce ambiguous.  I think

19    the provision is unambiguous.  It's the debtors -- I'm not sure

20    what the debtors are arguing.  Are they arguing that you must

21    take "and the servicer" out of the first sentence of this

22    agreement because of the other mistakes in the agreement?  The

23    case law in New York is clear.  You can't do that.  You can't

24    eliminate words.  You can't read out words.  If you think

25    something was a mistake based upon the arguments of the

1   parties --

2          THE COURT:  I think their argument is that it's

3   nonsensical and, as a result, shouldn't be enforced.  Because

4   it doesn't make any sense.  Now, I don't know if I agree with

5   that or not but I think that's their argument.

6          MR. GALLO:  Well --

7          THE COURT:  And because it's nonsensical your client

8   drafted it and you hold that against you.

9          MR. GALLO:  Your Honor, if that's the argument then I

10  don't even need to get into the mistake argument because I

11  think it's unambiguous.  But I think that for nonsensical -- if

12  they say the contract is -- if their argument is the contract

13  is nonsensical, that is akin to an argument that it is

14  ambiguous because this provision has to mean something.  You

15  have to ascribe meaning to every provision -- to the provisions

16  in a contract, so if it's nonsensical --

17         THE COURT:  Well, if you can.  I mean, again, it's

18  either -- if the provision is sufficiently ambiguous that you

19  can't figure it out, you don't enforce it.  Or if that

20  "including but not limited to" is limiting as opposed to

21  illustrative, since there is no obligation of the seller to

22  service the loan, it's meaningless.

23         MR. GALLO:  Your Honor, I would say that you have to

24  get to the point of very, very nonsensical before Your Honor

25  can just ignore a provision in a written agreement in New York.

1   If what they're arguing is that the agreement cannot -- is

2   nonsens --

3           THE COURT:  No, I -- no, I -- no, look.  If I read it

4   the way the debtor wants me to read it, it isn't ambiguous.  It

5   says what it says.  Failure of the seller to perform an

6   obligation the seller doesn't have.  Okay?  You know what?

7   Fine.  You have to indemnify them for the failure of the seller

8   to perform something the seller doesn't need to do.  You can

9   have that right.  It doesn't help you.

10          MR. GALLO:  Your Honor, I mean, again, I've already

11  made my point on the including but not limited to--

12          THE COURT:  I mean that's your strongest point

13  obviously.

14          MR. GALLO:  I've already made you my point on the

15  including but not limited to.  But the only point I'm trying to

16  get to, Your Honor, is that you can find it ambiguous my way --

17  I mean you can find it unambiguous my way.  You can find it

18  unambiguous their way.  But if you think that the two opposing

19  positions, you know, create an ambiguity or if you think that

20  there's some -- there's provisions in this document that create

21  an ambiguity then I think you're obligated to look at the parol

22  evidence to figure out what the parties meant by this

23  provision.  Because I'm asking you to enforce this provision.

24  It has to mean something.  So if it's nonsensical to the point

25  of ambiguity then you have to look at the parol evidence.  And

122

the only parol evidence in the record on this provision is

mine.   There's Exhibit 8, which is the black line that we

submitted.   That we entered into evidence.   That's the first

black line.   And it shows the black line against the 2005

agreement.   We know the debtors received that black line

because they produced it to me.   So it came out of the debtors'

files.   If you look at the indemnity provision in that black

line, Deutsche Bank Exhibit 8, there's one word that -- you

can't miss it.   Seller is added.   That's the only change.   They

add the word seller in two places.   I find it hard to believe,

based on -- with that parol, that in what -- that the change

was not intentional.   And that the -- what the parties did not

intend to put that in there.

On my client's testimony, Mr. Principato was the only

Then look at Exhibit 7.   What Exhibit 7 shows is that

this provision was exchanged again between the parties.   And,

again, the -- Exhibit 7 -- the e-mail says only those

provisions that have been changed are now being circulated

again between the parties.   This provision was exchanged again.

And that's when they eliminated the purchaser indemnity from

the provision.   So I think those black lines show, Your Honor,

that the parties were focused on this provision in the

contract.   They're in evidence for all purposes.   And you can

draw any inference you want from those black lines.

On my client's testimony, Mr. Principato was the only

person who sat on the stand during this trial from any -- that

123

any party offered that had negotiated any of these agreements.
And he testified that this was intentional.  And that the
effort was to make the servicer responsible for the seller's
reps and warranties.

I also urge you to look at other agreements in the
case.  There are other -- specifically DB Exhibit 9 and DB
Exhibit 10.  When the debtors wanted to enter into an agreement
where it was clear that the indemnity obligations between the
seller and the servicer were clearly different they knew how to
do it.  The EMC agreement has two separate indemnities.  One
for the seller, one for the servicer.  The Greenwich agreement,
entered the same exact day as my agreement, contains a very
similar indemnity provision except it says "the seller and the
servicer, as applicable, shall indemnify for all claims against
the seller and the servicer, as applicable."  That reads the
way the debtors want it to read.  My provision doesn't.

I want to address the cross-default arguments.  If I
understood them correctly they seem a bit circular.  Because
the Shaw case is dealing with cross-default in different
contracts, as I understand it.  So, this is one contract.  So
the debtors are arguing well, this is a cross-default between
two separate contracts, and you use that to determine that
they're two separate contracts.  It seems like a very circular
argument to me.  And if you look at the standards in the cases
that the debtors put in their brief regarding the issue of

124

1    severability under federal law -- that's the Gardenia case,

2    Integrated Health.  They're talking about are the obligations

3    of the parties to the agreement interrelated.  Are different

4    parties obligated on the same provision?  That's precisely what

5    this indemnity provision does.  That's precisely what makes

6    this an integrated agreement.  So it's really a circular

7    argument.

8            I'd also point Your Honor to the United Airlines

9    case.  This is a lower court case that was affirmed by the

10   Seventh Circuit.  This is 322 B.R. 347.  That case held that

11   there's no such thing as a cross-default where you have one

12   contract.  The parties in that case made the argument that a

13   provision consent contained in a single agreement was a cross-

14   default.  And the Court stated in that case you can't have a

15   cross-default in one agreement.  We looked for cases.  We

16   didn't fit it.  I don't know if the debtors found one.  But we

17   have not found a case where a Court found a provision to be an

18   impermissible cross-default when you're dealing with one

19   contract.  I think by definition cross-default must cross two

20   agreements.  And they've got to get to severability first

21   before they can get there.

22           So, Your Honor, given the evidence and given what my

23   agreement says, I think that you have to find that all of

24   the -- that the obligations based on the indemnity provision,

25   based on the default provision and based on the waterfall

1    provision, there is significant economic interrelation between

2    these provisions that you have to find that this is one

3    agreement.

4            Now, the debtors put on a lot of evidence that was

5    outside of the contract to show that these contracts, in

6    general, these MLPSAs, are meant to be two separate agreements.

7    I want to focus specifically on the testimony of three people,

8    Mr. Johnson, Mr. Aronoff and then my witness, Mr. Principato.

9    I found Mr. Johnson's testimony, actually, very illuminating on

10   the subject of whether or not these agreements are considered

11   two separate agreements that are not economically

12   interdependent.  I think Mr. Johnson's testimony made it clear

13   that the debtors view this from an economic standpoint as one

14   deal.  That's the testimony that he talked about both on direct

15   and on cross -- about how the debtors determine whether or not

16   to enter into servicing retained versus servicing released

17   transactions.  And he testified about what the debtors -- the

18   analysis that the debtors do to determine whether it's better

19   to retain the servicing or whether it's better to sell the

20   servicing.  This is an analysis that's done at the corp level.

21   And what do they look at?  They look at the servicing fee that

22   they're going to collect going forward on the servicing rights.

23   They look at whether or not retaining -- the economic benefit

24   of retaining the servicing rights will assist them with the

25   cost of paying their EPD claims.  They look at the potential

1    ability for EPD claims on the loans that they're going to buy.

2    They look at whether or not it's better to retain the

3    servicing, as opposed to selling the servicing and giving it to

4    one of their competitors.

5        So, I would posit, Your Honor, that when the debtors

6    are looking at these agreements they're looking at it as one

7    economically integrated transaction.  What are the costs and

8    benefits of my sale reps and warranties?  What are the costs

9    and benefits of my servicing reps and warranties?  How do all

10   those fit together?  Am I better off keeping the servicing?  Or

11   am I better off selling the servicing?

12       Now, Mr. Patton made a comment in his closing about

13   the fact that we were all surprised that this provision was in

14   there, that this indemnity provision was in there.  Mr. Johnson

15   wasn't surprised.  He told me -- and he also told me in his

16   deposition that I read in the record -- that it would not

17   surprise him if an indemnity provision bound both the servicer

18   to the sale reps and warranties.  You know why it didn't

19   surprise him?  Because a lot of times there's only one American

20   Home entity on the contract.  If you've got Countrywide's

21   contract American Home Corp. is both seller and servicer under

22   that contract.  And it's bound to all the rights and

23   obligations.

24       What he did say is that it didn't surprise him

25   that -- it wouldn't surprise him if this provision existed, but

127

he didn't know whether it existed because he never focused on

it.  I think Your Honor touched on this point in Mr. Patton's

argument.  No one ever focused on it, because there was never a

default.  And Mr. Johnson testified to that effect.  He said

prior to the days immediately leading up to the bankruptcy they

considered DB their partner.  They always worked collectively

to resolve EPD claims.  There was never any need to get to the

point where they would be declaring a default.  But fortunately

for us, we did declare a default.  And we did make demand on

American Home for payment of EPDs.  And that's Exhibit 4.

That's our demand letter for defaults on any EPDs.  That letter

didn't just go to corp, Your Honor; that letter went to

servicing as well.  We sent a letter to New York and to Texas.

So I think that is evidence supporting the fact that we felt

both parties were obligated on these rights.

        The other testimony, with respect to -- outside of

the contract with respect to the debtors saying that these are

clearly illuminated rights -- two sets of rights -- are the

testimony of Mr. Aronoff and the testimony of Principato.  Mr.

Principato.  Let's compare the reliability of the two first.

Mr. Aronoff has not negotiated an MLPSA as the seller or the

buyer under one since the year 2000.  Mr. Principato testified

that since the year 2000 he's negotiated over 200 of these

agreements.  Mr. Aronoff said he wasn't giving you any opinion

as to what the specific terms of my contract meant.  Quite

128

1    frankly, I don't see how his opinion has any value if that's

2    the case.  But nevertheless, he said he was not giving you an

3    opinion as to the specific terms of my contract.  Mr.

4    Principato, he negotiated my agreement.  He lived with my

5    agreement day to day in his day-to-day activities.

6         What did Mr. Principato say?  He said usually

7    Deutsche Bank likes to have these indemnity provisions so that

8    both parties are responsible for the obligations.  He said

9    that -- and he said lots of times, as with the Countrywide

10   agreement in this case, there's one party that's responsible

11   for both the seller's obligations and the servicer's

12   obligations.  And he said where they have two parties -- which

13   is the choice of the counterparty to the agreement -- Deutsche

14   Bank never chooses to do it with two parties.  They try to

15   incorporate the same protections they have with the one party

16   agreement in the two party agreement.

17        Now, I think we need to step back to talk about

18   credit enhancement.  And Mr. Patton used the term "extortion".

19   A bargain for rights in a contract between two sophisticated

20   parties, to me, are not extortion.  So what are these

21   provisions?  Why would we want this provision?  Well, you have

22   to step back and view the contract as a whole as it relates to

23   this contract.  I'm sorry.  The transaction as a whole as it

24   relates to this contract.  If American Home -- American Home

25   Corp. does not have the ability to make its payments to my

129

1   client on EPD claims and American Home Corp. and American Home

2   Servicing are very interrelated -- they're both here in

3   bankruptcy together; their economics are interrelated --

4   wouldn't my client want the right to terminate its servicing

5   rights and move its custodial accounts?  I'd say that it would.

6   I say that that right would be fundamental -- a fundamental

7   client right that my client would want.  If that company is in

8   financial distress and you have a servicer that's holding

9   custodial accounts that contains principal and interest that

10  belong to my client, I want the ability to move those custodial

11  accounts.

12          I don't know how familiar Your Honor is with the New

13  Century case, but we had a problem with that in the New Century

14  case where the custodial account money wasn't there anymore

15  when the entity filed for bankruptcy.  That's the type of

16  problem that these provisions are trying to protect against.

17          Also, recall the cross-examination of Mr. Power.

18  When he cross-examined a witness on the -- I think it was EMC's

19  witness -- on the speed with which these sale transactions can

20  close but the servicing transactions go onward.  Let's think

21  about that for a second.  The sale closes in a couple of days.

22  So the loans go to my client and my client sends the

23  consideration to the seller.  Other than a threat of a -- if

24  the obligations between the seller and the servicer are not

25  related other than the threat of a lawsuit, why would the

130

1   seller pay his EPD claims?  What is the incentive there other

2   than a threat of a lawsuit or -- obviously we hope they

3   followed their contractual agreements.  But the ongoing rights

4   of American Home as an entity under that contract are the

5   rights to receive the servicing fee.  So I think it would be

6   economically irrational for a purchaser, under that particular

7   agreement, not to link American Home's right to receive those

8   servicing fees with American Home's obligation to make the EPD

9   payments.  That's the only stick I have.  You don't make my EPD

10  claim payments, you lose the right to collect your servicing

11  fee.  Why wouldn't I want that?  Of course my client's going to

12  want that.

13          I'll touch briefly on Mr. Aronoff's points.  I don't

14  think any of them have any merit as to why he thought these two

15  agreements needs to be separate.  First he said they need to be

16  separate for issues of pricing because if the same party was on

17  the hook, it would put all the pricing out of whack.  Well, you

18  have agreements in this case where the same party is obligated

19  on both ends.  That's the Countrywide agreement.  You have Mr.

20  Principato's testimony that more than half of the agreements

21  that he does involves the same party as both seller and

22  servicer.  That hasn't crashed the market.  He said these have

23  to be separate so you can sell the servicing rights.  I think

24  Your Honor picked up on the point that I was trying to make

25  with him, which is that American Home didn't sell servicing

131

1    rights.  And he has no idea whether when American Home was

2    drafting these contracts, that was something that was important

3    to them.  Separate and apart from the fact that almost all

4    these agreements, including my own, contain an anti-assignment

5    clause.  So they can't sell the servicing rights without my

6    permission anyway.  It's going to be in agreement.

7            Mr. Patton said they don't -- these servicing rights

8    don't sit still.  Yes, they do.  Unless I give you from my --

9    unless my client give you my permission to sell them.

10           There's also this notion that they have to be

11   separate for later securitizations.  Quite frankly, I just

12   don't get that one.  If the -- first of all, if the agreement

13   was as easily separable as Mr. Aronoff stated, then AARs would

14   be a one page document.  I assign to you my quote, unquote

15   servicing rights.  Sincerely, Deutsche Bank.  Well, I urge you

16   to look at Section -- I urge you to look at Exhibit 5, Deutsche

17   Bank Exhibit 5.  Those are AARs.  Those are complicated

18   agreements.  Those agreements are seventeen pages long each.

19   Those agreements contain three pages of quote, unquote

20   modifications to the servicing provisions of the contract.

21   Another key thing those agreements also do is they specifically

22   reserve to Deutsche Bank its rights for the -- under the reps

23   and warranties under Section 7, its EPD rights.  So when my

24   client voluntarily agrees to transfer servicing to another --

25   his right to receive servicing to another entity, it thinks it

1  important enough to make sure it states oh, by the way, you're

2  also not getting these other rights because it's not that clear

3  in the agreement because everything is interrelated.  I think

4  the AARs are fantastic for us.

5          So, Your Honor, in light of all that evidence, in

6  light of the words in my contract, in light of the evidence

7  from Mr. Aronoff, from Mr. Johnson, from Mr. Principato, I

8  think you have to find that this agreement is economically

9  interrelated.  I think you have to find that this agreement is

10  not severable.

11          I just want to touch very briefly on the Fannie

12  Mae/Freddie Mac qualification issue.  The Fannie/Freddie

13  default in our agreement is Section 14.01(v)(i).  Well

14  basically what that agreement says -- well, we can -- if I can

15  find my agreement.  That it's an event of default if the

16  servicer ceases to meet the qualifications of either a Fannie

17  Mae or Freddie Mac seller or servicer.  It's either/or.  So

18  they have to have both.  If they default only -- a Fannie alone

19  isn't enough for them to satisfy this default provision.  So

20  the testimony in the record is that, as everyone has testified,

21  the new purchaser is not becoming Freddie approved.  The

22  testimony in the record is that while similar, the Fannie and

23  Freddie guidelines are different.  And I think Mr. Aronoff's

24  testimony on this provision was actually helpful for us,

25  because he said -- I think he said that these provisions have

1  meaning.  At least we know Mr. Principato said they have

2  meaning.  They provide a baseline.  And if the servicer -- if

3  the purchaser in this case is not Freddie approved, then I

4  don't think they can give us adequate assurances of future

5  performance because that's a requirement under our contract.

6           So, Your Honor, it's getting late, so I will -- let

7  me conclude.  Your Honor, my arguments are directed towards my

8  contract.  And I think I have a good contract.  And I think I

9  have arguments that are specific to my contract.  I'm not

10 necessarily asking you not to approve the sale.  All I'm asking

11 is that if you approve the sale, my contract shouldn't be in

12 it.  My contract -- that the contracts under my contract have

13 under 200 million dollars of UPB.  That was the testimony of

14 Mr. Love.  He said it was around 100 -- I think he said 180

15 million or 189 million.  So even at Mr. Weill's low-end

16 estimate of 40 billion, if you take my 200 million out of the

17 contract, they still meet their 38 billion dollar threshold by

18 over 1.8 billion dollars.  So taking my contracts out of this

19 agreement doesn't jeopardize the agreement as a whole.

20          So I just want to step back and just -- and talk

21 about what really -- what is -- what's going to happen in this

22 case.  If you allow the debtors to do what they want to do,

23 which is sever this contract and sell the servicing rights

24 separate from the sale reps and warranties, what's going to

25 happen is the servicing rights will get assigned, the debtors

134

and the debtors' estate, and, as you pointed out, primarily
Bank of America, will get the benefit of that -- the
consideration received for that sale and my client will get an
unsecured claim -- they will presumably reject the rest of the
contract and my client will get an unsecured claim in the
bankruptcy.

What happens if you don't approve my contract as part
of the sale?  The debtors will still have the right to go out
and find another buyer for my contract as a whole.  If they
can't find that buyer, presumably, they will reject that
contract.  I will -- my client will then have an unsecured
claim just like they would have on the other circumstance.  But
in that instance, I would -- all of my rights under the
contract would be preserved, because I would get my servicing
rights back.  And that's really what -- that's really the point
that we're making here is that when we bargained for this
agreement, the bargain was that if they default on the
servicing prov -- I'm sorry.  If they default on the payments
of reps and warranties and those defaults go unpaid, we can
terminate the agreement and we can transfer our servicing to
another servicer.  Now, Deutsche Bank doesn't perform servicing
so we would have to transfer the servicing to somebody else.
But that's what would hap -- that is what should happen.  That
is the benefit of the bargain that my client struck.  If you
breach the sale reps and warranties like they would in any --

1    in a contract rejection -- then we get to terminate the

2    servicing rights, and we get to transfer them to another

3    servicer.  To do what the debtors want you to do would deprive

4    my client of the benefit of that bargain.  And that's exactly

5    what the third circuit in Fleming has said that cannot be done

6    in these types of cases.

7             So, Your Honor, again I thank you for your attention

8    today, particularly late on Friday.  And I appreciate the

9    opportunity to appear before you.

10            THE COURT:  Thank you, Mr. Gallo.  All right.  Let's

11   take a recess.

12            (Recess from 6:13 p.m. to 6:32 p.m.)

13            THE CLERK:  All rise.

14            THE COURT:  Please be seated.

15            MR. GALLO:  Your Honor, I apologize.  Andrew Gallo

16   for DB Structured Products, Inc.  If you'll allow me, I just --

17   I got so caught up in my own argument that I didn't contemplate

18   defeat and there are a couple of issues -- there are a couple

19   of issues that I have with the debtors' order if that is the

20   order that you intend to enter.

21            THE COURT:  Well, we're not going to get into the

22   order right now.

23            MR. GALLO:  Okay.

24            THE COURT:  We'll deal with that at a different time.

25            MR. GALLO:  Thank you.

1        THE COURT:  But I admire your optimism.  Ms. Winfree,

2   hello.

3        MS. WINFREE:  Good evening, Your Honor.

4   Amanda Winfree, Ashby and Geddes.  I'll be very brief.  I rise

5   on behalf of two clients, Morgan Stanley Mortgage Capital

6   Holdings, LLC, a successor in interest by merger to Morgan

7   Stanley Mortgage Capital, Inc., and UBS Real Estate Securities,

8   Inc.

9        Your Honor, Morgan Stanley filed an objection and

10  enjoinder but ultimately we're down to one contract that's left

11  at issue in connection with the sale.  That's the certain

12  mortgage lend sale and servicing agreement dated January 1,

13  2006 which appears on schedule 1.1(J) of the executed purchase

14  agreement.

15       Pursuant to which Morgan Stanley agreed to purchase

16  and did purchase from time to time certain mortgage loans from

17  American Home Mortgage Corp, as seller, on a service to retain

18  basis and pursuant to which American Home Mortgage Servicing,

19  Inc., agreed to service those loans.

20       THE COURT:  Do you know the exhibit number?  Do you

21  know?

22       MS. WINFREE:  The debtors' exhibit number?

23       THE COURT:  Yes.

24       MS. WINFREE:  No, I'm afraid I don't.

25       THE COURT:  All right.  It's okay.  We'll figure it

1    out.  Okay.  Thank you.

2              MS. WINFREE:  It's the classic MLPSA.

3              THE COURT:  The classic.

4              MS. WINFREE:  The classic.

5              THE COURT:  With the indemnification and the

6    waterfall provision.

7              MS. WINFREE:  Yeah, let me get to that.  Under the

8    terms of that agreement, which I'll refer to as the Morgan

9    Stanley agreement, there were certain purchase and other

10   obligations which remain unpaid and for which Morgan Stanley

11   asserts a cure claim in the amount of approximately 154,000

12   dollars.

13             UBS also filed an objection and there again we're

14   down to one agreement left at issue in connection with the

15   sale, which is that certain master land purchase and servicing

16   agreement dated December 1, 2005, as subsequently amended and

17   which agreements appear on schedule 1.1(J) of the executed

18   asset purchase agreement.

19             Pursuant to which UBS agreed to purchase, and did

20   purchase from time to time, mortgage loans.  And American Home

21   Mortgage Corp, as seller, on a servicing retained basis and

22   pursuant to which American Home Mortgage Servicing, Inc.,

23   agreed to sell the loans -- service the loans.

24             Under the terms of that agreement, which I'll refer

25   to as the UBS agreement, American Home Mortgage Corp has

1    certain repurchase and other obligations.

2         THE CLERK:  (Indiscernible).

3         MS. WINFREE:  My apologies.

4         THE COURT:  She's tired.  She's a little tired.

5         MS. WINFREE:  I need a sandwich.  Had certain

6    purchase and other obligations which UBS -- which remain unpaid

7    and for which UBS asserts a cure claim in the amount 2. --

8    approximately 2.3 million dollars.

9         THE COURT:  Are those cure claims, for both of those,

10   are those failure to make EPD payments or are they -- premium

11   and capture?

12        MS. WINFREE:  They include premium recapture and, I

13   believe, the UBS cure claim also includes EPD claims.

14        THE COURT:  Are there any -- and I know I'm asking

15   you to buy into the debtors' theory but are there any servicing

16   related defaults -- payments as part of that cure amount or are

17   they all origination related cure payments.

18        MS. WINFREE:  To the extent that you would like to

19   classify those as origination related, I believe they are

20   origination related.

21        THE COURT:  Okay.  Thank you.

22        MS. WINFREE:  Your Honor, we join in the objections

23   recited by counsel to DB Structured Products and we're pretty

24   much content to rest on our objections filed and the record

25   that's been established during the sealed hearing.  But

1    briefly, we do not think the record here supports the relief

2    that the debtors are requesting, at least not with respect to

3    the Morgan Stanley or UBS agreements.

4             The record does not support a finding that these

5    contracts are non-executory.  And with respect to the executory

6    nature of these agreements, we would merely point out that

7    they're part of the record.

8             THE COURT:  Okay.

9             MS. WINFREE:  Second, to the extent that the Court

10   either finds either of these agreements to be non-executory and

11   we believe that it cannot.  We assert that the record does not

12   support a finding that the servicing rates are severable and

13   can be sold apart from the other rates and obligations

14   contained in the agreements under section 363.  And to that

15   extent we would note that both the Morgan Stanley and UBS

16   agreements contain the same indemnification, waterfall, anti-

17   assignment, default provisions as are contained in the DB

18   Structured Products, to the extent that that's helpful to the

19   Court to compare those.

20            THE COURT:  Thank you.

21            MS. WINFREE:  Those provisions are evidence of

22   significant economic inter-relation between the purchase

23   provisions and the servicing provisions.  And neither the

24   Morgan Stanley nor the UBS agreement should be part of the

25   sale.

140

1          THE COURT:  Thank you.

2          MS. WINFREE:  Thanks.

3          THE COURT:  What's that noise?  Yeah, I can hear it

4  to, is it your headphones?  Okay.  I'm sorry, it's -- I'm

5  hearing a noise over there, I don't know what it is.  Okay.

6  I'm sorry.  Who's next?

7          MR. DEHNEY:  Good evening, Robert Dehney from Morris,

8  Nichols, Arsht and Tunnell.  Your Honor, we were going to let

9  the people with the ML agreements go first.  Now there's myself

10  and one other person on the stand on one side.

11          THE COURT:  All right.  By stand alone you mean you

12  just have the servicing agreements?

13          MR. DEHNEY:  Well, by stand alone I'm referring to

14  the debtors' characterization in their reply brief that we have

15  a stand alone.  It is a -- there is a servicing agreement that

16  is one agreement that doesn't have the other provisions that

17  have been discussed by Mr. Gallo.

18          THE COURT:  But it references other agreements like

19  the insurance agreement?

20          MR. DEHNEY:  It references other agreements like the

21  insurance agreement and the pulling in service agreement, Your

22  Honor.  Those are Assured 1, 2 and 3.

23          Your Honor, I'm not going to repeat what Mr. Gallo

24  said about severability but I do want to start with a few

25  points.  We agree it's the debtors' burden of proof here and

1    while Mr. Patton went on and on about the other transactions,

2    no one even mentions the assured transactions and we think

3    that's important.  We think it's important because it is the

4    debtors' burden of proof and there's been no testimony offered

5    by any of the witnesses suggesting that our transaction

6    documents, which are identified and find are the operative

7    documents in the servicing agreement, as well as the other two

8    documents, that they should be severed.

9         There's been no suggestion, by any of the witnesses,

10   that they had any personal knowledge, that they had any

11   understanding.  And in fact, as I'll go through the testimony,

12   those witnesses who even tried to discuss our transaction in

13   cross-examination confirmed that they are transferring all of

14   the servicing rights, not just in the servicing agreement but I

15   think as Mr. Weill said, and servicing rights in other

16   agreements, which clearly fits within the document denominated

17   insurance.

18        The insurance agreement, as Your Honor heard, the

19   transaction is done.  They bargained for the insurance and what

20   the insurance carrier is providing is, we provide the

21   continuing insurance so long as they continue to service.  So

22   there is no party who is a greater interest in the viability of

23   the servicer and the qualifications then does the credit

24   enhancer.  But I wanted to start first with where we are

25   procedurally because we do think it is their burden of proof.

1          Second, Your Honor, in their reply brief at page 10,

2    again, they don't even address this transaction.  In the middle

3    of page 10, as discussed below, the objecting parties cannot

4    satisfy their burden of proving that these separate and

5    distinct RMBS and HELOC servicing agreements with AHM Servicing

6    are somehow integrated with an indivisible from the securities

7    related agreements, to which AHM Servicing is not a party.

8          Your Honor, American Home Servicing is a party to the

9    insurance agreement.  One simply needs to look at the cover

10   sheet, you look at the entire agreement and it provides that if

11   they fail to perform under that agreement we have the ability

12   to terminate.  We have the ability to terminate them as a

13   servicer.

14         The economic exchange back and forth is, so long as

15   they service in accordance with the guidelines, they get to

16   continue collecting their money.  If they fail to do that,

17   among our rights and remedies is we can go to the backup

18   servicer.

19         So I start first with procedurally, we don't think

20   they're there.  When the witnesses, Your Honor, what we heard

21   is Mr. Weill testify they're taking all servicing rights and

22   other rights.  They had nothing in particular to say about the

23   assured transaction, Your Honor.  We heard the purchaser say

24   that they're taking all servicing rights and are going to be

25   performing all obligations related to those servicing rights.

1          Now again, at the outset of this trial I asked if

2    someone could identify precisely what it is they're -- they're

3    trying to take so we could figure out what rights they're

4    taking.  So let's assume that they're trying to take all of the

5    rights related to the securitization.  So they are taking both

6    the rights to service in the insurance agreement and in the

7    servicer agreement are they taking all of the obligations.  If

8    they are, we have no problem understanding it's from and after

9    the effective date, Your Honor.

10          If they are arguing they are only taking the

11   servicing agreement, we are also party to the servicing

12   agreement, Your Honor.  And we have asked, are they taking the

13   four corners of that document, the servicing rights and

14   obligations and is the purchaser accepting those?  The

15   testimony says that's what they're doing.  The form of order

16   says differently.

17          THE COURT:  Touch on that a little bit.  A lot of the

18   disconnect, it seemed to me in the last five days, on this case

19   dealt with the debtors and the buyer wanting to say look, the

20   APA says we're taking servicing rights and anything related to

21   that.  And the client or the witness for the buyer said about a

22   hundred times, you know, if the document says I'm taking it,

23   I'm taking it and I'll pay it.  I'm not going to sit up here

24   and tell you a line item by line item.  I'll talk to the

25   lawyers; we'll figure it out, look to the APA.

1          The people doing cross-examination want to focus and

2     say, all right, we'll -- what about section 5 of my agreement?

3     What about article 6 of my agreement?  What about article 7 of

4     my agreement?  What about section 7.02(VI) of my agreement.

5     And isn't that counter to the whole structure of the APA?

6          Now, it may be that the buyer is doing nothing other

7     than buying a heck of a lot of litigation down the line as to

8     what the buyer has agreed to take and what the buyer hasn't

9     agreed to take.  But that's not the debtors' problem and that's

10    not the Court's problem.  It's -- it's assignable or its not.

11    It's sellable or it's not.  But a lot of the frustration, I

12    know, that you've expressed and that Mr. Fallon has expressed

13    and a lot of the other lawyers have expressed in trying to

14    figure out what they're taking and what they're not taking,

15    kind of, disconnects from the whole point of the APA, which is

16    not to delineate it but simply to say these are the contractual

17    rights we're taking.

18          So, the issue may be -- you know, I may rule and say

19    well you know what, that's -- they can say what they want in

20    the APA.  If they're going to take a contract, they're taking a

21    contract, period, end of story.

22          But if I do find that it's possible to separate out

23    servicing from other things, notwithstanding the fact that it's

24    all contained in one document --

25          MR. DEHNEY:  Uh-huh.

145

1          THE COURT:  -- why do I have to decide today, for

2    purposes -- having decided, assuming I decide that servicing is

3    severable from something else.  Now, your client's in a

4    different situation since that's all your contract provides

5    for. But assuming that servicing is somehow separable, do I

6    have to go any further?  I mean, isn't it -- isn't it -- you

7    know, it may be unfortunate but isn't it an issue for a later

8    day when the buyer doesn't fulfill some obligation you think he

9    should fulfill and you say why aren't you fulfilling this.  He

10   says well, it's not servicing related.  And they just brought a

11   lawsuit.  But we're giving the buyer what he wants.  If he

12   wants to buy litigation, God help him, but he can do it.

13          MR. DEHNEY:  Well, Your Honor, a couple of thoughts.

14   I was going to get up and say, Mr. Patton noted how what

15   they're wrestling with is that there are these inextricably

16   intertwined rights and obligations.  And we're trying to parse

17   through just what we're selling.  To which I would say, file an

18   decreditory judgment under 7001(2) and identify what property

19   interests are.  Your Honor makes that ruling and then we all

20   know what Your Honor is then finding is 541 and can sell.

21          So I would say, as a threshold matter, you have to

22   determine what is property of the estate under 541.  And then

23   whether they can sell it or assign it under 363 and 365.  It

24   can't be that the debtor comes in and gets basically the

25   Court's blessing that this is my property that I can sell

146

1    without first identifying what it is.

2         THE COURT:  Well, I can -- I can enter an order that

3    says assuming it's property of the estate I hereby allow you to

4    sell it and you can litigate later over whether I had that

5    authority or not.  It doesn't have to be -- A doesn't have to

6    precede B.

7         MR. DEHNEY:  Well, I think under 363(f) if there's

8    going to be a sale -- if they're going to argue what we have is

9    an interest and we agree that what we have is not able to be

10   broken down to a money damage, so we don't think you can under

11   363(f).  But I don't believe that you could enter an order

12   conveying something and then bar us from pursuing remedies

13   against the servicer after the final closing.  I guess the --

14   the difficulty --

15        THE COURT:  Fair enough.

16        MR. DEHNEY:  The difficulty we're having is this,

17   Your Honor.  If the purchaser said, and the debtor said, I have

18   a servicing agreement, I'm transferring it.  After the final --

19   after the final closing date, the effective date, I'm giving

20   that to them.  They're going to service, going into the future,

21   and Mr. Ross' representatives said they're going to do it very

22   well, that's fine.  What they're asking for is, after you

23   approve this transaction today and they do that, if they

24   decide -- if they end up doing it badly.  If they decide to

25   take the PNI advances and go to Vegas with them instead of

147

1    remitting them, which then increases my exposure, I have no

2    remedies.  That's what they're trying to do.

3            THE COURT:  And why wouldn't you have a remedy?

4            MR. DEHNEY:  Because they are setting it up in the

5    order so that your only recourse is here.

6            THE COURT:  Why wouldn't you have a remedy against

7    the buyer?

8            MR. DEHNEY:  Well, because the way the agreement is

9    set up, Your Honor, take us, for example, right now we have

10   rights under 7.05 we're a third-party beneficiary and we're a

11   party.  And the way they've defined the document in the order,

12   they define contract parties as parties.  And we say okay, what

13   happens to party's rights from and after the final closing

14   date?  The order says we'll determine that later.  That's why -

15   - so the frustration you're getting on our side there's the

16   severability issue, there's figuring out what's being conveyed

17   and I think the Court has to make that threshold determination.

18   If you're not going to make that determination and you're going

19   to say, look, it's sort of assumption of risk.  They're going

20   to get whatever they can get.  But the bundle of sticks are

21   going to be transferred and you guys can fight later in New

22   York Supreme over who has what.  That's one set of facts.  It's

23   different for them to put in an order that our rights are cut

24   off so that from and after the closing date we don't have

25   rights to enforce the provisions of the servicing agreement.

1          And I'll give you an example.  The form of order

2     that's been circulated only talks about contract parties.

3     Under the servicing agreement, 7.5 I'm an express third-party

4     beneficiary and it says I have the rights of a party.  We want

5     to know that when they limit who has what rights going forward

6     that it includes us.  We want to know -- and there's another

7     provision that says rights of third parties are affected.

8     Again, part of it is the argument on what it is they're trying

9     to accomplish Your Honor.  But the order would suggest that in

10    the normal course, six months from now after closing, if they

11    default or they go to transfer it to someone else who's not

12    qualified, I don't have a remedy.  And I have a remedy under

13    the agreement --

14         THE COURT:  Well, is your beef with the order or is

15    it with the underlying APA, this is where I'm getting confused?

16         MR. DEHNEY:  Well, Your Honor --

17         THE COURT:  If it's with the order, I haven't read

18    the order.

19         MR. DEHNEY:  I understand that.  But the objection is

20    if they're going to sell the servicing rights they have to take

21    the obligations.

22         THE COURT:  Right.

23         MR. DEHNEY:  And if they're going to sell the

24    servicing rights --

25         THE COURT:  Right.

1          MR. DEHNEY:  -- they're going to perform going

2     forward.  And if they're going to do that we have to have a

3     remedy in the event they default post-closing.

4          THE COURT:  And your remedy is against the acquirer.

5          MR. DEHNEY:  For everything from and after the

6     closing date.

7          THE COURT:  Right.

8          MR. DEHNEY:  That's not what they're asking for.

9     That's not our understanding of what they're asking for today.

10          THE COURT:  That's news -- that's news to me.  I

11     mean --

12          MR. DEHNEY:  That's not -- I'm sorry, Your Honor.

13     That -- our understanding is what they're trying to do is take

14     the servicing rights, like a coupon, clip it, sell it to WLR

15     and then when it comes time to figure out gee, what right did

16     they agree to perform and undertake to perform, forget the word

17     assumption.  Whether they assign it or assume it, what are they

18     undertaking to perform and what is the consequence of them

19     failing to do it?  That is the clarity that is not in the APA.

20          THE COURT:  No, no.  All right.  So, they're going to

21     sell a bundle of rights --

22          MR. DEHNEY:  Correct.

23          THE COURT:  -- and obligations to the acquirer.  If

24     the acquirer does not perform pursuant to their obligations

25     that are included in that bundle of rights and obligations,

1    your remedy is against the acquirer.  If it's not something he

2    took, your remedy is against the debtor, which will give you --

3    good luck -- I mean, you'll get what you get.

4              MR. DEHNEY:  Understood.

5              THE COURT:  But -- so why is there -- why is there

6    this disconnect?  I don't understand.

7              MR. DEHNEY:  Well, the disconnect is because when you

8    -- when you go through and say, what are they acquiring and

9    what are they undertaking to perform going forward --

10             THE COURT:  Right.

11             MR. DEHNEY:  -- the witnesses talk about the four

12   corners of the document and say we're going to perform

13   everything that the servicer is supposed to do.

14             THE COURT:  Uh-huh.

15             MR. DEHNEY:  Which, from the insurer's perspective if

16   they're providing the reports and doing the PNI that's great.

17   It's what happens when you don't and that comes back to, what

18   are they undertaking in its way of obligations under the APA.

19             THE COURT:  Well, if they don't do -- if the acquirer

20   doesn't perform as you think that he should or it should

21   perform for this petition --

22             MR. DEHNEY:  Right.

23             THE COURT:  -- and you complain about it and his

24   response is, it's not something I'm required to do under the

25   APA, how are you -- how are you harmed?  What's -- it either is

1    it or isn't.  And if it is, it's enforceable against him, and

2    if it isn't you have a claim against the debtors.  We only get

3    there if -- this, sort of, assumes that the contract is

4    severable.

5            MR. DEHNEY:  Right.  Well, actually it assumes -- it

6    assumes a number of things and it's what they're transferring

7    under 363, that assumes that Your Honor enters an order

8    determining what property of the estate is and that it can be

9    sold under 363 and even under that circumstance if it's sold

10   under 363 is it free of everything else that's in the

11   agreement.  And that has been briefed and raised in objection.

12   So yes, if you assume -- I think Mr. Gallo said he assumed, you

13   know, he wins.  And we believe, in the lack of testimony and

14   evidence from the debtor, they haven't satisfied their burden

15   of proof on our documents.

16           And then we say that it's a stand alone agreement so

17   they can only take that.  But even if it's a stand alone

18   agreement and they can only take the contract, Your Honor, then

19   we believe the obligations going forward post-closing have to

20   go with it.  It's really the severability argument.

21           THE COURT:  Okay.

22           MR. DEHNEY:  But when you ask, what are the

23   differences, the differences are, we have one agreement and

24   they haven't identified whether they're taking it or not.

25           THE COURT:  Right.  Well, you have one agreement and

152

1    then you also have related agreements.

2            MR. DEHNEY:  Correct.

3            THE COURT:  And they're -- and my understanding of

4    one of your disputes is that they're taking the one agreement

5    but they're not taking the related agreements, is that correct?

6            MR. DEHNEY:  Correct.

7            THE COURT:  All right.

8            MR. DEHNEY:  And our --

9            THE COURT:  Are they parties to the related

10   agreements?

11           MR. DEHNEY:  They are, Your Honor.  And that's the

12   distinction --

13           THE COURT:  That's two and three?

14           MR. DEHNEY:  That's the distinction we would make.

15   The insurance agreement is an agreement where it is the

16   servicer who's the party.  And the reason they are the party is

17   what we are insuring is the performance of the bonds going

18   forward --

19           THE COURT:  Why do they have to take the other

20   agreements?  I mean, this is, sort of, the flip side of the

21   severability argument.  You've -- you've got three different

22   actual documents.

23           MR. DEHNEY:  We do.

24           THE COURT:  And they're cherry picking one and

25   they're leaving two behind.  Now, it's a lot harder for them to

1    make that argument when it's all in one document, but you've

2    got three different documents.

3              MR. DEHNEY:  We do.

4              THE COURT:  Are they economically inter-dependent?  I

5    mean, is that the --

6              MR. DEHNEY:  Well, certainly we believe the insurance

7    and the servicing are economically connected.  And where I get

8    to that, Your Honor, is they service and in exchange for

9    servicing under the agreement they get their servicing fee.

10   The consideration flowing back and forth is they continue doing

11   good service, we don't terminate.  Their good service is -- is

12   the precondition for the continuing obligations under the

13   insurance agreement.  It's a specific default provision so that

14   when you talk about what are the requirements for a servicer, I

15   think Mr. Patton said gee, people contemplated transfers.  When

16   you're writing insurance you actually -- it is the servicer

17   itself that you're dealing with.

18             So the identity and the capabilities of the servers

19   are of paramount importance to us.  So it is actually directly

20   tied to the servicing mechanism.  So that is the consideration

21   back and forth.  If they don't service well, we terminate.  And

22   it's a continuing obligation in the insurance agreement as well

23   as in the servicing agreement.  And we have the rights in both.

24   So, you could argue I have two executory contracts but the way

25   they work, from our perspective is they're servicing rights

1   derive or continue to exist through this agreement, which is

2   the insurance, as well as a servicer.

3             THE COURT:  Okay.

4             MR. DEHNEY:  So that's the difference, we believe,

5   versus other agreements.

6             THE COURT:  Okay.

7             MR. DEHNEY:  Your Honor, the last point I'll make is

8   on adequate assurance of future performance.  And Mr. Patton

9   said the adequate assurance of future performance is eighty

10  percent provided by the debtors and twenty percent provided by

11  the purchasers.

12            THE COURT:  Right.

13            MR. DEHNEY:  My reading of the code says it's got to

14  be provided by the purchaser and the debtor is in bankruptcy.

15  So --

16            THE COURT:  That wasn't his point.  His point was

17  that the acquirer is taking the management with them and the

18  people who are already in place and have been servicing these

19  loans all along are going to continue to work for the acquirer.

20  So what he really meant was, management stays in place, the

21  servicing platform stays in place and oh, by the way we've got

22  to gather four billion dollars to fund it.  Now, I'm not sure

23  I'd say eighty/twenty, you know.  My -- it might flip the other

24  way around but --

25            MR. DEHNEY:  But Your Honor, on the adequate

155

1    assurance, I think on the testimony we elicited from the

2    purchaser was that it was too early for him to tell us what the

3    purchaser was ultimately going to look like at the final close.

4    We know that Mr. Ross has several funds and that there is money

5    that they are generating through their most recent funds

6    started in September.  But on the stand he said we do not have

7    the working capital or other financing in place today.  It is

8    too early in the transaction.

9            On the personnel he said, when I asked him -- I was

10   asking him to speculate on what it's going to look like at the

11   final close.  We know they don't have the permits or the

12   licenses so where I come out on that, Your Honor, is if Your

13   Honor is inclined to approve a transaction and you allow

14   something to go forward, I think, just as the purchaser thought

15   I was asking him to speculate on what it would look like on the

16   final closing, it is very difficult for this Court to find

17   there's adequate assurance today.  Perhaps conditional

18   approval, perhaps something where they come back in advance of

19   the final close.  But just as he can't give us comfort, I

20   submit to Your Honor, it would be very difficult on the record

21   here to find adequate assurance of future performance.

22           THE COURT:  Fair enough.

23           MR. DEHNEY:  Thank you, Your Honor.

24           THE COURT:  Thank you, Mr. Dehney.

25           MS. SALLIE:  Good evening, Your Honor.

1    Kathryn Sallie of the Bayard Firm on behalf of Connecticut

2    Housing Finance Authority, another stand alone.  And I'm sorry

3    I didn't make myself known when you first asked about the stand

4    alones.

5            I just want to make a couple really fine points.

6    First of all, as far as our contract goes you're talking about a

7    very, very small amount, four million dollars.  Which, if I'm

8    correct in my math, which is possibly not right, one one-

9    hundredth of one percent of the thirty-eight billion that would

10   be necessary for this sale.  So we're talking about a small

11   amount and, you know, not really all that necessary to getting

12   this thing approved anyway.

13           But the point I want to make is, under 363 if AHM

14   sells the servicing rights all of the provisions in our

15   servicing agreement will remain in effect.  One of those

16   provisions is that the agreement cannot be assigned without the

17   consent of CHFA.  In addition, the agreement provides that the

18   duties there under cannot be delegated.  And furthermore,

19   there's a right to terminate.  Clearly, you know, if this thing

20   goes forward and is sold; we can terminate and get out of it.

21   And again, as I said, considering the small amount it seems

22   like an unnecessary route to go if we can avoid it.

23           THE COURT:  I'll play devil's advocate.  I mean --

24           MS. SALLIE:  Uh-huh.

25           THE COURT:  -- why not let the debtors assign it, get

1    some money for it and then terminate it afterwards.  It's a

2    win/win for everybody except the acquirer.

3                MS. SALLIE:  That is true, Your Honor, and I cannot

4    deny that.  I can only further the fact that my client requests

5    that they be taken out of this order and --

6                THE COURT:  I understand.  It's a late hour, I

7    apologize.  It's not a -- that's not a fair question.

8                MS. SALLIE:  That's okay.  That's okay.  Just to go

9    forward as far as assignment goes, under 365 I just want to

10   make one further point that under 365(c)(1) there is applicable

11   law in Connecticut, a general statute 8-250-16 that excuses

12   CHFA from accepting performance from or rendering performance

13   to an entity other than the debtor because the buyer would have

14   to be a qualified financial institution to perform under the

15   servicing agreement.

16                Again, I know this has, kind of, been discussed and

17   Mr. Dehney just discussed it a little bit.  We would just

18   submit that, you know, why can't we wait until a time at which

19   the purchaser would be a qualified financial institution.

20                Thank you.

21                THE COURT:  You're welcome.  Is there anyone else?

22                MS. BOOTH:  Your Honor, do you want to hear non-

23   servicing?

24                THE COURT:  I want to hear objectors.  So, will I

25   hear from Duke?  You know, I went to the University of North

158

1    Carolina.  I don't want to influence negotiations but I need to

2    hear from Duke, Merrill Lynch, MERS and Travis County.  Yes,

3    ma'am?

4              MS. RUSH:  Good afternoon, Your Honor.  I'd like to

5    just have a few minutes.

6              THE COURT:  All right.  Yes, I'll give you some

7    leeway, Ms. Rush.

8              MS. RUSH:  Paula Rush.  Okay.  As I'm listening to

9    all of the arguments it seems to me that the people who own the

10   loans overwhelmingly want them back, they want the servicing

11   rights back for their loans.

12             THE COURT:  I don't know that that's true, Ms. Rush,

13   in all fairness.  We're talking about forty billion dollars in

14   loans that are being transferred.  And I've got objectors that

15   doesn't even get to a billion dollars.  So I think, actually

16   frankly, it's just the opposite.  Certainly the people you've

17   heard today overwhelmingly don't want them back.  Please

18   proceed, I apologize.

19             MS. RUSH:  That's okay.  I think that the reason why

20   the agreements are written the way they are, are for the

21   assurances that the servicer will perform a good service so

22   that they will get their payment.  And to take the servicer's

23   obligations and strip them out and assign the rights, I think

24   that's what they're concerned about.  Because the servicer

25   going forward, again, they haven't received their licenses.

159

1    They're not approved; they're not in the business.  So I think

2    that it is questionable, at least in my mind, everyone says

3    that American Home has the -- or the debtors' counsel said they

4    have the gold standard of approval from Fannie Mae.  Fannie Mae

5    is in their location on a daily basis right now making sure

6    that things go as they should.  I wouldn't exactly call that

7    the gold standard, that they're doing things appropriately.

8            The borrowers cannot contact the owners of the notes

9    directly.  They have to depend on the servicer in the whole

10   transaction to make sure that everything goes as that

11   noteholder would want it to go and everything that the MI, the

12   insurer of the loan pool, would want them to do to work with

13   borrowers and make sure that borrowers continue to pay and

14   everything went as it should.

15           So again, my position is about the adequate assurance

16   and I think that separating things out of the agreement does

17   damage the rights and remedies and the adequate assurance to

18   the noteholders that the servicer will perform in a manner that

19   will protect them and protect their assets.  And I think each

20   individual bank that owns loans; all of these different parties

21   have their own philosophies.

22           Wells Fargo is one example, which they're in a lot of

23   these agreements, they are doing loan modifications.  They are

24   working with borrowers.  They have specific requirements that

25   are different from another lender.  And I think that the

1    servicing unit needs to have a very strong, especially in

2    what's going on right now.  Things are deteriorating, they're

3    not improving.  So the communication is key between the

4    servicer and the noteholders to the success or the failure of

5    loans right now.

6              And I'm worried, with all the adversarial types of

7    things that are going on, and there's going to be an interim

8    period of -- between the original close and final close.  I'm

9    worried about the fact that everything will go smoothly and

10   that borrowers won't fall through the cracks in the meantime

11   because they cannot break through to the owners of the note.

12   They have to depend on the servicer.

13             THE COURT:  Thank you.

14             MS. RUGH:  Thank you.

15             THE COURT:  Ms. Booth?

16             MS. BOOTH:  I guess I'll take my turn.  Rebecca

17   Booth, Morgan, Lewis and Bockius on behalf of MERS, the

18   Mortgage Electronic Recording System, Your Honor.  We did file

19   an objection; it does not have anything to do with any of the

20   servicing testimony Your Honor's heard for the past umpteen

21   days.

22             Our objection is in two parts.  In the first instance

23   we have the same problem we had with the other order, which is

24   with regard to the fee.  The nuance in this instance is that

25   the fee to our client become due and payable upon the actual

161

1  transfer of the mortgages.  So what's going to happen in this

2  instance is the debtor is going to have an economic closing

3  very shortly.  They're going to get all the money.  They're

4  going to give all the money to the bank, save for some money

5  reserved for payment of costs directly associated with this

6  agreement which I assume includes attorney's fees and other

7  ancillary items.  And then all the money is going to be gone.

8  It's going to be a year from now they're going to be expected

9  to continue to close this transaction and transfer all the

10 servicing rights.  The horse is going to be out of the barn, so

11 to speak, and there's no guarantee from anybody that the fee

12 associated with the transfer of those mortgages will be paid.

13          This ties into a related problem which is, we have no

14 way of knowing at this time whether the acquirer will be a MERS

15 member.  If the acquirer is a MERS member then my client has

16 some recourse to the acquirer in the event that the debtor

17 fails to pay the fee.  If the acquirer is not a MERS member, my

18 client has no recourse to anybody.  And that --

19          THE COURT:  Can you participate in this field without

20 being a MERS member?  I mean, is it possible to service

21 loans --

22          MS. BOOTH:  Yes, Your Honor.

23          THE COURT:  Okay.

24          MS. BOOTH:  It is.  There are several people who are

25 not a MERS member.  Now my understanding is that Mr. Ross'

1    entities are intending to apply for membership and we have no

2    intention of denying it unless there's a good faith reason to

3    do so.  But that doesn't mean they're required to.  There's

4    nothing in the contract that obligates them to.  And if, for

5    some reason, they choose not to we could end up in a situation

6    where my client is owed a large fee for a part of an order an d

7    an administrative claim for an order that this Court entered

8    and nobody has the money or the obligation to pay it.  That's

9    the first problem.

10          The second problem is if the acquirer does not become

11   a MERS member, we cannot allow the final closing to occur until

12   MERS has been removed as the mortgagee of record for all of

13   these mortgages.  Because what happens under the contract

14   between MERS and its members, Your Honor, is the members are

15   obligated to indemnify MERS for, let's say, lawsuits brought by

16   noteholders who would naturally bring the lawsuit against MERS

17   as the nominal mortgagee.

18          Unfortunately, if they transfer all the servicing

19   rights to somebody who is not a MERS member, that party is not

20   under contract with MERS to protect MERS for the services

21   provided.  Are you with me?  Anybody with me?

22          THE COURT:  I'm here.  So your argument is that you

23   have a right to indemnification from -- I don't know is it from

24   the servicer or is it from the noteholder?

25          MS. BOOTH:  It's from the servicer, Your Honor.

163

```
1          THE COURT:  All right.  You have a right of
2     indemnification from the servicer.  So if you get an
3     economic -- if we go to the final close and the buyer is not a
4     MERS member and he -- he then messes up and you get sued, you
5     don't have a right to indemnification?
6          MS. BOOTH:  That's right.  And at the time --
7          THE COURT:  Well, that's -- I'm not sure how that
8     relates -- I'm not sure how that transfers to, you can't let
9     the close occur.  I mean, where's the indemnification
10    obligation come from?
11         MS. BOOTH:  Well, this is part of our problem.  The
12    indemnification obligation, Your Honor, is contained in a pre-
13    petition contract between the debtor and my client.  And
14    normally it's a pre-petition contract, it's a pre-petition
15    indemnification, we all get there.  But under the debtors'
16    current financing agreements they are obligated to remain a
17    member in good standing of MERS.  And if this happens that
18    covenant will be violated.
19         And the problem, Your Honor, is we're all trying to
20    look a year down the road.
21         THE COURT:  Wait a minute.  Are they -- are they
22    assigning the MERS agreement?
23         MS. BOOTH:  No, which is an additional part of my
24    problem, but that's neither here nor there, Your Honor, because
25    the buyers could become MERS members on their own and solve
```

164

1    this whole problem.

2            I guess my point is, Your Honor, we asked for two

3    very specific things.  I think one of them we've almost

4    resolved.  It's very limited to language in the order.  We

5    asked for a simple provision that says everybody acknowledges

6    that a fee will be due and that the debtors will pay the fee.

7    And if the debtors don't have the money the purchaser will pay

8    the fee.

9            The problem here is that nobody disagrees with me

10   that the fee will be paid.  The issue is that between the

11   debtor, the purchaser and the committee nobody will commit to

12   paying it.  They're all fighting about whose obligation its

13   going to be.

14           THE COURT:  Well, it's going to be an obligation of

15   the estate.  So your worry is that the case is going to be

16   administratively insolvent.

17           MS. BOOTH:  That is my worry, Your Honor.

18           THE COURT:  If the case is administratively

19   insolvent, that creates a lot of issues for a lot of different

20   people.

21           MS. BOOTH:  It does but I'm the one --

22           THE COURT:  Including the lender.

23           MS. BOOTH:  -- but I'm the one standing here

24   complaining about it today.

25           THE COURT:  I understand.

1          MS. BOOTH:  So we would ask for that provision to be

2  put into the order.  The additional provision that we wanted,

3  which I'm hearing Your Honor say may or may not be relevant, is

4  a provision saying that the final closing -- to the extent the

5  acquirer does not become a MERS member, the final closing can't

6  occur until MERS has been taken off as mortgagee of record

7  under all of these agreements.

8          THE COURT:  You're talking about 212,000 loans?

9          MS. BOOTH:  Yes, we are, Your Honor.

10          THE COURT:  How long would that take?

11          MS. BOOTH:  I have no idea.  Quite a while and it

12  would be costly.  I believe there's a thirty-five dollar

13  mortgage recording fee in the government agencies.  Which is

14  why I think the acquirer will become a member of MERS and this

15  will all be moot.  But Your Honor, we're trying to look a year

16  down the road and I don't know the answer.  But my client

17  can't --

18          THE COURT:  All right.  I understand your argument.

19          MS. BOOTH:  Okay.  Thank you.

20          THE COURT:  Okay.  You're welcome.  Anyone else?

21          MR. DEHNEY:  Merrill Lynch is resolved, Your Honor.

22          THE COURT:  When did that happen?

23          MR. DEHNEY:  Earlier today when I confirmed it was

24  only the one agreement that they found that is the subject of

25  the transfer.

1          THE COURT:  All right.  So I take them off.

2          MR. DEHNEY:  So they come off.

3          THE COURT:  All right.  Is there anyone present in

4    court for Duke University Federal Credit Union or Travis

5    County?  All right.  Any other objectors?  Mr. Patton,

6    rebuttal?  Please hit the high points.

7          MR. PATTON:  I will.  I'm surprised you didn't get a

8    round of applause for saying that.

9          THE COURT:  They're going to wait for the close to

10   see if it actually occurs.

11         MR. PATTON:  Yeah, that's for sure.  All right.

12   Let's go -- let's go back to the beginning.  Are you ready?

13   All right.

14         THE COURT:  In the beginning --

15         MR. PATTON:  Yeah, I think --

16         THE COURT:  -- the world was without form.  All

17   right.

18         MR. PATTON:  This is becoming vaudeville.  All right.

19   Let me -- a couple of things.  I'm going to try to run through

20   the Deutsche Bank -- the DB quickly.  One of the -- just point

21   out stuff -- some of this, I think, is obvious but I'll say it

22   quickly.  In 13.05 the notice to transfer is actually

23   permission to transfer and says that the transfers available

24   just cannot be unreasonably withheld.

25              And I do want to emphasize, by the way, that the --

1    they conceded that the state law and federal law, when it comes

2    to the severability issue, arrive at the same place.  And

3    there's an argument that -- that I won't make but it describes

4    how the evolution of bankruptcy law and the analysis of this

5    problem has been creeping toward an overt acknowledgement that

6    fundamentally this is -- this is a federal question and federal

7    law controls.

8              THE COURT:  Let me ask you about the 363 anti-

9    assignment issue.

10             MR. PATTON:  Uh-huh.

11             THE COURT:  Which is 365 voids that, that there's no

12   such provision under 363.

13             MR. PATTON:  363 -- that you can't --

14             THE COURT:  That any assignment clauses are basically

15   unenforceable under 365 --

16             MR. PATTON:  But under 363 there's --

17             THE COURT:  There's no similar provision under 363.

18             MR. PATTON:  Well, if under 363 what you're dealing

19   with is a -- a property right of the body of law dealing with

20   anti-alienation of property rights in general, I think, comes

21   into play.

22             THE COURT:  Okay.

23             MR. PATTON:  And it's -- it comes up in a different

24   context but it still applies.  To some extent it's a 363(l)

25   body of cases that deal with the expansion of the

168

1    contractual -- provisions that are found in contracts and other

2    arrangements that talk about the financial condition of the

3    debtor being a prohibition against the debtors' ability to use

4    property rights.  The case law has taken that concept, combined

5    it with the underlying bankruptcy code concept that I mentioned

6    earlier that it embraces and endorses the policy that the

7    purpose of the bankruptcy code is to assist estates in

8    maximizing the value of their assets.  And that body of law

9    moves -- moves beyond the notion that 363(l) is limited only to

10   the question of financial condition.  It's the same -- the case

11   law is the analogue of the expansion of the ipso facto language

12   found in 363.

13          Your Honor, with respect to 1401, I want to talk a

14   little bit about that.  I'm sorry, yes, 1401.  The -- the 1401

15   provision is just another cross to fall provision.  And what

16   1401 says is -- it's not just another fall -- what it -- what

17   1401 says that they get a remedy for a breech by the servicer,

18   specifically, and the only provision that came up was 1301.

19   1401 really stands for nothing other than the unremarkable

20   proposition, at least in their interpretation of it, that if

21   there is an indemnity obligation under 1301 they get a remedy

22   for it.  It doesn't -- it doesn't go even that far.  Your Honor

23   could pick away at the interpretation of that provision perhaps

24   much more effectively then I did.

25          With respect to 1301, a couple of things.  One is,

169

you all debated together a couple of different interpretations

of what our arguments might be, which I found fairly

illuminating in some respects.  One interpretation that I think

abides if you take a look at all of the evidence in the record

and walk down the parole evidence lane, is that -- is that the

argument that I articulated at the outset about where these

documents come from and how they evolved leads you not to the

conclusion that the correct interpretation of this very non-

sensible clause is that it should be read the way DB would like

it to be read.  I submit that the correct interpretation is

that it should be read the way its read in HSPC that was

drafted by Thacher Proffitt just a month later.

        And in fact, that's rather well supported by the fact

that the stopping off point which represents the document we're

looking at here and the evolution of this clause is a

bastardized hybrid between the original language that's found

in the servicing release contract and what I submit is the

final language that's found a month later in the HSBC contract.

And given how sloppy the wording or the drafting is, a fair

interpretation is what you saw here is a draft in midstream

that happened to get thrown on the desk and signed for closing.

        That's at least as sensible an interpretation of how

one should reform that clause if one were to reform it as any

other.  Frankly, I think if you simply take the Deutsche Bank

proposition that it makes perfect sense and choose to apply it

170

1   as written it becomes an empty set.  And so it's of no

2   particular consequence to this -- to this transaction because

3   all it does is it says that we are indemnifying DB for the

4   seller's failure to perform servicing obligations.

5           It uses the word including and Mr. Gallo would like

6   you to treat the word including as -- as an illustration, as an

7   example.  The problem is, the contract itself says, and this is

8   at section 29 sub (f) that the word include or including isn't

9   an illustration.  It's part of -- it says it's to be an

10  enumeration.  Now, an enumeration of one amounts to not much of

11  an enumeration but the document says that it's not something

12  that can be -- it's not intended that the word including be

13  used or read as an illustration or an introduction to an

14  illustration.

15          Also, we were challenged, in fact I think it may have

16  been almost a dare, to find a case that talked about across

17  default in the context of a consolidated contract and we were

18  accused of being circular or I was accused of being circular in

19  my analysis of what happens with a contract provision that

20  would otherwise be cross default provision if it were in

21  separate contracts but it's found in a single contract.  And we

22  go back to what I said at the outset was my most favoritist of

23  all cases in this case and that's the Shaw decision.  Just

24  about every question one could have about how to interpret the

25  issues in this case or decided in this -- these proceedings are

171

1    addressed in Shaw.  But in the Shaw decision, at page 177, the

2    Court talks specifically about this question of what happens

3    when there's a provision that would otherwise be a cross

4    default provision.  But it's found in a -- in an integrated --

5    an embedded contract situation.  And it's talking about the

6    cross default rule and I quote, this is an internal quote, it

7    says "this principle applies where distinct agreements are set

8    out in the same document."  And of particular relevance here

9    it applies where distinct agreements are linked by a cross

10   default clause providing for a loss of rights under one

11   agreement if another agreement is breached.  Those two

12   agreements are we in one document.

13           And it goes on to cite another authority approvingly

14   with the following quote; "cross default provisions do not

15   integrate executory contracts on expired leases that are

16   otherwise separate and severable."  So the Shaw case took on,

17   in the context of its analysis, it was integral to this case,

18   the question of whether the rules with respect to cross default

19   and integration are any different in the land of consolidated

20   or combined contracts then they are in the land of separate

21   contracts when you're analyzing the inter-relationship.  And I

22   suggest that this makes perfect sense because the first

23   question that you must turn to when you analyze whether a

24   contract can be severable is not whether something that would

25   otherwise be a cross default, and I'm going to inextricably

172

1    intertwine the two component parts.  But are they otherwise

2    severable.

3           The Gardenia standards all look at issues that rise

4    above the level of these contractual details that come out in

5    the context of a cross default provision.  They talked about

6    the status of the parties and their responsibilities, the

7    consideration and the purpose of the agreement.  And while it

8    is entirely possible that something that was at the margins of

9    a close call about whether it was a cross default provision in

10   the sense of being a credit enhancement or was perhaps

11   economically material might work its way into the Gardenia

12   analysis.

13          In a provision like this, that I think is not a close

14   call at all when it comes to determining whether or not it's a

15   credit enhancement type, impermissible cross default provision

16   doesn't get into the question or doesn't get into the analysis

17   of severability.  And here's the support in Shaw for the

18   proposition that it -- it does not.

19          In terms of -- a couple of factual comments that I

20   want to touch on just to clear up the record or at least give

21   me view of the record.  In Mr. Gallo's comments about what

22   Mr. Johnson said with respect to pricing, he -- he lighted over

23   Mr. Johnson's comments about how when they evaluate bids they

24   schedule out the value of each loan and they schedule out the

25   value of servicing and they value each of those components

1    separately.  And while they don't share that information with

2    the bidders, obviously, they -- in an internal way allocate

3    that value and assign it.

4            THE COURT:  Your -- your argument doesn't rise or

5    fall on AHM Corp and AHM Servicing being separate entities,

6    does it?  Because --

7            MR. PATTON:  No.

8            THE COURT:  -- you could have the very same MLPSA

9    where one, under your argument where you have one entity on

10   your side and, for instance, Countrywide would be an example of

11   one.

12           MR. PATTON:  Yeah.

13           THE COURT:  But you would still argue that the

14   servicing and the buy/sell components are severable?

15           MR. PATTON:  That's right.  The only advantage the

16   two entities gives us is ultimately it saves us from having to

17   work harder to get over the -- get through the Gardenia

18   analysis.

19           THE COURT:  Right.

20           MR. PATTON:  But the Gardenia analysis really talks

21   about separate parties and separate functions.  And with

22   respect to -- as I -- as part of a larger balancing test.  In

23   the Countrywide situation, what's important in our case and we

24   talked -- we allude to this in our briefing, but the -- we do

25   talk about this a little bit.  But the -- the situation we find

174

1    ourselves in at American Home is that where there is a contract

2    that's a single contract or a contract with a single party, the

3    servicing is performed by American Home Servicing or AHM

4    Servicing.  That function is only able to be performed by

5    servicing.  And because of the nature of our business and

6    structure and we would submit everybody's understanding of

7    that, the fact that the contract is executed by Corp --

8              THE COURT:  You're argument -- Corp's not a licensed

9    servicer.

10             MR. PATTON:  That's correct.  And the fact that Corp

11   signs the contract for all of its constituent parts doesn't

12   cause you to fail that first test in Gardenia that you've got

13   separate parties involved, or the second test whichever it is.

14   Particularly here where it's patently obvious to anyone who

15   looks at the situation and understands what the contract is all

16   about understands that the function that is the servicing

17   function component of that contract is going to be performed by

18   a separate party.

19             And the Gardenia test talks about separate parties

20   performing separate functions.  So here there could never be

21   any confusion about where the servicing was going to be

22   performed within the American Home family.

23             THE COURT:  And also, refresh me on the collateral

24   package, but you -- you separately collateralized with your

25   lenders --

175

1          MR. PATTON:  Yes.

2          THE COURT:  -- along these lines as well, is that

3    correct?

4          MR. PATTON:  Yeah.  The B of A facility, I forget.

5    Its north of 400 million, I believe.  I'm not sure where it is

6    today but the B of A facility, which is a loan facility.  B of

7    A is the lead.  There are several -- quite a few banks that are

8    members of the syndicate some of which may be objectors at some

9    point in this process, I don't know.

10          In any event, that loan package is secured by the

11    servicing assets and it's been a loan on the books of the

12    company for -- it had been a long on the books of the company

13    for quite some time before the bankruptcy was filed.  We've

14    been operating under that facility for -- for quite a time.

15    And of course it's now the subject of a cash collateral

16    stipulation which Your Honor approved early on in these

17    proceedings.

18          THE COURT:  Uh-huh.

19          MR. PATTON:  The bundle of assets that we are selling

20    are those assets that are subject to the Bank of America pledge

21    with the pre-petition liens and the post-petition liens.

22          THE COURT:  Prior to -- prior to the bankruptcy and

23    any effect that the cash collateral order may have had, would

24    Bank of America had, as part of their collateral package the

25    rights and obligations vis a vis AHM as seller versus purchaser

1   or was it limited to the rights and obligations of servicer as

2   servicer.  Does that make any sense to you, the question?

3          MR. PATTON:  Yes, Your Honor.  It was servicer as

4   servicer.  I don't recall if --

5          THE COURT:  So, for instance, if -- if AHM had had --

6   if AHM had had a claim against Deutsche Bank --

7          MR. PATTON:  Yeah.

8          THE COURT:  -- for some breach in its capacity as a

9   buyer that would not have been covered by -- that would not

10  have been part of Bank of America's collateral pre-petition?

11         MR. PATTON:  It would not have been part of the

12  collateral.  And not -- nor post.

13         THE COURT:  I -- I can't -- I know there are adequate

14  protection all over the place.  So I can't recall.

15         MR. PATTON:  Yeah, we actually --

16         THE COURT:  You were pretty careful about --

17         MR. PATTON:  -- we put a box around that.  So

18  that's -- and -- and -- actually I'm not sure where Deutsche

19  Bank's claim falls in that scheme.  But nevertheless, they

20  were -- that collateral package was designed and limited to be

21  focused on the servicing business itself and the assets that --

22  that that business is composed of.

23         The -- we -- Mr. Gallo argued, on behalf of DB, again

24  about the -- the business need for the cross defaults and the

25  importance of those.  And he used terms that -- that again, I

1    found to echo the language we find in Shaw that talks about

2    credit -- additional credit protection, credit enhancement is

3    an emblematic warning sign of an impermissible cross default.

4    And their description of this provision seems to fall squarely

5    in the category of a provision that Shaw highlighted as a -- as

6    an impermissible cross default.

7            And his romp through the case law, starting with

8    Fleming, was a romp.  He glossed over the deeper analysis.

9    First of all, Fleming tells us that the Court does have the

10   power to analyze a contract and look at the competing interest.

11   And in fact modify it under appropriate circumstances.  It lays

12   that as a foundational rule for the Courts in this circuit when

13   they come to contractual interpretation questions.  And the --

14   the economic interdependence test isn't a question of how

15   important is this provision in the mind of one party once a

16   crisis has developed such as this.  The question is whether or

17   not the contract will function appropriately when the provision

18   is -- whether the other contract will function appropriately

19   when the provision is excised from the contracts you want to

20   excise it from.  And in this case, it's perfectly clear that

21   the servicing function functions fine without the provision

22   that's sought to be enforced by Deutsche Bank.  And the loan

23   origination functioned fine without that provision.  There's

24   no -- there's no functional interdependence between the two.

25           And the -- and, you know, Folger Adams does a very

1  good job of demonstrating many of these issues in analyzing the

2  distinction from the point of view of recoupment and setoff.

3  And it -- it also helps highlight how the -- the question at

4  issue is whether or not the connection between the two

5  contracts and the two provisions -- or the provisions of the

6  two contracts are tied to the core of the contracts or tied to

7  the -- or is more in the form of a setoff or a collateral

8  attack.  I'm sorry, more in the form -- yeah, more in the form

9  of a setoff or a collateral attack.

10           Turning very quickly to Assured.  Your Honor, Mr.

11  Dehney -- I think the problem that Mr. Dehney has in the

12  context of our deal is that the servicing agreement that's

13  being sold.  While it identifies his client as a -- as a party

14  or third party beneficiary to it in his parlance, it does not

15  incorporate in any place at any time the insurance agreement

16  that he would like to have incorporated.  It's just simply not

17  referenced.  The other contract reference is the servicing

18  agreement but it doesn't work in reverse.  And that's too bad.

19           THE COURT:  Well, it references --

20           MR. PATTON:  Well, he's referenced.  I mean, his

21  entity -- his client is referenced.

22           THE COURT:  In the credit enhancer?

23           MR. PATTON:  Yeah.  And that's -- that -- so it's

24  certainly the case that under the contract that we are

25  transferring we are transferring a contract with a party that

1   has certain rights under that contract.  The problem is, there

2   are -- well, as you pointed out, there are other contracts to

3   which Mr. Dehney's client and my client are parties.  The

4   function of which is effected by this contract but there is no

5   link looking at -- there is no link back to the servicing

6   agreement if you start at the servicing agreement and look out.

7          THE COURT:  Well, isn't the -- isn't the pulling

8   agreement incorporated by reference in section 101?

9          MR. PATTON:  I'm sorry?

10         THE COURT:  Section 101 incorporates the pulling

11  agreement by reference.  For all purposes of this servicing

12  agreement, well, it's just the definitions, I guess. The

13  definitions contained in section 101 of the agreement, which is

14  the pulling agreement, which --

15         MR. PATTON:  That's right.  Yeah, the

16         THE COURT:  Well, right.  So the -- that's how you've

17  got to figure out who credit enhancer is and that's where you

18  got to -- that's where the definition is.

19         MR. PATTON:  Right.

20         THE COURT:  But you're -- I guess your point would be

21  to say it's simple for the definitions and no --

22         MR. PATTON:  That's right.  There is nothing in this

23  document that makes any of the obligations between the parties

24  to the insurance contract obligations that can be enforced

25  through -- against the parties in this agreement.

1          And he said also, it was, sort of interesting, that

2    his concern or his client's concern under either of these

3    contracts is that servicing perform well.  And to the extent

4    that he's a party with rights under the servicing agreement, he

5    asserted that he has the power under the servicing agreement to

6    terminate the contract if servicing doesn't perform well.  I'm

7    not entirely sure, after hearing his statement to that effect

8    that I understand it.  If he's correct on his legal theory

9    about his rights how there's any particular impact to his

10   client in terms of being able to protect themselves against

11   poor performance.  Now there may be other adverse effects to

12   our refusal to assume and assign the insurance contract.

13          THE COURT:  Right.

14          MR. PATTON:  And I don't think there's anything else

15   that --

16          THE COURT:  Well, what about this MERS issue?

17          MR. PATTON:  Oh MERS, I'm sorry.  Well, two things

18   with respect to MERS.  I mean, one, Your Honor -- well

19   obviously I would agree with Your Honor because it comes out

20   the way I want on the question of whether or not the concern

21   about getting paid is just a concern about the status of an

22   administrative claim down the road.  I guess many of us in this

23   room share that concern.  But I think that -- the -- I --

24          THE COURT:  Not all of us.

25          MR. PATTON:  And -- though --

1    THE COURT:  I'm more troubled, or at least confused

2 maybe and maybe it's because it's the late hour.  I'll

3 certainly think about it further.  The issue about the

4 indemnification provision in the MERS agreement somehow acting

5 as an impediment to closing.

6    MR. PATTON:  Yeah.  And I -- I -- my sense of the way

7 that -- and I say sense because I'm not entirely sure I

8 understand exactly how it could be an impediment to closing but

9 my sense is that if we -- if the -- the concern is that we

10 will -- functionally, I guess, what it has to be is this.  The

11 concern is we will come up to closing and reject the contract,

12 assuming it's an executory contract.  And the assets will move

13 and MERS will be left with subsequent -- claims that end up

14 being claims that they could lodge back as indemnity claims.

15 It does -- I -- I fail to see how that has -- how that sequence

16 of events has any particular impact on the right of the estate

17 to transfer the underlying asset.  It does strike me that if

18 MERS has any argument at all and -- somebody may kick me for

19 saying this --

20    THE COURT:  Well, let me -- let me put it this way.

21 It may be economically in the debtors' best interest to do that

22 and to create that claim.

23    MR. PATTON:  Well, that's exactly right.  And -- and

24 I don't know -- you know, being -- evaluating.  I think what

25 this turns into is an argument on a motion to compel assumption

182

1   or rejection.  Because I think what's going on is a debate

2   about whether the debtors' economic interest in keeping this

3   contract and then rejecting it outweighs whatever potential

4   harm that MERS suffers by our not making up our mind about

5   whether to assume or reject it.  I don't think it injects

6   itself into a sale hearing in any proper sense.  And the debate

7   we started to hear today struck me as the kind of argument you

8   would hear in a motion to compel assumption or assignment when

9   we weigh the rights and benefits that we have both under the

10  MERS contract and under the bankruptcy law to deal with this

11  contract in certain ways.  And the concern that MERS has that

12  our failure to make the decision to assume and assign the

13  contract will -- will harm them in some way that's

14  inappropriate when one balances the relative impact on MERS, on

15  the one hand and the estate on the other.  So I just don't see

16  how it fits into a proper objection to the sale proper.

17          THE COURT:  I understand.  I'm going to ask you to

18  answer one more question.  Ms. Rush raises, I think, the

19  following issue which is the mortgagors of these 200 and

20  something thousand dollar loans.  And these are dependant on

21  the servicer, obviously, for various things.  Should the Court

22  take into account the interest of the mortgagors and to sign

23  another (indiscernible), approve this transaction?  And if so,

24  how does that cut, one way or the other?

25          MR. PATTON:  Well, certainly the mortgagors have a

183

stake in this in the sense that servicing -- in the business of servicing their loans has a responsibility to do that job well. It has a responsibility to see that the principle and interest payments end up in the right place in a timely fashion and that the tax and insurance payments end up in the right place at the right time.

        And in that regard the concern of the mortgage holders -- sorry, the mortgagors is primarily one of -- of getting an answer to the question of whether or not this transaction harms, is neutral to or enhances the ability of American Home -- of AHM Servicing to do that job.  And the -- the -- the situation that we have right now, before the sale happens, assuming Your Honor approves the sale, is that we have American Home Mortgage -- sorry, American Home Servicing operating well, operating efficiently, operating in a context where it's managed to survive the effects of a transition into bankruptcy.  However, it's operating in a context where its ability to operate profitably has a shelf life.

        We are confronting an opportunity to sell servicing to an entity that will be able to capitalize the business, will be able to provide the funding that's necessary to enable the business to survive and thrive and in fact, as it stated the intent to acquire additional loans to service through the business and so allow the business to grow.

        And in that context, homeowners can only be benefited

184

1    by this transaction because the transaction will result in

2    homeowners being able to look to a healthier, stronger

3    servicing business then they have now and will have in the

4    future if we don't find a buyer to take this asset out of

5    bankruptcy into operating in a -- in a way that allows it to

6    thrive and grow.

7              Additionally, the alternative to a sale to someone of

8    this whole business would be to sell off the servicing rights,

9    send the goodbye/hello letters all of the homeowners, have new

10   servicers, and it's probably plural, take over the servicing

11   for all of these loans and transitioning the servicing onto the

12   platforms of new servicers.

13             And we know that the process of transferring

14   servicing is both time consuming, it takes time for the notices

15   to the homeowners to go out and for homeowners to respond.  I

16   can tell you anecdotally from working with the business that

17   transferring servicing generates problems and problems for

18   homeowners because it's a complicated task and there's an

19   opportunity for all sorts of miscommunications to happen with

20   the homeowners.  And there are opportunities for the servicing

21   business to degrade and opportunities for homeowners to

22   experience degradation in the quality of the loan servicing.

23             So, given that what we're confronted with is a choice

24   of either selling off the servicing and going through that

25   process of transitioning servicing and all of the risk

185

1    associated with transferring the servicing to new servicers or

2    the prospect of simply running the business and allowing it to

3    slowly wither or selling the business to a financially strong

4    and viable and committed purchaser, I think there's no doubt

5    that selling the business to someone like Wilber Ross who's

6    interested in growing this business is the very best thing that

7    could possibly happen to the homeowners.

8              THE COURT:  Thank you.  Anything further, Mr. Patton?

9              MR. PATTON:  One last, mostly for fun, tidbit and

10   that is, the second waterfall, Your Honor, that was referenced

11   in the DB, as the same sectional cross-reference problem.  It

12   just cross-references yet another wrong subsection.

13             THE COURT:  All right. Thank you.

14             MR. PATTON:  Thank you.  The committee, Mr.

15   Indelicato?

16             MR. INDELICATO:  Thank you, Your Honor.

17             THE CLERK:  (Indiscernible).

18             MR. INDELICATO:  Mark Indelicato.  Very briefly,

19   Your Honor.  First dealing with the MERS issue.  And I think,

20   as the Court recognized and pointed out, the APA's ambiguous as

21   to whether or not it's required at the final close, to incur

22   those fees and if they are incurred who pays them.  It

23   shouldn't surprise the Court that from the committee's

24   perspective this is a cost of the transaction and believe that

25   it will be bored by the lender or the purchaser but it should

186

1   not be a cost of the estate.

2           So, we just wanted to keep the record clear on that

3   point.  The other point is just to, sort of, clarify something

4   that I think has been addressed a number of times in the DB

5   agreement when they talked about the waterfall.  And Mr. Gallo

6   had made a reference to the fact that if there's an obligation

7   to repurchase that they're not entitled to any reimbursement.

8   Your Honor, the way we read that paragraph, and I guess it's

9   paragraph 11.09(ii) and (vi).  To the extent they're required

10  to repurchase they're required to -- they're permitted from not

11  recovering it as it relates to those individual loans.  It's

12  not that they're not entitled to any reimbursements.  It's on

13  an individual loan by loan basis.

14          So the fact that he was making the point, I think,

15  that they have this great right to the extent there's any right

16  to reimburse -- repurchase a loan, that they're not entitled to

17  any (indiscernible).  And I don't think that's correct in the

18  reading of the document.

19          THE COURT:  Okay.

20          MR. INDELICATO: Thank you.

21          THE COURT:  Anyone else?

22          MS. COUNEHAN:  Your Honor, Victoria Counihan on

23  behalf of the purchaser.  Just one brief point on the MERS fees

24  issue.  I just wanted to make clear that at this point the

25  purchaser has not agreed to accept that obligation under the

1   asset purchase agreement.  We don't believe that that is, at

2   this point, something that the purchaser should be taking on as

3   an obligation.  Thank you.

4           THE COURT:  Ms. Booth, you might be right.  There

5   might be something to worry about.

6           MR. TALMADGE:  Your Honor, Scott Talmadge again.

7   Needless to say, this is obviously a point that has not been

8   resolved by the parties.

9           THE COURT:  Sounds like it.

10          MR. TALMADGE:  And it's not something, though, that

11  we believe has to be resolved before the closing.  It's an

12  issue before the final closing.  But that is not something that

13  anyone has agreed upon at this point in time.

14          THE COURT:  All right.  I understand.  Ms. Booth?

15          MS. BOOTH:  And so, Your Honor, you see my problem.

16          THE COURT:  Yes, I do.  Thank you.  All right.

17  Anything else?  Mr. Gallo, you get the last word in.

18          MR. GALLO:  Your Honor, just one thirty-second point.

19  I just -- there was a question you asked Mr. Patton on his

20  rebuttal where you asked him would you be trying to do the same

21  thing -- that it's not necessary that the seller and servicer

22  be separate.  They should be trying to do the same thing with

23  an agreement where one party was obligated for both -- both the

24  sales and the service.  And I just want to -- just reference

25  back to some of Mr. Aronoff's testimony when I asked him if,

1    hypothetically, you were to interpret my indemnification

2    provision as I interpret it could -- would -- could you

3    transfer the servicing rights.  And he said, in that instance

4    you would need a separate agreement or you would need to excise

5    that provision from the agreement.  So I think that that's, by

6    implication, saying that it's not severable if you interpret

7    the indemnification provision as I do.

8             Thank you, Your Honor.  I appreciate it.

9             THE COURT:  All right.  Any further argument,

10   clarifications, anything?  All right.  Then I'll close -- then

11   I'll close the hearing -- the record and the argument on the

12   hearing.

13            These are complicated issues.  And they require

14   the -- they require, I think, some study of the law and they

15   require some study of the contracts.  So you're not going to

16   get a ruling today.

17            What I -- what I'm going to do is take the matter

18   under advisement, not for purposes of issuing a written

19   decision but for purposes of reading the record, reading the

20   contracts, reading the law and with the idea of giving an oral

21   ruling pretty soon.

22            We have a hearing on Tuesday at 2:00.  I don't know

23   what it's about but it's on my calendar.  Does anyone know what

24   it's about?  Is it an omnibus or --

25            MR. PATTON:  It's a sale.

1          THE COURT:  Is that the construction loan sale?

2          MR. PATTON:  No, Jennie Mae loans come in first.

3   There's two objections on it, Your Honor.

4          THE COURT:  Oh, there are objections?

5          MR. PATTON:  Yeah.

6          THE COURT:  Well, I'll give my oral ruling on the

7   23rd.  If I'm not in a position to do that, I will inform

8   debtors' counsel by Monday so they can let people know that

9   they don't need -- and if you just want to hear my ruling you

10  can participate by phone.  That's fine.

11         If I don't do it on the 23rd, you'll hear from me on

12  the 29th, which is the next time we're in court together.  All

13  right.

14         To the extent that the debtor has access to the

15  transcripts from the hearing and they can make a copy available

16  to the Court, I'd appreciate that.

17         MR. PATTON:  We will do that, Your Honor.  It's --

18  the first couple of days we're working off of the disk but we

19  will -- as we have it, you'll have it.

20         THE COURT:  I understand.  Thank you.  I really don't

21  want any more briefing.  I have everything I need.  I don't

22  need -- I mean, if someone feels they'd like to supplement the

23  record in some way and feels strongly about it, I guess you can

24  ask.  But I think I have everything I need to make -- to make a

25  decision.  And I will really endeavor to do so as quickly as

190

1    possible.  So we'll shoot for Tuesday.  If we don't make

2    Tuesday, we'll do the 29th, by no later than the 29th.  And

3    I'll let the debtors know and they can let the world know on

4    Monday whether or not I'll be in a position to rule on Tuesday.

5              All right.  Anything further for today?

6              MR. PATTON:  No, Your Honor.

7              THE COURT:  Again, thank you for an excellent

8    argument and excellent hearing and I wish you all a pleasant

9    weekend.  The hearing is adjourned.

10             MR. PATTON:  Thank you, Your Honor.

11             (Whereupon these proceedings were concluded at 7:55

12   p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

191

1

2                    **C E R T I F I C A T I O N**

3

4     I, Lisa Bar-Leib, court-approved transcriber, certify that the

5     foregoing is a correct transcript from the official electronic

6     sound recording of the proceedings in the above-entitled

7     matter.

8

9     _____          October 24, 2007

10    Signature of Transcriber                  Date

11

12    Lisa Bar-Leib

13    typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25

**A**

**AAR** 80:16 96:17
**AARs** 80:17 131:13
131:17 132:4
**abandon** 26:4
**abides** 169:4
**ability** 75:21 84:16
87:9 98:4 126:1
128:25 129:10
142:11,12 168:3
183:10,18
**able** 43:18,19 52:23
69:12 102:3
103:25 104:1
116:9 146:9 174:4
180:10 183:20,21
184:2
**above-entitled**
191:6
**absent** 105:12
**absolutely** 48:10
**absurd** 85:5
**absurdity** 50:25
**accelerated** 88:18
**accept** 98:10
107:22 118:20
186:25
**accepting** 143:14
157:12
**access** 189:14
**accom** 32:15
**accomplish** 41:20
43:14 66:6 72:25
75:25 148:9
**accomplished**
26:10
**accomplishes** 27:14
**accomplishing**
26:10 67:11
**account** 84:21
87:24 88:1,4,20
89:1 129:14
182:22
**accounts** 87:3,4,9
87:25 90:13
113:19 129:5,9,11

**accrue** 44:4
**accurately** 18:3
**accused** 170:18,18
**achieve** 97:3
**acknowledgement**
167:5
**acknowledges**
164:5
**acquire** 183:23
**acquired** 42:6
**acquirer** 149:4,23
149:24 150:1,19
154:17,19 157:2
161:14,15,16,17
162:10 165:5,14
**acquiring** 150:8
**Acquisition** 8:12
9:3,11
**act** 50:25
**acting** 181:4
**active** 27:20 58:10
**activities** 128:5
**actual** 26:5 152:22
160:25
**ad** 42:10
**Adams** 87:2 177:25
**add** 24:24 86:23
122:10
**added** 15:1 21:1
122:9
**addendum** 115:3
115:11,17
**addition** 61:6
117:10 156:17
**additional** 82:9
101:21 163:23
165:2 177:2
183:23
**Additionally** 27:12
41:9 84:20 89:12
92:21 184:7
**address** 15:6 16:1
62:5 103:13,15,17
104:13 109:9
115:8 123:17
142:2
**addressed** 20:20

30:10 38:20 49:6
94:5 100:21 105:3
171:1 186:4
**addresses** 31:23
73:21
**addressing** 29:5
**adequate** 59:17,22
60:22 92:7,9,12
93:14,19 94:22,23
106:17 133:4
154:8,9,25 155:17
155:21 159:15,17
176:13
**adjourned** 190:9
**administer** 81:7
**administrative**
2:10,15 32:13,14
32:24 162:7
180:22
**administratively**
164:16,18
**admire** 136:1
**admission** 36:15
**admit** 13:17 111:10
**admitted** 13:15,20
14:5
**admittedly** 60:6
86:11
**adopted** 95:22
**advance** 88:12,23
155:18
**advanced** 88:17
**advances** 40:4,21
44:19 88:4,14,16
88:21 89:19
115:21,21,24,24
116:5,7,16,25
146:25
**advantage** 43:25
173:15
**advantageous**
82:13
**adversarial** 160:6
**adverse** 180:11
**adversely** 72:17
**advised** 30:9
**advisement** 188:18

**advocate** 156:23
**affect** 21:5 73:18
**affiliate** 45:24
**affirmed** 124:9
**afraid** 136:24
**afternoon** 13:4,14
14:21 23:7 24:17
28:20 35:20 158:4
**agencies** 57:4
165:13
**agency** 46:13
**agenda** 16:15,16
17:4 25:9,10,11
51:14
**Agent** 2:10,16
**aggressively** 39:8
**ago** 19:13 60:13
**agree** 15:17 19:15
20:6,9 37:25 38:3
80:4 103:6 120:4
140:25 146:9
149:16 180:19
**agreed** 21:7 24:1
24:10 35:12 36:23
136:15,19 137:19
137:23 144:8,9
186:25 187:13
**agreement** 2:4,12
2:17 14:23 15:10
15:14 18:7 24:6,7
24:11 28:2,22
29:18 30:10,19
31:9,12,23 33:15
35:2,3,3,4,10,15
36:18,22 37:15,24
40:17 43:4 61:24
62:1,8,9,20,22
63:1,17 64:4,12
73:14 78:24,25
79:6 81:21 89:6,7
96:9,12 97:10,12
98:18 99:9,16
102:20 103:22
104:6 108:3,4,4
109:1,2 110:5,7
110:10,13,24
111:7,25 112:3,8

113:3,5,9,15,22
114:3,6,21,23
115:3,23,25 117:3
117:6,10,15 118:4
119:3,4,9,22,22
120:25 121:1
122:5 123:7,10,11
123:12 124:3,6,13
124:15,23 125:3
128:4,5,10,13,16
128:16 130:7,19
131:6,12 132:3,8
132:9,13,14,15
133:19,19 134:17
134:20 136:12,14
137:8,9,14,16,18
137:24,25 139:24
140:15,16,19,21
140:21 141:7,14
141:18 142:9,10
142:11 143:6,7,11
143:12 144:2,3,4
144:4 146:18
147:8,25 148:3,13
151:11,16,18,23
151:25 152:4,15
152:15 153:9,13
153:22,23 154:1
156:15,16,17
157:15 159:16
161:6 163:22
165:24 171:11,11
172:7 178:12,15
178:18 179:6,6,8
179:11,12,13,14
179:25 180:4,5
181:4 186:5 187:1
187:23 188:4,5
**agreements** 21:6
36:12,17 40:8
61:19 63:17,25
76:7 98:13,22,25
123:1,5 124:20
125:6,10,11 126:6
127:24 130:3,15
130:18,20 131:4
131:18,18,19,21

137:17 139:3,6,10
139:14,16 140:9
140:12,18,20
141:16 142:5,7
152:1,5,10,20
154:5 158:20
159:23 163:16
165:7 171:7,9,12
**agrees** 131:24
**AH** 8:12
**ahead** 20:17 31:20
33:23 66:22 101:6
**AHM** 32:11 75:22
94:9 142:5,7
156:13 173:5,5
174:3 175:25
176:5,6 183:11
**air** 77:1
**Airlines** 109:24
124:8
**akin** 120:13
**al** 68:9
**ALEX** 5:24
**ALFONSO** 5:17
**alive** 69:10
**alleges** 35:4
**allocate** 173:2
**allow** 16:20 29:15
43:19 53:9 72:14
75:8,10 95:8
105:13 133:22
135:16 146:3
155:13 162:11
183:24
**allowed** 55:12
**allowing** 35:25
185:2
**allows** 74:2 105:6
105:14 112:11,20
114:21 184:5
**allude** 173:24
**alluded** 77:12
**alones** 65:9 156:4
**alternate** 54:6
**alternative** 66:13
66:14 184:7
**ALVES** 7:22

**Amanda** 10:23
136:4
**ambiguity** 90:5
119:4 121:19,21
121:25
**ambiguous** 119:9
119:11,18 120:14
120:18 121:4,16
185:20
**amend** 25:3
**amended** 2:16
16:15 20:24
137:16
**amendments** 13:18
13:21 18:6,9,22
**America** 2:10,15
5:3,11 20:6 28:21
35:7 37:22 101:12
102:15 134:2
175:20,24
**American** 1:8
18:21 45:23 46:4
47:5,7 50:14 52:4
52:5 54:19,25
56:5 57:3,5,11,13
57:19 60:17 75:15
75:15,21 92:10
93:4,21 95:2
126:19,21 127:10
128:24,24 129:1,1
130:4,7,8,25
131:1 136:17,18
137:20,22,25
142:8 159:3 174:1
174:3,22 183:11
183:14,14
**America's** 176:10
**amount** 24:21,24
24:24 25:3 41:3,3
44:12 45:18 49:17
137:11 138:7,16
156:7,11,21
**amounts** 41:4 44:3
44:4,6,7,11 49:5
49:21 59:9 113:11
113:12 170:10
**ample** 44:12

**ana** 5:17 83:8
**analogue** 168:11
**analysis** 43:22
64:21 71:9,9,10
72:10 73:2 77:21
80:24,24 83:12,16
93:15,19 95:25
98:24 99:13 111:9
125:18,20 167:4
170:19 171:17
172:12,16 173:18
173:20 177:8
**analytical** 72:24
83:7
**analytically** 66:10
**analyze** 78:3 82:24
83:20 87:8 99:4
171:23 177:10
**analyzing** 74:24
83:10 84:21 87:10
171:21 178:1
**ancillary** 88:19
161:7
**ANDERSON** 5:2
**Andrew** 5:25 10:7
14:1 103:1 135:15
**anecdotally** 184:16
**ANGELL** 6:19
**announce** 16:12
**announced** 18:22
20:21
**announcing** 17:15
**annulled** 33:18
**anointed** 40:16
**answer** 43:2 63:2
99:17 165:16
182:18 183:9
**anti** 92:2 105:7
139:16 167:8
**anti-alienation**
167:20
**anti-assignment**
59:14 105:10
106:2 131:4
**ANTONOFF** 4:17
**anybody** 99:17
161:11,18 162:21

**anymore** 129:14
**anytime** 118:16
**anyway** 90:4 118:1
118:3,18 131:6
156:12
**APA** 28:8 62:19,20
62:25 143:20,25
144:5,15,20
148:15 149:19
150:18,25
**apart** 86:8 131:3
139:13
**APA's** 185:20
**apologies** 138:3
**apologize** 20:1 25:1
25:4 29:1 65:6
115:15 135:15
157:7 158:18
**apparent** 29:2
106:19
**appeal** 22:22
**appeals** 119:8
**appear** 14:24 91:4
91:5 135:9 137:17
**appeared** 16:15
**appears** 35:3 36:18
36:20 51:4 83:20
86:5 90:8 136:13
**appellate** 119:6
**applause** 166:8
**applicability** 77:18
84:18
**applicable** 46:11
73:14 74:4 77:21
103:16 106:3
123:14,15 157:10
**application** 27:6
28:3,7 49:5 85:13
**applied** 41:2
**applies** 73:9,9,10
85:19,25 167:24
171:7,9
**apply** 66:2 72:4
77:11 80:18
109:19,20,25
117:7 162:1
169:25

**appreciate** 13:5
29:21 135:8 188:8
189:16
**approach** 16:22
33:4 34:12 56:14
60:4 78:14 84:23
87:18
**approached** 49:8
49:10
**approaches** 66:6
**appropriate** 20:11
35:14 177:11
**appropriately**
159:7 177:17,18
**approval** 24:3 27:5
28:3,7 36:4 41:25
91:19 105:12
155:18 159:4
**approvals** 42:8
46:13 94:12,17
**approve** 18:10
28:19,24 29:23
30:4,6 34:5 35:11
101:4 105:5 106:3
108:7 133:10,11
134:7 146:23
155:13 182:23
**approved** 24:4
27:23 37:3 45:11
94:9,10 132:21
133:3 156:12
159:1 175:16
**approves** 32:2,2,17
41:25 183:13
**approving** 2:4,12
28:8 30:21,24
44:5 97:4
**approvingly**
171:13
**approximately**
137:11 138:8
**arduous** 95:18
**ARELENE** 7:22
**arguably** 87:17
**argue** 48:14 74:9
90:23 109:22,23
114:11 146:8

153:24 173:13
**argued** 52:16 83:1
87:5 95:9 176:23
**argues** 59:15
**arguing** 108:5
119:20,20 121:1
123:21 143:10
**argument** 44:15,15
65:17 67:20 72:8
90:14,15 105:3
106:8,9 108:16
109:10 120:2,5,9
120:10,12,13
123:24 124:7,12
127:3 135:17
148:8 151:20
152:21 153:1
162:22 165:18
167:3 169:6 173:4
173:9 174:8
181:18,25 182:7
188:9,11 190:8
**arguments** 13:7,11
14:4 72:23 95:22
102:16 103:15
112:22 114:9
119:25 123:17
133:7,9 158:9
169:2
**arises** 72:5
**arising** 60:23
**arms** 42:18,19,23
**Aronoff** 49:24
51:15 53:7 55:3
111:10 125:8
127:19,21,24
131:13 132:7
**Aronoff's** 51:23
52:3 130:13
132:23 187:25
**arose** 48:16 82:5,6
**arrangement** 68:3
**arrangements**
168:2
**arrive** 167:2
**Arsht** 6:9 14:22
140:8

**article** 144:3,3
**articulated** 81:1
169:6
**ascribe** 120:15
**Ashby** 10:16 19:18
136:4
**aside** 42:21 51:6
69:23
**asked** 42:22 43:7
111:21 117:5
143:1,12 155:9
156:3 164:2,5
187:19,20,25
**asking** 35:11 63:9
66:11 119:18
121:23 133:10,10
138:14 146:22
149:8,9 155:10,15
**asks** 78:2
**aspect** 33:14 42:24
50:20 51:4 82:3
**aspects** 96:8,9
**assaulted** 30:8
**assert** 59:8 103:20
139:11
**asserted** 180:5
**asserting** 111:4
**asserts** 137:11
138:7
**assessment** 49:20
**asset** 18:6 27:10,14
27:18 28:2 29:18
30:10,19 31:12
39:20,21,23 40:16
41:21 43:3 53:24
67:23 70:6,6,8
72:1,2,3 93:6
100:16 101:21
102:4,20 137:18
181:17 184:4
187:1
**assets** 26:4,8,11
27:3,13,25 28:4
33:19 40:3,19
42:1,9,13,14,15
44:18 45:16,17,19
66:17,25 70:1,4,4

72:1 73:1,1 77:16
87:14 102:2,20
159:19 168:8
175:11,19,20
176:21 181:12
**assign** 59:8 63:13
68:13 69:12 104:8
105:7,11,14,25
106:1 131:14
145:23 149:17
156:25 158:23
173:3 180:12
182:12
**assignability** 61:10
**assignable** 59:15
144:10
**assigned** 62:24
63:13 68:14 104:4
133:25 156:16
**assignee** 82:16
**assigning** 64:24
163:22
**assignment** 49:7
92:3 105:8,9,15
105:19 108:8
139:17 157:9
167:9,14 182:8
**assist** 125:24 168:7
**associated** 27:18
28:3 32:16 33:20
41:10 42:14 46:22
49:7 50:6 57:23
68:14 71:2 76:1
161:5,12 185:1
**assume** 30:25 59:5
59:8 63:13 64:13
68:10,22 69:12
70:19 105:6 143:4
149:17 151:12
161:6 180:12
182:5,12
**assumed** 23:9 56:1
62:23,24 63:13
151:12
**assumes** 151:3,5,6
151:7
**assuming** 20:12

37:3 41:9 64:24
65:5,6 69:9,9
145:2,5 146:3
181:12 183:13
**assumption** 49:7
105:8 147:19
149:17 181:25
182:8
**assumptions** 56:3
**assurance** 20:6
59:17,22 60:22
92:7,10,12 93:15
93:19 94:22,24
154:8,9 155:1,17
155:21 159:15,17
158:21
**assure** 77:3
**assured** 6:10 17:3
21:12,14 25:9
62:3,12 64:4
140:22 141:2
142:23 178:10
**ATT** 9:3,11
**attach** 106:18,21
**attached** 31:10
49:4 115:11
**attaching** 31:11
**attachment** 14:7
**attack** 178:8,9
**attempt** 51:7 78:18
91:6
**attempted** 56:23
60:8,11 78:19,21
**attempting** 97:3
**attend** 42:22
**attendance** 16:25
**attendant** 26:13
49:3
**attended** 48:15
**attention** 46:19
95:24 103:3 135:7
**attest** 42:23
**attitudes** 48:12
**Attorneys** 3:4,17
4:3,12 5:3,11,20
6:3,10,20 7:3,11

7:18 8:3,12 9:3,11
9:18 10:3,10,17
11:3,11,18 12:3
12:11,18
**attorney's** 161:6
**attributable** 55:6
**auction** 40:6,13,15
43:23 55:21
**August** 2:17
**Austin** 5:19 6:2
54:4
**authorities** 77:5
**authority** 25:10
30:24 34:7 146:5
156:2 171:13
**authorize** 28:12,13
95:8
**authorizing** 2:5,13
28:4
**available** 32:18,23
43:4 44:4 66:24
88:15,20 94:15
100:18 166:23
189:15
**Avenue** 3:18 5:12
5:21 8:4 9:5
10:11,19 11:12
12:4,19
**avoid** 76:17 156:22
**avoids** 68:11,13
**aware** 40:19 51:12
**awful** 52:10

**B**

**B** 1:22 2:4,13 3:14
4:17 6:17 11:23
27:17 101:19,22
102:1,4 146:6
175:4,6,6
**back** 15:15 30:20
35:8,16,25 37:14
44:6 54:20 57:14
71:1,16 80:21
97:5 98:24 102:12
107:20 110:1
114:24 128:17,22
133:20 134:15

142:14 150:17
153:10,21 155:18
158:10,11,17
166:12 170:22
179:5 181:14
187:25
**backer** 94:9
**background** 39:14
**backing** 95:3 105:1
**backup** 142:17
**bad** 178:18
**badly** 90:19 146:24
**balance** 40:25 41:2
41:5 42:10,12
51:5 58:13
**balances** 182:14
**balancing** 173:22
**bank** 2:9,15 4:12
5:3,11 7:3 10:3,10
11:11 17:23,24
19:8 21:21,23
22:17 28:21 35:6
35:23 37:22 51:6
51:12 53:1,6,12
53:19 54:16,19
57:22 69:8 78:13
81:11,13 82:18
84:22 87:2,16,22
101:12 102:15,17
102:19 122:8
128:7,14 131:15
131:17,22 134:2
134:21 159:20
161:4 166:20
169:24 175:20,24
176:6,10 177:22
**bankruptcy** 1:2,14
1:24 2:3,11 44:24
45:6 66:3,4 71:15
71:18 72:9 73:15
82:1 94:3 95:5
97:21 99:5 105:23
127:5 129:3,15
134:6 154:14
167:4 168:5,7
175:13,22 182:10
183:17 184:5

**banks** 75:3 175:7
**Bank's** 78:23 84:23
111:12 176:19
**bar** 146:12
**bargain** 81:19
128:19 134:17,24
135:4
**bargained** 86:11
114:22 134:16
141:19
**barn** 161:10
**Bar-Leib** 191:4,12
**based** 19:12 24:3
34:6 35:15 37:18
50:5 54:10 57:18
102:2 110:17
119:25 122:11
124:24,25,25
**baseline** 133:2
**bases** 79:3
**basic** 38:3
**basically** 35:24
112:18 132:14
145:24 167:14
**basis** 40:24 41:1,6
45:14 46:24 47:8
55:19 136:18
137:21 159:5
186:13
**bastardized** 169:16
**Battery** 7:19
**battle** 42:3
**Bayard** 12:2 156:1
**Bear** 5:20 6:3 11:18
**bearing** 84:8
**Bechtel** 82:1,7,10
82:11
**becoming** 132:21
166:18
**beef** 148:14
**began** 53:8
**beginning** 16:17
27:11 46:25
166:12,14
**begins** 57:14 74:24
75:1 112:13 115:4
**behalf** 13:15 21:12

21:21 23:25 24:18
28:21 29:1 35:1
62:12 95:14 136:5
156:1 160:17
176:23 186:23
**belabor** 56:25
**believe** 18:23 19:18
25:23 33:18,20
34:9 36:6,20,22
42:11 49:13,22
59:6 61:21 91:20
91:21 92:5 99:2
99:21 100:2,5,6
101:9 104:24
108:16 111:14
117:6 119:7
122:10 138:13,19
139:11 146:11
151:13,19 153:6
154:4 165:12
175:5 185:24
187:1,11
**believed** 56:1 59:4
84:25
**belong** 48:2 129:10
**belongs** 17:21
**bench** 29:18 56:14
**beneficial** 96:20
**beneficiary** 147:10
148:4 178:14
**benefit** 16:8,9
26:12 43:20 56:24
100:19 125:23
134:2,24 135:4
**benefited** 183:25
**benefits** 126:8,9
182:9
**best** 63:3,4 181:21
185:6
**better** 125:18,19
126:2,10,11
**beyond** 168:9
**bidder** 18:11 40:16
**bidders** 173:2
**bidding** 30:21 34:7
**bids** 40:10,11,11
172:23

**bifurcate** 30:25
**big** 72:19
**Bill** 19:17
**billion** 40:24 41:1,5
94:16 101:22
133:16,17,18
154:22 156:9
158:13,15
**bind** 76:15
**Bingham** 10:2,9
103:1
**birth** 53:8
**bit** 13:6 34:24
39:13 41:13 46:25
69:1 107:20
123:18 143:17
157:17 168:14
173:25
**black** 90:10 122:2,4
122:4,5,7,20,23
**blah** 32:8,8,8
**blank** 4:2 34:11
**bless** 30:3
**blessing** 30:2
145:25
**board** 27:16,19
**Bob** 55:4,8
**Bockius** 12:10 29:1
160:17
**body** 67:1,4 71:23
167:19,25 168:8
**boils** 110:3,4
**bonds** 152:17
**bones** 44:18
**BONNIE** 4:9
**book** 58:18
**books** 39:24 175:11
175:12
**Booth** 12:15 28:25
28:25 30:8,9
31:17,18,20 32:21
32:22 33:3 36:25
37:5,9 157:22
160:15,16,17
161:22,24 162:25
163:6,11,23
164:17,21,23

165:1,9,11,19
187:4,14,15
**Booth's** 31:21
**bored** 185:25
**borne** 54:12
**borrower** 104:9
116:1,2
**borrowers** 14:9
88:19 159:8,13,13
159:24 160:10
**Boston** 10:5
**bother** 65:10
**bottom** 21:16 59:10
**bound** 126:17,22
**boundary** 42:4
**Bowden** 10:22
19:17,17,22 20:1
20:4,9,18,24 21:9
21:18
**box** 176:17
**Brady** 3:11 13:8,14
13:14 14:3 23:24
23:25,25 24:9
34:25 35:1,1
36:18
**Brady's** 35:21
**BRANDON** 4:18
**Brandywine** 3:5
**breach** 134:25
176:8
**breached** 171:11
**break** 16:24 30:12
86:18,23 160:11
**breathe** 77:2
**breech** 168:17
**BRETT** 8:8
**brief** 34:16 59:3
66:7 82:7 87:2
91:16,19 100:10
101:1 104:21
105:3 107:4
109:20 123:25
136:4 140:14
142:1 186:23
**briefed** 39:9 151:11
**briefing** 82:4
173:24 189:21

**briefly** 91:14,15
115:1,22 130:13
132:11 139:1
185:18
**briefs** 110:1
**bring** 162:16
**bringing** 42:25
**brings** 92:17
**Broadway** 4:13
**broken** 146:10
**brought** 145:10
162:15
**bucket** 57:7
**buckets** 40:3,19
44:18 45:18 57:2
**Building** 3:5 8:13
**bundle** 52:17 68:7
70:3,7 72:11,15
147:20 149:21,25
175:19
**bundles** 71:7
**burden** 51:8 77:24
82:15 101:7,10
140:25 141:4,25
142:4 151:14
**burdened** 59:7
**burdens** 59:6 68:11
68:14
**business** 41:11,16
44:9,21 45:1,17
45:22 46:10,18
48:15 49:3 50:1
51:4,11,12,16,17
53:3,24 54:6,9,10
55:1,3 60:17
66:15 68:9 75:1
76:1,23 92:19,20
92:23,23 93:4,11
93:13,16,22 94:7
159:1 174:5
176:21,22,24
183:1,20,22,24,24
184:3,8,16,21
185:2,3,5,6
**businesses** 53:19
**BUTZ** 6:17
**buy** 51:24 70:1

126:1 138:15
145:12
**buyer** 41:17,17
43:12,22,23,24
60:25 92:16,17,17
92:21 127:22
134:9,10 143:19
143:21 144:6,8,8
145:8,11 147:7
157:13 163:3
176:9 184:4
**buyers** 163:25
**buying** 40:19 52:5
52:5 92:16 144:7
**buy/sell** 173:14
**byproducts** 88:9
**by-product** 27:23
41:16 45:5 66:3
**B.R** 124:10

— C —

**C** 2:6,14 3:2 13:1
191:2,2
**calculations** 56:2
**calendar** 188:23
**call** 40:13 59:3
60:20 72:6,7
82:25 159:6 172:9
172:14
**called** 62:20 63:1
65:20 80:25
101:24
**calling** 82:22
**calls** 99:9
**CANDEUB** 8:9
**capabilities** 153:18
**capacity** 22:8 176:8
**capital** 10:17 17:21
94:19 136:5,7
155:7
**capitalize** 72:2
183:20
**capture** 60:12,12
78:18 138:11
**captured** 18:3,16
68:9 71:6
**captures** 60:10

61:6 89:12
**care** 31:5
**careful** 54:18
176:16
**carefully** 54:15
**Carolina** 158:1
**carrier** 141:20
**CARSON** 5:2
**case** 1:4 15:12 21:3
27:11 32:4 39:17
39:17,19 41:23
51:15 54:18 73:17
76:5,17 77:12
82:2,3,4,5 83:9,15
84:5,23 87:2
88:11 90:24 91:11
92:10 103:9,18
104:10,15,20
105:18,18,20
109:11,15,17,24
110:1,9,11,13
111:10 112:22
118:13 119:3,5,6
119:7,8,23 123:6
123:19 124:1,9,9
124:10,12,14,17
128:2,10 129:13
129:14 130:18
133:3,22 143:18
164:15,18 168:4
168:10 170:16,23
170:25 171:16,17
173:23 177:7,20
178:24
**cases** 61:3 71:16,24
72:24 100:15
104:11 105:16
110:14,19,20
118:6 119:8
123:24 124:15
135:6 167:25
170:23
**cash** 41:8 42:5,12
42:15 50:23 56:4
89:7,9 175:15,23
**catalog** 78:20
**catalogs** 79:4

**catalogue** 16:5,13
**catalogued** 17:14
**catalogues** 56:12
57:11,12 58:4,15
**cataloguing** 49:8
**categorical** 60:15
**categories** 16:10
**category** 17:22,23
18:24,25 19:1,10
20:5 46:5 59:23
61:3,5,7 62:5
177:5
**caught** 46:19 48:17
135:17
**cause** 17:13 69:15
174:12
**causing** 72:17
**caveats** 18:15
**ceases** 132:16
**Centre** 4:4 6:11
**Century** 129:13,13
**certain** 2:5,13,16
41:9 75:24,24,25
119:14 136:11,16
137:9,15 138:1,5
179:1 182:11
**certainly** 39:16
42:19 43:21 61:20
74:24 75:20 80:8
84:22 85:25 86:14
92:8 100:4 119:12
153:6 158:16
178:24 181:3
182:25
**certified** 93:24
**certify** 191:4
**cetera** 117:13
**challenge** 59:24
72:6
**challenged** 170:15
**challenges** 73:7
**challenging** 61:10
87:4
**chance** 18:20
**change** 91:23 122:9
122:11
**changed** 17:13

122:17
**changes** 16:12
100:11
**CHAPMAN** 7:10
**character** 61:4
91:11
**characteristics**
47:2
**characterization**
140:14
**characterize** 22:12
**characterized**
62:14 108:17
**chart** 56:12 57:3
61:2
**charts** 56:9
**Chase** 4:4 6:11
11:3
**cheat** 16:4 22:4
**checked** 36:23
**check's** 24:22
**cherry** 152:24
**CHFA** 12:3 156:17
157:12
**Chicago** 7:13
**Chipman** 6:25
35:18,19 36:4,11
36:16 37:11,13,20
**choice** 76:15
128:13 184:23
**choose** 22:18 56:3
162:5 169:25
**chooses** 128:14
**CHRISTOPHER**
1:23
**CIFG** 20:5,19
**circuit** 104:15
105:18,20 109:24
124:10 135:5
177:12
**circular** 123:18,23
124:6 170:18,18
**circulate** 16:4
**circulated** 18:10
35:6,22 122:17
148:2
**circulating** 20:12

circumstance 134:12 151:9
circumstances 177:11
cite 105:17 119:5,6 171:13
cited 87:2
Citibank 7:18
CitiMortgage 8:3
claim 32:12,14,24 87:13 108:11,12 130:10 134:4,5,12 137:11 138:7,13 151:2 162:7 176:6 176:19 180:22 181:22
claims 59:11 74:3 106:21 109:3 114:14 117:13 123:14 125:25 126:1 127:7 129:1 130:1 138:9,13 181:13,14,14
clarifications 188:10
clarify 186:3
clarity 149:19
classic 137:2,3,4
classified 97:13,14
classify 138:19
Claudia 9:24 23:22
clause 74:4 117:17 117:18,24 118:1 131:5 169:9,15,23 171:10
clauses 167:14
clean 33:14
clear 2:5,14 15:8 15:15 23:12 36:17 70:21 74:3 92:7,8 96:22 103:25 109:24 117:16 119:23 123:8 125:12 132:2 172:20 177:20 186:2,24
clearly 83:19 99:25

113:7 118:11 123:9 127:18 141:16 156:19
clerk 13:2 17:7 30:17 135:13 138:2 185:17
Cleveland 9:6
client 23:13 30:1 35:21 106:22 112:11,20 113:1,3 113:18 114:14,21 114:22 116:3 120:7 129:1,4,7,7 129:10,22,22 131:9,24 134:3,5 134:11,24 135:4 143:21 157:4 160:25 161:15,18 162:6 163:13 165:16 178:13,21 179:3,3 180:10
clients 103:20 136:5
client's 32:24 122:24 130:11 145:3 180:2
clip 149:14
clipped 87:21
close 41:24 42:1 43:18 53:14 94:18 95:8 129:20 155:3 155:11,19 160:8,8 161:9 163:3,9 166:9 172:9,13 185:21 188:10,11
closed 15:23
closes 129:21
closest 95:4
closing 13:7,11 14:4 32:16 38:10 41:7,13,15 42:13 43:9,13,16 95:10 108:17 117:22 126:12 146:13,19 147:13,24 148:10 149:6 155:16 161:2 162:11

165:4,5 169:21 181:5,8,11 187:11 187:12
closure 42:5
COBB 11:2
code 2:3,12 66:3,5 71:15 97:6 99:5 100:11,20 154:13 168:5,7
cognomen 70:4
coherence 50:3
cohesive 72:21
collaboration 54:12
collateral 174:23 175:15,23,24 176:10,12,20 178:7,9
collateralized 174:24
collect 56:9 125:22 130:10
collected 56:6,7
collecting 68:5 71:5 142:16
collections 47:15 47:16
collectively 127:6
collects 16:10 58:11
Columbia 33:16
combination 40:12 72:20
combine 98:13
combined 168:4 171:20
combining 98:18 100:13
come 43:5 44:6 54:20 56:14 79:16 80:21 86:8 88:18 88:18 97:20 99:17 114:24 155:12,18 163:10 166:2 169:7 172:4 177:13 181:11 189:2

comes 32:25 58:12 91:18 145:24 149:15 150:17 167:1,20,23 172:14 180:19
comfort 30:1 155:19
coming 57:24 84:11 116:14
comma 117:19,20
commencement 73:16
comment 21:12 95:12 107:18 126:12
comments 172:19 172:21,23
commit 164:11
commitment 81:15
committed 94:8,20 185:4
committee 2:7 3:17 4:3 27:16 28:16 28:17 35:7,23,23 95:11,14 101:15 101:16 164:11 185:14
committee's 185:23
common 67:21 109:21,22
communication 160:3
companies 51:24
company 17:25 44:23 45:7 48:6 49:9 51:20 52:1 129:7 175:12,12
company's 94:4
compare 127:20 139:19
compel 181:25 182:8
compelled 107:22
compelling 67:1
competing 42:11 43:23 54:7 177:10
competitors 126:4

complain 150:23
complaining 164:24
complaints 45:9
complete 78:20
completed 74:18 74:22
completely 55:13
completes 95:10
complexity 69:24
compliance 46:11
compliant 46:15
complicate 75:16
complicated 80:6 80:17 131:17 184:18 188:13
component 26:8 43:1 48:24 50:21 52:14,17 55:5 65:7 76:22,25 77:23 78:1,4,9 81:20 85:10 91:25 91:25 172:1 174:17
components 72:19 80:11 90:24 172:25 173:14
composed 176:22
comprehensible 81:4
computerized 33:11
Conaway 3:3 54:7
conceded 167:1
concept 29:15 68:3 77:20 91:22 92:5 168:4,5
conceptual 60:18
concern 20:11 180:2,2,20,21,23 181:9,11 182:11 183:7
concerned 60:7 158:24
concerns 61:2,4 93:25
concerted 51:1

**conclude** 133:7
**concluded** 33:19
    40:11 49:10
    190:11
**concludes** 74:10
**conclusion** 43:10
    169:8
**condition** 73:12,13
    73:16 168:2,10
**conditional** 155:17
**conditionally** 94:10
**conditioned** 73:15
**conduct** 55:21
**conducting** 82:24
**confess** 60:8
**confidence** 67:10
**confidential** 31:6
    77:3
**confidentiality**
    31:4 40:8 75:23
    76:2,4,6,16
**confirm** 19:9 37:22
**confirmation** 36:13
**confirmed** 46:8
    141:13 165:23
**confirming** 21:3
**confront** 74:1
**confronted** 184:23
**confronting** 183:19
**confuse** 107:15
**confused** 20:15
    107:12,17 148:15
    181:1
**confusion** 174:21
**Congress** 91:21
    97:9,24 100:11,20
**conjunction** 97:23
    114:12
**connected** 153:7
**Connecticut** 25:9
    62:17 156:1
    157:11
**connection** 15:21
    21:4 22:19 24:1
    31:1,2 34:3 37:1,2
    40:5 41:14 58:24
    63:5,16 64:5

75:11 114:17
    136:11 137:14
    178:4
**connects** 87:16
**consent** 13:16,19
    29:11 124:13
    156:17
**consented** 14:14
    28:23
**consequence** 48:15
    149:18 170:2
**consider** 96:10
**considerable** 94:19
**consideration**
    39:19 72:13 78:6
    84:10 99:24
    129:23 134:3
    153:10,20 172:7
**considered** 42:14
    67:5 95:25 125:10
    127:6
**considering** 29:21
    156:21
**consist** 14:15 88:17
    115:24
**consistent** 91:1
**consists** 16:4,8
    25:22 46:5 67:24
    89:3
**consolidate** 60:13
**consolidated**
    170:17 171:19
**constituent** 174:11
**constitutes** 86:15
**construction** 189:1
**consumer** 76:7
    77:2,5
**consumers** 76:16
**consuming** 184:14
**contact** 73:1,5 83:6
    118:17 159:8
**contain** 70:23
    115:7 131:4,19
    139:16
**contained** 85:9
    115:2 124:13
    139:14,17 144:24

163:12 179:13
**containing** 83:23
**contains** 68:15
    89:16 105:10
    106:20 116:19
    123:12 129:9
**contemplate** 97:8
    135:17
**contemplated**
    41:14 102:20
    153:15
**contemplates** 31:9
**contemplating**
    36:19
**content** 60:10
    70:23 78:19
    138:24
**contested** 90:17
**context** 27:6 38:18
    41:14 43:17,25
    44:2 46:12 47:4
    47:14 49:6 52:20
    55:12,20 58:13,23
    61:1 63:8,11
    64:20 66:5 70:21
    71:20 72:5 74:9
    74:17,25 75:13
    77:11,13,17,20
    78:19 84:5,5,15
    85:24 87:1 91:18
    92:12 93:25 97:21
    167:24 170:17
    171:17 172:5
    178:12 183:15,17
    183:25
**continuances** 39:23
**continuation** 92:18
**continue** 53:16
    58:7 93:8 141:21
    142:16 153:10
    154:1,19 159:13
    161:9
**continuing** 112:20
    141:21 153:12,22
**continuous** 45:14
    46:24
**contract** 15:6 25:20

26:17 28:5,8 32:2
    32:3 33:19 35:9
    48:24 49:5 59:6,8
    59:24 64:14 65:13
    65:15 67:5,9,17
    67:21 68:6,10,14
    68:15,16,17,19
    69:11,14,15,16,16
    69:17,19,25 70:1
    70:5,8,12,15,19
    70:23 71:11,20,22
    73:2,6 74:2 76:11
    77:12,14,18,21,22
    78:4,7,9 82:11,17
    82:23 83:13,15,17
    83:18,23 84:1,2,3
    84:9,17,19,22
    85:11,12,14,22,24
    86:5,9,10 87:12
    87:16,17 88:10
    91:10 92:1 96:8
    96:15,21 97:13,14
    97:16,17,18 98:20
    103:21,21 104:4,4
    104:8,9,18,18
    105:7,7,10,12,13
    105:14,24 106:6,6
    106:11,12 108:1
    110:18,21 111:4,5
    111:9,9,12,13,14
    111:15,18,19,19
    111:21 112:10,23
    112:25 117:4,7
    118:5 120:12,12
    120:16 122:22
    123:20 124:12,19
    125:5 126:20,21
    126:22 127:17,25
    128:3,19,22,23,24
    130:4 131:20
    132:6 133:5,8,8,9
    133:11,12,12,17
    133:23 134:5,7,9
    134:11,14 135:1
    136:10 144:20,21
    145:4 147:12
    148:2 151:3,18

156:6 162:4,13,20
    163:13,14 169:17
    169:18 170:7,17
    170:19,21 171:5
    171:24 174:1,2,2
    174:7,11,15,17
    177:10,17,18
    178:17,24,25
    179:1,4,24 180:6
    180:12 181:11,12
    182:3,10,11,13
**contracts** 15:5
    20:25 23:9,10
    33:17 49:1,7 50:6
    50:7 56:14 57:9
    58:20 59:15 63:7
    64:25 73:8 74:25
    75:2 82:8,12
    83:21,22 84:25
    87:6 96:1,16 97:8
    98:1 99:7,18,20
    99:23 100:7,8,14
    100:14,23 101:3
    103:14,16,20
    105:4 109:7,9
    118:16 123:20,22
    123:23 125:5
    131:2 133:12,18
    139:5 153:24
    168:1 170:21
    171:15,20,21
    177:19 178:5,6,6
    179:2 180:3
    188:15,20
**contractual** 48:3
    114:5 130:3
    144:16 168:1
    172:4 177:13
**contract's** 67:17
**contrary** 93:21
    100:20
**contribution** 93:17
**control** 92:22
**controls** 167:7
**controversial** 77:19
**conversation** 65:7
**conveyed** 147:16

conveying 146:12
convince 67:16
convinced 67:13
cooperation 34:17
  75:23
copies 56:15,16
copy 14:19 17:7
  31:12 189:15
core 53:23 71:16
  72:9 178:6
corner 30:8
corners 143:13
  150:12
corp 16:2 17:4,16
  23:14 25:9 39:8
  125:20 126:21
  127:12 128:25
  129:1 136:17
  137:21,25 173:5
  174:7,10
corporate 94:8
Corporation 23:8
Corp's 174:8
correct 19:3,9 21:9
  22:24 31:3,6
  35:21 48:10 64:19
  107:10 108:17
  149:22 152:2,5,6
  156:8 169:8,10
  174:10 175:3
  180:8 186:17
  191:5
corrected 45:6
correctly 21:23
  123:18
cost 32:16 118:2
  125:25 185:24
  186:1
costly 165:12
costs 126:7,8 161:5
COUNEHAN
  186:22
Counihan 8:18
  186:22
counsel 15:2 28:16
  35:23 95:21 103:4
  138:23 159:3

189:8
count 85:14
counter 144:5
counterparties
  50:16,16,25 52:19
  56:2 57:21,23
  58:16 74:11,15,23
  75:3,16,20 96:4,5
  96:23 97:3 100:19
counterparty 71:22
  99:1 128:13
country 43:2
Countrymen 74:6
Countrywide 6:20
  17:17 34:23 35:4
  35:7,8,10,16,24
  35:25 36:12 128:9
  130:19 173:10,23
Countrywide's
  35:3 36:21 126:20
County 25:14
  158:2 166:5
couple 56:9 81:2
  86:3 88:7 129:21
  135:18,18 145:13
  156:5 166:19
  168:25 169:1
  172:19 189:18
coupon 149:14
course 39:16 40:14
  47:10 67:12 73:3
  73:9 74:2 77:18
  103:2 130:11
  148:10 175:15
court 1:2,14 13:3
  13:10,13,20,24
  14:17,19 15:16,18
  15:20 16:4,21,23
  17:2,7,9 18:7 19:2
  19:6,11,14,21,25
  20:3,8,13,15,23
  21:7,10,19 22:6
  22:14,17,22 23:1
  23:4,6,13,15,19
  23:23 24:8,16,25
  25:2,6,25 26:2,14
  26:21,24 29:5,17

29:21,23 30:3,12
  30:15,18 31:4,9
  31:16 32:6,10,12
  32:14,18,21 33:2
  33:6,9,12,21,23
  34:1,5,10,13,17
  34:20 35:11,14,18
  36:3,9,14,25 37:7
  37:11,19,25 38:4
  38:8 39:2 43:18
  45:21 48:5,18
  51:19,22 56:12,15
  56:17,21 59:21
  60:3,5,10 61:12
  61:17,22 62:3,7
  62:10,15,17 63:15
  63:21,24 64:3,8
  64:10,17,22,24
  65:3,10,12,17,19
  65:23 66:11,20,22
  67:15 68:16,18,21
  69:3,8 70:8,14,17
  76:2,9,20 78:3,8
  78:15,21 79:12,15
  79:17,22,24 80:2
  80:4 82:13 85:16
  85:21 86:1,17,21
  87:7,20 89:21,24
  90:2,5 95:7,11,16
  99:12,13 100:13
  101:3,5,7,11,22
  102:6,8,10,13,21
  103:8,9 104:11,16
  104:20,22 106:23
  107:1,5,8,11,14
  107:18,20 108:2,9
  108:13,21,24
  109:11,20 112:12
  112:15 113:17,24
  114:4 115:10,14
  115:16,19 117:18
  118:6,8,20 119:8
  119:8,10,13,15
  120:2,7,17 121:3
  121:12 124:9,14
  124:17 135:10,14
  135:21,24 136:1

136:20,23,25
  137:3,5 138:4,9
  138:14,21 139:8,9
  139:19,20 140:1,3
  140:11,18 143:17
  145:1 146:2,15
  147:3,6,17 148:14
  148:17,22,25
  149:4,7,10,20,23
  150:5,10,14,19,23
  151:21,25 152:3,7
  152:9,13,19,24
  153:4 154:3,6,12
  154:16 155:16,22
  155:24 156:23,25
  157:6,21,24 158:6
  158:12 160:13,15
  161:19,23 162:7
  162:22 163:1,7,21
  164:14,18,22,25
  165:8,10,18,20,22
  166:1,3,4,9,14,16
  167:8,11,14,17,22
  171:2 173:4,8,13
  173:19 174:8,23
  175:2,18,22 176:5
  176:8,13,16 177:9
  178:19,22 179:7
  179:10,16,20
  180:13,16,24
  181:1,20 182:17
  182:21 185:8,13
  185:20,23 186:19
  186:21 187:4,9,14
  187:16 188:9
  189:1,4,6,12,16
  189:20 190:7
courtroom 30:2
  47:1 78:17
Courts 177:12
court's 32:25 82:1
  144:10 145:25
court-approved
  191:4
covenant 163:18
cover 142:9
covered 38:23

98:15 176:9
covers 113:16
coy 65:24
co-counsel 14:24
  103:7
crack 75:5
cracks 160:10
crashed 130:22
create 81:14 91:21
  119:4 121:19,20
  181:22
created 56:9 57:19
  75:14
creates 68:6 164:19
creating 75:7
creation 55:10
  90:10
credit 2:16 25:11
  81:24 82:9,14,18
  82:20 83:15,25
  84:7,13 86:12
  89:4 91:11 96:23
  128:18 141:23
  166:4 172:10,15
  177:2,2,2 178:22
  179:17
creditor 87:18
creditors 2:7 3:17
  4:3 28:16,17
  100:18 101:1,12
  101:20 102:3,5
creeping 167:5
crisis 177:16
critical 45:1 51:3
  52:3,17 76:25
  116:24
cross 64:8 74:19
  80:25 81:14 82:15
  82:17,22,25 83:16
  83:23,25 84:4,13
  84:17 86:15 91:9
  98:14,21 100:14
  124:13,19 125:15
  168:15 170:20
  171:3,6,9,14,18
  171:25 172:5,9,15
  176:24 177:3,6

**crossed** 33:7 51:10
**cross-default** 55:2
55:14 63:6 64:21
65:4 123:17,19,21
124:11,15,18,19
**cross-defaults** 63:9
64:5,10
**cross-examination**
46:19 129:17
141:13 144:1
**cross-examined**
129:18
**cross-examiners**
43:8
**cross-offset** 82:8
**cross-reference**
185:11
**cross-references**
185:12
**crowd** 18:2,18
**Crowley** 4:16 19:3
19:8,8,12
**crucial** 95:25
**crystal** 70:20
**cure** 24:21,21,24
25:3 44:3,4,6,7,11
44:12,13 49:5,21
59:9 60:23 112:25
137:11 138:7,9,13
138:16,17
**cured** 91:22 92:4
**curers** 91:15
**current** 16:6
163:16
**custodial** 87:24
88:1,3,20 89:1
90:13 113:19
129:5,9,10,14
**customary** 35:13
**cut** 147:23 182:24
**CUTLER** 7:10

**D**
**d** 5:15 8:8 12:8
13:1 162:6
**daily** 93:23 159:5
**damage** 71:21,22

72:16 146:10
159:17
**DANIEL** 6:17
**dare** 170:16
**date** 13:23 42:1,13
49:13 116:2 143:9
146:19,19 147:14
147:24 149:6
191:10
**dated** 2:17 33:16
136:12 137:16
**DAVE** 9:8
**David** 6:7 34:16
**day** 9:2,10 39:17
80:12,13 123:12
128:5,15 148:6
**days** 35:20 39:3
45:2,20 53:7
95:17 107:17
127:5 129:21
143:18 160:21
189:18
**day-to-day** 128:5
**DB** 10:18 14:1
17:25 25:10 61:13
61:18,20 79:23,24
88:10 89:13,21,24
89:25 90:24 91:10
91:11 96:6,7
103:1 123:6,6
127:6 135:16
138:23 139:17
166:20 169:9
170:3 176:23
185:11 186:4
**DB-1** 103:21
105:10 111:12
112:14 115:10
**DB-4** 14:5,15
**DDNLPSA** 80:20
**DE** 3:8 4:7 5:6 6:14
6:23 7:6 8:6,16
9:21 10:20 11:6
11:21 12:6
**deal** 14:23 17:16
21:10 30:6 42:10
43:8 53:4,4,20

100:12 103:5
110:23 125:14
135:24 167:25
178:12 182:10
**dealing** 64:20
71:20 77:14 82:21
123:19 124:18
153:17 167:18,19
185:19
**deals** 20:21 71:13
115:20,21
**dealt** 25:7 67:11
143:19
**dean** 53:17
**debate** 81:4 87:6
182:1,6
**debated** 169:1
**debtor** 1:10 3:4
21:7 58:22 62:4
66:18 67:23 68:4
72:2 73:10,11,16
82:8,10,12,16
98:12 101:1,9
104:7,17 105:23
111:14 121:4
145:24 146:17
150:2 151:14
154:14 157:13
161:2,16 163:13
164:11 168:3
189:14
**debtors** 2:2,5,10,13
13:15,16,21 14:13
14:18 15:6 24:1,4
24:5,12 27:13
28:24 32:22 35:2
35:7,24 36:7 63:1
65:13,14 73:19
74:12 95:21 96:3
103:4 104:1,10,24
105:5,6,11 106:5
106:7 108:5
109:19 110:7
112:24,24 115:12
117:16 119:2,19
119:20 122:5,6
123:7,16,21,25

124:16 125:4,13
125:15,17,18
126:5 127:17
133:22,25 134:1,8
135:3,19 136:22
138:15 139:2
140:14,25 141:4
143:19 144:9
151:2 154:10
156:25 159:3
163:15 164:6,7
168:3 181:21
182:2 189:8 190:3
**December** 137:16
**decide** 145:1,2
146:24,24
**decided** 82:2 145:2
170:25
**decision** 40:15 81:1
82:1,4 92:22
111:3 170:23
171:1 182:12
188:19 189:25
**declare** 127:9
**declaring** 127:8
**decreditory** 145:18
**deemed** 77:14
**deeper** 177:8
**default** 14:6,6,8
47:18 48:8 49:9
49:10,11,21 69:13
73:8,23 80:25
81:14 82:15,17,22
83:1,16,24,25
84:4,13,18 86:15
91:9,20,22 92:4,6
98:21 112:9,11,19
112:24,25 113:1,5
113:6 114:15,16
114:21 124:14,25
127:4,8,9 132:13
132:15,18,19
134:17,18 139:17
148:11 149:3
153:13 170:17,20
171:4,6,10,14,18
171:25 172:5,9,15

177:3,6
**defaults** 47:21,23
48:25 49:3,19
59:7 60:23 64:9
74:21 91:16,17
98:14 100:14
127:11 134:19
138:16 176:24
**default-related**
48:14
**defeat** 79:15 83:3,4
135:18
**define** 97:10
147:12
**defined** 70:15
115:24 147:11
**definitely** 36:19
108:19,20
**definition** 31:5
47:23 124:19
179:18
**definitions** 179:12
179:13,21
**degradation**
184:22
**degrade** 184:21
**degree** 48:22 53:24
58:12
**Dehney** 6:16 14:21
14:22 21:11,11
62:3,4,9,11,11,14
140:7,7,13,20
144:25 145:13
146:7,16 147:4,8
148:16,19,23
149:1,5,8,12,22
150:4,7,11,15,22
151:5,22 152:2,6
152:8,11,14,23
153:3,6 154:4,7
154:13,25 155:23
155:24 157:17
165:21,23 166:2
178:11,11
**Dehney's** 179:3
**Delaware** 1:3,17
8:4 10:19 12:4

67:8
**delegated** 156:18
**delineate** 144:16
**delivered** 33:17
41:4 42:2,15 56:5
73:24,24
**delivering** 75:24
**demand** 127:9,11
**demonstrated**
80:12 85:2
**demonstrating**
178:1
**demonstrative**
56:17 58:25 60:2
60:13,16 78:12,12
87:19 115:5,6
**demonstratives**
103:12 111:17
**DENNIS** 11:15
**denominated**
141:16
**deny** 157:4
**denying** 162:2
**depend** 159:9
160:12
**dependant** 93:15
182:20
**dependent** 50:19
**depending** 23:16
45:12
**deposition** 126:16
**deprive** 135:3
**derive** 154:1
**derived** 47:6 50:22
**described** 21:18
40:1,20 44:21
45:16 89:19
**describes** 60:15
87:23 167:3
**describing** 49:1
**description** 50:1
177:4
**descriptive** 117:23
**designed** 59:20
82:17 83:15,24
84:6 89:10 176:20
**desire** 42:5 51:7

52:22
**desired** 66:16,17
**desk** 169:21
**despite** 57:18
**destiny** 92:22
**destroyed** 14:19
**detail** 16:19 30:19
74:25 108:15
**details** 172:4
**deteriorating** 160:2
**determination**
147:17,18
**determine** 42:3
96:15 111:7,8
118:23 123:22
125:15,18 145:22
147:14
**determining** 151:8
172:14
**detract** 75:17
**detrimental** 101:11
**Deutsch** 11:11 69:8
**Deutsche** 10:3,10
17:24 51:6,12
53:1,5,12,18
54:16,19 57:22
78:13,23 81:11,13
82:18 84:21,23
87:2,16,22 111:12
122:8 128:7,13
131:15,16,22
134:21 166:20
169:24 176:6,18
177:22
**devastating** 100:25
**developed** 67:4
177:16
**developing** 53:9
**devil** 102:8
**devil's** 156:23
**dichotomy** 61:23
**didactic** 72:8
**difference** 52:7,7,8
116:4,5 154:4
**differences** 50:9
100:3 151:23,23
**different** 30:25

37:5 58:2,3 95:23
96:5 100:4 110:12
123:9,19 124:3
132:23 135:24
145:4 147:23
152:21 153:2
159:20,25 164:19
167:23 169:1
171:19
**differently** 110:15
143:16
**difficult** 30:1 69:21
155:16,20
**difficulty** 146:14
146:16
**diligence** 40:9
**DINE** 7:23
**direct** 125:14
**directed** 133:7
**direction** 22:10
**directly** 80:4
153:19 159:9
161:5
**disagree** 103:19
104:7
**disagrees** 164:9
**disconnect** 143:18
150:6,7
**disconnects** 144:15
**discreetly** 79:5
**discrete** 70:3,7,22
71:7 72:11
**discuss** 20:10
141:12
**discussed** 74:1
140:17 142:3
157:16,17
**discussing** 16:3
**discussion** 90:15
**discussions** 44:10
**disguised** 92:2
**disk** 189:18
**dispute** 39:22
59:10,11 112:23
**disputed** 35:3
36:18 42:14,15
**disputes** 152:4

**disruption** 45:4,8
**disruptions** 94:4
**distinct** 17:25
79:20 142:5 171:7
171:9
**distinction** 52:4,8
83:7 152:12,14
178:2
**distinctions** 47:2
**distress** 129:8
**distribute** 16:24
**DISTRICT** 1:3
**docket** 19:23 107:9
**docketed** 34:8,15
**document** 14:2,5
14:25 17:16 30:13
31:5 37:23 43:6
54:3,4,21 62:7
64:5 71:6,7 79:9
80:24 81:2 83:1
88:9 89:23 90:18
103:22 107:2
121:20 131:14
141:16 143:13,22
144:24 147:11
150:12 153:1
169:14 170:11
171:8,12 179:23
186:18
**documentation**
18:12 35:13 36:1
37:24 38:1,2
**documents** 13:8,18
13:22,24 22:3
24:13,14 53:2,7,9
53:20 54:1,1,11
54:14 57:13 75:6
75:6,7,18,25 85:2
85:3 90:23 91:1,4
91:5,7 141:6,7,8
151:15 152:22
153:2 169:7
**DODGE** 6:19
**doing** 24:23 36:19
51:11,12 53:12,19
63:23 70:5 75:7
76:22 98:16

143:15 144:1,6
146:24 150:16
153:10 159:7,23
**dollar** 133:17
165:12 182:20
**dollars** 40:21,24
41:1,5,8 42:14
49:12,13 69:13
94:16,21 114:5
133:13,18 137:12
138:8 154:22
156:7 158:13,15
**door** 17:17
**Dorsey** 3:13 7:2
21:21
**doubt** 185:4
**DOUGLAS** 8:9
**draft** 75:7 90:5
169:20
**drafted** 89:21
90:19 120:8
169:12
**drafting** 75:5 131:2
169:19
**drafts** 23:2 50:5
**draw** 122:23
**drawn** 42:4
**DREBSKY** 11:15
**DUANE** 11:17
**due** 32:25 40:9 48:8
74:11,22 116:3
160:25 164:6
**Duke** 25:11 157:25
158:2 166:4
**duties** 156:18
**D.C** 6:5

───────────

**E**

**E** 1:22,22 3:2,2
13:1,1 38:7 191:2
**earlier** 38:12 61:7
78:1 165:23 168:6
**early** 20:20 24:6
47:18,20,23 48:7
155:2,8 175:16
**ease** 78:22
**easier** 103:11

**easily** 50:21 80:11
  80:11 83:19 85:2
  91:2 131:13
**East** 9:12
**easy** 70:18 79:9
  80:5 107:15
**echo** 95:15 177:1
**echoed** 49:25
**economic** 26:12
  38:3 41:24 42:13
  43:18,20 83:10
  84:8 96:16 104:3
  116:15,23 125:1
  125:13,23 139:22
  142:14 161:2
  163:3 177:14
  182:2
**economically** 72:20
  78:10 96:20 110:7
  110:14,21,23
  111:8,15,23
  125:11 126:7
  130:6 132:8 153:4
  153:7 172:11
  181:21
**economics** 89:5,6
  129:3
**editing** 16:7
**EDP** 88:4,12,14,22
  88:24 89:2,21
  90:7,8,11
**EDPs** 89:15,18
  103:23 104:2
**educating** 47:1
**EDWARDS** 6:19
**effect** 30:25 35:15
  67:2 76:7 100:17
  100:25 127:4
  156:15 175:23
  180:7
**effected** 179:4
**effective** 93:12
  143:9 146:19
**effectively** 45:8
  60:24 168:24
**effects** 180:11
  183:16

**efficiently** 183:15
**effort** 58:19 123:3
**eight** 44:21
**eighty** 154:9
**eighty/twenty**
  154:23
**either** 20:15 23:17
  29:23 32:2 40:12
  64:9 75:15 83:9
  106:16 116:16,20
  120:18 132:16
  139:10,10 150:25
  180:2 184:24
**either/or** 132:17
**electronic** 160:18
  191:5
**elements** 97:15
**elicited** 155:1
**eliminate** 14:10
  84:18 109:1
  119:24
**eliminated** 38:16
  122:19
**eliminating** 100:15
**elimination** 26:13
**embedded** 38:14
  171:5
**emblematic** 177:3
**embraces** 168:6
**EMC** 5:20 6:3 16:2
  17:15 25:17,19,22
  26:13 27:4,4,15
  28:5,13,18 33:14
  33:15 34:2,3,4,5
  37:1 39:7 107:2
  123:10
**EMC's** 27:24 61:14
  129:18
**emerge** 53:9 71:13
**emerged** 53:21
  71:12
**emerges** 54:15
  71:14 72:9
**emphasis** 52:10
**emphasize** 166:25
**emphasized** 39:16
  44:23 45:3,10

**employed** 93:9
**employees** 41:12
  44:22,25 93:5,12
**empty** 170:1
**EMS** 34:1
**enable** 55:24
  183:21
**encourage** 89:10
**Encumbrances** 2:6
  2:14
**endeavor** 189:25
**endorses** 168:6
**ends** 88:24 130:19
**enforce** 89:10
  117:9 119:18
  120:19 121:23
  147:25
**enforceable** 151:1
**enforced** 120:3
  177:22 179:24
**enforces** 116:11
**engaging** 71:9
**enhance** 89:11
**enhancement**
  81:24 82:14,18,20
  83:15,25 84:7,13
  86:12 89:4 91:11
  92:19 128:18
  172:10,15 177:2
**enhancements**
  81:23 96:24
**enhancer** 141:24
  178:22 179:17
**enhances** 183:10
**enjoinder** 136:10
**enjoined** 95:21
**ensure** 96:25
**ensuring** 94:12
**entangled** 72:1
**enter** 28:9,12 96:12
  96:12,17 123:7
  125:16 135:20
  146:2,11
**entered** 98:6,22
  122:3 123:12
  162:7
**entering** 100:14

**enters** 151:7
**entire** 27:24 44:15
  52:17 57:9 104:8
  142:10
**entirely** 49:14 81:4
  172:8 180:7 181:7
**entirety** 101:4
**entities** 18:11 26:11
  27:3 28:7 44:20
  45:24 46:5 58:14
  97:22 162:1 173:5
  173:16
**entitled** 97:12,17
  186:7,12,16
**entity** 26:9 40:14
  40:16,17 41:17
  43:9,17 53:4,4
  54:6,19,19 71:1
  92:11,14 93:6,7
  93:12,17,18 95:3
  126:20 129:15
  130:4 131:25
  157:13 173:9
  178:21 183:20
**entity's** 93:3
**entries** 57:9
**entry** 28:3 33:1
  44:5 45:6 76:24
  94:2
**enumeration**
  170:10,10,11
**environment** 51:9
**EPD** 59:11 69:13
  74:20 88:2 125:25
  126:1 127:7 129:1
  130:1,8,9 131:23
  138:10,13
**EPDs** 44:14 81:22
  114:19 127:10,11
**Eric** 7:8 21:20
**ERLICH** 4:19
**escalates** 40:23,25
**escalators** 41:2
**escrow** 44:3
**especially** 79:23
  160:1
**ESQ** 3:10,11,13,14

3:21,22 4:9,16,17
  4:18,19 5:8,15,16
  5:17,24,25 6:7,16
  6:17,25 7:8,22,23
  8:8,9,18 9:8,15,23
  9:24 10:7,14,22
  10:23 11:8,15,23
  12:8,15,22
**essence** 69:20 77:1
**essentially** 29:25
  49:16 59:2
**establish** 44:3
  59:21 60:21
**established** 45:23
  57:7 80:12 138:25
**estate** 10:18 19:20
  19:22 24:19,20
  25:2,14 26:9,12
  42:12 59:25 61:17
  67:24,25 72:3
  73:8,12,25 97:22
  98:18 99:3,4
  100:16 101:17
  102:2 105:22
  134:1 136:7
  145:22 146:3
  151:8 164:15
  181:16 182:15
  186:1
**estates** 41:20 168:7
**estate's** 28:1 42:4
  43:10 71:18
**estimate** 133:16
**estimating** 41:7
**et** 117:13
**evaluate** 172:23
**evaluated** 92:12
**evaluating** 83:10
  181:24
**evening** 136:3
  140:7 155:25
**event** 47:17 74:14
  90:6,8 91:10
  113:5 114:20
  132:15 149:3
  161:16 175:10
**events** 112:19

113:6 181:16
**everybody** 37:14
  56:15 61:1 157:2
  164:5
**everybody's** 16:9
  37:15 174:6
**evidence** 13:22
  36:11,15 56:18
  59:21 93:25
  109:14,16 117:8
  118:20 121:22,25
  122:1,3,22 124:22
  125:4 127:14
  132:5,6 139:21
  151:14 169:4,5
**evidentiary** 15:22
  15:23 66:14
**eviscerating** 98:12
  98:16
**evolution** 53:7 54:1
  167:4 169:15
**evolved** 169:7
**evolving** 53:20
**exact** 123:12
**exactly** 17:6 39:5
  42:3 51:4 64:16
  65:22 135:4 159:6
  181:8,23
**examiners** 74:20
**example** 53:5 55:16
  67:14 86:25 147:9
  148:1 159:22
  170:7 173:10
**excellent** 190:7,8
**excess** 41:4 59:9
  94:15
**exchange** 81:20
  142:14 153:8
**exchanged** 122:15
  122:18
**excise** 84:4,17
  105:7,13 177:20
  188:4
**excised** 177:19
**excited** 56:18
**excluded** 20:22,25
**exclusion** 24:5

**exclusively** 79:7
**excuse** 34:2 74:12
**excused** 34:19
**excuses** 157:11
**executed** 136:13
  137:17 174:7
**execution** 43:8
**executory** 66:9
  67:5 73:1,5,5 74:1
  74:5,10 75:2
  77:12,18 87:6,8
  112:23 139:5
  153:24 171:15
  181:12
**exercise** 39:1 79:2
  98:4
**exhausted** 74:23
**exhibit** 14:10,11
  15:1,9 31:10
  34:11 57:9 78:12
  115:4,12,18 122:2
  122:8,14,14,16
  123:6,7 127:10
  131:16,17 136:20
  136:22
**exhibits** 13:17,21
  36:7,9,10,11
  56:20
**exist** 70:14 85:23
  109:3 154:1
**existed** 126:25
  127:1
**existence** 83:3
  84:15
**existing** 93:6
**exists** 16:13 60:23
  70:15 100:6
  112:19
**expand** 68:3
**expansion** 167:25
  168:11
**expect** 52:1 63:8
**expectation** 93:4,8
**expected** 44:8
  52:20 92:25 161:8
**expects** 45:2
**expenses** 118:2

**experience** 46:14
  47:17 48:20 49:9
  49:11,11 50:5
  184:22
**experiment** 82:25
**expired** 171:15
**explain** 50:2 82:13
  115:22
**explained** 40:2,7
  47:5,14 49:8
  50:10 55:10,11,14
  74:17
**explaining** 51:7
**explains** 57:24
**explanation** 47:22
**explicit** 105:21
**exposure** 147:1
**express** 148:3
**expressed** 144:12
  144:12,13
**extensively** 49:18
**extent** 22:3 50:9
  57:24 70:2,2
  91:24 92:24,25
  138:18 139:9,15
  139:18 165:4
  167:24 180:3
  186:9,15 189:14
**extortion** 128:18
  128:20
**extortionary** 89:5
**extraordinary** 27:7
**extricate** 72:2
**eye** 53:19,20
**e-mail** 122:16
**E.C** 9:23

**F**

**f** 1:22 5:16 107:21
  107:21 170:8
  191:2
**face** 40:22
**facility** 8:8 144:12
  175:4,6,6,14
**facing** 41:18
**fact** 21:3 46:15
  48:6 51:19 52:12

52:16 60:24 70:15
  70:23 80:13 81:20
  85:6 93:10 94:1
  96:11 100:5,16
  101:18 126:13
  127:14 131:3
  141:11 144:23
  157:4 160:9
  169:13,13 170:15
  174:7,10 177:11
  183:22 186:6,14
**facto** 74:4 168:11
**factors** 100:24
**facts** 39:2 54:20
  66:2 69:3 74:8
  147:22
**factual** 52:3 91:17
  172:19
**fail** 90:21,22
  142:11,16 174:12
  181:15
**failing** 149:19
**fails** 114:5 161:17
**failure** 81:6 113:7
  113:10,12,13
  114:20 117:14
  118:3 121:5,7
  138:10 160:4
  170:4 182:12
**fair** 42:17 45:18
  146:15 155:22
  157:7 169:19
**fairly** 18:15 50:7,20
  55:15 59:14 78:2
  85:2 109:24 169:2
**fairness** 158:13
**faith** 42:18,20,24
  162:2
**fall** 58:20 160:10
  168:15,16 173:5
  177:4
**falling** 45:18
**Fallon** 8:8 144:12
**falls** 176:19
**familiar** 39:14 54:5
  129:12
**family** 174:22

**fancy** 94:7
**Fannie** 45:10,11,14
  46:5,7,12,16
  91:18 93:23,24
  94:9,9 132:11,16
  132:18,22 159:4,4
**Fannie/Freddie**
  91:25 132:12
**fantastic** 103:9
  132:4
**far** 15:19 20:12
  49:19 62:6 156:6
  157:9 168:22
**Fargo** 7:11 24:10
  24:10,13 57:21
  159:22
**fashion** 183:4
**FATELL** 4:9
**faulty** 73:24 91:12
**favor** 102:21
**favorable** 26:6 28:6
  28:9 42:12
**favorably** 93:7
**favoritist** 170:22
**February** 33:16
**federal** 10:4 25:11
  46:11 105:21
  109:21,21,22
  110:3 124:1 166:4
  167:1,6,6
**fee** 29:7 55:15,16
  55:18,22 56:5,6,6
  71:5 125:21 130:5
  130:11 153:9
  160:24,25 161:11
  161:17 162:6
  164:6,6,8,10
  165:13
**feel** 51:13
**feels** 189:22,23
**fees** 118:2 130:8
  161:6 185:22
  186:23
**felt** 127:14
**FGIC** 6:10 21:13
**field** 161:19
**fight** 147:21

**fighting** 164:12
**figure** 37:8 55:24
  120:19 121:22
  136:25 143:3,25
  144:14 149:15
  179:17
**figuring** 147:16
**file** 20:25 31:14
  35:14 145:17
  160:18
**filed** 2:7,15 15:4,7
  39:9 58:9 107:4
  129:15 136:9
  137:13 138:24
  175:13
**files** 122:7
**filing** 26:5,16,16
  45:5 105:23
**final** 35:13 36:1
  37:24 42:1 146:13
  146:18,19 147:13
  155:3,11,16,19
  160:8 162:11
  163:3 165:4,5
  169:18 185:21
  187:12
**finally** 42:2 92:7
**Finance** 156:2
**financial** 41:16
  43:24 73:13,16
  92:16,17,20,21
  93:17 94:9 95:3
  129:8 157:14,19
  168:2,10
**financially** 185:3
**financing** 25:10
  155:7 163:16
**find** 18:2 42:7
  75:18 77:17 83:17
  91:7,24 95:5
  101:3 103:14,20
  104:5 105:4,4
  108:1 109:7,8
  110:4 117:8
  118:14 121:16,17
  121:17 122:10
  124:23 125:2

**132**:8,9,15 134:9
  134:10 141:6
  144:22 155:16,21
  170:16 173:25
  177:1 184:4
**finding** 66:13 139:4
  139:12 145:20
**finds** 139:10
**fine** 15:14 22:5
  25:4 37:7,11
  103:5 121:7
  146:22 156:5
  177:21,23 189:10
**Finger** 54:5
**finish** 34:1
**firm** 12:2 53:12,14
  53:15 54:2,3,13
  54:16,16 103:5
  156:1
**first** 14:15 16:1
  29:8 34:1,17
  39:17 56:12 60:15
  60:16 69:22 75:2
  75:5 79:2,2,19
  83:18 85:23 87:22
  90:16 95:15
  102:24 103:2,10
  103:13,19 105:6
  109:18 113:5
  114:8,9 115:8
  119:21 122:3
  124:20 127:20
  130:15 131:12
  140:9 141:24
  142:19 146:1
  156:3,6 160:22
  162:9 171:22
  174:12 177:9
  185:19 189:2,18
**fit** 124:16 126:10
**fits** 141:16 182:16
**five** 95:17 107:17
  143:18
**fixed** 55:17
**flat** 56:6
**flawed** 91:20
**Fleming** 103:25

**135**:5 177:8,9
**flesh** 44:18
**flexibility** 42:6
**flip** 152:20 154:23
**Floor** 1:16 3:7 6:12
  6:22
**flow** 50:22 56:4
**flowing** 153:10
**flux** 23:3
**focus** 53:4 65:25
  95:24 109:15
  125:7 144:1
**focused** 46:20
  109:15 115:7
  122:21 127:1,3
  176:21
**focusing** 81:1 111:4
**Folger** 87:1 104:14
  104:15 177:25
**folks** 58:6,9 61:9
  73:8
**follow** 31:13
  103:11
**followed** 130:3
**following** 25:8
  41:24 53:1 82:6
  171:14 182:19
**forbidden** 84:13
**forces** 42:11
**forcing** 90:11
**foregoing** 191:5
**forfeiture** 73:18
**forget** 149:16 175:4
**form** 16:10 18:9
  19:12 20:11 28:23
  36:2 67:21 89:4
  96:7 143:15 148:1
  166:16 178:7,8,8
**formulated** 55:15
**forth** 15:15 21:25
  22:13 89:13
  142:14 153:10,21
**fortunately** 127:8
**forty** 158:13
**forty-one** 41:1,5
**forward** 16:11
  17:14,22 18:1,24

**18**:25 19:18 20:2
  21:15 29:16,23
  38:10 78:2 80:19
  92:20 109:1,2,3
  125:22 148:5
  149:2 150:9
  151:19 152:18
  155:14 156:20
  157:9 158:25
**found** 43:24 49:25
  82:12 87:1 88:11
  124:16,17,17
  125:9 165:24
  168:1,12 169:2,16
  169:18 170:21
  171:4 177:1
**foundational**
  177:12
**four** 45:18 57:2,16
  94:15 143:13
  150:11 154:22
  156:7
**fourth** 46:4 57:7
  59:13
**frame** 53:14
**framework** 111:2,6
**FRANKLIN** 7:15
**frankly** 27:11 28:6
  30:3 36:24 51:13
  81:8 91:7 128:1
  131:11 158:16
  169:24
**Freddie** 24:2,5,6
  46:6 132:17,21,23
  133:3
**FREDERICK**
  11:23
**free** 2:5,13 74:3
  151:10
**freely** 75:8
**Friday** 135:8
**FRIEDMAN** 9:15
**front** 108:18
**frustration** 144:11
  147:15
**fulfill** 82:10 145:8,9
**fulfilled** 94:25

**fulfilling** 145:9
**full** 42:12 60:10
  78:19
**fully** 39:8 45:2,15
  46:10 102:19
**fun** 185:9
**function** 90:25
  174:4,16,17
  177:17,18,21
  179:4
**functional** 44:22
  177:24
**functionally** 27:1
  181:10
**functioned** 177:23
**functions** 70:21
  173:21 174:20
  177:21
**fund** 154:22
**fundamental** 61:10
  99:5 100:5,20
  113:3 129:6,6
**fundamentally**
  72:4 73:2 167:6
**funding** 9:18 24:10
  24:10 61:15
  183:21
**funds** 32:18,23
  48:9 88:3,15,17
  88:17,20,24,25
  94:14 155:4,5
**further** 13:24
  15:21 22:10 145:6
  157:4,10 181:3
  185:8 188:9 190:5
**furthermore**
  156:18
**futile** 50:25
**future** 56:4 59:22
  60:22 67:10 92:13
  93:15,19 109:5
  133:4 146:20
  154:8,9 155:21
  184:4
**F.3d** 105:19

_____

**G**

**G** 9:8 13:1
**Gallo** 10:7 13:25
  14:1,1,20 102:23
  102:25 103:1
  104:13,17,21,23
  106:25 107:4,6,10
  107:12,16,19,25
  108:3,10,14,23,25
  109:13 112:13,16
  113:20 114:2,8
  115:15,17,20
  117:20 118:7,13
  118:22 119:12,14
  119:16 120:6,9,23
  121:10,14 135:10
  135:15,15,23,25
  140:17,23 151:12
  170:5 176:23
  186:5 187:17,18
**Gallo's** 172:21
**Gardenia** 77:12,19
  79:4,19 83:11
  91:2 110:9 124:1
  172:3,11 173:17
  173:20 174:12,19
**gather** 154:22
**Geddes** 10:16
  19:18 136:4
**gee** 149:15 153:15
**gel** 18:12
**general** 52:24
  125:6 157:11
  167:20
**generally** 90:25
**generate** 41:7
  101:21
**generated** 89:7
**generates** 184:17
**generating** 155:5
**getting** 50:4 77:4
  94:7,17 101:12
  132:2 133:6
  147:15 148:15
  156:11 180:21
  183:9
**give** 46:17 56:21
  75:21 78:21 97:24

98:3,8 102:24
  131:8,9 133:4
  148:1 150:2
  155:19 158:6
  161:4 172:20
  189:6
**given** 15:15 48:6
  50:11,11 95:2
  99:8,9 100:10,24
  116:1 124:22,22
  169:19 184:23
**gives** 73:17 173:16
**giving** 126:3
  127:24 128:2
  145:11 146:19
  188:20
**GLANTZ** 4:9
**glitch** 24:19
**global** 29:12
**glossed** 177:8
**GMAC** 9:18 23:8
  23:14
**go** 13:9 20:17 29:4
  29:16,23 31:20
  33:23 35:13 42:15
  47:24 52:6,11
  66:22 71:16 79:6
  87:25 88:12 98:14
  99:14 101:5,6
  102:23 107:21
  112:17 115:17
  127:12 129:20,22
  134:8,19 140:9
  141:11 142:17
  145:6 146:25
  148:11 150:8
  151:20 155:14
  156:22 157:8
  159:6,11 160:9
  163:3 166:12,12
  168:22 170:22
  184:15
**God** 18:24 145:12
**goes** 29:6 37:14
  83:16 87:24
  112:16 156:6,20
  157:9 159:10

171:13
**going** 15:3,24 16:1
  16:11 17:14,22
  18:1,24,25 19:18
  20:2,21 21:4,5,12
  21:15 27:4,22
  29:18 30:4 32:2,5
  33:16,24 34:14
  37:17,17 38:22,24
  39:5 42:4 52:6
  56:18 58:17 66:7
  66:11,23 69:10,11
  80:18,22 86:17
  92:20,21 93:5,5
  94:6 95:5 96:13
  97:10,24 98:10
  101:17 102:15
  104:9,18 106:11
  108:25 109:2,3
  117:4 125:22,22
  126:1 130:11
  131:6 133:21,24
  135:21 140:8,23
  142:24 143:23
  144:20 145:14
  146:8,8,20,20,21
  147:18,18,19,21
  148:5,20,23 149:1
  149:1,2,20 150:9
  150:12 151:19
  152:17 154:19
  155:3,10 158:25
  160:2,7,7 161:1,2
  161:3,4,7,8,8,10
  164:13,14,15
  166:9,19 171:25
  174:17,21 182:1
  182:17 184:24
  188:15,17
**gold** 93:22 159:4,7
**Goldman** 17:18
**good** 13:4,14 14:21
  23:7 24:17 28:20
  30:14 35:19,20
  38:4 42:18,20,24
  101:14 133:8
  136:3 140:7 150:3

153:11,11 155:25
  158:4,21 162:2
  163:17 178:1
**goodbye/hello**
  184:9
**governed** 74:5 85:8
  117:4
**government** 46:5
  165:13
**governmental** 57:4
**governs** 67:9 116:6
**grant** 28:11 48:21
  95:7
**granting** 2:6,14
  66:13
**grants** 18:8,14
**great** 30:19 103:4,6
  150:16 186:15
**greater** 67:9
  105:22,24 141:22
**GREENBERG**
  8:11
**Greenwich** 123:11
**Greer** 42:22
**grew** 54:10,11
**group** 44:24 54:13
  82:1 110:13
**groups** 42:3 44:22
**grow** 183:24 184:6
**growing** 185:6
**guarantee** 98:6,7
  161:11
**guarantees** 96:25
**Guaranty** 6:10
  17:4 25:9 62:3
  64:4
**guess** 18:2 37:16
  63:6 67:6 146:13
  160:16 164:2
  179:12,20 180:22
  181:10 186:8
  189:23
**guidance** 77:16
**guide** 58:18
**guidelines** 132:23
  142:15
**guys** 147:21

**H**

**H** 7:15
**Hahn** 3:16 28:15
  95:14
**half** 37:23 130:20
**halves** 86:9
**hand** 16:3 26:15,17
  27:9 71:17 78:11
  84:3 87:19 182:15
**handed** 60:13 62:6
**handing** 16:6
**handle** 44:13
**handling** 46:22
**hands** 27:15 32:5
  39:24 41:21,22
  52:14 75:11 80:19
  93:17
**hap** 134:23
**happen** 21:4 34:10
  96:15 98:11
  133:21,25 134:23
  161:1 165:22
  184:19 185:7
**happened** 24:8,9
  169:21
**happening** 93:24
**happens** 44:15
  47:12 87:3,23
  88:13 103:13
  112:19 134:7
  147:13 150:17
  162:13 163:17
  170:19 171:2
  183:13
**happy** 20:10
**harbor** 97:18
  100:22
**hard** 122:10
**harder** 152:25
  173:17
**harm** 182:4,13
**harmed** 150:25
**harmless** 117:13
**harms** 183:10
**hat** 69:1
**heading** 86:6

**headings** 85:10,13
85:14 86:7
**headphones** 140:4
**Health** 110:11
124:2
**healthier** 184:2
**hear** 31:17 38:22
54:23 102:22
140:3 157:22,24
157:25 158:2
182:7,8 189:9,11
**heard** 18:22 29:8
34:2 39:2 41:13
44:7,17 52:21,25
53:6,6,10,14,18
63:20 81:9,10
84:6 93:20,25
96:2 102:10,22
111:10 112:21
141:18 142:20,23
158:17 160:20
**hearing** 2:2,9 15:22
16:16,17 20:20
27:21 31:2 33:14
34:5,6 38:18
42:22 44:2 58:13
92:8 107:7 138:25
140:5 165:3 180:7
182:6 188:11,12
188:22 189:15
190:8,9
**heat** 58:12
**heavily** 90:17
**heck** 144:7
**hedging** 63:3,4
**HEIMAN** 9:8
**held** 25:21 27:13
45:22,25 46:1
88:1 124:10
**hello** 136:2
**HELOC** 20:21
21:14,16 142:5
**help** 76:20 89:21
121:9 145:12
**helpful** 132:24
139:18
**helping** 39:2

**helps** 76:22 178:3
**Hercules** 5:4
**Hessen** 3:16 28:16
95:14
**hierarchy** 58:20
**high** 53:24 166:6
**highlight** 178:3
**highlighted** 22:24
59:3 177:5
**highly** 53:23
**hired** 93:5
**hit** 166:6
**HL** 80:18
**hold** 40:15 100:13
117:12 120:8
**holders** 22:11
183:8
**holding** 40:5 129:8
**Holdings** 1:8 17:21
136:6
**holdover** 13:8
**hole** 72:21 90:10
**home** 1:8 18:21
45:23 46:4 47:5,7
50:14 51:25 52:5
52:6 54:19,25
56:5 57:3,5,11,13
57:20 60:17 75:15
75:15 92:10 93:4
93:21 95:2 126:20
126:21 127:10
128:24,24 129:1,1
130:4,25 131:1
136:17,18 137:20
137:22,25 142:8
159:3 174:1,3,22
183:11,14,14
**homeowners**
183:25 184:2,9,15
184:15,18,20,21
185:7
**Home's** 130:7,8
**HON** 1:23
**honor** 13:4,14,15
14:1,20,21,23
15:2,17,24 16:22
17:5,11 18:8,13

18:13 19:3,9,17
19:23 20:11,14,18
20:18 21:1,2,2,20
21:21 22:7 23:7
23:25 24:4,17
25:4,16,18,19,24
26:15,18,25 28:1
28:6,11,15,16,20
28:25 29:21 30:9
30:14 31:3,8,15
31:18,22 32:1,16
32:22 33:4,20
34:9,12,16,21,22
35:1,19,21 36:5
36:12,16 37:6,13
37:18,21 38:3,9
39:1,11 40:1,18
41:25 43:3 44:17
46:17 47:1,21
49:23 56:8,23
58:18 60:1,2,4,6
62:5,16 66:12
67:13 74:10 77:10
78:14,16,17 81:23
83:6 84:4,15
85:11,19 86:22
89:3 91:13 95:7
95:13,15,19 96:2
96:22 97:5,11,20
99:7,11,18,21,25
100:9 101:9,14,24
102:7,15,24,25,25
103:2,10 104:14
104:23 106:9,16
107:13,16,19
109:8,13,19,23
110:18 111:1,2,11
111:17,21 112:4,9
112:14 113:21
114:9,11 115:15
117:3 118:14,22
119:16 120:9,23
120:24 121:10,16
122:20 124:8,22
126:5 127:2,12
129:12 130:24
132:5 133:6,7

135:7,15 136:3,9
138:22 140:8,22
140:23 141:18
142:1,8,20,23
143:9,12 145:13
145:19,20 146:17
147:9 148:9,16
149:12 151:7,18
152:11 153:8
154:7,25 155:12
155:13,20,23,25
157:3,22 158:4
160:18 161:22
162:14,25 163:12
163:19,24 164:2
164:17 165:3,9,15
165:21 168:13,22
175:16 176:3
178:10 180:18,19
183:13 185:10,16
185:19 186:8,22
187:6,15,18 188:8
189:3,17 190:6,10
**honored** 63:10
**Honor's** 30:2 38:20
66:14 160:20
**hook** 74:15 130:17
**hope** 23:5 109:14
130:2
**hopefully** 16:19
56:11 92:18
103:12
**horse** 18:11 40:15
161:10
**host** 32:5
**hotly** 90:17
**hour** 100:10 157:6
181:2
**housekeeping** 13:6
**Housing** 25:10
156:2
**HSBC** 53:13 54:16
169:18
**HSPC** 169:11
**hundred** 143:22
**hundreds** 44:22
**hundredth** 156:9

**hurt** 102:5
**hybrid** 169:16
**hypothetical** 69:25
**hypothetically**
188:1
**hypotheticals**
69:21

**I**
**idea** 30:14 53:8
54:10 131:1
165:11 188:20
**identical** 83:9
90:14
**identifiable** 70:10
78:6 84:10
**identifiably** 72:14
**identification** 72:7
**identified** 15:5
59:13 60:16 63:18
63:25 64:1,12
94:5 141:6 151:24
**identifies** 58:15
60:19 62:4 87:23
178:13
**identify** 19:7 49:2
70:3,6 72:11,12
72:12 77:16,25
78:24 79:5,10,19
81:19 94:19 143:2
145:18
**identifying** 49:5
71:10 146:1
**identity** 153:18
**idle** 89:1 90:11
**ignore** 84:3 120:25
**ii** 112:17
**III** 7:15
**IL** 7:13
**illuminated** 127:18
**illuminating** 125:9
169:3
**illumination** 77:15
**illustration** 170:6,9
170:13,14
**illustrative** 22:4
99:19 118:12

119:1 120:21
**illustratively**
118:17
**imagine** 70:20
**imbedded** 68:12
83:13,13,17
**immediately** 16:16
127:5
**impact** 83:7 84:16
180:9 181:16
182:14
**impediment** 181:5
181:8
**impermissible**
86:15 124:18
172:15 177:3,6
**implicated** 68:2
**implication** 188:6
**importance** 153:19
176:25
**important** 27:21
29:20 43:22 44:1
52:11,14 77:7
81:11,12 84:24
85:2,3 90:18,20
94:21 112:10
116:8 117:23
131:2 132:1 141:3
141:3 173:23
177:15
**impose** 75:19
**improved** 45:13
**improving** 160:3
**inadvertently**
17:19
**inappropriate**
182:14
**Inaudible** 38:5
**incentive** 130:1
**inception** 101:16
**inclined** 155:13
**include** 55:5 69:16
85:12 138:12
170:8
**included** 19:19
26:5 29:13 55:17
82:19 85:15 86:12

88:19 96:9 149:25
**includes** 84:1
103:22,24 138:13
148:6 161:6
**including** 42:13
81:21 103:23
117:21,24 118:1
118:10,15,23,25
120:20 121:11,15
131:4 164:22
170:5,6,8,12
**inclusion** 21:17
29:12
**inconsistent** 52:21
63:21
**incorporate** 67:8
128:15 178:15
**incorporated**
178:16 179:8
**incorporates**
179:10
**increases** 147:1
**incremental** 41:3
**incur** 185:21
**incurable** 59:7
91:15,17,20 92:5
**incurred** 185:22
**Indelicato** 3:21
95:13,14 101:6,9
101:14,24 102:7
185:15,16,18,18
186:20
**indemnification**
64:14 79:25
111:24,25 117:11
137:5 139:16
162:23 163:2,5,9
163:12,15 181:4
188:1,7
**indemnify** 81:6
114:14 117:12
121:7 123:14
162:15
**indemnifying**
170:3
**indemnities** 64:9
64:11 123:10

**indemnity** 68:22,25
69:9 114:13,24
117:2 122:7,19
123:8,13 124:5,24
126:14,17 128:7
168:21 181:14
**independence**
72:13
**independent** 61:19
64:14 72:22 78:4
78:5 84:10
**indi** 17:3
**indicated** 15:2
41:21 81:18 95:21
96:6 97:9 99:22
**indication** 48:22
**Indicator** 24:6
**indicia** 72:13
**indiscernible** 138:2
182:23 185:17
186:17
**individual** 85:1
159:20 186:11,13
**indivisible** 142:6
**indulgence** 95:17
**industries** 53:22
**industry** 41:18
49:23 53:15,17
96:4,11 97:8
**inextricably** 90:21
145:15 171:25
**infected** 51:18
**inference** 122:23
**influence** 158:1
**inform** 189:7
**information** 16:14
29:10,15 31:13
56:9 57:16,17
60:12 76:19 77:2
173:1
**injects** 69:24 182:5
**inseverable** 111:4
**insist** 43:13
**insolvency** 73:12
73:15
**insolvent** 48:7
164:16,19

**instance** 17:3 64:4
85:23 102:1
109:25 134:13
160:22,24 161:2
173:10 176:5
188:3
**instances** 45:4
**institution** 157:14
157:19
**instructed** 26:3
**instructions** 29:22
**instrument** 73:14
**instruments** 75:8
**insurance** 46:23
70:25 71:5 140:19
140:21 141:17,18
141:19,20,21
142:9 143:6
152:15 153:6,13
153:16,22 154:2
178:15 179:24
180:12 183:5
**insure** 82:10
**insured** 94:11
**insurer** 159:12
**insurer's** 150:15
**insuring** 152:17
**intact** 93:5 104:19
**integral** 84:3
171:17
**integrate** 171:15
**integrated** 63:7
96:9 103:22
105:18 108:3
110:11 124:2,6
126:7 142:6 171:4
**integrates** 84:2
**integration** 171:19
**intend** 95:19
122:13 135:20
**intended** 76:22
91:21 170:12
**intending** 162:1
**intent** 92:25 110:15
110:16,17,20
111:7 183:23
**intention** 162:2

**intentional** 122:12
123:2
**interdependence**
177:14,24
**interdependent**
78:10 110:8,14,22
111:9,15,23
125:12
**interest** 46:22
51:16 68:8 71:18
73:11,19 96:16
107:23 115:25
129:9 136:6
141:22 146:9
177:10 181:21
182:2,22 183:3
**interested** 51:14
185:6
**interesting** 49:25
81:9 82:3 180:1
**interestingly** 43:7
53:10
**interests** 2:6,14
58:22 106:21
145:19
**interference** 98:4
**interim** 160:7
**intermediate** 119:6
**internal** 44:9 171:6
173:2
**interpret** 45:13
86:6 117:5 170:24
188:1,2,6
**interpretation**
85:10,14 117:7
118:21 168:20,23
169:3,8,10,20,22
177:13
**interpretations**
169:1
**interrelated** 110:6
110:11,22 112:8
124:3 129:2,3
132:3,9
**interrelation**
116:15,23 125:1
**interruption** 45:9

**intersection** 70:22
**interstices** 43:5
**intertwine** 172:1
**intertwined** 145:16
**inter-dependent**
153:4
**inter-relation**
139:22
**inter-relationship**
171:21
**introduced** 15:9
**introduction** 13:8
170:13
**invalidates** 74:3
**invaluable** 103:8
**investments** 98:9
**investor** 50:12,15
54:2,2 89:11
**investors** 46:1,3
51:11 54:13 75:3
80:15
**invoice** 24:21
**involve** 78:4
**involved** 28:17
50:12 80:9 101:16
101:17 102:18
105:19 174:13
**involves** 45:22
53:24 130:21
**involving** 47:4
**iota** 101:18
**ipso** 74:3 168:11
**irrational** 130:6
**issue** 13:8 14:2
21:23 22:23 23:1
30:5 33:18 37:16
39:6,9,11,19,22
48:7,13 49:22
65:21 72:4 85:17
100:21 103:13,15
103:17,18,19
104:24 109:16,16
123:25 132:12
136:11 137:14
144:18 145:7
147:16 164:10
167:2,9 178:4

180:16 181:3
182:19 185:19
186:24 187:12
**issues** 22:20 25:7
27:24 29:4 31:16
37:4 38:13,14,16
38:17,19,25 43:5
44:11 45:19 49:20
67:10,10 69:6
73:22 98:15 105:2
130:16 135:18,19
164:19 170:25
172:3 178:1
188:13
**issuing** 188:18
**item** 17:4 25:9,10
25:11 107:9
143:24,24
**items** 16:15 17:14
161:7

**J**

**J** 6:16 9:15 10:7
11:15 12:22
**JAMES** 3:12 8:2
**January** 136:12
**JEFF** 7:23
**Jennie** 46:6 189:2
**jeopardize** 133:19
**job** 39:1 103:5,7,9
178:1 183:2,11
**JOHN** 3:13 11:8
**Johnson** 4:18 55:4
55:8,8,21 74:16
75:4 125:8 126:14
127:4 132:7
172:22
**Johnson's** 125:9,12
172:23
**join** 101:1 138:22
**joined** 39:10
**JONES** 9:2,10
**JP** 11:3
**JR** 3:12
**Judge** 1:24 76:5
82:2,5
**judgment** 106:13

106:15 108:20
145:18
**jump** 81:3
**jurisdiction** 74:5

**K**

**K** 3:10 6:4
**Kathryn** 12:8
156:1
**Kaye** 5:10 28:21
102:14
**keep** 16:20 51:16
55:23,25 77:2
186:2
**keeping** 126:10
182:2
**keeps** 47:12 53:19
53:20
**kept** 69:22
**key** 51:19 52:12
109:16 116:24
119:17 131:21
160:3
**kick** 181:18
**Kim** 24:17
**KIMBERLY** 9:23
**kind** 14:24 53:4
83:3 99:16 103:10
144:15 157:16
182:7
**kinds** 48:25 52:21
75:24,25
**KISSEL** 7:17
**knew** 100:11,12
123:9
**knocked** 90:3
**know** 29:19 30:7,7
52:11 62:3 63:20
64:10 69:10 70:9
70:9 71:3 76:6,15
80:4,10 86:17
87:18 91:7 96:21
101:15 102:17,23
107:15 118:8,9,9
118:15,16 120:4
121:6,19 122:5
124:16 126:18

127:1 129:12
133:1 136:20,21
138:14 140:5
143:22 144:12,18
144:19 145:7,20
148:5,6 151:13
154:23 155:4,11
156:11,19 157:16
157:18,25 158:12
162:23 165:16
175:9 176:13
177:25 181:24,24
184:13 188:22,23
189:8 190:3,3
**knowing** 52:6
55:22 161:14
**knowledge** 141:10
**known** 156:3
**Kuney** 6:7 29:20,25
30:14 31:8,15
34:9,16,16,21

**L**

**L** 3:12 12:15
**lack** 151:13
**laid** 72:23
**Lakeside** 9:5
**land** 65:8,19
137:15 171:19,20
**LANDIS** 11:2
**lane** 169:5
**language** 20:25
21:2,8,18,24
22:18 29:11
113:10 164:4
168:11 169:16,18
177:1
**large** 50:15 58:12
59:19 80:24 92:13
92:24 93:10 162:6
**largely** 39:25 47:6
56:24
**larger** 48:11 68:6,6
68:6 77:7 173:22
**largest** 101:20
**late** 100:10 116:1
133:6 135:8 157:6

181:2
**LAURIE** 5:8
**law** 39:3 54:2,2,13
54:16,16 66:4
67:2,4,9 68:23
69:2 71:12,23
73:15 74:8 80:25
85:9,12,17,19,24
92:6 109:21,22,25
110:2,3,3 117:4,6
117:7 118:5,7,24
119:3,23 124:1
157:11 167:1,1,4
167:7,19 168:4,8
168:11 177:7
182:10 188:14,20
**laws** 46:11 76:12
76:14 77:6
**Lawson** 9:23 24:16
24:17,17
**lawsuit** 129:25
130:2 145:11
162:16
**lawsuits** 162:15
**lawyers** 143:25
144:13
**lays** 177:11
**lead** 175:7
**leading** 127:5
**leads** 169:7
**learned** 75:4 93:2
**leases** 171:15
**leave** 30:2
**leaving** 152:25
**led** 102:18
**ledger** 19:19
**leeway** 158:7
**left** 45:12 87:13
136:10 137:14
**legal** 42:1 66:1,8
90:22 91:20 92:5
103:15 109:18
111:2,5 180:8
**legion** 119:3
**legitimate** 97:4
**lend** 136:12

**lender** 159:25
    164:22 185:25
**lenders** 174:25
**lending** 25:13
    102:11
**length** 27:15 40:2
    42:18,19,23 44:21
    74:7 77:24 91:16
**Leo** 4:16 19:8
**letter** 14:6,6,7,16
    16:15 127:11,11
    127:12,13
**letters** 96:13,14,17
    184:9
**let's** 34:1 59:1,1
    67:20 68:16 70:19
    70:19,19 111:11
    111:13 113:4,4
    117:2 127:20
    129:20 135:10
    143:4 162:15
    166:12,12
**level** 54:8 61:11
    116:13 119:6
    125:20 172:4
**Lewis** 12:10 29:1
    160:17
**Leyton** 54:5,8
**LG** 76:5
**liabilities** 41:10
**license** 24:7 42:8
**licensed** 41:18
    94:10 174:8
**licenses** 46:9 94:17
    155:12 158:25
**licensure** 41:19,23
**lien** 27:17
**liens** 2:6,14 106:21
    175:21,21
**life** 183:18
**light** 54:21 132:5,6
    132:6
**lighted** 172:22
**lightly** 79:1
**likes** 128:7
**limit** 52:2 117:25
    118:1,4 148:5

**limited** 2:2,9,9
    19:19 117:21,24
    118:1,10,15,18,23
    118:25 120:20
    121:11,15 164:4
    168:9 176:1,20
**limiting** 118:12,18
    120:20
**line** 80:16 122:2,4,4
    122:5,8 143:24,24
    144:7
**lines** 42:4 122:20
    122:23 175:2
**link** 91:6 130:7
    179:5,5
**linked** 171:9
**liquidating** 39:17
    39:18
**liquidity** 54:11
    98:1,5,8
**Lisa** 191:4,12
**LISCIO** 5:16
**list** 17:19 23:11,11
    25:21 29:4 36:19
    50:15
**listed** 21:15 25:20
    63:17
**listening** 51:6
    158:8
**lists** 14:7
**litigate** 146:4
**litigation** 144:7
    145:12
**little** 13:6 19:13
    34:24 39:13 41:13
    45:8 46:25 76:3,3
    76:12 95:23 97:5
    107:20 138:4
    143:17 157:17
    168:14 173:25
**lived** 80:12 128:4
**LLC** 136:6
**LLP** 3:3,16 4:2,11
    5:2,10,19 6:2,9,19
    7:2,10,17 8:2,11
    9:2,10,17 10:2,9
    11:2,10,17 12:10

12:17
**loan** 29:7 40:12
    58:8 96:18 116:13
    120:22 159:12,23
    172:24 175:6,10
    175:11 177:22
    184:22 186:13,13
    186:16 189:1
**loans** 14:8 15:13
    34:5 35:9 36:21
    37:14 40:25 45:22
    45:25 46:1,3
    50:17 52:5 55:9
    55:17,20 57:4
    58:7 69:23 71:2
    74:17,18 80:19
    81:8 112:24
    116:20,21 117:1
    126:1 129:22
    136:16,19 137:20
    137:23,23 154:19
    158:10,11,14
    159:20 160:5
    161:21 165:8
    182:20 183:2,23
    184:11 186:11
    189:2
**location** 159:5
**lodge** 181:14
**LOEB** 12:17,17
**logic** 43:12
**long** 96:6,6 131:18
    141:21 142:14
    165:10 175:12
**look** 21:25 32:9
    49:23 53:21 54:15
    81:25 85:16 88:6
    96:10 97:2,5,11
    97:20,23 98:24
    99:3,6,13,14,18
    99:23 110:9,11,13
    111:6,11 113:4,4
    117:2 121:3,21,25
    122:7,14 123:5,24
    125:21,21,23,25
    126:2 131:16,16
    142:9,10 143:19

143:25 147:19
    155:3,10,15
    163:20 165:15
    169:4 172:3
    177:10 179:6
    184:2
**looked** 30:20 97:10
    97:24 99:11 110:1
    124:15
**looking** 49:14
    54:13 61:23 74:25
    93:13 95:23 96:23
    96:24 97:7 100:6
    100:7 115:4 126:6
    126:6 169:15
    179:5
**looks** 174:15
**Lopez** 7:8 21:20
**lose** 130:10
**Losing** 35:20
**loss** 91:18 171:10
**losses** 71:1 117:13
**lost** 116:5
**lot** 38:13,13 52:10
    56:16 95:19,20
    96:4 114:25,25
    115:1 125:4
    126:19 143:17
    144:7,11,13
    152:25 159:22
    164:19,19
**lots** 119:2 128:9
**Love** 44:7,17,20
    45:16,21 46:8,25
    47:13,16 49:1
    53:11 74:13 75:4
    133:14
**Love's** 48:1 49:25
    57:1
**low** 44:23
**lower** 124:9
**low-end** 133:15
**luck** 150:3
**Lynch** 12:18 14:23
    15:7,10 25:12
    158:2 165:21
**Lynch's** 15:20

**M**

**M** 5:17 10:23
**MA** 10:5
**Mac** 24:2,5,6 46:6
    132:12,17
**Madison** 3:18
    11:12
**Mae** 45:10,12,14
    46:5,6,7,12,16
    91:18 93:23,24
    94:9,9 132:17
    159:4,4 189:2
**Mae/Freddie**
    132:12
**magnitude** 46:17
**mail** 24:22
**main** 29:4 103:18
**major** 38:25 59:3
**making** 56:2 76:12
    92:22 134:16
    159:5 182:4
    186:14
**managed** 38:12
    183:16
**management** 93:7
    93:11,13 154:17
    154:20
**Manhattan** 4:4
    6:11
**manner** 73:24
    159:18
**MARGARET** 3:14
**margins** 50:9 172:8
**MARGOT** 4:19
**Mark** 3:21,22 5:16
    28:15 95:13
    185:18
**marked** 14:5
**market** 1:15 4:5
    5:5 6:13,21 7:4
    9:19 11:4,19
    12:12 50:3 52:24
    53:9 76:23 130:22
**marketable** 53:23
**marketplace** 50:19
    52:22

**marketplaces**
53:22
**master** 97:12
137:15
**match** 60:14 69:24
**material** 39:14
92:4 104:3 172:11
**math** 156:8
**matter** 1:6 67:15
68:23 69:2 84:8
92:5 111:1 118:24
145:21 188:17
191:7
**matters** 24:2 29:6
100:5 110:2
**maximize** 71:18
**maximizing** 54:11
168:8
**maximum** 102:4
**ma'am** 158:3
**McCutchen** 10:2,9
103:1
**mean** 27:1 32:15
51:22,23 64:19
65:5 67:16,24
76:8 81:5,9,16
108:21 110:17
111:5 117:19
120:14,17 121:10
121:12,17,24
140:11 145:6
149:11 150:3
152:20 153:5
156:23 161:20
162:3 163:9
178:20 180:18
189:22
**meaning** 120:15
133:1,2
**meaningful** 54:8
75:19
**meaningless** 85:7
120:22
**means** 67:12
118:19
**meant** 65:22
106:23 121:22

125:6 127:25
154:20
**mechanism** 42:7
153:20
**meet** 132:16 133:17
**meeting** 93:22
**member** 46:10
161:15,15,17,20
161:25 162:11,19
163:4,17 165:5,14
**members** 162:14
162:14 163:25
175:8
**membership** 162:1
**memo** 72:24
**memorandum** 74:7
77:24
**mentioned** 168:5
**mentions** 141:2
**merely** 82:11 139:6
**merger** 136:6
**merit** 130:14
**Merrill** 12:18
14:23 15:7,10,20
25:12 158:2
165:21
**MERS** 12:11 25:13
29:1,3,5,7,8,15
30:5 31:23,23
32:1,3,6 46:10
158:2 160:17
161:14,15,17,20
161:25 162:11,12
162:14,15,16,19
162:20,20 163:4
163:17,22,25
165:5,6,14 180:16
180:17,18 181:4
181:13,18 182:4
182:10,11,14
185:19 186:23
**messes** 163:4
**met** 99:22 100:24
**MI** 159:11
**microphone** 19:6
**middle** 142:2
**midstream** 169:20

**mild** 59:18
**mill** 76:4,6
**million** 40:21 41:8
69:13 94:21
133:13,15,15,16
138:8 156:7 175:5
**mind** 51:10 53:21
85:3 111:2,11
159:2 177:15
182:4
**minds** 92:9
**mine** 122:2
**minimal** 49:11
**minimum** 71:21,22
**minor** 18:6 73:20
**minute** 17:11 56:8
65:10 66:1 78:11
82:21,23 86:8
163:21
**minutes** 30:11
158:5
**miscommunicati...**
184:19
**mistake** 86:22
119:11,25 120:10
**mistakes** 119:2,4,9
119:17,22
**ML** 140:9
**MLPAs** 55:10
**MLPSA** 13:16,18
13:22 51:9 52:18
61:20,24 62:1,20
62:25 64:17 65:17
69:22 70:20,21
78:13,22,23 79:6
79:21 80:18 85:8
87:22 89:14 90:24
127:21 137:2
173:8
**MLPSAs** 51:1
53:13 55:10 61:18
67:13 74:5,10
107:14 125:6
**MLSAs** 63:6
**MLSP** 96:14
**modest** 49:16,17
**modification** 73:18

**modifications**
131:20 159:23
**modified** 113:22
**modify** 177:11
**moment** 15:24
17:15 44:6 50:15
54:22 60:13 70:20
81:25
**moments** 16:24
**Monday** 189:8
190:4
**Monday's** 20:20
**monetary** 106:12
106:15 108:11,12
108:20
**money** 68:1,5 90:11
90:12 91:22
101:19 102:11
107:22 108:18
129:14 142:16
146:10 155:4
157:1 161:3,4,4,7
162:8 164:7
**monitoring** 93:23
**monkey** 29:2
**Monroe** 7:12
**month** 46:21 116:1
116:2 169:12,18
**monthly** 115:21,24
116:4
**months** 41:19,20
148:10
**moot** 16:11 17:19
18:25 19:10 20:5
20:9 21:13,16
22:12 23:11,18
165:15
**Morgan** 3:10 10:17
11:3 12:10 17:20
25:12 29:1 61:14
61:18 136:5,6,9
136:15 137:8,10
139:3,15,24
160:17
**morning** 35:6,19
**Morris** 6:9 8:2
11:17 14:22 21:11

62:11 140:7
**mortgage** 1:8 2:4
2:12 8:12 9:3,11
10:17 16:2 17:15
17:20 18:21 23:8
23:14 25:13 39:7
40:4,22 44:19
45:22,24 47:6,7
47:10,11 50:17,23
51:25 52:5,6
55:17 57:3,13,20
75:15 81:8 92:10
93:4,21 98:2
100:4 136:5,7,12
136:16,17,18
137:20,21,22,25
160:18 165:13
183:7,14
**mortgagee** 162:12
162:17 165:6
**mortgages** 27:19
40:5 46:21,23
47:4,8,9 50:6,7,14
50:18,19 55:23,25
56:7 58:7 75:9,10
75:11,18 98:5
100:1 161:1,12
162:13
**mortgage-backed**
50:23
**mortgagor** 47:16
**mortgagors** 182:19
182:22,25 183:8
**mosaic** 48:11
**motion** 2:2,10 18:8
18:10,14 26:16,19
28:12,19,24 30:22
31:2,13 35:14
36:2 66:13 82:7
95:8 102:22
181:25 182:8
**motives** 92:25
**move** 18:24 24:10
52:23 129:5,10
181:12
**moved** 15:15 18:23
**moves** 168:9,9

moving 38:10

**N**

N 3:2 8:9 13:1
    191:2
name 23:21 191:13
names 14:8
National 17:24
    33:16
naturally 162:16
nature 39:21 48:1
    59:18 61:4 78:5
    91:5,11 92:1
    98:25 99:8,9,23
    100:7 139:6 174:5
near 94:19
necessarily 22:16
    110:6,22 133:10
necessary 30:23
    46:9 59:21 75:25
    85:20,20 94:11,17
    156:10,11 183:21
    187:21
need 19:6,15 29:11
    34:7 39:23 41:20
    41:23 42:5 49:6
    50:2 63:10 76:10
    82:21 94:18 98:13
    99:4 105:5 106:3
    109:18 112:1,2,3
    120:10 121:8
    127:7 128:17
    130:15 138:5
    158:1 176:24
    188:4,4 189:9,21
    189:22,24
needed 42:9 52:14
Needless 187:7
needs 22:16 29:15
    31:6 46:9 72:25
    94:13 116:3,4
    130:15 142:9
    160:1
negotiated 25:21
    27:15 40:8 76:24
    77:9 82:20 90:17
    111:24 123:1

127:21,23 128:4
negotiating 18:17
    42:3 52:4,19
negotiations 27:20
    28:17 42:17,24
    54:18 158:1
neither 139:23
    163:24
Nemours 8:13
neutral 183:10
never 30:10 47:17
    48:16,16 51:20
    68:2 127:1,3,7
    128:14 174:20
nevertheless 28:5
    128:2 176:19
new 3:19 4:12,14
    5:13,22 7:20 9:13
    10:12 11:13 12:20
    17:24 19:8 24:14
    67:8 80:19 83:21
    85:8,12 92:22
    94:7 110:14,16
    117:4,6,7 118:5,7
    119:3,23 120:25
    127:13 129:12,13
    132:21 147:21
    184:9,12 185:1
news 149:10,10
Nichols 6:9 14:22
    21:11 62:11 140:8
ninety 40:21,24
ninety-two 41:1,6
NIXON 11:10
noise 140:3,5
nominal 162:17
non 73:14 77:19
    157:22 169:8
noncontroversial
    74:7
nonexecutory 66:9
    73:2 77:15 105:5
nonperformance
    74:12,14
nonsecuritizing
    58:5
nonsens 121:2

nonsensical 119:13
    120:3,7,11,13,16
    120:24 121:24
non-auction 40:13
non-executory
    139:5,10
non-365 87:1
normal 96:11
    148:10
normally 163:14
north 1:15 5:5 6:13
    6:21 7:4 8:14 9:4
    11:19 20:6 157:25
    175:5
note 21:13,23 36:6
    44:1 67:22,23
    68:21,24 139:15
    160:11
noted 145:14
noteholder 159:11
    162:24
noteholders 159:18
    160:4 162:16
notes 49:14 159:8
notice 15:4 20:24
    27:10 35:15
    166:22
noticed 27:10
notices 15:3 44:11
    73:23 184:14
notion 52:10 55:6
    131:10 168:9
notwithstanding
    62:19 73:12,13
    81:5 144:23
NTC 11:11
nuance 26:4 37:10
    160:24
nuances 53:5
number 17:2,4
    19:23 25:12,12,13
    25:13,14 33:8
    38:16,17 40:8
    46:20 57:19,25
    63:6 115:12
    136:20,22 151:6
    186:4

numbered 57:12
numbers 49:15
numerous 50:12,13
    50:13 85:4
ny 3:19 4:14 5:13
    5:22 7:20 9:13
    10:12 11:13 12:20
    113:13
N.A 2:10,15 5:3,11
    7:11,18
N.W 6:4
N.Y 119:7

**O**

O 1:22 13:1 191:2
obey 32:3,8
object 29:14
objected 18:17
objecting 111:3
    142:3
objection 2:2,9,9
    13:20 14:17,18
    15:6,21 17:18,20
    17:21,24,25 18:1
    18:21 19:20 20:19
    20:19 22:19 24:3
    24:21,25 25:22
    26:14 27:5 29:3,6
    29:9,14,24 34:3
    35:17 36:5 37:4
    37:18 59:13,14,19
    136:9 137:13
    148:19 151:11
    160:19,22 182:16
objections 16:5,18
    16:20 18:5,9,12
    22:9 25:8 29:4
    38:13,15,21 39:7
    57:14,24 58:1,9
    59:1,2,3,18,19,23
    60:9,11,14,19,20
    60:21 61:7,8,22
    61:25 73:21
    138:22,24 189:3,4
objective 97:4,4
objector 25:19
    61:25

objectors 16:10
    18:4 38:14 52:13
    58:10,20 59:20
    102:22 157:24
    158:14 166:5
    175:8
obligated 71:4
    76:18 110:12,25
    112:1 114:1,15
    121:21 124:4
    127:15 130:18
    162:15 163:16
    187:23
obligates 114:2,10
    114:17 162:4
obligation 47:20
    68:22,24 69:9
    70:24 71:3 75:21
    76:18,23,24 81:7
    114:5 116:20,22
    118:11 120:21
    121:6 130:8 145:8
    153:22 162:8
    163:10,12 164:12
    164:14 168:21
    186:6,25 187:3
obligations 44:13
    47:25 48:3,4 51:2
    51:9,18 55:2,7
    60:25 61:9 62:21
    64:11,13,15 65:13
    65:14 69:17 70:24
    74:16 75:14,19
    78:8 82:11,12,16
    89:8 103:24 104:6
    104:9,19 106:18
    109:5 110:6,10,12
    110:25 111:8,14
    111:22 112:7
    116:12,14,17,25
    117:15 118:2,4,9
    123:8 124:2,24
    126:23 128:8,11
    128:12 129:24
    137:10 138:1,6
    139:13 142:25
    143:7,14 145:16

148:21 149:23,24
149:25 150:18
151:19 153:12
158:23 170:4
175:25 176:1
179:23,24
**obtain** 26:7 35:25
41:23 55:22 66:17
75:9 81:15
**obtaining** 26:7
**obvious** 73:6
166:21 174:14
**obviously** 21:25
26:12 27:5 30:8
44:14 92:21
102:16 103:18
121:13 130:2
173:2 180:19
182:21 187:7
**occasioned** 74:14
**occur** 162:11 163:9
165:6
**occurs** 55:10,11
119:11 166:10
**October** 1:19 107:8
191:9
**odd** 51:15 88:9
**offer** 58:18
**offered** 123:1 141:4
**offering** 48:21
**office** 13:9 42:22
**official** 2:7 3:17 4:3
191:5
**oh** 9:6 17:9 20:1
35:19 38:2 132:1
154:21 180:17
189:4
**okay** 13:13 15:18
20:18 21:19 22:17
22:22 31:15 37:7
37:15 38:8 62:15
63:24 65:23 80:2
85:21 86:1 87:20
95:11 99:3 104:16
107:11 115:19
121:6 135:23
136:25 137:1

138:21 139:8
140:4,5 147:12
151:21 154:3,6
157:8,8 158:8,19
161:23 165:19,20
167:22 186:19
**omnibus** 188:24
**once** 18:12 32:1
47:12 56:4 74:18
74:22 89:16 112:2
112:2 177:15
**ones** 59:4 75:22
91:12
**ongoing** 130:3
**onward** 129:20
**on-site** 45:14
**open** 21:23
**operate** 93:16
183:18
**operating** 45:7
93:16 175:14
183:15,15,15,17
184:5
**operation** 41:10
45:1
**operational** 60:17
**operationally**
93:22
**operations** 45:15
51:5
**operative** 50:8
141:6
**opinion** 54:6,7,8
82:6 127:24 128:1
128:3
**opportunities**
184:20,21
**opportunity** 28:22
47:22 81:14 95:15
135:9 183:19
184:19
**opposed** 62:1,20
120:20 126:3
**opposing** 66:6
121:18
**opposite** 158:16
**optimism** 136:1

**optimist** 101:25
**optimistic** 102:1
**option** 73:18 76:11
**oral** 28:12,19,24
30:22 188:20
189:6
**Orange** 8:14
**order** 2:2,11 14:12
16:14 17:16 18:10
18:13 19:12 20:12
21:1,24 22:20
23:1 24:20 25:7
25:18 26:16,25
28:3,9,12,23
29:12,13 30:20,21
30:21,23,24 31:10
31:17 32:2,3,15
33:1 34:4,6 36:2,8
36:10,20 42:7,9
44:5 63:10 66:12
77:3 102:23
104:25 106:6,19
106:20 135:19,20
135:22 143:15
146:2,11 147:5,11
147:14,23 148:1,9
148:14,17,18
151:7 157:5
160:23 162:6,7
164:4 165:2
175:23
**ordinary** 35:12
**organize** 56:10
**organized** 16:14
**original** 87:12
160:8 169:16
**originally** 23:10
**originated** 47:9
57:3
**origination** 138:17
138:19,20 177:23
**ought** 34:23 90:25
**outcome** 28:6
66:16,17 83:8
**outline** 103:10
**outset** 22:25 143:1
169:6 170:22

**outside** 125:5
127:16
**outstanding** 61:22
61:24 88:2,14,22
88:23
**outweighs** 182:3
**overcome** 106:5,7
**overlap** 70:22
**overrule** 30:7
**oversee** 77:5
**overt** 167:5
**overwhelmingly**
158:10,17
**owed** 75:14 113:11
113:12 162:6
**owing** 48:8
**owned** 24:13
**owners** 159:8
160:11
**owns** 47:8,10 71:19
159:20

---

## P

**P** 3:2,2 10:22 13:1
**PA** 12:13
**package** 174:24
175:10,24 176:20
**packet** 78:12
**page** 14:9 17:20
24:9 32:9 37:23
57:2,10,10,12,12
58:4,11 60:15,19
61:6 79:2,4 88:7
112:12,12,13,14
112:16 115:4
117:3 131:14
142:1,3 171:1
**pages** 14:10,11,12
14:15 27:1 57:15
57:16 131:18,19
**paid** 24:22,24
31:24 32:1,4
42:12 47:14,15,19
81:22 84:10 86:11
88:5 102:1 161:12
164:10 180:21
**pain** 42:25

**painful** 42:24
**PALMER** 6:19
**pants** 76:12
**paper** 34:11
**papers** 15:15 38:19
38:23 95:20
**paragraph** 32:9
78:18 90:16
106:20 186:8,9
**paragraphs** 79:4,7
79:8,9
**paramount** 153:19
**Park** 5:12 7:19
10:11 12:19
**parlance** 178:14
**parol** 117:8 118:20
121:21,25 122:1
122:11
**parole** 169:5
**parse** 78:22 79:9
145:16
**part** 14:12,13 22:3
22:15 26:8 27:23
31:24 48:11 49:9
67:24 68:6 71:17
75:20 77:1,13
78:2 80:6,23,24
82:22 92:13 93:10
96:12 97:17 99:22
106:12 108:6,19
134:7 138:16
139:7,24 148:8
162:6 163:11,23
170:9 173:22
175:24 176:10,11
**participant** 27:20
42:18
**participate** 161:19
189:10
**participated** 40:9
49:18
**particular** 16:1
27:24 29:9 48:13
53:5,17 55:18
77:1 81:19 85:8
109:25 110:5
130:6 142:22

170:2 171:8 180:9
181:16
**particularly** 39:20
48:5,19 77:8
135:8 174:14
**parties** 18:16,23
28:13 35:12 37:13
39:9,11 40:9,10
44:10 48:12 50:4
50:13 51:8 52:4
52:11,23 56:10
57:14,18,25 58:2
59:4 60:15,21
66:15 67:3 72:12
73:22 74:2 75:4,5
76:11,15,25 77:3
77:9 78:3,8 79:3
80:9 81:16,17
92:14 95:9 96:25
98:3,11 100:18
106:21,22 110:7
110:12,16,17,17
110:23,24 111:3,7
111:15,23 112:1
117:6 120:1
121:22 122:12,15
122:18,21 124:3,4
124:12 127:15
128:8,12,14,20
142:3 147:12,12
148:2,7 152:9
159:20 172:6
173:21 174:13,19
179:3,23,25 187:8
**partly** 55:13
**partner** 127:6
**parts** 72:22 77:23
78:1,4,7,9 85:11
97:18 160:22
172:1 174:11
**party** 39:8 46:1
57:6 58:5,5,11,14
61:13,23,25 68:22
72:16,17 87:3
100:3 110:10
111:20 123:1
128:10,15,16

130:16,18,21
141:22 142:7,8
143:11 147:11
148:4 152:16,16
162:19 174:2,18
177:15 178:13,14
178:25 180:4
187:23
**party's** 57:8 147:13
**pass** 16:9 47:21
**passage** 82:6
**patently** 174:14
**pathway** 66:24
**patience** 13:5 34:18
38:12 95:16 103:3
**pattern** 54:15,16
54:17
**Patton** 3:12 13:4,11
14:18 15:16,17,19
15:24 16:22 17:2
17:5,11 19:3,9,15
20:14,17,20 24:25
25:1,4,16,25 26:1
26:3,22,25 30:22
31:3,19,21 32:7
32:11,13,15,20
33:4,7,10,13,22
33:24 34:12,22
37:1 38:9 48:10
48:21 51:21 52:9
56:16,19,23 60:4
60:6 61:16,20
62:2,13,16 63:2
63:20,23,25 64:7
64:9,16,19,23
65:1,5,11,16,18
65:22,24 66:21,23
67:19 68:17,20
69:1,7,18 70:13
70:16,18 76:8,10
76:21 78:16 79:14
79:16,18,23 80:1
80:3,7 85:18,22
86:2,17,19,22
87:21 89:23,25
90:3,6 96:24
98:15 99:21 101:2

104:7 108:16
111:21 115:7,13
117:21 126:12
128:18 131:7
141:1 145:14
153:15 154:8
166:5,7,11,15,18
167:10,13,16,18
167:23 173:7,12
173:15,20 174:10
175:1,4,19 176:3
176:7,11,15,17
178:20,23 179:9
179:15,19,22
180:14,17,25
181:6,23 182:25
185:8,9,14 187:19
188:25 189:2,5,17
190:6,10
**Patton's** 28:19
111:16 115:5
127:2
**Paula** 158:8
**PAULINE** 3:10
**pause** 17:1,8,10
26:23 73:19 82:21
**pay** 47:20 48:9
68:25 69:12 88:12
88:15 90:11 114:5
114:14 130:1
143:23 159:13
161:17 162:8
164:6,7
**payable** 67:23
160:25
**paying** 125:25
164:12
**payment** 29:6
32:19,24 47:18,20
47:23 48:7,8
68:24 108:21,22
108:23,24 113:8
113:14,21,22,25
114:3,11 116:2
127:10 158:22
161:5
**payments** 31:23,24

32:1,4,6 46:21,23
88:18,18,19
113:17,18 114:1
114:18,19,20
116:6,10,11,12,25
128:25 130:9,10
134:18 138:10,16
138:17 183:4,5
**pays** 32:6 47:16
116:17 185:22
**PEABODY** 11:10
**pending** 16:11
17:23 20:13 26:18
30:5
**people** 16:25 48:15
52:1 102:12 107:3
118:21 125:7
140:9 144:1
153:15 154:18
158:9,16 161:24
164:20 189:8
**percent** 40:22
92:10,11 93:18
154:10,10 156:9
**percentage** 31:7
47:15
**perfect** 75:13 86:24
169:25 171:22
**perfection** 94:23
95:2,4
**perfectly** 69:25
71:21 177:20
**perform** 32:3 81:7
117:15 118:3
121:5,8 134:21
142:11 149:1,16
149:16,18,24
150:9,12,20,21
157:14 158:21
159:18 170:4
180:3,6
**performance** 59:22
60:22 74:11,12,22
89:11 91:23,25
92:2,13,14 93:15
93:19 133:5
152:17 154:8,9

155:21 157:12,12
180:11
**performed** 75:11
174:3,4,17,22
**performing** 52:15
68:5 74:16 75:22
142:25 174:20
**performs** 89:10
**period** 22:22
144:21 160:8
**permission** 131:6,9
166:23
**permits** 155:11
**permitted** 88:3
89:15 186:10
**person** 50:5 122:25
140:10
**personal** 70:10
141:10
**personnel** 155:9
**perspective** 97:2
99:4 150:15
153:25 185:24
**pertains** 15:10
**petition** 150:21
163:13
**Philadelphia** 12:13
**Phillips** 76:5
**philosophies**
159:21
**phone** 14:25
189:10
**phrase** 118:25
**pick** 168:23
**picked** 130:24
**picking** 78:23
152:24
**picture** 53:2,21
**piece** 34:11 70:10
**pieces** 29:10 30:25
97:16
**piling** 51:1
**PILLSBURY** 4:11
**PITTMAN** 4:11
**place** 43:16 69:22
72:11 154:18,20
154:21 155:7

167:2 176:14
178:15 183:4,5
**placed** 17:19 52:10
**places** 38:23 39:4
85:5 122:10
**plain** 113:9 117:25
**platform** 40:3,20
43:15,16 44:19
154:21
**platforms** 184:12
**play** 18:3,16 25:9
156:23 167:21
**Plaza** 5:4 7:19
**pleadings** 39:4,9
**pleasant** 190:8
**please** 13:3 17:7
34:15 56:22 86:21
135:14 158:17
166:6
**pledge** 175:20
**plural** 184:10
**PM** 1:20
**PNI** 113:19 116:3
146:25 150:16
**podium** 34:25
**point** 9:4 22:1,2
26:9 27:7 28:1
38:10,21 39:12
40:23 41:6 42:7
43:10,19 44:5
45:13,21 46:7,14
47:10,24 48:18
54:25 55:3 56:25
62:2 66:15 69:4,4
69:5,15 80:9
81:13,23 82:24
83:6,11,11,12
85:7 88:8 91:17
91:19 92:9 94:3,4
95:23 100:9
101:15 104:17
107:24 112:23
120:24 121:11,12
121:14,15,24
124:8 127:2,8
130:24 134:15
139:6 144:15

154:7,16,16
156:13 157:10
164:2 166:20
169:14 175:9
178:2 179:20
186:3,3,14,23,24
187:2,7,13,18
**pointed** 117:17
119:2 134:1 179:2
185:20
**pointing** 80:23
**points** 21:22 40:24
41:1 52:12 55:19
58:2 79:2 95:25
130:13 140:25
156:5 166:6
**policies** 81:13
**policy** 51:7 168:6
**pool** 55:17 159:12
**pools** 50:18
**poor** 180:11
**popular** 59:14
**populated** 56:13
**portfolio** 25:23
27:19
**portion** 87:17,18
96:18,18 98:19
**portions** 78:24,25
**posit** 106:16 111:21
112:3 118:14,19
126:5
**position** 36:21 63:1
64:13 92:22
104:14 159:15
189:7 190:4
**positions** 121:19
**possession** 24:12
76:18
**possible** 15:5 39:24
41:22,24 42:5
51:8 52:15 79:12
79:16 81:15,16
144:22 161:20
172:8 190:1
**possibly** 55:20
156:8 185:7
**post** 176:12

**post-closing** 149:3
151:19
**post-petition**
175:21
**potential** 27:25
125:25 182:3
**potentially** 23:2
72:17 77:22 78:20
100:25
**POTTER** 5:2
**power** 3:22 28:15
28:15 129:17
177:10 180:5
**pre** 163:12
**precede** 146:6
**precisely** 124:4,5
143:2
**precondition**
153:12
**predictability**
53:25
**predictable** 50:21
**preemption** 105:21
**preference** 67:6
**preferred** 66:24
67:7
**preliminary** 65:20
111:1
**premised** 94:22
**premises** 100:20
**premium** 44:14
47:18,20,23 48:8
59:11 81:22 104:3
114:19 138:10,12
**preparation** 16:2
49:18
**prepare** 49:4
**prepared** 26:18
53:13 85:4
**present** 25:18
166:3
**presentation** 38:11
58:14 60:8
**presented** 18:13
47:22,22 109:14
**presenting** 59:21
**preserve** 42:6

76:19 98:1,5
**preserved** 108:25
134:14
**press** 37:17
**pressing** 49:22
**presumably** 134:4
134:10
**pretty** 89:16 116:8
138:23 176:16
188:21
**prevent** 51:17
86:13
**previous** 90:15,16
105:16
**previously** 105:25
**pre-petition** 35:5
73:7,23 163:14,14
175:21 176:10
**price** 26:5,6 28:5
31:7 40:23 41:6
42:16,17 55:15
76:23 81:19,20
**pricing** 55:4,11,14
79:20 130:16,17
172:22
**primarily** 46:7
134:1 183:8
**primary** 98:2
**principal** 40:25
41:2,5 46:22
115:25 129:9
**Principato** 53:18
81:11 84:6 122:24
125:8 127:19,20
127:22 128:4,6
132:7 133:1
**Principato's** 84:23
130:20
**principle** 29:10
59:5 65:20 71:14
71:16,17,18,19
72:9 171:7 183:3
**principles** 66:2
71:15 72:4 117:7
**printed** 191:13
**prior** 15:2 16:16
40:13 127:5

175:22,22
**priority** 108:21,22
108:23
**private** 45:25 46:3
57:6,8 61:13
**probably** 34:23
73:4 184:10
**problem** 30:9
31:22 33:1 41:19
67:18 68:11 72:7
89:20 129:13,16
143:8 144:9,10
160:23 161:13
162:9,10 163:11
163:19,24 164:1,9
167:5 170:7
178:11 179:1
185:11 187:15
**problems** 32:5 86:5
184:17,17
**procedural** 27:7
29:6
**procedurally**
141:25 142:19
**procedures** 30:22
30:24 34:7
**proceed** 29:19
31:11 95:8 158:18
**proceeding** 27:25
**proceedings** 25:20
27:22 39:12,16
58:10,23 60:1
103:3 170:25
175:17 190:11
191:6
**proceeds** 27:5
101:13 106:18,21
**process** 33:11 40:6
40:9,14 41:13,15
41:15 47:1 49:2
66:11 74:17 83:8
83:9 84:20 94:12
102:18 175:9
184:13,25
**processing** 46:20
**produced** 122:6
**product** 84:19

**products** 10:3,10
10:18 14:2 18:1
25:11 61:13 78:23
89:14 103:1
135:16 138:23
139:18
**professionals**
102:17
**Proffitt** 53:8,12,14
53:15 54:3,12
89:22,23 169:12
**profitably** 183:18
**prohibition** 168:3
**prohibits** 85:9,10
85:13
**promise** 79:18
94:24 95:1,4
**promptly** 43:20
**proof** 101:7,10
140:25 141:4,25
151:15
**proper** 13:7 90:9
182:6,16,16
**properly** 17:21
83:20
**property** 2:5,13
59:25 67:25 68:9
70:10,11,11 71:10
71:19 73:8,10,11
73:11,19,25,25
97:22 98:12,17
105:22 112:21
145:18,22,25
146:3 151:8
167:19,20 168:4
**propose** 31:11
**proposed** 20:11
21:2 25:18 26:16
28:23 29:12 34:4
66:12
**proposing** 15:11
**proposition** 74:8
98:10 104:11
168:20 169:25
172:18
**prospect** 185:2
**protect** 76:16

129:16 159:19,19
162:20 180:10
**protection** 76:7
77:6 82:9 106:17
176:14 177:2
**protections** 97:17
97:25 98:19 99:8
100:22 128:15
**protective** 14:11
**prov** 134:18
**prove** 104:25 105:1
**provide** 35:8 62:21
70:24 71:2,5
83:24 98:22
106:17 116:21
133:2 141:20
183:21
**provided** 49:1
60:22 83:14 98:8
99:8 117:11
154:10,10,14
162:21
**provides** 27:2
45:11 77:15 88:2
114:13 142:10
145:4 156:17
**providing** 70:25
141:20 150:16
171:10
**proving** 142:4
**provision** 55:5
69:10 73:13 78:20
80:20 81:10 82:14
83:3,13,14,17,20
83:22,23,24,24
84:1,4,14,16,24
85:6,9,12 86:9,10
87:16,23 88:1,6
89:5,12,17 90:9
90:18 91:17 92:1
92:3 98:6,7,17
105:9,11,15 106:3
106:4 107:21,23
109:2 111:22,24
111:25 112:4,10
112:11 113:21
114:2,2,10,12,13

114:15,16,24
116:6 117:2,5,8,9
117:25 118:9
119:10,17,18,19
120:14,15,18,25
121:23,23 122:1,7
122:15,18,20,21
123:13,16 124:4,5
124:13,17,24,25
125:1 126:13,14
126:17,25 128:21
132:19,24 137:6
148:7 153:13
164:5 165:1,2,4
167:12,17 168:15
168:15,18,23
170:19,20 171:3,4
172:5,9,13,15
177:4,5,15,17,19
177:21,23 181:4
188:2,5,7
**provisionally** 22:10
**provisions** 48:14
50:8 62:22,23
63:6,12 75:19,23
75:24 76:3,4,9,16
80:6 82:8 85:5
87:22 88:8 90:20
91:3,5 97:6,18
98:3 99:6,15,15
100:12 104:4
105:8 110:5,21
111:6,18 112:7,9
112:25 115:6
120:15 121:20
122:17 125:2
128:7,21 129:16
131:20 132:25
139:17,21,23,23
140:16 147:25
156:14,16 168:1
171:14 178:5,5
**pulling** 140:21
179:7,10,14
**purchase** 2:4,12
18:7 28:2 29:18
30:10,19 31:6,12

40:17 43:3 81:20
93:13 99:25
102:20 136:13,15
136:16 137:9,15
137:18,19,20
138:6 139:22
187:1
**purchased** 40:20
40:21,23 41:6
46:3 58:6 69:20
71:11 75:9 92:19
**purchaser** 24:15
39:24 40:19 41:4
41:9,22 42:2,6,8
47:13 66:18 67:3
80:19 81:6 93:1
94:10,12,15 113:8
113:14 114:1
117:12,12,14
122:19 130:6
132:21 133:3
142:23 143:14
146:17 154:14
155:2,3,14 157:19
164:7,11 175:25
185:4,25 186:23
186:25 187:2
**purchasers** 57:6,8
58:5,8,12 61:13
75:12,12 154:11
**purchaser's** 41:22
**purchasing** 35:8
93:6 96:8
**pure** 51:17
**purely** 83:7
**purport** 90:20
**purports** 89:14
**purpose** 78:5 84:9
94:21 98:2 168:7
172:7
**purposes** 22:4
27:21,22 42:21
44:2 59:25 71:1
72:8 74:16 82:4
92:13 99:5 105:8
122:22 145:2
179:11 188:18,19

**pursuant** 2:3,11
62:24 70:1 106:4
136:15,18 137:19
137:22 149:24
**pursue** 63:9
**pursues** 66:8
**pursuing** 51:14
63:8 67:7 146:12
**pushed** 38:17
**put** 33:15 35:10,14
35:22 42:21 44:18
45:12 59:20 69:1
81:16 84:22 98:7
113:2 122:13
123:25 125:4
130:17 147:23
165:2 176:17
181:20
**putting** 44:13
69:23 75:6 98:2
**P.A** 10:16
**p.m** 30:16,16 86:20
86:20 135:12,12
190:12

### Q

**qualification**
132:12
**qualifications**
132:16 141:23
**qualified** 148:12
157:14,19
**qualify** 97:15
**qualifying** 40:11
**quality** 55:18 95:2
95:3 184:22
**question** 18:20
43:2 44:14 46:18
54:24 62:18 66:9
71:6,8 77:10,20
83:4,9 85:18,19
86:25 87:8 89:1
92:14 157:7 167:6
168:10 170:24
171:2,18,23
172:16 176:2
177:14,16 178:3

180:20 182:18
183:9 187:19
**questionable** 159:2
**questions** 14:25
21:22 73:22 83:2
177:13
**quicker** 101:19,19
**quickly** 26:20 33:7
39:24 41:22,24
42:5 43:18 52:15
79:1 94:5 166:20
166:22 178:10
189:25
**quite** 27:10 42:20
43:16 44:8,8 85:2
127:25 131:11
165:11 175:7,13
175:14
**quote** 82:7 105:21
131:14,19 171:6,6
171:14
**quoted** 88:7

**R**

**R** 1:22 3:2 4:18
5:24 6:7 13:1
191:2
**raised** 38:14 39:8
39:22 44:11 49:20
59:4 61:7 73:22
93:24 151:11
**raises** 182:18
**raising** 61:7
**range** 49:16
**rate** 96:25
**rates** 139:12,13
**RATH** 11:2
**reached** 25:17
34:23 35:2 39:10
**reaching** 111:16
**read** 21:2 29:18
30:4,13,18,20
31:5 83:22 84:1
85:24 86:4 110:20
113:20 114:15,16
117:21,22 118:23
119:24 121:3,4

123:16 126:16
148:17 169:9,10
169:11,11 170:13
186:8
**readily** 49:25 52:23
68:2 70:10
**reading** 83:21
107:2 117:25
154:13 186:18
188:19,19,20
**reads** 123:15
**ready** 166:12
**Real** 10:18 19:20
19:22 24:18,20
25:2,14 61:17
136:7
**really** 13:5 16:4,13
22:16 38:10,11
39:1,21 53:3 68:2
70:14 71:14,25
75:18 93:22 94:6
97:7 100:6 104:10
109:11 110:2
124:6 133:21
134:15,15 151:20
154:20 156:5,11
168:19 173:20
189:20,25
**reaping** 43:19
**reason** 67:6 76:21
81:21 152:16
158:19 162:2,5
**reasons** 59:16
66:25 86:13
**Rebecca** 12:15
28:25 160:16
**rebuttal** 95:9 166:6
187:20
**recall** 14:24 25:19
49:15 88:17
129:17 176:4,14
**recapture** 44:14
47:18,20,23 48:8
59:11 104:3
114:19 138:12
**receipts** 56:7
**receive** 67:25 68:24

116:7,15,24 130:5
130:7 131:25
**received** 13:22 40:7
40:10 60:14 87:25
122:5 134:3
158:25
**recess** 30:15,16
86:20 135:11,12
**reciprocal** 72:18
**recited** 138:23
**recognized** 185:20
**record** 14:12 15:8
15:22,23 19:17
22:3,16 24:12
25:7 31:1 32:25
33:15 34:6 35:11
35:22 38:24 39:4
40:18 44:9 54:14
56:10 77:25
117:22 122:1
126:16 132:20,22
138:24 139:1,4,7
139:11 155:20
162:12 165:6
169:4 172:20,21
186:2 188:11,19
189:23
**recording** 160:18
165:13 191:6
**records** 44:10
**recoupment** 87:5
87:10,11,13 178:2
**recourse** 147:5
161:16,18
**recovering** 186:11
**recovery** 98:7
102:3
**redacted** 31:13
33:5
**redaction** 33:11
**reduced** 106:12,15
108:10
**reducing** 108:11
**Reed** 9:17 23:23
24:18
**Reese** 119:7
**refer** 137:8,24

**reference** 38:20
86:7 89:17 178:17
179:8,11 186:6
187:24
**referenced** 63:17
79:5 87:21 90:7,9
178:17,20,21
185:10
**references** 64:4
140:18,20 178:19
**referring** 140:13
**refers** 17:4
**reflect** 25:18 57:15
**reflected** 39:3
**reflects** 40:17 57:3
**reform** 169:23,23
**refresh** 174:23
**refusal** 180:12
**regard** 22:20 29:6
31:4 45:10 58:22
60:1 160:24 183:7
**regarding** 123:25
**regardless** 28:1
69:6
**regards** 21:24
**regular** 21:14,15
**regulations** 46:12
**regulatory** 77:5
94:11
**reimburse** 186:16
**reimbursement**
116:7,9,24 186:7
**reimbursements**
186:12
**reiterate** 107:24
**reject** 134:4,10
181:11 182:5
**rejecting** 182:3
**rejection** 135:1
182:1
**relate** 60:16 116:13
**related** 2:6,15
13:18,21 47:25
48:1 49:3 57:25
58:1 60:25 63:7
78:24,25 103:23
113:18 116:25

117:14 118:3
129:25 138:16,17
138:19,20 142:7
142:25 143:5,20
145:10 152:1,5,9
161:13
**relates** 128:22,24
163:8 186:11
**relating** 34:4
**relation** 113:12
**relationships** 50:13
58:21
**relative** 182:14
**relatively** 27:2
57:21 58:9 59:18
74:6
**release** 169:17
**released** 47:3
125:16
**relevance** 86:6
171:8
**relevant** 78:20 93:1
165:3
**reliability** 53:25
127:20
**relief** 2:7,15 27:8
139:1
**rely** 38:19 93:14
**relying** 14:13 31:1
65:3
**remain** 93:5,24
137:10 138:6
156:15 163:16
**remained** 58:9
**remaining** 23:9
**remarkably** 94:3
**remarks** 103:11
**remedied** 94:5
**remedies** 142:17
146:12 147:2
159:17
**remedy** 147:3,6
148:12,12 149:3,4
150:1,2 168:17,21
**remember** 71:12
94:22
**remembered** 86:23

96:7
**remind** 45:20
**reminded** 86:24
**remit** 113:7,11,12
113:13,24 114:20
**remitted** 116:3
**remitting** 147:1
**remove** 36:6
**removed** 33:17
162:12
**removing** 37:16
**rendered** 28:9 85:5
85:7
**rendering** 157:12
**rep** 91:9
**repaid** 89:16,18,19
**repay** 88:4,20,24
89:15
**repayment** 116:16
**repayments** 88:12
**repeat** 25:25 38:11
95:19 102:16
140:23
**replace** 116:20
**replacement**
116:21
**reply** 15:7 82:7
104:12,13 105:3
105:17 106:23
140:14 142:1
**report** 13:12
**REPORTER** 19:5
23:21 38:5
**reports** 150:16
**represent** 23:8 26:6
60:9 100:19
**representation**
24:12 32:23 33:13
37:1,2
**representations**
24:1
**representatives**
102:18 146:21
**represented** 25:23
56:6
**representing** 20:5
89:24

**represents** 57:9
72:3 169:14
**reps** 47:25 51:2,10
90:7 103:23
116:13,19,19
123:4 126:8,9,18
131:22 133:24
134:19,25
**repurchase** 97:12
109:5 116:12,14
116:17,22 138:1
186:7,10,16
**repurchased** 61:9
**request** 39:22
**requesting** 139:2
**requests** 157:4
**require** 188:13,14
188:15
**required** 113:8,14
150:24 162:3
185:21 186:9,10
**requirement** 94:23
133:5
**requirements**
94:20 153:14
159:24
**requires** 16:7 53:24
116:1
**research** 76:13
**reserve** 25:3 42:15
44:12 131:22
**reserved** 161:5
**reserving** 24:23
**residential** 9:18
50:23 61:14
**resolution** 16:11
17:23 22:19 34:3
37:9
**resolutions** 38:16
**resolve** 22:9 29:14
37:3 38:13 127:7
**resolved** 16:11
17:18,19,22,23
18:6,8,25 19:10
20:5,9,13 21:16
21:17 22:12 23:8
23:17 39:7 49:21

61:15 67:11 80:23
89:2 164:4 165:21
187:8,11
**resolves** 15:20
**resolving** 83:8
**resorted** 57:17
**respect** 14:9 17:12
17:14 18:4,5 20:4
23:9,10 27:24,25
33:14 35:2,9
39:20 43:8,14
48:13,25 49:20
50:3 52:22,23
55:14,16 56:3
58:21 60:9,11,23
63:5,5 64:1 65:9
67:20 73:4,7,20
73:22,23,25 75:24
76:14 79:8 80:13
80:20,22 85:6,7,8
86:16,25 89:1
90:15,15 91:2,15
103:5,19 106:8
107:19 110:5
127:16,17 139:2,5
168:13,25 171:18
172:22 173:22
180:18
**respects** 169:3
**respond** 69:4
184:15
**responding** 63:3
69:5
**response** 44:11
46:18 150:24
**responsibilities**
32:8 68:7 71:4,8
72:16,21 172:6
**responsibility**
183:2,3
**responsible** 123:3
128:8,10
**rest** 134:4 138:24
**Restated** 2:16
**result** 38:15 39:7
41:18 61:14 120:3
184:1

**resulting** 84:17
**retain** 125:19 126:2
136:17
**retained** 47:3,7,8
55:12 125:16
137:21
**retaining** 125:23
125:24
**return** 96:25 98:6
**returned** 45:12
**reverse** 68:3
178:18
**reversed** 66:15
**review** 18:21 28:22
**reviewed** 30:19
110:1
**revised** 30:20,21,21
30:24 34:7
**revisions** 18:9
**revoke** 36:14
**Richards** 54:5,8
**RICK** 4:17
**right** 13:10,20
15:22 16:21 17:6
19:2,11 20:3,23
22:14 23:4,15,19
24:8,16,23 25:2,3
25:6,15 26:2
29:17 30:15,18
31:16,20 32:21
33:2,12 34:5,8,10
34:13,15 36:3
37:11 38:4 56:17
62:7 64:7,22
65:16,18 67:15,25
67:25 68:9,23
69:18 70:7,8,12
70:13 71:3 79:17
83:18 86:4 87:10
87:11 90:3,6,19
96:17 98:17
101:11,23 102:6
102:22 105:19
106:13,13,24
107:2,9,18 108:2
108:7,9,10,12,13
110:24,25 112:15

112:22 113:1,3
114:10 116:7,8
121:9 129:4,6,7
130:7,10 131:25
134:8 135:10,22
136:25 140:11
144:2 147:9
148:22,25 149:7
149:15,20 150:10
150:22 151:5,25
152:7 154:12
156:8,19 158:6
159:5 160:2,5
162:23 163:1,1,5
163:6 165:18
166:1,3,5,11,13
166:17,18 167:19
173:15,19 179:15
179:16,19,22
180:13 181:16,23
183:4,5,6,12
185:13 186:15,15
187:4,14,16 188:9
188:10 189:13
190:5
**rights** 15:10,13
27:18 28:4 29:7
34:4 35:8,16,25
40:4,22 43:15
44:19 47:11,12
50:1 51:20,25
52:17,19 55:24
56:5 62:21 63:16
65:13,14 68:7,18
69:15,16,16 70:3
70:4 71:7,11
72:12,15,21 75:10
75:10 80:16,18
97:4,22 98:4,12
99:2 103:24 104:8
104:19 105:11,22
105:24,24 106:2,6
106:10,11,17
108:5,6,8,14,18
108:19 110:25
111:20 112:21
113:2 125:22,24

126:22 127:15,18
127:18 128:19
129:5 130:3,5,23
131:1,5,7,15,22
131:23 132:2
133:23,25 134:13
134:15 135:2
141:14,15 142:17
142:21,22,24,25
143:3,5,6,13,20
144:17 145:16
147:10,13,23,25
148:4,5,7,20,24
149:14,21,25
153:23,25 156:14
158:11,23 159:17
161:10 162:19
167:20 168:4
171:10 175:25
176:1 179:1 180:4
180:9 182:9 184:8
188:3
**rise** 13:2 14:22
30:17 75:21
102:24 135:13
136:4 172:3 173:4
**risk** 26:13 43:8,8
43:11 147:19
184:25
**RMBS** 142:5
**road** 94:16 163:20
165:16 180:22
**Robert** 3:11 6:16
13:14 14:21 21:11
23:25 35:1 62:11
140:7
**Robin** 34:14 56:21
**robust** 67:3
**rock** 70:9
**ROME** 4:2
**romp** 177:7,8
**room** 180:23
**ROSNER** 11:23
**Ross** 18:11 26:9,11
27:3 28:7 40:14
40:16,17 41:17
43:9,17 44:20

92:11 93:2,6,7,12
93:17,18 95:3
146:21 155:4
161:25 185:5
**round** 166:8
**route** 63:8 156:22
**ROVIRA** 5:24
**RUBENSTEIN**
12:22
**RUGH** 160:14
**rule** 28:2,6 64:21
80:25 82:15 83:25
86:12 89:13
144:18 171:6
177:12 190:4
**rules** 68:13 76:5
171:18
**ruling** 66:14
145:19 188:16,21
189:6,9
**run** 76:4,6 93:11
94:7 166:19
**running** 72:10 94:2
185:2
**runoff** 54:18
**Rush** 158:4,7,8,8
158:12,19 182:18

———————
**S**
**S** 1:23 3:2,11,21
13:1
**Sachs** 17:18
**safe** 68:21 97:18
100:22
**salability** 75:17
**sale** 20:22,25 21:5
21:24 24:6,7
25:20 26:8,8 27:9
27:10,13 28:4,7
28:18,18,23 31:2
34:6 35:17 36:7,7
36:9,20 37:1,3,5
40:17 41:14,25
43:24 44:5 47:25
49:6 50:6 55:4
62:21 63:11 74:18
77:17 87:3,17

95:5,8 101:4,13
101:18 102:19
103:23 105:5
106:4,18,19,20,22
108:4 117:1 126:8
126:18 129:19,21
133:10,11,24
134:3,8,25 136:11
136:12 137:15
139:25 146:8
156:10 182:6,16
183:12,13 184:7
188:25 189:1
**sales** 47:4,7 74:22
89:6 187:24
**Sallie** 12:8 155:25
156:1,24 157:3,8
**sandwich** 138:5
**sat** 122:25
**satisfaction** 93:14
107:22
**satisfied** 45:15 91:2
92:2 108:20,24
109:3,4 151:14
**satisfy** 44:4 89:8
94:23 108:11
132:19 142:4
**save** 161:4
**saves** 173:16
**saw** 19:13 53:13
80:13 109:14,14
169:20
**saying** 69:2 97:24
98:18 99:18
104:23 108:22
110:20 114:8
127:17 165:4
166:8 181:19
188:6
**says** 31:23 32:7
34:11 62:7 81:5
82:5,15 89:13
98:17 106:20
108:7 111:18
112:18 113:13,21
113:24 116:19
117:10 118:9

121:5,5 122:16
123:13 124:23
132:14 143:15,16
143:20,22 145:10
146:3 147:14
148:4,7 154:13
159:2 164:5
166:23 168:16,17
170:3,7,9,11
171:7
**scanned** 34:14
**schedule** 15:3
24:11 27:14 35:4
49:4,19 136:13
137:17 172:24,24
**scheduled** 27:12
59:10
**schedules** 21:25
**scheme** 77:7
176:19
**Schmidt** 119:5
**Schnabel** 7:8 21:20
21:20 22:7,15,21
22:24 23:2,5
**Scholer** 5:10 28:21
102:15
**scope** 24:7
**score** 16:20
**Scott** 5:15 9:15
28:20 37:21 38:6
102:14 187:6
**scoured** 75:18
**screw-up** 89:16
**se** 69:8
**seal** 26:5,17 31:14
**sealed** 138:25
**seat** 76:12
**seated** 13:3 86:21
135:14
**second** 2:16 20:24
22:2 25:24 79:4
80:22 88:7 90:19
105:1 106:5
129:21 139:9
142:1 162:10
174:13 185:10
**secondly** 34:18

**section** 65:4,4,12
73:20 79:13 97:7
97:15 105:9,10
106:2 108:6,7
112:6,11 113:4,6
114:12,17,19
115:2,7,9,9,18,20
115:21 116:10,13
116:18 117:22
131:16,23 132:13
139:14 144:2,4
170:8 179:8,10,13
**sectional** 185:11
**Sections** 2:3,11
**secure** 69:13
**secured** 175:10
**securities** 10:18
19:20,22 25:14
61:17 97:13,14,15
98:1,20 136:7
142:6
**securitization**
21:14 45:23 57:13
143:5
**securitizations**
46:2,2 57:5,7,11
57:20 58:15,16
131:11
**securitizers** 58:6
**securitizing** 58:11
**security** 50:24
**see** 20:2,8 26:25
29:13 31:19,21
37:22 39:1 50:15
57:10,18 58:8
61:1 68:16 76:5
79:6 82:25 101:17
106:19 111:2
128:1 166:10
181:15 182:15
183:3 187:15
**seeing** 54:18
**seek** 13:17 109:1
**seeking** 14:11 27:7
39:20
**seen** 30:11 47:17
53:22 66:7

**sees** 110:18
**SELBER** 5:8
**selected** 40:14
**sell** 2:5,13 35:15
39:20 51:24 55:24
55:25 58:21 63:13
64:13 68:10,12,16
68:23 70:4 74:2
101:21 102:3
104:7,18,18
105:14,25 106:1,6
125:19 130:23,25
131:5,9 133:23
137:23 145:20,23
145:25 146:4
148:20,23 149:14
149:21 183:19
184:8
**sellable** 144:11
**seller** 51:1,2,9,18
55:7 67:3 78:24
79:5,7,7,10 81:5,7
84:11 86:7 89:8,9
89:11 90:11,12,21
91:9 112:8 114:15
114:18 116:17,24
117:11,15 118:3
118:10,11 120:21
121:5,6,7,8 122:9
122:10 123:9,11
123:13,15 126:21
127:21 129:23,24
130:1,21 132:17
136:17 137:21
175:25 187:21
**seller's** 55:2 123:3
128:11 170:4
**selling** 25:22 34:4
40:1,3 41:16 43:9
43:17 52:5 55:9
55:20 64:25 65:13
65:14 68:17,18
69:15 70:5,9,11
70:11 74:17,18
126:3,11 145:17
175:19 184:24
185:3,5

**sells** 47:9,9,11
156:14
**send** 184:9
**sends** 129:22
**sense** 46:17 50:19
56:11,11 59:19
63:11 67:9 75:13
76:13 77:6 78:21
81:8 89:7 90:22
90:22 92:3 114:7
120:4 169:25
171:22 172:10
176:2 181:6,7,9
182:6 183:1
**sensible** 169:9,22
**sensitive** 31:12
**sent** 24:20 127:13
**sentence** 119:21
**sentiments** 95:16
**separable** 83:19
131:13 145:5
**separate** 17:25
36:20 72:12,13,15
72:25 77:16 78:6
78:7,8 79:20
83:14,18,21 84:2
96:16 99:25
111:18 123:10,22
123:23 125:6,11
130:15,16,23
131:3,11 133:24
142:4 144:22
170:21 171:16,20
173:5,21,21
174:13,18,19,20
187:22 188:4
**separated** 78:10
**separately** 86:11
173:1 174:24
**separateness** 80:10
**separating** 159:16
**September** 15:9
82:2 155:6
**sequence** 181:15
**serious** 39:19 61:8
**servers** 153:18
**service** 40:4 45:4

58:7 62:9 81:7
112:24 115:11
120:22 136:17,19
137:23 140:21
141:21 142:15
143:6 146:20
153:8,11,11,21
158:21 161:20
183:23 187:24
**serviced** 36:22
37:15 45:17 46:4
50:17
**servicer** 32:8,10,11
50:11,14 51:17,25
52:15 55:1 78:25
79:8,10 81:6
84:11 86:7 87:25
88:3,4,12,14,15
88:21,23 89:14,15
89:19 90:10,12,20
100:3 112:8 113:7
113:11,11,12,13
113:16,17,23,24
113:25 114:1,3,4
114:10,13,18
115:25 116:3,15
116:16 117:12
119:21 123:3,9,11
123:14,15 126:17
126:21 129:8,24
130:22 132:16,17
133:2 134:21
135:3 141:23
142:13,18 143:7
146:13 150:13
152:16 153:14,16
154:2 158:21,24
159:9,18 160:4,12
162:24,25 163:2
168:17 174:9
176:1,2,3,4
182:21 187:21
**servicers** 50:17
51:3,12,22 80:14
184:10,12 185:1
**servicer's** 114:20
116:6 128:11

158:22
**services** 45:25 46:1
46:6 68:5 162:20
**servicing** 2:4,12
15:10,13 24:6
27:17 28:4 29:7
32:11 34:4 35:8
35:16,25 40:5,22
41:10 43:15 44:19
45:17,21,22,24
46:4,7,8 47:3,3,5
47:6,6,6,8,11,12
47:13,13,14,19,20
48:1,2,3 49:3 50:1
50:1,4,7,14,20
51:4,20,24,24
52:6,13,19,23
53:3 55:5,6,11,12
55:15,21,22,23,23
55:24,25 56:1,4,5
56:6 60:17,24,25
61:19,24,25 62:8
62:20,22 63:1
68:9 69:20,22,22
74:15,16 75:9,10
75:15,17,22 76:1
80:14,15,18 84:9
84:19 87:17 89:6
89:8,9 92:11
93:22 94:1,2 95:2
96:9,19 97:21
98:23 100:1,12
103:24 105:11
106:2,12 108:4,5
108:6,8,19 112:20
112:21 113:2,2,13
114:22 115:3,17
115:20 125:16,16
125:19,20,21,22
125:24 126:3,3,9
126:10,11 127:13
129:2,4,20 130:5
130:8,10,23,25
131:5,7,15,20,24
131:25 133:23,25
134:14,18,20,21
134:22 135:2

136:12,18 137:15
137:21,22 138:15
139:12,23 140:12
140:15 141:7,14
141:14,15 142:5,5
142:7,8,21,24,25
143:11,11,13,20
144:23 145:2,5,10
146:18 147:25
148:3,20,24
149:14 153:7,9,9
153:20,23,25
154:18,21 156:14
156:15 157:15,23
158:10 160:1,20
161:10 162:18
169:17 170:4
172:25 173:5,14
174:3,3,4,5,16,21
175:11 176:21
177:21 178:12,17
179:5,6,11 180:3
180:4,5,6 183:1,2
183:11,14,19
184:3,8,10,11,14
184:17,20,22,24
184:25 185:1
188:3
**set** 24:21 33:18
46:3 54:11 71:4
75:7 105:16
111:20 147:9,22
170:1 171:7
**setoff** 87:5,10,11,12
178:2,7,9
**sets** 57:5 89:13
127:18
**setting** 39:13 147:4
**settled** 34:18
**settlement** 15:25
16:2 17:15,17
25:17,21 29:2
34:22
**settlements** 13:12
15:25 16:3 39:10
**seventeen** 131:18
**Seventh** 5:21

124:10
**sever** 69:11,14
  84:17 87:9 96:21
  133:23
**severability** 44:16
  59:11 61:10 71:9
  71:13,25 72:6
  77:11 83:3,5
  85:17,18 87:1
  96:1 98:15 99:1
  99:22 100:6 101:8
  101:10 103:17
  104:24 105:2,4
  108:15 109:10
  111:3 124:1,20
  140:24 147:16
  151:20 152:21
  167:2 172:17
**severable** 65:15
  67:14,17,17 68:23
  69:2 77:22 83:1
  87:7 90:25 91:1
  99:10,11,12,14
  100:15,24 101:3
  103:14,16 106:1,6
  108:1 109:7,7,9
  132:10 139:12
  145:3 151:4
  171:16,24 172:2
  173:14 188:6
**severance** 69:5
  86:14,14 109:21
  109:23
**severe** 106:11
**severed** 83:5 97:9
  99:2,20 100:8
  141:8
**severing** 84:19
**SEWARD** 7:17
**Shannon** 76:5
**share** 173:1 180:23
**Shaw** 4:11 81:1
  82:1,5 83:12
  84:13 86:13
  110:13 123:19
  170:23 171:1,1,16
  172:17 177:1,5

**shed** 54:20
**sheet** 16:5 18:21
  20:2 21:22,22
  22:4 35:6,22 51:5
  142:10
**shelf** 183:18
**shoot** 190:1
**short** 16:9 27:2
  86:18
**shorter** 17:3
**shorthand** 60:7
  61:8
**shortly** 161:3
**shoulders** 51:2
**show** 56:8 58:25
  60:2 122:20 125:5
**shows** 56:13 80:8
  97:7 111:19 122:4
  122:14
**show-me** 59:19
  60:20 61:5
**side** 19:19 20:2
  44:13 48:23 51:9
  51:17 55:1,2,7
  80:15 84:11,11,12
  89:6 90:10 92:15
  92:23 110:7,24
  140:10 147:15
  152:20 173:10
**sides** 104:9
**Sidley** 5:19 6:2
  54:4
**sign** 30:4 177:3
  182:22
**Signature** 191:10
**signed** 35:24
  169:21
**significance** 48:11
  83:10
**significant** 48:6,19
  48:24 57:19 77:7
  89:16 125:1
  139:22
**signs** 174:11
**SILVERSTEIN**
  5:8
**similar** 56:2 123:13

132:22 167:17
**Similarly** 104:5
**simple** 31:22 37:9
  57:2 80:16,18
  164:5 179:21
**simplify** 60:8
**simply** 15:12 38:19
  58:4,14,18 59:7
  67:24 69:4 73:20
  74:9 75:16 79:2
  87:12,21,22 88:25
  89:9,10 92:6
  142:9 144:16
  169:24 178:16
  185:2
**Sincerely** 131:15
**single** 43:13 69:25
  71:6 80:16 82:23
  101:20 124:13
  170:21 174:2,2
**Sir** 19:5
**sit** 29:18 52:20
  88:25 131:8
  143:23
**sits** 90:11
**sitting** 15:7
**situation** 68:4
  145:4 162:5 171:5
  173:23,25 174:15
  183:12
**six** 40:20 59:3
  148:10
**sixth** 59:23
**sizeable** 50:11,12
**slides** 78:13
**slight** 37:10
**slightly** 37:5 58:1,3
**sloppily** 85:4
**sloppy** 169:19
**slowly** 185:3
**small** 44:8,8 156:7
  156:10,21
**Smith** 9:17 23:23
  24:18
**smooth** 94:3
**smoothly** 45:8 94:2
  160:9

**social** 77:7
**sold** 24:15 25:21
  26:11 27:3,4
  36:17 41:2,4
  43:11,21 44:20
  47:7 51:20 55:11
  57:4,4,6 62:24
  63:14 67:21,22
  69:23 87:4,9
  139:13 151:9,9
  156:20 178:13
**solely** 14:15
**solution** 41:23
**Solutions** 24:19
  105:18
**solve** 31:19,21
  163:25
**somebodies** 61:3
**somebody** 61:3
  108:18 116:16
  134:22 162:19
  181:18
**SONTCHI** 1:23
**soon** 188:21
**sophisticated** 33:10
  128:19
**sorry** 17:5 23:13,21
  25:1,5,23 33:22
  35:20 36:14 37:12
  57:15,16 65:10
  66:21 68:1 73:13
  90:2,4 102:9
  106:25 107:12
  112:13 128:23
  134:18 140:4,6
  149:12 156:2
  168:14 178:8
  179:9 180:17
  183:8,14
**sort** 18:18 24:19
  52:2 61:4 70:14
  76:4,6 89:4
  147:19 151:3
  152:20 180:1
  186:3
**sorts** 184:19
**sought** 82:9 84:10

177:22
**sound** 191:6
**Sounds** 187:9
**source** 48:9 53:16
**so-called** 20:21
**speak** 19:6 27:16
  28:14 102:8
  161:11
**special** 97:25 99:8
**specific** 24:5 71:23
  84:9 103:15 111:7
  118:13 127:25
  128:3 133:9
  153:13 159:24
  164:3
**specifically** 63:18
  77:9 82:9,14,19
  84:7 105:20 111:5
  111:12,13,20
  123:6 125:7
  131:21 168:15
  171:2
**speculate** 155:10
  155:15
**speed** 39:19 129:19
**spend** 34:24 38:24
  58:17
**spent** 45:18 46:25
**spoke** 14:3
**Springer** 9:24 23:6
  23:7,14,17,20,22
  23:22,23
**squarely** 177:4
**stable** 44:25
**stake** 58:3 72:18,19
  183:1
**stalking** 18:11
  40:15
**stand** 53:11 55:9
  62:4,13 63:12
  65:9 74:13 83:14
  84:2,18 122:25
  140:10,11,13,15
  151:16,17 155:6
  156:2,3
**standard** 55:18
  93:23 106:20

109:19 159:4,7
**standards** 123:24
172:3
**standing** 102:16
163:17 164:23
**standpoint** 125:13
**stands** 168:19
**Stanley** 10:17
17:20 25:12 61:14
61:18 136:5,7,9
136:15 137:9,10
139:3,15,24
**STARGATT** 3:3
**start** 33:25 66:1
109:18 112:17
140:24 141:24
142:19 179:6
**started** 16:17 57:2
74:19,20 92:9
94:16 155:6 182:7
**starting** 40:23
177:7
**starts** 115:18
**state** 18:3,16 46:11
73:6 76:14 85:17
85:19,24 94:11
109:20,24 110:3
110:14,15 112:2
167:1
**stated** 74:9 105:20
124:14 131:13
183:22
**statement** 180:7
**statements** 25:6
101:2
**states** 1:2,14 41:19
42:9 46:9 113:6
132:1
**stating** 71:21
**status** 16:6,19 18:5
18:21 45:13,15
172:6 180:21
**statute** 157:11
**stay** 94:17 96:19
98:5
**stays** 97:1 154:20
154:21

**Stearns** 5:20 6:3
**Stearns/EMC**
11:18
**step** 79:1 80:7
83:20 98:24
128:17,22 133:20
**STERN** 5:25
**STEVE** 10:14
**stick** 130:9
**sticking** 95:17
**sticks** 147:20
**stipulation** 24:4
45:11 175:16
**stole** 89:25
**stop** 75:22 82:23
**stopping** 71:1
169:14
**Storper** 94:14
**story** 144:21
**straight** 13:9 56:20
78:2 107:17
**straightforward**
64:21 66:10
**strategic** 41:17
43:12,13,21,23
92:17
**stream** 56:4
**Street** 1:15 3:6 4:5
5:5 6:4,13,21 7:4
7:12 8:14 9:12,19
10:4 11:4,19
12:12
**strenuous** 42:20
**strict** 117:8
**strictly** 60:23
**stride** 90:4
**strike** 181:17
**strikes** 51:15
**strip** 158:23
**STROCK** 11:8
**strong** 72:14 160:1
185:3
**stronger** 184:2
**strongest** 121:12
**strongly** 189:23
**struck** 42:10
134:24 182:7

**structural** 61:2
77:15
**structure** 78:23
94:8 144:5 174:6
**structured** 10:3,10
10:18 14:2 18:1
25:10 61:13,18,20
66:4 89:13 103:1
135:16 138:23
139:18
**struggling** 65:25
86:25
**study** 188:14,15
**stuff** 166:21
**sub** 115:7 170:8
**subject** 15:13 21:17
22:10,18 25:6
35:9,12 36:1
37:23,25 38:2
84:8 87:5 98:25
100:4 125:10
165:24 175:15,20
**submission** 26:18
**submit** 21:1 36:1
71:23 84:4 117:10
155:20 157:18
169:10,17 174:6
**submitted** 16:16
122:3
**submitting** 18:7
**subordinate** 116:12
**subsection** 89:19
113:6 117:11
185:12
**subsequent** 75:12
82:16 181:13
**subsequently**
137:16
**substantial** 75:19
**substantially** 41:11
46:15
**success** 160:4
**successful** 94:6
**successor** 136:6
**sued** 163:4
**suffering** 43:1
**suffers** 182:4

**suffice** 103:13
**sufficient** 32:18,23
40:12 85:20
**sufficiently** 72:14
120:18
**suggest** 44:12 53:6
148:9 171:22
**suggested** 50:24
**suggesting** 141:5
**suggestion** 52:18
141:9
**suggests** 51:15 53:3
54:17
**suit** 107:17
**suitable** 116:21
**Suite** 4:6 7:5 8:5,15
9:20 11:5,20 12:5
**suits** 99:1
**summary** 16:18
37:23
**supplement** 189:22
**supplemental** 15:4
**support** 28:18
72:24 81:15 82:7
92:20 94:8 101:1
139:4,12 172:17
**supported** 169:13
**supporting** 127:14
**supports** 102:19
104:14,17 139:1
**suppose** 52:9
**supposed** 150:13
**Supreme** 147:22
**sure** 15:14 18:18
31:18 35:10,21
49:14 54:7 63:10
67:19 69:18 76:11
79:18 81:22 86:19
107:2 109:11
110:2 119:19
132:1 154:22
159:5,10,13 163:7
163:8 166:11
175:5 176:18
180:7 181:7
**surfaced** 75:23
**surprise** 48:17

74:24 126:17,19
126:24,25 185:23
**surprised** 55:13
126:13,15 166:7
**surreplies** 107:14
**surreply** 106:9,23
107:1,2
**surrounding** 45:19
67:2,4 74:8
**survive** 183:16,22
**suspect** 75:2
**sustain** 117:14
**sweet** 27:2
**syndicate** 175:8
**system** 29:8 160:18

**T**

**T** 3:13,22 4:16 19:8
191:2,2
**table** 39:11,13
92:18
**tact** 95:23
**tag** 79:19
**tags** 79:3
**tailored** 77:8 84:25
**take** 14:10 16:23,24
16:24 17:2,11
18:18 26:18 30:11
30:12,15 32:9
41:19 42:9 43:16
56:8 58:1 67:20
68:11 70:19,19
75:5 78:11 80:21
80:21 81:25,25
84:20 86:18,22
88:6 95:15 97:5
104:2,3 111:11
119:21 133:16
135:11 143:3,4
144:8,9,20 146:25
147:9 148:20
149:13 151:17,18
152:19 158:22
160:16 165:10
166:1 169:4,24
182:22 184:4,10
188:17

**taken** 23:11 54:14
  157:5 165:6 168:4
**takes** 58:14 111:22
  111:23 184:14
**talk** 66:7 71:24
  87:3 91:16 110:15
  110:16 111:13
  112:5,5 115:8
  128:17 133:20
  143:24 150:11
  153:14 168:2,13
  173:25
**talked** 40:6 44:21
  74:7 77:10,23
  112:4,6 125:14
  170:16 172:5
  173:24 186:5
**talking** 34:24 36:25
  38:24 45:19 66:1
  71:25 73:4 74:19
  74:20 85:23
  103:21 105:4
  107:23 110:19
  124:2 156:6,10
  158:13 165:8
  171:5
**talks** 58:25 66:8
  73:10 97:12,13
  110:9 148:2 171:2
  173:20 174:19
  177:1
**Talmadge** 5:15
  28:20,21 37:21,21
  38:2,6,6 102:9,12
  102:14,14 187:6,6
  187:10
**task** 59:20 95:18
  184:18
**tax** 24:19 46:23
  183:5
**TAYLOR** 3:3
**team** 93:11,14
**tease** 71:7
**technical** 22:11
**TELEPHONIC...**
  3:14 4:20 5:25
  12:23

**tell** 15:19 16:6,7
  17:12 18:4 42:19
  49:19 87:24 89:18
  99:19 110:20
  143:24 155:2
  184:16
**telling** 43:24
**tells** 97:21 112:18
  177:9
**temperature** 18:18
**tend** 50:9
**tension** 71:15
**ten-day** 22:22
**term** 35:6,22 94:19
  94:24 113:22
  118:15,16 128:18
**terminate** 112:20
  113:1 114:6,22
  129:4 134:20
  135:1 142:12,12
  153:11,21 156:19
  156:20 157:1
  180:6
**terminated** 59:24
**termination** 35:5
  73:18 106:13
**terms** 22:12 24:20
  26:12 37:23,25
  38:3 39:12 44:9,9
  44:10 50:8,22
  51:5 54:24 56:1
  56:13 79:10 106:4
  110:13 111:13
  113:9,15,22
  114:23 115:23
  127:25 128:3
  137:8,24 172:19
  176:25 180:10
**terribly** 90:18
**test** 72:19 74:6,9
  77:13,15,19 78:1
  78:2 79:4,19
  83:11 99:22
  173:22 174:12,13
  174:19 177:14
**testified** 42:16,17
  47:17 62:18 74:13

94:14 123:2
  125:17 127:4,22
  132:20
**testify** 142:21
**testifying** 40:6
  49:24
**testimony** 44:7,17
  45:20 46:13 49:1
  49:12 51:23 52:3
  52:21,25 54:24
  80:8 81:9 82:18
  84:5,24 93:20,21
  94:1 96:2,22
  122:24 125:7,9,12
  125:14 127:16,19
  127:19 130:20
  132:20,22,24
  133:13 141:4,11
  143:15 151:13
  155:1 160:20
  187:25
**tests** 91:2
**Texas** 24:13 127:13
**Thacher** 53:8,12,13
  53:15 54:3,12
  89:22,23 169:12
**thank** 13:4,24
  14:20 16:23 19:14
  20:3 23:20 26:22
  26:24 30:14 31:15
  33:3,9 34:21
  37:20 56:21 60:5
  78:15 87:20 95:11
  95:13,16 101:4
  102:6,7,21,25
  103:2,4,7 115:14
  135:7,10,25 137:1
  138:21 139:20
  140:1 155:23,24
  157:20 160:13,14
  165:19 185:8,13
  185:14,16 186:20
  187:3,16 188:8
  189:20 190:7,10
**thanking** 38:12
**thanks** 34:17 140:2
**theories** 66:8

**theory** 91:20
  138:15 180:8
**they'd** 189:22
**thing** 15:11 36:5
  49:24 79:8 95:4
  110:4 115:5
  124:11 131:21
  156:12,19 185:6
  187:21,22
**things** 34:17 54:23
  77:8 81:3 86:3,23
  88:7 92:18 95:20
  95:20 101:25
  144:23 151:6
  159:6,7,16 160:2
  160:7 164:3
  166:19 168:25
  180:17 182:21
**think** 13:6 14:13,13
  18:15 22:1,16
  23:5 29:13,20
  30:22,23,23 31:11
  31:22 32:9 33:25
  36:6,23 37:13,15
  37:17 38:9,15,20
  38:22,22 39:6,13
  43:23 44:1 46:20
  47:21 48:11 49:11
  52:18 53:10 55:16
  61:14 63:2 69:19
  72:23 73:6 74:6
  74:13 76:21,23
  78:1,17 80:8,23
  82:25 83:16 84:20
  85:16 86:3 90:8
  91:14 92:7 93:20
  94:20 95:4 96:2,5
  96:22 97:6 98:15
  99:4,16,17,19,22
  99:24 100:2,13,15
  100:23,24 103:5,6
  103:17,24 104:5,7
  104:10,14 105:2
  105:16 109:6,6,8
  109:13,16,18,22
  109:25 110:3
  111:10 112:1,9

114:22 116:8
  117:5,16,23 119:1
  119:16,18,24
  120:2,5,11,11
  121:18,19,21
  122:20 124:19,23
  125:12 127:2,14
  128:17 129:18,20
  130:5,14,23 132:3
  132:8,9,23,25
  133:4,8,8,14
  139:1 141:2,3,15
  141:25 142:19
  145:8 146:7,10
  147:17 150:20
  151:12 153:15
  155:1,14 158:15
  158:19,23 159:1
  159:16,19,25
  164:3 165:14
  166:15,21 167:20
  169:3,24 170:15
  172:13 178:11
  180:14,23 181:3
  181:24 182:1,5,18
  185:4,19 186:4,14
  186:17 188:5,14
  189:24
**thinks** 131:25
**third** 46:1 57:11
  58:4,5,11,14 67:3
  68:22 72:16
  104:15 105:18,20
  135:5 148:7
  178:14
**third-party** 147:10
  148:3
**thirteen** 44:25
**thirty** 40:7 94:21
**thirty-eight** 40:24
  156:9
**thirty-five** 165:12
**thirty-second**
  187:18
**thought** 51:10 65:6
  82:25 85:1 111:24
  130:14 155:14

**thoughts** 145:13
**thousand** 182:20
**threat** 129:23,25
130:2
**three** 14:15 16:10
20:7 40:2,19 43:2
44:18 57:15,23
72:19 77:13 78:2
87:21 99:22 125:7
131:19 152:13,21
153:2
**three-page** 14:6
**threshold** 133:17
145:21 147:17
**thrive** 183:22 184:6
**thriving** 94:7
**throwing** 29:2
**thrown** 169:21
**throw-away** 46:18
**thunder** 90:1
**tidbit** 185:9
**tie** 57:14 89:5 90:20
**tied** 90:12 153:20
178:6,6
**ties** 86:9 89:9
161:13
**time** 20:11 21:10
27:11 33:25 34:24
38:24 40:18 42:7
43:16 45:18 46:25
47:21 49:9 53:14
54:14 58:17 83:23
96:6 135:24
136:16,16 137:20
137:20 149:15
157:18 161:14
163:6 175:13,14
178:15 183:6
184:14,14 187:13
189:12
**timely** 183:4
**times** 39:15 126:19
128:9 143:22
186:4
**tired** 138:4,4
**title** 73:17
**TNI** 113:19

**today** 13:17 15:8
20:12 21:4 24:18
27:23 28:24 35:11
36:17 38:22 39:1
45:1 49:22 51:20
66:7 93:16 98:11
99:25 101:2
102:19 106:10
109:2,3 135:8
145:1 146:23
149:9 155:7,17
158:17 164:24
165:23 175:6
182:7 188:16
190:5
**today's** 42:22 44:2
**told** 26:3 55:9
126:15,15
**tomorrow** 45:2
**top** 7:15 21:15
44:25
**topics** 68:8 91:13
**tort** 102:10 105:19
**total** 41:3
**touch** 68:7 91:14
91:15 115:1
130:13 132:11
143:17 172:20
**touched** 64:23
127:2
**touching** 38:18
**tough** 42:2
**track** 35:20 83:23
**trade** 75:8
**traded** 50:22
**trading** 55:10
**trail** 88:24
**transaction** 21:17
27:5 29:9 31:25
31:25 32:16 37:24
43:20 44:2,3 53:5
66:6 74:21 77:1,8
80:9,11 84:12
92:15,24 94:18
95:6 100:7 101:15
126:7 128:23
141:5,12,19 142:2

142:23 146:23
155:8,13 159:10
161:9 170:2
182:23 183:10
184:1,1 185:24
**transactions** 47:3
48:13 50:13 51:8
66:5,16 76:1
81:16 85:1 125:17
129:19,20 141:1,2
**transcriber** 191:4
191:10
**transcript** 191:5
**transcripts** 189:15
**transfer** 15:11
27:14,23 28:13
43:15 66:18,24,25
67:5,12 72:15
73:14 80:14,15
96:18 108:5
131:24 134:20,22
135:2 148:11
161:1,9,12 162:18
165:25 166:22,23
181:17 188:3
**transferability**
50:18 52:13
**transferred** 15:4
24:15 40:25 50:2
60:24 63:18 64:12
68:1 147:21
158:14
**transferring** 15:12
29:7 64:1 70:5
100:17,19 141:13
146:18 151:6
178:25,25 184:13
184:17 185:1
**transfers** 67:2
153:15 163:8
166:23
**transition** 183:16
**transitioning**
184:11,25
**trapped** 88:16
**TRAURIG** 8:11
**traveled** 87:13

**Travis** 25:13 158:2
166:4
**treat** 83:5 170:6
**treated** 90:25
**trial** 122:25 143:1
**trick** 69:1
**tried** 56:10 81:17
109:15 141:12
**trouble** 76:17 77:4
**troubled** 181:1
**true** 51:21 70:16,16
157:3 158:12
**truly** 75:2
**truncated** 57:1
**trust** 17:24 57:13
57:21,22,22,23,25
58:1,3
**trustee** 4:12 7:3
22:8 105:21
**trusts** 45:23 57:19
**try** 39:5 58:19
81:14 94:19
128:14 166:19
**trying** 29:25 37:7
49:2 58:21 69:14
69:24 72:2 96:21
107:15 121:15
129:16 130:24
143:3,4 144:13
145:16 147:2
148:8 149:13
163:19 165:15
187:20,22
**Tuesday** 188:22
190:1,2,4
**Tunnell** 6:9 14:22
140:8
**turmoil** 26:13
**turn** 25:17 34:25
59:1,1 65:2 87:15
160:16 171:23
**Turning** 58:24
178:10
**turnover** 44:24
**turns** 181:25
**TWA** 104:20
**twenty** 94:20

154:10
**twenty-five** 55:18
**two** 14:10 18:15
20:6 21:21,22
22:2 24:1 34:16
36:12,17 40:22
42:11 43:1 45:4
57:15,22 70:21
71:15 77:22 78:9
79:3 80:5,10 83:2
83:21 86:5,9,14
86:23 90:20,23
91:1,3,4,6,13
92:18 94:4 100:3
110:6,24 112:7
114:9 115:6
121:18 122:10
123:10,22,23
124:19 125:6,11
127:18,20 128:12
128:14,16,19
130:14 136:5
141:7 152:13,25
153:24 160:22
164:2 171:11
172:1 173:16
177:24 178:4,5,6
180:17 189:3
**two-closing** 41:15
**two-page** 21:22
**two-pager** 17:13
**two-step** 41:15
43:9
**type** 59:13 76:6
82:14 83:16 84:13
129:15 172:15
**typed** 191:13
**types** 45:16 97:22
97:25 98:8,22
135:6 160:6
**T-A-L-M-A-D-G**
38:6

**U**
**UBS** 10:18 13:16
13:16,18,22 19:20
19:22 25:14 61:17

61:17 136:7
137:13,19,25
138:6,7,13 139:3
139:15,24
**Uh-huh** 144:25
150:14 156:24
167:10 175:18
**ultimate** 82:4
**ultimately** 14:25
18:12,13 40:10
41:25 42:10 51:14
57:20 66:12,16
72:10 84:17 89:2
136:10 155:3
173:16
**umpteen** 160:20
**Um-hmm** 60:3
**unambiguous**
113:10 117:9,16
118:24 119:19
120:11 121:17,18
**unambiguously**
113:7 118:5,19,24
**unaware** 48:2
**unchallenged**
39:25
**unconditionally**
22:9
**underlying** 25:22
27:18 50:18 56:7
58:3 65:6 69:23
71:14 75:17 87:10
87:11 148:15
168:5 181:17
**understand** 35:16
48:18 58:19 76:14
84:22 115:22
123:20 148:19
150:6 157:6
164:25 165:18
180:8 181:8
182:17 187:14
189:20
**understanding**
25:8 55:1 62:19
63:16 74:21
141:11 143:8

149:9,13 152:3
161:25 174:6
**understands**
174:15,16
**understood** 48:23
50:21 100:21
123:18 150:4
**undertake** 149:16
**undertaking**
149:18 150:9,18
**unenforceable**
86:15 167:15
**unfold** 27:22
**unfortunate** 145:7
**unfortunately**
19:23 102:4
162:18
**unidentified** 62:23
**uniform** 50:8,20
**uniformity** 50:3
**Union** 25:12 166:4
**unique** 91:9 96:4
**unit** 160:1
**United** 1:2,14
109:23 124:8
**University** 25:11
157:25 166:4
**unnecessary**
156:22
**unpaid** 40:24 41:1
41:5 88:2,4,14
134:19 137:10
138:6
**unquote** 131:14,19
**unreasonably**
166:24
**unrelated** 63:7
82:17
**unremarkable**
168:19
**unsecured** 2:7 3:17
4:3 32:12 100:18
100:25 101:12,20
102:3,5 134:4,5
134:11
**unused** 90:11
**unusual** 76:3

**UPB** 133:13
**urge** 101:2 123:5
131:15,16
**use** 22:19 110:13
118:21 123:22
168:3
**user** 50:5
**uses** 170:5
**usually** 110:17
128:6
**utility** 52:2
**U.S** 1:24 7:3 21:21
21:23 22:17

_____
### V
**v** 115:9,21 116:6,10
**vacillate** 109:20
**VADIM** 12:22
**valuable** 53:23
99:2 100:16
**value** 50:21,22
71:18 72:3 100:17
101:18,21 102:4
128:1 168:8
172:24,25,25
173:3
**variation** 53:25
**variety** 68:5,7 70:1
70:24
**various** 16:18
18:16 42:9 46:9
60:10 68:13 77:5
182:21
**vaudeville** 166:18
**Vegas** 146:25
**vehicle** 67:7
**vendor** 49:19
**verifies** 37:14
**version** 17:3 33:5
57:1
**versus** 54:16 61:24
66:9 67:7 82:1
125:16 154:5
175:25
**vi** 186:9
**viability** 141:22
**viable** 185:4

**Victoria** 8:18
186:22
**view** 26:9 27:7 28:1
42:16 43:10 45:21
46:14 47:19 48:1
50:4 51:3 52:16
54:25 55:3,4 58:2
59:2,18 66:15
80:9 81:13,24
82:19,24 83:6,11
83:11,12 91:17
92:9 93:18 94:3,4
101:20 110:23
125:13 128:22
172:21 178:2
**viewed** 48:23 80:10
84:24 93:7
**views** 48:12
**vigor** 38:17
**vigorous** 94:8
**violated** 116:20
163:18
**violates** 83:25
86:12
**violating** 59:5
**vis** 175:25,25
**vision** 92:25
**voids** 167:11
**volatize** 82:15
**voluntarily** 131:24

_____
### W
**W** 5:25 8:18
**wait** 65:10 157:18
163:21 166:9
**walk** 15:25 17:17
169:5
**Walrath** 82:2
**want** 14:3,12 15:8
15:14 18:17 22:11
31:11,17,19 36:12
36:14,16 37:22
42:21 56:8 58:25
60:21 65:25 69:12
78:11,16 79:18
88:8 91:8,14,14
97:5 98:1 100:10

102:12,23 103:13
103:14,17 104:1
104:25 105:25
106:1 107:1,11,21
109:9 112:5,5
114:24 115:1,8
118:14,20,22,23
122:23 123:16,17
125:7 128:21
129:4,7,10 130:11
130:12 132:11
133:20,22 135:3
140:24 144:1,19
148:4,6 156:5,13
157:9,22,24 158:1
158:10,10,17
159:11,12 166:25
168:13 172:20
177:19 180:20
187:24 189:9,21
**wanted** 23:12 24:11
85:16 86:23 95:24
98:3 100:9,12
103:10 123:7
141:24 165:2
186:2,24
**wanting** 143:19
**wants** 13:9 25:2
35:10,22 90:12
99:17 121:4
145:11,12
**warning** 177:3
**warrantee** 90:7
**warranties** 47:25
51:2,10 55:7
103:23 116:13
123:4 126:8,9,18
131:23 133:24
134:19,25
**warranty** 91:9
**Washington** 6:5
**wasn't** 49:14 52:6
52:15 98:6,7
126:15 127:24
129:14 154:16
**wasting** 39:21
**waterfall** 79:24

80:22 86:8,16
87:15 88:1,10,11
88:13,16 91:6
106:14 108:14,18
112:5 115:1,2,7
116:11 124:25
137:6 139:16
185:10 186:5
**way** 14:4 15:15
27:22 30:6 31:4
33:25 43:4 45:5
47:14 48:19 51:1
52:22,24 53:2,2
53:10 54:17,23
56:10 60:15,17,18
63:4 66:3,4,5,7,10
68:8 71:24 75:14
81:17 84:21 88:9
91:1 99:6,12
108:16 113:20
117:14,25 121:4
121:16,17,18
123:16 132:1
147:8,11 150:18
153:24 154:21,24
158:20 161:14
166:25 169:9,11
172:11 173:2
180:20 181:6,20
182:13,24 184:5
186:8 189:23
**ways** 79:20 96:5
182:11
**wearing** 107:16
**weave** 39:2
**week** 16:17
**weekend** 107:4,5,6
107:8 190:9
**weigh** 182:9
**Weill** 40:2,5 42:16
43:7 62:18 141:15
142:21
**Weill's** 133:15
**welcome** 157:21
165:20
**Wells** 7:11 24:9,10
24:13 57:21

159:22
**went** 30:20 49:2
50:2 82:13 87:8
110:1 127:12
141:1 157:25
159:14
**West** 3:6 7:12
**we'll** 13:9 16:9,23
18:7 21:10 26:16
30:5 35:13,13
36:1,5 50:15
60:12 79:16 94:13
102:24 135:24
136:25 143:25
144:2 147:14
190:1,2
**we're** 14:11 16:1
20:10 21:15 23:17
24:23 26:3,7 27:6
32:2 34:18 35:11
36:19 38:9 39:14
39:20 40:1,3
41:18 43:11 53:16
54:4,18 58:20
59:5 63:23 64:1
64:20 65:25 66:11
77:14 82:21 85:23
86:17 97:23,24
99:17 102:3
107:25 134:16
135:21 136:10
137:13 138:23
143:20 144:17
145:11,16,17
146:16 147:10,10
150:12 156:6,10
158:13 163:19
165:15 169:14
184:23 189:12,18
**we've** 13:6 18:3,17
25:17 27:15 32:4
36:23 38:12,20
39:2,10 40:2
52:21,25 53:18,22
54:14 59:2,13
60:14,16,22 63:25
64:1 72:23 73:25

75:4 77:10,23
83:1 88:6,11 93:2
93:23,25 95:1,4
95:20 96:2 112:21
154:21 164:3
175:13
**whack** 130:17
**whatsoever** 21:5
**wherewithal** 92:20
**whichever** 174:13
**WHITEMAN** 3:14
**Whitney** 7:2 21:21
**wholeheartedly**
28:18
**who've** 18:16 73:22
**WILAMOWSKY**
10:14
**Wilber** 185:5
**Wilbur** 26:9
**WILLIAM** 6:25
10:22
**willing** 18:24
**Wilmington** 1:17
3:8 4:7 5:6 6:14
6:23 7:6 8:6,16
9:21 10:20 11:6
11:21 12:6
**Winfree** 10:23
136:1,3,4,22,24
137:2,4,7 138:3,5
138:12,18,22
139:9,21 140:2
**Winfrey** 103:8
**winning** 40:16
**wins** 151:13
**WINTHROP** 4:11
**win/win** 157:2
**wipe** 105:14
**wish** 28:14 34:2
54:9 102:22 190:8
**withdraw** 22:9 36:5
88:3
**withdrawal** 24:3
**withdrawing** 27:4
35:17
**withdrawn** 16:12
17:20 18:25 19:10

20:5,10 21:13,16
22:18 24:2
**Withdrawn/Moot**
23:15
**wither** 185:3
**withheld** 166:24
**witness** 42:25 51:6
53:1 93:3 96:5
125:8 129:18,19
143:21
**witnesses** 53:1 93:3
94:1 96:3,3 141:5
141:9,12 142:20
150:11
**WLR** 149:14
**wonder** 51:11
**Wood** 89:22
**word** 122:8,10
149:16 170:5,6,8
170:12 187:17
**wording** 169:19
**words** 58:6 110:18
113:19 119:24,24
132:6
**work** 16:20 17:12
44:24 53:2,12
66:5,9 71:24
72:25 94:19
153:25 154:19
159:12 172:11
173:17 178:18
**worked** 56:25
127:6
**working** 33:25
44:22 155:7
159:24 184:16
189:18
**works** 43:4 52:22
52:24 53:3 66:4
88:10 109:6
114:12
**world** 107:25
166:16 190:3
**worried** 160:6,9
**worry** 73:3 164:15
164:17 187:5
**wouldn't** 34:10

67:22 126:25
129:4 130:11
147:3,6 159:6
**wrap** 13:9
**wrench** 29:2
**wrestled** 26:14
**wrestling** 145:15
**writing** 153:16
**written** 81:3 117:9
120:25 158:20
170:1 188:18
**wrong** 96:13
185:12
**wrote** 63:19 81:17

**X**

**x** 1:5,12 112:18
114:5

**Y**

**yeah** 19:14 26:4
56:15,19 62:7,10
63:20 102:13,14
104:22,23 107:6,8
107:8 117:18
137:7 140:3
166:11,15 173:12
175:4 176:7,15
178:8,23 179:15
181:6 189:5
**year** 127:22,23
161:8 163:20
165:15
**Yesterday** 13:15
**York** 3:19 4:12,14
5:13,22 7:20 9:13
10:12 11:13 12:20
17:24 19:9 24:14
67:8 85:9,12
110:14,16 117:4,6
117:7 118:5,7
119:3,23 120:25
127:13 147:22
**Young** 3:3 54:7

**Z**

**Z** 9:24

**ZC** 24:18,20 25:2

**0**

**02110** 10:5
**06** 49:13 82:2
**07-11047-css** 1:4

**1**

**1** 15:9 25:23 57:2
  136:12 137:16
  140:22
**1st** 33:16
**1.1** 101:22
**1.1J** 24:11 33:17
  36:21 56:13 57:10
**1.1(J)** 136:13
  137:17
**1.8** 133:18
**10** 2:17 32:9 123:7
  142:1,3
**100** 133:14
**1000** 3:6
**10004** 7:20
**10017** 9:13
**10019** 5:22
**10022** 3:19 5:13
  10:12 11:13
**10036** 4:14
**1007** 8:14
**101** 179:8,10,13
**10154** 12:20
**105** 2:3,11
**11** 39:17 73:17
**11s** 39:18
**11.09** 115:2,8,9,18
  116:6
**11.09(ii)** 186:9
**11.09(2)** 116:18
**1100** 11:19
**1105** 7:4
**111** 7:12 13:17,21
**116** 13:17,21
**1200** 8:15 11:20
**1201** 4:5 6:13 9:19
**124** 105:18
**13.01** 80:20,22 81:3
  84:16 85:6,15

**86**:3 112:6 114:12
  114:17,17
**13.05** 105:10 106:4
  108:7 166:22
**13.07** 79:13
**1301** 168:18,21,25
**1313** 5:5
**14.01** 112:11 113:6
**14.01(i)** 114:19
**14.01(v)(i)** 132:13
**1401** 168:13,14,14
  168:16,17,19
**15** 107:9
**15th** 6:22
**15,000** 49:13
**150** 10:4
**1500** 8:5 9:20
**1501** 6:4
**151** 119:5
**1533** 107:9
**154,000** 137:11
**1540** 4:13
**1600** 7:5
**17th** 3:7
**1701** 12:12
**177** 171:1
**18** 25:10
**18th** 6:12
**180** 133:14
**189** 133:15
**19** 1:19
**19103** 12:13
**195** 119:8
**19801** 3:8 4:7 5:6
  6:23 7:6 8:6,16
  9:21 11:21
**19899** 6:14 10:20
  11:6 12:6

**2**

**2** 17:20 24:9 33:16
  115:7,7,20 138:7
  140:22
**2d** 119:5,7
**2.06** 31:22
**2.3** 138:8
**2:00** 188:22

**2:10** 1:20
**2:40** 30:16
**20** 13:16 92:11
  93:18
**200** 127:23 133:13
  133:16 182:19
**2000** 127:22,23
**20005** 6:5
**2002** 33:16
**2003** 15:9
**2005** 49:12 122:4
  137:16
**2006** 2:17 136:13
**2007** 1:19 107:9
  191:9
**210,000** 46:21,21
**212,000** 165:8
**222** 9:12 12:4
**23rd** 189:7,11
**24** 25:14 191:9
**26th** 15:4
**27** 25:12
**29** 170:8
**29th** 189:12 190:2
  190:2

**3**

**3** 70:2 140:22
**3:03** 30:16
**322** 124:10
**33** 36:7
**345** 12:19
**347** 124:10
**35** 115:13
**362** 71:10
**363** 2:3,11 65:12
  66:8 67:7,18,22
  68:1,10,12 69:6
  70:3 74:1,2,4 99:5
  103:16 104:5,25
  105:2,6,9,12,14
  105:24 106:2,7
  108:6 109:6
  139:14 145:23
  151:7,9,10 156:13
  167:8,12,13,16,17
  167:18 168:12

**363F** 74:3
**363L** 74:3
**363(e)** 106:16
**363(f)** 106:7,8
  146:7,11
**363(f)(5)** 106:8
**363(l)** 167:24 168:9
**365** 64:21 65:4,8
  66:8,25 67:2,7,12
  67:13,18,22 68:1
  68:2,12,15 69:6
  71:10,13,14,23
  72:4 77:14 104:1
  105:1 145:23
  157:9 167:11,15
**365(c)(1)** 157:10
**365(f)** 105:6
**37** 36:7
**38** 25:12 133:17
**399** 10:11

**4**

**4** 25:11 127:10
**4:45** 86:20
**4:57** 86:20
**40** 133:16
**400** 175:5
**41st** 9:12
**425** 5:12
**437** 11:12
**44114** 9:6
**45** 25:13
**460** 41:7
**48** 25:14
**487** 105:19
**488** 3:18

**5**

**5** 107:21,21 131:11
  131:17 144:2
**5th** 1:16
**50** 25:14
**50,000** 49:12
**500** 8:4 10:19 41:8
**541** 66:8 73:9,9
  97:21 98:17 99:6
  99:15,19 145:20

**145**:22
**541C1** 73:9
**541(d)** 97:23
**541(3)** 97:7
**55** 117:3
**555** 39:9,11
**57** 112:14
**58** 112:16

**6**

**6** 144:3
**6:13** 135:12
**6:32** 135:12
**600** 11:5
**60603** 7:13
**62** 25:13
**68** 25:13
**69** 17:4,4 25:9

**7**

**7** 97:11,11 122:14
  122:14,16 131:23
  144:3
**7th** 109:24
**7.02(VI)** 144:4
**7.03** 89:20 90:6,7
  116:18,19
**7.04** 116:13,19
  117:11
**7.05** 90:8 147:10
**7.5** 148:3
**7:55** 190:11
**7001(2)** 145:18
**73** 25:11
**741** 97:7,11,11,23
  97:25 99:15,19
**787** 5:21
**79** 25:15

**8**

**8** 97:11 115:4,18
  122:2,8
**8-what** 115:16
**8-250-16** 157:11
**8-7** 115:4,18
**80** 92:10
**800** 4:6

**824** 1:15
**84** 15:1,9
**85** 49:13

---

**9**

**9** 123:6
**900** 12:5
**901** 9:5
**9019** 27:6
**919** 6:21 11:4
**97** 119:7
**97A** 119:5