UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .    Chapter 11
                                .
AMERICAN HOME MORTGAGE          .    Case No. 07-11047(CSS)
HOLDINGS, INC., a Delaware      .    (Jointly Administered)
corporation, *et al.,*          .
                                .    Oct. 23, 2007 (2:15 p.m.)
            Debtors.            .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE CLERK: All rise.

2          THE COURT: Please be seated.  Good afternoon.

3          UNIDENTIFIED SPEAKER: Good afternoon, Your Honor.

4          THE COURT: Mr. Brady.

5          MR. BRADY: Good afternoon, Your Honor.  Robert

6    Brady on behalf of the debtors.  Your Honor, the one matter

7    that was originally scheduled for today is the debtors'

8    motion to sell the Ginnie Mae portfolio to Midfirst.  We need

9    to ask the Court's indulgence and ask for a short continuance

10   of that hearing.  There were two objections filed, one by the

11   Creditors Committee, one by Bank of America.  We did work

12   with both the bank and the Committee on changes to the APA

13   that would satisfy their objection.  We sent that to

14   Midfirst.  We received a revised APA from Midfirst just

15   moment ago, and we have not had a time to go through it and

16   work with the bank and the Committee to see if we can reach

17   resolution.  In light of the sell-it or lose-it nature of the

18   Ginnie Mae portfolio asset, we still have some time.  It has

19   to close by October 31 with a transfer by November 1.

20   Midfirst is prepared to meet that timetable still if we can

21   get resolution of these issues.  So, we would ask for just a

22   short continuance to perhaps Thursday, if we could, to try to

23   hammer out the APA.

24          THE COURT: What time - Well, I have 10, 11, 12, and

25   2 already on Thursday, so I can go 1 or 3, whichever you

1    prefer.

2            MR. BRADY: The way this has gone so far, Your

3    Honor, even those two hours would be helpful, so we'll take 3

4    p.m. on Thursday.

5            THE COURT: All right, 3 p.m. Thursday, that's fine,

6    and I have a lot of availability Friday if you need to go to

7    Friday.

8            MR. BRADY: Thank you, Your Honor.

9            THE COURT: All right, so, we'll continue both the

10   sale motion and the motion to file under seal until Thursday

11   at 3?  I will note there was also an objection by MERS to the

12   sale motion, just so the record's clear.

13           MR. BRADY: Yes, Your Honor, we would take that up

14   at the hearing.  The two objections I spoke of dealt with the

15   terms of the APA.

16           THE COURT: All right, okay.

17           MR. HOLCOMB (TELEPHONIC): Your Honor, William

18   Holcomb appearing on behalf of Midland.

19           THE COURT: Yes, sir.

20           MR. HOLCOMB (TELEPHONIC): Your Honor, I appreciate

21   you allowing us to appear by telephone.  If I may, Your

22   Honor, if it's necessary and we need to be up in Delaware

23   next week, I would request that the Court allow us the

24   accommodation for us to appear without local counsel if

25   that's possible given how quickly this matter has proceeded.

1  I've appeared numerous times in front of the Court up there,

2  and I would, of course, request that we have that

3  accommodation.  We're trying to focus on getting the bail

4  flanged up at this point, and I think that that's where our

5  focus needs to be so that possibly there's not a need for

6  appearance at all.

7      THE COURT: Well, as far as I know, this is your

8  first appearance in court altogether, and you have 30 days

9  under our local rules to affiliate with local counsel in any

10  event.  So, I frankly don't think it's an issue for the

11  Court, and I think you're fine underneath the prevailing

12  local rules as it stands.  All right?

13      MR. HOLCOMB (TELEPHONIC): Thank you, Your Honor.  I

14  wanted just to make sure that that was okay.

15      THE COURT: Understood.  We like local counsel, but

16  we don't like to turn away buyers either, so, to be

17  accommodating; all right?  And that leaves us with the

18  Court's ruling on the motion approving sale procedures in

19  connection with the servicing business, and I appreciate your

20  patience in allowing me some time to put my thoughts together

21  and review the important pleadings and cases as well as the

22  factual record, and the Court's - I'm prepared to give my

23  ruling.  I apologize ahead of time, but it's rather lengthy,

24  so, you just have to take as many notes as you can.  I'm

25  going to read it and hopefully do so slowly enough that it

1    will be decipherable on the record.  Before the Court, is the

2    debtors' motion to sell substantially all of its assets

3    related to its mortgage loan servicing business.  There was a

4    five-day trial in this matter consisting of testimony by

5    seven witnesses and extensive oral argument.  There are a

6    number of factual and legal issues before the Court, but I

7    think it would be helpful to start with matters that are

8    either not contested or easily resolved by the Court.  First,

9    there is no question as to whether the debtors have satisfied

10   their burden of proof under <u>Abbott Dairies</u> that the sale is

11   in the sound business judgment of the debtors.  It is

12   uncontested that: (1) A sound business purpose justifies the

13   sale of the servicing business.  (2) Adequate and reasonable

14   notice has been given to interested persons, subject only to

15   certain objections regarding issues that go more to the

16   severability of contract rights than actual notice.  (3) The

17   debtors have obtained a fair and reasonable price, and (4)

18   The debtors have acted in good faith subject again only to

19   certain objections regarding the debtors' good faith

20   determination of cure amounts.  Moreover, it is uncontested

21   that the debtors have complied with the revised bidding

22   procedures approved by the Court.  Second, subject fully to

23   the upcoming discussion regarding the pending objections, the

24   debtors have satisfied their burden under § 365 of the

25   Bankruptcy Code to assume and assign those executory

1  contracts that are not subject to pending objections.  In

2  order to assume and assign an executory contract, the debtors

3  must cure all defaults under the assigned contract and

4  provide adequate assurance of future performance.  Taking the

5  second prong first, through the testimony of Mr. Stroper

6  (phonetical) and based upon the terms of the APA, the debtors

7  have established adequate assurance of future performance.

8  The way the APA is structured is somewhat unusual.  Upon

9  Court approval, the debtors and the buyer will move to a

10 quote, "economic close", end of quotation.  Upon the economic

11 close, the buyer will pay the consideration under the APA and

12 will obtain the risk and rewards of the ongoing servicing

13 business but not legal title to the assets.  Legal title will

14 pass at the final close, which can only occur when the

15 buyer's duly licensed by applicable authorities to operate a

16 servicing business.  There may be a lag of several months

17 between the economic close and the legal close.  Certain

18 objectors argue that no such adequate assurance is provided

19 due to the time lag between the economic close and the final

20 close.  The objectors argue in effect that the buyer will

21 have no incentive to maintain the servicing business until

22 the final close and do what needs to be done, i.e., retain

23 management, become a licensed servicer, join MERS, adequately

24 fund the business, et cetera, in order to effectuate the

25 final close.  I disagree.  Under the APA, the buyer will

1   transfer approximately $500 million to the debtors at the

2   economic close and will bear the burden of risk and reward of

3   the operation of the business going forward.  Morever, the

4   testimony clearly established that the buyer has more than

5   sufficient capital available to operate the business.  The

6   objectors want, in effect, a guarantee that the buyer will

7   continue to funnel resources into the business even if it may

8   not make sense to do so.  No such guarantee is required.  If

9   the Court was being asked to approve an economic close months

10  in the future, I would be more sympathetic to the objector's

11  argument, but the transfer of the risk and rewards of the

12  business in short order to an entity with ready availability

13  of more than sufficient capital that intends to maintain as

14  much of current management as possible is more than enough to

15  establish adequate assurance of future performance.  In

16  connection with the requirement the defaults be cured, there

17  is no question that the testimony of the witnesses and the

18  terms of the APA provide that the cure of all defaults,

19  provided however, that where applicable the assumed

20  contracts, such as the master loan purchase and sale

21  agreements, are severable into two contracts; one related to

22  the purchase and sale of mortgages, and one related to the

23  servicing of mortgages.  The Court finds, subject fully to

24  the upcoming discussion regarding the pending objections,

25  that the testimony of Mr. Love, Mr. Johnson, and Mr. Erinoff

1   (phonetical) establishes the debtors' *prima facie* case that

2   those contracts for which no objection is currently pending

3   are indeed severable into two contracts, and thus, the

4   debtors need only cure defaults relating to the servicing of

5   mortgages, which is clearly provided for by the terms of the

6   APA and through the testimony of the witnesses.  Thus, in

7   connection with contracts not subject to pending objections,

8   and debtors have satisfied the criteria of § 365 of the

9   Bankruptcy Code and may assume and assign those contracts or

10  portions of contracts relating to servicing of mortgages *cum*

11  *onere*, i.e., with all rights and obligations related to

12  servicing.  Third, subject fully to the upcoming discussion

13  regarding the pending objections and as limited by my more

14  immediate comments, the debtors have satisfied their burden

15  under § 363 of the Bankruptcy Code to transfer their contract

16  rights relating to the servicing of mortgages.  The debtors'

17  position is that the servicing contracts are non-executory,

18  thus, the debtors can sell the, quote, "servicing rights",

19  end quote, under those contracts.  The debtors have defined

20  servicing rights as, quote, "The right to service mortgages

21  on the terms and consistent with the obligations set forth in

22  the relevant contracts", end quote.  While I agree that the

23  contracts are non-executory and the contract rights may be

24  transferred under § 363, I disagree somewhat with how the

25  debtors have characterized what they are transferring.  The

1   debtors' rights under a contract are property of the estate

2   under § 541 of the Bankruptcy Code.  Because a contract right

3   is a type of property, many of the rules governing its

4   transfer are similar to the rules of property law governing

5   the sale of land and chattels or personal property.  However,

6   unlike land and chattels, a contract right is a type of

7   intangible property.  Under the common law of contracts,

8   there is a distinction between the assignment of rights under

9   a contract, the delegation of duties under a contract, and

10  the transfers of rights and obligations under a contract.

11  Under the Bankruptcy Code, if a contract is executory, i.e.,

12  the obligations of the debtor and the other party to the

13  contract are so underperformed that the failure of either to

14  complete performance would constitute a material breach

15  excusing the performance of the other, the debtor must comply

16  with § 365 of the Bankruptcy Code in order to transfer the

17  rights and obligations under such contract.  In the event a

18  contract is not executory, the debtor may assign, delegate,

19  or transfer rights and/or obligations under the contract as

20  applicable under § 363 of the Bankruptcy Code, provided that

21  the criteria of that section are satisfied.  The debtors

22  argue that the contracts relating to the servicing of

23  mortgages are not executory.  Debtors have satisfied their

24  burden of proof in establishing that those contracts, not

25  subject to pending objections, are not executory.

1   Specifically, as discussed previously, the Court finds that

2   the testimony of Mr. Love, Mr. Johnson, and Mr. Erinoff

3   established that the debtors' *prima facie* case that those

4   contracts for which no objection is currently pending are

5   severable into two contracts.  Moreover, the testimony of Mr.

6   Love and Mr. Erinoff established that the servicing portion

7   of those contracts contain no material obligations on behalf

8   of the owner of the mortgage that if breached would be

9   sufficient to excuse the performance of the servicer.

10  Specifically, the servicer's right of payment of its

11  servicing fees and other fees is not an obligation of the

12  mortgagee, but rather is solely payable from the stream of

13  payments of the mortgagor or the proceeds of the collateral

14  in the event of nonpayment by the mortgagor.  Thus, the

15  contracts are not executory.  Although it is less than clear,

16  the debtors seem to further argue that the APA constitutes a

17  delegation of the debtors' duties under the servicing

18  contracts rather than a transfer of the rights and

19  obligations under the servicing contracts.  Thus, the debtors

20  appear to argue that they are transferring less than the

21  entire bundle of rights and obligations under the servicing

22  contracts.  I disagree.  What the debtors are doing is

23  transferring all the rights and obligations under the

24  servicing contracts to the buyer.  If that was not the case,

25  for example if the buyer was not also obtaining the right of

1    payment under the servicing contract, albeit from the

2    mortgagor and not the mortgagee, the debtors would have to

3    pay the buyer to agree to the delegation of the obligations

4    under the contracts, and that is clearly not the case.

5    Moreover, finding that the debtors are effectuating a

6    transfer of rights and obligations, rather than solely a

7    delegation of obligations, is consistent with the Third

8    Circuit's holding in <u>Folger Adams</u>, which allowed for the

9    assignment of the debtors' rights under a non-executory

10   contract subject to the defenses to those rights, i.e., the

11   obligations.  Although not stated in these exact terms, in

12   <u>Folger Adams</u>, the Third Circuit authorized the transfer of

13   the rights and obligations of the contract, and importantly,

14   this is a different issue from severability and assumes the

15   contracts are severable.  Thus, the Court finds, that the

16   debtors are not seeking to delegate the debtors' obligations

17   under the servicing contracts bur rather seeking to transfer

18   the rights and obligations under the servicing contracts, and

19   as a result, the buyer was purchasing and undertaking all

20   rights and obligations relating to servicing under the

21   transferred contracts.  With those rulings, I believe I have

22   disposed of all the issues before the Court other than the

23   review and approval of the proposed order and the pending

24   objections.  I turn now to the objections.  At the conclusion

25   of the hearing on Friday, there were eight remaining

1   objectors.  They are: (1) Mortgage Electronic Registration

2   Systems, Inc., or MERS, Docket No. 1062; (2) Duke University

3   Federal Credit Union, Docket No. 831; (3) Travis County,

4   Texas, Docket No. 911; (4) Connecticut Housing Financing

5   Authority, Docket No. 813; (5) Assured Guaranty Corp., Docket

6   No. 1065; (6) DB Structured Products, Inc., Docket Nos. 675,

7   1108, and 1533; (7) Mortgage Stanley Mortgage Capital

8   Holdings, LLC - excuse me, Morgan Stanley Mortgage Capital

9   Holdings, LLC, Docket No. 849; and finally number (8) UBS

10  Real Estate Securities, Inc., Docket Nos. 828, 1029, and

11  1123.  Now, we'll address the objections in the order listed.

12  First, MERS.  MERS is a party to a contract with the debtors

13  that is not being transferred to the buyer.  Included in the

14  obligations under that contract is the debtors' obligation to

15  indemnify MERS in the event that certain actions are not

16  taken by the entity servicing the mortgages on the MERS

17  system.  MERS makes two related objections.  First, MERS

18  argues that there are certain fees that must be paid in

19  connection with transferring to the buyer - excuse me.  I'm

20  sorry.  First, MERS argues there are certain fees that must

21  be paid in connection with transferring to the buyer the

22  mortgages on the MERS system.  MERS is further concerned that

23  there will be insufficient funds in the debtors' estate to

24  make the MERS payment.  Thus, MERS argues that the sale order

25  should obligate the debtors to make those payments and funds

1    should be set aside at the economic close to do so.  Second,

2    MERS argues that the sale cannot proceed to final closing in

3    the event that the buyer is not a MERS member unless prior to

4    closing all of the mortgages on the MERS system are de-

5    registered because otherwise MERS will only have a claim

6    against the debtors as opposed to the buyer for potential

7    wrongdoing by the buyer.  I'm overruling the objection on

8    both grounds.  First, with regard to the transfer payment,

9    the debtors, the Committee, the banks, and the buyer, as well

10   as most importantly the terms of the APA all acknowledge that

11   the transfer payment must be paid.  They do not agree as to

12   which party's obligated to make the payment.  MERS is not

13   entitled to anything more.  If MERS has a right to payment,

14   it will be paid.  I'm not being asked at this time to

15   determine who is liable on that payment or to affect MERS

16   right to payment.  To the extent MERS is worried about

17   administrative insolvency, it joins a long list of other

18   administrative creditors, including the professionals with

19   similar worries, but there is no evidence before the Court to

20   suggest at this time that there is any significant

21   possibility of administrative insolvency, and to the extent

22   that MERS is concerned that it may have an unsecured claim

23   against the debtors in connection with a contract not being

24   assumed that may not be paid in full, the list of similarly

25   situated creditors is even longer.  Again, MERS has no right

1   to anything other than its claim absent some legal right,

2   other than to assert a claim, I am not going to give MERS the

3   right in effect to block the closing of the transaction.  So

4   the MERS objection is overruled.  Duke University Federal

5   Credit Union objects that the debtors have not established

6   adequate assurance of future performance.  Duke did not

7   actively participate in the hearing and was not present for

8   oral argument.  As set forth earlier, the Court finds that to

9   the extent applicable the debtors have indeed satisfied their

10  burden of providing adequate assurance of future performance,

11  and the objection is overruled.  Travis County, Texas.

12  Travis County, Texas holds a statutory lien against certain

13  personal property of the debtors.  Travis County asserts that

14  its lien should attach to the proceeds of the sale.  Travis

15  County did not actively participate in the hearing and was

16  not present for oral argument.  Nonetheless, Travis County's

17  position is entirely consistent with the law which provides

18  that its lien will attach to the proceeds.  I understand that

19  the debtors have included language to that effect in the

20  proposed sale order, thus, based upon the provisions of the

21  order, the objection is moot, but to the extent that the

22  debtors propose a sale order that does not provide such

23  language, the objection is sustained.  Of course, all rights

24  and defenses concerning whether Travis County has a valid

25  lien and the priority of the lien as well as the amount of

1   the claim are fully preserved.  Number 4, Connecticut Housing

2   Financing Authority or CHFA.  Connecticut Housing Financing

3   Authority is a party to what the debtors characterize as a

4   standalone servicing agreement.  Specifically, the agreement

5   is not a document combining rights and obligations concerning

6   the purchase and sale of mortgage loans with rights and

7   obligations regarding the servicing of mortgages.  Rather, it

8   relates solely to servicing.  CHFA makes a number of

9   objections to the debtors' proposed assumption and assignment

10  of its contract.  Specifically, Connecticut Housing argues

11  that (1) the debtors must secure non-monetary, including

12  historical, and monetary defaults under the contract; (2) the

13  debtors have failed to establish adequate assurance of future

14  performance; (3) Connecticut Housing's consent, which is not

15  given, is required; and (4) the debtors cannot assume and

16  assign the underlying mortgages or mortgage files.  Those

17  objections are overruled or moot.  First, as discussed

18  earlier, I find that the contract with Connecticut Housing is

19  not executory, thus, § 365 is inapplicable.  Second, to the

20  extent § 365 is applicable, applying the Joshua Slocomb test

21  there are no material and economically significant non-

22  monetary defaults, historical or otherwise, that need to be

23  cured.  I note that Connecticut Housing did not cross-examine

24  any of the witnesses and did not provide any independent

25  evidence concerning the materiality or the economic

1   significance of the non-monetary defaults.  Moreover, as

2   discussed earlier, the debtors have established adequate

3   assurance of future performance.  With regard to consent,

4   regardless of whether § 365 or 363 is applicable, Connecticut

5   Housing's consent is not required under § 365(F)(1) and

6   363(L) respectively.  Finally, the debtors are not seeking

7   assumption and assignment of the underlying mortgages or

8   mortgage files.  As part of the transfer, the contract

9   relating to servicing, the debtors are simply asserting and

10  transferring the possessory interest in the mortgage files.

11  Finally, through the testimony of Mr. Love and Mr. Stroper,

12  the debtors have established that Connecticut Housing's

13  interest in the mortgage files is adequately protected.

14  Five, Assured Guaranty Corp.  AHM Servicing is the servicer

15  of certain mortgage loans in a securitization trust under a

16  standalone servicing agreement dated as of June 2007 and

17  admitted into evidence as Assured Exhibit 1.  Assured is not

18  a contract party to the servicing agreement but is an

19  expressed third party beneficiary under § 7.05 of that

20  agreement.  Pursuant to a separate insurance and indemnity

21  agreement between the debtors and Assured dated as of June

22  2007 and admitted into evidence as Assured Exhibit 2, Assured

23  is the insurer of the certificates issued under the

24  securitization of the mortgages by the buyer.  The

25  securitization document is admitted into evidence as Exhibit

1   3.   Through the sale motion, the debtors seek to transfer the

2   servicing contract to the buyer.   The debtors are not

3   transferring the insurance and indemnity agreements nor the

4   pooling and servicing agreements admitted into evidence as

5   Assured Exhibits 2 and 3 respectively.   Assured objects to

6   the sale for the following three reasons: First, Assured

7   argues that the debtors' rights and obligations under the

8   insurance agreements must be transferred with the servicing

9   agreements.   Assured argues that the three documents are

10  economically interrelated and thus one non-severable

11  contract.   Thus, they must be transferred in toto regardless

12  of whether the transfer is under § 363 or 365 of the

13  Bankruptcy Code.   Second, Assured argues that the debtors

14  have failed to sustain their burden of proof of adequate

15  assurance of future performance, and third, Assured objects

16  to the transfer of the agreements on the basis that the APA

17  does not provide for the cure of defaults under the insurance

18  agreements.   Assured's first and third bases for objecting to

19  the sale rise and fall on whether the three documents are so

20  economically interrelated that they cannot be assumed and

21  assigned or transferred separately but rather must be dealt

22  with in toto.   If the documents are severable, there is no

23  legal basis for requiring the debtors to transfer the

24  insurance agreement or pooling and servicing agreement nor

25  for requiring the debtors to cure defaults under contracts

1    not being assumed or assigned.  Chief Judge Walrath recently

2    discussed this principle in depth in her opinion in <u>Shaw</u>

3    <u>Group vs. Bechtel Jacobs</u>, 350 BR 166.  In <u>Shaw</u>, Chief Judge

4    Walrath noted at page 177 that, quote, "In order to assume a

5    particular executory contract, the debtor's only required to

6    perform under that discrete contract not under other

7    substantially unrelated agreements."  End quote.  This is

8    true where distinct agreements are in the same document or in

9    different documents and is equally applicable to the transfer

10   under § 363 of the Bankruptcy Code of rights and obligations

11   under non-executory contracts.  Thus, the debtors have every

12   right to transfer or assume and assign the servicing

13   agreement separately from the other agreements provided,

14   however, that those agreements are in fact separate.  That

15   leaves the Court with the task of determining whether the

16   agreements are separate.  Regardless of whether state or

17   federal law is controlling, the standard of the Court's

18   review is substantially the same.  The intention of the

19   parties is the governing principle and contract construction,

20   and absent ambiguity in the terms of the contract, intent is

21   gleaned from the four corners of the instrument.

22   Furthermore, that the terms of the transaction are set forth

23   in one instrument is not conclusive evidence that the parties

24   intended to make only one contract but is only a factor in

25   determining intent.  The converse is also true, the fact that

1   the terms of the transaction are set forth in three

2   instruments is only one factor in determining whether the

3   parties intended to create three contracts.  The rights and

4   obligations under the various Assured contracts must be

5   economically interdependent in order to implicate the *cum*

6   *onere* principle.  As the agreements are contained in three

7   separate documents, it would not be unreasonable to presume

8   they are separate agreements and place the burden of proof on

9   Assured to establish otherwise.  Nonetheless, the Court will

10  rest the burden of proof on the debtors to establish the

11  documents are separate agreements which the Court finds the

12  debtors have satisfied.  The 11th Circuit in <u>In re: Gardinere</u>

13  (phonetical) apply that three part test in determining

14  severability.  (1) Are the nature and purpose of the

15  agreements different?  (2) Is the consideration for each

16  agreement separate and distinct?  And (3) Are the obligations

17  of each party to the instrument interrelated?  All three

18  criteria favor a finding of severability of the Assured

19  contracts.  The nature and purpose of the servicing agreement

20  is wholly different from the pooling agreement by which the

21  mortgages were securitized and the insurance agreement under

22  which the insured provided insurance for the benefit of the

23  holders of the certificates under the securitization.

24  Similarly, the consideration under each agreement is readily

25  identifiable and separate and distinct.  Third, the rights

1   and obligations of the parties under the agreement are not

2   interrelated.  On this final point, these documents lack the

3   indemnity and waterfall provisions that will be discussed

4   shortly in connection with the remaining objections.  The

5   interrelation is limited to cross-referencing of definitions

6   between the documents and Assured's status as a third party

7   beneficiary of the servicing agreement.  That is insufficient

8   in this case to make the rights and obligations of the party

9   under the servicing agreement interrelated to the rights and

10  obligations under the other documents.  Thus, the documents

11  are in fact what they appear to be, three separate

12  agreements, and the debtors can independently transfer,

13  assume and assign the rights and obligations under the

14  servicing agreement.  The final basis of Assured's objection

15  is that the debtors have failed to establish adequate

16  assurance of future performance.  For the reasons discussed

17  earlier, I disagree.  Thus, Assured's objection is overruled.

18  That leaves the Court with the final three objections, all of

19  which raise substantially the same issues.  DB Structured

20  Properties, Morgan Stanley, and UBS Real Estate are all

21  parties to master loan purchase and sale agreements or MLPSAs

22  with American Home Mortgage Corp. and American Home Mortgage

23  Servicing.  MLPSAs are single documents that provide for the

24  purchase and sale of mortgages originated by American Home

25  Mortgage Corp. to investors.  Those investors then either

1   hold the purchased mortgages or place them into a

2   securitization trust, and MLPSAs also provide for the

3   servicing of the mortgages subject to the agreement by

4   American Home Mortgage Servicing.  Under the MLPSAs, the

5   purchaser of the mortgages can assert two types of claims

6   back against the purchaser, each of which require that the

7   purchaser repurchase the mortgage and pay damages to the

8   purchaser: one, premium recapture and two, early payment

9   defaults.  A premium recapture claim arises when the

10  mortgagor repays the mortgage in a set period of time, often

11  a year, either through sale of the home or refinancing.  As

12  this early sale deprives the purchaser of certain economic

13  benefits of the transaction, i.e., the anticipated stream of

14  interest payments, the purchaser can require the seller to

15  repurchase the mortgage for the unpaid principal balance plus

16  the premium paid by the purchaser for the anticipated

17  interest payments.  An early payment default occurs when the

18  mortgagor fails to make on a timely basis one of the first

19  few payments due under the note and mortgage, usually one of

20  the first three.  The purchaser then has the option to

21  require the seller to repurchase the loan.  The purchaser

22  determines independently whether a claim for premium

23  recapture or early payment default can be made based upon the

24  information that the purchaser receives from the servicer in

25  the ordinary course of the servicing relationship.  When the

1  seller receives such a claim, it will often require from the

2  servicer - excuse me.  When the seller receives such a claim,

3  it will often inquire from the servicer as to whether the

4  information asserted by the purchaser is accurate in order

5  for the seller to determine whether the claim is valid.

6  Broadly speaking, the servicer and the seller/purchaser

7  portions of the contract are readily distinguishable except

8  for two types of provisions - You think it's bad listening to

9  me to say all this, I had to listen to you guys for five

10 days, so - We're almost there.  First, the MLPSAs contain a

11 provision that provides that the servicer shall indemnify the

12 purchaser from loss including loss arising from the seller's

13 failure to perform its duties relating to the purchase and

14 sale of mortgages.  Second, the MLPSAs contain provisions

15 that provide that the servicer may not seek reimbursement of

16 advances from the custodial accounts on behalf of the

17 purchasers in the event that the seller is in breach of its

18 obligation to repurchase mortgages on account of early

19 payment defaults or premium recapture.  This provision was

20 referred to as the waterfall provision throughout the case.

21 DB Structured, Morgan Stanley, and UBS Real Estate have all

22 asserted claims against AHM Mortgage Corporation - excuse me

23 American Home Mortgage Corporation for premium recapture

24 and/or early payment defaults for which they assert servicing

25 is liable under the indemnification provision and/or the

1  waterfall provisions.  There was extensive testimony and

2  argument concerning whether the indemnity and waterfall

3  provisions contained in the DB Structured MLPSA provide, as I

4  just described.  Most, if not all of that testimony, was

5  subject to a standing objection that it was inadmissible

6  parol evidence.  The Court agrees that the indemnity and

7  waterfall provisions in the DB Structured MLPSA are clear and

8  unambiguous on their face, and thus, any parol evidence as to

9  the parties' intent or the meaning of the provisions is

10  inadmissible.  In making my findings and ruling on this

11  objection, I have read the indemnity and waterfall provisions

12  in the MLPSAs of the remaining objectors in the light most

13  favorable to the objectors.  Based upon the indemnity and

14  waterfall provisions, the remaining objectors assert that the

15  MLPSAs are not severable contracts, and they can only be

16  transferred and/or assumed and assigned in toto.  The legal

17  standard governing whether the MLPSAs are severable is the

18  same discussed earlier in connection with the Assured

19  objection, i.e., based upon the intention of the parties

20  gleaned from the four corners of the documents: (1) Are the

21  nature and purpose of the agreements different? (2) Is the

22  consideration for each agreement separate and distinct; and

23  (3) Are the obligations of each party to the instrument

24  interrelated?  As with the Assured objection, a reading of

25  the MLPSAs at issue establishes that the nature and purpose

1   of the agreements regarding servicing is different from the

2   nature and purpose of the purchase sale portions.  Similarly,

3   the MLPSAs establish separate and distinct consideration.

4   Finally, the obligations of each party relating to purchase

5   and sale of mortgages and the servicing of mortgages are not

6   interrelated except, perhaps, for the indemnity and waterfall

7   provisions.  The indemnity and waterfall provisions, however,

8   are not sufficient on their own to make the agreements

9   interrelated.  Chief Judge Walrath's opinion in Shaw v.

10  Bechtel is directly on point and is squarely opposed to the

11  objector's position.  In Shaw, the debtor had entered into

12  four contracts with Bechtel.  The debtor transferred three of

13  the four contracts to Shaw under §§ 363 and 365 of the

14  Bankruptcy Code, and the debtor rejected the fourth contract.

15  While Bechtel did not object to the transfer of the

16  contracts, post-closing, Bechtel refused to pay certain sums

17  due to Shaw under the transferred contracts based upon

18  Bechtel's right under the terms of the contracts to set off

19  from what was due to Shaw under the transferred contracts

20  amounts owed to Bechtel by the debtor under the rejected

21  contract.  The Bankruptcy Court granted summary judgment in

22  favor of Shaw finding that the provision relied upon by

23  Bechtel was an unenforceable cross-default provision that was

24  insufficient to make the assumed and rejected contracts

25  interrelated.  In so ruling, the Court made a number of

1    comments that are particularly instructive in this case.

2    Specifically, as previously cited, the Court in quoting from

3    the United Airlines case, noted, quote, "In order to assume a

4    particular executory contract or unexpired lease, the debtor

5    is only required to perform under that discrete contract or

6    lease not under other substantially unrelated agreements.

7    This principle applies where distinct agreements are set out

8    in the same document, and of particular relevance here, it

9    applies where distinct agreements are linked by a cross-

10   default clause providing for a loss of rights under one

11   agreement if another agreement is breached.  Thus, assumption

12   under § 365 is subject to a well-established cross-default

13   rule.  Cross-default provisions do not integrate executory

14   contracts or unexpired leases that otherwise are separate or

15   severable."  End quote.  The Court further quoted from note

16   11 on page 468 of the United Airlines opinion, that quote,

17   "Just as the *cum onere* rule prevents the estate from avoiding

18   obligations that are an integral part of an assumed

19   agreement, so the cross-default rule prevents the non-debtor

20   party from imposing on the estate the costs of substantially

21   unrelated agreements."  End quote.  The Shaw Court found that

22   the provision relied upon by Bechtel was a cross-default

23   clause that was unenforceable because it resulted in an anti-

24   assignment provision that was contrary to the policy under

25   the Bankruptcy Code.  In so ruling, the Court stated as

 1   follows on page 178 and 179: "The Court rejects Bechtel's

 2   arguments.  The fact that the offset provision did not

 3   expressly prohibit separate assumption and rejection of the

 4   Bechtel sub-contracts is irrelevant.  The Third Circuit has

 5   noted that § 365(F) was designed to prevent anti-alienation

 6   or other clauses and leases in executory contracts assumed by

 7   the debtor from defeating his or her ability to realize the

 8   full value of the debtor's assets in a bankruptcy case.

 9   Therefore, the offending provision may not necessarily be one

10   that directly prohibits assignment of a contract but may be

11   one that indirectly interferes with the debtor's ability to

12   realize the value of its assets.  Defacto anti-assignment

13   provisions may be found in a variety of forms, including

14   lease provisions that limit the permitted use of the leased

15   premises, lease provisions that require payment of some

16   portion of the proceeds or profit realized upon assignment,

17   and cross-default provisions.  Cross-default provisions are

18   inherently suspect because they interfere with the debtor's

19   rejection power by saddling the estate, albeit indirectly,

20   with the burdens of unwanted executory contracts.  Under

21   Bechtel's own interpretation of the offset provision, the

22   debtor's default, i.e., rejection of the Portsmouth contract,

23   triggered the loss of substantial rights under the TSCA and

24   tank contracts at issue in that case.  As a result, the Court

25   concludes that the offset provision is a classic cross-

1    default clause which is not enforceable under § 365(F)(3)."

2    End quote.  Chief Judge Walrath further stated that the

3    critical feature of decisions which do not invalidate cross-

4    default provisions, is, quote, "That the agreements linked by

5    a cross-default clause were economically interdependent, the

6    consideration for one agreement supported the other."  End

7    quote.  Finally, she stated that, quote, "Courts have

8    repeatedly refused to enforce cross-default clauses that

9    attempt to link parallel contracts with unrelated

10   consideration."  End quote.  Although the issue before this

11   Court is a closer call than that presented in the Shaw v.

12   Bechtel matter, I find that even reading the MLPSAs in a

13   light most favorable to the objectors, the indemnity and

14   waterfall provisions contained in the objector's MLPSAs are

15   unenforceable cross-default provisions that serve as defacto

16   anti-assignment provisions and they are insufficient on their

17   own to make the purchase sale and servicing agreements

18   contained in the MLPSAs economically interdependent.  In so

19   finding, the Court considers it's significant that the only

20   possible basis to find the purchase sale and servicing

21   agreements economically interdependent are the indemnity and

22   the waterfall provisions.  Moreover, to the extent that the

23   testimony of Mr. Principato of DB Structured properties is

24   admissible, it would support a finding that the agreements

25   are not economically interdependent.  Mr. Principato

1   testified that the indemnity and waterfall provisions were

2   standard provisions in all MLPSAs and were designed as credit

3   enhancements on behalf of the investor.  Chief Judge Walrath

4   found similar facts and <u>Shaw v. Bechtel</u> supported a finding

5   that the agreements at issue were not economically

6   interdependent.  The crux of the issue before the Court and

7   the primary factor underlying the overruling of the

8   objections can be summarized by the following quotation from

9   the <u>Shaw/Bechtel</u> case, quote, "The rejection power is

10  frustrated when one creditor, based on the happenstance of

11  having multiple cross-defaulted contracts with the debtor

12  receives a dollar-for-dollar distribution on its rejection

13  damages claim from assets that would otherwise be available

14  to the estate for the benefit of all creditors.  The

15  possibility that the debtor's assignee may shoulder this

16  burden in a given case is a distinction without a difference.

17  A rational assignee with knowledge of a cross-default of

18  liabilities would simply reduce its purchase price

19  accordingly thereby diminishing value realized by the estate

20  from the sale of the remaining contracts." End quote.  Thus,

21  based upon §§ 363(L) and 365(F), the Court overrules the

22  objection of DB Structured Properties, Morgan Stanley, and

23  UBS Real Estate on the basis that the MLPSAs are non-

24  severable contracts that may only be transferred or assumed

25  and assigned in toto.  DB Structured Properties, Morgan

1    Stanley, and UBS Real Estate also raise a number of other

2    objections to the sale, all of which have been addressed in

3    the Court's previous comments in connection with overruling

4    the other objections.  Specifically, they argue that: (1) The

5    debtors must cure a non-monetary including historical and

6    monetary defaults under the contracts.  (2) The debtors have

7    failed to establish adequate assurance of future performance,

8    and (3) The Court must base it's ruling on evidence.  The

9    first two objections are overruled for the reasons previously

10   given.  The final objection is moot as the Court conducted a

11   five-day evidentiary hearing, heard testimony from seven

12   witnesses, read numerous documents admitted into evidence

13   including the MLPSAs at issue, and thoroughly considered the

14   evidence and arguments of counsel.  Thus, for the foregoing

15   reasons, all objections - all remaining objections to the

16   sale motion are overruled, and the Court will grant the

17   motion and consider an order consistent with the foregoing

18   rulings.

19           MR. PATTON: Thank you, Your Honor.  We will send an

20   order over in short order.  We have, as I indicated, captured

21   a number of the terms of the various settlements that we

22   reached in the order.  We've also captured some of the terms

23   of settlements, as I mentioned, in a short list of some

24   revisions to the APA, and we'll get that to Your Honor

25   tomorrow.

1          THE COURT: Are there any outstanding objections in

2    connection with the sale order?

3          MR. PATTON: I think there's one - Well, with

4    respect to the sale order.

5          THE COURT: The form of order.

6          MR. PATTON: There may be, and we do have one

7    ongoing discussion with respect to a cure amount on a vendor

8    claim, I believe.  But I suspect we will have some issues

9    with respect to the sale order.  We have been working to

10   resolve all of the language issues with respect to the sale

11   order with respect to all of the parties that we've settled

12   with and with respect to the Committee, Bank of America, and

13   obviously the purchaser.  I don't know if with respect to the

14   parties whose objections Your Honor has overruled today, we

15   will have issues.  They've not been a part of the discussion

16   with respect to the order, so that's one area to which I'm

17   unable to speak.

18         THE COURT: All right, well, I guess my question is,

19   How do we proceed?  Do you want to submit it under

20   certification of counsel if it's all resolved, but if not,

21   people need to be heard.

22         MR. PATTON: Yeah.  Why don't we - If this works for

23   Your Honor, I propose - We'll circulate it tomorrow.  I'll

24   submit it to Your Honor tomorrow.  We will indicate in our

25   certification who we have sign-off from and then perhaps if

1    Your Honor has time - I guess we heard about Thursday.  If

2    Your Honor has time on Thursday, that would be ideal from our

3    point of view.

4            THE COURT: That's fine.

5            MR. PATTON: At the same time?  At 3 o'clock?

6            THE COURT: Yeah, that's fine.

7            MR. PATTON: Okay.

8            THE COURT: Mr. Schnabel.

9            MR. SCHNABEL: Your Honor, for the record, Eric

10   Lopez Schnabel with Dorsey & Whitney on behalf of U.S. Bank.

11   Your Honor, we have thirteen securitizations that are part of

12   this sale.  Two things: (1) there is an open issue with the

13   order that we've carved out that we will just have brief

14   argument on, and then there are some language issues that all

15   the parties are still looking at, and that will either be

16   resolved or it won't.  So, I do know of one issue, however,

17   with U.S. Bank and the debtors that we will have an issue on

18   on the order.

19           THE COURT: All right.

20           MR. SCHNABEL:  Number (2), Your Honor, and I don't

21   know if you recall that we had some colloquy on this issue on

22   Friday with regard to U.S. Bank's objections.  At this time,

23   U.S. Bank is unable to unconditionally resolve its

24   objections, and that's in part because we may have possible

25   further direction from our holders, and we would like an

1    opportunity to provide them with notice.  So, at this time we

2    can only provisionally resolve our objection.  Such

3    provisional resolution is contingent upon (1) the sale order

4    language that we're still discussing with the debtors, but

5    also (2) the direction, if any, by our holders.  So, at this

6    point in time, if the Court has to overruled our objection,

7    sobeit, we'll live with that, but, you know, we can't, if you

8    recall, be classified as being resolved.

9           THE COURT: Yeah, I - Subject to your comments to

10   the order, the objection is overruled.

11          MR. SCHNABEL: Thank you, Your Honor.

12          MR. MINUTI: Good afternoon, Your Honor.

13          THE COURT: Good afternoon.

14          MR. MINUTI: Mark Minute from Saul Ewing.  I'm here

15   today for Security Connections, Incorporated.  Your Honor,

16   I've sort of been in and out of this hearing, but let me take

17   you back to the first day of the hearing.  You'll recall that

18   one of the first things that Mr. Patton did in his

19   introduction was announce at least one resolution or

20   objection on the record, and that was to my client.  My

21   client, subject to documentation, Your Honor, and presenting

22   an order to Your Honor to sign, just to give Your Honor some

23   context, what my client does for the debtors actually

24   satisfies mortgages throughout the country, and what we do is

25   we bill the debtor monthly in arrears for the services we

1   provide, but we also bill them $130,000 a month which is a

2   prepayment for third-party expenses we incur when we go to

3   satisfy a mortgage, for example.  The resolution that we had

4   reached with the debtor, subject to documentation, was

5   essentially that we were going to recoup services that were

6   due to us against prepaid third-party expenses and then sort

7   of true-off everything as of the initial closing.  Since the

8   initial - the first day of the sale hearing, Your Honor, I

9   drafted a stipulation.  I've shared it with the debtor.  The

10  clients have reconciled numbers and literally now or before

11  Your Honor this hearing today, I've been informed that the

12  buyer has a potential issue with our matter.  So, what I'm

13  asking of the Court is the following: I have agreed with the

14  debtor and the buyer to try to resolve the buyer's issue

15  before Your Honor signs the order, but in the event that we

16  can't do that, I'm going to need, Your Honor, probably about

17  five minutes to press my limited objection, and, as I said,

18  it really goes to preserving my recoupment and setoff rights.

19  So, I don't need Your Honor to decide that today.  My hope is

20  we'll be able to resolve the buyer's issue, but if not, I'd

21  like an opportunity to at least present that argument before

22  the order is presented to Your Honor.

23          THE COURT: You can do that on Thursday.  That's

24  fine.

25          MR. MINUTI: Thank you, Your Honor.

1          THE COURT: Mr. Gallo?

2          MR. GALLO: Good afternoon, Your Honor.  Andrew

3   Gallo for DB Structured Products, Inc.  First of all, for the

4   record, I'd like to note that I am wearing a different suit

5   today.  As Mr. Patton indicated, we have yet to have any

6   discussions with the debtor about the form of order, and we

7   do have the current form of order, and, based upon our review

8   of that order, we do believe we will have issues with it.

9   So, but, I understand from Your Honor's statements here today

10  that we'll be able to - if we can't work those out with the

11  debtor in the next couple of days, we'll be able to raise

12  those with you on Thursday.

13         THE COURT: Yeah, I'm not making any ruling today in

14  connection with the form of order.  Everyone's rights are

15  reserved in connection with the form of order.  I haven't

16  even looked at it.  So I have no idea if it's reasonable or

17  outrageous or - One thing I'm sure it is and that's not

18  short, but that's all I know.  Mr. Bowden?

19         MR. BOWDEN: Thanks, Your Honor.  Good afternoon.

20  Bill Bowden of Ashby & Geddes.  Your Honor, I rise on behalf

21  of CIFG Assurance.  Your Honor, again, we take Your Honor

22  back to the first day of the hearing.  Mr. Patton announced

23  that the so-called Heloc agreements have been withdrawn from

24  the sale.  We had had one language issue with respect to the

25  proposed order extant.  I was emailed by my co-counsel

1    shortly before the hearing began who advised that that issue

2    might be resolvable as between us and the purchaser.  If not,

3    it will be an issue to be taken up before Your Honor on

4    Thursday.  Another issue that I wanted to get clarification

5    on from this side of the courtroom is, there will be a first

6    amendment, as I understand, to the asset purchase agreement

7    appended to the form of order.  The first amendment to the

8    asset purchase agreement contains or refers to various

9    exhibits including an Exhibit A which lists contracts to be

10   excluded from Schedule 1.1(J) of the APA.  Schedule 1.1(J)

11   are the servicing agreements to be sold or assumed and

12   assigned to the buyer.  I simply ask that whenever the order

13   it circulated it include a complete package of the amendments

14   to the exhibit, et cetera.

15            THE COURT: All right, sounds reasonable.  It will

16   make for a big document, but -

17            MR. PATTON: We will do that, Your Honor.

18            (The remainder of this page is intentionally left

19   blank.)

20

21

22

23

24

25

1          THE COURT: All right.  Anything further for today?

2    All right, thank you very much.  The hearing is concluded,

3    and I'll either get a certification of counsel or more likely

4    see you on Thursday at 3 o'clock.

5          All: Thank you, Your Honor.

6          (Whereupon at 3:05 p.m., the hearing in this matter

7    was concluded for this date.)

8

9

10

11

12

13

14

15

16

17

18          I, Elaine M. Ryan, approved transcriber for the

19    United States Courts, certify that the foregoing is a correct

20    transcript from the electronic sound recording of the

21    proceedings in the above-entitled matter.

22

23    /s/ Elaine M.  Ryan                          October 24, 2007
      Elaine M. Ryan
      2801 Faulkland Road
      Wilmington, DE 19808
      (302) 683-0221