| | | | |
|---|---|---|---|
| 2086802 070106 | 134.25 | 211.95 | 346.2 GNMA II |
| 2086802 080106 | 134.84 | 211.36 | 346.2 GNMA II |
| 2086802 090106 | 135.43 | 210.77 | 346.2 GNMA II |
| 2086802 100106 | 136.02 | 210.18 | 346.2 GNMA II |
| 2086802 110106 | 123.29 | 249.51 | 372.8 GNMA II |
| 2086802 120106 | 123.93 | 248.87 | 372.8 GNMA II |
| 2086802 010107 | 124.58 | 248.22 | 372.8 GNMA II |
| 2086802 020107 | 125.23 | 247.57 | 372.8 GNMA II |
| 2086802 030107 | 125.88 | 246.92 | 372.8 GNMA II |
| 2086802 040107 | 126.54 | 246.26 | 372.8 GNMA II |
| 2086802 050107 | 127.2 | 245.6 | 372.8 GNMA II |
| 2086802 060107 | 127.86 | 244.94 | 372.8 GNMA II |
| 2086802 070107 | 128.52 | 244.28 | 372.8 GNMA II |
| 2086802 080107 | 129.19 | 243.61 | 372.8 GNMA II |
| 2086802 090107 | 129.87 | 242.93 | 372.8 GNMA II |
| 2120474 020106 | 157.68 | 293.92 | 451.6 GNMA II |
| 2120474 030106 | 158.42 | 293.18 | 451.6 GNMA II |
| 2120474 040106 | 159.16 | 292.44 | 451.6 GNMA II |
| 2120474 050106 | 159.91 | 291.69 | 451.6 GNMA II |
| 2120474 060106 | 160.66 | 290.94 | 451.6 GNMA II |
| 2120474 070106 | 161.41 | 290.19 | 451.6 GNMA II |
| 2120474 080106 | 162.17 | 289.43 | 451.6 GNMA II |
| 2120474 090106 | 162.93 | 288.67 | 451.6 GNMA II |
| 2120474 100106 | 163.69 | 287.91 | 451.6 GNMA II |
| 2120474 110106 | 164.46 | 287.14 | 451.6 GNMA II |
| 2120474 120106 | 165.23 | 286.37 | 451.6 GNMA II |
| 2120474 010107 | 166.01 | 285.59 | 451.6 GNMA II |
| 2120474 020107 | 150.38 | 335.45 | 485.83 GNMA II |
| 2120474 030107 | 151.21 | 334.62 | 485.83 GNMA II |
| 2120474 040107 | 152.05 | 333.78 | 485.83 GNMA II |
| 2120474 050107 | 152.88 | 332.95 | 485.83 GNMA II |
| 2120474 060107 | 153.73 | 332.1 | 485.83 GNMA II |
| 2120474 070107 | 154.58 | 331.25 | 485.83 GNMA II |
| 2120474 080107 | 155.43 | 330.4 | 485.83 GNMA II |
| 2120474 090107 | 156.29 | 329.54 | 485.83 GNMA II |
| 2156567 090107 | 68.2 | 167.67 | 235.87 GNMA II |
| 2259436 060107 | 186.43 | 439.52 | 625.95 GNMA II |
| 2259436 070107 | 187.46 | 438.49 | 625.95 GNMA II |
| 2259436 080107 | 188.49 | 437.46 | 625.95 GNMA II |
| 2259436 090107 | 189.53 | 436.42 | 625.95 GNMA II |
| 2271830 090107 | 225.61 | 594.44 | 820.05 GNMA II |
| 2291470 080107 | 229.98 | 587.51 | 817.49 GNMA II |
| 2291470 090107 | 231.29 | 586.2 | 817.49 GNMA II |
| 2350314 090107 | 131.82 | 391.42 | 523.24 GNMA II |
| 3057420 090107 | 130.87 | 282.1 | 412.97 GNMA II |
| 3129221 080107 | 138.13 | 407.31 | 545.44 GNMA II |
| 3129221 090107 | 138.95 | 406.49 | 545.44 GNMA II |
| 3171422 090107 | 86.68 | 272.48 | 359.16 GNMA II |
| 3184823 090107 | 57.43 | 180.5 | 237.93 GNMA II |
| 3169465 090107 | 110.42 | 352.3 | 462.72 GNMA II |
| 3210882 070106 | 96.5 | 195.9 | 292.4 GNMA II |
| 3210882 080106 | 85.2 | 231.83 | 317.03 GNMA II |

| | | | | |
|---|---|---|---|---|
| 3210882 090106 | 85.65 | 231.38 | 317.03 | GNMA II |
| 3210882 100106 | 86.11 | 230.92 | 317.03 | GNMA II |
| 3210882 110106 | 86.57 | 230.46 | 317.03 | GNMA II |
| 3210882 120106 | 87.03 | 230 | 317.03 | GNMA II |
| 3210882 010107 | 87.49 | 229.54 | 317.03 | GNMA II |
| 3210882 020107 | 87.95 | 229.08 | 317.03 | GNMA II |
| 3210882 030107 | 88.42 | 228.61 | 317.03 | GNMA II |
| 3210882 040107 | 88.89 | 228.14 | 317.03 | GNMA II |
| 3210882 050107 | 89.36 | 227.67 | 317.03 | GNMA II |
| 3210882 060107 | 89.84 | 227.19 | 317.03 | GNMA II |
| 3210882 070107 | 90.32 | 226.71 | 317.03 | GNMA II |
| 3210882 080107 | 80.63 | 261.72 | 342.35 | GNMA II |
| 3210882 090107 | 81.12 | 261.23 | 342.35 | GNMA II |
| 3260952 090107 | 108.64 | 355.48 | 464.12 | GNMA II |
| 3243677 090107 | 68.34 | 223.65 | 291.99 | GNMA II |
| 3272313 120106 | 82.47 | 247.13 | 329.6 | GNMA II |
| 3272313 010107 | 82.93 | 246.67 | 329.6 | GNMA II |
| 3272313 020107 | 83.4 | 246.2 | 329.6 | GNMA II |
| 3272313 030107 | 83.87 | 245.73 | 329.6 | GNMA II |
| 3272313 040107 | 84.34 | 245.26 | 329.6 | GNMA II |
| 3272313 050107 | 84.81 | 244.79 | 329.6 | GNMA II |
| 3272313 060107 | 85.29 | 244.31 | 329.6 | GNMA II |
| 3272313 070107 | 85.77 | 243.83 | 329.6 | GNMA II |
| 3272313 080107 | 86.25 | 243.35 | 329.6 | GNMA II |
| 3272313 090107 | 86.74 | 242.86 | 329.6 | GNMA II |
| 3251294 020106 | 75.87 | 183.33 | 259.2 | GNMA II |
| 3251294 030106 | 76.24 | 182.96 | 259.2 | GNMA II |
| 3251294 040106 | 76.6 | 182.6 | 259.2 | GNMA II |
| 3251294 050106 | 76.97 | 182.23 | 259.2 | GNMA II |
| 3251294 060106 | 77.34 | 181.86 | 259.2 | GNMA II |
| 3251294 070106 | 77.71 | 181.49 | 259.2 | GNMA II |
| 3251294 080106 | 78.08 | 181.12 | 259.2 | GNMA II |
| 3251294 090106 | 78.46 | 180.74 | 259.2 | GNMA II |
| 3251294 100106 | 78.83 | 180.37 | 259.2 | GNMA II |
| 3251294 110106 | 69.99 | 211.29 | 281.28 | GNMA II |
| 3251294 120106 | 70.38 | 210.9 | 281.28 | GNMA II |
| 3251294 010107 | 70.78 | 210.5 | 281.28 | GNMA II |
| 3251294 020107 | 71.17 | 210.11 | 281.28 | GNMA II |
| 3251294 030107 | 71.57 | 209.71 | 281.28 | GNMA II |
| 3251294 040107 | 71.98 | 209.3 | 281.28 | GNMA II |
| 3251294 050107 | 72.38 | 208.9 | 281.28 | GNMA II |
| 3251294 060107 | 72.79 | 208.49 | 281.28 | GNMA II |
| 3251294 070107 | 73.2 | 208.08 | 281.28 | GNMA II |
| 3251294 080107 | 73.61 | 207.67 | 281.28 | GNMA II |
| 3251294 090107 | 74.02 | 207.26 | 281.28 | GNMA II |
| 3289356 080107 | 92.92 | 266.16 | 359.08 | GNMA II |
| 3289356 090107 | 93.44 | 265.64 | 359.08 | GNMA II |
| 3282427 080107 | 207.97 | 591.24 | 799.21 | GNMA II |
| 3282427 090107 | 209.14 | 590.07 | 799.21 | GNMA II |
| 3346308 090107 | 71.05 | 224.85 | 295.9 | GNMA II |
| 3314806 040102 | 58.83 | 349.83 | 408.66 | GNMA II |
| 3314806 050102 | 59.2 | 349.46 | 408.66 | GNMA II |

| | | | |
|---|---|---|---|
| 3314806 060102 | 59.58 | 349.08 | 408.66 GNMA II |
| 3314806 070102 | 59.96 | 348.7 | 408.66 GNMA II |
| 3314806 080102 | 60.34 | 348.32 | 408.66 GNMA II |
| 3314806 090102 | 60.72 | 347.94 | 408.66 GNMA II |
| 3314806 100102 | 61.11 | 347.55 | 408.66 GNMA II |
| 3314806 110102 | 61.5 | 347.16 | 408.66 GNMA II |
| 3314806 120102 | 61.89 | 346.77 | 408.66 GNMA II |
| 3314806 010103 | 62.28 | 346.38 | 408.66 GNMA II |
| 3314806 020103 | 73.28 | 300.61 | 373.89 GNMA II |
| 3314806 030103 | 73.68 | 300.21 | 373.89 GNMA II |
| 3314806 040103 | 74.09 | 299.8 | 373.89 GNMA II |
| 3314806 050103 | 74.5 | 299.39 | 373.89 GNMA II |
| 3314806 060103 | 74.91 | 298.98 | 373.89 GNMA II |
| 3314806 070103 | 75.33 | 298.56 | 373.89 GNMA II |
| 3314806 080103 | 75.74 | 298.15 | 373.89 GNMA II |
| 3314806 090103 | 76.16 | 297.73 | 373.89 GNMA II |
| 3314806 100103 | 76.58 | 297.31 | 373.89 GNMA II |
| 3314806 110103 | 77 | 296.89 | 373.89 GNMA II |
| 3314806 120103 | 77.43 | 296.46 | 373.89 GNMA II |
| 3314806 010104 | 77.86 | 296.03 | 373.89 GNMA II |
| 3314806 020104 | 90.47 | 250.99 | 341.46 GNMA II |
| 3314806 030104 | 90.9 | 250.56 | 341.46 GNMA II |
| 3314806 040104 | 91.32 | 250.14 | 341.46 GNMA II |
| 3314806 050104 | 91.75 | 249.71 | 341.46 GNMA II |
| 3314806 060104 | 92.18 | 249.28 | 341.46 GNMA II |
| 3314806 070104 | 92.62 | 248.84 | 341.46 GNMA II |
| 3314806 080104 | 93.05 | 248.41 | 341.46 GNMA II |
| 3314806 090104 | 93.49 | 247.97 | 341.46 GNMA II |
| 3314806 100104 | 93.92 | 247.54 | 341.46 GNMA II |
| 3314806 110104 | 94.36 | 247.1 | 341.46 GNMA II |
| 3314806 120104 | 94.81 | 246.65 | 341.46 GNMA II |
| 3314806 010105 | 95.25 | 246.21 | 341.46 GNMA II |
| 3314806 020105 | 102.37 | 223.92 | 326.29 GNMA II |
| 3314806 030105 | 102.81 | 223.48 | 326.29 GNMA II |
| 3314806 040105 | 103.25 | 223.04 | 326.29 GNMA II |
| 3314806 050105 | 103.69 | 222.6 | 326.29 GNMA II |
| 3314806 060105 | 104.13 | 222.16 | 326.29 GNMA II |
| 3314806 070105 | 104.58 | 221.71 | 326.29 GNMA II |
| 3314806 080105 | 105.02 | 221.27 | 326.29 GNMA II |
| 3314806 090105 | 105.47 | 220.82 | 326.29 GNMA II |
| 3314806 100105 | 105.92 | 220.37 | 326.29 GNMA II |
| 3314806 110105 | 106.38 | 219.91 | 326.29 GNMA II |
| 3314806 120105 | 106.83 | 219.46 | 326.29 GNMA II |
| 3314806 010106 | 107.29 | 219 | 326.29 GNMA II |
| 3314806 020106 | 94.72 | 261.19 | 355.91 GNMA II |
| 3314806 030106 | 95.2 | 260.71 | 355.91 GNMA II |
| 3314806 040106 | 95.69 | 260.22 | 355.91 GNMA II |
| 3314806 050106 | 96.18 | 259.73 | 355.91 GNMA II |
| 3314806 060106 | 96.67 | 259.24 | 355.91 GNMA II |
| 3314806 070106 | 97.16 | 258.75 | 355.91 GNMA II |
| 3314806 080106 | 97.66 | 258.25 | 355.91 GNMA II |
| 3314806 090106 | 98.16 | 257.75 | 355.91 GNMA II |

| | | | |
|---|---|---|---|
| 3314806 100106 | 98.66 | 257.25 | 355.91 GNMA II |
| 3314806 110106 | 99.16 | 256.75 | 355.91 GNMA II |
| 3314806 120106 | 99.67 | 256.24 | 355.91 GNMA II |
| 3314806 010107 | 100.18 | 255.73 | 355.91 GNMA II |
| 3314806 020107 | 88.86 | 296.89 | 385.75 GNMA II |
| 3314806 030107 | 89.39 | 296.36 | 385.75 GNMA II |
| 3314806 040107 | 89.92 | 295.83 | 385.75 GNMA II |
| 3314806 050107 | 90.45 | 295.3 | 385.75 GNMA II |
| 3314806 060107 | 90.99 | 294.76 | 385.75 GNMA II |
| 3314806 070107 | 91.53 | 294.22 | 385.75 GNMA II |
| 3314806 080107 | 92.07 | 293.68 | 385.75 GNMA II |
| 3314806 090107 | 92.62 | 293.13 | 385.75 GNMA II |
| 3321231 090107 | 55.5 | 174.75 | 230.25 GNMA II |
| 3328045 090107 | 44.6 | 140.85 | 185.45 GNMA II |
| 3377846 090107 | 46.33 | 156.31 | 202.64 GNMA II |
| 3384411 090107 | 82.89 | 286.73 | 369.62 GNMA II |
| 3403778 090107 | 149.43 | 504.21 | 653.64 GNMA II |
| 3509114 050107 | 100.59 | 283.76 | 384.35 GNMA II |
| 3509114 060107 | 101.12 | 283.23 | 384.35 GNMA II |
| 3509114 070107 | 101.66 | 282.69 | 384.35 GNMA II |
| 3509114 080107 | 90.01 | 326.41 | 416.42 GNMA II |
| 3509114 090107 | 90.57 | 325.85 | 416.42 GNMA II |
| 3455323 090107 | 189.71 | 546.41 | 736.12 GNMA II |
| 3476620 070107 | 195.06 | 574.21 | 769.27 GNMA II |
| 3476620 080107 | 196.12 | 573.15 | 769.27 GNMA II |
| 3476620 090107 | 197.18 | 572.09 | 769.27 GNMA II |
| 3635224 090107 | 145.78 | 571.24 | 717.02 GNMA II |
| 3913111 090107 | 140.5 | 444.37 | 584.87 GNMA II |
| 3952048 090107 | 74.95 | 287.03 | 361.98 GNMA II |
| 3954092 090107 | 119.77 | 462.08 | 581.85 GNMA II |
| 3994452 090107 | 106.79 | 433.03 | 539.82 GNMA II |
| 4007527 120106 | 220.43 | 657.11 | 877.54 GNMA II |
| 4007527 010107 | 221.53 | 656.01 | 877.54 GNMA II |
| 4007527 020107 | 222.64 | 654.9 | 877.54 GNMA II |
| 4007527 030107 | 223.75 | 653.79 | 877.54 GNMA II |
| 4007527 040107 | 224.87 | 652.67 | 877.54 GNMA II |
| 4007527 050107 | 196.67 | 760.14 | 956.81 GNMA II |
| 4007527 060107 | 197.82 | 758.99 | 956.81 GNMA II |
| 4007527 070107 | 198.97 | 757.84 | 956.81 GNMA II |
| 4007527 080107 | 200.13 | 756.68 | 956.81 GNMA II |
| 4007527 090107 | 201.3 | 755.51 | 956.81 GNMA II |
| 3981974 080107 | 103.8 | 424.04 | 527.84 GNMA II |
| 3981974 090107 | 104.42 | 423.42 | 527.84 GNMA II |
| 4005585 090107 | 147.15 | 627.11 | 774.26 GNMA II |
| 4051695 080107 | 124.11 | 532.89 | 657 GNMA II |
| 4051695 090107 | 124.87 | 532.13 | 657 GNMA II |
| 4059576 120106 | 161.8 | 550.1 | 711.9 GNMA II |
| 4059576 010107 | 162.66 | 549.24 | 711.9 GNMA II |
| 4059576 020107 | 163.52 | 548.38 | 711.9 GNMA II |
| 4059576 030107 | 164.39 | 547.51 | 711.9 GNMA II |
| 4059576 040107 | 165.26 | 546.64 | 711.9 GNMA II |
| 4059576 050107 | 166.14 | 545.76 | 711.9 GNMA II |

| | | | |
|---|---|---|---|
| 4059576 060107 | 167.02 | 544.88 | 711.9 GNMA II |
| 4059576 070107 | 167.91 | 543.99 | 711.9 GNMA II |
| 4059576 080107 | 146.32 | 628.29 | 774.61 GNMA II |
| 4059576 090107 | 147.22 | 627.39 | 774.61 GNMA II |
| 4074732 090107 | 85.51 | 369.96 | 455.47 GNMA II |
| 4052471 020107 | 168.66 | 574.88 | 743.54 GNMA II |
| 4052471 030107 | 169.55 | 573.99 | 743.54 GNMA II |
| 4052471 040107 | 170.45 | 573.09 | 743.54 GNMA II |
| 4052471 050107 | 171.36 | 572.18 | 743.54 GNMA II |
| 4052471 060107 | 172.27 | 571.27 | 743.54 GNMA II |
| 4052471 070107 | 173.18 | 570.36 | 743.54 GNMA II |
| 4052471 080107 | 151.12 | 658.76 | 809.88 GNMA II |
| 4052471 090107 | 152.05 | 657.83 | 809.88 GNMA II |
| 4067775 090107 | 118.52 | 512.77 | 631.29 GNMA II |
| 4107327 040107 | 142.53 | 500.83 | 643.36 GNMA II |
| 4107327 050107 | 143.3 | 500.06 | 643.36 GNMA II |
| 4107327 060107 | 144.08 | 499.28 | 643.36 GNMA II |
| 4107327 070107 | 144.86 | 498.5 | 643.36 GNMA II |
| 4107327 080107 | 145.64 | 497.72 | 643.36 GNMA II |
| 4107327 090107 | 146.43 | 496.93 | 643.36 GNMA II |
| 4304553 090107 | 128.07 | 601.65 | 729.72 GNMA II |
| 4379269 080107 | 107.22 | 249.35 | 356.57 GNMA II |
| 4379269 090107 | 107.67 | 248.9 | 356.57 GNMA II |
| 4450514 090107 | 151.86 | 644.2 | 796.06 GNMA II |
| 4434356 090107 | 125.07 | 534.28 | 659.35 GNMA II |
| 4547444 080107 | 111.35 | 467.92 | 579.27 GNMA II |
| 4547444 090107 | 111.98 | 467.29 | 579.27 GNMA II |
| 4460680 070107 | 179.69 | 764.47 | 944.16 GNMA II |
| 4460680 080107 | 180.7 | 763.46 | 944.16 GNMA II |
| 4460680 090107 | 181.71 | 762.45 | 944.16 GNMA II |
| 4591168 090107 | 129.01 | 657.31 | 786.32 GNMA II |
| 4597792 090107 | 192.95 | 777.3 | 970.25 GNMA II |
| 4629638 090107 | 183.27 | 743.36 | 926.63 GNMA II |
| 4680282 080105 | 137.34 | 326.22 | 463.56 GNMA II |
| 4680282 090105 | 137.86 | 325.7 | 463.56 GNMA II |
| 4680282 100105 | 138.37 | 325.19 | 463.56 GNMA II |
| 4680282 110105 | 118.1 | 396.82 | 514.92 GNMA II |
| 4680282 120105 | 118.65 | 396.27 | 514.92 GNMA II |
| 4680282 010106 | 119.19 | 395.73 | 514.92 GNMA II |
| 4680282 020106 | 119.74 | 395.18 | 514.92 GNMA II |
| 4680282 030106 | 120.29 | 394.63 | 514.92 GNMA II |
| 4680282 040106 | 120.84 | 394.08 | 514.92 GNMA II |
| 4680282 050106 | 121.39 | 393.53 | 514.92 GNMA II |
| 4680282 060106 | 121.95 | 392.97 | 514.92 GNMA II |
| 4680282 070106 | 122.51 | 392.41 | 514.92 GNMA II |
| 4680282 080106 | 123.07 | 391.85 | 514.92 GNMA II |
| 4680282 090106 | 123.63 | 391.29 | 514.92 GNMA II |
| 4680282 100106 | 124.2 | 390.72 | 514.92 GNMA II |
| 4680282 110106 | 106.32 | 461.09 | 567.41 GNMA II |
| 4680282 120106 | 106.9 | 460.51 | 567.41 GNMA II |
| 4680282 010107 | 107.48 | 459.93 | 567.41 GNMA II |
| 4680282 020107 | 108.06 | 459.35 | 567.41 GNMA II |

| | | | |
|---|---|---|---|
| 4680282 030107 | | | |
| 4680282 040107 | 108.64 | 458.77 | |
| 4680282 050107 | 109.23 | 458.18 | 567.41 GNMA II |
| 4680282 060107 | 109.82 | 457.59 | 567.41 GNMA II |
| 4680282 070107 | 110.42 | 456.99 | 567.41 GNMA II |
| 4680282 080107 | 111.02 | 456.39 | 567.41 GNMA II |
| 4680282 090107 | 111.62 | 455.79 | 567.41 GNMA II |
| 4729135 090107 | 112.22 | 455.19 | 567.41 GNMA II |
| 4791744 080107 | 251.4 | 1151.91 | 1403.31 GNMA II |
| 4791744 090107 | 129.38 | 595.68 | 725.06 GNMA II |
| 4731077 090107 | 130.12 | 594.94 | 725.06 GNMA II |
| 4598681 100106 | 110.51 | 546.02 | 656.53 GNMA II |
| 4598681 110106 | 141.84 | 510.91 | 652.75 GNMA II |
| 4598681 120106 | 142.53 | 510.22 | 652.75 GNMA II |
| 4598681 010107 | 143.23 | 509.52 | 652.75 GNMA II |
| 4598681 020107 | 143.93 | 508.82 | 652.75 GNMA II |
| 4598681 030107 | 121.51 | 594.6 | 716.11 GNMA II |
| 4598681 040107 | 122.2 | 593.91 | 716.11 GNMA II |
| 4598681 050107 | 122.9 | 593.21 | 716.11 GNMA II |
| 4598681 060107 | 123.61 | 592.5 | 716.11 GNMA II |
| 4598681 070107 | 124.32 | 591.79 | 716.11 GNMA II |
| 4598681 080107 | 125.03 | 591.08 | 716.11 GNMA II |
| 4598681 090107 | 125.75 | 590.36 | 716.11 GNMA II |
| 4731736 080107 | 126.47 | 589.64 | 716.11 GNMA II |
| 4731736 090107 | 173.79 | 787.86 | 961.65 GNMA II |
| 4632332 090107 | 174.76 | 786.89 | 961.65 GNMA II |
| 4816926 090107 | 131.44 | 638.85 | 770.29 GNMA II |
| 4863557 090107 | 115.87 | 563.11 | 678.98 GNMA II |
| 4950728 080107 | 128.52 | 582.22 | 710.74 GNMA II |
| 4950728 090107 | 175.03 | 798.63 | 973.66 GNMA II |
| 4713358 090107 | 176.02 | 797.64 | 973.66 GNMA II |
| | 145.98 | 714.51 | 860.49 GNMA II |

**Exhibit B**

**Blackline**

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------x

|  |  |
|---|---|
| In re: | : Chapter 11 |
|  | : |
|  | : Case No. 07-11047 (CSS) |
| AMERICAN HOME MORTGAGE | : |
| HOLDINGS, INC., a Delaware corporation, et | : Jointly Administered |
| al.,[1] | : |
|  | : **Ref. Docket No.————: 1553** |
| Debtors. | : |
|  | x |

-----------------------------------------------------------

-

## ORDER PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE: (A) APPROVING THE MORTGAGE SERVICING PURCHASE AGREEMENT; AND (B) AUTHORIZING THE DEBTORS TO SELL CERTAIN PROPERTY FREE AND CLEAR OF LIENS, INTERESTS, AND ENCUMBRANCES, AND (C) GRANTING RELATED RELIEF

Upon the *Motion for an Order Pursuant to Sections 105 and 363 of the Bankruptcy Code: (A) Approving the Mortgage Servicing Purchase Agreement; and (B) Authorizing the Debtors to Sell Certain Property Free and Clear of Liens, Interests, and Encumbrances, and (C) Granting Related Relief* (the "Motion"), filed by the above-captioned debtors-in-possession (the "Debtors"), and the Debtors and the Buyer[2] having agreed to enter into the Purchase Agreement, as modified, a copy of which is hereto annexed as Exhibit A; and due and sufficient notice having been given to all parties-in-interest; and any objections to the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

relief requested in the Motion having been withdrawn or resolved and to the extent not

withdrawn or resolved, are hereby overruled; and it appearing that entry into the Purchase

Agreement and sale of the Property to the Buyer, are in the best interests of the Debtors, their

estates, creditors and other parties-in-interest; and sufficient cause appearing therefore,

IT IS HEREBY FOUND AND DETERMINED that:

A.      It is in the best interests of the Debtors, the Debtors' estates, their

creditors, and other parties-in-interest to grant the relief requested in the Motion and this Order

and authorize the Debtors to enter into the Purchase Agreement;

B.      The Debtors are authorized to sell the Property free and clear of all

interests of any kind or nature whatsoever, except as set forth in the Motion, because one or more

of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) have been satisfied.  Those holders of

interests who did not object to the Motion or the relief requested therein, or who

imposedinterposed and then withdrew their objections, are deemed to have consented to the sale

pursuant to 11 U.S.C. § 363(f)(2). Those holders of interests who did object fall within one or

more of the other subsections of 11 U.S.C. § 363(f) and are adequately protected by having their

interests, if any, attach to the proceeds of the sale of the Property.

C.      To the extent any inconsistency arises as between this Order and the

Purchase Agreement, this Order shall control.

C.      The Purchase Agreement was negotiated and proposed, and has been

entered into by the parties, in good faith, from arms-length bargaining positions, and without

collusion. The Buyer is a good faith purchaser within the meaning of section 363(m) of the

Bankruptcy Code and is entitled to the protection thereof.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

066585.1001

D.    The Debtors are not selling personally identifiable information to the Buyer.  Additionally, (i) the privacy policy given by Debtors to homeowners does not prohibit the sale contemplated under the Purchase Agreement and (ii) the sale is consistent with the privacy policy given by the Debtors to homeowners.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:

1.    The relief requested in the Motion is granted.

2.    The modified Purchase Agreement in the form attached hereto as Exhibit A, each of its terms and conditions, and each of the transactions contemplated therein are approved in their entirety.

~~3.    Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized to perform their obligations under and comply with the terms of the Purchase Agreement and consummate the sale of the Property to the Buyer pursuant to and in accordance with the terms and conditions of the Purchase Agreement.~~

3.    ~~4. The~~Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized to execute ~~and deliver, and are empowered to perform under, consummate and implement, the Purchase Agreement~~, deliver, and perform their obligations under and comply with the terms of the Purchase Agreement and consummate the sale of the Property to the Buyer pursuant to and in accordance with the terms and the conditions of the Purchase Agreement and this Order, together with all additional instruments and documents that may be reasonably necessary or desirable to perform under, consummate and implement the transactions contemplated by the Purchase Agreement, and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer the Property, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement and this Order.

- 3 -

066585.1001

4.    Notwithstanding anything to the contrary in this Order or the Purchase

Agreement, to the extent any of the Property consist of an interest in a consumer credit

transaction subject to the Truth in Lending Act or an interest in a consumer credit contract (as

defined in section 433.1 of title 16 of the Code of Federal Regulations), the Buyer shall remain

subject to the same claims and defenses that are related to such consumer credit transaction or

such consumer credit contract to the same extent as the Buyer would be subject to such claims

and defenses of the consumer if such interest had been purchased at a sale not under section 363

of the Bankruptcy Code, as provided for in section 363(o) of the Bankruptcy Code.

5.    Notwithstanding anything set forth to the contrary in the Purchase

Agreement, the Buyer understands and agrees that the Debtors are conveying their rights to the

Property as is, without warranties or representations of any kind, whether express or implied,

except as otherwise set forth in the Purchase Agreement.

6.    ~~The Debtors and the Buyer are authorized to take any and all actions as~~

~~may be necessary or desirable to implement the Purchase Agreement and each of the transactions~~

~~contemplated thereunder.~~

6.    ~~7.~~ The sale of the Property by the Debtors to the Buyer is free and clear of

all liens, claims, security interests, pledges or other encumbrances thereon, provided that the

liens and security interests of the Administrative Agent in the Property shall attach to the

proceeds thereof.

7.    From and after the Sale Date, any funds received by the Debtors or

Debtors' agent in connection with servicing the GNMA Portfolio are for the account of and shall

be held in trust for the Buyer, and Debtors' lockbox function shall be segregated with respect to

the GNMA Portfolio.

8.      Based on the Debtors' representation that the GNMA Portfolio is over-collateralized by no less than $300,000, the Buyer is entitled to any amounts realized from such over-collateralization.

9.      From the date of this Order through November 30, 2007, Buyer shall at Buyer's option, have the right to enter the Debtors' premises during normal business hours for the purpose of performing any audit or reconciliation that Buyer deems necessary with respect to the GNMA Portfolio.  Buyer and Debtors shall mutually cooperate in all respects to facilitate and coordinate such audit and reconciliation as time is of the essence.

10.      8. The Buyer is hereby deemed to be a good faith purchaser of the Property and is entitled to the protections of 11 U.S.C. § 363(m).

11.      9. The sale of the Property by the Debtors to the Buyer is not subject to the ten (10) day stay provided for in Bankruptcy Rule 6004(h).

12.      The Buyer hereby waives the requirement of section 9.1(C) of the Purchase Agreement that the Sale Order shall have become a Final Order on or before November 1, 2007.

13.      10. All net proceeds of the sale of the Property received by the Debtors, (including, without limitation, the proceeds and amounts retained or received from all outstanding documented advances) and in excess of the amount to be paid to GNMA pursuant to the Stipulation and this Order, shall be paid to the Administrative Agent in accordance with the terms of the *Final Order (I) Authorizing Debtors' Limited Use of Cash Collateral and (II) Granting Replacement Liens and Adequate Protection to Certain Pre-Petition Secured Parties*, approved by the Court on September 4, 2007. 2007 (the "Cash Collateral Order").

066585.1001

14.     All rights of the Debtors under and pursuant to the Purchase Agreement including, without limitation, the Debtors' rights to enforce the provisions of the Purchase Agreement, constitute "Collateral" (as defined in the Cash Collateral Order) of the Administrative Agent.

15.     To the extent there are any inconsistencies between this Order and the Purchase Agreement, the terms of this Order shall govern.

16.     11. The Buyer is authorized to execute, on behalf of the Debtors, mortgage assignments, note endorsements and satisfactions and releases related to the Loans, and to endorse loss draft checks, payoff checks, payment checks, refund checks and claim checks.

17.     12.

This Court hereby retains ~~exclusive~~ jurisdiction over ~~any and all matters~~the Buyer and the

Debtors to enforce or to resolve any dispute arising from or related to the ~~implementation or~~

~~integration of this Order or the~~ Purchase Agreement or this Order.

Dated:  Wilmington, Delaware
        October _____, 2007

_____
                                        Christopher S. Sontchi
                                        United States Bankruptcy Judge

Document comparison done by Workshare DeltaView on Monday, October 29, 2007
12:36:26 PM

| Input: | |
|---|---|
| Document 1 | interwovenSite://WSDMS/DB02/6278938/4 |
| Document 2 | interwovenSite://WSDMS/DB02/6278938/9 |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 45 |
| Deletions | 25 |
| Moved from | 5 |
| Moved to | 5 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 80 |

# MORTGAGE SERVICING PURCHASE AGREEMENT

### BY AND BETWEEN

# MIDFIRST BANK

### AND

# AMERICAN HOME MORTGAGE SERVICING, INC.

## TABLE OF CONTENTS

1.    Definitions................................................................................................. 2
2.    Purchase and Sale; Good Title.......................................................... 8
3.    Purchase Price...................................................................................... 8
4.    Delivery................................................................................................ 1113
5.    Representations and Warranties of Seller.................................... 1416
6.    Representations and Warranties of Buyer.................................... 1618
7.    Approvals of GNMA........................................................................ 1719
8.    Certain Covenants of Seller............................................................ 1719
9.    Closing Conditions .......................................................................... 2224
10.   Notices ................................................................................................ 2326
11.   Bankruptcy Provisions .................................................................... 2427
12.   Reserved............................................................................................. 2528
13.   Entire Agreement ............................................................................. 2528
14.   Construction of Agreement............................................................ 2528
15.   Reserved............................................................................................. 2528
16.   Reserved............................................................................................. 2528
17.   Waivers ............................................................................................... 2528
18.   Governing Law ................................................................................. 2528
19.   Reserved............................................................................................. 2628
20.   Publicity and Confidentiality ........................................................ 2629
21.   Cooperation....................................................................................... 2629

Exhibits:

    A    Schedule of Mortgage Pools
    B    Form of Assignment
    C    Form of Servicing Portfolio Purchase Schedule
    D    Form of Trust Receipt
    E    Transfer Instructions
    F    Schedule of Loans In Litigation
    G    P & I Advances

DB02:6273247.86329008.2                                          066585.1001

## MORTGAGE SERVICING PURCHASE AGREEMENT

THIS MORTGAGE SERVICING PURCHASE AGREEMENT (herein the "Agreement") dated as of the 9th day of October, 2007, by and between **MIDFIRST BANK**, a federally chartered savings association, with its principal office being located in Oklahoma City, Oklahoma (hereinafter called "Buyer"), and **AMERICAN HOME MORTGAGE SERVICING, INC.**, a Maryland corporation, with their principal office being located in Irving, Texas (hereinafter called "Seller"):

### WITNESSETH:

WHEREAS, Seller is the servicer under guaranty servicing contracts with GNMA with respect to certain FHA Loans, VA Loans and other Loans insured by other agencies of the United States of America comprising Mortgage Pools securing certain GNMA Mortgage-Backed Securities which Loans and their respective Mortgage Pools are more particularly described in Exhibit "A" attached hereto and incorporated herein by reference; and

WHEREAS, subject to approval of GNMA and the terms of this Agreement and upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 363 and 365 of the Bankruptcy Code, (i) Seller desires to sell, transfer, convey and assign to Buyer its rights, obligations and benefits as servicer of the Loans under the respective Mortgage Pools, including all of Seller's right, title and interest in the Custodial Accounts, and certain of Seller's other rights and property incidental thereto, and (ii) Buyer desires to purchase, accept and assume such conveyance, all as more particularly set forth below.

WHEREAS, on August 6, 2007 (the "Petition Date"), American Home Mortgage Holdings, Inc. and certain of its subsidiaries and affiliate companies, including Seller (collectively "Debtors"), filed voluntary petitions ("Petitions") for relief in the bankruptcy case captioned In re American Home Mortgage Holdings, Inc., a Delaware corporation, et al., Case No. 07-11047 (CSS) Jointly Administered (the "Bankruptcy Cases") under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (together with any court having proper jurisdiction under the Bankruptcy Code, the "Bankruptcy Court").

WHEREAS on September 20, 2007, the Bankruptcy Court entered a Stipulation and Order Resolving Motion of United States for an Order (I) Requiring Turnover of Non-Estate Property Belonging to the Government National Mortgage Association and (II) Declaring that the Government National Mortgage Association Is Not Subject to the Automatic Stay (the "Stipulation and Order") wherein, *inter alia*, Debtors and Government National Mortgage Association agreed to allow Debtors to have until October 9, 2007 to execute a binding contract to sell the servicing rights to the Ginnie Mae Portfolio (as defined in the Stipulation and Order) to a GNMA approved issuer/servicer in good standing which contract shall satisfy all conditions precedent set forth in the Stipulation and Order, including, providing sufficient proceeds to reimburse GNMA for certain expenses.

1

NOW, THEREFORE, in consideration of the mutual promises contained herein, and intending to be legally bound hereby, Buyer and Seller agree as follows:

1.     Definitions Unless the context requires otherwise, the following terms shall for all purposes of this Agreement have the meanings hereinafter specified:

"Administrative Agent" shall mean Bank of America, N.A., as administrative agent under that certain Second Amended and Restated Credit Agreement, dated August 10, 2006, among Seller, certain affiliates of Seller, Bank of America, N.A., as administrative agent, and certain other parties, as amended

"Advances" shall mean, with respect to the Loans, all customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) incurred in the performance by the Seller of Seller's servicing obligations in accordance with GNMA Requirements, including, but not limited to, the cost of (a) the preservation, restoration and protection of the Mortgaged Property, (b) any enforcement or judicial proceedings, including foreclosures, (c) the management and liquidation of the Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage (except with respect to any expenses incurred in connection with procuring or transferring tax and flood service contracts as provided therein), (d) any advances by the Seller of principal and interest payments, and (e) any advances by the Seller of taxes and insurance premiums.

"Assignment Holdback" shall mean $400,000.00, which amount shall represent the cost to properly prepare and record the assignment of mortgage to reflect Buyer as the servicer of record for each Loan.

"Bankruptcy Cases" shall have the meaning specified in the Recitals above.

"Bankruptcy Code" shall have the meaning specified in the Recitals above.

"Bankruptcy Court" shall have the meaning specified in the Recitals above.

"Bankruptcy Exceptions" means any limitations, omissions or failures of performance arising due to the fact that the Seller is operating as a debtor in possession under the Bankruptcy Code, including but not limited to, (i) Seller's inability to maintain the services of their officers or other employees or the fact that a substantial number of Seller's employees have left their positions and continue to leave their positions, (ii) Seller's inability to maintain the continued operation of any operating function at a standard consistent with past practice, (iii) vendors and counterparties of Seller failing to continue to perform their obligations to Sellers, and (iv) ongoing litigation with respect to the business of Seller and the Property.

"Business Day" shall mean any day other than (a) a Saturday or Sunday or (b) a day on which any banking institution in Oklahoma is authorized or obligated by law or executive order to be closed.

"Cash Collateral Order" shall mean the Order of the Bankruptcy Court (i) Authorizing Debtors' Use of Cash Collateral and (ii) Granting Replacement Liens and Adequate Protection to Certain Pre-Petition Secured Creditors, dated September 4, 2007, entered in the Bankruptcy Cases.

"Claim" shall have the meaning set forth in the Bankruptcy Code (11 U.S.C. § 101(5)).

"Custodial Accounts" shall mean those accounts established and maintained in accordance with the provisions of the Servicing Contract and GNMA Requirements for (i) the deposit and retention of interest and principal and (ii) the deposit and retention of all collections of taxes, assessments, ground rents, hazard and mortgage insurance or comparable items with respect to each Loan, and all other escrow or similar accounts (including without limitation HUD Section 235 Loans) with respect to each Loan.

"Custodial File" shall mean all documents, agreements or instruments held by Seller or its GNMA custodian relating to a Loan, Mortgage, Mortgage Note, or Mortgage Pool, including, without limitation, the title insurance policy, mortgage insurance certificate, loan guaranty certificate, intervening mortgage assignments, intervening Note endorsements and any other documents, agreements, or instruments under which legal rights or obligations are created or exist, and shall at a minimum include the Mortgage Note or a lost note instrument bond/surety bond, in compliance with GNMA Requirements, and the Mortgage securing the same.

"Custodian Holdback" shall mean $25,000.00, which amount shall represent the cost to pack and ship all custodial files to Buyer from the respective Custodian.

"Escrow Deposits" shall mean and include impounds or similar terms to indicate the deposit and retention of collections for taxes, assessments, ground rents, hazard and mortgage insurance or comparable items with respect to each Loan, and all other escrow or similar accounts maintained with respect to each Loan.

"FHA" shall mean the Federal Housing Administration or any successor thereto.

"Final Order" shall mean an order or judgment: (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, the order or judgment has been affirmed by the highest court to which such order or judgment was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired; provided, that the theoretical possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not prevent such order or judgment from being considered a Final Order.

"GNMA" shall mean the Government National Mortgage Association or any successor thereto.

"GNMA Requirements" shall mean with respect to GNMA all applicable provisions of Section 306(g) of the National Housing Act and the rules and regulations promulgated by GNMA, including without limitation, the GNMA Mortgage-Backed Securities Guide as revised from time to time.

"HUD" shall mean the United States Department of Housing and Urban Development or any successor thereto.

"In Bankruptcy" shall mean, with respect to those Loans which the Mortgagor thereof has sought relief under or has otherwise been subjected to the federal bankruptcy laws or any similar laws of general application for the relief of debtors, through the institution of appropriate proceedings, and such proceedings are continuing, and shall be deemed to continue until the real property subject to a Mortgage is released from the jurisdiction of the bankruptcy or other court in which the matter is pending, whether because such proceeding is dismissed, finally concluded or otherwise.

"In Foreclosure" shall mean that a Loan has been referred to an attorney to commence foreclosure or to an attorney or trustee to commence a sale under a power of sale pursuant to the law of the state wherein the Loan is to be enforced.

"In Litigation" shall mean that (i) the Mortgagor is a named plaintiff or defendant in a pending lawsuit involving Seller, which are not routine uncontested foreclosure or bankruptcy proceedings, (ii) the Mortgagor is a member of a certified class in any class action lawsuit in which Seller is a defendant, or (iii) any other cause of action or litigation in which Seller, or a prior servicer, is a named party in a lawsuit and which affects a Loan, the Property or the servicing rights related thereto. The Loans that are In Litigation are described on Exhibit "F".

"Insurance Proceeds" shall mean any and all pending or prospective sums payable by FHA or VA or any other insurer of any mortgage life, hazard, disability, title or other insurance in connection with any Loan.

"Insurer Requirements" shall mean the rules and regulations promulgated by an entity or person who insures or guarantees all or any portion of the risk of loss upon borrower's default on any of the Mortgage Notes, including, without limitation, HUD, FHA or VA.

"Loan" shall mean (i) the indebtedness created by each Mortgage Note, Mortgage or other item contained in the Custodial File relating to the Property including, without limitation, the Mortgage Pools and (ii) any FHA insurance or VA guaranty or any insurance with respect to life, hazard, disability, title or other insurance associated with such Custodial File.

4

066585.1001

"Material Adverse Effect" shall mean any result, occurrence, change, effect, event or circumstance, that, individually or in the aggregate, has had or would reasonably be expected to have, a Material Adverse Effect or change in the Property taken as a whole or the ability of Seller to perform Seller's obligations under this Agreement, except for any result, occurrence, change, effect, event, or circumstance relating to (i) the economy or the financial markets in general, except to the extent specifically related to or disproportionately impacting Sellers or the Property, (ii) the industry in which the Seller operates in general and not specifically relating to the Property, except to the extent disproportionately impacting Seller or the Property, (iii) the announcement of this Agreement or the transaction contemplated hereby or the identity of Buyer, (iv) changes in applicable laws after the date hereof, (v) the fact that Seller will be operating as a debtor-in-possession under the Bankruptcy Code, or (vi) changes in GAAP or regulatory accounting principles after the date hereof.

"Mortgage" shall mean a valid and enforceable mortgage, deed of trust or other security instrument creating a first lien upon described real property improved by a single family (1-4 families) dwelling, which secures repayment of a Mortgage Note.

"Mortgage Note" shall mean a valid and enforceable promissory note or other evidence of indebtedness owned and held under each respective Mortgage Pool, the repayment of which is secured by a Mortgage.

"Mortgage Pool" shall mean the pool or portfolio of Mortgage Notes and Mortgages, in connection with certain GNMA pools of Loans which are the subject of this Agreement.

"Mortgaged Property" shall mean the fully constructed one-to-four family residential real property that is encumbered by a Mortgage, including all buildings and fixtures thereon and all accessions thereto, including installations of mechanical, electrical, plumbing, heating, and air conditioning systems located in or affixed to such buildings, and all alterations, additions, and replacements.

"Mortgagor" shall mean an obligor of the Mortgage or Mortgage Note.

"Passthrough Rate" shall mean the per annum rate of interest required by each Mortgage Note to be paid by the related Mortgagor, less a per annum net servicing fee (not including the GNMA guarantee fee).

"P & I Advances" shall mean those Advances set forth on Exhibit G.

"Petitions" shall have the same meaning as specified in the Recitals above.

"Petition Date" shall have the same meaning as specified in the Recitals above.

"Property" shall mean all of the following rights, property, documents, agreements and funds related to the Mortgage Pools described on Exhibit "A":

(i) All rights and benefits as servicer of each Mortgage Pool, including (without limitation) all rights, interests and responsibilities under the Servicing Contract for servicing each Loan and all rights to receive and retain all servicing fees, late fees, assumption fees, insurance commissions and other amounts in connection therewith;

(ii) All right, title and interest, as GNMA Servicer and Issuer, to each Loan, Mortgage, Mortgage Note, Custodial File, Mortgage Pool, and Insurance Proceeds;

(iii) All right, title and interest as servicer in all funds in the Custodial Accounts; all accrued and uncollected late fees or other amounts due and unpaid by the Mortgagor and all unreimbursed Advances with respect to each Loan and the right to collect, recover or be reimbursed for the same; and

(iv) All right, title and interest as servicer in and to the servicing/credit, foreclosure, bankruptcy, and insurance files relating to each Loan and the closing and servicing thereof, all payment histories of each Loan reflecting payments received and Advances made and all other books, records, files and the contents thereof held or maintained by or for the servicer or GNMA with respect to the Mortgage Pool or Custodial File.

"Reconciliation Threshold" shall mean an amount equal to $400,000, subject to increase in Seller's discretion as set forth in Section 9.4.

"Reduction Amount" shall mean an amount equal to $300,000.00 to reflect the costs associated with loans that cannot be transferred to HUD, all claims for mortgagee neglect, any claims for post-foreclosure curtailments, and all claims for late foreclosure referrals.

"Sale" shall mean the purchase and sale contemplated by this Agreement in accordance with the Stipulation and Order and the Sale Order.

"Sale Date" shall mean the close of business on October 31, 2007, or such other time as may be mutually agreed upon in writing by Buyer and Seller that is no later than the close of business on November 1, 2007; at which time the entire economic benefit of the Property (including without limitation, all rights, titles, interests, obligations and benefits associated therewith) will be transferred to Buyer.

"Sale Order" shall mean an Order or Orders of the Bankruptcy Court issued pursuant to Sections 363 and 365 of the Bankruptcy Code, authorizing and approving, among other things the purchase and sale contemplated by this Agreement, free and clear of all liens, claims, interests and encumbrances.

"Sale Hearing" shall mean the hearing conducted by the Bankruptcy Court in these Bankruptcy Cases at which Debtors seek entry of the Sale Order including approval from the Bankruptcy Court of Sale pursuant to the Sale Motion.

"Sale Motion" shall mean the motion filed by the Seller with the Bankruptcy Court for the approval of the Sale Order in the form of a Final Order.

"Servicing Contract" shall mean each agreement between Seller and GNMA under which Seller is servicing a Mortgage Pool for GNMA.

"Settlement Date" shall mean a date which is fifteen (15) Business Days after the Transfer Date.

"Stipulation and Order" shall have the meaning specified in the Recitals above.

"T & I Advances" shall mean any advances by the Seller of taxes and insurance premiums.

"Tax Contract Holdback" shall mean $116,000.00, which amount shall represent the cost to obtain a life of loan, fully transferable First American tax contract for each Loan.

"Three Month Mortgage" shall mean any Loan:

(i) Which, as of the Sale Date, is ninety (90) days or more past due under the terms of the Mortgage Note for any payment due; for the purposes of this Agreement, a Loan will be considered ninety (90) days or more past due if, as of the close of business on October 31, 2007, the respective Mortgagor has not paid the full amount of all principal, interest and escrow payments which were due on or before August 1, 2007; or

(ii) Which, as of the Sale Date, is (i) In Foreclosure, (ii) In Litigation, or (iii) In Bankruptcy.

"Transfer Date" shall mean the close of business on October 31, 2007, or a date mutually acceptable to Buyer and Seller that is no later than the close of business on November 1, 2007, which shall be the day after the date which Seller closed the books of account with respect to each Mortgage Pool in order to transfer the servicing responsibilities under the Servicing Contract to Buyer.

"VA" shall mean the Veterans' Administration, or any successor thereto.

"Farm Loan" shall mean any Loan that is insured by an agency of the United States government, other than FHA or VA, including without limitation, the Farmer's Home Loan Association and the Rural Housing Development Agency.

"MERS" shall mean the Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

"MERS Loan" shall mean any Loan registered with MERS on the MERS System.

"MERS System" shall mean the system of recording transfers of Mortgages electronically maintained by MERS.

2.    Purchase and Sale; Good Title.

2.1 Purchase and Sale. Subject to the terms and provisions set forth in this Agreement, on the Sale Date Buyer shall purchase the Property from Seller, and Seller shall sell, transfer, assign and convey the Property to Buyer pursuant to an executed assignment of Seller's rights and obligations as servicer of each Mortgage Pool and other Property in the form of Exhibit "B", hereto attached, which shall be delivered to Buyer on or before the Sale Date.  On the Transfer Date, Buyer shall commence the servicing of the Loans and Seller shall cease servicing the Loans.

2.2 Good Title.   Subject to entry of the Sale Order, Seller is the sole holder of the Property and has good and marketable title to and has the right to assign and transfer the Property, and to assign, transfer and deliver the Property as contemplated by this Agreement free and clear of any and all Claims, charges, defenses, interests, security interests, liens, offsets and encumbrances.   Subject to entry of the Sale Order and Seller's satisfaction of all obligations under the Stipulation and Order, the sale, transfer and assignment of the Property by the Seller are valid and enforceable and will effectively vest in the Buyer good title, free and clear of any and all liens, Claims and encumbrances.

3.    Purchase Price.

3.1  The purchase price to be paid by the Buyer for the Property shall be the sum of:

3.1.1  Seventy-Five Hundredths of One Percent (0.75%) of the aggregate unpaid principal balances as of the Sale Date of all Loans that are not Three Month Mortgages; minus

3.1.2  An amount equal to One Thousand Five Hundred Dollars ($1,500) for each Loan which, as of the Sale Date, is (i) ninety (90) days or more past due under the terms of the Mortgage Note, (ii) In Bankruptcy and thirty (30) days or more past due, (iii) In Foreclosure, or (iv) In Litigation.   For purposes of this Agreement, a Loan will be considered thirty (30) days or more past due if, as of the close of business on October 31, 2007, the respective Mortgagor has not paid the full amount of all principal, interest and escrow payments which were due on or before October 1, 2007; minus

3.1.3  The Reduction Amount.

3.2   The purchase price determined under Section 3.1 shall be paid by bank wire in immediately available funds as follows:

3.2.1   On the Sale Date an initial installment to Seller in the amount equal to the greater of (i) ~~Twenty~~Forty Percent (~~20~~40%) of the purchase price contemplated in Section ~~3.1~~3.1.1; and (ii) the amounts payable by Sellers to GNMA pursuant to the Stipulation and Order, provided that Seller has performed its obligations under Section 9 and delivered to Buyer the assignment required in Section 4.1.

3.2.2   Buyer shall on the Settlement Date and upon (i) Seller's complete satisfaction of all conditions required to be satisfied by Seller pursuant to Sections 4.2.4, 4.2.7, 7 and 8.8 prior to the Settlement Date, and (ii) Seller's substantial satisfaction of all other conditions required to be satisfied by Seller prior to the Settlement Date, pay a second installment in an amount equal to: (i) Eighty-Five Percent (~~80~~85%) of the purchase price contemplated in Section 3.1.1; minus (ii) One Hundred Percent (100%) of the ~~amounts~~amount contemplated in Section 3.1.2; minus (iii) the initial installment described in Section 3.2.1; minus (v) the Reduction Amount; minus (vi) the Assignment Holdback; minus (~~vi~~vii) the Custodian Holdback; minus (~~vii~~viii) the Tax Contract Holdback; minus (ix) the Reconciliation Threshold; plus (~~viii~~x) interest described in Section 3.2.8.

~~3.2.3   Reserved.~~

3.2.3   No later than November 30, 2007, Buyer shall complete a final audit and reconciliation of Seller's Custodial Accounts and provide Seller with written notice of any identified deficiencies ("Identified Deficiencies"). In connection with such final audit and reconciliation, the Parties agree to cooperate together with GNMA to resolve any discrepancies that may arise. If Seller (with the consent of the Administrative Agent and after consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases) does not object to the amount of the Identified Deficiencies within ten (10) days after written notice of the Identified Deficiencies, then Buyer shall retain from the Reconciliation Threshold the amount of the Identified Deficiencies and pay the remainder of the Reconciliation Threshold to Seller. If Seller objects to all or any portion of the Identified Deficiencies, then Buyer shall pay the amount of the Reconciliation Threshold that is in excess of the Identified Deficiencies to Seller and the parties shall, in good faith, seek to resolve any objection (with the consent of the Administrative Agent and after consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases in the case of Seller) for a period of fifteen (15) days. If Buyer and Seller are not able to resolve a dispute with respect to any Identified Deficiencies during such fifteen-day period, the dispute shall be submitted to the Bankruptcy Court for final determination. Notwithstanding any provisions of this Agreement to the contrary, in no event shall Seller be responsible for any Identified Deficiencies in excess of the Reconciliation Threshold and other unpaid portions of the purchase price as contemplated in Section 3.2.4 and Buyer's recourse for Identified Deficiencies shall be limited to the

9

066585.1001

amounts held as the Reconciliation Threshold and other unpaid portions of the purchase price as contemplated in Section 3.2.4. The Parties agree that the reimbursement of T & I Advances to Seller in accordance with Section 3.3 will not result in, and Buyer will not assert any, Identified Deficiencies solely arising out of such reimbursement (it being understood that there may be Identified Deficiencies with respect to the accuracy of the amounts so reimbursed).

3.2.4  An amount equal to Fifteen Percent (15%)The balance of the purchase price contemplated in Section 3.1.1,3.1, plus the interest described in Section 3.2.8, shall be paid in subsequent installments on a pro rata basis based on the unpaid principal balances of the Mortgage Pools, as of the Sale Date, once the Custodial File, upon the earlier of (i) one hundred and twenty (120) days after the Sale Date; and (ii) once the Custodial Files related to each Loan which is included in suchthe Mortgage PoolPools as of the Sale Date is complete and in compliance with the requirements for certification or recertification by Buyer's GNMA custodian in accordance with the GNMA Requirements, Insurer Requirements and the requirements of federal, state and local laws, with each such installment being paid on the fifteenth (15th) Business Day of the month immediately following the month each Loan related to a Mortgage Pool as of the Sale Date becomes in compliance with GNMA Requirements, Insurer Requirements and the requirements of federal, state and local laws.  Notwithstanding the prior provisions of this Section 3.2.4, amounts payable pursuant to this Section 3.2.4 shall be subject to offset for (i) any failure of Seller to perform, (ii) any breach of Seller's representations, warranties, or delivery obligations, covenants, (iii) any Seller indemnification obligations, (iv) any Identified Deficiencies, or (v) other remedies of Buyer under this Agreement.  In the event that the Custodial Files are not in compliance with the requirements for certification or recertification on the date that the balance of the purchase price is paid in accordance with this Section 3.2.4, Buyer shall offset from such payment of purchase price for custodial documentation defects in accordance with the following schedule:

| | |
|---|---|
| Missing Custodial File: | $2,625.00 |
| Note: | $2,000.00 |
| Mortgage: | $250.00 |
| Interim Assignment: | $200.00 |
| Title Policy: | $175.00 |

Ninety (90) days after the Sale Date, Buyer shall provide Seller with written notice of any intended setoffs or reimbursements under this Section 3.2.4 ("Intended Setoffs"). If Seller (with the consent of the Administrative Agent and after consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases) does not object to the amount of any Intended Setoffs within ten (10) days after written notice of any Intended Setoff, then Buyer shall retain from the remaining purchase price the amount of the Intended Setoffs and pay the remainder of the purchase price to Seller.  If Seller objects to all or any portion of the Intended Setoffs, then Buyer shall pay the amount of the remaining purchase price that is in excess of the Intended Setoffs to Seller and the

10

parties shall, in good faith, seek to resolve any objection (with the consent of the Administrative Agent and after consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases in the case of Seller) for a period of fifteen (15) days.  If Buyer and Seller are not able to resolve a dispute with respect to any Intended Setoffs during such fifteen-day period, the dispute shall be submitted to the Bankruptcy Court for final determination.    Notwithstanding any provisions of this Agreement to the contrary, in no event shall Seller be responsible for any Intended Setoffs in excess of the unpaid purchase price and Buyer's recourse for Intended Setoffs shall be limited to the unpaid purchase price.

~~3.2.5  The balance of the purchase price contemplated in Section 3.1.1, plus the interest described in Section 3.2.8, shall be paid on a date which is fifteen (15) Business Days following the date on which all Loans included in each Mortgage Pool as of the Sale Date are in compliance with the requirements for certification or recertification by Buyer's custodian in accordance with GNMA Requirements related to documentation.~~
    3.2.5  Reserved.

    3.2.6   For the purposes of this Agreement, including without limitation, the payment of the purchase price under Sections ~~3.2.4 and 3.2.5,~~3.2.4, GNMA Requirements shall apply to all Loans as of the Sale Date, regardless of whether (i) a Loan has been removed from a Mortgage Pool subsequent to the Sale Date, or (ii) the Loan has been removed from the custody of the GNMA Custodian by way of GNMA Form 11708 subsequent to the Sale Date.  ~~Furthermore, regardless of whether a Mortgage Pool is eligible for recertification or has been recertified, Buyer shall not be obligated to pay Seller the purchase price related to such Mortgage Pool pursuant to Sections 3.2.4 or 3.2.5 until all Loans in such Mortgage Pool as of the Sale Date have satisfied GNMA Requirements related to documentation.~~

    3.2.7   ~~The~~Except as set forth below, the payment of part ~~or all~~ of the purchase price pursuant to this Section 3 does not excuse or limit the full performance of all obligations of Seller under this Agreement, and does not waive, impair, alter or reduce the obligation of Seller to indemnify Buyer with respect to a breach of any representation, warranty or delivery requirement pursuant to this Agreement, nor waive, impair, alter or reduce any of the other  remedies of Buyer under this Agreement; provided, however, that, subject to and in accordance with the procedures set forth in Sections 3.2.3 and 3.2.4, Buyer's  recourse for any Identified Deficiency or Seller's breach of any representation, warranty or delivery requirement, any indemnification obligations, or other remedies shall be limited to offset against the amount of purchase price that has not been paid by Buyer to Seller at the time such breach is discovered by Buyer or such obligation arises and Seller shall not be liable to pay Buyer or any other Person any damages, Identified Deficiency indemnifications, fees, penalties or other similar payments due to any breach or violation of, or default under, any provision of this Agreement by Seller, including, but not limited to, Seller's representations, warranties, covenants and agreements contained herein (it being understood that Buyer may only

11

satisfy such claims out of the amount of the purchase price that has not been paid by Buyer to Seller at the time such breach is discovered by Buyer or such obligation arises); provided that this Section 3.2.7 is not intended to limit or restrict Buyer's right to seek equitable relief to enforce Seller's delivery requirements under this Agreement with respect to items that are in Seller's possession. Nothing in this Section 3.2 shall be construed to obligate Buyer to pay to Seller an amount that is greater than the amount described in Section 3.1, plus the associated interest.

3.2.8 On the date each installment of the purchase price is paid by Buyer pursuant to this Section, Buyer shall pay interest on the average daily balance of the amount of such installment computed at the one (1) month Federal Funds Target Rate Expected as published by *Bloomberg* on the first Business Day of each month commencing on the day following the Transfer Date and ending on the day prior to the date such installment is paid.

3.2.9 The Assignment Holdback shall be used to reimburse Buyer for the actual documented costs incurred to properly prepare and record the assignment of mortgage to reflect Buyer as the servicer of record for each Loan. Buyer shall provide Seller with a report of the amounts paid out of the Assignment Holdback on a monthly basis commencing on the thirtieth (30th) day after the Settlement Date. If such actual aggregate costs are less than the Assignment Holdback, then Buyer shall remit to Seller the difference between such actual cost and the Assignment Holdback in the next scheduled payment of the Purchase Pricepurchase price. If such actual cost is more than the Assignment Holdback, then Buyer shall deduct the difference from the next scheduled payment of the Purchase Pricepurchase price.

3.2.10 The Custodian Holdback shall be used to reimburse Buyer for the actual documented costs to pack and ship all custodial files to Buyer from the respective custodians. Buyer shall provide Seller with a report of the amounts paid out of the Custodian Holdback no later than thirty (30) days after the Settlement Date. If such actual cost is less than the Custodian Holdback, then Buyer shall remit to Seller the difference between such actual cost and the Custodian Holdback in the next scheduled payment of the Purchase Pricepurchase price. If such actual cost is more than the Custodian Holdback, then Buyer shall deduct the difference from the next scheduled payment of the Purchase Pricepurchase price.

3.2.11 The Tax Contract Holdback shall be used to reimburse Buyer for the actual documented costs incurred to obtain a life of loan, fully transferable First American tax contract for each Loan. Buyer shall provide Seller with a report of the amounts paid out of the Tax Contract Holdback no later than sixty (60) days after the Settlement Date. If such actual aggregate cost is less than the Tax Contract Holdback, then Buyer shall remit to Seller the difference between such actual cost and the Tax Contract Holdback in the next scheduled payment of the Purchase Pricepurchase price. If such actual cost is

more than the Tax Contract Holdback, then Buyer shall deduct the difference from the next scheduled payment of the ~~Purchase Price~~purchase price.

3.3 ~~Buyer shall, (A) on~~On the Sale Date, (i) Buyer shall pay to Seller One Hundred Percent (100%) of the unreimbursed P & I Advances; and ~~(B) on~~ii) Seller shall be reimbursed for all T & I Advances by withholding such amounts from the transfers of Custodial Accounts to be made by Seller in accordance with Section 4.2.4. Buyer and Seller agree that reimbursement of the T& I Advances as provided in this Section 3.3 shall not result in or be deemed to result in a deficiency with respect to the Custodial Accounts (other than any deficiency arising out of an inaccuracy of the amount of the T & I Advances). On the Settlement Date and upon Seller's substantial satisfaction of all conditions required to be satisfied by Seller prior to the Settlement Date, Buyer shall pay to Seller One Hundred Percent (100%) of the unreimbursed Advances (other than P & I Advances and T & I Advances) as of the Transfer Date; provided that, with respect to Advances other than P & I Advances and T & I Advances, no payment will be made for an Advance related to a Loan unless a valid invoice or other reasonable supporting documentation in accordance with applicable Insurer Requirements for reimbursement has been delivered to Buyer so that Buyer can ~~collect~~submit claims for reimbursement of such Advance from the Mortgagor, FHA, or VA ~~as applicable.~~, as applicable, in accordance with applicable Insurer Requirements. On the Settlement Date, Buyer and Seller shall reconcile all Advances, with any additional amounts due to Seller to be added to, or any amounts due from Seller to Buyer to be deducted from, the payment to be made by Buyer to Seller on the Settlement Date pursuant to Section 3.2.2.

3.4 Except for amounts payable to GNMA pursuant to the Stipulation and Order which will be wired to an account designated by GNMA to Sellers that Sellers will provide to Buyer no later than one Business Day prior to the Sale Date, Buyer will wire all funds payable pursuant to Section 3, on the day such amounts are due, to an account designated in the Sale Order by the Administrative Agent in accordance with and subject to the Cash Collateral Order.

4.    Delivery.

4.1 The closing shall be held on the Sale Date at the loan administration offices of the Buyer at 999 NW Grand Boulevard, Suite 500, Oklahoma City, Oklahoma 73118, or at such other time and manner as Buyer and Seller may agree, at which time Seller shall deliver or shall have previously delivered to Buyer a fully executed assignment of Seller's right, title and interest to the Property in the form of Exhibit "B".

4.2 On the date specified below, Seller shall deliver to Buyer, the following:

4.2.1 Prior to the Transfer Date, Seller shall provide Buyer a list, via electronic media in a format acceptable to Buyer, showing by Loan number for each Loan the taxing authority/payee with respect to each such Loan or such other tax information via computer tape as shall be mutually agreeable to Buyer and Seller.

13

066585.1001

4.2.2  Within five (5) Business Days following the Sale Date, Seller shall provide to Buyer a Servicing Portfolio Purchase Schedule in the form of Exhibit "C".

4.2.3  Within five (5) Business Days following the Sale Date, Seller shall provide to Buyer a copy of Exhibits "A", "F", and "G" to this Agreement updated as of the Sale Date.

4.2.4  Subject to GNMA's execution of an assignment of servicing on November 2, 2007, ~~within three (3) Business Days following~~in accordance with the Transfer ~~Date~~Instructions on Exhibit "E", the Seller shall transfer to Buyer all the amounts deposited into the Custodial Accounts (net of T&I Advances). On the Settlement Date, Seller shall pay interest to Buyer calculated against the amount of such funds at the one (1) month federal funds target rate expected as published by *Bloomberg* on the Transfer Date, commencing on the Transfer Date and ending on the date such funds are transferred to Buyer.

4.2.5  No later than ~~three~~five (3̶5̶) Business Days after the Transfer Date, Seller shall furnish to Buyer trial balances as of the Transfer Date which shall be reconciled with Seller's GNMA reports in a manner reasonably acceptable to Buyer.  The trial balance shall identify Seller's Loan number for each Loan as of the Transfer Date, and set forth for each such Loan as of such date:

4.2.5.1  The current principal balance;

4.2.5.2  The current Custodial Account balances;

4.2.5.3  The due date of the next installment payment of principal and interest;

4.2.5.4  The amount of all accrued and unpaid late charges, NSF fees and all other fees and charges due from the Mortgagor, if any; and

4.2.5.5  The Advances related to the Escrow Deposits.

4.2.6  No later than ten (10) Business Days after the Transfer Date, with respect to each Loan, Seller shall provide to Buyer in the form and manner described in Exhibit "E", (i) Seller's last analysis of the Escrow Deposits in the Custodial Accounts; and (ii) the last two (2) years' history transactions and copies of all codes applicable to such history transactions used on the records maintained by Seller with respect to each such Loan.

4.2.7  No later than two (2) Business Days after the Transfer Date, Seller at its sole cost and expense shall provide to Buyer computer tapes, in a mutually agreed upon format, containing Seller's ~~complete~~ database, as of the Transfer Date, relating to the Loans and such other information as may be reasonably requested by Buyer to enable

14

Buyer to service the Loans and comply with GNMA Requirements, Insurer Requirements, applicable federal, state and local laws and regulations and prudent industry practices. No later than seven (7) Business Days after the Transfer Date Seller shall deliver to Buyer the ACS-GSG tape (formerly known as the Cooper's Tape). From and after the date of this Agreement, Seller shall reasonably assist Buyer in an automated computer conversion of the Property, providing computer tapes as reasonably requested by Buyer.

4.2.8  No later than five (5) Business Days after the Transfer Date, Seller shall furnish to Buyer:

4.2.8.1  The report setting forth the amount of Seller's unreimbursed Advances, and each corresponding invoice, as of the Transfer Date, that are not related to principal, interest or the Escrow Deposits for each Loan identified by Seller's Loan number; and

4.2.8.2  The report as of the Transfer Date via electronic media in a format acceptable to Buyer setting forth the unpaid principal amount and due date of the next installment payment of principal and interest of each Loan identified by Seller's Loan number which is a Three Month Mortgage.

4.2.9  Reserved

4.2.10  Within three (3) Business Days after the Transfer Date, Seller shall deliver to Buyer all files described in subsection (iv) of the definition of "Property" in Section 1, which are or become in Seller's or its representative's possession, including, without limitation, all servicing/credit files and Custodial Files; provided, however, that Seller shall have up to ninety (90) Business Days after the Transfer Date to deliver to Buyer all servicing/credit files stored at Seller's Melville storage facility. Within three (3) Business Days after the Transfer Date, Seller shall cause all Custodial Files and all documents related to the Loans in the possession of Seller's GNMA custodian to be delivered, at Seller's sole cost and expense, to the GNMA custodian appointed by Buyer. Provided that, for those documents which are in the possession of an attorney or trustee with respect to bankruptcy or foreclosure proceedings, Seller may deliver a signed trust receipt in the form of Exhibit "D", signed by such attorney or trustee, and photocopies of the subject documents in lieu of delivering the actual documents to Buyer, provided further that Seller's delivery of such trust receipts shall in no way relieve Seller of its obligations under Section 8 herein except where the breach of such obligations is caused solely by said attorney's or trustee's losing one or more of the documents related to such trust receipt after the Transfer Date.

4.2.11  On Within three (3) Business Days after the Transfer Date, with respect to all Mortgage Notes, Seller shall properly endorse such Mortgage Notes without recourse with an original signature of a Vice President of Seller as described below; provided that

15

066585.1001

by accepting such endorsement without recourse, Buyer does not waive, limit or reduce any of Seller's obligations under this Agreement, including without limitation, those described in Section 8.4.

<div align="center">

Pay to the Order of

MidFirst Bank
Without Recourse

American Home Mortgage Servicing, Inc.

</div>

By: _____
_____, Vice President

4.2.12   On or before the Settlement Date, Seller shall deliver such other assignments, instruments of transfer, and other documents as Buyer may reasonably require to be in accordance with GNMA Requirements, Insurer Requirements, other federal, state and local laws or in order to complete the transactions contemplated hereunder and to evidence compliance by Seller with the covenants, agreements, representations and warranties made by it hereunder. For purposes of this section 4.2.12, if Seller delivers the assignments to the proper recording office in due form for recording and delivers a certified copy of the assignment sent for recording to Buyer, Seller shall be deemed to be in compliance with this delivery requirement with respect to assignments.

4.2.13  On or before the Settlement Date, Seller shall use commercially reasonable efforts to deliver to Buyer those things required to be delivered on or before the Settlement Date in the time and manner required in the transfer instructions described in Exhibit "E"; provided, however, that failure to deliver any items set forth in Exhibit "E" within the time specified shall not be a breach of this Agreement so long as the items required to be delivered on or before the Settlement Date are delivered on or before the Settlement Date.

5.     Representations and Warranties of Seller.   As an inducement to enter into this Agreement, Seller represents and warrants to Buyer as follows (it being acknowledged that each such representation and warranty shall survive the Sale and Settlement Dates):

5.1     Seller is duly incorporated, validly existing and in good standing under the laws of the jurisdiction of its incorporation; subject to the Bankruptcy Exceptions, has all requisite corporate power and authority to own its properties and carry on its business as and where now being conducted and is duly qualified to do business and is in good standing in each jurisdiction in which the character and location of the properties owned or leased by it or the nature of the business transacted makes such qualifications necessary; and has all requisite corporate power and authority to enter into this Agreement, and the agreements to which it is or will become a party contemplated by this Agreement, and to carry out the transactions contemplated hereby.

<div align="center">16</div>

5.2    The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have each been duly and validly authorized by all necessary organizational action (subject to entry and effectiveness of the Sale Order). This Agreement constitutes a valid and legally binding agreement enforceable in accordance with its respective terms; except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other laws relating to or affecting the enforcement of creditors' rights and by general equity principles (subject to entry and effectiveness of the Sale Order).

5.3    The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby will not violate, conflict with, result in a breach of, constitute a default under, or be prohibited by, or require any additional approval under its charter, certificate of incorporation, by-law's, or upon obtaining GNMA approval (in accordance with the Stipulation and Order) and the Administrative Agent's approval (in accordance with the Cash Collateral Order), any instrument or agreement to which it is a party or by which it is bound or which affects the Property, or any federal or state law, rule or regulation or any judicial or administrative decree, order, ruling or regulation applicable to it, or to the Property; provided, however, that enforceability of the provisions hereof requiring consummation of the transactions contemplated hereby is subject to entry and effectiveness of the Sale Order or any other action by the Bankruptcy Court. Except for the approval of the Bankruptcy Court and GNMA approval and subject to entry and effectiveness of the Sale Order by the Bankruptcy Court, Seller is not required to obtain the consent of any other party (including any rating agency) or any consent, license, approval or authorization from, or registration or declaration with, governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Agreement, except such as have been obtained or made.

5.4    Except with respect to those Loans described in Exhibit "F" and Seller's satisfaction of all requirements under the Stipulation and Order, there is no litigation (including without limitation, any class actions) or investigations, either pending or to its knowledge threatened, nor any settlements of litigation, nor proceedings of any kind, pending or to its knowledge threatened, by any federal, state or local government or administrative body, related to or affecting any of the Property, or Seller's ability to consummate the transactions contemplated hereby, including without limitation, the servicing of the respective Loans and Mortgage Pools in accordance with GNMA Requirements and Insurer Requirements or which has resulted or would result in an amendment or modification to the terms of any Mortgage, Mortgage Note or Mortgage Pool; and there are no judgments, settlements, decrees, injunctions or other agreements or understandings which affect the value of the Loans or the servicing rights associated therewith.

5.5    Subject to entry of the Sale Order, the sale, transfer and assignment by Seller to Buyer of the Property, and the instruments required to be executed by Seller and delivered to PurchaserBuyer pursuant to GNMA Requirements or other contractual provisions, are, or will be on the Sale Date, valid and enforceable in accordance with their terms and will effectively vest in

Buyer good and marketable title to the Property, free and clear of any and all liens, claims, or Encumbrances.

5.6     Seller is authorized by GNMA as the eligible servicer of each Mortgage Pool and is entitled to the fees, compensation and reimbursement of expenses as provided by each Servicing Contract and the GNMA Requirements.

5.7     Subject to the rights of GNMA, any Custodian and the holders of GNMA Mortgage-Backed Securities, on or before the Sale Date, Seller will have full and complete title to the Property.   On the Sale Date the Property will be free and clear of all encumbrances whatsoever, and Seller will have the unencumbered right to transfer and assign the same as contemplated by this Agreement, and upon the assignment and transfer contemplated in Section 2 of this Agreement, unencumbered full and complete title thereto shall be vested in Buyer.

5.8     All Advances made with respect to a Loan are (i) accounted for in accordance with GNMA Requirements and Insurer Requirements, (ii) legally collectible from a Mortgagor in the amounts as reflected on the books and records of Seller, except as the enforcement of collection may be limited by bankruptcy, insolvency, reorganization or other laws relating to or affecting the enforcement of creditors' rights and (iii) properly documented to support collection.

5.9     The information provided by Seller set forth in all Exhibits attached hereto and incorporated herein by reference is true, correct and complete as of the date thereof in the case of each item described on each Exhibit.

5.10    Except as set forth on Schedule 5.10, each Loan is validly insured or guaranteed to the maximum amount permitted by law by FHA, HUD, VA or other agency of the United States government, as the case may be, and complies with GNMA Requirements with respect to mortgage insurance including, without limitation, FHA's insuring no less than one hundred percent (100%) of the unpaid principal balance of each FHA Loan and VA's guarantee shall be no less than twenty-five percent (25%) of the unpaid principal balance of each VA Loan.  Subject to Seller's fulfillment of all obligations under the Stipulation and Order, all premiums or other charges due in connection with such insurance or guaranty have been paid.  There has been no act or omission that would or may invalidate, reduce or impair any such insurance or guaranty. No Loan that is insured by FHA is coinsured with respect to such Mortgage insurance.

6.      Representations and Warranties of Buyer.   As an inducement to enter into this Agreement, Buyer represents and warrants to Seller as follows (it being acknowledged that each such representation and warranty shall survive the Sale and Settlement Dates):

6.1     Buyer is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization; has all requisite corporate power and authority to own its properties and carry on its business as and where now being conducted and is duly qualified to do business and is in good standing in each jurisdiction in which the character and location of the properties owned or leased by it or the nature of the business transacted makes such

qualifications necessary; and has all requisite corporate power and authority to enter into this Agreement, and the agreements to which it is or will become a party contemplated by this Agreement, and to carry out the transactions contemplated hereby.

6.2    The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have each been duly and validly authorized by all necessary organizational action.    This Agreement constitutes a valid and legally binding agreement enforceable in accordance with its respective terms; except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other laws relating to or affecting the enforcement of creditors' rights and by general equity principles (subject to entry and effectiveness of the Sale Order).

6.3    The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby will not violate, conflict with, result in a breach of, constitute a default under, or be prohibited by, or require any additional approval under its charter, certificate of incorporation, by-law's, or upon obtaining GNMA approval, any instrument or agreement to which it is a party or by which it is bound or which affects the Property, or any federal or state law, rule or regulation or any judicial or administrative decree, order, ruling or regulation applicable to it, or to the Property; provided, however, that enforceability of the provisions hereof requiring consummation of the transactions contemplated hereby is subject to entry and effectiveness of the Sale Order or any other action by the Bankruptcy Court. Buyer is not required to obtain the consent of any other party (including any rating agency) or any consent, license, approval or authorization from, or registration or declaration with, governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Agreement, except such as have been obtained or made.

6.4    There is no litigation (including without limitation, any class actions) or investigations, either pending or to its knowledge threatened, nor any settlements of litigation, nor proceedings of any kind, pending or to its knowledge threatened, by any federal, state or local government or administrative body, which will or might materially and adversely affect Buyer's ability to consummate the transactions contemplated hereby.

6.5    Buyer is an eligible servicer under GNMA Requirements in good standing with the requisite financial criteria and adequate resources to complete the transactions contemplated hereby on the conditions stated herein.

6.6    Each Loan shall be the subject of a life of loan, fully transferable at no cost to Buyer, flood certification contract, which shall be transferred to Buyer.

7.    Approvals of GNMA.

7.1    Buyer and Seller acknowledge and agree that Seller ~~will take~~has taken all necessary steps and actions (with Buyer's reasonable cooperation, if requested) in order to obtain all approvals required by GNMA of the transactions contemplated by this Agreement on or prior

066585.1001

to the Transfer Date, including without limitation, the approval of Buyer to be the GNMA Issuer of record commencing on the month immediately following the Transfer Date.

7.2    Seller agrees to prepare at its sole cost and expense any and all assignments, endorsements, agreements and other instruments required by GNMA in order to obtain its approval and to pay all GNMA's charges and fees in connection with such approval. It is agreed that the execution, recordation and delivery of any and all assignments, endorsements, agreements and other instruments with respect to the purchase and sale of the Property required by GNMA and this Agreement are contingent upon the Sale, failing which all such assignments, endorsements, agreements and instruments shall be null and void and shall be returned to the party executing the same or, if executed by both parties, shall be destroyed. In the event that the transactions contemplated by this Agreement cannot be completed by reason of the failure of GNMA to approve the same, Seller and Buyer shall refund to each other all sums paid by one party hereto to the other party hereto under this Agreement. Notwithstanding any provisions of this Agreement to the contrary, Buyer and Seller agree that, in accordance with Paragraph 3 of the Stipulation and Order, GNMA will not be obligated to, and will not (i) reimburse any Advances to Seller or any other party or (ii) fund any shortfalls to any Custodial Accounts

8.    Certain Covenants of Seller. Seller covenants and agrees with Buyer as follows, it being understood and agreed that each of the following covenants and agreements shall survive the Transfer Date:

8.1    Interim Operations of Seller. Subject to the Bankruptcy Exceptions, or any order of the Bankruptcy Court, Seller covenants and agrees that, after the date hereof and prior to the Transfer Date, except as expressly provided in this Agreement or as may be agreed in writing by Buyer:

(i) the Seller shall conduct its business substantially in the same manner as conducted since the filing of the Bankruptcy Cases, and Seller shall use commercially reasonable efforts to preserve the business organization intact, keep available the services of its current officers and employees and maintain the existing relations with customers, suppliers, creditors, business partners and others having business dealings with the Seller;

(ii) prior to the Transfer Date, except in the ordinary course of business, Seller or any Affiliate shall not modify, amend or terminate any agreement affecting the Servicing Contracts, except as necessary to assume and assign agreement pursuant to Section 365 of the Bankruptcy Code;

(iii) Seller or any Affiliate shall not terminate or permit to lapse any material permits or other government authorizations of any government entities that are necessary for the operation of Seller's business; and which the failure to have would cause a Material Adverse Effect, except when such termination or lapse results from any order or other proceeding instituted by any government entity;

20

066585.1001

(iv) Seller or any Affiliate shall not take, or agree to or commit to take, any action that would or is reasonably likely to result in any of the conditions to the sale contemplated herein to not be satisfied, or would make any representation or warranty of Seller contained herein inaccurate in any material respect at, or as of any time prior to, the Transfer Date or that would materially impair the ability of Seller or Buyer to consummate such sale in accordance with the terms hereof or materially delay such consummation;

(v) Seller shall conduct its business in accordance with GNMA Requirements and shall maintain in full force and effect all material permits and governmental authorizations; and

(vi) neither Seller nor any Affiliate shall take any action in contravention of the foregoing, or authorize, recommend, propose or announce an intention to take any action in contravention of any of the foregoing.

8.2    Reserved.

8.3    Reserved.

8.4    Reserved.

8.5    From and after the date of its execution of this Agreement, upon reasonable notice from Buyer, Seller shall make reasonably available to Buyer or cause to be made available to Buyer for Buyer's inspection, copying and reproduction, the Property and all books and records maintained by, through or for Seller relative thereto including, without limitation, Seller's computer database, monthly GNMA reports, GNMA audit reports and reports of independent auditors and, until the Transfer Date, Buyer and its authorized officers, employees and agents shall be given reasonable access thereto. In addition, Seller shall hereafter and for the ninety-day period following the Sale Date , upon reasonable request of Buyer, assist and cooperate with Buyer in an orderly and efficient transfer as herein contemplated and provide such documents or information as may be necessary to enable Buyer to carry out its responsibilities for servicing each Loan after the Transfer Date.

8.6    Not more than thirty (30) days after the effective date of transfer, as defined in the Real Estate Settlement Procedures Act, Buyer and Seller shall notify each Mortgagor of the assignment of the servicing transferred hereunder in accordance with the Real Estate Settlement Procedures Act and the cost of such notification shall be borne one-half by Buyer and one-half by Seller. Such notifications shall be by letter, the form and provisions of which shall be mutually agreed to by Buyer and Seller.

8.7    Reserved.

8.8    No later than the time frames or in the manner described in Exhibit "E", Seller shall prepare and mail to each mortgage, hazard, flood or casualty insurer for each Loan, an automated request via computer tape or letter, as reasonably requested by Buyer, of Seller for an endorsement of such policies of insurance effective on the Transfer Date deleting Seller and naming Midland Mortgage Co., its successors and/or assigns as the named mortgagee insured therein, together with the Loan number of Buyer and with instructions that such endorsement and any further billings, notices, policies, and other communications relating to the insurance be forwarded directly to Midland Mortgage Co. at the address herein specified for notices to Buyer. Seller agrees to pay all costs related to affecting all such notices. With respect to all FHA Loans, Seller shall submit all notices to HUD identifying the change in mortgagee from Seller to Buyer in the time and manner described in the Transfer Instructions, and take any additional actions that may be required to update HUD's Single Family Insurance System to reflect Buyer as the holder and servicer of record on and after the Transfer Date.

8.9    Seller, at its expense, will provide to the Internal Revenue Service and to each Mortgagor who shall have paid any interest with respect to the period beginning January 1, 2007, and ending on the Transfer Date, a statement of such interest paid, in the form prescribed by the Internal Revenue Service, on or before the date such statement is required to be sent according to the regulations of the Internal Revenue Service.

8.10    Prior to transferring the amounts deposited into the Custodial Accounts to Buyer pursuant to Section 4.2.4 of the Agreement, Seller will (i) make at its sole cost and expense any adjustments to the Custodial Accounts, including (without limitation) the deposit of funds thereto, to insure that no deficiency for which the servicer is required to make a deposit or take other actions under GNMA Requirements or Insurer Requirements, shall exist therein as of the Transfer Date, and, (ii) deposit to the Custodial Accounts all interest accrued and owing on Escrow Deposits as may be required under federal or state laws and regulations.

8.11    Reserved

8.12    Reserved.

8.13    Reserved.

8.14    Reserved.

8.15    Reserved.

8.16    Reserved.

8.17    Reserved.

8.18    Seller, at its expense, will prepare a statement detailing the amount of interest paid to GNMA certificate holders in the form prescribed by the Internal Revenue Service and will

22

deliver such statements to (i) each GNMA certificate holder with respect to which Seller has remitted security checks in the month of January, 2007, through the month of the Transfer Date, and (ii) the Internal Revenue Service, on or before the date such statement is required to be delivered, pursuant to the regulations of the Internal Revenue Service.

8.19    Within five (5) Business Days following the Transfer Date, Seller, at its sole cost and expense, will have forwarded to Buyer, in the proper form, the unrecorded assignments from Seller to Buyer for all Loans that are not MERS Loans which, as of the Transfer Date, are Three Month Mortgages. All such assignments shall contain the Loan number of Buyer, along with a check for payment of all costs and fees necessary to record such assignments. Buyer shall send a cross-reference file in a format reasonably acceptable to Seller with all of Buyer's and Seller's Loan numbers.

8.20    Within five (5) Business Days following the Transfer Date, for all Loans that are not MERS Loans that are not (i) ninety (90) days or more past due under the terms of the Mortgage Note, (ii) In Bankruptcy and ninety (90) days or more past due under the terms of the Mortgage Note, (iii) In Foreclosure or (iv) In Litigation, by the Transfer Date, Seller, at its sole cost and expense (a) shall have caused all related Mortgage Notes to be endorsed in the manner described in Section 4.2.11 and in accordance with Section 8.27 and (b) shall have recorded or shall have submitted to the appropriate recording office for recording, in the proper form, assignments from Seller to Buyer of all respective Mortgages with instructions to the recording office to return the original assignment to the Buyer. Prior to the deadline for recertification of the Mortgage Pools pursuant to GNMA Requirements, Seller shall deliver to Buyer all recorded Mortgage assignments from Seller to Buyer. All such assignments shall contain the Loan number of Buyer; provided that Buyer deliver to Seller the cross-reference file described in Section 8.19. Within thirty (30) days following the Transfer Date, Seller shall deliver to Buyer copies of all such unrecorded assignments.

8.21    Reserved.

8.22    <u>MERS Loans</u>. Seller shall deliver Buyer documentation necessary for Buyer to verify that all MERS Loans have been transferred to Buyer on the MERS ~~Systemand~~System and Seller shall reasonably assist Buyer in the set-up and transfer of Loans under the MERS System. Seller shall direct MERS to provide Buyer with any notifications received by MERS as assignee of the Mortgage. Seller shall, on the Transfer Date, cause MERS to transfer ownership of such Loans under the MERS System from Seller to Buyer. After the transfer of ownership has occurred, Buyer shall have complete title, subject to the rights of GNMA, in and to each related Mortgage related to such Loan.

8.23    With respect to any Loan which is past due under the terms of the Mortgage Note, or is In Bankruptcy, In Litigation or In Foreclosure, Seller shall, prior to the Transfer Date, take all actions due within thirty (30) days following Transfer Date to assure compliance with Insurer Requirements.

066585.1001

8.24    Seller shall deliver to Buyer all items described in Exhibit "E" in the time and manner described therein.

8.25    Seller shall forward all unpaid invoices related to the Loans for services rendered prior to the Transfer Date and Buyer shall pay such invoices provided that (i) such invoices are received by Buyer within sixty (60) days after the Transfer Date and (ii) such amount would have been an Advance if the invoice had been paid by Seller on or prior to Transfer Date and (iii) such amount is, in Buyer's reasonable opinion, fully collectible from the Mortgagor, FHA or VA.

8.26    Reserved.

8.27    With respect to any document required to transfer ownership of the Property from Seller to Buyer, whether recorded or not, including the Mortgage Note endorsements and the Mortgage assignments, each such document shall contain an original signature of a duly authorized officer of Seller, and Seller shall provide to Buyer corporate resolutions evidencing the authority of the individual signing such documents. Each such endorsement or assignment shall comply with GNMA Requirements, Insurer Requirements and applicable federal, state or local law in order to be both recordable in the real property records and be an effective conveyance of Seller's interest in and to the real estate, Mortgage or lien granted therein. Seller shall also provide Buyer with a limited power of attorney, in form and substance mutually acceptable to Buyer and Seller, that will permit Buyer to execute on behalf of Seller, Mortgage assignments, note endorsements, and satisfactions and releases related to the Loans and to endorse loss draft checks, payoff checks, payment checks, refund checks, and claim checks related to the Loans. Seller shall provide such number of originally executed copies of such limited power of attorney as may reasonably be requested by Buyer. The Sale Order shall also seek the appointment of those individuals designated by Buyer to serve as officers of Seller for the limited purpose of executing on behalf of Seller, Mortgage assignments, note endorsements and satisfactions and releases related to the Loans, and for endorsing loss draft checks, payoff checks, payment checks, refund checks and claim checks related to the Loans.

8.28    Seller shall transfer all flood certification contracts to Buyer, at the sole expense of Seller.

8.29    Reserved.

8.30    Reserved.

8.31    Reserved.

8.32    Reserved.

8.33    Reserved.

24

066585.1001

8.34    Reserved.

8.35    Reserved.

8.36    Reserved.

8.37    Reserved.

8.38    Reserved.

8.39    From and after the execution of this Agreement, Seller shall not disclose any information relating to the Mortgagors or the Loans, including, but not limited to, the names and/or addresses of the Mortgagors, or the Loan list, to any person or entity other than the Buyer unless such disclosure is required under any order of the Bankruptcy Court or is necessary for Seller to reasonably service the Loans and to comply with GNMA Requirements, Insurer Requirements, or applicable federal, state or local laws.

9.    Closing Conditions.    The respective obligations of Buyer and Seller to complete the purchase and sale of the Property pursuant to this Agreement is subject to the fulfillment on or prior to Sale Date of each of the conditions to be fulfilled by the other, unless the same is specifically waived in writing by the party for whose benefit the same is to be fulfilled.  Seller and Buyer shall each have performed in all respects all of its covenants and agreements contained herein which are required to be performed by it on or prior to the Sale Date.  The respective obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, or waiver by Buyer or Seller, as applicable, on or prior to the Sale Date, of all of the following conditions precedent:

9.1    Sale Order.  The Sale Order (A) shall have been entered by the Bankruptcy Court, (B) shall not have been modified or amended in any manner that is adverse to Buyer unless agreed to in writing by Buyer in its reasonable discretion, and (C) shall have become a Final Order.

9.2    Seller Conditions.

(a)    The representations and warranties of the Buyer contained in this Agreement shall be true and correct on the date of this Agreement (except to the extent cured prior to the Sale Date) and on the Sale Date as though made on the Sale Date, except to the extent such representations and warranties speak as of an earlier date, and except to the extent that any such failure of a representation or warranty to be true and correct, individually or in the aggregate, would not have a Material Adverse Effect; and

(b)    The amount payable by Buyer to Seller pursuant to Section 3.2.1 shall be sufficient to permit Seller to pay all monetary obligations to GNMA that are required to be paid under the Stipulation and Order.

066585.1001

9.3    Buyer Conditions.

(a)    The representations and warranties of the Seller contained in this Agreement shall be true and correct on the date of this Agreement (except to the extent cured prior to the Sale Date) and on the Sale Date as though made on the Sale Date, except to the extent such representations and warranties speak as of an earlier date, and except to the extent that any such failure of a representation or warranty to be true and correct, individually or in the aggregate, would not have a Material Adverse Effect.

(b)    The Sale Order shall have been entered by the Bankruptcy Court, become effective, and not been stayed, and shall provide, *inter alia*, that the Property will be transferred to and title shall vest in Buyer free and clear of any and all Claims, charges, defenses, interests, security interests, liens, offsets and encumbrances.

9.4    Mutual Conditions. Prior to the Sale Date, Buyer shall conduct an initial audit and reconciliation of the Seller's Custodial Accounts and shall provide Seller with notice of all deficiencies that are discovered, if any (the "Initial Custodial Deficiencies"). In connection with such initial audit and reconciliation, the Parties agree to cooperate together with GNMA to determine the Initial Custodial Deficiencies, if any. If the Initial Custodial Deficiencies exceed the Reconciliation Threshold then Seller shall have the option (with the written consent of the Administrative Agent and after consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases) to increase the amount of the Reconciliation Threshold by an amount equal to the difference between the Initial Custodial Deficiencies and the Reconciliation Threshold (the "Custodial Shortfall") or to terminate this Agreement. In the event Seller elects to increase the Reconciliation Threshold by the Custodial Shortfall and, as a result of such increase, the Reconciliation Threshold does not exceed $800,000, then the conditions set forth in this Section 9.4 shall be satisfied. In the event Seller elects not to increase the Reconciliation Threshold by the Custodial Shortfall, Buyer shall, in its sole discretion, elect (i) to waive Seller's obligation to fund the Custodial Shortfall and close the transaction (in which cases Sellers liability for any shortfall shall be limited to the Reconciliation Threshold in accordance with Section 3.2.3 and any other unpaid portion of the purchase price under Section 3.2.4), or (ii) to terminate this Agreement. In the event either Seller or Buyer elects to terminate this Agreement pursuant to this Section 9.4, this Agreement shall become void and of no further force and effect and the transactions contemplated by this Agreement shall be abandoned, without further action by any party, and no party shall have any liability or further obligation to any other party resulting from such termination.

10.    Notices. Any notice or demand which is required or permitted to be given by any provision of this Agreement shall be deemed to have been sufficiently given if either served personally, sent by pre-paid or registered or certified mail, or sent via overnight delivery, addressed to a party at its address set forth below.

066585.1001

BUYER:

MidFirst Bank
999 NW Grand Boulevard
Oklahoma City, Oklahoma 73118-6077
Attention:      Scott Reed, First Vice President

with copy (that will not constitute notice) to:

MidFirst Bank
999 NW Grand Boulevard
Oklahoma City, Oklahoma 73118-6077
Attention:      Ken R. Clark, Executive Vice President

And

MidFirst Bank
507 NW Grand Boulevard
Oklahoma City, Oklahoma 73118
Attention:      David B. Morgan, Esq., General Counsel


SELLER:

American Home Mortgage Servicing, Inc.
4600 Regent Blvd, Suite 200
Irving, Texas 75063
Attention:  David Friedman
Fax:  (866) 841-2568
E-mail:  David.Friedman@Americanhm.com

with a copy (that will not constitute notice) to:

American Home Mortgage Servicing, Inc.
538 Broadhollow Road
Melville, NY 11747
Attention: Alan Horn, General Counsel
Fax:  (800) 209-7276
E-mail:  Alan.Horn@Americanhm.com

And

27

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Attention: Robert S. Brady
Fax: (302) 571-6690
E-mail: rbrady@ycst.com

Either party may change its address by notice to the other.

11. Bankruptcy Provisions: Seller shall use its commercially reasonable efforts to seek approval of the Sale by the Bankruptcy Court and entry of the Sale Order. Seller hereby agrees that it shall, and shall cause all of its affiliates to, comply with all of the obligations of the Seller under the Sale Order (after the entry of such Order by the Bankruptcy Court). Seller shall use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the Sale contemplated under this Agreement, including serving on all required Persons in the Bankruptcy Cases (including (i) all Persons who are known to possess or assert a lien, Claim, interest or encumbrance against any of the Property, (ii) the Internal Revenue Service, and (iii) all other Persons required by any order of the Bankruptcy Court notice of the Sale Motion, the Sale Hearing and the objection deadline in accordance with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure, the Stipulation and Order or other orders of the Bankruptcy Court, and any applicable local rules of the Bankruptcy Court.

~~12. Reserved.~~
12. Survival of Representations and Warranties. All representations and warranties of the parties contained in this Agreement and in any certificate or instrument delivered by any party to the other party shall survive for a period of one hundred and twenty (120) days after the Sale Date and after such one hundred and twenty (120) day period no party shall have any liability or obligation to the other party for any breach thereof.

13. Entire Agreement. This Agreement contains the entire agreement of the parties and supersedes and render null and void the letter agreement dated September 19, 2007, and there are no representations, inducements or other provisions other than those expressed in writing herein. Titles are for convenience only and neither limit nor amplify the provisions of this Agreement. All changes, additions or deletions hereto must be made in writing and signed by each of the parties.

14. Construction of Agreement. The parties acknowledge that each party and each party's counsel have reviewed and revised this Agreement and that normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party will not be employed in the interpretation of this Agreement or any amendments or schedules hereto.

15. Reserved.

16.    Reserved.

17.    <u>Waivers</u>.  A waiver of any term, condition or obligation under this Agreement by any party shall not be construed as a waiver by such party of any other term, condition or obligation nor shall any such waiver constitute a waiver of a subsequent breach of the same term, condition or obligation or of any right consequent thereon.  Buyer's knowledge of a breach by Seller does not constitute a waiver of Buyer's rights under this Agreement.

18.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Oklahoma. Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10 hereof.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in the Bankruptcy Court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 10.

19.    Reserved.

20.    <u>Publicity and Confidentiality</u>.  Subject to any disclosure required in connection with the Bankruptcy Cases and in order to obtain Bankruptcy Court approval of this Agreement and entry of the Sale Order, for a period of two years after the Transfer Date, neither Seller nor Buyer nor any of such party's affiliates, brokers or agents will disclose to any person or entity not a party hereto any term of this Agreement (including, without limitation, price), or issue any press release or make any public statement with respect to this Agreement or the transactions contemplated hereby, in each case except in accordance with the following guidelines:

        20.1    None of the parties shall be required to consult with the others prior to making any disclosures required by the Securities Exchange Commission or applicable law; and

        20.2    Nothing in this Section shall be construed to limit confidential communications with accountants, attorneys and auditors.

21.    <u>Cooperation</u>.  Seller and Buyer shall cooperate fully and reasonably with each other and their respective counsel and other representatives and advisors in connection with the steps required to be taken as part of their respective obligations under this Agreement including,

without limitation, securing the approval of GNMA and the approval and acceptance by Buyer and Seller of any and all documentation which may be required to effectuate the transfer of the Property to Buyer or process the release or satisfaction of a Mortgage.

*{Signature Page Follows}*

30

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**"BUYER"**

**MIDFIRST BANK**, a federally chartered savings association

By:_____
         Scott Reed, First Vice President

**"SELLER"**

**AMERICAN HOME MORTGAGE SERVICING, INC.**, a Maryland corporation

By:_____
         Name:
         Title:

Document comparison done by Workshare DeltaView on Monday, October 29, 2007 12:37:51 PM

| Input: | |
|---|---|
| Document 1 | interwovenSite://WSDMS/DB02/6273247/8 |
| Document 2 | file://C:/Documents and Settings/cgrea/My Documents/AHM - MidFirst GNMA Agreement 102807 (3).DOC |
| Rendering set | standard |

| Legend: |
|---|
| Insertion |
| ~~Deletion~~ |
| ~~Moved from~~ |
| Moved to |
| Style change |
| Format change |
| ~~Moved deletion~~ |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 95 |
| Deletions | 66 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 161 |