IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------ x

In re:                                              :    Chapter 11
                                                    :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,              :    Case No. 07-11047 (CSS)
a Delaware corporation, et al.,[1]                  :
                                                    :    Jointly Administered
                     Debtors.                       :
                                                    :    **Objection Deadline: November 6, 2007 at 4:00 p.m. (ET)**
                                                    :    **Hearing Date: November 14, 2007 at 10:00 a.m. (ET)**

------------------------------------------------------------------ x

## DEBTORS' MOTION PURSUANT TO SECTION 105 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 4001(d) AND 9019(a) FOR AN ORDER APPROVING AND AUTHORIZING SETTLEMENT AGREEMENT WITH SOCIÉTÉ GÉNÉRALE, AS ADMINISTRATIVE AGENT, AND BARTON CAPITAL LLC

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and

debtors in possession in the above cases (collectively, "AHM" or the "Debtors"), by this motion

(the "Motion"), seek entry of an order pursuant to Rules 4001(d) and 9019(a) of the Federal

Rules of Bankruptcy Procedure ("Bankruptcy Rules") and section 105(a) of Title 11 of the

United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") approving a settlement

agreement (the "Agreement") by and among AHM Corp. and AHM Servicing, and Société

Générale, as administrative agent ("SocGen") and Barton Capital LLC ("Buyer" and together

with SocGen, the "Buyers"), a copy of which is attached to the proposed form of Order annexed

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

hereto (the "Order"). In support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2.      On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

4.      On August 14, 2007, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "Committee"). No trustee or examiner has been appointed.

5.      On September 13, 2007, SocGen filed a Motion for an Order Granting Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362 (the "Stay Relief Motion").

## THE DEBTORS' BUSINESS[2]

6.      Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and

---

[2] The facts set forth herein are derived from the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief (the "First Day Declaration"), which is incorporated by reference.

sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

7.     As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

8.     A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes a valuable asset of the Debtors' estates.

## EVENTS LEADING TO THE CHAPTER 11 FILING

9.     Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing

default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

10.    The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

11.    In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders – the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

12.    On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

13.    The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors now employ approximately 1,000 persons who are

absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed, the retail branches are closed and the Debtors' remaining assets are sold.

14.     In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions.  Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual securities in securitization trusts and scratch and dent loans, to financial and strategic investors.

15.     Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## RELEVANT BACKGROUND

16.     On October 16, 2006, the Buyers, AHM Corp. and AHM Servicing executed that certain Mortgage Loan Purchase and Sale Agreement dated October 16, 2006 (as amended from time to time, the "MLPSA"), pursuant to which the Buyers purchased a portfolio of mortgage loans from AHM Corp., which were originated by AHM Corp. (the "Barton Portfolio").  AHM Servicing serviced the Barton Portfolio on an interim basis, and in its capacity as servicer, collected principal and interest from end borrowers on the Buyers' behalf and held such collections in trust for Buyers' benefit until certain remittance dates defined in the MLPSA.  Pursuant to the MLPSA, the Buyers purchased, among other things, all right, title and interest in the purchased mortgage loans, the collections collected on account thereof, and all documents and files related to the servicing of the mortgage loans.

17.    SocGen asserts that pursuant to the MLPSA and effective August 2, 2007,

2007, (the "Termination Date"), it validly terminated the eligibility of the Debtors to sell

mortgages to and service mortgages for the Buyers (hereinafter, the "Termination").  The

Debtors dispute the validity of such Termination.

18.    Since the Petition Date, the Debtors have sought to sell their businesses

and assets to financial and strategic investors.  The Debtors have obtained a buyer for the

majority of its servicing business, but not the servicing rights under the MLPSA.  In order to

avoid a costly dispute with the Buyers arising from the MLPSA, the Parties wish to compromise

and settle the controversy between them on the terms and conditions set forth in the Agreement.

## THE AGREEMENT

19.    The effectiveness of the Agreement is conditioned upon approval of the

Bankruptcy Court.  The principal terms of the Agreement are set forth below:[3]

    a.    Upon  the entry of a final order of the Bankruptcy Court approving the
          Agreement, the parties agree that the MLPSA shall be deemed terminated
          as permitted by Section 11.01 of the MLPSA and from and after the
          execution of the Agreement, the parties shall only have those specific
          obligations set forth in the Agreement with respect to any Mortgage Loans
          purchased by Buyers under the MLPSA.

    b.    Buyers shall retain their current ownership rights with respect to all
          Mortgage Loans (including Subject Mortgage Loans) and related interests
          (including but not limited to servicing rights and other Mortgage Loan
          Assets), purchased in accordance with the MLPSA prior to the date of the
          Agreement free and clear of any and all liens, claims, interests or pledges
          arising by, through, or under any of the Seller Parties.

    c.    With respect to any Mortgage Loans purchased by Buyers prior to the date
          of the Agreement, Sellers shall use their commercially reasonable efforts
          to resolve any and all document exceptions, including all outstanding
          trailing documents such as a Final Title Policy and recorded mortgage or

---

[3] The terms of the Agreement set forth herein are a summary only, and all terms not defined herein shall be given
the meanings ascribed to them in the Agreement.  To the extent of any inconsistency between this summary and the
Agreement, the terms of the Agreement shall govern.

other issues rendering any Mortgage Loan to be a Defective Mortgage Loan, as well as use commercially reasonable efforts to resolve any underwriting exceptions to any Mortgage Loans. Sellers shall also use commercially reasonable efforts to cooperate with Buyers in Buyers' efforts to sell the Mortgage Loans to the applicable Approved Takeout Investors or other third-parties in Buyers' sole discretion.

d.    (a)    Sellers shall (i) upon the later of five (5) business days of the entry of a final order of the Bankruptcy Court approving the Agreement or five (5) business days after receiving notification from the Buyer of the identity of the Servicing Transferee (the "Transfer Date"): (x) commence transferring all files and documents, including electronic files relating to the Subject Mortgage Loans and all escrow amounts or other funds held by Sellers with respect to the Subject Mortgage Loans to the Servicing Transferee or such other servicer designated in writing by Buyers, including providing updated data on the Subject Mortgage Loans in a format reasonably acceptable to the Servicing Transferee and (y) continue providing all files, documents and other information relating to the Subject Mortgage Loans to the Buyers or the Servicing Transferee as reasonably requested and as necessary to effectuate the successful transition of servicing to the Servicing Transferee, including the satisfaction of any document exceptions identified by the Servicing Transferee; (ii) immediately upon the entry of a final order of the Bankruptcy Court (x) remit into the Collection Account, pursuant to the wire instructions set forth on Exhibit B attached to the Agreement, an amount equal to $2,666,000, which amount shall reflect the amount of P&I Collections collected by the Sellers on the Buyers' behalf from July 1, 2007 through and including July 31, 2007 and (y) remit, immediately upon receipt, into the Collection Account, pursuant to the wire instructions set forth on Exhibit B attached to the Agreement, all P&I Collections received by the Debtors after August 1, 2007 (collectively, the "P&I Payment"); (iii) provide Buyers with access and cooperation during normal business hours upon not less than 48 hours notice to Sellers, including onsite access to Sellers' facility in Melville, New York and Texas and personnel access, in accordance with Exhibit C attached to the Agreement and (iv) use commercially reasonable efforts to ensure that all transfers to the Servicing Transferee (except those transfers set forth in subparagraph (a)(i)(y) of paragraph 5 of the Agreement), delivery of all "goodbye" letters (as hereinafter described in paragraph 5(a) of the Agreement) to the Subject Mortgage Loan borrowers, and any other obligations of Sellers under paragraph 5(a) within fifteen (15) business days from the Transfer Date, unless otherwise agreed by the parties. For this purpose, Sellers shall cooperate with Buyers or any Servicing Transferee to obtain the consent or approval of any third party underwriter or any other insurer or guarantor that may be necessary in connection with the transfer of servicing rights, as well as use commercially reasonable efforts to

cooperate and coordinate with Servicing Transferee and/or Buyers to comply with any applicable so-called "goodbye" letter requirements or other applicable requirements of the Real Estate Settlement Procedures Act or other applicable legal or regulatory requirement associated with transfer of the servicing of the Subject Mortgage Loans. Any "goodbye" letter shall be in form and substance reasonably satisfactory to Buyers.

(b)    In the event that after the execution of the Agreement, Sellers receive any documents or funds on account of the Mortgage Loans, it is agreed that such documents or funds, as applicable, do not constitute the property of the Sellers or of the Sellers' bankruptcy estates and Sellers shall immediately notify Buyers of such receipt and immediately forward such property to Servicing Transferee, unless directed otherwise by Buyers. In the event any borrower under any Subject Mortgage Loan contacts Sellers regarding its Mortgage Loan, such borrower shall be referred to Servicing Transferee.

e.    For and in consideration of the services to be provided by Sellers hereunder and in lieu of any other amounts that may be payable to Sellers under the terms of the MLPSA, including, without limitation, any Completion Fee or Servicing Fee, Buyers shall pay Sellers the sum of $150,000.00 (the "Cooperation Fee") by wire transfer of immediately available funds to the account designated in Exhibit "A" to the Agreement, $75,000 of which is to be paid upon the Sellers' transfer of the P&I Payment, and $75,000 of which is to be paidwithin five (5) Business Days of the Sellers' satisfaction of their obligations under paragraph 5(a) of the Agreement. Upon payment of the Cooperation Fee, Buyers shall have no further payment obligations to Sellers under the MLPSA or the Agreement and to the extent otherwise payable, any Completion Fees or Servicing Fees shall be waived.

f.    The servicing obligations with respect to the Subject Mortgage Loans shall be transferred and assigned to and accepted by Buyers on an "as is," "where is" and "with all faults" condition, free of any warranties or representations whatsoever, whether express or implied, except as expressly set forth in the Agreement, including, without limitation, paragraph 4 of the Agreement.

g.    (a)    Upon Buyers' satisfaction of their obligations under the Agreement and subject to Bankruptcy Court approval, Sellers hereby unconditionally release Buyers and Buyers' officers, directors, partners, stockholders, employees, representatives, attorneys, agents and affiliates (collectively with Buyers, "Buyer Parties"), of and from any and all liabilities, debts, guarantees, claims, demands, actions, causes of action, suits, controversies, disputes, dues, sums of money, accounts, reckonings, bonds, bills, covenants, promises, variances, trespasses, damages,

judgments, executions, commitments, responsibilities, obligations and rights to payment of any kind or nature whatsoever, in law, admiralty, equity, arbitration or otherwise, whether known or unknown, direct or indirect, absolute or contingent, accrued or unaccrued, matured or unmatured, disputed or undisputed, secured or unsecured, *in personam* or *in rem*, and whether or not reflected, or required to be reflected, in any party's financial statements (collectively, "Liabilities"),  arising under or in connection with the MLPSA, the Performance Guaranty,  Custodial Agreement, or any other agreement or document executed or delivered in connection therewith.  Sellers further agree not to challenge Buyers' ownership rights and interests relating to the Mortgage Loans and Mortgage Loan Assets (including servicing rights); provided, however, that the release granted by Sellers shall have no effect upon the continuing rights, Liabilities and obligations of Buyers under the Agreement.  Sellers represent and warrant to Buyers that neither Seller has sold, assigned, granted, or transferred to any other person or entity any claim, demand, or cause of action that Sellers have, may have had or in the future may have with respect to the MLPSA, the Custodial Agreement or any other agreement or document executed or delivered in connection therewith.

h.      (b)      Upon Sellers' satisfaction of their obligations under the Agreement and subject to Bankruptcy Court approval,  Buyers hereby unconditionally release Sellers and Sellers' respective officers, directors, partners, stockholders, employees, representatives, attorneys, agents and affiliates (collectively with Sellers, "Seller Parties"), of and from any and all Liabilities arising under or in connection with the MLPSA, the Performance Guaranty, the Custodial Agreement or any other agreement or document executed or delivered in connection therewith; provided, however, that the foregoing release granted by Buyers shall have no effect upon the continuing rights, Liabilities and obligations of Sellers under the Agreement, and provided further that the Buyer Parties shall not release AHM Corp., American Home Mortgage Holdings, Inc. and American Home Mortgage Investment Corp. from Liabilities in respect of certain claims the Buyer Parties may have against the Seller Parties, which unreleased claims are solely limited to claims existing under sections 7.01 or 2.04(c) of the MLPSA, the Performance Guarantee or the Custodial Agreement, and are further limited to claims that arise out of or on account of violations of applicable law in connection with the origination, underwriting, investigation, documentation, settlement, or servicing of the Mortgage Loans under the Real Estate Settlement Procedures Act, the Truth in Lending Act, the Home Ownership and Equity Protection Act or any other law, rule or regulation relating to usury, predatory lending, high cost lending, truth-in-lending, fair credit billing, fair credit reporting, equal credit opportunity, fair debt collection practices, privacy and other applicable federal, state and local consumer protection laws (the "Retained Claims").  The parties agree that the Agreement shall not be construed as

creating any administrative claims under section 503(b) of the Bankruptcy Code or otherwise on account of the Retained Claims. The Agreement shall not create, enhance, or diminish the Buyer Parties' rights to assert Retained Claims against the Seller Parties under the MLPSA, the Performance Guarantee or the Custodial Agreement. Buyers represent and warrant to Sellers that Buyers have not sold, assigned, granted, or transferred to any other person or entity any claim, demand, or cause of action that Buyers have, may have had or in the future may have with respect to the MLPSA, the Performance Guarantee and the Custodial Agreement.

## RELIEF REQUESTED AND BASIS THEREFOR

20.    By this Motion, the Debtors are seeking this Court's approval of the Agreement pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rules 4001(d) and 9019(a).

## STANDARDS FOR AGREEMENTS PURSUANT TO RULE 4001

21.    Rule 4001(d) of the Federal Rules of Bankruptcy Procedure provides that "[a] motion for approval of an agreement . . . to modify or terminate the stay provided for in § 362 . . . shall be served on any committee . . . appointed pursuant to § 1102 of the Code or its authorized agent and on such other entities as the court may direct. The motion shall be accompanied by a copy of the agreement." Rule 4001(d) goes on to further state that, "[i]f no objection is filed, the court may enter an order approving . . . the agreement without conducting a hearing."

22.    By this Motion, the Debtors seek approval of the Agreement in order to resolve the Stay Relief Motion. Pursuant to the Agreement, the Buyers are entitled to effect the transfer of the servicing rights under the MLPSA and obtain principal and interest payments collected by AHM Servicing, while the Debtors receive broad releases from the Buyers of potentially significant claims arising out of the MLPSA, as well as a fee for the Debtors' cooperation in effecting a transfer of the servicing rights.

23.    Accordingly, the Debtors request that the Court approve the Agreement pursuant to Bankruptcy Rule 4001(d).

## STANDARDS FOR SETTLEMENTS PURSUANT TO RULE 9019

24.    Rule 9019(a) of the Federal Rules of Bankruptcy Procedure provides that "on motion by the trustee and after a hearing, the Court may approve a compromise or settlement." The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged. In re Penn Central Transp. Co., 596 F.2d 1002 (3d Cir. 1979). The Supreme Court has recognized that "in administering a reorganization proceeding in an economical and practical manner, it will often be wise to arrange the settlement of claims in which there are substantial and reasonable doubts." In re Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. V. Anderson, 390 U.S. 414 (1986).

25.    Approval of a proposed settlement is within the "sound discretion" of the Bankruptcy Court. In re Neshaminy Office Building Associates, 62 B.R. 798, 803 (Bankr. E.D. Pa. 1986). The court must determine whether the proposed settlement is in the "best interests of the estate." See In the Matter of Energy Cooperative, Inc., 886 F.2d 921, 927 (7th Cir. 1989). In determining whether to approve an motion to settle a controversy, a Bankruptcy Court must determine whether it is fair, reasonable and adequate by examining four factors:

> (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection: (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

Official Comm. of Unsec. Cred. Of Penn. Truck Lines, Inc., v. Penn Truck Lines, Inc. (In re Penn Truck Lines, Inc.), 150 B.R. 595, 598 (Bankr. E.D. Pa. 1992). The Court should not substitute its judgment for that of a trustee. Neshaminy Office Building Associates, 62 B.R. at

803. The Court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to see whether the settlement falls below the lowest point in the range of reasonableness. In re W.T. Grant and Co., 699 F.2d 599, 608 (2d Cir. 1983), cert. denied, 464 U.S. 22 (1983). In addition, "because the bankruptcy judge is unequally situated to consider the equities and reasonableness of a particular compromise, approval or denial of a compromise will not be disturbed on appeal absent a clear abuse of discretion." Neshaminy Office Building Assoc., 62 B.R. at 803 (citing, In re Patel, 43 B.R. 500, 505 (Bankr. N.D. Ill. 1984).

26.     The Debtors believe that the terms of the Agreement are reasonable and provide for a fair and practical resolution of (a) the litigation and claims with the Buyers and (b) the dispute with the Buyers regarding the servicing of its loan servicing. The Agreement is in the best interest of the Debtors, their estates and creditors, as the Agreement resolves both the Stay Relief Motion and potentially millions of dollars of claims that would otherwise be asserted against the Debtors by the Buyers. Furthermore, the Agreement was the product of significant and lengthy discussions and negotiations between the Debtors and the Buyers and falls well above the lowest point in the range of reasonableness. Absent the Agreement, the disputes between the Debtors and the Buyers would have to be litigated before the Court. Any litigation not only has inherent risks with no assurances of a favorable outcome, but would likely be a drawn-out and expensive process. The resolution of this dispute with the Buyers under the terms of the Agreement, without the need for litigation, is a favorable outcome, because it will allow the Debtors to transfer the servicing rights, and receive some value (in the form of the Cooperation Fee) in exchange for the orderly transfer of such servicing rights. Accordingly, a

review of the four factors set forth above, clearly demonstrates that the Stipulation is reasonable, fair and equitable and in the best interest of the Debtors, the Debtors' estates and creditors.

27.    For the foregoing reasons, the Debtors submit that the approval of the settlements and compromises according to the terms of the Agreement should be approved pursuant to Bankruptcy Rule 9019.

<h2 style="text-align:center"><u>NOTICE</u></h2>

28.    Notice of this Motion will be provided to (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Bank of America, N.A.; (iv) Counsel to the Agent for the Debtors' Postpetition Lender; and (v) all parties entitled to notice under Del. Bankr. LR 2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

<h2 style="text-align:center"><u>NO PREVIOUS REQUEST</u></h2>

29.    No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court issue and enter Orders (i) pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rules 4001 and 9019, approving the Agreement, and (ii) granting such other and further relief as may be just and proper.

Dated:  Wilmington, Delaware
        October 29, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____/s/ Sean T. Greecher_____
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Sean T. Greecher (No. 4484)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors-in-Possession

# EXHIBIT A

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT ("Agreement"), is entered into as of this __ day of October__, 2007, by and among American Home Mortgage Corp., a New York corporation ("AHM"), American Home Mortgage Servicing, Inc. (f/k/a Columbia National, Incorporated), a Maryland corporation ("AHMS" and together with AHM, collectively, "Sellers"), Société Générale, a banking corporation organized under the laws of France, acting in its capacity as Administrative Agent for the Purchasers party to the MLPSA (as defined below), and Barton Capital LLC, as Conduit Purchaser and Committed Purchaser under the MLPSA ("Buyers"). Buyers and Sellers are collectively referred to herein as the "parties" and individually as a "party."

WHEREAS, Sellers and Buyers entered into that certain Mortgage Loan Purchase and Sale Agreement, dated October 16, 2006 (as amended from time to time, the "MLPSA") executed by Sellers and Buyers;

WHEREAS, in connection with the MLPSA, Sellers, Buyers, and Deutsche Bank National Trust Company (the "Custodian") executed that certain Custodial Agreement, dated as of October 16, 2006 (the "Custodial Agreement");

WHEREAS, in connection with the MLPSA, American Home Mortgage Holdings, Inc. and American Home Mortgage Investment Corp., and the Buyers executed that certain Performance Guaranty, dated as of October 16, 2006 (the "Performance Guaranty");

WHEREAS, under the terms of the MLPSA, Buyers from time to time have purchased 100% undivided ownership interests in Mortgage Loans from AHM, for which AHMS is obligated to collect principal and interest payments, hold collections in trust, and remit collections to Buyers (the "Subject Mortgage Loans");

WHEREAS, Buyers desire to implement the transfer of the servicing obligations with respect to the Subject Mortgage Loans and in accordance with the MLPSA;

WHEREAS, on August 1, 2007, Société Générale delivered to Sellers a certain notice ("Service Notice")  declaring a Termination Date under the MLPSA, allegedly terminating AHMS' servicing rights thereunder and allegedly effecting a transfer of the servicing of the Subject Mortgage Loans to Buyers, who would thereafter designate the party to act as successor servicer for the Subject Mortgage Loans on behalf of Buyers (the "Servicing Transferee");

WHEREAS, on August 6, 2007, Sellers and certain of Sellers' affiliates (collectively, the "Debtors") each filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, on August 6, 2007, the Debtors filed the *Emergency Motion of the Debtors for Orders: (A)(I) Approving Sale Procedures; (II) Scheduling a Hearing to Consider Sale of Certain Assets Used in Debtors' Loan Servicing Business; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief; and (B)(I) Authorizing the Sale of Such Assets*

*Free and Clear of Liens, Claims, Encumbrances and Other Interests; (II) Authorizing and Approving Purchase Agreement Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* (the "Sale Motion");

WHEREAS, on September 13, 2007, Buyers filed an objection to the Sale Motion [Docket No. 733] (the "Sale Objection") and a motion for relief from the automatic stay to effectuate the transfer of servicing rights under the MLPSA [Docket No. 734] (the "Stay Relief Motion"); and

WHEREAS, Sellers and Buyers now desire, in full and final settlement and resolution of the Sale Objection and the Stay Relief Motion, to terminate the MLPSA and implement the transfer of the servicing of the Subject Mortgage Loans, in accordance with this Agreement;

NOW, THEREFORE, Sellers and Buyers, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, intending to be legally bound hereby, agree as follows:

1.      Capitalized terms used in this Agreement and not otherwise defined herein shall have the meaning ascribed to such terms in the MLPSA unless otherwise indicated.

2.      Upon the entry of a final order of the Bankruptcy Court approving this Agreement, the parties agree that the MLPSA shall be deemed terminated as permitted by Section 11.01 of the MLPSA and from and after the execution of this Agreement, the parties shall only have those specific obligations set forth in this Agreement with respect to any Mortgage Loans purchased by Buyers under the MLPSA.

3.      Buyers shall retain their current ownership rights with respect to all Mortgage Loans (including Subject Mortgage Loans) and related interests (including but not limited to servicing rights and other Mortgage Loan Assets), purchased in accordance with the MLPSA prior to the date of this Agreement free and clear of any and all liens, claims, interests or pledges arising by, through, or under any of the Seller Parties (defined below).

4.      With respect to any Mortgage Loans purchased by Buyers prior to the date of this Agreement, Sellers shall use their commercially reasonable efforts to resolve any and all document exceptions, including all outstanding trailing documents such as a Final Title Policy and recorded mortgage or other issues rendering any Mortgage Loan to be a Defective Mortgage Loan, as well as use commercially reasonable efforts to resolve any underwriting exceptions to any Mortgage Loans. Sellers shall also use commercially reasonable efforts to cooperate with Buyers in Buyers' efforts to sell the Mortgage Loans to the applicable Approved Takeout Investors or other third-parties in Buyers' sole discretion.

5.      (a)      Sellers shall (i) upon the later of five (5) business days of the entry of a final order of the Bankruptcy Court approving this Agreement or five (5) business days after receiving notification from the Buyer of the identity of the Servicing Transferee (the "Transfer Date"): (x) commence transferring all files and documents, including electronic files relating to

the Subject Mortgage Loans and all escrow amounts or other funds held by Sellers with respect to the Subject Mortgage Loans to the Servicing Transferee or such other servicer designated in writing by Buyers, including providing updated data on the Subject Mortgage Loans in a format reasonably acceptable to the Servicing Transferee and (y) continue providing all files, documents and other information relating to the Subject Mortgage Loans to the Buyers or the Servicing Transferee as reasonably requested and as necessary to effectuate the successful transition of servicing to the Servicing Transferee, including the satisfaction of any document exceptions identified by the Servicing Transferee; (ii) immediately upon the entry of a final order of the Bankruptcy Court (x) remit into the Collection Account, pursuant to the wire instructions set forth on Exhibit B attached hereto, an amount equal to $2,666,000, which amount shall reflect the amount of P&I Collections collected by the Sellers on the Buyers' behalf from July 1, 2007 through and including July 31, 2007 and (y) remit, immediately upon receipt, into the Collection Account, pursuant to the wire instructions set forth on Exhibit B attached hereto, all P&I Collections received by the Debtors after August 1, 2007 (collectively, the "P&I Payment"); (iii) provide Buyers with access and cooperation during normal business hours  upon not less than 48 hours notice to Sellers, including onsite access to Sellers' facility in Melville, New York and Texas and personnel access, in accordance with Exhibit C attached hereto and (iv) use commercially reasonable efforts to ensure that all transfers to the Servicing Transferee (except those transfers set forth in subparagraph (a)(i)(y) of this paragraph 5), delivery of all "goodbye" letters (as hereinafter described in this paragraph 5(a)) to the Subject Mortgage Loan borrowers, and any other obligations of Sellers under this paragraph 5(a) within fifteen (15) business days from the Transfer Date, unless otherwise agreed by the parties.  For this purpose, Sellers shall cooperate with Buyers or any Servicing Transferee to obtain the consent or approval of any third party underwriter or any other insurer or guarantor that may be necessary in connection with the transfer of servicing rights, as well as use commercially reasonable efforts to cooperate and coordinate with Servicing Transferee and/or Buyers to comply with any applicable so-called "goodbye" letter requirements or other applicable requirements of the Real Estate Settlement Procedures Act or other applicable legal or regulatory requirement associated with transfer of the servicing of the Subject Mortgage Loans. Any "goodbye" letter shall be in form and substance reasonably satisfactory to Buyers.

        (b)     In the event that after the execution of this Agreement, Sellers receive any documents or funds on account of the Mortgage Loans, it is agreed that such documents or funds, as applicable, do not constitute the property of the Sellers or of the Sellers' bankruptcy estates and Sellers shall immediately notify Buyers of such receipt and immediately forward such property to Servicing Transferee, unless directed otherwise by Buyers.  In the event any borrower under any Subject Mortgage Loan contacts Sellers regarding its Mortgage Loan, such borrower shall be referred to Servicing Transferee.

     6.     For and in consideration of the services to be provided by Sellers hereunder and in lieu of any other amounts that may be payable to Sellers under the terms of the MLPSA, including, without limitation, any Completion Fee or Servicing Fee, Buyers shall pay Sellers the sum of $150,000.00 (the "Cooperation Fee") by wire transfer of immediately available funds to the account designated in Exhibit "A" to this Agreement, $75,000 of which is to be paid upon the Sellers' transfer of the P&I Payment, and $75,000 of which is to be paidwithin five (5) Business Days of the Sellers' satisfaction of their obligations under paragraph 5(a), above.  Upon payment of the Cooperation Fee, Buyers shall have no further payment obligations to Sellers under the

MLPSA or this Agreement and to the extent otherwise payable, any Completion Fees or Servicing Fees shall be waived.

The parties agree that the Sellers' failure to perform their obligations hereunder will cause irreparable injury to the Buyers that cannot be compensated by money damages and that specific performance shall be an appropriate remedy for such performance failures.

7.       The servicing obligations with respect to the Subject Mortgage Loans shall be transferred and assigned to and accepted by Buyers on an "as is," "where is" and "with all faults" condition, free of any warranties or representations whatsoever, whether express or implied, except as expressly set forth in this Agreement, including, without limitation, paragraph 4 of this Agreement.

8.       (a)       Upon Buyers' satisfaction of their obligations under this Agreement and subject to Bankruptcy Court approval, Sellers hereby unconditionally release Buyers and Buyers' officers, directors, partners, stockholders, employees, representatives, attorneys, agents and affiliates (collectively with Buyers, "Buyer Parties"), of and from any and all liabilities, debts, guarantees, claims, demands, actions, causes of action, suits, controversies, disputes, dues, sums of money, accounts, reckonings, bonds, bills, covenants, promises, variances, trespasses, damages, judgments, executions, commitments, responsibilities, obligations and rights to payment of any kind or nature whatsoever, in law, admiralty, equity, arbitration or otherwise, whether known or unknown, direct or indirect, absolute or contingent, accrued or unaccrued, matured or unmatured, disputed or undisputed, secured or unsecured, *in personam* or *in rem*, and whether or not reflected, or required to be reflected, in any party's financial statements (collectively, "Liabilities"), arising under or in connection with the MLPSA, the Performance Guaranty, Custodial Agreement, or any other agreement or document executed or delivered in connection therewith. Sellers further agree not to challenge Buyers' ownership rights and interests relating to the Mortgage Loans and Mortgage Loan Assets (including servicing rights); provided, however, that the release granted by Sellers shall have no effect upon the continuing rights, Liabilities and obligations of Buyers under this Agreement. Sellers represent and warrant to Buyers that neither Seller has sold, assigned, granted, or transferred to any other person or entity any claim, demand, or cause of action that Sellers have, may have had or in the future may have with respect to the MLPSA, the Custodial Agreement or any other agreement or document executed or delivered in connection therewith.

(b)       Upon Sellers' satisfaction of their obligations under this Agreement and subject to Bankruptcy Court approval, Buyers hereby unconditionally release Sellers and Sellers' respective directors, partners, stockholders, employees, representatives, attorneys, agents and affiliates (collectively with Sellers, "Seller Parties"), of and from any and all Liabilities arising under or in connection with the MLPSA, the Performance Guaranty, the Custodial Agreement or any other agreement or document executed or delivered in connection therewith; provided, however, that the foregoing release granted by Buyers shall have no effect upon the continuing rights, Liabilities and obligations of Sellers under this Agreement, and provided further that the Buyer Parties shall not release AHM Corp., American Home Mortgage Holdings, Inc. and American Home Mortgage Investment Corp. from Liabilities in respect of certain claims the Buyer Parties may have against the Seller Parties, which unreleased claims are

solely limited to claims existing under sections 7.01 or 2.04(c) of the MLPSA, the Performance Guarantee or the Custodial Agreement, and are further limited to claims that arise out of or on account of violations of applicable law in connection with the origination, underwriting, investigation, documentation, settlement, or servicing of the Mortgage Loans under the Real Estate Settlement Procedures Act, the Truth in Lending Act, the Home Ownership and Equity Protection Act or any other law, rule or regulation relating to usury, predatory lending, high cost lending, truth-in-lending, fair credit billing, fair credit reporting, equal credit opportunity, fair debt collection practices, privacy and other applicable federal, state and local consumer protection laws (the "Retained Claims"). The parties agree that this Agreement shall not be construed as creating any administrative claims under section 503(b) of the Bankruptcy Code or otherwise on account of the Retained Claims. This Agreement shall not create, enhance, or diminish the Buyer Parties' rights to assert Retained Claims against the Seller Parties under the MLPSA, the Performance Guarantee or the Custodial Agreement. Buyers represent and warrant to Sellers that Buyers have not sold, assigned, granted, or transferred to any other person or entity any claim, demand, or cause of action that Buyers have, may have had or in the future may have with respect to the MLPSA, the Performance Guarantee and the Custodial Agreement.

9.      No party may assign such party's rights or obligations under this Agreement without obtaining the prior written consent of the other parties hereto. Notwithstanding the foregoing, nothing in this Agreement shall impair Buyers' ability to sell or otherwise transfer or assign its interests in the Mortgage Loans, including the corresponding servicing rights of such loans.

10.     This Agreement sets forth the entire understanding of the parties with respect to the subject matter hereof, supersedes all existing agreements among the parties with respect to such matters, and shall not be modified or amended except by a further written document signed by all parties.

11.     No provision hereof may be waived except by an agreement in writing signed by the waiving party. Any waiver by any party of a breach of any provision of this Agreement shall not operate as or be construed to be a waiver of any other breach of that provision or of any breach of any other provision of this Agreement. The failure of a party to insist upon strict adherence to any term of this Agreement on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

12.     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns including any chapter 7 trustee appointed in the Sellers' bankruptcy cases.

13.     This Agreement does not create, and shall not be construed as creating, any rights enforceable by any person not a party to this Agreement. Sellers and Buyers mutually represent to each other that they have not assigned their rights under the MLPSA to any other entity and that no other entity may assert rights under the MLPSA as a third-party beneficiary or otherwise.

14.    All notices and other communications required or permitted under this Agreement shall be in writing and shall be delivered personally or sent by: (i) registered mail, or certified mail, return receipt requested; (ii) a nationally-recognized courier service guaranteeing next-day delivery, charges pre-paid; or (iii) facsimile (with the original promptly sent by any of the foregoing methods). Any such notices shall be addressed to the receiving party at such party's address set forth below, or at such other address as may from time to time be furnished by similar notice by either party.

If to Buyers, to:

Société Générale
1221 Avenue of the Americas
New York, NY 10020
Attention: James F. Ahern, Managing Director
Facsimile: (212) 278-7320

With copies (which shall not constitute notice) to:

Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Attention: Matthew A. Clemente, Esquire
Facsimile: (312) 853-7036

If to Sellers, to:

American Home Mortgage Corp.
520 Broadhollow Road
Mellville, New York 11747
Attention: Mr. Craig Pino
            Executive Vice President & Treasurer
Facsimile: (516) 495-5411

With copies (which shall not constitute notice) to:

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Attention: Craig D. Grear, Esquire
Facsimile: (302) 576-3296

Any such notice or communication shall be effective upon (i) personal delivery, (ii) upon transmission by facsimile and subsequent receipt by the sender of a facsimile confirmation report, (iii) one day after it is sent, if sent by courier, or (iv) three (3) days after it is sent, if sent by registered or certified mail, as the case may be.

15.     The effectiveness of this Agreement, and the parties' obligations to perform hereunder, is conditioned upon the entry of a final order of the Bankruptcy Court approving this Agreement in its entirety, which order and supporting pleadings shall be in form and substance reasonably satisfactory to the parties hereto. If any provision of this Agreement, or any part thereof, is declared invalid, illegal, or incapable of being enforced by any court of competent jurisdiction for any reason whatsoever, all of the remaining provisions of this Agreement shall nevertheless continue in full force and effect, and no provision shall be deemed dependent upon any other provisions unless so expressed herein. The invalid unenforceable provision shall be interpreted, if possible, so as to render it enforceable on a limited and reasonable basis. Notwithstanding the foregoing, upon any binding determination by a court of competent jurisdiction that (i) Buyers are not entitled to retain any portion of any Mortgage Loans, including servicing rights and related interests, or any portion of the Collections paid to Buyers under the MLPSA or this Agreement or (ii) any provision of this Agreement is unenforceable, then the releases issued by Buyers and Sellers in paragraph 8 shall be revoked and of no force and effect, and Sellers shall repay to Buyers the Cooperation Fee no later than three (3) Business Days after such a determination.

16.     This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to any conflict of law provisions thereunder.

17.     Each of the parties to this Agreement participated in the drafting of this Agreement and the interpretation of any ambiguity contained in this Agreement will not be affected by the claim that a particular party drafted any provision hereof.

18.     Each of the parties to this Agreement mutually represents that each of the persons executing this Agreement on behalf of it is duly authorized to execute and deliver this Agreement on behalf of such party, and that each party has full power and authority to enter into this Agreement.

*{Signature Page Follows}*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above-written.

Sellers:

AMERICAN HOME MORTGAGE CORP.

By:_____
       Name:
       Title:

AMERICAN HOME MORTGAGE
SERVICING, INC.

By:_____
       Name:
       Title:

Buyers:

SOCIETE GENERALE, as Administrative Agent

By:_____
       Name:
       Title:

BARTON CAPITAL LLC, as Conduit Purchaser
and Committed Purchaser

By:_____
       Name:
       Title:

Exhibit "A"

Sellers' Wiring Instructions

Bank:    Northfork Bank

ABA:     021407912

Account Name:    American Home Mortgage Investment Corp.

A/C Number:  3124073044

Ref:  Société Générale Cooperation Fee

Exhibit "B"

Buyers' Wiring Instructions

Societe Generale, NY NY
ABA 026-004-226
A/C No. 9030425
Re: Barton – AHM Gestation

CH1 4025337v.1