**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re:* | ) Chapter 11 |
| | ) |
| AMERICAN HOME MORTGAGE HOLDINGS, | ) Case No. 07-11047 (CSS) |
| INC., a Delaware corporation, <u>et al.</u>, | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) **Related Docket Item Nos. 11, 113, 403, 674, 675, 865, 937,** |
| | ) **1443, 1533, [Order]** |
| | ) |

**EMERGENCY MOTION OF DB STRUCTURED PRODUCTS,**
**INC. FOR LIMITED STAY PENDING APPEAL**

DB Structured Products, Inc. ("<u>DBSP</u>"), by and through its undersigned counsel,

hereby moves, pursuant to Fed. R. Bankr. P. 8005, for a stay pending appeal (the "<u>Motion for</u>

<u>Stay</u>") of the portions of this Court's order (the "<u>Order</u>"), dated October 30, 2007, granting the

Debtors' Motion to Approve the Sale of their Servicing Business (the "<u>Sale Motion</u>") that pertain

to the Debtors sale and assignment of the Master Mortgage Loan Purchase and Servicing

Agreement between the Debtors and DBSP (the "MLPSA").[1]

## I.    PRELIMINARY STATEMENT

On October 23, 2007, this Court issued an oral ruling (the "<u>Ruling</u>") approving

the sale (the "<u>Sale</u>") of the Debtors' loan servicing business to AH Mortgage Acquisition Co.,

Inc. (the "<u>Buyer</u>").  On October 25, 2007, the Court held a hearing to review and consider

objections to the Debtors' proposed form of order approving the Sale, and concluded that,

subject to certain revisions, it would enter an order substantially in the form proposed by the

Debtors (the "<u>Order</u>").  The Order was entered by the Court on October 30, 2007.  Included in

the approved Sale are certain of the Debtors' rights and obligations arising out of the MLPSA.

The Court should issue a limited stay of the Order solely insofar as it would authorize the assignment of, and otherwise impair DBSP's rights under, the MLPSA, pending an expedited appeal that DBSP intends to take to the District Court.  While numerous grounds for a stay are set forth in the instant Motion, one basis stands out as particularly compelling:  Even assuming, *arguendo,* the correctness of the Court's factual conclusions, the Court's decision to permit the "free and clear" transfer of the Debtors' servicing rights under the MLPSA entirely depends on a conclusion of law that directly contravenes binding Third Circuit authority to the contrary.

The Debtors contended at trial, and the Court agreed in its Ruling, that the MLPSA is not an executory contract within the meaning of section 365 of the Bankruptcy Code.  As the Court stated in its ruling, "the testimony of Mr. Love and Mr. Aronoff established that the servicing portion of those [loan sale and servicing] contracts contain no material obligations on behalf of the owner of the mortgage, that if breached would be sufficient to excuse the performance of the servicer.  Specifically, the servicer's right of payment of its servicing fees and other fees is not an obligation of the mortgagee.... Thus, the contracts are *not executory*." October 23, 2007 Hearing Transcript at 11:17-21 (emphasis added).  Because the MLPSA is not executory, the Court found that section 365 of the Bankruptcy Code does not apply, and that the Debtors rights under the MLPSA had to be transferred pursuant to section 363.

Because, as a result of the Court's findings, section 365 of the Bankruptcy Code is inapplicable to the MLPSA, it could not form a basis for the Court's decision to override the servicing assignment restrictions contained in the MLPSA as well as the indemnity and

---

[1]        The MLPSA was admitted by the Court as Debtors' Exhibit 35 to the Sale Hearing.

2

"waterfall" provisions that the Court concluded "serve as de-facto anti-assignment provisions" that are unenforceable by DBSP. *Id.* at 33:5. In recognition of this fact, the Court appears to have relied on section 363(l) of the Bankruptcy Code to find that the servicing provisions of the MLPSA are transferable despite the restrictions on transfer contained in the MLPSA. *Id.* at 18:24-19:3 and 34:18-23. By its terms, section 363(l) applies to render unenforceable any contract provision that "is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under [the Bankruptcy Code], or on the appointment of... a trustee... or a custodian, *and* that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in [its] property." 11 U.S.C. § 363(l) (emphasis added).

It is difficult to imagine how section 363(l) could plausibly be interpreted to cover a contractual assignment restriction of the nature contained in the MLPSA, which is not conditioned on the Debtors' insolvency and does not otherwise fall within the terms of section 363(l). But even if this Court disagrees, a ruling on that basis would necessarily be in error because the United States Court of Appeals for the Third Circuit already has held in *Integrated Solutions, Inc. v. Service Support Specialties, Inc.,* 124 F.3d 487 (3rd Cir. 1997) that even an *actual* (much less a *de facto)* assignment restriction does not fall within the scope of section 363(l) and therefore remains enforceable in bankruptcy. In *Integrated,* a chapter 11 trustee attempted to sell certain tort claims to a third party that were not assignable under applicable non-bankruptcy law. *See id.* at 490. In support of this effort, the buyer argued that section 363 should be interpreted to override transfer restrictions, because, it argued, "'the overriding purpose of the Bankruptcy Code is the expeditious and equitable distribution of the assets of the debtor's estate.'" *Id.* at 493. The Third Circuit rejected the buyer's argument, noting the absence of any suggestion in the statute or legislative history of 363 that "would even raise an

3

inference that Congress intended to give the trustee such authority under such provisions." *Id.*
The Third Circuit went on to say:

> The clear lack of Congressional intent to preempt state law restrictions on
> transferring property of the estate is even more telling given the explicit
> language that Congress uses when it intends to displace state non-
> bankruptcy law in other provisions of the Bankruptcy Code.

*Id.* The Court then went on to list such examples of "explicit language," *including section
363(l).* Thus, not only did the Third Circuit expressly hold that the Bankruptcy Code does not

authorize transfers of assets in contravention of applicable non-bankruptcy law, it also

specifically, if implicitly, rejected any argument that section 363(l) somehow provides a basis for

doing so. *See also Grochocinski v. Crossman (In re Crossman),* 259 B.R. 301, 306-08 (Bankr.

N.D. Ill. 2001) (adopting *Integrated* reasoning and denying transfer of assets subject to statutory

and contractual restrictions on assignment).

   This reasoning was followed by Chief Judge Walrath in *The Shaw Group, Inc. v.

Bechtel Jacobs Company, LLC,* 350 B.R. 166 (Bankr. D. Del. 2006), the decision that this Court

relied upon almost exclusively in overruling DBSP's objection to the Sale. In *Shaw Group,*

Chief Judge Walrath considered whether certain provisions of various contracts assumed and

assigned by the Debtor were enforceable against the assignee. Chief Judge Walrath analyzed the

issue under both sections 363 and 365. While Chief Judge Walrath invalidated the provisions

pursuant to section 365(f)(3) as impermissible cross-defaults and, therefore, *de facto* anti-

assignment provisions (*see id.* at 179), she did not apply the same reasoning when considering

the provisions under section 363. Because section 363 contains no analog to section 365(f)(3),

anti-assignment provisions, or *de facto* anti-assignment provisions, in contracts that are

transferred pursuant to section 363 are enforceable to the extent that such provisions are

4

enforceable under state law. As Chief Judge Walrath wrote, the sale of a contract pursuant to section 363 "could not eliminate" the parties' existing rights and defenses under the contract. *Id.* at 172-73 (citing *Folger Adam Sec. Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 264 (3d Cir. 2000)). Accordingly, when analyzing the contractual provisions before the court in the *Shaw Group* case under section 363, Chief Judge Walrath considered whether the provisions were enforceable under state law, and did not rely on section 363(l) to invalidate the provisions as *de facto* anti-assignment clauses. *See id.*

Thus, the MLPSA, which has been found to be non-executory, can only be transferred subject to and conditioned upon compliance with any "anti-assignment" provisions contained therein, whether *de facto* or *de jure*. The Court's holding to the contrary constitutes a clear error and, therefore, DBSP's likelihood of prevailing on appeal is very high. For this reason, and for the additional reasons set forth herein, DBSP respectfully submits that the Court should issue a limited stay of the Ruling and the Order to protect DBSP's rights in the MLPSA pending appellate review, which DBSP intends to proceed with on an expedited basis.

## II.    Pertinent Background

1.     On August 6, 2007 (the "Petition Date"), American Home Mortgage Corp. (the "Seller"), American Home Mortgage Servicing, Inc. (the "Servicer" and collectively with the Seller the "Contracting Debtors"), and certain of their affiliates (collectively with the Contracting Debtors, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned cases (the "Cases").

## A.    The MLPSA

2.     Both of the Contracting Debtors are parties to the MLPSA with DBSP, dated as of May 1, 2006, pursuant to which DBSP purchased mortgage loans from the

5

Contracting Debtors. The MLPSA is for "servicing retained" sales, pursuant to which the Seller

agreed to sell mortgage loans to DBSP and the Servicer agreed to subsequently service those

same mortgage loans for DBSP's benefit in exchange for the right to a "Servicing Fee."[2]

     3.    The MLPSA provides that DBSP can terminate the Servicer as servicer of

its mortgage loans if the Servicer defaults on any of the obligations of the Contracting Debtors

under the MLPSA. *See* MLPSA § 14.01.

     4.    The MLPSA further provides that the Contracting Debtors are obligated to

repurchase mortgage loans, or to otherwise pay amounts to DBSP, if certain representations and

warranties made by the Seller with respect to the mortgage loans sold to DBSP are breached.

Specifically, these obligations include the following: (1) pursuant to Section 7.06 of the

MLPSA, if any borrower fails to make the first, second or third scheduled monthly payment on a

loan sold to DBSP, DBSP has the right to request that the Contracting Debtors repurchase the

loan (claims pursuant to this section of the MLPSA are known as early payment default or

"EPD" claims); and (2) pursuant to Section 7.05 of the MLPSA, if any borrower prepays his/her

mortgage loan in full within a specified time period, the Contracting Debtors are obligated to pay

an amount to DBSP (calculated pursuant to the formula contained in section 7.05) as

compensation for the loss of interest caused by the early payment (claims pursuant to this section

of the MLPSA are known as "Premium Recapture" claims).

     5.    DBSP claims that it is owed approximately $18 million for EPD and

---

[2]    DBSP and the Seller and Servicer are also parties to a November 1, 2005 Master Mortgage Loan
Purchase and Interim Servicing Agreement (the "MLPISA") that governed "servicing released"
sales - or sales for which the Servicer would not ultimately remain as the servicer of the loans
sold. The MLPISA was admitted by the Court as DBSP Exhibit 6 to the Sale Hearing.

Premium Recapture claims pursuant to the MLPSA.[3]

6.     The MLPSA restricts the Contracting Debtors' right to transfer servicing rights to a third party, and, consistent therewith, it is an event of default that entitles DBSP to terminate the Servicer under the MLPSA for the Contracting Debtors to transfer those rights without DBSP's consent.  MLPSA §§ 13.04, 13.05 and 14.01(vii).  Additionally, it is an event of default that entitles DBSP to terminate the Servicer if the Servicer "ceases to meet the qualifications of *either* a FNMA ["Fannie Mae"] *or* a FHLMC ["Freddie Mac"] servicer." MLPSA § 14.01(vi) (emphasis added).

7.     Three other provisions of the MLPSA are of primary importance when considering the Court's ruling that the MLPSA is severable into two separate and distinct contracts:

> ***The Indemnity Provision*** - Section 13.01 of the MLPSA (the "Indemnity Provision") provides, in pertinent part, that the Servicer is to indemnify and hold DBSP harmless for "any and all claims, losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and any other costs, fees and expenses that the Purchaser may sustain in any way related to the failure of the Seller to perform its obligations under this Agreement . . . ."

> ***The Payment Default Provision*** - Section 14.01(i) of the MLPSA (the "Payment Default Provision") provides that it shall be an event of default by the Servicer that, if not cured, would entitle DBSP to terminate the Servicer if the Servicer should fail "to remit to the Purchaser ***any payment*** required to be made under the terms of this Agreement . . . ." (emphasis added).

> ***The Waterfall Provisions*** - Sections 11.09(ii) & (vi) of the MLPSA (the "Waterfall Provisions") provide that the Servicer cannot be reimbursed for certain advances the Servicer is required to provide with respect its servicing of the mortgage loans until certain repurchase obligations relating to sale related representations and warranties under the MLPSA are satisfied.

**B.     The Sale Motion**

---

[3]     At the Sale Hearing, the Debtors stipulated to the fact that DBSP asserts this claim.

8.      On August 6, 2007, the Debtors filed the Sale Motion requesting approval of the sale of substantially all of the Debtors' assets relating to its loan servicing business, including the Contracting Debtors' contractual rights under the MLPSA that allow the Debtors to service the mortgage loans sold to DBSP.  The Sale Motion was later supplemented and amended to reflect that the Debtors had agreed to a stalking horse asset purchase agreement (the "APA") with the Buyer.  After an unsuccessful attempt at an auction, the Debtors sought approval of the Sale to the Buyer pursuant to the APA.

9.      DBSP objected to the Sale (the "DBSP Objection") (see Docket Nos. 675, 1108, and 1533).

10.      Pursuant to the APA, the Buyer agreed to purchase only the Debtors' rights and obligations relating to the specific task of servicing mortgage loans and did not agree to assume any obligations relating to the sale of mortgage loans, including any EPD or Premium Recapture claims.  Additionally, the Debtors sought a ruling that claims for EPD's or Premium Recapture did not have to be cured prior to the sale of servicing rights under the MLPSA.

11.      Accordingly, as part of the Sale Motion, the Debtors requested a finding that to the extent any rights and obligations relating to the servicing of mortgage loans were contained in a contract that also concerned the sale of those loans, the servicing and sale portions of the agreement were two separate and distinct contracts that were severable from one another.

**C.      The Ruling**

12.      The Court held a hearing on the Sale motion (the "Sale Hearing") that spanned five days during which it heard the testimony of seven witnesses and extensive oral argument.  DBSP actively participated in the Sale Hearing.  Following the conclusion of the Sale Hearing, the Court issued the Ruling orally at an October 23, 2007 hearing.

A/72252144.10/0801826-0000327609

13.    For purposes of DBSP's Objection, following are the key aspects of the

Court's Ruling:

- The MLPSA is not executory and, therefore, Bankruptcy Code section 363, and not 365, is applicable to the Debtors sale of the servicing provisions of the MLPSA. October 23, 2007 Hearing Transcript at 10-11.

- The Debtors must transfer all of their rights and obligations under the servicing provisions of the MLPSA pursuant to section 363. Section 363 does not allow the Debtor to transfer "less than the entire bundle of rights and obligations under the servicing contracts." *Id.* at 12.

- The Indemnity Provision and the Waterfall Provisions in the MLPSA are clear and unambiguous and provide: (1) that the Servicer is liable for all amounts owed by the Seller under the MLPSA and (2) that the Servicer cannot be reimbursed for certain advances absent the payment of certain repurchase obligations under the MLPSA. *Id.* at 28-29.

- Notwithstanding the Indemnity Provision and the Waterfall Provisions, the MLPSA is severable into two distinct contracts - a contract for the sale of mortgage loans and a contract for the servicing of mortgage loans. *Id.* at 28-29.

- The Indemnity Provision and the Waterfall Provisions are not sufficient on their own to make the sale and servicing agreements contained within the MLPSA interrelated because, pursuant to the *Shaw Group* decision, these are cross-default provisions that are unenforceable by DBSP. *Id.* at 29-34.

- Because the servicing portion of the MLPSA is severable from the sale portion of the agreement, the Debtors can sell the servicing portion of the MLPSA to the Buyer without curing any outstanding EPD or Premium Recapture claims under the MLPSA. *Id.* at 21, 35.

14.    On October 30, 2007, the Court entered the Order approving the Sale in a

manner consisting with the Ruling.

### III. Argument

**A.    Standard for Granting a Stay Pending Appeal**

15.    Bankruptcy Rule 8005 contemplates that a bankruptcy court grant a stay

pending appeal in order to protect the rights of the parties while an appeal of one of its orders is

9

pending. The Third Circuit has recognized that "a myriad of circumstances can occur that would necessitate the grant of a stay pending appeal in order to preserve a party's position." *In re Highway Truck Drivers & Helpers Local Union #107*, 888 F.2d 293, 298 (3d Cir. 1989).

16.     The granting of a motion for a stay pending appeal is within this Court's sound discretion. *In re United Merchants & Mfrs., Inc.* 138 B.R. 426, 430 (D. Del. 1992). The standards that guide the court in the exercise of its discretion are similar to the standards for granting a preliminary injunction. *See, e.g., Matter of Del. & Hudson Ry. Co.*, 90 B.R. 90, 91 (Bankr. D. Del. 1988). The party seeking such relief must show that: "(1) it is likely to prevail on the merits of its appeal; (2) it will suffer irreparable injury absent a stay; (3) a stay will not cause substantial harm to other interested parties; and (4) a stay will not harm the public interest." *In re Columbia Gas System, Inc.*, 1992 U.S. Dist. LEXIS 3253, *3-4 (D. Del. Mar. 10, 1992) (citing *Del. & Hudson*, 90 B.R. at 91); *U.S. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 18 F.3d 208, 211 (3d Cir. 1994).

17.     No one factor is determinative. Instead, "proper judgment under Rule 8005 entails a delicate balancing of all the elements." *In re Trans World Airlines Inc.*, 2001 WL 1820325, *2 (Bankr. D. Del. Mar. 27, 2001); *see also Hertz Corp. v. ANC Rental Corp. (In re ANC Rental Corp.)*, 2002 U.S. Dist. LEXIS 9409, *5-7 (D. Del. May 22, 2002); *Morgan v. Polaroid Corp. (In re Polaroid Corp.)*, 2004 U. S. Dist. LEXIS 1917, *3 (D. Del. Feb. 9, 2004).

18.     "Probable success on the merits means that 'the movant has a substantial case, or a strong case on appeal.'" *Columbia Gas*, 1992 U.S. Dist. LEXIS at *4 (quoting *In re Public Serv. Co. of N.H.*, 116 B.R. 347, 349 (Bankr. D. N.H. 1990)). The movant carries that burden if it shows that the issues presented are novel and complex, and the appellate court's review is *de novo. See Columbia Gas*, 1992 U.S. Dist. LEXIS at *4-5.

10

19.    Thus, DBSP need not convince this Court to change its mind or even to develop serious doubts concerning the correctness of its decision. *Goldstein v. Miller*, 488 F. Supp. 156, 172-73 (D. Md. 1980), *cert. denied sub nom.*, *Goldstein v. Regan*, 454 U.S. 828 (1981). Instead, DBSP need only demonstrate that this Court ruled on a difficult legal question and the equities of the case suggest that the status quo should be maintained. *Id.*; *see also Evans v. Buchanan*, 435 F. Supp. 832, 844 (D. Del. 1977) (stay may be appropriate and success factor satisfied, where appeal raises serious and difficult questions of law and threat of irreparable injury to applicant is immediate and substantial).

20.    Moreover, there is strong support for the proposition that this Court should give serious consideration to motions seeking a preservation of the status quo pending appeal in the context of a sale of assets that would be subject to section 363(m) of the Bankruptcy Code. While DBSP does not believe that section 363(m) would apply with respect to the initial "economic closing" contemplated by the APA, upon information and belief, the Debtors do not concede this point. Moreover, section 363(m) would apply after the final "legal closing" of the transaction and, at that point, could render DBSP's appeal moot, or at least limit available avenues of relief.

21.    The Second Circuit Court of Appeals, noting the limited scope of review under section 363(m) after a sale is consummated, expressed concern that the district court's denial of the stay request effectively denied meaningful review on appeal and stated:

> [W]here an appellant timely moves to stay a judicially authorized sale, a district court's denial of that motion will similarly limit the issues on appeal. Although an appellant's challenge to a sale authorization might raise meritorious arguments, a district court's denial of a requested stay has the effect of precluding this Court from reviewing those issues, other than the good faith of the purchaser, if the sale has closed in the interim. It becomes important for a district judges to appreciate the special consequences of denying a stay of a bankruptcy sale, even a very brief stay to permit this Court time to consider whether a stay pending appeal is

11

warranted.

*In re Gucci*, 105 F.3d 837, 840 (2d Cir. 1997).

22.    In addition, Bankruptcy Rule 8005 enables this Court to "tailor relief to the unique circumstances of the case, '[n]otwithstanding Rule 7062,' by making 'any appropriate order during the pendency of an appeal on such terms as will protect the rights of all the parties in interest.'" *In re Trans World Airlines, Inc.*, 18 F.3d 208, 212 (3d Cir. 1994). Thus, Rule 8005, by its express terms provides this Court with broad discretion. *See id.* at 211. Indeed, Bankruptcy Rule 8005 is "a flexible tool which permits a bankruptcy court to uniquely tailor relief to the circumstances of the case, so that the appellate process will neither undo nor overwhelm the administration of the bankruptcy case." *In re Gleasman*, 111 B.R. 595, 599 (Bankr. W.D. Tex. 1990) (holding that a bankruptcy judge "can design stays to avoid unjust results, taking into consideration all the exigencies of the entire bankruptcy case.").

**B.    DBSP Is Likely to Succeed on the Merits of its Appeal.**

23.    The Ruling and Order rest on several legal errors that provide strong grounds for appeal.[4]

**1.    *The Court Erred in Finding that the Servicing Portions of the MLPSA Could be Transferred pursuant to Section 363 in Light of the Anti-Assignment Provisions and Other Restrictions Contained in the MLPSA.***

24.    Assuming, *arguendo*, that the Court correctly concluded that the MLPSA is severable and that the servicing portion thereof is a separate and distinct non-executory contract (the "Servicing Contract"), it was an error for the Court to conclude that the Servicing Contract could be transferred by the Debtors pursuant to section 363 of the Bankruptcy Code

---

[4]    The errors listed here are not meant to be exhaustive, and DBSP reserves the right to raise additional arguments in its appeal.

12

notwithstanding Section 13.05 of the MLPSA, which requires the consent of DBSP prior to a

transfer of servicing rights. Additionally, there is no authority that could have allowed the Court

to invalidate the Indemnity Provision, Waterfall Provisions, and the requirement of Section

14.01(vi) of the MLPSA that the new servicer be Freddie Mac qualified, where the Servicing

Contract is being transferred pursuant to section 363, and not assumed and assigned pursuant to

section 365.

        25.     As the Court itself stated in the Ruling, pursuant to section 363 the

Debtors must transfer "all of their rights and obligations under the servicing contracts to the

Buyer." October 23, 2007 Hearing Transcript at 12. This portion of the Ruling is consistent

with the Third Circuit's decision in *Folger Adam*, in which the Third Circuit held that the

assignment of a debtor's rights under a non-executory contract is subject to all of the defenses

that the counterparty to the contract has in relation to those rights. *See Folger Adam*, 209 F.3d at

264-65. Accordingly, unless there is a specific provision in the Bankruptcy Code that preempts

state law and allows the Court to excise specific rights that DBSP has under the Servicing

Contract, those rights are enforceable by DBSP in relation to any effort by the Debtors to transfer

the Servicing Contract to a third party pursuant to section 363.

        26.     Where an executory contract is being assumed and assigned, section

365(f) of the Bankruptcy Code invalidates any anti-assignment provisions that would prevent

such assumption and assignment by the debtor. Thus, section 365(f) expressly preempts state

law contract rights and permits a debtor to assign the executory contract without the

counterparty's consent. Courts have interpreted section 365(f) to invalidate not only anti-

assignment clauses, but also *de facto* anti-assignment clauses, such as cross-default provisions in

unrelated executory contracts. *See Shaw Group*, 350 B.R. at 180-81.

27.    However, there is no analog to section 365(f) in section 363.  Accordingly, where a contract is not executory, as the Court found with respect to the Servicing Contract, there is no basis to invalidate anti-assignment or *de facto* anti-assignment provisions with respect to a transfer of that contract pursuant to section 363.

28.    The Third Circuit's decision in *Integrated* confirms this analysis.  In that case, the buyer, Integrated Solutions, purchased from a trustee in bankruptcy prejudgment tort claims, which, under New Jersey state law, are not assignable.  The Court held that the prejudgment tort claims were property of the estate under section 541 of the Bankruptcy Code, because that section draws in all interests of the debtor in property, regardless of whether state law would otherwise restrict transfer of those interests.  *Integrated*, 124 F.3d. at 491.  However, once an interest in property becomes property of the estate, the scope of that interest is determined by state law.  *Id.* at 492 (citing *Butner v. United States,* 440 U.S. 48, 54 (1979) ("Property interests are created and defined by state law"); *see also Nobelman v. Am. Sav. Bank,* 508 U.S. 324, 329 (1993) ("In the absence of a controlling federal rule, we generally assume that Congress has left the determination of property rights in the assets of a bankrupt's estate to state law").  As a result, "the trustee's rights in property are limited to only those rights that the debtor possessed pre-petition."  *Id.* at 493.  Moreover, section 363(b)(1) of the Bankruptcy Code does not "expressly authorize[] the trustee to sell property in violation of state law transfer restrictions."  *Id.* (comparing 363(b)(1) to other Code provisions that explicitly preempt state non-bankruptcy law); *see also In re Kaiser Aluminum Corp.,* 343 B.R. 88 (D. Del. 2006) (noting that while section 363 does not preempt state law, section 1123(a) does (citing *Integrated*)).  The Third Circuit found that "since [the debtor] would have been prohibited from assigning its

14

prejudgment tort claim under New Jersey state law, the trustee in [the debtor's] bankruptcy was subject to the same restriction." *Id.* at 494.

29.    While *Integrated* deals with a tort claim, the same analysis is applicable where the asset being transferred is a contract. Nothing in the Bankruptcy Code permits the invalidation of anti-assignment provisions in non-executory contracts. To the contrary, numerous courts have held that anti-assignment provisions are enforceable where a contract is not executory. For example, in *Sullivan v. Paul* the bankruptcy trustee sought to sell the debtor's rights to receive payments under an annuity contract. *Sullivan v. Paul (In re Paul),* 355 B.R. 64 (Bankr. N.D. Ill. 2001). However, the Bankruptcy Court ruled that the trustee could not do so because the contractual anti-assignment provision would be enforceable under state law. *Id.* at 68 ("[Section] 363(b)(1) does not expand a trustee's rights in property of the estate beyond those held by the debtor. Section 363(b)(1) merely allows a trustee to sell property if the debtor would have had the same right under state law"); *see also Crossman,* 259 B.R. 306-08 (endorsing *Integrated Solutions* and rejecting a trustee's attempt to sell a settlement agreement that contained an otherwise enforceable anti-assignment provision); *C-Power Products v. Schiro (In re C-Power Products),* 230 B.R. 800, 803 (Bankr. N.D. Tex. 1998) (finding that "for a sale under § 363(f) free and clear of that anti-assignment restriction, one of the conditions of § 363(f)(1) through (5) must be met"); *Calvert v. Bongards Creameries (In re Schauer)*, 835 F.2d 1222, 1225 (8th Cir. 1987) (holding that section 363 does not invalidate transferability restrictions in a farm cooperative's bylaws relating to patronage margin certificates because state law defines the debtor's interest in property).

30.    Accordingly, it was clear error for the Court to find that the Servicing Contract could be sold by the Debtors to the Buyer notwithstanding the fact that DBSP did not

15

consent to the sale pursuant to section 13.05 of the MLPSA.  While the Ruling includes no

explanation as to why section 13.05 is unenforceable,  the Court apparently relied on section

363(l) in support of its finding that DBSP's consent was not required.  *See* Transcript of October

23, 2007 Hearing at 18-19, 34.  However, because section 363(l) deals solely with the

invalidation of *ipso facto* clauses, it has no relevance where anti-assignment clauses are at issue.

Indeed, the Court in *Integrated*, in support of its ruling *enforcing* the relevant assignment

restriction in that case, cited section 363(l) as an example of a *different* type of contractual

restriction that is *un*enforceable in bankruptcy due to specific Congressional preemption.[5]  *See*

*Integrated,* 124 F.3d at 493.

     31.    Similarly, it was clear error for the court to rely upon the *Shaw Group*

decision to find that the Indemnity and Waterfall Provisions are unenforceable cross-defaults.

The court in *Shaw Group* based its finding that cross-default provisions are unenforceable on the

theory that they are *de facto* anti-assignment provisions that are invalidated by section 365(f)(3).

*See Shaw Group*, 350 B.R. at 179 ("[T]he Court concludes that the Offset Provision is a classic

cross-default clause which is not enforceable under section 365(f)(3).") (citing *United Air Lines,*

*Inc. v. U.S. Bank Trust, National Association (In re UAL Corp.),* 346 B.R. 456, 470 (Bankr. N.D.

Ill. 2006)).[6]  This analysis is not applicable where, as here, the Servicing Contract is being sold

---

[5]    The *Integrated* Court's conclusion was necessarily correct:  if a provision in the Bankruptcy Code rendering *ipso facto* clauses unenforceable could be read so broadly as to cover anti-assignment provisions as well, then section 365(f)(3) of the Bankruptcy Code, which overrides anti-assignment provisions in the context of *executory* contracts, would be rendered entirely redundant, given that section 365 contains its own *ipso facto* provision that corresponds to section 363(l).  *See* 11 U.S.C. § 365(b)(2).

[6]    Other cases applying the so-called "cross-default" rule have done so only with respect to section 365.  *See, e.g., In re Convenience USA, Inc.,* 2002 WL 230772 (Bankr. M.D. N.C. Feb. 12, 2002) (cross default provisions do not integrate executory contracts); *In re UAL Corp.,* 346 B.R. at 468 (assumption of an executory contract "under § 365 is subject to a 'well-established' cross-default rule"); *Kopel v. Campanile (In re Kopel),* 232 B.R. 57, 64-65 (Bankr. E.D.N.Y. 1999) (enforcing

16

pursuant to section 363.  *Shaw*, in fact, supports DBSP's position because the Court in that case stated that contracts transferred pursuant to section 363 remain subject to applicable defenses and obligations.  *Id.* at 173 (citing *Folger Adam*, 209 F.3d at 263).

32.    Therefore, even if the Servicing Contract was severable from the rest of the MLPSA, it was an error for the Court to approve the sale of the Servicing Contract to the Buyer without the Indemnity and Waterfall Provisions intact.  Those obligations of the Servicer are part of the Servicing Contract and, accordingly, would have to be transferred as part of the Servicing Contract under section 363.

33.    Finally, an integral part of the Servicing Contract (again, assuming it is severable from the rest of the MLPSA) are the provisions that require the Servicer to meet the qualifications of both a Fannie Mae and a Freddie Mac servicer.  *See* MLPSA §§ 7.02( v) & 14.01(vi).  While evidence was admitted at the Sale Hearing that the Buyer is engaging in efforts to become Fannie Mae qualified, the evidence also showed that no effort is being made to become Freddie Mac qualified.  As both Mr. Aronoff and Mr. Love testified, the Fannie Mae and Freddie Mac guidelines are not identical.  Just because a party is Fannie Mae qualified does not mean it is also Freddie Mac qualified.  There is no basis for the Court to invalidate the Freddie Mac qualification requirements, particularly for purposes of a sale of the Servicing Contract pursuant to section 363.  Accordingly, it was error for the Court to approve the sale of the Servicing Contract to the Buyer, who is not Freddie Mac qualified and does not intend to become Freddie Mac qualified, over DBSP's objection.

---

cross-default provision in executory contract sought to be assumed under section 365); *In re Wheeling-Pittsburgh Steel Corp.*, 54 B.R. 772, 778-79 (Bankr. W.D. Pa. 1985) (construing cross-default provisions in separate insurance policies; noting that not all cross-default provisions are unenforceable and distinguishing cross-default provisions in <u>non-executory</u> contracts).

17

2.      *The Court Incorrectly Concluded that the Servicing*
        *Obligations are Severable from the MLPSA.*

34.      The Court applied an incorrect legal standard in determining that the

Agreement is severable.  The Court incorrectly used the so-called "cross-default rule," which is

inapplicable to non-executory contracts, to invalidate provisions that create interrelated

obligations and linked consideration among the parties to the Agreement.  Having invalidated

those provisions, the Court then concluded that the Agreement was severable because the

obligations of the parties were not interrelated.  This reasoning has no basis in law.

35.      Severability of contracts is determined by the intent of the parties.  *In re*

*Gardinier, Inc.*, 831 F.2d 974, 976 (11th Cir. 1987).  Where, as here, an agreement is

unambiguous, intent is determined as a matter of law by reviewing the terms within the four

corners of the agreement.  *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528 (2007) ("extrinsic

evidence may not be considered unless the document itself is ambiguous"); *Greenfield v. Philles*

*Records, Inc.*, 98 N.Y.2d 562, 569 (2002) ("[A] written agreement that is complete, clear and

unambiguous on its face must be enforced according to the plain meaning of its terms.");

*Schmidt v. Magnetic Head Corp.*, 97 A.D.2d 151, 157 (N.Y. App. Div. 1983) ("[W]here the

intention of the parties is clearly and unambiguously set forth in the agreement itself effect must

be given to the intent as indicated by the language used . . . .  The express 'provisions establish

the rights of the parties . . . .'") (citations omitted).

36.      The three factors applied in *Gardinier*, and by the Court in this case, to

determine whether a contract is severable is whether the terms of the agreement reflect the

following:  (1) that the nature and purpose of the obligations sought to be severed are different,

(2) that the consideration for each obligation is different, and (3) whether the obligations of the

parties are interrelated. *See Gardinier*, 831 F.2d at 976; October 23, 2007 Hearing Transcript at 23.

37.    As an initial matter, the Court incorrectly applied the so-called "cross-default rule" to invalidate the Indemnity and Waterfall provisions of the Agreement. First, as discussed more fully above, this rule is only applicable when considering assumption and assignment of an agreement under section 365. Where, as here, a contract is non-executory, there is no basis to invalidate these provisions.

38.    Additionally, the "cross-default rule" was applied by the court in *Shaw* to determine whether two contracts that were already separate were sufficiently linked for purposes of assumption or assignment under section 365. In this case, the Court used the "cross-default rule" to invalidate unambiguous provisions of a single writing for the purpose of determining whether the writing is severable into two agreements. No precedent supports the application of the "cross-default rule" in this manner. To the contrary, the law is clear that in determining the intent of the parties for purposes of severability, the Court must consider the intent of the parties as expressed by all terms of the agreement in question. *Matter of the Estate of Wilson*, 50 N.Y.2d 59, 65 (1980) ("whether the provisions of a contract are severable depends largely upon the intent of the parties as reflected in the language they employ and the particular circumstantial milieu in which the agreement came into being."); *A & J Enterprise Solutions, Inc. v. Business Applications Outsourcing Technologies, Inc.,* 812 N.Y.S.2d 226, 229-30 (N.Y.Dist.Ct., 2nd Dist. 2005) ("As to whether the claims grew out of an entire contract or a divisible contract is an issue of fact to be determined by the intention of the parties which is to be gathered from the agreement itself and the circumstances surrounding its execution."). Accordingly, it was error

19

for the Court not to consider the Indemnity and Waterfall provisions to determine whether the MLPSA was severable.

39.     When considered as a whole, in light of the testimony that placed the contractual provisions in context, the terms of the MLPSA can only support a finding that it is one integrated agreement that is not severable into two separate contracts.

40.     First, the nature and purpose of the sale and servicing portions of the agreement are not different.  The MLPSA relates to a "servicing retained" sale - one transaction in which loans are sold and servicing is retained by the seller.  As Mr. Johnson testified, in considering whether to sell loans servicing retained as opposed to servicing released, the Debtors considered the economic impact of the entire transaction including:  (1) the price to be received for the loans without the servicing, (2) the anticipated servicing revenue to the Debtors associated with the retained servicing, (3) the anticipated cost to the Debtors of potential EPD and Premium Recapture claims, (4) the competitive advantage to the Debtors associated with retaining the servicing; and (5) the efficiencies that inure to the Debtors with respect to identifying valid EPD and Premium Recapture claims when the Debtors control the servicing.[7] Accordingly, the MLPSA was viewed as one interrelated economic transaction by the Debtors, not two separate, unrelated agreements.  The sale and servicing provisions of the MLPSA were "contemporaneously executed as necessary elements of the same transaction, such that there would have been no transaction without each."  *See In re Kopel*, 232 B.R. 57, 67 (Bankr. E.D.N.Y. 1999).

---

[7]     Mr. Johnson testified at the Sale Hearing on October 17, 2007.  A final transcript of the proceedings from this day of the Sale Hearing is not yet available.

A/72252144.10/0801826-0000327609

41.    Second, the Waterfall and Payment Default Provisions evidence that the consideration for both of the sale and servicing portions of the MLPSA is not separate and distinct. Pursuant to the Payment Default Provision, DBSP can terminate the Servicer if the Servicer fails to make "any payment" required by the terms of the MLPSA. The provision is not limited solely to payments relating to the servicing of the loans. Accordingly, the MLPSA is unambiguously clear that if the Servicer fails to make any payments due, including payments on EPD or Premium Recapture claims, servicing can be terminated. In fact, when DBSP issued a default notice based upon the Contracting Debtors' failure to satisfy EPD claims, the notice was sent to both the Seller and the Servicer. *See* DB Exhibit 4 to the Sale Hearing.

42.    Additionally, the Waterfall Provisions are the single most important provisions in the MLPSA concerning servicing compensation because they govern how the Servicer is to make withdrawals from the Custodial Account. The fact that the Waterfall Provisions make reimbursement for advances by the Servicer subordinate to the payment of certain repurchase obligations for defaults relating to the sale of the mortgage loans, proves, unequivocally, that the parties to the MLPSA viewed the consideration for the sale and servicing of the loans as interrelated.

43.    The final *Gardinier* factor, whether the obligations of each party to the MLPSA are interrelated, is the factor that most favors DBSP. As the Court found, the Indemnity Provision is unambiguous and obligates the Servicer to make any and all payments under the MLPSA that relate to the mortgage loan sales, including EPD and Premium Recapture claims. Accordingly, the Servicer has the same obligations as the Seller under the MLPSA.

44.    A finding that the MLPSA is one integrated contract is also consistent with the "circumstances surrounding the execution" of the agreement. *A & J Enterprise,* 812

21

N.Y.S.2d at 229-30. DBSP's witness, Peter Principato, was the only witness to offer testimony

about the negotiations surrounding the MLPSA. He testified that DBSP typically entered

MLPSA agreements where one entity acted as servicer and seller and that, when counterparties

insisted on using two entities, DBSP's goal was to make both the seller and servicer responsible

for all obligations under the agreement, just like the one-entity agreements. October 18, 2007

Hearing Transcript at 217-221. When viewed in this context, the terms of the MLPSA clearly

reflect the parties' intent to have one integrated agreement, not two.

**3.**   ***The Court's Ruling Is Contrary to the Third Circuit's
Recent Decision In re Fleming Companies, Inc.***

45.   In *In re Fleming Companies, Inc.*, 2007 WL 2490776 (3d Cir. Aug. 22, 2007), the

Third Circuit recently reiterated that bankruptcy courts "'must be sensitive to the rights of the

non-debtor contracting party . . . and the policy requiring that the non-debtor receive the full

benefit of his or her bargain.'" *Id.* at *4 (quoting *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1091

(3rd Cir. 1990)).

46.   The unambiguous terms of the MLPSA reflect that DBSP bargained for an

agreement pursuant to which both the Servicer and the Seller would be liable for all obligations.

The terms of the MLPSA clearly establish why it was important for DBSP to have both the

Servicer and Seller liable for all obligations, and why DBSP would bargain for a provision that

allows it to terminate servicing if sale related claims go unpaid. Pursuant to the MLPSA, the

Servicer retains and controls Custodial Accounts in trust for DBSP that contain all of the

principal and interest payments collected on the mortgage loans owned by DBSP. *See* MLPSA §

11.08. Failure of the Seller or Servicer to make EPD or Premium Recapture payments under the

MLPSA could be indicative of financial distress. In such a situation, DBSP would want the right

to terminate servicing and move its Custodial Accounts to a new servicer.

22

47.    By severing the MLPSA, and allowing the servicing rights under the contract to be transferred prior to the satisfaction of EPD and Premium Recapture claims, the Court eviscerated DBSP's bargain. The Ruling essentially allows the Debtors to do in bankruptcy what they did not successfully bargain for outside of bankruptcy - to capitalize and realize value from the servicing portion of the MLPSA without fulfilling their obligations under the sale portions of the MLPSA. That result is in direct conflict with the policy, and the law, as expressed by the Third Circuit in *Fleming*.

**C.    DBSP will Be Irreparably Harmed Absent a Stay.**

48.    "Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *GTE Sylvania, Inc. v. Consumer Product Safety Comm'n.*, 404 F. Supp. 352, 373 (D. Del. 1975) (citing 11 Charles A. Wright & Arthur A. Miller, *Federal Practice & Procedure* § 2948, at 431 (1973)).

49.    Under the circumstances here, the irreparable harm to DBSP in the absence of a stay pending appeal is that the appeal could be rendered moot if the Debtors close the sale to the Buyer while the appeal is pending. While DBSP does not believe that 363(m) would apply with respect to the initial "economic closing" contemplated by the APA, upon information and belief, the Debtors and the Buyer do not concede this point. Moreover, 363(m) would apply after the final "legal closing" of the transaction and, at that point, could render DBSP's appeal moot or limit available avenues of redress.

50.    The rendering of an appeal as moot is the "'quintessential form of prejudice'" constituting irreparable harm sufficient to justify a stay. *In re Country Squire*

23

*Assoc.*, 203 B.R. 182, 183 (2d Cir. B.A.P. 1996) (citing *In re Advanced Mining Systems,*

*Inc.*, 173 B.R. 467, 469 (S.D.N.Y. 1994).

**D.    Any Harm to the Debtors Caused By a Stay Would Be Minimal in Comparison to the Potential Harm to DBSP.**

51.    The Debtors will not suffer harm if the Court grants a stay because: (i) the

DBSP servicing rights are unnecessary to close the Sale; and (ii) DBSP will agree to expedite the

appeal.

52.    First, the Asset Purchase Agreement signed by the Debtors requires, as a

condition to closing, that the unpaid principal balance of the mortgage loans serviced by the

Debtors shall not be less than $38 billion.  Exclusion of the MLPSA, relating to mortgage loans

with less than $200 million in aggregate unpaid principal balance, will not affect the Debtors'

ability to close the Sale and does not represent a material portion of the assets to be sold.

Moreover, the Purchaser and the Debtors have agreed to a two-step closing, thereby

acknowledging that they are not in a position to consummate the transaction immediately.  The

Debtors will suffer no harm if DBSP's appeal is ultimately overruled and they are then allowed

to transfer to the Buyer the servicing portion of the MLPSA.

53.    Second, in the event the Court decides that the benefits to granting a stay

pending appeal outweighs the inconvenience to the Debtors, DBSP will agree to expedite the

appeal in order to mitigate the inconvenience experienced by the Debtors and/or the Buyer.

**E.    The Public Interest Favors a Stay.**

54.    DBSP asserts that the issues outlined above present significant issues of

law and that the public interest would be served by staying the Order as to the MLPSA pending

outcome of the appeal for two reasons.  First, the MLPSA is representative of a multitude of

24

Mortgage Loan Purchase and Servicing Agreements in the broader market. The rulings of the Court, and any rulings on appeal, will have wide ranging effects on market participants.

55.    Further, due to the importance of the issues raised, appellate review provides broader guidance and promotes greater stability in the market. Many opportunities for appellate review are lost because parties fail to move for, or are denied, a stay pending appeal. Reliance on exigent circumstances to deny a stay pending appeal effectively deprives parties of the opportunity for meaningful review.

25

## IV.    CONCLUSION

For the foregoing reasons, DBSP respectfully requests that the Court stay the

Order approving the Sale insofar as it would authorize the assignment of, and/or otherwise

impair, DBSP's rights under the MLPSA pending DBSP's expedited appeal of that portion of the

Order, or for such other and further relief as the Court deems just and proper.

Dated:  October 30, 2007

**BINGHAM McCUTCHEN LLP**
Steven Wilamowsky
399 Park Avenue
New York, NY 10022
(212) 705-7000

**BINGHAM McCUTCHEN LLP**
Andrew J. Gallo
150 Federal Street
Boston, MA  02110
(617) 951-8117

- and -

**ASHBY & GEDDES, P.A.**

/s/ William P. Bowden
William P. Bowden (I.D. #2553)
Don A. Beskrone (I.D. #4380)
Gregory A. Taylor (I.D. #4008)
Amanda M. Winfree (I.D. #4615)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Counsel to DB Structured Products, Inc.*

185430.1

26