## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------ X
In re:                                                       :   Chapter 11
                                                             :
AMERICAN HOME MORTGAGE                                       :   Case No. 07-11047 (CSS)
HOLDINGS, INC.,                                              :
a Delaware corporation, et al., 1                            :   Jointly Administered
                                                             :
            Debtors.                                         :   Objection Deadline: November 5, 2007 at 10:00 a.m. (ET)
                                                             :                       (requested)
                                                             :   Hearing Date: November 5, 2007 at 3:00 p.m. (ET)
------------------------------------------------------------ X                     (requested)
```

## DEBTORS' MOTION PURSUANT TO SECTION 105 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR AN ORDER APPROVING AND AUTHORIZING THE SETTLEMENT AGREEMENT BY AND BETWEEN THE DEBTORS AND BEAR STEARNS MORTGAGE CAPITAL CORP. AND EMC MORTGAGE CORP. RESOLVING ADVERSARY PROCEEDING (07-51701)

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and

debtors in possession in the above cases (collectively, "AHM" or the "Debtors"), by this motion

(the "Motion"), seek entry of an order pursuant to Rule 9019(a) of the Federal Rules of

Bankruptcy Procedure ("Bankruptcy Rules") and section 105(a) of Title 11 of the United States

Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") approving the settlement agreement

between the Debtors and Bear Stearns Mortgage Corp. ("BSMCC") and EMC Mortgage Corp.

("EMC" together with the Debtors and BSMCC, the "Parties") resolving adversary proceeding

(07-51701) (the "Settlement Agreement"), a copy of which is attached as Exhibit A to the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

proposed form of Order also attached hereto.  In support of the Motion, the Debtors respectfully

represent as follows:

## STATUS OF THE CASE AND JURISDICTION

1.      On August 6, 2007 (the "Petition Date"), each of the Debtors filed with

this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors'

chapter 11 cases are being jointly administered pursuant to Rule 1005(b) of the Federal Rules of

Bankruptcy Procedure.  Each Debtor is continuing to operate its business and manage its

properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

2.      On August 14, 2007, the United States Trustee for the District of Delaware

appointed The Official Committee of Unsecured Creditors (the "Committee").  No trustee or

examiner has been appointed.

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief

requested are section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019.

## GENERAL BACKGROUND

### A.      The Debtors' Business

4.      Prior to the filing of these bankruptcy cases, AHM's business primarily

entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage

loans and mortgage-backed securities resulting from the securitizations of residential mortgage

loans.  AHM also invested in securitized mortgage loans originated by others and originated and

sold mortgage loans to institutional investors.  AHM offered an array of mortgage products and

primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

5.      As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

6.      A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion. AHM continues to conduct its servicing business, which constitutes an important asset of the Debtors' estates.

**B.      Events Leading to the Chapter 11 Filing**

7.      Beginning in late 2006, and continuing through 2007, the credit markets became concerned over the quality of subprime mortgages and, specifically, the increasing default rates on such mortgages. These concerns became exacerbated by the failure of two major hedge funds with concentrated investments in subprime loans.

8.    The concern in the credit markets has spread beyond the subprime market and has been reflected in the widening of the spread between the rate of interest on U.S. Treasury issued securities and general corporate debt securities. The surge in mortgage delinquencies for subprime home loans also generated anxiety in the market about borrowers with adjustable rate mortgages scheduled to reset with higher rates in 2007 and 2008.

9.    In the weeks prior to the Petition Date, this unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders -- the financial institutions that provide short term credit facilities needed to originate and purchase loans – began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening AHM's continued viability.

10.    On July 27, 2007, AHM Investment announced that its Board of Directors had decided to delay payment of its quarterly cash dividend on the company's common stock and anticipated delaying payment of its quarterly cash dividends on its preferred stock to preserve liquidity.

11.    The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors now employ approximately 1000 persons who are absolutely essential to the Debtors' continued operations, although that number is expected to

decline as various wind-up tasks are completed, the retail branches are closed and the Debtors'

remaining assets are sold.

12.     In the wake of these events, the Debtors, assisted by counsel and

professional advisors, sought alternative funding sources and capital infusions.  Additionally, the

Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans

owned by the Debtors, residual securities in securitization trusts and "scratch and dent" loans, to

financial and strategic investors.

13.     Unfortunately, in the short time available and given the severe financial

pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity

crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve

and maximize the value of their estates through orderly sales of their assets..

## RELEVANT BACKGROUND

14.     BSMCC and AHM Corp., AHM Investment, AHM Acceptance and AHM

Servicing (collectively, the "Defendants") were parties to a certain Whole Loan Master

Repurchase Agreement, dated June 23, 2004 (as amended, supplemented and otherwise

modified, the "Repurchase Agreement") pursuant to which BSMCC purchased certain mortgage

loans (the "Purchased Mortgage Loans") from the Defendants and the Defendants were to

repurchase the Purchased Mortgage Loans from BSMCC on demand, or at a later, agreed upon

date (the "Repurchase Date").

15.     With respect to any purchase of Purchased Mortgage Loans by BSMCC,

the Repurchase Agreement provided that the Defendants maintain a certain margin amount

calculated at a previously agreed upon percentage of the price at which the Defendants agreed to

repurchase the Purchased Mortgage Loans from BSMCC.

16.     Pursuant to the Repurchase Agreement, if the Defendants failed to maintain the requisite margin amount, the Defendants were obligated, upon notice, to transfer cash in the amount of the deficiency (the "Margin Call"). Failure to meet a Margin Call was an Event of Default (as the term was defined in the Repurchase Agreement) thus rendering all amounts immediately due and payable by the Defendants and requiring that the Defendants transfer to BSMCC all documents and subsequently received funds related to the Purchased Mortgage Loans.

17.     On August 10, 2007, BSMCC sold the Purchased Mortgage Loans to EMC on a servicing related basis as the result of the Defendants' alleged prepetition failure to meet a certain Margin Call and requested that the Defendants turn over all documents and subsequently received funds related to the Purchased Mortgage Loans.

18.     On August 24, 2007, BSMCC and EMC (together, the "Plaintiffs") filed their Complaint for Declaratory and Injunctive Relief (the "Complaint") [D.I. 1], thereby initiating an adversary proceeding, Adv. Proc. Case No. 07-51701 (the "Adversary Proceeding"). By the Complaint, the Plaintiffs sought a declaratory judgment that, among other things, (i) the Defendants were obligated to provide access to and deliver certain documents related to the Purchased Mortgage Loans to EMC, (ii) the Defendants were obligated to transfer certain documents related to the Purchased Mortgage Loans to EMC, (iii) the Defendants were obligated to prevent commingling of funds or payments related to the Purchased Mortgage Loans, (iv) the Defendants breached the Repurchase Agreement, and (v) the Defendants exercised and assumed an unauthorized right of ownership of the Purchased Mortgage Loans by failing to turn same over to EMC upon request.

19.     On September 11, 2007, the Defendants filed their Answer to the

Complaint for Declaratory and Injunctive Relief (the "Answer") [D.I. 8] whereby the Defendants

opposed the relief sought in the Complaint.

20.     As a result of extensive negotiations, the Parties have reached an

agreement the terms of which are embodied in the executed Settlement Agreement attached

hereto.

## SETTLEMENT AGREEMENT[2]

21.     Pursuant to the Settlement Agreement, the Defendants shall convey to

EMC, no later than November 2, 2007 (the "Transfer Date") all Servicing Rights (as defined in

the Settlement Agreement), related to the Purchased Mortgage Loans under the Repurchase

Agreement.

22.     The Plaintiffs shall transfer $100,000 (the "Settlement Amount") to AHM

Servicing.  In addition, the Plaintiffs shall cause to be transferred the following "Non-MSR

Related Collateral" as defined below:

    a.      the security known as AHM 2004-1IIA with Original Face
            Amount of $3,015,925 with CUSIP No. 02660TAJ2;

    b.      all Principal and Interest ("P&I") received by BSMCC on account
            of above security;

    c.      cash collateral balances unrelated to the P&I payments believed to
            be $28,051.00 as of October 10, 2007 based on the collateral
            statement received from BSMCC; and

    d.      interest on cash balances held by BSMCC using an industry rate of
            Fed Funds effective for cash collateral balances held by a swap or
            repo counterparty.

23.     The Plaintiffs shall pay the Settlement Amount and release the Non-MSR

Related Collateral to the Defendants no later than two (2) business days after the completion of

---

[2] The terms of the Settlement Agreement set forth herein are a summary only.  To the extent of any inconsistency
between the summary herein and the Settlement Agreement, the terms of the Settlement Agreement shall govern.

the Defendants' transfer obligations described in paragraph 22 (the "Settlement Payment Date"),

provided however, that in the event that the Plaintiffs do not timely pay the Settlement Amount,

the Settlement Amount shall accrue liquidated damages of $1,000 per day calculated from and

after the Transfer Date, plus cost of collection, including reasonable attorneys' fees.

## RELIEF REQUESTED AND BASIS THEREFOR

24.    By this Motion, the Debtors are seeking approval of the Settlement

Agreement pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019.  The

Debtors and the Plaintiffs have weighed the costs and risks associated with the continued

litigation of the Adversary Proceeding against the compromises contained within the Settlement

Agreement and have concluded that it is in their respective best interest to compromise and settle

the matter pursuant to the terms of the Settlement Agreement without further litigation.

## STANDARDS FOR SETTLEMENTS

25.    Rule 9019(a) of the Federal Rules of Bankruptcy Procedure provides that

"on motion by the trustee and after a hearing, the Court may approve a compromise or

settlement."  The settlement of time-consuming and burdensome litigation, especially in the

bankruptcy context, is encouraged.  In re Penn Central Transp. Co., 596 F.2d 1002 (3d Cir.

1979).  The Supreme Court has recognized that "in administering a reorganization proceeding in

an economical and practical manner, it will often be wise to arrange the settlement of claims in

which there are substantial and reasonable doubts."  In re Protective Comm. for Indep.

Stockholders of TMT Ferry, Inc. V. Anderson, 390 U.S. 414 (1986).

26.    Approval of a proposed settlement is within the "sound discretion" of the

Bankruptcy Court.  In re Neshaminy Office Building Associates, 62 B.R. 798, 803 (Bankr. E.D.

Pa. 1986).  The court must determine whether the proposed settlement is in the "best interests of

the estate." See In the Matter of Energy Cooperative, Inc., 886 F.2d 921, 927 (7th Cir. 1989). In

determining whether to approve an motion to settle a controversy, a Bankruptcy Court must

determine whether it is fair, reasonable and adequate by examining four factors:

> (a) the probability of success in the litigation; (b) the difficulties, if
> any, to be encountered in the matter of collection: (c) the
> complexity of the litigation involved, and the expense,
> inconvenience and delay necessarily attending it; and (d) the
> paramount interest of the creditors and a proper deference to their
> reasonable views in the premises.

Official Comm. of Unsec. Cred. Of Penn. Truck Lines, Inc., v. Penn Truck Lines, Inc. (In re

Penn Truck Lines, Inc.), 150 B.R. 595, 598 (Bankr. E.D. Pa. 1992). The Court should not

substitute its judgment for that of a trustee. Neshaminy Office Building Associates, 62 B.R. at

803. The Court is not to decide the numerous questions of law or fact raised by litigation, but

rather should canvas the issues to see whether the settlement falls below the lowest point in the

range of reasonableness. In re W.T. Grant and Co., 699 F.2d 599, 608 (2d Cir. 1983), cert.

denied, 464 U.S. 22 (1983). In addition, "because the bankruptcy judge is unequally situated to

consider the equities and reasonableness of a particular compromise, approval or denial of a

compromise will not be disturbed on appeal absent a clear abuse of discretion." Neshaminy

Office Building Assoc., 62 B.R. at 803 (citing, In re Patel, 43 B.R. 500, 505 (Bankr. N.D. Ill.

1984).

27.    In examining those factors, the court should not substitute its judgment for

that of a debtor. Neshaminy Office Building Associates, 62 B.R. at 803. The Court is not to

decide the numerous questions of law or fact raised by litigation, but rather should canvas the

issues to see whether the settlement falls below the lowest point in the range of reasonableness.

In re W.T. Grant and Co., 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 22 (1983). It

is important that the Bankruptcy Court "apprise[] itself of all facts necessary to form an

intelligent and objective opinion of the probability of ultimate success should the claims be litigated, and estimate[] the complexity, expense and likely duration of such litigation, and other factors relevant to a full and fair assessment of the [claims]." In re Penn Cent., 596 F.2d at 1146.

28.    As an ancillary matter, "because the bankruptcy judge is uniquely situated to consider the equities and reasonableness of a particular compromise, approval or denial of a compromise will not be disturbed on appeal absent a clear abuse of discretion." Neshaminy Office Building Assoc., 62 B.R. at 803 (citing, In re Patel, 43 B.R. 500, 505 (Bankr. N.D. Ill. 1984).

29.    The factors set forth above are satisfied in the instant case for the following reasons. First, although the Debtors believe that they would ultimately prevail in the Adversary Proceeding, the Debtors acknowledge that litigation with the Plaintiffs has inherent risks, much like all litigation. That being said, the Debtors anticipate that litigating the claims advanced in the Complaint will be time consuming and expensive because of complicated legal and factual disputes. Litigating these issues would require numerous depositions and document requests of several third parties, in addition to the costs of discovery vis-à-vis the parties themselves. Moreover, litigating the Adversary Proceeding to conclusion would take months to complete. Finally, approval of the Settlement Agreement will allow the Debtors to focus on prosecuting these bankruptcy cases without burdening the Debtors' estates with additional, unnecessary administrative expenses.

30.    In light of the above, the Debtors believe the Settlement Agreement is fair, equitable, and in the best interests of the their creditors and their estates, represents an exercise of the their sound business judgment, and should be approved pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019.

## NOTICE

31.    Notice of this Motion will be provided via overnight delivery, fax or email

to (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii)

counsel to Bank of America; (iv) Counsel to the Agent for the Debtors' Postpetition Lender; (v)

counsel to the Plaintiffs, and (vi) all parties entitled to notice under Del. Bankr. LR 2002-1(b).

In light of the nature of the relief requested herein, the Debtors submit that no other or further

notice is required.

## NO PREVIOUS REQUEST

32.    No prior request for the relief sought in this Motion has been made to this

or any other court.

WHEREFORE, the Debtors respectfully request that this Court issue and enter an

order (i) pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019,

approving the Settlement Agreement, and (ii) granting such other and further relief as may be

just and proper.

Dated:    Wilmington, Delaware        YOUNG CONAWAY STARGATT & TAYLOR, LLP
          October 31, 2007

          James L. Patton, Jr. (No. 2202)
          Pauline K. Morgan (No. 3650))
          Sean M. Beach (No. 4070)
          Matthew B. Lunn (No. 4119)
          Donald J. Bowman, Jr. (No. 4383)
          The Brandywine Building
          1000 West Street, 17th Floor
          Wilmington, Delaware 19801
          Telephone: (302) 571-6600
          Facsimile: (302) 571-1253

          Counsel for Debtors and Debtors in Possession