# EXHIBIT A

# STANDARD OFFICE LEASE

## 1140 GALAXY WAY, CONCORD, CA.

1. **Basic Lease Provisions ("Basic Lease Provisions")**

    1.1    **Parties:** This Lease, dated, for reference purposes only, November 05, 2002, is made by and between 1140 Galaxy Way, Inc., (herein called "Lessor") and Irwin Mortgage Corporation, an Indiana corporation, (herein called "Lessee").

    1.2    **Premises:** Suite Number 150, consisting of approximately 9,165 square feet, more or less, as defined in paragraph 2 and as shown on Exhibit "A" hereto (the "Premises").

    1.3    **Building:** Commonly described as being located at 1140 Galaxy Way in the City of Concord, County of Contra Costa, State of California, and as defined in paragraph 2.

    1.4    **Use:** General Office Use including operations for regional headquarters, including office and administrative functions and for any other legally permitted use, subject to paragraph 6.

    1.5    **Term:** Six (6) years, one (1) month, commencing April 1, 2003 ("Commencement Date") and ending April 30, 2009, as defined in paragraph 3.

    1.6    **Base Rent Schedule:** Month 1 - $0.00; Months 2-25 - $11,914.50 per month; Months 26 – 49 - $12,831.00 per month; Months 50 – 73 - $13,747.50 per month. All rentals shall be due and payable on the first day of each month, per paragraph 4.1.

    1.7    **Base Rent Increase:** See Paragraph 1.6 above.

    1.8    **Rent Prepaid Upon Execution:** $11,914.50 for May, 2003's rental shall be prepaid within thirty (30) days of the execution of this Lease. Rental for the month of April 2003 has been abated.

    1.9    **Security Deposit:** Waived.

    1.10    **Lessee's Share of Operating Expenses:** 30.45% as defined in paragraph 4.2.

2. **Premises, Parking and Common Areas:**

    2.1    **Premises:** The Premises are a portion of a building, herein sometimes referred to as the "Building" identified in paragraph 1.3 of the Basic Lease Provisions. "Building" shall include adjacent parking structures used in connection therewith. The Premises, the Building, the Common Areas, the land upon which the same are located, along with all other buildings and Improvements thereon or thereunder, are herein collectively referred to as the "Office Building Project." Lessor hereby leases to Lessee and Lessee leases from Lessor for the term at the rental, and upon all of the conditions set forth herein, the real property referred to in the Basic Lease Provisions, paragraph 1.2, as the "Premises," including rights to the Common Areas as hereinafter specified.

    2.2    **Vehicle Parking:** Subject to the rules and regulations attached hereto, and as established by Lessor from time to time, Lessee shall be entitled to rent and use forty-one (41) parking spaces in the Office Building Project.

        2.2.1    If Lessee commits any of the prohibited activities described in the Lease or the rules then in effect, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

        2.2.2    The monthly parking rate per parking space will be $0.00 per month during the Term and each Option Term.

    2.3    **Common Areas-Definition:** The term "Common Areas" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Office Building Project that are provided and designated by the Lessor from time to time for the general non-exclusive use of Lessor, Lessee and of other lessees of the Office Building Project and their respective employees, suppliers, shippers, customers and invitees, including but not limited to common entrances, lobbies, corridors, stairways and stairwells, public restrooms, elevators, escalators, parking areas to the extent not otherwise prohibited by this Lease, loading and unloading areas, trash areas, roadways, sidewalks, walkways, parkways, ramps, driveways, landscaped areas and decorative walls.

    2.4    **Common Areas-Rules and Regulations:** Lessee agrees to abide by and conform to the rules and regulations attached hereto as Exhibit B with respect to the Office Building Project and Common Areas, and to cause its employees, suppliers, shippers, customers, and invitees to so abide and conform. Lessor or such other person(s) as Lessor may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to modify, amend and enforce said rules and regulations. Lessor shall not be responsible to Lessee for the non-compliance with said rules and regulations by other lessees, their agents, employees and invitees of the Office Building Project.

    2.5    **Common Areas-Changes:** Lessor shall have the right, in Lessor's sole discretion, from time to time, and so long as Lessee's business is not materially interrupted:

        (a) To make changes to the building interior and exterior and Common Areas, including, without limitation, changes in the location, size, shape, number, and appearance thereof, including but not limited to the lobbies, windows, stairways, air shafts, elevators, escalators, restrooms, driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, decorative walls, landscaped areas and walkways; provided, however, Lessor shall at all times provide the parking facilities required by applicable law;

        (b) To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available;

        (c) To designate other land and improvements outside the boundaries of the Office Building Project to be a part of the Common Areas, provided that such other land and improvements have a reasonable and functional relationship to the Office Building Project;

        (d) To add additional buildings and improvements to the Common Areas;

        (e) To use the common Areas while engaged in making additional Improvements, repairs or alterations to the Office Building Project, or any portion thereof;

        (f) To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Office Building Project as Lessor may, in the exercise of sound business judgment deem to be appropriate.

### 3. Term

**3.1    Term:** The term and Commencement Date of this Lease shall be as specified in paragraph 1.5 of the Basic Lease Provisions.

**3.2    Delay in Possession:** Notwithstanding said Commencement Date, if for any reason Lessor cannot deliver possession of the Premises to Lessee on said date and subject to paragraph 3.2.2, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or the obligations of Lessee hereunder or extend the term hereof; but in such case, Lessee shall not be obligated to pay rent or perform any other obligation of Lessee under the terms of this Lease, except as may be otherwise provided in this Lease, until possession of the Premises is tendered to Lessee, as hereinafter defined; provided, however, that if Lessor shall not have delivered possession of the Premises within one hundred twenty (120) days following said Commencement Date, as the same may be extended under the terms of a Work Letter executed by Lessor and Lessee, Lessee may, at Lessee's option, by notice in writing to Lessor within ten (10) days thereafter, cancel this lease, in which event the parties shall be discharged from all obligations hereunder; provided, however, that, as to Lessee's obligations, Lessor shall return any money previously deposited by Lessee (less any offsets due Lessor for Non-Standard Improvements); and provided further, that if such written notice by Lessee is not received by Lessor within said ten (10) day period, Lessee's right to cancel this Lease hereunder shall terminate and be of no further force or effect.

**3.2.1    Possession Tendered – Defined:** Possession of the Premises shall be deemed tendered to Lessee ("Tender of Possession") when (1) the improvements to be provided by Lessor under this Lease are substantially completed as evidenced by a Certificate of Occupancy and completion of Lessee improvements subject to a punchlist to be completed within 30 days, (2) the Building utilities are ready for use in the Premises, and (3) Lessee has reasonable access to the Premises.

**3.2.2    Delays Caused by Lessee:** There shall be no abatement of rent and the one hundred eighty (180) day period following the Commencement Date before which Lessee's right to cancel this Lease accrues under paragraph 3.2, shall be deemed extended to the extent of any delays caused by acts of omissions of Lessee, its agents, employees and contractors.

**3.3    Early Possession:** Tenant shall be provided early possession of the Premises for purposes of installation of Tenant's furniture, fixtures and equipment ("FFE Period"). The FFE Period shall commence on the later of March 1, 2003 or the date of substantial completion of the tenant improvements (subject to a punchlist to be completed within 30 days) but no later than March 15, 2003.

**3.4    Uncertain Commencement:** In the event commencement of the Lease term is later than April 1, 2003, Lessee and Lessor shall execute an amendment to this Lease memorializing the date of Tender of Possession (as defined in paragraph 3.2.1) or the actual taking of possession by Lessee, whichever first occurs, as the Commencement Date.

### 4. Rent

**4.1    Base Rent:** Subject to adjustment as hereinafter provided in paragraph 4.2 and except as may be otherwise expressly provided in this Lease. Lessee shall pay to Lessor the Base Rent for the Premises set forth in paragraph 1.6 of the Basic Lease Provisions, without offset or deduction. Lessee shall pay Lessor within thirty (30) days of execution hereof the advance Base Rent described in paragraph 1.8 of the Basic Lease Provisions. Rent for any period during the term hereof which is for less than one month shall be prorated based upon the actual number of days of the calendar month involved. Rent shall be payable in lawful money of the United States to Lessor at the address stated herein or to such other persons or at such other places as Lessor may designate in writing.

**4.2    Operating Expense Increase:** Lessee shall pay to Lessor annually during the term hereof, in addition to the Base Rent Lessee's Share, as hereinafter defined, of the amount by which all Operating Expenses, as hereinafter defined, for each Comparison Year exceeds the amount of all Operating Expenses for the Base Year, such excess being hereinafter referred to as the "Operating Expense Increase" in accordance with the following provisions:

(a) "Lessee's Share" is defined, for purposes of this Lease, as the percentage set forth in paragraph 1.10 of the Basic Lease Provisions, which percentage has been determined by dividing the approximate square footage of the rentable space contained in the Office Building Project. It is understood and agreed that the square footage figures set forth in the Basic Lease Provisions are approximations which Lessor and Lessee agree are reasonable and shall not be subject to revision except in connection with an actual change in the size of the Premises or a change in the space available for lease in the Office Building Project. Lessor shall provide Lessee with a non-cumulative cap of 4% per year on increases in operating expenses, other than real property taxes, insurance and utilities.

(b) "Base Year" is defined as the calendar year in which the Lease term commences.

(c) "Comparison Year" is defined as each calendar year during the term of this Lease subsequent to the Base Year; provided, however, Lessee shall have no obligation to pay a share of the Operating Expense Increase applicable to the first twelve (12) months of the Lease Term (other than such as are mandated by a governmental authority, as to which government mandated expenses Lessee shall pay Lessee's Share, notwithstanding they occur during the first twelve (12) months). Lessee's Share of the Operating Expense Increase for the first and last Comparison Years of the Lease Term shall be prorated according to that portion of such Comparison Year as to which Lessee is responsible for a share of such increase.

(d) "Operating Expenses" is defined, for purposes of this Lease, to include all reasonable and actual costs, if any, incurred by Lessor in the exercise of its reasonable discretion, for:

(i) The operating, repair, maintenance, and replacement, in neat, clean, safe, good order and condition, of the Office Building Project, including but not limited to, the following:

(aa) The Common Areas, including their surfaces, coverings, decorative items, carpets, drapes and window coverings, and including parking areas, loading and unloading areas, trash areas, roadways, sidewalks, walkways, stairways, parkways, driveways, landscaped areas, striping, bumpers, irrigation systems, Common Area lighting facilities, building exteriors and roofs, fences and gates;

(bb) All heating, air conditioning, plumbing, electrical systems, life safety equipment, telecommunication and other equipment used in common by, or for the benefit of, lessees or occupants of the Office Building Project, including elevators and escalators, tenant directories, fire detection systems including sprinkler system maintenance and repair.

(ii) Trash disposal, janitorial and security services;

(iii) Any other services to be provided by Lessor that is elsewhere in this Lease stated to b an "Operating Expense";

(iv) The cost of the premiums for the liability and property insurance policies to be maintained by Lessor under paragraph 8 hereof;

(v) The amount of the real property taxes to be paid by Lessor under paragraph 10.1 hereof;

(vi) The cost of water, sewer, gas, electricity, and other publicly mandated services to the Office Building Project;

(vii) Labor, salaries and applicable fringe benefits and costs, materials, supplies and tools, used in maintaining and/or cleaning the Office Building Project and accounting and a management fee attributable to the operation of the Office Building Project;

(viii) Replacing and/or adding improvements mandated by any governmental agency and any repairs or removals necessitated thereby amortized over its useful life according to Federal Income tax regulations of guidelines for depreciation thereof (including interest on the unamortized balance as is then reasonable in the judgment of Lessor's accountants);

(ix) Replacements of equipment or improvements that have a useful life for depreciation purposes according to Federal income tax guidelines of five (5) years or less, as amortized over such life.

(e) Operating Expenses shall not include the costs of replacements of equipment or improvements that have a useful life for Federal income tax purposes in excess of five (5) years unless it is of the type described in paragraph 4.2(d)(iii), in which case their cost shall be included as above provided.

(f) Operating Expenses shall not include any expenses paid by any lessee directly to third parties, or as to which Lessor is otherwise reimbursed by any third party, other tenant, or by insurance proceeds.

(g) Lessee's Share of Operating Expense Increase shall be payable by Lessee within thirty (30) days after a reasonably detailed statement of actual expenses is presented to Lessee by Lessor. At Lessor's option, however, an amount may be estimated by Lessor from time to time in advance of Lessee's Share of the Operating Expense Increase for any Comparison Year, and the same shall be payable monthly or quarterly, as Lessor shall designate, during each Comparison Year of the Lease term, on the same day as the Base Rent is due hereunder. In the event that Lessee pays Lessor's estimate of Lessee's Share of Operating Expense Increase as aforesaid, Lessor shall deliver to Lessee within sixty (60) days after the expiration of each Comparison Year a reasonably detailed statement showing Lessee's Share of the actual Operating Expense Increase Incurred during such year. If Lessee's payments under this paragraph 4.2(g) during said Comparison Year exceed Lessee's Share as indicated on said statement, Lessee shall refund the excess to Lessee within thirty (30) days of issuance of said statement. If Lessee's payments under this paragraph during said Comparison Year were less than Lessee's Share as indicated on said statement, Lessee shall pay to Lessor the amount of the deficiency within ten (10) days after delivery by Lessor to Lessee of said statement. Lessor and Lessee shall forthwith adjust between them by cash payment any balance determined to exist with respect to that portion of the last Comparison Year for which Lessee is responsible as to Operating Expense Increases, notwithstanding that the Lease term may have terminated before the end of such Comparison Year. Lessor's managing agent shall retain the books of account for at least twelve (12) months after the delivery of Lessor's accounting statement to Lessee. Lessee, or its authorized agent, shall have the right, within the twelve (12) month period after receiving Lessor's accounting statement, upon thirty (30) days prior written notice to Lessor, to inspect, at Lessor's local offices, Lessor's books and records regarding Operating Expenses and Property Taxes. In the event Lessee's audit shall disclose that Lessor has overstated Lessee's Percentage Share of Operating Expenses and Property Taxes by ten percent (10%) or more during any one accounting year, then Lessor shall pay for the reasonable cost of said audit. If billing discrepancy does not exceed (10%), then Lessee shall pay for the full cost of the audit and any other related Lessor, or management costs. Any refund due to Lessee shall be payable in any event.

**5    Security Deposit        Intentionally Deleted.**

**6    Use**

6.1        Use. The Premises shall be used and occupied only for the purpose set forth in paragraph 1.4 of the Basic Lease Provisions and for no other purpose.

6.2        Compliance with Law.

(a) Lessor warrants to Lessee that the Premises, Building and all building systems in the state existing on the date that the Lease term commences, but without regard to alterations or improvements made by Lessee or the use for which Lessee will occupy the Premises, does not violate any covenants or restrictions of record, or any applicable building code, regulation or ordinance in effect on such Lease term Commencement Date. In the event it is determined that this warranty has been violated, then it shall be the obligation of the Lessor, after written notice from Lessee, to promptly, at Lessor's sole cost and expense, rectify any such violation.

(b) Except as provided in paragraph 6.2(a) Lessee shall, at Lessee's expense, promptly comply with all applicable statutes, ordinances, rules, regulations, orders, covenants and restrictions of record, and requirements of any fire insurance underwriters or rating bureaus, now in effect or which may hereafter come into effect, whether or not they reflect a change in policy from that now existing, during the term or any part of the term hereof, relating in any manner to the Premises and the occupation and use by Lessee of the Premises. Lessee shall conduct its business in a lawful manner, and shall not use or permit the use of the Premises or the Common Areas in any manner that will tend to create waste or a nuisance or shall tend to disturb other occupants of the Office Building Project.

6.3        Condition of Premises

(a) Lessor shall deliver the Premises to Lessee in a clean condition on the Lease Commencement Date (unless Lessee is already in possession) and Lessor warrants to Lessee that the plumbing, lighting, air conditioning, and heating system in the Premises shall be in good operating condition for a period of six (6) months from the Tender of Possession. In the event that it is determined that this warranty has been violated, then it shall be the obligation of Lessor, after receipt of written notice from Lessee setting forth with specificity the nature of the violation, to promptly, at Lessor's sole cost, rectify such violation.

(b) Except as otherwise provided in this Lease, Lessee hereby accepts the Premises and the Office Building Project in their condition existing as of the lease Commencement Date or the date that Lessee takes possession of the Premises, whichever is earlier, subject to all applicable zoning, municipal, county and state laws, ordinances and regulations governing and regulating the use of the Premises, and any easements, covenants or restrictions of record, and accepts this Lease subject thereto and to all matters disclosed thereby and by any exhibits attached hereto. Lessee acknowledges that neither Lessor nor Lessor's agent or agents has made any representation or warranty as to the present or future suitability of the Premises, Common Areas, or Office Building Project for the conduct of Lessee's business.

**7.    Maintenance, Repairs, Alterations and Common Area Services**

7.1        Lessor's Obligations. Lessor shall keep the Office Building Project, including the premises, interior and exterior walls, roof, and common areas and the equipment whether used exclusively for the Premises or in common with other premises, in good

condition and repair; provided, however, Lessor shall not be obligated to paint, repair or replace wall coverings, or to repair or replace any improvements that are not ordinarily a part of the Building or are above then Building standards. Except as provided in paragraph 9.5, there shall be no abatement of rent or liability of Lessee on account of any injury or interference with Lessee's business with respect to any improvements, alterations or repairs made by Lessor to the Office Building Project or any part thereof. Lessee expressly waives the benefits of any statute now or hereafter in effect which would otherwise afford Lessee the right to make repairs at Lessor's expense or to terminate this Lease because of Lessor's failure to keep the premises in good order, condition and repair.

7.2     Lessee's Obligations.

(a) Notwithstanding Lessor's obligation to keep the Premises in good condition and repair, Lessee shall be responsible for payment of the cost thereof to Lessor as additional rent for that portion of the cost of any maintenance and repair of the Premises, or any equipment (wherever located) that serves only Lessee or the Premises, to the extent such cost is attributable to causes beyond normal wear and tear. Lessee shall be responsible for the cost of painting, repairing or replacing wall coverings, and to repair or replace any Premises improvements that are not ordinarily a part of the Building or that area above the Building standards.

(b) On the last day of the term hereof, or on any sooner termination, Lessee shall surrender the Premises to Lessor in the same condition as received, ordinary wear and tear excepted, clean and free of debris. Any damage or deterioration of the Premises shall not be deemed ordinary wear and tear if the same could have been prevented by good maintenance practices by Lessee. Lessee shall repair any damage to the Premises occasioned by the installation or removal of Lessee's trade fixtures, alterations, furnishings and equipment. Except as otherwise stated in this Lease, Lessee shall leave the air lines, power panels, electrical distribution systems, lighting fixtures, air conditioning, window coverings, wall coverings, carpets, wall paneling, ceilings and plumbing on the Premises and in good operating condition.

7.3     Alterations and Additions.

(a) Lessee shall not, without Lessor's prior written consent make any alterations, improvements, additions, Utility Installations, or repairs in, on or about the Premises in excess of $5,000.00. As used in this paragraph 7.3 the term "Utility Installation" shall mean carpeting, window and wall coverings, power panels, electrical distribution systems, lighting fixtures, air conditioning, plumbing, and telephone and telecommunication wiring and equipment. At the expiration of the term, Lessor may require the removal of any or all of said alterations, improvements, additions or Utility Installations, and the restoration of the Premises and the Office Building Project to their prior condition, at Lessee's expense. Should Lessor permit Lessee to make its own alterations, improvements, additions or Utility Installations, Lessee shall use only such contractor as has been expressly approved by Lessor, and Lessor may require Lessee to provide Lessor, at Lessee's sole cost and expense, a lien and completion bond in an amount equal to one and one-half times the estimated cost of such improvements, to insure Lessor against any liability for mechanic's and materialmen's liens and to insure completion of the work. Should Lessee make any alterations, improvements, additions or Utility Installations without the prior approval of Lessor, or use a contractor not expressly approved by Lessor, Lessor may, at any time during the term of this Lease, require that Lessee remove any part or all of same.

(b) Any alterations, improvements, additions or Utility Installations in or about the Premises or the Office Building Project that Lessee shall desire to make shall be presented to Lessor in written form, with proposed detailed plans. If Lessor shall give its consent to Lessee's making such alteration, improvement, addition or Utility Installation, the consent shall be deemed conditioned upon Lessee acquiring a permit to do so from the applicable governmental agencies, furnishing a copy thereof to Lessor prior to the commencement of the work, and compliance by Lessee with all conditions of said permit in a prompt and expeditious manner.

(c) Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use in the premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises, the Building or the Office Building Project, or any interest therein.

(d) Lessee shall give Lessor not less than ten (10) days' notice prior to the commencement of any work in the Premises by Lessee, and Lessor shall have the right to post notices of non-responsibility in or on the Premises or the Building as provided by law. If Lessee shall, in good faith, contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend itself and Lessor against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof against the Lessor or the Premises, the Building or the Office Building Project, upon the condition that is Lessor shall require, Lessee shall furnish to Lessor a surety bond satisfactory to Lessor in an amount equal to such contested Lien claim or demand indemnifying Lessor against liability for the same and holding the Premises, the Building and the Office Building Project free from the effect of such lien or claim. In addition, Lessor may require Lessee to pay Lessor's reasonable attorneys fees and costs in participating in such action if Lessor shall decide it is to Lessor's best interest so to do.

(e) All alterations, improvements, additions and Utility Installations (whether or not such Utility Installations constitute trade fixtures of Lessee), which may be made to the premises by Lessee, including but not limited to, floor coverings, paneling, doors, drapes, built-ins, moldings, sound attenuation, and lighting and telephone or communication systems, conduit, wiring and outlets, shall be made and done in a good and workmanlike manner and of good and sufficient quality and materials and shall be the property of Lessor and remain upon and be surrendered with the Premises at the expiration of the Lease term, unless Lessor requires their removal pursuant to paragraph 7.3 (a). Provided Lessee is not in default, notwithstanding the provisions of this paragraph 7.3 (e), Lessee's personal property and equipment, other than that which is affixed to the Premises so that it cannot be removed without material damage to the Premises or the building, and other than Utility Installations, shall remain the property of Lessee and may be removed by Lessee subject to the provisions of paragraph 7.2.

(f) Lessee shall provide Lessor with as-built plans and specifications for any alterations, improvements, additions or Utility Installations.

7.4     Utility Additions. Lessor reserves the right to install new or additional utility facilities throughout the Office Building Project for the benefit of Lessor or Lessee, or any other lessee of the Office Building Project, including, but not by way of limitation, such utilities as plumbing, electrical systems, security systems, communications systems, and fire protection and detection systems, so long as such installations do not unreasonably interfere with Lessee's use of the Premises.

8.     Insurance; Indemnity

8.1     Liability Insurance – Lessee: Lessee shall, at Lessee's expense, obtain and keep in force during the term of this Lease a policy of Comprehensive General Liability insurance utilizing an Insurance Services Office standard form with Broad form General Liability Endorsement (GL0404), or equivalent, in an amount of not less than $1,000,000 per occurrence of bodily injury and property damage combined or in a greater amount as reasonably determined by Lessor and shall insure Lessee with Lessor as an additional

insured against liability arising out of the use, occupancy or maintenance of the Premises. Compliance with the above requirement shall not, ho3wever, limit the liability of Lessee hereunder.

8.2    **Liability Insurance – Lessor.** Lessor shall obtain and keep in force during the term of this Lease a policy of Combined Single Limit Bodily Injury and Broad Form property Damage Insurance, plus coverage against such other risks Lessor deems advisable from time to tie, insuring Lessor, but not lessee, against liability arising out of the ownership, use, occupancy or maintenance of the Office Building Project in an amount not less than $5,000,000.00 per occurrence.

8.3    **Property Insurance – Lessee.** Lessee shall, at Lessee's expense, obtain and keep in force during the term of this Lease for the benefit of Lessee, replacement cost fire and extended coverage insurance, with vandalism and malicious mischief, sprinkler leakage and earthquake sprinkler leakage endorsements, in an amount sufficient to cover not less than 100% of the full replacement cost, as the same may exist from time to time, of all of Lessee's personal property, fixtures, equipment and tenant improvements.

8.4    **Property Insurance – Lessor.** Lessor shall obtain and keep in force during the term of this Lease a policy or policies of insurance covering loss or damage to the Office Building Project improvements, but not Lessee's personal property, fixtures, equipment or tenant improvements, in the amount of the full replacement cost thereof, as the same may exist from time to time, utilizing Insurance Services Office standard form, or equivalent, providing protection against all perils included within the classification of fire extended coverage, vandalism, malicious mischief plate glass, and such other perils as Lessor deems advisable or may be required by a lender having a lien on the Office Building Project. In addition, Lessor shall obtain and keep in force, during the term of this Lease, a policy of rental value insurance covering a period of one year, with loss payable to Lessor, which insurance shall also cover all Operating Expenses for said period. Lessee will not be named in any such policies carried by Lessor and shall have no right to any proceeds therefrom. The policies required by these paragraphs 8.2 and 8.4 shall contain such deductibles as Lessor reasonably determines or the amounts under the applicable insurance policies carried by Lessor. Lessee shall pay the entirety of any increase in the property insurance premium for the Office Building Project over what it was immediately prior to the commencement of the term of this Lease if the increase is specified by Lessor's insurance carrier as being caused by the nature of Lessee's occupancy or any act or omission of Lessee.

8.5    **Insurance Policies.** Lessee shall deliver to Lessor copies of liability insurance policies required under paragraph 8.1 and property insurance policies required under paragraph 8.3 or certificates evidencing the existence and amounts of such insurance within seven (7) days after the Commencement Date of this Lease. No such policy shall be cancelable or subject to reduction of coverage or other modification except after thirty (30) days prior written notice to Lessor. Lessee shall, at least thirty (30) days prior to the expiration of such policies, furnish Lessor with renewals thereof.

8.7    **Indemnity.** Except for the gross negligence or willful misconduct of the other party, each party shall indemnify and hold harmless the other party, its respective agents, shareholders, officers, directors, employees, Lessor's master or ground lessor, partners and lenders, from and against any and all claims for damage to the person or property of anyone or any entity arising from the use of the Office Building Project, or from the conduct of the other party's business or from any activity, work or things done, permitted or suffered by that party in or about the Premises of elsewhere and shall indemnify and hold harmless the other party from and against any and all claims, costs and expenses arising solely from any breach or default in the performance of any obligation to be performed under the terms of this Lease, or arising from any act or omission of the other party, or any of its agents, contractors, employees or invitees and from and against all costs, attorney's fees, expenses and liabilities incurred by the party as the result of any such use, conduct, activity, work, things done, permitted or suffered, breach, default or negligence, and in dealing reasonably therewith, including but not limited to the defense or pursuit of any claim or any action or proceeding involved therein; and in case any action or proceeding be brought against it by reason of any such matter, that party upon notice shall defend the same at its expense and shall cooperate in such defense.

8.91    **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified in this paragraph 8 are adequate to cover Lessee's property or obligations under this Lease.

9.    **Damage or Destruction.**

9.1    **Definitions.**

(a) "Premises Damage" shall mean if the Premises are damaged or destroyed to any extent.

(b) "Premises Building Partial Damage" shall mean if the Building of which the Premises are a part is damaged or destroyed to the extent that the cost to repair is less than fifty percent (50%) of the then Replacement Cost of the Building.

(c) "Premises Building Total Destruction" shall mean if the Building of which the Premises are a part is damaged or destroyed to the extent the cost to repair if fifty percent (50%) or more of the Replacement Cost of the Building.

(d) "Office Building Project Buildings" shall mean all of the building so in the Office Building Project site.

(e) "Office Building Project Building Total Destruction" shall mean if the Office Building Project Buildings are damaged or destroyed to the extent that the cost of repairs is fifty percent (50%) or more of the then Replacement Cost of the Office Building Project Buildings.

(f) "Insured Loss" shall mean damage or destruction which was caused by an event required to be covered by the insurance described in paragraph 8. The fact that an Insured Loss has a deductible amount shall not make the loss an uninsured loss.

(g) "Replacement Cost" shall mean the amount o money necessary to be spent in order to repair or rebuilt the damaged area to the condition that existed immediately prior to the damage occurring, excluding all improvements made by lessees, other than those installed by Lessor at Lessee's expense.

9.2    **Premises Damage; Premises Building Partial Damage.**

(a) Insured Loss: Subject to the provisions of paragraph 9.4 and 9.5, if at any time during the term of this Lease there is damage which is an Insured Loss and which falls into the classification of either Premises Damage or Premises Building Partial damage, then lessor shall, as soon as reasonably possible and to the extent that required materials and labor are readily available through usual commercial channels, at Lessor's expense, repair such damage (but not Lessee's fixtures, equipment or tenant improvements originally paid for by Lessee) to its condition existing at the time of the damage, and this Lease shall continue in full force and effect.

(b) Uninsured Loss: Subject to the provisions of paragraphs 9.4 and 9.5, if at any time during the term of this Lease there is damage which is not an Insured Loss and which falls within the classification of Premises Damage or Premises Building Partial Damage, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), which damage prevents Lessee from making any substantial use of the Premises, Lessor may at Lessor's option either (i) repair such

damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) give written notice to Lessee within thirty (30) days after the date of the occurrence of such damage of Lessor's intention to cancel and terminate this Lease as of the date of the occurrence of such damage, in which event this Lease shall terminate as of the date of the occurrence of such damage.

9.3    **Premises Building Total Destruction; Office Building Project Total Destruction.** Subject to the provisions of paragraphs 9.4 and 9.5, if at any time during the term of this Lease there is damage, whether or not it is an Insured Loss, which falls into the classifications of either (i) Premises Building Total Destruction, or (ii) Office Building Project Total Destruction, then Lessor may at Lessor's option either (i) repair such damage of destruction as soon as reasonably possible at Lessor's expense (to the extent the required materials are readily available through usual commercial channels) to its condition existing at the time of the damage, but not Lessee's fixtures, equipment or tenant improvements, and this Lease shall continue in full force and effect, or (ii) give written notice to Lessee within thirty (30) days after the date of occurrence of such damage of Lessor's intention to cancel and terminate this Lease, in which case this Lease shall terminate as of the date of the occurrence of such damage.

9.4    **Damage Near End of Term:**

(a) Subject to paragraph 9.4(b), if at any time during the last twelve (12) months of the term of this Lease there is substantial damage to the Premises, Lessor may at Lessor's option cancel and terminate this Lease as of the date of occurrence of such damage by giving written notice to Lessee of Lessor's election to do so within 30 days after the date of occurrence of such damage.

(b) Notwithstanding paragraph 9.4(a), in the event that Lessee has an option to extend or renew this Lease, and the time within which said option may be exercised has not yet expired, Lessee shall exercise such option, if it is to be exercised at all, no later than twenty (20) days after the occurrence of an Insured Loss falling within the classification of Premises Damage during the last twelve (12) months of the term of this Lease. If Lessee duly exercises such option during said twenty (20) day period, Lessor shall, at Lessor's expense, repair such damage, but not Lessee's fixtures, equipment or tenant improvements, as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option during said twenty (20) day period, then Lessor may at Lessor's option terminate and cancel this Lease as of the expiration of said twenty (20) day period by giving written notice to Lessee of Lessor's election to do so within ten (10) days after the expiration of said twenty (20) day period, notwithstanding any term or provision in the grant of option to the contrary.

9.5    **Abatement of Rent; Lessee's Remedies:**

(a) In the event Lessor repairs or restores the Building or Premises pursuant to the provisions of this paragraph 9, and any part of the Premises are not usable (including loss of use due to loss of access or essential services), the rent payable hereunder (including Lessee's Share of Operating Expenses) for the period during which such damage, repair or restoration continues shall be abated, provided (1) the damage was not the result of the negligence of Lessee, and (2) such abatement shall only be to the extent the operation and profitability of Lessee's business as operated from the Premises is adversely affected, Except for said abatement of rent, if any, Lessee shall have no claim against Lessor for any damage suffered by reason of any such damage, destruction, repair or restoration.

(b) If Lessor shall be obligated to repair or restore the Premises or the Building under the provisions of this paragraph 9, and shall not commence such repair or restoration within ninety (90) days after such occurrence, or if Lessor shall not complete the restoration and repair within six (6) months after such occurrence, Lessee may at Lessee's option cancel and terminate this Lease by giving Lessor written notice of Lessee's election to do so at any time prior to the commencement or completion respectively, of such repair or restoration. In such event this Lease shall terminate as of the date of such notice.

(c) Lessee agrees to cooperate with Lessor in connection with any such restoration and repair, including but not limited to the approval and/or execution of plans and specifications required.

9.6    **Termination – Advance payments.** Upon Termination of this Lease pursuant to this paragraph 9, an equitable adjustment shall be made concerning advance rent and any advance payments made by Lessee to Lessor.

9.7    **Waiver.** Lessor and Lessee waive the provisions of any statute which relate to termination of leases when leased property is destroyed and agree that such event shall be governed by the terms of this Lease.

**10. Real Property Taxes**

10.1    **Payment of Taxes.** Lessor shall pay the real property tax, as defined in paragraph 10.3, applicable to the Office Building Project subject to reimbursement by Lessee of Lessee'' Share of such taxes in accordance with the provisions of paragraph 4.2, except as otherwise provided in paragraph 10.2.

10.2    **Additional Improvements.** Lessee shall not be responsible for paying any increase in real property tax specified in the tax assessor's records and work sheets as being caused by additional improvements placed upon the Office Building Project by other lessees or by Lessor for the exclusive enjoyment of any other lessee. Lessee shall, however, pay to Lessor at the time that Operating Expenses are payable under paragraph 4.2(c) the entirety of any increase in real property tax if assessed solely by reason of additional improvements placed upon the Premises by Lessee or at Lessee's request.

10.3    **Definition of "Real Property Tax."** As used herein, the term "real property tax" shall include any form of real estate tax or assessment, general, special, ordinary or extraordinary and any license fee, commercial rental tax, improvement bond or bonds, levy or tax (other than inheritance, personal income or estate taxes) imposed on the Office Building Project or any portion thereof by any authority having the direct or indirect power to tax, including any city, county, state or federal government, or any school, agricultural, sanitary, fire, street, drainage or other improvement district thereof, as against any legal or equitable interest of Lessor in the Office Building Project or in any portion thereof, as against Lessor's right to rent or other income therefrom, and as against Lessor's business of leasing the Office Building Project or in any portion thereof, as against Lessor's right to rent or other income therefrom, and as against Lessor's business of leasing the Office Building Project. The term "real property tax" shall also include any tax, fee, levy, assessment or charge (i) in substitution of, partially or totally, any tax, fee, levy, assessment or charge hereinabove included within the definition of "real property tax," or in the nature of which was hereinbefore included within the definition of "real property tax," or (iii) which is imposed for a service or right not charge prior to June 1, 1978, or, if previously charged, has been increased since June 1, 1978, or (iv) which is imposed as a result of a change in ownership, as defined by applicable local statutes for property tax by reason of such change of ownership, or (v) which is imposed by reason of this transaction, any modifications or changes hereto, or any transfers hereof.

10.4    **Joint Assessment.** If the improvements or property, the taxes for which are to paid separately by Lessee under paragraph 10.2 or 10.5 are not separately assessed, Lessee's portion of that tax shall be equitably determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information (which may include the cost of construction) as may be reasonably available. Lessor's reasonable determination thereof, in good faith, shall be conclusive.

**10.5    Personal Property Taxes.**

(a) Lessee shall pay prior to delinquency all taxes assessed against and levied upon trade fixtures, furnishings, equipment and all other personal property of Lessee contained in the Premises or elsewhere.

(b) If any of Lessee's said personal property shall be assessed with Lessor's real property, Lessee shall pay to Lessor the taxes attributable to Lessee within ten (10) days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

**11. Utilities**

**11.1 Services Provided by Lessor.** Lessor shall provide heating, ventilation, air conditioning, reasonable amounts of electricity for normal lighting and office machines, water for reasonable and normal drinking and lavatory use, and replacement light bulbs and/or fluorescent tubes and ballasts for standard overhead fixtures.

**11.2 Services Exclusive to Lessee.** Lessee shall pay for all water, gas, heat, light, power, telephone and other utilities and services, including janitorial, specially or exclusively supplied and/or metered exclusively to the Premises or to Lessee, together with any taxes thereon. If any such services are not separately metered to the Premises, Lessee shall pay at Lessor's option, either Lessee's Share or a reasonable proportion to be determined by Lessor of all charges jointly metered with other premises in the Building.

**11.3 Hours of Service.** Intentionally Deleted.

**11.4 Excess Usage by Lessee.** Lessee shall not make connection to the utilities except by or through existing outlets and shall not install or use machinery or equipment in or about the Premises that uses excess water, lighting or power, or suffer or permit any act that causes extra burden upon the utilities or services, including but not limited to security services, over standard office usage for the Office Building Project. Lessor shall require Lessee to reimburse Lessor for any excess expenses or costs that may arise out of a breach of this subparagraph by Lessee. Lessor may, in its sole discretion, install supplemental equipment and/or separate metering applicable to Lessee's excess usage or loading.

**11.5 Interruptions.** There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruptions or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable contro9l or in cooperation with governmental request or directions.

**12. Assignment and Subletting.**

**12.1 Lessor's Consent Required.** Lessee shall not voluntarily or by operation of law assign, transfer, mortgage, sublet, or otherwise transfer or encumber all or any part of Lessee's interest in the Lease or in the Premises, without Lessor's prior written consent, which Lessor shall not unreasonably withhold. Lessor shall respond to Lessee's request for consent hereunder in a timely manner and any attempted assignment, transfer, mortgage, encumbrance or subletting without such consent shall be void, and shall constitute a material default and breach of this Lease without the need for notice to Lessee under paragraph 13.1. "Transfer" within the meaning of this paragraph 12 shall include the transfer or transfers aggregating: (a) if Lessee is a corporation, more than twenty-five percent (25%) of the voting stock of such corporation, or (b) if Lessee is a partnership, more than twenty-five percent (25%) of the profit and loss participation in such partnership.

**12.2.1    Lessee Affiliate.** Intentionally Deleted.

**12.3    Terms and Conditions Applicable to Assignment and Subletting.**

(a) Regardless of Lessor's consent, no assignment or subletting shall release Lessee of Lessee's obligations hereunder or alter the primary liability of Lessee to pay the rent and other sums due Lessor hereunder including Lessee's Share of Operating Expenses, and to perform all other obligations to be performed by Lessee hereunder.

(b) Lessor may accept rent from any person other than Lessee pending approval or disapproval of such assignment.

(c) Neither a delay in the approval or disapproval of such assignment or subletting, nor the acceptance of rent, shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for the breach of any of the terms or conditions of this paragraph 12 of this Lease.

(d) If Lessee's obligations under this Lease have been guaranteed by third parties, then an assignment or sublease, and Lessor's consent thereto, shall not be effective unless said guarantors give their written consent to such sublease and the terms thereof.

(e) The consent by Lessor to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting by Lessee or to any subsequent or successive assignment or subletting by the sublessee. However, Lessor may consent to subsequent subletting and assignments of the sublease or any amendments or modifications thereto without notifying Lessee or anyone else liable on the Lease or sublease and without obtaining their consent and such action shall not relieve such persons from liability under this Lease or said sublease; provided, however, such persons shall not be responsible to the extent any such amendment or modification enlarges or increases the obligations of the Lessee or sublessee under this Lease or such sublease.

(f) In the event of any default under this Lease, Lessor may proceed directly against Lessee, any guarantors, or any one else responsible for the performance of this Lease, including the sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor or Lessee.

(g) Lessor's written consent to any assignment or subletting of the Premises by Lessee shall not constitute an acknowledgment that no default then exists under this Lease of the obligations to be performed by Lessee nor shall such consent be deemed a waiver of any then existing default, except as may be otherwise stated by Lessor at the time.

(h) The discovery of the fact that any financial statement relied upon by Lessor in giving its consent to an assignment or subletting was materially false shall, at Lessor's election, render Lessor's said consent null and void.

**12.4    Additional Terms and Conditions Applicable to Subletting.** Regardless of Lessor's consent, the following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all rentals and income arising from any sublease heretofore or hereafter made by Lessee, and Lessor may collect such rent and income and apply same toward Lessee's obligations under this Lease; provided, however, that until a default shall occur in the performance of Lessee's obligations under this Lease, Lessee, after first deducting its reasonable and customary expenses for subletting, may receive, collect and enjoy fifty percent (50%) of any rents accruing under such sublease, which are in excess of Lessee's rental obligations under the Lease. Lessor shall not, by reason of this or any other assignment of such sublease to Lessor nor by reason of the collection of the rents from a sublessee, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee under such sublease. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from

Lessor stating that a default exists in the performance of Lessee's obligations under this Lease, to pay to Lessor the rents due and to become due under the sublease. Lessee agrees that such sublessee shall have the right to rely upon any such statement and request from Lessor, and that such sublessee shall pay such rents to Lessor without any obligation or right to inquire as to whether such default exists and notwithstanding any notice from or claim from Lessee to the contrary, lessee shall have no right or claim against said sublessee or Lessor for any such rents so paid by said sublessee to Lessor.

(b)  No sublease entered into by Lessee shall be effective unless and until it has been approved in writing by Lessor.  In entering into any sublease, Lessee shall use only such form of sublease as is satisfactory to Lessor, and once approved by Lessor, such sublease shall not be changed or modified without Lessor's prior written consent.  Any sublessee shall, by reason of entering into a sublease under this Lease, be deemed, for the benefit of Lessor, to have assumed and agreed to conform and comply with each and every obligation herein to be performed by Lessee other than such obligations as are contrary to or inconsistent with provisions contained in a sublease to which Lessor has expressly consented in writing.

(c)  In the event Lessee shall default in the performance of its obligations under this Lease, Lessor, at its option and without any obligation to do so, may require any sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of Lessee under such sublease from the time of the exercise of said option to the termination of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to Lessee or for any other prior defaults of Lessee under such sublease.

(d)  No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e)  With respect to any subletting to which Lessor has consented, Lessor agrees to deliver a copy of any notice of default by Lessee to the sublessee.  Such sublessee shall have the right to cure a default of Lessee within three (3) days after service of said notice of default upon such sublessee, and the sublessee shall have a right of reimbursement and offset from and against Lessee for any such defaults cured by the sublessee.

**12.5  Lessor's Expenses.**  In the event Lessee shall assign or sublet the Premises or request the consent of Lessor to any assignment or subletting or if Lessee shall request the consent of Lessor for any act Lessee proposes to do then Lessee shall pay Lessor's reasonable costs and expenses incurred in connection therewith, including attorneys', architects', engineers' or other consultants' fees, which shall not exceed $500 per occurrence.

**12.6 Conditions to Consent.**  Lessor reserves the right to condition any approval to assign or sublet upon Lessor's determination that the proposed assignee or sublessee shall conduct a business on the Premises consistent with the general character of the other occupants of the Office Building Project and not in violation of any exclusives or rights then held by other tenants.

**12.7    Sublease Profits.**  Lessee shall share any sublease profits with Lessor on a 50%/50% basis after first deducting Lessee's reasonable costs to sublet the Premises.

**12.8    Lessee Affiliate.**  Notwithstanding the provisions of paragraph 12.1 hereof, Lessee may assign or sublet the Premises, or any portion thereof, without Lessor's consent, to any corporation which controls, is controlled by or is under common control with Lessee, or to any corporation resulting from the merger or consolidation with Lessee, or to any person or entity which acquires all the assets of Lessee as a going concern of the business that is being conducted on the Premises, all of which are referred to as "Lessee Affiliate"; provided that before such assignment shall be effective, (a) said assignee shall assume, in full, the obligations of Lessee under this Lease and (b) Lessor shall be given written notice of such assignment and assumption.  Any such assignment shall not, in any way, affect or limit the liability of Lessee under the terms of this Lease even if after such assignment or subletting the terms of this Lease are materially changed or altered without the consent of Lessee, the consent of whom shall not be necessary.  Lessee shall be entitled to keep all of the profit from sublease or assignment to a Lessee Affiliate.

**13. Default; Remedies**

**13.1    Default.**  The occurrence of any one or more of the following events shall constitute a material default of this Lease by Lessee:

(a)  The vacation or abandonment of the Premises by Lessee.  Vacation of the Premises shall include the failure to occupy the Premises for a continuous period of sixty (60) days or more, without the payment of rent when due.

(b)  The breach by Lessee of any of the covenants, conditions or provisions of paragraphs 8.3(a), (b), or (d) (alterations), 12.1 (assignment or subletting), 13.1(a) (vacation or abandonment), 13.1(e) (insolvency), 13.1(f) (false statement), 33 (auctions), or 41.1 (easements), all of which are hereby deemed to be material, non-curable defaults without the necessity of any notice by Lessor to Lessee thereof.

(c)  The failure by Lessee to make any payment of rent or any other payment required to be made by Lessee hereunder, as and when due, where such failure shall continue for a period of five (5) business days after written notice thereof from Lessor to Lessee.  In the event that Lessor serves Lessee with a Notice to Pay Rent or Quit pursuant to applicable Unlawful Detainer statutes such Notice to Pay Rent or Quit shall also constitute the notice required by this subparagraph.

(d)  The failure by Lessee to observe or perform any of the covenants, conditions or provisions of this Lease to be observed or performed by Lessee other than those referenced in subparagraphs (b) and (c), above, where such failure shall continue for a period of thirty (30) days after written notice thereof from Lessor to Lessee; provided, however, that if the nature of Lessee's noncompliance is such that more than thirty (30) days are reasonably required for its cure, then Lessee shall not be deemed to be in default if Lessee commenced such cure within said thirty (30) day period and thereafter diligently pursues such cure to completion.  To the extent permitted by law, such thirty (30) day notice shall constitute the sole and exclusive notice required to be given to Lessee under applicable Unlawful Detainer statutes.

(e)  (i) The making by Lessee of any general arrangement or general assignment for the benefit of creditors; (ii) Lessee becoming a "debtor" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within sixty (60) days; (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within thirty (30) days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within thirty (30) days.  In the event that any provision of this paragraph 13.1(e) is contrary to any applicable law, such provision shall be of no force or effect.

(f)  The discovery by Lessor that any financial statement given to Lessor by Lessee, or its successor in interest or by any guarantor of Lessee's obligation hereunder, was materially false.

**13.2    Remedies.** In the event of any material default or breach of this Lease by Lessee, Lessor may at any time thereafter, with or without notice or demand and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such default:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease and the term hereof shall terminate and Lessee shall immediately surrender possession of the Premises to Lessor. In such event Lessor shall be entitled to recover from Lessee all damages incurred by Lessor by reason of Lessee's default including, but not limited to, the cost of recovering possession of the Premises; expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and any real estate commission actually paid; the worth at the time of award by the court having jurisdiction thereof of the amount by which the unpaid rent for the balance of the term after the time of such award exceeds the amount of such rental loss for the same period that Lessee proves could be reasonably avoided; that portion of the leasing commission paid by Lessor pursuant to paragraph 15 applicable to the unexpired term of this Lease.

(b) Maintain Lessee's right to possession in which case this Lease shall continue in effect whether or not Lessee shall have vacated or abandoned the Premises. In such event Lessor shall be entitled to enforce all of Lessor's rights and remedies under this Lease, including the right to recover the rent as it becomes due hereunder.

(c) Pursue any other remedy now or hereafter available to Lessor under the laws or judicial decisions of the state wherein the Premises are located. Unpaid installments of rent and other unpaid monetary obligations of Lessee under the terms of this Lease shall bear interest from the date due at the maximum rate then allowable by law.

**13.3    Default by Lessor.** Lessor shall not be in default unless Lessor fails to perform obligations required of Lessor within a reasonable time, but in no event later than thirty (30) days after written notice by Lessee to Lessor and to the holder of any first mortgage or deed of trust covering the Premises whose name and address shall have theretofore been furnished to Lessee in writing, specifying wherein Lessor has failed to perform such obligation; provided, however, that if the nature of Lessor's obligation is such that more than thirty (30) days are required for performance then Lessor shall not be in default if Lessor commences performance within such 30-day period and thereafter diligently pursues the same to completion.

**13.4    Late Charges.** Lessee hereby acknowledges that late payment by Lessee to Lessor of Base Rent, Lessee's Share of Operating Expenses or other sums due hereunder will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed on Lessor by the terms of any mortgage or trust deed covering the Office Building Project. Accordingly, if any installment of Base Rent shall not be received by Lessor or Lessor's designee within ten (10) days after such amount shall be due, or if any installment of Operating Expenses, or any other sum due from Lessee shall not be received by Lessor or Lessor's designee within thirty (30) days after such amount shall be due, then Lessee shall pay Lessor on demand as a late charge an additional amount equal to six percent (6%) of the overdue payment. However, Lessor shall allow Lessee to submit one installment after the due date per calendar year without collecting the late charge. Lessee agrees that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of late payment by Lessee. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's default with respect to such overdue amount, nor prevent Lessor from exercising any of the other rights and remedies granted hereunder.

**14.    Condemnation.** If the Premises or any portion thereof or the Office Building Project are taken under the power of eminent domain, or sold under the threat of the exercise of said power (all of which are herein called "condemnation"), this Lease shall terminate as to the part so taken as of the date the condemning authority takes title or possession, whichever first occurs; provided that if so much of the Premises or the Office Building Project are taken by such condemnation as would substantially and adversely affect the operation and profitability of Lessee's business conducted from the Premises, Lessee shall have the option, to be exercised only in writing within thirty (30) days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within thirty (30) days after the condemning authority shall have taken possession), to terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the rent and Lessee's Share of Operating Expenses shall be reduced in the proportion that the floor area of the Premises taken bears to the total floor area of the Premises. Common Areas taken shall be excluded from the Common Areas usable by Lessee and no reduction of rent shall occur with respect thereto or by reason thereof. Lessor shall have the option in its sole discretion to terminate this Lease as of the taking of possession by the condemning authority, by giving written notice to Lessee of such election within thirty (30) days after receipt of notice of a taking by condemnation of any part of the Premises or the Office Building Project. Any award for the taking of all or any part of the Premises or the   or the Office Building Project under the power of eminent domain or any payment made under threat of the of the exercise of such power shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold or for the taking of the fee, or as severance damages; provided, however, that Lessee shall be entitled to any separate award for loss of or damage to Lessee's trade fixtures, removable personal property and unamortized tenant improvements that have been paid for by Lessee. For that purpose the cost of such improvements shall be amortized over the original term of this Lease excluding any options. In the event that this Lease is not terminated by reason of such condemnation, Lessor shall to the extent of severance damages received by Lessor in connection with such condemnation, repair any damage to the Premises caused by such condemnation except to the extent that Lessee has been reimbursed therefor by the condemning authority. Lessee shall pay any amount in excess of such severance damages required to complete such repair.

**15. Broker's Fee.**

(a) The brokers involved in this transaction are Cushman & Wakefield of California, Inc., which represents Landlord and CM Realty Corporation, which represents Tenant. Upon execution of this Lease by both parties, Lessor shall pay to Cushman & Wakefield of California, Inc. a brokerage fee in the amount of $68,920.80 for brokerage services rendered by said brokers to Lessor in this transaction. Out of this brokerage fee received by Lessor, Cushman & Wakefield of California, Inc. shall pay CM Realty Corporation $45,825.00 as its share and retain $23,095.80 as its compensation.

(b) Lessor agrees to pay said fee not only on behalf of Lessor but also on behalf of any person, corporation, association, or other entity having an ownership interest in said real property or any part thereof, when such fee is due hereunder. Any transferee of Lessor's interest in this Lease, whether such transfer is by agreement or by operation of law, shall be deemed to have assumed Lessor's obligation under this paragraph 15. Each listing and cooperating broker shall be a third party beneficiary of the provisions of this paragraph 15 to the extent of their interest in any commission arising under this Lease and may enforce that right directly against Lessor; provided, however, that all brokers having a right to any part of such total commission shall be a necessary party to any suit with respect thereto.

(c) Lessee and Lessor each represent and warrant to the other that neither has had any dealings with any person, firm, broker or finder (other than the person(s), if any, whose names are set forth in paragraph 15(a), above) in connection with the negotiation of this Lease and/or the consummation of the transaction contemplated hereby, and no other broker or other person, firm or entity is entitled to any commission or finder's fee in connection with said transaction and Lessee and Lessor do each hereby indemnify and hold the other harmless from and against any costs, expenses, attorney's fees or liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying party.

**16. Estoppel Certificate.**

(a) Each party (as "responding party") shall at any time upon not less than ten (10) days' prior written notice from the other party ("requesting party") execute, acknowledge and deliver to the requesting party a statement in writing (i) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect) and the date to which the rent and other charges are paid in advance, if any, and (ii) acknowledging that there are not, to the responding party's knowledge, any uncured defaults on the part of the requesting party, or specifying such defaults if any are claimed. Any such statement may be conclusively relied upon by any prospective purchaser or encumbrancer of the Office Building Project or of the business of Lessee.

(b) The failure to deliver such statement within such time shall be conclusive upon such party that (i) this Lease is in full force and effect, without modification except as may be represented by the requesting party, (ii) there are no uncured defaults in the requesting party's performance, and (iii) if Lessor is the requesting party, not more than one month's rent has been paid in advance and furthermore does hereby make, make, constitute and irrevocably appoint the other as its attorney-in-fact and in its name, place and stead, to execute such documents in accordance with this paragraph 16.

(c) If Lessor desires to finance, refinance, or sell the Office Building Project, or any part hereof, Lessee hereby agrees to deliver to any lender or purchaser designated by Lessor such financial statements of Lessee as may be reasonably required by such lender or purchaser.

**17. Lessor's Liability.** The term "Lessor" as used herein shall mean only the owner or owners, at the time in question, of the fee title or a lessee's interest in a ground lease of the Office Building Project, and except as expressly provided in paragraph 15, in the event of any transfer of such title or interest, Lessor herein named (and in case of any subsequent transfers then the grantor) shall be relieved from and after the date of such transfer of all liability as respects Lessor's obligations thereafter to be performed, provided that any funds in the hands of Lessor or the then grantor at the time of such transfer, in which Lessee has an interest, shall be delivered to the grantee. The obligations contained in this Lease to be performed by Lessor shall, subject as aforesaid, be binding on Lessor's successors and assigns, only during their respective periods of ownership.

**18. Severability.** The invalidity of any provision of this Lease as determined by a court of competent jurisdiction shall in no way affect the validity of any other provision hereof.

**19. Interest on Past-Due Obligations.** Except as expressly herein provided, any amount due to Lessor not paid when due shall bear interest at the maximum rate then allowable by law or judgements from the date due. Payment of such interest shall not excuse or cure any default by Lessee under this Lease; provided, however, that interest shall not be payable on late charges incurred by Lessee nor on any amounts upon which late charges are paid by Lessee.

**20. Time of Essence.** Time is of the essence with respect to the obligations to be performed under this Lease.

**21. Additional Rent.** All monetary obligations of Lessee to Lessor under the terms of this Lease, including by not limited to Lessee's Share of Operating Expense and any other expenses payable by Lessee hereunder shall be deemed to be rent.

**22. Incorporation of Prior Agreements; Amendments.** This Lease contains all agreements of the parties with respect to any matter mentioned herein. No prior or contemporaneous agreement or understanding pertaining to any such matter shall be effective. This Lease may be modified in writing only, signed by the parties in interest at the time of the modification. Except as otherwise stated in this Lease, Lessee hereby acknowledges that neither the real estate broker listed in paragraph 15 hereof nor any cooperating broker on this transaction nor the Lessor or any employee or agents of any of said persons has made any oral or written warranties or representations to Lessee relative to the condition or use by Lessee of the Premises or the Office Building Project and Lessee acknowledges that Lessee assumes all responsibility regarding the Occupational Safety Health Act, the legal use and adaptability of the Premises and the compliance thereof with all applicable laws and regulations in effect during the term of this Lease.

**23. Notices.** Any notice required or permitted to be given hereunder shall be in writing and may be given by personal delivery or by certified or registered mail, and shall be deemed sufficiently given if delivered or addressed to Lessee or to Lessor at the address noted below or adjacent to the signature of the respective parties, as the case may be. Mailed notices shall be deemed given upon actual receipt at the address required, or forty-eight hours following deposit in the mail, postage prepaid, whichever first occurs. Either party may by notice to the other specify a different address for notice purposes except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice purposes. A copy of all notices required or permitted to be given to Lessee hereunder shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate by notice to Lessee. Notices to Lessor shall be sent to: Attention: Jim Gilchrist, Transwestern Commercial Services, 3480 Buskirk Avenue, Suite 290, Pleasant Hill, CA. 94523, telephone: (925) 939-1209 and facsimile: (925) 939-1253. Notices to Lessee shall be sent to: Attention: Aimee R. Hill, Irwin Mortgage Corporation, 9265 Counselor's Row, Indianapolis, IN 46240, telephone: (317) 844-7788 and facsimile: (317) 573-8559; with a copy to: Lyle Shearer, Irwin Mortgage Corporation, 1140 Galaxy Way, Concord, CA 94526.

**24. Waivers.** No waiver by Lessor of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by Lessee of the same or any other provision. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to or approval of any subsequent act by Lessee. The acceptance of rent hereunder by Lessor shall not be a waiver of any preceding breach by Lessee of any provision hereof, other than the failure of Lessee to pay the particular rent so accepted, regardless of Lessor's knowledge of such preceding breach at the time of acceptance of such rent.

**25. Recording.** Intentionally Deleted.

**26. Holding Over.** If Lessee provides Lessor with ninety days prior written notice, Lessee shall have the right to holdover for a period up to three (3) months after the expiration of the initial Term or any extension Term thereof at one hundred ten percent (110%) of the rent payable immediately preceding the termination date of this Lease, and all Options, if any, granted under the terms of this Lease shall be deemed terminated and be of no further effect during said month to month tenancy. After the initial three (3) months as per the above, the holdover rate shall be one hundred twenty five percent (125%) of the rent payable immediately preceding the

termination date of this Lease. If Lessee does not deliver such three (3) month notice, and Lessee, with Lessor's consent, remains in possession of the Premises or any part thereof after the expiration of the term hereof, such occupancy shall be a tenancy from month to month upon all the provisions of this Lease pertaining to the obligations of Lessee, except that the rent payable shall be one hundred and twenty five percent (125%) of the rent payable immediately preceding the termination date of this Lease.

**27. Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

**28. Covenants and Conditions.** Each provision of this Lease performable by Lessee shall be deemed both a covenant and a condition.

**29. Binding Effect; Choice of Law.** Subject to any provisions hereof restricting assignment or subletting by Lessee and subject to the provisions of paragraph 17, this Lease shall bind the parties, their personal representatives, successors and assigns. This Lease shall be governed by the laws of the State where the Office Building Project is located and any litigation concerning this Lease between the parties hereto shall be initiated in the county in which the Office Building Project is located.

**30. Subordination.**

(a) This Lease, and any Option or right of first refusal granted hereby, at Lessor's option, shall be subordinate to any ground lese, mortgage, deed of trust, or any other hypothecation or security now or hereafter placed upon the Office Building Project and to any and all advances made on the security thereof and to all renewals, modifications, consolidations, replacements and extensions thereof. Notwithstanding such subordination, Lessee's right to quiet possession of the Premises shall not be disturbed if Lessee is not in default and so long as Lessee shall pay the rent and observe and perform all of the provisions of this Lease, unless this Lease is otherwise terminated pursuant to its terms. If any mortgage, trustee or ground lessor shall elect to have this Lease and any Options granted hereby prior to the lien of its mortgage, deed of trust or ground lease, and shall give written notice thereof to Lessee, this Lease and such Options shall be deemed prior to such mortgage, deed of trust or ground lease, whether this Lease or such Options are dated prior or subsequent to the date of said mortgage, deed of trust or ground lease or the date of recording thereof.

(b) Lessee agrees to execute any documents required to effectuate an attornment, a subordination, or to make this Lease or any Option granted herein prior to the lien of any mortgage, deed of trust or ground lease, as the case may be. Lessee's failure to execute such documents within ten (10) days after written demand shall enable Lessor to execute such documents on behalf of Lessee as Lessee's attorney-in-fact. Lessee does hereby make, constitute and irrevocably appoint Lessor as Lessee's attorney-in-fact and in Lessee's name, place and stead, to execute such documents in accordance with this paragraph 30(b).

(c) Provided Lessee is not in default of its obligations under this Lease, Lessor shall use its best efforts to provide a non-disturbance agreement to Lessee within sixty days after the Commencement Date of this Lease.

**31. Attorney's Fees.**

31.1    If either party or the broker(s) named herein bring an action to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action, trial or appeal thereon, shall be entitled to his reasonable attorney's fees to be paid by the losing party as fixed by the court in the same or a separate suit, and whether or not such action is pursued to decision or judgment. The provisions of this paragraph shall inure to the benefit of the broker named herein who seeks to enforce a right hereunder.

31.2    The attorneys' fee award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred in good faith.

31.3    Lessor shall be entitled to reasonable attorneys' fees and all other costs and expenses incurred in the preparation and service of notices of default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such default.

**32. Lessor's Access.**

32.1    Lessor and Lessor's agents shall have the right to enter the Premises at reasonable times and upon reasonable notice for the purpose of inspecting the same, performing any services required of Lessor, showing the same to prospective purchasers, lenders, or lessees, taking such safety measures, erecting such scaffolding or other necessary structures, making such alterations, repairs, improvements or additions to the Premises or to the Office Building Project as Lessor may reasonably deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect to Lessee's use of the Premises. Lessor may at any time place on or about the Premises or the Building any ordinary "For Sale" signs and Lessor may at any time during the last 120 days of the term hereof place on or about the Premises any ordinary "For Lease" signs.

32.2    All activities of Lessor pursuant to this paragraph shall be without abatement of rent, nor shall Lessor have any liability to Lessee for the same.

32.3    Lessor shall have the right to retain keys to the Premises and to unlock all doors in or upon the Premises other than to files, vaults and safes, and in the case of emergency to enter the Premises by any reasonably appropriate means, and any such entry shall not be deemed a forceable or unlawful entry or detainer of the Premises or an eviction. Lessee waives any charges for damages or injuries or interference with Lessee's property or business in connection therewith.

**33. Auctions.** Lessee shall not conduct, nor permit to be conducted, either voluntarily or involuntarily, any auction upon the premises or the Common Areas without first having obtained Lessor's prior written consent. Notwithstanding anything to the contrary in this Lease, Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to grant such consent. The holding of any auction on the Premises or Common Areas in violation of this paragraph shall constitute a material default of this Lease.

**34. Signs.** Lessee shall not place any sign upon the Premises or the Office Building Project without Lessor's prior written consent. Lessee shall have the non-exclusive right to place its sign identification on the monument sign fronting the property at Lessor's expense. Additionally Lessee shall have the non-exclusive right, at Lessee's sole expense, to place its sign identification on the building eyebrow above its Premises. All signage requests including renderings and plans shall be first presented to Lessor for its review and approval. Lessee's signage shall be in building standard font, size and colors. Lessor shall require professional installation and watertight conditions for any building penetrations. If required, Lessee shall also obtain the approval of the City of Concord for its signage requests. Lessor shall reasonably cooperate with Lessee where necessary for Lessee to obtain its signage. Under no circumstances shall Lessee place a sign on any roof of the Office Building Project.

**35. Merger.** The voluntary or other surrender of this Lease by Lessee, or a mutual cancellation thereof, or a termination by Lessor, shall not work a merger, and shall, at the option of lessor, terminate all or any existing subtenancies or may at the option of Lessor, operate as an assignment to Lessor of any or all of such subtenancies.

**36. Consents.** Except for paragraphs 33 (auctions) and 34 (signs) hereof, wherever in this Lease the consent of one party is required to an act of the other party such consent shall not be unreasonably withheld or delayed.

**37. Guarantor.** In the event that there is a guarantor of this Lease, said guarantor shall have the same obligations as Lessee under this Lease.

**38. Quiet Possession.** Upon Lessee paying the rent for the Premises and observing and performing all of the covenants, conditions and provisions on Lessee's part to be observed and performed hereunder, Lessee shall have quiet possession of the Premises for the entire term hereof subject to all of the provisions of this Lease. The individuals executing this Lease on behalf of Lessor represent and warrant to Lessee that they are fully authorized and legally capable of executing this Lease on behalf of Lessor and that such execution is binding upon all parties holding an ownership interest in the Office Building Project.

**39. Options.**

**39.1 Definition.** As used in this paragraph the word "Option" has the following meaning: (1) the right or option to extend the term of this Lease or to renew this Lease or to extend or renew any lease that Lessee has on other property of Lessor, (2) the option or right of first refusal to lease the Premises or the right of first offer to lease the Premises or the right of first refusal to lease other space within the Office Building Project or other property of Lessor or the right of first offer to lease other space within the Office Building Project or other property of lessor, (3) the right or option to purchase the Premises or the Office Building Project, or the right of first refusal to purchase the Premises or the Office Building Project or the right of first offer to purchase the Premises or the Office Building Project, or the right or option to purchase other property of Lessor, or the right of first refusal to purchase other property of Lessor or the right of first offer to purchase other property of Lessor.

**39.2 Options Personal.** Each option granted to Lessee in this Lease is personal to the original Lessee and may be exercised only by the original Lessee while occupying the Premises who does so without the intent of thereafter assigning this Lease or subletting the Premises or any portion thereof, and may not be exercised or be assigned, voluntarily or involuntarily, by or to any person or entity other than Lessee; provided, however, that an Option may be exercised by or assigned to any Lessee Affiliate as defined in paragraph 12.2 of this Lease. The Options, if any, herein granted to Lessee are not assignable separate and apart from this lease, nor may any Option be separated from this Lease in any manner, either by reservation or otherwise.

**39.3 Multiple Options.** In the event that Lessee has any multiple options to extend or renew this Lease a later option cannot be exercised unless the prior option to extend or renew this Lease has been so exercised.

**39.4 Effect of Default on Options.**

(a) Lessee shall have no right to exercise an Option, notwithstanding any provision in the grant of Option to the contrary, (i) during the time commencing from the date Lessor gives to Lessee a notice of default pursuant to paragraph 13.1(c) or 13.1(d) and continuing until the noncompliance alleged in said notice of default is cured, or (ii) during the period of time commencing on the day after a monetary obligation to Lessor is due from Lessee and unpaid (without any necessity for notice thereof to Lessee) and continuing until the obligation is paid, if the failure to pay constitutes a default under this Lease, or (iii) in the event that Lessor has given to Lessee three or more notices of default under paragraph 13.1(c), or paragraph 13.1(d), whether or not the defaults are cured, during the 12 month period of time immediately prior to the time that Lessee attempts to exercise the subject Option, (iv) if Lessee has committed any non-curable breach, including without limitation those described in paragraph 13.1(b), or is otherwise in default of any of the terms, covenants and conditions of this Lease.

(b) The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of paragraph 39.4(a).

(c) All rights of Lessee under the provisions of an Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and during the term of this Lease, (i) Lessee fails to pay to Lessor a monetary obligation of Lessee for a period of thirty (30) days after such obligation becomes due, or (ii) Lessee fails to commence to cure a default specified in paragraph 13.1(d) within thirty (30) days after the date that Lessor gives notice to Lessee of such default and/or Lessee fails thereafter to diligently prosecute said cure to completion, (iii) Lessor gives to Lessee three or more notices of default under paragraph 13.1 (c), or paragraph 13.1(d), whether or not the defaults are cured, or (iv) if Lessee has committed any non-curable breach, including without limitation those described in paragraph 13.1(b), or is otherwise in monetary default of any of the terms, covenants and conditions of this Lease.

**40. Security Measures-Lessor's Reservations.**

**40.1** Lessee hereby acknowledges that Lessor shall have no obligation whatsoever to provide guard service or other security measures for the benefit of the Premises or the Office Building Project. Lessee assumes all responsibility for the protection of Lessee, its agents, and invitees. Lessor, at its option, may elect to provide security protection for the Office Building Project or any part thereof, in which event the cost thereof shall be included within the definition of Operating Expenses, as set forth in paragraph 4.2(b).

**40.2** Lessor shall have the following rights:

(a) To change the name, address or title of the Office Building Project or building in which the Premises are located upon not less than 90 days prior written notice.

(b) To, at Lessor's expense, provide and install Building standard graphics on the door of the Premises and at Lessee's expense, provide and install Building standard graphics on such portions of the Common Areas as Lessor shall reasonably deem appropriate.

(c) To permit any lessee the exclusive right to conduct any business as long as such exclusive does not conflict with any rights expressly given herein.

(d) To place such signs, notices or displays as Lessor reasonably deems necessary or advisable upon the roof, exterior of the buildings or the Office Building Project or on pole signs in the Common Areas

**40.3** Lessee shall not:

(a) Use a representation (photographic or otherwise) of the building or the Office Building Project or their name(s) in connection with Lessee's business.

(b) Except in emergency, to go upon the roof of the Building.

**41. Easements.**

**41.1.** Lessor reserves to itself the right, from time to time, to grant such easements, rights and dedications that Lessor deems necessary or desirable, and to cause the recordation of Parcel Maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee. Lessee shall sign any of the

aforementioned documents upon request of Lessor and failure to do so shall enable the Lessor to execute such documents on behalf of Lessee as Lessee's attorney-in-fact. Lessee does hereby make, constitute and irrevocably appoint Lessor as Lessee's attorney-in-fact and in Lessee's name, place and stead, to execute such documents in accordance with this paragraph 42.

41.2    The obstruction of Lessee's view, air, or light by any structure erected in the vicinity of the Building, whether by Lessor or third parties, shall in no way affect this Lease or impose any liability upon Lessor.

**42. Performance Under Protest.** If at any time a dispute shall arise as to any amount or sum of money to be paid by one party to the other under the provisions hereof, the party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment, and there shall survive the right on the part of said party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said party to pay such sum or any part thereof, said party shale be entitled to recover such sum or so much thereof as it was not legally required to pay under the provisions of this Lease.

**43. Authority.** If Lessee is a corporation, trust, or general or limited partnership, Lessee and each individual executing the Lease on behalf of such entity, represent and warrant that such individual is duly authorized to execute and deliver this Lease on behalf of said entity. If Lessee is a corporation, trust or partnership, Lessee shall, within thirty (30) days after execution of this Lease, deliver to Lessor evidence of such authority satisfactory to Lessor.

**44. Conflict.** Any conflict between the printed provisions, Exhibits or Addenda of this Lease and the typewritten or handwritten provisions, if any, shall be controlled by the typewritten or handwritten provisions.

**45. No Offer.** Preparation of this Lease by Lessor or Lessor's agent and submission of same to Lessee shall not be deemed an offer to Lessee to lease. This Lease shall become binding upon Lessor and Lessee only when fully executed by both parties.

**46. Lender Modification.** Lessee agrees to make such reasonable modifications to this Lease as may be reasonably required by an institutional lender in connection with the obtaining of normal financing of the Office Building Project.

**47. Multiple Parties.** If more than one person or entity is named as either Lessor or Lessee herein, except as otherwise expressly provided herein, the obligations of the Lessor or Lessee herein shall be the joint and several responsibility of all persons or entities named herein as such Lessor or Lessee, respectively..

**48. Attachments.** Attached hereto are the following documents, which constitute a part of this Lease.
- Addendum -

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN AND, BY EXECUTION OF THIS LEASE, SHOW THEIR INFOMRED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

IF THIS LEASE HAS BEEN FILLED IN IT HAS BEEN PREPARED FOR SUBMISSION TO YOUR ATTORNEY FOR HIS APPROVAL. NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE REAL ESTATE BROKER OR ITS AGENTS OR EMPLOYEES AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION RELATING THERETO; THE PARTIES SHALL RELY SOLELY UPON THE ADVICE OF THEIR OWN LEGAL COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.

LESSOR:

1140 GALAXY WAY INC.

By: VICTORIA LUKOH & MARIO CASTILLO

Its: AUTHORISED SIGNATORIES
ATTORNEYS IN FACT FOR THE DIRECTORS

Executed at GEORGE TOWN, GRAND CAYMAN

On DECEMBER 12, 2002

Address 67 FORT STREET

LESSEE

Irwin Mortgage Corporation, an Indiana Corporation

By: _____

Its: First Vice President

By: Renee Gunderson

Its: First Vice President

Executed at Indianapolis IN

On December 4, 2002

Address 9265 Counselor's Row

## Addendum

This is an Addendum to the **Standard Office Lease-Net** dated November 15, 2002 by and between 1140 Galaxy Way Inc., "Lessor", and Irwin Mortgage Corporation, an Indiana corporation, "Lessee".

1. **Premises:** The Premises identified under article 1.2 of the Lease and illustrated in Exhibit "A" consists of approximately 9,165 rentable square feet of office space based on the local area custom for measurement of single story "office, office/flex" buildings.

2. **Base Rent Schedule:** The contract rental rate shall include Operating Expenses but otherwise shall be <u>net</u> of utilities and janitorial serving the Premises, and in accordance with the following schedule:

   Month 1 - $0.00; Months 2-25 - $11,914.50 per month; Months 26 – 49 - $12,831.00 per month; Months 50 – 73 - $13,747.50 per month. All rentals shall be due and payable on the first day of each month, per paragraph 4.1 of the Lease.

3. **Option to Terminate:** Lessee shall have a one time right to terminate the lease agreement effective the end of the sixty first (61st) month of the term by first providing Lessor with (i) at least six month's prior written notice of its intent to terminate and (ii) issuance to Lessor within five (5) days prior to the effective termination date a check for the early termination fee as consideration for the unamortized tenant improvements and leasing commissions in the amount of $40,000.

3. **PG&E & Janitorial Service:** Lessee shall be responsible for directly contracting for and payment of its own electrical and gas service to the Premises and for its own janitorial service and supplies to the Premises.

4. **Parking:** (a) Lessee shall be allowed the use of 41 unassigned parking stalls, as identified under article 2.2 of the Lease. (b) Should the City of Concord exercise its right to use an existing easement through the parking lot of the Office Building Project to extend Galaxy Way, then the number of parking stalls Lessor shall be obligated to provide Lessee shall be reduced to 37 stalls.

6. **Tenant Improvements:** Lessor, at Lessor's cost, shall provide tenant improvements to the Premises using building standard materials and finishes based on the scope of work identified in the preliminary plans prepared by the Ryan Design Group dated October 2, 2002 "the Preliminary Plans", and final construction drawings to be agreed upon by Lessor and Lessee ("Lessor's Turnkey Work"). Lessee shall sign off on the Preliminary Plans and the Construction Drawings. Lessor's managing agent shall oversee the tenant improvement construction. Lessor shall construct the Premises in accordance with local codes and the ADA.

   In the event Lessee requests changes to the above-described scope of work, Lessee shall pay for any and all costs, which exceed the costs of Lessor's Turnkey Work. Payment by Lessee to Lessor shall be made upon presentation of a cost estimate and written authorization to proceed with the work or an invoice for completion of work and services as the case may be.

   Lessor shall bid the construction to a minimum of two (2) contractors. Lessor shall be responsible for hiring the contractor and ensuring the work is done in a timely and cost effective manner. Lessor, after its review of the bids and appropriate adjustments as required by Lessor in Lessor's opinion to equally compare the bids, shall select the low bidder to complete the work.

   Within thirty (30) days after substantial completion of the tenant improvements, as evidenced by a Certificate of Occupancy and a punchlist of non-material items, Lessor shall prosecute to completion the punchlist items.

7. **Option to Extend:** Subject to the provisions of this Paragraph, Lessee shall have the right to extend the term of this Lease for an additional term (the "Extended Term") of five (5) years for the entire Premises. Lessee may exercise such right only by giving Lessor written notice of exercise of such right on or before the date which is at least six (6)

1

months prior to the termination date of the Lease, and only if Lessee is in possession of the Premises, has not sublet the entire Premises or assigned this Lease, and no event of default exists under this Lease when Lessee exercises such right or when the Extended Term is to commence.  If Lessee fails to exercise such right in accordance with this Paragraph, such right shall terminate.  If Lessee exercises such right in accordance with this Paragraph, all of the terms, covenants, and conditions of the Lease shall remain in effect during the Extended Term, except that the Base Rent shall be reset at 95% of the then Fair Market Rental Value.  "Fair Market Rental Value" shall mean the monthly rental rate per square foot, prevailing at the commencement of the Extended Term for direct leases, new or renewal, then being entered into for comparable space in comparable buildings by comparable tenants for arms length transactions in the Northern I-680 Corridor area and used for comparable purpose.  Further consideration shall be given for rental abatement provided, length of lease terms, size and location of premises being leased, tenant improvement allowances and other inducements granted in the comparable deals.  The base year for operating expenses and taxes shall be reset to the calendar year in which the Extended Term commences.  Within thirty (30) days after Lessor's receipt of Lessee's notice specified above, Lessor and Lessee shall meet, negotiate and attempt to agree upon the fair market rental value for the Premises for the Extended Term.  If Lessor and Lessee have not agreed in writing on such fair market rental value within forty-five (45) days of Lessor's receipt of Lessee's notice specified above then, upon written notice of either party to the other requesting a determination of such fair market rental value by real estate brokers or appraisers, such fair market value shall be determined by real estate brokers or appraisers in accordance with the terms of the following paragraph (*Determination of Fair Market Rental Value*).  If the fair market rental value of the Premises for the Extended Term is not determined by commencement of the Extended term, Lessee shall pay Base Rent during the Extended Term, when due at the annual rate payable during the last month of the initial term, subject to retroactive adjustment agreed to between the parties upon final resolution of the rental rate in accordance with the following paragraph (*Determination of Fair Market Rental Value*).

8.   *Determination of Fair Market Rental Value:*  Whenever, pursuant to this Addendum, fair market rental is to be determined by a single arbitrator, the procedures of this Paragraph shall apply. The parties shall agree to use their best efforts to agree and elect (and share the fees of) a single appraiser or unbiased real estate broker with at least five (5) years of commercial real estate office appraisal or leasing experience in the County of Contra Costa ("Arbitrator").  Each party shall, within ten (10) days after the notice of request for the determination of fair market rental value by single arbitrator, notify the other party of the name and address of the arbitrator recommended by such party.  The parties shall use best efforts to select the single Arbitrator in a timely manner.  If either Lessor or Lessee shall fail to timely so recommend an arbitrator, the appointed arbitrator shall by default become the single Arbitrator within (10) days after the failure of Lessor or Lessee, as the case may be, to so recommend an arbitrator.   Once the single Arbitrator is appointed, Lessor and Lessee shall each independently submit to the Arbitrator its determination of the Fair Market Rent for the Extended Term.  It is in Lessor's and Lessee's best interests to select a rate that that they believe fairly and closely represents Fair Market Rental Value as defined under the selection criteria under paragraph 7 above.  In the event Lessor or Lessee select an arbitrarily low or high rate as the case may be, the Arbitrator shall be forced to discard said rate if the other selected rate is more fairly representative of the Fair Market Rental Value.  Such single Arbitrator shall, within thirty (30) days after his or her receipt of both Lessor's and Lessee's determinations of Fair Market Rental Value, select one of the determinations to be the binding Fair Market Rental Value.  The arbitrator shall not have the right to impose a middle ground.  For clarification to the parties, the 5% discount referenced under paragraph 7 above shall be applied after the Arbitrator's decision is made.

9.   *Handicap Accessibility:*  Lessor shall be responsible for delivering the Building in compliance with the Americans With Disabilities Act ("ADA") as it relates to the Premises and the common areas of the building.   In addition, Lessor shall construct the improvements to the Premises in accordance with the ADA.  Lessee shall be responsible for complying with the ADA as it regards the Premises from and after the Commencement Date and continuing for the entire term of the Lease and any extensions thereof.

10.  *Roof Repairs, Ceiling Tiles and Light Fixtures:*  Lessor, at its expense, shall be responsible for the cost of any roof repairs throughout the Term of the lease. Additionally, Lessor shall replace any ceiling tiles damaged from moisture due to the roof or HVAC/mechanical systems.  Lessor shall replace building standard florescent light bulbs throughout the lease Term.

2

IrwinMortgageLsAdd2

11. **Hazardous Substances:** To the best of Lessor's actual knowledge there is no Radon Gas, Asbestos or other hazardous substances in or around the Building or Premises, which pose a present danger to health, life or safety.

12. **Non-Disturbance Agreement:** Lessee will be provided a Non-Disturbance Agreement from all current and future holders of a superior interest which states the following:

Lessee agrees to subordinate this Lease to such mortgage, deed of trust, ground leases, overriding leases or superior leases covering the whole or any portion of the Property, but only if the holder of such mortgage/ground leases executes and delivers to Lessee a Subordination, Non-Disturbance and Attornment Agreement provided the Subordination, Non-Disturbance and Attornment Agreement shall not increase the obligations or liabilities of the Lessee or reduce the rights or remedies of the Lessee under this Lease.

Said Subordination, Non-Disturbance and Attornment Agreement shall be prepared by Lessor's lender and shall be in a commercially standard form. Lessor will use its best efforts to cause its current lender to provide the form of the Agreement within sixty (60) days after execution of the Lease Agreement.

13. **Consent by Lessor or Lessee:** Whenever any provision in the Lease requires either parties consent, Lessor and Lessee agree that such consent shall not be unreasonably conditioned, withheld or delayed.

14. **Operating Expense Exclusions:** Operating Expenses shall include the reasonable and necessary expenses, which are actually paid by Landlord in connection with the operation, maintenance and repair of the Building, Premises and Project (collectively, the "Project") as reasonably determined in accordance with generally accepted accounting principles ("GAAP"), consistently applied, but specifically excluding the following:

i) interest, principal, points and fees on, and any other costs relating to, any debt instrument encumbering, or any other financing relating to, all or any portion of the Project;

ii) ground lease rental;

iii) costs for utilities, services and other benefits that are provided selectively to other tenants or occupants for their benefit and not provided to Tenant;

iv) costs, which are payable or reimbursable to Landlord by warranties or guarantees, insurers or governmental authorities, Tenant, other tenants or occupants or otherwise;

v) leasing, brokers' and other fees and commissions, attorneys' fees, court costs and other legal expenses, space preparation costs, leasing inducements and concessions, and other costs incurred in connection with leasing of the Project (including advertising, marketing and promotional expenses) or negotiations or disputes with past, present, future or prospective tenants or other occupants, or in enforcing leases, or in defense of Landlord's interest in or title to the Project;

vi) management, administrative, coordination, supervision or similar fees, or Landlord's general and administrative and overhead expenses, except for a property management fee not to exceed two and one-half percent (2.5%) of Tenant's Rent;

vii) any improvements, alterations or other capital expenditures, or depreciation or amortization thereof or of any portion of the Project or any improvements or equipment (and the costs of leasing HVAC, elevators and other equipment normally considered to be of a capital nature);

viii) tenant improvement costs and other costs (including permit, license, inspection and other fees) incurred in renovating or otherwise improving, decorating, painting or altering space for Tenant, other tenants or occupants or vacant space at the Project;

ix) repairs, alterations, additions, improvements, or replacements made to rectify or correct any defect in the design, materials or workmanship of any portion of the Project, or to comply with any laws or governmental regulations including ADA and state and local disability access requirements;

x) damage and repairs attributable to fire or other casualty;

xi) damage and repairs covered under any insurance policy carried by, or required to be carried by, Landlord in connection with the Project;

xii) damage and repairs caused by or necessitated by the negligence or willful misconduct of Landlord or Landlord's agents, employees or contractors;

xiii) compensation, benefits and other costs of executives and employees above the grade of building manager;

xiv) compensation, benefits and other costs of all other personnel to the extent such personnel provide services not solely in connection with the operation or maintenance of the Project;

3

IrwinMortgageLsAdd2

xv)     Interest, penalties or other costs arising out of Landlord's failure to make timely payment and performance of its obligations;

xvi)    costs of or other amounts paid to subsidiaries or affiliates of Landlord for management or other services for the Project or for supplies or other materials to the extent that such costs or amounts exceed the competitive cost of similar services, supplies or materials available from third parties unrelated to Landlord;

xvii)   costs (including expert and consulting fees and expenses) incurred to test, monitor, survey, cleanup, contain, abate, remove or otherwise remedy Hazardous Substances from the Project;

xviii)  rent for space within the Project or other locations;

xix)    costs of sculptures, paintings, decorations and other objects of art;

xx)     costs of any political, charitable, civic or other contribution or donation;

xxi)    any cost or expense which, under GAAP, would not be considered a normal or reasonable maintenance and operating expense; for similar projects in the same geographical area.

15.     *Base Year:* Base year shall be adjusted to reflect 100% occupancy and a fully assessed building.

16.     *Security:* Lessee will have the right to install its own security system, subject to prior written consent of Lessor, not to be unreasonably withheld, denied or conditioned.

17.     *Non-Disturbance:* Lessor shall use its best efforts to provide a non-disturbance agreement to Lessee within sixty (60) days of the Commencement Date.

18.     *Insurance Requirements:* All insurance requirements required under the lease shall be issued by insurance companies selected by Lessee, but subject to approval by Lessor, which approval shall not be unreasonably withheld. The insurers must be of recognized good standing with a rated of at lease A+ in Best's Key Rating Guide and must be licensed to do business in the state in which the property in located.

19.     *Signage:* Lessee shall not place any sign upon the Premises or the Office Building Project without Lessor's prior written consent. Lessee shall have the non-exclusive right to place its sign identification on the monument sign fronting the property at Lessee's expense. Additionally Lessee shall have the non-exclusive right, at Lessee's sole expense, to place its sign identification on the building eyebrow above its Premises. All signage requests including renderings and plans shall be first presented to Lessor for its review and approval. Lessee's signage shall be in building standard font, size and colors. Lessor shall require professional installation and watertight conditions for any building penetrations. If required, Lessee shall also obtain the approval of the City of Concord for its signage requests. Lessor shall reasonably cooperate with Lessee where necessary for Lessee to obtain its signage. Under no circumstances shall Lessee place a sign on any roof of the Office Building Project.

20.     *Inconsistencies:* In the event of any inconsistencies between the terms of this Addendum and the terms of the Standard Office Lease-Net to which this Addendum is attached, the terms of this Addendum shall control.


LESSOR:                                          LESSEE:

1140 GALAXY WAY, INC.                            IRWIN MORTGAGE CORPORATION, AN
                                                 INDIANA CORPORATION

By                                               By

AUTHORISED SIGNATORIES                           First Vice President  First Vice Pres.
Its: ATTORNEYS IN FACT                           Its:
FOR THE DIRECTORS
Date: December 12, 02                            Date: 12.4.02


4

IrwinMortgageLsAdd2