## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| AMERICAN HOME MORTGAGE | ) | |
| HOLDINGS, INC., a Delaware | ) | Case No 07-11047 (CSS) |
| corporation, *et al.*, | ) | |
| | ) | Jointly Administered |
| Debtor. | ) | |
| | ) | **Objections Due: November 20, 2007 at 4:00 p.m.** |
| | ) | **(prevailing Eastern Time)** |
| | ) | **Hearing Date: November 28, 2007 at 10:00 a.m.** |
| | ) | **(prevailing Eastern Time)** |
| | ) | |

### MOTION OF FNC, INC. FOR ADEQUATE PROTECTION AND RELIEF FROM AUTOMATIC STAY WITH RESPECT TO COLLATERAL MANAGEMENT SYSTEM LICENSE AGREEMENT, OR IN THE ALTERNATIVE, TO COMPEL DEBTORS TO ASSUME OR REJECT AGREEMENT <u>AS AN EXECUTORY CONTRACT</u>

FNC, Inc. ("FNC") hereby files this Motion for Adequate Protection and Relief from the Automatic Stay (the "Motion") with respect to that certain Collateral Management System®️ License Agreement between it and HomeGate Settlement Services, Inc. ("HomeGate" or "HGSS" or the "Debtor"), one of the Debtors[1] herein. In support of the Motion, FNC presents to the Court the following:

### II. JURISDICTION AND VENUE

The Court has jurisdiction over the subject matter of the Motion pursuant to 28 U.S.C. § 1334(b) and the standing order of reference of the district court. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (b)(2)(G).

Venue in this Court is proper under 28 U.S.C. §§ 1408 and 1409(a).

---

[1] Debtors are: American Home Mortgage Holdings Inc.; American Home Mortgage Investment Corp.; American Home Mortgage Acceptance, Inc.; American Home Mortgage Servicing, Inc.; American Home Mortgage Corp.; American Home Mortgage Ventures LLC; HomeGate Settlement Services, Inc.; and Great Oak Abstract Corp. (collectively, the "Debtors").

1626403/4

## II. BACKGROUND

### A. The Parties and the Collateral Management System Implementation and Modification Agreement.

1.      On August 6, 2007 (the "Petition Date"), the Debtors filed a voluntary petition for relief under the Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Since the Petition Date, the Debtors have operated their businesses and managed their affairs as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.      Prior to the Petition Date, FNC provided collateral management system ("CMS"®) software to HomeGate under a certain Collateral Management System Implementation and Modification Agreement (the "CMS Agreement"). The CMS Agreement was between FNC and HomeGate, a wholly-owned subsidiary of American Home Mortgage Corporation ("American Home Mortgage" or "AHM"). It was executed by HomeGate on November 21, 2003 and was accepted by FNC on November 24, 2003. See Exhibit A.

3.      HomeGate was a vendor management company that was established by American Home Mortgage to help expedite the mortgage process by managing third-party vendors. While HomeGate processed flood insurance and credit reports, the primary function of HomeGate was the ordering, processing and underwriting of the appraisals for AHM.

4.      The CMS Agreement is a nonexclusive, limited-term license to install, store, load, execute and display (collectively, "Use") copies of the CMS software, and any designated backup in support of HomeGate's business operations. The FNC Collateral Management System, licensed to HomeGate pursuant to the CMS Agreement, permitted HomeGate to automate and manage the procurement of various products and services from certain of its third-party providers, particularly appraisers. Although HomeGate was the primary user of the FNC

Collateral Management System ("HGSS System"), other subsidiaries or affiliates of HomeGate could also use the HGSS System, but only if they were owned 100% by HomeGate or its parent, American Home Mortgage. AHM currently operates a separate system under the same CMS Agreement for its Real Estate Owned ("REO") operations (the "REO System").

5.    The CMS Agreement was for an initial term of two years, and the CMS Agreement (Section 6, page 13) provided that the Agreement "shall renew automatically for successive six month terms, unless either party gives 60 days advance written notice of its intent to terminate." Neither FNC nor the Debtors has given written notice of its intent to terminate the CMS Agreement.

6.    The Debtors have not used the HGSS System following the Debtors' notice to FNC that AHM was discontinuing its mortgage origination business and that portion of the Debtors' operations would no longer be active or functioning. Thereafter, because of security concerns, discussed in more detail herein, FNC limited access to the HGSS System in order to maintain the integrity of the data within the HGSS System and to prevent any unauthorized dissemination of nonpublic personal information. The REO System, however, remains fully functional and active.

## B. The Debtors' Loan Servicing Business Sale Motion and the Status of the CMS Agreement

7.    On August 7, 2007, the Debtors filed their Emergency Motion for Orders: (A)(i) Approving Sale Procedures; (ii) Scheduling a Hearing to Consider Sale of Certain Assets Used in the Debtors' Loan Servicing Business; (iii) Approving Form and Manner of Notice Thereof; and (iv) Granting Related Relief; and (B)(i) Authorizing the Sale of Such Assets Free and Clear of Liens, Claim, Encumbrances, and Other Interests; (ii) Authorizing and Approving Purchase Agreement Thereto; (iii) Approving the Assumption and Assignment of Certain Executory

Contracts and Unexpired Leases Related Thereto; and (iv) Granting Related Relief [Dkt. # 11] (the "Emergency Motion") with the Bankruptcy Court.

8.      By the Emergency Motion, the Debtors requested the authority to sell the assets related to the Debtors mortgage loan servicing business (the "Servicing Business") free and clear of all liens, claims, encumbrances and other interests pursuant to section 363 of the Bankruptcy Code and also the authority to assume and assign various agreements related to the Servicing Business pursuant to Rules 6006 and 9014 of the Federal Rules of Bankruptcy Procedure.

9.      In the Motion, the Debtors listed the CMS Agreement as one of the executory contracts which it proposed to assume and assign to the Buyer.

10.      FNC filed an Objection [Dkt. # 720] to the Emergency Motion in which it pointed out that the Debtors listed the "cure amount" for the CMS Agreement as being $296,801.73, when the correct cure amount of the principal obligation was $496,579.35, as more fully reflected on unpaid invoices for the period of June 1, 2007 through August 4, 2007, attached to the Objection as Exhibit "A". Under the CMS Agreement, the Debtors also were obligated to pay interest on the past due, unpaid amounts and for attorneys' fees incurred in the collection of the amount due to FNC.

11.      The objection filed by FNC also pointed out that in the event that the CMS Agreement was not assumed and assigned pursuant to FNC's consent, the executory contract should be rejected no later than ten (10) days after entry of the order approving the sale. FNC sought this relief because it was, and continues to be, concerned that if the CMS Agreement is not promptly rejected, the licensed software and the transfer to or use by or for the benefit of a prospective purchaser would effect a *de facto* assignment of the licensed software in derogation of the CMS Agreement. That is, the Debtors, without an assumption of the CMS Agreement, would pass such benefits under the CMS Agreement *(i.e.,* the use of the licensed software)

1626403/4                                        4

through to the Buyer in derogation of FNC's right to control the parties that utilize FNC's licensed software. A *de facto* assignment would circumvent all the requirements of section 365 of the Bankruptcy Code by permitting the Buyer to receive the benefits of the CMS Agreement for as long as it chose without ever having to become liable on the contract.

12.    Subsequently, the Debtors sought to negotiate with FNC a cure amount less than that which was required by the Bankruptcy Code. FNC rejected the Debtors' proposal for a substantially reduced cure amount. Consequently, on or about October 15, 2007, the Debtors filed their Second Notice of Contracts Excluded from (i) Possible Assumption and Assignment of Certain Leases, License Agreements, and Executory Contracts; and (ii) Proposed Cure Obligations, if Any (Dkt. # 1546), in which the Debtors removed the CMS Agreement as one which they sought to assume and assign. The Debtors contended that the FNC Objection was moot and that FNC would need to move to effect a determination regarding the assumption or rejection of the CMS Agreement.

13.    Because the HGSS System for HomeGate has been inactive, as discussed in more detail herein, FNC proposed certain reasonable fees to AHM for retrieving and furnishing appraisal information to AHM. Specifically, FNC proposed that it would bill AHM for FNC's costs in FNC's pulling requested data and forwarding it to AHM as follows:

A.    $15.00 per file for the first appraisal file on a specific property;

B.    $6.00 for each additional appraisal file on the same property (even if this file was within the same folder); and

C.    A minimum charge of $500.00 per request, regardless of the number of appraisal files requested.

The Debtors did not accept this offer or agree to pay these reasonable expenses incurred by FNC to provide the requested information and documentation to the Debtors.

13.     As noted in the Limited Objection of the Official Committee of Unsecured

Creditors to the Emergency Motion (Dkt. # 1621), "[t]he Seller [the Debtors], as servicer, does

not own the funds in the Custodial Accounts nor the files related to each Loan and cannot

'convey the Property' or 'good and marketable title' other than the rights and interests that it has

*as servicer*." ¶12, at 4-5.

14.     On or about October 29, 2007, the Court entered its Order Approving Sale of

Debtors' Servicing Business to MidFirst Bank, as Buyer (Dkt. # 1697). The Order provides, in

part: "The Debtors are not selling personally identifiable information to the Buyer." Sale Order,

¶D, at 2. Furthermore, none of the data or personal information in the HGSS System appears to

be "Property" conveyed to the Buyer under the Mortgage Servicing Purchase Agreement, a copy

of which was attached as Exhibit "A" to the Sale Order.

### C. Privacy Concerns and the Collateral Management System

15.     The HGSS System contains certain customer information which is stored and

processed for the purpose of originating and servicing mortgages with individual mortgage

borrowers. In fact, the HGSS System presently maintains information for approximately a half

million (500,000) appraisals, all of which contain personally identifiable information of the loan

applicants. The HGSS System is an internet-based system. Therefore, any HomeGate employee

who had a password to the HGSS System could log in from any computer with internet access

and retrieve the information and data within the HGSS System, including the nonpublic, personal

information.

16.     As detailed more fully below, both FNC and Debtors are subject to various "data

breach" statutes and regulations enacted by the federal government which require FNC (with the

advice and assistance of the Debtors) to maintain certain security practices and employ certain

encryption technology to comply with the provisions of these statutes (or avoid their disclosure

1626403/4                                             6

requirements). *See, e.g.*, Gramm-Leach-Bliley Financial Services Modernization Act, Pub. L.

No. 106-102, 15 U.S.C. § 6801, et seq. ("G-L-B Act") and 16 C.F.R. § 313, 65 Fed. Reg. 33646

(May 24, 2000)).   At least 35 states have also adopted "data breach" statutes (*see, e.g.*, National

Conference    of    State    Legislatures,    State    Security    Breach    Notification    Laws,

http://www.ncsl.org/programs/lis/cip/priv/breachlaws.htm).

17.    One aspect of the G-L-B Act is the Privacy Rule, under which both FNC and the

Debtors are defined as "financial institutions" and subject to the provisions of the G-L-B Act and

the regulations. *See* 15 U.S.C. § 6801-6809; *see also* 16 C.F.R. Part 313, Privacy of Consumer

Financial Information; Final Rule.   Another aspect of the G-L-B Act is the Safeguards Rule,

which requires financial institutions to develop a written information security plan that describes

how the company is prepared to protect clients' nonpublic personal information. *See* 15 U.S.C. §

6801-6809; *see also* 16 C.F.R. Part 314, Standards for Safeguarding Customer Information; Final

Rule.

18.    Section 501 of the G-L-B Act requires the specified federal agencies to establish

appropriate standards for the financial institutions subject to their respective jurisdictions relating

to administrative, technical, and physical safeguards for customer records and information. The

safeguards of the G-L-B Act are designed, among other things, to: (a) insure the security and

confidentiality of customer records and information; (b) protect against any anticipated threats or

hazards to the security or integrity of such records; and (c) protect against unauthorized access to

or use of such records or information that could result in substantial harm or inconvenience to

any customer.

19.    Pursuant to the G-L-B Act, these federal agencies adopted the Interagency

Guidelines Establishing Standards for Safeguarding Customer Information (66 Fed. Reg. 8616,

12 C.F.R. Part 30 et al.) (the "Guidelines").   Under these Guidelines, financial institutions are

obligated to develop and maintain an Information Security Program.  Both FNC and the Debtors are required independently to maintain the integrity of the non-public personal information in the HGSS System.

20.    The maintenance of the appropriate security of any major system, such as FNC's CMS software, requires the active participation of both the provider of the system (FNC) and the user of the system (HomeGate).  For example, each party was to appoint a project coordinator who would have day-to-day responsibility for overseeing and coordinating the activities related to the HGSS System.  In the CMS Agreement, both HomeGate and FNC recognized "the importance of maintaining a consistent team of project participants and shall make reasonable effort to retain their respective project coordinators for the duration of this project."  CMS Agreement, Section 2(a), at 7.  Furthermore, the CMS Agreement requires both parties to work cooperatively to prevent a data breach.  FNC and HomeGate are obligated to "meet and confer" on a routine basis with respect to the Information Security Program.

21.    As a result of the Guidelines and a contractual obligation between FNC and HomeGate, FNC maintains the security of the HGSS System according to its own Information Security Program.  *See* CMS Agreement (Exhibit A to the Motion) at Exhibit E.  FNC also worked with and provided information to HomeGate so HomeGate could complete its own Information Security Program.

22.    The Federal Trade Commission ("FTC") has been particularly active in penalizing companies under the Fair Credit Reporting Act[2], the G-L-B Act[3] and section 5 of the Federal

---

[2] See 15 U.S.C.A. § § 1681-81x.

[3] See 15 U.S.C.A. § § 6801-09.  G-L-B Act violations are applicable to FNC through the broad definitions in the Act's enforcement provisions.  See 15 U.S.C. § 6805.  Depending on the particular supervisory authority, companies may be subject to various civil penalties.  See 15 U.S.C. § 6805.  In addition, under certain circumstances, violations may also be punishable by criminal penalties and fines, including imprisonment up to five years. 15 U.S.C. § 6823.

Trade Commission Act ("FTC Act")[4].   Chair Deborah Platt Majoras has made numerous statements in connection with FTC enforcement actions indicating that companies have a duty to protect information they collect.  *See* Press Release, BJ'S Wholesale Club Settles FTC Charges (June 16, 2005), available at www.ftc.gov/opa/2005/06/bjswholesale.htm ("Consumers must have the confidence that companies that possess their confidential information will handle it with due care and appropriately provide for its security"); Press Release, ChoicePoint Settles Data Security Breach Charges; to Pay $10 Million in Civil Penalties, $5 Million for Consumer Redress (Jan. 26, 2006), available at www.ftc.gov/opa/2006/01/choicepoint.htm ("Consumers' private data must be protected from thieves . . .. Data security is critical to consumers, and protecting it is a priority for the FTC, as it should be to every business in America."); Press Release, CardSystems Solutions Settles FTC Charges (Feb. 23, 2006), available at www.ftc.gov/opa/2006/02/cardsystems_r.htm ("Any company that keeps sensitive consumer information must take steps to ensure that the data is held in a secure manner.").

23.    Under the FTC Act, the FTC has pursued actions against companies for data security and privacy violations under the deceptive practices and the unfair practices prong of the Act. *See* 15 U.S.C. § 45(a)(1) (2000). The FTC deems it a deceptive practice for a company to represent that it will keep information safe, such as through a website or other marketing materials, and then not have the proper systems and precautions in place to do so. *See In re Petco Animal Supplies, Inc.*, File No. 032 3221 (Mar. 8, 2005), Complaint at 2-3, *available at* www.ftc.gov/os/caselist/0323221/050308comp0323221.pdf; *See In re Guess? Inc.*, File No. 022 3260 (Aug. 5, 2003), Complaint, *available at* www.ftc.gov/os/2003/06/guesscmp.htm; and *See In re Eli Lilly,* File No. 012-3214 (May 10, 2002). Complaint at 2-3, *available at*

---

[4] See 15 U.S.C. § 45(a)(1) (2000)).
1626403/4                                                                9

www.ftc.gov/os/2002/01/lillycmp.pdf. The FTC also believes it unfair under the FTC Act for a company not to employ reasonable and appropriate measures to secure personal information. *See* Letter from the FTC to Hon. Wendell Ford and Hon. John Danforth, Committee on Commerce, Science and Transportation, United States Senate, Commission Statement of Policy on the Scope of Consumer Unfairness Jurisdiction (Dec. 17, 1980), *reprinted in* Appendix to *In re* International Harvester Co., 104 F.T.C. 949 (Dec. 21, 1984).

24. The FTC has a list of violations it pursues under its privacy and data breach enforcement actions: (i) the failure to encrypt data while in transmission;[5] (ii) a failure to use readily available security measures to protect wireless networks;[6] (iii) the failure to have adequate passwords;[7] (iv) the unnecessary storage of documents and records;[8] (v) failure to have sufficient measures to detect unauthorized access;[9] and (vi) not adequately assessing commonly known or foreseeable risks to data security.[10]

---

[5] *In re* BJ's Wholesale Club, Inc., FTC File No. 042 3160 (June 16, 2005), *available at* http://www.ftc.gov/os/caselist/0423160/0423160.htm.

[6] *Id.*

[7] *Id.* (Stored personal information in files that could be accessed anonymously). *See also In re CardSystems Solutions, Inc., and Solidus Networks, Inc., Doing Business as Pay By Touch Solutions*, File No. 052 3148 (Feb. 23, 2006), *available at* http:// www.ftc.gov/os/caselist/0523148/0523148.htm (failure to use strong passwords to prevent hackers); *In re DSW Inc.*, File No. 052 3096 (March 14, 2006), *available at* http:// www.ftc.gov/os/caselist/0523096/0523096.htm (stored information in unencrypted files which could be accessed with commonly known user ID and passwords).

[8] *In re BJ's Wholesale, supra* (created unnecessary risk because it stored information for up to thirty days where there was no business need); *In re DSW, Inc., supra* (created unnecessary risks to sensitive information by storing it in multiple files when it no longer had a business need for it); *In re CardSystem Solutions, supra* (creating unnecessary risks to sensitive information by simply storing the information).

[9] *In re BJ's Wholesale, supra* (failed to have sufficient measures to detect unauthorized access); *In re DSW, Inc., supra* (failed to employ sufficient measures to detect unauthorized access); *In re CardSystem Solutions, supra* (failure to employ sufficient detection or to conduct security investigation).

[10] *In re CardSystem Solutions, supra* (not adequately assessing the vulnerability of attacks based on SQL (structured query language)).

25.    Two enforcement actions by the FTC against Nations Title Agency, Inc. and Superior Mortgage Corp. illustrate the potential risk of liability under federal law that the dormant HGSS system poses for FNC under the current circumstances. *See In re Nations Title Agency*, File No. 052 3117 (June 20, 2006), *available at* www.ftc.gov/os/caselist/0523117/0523117NationsTitle_Complaint.pdf; *In re Superior Mortgage Corp.* FTC, File No. 052 3136 (Sept. 28, 2005), *available at* www.ftc.gov/os/caselist/0523136/051216comp0523136.pdf.

26.    In the action against Nations Title Agency, Inc., the FTC similarly relied on the G-L-B Act, FTC Safeguards Rule and the "deceptive" prong of the FTC Act in addition to the G-L-B Act FTC Privacy Rule. *In re* Nations Title Agency, File No. 052 3117 (June 20, 2006), *available at* www.ftc.gov/os/caselist/0523117/0523117NationsTitle_Complaint.pdf. The FTC alleged that Nations Title Agency failed to provide reasonable and appropriate security for consumers' personal information by failing to: (i) assess risks to the information they collected and stored both online and offline; (ii) implement reasonable policies and procedures in key areas, such as employee screening and training and the collection, handling, and disposal of personal information; (iii) implement simple, low-cost, and readily available defenses to common web site attacks, or implement reasonable access controls, such as strong passwords, to prevent a hacker from gaining access to personal information stored on Nations Title Agency's computer network; (iv) employ reasonable measures to detect and respond to unauthorized access to personal information or to conduct security investigations; and (v) provide reasonable oversight for the handling of personal information by service providers, such as third parties employed to process the information and assist in real estate closings. *Id.* at 2.

27.    The allegations against Superior Mortgage were similar, including failing to assess risks to customer information in a timely manner, failing to implement appropriate

security to limit access to company systems and documents containing sensitive customer information; failing to encrypt or otherwise protect sensitive customer information prior to sending it via e-mail; and failing to ensure that its service providers were providing appropriate security for customer information and addressing known risks in a timely manner. *In re Superior Mortgage Corp.* FTC File No. 052 3136 (Sept. 28, 2005), *available at* www.ftc.gov/os/caselist/0523136/051216comp0523136.pdf.

28.    These enforcement actions, at minimum, serve as a clear call to FNC to proactively move to prevent a data breach and, that they will be held responsible for the actions of the parties with which they do business in regard to the personal information entrusted to them.

29.    The financial risks to FNC with respect to security breaches or data breaches for the HGSS System are great.  Failure to comply with the myriad state and federal regulations would expose FNC to administrative enforcement proceedings as well as to significant financial costs in terms of the cost of notification and disclosure, restitution, as well as fines and penalties, all of would likely result from a data breach.  Needless to say, penalties and fines related to any data breach related to the over 500,000 files in the HGSS System would be catastrophic for FNC and likely would render FNC insolvent.

30.    More importantly to FNC, as a provider of services to large financial institutions, FNC would be exposed to a loss of its business reputation in the marketplace without adequate safeguards in place to protect against data breaches from the Debtors or their former employees. To the extent that any FNC collateral management system was related to a data breach, the damage to FNC's market reputation could be devastating.  One of the stated purposes of the data breach statutes is to cause the owners or processors of personal information to change their behavior in order to avoid making an embarrassing disclosure of its failure to protect that

information.   Any failure or reported failure would cause FNC's current clients to question

FNC's ability to provide them with adequately secure systems, thus jeopardizing those

relationships.   It would also cause potential new clients to hesitate before engaging FNC for

collateral management system services.

31.     As the Debtors' Emergency Motion noted, as of December 31, 2006, AHM

operated more than 550 loan production offices located in 47 states and the District of Columbia,

and made loans throughout all 50 states and the District of Columbia.   Emergency Motion, ¶ 6, at

3.   The HGSS System assisted HomeGate in the origination process by connecting lenders and

appraisers and thereby permitting lenders to have access to and share appraisal documents and

information.   Many of HomeGate's loan origination offices had access to the data within the

HGSS System, including nonpublic personal information.

32.     When a system of the size and complexity of FNC's HGSS System is "dormant",

both provider and user are at greater risk, since it requires active participation on the part of both

parties to note system anomalies and risks.   Moreover, on information and belief, the Debtors

were not undertaking any of the audit processes for the HGSS System that are required for the

maintenance of proper security for the system and the data contained therein.

33.     Currently, the Debtors are not using the HomeGate implementation of the CMS

Agreement following HomeGate's notice to FNC that AHM was discontinuing its mortgage

origination business and that portion of the Debtors' operations would no longer be active or

functioning.   The Debtors' Emergency Motion confirmed that the Debtors were forced "to

discontinue their retail and indirect loan origination business."  Emergency Motion, ¶12, at 5.

34.     HomeGate's notice to FNC of the discontinuance of its mortgage origination

business was coupled with the Debtors' layoff of substantially all of the HomeGate personnel

with whom FNC had any regular, direct and active contact – administrative assistants, systems

analysts, operations or vendor relations personnel, and even the President of HomeGate. The Debtors' Emergency Motion acknowledged: "[T]he Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees." Emergency Motion, ¶12, at 6). On information and belief, all of the HomeGate operations have been terminated by the Debtors.

35.     As of the Petition Date, there were 342 users with log-in passwords with access to the HGSS system. Furthermore, as HomeGate employees were being terminated, FNC was never informed or advised by the Debtors as to who was, and who was no longer, an authorized user of the HGSS System. To date, FNC still has not received any such information from any of the Debtors.

36.     FNC was concerned by the fact that the Debtors' security procedures and personnel were inadequate to protect the integrity of the data and information within the HGSS System. FNC recognized the security risks in light of the more than 6,500 former employees, some of whom may have been disgruntled at the fact of their sudden termination, and at least 342 of whom had passwords (which they may have shared with others) who had access to the nonpublic personal information with respect to the approximately 500,000 appraisals in the HGSS System. Because FNC never received any instructions or direction from the Debtors as to how they intended to address these security issues and because the HGSS System was potentially porous and susceptible of being easily penetrated by former employees of HomeGate, FNC took steps to limit access to the HGSS System in order to maintain the integrity of the data within the HGSS System and to prevent any unauthorized dissemination of nonpublic personal information.

37.     Although the Debtors are no longer originating new mortgage loans, the Debtors are still using the REO System in the Debtors' daily operations, and the REO System using the CMS software continues to be fully operable and functional. The data and information within the HGSS System, however, may be of limited use to the Debtors' REO operation in light of the

1626403/4                                              14

age of the appraisals and the substantial changes in real estate market conditions. Generally, lenders foreclosing on home mortgages make a sound estimate of property value of the subject property based on an appraisal that provides a sound estimate of the current market value of the property at the time of the foreclosure sale. Where there have been significant declines in market prices from the values established when the initial appraisals were obtained and the loans were made, lenders may need to obtain new, current appraisals rather than relying on older appraisals using outdated data if a home mortgage goes into foreclosure.

38.    The Debtors have not addressed the status of personally identifiable information that was not transferred as a part of the Property purchased by the Buyer[11], and no consumer privacy ombudsman has been appointed in accordance with section 332 of the Bankruptcy Code. FNC believes that the relief it has requested herein, if granted, will address many, if not all, of the issues related to personally identifiable information with respect to the data in the HGSS System.

### III.    RELIEF REQUESTED AND ARGUMENT

39.    Because: (a) neither HomeGate nor any of the other Debtors is still engaged in the loan origination business; (b) the Debtors laid off 6,500 employees, including substantially all of the 342 who had passwords to give them access to the nonpublic personal information with respect to the approximately 500,000 appraisals in the HGSS System; (c) the Debtors laid off all of the HomeGate employees who worked with FNC on security issues related to the nonpublic personally identifiable information; (d) the Debtors notified FNC that they do not desire to

---

[11] Although the Sale Order provides that the privacy policy given by the Debtors to the homeowners does not prohibit the sale contemplated under the Purchase Agreement and the sale is consistent with the privacy policy given by the Debtors to the homeowners, there is no specific finding in the Sale Order that the sale of the Property is consistent with the provisions of section 363(b)(1) of the Bankruptcy Code. Furthermore, the Sale Order does not address appraisals, and the CMS Agreement was removed from the list of contracts to be assumed and assigned pursuant to the Sale Order. Consequently, neither the HGSS System nor the information contained therein that is subject to the privacy laws was a part of the Property sold to the Buyer pursuant to the Sale Order.

1626403/4

assume and assign the CMS Agreement; (e) the Debtors have completely failed to address any security issues with FNC; (f) significant risks exist to FNC and the Debtors for unauthorized access to the HGSS System; and (g) the Debtors have failed the requirements of section 363(b)(1) with respect to information contained in the HGSS System, FNC respectfully requests that this Court grant it adequate protection of its interests as more fully set forth below pending the assumption or rejection of the CMS Agreement,  to compel Debtors to assume or reject the CMS Agreement, or relief from the automatic stay, all as more particularly set forth below.

40.    FNC further contends that the Debtors should be required either to assume or reject the CMS Agreement within a stated period of time, but in the meantime, to provide adequate assurance of performance of their duties and responsibilities thereunder, not only for the protection of the interests of both FNC and the Debtors, but also for the protection of the customer and personal information maintained with the HGSS System.

## A.    Cause Exists to Modify or Condition the Automatic Stay.

41.    Section 362 provides the relevant authority for modifying the automatic stay in these cases.  Section 362(d)(1) of the Bankruptcy Code provides in relevant part that a bankruptcy court "shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-- for cause. . . ." 11 U.S.C. § 362(d)(1).  While section 362(d)(1) permits this Court to grant relief from the stay for "cause," that term is not defined by the Bankruptcy Code.  Consequently, the Bankruptcy Court must decide what constitutes "cause" to lift the automatic stay on a case-by-case basis.  *In re Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (*citing In re Fernstrom Storage and Van Co.*, 938 F.2d 731, 735 (7th Cir. 1991)).  Section 362(d)(1) of the Bankruptcy Code provides that on request of a party in interest and after notice and a hearing, the Court shall grant

relief from the stay "for cause, including the lack of adequate protection of an interest in property of such party in interest."

42.    "[A]dequate protection is a flexible concept which requires a Court to make decisions on a case-by-case basis, after full consideration of the peculiar characteristics common to each proceeding." *In re Monroe Park,* 17 B.R. 934, 941 (D.Del.1982) (citations omitted).  As a court of equity, this Court may consider the consequences of the stay on both of the parties in tailoring relief appropriate for the particular facts of this case.  "Cause" under section 362(d)(1) may include a lack of adequate protection of the creditor's interest.  FNC's interest in the contract is not adequately protected.  Moreover, the Debtors have requested that FNC provide additional services to the Debtors, specifically copying and providing to the Debtors copies of appraisal files that are in the HGSS System, without agreeing to pay for the cost of such copies.

43.    Courts have broad powers in fashioning relief from the automatic stay, including conditioning the lifting of such stay on certain actions.  *See E. Refractories Co., Inc. v. Forty Eight Insulations Inc.,* 157 F.3d 169, 172 (2d Cir. 1998) ("bankruptcy courts have the plastic powers to modify or condition an automatic stay so as to fashion the appropriate scope of relief."); *In re Shared Techs. Cellular, Inc.,* 293 B.R. 89, 93 (D. Conn. 2003) ("The statutory language clearly grants bankruptcy courts authority to modify or condition the automatic stay, thereby empowering them to shape relief mindful of the particular circumstances of each case."). Accordingly, this Court can condition lifting or modifying the automatic stay on the Debtors' providing adequate assurance of compliance with their responsibilities under the CMS Agreement.

44.    In addition to the indebtedness that the Debtors owes and will owe to FNC on a post-petition basis, FNC is particularly concerned about the Debtors' ongoing refusal or inability to cooperate with FNC to meet the parties' obligations to safeguard the security of the data and

1626403/4                                                    17

the personal identifiable information contained in the HGSS System. The G-L-B Act requires prevention of a data breach. It is a statute which emphasizes taking proactive measures to avoid a data breach, so maintaining proper safeguards is mandated by the G-L-B Act. One of the fundamental mechanisms for protecting the integrity of the HGSS System and the information contained therein, and thereby the reputation of FNC, is the Debtors' maintaining an adequate Information Security Program. Maintaining proper security for the HGSS System and the data contained therein requires the active participation of the user of the system (HomeGate) to note system anomalies and risks, to conduct regular audit processes, and to work closely with FNC.

45.    Certainly, FNC's reputation and name is part of the basis of the bargain between it and HomeGate under the CMS Agreement. *See In re Tudor Motor Lodge Associates, Ltd. Partnership*. 102 B.R. 936, 955 (Bankr. D.N.J. 1989). The Debtors must adequately "protect these highly valuable, though intangible, commodities." *Id.* at 954. The name and reputation of FNC are "of such a type that money may never protect the movant. The movant's reputation to the general public is at stake." *Id.* at 957 (*quoting B-K of Kansas*, 69 B.R. at 815).

46.    In an analogous case which involved franchise rights, and not access to approximately 500,000 files containing personal identifiable information, a bankruptcy court determined that a franchisor was not adequately protected, and sufficient cause therefore existed to lift the automatic stay, where a franchisee (i) continued to default on post-petition monetary obligations to the franchisor and (ii) money was insufficient to adequately protect the franchisor. *In re B-K of Kansas, Inc.*, 69 B.R. 812, 815 (Bankr. D. Kan. 1987). In *B-K of Kansas*, the debtor was an operator of several Burger King franchises. Following the commencement of the debtor's case, the debtor failed to make required franchise payments to Burger King, but continued to use Burger King's trade name and service marks without compensation to Burger King. Burger King moved for relief from the automatic stay to pursue its franchise rights. The

court granted the motion, finding that the deficiency in payments showed that Burger King was not adequately protected. The court also held that the potential harm to Burger King's reputation that could be caused by the debtor's actions might never be adequately protected, even by the payment of money. Accordingly, the Court granted Burger King relief from the automatic stay.

47.    Here, the Debtors also have failed to make all of their required post-petition payments to FNC on a timely basis. Also, as described herein, the Debtors have been uncooperative in meeting their obligations to safeguard the HGSS System and the confidential data used therein. All of the persons with HomeGate with whom FNC worked with respect to the HGSS System, from the President down, have been terminated. Apart from the Debtor, FNC has many other clients who use and trust the client-specific version of the CMS System. If the Debtors are granted access to the HGSS System and fail to comply with their obligations thereunder with respect to the security of the HGSS System and the requirements of applicable law, the consequences could be devastating to FNC. Not only might FNC and its officers be liable for draconian civil and criminal penalties, but FNC could be irreparably harmed if the HGSS System is associated with such breaches so that other FNC customers who use their client-specific version of the CMS System terminate their contracts and move to other providers because of the association of the HGSS System with such data breaches. No amount of money could provide adequate protection under those circumstances. Accordingly, it is appropriate to grant FNC relief from the automatic stay to pursue its rights to terminate the CMS Agreement with the Debtor.

48.    Good cause also exists to modify, condition or lift the stay as requested in this Motion. The Debtors have not offered assurances that they intend to perform post-petition under the CMS Agreement. In fact, the Debtors have indicated just the opposite. The Debtors have refused to agree to reimburse FNC for reimbursement of expenses associated with measures to

safely transfer information to them.  Furthermore, the Debtors have not acted in a manner which supports the mutual contractual obligations to protect the consumer information in the HGSS Systems nor even communicated with FNC regarding the same.

49.    Because the Court has approved the sale of the Servicing Business to MidFirst Bank, which is not a subsidiary or an affiliate of HomeGate that is "owned 100% by the Client [HomeGate] or Client's parent" (CMS Agreement, Section 4 (b), at 10), the Buyer cannot use the HGSS System for its operations.  Moreover, because the CMS Agreement is a non-transferable, non-exclusive license, the Buyer cannot use the HGSS System without the express written consent of FNC.  Even during the period pending licensing by the Buyer, it is inequitable for the Debtors to continue to use the HGSS System as it results in a *de facto* assignment of the HGSS System in derogation of applicable state law.  The unfairness of the circumstances is exacerbated by the refusal of the Debtors to pay the full cure amount required by the Bankruptcy Code when they initially sought to assume and assign the CMS Agreement.

50.    As a result, and for all of the foregoing reasons articulated in the arguments above, FNC requests that the stay be conditioned on the Debtors' timely performance under the CMS Agreement and the escrowing of funds sufficient to meet these post-petition obligations.

**B.    In the Alternative, the Court should Compel the Debtors to Assume or Reject the CMS Agreement.**

51.    The Court may order the Debtors "to determine within a specified period of time whether to assume or reject" executory contracts.  11 U.S.C. § 365(d)(2).  "Congress intended this provision to 'prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-à-vis the estate.'"  *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1079 (3d Cir. 1992) (*citing* S. Rep. No. 989, 95th Cong., 2d Sess. 59 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5845).

52.    FNC requests that this Court enter an order pursuant to section 365(d)(2) of the Bankruptcy Code compelling the Debtors to seek to assume or reject the CMS Agreement.  The uncertainty surrounding the Debtors' sale process vis-à-vis the CMS Agreement and their failure to pay post-petition obligations warrant an immediate assumption or rejection of the CMS Agreement.  Absent that, the Debtors will continue enjoying the use of the CMS Agreement without assurances that post-petition obligations, including the reimbursement of expenses under the CMS Agreement will be paid.  The Debtors should not be allowed to enjoy the benefits of the CMS Agreement without in turn meeting the accompanying obligations.  *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1306 (11th Cir. 2007) ("debtor cannot accept only benefits of an executory contract while eschewing the burdens").   If the Debtors do not satisfy their post-petition obligations, FNC will essentially be forced to provide unsecured, post-petition credit for the Debtors' sale process without any indication whether the Debtors intend to assume or reject the CMS Agreement.  Furthermore, FNC's potential exposure under the G-L-B Act, state law and the contract, especially under the current circumstances where the Debtors' failure to honor their post-petition obligations related to the protection of the personally identifiable information located within the HGSS System, warrants a determination regarding the status of the contact as soon as possible.

WHEREFORE, for all of the above reasons, FNC requests that the Court enter an order (i) granting this Motion; (ii)  requiring the Debtors to provide adequate protection of FNC's interests by permitting the HGSS System to remain dormant and inactive so that the only access to the HGSS System is by FNC personnel; (iii) requiring the Debtors to provide adequate protection of FNC's interests by requiring, insofar as the REO System is concerned, that the Debtors continue to participate actively as the user of the system with FNC (as the provider) in maintaining the integrity of the security of the HGSS System, including requiring the Debtors to

1626403/4                                                 21

be involved in the audit processes that is inherent in the maintenance of proper security for the system and the data contained therein; (iv) requiring the Debtors provide adequate protection of FNC's interests by requiring the Debtors comply with the requirements of 11 U.S.C. § 363(b)(1) with respect to personally identifiable information; (v) requiring the Debtors to provide adequate protection of FNC's interests financially by requiring the Debtors to pay FNC in the ordinary course for the reasonable costs and expenses incurred by FNC pursuant to the CMS Agreement for the use of the HGSS System prior to the Debtors' decision to assume or reject the CMS Agreement as an executory contract, including charges for providing requested information and documentation contained in the dormant HGSS System, as set forth above; (vi) compelling the Debtors to assume or reject the CMS Agreement within 30 days from the date of the filing of this Motion; (vii) alternatively, for relief from the automatic stay to permit FNC to give written notice of its intent to terminate under the express terms of the CMS Agreement; and (viii) granting such other and further relief as is just and equitable.

Dated: November 2, 2007

**MORRIS JAMES LLP**

Rafael Zahralddin-Aravena (DE Bar No. 4166)
Morris James LLP
500 Delaware Ave., Suite 1500
P.O. Box 2306
Wilmington, Delaware  19899-2306
Telephone:  (302) 888-6947
Facsimile:  (302) 571-1750
Email:  rxza@morrisjames.com

-and-

Stephen W. Rosenblatt (MS Bar No. 5676)
Butler Snow O'Mara Stevens & Cannada PLLC
17th Floor, Regions Plaza
Post Office Box 22567
Jackson, Mississippi  39225-2567
Telephone:  (601) 985-4504
Email:  steve.rosenblatt@butlersnow.com

*Counsel for FNC, Inc.*