# EXHIBIT A



> *FNC, Inc.*
> **CONFIDENTIAL**

**Collateral Management System
Implementation and Modification
Agreement
*Execution Version***

---

Client agrees to the implementation and modification of the FNC Collateral Management System according to the terms and conditions of this Agreement, which includes the attached documents.

## Parties

Client:    HomeGate Settlement Services*
520 Broadhollow Road
Melville, NY 11747
Phone:  (516) 396-7723
Fax: _____
Attention:  Lance Thoet

*HomeGate Settlement Services is a wholly-owned subsidiary of American Home Mortgage Corporation, which shall guarantee HomeGate Settlement Services obligations under this agreement

FNC:    FNC Inc, a Mississippi corporation ("FNC")
606 Van Buren
Oxford, MS  38655
662-236-2020
662-236-2037 (Facsimile)
Attention:  General Counsel

## Dates

The initial term of this agreement shall be 2 years

Date of signature: _____

Commencement Date: _____

Initial Termination Date: _____

## Project Managers

Client:    Lance Thoet
President

(516) 396-7723
lthoet@homegateservices.com

[name #2]_____
[title] _____
telephone _____
e-mail _____

FNC:        Nick Wanzenreid
            Project Manager
            (714) 966-1099, ext 555; (310) 463-5293 cell
            nwanzenreid@fncinc.com

            [name #2]_____
            [title] _____
            telephone _____

**This Agreement includes the following documents, all of which are incorporated herein by reference**

- **Standard Terms and Conditions** (revision date 20 August 2003)

- **Exhibit A**       **Statement of Work (including sub-exhibits)**
- **Exhibit B**       **Pricing**
- **Exhibit C**       **Client's Travel and Expense Reimbursement Policy**
- **Exhibit D**       **Client Related Organizations**

**IN WITNESS WHEREOF,** for adequate consideration and intending to be legally bound, the parties hereto have caused this Agreement to be executed by their duly authorized representatives.

[Client].                              FNC, Inc.

By: _____           By: _____

Name   LANCE A. THOET                 Name   Charles A. Hurst

Title   PRESIDENT                     Title   Director, National Sales

Date   11-21-2003                     Date   11/24/2003



**Collateral Management System
Standard Terms and Conditions**
August 20, 2003 version

**THESE STANDARD TERMS AND CONDITIONS** along with all Exhibits and Schedules (the "**CMS Agreement**") shall govern the rights and obligations of FNC, Inc and Client with respect to all issues regarding FNC's licensing, modification, installation, maintenance and management of FNC's Collateral Management System for Client.

**WHEREAS,** FNC has developed and owns the FNC Collateral Management System, which it licenses to Clients to allow them to, among other things, automate and manage the procurement of various products and services from certain of Clients' third party Providers;

**WHEREAS,** FNC has created, owns, and operates the FNC Ports for the processing of and for the fulfillment of requests for Provider's Products and services;

**WHEREAS,** FNC desires to license to Client the Collateral Management System, including especially the Software, to provide access to the FNC Systems and FNC Ports, and to grant Client a non-transferable, non-exclusive, revocable right to gain access to and use the FNC Ports and FNC Systems, and Client desires to license the Software and to subscribe to and interface to the FNC Ports and FNC Systems, all pursuant to the terms and conditions provided in these Standard Terms and Conditions including all Exhibits and Schedules. These Standard Terms and Conditions, including all Exhibits and Schedules are incorporated into the Collateral Management System Implementation and Modification Adoption Agreement

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

## Definitions

For purposes of this Agreement, the following terms shall have the meanings defined in this section for all purposes of this Agreement. The singular form includes the plural form and vice versa. Any capitalized term used in this agreement and not included here shall have the meaning given to it elsewhere in the Agreement.

"Base Technology" shall mean all of the Collateral Management System computer software, processes and source codes developed by FNC and/or licensed to it without modification to suit Client's specific requirements.

"Client" shall mean a financial institution and/or other individual or entity desiring to use the FNC Collateral Management Systems.

"Confidential Information" shall mean all of Client's or FNC's confidential and proprietary information including, but not limited to: Client's or FNC's forms, processes, software, systems, pricing, technology and know-how; customer, vendor, agent, and/or appraiser identities and lists; business or financial information and plans; research and development plans or projects; the identity of any existing or potential co- or joint-venturer; any information that is marked or identified, orally or in writing, by Client or by FNC, as confidential or proprietary; and any information that FNC or Client should recognize as confidential or proprietary from the circumstances surrounding its disclosure.

"Custom Work Product" shall means any Functional Design, Technical Description and any software (including programs, modules, code, algorithms, flowcharts, data diagrams, documentation and the like) created by FNC on behalf of Client and in furtherance of the Statement of Work whether before or after the execution of this agreement. Custom Work Product does not include any Base Technology, any third party software, any preexisting software owned by FNC or by any third party and incorporated or "embedded" into the Custom Work Product.

"Documentation" shall mean descriptive information in whatever form that describes the FNC Collateral Management System functions and features in sufficient detail to be understandable to a CMS user of general proficiency.

"Delivery" shall mean the successful transmission of a completed Provider Product or service to the Client (or Client's designee) by use of FNC Collateral Management Systems, FNC Ports, or other method designated in writing as acceptable to the Client.

"FNC Collateral Management System" (sometimes referred to as the "FNC CMS" or the "CMS") shall mean the collateral processing software systems such as the Appraisal Management System (AMS), the Collateral Management System (CMS) and the BankPort system and other related FNC electronic commerce systems that have been or may be developed by FNC for the purpose of allowing FNC's Client customers to (among other things) automate and manage their procurement of products and services, especially from third parties. Once modified and adapted to suit Client, installed and in operation, the specific instance of the Collateral Management System may be referred to as "Client's Collateral Management System".

"FNC Port" shall mean the Internet based, electronic commerce systems such as "Appraisalport.com", "Bankport.com" and other transactional systems along with other communication interfaces or alternative accesses as have been or may be developed by FNC. These systems are for the processing of requests for products and services from Clients, and for the fulfillment of the Clients' requests by Providers of third party services.

"Order" shall mean a Client offer or request transmitted through FNC Collateral Management Systems and FNC Ports for one of Provider's Products or Services that the Provider may or may not accept.

"Provider" shall mean a vendor or supplier (whether an individual or entity) of certain products and services that Client desires to obtain, especially through the FNC Collateral Management Systems.

"Provider Product or Service" (sometimes referred to as "Products") shall include any product, service and/or information that Provider may supply or transfer to a Client through the FNC Collateral Management Systems and/or FNC Ports.

"Software" shall mean all of the Base Technology and Custom Work Product, as well as any and all ancillary and/or complementary software necessary and/or convenient to the operation of the Collateral Management System. For purposes of convenience and reference the Software may be subdivided into parts, especially server site software, client site software and web application software, and derivative works thereof. All of these parts and portions of the Software are incorporated into the definition of the Software.

"Transaction" shall mean either:

(1)     Individual or Unbundled pricing. In the case of Individual or Unbundled Pricing, a Transaction is the successful transmission of a completed Provider Product or Service Delivery (where a fee is due to a Provider) in response to a Client Order. Multiple communications that are part of the same Order and Delivery between Client and a Provider will be considered part of the same Transaction.

However, where there is more than one transmission and the Provider Product or Service Delivery is entitled to a separate billing charge from Client, such separate event shall be deemed a separate Transaction for purposes of this Agreement, and a separate fee shall be due to FNC.

(2)     Bundled pricing. In the case of Bundled Pricing, a Transaction occurs with the opening of a separate Client electronic loan folder within the Client's FNC Collateral Management System and the successful transmission of a Client Order for a Provider's Products from within that loan folder.

# 1.    General Undertaking.

FNC shall perform the services and at the prices set forth in the attached <u>Statement of Work, Exhibit A</u> (including its sub-exhibits) according to the terms of this Agreement.  Those services are generally described as including:

(a)    <u>Software Design</u>.    FNC owns or has requisite rights to certain preexisting computer software (the "Base Technology").  Client wants to modify and adapt the Base Technology to meet Client's particular needs. Those changes will be incorporated into a Project Plan developed by the parties once this agreement is executed.

(b)    <u>Software Development</u>. FNC shall develop, test and implement the Software in accordance with the Statement of Work, Exhibit A and its sub-exhibits and the Project Plan and Section 2 ("Project Management").

(c)    <u>Training Services.</u> FNC shall provide Client (at Client's cost) a certain number of Training Days identified in the Statement of Work for the training of Client's staff in the use and operation of the Software at a site provided by Client.

A customized training program, which will include a minimum of 3 days of classroom style training, will be developed for Client by FNC as part of the Implementation Fee.  In addition, FNC will conduct at its cost six WebEx training sessions to Client's appraisal network.

(d)    <u>User Documentation</u>.  FNC shall, no later than five (5) calendar days after final delivery and Client's acceptance of the Software, provide Client five (5) printed copies of Documentation (along with a single electronic copy) describing in reasonable detail (understandable by a CMS user of general proficiency) the use and operation of the Client CMS and the FNC Ports.  Client may use this Documentation during the term of this Agreement. Client may reproduce the Documentation solely for purposes authorized herein.

(e)    <u>Interface with FNC Systems and FNC Ports</u>.  FNC will process and transmit Orders, Products and communications between Client and Providers via FNC Collateral Management System and FNC Ports, relaying them in an electronic format. FNC and Client will use commercially reasonable efforts to complete the interface between FNC and Client to enable the Client to have full use of the FNC Systems and FNC Ports.

FNC is not a re-seller of Provider's Products, is not a vendor manager for Providers, nor is it acting as an agent on behalf of either Client or Provider.  It is not responsible for the content of the information or data transmitted through the FNC Ports or FNC Collateral Management System, and specifically disclaims any liability for the accuracy, appropriateness or authenticity of the content, Products, communications or Transactions.

(f)    Maintenance Agreement. FNC will provide maintenance and support of the Software as agreed upon in the Statement of Work, Exhibit A, for the fees stated Exhibit B, Pricing.

## 2.    Project Management.

(a)    Project Coordinators. Each party shall appoint a project coordinator having day-to-day responsibility for overseeing and coordinating the activities contemplated herein. Project coordinator duties shall include scheduling and presiding over meetings and design/review sessions, coordinating with their individual staffs, conducting testing and acceptance of portions of the Software and/or other aspects of Client's Collateral Management System. The initial project coordinators for Client and for FNC shall be designated in the Acceptance Form for this Agreement. Each party acknowledges the importance of maintaining a consistent team of project participants and shall make reasonable effort to retain their respective project coordinators for the duration of this project.

(b)    Project Definition. Within thirty (30) days following the acceptance and delivery of this Agreement, the Project Coordinators will jointly develop and publish a project scope and delivery schedule. After completion and acceptance of this project document, the project team will undertake the project implementation process, which will be accomplished in conjunction with the delivery schedule.

(c)    Project Schedule. The parties shall prepare a Project Schedule for the work contemplated herein. Unless otherwise agreed in writing, any Project Schedule prepared by the parties shall be considered a reasonably accurate estimate, which the parties will agree in good faith to follow.

(d)    Certain Client Responsibilities. The Client shall make every reasonable effort to maintain a stable scope of work and both parties will work in good faith to minimize the number of changes in the scope of work throughout the process to assure a prompt development and installation of Client's CMS. Client shall provide prompt and timely feedback and approval of all work product delivered hereunder. In addition, the Client shall make reasonable efforts to ensure

(i)    any associated software and equipment necessary to operate the CMS are installed and operated according to at least the minimum requirements designated by FNC (and any applicable manufacturer specifications and recommendations);

(ii)    all upgrades, new releases and engineering changes to associated software and equipment specified or recommended by FNC or the applicable manufacturer have been procured by Client and properly installed, especially including those described in the Statement of Work or other documents;

(iii)    where Client is hosting its own CMS installation and servers, the Client has established a suitable first rate facility for the location and operation of any and all servers and telecommunications required for the operation and convenience of the FNC Collateral Management System, including, at a minimum a continuous,

uninterrupted and suitable power supply, uninterrupted and suitable controlled temperature, humidity and other environmental conditions, redundant telecommunications sources, all as recommended by the applicable manufacturers and/or FNC;

(iv)    no other associated software or equipment which may have an adverse effect on the performance of the Software has been introduced;

(v)    no changes to any source code, configuration parameters or other user-adjustable features for the Software are made without the express consent of FNC, and

(vi)    where Client is hosting its own CMS installation and servers,  that Client institutes appropriate backup and recovery procedures.

(e)    <u>Testing & Acceptance</u>.

(i)    <u>Test Procedure</u>.  FNC shall install and provide Client reasonable on-site assistance in testing the Software. Following delivery and installation of the Beta Version, Client shall have a testing period (the "Test Period") as outlined in the project scope plan.  The Test Period following delivery of the Beta Version will allow Client to conduct reasonable testing of the Software to determine whether it performs substantially in accordance with the Technical Description developed jointly by the parties. Client shall FNC with provide reasonable access to its premises during regular business hours (with prior written notice); proper environmental and site conditions; any required test data in a format acceptable to FNC; and the cooperation of its staff to assist FNC during installation and testing of the Software. On-site testing shall be conducted by reference to a written "Test Plan" adopted by FNC and Client. Client shall promptly "sign off" each function on the Test Plan as it is demonstrated.  The "Test Period" shall continue for no more than 30 days, unless extended in writing by the parties, which writing states the number of days.

(ii)    <u>Correction of Defects</u>.  If no material defects are identified in writing during execution of the Test Plan during the Test Period, the Software shall be deemed accepted by Client. If material defects are identified during the Test Period, Client shall provide a written list of such defects, identifying the particular specification at issue and providing detailed reasons why the tested feature does not meet the specification.  FNC shall have a reasonable opportunity to correct, replace or provide functional "workarounds" for all items or to commence corrective action reasonably acceptable to Client and proceed with reasonable diligence to completion.

(iii)    <u>Acceptance of Software</u>.  The Software shall be deemed accepted if Client does not notify FNC in writing of any material defects during the Test Period.

It is the stated goal of both Client and FNC that the Software be installed and in operation quickly so as to give the Client the beneficial value of the Software.  During the Test Period and thereafter, Client shall work in good faith to make beneficial use of the Software, even to the extent that it may or may not have material or immaterial defects.  To the extent that there may be material defects that Client identifies in writing, the remainder of the Software shall be deemed accepted, subject to the remedy of those material defects.  Client and FNC may agree, however, that the Software is provisionally accepted and place it into operation, subject to an adjustment in

Client's liability to FNC (which the parties shall negotiate in good faith).

## 3 Price and Payment.

(a) FNC Software Design Services. FNC shall be responsible for any software design and all development services with respect to Client's core CMS system In addition, future development, enhancements and customizations will be included within the transaction pricing for Client's CMS system (as described and enumerated herein). To the extent Client requires design and/or development services outside of its CMS system, and no other method is set, all design and development services shall be performed on a straight "time and materials" basis at the labor rates set forth in the attached Pricing Schedule, Exhibit B. FNC shall maintain contemporaneous time records of services performed. Any services performed outside the scope of Client's CMS system, unless otherwise agreed, shall be compensated at FNC's then current published rates, which shall be reasonable in light of similar services provided within the software community. No rates shall increase more that 10% during any calendar year.

(b) Base System Implementation Fee. The Software is being implemented by FNC in consideration of the Base System Implementation Fee set forth in the attached Pricing Schedule, Exhibit B.

(c) Charges for Use of the FNC Systems and FNC Ports. Through the FNC CMS and the FNC Ports, FNC will track all Client requests made to Providers. The tracking will include a listing of all Client Orders, the dates and times on which the orders are placed, the dates and times on which Client delivers the products ordered through the FNC CMS and FNC Ports and other information as required or convenient to the tracking and billing of Transactions. Client agrees to pay FNC a fee for each Transaction as set forth in Exhibit B.

Client agrees that the Fees to be paid by Client are Confidential Information, and shall not be disclosed to any person or entity without FNC's written permission. If Client should learn the terms of any fee relationship between FNC and any third party, Client agrees that such terms are also confidential and Client will not disclose such information to any person or entity without FNC's written permission.

(d) Out-of-Pocket Costs and Taxes. Except as otherwise set forth in this Agreement, prices quoted for services do not include (and Client shall reimburse FNC for) its cost of travel (including, for example, air and train fare, lodging and meals, auto rental, cab fare, other fare, local mileage, standard per diem, etc.) and out-of-pocket costs for photocopying, overnight courier, long-distance telephone, Internet services and the like. All reimbursements shall be consistent with Client's normal travel and expense reimbursement policies. A copy of Client's normal travel and expense reimbursement policies is attached to this Agreement as Exhibit C.

Unless separately stated on invoices issued by FNC under this Agreement, Client shall indemnify and hold FNC harmless from all sales, use, gross receipts, value-added, GST, personal property or other tax or levy (including interest and penalties) imposed on the services or technology

delivered hereunder, other than taxes based on the net income of FNC.

During the implementation period but not thereafter, FNC will assume travel related expenses for its employees.  The implementation period will end after final acceptance of the CMS system (after the testing period) or when Client begins to use its CMS system for transactions in live production, whichever comes first.

      (e)     <u>Billing and Payment</u>.    FNC will bill Client on a monthly basis the total amount of all fees, charges and reimbursements due and Client agrees to pay all such invoices within 30 days of the date of invoice.  Client further agrees that if any sum is unpaid 15 days past the invoice payment due date, Client shall pay FNC 1% interest per month on said unpaid funds from date of invoice until paid in full.  Furthermore, Client agrees to pay all costs of collecting said funds due, include reasonable attorneys' fees (whether any action or suit is commenced or not) and costs of any suit.

      If payment of fees is not received within 60 days of invoice date, FNC may, at its option, interrupt and/or terminate services provided under this Agreement to Client until such time as the invoice is paid in full.

      Client shall inform FNC in writing (which may include an electronic writing) of any billing problems or discrepancies within 45 days after such charge first appears on Client's invoice.  If Client does not bring a dispute concerning a charge to FNC's attention within 45 days of receipt of the invoice first containing such charge, Client shall be deemed to have waived its rights to dispute such problems or discrepancies.

## 4      Proprietary Rights.

      (a)     <u>Ownership of the Software</u>.  FNC owns and shall own all rights, title and interest to the Software (including for example, the Collateral Management System--whether FNC's or Client's), the FNC Ports, and any Software whether related thereto or not), including any modifications to the Software regardless of whether made by FNC or Client, or whether to the FNC CMS and/or FNC Ports.

      (b)     <u>Site License</u>.  Client is granted a nonexclusive, limited term license to install, store, load, execute and display (collectively, "Use") copies of the Software, and any designated backup in support of its business operations.  This license shall be read to encompass all of the subportions of the Software, including, for example Custom Work Product, Base Technology and any third party software, and the subdivisions thereof, especially as to server site software, client site software and web application software.

Notwithstanding anything contained herein, the parties agree that the Software may be used throughout the Client's organization, including its subsidiaries and affiliates' location, but only to the extent that they are owned 100% by the Client or Client's parent.  A list of Client's parent, subsidiaries and affiliates is attached to this Agreement as Exhibit D   It may also be used at any

Client designated disaster recovery site.

Client may not transfer this license to the Software without FNC's prior written consent (which it may exercise in its sole and absolute discretion).  It may not be sublicensed by Client without FNC's prior written consent, except that Client may assign, sublicense or otherwise transfer this Agreement and the licenses hereunder to Client's wholly-owned subsidiaries, parent or affiliates or any successor by merger or consolidation of Client without FNC's consent.

       (c)    <u>Object Code License</u>.  Any Software or any other technology licensed under the Agreement is being provided only in machine-readable object code form.  This license does not extend to, nor shall Client have access to or claim on any source code or other versions of the Software.

       (d)    <u>Ownership of Client's Data</u>.  The parties agree that any information, image or data contained within an Order, Delivery, Provider Product, Transaction or other communication between Client and Client's providers is Confidential Information.  In addition, all information related to any Provider, including without limitation, any pricing is Confidential Information.  All such information, image and data is the property of Client or Clients' provider or customer, as the case may be, and is not the property of FNC.  FNC shall not extract or retrieve any data, image or information from any Order, Delivery, Provider Product, Transaction or other communications, unless the extraction or retrieval of such information is specifically agreed in advance in writing, between the parties.

       (e)    <u>CMS System Source Code Escrow</u>.  FNC shall maintain a copy of the most current version of the source code that forms the basis for Client's CMS system (and the latest version of any documentation thereto) in FNC's established standard source code escrow account.  The source code escrow will be subject to the terms and conditions of the escrow agreement between FNC and the escrow holder.  FNC shall make those terms and conditions available to Client upon request.

In the event that Client desires a different source code escrow agreement or account, then FNC will cooperate with Client in establishing such account on terms acceptable to FNC.  Client will bear the cost of such source code escrow account.

## 5    Term and Termination.

    The term of this Agreement (the "Term") shall be set forth in the Acceptance Form to this Agreement.  In the absence of any term indicated in the Acceptance form, the term shall commence upon the date of this Agreement, and shall continue in full force and effect for a period of two (2) years, unless properly terminated by the parties.

    Either party may, in addition to other relief, terminate this Agreement if:

       (i)    the other party breaches any material provision hereof (including, for example,

any duty to make payments hereunder) and fails within thirty (30) days after receipt of written notice of default to correct such default or to commence corrective action reasonably acceptable to the aggrieved party and proceed with due diligence to completion

(ii)     Either party shall be in default hereof in the event of

1.     a filing by or against the other party of a proceeding under any bankruptcy or similar law, unless such proceeding is dismissed within 30 days from the date of filing;

2.     the filing by or against the other party of a proceeding for dissolution or liquidation, unless such proceeding is dismissed within 30 days from the date of filing;

3.     the making by the other party of any assignment of a material portion of its assets for the benefit of creditors;

4.     the appointment of or the application for the appointment of a receiver, trustee or custodian for all or a material portion of the assets of the other party, unless such appointment or application is revoked or dismissed within 30 days from the date hereof;

5.     the attempt by the other party to make any adjustment, settlement or extension of its debts with its creditors generally;

6.     the issuance or the obtaining of a levy of execution upon or against a material portion of the assets of the other party, unless such lien or levy of execution is dissolved within 30 days from the date thereof.

(i)     Either party may terminate this agreement upon written notice in the event that the other party is in violation of the provisions regarding Confidential Information and/or Proprietary Rights, especially as set out in Section 4, Proprietary Rights and Section 8, Confidential Information.

(ii)    Client may terminate this agreement upon written notice in the event that FNC is unable to upload valuation report fields as data to Client's CMS from any Appraisal Form Software Provider that has adopted the AI Ready Standard, provided that the service request is procured and delivered via CMS and AppraisalPort.

(iii)   In the event that an Appraisal Form Software Provider that has currently adopted the AI Ready Standard at the time of this agreement, decides to discontinue the inclusion of an AI Ready Standard version in future software releases, FNC at its cost will convert up to 20 mutually agreed fields from the appraisals of that software provider to data, provided those appraisals are received as first generation PDF files.

(iv)    Client may terminate this agreement upon written notice in the event that a

major Flood, Credit, or Title services provider that Client either conducts a material portion of its business with or desires to conduct a material portion of its business with does not want to work with FNC Port.

(v)    Client may terminate this agreement upon written notice in the event that the service level up time for two consecutive months or three months in a rolling six month period is < 98% during Client's core business hours.

Except for the grounds stated above, Client may not terminate the Agreement during the term of this Agreement.  This agreement shall renew automatically for successive six month terms, unless either party gives 60 days advance written notice of its intent to terminate. Termination shall have no effect on the parties' rights or obligations regarding Proprietary Rights, Confidential Information or Injunctive Relief.

## 6.    Warranties and Indemnification.

(a)    <u>Online content</u>.  FNC does not assume any responsibility or liability for content (including, for example, any data, image or information) that is provided by others, including the Client and/or its Providers and transmitted or forwarded by FNC through the FNC Ports, CMS and/or any other medium or process within its control.

FNC, however, in its discretion, may upon notice that Client (including, for example, any of Client's employees, contractors or invitees) or any of Client's Providers have gained unauthorized or unlawful access to, or made any unauthorized or unlawful use of any FNC Port, FNC CMS and/or any other medium or process within its control, may take action to deny access to any such person or entity or seek other remedies, especially to the extent that any such access or use may reflect badly on the reputation or credibility of such Port, CMS or other medium or process.

For purposes of this paragraph, by way of example but not in limitation:

Unauthorized copying, modification of information or misuse of information shall be considered unauthorized use.

Access to any of the FNC Ports, FNC CMS and/or any other medium or process within FNC's control by an otherwise authorized user who does not have permission to gain access to the portion to which the user has gained access—regardless of motivation—shall be considered unauthorized access.

Client agrees to defend and hold harmless FNC and its subsidiaries, affiliates, related companies, employees, officers, directors and agents for all claims relating to Client and/or its Providers' misuse of content from the Ports.  Furthermore, by submitting or posting content there, Client is representing that Client and/or its Providers are authorized to distribute such content or Client and/or its Providers' Product.

(b)    <u>Warranties And Limitations Of Liability</u>

CLIENT EXPRESSLY AGREES THAT THE USE OF PORTS, FNC SOFTWARE, THE COLLATERAL MANAGEMENT SYSTEM, AND/OR THE INTERNET, IS AT CLIENT'S SOLE RISK.  FNC, FNC SOFTWARE, SYSTEM, PORT, THIRD-PARTY VIRUS CHECKING TECHNOLOGY AND THE INTERNET ARE PROVIDED "AS IS" AND "AS AVAILABLE" FOR USE, WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, TITLE, FITNESS FOR A PARTICULAR PURPOSE, AND AGAINST INFRINGEMENT UNLESS SUCH WARRANTIES ARE LEGALLY INCAPABLE OF EXCLUSION, AND THEN ONLY TO THE EXTENT OF THAT EXCLUSION.  FNC PROVIDES THE PORT SERVICE ON A COMMERCIALLY REASONABLE BASIS.

FNC SPECIFICALLY DISCLAIMS ANY WARRANTY THAT THE PORTS, FNC SOFTWARE, THE COLLATERAL MANAGEMENT SYSTEM, AND/OR THE INTERNET WILL BE ERROR FREE OR WILL OPERATE WITHOUT INTERRUPTION.

FNC'S ENTIRE LIABILITY, AND CLIENT'S EXCLUSIVE REMEDY WITH RESPECT TO ANY DISPUTE WITH FNC SHALL BE THE TERMINATION OF THIS AGREEMENT AND POTENTIAL DAMAGES IN AN AMOUNT LIMITED TO THE INITIAL IMPLEMENTATION FEE PAID, OR THE PREVIOUS THREE MONTHS TRANSACTION FEES, WHICHEVER IS GREATER IN NO CASE SHALL FNC BE LIABLE FOR INDIRECT OR CONSEQUENTIAL DAMAGES (INCLUDING BUT NOT LIMITED TO LOSS OF PROFIT) ARISING FROM CLIENT AND/OR ITS PROVIDER'S USE OF PORT, OR THE INTERNET OR FOR ANY OTHER CLAIM RELATED IN ANY WAY TO THIS AGREEMENT OR THE SERVICES CONTEMPLATED HEREIN WHETHER OR NOT FNC HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE OR NOT.  TO THE EXTENT THAT A STATE OR JURISDICTION DOES NOT ALLOW THE EXCLUSION OR THE LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, IN SUCH STATES OR JURISDICTIONS, AS TO THAT STATE OR JURISDICTION FNC'S LIABILITY SHALL BE LIMITED TO THE FULL EXTENT PERMITTED BY LAW.

FNC DOES NOT ENDORSE, WARRANT OR GUARANTEE ANY PRODUCT OR SERVICE OFFERED THROUGH PORTS AND WILL NOT BE A PARTY TO OR IN ANY WAY BE RESPONSIBLE FOR MONITORING ANY TRANSACTION BETWEEN CLIENT AND/OR ITS PROVIDERS AND CLIENTS OR THIRD-PARTIES.

    (c)    <u>Indemnification</u>

        i.  By Client

Client agrees to defend, indemnify and hold harmless FNC and FNC's affiliated subsidiaries, employees, contractors, officers, directors, and telecommunications providers from all liabilities, claims and expenses, including attorneys fees and costs, that arise from a breach of this Agreement by Client, for any claim arising from any malfunction or other disruptions of the FNC

Systems or Ports due to Client's negligence or intentional misconduct, or arising from the content of any of Client and/or its Providers' Products. FNC reserves the right to participate in the defense and control of any matter otherwise subject to indemnification by Client and/or its Providers.

        ii.      By FNC

FNC agrees to defend, indemnify and hold Client and Client's affiliated entities, its officers, directors, contractors and employees harmless from and against losses, claims, demands, expenses, including attorney's fees, made by a third party, directly related to a malfunction or improper operation of FNC Systems or FNC Ports due to FNC's sole negligence or intentional misconduct, except that no indemnification shall be due if the claim relates to the content of the Client and/or its Provider's Products properly delivered by FNC.


## 7.     Authorized and Unauthorized Use.

        a.      Restrictions on Rights With Respect to the CMS or Ports

This grant of access to the CMS or the Ports is subject to the restriction that neither Client nor anyone acting on its behalf or its ostensible authority may copy or decompile, disassemble, decrypt or otherwise reverse engineer (or allow or suffer others to copy or decompile, disassemble, decrypt or otherwise reverse engineer) the FNC or Client's CMS, FNC Ports, the Software, any data or any other software, device or interface or any part thereof (except that Client may maintain for a limited time magnetic or electronic copies of the Software, any data and any installed software in authorized and approved use). Neither shall Client nor anyone acting on its behalf or its ostensible authority make derivative works from the Software or any FNC software. Client may not modify FNC software or use it in any way not expressly authorized by this Agreement.

        b.      Variations in performance

Client understands that FNC's introduction of various technologies may not be consistent across all hardware and software platforms and that the performance and some features offered by FNC software may vary depending on the computer and other equipment that Client has chosen to employ.

        c.      Additional License Provisions

Furthermore, there may be additional terms and conditions attached by FNC to Client's uses of additional FNC software and /or services, or a third-party's software and/or services, that FNC may make available over its web site(s), and Client accepts the terms of any agreement covering additional software or services that Client uses and agrees to comply with the same. FNC will provide the terms of any such agreements to Client upon making the additional services or software available to Client. Client is not, however, required to purchase, license, lease, utilize, or

accept and pay for any such additional services or software.

    d.    Restriction on Time Sharing, etc

Client shall not utilize the Software, the CMS, the Ports and/or any data contained therein or any software, device and/or interface or any part thereof associated with the Software, the CMS or the Ports, to provide any time sharing, service bureau or similar services to any person or entity.

## 8.    Confidential Information.

The parties agree to maintain the confidentiality of the Confidential Information they receive. Neither party shall divulge or use Confidential Information except as required by law or for the limited purposes of this Agreement.

Confidential Information shall not include information that

    (a)  become generally available to the public other than as a result of disclosure by the Receiving Party or its representatives;

    (b)  is available to the Receiving Party on a non-confidential basis prior to disclosure by the Disclosing Party;

    (c)  become available to the Receiving Party on a non-confidential basis from a source other than the Disclosing Party, provided that such source is not bound by an obligation of confidentiality to the Disclosing Party; or

    (d)  is developed independently by the Receiving Party without the use of the Disclosing Party's Confidential Information.

Each party acknowledges that certain information, records, files, or documents relating to the other party's customers ("Customer Information") may be disclosed or delivered to the other party, or may come to each other's attention during the course of performance of this Agreement, and that such parties have certain rights under the Gramm-Leach-Biley Act of 1999, as it may be amended from time to time, and the regulations promulgated thereunder (the "GLB Act"). Each party shall not use or disclose, either directly or indirectly, to any person, firm or corporation any Customer Information, other than in the ordinary course of carrying out the purposes of the Agreement or as permitted under applicable law, including use under an exception to the GLB Act.

Notwithstanding any of the foregoing, in the event either party is required by law, regulations or court order to disclose any Customer Information, the disclosing agent will provide the other party with immediate notice to allow that party a reasonable opportunity to obtain a protective order. Both parties agree to implement and maintain appropriate measures designed to: (i) ensure the security of integrity of Customer Information; (ii) protect against any anticipated threats or hazards to the security or integrity of Customers Information; (iii) protect against unauthorized access to or use of customer Information that could result in substantial harm to any of these customers. This provision shall

survive termination of the Agreement. Both parties will make their subcontractors or agents aware of and shall cause them to comply with this provision of this agreement.

·   FNC further agrees to comply with all applicable federal and state privacy regulations, in effect as of the date of this Agreement and enacted at any time thereafter, concerning the use and protection of Customer Information, FNC shall be responsible for indemnify, and hold Client harmless from and against any damages or liability resulting ins such breach.

## 9.    Pricing.

a.    Client and FNC agree that the FNC Fees to be paid to FNC in accordance with this Agreement for the goods, facilities and services provided by FNC pursuant to this Agreement represent fair and reasonable compensation for the value of such goods, facilities and services and that the manner and timing of such payments has been selected by the parties as a matter of convenience only.  Each party has come to its own conclusion regarding whether the compensation arrangements and other terms and conditions of this Agreement comply with applicable requirements of the Real Estate Settlement Procedures Act of 1974, as amended ("RESPA"), and other applicable law.  In reaching their independent conclusions, neither party is relying on any opinion, representation or information obtained directly or indirectly from the other party.  In the event that it is determined, or based upon subsequent information or events FNC or Client reasonably conclude that the compensation arrangements described in this Agreement violate or conflict or may violate or conflict with RESPA or other applicable law, the parties agree to modify this Agreement to provide for an alternate compensation structure that complies with RESPA or such other applicable law and that, to the extent feasible and permissible, provides FNC with compensation that is equivalent economically to the compensation provided for herein, or in the alternative, either Client or FNC may terminate this Agreement without further cause, as described in Section 9 below.  Each party agrees that it will not assert any claim against the other party to the effect that the relationship established hereunder, including without limitation the compensation arrangements, violates RESPA or otherwise imposes any obligation on the parties which would not arise under an arm's-length commercial agreement.

b.    FNC warrants that the fees paid by Client under this agreement are substantially equivalent to or better than the terms being offered by FNC to any of their existing clients.

c.    In the event that FNC charges any existing or future client CMS transaction fees (Exhibit B, Pricing, section 2D & 2E) that are better than those charged to Client, then FNC shall reduce its fees to Client to those same fees effective with the date the better pricing is first charged to the other client.

d.    FNC warrants that any fees charged to Providers of products and services to Client for the ordering and/or delivery of Provider Products or Services through the Client CMS shall be the same or lower than those charged to the same Providers for ordering and/or delivery to other FNC clients through their Client CMS.

**Exhibit E**

## Security Requirements Document

In addition to the Service Level Standards and other requirements within a Collateral Management System installation, FNC incorporates the following security measures and requirements in each CMS installation.

1.  FNC will be responsible for determining and maintaining levels of security residing on the FNC hardware or systems that are consistent with industry standards and those required by law.

2.  The security provided at its end of the connection will not allow unauthorized traffic to pass into Client networks. All passwords and other highly sensitive information (as identified by the parties) will be encrypted as may be required by Gramm-Leach-Bliley Act and related regulations, and other privacy related laws.

3.  FNC will notify Client in writing immediately upon becoming aware of any security breach (including, without limitation, any unauthorized access to the Software, FNC Systems or FNC Ports) or other event that could pose a material risk to Client or its affiliates or customers (each an "Incident"). The notification will include at least the following information: (i) the nature of the Incident; (ii) which Software, FNC System or FNC Port was affected, if any; (iii) what corrective action FNC took or will take to prevent further Incidents; (iv) what FNC did or will do to mitigate any deleterious effect of the Incident; and (v) such other information, including a written report, as Client may reasonably request.

4.  In the event of an unauthorized access to the CMS, Client may disconnect itself from the CMS to the extent reasonably necessary to prevent any continued unauthorized access. In the event of a disconnection, Client and FNC shall agree upon and implement, at FNC's expense, an alternative method for the provision of access to CMS until the unauthorized access has ceased.

5.  FNC will not permit any extraneous access from platforms or use of protocols other than those in the current configuration presented by FNC.

6.  FNC will maintain an alert system status regarding all vulnerabilities and security patches or corrective actions through an industry-recognized service issuing security advisories.

7.  FNC will supply Client with a letter certifying it has developed and engineered its software without any undocumented application code that bypasses any security features. To the extent FNC has provided an undocumented means for access to facilitate programming and code modification, FNC will identify those access means to Client and assist Client in

removing them. If FNC is using purchased software from another service provider, FNC agrees to obtain such a certification letter from its software Service Provider.

8. · As the CMS system is installed, and the closer to production it becomes, FNC will increase the level of security within the CMS until it meets final security requirements at final implementation. FNC will provide Client assessments based on a schedule mutually agreed upon in writing.

9. FNC will establish and maintain all application and system logs for the CMS it hosts for Client under its domain. It will provide Client copies of all such logs as requested.

10. FNC will provide Client with a documented description of its disaster recovery strategy/capability as part of the CMS implementation project. This description will address actions to be taken in the event of an extended interruption in service. (A service interruption could be caused by a number of events ranging from technical hardware/ software/network related malfunctions to a catastrophic disaster). The description will address:

   • Risk avoidance and disaster prevention provisions in place (e.g. physical security systems, fire protection/suppression systems, equipment spare parts on-site, Uninterrupted Power Supply (UPS) and backup generators, etc.).

   • Recovery time frames (in a worst case scenario, define the maximum allowable downtime).

   • Data backup and off-site storage process.

   • Lost customer data/data in progress recovery.

   • Service recovery strategy (e.g. internal/redundant backup, commercial hot site backup, equipment "quick ship" agreements with other vendors, etc.).

   • Notification process.

   • Recovery testing process, which states the number of recovery tests per year and whether or not the Client is involved in the recovery testing.

   • Recovery Plan maintenance which describes who maintains the recovery plan, how frequently it is reviewed and/or updated as a result of technical/product/services changes.

   • Defined recovery roles and responsibilities assumed by FNC and Client.

11. As long as FNC is providing CMS hosting services to Client, FNC will allow Client (or Client's authorized representative under an appropriate confidentiality obligation) to conduct network assessments and audits of FNC's security, computer systems and processing

environment. However, any information observed and/or obtained during such assessments and/or audits is treated as Confidential Information (which is governed by the agreements between FNC and Client). Client may terminate FNC's access to any Client network if the assessment and/or audit reveal inappropriate or inadequate security until FNC satisfactorily complies with Client's security requirements.

12. FNC will provide Client with the necessary information for it to complete an Information Security Program, as may be required by the Gramm-Leach-Bliley Act and related regulations, the Interagency Guidelines and other related regulations.

As part of this information, FNC and Client will meet and confer on a routine basis with respect to the Information Security Program. As part of meet and confer sessions, FNC will brief Client on the various aspects of the security requirements, including such topics as encryption methods, logical access controls and the like.