UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .    Chapter 11
                                .
AMERICAN HOME MORTGAGE          .    Case No. 07-11047(CSS)
HOLDINGS, INC., a Delaware      .    (Jointly Administered)
corporation, *et al.*,          .
                                .    Oct. 30, 2007 (10:09 a.m.)
        Debtors.                .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE CLERK: All rise.

2          THE COURT: Please be seated.

3          MS. MORGAN: Good morning, Your Honor.

4          THE COURT: Good morning.

5          MS. MORGAN: Pauline Morgan from Young, Conaway,

6    Stargatt & Taylor on behalf of the debtors.

7          THE COURT: Your voice sounds better.

8          MS. MORGAN: It is much better, thank you, Your

9    Honor.  We only have a short agenda for today, Your Honor,

10   and the first item is the debtors' motion for authority to

11   terminate their deferred compensation plan.  As indicated on

12   the agenda, Your Honor, we did reach a settlement agreement

13   with the majority of the participants, and I'm pleased to

14   report that just prior to this hearing we also achieved a

15   settlement with the final objector.  As you'll recall, Your

16   Honor, we filed this on the 29th of August, or maybe the 30th

17   of August, and it was initially set for hearing on September

18   17th.  We adjourned it by agreement once to the 1st, and at

19   that time, Mr. Malloy, who represented - I think his papers

20   indicated he represented about 43, but since then he now

21   represents approximately 102 differed plan participants.  He

22   had asked for this adjournment to do some discovery, and we

23   did engage in informal discovery, document requests that Mr.

24   Malloy asked for and we provided, and late last week, Your

25   Honor, we did reach a settlement with Mr. Malloy's group.

1    Again, it's 102 participants and included among those are

2    Patricia Shephard, George Hart, Gail Thakarar, and Mark James

3    who filed their own objections but then subsequently became a

4    part of the participant group as we're calling them.  The

5    agreement, Your Honor, would provide for allowed priority

6    wage claims for these individuals up to the maximum of

7    10,950, again to the extent they have claims that would

8    relate to services that would fall within the statute,

9    services rendered 180 days before the filing, and as you may

10   recall on the first day of the case, we did receive authority

11   to pay some terminated employees.  It was subject to an

12   overall cap plus the 10,950 cap, so anything they would have

13   received already, obviously, is credited against the 10,950.

14   We're not seeking to pay anyone a priority claim in excess of

15   that amount.  In addition, again, for the participant group,

16   the debtors have agreed to make a cash payment of $400,000 to

17   be shared among the participants.  They would also be free to

18   file general unsecured claims for any balance, subject to the

19   debtors' right to object.  With respect to litigation claims,

20   they've agreed to a waiver of litigation claims in exchange

21   for the debtors' agreement to waive any preference claims

22   against those participants, and when we were considering this

23   settlement, we did ask our client to review its records for

24   payments made within the 90 days and actually none of Mr.

25   Malloy's participant group did receive any payment within the

1    90 days.  A few of them received payments within a year, but

2    we do not believe they're insiders.  So, the debtors believe

3    this settlement is appropriate, and we believe it's a good

4    settlement for the estate and for the participants.  You'll

5    hear from Mr. Indelicato soon.  We have shared up this

6    obviously with the Committee, and they are still conducting

7    due diligence with respect to the claims and any preference

8    exposure or a possible benefit we could get from a

9    preference.  Again, we don't believe there is any, but the

10   Committee is still looking in our documents with respect to

11   that.  So I don't think we're going to be here today, Your

12   Honor, asking for an order, but we would ask for an order

13   shortly.  Again, assuming the U.S. - I'm sorry, assuming the

14   Committee agrees that settlement is in the best interests of

15   the estate.

16            THE COURT: All right.

17            MS. MORGAN: Your Honor, with respect to the final

18   objector, that was Valerie Scruggs who's represented by

19   counsel, also, and that is a settlement we just achieved just

20   prior to getting into court today, and it's essentially the

21   same, just a little different.  We would also give Ms.

22   Scruggs a priority claim of up to 10,950 and a cash payment

23   of $7,000, and again, as with the other claimants, waiver of

24   litigation claims in exchange for the debtors' waiver of any

25   causes of action under 547.  So, Your Honor, again we come to

1  this in a little unusual way.  I don't know how you'd like to

2  proceed.  We were prepared to go forward today.  We do have a

3  witness.  I can make a proffer if you'd like.  I think this

4  is largely a document case.  The plan and the trust do

5  control.  They do provide that this is an unfunded plan

6  within the meaning of ERISA.  It's a top hat plan.  It was

7  only available to a select group of highly paid management

8  employees.  Your Honor, we do believe it falls within the

9  statute, and under the ERISA statute for exemption, and under

10 the Third Circuit decision in IT Group, we believe that the

11 participants do not have any claim to the funds in the trust

12 other than general unsecured claims.  We believe our case is

13 strong, but I'm prepared to put it on.  I don't know how you

14 want to proceed.

15        THE COURT: Well, I think - I agree that I think you

16 have a very strong case, but I think just to make sure the

17 factual record is laid, I would like you to proffer the

18 factual testimony that you think appropriate in connection

19 with the relief you're seeking as well as the settlement -

20        MS. MORGAN: That's fine, Your Honor.

21        THE COURT:  - of the claims, and then I think if

22 anyone, I doubt, since it's now unopposed, there will be any

23 cross-examination, so that won't be an issue, and then I can

24 hear from anyone with regard to comments in connection with

25 the motion itself or the settlement.

1           MS. MORGAN: Very well, Your Honor.

2           THE COURT: And if there are unresolved issues with

3   the Committee, what we'll probably do is leave it open at the

4   end of the hearing and allow you to submit an order under

5   certification of counsel.

6           MS. MORGAN: That's exactly what we planned to

7   propose, so thank you, Your Honor.

8           THE COURT: Very well.  Why don't you proffer your

9   witness then.

10          MS. MORGAN: Thank you.  Your Honor, Mr. Alan Horn,

11  who is seated at counsel table, he is secretary, executive

12  vice president, and general counsel of American Home Mortgage

13  Investment Corp., one of the debtors, and the ultimate parent

14  of each of the other debtors.  If Mr. Horn were called to

15  testify, he would state that he's been employed by the

16  debtors since January of 2003.  After graduating from Temple

17  University Law School, he was admitted to practice law in the

18  State of New York in 1977 and remains in good standing.  He

19  would state that he's familiar with the debtors' motion for

20  an order terminating their non-qualified deferred

21  compensation plan, and that he's qualified to testify as to

22  the merits and the necessity for the relief sought in the

23  motion as well as the reasonableness of the settlement

24  achieved with the various objectors.  He would testify that

25  American Home Mortgage Holdings adopted the deferred comp

1   plan effective as of October 1, 2003.  He would testify that

2   he's familiar with the plan and was involved in the plan's

3   implementation.  The company chose to adopt the plan to

4   recruit and retain highly qualified employees and to compete

5   favorably with other mortgage origination companies who

6   offered deferred compensation plans to their employees.  The

7   plan was thought to be an attractive benefit for highly

8   compensated employees because it provided a mechanism for

9   those employees to defer portions of their compensation in

10  return for favorable tax treatment.  A deferring compensation

11  resulted in a deferral of federal tax payments.  Participants

12  who chose to defer would not have the deferred comp subject

13  to federal taxation while employed but would be taxed on that

14  compensation when it was eventually paid at a later time.

15  The plan was designed as a so-called top hat plan so that it

16  would be exempt from ERISA requirements.  To qualify, the

17  plan was required to be unfunded and maintained primarily for

18  the purpose of providing deferred comp for a select group of

19  management or highly compensated employees, and that intent

20  was set forth in the introductory paragraphs of the plan.

21  The company was careful to implement the plan so that it

22  would come within the ERISA exemption.  It was maintained,

23  again, for a select group of management or highly compensated

24  employees.  In the American Home's case it was limited to

25  employees who were projected to make in excess of $200,000 in

1    annual compensation.  Because of that compensation

2    requirement, it was only available to a select group of

3    employees.  As of January 1, 2007, only 4.5 percent or 336 of

4    the company's 7,500 employees were actually eligible to

5    participate and of those only 146 elected to participate.  He

6    would testify that the participation was voluntary, and that

7    eligible employees had to affirmatively elect to participate

8    by completing and signing a compensation deferral agreement.

9    Employees eligible were provided enrollment kits during a

10   specified enrollment period each year.  He would state that a

11   true and correct copy of the enrollment kit was attached as

12   Exhibit A to the debtors' reply.  The last few pages of the

13   enrollment kit included the compensation deferral agreement

14   that each employee could complete if it chose to participate

15   in the program.  If they did not fill out the compensation

16   form, no compensation was deferred.  The enrollment kits were

17   mailed to the eligible employees' homes and were also

18   available electronically.  The kits included a summary of the

19   plan which highlighted the benefits and risks associated with

20   participation and also included a frequently asked question

21   section with the answers, and in those sections of the

22   enrollment kit, employees were notified that in the event of

23   an insolvency, the funds in the trust were available to the

24   company's general creditors.  Mr. Horn would testify that the

25   Newport Group was the administrative services provider for

1   the plan.  Newport Group specializes in this type of

2   retirement plan administration, and during each enrollment

3   period the Newport Group conducted presentations and web

4   casts highlighting the benefits attendant to the plan as well

5   as the risks.  Mr. Horn would testify that on January 1,

6   2004, the company implemented a trust agreement with Merrill

7   Lynch Trust Company as Trustee.  The company's entry into the

8   trust agreement was voluntary, and the purpose of

9   establishing the trust was to provide the company with a

10  ready source of funds to assist it in meeting its liabilities

11  under the plan.  The implementation of the trust was not a

12  requirement of the plan.  Again, Mr. Horn would testify that

13  the provisions of the trust were also specifically

14  highlighted in the enrollment kit given to each eligible

15  employee.  Page 14 of the enrollment kit, which was the plan

16  summary and, again, this is attached to our reply, the

17  materials explain that in order to qualify and to maintain

18  the tax deferred status, the assets held in the Rabbi Trust

19  remain available to general creditors upon an insolvency.

20  Again, that was reiterated in the question and answer section

21  of the enrollment kit.  Mr. Horn would testify that upon a

22  plan participant's termination, withdrawals from the trust

23  were made from corporate assets of the implacable employer.

24  Withdrawal payments were not made from the trust itself and

25  were not administered by the Trustee.  Soon after the company

1   filed its petitions on August 6th, the company determined that

2   the plan should be terminated and on August 29th, Michael

3   Strauss, the sole director of AHM Holdings, executed a

4   resolution terminating the plan and following that the

5   debtors filed a motion seeking the court approval of that

6   termination.  Mr. Horn would testify that the trust assets

7   currently consist of approximately $23 million.  Because of

8   the structure of the top hat plan, the debtors are owners of

9   the trust assets and consider the trust assets to be

10  unencumbered assets of the estate available to the debtors'

11  general creditors.  Mr. Horn would testify that it is in the

12  best interests of the estate and creditors that it be

13  entitled to use the trust assets in conducting their

14  post-petition operations, specifically, the debtors need the

15  trust assets to provide an additional funding source.  If the

16  trust assets were not available, we would be forced to draw

17  on the post-petition DIP facility, which in turn would cause

18  the debtors to incur additional interest charges.  Mr. Horn

19  would testify that it makes no sense to incur those charges

20  when the debtors have their own funds available for use.

21  With respect to the settlement outlined to the Court prior to

22  this testimony, Mr. Horn would state that the proposed

23  settlement with the objecting parties is fair and equitable,

24  represents a settlement above the lowest point in the

25  reasonable range of potential litigation outcomes, and from

1    the debtors' perspective most importantly obviates the

2    expense, delay, inconvenience, and uncertainty in connection

3    with a litigation as well as any possible appeal of the

4    litigation, and that it advances the paramount interests of

5    creditors.    In conclusion, Mr. Horn would testify that

6    terminating the plan, again, will allow the debtors access to

7    the trust assets, consistent with the provisions of the plan

8    and the trust, and will serve as a benefit to the debtors'

9    general unsecured creditors, and that would conclude the

10   testimony.

11        THE COURT: I have a question.  You mentioned during

12   your recitation of the settlement that none of the preference

13   - none of the people receiving releases were insiders, that

14   during the proffer, it's clear that these are management

15   level employees, so maybe you can expand a little bit on why

16   the debtors - What the debtors' factual basis - what Mr. Horn

17   would testify as his factual basis for making a determination

18   that the participants are not insiders?

19        MS. MORGAN: Sure, Your Honor.  With respect to

20   that, Mr. Horn would testify that the plan was available to

21   management or highly compensated employees, and the

22   individuals that received payments within the 90 days of the

23   filing, outside of their regular salary payments, were not

24   management, were not insiders within the meaning of the

25   Bankruptcy Code.

1          THE COURT: You said there may have been some

2    payments outside 90 days but they weren't to insiders.

3          MS. MORGAN: Yes, Your Honor.  There were five

4    individuals who received payments outside of the 90 days.

5    Only one of those has even an officer title, and the officer

6    title is - I may get this slightly wrong, but I believe it's

7    called "learning officer", and in effect that person was a

8    trainer in the HR Department, was not an officer under the

9    company's bylaws and not an officer, we believe, within the

10   meaning of either § 547 or 101.

11         THE COURT: Okay.  Thank you.  Does anyone wish to

12   cross-examine the witness?  All right, hearing none, I'll

13   accept the testimony.  Anyone have any statements in connect

14   - I'm sorry.

15         MR. HUGGETT: Your Honor, may I have just a moment?

16         THE COURT: Yes, Mr. Huggett, yes.

17         MR. HUGGETT: Your Honor, Jim Huggett for the

18   participant group.  I don't mean to be the fly in the

19   ointment here, and I don't think what I'm going to raise is

20   going to be a problem.  You may recognize that my firm is

21   counsel to a class of Warren Act creditors in an adversary

22   proceeding in this case.  Many of them have overlapped, that

23   is members of the participant group are members of the

24   putative class or perhaps even named representatives in the

25   complaint.  The Committee's involved in that Warren Act

1    adversary proceeding as well.  It's just come to our, sort

2    of, collective attention that we may not have 100 percent

3    agreement as to the nature and scope of the releases that

4    debtors' counsel discussed.  Specifically, I don't think we

5    have any clarity whether Warren Act claims are in fact being

6    released by virtue of the settlement that's been put on the

7    record here, and it was not my understanding that they would

8    be released.  So, I don't know if that holds anything up

9    here, but it's something that's probably going to have to

10    make it way into a stipulation or an order that makes its way

11    to your desk.  So I did want to bring that to your attention.

12    I also note I have not discussed this with the Creditors

13    Committee because it's just coming up now.  I'll beg your

14    pardon in that respect.

15            THE COURT: Do we need a - Well, go ahead, finish.

16            MR. HUGGETT: I think you're going to see a

17    certification of counsel with a stipulated form of order

18    that's been consented to by all parties.  So presumably that

19    will be the resolution, but it appears to me that Ms. Morgan

20    and I don't exactly share an understanding of what's being

21    released and what's not under that deal, so I thought it

22    better to get it on the record now rather than later.  The

23    second thing is, we're here on a settlement.  We agreed to

24    the settlement.  We certainly are 90 percent of the way there

25    in principal, but with respect to the proffer that was just

1  put on, I'm not going to cross-examine and I'm not going to

2  set forth any proffer.  I don't have a witness here, but I

3  would simply observe that a lot of the statements made in the

4  proffer were statements you would make and offer as evidence

5  in support of the motion and in support of overruling our

6  objection to that motion.  I wanted to make it clear that,

7  you know, we're not cross-examining and we're not submitting

8  a competing proffer not because we agree with all of those

9  statements.  Some of them we dispute and we have some issues

10  with them, but because it's a settlement.   In the event that

11  the settlement blows up for some reason that we don't see

12  right here and now and ultimately, you know, no order is

13  signed approving this or the settlement doesn't consummate,

14  you know, we'll just respectfully reserve the right to come

15  back and do our cross-examination and put on our case, if it

16  comes to that, but I didn't want my silence to be construed

17  as assent to the testimony.  And with that, I'll sit, unless

18  the Court has additional questions or concerns.

19        THE COURT: Let me hear a response.

20        MR. HUGGETT: Again, I think you're going to see an

21  order - a stipulated form of order under certification of

22  counsel -

23        THE COURT: All right.

24        MR. HUGGETT: - and that will resolve it.

25        THE COURT: Let me hear from Ms. Morgan.

1          MS. MORGAN: Your Honor, I did speak to my

2    colleague, Ms. Coyle, who conducted a lot of these

3    negotiations and it is her understanding that it was

4    litigation claims relating to the deferred comp plan.  Now,

5    again, the Committee is still conducting its due diligence.

6    We hope that they'll agree with us that this settlement is

7    still appropriate, and we'll submit a form of order,

8    hopefully, and if not we'll be back before Your Honor.

9          THE COURT: What is your response to the reservation

10   of rights?

11         MS. MORGAN: Your Honor, I have no problem with the

12   reservation of rights.  We believe we put on the case we

13   needed to create a record for this Court to exercise its

14   independent judgment and approve this motion in the event

15   that we're able to present an order under cert of counsel.

16         THE COURT: Very well.  Let me hear from anyone

17   else.  Thank you.

18         MR. McMAHON: Your Honor, Joseph McMahon for the

19   United States Trustee.  I - this morning is, I guess, the

20   first time I heard about the rappel in the settlements, so I

21   basically have two comments: The first is, I guess, a request

22   for clarification from debtors' counsel.  Your Honor is well

23   aware of the position we take at the first day hearing with

24   respect to certain, I guess, opinions being made consistent

25   with priority caps and 507(a)(4) and (a)(5).  The question we

1   have is - and it wasn't clear from the terms that were put on

2   the record, whether the payments that are being made are,

3   let's say, net of amounts that were already made to those

4   particular employees as of the first day or whether it's kind

5   of like a new priority requested.

6          THE COURT: I think you misheard her because it was

7   pretty clear that it - no one is getting more than a grand

8   total of $10,950 in priority claims.  So if someone's already

9   received $8,000, all this settlement does is provide an

10  opportunity for an additional $2,950.

11         MR. McMAHON: Oh, and I -

12         THE COURT: And I know it's difficult to follow a

13  settlement as it develops, but that's correct, Ms. Morgan; is

14  that right?

15         MS. MORGAN: that is correct, Your Honor.  I

16  neglected to say that payment would not be immediate on that.

17  It would be whenever other priority claimants are getting

18  paid.

19         THE COURT: Through a plan or whatever.

20         MS. MORGAN: Through a plan or whatever.

21         THE COURT: Okay.

22         MR. McMAHON: And, Your Honor, that's helpful.  The

23  second point I would just make is with respect to the

24  payments to these various employees.  Certainly, while I

25  appreciate the fact that, certainly, a possible outcome of

1   litigation in this context is for a mutual release of claims

2   by the - against the affected employees and the debtors'

3   estate with respect to these matters.  If I heard it

4   correctly, my understanding is that payments that are being

5   released by the debtors' estate include any payments, I

6   guess, that would be made within the preference period to

7   these individuals, and I guess I'm a bit concerned that while

8   I don't question the debtors' judgment in terms of addressing

9   those payments through a settlement, I don't know if we have

10  specific amounts here or some information that would allow us

11  to make an informed decision about the reasonableness of

12  what's been proposed.  Therefore, Your Honor, I just would

13  raise by comment whether it would be appropriate to paper

14  this and put it out on notice, especially in light of the

15  fact that we don't know where, I guess, Mr. Huggett's clients

16  stand with respect to that issue.

17          THE COURT: Okay.  Thank you.

18          MR. McMAHON: Thank you.

19          THE COURT: I'll hear from the Committee.

20          MR. INDELICATO: Thank you, Your Honor.  Mark

21  Indelicato from Hahn & Hessen on behalf of the Committee.

22  Your Honor, let me state first that the debtor has kept the

23  Committee fully apprised of the settlement negotiations, but

24  they have been rapidly developing and really have only come

25  to fruition over the last couple of days.  As the Committee

1   has stated before, we agree wholeheartedly with the debtors'

2   initial motion.  We believe that the quote, "Rabbi Trust" is

3   an independent obligation or a standalone document that is

4   independent from the sort of top hat plan, and we believe it

5   is property of the estate and should be turned over to the

6   debtor.  We are looking at the proposed settlement, Your

7   Honor.  There are a couple of issues the Committee needs too

8   examine including the scope of the release, including the

9   waiver of claims as well as whether or not, as a legal

10  matter, since this, at least in the Committee's view, is a

11  legitimate top hat plan, whether or not the payments earned

12  within the 180 days are in fact entitled to the priority.

13  Based on discussions we've had with debtors' counsel, that

14  debtors' counsel have satisfied themselves that that is true.

15  The Committee now needs to look at that just to make sure

16  that as a matter of law that is in fact the case.  In light

17  of that, Your Honor, we will work with the debtor to see that

18  we can get an order that is acceptable to all parties.  If

19  not, then we'll be back before Your Honor.  A couple of

20  comments: The first with respect to Mr. Huggett's reservation

21  of rights.  I have no problem with there being a reservation

22  of rights if there's no settlement, Your Honor, but I think

23  we must put it in the context of today's hearing and what

24  they're reserving their rights to do is to cross-examine Mr.

25  Horn at a subsequent hearing.  I don't think we can reserve

1    our rights as to what his testimony is, the proffer, if

2    accepted was what it was and they will have their right to

3    cross-examine at a future hearing.  With respect to the

4    releases that go between the parties, I understand Mr.

5    Huggett's comment that he did not believe it related to

6    Warren Act claims, and that may or may not be appropriate.

7    The Committee will look at that, but I think what the parties

8    have negotiated is a very narrow release as it relates to

9    employee related claims emanating from the deferred

10   compensation plan.  That may be where we all end up and that

11   may address some of Mr. McMahon's concerns as well.  And Mr.

12   McMahon's final comment, Your Honor, this was a motion that

13   has been on notice to all parties for some period of time.

14   I'm not sure whether we need to incur the cost and expense of

15   papering the settlement.  The parties who have objected, have

16   either resolve their objections, have appeared before or are

17   here today, and while I do appreciate the need for the 9019

18   motions, in this case, I think it would be a waste of the

19   estate resources and potentially delay the debtors' receipt

20   of the funds which could have an economic impact on the

21   estate, however slight that might be.  So, what we're asking,

22   Your Honor, is a little indulgence from the Committee.  We

23   would like a period of time to continue our investigation.

24   We have a Committee meeting scheduled for Thursday.

25   Hopefully by that time, we will have gotten all of the

1    information we need and be able to make a recommendation to

2    the Committee, and we'll be able to get back to the debtor

3    with the Committee's position, and if it is - we are

4    supporting the debtor, we will be able to submit an order

5    shortly thereafter.  So, Your Honor, subject to Committee

6    approval, we think the debtor has met their burden on both

7    the settlement and more importantly on the motion.  Thank

8    you.

9          MR. HUGGETT: Your Honor, Jim Huggett for the

10   participant group, very briefly.  I concur with the

11   presentation given by Mr. Indelicato, and I wanted to observe

12   that Ms. Morgan and I have a settlement.  I do believe that

13   this is resolved and that all of this is just relatively

14   minor details.  I did rise to address the issue raised by Mr.

15   McMahon, which I think is an interesting one, and I did not

16   get opportunity to speak with him before this hearing.  I

17   apologize to him for that.  He's trying to keep up with the

18   settlement.  The idea of sending this out on a 9019 motion or

19   some other form of notice, we think is inappropriate and I'd

20   just like to take a second to give you a couple of good

21   reasons why I think it's inappropriate or at a minimum

22   unnecessary.  The first is, I'm not sure we made a clear

23   evidentiary record on this.  Ms. Coyle indicates the motion

24   was served on literally every single one of the beneficiaries

25   of the plan.  So, all of them have had an opportunity to

1   object.  I believe five or six contested matters including

2   but not limited to the objection that I filed on behalf of

3   the participant group had been initiated as a result of that

4   service, and so all of the others, really, have had ample

5   opportunity to respond to the motion and to participate in

6   this.  I think they're aware of it.  Their rights have been

7   protected and if they wanted to get involved, they're

8   involved.  The other things is that there is, I can aver to

9   you that there's very substantial communication amongst the

10  members of the participant group.  We started out with a

11  small handful of relatively active people, and then moved

12  onto a larger group.  I think at the first hearing we came to

13  you with 35 or 40 members in the group at that time out of a

14  140.  It's not gone up over a hundred.  I believe Ms. Morgan

15  correctly indicated we're at 102 or 103 right now.  So,

16  again, that tells you that these are people who are actively

17  involved and actively aware.  We have an email chain by which

18  we communicate with them.  I think it's very unlikely that

19  there's anyone out there who really needs additional or

20  further notice in this respect.  The last point in this

21  regard is simply one of equities.  I know I'm not making an

22  evidentiary presentation.  This is a lawyer talking from the

23  bench, but if we step back, what we're talking about here is

24  money that these people believe they're owed on account of

25  labor and time that they put in.  Some of them claim, and

1  again this is not evidence, but some of them claim to have

2  made written or oral requests to the debtors to have the

3  money paid over to them even prior to the bankruptcy filing

4  to which they would have been entitled and were not paid.

5  You'll recall that was the essence of the Scruggs objection

6  at the last hearing.  So, for all of these reasons, I think

7  that there's ample reason to decline to require any further

8  notice with respect to this - Oh, one I didn't add, by the

9  way, is the obvious one, the fact that the Creditors

10 Committee, a critical party to the process, is actively

11 involved in the case and will be carefully looking at any

12 settlement agreement that we ultimately reach with an eye

13 towards protecting the estate.  So, with that presentation,

14 unless the Court has additional questions or concerns, I

15 wanted to rise and address the notice issue.

16       THE COURT: Thank you.  Well, I frankly, most of

17 your comments, I think, are irrelevant to the notice issue

18 because Mr. McMahon's point is not that the participant group

19 is not privy to what has been settled.  Of course, the

20 participant group is privy to what's been settled.  His

21 comments go more towards the fact that the settlement

22 encompasses relief not contemplated by the initial motion and

23 the initial notice.  And as a result, is it sufficiently

24 material to require additional notice, and specifically he

25 focuses on, I think appropriately, the release of preference

1    or potential preference claims against the participant group.

2    Obviously, the participant group is in favor of that.  That's

3    not a big surprise.  The issue is whether that's appropriate

4    for the debtors to agree to and whether other parties in

5    interest who aren't participants - members of the participant

6    group care enough to participate and think that that's an

7    important issue.  Now, what is relevant is, the Committee is

8    monitoring the situation - I won't say they're onboard.  The

9    Committee is monitoring the situation.  It's an extremely

10   active committee.  If anyone is going to care enough to do

11   the analysis and to make a substantive response, it's going

12   to be the Committee.  So, I think that is relevant, and I

13   think that's the ultimate determination here why additional

14   notice is not required because the party who is going to do

15   the investigation and make the determination is more than

16   aware of what's going on and is on notice and frankly is in a

17   position to either green light or red light the settlement,

18   and if they green light it, they'll submit it under

19   certification of counsel and I'll sign an order, and if they

20   red light it, we'll have a hearing.  So, I don't think

21   additional notice is required for that reason, and I'm happy

22   to take the matter under advisement when I get it under

23   certification of counsel.  However, it sounds like there's

24   enough moving parts that what I'd like to do is pencil this

25   in for the omnibus hearing on November 14th at 10 a.m. in the

1   event that things fall apart and you need a court hearing,

2   that's when you're going to have a court hearing.  We're not

3   going to - I just don't have time to hear you before that.

4   So, the matter will be continued until November 14th, however,

5   if there's an agreement, submit an order under certification

6   of counsel, and if the Court has no objections, I'll sign it.

7   All right?

8          MS. MORGAN: Thank you, Your Honor.

9          MR. HUGGETT: Thank you, Your Honor.

10          MS. MORGAN: Your Honor, the only other matter

11   listed for today's agenda was the debtors' motion for

12   approval of their motion to sell various construction loans

13   and I believe, Your Honor, we called chambers and advised the

14   Court that we would like to adjourn that by agreement until

15   the next omnibus hearing on November 14th.

16          THE COURT: Oh, okay, I did not know that, but

17   that's fine.

18          MS. MORGAN: Oh, I'm sorry.  Someone was supposed to

19   call chambers.

20          THE COURT: We had Ms. Gatson (phonetical) and Ms.

21   Symanski (phonetical) out yesterday, so -

22          MS. MORGAN: Okay.

23          THE COURT:  - they very well may have been lost

24   somewhere in the voice mail system that I don't know how to

25   operate.  So -

1      MS. MORGAN: We will list that - I understand, Your

2  Honor.  We will list that for the November 14 omnibus

3  hearing.  Another housekeeping matter I wanted to bring to

4  your attention is - and you may not be as acutely aware of

5  this as we are, but our cash collateral order expires

6  tomorrow.  We have been in negotiations with BofA for a brief

7  extension.  Again it's not finalized yet, but I think what

8  the parties are contemplating is an extension until November

9  15 essentially along the same lines as the prior order with

10  some modifications, but that is still somewhat of a work in

11  process, so I believe, Your Honor, we intend to file a motion

12  today and ask you to hear it on an interim basis tomorrow

13  with a final hearing on the 14th.

14      THE COURT: All right.  I have a - We have a rather

15  lengthy agenda, but at - When is it?

16      MS. MORGAN: It's at 10, I believe, tomorrow, Your

17  Honor.

18      THE COURT: I'm sorry.  I'm hitting the wrong

19  buttons.  Yes.  That's fine.  That's fine.  That's not what

20  Mr. Bowman called about; correct?

21      MS. MORGAN: It is not what Mr. Bowman called about.

22  I believe he called about our Rule 9019 settlement motion,

23  which I understand Your Honor would be amenable to hearing

24  next Monday, along with the pretrial conference -

25      THE COURT: Yes, the 5th.

1             MS. MORGAN: Yes.

2             THE COURT: Okay, very well.

3             MS. MORGAN: Thank you, Your Honor.

4             THE COURT: All right.  Anything else?

5             MS. MORGAN: That's it.  That concludes our agenda.

6             THE COURT: Just so you know, the sale order for the

7    servicing business has been docketed.

8             MS. MORGAN: Thank you very much, Your Honor.

9             THE COURT: You're welcome.

10            MS. MORGAN: At last.

11            ALL: Thank you, Your Honor.

12            (Whereupon at 10:44 a.m., the hearing in this

13    matter was concluded for this date.)

14

15

16

17

18            I, Elaine M. Ryan, approved transcriber for the

19    United States Courts, certify that the foregoing is a correct

20    transcript from the electronic sound recording of the

21    proceedings in the above-entitled matter.

22

23    /e/ Elaine M. Ryan                    November 1, 2007
      Elaine M. Ryan
      2801 Faulkland Road
      Wilmington, DE 19808
      (302) 683-0221