UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                                   .
IN RE:                             .     Chapter 11
                                   .
American Home Mortgage, Inc.,      .
                                   .
          Debtor(s).               .     Bankruptcy #07-11047 (CSS)
.......................................................
```

Wilmington, DE
October 25, 2007
3:00 p.m.

TRANSCRIPT OF SALE MOTION
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For The Debtor(s):              M. Blake Cleary, Esq.
                                Young Conaway Stargatt
                                & Taylor, LLP
                                The Brandywine Bldg.
                                Wilmington, DE 19801

                                Pauline K. Morgan, Esq.
                                Young Conaway Stargatt
                                & Taylor, LLP
                                The Brandywine Bldg.
                                Wilmington, DE 19801

                                Robert S. Brady, Esq.
                                Young Conaway Stargatt
                                & Taylor, LLP
                                The Brandywine Bldg.
                                Wilmington, DE 19801

                                Sean M. Beach, Esq.
                                Young Conaway Stargatt
                                & Taylor, LLP
                                The Brandywine Bldg.
                                Wilmington, DE 19801

Craig D. Grear, Esq.
Young Conaway Stargatt
& Taylor, LLP
The Brandywine Bldg.
Wilmington, DE 19801

Matthew B. Lunn, Esq.
Young Conaway Stargatt
& Taylor, LLP
The Brandywine Bldg.
Wilmington, DE 19801

Donald J. Bowman, Esq.
Young Conaway Stargatt
& Taylor, LLP
The Brandywine Bldg.
Wilmington, DE 19801

For The Official Committee: David Carickhoff, Esq.
of Unsecured Creditors      Blank Rome, LLP
                            Chase Manhattan Centre
                            1201 Market street-Ste. 800
                            Wilmington, DE 19801

                            Mark S. Indelicato, Esq.
                            Hahn & Hessen, LLP
                            488 Madison Ave.
                            New York, NY 10022

For DB Structured Products: Amanda M. Winfree, Esq.
                            Ashby & Geddes, PA
                            500 Delaware Ave.
                            Wilmington, DE 19899

                            Steven Wilamowsky, Esq.
                            Bingham McCutchen, LLP
                            399 Park Ave.
                            New York, NY 10022

For CIFG Assurance and:     William P. Bowden, Esq.
Morgan Stanley Mortgage     Ashby & Geddes, PA
Capital                     500 Delaware Ave.
                            Wilmington, DE 19899

For AH Mortgage Acquisition: Victoria Counihan, Esq.
WLP                         Greenberg Traurig, LLP
                            The Nemours Building
                            1007 North Orange Street
                            Wilmington, DE 19801

For Bank of America, NA:      Gabriel R. MacConaill, Esq.
                              Potter Anderson & Corroon, LLP
                              1313 N. Market St.-6th Fl.
                              Wilmington, DE 19801

                              Scott D. Talmadge, Esq.
                              Kaye Scholer
                              425 Park Ave.
                              New York, NY 10022

                              Ana M. Alfonso, Esq.
                              Kaye Scholer
                              425 Park Ave.
                              New York, NY 10022

For GMAC & Residential:       Kimberly E.C. Lawson, Esq.
Funding                       Reed Smith, LLP
                              1201 Market St-Ste. 1500
                              Wilmington, DE 19801

For US Bank:                  Eric L. Schnabel, Esq.
                              Dorsey & Whitney
                              1105 N. Market st.-Ste. 1600
                              Wilmington, DE 19801

                              Michael Foreman, Esq.
                              Dorsey & Whitney
                              1105 N. Market st.-Ste. 1600
                              Wilmington, DE 19801

For CitiMortgage, Inc.:       Stephen M. Miller, Esq.
                              Morris James, LLP
                              500 Delaware Ave.-Ste. 500
                              Wilmington, DE 19899

For Wells Fargo:              Todd C. Schiltz, Esq.
                              Wolf Block Schorr and
                              Solis-Cohen, LLP
                              Wilmington Trust Center
                              1100 North Market Street
                              Wilmington, DE 19801

For JP Morgan Chase:          John H. Strock, Esq.
                              Landis Rath & Cobb, LLP
                              919 Market St.-Ste. 600
                              Wilmington, DE 19801

4

```
For Assured Guaranty Corp.:    Daniel B. Butz, Esq.
and FGIC                       Morris Nichols Arsht
                               & Tunnell, LLP
                               Chase Manhattan Centre
                               1201 N. Market St.
                               Wilmington, DE 19899


For MERS:                      Rebecca Lynn Booth, Esq.
                               Morgan Lewis & Bockius, LLP
                               1701 Market Street
                               Philadelphia, PA 19103


For Security                   Mark Minuti, Esq.
                               Saul Ewing, LLP
                               222 Delaware Ave.-Ste. 1200
                               Wilmington, DE 19801


For The U.S. Trustee:          Joseph J. McMahon, Jr., Esq.
                               Office of the United States
                               Trustee
                               844 King St. - Ste. 2207
                               Lockbox 35
                               Wilmington, DE 19801


(Via telephone)

For AH Mortgage Acquisition:   Michael Weinberg, Esq.
Co. Inc.                       Jones Day
                               2727 North Harwood street
                               Dallas, TX 75201

                               David G. Heiman, Esq.
                               Jones Day
                               North Point, 901 Lakeside Ave.
                               Cleveland, OH 44114

                               Scott Friedman, Esq.
                               Jones Day
                               222 East 41st Street
                               New York, NY 10017

                               Benjamin Rosenblum, Esq.
                               Jones Day
                               2727 North Harwood street
                               Dallas, TX 75201
```

For Bank of America:        Margot B. Schonholtz, Esq.
                            Kaye Scholer
                            425 Park Ave.
                            New York, NY 10022

For Wells Fargo Bank:       Franklin Top, Esq.
                            Chapman & Cutler, LLP
                            111 W. Monroe St.
                            Chicago, IL 60603

For Bear Stearns:           Alex R. Rovira, Esq.
                            Sidley Austin, LLP
                            787 Seventh Ave.
                            New York, NY 10019

                            Teresa Chan, Esq.
                            Sidley Austin, LLP
                            787 Seventh Ave.
                            New York, NY 10019

For Merrill Lynch:          Vadim Rubinstein, Esq.
                            Loeb & Loeb, LLP
                            10100 Santa Monica Blvd.
                            Los Angeles, CA 90067

For Midfirst Bank:          William H. Hoch, III, Esq.
                            Crowe & Dunlevy, PC
                            20 North Broadway, Suite 1800
                            Oklahoma City, OK 73102

                            Craig R. May, Esq.
                            Wheeler Trigg Kennedy, LLP
                            1801 California Street
                            Denver, CO 80202

For US Bank:                Katherine A. Constantine, Esq.
                            Dorsey & Whitney, LLP
                            Suite 1500, 50 S. Sixth Street
                            Minneapolis, MN 55402

For Bank of New York:       Leo Zrowley, Esq.
                            Pillsbury Winthrop Shaw Pittman,
                            LLP
                            California

```
For Deutsche National Bank:     Dennis Drebsky, Esq.
Trust Co.                        Nixon Peabody, LLP
                                 Gas Company Tower
                                 555 West Fifth Street
                                 Los Angeles, CA 90013

For Financial Guarantee:        Bruce A. Wilson, Esq.
                                 Kutak Rock, LLP
                                 The Omaha Building
                                 1650 Farnam Street
                                 Omaha, NE 68102

For USA:                        Mary A. De Falaise, Esq.
                                 Civil Division, Department
                                 Of Justice
                                 US Government

Audio Operator:                 Leslie Murin

Transcribing Firm:              Writer's Cramp, Inc.
                                 6 Norton Rd.
                                 Monmouth Jct., NJ 08852
                                 732-329-0191
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1     (Proceedings in progress)

2         MR. BEACH:  -- Committee, Bank of America and MERS.

3   And the Seal Motion was opposed by the United States Trustee.

4   I'm pleased to report that we do have a settlement in principal

5   with respect to the Committee and the Bank of America

6   objections.  We unfortunately don't have a final asset purchase

7   agreement and Sale Order, but I believe we can go through the

8   key components of the APA with most of the changes, and then

9   perhaps we can submit it under Certification of Counsel to Your

10  Honor tomorrow, if we can come to a final agreement.

11      Your Honor, with respect to the MERS objection, I believe

12  that that can be resolved by putting a representation on the

13  record leaving only the U.S. Trustee's objection to this Seal

14  Motion to be resolved.

15      Your Honor, with respect to the sale, I think some

16  contextural background is important to understand the nature of

17  the marketing and sale efforts related to the sale of these

18  servicing rights with respect to the Ginnie Mae portfolio.  On

19  August 3rd, 2007 Ginnie Mae gave notice to AHM of default and

20  purported termination of the Debtor's rights to service the

21  Ginnie Mae portfolio of loans.  The Debtors disputed that

22  termination.  Ginnie Mae filed a Turnover Motion and the

23  Debtors objected to that motion.  And on September 20th, 2007

24  the Court, at the request of the Debtors and Ginnie Mae,

25  approved the stipulation that permitted the Debtors to sell the

1    Ginnie Mae portfolio of loans, or the servicing rights related

2    to those loans, under some significant restrictions, one of

3    which was that the Debtors needed to have an executed APA with

4    regard to these servicing rights by October 9th and that the

5    deal has to close by November 1st, 2007.  And the stipulation

6    also subjected the sale to certain other requirements, that

7    payments be made from the proceeds of the sale to Ginnie Mae.

8        As a result, the Debtor's ability to sell the property was

9    restricted by the terms of the stipulation and significantly

10   restricted the number of potential purchasers for the property.

11       If the time line under the stipulation was not met Ginnie

12   Mae would be entitled to demand turnover the property and

13   potentially eliminate the value to the Debtor's Estates.

14   Therefore arranging the sale of the property on the basis of

15   the Debtor's sound business judgment promptness played a large

16   role in the Debtor's considerations.

17       Under these constraints of the abbreviated schedule in

18   which the Debtors were required to sell the property, as well

19   as the requirements that the sale proceeds be paid -- or

20   certain of the sale proceeds be paid to Ginnie Mae, and the

21   additional conditions and restrictions under the Ginnie Mae

22   guidelines, the Debtors undertook significant efforts to find a

23   Ginnie Mae approved seller/servicer.  And on October 9th, 2007

24   the Debtors and Midfirst entered into a purchase agreement for

25   the sale of these servicing rights.

1    Your Honor, this servicing sale is in many ways similar to

2    the -- several other servicing sales that Your Honor has dealt

3    with in these cases thus far.  And it's changed primarily in --

4    with respect to the time line and restrictions of the

5    stipulation and the fact that Ginnie Mae is a governmental

6    entity and there's certain other restrictions under the

7    guidelines.  But the purchase price is primarily a component of

8    a purchase price percentage multiplied by the unpaid principal

9    balance of the underlying loans with certain deductions to that

10   purchase price and payments that need to be made to Ginnie Mae.

11       Your Honor, what I'd like to do now, if it's acceptable,

12   is to hand up a blackline of the Sale Order and the APA, as

13   well as the purchase price calculation, which the Debtors are

14   proposing to keep under seal, and then to briefly walk through

15   those with Your Honor to show the changes that have been made

16   since the filed version of those documents.  And again, Your

17   Honor, it's still subject to some additional changes that I

18   propose that we submit under Certification of Counsel.

19       May I approach?

20       THE COURT:  Thank you.

21   (Pause in proceedings)

22       MR. BEACH:  Thank you, Your Honor.  Your Honor, the

23   purchase price calculation has been shared with Bank of

24   America, the Committee, the U.S. Trustee and Midfirst, and it

25   contains confidential commercial information that the Debtors

1   are requesting be not disclosed.

2       The primary changes to the APA --

3           THE COURT:  Wait a minute.  What am I looking at

4   here?  Which is what?  Is this Exhibit-C what you're talking

5   about?

6           MR. BEACH:  Yes, that's the purchase price

7   calculation.  And I can walk through that with you in a moment.

8           THE COURT:  Oh, all right.

9           MR. BEACH:  In broad strokes, Your Honor, the primary

10  changes made to the APA are in a couple categories.  First, the

11  payments to be made on the transfer date were initially 20% of

12  the purchase price -- actually the greater of 20% of the

13  purchase price, or the amount to be paid to Ginnie Mae under

14  the stipulation and Sale Order.  That has been changed to 40%,

15  so the Debtors are given a larger payment on the initial

16  payment date, which is the transfer date.  And there have been

17  some other time line changes that I'll explain in a moment with

18  respect to the other payments under the sale.

19      Another category of changes is -- and again, this is based

20  on negotiations with the Committee, Bank of America and

21  Midfirst, is to limit the liabilities under the APA such that

22  all of the liabilities to the Estates are limited to the

23  holdbacks and deductions under the APA.

24      And then finally, the other category of changes are

25  generally clean-up items under the APA to clarify certain

1  points.

2       Your Honor, the -- there are also modifications to the

3  Sale Order, and it may make sense just to walk through those

4  quickly, and I'll just make one point, and that's that I

5  believe that there are certain other clarification type changes

6  that Midfirst is requesting and that those will be submitted

7  under blackline as well, if it's acceptable to Your Honor.  The

8  --

9            THE COURT:  You're going through the order now?

10           MR. BEACH:  Yes.  Paragraphs A and B there's just

11  some clarification changes.  Paragraph C was stricken by

12  essentially put in the decretal paragraphs of the order.  And

13  new paragraph C indicates that it's just a good faith finding,

14  Your Honor.  Paragraph D is a -- at the request of the United

15  States Trustee with regard to personally identifiable

16  information and confirming that that's not being sold under

17  this sale.

18       And then in the decretal paragraphs, Your Honor, as a

19  result of changing the asset purchase agreement we just add the

20  modified purchase agreement and we added language that's

21  substantially in the form attached hereto, although I would

22  hope that by tomorrow morning we'll actually have an executed

23  APA and that that will be in final form.

24       Paragraph 3 really I think can be characterized as just

25  changes from Bank of America that essentially incorporate the

1  same language that was in certain other paragraphs, but it's

2  essentially just the 363 relief.

3      Paragraph #4, Your Honor, is a paragraph requested by the

4  U.S. Trustee which I believe has been in some of the other

5  servicing Sale Orders.  Paragraph #6 and paragraph 11 have been

6  changed to -- at the request of Bank of America just to confirm

7  the distribution of the proceeds of the Sale and the Cash

8  Collateral Order.

9      Paragraph #7 was a clarification requested by Midfirst

10  that from and after the transfer date all proceeds will be on

11  account of Midfirst.

12      As a result of the timing and the requirements for closing

13  on November 1st Midfirst has agreed to waive their requirement

14  to -- that a Final Order be entered by November 1st, and this

15  is just a modification of the APA in that regard.

16      Paragraph #12 is at the request of Bank of America, and

17  again, relates to the distribution of the collateral.  And

18  paragraph 13 is essentially the finding that was changed into

19  the decretal paragraph.

20      Your Honor, I think Midfirst hasn't yet commented on this

21  version, and I know that they want a couple other clarification

22  paragraphs, but I believe that otherwise this is in

23  substantially file form.

24      Your Honor, as of September 30, 2007 there were 5,649

25  mortgage loans serviced with an aggregate unpaid principal

1 balance of approximately 446 million.  And Your Honor, it may

2 be useful at this point if you refer to the Exhibit-C that I

3 handed up, which is the purchase price calculation.

4     The gross UPBs are then reduced by loans 90-plus days

5 delinquent, loans in foreclosure, loans in bankruptcy, loans in

6 litigation -- excuse me, Your Honor -- and resulting in net

7 unpaid principal balance of approximately 427 million.  The net

8 UPBs are multiplied by the purchase price percentage which the

9 Debtors are requesting be kept under seal, and then adjusted to

10 reduce the purchase price by approximately $1500 for each of

11 the 189 loans that are 90-plus days delinquent in foreclosure

12 or in bankruptcy, 30-plus days delinquent, or in litigation for

13 reduction of approximately 283,000.

14     Certain other fees and costs that will reduce the net

15 proceeds to the Estate from the sale, most of which are

16 required to be paid under the stipulation or Ginnie Mae

17 guidelines include pool transfer fees, Ginnie Mae legal and

18 advisor fees, tax fees, assignment fees, custodian fees and a

19 reduction amount which relates to the scratch and dent loans

20 that can't be fixed.

21     And payment of the purchase price will essentially be in

22 three installments, the first of which is the 40% I mentioned

23 on the transfer date, and that again is the greater of 40% or

24 what's owed to Ginnie Mae under the stipulation.  The second

25 installment payment of approximately 45% of the purchase price

1    is to be paid approximately 15 business days, I believe it is,

2    after the transfer date.  And then there's a holdback of 15%

3    plus an additional holdback.  And Your Honor, this is -- this

4    additional holdback of $400,000 is the piece of the APA that

5    still needs to be added, as we've been in negotiations with the

6    parties today with respect to the $400,000 holdback.  And the

7    $400,000 holdback relates to the reconciliation of certain

8    custodial amounts or custodial -- well, the reconciliation of

9    the custodial accounts and the possibility of payments that

10   could come out of that escrow or holdback amount.

11       Your Honor, that was a negotiated piece as part of the

12   limitation of liability that has been negotiated over the last

13   couple days.  And as a result of that the -- to the extent that

14   there are any -- the Debtors don't believe that there will be

15   anywhere near 400,000 in holdbacks related to these custodial

16   accounts, but to the extent that there are holdbacks or

17   reconciliations with regard to the custodial accounts in excess

18   of the 400,000 then that will be the responsibility of

19   Midfirst.

20       And the holdback amount with respect to the $400,000 that

21   I mentioned is to be payable at the end of November or

22   approximately at the end of November, once the custodial

23   accounts are reconciled, and the remaining holdback amount is

24   to be paid approximately 120 days from the transfer date.  In

25   addition, Your Honor, under the terms of the APA the Debtors

1  will also receive reimbursement for advances.

2     Your Honor, I think that generally sums up the purchase

3  price calculation, obviously leaving out the actual purchase

4  price and purchase price percentage which we're asking be held

5  under seal.

6     So I'd like to address those two remaining objections at

7  this point, Your Honor.  One is --

8          THE COURT:  Slow down.

9          MR. BEACH:  Yes, Your Honor.

10         THE COURT:  Where on this chart do you show me what

11 the Debtors are actually going to receive?

12         MR. BEACH:  The --

13         THE COURT:  And when?

14         MR. BEACH:  The adjusted purchase -- well it's broken

15 down --

16         THE COURT:  The adjusted purchase price at the

17 bottom.

18         MR. BEACH:  Correct, Your Honor.

19         THE COURT:  Which column?

20         MR. BEACH:  And it's in the third column that starts

21 with Purchase Price and Adjustments.

22         THE COURT:  What's the advances column?

23         MR. BEACH:  And that advances column is the

24 additional amount that's gonna be paid for reimbursement of the

25 advances.

1          THE COURT:  Paid by whom?

2          MR. BEACH:  Well --

3          THE COURT:  Paid by the buyer.

4          MR. BEACH:  It'll --

5          THE COURT:  Paid by the buyer for advances?

6          MR. BEACH:  It will be paid by the buyer.  Some of

7    that money will be netted out from money that the Debtors have,

8    and before that money is sent over to Ginnie Mae or to

9    Midfirst.  We're gonna net out the advances that the Debtors

10   are holding.  That's -- particularly with respect to the tax

11   and insurance payments.

12         THE COURT:  So is the number the advances?

13         MR. BEACH:  Plus the -- the aggregate number of the

14   advances, and the purchase price is the last number on the

15   bottom-right corner of the page.

16         THE COURT:  Well, they don't add up, do they?

17         MR. BEACH:  I believe they do, Your Honor, but I am a

18   lawyer and not that great at math.

19         THE COURT:  So that figure, the advances figure, you

20   need to explain to me whether that's a real number, that's a

21   number that may go up, that's a number may go down, what the

22   affect is.  I don't understand your advances column.

23         MR. BEACH:  Sure, Your Honor.  If you give me a

24   moment.

25         THE COURT:  I'm sorry.

1          MR. BEACH:  Your Honor, I believe that those are

2     estimates of advances but that the numbers are pretty close to

3     what the advances are.  You know, I believe the Debtors have --

4          THE COURT:  Is sale date the transfer date?  Sale

5     date's the transfer date?

6          MR. BEACH:  Yes, Your Honor.

7          THE COURT:  All right.  So the gross PNI and gross

8     TNI advances as of the sale date the Debtor's getting

9     reimbursed for those numbers?

10         MR. BEACH:  Yes.

11         THE COURT:  Subject to adjustments?

12         MR. BEACH:  Yes, Your Honor.

13         THE COURT:  And what's corporate advances?  What's

14    that?

15         MR. BEACH:  Corporate advances --

16         THE COURT:  Reimburse the settlement date.

17         MR. BEACH:  -- relate to -- yeah, those are

18    essentially reimbursements for, I believe, foreclosure costs

19    and other corporate advances that the company has made to -- in

20    connection with the servicing operations to pay foreclosure

21    professionals and other amounts.

22         THE COURT:  Now the -- so all right.  So you get to

23    the total consideration paid to the Debtors by adding the

24    purchase price and adjustments plus the advances.  The advances

25    is a pass through, it's dollar for dollar reimbursement, or --

1          MR. BEACH:  Yes, Your Honor.

2          THE COURT:  -- it's probably not even dollar for

3  dollar.

4          MR. BEACH:  That's essentially correct.  The

5  advantage of the sale is that we get the payment without having

6  to have any additional time pass or motions filed to get those

7  advances paid.

8          THE COURT:  Those are advances made by the Debtor to

9  Ginnie Mae into the custodial accounts?

10          MR. BEACH:  Yes, Your Honor.

11          THE COURT:  All right.  The repurchase -- or the

12  adjusted purchase price, there are a series of holdbacks that

13  are not included in that, so the purchase price could go up but

14  it can't go down, is that what you're telling me?

15          MR. BEACH:  Your Honor, I believe this -- I believe

16  that's -- yes, that -- well, I believe that's correct, Your

17  Honor, although this, as you see it relates to the portfolio of

18  loans as of September 30th, 2007.  And so, you know, I believe

19  some of these numbers will need to be undated from potential

20  changes as of the closing date.  So assuming the closing date

21  is 10/31 these numbers will need to be undated at that time.

22      Now, Your Honor, I don't believe there's -- we expect

23  there to be an appreciable difference in what the numbers are,

24  so I think the purchase price is relatively close to what the

25  end result will be.  Because of the limitation of liabilities

1  we believe that there, you know, is a cap on liabilities under

2  the terms of the deal, the revised terms of the deal.  But as

3  Your Honor sees from this calculation there are a number of

4  additional deductions, and again, those relate partially

5  because of the stipulation and the stipulated --

6          THE COURT:  I have to tell you, Mr. Beach, I don't

7  see any -- I am hopelessly confused by this chart.  I have no

8  concept of what you're talking about.  You've lost me, all

9  right.  I'm sorry, but --

10         MR. BEACH:  All right, Your Honor, well maybe --

11         THE COURT:  And I'd add secondly, I haven't heard any

12 evidence yet.  So I don't know how you intend to go forward,

13 but at this point I have no idea what you're selling these

14 loans for.  I'm sorry, I --

15         MR. BEACH:  Would it be helpful, Your Honor --

16         THE COURT:  I'm trying to get it.

17         MR. BEACH:  -- if I walk through the chart from the

18 top?

19         THE COURT:  Well, do you have a witness that can walk

20 through the chart for me?  I like you, Mr. Beach, but you're

21 not allowed to testify.

22         MR. BEACH:  I understand that, Your Honor.  I think

23 that we determined to approach this from two possible angles.

24 One is that this stipulation that was entered into with Ginnie

25 Mae set the sale or the return of the servicing rights with

1  respect to the Ginnie Mae portfolio as a fait accompli.  And by

2  virtue of that if these aren't sold, and right now Midfirst is

3  the only game in town and we're fast approaching the November

4  1st date, you know, we believe that that has already been put

5  out there.

6          THE COURT:  Your point is, if I don't approve

7  anything by November 1st you get nothing, so a dollar is worth

8  more than nothing.

9          MR. BEACH:  That's essentially my point, Your Honor.

10  I do -- I did prepare -- I don't have a witness here today,

11  Your Honor.  But because there hasn't been any contest

12  particularly based on the resolutions with the Committee and

13  Bank of America to the Debtor's business judgment to the good

14  faith and to the purchase price I do have affidavits from Kevin

15  Nystrum and an affidavit from our advisors, Michael Low, that

16  are executed, and assuming no one contests the use of those

17  declarations then I would propose to submit those to Your Honor

18  as evidence to support the sale.

19          THE COURT:  Any objection to the use of declaration?

20          MR. INDELICATO:  No objection, Your Honor.

21          UNIDENTIFIED SPEAKER:  No objection, Your Honor.

22          THE COURT:  All right, Mr. McMahon, any objection to

23  the use of declaration?  You don't have a pending objection to

24  the sale, but somewhat related --

25          MR. MCMAHON:  That's correct, Your Honor.  Just I'd

1  like to see the declarations.  I haven't had the chance to take

2  a look at them.

3        THE COURT:  Yes, you may.  You know, let me suggest

4  this.  Can we take Mr. McMahon's objection to the fact that you

5  and I are talking past each other partly because we can't say

6  numbers without violating the request that the purchase price

7  percentage be under seal.  I'm not saying I'm going to grant or

8  deny that motion, but to the extent I deny it it could seek --

9  it could actually result in clarity to the conversation as to

10  what exactly the purchase price is.  So may I suggest that we

11  deal with that issue before we go further trying to figure out

12  what the terms of the deal with Midfirst are.

13        MR. BEACH:  Sure, Your Honor.  Your Honor, the U.S.

14  Trustee contends that the purchase price must be unsealed.  And

15  the U.S. Trustee's papers seem to indicate that the purchase

16  price is not the type of commercial information that should be

17  kept confidential.  As Your Honor is aware, commercial

18  information has been defined as information that would cause an

19  unfair advantage to competitors by providing them with

20  information as to the commercial operations of the interested

21  parties.

22        Here the parties negotiated a confidentiality agreement in

23  the APA.  The relief requested here is identical to the relief

24  requested and granted under the Barclays sale and the U.S.

25  Trustee didn't object to the purchase price being sealed in

1  connection with that sale.

2      The Debtors still have servicing rights that are remaining

3  to be sold and are concerned that -- about these one off sales

4  artificially capping the purchase price of other sales that

5  will come shortly.

6      In addition, the U.S. Trustee's reliance on the <u>Altera</u>

7  decision, Your Honor, is entirely misplaced.  In <u>Altera</u> the

8  Court ruled that the Debtor's business was providing care to

9  elderly residents, not settling personal injury claims.  Here

10  the Debtor's business prepetition involved valuing servicing

11  rights to determine whether the -- to sell servicing retained

12  or servicing released.  Since the petition date the Debtors

13  have been marketing and selling assets, including selling

14  servicing rights in groups and in one off sales.

15      Indeed, this is a liquidating case and the Debtor's

16  primary mandate at this point is to liquidate the assets for

17  the highest and best value.  <u>Altera</u>, on the other hand, was a

18  reorganized Debtor with a different mandate.

19      In addition, Your Honor, section 107(b) is not viewed

20  solely with the eye of the Debtor.  107(b) provides that the

21  Court shall protect an entity or a person, not just the Debtor.

22  And Midfirst has advised the Debtor that they view the price as

23  commercial information and request that it be kept under seal.

24      Finally, Your Honor, the U.S. Trustee's assertion that the

25  disclosure of the purchase price in connection with the bulk

1   servicing sale to Wilbur Ross somehow prevents us from sealing

2   the purchase price in this or other one off servicing sales.

3   And first -- Midfirst is clearly in the business of buying and

4   selling servicing rights.  And as I've indicated before, this

5   is not something atypical of the Debtors.  They value servicing

6   rights in connection with sales of servicing retained and

7   servicing released sales.  And again, in this bankruptcy case

8   it is the mandate of the Debtor to liquidate its assets for the

9   highest and best value, and that has and does include the

10  selling of servicing rights.

11       In addition, in the Wilbur Ross deal the purchase price

12  was a blended rate with a large number of distinct entities and

13  servicing rights.  And so there's no way to make a distinction

14  between the percentage that was disclosed under the Wilbur Ross

15  deal to determine what actual purchase price percentage was

16  allocated to any one set of servicing rights or to any one

17  entity owning those loans.

18       And last, Wilbur Ross, unlike Midfirst, did not negotiate

19  for the nondisclosure of the purchase price.  So Your Honor, we

20  believe that the U.S. Trustee's objection should be overruled

21  and that these -- this purchase price and the purchase price

22  percentage should be under seal.  And notwithstanding the

23  immediate confusion we have, Your Honor, I think we can get

24  through that.

25            THE COURT:  Okay.

1          MR. BEACH:  Thank you.

2          THE COURT:  Mr. McMahon.

3          MR. MCMAHON:  Your Honor, good afternoon, Joseph

4    McMahon for the United States Trustee.  When we're talking

5    about the exceptions in 107 we're talking about what Judge

6    Walrath has characterized as limited exceptions to the general

7    rule that papers filed in Bankruptcy Court are public records,

8    what Judge Walrath says in the Altera decision at page 75.  So

9    the issue before the Court today is the price which our

10   purchaser has agreed to pay for the mortgage servicing rights

11   at issue, confidential commercial information.  In our papers

12   the Debtors -- as the Debtors have, we cite the definition from

13   Orion where confidential information is defined as information

14   that will cause an unfair advantage to competitors by providing

15   them information as to the commercial operations of the Debtor.

16        In Altera Judge Walrath cites to several cases which frame

17   the definition in these terms.  "Disclosure must reasonably be

18   expected to cause the entity commercial injury."  And another

19   one is, "The information is so critical to the operations of

20   the entity seeking the Protective Order that its disclosure

21   will unfairly benefit that entity's competitors."

22        So there's really two core concepts that we derive from

23   Altera.  First, to borrow a concept from antitrust lingo, "The

24   relevant market is the ordinary course market which the going

25   concern participated in prior to bankruptcy."  And we're

1  talking about the business of servicing mortgage loans.  To be

2  clear, Your Honor, we're not talking about the market for

3  bankrupt companies selling assets pursuant to section 363 of

4  the Bankruptcy Code.  And I think that's the critical

5  distinction which Altera draws.

6       When presented with the argument that having this

7  information out there would cause some asserted injury to the

8  bankruptcy Estate Judge Walrath addressed that argument saying

9  that, well, it's not causing -- or creating an unfair advantage

10  for Altera's market competitors, specifically in the health

11  care business that it was involved in.  That argument is

12  specified at page 76.  And we suggested by analogy, Your Honor,

13  the same should hold true here.  There's -- the exposure of the

14  purchase price to the market does not create an unfair

15  advantage to American Homes market competitors.

16       And the second point I want to derive from Altera, Your

17  Honor, that I think is important is that the standard tends

18  towards almost like an irreparable harm standard.  When Judge

19  Walrath cites the opinion we talk about the information has to

20  be critical to operations, commercial injury.  We're talking

21  about something more than some type of potential this-may-occur

22  type situation.

23       So applying those concepts to this particular motion, Your

24  Honor, we think that the result is pretty apparent.  And I want

25  to talk about the proposed motion from two angles.  Let's start

1   with the Debtor's Estates.  First, within a matter of days,

2   assuming that we can get through the issues relating to the

3   sale of the servicing unit, American Home isn't even gonna be a

4   market participant in the sense that it will bear the economic

5   risks associated with operating the servicing business.  To

6   talk generally about the terms of the deal again, Your Honor,

7   as of the date of the initial close the Ross entity will bear

8   the economic risk associated with the enterprise.  So

9   therefore, any assertion that there's gonna be commercial risk

10  to the Debtor's Estates really doesn't have a basis in fact.

11      Second, the impact of the availability that that

12  information will have on whatever it is the Debtors are trying

13  to do in connection with the bankruptcy case again, under

14  Altera we assert that that's irrelevant.  But even taking their

15  assertions at face value basically they're saying that the

16  existence of that purchase price will potentially be used by a

17  potential purchaser at the negotiation table or in the process

18  against us.  And Your Honor, we believe that that bald

19  assertion does not meet the statutory standard.

20      Let's talk about Midfirst for a second, and because that

21  issue has been raised for our office Midfirst also has an

22  interest in this.  And I believe that Mr. Beach may have

23  referenced that at the podium.  The first thing I have to offer

24  in response to that, Your Honor, is that there's a notice issue

25  here.  Nothing in the motion suggests that Midfirst has taken

1   an interest in this issue.  The motion is strictly framed in

2   the -- with reference to the Debtor's interest in protecting

3   its negotiation position.  It's not a joint motion.

4       And further, Your Honor, I note that I guess despite

5   whatever assertion that Midfirst has an interest in this issue

6   Midfirst didn't, from my knowledge, even file a joinder to the

7   Debtor's motion.  So at least I haven't seen any indication

8   this issue has any import to Midfirst.  The Court doesn't have

9   any notice of it.  And we don't have any evidence of that

10  today.

11      Second, Your Honor, I would say the same thing with

12  respect to Midfirst's interest that I said to the Debtor's

13  ability to sell their loans within bankruptcy market, which is

14  that the, I guess, alleged, or potential impact to Midfirst

15  with respect to whatever sales may occur on the secondary

16  market is at best attenuated mere speculation as to injury, and

17  certainly not the type of concrete we-can-see-this-coming type

18  injury that Judge Walrath referred to in Altera.

19      Third, at bottom, Your Honor, I do note that with respect

20  to the sale of the servicing right, both in the New Century

21  bankruptcy cases and these bankruptcy cases, the bulk of the

22  sales were not filed under seal.  And to the extent that

23  there's some suggestion that we should be making a distinction

24  between strategic and financial buyers in assessing whether or

25  not we should be putting this information under seal, Mr. Ross

1  and his entity fall within one category, and Midfirst falling

2  within another.  Your Honor, we respectfully disagree.  That's

3  really not the direction, I don't think, that we should be

4  taking this issue in.

5      So I hopefully within my papers and my presentation here,

6  Your Honor, identified our issues.

7          THE COURT:  Thank you.

8          MR. MCMAHON:  Thank you.

9          MR. HOCH:  Your Honor, Will Hoch with Midfirst Bank.

10         THE COURT:  Yes?

11         MR. HOCH:  Your Honor, if I may.  First of all, I'd

12  like to raise the issue that Midfirst Bank is very concerned

13  about the disclosure of the purchase price, and I think the

14  Court should be aware that first of all it does affect current

15  and future dealings that Midfirst Bank has that are in the

16  works in terms of negotiations on other similar purchases of

17  servicing rights that are out there that are ongoing and that

18  are current.  So Midfirst is concerned about the disclosure of

19  the purchase price and the disclosure of certain terms related

20  to the -- to this agreement.

21      That being said, Your Honor, the -- Midfirst Bank

22  understands the concern that the Bankruptcy Code has and that

23  the Court would have with respect to no disclosure in the

24  future, and Midfirst Bank was under the understanding that

25  eventually the purchase price would be disclosed after a

1   certain amount of time had passed.  And Midfirst Bank is

2   agreeable to allow that to happen, so long as it's not during

3   -- immediately after the closing.

4        And again, the concern is is that there is significant

5   negotiations that are ongoing right now that are -- that

6   Midfirst is participating in currently that would or could

7   upset those transactions or those negotiations, especially if

8   these terms were immediately disclosed.  And for that reason,

9   you know, Midfirst would ask, and has asked that the purchase

10  price be withheld from public disclosure until a later time,

11  not indefinitely, but until a later time.  Until some time has

12  passed in order that this matter can be substantively

13  consummated, and then those other -- it will not affect the

14  other deals that are existing or that are in the works.

15           THE COURT:  Thank you.

16           MR. BEACH:  Your Honor, in connection with that, the

17  negotiated term under the APA says that we'll keep the purchase

18  price under seal for approximately two years.  You know, the

19  Debtors are certainly amenable to a time period as well, as a

20  result of the fact that we are liquidating the remainder of our

21  servicing rights and expect to be able to do that over the next

22  couple of months.

23        One other thing I did want to point out, Your Honor, is

24  that we -- in the Seal Motion we do mention Midfirst, and we

25  specifically mention the concern that there could be leverage

1   interposed by another party in negotiations with either the

2   Debtors or Midfirst in connection with other sales.  So I did

3   just want to clarify that point for the record as well.

4         THE COURT:  All right, thank you.  Well, much to my

5   chagrin I'm going to overrule the Office of the United States

6   Trustee's objection and grant the motion.  107(b)(2) provides

7   that on request of a party-in-interest or on my -- on the

8   Court's own motion the Court may protect an entity with respect

9   to a trade secret or confidential information.

10      So I'm not particularly troubled that to the extent we're

11  seeking to protect the confidential information as it pertains

12  to Midfirst that Midfirst isn't the Movant, I don't think

13  that's required.  I think the Debtors can make their own

14  motion, or based on evidence the Court can actually make its

15  own motion to protect confidential information.

16      It was clear to me from the extensive testimony in

17  connection with the Wilbur Ross sale that the pricing on the

18  buying and selling of servicing rights is subject to a number

19  of factors, not insignificantly companies' internal rate of

20  return based on their cost of operations, based upon their

21  calculation of the interest rate spread, et cetera, that when

22  you're talking about financial services the buying and selling

23  of financial vehicles, pricing is really all there is to the

24  business.  And lots of people spend a lot of money and a lot of

25  brain power trying to figure out what the appropriate pricing

1  mechanism is.

2      So at least in connection with the buyer, Midfirst, I

3  think that there is a significant issue of pricing and

4  confidentiality of pricing involved.

5      Now I have to weigh that against the interest of full

6  disclosure in the bankruptcy process, and were this a contested

7  hearing on whether or not this was a rational exercise of the

8  Debtor's business judgment frankly I'm not sure there'd be any

9  way around disclosing the information.  But the reality is that

10  all the objections to the substance of the sale have been

11  resolved, and as Mr. Beach rather eloquently reminded the Court

12  a dollar is worth more than nothing, and in the event this

13  doesn't go forward Ginnie Mae is going to get the servicing

14  here and the Debtors are not going to have much to show for it.

15      So I think given the facts of this case, at least this

16  motion, protecting Midfirst's confidential information

17  regarding its internal pricing of the Ginnie Mae loans should

18  be protected.  I'm not at all, frankly, very moved by the

19  Debtors's attempt to protect themselves.  I think the Altera

20  decision showed Judge Walrath is very applicable to the

21  Debtor's basic argument, which is you can't let other people

22  know what people are buying this for because then we're not

23  going to be able to get a good price the next time around.

24  That's almost exactly what Judge Walrath was dealing with in

25  Altera in connection with the settlements.

1    So I don't have to decide it because I've already said I'm

2  going to grant the motion, at least to protect the rights of

3  the buyer.  But I offer that for what it's worth that I'm not

4  particularly inclined to protect the Debtor in this instance.

5  And were the buyer's interest not implicated I'd probably

6  sustain the objection.  But the buyer's rights are implicated.

7  I think that based on the evidence that I've heard in

8  connection with other matters it's clearly confidential

9  information that should be protected for some time.

10    I'm not going to get into negotiating the terms of the

11  APA, but if three, four, five months, weeks, whatever is

12  appropriate, someone brings a Motion to Lift the Seal Order, if

13  you will, or the order providing for the preservation of the

14  information under seal, and there's no longer a legitimate

15  business reason to protect the buyer's financial interest then

16  the Court would be inclined to grant the motion.  But I have to

17  wait for a future date for that.

18    So overrule the Office of the United States Trustee's

19  objection, and I'll grant the motion to keep the information

20  under seal under 107(b).  I don't know if you have -- just sign

21  the order that was attached, or do you have a --

22    MR. BEACH:  Your Honor, I don't have an order.  I

23  could -- either signing the order that was attached is fine, or

24  we can submit it -- if there's approval of the sale, we can

25  submit it with those.

1          THE COURT:  Well, you're going to want it under no

2   matter what.  I assume --

3          MR. BEACH:  That's right, Your Honor.

4          THE COURT:  -- that Midfirst doesn't want anyone to

5   know what they bid.  Why don't you submit an order under

6   Certification of Counsel, making sure it protects everybody's

7   rights, and give Mr. McMahon an opportunity to comment on it if

8   he deems that as appropriate.  But pending further order of the

9   Court the information will remain under seal.

10          MR. BEACH:  Thank you, Your Honor.

11          THE COURT:  The motion's granted.  So let's turn back

12   to -- do you have the affidavits?  Oh, Mr. McMahon --

13          MR. BEACH:  I do, Your Honor, may I approach?

14          THE COURT:  -- probably hasn't had the opportunity to

15   look at them yet.

16          MR. MCMAHON:  Your Honor, no objection to proceeding

17   by affidavit.

18          THE COURT:  All right, thank you.  Court will admit

19   the declarations.  Thank you.  I think I'm going to ask you a

20   series of questions, Mr. Beach, and maybe that will get us

21   where we need to go.  You ready?

22          MR. BEACH:  Sure, Your Honor.

23          THE COURT:  All right.  I'm looking at Exhibit-C.

24   Now -- by the way, if the buyer wants to chime in and fix this

25   at any time that's fine.  But we'll see if we can proceed

1   without you.

2       Okay.  I get the unpaid principal balance.  I understand

3   that.  Loan count.  Then there's a series of line items for

4   loans that are either in foreclosure or delinquent, et cetera.

5   They come off the top.  So they're not being transferred, is

6   that correct?

7           MR. BEACH:  The loans are being transferred.  They're

8   just --

9           THE COURT:  They're accounted for purchase price in a

10  different way.

11          MR. BEACH:  -- the UPBs are not -- well, they're not

12  accounted for at all in the purchase price.  They're just --

13          THE COURT:  They get them for free.

14          MR. BEACH:  Correct.

15          THE COURT:  All right.

16          MR. BEACH:  Well, not --

17          THE COURT:  God help them.

18          MR. BEACH:  Well, not even for free.  We're paying

19  them for some of them.

20          THE COURT:  Right, I understand, okay.  That's that

21  delegation of duties thing I was talking about the other day.

22  Okay, so you get your total pools.  The UPB comes off so you

23  get a total unpaid principal amount.  Now that's not

24  confidential, is it?

25          MR. BEACH:  No, it's not, Your Honor.

1           THE COURT:  All right.  So that's 427 million.  And

2    then you multiply it by the purchase price percentage, which is

3    what everybody wants to keep secret.  So then I go over to

4    purchase price and adjustments and get a number.  That's the

5    raw number the Debtors are receiving.

6           MR. BEACH:  Yes, Your Honor.

7           THE COURT:  Subject to some adjustments.

8           MR. BEACH:  Yes.

9           THE COURT:  At least -- and that's regardless of

10   advances.  That's just for unpaid principal.

11          MR. BEACH:  Correct.

12          THE COURT:  All right.  Then for all those loans that

13   we just talked about that are delinquent for whatever reason

14   you're paying a fee per loan to the buyer to take it off your

15   hands.

16          MR. BEACH:  Yeah.  Not all of them, but some

17   categories of those, yes.

18          THE COURT:  All right, I've got it.  And that -- so

19   you take that number and you take it -- you subtract it out,

20   and that's where you get the purchase price less adjustments,

21   with the double underline under it.

22          MR. BEACH:  Correct.

23          THE COURT:  Right?  Okay.  So that's the sale price

24   plus advances, right?

25          MR. BEACH:  Correct.

1          THE COURT:  Okay.

2          MR. BEACH:  Minus the deductions.

3          THE COURT:  Well, there we go, here we go.  Now,

4    that's what I'm trying to figure out.

5      (Laughter)

6          THE COURT:  It's really late in the day for math.  I

7    mean, yikes.  Okay.  So on the initial close, or however you're

8    calling it, the transfer date I guess, you get 40% of that

9    figure, right?

10          MR. BEACH:  That's correct, Your Honor, with the

11    caveat that it's 40% -- the greater of 40% -- that's why this

12    is so complicated.  The greater of 40%, or what's owed to

13    Ginnie Mae, which we think is gonna be well below 40%.  So

14    it'll -- it should --

15          THE COURT:  So it will be 40%, let's assume that.

16          MR. BEACH:  Yes.

17          THE COURT:  It could be less though.

18          MR. BEACH:  It could be more.

19          THE COURT:  It could be more.

20          MR. BEACH:  If it is more because we owe more to

21    Ginnie Mae then they get all of that.

22          THE COURT:  Who gets all of that?  Who's they?

23          MR. BEACH:  Ginnie Mae.

24          THE COURT:  Ginnie Mae gets it all.

25          MR. BEACH:  In other words, we get 40% of that

1  amount.  A portion of that 40% will be paid over to Ginnie Mae.

2          THE COURT:  All right.  If you owe -- oh, okay.  So

3  if the gross amount you owe Ginnie Mae is in excess of the 40%

4  initial number you're just a conduit for Ginnie Mae.

5          MR. BEACH:  Correct, Your Honor.

6          THE COURT:  All right, I've got it.  All right, let's

7  -- that is what it is, so I'm not particularly worried about

8  that.  There's nothing we can do about the Ginnie Mae

9  stipulation.  All right, so 40% funding.  And then that 40% you

10 take off the top some more fees, is that right?

11         MR. BEACH:  I mean, that's part of what is being paid

12 to Ginnie Mae, those two -- the pool transfer fee and the

13 bearing point --

14         THE COURT:  That goes to Ginnie Mae?  All right.

15         MR. BEACH:  Yeah, I believe that's part of the Ginnie

16 Mae stipulation.

17         THE COURT:  So it comes into the Estate but it goes

18 right back out to door the Ginnie Mae.

19         MR. BEACH:  Correct, Your Honor.

20         THE COURT:  All right.  What's this holdback?

21         MR. BEACH:  The --

22         THE COURT:  15% holdback.

23         MR. BEACH:  The holdback primarily -- let me just

24 turn to the APA for the moment, Your Honor.  Yeah, Your Honor,

25 Mr. Brady pointed out to me that it's really not in the

1  appropriate place on this chart.  That 15% holdback is what's

2  being paid after the 120 day, essentially a reconciliation

3  period.  And --

4          THE COURT:  So that should be at the bottom.

5          MR. BEACH:  It should be, Your Honor.

6          THE COURT:  All right, I've got you.

7          MR. BEACH:  Now the one --

8          THE COURT:  We'll worry about that later then, all

9  right.  So you get 40% up front minus some fees that go to

10  Ginnie Mae.  And then you get 45% in the second installment,

11  correct?

12          MR. BEACH:  Correct, Your Honor.

13          THE COURT:  All right.  And what has to happen

14  between the first and second installment?

15          MR. BEACH:  I will need to refer to the APA for that.

16  It is in section -- section 3.2.2, Your Honor, I believe is the

17  section.

18          THE COURT:  Series of conditions.

19          MR. BEACH:  Right, and they're all listed in the

20  Romanette there.  The number used here is 85%, and that is

21  because in one of those other Romanettes it excludes the

22  initial payment of 40%.

23          THE COURT:  Well, 40 plus 45 is 85.  I got that.  All

24  right.

25          MR. BEACH:  I'm sorry, Your Honor?

1            THE COURT:  That's okay, I got it.

2            MR. BEACH:  Okay.  So it --

3            THE COURT:  What's the condition to the settlement

4   date then, as opposed to the transfer date?  It's just 15 days

5   later?

6            MR. BEACH:  Yeah, it is 15 days later.

7            THE COURT:  Are there any conditions precedent to the

8   settlement date?  Other than the passage of time?

9            MR. BEACH:  I thought those were -- those conditions

10  were in here, but as I read it now it doesn't appear that

11  they're really conditions, they're just certain deductions.

12  But I'd ask Midfirst to point out if there is any -- are any

13  conditions with respect to that payment other than the running

14  of the 15 days.

15           MR. HOCH:  Your Honor, Will Hoch.  I don't have the

16  APA in front of me, immediately in front of me.  But basically

17  what it allows for is for the transfer there's a lot of the

18  mechanical things that have to take place within those 15 days.

19  We will not have any, you know, any of the mortgage files, et

20  cetera.  And so my recollection is that it relates to the

21  transfer, physical transfer of the files.  There will be some

22  reconciliation that will be done within those -- within that

23  time period that primarily the primary holdback relates to the

24  15% and the $400,000 that was referenced earlier in the

25  hearing.

1          THE COURT:  All right, I've got it.

2          MR. BEACH:  Your Honor, and I think most of those

3    conditions, requirements are set forth in section 4 of the APA.

4          THE COURT:  Okay.  Now in that 45% second installment

5    there's a series of deductions that get taken off the top of

6    that as well.

7          MR. BEACH:  Yes, Your Honor.

8          THE COURT:  Right?  And then you get to that net

9    number, which is the adjusted second installment.

10          MR. BEACH:  Right.

11          THE COURT:  So -- and then there's a -- after all

12    that there's a holdback, a 15% holdback, which gets held until

13    when?

14          MR. BEACH:  It gets held 'til about 120 days after

15    the transfer date.

16          THE COURT:  All right.  So once the 40% is paid

17    subject to the deductions, the 45% is paid subject to the

18    deductions, and you get the 15% holdback, if you get it all,

19    you get to that adjusted purchase price number down below, all

20    right, correct?  And that's really what you're actually

21    receiving.

22          MR. BEACH:  Yes, Your Honor.

23          THE COURT:  Okay.

24          MR. BEACH:  I believe that's correct.  And I believe

25    that this Exhibit-C that you're looking at reflects the

1  additional $400,000 holdback.  But as I look at this chart I

2  can't see exactly where that is.  We expect to get most of that

3  holdback back at the end of November.

4           THE COURT:  Is that an additional holdback over the

5  15% holdback?

6           MR. BEACH:  It is, Your Honor.

7           THE COURT:  All right.  Now with regard to the

8  advances, is it a -- there's just a dollar for dollar for the

9  advances subject to reconciliation, correct?

10          MR. BEACH:  Correct, Your Honor.

11          THE COURT:  All right.  Okay.  I've got it.

12          MR. BEACH:  Thank you, Your Honor.

13          THE COURT:  Anybody wish to be heard in connection

14  with any of this?

15          ALL:  (No verbal response).

16          THE COURT:  And just so we're clear, the Court has

17  accepted the declaration of Michael Low and Kevin Nystrum as

18  evidence in support of the motion.  Mr. Indelicato.

19          MR. INDELICATO:  Thank you, Your Honor, Mark

20  Indelicato from Hahn & Hessen on behalf of the Committee.  Your

21  Honor now appreciates I think why we ended up filing an

22  objection to this motion.  As we indicated, and as the Court

23  indicated and Mr. Beach indicated, as a result of the Ginnie

24  Mae stip the ultimate conclusion we reached was a dollar was

25  better than nothing.  But the original APA that we had we were

1  concerned that there wasn't even gonna be a dollar.

2          THE COURT:  Yes.

3          MR. INDELICATO:  But as a result of the changes that

4  we believe we have negotiated and subject to seeing a final

5  copy of the APA, we believe that all of our objections have

6  been resolved.  The main concerns we had was an increase of the

7  initial purchase price, of the initial funding, and as well as

8  the limitation of liabilities.  And with those changes, Your

9  Honor, we reluctantly agree that this is in the best interest

10  of the Estate in that if not done we may lose all value.  So we

11  would urge the Court to approve the sale.

12          THE COURT:  All right.  Thank you.  Bank of America.

13          MR. TALMADGE:  Scott Talmadge from Kaye Scholer for

14  Bank of America, Your Honor.  With the changes and subject

15  obviously to seeing the revised APA, as well as the revised

16  agreement we believe now that the agreement will provide value.

17  Obviously it's always been our position, and the orders provide

18  that the proceeds in excess of that which gets paid to Ginnie

19  Mae will get paid to Bank of America as administrative agent

20  for the prepetition Secured Lenders.  So subject to getting the

21  APA and the order in shape we believe the deal should go

22  forward.

23          THE COURT:  All right.  Thank you.

24          MR. HOCH:  Your Honor, Will Hoch appearing on behalf

25  of Midfirst.  We worked very diligently in the last couple of

1   days with all of the different entities that were concerned

2   about this.  Our nose has been appropriately bloodied with

3   respect to timing issues and deducts and timing of payments.

4   We have we feel negotiated in good faith and have an

5   appropriate APA subject again, as the other parties said, to

6   finalizing that language.  And you know, as we said, we have

7   been working very hard on this.  We appreciate everybody's

8   efforts.  Everybody has been available and the Court has been

9   available, and we thank everybody in that effort.  And

10  obviously we would request that the matter be approved as well.

11          THE COURT:  All right.  Anybody else wish to be

12  heard?

13          MR. BEACH:  Your Honor, if I may.  There was one

14  other objection by MERS, and we've discussed the matter with

15  MERS and have indicated that the Debtors do have a third party

16  agreement with MERS.  Your Honor addressed some of the issues

17  related to MERS with respect to the largest servicing sale.  We

18  have told MERS that we're not affecting that agreement that the

19  Debtors have with this APA or the Sale Order, and that there

20  are about 177 loans in this Ginnie Mae portfolio that are

21  registered with MERS.  And there are some transfer fees that

22  might be required to be paid under the terms of that separate

23  agreement at about $4.95 a loan, which comes out to about $876,

24  I believe.

25          So I told MERS that I would represent that this Sale Order

1  and the APA aren't affecting that separate agreement.  And I

2  believe that should resolve their --

3        THE COURT:  Well, who's going to pay the transfer

4  fee?

5        MR. BEACH:  I mean, it's --

6        THE COURT:  Are you saying the Debtors are?

7        MR. BEACH:  We're gonna comply with the APA and to

8  the extent we're required to pay transfer fees under our

9  separate agreement then to comply with the APA then we're gonna

10 be required to do that.

11       THE COURT:  All right.  Ms. Booth.

12       MS. BOOTH:  Good evening, Your Honor, Rebecca Booth

13 of Morgan Lewis & Bockius on behalf of MERS.  I do appreciate

14 Mr. Beach's representations.  Our main issue was that the APA

15 directed the Debtors to direct MERS to do certain things.  We

16 just want to be clear on the record that nothing in the APA or

17 the Sale Order is going to obligate MERS to do anything beyond

18 what is in their current agreement, both with Midfirst and with

19 the Debtors.  And I think we're clear on that point.  So --

20       THE COURT:  Well --

21       MS. BOOTH:  -- we can withdraw our objection at this

22 point.

23       THE COURT:  Very well, thank you.  Okay.  I will

24 approve the transaction subject to receiving and reviewing the

25 Final Order and final APA under Certification of Counsel.  If I

1  have any issues with it I'll let you know.

2         MR. BEACH:  Thank you, Your Honor.

3         THE COURT:  But --

4         MR. BEACH:  What I --

5         THE COURT:  -- as presented to the Court and based on

6  the representations of counsel I don't think there'll be any

7  issues and I expect I'll sign the order.

8         MR. BEACH:  Thank you, Your Honor.  What I would

9  propose to do is to send Your Honor a blackline of the APA and

10  the Sale Order to the versions of the blacklines that your --

11  that I've handed up to Your Honor today.  Unless you want a

12  full blackline to the final --

13         THE COURT:  You better give me a cumulative

14  blackline.

15         MR. BEACH:  Cumulative?  Okay.

16         THE COURT:  I want the whole thing.

17         MR. BEACH:  Okay, I'll do that.  Thank you.

18         THE COURT:  Otherwise you're asking me to remember

19  too much.

20      (Laughter)

21         MR. BEACH:  We'll do that, Your Honor.  And we're

22  gonna endeavor, given the time line and the sale to get that to

23  Your Honor tomorrow morning.

24         THE COURT:  Okay.

25         MR. BEACH:  Thank you.  Your Honor, the next item on

1    the agenda is with respect to the Wilbur Ross servicing sale

2    and the Servicing Sale Order, and I'd like to cede the podium

3    to Mr. Cleary.

4           THE COURT:  Okay.

5           MR. CLEARY:  Good afternoon, Your Honor.  For the

6    reord, Blake Cleary of Young Conaway Stargatt & Taylor.  I have

7    the unenviable job of trying to present the Form of Order to

8    you.  I can tell you by way of background this order came about

9    after approximately --

10       (Phone beeps)

11          THE COURT:  Courtcall?  Did you -- you don't need to

12   mute it.  You didn't do it?  Okay.  Is that person still on?

13   Is the Courtcall operator there?

14          OPERATOR:  Yes, this is the operator.  I have muted

15   that line and I'll check with it.

16          THE COURT:  He's still on that line?

17          OPERATOR:  Yes.

18          THE COURT:  Well, take him off.

19          OPERATOR:  Okay.

20          THE COURT:  Go ahead.

21          MR. CLEARY:  I certainly hope that the music didn't

22   mean I had to dance in front of Your Honor.

23       (Laughter)

24          THE COURT:  I hope so too.

25       (Laughter)

1           MR. CLEARY:  That makes two of us.  But by way of

2  background, the form of order that was filed yesterday under a

3  Notice of Filing and appears at Docket #1658 was the

4  culmination of approximately two weeks of negotiations with

5  some of the parties who are in the Courtroom today -- some of

6  which are appearing by phone and some others who are not

7  present.

8       And at the outset I'd like to thank those parties, thank

9  the Committee, thank the banks -- to try to minimize the

10  issues.  I think that being said, certainly there are issues

11  the Court may have with the Form of Order and there are issues

12  that we just simply couldn't resolve before we came before Your

13  Honor this afternoon.  Try as we might, we were unable to do

14  that.  And for that we apologize, but there are a few lingering

15  issues.

16       I guess I could propose to proceed a couple of different

17  ways -- address Your Honor's questions with -- if any, with

18  respect to the Form of Order that was presented.  We do have a

19  further blackline, which I could hand you and walk you through

20  the further changes we have made again to accommodate comments,

21  concerns, issues raised by various parties to the transaction,

22  if you would like to proceed that way.  And then --

23           THE COURT:  Well, let's -- yes, let's do that.

24  Let's --

25           MR. CLEARY:  Okay.  Yeah.

1          THE COURT:  -- run through the changes and then

2    let's take the objections that are outstanding this.

3          MR. CLEARY:  Thank you, Your Honor.  If I may

4    approach with a further blackline of what was -- from what was

5    filed yesterday?

6          THE COURT:  Yes.

7       (Pause in proceedings)

8          THE COURT:  Thank you.

9          MR. CLEARY:  Your Honor, I think we can move

10   hopefully relatively quickly.  I guess the first substantive

11   changes appear on page 3.  There was an inadvertent deletion of

12   language which read "with such interest transferring and

13   attaching to the proceeds of the sale," which is on

14   approximately the fourth or the fifth and sixth lines.

15      We didn't need to strike those in what was submitted to

16   you so those remain but we did carry forward that language down

17   to the end of that paragraph and that was to recognize the

18   concept that, consistent with Your Honor's ruling, there was a

19   363 and a 365 finding with respect to Your Honor's ruling and

20   so it made clear that to the extent it's not executory that

21   it's still free and clear.  And so we brought that language

22   down.

23      Your Honor, the next change appears in footnote 4 on page

24   4.  And I believe what I handed you has a handwritten

25   strikethrough on the second and -- or the third and fourth line

1   so that we would be striking the words "all findings of fact

2   and conclusions of law announced by the Court at the sale

3   hearing in relation to the motion are hereby incorporated

4   herein to the extent not inconsistent herewith."  And so we've

5   struck that language mainly because --

6           THE COURT:  Did you strike the whole sentence?

7           MR. CLEARY:  We struck the whole sentence.

8           THE COURT:  What I have is -- doesn't have the whole

9   sentence struck.  What I have says -- still says "all findings

10  of fact and conclusions of law announced by the Court at the

11  sale hearing in relation to the motion are hereby incorporated

12  herein."  So you've got -- you're getting rid of that?

13          MR. CLEARY:  We're getting rid of that whole

14  sentence.  I guess what you have, Your Honor, strikes through

15  "to the extent not inconsistent herewith."

16          THE COURT:  Yes.  Yes.

17          MR. CLEARY:  But it strikes the whole sentence.

18          THE COURT:  It should be the whole sentence?

19          MR. CLEARY:  Should be the whole sentence because we

20  didn't mean to -- we meant this order to be consistent with

21  Your Honor's rulings, not incorporate some and not others.  So

22  we've --

23          THE COURT:  Good.

24          MR. CLEARY:  -- struck through that --

25          THE COURT:  Okay.

1          MR. CLEARY:  -- sentence.  The next substantive

2  blackline change appears at paragraph -- or at page 8.  And I

3  think this is mainly a cleanup change.  It says, "provided

4  however that no party to another agreement capitalized terms

5  may proceed against the purchaser's collateral."  I think it

6  cleaned up the language that we had there.

7          THE COURT:  Okay.

8          MR. CLEARY:  Your Honor, the next change appears on

9  page 9, in paragraph --

10         THE COURT:  At 8, there's a change at the bottom of

11 8 --

12         MR. CLEARY:  Oh, you're right, Your Honor.  I

13 considered that to be a nit and I didn't bring that to Your

14 Honor's attention.  I do apologize.  At the end there we've

15 struck the word "any" and then inserted "if any."

16         THE COURT:  All right.

17         MR. CLEARY:  Your Honor, the next change is page --

18 again, page 9 and this is to make clear that such interests

19 will attach to the proceeds of the sale or be satisfied solely

20 from the cure amount.

21         THE COURT:  I'm sorry.  If anybody has a Blackberry

22 on the table, it's helpful if you actually leave them below

23 otherwise they interfere with the microphone when they sync up.

24 That's what that noise is.  Go ahead, I'm sorry.

25         MR. CLEARY:  Thank you.  And Your Honor, there is

1  one additional language I think we haven't shared it with all

2  parties but I think it's consistent with the intent of that

3  added language so we would add after "cure escrow" that deals

4  with the Debtors' portion and then insert "and the purchaser's

5  cure escrow" to kind of clean that up to say that interests

6  would attach to those -- proceeds of sale were -- be satisfied

7  from those respective amounts.

8           THE COURT:  I'm sorry, so you're making an

9  additional change?

10          MR. CLEARY:  Yes, Your Honor.

11          THE COURT:  So what is it -- so in that such

12 interests will attach to certain proceeds of the sale or be

13 satisfied solely from the cure escrow --

14          MR. CLEARY:  And/or --

15          THE COURT:  -- and/or --

16          MR. CLEARY:  -- the purchaser's cure escrow.

17          THE COURT:  Oh, okay.

18          MR. CLEARY:  So that it wasn't limiting, it was

19 meant to be --

20          THE COURT:  I got you.

21          MR. CLEARY:  -- both escrows.

22          MR. BOWDEN:  Your Honor, I apologize to Mr. Cleary.

23 Can you tell us what paragraph that is?

24          THE COURT:  Paragraph M, page 9.

25          MR. BOWDEN:  Thank you.

1            THE COURT:  You're welcome.

2            MR. CLEARY:  Your Honor, that --

3            THE COURT:  So it now reads, "and that such interest

4   will attach to certain proceeds of the sale or be satisfied

5   solely from the cure escrow and/or the purchaser's cure escrow

6   as provided in this order."  Got it.

7            MR. CLEARY:  Your Honor, I think I made a mistake.

8   It's cure amount, not cure escrow.  So I may have created some

9   confusion on that.

10           THE COURT:  Cure amount and/or the purchaser's cure

11  escrow.

12           MR. CLEARY:  Right.  Capitalized term --

13           THE COURT:  Yes.

14           MR. CLEARY:  -- purchaser's cure amount.  On turning

15  to the next page we did have a cleanup item there to delete the

16  word "ultimately."  And that's on page 10.

17       Your Honor, the next page, page 11 includes some changes

18  that you'll see throughout.  And they were inserted to capture

19  the concept of the 365/363 finding the Court made.  And so in

20  addition to the assumption and assignment it adds the words "or

21  transfer by the Debtors."

22           THE COURT:  Very well.

23           MR. CLEARY:  On page 12, Your Honor, there is a nit.

24  We actually inserted an extra "s" after relates and so we

25  cleaned that up.  I think on the fourth line down, there's an

1  extra -- where it's X -- (X) -- we've got the X in the wrong

2  place but we'll clean that up at the next version.

3       Your Honor, the next change is page 13 in paragraph 2.

4  And this change reflects that the Debtors were authorized to

5  take such steps as are necessary to comply with the provisions

6  of the APA and so it adds in the beginning of that proviso --

7  it adds that any documents executed by the sellers in

8  connection with the transactions --

9            THE COURT:  Okay.

10           MR. CLEARY:  -- were authorized to take steps

11  necessary to comply with the provisions of the APA.

12       I think the next substantive changes are found on page 15,

13  paragraph 5.  These changes in paragraph 5 address the issue of

14  the net proceeds being deposited consistent with the cash

15  collateral order but it cleans up language and it says,

16  "regardless of whether the termination date has occurred" so

17  it's regardless of whether the cash collateral order is in

18  place that the proceeds will continue to follow consistent with

19  what's in the order.

20       In addition, Your Honor, there was some bracketed language

21  -- last sentence --

22           THE COURT:  Right.

23           MR. CLEARY:  -- of -- we've deleted those brackets

24  and those are now officially in the proposed Form of Order.

25       The next changes appear in paragraph 9 and again this is

54

1   consistent that it will be in the manner set forth in the cash

2   collateral order regardless of whether the termination event

3   under the cash collateral order has occurred and again this is

4   a series of changes you'll see throughout the document.  And

5   two of those changes you'll find on page 18 in paragraphs 10

6   and paragraphs 11.

7       Your Honor, the next change is paragraph 18 and this was a

8   cleanup change to qualify the term "budget" and it's as defined

9   in the APA.

10      Your Honor, the next page -- page -- change is at page 23,

11  paragraph 24.  We did receive comments from some parties you'll

12  hear from in a moment.  One of those was DB Structured and this

13  addressed one of their comments about having been deemed to

14  consent -- we've modified the language in this provision and

15  that has addressed, I believe, to the satisfaction of DB

16  Structured, at least one of their issues.

17          THE COURT:  All right.

18          MR. CLEARY:  I think it might have been raised by

19  other parties with respect to that deeming consent and I hope

20  that we've addressed it in that paragraph.

21          THE COURT:  Well, I think that language more

22  accurately reflects the ruling, so --

23          MR. CLEARY:  Thank you.  Paragraph 33 we had a

24  change -- we inadvertently got the name wrong of Ms. Lawson's

25  client when she reserved her rights to -- on the cure amount,

1  and so we've got some cleanup language there to deal with the

2  name --

3           THE COURT:  All right.

4           MR. CLEARY:  -- that we inadvertently got wrong.

5       Page 29, paragraph 36, we've got some cleanup language

6  there to make clear that the Debtors are and remain liable to

7  pay -- and I'm reading one, two, three, four, five, six, seven

8  lines down -- we've inserted the words "from the cure escrow"

9  and -- to make clear that the payments are coming from the cure

10  -- or the cure amounts are coming from the cure escrow.

11      We also have been requested to insert additional language,

12  which has been proposed by US Bank and we need to share it with

13  others.  But I told them I would read it into the record to the

14  extent we can agree to that amongst our side.

15      And it would appear at the end of line -- 1, 2, 3, 4, 5,

16  6, 7, 8, 9 -- I believe at the end of line 10 after the word

17  escrow -- "cure escrow" so it -- working backwards, it would

18  say, "provided however all payments on account of and related

19  to the sellers' cure amount shall be limited to and satisfied

20  from the cure escrow" and then it would add the new language,

21  "and upon Debtors' receipt of the cure -- purchaser's cure

22  amount, the Debtors shall earmark and segregate such funds and

23  subject to further order of the Court, promptly pay to the

24  applicable party."

25      Again, that was discussed.  I'm not sure it's been agreed

1  to by everybody but that's the proposed language, which also

2  raises an additional issue procedurally with respect to

3  concerns from various objecting parties.

4      And that is, the mechanism and the procedure by which

5  monies will come out of the cure escrow to pay the cure amounts

6  because they're being escrowed today but they're not going to

7  become due until some period of time.

8      And what we had proposed to do would be to file a

9  subsequent motion with the Court, provide an opportunity to be

10  noticed and an opportunity to be heard by objecting parties

11  here today.  But set forth a procedure by which those monies

12  would be satisfied and paid.  But that would be subject of

13  another pleading so that we're not binding folks and that

14  seemed to work for at least some of the objecting parties.

15      And hopefully it goes a long way to satisfying any other

16  issues that are -- that go to the mechanism and the procedure

17  by which the money would come out of the cure.

18      Your Honor, we've got a clarification or cleanup change in

19  paragraph 43 at the -- it reads "shall have been paid" and

20  we've inserted the word "have" in two spots there.

21          THE COURT:  All right.

22          MR. CLEARY:  Also consistent with the language,

23  we've proposed to add or some of the objecting parties proposed

24  to add dealing with the receipt of the purchaser's cure amount.

25  The proposed language would be -- and inserted after the words

1  of paragraph 32, above in the second line.  And we have

2  received purchaser's cure amount and segregated pursuant to, I

3  believe, paragraph 36.

4            THE COURT:  Okay.

5            MR. CLEARY:  Paragraph 44 was an insertion.  It

6  doesn't show up as a blackline in here but was an insertion in

7  there and US Bank wanted to address this paragraph.

8            THE COURT:  Where --

9            MR. CLEARY:  But in essence what this paragraph

10 does, my understanding --

11           THE COURT:  Where are you?  I'm sorry.

12           MR. CLEARY:  I'm sorry, paragraph 44 on page 32.

13           THE COURT:  Oh, okay.  It doesn't show up as an

14 insert.  Okay.

15           MR. CLEARY:  It does not show up as a blackline but

16 it was inserted from the Form of Order filed with the motion,

17 it should have showed up in what we filed yesterday.

18           THE COURT:  All right.

19           MR. CLEARY:  But US Bank wanted a -- something on

20 the statement with respect to -- or the record with respect to

21 that, and that's simply to kind of, again, protect and be

22 consistent with the Court's ruling under 365/363 ruling.  And

23 so the purchaser has requested that language be inserted.

24           THE COURT:  What does it mean?  I mean, I don't

25 understand it.

1          MR. CLEARY:  Your Honor, I think Counsel for the

2 purchaser is on the phone.  This is their requested language.

3 But I think in essence it deals with the concept again of the

4 365/365 -- 363/365 concept that it will accrue to the benefit

5 of the purchaser with respect to the purchased assets and

6 purchaser's collateral, whether or not they are assumed under

7 365 or 363.  I don't know if the purchaser wants to add any

8 color on that provision?

9          MR. HEIMAN:  No, I don't think so.

10          MR. INDELICATO:  Your Honor, Mark Indelicato --

11          THE COURT:  Then you're clearly missing the puzzled

12 look on my face, because you're on the telephone.  I don't get

13 it.

14          MR. INDELICATO:  Your Honor, if I may, Mark

15 Indelicato and --

16          THE COURT:  And who spoke on the phone?  You need to

17 identify yourself.

18          MR. HEIMAN:  Dave Heiman, sorry.

19          THE COURT:  That was Mr. Heiman.

20          MR. HEIMAN:  David Heiman of Jones Day.

21          THE COURT:  Thank you.

22          MR. INDELICATO:  Yes, Mr. Heiman will correct me if

23 I'm wrong.  I believe the intent of that paragraph was really

24 to encapsulate the Court's ruling and to say whether or not

25 these agreements were deemed to be executory under 365 or

1  whether they were deemed to be assigned under 363, we were

2  setting up a cure escrow to deal with any amounts due under

3  those contracts.

4      And to the extent any claims emanated under those

5  contracts, they were going to be sort of -- they would need to

6  look to the cure escrow to get their payment and they wouldn't

7  have any ability to go against the purchaser's assets or the

8  purchaser's collateral to satisfy those claims.  It may not

9  have been artfully done, but that was really the intent of the

10  paragraph.

11          THE COURT:  All right.  Mr. Heiman, do you agree?

12          MR. HEIMAN:  Yes, Your Honor, I do.

13          THE COURT:  All right.  I --

14          MR. HEIMAN:  I mean, I must say that there -- you

15  know, this order has a long history so we've tried to -- we've

16  tried our best with everybody else to reflect the ruling and

17  that's what this is about.

18          THE COURT:  Okay.  Okay.  I -- okay, well, we can

19  talk about it later if we have to.

20          MR. CLEARY:  Thank you, Your Honor.  Turning to the

21  next blackline change, appears in paragraph 45 -- we struck the

22  language "and the holders of liens arising from the financing."

23  This is a cleanup related to the removal of a paragraph that

24  was previously in the Form of Order dealing with the financing.

25          THE COURT:  Okay.

1        MR. CLEARY:  And that's not in there so there's no

2  need for the reference.  The next change is on paragraph 45

3  again but on page 33.  And there were some changes there to

4  deal with the injunction to clarify that -- BofA's rights to

5  the proceeds aren't affected.

6      There's also an additional change in that paragraph

7  consistent with the previous changes to contemplate the issue

8  that the cash collateral order may not be around but regardless

9  of whether a termination date has occurred, the proceeds will

10  go to BofA.

11      Your Honor, on page 39, paragraph 56, we've removed the

12  brackets in that paragraph.

13      And I think that brings us to I guess the one other issue

14  that you'll at least hear at least one objector -- maybe two --

15  and that's on the final paragraph of the order.  And this deals

16  with the final and appealable order and the effectiveness of

17  the -- of this Court's ruling pursuant to 6004(h) and 6006(d).

18  Your Honor, this was a paragraph that was negotiated in the

19  Form of Order that was originally attached to the APA.

20      It is something that the purchasers have requested and so,

21  you know, we seek the Court's indulgence to grant that

22  provision.  You will hear from at least one party, maybe two,

23  who think that paragraph's not appropriate.

24        THE COURT:  All right.

25        MR. CLEARY:  And that's the presentation on that.

1    With respect to objectors, I obviously will cede the podium to

2    allow folks to be heard.  I did want to make one comment and

3    representation on the record with respect to Mr. Minuti's

4    client and I hope I get the name of it correct.  But it's -- I

5    believe -- SCSI.

6         Prior to the entry of this order, Mr. Minuti's client has

7    exercised his recoupment rights with respect to the payment

8    that we had placed in the cure escrow.  I mean, I'm sorry, we

9    placed in the cure amount on a schedule to -- a proposed

10   schedule with respect to the sale order.

11        Again, we're going to modify that to reflect that there is

12   no cure amount owed with respect to Mr. Minuti because of the

13   exercise of his recoupment rights, which has been done with the

14   knowledge and no objection from the Committee or Bof A or the

15   Debtors.  And we'll work through that issue -- I believe there

16   may be some language we would need to come up with to possibly

17   insert in the language in the order and we'll do that.

18        But there is no intent to effect Mr. Minuti's recoupment

19   rights or his client's recoupment rights and to the extent that

20   it were ever determined that he either improperly or was not

21   able to effect any recoupment rights then those rights would be

22   preserved and he would be able to assert a claim with respect

23   to the cure amount.

24        I don't think that will ever arise, but that was part of

25   the understanding with Mr. Minuti's client and so I make that

1  representation on the record with respect to that.

2       THE COURT:  So, okay -- Mr. Minuti?

3       MR. MINUTI:  Good afternoon, Your Honor.  Mark

4  Minuti from Saul Ewing.  Your Honor, my client for the record -

5  - the client's name is Security Connections Inc. -- we

6  abbreviate it SCI.

7       Your Honor, my understanding is just a little bit

8  different than Mr. Cleary.  My client -- you know, it's sort of

9  a misnomer in terms of the effectuated a recoupment.  As I

10 understand it, recoupment is really a defense, so really what

11 I'm saying is that I'm not going to pay amounts that are

12 allegedly due because I'm going to recoup it against amounts

13 that I believe are owed to me.

14      So I think what we're going to try to agree upon, Your

15 Honor, is language that's going to go in the order that's going

16 to preserve essentially my recoupment right in the event that

17 it's ever challenged later.

18      Where I disagree with Mr. Cleary is I believe what we're

19 going to do is include a cure claim in the cure schedule for my

20 client with the understanding that if my -- if nobody ever

21 challenges my recoupment rights, I obviously am not going to be

22 owed anything.  If somebody challenges the recoupment and is

23 successful, then my rights to the cure claim, to assert a set-

24 off claim and so on and so forth will be preserved.

25      So what I thought we had agreed to is we're going to try

1  to work on language to put in the order to that effect.  If

2  we're unable to do that, Your Honor, I'd like an opportunity at

3  least to present some objections to the Form of Order.  That

4  won't be necessary if we agree on language.

5      So as long as Your Honor was agreeable to that and Mr.

6  Cleary's agreeable to that, I think we're going to be able to

7  work it out.

8          THE COURT:  Well, it's really up to Mr. Cleary.

9          MR. CLEARY:  Your Honor, I think conceptually we're

10 saying the same thing.  Procedurally we may get there in a

11 different way and I think that probably the way Mr. Minuti

12 proposes it is probably fine.

13         THE COURT:  Okay.

14         MR. MINUTI:  Thank you, Judge.

15         MR. CLEARY:  Thank you.

16         MR. MINUTI:  Thank you.

17         MR. CLEARY:  Again, I appreciate everybody's efforts

18 to try to negotiate these terms and I appreciate the committee

19 and the bank's involvement and again this was a Form of Order

20 that I can tell you there were many hours spent and many cooks

21 into it.

22     So to the extent Your Honor has questions or concerns with

23 respect to the provisions, I'll do my best but there are

24 probably others in the Courtroom that may be able to address

25 the Court's concerns better than I may be since it's really not

1  possible for one person to have been involved in every single

2  negotiation and discussion with respect to the provisions of

3  this order.

4      I guess with that being said unless Your Honor has any

5  questions with respect to the Form of Order, I would yield the

6  podium to any objectors with --

7              THE COURT:  Yes.

8              MR. CLEARY:  -- respect to the proposed Form of

9  Order that we filed.

10             THE COURT:  Yes, let me hear from anybody that's got

11 any issues with the Form of Order.  Mr. Schnabel?

12             MR. SCHNABEL:  Thank you, Your Honor.  For the

13 record, Eric Lopez Schnabel of Dorsey & Whitney on behalf of US

14 Bank.  Your Honor, let me just run through a couple of things,

15 some of which I think were cleaned up.

16     With respect to -- and I'll just go through the order in

17 chronological order.

18             THE COURT:  That would be helpful.

19             MR. SCHNABEL:  I guess not chronological --

20 whatever, enumerated order.  It's been a long month.  With

21 respect to paragraph M, Your Honor, which is on page 9, there

22 is no defined purchase cure escrow so we just have to clean up

23 that language.  I think it's the purchaser's cure amount.  The

24 addition that Mr. Cleary spoke about in paragraph M --

25             THE COURT:  M or N?

1          MR. SCHNABEL:  M as in Mary.  So it should read

2   something to the effect of "or be satisfied solely from the

3   cure escrow defined term or the purchaser's cure amount."

4          THE COURT:  Yes, he just missed --

5          MR. SCHNABEL:  As a defined term.

6          THE COURT:  He just misspoke.

7          MR. SCHNABEL:  I just -- okay.  I just wanted to

8   make sure that that was correct on the record.

9          Your Honor, the next kind of clarification statement we'd

10  like to make is regarding a new change which appears at

11  paragraph P as in Paul, last sentence, and the identical

12  language appears at paragraph 29, also last sentence.  It's

13  both a finding and an ordered paragraph.  Paragraph P and 29 in

14  the last sentence speak of waterfall provisions.

15         And we believe this is really -- we like a little bit of a

16  clarification because it -- all these agreements have some sort

17  of a waterfall provision.

18         And as it relates to servicing and servicing rights, which

19  are being assumed and assigned or transferred pursuant to the

20  sale, those servicing type of waterfall provisions -- our

21  belief is that the intent of this order is not to sever those

22  or make those inapplicable.  But that this language really goes

23  to other contracts or other agreements, which is a defined

24  term, regarding DB Structured Products' issue with their

25  waterfall that was discussed at closing argument and that Your

1    Honor's ruling.

2        And so the question is, is that what this is really

3    intended to deal with?  And it's not waterfall agreements that

4    relate to assumed contracts, whether it's between -- within one

5    contract or between --

6            THE COURT:  So you're seeking --

7            MR. SCHNABEL:  -- two assumed contracts.

8            THE COURT:  -- a little more clarity there that --

9            MR. SCHNABEL:  Right.

10           THE COURT:  -- what they really mean is that to the

11    extent a waterfall provision is -- well, it's a servicing --

12    the provisions that we spent some time with are like the DB

13    Structured provision, which provides a waterfall of payments in

14    connection with when the servicer can pay itself out of the

15    custodial accounts.

16        And the Court's ruling was that to the extent that the

17    waterfall provision purported to prevent the servicer from

18    reimbursing itself out of the custodial account, due to a

19    default under the sale portion of the contract that that was an

20    unenforceable cross default provision.

21        I assume that's what this is meant to attempt to -- that

22    rather inarticulate ruling but that this is meant to address

23    that.  And I think I agree with Mr. Schnabel that I think more

24    clarity is needed here.

25           MR. SCHNABEL:  I don't know if anyone wants to

1   respond or whether they'll just take that back and --

2           THE COURT:  Well, I just responded, so --

3       (Laughter)

4           MR. SCHNABEL:  I mean a response to Your Honor.  I

5   don't disagree with you --

6           MR. CLEARY:  I didn't think there was a response

7   required.

8           MR. SCHNABEL:  Your Honor, I would never disagree

9   with you agreeing with me.

10          THE COURT:  Well, not in public, but -- or not in

11  Court at least.  All right, no, I -- that's fine.  Okay.  I

12  agree because I think the way it's written here it's a little

13  too broad.  The way to pick it up may simply be to incorporate

14  or reference some of the other defined terms that are in the

15  order like other agreements and -- just a little more

16  specificity I think.

17          MR. SCHNABEL:  Your Honor, thank you.  Your Honor,

18  with respect to paragraph 33 -- and this really goes to

19  Schedule 1 on some of the exhibits, we have had -- provided

20  some comments with regards to language in Schedule 1.  And also

21  the exhibits and I just want to reserve our right to make sure

22  that those are included and that all our agreements are

23  properly delineated in those exhibits.  So I just say that for

24  the record.  But we didn't have any specific comment there.

25          THE COURT:  So in other words, you've asked --

1   you've made certain comments to the exhibits.  You don't know

2   if they've been incorporated or not.

3            MR. SCHNABEL:  Correct.

4            THE COURT:  All right.

5            MR. SCHNABEL:  With respect to paragraph 35 -- and

6   this really arises out of a new language --

7            THE COURT:  Do you have a page?  Page?

8            MR. SCHNABEL:  I'm sorry.

9            THE COURT:  That's okay.  I just -- 28.  I got it.

10  I got it.

11           MR. SCHNABEL:  It's page --

12           THE COURT:  Okay.

13           MR. SCHNABEL:  Unfortunately I'm working from an

14  older redline.  And this arises from new language in a finding

15  back in paragraph R relating to the cure amounts being full

16  satisfaction of the claims.  And Your Honor, the concept is

17  that there's a $10 million escrow and that's for 365 is going

18  to satisfy the cures.

19      But we've -- I don't think anyone's objecting to that

20  anymore or their objection's been overruled.  But the -- what

21  we wanted to do is in case the cure escrow is not enough --

22  it's not large enough to satisfy all the cure claims that the

23  rights for parties to file an Unsecured claim is preserved, so

24  some language in 35 that preserved that right --

25           THE COURT:  Say it again?  I'm sorry, I missed the

1  end.

2          MR. SCHNABEL:  So to the extent to that our cure

3  claims exceed the $10 million escrow and therefore we have

4  unpaid cure claims that those counterparties' rights to assert

5  those unpaid amounts are preserved and asserted as an Unsecured

6  claim.  And this is something that I discussed with Committee

7  Counsel and I believe they're in agreement with adding some

8  language in paragraph 35 to that effect.

9          THE COURT:  All right.  So if the cure amounts

10  exceed $10 million, you'll have an allowed unsecured claim --

11  or the right to assert an allowed unsecured claim for the

12  balance?

13          MR. SCHNABEL:  I think it's the right to assert and

14  obviously subject to everyone else's right to object or --

15          THE COURT:  All right.

16          MR. SCHNABEL:  -- to do whatever they want.

17          THE COURT:  So you're going to add language to that

18  effect?

19          MR. SCHNABEL:  Yes.

20          THE COURT:  Okay.

21          MR. SCHNABEL:  Your Honor, with respect to agreement

22  -- obviously, and appreciate the additional language that was

23  read into the record with respect to paragraph 36 regarding the

24  Debtors' receipt of the purchasers' cure escrow and also at

25  paragraph 43 so subject to having that be finalized we're okay

1  with those two concepts.

2      And that also leads us to two comments we had in the

3  escrow agreement, which will I think be resolved with this

4  subsequent motion on distributions.  Specifically that there be

5  some provision regarding a payment -- the prorated payment of

6  undisputed cure amounts so that you don't have to wait for

7  maybe only 10% of your cure claim to be -- which is disputed,

8  you don't have to wait --

9           THE COURT:  Like an initial distribution under a

10  Pott plan?

11           MR. SCHNABEL:  Correct.  And --

12           THE COURT:  All right.

13           MR. SCHNABEL:  -- also obviously --

14           THE COURT:  Fully reserve the amount, et cetera,

15  okay.

16           MR. SCHNABEL:  And of course also the residual

17  payment that would occur once the true pro rata is finally

18  calculated just like a Pott plan.  So those two concepts I

19  think will be now handled in the subsequent order --

20           THE COURT:  All right.

21           MR. SCHNABEL:  So we'll deal with that then.  Your

22  Honor, paragraph --

23           THE COURT:  Are the Debtors -- is there a time line

24  for the filing of that motion?

25           MR. CLEARY:  Your Honor, we'll do it promptly.  I

1  don't think --

2          THE COURT:  So, weeks?  Maybe months?

3          MR. CLEARY:  -- it'll be tomorrow probably.

4          THE COURT:  But not -- certainly not months and

5  months, right?

6          MR. CLEARY:  No, that's right, Your Honor.

7          THE COURT:  All right.

8      (Laughter)

9          MR. SCHNABEL:  Your Honor, paragraph 44 we had the

10  same reaction as Your Honor did.  And I -- if that's the intent

11  of the clarification that we received both in the hallway and

12  in here, you know, perhaps they can clean the language up or --

13          THE COURT:  Well, if that was the intent, that's not

14  clear to me.

15      And if the intent is to make it clear that, you know, the

16  assumed or transferred contracts are being transferred free and

17  clear of any claims, you know, in the nature of cure claims,

18  I'm having a hard time articulating it too.  But I don't think

19  it reads as how it was described to me by Mr. Indelicato, so

20  I'm going to give you the unenviable task --

21          MR. HEIMAN:  Your Honor --

22          THE COURT:  -- of going back and trying again.

23          MR. INDELICATO:  Thank you, Your Honor.

24          MR. HEIMAN:  Excuse me, Your Honor.

25          THE COURT:  Yes.

1          MR. HEIMAN:  It's David Heiman again.  Sorry for the

2    interruption.

3          THE COURT:  No, no, please.

4          MR. HEIMAN:  But I just want to make it clear to

5    Your Honor that we're not married to any language, specifically

6    as I said before, this order has a long and complicated if not

7    convoluted history.

8        So that our concern is simply that you know, we were

9    always looking for the kind of relief you get under 365 and in

10   order to accommodate the Debtor and the rulings and the legal

11   effectiveness, we just wanted to make sure we still get the

12   same relief.  So that's all that's about.

13         THE COURT:  Okay, well, I have no problem with the

14   concept.  It's just, I don't think the language tracks what

15   you're trying to accomplish and I thankfully am in the position

16   of not having to propose an alternative.  But --

17         MR. HEIMAN:  Well, we'll work with the --

18         THE COURT:  -- simply --

19         MR. HEIMAN:  -- Debtor and the objectors if

20   necessary on it.  But I just wanted to make it clear we're not

21   married to any of the language.

22         THE COURT:  All right.  Thank you.

23         MR. SCHNABEL:  Your Honor, with respect to paragraph

24   69 --

25         THE COURT:  Paragraph what?

1          MR. SCHNABEL:  69, it's on page --

2          THE COURT:  Mine don't go that high.

3          MR. SCHNABEL:  -- 43, at least of my version -- 42

4  of --

5          THE COURT:  Oh, it does.  Okay.  Got it.

6          MR. SCHNABEL:  -- your redline.

7          THE COURT:  Oh, the --

8          MR. SCHNABEL:  The 10-day stay.

9          THE COURT:  Yes.

10          MR. SCHNABEL:  Your Honor, we would like the

11  opportunity to provide notice to our holders to determine if

12  they so choose to give us further direction regarding this

13  matter.

14      The testimony, Judge, that you heard during this trial was

15  that there was going to be no initial closing or what was

16  called a financial closing until the end of this month or early

17  next month.  And I believe the drop-dead date was around

18  November 15th.

19      Thus, there's no compelling reason to override the 10-day

20  stay as found in Federal Bankruptcy Rule 6004 and 6006.  So,

21  Your Honor, we object to that provision.

22          THE COURT:  When's the initial close going to be?

23          MS. MORGAN:  Your Honor, we don't know exactly.  The

24  purchaser -- sorry, for the record, Pauline Morgan from Young

25  Conaway Stargatt & Taylor.  I'm sorry for my voice, too.

1      I think the purchaser was intending to make every effort

2  to hit 10-31 but I'm not positive that's going to happen.  And

3  I know purchasers' Counsel is on the phone.  I know we would

4  like and expect to have a prompt closing but I don't know when

5  exactly that will be.

6           MR. HEIMAN:  Your Honor, it's David Heiman again.  I

7  apologize.  I did not hear your question.  I'm sorry.

8           THE COURT:  I'm sorry.  The question was, when is

9  the initial close going to occur?

10           MR. HEIMAN:  Well --

11           THE COURT:  Or predicted to occur?

12           MR. HEIMAN:  You know, as usual, it would be as soon

13  as possible but if it facilitates the advancement of this

14  hearing you know, we're okay to acknowledge that it's not going

15  to close within the next 10 days or to eliminate the

16  requirement of paragraph 69.

17           THE COURT:  Okay, that resolves it.  Pull it out.

18           MR. SCHNABEL:  Your Honor, those are all the

19  comments we have at this time --

20           THE COURT:  Okay, thank you.

21           MR. SCHNABEL:  -- for US Bank.  Thank you, Judge.

22           THE COURT:  Who's next?  DB?

23           MR. WILAMOWSKY:  Good evening, Your Honor, Steven

24  Wilamowsky from Bingham McCutchen, LLP on behalf of DB

25  Structured Products, Inc.  If I can just state for the record,

1  it really goes without saying but for the benefit of the record

2  I just want to say that obviously we look to the Form of Order

3  to see if we have the objections that we had with Your Honor's

4  ruling sort of assumed correct.

5       Obviously to the extent that we are -- you know, whatever

6  our appellate rights are or whatever we do, you know, that

7  obviously we would object to the whole order.  But that's not

8  what we're here for, so --

9            THE COURT:  Good.

10            MR. WILAMOWSKY:  -- our comments are directed at --

11  yes.  Then just for the record, Your Honor --

12            THE COURT:  No.

13            MR. WILAMOWSKY:  I didn't have any doubt --

14            THE COURT:  No, that's a fair reservation of rights

15  and --

16            MR. WILAMOWSKY:  If we can go, Your Honor, in the --

17  I'd like to go in the order and -- as Mr. Schnabel did, in the

18  order of page order.  But just to start with a very short

19  general comment, which is that I think -- and some -- you'll

20  see some of my comments are directed at this point.

21       It's just there are just numerous places where we don't

22  think that the ruling is reflected in that our reading of the

23  ruling -- which I think was pretty clear -- is that it's not

24  that Your Honor said that they can -- and in fact, Your Honor

25  said the opposite.

1    They can't sell the bundle of rights associated with a

2    non-executive -- executory contract without with concomitant

3    obligations.  Your Honor said they couldn't do that.

4    What they could do is Your Honor said that there are two

5    severable agreements and so therefore to the extent that the

6    bundle of obligations are tied to that other agreement, that

7    other agreement can be left behind in toto, both with its

8    rights and its obligations.

9    So if it's related to the loan service -- loan origination

10    and sale part, then it can stay behind, not because the Debtors

11    have the ability to separate rights from obligations but

12    because Your Honor held that there were two separate

13    agreements.  And there's a servicing part and there's a loan

14    sale part.

15         THE COURT:  Okay.

16         MR. WILAMOWSKY:  Okay.  Your Honor, if we could go

17    to that point and this is -- I start with paragraph J.  I was

18    working on the prior version of the Debtors' blackline before

19    the one from today.  But paragraph J, which I believe in the

20    current blackline shows up starting on page 7 and running into

21    page 8.

22    And the agreement -- the order says the purchaser shall

23    have no liability under any other agreement, which we

24    understand is consistent with Your Honor's ruling.  But then it

25    says permit result or give rise to any --

1          THE COURT:  Whoa.  Whoa, where are you?

2          MR. WILAMOWSKY:  I'm sorry -- ii in that discussion

3   which is I think right before -- towards the very end of the

4   paragraph.

5          THE COURT:  J, right?

6          MR. WILAMOWSKY:  Yes.

7          THE COURT:  Got it.

8          MR. WILAMOWSKY:  Toward the very end of the

9   paragraph, the order refers to permit, result or give rise to

10  any set-off delay, deferral, defense, recoupment claim,

11  counterclaim, default -- most of that I think is right based on

12  Your Honor's ruling that they're two separate agreements and

13  that the other agreement is not one agreement which -- the

14  servicing agreement.

15      However I think that it is not correct at a minimum with

16  respect to recoupment because, Your Honor -- and I don't know -

17  - the fact that Your Honor severed the two agreements may mean

18  that under applicable law there's no big consensus in the case

19  law as to whether you can only do recoupment under one

20  agreement or whether there's recoupment -- the 9th Circuit's

21  certainly been much more liberal in terms of whether a series

22  of related agreements that were part of a transaction

23  negotiated at one time, whether that gives rise to a right of

24  recoupment.

25      That's not for today, but recoupment as somebody

1    previously said is -- maybe as Mr. Minuti, I think said, is a

2    defense.  And to the -- and that defense does not necessarily

3    correspond perfectly with the ruling that there's a single

4    agreement.

5        There are cases that have held that if you have multiple

6    agreements that there may still be a recoupment right if other

7    requirements are satisfied in terms of being more generally

8    related and not necessarily the interdependent test that Your

9    Honor would apply to sever two agreements.  So we just don't

10   think the word recoupment belongs in here.  Your Honor --

11            THE COURT:  Hang on.  Hang on.

12            MR. WILAMOWSKY:  Oh, I'm sorry.

13        (Pause in proceedings)

14            THE COURT:  Is there a response from the Debtor or

15   the buyer?

16            MR. HEIMAN:  Your Honor, it's David Heiman again.

17   Since I can't see whether the Debtor has risen to respond, I

18   will provide a quick response if I may.  And it's pretty simple

19   to us as the purchaser.

20        As Your Honor knows, there is sort of a bright line here

21   that we are taking liabilities after the initial closing and

22   whether recoupment is a defense or something other than that,

23   it's certainly something that we believe we're entitled not to

24   have asserted against us for other than our responsibilities

25   under the servicing agreement.

1      That's all this is intended to do.  It doesn't harm

2   anybody.  It is the Debtors' understanding as well as the -- at

3   least the principal Creditors represented in the Court that

4   that's what we're doing.  We're buying the assets and we're

5   going to have an economic close that we've agreed will result

6   in liabilities to us as a result of that economic close.  Or I

7   should say after that economic close.

8      We have no idea what are the rights parties have in

9   connection with these agreements.  And whatever they are,

10  though, they're -- they apply and are limited to the Debtors

11  and are not to be somehow bled into the assets as owned by the

12  purchaser.

13          THE COURT:  Okay.  I agree actually.  I think not

14  having this language in here would create just as much trouble

15  frankly as if I had -- well, I won't say trouble, but would

16  have in effect the same result as if I had not overruled the

17  objection.

18      And to the extent -- to be clear, to the extent that I am

19  in so ruling foregoing DB's defense of recoupment in the event

20  that it fails to do some obligation in connection with the sale

21  agreement -- excuse me, in connection with the servicing

22  agreement, based on some claim arising from the other

23  agreement, that defense is indeed no longer available.  So I'll

24  overrule that objection.

25          MR. WILAMOWSKY:  Okay, Your Honor.  Moving on, if we

1  could go to paragraph K, which on the new version I think shows

2  up on page 9, the new blackline -- and this is just -- I mean,

3  I'd like the agreement -- the order to be as clear as possible

4  and it's just not.  It says the purchaser has demonstrated its

5  ability to satisfy the purchaser's cure amount -- I'm sorry --

6            THE COURT:  Wait, where are you?

7            MR. WILAMOWSKY:  Let me -- I keep doing that.

8  They're long paragraphs.  I have to refer to the right

9  sentences.  It's the last paragraph on the end of that

10  paragraph -- the last sentence --

11            THE COURT:  Last sentence.

12            MR. WILAMOWSKY:  -- at the end of that paragraph

13  says --

14            THE COURT:  All right.  I got it.

15            MR. WILAMOWSKY:  The purchaser has demonstrated its

16  ability to satisfy the purchaser's cure amount and provided

17  adequate assurance of its future performance of and under the

18  assumed contract within the meanings of sections -- and then

19  let me skip to the relevant part -- Section 363 of the

20  Bankruptcy Code.  I don't know what that means.

21     There is no meaning of adequate assurance of future

22  performance under Section 363 of the Bankruptcy Code.  There's

23  no -- as Your Honor -- I mean, the Debtors argued in --

24  purportedly in -- for their benefit during the hearing they

25  didn't have to satisfy that because there is nothing in 363

1  that requires adequate assurance.  So I just don't know what

2  that means.

3        THE COURT:  Well, it's interesting because the way

4  the sentence is written it's unclear what that clause is

5  modifying.  Whether within the meaning of Section 365 and 363

6  is meant to refer to adequate assurance of future performance

7  or whether it's meant to refer to the very beginning of the

8  sentence where it's demonstrated its ability to satisfy the

9  amounts.

10     I think it's meant to satisfy -- I think it's meant to

11  refer to adequate assurance of future performance and as there

12  is no requirement to do that under Section 363 of the

13  Bankruptcy Code, I assume there's no objection to removing

14  that.

15     But if the provision is meant to show that the Debtors

16  have -- or that the buyer has demonstrated an ability to close,

17  or to perform under the transferred contracts, if that's what

18  that's meant to capture, maybe we could be a little more

19  specific.  I'm not saying, you know, you can't get a finding

20  that you've demonstrated the ability to perform under the

21  transferred contracts.

22     But I suspect -- I agree that it -- you know, adequate

23  assurance is a term of -- well, I won't say it's a term of --

24  it's a defined term in the -- well, it's an undefined term in

25  the Bankruptcy Code.

1          MR. WILAMOWSKY:  Right.

2      (Laughter)

3          THE COURT:  But it's a term referred to in Section

4   365 of the Bankruptcy Code.  Now -- no, wait a minute.  Let me

5   back up.  I'm doing this on the fly.  However, Judge Walrath

6   ruled in <u>Shaw v. Bechtel</u> that you can sell under 363 contracts

7   that have been assumed under 365, right?  Somebody nod.  You

8   know, okay.  Right.

9      So I'll leave it in there because I don't think it hurts

10  and to the extent the issue is whether something that's been

11  sold under 363 is an assumed contract under 365 I want to make

12  it clear that adequate assurance has been provided.  So having

13  just sustained the objection I'll now overrule it.

14         MR. WILAMOWSKY:  Okay.

15     (Laughter)

16         MR. WILAMOWSKY:  Thank you, Your Honor.  All right,

17  if we could move to now -- and I will try to be clear with

18  which sentence I'm referring to but if we refer to now

19  paragraph N as in Nancy, which is satisfaction of Bankruptcy

20  Code Section 363(f) 1 through 5.  And that is page 10 on the

21  new blackline.  The -- and this, I think, goes to the heart of

22  where the Debtors are getting it wrong in this order.

23     It says -- well, it starts the sellers may sell purchased

24  assets free and clear of all interest because in each case, one

25  or more of the standards of Section 363(f) 1 through 5 has been

1   satisfied.  Skip a sentence, it says, those persons with

2   interest in the purchased assets who did object -- that's us --

3   fall within one or more of the subsections of Section 363(f) of

4   the Bankruptcy Code.

5       Now I think Your Honor's ruling conceded it and I think

6   everybody would concede it.  We don't fall within any section

7   of the Section 363(f) of the Bankruptcy Code.  We're being told

8   that we're being transferred not free and clear of the rights

9   and obligations -- we're being told that the relevant or the

10  most important obligations, the EPDs and the recaptures, are

11  not part of this agreement.

12      That's different than saying that you could sell under

13  363(f).  There's no question that none of the 363(f) standards

14  are met with respect to us.

15      (Pause in proceedings)

16          THE COURT:  May I have a response, please?

17          MS. MORGAN:  I'll do it from here.  Again, Pauline

18  Morgan for the record.

19          THE COURT:  That's fine.

20          MS. MORGAN:  Your Honor, I do believe that -- or we

21  believe that Your Honor did rule that we could transfer both

22  under 363 and 365 and we think 363(f)5 is satisfied because I

23  do think that DB Structured would be required to accept a money

24  judgment in satisfaction of its interests.

25          MR. WILAMOWSKY:  Your Honor, that can't be right.  I

1  can't -- I mean, I would not be required to accept a money

2  satisfaction for example in satisfaction of my right to

3  terminate the agreement.

4      I wouldn't be required to accept a money judgment in

5  satisfaction of my right to consent to the transfer.  I mean,

6  there are all kinds of provisions in this agreement that the

7  Debtors are -- that are being overridden.

8          THE COURT:  No, I -- well, I disagree.  To the

9  extent it was less than clear, I did rule that the contract

10  rights could be transferred under 363(f) because all of the

11  provisions that I found -- that were -- that you're talking

12  about where you generally couldn't be compelled to accept money

13  damages for, I found to be unenforceable anti-assignment

14  provisions under 363(l).  So that objection's overruled.

15          MR. WILAMOWSKY:  Okay.

16          THE COURT:  All right, and the 3rd Circuit will hear

17  you on it.

18          MR. WILAMOWSKY:  No, no.  That's fine, Your Honor.

19  And I just -- if you give me this 20 seconds because I was

20  quite sure of myself on that.  And now I just need to -- I

21  don't want to waste Your Honor's time too much.  A little bit

22  but not much.  Okay.

23      (Pause in proceedings)

24          MR. WILAMOWSKY:  All right.  I'm going to skip my

25  comment on P.  And I'm going to skip to R, which is on page 12

1  of the current version of the blackline.  Now, I'm really not

2  trying to be cute here, Your Honor, but this is not addressed

3  in your oral -- which I've reviewed the transcript.  It's not

4  addressed at all.

5      There is a finding here that says there are no uncured

6  defaults or breaches under such agreements that relate to acts

7  or omissions that occurred in the period or otherwise arose

8  prior to the entry of the date of the order.

9      Your Honor, there is nothing in your ruling and there's

10  nothing in the evidence before the Court that was presented at

11  the trial to justify that statement.  In fact, the evidence was

12  to the contrary.

13      As Your Honor may recall, our agreement -- the DBSP

14  agreement -- in contrast to some of the other agreements

15  require both Fannie Mae and Freddie Mac approval.  The Debtors

16  have gotten -- went out and got Fannie Mae approval.  The

17  evidence was exactly to the contrary -- the evidence on Freddie

18  Mac.  The evidence was that they don't have Freddie Mac

19  approval.

20      They've not even alleged that they have Freddie Mac

21  approval, and so how are they expecting you to enter an order

22  today which contains a finding that there are no defaults?

23          THE COURT:  Well --

24          MR. WILAMOWSKY:  And it's a servicing related

25  default so it's not one that's unenforceable.

1          THE COURT:  No, there are no material defaults.  The

2     evidence was overwhelming that there's been no real impairment

3     of the servicing.  And to the extent that the Freddie Mac was

4     in there -- again, I think it's -- it was not material.  So my

5     finding is that there are no material defaults.

6          MR. WILAMOWSKY:  Okay.  And I appreciate that, Your

7     Honor.  I didn't think you were going to suddenly say that,

8     you're right, you can terminate the agreement.  But I

9     appreciate that you clarified the record --

10         THE COURT:  It's all right.

11         MR. WILAMOWSKY:  -- for us that way.

12         THE COURT:  You know I -- and I would -- and I'm not

13    in any way being critical.

14         MR. WILAMOWSKY:  Right.

15         THE COURT:  I did the best I could and I know it was

16    an overly lengthy reading as it was.  So -- but no, I think the

17    evidence -- just to be clear, I think the evidence of Mr. Love

18    was more than clear that there'd been no material change in the

19    actual performance of servicing and I think that based on the

20    evidence of Mr. Johnson, and Mr. Weil and Mr. Strover among

21    other -- well, not Mr. Strover, but Mr. Weil, and Mr. Johnson

22    and Mr. Love that -- and Mr. Ernoff -- that the Freddie Mac

23    default was not material.

24         MR. WILAMOWSKY:  Okay.

25         THE COURT:  As far as the Court was concerned.

1          MR. WILAMOWSKY:  Okay.  All right.

2      (Pause in proceedings)

3          MR. WILAMOWSKY:  Okay, Your Honor, the next -- I'm

4  skipping to the granting of the liens, which is on page 15 or

5  16 in the blackline -- probably 17 -- 17 in the new blackline.

6  And I think it'll be easier for me to describe this

7  conceptually.  Actually, I've changed my mind.  Let me describe

8  it with reference to text in the agreement.

9      They're giving a senior lien on the purchaser's collateral

10 -- the Debtors are.  That is junior only to any permitted lien

11 or a lien with respect to any financing.  And we believe, Your

12 Honor, that it should be immediately junior to any valid pre-

13 existing lien.  They've shown no basis for priming, and let me

14 tell you what I'm getting at.

15     I'm not just trying to make trouble in a theoretical

16 point.  If the Court -- if an Appellate Court were to say that

17 you could not -- that the Debtors could not transfer the

18 agreement without transferring other obligations, and therefore

19 -- we couldn't be in a position where we would have to come

20 back and say, okay, now look, we have these contract rights

21 that have -- that are part of this agreement that had -- that

22 the Court did not have the authority to excise.

23     And then have somebody say, okay, but you know, guess

24 what, I got a lien on the purchase of -- defined term

25 purchaser's collateral, which include all these servicing

1  rights and servicing agreements that's senior to any other

2  claim and therefore it's -- your claims under the contract to

3  the extent that they are interpreted to be interests of the

4  sort that can be sold free and clear, too bad.

5      They're now junior to the purchaser's claims and you have

6  nothing to say about it.  So even if I would have avoided

7  mootness issues otherwise, somebody would come back to me and

8  say, no, you -- it doesn't matter what the Circuit said.

9  Doesn't matter what the District Court said.

10     You're -- we've given liens on everything and senior liens

11  so it's senior to your claims under the agreements.

12         THE COURT:  All right.  Well, let me ask this

13  question of the Debtors.  What's the definition of permitted

14  lien?  It's a defined term.  Is that contained in the APA?  I

15  didn't think this was priming provision.

16         MS. MORGAN:  Your Honor, it is not a priming lien

17  and that's why there is the concept of permitted liens to allow

18  the new lien that the purchaser we believe is entitled to.  It

19  will have paid the purchase price -- and I'm sorry, I'll refer

20  to the APA -- permitted lien is defined as "liens arising under

21  the terms of an assumed contract.  Liens arising on the

22  purchased assets after the initial closing date that are not

23  the result of a breach by any seller of this agreement."

24     So it's liens of other parties, Your Honor, that are

25  already in place or arising under an assumed contract.  Mr.

1  Wilamowsky's client does not have a lien right now, Your Honor.

2  BofA right now has a lien on this --

3         THE COURT:  I was going to say, this collateral's

4  actually already subject to a lien.

5         MS. MORGAN:  Correct, Your Honor.  So I think in

6  effect he's trying to elevate whatever --

7         MR. WILAMOWSKY:  No.

8         MS. MORGAN:  -- interests he has now to lien status

9  that doesn't exist today.

10         THE COURT:  Why is your collateral not -- why are --

11  the servicing rights are subject to the Bank of America cash

12  collateral lien.

13         MR. WILAMOWSKY:  Right, but under New York law,

14  which governs -- and I think probably the law of every state in

15  the union, frankly, if I have rights under a contract, even if

16  in Bankruptcy law, you can somehow interpret them to be

17  interests that can be sold free and clear of, if I have a right

18  under a contract, I'm quite sure that under New York law,

19  somebody with a blanket -- lender with a blanket lien can't

20  come and say, no, you can't assert that defense or you can't

21  assert that -- you know, that corresponding right under your

22  contract with my borrower because I'm senior to it.  It seems

23  elementary to me.

24         THE COURT:  Whoa, say that again.

25         MR. WILAMOWSKY:  If --

1          THE COURT:  Look.

2          MR. WILAMOWSKY:  -- we're getting very -- you know,

3     all I would say is, maybe I can make it simpler.  Why can't we

4     just say -- and because really I do want to get out of here

5     almost as much as everyone else.

6          Why can't we just say that it's immediately junior to any

7     pre-existing validly perfected lien or interest?  Something

8     like that?  Why do we have to have the reference back to

9     defined terms?

10          THE COURT:  Well, now --

11          MR. HEIMAN:  Your Honor, it's David Heiman again.

12     (Laughter)

13          MR. HEIMAN:  May I?

14          THE COURT:  Yes please.

15          MR. HEIMAN:  Do you want to -- okay.

16          THE COURT:  I think it's rather obvious but go

17     ahead.

18          MR. HEIMAN:  I don't like to interrupt your train of

19     thought but --

20          THE COURT:  Well, that's -- that train -- don't

21     worry.

22     (Laughter)

23          MR. HEIMAN:  I don't understand this objection at

24     all.  I don't understand why he even cares.  He's the owner of

25     a portfolio of loans.  If there are any liens on the servicing

1   assets, they would be transferred to the proceeds.

2       This is like any other 363 sale in that respect that we're

3   going to pay a very sizeable sum for these assets -- the

4   proceeds of those assets and that's the value of those assets

5   by virtue of the market speaking as to the value.

6       And those assets -- those proceeds will be available in

7   accordance with the rights of all parties who have had rights

8   or interest.  And it's just that simple.  So you know, for us

9   to pay these substantial sums and not have this right makes no

10  sense.

11      THE COURT:  Well, let me see if I can think it

12  through.  Basically, what I'm hearing is that if there's some

13  claim against the servicing contract -- if there's some claim

14  against the Debtors or the buyer in connection with, say -- I

15  don't know, conversion of the servicing rights because the

16  Court approved the bifurcation of the contract, that's a claim.

17      It may be an administrative claim.  It may be an Unsecured

18  claim.  It may be a claim capable of specific performance.  But

19  what it's not is a Secured claim.  And as a result, there is no

20  lien to preserve.  You haven't filed one.  You don't have a

21  right to one.  You don't have a security agreement for one.

22      I'm not aware of any state law concept -- you can say it's

23  obvious but I don't know what you're talking about.  A state

24  law concept that gives rise to a lien in the event that there's

25  a breach of contract?

1          MR. WILAMOWSKY:  No.

2          THE COURT:  That's -- I'm not aware of any such --

3  so you need to articulate to me what exactly it is you think

4  gives you a rise -- gives rise to a Secured claim that would

5  somehow be impaired by this provision.

6          MR. WILAMOWSKY:  I think that it goes -- well, give

7  me about 10 seconds.  I'm about to -- I think drop the

8  objection and move on.  But --

9      (Pause in proceedings)

10          MR. WILAMOWSKY:  I guess what I was just saying was

11  that the -- and I think I can drop this.  I was saying that the

12  contract rights of a party -- the lien of a bank, let's say, on

13  a contract are subordinate to the contract -- to the rights

14  within that contract for the non-borrower party.  But I think

15  we can move on.

16          THE COURT:  Okay.

17          MR. WILAMOWSKY:  All right, and this one I really --

18  the next one is in the same paragraph.  Notwithstanding --

19  sentence that begins notwithstanding the foregoing if any

20  permitted lien is voided extinguished -- and then it says,

21  notwithstanding anything to the contrary in Section 551 of the

22  Bankruptcy Code, I don't know what that's all about.

23      I mean, there is no discretion in Section 551.  It's about

24  as clear as could be -- it's automatic.  It even uses the word

25  automatic.  Suddenly they're asking you to override Section 551

1   of the Bankruptcy Code -- it's the first -- I can't -- I don't

2   -- I just don't understand that.

3            THE COURT:  And what's the applicability of Section

4   551 here?  Basically --

5            MR. WILAMOWSKY:  If there's a permitted lien --

6            THE COURT:  No, no.  I'm asking the Debtors.

7            MR. WILAMOWSKY:  Oh, I'm sorry.

8            THE COURT:  What's the applicability of 551 here?

9            MS. MORGAN:  Your Honor, I'm sorry.  Give me one

10  moment.

11           THE COURT:  That's all right.

12      (Pause in proceedings)

13           MS. MORGAN:  Your Honor, I'm not sure and I'm not

14  the author of this paragraph, but my reading of Section 551 is

15  -- and as I think you frequently see in DIP orders and cash

16  collateral orders, that if this lien would be invalidated for

17  some reason --

18           THE COURT:  It's not preserved?

19           MS. MORGAN:  Right, Your Honor.  And again, the

20  intent of this section is -- well, the intent of the entire

21  provision is for the purchaser to get a lien on its purchased

22  assets which it paid money for, except to the extent of

23  permitted liens.

24      So if a permitted lien was invalidated, the purchaser's

25  security interest should spring back, if you will, to cover

1  everything that it was intended to receive as a part of this

2  transaction.

3          THE COURT:  All right.  "Notwithstanding the

4  foregoing, if any permitted lien is voided, the liens granted

5  to the purchaser shall be deemed first priority liens without

6  any further action by the Debtors."

7      All right, so the lien is -- the lien being granted the

8  purchaser is junior to the permitted lien?  So if a permitted

9  lien is voided, the idea is that the purchaser automatically

10  moves up a notch on the ladder.  And 551 says that any transfer

11  avoided or any lien void is preserved for the benefit of the

12  Estate.  Oh, all right.

13      So all this is saying is that if a permitted lien is

14  voided, it is not preserved for the benefit of the Estate and

15  that the purchaser automatically steps up a notch.

16          UNIDENTIFIED SPEAKER:  Right.

17          THE COURT:  All right, based on that I'll overrule

18  the objection.

19          MR. WILAMOWSKY:  Okay.

20      (Pause in proceedings)

21          THE COURT:  Somebody can hit the air conditioner in

22  the back of the Court.  They work -- all you have to do is sort

23  of press the middle of the thing until the A/C kicks on.  That

24  would be helpful.  (Laughs).  It's an intelligence test.

25      (Laughter)

1          THE COURT:  I know Mr. Bowden knows how to work it

2    because they work just like ours used to work at our old law

3    firm, which means hardly at all.

4          MR. BOWDEN:  Which means you just push it --

5          THE COURT:  Thank you, Mr. Bowden.

6          MR. WILAMOWSKY:  Your Honor, I'm going to skip now

7    to -- your previous statements are allowing me to skip a number

8    of items, so --

9          THE COURT:  All right.

10         MR. WILAMOWSKY:  -- just bear with me, I apologize -

11   -

12         THE COURT:  Sure, take your time.  Thank you,

13   gentlemen.

14     (Pause in proceedings)

15         MR. WILAMOWSKY:  Your Honor, let's skip to paragraph

16   40, which is on page 31 running into 32 of the blackline.

17         THE COURT:  All right.

18         MR. WILAMOWSKY:  And -- I just don't know the --

19   understanding that your clients has held that, you know,

20   various provisions are not material or whatever and therefore

21   can be excised even under 363 -- I still think that this

22   sentence doesn't make sense.  It says "No effect shall be given

23   to any default of the type set forth" -- I'm sorry, I did it

24   again.  I'm in the last sentence.

25         THE COURT:  Very well.

1          MR. WILAMOWSKY:  I'm in the last sentence.  And the

2    last part of that last sentence says --

3          THE COURT:  What paragraph?

4          MR. WILAMOWSKY:  40.

5          THE COURT:  All right.  I think they may have

6    renumbered them on you.

7          MR. WILAMOWSKY:  Let's see -- no.  No, I think that

8    on this new one it's still 40.  All the -- it's the paragraph

9    beginning with "all defaults and other obligations"?

10          THE COURT:  Okay.  All right.

11          MR. WILAMOWSKY:  Okay.  And then, "Without limiting

12    to the foregoing" --

13          THE COURT:  Got it.

14          MR. WILAMOWSKY:  -- "no effect shall be given to any

15    default of the type set forth in 365(b)(2) of the Bankruptcy

16    Code or of the type in 365(b)(1) of the Bankruptcy Code,

17    whether or not it's an executory contract."  What's the legal

18    basis for that, Your Honor?  There is none.

19       I mean if I have a contract that's a contract under 363 --

20    365 doesn't govern.  There may be other reasons why Your Honor

21    was able to get the Debtors the relief that they want because

22    of severability or because of whatever else, but can't tell me

23    that no effect is going to be given to a particular kind of

24    default because it falls under 365(b)(2) of the Bankruptcy Code

25    and 362(b)(2) renders such kinds of defaults unenforceable.

1    Yeah, it does, only if it's a 365 agreement.  But not if it's a

2    363 agreement.

3         (Pause in proceedings)

4              THE COURT:  Someone want to respond?

5              MS. MORGAN:  Your Honor, again --

6              MR. HEIMAN:  Your Honor, it's David Heiman.  Again,

7    I'm not sure frankly why he cares about this, but just in

8    essence we don't want to take a contract under 363 that has an

9    anti-assignment clause or an ipso facto clause or something

10   like that.

11        And -- because it's under 363 -- by the way I think if you

12   look -- I'm not sure about this but at 363(l), that you know,

13   we're not -- we don't want to be exposed to somebody saying

14   because of the filing of the bankruptcy or anti-assignment or

15   anything else that would be available under 365 that somehow

16   we're exposed to a claim of default.

17        (Pause in proceedings)

18             THE COURT:  All right, overruled based on 363(l).

19             MR. WILAMOWSKY:  Okay.  I accept that, Your Honor,

20   but just for the record and since Mr. Heiman made that -- the

21   statement, I just want to note that the -- strike that.

22             THE COURT:  Well, just to be clear, I mean, it was -

23   - I made this statement in connection with overruling the

24   Connecticut Housing Finance Authorities objection.  But I

25   believe that with regard to these types of provisions and sort

1   of broadening it more, it was -- my ruling was in connection

2   with consent.

3        MR. WILAMOWSKY:  Okay, I --

4        THE COURT:  But I think 365(f)(1), 363(l), I think

5   both of those would allow for the transfer, notwithstanding

6   these type of defaults under 365(b).

7        MR. WILAMOWSKY:  Okay, Your Honor.  I'll accept that

8   and for the purposes of today, just -- I would like to -- I

9   would just -- it's just bothering me a lot.  If I could have 10

10  seconds, it's -- I know this is not a Motion for

11  Reconsideration but I just want to state something.

12       THE COURT:  Sure.

13       MR. WILAMOWSKY:  Which is --

14       THE COURT:  State away.

15       MR. WILAMOWSKY:  -- the 3rd Circuit has directly

16  held in a decision that was issued in 1997 that is still good

17  law that 363 -- that anti-assignment provisions are enforceable

18  in -- under 363 as opposed to 365.  And one of the things the

19  3rd Circuit said is, the Congress knew how to restrict -- how

20  to override restrictions when it wanted to.

21    Look, it did it in 363(l) with respect to ipso facto, so

22  the 3rd Circuit has -- that's why, I mean, I apologize, Your

23  Honor.  And I know that a lot of thought went into the decision

24  and I know this is not a Motion for Reconsideration but the 3rd

25  Circuit and subsequent cases in other Courts have specifically

1  held that an anti-assignment provision is enforceable with

2  respect to a 363 contract.  I've said my piece, so --

3          THE COURT:  All right.

4          MR. WILAMOWSKY:  That's fine.

5          THE COURT:  Your objection's noted for the record.

6  And I would note also that the Debtors sought and I ruled that

7  they could find -- they could assume and assign your contract

8  under 363 or 365 so it's a distinction without a difference in

9  my mind, but if I'm wrong, I'm wrong.  And but the objection --

10          MR. WILAMOWSKY:  Yeah.

11          THE COURT:  -- is noted and overruled.

12          MR. WILAMOWSKY:  Thank you, Your Honor.  And I

13  appreciate the indulgence.

14          THE COURT:  That's all right.

15          MR. WILAMOWSKY:  Okay.  Okay, now that really brings

16  us to the provision that was -- been spoken about before.  And

17  I don't want to beat a dead horse because it's going to get

18  renegotiated.  So I'll just add to the fact that I think that

19  it needs to be adjusted because --

20          THE COURT:  This paragraph 44?

21          MR. WILAMOWSKY:  44.  Yeah.  But that's -- it's been

22  discussed.

23          THE COURT:  Okay.

24          MR. WILAMOWSKY:  And that's going to be revised.  I

25  think -- I don't want to over promise, but I think I'm down to

1  two points.  The injunction provisions, Your Honor, are very

2  disturbing to us for the following reasons.

3      I know that they're not unusual in the context of a 363

4  order although I would certainly question whether or not you

5  should be able to get one in a 363 order because the bankruptcy

6  rules are pretty clear that an injunction is something that you

7  get only in the context of an adversary proceeding.

8      But be that as it may, in this context in particular,

9  where the Debtors are stripped away the servicing rights and

10 are transferring away the servicing rights, and -- but have not

11 specifically identified what those are -- and I think that what

12 Your Honor said to Mr. Dehney during the argument at one point

13 last week was well, maybe the buyer bought itself into a

14 litigation if it's not clear whether any particular provision

15 is a servicing right or not, then maybe the buyer -- why

16 shouldn't I approve that for the benefit of the Estate and let

17 the buyer litigate about it.

18     And the answer to that -- the response to that question is

19 this provision, Your Honor.  What this is doing by creating an

20 injunction, it says that --

21         THE COURT:  Where are you?  Where are you?

22         MR. WILAMOWSKY:  The injunctive -- all the

23 injunctive provisions.

24         THE COURT:  Well, can you give me a paragraph?

25         MR. WILAMOWSKY:  Oh, yeah.  I'm sorry.  It's titled

1    injunction.

2            THE COURT:  There's 69 paragraphs in this order.

3            MR. WILAMOWSKY:  I apologize, Your Honor.  I was

4    just -- because it has a title, I'm sorry.  Page 33 in the new

5    version, starting from paragraph 45.

6            THE COURT:  All right.  Thank you.

7            MR. WILAMOWSKY:  And what I'm saying is that Mr.

8    Dehney had said, okay, what happens, you know, we've got --

9    it's not clear what -- is this servicing, is that servicing?

10   And Your Honor's response, which I think it made sense to some

11   -- well, I'm not going to editorialize.

12       Your Honor responded that maybe the buyer bought into a

13   litigation.  Maybe there will be a dispute as to whether a

14   particular item is servicing related or not.  And maybe that's

15   the buyer's problem and it's not the Debtor's problem and the

16   Debtors will get a benefit for the Estate.  And if the buyer

17   bought a litigation that's what the buyer bought.

18       The answer or the problem with that response is the

19   Debtors -- by the Debtors putting in this injunctive provision

20   because this -- what this injunction effectively says is that

21   if I in good faith make a claim on behalf of my client because

22   I believe that a servicing related default has occurred that

23   has not been excised by the Court previously.  If I believe

24   that a servicing related default is occurring or has occurred

25   and I assert a claim based on it, it's at my peril that some

1  Court later on is going to disagree with me and think that --

2  say, no, it's sale related and, therefore, I will be in

3  contempt of this Order, arguably.

4      So in the context of this particular -- I know they show

5  up in a lot of 363 orders, again, I think that's because

6  they're very often not objected to because I don't think the

7  adversary rules allow it, but in the context of this particular

8  Order it just doesn't belong because the servicing rights have

9  not been specifically defined.  As Your Honor saw from the

10 AA&Rs there are, you know, there are a lot of agreements with

11 various modifications in terms of Debtor and efforts that are

12 made when servicing rights are separated out, and if I assert a

13 good faith claim that something is a servicing-related default

14 and the Debtor or the buyer --

15         THE COURT:  I got you.  I got you.

16         MR. WILAMOWSKY:  You understand the point?

17         THE COURT:  Yes.

18         MR. WILAMOWSKY:  Okay.

19         THE COURT:  Why am I enjoining -- why isn't the

20 asset purchase agreement and the operation of law which

21 transfers these assets free and clear of any liens, claims and

22 encumbrances and the other provisions of 365 and 363 not

23 enough?  Why am I entering an injunction?

24         MS. MORGAN:  Your Honor, I'll let the purchaser

25 speak but I think that the purchaser needs to protect itself

1    from this very type of litigation.  The purchaser is buying

2    free and clear and we will have, I would think, DB trying to

3    argue that it wasn't free and clear of a certain provision or a

4    certain interest and I think the buyer is entitled to for what

5    it paid for these assets to have those assets without that kind

6    of burden and, Your Honor --

7            THE COURT:  Well, if they wanted that they could

8    have bought the assets pursuant to a plan of reorganization

9    that actually provides for the provisions you're talking about

10   as opposed to doing an asset sale under a motion under Section

11   363 and 365.

12           MS. MORGAN:  Well, Your Honor, I do think although

13   they certainly appear in a plan they also very frequently

14   appear in a sale order and for the reason that the purchaser

15   needs this type of protection in order to get the benefit of

16   its bargain, and I think as far as being burdened, I think if

17   there's a difference -- I'm not an expert on Mr. Wilamowsky's

18   clients' agreement but I believe it had a separate servicing

19   rights section and, perhaps, a separate servicing rights

20   addendum.  So I don't think there's going to be too much

21   confusion here but if there is I think they certainly can come

22   back to this Court.

23           MR. WILAMOWSKY:  Your Honor, may I respond to that

24   one point?  The Debtors have never been willing to accept --

25   just break out the servicing addendum because that has other

1  obligations that they're not interested in.

2          THE COURT:  Okay.

3          MR. WILAMOWSKY:  They have never said -- so there

4  are obligations throughout the agreement that might be

5  servicing-related.

6          THE COURT:  Mr. Heiman, do you have a response?

7          MR. HEIMAN:  Yes.  I mean, Your Honor, this is truly

8  an essential part of a transaction like this and as it has been

9  said it's not uncommon to have this and there's no reason --

10  there's nothing different about this transaction that should

11  expose the purchaser to claims in State Court for -- regardless

12  of the validity or, you know, regardless of the cure escrow to

13  assert claims in State Court or to refuse to pay amounts based

14  on something that we didn't do or acquire.  And we live in

15  America where anybody can sue anybody and we all have that

16  experience and, you know, to me this is not only appropriate

17  but essential to a transaction.

18          THE COURT:  So you're saying the injunction would be

19  anti-American?

20          (Laughter)

21          MR. HEIMAN:  Well, if we want to get into a

22  philosophical discussion about it, how easy it is to sue in the

23  United States and so forth, I guess that would be the case.

24  But obviously, you know, I intended to if I was going to speak

25  on this to precede my comments and I actually neglected to do

1  so by making it clear to everybody including DB -- and by the

2  way, we've already spoken to DB and DB knows what our

3  intentions are with respect to servicing their contracts if

4  they're willing.

5       So, you know, much of the issues here we're talking about

6  are lawyer issues that are the creation of some theoretical

7  possibility which, I think, all of us tend to dislike a little

8  bit, but on the other hand that in and of itself is a basis for

9  providing a purchaser with this kind of relief because lawyers

10  create issues.

11      I don't think this is a real issue.  I don't think that

12  there's going to be a problem separating the servicing from the

13  origination, and I believe that once this thing gets done this

14  will be business as usual and, you know, hopefully, everybody

15  will be quite pleased with the transaction.  So I know that's

16  not relevant to the legal issue but I do think it's important

17  to put this thing in context.

18      We are spending a lot of money and we're not buying

19  litigation.  I know what Your Honor said because I observed the

20  comments in Court last week and I think to some extent you're

21  correct, you know, if somebody wants to make some issue of the

22  difference between servicing and origination, they can, they

23  can come back to you, they can do whatever they want, they can

24  make assertions against us, but we're not prepared to take

25  assets and not have some protection against lawsuits that don't

1  have merit.

2          MR. WILAMOWSKY:  Your Honor, may I respond?

3          THE COURT:  Sure.

4          MR. WILAMOWSKY:  First of all, I also agree that if

5  I had to bet I would think that there probably won't be a

6  problem but who's gonna bear the risk right now under this way

7  this is structured if I believe that I've got a claim and I

8  even so much as make demand in a letter to Mr. Heiman's client

9  I have, arguably, violated the injunction, and nothing that Mr.

10  Heiman has said has really given me comfort on that because

11  basically what he's saying is that we paid a lot of money --

12          MR. HEIMAN:  Your Honor, with this stuff now let's

13  not get carried away.  Obviously, that's not true.  He can

14  write all the letters he wants to me or call me or do whatever

15  and, you know, I've already demonstrated to him that we're

16  prepared to deal with every issue.  This is not the real world,

17  what he's talking about.

18          MR. WILAMOWSKY:  If he wants to -- look, DBSP is a

19  deep pocket, Wilbur Ross is a deep pocket, if somebody sues

20  somebody in a way that is -- if it's harassment, if it's, you

21  know, God forbid, a Rule 11 violation, if it's not presenting a

22  colorable claim then the law has ways to deal with that.  But

23  we should be on a level playing field.  If we've got a claim

24  and he's got a defense or if he's got a defense -- notice, if

25  he has a claim -- and I also paid a lot of money for these

1  loans -- notice, if he has a claim against me he doesn't have

2  any injunction blocking him, so I don't know why it's only

3  relevant the amount that he's paying.  He's not paying anything

4  to me, he's paying it all to the Estate.  My rights are still -

5  - should be given due consideration, and there should be a

6  level playing field when it comes to any dispute, which I agree

7  with Mr. Heiman, in all likelihood is not going to happen.

8        MR. HEIMAN:  That's trying to stand everything on

9  its head, Your Honor.  We have no claims against DB.  We would

10 be pleased to service their claims -- I'm sorry, their loans --

11 if they choose to do so.  If they choose not to do so we have

12 no claims against them.  It's totally standing everything on

13 its head.

14    He's not spending any money in this transaction, he's not

15 doing anything.  He's unhappy apparently about the situation.

16 We did not create the bankruptcy.  All we're doing is trying to

17 buy a servicing business and put some very serious money into

18 the Estate, and I think we're entitled to know when we do that

19 we're not buying a burden or a problem, and I'm not worried

20 about DB so much, I'm just worried about everybody where they

21 have contracts and, you know, nobody has tried to go through

22 and say, are you happy or not happy or whatever.  But you know,

23 anybody who is going to do a servicing business is going to

24 have a relationship with their counterparties and make it work.

25 We're not spending $500 million to have unhappy customers.

1          THE COURT:  Understood.  Thank you, Mr. Heiman.  I'm

2     going to overrule the objection.  I think these are -- again,

3     this is a fair and normal provision in this type of sale

4     agreement.  I think, frankly, that if there is truly a good

5     faith dispute as to whether or not something is related to

6     servicing as opposed to related to a sale agreement and the

7     parties take action in connection with trying to assert their

8     rights, except frankly, notwithstanding the injunction, I don't

9     expect that if there truly is a good faith dispute that any

10    Court in the land, including mine, would come down too harshly

11    on the party asserting those rights in good faith, even if in

12    the end run they disagreed.

13         So that may be sort of waffling a bit, frankly, but I

14    think the greater good of making it clear who you go with and

15    who your rights are against and to effectuate the true transfer

16    of the assets, I think it's normal course to have these types

17    of provisions, and I think they're well supported by the record

18    in this case.  So I will grant the -- I'll overrule the

19    objection.

20         MR. WILAMOWSKY:  Okay, Your Honor, which I think

21    brings me to -- I'm going to check my notes for a moment so I

22    reserve my right, but I have another comment but I think this

23    is my final -- I think it's my final comment.

24         THE COURT:  All right.

25         MR. WILAMOWSKY:  Section 363(m) protections, which I

1  believe is Paragraph 51, and here we don't have any problem

2  with the finding -- don't forget -- I mean 363(m) is self-

3  effectuating.  What the Debtors do need is they need a finding

4  that says that as a matter of fact the Court has found that

5  based on the testimony and based on everything else and the

6  sales process that this was negotiated, that this was arm's

7  length, that this was good faith.  We don't have a problem with

8  that.

9       But what it looks like the Debtors are trying to do in the

10  second sentence -- and by the way, I don't -- this whole

11  provision, therefore, should be in the findings and it is in

12  the findings -- but what it looks like the Debtors are trying

13  to do in the second sentence which I would object to and I

14  don't think Your Honor has to make a ruling about it now

15  because 363(m) does what it does, but it looks like the Debtors

16  are trying to say that -- to have a 363(m) mootness declared in

17  connection with an initial closing.

18       Your Honor, at the initial closing there is not going to

19  be any sale of assets, there's going to be an exchange of cash

20  for a promise, there's going to be a lien.  There isn't -- my

21  contract is not going to change hands as of the initial

22  closing.  So what it looks to me -- and maybe I'm not just,

23  maybe the Debtors can clarify -- but it looks to me from the

24  language beginning with "accordingly," what it looks like the

25  Debtors are trying to do is create the illusion or create a

1  mootness situation based on 363(m) when it's not warranted or

2  justified by 363(m) in that case because the asset in question

3  and the asset under appeal will not have yet been transferred.

4           THE COURT:  You know, I hate provisions like this

5  where you reference a section of the Code and then you go and

6  tell me what the section of the Code says.  All right?  The

7  first sentence is all you need.  You've got all the protections

8  of 363(m).  Period.  It doesn't get any better than that.  So I

9  agree, I'm going to strike the second sentence.

10          MR. WILAMOWSKY:  Thank you, Your Honor.  It looks

11  like I saved the best for last on that.  If you'll give me -- I

12  need about 20 seconds and I could just go through my list to

13  make sure I haven't missed anything.

14          THE COURT:  Very well.

15      (Pause in proceedings)

16          MR. HEIMAN:  Your Honor, you didn't let me speak to

17  the last objection.

18          THE COURT:  I'm sorry, Mr. Heiman, would you like to

19  be heard?

20          MR. HEIMAN:  No, sir.

21          THE COURT:  All right.

22      (Laughter)

23      (Pause in proceedings)

24          THE COURT:  I won't say I'm a young Judge but I'm a

25  new Judge.  So I occasionally get ahead of myself.  So if you

1  do wish to speak, please, don't hesitate.

2          MR. WILAMOWSKY:  Okay.  And Your Honor, we

3  understand that the 6004/6006 issue has been mooted because

4  it's going to go away so in fact that was my last comment.

5  And, Your Honor, while we certainly disagree with many of your

6  rulings in this context we do very much appreciate Your Honor's

7  indulgence, consideration and courtesies, and so, thank you

8  very much.

9          THE COURT:  You're welcome.  I'm going to need to

10 take a short recess.  So say five or ten minutes.  I'm sure

11 there are other people who have comments.  Right?  Yes.  Okay.

12 A short recess.

13     (Court in recess)

14          THE CLERK:  All rise.

15          THE COURT:  Please be seated.  Ms. Lawson.

16          MS. LAWSON:  Good evening, Your Honor.  Kim Lawson

17 from Reed, Smith on behalf of GMAC today.

18     I'm not going to repeat the arguments made.  We did have

19 the same concerns as were raised by U.S. Bank which, I think,

20 based on the prior record are being addressed and I won't

21 reargue those issues.  The other issue that we had that's

22 remaining with the Order is in relationship to paragraph Q on

23 page 12, and what I am actually going to do is with a

24 reservation of rights to comment is I'm going to defer that

25 argument to Mr. Bowden and Mr. Butz as they are the insureds

1  that are effected and I will comment to the extent I need to,

2  but I'd rather not duplicate arguments and argue things that

3  are going to be argued multiple times.

4          THE COURT:  Okay.  Thank you.

5          MS. LAWSON:  My remaining issue is not with the

6  Order but with something that we did not receive until Tuesday

7  evening from the Debtors, and it relates to the first amendment

8  to the asset purchase agreement.  And if Your Honor recalls

9  from the first day of argument in this case, it was October

10  15th, the Debtors filed a second notice of contracts to be

11  excluded from the asset purchase agreement and made

12  representations on the record that they were removing the HELOC

13  agreements with the exception of 2007-SD1 from the sale

14  process, and that they were not going to go forward in any way

15  at the sale hearing regarding those agreements.

16      Well, on Tuesday evening they distributed a first

17  amendment, and attached to that first amendment is an Exhibit-C

18  which adds every single HELOC agreement where GMAC is the back-

19  up servicer that was excluded during the sale hearing, now puts

20  it in under Section 6.10(f) as being included as one of those

21  contracts that will now be subserviced under the asset purchase

22  agreement.

23      We did not proceed with any type of oral argument or any

24  evidence with reference to those agreements based on the notice

25  of their being removed and the representations by the Debtor on

1  the record.  So at this point we're sort of blind-sided by how

2  we now proceed with these provisions.

3           THE COURT:  All right.  Let me hear the Debtor's

4  response.  Mr. Grear, you're not doing that are you?

5           MR. GREAR:  Your Honor, Craig Grear on behalf of the

6  Debtor in a rare appearance here in Bankruptcy Court, but

7  6.1(f) if I could address that, these loans need to continue to

8  be serviced.  Now, 6.1(f) sets forth loans that the Debtor is

9  not servicing for which the Debtor is not selling to the

10 purchaser.  They would retain them either for sale or other

11 resolution.  After the initial closing Debtors will continue to

12 service those loans.  Any fees on that, although earned by the

13 Debtors, will be for the account of the purchaser.  After the

14 final closing is when any self-servicing on those loans would

15 occur but for the initial closing there is no self-servicing on

16 those loans.

17          THE COURT:  Well, wait a minute.  How can you do --

18 you can't sort of do it backwards.  I mean you sort of said you

19 weren't going to sell the servicing rights and now you're

20 saying, but if we don't depose of the HELOCs by the final close

21 we're going to sell the servicing rights.

22          MR. GREAR:  We're not selling those right now, we're

23 maintaining the status quo with respect to those loans, Your

24 Honor.  If in fact we don't there's no servicing for the loans.

25          THE COURT:  I understand until the final close.  I

1  don't think anyone -- because the reality is the Debtor is the

2  Debtor until the final close so to the extent that the HELOC

3  loans are being serviced by the Debtor after the initial close

4  is sort of neither here nor there.  But what I take from Ms.

5  Lawson's comments are by including it on that exhibit when the

6  final close occurs if the HELOC loans have not otherwise been

7  disposed of the buyer will service them as subservicer.

8            MR. GREAR:  That is correct, Your Honor.

9            THE COURT:  All right.  Now, do you have a right to

10 do that without having asked the Court for permission to do it?

11           MR. GREAR:  I think the intention here -- again, we

12 sort of run into the same situation.  If we've transferred all

13 of our servicing assets there's nobody to service those loans.

14 The intention obviously is to resolve any issues with respect

15 to --

16           THE COURT:  That's just motivational, you know.

17           MR. GREAR:  Understood.

18           THE COURT:  But my point being I understand the

19 practical reality but I think you're -- well, I understand what

20 you're trying to do.  Let's put it that way.  I'm just not sure

21 you have permission to do it.

22           MR. GREAR:  And I think, Your Honor, you know, in

23 consultation with our client we may look into taking them off.

24 I do note the practical issue that if we get to the final

25 closing and there's not a resolution with respect to the

1  HELOCs, the HELOCs may have initiated a situation where they

2  don't have servicing but I leave that to them.

3       THE COURT:  All right.  Let me hear from the other

4  counsel because they appear to want to be heard, I take it, on

5  this matter, Mr. Bowden?  A similar issue?

6       MR. BOWDEN:  Good evening, Your Honor.  For the

7  record, Bill Bowden of Ashby & Geddes for CIFG Assurance.  Yes,

8  we have the similar issue.  All of these relevant agreements

9  contain provisions that insure that any subservicing

10  arrangement be on terms consistent with the applicable

11  agreement.

12       THE COURT:  Yes.  You don't need to start -- you

13  know, I'm going to sustain the objection.  I don't see how you

14  can backdoor this.  I think that's exactly what you're trying

15  to do is backdoor through the subservicing.  Now, maybe you can

16  bring a motion to the Court for authority to transfer the

17  subservicing rights to Mr. Ross' client or Mr. Ross' entity and

18  we'll hear that and it will be on fair notice and they'll have

19  an opportunity to present their objections.  But I think

20  otherwise -- and, you know, I may grant that or I may not, I

21  don't know, it depends on what day of the week it is, I guess,

22  but I think it's only fair to provide proper opportunity and

23  notice to be heard on those issues.  And I heard at the

24  beginning of the hearing that the HELOC loans were off the

25  table, and I think, frankly, this schedule backdoors that.

1          MR. BOWDEN:  Your Honor --

2          THE COURT:  Keep going.  I'm sorry.

3          MR. BOWDEN:  That's why I didn't want to cut Your

4   Honor off.  Again, Bill Bowden.  Your Honor, the first

5   amendment -- the section of the first amendment that Ms. Lawson

6   referenced that will then have to come out at least to the

7   draft that was circulated Tuesday evening is Section 11.3.  I

8   just wanted that on the record.

9          THE COURT:  I don't know if it needs to come out,

10  it's just not going to be enforceable, it a sort of a nullity.

11  There are people sort of buzzing around here so --

12         MR. CLEARY:  I didn't hear the last point.  Sorry,

13  we're trying to resolve the first issue with respect to the --

14  it's the fact that they show up on the first amendment and so I

15  don't want to -- I want to make sure I can address the response

16  and I think before we move off the issue that I think the Court

17  was trying to wrestle with it seems to make, I think, the most

18  sense from our perspective -- and I don't know with the

19  purchasers because, you know, we're doing this a little bit on

20  the fly -- but if the Court is concerned about this happening

21  and then not having an opportunity to be heard maybe what we

22  would propose is that before any transfer would occur we would

23  have to file something with the Court and there would be an

24  opportunity to be heard and then parties could come back so it

25  wouldn't happen -- we wouldn't backdoor it so-to-speak, that if

1  it were going to happen it could happen but there would be

2  another hearing before it would actually occur.

3          THE COURT:  Well, let's just be clear.  You can

4  resolve it in a procedural way.  You leave it in the APA if you

5  like but you don't have authority from the Court to assign or

6  transfer the HELOCs even on a subservicing basis at this point.

7  This Order isn't going to do it, so -- and it's not going to be

8  approved without notice and an opportunity for a hearing.

9          MR. CLEARY:  Thanks.

10          THE COURT:  So however you want to resolve it is

11  fine.

12          MR. CLEARY:  Okay.  Thank you, Your Honor.

13          MR. GREAR:  Your Honor, if we could have just one

14  clarifying point on that is that's upon final closing.  This

15  does not effect servicing of those on the initial closing?

16          THE COURT:  Well, there is no transfer or servicing

17  to anybody at the interim closing.

18          MR. GREAR:  That's correct.

19          THE COURT:  The servicing is staying with the

20  Debtor.  I'm in no way affecting what you're doing with the

21  HELOC loans and, again, this applies to the objectors.  I mean

22  if people have issues that they didn't raise I'm not, you know,

23  tilting at windmills for them.  I think it deals with the

24  people who have raised the issue.

25          MR. GREAR:  Okay.  Thank you, Your Honor.

1          MR. BOWDEN:  Your Honor, thank you.  We have one

2    additional issue with respect to the HELOCs that Mr. Butz will

3    take the lead on.

4          THE COURT:  All right.  You guys are tag-teaming me.

5    All right.  Mr. Butz.

6          MR. BUTZ:  Good evening, Your Honor.  For the

7    record, Daniel Butz from Morris, Nichols, Arsht & Tunnel on

8    behalf of Assured Guaranty and FGIC.

9          THE COURT:  Who, I'm sorry, who?  Fidget?

10         MR. BUTZ:  FGIC.

11         THE COURT:  Okay.

12         MR. BUTZ:  One of the other insurers.  These issues

13   all deal with third party rights for assured thirty party

14   rights as to both assumed contracts and for everyone, including

15   Mr. Bowden's client, for contracts being left behind.  We would

16   just like -- in certain places in the current proposed order

17   there are places where the parties to contracts are mentioned.

18   We would like to have inserted parties to these contracts or

19   express third party beneficiaries of these contracts.  Just

20   that sort of language.  The first place for that would appear

21   is in paragraph 2 which, I believe, is on page 12.  This is one

22   that's applicable to all of the insurers whether or not their

23   contracts are being transferred or not.

24         THE COURT:  So what do you want it to read?

25         MR. BUTZ:  Starting at the second line after the

1  comma, "This order is without prejudice to the right of non-

2  Debtor parties to such contracts or express third party

3  beneficiaries thereto," or something to that effect.

4       Again, our concern is mainly -- and I think I explained

5  this to counsel during the break -- is that the old Latin maxim

6  of construction that in English says, "the inclusion of one

7  thing denotes the exclusion of the others" and the fact that it

8  is only talking about the parties to contracts even though

9  under -- at least in the Schwartz case under 7.05 of the

10  servicing agreement it says that they are a third party

11  beneficiary with all the benefits of a party.  We would just

12  like the Order to reflect that.  There are a few other places

13  as well where we would like similar language, including

14  paragraphs 57, 58 and 59.

15            THE COURT:  I'm sorry?

16            MR. BUTZ:  I'm sorry.  Page 40, I believe, paragraph

17  57, paragraph 58 and paragraph 59.

18            THE COURT:  Paragraphs 57, 58 and 59.

19            MR. BUTZ:  Yes.  And paragraph 57, it would be found

20  four lines down.  A similar request, "he was a party to an

21  assumed contract, he was a party to or an express third party

22  beneficiary of an assumed contract," and at page -- I'm sorry -

23  - at paragraph 58, similarly, the very last line of paragraph

24  58, "that is a party to or an express third party beneficiary

25  of an assumed contract" and then in the -- I guess it would be

1  the second line of paragraph 59.

2       (Pause in proceedings)

3            THE COURT:  All right.  Let me hear a response.

4            MR. HEIMAN:  Your Honor, it's Dave Heiman again.

5  The only -- we have no problem with the concept.  The only

6  thing I can say is there's a lot of language that this is being

7  injected to and I just want to make sure that nothing -- you

8  know, without prejudice doesn't concern me at all because

9  certainly nothing is intended to prejudice their rights.  What

10 does concern me if it's something other than without prejudice

11 that could somehow be read to expand their rights.  So I just

12 want to make sure that --

13           THE COURT:  Yes, I hear you.  I thought that Q and

14 59 are kind of no-brainers because all they really say is what

15 this Order doesn't do.

16           MR. HEIMAN:  Yes.

17           THE COURT:  You know, it doesn't prejudice their

18 rights to the non-assumed contracts to take a position.

19           MR. HEIMAN:  Yes, I agree with that.  All I'm saying

20 is to the extent -- I mean I guess we'll want to look at the

21 language and make sure that somehow it doesn't expand third

22 party rights --

23           THE COURT:  And that's what concerns me about 57 and

24 58.  I think maybe those provisions are actually expanding

25 rights as opposed to making sure they're not being prejudiced.

1  Except for -- all right, let me read it again.

2       (Pause in proceedings)

3           THE COURT:  Well, all 57 says is that if you're not

4  a party to an assumed contract or a counterparty to an assumed

5  contract as a defined term that the entry of the Order is not

6  subjecting you to liability, I think.  Is that what it's doing,

7  Mr. Cleary?

8           MR. CLEARY:  I was going to say I'll read it out

9  loud and we can figure it all out but I mean, conceptually,

10 we're in line with the purchaser and that is there are rights -

11 - and I think Mr. Denny and others probably have read their

12 provisions to the Court -- and the concept we agree with, and

13 that is whatever rights they have under those agreements, they

14 have, they're not purchased assets.

15      What we are afraid of is that some inclusion of some

16 language could be construed to expand those rights, the exact

17 opposite argument of what they're concerned about.  And so

18 somewhere we've got to come up with some language that kind of

19 bridges the gap between those two fears and concerns, but I

20 think, conceptually, everybody seems to be on the same page

21 because I think --

22          THE COURT:  Well, that's where I am.

23          MR. CLEARY:  Well, I think you said this to Mr.

24 Denny in the hearing is that, your rights are what your rights

25 are, and maybe --

1          THE COURT:  Well, but if we're going to delineate

2   that certain types of rights are not being effected -- the

3   rights of certain parties are unaffected, I don't think it

4   hurts to make it clear -- I think it's helpful if you're going

5   to start listing -- although, this is why you should never list

6   things because when you start listing it everybody wants to be

7   included, but you've done it that way and I'm not in any way

8   expanding their rights, so -- but I think this kind of comfort

9   language shouldn't be a problem.

10          MR. CLEARY:  And I think we can probably --

11          THE COURT:  But I don't see where it goes in 58, I

12   have to say.  I'm lost there.  I got 57, I got 59, I got Q.  I

13   don't see contract parties in 58, Mr. Butz, so I'm not sure

14   where it goes.  That's about monthly status reports.

15          MR. BUTZ:  Your Honor, Daniel Butz, once again.

16   It's at the very end at least from the last sentence, the copy

17   I have, allowing the --

18          THE COURT:  Now, see, now that's an example, I

19   think, where you're expanding your rights, "Upon written

20   request to counsel for the Debtors, the Debtors shall provide

21   the monthly status reports to," and then there's a whole list

22   of people in connection with assumed contracts.

23          MR. BUTZ:  I understand but --

24          THE COURT:  I'm not sure you're entitled to that.

25          MR. BUTZ:  Actually, under our agreement we do have

1  various informational rights throughout the agreements.

2        THE COURT:  Well, they are what they are.

3        MR. BUTZ:  Well, I mean, Your Honor, we'd frankly be

4  fine if there was a separate little paragraph saying the rights

5  of third party beneficiaries are what they are under the

6  assumed contracts.

7        MR. HEIMAN:  Your Honor, I think we would prefer

8  that without trying to intersperse it throughout the documents,

9  just to have a paragraph that says nothing in this Order shall

10  prejudice the rights of third party beneficiaries to the extent

11  of whatever their rights are.

12        THE COURT:  To the --

13        MR. HEIMAN:  I mean --

14        THE COURT:  Well, see, now he's a third party

15  beneficiary to an assumed contract so -- well, you guys can

16  work it out however you want to work it out.

17        MR. HEIMAN:  Yes, that's true too.

18        THE COURT:  My ruling is that to the extent that the

19  Order is saying that certain types of parties' rights are not

20  effected by the Order or the transaction that it to the extent

21  appropriate should also include third party beneficiaries to

22  contracts as among those listed entities.  But I am in no way

23  expanding the Debtor's or the buyer's duties to third party

24  beneficiaries, and I don't want any changes to the Order that

25  would do that.

1           MR. BUTZ:  That's exactly what we want.  Thank you,

2   Your Honor.

3           THE COURT:  All right.  So you can either do it in a

4   separate paragraph that's acceptable or you can mark up the

5   existing paragraphs, however you want to proceed, but I'm

6   sustaining Mr. Butz's objection --

7           MR. BUTZ:  Thank you.

8           THE COURT:  -- as modified on the record.  Mr.

9   Bowden.

10          MR. BOWDEN:  Good evening again, Your Honor, Bill

11  Bowden of Ashby & Geddes.  Your Honor, I'm on my feet and at

12  the podium this time on behalf of another client, Morgan

13  Stanley Mortgage Capital.  I have very minor suggested language

14  changes to three parts of the Order if Your Honor could bear

15  with me.

16          THE COURT:  Sure.

17          MR. BOWDEN:  Your Honor, the first is paragraph R on

18  page 12 at the very end of the paragraph.  Your Honor, it's

19  apparent from a read of the Order and from this motion that

20  {quote}, "assumed contracts" {close quote}, are being treated

21  much differently then {quote}, "other contracts" {close quote},

22  and "other contracts" is defined in the Order but it does not

23  have a corresponding definition in the asset purchase

24  agreement.  So we had asked for a provision at the end of

25  paragraph R to the following affect, {quote} "For the avoidance

1  of doubt no Other Agreement is an Assumed Contract."  It seems

2  straightforward belts and suspenders, Your Honor.

3          THE COURT:  Well --

4          MR. HEIMAN:  As I understand it, Your Honor, our

5  only problem with that is there are some non-service contracts

6  that are being assumed under the asset purchase agreement such

7  as leases or equipment leases or computer equipment and so

8  forth, and we did not want to -- that could be technically

9  inconsistent.

10          THE COURT:  Could you read it again, Mr. Bowden?

11  I'm sorry.

12          MR. BOWDEN:  Certainly, Your Honor.  "For the

13  avoidance of doubt, no Other Agreement that is an Assumed

14  Contract."

15          THE COURT:  And "Other Agreements" are defined

16  where?

17          MR. BOWDEN:  "Other Agreements" are defined early on

18  in the Order.  Bear with me, Your Honor, while I find it.

19          THE COURT:  Sure.

20          MR. BOWDEN:  J.  Thank you.  J.  Page 7.  It goes to

21  the severability issue point, Your Honor.  So while I hear what

22  Mr. Heiman's concern is I don't think it has any bearing given

23  the way "Other Agreements" --

24          THE COURT:  Yes, let me read it.

25          MR. BOWDEN:  Sorry.

1        (Pause in proceedings)

2            THE COURT:  Oh, well yes -- no, but his point is

3    "Other Agreements" -- you know, I see his point because "Other

4    Agreements" could include a whole host of agreements that may

5    be being assumed and assigned but are not servicing agreements.

6    Is that your point, Mr. Heiman?

7            MR. HEIMAN:  Yes.

8            MR. BOWDEN:  Okay.

9            MR. HEIMAN:  You know, I'm not clear on that but

10   that's my concern.

11           MR. BOWDEN:  All right.

12           THE COURT:  But I think -- but "Assumed Contracts"

13   is defined in the APA.  Correct?  How is it defined in the APA?

14           MR. HEIMAN:  Hopefully, the Debtor will answer that,

15   Your Honor.  I don't have it in front of me.

16           MS. MORGAN:  Your Honor, it's defined as with

17   reference to Section 2.1(b) and it's fairly lengthy but there

18   is a definition of "Assumed Contracts" and I can read it but it

19   does include, "a contract set forth on Schedule 2.1(b), real

20   property leases, software contracts, assigned leases, servicing

21   agreements, contracts related to the business," --

22           THE COURT:  Okay.

23           MS. MORGAN:  -- I'm skipping somewhat --

24           MR. BOWDEN:  Your Honor, do you need a recess?

25           THE COURT:  What you're really worried about is you

1  want to make sure that they're not trying to backdoor you into

2  the deal.

3          MR. BOWDEN:  Correct.

4          THE COURT:  Can we say this?  Well, I don't know how

5  we say it.

6      (Pause in proceedings)

7          THE COURT:  Well, if that's what you're saying -- if

8  you're saying that you're assuming and assigning executory

9  contracts such as leases which could be included in the

10 definition of "Other Agreement," I go a little further down in

11 paragraph J and I read, "Nothing in the APA or this Order shall

12 have any affect on any other agreement or any claims related

13 thereto against Debtors and the rights if any of all parties

14 against the Debtor in respect of other agreements are

15 reserved."  It goes on, "The rights if any of parties against

16 the Debtors in respect of other agreements are not the subject

17 matter of the hearing and are expressly reserved provided,

18 however, that no party through any other agreement may proceed

19 against the purchaser's collateral."  It sounds to me like this

20 Order says that "Other Agreements" aren't part of this Order.

21          MR. BOWDEN:  Point taken, Your Honor.  I understand.

22          THE COURT:  Well, my point is I think they just

23 defined away a bunch of stuff they thought they were buying.

24          MR. HEIMAN:  I think we'll have to make sure to

25 clarify that, Your Honor, obviously because there are things

1  that are being transferred other than service agreements.

2      (Laughter)

3          THE COURT:  You can send the bill to Mr. Bowden for

4  his services.  All right.  I don't think there should be an

5  issue with making it clear and the problem, of course, is when

6  you're cross-indicing various -- but the way I read it "Other

7  Agreements" clearly were not being subject by the Order and I

8  think the provisions provide it.  Now, I may have created more

9  problems than I solved for you by my comments but I don't think

10 it's at all unreasonable to expect some clarity on that.

11         MR. BOWDEN:  Your Honor, thank you very much.  Let

12 me move on to my next point and it is on page 13, paragraph 1,

13 and I hate to go back on what I said earlier, Your Honor, but

14 this is a point for CIFG Assurance.

15         THE COURT:  All right.

16         MR. BOWDEN:  Paragraph 1, the second sentence,

17 provides the standard language "objections not overruled," et

18 cetera, et cetera, et cetera, "were resolved on the record or

19 overruled on the merits."  That doesn't, I think, accurately

20 capture what happened with the HELOC transactions to which

21 parties objected that were captured or that were excluded on

22 the first day of the hearing.  So I'd ask that there be some

23 clarifying language in connection with that point.

24     Your Honor, I'm getting puzzled looks from, Your Honor,

25 from the other side of the table.  Let me try to --

1    THE COURT:  Your point is you filed an objection in

2  connection with the HELOC loans and they pulled the HELOC loans

3  --

4    MR. BOWDEN:  Correct.

5    THE COURT:  -- sort of and then they tried to

6  backdoor it --

7    MR. BOWDEN:  Let's not go there, Your Honor.

8    THE COURT:  -- which was overruled.  So actually

9  your objection was sustained if you like but, frankly, I think

10  isn't it -- well, it's not really covered by any of those

11  adjectives is it, "withdrawn, waived or settled," or "moot."

12  Can we add "moot"?  Let's add "moot" because I think your

13  objection was rendered moot by the fact that they pulled it

14  from the sale.

15    MR. BOWDEN:  Thank you, Your Honor.  Two other

16  comments, Your Honor -- actually, three, but they're all

17  essentially the same.  Your Honor, the next is on page 24,

18  paragraph 25.  And, Your Honor, I want to give Your Honor an

19  opportunity to read the first sentence and clause -- subclause

20  (a) there.  Your Honor, after the word "affected" in the line

21  beginning "Terminated and that the conveyances described

22  therein have been affected," insert {quote}, "subject to the

23  payment of the seller's cure amount and the purchaser's cure

24  amount."  Obviously, Your Honor, we're --

25    THE COURT:  Where are you here?  I've lost you.

1              MR. BOWDEN:  I apologize.

2              THE COURT:  What line and number are you on?

3    Paragraph 25.  Right?

4              MR. BOWDEN:  Paragraph 25.

5              THE COURT:  Okay.

6              MR. BOWDEN:  The sixth line down beginning,

7    "Terminated."

8              THE COURT:  Okay.  So, "The Order shall be effective

9    as a" -- "This Order shall be effective as a determination that

10   on the final closing date all interest of any kind or nature

11   whatsoever existing with respect to purchased assets or with

12   respect to any act or omission that occurred prior to the final

13   closing and then unconditionally released, discharged and

14   terminated" and then what do you want to put in there?

15             MR. BOWDEN:  Your Honor, the point of the language

16   that I had read was to insure that the obligations to pay

17   seller's cure amount and purchaser's cure amount were not among

18   the obligations released so the language proposed was, {quote}

19   "subject to the payment of the seller's cure amount and the

20   purchaser's cure amount."

21             THE COURT:  Any issue with that?  I think something

22   along those lines is fine.

23             MR. BOWDEN:  Thank you, Your Honor.

24             THE COURT:  I mean you may need to tweak the

25   language a little bit to make it clear that, you know, if any

1  or whatever --

2          MR. BOWDEN:  Understood, Your Honor.  Your Honor, on

3  page 29, paragraph 36, Your Honor, the second line from the

4  bottom beginning, "Due by such persons."  If Your Honor goes up

5  to the beginning of that sentence beginning, "Notwithstanding

6  the foregoing and for the avoidance of doubt the purchaser

7  shall in accordance" and then it goes on to say --

8          THE COURT:  Okay.  All right.  "Notwithstanding the

9  foregoing and for the avoidance."  Okay.

10          MR. BOWDEN:  "And no person shall be entitled to

11  exercise or assert any right of setoff, recoupment or any

12  defense that arose from any act or omission that occurred prior

13  to the Initial Closing, against any amounts due by such

14  person," I would propose to insert, {quote} "in respect of the

15  Purchased Assets or the Purchaser's Collateral."  Obviously,

16  Your Honor, Mr. Heiman's client wants assurance that recoupment

17  claims as was previously discussed on the record are not a

18  worry of his, but we think that that's an appropriate

19  limitation only with respect to what Mr. Heiman is buying and

20  the collateral he is getting.

21          THE COURT:  No, I disagree.  I think if you put that

22  limitation in there you may be basically doing the same thing

23  that I previously overruled with DB which is to forego the

24  defense of recoupment in connection with claims that are more

25  properly related to sale as opposed to servicing.

1          MR. BOWDEN:  Okay.

2          THE COURT:  So I'll overrule that objection.

3          MR. BOWDEN:  Your Honor, thank you.  I had a similar

4   comment, Your Honor, and I think I know Your Honor's ruling on

5   this, the identical language we had proposed to insert in

6   paragraph 45, the carryover paragraph, Your Honor, on page 34,

7   three lines up from the bottom of that paragraph on page 34.

8          THE COURT:  "Any exercise or assertion of any right

9   of set off," et cetera?

10         MR. BOWDEN:  Et cetera, the same language we would

11  proposed to be inserted following the word "person," "in

12  respect of the Purchased Assets or the Purchaser's Collateral."

13         THE COURT:  No, I'm going to overrule it for the

14  same reason.

15         MR. BOWDEN:  Thank you, Your Honor.

16         THE COURT:  You're welcome.

17         MR. BOWDEN:  I think that's all I have.

18         MR. FRIEDMAN:  Your Honor, Scott Friedman from Jones

19  Day on behalf of the purchaser.  If I may have a moment to

20  discuss one of the objections that was mentioned, and this goes

21  to the -- I believe it was the second one that was just

22  mentioned with respect to the cure amount -- I believe that

23  consistent with the rest of the Order, the language should be

24  not "subject to payment," but "subject to the deposit into the

25  cure escrow when the purchaser's cure obligations to the

1    Debtor."

2              THE COURT:  Okay.

3              MR. FRIEDMAN:  I'm not sure that was --

4              THE COURT:  That was my point, to make sure that --

5    that's fine, sir.  My point there was I wasn't sure Mr.

6    Bowden's language was correct because I thought it might not be

7    given all the different definitions but the concept was fine so

8    I'm sure you'll be able to communicate that with the Debtor's

9    lawyers.  I appreciate that clarification.

10             MR. FRIEDMAN:  Thank you.  We'll work on language,

11   Your Honor.

12             THE COURT:  Okay.  Thank you, Mr. Bowden.  Anyone

13   else have any issues with the Order?

14             MR. WILSON:  Your Honor, this is Bruce Wilson of

15   Kutak, Rock.  I am co-counsel with Mr. Butz for FGIC, one of

16   the insurers for the HELOC.  Before we leave the insurer issues

17   I'd just like to add one point and that is we've asked for some

18   reservation of rights language in the Order just clarifying

19   that the HELOCs were in fact not addressed by the Order and the

20   Order is not binding on the HELOCs.  I think that is even more

21   important now if the sentence in paragraph -- I'm sorry, the

22   sentence in footnote 4 is removed as requested by the Debtors,

23   because if you remove that sentence and you read that in

24   conjunction with paragraph 52 on page 38, "To the effect that

25   the Order is binding on third parties," then we would be, I

1   think, subject to the argument that the Order is in fact

2   binding on the HELOCs and I think that was contrary to the

3   agreement at the outset of the hearing.

4           THE COURT:  Well, there's no question in mind that

5   the provisions of this Order are binding on a lot of people

6   including the HELOC participants to the extent that they're

7   going to try to assert something contrary to the order.  That

8   doesn't mean that the HELOC loans were transferred and I think

9   the record is already crystal clear that they're not

10  transferred and I've already sustained the objection to make

11  sure that they're not going to be subject to sub-servicing.  So

12  I don't think any additional language is required.

13          MR. WILSON:  Okay.  I appreciate that, Your Honor.

14          THE COURT:  That's all right.

15          MR. INDELICATO:  Your Honor, Mark Indelicato from

16  Hahn & Hesson on behalf of the Committee.  At the risk of being

17  told that the record is crystal clear yet again, I rise only to

18  address the issue about the HELOC loans and just to explain to

19  the Court at least what my concern is and when we were

20  negotiating the APA on behalf of the Committee.

21      I understand the Court's concern and the HELOC loans are

22  out and they are not transferred and there was never any

23  intention they would be transferred, but what our concern is

24  that we retain a mechanism that to the extent they are not

25  dealt with by the final close that we would submit an

1  appropriate motion to the Court and everybody's rights would be

2  reserved, but if the Court grants the motion that the purchaser

3  will provide the sub-servicing.

4      Our concern is that if we're left with just these random

5  servicing rights without an agreement by the purchaser to take

6  them under the agreements of the existing APA, if this Court

7  later approves it then I'm going to be stuck in a situation

8  where I was with the Ginnie Mae settlement where I'm gonna have

9  to do whatever I can do to just minimize liability.

10     So all I'm asking for the Court is -- and I think this was

11 the intent but I just want to make sure, is that they're

12 clearly not being transferred, there was no intent to backdoor

13 the HELOCs into the transaction, but the intent is that

14 pursuant to a later motion if the Court grants us the right to

15 transfer them to the purchaser that the purchaser will agree to

16 take them under the terms of the existing APA, which is what

17 was negotiated by the parties.

18         THE COURT:  All right.  Well, I think that's what I

19 -- well, what I said was you can leave it in the APA but

20 nothing in my order is approving that provision of the APA.

21 Now, whether there's -- I'm not in any way obligating Mr.

22 Heiman's client.  I mean if he has a defense arising from my

23 ruling, he has a defense arising from my ruling.  It is what it

24 is.

25         MR. INDELICATO:  That's fine, Your Honor.

1          THE COURT:  But so however you'd like to proceed is

2    up to you.

3          MR. HEIMAN:  Your Honor, I would only say -- you

4    know, the APA says we're obligated to take those loans if

5    they're sold but now that they're being excluded I'm not sure

6    what the APA says.  I am comfortable that we would, based on

7    the current circumstances, do it, would take the loans but I

8    just -- I think the APA is going to control this.  I can't

9    speak for the purchaser if three months from now some

10   circumstances are different.  If the APA requires it,

11   obviously, we'll do it.

12         MR. INDELICATO:  I think we're fine with that, Your

13   Honor.

14         THE COURT:  Okay.  You don't need to say anything,

15   Ms. Lawson.  You're fine.  Anything else?

16         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

17         THE COURT:  You're welcome.  Mr. Cleary.

18         MR. CLEARY:  Your Honor, we --

19         THE COURT:  You'll give me an order at 8:00 a.m.,

20   right?

21     (Laughter)

22         MR. CLEARY:  -- sincerely thank you for your

23   patience over the past week and a half and we will endeavor to

24   get a copy of the Form of Order consistent with today's rulings

25   over to your chambers as soon as possible.

1          THE COURT:  All right.  Well, I am in tomorrow but

2     among other things it's my wife's birthday so, you know, we've

3     got a pretty hard stop at 4:30 or fiveish, so really try to --

4     if it's going to be -- you know, just communicate with

5     Chambers, we'll work it out.  Ms. Semanski is out so call Ms.

6     Gatson directly but communicate with Chambers and we'll figure

7     it out.

8          MR. CLEARY:  Will do.

9          THE COURT:  I'll be available as much as I can.

10         MR. CLEARY:  Okay.  Thank you, Your Honor.  We will

11    keep your Chambers apprised of our status.

12         THE COURT:  All right.

13         MR. CLEARY:  Thanks very much and thanks again, Your

14    Honor.

15         THE COURT:  You're welcome.  Thank you.  Have a

16    pleasant evening.

17         MR. HEIMAN:  Your Honor, thank you for allowing us

18    to participate by telephone.

19         THE COURT:  Well, we missed your presence in court

20    but if nothing else you know you couldn't see the daggers that

21    were being thrown at you from the objectors.

22         MR. HEIMAN:  Well, that's why I'm in my office

23    rather than --

24         THE COURT:  That's why you're safely in Chicago.  I

25    understand.  Or wherever you are.  I'm not sure.  All right.

138

1  The hearing is adjourned.

2          ALL:  Thank you, Your Honor.

3      (Court adjourned)

4

5                    CERTIFICATION
6  I certify that the foregoing is a correct transcript from the
7  electronic sound recording of the proceedings in the above-
8  entitled matter.
9

10 *Lewis Parham*                    10/31/07

11 _____          _____
12 Signature of Transcriber              Date