IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x
In re:                                        :    Chapter 11
                                              :
AMERICAN HOME MORTGAGE                        :    Case No. 07-11047 (CSS)
HOLDINGS, INC.,                               :
a Delaware corporation, et al.,               :    Jointly Administered
                                              :
        Debtors.                              :
                                              :    **Objection Deadline: November 21, 2007 at 4:00 p.m. (ET)**
                                              :    **Hearing Date:  November 28, 2007 at 10:00 a.m. (ET)**
------------------------------------------------------- x

## DEBTORS' MOTION FOR ORDER AUTHORIZING PAYMENT OF INCENTIVE PAY TO SENIOR MANAGEMENT PURSUANT TO SECTIONS 105(a), 363(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and

debtors in possession in the above cases (collectively, "AHM" or the "Debtors")[1], hereby

submit this motion (the "Motion") for entry of an order, pursuant to sections 105(a), 363(b)(1)

and 503(c)(3) of title 11 of the United States Code (as amended from time to time, the

"Bankruptcy Code"), authorizing, but not directing, payment of incentive pay to certain

members of senior management.  In support of the Motion, the Debtors, by and through their

undersigned counsel, respectively represent as follows:

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

## PRELIMINARY STATEMENT[2]

1.      On August 3, 2007, the Debtors were forced to drastically reduce their workforce from approximately 7,500 employees to only those approximately 1,000 employees determined to be essential to: (a) wind-down the loan origination business (approximately 250 employees); (b) maintain the valuable loan servicing business until a sale of such business could be consummated (approximately 450 employees); and (c) administer, manage and wind-down the Debtors' remaining businesses in chapter 11 and maximize the value of the assets. Since the Petition Date, because of the wind-down of the loan origination business and certain other tasks having been completed, and because of attrition, the Debtors' workforce has been further depleted. As a result, members of the Debtors' Senior Management (as defined below) have been, and will continue to be, faced with the daunting challenge of maintaining and motivating a drastically reduced workforce being forced to perform, in addition to their prepetition duties, the duties previously performed by their former colleagues, along with the additional tasks associated with these chapter 11 cases. At the same time, Senior Management is being asked to conduct structured sales of substantially all of the Debtors' assets within an expedited timeframe.

2.      To incentivize the approximately 27 executives,[3] senior vice presidents, and vice presidents remaining in the Debtors' employ (the "Senior Management" or "Plan Participants")[4], the Debtors have developed an executive incentive plan (as described in greater detail below, the "EIP") which aligns the interests of Senior Management with the interests of the Debtors' stakeholders. In fact, the EIP is the result of significant discussions and

---

[2] Capitalized terms in this Summary shall have the meanings ascribed to them below in this Motion.

[3] Michael Strauss, the Debtors' chief executive officer, is not a Plan Participant.

[4] Three of the Plan Participants are vice presidents whom the Debtors originally attempted to include within their Non-Insider Employee Retention Plan; however, because of their job titles, they were not among the list of non-insider employees ultimately approved by the Bankruptcy Court.

DB02:6161724.13                                                                                                  066585.1001

negotiations with the Official Committee of Unsecured Creditors (the "Committee") during the past several months. The amounts payable to Plan Participants pursuant to the EIP are contingent upon not only the Debtors' successful and timely completion of certain asset sales, but also the efficient management of an expedited wind-down of the Debtors' business following such sales.

3.      As will be discussed in greater detail herein, the EIP provides for contributions to a Plan Pool (as defined below) based upon the achievement of certain objective measures, including value obtained through asset sales, management of the asset sales process, minimization of wind-down costs, and the rapid confirmation of a plan of liquidation.

4.      The Debtors submit that the EIP, which has a maximum aggregate payout of $9 million, provides significant value at relatively small cost to these estates.  In light of the value, size, and complexity of the Debtors' business, as well as the issues that have already arisen and will continue to arise in these bankruptcy cases, the Debtors submit that the amounts that they seek authority to pay Senior Management herein are reasonable and responsibly targeted and the approval of the EIP serves the best interests of these estates.

## STATUS OF THE CASE AND JURISDICTION

5.      On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On August 7, 2007, this Court entered an Order granting joint administration of these Chapter 11 cases.

6.      On August 14, 2007, the Office of the United States Trustee appointed the Committee.  No trustee or examiner has been appointed.

3

7.    This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1134. Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2). The basis for the relief requested herein are sections 105(a), 363(b)(1) and 503(c)(3) of the Bankruptcy Code.

## BACKGROUND

## I.    The Debtors' Business

8.    Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

9.    One segment of the Debtors' business is the loan servicing business (the "Servicing Business"), which is an active and revenue producing unit that is conducted through AHM Servicing. As this Court is well aware, the Servicing Business has been and remains a very important and profitable part of the Debtors' business. Loans are serviced primarily for the trusts of the Debtors' securitizations and for Fannie Mae and other third-party purchasers of the loans originated by the Debtors. Servicing Business activities are designed and implemented to ensure that the borrowers repay each loan in a mortgage servicing portfolio in accordance with its terms. The Debtors' Servicing Business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries and enables the Debtors to maintain control over the collection and default mitigation processes.

4

## II.    Events Leading to the Chapter 11 Filing

10.    In the weeks prior to the Petition Date, an unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening AHM's continued viability.

11.    The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees. The Debtors now employ or contract approximately 650 persons who are absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed and the Debtors' remaining assets are sold.

12.    In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions. Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual mortgage-backed securities in securitization trusts and "scratch and dent" loans, to financial and strategic investors.

13.    Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

5

III.    **The Sale of the Servicing Business**

14.    On the Petition Date, the Debtors filed their *Emergency Motion of the Debtors for Orders: (A)(i) Approving Sale Procedures; (ii) Scheduling a Hearing to Consider Sale of Certain Assets Used in the Debtors' Loan Servicing Business; (iii) Approving Form and Manner of Notice Thereof; and (iv) Granting Related Relief; and (B)(i) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (ii) Authorizing and Approving Purchase Agreement Thereto; (iii) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (iv) Granting Related Relief* [Docket No. 11] (the "Sale Motion"). By Orders dated August 9, 2007, [Docket No. 113] and September 25, 2007 [Docket No. 937], this Court established sale procedures and revised sale procedures in furtherance of the Sale Motion.

15.    Since the Petition Date, the sale of the Servicing Business has been a primary focus of the Debtors' efforts to maximize value for their creditors. By Order dated October 30, 2007 [Docket No. 1711] (the "Sale Order"), after a five-day hearing, this Court approved the sale (the "Servicing Sale") of the Servicing Business to AH Mortgage Acquisition Co., Inc. (the "Purchaser") for a purchase price estimated to be $450-500 million. The Servicing Sale will be closed in two steps - an initial (or economic) closing currently anticipated to occur in mid-November and a final closing anticipated to occur on or prior to September 30, 2008.

**THE EXECUTIVE INCENTIVE PLAN[5]**

16.    The EIP, a copy of which is annexed hereto as Exhibit 1, is designed to maximize assets available for distribution to creditors by providing incentives to Senior Management to: (i) maximize the net recovery, after settlement of secured claims and payment

---

[5] The descriptions herein are qualified in their entirety by reference to the EIP. To the extent there is a discrepancy between the terms of the EIP and the descriptions contained herein, the terms of the EIP control. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the EIP.

DB02:6161724.13                                                                                    066585.1001

of sale-related expenses, received by the Debtors upon sales of assets of the estate; (ii) consummate the sale of certain of the Debtors' assets in an expeditious manner; (iii) efficiently manage the cost of the wind-down of the Debtors' operations; and (iv) quickly confirm a plan of liquidation.

17.    As stated above, the EIP is the product of significant negotiations between the Debtors and the Committee, and has been discussed between, and developed by, such parties since the early stages of these cases.  Indeed, the Debtors have delayed filing this Motion because they wanted to ensure that the EIP was acceptable to the Committee, prior to seeking Court approval.

**I.    EIP Components**

18.    Pursuant to the EIP, the Debtors shall contribute (each, a "Contribution") to a pool (the "Plan Pool") to finance payments under the EIP.  Contributions to the Plan Pool, which will not be less than $3.65 million[6] (the "Minimum Plan Pool") nor more than $9 million, shall be based upon the following objective components:

**A.    Asset Sales/Dispositions**

19.    The fundamental purpose of any chapter 11 case is to maximize the value of a debtor's estate.  In accordance with this precept, the Debtors wish to maximize the net recovery, after settlement of secured claims, received by AHM upon the consummation of the sale or disposition of the various assets (the "Asset Sales") of the Debtors including, among other things, the Servicing Business, the American Home Bank (the "Thrift"), mortgage loans, financial assets, real estate holdings, interests in reinsurance companies, furniture, fixtures & equipment, the Rabbi trust, and any other assets of the Debtors (collectively, the "Assets").  The

---

[6]  The Minimum Plan Pool may be reduced if any of the Plan Participants retire, die, voluntarily resign, or are terminated for cause.

066585.1001

contribution, if any, upon the consummation of the Asset Sales (the "Asset Sales Contribution")

shall be calculated based upon the extent to which the proceeds remaining from the Asset Sales

after payment of secured debt and costs associated with the Asset Sales (the "Net Proceeds"),

exceed certain threshold amounts.

20.    There shall be no Asset Sales Contribution if the Net Proceeds are less

than $230 million.  If the Net Proceeds are between $230 and $300 million, the Asset Sales

Contribution shall be one and one half percent (1.5%) of the Net Proceeds which exceed $230

million, but are less than $300 million.  If the Net Proceeds are between $300 and $400 million,

the Asset Sales Contribution shall be the sum of $1.05 million plus two and one quarter percent

(2.25%) of the Net Proceeds which exceed $300 million but are less than $400 million.  If the

Net Proceeds exceed $400 million, the Asset Sales Contribution shall be the sum of $3.3 million

plus three percent (3%) of the net proceeds, which exceed $400 million.

21.    Regardless of the actual Net Proceeds obtained as a result of the Asset

Sales, the Asset Sales Contribution shall not exceed $5 million.

**B.    Management of Asset Sales Process**

22.    As noted above, the Debtors desire to sell certain of their core assets as a

going concern; however, maintaining such businesses as a going concern requires the Debtors to

incur substantial administrative costs during the sale process.  Accordingly, the Debtors desire to

incentivize Senior Management to efficiently and expeditiously close certain Asset Sales,

thereby cutting off the administrative drain on their estates while maximizing the value of the

Assets. The Debtors will contribute into the Plan Pool based upon the time it takes to

consummate the sales of the Servicing Business and the Thrift (the "Asset Sales Process

Contribution").

8

23.    Specifically, the EIP provides that the Debtors will make an Asset Sales

Process Contribution in the amount of $700,000 if there is an agreement in principle with respect

to the sale of the Servicing Business on or before October 31, 2007. In light of the entry of the

Sale Order on October 30, 2007, this milestone has been satisfied.[7]

24.    With respect to the sale of the Thrift, the Debtors will make an Asset Sales

Process Contribution in the amount of $300,000 if there is an agreement in principle with respect

to its sale on or before January 31, 2008. The Debtors will make an Asset Sales Process

Contribution in the amount of $150,000 if there is an agreement in principle regarding the Thrift

on or before February 28, 2008, but subsequent to January 31, 2008. No Asset Sales Process

Contribution will be made regarding the Thrift if there is not an agreement in principle with

respect to the sale of the Thrift by March 1, 2008.

## C.    Management of Wind-Down Costs

25.    To achieve the maximum return for creditors during these chapter 11

cases, the Debtors also understand that they must minimize the costs (the "Wind-Down Costs")

of winding down their business. Accordingly, the Debtors propose to incentivize Senior

Management to minimize these costs by making additional Contributions to the Plan Pool

depending upon the total Wind-Down Costs (the "Wind-Down Costs Contribution"). The Wind-

Down Costs consist of the Debtors' expenses during the liquidation process, excluding:  (i)

operating expenses of the servicing operations; (ii) fees and expenses associated with the

Debtors' chapter 11 cases, including all professional fees; and (iii) health insurance costs of the

Debtors' employees.

---

[7] As indicated above, the EIP has been the subject of negotiations with the Committee for several weeks, long before
the achievement of this goal was certain.

066585.1001

26.    There shall be no Wind-Down Costs Contribution if the Wind-Down
Costs exceed $45 million.  If the Wind-Down Costs are less than $45 million, the Wind-Down
Costs Contribution shall be ten percent (10%) of the amount by which the Wind-Down Costs are
less than $45 million; provided, however, that if the Wind-Down Costs are less than $40 million,
the Wind-Down Costs Contribution shall be the sum of $500,000 plus twenty percent (20%) of
the amount by which the Wind-Down Costs are less than $40 million.

27.    Regardless of the actual Wind-Down Costs, the Wind-Down Costs
Contributions will not exceed $2 million.

**D.    Plan Confirmation**

28.    The Debtors will endeavor to conclude these cases as quickly as possible
to expedite distributions to creditors.  The contribution, if any, associated with the expeditious
completion of the Debtors' bankruptcy cases (the "Plan Confirmation Contribution") shall be
determined based upon the time it takes the Debtors to obtain confirmation of a plan of
liquidation (the "Plan").  If the Plan is confirmed by the Court by June 6, 2008 (ten months from
the filing date), the Plan Confirmation Contribution shall be $1 million.  If the Plan is confirmed
by the Court after June 5, 2008, but prior to August 6, 2008 (twelve months from the filing date),
the Plan Confirmation Contribution shall be $500,000.

29.    There shall be no Plan Confirmation Contribution if the Court does not
confirm the Plan prior to August 6, 2008.

**II.    Additional EIP Terms**

**A.    Plan Payments**

30.    Plan Participants are not eligible for payments if they resign voluntarily or
are terminated for cause.  Moreover, as a condition precedent to receiving payments under the

10

EIP, Plan Participants are required to fully execute and return to the Debtors a general release
and waiver of claims in substantially the form attached to the EIP as <u>Exhibit B</u>.

31.    Payments from the Minimum Plan Pool shall be made according to the
percentages identified on <u>Exhibit C</u> to the EIP. Payments in excess of the Minimum Plan Pool
amount will be made based upon subjective criteria determined by: (a) Michael Strauss, the
Debtors' Chief Executive Officer; (b) Steve Cooper, the Debtors' Chief Restructuring Officer;
and (c) the compensation committee of the Debtors' Board of Directors (collectively, the
"<u>Reviewing Parties</u>"). The subjective criteria considered by the Reviewing Parties will be driven
by the overall job performance of individual Plan Participants and their contribution to the value
of the estates available for distribution to the Debtors' creditors.

32.    Minimum Plan Pool payments will be made to Plan Participants on
January 31, 2008. Every three (3) months thereafter, each Plan Participant will be paid his or her
pro rata share of fifty percent (50%) of the remaining estimated Plan Pool. Final payments will
be made to Plan Participants upon the completion of the claims reconciliation process.

33.    All payments under the Plan shall be in lieu of any other performance
bonus, severance, or retention compensation under any other plan, program, agreement,
applicable law or policy otherwise applicable to the Plan Participants and the Debtors.

**B.    Updated Plan**

34.    The Debtors shall implement an updated executive incentive plan (the
"<u>Updated Plan</u>") for the period from February 1, 2008 to July 31, 2008, which shall be only for
the benefit of those Plan Participants (the "<u>Remaining Plan Participants</u>") to be employed by the
Debtors from February 1, 2008 to July 31, 2008. On or before January 31, 2008, the Debtors
will provide the Committee a draft of the Updated Plan. The Debtors will work with the

11

Committee to ensure that the Committee agrees to the terms of the Updated Plan, and will not

file the Updated Plan with the Court absent Committee approval.  The Updated Plan will include,

among other terms, the identities of the Remaining Plan Participants, a job description for each

Remaining Plan Participant, and the base salary and individual incentive bonus plan for each

Remaining Plan Participant.  The Updated Plan shall not provide for any additional

Contributions to the Plan Pools.

## RELIEF REQUESTED

35.    By this Motion, the Debtors seek entry of an order under Bankruptcy Code

sections 105(a), 363(b)(1) and 503(c)(3): (i) approving the EIP as described herein; (ii)

authorizing the Debtors to implement the EIP; and (iii) allowing all payments thereunder as

administrative expenses of the Debtors' estates.

## BASIS FOR RELIEF REQUESTED

36.    As part of the Debtors' efforts to solicit, negotiate, and consummate the

sale of their assets, members of Senior Management have been called upon to take on significant

responsibilities in addition to their normal day-to-day functions.  Currently, their additional

responsibilities include providing assistance to the Debtors' bankruptcy counsel and advisors

with respect to issues arising in the bankruptcy cases, reviewing sale solicitation materials,

preparing business plans, gathering and coordinating the dissemination of due diligence

information and reviewing, commenting on, and negotiating the terms of proposed asset

purchase agreements and related documents.  Upon the consummation of the Asset Sales, the

duties of Senior Management will shift to the tasks associated with the transfer of the Assets,

followed by the efficient wind-down of the Debtors' affairs and these chapter 11 cases, such as

the claims reconciliation process, assisting counsel with pending adversary proceedings, and the

12

formulation of the Plan.  Accordingly, the efforts of these employees have been, are, and will

continue to be, critical to the achievement of a successful outcome of these cases for the benefit

of the Debtors' stakeholders.

37.    Senior Management is being asked to take on significant additional

responsibilities, yet they are unable to achieve the prepetition bonuses that had become a

customary part of their compensation package.  By this Motion, the Debtors seek the authority to

provide incentives to those individuals tasked with navigating the Debtors through this

challenging period.  Senior Management continues to work against the backdrop of uncertainty

of their continued employment and without assumed employment or severance agreements.  To

properly and fairly incentivize and reward the performance of the members of Senior

Management for the benefit of these estates, the Debtors' Board of Directors approved the

formation of the EIP in its current structure to appropriately reward the substantial contribution

and performance of the employees and to incentivize them to maximize creditor recoveries.  The

efforts of Senior Management have been and will continue to be instrumental in achieving

maximum value for the Debtors' stakeholders.

**I.    The EIP Should Be Approved Pursuant to Sections105 (a),
        363(b)(1) and 503(c)(3) of the Bankruptcy Code.**

**A.    Section 363(b) of the Bankruptcy Code**

38.    Section 363(b)(1) of the Bankruptcy Code permits a debtor-in-possession

to use property of the estate "other than in the ordinary course of business" after notice and a

hearing.  11 U.S.C. § 363(b)(I).  Uses of estate property outside the ordinary course of business

may be authorized if the debtor demonstrates a "sound business purpose" for it.  See In re

Lionel Corp., 722 F. 2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a

judge determining a 363(b) application expressly find from the evidence presented before

him a good business reason to grant the application."); In re Delaware Hudson Ry. Co., 124

B.R. 169, 179 (Bankr. Del. 1991).

39.    Once the debtor articulates a valid business justification for a particular

form of relief, the Court reviews the debtor's request under the "business judgment rule."  The

business judgment rule "is a presumption that in making a business decision the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the action

was in the best interests of the company." In re Integrated Resources. Inc., 147 B.R. 650, 656

(S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

40.    The business judgment rule has vitality in chapter 11 cases and shields a

debtor's management from judicial second-guessing. See id.; see also Myers v. Martin (In re

Martin), 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts

defer to a trustee's judgment concerning use of property under Bankruptcy Code section

363(b) when there is a legitimate business justification); In re Montgomery Ward Holding

Corp., 242 B.R. 147, 153 (D. Del. 1999) (affirming bankruptcy court approval of key employee

retention program, stating that "[i]n determining whether to authorize the use, sale or lease of

property of the estate under [section 363(b)], courts require the debtors to show that a sound

business purpose justifies such actions.").

**B.    The EIP Also Should Be Evaluated under Section 503(c)(3) of the
Bankruptcy Code, Using the Same Standard as Section 363(b).**

41.    Section 503(c), which is applicable in all bankruptcy cases filed after

October 2005, provides criteria for courts to use in approving certain types of payments to

insiders and "other transfers or obligations that are outside the ordinary course of business."

Section 503(c) comprises three subsections: (1) a general prohibition against retention plans

for insiders; (2) limitations on severance payments; and (3) standards governing other

14

transfers to certain employees and consultants, among others, that are outside of the ordinary course. For the reasons set forth herein, neither section 503(c)(1) nor section 503(c)(2) are applicable to evaluating the EIP.

42.    By the statute's plain language, section 503(c)(1) pertains solely to retention plans of insiders and section 503(c)(2) addresses only the requirements for severance plans, and neither provision applies to performance-based incentive plans. See, e.g., In re Nobex Corp., No. 05-20050, January 12, 2006, Hearing Tr. at 67 (Bankr. D. Del. 2006) (Walrath, J.); In re Calpine Corp., No. 05-60200, April 26, 2006 Hearing Tr. at 87 (Bankr. S.D.N.Y. 2006) (Lifland, J.). Indeed, one court recently held that:

> If sections 503(c)(1) and (c)(2) are not operative, a court may consider whether the payments are permissible under section 503(c)(3), which limits payments made to management and employees, among others, outside the ordinary course, unless such payments are shown to be justified under the facts and circumstances of chapter 11 case. As one treatise points out, the test appears to be no more stringent a test than the one courts must apply in approving any administrative expense under 503(b)(1)(A).

In re Dana Corporation, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006).

43.    The EIP is intended to provide neither bonuses for retention, nor severance pay. In particular, the EIP is comprised of only targeted incentive payments to management employees who play critical roles in the Debtors' operations. The Plan Participants are either directly involved with the implementation of the proposed Asset Sales, or the management of the Debtors' operations so as to ensure that the Assets which are the subject of these sales and the estates as a whole, retain value. These incentive payments are based upon the successful achievement of certain Asset Sale-related goals, the efficient management of the bankruptcy cases, and the expedited completion of these cases. Consequently, the EIP is properly characterized as a performance based, sale-related

15

management incentive plan, not a retention plan for insiders subject to the requirements of Bankruptcy Code section 503(c)(1).

44.    Although the members of Senior Management may be deemed "insiders" within the meaning of the Bankruptcy Code, the EIP has been crafted with great care, and in consultation with the Committee, to ensure that it directly incentivizes all Plan Participants to meet certain performance objectives. Even if the EIP has the indirect effect of reducing the Debtors' attrition rate among those employees covered by the plan, that does not convert the EIP to a "retention" plan. All successful incentive-based plans have the byproduct of incentivizing eligible employees to remain with the debtor. Thus, while the Debtors acknowledge that one benefit may be a reduced attrition rate, this does not convert the EIP to a "retention" plan, nor does it detract from the primary purpose of the plan, which is to provide incentives to participants to help the Debtors maximize the value of these estates for the benefit of their creditors.

45.    The Minimum Plan Pool is not in place to retain the members of Senior Management, but to motivate them. As mentioned above, members of the Senior Management are in the process of assisting with the consummation of the Servicing Sale as a going-concern. The Servicing Sale required tremendous effort from the Plan Participants; yielding a benefit to these estates of $450 to $500 million. Thus, they have already achieved measurable success. However, the dedication of the members of the Senior Management remains critical if the Servicing Sale is to be closed, and the sales of the Debtors' remaining assets are to be conducted in a fashion that brings the maximum return to these estates. The Debtors submit that the Minimum Plan Pool is a critical motivational component of the EIP, which is necessary to compel the Plan Participants to continue to put in the many additional hours needed to liquidate

066585.1001

the Debtors' assets and wind-down the Debtors' affairs.  Accordingly, although not expressly

conditioned upon the achievement of any of the EIP's objective components, the Minimum Plan

Pool, an element of the EIP that is not opposed by the Committee, exists to reward the Plan

Participants for the extraordinary efforts that will be needed to successfully and timely complete

the Asset Sales and wind down the Debtors' affairs.  Courts within this jurisdiction have

approved similar management incentive plans containing minimum payment amounts.  See, e.g.,

In re New Century TRS Holdings, Inc., Case No. 07-10416 (Carey, J.) (Bankr. D. Del. May 29,

2007) (approving incentive payments to insiders simply for achieving stalking horse bid that was

already in place); In re Global Home Products LLC, Case No. 06-10340 (Gross, J.) (Bankr. D.

Del. May 30, 2006) (approving management incentive program that required only the closing of

a going concern sale).

        46.     Finally, the EIP does not constitute severance for insiders subject to the

provisions of Bankruptcy Code section 503(c)(2), because it does not provide benefits to Plan

Participants upon termination of their employment with the Debtors.  See 11 U.S.C. § 503(c)(2).

Under the terms of the EIP, a Plan Participant will receive compensation regardless of whether the

participant thereafter remains employed by the Debtors.  Therefore, the EIP is a management and

sales-incentive plan, not a severance plan for insiders subject to the requirements of Bankruptcy

Code section 503(c)(2).

        47.     To the extent that distributions under the EIP are payments "outside the

ordinary course of business," they should be evaluated under section 503(c)(3).  See, e.g., Nobex

Corp., Case No. 05-20050, January 12, 2006, Hearing Tr. at 67; In re Musicland Holding Corp.,

Case No. 06-10064 (Bernstein, J.) (Bankr. S.D.N.Y. Feb. 1, 2006) (debtor continuing to provide

incentive bonuses under management incentive plan did not violate section 503(c) of the

Bankruptcy Code); In re Dana Corporation, 2006 WL 3479406 at *12; In re Werner Holding Co.

(DE). Inc., Case No. 06-10578 (Carey, J.) (Bankr. D. Del. July 20, 2006, August 22, 2006, and

December 20, 2006) (ordering various relief requested in connection with debtor's incentive

bonus plans pursuant to sections 363(b) and 503(c) of the Bankruptcy Code).

48.    Section 503(c)(3) states, in relevant part, that "there shall be neither

allowed nor paid ... other transfers or obligations that are outside the ordinary course of business

and not justified by the facts and circumstances of the case...."  Since courts have begun to analyze

various payments under section 503(c)(3), they have been unanimous in holding that they must

use the "business judgment" standard as the proper standard for determining whether incentive

programs and the payments thereunder are justified. See, e.g., In re Werner Holding Co. (DE).

Inc., Case No. 06-10578 (Carey, J.) (Bankr. D. Del. July 20, 2006, August 22, 2006, and

December 20, 2006); In re Nobex Corporation, No. 05-20050 (Sontchi, J.) (Bankr. D. Del. May

15, 2006 and Dec. 21, 2005); In re Riverstone Networks. Inc., No. 06-10110 (Sontchi, J.) (Bankr.

D. Del. March 28, 2006); In re Pliant Corporation, No. 06-100001 (Walrath, J.) (Bankr. D. Del.

March 14, 2006).

49.    Indeed, in the Nobex case, Judge Walrath stated that:

> [Section] (c)(3) was meant to provide a standard, albeit not as clear, for any
> other transfers or obligations outside the ordinary course of business.... I
> read (c)(3) to be the catch-all and the standard under (c)(3) for any transfers
> or obligations made outside the ordinary course of business are those that
> are justified by the facts and circumstances of the case.... I find it quite
> frankly nothing more than a reiteration of the standard under 363 ... under
> which courts had previously authorized transfers outside the ordinary
> course of business and that [are], based on the business judgment of the
> debtor....

January 12, 2006, Hearing Tr. at 86-87, In re Nobex Corp., Case No. 05-20050 (Walrath, J.)

(Bankr. D. Del.) (an order approving the management incentive plan at issue was entered January

18

20, 2006). See also In re Dana Corporation, 2006 WL 3479406 at *6 (Bankr. S.D.N.Y. 2006) (Judge Lifland agreeing that management incentive programs should be evaluated under the business judgment standard).

C.    **The EIP Has a Sound Business Purpose, and Should Be Authorized by this Court Pursuant to Sections 363(b)(1) and 503(c)(3).**

50.    The EIP satisfies the applicable standards.  To begin with, the EIP is precisely calibrated to achieve the desired performance.  The EIP is also fair and reasonable in scope and does not discriminate unfairly.

51.    Initially, the EIP will reward participants for their significant efforts since the Petition Date and their increased responsibilities and burdens over the upcoming months as a result of the preparation for, and closing of, the Asset Sales, followed by the efficient wind-down of the Debtors' operations and these chapter 11 cases.  Moreover, as outlined above, the EIP is structured to maximize value for the Debtors' estates and creditors.  Indeed, the sales incentive bonuses are tied directly to the proceeds received by the Debtors as a result of the Asset Sales.  Moreover, the case management-related incentives set forth in the EIP depend upon the minimization of cash outflow through both the efficient management, and expedited conclusion, of the bankruptcy cases.  Thus, the motivations of Plan Participants are aligned with the motivations of the Debtors and their creditors.

52.    Secondly, the Debtors' ability to preserve the value of their Assets would be substantially hindered if the Debtors are unable to properly incentivize their employees.  The fact that the Debtors are essentially now in the business of preserving assets for sale and winding down their operations, makes it virtually impossible to attract any employees, let alone those equal to the caliber of the Senior Management. Authorization to implement the EIP will provide the Debtors' employees with a greater sense of financial security thereby

19

minimizing the need to seek other employment which would otherwise distract the employees from the necessary tasks they need to perform for the Debtors. Providing incentives to encourage employees to focus on the Debtors' objectives, and to motivate them to provide optimal levels of performance, is necessary to successfully maintain the business.

53.    Third, the overall cost of the EIP is reasonable, particularly in the context of the magnitude of the sale process and the size of these estates. Indeed, it is not too much to say that the Debtors' ability to generate any real recovery for creditors depends entirely upon the proper and timely execution of the Asset Sales, along with a dedicated focus toward the efficient management of these cases.

54.    Finally, targeted incentive programs have repeatedly been recognized by this and other courts, as having particular value in motivating management teams. See, e.g., In re Werner Holding Co. (DE), Inc., Case No. 06-10578 (Carey, J.) (Bankr. D. Del. Dec. 27, 2006) (approving employee incentive plan providing for cash payments as rewards for attainment of collective operational restructuring goals and personal performance goals in support); In re Global Home Products LLC, Case No. 06-10340 (Gross, J.) (Bankr. D. Del. May 30, 2006) (approving management incentive program provided that plan participants fulfilled their obligations to the debtors through the closing of a sale of substantially all of the Debtors' assets); In re Riverstone Networks, Inc., Case No. 06-10110 (Sontchi, J.) (Bankr. D. Del. Apr. 3, 2006) (approving an employee bonus program providing for cash payments for successful completion of certain individual and company performance goals); In re Pliant Corp., Case No. 06-10001 (Walrath, J.) (Bankr. D. Del. Feb. 21, 2006) (approving management incentive compensation plan providing for cash awards for achievement of organizational performance goals and personal performance goals); In re Nobex Corp., Case No. 05-20050 (Walrath, J.) (Bankr. D. Del. Jan. 20,

20

066585.1001

2006) (approving "sale-related incentive pay" to officers, contingent on a successful sale of

the company for a price in excess of that offered by an existing, stalking horse bidder, in

connection with the debtor's pursuit of a sale of the company).

## II.    The EIP May Additionally Be Authorized Pursuant to Section 105(a) of the Bankruptcy Code.

55.    Section 105(a) of the Bankruptcy Code empowers the Court to "issue any

order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy

Code]. " 11 U.S.C. § 105(1).

56.    The Debtors strongly and reasonably believe that the EIP is critical to their

ability to maximize returns to creditors.  With regard to the Asset Sale related components of the

EIP, the payments are essential to motivate the Plan Participants to dedicate themselves to

ensuring that maximum value is achieved within reasonable, yet expedited timeframes.  As it

pertains to the case management components of the EIP, the payments are structured to focus the

Plan Participants on the execution their duties efficiently and expeditiously.  Simply stated, the

EIP is necessary and appropriate, because it rewards the Senior Management for their efforts to

bring value into these estates, and to retain such value for the benefit of the Debtors'

creditors.

57.    The Debtors respectfully submit that the implementation of the EIP is an

appropriate exercise of the Debtors' business judgment; is necessary and in the best interest of

the Debtors, their creditors, and their estates; and should be approved under sections 105(a),

363(b) and 503(c)(3) of the Bankruptcy Code and allowed as administrative expenses under

section 503(b) of the Bankruptcy Code.

## NOTICE

58.     Notice of this Motion will be provided to: (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Bank of America; (iv) counsel to the Agent for the Debtors' Postpetition Lender; and (v) all parties entitled to notice under Del. Bankr. LR 2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

59.     No previous motion for the relief sought herein has been made to this or another Court.

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
    November 8 , 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Pauline K. Morgan (No. 3650)
M. Blake Cleary (No. 3614)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession

DB02:6161724.13                                                                    066585.1001