IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x
In re:                                                           :   Chapter 11
                                                                 :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,                           :   Case No. 07-11047 (CSS)
a Delaware corporation, et al.,                                  :
                                                                 :   Jointly Administered
     Debtors.                                                    :
                                                                 :   Ref. Docket No. _____
---------------------------------------------------------------- x

### ORDER AUTHORIZING PAYMENT OF INCENTIVE PAY TO SENIOR MANAGEMENT PURSUANT TO SECTIONS 105(a), 363(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE

Upon consideration of the motion (the "Motion") of the debtors and debtors in possession in the above cases (collectively, the "Debtors") for entry of an order, pursuant to sections 105(a), 363(b)(1) and 503(c)(3) of title 11 of the United States Code (the "Bankruptcy Code"), authorizing, but not directing, payment of incentive pay to certain members of Senior Management; and due and sufficient notice of the Motion having been given; and it appearing that the relief requested by this Motion is in the best interest of the Debtors, their estates and creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED that:**

1. The Motion is granted.

2. Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

3. Pursuant to sections 105(a), 363(b) and 503(c)(3) of the Bankruptcy Code, the Debtors are authorized, but not required, (a) to adopt and implement the Executive Incentive Plan ("EIP"), (b) to make Contributions into the Plan Pool in accordance with the terms of the EIP in an amount not to exceed $9 million, (c) to make payments consistent with the EIP; and (d)

to take such other actions as may be necessary to implement the EIP, including, without limitation, designing and/or altering the EIP in any manner necessary to comply with applicable law.

4. The authorization granted hereby to make payments to Senior Management under the EIP shall not create any obligation on the part of the Debtors or their officers, directors, attorneys or agents to make payments under the EIP and none of the foregoing persons shall have any liability on account of any decision by the Debtors not to honor the EIP.

5. Neither this Order nor any payment or performance by the Debtors authorized hereunder shall be deemed an assumption of any executory contract or otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract.

6. Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry hereof.

7. This Court shall retain jurisdiction with respect to all matters relating to the interpretation or implementation of this Order.

Dated: Wilmington, Delaware
_____, 2007

_____
Christopher S. Sontchi
United States Bankruptcy Judge

# Exhibit 1

# AMERICAN HOME MORTGAGE HOLDINGS, INC.

## EXECUTIVE INCENTIVE PLAN

**PLAN OBJECTIVE**

The American Home Mortgage Holdings, Inc. Executive Incentive Plan (the "Plan") is designed to maximize assets available for distribution to creditors by providing incentives to certain executives of American Home Mortgage Holdings, Inc. and certain of its direct and indirect affiliates (collectively, the "Debtors") to: (i) maximize the net recovery, after settlement of secured claims, received by AHM upon the consummation of the sale of the various assets of the Debtors including, among other things, the servicing assets and servicing platform (the "Servicing Business"), the American Home Bank (the "Thrift"), mortgage loans, financial assets, real estate holdings, interests in the reinsurance companies, furniture, fixtures & equipment, the Rabbi trust and any other assets of the Debtors (collectively, the "Assets"); (ii) consummate the sale of the Servicing Business and Thrift in an expedited manner; and (iii) efficiently and expeditiously manage the timing and cost of the wind-down of the Debtors' operations; and (iv) quickly obtain confirmation of a plan of liquidation.

**ELIGIBLE EMPLOYEES**

The Plan covers the Debtors' employees listed on Exhibit A hereto (the "Plan Participants")

All payments under the Plan (the "Plan Payments") shall be in lieu of any other performance bonus, retention or severance compensation under any other plan, program, agreement, applicable law or policy otherwise applicable to the Plan Participants and the Debtors. As a condition precedent of any obligation of the Debtors to make any payment to a Plan Participant under the Plan, the Plan Participant shall, upon or within thirty (30) days of the date that such payment is made to the Plan Participant or such Plan Participant otherwise becomes entitled to such payment, be required to fully execute and return to the Debtors a general release and waiver of claims, excluding those claims specifically excepted from the release and waiver as described therein, in substantially the form attached hereto as Exhibit B. The Debtors shall have no obligation to make any payment under the Plan and shall not make any payment to any Plan Participant who does not satisfy such release requirement or who otherwise revokes such release within any revocation period afforded by applicable law.

**PLAN POOLS**

The amounts contributed (each a "Contribution") by the Debtors, if any, to finance payments under the Plan (the "Plan Pool") shall be based upon four objective components and shall be calculated as follows:

**i.    Asset Sales**

The contribution, if any, upon the consummation of the Asset sales (the "Asset Sales Contribution") shall be calculated based upon the extent to which the proceeds remaining from the Asset sales after payment of secured debt and costs associated with the Asset sales (the "Net Proceeds"), exceeds certain threshold amounts. The cash balance as of August 6, 2007 (the

"Petition Date") shall be excluded from the Net Proceeds. There shall be no Asset Sales Contribution if the Net Proceeds are less than $230 million. If the Net Proceeds are between $230 and $300 million, the Asset Sales Contribution shall be one and one half percent (1.5%) of the Net Proceeds, which exceed $230 million, but are less than $300 million. If the Net Proceeds are between $300 and $400 million, the Asset Sales Contribution shall be the sum of $1.05 million plus the two and one quarter percent (2.25%) of the Net Proceeds which exceed $300 million but are less than $400 million. If the Net Proceeds exceed $400 million, the Asset Sales Contribution shall be the sum of $3.3 million plus three percent (3%) of the Net Proceeds, which exceed $400 million. For example, if the Net Proceeds are $450 million, the Asset Sales Contribution shall be $4.8 million (($230 million * .00) + ($70 million * .015) + ($100 million * .0225) + ($50 million * .03)). Regardless of the actual Net Proceeds obtained, the Asset Sales Contribution shall not exceed $5 million.

### ii.   Management of Asset Sales Process

The contribution, if any, associated with the management of the Servicing Business sale (the "Servicing Business Sale Process Contribution") and the Thrift sale (the "Thrift Sale Process Contribution", and collectively, with the Servicing Business Sale Process Contribution, the "Asset Sales Process Contribution") shall be calculated based upon the time in which it takes to consummate such Asset sales.

There shall be no Servicing Business Sale Process Contribution if there is not an agreement in principle with respect to the sale of the Servicing Business on or before December 1, 2007. If there is an agreement in principle with respect to the sale of the Servicing Business on or before November 30, 2007, but subsequent to October 31, 2007, the Servicing Business Sale Process Contribution shall be $350,000. If there is an agreement in principle with respect to the sale of the Servicing Business on or before October 31, 2007, the Servicing Business Sale Process Contribution shall be $700,000.

There shall be no Thrift Sale Process Contribution if there is not an agreement in principle with respect to the sale of the Thrift prior to March 1, 2008. If there is an agreement in principle with respect to the sale of the Thrift on or before February 28, 2008, but subsequent to January 31, 2008, the Thrift Sale Process Contribution shall be $150,000. If there is an agreement in principle with respect to the sale of the Thrift on or before January 31, 2008, the Thrift Sale Process Contribution shall be $300,000.

The Asset Sales Process Contribution shall not exceed $1 million.

### iii.   Management of Wind-Down Costs

The contribution, if any, associated with the management of wind-down costs (the "Wind-Down Costs Contribution") shall be calculated based upon the extent to which the costs of winding down the Debtors' businesses (the "Wind-Down Costs") are minimized. The Wind-Down Costs consist of the Debtors' expenses during the liquidation process, excluding: (i) operating expenses of the servicing operations; (ii) fees and expenses associated with the Debtors' chapter 11 cases, including all professional fees; and (iii) health insurance costs of the Debtors' employees. There shall be no Wind-Down Costs Contribution if the Wind-Down Costs exceed $45 million. If the

2

Wind-Down Costs are less than $45 million, the Wind-Down Costs Contribution shall be ten percent (10%) of the amount by which the Wind-Down Costs are less than $45 million; provided however, that if the Wind-Down Costs are less than $40 million, the Wind-Down Costs Contribution shall be the sum of $500,000 plus twenty percent (20%) of the amount by which the Wind-Down Costs are less than $40 million. For example, if the Wind-Down Costs are $35 million, the Wind-Down Costs Contribution shall be $1.5 million ((($45 million - $40 million) * .10) + (($40 million - $35 million) * .20))). Regardless of the actual Wind-Down Costs, the Wind-Down Costs Contribution shall not exceed $2 million.

### iv.   Confirmation of the Plan

The contribution, if any, associated with the timely completion of the Debtors' chapter 11 cases (the "Plan Confirmation Contribution") shall be determined based upon the time it takes the Debtors to obtain confirmation of a plan of liquidation (the "Liquidation Plan"). If the Liquidation Plan is confirmed by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") by June 6, 2008 (ten months from the filing date), the Plan Confirmation Contribution shall be $1 million. If the Liquidation Plan is confirmed by the Bankruptcy Court after June 5, 2008 but prior to August 6, 2008 (twelve months from the filing date), the Plan Confirmation Contribution shall be $500,000. There shall be no Plan Confirmation Contribution if the Liquidation Plan is not confirmed prior to August 6, 2008.

The Debtors shall provide the official committee of unsecured creditors appointed in their chapter 11 cases (the "Committee") with a draft of the Liquidation Plan by January 31, 2008.

## PLAN POOL

Collectively, Contributions to the Plan Pool shall not exceed $9 million. Alternatively, Contributions to the Plan Pool shall not be less than $3.65 million (the "Minimum Plan Pool").

## PLAN PAYMENTS

### i.   Allocation of Plan Payments

The Minimum Plan Pool payments shall be paid to participants in accordance with the percentages identified on the schedule attached hereto as Exhibit C. Payments made in excess of the Minimum Plan Pool amount, if any, shall be made to Plan Participants based upon subjective criteria to be determined by: (a) Michael Strauss, the Debtors' Chief Executive Officer; (b) Steve Cooper, the Debtors' Chief Restructuring Officer; and (c) the compensation committee of the Debtors' Board of Directors (collectively, the "Reviewing Parties"). The subjective criteria considered by the Reviewing Parties shall be driven by the overall job performance of individual Plan Participants and their contribution to the value of the estates available for distribution to the Debtors' creditors.

### ii.   Timing of Plan Payments

On January 31, 2008, each Plan Participant shall be paid his or her pro rata share of the Minimum Plan Pool. Every three (3) months thereafter, each Plan Participant shall be paid his or her pro rata share of fifty percent (50%) of the remaining estimated Plan Pool. Each Plan

Participant shall be paid his or her final Plan Payment upon the completion of the claims reconciliation process.

## UPDATED EXECUTIVE INCENTIVE PLAN

The Debtors shall implement an updated executive incentive plan (the "Updated Plan") from February 1, 2008 to July 31, 2008, which shall be only for the benefit of those Plan Participants (the "Remaining Plan Participants") to be employed by the Debtors from February 1, 2008 to July 31, 2008. On or before January 31, 2008, the Debtors will provide the Committee a draft of the Updated Plan. The Debtors will work with the Committee to ensure that the Committee agrees to the terms of the Updated Plan, and will not file the Updated Plan with the Bankruptcy Court absent Committee approval. The Updated Plan will include, among other terms, the identities of the Remaining Plan Participants, a job description for each Remaining Plan Participant, and the base salary and individual incentive bonus plan for each Remaining Plan Participant. The Updated Plan shall not provide for any additional Contributions to the Plan Pools.

## TERMINATION OF EMPLOYMENT

Awards under the Plan are offered as discretionary incentive amounts. Plan Payments shall be made to each entitled Plan Participant in accordance with the terms of the Plan, even if such Plan Participant is not employed by the Debtors at the time a Plan Payment is to be made, unless the Plan Participant retires, dies, voluntarily resigns, or is terminated for cause, in which case the Plan Participant shall not be entitled to any Plan Payments after the termination of his or her employment.

For purposes of the Plan, the term "for cause" means, either before or after adoption of the Plan:

- The arrest or conviction (or plea of guilty or nolo contendere) of Plan Participant of any felony or other crime involving dishonesty or moral turpitude;

- A finding by the Reviewing Parties that the Plan Participant engaged in willful misconduct, or was grossly negligent, in the performance of his or her duties;

- Unlawful use of narcotics or other controlled substances in a manner the Reviewing Parties reasonably determine to be adverse to the best interests of the Debtors;

- A material and direct conflict of interest, not specifically waived in advance by the Debtors;

- Unauthorized use or disclosure of confidential information that belongs to the Debtors, their customers or employees;

- Repeated absences from work that the Reviewing Parties reasonably determine to be materially adverse to the best interests of the Debtors;

- Repeated failure of Plan Participant to perform his or her job duties in a satisfactory manner; provided that such failure continues for more than 21 days after written notice thereof which specifically identifies the manner in which Plan Participant is believed to have materially

4

failed to perform said duties;

- Refusal to follow the instructions of a direct supervisor or from a member of the Debtors' board of directors; or

- Other material misconduct including, but not limited to: falsification of the Debtors' records, theft, sexual harassment, or possession of firearms, controlled substances or illegal drugs on the Debtors premises or while performing the Debtors' business.

## FURTHER ACTIONS

As a condition to each Plan Participant's eligibility to participate in the Plan, such Plan Participant shall agree to take such further actions as are reasonably requested by the Debtors, including such actions as the Debtors may request subsequent to the termination of such Plan Participant's employment with the Debtors, as the case may be, to assist the Debtors in the conduct of their chapter 11 cases.

## CHANGE OF ADDRESS

The Plan Participants shall be responsible for notifying the Debtors of any change of address before payment is made by mail notification to _____.

## NO PROMISE OF CONTINUED EMPLOYMENT

The Plan and any Plan Participant's selection as a participant in the Plan does not, and is in no manner intended to constitute, a promise of employment for any period of time or to change a Plan Participant's status, if applicable, as an at will employee subject to termination at any time for any reason.

## TAXES

All payments made pursuant to the Plan shall be subject to standard withholding and deductions. Neither the Debtors nor their officers or agents make or has made any representation about the tax consequences of any payments or benefits offered by the Debtors to any Plan Participant.

## SEVERABILITY

If any provision of the Plan is determined to be invalid or unenforceable, in whole or in part, this determination shall not affect any other provision of the Plan and the provision in question shall be modified as to be rendered enforceable in a manner consistent with the intent of the parties insofar as possible. Any waiver of or breach of any of the terms of the Plan shall not operate or be construed as a waiver of any other breach of such terms or conditions or of any other terms and conditions, nor shall any failure to enforce any provision hereof operate or be construed as a waiver of such provision or of any other provision.

## CHOICE OF LAW AND VENUE

The Plan shall be governed by the laws of the State of Delaware, notwithstanding that State's

conflict of law provisions. The Debtors and each of the Plan Participants shall irrevocably and unconditionally consent to the exclusive jurisdiction of the Bankruptcy Court. The Debtors and each of the Plan Participants shall irrevocably and unconditionally waive any objection to the laying of venue of any action, suit, or proceeding arising out of or related to the Plan in the Bankruptcy Court and shall further irrevocably and unconditionally waive and agree not to plead or claim that any such action, suit or proceeding brought in the Bankruptcy Court has been brought in an inconvenient forum.

## ENTIRE AGREEMENT AND AMENDMENT

This document constitutes the complete, final and exclusive embodiment of the terms and conditions of the Plan and may only be modified in writing signed by an authorized officer of one of the Debtors. Any agreement between any Plan Participant and the Debtors with regard to the Plan and its subject matter is superseded in its entirety by this document.

## NO ASSIGNMENT

The rights of a Plan Participant or any other person to any payment or other benefits under the Plan may not be assigned, transferred, pledged, or encumbered except by will or the laws of decent and distribution.

# EXHIBIT A

## AMERICAN HOME MORTGAGE HOLDINGS, INC.

## EXECUTIVE INCENTIVE PLAN

## PARTICIPANT LIST

[FILED UNDER SEAL PURSUANT TO DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTION 107(b) AND FED R. BANKR. P. 9018 FOR AUTHORIZATION TO FILE CERTAIN PORTIONS OF EXHIBIT TO DEBTORS' MOTION FOR ORDER AUTHORIZING PAYMENT OF INCENTIVE PAY TO SENIOR MANAGEMENT PURSUANT TO SECTIONS 105(a), 363(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE UNDER SEAL]

## EXHIBIT B

## FORM RELEASE AGREEMENT

# RELEASE

This GENERAL RELEASE ("Release") dated as of this _____ day by _____ (the "Executive").

WHEREAS, the Executive [was / is] an employee of American Home Mortgage Holdings, Inc. and / or certain of its direct and indirect affiliates (collectively, the "Company"); and

WHEREAS, the Executive was a participant in the American Home Mortgage Holdings, Inc. Executive Plan (the "Plan") dated _____, 2007; and

WHEREAS, pursuant to the Plan, Executive is eligible for certain incentive compensation, contingent upon the full execution of this Release.

NOW, THEREFORE, in consideration of the premises and mutual agreements contained in the Plan, the Executive agrees as follows:

1. Executive, on Executive's own behalf and on behalf of Executive's heirs, estate and beneficiaries, does hereby release the Company, and any of its subsidiaries or affiliates, and each past or present officer, director, agent, employee, shareholder, and insurer of any such entities (collectively, the "Released Parties"), from any and all claims made, to be made, or which might have been made of whatever nature, whether known or unknown, from the beginning of time, including those that arose as a consequence of Executive's employment by Company, or arising out of the severance of such employment relationship, or arising out of any act committed or omitted during or after the existence of such employment relationship, all up through and including the date on which this Release is executed, including, but not limited to, those which were, could have been or could be the subject of an administrative or judicial proceeding filed by Executive or on Executive's behalf under federal, state or local law, whether by statute, regulation, in contract or tort, and including, but not limited to, every claim for front pay, back pay, wages, bonus, fringe benefit, any form of discrimination (including but not limited to, every claim of race, color, sex, religion, national origin, disability or age discrimination), wrongful termination, emotional distress, pain and suffering, breach of contract, compensatory or punitive damages, interest, attorney's fees, reinstatement or reemployment. If any court rules that such waiver of rights to file, or have filed on Executive's behalf, any administrative or judicial charges or complaints is ineffective, Executive agrees not to seek or accept any money damages or any other relief upon the filing of any such administrative or judicial charges or complaints. Executive acknowledges and agrees that even though claims and facts in addition to those now known or believed by Executive to exist may subsequently be discovered, it is Executive's intention to fully settle and release all claims Executive may have against the Released Parties, whether known, unknown or suspected.

2. The Executive has been informed and acknowledges that Executive is also releasing any rights or claims Executive may have against the Released Parties under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621, *et seq.* ("ADEA"), up to and including the date of execution of this Release. Executive acknowledges that Executive has consulted with an attorney before signing this Release, and further understands that Executive

has a period of twenty-one (21) days during which time Executive may consider whether to accept the terms of this Release. Executive has a right to revoke this Release as far as it extends to potential claims under the ADEA, by informing the Company of Executive's intent to revoke this Release within seven (7) calendar days following its execution. To be effective, written notice of revocation must be delivered by hand or overnight mail to the Company's attorney at the following address: Scott A. Holt, Esquire, Young Conaway Stargatt & Taylor, LLP, P.O. Box 391, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware 19899. No payments or benefits shall be provided to the Executive pursuant to the Plan until Executive executes this Release and the revocation period described in this paragraph has expired.

    3. The Company and Executive acknowledge and agree that the releases contained in Paragraphs 1 and 2 do not, and shall not be construed to, release or limit the scope of any existing obligation of the Company (i) to indemnify Executive for Executive's acts as an officer or director of Company in accordance with the bylaws of Company and the policies and procedures of Company that are presently in effect; (ii) to Executive and Executive's eligible, participating dependents or beneficiaries under any existing group welfare or retirement plan of Company in which Executive and/or such dependents are participants; or (iii) to the Executive under the terms of the Plan, including any rights Executive may have to incentive compensation payments following the execution of this Release.

    IN WITNESS WHEREOF, the parties have executed this Release on the date first above written.

EXECUTIVE

_____

American Home Mortgage Holdings, Inc.

By:_____

## EXHIBIT C

## MINIMUM PLAN POOL PAYMENT ALLOCATIONS

[FILED UNDER SEAL PURSUANT TO DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTION 107(b) AND FED R. BANKR. P. 9018 FOR AUTHORIZATION TO FILE CERTAIN PORTIONS OF EXHIBIT TO DEBTORS' MOTION FOR ORDER AUTHORIZING PAYMENT OF INCENTIVE PAY TO SENIOR MANAGEMENT PURSUANT TO SECTIONS 105(a), 363(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE UNDER SEAL]