UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x
In re:                                                       :  Chapter 11
                                                             :
AMERICAN HOME MORTGAGE                                       :  Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,[1]           :
                                                             :  Jointly Administered
         Debtors.                                            :  Ref. Docket No. 1778
------------------------------------------------------------ x

**DEBTORS' OPPOSITION TO THE MOTION AND JOINDER OF UBS
REAL ESTATE SECURITIES INC. TO EMERGENCY MOTION OF DB
STRUCTURED PRODUCTS, INC. FOR LIMITED STAY PENDING APPEAL**

The debtors and debtors in possession in the above cases (collectively, "AHM" or the "Debtors"), by and through their undersigned counsel, hereby request that this Court deny the motion [Docket No. 1778] (the "Stay Motion") by UBS Real Estate Securities Inc. ("UBS") for a limited stay pending appeal of the Court's order entered October 30, 2007 (the "Sale Order"), which approved, among other things, the Debtors' sale and assignment of the Debtors' rights to service loans (the "Servicing Rights") as set forth in the terms of that certain Master Loan Purchase and Servicing Agreement between certain of the Debtors and UBS (the "MLPSA"). In support of their opposition to the Stay Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

## PRELIMINARY STATEMENT

1. UBS fails to meet its very high burden to justify the extraordinary remedy of a stay pending appeal. To obtain a stay, UBS must satisfy the same requisites that are required for obtaining a preliminary injunction – a likelihood of success on the merits, the threat of irreparable harm, the absence of any harm to the non-appealing parties and a showing that public interest weighs in favor of a stay. None are present here. UBS does not own any loans that are serviced by the Debtors and governed by the Sale Order – having previously conveyed those loans to securitization trusts, the trustees of which have consented to entry of the Sale Order. Therefore, UBS cannot succeed in an appeal of the Sale Order, because for among other reasons, it is not a "person aggrieved" by the Sale Order and therefore has no standing to appeal; nor is there any risk of harm to UBS, much less irreparable harm, if the Sale Order is not stayed. When balanced against the risk of significant harm to the Debtors and their estates if the Sale Order is stayed and the strong public interest in an orderly transition of the Debtors' servicing business, a stay of the Sale Order is inappropriate, and the Stay Motion should be denied.

## OBJECTION

2. A stay pending appeal constitutes extraordinary relief for which the moving party carries a heavy burden. Cuomo v. United States Nuclear Regulatory Comm'n, 772 F.2d 972, 978 (D.C. Cir. 1985) ("[o]n a motion for stay, it is the movant's obligation to justify the court's exercise of such an extraordinary remedy"); Belcher v. Birmingham Trust Nat'l Bank, 395 F.2d 685, 686 (5th Cir. 1968) (stay pending appeal is an "extraordinary remedy"). Stays pending appeal "are a disfavored remedy because they interrupt the ordinary process of judicial review and postpone relief for the prevailing party." Dellums v. Smith, 577 F. Supp. 1456, 1457 (N.D. Cal. 1984), rev'd on other grounds, 797 F.2d 817 (9th Cir. 1986).

3.      Federal Rule of Bankruptcy Procedure 8005 governs appeals from an order of the Bankruptcy Court and authorizes the Court under limited circumstances to stay an order pending an appeal therefrom. Fed. R. Bankr. P. 8005. In this Circuit, the applicable legal standard for determining whether to grant a stay is similar to the standard for a preliminary injunction request. Specifically, the Third Circuit Court of Appeals has held that courts must consider the following four factors in deciding whether to issue a stay pending appeal:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits;
>
> (2) whether the applicant will be irreparably injured absent a stay;
>
> (3) whether issuance of the stay will substantially injure the other parties interested in the proceedings; and
>
> (4) where the public interest lies.

Republic of the Philippines v. Westinghouse Elec. Corp., 949 F.2d 653, 658 (3d Cir. 1991); see also, In re ANC Rental Corp., 2002 WL 1058196, at *2 (D. Del. May 22, 2002). If the movant *fails to make a showing on any one of these four factors*, the court may deny the stay. Id. (citing In re Blackwell, 162 B.R. 117, 120 (E.D. Pa. 1993)) (emphasis added).

i.      *Likelihood of success on the merits.*

UBS cannot succeed on the merits because it has no standing to appeal the Sale Order.

4.      Simply put, UBS cannot succeed on the merits of the appeal because it has no standing to appeal the Sale Order. The Sale Order has no direct, adverse pecuniary effect on UBS. In re Combustion Engineering, Inc., 391 F.3d 190, 214 (3d Cir. 2004). "Appellate standing in bankruptcy cases is limited to 'persons aggrieved'" by the entry of an order by the bankruptcy court. In re PWS Holding Corp., 228 F.3d 224, 249 (3d Cir. 2000); Travelers Ins. Co. v. H.K. Porter Co., Inc., 45 F.3d 737, 741 (3d Cir. 1995); In re Dykes, 10 F.3d 184, 187 (3d

Cir. 1993). The "person aggrieved" standard is met when a bankruptcy court's order (i) diminishes the property of a party, (ii) increases the burden on a party, or (iii) impairs the rights of a party. PWS Holding, 228 F.3d at 249. At its essence, "the persons aggrieved test now exists as a prudential standing requirement that limits bankruptcy appeals to persons whose rights or interests are directly and adversely affected pecuniarily by an order or decree of the bankruptcy court." Combustion Engineering, 391 F.3d at 214 (citing In re Dykes, 10 F.3d at 187) (internal punctuation omitted). The "person aggrieved" standard, accordingly, is "more stringent than the constitutional test for standing." Travelers Ins. Co., 45 F.3d at 741. "Standing in bankruptcy matters turns upon the sections of the code that are asserted." In re ANC Rental Corp., 280 B.R. 808, 818 (D. Del. 2002) (citing In re James Wilson Assoc., 965 F.2d 160, 168 (7th Cir. 1992).

5.  Further, as the Third Circuit noted, the "person aggrieved" requirement for standing at the appellate level is far more limited than § 1109 of the Bankruptcy Code, which gives "any party in interest" the right to be heard at the trial level. "[Section 1109]…confers broad standing at the trial level. However, courts do not extend that provision to appellate standing…." PWS Holding, 228 F.3d at 248-49, citing Kane v. Johns-Manville Corp., 843 F.2d 636, 643 (2d Cir. 1988) (citation omitted).

6.  UBS is not a "person aggrieved," and its pecuniary interests are unaffected by the Sale Order. The MLPSA provides, *inter alia*, for the sale of loans by the Debtors to UBS on a servicing-retained basis. Loan sales were evidenced by a trade confirmation (the "Trade Confirmation") with the Debtors, whereby UBS would purchase the loans scheduled on each Trade Confirmation from the Debtors on a servicing-retained basis. UBS has securitized all the loans it had purchased under the MLPSA by transferring both the loans and any related servicing provisions of the MLPSA to securitization trusts, pursuant to certain Assumption, Assignment

and Recognition Agreements (the "AAR Agreements"). Section 1 of the AAR Agreements provide, in pertinent part (the italicized portion does not appear in all AAR Agreements):

> 1. a. [UBS] hereby conveys, sells, grants, transfers and assigns to Assignee all of the right, title and interest (other than those rights specifically retained by [UBS] pursuant to this Agreement) of [UBS], in, to and under (a) those certain Mortgage Loans listed on Exhibit A attached hereto (the "Mortgage Loans") and (b) solely with respect to the servicing provisions as they relate to the Mortgage Loans (as limited in Section 1(c) below), that certain Master Loan Purchase and Servicing Agreement dated as of December 1, 2005, by and between [UBS], the Company, and the Servicer and any related amendments thereto (the "Servicing Agreement"), attached hereto as Exhibit B[.]
>
> ...
>
> c. [UBS RESI] specifically reserves and does not assign to the Assignee hereunder those rights under the Servicing Agreement that do not relate to the servicing of the Mortgage Loans (including without limitation, the representations and warranties made by the Company and the document delivery requirements of the Company and the remedies (including indemnification) available for breaches thereof, *but excluding any remedies under section 7.06 of the Servicing Agreement [EPD provision] which shall be assigned by the [UBS RESI] to [Mortgage Asset Securitization Transactions, Inc.] hereby).*

7.  As evidenced by the above, through the AAR Agreements, UBS has already transferred its interest in all of the mortgage loans it owned under the MLPSA, as well as the servicing related provisions of the MLPSA, to certain securitization trusts. The securitization trusts, acting through their trustees, filed objections to the sale of the Debtors' mortgage loan servicing business to the Buyer (the "Sale"), actively participated in the hearing to approve the Sale (the "Sale Hearing") and ultimately consented to the entry of the Sale Order.

8.  UBS suffers no diminution in property, no increase in burden and no impairment of rights as a result of the Sale Order because UBS no longer owns any mortgage loans serviced by the Debtors, including any right, title, or interest in the servicing provisions of the MLPSA.

9.  Additionally, the Sale Order, and the asset purchase agreement (the "APA") entered into between the Debtors and AH Mortgage Acquisition Co., Inc. (the "Buyer")

approved by the Sale Order, have no effect on any rights under the MLPSA that do not relate to the servicing of mortgage loans. The Sale Order does not assume and assign or transfer the MLPSA with respect to the non-servicing related provisions and, further, has no effect on the claims, if any, UBS may have against the Debtors with respect to those provisions. Since the Sale Order only affects the servicing provisions of the MLPSA, which UBS has previously transferred, and leaves unimpaired whatever rights UBS may have under the MLPSA against the Debtors, the Sale Order has no direct, adverse effect on the pecuniary interest of UBS. Therefore, even with respect to any remaining claims under the MLPSA, UBS cannot show it is a "person aggrieved" by the Sale Order and has no standing to appeal.

<u>Even if UBS had standing to appeal, no clear error was committed.</u>

10.    To succeed on appeal, a party seeking a stay pending appeal must first demonstrate that this Court committed clear error in approving the Sale. An appellate court would need to be left with the "'definite and firm conviction that a mistake has been committed.'" <u>In re Del. & Hudson Ry. Co.</u>, 124 B.R. 169, 178 (D. Del. 1991) (quoting <u>United States v. U.S. Gypsum Co.</u>, 333 U.S. 364, 395 (1948)).

11.    Numerous objections to the Sale were filed by numerous interested parties, including two objections and a reservation of rights from UBS. The Court held a week-long Sale Hearing. As was obvious to everyone in the courtroom throughout the Sale Hearing, this Court deliberated with great care after considering the evidence presented and the arguments of counsel,[2] and ultimately ruled, based both upon its own findings of fact and upon several theories of applicable law, in the Debtors' favor. The Debtors believe that the record amply

---

[2] Perhaps in recognition of its limited stake in the Sale, UBS played a very minor role in the Sale Hearing, choosing to offer no testimony, nor to cross-examine any of the Debtors' witnesses, in support of its position.

justifies the Court's decision approving the Sale. Yet, even assuming, *arguendo*, that reasonable minds can differ, UBS must demonstrate that the Court's factfinding constitutes "clear error." Anderson v. Bessemer City, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). Based on this very high standard of review on appeal, the Debtors submit that UBS could not demonstrate a likelihood of success on the merits of its appeal.

12.    Through the Stay Motion, UBS joins in and incorporates by reference the arguments made in the Emergency Motion of DB Structured Products, Inc. ("DBSP") for Limited Stay Pending Appeal [D.I. 1713] (the "DBSP Motion"), which was withdrawn by DBSP on November 6, 2007 [D.I. 1830]. The Debtors incorporate by reference their Omnibus Response to Certain Objections to the Sale of Certain Assets and the Assumption and Assignment of Executory Contracts Relating to the Debtors' Loan Servicing Business [D.I. 1443] (the "Debtors' Sale Brief"), and the arguments made on the record at the Sale Hearing.[3]

13.    The DBSP Motion raised essentially two grounds for appeal. First, DBSP argued that the sale of servicing rights under that certain Master Mortgage Loan Purchase and Servicing Agreement between the Debtors and DBSP (the "DB MLPSA") pursuant to § 363 of the Bankruptcy Code in contravention of a contractual anti-assignment provision is directly at odds with the Third Circuit's decision in Integrated Solutions, Inc. v. Service Support

---

[3] The Debtors reserve their right, as appellees, to raise any other or further arguments in support of the Sale Order that are supported by the law and the evidentiary record, whether or not such arguments were previously raised. Further, because the Stay Motion simply joined in and incorporated by reference the arguments of DBSP, which deal with provisions of a contract between DBSP and the Debtors and not the MLPSA to which UBS is a party, the Debtors reserve their right to assert any other and further arguments in response to issues raised by UBS at the hearing on the Stay Motion, which will be the first time the Debtors will have an opportunity to hear such arguments.

Specialties, Inc., 124 F.3d 487 (3d Cir. 1997).[4] Second, DBSP argued that the Court misapplied the Gardinier factors and erroneously applied the "cross-default rule" in determining that the Embedded Servicing Agreement (as defined in the Debtors' Sale Brief) was severable from the DB MLPSA. Both arguments are without merit.

14. The Integrated Solutions case is inapposite. In that case, a purchaser obtained prejudgment tort claims through a § 363 sale from a chapter 7 trustee and then sued on the claims. The defendants moved to dismiss for lack of standing, arguing that applicable state law prohibited the assignment of prejudgment tort claims and, accordingly, that the chapter 7 trustee was the only party with standing to bring the claims. The purchaser argued that §§ 704(1) (requiring chapter 7 trustee to expeditiously collect and reduce to money property of the estate) and 363(b)(1) (permitting trustee to sell property of the estate outside the ordinary course of business) of the Bankruptcy Code pre-empted state law restrictions on the transfer of the tort claims, which were property of the bankruptcy estate. The bankruptcy court disagreed with the purchaser and granted the defendants' motion to dismiss. On appeal, the Third Circuit considered the following, narrow question: "Did Congress intend to preempt state law restrictions on the assignability of tort claims under federal bankruptcy law?" Integrated Solutions, 124 F.3d at 490. The court found nothing in §§ 704(1) or 363(b)(1) expressly authorizing the trustee to sell property free of state law restrictions and nothing in the legislative history indicating Congress intended such a result. This was underscored by the fact that other provisions of the Bankruptcy Code, including § 363(l) (invalidating *ipso facto* provisions), expressly displace otherwise applicable law. Accordingly, the court concluded that "neither

---

[4] The Integrated Solutions case does not appear in any of DBSP's papers. DBSP raised the case for the first time in oral argument at the Sale Hearing.

§ 363(b)(1) nor § 704(1) indicates a specific congressional intent to preempt state laws limiting the assignability of tort claims belonging to the estate." Integrated Solutions, 124 F.3d at 494.

15. At issue in this case are *contract rights*, not prejudgment tort claims. Unlike prejudgment tort claims, contract rights are inherently assignable under state law. Indeed, under New York state law, which governs the MLPSA, contractual provisions that restrict alienability are narrowly construed. Thus, for example,

> [f]or a contractual clause forbidding or restricting an assignment of rights thereunder to reveal the intent necessary to *preclude* the power to assign, or cause an assignment violative of contractual provisions to be wholly *void*, such clause must contain express provisions that any assignment shall be void or invalid if not made in a certain specified way. Such must specifically eliminate the power as well as the right to assign the contract in violation of its bar or restrictions, *otherwise the original obligor is given only the right to damages for its breach, but does not [sic] render the assignment ineffective.*

University Mews Assocs. v. Jeanmarie, 471 N.Y.S.2d 457, 461 (N.Y. Sup. Ct. 1983) (emphasis added, citations omitted). The UBS contractual anti-assignment provision does not *preclude* assignment under this test. It simply provides that the Debtors "shall not" assign without UBS's consent. Thus, at best, UBS has a claim for money damages for the Debtors' breach of the anti-assignment provision, which it is free to assert against the Debtors' bankruptcy estates, but which does not support a stay pending appeal.

16. Even if the MLPSA's "anti-assignment" provision precluded assignment of the Servicing Rights under New York state law, Integrated Solutions still does not control in light of more recent, directly applicable Third Circuit precedent. As discussed in the Debtors' Sale Brief, the In re Fleming Cos. decision provides that "the bankruptcy court has discretion to excise or waive a bargained-for element of a contract" and "can excise or refuse enforcement of terms of a contract in order to permit assignment," 499 F.3d 300, 305 (3d Cir. 2007), which confirms the federal bankruptcy policy interest in permitting the free assignment of contract

rights to maximize the value of the bankruptcy estate for the benefit of creditors. Although the rule in Fleming was derived from cases decided under various subsections of § 365, the Third Circuit did not rely on any particular subsection of § 365 in reaching its conclusion that the bankruptcy court has the power to modify contract rights. Nor is there any principled reason to believe that the bankruptcy court's broad equitable powers are confined to "executory contracts" subject to § 365 and do not apply to non-executory contracts subject to § 363. Indeed, that § 365 and § 363 principles are somewhat interchangeable is apparent from the Folger Adam Security, Inc. v. DeMatteis/MacGregor JV decision, which applied the § 365 *cum onere* principle to a sale of contract rights under § 363 to arrive at its conclusion that the right to payment under a contract may not be sold free and clear of contractual defenses such as recoupment. See 209 F.3d 252, 264 (3d Cir. 2000) ("Bankruptcy law generally does not permit a debtor or an estate to assume the benefits of a contract and reject the unfavorable aspects of the same contract."). The Debtors submit that, after balancing the interests of UBS with the interests of the Debtors and their creditors as required by the Fleming opinion, the Court acted within its discretion in permitting sale of the Servicing Agreement notwithstanding any contractual "anti-assignment" provision.

17.     The second alleged ground for appeal, *i.e.*, that the Court erroneously found the Servicing Rights severable from the MLPSA under state law, is no more availing than the first. Again, since UBS has already agreed to sever and transfer the Servicing Rights through the AARs this argument borrowed from the DBSP Motion is particularly unavailing to UBS. Further, as discussed in the Debtors' Sale Brief and as evidenced by the testimony at the Sale Hearing, the nature and purpose of the origination/sale obligations and the servicing obligations under the MLPSA were separate and distinct (and were borne by distinct legal entities, the "Seller" and "Servicer," respectively), and the consideration underlying such obligations was

readily apportionable and not economically interrelated. This is so notwithstanding the purported cross-indemnity and "waterfall" provisions, which the Court concluded were insufficient in themselves to render the two halves of the MLPSA "economically interrelated" so as to thwart the benefit of UBS's bargain if they were severed. That the Court, in reaching this conclusion, relied heavily on cases applying the "cross-default rule" in the § 365 context is a distinction without a difference. As stated by Chief Judge Walrath in the Shaw Group v. Bechtel Jacobs Co. (In re IT Group, Inc.) case, the cross-default rule is simply a necessary corollary of the *cum onere* principle. 350 B.R. 166, 177 (Bankr. D. Del. 2006). Though the *cum onere* principle is most typically invoked in relation to § 365, as discussed above, the Third Circuit has applied it to the sale of contract rights under § 363. See Folger Adam, 209 F.3d at 264. Thus, there is no principled reason to believe that the cross-default rule, the necessary corollary of the *cum onere* principle, does not similarly apply in a § 363 context.

ii.    *Irreparable harm to the moving party.*

18.    As stated above, the Debtors do not service *any* loans owned by UBS through the MLPSA. UBS previously transferred its interest in all such mortgage loans to securitization trusts, and UBS's rights are not affected by the Sale Order because UBS had previously transferred the servicing-related provisions of the MLPSA, along with the loans serviced by the Debtors.

19.    Even if UBS had standing to object to the transfer of the Servicing Rights, no irreparable harm will be suffered by UBS to justify the grant of a stay pending appeal. The only identified harm – that absent a stay § 363(m) may render its appeal moot – is insufficient, by itself, to merit a stay pending appeal. Westinghouse Elec. Corp., 949 F.2d at 658 (holding that the fact that the decision on the stay may be dispositive of the appeal does not by itself

justify "pretermitting an examination of the nature of the irreparable injury alleged and the particular harm that will befall the appellant" absent a stay); In re Trans World Airlines, Inc., 2001 Bankr. LEXIS 723, at *28 (Bankr. D. Del. Mar. 27, 2001) (holding that a threatened loss of appellate rights under § 363(m) is not sufficient, without more, for a showing of irreparable harm); In re Edwards, 228 B.R. 573, 580 (Bankr. E.D. Pa. 1999) (the fact that absent a stay, appeal will be rendered moot under § 363(m), is not sufficient by itself to meet the movant's burden of establishing irreparable harm); In re Baldwin United Corp., 45 B.R. 385, 386 (Bankr. S.D. Ohio 1984) (finding that if the court were to accept the argument that § 363(m) is sufficient for a showing of irreparable harm, then every order permitting the sale of property under § 363(b) would be stayed pending appeal, a result clearly contrary to the purpose of § 363(m)). UBS has failed to articulate any harm it would suffer without a stay, let alone irreparable harm.[5]

20.   Other than the potential for mootness (again, an argument borrowed from the DBSP Motion), it is unclear what rights UBS claims are affected by transfer of the Servicing Rights, since UBS no longer owns any loans serviced by the Debtors under the MLPSA, and UBS has failed to articulate any other harm. The AARs demonstrate that UBS has no interest in the Servicing Rights. The owners of the loans – the securitization trusts – have consented to the transfer of the Servicing Rights to the Buyer pursuant to § 365. The Debtors and their constituents who supported the Sale expended significant time and effort negotiating with the trustees of those securitization trusts and ultimately resolved all of their sale objections, a result that was announced to the Court at the Sale Hearing. To the extent that UBS seeks to affect the

---

[5] To the extent UBS argues that it could suffer monetary damages absent a stay, such damages would be nominal, at best. Further, monetary damages incurred do not constitute irreparable harm. Sampson v. Murray, 415 U.S. 61, 90 (1974); Manakee Prof'l. Med. Transp. Serv. v. Shalala, 71 F.3d 574, 581 (6th Cir. 1995); Tri County Home Health Servs., Inc. v. United States HHS (In re Tri County Home Health Servs., Inc.), 230 B.R. 106, 112 (Bankr. W.D. Tenn. 1999).

interest of the trustees of the securitized trusts or to undermine the effectiveness of the trustees' stipulation with the Debtors, UBS has no right (as the previous owner of the loans) to do so.

*iii.    Irreparable harm to the Debtors.*

21.    UBS erroneously suggests in the Stay Motion that a stay pending appeal can be fashioned that would stay the effectiveness of the Sale Order solely as regarding the Servicing Rights, and that such stay would not affect the Debtors' ability to close the Sale. However, the APA requires, as a condition to the Buyer closing the Sale, that the Sale Order has been entered, has become final, and is not subject to any stay of effectiveness. APA, at § 8.1(b). Accordingly, the APA as submitted with the Sale Order states that any stay of the Sale Order pending appeal authorizes the Buyer to not consummate the Sale in its entirety, even if the only issue on appeal is the Debtors' right to transfer the Servicing Rights to the Buyer.

22.    The Court is certainly aware that there is an immediate need for the Debtors to complete a sale of their servicing business. If the Buyer seeks to exercise its rights under the APA to walk away from the Sale based upon the Sale Order not becoming a final, unstayed order, the consequences to the estates would be dire. Parties, including federal agencies, would likely seek to terminate their servicing agreements with the Debtors. Because the Debtors are no longer originating mortgage loans, the value of the Debtors' servicing rights would continue to decline based upon ordinary business factors (such as the payment and refinancing of mortgage loans) as well. If the Buyer were unwilling to close the Sale in the face of a stay of the Sale Order, all value from the Debtors' servicing business could be lost. When

viewed in contrast to the total absence of harm to UBS, which owns no loans that are serviced by the Debtors, a stay pending appeal is inappropriate.[6]

*iv.   Public Interest.*

23.   An appeal of the Sale Order would center upon whether the Debtors are entitled to transfer mortgage loan servicing rights for fair value, or whether UBS (which has no interest in the loans or the Servicing Rights) is entitled to priority treatment of claims it may retain as the original party to the MLPSA. If the Sale closes, UBS *arguably* could find that its appellate rights (to the extent any exist) are moot. Conversely, if the Sale does not close because a stay is granted and the Buyer is unwilling to close, hundreds of thousands of consumers whose mortgages are serviced by the Debtors stand to be harmed.

24.   If a closing occurs under the APA, servicing of loans will continue uninterrupted. However, if a stay were granted and the Debtors were unable to close, all of the stability that has been negotiated for under the APA would be replaced by chaotic litigation with numerous parties, which the Debtors would have to fight with dwindling resources. These circumstances could have serious negative consequences on the servicing of consumers' loans. As such, a stay, and the potential consequences arising thereafter if the Buyer were to exercise its right to not close the Sale, would seriously harm the public interest, both in terms of the creditors of the Debtors which would potentially lose out on significant value obtained by the estates through closing of the Sale, and in terms of the individual customers of the Debtors who would

---

[6] Indeed, the total absence of harm suggests that UBS's true motive is to simply obtain more preferable treatment for alleged claims under the MLPSA, which claims were found by the Court to be wholly unrelated to the Servicing Rights.

face further uncertainty regarding the status of the servicer of their home loans, who among other things pays taxes and insurance on their behalf.

*v.    If the Court is inclined to grant a stay, the posting of a bond should be required.*

25.    UBS has not shown and cannot establish any of the requisites for a stay pending appeal. However, if the Court were to grant a stay, UBS should be required to post a bond to protect the Debtors and the other parties that support the sale against the potential for loss resulting from the stay.

26.    The purpose of a bond is to protect the non-appealing parties from *potential* losses resulting from the stay. In re United Merch. & Mfrs., Inc., 138 B.R. 426, 430 (D. Del. 1992) (citing In re Alwan Bros. Co., 112 B.R. 294, 296 (Bankr. C.D. Ill. 1990)); see Normco., 1997 WL 695722, at *2 (citing Federal Prescription Serv., Inc. v. Am. Pharm. Ass'n, 636 F.2d 755, 760 (D.C. Cir. 1980) (the purpose of a bond is to secure the opposing party from loss resulting from a stay of execution). The bond is protective; there is no requirement that the adverse parties demonstrate *actual* losses that will result from a stay.

27.    As stated above, the Buyer could seek to invoke provisions of the APA that arguably authorize the Buyer not to close on the sale if a stay is granted. A failure to close the sale would potentially result in the Debtors' estates losing all value for the servicing rights. To the extent the Stay Motion has any merit, and the Court were inclined to grant the stay pending appeal, the appropriate amount of a bond to secure the Debtors from loss is the full Purchase Price (as defined in the APA) of approximately $500 million. To the extent UBS intends to appeal the Sale Order and put the entire sale process in jeopardy, it is only fair for UBS to bear the risk that it foists on the estates if a closing will not subsequently occur.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that this Court deny the Stay Motion or, in the alternative, require the posting of a bond in the amount of $500 million, and grant such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
November 8, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
Patrick A. Jackson (No. 4976)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel to the Debtors and Debtors in Possession