UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                      .    Case No. 07-11047 (CSS)
                            .    Adv. Nos. 07-51684 (CSS),
                            .            07-51704 (CSS)
                            .
AMERICAN HOME MORTGAGE      .
HOLDINGS, INC., et al.,     .    824 Market Street, 5th Floor
                            .    Wilmington, Delaware 19801
                            .
                            .
          Debtors.          .    November 5, 2007
. . . . . . . . . . . . . ..      3:07 p.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:           Young, Conaway, Stargatt & Taylor, LLP
                           By:  DONALD J. BOWMAN, JR., ESQ.
                                ROBERT S. BRADY, ESQ.
                                ERIN EDWARDS, ESQ.
                           The Brandywine Building
                           1000 West Street, 17th Floor
                           Wilmington, DE 19801


For the Debtors:           Quinn, Emanuel, Urquhart, Oliver
                             & Hedges, LLP
                           By:  JAMES C. TECCE, ESQ.
                                CARLOS A. RODRIGUEZ, ESQ.
                           51 Madison Avenue
                           New York, NY 10010


Audio Operator:            Leslie Murin


Proceedings recorded by electronic sound recording, transcript
               produced by transcription service
_____

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311   Fax No. (609) 587-3599

2

APPEARANCES (cont.):

For the Committee:        Hahn & Hessen, LLP
                          By:  MARK S. INDELICATO, ESQ.
                          488 Madison Avenue, 14th & 15th Floor
                          New York, NY 10022

For Bank of America:      Kaye Scholer, LLP
(via telephone)           By:  SCOTT D. TALMADGE, ESQ.
                          425 Park Avenue
                          New York, NY 10022-3598

For Credit Suisse:        Weil, Gotshal & Manges, LLP
                          By:  HOWARD B. COMET, ESQ.
                               CHRISTOPHER J. MARCUS, ESQ.
                               SAIMA MAJID, ESQ.
                          767 Fifth Avenue
                          New York, NY 10153

For Credit Suisse:        Weil, Gotshal & Manges, LLP
                          By:  MELANIE GRAY, ESQ.
                               ELEANOR H. GILBANE, ESQ.
                                    (via telephone)
                          700 Louisiana, Suite 1600
                          Houston, TX 77002

For Calyon New York       Hunton & Williams, LLP
Branch:                   By:  JASON W. HARBOUR, ESQ.
                               BENJAMIN C. ACKERLY, ESQ.
                          Riverfront Plaza, East Tower
                          951 East Byrd Street
                          Richmond, VA 23219-4074

For Calyon New York       Hunton & Williams, LLP
Branch:                   By:  THOMAS A. RICE, ESQ.
(via telephone)           200 Park Avenue
                          New York, NY 10166-0091

For Credit Suisse:        Womble Carlyle
                          By:  STEVEN K. KORTANEK, ESQ.
                          222 Delaware Avenue, Suite 1501
                          Wilmington, DE 19801

For the Trustee:          United States Department of Justice
                          Office of the United States Trustee
                          J. Caleb Boggs Federal Building
                          By:  JOSEPH J. McMAHON, JR., ESQ.
                          844 King Street, Suite 2207, Lkbox 35
                          Wilmington, DE 19801


**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (cont.):

| | |
|---|---|
| For Bank of America: | Potter, Anderson & Corroon, LLP<br>By:  GABRIEL R. MACCONAILL, ESQ.<br>Hercules Plaza<br>1313 North Market Street, 6th Floor<br>Wilmington, DE 19801 |
| For Bear Stearns/<br>EMC Mortgage: | Duane Morris<br>By:  RICHARD W. RILEY, ESQ.<br>1100 North Market Street, Suite 1200<br>Wilmington, DE 19801-1246 |
| For Calyon New York<br>Branch: | Eckert Seamans<br>By:  MICHAEL BUSENKELL, ESQ.<br>300 Delaware Avenue, Suite 1210<br>Wilmington, DE 19801 |
| For Murray Capital<br>Management:<br>(via telephone) | Murray Capital Management<br>By:  MARTI P. MURRAY, ESQ.<br>680 Fifth Avenue, 26th Floor<br>New York, NY 10019-5429 |
| For Bear Stearns:<br>(via telephone) | Sidley Austin<br>By:  MATTHEW S. FERGUSON, ESQ.<br>787 Seventh Avenue<br>New York, NY 10019 |

### I N D E X

**MOTION**

**PAGE**

**MOTION RE: SETTLEMENT**

**ARGUMENT**

| | |
|---|---|
| By Mr. Bowman | 5 |
| By Mr. Indelicato | 7 |
| By Mr. Talmadge | 7 |

**DECISION**

| | |
|---|---|
| By the Court | 7 |

**MOTION RE: EXPERT TESTIMONY**

**ARGUMENT**

| | |
|---|---|
| By Ms. Gray | 9 |
| By Mr. Harbour | 17 |
| By Mr. Tecce | 22 |
| By Ms. Gray | 28 |
| By Mr. Harbour | 33 |
| By Mr. Tecce | 34 |

**DECISION**

| | |
|---|---|
| By the Court | 36 |

**MOTION RE: SPOLIATION**

**ARGUMENT**

| | |
|---|---|
| By Mr. Tecce | 38 |
| By Mr. Harbour | 43 |
| By Mr. Tecce | 48 |

**DECISION**

| | |
|---|---|
| By the Court | 49 |

**J&J COURT TRANSCRIBERS, INC.**

1              THE COURT:   Please be seated.   Good afternoon.

2              MR. BOWMAN:   Good afternoon, Your Honor.   Donald

3    Bowman, Young, Conaway, Stargatt & Taylor on behalf of the

4    debtors.   Your Honor, the first item on the agenda is the

5    debtor's motion pursuant to Section 105 of the Bankruptcy Code

6    and Bankruptcy Rule 9019 to approve the settlement by and

7    between Bear Stearns and PNC Mortgage.

8              Your Honor, by this motion the debtors are seeking

9    the Court to enter an order approving the settlement which in

10   essence resolves the adversary proceeding with Bear Stearns and

11   EMC.

12             Since the filing of the motion, Your Honor, we have

13   been in contact with the Committee and Bank of America and

14   we've resolved -- I believe we've resolved all the issues that

15   they have had with the motion itself and it's embodied in the

16   revised form of order which we're prepared to hand up in a

17   second, Your Honor.

18             Generally the settlement provides that the debtors

19   shall transfer by November 6th all servicing rights to the

20   purchase of mortgage loans to EMC and all custodial accounts

21   minus any advances and expenses associated with the transfer.

22   The debtors have also agreed, Your Honor, to give an accounting

23   of the advances and expenses at the time of the transfer.

24             In exchange for that, Your Honor, the -- Bear Stearns

25   and EMC shall transfer directly to Bank of America a settlement

6

1  amount in the amount of $100,000.  In return collateral in the

2  form of securities which are unrelated to the repurchase

3  agreement.

4          And as I said, Your Honor, we have a -- a revised

5  form of order that I'm prepared to hand up if I may approach?

6          THE COURT:  Yes, you may.  Thank you.

7          MR. BOWMAN:  If Your Honor would like I can walk you

8  through the -- the minimal changes on a blackline version?

9          THE COURT:  Please.

10          MR. BOWMAN:  Okay.  Moving to Page 2 on the blackline

11  again, the third order paragraph was added which basically,

12  Your Honor, just made clear that the debtors are authorized to

13  perform under the settlement agreement.

14          The fourth order paragraph was added to make the

15  transfer date November 6th.  As Your Honor is probably aware

16  November 2nd was the date that was initially contemplated.

17          The fifth order paragraph makes clear that Bank of

18  American is to receive the settlement amount, again, $100,000.

19          And the sixth order paragraph, Your Honor, just

20  simply says that the parties are basically awaiting the

21  confidentiality provision incorporated in Section 3 of the

22  settlement agreement.

23          THE COURT:  All right.

24          MR. BOWMAN:  Your Honor, with that I believe we have

25  resolved all the issues of Bank of America and the Committee

1  and we would ask that the order be entered.

2          THE COURT:  Does anyone wish to be heard in

3  connection with this matter?  Mr. Indelicato?

4          MR. INDELICATO:  Thank you, Your Honor.  I'm Mark

5  Indelicato on behalf of the Committee.  Your Honor, we had

6  hoped there would be more settlements presented today, but

7  we'll take the Bear Stearns settlement.

8          We have reviewed the settlement and we believe based

9  on the terms, although it's not a lot of money coming back to

10  the estate, we believe the settlement is in the best interest

11  and we would encourage the Court to approve the settlement.

12          THE COURT:  Anyone else?

13          MR. TALMADGE:  Your Honor, this is Scott Talmadge on

14  the phone on behalf of Bank of America, the administrative

15  agent.  And with the changes to the order we have no objection

16  to consent to the settlement agreement.

17          THE COURT:  All right.  Thank you.  Anyone else?  All

18  right.  Hearing none I'll approve the settlement.

19          MR. BOWMAN:  Okay.  Thank you, Your Honor.

20          THE COURT:  Is anyone here who's here just for that

21  including people on the telephone may be excused.  No takers.

22                          (Pause)

23          THE COURT:  Good afternoon.

24          MR. COMET:  Good afternoon, Your Honor.  Howard Comet

25  for Credit Suisse First Boston Mortgage Capital in one of the

1  adversary proceedings that's scheduled for a pretrial

2  conference this afternoon.

3         I believe, Your Honor, that in connection with those

4  adversary proceedings, the Credit Suisse one and the Calyon

5  one, there are motions in limine scheduled for today.  There

6  are several -- I think some housekeeping issues regarding the

7  trial that's scheduled for tomorrow.

8         I don't know in what sequence the Court wants to take

9  up the matters.

10        THE COURT:  Well let's -- let's deal with these

11 motions in limine because it may theoretically simplify or

12 complicate I guess depending -- well it won't make it anymore

13 complicated.  It has the possibility of simplifying

14 theoretically the trial.

15        So I think if we deal with those -- deal with those

16 first that makes the most sense.  And I would propose, unless

17 anyone objects, dealing with them with -- initially dealing

18 with the two motions in limine to exclude the debtor's expert

19 witness and then we'll turn to the debtor's motion to exclude

20 the Calyon witness.

21        MR. COMET:  Thank you, Your Honor.  I'd like to

22 introduce my partner Melanie Gray who will argue on behalf of

23 Credit Suisse on the motion.

24        THE COURT:  Very well.  Thank you.  Good afternoon,

25 Ms. Gray.

1          MS. GRAY:   Good afternoon, Your Honor.   Melanie Gray

2     with Weil, Gotshal & Manges on behalf of Credit Suisse First

3     Boston Mortgage Capital.

4          This Court is well versed in the Rules of Evidence

5     and in particular the rules regarding the admissibility of

6     expert testimony.   The Third Circuit, the District Courts in

7     Delaware, and in fact this Court has written numerous opinions

8     that clearly set forth as appropriate standard for determining

9     the admissibility of expert opinion testimony.   Qualification,

10    reliability, fit.

11         American Homes proffered expert, Professor David

12    Carlson, fails to satisfy at least two of those tests.   He is

13    neither qualified in the area in which he purports to give

14    expert testimony regarding repurchase agreements and in

15    particular mortgage repurchase agreements and his testimony is

16    comprised exclusively of legal opinions which does not satisfy

17    the fit test because it's within the Court's providence to

18    determine the applicable legal standard for determining whether

19    or not the Credit Suisse mortgage repurchase agreement

20    satisfies the definition of 10147 of the Bankruptcy Code and

21    therefore is entitled to the safe harbor protections of Section

22    559 and 555.

23         I don't want to repeat the arguments that are in our

24    motion in limine, however there are just a couple of points I

25    would like to highlight.

**J&J COURT TRANSCRIBERS, INC.**

1          Professor Carlson, while he has practiced law for a

2    few years and he has taught law for many years, his area and

3    his experience does not fit the facts or the issues in this

4    case.  He has never drafted or negotiated a repurchase

5    agreement or a mortgage repurchase agreement, his -- prior to

6    this engagement he had never even reviewed one.

7          And in connection with this engagement the only

8    mortgage repurchase agreements that he reviewed are the three

9    that are at issue in this case.

10         He did not engage in any systematic or methodical

11   testing of the market with regard to mortgage repurchase

12   agreements.  The two conversations that he identified as

13   discussions with market participants were total 45 minutes.

14   One was with another law professor who is not a market

15   participant in this area and indeed who did not embrace

16   Professor Carlson's opinions, and the other was a retired

17   banker who had not been in the banking industry or in the

18   mortgage finance industry since 1990.

19         Clearly those are not the kinds of either

20   qualifications or experience that are needed to qualify an

21   expert to give testimony regarding facts that are at issue in

22   this case.

23         And that's what I want to come back to is that there

24   are no facts that are in dispute with regard to the issue of

25   whether the Credit Suisse mortgage repurchase agreement

1  satisfies the appropriate definition is entitled to the safe

2  harbor protections.

3          And Professor Carlson has no factual expertise that

4  supports his opinion.  And indeed his report reads like a legal

5  brief where he analyzes the Uniform Commercial Code, he

6  analyzes the Bankruptcy Code, and tries to tell this Court what

7  Congress meant when it amended the safe harbor provisions of

8  the Bankruptcy Code.

9          He analyzes cases and in fact a number of cases both

10 in State Court and in Bankruptcy opinions that do not address

11 the specific issue that is here.

12         But when you look at the totality of what Professor

13 Carlson has done and when you look at what he reviewed in order

14 to form his opinions and look at what his background and

15 experience is, it is hard to imagine a clearer case where what

16 Professor Carlson can provide to this Court is anything other

17 than legal opinion.

18         What Professor Carlson tries to do is to tell this

19 Court what he believes the two prong test should be in

20 determining whether or not the Credit Suisse repurchase

21 agreement should be safe harbored.  It is not a test that is

22 written in the statute, it is not a test that is referenced in

23 the legislative history, but yet he wants to tell this Court

24 that as a result of his review of the development of the UCC of

25 various provisions within the UCC there should be engrafted

1  upon the definition of repurchase agreements under the

2  Bankruptcy Code an additional two part test before you reach

3  the determination of whether they are safe harbored.

4         Professor Carlson admits that his opinions are based

5  upon his legal analysis and are legal conclusions.  And we have

6  attached the relevant pages of his deposition to our motion in

7  limine and in our reply to demonstrate that.  And I won't read

8  them but yet he admits that his determination that the mortgage

9  repurchase agreement would be treated as a secured financing

10 under New York law is a legal conclusion.

11        He admits that his conclusion that the mortgage

12 repurchase agreement is not entitled to safe harbor protection

13 is a legal opinion.  And that's on Pages both 167 and 75 of his

14 deposition.  He acknowledged that legal training would be

15 needed to render his opinions and that is what he brings to the

16 table.

17        Now while he may be experienced in reading all these

18 cases and while he may have his particular view about whether

19 Congress can decide if certain agreements should be carved out

20 of the automatic stay and should be taken out of the

21 determination of whether they are a financing or something else

22 similar to what Congress did under Section 1110, that's legal

23 opinion and that's within the sole province of this Court.

24        Professor Carlson admitted that he has no other facts

25 or evidence to present to this Court.  And when I asked him in

1 response to the Court's statement at the preliminary hearing,

2 at the preliminary injunction hearing, that the defendants must

3 come forward with some evidence to rebut the presumption that

4 the agreement is a repurchase agreement and I asked Professor

5 Carlson if he had any such evidence other than his legal

6 opinions to provide to this Court, he said no.

7        As the Court is aware it's the defendant's, American

8 Home, burden to establish that Professor Carlson's opinions are

9 admissible by a preponderance of the evidence.  They have not

10 done that and they have failed to come forward to show this

11 Court how his opinions are anything but legal opinions.

12        In their reply response oh they characterize them as

13 factual, that there are factual issues or factual aspects, but

14 I will have to say having reading it myself several times I

15 still don't see what they are.  And I will also -- I know

16 Calyon wants to respond as well with regard to that particular

17 issue as their reply covered that I believe quite nicely in

18 saying yeah you can call it anything you want but when you get

19 down to the bottom of it these are legal opinions.

20        I want to now go to the -- what I think really is

21 what you're going to hear American Home push this Court to do

22 and hopefully address why I think that it would be a mistake

23 for the Court to take that bait.

24        American Home is asking this Court to delay deciding

25 and please let Professor Carlson get on the stand.  And while

1  that may be appropriate in many cases in order to allow the

2  Court to parse through the various testimony and then decide

3  where that line and the cases talk in terms of sometimes a

4  blurred line between custom and practice and legal opinion.

5         We don't have any risk of a blurred line here such

6  that you may be improperly excluding testimony related to

7  custom, industry or practice because Professor Carlson has no

8  experience in custom or industry or practice and I believe his

9  deposition testimony makes this clear.

10        This is not a case where the Court is not aware of

11  what the underpinnings of the expert's testimony is.  Those

12  underpinnings are very clear both in his report and in the

13  deposition excerpts that we have provided to the Court.  So

14  there is not a risk that the Court may draw the line too

15  harshly and exclude admissible testimony.

16        Instead you have an instance where American Home is

17  asking a law professor basically to carry their water in trying

18  to convince this Court that there is a test other than what is

19  in the definition of Section 10147 to find that the Credit

20  Suisse mortgage repurchase agreement indeed satisfies

21  Congress's definition of a mortgage repurchase agreement.

22        And why do I think that it's a mistake for the Court

23  to take the bait?  Number of reasons.  First I think that it

24  would complicate the trial.  It's one thing to have the lawyers

25  engage in argument, it's another thing -- and if you saw other

1  portions of the deposition that weren't quoted -- it's another

2  thing to try to cross examine a law professor on the law.  And

3  that we believe would, one, be a waste of time and a

4  complication in this case.

5       Second, it would set, we believe, a precedent that

6  would invite all litigants to hire legal experts to come in

7  with the hope that at least they can get an extra bite at the

8  apple and put someone of notable reputation on the stand to

9  help sway what is the Court's job.  And we think that that

10 would be a disappointing and just a bad development in

11 litigation.  We put enough people on the stands and generally

12 should be cutting back as opposed to adding to it.

13      And as in fact recently the Court in <u>Cantor v.</u>

14 <u>Pearlman</u> said, able attorneys on both sides of the case can

15 articulate the law in their arguments and post-trial briefing.

16 And really we should not invite law professors or other legal

17 experts to get on the stand to do it.

18      So there is no basis to believe that there would be

19 an increased efficiency as a result of letting Professor

20 Carlson testify.

21      In addition, Your Honor, there will be no prejudice

22 to American Home by virtue of excluding Professor Carlson from

23 testifying.  The legal arguments that Professor Carlson makes

24 can be equally made by American Home in their briefs and by

25 their lawyers in opening and closing argument and indeed they

1 have.

2          If you look at the pretrial memorandum that's been
3 filed by American Home at noon today, those arguments are all
4 there.  I say that that's prima facie evidence that these are
5 legal arguments and are not factual expertise or the person of
6 other qualifications that Professor Carlson is bringing to
7 support his opinions.

8          As the Second Circuit and in closing I will just say
9 that the Second Circuit, which again the District Courts in
10 Delaware have made reference to, there are two opinions that
11 are often cited the <u>High v. Jacobs</u> and the Martz Court said --
12 and I'm quoting from <u>High v. Jacobs</u> now, if I'm pronouncing
13 that correctly -- whereas an expert may be uniquely qualified
14 by experience to assist the trier of fact, he is not qualified
15 to compete with a judge in the function of instructing the
16 jury.

17          The basis of expert capacity according to Wigmore,
18 Section 555, may be summed up in the term experience.  But
19 experience is hardly a qualification for construing a document
20 for its legal effect when there is a knowledgeable gentleman in
21 a robe whose exclusive process -- province is to instruct the
22 jury on the law.

23          And the courts made clear whether it's a jury trial
24 or a bench trial, if it is for the Court to interpret an
25 agreement, to interpret a statute, legal expert testimony is

1 not relevant, it does not fit, and should not be admitted.

2        And so, Your Honor, we say that this is exactly the

3 clear case where a line can be drawn that is the appropriate

4 line in differentiating what is inappropriate legal testimony

5 from any other alleged custom or practice.  And we would ask

6 that the Court grant the motion in limine and exclude Professor

7 Carlson's report and any testimony.

8        And I'm happy to answer any questions the Court may

9 have.

10        THE COURT:  I have none.  Thank you.

11        MS. GRAY:  Thank you.

12        THE COURT:  Let me hear from Calyon.

13        MR. HARBOUR:  Good afternoon, Your Honor.

14        THE COURT:  Good afternoon.

15        MR. HARBOUR:  May it please the Court.  For the

16 record Jason Harbour of Hunter & Williams on behalf of Calyon

17 New York Branch.  Your Honor, I'll be brief and rely on Ms.

18 Gray's well spoken argument in the main part.

19        But just to address a few issues, Your Honor.  First,

20 this is not a case where the Court needs to worry about being

21 hesitant to rule on an evidentiary issue in a vacuum.  That

22 simply is not the case here.

23        We have Mr. Carlson's report, his deposition

24 testimony which has been set forth very fully by CFSB in their

25 briefs, and in fact the objection filed by the debtors

1  themselves.  And nowhere in any of that, Your Honor, is there

2  the identification of a single factual issue for which Mr.

3  Carlson would take the stand, testify, and assist the Court.

4  Every issue he identifies is a legal issue.

5          Again, Your Honor, they've had more than an adequate

6  opportunity to provide this Court, Calyon or CSFB with a single

7  factual issue about Mr. -- about which Mr. Carlson's qualified

8  and able to give expert testimony.

9          Instead every opinion they identify in their

10 objection, Your Honor, is either about the effect, the

11 interpretation, the characterization or the legal significance

12 of provisions of the repurchase agreement.  It's black letter

13 law, Your Honor, that each of these things constitutes a legal

14 opinion.

15         Moving off of that topic, Your Honor.  The other

16 topic here is just fundamental relevance.  If he is allowed to

17 testify, is it even relevant?  And I was not at the deposition

18 so I was surprised to learn this when I read the -- the

19 testimony, but his own testimony at the deposition demonstrates

20 that it's not going to be relevant.

21         As Ms. Gray indicated to Your Honor, what he is

22 arguing to the Court in connection with the debtor's position

23 is that the Court should write additional qualifications,

24 requirements onto the definition of repurchase agreement in

25 10147 of the Bankruptcy Code.

1          In his -- in his deposition however there is a

2 question -- and this is on Page 105, Line 13 -- the question

3 from Ms. Gray was do you believe that there is ambiguity within

4 the definition of a repurchase agreement under Section 10147?

5 There -- answer -- there is no ambiguity.  Again Ms. Gray, so

6 would you agree that if a mortgage repurchase agreement

7 satisfied the criteria articulated in Section 10147 it should

8 be treated as a repurchase agreement under the Bankruptcy Code?

9 Answer yes.

10          With that, Your Honor, there is no relevance to Mr.

11 Carlson's testimony.  He acknowledges that all this court has

12 to do is apply the standards set forth in the Bankruptcy Code.

13 Yet what he testifies about in his report and what he writes

14 about in his report and what he -- the debtor's proposed to

15 have him testify about --

16          THE COURT:  Well wait a minute.  I mean all that's

17 true if it's a repurchase agreement and to quote a clever

18 writer, you can't make a chicken a duck by calling it a duck.

19 All right.  You can't make a --

20          MR. HARBOUR:  That is absolutely correct, Your Honor.

21          THE COURT:  -- you can't make something that's not a

22 repurchase agreement a repurchase agreement by just calling it

23 a repurchase agreement.

24          MR. HARBOUR:  Absolutely.

25          THE COURT:  And I know -- I know whatever your

1  theories are, but his testimony if admitted goes to whether or

2  not it truly is a repurchase agreement.

3           MR. HARBOUR:  His testimony goes to his created

4  requirement that something needs to be a true repo to be a

5  repurchase agreement.

6           THE COURT:  All right.

7           MR. HARBOUR:  Not to any of the factors set forth in

8  Section 10147 of the Bankruptcy Code.  In admitting that it's

9  unambiguous, Your Honor, he -

10          THE COURT:  Well it's unambiguous --

11          MR. HARBOUR:  -- he lays the premise down that the

12  Court cannot, as mandated by the Supreme Court, do anything

13  other than apply the text as written.  I interrupted, Your

14  Honor, I apologize.

15          THE COURT:  That's all right.  Well plain meaning is

16  a starting point.  It's not a mandatory exit point.  Plain

17  meaning is where we start with statutory interpretation.  And,

18  true, if it is -- if the statute is unambiguous and says what

19  it says, that's the beginning, middle, and end of the analysis.

20  But if there is ambiguity, then we move on.

21          And I don't think anyone on the other side argues the

22  repurchase agreement says what it says.  I don't think anyone

23  argues there's anything particularly ambiguous in the term

24  repurchase agreement.

25          The issue is whether just calling something the

1  repurchase agreement is sufficient to fulfill the statutory

2  obligation of it being a repurchase agreement.

3          I understand your position and your -- and the other

4  plaintiffs position to be that the Court's inquiry is quite

5  limited and as long as for instance it calls the repurchase

6  within a year and says it's a repurchase agreement, that's as

7  far as the test goes.

8          All of that said, and the other side disagrees, I

9  don't think that necessarily goes to whether it's a legal

10 opinion he's offering or not.  I think it goes to the relevance

11 issue to the extent it's not a legal opinion.

12         MR. HARBOUR:  Exactly, Your Honor, that was my point.

13         THE COURT:  All right.

14         MR. HARBOUR:  This section was with respect to

15 whether or not it's relevant.  And Your Honor is correct.  It

16 is for Your Honor to decide whether it is ambiguous or not.

17 But once Mr. Carlson admits it's ambiguous, he should know full

18 well that he can't then add anything else to it -- once he

19 admits it's unambiguous rather.  I'm sorry.  I misspoke.

20         THE COURT:  Very well.

21         MR. HARBOUR:  And with that, Your Honor, I would just

22 ask for the reasons we discussed here, the well articulated

23 positions set forth in the -- in our papers and then CSFB's

24 papers, that you -- that you deny or that you grant rather the

25 motions in limine and exclude Professor Carlson's testimony and

1  the report.   Thank you, Your Honor.

2              THE COURT:   I'll hear from the debtor.

3              MR. TECCE:   Good afternoon, Your Honor.   James Tecce

4  of Quinn, Emanuel on behalf of the debtors.   A couple points

5  I'd like to start with by clarifying in response to the

6  arguments we've heard so far.

7              First of all Mr. Carlson is not opining whether or

8  not the agreements in question are repurchase agreements under

9  10147.   What his report says, to be precise, is I have reviewed

10  the forms that have been developed by market participants and I

11  have reviewed these agreements to determine whether or not they

12  contain features that are in the forms.

13              And if there is any question as to what the summary

14  of his conclusion is, it appears in his report which is

15  attached to the motion in the section Summary of My Opinion in

16  Paragraph 4.

17              In my opinion the Calyon and Credit Suisse agreements

18  contain provisions that are inconsistent with true repos.   The

19  inconsistent provisions are A and B.   He has merely reviewed

20  the model form and he's reviewed the agreements in question and

21  that's his conclusion.

22              Secondly, he's not testifying to the governing law in

23  this case.

24              THE COURT:   Let me interrupt you there for a minute.

25  Isn't the whole basis of what you just said based on a legal

conclusion as to what a true repo is versus what isn't a true

repo?  And isn't saying something is or isn't a true repo a

legal conclusion?

And as a result, isn't what he's really saying I

think a true repo contains the following elements A, B, and C

and these documents lack elements A and B?

MR. TECCE:  But what --

THE COURT:  Isn't that my job with your help?

MR. TECCE:  Your Honor, what he's saying is that

what's set forth in those agreements is -- in the model

agreements is set forth in the agreements in issue.  And it is

Your Honor's job ultimately to make that determination.

But there's no risk here that he will mislead a jury

in instructing them with respect to the law in this case and

there's no risk here that he'll provide the governing law in

this case.

And Your Honor as the ultimate gatekeeper is -- is in

the position to make a determination as to what the relevance

of his testimony is on the basis of his background and the

report that -- that Your Honor perhaps has already read.

THE COURT:  Well certainly -- certainly the gate

keeping function I think as a practical matter is less -- is

less important without a jury.

At the same time although there is no danger of

confusing a jury, there is a danger of confusing me.  And while

1  I am hopefully more versed in the law than an average juror,

2  I'm certainly not necessarily more versed in understanding

3  facts --

4          MR. TECCE:  Right.

5          THE COURT:  -- than your average juror.  And I think

6  your argument really is based on one, from my opinion, it

7  really sort of has me sort of being very -- on my part which

8  is, you know, okay maybe a jury couldn't get it but I can so

9  just let it in and I'll figure it all out because I'm a lot

10 smarter than your average juror.

11         You know I mean just -- and most of the cases cited

12 by the other side are clearly jury cases and that's what the

13 Third Circuit was focused on in <u>Berkeley</u>.  But it is

14 appropriate at times notwithstanding the absence of a jury to

15 exclude expert testimony.

16         MR. TECCE:  Well actually, Your Honor, my response to

17 that would be -- and going to the case that are cited in CSFB's

18 breach -- brief -- sorry -- is that if the contract is

19 straightforward, if it's a requirements contract which is a

20 contract at issue in one of their cases, or a franchise

21 agreement which is an issue in one of their cases, or a

22 question of whether or not an expert should testify as to the

23 law governing whether a judge should be recused from a case, in

24 those circumstances it may be appropriate to exclude expert

25 testimony.

1          But here the agreements are rather complex.  To cite

2  the Third Circuit, Your Honor, in the <u>Bevel</u> case, the repo

3  market is as complex as it is crucial.  The agreements are not

4  straightforward and to the extent that Mr. Carlson's testimony

5  can provide insight into those agreements would aid the Court.

6  Again, the Court is free to discount Mr. Carlson's testimony.

7          And to the extent that there are facts in dispute

8  with respect to the text of the agreements, which there are,

9  Your Honor, and it will come out ultimately not -- I don't

10  believe it was mentioned in the pretrial brief -- but during

11  the trial when the evidence comes out based on the depositions

12  that we've seen to date, there's a dispute as to whether or not

13  the sellers retained any interest in the income generated by

14  these assets.

15          Mr. Carlson can speak to his reading on the agreement

16  on that, CSFB can put in counter evidence, and Your Honor can

17  make a ultimate conclusion and decide whether to accept Mr.

18  Carlson's testimony or to discount it based on his background.

19          THE COURT:  Well just because -- I mean if you look

20  at Judge Jordan's decision in <u>Cantor v. Pearlman</u>, you know,

21  he's dealing with immensely complicated issues of fiduciary

22  duty.  I used to know what they -- I used to know my way around

23  that a little bit and unless you're cognizant of it on an

24  everyday basis, it's a complex and constantly developing area

25  of the law.

1        Notwithstanding that he -- and notwithstanding it was

2   a bench trial, he excluded the evidence of two of the smarter

3   fiduciary duty people that I've ever met, Professor Hammermash

4   and former Justice Walsh.

5        So I'm not sure complexity alone is enough to get you

6   over the hurdle of -- of the <u>Berkeley</u> issue which is if it's a

7   legal opinion -- I mean it's pretty straightforward -- if it's

8   a legal opinion I'm not -- if the expert opinion is a legal

9   opinion I'm not supposed to admit the testimony period.

10       MR. TECCE:  But again I think perhaps in

11  contradiction to the <u>Cantor</u> case, Mr. Carlson is not going to

12  testify as to which law governs the analysis for these

13  agreements nor is -- nor will we concede that he's offering a

14  legal opinion.  He's comparing two agreements with the third

15  and he's reviewed the agreements, the text of the agreements,

16  and compared them to a third agreement.

17       The Court is free to discount that testimony in terms

18  of relevance and in terms of whether it takes any instruction

19  or any guidance from Mr. Carlson.

20       So the last point, Your Honor, is that it's not clear

21  what the prejudice to -- to Credit Suisse and Calyon is by

22  letting him testify and certainly not to letting him testify

23  before reaching a decision as to whether or not the Court is

24  going to -- to accept his testimony or to exclude it.

25       There's no -- there's no prejudice to Credit Suisse

1  by letting Mr. Carlson testify.  He's already been deposed by

2  Credit Suisse so it doesn't harm their case in any way.  It's

3  not going to mislead anyone.  His testimony will not mislead a

4  jury or anyone else.

5        And at the conclusion of that testimony if the Court

6  chooses to accept or exclude his testimony it has a much more

7  developed record upon which to make that decision.  And to

8  allow that process to unfold that way, to allow Mr. Carlson to

9  come and testify first, it's not going to -- it's not going to

10 prejudice him in any way.

11       And I believe the explanation that was given as to

12 the potential prejudice was that it would complicate the trial.

13 Your Honor, I think there are probably six or seven witnesses

14 who are going to testify in this case so I don't -- I don't

15 know that Mr. Carlson being the sixth witness as opposed to

16 five witnesses is going to complicate this trial which probably

17 will span two or three days.

18       The other point, Your Honor, I guess is that the

19 Court has already seen his report.  I don't know whether the

20 Court has read his report or not, but it's already been

21 attached to -- it's been attached to the -- the pleadings that

22 have been submitted in this case.  So it's not a secret as to

23 what he will say.

24       And given that there's no threat to usurp the trier

25 of fact function here, we'd submit that Mr. Carlson should be

1  allowed to testify.

2         One point I would like to make, Your Honor, which is

3  that -- before I sit down.  We have moved in limine to exclude

4  Mr. Adelson who is the Calyon -- who is the Calyon -- the

5  proposed expert for Calyon.  And the basis of our motion is

6  spoliation of evidence.

7         But I'd like to reserve my rights, Your Honor,

8  depending upon the disposition of this motion to -- to raise

9  similar issues because when one considers the -- the background

10 of both witnesses, the arguments apply frankly with equal --

11 with equal merit in terms of qualification and relevance to the

12 opinions that have been expressed by both witnesses.

13         THE COURT:  Thank you.

14         MR. TECCE:  Thank you.

15         THE COURT:  Reply?

16         MS. GRAY:  Thank you, Your Honor.  Mr. Tecce started

17 out by saying that Professor Carlson was going to testify

18 whether it really is a repurchase agreement.  That's a question

19 of law.

20         Mr. Tecce went on to say well he's going to compare

21 this global Bond Market Association form with these other two

22 and tell you that there are differences and that's why these

23 two are not repurchase agreements under Section 10147.

24         A couple of problems with that.  First, we'll

25 stipulate that there are different provisions between the

1  global Bond Market Association form repurchase agreement and

2  our mortgage repurchase agreement.  You don't need expert

3  testimony to see that there are differences between those two.

4       Second, it's not as if Mr. -- Professor Carlson had

5  industry expertise that he came to this assignment with, some

6  industry based opinion that that global Bond Market Association

7  form was the sine qua non of repurchase agreements.

8       No, he had a conversation with American Home's

9  counsel and they said, you know, we should go look for one and

10  he downloaded it off of the internet, never seen it before.

11  And this is a form from the Bond Market Association that

12  governs international transactions governed by UK law.

13       And he decides based upon his legal analysis that

14  that form is a repurchase agreement that satisfies the

15  definition of 10147.

16       So there are a couple of things wrapped up in where

17  his starting point is that is based upon his legal analysis

18  which is this two part test that he has devised.  And -- and

19  based upon that two part test he says, okay, the BMA global

20  form satisfies it.

21       Now interestingly the domestic form that is used

22  throughout this company -- country for repurchase agreements

23  involving trillions of dollars of securities, he says nah

24  that's not a true repo under 10147 because it doesn't have

25  these same provisions of the global UK law governed repurchase

1  agreement.

2        But I -- what I -- the point I want to make is

3  twofold.  One, he brings his legal expertise in deciding that

4  the global BMA is this true repurchase agreement that qualifies

5  for 10147 or at least he looks at it and says, huh, I'm going

6  to now say that it has to beat these two tests.

7        Then he comes over to our repurchase agreement and

8  says do we have those provisions.  Well, you know, that --

9  whether you call it relevance, whether you call it fit, whether

10  you call it qualification, it's not -- he does not have the

11  expertise in the industry.

12        Now American Home, if they wanted to present a case

13  to educate this Court with regard to custom, with regard to

14  practice, with regard to why these agreements are structured

15  the way they are, why it's important that these -- that these

16  agreements have certain terms, how they work, they could have

17  gone out and found such an expert and brought him here and put

18  him or her on the stand to testify as to the industry, as to

19  practice and custom, all of that.

20        We would be having a different argument or possibly

21  even with lawyers no argument at all.  But that's not what they

22  did.  They went and found a law professor.  And not a law

23  professor that has experience in this area, but someone who's

24  brand new to it.  And that's just where we think the line is so

25  clear that the Court does not go astray in saying based upon

1  the record that the Court can exclude him now.

2        The -- while it is true with a bench trial as in any

3  evidentiary ruling, the -- the issues when you're dealing with

4  a jury are different, and we respect that.  However, as many

5  Courts have said that while -- while it's a bench trial it

6  doesn't mean that you can just ignore the Rules of Evidence.

7  And the fact that Mr. Tecce said that Professor Carlson is not

8  going to deliver the ultimate conclusion, cases have also said

9  the fact that there was amendment that allows expert testimony

10 on the ultimate issue in the case, that still does not negate

11 -- and this is in the advisory rules -- the fact that the Court

12 has to exercise its gate keeping functions to not allow all

13 testimony in, especially if it is based upon legal criteria.

14        It says these provisions afford ample assurances

15 against the admission of opinions which would merely tell the

16 jury what result to reach.  They also stand ready to exclude

17 opinions phrased in terms of inequitable -- inadequately

18 explored legal criteria.

19        I mean it's like okay you can let ultimate conclusion

20 or issues -- opinions as to ultimate issues in, but that

21 doesn't mean it's an open door to instruct the jury or the fact

22 finder.  And the cases speak in terms of the -- the determiners

23 of the law and the finders of fact and in this instance it's

24 both of you.

25        Many of the cases, or at least some of the cases,

1  that we cite are cases on summary judgment where it is the

2  Court that's making the determination of whether or not an

3  expert that is giving legal opinions, whether that can be the

4  basis for the summary judgment and in that context there's no

5  jury.  The Courts will still exclude those opinions that rest

6  on legal opinion.

7          Saying that Credit Suisse, Calyon is not going to be

8  prejudiced is really turning the burden on its head and it is

9  American Home's burden to show that there is an appropriate

10 basis to admit Professor Carlson's opinion.  They have not done

11 it and we believe that it is inappropriate and think that the

12 presidential effect will be disastrous with regard to future

13 cases in believing that, you know, that we can all come into

14 this Court with our legal experts and put them on the stand.

15         THE COURT:  You know the problem with -- problem with

16 that is it cuts both ways.  The second you exclude the

17 testimony of an expert you tend to get a lot more motions in

18 limine filed.  That's the reputation of a judge who actually

19 grants motions to exclude expert testimony.  So it can cut --

20 it can cut both ways.

21         I can get a lot -- if I -- if I grant your motion I

22 could get a lot more motions or if I deny your motion I can get

23 a lot more witnesses.

24         MS. GRAY:  Your Honor, I appreciate that may be a

25 consequence, but the hour that we may spend arguing this motion

1 in limine or others I would posit would be one quarter of the

2 time that it takes to present direct testimony, cross examine,

3 especially with regard to legal experts.

4       And think that the -- the net effect is that while it

5 may take more time at the beginning -- and again, if the Court

6 balances all the things and makes good decisions, hopefully we

7 can follow them and won't make -- bring motions in limine that

8 shouldn't be.

9       But yet it still is going to cut down on just the

10 floodgates -- because we may be talking yes there's going to be

11 some -- but there very well could be the floodgates, but I -- I

12 hear your point with regard to that, but believe that this

13 record is complete and I believe Mr. Tecce admitted that.  That

14 the Court has the opinion, the Court knows that Professor

15 Carlson is going to testify to.

16       Professor Carlson said he didn't have any other

17 opinions than those that are in his report so the Court has

18 everything it needs to make its decision.

19       THE COURT:  Thank you.

20       MS. GRAY:  Thank you.

21       THE COURT:  Mr. Harbour?

22       MR. HARBOUR:  For the record again Jason Harbour.

23 Your Honor, when Mr. Tecce stood here and spoke he talked about

24 two issues Mr. Carlson -- Professor Carlson rather would talk

25 about and that's identifying provisions in a form agreement

1 that he believes relevant and then comparing those provisions

2 to the provisions in the CSFB and Calyon agreement.

3         Both of those issues are legal opinions, Your Honor.

4 If that's all they have, it's legal opinion and it should be

5 struck.

6         With respect to Mr. Tecce's comments about Mr.

7 Adelson we certainly agree that Mr. Adelson will not be

8 presenting legal testimony, he will be presenting testimony

9 regarding industry practice and custom to the extent of course

10 if the Court denies the motion in limine that's pending.

11         For those reasons and the reasons stated by Ms. Gray,

12 we respectfully request that this Court grant the motions in

13 limine because the debtors have not met their affirmative

14 burden to prove Mr. Carlson's testimony should be admitted to

15 this Court.

16         THE COURT:  All right.

17         MR. HARBOUR:  Thank you.

18         MR. TECCE:  Your Honor, may I be allowed one minute

19 on this reply?

20         THE COURT:  Yes.

21         MR. TECCE:  Thank you.  Your Honor, the critis resis

22 (phonetic) point I believe is that we could have gone out and

23 found an expert with market experience and we didn't do that

24 because we -- we brought in a law professor.

25         But a few things.  Number one, this law professor has

1  also been -- was in practice for 14 years and graduated from

2  law school 30 years ago.

3         Number two, he has interaction with market

4  participants.  He did testify at his deposition that in

5  connection with his report he spoke to two market participants,

6  but he has other interaction with market participants.

7         Number three, Your Honor, the point is that -- that

8  goes to the procedure is that he should be allowed to testify

9  to his background.  He should be allowed to testify to what it

10  is that he's done.  And the Court, based on that, based on what

11  the Court hears about his experience, about his time and prior

12  practice, the Court is free to discount his testimony and free

13  to say I don't believe that you have relevant market

14  experience, but after you hear him testify.

15         So it goes to weight and how much weight you accord

16  to his testimony.  You may not think he has enough market

17  experience, but that's a conclusion for the Court.

18         The last point, Your Honor, he's not giving a legal

19  opinion.  What he's doing is applying the law to the facts as

20  he sees them which he can do.  And, again, the Court is -- is

21  free to -- to dismiss his conclusion and the decision that he

22  makes in applying the law to the facts in this case.

23         Thank you, Your Honor.

24         THE COURT:  You're welcome.  Well I did -- I did read

25  Professor Carlson's report and I did read the briefs very

1 carefully and -- and the law.  And I am going to grant the

2 motions in limine because I think reading the -- reading Mr.

3 Carlson's report and frankly reading the debtor's objection in

4 the light most favorable to the debtors, still leads to the

5 exclusion of the evidence in the controlling law.

6         Judge Jordan dealt with these issues I think, as

7 always, very -- very artfully and succinctly in the <u>Cantor v.</u>

8 <u>Pearlman</u> case and he noted sort of setting it all forward the

9 Third Circuit has specifically instructed the District Courts

10 to ensure that an expert does not testify as to the governing

11 law of the case.

12         And I think a reading of the debtor's report and

13 objection in the light most favorable to them still leads you

14 that Mr. Carlson, Professor Carlson, is going to testify as to

15 what constitutes a repurchase agreement and whether these

16 documents at issue are repurchase agreements.

17         There is no other way to read his testimony and that

18 is the governing law of this case.  That is what this Court is

19 going to have to determine, whether these are in fact

20 repurchase agreements.  If they are I think frankly that the

21 rest of the -- the analysis is rather cookie cutter, but we'll

22 get to that when we get to it.

23         And then Judge Jordan goes on to note that part of

24 the Third Circuit's holding in <u>Berkeley</u> is based on a concern

25 about usurping the Court's role in explaining the law to the

1  jury.  But jury confusion is not the rationale for the rule and
2  I think that's significant.

3          In this case I think debtor's counsel admits that --
4  and I think it's true -- we do know what the expert is going to
5  say based on the report, based on statements in his deposition,
6  and as a result I don't think it's at all ambiguous or unclear
7  that he's going to testify as to a legal conclusion.

8          And there -- as a result, you know, despite his
9  qualifications, despite the fact that it may be very
10 interesting testimony, to paraphrase Judge Jordan, I don't
11 think I'll be assisted in my role as a fact finder in this
12 trial by hearing the law explained to me from the witness
13 stand.  And I think that's what the witness would do.

14         There was no testimony proffered in the report or
15 discussed in any of the sections that I reviewed of the
16 deposition or cited in the briefs that I think could fairly be
17 construed as testimony regarding custom, industry or practice
18 which is the Fifth Circuit's sort of carveout if you will of
19 the general rule that legal opinion testimony is not
20 admissible.

21         So I don't think those issues are -- are implicated
22 in this case.  So notwithstanding the fact that it may lead to
23 more motions in limine, I think the Court has a obligation to
24 -- to apply the Rules of Evidence even in a bench trial.  And
25 as a result I'm going to grant the motion in limine with regard

1 to the legal opinion issued not based on qualification because

2 that is a situation where I think frankly the Court would need

3 to hear voir dire and cross examination as to qualification

4 before I could make a determination and as a result I would not

5 grant a motion in limine on qualification grounds without

6 allowing that further testimony.

7        But because I grant it on the other grounds which is

8 that the opinion will be legal testimony and based on what was

9 said in the report, in the briefs, and in the deposition, I

10 don't think there will be any further testimony that would be

11 necessary in order to make that decision and it would be

12 frankly a waste of a day or two or three to have the direct,

13 cross, and redirect of the witness.

14        I'm going to grant the motion in limine and exclude

15 the report and the testimony.  And I'd ask movants to submit a

16 form of order.

17        Now let's move to the debtor's motion to exclude on

18 basis of spoliation.  And your rights with regard to any other

19 grounds are -- are fully preserved.

20        MR. TECCE:  Thank you very much, Your Honor.  I'll be

21 brief because we've been here for awhile and our arguments are

22 set forth in our papers but -- so I won't repeat them here.

23        But speaking of enforcing the Rules of Evidence, Your

24 Honor, and the Rules of Civil Procedure for that matter, I'd

25 like to start with Rule 26 which requires -- excuse me, Your

1    Honor -- which requires in the context of expert testimony the

2    disclosure of anything considered by the expert.

3        And the genesis of this dispute, Your Honor, started

4    when we requested on the 11th of September that the counter

5    parties, number one, produce to us copies of all documents that

6    were considered by their expert and as well as drafts of their

7    expert's reports.  And we requested the ability to use those

8    documents in connection with the depositions taken of the

9    experts.

10       We were unable to secure a -- a firm agreement and we

11   proceeded to meet and confer on September 18 per the scheduling

12   stipulation and again on the 21st we raised the request a

13   second time for the same three items; number one, documents

14   considered by the experts; number two, drafts of the experts

15   reports; and, three, the ability to use those documents in

16   connection with the expert depositions.

17       On the 24th of September we -- it's become aware to

18   us -- known to us based on the a deposition of the -- of the

19   expert, Mr. Adelson, that on the 24th of September in Calyon's

20   attorney's offices where he was preparing his report a draft of

21   the report was prepared and it was considered or it was

22   reviewed by Mr. Adelson and Calyon's counsel and then it was

23   destroyed.  It was thrown out notwithstanding the requests that

24   we had made for copies of drafts of expert reports and

25   notwithstanding the fact that frankly we provided all the

1 drafts of our own experts reports to -- to opposing counsel.

2         So we -- to be clear, Your Honor, we requested these

3 documents.  At that point we submit that a duty to retain them

4 had arisen and we requested them at least two weeks or

5 approximately 12 days before the drafting began and

6 notwithstanding those requests the documents were destroyed.

7         So the problem that we now have is that it's not

8 clear to us what initial conclusions Mr. Adelson reached in

9 that first draft.  Now Mr. Adelson's testimony -- and it's set

10 forth at length in the objection filed by Calyon -- Mr.

11 Adelson's testimony, it's a little -- it's -- it's not entirely

12 clear.

13         He did testify, to be fair, that he just changed the

14 ordering of certain things and that he had six conclusions

15 which he then collapsed into three conclusions and that those

16 were the changes.  They were stylistic.

17         But he also testified when I asked him whether he

18 changed any of his conclusions, he said that he did not add

19 anything -- that doesn't mean he didn't delete anything -- and

20 he says that I was getting into a level of detail where he

21 didn't quite remember.

22         And if there's any question as to what the exact

23 testimony was, it was you are going into detail.  I don't

24 remember transcript of 107:24-25.

25         The problem we now have, Your Honor, is that I have

1  not seen or the debtors have not seen this initial draft and we

2  can't really cross examine this witness or -- or go to the

3  conclusions that he reaches in the final report without knowing

4  the conclusions that he reached in his first report.

5         And the remedy we think is to exclude his testimony

6  because of the destruction of the documents at a time when they

7  were under a duty to maintain the documents.  And that, Your

8  Honor, is the spoliation argument.

9         One other point.  Mr. Adelson's reaffirmation time

10  after time on the record that the conversation with counsel did

11  not alter his views, that's an interesting position but it

12  doesn't change the fact that there's a rule in place that says

13  that you have to provide the evidence on which the expert --

14  the evidence the expert considered and some of the cases say

15  that once a request is made for that information the duty to

16  preserve it is in play.

17         THE COURT:  Did his -- did you ask him did his

18  testimony cover whether in this meeting on September 24th

19  whether counsel was taking any notes of the meeting?

20         MR. TECCE:  I -- I don't recall.  I don't believe

21  that I asked him that specific question, Your Honor.

22         THE COURT:  Did you ask Calyon's counsel to produce

23  their notes of the meeting with their -- with their expert?

24         MR. TECCE:  I did not, Your Honor.

25         THE COURT:  Okay.

1          MR. TECCE:  Okay.  But what I was just saying to

2    conclude the thought, Your Honor, is that affirmation of that

3    you prepared the report independently does not excuse a party

4    from compliance with the rules and duties.

5          Now to go to the question of whether Mr. Adelson,

6    apart from the spoliation -- spoliation argument -- excuse me

7    -- to the relevance of his opinion, Your Honor, the fact are --

8    are very similar.  Mr. Adelson --

9          THE COURT:  Well I can't get into that because I

10   don't want to get into that.  Let's put it this way.  I don't

11   want to get into that right this second because I haven't -- it

12   hasn't been briefed, you know, and I haven't read the report

13   like I read -- read Professor Carlson's report.

14         MR. TECCE:  No, I'm not getting into his report.  I

15   want -- what I would like to speak to is --

16         THE COURT:  Okay.

17         MR. TECCE:  -- are his -- his -- I would -- without

18   getting into the text of his report I would just note that,

19   number one, Mr. Adelson is not -- he is a -- a research analyst

20   at Pneumora (phonetic) -- or he was previously a research

21   analyst at Pneumora, he's now a private consultant.

22         And he left Thacher, Proffitt & Wood in 1991 and went

23   to Moodies where he was a research analyst and that is the

24   capacity in which he performed his job there and at Pneumora.

25   He has not -- since he left Thacher, Proffitt & Wood in 1991 --

1  he has not negotiated a repurchase agreement, he has not

2  drafted a repurchase agreement, he has not bought and sold

3  mortgage loans under a repurchase agreement.  What's more he

4  has not written a research report that is dedicated to

5  repurchase agreements.

6          So his -- the extent of his -- his contact with

7  market participants is very similar to -- to Mr. Carlson's and

8  as a consequence his qualifications to testify as to the

9  "market practice" with respect to these agreements we think are

10 -- are subject to challenge.

11         What's more the -- notwithstanding the way Mr.

12 Adelson's report is styled, he ultimately will, whether it's

13 packaged directly or indirectly, he ultimately will be

14 testifying as to whether or not these agreements are repurchase

15 agreements and as such we think that there's basis to exclude

16 his testimony on that ground for the same reasons as Mr.

17 Carlson's.

18         THE COURT:  All right.

19         MR. TECCE:  Thank you.

20         THE COURT:  Thank you.  Yes?

21         MR. HARBOUR:  Again for the record Jason Harbour,

22 Your Honor.  The Third Circuit has a three part test to exclude

23 testimony based on spoliation.

24         The first prong is degree of fault, the second prong

25 is the degree of prejudice here that would be suffered by the

1 debtors, and the third prong is whether -- is whether a lesser

2 sanction will avoid substantial unfairness to the debtors.

3       The debtor's argument focuses on a draft that was

4 produced on September 24th, less than a week after Mr. Adelson

5 was retained and that wasn't produced.  I can't say anything

6 about that, Your Honor, it was not produced.

7       That's really all I can say.  It wasn't produced.

8 Standing here today having this argument I surely wish that we

9 would have produced it.  But it was not produced, it was not

10 kept, and it did not happen.

11       But moving on to the other prongs of the test which

12 also need to be met here, there's simply no prejudice that

13 would suffered by the debtors to allow Mr. Adelson to testify

14 even though they don't have the expert -- the initial prep.

15       THE COURT:  How did they -- how did they cross

16 examine him?

17       MR. HARBOUR:  They cross --

18       THE COURT:  Without the -- without the draft?

19       MR. HARBOUR:  They cross examined him about what the

20 draft contained.

21       THE COURT:  But they can't impeach him.  All they can

22 do is -- all they can do is ask if the draft changed and he can

23 say no and then they can't show him the document which if I

24 give even a hint of an inference against you has

25 inconsistencies in it which would impeach his answer that

1 nothing changed.

2          So I mean without the drafts the prejudice is they

3 cannot effectively cross examine the witness.

4          MR. HARBOUR:  Your Honor, with all due respect I -- I

5 would submit that they can effectively cross examine the

6 witness because they can confirm whether or not the opinions

7 and conclusions reached in the point are independently his.

8          He repeatedly testified and will testify here that

9 the conclusions he reached -- reaches are his conclusions.

10          To be fair to Mr. Adelson, Your Honor, he testified

11 repeatedly that the conclusions were his own and, Your Honor,

12 frankly as officers of the court we wouldn't offer an expert to

13 this Court or any other Court if the conclusions of the expert

14 were not their own.

15          He also testified repeatedly about the nature of the

16 changes.  He testified that the changes were to form and that

17 they resulted in combining conclusions, that they were only

18 style and organization, and they didn't go to the substance of

19 the conclusions.

20          Moreover, Your Honor, not only will they have an

21 opportunity, they have had an opportunity to cross examine him

22 on these points extensively.  But Your Honor will be able to

23 listen to him when he testifies about what his conclusions are

24 and determine whether they are independent conclusions.

25          Moreover, Your Honor, the conclusions of the report

1  themself are important here because these aren't controversial

2  conclusions.  The first conclusions is simply that mortgage

3  loans need to be serviced at all times and it is customary for

4  a repo seller to service the mortgage loans prior to a default.

5           While this isn't identical, Your Honor, this is quite

6  similar to Mr. Kaiserman's testimony at the CSFB preliminary

7  hearing, which is on the transcript at Page 36, 1 through 15,

8  in which he indicated that it would be destructive to transfer

9  servicing to the repo purchaser on the repurchase agreement and

10 that it would be -- and that they would be serviced by AHM or

11 HMS I guess as a matter of convenience.

12          Second conclusion that a repo is customarily provided

13 for the repurchase of exactly the same loans that were

14 delivered on the first leg and that it would be unusual for a

15 whole loan repo to permit delivery of different mortgage loans.

16          Again this is not identical, Your Honor, but it is

17 similar to testimony the debtors themselves have designated in

18 Mr. Alan Sedrayne's (phonetic) transcript of his deposition --

19 one of the debtor's witnesses, Your Honor, or one of the people

20 deposed from Calyon rather -- about whether the same loans need

21 to be delivered to sellers in the second leg of a repurchase

22 transaction.

23          Specifically the question to Mr. Sedrayne was because

24 of the nature of what is -- was being purchased, is it your

25 position that you would always have to return back the very

1 same items that were sold in the first instance?  To which Alan

2 Sedrayne answered I think that's correct, yes.

3        The questioning before this led up was about the

4 repurchase agreement at issue, but this question clearly

5 demonstrates a question about repurchase agreements in general

6 which is, again, similar to the conclusion Mr. Carlson will

7 reach, his second conclusion.

8        The third conclusion is merely that after the 2005

9 Bankruptcy Court amendments it was common for warehouse lenders

10 to reformulate warehouse facilities as leases.

11        Your Honor, at the CSFB preliminary hearing Robert

12 Love testified very similarly on Page 119, 6 through 9, in

13 which he said after 2005 there is more of a push to

14 recharacterize mortgage loan warehouse facilities as mortgage

15 loan repurchase agreements.  And his understanding was -- was

16 that it had to do with some changes to the bankruptcy laws.

17        There isn't any prejudice here, Your Honor, because

18 these conclusions aren't -- they don't -- I don't know --

19 they're not controversial, Your Honor.  They are conclusions

20 that an expert can render, certainly, but they're not

21 controversial such that the debtors are going to be prejudiced

22 by allowing these conclusions into the record.

23        Finally, Your Honor, and the last part of the Third

24 Circuit's three part test is whether a lesser sanction would

25 avoid any substantial unfairness to the debtors.

1          Well we would certainly argue that there is no

2  unfairness to the debtors let alone substantial unfairness as

3  indicated in the objection, Your Honor.

4          During the deposition the debtors frankly didn't

5  spend a lot of time on the conclusions themselves.  What they

6  spent a lot of time on was a paragraph right above the

7  conclusions on the first paragraph in fact on Page 3 of their

8  report which arguably may come closer to addressing a legal

9  opinion.

10         Based on the debtor's apparent concern with that and

11 Mr. Tecce suggested that he may be testifying to the ultimate

12 legal opinion in the case, we are more than willing to accept a

13 lesser sanction of having that paragraph excluded from the

14 report and this Court's consideration and any testimony from

15 Mr. Adelson about that excluded as well.

16         Thus we respectfully request that this Court deny the

17 motion in limine with respect to his testimony and report

18 because there's not sufficient prejudice to warrant excluding

19 the testimony that is otherwise non-controversial.

20         THE COURT:  Thank you.  Reply?

21         MR. TECCE:  Very briefly, Your Honor.  First of all

22 the -- the conclusions which -- from Mr. Adelson's report, I

23 thought we were staying away from that, but it's now been read

24 into the record so I'll speak to them.

25         I think ultimately Mr. Adelson is getting to the same

1  place that Credit Suisse didn't want Mr. Carlson to go to which

2  is to say whether or not these agreements are repurchase

3  agreements under 10147 of the Code and perhaps -- perhaps the

4  three conclusions have been drafted so artfully that it's not

5  as transparent as the Court or Credit Suisse would believe, but

6  the conclusions ultimately do go to the same place.

7          The trouble that American Home is in is that it

8  doesn't know how the conclusion started out and it doesn't know

9  what the conclusions looked like on September 24th before the

10 report was destroyed and therefore it cannot -- it's really

11 been deprived of a very important tool during this adversary

12 process which is the ability to try and impeach this witness

13 and to see exactly how the conclusions changed.

14         So we respectfully submit that the only remedy at

15 this point is to have the report excluded.

16         THE COURT:  All right.  I agree.

17         MR. TECCE:  Thank you.

18         THE COURT:  Frankly this really -- this is a no

19 brainer, all right?  This isn't a -- this isn't an expert

20 witness who, you know, sort of did this accidentally.  This

21 happened with counsel present in counsel's office while there

22 were pending discovery requests pending.

23         The level of culpability for destruction of evidence

24 in that situation is extremely high and will not be tolerated

25 by the Court.

1          The debtors have been prejudiced by the inability to

2    cross examine and impeach the witness.  In my experience one of

3    the key methods to understanding the background, the basis, and

4    the weaknesses of an expert -- of an expert testimony is to see

5    how that testimony developed.  Look at the drafts, to see the

6    first draft, to look at the final draft report and say wait a

7    minute, how come the discount rate went from 5 percent to 12

8    percent?

9          So I think that frankly all of the statements in the

10   response of Calyon as to sort of, you know, what the witness

11   testified and what he didn't testify, what he sort of -- how he

12   was independent, how he, you know, didn't change his report.

13         I'm not saying that I don't believe the man, but when

14   you don't give the debtors an opportunity and access to the

15   documents that are necessary to impeach those statements

16   because of inappropriate destruction of evidence by Calyon, I

17   think that's prejudiced.  I think it's unfair and it shouldn't

18   have happened.

19         And I -- I don't accept the offer of the lesser

20   sanction in this case as being sufficient to avoid the

21   prejudice to the opposing party.  So I'm applying the <u>Nowacki</u>

22   <u>Electric Tool</u> (phonetic) test of the Third Circuit and I'm

23   going to exclude the testimony and report in its entirety.

24         All right.

25         MR. COMET:  Howard Comet, Your Honor.  Turning then I

1 guess to the housekeeping matters.  It's my understanding we

2 are commencing at 10:00 tomorrow I believe, is that -- is that

3 the Court's schedule?

4           THE COURT:  That's the normal starting time so that's

5 probably correct.

6           MR. COMET:  Okay.  And --

7           THE COURT:  And I looked at the pretrial memos which

8 were very helpful.  I appreciate them.  But I'm sorry, not to

9 interrupt you.

10           MR. COMET:  What -- one question, Your Honor.  There

11 will be I believe some deposition testimony submitted and I

12 guess the question is to the form in which the Court would like

13 to receive that.

14           It's my understanding the Court normally doesn't have

15 lawyers read the testimony but has it submitted in written

16 form.

17           THE COURT:  I would prefer that unless people feel

18 otherwise.  My experience with having it read is it's very

19 difficult to read that sort of thing on the record and do it --

20 do it in a way that anyone can follow.

21           And my experience with lengthy videotape deposition

22 testimony was never again.  So I --

23           MR. COMET:  None of -- none of the depositions in

24 this case were videotaped in any event, Your Honor.

25           THE COURT:  So I would prefer written submissions.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. COMET:  Do you -- do you want the parties to

2     combine their designations, Your Honor, or submit separate

3     parts or?

4          THE COURT:  Well I mean it's preferable to know

5     what's been designated and cross designated.  But if it can be

6     done in a, you know, it's also preferable it be done in a way

7     that makes it easy for me to read.

8          So I don't know how we were -- you were anticipating

9     proceeding.  I assume you sort of -- have you already

10    designated and cross designated portions of the transcript?

11         MR. COMET:  Yes insofar as Credit Suisse and -- and

12    the debtors are concerned, Your Honor.  I think I'll let Mr.

13    Ackerly or Mr. Tecce address what the status is with -- with

14    Calyon and -- and the debtors.  But yes --

15         THE COURT:  I think one -- one sort of set, you know,

16    if I -- if it's going to be the deposition of John Smith, I'd

17    rather have just the deposition of John Smith with the

18    designations and cross designations identified in a way I can

19    read it as opposed to having to track down four or five

20    different notebooks.

21         MR. COMET:  We'll try to do that, Your Honor.  My

22    experience is we could have the -- the list in the front and

23    then in the transcript maybe block off things in different

24    colors so you would know which --

25         THE COURT:  That would be excellent.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. COMET:  Okay.  And then insofar as there are any

2    objections that parties want to assert that were raised in the

3    deposition proceeding, I would suggest we also provide a list

4    of those to the Court to -- to rule on.

5          THE COURT:  That's fine.  I don't know what the

6    timing -- if that needs to be sort of post-trial as opposed to

7    during trial.  I mean the sooner the better, but I don't want

8    to squeeze the lawyers too much.

9          MR. COMET:  There isn't that -- I understand, Your

10   Honor -- there is not that much.  I think we may not be able to

11   do -- have it ready tomorrow morning, but I think we should be

12   able to do it during the course of the trial.

13         THE COURT:  All right.

14         MR. COMET:  We -- Credit Suisse will also ask the

15   Court, Your Honor, to consider the preliminary hearing --

16   excuse me -- preliminary injunction hearing testimony to the

17   extent that's relevant to the issues in this phase during

18   trial.

19         I think that's directly provided for in the Rules,

20   Your Honor, Rule 65 of the Federal Rules of Civil Procedure

21   which is made applicable by Rule 7065 of the Bankruptcy Rule.

22   Says in subdivision (a)(ii) first provides for the possibility

23   of a consolidation of a preliminary injunction hearing in the

24   trial on the merits and then goes on to say even when this

25   consolidation is not ordered, any evidence received upon an

1   application for a preliminary injunction which would be

2   admissible in a trial on the merits, becomes part of the record

3   on the trial and need not be repeated upon the trial.

4           So I would ask that Your Honor and if --

5           THE COURT:  Is there any objection to that piece?

6   Okay.  Thank you.

7           MR. COMET:  We -- we can --

8           THE COURT:  And again if you can submit that to me in

9   a way that I can read it, that would be preferable.

10          MR. COMET:  We will submit the transcript of the

11  witness's testimony from the preliminary injunction hearing,

12  Your Honor.

13          THE COURT:  All right.

14          MR. COMET:  One -- one item, Your Honor, that I was

15  asked to raise with the Court is this.  The -- the lawyer who

16  filed a -- an amicus brief, Your Honor, on behalf of CFSB which

17  is what is now the name of the Bond Market Association, the

18  promulgator of the form that have been discussed today, Mr. Jay

19  Tidelbaum.

20          He asked me to raise to the Court whether if he

21  appears tomorrow morning he might be able to make some brief

22  statement during the opening statements at the trial which

23  obviously Credit Suisse would have no objection to, Your Honor.

24          THE COURT:  All right.  That's fine.  I mean opening

25  statements aren't evidence, so that's fine.  But he's not going

1  to try to participate in the actual trial.

2          MR. COMET:  I don't believe so, Your Honor, nothing

3  beyond -- beyond that.

4          THE COURT:  Is -- this jumps ahead a little bit, but

5  I had some notes here too and while we're on it -- is the

6  Committee going to actively participate in the trial?  And by

7  that I mean examining or cross examining witnesses?

8          MR. INDELICATO:  No, Your Honor.

9          THE COURT:  Okay.  So it will just be the debtors,

10 Credit Suisse, and Calyon, correct.  Okay.

11         MR. COMET:  The only other item I have, Your Honor --

12 at least on my list, I don't know about other counsel -- is

13 that I assume -- well I believe there's been some discussion

14 and I think the sequence in which we intend to proceed is that

15 Credit Suisse would present its case, Calyon would then present

16 its case, the debtors would then present their response to both

17 cases and then there would if necessary I guess be rebuttal

18 after that.

19         There may be thoughts by other counsel of a different

20 sequence, but I would just -- I believe, Your Honor, that we

21 have not consolidated these adversary proceedings, they're

22 simply being sort of jointly tried.  So, for example, the

23 testimony of Calyon witnesses would not be evidence in the

24 Credit Suisse proceeding and we would not be under any

25 obligation or have the right for that matter to cross examine

1  them.

2         On the other hand the debtor's witnesses I guess will

3  be testifying once, rather than twice --

4         THE COURT:  Right.

5         MR. COMET:  -- in both cases and so to the extent

6  that they give testimony relevant to Credit Suisse we would

7  cross examine them on that and similarly Calyon, there may be

8  some overlap, although we'll try to avoid asking the same

9  question twice as much as possible.

10         But that -- that -- just wanted to put that on the

11  record.  That's how I imagine it would proceed, Your Honor.

12         THE COURT:  Well let's -- let's address that sequence

13  issue.  Is there any -- any objection or problem with the

14  proposed sequence?  Hearing none.  Well hearing some.  I don't

15  know.

16         MR. TECCE:  Could I have a second, Your Honor?

17         THE COURT:  Yes.

18         MR. TECCE:  Your Honor, assuming that the -- the

19  order of things will be that the -- the plaintiffs, Credit

20  Suisse and Calyon, will call their witnesses first, we will

21  cross examine their witnesses, and then we will present our

22  witnesses, they can cross examine our witnesses.  That -- that

23  procedure works for us.

24         I don't know whether or not rebuttal witnesses from

25  their side after we have gone would be appropriate or necessary

1  at that point in time and it would be our --

2          THE COURT:  Well we can't judge that until we know

3  what --

4          MR. TECCE:  Fair enough.

5          THE COURT:  -- they're trying to rebut.

6          MR. TECCE:  That's fair enough.  So we'd like to

7  reserve our rights to oppose any merits at that point.

8          THE COURT:  Sure.  Of course.  Right.  Yes, I'm not

9  talking about merits, I'm talking about sort of sequence of how

10 they're going to proceed and ground rules.

11         MR. TECCE:  Yes, sir.

12         MR. ACKERLY:  Your Honor, Ben Ackerly on behalf of

13 Calyon.  The people are certainly in basic agreement with

14 CSFB's counsel.  I mean there is -- there are two claims here,

15 there are defenses to both claims, and then there are

16 counterclaims to both claims.

17         And so it seems to me that the claims need to be put

18 on first and then the rebuttal defense to those -- to those

19 claims and then we would have a chance to rebut that as --

20 because we have the burden of proof in our claims.

21         His counterclaim would get put on and we would have

22 -- we would have a chance if we chose to to put on rebuttal

23 evidence with respect to his counterclaim.

24         But I just don't want to be in a situation where we

25 are precluded from putting on evidence in response to the

1  counterclaim because we put on our case in chief.  That's my

2  concern.

3          THE COURT:  All right.  Well you won't be.

4          MR. ACKERLY:  Okay.  The --

5          THE COURT:  I'm sorry.

6          MR. ACKERLY:  I think -- I think Mr. Comet addressed

7  this as far as the -- as the witnesses are concerned and

8  whether we're bound by witnesses, you know, that -- you know

9  obviously Calyon's bound by the witnesses it puts on but is not

10 bound by the witnesses that Mr. Comet puts on.  And we would

11 have a right to cross examine obviously the witnesses the

12 debtor -- the debtor puts on.

13         MR. ACKERLY:  The other issue, Your Honor, which Mr.

14 Comet brought up had to do with the depositions of the

15 designation of depositions.  We were not aware -- there was an

16 agreement apparently between the debtor and CSFB with respect

17 to designation of deposition and testimony.

18         We did not become aware of such agreement until I

19 think it was Thursday night, this past Thursday night, when we

20 saw an email trading back where people were submitting who --

21 who they were going to put on in evidence and what their

22 exhibits were in which there was a reference to a deadline

23 which already passed for designating the -- the portions of the

24 deposition testimony.

25         The next morning we inquired I believe of Mr. Tecce

1  and he furnished us with an agreement between his firm and

2  CSFB's firm which we were not a party to and did not know about

3  it.  So as a result we have not -- we have not designated or

4  counter designated anything.

5       We propose to put our case on in chief through live

6  evidence.  We don't propose to put it on through any

7  designation.  But the debtor has indicated that its proposal is

8  to put on I assume its defense through the designation of

9  certain testimony of Calyon witnesses which we have not counter

10 designated, again because we weren't aware that that was --

11 that was the issue.

12      And what quite frankly I counted on is that, you

13 know, the Rules and Rule 32 would apply here and we would have

14 -- we would have a right at trial with respect to the use of

15 those -- those depositions.  If they want to submit the

16 depositions, then we would ask for time to do counter

17 designations on that if that proves to be necessary.

18      THE COURT:  Well I think absent an agreement the

19 rules apply, right?

20      MR. TECCE:  In terms of the absence of an agreement,

21 Your Honor, the -- I'll confess that there was an agreement

22 reached with -- with Credit Suisse between Credit Suisse and

23 the debtors.  But to be honest, given that every deadline

24 that's been reached in this case under the scheduling

25 stipulation applied to all three of us it might have been an

1  afterthought that Calyon was not included.

2         So I -- I don't want to create the impression that we

3  were trying to push them out of the picture in any way.  I

4  think it was an oversight and if -- if they want to counter

5  designate deposition testimony, then the Rule would apply.

6  That's fine.

7         THE COURT:  Okay.

8         MR. TECCE:  Thank you.

9         THE COURT:  I had a -- I had a -- unless anyone has -

10 - I had a couple of issues I wanted to raise to make sure we --

11        MR. TECCE:  Your Honor, if I may raise two

12 housekeeping issues?

13        THE COURT:  Sure.

14        MR. TECCE:  The first one is that we were actually

15 were under the -- there was a scheduling issue with respect to

16 the testimony of Mr. Adelson and Mr. -- Calyon's counsel had

17 requested that we accommodate Mr. Adelson's schedule which was

18 that he would not be available to testify until Wednesday

19 morning.

20        And what we told them was that was fine provided that

21 the -- the Calyon and CSFB cases proceed in toto and then our

22 case start.  Meaning that assuming that we were done say at

23 2:00 on Tuesday and we had nothing to do for their cases in

24 chief but to go forward with Mr. Adelson, that we would wait

25 until Wednesday morning because I did not want the debtors to

1  have to start presenting their case in chief in the afternoon

2  and then switch back to Mr. Adelson.

3          And but as a consequence of that we scheduled our own

4  witnesses and made our own witnesses have made arrangements now

5  to not be available until Wednesday morning.  So we don't have

6  Mr. Adelson's testimony on Wednesday morning.

7          I'm not sure how long we'll go tomorrow.

8          THE COURT:  You think we're going to finish Credit

9  Suisse direct, cross, and redirect; Calyon direct, cross, and

10  redirect in a place that's going to put you in a squeeze for

11  Wednesday morning?

12          MR. TECCE:  Your Honor, I just -- I raise the point.

13  Thank you very much.  Okay that's --

14          THE COURT:  In --

15          MR. TECCE:  -- that's my first housekeeping issue.

16          THE COURT:  In my experience -- how many witnesses

17  does Credit Suisse have?

18          MR. COMET:  Just one.

19          THE COURT:  Just one.  How many does Calyon have?

20          MR. ACKERLY:  Just one.

21          THE COURT:  Just one.  Oh, that's possible.  All

22  right.  Okay.

23          MR. TECCE:  Is that -- it's just one.  Okay.  I

24  thought that Calyon had two witnesses but we can talk to them

25  after the --

1          THE COURT:  So is the problem you --

2          MR. TECCE:  The problem is that our witnesses are --

3  we can't start our case in chief until Wednesday.

4          THE COURT:  That won't be a problem.

5          MR. TECCE:  Okay.  Thank you.

6          THE COURT:  You're welcome.

7          MR. TECCE:  The second question, Your Honor, is -- is

8  one of procedure.  I don't know how to approach the Court on

9  this issue.  There is a -- there is a discovery dispute about a

10  document that was produced.

11          THE COURT:  There's a what?  I'm sorry.

12          MR. TECCE:  A discovery dispute.

13          THE COURT:  Discovery dispute.

14          MR. TECCE:  About a document that was produced and I

15  won't talk about what the text of the document is, but we

16  received a letter from Calyon's counsels saying that they had

17  produced certain documents to the debtors which they asserted a

18  privilege with respect to.

19          And there's one of them where we dispute that the

20  document is privileged and at some point I think there's going

21  to be an issue here as to whether or not we can use the

22  document because we do want to use the document.

23          So I don't know how to approach the Court.  No motion

24  for protective order has been filed with respect to the

25  document and I don't -- we haven't filed, frankly, a motion in

1  limine with respect to the document.

2          But this is an issue that I'd like, if I could, to

3  get some guidance from the Court on how best to proceed.

4          THE COURT:  All right.  What's the problem?  It's a

5  privilege issue?

6          MR. TECCE:  Calyon's taking the position that the

7  document is privileged, our -- we would argue that it's not.

8  And I -- I don't want --

9          THE COURT:  I think the only way we can address it is

10 when and if it arises.

11         MR. TECCE:  Okay.

12         THE COURT:  I --

13         MR. TECCE:  Meaning in the course of the trial if we

14 were to present -- fine.  As long as -- I just wanted to flag

15 the issue for the Court's concern.

16         THE COURT:  No, I appreciate that.

17         MR. TECCE:  Okay.  Thank you.

18         THE COURT:  I don't think there's any other -- it may

19 be that you don't use it, it may be that you use it in a

20 context they don't care about.

21         MR. TECCE:  Okay.

22         THE COURT:  And maybe that they do care at which

23 point I'll hear an objection as to privilege and -- and we'll

24 figure it out.

25         MR. TECCE:  Thank you very much, Your Honor.

1          THE COURT:  All right.  Now looking at the pretrials

2    sort of raised some issues for me and I want to sort of get

3    them out in the open and see how we're going to proceed because

4    sort of preliminarily I noted that the debtor's pretrial

5    memorandum was submitted in redacted and unredacted form due to

6    confidentiality.

7          Are there any confidential documents we're going to

8    need to deal with in this case?

9          MR. TECCE:  Actually I'll yield to Mr. Comet.  I feel

10   obligated to speak to that, Your Honor.  We redacted because we

11   referred to deposition transcripts and documents that had been

12   marked confidential by Credit Suisse.

13         It's not our position that they have to remain

14   sealed, but I did not want to publically file the document --

15         THE COURT:  Well that's --

16         MR. TECCE:  -- under those circumstances.

17         THE COURT:  -- completely appropriate.

18         MR. TECCE:  Thank you.

19         THE COURT:  You acted as you should have.  Mr. Comet?

20         MR. COMET:  Your Honor, I think there's two issues.

21   One is the pretrial memoranda and the second is what will

22   happen during trial.  With regard to the pretrial memoranda I

23   don't believe there's anything in the text of the debtor's

24   memorandum that we have any problem with disclosing.  I have

25   not had a lot of time to read it, but that's my initial view

**J&J COURT TRANSCRIBERS, INC.**

1 and I can certainly confirm that by tomorrow morning.

2          As far as the exhibits go, I have not really had a

3 chance to look at them yet because we -- initially we just got

4 the redacted version on the court docket and then we had a --

5 we asked for the unredacted version be sent to us and it was

6 sent to us.  But by the time we got it and got everything

7 printed out it was virtually time to come here, Your Honor.

8          So I have not really had a chance to examine them yet

9 and I don't know whether there might be an exhibit that has

10 something confidential.

11          The -- I suspect if it does it will be very limited

12 and that in a sense leads me to the trial evidence as well,

13 Your Honor.  There are a handful of Credit Suisse documents

14 related to the mortgage repurchase agreement here that have

15 some highly confidential pricing --

16          THE COURT:  Pricing information.

17          MR. COMET:  -- information which is not relevant to

18 the trial and in fact we've agreed with the debtors already

19 that the exhibits for trial will have those items redacted out.

20 And it might be the same thing in -- I don't know -- in the

21 exhibits that were with the pretrial memorandum.

22          So I think we can work together.  If there is

23 anything in the end that needs to be redacted would be like a

24 handful of items within a couple of documents.

25          THE COURT:  Well let me just ask you.  Are you saying

1   redacted so that I get it in a redacted form and you don't care

2   that I don't know what's been redacted or are you talking about

3   redacted where you want me to see what it looks like unredacted

4   and yet you want a publically redacted version?

5            MR. COMET:  The first, Your Honor.

6            THE COURT:  All right.  Fine.  Then that's not an

7   issue.

8            MR. COMET:  Okay.

9            THE COURT:  If there are documents that you want me

10  to see in unredacted form that contain confidential information

11  under 107(b), the way I would like to do it is I'll take them

12  under -- I'll take them in that manner, but you're going to

13  need to followup with a formal motion to protect the documents

14  under the appropriate standard which under 107(b) is a fairly

15  light frankly standard to meet.

16           Which leads to the related issue of sealing the

17  record.  Do you anticipate requesting at any time that the

18  Court seal the courtroom or seal the record on testimony?

19           MR. COMET:  I don't believe so, Your Honor.  I don't

20  anticipate that at this time because I think the items that are

21  highly confidential the parties agreed are not relevant to

22  trial so they should not need to be the subject of testimony.

23           THE COURT:  My position on that is going to be -- if

24  it comes up -- I think that's a much higher standard to meet

25  and I do require a formal motion supported by evidence.  And

**J&J COURT TRANSCRIBERS, INC.**

1  that can be in the form of a declaration or something.

2           But what I don't want to be in, a situation we can't

3  have arise is that we're in the middle of cross examining, you

4  know, or direct examination of a witness and you ask me to

5  clear the courtroom and there are 30 people here that you want

6  me to -- to be shown the door,  That's not going to happen.

7           So if that's what you want to do you need to sort of

8  think ahead, plan ahead, and file a formal motion with the

9  supporting declaration to that effect.  But it sounds like it's

10 not going to be an issue.

11          MR. COMET:  As far as I know at the moment, Your

12 Honor, I'm not aware of any problem of that sort.

13          THE COURT:  The other housekeeping matter is just to

14 be clear, I generally don't allow recross.  We do direct, we do

15 cross, we do redirect.  If you truly feel that during redirect

16 someone went, you know, beyond the scope of -- of cross, make

17 your argument.  But I would -- in order to keep the trial

18 moving and as to not have a continuing endless examinations,

19 generally speaking there is no recross.

20          And the other -- the other thing I wanted to clear

21 up, which I think we've already have, is who's going to

22 actually be -- the Committee is not going to be examining

23 witnesses so it's just the -- it's just the adversary

24 proceeding parties that will be examining witnesses.

25          MR. COMET:  That's my understanding, Your Honor.


**J&J COURT TRANSCRIBERS, INC.**

1         THE COURT:  All right.  Have you made a -- I would

2  suggest in connection with the cross examination of the

3  debtor's witnesses that we stick with the same order of Credit

4  Suisse first, Calyon second, just the logic of the record, if

5  that's acceptable to Calyon.

6         MR. ACKERLY:  That's fine.

7         THE COURT:  All right.  That worked -- that's worked

8  well in other trials that I've had where there were two parties

9  on one side as opposed to another.

10        All right.  Anything else?

11        MR. COMET:  I have nothing else, Your Honor.

12        MR. TECCE:  Actually I just wanted a clarification as

13  to which witness from Calyon is testifying tomorrow because two

14  were identified and I believe only one --

15        THE COURT:  I think that's fair.

16        MR. ACKERLY:  Sam (indiscernible).

17        MR. TECCE:  Thank you very much.

18        THE COURT:  All right.  Okay.  Anything else for

19  today?  No.  I appreciate everyone's time.  I'll await a form

20  of order from the debtors as well on the -- on the motion in

21  limine under certification of counsel.

22        MR. TECCE:  Thank you very much.

23        MR. COMET:  Your Honor, I just have one question

24  prompted by Mr. Tecce's question which is can we know the

25  witnesses the debtors will be calling and the sequence they'll

1  be calling them in?

2         MR. TECCE:  Your Honor, again it's Wednesday morning

3  and I believe it will be Mr. Pinot first followed by Mr. Robert

4  Love.

5         MR. COMET:  Thank you.

6         THE COURT:  I haven't seen Mr. Love in a week, you

7  know, I miss him.

8                      (Laughter)

9         THE COURT:  All right.  Anything further for today?

10 Thank you very much.  Hearing is adjourned.

11         MR. TECCE:  Thank you, Your Honor.

12

13                    * * * * *

14

15               **C E R T I F I C A T I O N**

16         I, JANET D. PERSONS, court approved transcriber,

17 certify that the foregoing is a correct transcript from the

18 official electronic sound recording of the proceedings in the

19 above-entitled matter, and to the best of my ability.

20

21 /s/ Janet D. Persons              DATE:  November 9, 2007

22 JANET D. PERSONS

23 J&J COURT TRANSCRIBERS, INC.

24

25

                    **J&J COURT TRANSCRIBERS, INC.**