UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                    .      Case No. 07-11047(CSS)
                          .
                          .
AMERICAN HOME MORTGAGE     .
HOLDINGS, INC.,           .      824 Market Street
                          .      Wilmington, Delaware 19801
                          .
          Debtor.         .      November 7, 2007
. . . . . . . . . . . . . ..     9:08 a.m.


TRANSCRIPT OF TRIAL
BEFORE HONORABLE CHRISTOPHER SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:           Young Conaway Stargatt & Taylor LLP
                          By:  CURTIS J. CROWTHER, ESQ.
                               ERIN EDWARDS, ESQ.
                          The Brandywine Building
                          1000 West Street, 17th Floor
                          Wilmington, DE  19899


For the Debtor:           Quinn Emanuel Urquhart Oliver &
                            Hedges, LLP
                          By:  SUSHEEL KIRPALANI, ESQ.
                               JAMES C. TECCE, ESQ.
                          51 Madison avenue, 22nd Floor
                          New York, NY  10010


For Calyon New York       Hunton & Williams LLP
Branch:                   By:  JASON HARBOUR, ESQ.
                               BEN ACKERLY, ESQ.
                          Riverfront Plaza, East Tower
                          951 East Byrd Street
                          Richmond, VA  23219-4074


Audio Operator:           Nikita Barksdale


Proceedings recorded by electronic sound recording, transcript
produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No. (609) 587-3599**

**APPEARANCES (CONT'D)**

```
For Credit Suisse          Weil Gotshal & Manges
First Boston:              By:  HOWARD COMET, ESQ.
                          767 Fifth Avenue
                          New York, NY 10153

For Met Capital LLC:       Weil Gotshal & Manges
                          By:  MELANIE GRAY, ESQ.
                          700 Louisiana, Suite 1600
                          Houston, TX  77002

For the Creditors'         Blank Rome LLP
Committee:                By:  BONNIE FATELL, ESQ.
                          Chase Manhattan Centre
                          1201 Market Street, Suite 800
                          Wilmington, DE  19801
```

3

**I N D E X**

| | PAGE |
|---|---|
| **WITNESSES FOR THE CREDITOR** | |
| SAM PILCER | |
| Direct Examination by Mr. Ackerly | 6 |
| Cross Examination by Mr. Tecce | 26 |
| Redirect Examination by Mr. Ackerly | 48 |
| | |
| **WITNESSES FOR THE DEBTOR** | |
| ROBERT LOVE JR. | |
| Direct Examination by Ms. Edwards | 51 |
| Cross Examination by Ms. Gray | 70 |
| Cross Examination by Mr. Harbour | 87 |

| **EXHIBITS** | | **I.D.** | **EVD.** |
|---|---|---|---|
| C1 through 13 | Documents | 6 | 6 |
| 6 | Document | 44 | 46 |
| 7 | Document | 44 | 46 |
| AHM-101 | Document | 44 | 46 |

1          THE COURT:  Good morning.

2          MR. COMET:  Good morning, Your  Honor.

3          THE COURT:  Do we want to turn straight to Calyon or

4 do we need to deal with the issues about the deposition and the

5 last set or Credit Suisse' exhibits?

6          MR. COMET:  Howard Comet, Your  Honor, for Credit

7 Suisse.  AS far as the deposition designations, I think Credit

8 Suisse has completed what it needs to do.  I think we may just

9 be waiting for the debtors to tell us if they have anything to

10 add in terms of injections to the matters.

11          MR. TECCE:  Your  Honor, we're almost complete with

12 that.

13          THE COURT:  Okay, that's fine.  Take your time.  So

14 we'll hold that off until a later time.  What about the

15 --

16          MS. GRAY:  The chart and the matrix?

17          THE COURT:  -- the chart and the matrix and those

18 other exhibits, Mr. Crowther?

19          MR. CROWTHER:  The objection is withdrawn, Your

20 Honor.

21          THE COURT:  Okay, very well.  Those are admitted

22 without objection.

23          MS. GRAY:  Your  Honor, Melanie Gray on behalf of

24 Credit Suisse.  We have a proposed order with regard to the

25 Court's ruling on the  motion in limine to strike the report

**J&J COURT TRANSCRIBERS, INC.**

1  and testimony of Professor Carlson.  All the parties have

2  reviewed it and signed off on the form of the order.   So if I

3  might hand it out.

4           THE COURT:  You may.

5           MS. GRAY:  Thank you.

6           THE COURT:  Thank you.  Why do I have three?  They're

7  all Credit.  I think I only need one, right?

8           MS. GRAY:  Yes, they're all the same, Your  Honor.

9           THE COURT:  Okay, it's double captioned.

10           MS. GRAY:  Yes.

11           THE COURT:  I've got it.  I'll sign the order.

12           MS. GRAY:  Thank you.

13           THE COURT:  Any other preliminary matters?  We'll

14  turn to Calyon then.  Good morning, Mr. Ackerly.

15           MR. ACKERLY:  Good morning, Your  Honor.  On behalf

16  of Calyon New York Branch, Ben Ackerly and Jason Harbour.  As

17  just an introductory matter, Your  Honor, we have tendered a

18  book of exhibits to the debtors.  The exhibits, with one

19  exception that we're asking the Court to admit are all the

20  exhibits that were attached to the complaint which the debtor

21  has admitted in the complaint.  So we would move that those

22  exhibits, which I believe are one through 12 in the book, be

23  admitted.  And then we're asking the Court to take judicial

24  notice of a declaration that was filed by Michael Strauss, the

25  chairman, chief executive officer and president of American

1  Home, as part of the first day pleadings in this case.  So

2  we're asking the Court to take judicial notice of that and

3  we're asking for the admission -- if I can approach the bench I

4  will give you a copy of the exhibit book.

5          THE COURT:  Yes.  Thank you.  Is the declaration in

6  here?

7          MR. ACKERLY:  Yes, sir.  It's Number 13.

8          THE COURT:  Any objection?

9          MR. CROWTHER:  There is no objection to Exhibits 1

10 through 13 on Calyon's list of exhibits.

11          THE COURT:  All right.  Exhibits 1 to 13 are admitted

12 without objection.

13          MR. ACKERLY:  Thank you, Your  Honor.  I would like

14 to call Sam Pilcer as our witness.

15          THE COURT:  Please take the stand, sir.

16          THE CLERK:  Please state your full name, spell your

17 last name for the record.  Sam Pilcer, P as in Peter, I-l-c as

18 in Charles, e-r.

19              S A M   P I L C E R, WITNESS, SWORN

20          THE CLERK:  Thank you.  You may be seated.

21 DIRECT EXAMINATION BY MR. ACKERLY:

22 Q    Mr. Pilcer, for the record, would you state your full name

23 and residence address?

24 A    My name is Sam Pilcer.  I live in New York City, 1230 Park

25 Avenue, New York City.

Pilcer - Direct/Ackerly                        7

1  Q    And where are you employed, Mr. Pilcer?

2  A    I work for Calyon, New York branch.

3  Q    And how long have you worked there?

4  A    I've been there since late September 2003.

5  Q    Okay.  What is your current title at Calyon?

6  A    Managing director.

7  Q    And how long have you been a managing director?

8  A    Since I started there.

9  Q    What is Calyon New York Branch?

10 A    It is a branch in New York State, a Federal Reserve

11 regulated branch of Calyon, which is a financial company,

12 subsidiary of Credit Agricole based in France.  Credit

13 Agricole's one of the largest banks in the world.

14 Q    Does Calyon New York Branch engage in commercial

15 transactions?

16 A    Exclusively.  Calyon does not have any retail operations

17 in the US.

18 Q    In what department or area of Calyon New York Branch do

19 you work?

20 A    I'm a supervisor within what's called Liquid Assets

21 Securitization.

22 Q    Please explain what Liquid Assets Securitization does.

23 A    Fundamentally, Liquid Assets Securitization is in place to

24 administer and operate the asset backed commercial paper

25 conduits -- the U.S. based asset backed commercial paper

1  conduits of Calyon.

2  Q    Are those conduits in any way related to the repurchase

3  agreement in this case?

4  A    Yes.  Those conduits, one of the conduits is called

5  Lafayette Asset Securitization LLC and it was one of the

6  providers of financing under the repo.

7  Q    Okay.  How many people work in your group?

8  A    Between 20 and 25 people.

9  Q    What are your duties and responsibilities as managing

10  director of the LASG?

11  A    Primarily structuring and executiion of transactions

12  within the conduits.

13  Q    Would this include supervision of the repurchasing

14  agreement at issue with American Home Mortgage Service?

15  A    Yes, it would include supervision of that.

16         MR. ACKERLY:  I'm going to hand the witness, the

17  address -- the exhibit book, Your Honor.

18  BY MR. ACKERLY:

19  Q    I'd like to call your attention, Mr. Pilcer, to Tab 1 in

20  the book.

21  A    I have that.

22  Q    Is that a copy of the repurchase agreement with American

23  Home Mortgage dated November 21st, 2006?

24  A    It is.

25  Q    Are you familiar with this repurchase agreement?

**J&J COURT TRANSCRIBERS, INC.**

1  A    I am.

2  Q    Who negotiated this repurchase agreement on behalf of

3  Calyon?

4  A    This was negotiated by someone who worked in our group at

5  the time primarily.  A person by the name of Anthony Brown.

6  Q    Is he still with Calyon?

7  A    No, he no longer is.

8  Q    When did he leave?

9  A    He left in I believe, April of '07.

10 Q    Okay.  Did you consult with Mr. Brown periodically about

11 the repurchase agreement as it was being prepared?

12 A    Yes I did.

13 Q    I would call your attention in the repurchase agreement to

14 Paragraphs 3 and 4.  I believe they're on what is Page 1.  AI

15 have that.

16 Q    Okay.  Paragraph 3 refers to an existing repurchase

17 agreement and Paragraph 4 refers to an existing loan agreement.

18 Do you see that?

19 A    Correct.  Yes, I do.

20 Q    Would you explain to the Court what the existing

21 repurchase agreement and what the existing loan agreement was?

22 A    Okay.  Under a preexisting arrangement that Calyon had

23 with American Home, it did not provide a direct repo to

24 American Home.  What was in place was a repo between American

25 Home and a wholly-owned bankruptcy remote subsidiary of

1 American Home called AHM SPV I.  At the second stage of this

2 transaction was a loan by the conduits, that being Lafayette

3 and other conduits, to AHM SPV I.

4 Q    So was this essentially a two-tier or two-step

5 transaction?

6 A    Yes, two-tier.

7 Q    Did the November 2006 repurchase agreement terminate the

8 existing loan agreement?

9 A    Yes it did.

10 Q    And did it eliminate the existing repurchase agreement?

11 A    Yes it did.

12 Q    Mr. Pilcer, why did Calyon and American Home Entities

13 change from a loan structure to a repurchase agreement

14 structure?

15        MR. CROWTHER:  Objection.  Calls for state of mind of

16 an other party.

17        THE COURT:  I'm sorry, Mr. Crowther, I didn't hear

18 that.

19        MR. CROWTHER:  I said objection, calls for the state

20 of mind of AHM, another party.

21 BY MR. ACKERLY:

22 Q    Would you state why Calyon --

23 A    Specific to Calyon, the conversion to a direct repo was

24 specifically to take advantage of the safe harbor protection

25 afforded to repos under the bankruptcy code revision in October

1 of 2005.

2 Q    Are you aware whether there was any objection from

3 American Home as to restructuring this loan agreement as a

4 repurchase agreement?

5         MR. CROWTHER:  Objection to competence.

6         MR. ACKERLY:  Your  Honor, he can testify whether

7 he's aware as an adverse party.

8         THE COURT:  Overruled.

9 BY MR. ACKERLY:

10 A    I'm not aware of that.

11 Q    Under the repurchase agreement, is Calyon the

12 administrative agent?

13 A    Yes.

14 Q    Okay.  And as administrative agent, is Calyon authorized

15 to bring this suit?

16 A    Yes we are.

17 Q    Okay.  Under the repurchase agreement, who are the

18 issuers?

19 A    If I can explain in general who the issuers are, they're

20 described on the first page of the repo, and they're all asset

21 backed commercial paper conduits administered by both Calyon

22 and other banks in the repo syndicate.

23 Q    Are they identified as purchasers also?

24 A    Yes they are.

25 Q    Okay.  Now who are the banks that are listed in the

Pilcer - Direct/Ackerly                              12

1  repurchase agreement?

2  A    The banks would be the administrators of these various

3  asset backed commercial paper conduits.  With one other bank

4  being Lloyds TSB which did not finance this transaction in its

5  own CP conduit, but was a liquidity provider to the Lafayette

6  conduit administered by Calyon.

7  Q    Were the banks purchasers under the repurchase agreement?

8  A    I believe they were as a backup to the conduits to the

9  extent the conduits couldn't issue CP.

10           THE COURT:  What's CP?

11           THE WITNESS:  Commercial paper.  I'm sorry.

12  BY MR. ACKERLY:

13  Q    The repurchase agreement refers to a custodial agreement.

14  I would ask you to look at Tab 2 in your book.  Are you there?

15  A    Yes.

16  Q    Is this a copy of the custodial agreement referred to in

17  the repurchase agreement?

18  A    It is.

19  Q    What was the role of the custodian?

20  A    Custodian is a standard feature in what you call tri-party

21  repos of this sort whereby the custodian, that being Deutsche

22  Bank, is holding certain loan documents relative to the

23  mortgages for this transaction.

24  Q    Mr. Pilcer, can you explain briefly your understanding of

25  what the repurchase agreement provides for?

**J&J COURT TRANSCRIBERS, INC.**

1 A    The repurchase agreement provides for the conduits and/or

2 the banks to purchase certain mortgage or eligible mortgages

3 from American Home with a simultaneous agreement by American

4 Home to repurchase those mortgages for a period within a year.

5 A point in fact, the maximum tenor for these mortgages in this

6 facility was 180 days.  The repurchase price is equal to the

7 purchase price plus a purchase premium for the time value of

8 money.

9 Q    Mr. Pilcer, what types of mortgage loans were bought and

10 sold under this repurchase agreement?

11 A    These are various types of residential mortgage loans in

12 accordance with various eligibility criteria laid out in the

13 repo.

14 Q    Prior to the default under the repo, did the parties to

15 the repurchase agreement operate under the terms of the

16 repurchase agreement?

17         MR. CROWTHER:  Objection.  (Indiscernible) is not in

18 evidence.

19         MR. ACKERLY:  The repurchase agreement, Your  Honor,

20 is in evidence, and the witness has just described how they

21 performed under the repurchase order.

22         MR. CROWTHER:  The objection is to the

23 characterization of the existence of a default.

24         THE COURT:  Overruled.

25 BY MR. ACKERLY:

Pilcer - Direct/Ackerly                    14

1  A    All right, repeat the question.  I'm sorry.

2            MR. ACKERLY:  Could the court reporter read the

3  question back?

4            THE COURT:  You need to give her the mic.

5            COURT REPORTER:  Question, prior to the default under

6  the repo, did the parties to the repurchase agreement operate

7  under the terms of the repurchase agreement?

8  BY MR. ACKERLY:

9  A    Yes, they did.

10 Q    Under the repurchase agreement, Mr. Pilcer, were the

11 purchasers required to sell back to the sellers the same

12 mortgages which the purchasers had purchased under the

13 repurchase agreement?

14 A    Yes they were.

15 Q    Do you understand why this was required?

16 A    Yes.  Mortgages are very specific assets and they're not

17 at all what I would characterize as fungible assets that could

18 be substituted.

19 Q    Would you turn in the repurchase agreement to Tag 1 to

20 Page 55.

21 A    Yes.  I'm there.

22 Q    Okay.  Focusing on Section 2.2-3(d), are you with me?

23 A    Yes.

24 Q    It begins, the administrative agent on behalf of the

25 purchasers.

**J&J COURT TRANSCRIBERS, INC.**

1  A     Yes.

2  Q     Would you read that into the record please?

3  A     Entire D?

4  Q     The entire D.

5  A     "The administrative agent on behalf of the purchasers

6  shall have free and unrestricted use of all mortgage loans and

7  nothing in this repurchase agreement shall preclude the

8  administrative agent on behalf of the purchasers from engaging

9  in repurchase transactions with the mortgage loans or otherwise

10 pledging, re-pledging, transferring, hypothecating or re-

11 hypothecating the mortgage loans on terms and subject to

12 conditions within the administrative agent's absolute

13 discretion on behalf of the purchasers.  In all cases, subject

14 to the purchasers obligation to reconvey the mortgage loans on

15 the repurchase date, the administrative agent shall give notice

16 to the sellers of any such pledge, re-pledge, transfer,

17 hypothecation or re-hypothecation."

18 Q     Thank you.  Mr. Pilcer, in addition to the mortgage loans,

19 did the purchasers, under the repurchase agreement also

20 purchase the right to service those loans?

21 A     The purchaser purchased that right.

22 Q     Did the purchasers pay more for the mortgage loans because

23 they were sold servicing released?

24       MR. CROWTHER:  Objection to competence, Your  Honor.

25 He testified he wasn't involved in negotiation of this

1   agreement.

2            MR. ACKERLY:  Your  Honor, he had overall supervision

3   for it.  He's testified he's familiar with the agreement.  I

4   think he can testify what the agreement says.

5            THE COURT:  Overruled.

6   BY MR. ACKERLY:

7   Q    Do you want me to read the question back?

8   A    Could you try that again?  I'm sorry, yes.

9   Q    Did the purchasers pay more for the mortgage loans because

10  they were sold servicing released?

11  A    Yes.  The advance rates or haircuts as you would call them

12  within this repo are relatively low, which would characterize a

13  purchase price of mortgages that is more or less full price

14  with no discount for what I would call a servicing retain type

15  discount.

16  Q    Turn if you will to Section 11.1 of the repurchase

17  agreement, Page 91.

18  A    Yes.

19  Q    That's entitled designation of servicer.  Are you familiar

20  with this section?

21  A    Yes.

22  Q    Under this section of the repurchase agreement, did Calyon

23  have the right to designate an interim servicer for the

24  mortgage loans while they were subject to the repurchase

25  agreement?

1  A    Let me just read something.  Hold on.  Okay.  You'll have

2  to repeat the question.  Sorry.

3  Q    Under Section 11.1 of the repurchase agreement, did Calyon

4  have the right to designate an interim servicer for the

5  mortgage loans while they were subject to the repurchase

6  agreement?

7          MR. CROWTHER:  Objection, calls for a legal

8  conclusion.

9          MR. ACKERLY:  I don't believe it calls for a legal

10 conclusion.  The paragraph's entitled designate.

11         THE COURT:  Overruled.

12 BY MR. ACKERLY:

13 A    Okay.  Calyon had the right to designate a servicer upon

14 an event of default.  It's my understanding from reading this,

15 the servicer that we designated absent default was American

16 Home and for convenience purposes, that made the most sense in

17 this transaction.

18 Q    Would you explain in more detail why it was convenient to

19 appoint American Home Servicing as the interim servicer?

20 A    Again, American Home is a servicer, was a servicer.

21 American Home originated these mortgages and sold them to us

22 under the repo.  Like most repo transactions, it was not

23 envisioned that the loans in this repo would be in the facility

24 generally for more than about a month in any case, nor more

25 than 180 days.  And a point in fact, designating a new servicer

1  after American Home had already been the initial servicer of

2  these loans would have been impractical and logistically

3  extremely difficult.  You would have to move mortgage files,

4  you know, put electronic files on a new servicer's platform, et

5  cetera.

6  Q    Why do you need a servicer for these residential mortgage

7  loans?

8  A    Servicers are always needed for residential mortgage

9  loans.  Essentially for monitoring and maintaining the

10  mortgages and ensuring that collections are received and

11  allocated properly.  In the case of a repo like this which is

12  essentially for newly originated mortgages, generally what a

13  servicer is responsible for doing is sending what are called

14  hello letters and you know, payment books or some designation

15  of where to make those payments.  So it's to ensure the smooth

16  operation of the mortgages and receipt of payment.

17  Q    Did designating American Home Servicer as the interim

18  servicer of these mortgages facilitate the purchases and sales

19  under the repurchase agreement?

20  A    Yes.

21  Q    Mr. Pilcer, how long did a mortgage remain subject to this

22  mortgage repurchase agreement, the repurchase agreement,

23  typical?

24            MR. CROWTHER:  Objection, asked --

25            THE WITNESS:  That's been asked and answered twice so

1 far, Your  Honor.

2              THE COURT:  Overruled.

3              MR. ACKERLY:  I don't believe I asked that question

4 before.  There may have been an answer about it, but I don't

5 think I asked the question.

6              THE COURT:  I already overruled the objection.

7              THE WITNESS:  It's overruled?

8              THE COURT:  Yes, I'm sorry.

9 BY MR. ACKERLY:

10 A    Again, the mortgage under the repo is theoretically there

11 for the life of the mortgage, but in practicality, the

12 mortgages were typically there for less than a month, in some

13 cases 15 to 20 days.

14 Q    What would American Home Mortgage do with the mortgages

15 once they repurchased them from the purchasers under the

16 repurchase agreement?

17 A    They would either be sold to sold forward counter parties

18 or they would be placed by American Home into American Home's

19 own mortgage backed securities securitization transactions.

20 Q    Mr. Pilcer, what happens to the servicing under the

21 repurchase agreement if there's an event of default under the

22 repurchase agreement?

23              MR. CROWTHER:  Objection, calls for legal conclusion.

24              THE COURT:  Overruled.

25 BY MR. ACKERLY:

**J&J COURT TRANSCRIBERS, INC.**

1  A    It's our right as a remedy upon an event of default to

2  terminate the servicing of American Home and transfer that to

3  our designated servicer.

4  Q    Did Calyon in fact declare an event of default under the

5  repurchase agreement prior to the bankruptcy filing?

6  A    Yes we did.  A few days prior.

7  Q    Did you also designate a new servicer when you declared an

8  event of default?

9  A    Yes we did.  Chase Mortgage Company.  Chase Mortgage -- I

10 forget their exact name.

11 Q    Was the designation of Chase limited in any respect?

12 A    Yes.  A significant part of the portfolio would have

13 referred to as option ARM mortgages which Chase did not service

14 for which we were going to get a sub-servicer to service.

15 Q    Okay, so Chase could not service the option ARM mortgages?

16 A    No they couldn't.

17 Q    Okay.  Could you find someone who could service them when

18 you declared any of them in default?

19 A    Yes.  We found an entity called Cenlar, C-e-n-l-a-r, as

20 the designated subservicer for the option ARM mortgage loans.

21 Q    But on August 1st, 2001, who was servicing --

22 A    2007.

23 Q    -- excuse me -- August 1, 2007, who was servicing the

24 option ARM loans?

25 A    At that time American Home was.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And did American Home continue to service those on an

2  interim basis after the event of default?

3  A    Yes.  We sent out weekly interim renewal notices for

4  American Home to service those mortgages for several weeks

5  after the event of default.

6  Q    And why did you continue American Home Mortgage servicing

7  the option ARM loans for a period of weeks?

8  A    Again, the ability to transfer the servicing was going to

9  take a little while and it made sense for American Home to

10 function in that capacity.

11 Q    Has the week to week servicing arrangement on the options

12 ARMs with American Home Servicing terminated?

13 A    Yes it has.

14 Q    Mr. Pilcer, is the right to designate a new servicer upon

15 an event of default important to Calyon?

16 A    Yes, very important.

17 Q    Why?

18 A    It allows us to -- again, it's our believe and we think

19 the contract is clear that we're purchasing these montages on a

20 servicing release.  And in order to get the best possible

21 realization dollar for these mortgages, we want to have what we

22 think is the best possible servicer servicing these loans.

23 Q    Can you sell the loans for as much without being able to

24 sell them servicing released?

25       MR. CROWTHER:  Objection, calls for speculation.

**J&J COURT TRANSCRIBERS, INC.**

1  BY MR. ACKERLY:

2  Q    If you know.

3  A    Okay, what I do know is there's generally some what I

4  would call that material haircut that could be taken on an

5  owner of a mortgage.  Selling that mortgage on a servicing

6  retained basis.

7  Q    In connection with the default, Mr. Pilcer, did Calyon

8  request that the seller servicers, the debtors, assemble and

9  turn over to collateral the servicing related documents like

10 the montages, instruments, records and those sorts of things.

11 A    Yes, we made that request of American Home.

12 Q    Did you also request that they segregate and remit all

13 collections to Calyon?

14 A    Yes, that was requested.

15 Q    Was Deutsche Bank, as the custodian also notified of the

16 default?

17 A    Yes.  Deutsche Bank was notified of the default and to do

18 the same process, segregate documents and sweep cash that they

19 held on hand.

20 Q    I would like you to look at Exhibits 3 through 12 in your

21 book.

22 A    Yes.

23 Q    Now my question to you, are these the notices that went

24 out from Calyon Bank that you just described?

25 A    Let me just review.

1                          (Pause)

2  BY MR. ACKERLY:

3  A    Yes, these are various notices of events of default,

4  discontinuation of servicing, interim servicing.  These notices

5  were sent to American Home and Deutsche Bank.

6  Q    Is your signature on most of those documents?

7  A    I believe it's on most of them, but I can't -- I'd have to

8  verify, yes.

9  Q    Okay.  All right, Mr. Pilcer, moving on, does American

10 Home Mortgage's Chapter 11 Bankruptcy constitute an event of

11 default as it's defined in the repurchase agreement?

12 A    Yes.  It's very specifically an event of default under

13 Section 9, I believe, of the repo.

14 Q    Does the bankruptcy filing automatically terminate the

15 repurchase agreement?

16        MR. CROWTHER:  Objection, calls for a legal

17 conclusion.

18        MR. ACKERLY:  Your  Honor, we can go through the

19 repurchase agreement and point out the terms in the repurchase

20 agreement on event of defaults and the consequence of an event

21 of default and a termination event.  I'm just trying to save a

22 little time.

23        THE COURT:  Well most of this evidence is frankly

24 nothing more than a restatement of what I can read when I read

25 the contract.

1          MR. ACKERLY:  Yes, sir.

2          THE COURT:  And I'm not asking -- and I understand

3   it's not a legal conclusion.  But for purposes of understanding

4   of the record and making a presentation that's helpful or at

5   least thorough for the Court, I'll allow the witness to give

6   his understanding of these various terms.  That's why I've

7   overruled the objections previously.  So I understand they're

8   not legal conclusions, but I'll overrule the objection and the

9   witness can testify as to his understanding of the provisions

10  of the contract to the extent it's helpful.  To the Court, it

11  may be helpful.

12  BY MR. ACKERLY:

13  Q    Mr. Pilcer, would you like for me to restate the question?

14  A    Yes.

15  Q    Did the bankruptcy filing by American Home and its

16  affiliates automatically terminate the repurchase agreement?

17  A    Yes it did.

18  Q    Is that provided in the repurchase agreement?

19  A    Yes, it's there.

20  Q    Okay.  How many mortgages were subject to this repurchase

21  agreement on August 6th, 2007?

22  A    Approximately 5700 mortgages.

23  Q    What was the approximate repurchase price for the

24  mortgages on the petition date?

25  A    It's between 1.1 and $1.2 billion.

1 Q    Have the debtors, pursuant to Calyon's request, assembled

2 all the documents, instruments and records and made them

3 available to Calyon?

4 A    No they've not.

5 Q    Okay.  Have the debtors turned over all collections to

6 Calyon?

7 A    No they've not.

8 Q    Have the debtors surrendered the servicing to the new

9 servicers that have been designated by Calyon?

10 A    No they haven't.

11 Q    What is the impact on the purchasers under the repurchase

12 agreement of the debtor's failure to surrender servicing?

13 A    Well, the impact is that we're essentially frozen in our

14 ability to effect a proper liquidation strategy for the sale

15 and/or securitization of these mortgages to realize the best

16 possible amount to repay the repurchase obligation that's owed

17 to us.

18 Q    What is the impact on the purchaser's -- under the

19 repurchase agreement -- of the debtor's failure to turn over

20 the books and records related to the mortgage loans?

21 A    The books and records are part and parcel with the

22 servicing in that it's very difficult to perform proper due

23 diligence in order to sell or securitize these mortgages.

24 Nobody can really figure out a proper valuation of these

25 mortgages without the full complement of files that go with

them.

Q    In your opinion, if you sell the mortgages without the

requisite servicing files, would it result in a lower price?

A    Significantly.  Some of them -- quite a few of them

actually, could be characterized as what are called scratch and

dent loans without the proper documentation.  That's resulting

in a substantial discount to the purchase price that we paid

for these mortgages.

Q    Let me have just a minute.  Mr. Pilcer, if you would

answer any cross examination questions.

            THE COURT:  Thank you.  Cross.

            MR. ACKERLY:  Your  Honor, I would interpose an

objection to Mr. Tecce doing the cross examination since he was

not the one objecting to the witness's testimony.

            THE COURT:  Overruled.

CROSS EXAMINATION BY MR. TECCE:

Q    Good morning, Mr. Pilcer.  My name is James Tecce, I'm an

attorney at Quinn Emanuel.  We are counsel for American Home

Mortgage in this case.

A    Good morning.

Q    Thank you for appearing today.  Mr. Pilcer, can I direct

your attention please to what I believe is Calyon Exhibit

Number 1, in their binder, which is the repurchase agreement.

Do you have that document?

A    Yes.

1  Q    Mr. Pilcer, can I direct your attention specifically to

2  Page 91 of that agreement?

3  A    Yes.

4  Q    Section 11.1 at the bottom of that agreement.

5  A    Mm-mm.

6  Q    Could you read the second sentence of that section please?

7  A    The second section -- the second sentence of 11.1?

8  Q    Yes, sir.

9  A    Okay, hold on.  "Until the administrative agent gives

10 notice to the sellers of the designation of a new servicer

11 after the occurrence of a default of an event of default,

12 American Home Mortgages Servicing Inc., is hereby designated as

13 and hereby agrees to perform the duties and obligations of the

14 servicer pursuant to the terms hereof.

15        MR. TECCE:  Your  Honor, we have a binder of exhibits

16 that the debtors have designated in the Calyon case and we've

17 provided Calyon's counsel with a copy.  May I approach the

18 witness with a copy of the binder?  It's not on the bench

19 there.

20        THE COURT:  All right.  That's fine.  When we do

21 that, let's make some space by getting those four Credit Suisse

22 binders and just piling them on the floor there if that's all

23 right.  I don't want to lose them, but --

24        UNIDENTIFIED SPEAKER:  (Indiscernible) take a

25 two-minute break.

**J&J COURT TRANSCRIBERS, INC.**

Pilcer - Cross/Tecce                          28

1        THE COURT:  You need a break?  All right, we're going

2   to take a short recess.  You may not discuss the substance of

3   your testimony during the break, sir.

4                        (Recess)

5        THE COURT:  Please be seated.

6        MR. TECCE:  Good morning, Your  Honor.  I think I

7   need to adjust the mic, sir.  James Tecce again.  We were just

8   about to distribute the binders, may I approach the witness and

9   then the bench, Your  Honor?

10       THE COURT:  Yes you may.

11       MR. TECCE:  Thank you very much.

12       THE WITNESS:  Thank you.  Okay, I have them.

13  BY MR. TECCE:

14  Q    Mr. Pilcer, can I please direct your attention to Tab

15  Number 6 of this binder?

16  A    Yes.

17  Q    And what is the document at Tab Number 6?

18  A    It's something called Calyon America's general credit

19  policies and procedures manual.

20  Q    And have you seen this document before?

21  A    Just last week in deposition.

22  Q    Was this document ever e-mailed to you?

23  A    Not to my knowledge.

24       MR. TECCE:  Your  Honor, may I approach the witness

25  and the bench?

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes.

2          MR. TECCE:  Thank you.  Your  Honor, this document

3 has not been designated in the binder.  It's an e-mail.  I

4 would propose to designate it Calyon 101.

5          THE COURT:  Well it's not their exhibit.

6          MR. TECCE:  Okay, American Home 101.

7          MR. COMET:  I apologize, Your  Honor, just --

8          MR. TECCE:  And not in the Credit Suisse case, just

9 in the Calyon case.

10          MR. COMET:  There's two American Home 101's.

11          THE COURT:  Well we're going to have two debtor's

12 exhibits one through 21 as well, so they'll be specific to the

13 case they're in.

14 BY MR. TECCE:

15 Q    Sir, do you recognize this document?

16 A    Yes, I saw this last week at deposition.

17 Q    At the top of the document -- this is an e-mail, correct?

18 A    Yes it is.

19 Q    And is it an e-mail from Tina Carnpethus (phonetic) to a

20 list of people, correct?

21 A    Yes it is.

22 Q    Okay, and is that your name, sir, in the to line?

23 A    Yes, I'm on the list.

24 Q    And her e-mail says, see below on minimum legal

25 protection, correct?

1  A    Correct.

2  Q    Now flipping to the next page.

3  A    Yes.

4  Q    Can you read please the --

5  A    Minimal legal protection memos.  Do you want me to read

6  this?

7  Q    Yes, sir.

8  A    Okay.

9  Q    Just the first sentence actually of that paragraph.

10 A    Okay.  "Everyone addressed above is required to read the

11 general credit policies and procedures attached and available

12 on the Internet."

13 Q    Do you have an understanding as to whether or not that is

14 referring to the document in front of you?

15 A    I'm assuming it does.

16 Q    And do you know whether or not this document is in fact on

17 the Calyon Internet?

18 A    I'm assuming it is.

19 Q    Okay.  Mr. Pilcer, could I please ask you to turn to Tab 7

20 in that binder?

21 A    Yes.

22 Q    And can you tell me what this document is in Tab 7?

23 A    Tab 7 is an e-mail as well.

24 Q    And at the bottom -- is it fair to say this is two

25 e-mails, correct?

1  A    Yes.

2  Q    So starting with the e-mail at the bottom, is that an e-

3  mail from you?

4  A    Yes they are.

5  Q    And to whom is that e-mail addressed?

6  A    This is the one at the bottom?

7  Q    Yes, sir.

8  A    This is addressed to various people at each of the

9  syndicate banks in the repo.  It's also addressed to our

10 outside counsel in this matter which are various people at

11 Hunton Williams.

12 Q    And can you please read for me the first two sentences of

13 that e-mail?

14 A    "We (Calyon) will be speaking to Craig Pino (phonetic) at

15 five p.m."  You said the first two sentences, right?

16 Q    That's correct, sir.

17 A    Okay.  "We owe him a duty to listen to whatever solution

18 to this problem he has in mind, however we also need to convey

19 to him the direction that the conduit lending group wants to

20 take on this loan.  That message is that we will no longer

21 provide any funding to this transaction and we would expect to

22 be paid off from the proceeds of realization of our collateral.

23 We have notified Deutsche Bank to segregate our collateral and

24 they will await further instructions as to its disposition.  We

25 also expect to transfer servicing of the loans in our

1 collateral pool." Do you want anything further read?

2 Q    No, that's fine.

3 A    Okay.

4 Q    Going to the second e-mail at the top of the page. Is

5 this an e-mail from you, sir?

6 A    Yes it is.

7 Q    And without asking you to confirm whether every e-mail

8 addressee is identical, is this generally addressed to the same

9 group?

10 A    Generally it is, yes.

11 Q    And could you please read --

12 A    The entire thing or --

13 Q    No, just the first three sentences please.

14 A    Okay. "Amhome and Lazard (phonetic) have made no real

15 progress. They indicated several possibilities they're working

16 on that they couldn't be too specific on. We told them we were

17 calling our loan. They were disappointed, but understood."

18 Anything further?

19 Q    That's fine.

20 A    Okay.

21 Q    Mr. Pilcer, with respect to the mortgage loans that are

22 the subject of the Calyon agreement, the Tab 1 in the exhibit

23 file, did Calyon ever try and sell those loans prior to an

24 event of default to a third party?

25 A    No we did not.

1 Q    Does that agreement provide for the payment of a servicing

2 fee?

3 A    Yes it does.

4 Q    I believe that you testified previously that at some point

5 in 2006, the old Calyon loan agreement was transformed or -- I

6 don't want to mischaracterize your testimony -- but was

7 rewritten to a repurchase agreement, is that correct?

8 A    Yes.

9 Q    Okay.  And what's your understanding of what the features

10 are of a repurchase agreement?

11 A    Okay.  The features of a repur. agreement are for the

12 conduit end or bank group to purchase the loans and agree to

13 reconvey them back to the seller who is required to repurchase

14 those loans at a date certain prior to one year.  The purchase

15 price is going to be equal to the purchase price that the bank

16 group had plus what I would characterize as a premium to

17 compensate the group for the use of the money.  In addition to

18 which, it has features on what you would call margin

19 maintenance because there is a requirement to keep a certain

20 minimum haircut that's determined based on certain categories

21 of eligible collateral.

22 Q    With respect to the mortgages loans that are the subject

23 of the Calyon agreement, who do you understand to own the

24 servicing rights that relate to those loans?

25 A    The bank group owns those servicing rights.

1 Q    And has it always been your understanding that the bank

2 group owns those servicing rights?

3 A    Yes.

4         MR. TECCE:  May I approach the witness and the bench,

5 Your  Honor?

6         MR. ACKERLY:  Your  Honor, he is about to hand the

7 witness a document which we contend to be privileged and we ask

8 to be withdrawn from the discovery.  This is the issue we

9 talked about briefly yesterday so we need to address it with

10 the Court before it comes into evidence as a privileged

11 document.

12        MR. TECCE:  That's correct, Your  Honor.  I did raise

13 this issue at the pretrial conference and I'm prepared to argue

14 as to why it's not privileged.  I just would take direction as

15 to whether Your  Honor would be handed the documents and can

16 view it in context or whether we could argue about the document

17 in a vacuum.

18        THE COURT:  Do you have any position whether I can

19 look at it in camera -- or not in camera -- or whether I can

20 look at it in this context or would you prefer to try to argue

21 without me seeing it?

22        MR. ACKERLY:  I have no objection to the Court

23 looking at the letter, I think it would help the Court make the

24 decision.

25        THE COURT:  Okay.  You may approach me.  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. ACKERLY:  Would you like for me, Your  Honor, to

2   address the objection?

3          THE COURT:  Yes, that's -- since you have this sort

4   of burden of proof indicating this privilege.

5          MR. ACKERLY:  Your  Honor, as the Court is aware,

6   this case was put on an accelerated schedule for trial at the

7   request of my client and others and we entered into a

8   stipulation, the parties, as to how the trial would be

9   conducted and what the issues would be and also with respect to

10  discovery, and it did provide for document discovery.  In the

11  course of the document discovery we produced over 50,000 pages

12  of documents to the debtors.  We had approximately ten contract

13  attorneys working over a weekend to get those documents

14  together.  Those contract attorneys were reviewing the

15  documents primarily for privilege issues.

16         We realized after the documents had been produced,

17  and in connection with the preparation for depositions -- you

18  remember the case was continued -- in connection with some

19  depositions, that some documents had been produced which

20  otherwise would have been withheld as privileged.

21         This particular document is an e-mail from Mr. Pilcer

22  that's dated July 31st, 2007 and the reference of the e-mail is

23  EODs on securitization.  And EOD stands for event of default.

24         THE COURT:  I see August 1st.  Do I have to go back

25  further?

1              MR. ACKERLY:  You have to go back.

2              THE COURT:  This is a string?

3              MR. ACKERLY:  It's a string.   So if you go back to

4    what's designated as Calyon, Page 4482.

5              THE COURT:  4482, all right.

6              MR. ACKERLY:  There should be at the beginning, about

7    middle of that page an original message.

8              THE COURT:  Okay, from?

9              MR. ACKERLY:  From Mr. Pilcer.

10             THE COURT:  Xavier Ratoy (phonetic) and others?

11             MR. ACKERLY:  Mr. Pilcer would testify that all the

12   addressees of this e-mail are employees of Calyon Bank or its

13   parent in France.  The Re: of the e-mail is EOD on

14   securitizations.  And EOD, as I said, refers to events of

15   default.  Mr. Pilcer would further testify that this document

16   was sent out at a time when the parties were considering

17   whether to call and event of default.  You will see that the e-

18   mail was addressed to, among other people, a Richard Carlson.

19   Mr. Carlson is in house general counsel for Calyon Branch New

20   York.

21             THE COURT:  Where is he?  Oh, he's one of the cc's.

22             MR. ACKERLY:  He's one of the cc's.

23             THE COURT:  All right.

24             MR. ACKERLY:  You'll see in the second paragraph of

25   the memorandum -- or the e-mail -- it said this afternoon we

**J&J COURT TRANSCRIBERS, INC.**

1   had an approximately 90-minute conference call with our

2   external lawyers on the deal, Hunton and Williams, as well as

3   with Richard Carlson and David Hooker, who are Calyon's New

4   York legal division.  Hunton and Williams provided us with

5   several important points that bolster the argument as to what

6   Calyon should do with respect to the event of default.  And

7   then on the next page, Mr. Pilcer has sent an e-mail to the

8   people concerning his interpretation of that legal advice.

9   Your  Honor, we believe that this is clearly privileged.  Mr.

10  Pilcer would testify that this information was sent on to

11  people at the bank who needed to know this information in

12  connection with the decisions they were making about whether to

13  call an event of default.

14          And I think the case law is very clear, Your  Honor,

15  that if a client attempts to summarize legal advice to people

16  in his organization who need to know the legal advice, then

17  that summary is protected by the privilege as well.  And so we

18  would ask that this document be withheld from the production

19  and not be used as an exhibit in this case.

20          THE COURT:  What about the other e-mails that are

21  attached?

22          MR. ACKERLY:  There is, Your  Honor, if you flip back

23  to the Page 4484, there is an e-mail there from Mary Ford-

24  McBride (phonetic), again, internally addressed, cc'd to

25  Richard Carlson, which refers to Mr. Pilcer having checked with

1 inside counsel.

2         THE COURT:  Okay.  All right, so same issue.

3         MR. ACKERLY:  Yes, sir.  We sent a letter to Quinn

4 Emanuel and Young Conaway on October the 26th as soon as we

5 discovered this and asked that this document be withdrawn.

6 They're response has been they want to put it into evidence.

7         THE COURT:  All right.  Let me here response.

8         MR. TECCE:  Your  Honor, first of all, the paragraph

9 which Mr. Ackerly read, the last sentence of that paragraph

10 refers to these together, meaning the conversation with Hunton

11 Williams, with our business rationale are as follows.  So the

12 text of this e-mail contains both business rationale and a

13 summary of that conversation, so it's not entirely

14 attorney/client communication or attorney/client privilege.

15         And Number 2, the e-mail is being offered for the

16 purpose of impeaching the witness's testimony on the issue

17 which I raised immediately prior to bringing the e-mail to the

18 bench and to opposing counsel.  So it's being used for that

19 purpose.

20         Lastly, Your  Honor, Hunton and Williams did advise

21 us in a letter dated October 26th that they asserted privilege

22 with respect to this document.  We told them on November 1st

23 that -- in a written response back -- that we disputed that and

24 that we intended to raise it at the pretrial conference, which

25 we did.  And the document doesn't appear in any witness binder

1 or has not been designated as an exhibit because we did

2 sequester it at that point.  But at no point did they approach

3 the Court for a protective order or try to enforce the

4 privilege after hearing that we intended to try and introduce

5 it into evidence.

6          So Number 1, we don't believe the document is

7 privileged given the business rational overlay, and Number 2,

8 we don't believe that they've taken adequate steps under Third

9 Circuit Law to protect the privilege -- or the asserted

10 privilege.

11          THE COURT:  Is the -- are the bullet points -- and

12 I'm not going to read them -- but I see there are five bullet

13 points that indicate sort of legal advice and business

14 rationale, are they capable of being separated out, i.e., can

15 the legal advice be separated from the business points or are

16 they irretrievably intermingled?

17          MR. ACKERLY:  Your  Honor, I believe that they cannot

18 be segregated, because I believe the business rationale is

19 somehow tied into the legal advice.  I don't believe they can

20 be separated like that.

21          THE COURT:  All right.  Well, if they're

22 incorporated, if business rational, you know, and legal advice

23 are basically incorporated into a position, generally speaking,

24 that would be privileged information.  I mean, the whole point

25 of the attorney/client privilege in a commercial relationship

1 is for the client to provide the lawyer with his business

2 rationale for wanting to do something and the lawyer either

3 saying he can or can't do it or what effects what he wants to

4 do might have from a legal perspective so that the client can

5 then make a rational business decision based upon legal advice.

6 And if he's passing that on to his superiors or colleagues to

7 the bank with a recommendation of how to proceed based on a mix

8 of his business information with his attorney/client

9 information, that's both sort of normal and isn't that

10 privileged?

11          MR. TECCE:  Well, Your  Honor, I think that given the

12 fact that the two have now -- are intersected, the business

13 rationale and the legal advice, that the text loses its status

14 of being an attorney communication or advice from an attorney.

15 It's a business decision that's been reached, albeit based on

16 the conversation, but it's still a decision to proceed one way

17 based on what your understanding is and how you're going to

18 proceed with respect to American Home based on the situation at

19 the time.

20          The second point I would make on this is that we're

21 not asking -- the waiver -- well, first of all, to the extent

22 that there is any privilege, we'd submit that it's been waived

23 by virtue of the fact that the document was produced and no

24 steps were taken -- affirmative steps apart from a letter --

25 but I mean, no steps were taken, no application was made to the

1 Court for protective order.  But to the extent that there was a

2 waiver, we're not arguing that all the communications relating

3 to what's in this e-mail are no longer privileged.  We're not

4 trying to reach past this e-mail, we're not trying to ask about

5 the conversations with Hunton and Williams.  You know, and

6 although it could be argued that that may be the case, that the

7 waiver with respect to this particular issue waives the

8 communications -- we're not going there.  We're just talking

9 about the document that's in front of the Court and the second

10 bullet point.

11          THE COURT:  Well I'm not moved at all by the fact

12 that Richard Carlson is copied on an e-mail and that somehow

13 makes it privileged.  The only -- you know, you can't hide

14 business decisions as privileged communications by copying

15 internal counsel, so that's not going to get them anywhere.

16 I'm more concerned with the fact that they had a call with

17 Hunton and Williams, Carlson -- who's David Booker, is he a

18 lawyer?

19          MR. ACKERLY:  In house counsel.

20          THE COURT:  All right.  With the lawyers.  Hunton and

21 Williams provided important points that bolster the argument --

22 I guess the question is what are those important points?  I

23 mean, you would acknowledge that those important -- are you

24 acknowledging that those important points were legal advice?

25          MR. TECCE:  No, Your  Honor, I would argue that they

1 are connected with business rationale and that's further

2 underscored by the fact that this is an e-mail between -- from

3 a business person to a business person.  The fact that counsel

4 may be cc'd --

5        THE COURT:  Well look, if I'm a business person and I

6 have a meeting with the lawyer and the lawyer tells me, you

7 know, I want to do X, and the lawyer tells me, if you do X

8 you're exposing the company to criminal liability and then I

9 write my superior and say, we really shouldn't do X because I

10 had a meeting with the lawyers and we'd be exposing the company

11 to criminal liability.  That's a privileged communication,

12 right?

13        MR. TECCE:  Yes, but I don't think that this document

14 is similar to that situation for the following reason, Your

15 Honor.  The time frame of this document, which is --

16        THE COURT:  Well, what if we said, okay, the lawyers

17 says we shouldn't do X because we'd be exposing it to criminal

18 liability, I understand that that's a risk factor, but we're

19 going to make a hell of a lot of money on this deal so I don't

20 care.  So now I'm telling my superior I had a conversation that

21 we should buy double-hulled tankers so that we don't expose

22 ourselves to criminal liability for polluting the environment,

23 but they cost too much and we're going to make even more money

24 than anyone could ever believe selling oil, and as a result we

25 should do it anyway, and I send that memo.  That's still

1 privileged, or isn't it?

2          MR. TECCE:  But this memo is one step beyond the

3 example that you've given me.  This memo doesn't articulate

4 that we had a conversation with Hunton and Williams and Hunton

5 and Williams said X, therefore we should do Y.  This says, we

6 had a conversation -- and the Y  being the next business step.

7 This e-mail says, we had a conversation with Hunton and

8 Williams and we should do Y, which is the business step.  It

9 doesn't really get into the particulars of that conversation.

10          THE COURT:  All right.  Let me hear a response on

11 that.

12          MR. ACKERLY:  Your  Honor, again, the context of this

13 was July 31.  The exhibits -- the case in chief show that that

14 event of default was declared on August 1st, a day later.  The

15 subject of this, and clearly the subject of the legal advice as

16 indicated at the bottom of the page is to bolster the argument

17 that Calyon should vote in favor of, the reasons why.  That's

18 what the legal advice was and then that is summarized, you

19 know, in the bullet points.  So to me this is clearly Mr.

20 Pilcer taking legal advice that he got from his inside and

21 outside lawyers on an issue that they were addressing on July

22 31st, summarizing that to his colleagues in the bank.

23          I mean, I'm not taking the position this is

24 privileged because it was cc'd to a lawyer, I'm taking the

25 position that this is privileged because it summarizes in the

1 context of the decision they made, the legal advice they got

2 about why they should do something.  And we believe that that

3 should not be admitted.

4        With respect to the argument that we didn't do this

5 properly, we did send a letter, we sent a letter as soon as we

6 discovered it.  I don't recall receiving a response from them

7 other than an oral response.  And I might add that Quinn

8 Emanuel had the same issues with respect to a request to us

9 about withdrawing documents that they had produced that they

10 claimed to be privileged and we immediately destroyed them.

11        So, Your  Honor, I think this is -- you know, we had

12 to produce a lot of documents in a very short period of time.

13 We had to use a lot of contract lawyers to get this done within

14 the period of time.  And you know, this should not have been

15 produced, but it doesn't mean we can't withdraw it from the

16 production because it's privileged.

17        THE COURT:  Give me a moment to actually read the --

18 I was hoping to avoid having to read it, but -- all right, I'm

19 going to sustain the objection.   Looking at the bullet points,

20 I think they're clearly, I'd say overarchingly in the nature of

21 legal advice.  I think the production of the document was

22 inadvertent, and I think given the speed and pace of discovery

23 in this case that filing a formal protective order was not

24 required.  They sent you a letter, you responded, you acted

25 appropriately by holding it aside, but not necessarily turning

1 it back.  The issue was raised at the pretrial and I think

2 that's all that needed to be done.  So the Court considers the

3 document privileged, there's no waiver of the attorney/client

4 privilege and I won't consider it.

5          MR. TECCE:  Okay.  Your  Honor, thank you very much.

6 I have no more questions for this witness.

7          THE COURT:  Redirect?

8          MR. ACKERLY:  One second, Your  Honor.

9          MR. TECCE:  Your  Honor, perhaps (indiscernible), at

10 this point in time, I'd like to move Exhibits 6, 7 and AHM-101

11 into evidence.  This was Tab 6.

12          THE COURT:  Yes, any objection?

13          MR. ACKERLY:  Yes, sir.  We would object on relevance

14 grounds.  There's been no testimony whatsoever that this has

15 anything to do with the repurchase agreement.

16          THE COURT:  Which one are you talking about here?

17 He's got three exhibits here.

18          MR. ACKERLY:  I'm talking about what's called Calyon

19 America's general credit procedures.  I'm not sure it's been

20 numbered.  It was in the book as Exhibit 6.

21          THE COURT:  So your objection is to relevance?

22          MR. ACKERLY:  Yes, sir.  There's no evidence that it

23 has anything to do with the repurchase agreement.

24          THE COURT:  Well doesn't Exhibit 101 create a nexus?

25          MR. ACKERLY:  Not to the repurchase agreement I

1 believe.

2           THE COURT:  All right, I think it's relevant.  I'm

3 going to allow it.  Overrule the objection on relevancy.  So

4 Exhibits 6, 7 and 101 are admitted.

5           MR. TECCE:  Thank you very much, Your  Honor.

6           MR. ACKERLY:  Your  Honor, excuse me a second.  Which

7 one is 101?

8           THE COURT:  101 is the e-mail from Tina Carnpethus to

9 Sam Pilcer and others.

10          MR. ACKERLY:  Okay, we just had the same objection to

11 that one, but you've overruled.

12          THE COURT:  Yes.  I'm sorry if I got ahead of you.

13 So Exhibit 6 and 101, the objection as to relevancy is

14 overruled, was there an objection to Number 7, Mr. Ackerly?

15 Those are the two e-mails from Mr. Pilcer?

16          MR. ACKERLY:  Yes, sir.

17          THE COURT:  Basis?  Whatever, if you want to go to

18 the -- whatever's easier for you, sir.  I'm not trying to make

19 it at all difficult for anybody.  It's tight quarters at these

20 tables.

21          MR. ACKERLY:  Focusing on what is Exhibit 7, the two

22 e-mails both from Sam Pilcer, Your  Honor, we believe these

23 documents are irrelevant.  They don't go to the case in chief

24 that we put on.  If anything they go to the counter claim that

25 the debtors' got that the loan should be recharacterized.  They

1 go beyond the scope of the direct examination.  They are in

2 essence an effort to vary the terms of the repurchase agreement

3 by drawing the Court's attention to the use of the word loan

4 and use of the word collateral in these e-mails.  And we

5 believe that evidence of intent beyond the four corners of the

6 document that's at issue is not admissible in this case.  And

7 for that reason we object.

8           THE COURT:  Well then why did you ask your witness a

9 series of questions about why it was important to him to switch

10 from a warehouse lending to a repurchase agreement?  That's

11 intent, right?

12          MR. ACKERLY:  That was the intent with respect to why

13 the loan changed, not their intent with respect or what they

14 meant to do under the repurchase agreement.

15          THE COURT:  Well I do think it's relevant and I don't

16 think it needs to be wait until their counter claim and I think

17 it refutes -- or at least purports to refute some of the

18 statements made on direct testimony by the witness, so I'll

19 overrule that objection.  Just so the record is clear, Exhibit

20 6, 7 and 101 are admitted over the objection of Calyon.

21          MR. ACKERLY:  One second, Your  Honor, about

22 redirect.

23          THE COURT:  Sure.  Do you want to take a recess or --

24 we can do that, that's fine.

25          MR. CROWTHER:  Are we going to recess, Your  Honor?

1  REDIRECT EXAMINATION BY MR. ACKERLY:

2  Q    Mr. Pilcer, if you would look at what was introduced as

3  Defendant's Exhibit 7 in the book.

4  A    Yes.

5  Q    What I want you to focus on is your e-mail of July 28th,

6  2007 at 6:02 p.m.

7  A    Yes.

8  Q    Okay.  Would you give the context in which this e-mail was

9  sent?

10  A    Well, the context is that it was written on a Saturday

11  night at six p.m. in what I would characterize as an emergency

12  situation involving a group of several banks with problematic

13  exposure of about $1.2 billion.

14  Q    In the third sentence of the e-mail, you say we told them

15  we were calling out loan.  Who is the them?

16  A    That would be American Home.

17  Q    And your use of the word loan, what were you referring to?

18  A    That was what I would call a convenient characterization

19  of the exposure, of the amount of dollars that were owed to us

20  by American Home, which was their obligation under the

21  repurchase agreement to repurchase for me.

22  Q    Were you using the word loan in any legal context?

23  A    Absolutely not.

24  Q    Okay.

25  A    I'm not a lawyer.


**J&J COURT TRANSCRIBERS, INC.**

1           MR. ACKERLY:  No further questions.

2           THE COURT:  You say that with pride, sir.

3                          (Laughter)

4           THE COURT:  You may step down.

5           MR. ACKERLY:  We have no further evidence, Your

6   Honor.

7           THE COURT:  All right.

8           MR. CROWTHER:  Your  Honor, may I be heard?

9           THE COURT:  Yes, Mr. Crowther.

10          MR. CROWTHER:  With the Court's indulgence, we'd like

11  a short recess to bring in our next witness -- well our first

12  witness -- but that will be Mr. Love.  Just so Your  Honor

13  knows, the four o'clock motion for stay of the appeal has been

14  withdrawn.  That leaves the Court's calendar open for this

15  afternoon.

16          THE COURT:  No it doesn't, I have another --

17          MR. CROWTHER:  No, no, I mean at four o'clock.  They

18  tole me to let you know that it was off your calendar because

19  it was just done.

20          THE COURT:  I understand that, but there is a pending

21  matter that still has to be heard which was the -- Mr. Butts'

22  motion objection to the form of order that's separate from the

23  Deutsche Bank issue, but was scheduled for the same time.

24          MR. CROWTHER:  That's also been withdrawn, but we'll

25  find out and let Your  Honor know.

1          THE COURT:  Oh okay, if that's the case, let me know.

2          MR. CROWTHER:  I certainly will.  But at this point

3  we'd like a short recess to bring Mr. Love in to testify.

4          THE COURT:  I have to run across the street for a

5  business matter, internal court business matter, so let's take

6  a recess to 11 if we may and we'll reconvene at 11 with Mr.

7  Love.

8          MR. CROWTHER:  Thank you.

9                    (Recess)

10          THE COURT:  Please be seated.

11          MS. EDWARDS:  Good morning, Your  Honor.  Erin

12  Edwards from Young, Conaway, Stargatt and Taylor on behalf of

13  the debtor defendants.  I have one housekeeping matter before

14  we begin.  The sale or order matter that's scheduled for four

15  o'clock will still be going forward, but I was asked to let you

16  know that it should not take much of the Court's time.

17          THE COURT:  Thank you.

18          MS. EDWARDS:  The debtors would like to call Robert

19  Love.

20          THE COURT:  Very well.

21          THE CLERK:  Please place your hand on the Bible.

22        R O B E R T   L O V E, DEBTOR'S WITNESS, SWORN

23          THE CLERK:  Please state your full name and spell

24  your last name for the record.

25          THE WITNESS:  Robert L. Love, Jr.  The last name is

1  Love, L-o-v-e.

2           THE COURT:  Do you have a cell phone in your pocket,

3  Mr. Love?

4           THE WITNESS:  I have one that's off.  A Blackberry

5  that's off.

6           THE COURT:  Okay, that's fine.

7  DIRECT EXAMINATION BY MS. EDWARDS:

8  Q    Mr. Love, by whom are you currently employed?

9  A    I'm currently employed by American Home Mortgage Servicing

10 Inc.

11 Q    and where is American Home Mortgage Servicing located?

12 A    It's located in Irving, Texas.

13 Q    And what is your title in American Home Mortgage

14 Servicing?

15 A    I'm currently the vice president of loan sales and new

16 product lines.

17 Q    What are your responsibilities?

18 A    I'm a member of the senior management team at American

19 Home Mortgage Servicing.  The groups that I directly manage are

20 responsible for the transfer and servicing of loans both on and

21 off of the AHM servicing system as well as tying out loan sales

22 transactions.  I also manage a group that was responsible for

23 setting up any servicing retained transactions that we had

24 within our system as well as portion out -- deal summary sheets

25 to the rest of the internal parties at American Home Mortgage

                    **J&J COURT TRANSCRIBERS, INC.**

1  Servicing that would lay out the structures in terms of those

2  deals for the internal parties.

3  Q    How long have you worked for AHM Servicing?

4  A    I've worked for American Home Mortgage's Servicing since

5  June of 2002.

6  Q    And what did you do prior to joining American Home

7  Servicing?

8  A    Prior to joining American Home Mortgage Servicing I worked

9  for a company which was Columbia National Inc., which is a

10  company that was acquired by American Home in June of 2002 and

11  which is the company where American Home Mortgage Servicing

12  came from.

13  Q    Can you describe the debtor's business pre-bankruptcy and

14  how it worked?

15  A    At a high level pre-bankruptcy, American Home Mortgage was

16  in the business of originating, selling, investing in and

17  securitizing mortgage loans.

18  Q    And generally, what does it mean to service a loan?

19  A    To service a loan really encompasses a series of primarily

20  administrative functions that relate to the interactions with

21  the homeowner after their loan closes, the preparation of

22  statements, collection of payments, management of loans through

23  the collection and potential default processes as well as other

24  items that are related to the administration of escrow, tax and

25  insurance payments and managing another other correspondence

1 that would relate to the homeowners in that fashion.

2 Q    Who were the parties for which American Home Mortgage

3 Servicing services loans?

4 A    A few weeks ago at the sale approval hearing we talked

5 about four groups of loans that American Home Mortgages

6 Services for and that was just limited to the population of

7 loans that was proposed for that sale.  Those four groups were

8 AHM securitizations, private investors, third party

9 securitizations and then the government-sponsored entities,

10 which is Fannie Mae, Freddie Mac and Ginnie Mae.

11            There's two additional groups that AHM services for.

12 The first is what we would term as interim service loans which

13 are loans that have been sold in a trade, service and released

14 and AHM is still servicing those loans, usually for a

15 predetermined period of time until the transfer date is set,

16 and the transfer date is the date that the servicing is

17 scheduled to transfer to the new servicer or to the purchaser's

18 designee.

19            The last group of loans are a group of loans that

20 what we consider in servicing to be warehouse loans.  And those

21 are loans that we're servicing for American Home which are

22 loans that they have that are being held for sale.  And I guess

23 by held for sale, what I mean is that those are loans that have

24 not yet been sold to an investor in you know, service and

25 released or service and retained a trade.

1  Q    What categories of loans does American Home Mortgage

2  service -- Servicing service?

3  A    The categories really are tied to those six groups.  You

4  know, the first group, the American Home Mortgage

5  Securitizations were servicing for the securitization trust.

6  The private investors were servicing for the private investors.

7  The third party securitizations is, again, we're servicing for

8  the securitization trust with the GSE's the government

9  sponsored entities, it's for any one of those three parties.

10        The warehouse loans we're servicing on behalf of

11  American Home.  And then the last group, the interim service,

12  we're servicing those for the investor that purchased the loans

13  in a servicing released transaction.

14  Q    Can you explain to the Court what you mean by warehouse

15  loans?

16  A    The easiest way, I guess, to explain what we're referring

17  to as a warehouse loan is if you just take an individual loan

18  and if today American home originated a loan with that

19  borrower, tomorrow the loan would board down to our servicing

20  system and we would begin to service that loan.  The loan would

21  board into what we have designated as or called warehouse

22  accounts in the servicing system.  The designation of which

23  warehouse account it would go into is based on what HM entity

24  originated that loan or currently owned that loan.

25        For example, if it was -- and the split there was

1 whether it was the taxable rate subsidiary which was the

2 mortgage corp., or the qualified rat subsidiary which was the

3 rate.  So if the loan was originated or currently owned by the

4 mortgage corp, it would board down into Investor 21 and if it

5 was the qualified rate subsidiary it would board down into

6 Investor 11 for example.  The loans would stay in those

7 warehouse investors until there was an alternate trade, where

8 the loans were sold either servicing released or servicing

9 retained.

10        In between those two periods of time when the loan

11 originally board the system until that trade took place, every

12 day  as collections would come in so once the borrower started

13 to have payments to come in, we would remit and report those

14 payments back to corporate every night.

15        So that was the main function and what we're

16 referring to with warehouse loans, we perform all the other

17 servicing functions.  You know, we're doing statements, we're

18 paying tax and insurance items as those come up.  But that's

19 what we're referring to when we refer to warehouse loans are

20 loans that are being held for sale as we would call them.

21 Q    Did American Home Mortgage Servicing have an understanding

22 where the money came from that went to the borrower to

23 originate a loan?

24 A    From our perspective, we would not know how that original

25 loan, mortgage loan given to the borrower was financed from the

1 AHM perspective.  The loan would close and it would board down

2 to our system, but what mechanism AHM used to provide the cash

3 at the closing table to the homeowner for the loan was not

4 something that really fell into our influency.  The loan closed

5 and then it board down to the system and we began servicing it.

6 Q    Would servicing of the money to originate a loan from a

7 borrower came from a (indiscernible) purchase agreement?

8 A    We would not know.

9 Q    Would you know if it would come from a loan?

10 A    We would not know, again.

11 Q    Would there be any difference with how American Home

12 Mortgage Servicing set up and serviced a mortgage under a

13 warehouse line if the money used to originate the loan was

14 borrowed under secured financing versus a repurchase agreement?

15 A    There would not be a difference.  Again, the difference in

16 how the loans would board would be which AHM entity was

17 associated with that loan, if it was either the taxable rate

18 subsidiary or the qualified rate subsidiary.

19 Q    You testified earlier that a mortgage originated under a

20 warehouse line would be coded to the AHM specific entity that

21 owned the loan on the system.  Would servicing be aware of

22 AHM's transferred a mortgage to, for example, Calyon?

23 A    We would generally not be aware if AHM moved the loan from

24 one warehouse facility to another or in your example, moved it

25 to the Calyon facility.  The only time that we would receive

1  any notification of changes or we would move the loan from one

2  of our warehouse investor codes to another was if the AHM

3  entity associated with that changed.  So if the mortgage corp

4  originated the loan and then later if they reacquired it, we

5  would then transfer it, but that wouldn't tell us if the loan

6  was being financed on a lending facility which one it would be

7  on or if that changed at the same time.

8  Q    You've described for us so far what happens up to the

9  point when the mortgage is loaded up onto the servicing system

10 or boarded.  Can you describe what happens next?

11 A    What's going to happen next that would change anything

12 with those warehouse lines would be when there is an ultimate

13 sale to an investor.  And again, it would go back to depend if

14 the sale was a servicing release transaction or a servicing

15 retained transaction.  And basically what would happen would be

16 very substantially similar.  But if a particular loan was in a

17 servicing release transaction for example, we would transfer

18 that loan out of one of our -- whichever warehouse account in

19 the servicing system that loan was sitting in and we would

20 transfer it to a new investor code that was set up for that

21 particular trade where if the investor was investor A and their

22 servicer is servicer B, we would have an investor code and a

23 pool number set up for investor A, for servicer B, and we would

24 transfer the loan into that investor code based on how it was

25 sold to them and we would then service the loan and collect

1  payments until the transfer date.

2        The investor code that we transfer it into would have

3  separate bank accounts set up for that investor.  One for

4  principal and interest and the other for taxes and insurance.

5  As the payments would come in, the payments would get moved to

6  that bank account.  At the end of each month end, we would

7  typically report and remit to those investors as well as at the

8  time of transfer we would report and remit to them final -- for

9  a final time as well as facilitate the transfer of servicing to

10 their new servicer at that time.

11       If the loan was in a servicing retained trade, all

12 the same steps we would go through, only once we get it

13 transferred into the new investor code, set up for that deal or

14 that investor or that securitization, that loan would stay

15 there instead of transitioning to a new servicer because the

16 trade was one that was service and retained.

17 Q   And can you remind the Court what it means to sell a loan

18 on a servicing release versus a servicing retained basis?

19 A   The simplest way to look at it is that there's -- there's

20 two basic assets associated with the loan.  There is the

21 underlying note and mortgage, which is the piece that really is

22 going to pay much like a bond, and the other asset is the

23 servicing rights.  And they're two separate assets and

24 sometimes they're traded together, sometimes they're traded

25 separately.  If the investor buys both the underlying note and

1  mortgage as well as the servicing rights, that's a service and

2  released trade.  If they just buy the underlying note and

3  mortgage, but they don't buy the servicing asset, that's a

4  servicing retained trade where we retain the servicing asset.

5  Q    You testified earlier regarding how American Home Mortgage

6  Servicing services loans on the warehouse lines.  Who does

7  American Home Mortgage Servicing service these loans for?

8  A    From our perspective, we're servicing those accounts for

9  either, it was either American Home Mortgage Corp., or American

10 Home Mortgage Acceptance of Investment if it was the

11 (indiscernible).  So it would depend on whichever party we knew

12 to have the ownership entity at AHM who was holding those loans

13 for sale.

14 Q    And what is your understanding of the purpose of the

15 warehouse facilities?

16 A    From my understanding, at a high level, the purpose of the

17 warehouse facilities is basically to provide an interim source

18 of financing for the loans until the loans can ultimately be

19 sold to an end investor, whether it's a service and released or

20 servicing retained trade at that point in time.

21 Q    Did American Home Mortgage Servicing act as a servicer for

22 all loans originated by AHM and then transferred to a warehouse

23 loan?

24 A    With the exception of construction loans while they were

25 in the construction phase, which were handled by our

1 construction lending group, every loan that American Home

2 originated would board down to the system and we would continue

3 to service those loans either until (a) the loans were included

4 in a servicing release transaction and we completed a servicing

5 transfer to a new servicer or (b) the loans paid off through

6 the normal course of their life.

7 Q    Is there any reason why AHM Servicing always acted as the

8 servicer in these situations?

9 A    I mean, probably just from a couple of practical reasons

10 where AHM was servicing those loans from the time that they

11 originated, as I just mentioned.  The purpose behind us

12 continuing to service the loans were that these were assets

13 that needed to be served and preserved the value so that they

14 could ultimately be sold in a final sale whether that was

15 servicing released or servicing retained.  It was at the time

16 of those ultimate sales where we would then -- it would then be

17 decided based upon how the bids came in if we would retain the

18 servicing rights indefinitely or if we would transfer the

19 servicing if the investor bought the servicing as well.  I lost

20 my train of thought.  Sorry.

21 Q    Were there any other reasons why AHM Servicing acted as

22 the servicer in this situation?

23 A    In many of the trades, and I think as we've mentioned,

24 they would be servicing retained trades, so I mean, I think

25 just from a practical matter, it would not make -- it wouldn't

1 make any sense for AHM not to service those loans when there

2 was a very high likelihood that we would continue to service

3 those loans permanently if we retain the servicing asset.

4 Q    Do you consider servicing the warehouse lines -- or the

5 mortgages on the warehouse lines an asset of American Home

6 Mortgage Servicing?

7 A    I would --

8         MS. GRAY:  Objection, Your  Honor.  Foundation as to

9 whether he knows what the assets are of American Home with

10 regard to the servicing.

11         MS. EDWARDS:  Your  Honor, he's testified to his

12 experience in the servicing industry with respect to American

13 Home and discussed what he believed the warehouse facility was

14 and what he was servicing for the warehouse facilities.

15         THE COURT:  Yeah, I think his -- he's sufficiently

16 high up in management in American Home Servicing based on his

17 testimony that he should be aware of the basic assets of that

18 business, so I'll overrule the objection.

19 BY MS. EDWARDS:

20 A    I would just say that in my opinion, servicing rights are

21 always an asset.  Servicing rights are traded separately all

22 the time from the actual mortgage loans.  It's a separate asset

23 that has its own distinct market that a lot of times servicing

24 rights are just sold on their own.  There are times when

25 mortgage loans and the associated servicing rights are sold

1 together, but servicing rights are a distinct asset and they're

2 traded separately very frequently.

3 Q     Can you locate the Calyon binder up there and turn to

4 Exhibit 1 please?  I'm sorry, Calyon Exhibit 1.

5          THE COURT:  The really big binder?

6          MS. EDWARDS:  Yes, the really big binder.

7 BY MS. EDWARDS:

8 A     Okay, I'm there.

9 Q     Okay.  Is --

10          THE COURT:  Exhibit 1?

11          MS. EDWARDS:  Exhibit 1 please.

12 BY MS. EDWARDS:

13 Q     Have you seen this before?

14 A     I have seen this agreement.  I first saw it, I believe,

15 the day before my deposition, which I think was around October

16 25th, and I also saw it the day of the deposition.

17 Q     Is American Home Mortgage Servicing a party to this

18 agreement?

19 A     Yes, they are listed as a party.

20 Q     Is American Home Mortgage Servicing currently servicing

21 loans that are subject to this agreement?

22 A     We are currently servicing loans that were subject to this

23 agreement.

24 Q     Is Servicing being compensated for the servicing of these

25 loans?

**J&J COURT TRANSCRIBERS, INC.**

1  A    We are being compensated for the servicing of these loans.

2  Q    How much are you being compensated?

3  A    The servicing fee for this particular line is 50 basis

4  points on an annualized basis based on the unpaid principal

5  balance on each of the mortgage loans.

6              THE COURT:  I'm sorry, 50?

7              THE WITNESS:  Fifty basis points, yes.

8  BY MS. EDWARDS:

9  Q    And how does American Home Mortgage Servicing get paid

10 these 50 basis points?

11 A    In the normal course the way that it would have happened

12 really would have been a piece that we wouldn't have been

13 involved with.  As I spoke before, AHM was collecting and

14 remitting payments on all the warehouse loans back to corporate

15 nightly.  And that was really a piece that the corporate

16 accounting group handled from that end as far as making sure

17 that AHM Servicing was credited with the appropriate fees.

18 Q    Where is corporate located?

19 A    Corporate is located in Melville, New York.

20 Q    Can you find --

21             THE COURT:  I'm sorry.  Your servicing is compensated

22 by corporate for servicing its loan?

23             THE WITNESS:  Yeah.  I mean, I guess the difference

24 would be when we talk about all the loans that were in the

25 servicing sale, all those loans -- the servicing fees are

1  actually loaded to the loans and American Home Mortgage

2  Servicing is remitting to the investors each month and we're

3  collecting and deducting those fees at the loan level.

4          In the case of the warehouse accounts, rather than --

5  what was happening before was we would collect payments daily

6  and we would pass the entire payments back to corporate every

7  night along with the loan level accounting of what came in and

8  was collected on those loans.  So from that perspective, in the

9  ordinary course, we did not have what the servicing fee was

10 loaded to the loan and we were not (indiscernible).  The

11 accounting group would handle that piece on a day to day basis.

12 Q    And has anything changed with respect to how American Home

13 Servicing is getting paid for the Calyon loans?

14 A    The only thing that's changed is at the beginning of

15 August we were directed to set up separate accounts for each of

16 the warehouse facilities that were currently in place at that

17 time.  And at that time -- because at that point that's where

18 all the warehouse lines really kind of became frozen in time if

19 you will, so we were asked to set up separate investor codes

20 and separate bank accounts for each one of the then existing

21 warehouse facilities that was being managed by corporate.  They

22 gave us lists of loans that were currently residing on each of

23 those facilities and asked us to transfer and segregate those

24 loans within the accounts and from that point forward to begin

25 to collect those payments into those bank accounts.

Love - Direct/Edwards                    65

1          So what we did at that point was we inquired as to

2   what the servicing fees were that we had historically been

3   credited on the different lines and we loaded the servicing

4   fees to those accounts in order to keep the accounting

5   consistent from that point forward.  So since that time the

6   money has not been passed back nightly, but rather it's been

7   collected in those accounts through the servicing system.

8   Q    Can you locate the Calyon -- I'm sorry, the CSFB Exhibit

9   Binder 1, looking for Exhibit Number 1.

10             THE COURT:  That's not up there anymore.

11             MS. EDWARDS:  Oh, I'm sorry.

12             THE COURT:  Thank you, Mr. Comet.

13  BY MS. EDWARDS:

14  A    What exhibit did you say?

15  Q    Exhibit 1.

16  A    Okay.

17  Q    Have you seen this document before?

18  A    I believe that I have seen this document before.

19  Q    And is American Home Mortgage Servicing a party to this

20  agreement?

21  A    American Home Mortgage Servicing Inc., is listed as a

22  party to the agreement.

23  Q    Is American Home Mortgage Servicing currently servicing

24  loans that are subject to this agreement?

25  A    We are currently servicing loans subject to this

Love - Direct/Edwards                    66

1  agreement.

2  Q    Has American Home Mortgage Servicing been compensate for

3  servicing these CSFB loans?

4          MS. GRAY:  Objection, Your  Honor, with regard to

5  from whom, so as to the form of the question.

6          THE COURT:  So objection sustained.  Be more

7  specific, Ms. Edwards.

8  BY MS. EDWARDS:

9  Q    In the past has American Home Mortgage Servicing been

10  compensated -- who has American Home Mortgage Servicing been

11  compensated for servicing CSFB loans?

12          MS. GRAY:  Objection, Your  Honor.  Assumes facts not

13  in evidence.  She hasn't established whether or not they have

14  been compensated.

15          THE COURT:  Sustained.

16  BY MS. EDWARDS:

17  Q    Has American Home Mortgage Servicing received any payment

18  for servicing the CSFB loans?

19  A    Historically, AHM Servicing would have received a

20  compensation for servicing the loans subject to this agreement

21  in a few different fashions.  One would be in the form of any

22  ancillary fees that the servicer Would retain which would be

23  any late payment charges as well as could be fees -- the

24  borrower could be charged a fee to make a payment over the

25  phone through an automated system which is a fee that the

1  servicer would keep as well which are typically referred to as

2  ancillary fees.

3       The other way that historically AHM Servicing would

4  have received compensation would have been that we would have

5  been paid at 12.5 basis points by corporate for servicing those

6  loans.  And it would have been much the same process as I

7  described earlier we're the payments in full are remitted back

8  to corporate every night and it's our understanding that we

9  were paid 12.5 basis points for servicing those loans.

10          MS. EDWARDS:  Your  Honor, may I have one moment?

11          THE COURT:  Mm-mm.

12                     (Pause)

13          MS. EDWARDS:  Thank, Your  Honor, I have no further

14  questions on direct.

15          THE COURT:  All right.  Cross by Credit Suisse.  Now

16  in order to avoid duplication, unless there's an objection, I'm

17  going to allow the cross examination of this witness to be

18  applicable in both adversary proceedings.  Is that problematic?

19          MS. FATELL:  Your  Honor, Bonnie Fatell for the

20  Creditor's Committee.  May I interject a comment for a moment?

21  We have been in very close negotiations with CSFB over the past

22  two days and the Court may have seen a number of going in and

23  out of court all day long.  We are this close to finalizing

24  what we believe is a settlement and we hope to be able to come

25  in this afternoon and present that on the record.  One of the

1 benefits, obviously, to the debtor of having a settlement is

2 not having Credit Suisse be cross examining our witness and

3 continuing the litigation.  And so we would ask if the Court

4 would adjourn this for a short period of time so that we can

5 see if we can't present that settlement this afternoon.

6          THE COURT:  Is that acceptable to Credit Suisse?

7          MR. COMET:  We knew, obviously about the discussions,

8 Your  Honor, we don't even know the status.  We can take a

9 short recess so we can check what the client wants to do?

10          THE COURT:  Mr. Ackerly, do you have any objection?

11 I wasn't planning on taking lunch because I have a hard stop --

12 to use Judge Shannon's phrase -- at two o'clock because I  have

13 other matters.  I have a two o'clock, a three o'clock and a

14 four o'clock.  So we're going to be done for the day at two,

15 which means we really need to be done by about 1:45 to give you

16 an opportunity to clean up and make the courtroom presentable

17 for the rest of the matters.  So I really wasn't planning on

18 taking lunch.

19          So I don't want to break for too long.  Mr. Ackerly,

20 do you have any objection to a recess?

21          MR. ACKERLY:  Your  Honor, we've taken several

22 recesses for this already --

23          THE COURT:  I know.

24          MR. ACKERLY:  -- we're in the middle of a witness

25 basically.  I mean if it's a very short recess that's fine, but

1  we would like to move one.

2          THE COURT:  I was wondering whether we could switch

3  orders and have Calyon do the initial cross.  Would that be

4  objectionable?  Well let's do this.  Let's take a short five or

5  ten-minute recess to see if we can eliminate Credit Suisse all

6  together.  And if not, to allow the negotiations to continue,

7  what we'll do is we'll start with Calyon to do the cross, even

8  tough that wasn't the protocol, and again, hopefully in order

9  to avoid some duplication, I'll allow Credit Suisse to

10  basically use the Calyon cross in its own case to avoid

11  hopefully some duplication.

12          If during the break the debtors think that's

13  problematic, let's talk about it when we get back.

14          UNIDENTIFIED ATTORNEY:  We'd like to mull that over,

15  Your  Honor, and get back to you on that point.

16          THE COURT:  Perfectly appropriate and fine.  So we'll

17  take one more recess for five or ten minutes and then we'll

18  proceed with Calyon.

19                      (Recess)

20          THE COURT:  Please be seated.

21          MS. EDWARDS:  Your  Honor, Erin Edwards on behalf of

22  the debtor defendants.  Another housekeeping matter.  The

23  hearing regarding to the sale order has been adjourned now to

24  Friday at four o'clock.  It's also my understanding that the

25  parties are going to stick to the original order and CSFB is

1 going to go first and then Calyon for the cross.

2          THE COURT:  Okay.  we're not going to take any more

3 objections to -- no more recesses to talk settlement.  Let's

4 get this done.  If you can't cut a deal you can't cut a deal.

5 Let's get it done.   How about the issue of cross?

6          MR. TECCE:  We have no objection.

7          THE COURT:  No objection?  Okay.

8          MS. GRAY:  Good afternoon, Melanie Gray for the

9 record.

10 CROSS EXAMINATION BY MELANIE GRAY:

11 Q    Mr. Love, I took your deposition in Dallas a couple of

12 weeks ago, correct?

13 A    That is correct.

14 Q    And you testified you're a member of the senior management

15 of American Home Mortgage Servicing, correct?

16 A    That is correct.

17 Q    You don't hold any other position or title with any of the

18 other debtors, do you?

19 A    Not to my knowledge.

20 Q    Despite being a member of what you characterize as the

21 senior management team, you only became familiar with the term

22 mortgage repurchase agreement shortly before the preliminary

23 injunction hearing with Credit Suisse back in mid August,

24 correct?

25 A    I believe that's correct.

1 Q    And prior to the preliminary injunction hearing in mid

2 August, you had never reviewed the terms of a mortgage

3 repurchase agreement, had you?

4 A    Not that I can recall.

5 Q    In addition to being not familiar with mortgage repurchase

6 agreements until the preliminary injunction hearing, you have

7 no personal knowledge with regard to the agreement between

8 Credit Suisse and American Home, is that correct?

9 A    I guess when you say no personal knowledge --

10 Q    Well I can break it down for you, Mr. Love.  You were not

11 involved in any of the negotiations concerning the mortgage

12 repurchase agreement, were you?

13 A    No I was not.

14 Q    You were not involved with any of the drafting of review

15 of the mortgage repurchase agreement, were you?

16 A    I was not involved in that process.

17 Q    You did not review the mortgage repurchase agreement at or

18 shortly after the time it was entered into, did you?

19 A    That's correct.

20 Q    You have no personal knowledge with regard to the intended

21 purpose of the mortgage repurchase agreement, do you?

22 A    I do not.

23 Q    So that's what I mean by you don't have any personal

24 knowledge with regard to the terms of the mortgage repurchase

25 agreement between Credit Suisse and American Home, is that

1  correct?

2  A     I guess that's correct.  I mean, I understand what you're

3  saying.  I would agree with that.

4  Q     Now you testified on direct that American Home Mortgage

5  Servicing services mortgages during the interim period while

6  they're boarded on AHMS's platform in a warehouse facility for

7  the benefit of American Home, do you remember that testimony?

8  A     I do.

9  Q     By virtue of your testimony when you said for the benefit

10  of American Home, you weren't purporting to characterize the

11  legal arrangements between the parties, were you?

12  A     I was not.

13  Q     And in fact you can't testify as to whether or not that is

14  consistent with what the terms of the Credit Suisse First

15  Boston mortgage repurchase agreement is, can you?

16  A     I was just explaining it from our business perspective of

17  the interactions that we had with those loans and the parties

18  that we would be involved with and again, I was explaining from

19  the practical standpoint of how we would interact with American

20  Home Mortgage and you know, if you were to have given me a loan

21  number, we couldn't tell you if it was on the CSFB line or a

22  loan that was financed strictly with cash.  And we would only

23  know it to be a loan that was currently being held for sale by

24  American Home.

25  Q     So you really wouldn't be able to tell this Court or

1  assist in making any differentiation with regard to whether the

2  loans were held under a repurchase agreement or any other type

3  of arrangement, is that correct?

4  A    That's correct.

5  Q    Now let's look at CSFB Exhibit 1 which is in the first

6  binder and let me know if you  have it up there.   I believe

7  Ms. Edwards directed your attention to that as well.  Do you

8  have that, Mr. Love?

9  A    I have it.

10  Q    Okay.  CSFB Exhibit 1 is the master repurchase agreement,

11  is it not?

12  A    That is correct.

13  Q    Okay.  Now let's look at the very first page.  You'll see

14  that American Home Mortgage Servicing Inc., is a party to this

15  agreement which I believe you agreed with Ms. Edwards on

16  direct, correct?

17  A    That's correct.

18  Q    And it is a seller under this agreement, is it not?

19  A    That's how it's listed.

20  Q    Okay.  Now if you flip over to Page 34, Section 12, that's

21  the servicing provision of this agreement, is it not?

22  A    I believe that's correct.

23  Q    We spent some time in your deposition regarding this

24  provision, didn't we?

25  A    We did.

1  Q    Okay.  And you'll notice that the very first sentence of

2  Section 12A references the sellers, and you understand those to

3  be the American Home parties that are listed on the first page

4  of this agreement, do you not?

5  A    All the parties listed on the front as seller appear to be

6  American Home Mortgage Servicing.

7  Q    Okay.  And I'll correct myself.  I apologize, because

8  there is one American Home entity that's listed as a guarantor.

9  But with that exception, all the other American Home entities

10 are sellers, correct?

11 A    That appears to be correct.

12 Q    And you understand Credit Suisse First Boston Mortgage

13 Capital LLC to be the buyer under this mortgage repurchase

14 agreement?

15 A    That's how they're characterized on the first page.

16 Q    And could you please read the first sentence of Section

17 12A into the record, on Page 34?

18 A    Sure.  "Sellers on buyer's behalf shall contract with

19 servicer too or if a seller is the servicer such seller shall

20 service the purchased assets consistent with the degree of

21 skill and are that sellers customarily require with respect to

22 similar purchased assets owned or managed by it and in

23 accordance with accepted servicing practices.

24 Q    You don't have any factual knowledge to dispute that

25 American Home Mortgage Servicing is servicing the mortgages

1  under the CSFB repo on behalf of CSFB, do you?

2  A    The only thing that I would say in response to that is

3  that just from -- I mean from our perspective, who we

4  interacted with was American Home.  They were be the ones that

5  would be directing what would happen with those loans and would

6  be the ones that would notify us or let us know if the loan was

7  ultimately sold to an investor.  But coming from our

8  perspective, we were servicing them for American Home, American

9  Home Mortgage Corp., anything else outside of that, I would not

10 have any personal knowledge to.

11 Q    And you don't have any knowledge with regard to whom

12 American Home Mortgage Corp., was acting on behalf of when they

13 were interacting with  you with regard to these loans, do you?

14 A    It was never portrayed to us that they were having us

15 service or perform any functions on anyone else's behalf form

16 our perspective.

17 Q    Because they never said anything about on whose behalf

18 they were instructing you, did they?

19 A    I can't recall any conversations or direction that would

20 really be anything contrary to them.  They were directing us on

21 their own  behalf since they were the ones that were holding

22 those loans for sale.

23 Q    You testified on direct the difference between servicing

24 retained and servicing released, do you recall that?

25 A    I do.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And you don't have any basis to dispute that the sale of

2  the mortgage loans under the CSFB repurchase agreement was on a

3  servicing release basis, do you?

4  A    I mean, from my perspective I wouldn't really categorize

5  it as either, either servicing released or servicing retained.

6  It's not that type of a loan sale transaction to an investor.

7  Q    And indeed, when you discussed the difference between

8  serviced retained and service released, your testimony was

9  really directed to the types of sales of mortgage loans to the

10  end investors, correct, and what those agreements provide?

11  A    Correct.  To an investor that is -- that's behind the

12  loan, either with or without the servicing.

13  Q    Let me ask you to take a look at CSFB Exhibit Number 27,

14  which I believe is in Volume II which will be handed up to you.

15

16  A    You said 27?

17  Q    I did say 27, thank you.  Have you ever seen this before?

18  A    I d not believe that I have.

19  Q    Have you ever seen any pricing side letters that are as

20  part of an arrangement between American Home and financial

21  counter party.

22  A    I would have seen purchase price in terms letters or

23  pricing side letters that would relate to mortgage loan sales,

24  servicing released or servicing retained transactions.

25  Q    Okay.  And is it true that sometimes you find that whether

1  or not the arrangement is a servicing release for servicing

2  retained as part of the pricing side letter?

3  A    That could be contained in there.

4  Q    Okay.  Because you understand that the pricing is effected

5  by wether or not the mortgages are sold on a servicing released

6  or a servicing retained basis, correct?

7           MS. EDWARDS:  Objection, foundation.

8           THE COURT:  What was the question again?  Can you

9  read it back?  Sorry.

10          COURT REPORTER:  Question, because you understand

11 that the pricing is effected by whether or not the mortgages

12 are sold on a servicing released or a servicing retained basis,

13 correct?

14          THE COURT:  And the objection is this witness lacks

15 foundation?  There's a lack of foundation how?  What's the

16 objection?

17          MS. EDWARDS:  He's -- the witness -- Mr. Love never

18 testified that he had anything to do with understanding the

19 pricing associated with servicing release versus servicing

20 retained.

21          THE COURT:  So it's beyond the scope of direct?

22          MS. EDWARDS:  It's beyond the scope of direct.

23          THE COURT:  What's your response?

24          MS. GRAY:  Your Honor, I believe that on direct

25 examination, Ms. Erin -- Ms. Edwards walked Mr. Love through

1  every -- just about every aspect of how the servicing relates

2  and how they are boarded on and boarded off American Home.  He

3  identified he was a member of the senior management team and

4  that the servicing is an asset of American Home Servicing.  If

5  he is competent to testify as to whether the servicing is an

6  asset, I would think that he would also -- it would be relevant

7  to and he would have the requisite knowledge to testify whether

8  or not there's a pricing differential with regard to whether

9  the mortgages are sold on a servicing retainer, servicing

10  release basis.

11         THE COURT:  All right.  Objection's overruled.

12  BY MS. GRAY:

13  A    Could you just repeat the question for me?

14  Q    Sure, and I'll try to make it shorter.  You understand

15  that there is a difference in how the pricing for the sale of

16  mortgage loans depending upon whether they are sold on a

17  servicing released or servicing retained basis, correct?

18  A    Typically speaking, if an investor was buying both an

19  underlying mortgage and note and also buying a servicing asset,

20  the pricing would be higher than if they were just buying the

21  note and not buying a servicing asset.

22  Q    So there is a differential in your understanding?

23  A    Fairly speaking, I would say that that is correct.

24  Q    Now in Exhibit Number 27 that has been admitted as CSFB

25  Exhibit Number 27, you'll see under Section 1.4 that the market

1  value means with respect to any purchase asset as of the date

2  of determination, the whole loan servicing release fair market

3  value of such assets on such date.  And the sentence goes on,

4  and please review as much as you need, but I want to focus your

5  attention there.  Do you see that?

6  A    I do.

7  Q    And do you understand that pursuant to this pricing letter

8  that the mortgage loans were indeed sold to Credit Suisse on a

9  servicing release basis?

10           MS. EDWARDS:  Objection, Your  Honor.  Mr. Love

11  testified that he's never seen this letter before, subject to

12  his competence to answer this question.

13           THE COURT:  Your response?

14           MS. GRAY:  Well, Your  Honor, he did testify he

15  understood the differences between it and I said now that he

16  has read that does that -- is he able to say whether or not

17  they are sold on a servicing released or servicing retained

18  basis.

19           MS. EDWARDS:  Your  Honor, that doesn't mean he has

20  knowledge of this letter, and reading one section right now in

21  a minute can speak to it.

22           MS. GRAY:  Your  Honor, I'll withdraw the question.

23           THE COURT:  All right.

24  BY MS. GRAY:

25  Q    Mr. Love, you don't know whether or not the mortgages sold

1 to Credit Suisse under the mortgage repurchase agreement were

2 sold under servicing released or servicing retained basis, do

3 you?

4 A    I don't have any knowledge of that.

5 Q    Do you know whether American Home Servicing has any

6 designations or license to sell mortgage loans?

7 A    Licenses to sell mortgage loans?

8 Q    Yes.

9 A    I actually don't know if that's a requirement or not from

10 that side.

11 Q    But do you know whether they hold any designations or

12 licenses?

13 A    I know that American Home holds several licenses for a

14 number of different purposes.  I don't know if any of them are

15 specific or necessary to be able to sell loans.

16 Q    Okay.  We've spent some time looking at the pricing letter

17 that was Exhibit Number 27, have you ever seen a letter that is

18 known as a release letter pursuant to which mortgage loans are

19 transferred to the repo buyer under mortgage repurchase

20 agreement?

21 A    I do not recall having seen such a letter.

22 Q    On direct you testified, if I understood it correctly,

23 that as a practical -- for practical purposes, the day to day

24 servicing is not transferred while a mortgage loan is held in

25 the warehouse facility.  Do you recall that testimony?

1  A     I recall the lines of questioning around that.

2  Q     Okay.  And indeed you agree that there are  number of

3  practical reasons why the day to day servicing of a mortgage

4  loan is not transferred while it is held by American Home in a

5  warehouse arrangement, correct?

6  A     I believe what I testified is that in many respects, it

7  wouldn't make any sense to transfer servicing away on an asset

8  that they would intend to retain the servicing on a permanent

9  basis.  And usually that determination was not made until the

10 time when the loan was ultimately sold to an investor because

11 AHM utilized what they referred to as invest execution

12 strategy.  So on a lot of pools of loans they would package up

13 the pools of loans based on product, off them out to bid and it

14 would be at the time that the bids come back in that they would

15 determine whether the bid would be servicing released or

16 servicing retained.

17 Q     So you would agree that retaining the servicing

18 facilitates the end sale of those mortgage loans to a final

19 investor, correct?

20 A     It would facilitate preserving the value of the assets to

21 be able to maximize the sale when AHM would sell those loans to

22 an investor.

23 Q     Now there are other practical reasons as well why

24 servicing is not transferred during this interim period,

25 correct?

**J&J COURT TRANSCRIBERS, INC.**

1  A    There could be practical reasons.

2  Q    Well, one of the reasons is it doesn't make any sense

3  because you'd have to notify the borrower -- and I mean the

4  home buyer/borrower -- that servicing was being transferred.

5  You understand that, do you not, Mr. Love?

6          MS. EDWARDS:  Objection, Your Honor.  That exceeds

7  the scope of the direct testimony and assumes facts that are

8  not in evidence.

9          THE COURT:  No, I think it's well within the scope of

10  what you took him through.  Overruled.

11  BY MS. GRAY:

12  A    Could you repeat that for me please?

13  Q    Sure.  One of the practical reasons why the day to day

14  servicing of a mortgage loan that's being held in a warehouse

15  facility is not transferred is because it could create

16  confusion on behalf of the borrower with regard to where to

17  send payments, isn't that correct?

18  A    I would say that any time that you're going to transfer

19  servicing, part of what you described is definitely part of the

20  process.  You're changing physical location where home owner

21  needs to send their payment and there would have to be a

22  communication of such.  It would have to be a factor that

23  parties would consider if they want to contemplate a transfer

24  of servicing.

25  Q    And you believe that that could cause confusion on behalf

1 of the borrower whenever you transfer servicing under a

2 mortgage loan, correct?

3 A    It opens the potential for borrower confusion if they have

4 trouble understanding or reading the letters they get or if

5 they don't pay attention to a letter.  It opens the potential

6 for confusion.

7 Q    And you would agree that whenever there is borrower

8 confusion that can lead to an increase in delinquencies or

9 payments lost in transit, correct?

10 A    It could lead to that.

11 Q    And you also agree that the transfer of mortgage servicing

12 under repo could slow down the sale of mortgages to end

13 investors, correct?

14 A    It could slow down that process.

15 Q    And American Home's business model is to try to turn the

16 sale of mortgage loans from the warehouse facility to the end

17 investor as quickly as possible, correct?

18 A    I think at a high level it would be probably as quickly as

19 possible given wanting to achieve the maximum return, so it

20 would be probably a combination of those two factors.

21 Q    Understood.  And when American Home sells loans that are

22 subject of a warehouse facility to an end investor, American

23 Home is required to make certain reps and warranties with

24 regard to those loans, correct?

25 A    Reps and warranties to the investor?

1  Q    Yes.

2  A    It is very typical that AHM as seller would make certain

3  reps and warranties.

4  Q    Many of those reps and warranties are at the loan level,

5  are they not?

6  A    Typically there's a section of reps that would be at the

7  loan level.

8  Q    And by virtue of American Home Mortgage Servicing handing

9  the day to day servicing during this interim period, you agree

10 that it's easier for American Home to obtain the information

11 needed to make the representations and warranties at the loan,

12 correct?

13 A    I would say that it allows AHM access to the information

14 they would need to receive from any servicer to perform that

15 function.

16 Q    And I believe that you have testified this before and I

17 apologize if I'm being redundant, but I want to make certain

18 the record is clear.  The interim servicing of loans under a

19 repurchase agreement helps preserve the value of its loans,

20 does it not, Mr. Love?

21 A    I don't know that I would necessarily refer to it as

22 interim servicing.  When I was referring to interim servicing

23 before what we characterized as interim servicing are loans

24 that have already been sold to a final investor subject to a

25 servicing release transaction and we're servicing those loans

1  for it would typically be a predetermined period of time.  But

2  if we're just talking about -- if we're servicing loans that

3  are being held for sale, I believe that I did testify that part

4  of the reason of servicing loans pursuant to that purpose or

5  for any reason really is to preserve the value of that

6  underlying asset.

7  Q    And I apologize, you did make that distinction between

8  interim servicing and servicing while loans are held for sale.

9  Q    Now you recall in your deposition on October 25th, you

10  reviewed in detail -- let me rephrase -- in your deposition on

11  October 25th, you reviewed the servicing provision of the CSFB

12  mortgage repurchase agreement which we've looked at here today

13  as Exhibit 1, correct?

14  A    I did spend several minutes looking over those provisions

15  during the deposition.

16  Q    And you testified that you've also reviewed other

17  servicing agreements to which American Home is a party,

18  correct?

19  A    That's correct.

20  Q    And you drew the distinction -- let me ask you this --

21  isn't it true that we're there is a servicing retained

22  arrangement with regard to the sale of mortgage loans, that

23  those agreements have much more extensive provisions with

24  regard to the servicing obligations of American Home than that

25  which you reviewed in CSFB Exhibit 1, which is the repurchase

1  agreement?

2  A    Both servicing released and servicing retained agreements

3  do contain much more detailed servicing provisions than was in

4  this agreement.

5  Q    Okay.  And this agreement essentially just sets forth that

6  American Home mortgage servicing is required to service the

7  mortgage that are under this repo at a commercially reasonably

8  fashion, correct?

9  A    I believe that would be correct.

10 Q    Now we talked in response to Ms. Edwards question at the

11 end of your testimony, we got into this issue of compensation

12 for American Home Mortgage Servicing.  The testimony that you

13 gave at the preliminary injunction hearing has already been

14 admitted into this proceeding as CSFB Exhibit 101.  And you

15 testified -- is it correct that you gave truthful testimony in

16 that hearing?

17 A    It is.

18 Q    And you do not have any knowledge with regard to whether

19 CSFB has any obligation to compensate any American Home entity

20 with regard to the servicing provided by American Home Mortgage

21 Servicing with regard to the mortgage loans under its repo, do

22 you?

23        MS. EDWARDS:  Objection, calls for a legal

24 conclusion.

25        THE COURT:  Overruled.

**J&J COURT TRANSCRIBERS, INC.**

1  BY MS. GRAY:

2  A    I do not have any specific knowledge.

3  Q    You don't have any general knowledge either, do you?

4  A    I do not.

5         MS. GRAY:  Your Honor, if I may have one moment, but

6  not a recess.

7         THE COURT:  Just so we're clear, I meant no more

8  recesses today.  I always encourage settlement, but I want to

9  try to get as much in as we can today.

10        MS. GRAY:  Your Honor, we have no more questions.

11        THE COURT:  Thank you.  Mr. Ackerly?

12        MR. ACKERLY:  Mr. Harbour.

13        THE COURT:  All right, Mr. Harbour, very well.

14 CROSS EXAMINATION BY MR. HARBOUR:

15 Q    Good afternoon, Mr. Love.  My name is Jason Harbour and

16 I'm going to ask you a few questions in the same way that Ms.

17 Gray did.  First, you testified on direct regarding the

18 servicing fee in the Calyon agreement, do you recall that?

19 A    I do.

20 Q    And you testified that certain funds has been placed in

21 accounts post-petition as a result of shortly before the

22 petition date, is that correct?

23 A    That is correct.

24 Q    Do you know, since the bankruptcy has been filed, whether

25 the servicing fee related to the Calyon repo has actually been

1 charged to those accounts or otherwise paid to AHM Servicing?

2 A    It is my understanding that a servicing fee of 50 basis

3 points has been loaded at the loan level on the servicing

4 system which would help to properly account for when a payment

5 comes in, what portion of that payment would relate to that 50

6 basis point fee.

7 Q    I understand that.  But my question is whether any funds

8 have gone out of the account as a result of loading that data

9 into the system.

10 A    I actually don't know for a fact sitting here if the funds

11 have gone out of that account of not.

12 Q    Who would know?

13 A    It probably would involve our Investor Reporting Group

14 actually looking at the records associated with that.

15 Q    Thank you.  Were you involved in drafting the Calyon

16 repurchase agreement?

17 A    I was not.

18 Q    Were you involved with negotiating the Calyon repurchase

19 agreement?

20 A    I was not.

21 Q    Did you receive the Calyon purchase agreement until

22 immediately prior to the deposition?

23 A    I do not believe that I did.

24 Q    Had you read it prior to the deposition?

25 A    Not until -- the day before my deposition I briefly

1 reviewed some of the servicing provisions of that agreement.

2 But I do not recall having seen the agreement prior to that.

3 Q    You  have no personal knowledge of the intent or purpose

4 of the Calyon repurchase agreement, do you?

5 A    I do not.

6 Q    And sitting here today, you can't testify as to the legal

7 terms of the Calyon repurchase agreement regarding servicing or

8 who owns servicing, isn't that correct?  Not who performs the

9 servicing, who owns the servicing.

10 A    I do not believe I can make that conclusion for you.

11 Q    Thank you.  Similar to the CSFB agreement, you have no

12 personal knowledge of who AHMS was acting for under the Calyon

13 repurchase agreement, do you?

14 A    My answer would be very similar to the CSFB one in that

15 from our perspective, we have always been servicing all the

16 loans held for sale for AHM.

17 Q    But you have no personal knowledge of who you're acting

18 for under the Calyon repurchase agreement?

19 A    From a legal/technical standpoint, I would say that's

20 correct.

21 Q    And no one ever told you on whose behalf you were

22 servicing for under the Calyon agreement?

23 A    I do not recall ever having had any conversations or

24 anything related to that.

25 Q    You testified earlier that you did not know if the loan

1  sold under the CSFB repo or sold on a servicing released or

2  servicing retained basis, is that correct?

3  A    We would know -- I guess maybe I'm getting confused by the

4  question -- but we would know when the loans were ultimately

5  sold if that trade was a servicing released or servicing

6  retained transaction.  I don't know if that's your question or

7  not.

8  Q    No, my question is more specific to when the loans are

9  actually on the line, on the CSFB line, that transfer itself,

10 whether that transfer itself was on a servicing released or

11 servicing retained basis.  Your testimony today was that you

12 did not know whether that transfer was servicing released or

13 servicing retained.

14 A    I mean, from our perspective it was servicing retained

15 because just from the fact that we were servicing the loans

16 from the point that the loans were originated in our system

17 until a point if the loans were sold servicing released.  But

18 as I testified earlier, we actually wouldn't even know if a

19 particular loan was even under the -- was being financed under

20 the Calyon line or some other fashion.  We were just servicing

21 the loans that were being held for sale.

22 Q    Right.  So you would not know if loans that were

23 transferred under the Calyon repo were sold to Calyon for

24 instance, on a servicing released or servicing retained basis?

25 A    From my perspective, I wouldn't look at the loans as being

1  sold to Calyon, but I would not have any knowledge of that.

2  Q    Thank you.  You testified about potential delinquency rate

3  increases that could happen if loans that are under a warehouse

4  facility are transferred while they are under that facility, do

5  you recall that testimony?

6  A    I think it really was just related to servicing transfers

7  in general in that any time that there is a servicing transfer,

8  it opens up the possibility for there to be what I would

9  consider an artificial increase in delinquency, so an increase

10  in delinquency that's created not because of the fact that the

11  home owner is delinquent of  doesn't have the funds to pay.

12  Q    And as a result of that, was it convenient for American

13  Home Mortgage not to transfer servicing to other parties when

14  the -- not to have who performed the servicing transferred to

15  other parties while the loans were under the warehouse

16  facilities?

17  A    I don't know that I would say that it was convenient.  I

18  don't know that it would make a lot of sense.  I mean, loans

19  could move from one warehouse facility to another to another

20  throughout the course of the life of a loan until it was

21  ultimately sold to an investor.  Again, we would -- when the

22  time the loans were originated, we would board the loans down

23  to the system and we would service the loan forever unless the

24  loans were sold to an investor in the servicing release trade.

25  Q    Do you know whether the delinquency rates have trended

1 upward for mortgage loans being serviced by American Home

2 Mortgage Servicing since the bankruptcy filing?

3 A    Generally speaking the delinquency rates have trended up

4 for American Home Mortgage Servicing and the rest of the

5 servicing industry as well.

6 Q    Has the delinquency rates for the mortgage loans under the

7 Calyon repo risen since immediately prior to the bankruptcy

8 case?

9 A    I believe that it has.

10 Q    Is it your understanding that as a result of the RESPA 15-

11 day prior notice requirement that servicing -- that who

12 services mortgage loans can't be transferred to -- a new

13 servicer can't receive those in any less than 15 days?

14          THE COURT:  Start over, say that again.

15          MR. HARBOUR:  I apologize, Your  Honor.

16 BY MR. HARBOUR:

17 Q    As a result of the RESPA 15-day prior notice requirement,

18 can servicing be transferred to a new servicer in less than 15

19 days?

20 A    Under normal circumstances.  There are some exceptions to

21 that Section 6 of RESPA that applies to transfer of servicing

22 notices.  But under normal situations, what that section sets

23 out is that the effective date of the  servicing transfer,

24 there must be a notice sent to the home owner at least 15 days

25 prior to the effective date of the transfer.

1  Q    Do you recall the servicing provisions contained in the

2  Calyon repurchase agreement?

3  A    Generally speaking, I recall having looked at them during

4  the deposition, the day prior.

5  Q    Do you recall that they were similar to the CSFB servicing

6  provisions in that they did not go into extensive detail about

7  the responsibilities of servicing?

8  A    They were substantially similar to CSFB.  Both of those

9  agreements basically laid out that we would service the loans

10  pursuant to our policies and procedures and accepted servicing

11  practices rather than go out and for each particular section,

12  specifically lay out the details that would be followed or any

13  special request for any type of the servicing functions.

14  Q    Under the Calyon agreement, it basically just references

15  that the loans will be serviced on a commercially and

16  reasonable fashion, is that correct?

17  A    That's probably a fair characterization.

18  Q    And those servicing provisions -- strike that.  Servicing

19  with respect to mortgage loans relates to preserving the value

20  of the mortgage loans, correct?

21  A    That would be one of the goals or purposes of mortgage

22  servicing.

23  Q    And the servicing provisions in the Calyon agreement

24  relate to the preservation of the value of the mortgage loans

25  under the Calyon agreement.

**J&J COURT TRANSCRIBERS, INC.**

1  A    It doesn't specifically address it that way, but in the

2  fact that it addresses that the loans are being serviced in a

3  commercially reasonably fashion according to accepted servicing

4  practices, what those functions would entail and what that

5  level of service would entail, one would think would help to

6  preserve that value.

7              MR. HARBOUR:  May I have a moment, Your  Honor?

8              THE COURT:  Yes.

9              MR.  HARBOUR:  That's all, Your  Honor.  Thank you.

10             THE COURT:  Thank you.  Redirect?

11             MS. EDWARDS:  No, Your  Honor.

12             THE COURT:  Mr. Love, you may step down.

13             THE WITNESS:  Thank you.

14             THE COURT:  Any other witnesses?

15             MR. KIRPALANI:  Yes, Your  Honor.  Susheeel Kirpalani

16 from Quinn Emanuel.  The debtors have one more witness, which

17 is Craig Pino (phonetic), but I don't know if we -- I know we

18 won't have time to finish him by 1:45.

19             THE COURT:  Well then let's not start him.

20             MR. KIRPALANI:  Okay.

21             THE COURT:  That doesn't make any sense.  So I have

22 us on the schedule for 10:30 tomorrow.  My ten has been

23 cancelled so I can start again at nine if that's what people

24 prefer.  I think we would almost certainly be able to finish

25 tomorrow on that case.  Is that acceptable?

1          MR. KIRPALANI:  It is with the debtors, Your  Honor.

2          UNIDENTIFIED ATTORNEY:  Yes, sir.

3          THE COURT:  All right.  We'll start tomorrow at nine

4  a.m.  I'd ask you -- we'll take care of the exhibits here at

5  the witness stand, but I'd ask counsel to please completely

6  clear the tables and the immediate area around -- you can leave

7  those bookshelves you brought in, the boxes, et cetera.  But if

8  you could clean everything up as best you can, I have Consumer

9  docket at two and then I have another matter at three on a

10  discovery matter, so there will be other counsel present.

11          MR. CROWTHER:  Your  Honor, (indiscernible) we have

12  something come in for those documents to take them out of here?

13          THE COURT:  As long as they're out of here by two.

14  So make sure they understand that there will be other people

15  here.   Thank you very  much.  We're in recess until tomorrow

16  morning at nine a.m.

17                    *  *  *  *  *

18                **C E R T I F I C A T I O N**

19          I, RITA BERGEN, court approved transcriber, certify

20  that the foregoing is a correct transcript from the official

21  electronic sound recording of the proceedings in the above-

22  entitled matter, and to the best of my ability.

23

24  /s/ Rita Bergen              DATE:  November 13, 2007

25  J&J COURT TRANSCRIBERS, INC.


                    **J&J COURT TRANSCRIBERS, INC.**