```
                  UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE

IN RE:                        .  Case No. 07-11047
                              .
   AMERICAN HOME MORTGAGE      .
   HOLDINGS, INC.,            .
                              .  824 North Market Street
                              .  Wilmington, DE  19801
               Debtor.        .
                              .
                              .  November 8, 2007
. . . . . . . . . . . . . ..  9:25 a.m.
```

                      TRANSCRIPT OF TRIAL
             BEFORE HONORABLE CHRISTOPHER SONTCHI
             UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            Young Conaway Stargatt & Taylor LLP
                           By:  CURTIS J. CROWTHER, ESQ.
                           The Brandywine Building
                           1000 West Street, 17th Floor
                           Wilmington, DE 19899


For the Debtor:            Quinn Emanuel Urquhart Oliver &
                                Hedges, LLP
                           By:  SUSHEEL KIRPALANI, ESQ.
                                JAMES C. TECCE, ESQ.
                           51 Madison Avenue, 22nd Floor
                           New York, NY 10010


For Calyon New York        Hunton & Williams LLP
Branch:                    By:  JASON HARBOUR, ESQ.
                                BEN ACKERLY, ESQ.
                           Riverfront Plaza, East Tower
                           951 East Byrd Street
                           Richmond, VA 23219-4074


Audio Operator:            Brandon McCarthy

Proceedings recorded by electronic sound recording, transcript
            Produced by transcription service.
_____

              J&J COURT TRANSCRIBERS, INC.
                  268 Evergreen Avenue
                 Hamilton, New Jersey 08619
              E-mail:  jjcourt@optonline.net

        (609)586-2311    Fax No. (609) 587-3599

APPEARANCES:   (Cont.)

```
For Calyon New York          Eckert Seamans Cherin & Mellott, LLC
Branch:                      By:  MICHAEL BUSENKELL, ESQ.
                             300 Delaware Avenue, Suite 1210
                             Wilmington, DE 19801


For Credit Suisse            Weil Gotshal & Manges
First Boston:                By:  HOWARD COMET, ESQ.
                                  SAIMA MAJID, ESQ.
                             767 Fifth Avenue
                             New York, NY 10153


For Met Capital LLC:         Weil Gotshal & Manges
                             By:  MELANIE GRAY, ESQ.
                             700 Louisiana, Suite 1600
                             Houston, TX 77002


For Met Capital LLC:         Womble Carlyle Sandridge & Rice
                             By:  STEVEN K. KORTANEK, ESQ.
                             222 Delaware Avenue, Suite 150
                             Wilmington, DE 19801


For the Creditors'           Hahn & Hessen LLP
Committee:                   By:  GREGORY KOCHANSKY, ESQ.
                             488 Madison Avenue, 14th & 15th Fl.
                             New York, NY 10022


For the Creditor's           Blank Rome LLP
Committee:                   By:  BONNIE FATELL, ESQ.
                             Chase Manhattan Centre
                             1201 Market Street, Suite 800
                             Wilmington, DE 19801


For AHM:                     American Home Mortgage Holdings, Inc.
                             By:  DAVID FRIEDMAN
                             (Telephonic Appearance)


For the Securities           Teitelbaum & Baskin, LLP
Industry Financial           By:  JAY TEITELBAUM, ESQ.
Markets Association:         3 Barker Avenue, Third Floor
                             White Plains, NY 10601
                             (Telephonic Appearance)
```

## I N D E X

**WITNESS**                                                    **PAGE**

CRAIG PINO
    Direct Examination by Mr. Kirpalani          12
    Cross Examination by Mr. Harbour             41
    Redirect Examination by Mr. Kirpalani        56


**EXHIBITS**                                    **ID**          **MARKED**

D-1   Agreement                                 --                    7
D-2   Blackline Agreement                       --                   63
D-4   Hunton Williams Letter                    --                   63
D-13 Email                                      --                   63

AHM102     Whole Loan Purchase Agreement        61                   63

4

1          THE CLERK: All rise.

2          THE COURT:  Please be seated.  I apologize.  I got

3  stuck on a phone call in another matter.  I do apologize.

4          MR. BRADY:  No problem, Your Honor.  Good morning,

5  Robert Brady on behalf of the debtors, Your Honor.  I'd like to

6  begin by announcing to the Court that we have reached a global

7  resolution of issues between the debtors and Credit Suisse.

8          Last evening the parties executed a term sheet of

9  principal terms.  The term sheet obligates the parties to work

10  in good faith to enter into definitive documentation, a

11  settlement agreement, and contemplates the filing of a Rule

12  9019 motion.  It may shock you but it also obligates the

13  debtors to seek shortened notice on the hearing on that Rule

14  9019 motion.

15          THE COURT:  I don't think you've filed a motion yet

16  in this case. It was not accompanied by a motion to shorten.

17          MR. BRADY:  Well we try to be consistent Your Honor.

18          THE COURT:  All right.

19          MR. BRADY:  The parties would then request that Your

20  Honor adjourn the trial on the CS adversary proceeding to a

21  date that is at least 10 days after what date is scheduled on

22  the Rule 9010 motion.  The committee Your Honor has been

23  involved in the negotiation of the settlement.  They have

24  agreed to support the settlement agreement and the Rule 9019

25  motion and agree to be bound by an order approving that if

5

1  entered by the Court.

2        The parties, Your Honor, are happy to give the Court

3  details on the settlement.  However, at this point since it is

4  subject to definitive documentation the parties wish to keep

5  that confidential.  So if Your Honor is inclined to hear the

6  terms we would ask that that be in camera.

7        THE COURT:  I don't need to hear the terms.  I'll

8  worry about that when I look at the 9019 motion.

9        MR. BRADY:  Thank you, Your Honor.  With that, since

10  the deadlines in the agreement by which we have to complete the

11  settlement, file a 9019 motion and then seek expedited

12  consideration of that, I don't think we can at this point set a

13  new trial date if that becomes necessary.  But when we seek to

14  shorten notice on the 9019 motion perhaps we can include in

15  that a backup trial date if it becomes necessary

16        THE COURT:  Do you want a date now for your 9019?

17        MR. BRADY:  The motion requires that we file -- I'm

18  sorry the term sheet requires that we file the 9019 by no later

19  than November 14th and then seek approval with no more than

20  five days notice.

21        THE COURT:  Well, five business days notice I take

22  it?  It's unclear right?

23        MR. BRADY:  It's undefined.  It's just five days.

24        THE COURT:  We have our first hiccup in the

25  agreement.  I can give you -- well I guess it depends on when

6

1  you file it.  If you file it earlier than the 14th, and that

2  seems unlikely because the 12th is a holiday.  Let's see, I'll

3  give you the 21st, the day before Thanksgiving or I can give

4  you the 20th.  Twentieth is probably better, right?  How about

5  2:00 p.m. on November 20th for the 9019?

6       MR. BRADY:  Thank you, Your Honor.  That works for

7  the debtors.

8       THE COURT:  You want to reconvene the trial date,

9  makes that necessary.

10      MR. BRADY:  At least 10 days.

11      THE COURT:  At least 10 days after that.  I'll let

12  you -- I have pretty good availability in December so why don't

13  we just address that if it's okay, we'll just address that at

14  the settlement hearing.  Is that appropriate.

15      MS. FATELL:  Good morning, Your Honor.  Bonnie Fatell

16  from Blank Rome on behalf of the creditors committee.  I just

17  wanted to endorse what's been said by debtor's counsel.  The

18  committee does support the settlement.  We've been actively

19  involved in the negotiations since sometime last week.  And as

20  the Court knows we've been in and out of the courtroom for the

21  past few days trying to resolve this.  We had hoped to resolve

22  this before we got to the last day of trial but we think

23  everybody worked really hard to try and come up with a

24  resolution that addressed everybody's needs and we just agree.

25      THE COURT:  Thank you.  All right.  So you are going

1 to put a witness on now, the debtor's are going to put on a

2 witness now for Kirpalani to cross examine.  This is obviously

3 without prejudice to Credit Suisse's ability to cross examine

4 this witness in connection with its adversary proceeding in the

5 event that the 9019 is not approved. Is that correct?

6         MR. KIRPALANI:  That's correct, Your Honor, although

7 we may need to recall Mr. Pino because he's not going to spend

8 time on the Credit Suisse matter.

9         THE COURT:  Very well.  Is that acceptable?

10         MR. COMET:  That is acceptable.

11         THE COURT:  We'll proceed.

12         MR. COMET:  If Your Honor would give us a moment.  We

13 have --

14         MS. FATELL:  If we may be excused.

15         THE COURT:  Absolutely.  Let's take a very short, I

16 promise, recess to deal with whether the court reporters will

17 stay.

18                    (Recess)

19         THE COURT:  Please be seated.

20         MR. TECCE:  Good morning, Your Honor.

21         THE COURT:  Glad you are still here.

22         MR. TECCE:  James Tecce of Quinn Emanuel for the

23 debtor's Your Honor.  Before we begin with Mr. Pino, I was

24 wondering if we could try to move for admission certain

25 exhibits in our binder into evidence?  Specifically one through

1  four and eight through fourteen.  My understanding is that

2  there are objections so we'll give the Court a second to --

3            THE COURT:  This is in the defendant's exhibit

4  binder.

5            MR. TECCE:  That's correct.  It's the Calyon New York

6  Branch v. American Home defendant exhibit binder.

7            THE COURT:  Which ones?

8            MR. TECCE:  We'd like to move in one through four and

9  eight through fourteen.  We understand there are objections to

10  all of those with the exception of number one which is the

11  actual agreement which has been moved into evidence in the

12  Calyon case.

13            THE COURT:  So there is no objection to Exhibit 1?

14            MR. ACKERLY:  No objection, Your Honor.

15            THE COURT:  So Exhibit 1 is admitted without

16  objection.  I'll hear your objections to the remainder.

17            MR. ACKERLY:  Your Honor, our objection is quite

18  fundamental.  These exhibits need to be authenticated by some

19  witness.  The mere fact that they were produced doesn't mean

20  that they come into evidence in this trial.  The proponent of

21  these exhibits needs to put on evidence to authenticate them.

22  We're not prepared to admit they -- agree to the admission of

23  these exhibits without proper authentication.

24            THE COURT:  All right.  Response?

25            MR. TECCE:  Well Your Honor if I could actually just

1 take the exhibits one by one and I think I can respond to that.

2        THE COURT: Yes, you may.

3        MR. TECCE: Okay. Thank you. Your Honor, turning to

4 tab 2, this document is a blackline version of the loan

5 agreement versus the repurchase agreement. It was produced in

6 response to our document request. It was produced by Calyon.

7 And it was shown to Mr. Pilcer at his deposition and he

8 identified the document and the transcript citation for that is

9 Page 33:14 to 33:17. So we would submit, Your Honor, that it's

10 been authenticated by Calyon's own 30(b)-6 witness and in

11 conjunction with the fact that it was produced by them that

12 it's been authenticated.

13        MR. ACKERLY: Could we object --

14        THE COURT: Yes, let's do this.

15        MR. ACKERLY: Your Honor, Mr. Tecce's explanation of

16 what this is is the very reason that you need a witness to

17 authenticate it and explain what it is.

18        THE COURT: When he says that he has one, your client

19 identified it at his deposition.

20        MR. ACKERLY: They have not designated that portion

21 of the deposition. He did not identify this --

22        THE COURT: Is your client in the courtroom?

23        MR. ACKERLY: My client is in the courtroom.

24        THE COURT: Put him back on the stand if we have to.

25 Very well. That's fine. The objection at least placed on the

1  current record stands.  I think it's a fair point that the
2  deposition testimony is not in evidence at this time.  We do
3  need testimony to prove up that and, you know, the document is
4  what you purport it to be.  That may be --
5        MR. TECCE:  That may take care of a couple of these.
6  That certainly takes care of tab number 3 which is a blackline
7  of the custodial agreement subject to what Calyon says it is.
8  But number 4 Your Honor I think is a little bit different.
9        THE COURT:  You didn't move four.
10        MR. TECCE:  Yes, I said one through four.
11        THE COURT:  Oh, you did, I apologize.
12        MR. TECCE:  That's okay.  Number 4 is the opinion
13  letter issued by Hunt & Williams in connection with the closing
14  of this agreement.  Now what is in evidence is the Calyon
15  repurchase agreement and that document as a conditioned
16  proceeding required the issuance of this letter.  It was signed
17  by Mr. Pilcer, the witness, that's correct.  It was produced in
18  response to our document request.  It's produced by Calyon and
19  it's an admission by basically an agent of Calyon.  It's highly
20  relevant to the subject matter of our claim.  So we would move
21  this into evidence as well.
22        MR. ACKERLY:  Again, Your Honor, what it is needs to
23  be established in the evidence.  There is nothing in the
24  designations or the case so far that addresses this.  Their
25  witness, Mr. Pino, signed this as well and they are going to

1  put him on and let him identify this document.  But it simply

2  cannot come into evidence with just based on what counsel says

3  it is and the purpose of it.  So we object to this as well.

4        THE COURT:  Let me ask you a question.  Is one of the

5  basis for self-authentication under Rule 902 is commercial

6  paper and related documents.  Commercial paper, signatures

7  thereon and documents relating thereto to the extent provided

8  by general commercial law.  It is my understanding that it's

9  your position that these things trade as commercial paper.  So

10 why aren't opinion letters related to the mortgage documents

11 that you indicate in your position is that they are freely

12 fungible, why isn't it a self-authenticating document?

13       MR. ACKERLY:  Your Honor, I don't think it's our

14 position that repos trade as commercial paper.  Commercial

15 paper may be a part of a repo transaction but a repo, a

16 repurchase agreement is not commercial paper.  You know, I

17 would certainly stipulate --

18       THE COURT:  The mortgage is underlying them.

19       MR. ACKERLY:  What's that?

20       THE COURT:  The mortgages that you trade underlying

21 them are.  Isn't that the whole basis of including repurchase

22 agreements under Section 555 and 559?

23       MR. ACKERLY:  It is.  It is.  Your Honor, it's a very

24 simple thing.  Mr. Pino reviewed this document and they are

25 going to offer him as a witness.  So they simply should put the

1  document through him rather than not.

2          THE COURT:  All right.  I'll sustain the objection

3  based on the current record.

4          MR. TECCE:  Your Honor, I had hoped to start with

5  this to resolve the authentication issues.  I think at this

6  point rather than go back and forth with respect to the balance

7  of the exhibits, if it's okay with the Court we will just

8  proceed with Mr. Pino on the stand.

9          THE COURT:  Very well.

10         MR. TECCE:  And see where we are.  I just would like

11 to highlight to the Court's attention that I did provide

12 opposing counsel this morning with two additional documents

13 which are not in the binder which will become relevant in Mr.

14 Pino's testimony and we will likely move for their admission as

15 well.

16         THE COURT:  All right.

17         MR. TECCE:  Thank you very much.

18         MR. KIRPALANI:  Good morning, Your Honor.

19         THE COURT:  Good morning.

20         MR. KIRPALANI:  Susheel Kirpalani of Quinn Emanuel

21 for the debtors.  The debtors would like to call their second

22 and final witness, Mr. Craig Pino.

23         THE COURT:  Please take the stand Mr. Pino.

24 C R A I G   P I N O, WITNESS, SWORN

25         THE WITNESS:  Craig Pino, P-i-n-o.

1                    DIRECT EXAMINATION

2  BY MR. KIRPALANI:

3  Q    Good morning, Mr. Pino.  Mr. Pino, who is your current

4  employer?

5  A    American Home Mortgage Corp.

6  Q    And since when have you been employed by American Home?

7  A    February 2004.

8  Q    Prior to your employment at American Home, Mr. Pino, where

9  were you employed?

10 A    Countrywide Home Loans.

11 Q    And prior to filing for bankruptcy what was your principal

12 function at American Home?

13 A    I was Executive Vice President and Treasurer.

14 Q    And can you describe what were your responsibilities as

15 Executive Vice President and Treasurer?

16 A    I was responsible for the financing position of the

17 company as well as the cash management position and treasury

18 operations.

19 Q    Who at the company would have had principal responsibility

20 for negotiating warehouse lines with lenders?

21 A    I would.

22 Q    And was that function at American Home similar to the

23 function that you had at Countrywide?

24 A    Yes, it was.

25 Q    And you said that you'd been at American Homes since

1  February 2004.  How long were you at Countrywide?

2  A    From August 1996 to February 2004.

3  Q    Mr. Pino, are you familiar with the facts and the

4  adversary proceeding that is going on today between American

5  Home and Calyon?

6  A    Yes, I am.

7  Q    Did American Home have a warehouse line with the Calyon

8  New York Branch?

9  A    Yes, it did.

10 Q    I'm going to refer to that as the Calyon warehouse

11 facility.  So that's the transaction I'm referring to.  When

12 did American Homes first obtain warehouse financing from

13 Calyon?

14 A    I believe it was in the middle of 2003.

15 Q    So prior to your arrival?

16 A    Yes, it was.

17 Q    Did you become familiar with that transaction upon your

18 arrival at American Home?

19 A    Yes, I did.

20 Q    Can you describe the transaction as it existed from 2005

21 to 2006?  So prior to the current Calyon agreement, what was

22 the structure of the transaction?

23 A    It was a two step financing transaction where American

24 Home Mortgage entered into a repurchase agreement with a wholly

25 owned special purpose vehicle.  American Home would transfer

1  mortgages through repurchase agreement to the SPV.  The SPV

2  would enter into a loan agreement or it entered into a loan

3  agreement for funding with Calyon and its related commercial

4  paper entity.  The SPV would borrow money from the conduit and

5  use that money to purchase mortgages from American Home.

6           MR. KIRPALANI:  Your Honor, may I use the light

7  board?

8           THE COURT:  Yes.  You are going to need the mic

9  though Mr. Kirpalani.  I don't know who has it.  Can you see

10 okay, Mr. Ackerly?

11          MR. ACKERLY:  It's a little tough.

12          THE COURT:  That'll do.  Do you have the handheld

13 one?

14          MR. KIRPALANI:  Yes.

15          THE COURT:  Okay.  Use that one if you can.

16 Q    Mr. Pino I just want to make sure that I understand the

17 transaction and the Court understands the transaction as it

18 existed prior to its current version.  You said American Home

19 Mortgage was the -- what role did American Home Mortgage have

20 in that transaction?

21 A    It was the originator of the mortgages and the one really

22 seeking the financing.

23 Q    And you said that it had a wholly owned special purpose --

24 I'm just recapping.  I'm asking you to explain again what you

25 said five minutes ago which I think was it had a wholly owned

Pino - Direct                                        16

1  special purpose vehicle.

2  A    American Home had a wholly owned special purpose vehicle

3  that it entered into a repurchase agreement with to finance the

4  mortgages.

5  Q    And this repurchase agreement that you referred to, can

6  you describe what type of a document that was?

7  A    I believe it was modeled after the standard BMA repurchase

8  form.

9           THE COURT:  Standard what?

10           THE WITNESS:  BMA repurchase form.

11  Q    BMA is an acronym for something?

12  A    Bond Market Association

13  Q    Is that the association that is also affiliated with an

14  association called SIFMA?

15  A    Not sure how they are --

16  Q    So you testified American Home had repurchase agreement

17  with the SPV and then what happened with respect to the SPV and

18  Calyon?  What's the relationship?

19  A    The SPV entered into a loan agreement with Calyon with

20  commercial paper entity conduit of Calyons.

21  Q    Does this picture accurately depict the structure of that?

22  A    Yes.

23  Q    Okay.  And you said that this was what time frame, this

24  transaction?

25  A    It was originally structured that way and I think it was

Pino - Direct                                    17

1  the middle of 2003.  Not sure of the exact date.

2  Q    Until when?

3  A    November 2006.

4  Q    I just want to ask you a couple of questions about that

5  transaction that we were just talking about.  The -- well I

6  guess what we'll refer to as the SPV repo/loan or two tier loan

7  or two tier repo.  What phrase do you refer to it as?

8  A    Two step financing.

9  Q     Okay.  The two step financing.  So could you describe the

10  process by which American Home would obtain funding under the

11  two step financing structure?

12  A    American Home when it wanted to fund mortgage loans

13  through that facility would enter into a repurchase agreement

14  with the SPV.  American Home would internally transfer the

15  mortgage loans from American Home Mortgage Corp. to the SPV.

16  The SPV -- American Home was really the manager of the SPV, if

17  you will, so it would be the same operational people but

18  American Home -- the SPV would send a funding request to Calyon

19  to borrow the money in some proportion to the amount of loan.

20  So we would typically have a haircut if it was a three year, or

21  five percent haircut for certain assets.  American Home would

22  request 97 or 95 percent financing against the loans it moved

23  to the SPV.

24  Q    And then the funding was provided by what entity?

25  A    From -- the loan was provided from Calyon's commercial

Pino - Direct                              18

1  conduit to the SPV.  And the SPV in turn through the repurchase

2  agreement would provide financing to American Home.

3  Q    Okay.  Did there come a time when the form of the Calyon

4  warehouse facility changed?

5  A    Yes, there did.

6  Q    When was that?

7  A    November 2006.

8            THE COURT:  Can you move the microphone a little

9  closer?  Just, there you go.  That's fine.

10 A    November 2006.

11 Q    How did the transaction structure change?

12 A    We eliminated the SPV and entered into a repo agreement

13 between Calyon and American Home.

14 Q    I want to draw how you believe the transaction changed.

15 So American Home is still the originator, is that correct?

16 A    That's correct.

17 Q    What did you say happened with the SPV?

18 A    We eliminated the SPV.

19 Q    So what entity provides the financing or the funding?

20 A    Calyon commercial paper facility.  Actually at this point

21 it's a syndicated facility so Calyon was providing as agent for

22 a number of commercial paper facilities.

23 Q    And the form of the document between American Home and

24 Calyon, what was that?

25 A    A repurchase agreement.

Pino - Direct                                    19

1  Q    Going back to the structure before, there was a repurchase

2  agreement in that structure as well, correct?

3  A    That's correct.

4  Q    And that was the repurchase agreement between which

5  entities?

6  A    American Home Mortgage and the SPV.

7  Q    So did the parties take that document and just change the

8  parties to it to be American Home and Calyon?

9            MR. HARBOUR:   Objection, leading, Your Honor.

10 Q    Where did they get the form of the document for the new

11 repurchase agreement?

12 A    They adopted the loan agreement.

13 Q    This loan agreement?

14 A    The loan agreement between -- yeah, between Calyon and the

15 SPV and changed some wording in the loan agreement to create

16 the repurchase agreement.

17 Q    Did the parties consider using the BMA standardized repo

18 form?

19 A    I believe we did discuss using that form with Calyon.

20 Q    So under the changed agreement, under the current

21 agreement with Calyon I guess we'll call that the Calyon MRA or

22 the Calyon Master Repurchase Agreement.  I think that is the

23 most unobjectionable term.

24            Did the change in the form from the secured loan

25 agreement to the Calyon MRA change the way that American Home

1 ultimately obtained funding from Calyon?

2          MR. HARBOUR:  Objection your Honor.  He's leading.

3          THE COURT:  Overruled.

4 A    It eliminated the special purpose vehicle so rather than

5 American Home first moving the loans into the special purpose

6 vehicle, it no longer did that.  Operationally between us and

7 Calyon it didn't' really change how we received the funding.

8 Q    Did the change in form from this secured loan agreement to

9 the MRA change the way American Home originated mortgages and

10 put them on the Calyon warehouse line?

11 A    Again it eliminated the step of us moving loans off of

12 American Home Mortgage's books to the SPV.  But other than

13 that, it didn't change.

14 Q    Did the change in form from the secured loan agreement to

15 the MRA --

16          MR. HARBOUR:  Objection, Your Honor, to relevancy.

17 You've given him plenty of room here and he keeps talking about

18 the change in form.  Whether the form changed or not, the issue

19 for the Court is whether the parties operated under the

20 document I think.  Otherwise, he needs to establish that there

21 is some ambiguity in the document that suggests that somehow

22 something other than the repurchase agreement itself controls

23 and that the parties didn't operate under it.

24          THE COURT:  Is that the relevancy objection?

25          MR. HARBOUR:  It's a relevancy objection.

1          THE COURT:  Overruled.

2  Q    Did the change in form from the secured loan agreement to

3  the MRA change the way American Home took mortgages off the

4  warehouse line to sell to a third party?

5  A    It didn't.

6  Q    Under the Calyon MRA what would happen if Calyon sold one

7  of the mortgage loans covered by the MRA and then American Home

8  wanted to repurchase it?

9  A    If -- there wasn't really any provision in the MRA to

10 address if Calyon wasn't able to deliver that mortgage loan

11 back to American Home.

12 Q    Okay but if American -- did American Home have the right

13 to request or demand repurchases from Calyon of loans on the

14 warehouse lines?

15 A    Yes, it did.

16 Q    So if American Home made a request and Calyon had sold

17 those loans or was otherwise unable to deliver those loans to

18 American Home, what would have been the result?

19 A    I don't think there was any provision in the agreement to

20 address that.

21 Q    Did the agreement provide for any way to calculate damages

22 in the event that occurred?

23 A    I don't think it contemplated it at all.

24 Q    Did Calyon, as administrative agent under the Calyon MRA,

25 charge any fees to American Home?

Pino - Direct                                    22

1  A    As agent it charged an agent fee.

2  Q    Was there any other fees?

3  A    There was also essentially an unused fee that got paid to

4  all of the members of the syndicate based on the unused or

5  unfunded portion of their commitment.

6  Q    And prior to the Calyon MRA when the parties had operated

7  under the Calyon secured or the two tier financing, did Calyon

8  charge any fees at that time?

9  A    I believe there was also an agent fee and an unused fee.

10 Q    An unused fee?  Is that what you said?

11 A    Yes.

12 Q    Did the Calyon MRA with American Home operate in any

13 different way from the loan agreement between Calyon and the

14 SPV?

15 A    Not that I can recall.

16 Q    Mr. Pino, I'd like to ask you to recall the events leading

17 up to the change in the form of the Calyon warehouse facility.

18 Okay?  When exactly did that occur if you recall?

19 A    The change in the form occurred in November of 2006.

20 Q    Do you have an understanding as to why the agreement was

21 changed at that time?

22 A    I think there were a number of factors both on the

23 lender's side and on American Home's side that caused us to

24 consider changing it.  I think the reason that we felt we were

25 able to change it was the change in bankruptcy law.

Pino - Direct                                    23

1   Q    Do you recall what the term of the facility, the duration

2   of the facility previously was?

3   A    Three hundred sixty four day, I believe.

4   Q    Was it set to expire in November 2006?

5   A    Yes, it was.

6   Q    Do you recall there being any correspondence between

7   American Home and Calyon about changing the form of the

8   transaction?

9   A    I'm sure there was.

10  Q    I would like to ask you to turn to the debtor's Exhibit

11  13.

12         THE COURT:  There should be a blue cover.  It should

13  say at the top Calyon New York Branch v. American Home.

14         THE WITNESS:  Thank you, Your Honor.

15  Q    Just let me know when you got there.

16  A    I'm there.

17  Q    Do you recognize that document?

18  A    Yes, I do.

19  Q    Can you tell the Court what it is?

20  A    It was an email from a lawyer representing Calyon

21  describing some of the changes being made to the form of the

22  agreement.

23  Q    Do you know what the purpose of the communication was?

24  A    I think she was just describing their position on which

25  changes they were making to the agreement.

1  Q    I should have asked a different question.  Mr. Pino, what

2  was happening at the time this email was sent?  First of all,

3  were you sent this email yourself in November 19, 2006?

4  A    Yes, I was.

5  Q    Okay.  What was happening on November 19, 2006 between

6  Calyon and American Home?

7  A    What do you mean by what was happening?

8  Q    Were you negotiating any agreements?

9  A    We were in the process of renegotiating the Calyon

10  facility.

11  Q    Perhaps it's easiest.  Can you just read the email into

12  the record starting with, "In addition..."  The second

13  paragraph.

14          MR. HARBOUR:  Your Honor, I would object to reading

15  it into the record to the extent that it's being offered to

16  vary or alter the terms of the agreement which in its self has

17  an integration clause so that to the extent it is offered for

18  that purpose, it's parole evidence and should be inadmissible.

19          THE COURT:  I will hold the parole evidence rule or

20  objection in abeyance pending -- in other words, I don't think

21  I'm in a position at this point to make a definitive ruling on

22  whether or not the document on its face is ambiguous or

23  unambiguous.  And as a result, to the extent I do find it is

24  not ambiguous and reflects the parties' intent, then yes parole

25  evidence would not be admissible.  So I can't make that

1  determination at this time.  I'm going to have to hold that.

2  You can basically have a standing objection based on parole

3  evidence.  I'm not in a position to rule on that one way or the

4  other at this time.

5          MR. HARBOUR:  Your Honor, just to clarify, so I

6  shouldn't say anything about any of the other exhibits to the

7  extent it is parole evidence?

8          THE COURT:  You can if you like.  However you want to

9  proceed. You don't have to.

10          MR. HARBOUR:  That was my question.  Thank you very

11  much.

12          THE COURT:  If you want to have a belts and

13  suspenders approach you may?

14          MR. HARBOUR:  If I don't have to, then I don't have

15  to.  Thank you.

16  Q    So Mr. Pino, can you just read aloud starting with the

17  second paragraph, "In addition..."?

18  A    In addition, we have made changes at the request of our

19  bankruptcy lawyers in connection with our giving the safe

20  harbor opinion.  As you know Cadwalder proposed making radical

21  changes to the agreement including perhaps starting over with a

22  more traditional repo form rather than the agreement we have

23  which admittedly is our old loan agreement converted into a

24  repo which we did to facilitate review by the parties in order

25  to give our opinion.

1       We weren't going to be able to do that and still

2   close on Monday so when Marissa called me about this midday on

3   Friday, I asked my bankruptcy partner to jump in and see what

4   they would require to give the opinion.  I think you will agree

5   that the changes our bankruptcy lawyers are proposing are not

6   radical.  The main change is made from this purpose include a

7   new definition of mortgage loan and changes to sections 2.23,

8   3.3 and article 8.  As you review these keep in mind that these

9   were made because the loans are owned by the purchasers subject

10  to AHM's rights and obligations to repurchase them.

11      I don't think that these changes to the document will

12  require operational modifications.  Please call me once you

13  have reviewed these sections and the other changes and let me

14  know if you have any questions.  Thanks.  Amy.

15  Q    Mr. Pino, do you recall whether Calyon's counsel

16  circulated any redlines of the two tier financing agreement

17  compared against the MRA?

18  A    I recall that they did.

19  Q    Do you recall -- how did you recall that they did?  How

20  did you receive them?  Did you receive them?

21  A    I received them via email.  Yes.

22  Q    Just to be clear, you recall receiving an email that

23  talked about a redline or attached a redline or both?

24  A    Well I should say I recall -- I recall a version of the

25  redline agreement against the old, of the new repurchase

Pino - Direct                                    27

1  agreement against the loan agreement.  I assume since all of my

2  correspondence that came with regard to the transaction came

3  through email that it would have come via email.  But I don't

4  recall a specific email or a specific email that attached that

5  document.

6  Q    Would it refresh your recollection to show you a copy of

7  the mail?

8  A    I'm sure it would, yes.

9          MR. KIRPALANI:  Your Honor, may I approach?

10         THE COURT:  Yes.  Thank you.

11 A    Thank you.

12 Q    Mr. Pino, I apologize.  I gave out all my copies. So can

13 you just tell does that document refresh your recollection as

14 to whether you received any redlines?

15 A    Yes.  This is an email from one of Calyon's external

16 counsels that had the attachment of the updated repurchase

17 agreement blacklined against the old loan agreement.

18 Q    Okay.  I just ask you to leave that to the side.  And can

19 you turn to the debtor's Exhibit 2?

20 A    I have it.

21 Q    And can you tell the Court what is -- do you recognize

22 that document, the debtor's Exhibit 2?

23 A    It looks to be the blackline version or the redline

24 version of the pre-existing loan agreement amended to the

25 repurchase agreement.

1  Q    Can you turn to the final page of the redline agreement?

2  A    Yes.

3  Q    Do you see a box?  The final box called statistics?

4  A    Yes, I do.

5  Q    Can you tell the Court the total number of changes in this

6  redline version?

7  A    It has insertions of 2,206, deletions of 1,932.  No moved

8  to or moved from changes, no format changes. A total changes of

9  4,138.

10 Q    And then on the prior page at the bottom, there is a

11 reference to when the document comparison had been done.  Do

12 you see that?

13 A    Yes, I do.

14 Q    Do you recall whether this document is exactly the same

15 document that was emailed to you?

16 A    When I look at the statistics on the email that you just

17 handed me, it appears to be the exact same document.

18 Q    Thank you, Mr. Pino.  I can take back that.  Mr. Pino, did

19 you have occasion in sitting in the courtroom yesterday to read

20 the transcript of the opening argument in the adversary

21 proceeding?

22 A    Yes, I did.

23 Q    Did you read the argument by counsel for the acronym

24 SIFMA?

25 A    Yes, I did.

1  Q    I'd like to read you a passage from the transcript.    On

2  Page 47, Line 18 of the November 6 transcript of these

3  proceedings, counsel for SIFMA said and I'm quoting, "The

4  parties took great pains to start with what I believe is the

5  SIFMA standard form."

6         Mr. Pino, having negotiated the Calyon MRA do you

7  agree with that statement from a factual perspective?

8  A    I don't agree with it.

9  Q    Mr. Pino, other than the original two tier repo that

10 existed between American Home and the SPV which I believe you

11 stated was based on the BMA form, did American Home have any

12 other counter-parties that was based on the BMA form?

13 A    Yes, we did.

14 Q    What parties was that?

15 A    I'm certain that our Bear Sterns repo facility was based

16 on that form.

17 Q    Do you recall any differences between the Bear Sterns

18 master repurchase agreement as compared to the Calyon MRA?

19        MR. HARBOUR:  Objection, relevance Your Honor.  It's

20 not clear what relevance any differences in agreements with

21 other repo parties have to Calyon repurchase agreement.

22        MR. KIRPALANI:  I think Your Honor it's a material

23 issue in this case whether there even is a standardized form

24 for repurchase agreements.  I believe Your Honor had asked

25 questions about that during the opening arguments and if Mr.

1  Pino has knowledge about a standardized form being used for

2  Home Loan Mortgages, we think it's highly relevant.

3            THE COURT:  Overruled.

4  Q    Do you recall provisions in the Bear Sterns master

5  repurchase agreement that do not -- that do or do not exist in

6  the Calyon MRA?

7  A    I recall that there are -- that there were some

8  differences, specifically I don't remember exactly what they

9  were.

10 Q    Would it refresh your recollection to see a copy of it,

11 the Bear Sterns MRA?

12 A    I'm sure it would.

13            MR. KIRPALANI:  Your Honor, may I approach?

14            THE COURT:  Yes.

15 Q    Mr. Pino, I've handed you a copy of the whole loan master

16 repurchase agreement between Bear Sterns and American Home that

17 had been the subject of an adversary proceeding that was being

18 tried at the same time as this adversary proceeding, but we

19 settled with them.  Do you recognize this document, Mr. Pino?

20 A    Yes, I do.

21 Q    Can you tell the Court, what is this document?

22 A    This was a whole loan repo agreement between Bear Sterns

23 Mortgage Capital and American Home Mortgage Acceptance Corp.

24 Q    If you turn to Page 17 of the document.

25 A    I have.

1  Q    Do you know whose signature that is next to American Home,

2  the signature block?

3  A    It appears to be Tom McDonough.

4  Q    Who is Tom McDonough?

5  A    He was previously our chief investment officer at American

6  Home.

7  Q    Did you work along side him?

8  A    Yes, I did.

9  Q    Do you recognize that as his signature?

10 A    It looks like his signature, yes.

11 Q    I'd like to draw your attention to Section 11 called

12 events of default.  Can you read out loud Section 11(A)(1) for

13 the Court?

14 A    Seller fails to repurchase or buyer fails to transfer

15 purchase mortgage loans upon the applicable repurchase pursuant

16 to the terms hereof.

17 Q    Do you recall whether the Calyon MRA has a similar event

18 of default if the buyer fails to transfer purchased mortgage

19 loans back to American Home?

20 A    I don't believe it does.

21 Q    And I'd ask you to turn to Page 10.  Again we're in

22 Section 11 which is the events of default.  In Section (E)(ii)

23 can you read that section for the Court?  I'm going to ask you

24 if there is a similar provision in the Calyon agreement.

25 A    As to transactions in which the defaulting party is the

1 buyer, (a) purchases mortgage loans, replacement -- in quotes

2 -- parenthesis replacement mortgage loans and then end of

3 quotes and end of parenthesis, having substantially the same

4 features including outstanding principal amount, maturity and

5 fixed and/or adjustable interest rate as to purchase mortgage

6 loans that are not transferred by the buyer to the seller as

7 required hereunder --

8 Q    That's fine.  As to that provision, is there a similar

9 provision in the Calyon MRA?

10 A    There is not.

11 Q    Did the debtors seek to challenge whether the Bear Sterns

12 MRA is a true repurchase agreement?

13         MR. HARBOUR:  Objection to relevance Your Honor.

14         MR. KIRPALANI:  It goes to the heart of the same

15 issue, Your Honor.

16         THE COURT:  Overruled.

17 A    We did not.

18 Q    Did American Home have any other financing relationships

19 with Calyon other than the Calyon MRA?

20 A    Yes it did.

21 Q    Were any of them whole loan repurchase agreements?

22 A    No.

23 Q    Can you tell the Court what they are?  What other

24 financing relationships does American Home have with Calyon

25 right now?

1 A     Calyon was a participant in our syndicated revolving

2 credit facility which was in addition to being used to finance

3 our service, our MSR as our mortgage servicing rates, as well

4 as mortgage servicing advances was a warehouse facility finance

5 whole loans.  Additionally, Calyon was a market value swap

6 provider to our Broad Hollow funding commercial paper vehicle.

7 Q     In the B of A facility that you referenced is that B of A

8 and Calyon or is there a syndicate of lenders?  Can you just

9 tell the Court more about that transaction?

10 A     It's a syndicated facility that Bank of American is the

11 agent on and Calyon is one of the participants.

12 Q     Is there any overlap between the participants and the Bank

13 of American syndicate and the Calyon syndicate under the Calyon

14 MRA?

15 A     I believe that all of the commercial paper conduits in the

16 Calyon facility are sponsored by banks that are also members of

17 the Bank of America led syndicated facility.

18 Q     Are there any other warehouse facilities that American

19 Home had used that follow a traditional secured loan form like

20 BMA?

21 A     Yes.  We had another secured loan that was with JP Morgan.

22 Q     Can you just tell the Court what is the substantive

23 difference between the purpose to the company of using the B of

24 A or JP Morgan financing facility versus the Calyon MRA

25 facility?

1  A    I mean each of them provided additional liquidity.  There

2  is a financing -- there is a lower cost to finance on the

3  Calyon commercial paper facility.

4  Q    How are the loans financed under the Calyon MRA reflected

5  on American Homes books and records?

6  A    They are either in a category of loans held for investment

7  or loans held for sale.

8  Q    What does that mean in terms of how ownership is

9  reflected?

10  A    They show as assets of American Home Mortgage.

11  Q    In going back to the original two tier financing structure

12  where there was a repurchase agreement between American Home

13  and the SPV, how were the loans subject to that repo reflected

14  as to ownership?

15  A    When we borrowed under the repo with the SPV we would

16  transfer the loans from American Home Mortgage Corp. into the

17  SPV so they would be reflected as assets of the SPV.

18  Q    One more question on the two tier being converted into the

19  Calyon MRA.  When the facility was converted to the MRA

20  structure, was it the exact same pool of assets that continued

21  to be financed by Calyon?

22  A    It generally was.  I mean on the day that we -- on every

23  day that the facility was in place just about assets would flow

24  in and out from the day that it was a loan agreement with the

25  SPV to the day that it was a repo agreement with American Home.

1  They were generally the same mortgages.

2  Q    Mr. Pino, what is the aggregate par amount of unpaid

3  principal balance amount of the mortgage amounts on the Calyon

4  warehouse facility?

5  A    About a billion one.

6  Q    In terms of a percentage of unpaid principal balance, do

7  you know what the amount owed to Calyon is under the Calyon

8  MRA?

9  A    I believe it's about 96 percent.

10 Q    I'd like you to turn to the debtor's Exhibit 1 which is

11 the Calyon MRA itself.  Are you familiar with this document?

12 A    Yes, I am.

13 Q    Did you have any role in negotiating the Calyon MRA?

14 A    Yes, I did.

15 Q    What was your role?

16 A    I was the main business person at American Home involved

17 in the negotiation.

18 Q    Is any -- the parties to the Calyon MRA are any of those

19 parties the servicing entity within the American Home

20 organization?

21 A    American Home Servicing Inc. is the servicer.

22 Q    I'd like you to turn to the definition of a servicer

23 default.  It's on Page 31.

24 A    Okay.

25 Q    I know you've walked me through this before.  Can you just

1  explain what was the purpose of this definition and the

2  features of there being a servicer default in this agreement?

3  A    There are, in this agreement, separate events of default

4  that would cause a servicer default from events of default that

5  would cause a seller to default or a borrower to default under

6  the agreement.

7  Q    In the language of the definition of servicer default

8  where it says, "any event of default to the extent relating to

9  the servicer in its capacity as servicer only."  What is your

10 understanding as the business person who negotiated this

11 facility as to when there would be a servicer default?

12 A    I'm not sure I understand your question.  I think it would

13 be when the servicer triggered or tripped one of these events

14 of default.

15 Q    You know what I'm trying to understand is what does it

16 mean to be -- have an event of default in the capacity of

17 servicer?

18 A    That's vague to me and I'm not sure exactly what that

19 means.

20 Q    Do you have an understanding as to whether the servicing

21 entity had separate obligations from American Home Mortgage,

22 the originating entity, under this agreement?

23 A    When you say separate obligations, I'm not sure what you

24 mean by that.

25 Q    What was the purpose of the servicer being a party to this

1 agreement and there being a servicer default?

2 A    The purpose of it being a servicer to this agreement was

3 that it was the one who was servicing the loans under the

4 agreement.  The reason for a servicer default was to give

5 Calyon the opportunity to change servicers in the event that it

6 tripped one of the defaults.

7            MR. KIRPALANI:  Can I just have a minute, Your Honor?

8            THE COURT:  Yes.

9 Q    Mr. Pino, can you turn to the debtor's trial Exhibit 4?

10 A    I have.

11 Q    Do you recognize that document?

12 A    Yes, I do.

13 Q    And is that your signature? The pages are not numbered.  I

14 apologize. ON the base numbering it is AHM-Calyon 053253.

15 A    Yes, that is my signature.

16 Q    Can you tell the Court what this document is?

17 A    This is the true sell opinion that was delivered from

18 Hunton & Williams in connection with the closing requirements

19 of the facility.

20 Q    I'm going to ask you to turn to page 5 of the actual

21 letter itself.  There's a section and a roman numeral called

22 analysis.

23 A     I see it.

24 Q    Can you read out loud the first sentence of that?  The

25 sentence starting while the repurchase.

1  A    While the repurchase agreement does not follow a standard

2  form repurchase agreement, the repurchase agreement clearly

3  falls within the plain language of the "repurchase agreement"

4  definition under the bankruptcy code.  Furthermore, if the

5  repurchase agreement reflects a predominance of critical

6  repurchase agreement features typical of a standardized

7  repurchase agreement.

8  Q    And then on the next page.  The first full paragraph which

9  starts additionally.  Can you just read the first sentence

10 there?

11 A    Additionally while it can be argued that the repurchase

12 agreement is not a standard repurchase agreement in the market,

13 the repurchase agreement does contain key features of the

14 standardized repurchase agreement.

15 Q    That's all.  In -- sorry to do this to you, but can you

16 turn back to trial Exhibit 1, the Calyon MRA itself?  I ask you

17 to turn to page 64 of the Calyon MRA, Section 4.1C.  Just let

18 me know when you are there.

19 A    I'm there.

20           THE COURT: I'm sorry.  Which section?

21           MR. KIRPALANI:  Section 4.1C.

22           THE COURT:  Thank you.

23 Q    Do you have an understanding as to what this section deals

24 with in the Calyon MRA?

25 A    The headings is conditions precedent under article 4 and

1 in section 4.1.

2 Q    Let me be more specific, Mr. Pino, and try to interpret

3 anything.  Can you just read section 4.1 the lead in sentence,

4 the effectiveness?

5 A    The effectiveness of this agreement and the making of the

6 initial purchase hereunder shall not occur until the

7 satisfaction of the conditions precedent specified in this

8 section 4.1 hereof and the delivery of the administrative agent

9 of the following (each of the following documents being duly

10 executed and delivered and in the form and substance reasonably

11 satisfactory to the managing agents and each in its sufficient

12 number originals that each managing agent may have an executed

13 original of each document.

14 Q    Thank you.  If you look at Section 4.1E it says "favorable

15 written opinion from Hunton & Williams, counsel to the

16 administrative agent to the effect that this agreement is

17 covered by the safe harbor purchase agreements under the

18 bankruptcy code."  Do you see that?

19 A    Yes, I do.

20 Q    The document that you were looking at a few minutes ago,

21 the debtor's Exhibit 4, is it your understanding that that is

22 the document that satisfies this condition preceding to the

23 MRA?

24 A    Yes, it is.

25 Q    I'd like you to turn to Section 2.23 of the MRA if you

Pino - Direct                          40

1  could?

2         THE COURT:  Do you have a page number?

3         MR. KIRPALANI:  Sorry, Judge, Page 55.

4  A    I have it.

5  Q    Section 2.23 intent of the sellers and the purchasers.  Do

6  you see that section?

7  A    Yes, I do.

8  Q    I'd like to draw your attention to subparagraph C.  Could

9  you just read into the record I think it's the third sentence

10 that starts in the event that contrary to the neutral intent?

11 Do you see that sentence?

12 A    Yes, I do.

13 Q    Could you just read that out loud?

14 A    In the event that contrary to the mutual intent of the

15 sellers and the purchasers any purchase of mortgage assets

16 hereunder is not characterized as a sale or absolute transfer,

17 the seller shall effective as of the date hereof be deemed to

18 have granted (and the sellers hereby grant) to the purchaser a

19 first priority security interest in and to any and all mortgage

20 assets, the related mortgage loan collateral and the proceeds

21 thereof to secure the repayment of all amounts advanced to the

22 seller hereunder with accrued interest thereon and this

23 agreement shall be deemed to be a security agreement.

24 Q    Thank you.

25         MR. KIRPALANI:  Your Honor, we have no further

1 questions at this time.

2          THE COURT:  Let's take a short break before cross.

3                    (Break)

4          THE COURT:  Please be seated.

5          MR. GELLERT:  I'm going to go ahead and get this.

6          THE COURT:  Would you adjust the microphone Mr. Pino?

7 Thank you.

8          MR. HARBOUR:  For the record, Jason Harbour on behalf

9 of Calyon New York Branch.

10                    CROSS EXAMINATION

11 BY MR. HARBOUR:

12 Q    Good morning, Mr. Pino.

13 A    Good morning.

14 Q    You testified a few moments ago that there -- about the

15 change to the structure from the 2005 agreement to the 2006

16 repurchase agreement, correct?

17 A    Yes.

18 Q    And you testified that one of the changes was the SPV, the

19 special purpose vehicle entity, had been removed from the

20 transaction.  Is that correct?

21 A    Yes.

22 Q    And among other things, other changes were that instead of

23 a loan agreement from Calyon to the special purpose entity now

24 there is a direct repurchase agreement with Calyon and American

25 Home Mortgage, correct?

Pino - Cross                                    42

1  A     Yes.

2  Q     Is it your testimony here today that all repurchase

3  agreements are identical?

4  A     No.

5  Q     You testified that on American Home Mortgages books and

6  records under the current facility the repurchase agreement,

7  the Calyon repurchase agreement that the mortgage loans are

8  identified as assets of American Home Mortgage, correct?

9  A     Yes.

10 Q     Is that also how American Home Mortgage categorized the

11 assets of other repurchase facilities?

12 A     Yes.

13 Q     All of them?

14 A     Yes.

15 Q     Including Bear Sterns?

16 A     Yes.

17 Q     Do you still have the Bear Sterns agreement that was

18 handed to you by counsel?

19 A     Yes, I do.

20 Q     If you would, could you please turn to Page 10 and read

21 for the Court the subsection, not the romanette, simply the

22 subsection?

23 A     Subsection E, after one business days notice to the

24 defaulting party (which notice need not be given if an act of

25 insolvency shall have occurred and which may be the notice

1  given under subparagraph B of this paragraph or notice referred

2  to in clause ii of the first sentence of subparagraph A of this

3  paragraph the non-defaulting party may.

4  Q    So is it your understanding that what follows are rights

5  that the non-defaulting party can do?

6  A    Yes.

7  Q    Okay.  Can you read please for the Court the first clause

8  in romanette ii?

9  A    As to transactions in which the defaulting party is the

10 buyer, (A) purchase the mortgage loans, replacement mortgage

11 loans having substantially the same features including

12 outstanding principal amount, maturity and fixed and/or

13 adjustable interest rate as any purchase mortgage loan that are

14 not transferred by buyer to seller as required hereunder, or

15 (B) in sole discretion will active in lieu of repurchasing

16 replacement mortgage loans to be deemed to have purchased

17 replacement mortgage loans at a price therefore on such date

18 calculated as the average price is obtained from three

19 nationally recognized registered broker dealers that buy and

20 sell comparable mortgage loans in a secondary market.

21 Q    And now based on your understanding of E and romanette ii

22 here, these are rights that the seller would have, correct?

23 A    That's correct.

24 Q    You entered into the Calyon 2006 repurchase agreement and

25 for the purpose of simplification I'll call it the repurchase

1  agreement from here on out with the advice of counsel, correct?

2  A    Yes.

3  Q    And you read the repurchase agreement before entering it

4  into the record, correct?

5  A    Yes, I did.

6  Q    And at the time in late November 2006 you were in a hurry

7  to close the transaction because the prior agreement, the 2005

8  agreement, had a termination date of November 21, 2006?

9  A    I don't remember the exact date but I know we were in a

10 hurry to close it.

11 Q    Late November then?

12 A    Sounds right, yes.

13 Q    Based on your understanding the Calyon repurchase

14 agreement terminated the 2005 facility, correct?

15 A    Yes.

16 Q    And between November 2006 and July 2007 the parties to the

17 repurchase agreement operated under the terms of the repurchase

18 agreement, correct?

19 A    Yes.

20 Q    And to your knowledge Calyon transferred funds to the

21 defendants on account of eligible mortgage loans and the

22 defendants agreed to repurchase the purchased mortgage loans on

23 the applicable repurchase date, correct?

24 A    Yes.

25 Q    Based on your understanding of the repurchase agreement,

1  it provided for the transfer of the one or more mortgage loans

2  or interests in mortgage loans, correct?

3  A    Yes.

4  Q    Based on your understanding of the repurchase agreement,

5  there was a simultaneous agreement by the purchasers to then

6  retransfer mortgage loans back to the defendants within one

7  year, correct?

8  A    No later than one year.  I don't remember exactly.  I

9  think they had to transfer the mortgage loans back to us when

10 we gave them notice to purchase it.  Not longer than one year.

11 Q    Thank you.  Based on your understanding of the repurchase

12 agreement, the retransfer of mortgage loans back to the

13 defendants within one year was for cash, correct, for funds?

14 A    Yes.

15 Q    Do you know whether American Home Mortgage Servicing is a

16 seller under the repurchase agreement?

17 A    I believe it's a seller as well as a servicer.

18 Q    So it's a seller under the repurchase agreement?

19 A    Yes.

20 Q    And have the defendants ever received a notice from Calyon

21 requesting that the defendants transfer the servicing of

22 certain of the mortgage loans under the Calyon repo to JPM

23 Chase, correct?

24        MR. KIRPALANI:  Objection, Your Honor.  Beyond the

25 scope.

1          THE COURT:  I'll allow it.  Overrule the objection.

2    There was some testimony as to the obligations of servicer and

3    under the repo agreement so I'll allow the question.

4    A    I believe we have.

5    Q    And the defendants have received at least one other notice

6    from Calyon requesting that the defendants transfer servicing

7    of the purchaser pay option loans, correct?

8    A    Yes.

9    Q    The defendants have not transferred servicing to Calyon or

10   its designees, have they?

11   A    No, they haven't.

12   Q    Based on your understanding of the repurchase agreement,

13   absent an extension or a prior event of default, the repurchase

14   agreement would terminate at the latest on November 20, 2007,

15   correct?

16   A    I don't remember the exact date but --

17   Q    Late November 2007?

18   A    Yes.

19   Q    Based on our understanding of the repurchase agreement,

20   upon an event of default the repurchase obligations would

21   become automatically due and payable wouldn't they?

22   A    Yes, they would.

23   Q    And again based on your understanding of the repurchase

24   agreement, upon an event of default the termination date and

25   the repurchase dates would immediately occur, correct?

1  A     I believe so, yes.

2  Q     Can you turn your attention -- do you have the Calyon

3  Exhibit binder, Exhibit 1, the repurchase agreement itself?

4  A     Yes.

5  Q     Could you please turn to Page 59?  Section 3.3A.  Could

6  you read that first sentence out loud please?

7  A     Generally it is understood and agreed that the purchasers

8  own 100 percent of the beneficial interest and into the

9  mortgage loans purchased hereunder.

10 Q     The defendants did not object to this provision in the

11 repurchase agreement?

12 A     No, we did not.

13 Q     While at American Home you were involved in approximately

14 15 warehouse financing agreements that were labeled as

15 repurchase agreements, correct?  Mortgage loans.

16 A     Approximately.

17 Q     Based on your understanding of those repurchase

18 agreements, as a general matter, after they end if they are not

19 extended and the debtors don't buy back the mortgages, the

20 debtors would have to turn over the servicing rights, correct?

21 A     Can you ask that one more time?

22 Q     Sure, it's a long question.  I'm trying to get a few

23 thoughts in there.  This is just generally as to those

24 repurchase agreements we were talking about.  When they end, if

25 they are extended and the debtor's don't buy back the

1  mortgages, the debtors have to turn over the servicing to the

2  purchaser, correct?

3  A    Under the terms of the agreements?

4  Q    Yes.

5  A    I can't recall in all the agreements if that is even how

6  it would be contemplated, or if it's contemplated.

7  Q    Can you say as a general matter whether that's your

8  understanding of them?

9         MR. KIRPALANI:  Objection Your Honor.  He said he

10  can't recall.

11        THE COURT:  Sustained.

12  Q    Do you  have the Calyon Exhibit Binder up there Mr. Pino?

13  A    I do.

14  Q    Can you please turn to Number 14 and Tab 14 and if you

15  could look on Page 47.  I'm sorry, Page 151.  And I guess can

16  you hold that and just let's identify what the document is

17  first.  Do you -- can you look at the first page and see that

18  this is a transcript of the deposition that was taken on

19  October 9, 2007 in New York?

20  A    Yes, it is.

21  Q    I'll read to you the question on Page 151.  But as a

22  general matter when you are entering into these repurchase

23  agreements and servicing may or may not be discussed in

24  whatever small or large amount it is.  Was it the debtor's

25  general understanding that after the facility ends and I

Pino - Cross                                    49

1  believe earlier today you testified that each of these

2  facilities was of a duration of a year or less, that after that

3  year that it is not extended and the debtors don't buy back the

4  mortgages that the debtors would retain the servicing rights

5  generally as a conceptual matter?  And the answer was,

6  generally that sounds right.

7           The follow up question was that they would retain the

8  servicing rights post termination or that they would have to

9  turn them over.  Your answer was turn them over.  Do you see

10 that?

11 A    Yes, I do.

12 Q    Is that accurate?

13 A    What you read, yeah.

14 Q    Is it true?  Are your answers true?

15 A    I believe they are, yes.

16 Q    Thank you.  Does that refresh your answer to the question

17 I asked earlier about whether as a general matter for the

18 servicing agreements that at the end of them if American Home

19 Mortgage doesn't buy the mortgages back that the servicing is

20 going to have to be turned over to the repurchase parties?

21 A    I would answer really the same way that I answered in the

22 deposition to say it sounds right which what I really meant,

23 you know, we didn't really typically contemplate a warehouse

24 facility or a repurchase agreement for that matter.  Just

25 expiring, you know, on its own accord and just walking away

1  from it so turning over servicing rights and turning over the

2  mortgage loans just for whatever the advance was.  I think we

3  only ever really contemplated, you know, that type of scenario

4  in event of a default situation not just caused by the fact

5  that line expired and we didn't refinance it.  But something

6  like financial distress or bankruptcy and in the deposition

7  when I said sounds right, I guess probably really should have

8  answered that I don't know that anybody in my organization, but

9  especially I hadn't given a lot of conceptual thought to what

10 just happens at the end of a repo if it doesn't get refinanced.

11 I don't know if I gave a lot of thought I would come up with

12 the we just turn everything over and walk away.  But to your

13 point, I think I probably would answer the same way.

14        Not having given a lot of thought to it conceptually,

15 that kind of sounds right.

16 Q    Not having given it a lot of thought you would answer the

17 same way?

18 A    Yes.

19 Q    In the approximately 15 mortgage repurchase agreements

20 that you've been involved with at American Home have any of

21 them allowed the counter-party to transfer back mortgage loans

22 other than the ones that were transferred to the counter-party

23 in a non-breach situation?

24 A    Have any allowed or provided for?

25 Q    Allowed for the counter-party to transfer back to American

1  Home different mortgage loans?

2  A    When you say allowed for, do you mean said it was okay to

3  do it or provided for what would happen if they did do it?

4  Q    Said that it was okay to do it.

5  A    None said it was okay to do it.

6  Q    Do you recall any instants in connection with the

7  approximately 15 agreements in which the counter-party

8  attempted to give American Home back different loans than the

9  ones American Home put on the lines?

10  A    I don't recall any.

11  Q    Do you recall any instance under the approximately 15

12  agreements in which the servicing was transferred from the

13  servicer who had been doing it before the mortgage loans were

14  put on the line to another servicer during the period while the

15  mortgage loans were on the line?

16  A    Other than very early on when American Home had a sub

17  servicing relationship because we didn't have a servicing

18  business of our own.

19  Q    What time period are you referring to?

20  A    I think 2002, 2003.

21  Q    So after that there wouldn't have been any though?

22  A    No.

23  Q    Are you aware of how the funds have been treated that have

24  been received on the Calyon line since the bankruptcy problem?

25  A    Generally yes.

1  Q    Have they been segregated and put in segregated accounts?

2  A    I believe so, yes.

3  Q    Has any amount been deducted from these accounts or other

4  funds held by the defendants with respect to the mortgage loans

5  under the Calyon repurchase agreement for a purchasing fee?

6  A    I'm not sure.

7  Q    Do you know who would know?

8  A    I believe it would be somebody either in our investor

9  reporting group or our loan servicing area.

10 Q    Do you recall defendant's Exhibit 4 which was the Hunton

11 Williams opinion letter that Mr. Kirpalani asked you some

12 questions about?

13 A    Yes.

14 Q    You might not need to look at it for this.  You can pull

15 it out certainly if you want to look at it though.  Do you

16 recall who signed the certificate on behalf of American

17 Mortgage at the end of the opinion letter?

18 A    I did.

19 Q    And at the time you signed it was the certificate correct?

20 A    Yes, I believe so.

21 Q    Could you give me a moment, Your Honor.  I may be just

22 about done.  I need to pull a document Your Honor.  Can you

23 give me a couple of minutes.  Very briefly.

24          THE COURT:  We'll take a short recess.

25          THE WITNESS:  May I run to the men's room please?

1          THE COURT:  Yes, you may.  You may do what you like

2  just don't talk about the substance of your testimony to anyone

3  in the men's room.

4                          (Recess)

5          THE COURT:  Please be seated.

6          MR. HARBOUR:  Thank you for your patience, Your

7  Honor.  If I may approach the witness to hand him what was CSF

8  fee binder but contains exhibits from Mr. Pino's depositions?

9          THE COURT:  Okay.

10  Q    First could you tell us what this document is please?

11  A    It's a repurchase agreement dated December 8, 2006 between

12  Society Generale and American Home Mortgage Investment Corp.

13  Q    And does this -- is this a form master repurchase

14  agreement?

15  A    It is a form master repurchase agreement from the bond

16  market association.

17  Q    And this is one of the 15 that we were talking about, one

18  of the 15 repurchasing agreements that American had,

19  approximately 15?

20  A    No, this is actually not a whole loan repurchase

21  agreement.  This is actually a MBS securities repurchase

22  agreement.  We probably had an American Home, another 15 of

23  these and maybe at Countrywide.

24  Q    Fair enough.  In any event, can you read Paragraph 6

25  please?

1 A    Paragraph 6, security interest.  Although the parties

2 intend that all transactions hereunder be sale and purchases

3 not loans, in the event that such transactions are deemed to be

4 loans seller shall be deemed to have pledged to the buyer a

5 security for the performance by the seller of its obligations

6 under each of such transaction and shall be deemed to have

7 granted to buyer a security interest in all of the purchase

8 securities with respect to all transactions hereunder and all

9 income herein, thereon and other proceeds thereof.

10 Q    Okay.  Could you turn back to the Bear Sterns agreement

11 please?

12 A    Yes.

13 Q    And read Paragraph 6 of that agreement.

14 A    Paragraph 6, security interest.  Although the parties

15 intend that all transactions hereunder be sale and purchases

16 and not loans, in the event that any such transactions are

17 deemed to be loans seller shall be deemed to have pledged to

18 the buyer a security interest for the performance by seller of

19 its obligations under each such transaction and shall be deemed

20 to have granted and the seller does hereby grant to buyer a

21 security interest in all of the purchase mortgage loans and

22 notes with respect to all transactions hereunder and all

23 proceeds thereof.  Seller shall pay all fees and expenses

24 associated with perfecting such security interests including,

25 without limitation, the cost of filing financing statements

1 under the uniform commercial code in recording assignments of

2 mortgages as required by buyer in its sole discretion.

3 Q    And is it your understanding that this provision provided

4 a backup security agreement to the Bear Sterns repo?

5 A    I believe so, yes.

6 Q    And is it your understanding that each of the 15

7 repurchase agreements that American Home entered into had such

8 similar backstop security interest language generally?

9 A    I believe so, yes.

10         MR. HARBOUR:  I think that's all Your Honor. One

11 more, excuse me.

12 Q    Could you turn to the American Home Mortgage Binder Number

13 Exhibit 2?  Just go to the last page please.  That's where

14 we'll start. On the second to last page, Mr. Pino, what's the

15 date on that for this document?

16 A    Wednesday, November 1, 2006.

17 Q    When did you receive the final document -- final

18 repurchase agreement?  Do you remember when that document was

19 finalized?

20 A    I don't recall.  Around the 19th I believe.

21 Q    Fair enough.  So is it possible that there have been

22 changes to even since this blackline to the final agreement?

23 A    Certainly, yes.

24 Q    And this is dated November 1st, there probably were.  Is

25 that your recollection?

1  A    Yes.

2  Q    So this isn't a blackline against the final version of the

3  repurchase agreement?

4  A    That's correct.

5          MR. HARBOUR:  No further questions, Your Honor.

6  Thank you.

7          THE COURT:  All right.  Redirect.

8                    REDIRECT EXAMINATION

9  BY MR. KIRPALANI:

10 Q    Mr. Pino, Mr. Harbour asked you about his firm's opinion

11 letter on cross examination.  Do you recall that?

12 A    Yes.

13 Q    And he asked you if you certified to certain things.  Do

14 you recall that as well?

15 A    Yes.

16 Q    If I could ask you to turn to it, it's Exhibit 4 in the

17 debtor's trial binder?  Do you have that in front of you?  Can

18 you turn to the certificate itself that you recalled signing?

19 It's at the end of the letter, Exhibit A.

20 A    I have.

21 Q    And can you just look at what it is that you certified to,

22 so it's numbers 1, 2 and 3.  Just take a look at Number 2.

23 Could you reach out loud what that says?

24 A    Each of the factual statements contained in Section 1 of

25 the letter opinion and each of the factual assumptions made in

1  Section 3 in the letter opinion therein is true, accurate, and

2  complete in all material respects as of the date hereof.

3  Q    And now can you turn back to Page 5 of the letter?  The

4  section I asked you about on direct examination?

5  A    Yes.

6  Q    What section is that?

7  A    Analysis.

8  Q    And there is a roman numeral to the left?

9  A    Section 5.

10 Q    Section 4?

11 A    I'm sorry, Section 4.

12 Q    Section 4.  Thank you.  I'd like to ask you a question, do

13 you still have that BMA form master repo agreement with Socgen

14 that Mr. Harbour gave to you?

15 A    Yes, I do.

16 Q    Can you describe that please?  Can you turn to Section 11,

17 the events of default section?

18 A    I have.

19 Q    Is it your understanding that this events of default

20 Section 11 --

21        MR. HARBOUR:  Objection Your Honor.  This is beyond

22 the scope of the cross.  The cross just focused on one discreet

23 provision in the agreement.

24        THE COURT:  Overruled.  You focused on the agreement.

25 You don't get to cherry pick.  It's fair game.  All four

Pino - Redirect                                         58

1  corners of that agreement are fair game.

2  Q    Mr. Pino, this Section 11 events of default section, does

3  this appear to be the same events of default section that is in

4  the Bear Sterns master repo?  You can compare the two documents

5  if you like?  The Bear Sterns one I handed you earlier.

6  A    No they appear to be different.

7  Q    Okay.  Can you tell us what the differences are?

8  A    Well they appeared to be a lot different.

9  Q    Section 11.

10 A    Events of default?

11 Q    Yes.

12 A    In the Bear Sterns letter you handed me Section 11 is

13 events of default, event of termination.

14 Q    Right.

15 A    It starts with Subsection A in the Socgen agreement.  It

16 starts with a paragraph describing what events of default are.

17 Q    Okay, fair enough.  Let me ask you to look at romanette i

18 of Section 11.  It says in the event that (1) seller fails to

19 transfer or buyer fails to purchase.  Do you see that?

20 A    Yes, I do.

21 Q    Can you look at Section 11A(1) of the Bear Sterns

22 agreement?

23 A    Yes.

24 Q    And what does that say?

25 A    It says seller fails to repurchase or buyer fails to

1  transfer purchase mortgage loans upon --

2  Q    And can you look at Section 11D, romanette ii of the

3  Socgen Agreement?

4  A    11D, romanette ii, okay.

5  Q    Yes.  Can you just read the lead into this -- I'll read it

6  to you actually.  It's romanette ii, as to transactions in

7  which the defaulting party is acting as buyer (a) immediately

8  purchaser recognized market or otherwise in a commercially

9  reasonable manner at such price or prices as the non-defaulting

10  party may reasonably deem satisfactory securities, replacement

11  securities of the same class and amount as any purchase

12  securities that are not delivered by the defaulting party to

13  the non-defaulting party.  And then it continues.

14          Can you look at Section 11E(2) of the Bear Sterns

15  agreement?  I believe you testified earlier that the subject

16  matter of these two agreements is different.  Is that correct?

17  A    That's correct.

18  Q    What's the difference in the subject matter of the

19  agreements?

20  A    The Socgen agreement, the Society Generale agreement is

21  for repurchase agreements involving securities and the Bear

22  Sterns agreement is for repurchases involving mortgage loans.

23  Q    Okay.  And I believe this is the section that I asked you

24  to take a look at during direct examination.

25  A    Yes.

1 Q    Is it your understanding that Section E(2) of the Bear

2 Sterns master repo contemplates the possibility that Bear

3 Sterns is unable to deliver the same mortgages that were the

4 subject of the Bear Sterns master repo?

5 A    Yes.

6           MR. KIRPALANI:  No further questions.

7           THE COURT:  Thank you.

8           MR. KIRPALANI:  I believe Mr. Tecce would like to

9 address those issues about those documents.

10          THE COURT:  Very well.  Mr. Pino, you can step down.

11 Thank you.  Just so the record is clear.  At this point I have

12 admitted into evidence Calyon exhibits 1 through 13 and debtor

13 exhibit 1.  You can take the podium.

14          MR. TECCE:  I will, yes.  That's correct Your Honor.

15 You've admitted into what I would refer to as AHM Calyon 1, but

16 you've also admitted into evidence AHM Calyon 6, 7 and AHM

17 Calyon 101 which was the single email that was accompanying the

18 Calyon policies and procedures manual.

19          At this point, Your Honor, I would like to renew my

20 motion.

21          THE COURT:  Hang on.  AHM 101, was that the email or

22 the Bear Sterns?

23          MR. TECCE:  That's the email that accompanied the

24 Calyon policy practices and procedures manual which is Exhibit

25 6.

1          THE COURT:  And also debtor's 6 and 7 has been

2 previously admitted, is that correct?

3          MR. TECCE:  Correct, Your Honor.  I moved to the

4 admission of debtor's 7 yesterday at the conclusion of my cross

5 of Mr. Pilcer.  At this point, I would like to renew my motion

6 with respect to -- thank you.

7          Just for the record, Your Honor, AHM Calyon 101 is a

8 two page document bearing the bates AHM Calyon 3611 to 3612.

9          THE COURT:  I have it.  Thank you.

10          MR. TECCE:  Thank you very much.  With respect to --

11 at this point, Your Honor, I would like to move for the

12 admission of Exhibits 2, 4, 13, and this Bear Sterns whole loan

13 master repurchase agreement which Mr. Pino just testified to

14 and which he was just cross examined on by the witness, and

15 which has been marked as actually CSFB Exhibit 64 in this

16 proceeding.

17          With respect to the blackline, I believe that any

18 issue as to authenticity --

19          THE COURT:  The last piece you are talking about.

20 I'm sorry.  The whole loan master repurchase agreement from

21 Bear Sterns.

22          MR. TECCE:  Between Bear Sterns and American Home

23 Mortgage.

24          THE COURT: Dated June 23, 2004.

25          MR. TECCE:  June 23, 2004.  That's correct, Your

1 Honor.  And I would like that as AHM Calyon 102.

2          THE COURT:  We'll mark it as AHM 102.  Sorry I just

3 want to make sure I have all the right documents.  Very well.

4 So you are now moving 2, 4, 13, AHM 102?

5          MR. TECCE:  Let me just make sure I got that right.

6 Two, which is the blackline agreement.  Four, which is the

7 Hunton & Williams letter.  Thirteen, no, that's right, 13 which

8 is the email from Williams dated November 19, 2006 7:51 p.m.

9 And, I don't want to clutter the record but I would just submit

10 that in response to the objections raised this morning, I

11 believe Mr. Pino has cured any authenticity issues with respect

12 to the blackline agreement.

13          He matched the blackline agreement with a copy of

14 that agreement which was sent to him by email.  Again it was

15 produced by Calyon in response to our document request.  It's

16 highly relevant to the issues in this litigation.  Number 4,

17 and the testimony of the witness has identified it as well as

18 the testimony of Calyon's witness in his deposition.

19          Number 4 is the Hunton & Williams letter which was

20 identified by Mr. Pino which is relevant which was drafted in

21 response to a condition precedent in the agreement which itself

22 has been admitted into evidence, which was signed by Mr. Pino

23 the witness who testified to it.  I submit that that should be

24 admitted as well.  And the email dated November 19 was

25 addressed to Mr. Pino.  He testified to having received the

1 email.  It was sent from Amy Williams at Hunton who is Calyon's

2 attorney and the rest is the agreement at issue in this case,

3 Your Honor.

4          THE COURT:  Any objection?

5          MR. TECCE: And just with respect to the last one,

6 Your Honor, I just note the whole loan master repurchase

7 agreement was testified to by Mr. Pino and he was cross

8 examined by opposing counsel with respect to that document.

9 Also relevant for the case.  Thank you.

10          THE COURT:  Any objection?  Mr. Ackerly.

11          MR. ACKERLY:  Your Honor, the only objection that we

12 will make is with respect to the blackline of the amended and

13 restated loan agreement.  The basis of the objection is that

14 Mr. Pino admitted on cross examination that the file document

15 is not the same as this document.  So this document is one

16 perhaps of many drafts that was prepared in connection with

17 this transaction.  it has no relevance to the executed copy

18 because it -- he admitted directly that it's not a blackline of

19 the final executed copy.

20          So what possible relevance or usefulness could it

21 have in connection with the issues in the case?  That's our

22 objection.  We don't object to the Hunton Williams opinion

23 letter that Mr. Pino acknowledged that, as well as the email

24 which he received.  And we don't object to the Bear Sterns.

25          THE COURT:  All right.  I'm going to overrule the

1  relevancy objection with regard to defendant's Exhibit 2.   It

2  is relevant to the legal argument of the debtors that this is

3  not a "true repo" because it is a blackline of a loan

4  agreement.   And although this doesn't indicate the final

5  agreement, it shows the changes that took it from loan

6  agreement to repo.

7          Now whether or not that legal theory is going to hold

8  water is a different issue.   But I think it is relevant so I

9  overrule that objection.   So Exhibit 2 is admitted over the

10 objection of Calyon.   And Exhibits 4, 13, and 102 are admitted

11 without objection.

12          MR. TECCE: Thank you, Your Honor.

13          THE COURT:   And the only open issue on evidence I

14 think in connection with Calyon would be deposition

15 designation.

16          MR. TECCE:   Correct, Your Honor.   Thank you and I

17 just would take direction from the Court as to how you want to

18 proceed with that.   I would submit Your Honor that reading the

19 -- once we get past the -- there are two issues I think.

20 Number one, the designations that have been made by debtors and

21 Calyon's objection to those designations.   We have not objected

22 to any designations by Calyon to the transcripts.

23          I think the second issue then is how Your Honor would

24 like to proceed once those objections are resolved with respect

25 to the balance of the designations and actually getting them

1  into evidence, whether Your Honor would actually like us to

2  read them into the record, or whether it would suffice to

3  present the Court with a copy of the transcript.  We have

4  prepared and we have highlighted in yellow the debtor's

5  designations and the Calyon's in red, which subject to the

6  Court's discretion on that we would submit would be a more

7  efficient way to proceed.

8          THE COURT:  All right.  So they are ready to be

9  submitted but there are some objections?

10         MR. TECCE:  That's correct.

11         THE COURT:  All right.  I certainly don't want them

12 read, r-e-a-d into the record.  I'm not in any way excluding

13 the red designations.

14         MR. ACKERLY:  We have some attachment to the red

15 designation but the only other thing we need to do with that is

16 the debtors presented us with a yellow and red markup which we

17 have not had a chance to review yet to be sure that it's

18 correct with respect to designation.  We would like to do that.

19         THE COURT:  All right.  So we have -- so you need an

20 opportunity to review what the debtor has prepared to make sure

21 it's accurate before it's submitted to Court which is fine.

22 Once you have had an opportunity to do that, if it is fine, you

23 can just send it over to the Court and it will be admitted into

24 evidence subject to any objections you have.

25         Can we deal with the objections now or is that

1  something that needs to be done after you've had an opportunity

2  to review it?  Here's what I'd like to do.  Actually I'm going

3  to withdraw my question.  Strike that.

4       What I'd like to do is I think the best way to deal

5  with the objections to the deposition designations would be to

6  have them submitted in writing because I'm going to want -- so

7  to the extent there is an objection what I would propose is to

8  give you a deadline of whatever you think would be an

9  appropriate time to articulate that objection and the debtors

10  can respond.  Then I will decide that when I also go through

11  the process of reading the deposition transcripts.  I'll make

12  my rulings in connection with the merits of the case.

13       I do think it would be helpful to have post-trial

14  briefing and I'd like to schedule an argument for after the

15  briefing.  I understand there is urgency and I am more than

16  happy to have this done as quickly as humanly possible.  I know

17  you are getting dailies of the transcripts so we have claims,

18  counterclaims.  I don't know if the parties have had a

19  discussion about whether they would like to do simultaneous

20  briefing or not.  That's always a little difficult but it would

21  be helpful if you could -- what I'm really looking for in

22  connection with post-trial briefing is to mesh your legal

23  arguments with the record that was actually developed for the

24  Court.

25       Maybe we can take some time for you guys to discuss

1  it or however you would like to proceed how you want to go.

2      MR. ACKERLY:  Well as the Court is aware we have

3  already filed pre-trial briefs.  And because the burden of

4  proof is shared because they have the burden of proof with

5  respect to their counterclaim it would seem to me that we

6  should file simultaneous briefs.

7      THE COURT: I think that makes sense.

8      MR. ACKERLY:  And the stipulation that we entered

9  into contemplated that they be filed within 10 days after the

10 conclusion of the trial which I think would have it fall on the

11 Sunday so it would be on -- it would be a week from this coming

12 Monday if I'm correct.

13     THE COURT:  So the 19th?  All right.  And do you want

14 an opportunity to answer each other?  Do we need to build in a

15 reply as well or can we just go with -- I think opening an

16 answer should be sufficient.  That's Thanksgiving week.  Do you

17 have a preference when you want the answering briefs due?

18 Should we make them the 26th, the next Monday and then we can

19 have oral argument the 27th or 28th?

20     I want to be sensitive to the demands of time but I

21 have to have a chance to actually read this stuff.

22     MR. KIRPALANI:  Your Honor, if it's okay with the

23 Court I think the counsel for the parties feel that one opening

24 brief would probably be sufficient.

25     THE COURT:  So answering is not required?  Very well,

1 that's fine.  So when would you like oral argument?  I'll get

2 the briefs on the 19th.  I could hear you that week, the 21st,

3 the day before Thanksgiving.  It's easy for me.  I live down

4 the road.  For the out-of-town people I know it's difficult.

5 The worst travel day of the year so that probably doesn't make

6 a lot of sense.

7        MR. ACKERLY:  If the Court were to do it on the 21st

8 I would just request we do it first thing in the morning so we

9 can finish.

10        MR. KIRPALANI:  I would ask that we not do it that

11 day.

12        THE COURT:  I'll tell you what, let's -- I've got

13 tons of availability on Monday the 26th.  We can do oral

14 argument on Monday the 26th.  That gives me an opportunity to

15 really be ready and it'll accelerate the decision process I

16 think from the Court.

17        MR. ACKERLY:  Would it be okay to do it in the

18 afternoon?

19        THE COURT:  Yes.  Two, three?

20        MR. ACKERLY:  Three. I have a physical that morning.

21        THE COURT:  Well Mr. Ackerly I want to make sure you

22 are here in one piece.

23        MR. ACKERLY:  Three o'clock would be fine.

24        THE COURT:  Three o'clock on the 26th.  If I could

25 also request -- I'm sorry the briefs will be simultaneous --

1 one brief, simultaneously on the 19th, let's say 4:00 p.m.  I

2 trust the professionalism with the parties that you will -- if

3 it's not truly simultaneous it will be in effect simultaneous.

4 No one will be responding on anyone else.

5         I'd like the transcript at some point.

6         MR. TECCE: I think Mr. Harbour has said that on

7 Friday or Monday he will give us his objections and we'll

8 provide written responses, does by Wednesday or Thursday of

9 next week work?  If that's fine, then we'll submit our

10 responses with Mr. Harbour's objections and designation.

11         THE COURT:  That's fine.  When --

12         MR. TECCE:  Actually strike that Your Honor.  Would

13 you like to see what we've designated and what they've

14 designated before the objections are done because that draft

15 should be done as soon as Calyon's attorney --

16         THE COURT:  No, no, no let's get it all at once.  So

17 that way I'll know what I'm supposed to read and what I'm not

18 supposed to read.

19         MR. TECCE:  That's fair.

20         THE COURT:  Mr. Harbour is going to get you

21 objections by Monday the 12th?

22         MR. HARBOUR:  Yes, Your Honor.

23         THE COURT:  And then you'll have til when to respond?

24 I'm sorry.

25         MR. TECCE:  I said Wednesday or Thursday of next

1  week.  Thursday if I could Your Honor.

2         THE COURT:  Yes, Thursday and then send it over with

3  the briefing on the 19th.  That way I get one package.

4         MR. TECCE:  That's fine.

5         THE COURT:  So either late in the day on the 19th or

6  early the 20th send over the briefing, send over the deposition

7  designations with any back and forth as to objections and send

8  over the trial transcript.

9         MR. TECCE:  The only practical problem Your Honor, is

10  we may be wanting to cite two deposition transcripts that we

11  believe should be in the record as part of our brief.

12         THE COURT:  All right.

13         MR. TECCE:  There won't be a ruling on them.

14         THE COURT:  Then you are going to have to respond by

15  the 14th and send it over Monday the 15th and I'll make my

16  rulings.

17         MR. TECCE: I think that's the only way it would work.

18         THE COURT:  Thursday the 15th and I will make my

19  rulings.  Mr. Harbour you'll give them your written objections

20  by Monday the 12th.  It's actually a holiday but not to people

21  who --

22         MR. HARBOUR:  Not to us.

23         THE COURT:  Not to people who are in private

24  practice.  And responses by the 14th.  Send over a package on

25  the 15th and I'll get you my answers.  Then on the 19th you'll

71

1    or probably it'll be the morning of the 20th send over the

2    briefing and the trial transcript.

3            MR. HARBOUR:  Thank you, Your Honor.

4            THE COURT:  And a complete set to the extent

5    necessary of the deposition designations.

6            MR. TECCE:  Thank you very much, Your Honor.

7            THE COURT:  Is there anything else for today then?

8    All right.  Thank you very much and I look forward to hearing

9    from you and we're adjourned.

10                           * * * * *

11                   C E R T I F I C A T I O N

12            I, Lynn Schmitz, certify that the foregoing is a

13    correct transcript from the official electronic sound recording

14    of the proceedings in the above-entitled matter, and to the

15    best of my ability.

16

17    /s/ Lynn Schmitz                Date:  November 12, 2007

18    LYNN SCHMITZ

19    J&J COURT TRANSCRIBERS, INC.

20

21

22

23

24

25