UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                        .      Case No.  07-11047
                              .
                              .
                              .
AMERICAN HOME MORTGAGE        .
HOLDINGS, INC.,               .      824 Market Street
                              .      Wilmington, Delaware  19801
          Debtor.            .
                              .      November 6, 2007
. . . . . . . . . . . . ..      11:18 a.m.

TRANSCRIPT OF TRIAL
BEFORE HONORABLE CHRISTOPHER SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            Young Conaway Stargatt & Taylor LLP
                           By:  CURTIS J. CROWTHER, ESQ.
                           The Brandywine Building
                           1000 West Street, 17th Floor
                           Wilmington, DE  19899


For the Debtor:            Quinn Emanuel Urquhart Oliver &
                             Hedges, LLP
                           By:  SUSHEEL KIRPALANI, ESQ.
                                JAMES C. TECCE, ESQ.
                           51 Madison avenue, 22nd Floor
                           New York, NY  10010



For Calyon New York        Hunton & Williams LLP
Branch:                    By:  JASON HARBOUR, ESQ.
                                BEN ACKERLY, ESQ.
                           Riverfront Plaza, East Tower
                           951 East Byrd Street
                           Richmond, VA  23219-4074


Audio Operator:            Nickita Barksdale

Proceedings recorded by electronic sound recording, transcript
             produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

2

APPEARANCES (CONT'D):

| | |
|---|---|
| For Calyon New York Branch: | Eckert Seamans Cherin & Mellott, LLC<br>By:  MICHAEL BUSENKELL, ESQ.<br>300 Delaware Avenue, Suite 1210<br>Wilmington, DE  19801 |
| For Credit Suisse First Boston: | Weil Gotshal & Manges<br>By:  HOWARD COMET, ESQ.<br>      SAIMA MAJID, ESQ.<br>767 Fifth Avenue<br>New York, NY 10153 |
| For Met Capital LLC: | Weil Gotshal & Manges<br>By:  MELANIE GRAY, ESQ.<br>700 Louisiana, Suite 1600<br>Houston, TX  77002 |
| For Met Capital LLC: | Womble Carlyle Sandridge & Rice<br>By:  STEVEN K. KORTANEK, ESQ.<br>222 Delaware Avenue, Suite 150<br>Wilmington, DE  19801 |
| For the Creditors' Committee: | Hahn & Hessen LLP<br>By:  GREGORY KOCHANSKY, ESQ.<br>488 Madison Avenue, 14th & 15th Fl.<br>New York, NY  10022 |
| For the Creditors' Committee: | Blank Rome LLP<br>By:  BONNIE FATELL, ESQ.<br>Chase Manhattan Centre<br>1201 Market Street, Suite 800<br>Wilmington, DE  19801 |
| For AHM: | American Home Mortgage Holdings, Inc.<br>By:  DAVID FRIEDMAN<br>(Telephonic appearance) |
| For the Securities Industry Financial Markets Association: | Teitelbaum & Baskin, LLP<br>By:  JAY TEITELBAUM, ESQ.<br>3 Barker Avenue, Third Floor<br>White Plains, NY  10601<br>(Telephonic appearance) |

# I N D E X

|  | PAGE |
|---|---|
| **OPENING STATEMENTS** | |
| By Mr. Comet | 4 |
| By Mr. Ackerly | 30 |
| By Mr. Teitelbaum | 35 |
| By Mr. Tecce | 42 |
| By Mr. Comet | 56 |

**WITNESSES**
BRUCE KAISERMAN

|  | PAGE |
|---|---|
| Direct Examination by Mr. Comet | 66 |
| Cross Examination by Mr. Crowther | 123 |
| Redirect Examination by Mr. Comet | 139 |

| **EXHIBITS** |  | **ID.** | **EVD.** |
|---|---|---|---|
| CSFB-101 | Transcript | | 63 |
| CSFB-1 through | | | |
| CSFB 7 | Documents | | 64 |
| CSFB-32 through | | | |
| CSFB-36 | Mortgage Repurchase Agreements | 69 | 70 |
| CSFB-22 | Agreement | 71 | 71 |
| CSFB-27 | Letter | 91 | 92 |
| CSFB-31 | Listing of Loans | 102 | 110 |
| CSFB-23 | Agreement | 114 | 116 |
| D-6 | Due Diligence Documents | 129 | 129 |
| AHM-101 | Bear Stearns Agreement | 139 | |
| CSFB-38 through | | | |
| CSFB-64 | Contracts | | 147 |

1        THE CLERK:  All rise.

2        THE COURT:  Please be seated.  Good morning.

3        UNIDENTIFIED ATTORNEYS:  Good morning, Your Honor.

4        THE COURT:  How are we doing?  Should we start?  Do

5   you have anything to report before we begin?

6        MR. COMET:  I don't believe so, Your Honor.

7        THE COURT:  All right.

8        MR. COMET:  Good morning, Your Honor.  Howard Comet,

9   Weil, Gotshal & Manges, for Credit Suisse First Boston Mortgage

10  Capital.  I'd like to make an opening statement before the

11  trial, Your Honor.

12        Today, Your Honor, is three months to the day since

13  American Home's bankruptcy case was filed, and this adversary

14  proceeding began.  Since that time Credit Suisse has been

15  seeking to obtain something that is plainly and unambiguously

16  provided for in its mortgage repurchase agreement with American

17  Home, namely the turnover of the records relating to the

18  mortgage loans that American Home transferred to Credit Suisse

19  under that agreement.  American Home has refused to turn over

20  the records.  Initially what we heard was that American Home

21  wanted to sell the servicing loans.  But American Home has now

22  sold its servicing platform without those loans, and, in fact,

23  American Home will soon be required to pay the purchaser of the

24  servicing platform to keep servicing those loans without any

25  apparent benefit to the estate.

**J&J COURT TRANSCRIBERS, INC.**

1           In the preliminary injunction hearing, American Home

2   did not claim that it was getting any benefit from the

3   servicing, per se.   To the contrary, American Home admitted

4   that it is entitled to no compensation for servicing the Credit

5   Suisse loans.   Instead, American Home's treasurer, Mr. Pino

6   (phonetic), testified that American Home wants to control the

7   sale of the loans, and is using its control over the servicing

8   records to block Credit Suisse from selling the loans.

9   American Home's effort to block Credit Suisse from liquidating

10  its position under the parties' repurchase agreement is

11  thwarting the clear intent and purpose behind legislation that

12  Congress has repeatedly amended precisely for the purpose of

13  borrowing, that conduct.   The specific purpose of the safe

14  harbor provisions of the Bankruptcy Code is to ensure the

15  ability of parties to repurchase agreements and certain other

16  types of contracts to promptly liquidate those agreements when

17  their counter-parties become insolvent.   The express purpose

18  behind American Home's conduct, on the other hand, has been to

19  block the liquidation of the repurchase agreement, which I

20  believe is frustrating the intent of the law.

21          Under the parties' stipulation, Your Honor, the

22  issues for this trial are, one, whether the repurchase

23  agreement between Credit Suisse and American Home was

24  terminated by American Home's bankruptcy filing, as the

25  contract expressly provides, and two, whether Credit Suisse is

1  therefore entitled to the turnover of the records relating to

2  the mortgages it purchased pursuant to that agreement, and that

3  agreement also expressly provides that Credit Suisse is the

4  owner of those records and is entitled to the turnover.

5          Now, within those two issues there are several legal

6  questions that have been raised.  The first question is whether

7  the termination provision of the contract is effective because

8  it is covered by the safe harbor provisions of the Bankruptcy

9  Code, or whether, as American Home argues, the safe harbor

10  provisions don't apply because the mortgage repurchase

11  agreement should be re-characterized as a secure loan

12  agreement.

13          The second question involves American Home's argument

14  that even if the safe harbor provisions apply to the sale of

15  the mortgages, the parties' agreement contains within it a

16  severable servicing contract which is not covered by the safe

17  harbor provisions and has not been terminated.

18          And the third question concerns the debtor's argument

19  that even if the entire agreement has been terminated, they

20  still should not be required to turn over the records that

21  Credit Suisse owns.

22          For all three of these questions, Your Honor, there

23  are really no facts in dispute.  There are only issues of law

24  that can be decided on the face of the parties' mortgage

25  repurchase agreement, much as the Court decided the first two

1  questions I described on a preliminary basis during the

2  preliminary injunction hearing.

3        Even though we believe there are no material facts in

4  dispute, Your Honor, we plan to present evidence in this trial

5  that goes beyond the face of the contract.  We're doing that to

6  present the industry and business context for this repurchase

7  agreement and mortgage repurchase agreements in general.  I

8  believe that evidence will show why American Home's arguments

9  are not only wrong on the law, but are also divorced from the

10  commercial reality of the way this industry operates, and are

11  completely impractical.  Put another way, Your Honor, if

12  American Home's arguments were accepted, they would frankly

13  nullify the intent of Congress to bring the mortgage repurchase

14  market under the protection of the safe harbor provisions.

15        I want to point out, however, that at the same time

16  that we present evidence that goes beyond the contract, we

17  don't want to lose sight of the fact that the dispositive

18  evidence that the Court needs to make its ruling here is almost

19  entirely contained within the four corners of the parties'

20  agreement and as such it's necessarily undisputed.  There's no

21  conflict here about what the words are in the agreement.  We

22  believe that the additional evidence that we'll present will be

23  helpful in understanding the context and consequences of this

24  dispute, but this really is a matter that is governed almost

25  entirely by the applicable statutes and the plain language of

1  the parties' contracts.

2          So, let me turn, then, Your Honor, to the elements,

3  as I see them, of the Credit Suisse claims.  Here the parties'

4  mortgage repurchase agreement plainly provides, one, that it's

5  terminated by American Home's bankruptcy filing.  Two, that

6  Credit Suisse owns the mortgages and all the records pertaining

7  to them.  Three, that American Home is to service the mortgages

8  only during the term of the repurchase transactions.  And four,

9  that once the contract is terminated American Home has no right

10 to the servicing records for any mortgages it didn't

11 repurchase.  As to those four points I don't believe there's

12 any dispute that everything I just said is contained within the

13 four corners of the contract and expressly provided for by the

14 contract.  So, the dispute instead is whether the plain terms

15 of the contract are enforceable.  And I think it's clear that

16 American Home wants to argue that the contract is not

17 enforceable, which is what they're doing.  They have the burden

18 to show that.  And they made a variety of arguments in an

19 effort to show that the bankruptcy termination clause of the

20 contract, the ipso facto clause, is not enforceable.

21          Now, we recognize, of course, Your Honor, that

22 Section 365 of the Bankruptcy Code bars the enforcement of the

23 ipso facto clauses in many types of executory contracts.  Just

24 note in passing that Section 365, of course, doesn't apply to

25 non-executory contracts, which may mean that it doesn't even

**J&J COURT TRANSCRIBERS, INC.**

1  apply here.  But even if the contract here is executory, the

2  safe harbor provisions are one of the principal exceptions to

3  both Section 365 and to the automatic stay, and two of the safe

4  harbor provisions apply to the mortgage repurchase agreement

5  between Credit Suisse and American Home.

6        First, Section 559 applies.  That section applies to

7  repurchase agreements, which are defined in Section 101(47) of

8  the Bankruptcy Code as agreements that provide for the transfer

9  of certain specified kinds of property against a transfer of

10 funds with a simultaneous agreement by the buyer to transfer

11 back to the seller within a year.  One of the specified kinds

12 of property covered by Section 101(47) is mortgage loans, which

13 Congress specifically added to the statute in 2005.

14       The repurchase agreement between Credit Suisse and

15 American Home is a repurchase agreement within the meaning of

16 Section 101(47), because it provides for the transfer of

17 mortgage loans to Credit Suisse by American Home in return for

18 funds with a simultaneous agreement by Credit Suisse to

19 retransfer the mortgage loans to American Home within a year.

20 In fact, the entire agreement, not just the individual

21 transactions under it, lasted less than 11 months.  The

22 agreement was executed on September 13th, 2006, and the

23 termination date of the agreement was August 15th, 2007.  That

24 -- August 15 was the date by which, at the latest, all of the

25 repurchase transactions under the agreement had to be

1  completed.  So, at this point the agreement has actually

2  expired of its own terms.

3          But all of that is within the four corners of the

4  contract, Your Honor, and I believe that means that all the

5  facts necessary to bring the repurchase agreement between

6  American Home and Credit Suisse within the scope of the safe

7  harbor protections in Section 559 are found on the face of the

8  contract, and are therefore, again, not really subject to

9  dispute.

10          And I think what's going to happen here in the trial,

11  the best I can tell, is that American Home is not going to

12  dispute the words in the contract, although they may -- since

13  they can't do that, they may try to cast some doubt on them by

14  offering what I think will be a very small quantity of what

15  amounts to parol evidence.  From their pretrial memorandum I

16  can see, for example, that they have an e-mail that somebody

17  sent where he used the word borrowing instead of selling.  That

18  e-mail, if they offer it, as the Court will see, is accompanied

19  by a legal document that specifically indicates that the

20  parties were agreeing to enter into a mortgage repurchase

21  agreement in which American Home would be the seller and Credit

22  Suisse would be the buyer.  And that's the legal document, not

23  a passing word in an e-mail.  Similarly, they have an internal

24  Credit Suisse document with no specific relationship to this

25  contract that uses the word lending in connection with

1 warehouse facilities that Credit Suisse does in the former

2 mortgage repurchase agreements.  I think they've actually

3 misconstrued the terminology, but again, that has nothing to do

4 with defining the legal relationship here, Your Honor, which is

5 defined by the contracts of the parties, which is unambiguous.

6          Now, on the other hand, I think what the Court will

7 see and the evidence it will present is that American Home knew

8 from the first moment that this agreement began to be

9 negotiated, that what Credit Suisse was proposing was a

10 repurchase agreement in which American Home would be the

11 seller, Credit Suisse would be the buyer.  Mr. Pino, the

12 treasurer of American Home, testified at his deposition, and

13 we'll submit that deposition testimony, Your Honor, that he

14 knew a repurchase agreement was being proposed here, that he

15 never objected to that, that he never asked for a secured

16 lending agreement.  He also gave testimony that indicates every

17 mortgage repurchase agreement that he's worked on at American

18 Home has always provided that it would be covered by the safe

19 harbor provisions of the Bankruptcy Code.  He's very familiar

20 with that situation.  He's worked on agreements for American

21 Home where he's arranged for American Home's outside counsel to

22 provide formal legal opinions to the counter-parties at

23 American Home saying these agreements are protected by the safe

24 harbor provisions of the Bankruptcy Code, and American Home

25 knew exactly what it was entering into here, and so did Credit

1 Suisse, and Credit Suisse relied on the nature of the

2 agreement.

3           I think the evidence will also show, Your Honor, a

4 course of conduct by the parties which -- I don't think it

5 necessary to show, but because the contract governs -- but the

6 course of conduct will show that whenever loans were

7 transferred from American Home to Credit Suisse under the

8 mortgage and purchase agreement, American Home repeatedly

9 executed legal documents, releases of all their rights, claims,

10 and interests in the mortgage loans in return for a payment

11 from Credit Suisse, and thereby transferred the loans to Credit

12 Suisse.  If you had just those documents on their own, they are

13 sufficient to transfer ownership of the loans, Your Honor, and

14 that occurred on repeated occasions throughout the course of

15 the parties' relationship.  So, I think the facts of what the

16 contract provides won't be able to be varied here, Your Honor,

17 and rather confirmed by the course of conduct.

18           And I also think there's no real dispute about

19 whether any of the elements that appear in the definition of a

20 repurchase agreement in Section 101(47) are satisfied.  All the

21 elements in the face of the statute are clearly satisfied here.

22 Instead, what is occurring is American Home is trying to import

23 into the language of the statute some additional requirements

24 of considerations, frankly by arguing that incorporates state

25 law tests for determining whether something is a purchase and

1   sale, or true sale, as opposed to a secured financing.

2           I'd like to discuss that argument a little more, Your

3   Honor, but let me first point out that as the Court -- I

4   believe it has been able to see in the pretrial briefing,

5   including the SIFMA amicus brief, the legislative history of

6   the 2005 amendments to the Bankruptcy Code says in so many

7   words that Congress intended to eliminate any consideration

8   where the repurchase agreements are purchases and sales, or

9   instead are secured financings.  If I wanted to go and write

10  some legislative history to support our position in this case,

11  I don't think I could have written something more precisely on

12  point or more supportive of our position.  So, I think under

13  559 there should be no question that the evidence will show,

14  Your Honor, that the safe harbor provisions of that section

15  apply to this contract, and make it enforceable.

16          The second safe harbor provision that applies here,

17  Your Honor, is Section 555.  That section covers security

18  contracts -- securities contracts, which are, in turn, defined

19  in Section 741 of the Bankruptcy Code.  Section 741 was also

20  amended in 2005 and is covered by the same statement in the

21  legislative history about eliminating arguments that an

22  agreement is the secured financing.

23          Section 741 actually was also amended again very late

24  last year, in 2006, so late that it -- the amendment doesn't

25  even show up in the 2007 Collier's publications.  It's only in

1  a supplement.  And the thrust of that amendment, I think, Your

2  Honor, is to make even clearer that all repurchase transactions

3  are covered by the safe harbor provisions.  As Subdivision 7 of

4  Section 741, Your Honor, defines securities contracts, as it

5  now reads it covers contracts where the purchase, sale, or loan

6  of certain kinds of property, including specifically mortgage

7  loans, and it also expressly includes any repurchase or reverse

8  repurchase transactions, "whether or not such repurchase

9  transaction or reverse repurchase transaction is a repurchase

10 agreement as defined in Section 101."  That whether or not

11 language was added by the 2006 amendment, and I think is

12 intended to make it doubly clear that Congress wants the safe

13 harbor provisions to cover any repurchase transaction in

14 certain kinds of properties, including mortgage loans.

15         Now, we actually would not mind, Your Honor, if the

16 Court, in this case, were to rule in our favor just under

17 Section 555, and did not even reach the 559 issue.  That's

18 because there's no requirement under Section 555 for a party

19 that contracted with the debtor to turn over to the debtor any

20 excess proceeds obtained upon liquidation of the contract.

21 There is such a requirement in Section 559.  So, in effect, 559

22 doesn't only create a safe harbor for counterparties to

23 debtors, it also provides important rights to debtors, and

24 American Home believes there's some excess value in these

25 loans.  They really should be arguing for the application of

1 Section 559 here.  But they are apparently not.

2          I think that brings us, Your Honor, to the re-

3 characterization issue because, again, under 559 and 555, the

4 plain language of the statutes and the plain language of the

5 contracts mesh and bring them together.

6          The re-characterization issue, Your Honor, is a legal

7 issue, which we believe the Court, in a sense, should not even

8 entertain because Congress, as I've said, has adopted

9 Bankruptcy Code definitions that define whether a repurchase

10 agreement is entitled to the protection of the safe harbor

11 provisions and that those requirements of the Bankruptcy Code

12 are satisfied.  That should be the end of the analysis.  As the

13 legislative history indicates, there should not be even any

14 inquiry into whether under state law principles the agreement

15 might, for some other purpose, be characterized as a secured

16 financing or a purchase and sale.  That question, I think,

17 Congress has rendered irrelevant under the Bankruptcy Code.

18 But in any event, Your Honor, I think the evidence at trial

19 will show, as I mentioned before, that the re-characterization

20 argument is also divorced from commercial reality, and would

21 end up nullifying the intent of Congress if accepted.

22          American Home's major point, and the one that they

23 led off with in their pretrial memorandum is that a repurchase

24 agreement doesn't provide for an actual sale.  It's really a

25 secured financing if, in the first stage of the repurchase

1  transaction the buyer isn't given complete ownership rights in

2  the property that are purchased.  And by complete ownership

3  what they mean is that the buyer has to be able to freely and

4  finally alienate or sell the property that they purchased

5  notwithstanding their simultaneous commitment to sell something

6  back to the debtor, or the seller, the counterparty.  And what

7  the debtor's position is is that the buyer, under the

8  repurchase agreement, has to be able to substitute different

9  property so they can finally sell the actual property or it

10  will substitute something different.  And this substitutability

11  argument, according to American Home, applies not just to

12  mortgage repurchase agreements, but to every repurchase

13  agreement covered by the safe harbor provisions, or it defines,

14  according to American Home, whether or not any repurchase

15  agreement is covered by the safe harbor provisions.  So, if

16  that argument were accepted, Your Honor, it would have profound

17  consequences for what the safe harbor provisions cover for

18  every aspect of repurchase agreements.

19         As the Court may recall, American Home's counsel, Mr.

20  Kirpalani brought up this substitutability argument during the

21  preliminary injunction hearing, and as I said at that time, a

22  repurchase agreement can allow for the substitution of

23  different property only if the property sold in the first stage

24  is fungible.  A security certificate of some sort where there's

25  a whole issue of shares, and you give back another share of the

1  same series, that's fungible.  Mortgage loans are not fungible.

2  I don't think there's any dispute about that.  Every mortgage

3  loan is unique, secured by different real property.  It has a

4  different borrower, a different payment history.  So, given

5  that, Your Honor -- I don't think it's very surprising that --

6  there do not appear to be any mortgage repurchase agreements

7  that allow for substitution of different mortgages.  Everyone

8  we have seen or heard about requires that the same property be

9  returned.  Mr. Kaiserman, from Credit Suisse, who testified in

10 the preliminary injunction hearing and will testify again in

11 this trial, he's been involved in approximately 100 mortgage

12 repurchase agreements at Credit Suisse.  He'll testify that

13 every one required the return of the same property.  Mr. Pino,

14 American Home's treasurer, testified at his deposition he's

15 dealt with about 15 mortgage repurchase agreements since 2004,

16 when he joined American Home.  He could not recall any that

17 allowed -- authorized the substitution of different mortgages

18 and he said there was never an occasion when one of American

19 Home's counterparties tried to resell them different mortgages.

20 We'll also offer additional evidence at trial to show that

21 mortgage repurchase agreements invariably require resale of the

22 same mortgages.  Since that's the commercial reality, if

23 American Home's re-characterization were accepted, then

24 mortgage repurchase agreements, as they currently exist, Your

25 Honor, would not be covered by the safe harbor provisions, and

1  the intent of Congress would be nullified.  No mortgage

2  repurchase agreement that we are aware of, or I believe that

3  the debtors have identified, would be covered by the safe

4  harbor provisions.  Indeed, Your Honors, it's not just limited

5  to mortgage repurchase agreements.  Substitution is not allowed

6  under the standard bond market association agreement for U.S.

7  transactions.  So, ruling that substitution is required would

8  have drastic consequences.  And I think beyond the substitution

9  point, American Home is going to argue that its mortgage

10 repurchase agreement of Credit Suisse should be re-

11 characterized because it contains other provisions of a type

12 which are almost always found not only in mortgage repurchase

13 agreements, but also in virtually all repurchase agreements.

14         One of the items of evidence we intend to offer, Your

15 Honor, is that we looked a the public records of mortgage

16 repurchase agreements, public companies such as American Home

17 often file their mortgage repurchase agreements with the SEC.

18 Those are available on EDGAR filings.  So, we looked there for

19 the mortgage repurchase agreements among the many types of

20 repurchase agreements that filed, and we have the first 20 or

21 so that we could find, and we've compared them to the Credit

22 Suisse agreement.  They all provide for resale of the same

23 mortgages.  They all contain most of the same terms that

24 American Home is complaining about.  None of them, Your Honor,

25 follow the global form that's promulgated by the bond market

1 association for transactions governed by English law.  I think

2 that's probably not surprising, but that's the form that in

3 American Home's pretrial memorandum they say is the market

4 form.  I don't think they'll present to Your Honor a single

5 United States mortgage repurchase agreement that remotely

6 resembles that global bond market association form.  So, if

7 American Home's arguments are accepted that you have to follow

8 that form, that would undermine not just mortgage repurchase

9 agreements, I think, Your Honor, but the entire repo market.

10        Now, mortgage repurchase agreements, Your Honor, I

11 think the evidence will show, provide for resale of the same

12 mortgages, not only because mortgages are not fungible, but

13 also because of the nature of the way mortgage repurchase

14 agreements are used in the actual marketplace, which we'll

15 present evidence about that I think will also show why American

16 Home's arguments would undermine the actual marketplace in

17 which these agreements are used.  Mortgage repurchase

18 agreements are used, as far as we can tell, for one thing and

19 one thing only, Your Honor.  They're used for warehouse

20 financing.  And what that is is temporary financing that's

21 provided to a mortgage originator between the time that the

22 originator, like American Home, originates mortgages or

23 sometimes buys them from other parties who originated them.

24 So, between that time of the origination or acquisition and the

25 time that the originator sells the mortgage to a long term or

1  take out purchaser.  So, in this interim period between the

2  origination and the eventual sale of the mortgage to a take out

3  purchaser, warehouse financing in the form of mortgage

4  repurchase agreements is huge.  And that's -- Mr. Kaiserman

5  will testify, again, that in his experience that's the only

6  thing mortgage repurchase agreements for whole loans have been

7  used for, and Mr. Pino testified at his deposition that all of

8  the mortgage repurchase agreements he worked on for American

9  Home were used solely for warehouse financing.  And so, the

10 evidence, Your Honor, I think will show that what mortgage

11 originators do is they enter into these repurchase agreements

12 to get the money they need to originate mortgages or buy them.

13 When they -- when they originate the mortgage there's a

14 simultaneous transaction.  On the day a homeowner, for example,

15 buys a property and enters into a mortgage, most of the money

16 for that transaction to fund the mortgage comes from the

17 repurchase or repo bank.  That's sent to an escrow agent, along

18 with a small amount of additional funds from the originator,

19 and, of course there may be a down payment from the homeowner.

20 That funds the sale of the home.  At the same time the

21 homeowner gives a mortgage on its face to American Home, but

22 virtually simultaneously American Home, in turn, transfers that

23 mortgage to the repo bank, who becomes the owner of it for that

24 period, having provided the funding on that same day.  And what

25 happens next?  The evidence will show, Your Honor, that the

1  originator immediately looks to make a longer term sale of that

2  mortgage.  They may, in fact, have an agreement already with

3  some take out or long-term purchaser, commitment to buy

4  mortgages which they're planning to eventually use to sell this

5  mortgage, or they may go out and arrange a sale to a

6  securitization trust, or a bank, or a Fannie Mae, as the take

7  out purchaser of the loan.  Now, in order to arrange that sale,

8  the originator has to identify the specific loans it's planning

9  to transfer to the take out purchaser.  It provides very

10 detailed information, schedules of the loans with 20, 30, 40

11 items of information about them, representations and warranties

12 about them that may, in the aggregate, add up to 100 or more

13 data points about each specific mortgage.  And the take out

14 purchaser reviews that and decides whether to accept the

15 mortgages.  And then when it's all said, on a particular day

16 there's another simultaneous transaction.  The mortgage

17 originator notifies the repo bank, we're now going to sell the

18 mortgages to this take out purchaser.  So, on that day the

19 repurchase is made from the repo bank by the mortgage

20 originator, and simultaneously the loans are sold to the take

21 out purchaser.  The money involved in this moves from the take

22 out purchaser directly to the repo bank, which takes out the

23 repurchase price, and if there's any excess they'll send that

24 over to the originator, and the mortgage moves through the

25 originator nominally to the take out purchaser.

**J&J COURT TRANSCRIBERS, INC.**

1          So, what this means, Your Honor, is the only way the

2   originator can accomplish either the repurchase for the repo

3   bank, or the sale to the take out purchaser is by knowing

4   exactly what loans are involved in order to sell them to the

5   take out purchaser, who decides whether to accept them, and --

6   to get them back from the repo bank.  If, on that day, the repo

7   bank said I'm not going to sell you back the same loans, I want

8   to substitute something different, the whole transaction would

9   collapse because the take out purchaser only re-divides (sic)

10  specific loans which they've received hundreds of items of

11  information about.  They can't take these new loans.  The

12  originator is going to say how do I know these loans are worth

13  the same thing as the loans I sold you to the repo bank?  The

14  substitution simply wouldn't work.  The whole transaction would

15  collapse.  And it would defeat the whole purpose for which

16  mortgage repurchase agreements are used, which is, again, just

17  to provide this temporary financing to get from the origination

18  to the take out purchaser.

19          So, to impose a substitution requirement here in

20  order to make a mortgage repurchase agreement enforceable would

21  simply have nothing to do with the reality for which they're

22  used, and would potentially undermine the entire market, Your

23  Honor.  That's the commercial reality and context here that

24  American Home's argument simply ignores.

25          That brings us, I think, Your Honor, to the servicing

1  and remedy issues in this case.  First, let me note that

2  American Home's pretrial memorandum mis-states what Credit

3  Suisse's legal argument is about the servicing issue, and

4  whether the servicing portion of the contract is severable.  We

5  have not argued, and don't intend to argue that the servicing

6  portion of the agreement is covered by the safe harbor

7  provisions because it's an interest in a mortgage loan.  It's

8  covered by the safe harbor provisions because it's part of the

9  related terms of the agreement, which are specifically covered

10 by Section 101(47), and because it's an integral part of the

11 same transaction as the mortgage purchase and repurchase.  The

12 undisputed facts, I think, Your Honor, are that the repurchase

13 agreement between Credit Suisse and American Home provide for

14 American Home to service the loans only in this brief interval

15 between the purchase and repurchase stage of the parties'

16 transactions.  The evidence will be, Your Honor, that that

17 period is -- can be as short as 15 days, and typically is not

18 longer than 30 to 60 days.

19        It's undisputed, again, and I think the evidence at

20 trial will concern that servicing is never transferred in that

21 period.  It remains with whoever the servicer is, most often

22 the seller, and is not transferred, as Mr. Kaiserman previously

23 testified, because that would be highly disruptive to

24 borrowers, it could cause great confusion, it could cause

25 problems with payments, and could impair -- therefore impair

**J&J COURT TRANSCRIBERS, INC.**

1  the value of the mortgages.  And so, really, the servicing

2  that's not transferred is left in the hands of the seller in

3  order to support the value of the mortgages in order to make

4  sure that the purchase and repurchase transaction can proceed

5  as planned.  It's an integral part of that.  It's function is

6  to make that transaction workable.  The agreement between

7  Credit Suisse and American Home also doesn't require Credit

8  Suisse to pay anything to American Home for servicing.  That

9  means there's no consideration here that could be apportioned

10 to create a severable contract, nor is there anything

11 beneficial to the estate about making this argument for

12 severance.  We raised this issue of preliminary injunction

13 hearing.  The issue remains, Your Honor, there's no possible

14 benefit to this estate to sever this contract.  What could they

15 do with it?  All they have is a servicing obligation, which

16 frankly is terminated, we believe, even by the terms -- the

17 time period term of the contract, but even assuming,

18 hypothetically, you could sever it, all you have is an

19 obligation to service for no compensation.  What possibly could

20 be done with that?  It can't be sold to anyone.  No one is

21 going to buy that obligation for no compensation, and

22 therefore, Your Honor, this whole argument for this contract

23 makes no sense at all, but certainly the absence of

24 consideration argues very strongly, if not conclusively,

25 against the idea that it can be severed.

1          But also, Your Honor, the idea of allowing American

2   Home to take the servicing here is fundamentally unwarranted

3   because Credit Suisse bought the servicing.  I think the

4   evidence will show, and I think it will be undisputed that

5   Credit Suisse bought these loans on a servicing release basis.

6   The pricing was determined based on a servicing release price.

7          So, what we have, Your Honor, is the flip side, in a

8   way, of the situation that was presented to the Court when

9   American Home sought approval for the sale of its servicing

10  platform.  As I'm sure the Court will recall, several parties

11  objected to severing the servicing under agreements in which

12  they bought loans that American Home sold to them on a

13  servicing retained basis there.  Those objectors relied on

14  defaults that had occurred in connection with the sale of the

15  mortgages --

16         THE COURT:  Let me ask you a question.  In the normal

17  context of the operation of the repurchase agreement, in the

18  context of warehouse lending, the sale would have been on a

19  servicing released basis, American Home would have packaged the

20  loan to a securitization trust or whatnot, and would have

21  bought back the loan from Credit Suisse.  When they bought back

22  the loan from Credit Suisse would Credit Suisse have retained

23  the servicing rights?

24         MR. COMET:  No, Your Honor.

25         THE COURT:  All right.  So, they would buy it back on

1  a servicing released basis, as well --

2              MR. COMET:   That's correct.

3              THE COURT:   -- and then at a later time make a

4  decision when they sent it to a securitization trust whether

5  that would be priced at all in a servicing release through a

6  servicing retained basis?

7              MR. COMET:   Yes, Your Honor.

8              THE COURT:   All right.

9              MR. COMET:   But here -- and obviously here, Your

10 Honor, they had the option with regard to the loans that are

11 now in dispute.  I mean, what we have is approximately 250

12 loans that American Home never repurchased from Credit Suisse,

13 that remained with Credit Suisse as of the time of the

14 bankruptcy filing, and they could have repurchased those loans

15 but they didn't.  If they repurchased them they would have

16 retained the servicing rights back because they would have

17 repurchased them at the same price they were sold at.  It would

18 have been the servicing released price.  They didn't do that.

19 They sold them on a servicing released basis.  And so, if they

20 now can take away the servicing in some respect from Credit

21 Suisse, what they're doing is taking it away, something that

22 Credit Suisse bought, without paying Credit Suisse back for it,

23 and selling it again, presumably, if that's even possible, for

24 a second time.  I mean, that is simply -- would simply be

25 conversion of what Credit --

1          THE COURT:  But they never intended to, on a

2   permanent basis, to sell the servicing rights to Credit Suisse.

3   That was never the intent of the contract.

4          MR. COMET:  The intent of the contract was that they

5   would repay the servicing released price back and repurchase,

6   but the intent of the contract also provided that if they

7   didn't do that, Your Honor, the servicing would naturally

8   remain with Credit Suisse, who had bought it, and that Credit

9   Suisse would be entitled to take the loans and control the

10  servicing.  In fact, the remedy provision of the contract

11  specifically recognizes that that's what would occur because

12  the remedy provision of the contract says once Credit Suisse

13  takes back the loans upon the default, or not takes back the

14  loans, takes total control of the loans, including the

15  servicing upon the default by American Home, Credit Suisse can

16  then choose whether, in reselling them, to sell them on a

17  servicing released or servicing retained basis.  That -- what

18  the evidence will show here is that was in the contract that

19  Credit Suisse proposed to American Home.  American Home's only

20  response to that was, no, we are entitled to somehow have the

21  servicing back, even if we default.  They simply said, well, if

22  you choose to sell it on a servicing retained basis to some

23  third party, and you -- Credit Suisse, you are going to keep

24  the servicing for yourself, you have to give us a credit

25  against the amount we owe, the debt we never repaid, for the

**J&J COURT TRANSCRIBERS, INC.**

1  value of the servicing retained rights.  So, in effect,

2  American Home -- and so, that was added at American Home's

3  request to the contract.  So, American Home expressly

4  recognized what would happen here in the event of a default,

5  namely that Credit Suisse, having bought the servicing, would

6  now control it, would take control of all the records, that's

7  specifically provided for in the contract, and would have the

8  choice, on Credit Suisse's part, whether thereafter to sell the

9  loans on a servicing released or servicing retained basis.

10 They didn't object to that.  All they wanted to do was make

11 sure that when -- if Credit Suisse said to them we've sold the

12 loans for less than the amount we had advanced, and you still

13 owe us the money then, that Credit Suisse gave them credit for

14 the value of the servicing retained rights.

15         So, they would get a windfall here, Your Honor, if

16 what they can do now is having sold the servicing on a

17 servicing released basis take it back.  This is exactly the

18 kind of windfall they were objecting to in connection with the

19 sale of the servicing platform.  They were saying there that if

20 the parties who purchased loans from them on a servicing

21 retained basis could take away the servicing rights because of

22 defaults in connection with the sale of the loans, not in

23 connection with the servicing, they would get a windfall,

24 because they had bought the loans on a servicing retained

25 basis, they hadn't paid for the servicing.  Well, here it's the

1  flip side.  They sold the loans on a servicing released basis,

2  and they can now take away the servicing from Credit Suisse,

3  that's giving them a windfall, taking away the property that

4  Credit Suisse purchased.

5          But I think what all this indicates, further, Your

6  Honor, is that the servicing here is -- was incidental to this

7  contract, to the purchase and repurchase transactions.  It was

8  not somehow a separate agreement.  It went -- the servicing

9  went with the purchase and back with the repurchase, and the

10  physical act of continuing to service the loans was left in

11  American Home's hands because as a practical matter there's no

12  other way to do these transactions given the disruption in the

13  transfer, and it's a related, or incidental, or integral part

14  of the contract intended to maintain the value and allow the

15  purchase and repurchase transaction to take place.

16          Finally, Your Honor, American Home has suggested that

17  even if Credit Suisse owns the loans, and even if the servicing

18  can't be separated, and the entire contract is terminated, the

19  Court still shouldn't order them to turn over the servicing

20  records.  That's, I believe, simply a claim that they can

21  convert Credit Suisse's property.  The Court will have made a

22  determination that Credit Suisse is the owner of the loans and

23  the servicing, that the contract is has been terminated.  The

24  contract created a bailment relationship under which they held

25  the -- continued the servicing during the term of a repurchase

1  transaction on Credit Suisse's behalf, where Credit Suisse was

2  the owner.  And the contract says all that in so many words.

3  So that all they have there is a possessory interest during the

4  term of the contract in the servicing records and files.  Once

5  the contract is terminated, they no longer have even a

6  possessory interest.  Bankruptcy Courts regularly order the

7  turnover of property to the owner once the Court determines

8  that the property is not property of the estate, and that the

9  debtor has no legitimate interest in it.  It often comes up in

10  the context of motions for relief from the stay where the Court

11  determines that this isn't property of the estate, somebody

12  else owns it.  The Court orders the actual turnover of the

13  property here.  We don't believe relief from the stay is

14  needed, but it's the same problem.  The debtors are holding

15  somebody else's property.  They can be ordered to turn it over.

16  That's a remedy that State Courts order all the time, as well,

17  under replevin, and it's plainly what should be ordered here,

18  Your Honor, and that's what we will ask the Court to order at

19  the end of this trial.  Thank you.

20          THE COURT:  Thank you.

21          MR. ACKERLY:  Good afternoon, Your Honor.  Ben

22  Ackerly, along with Jason Harbour and Mike Busenkell, on behalf

23  of Calyon New York Branch, the other plaintiff in these

24  adversary proceedings.  Your Honor, our case is virtually

25  identical to the case that Mr. Comet has so eloquently

**J&J COURT TRANSCRIBERS, INC.**

1 explained, so I will not -- I will try to avoid re-treading

2 everything that he has said in connection with my opening

3 statement.  We see this case as a very simple, very

4 straightforward case, and that is whether the repurchase

5 agreement at issue is a repurchase agreement as defined by

6 Congress and put in Section 101(47) of the Bankruptcy Code.

7 That's the issue.  The definition of repurchase agreement does

8 not address anything about substitutability, or the requirement

9 to sell back the same mortgages, or any of the issues which

10 have been raised as defenses by the debtors in these cases.

11           The definition is very, very straightforward, and we

12 believe, Your Honor, that when you look at the four corners of

13 the document, at our repurchase agreement, you will see that

14 the clear intent of the parties was to create a repurchase

15 agreement.  You will also see that the clear intent of the

16 parties was to have a repurchase agreement that qualified under

17 101(47).

18           Your Honor, it is important to note here that in this

19 case there is no dispute that the parties entered into the

20 repurchase agreement, that the parties operated pursuant to the

21 terms of the repurchase agreement.  There is no allegation

22 that's been made to my knowledge by the debtors that the

23 repurchase agreements do not satisfy the definition in 101(47).

24 In fact, the debtor's chief executive officer, in his first day

25 declaration to the Court, stated in Paragraph 14 of his

1  declaration, that pursuant to these facilities, referring to

2  warehouse mortgage facilities, the loans are sold to an

3  institution for a purchase price that is generally thought to

4  be less than the fair market value of the loans.  The sale is

5  subject to the obligation of the debtors to repurchase the

6  loans at a price equal to the original purchase price, plus a

7  price differential, the time value of money, and is subject to

8  an obligation on the part of the purchaser to resell the loan

9  to the debtor at that price.

10         Your Honor, there's simply no dispute in this case,

11 as far as I'm aware, that the repurchase agreements that are at

12 issue here satisfy the definition of Section 101(47) of the

13 Bankruptcy Code.  Now, the other issues that, you know, are

14 here, are going to be essentially parol evidence.  The debtors

15 are going to, during the course of this trial, attempt to

16 introduce a lot of evidence as to what the parties' intent was.

17 And we submit that the parties' affirmative intent is clear

18 from the four corners of the contract.  The repurchase

19 agreement very clearly provides for the transfer of mortgages

20 against the transfer of funds with simultaneous agreement to

21 retransfer the mortgages upon the transfer of funds within 180

22 days and that satisfies the definition in 101(47).

23         There's also a statement of intent in our repurchase

24 agreement that indicates that the parties intend it to be a

25 repurchase agreement.  There's also an integration clause in

1  our contract that the repurchase agreement and the related

2  documents are the entire agreement among the parties and may

3  not be altered or varied.  So, Your Honor, we think that the

4  issue here that the Court has to resolve is whether the

5  repurchase agreement at issue satisfies the definition in

6  101(47).  If it does, then it's entitled to the benefit of the

7  safe harbor.  One of the other issues in the case is, you know,

8  whether the filing of bankruptcy created an automatic default

9  and right to terminate, and that's clear from the documents.

10 So, that should not be an issue in the case.

11          The debtor has raised some counterclaims -- has

12 raised a counterclaim.  The first prong of its counterclaim is

13 that the repurchase agreements are not safe harbored.  The

14 second is that the automatic stay applies.  And the third is

15 that there's no entitlement nor requirement that they have to

16 turn over the proceeds even if we establish that it is safe

17 harbored.

18          I think, for the reasons that I have argued and Mr.

19 Comet has argued, that these are repurchase agreements under

20 the Bankruptcy Code.  The first prong of the counterclaim goes

21 away because the Court would find that it is a repurchase

22 agreement that is safe harbored.  The Sections 559 and 555 upon

23 which we are relying both provide that the automatic stay does

24 not apply to the enforcement of those obligations, so the

25 automatic stay goes away.

1          As far as the entitlement to turn over is concerned,

2     the agreement on its face obligates the debtor to do that.  We

3     believe that the Court has the power, under Section 541, or

4     Section 105, to order the debtor to do that, because if the

5     Court does not order the debtor to turn over the property, even

6     after finding that it's a repurchase agreement, then the debtor

7     is still effectively frustrating the congressional intent of

8     Section 559 and 555 that the parties be able to promptly

9     liquidate their collateral.

10          The other issue in the case, Your Honor, is that the

11    debtor has taken the position that even if it loses everything

12    in connection with 555 and 559, that the servicing should be

13    separate from the repurchase agreement.  It would be -- the

14    Court will see from the evidence that there is no separate

15    servicing agreement, that the servicing is economically

16    interdependent with the repurchase agreement.  The servicing

17    right is an integral part of the repurchase agreement.  The

18    testimony will be that the servicing right was transferred as

19    part of the transfer of the mortgages and a servicing right, as

20    the Court questioned, goes back upon the repurchase of the

21    mortgages.  But importantly, the reason the servicing right is

22    transferred to the repo buyer is that in the event of a default

23    and the requirement that the repo buyer have to liquidate the

24    collateral, the repo buyer owns the servicing rights associated

25    with the mortgages and can transfer those to a buyer when it

**J&J COURT TRANSCRIBERS, INC.**

1  liquidates its property, and that's a very important right.

2  We'll have evidence on that.

3          So, Your Honor, we believe, just in summary, that the

4  issue here is a very simple, straightforward issue.  There's no

5  dispute about the relevant repurchase agreements.  There's no

6  argument that they are ambiguous.  And so, we submit that the

7  debtor should not be able to put on evidence that would alter

8  or vary them, that it would be simply irrelevant to the Court's

9  determination of whether they satisfy the provisions of Section

10 101(47).  Thank you.

11         THE COURT:  Should we hear from SISBO (phonetic)

12 before we hear from --

13         MR. TECCE:  That's fine with me, Your Honor.  I'd

14 just --

15         THE COURT:  Are they present?

16         MR. COMET:  I believe, Your Honor, that Mr.

17 Teitelbaum is on the phone.  I thought he was coming down, but

18 that may have been a mis-communication.  I believe he has

19 dialed in and is available on the phone to speak.

20         THE COURT:  All right.

21         MR. TEITELBAUM:  I am, Your Honor.  This is Jay

22 Teitelbaum at Teitelbaum and Baskin.  Hopefully you can hear

23 me.  I want to apologize.  We're having a storm here, and we've

24 lost our phone, so I've had to dial in from my cell.  Hopefully

25 the reception is okay.

1          THE COURT:  Okay.

2          MR. TEITELBAUM:  Thank you.  Your Honor, first of

3   all, Jay Teitelbaum for the Securities Industry Financial

4   Markets Association, and first I'd like to thank the Court for

5   allowing the participation by phone, and for allowing us to

6   file the amicus brief in this case, because this is really a

7   very significant matter in the context of the financial

8   community and the industry.

9          And, Your Honor, as we've set forth in our brief, I

10  guess the point is we don't really have a specific dog in this

11  fight, as the saying goes, but we do represent the interests of

12  thousands of securities firms, banks, and other institutions

13  which are involved in this industry, which, as we've set forth

14  in our brief, involve in excess of six trillion dollars in

15  transactions.  And the reason that these transactions work is

16  because there is some consistency in the way the transactions

17  are entered into, perceived, and implemented.  And that's

18  really the goal of SIFMA here is to promote this sense of

19  consistency and policy so that the market can continue to

20  expand.  And that's why we felt that this case was so ripe for

21  us to get involved.

22         And we would agree with the comments that have been

23  made by counsel thus far that Congress and the community, the

24  financial community, have made very clear the intent to protect

25  this category of financial accommodations.  And the fact that

1 the parties worked from our standard form of agreement and

2 expanded it to fit their needs is really a telling fact in this

3 case.  We're not going to, as Mr. Comet and others discussed,

4 get involved in the nuances and the facts in this case, but

5 it's an important fact because that agreement is a standard in

6 the industry, accepted by the industry for repo agreements.

7 And the specific mechanics entered into by the parties of

8 whether similar or identical securities need to be transferred

9 and re-transferred, or the need for servicing of securities is

10 really, we respectfully submit, not the issue.  The issue is

11 how is this agreement viewed in the community?  What does the

12 agreement say?  And what we would submit is the agreement says

13 that it is a repo agreement.  And frankly, if it looks like a

14 repo and it acts like a repo, Congress has said it's a repo.

15 And therefore, it's appropriate for the Court, as a matter of

16 law, to conclude within the four corners of the document that

17 it is a repo under 101(47) of the Code, and then we turn to the

18 safe harbor provisions of 555 and 559.

19          And, Your Honor, interestingly in this case, I mean,

20 the repo agreement specifically says certain things, that the

21 parties identify themselves as buyers and sellers.  And these

22 things are all consistent, by the way, with what's in the

23 standard form, that they've identified themselves as buyers and

24 sellers and they've stated that the transactions are to be

25 treated as a sale.  They even reference the Bankruptcy Code

                    **J&J COURT TRANSCRIBERS, INC.**

1  555, 559, 101(47), and that these agreements be treated as

2  transfers of securities.  So, Your Honor, what we would say is,

3  from the four corners of the document, if we just go back to

4  basic principles of state contract law, there is really no

5  reason to look at the intent of the parties and kind of go back

6  to the whole <u>Lombard Wall</u> (phonetic) pre-1984 amendment issue

7  of is it or isn't it.  Congress has now said if it says it is,

8  it is.  And therefore, we don't want to create the uncertainty

9  in the financial community that the debtors would have the

10 Court create by engaging in this parol evidence inquiry as to

11 what the express words of the agreement mean.

12          And frankly, Your Honor, as important as the express

13 words of the agreement, we would submit, as the Supreme Court

14 has said, that Congress has pretty much laid out the express

15 treatment of these agreements in not only the '84 amendments,

16 but more recently in the 2005 amendments, where -- there was a

17 recognition, explicitly, I believe, through the legislative

18 history, as we've cited in our brief, that the financial

19 markets and the financial products have expanded dramatically,

20 and it ballooned into all different kind of CMOs, and other

21 kind of collateralized loan obligations, and that it's a

22 virtual impossibility for the laws and the forms to keep up.

23 And what we've read, and what we see is that the intent behind

24 the amendments was to reflect what the market does with these

25 agreements and treat them the way the market would treat them.

**J&J COURT TRANSCRIBERS, INC.**

1  And we believe that's precisely what Congress did in '05.  It

2  recognized, for example, that collateralized mortgage

3  obligations and related securities agreements could fall, and

4  will fall under repo, in fact, and are entitled to the safe

5  harbor provisions.  So, we believe that Congress has actually

6  done a couple of very important things.  It's made your job, we

7  think, and we would submit, a bit easier, because you don't

8  have to engage in the type of inquiry that the debtors would

9  have you engage.  It's essentially saying this is a repo

10  agreement under the financial markets, the Court should

11  essentially treat it that way, and then apply 555 and 559.

12          Your Honor, I'd just like to touch upon, because I

13  did not hear it touched upon, and we made the argument in our

14  brief, the issue of re-characterization, which is this a sale,

15  is it a loan, was lien granted?  We would submit, Your Honor,

16  that when you look at the definition under 101(47), Congress

17  didn't use the word sale and repurchase.  It used the word

18  transfer, which is a much broader term under the definition of

19  10154.  And a transfer would include a sale, a loan, a

20  securitization, all of those types of things.  And what

21  basically we would say is, call it what you will, it was a

22  transfer and a contemporaneous obligation to retransfer

23  mortgage obligations or related securities, and therefore is,

24  by definition, a repo, and that there really is no need to

25  engage, if you will, in is it or is it not a sale or a

1 securitization.

2          And so, Your Honor, what we would submit is that

3 Congress didn't seek to micro manage these agreements.  It left

4 it to the marketplace, and it recognized that this trillion

5 dollar industry needed flexibility in treating repos and needed

6 some consistency -- it needed consistency in how the Courts

7 addressed them.  And, Your Honor, that's why we've submitted

8 this brief, and I'm not going to belabor the point, but I would

9 be happy to try to address any questions that Your Honor may

10 have arising from our brief, or anything else.  And to the

11 extent I can add to them, I will.

12          THE COURT:  Well, I have a couple comments.  You

13 make, in effect, the argument that if it looks like a repo and

14 acts like a repo, it's a repo.  So, you know, if it looks like

15 a duck and acts like a duck, it's a duck.  I don't think that's

16 the argument that the debtors are making.  I think the debtors

17 are going to make the argument that in effect you want to say

18 if it looks like a chicken and acts like a chicken, I can call

19 it a duck and make it a duck.  And I don't know if I can do

20 that.  I don't even know if Congress, in all its power, can do

21 that.  Just because you call it a repurchase agreement doesn't

22 make it a repurchase agreement.  What if it was just a note, a

23 regular old-fashioned unsecured promissory note, but you called

24 it a repurchase agreement?  Under your argument that would be

25 the beginning then on end of the analysis, and I don't go any

1  further.  You call it a repurchase agreement, it's a repurchase

2  agreement.  You go a little further, because I think you

3  understand that would be, frankly, absurd, and say, well, no,

4  what Congress really said is if it's a repo under the financial

5  markets, then I need to treat it like it's a repo.  So, that's

6  a step further.  In order to make that finding don't I need

7  evidence in order to know whether or not the market would

8  consider something that may not particularly look like a

9  repurchase agreement, to me, from an academic exercise, but the

10  financial markets treat it as such.  And how do I make that

11  determination?  Do I do that on the four corners of the

12  document, or do I need additional evidence?

13          MR. TEITELBAUM:  Well, Your Honor, I would agree.  I

14  guess any argument, you know, if we had a chicken and we put a

15  sign on it that claimed -- that called it a duck, it doesn't

16  make it a duck.  But what we do have here, and what I believe

17  is undisputed, is that we've got an agreement that is a

18  standard in the financial community where parties took great

19  pains to start with what I believe was the -- you know,

20  standard form, they took great pains to identify themselves as

21  parties to a repurchase agreement.  They've identified their

22  rights and duties as being limited by 555, 559, 101(47).  What

23  I would submit is that under, in fact, state law, the clear

24  intent of the parties was expressed within the four corners of

25  the agreement, and that you really don't need to go beyond the

1 four corners of the document.  This isn't the absurd extreme

2 where it's just a note and someone's put a label on it for a

3 repo.  You know, this was an agreement negotiated and entered

4 into by sophisticated parties in the financial community using

5 a standard form as modified to fit the specific needs of the

6 parties.  And I would submit that Your Honor could take

7 judicial notice of that fact, and need not take further

8 evidence on that issue.

9        THE COURT:  All right.  Thank you.  I'll hear from

10 the debtors.

11        MR. TECCE:  Good morning, Your Honor.  James Tecce,

12 Quinn Emanuel, on behalf of the debtors.  Your Honor, I've

13 viewed the progress of this trial, and the two areas of inquiry

14 where the trial will go in two different baskets, if you will.

15 The first question being a question of re-characterization and

16 whether the underlying agreements should be re-characterized

17 under the code that, in fact, they are disguised financings and

18 they are not repurchase agreements.  And then the second area

19 of inquiry as to -- assuming that that is not the case,

20 assuming that these are genuine repurchase agreements, if that

21 is true, are the servicing portions of these agreement

22 repurchase agreements as well, or has the Bankruptcy Code

23 carved them out from the safe harbor protections of 555 and

24 559?  So, I think I'd like to start with that argument first,

25 and then I'll address re-characterization second, not to

Tecce - Opening                                    43

1  minimize the importance of it.

2          But starting with servicing, Your Honor, if one looks

3  to the definition of repurchase agreement and 101(47)(a)(4),

4  it's clear that servicing is not specifically mentioned, and

5  it's also clear that to the extent a repurchase agreement

6  contains provisions which are not repurchase agreements, which

7  are not the purchase and sale of assets, then they're not a

8  repurchase agreement.  Now, that sounds a bit circular, but

9  that carve out in 101(47)(a)(4) and a companion carve out, Your

10 Honor, in 741(7)(a)(1), which uses the exact same language,

11 makes it clear -- the plain text of those statutes makes it

12 clear that servicing is not subject to the automatic stay.

13         Moreover, Your Honor, it is true that we argued in

14 our pre-trial memorandum that servicing is not an interest in

15 mortgage loans, and whether that's been raised by Credit Suisse

16 in their memorandum or not, we make the point that servicing is

17 not a mortgage loan, nor is it interest in a mortgage loan, and

18 Congress was pretty clear in 541(d) that servicing modifies

19 both mortgage and interest in a mortgage, and therefore

20 servicing is not interest in a mortgage.

21         But what's more, Your Honor, it's also not related

22 terms.  And by that, looking at 101(47)(a)(1), it says an

23 agreement including related terms.  Well, we would submit, Your

24 Honor, that related terms are terms related to the purchases

25 and sales of the underlying assets that are the subject of the

1  repo agreement.  Again, not servicing, because there are repos

2  that don't have any servicing provisions, and there are repos

3  where there are servicing agreements that are entirely separate

4  and distinct from the repo, so and related terms would not

5  bring servicing into the equation, Your Honor.

6          What's more, Your Honor, there's an issue of

7  severability here, and I dispute the characterizations of my

8  adversaries that there are no factual issues in this trial

9  because there is a factual issue, unless anybody wants to

10  concede that the servicing is a severable provision or a

11  severable part of these agreements, unless they want to

12  stipulate to that fact there's going to be an inquiry as to

13  whether or not it is.  And we'd submit that it is, that

14  servicing is severable from these agreements, and as such if

15  it's severable it just serves to underscore that the automatic

16  stay continues to apply to servicing, especially because of the

17  definitions of repurchase agreement in 101(47) and the

18  definition of securities contract serves to further underscore

19  that  servicing is severable from the underlying repurchase

20  agreement.  And there shouldn't be any question as to whether

21  or not they're severable because servicing deals with an

22  entirely separate subject matter.  It deals with an entirely

23  separate nature.  It does not deal with the purchase and sale

24  of an underlying whole loan mortgage.  It deals with servicing

25  that mortgage.  It deals with collecting principal and interest

1 payments, sending good bye letters and hello letters.  It's of

2 an entirely different nature than the underlying asset that is

3 the subject of these agreements.

4        What's more, Your Honor, it was performed by an

5 entirely separate entity.  The entity that is counterparty to

6 these repurchase agreements, American Home Mortgage Servicing,

7 Inc., that was the servicing entity.  It's a separate entity

8 added to this agreement for purposes of servicing, and I think

9 in the Delaware, the Integrated Resources case I believe makes

10 mention of the fact it's relevant in determining whether or not

11 the contract is severable, whether or not the portion of that

12 agreement involves a separate corporate entity, and here it

13 does.

14        What's more, Your Honor, the allegation that

15 servicing ceased being the debtor's property upon a filing of

16 these bankruptcy cases is underlied specifically by 541(c).

17 We've talked about 365, but 541(c) says specifically that

18 simply because a termination arises by virtue of the

19 commencement of a case, that doesn't mean that that doesn't

20 become property of the estate if you lose it or if it's -- if

21 the debtor loses that right by virtue of the bankruptcy filing.

22 So, assuming that servicing was terminated upon the filing of

23 the bankruptcy cases, 541(c) says that it's our property and

24 it's still property of the estate notwithstanding those ipso

25 facto provisions.

**J&J COURT TRANSCRIBERS, INC.**

1          In terms of the claim of Credit Suisse and Calyon,

2    Your Honor, they have a claim for a breach of a pre-petition

3    agreement.  They have a claim seeking specific performance,

4    handing over of the servicing files, but in reality all they

5    have is a claim for a breach of the agreement.  They have an

6    entitlement to some amount of money.  Some amount of money will

7    compensate them for the fact that the debtor will not surrender

8    the servicing rights.  And it's not clear anywhere in this code

9    where it is that certain creditors get priority and preference

10   over every other creditor in the case and gets specific

11   performance with respect to their pre-petition claims arising

12   out of pre-petition contracts.  At best, if it could file a

13   proof of claim for the damages that they're incurring as a

14   consequence of the failure to obtain servicing, but they're not

15   entitled to specific performance relating to servicing.  Some

16   amount of money can compensate them for the damages that

17   they're -- and I'm not trying to minimize their situation, but

18   they have a claim, and they're not entitled to any kind of

19   special equitable relief.

20          Now, switching gears, Your Honor, to the issue of re-

21   characterization, the question, as we've viewed it in our pre-

22   trial memo and frankly throughout this case, is whether or not

23   a disguised secured financing agreement that operates like a

24   secured financing agreement that involves the pledging of

25   collateral that's never sold, that involves the pledging of

1  collateral that the counterparty never tries to sell, that

2  involves the parking of assets with another entity, an entity

3  that may or may just be a branch or an affiliate, that whether

4  that type of an agreement, a secured financing, can be a

5  repurchase agreement simply because the parties affixed the

6  title repurchase agreement to that agreement.  And, you know,

7  it even applies if they affixed the operative language from 559

8  to the operative provisions of their agreement, if they called,

9  instead of calling it a borrowing they called it a purchase --

10 or, instead of calling it a repayment they called it a sale.

11 Even ascribing the words of 559 to a secured financing

12 agreement, that doesn't make it in substance a repurchase

13 agreement.  In substance -- I don't believe -- it's our

14 position that Congress did not intend secured financing

15 agreements that don't involve the prompt disposition of

16 collateral to a third party as soon as it's purchased to be

17 excluded from the safe harbors.

18      And the question, because -- to respond to the

19 argument that the statute does not necessarily say this, well,

20 the statute does, and I'll speak to this in a second, does

21 speak to alienability and substitutability, if you will, but

22 going back, Your Honor, to -- there's been discussion of the

23 2005 amendments, but let's go back to the genesis of 559, and

24 555, and the Third Circuit, Your Honor, and I won't read at too

25 much length from the decision, but in the Third Circuit in

1  <u>Bevil, Bresler</u>, discussed the inception of 559.  And what it

2  said is, in part, primary dealers act, in effect, as first tier

3  underwriters of new issuances of U.S. Treasury securities, and

4  they finance a major portion of their purchases by selling the

5  securities under repos to secondary dealers, who, in turn,

6  finance their purchase by selling the securities under repos to

7  institutions and other customers.  So, there's three sales

8  right there with respect to the underlying securities.  And

9  what <u>Bevil, Bresler</u> recognizes is that the repo market is as

10 complex as it is critical.  It's built upon transactions that

11 are highly inter-rated, the three sales.  A collapse of one

12 institution involved in a repo transaction could start a chain

13 reaction, putting at risk hundreds of billions of dollars and

14 threatening the solvency of many additional institutions.  So,

15 reading on, Your Honor, the certainty and fluidity needed by

16 professionals on both sides of the transactions is of such

17 importance that one debtor's filing of a petition should not be

18 permitted to impair the functioning of the market as a result

19 of the code's automatic stay or have the integrity of the

20 contract relationships upset by the code's avoidance

21 provisions.

22       What the Court is saying, Your Honor, is that the

23 inception of this provision started to ensure that in the repo

24 market the sales could continue not withstanding the bankruptcy

25 filing of one of the participants along the inter-related chain

1  of exponential sales that related to these securities.  So,

2  what does that translate to in terms of agreements?  What does

3  that translate to in terms of text?  What it means is that the

4  hallmark of the repurchase agreement is alienability.  The

5  hallmark of the repurchase agreement is fluidity, to use the

6  Court's term.  And what features suggest that there's fluidity

7  with respect to the underlying asset?  Features in the

8  agreement that ensure that the repo buyer can promptly sell the

9  asset that it buys in a reverse repo to a third party.  And

10 those features are lacking in these agreements.

11          The other feature is substitutability, meaning that

12 the repo buyer has the option of returning something different.

13 If the repo buyer buys IBM stock on day one, it can play with

14 the stock, reverse repo the stock, subject only to its

15 obligation to go out and get IBM stock from anywhere in the

16 marketplace and return it at the conclusion of the repo.  That

17 is the true repo, as far as we're concerned, and that is not

18 the agreements in question here.  The agreements in question

19 contain provisions that has explicitly restricted that ability

20 by requiring that equivalent or -- I'm sorry -- that requiring

21 that identical mortgages be returned.  And as a consequence,

22 the mortgages were never -- never even attempted to sell the

23 mortgages to unaffiliated parties, to third parties not

24 affiliated with these entities.  And you don't have to take our

25 word for it as to the significance of these provisions because

1  the model form, which is the form developed by market

2  participants, contains these very provisions.  There is no

3  restriction on the ability to sell, and there's ability to

4  return equivalent securities.  Presumably that model form

5  reflects the practice of the market on this point, and our

6  agreements lack both of those.

7           So, what happened -- what happened in practice here?

8  What happened in practice is that with respect to Calyon, Your

9  Honor, what happened -- the sequence of events, Calyon was

10  party to a very significant loan agreement involving American

11  Home, over a billion dollars.  Around November of 2006, I

12  believe, the parties decided that the agreement would be

13  transferred into a repurchase agreement, so the Calyon loan

14  agreement was taken and it was cut and pasted into a quote,

15  unquote, repurchase agreement.  Words were changed, but

16  operationally the agreement operated exactly the same way.

17  Now, this is true notwithstanding the fact that American Home's

18  counsel suggested that perhaps the market form should be

19  followed.  That idea was rejected.  This was also true

20  notwithstanding Calyon's own internal policies and procedures

21  that the market form should be used, the VMA form.  All that

22  was disregarded.  The one $1.6 billion loan agreement was cut

23  and pasted over a few days into the newly formed repurchase

24  agreement.  And that is not the type of agreement, and that is

25  not the type of activity with respect to a loan agreement that

1  Congress intended to exempt from 559.

2          In the case of Credit Suisse, Your Honor, it's not

3  surprising that we take the position that both of these

4  agreements were secured financings because they both have their

5  -- have some connection to a secured financing agreement, the

6  Calyon agreement has its genesis, basically, in the old loan

7  agreement.  With respect to Credit Suisse, Your Honor, number

8  one, the Credit Suisse form -- the Credit Suisse agreement does

9  not follow the market form, concededly.  Number two, there are

10 -- during the time that the agreement was being drafted, the

11 request was made by American Home that the covenants to the

12 extent, if any, and we would not concede that a repurchase

13 agreement should have covenants, but covenants, if any, should

14 match the B of A facility, the existing Bank of America

15 facility to which American Home was party.  And as a

16 consequence, the B of A covenants were put into the Credit

17 Suisse form.  So, both of these agreements have close

18 connection, if not genesis, if you will, in secured loans, and

19 they're not the type of agreements, on their -- they're not the

20 types of agreements substantively that should be within the

21 safe harbor.

22         Now, in practice, what happened once the agreements

23 were executed corroborates this point.  With respect to Calyon,

24 operationally, as we've said, operated exactly the same way.

25 Credit Suisse took the mortgage loans and basically sold them,

1  if you will, allegedly sold them, to an entity called, I

2  believe, Credit Suisse Cayman Islands Branch.  Now, I'll assume

3  that that's a separate entity from the entity that's actually

4  party to the agreement, but it's an affiliate.  It never tried

5  to sell the loans to a third party, and neither did Calyon.

6  And that just serves to underscore the point that the loans

7  were not assets that were purchased under a repurchase

8  agreement.  They were collateral.  There was always an

9  obligation to absolutely return the identical loans that were

10 purchased.  And as collateral, Your Honor, it just signifies

11 that these are secured loans and they're not supposed to fall

12 within the 559 safe harbor.

13       They also had features, Your Honor, that are

14 consistent with secured loans, covenants, a lack of a

15 relationship between the interest or the price differential, if

16 you will, that is paid with respect to the transaction, a lack

17 of relationship between that price differential and the income

18 that's actually produced by the underlying asset, suggesting

19 that the price differential is really a function of the

20 counterparty's economic risk, and a function of the quality of

21 the collateral and not actually the income that the collateral

22 produces.

23       There's also an issue, I think, another factual

24 issue, notwithstanding the statements that there are no factual

25 issue as to whether or not American Home retained an interest

1  in the income from the underlying mortgage loans.  American

2  Home submits that it did have an interest in that income, and I

3  believe that that will be disputed by Credit Suisse, at least,

4  and probably Calyon.

5           Your Honor, with respect to the question of intent, I

6  noticed this word has been bantered around a little bit this

7  morning.  I think on the issue of intent I understand that the

8  agreements contain a provision that says that the parties

9  intend -- I understand Mr. Pino was asked at his deposition

10  whether or not it was the representation and warranty in this

11  CSFB agreement that the parties intend -- I think the Third

12  Circuit, in <u>Pillowtex</u>, has seen that -- or expressed the view,

13  at least, that parties can say what they want about what their

14  intent is, but the substance of the agreement really controls.

15  And in <u>Pillowtex</u> the question was whether or not a lease was a

16  lease or a secured financing, and what the Third Circuit did

17  first was mention Judge Walsh's view, I guess, that statements

18  of intent are not controlling vis-a-vis actual economic

19  substance of the transaction, and it found support for that

20  proposition in the fact that the Uniform Commercial Code had

21  been amended.  The lease provision of the Uniform Commercial

22  Code which identified certain factors to determine whether or

23  not something was a lease or a secured financing had been

24  amended, so that intent of the parties was not relevant to that

25  determination.  Well, similarly, Your Honor, Article 9 has been

1  amended to determine whether or not something is a secured

2  financing or secured transaction.  It is no longer an issue as

3  to whether or not the parties intended it to be a secured

4  financing or not.  That just serves to underscore the point

5  that economic substance is what controls, and not statements of

6  intent set forth in an agreement.

7           In terms of, Your Honor, what I would consider the

8  drama arguments, if you will that the decision that Your Honor

9  faces is whether or not it intends to rewrite the Bankruptcy

10 Code, or undermine what Congress has done, or turn a six

11 trillion dollar industry on its head, that's not what we're

12 asking the Court to do at all.  What we're asking the Court to

13 do is to look at two agreements, two agreements that are

14 secured financings, and to assure that -- or to review these

15 agreements for economic substance and to ensure that they're

16 not entitled to any protections under the Bankruptcy Code that

17 Congress did not intend for secured financings to have.  And it

18 goes to what the text of these agreements are.  It goes to how

19 they operated substantively.  It is not a decision with respect

20 to every repurchase agreement involving whole loan mortgages.

21 We're not asking for that kind of broad determination.  We're

22 asking for a determination with respect to the two agreements

23 that are in front of this Court today.  We're not asking the

24 Court to eviscerate the statute.  And we're certainly not

25 asking the Court to make a determination that the way that the

1  whole -- the way that the six trillion dollar repo industry

2  operates should be recalibrated in some form or another.

3          The issue here in terms of what the overall picture

4  in these cases is is what kind of value can be generated for

5  the estates with respect to these loans.  Should there be --

6  should property of the estate, i.e., the servicing, be used so

7  that two creditors can take these assets and sell them any way

8  they see fit, just to make sure that their own interests are

9  protected, or should that property of the estate be used in a

10 way that ensures that those loans are sold so that it maximizes

11 value, not just for these two creditors, but for the estates in

12 general.  And that's really the larger picture here with

13 respect to what the case is about.  So -- if I could have a

14 second, Your Honor, I think I'm reaching the conclusion here.

15                        (Pause)

16         MR. TECCE: Your Honor, I think that would conclude my

17 opening statement, only that, again, the -- with respect to the

18 question of servicing, Your Honor, our position is that two

19 creditors should not be entitled to use what is property of the

20 estate in a way that affords them preferential or priority

21 treatment over other general unsecured creditors because they

22 have nothing more than a breach of a pre-petition agreement,

23 and that the automatic stay does not apply to servicing on the

24 basis of those exceptions in 101(47) or 741(7) that I

25 articulated.  Thank you, Your Honor.

1          MR. COMET:  May I respond?

2          THE COURT:  Do we need reply in opening argument?  I

3    mean -- if you feel strongly about it, go ahead.  But --

4          MR. COMET:  Just a couple of points, briefly, Your

5    Honor.  I think just to set the context for some of the issues

6    here, one thing -- I think there's some confusion in Mr.

7    Tecce's arguments about what form of agreement he's talking

8    about.  The model form of -- the VMA form, which is attached to

9    the SIFMA brief, this exhibit here, from 1996 for the U.S.

10   transactions, requires that the same property that's sold be

11   returned.  That form was discussed in the <u>Criminea</u> (phonetic)

12   case that the debtors cite, and that a point was made about it,

13   it hasn't been changed, it requires that.  The form that Mr.

14   Tecce is talking about is a market participant form is this

15   global form under English law.  We have never seen a mortgage

16   repurchase agreement in the United States or any repurchase

17   agreement in the United States that uses that form.  I don't

18   think there will be any evidence that form is ever used.  So,

19   the arguments that Mr. Tecce is making would dramatically

20   effect the standard forms that are used and the forms actually

21   used for mortgage repurchase agreements.

22          The second point as to the context of the issues

23   here, Your Honor, Mr. Tecce's point about specific performance

24   is incorrect.  I mean, Credit Suisse has a provision in its

25   contract that entitles it to the return of servicing, could ask

1 the Court for specific performance relief in that respect.   I

2 think that would be warranted, notwithstanding any of Mr.

3 Tecce's arguments, but there's actually a much simpler way to

4 get to the same result here, that I think moots all of his

5 arguments about this.   Even if there were no provision in this

6 contract saying that upon the termination the debtors have to

7 return the property, if this were a warehouse agreement with a

8 company where you placed your property there, and the term of

9 the agreement has ended and they're holding your property, they

10 have to return it.   They have no legal right, no possessory

11 interest in the property.   They return it.   That is, as I said

12 before, typically ordered by Bankruptcy Courts.   It's not a

13 question of specific performance or an equitable remedy that

14 gives rise to -- in fact, it is a remedy at law.   It's a remedy

15 in State Court proceedings that's brought under the doctrine if

16 replevin, or the rule of replevin.   If you try to bring a

17 replevin action saying somebody else is holding my property,

18 I'm the owner, you have to give it to me.   If you try to bring

19 a replevin action in the Chancery Court here in Delaware, it

20 would be dismissed because it's not an equitable claim at all.

21 It's a claim at law.   It's a normal claim of an owner of

22 property to recover his property.   Damages are not the remedy.

23 As long as the property is available, damages are not

24 considered.   You simply order the holder, who has no interest

25 in the property, to turn it over to the owner.   That's what

1  will be the result here if the Court rules that this contract

2  has been terminated and they're continuing to hold Credit

3  Suisse's property.  So, it's not a question of gaining priority

4  over other unsecured creditors.  This is not a claim.  It's

5  simply a right to ownership of the property which Bankruptcy

6  Courts regularly order turned over.

7           The last point I want to make, Your Honor, it sort of

8  connects several of Mr. Tecce's points, I think he has

9  misinterpreted the <u>Bevil, Bresler</u> decision.  <u>Bevil, Bresler</u>, in

10 a sense, is talking about liquidity in connection with

11 repurchase agreements.  It's talking about liquidity in the

12 same way that Congress is, which is they want to make sure that

13 when one of the parties to a repurchase agreement becomes

14 insolvent, the other party will be able to liquidate that

15 agreement.  They're not talking about liquidity prior to that

16 point, before an insolvency, that somehow you have to have

17 liquid rights to alienate the property beforehand.  Mr. Tecce

18 seems to be imposing a whole new requirement that it's not a

19 valid repurchase agreement unless you've also entered into a

20 back -- to back repurchase agreement another party and then

21 maybe they've entered into another one, so you have to have

22 three stages.  That's not in the statute anywhere.  I don't

23 know of any authority that suggests that's a requirement to

24 make it a valid repurchase agreement.

25           The liquidity issue is liquidity upon insolvency of

**J&J COURT TRANSCRIBERS, INC.**

1  one of the parties, and that's what they're thwarting.  Now, in

2  point of fact, the agreement that Credit Suisse has says

3  specifically Credit Suisse, during the term of the repo, can

4  enter into a repurchase agreement to the property, transfer it,

5  pledge it, or otherwise convey it.  It's completely unlimited.

6  The only obligation is that when the repurchase date comes due

7  it has to return that property.

8         What Credit Suisse, in fact, it was entering into

9  repurchase agreements, as the evidence will show.  It

10 transferred it to separate legal entities, albeit affiliated

11 ones.  They, in turn, transferred it to other entities.  You

12 have a whole chain among affiliated entities that occurred, and

13 that is fully consistent with the agreement, with normal

14 practice repurchase agreements, and what Mr. Tecce wants to

15 impose upon that is requirement of substitutability.  He says

16 the IBM stock.  Well, IBM stock is fungible.  There's no

17 mortgage repurchase agreement that allows this kind of transfer

18 that he's talking about, and no form of market agreement that

19 allows and provides for that.

20        The last point, Your Honor, he says that the Credit

21 Suisse agreement is somehow has similar terms to secured

22 financing.  We agree, it has some similar terms.  It, for

23 example, has financial covenants.  All sorts of contracts have

24 financial covenants, including supply contracts and other

25 things.  Any time a party enters into a contract where the

1   other party has million dollars of obligations, you want to be

2   sure they have financial capability.  At the request of Bank --

3   excuse me -- of American Home, they wanted similar financial

4   covenants in their contracts, so Credit Suisse agreed to

5   similar covenants to Bank of America.  But virtually all

6   repurchase agreements have similarities to secured loans.  The

7   cases all recognize that.  Every case that's considered these

8   kinds of issues have said that, and they've all essentially

9   found that they're still repurchase agreements, and I would

10  suggest to Your Honor, we submit that Congress has recognized

11  that, too.  It's in the legislative history that we talked

12  about, but it's also built into the statute.  The reason 559

13  requires that the excess be paid over to the debtors upon

14  liquidation of the property, the only possible reason for that

15  is because Congress recognized the economic similarity between

16  repurchase agreements and secured financings.  Normally, if you

17  have a true sale or purchase, and then you go and liquidate

18  your property, you don't have to give the excess back to your

19  counterparty.  It's only because Congress recognized the

20  economic similarity here that they require that.  So, Congress

21  has already made provision for that situation.  To now say that

22  you're going to take the same factors that Congress has made

23  provision for and invalidate the whole agreement as a result

24  and in effect invalidate the safe harbor is totally contrary to

25  the intent of Congress, Your Honor, which, in that respect, has

1   clearly preempted state law.

2           Mr. Tecce is relying on the UCC and other things.

3   The legislative history on the history of equipment lease

4   versus secured financing, as the Third Circuit said in the

5   Continental Airlines case, which is what Pillowtex, which he

6   referred to, cites, is perfectly clear that Congress, in that

7   instance, wanted state law to govern that issue under the UCC.

8   In the case of repurchase agreements, Congress has adopted its

9   own definition.  It's not simply a matter, Your Honor, of

10  calling it a repurchase agreement.  Congress said you have to

11  have the following five elements, which this agreement has.

12  You have to enter an agreement for sale in return for transfer

13  of funds for a certain kind of property with a simultaneous

14  agreement to resell within a certain specified time period.

15  All those elements are satisfied, not just the label of

16  repurchase agreement.  That is the federal law here that

17  applies here.  Congress can preempt state law definitions.

18  It's done that as to things like real property in the 2005

19  amendments.  It's created its own definition for that in

20  certain purposes, as the case we cited in our brief did.  It's

21  absolutely clear here, Congress intended a uniform nationwide

22  standard for repurchase agreements because they were protecting

23  national and international markets.  There's absolutely no

24  basis for importing or injecting state law into this, which is

25  what the debtors are attempting to do.  Thank you.

1          MR. TECCE:  Your Honor, I'm not going to engage in a

2 back and forth here.  I understand it's opening remarks.

3          THE COURT:  Correct.

4          MR. TECCE:  So, if I can have one minute, Your Honor,

5 just to clarify --

6          THE COURT:  Yes.  And that will be it.

7          MR. TECCE:  The form to which I'm referring is the

8 global master repurchase agreement form of 2000, and it does

9 provide for the return of equivalent securities and

10 substitution.  That form will come out during the trial.  So,

11 we'll be able to review it then.  Secondly, Your Honor, I just

12 want to clarify I was not incorrect in my recitation of the

13 CSFBA agreement.  The word sell does not appear in the

14 transactions to which the parties entitled to engage in the

15 repurchase transactions absent an event of default, so --

16 without an event of default the word sell is not used.  Yes,

17 the word convey, or pledge, or hypothecate is used, but the

18 word sell is not used absent (indiscernible) --

19          THE COURT:  All right.

20          MR. TECCE:  Thank you.

21          THE COURT:  All right.  So, that will close the

22 opening arguments.  We're going to turn to the evidence after

23 lunch.  What -- Credit Suisse has a witness?

24          MR. COMET:  Yes, sir.

25          THE COURT:  All right.  So, let's reconvene promptly

1  at 2:00, all right, and we'll turn to the evidence.

2                     (Recess)

3           THE CLERK:  All rise.

4           THE COURT:  Please be seated.  Call your witness.

5           MR. COMET:  Before we do that, Your Honor --

6           THE COURT:  Oh.

7           MR. COMET:  -- I just wanted to offer the preliminary

8  injunction hearing transcripts that were discussed yesterday.

9  I have two sets for the Court and (indiscernible).

10          THE COURT:  Yes, you may.  Give one to me and one to

11 my clerk, if you would.  Thank you.  How should we mark this

12 for -- CSFB Exhibit 1?  Or do you have others with that --

13          MR. COMET:  We do, Your Honor.  In fact, the exhibits

14 from the preliminary injunction hearing, we kept them, to not

15 confuse the sequence, they were 1 through 7, and then we have

16 additional exhibits.  I didn't realize we'd be marking this,

17 the transcript as an exhibit, as such.

18          THE COURT:  Well, let's call it Credit Suisse -- CSFB

19 Exhibit 101.  How about that?

20          MR. COMET:  That's fine.

21          THE COURT:  Any objection to its admission?

22          MR. TECCE:  No, Your Honor.

23          THE COURT:  All right.  It's admitted without

24 objection.

25          MR. COMET:  And the -- as I stated, Your Honor, the

1  exhibits that were received in Evidence at the preliminary

2  injunction hearing are our Exhibits 1 through 7, and under the

3  rule which deems this part of the record, I -- I'm operating on

4  the assumption that those exhibits are already in the record,

5  Your Honor, unless there's any objection?

6              THE COURT:  Any objection?

7              MR. TECCE:  No objection.

8              THE COURT:  All right.  Just for clarity's purposes,

9  CSFB Exhibits 1 through 7, which were previously admitted in

10  the preliminary injunction hearing, are admitted without

11  objection into this hearing.  Do you have copies of them for

12  me?

13             MR. COMET:  Yes.  We have three binders, Your Honor.

14  They're in the first binder, so --

15             THE COURT:  All right.

16                        (Pause)

17             MR. COMET:  Your Honor, in addition to those three

18  binders, we have some additional exhibits that we didn't put

19  into binders because we were not planning to ask any witness

20  questions about them.  What they are are the contracts that I

21  referred to in my opening, contracts downloaded from the SEC

22  web site.  Some of them are also contracts, or many of them are

23  contracts of American Home with other parties.  And we have

24  those separately in boxes, in folders for each individual one.

25  I could give them to the Court now or later.  I was going to

**J&J COURT TRANSCRIBERS, INC.**

1 ask to introduce those at the end of our -- of the Credit

2 Suisse case.

3          THE COURT:  Let's wait until the end, then, if

4 they're loose.

5          MR. COMET:  They're not in binders, but they're each

6 in a separate folder.

7          THE COURT:  All right.

8          MR. CROWTHER:  Your Honor, for purposes of

9 clarification, were the three binders that Your Honor was

10 handed just Exhibits 1 through 7 with respect to the

11 preliminary injunction hearing transcript, or were there

12 additional exhibits handed up?  We're not sure what was handed

13 up.

14          UNIDENTIFIED SPEAKER:  Excuse me, Your Honor

15 (indiscernible).  I apologize.  Here's the debtors' copy.

16          THE COURT:  All right.  Hang on.  Slow down. Mr.

17 Crowther, you need to identify yourself for the record.

18          MR. CROWTHER:  I apologize.  Curtis Crowther from

19 Young, Conaway, on behalf of the debtors.  Your Honor, we did

20 not agree to move all of their exhibits into Evidence, only

21 Exhibits 1 through 7.

22          THE COURT:  Yes.  Agreed.

23          MR. COMET:  The binders, Your Honor, have Exhibits 1

24 through 37, and I agree, only 1 through 7 are in Evidence at

25 this point.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes.

2          MR. COMET:  Your Honor, Credit Suisse calls Bruce

3   Kaiserman as a witness.

4          THE CLERK:  Please place your hand on the Bible.

5   Please state your full name and spell your last name for the

6   record.

7          MR. KAISERMAN:  Bruce Kaiserman, K-a-i-s-e-r-m-a-n.

8          BRUCE KAISERMAN, CREDIT SUISSE WITNESS, SWORN

9          THE CLERK:  Thank you.  Be seated.

10                         DIRECT EXAMINATION

11  BY MR. COMET:

12  Q    Mr. Kaiserman, you previously testified at the preliminary

13  injunction hearing and your testimony there is in the record

14  already, but I'd like to go over a few items.  First, could you

15  describe, again, your position and responsibilities for Credit

16  Suisse entities?

17  A    Certainly.  I'm a director for Credit Suisse Securities,

18  I'm a vice president and director for DLJ Mortgage Capital, and

19  I'm a vice president for Credit Suisse First Boston Mortgage

20  Capital.  My day-to-day responsibilities include all aspects of

21  mortgage finance, from the origination of mortgage loans

22  through the acquisition of mortgage loans, repo financing of

23  mortgage loans, servicing of mortgage loans, and eventually

24  securitization and/or whole loan sales of mortgage loans.

25  Q    With regard to origination, what experience do you have

**J&J COURT TRANSCRIBERS, INC.**

1  with that?

2  A    Certainly.  Credit Suisse has a wholly-owned subsidiary

3  known as Credit Suisse Financial Corporation, which acts as an

4  originator of residential mortgage loans.  In my day-to-day

5  activities I was responsible for the establishment of that

6  business and am today responsible for its on-going management.

7  Q    And you mention that you have responsibility for purchases

8  of whole loans.  What responsibilities do you have in that

9  regard?

10  A    Yes, sir.  For DLJ Mortgage Capital, which is the entity

11  that acts as a whole loan purchaser, I am responsible for all

12  whole loan trading from a deal management perspective.  What

13  that means is I'm not responsible for trading it, but I am

14  responsible for the settlement and all transactions related to

15  whole loan trading.

16  Q    And you mentioned you had responsibilities for servicing?

17  What are your responsibilities regarding that?

18  A    Yes, sir.  In 2005, Credit Suisse acquired a company that

19  services mortgage loans.  I was the lead banker on that

20  acquisition, and today am responsible for its on-going

21  management.  It services approximately 260,000 loans with an

22  outstanding balance of 26 billion.

23  Q    And with regard to mortgage repurchase agreements, what is

24  your responsibility for that?

25  A    Again, I am a vice president for Credit Suisse First

1  Boston Mortgage Capital, and in that capacity I'm responsible

2  for all repo financing, contracts, as well as the negotiation

3  and the execution of those agreements, and the on-going

4  management of that business.

5  Q    All right.  What I'd like to do is, to separate the

6  entities, refer to that business that you just mentioned,

7  Credit Suisse First Boston Mortgage Capital, as CSFB as we go

8  forward.  Is that okay?

9  A    Certainly.

10  Q    You testified previously about the agreement between CSFB

11  and American Home, the mortgage, repurchase agreement, and in

12  addition to that agreement how many mortgage repurchase

13  agreements have you had responsibility for been involved with

14  while -- in your employment?

15  A    Approximately 100.

16  Q    And what is the purpose for which those mortgage

17  repurchase agreements that's been used -- have been used for?

18  A    Sure.  The mortgage repurchase agreements that we've

19  executed are intended to provide short-term financing for

20  mortgage originators to take them from the period of time that

21  they either originate a loan or acquire a loan in the secondary

22  market, until they find a long-term take out investor to

23  purchase those loans.  Oftentimes it starts and ends within 15

24  to 60 days.

25  Q    Is that what's sometimes referred to as warehouse

1 financing?

2 A    Yes, sir.

3 Q    And were all of the mortgage repurchase agreements that

4 you've been involved with at Credit Suisse and CSFB used for

5 that warehouse financing purpose?

6 A    Yes, sir.

7          MR. COMET:  May I approach the witness to give him

8 exhibit binders, Your Honor?

9          THE COURT:  Yes.

10                           (Pause)

11 Q    You testified previously, Mr. Kaiserman, at the

12 preliminary injunction hearing, that CSFB had mortgage

13 repurchase agreements with mortgage originators other than

14 American Home that had become insolvent.  I'd ask you to look

15 in the exhibit binder at Exhibits 32 through 36.  Are those,

16 respectively, Exhibits 32 through 36, mortgage repurchase

17 agreements between CSFB and Aegis, A-e-g-i-s, New Century,

18 People's Choice, ResMAE, and Silver State?

19 A    Yes, sir.

20          MR. COMET:  I'd offer those in Evidence, Your Honor.

21          MR. CROWTHER:  Objection on relevance, Your Honor.

22          MR. COMET:  The relevance, Your Honor, is to show the

23 market practice, and since it shows the form of repurchase

24 agreements it's evidence of other additional repurchase

25 agreements that helps to show the Court what is done in

**J&J COURT TRANSCRIBERS, INC.**

1 practice.

2           MR. CROWTHER:  May I respond, Your Honor?  Curtis

3 Crowther on behalf of the debtors.  They only show CSFB's

4 conduct, no one else's.  It's not even remotely market

5 evidence.

6           MR. COMET:  Your Honor, it shows not only CSFB's

7 conduct, but the conduct of all of the counterparties to these

8 agreements.

9           MR. CROWTHER:  Again, Your Honor, we would object on

10 the basis of relevance.  It has no foundation of any

11 relationship to the market.

12           THE COURT:  I'll overrule the objection and allow the

13 admission of Exhibits 32, 33, 34, 35 and 36 into Evidence.  I

14 think, Mr. Crowther, you're able to cross examine the witness

15 in connection with the motion and make your arguments as to

16 relevance.  I think they go more to weight, frankly.

17           MR. COMET:  I would also note for the record, Your

18 Honor, that American Home has designated one of the same

19 agreements as one of their exhibits for this trial.

20           THE COURT:  Well, you already won, so --

21           MR. COMET:  Yes, Your Honor.

22           THE COURT:  I'll strike that statement.

23           MR. COMET:  Okay.  Sorry.

24 Q    And your understanding, Mr. Kaiserman, Exhibits 32 through

25 36, how do they compare to the agreement between CSFB and

                    **J&J COURT TRANSCRIBERS, INC.**

1  American Home?

2  A    Other than the names and the dates, and some economic

3  terms, they are the same.

4  Q    Mr. Kaiserman, as of September 13th, 2006, which was the

5  day that CSFB and American Home entered into their mortgage

6  repurchase agreement, which is Exhibit 1 in Evidence, what was

7  the total dollar amount of CSFB's outstanding advances under

8  all of its mortgage repurchase agreements on that day,

9  excluding any agreements with affiliates?

10  A    In excess of five-and-a-half billion dollars.

11  Q    Does CSFB provide warehouse financing to mortgage

12  originators in the form of secured lending arrangements?

13  A    No, sir.

14  Q    Now, you mention that DLJ, one of the Credit Suisse

15  entities, is responsible for whole loan purchases, is that

16  correct?

17  A    Yes, sir.

18  Q    If you could look at Exhibit 22, please?

19  A    Is Exhibit 22 an agreement between DLJ Mortgage Capital

20  and American Home regarding whole loan purchases and servicing?

21  A    Yes, sir.

22       MR. COMET:  I'd offer Exhibit 22 in Evidence, Your

23  Honor.

24       MR. CROWTHER:  No objection to that, Your Honor.

25       THE COURT:  Admitted without objection.  Mr.

**J&J COURT TRANSCRIBERS, INC.**

1  Crowther, if it's easier for you, you can remain seated and

2  just use the microphone for making your objections.

3            MR. CROWTHER:  Thank you, Your Honor.

4            THE COURT:  If you could pull that closer to you?

5  There you go.

6  Q    I'd like to ask you some questions now, Mr. Kaiserman,

7  based on your experience with the various aspects of mortgage

8  financing that you've described that you have responsibilities

9  for.

10           MR. COMET:  Your Honor, for this I'd like to use a

11 chart.  We don't intend to offer it in Evidence, but just as a

12 visual aid during the course of the witness's testimony.  I

13 have some small size versions of the chart which I've already

14 given copies to American Home's counsel, and we also have a

15 large one that I'd like to put up on the display there.

16           THE COURT:  All right.  You'd better give me a small

17 version in case I can't see.  Thank you.

18                          (Pause)

19           MR. COMET:  I'd like to give a small version to the

20 witness, as well, Your Honor.

21           THE COURT:  Yes.  Please.

22           THE WITNESS:  Thank you.

23 Q    Well, what I'd like to ask you about, Mr. Kaiserman, in

24 the first instance, is what happens in the stage of a

25 repurchase agreement transaction where funds are obtained from

**J&J COURT TRANSCRIBERS, INC.**

1  a bank pursuant to a repurchase agreement, what connection that

2  has to mortgage origination.  Can you describe, in your

3  experience, how funds obtained by an originator from a

4  repurchase agreement are used in connection with mortgage

5  origination?

6  A    Certainly.  As the diagram indicates, what happens as a

7  mortgage originator originates a mortgage loan, is really a --

8  two, possibly three-part transaction, depending on the type of

9  loan that they will be originating.  The example in this

10 diagram is a situation where the mortgage loan that's being

11 originated is to be used for a purchase of a home.  As the

12 diagram indicates, the repo bank, which is the top box on the

13 chart, remits funds into an escrow account.  The mortgage

14 originator, which is the second box, remits funds into an

15 escrow account.

16 Q    Is that what's referred to in the chart as the haircut?

17 A    Yes, sir.  And then, if the mortgagor, or here, the person

18 purchasing a home, is putting money down for the down payment,

19 it too is added to that escrow account.  The combined amounts,

20 the money from the repo bank, from the mortgage originator, and

21 from the mortgagor, is used to purchase the home.  At the same

22 time, the mortgagor, or the borrower here, executes a

23 promissory note and a mortgage for the benefit of the mortgage

24 originator, which is immediately purchased by the repo bank.

25 And so, what happens is the flow of funds moves into the escrow

Kaiserman - Direct/Comet                    74

1  account.   The borrower purchases the home, signs a note and a

2  mortgage, and the mortgage and the note are given to the

3  mortgage originator, who immediately sells it to the repo bank.

4  Q    Is this all done essentially at the same time?

5  A    Yes, sir.

6  Q    So, it's a simultaneous transaction, the funding coming

7  together and the mortgage moving to the repo bank?

8            MR. CROWTHER:  Objection.  Leading.

9            THE COURT:  Don't lead the witness.

10           MR. COMET:  Okay.

11 A    Yes, sir.

12 Q    Now, what is the haircut that's referenced on the chart?

13 A    Sure.  When the repo bank purchases the mortgage in this

14 example, it purchases it for a purchase price that is less than

15 the amount of the loan balance, and as a result, to actually

16 close the mortgage loan, the mortgage originator is required to

17 put money up, which is commonly referred to as a haircut, to

18 fund the entire amount of the loan.

19 Q    And is -- what typically would be the percentage amount of

20 the haircut as compared to the loan?

21 A    It would vary.  Oftentimes it could be as little as,

22 perhaps, one percent or two percent.  In some cases maybe 20

23 percent.  It depends.  It could range from a small amount to a

24 large amount.

25 Q    Is it normally significantly less than half the total

*J&J COURT TRANSCRIBERS, INC.*

Kaiserman – Direct/Comet                              75

1  amount of the loan?

2  A    Yes, sir.

3  Q    Now, what you've just described is a transaction in which

4  the mortgage is being originated in connection with the

5  purchase of a particular piece of property.  Do originators, in

6  your experience, obtain mortgages in other ways and finance

7  them through funds from a repurchase agreement?

8  A    Indeed.  A mortgage originator may also originate a

9  refinance transaction, which, using he same diagram, instead of

10  there being a person purchasing a property, here the mortgagor,

11  the borrower, there's already a home owned, the borrower

12  already has a loan outstanding against that home, and the

13  borrower is refinancing that loan.  In this example the flow of

14  funds and the flow of the mortgage would follow the same way.

15  Of course, the difference being instead of the money going to a

16  property seller, it would go to the prior lender to satisfy the

17  then outstanding loan, so that the new loan could be put in

18  place, and then simultaneously purchased by the repo bank.  In

19  addition, you could use a repo facility, and indeed many do, to

20  allow a mortgage originator to purchase mortgage loans that

21  have been originated by other parties in the secondary market.

22  And in doing so, the flow of funds and the movement of the

23  mortgage would function in the same way.  The only difference

24  is instead of extending money to a borrower, the money is going

25  to the originator, who had originated the same loans, in order

**J&J COURT TRANSCRIBERS, INC.**

1  to purchase them by the mortgage originator, and immediately

2  sell them to the repo bank.  So, it could be used for three

3  purposes, to purchase a property, to refinance a property, or

4  for a mortgage originator to purchase mortgage loans in the

5  secondary market that had already been originated.

6  Q    And in each instance what happens to the mortgage in that

7  transaction?

8  A    In each instance that mortgage is purchased by the repo

9  bank by selling it from the mortgage originator to the repo

10  bank in return for the funds that either go to the escrow

11  account for a property seller, or to the prior lender to

12  satisfy the refinance loan, or to the seller of the portfolio

13  of mortgage loans that the mortgage originator is purchasing

14  through the use of its repo facility from a repo bank.

15  Q    You testified previously in the preliminary injunction

16  hearing that the loans -- that CSFB purchased under its

17  agreement with American Home were scratch and dent loans.  How

18  do loans of that type fit into this type of transaction that

19  you've been describing?

20  A    Sure.  Scratch and dent loans would typically fall in the

21  last category, which is where the mortgage originator is

22  generally re -- or purchasing them from a third party.  A

23  scratch and dent loan is a loan that, for one of three reasons,

24  is considered to be defective.  The first is that it has had a

25  performance problem in the past, meaning perhaps it was

1 delinquent, or it's currently delinquent.  The second reason

2 would be the documentation associated with the loan is

3 deficient for one or more reasons.  The third reason would be

4 that the mortgage loan has credit issues associated with the

5 loan.  Perhaps it was an exception to the underwriting

6 guidelines, or something of that sort.  So, in each of those

7 three cases it's considered a scratch and dent loan.  The repo

8 facility with American Home was designed to finance scratch and

9 dent loans.  Those loans were either owned by American Home,

10 perhaps through other financing facilities, or owned by another

11 financier through a similar repo arrangement, or they were

12 owned by another purchaser as a take out purchaser who's asked

13 American Home to repurchase the loans as a result of the

14 documentation deficiency, the delinquency, or the credit

15 deficiency that we described earlier.

16 Q    So, in those situations the funds that CSFB provided on

17 the repurchase agreement, what did -- did they finance those

18 different types of transactions by American Home?

19 A    The funds from CSFB under the master repurchase agreement

20 would have flown, in most instances, to a prior financier, who

21 delivered the mortgages either directly to CSFB, or through the

22 originator to CSFB.  And so, our funds ended up going directly

23 to a prior financier.  If American Home had financed those

24 loans through some other mechanism, it's possible that the

25 money went to American Home.

1  Q     Now, did CSFB ever purchase loans from American Home

2  pursuant to any agreement other than it's -- the master

3  repurchase agreement?

4  A     Yes, sir.

5  Q     CSFB?

6  A     I'm sorry.  No, sir.

7  Q     Did other Credit Suisse entities purchase loans from

8  American Home?

9  A     Yes, sir.

10 Q     Exhibit 22 that you looked at before, that DLJ agreement,

11 is that an agreement under which DLJ purchased loans from

12 American Home?

13 A     Yes, sir.

14 Q     And you had used the term take out buyer, take out

15 purchaser before.  Is that the type of transactions that DLJ

16 did?

17 A     Yes, sir.

18 Q     And does CSFB do take out purchases?

19 A     No, sir, we don't.  CSFB acts entirely as a repo bank

20 under master repurchase agreements.

21 Q     I'd like to move to the next stage now.  Let me just

22 change the chart if I can.

23                        (Pause)

24 Q     I'd like to move to the next stage, in effect, under

25 repurchase agreement.  After a originator has transferred loans

**J&J COURT TRANSCRIBERS, INC.**

1  to CSFB, or a repo bank, pursuant to a repurchase agreement,

2  what, in your experience, does the originator do, then, with --

3  in relationship to the loans?

4  A    Certainly.  The mortgage originator would begin the

5  process of looking for a take out purchaser to purchase the

6  mortgage loans.  It may do so by starting new, meaning

7  assembling a portfolio of loans, to show to a take out

8  purchaser or several take out purchasers, for them to

9  potentially consider purchasing those loans.  They may also

10  have an existing commitment with the take out purchaser to

11  purchase mortgage loans generally, subject to the specifics of

12  what the loans are and the specifics of the commitment.  And

13  what I mean by that is the commitment may say I'll purchase

14  mortgage loans in an amount not to exceed a certain dollar

15  amount by a certain date with the weighted average interest

16  rate of some number, among other things.  And so, during --

17  once the loans have been sold to the repo bank, the mortgage

18  originator will take the time to find a take out purchaser,

19  again, either a new one, or under an existing commitment.  When

20  they find a take out purchaser, the take out purchaser will

21  perform a review of the loans that they expect to purchase.

22  The review is quite extensive.  They'll perform what's known as

23  a due diligence review, looking at the credit of the borrowers,

24  individual borrowers, the appraisal, the individual appraisals

25  for each of the loans, the income, the employment, the assets

1  of the individual borrowers, and, of course, the data that the

2  mortgage originator delivers to the take out purchaser.  The

3  review, depending on the number of loans, could take as many as

4  three weeks, and oftentimes is quite expensive, perhaps as much

5  as $300 per loan.

6  Q    Where does the originator, in your experience, get the

7  information from to provide regarding these individual loans?

8  A    Certainly.  The data that they deliver to the take out

9  purchaser comes from two primary sources.  The first is the

10 origination date.  There are certain key data points about the

11 loans that are established as of day one that don't change.

12 There are also data points about the mortgage loans that the

13 take out purchaser wants to know that change over time.  And

14 those data points come from the servicer of the loan.  Those

15 data points include things like the next day that the payment

16 is due, the amount of the next payment, the interest rate for

17 the payment, and things of that sort.

18 Q    So, those items, in your experience, did they come -- are

19 they obtained through access to the servicing records of the

20 loans?

21 A    Yes, sir.

22 Q    Once the take out purchaser completes its due diligence

23 review, they'd begin the process of confirming the pricing for

24 the mortgage portfolio.  That process is sometimes referred to

25 as tying out.  The take out purchaser, together with the

1  mortgage originator, will finally agree upon a total dollar

2  amount for the portfolio, and at the same time the mortgage

3  originator will contact the repo bank to say we've made

4  arrangements to repurchase these loans through a sale to a take

5  out purchaser, and the mortgage originator, together with the

6  repo bank, will begin its process of tying out.  In effect, the

7  mortgage originator is confirming the repurchase price it owes

8  to the repo bank to buy back the mortgage loans, and once the

9  repo bank, together with the mortgage originator tie out, and

10 everyone is in agreement, the funds move as described in the

11 chart, and that is the take out purchaser actually remits the

12 funds to the repo bank.

13 Q    So, those fund that you're referring to, that's the

14 purchase price that the take out purchaser is paying to the

15 originator for the purchase of these loans, which is actually

16 physically transmitted to the repo bank.  Is that what you're

17 saying?

18 A    That's correct.  And as the chart demonstrates, the repo

19 bank takes the purchase price from the take out purchaser to

20 apply those monies to satisfy the repurchase price owed from

21 the mortgage originator to the repo bank, and takes the excess,

22 if any, and forwards those funds to the mortgage originator.

23 Q    What happens to the mortgage in this transaction?

24 A    The mortgage in this transaction is repurchased by the

25 mortgage originator and immediately or simultaneously purchased

1  by the take out purchaser from the mortgage originator.

2  Q    And in connection with the purchase by the take out

3  purchaser, is further information or representations provided

4  to the take out purchaser regarding the loans?

5  A    Indeed.  The mortgage originator, in its agreement with

6  the take out purchaser, will make certain representations and

7  warranties.  In many instances, there are more than 75 specific

8  representations and warranties about the nature of the mortgage

9  loans that the take out purchaser is purchasing, and many of

10 them are related to the data about the loans, the quality of

11 the loans, the characteristics of the loans, and they are all

12 contained in their agreement between the mortgage originator

13 and the take out purchaser.

14 Q    Does that information, those representations relate

15 specifically to each individual loan?

16 A    Yes, sir.  They do.  All of the loans -- the

17 representations and warranties relate to the mortgage loans

18 loan by loan.  Each loan has the benefit of specific

19 representations and warranties about that loan.

20 Q    And are the sources of the information that an originator

21 uses in your experience for that the same as you described

22 before, the original mortgage files and the servicing records?

23 A    Yes, sir.

24 Q    If you could look, again, for a moment at Exhibit 22?

25 That's the DLJ agreement.  Binder 2.

**J&J COURT TRANSCRIBERS, INC.**

1                          (Pause)

2  Q    If you look in there at Page 7 you'll see, near the bottom

3  of that page, a definition of the mortgage loan schedule.  Do

4  you see that?

5  A    I do.

6  Q    And you'll see that continues over to Page 10 and lists 38

7  items for each individual loan, or 38 paragraphs of information

8  about each individual loan, and four paragraphs of aggregated

9  information.  Do you see that?

10 A    I do.

11 Q    Is that customary, in your experience, to provide a

12 mortgage schedule of that type in connection with a take out

13 purchase?

14 A    It is.  In fact, this list is just a subset of what is

15 typically delivered by a mortgage originator to a take out

16 purchaser.  In our own case, where DLJ Mortgage Capital acts as

17 a take out purchaser, the list, notwithstanding what this

18 agreement shows, is oftentimes more than 100 or 125 specific

19 data points about the mortgage loans.

20 Q    Well, I actually asked you about the schedule and those

21 pages.  Now, if you turn in the agreement to Page 22 in Exhibit

22 22?

23 A    Um-hmm.

24 Q    You'll see there Section 3.02 entitled representations and

25 warranties as to individual mortgage loans.  Do you see that?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    And that continues for, I think, ten pages in the

3  agreement, to Page 32.  It goes from Paragraph A to Paragraph

4  Triple O?  Do you see that?

5  A    Yes.

6  Q    And you understand these are all representations of

7  warranties as to individual loans that American Home was

8  agreeing to provide to DLJ in connection with take out

9  purchases?

10        MR. CROWTHER:  Objection, Your Honor.  Counsel is

11  testifying.

12        MR. COMET:  Your Honor, I think this is sort of a

13  self-explanatory thing.  I'm just trying to get into the record

14  what it is.  But I can reframe the question if that will help.

15        THE COURT:  Yes.  The objection is sustained.

16  Q    What does Section 3.02 provide for in your understanding?

17  A    Section 3.02 are the loan level representations and

18  warranties made by a take out purchaser -- sorry -- made by a

19  mortgage originator to a take out purchaser.  As you can see,

20  they are quite extensive, numbering or lettering from A to

21  Triple O, going on for at least ten pages.  Many of these

22  representations and warranties contain multiple representations

23  and warranties within each lettered paragraph.  And these are

24  typically representations and warranties made by mortgage

25  originators to a take out purchaser in connection with a take

1  out purchaser's purchase.

2  Q    And in this instance, who was making these representations

3  and warranties?

4  A    In this agreement the representations and warranties were

5  made by American Home to DLJ Mortgage Capital, who was acting

6  as the take out purchaser.

7  Q    Okay.  So, I think you were describing the transaction

8  under which the loans are purchased by the take out purchaser

9  and the -- and simultaneously there's a repurchase of the loans

10 under the repurchase agreement.  Now, is the structure you

11 described for that, is that a typical structure in your

12 experience?

13 A    Yes, sir.  It is.

14 Q    And what would happen, in your understanding, if when the

15 originator asked to repurchase in contemplation of transferring

16 the loans to the take out purchaser, the repo bank proposed to

17 substitute different loans?

18 A    Sure.  I think the mortgage originator would say to the

19 repo bank these are new loans, these are not the loans that I

20 was expecting.  I know nothing about them.  I don't know

21 anything about the data or the way in which they were

22 originated, and would like to review them to make sure that

23 they're acceptable.  These were not the loans I expected to

24 purchase, and they, themselves, would likely perform a due

25 diligence review similar to the due diligence review that I

1  described earlier performed by a take out purchaser.  In

2  addition, they may be questioning the amount that they're

3  required to pay, or the repurchase price they're required to

4  pay to the repo bank for those mortgage loans.  The repurchase

5  price, as I described earlier, is something that's confirmed

6  and tied out based on a specific pool of mortgage loans between

7  the mortgage originator and the repo bank.  At the same time,

8  once that process is complete, the take out purchaser would say

9  the same thing.  The take out purchaser would say these aren't

10  the loans that I reviewed.  These aren't the loans, the data

11  and information which you, mortgage originator, have sent to me

12  during the due diligence review in my contemplation of

13  purchasing those loans, I now need to start again, if at all.

14  In addition, the proceeds that the take out purchaser was

15  intending to remit to purchase the mortgage loans would again

16  be called into question because the loans that they're now

17  being presented are different loans, the data is different, the

18  credit is different, the real estate is different.  Everything

19  about the loans are different, and therefore the whole process

20  would stop.

21  Q    So, could the transaction go forward as had been

22  contemplated between the originator and the take out purchaser?

23  A    No, sir.

24  Q    Now, you've testified you've been involved in about 100

25  mortgage repurchase agreements with CSFB.  Of those 100 have

1 any of them allowed CSFB to substitute different mortgages at

2 the time of the repurchase?

3 A    No, sir.

4 Q    And you also testified in the preliminary injunction

5 hearing that you had reviewed mortgage repurchase agreements

6 that other banks or financial institutions have entered into

7 with originators.  Can you estimate about how many of those

8 you've reviewed?

9 A    Sure.  Approximately 50, and that comes up in connection

10 with my day-to-day activities for looking at potential mortgage

11 repurchase arrangements to enter into with companies like

12 American Home.  We oftentimes would like to know what type of

13 financing agreements they have with other repo banks or

14 financiers, and we'll look at them there.  In addition, Credit

15 Suisse has purchased other companies, or contemplated

16 purchasing other companies, and in that regard we evaluate the

17 company and its financing capabilities.  We will review the

18 agreements they have with other financiers.  And finally, when

19 acting as a take out purchaser, it's of importance to Credit

20 Suisse and in particular DLJ Mortgage Capital, to know that the

21 company from which we'll be purchasing loans has adequate

22 financing capabilities, and to verify that we will review their

23 agreements, as well.  So, in those three capacities we will

24 review them.  And I've probably reviewed at least 50.

25 Q    Okay.  Did any of those agreements allow the repo bank to

1  substitute different mortgages at the time of the repurchase?

2  A    No, sir.

3  Q    And, in general, how do those agreements compare to the

4  form of repurchase agreements that CSFB uses?

5  A    They are similar.  The differences would be the names of

6  the parties, the dates, and the economics.

7  Q    Okay.  I'd like to ask you about the servicing of mortgage

8  loans during the period in between the two transactions that we

9  looked at here, and between the original purchase under a

10  repurchase agreement and the repurchase stage.  Now, you

11  testified at the preliminary injunction hearing about that, and

12  about how the servicing is left with the seller, or the

13  responsibility for it with the seller in that period.  Can you

14  explain again the reasons why that arrangement is used?

15  A    Sure.  As I said earlier, the servicing is left with the

16  mortgage originator while these transactions are outstanding

17  entirely for convenience reasons.  If, for example, the

18  mortgage originator was asked to transfer the servicing to a

19  third party, it would add, among other things, unnecessary

20  delays to the transaction.  As a result of certain federal

21  rules, the mortgage originator in that example would be

22  required to tell the borrowers that they are no longer the

23  servicer, that there's a new servicer, that they should remit

24  their payments to that new servicer, and, you know, act

25  accordingly.  At the same time, when the transaction was

1  repurchased, the new servicer would have to transfer, again,

2  the mortgage loan servicing either to the mortgage originator

3  or perhaps to a take out purchaser, and in doing so would again

4  advise the borrower that they are no longer their servicer and

5  that they should remit their payments to a new servicer.  Each

6  of those notifications take at least 15 days.  And so,

7  automatically you've extended these transactions to at least 30

8  days.

9  Q    When you say these transactions, you mean the two legs of

10 the repurchase agreement transaction?  Is that correct?

11 A    Yes, sir.  In addition, as a result of servicing

12 transfers, it is oftentimes the case that a borrower will

13 become confused about where they are to remit their payment,

14 and oftentimes will either remit the payment to the wrong

15 entity or not remit a payment at all, being concerned that

16 perhaps there's something inappropriate going on.  And so, the

17 borrowers may fall behind in their payment, whether it's

18 because they don't make their payment or they make their

19 payment to the wrong entity, who, in turn, has to forward it to

20 the correct entity, and the borrower becomes delinquent.  If a

21 borrower becomes delinquent, the value of that loan goes down

22 significantly upon the occurrence of that delinquency, and so,

23 it would really jeopardize these transactions if the value of

24 the loans themselves would go down as a result of a

25 delinquency.  And finally, as the mortgage originator searches

1  for a take out purchaser in stage two, not having possession of

2  the files, not having the on-going responsibilities to service

3  adds a layer of complexity to it.  They would need to contact

4  the servicer to get updated information.  They would be

5  uncomfortable, or may be uncomfortable with the way in which

6  the other servicer was servicing the loans, knowing that, as we

7  looked at in Exhibit 22, they would have to make

8  representations and warranties about the way in which the loans

9  were serviced, the data that they would be representing and

10 warranting.  And so, for those three reasons the servicing is

11 left with the mortgage originator while these transactions are

12 outstanding.

13 Q    Have you seen any repurchase agreement in your experience

14 that required the servicing responsibility to be transferred

15 away from the seller under the repurchase agreement during the

16 term of the repurchase transactions?

17 A    No, sir.

18 Q    Now, in CSFB's repurchase agreements, does it normally

19 seek to include provisions going to the credit worthiness of

20 its counterparty in those agreements?

21 A    Yes, sir.  Indeed, in our master repurchase agreement you

22 will find covenants that you will find in most agreements where

23 there is a series of transactions contemplated over a period of

24 time where one or both of the parties have financial and other

25 obligations that the other party would like comfort and

**J&J COURT TRANSCRIBERS, INC.**

1 assurances they have the ability to satisfy.  And so, it's not

2 uncommon, as is the case here with the master repurchase

3 agreement, to have covenants and the like to give the parties

4 the assurances that they need for an agreement that has

5 multiple transactions over a period of time.

6 Q    And in connection with the American Home agreement, was

7 CSFB looking for assurances that American Home would be able to

8 perform its obligations to make repurchases?

9 A    Indeed we were.

10 Q    I'd like to ask you to look at Exhibit 27.  That's also in

11 the second binder.

12                        (Pause)

13         MR. COMET:  This, Your Honor, is one of the documents

14 I mentioned yesterday, where some items that are -- I believe

15 are not relevant to this proceeding have been redacted because

16 they're confidential information.

17 Q    Mr. Kaiserman, is this letter connected to the mortgage

18 repurchase agreement between CSFB and American Home?

19 A    It is.  This is the pricing side letter that is made

20 reference to in the master repurchase agreement between CSFB

21 and American Home.  As you can see, it includes several terms

22 that are integral to the agreement and works together with that

23 agreement.

24 Q    Well, and if you look at the first sentence of Exhibit 27,

25 in your understanding does that indicate the connection between

1  the master repurchase agreement and this letter?

2          MR. CROWTHER:  Objection, Your Honor.  Leading, and

3  counsel is testifying again.

4          THE COURT:  Sustained.

5  Q    What does the first sentence in Exhibit 27 indicate, in

6  your understanding, Mr. Kaiserman?

7  A    It makes reference to the master repurchase agreement

8  between the parties, American Home and CSFB, and -- that's it.

9  Q    Does it say anything about -- well, why don't you read

10 that --

11 A    Sure.

12 Q    -- the first part of that sentence into the record,

13 please?

14 A    Sure.

15          MR. COMET:  Let me first, Your Honor, I'd like to

16 offer Exhibit 27 into Evidence.

17          THE COURT:  Any objection?

18          MR. CROWTHER:  No objection, Your Honor.

19          THE COURT:  It's admitted without objection.

20 A    It says reference is hereby made to, and this side letter,

21 the pricing letter, pricing side letter, is hereby incorporated

22 by reference into the master repurchase agreement dated as of

23 September 13th, 2006, among American Home Mortgage Corp.,

24 American Home Mortgage Acceptance, Inc., American Home Mortgage

25 Servicing, Inc., American Home Mortgage Investment Corp.,

1 American Home Mortgage Holdings, Inc., and Credit Suisse First

2 Boston Mortgage Capital, LLC.

3 Q    Thank you.  And the various American Home entities that

4 you just mentioned, how are they referred to in that paragraph?

5 Are they given a label?

6 A    They are.  They are all referred to as a seller except for

7 American Home Mortgage Holdings, Inc., which is referred to as

8 the guarantor, and Credit Suisse First Boston Mortgage Capital

9 is referred to as the buyer.

10 Q    Okay.  Now, if you look at Section 1.4 in Exhibit 27, on

11 the first page there, it refers to market value.  Do you see

12 that?

13 A    I do.

14 Q    Okay.  And does this have some connection to the pricing

15 of CSFB's purchase of mortgage loans under the master

16 repurchase agreement with American Home?

17 A    It does.  The definition market value, which I can read it

18 if you'd like, is used in the mortgage -- the master repurchase

19 agreement to determine the price at which the buyer, Credit

20 Suisse First Boston Mortgage Capital, buys the mortgage loans

21 from American Home Mortgage, and it -- one thing to note is it

22 does say, and I'll read it in part, it says, market value means

23 with respect to any purchased assets as of any date of

24 determination, the whole loan servicing released fair market

25 value of such purchased assets on such date.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And the whole loan servicing release fair market value,

2  was that used by CSFB in determining the price at which it

3  would purchase mortgages under the agreement with American

4  Home?

5  A    Indeed.  The agreement with American Home, the price that

6  we paid for the mortgage loans is related to this market value

7  concept which, as you can read, includes -- or it makes it

8  clear that it's the servicing as well as the mortgage loan.

9  The term servicing released means that not only are we

10  purchasing the whole loan, but we're purchasing the servicing,

11  as well, and the value ascribed or the market value was

12  inclusive of the servicing.

13  Q    Okay.  Is that different from purchasing a loan on a

14  servicing retained basis?

15  A    Yes, sir.  It is.

16  Q    How is it different?

17  A    If we were purchasing just the loan and not the servicing

18  associated with it, which would be referred to as a servicing

19  retained purchase, the market value of the loan would be less

20  than the market value of a loan where you're also purchasing

21  the servicing, again, here a released purchase.

22  Q    Okay.  So, was the pricing that CSFB paid to American Home

23  for the purchase of loans under the master repurchase agreement

24  based on the value of the loans?

25  A    It was based on the value of the loans as well as the

1  servicing.

2  Q    Now, if American Home says it's entitled to keep the

3  servicing here and settle it or be paid for it by someone else,

4  is that consistent, in your understanding, with the contract?

5         MR. CROWTHER:  Objection.  Calls for a legal

6  conclusion.

7         THE COURT:  Sustained.

8  Q    Okay.  In your experience with agreements -- well, let me

9  ask you a different question.  Does -- has CSFB ever purchased

10  loans under a mortgage repurchase agreement on a servicing

11  retained basis?

12  A    No, sir.

13  Q    Why not?

14  A    For one, the pricing is based on a servicing released

15  basis, and therefore, if we weren't purchasing the servicing,

16  as well, the purchase price would be overstated.  So, the first

17  reason is we price everything on a servicing released basis.

18  In addition, we purchased these loans and the servicing with

19  the expectation that the mortgages will either be repurchased

20  by the mortgage originator, or they will fail to do that, at

21  which point we want to know that we own the servicing rights,

22  as well.  And so, for that reason CSFB, when it enters into

23  master repurchase agreements, it only does so on a released

24  basis.

25  Q    Why is it that you want to know that if the originator

1  defaults you'll have the loans on a servicing release basis,

2  including the servicing

3  A    Because we'd like to close out the transaction and move

4  on.  If we haven't purchased the servicing rights, then we will

5  continue to be involved with the mortgage originator and by

6  purchasing the servicing we're done, we have the mortgage

7  loans, we have the servicing, and we can sell the same on a

8  released or a retained basis, as we desire.  Indeed, the master

9  repurchase agreement specifically acknowledges that upon the

10 occurrence of an event of default CSFB can sell the mortgage

11 loans either on a released or a retained basis.  And so, it's

12 critically important for CSFB, in entering into these

13 agreements, to know that upon the occurrence of an event of

14 default, that it also has the servicing.

15 Q    Now, does DLJ enter into agreements for loan purchases on

16 a servicing retained basis?

17 A    Yes, sir.  We do.

18 Q    And if you look, again, at Exhibit 22, which is in the

19 same binder, is that an agreement that DLJ had with American

20 Home to purchase loans on a servicing retained basis?

21 A    Yes, sir.  It is.

22 Q    And in that type of agreement are there normally, in your

23 experience, provisions dealing with the possibility that the --

24 the take out purchaser, like DLJ, may choose to sell the loan

25 and transfer the servicing arrangement to a different owner?

1 A    Yes, sir.  There is.  In Section -- Article 10, Section

2 10-01, entitled Reconstitution of Mortgage Loans, this entire

3 article is dedicated to a situation where the take out

4 purchaser decides to either securitize the loans, or sell them

5 as whole loans to a third party, and this article includes

6 certain obligations and provisions for the mortgage originator,

7 here American Home, to cooperate with the purchaser in its

8 efforts to sell those mortgage loans, or to securitize them,

9 including things such as agreeing to service the loans for the

10 benefit of some third party, or a securitization trust, or

11 maybe Fannie Mae or Freddie Mac.

12 Q    Does CSFB include provisions like Article 10 in Exhibit 22

13 in its mortgage repurchase agreements?

14 A    No, sir.  We don't.

15 Q    Why not?

16 A    The master repurchase agreement, as I mentioned earlier,

17 it is expected that the mortgage originator, American Home,

18 will repurchase the mortgage loans.  If they fail to repurchase

19 the mortgage loans upon the occurrence of an event of default,

20 then we have not only the mortgage loans, but also the

21 servicing, and we don't need them to cooperate other than to

22 turn over the files.  We can sell them as we choose.  We are

23 the owner of the servicing rights.  And we don't need their

24 cooperation with a third party purchaser to agree to service

25 them.  They're being purchased on a released basis.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    If you look in Exhibit 22, at Page 63, it's Article 9,

2 you'll see there the termination provision.  What does this

3 provide about the length of time that the agreement would last,

4 in your understanding?

5 A    Sure.  The agreement lasts until either the parties agree

6 that it's going to terminate, or the latest maturing mortgage

7 loan in the portfolio that was purchased.  In effect, this

8 agreement could last 30 years.  Most of the loans we purchase

9 are 30 year mortgage loans, and this agreement would last until

10 the latest maturing mortgage loan is paid in full or

11 liquidated.

12 Q    All right.  I'd like to go back now for a moment to

13 Exhibit 27, the pricing side letter.  And if you'd turn in that

14 to Page 6, you'll see Section 1.11, and a termination date.  Do

15 you see that?

16 A    Yes, sir.

17 Q    And this is in Evidence.  That says the termination date

18 means the earlier of A, August 15, 2007, and B, the date of

19 occurrence of an event of default.  What's your understanding

20 about the significance of this for the length of time the

21 mortgage repurchase agreement would last?

22 A    In either case any and all outstanding transactions on

23 August 15th were to be concluded in the American Home or the

24 mortgage originator was to repurchase them by that date, August

25 15th, 2007.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And that was a little less than 11 months from the

2  September 13, 2006 execution date of the agreement.  Is that

3  correct?

4  A    Yes, sir.

5  Q    And was there any agreement between CSFB and American Home

6  to extend the mortgage repurchase agreement for a longer time

7  period?

8  A    No, sir.

9  Q    Now, putting aside CSFB's declaration of a default by

10 American Home, do you have an understanding of whether the

11 repurchase agreement between American Home and CSFB would still

12 be in place today?

13 A    I do.  And the agreement would not be in place.  As is

14 evidenced by the agreements, all of the outstanding

15 transactions, if any, as of August 15th, 2007, would need to be

16 repurchased as the agreement was terminated on that date.  In

17 addition to repurchasing all the loans, all the servicing that

18 was being performed during the pendency of these transactions

19 was to be completed and terminated, as well.

20 Q    What -- if the -- in your understanding when American Home

21 repurchased loans, what happened to the servicing at that

22 point?

23 A    If they repurchased the loans, the servicing would be

24 disposed of by them, having just repurchased it from CSFB, as

25 and when they wanted.  In our example, in the diagram, it may

**J&J COURT TRANSCRIBERS, INC.**

1  have been sold to the take out purchaser, or it may have been

2  retained by the mortgage originator.  That was up to them, them

3  being the mortgage originator, together with the take out

4  purchaser.

5  Q    Now, did CSFB purchase mortgage loans from American Home

6  pursuant to the mortgage repurchase agreement that they had?

7  A    Yes.

8  Q    Okay.  Did it purchase anything other than mortgage loans

9  under that agreement?

10  A    No.

11  Q    After the repurchase agreement was entered into, how did

12  work in practice between Credit -- excuse me -- CSFB and

13  American Home in terms of the transfer of loans under the

14  repurchase agreement?

15  A    Sure.  After the agreement was executed, what typically

16  happened was American Home presented to CSFB a portfolio or a

17  pool of mortgage loans that it wanted to enter into a

18  repurchase transaction with CSFB under the new agreement.  They

19  would present to us this portfolio, or pool of loans.  They

20  would remit to us certain data about the loans, and we would

21  review the data to determine what the market value of the loans

22  would be in our opinion.  We would share that information with

23  American Home, and they, in turn, would evaluate it on their

24  side, and if they were so inclined, given the market values

25  we've provided to them, they would agree to enter into a

1 repurchase transaction with that subject pool.  At the same

2 time, they would deliver the notes and the mortgages to us or

3 our designee.  We would perform the confirmation or the tie out

4 process we described earlier.  We would agree on the funds to

5 be -- the proceeds for the purchase, and we would remit the

6 funds.  And that process would happen regularly.

7 Q    Now, I'd like to ask you about what -- the documentation

8 that American Home provided in connection with that.  I think

9 you mentioned the promissory notes and the mortgages.  Was

10 there other documentation provided?

11 A    Typically the mortgages and the notes, as well as the rest

12 of the collateral file, which are origination documents, would

13 be shipped to CSFB's designee, which it happens was in -- I

14 believe in this case, Deutsche Bank.  I could be mistaken.  In

15 either case, it would be shipped to us our designee with what's

16 known as a release letter, which, in many instances, the loans

17 were owned by American Home, and the release letter would

18 recite that American Home, upon receipt of a certain dollar

19 amount, would be releasing all interest, all right, title, and

20 interest in and to the loans that are set forth on a schedule

21 to CSFB upon receipt of that funds.  In other cases, if the

22 loans were perhaps themselves with a repo bank, American Home

23 would direct the repo bank to ship them to CSFB and in that

24 letter it would also acknowledge that upon receipt of the money

25 they would release their right, title, and interest in and to

1  the mortgage loans.

2  Q    Okay.  Could you look at Exhibit 31, please, which is in

3  the next binder, Binder Number 3?  It's possible I put that on

4  the floor by you.

5                            (Pause)

6  A    Okay.

7  Q    Okay.  Can you explain what Exhibit 31 is?

8  A    Sure.  The first, it looks to be five pages, represent the

9  list -- a list of loans that is or were the subject of a

10  repurchase transaction when American Home was in default under

11  the agreement.  It's about 250 loans, or 225 loans, which are

12  described in that first five pages.

13  Q    Were these loans repurchased by American Home?

14  A    No, sir.  They were not.  Behind that are the release

15  letters that I described earlier, which go to each of the list

16  -- the loans on the first five pages, the list of loans.  So,

17  they really should be viewed together.  The release letter and

18  the related schedule to the release letter tie back to the

19  first five pages of the mortgage loans.

20  Q    So, are there release letters and schedules here in

21  connection with each transaction under which the loans on the

22  first five pages were sold?

23  A    Yes, sir.

24         MR. COMET:  Okay.  I'd move the introduction of

25  Exhibit 31, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1        MR. CROWTHER:  Your Honor, if you'll look at Exhibit

2    31, I will object on the basis that they don't seem to match

3    up.  There are missing schedules, missing exhibits to the

4    various correspondence that they're referring to as release

5    letters.  They don't correspond with one another.

6        MR. COMET:  I can't respond to that, Your Honor,

7    because I don't know what he's saying doesn't correspond.  The

8    witness has testified that there's a release letter in the

9    schedule for -- related to each of the loans on the first five

10   pages.

11       THE COURT:  How does he know that?

12       MR. COMET:  He -- well --

13   Q    Can you tell me how this exhibit was put together, Mr.

14   Kaiserman?

15   A    Sure.  I asked some of the people that work in my

16   department to assemble a list of all of the mortgage loans that

17   were outstanding that were not repurchased by American Home,

18   which is what the first five pages represent.  I then asked

19   them to assemble from our records all of the release letters

20   and related schedules that we received when we purchased each

21   of the loans listed on the first five pages.  That's what you

22   have behind the first five pages, each of those release

23   letters.  It's worth noting that some of the schedules attached

24   to the release letters may list loans that were actually

25   repurchased.  As I mentioned earlier, they would present a --

1 they, American Home, would present a pool to CSFB to price and

2 then to eventually enter into a repurchase transaction with.

3 Some of those loans, as we know, were repurchased by American

4 Home.  Some were not.  So, the lists attached to this -- the

5 release letters, may have more loans on it than on the first

6 five pages, but each and every one on the first five pages,

7 every loan, it ties back to the schedules in the release

8 letters.

9 Q    Well, let's look at one example if we could.

10 A    Sure.

11 Q    If you look at the first page of Exhibit 31, Mr.

12 Kaiserman, you'll see the -- not the first entry, but the next

13 two are dated, 11/2/2006.  Do you see that?

14 A    I do.

15 Q    And the names indicated there are Prescott and Sheldon.

16 Do you see that?

17 A    Yes, sir.

18 Q    Is it your understanding those are the borrowers for the

19 loans?

20 A    Yes, sir.

21 Q    Okay.  And then if you turn, after the first five pages,

22 to I guess the third page, do you see a letter dated November

23 2nd, 2006?

24 A    Yes, sir.  I do.

25 Q    A transmittal letter from Bank of America to Credit

1  Suisse?

2  A    Yes, sir.

3  Q    And then -- that's a two-page letter, and then with it you

4  see a schedule there, at the third page?

5  A    I do.

6  Q    And then you see the third item on that schedule is a loan

7  with a borrower named Sheldon?

8  A    Yes.

9  Q    Do you see that?  And the loan number there is 1153218.

10 Do you see that?

11 A    Yes.

12 Q    And is that the same number that appears next to the name

13 Sheldon on the date 11/2/2006 on the first page of Exhibit 31?

14 A    Yes, sir.

15 Q    And three names below Sheldon on that schedule with the

16 November 2nd, 2006 letter do you see the name Prescott there?

17 A    Yes, sir.

18 Q    And the loan number is 11517 --

19           THE COURT:  Don't read the loan numbers in.  I'm a

20 little concerned here.  These are individuals who aren't

21 parties to this proceeding.  We're getting into a lot of level

22 of detail on the record that could be construed as their

23 personal financial information, broadly.  So, I don't want to

24 forego your ability to make the record, but let's -- let's

25 strike from the record the reading of the loan numbers.

1          MR. COMET:  Okay.  Just to say, Your Honor, those

2   numbers, I understand, are just -- are internal identifying

3   numbers, and we did, as I've told American Home's counsel

4   already, we did remove from the schedules things like

5   addresses, social security numbers --

6          THE COURT:  Okay.

7          MR. COMET:  -- etcetera, to protect the

8   confidentiality of these individuals.

9          THE COURT:  All right.

10          MR. COMET:  I just thought the name and the number

11  you'd like to know who Miller is, for example, what number --

12          MR. CROWTHER:  Your Honor, if might be heard on an

13  evidentiary objection?

14          THE COURT:  Yes.

15          MR. CROWTHER:  It's more fundamental than the list.

16  This witness just testified that somebody else put it together

17  that he asked other people to do it, so essentially he lacks

18  the competence to authenticate the document.  Moreover, it's

19  based upon hearsay.  The mere fact that he's in here saying

20  somebody else did it is simply double hearsay.  It should be

21  excluded on the basis of both competence by his own testimony

22  that he did not compile this list, and second, that it was

23  based upon somebody else's alleged knowledge who is not in this

24  courtroom.

25          MR. COMET:  Your Honor, it's not hearsay in either

1  respect.  These are operative documents.  They're not records

2  of other information.  These are the letters that actually

3  provided for the releases with the schedules that accompany

4  them.  Mr. Kaiserman knows that these came from the files of

5  Credit Suisse.  He doesn't have to have been the one to go to

6  the individual file and pull it out.  People under his

7  direction collected the documents.  These are the operative

8  documents that relate to the loans.  They can all be matched

9  up, the letters and the schedules, to the names on the list,

10 and so, I don't see that -- it's not hearsay because they're

11 operative documents, nor is he -- he can testify from his

12 personal knowledge that these were gathered from the files of

13 CSFB.  I don't think he has to have been the one to go and pull

14 them out of a file or database.  I don't believe there's any

15 authority for that position in the evidence rules.

16         MR. CROWTHER:  He must be competent to testify that

17 it is what it purports to be, and he cannot do so.  He can only

18 predicate his testimony on what somebody else allegedly was

19 instructed to do, and what he alleges they carried out.  He

20 cannot testify they are, in fact, what he purports them to be,

21 and that is the foundation that is required to authenticate the

22 documents sought to be admitted into Evidence.  Certainly they

23 appear to be letters.  Certainly they appear to be schedules.

24 However, there is no testimony, competent or otherwise, that

25 they, in fact, relate to one another, or that they are, in

1  fact, organized properly, or that they actually are matched up.

2  Rather, the witness simply testified that somebody else did it,

3  and this is what they said it was.  That's not authentication.

4  That's sort of a chain of custody problem.  This is what

5  somebody else says it's evidence of, and here I'm going to

6  introduce it as what they told me.

7        MR. COMET:  Your Honor, Mr. Kaiserman has just

8  testified that somebody else collected them.  He's -- as I'll

9  bring out, he's reviewed them all, identified them all as

10 letters relating to the loans listed on the schedule, and they

11 all, on their face, indicate they're loans listed on the

12 schedule.  They all also -- American Home should have exactly

13 the same documents in its files, Your Honor, if they think that

14 there's the wrong letter or the wrong schedule here for any

15 loan, they can raise that.  But these --

16       THE COURT:  All right.  Well, why don't you ask --

17 why don't you continue to develop your record on whether -- on

18 what these documents are.

19       MR. COMET:  Okay.

20 Q    Have you reviewed the documents in Exhibit 31, Mr.

21 Kaiserman?

22 A    Yes, sir.

23 Q    And have you -- and do you recognize them, as documents,

24 as the type of release letters that are commonly provided in

25 your experience in the industry?

**J&J COURT TRANSCRIBERS, INC.**

1 A    Yes, sir.

2 Q    And do you recognize them all to refer, in connection with

3 the schedules that accompany them, to the loans listed on the

4 schedule of the loans that remain outstanding from American

5 Home?

6 A    Yes, sir.

7           MR. COMET:  I would offer into Evidence, Your Honor,

8 I would just add one thing.  Witnesses, all the time, say

9 here's the contract that this company entered into.  They may

10 not have been the person who signed the contract, but they went

11 to the ordinary files of the company, and had either pulled

12 themselves the contract or had someone pull it for them, and

13 they can identify it as the company's contract.  It's an

14 operative document.  It's not hearsay.  And in normal business

15 practice they're able to identify the operative documents of

16 the company, and that's all that's occurring here.  Mr.

17 Kaiserman has reviewed these.  He's checked them to see that

18 they match up.  And he's identifying them as the operative

19 documents of the company.

20           THE COURT:  Mr. Crowther?

21           MR. CROWTHER:  Essentially, Your Honor, that mis-

22 states what Mr. Kaiserman just said.  Once again, he testified

23 that somebody else did this, not that he went and verified that

24 these were, in fact, the schedules that were attached to the

25 letters.  In a contract example, for instance, the reason it's

1  authenticated is because it's usually signed by a party, and

2  therefore it's self-authenticating with their signature

3  attached to it.  In this case, some of the letters themselves

4  may be self-authenticating because they're signed by the

5  debtors, but the attachments are not.  They are separate.  They

6  are unsigned.  And without testimony that they, in fact, go and

7  coincide with the letter itself, they're not Exhibit A, and

8  they're therefore marked as such as a contract addendum or

9  exhibit would be.  These are all simply inserts.  They could

10 easily have been shuffled down the hallway like a deck of

11 cards, put back together in whatever format or form they felt

12 convenient, and said here you go, this is Exhibit 31.

13        THE COURT:  All right.  I'm going to overrule the

14 objection.  I think the evidence in the record is sufficient to

15 authenticate the documents, and indicate that they are what

16 they purport to be on two basis.  One, I think there was the

17 testimony of Mr. Kaiserman based upon his review, albeit he did

18 not actually pull and collate the documents, but he testified

19 that he reviewed them and that they were what they purport to

20 be.  In addition, under Rule 901(b), evidence describing a

21 process or system used to produce a result in showing that the

22 process or system produces an accurate result can authenticate

23 a document.  I think Mr. Kaiserman's testimony as to how the

24 documents were pulled at his direction and collated is

25 sufficient to satisfy that, so I'll overrule the objection and

1  Exhibit 31 is admitted into Evidence.

2  Q    Okay.  Let's look for another moment, Mr. Kaiserman, at

3  the letter we were looking at previously, the letter dated

4  November 2nd, 2006, the transmittal letter.  Do you have that?

5  A    Yes, sir.

6  Q    Okay.  Can you -- the Re, or subject line of that letter,

7  what does that say?

8  A    It says "American Home Mortgage sale of mortgage loans or

9  warehouse-related MBS."

10  Q    Okay.  And can you read the first sentence of the letter?

11  A    "Attached please find those mortgage loans or warehouse-

12  related MBS listed separately on the attached schedule, which

13  mortgage loans or warehouse-related MBS are owned by American

14  Home Mortgage, the borrower, and are being delivered to you for

15  purchase."

16  Q    And this letter is addressed to Credit Suisse, is that

17  correct?

18  A    Yes, sir.

19  Q    In this letter, if you look at the second page, is it

20  signed on behalf of American Home Mortgage?

21  A    Yes, sir.  It is.  It's signed by Geodi (phonetic) Rocco.

22  Q    All right.  I'd like you to hold that for a moment, aside,

23  and look for a moment at Exhibit 1 in the first binder.  That's

24  the mortgage repurchase agreement that's in Evidence.  Do you

25  have that document, sir?

Kaiserman - Direct/Comet                    112

1  A    Yes, sir.

2  Q    Okay.  And then I'd like you to turn in there, first the

3  main part of the contract that goes up to Page 67, and then

4  there's some signature pages, and then there's -- immediately

5  behind that there's a Schedule 1, which has a -- it appears 16

6  pages.  And then right behind that there's a Schedule 2.

7  That's where I'd like to get to, Schedule 2.

8  A    Okay.

9  Q    Do you have that?

10 A    Yes, sir.

11 Q    Okay.  And Schedule 2 has four pages, and the first two

12 pages refer to four American Home Mortgage entities.  Do you

13 see that?

14 A    I do.

15 Q    Okay.  And what do you understand those first two pages to

16 be?

17 A    The first two pages are intended to demonstrate who is

18 authorized on behalf of each of the four entities to sign, as

19 well as a sample of their signature, and what their titles are.

20 Q    And is one of the persons listed for those four entities

21 Geodi Rocco?

22 A    Yes, sir.

23 Q    And to -- I'd like to ask you, did you review Exhibit 31

24 to see whether each of the letters that's signed on behalf of

25 American Home in Exhibit 31 is signed by someone listed on

**J&J COURT TRANSCRIBERS, INC.**

1  Schedule 2 as a person authorized to act for American Home

2  under the mortgage repurchase agreement?

3  A    Indeed I did.

4  Q    And what did you find?

5  A    I found that in each instance the letters in Exhibit 31

6  were signed by one of the persons listed in Schedule 2, and in

7  particular, it was one of three people, Bonita Tsing

8  (phonetic), Andrew Dokos (phonetic), and Geodi Rocco.

9  Q    Thank you.  Now, let's go back for a moment to Exhibit 31.

10 And I'd like you to look at the first letter there, behind the

11 five-page schedule, the letter dated October 6th, 2006.  Do you

12 see that?

13 A    I do.

14 Q    Okay.  And is that letter signed on behalf of American

15 Home Mortgage Corp.?

16 A    Yes, sir.  By Andrew Dokos.

17 Q    And what is the Re, or subject line of that letter?

18 A    "Certain mortgage loans identified on the following

19 schedule hereto and owned by American Home Mortgage

20 Corporation."

21 Q    And what does the text of the letter say about those

22 mortgage loans?

23 A    It says, "The undersigned hereby releases all rights,

24 interests, liens, or claims of any kind with respect to the 12

25 mortgage loans, such release to be effective automatically

**J&J COURT TRANSCRIBERS, INC.**

Kaiserman - Direct/Comet                    114

1  without any further actions by any party upon payment in one or

2  more installments in the immediately available funds of

3  $6,270,313.52.  American Home Mortgage Corp., as servicer,

4  hereby releases its -- it interest on the following loan."

5  Q    Okay.

6  A    And then there's wire instructions.

7  Q    Now, let's -- and are there additional letters with the

8  same text except for different amounts of loans, and different

9  dollar amounts in Exhibit 31?

10  A    Yes --

11        MR. CROWTHER:  Objection, Your Honor.  Counsel is

12  testifying again.

13        THE COURT:  Overruled.  What was your answer?

14        THE WITNESS:  Yes, sir.

15  Q    Let's look, again, for a moment, at the next letter, the

16  one dated November 2nd, 2006.  And does that say Exhibit 7A at

17  the top of the letter?

18  A    Yes, sir.

19  Q    And at the bottom right, on just the first two pages, does

20  it say Exhibit 7A to security agreement?

21  A    Yes, sir.

22  Q    Okay.  I'd like you to keep that in mind for a moment, and

23  look at Exhibit 23, which is in, unfortunately a different

24  binder, in Volume 2.  Do you have Exhibit 23?

25  A    Yes, sir.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.  What do you understand Exhibit 23 to be?

2  A    This is an agreement between American Home and Bank of

3  America, as the agent for a credit agreement dated August 10th,

4  2006.

5  Q    Is there a Credit Suisse entity, in your understanding,

6  that is a party, or a participant in this agreement?

7  A    Yes, sir.  There is.

8  Q    Is that CSFB?

9  A    No, sir.  It's not CSFB.  It's one of its affiliates.

10 Q    Now, if you look in Exhibit 23, there's the main contract,

11 which has a lot of signature pages.  It goes, I think, to Page

12 53, then there's a series of signature pages.  And then, at

13 least in the copy I have, there's a green page inserted as a

14 divider.  I don't know if it's in all of them.

15 A    Yes, sir.

16 Q    Okay.  And then behind that there's a list of exhibits.

17 Do you see that?

18 A    I do.

19 Q    Okay.  Then Exhibit B is indicated to be the form of

20 security and collateral agency agreement?  Do you see that?

21 A    Yes, sir.

22 Q    If you turn, I think just three pages further, do you see

23 Exhibit D, form of security and collateral agency agreement?

24 Do you see that?

25 A    Yes, sir.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    Okay.  And then, if you turn in that to Page 7, you'll see

2 there's a section headed handling of collateral and settlement

3 account.  Do you see that?

4 A    Yes.

5 Q    Okay.

6           MR. COMET:  Actually, before I ask you another

7 question I'd like to move the introduction, Your Honor, of

8 Exhibit 23.

9           MR. CROWTHER:  Relevance, Your Honor.

10           MR. COMET:  The relevance, Your Honor, is that this,

11 as will become clear in a moment, this exhibit relates directly

12 to some of those --

13           THE COURT:  He's going to explain the footer on the

14 bottom of the exhibit, so relevance is overruled.

15           MR. COMET:  Is it in Evidence, Your Honor?

16           THE COURT:  Yes.

17           MR. COMET:  Thank you.

18           THE COURT:  I'm sorry.  The objection to relevance is

19 overruled.  The document is admitted.

20           MR. COMET:  Okay.

21 Q    Okay.  Under Section 6 on that Page 7 we were looking at

22 in the security agreement in Exhibit 23, Mr. Kaiserman, can you

23 read subparagraph B, please?

24 A    Certainly.  "Unless an event of default or potential

25 default has occurred and is continuing, upon delivery by the

1  borrowers to the collateral agent of a shipping request in the

2  form of that attached hereto as Exhibit 6, the collateral agent

3  will transmit mortgage related collateral held by it as

4  directed by the borrowers as follows."

5  Q    And then can you continue reading subparagraph 1?

6  A    If the transmittal is of documentation for mortgage

7  related collateral in the possession of the collateral agent in

8  connection with the sale thereof to a permanent investor, as

9  the collateral agent is notified by the applicable borrower in

10 writing, such transmittal will be under cover of a transmittal

11 letter and a form of that attached hereto as Exhibit 7A."

12 Q    Before we turn to Exhibit 7A, could you also read in that

13 same 6B section on the next page, there's a subparagraph 3,

14 could you read what that says?

15 A    Sure.  "If the transmittal is of documentation for

16 mortgage related collateral in the possession of the collateral

17 agent in connection with the shipment to another financier to

18 be included as collateral under another financing as the

19 applicable borrower shall notify the collateral agent in

20 writing, such transmittal will be under cover of a transmittal

21 letter in the form of that attached hereto as Exhibit 7E."

22 Q    Okay.  And then let's turn forward in the security

23 agreement, the last page, I think, is 17, and there's a

24 signature pages, and then if you keep turning I think you'll

25 come to Exhibit 7A.  Do you see that?

1  A    Yes, sir.

2  Q    And that's a form of transmittal letter.  Is that correct?

3  A    Yes, sir.

4  Q    Okay.  And then, if you keep turning you'll come to

5  Exhibit 7E.  Do you see that?

6  A    Yes, sir.

7  Q    And what's the heading of 7E?

8  A    Form of transmittal letter to take out lender.

9  Q    Okay.

10 A    And there's a parenthetical that says take out lender.

11 Q    Now, the form of Exhibit 7A in Exhibit 23 in Evidence, how

12 does that compare, if you could, to the transmittal letter we

13 were looking at previously in Exhibit 31?

14 A    Obviously the dates are filled in.  The approved

15 institution is filled in.  The dollar amount is filled in.  The

16 wire instructions are filled in.  But otherwise they are the

17 same.

18 Q    And in Exhibit 31 are there additional instances of this

19 type of transmittal letter marked as Exhibit 7A in connection

20 with the transfer of loans to Credit Suisse?

21 A    Yes, sir.  There are many.

22 Q    In Exhibit 31 are there any examples of the form of

23 transmittal letter that's Exhibit 7E that we were looking at in

24 Exhibit 23 in Evidence?

25 A    No.

1  Q    Okay.  I think we're done with Exhibit 31 for the moment.

2  I'd like to go to --

3            THE COURT:  Mr. Comet, let's -- if it's all right

4  with you, would this be an appropriate time to take a brief

5  recess?

6            MR. COMET:  That's fine, Your Honor.

7            THE COURT:  All right.  Let's take, say, a five-

8  minute recess.

9            MR. COMET:  Thank you.

10                      (Recess)

11           THE CLERK:  All rise.

12           THE COURT:  Please be seated.

13           MR. COMET:  May I continue, Your Honor?

14           THE COURT:  Yes, you may.  Thank you.

15                 CONTINUED DIRECT EXAMINATION

16  BY MR. COMET:

17  Q    If you could look, Mr. Kaiserman, at Exhibit 1 in the

18  first binder?  That's the mortgage repurchase agreement that's

19  in Evidence.  If you could turn, in that agreement, to Page 57?

20           THE COURT:  57?

21           MR. COMET:  57.  Yes, Your Honor.  Section 18 on Page

22  57.

23  Q    Do you see that, Mr. Kaiserman?

24  A    I do.

25  Q    Okay.  That -- Section 18 on Page 57, Exhibit 1, is headed
                    **J&J COURT TRANSCRIBERS, INC.**

1  repurchase transactions.  Could you read the first sentence of

2  that section?

3  A    Certainly.  "Buyer may, in its sole election, engage in

4  repurchase transactions with purchased assets, or otherwise

5  pledge, hypothecate, assign, transfer, or otherwise convey the

6  purchased assets with a counterparty of buyer's choice."

7  Q    Did CSFB exercise its rights under the sentence you just

8  read in connection with the loans that it purchased from

9  American Home Mortgage?

10 A    Yes, sir.  We did.

11 Q    And how did CSFB do that?

12 A    CSFB, upon entering into repurchase transactions with

13 American Home under this agreement, entered into repurchase

14 transactions itself with Credit Suisse, the Cayman Branch, or

15 Credit Suisse, the Nassau Branch, which is an affiliate of

16 CSFB, and it's a division of the Swiss Bank.

17 Q    are those Cayman and Nassau branches you mentioned, are

18 those different legal entities from CSFB?

19 A    Yes, sir.  They are.

20 Q    Now, has CSFB done the same thing with other mortgage

21 loans that it's purchased under mortgage repurchase agreements

22 with other parties?

23 A    Yes, sir.  We have.  As an ordinary course all of the

24 loans that we purchase under master repurchase agreements are

25 themselves included in repurchase transactions with the two

1 entities I referred to a moment ago.

2 Q    And what do those two entities do with the mortgages, in

3 your understanding?

4 A    They also engage in repurchase transactions with other

5 affiliates, and eventually the loans get to our parent company

6 in Zurich, the Credit Suisse Group.

7 Q    And why does CSFB engage in those repurchase transactions

8 with affiliates, using the mortgage loans it's purchased from

9 counterparties under mortgage repurchase agreements?

10          MR. CROWTHER:  Objection to competence, outside of

11 the entities he is employed by.

12          MR. COMET:  I asked him why CSFB does it, Your Honor.

13          THE COURT:  What's the -- why -- and by CSFB you mean

14 --

15          MR. COMET:  Just Credit Suisse First Boston Mortgage

16 Capital --

17          THE COURT:  Right.

18          MR. COMET:  -- the party in this case.

19          THE COURT:  All right.  So, what was the question

20 again?  Why does CSFB engage in these repurchase transactions?

21          MR. COMET:  Yes.

22          THE COURT:  With its affiliates?  All right.

23 Objection overruled.

24 A    CSFB engages in these transactions with its affiliates to

25 raise short-term capital so that it can continue to engage in

**J&J COURT TRANSCRIBERS, INC.**

1 repurchase transactions similar to the one with American Home.

2 Q    When you say short-term capital, you mean it acquires

3 funds, money that it can use for the transactions?

4 A    Through the repurchase arrangements with the Cayman or the

5 Nassau branch of Credit Suisse, it receives funds.  It, in

6 turn, uses those funds to enter into additional repurchase

7 transactions with perhaps American Home or other entities.  It

8 replenishes its cash.

9 Q    I think I just have one further question that I forgot to

10 ask earlier, which is, Mr. Kaiserman, you testified previously

11 that in your understanding all the repurchase transactions

12 under this mortgage repurchase agreement, that's Exhibit 1, had

13 to be completed by August 15th of 2007.  What, in your

14 understanding, would occur under the agreement if we had

15 reached August 15th, 2007, without an event of default, and

16 prior to that, and American Home failed to make repurchases of

17 some of the loans?

18         MR. CROWTHER:  Objection.  Calls for a legal

19 conclusion.

20         MR. COMET:  I'm asking for his understanding of how

21 the agreement works, Your Honor.

22         THE COURT:  I'll allow the question.  Objection

23 overruled.

24 A    If there were transactions outstanding on August 15th,

25 2007, that would constitute a repurchase date which is the date

Kaiserman - Cross/Crowther                    123

1 on which American Home is required to repurchase all of the

2 then outstanding transactions.  If they failed to do that, it

3 would constitute an event of default, giving us the right to

4 exercise our remedies described in the agreement, which would

5 be to sell the mortgage loans ourselves on a released or

6 retained basis.

7            MR. COMET:  I have no further questions at this time,

8 Your Honor.

9            THE COURT:  All right.  Cross?

10                      CROSS EXAMINATION

11 BY MR. CROWTHER:

12 Q    Sir, can I ask you to turn to CSFB Exhibit 1, please?

13 A    Sure.

14 Q    Can you tell us what your role was in the negotiation of

15 that document?

16 A    Sure.  As a starting matter, this agreement was prepared

17 on a form that I was involved in the preparation for

18 establishing this business.  As to this specific agreement,

19 consistent with existing CSFB policy, the primary person to

20 handle the day-to-day negotiations was one of my colleagues.

21 Consistent with those instructions, in the event that material

22 changes were requested by any of the parties, this primary

23 person was to bring them to our -- my attention.  In this

24 agreement there were no examples where material changes were

25 requested that I was asked to weigh in on the requested change.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Is that a long way of saying that you weren't involved at

2  all in the negotiation of that agreement?

3  A    No.  I was involved through the people that work with me.

4  Q    What was your personal involvement, sir?

5  A    I'm a senior manager for the business.  The people

6  empowered with the day-to-day negotiations are given limited

7  authority to make changes.  And if they were asked to make

8  changes beyond their authority they were to come to me.  So, I

9  was involved in it in a managerial capacity.

10 Q    How many times did they come to you in the negotiation of

11 Exhibit 1, sir?

12 A    None.

13 Q    So, you made no managerial decisions with respect to

14 Exhibit 1, correct?

15 A    No.  As I mentioned earlier, this is a form that I was

16 involved in the preparation.  I was also involved from a

17 managerial perspective setting forth the maximum authority that

18 those other persons had.  So long as they did not exceed their

19 authority, there was no need to come to me.  I was involved in

20 that capacity.

21 Q    And no one came to you?

22 A    Yes, sir.  That's correct.

23 Q    Is it fair to say, sir, that you had no input into the

24 exact language that's in the contract other than a form?

25 A    Yes, sir.

1  Q    Let me ask you to turn to Plaintiff's 22, CSFB 22.

2  A    Yes, sir.

3  Q    Isn't it true that you had no personal involvement in the

4  negotiation of that document?

5  A    No.

6  Q    Please tell us what your personal involvement in the

7  negotiation of that document was, sir?

8  A    There were changes requested to this agreement along the

9  lines of what we described for Exhibit 1 that were brought to

10  my attention.

11  Q    Please identify what those changes were for us, sir.

12  A    Sure.  Exhibit 9 had other termination provisions, which

13  American Home wanted removed, which were beyond the scope of

14  the authority of the person who works for me and they brought

15  them to my attention to rule on whether or not the changes were

16  acceptable.  In addition, there were other similar changes that

17  were beyond the scope of the authority of the person who was

18  negotiating them that brought them to my attention to rule on

19  the requested change.

20  Q    Please tell us what those were, sir.

21  A    Give me a moment, sir.

22                        (Pause)

23  A    If you look at Section 305 on Page 34 --

24  Q    Go ahead, sir.  What did you do to that provision?

25  A    In our form agreement -- 305 is what's known as early

**J&J COURT TRANSCRIBERS, INC.**

Kaiserman - Cross/Crowther                126

1  payment default, or EPD.  In our form agreement the early

2  payment default provision contemplates that the protection

3  described in that section would apply for three monthly

4  payments.  As you can see, this does not apply to three

5  payments.  The three payments was removed.  It's only a single

6  payment.  And if you give me a moment I can continue to look.

7                         (Pause)

8  A    If you look at Section 303, beginning on Page 32, in our

9  form agreement there's a provision called a knowledge clawback,

10  the purchase of which is to negate the knowledge qualifiers in

11  Sections 302.  What I mean by that is there are some reps and

12  warrants in Section 302 that might say to the best of the

13  seller's knowledge, so on, so forth.  In Section 303 of our

14  form agreement there's a provision called a knowledge clawback,

15  which says notwithstanding any lack of knowledge on the part of

16  the seller, if the statement is untrue, without regard to

17  knowledge, they are still required to repurchase the related

18  loans.  As you can see, that provision appears to have been

19  removed, as well.  That was one such comment that I was asked

20  to weigh in on.  And if you'll give me a moment?

21                         (Pause)

22  A    If you look at, again, Section 303, the first paragraph,

23  which carries over to Page 33, the last full sentence, it talks

24  about a representation or warranty in Section 301, which if

25  breached, in our form agreement, if there's a breach of any of

**J&J COURT TRANSCRIBERS, INC.**

1 the representations and warranties in Section 301, the seller

2 is required to repurchase all of the mortgage loans.  As you'll

3 note, it says if there is a breach of Section 301, the seller

4 is required to repurchase all mortgage loans directly affected

5 by such breach.  That's another change that I was asked to

6 weigh in on.  And if you'll give me a moment?

7                         (Pause)

8 A    If you look at Section 207 on Page 16, this is the section

9 dealing with the delivery of the mortgage loan documents.  In

10 our form agreement we asked that the documents be delivered to

11 us four days before the closing date so that we have time to

12 review and check them in.  American Home asked that it be

13 reduced from four to three.  I was asked to weigh in on that

14 change.  In that same section, the first full paragraph, carry

15 over to 17, final sentence, there's two changes there that I

16 was involved in.  The first is the insertion of the word

17 commercially, where it says the seller shall use commercially

18 reasonable.  Our form agreement does not have the word

19 commercially.  And the time frame of 120 days in the final line

20 was extended.

21      If you turn to Page 12, in the definition of repurchase

22 price, Romanette 3, which is one, two, three, four, five lines

23 up from the end of the definition, mid-page -- I'm sorry --

24 mid-way across the page, left to right, it begins plus

25 Romanette 3.  The language after the semi-colon, less amounts

1 received or advanced in respect of such repurchased mortgage

2 loan which are being held in the custodial account for

3 distribution in the month of repurchase.  That language was

4 added and I was asked to weigh in on that.  I'm sure there are

5 others, but those are the main ones that I recall, sir.

6 Q    So, sitting here today in Court, you're not aware of any

7 others that you weighed in on?

8 A    I'm sure if I went through page by page, I would recall

9 others.

10 Q    Let's turn to Exhibit 27.  Did you weigh in on any of the

11 financial or economic terms set forth in Exhibit 27?

12 A    Like the master repurchase agreement in Exhibit 1, the

13 pricing side letter is on a form that I was involved in.  The

14 people charged with the day-to-day negotiation and execution

15 are given parameters within which to operate.  No issues were

16 brought to my attention.

17 Q    So, you were not personally involved in any of the

18 information that's on that side letter, correct?

19 A    Yes, sir.

20 Q    You testified about your due diligence review of your

21 customers.  Is that standard operating procedure for CSFB?

22 A    It's standard operating procedure for not only CSFB, but

23 also for DLJ Mortgage Capital.  Yes, sir.

24         MR. CROWTHER:  Your Honor, may I approach the

25 witness?

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes.

2          THE WITNESS:  Thank you.

3          MR. CROWTHER:  May I approach, Your Honor, with a

4   binder?

5          THE COURT:  Yes.

6   Q    Sir, if may I ask you to turn to Tab 6 in the binder I

7   just handed to you?

8   A    Yes, sir.

9   Q    Is this the due diligence process you're referring to?

10  A    If I might have a moment to just review it?

11  Q    Absolutely.

12  A    Thank you.

13                          (Pause)

14  A    Thank you.  I've reviewed it.  It is the due diligence

15  process that I referred to earlier for CSFB.

16         MR. CROWTHER:  Your Honor, I ask that this be

17  admitted into Evidence as Defendant's 6, the reason being it's

18  already pre-marked as Defendant's 6.

19         THE COURT:  Mr. Comet?

20         MR. COMET:  No objection.

21         THE COURT:  It's admitted without objection.

22  Q    You testified, sir, about looking at -- and you said it

23  two different ways, approximately and at least 50 repo

24  agreements.  Do you recall that testimony?

25  A    I do.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Now, were those 50 different repo agreements involving

2  completely different parties?

3  A    No.  They would be 50 agreements in total, spread across

4  multiple customers.  Some agreements would apply to the same

5  customer, so they might have two repurchase agreements with two

6  different repo banks.

7  Q    Can you identify for us which repo banks the agreements

8  you looked at?

9  A    It would be multiple banks, including Lehman Brothers or

10  its equivalent of CSFB, Deutsche Bank, Barclay's, Merrill

11  Lynch, Bear Stearns -- again, all the equivalents, that's not

12  the legal entity, that's their parent company's name --

13  Washington Mutual, ABN AMRO, Calyon, Greenwich, Goldman Sachs.

14  Those are the main ones, sir.

15  Q    Is that all of the entities that are involved in repo

16  purchases, sir?

17          MR. COMET:  Objection, Your Honor.  Is this limited

18  to the mortgage repurchase agreements, or all repurchase

19  agreements?

20          MR. CROWTHER:  We'll limit it to mortgage

21  repurchases, Your Honor.

22  A    No, sir.  It's not all.

23  Q    And why did you exclude some of the entities that are

24  involved in mortgage repurchases from your review?

25          MR. COMET:  Objection, Your Honor.  There's no

**J&J COURT TRANSCRIBERS, INC.**

Kaiserman - Cross/Crowther                    131

1 foundation for the notion that Mr. Kaiserman excluded anything.

2 He testified to those he happened to review.  I don't

3 understand the premise of your question about exclusion.

4          THE COURT:  Overruled.

5 A    I didn't mention the other institutions that may engage in

6 repo financing for mortgage loans because I didn't review their

7 agreements.

8 Q    Why didn't you review their agreements, sir?

9 A    My day-to-day activities never caused me to do so.

10 Q    Do you know if American Home Mortgage Servicing is in the

11 business of selling mortgage loans?

12 A    No, sir.  I don't.

13 Q    Would it surprise you if they weren't?

14 A    No, sir.  It wouldn't.

15 Q    Why do you list American Home Mortgage Servicing, Inc. as

16 a seller in your repurchase agreement?

17 A    American Home asked us to.

18 Q    Is that the only reason, sir?

19 A    Yes.

20 Q    Has CSFB ever, in the entire history of its relationship

21 with AHM, ever tried to sell one of the mortgages and the

22 mortgage repo agreements to any unrelated third party?

23 A    No.

24 Q    It's never even attempted to do that?

25 A    No.

1  Q    Do you have a position with the Cayman Islands and Bermuda

2  CSFB entities?

3  A    No, sir.

4  Q    Is it fair to say that whatever CSFB desires to happen

5  with those mortgages it can direct the Cayman Branch or the

6  Nassau Branch to return those mortgages?

7  A    Could you repeat the question?

8  Q    Sure.  Is it fair to say that at any time CSFB could

9  direct the Cayman Branch or the Nassau Branch to return the

10  mortgage loans at any time?

11  A    I'm answering your question in the context of a repurchase

12  transaction that we may have engaged in with either of those

13  two entities by CSFB.  When we enter into those transactions we

14  do so on an overnight basis, and so, it really has no

15  application given the question you've asked me.  We enter into

16  it with the understanding that it's an overnight basis, and

17  that the repo transaction would end on the following day.

18  Q    Is it essentially a sweep of transaction which are turned

19  automatically the next day?

20  A    Can you define sweep?

21  Q    Do you have any involvement with sweep accounts, sir?

22  A    No, sir.

23  Q    In your business in mortgage repos you've never dealt with

24  a sweep account before?

25  A    No, sir.  I'm sorry.  Was that a question?

**J&J COURT TRANSCRIBERS, INC.**

1 Q    Yes.

2 A    I thought you said something.  I couldn't hear.

3         MR. COMET:  I think he's -- it's just the noise of

4 the mike, Your Honor.

5         THE WITNESS:  Oh.  Okay.

6         MR. CROWTHER:  Probably a little feedback, sir.  I

7 apologize.

8         THE WITNESS:  No problem.

9 Q    Earlier you testified that you reviewed Bear Stearns, and

10 you used that as the mortgage along with Bear Stearns, form

11 repo agreement.  Were you aware if the Bear Stearns form repo

12 allowed substitute mortgage collateral?

13 A    I was not aware.

14 Q    Are you aware if it does not allow substitute mortgage

15 collateral?

16 A    Can you restate the question?

17 Q    Sure.  I asked you first whether you're aware if it does

18 allow substituted collateral.

19 A    Correct.

20 Q    I'm now asking you whether you're aware if it does not

21 allow substituted collateral.

22 A    Yes.  My recollection was it does not allow substitution.

23         MR. CROWTHER:  May I have a moment, Your Honor?

24         THE COURT:  Yes.

25                         (Pause)

                    **J&J COURT TRANSCRIBERS, INC.**

Kaiserman - Cross/Crowther                    134

1           MR. CROWTHER:  May I approach the witness, Your

2   Honor?

3           THE COURT:  Yes.

4           THE WITNESS:  Thank you.

5           MR. CROWTHER:  May I approach the bench, Your Honor?

6           THE COURT:  Yes.  Thank you.

7   Q    Sir, could you tell us what this agreement purports to be?

8   A    The title of it is whole loan master repurchase agreement,

9   and it's dated June 23rd, 2004, and it's between Bear Stearns

10  Mortgage Capital Corporation, and American Home Mortgage

11  Acceptance, Inc.  I have not read it.  I can't tell you what it

12  appears to be, but if you give me a moment, I can look at it.

13  Q    You're welcome to look at it, sir.

14                        (Pause)

15          THE COURT:  I'm not going to sit here while this

16  gentleman reads a 35 page document, so I don't know --

17          MR. CROWTHER:  I'd be more than happy to direct him

18  to the provisions, Your Honor.

19          THE COURT:  Let's move this along.  Okay?

20  Q    If you'd turn to Page 3, Subsection D, replacement

21  mortgage loans.  Do you see that?

22  A    I do.

23  Q    Can you please read that for the record?

24  A    I'm sorry.  One more time.  Which section?

25  Q    Sure.  It's Page 3 --

**J&J COURT TRANSCRIBERS, INC.**

1    A    Yes.

2    Q    -- and it's caption is V.

3    A    Yes.

4    Q    Can you read that into the record, please?

5    A    Sure.  It says, "Replacement mortgage loans, the meaning

6    specified in Paragraph 11E, Roman III hereof."

7    Q    Actually, it says, "I, I, correct?  Not three.

8    A    I'm sorry.  Roman II.  Yes.  Thank you.

9    Q    I'd ask you to turn to Page 10, which is Section 11E, II.

10   A    Yes.

11   Q    Can you please into the record what E, Subsection II says?

12   A    Sure.  "As to transactions in which the defaulting party

13   is buyer, A, purchased mortgage loans, replacement mortgage

14   loans, having substantially the same features, including

15   outstanding principal amount, maturity, and fixed and/or

16   adjustable interest rate as any purchased mortgage loans that

17   are not transferred by buyer to seller as required hereunder,

18   or, B, in its sole discretion elect in lieu of repurchasing

19   replacement mortgage loans to be deemed to have --" I'm sorry,

20   "-- to be deemed to have purchased replacement mortgage loans

21   at the price therefore on such date, calculated as the average

22   of the prices obtained from three nationally recognized

23   registered broker dealers that buy and sell comparable mortgage

24   loans in the secondary market."

25   Q    Would it be fair to say, sir, that under this repo

**J&J COURT TRANSCRIBERS, INC.**

Kaiserman - Cross/Crowther                     136

1  agreement with Bear Stearns there are circumstances where the

2  exact mortgage loans do not have to be returned?

3          MR. COMET:  Objection, Your Honor.  It calls for a

4  legal interpretation of the document, and mis-states the

5  document, as well.

6          THE COURT:  Mr. Crowther?

7          MR. CROWTHER:  I'll withdraw the question, Your

8  Honor.

9          THE COURT:  All right.

10 Q    I'm going to ask you to turn to Paragraph 9, sir.  That's

11 on Page 6.

12 A    Yes, sir.

13 Q    Could you please read the first sentence of that

14 provision?

15 A    Sure.  "Seller may, subject to agreement with acceptance

16 by and upon notice to buyer, substitute loans substantially

17 similar to the purchased loans for any purchased loans."

18 Q    I thought there would be a crisis if the exact same loans

19 didn't go every which way in the transaction?

20         MR. COMET:  Objection, Your Honor.  Argumentative.

21 Not in the form of a question.  And --

22         THE COURT:  Sustained.  There's no question -- well,

23 he hasn't asked a -- that's not a question, so -- objection is

24 sustained.  Mr. Crowther, you can rephrase.

25         MR. CROWTHER:  Certainly.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    Didn't you testify earlier, sir, that it was required that

2 the mortgages going both ways be identical because it would

3 essentially cause a crisis if they were not?

4         MR. COMET:  Objection, Your Honor.  He's asking about

5 a different type of transaction than what this paragraph refers

6 to, and he has to lay the foundation for -- in other words,

7 he's asking Mr. Kaiserman about testimony Mr. Kaiserman gave

8 that didn't refer to the type of transaction that's referenced

9 in the paragraph in this Bear Stearns agreement that he's

10 asking about.

11        THE COURT:  Overruled.  If you want to get into that

12 on redirect, you can, but I think it's a proper question.

13 A    I think what I said was if the mortgage originator

14 attempted to deliver to the takeout purchaser loans that the

15 take out purchaser wasn't expecting to purchase, they would

16 likely not agree, sight unseen, to purchase them, and I think

17 what I said was that the whole process would start again.  I

18 don't think I used the term crisis, but perhaps I did.

19 Q    So, it is possible that different mortgage loans could be

20 substituted?

21 A    In which leg of that transaction?

22 Q    In either leg, sir.

23 A    Well, this agreement seems to speak to between the repo

24 bank and the mortgage originator, and so, in this instance it's

25 possible, it clearly contemplates it.

1 Q    Isn't it also possible that in the repurchase transaction

2 it is at least possible that substituted mortgage loans could

3 be repurchased?

4 A    I think I just answered that.  What I said was in the

5 context of that diagram this Paragraph 9 talks about the

6 mortgage originator and the repo bank, and the repo bank

7 repurchasing from the mortgage originator different loans.  And

8 I think I've said this agreement clearly contemplates that.

9 Q    When you say that diagram, you're referring to the diagram

10 of typical transactions, Stage 2?

11 A    Yes, sir.

12 Q    But, sir, I asked you whether it was possible in a

13 repurchase transaction.  I'm not asking you in this transaction

14 that you're looking at in front of you.  I'm asking you in a

15 repurchase transaction is it possible to substitute the

16 mortgage loans?

17 A    Bear Stearns did it.

18         MR. CROWTHER:  No further questions, Your Honor.

19         THE COURT:  Redirect?

20         MR. COMET:  Yes, sir.  Has this Bear Stearns

21 agreement been identified for the record with an exhibit

22 number, Your Honor?

23         THE COURT:  I do not believe so.

24         MR. COMET:  Okay.  I think it may be the same as what

25 we have as Exhibit 64, but let me ask about it.

**J&J COURT TRANSCRIBERS, INC.**

1                    REDIRECT EXAMINATION

2  BY MR. COMET:

3  Q    Could you look, Mr. Kaiserman, at Paragraph 8 in the Bear

4  Stearns agreement?

5  A    Yes, sir.

6            THE COURT:  Let's -- for clarity of the record, let's

7  mark this as something.  I don't particularly care what, but --

8            MR. CROWTHER:  I think it would be appropriate to

9  mark it as AHM -- I think we're up to 102.  We're already

10 marked as -- we can mark another document as -- I'm sorry.

11 AHM-101, if we keep consistent with Your Honor's extra

12 exhibits.

13           THE COURT:  All right.  We'll call it AHM-101 for

14 purposes of Identification.

15 Q    Okay.  Mr. Kaiserman, in the Bear Stearns agreement that's

16 been marked as AHM-101, Paragraph 8, could you read the second

17 sentence of that paragraph?

18 A    Certainly.  It says, "Ownership of all purchased mortgage

19 loans shall pass to buyer, and nothing in this agreement shall

20 preclude buyer from engaging in repurchase transactions with

21 the --" sorry "-- with the purchased mortgage loans or

22 otherwise pledging or hypothecating the purchased mortgage

23 loans, but no such transactions shall relieve buyer of its

24 obligations to resell and transfer purchased mortgage loans to

25 seller pursuant to the terms hereof."

Kaiserman - Redirect/Comet                    140

Q    Okay.  And if you'll just hold that for a moment, and I'd

like  you to turn back in Plaintiff's Exhibit 1, the mortgage

repurchase agreement between CSFB and American Home, to Page

57, Paragraph 18, that you were looking at previously.  Okay.

And you already read the first sentence of that into the

record, the sentence that refers to buyer being able to engage

in pledges, hypothecations and assignments.  Could you read the

first part of the next sentence?

A    Sure.  It says, "Unless an event of default shall have

occurred, no such transaction shall relieve buyer of its

obligation to transfer purchased assets to seller pursuant to

Section 4 hereof."

Q    That's sufficient.  That's the part I wanted.  Now, if you

look in the Bear Stearns agreement, AHM Exhibit 101, at Page 3,

Paragraph U, you'll see that has a definition for purchased

mortgage loans?

A    Yes, sir.

Q    Defining them as the mortgage loans sold by seller to

buyer in the transaction hereunder, and any mortgage loans

substituted therefore in accordance with Paragraph 9.  Do you

see that?

A    Yes, sir.

Q    So, which party has the right to substitute mortgage loans

under this Bear Stearns agreement in your understanding,

looking back at Paragraph 9, as well?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Sure.

2                        (Pause)

3  A    It says it's the seller.

4  Q    Okay.  I'd like you to look at stage one chart that we

5  looked at before.  That's the mortgage origination chart

6  showing the first leg of a repurchase transaction.  Now, it's

7  your understanding the substitution that's contemplated in the

8  Bear Stearns agreement, does that take place --

9        THE COURT:  You're going to -- can you get the mike

10 for Mr. Comet?  Otherwise we lose you in the -- it's okay.  You

11 can do it.  She's got a hand-held mike.  Otherwise we lose you

12 on the tape.  It's your chance to be a game show host.

13                      (Laughter)

14 Q    Mr. Kaiserman, the substitution described in the Bear

15 Stearns agreement, in your understanding does that take place

16 in the stage here during the repurchase by the originator from

17 the repo bank, or does that take place in stage one, when the

18 originator is transferring the mortgage to the repo bank?

19 A    I think it's stage one.

20 Q    Now, typically, in the situation in which an originator is

21 transferring a loan to the repurchase bank, does the repurchase

22 bank do the same level of due diligence regarding the purchase

23 of those loans that occurs when the take out purchaser buys

24 loans in the stage two transaction?

25 A    No, sir.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    What's the difference?

2  A    The difference is there is a cursory review to ensure that

3  it's eligible under the repurchase agreement for a transaction,

4  otherwise it is priced along the lines of what we discussed

5  earlier, to determine a market value, and assuming the parties

6  agree with the market value the loans are entered into the

7  repurchase arrangement.

8  Q    You mentioned, Mr. Kaiserman, that one of your colleagues

9  had the primary responsibility for negotiating the mortgage

10 repurchase agreement between CSFB and American Home.  Who is

11 that person?

12 A    Randall Shy.

13 Q    Is he still working for Credit Suisse?

14 A    No, sir.

15 Q    Just one more question, I think.  If you can look in the

16 binder, Mr. Kaiserman, that the debtors' exhibits -- at Exhibit

17 6.  That's the exhibit Mr. Crowther -- is that right --

18        MR. CROWTHER:  Yes.  Thanks.

19 Q    -- asked you to look at.  I just wanted you to look at one

20 item in there.  Okay.  If you look at the third page of the

21 exhibit it has a number in the lower right of 17-4.  Do you see

22 that?

23 A    Yes, sir.

24 Q    Okay.  That's Section 17.2, diligence and credit review.

25 Do you see that?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes, sir.

2  Q    Okay.  And there's a sentence there in the second full

3  paragraph which says, "The overall objective in the Credit

4  Suisse Mortgage Finance Group's due diligence is to evaluate

5  the level of risk associated in doing business with a

6  prospective customer and their ability to operate in accordance

7  with the Credit Suisse Mortgage Finance Group's lending

8  philosophy."  In that sentence what do you understand the

9  reference to lending philosophy to refer to?

10 A    Sure.  Lending philosophy refers to the mortgage

11 originator's view on the loans that it makes and its lending

12 philosophy when it extends loans to individual borrowers.  They

13 want to make sure, CSFB, that is, wants to make sure that the

14 loans mortgage originators originate are loans that make sense,

15 that are reasonable, that give the borrower some benefit, and

16 that are otherwise prudently underwritten.

17          MR. COMET:  Thank you.  I have no further questions.

18          THE COURT:  You may step down, sir.

19          MR. CROWTHER:  No further questions, Your Honor.

20          THE WITNESS:  Leave all this there?

21          THE COURT:  Yes.  Leave it there.  That was -- you

22 had just the one witness, correct?

23          MR. COMET:  Just the one witness, Your Honor.  The

24 only other thing we have is that --

25          THE COURT:  You need to be at the mike, Mr. Comet.

**J&J COURT TRANSCRIBERS, INC.**

1  I'm sorry.

2          MR. COMET:  My fault, Your Honor.

3          THE COURT:  That's okay.

4          MR. COMET:  Exhibits 38 through 64 in our exhibit

5  list, Your Honor, are not in the binders.  They are a group of

6  contracts, some of them I think from 57 to 64, are American

7  Home Mortgage repurchase agreements with other parties,

8  including number 64, which is the one with Bear Stearns.  The

9  ones from 37 to 56 are ones that we obtained from public

10 filings with the SEC.  And we've discussed with the debtors, I

11 don't believe they have any objection on authenticity to any of

12 these documents, and I'd like to move them in Evidence.  I can

13 -- I don't know if there's a relevancy objection.  If there is

14 I can address that.

15         THE COURT:  Hold on.  Let's hear if there's an

16 objection.

17         MR. CROWTHER:  There is a relevancy objection, Your

18 Honor.  There's no foundation as to what the basis of relevancy

19 these documents would be.  There's no basis of or foundation

20 that these were representative of the market.  In fact, just

21 the contrary.  The witness testified that he did not canvas the

22 entire market, and only part of the market.  And he, in fact,

23 excluded, whether inadvertently, unintentionally, or

24 intentionally, part of the market.  So, we don't believe

25 there's any evidentiary foundation for these agreements.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. COMET:  First, Your Honor, there's no connection

2  to Mr. Kaiserman's testimony.  Mr. Kaiserman testified about

3  the agreements he reviewed in the ordinary course of his

4  business, so he didn't exercise any exclusion or non-exclusion.

5  He testified about those agreements.  These agreements are the

6  ones that are publicly available on the SEC web site.  They are

7  being offered, Your Honor, as many examples of mortgage

8  repurchase agreements that help -- I -- we're not going to

9  represent they're conclusive of everything in the market.  They

10 certainly aren't.  But they are many examples of what is in the

11 market.  They all are inconsistent with American Home's

12 representation that somehow the global BMA form agreement

13 defines what's representative in the market.

14          THE COURT:  What fact that is of consequence to the

15 determination at issue do they help establish?

16          MR. COMET:  What we've done, Your Honor, is we've

17 prepared charts, and I don't intend -- I don't want to offer

18 the charts into Evidence because they are, in a sense, I

19 suppose, argument, or they're simply -- they're intended to

20 assist the Court in directing Your Honor to the provisions of

21 these agreements, 38 to 64, that relate to the items identified

22 in American Home's counter claim as Items in the CSFB agreement

23 that purportedly make it not a repurchase agreement and make it

24 a secured financing.  So, for example, in Paragraph 9B of

25 American Home's counter claim, they say that one of the things

1 that make the CSFB agreement not a mortgage repurchase

2 agreement is that the buyer has to return the same mortgage

3 loans, not replacement loans that are similar.  So, the way

4 this chart works, Your Honor, it lists that paragraph from the

5 counter claim, it lists the CSFB agreement as saying yes,

6 that's true in the CSFB agreement, and then it compares the

7 other agreements with references to sections in them to show

8 whether they contain the same type of provision or not.  We've

9 done that for a series of paragraphs from American Home's

10 counter claim.  So, this would point Your Honor to the facts as

11 to which these are material to show the market, or what, you

12 know, some significant part of the market from major

13 participants, and, of course, in the last group, American

14 Home's own agreements, to show that the same provisions, in

15 most instances, there are some exceptions which we've noted,

16 but the same provisions in most instances are found in all of

17 these agreements.

18          THE COURT:  All right.  Okay.  Mr. Crowther?

19          MR. CROWTHER:  I think the key to the objection is

20 just what counsel said.  He's purporting to demonstrate the

21 market, but he clearly hasn't canvassed the entire market.

22 He's cherry picked agreements and wishes to offer them into

23 Evidence to establish something there's absolutely zero

24 foundation for, and that is the agreements that were cherry

25 picked evidence a market.  They evidence individual agreements,

1 but they do not evidence a market.  Evidence of other

2 individual agreements are not relevant or probative to this

3 dispute.  Evidence of a market may very well be, but counsel

4 does not present those documents with any foundation that

5 they're representative of a market, nor does he actually create

6 a foundation that they're representative of a market -- of the

7 kinds of mortgages that AHM was entering into agreements with

8 CSFB --

9          THE COURT:  Well, I -- okay.  I don't think his point

10 rises or falls on whether he's demonstrating a market or not.

11 I think it's some evidence that there are agreements out there

12 that may or may not contain provisions that the debtors have

13 taken the position are critical to determining whether

14 something is a true repo.  So, I think it's relevant.  I think

15 whether or not it represents a cherry picked snapshot of the

16 types of agreements that support or don't support his position

17 as opposed to a true market snap shot is an issue that goes to

18 weight, and I'll allow you a lot of latitude on argument in

19 connection with briefing, as well as in your case, to the

20 extent you wish to address those issues.  So, I'll overrule the

21 objection and admit the documents into Evidence.

22          MR. COMET:  Thank you, Your Honor.  Judge, if I could

23 add one thing for the record, I think Mr. Crowther never asked

24 us how we obtained these, and he's just assumed they're cherry

25 picked.  The actual process was we download -- we went into --

1          THE COURT:  Well, now you're testifying.

2          MR. COMET:  Okay.

3          THE COURT:  And I don't want to hear that.

4          MR. COMET:  I'll stop.  But I --

5          THE COURT:  Again, you've already won.

6          MR. COMET:  I understand.  I object to the assertion

7   that these were cherry picked.  It lacks any foundation, Your

8   Honor, or knowledge, and it's not true.

9          THE COURT:  Well, it's not evidence.  It's argument.

10  So -- c'est la vie.

11         MR. COMET:  So, we have two boxes, Your Honor, with

12  the exhibits.  We'll put them wherever you would like them to

13  be put.

14                         (Laughter)

15         THE COURT:  Really?

16         MR. COMET:  Maybe I should take that back.

17                         (Laughter)

18         MR. COMET:  We will put them in an appropriate place.

19         THE COURT:  You're getting deeper.  Just bring it

20  over here.

21                         (Laughter)

22         MR. COMET:  One box with two sets.

23                          (Pause)

24         MR. COMET:  And then, Your Honor, if I could submit

25  to the Court just two sets of the charts that go with the

1 exhibits?

2          THE COURT:  Yes.

3          MR. CROWTHER:  Your Honor, there was actually no

4 objection to the charts.  The charts reference provisions of

5 the agreements upon which copies we have obtained from counsel.

6 Those pages are all missing.  And we've responded that there

7 were pages missing from the agreements provided that are now

8 presented to Your Honor admitted into Evidence.  So, the chart,

9 as it stands now, cites to provisions that are not in Evidence

10 with Your Honor from the copies that we have of those

11 documents.

12          MR. COMET:  Your Honor, first of all, we've provided

13 copies of only some of these, otherwise what we did was give

14 counsel links to where all the documents can be accessed in the

15 SEC EDGAR web site, and what is being offered and will be

16 offered to them is exactly what prints out from those web

17 sites.  As far as advising us about pages missing, as I recall

18 there was reference to one document that certain -- a form of

19 letter that is reference in the exhibit was not attached to the

20 document.  It's not attached to what we're submitting to the

21 Court, nor is it relevant to any of the items compared in the

22 chart, so I don't understand counsel's objection.

23          THE COURT:  Let me see the charts.

24          MR. CROWTHER:  At the very least, Your Honor, we'd

25 like the opportunity to cross reference the agreements with the

1  chart.  Now that they're different, as opposed to just

2  providing us links, we now actually have the documents being

3  admitted into Evidence.  I think we're at least entitled to

4  determine whether or not they're complete.

5          THE COURT:  All right.  Well, you can do that over

6  the recess, the overnight recess.  So, I will -- I mean, again,

7  the charts are not evidence.  They are in the nature of

8  argument, or a demonstrative, and I will hold in abeyance --

9  I'll give you a standing objection on the documents I've

10  already admitted into Evidence to reconsider that admission if,

11  upon review of the actual documents you find that they are in

12  important ways incomplete, I'll allow you to raise that issue

13  some time tomorrow, and we can have an argument on it.  And if

14  I find that they're incomplete, or deceptive, or whatever, I'll

15  revoke admission.  So, that objection is held for tomorrow.

16          MR. CROWTHER:  Thank you, Your Honor.

17          MR. COMET:  Thank you, Your Honor.  With that, Your

18  Honor -- oh, well, I was going to say we rest, Your Honor, but

19  we have deposition materials that we've submitted, as discussed

20  yesterday, we're working out getting all the designations in

21  order to submit them to Your Honor.  We actually, I believe,

22  provided counsel already with a mark up to see if they had any

23  problems with it, and hopefully we'll be able to submit

24  something very soon.  But including the deposition

25  designations, that would conclude our case, and CSFB would

1  rest, Your Honor.

2          THE COURT:  Okay.  Then, subject to the ruling in

3  connection with sort of the open objection with the last

4  exhibits admitted and the reservation to supplement the record

5  with the deposition testimony, that will close your case.

6          MR. COMET:  Yes, Your Honor.  I would just add that

7  if we are in advertently missing a page from one of the

8  exhibits and we can retrieve it, we will put it into the

9  exhibit.

10          THE COURT:  Well -- sure.  I understand.

11          MR. COMET:  Thank you.

12          THE COURT:  All rights are reserved in connection

13  with that.  That's as far as we're going to go this evening.

14  Calyon -- it doesn't make any sense to me to start a new

15  witness at 5:07 p.m. when we have a couple days to go.  All

16  right.  So, we're on the schedule for tomorrow at ten.  I can

17  start earlier if you'd like.  I can start as early as nine.  We

18  do have to stop at two for my Chapter 7 calendar, and then I

19  have other matters at three, and at four.  So, we're going to

20  have a bit of an early stop tomorrow.  So, as a result we can

21  start at nine, if the parties would like to do that, or we can

22  start at ten.

23          MR. CROWTHER:  A nine a.m. start is fine with us,

24  Your Honor.

25          THE COURT:  Calyon, is that all right?

**J&J COURT TRANSCRIBERS, INC.**

152

1          UNIDENTIFIED ATTORNEY:  That's fine.

2          THE COURT:  Okay.  We'll reconvene at nine a.m.

3 tomorrow, then.  Thank you.  We're in recess until nine.

4                    * * * * *

## C E R T I F I C A T I O N

          I, TAMMY DeRISI, court approved transcriber, certify
that the foregoing is a correct transcript from the official
electronic sound recording of the proceedings in the above-
entitled matter.


/s/ Tammy DeRisi              Date:  November 13, 2007

TAMMY DeRISI

J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**