# EXHIBIT A

# DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT
## (LIMITED RECOURSE)

**by and among**

**AMERICAN HOME MORTGAGE INVESTMENT CORP.,
AMERICAN HOME MORTGAGE CORP.,
AMERICAN HOME MORTGAGE SERVICING, INC.,
each as a debtor and debtor-in-possession,
as the Borrowers**

**THE LENDERS PARTY HERETO,**

**and**

**and,
AH MORTGAGE ACQUISITION CO., INC.
as Administrative Agent**

**November [   ], 2007**

NYI-4032312v8

DB02:6367667.1

066585.1001

## TABLE OF CONTENTS

Section 1.    Definitions and Accounting Matters ........................................................................ 2
    1.01    Certain Defined Terms ..................................................................................... 2
    1.02    Accounting Terms and Determinations .......................................................... 16
    1.03    Uniform Commercial Code ............................................................................ 16
    1.04    Construction .................................................................................................. 16
    1.05    Conflicts; Purchase Agreement Obligations .................................................. 17
Section 2.    Loans, Evidence of Debt and Prepayments ......................................................... 17
    2.01    Loans ............................................................................................................. 17
    2.02    Evidence of Debt ........................................................................................... 17
    2.03    Procedure for Borrowing .............................................................................. 18
    2.04    Limitation on Types of Loans; Illegality ...................................................... 20
    2.05    Repayment of Loans; Interest ....................................................................... 21
    2.06    Mandatory Prepayment; Reduction of Commitments .................................... 21
    2.07    Optional Prepayments ................................................................................... 22
    2.08    Requirements of Law ..................................................................................... 22
    2.09    Purpose of Loans ........................................................................................... 24
Section 3.    Payments; Computations; Taxes; Fees ................................................................ 24
    3.01    Payments ....................................................................................................... 24
    3.02    Sharing of Payments Etc ................................................................................ 24
    3.03    Apportionment of Payments .......................................................................... 24
    3.04    Computations ................................................................................................. 25
    3.05    Limited Recourse; Remedies ......................................................................... 25
    3.06    U.S. Taxes ..................................................................................................... 26
Section 4.    Collateral Security and Administrative Priority ................................................... 27
    4.01    Collateral; Security Interest .......................................................................... 27
    4.02    Perfection of Security Interests ..................................................................... 28
    4.03    Rights of Lender; Limitations on Lenders' Obligations ................................. 29
    4.04    Covenants of the Borrowers with Respect to Collateral ................................ 29
Section 5.    Conditions Precedent ......................................................................................... 30
    5.01    Conditions Precedent to Initial Loan ............................................................ 30
    5.02    Conditions Precedent to Initial and Subsequent Loans .................................. 30

## TABLE OF CONTENTS
(continued)

Section 6.    Borrowers Representations and Warranties ........................................................ 31

    6.01    Existence; Compliance with Law ........................................................................ 31

    6.02    [Reserved] ............................................................................................................ 31

    6.03    Litigation. There are no actions, suits, arbitrations, investigations or proceedings pending or, to its knowledge, threatened against any Borrower or any Affiliate of any Borrower or affecting any of the property thereof before any Governmental Authority, (i) as to which individually or in the aggregate there is a reasonable likelihood of an adverse decision which would be reasonably likely to have a Material Adverse Effect, or (ii) which questions the validity or enforceability of any of the Loan Documents or any action to be taken in connection with the transactions contemplated hereby or thereby and there is a reasonable likelihood of a materially adverse decision or a Material Adverse Effect ................................... 32

    6.04    No Breach ............................................................................................................ 32

    6.05    Action................................................................................................................... 32

    6.06    Approvals............................................................................................................. 32

    6.07    Margin Regulations.............................................................................................. 32

    6.08    Taxes.................................................................................................................... 32

    6.09    Intellectual Property ............................................................................................ 33

    6.10    Environmental Matters......................................................................................... 33

    6.11    Investment Company Act ..................................................................................... 34

    6.12    No Legal Bar........................................................................................................ 34

    6.13    No Default............................................................................................................ 34

    6.14    Collateral; Collateral Security; Administrative Priority ...................................... 34

    6.15    [Reserved] ............................................................................................................ 34

    6.16    True and Complete Disclosure............................................................................. 34

    6.17    ERISA .................................................................................................................. 35

    6.18    Use of Proceeds................................................................................................... 35

    6.19    Insurance ............................................................................................................. 35

    6.20    No Agent or Lender Licenses .............................................................................. 35

    6.21    [Reserved] ............................................................................................................ 35

    6.22    Orders................................................................................................................... 36

    6.23    REIT Status .......................................................................................................... 36

## TABLE OF CONTENTS
(continued)

| | | | |
|---|---|---|---|
| 6.24 | MERS Membership | | 36 |
| 6.25 | Collection Accounts and Escrow Accounts | | 36 |
| 6.26 | Anti-Terrorism Law Compliance | | 36 |
| Section 7. | Covenants of the Borrowers | | 36 |
| 7.01 | Financial Statements and Other Information | | 36 |
| 7.02 | Litigation | | 37 |
| 7.03 | Existence, Etc | | 37 |
| 7.04 | Prohibition of Fundamental Changes | | 38 |
| 7.05 | [Reserved] | | 38 |
| 7.06 | [Reserved] | | 38 |
| 7.07 | Notices | | 38 |
| 7.08 | Lines of Business | | 39 |
| 7.09 | Transactions with Affiliates | | 39 |
| 7.10 | Use of Proceeds | | 39 |
| 7.11 | Limitation on Liens | | 39 |
| 7.12 | Limitation on Sale of Assets | | 39 |
| 7.13 | Limitation on Distributions | | 40 |
| 7.14 | Restricted Payments | | 40 |
| 7.15 | Loans, Investments, Etc | | 40 |
| 7.16 | Orders; Lien Priority; Payment of Claims | | 40 |
| 7.17 | Maintenance of Collateral; Insurance | | 40 |
| 7.18 | ERISA | | 40 |
| 7.19 | [Reserved] | | 41 |
| 7.20 | MERS | | 41 |
| 7.21 | REIT | | 42 |
| 7.22 | [Reserved] | | 42 |
| Section 8. | Events of Default | | 42 |
| Section 9. | Remedies Upon Default | | 44 |
| Section 10. | Administrative Agent | | 45 |
| 10.01 | Appointment | | 45 |
| 10.02 | Nature of Duties | | 45 |

# TABLE OF CONTENTS
(continued)

10.03  Rights, Exculpation, Etc ........................................................................................ 46

10.04  Reliance ................................................................................................................... 47

10.05  Indemnification ...................................................................................................... 47

10.06  Agent Individually .................................................................................................. 47

10.07  Successor Agent ...................................................................................................... 47

10.08  Collateral Matters ................................................................................................... 48

Section 11.    Miscellaneous ................................................................................................. 49

11.01  Amendments, Etc .................................................................................................... 49

11.02  Waiver ...................................................................................................................... 50

11.03  Notices ..................................................................................................................... 50

11.04  [Reserved] ............................................................................................................... 50

11.05  Amendments ........................................................................................................... 50

11.06  Successors and Assigns ......................................................................................... 50

11.07  [Reserved] ............................................................................................................... 50

11.08  Captions .................................................................................................................. 51

11.09  Counterparts:  Telefacsimile Execution ............................................................... 51

11.10  LOAN AGREEMENT CONSTITUTES SECURITY AGREEMENT: GOVERNING LAW ............................................................................................. 51

11.11  CERTAIN, WAIVERS:  WAIVER OF JURY TRIAL ........................................ 51

11.12  Acknowledgments .................................................................................................. 51

11.13  No Party Deemed Drafter ...................................................................................... 52

11.14  AHMS as Agent for Borrowers ............................................................................ 52

11.15  Assignments:  Participations ................................................................................. 52

11.16  [Reserved] ............................................................................................................... 55

11.17  Entire Agreement ................................................................................................... 55

11.18  Records ................................................................................................................... 55

11.19  Confidentiality ....................................................................................................... 56

11.20  Public Announcements .......................................................................................... 56

11.21  USA Patriot Act ..................................................................................................... 56

# TABLE OF CONTENTS

## SCHEDULES

Schedule A          Lenders and Commitment

## EXHIBITS

Exhibit A     Borrowing Notice

Exhibit B     Sale Order

Exhibit C     Interim Financing Order

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT
## (LIMITED RECOURSE)

THIS DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT (LIMITED RECOURSE) (as amended, restated or otherwise modified from time to time, this "Agreement" or this "Loan Agreement"), dated as of November [ ], 2007, by and among:

(i)    American Home Mortgage Investment Corp., as a debtor and a debtor-in-possession, a Maryland corporation ("AHMIC"), American Home Mortgage Corp., as a debtor and a debtor-in-possession, a New York corporation ("AHMC"), and American Home Mortgage Servicing, Inc., as a debtor and a debtor-in-possession, a Maryland corporation ("AHMS"; together with AHMIC, AHMC, collectively, the "Borrowers" and individually a "Borrower");

(ii)    the Lenders from time to time party hereto, including the initial lenders party hereto as set forth on Schedule A hereto (each individually a "Lender" and, collectively, the "Lenders"); and

(iii)    AH Mortgage Acquisition Co., Inc., a Delaware Corporation ("AHM Acquisition"), as administrative agent for the Lenders (in such capacity, the "Administrative Agent").

### RECITALS

On August 6, 2007 (the "Filing Date"), the Borrowers commenced cases (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and, subject to the Sale Order (defined below) the Borrowers have retained possession of their assets and are authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession.

The Bankruptcy Court has authorized the joint administration of the bankruptcy estate of each Borrower, together with certain other affiliates of the Borrowers.

On September 25, 2007, the Borrowers, as sellers, and AHM Acquisition, as purchaser, entered into the Asset Purchase Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), pursuant to which the Borrowers agreed to sell and AHM Acquisition agreed to buy all of the Purchased Assets (as defined in the Purchase Agreement) and AHM Acquisition agreed to assume all of the Assumed Liabilities (as defined in the Purchase Agreement, all subject to the terms and conditions set forth in the Purchase Agreement and subject to the Sale Order (the transactions contemplated pursuant to the Purchase Agreement and related documents and the Sale Order are collectively referred to herein as the "Transactions").

On October 30, 2007, the Bankruptcy Court entered an order (the "Sale Order"), the form of which is attached hereto as Exhibit B, pursuant to which, among other things, the Bankruptcy Court approved the Transactions.

Subject to the approval of the Bankruptcy Court, the Borrowers, the Lenders and the Administrative Agent wish to enter into an agreement to provide to the Borrowers a debtor-in-possession senior, secured, revolving credit facility of up to $50,000,000 (the "Facility") for working capital needs to the extent permitted pursuant to this Loan Agreement.

The Lenders have agreed, upon the terms and subject to the conditions of this Loan Agreement, to provide such financing to the Borrowers.

Accordingly, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

### Section 1. Definitions and Accounting Matters

1.01    Certain Defined Terms.    Capitalized terms that are used in this Agreement and not defined herein and that are defined in the Purchase Agreement, shall have the meaning given to such terms in the Purchase Agreement. As used herein, the following terms have the following meanings:

"Administrative Agent" has the meaning set forth in the preamble hereto.

"Administrative Borrower" has the meaning set forth in Section 11.14 hereof.

"Affiliate" has the meaning provided in the Bankruptcy Code.

"Agency Guide" means the FHLMC Guide, the FNMA Guide or the GNMA Guide, as applicable.

"Agreement" has the meaning set forth in the preamble hereto.

"AHM Acquisition" has the meaning set forth in the preamble hereto.

"AHMIC" has the meaning set forth in the preamble hereto.

"AHMC" has the meaning set forth in the preamble hereto.

"AHMS" has the meaning set forth in the preamble hereto.

"Applicable Margin" means 3.00% per annum.

"Approved Fund" means, with respect to any Lender that is a fund that invests in bank loans and similar commercial extensions of credit, any other fund that invests in bank loans and similar commercial extensions of credit and is managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Authorized Officer" means David Friedman, Joel Gendron, Robert Love or any officer of AHMS approved by the Administrative Agent.

"Availability" means, as of any date of determination, the amount that the Borrowers are entitled to borrow as Loans hereunder (after giving effect to all then outstanding Loans, interest thereon, fees, and expenses and all sublimits and reserves then applicable hereunder).

"B of A" means Bank of America, N.A.

"B of A Collateral" means all "Pre-Petition Collateral" and "Collateral" as defined in that certain Interim Order (I) Authorizing Debtors' Limited Use Of Cash Collateral, (II) Granting Replacement Liens And Adequate Protection To Certain Pre-Petition Secured Parties And (III) Scheduling Final Hearing Pursuant To Bankruptcy Rule 4001 entered by the Bankruptcy Court in the Chapter 11 Cases, and any final orders entered in respect thereto, as such order may amended or supplemented from time to time with the prior written consent of the Administrative Agent.

"B of A Credit Agreement" means that certain Second Amended and Restated Credit Agreement, dated as of August 10, 2006, by and among AHMIC, American Home Mortgage Servicing, Inc., American Home Mortgage Corp, American Home Mortgage Acceptance, Inc., the lenders from time to time party thereto and B of A, as administrative agent for such lenders, as amended from time to time.

"Bankruptcy Code" has the meaning set forth in the recitals hereto.

"Bankruptcy Court" has the meaning set forth in the recitals hereto.

"Borrower" has the meaning set forth in the preamble hereto.

"Borrower Account" means one or more deposit accounts of AHMS located at a financial institution acceptable to the Administrative Agent and designated by the Administrative Agent as a "Borrower Account"..

"Borrowing Notice" means the certificate prepared by the Administrative Borrower, substantially in the form of Exhibit A attached hereto.

"Business Day" means any day other than (i) a Saturday or Sunday, (ii) a day on which the New York Stock Exchange, the Federal Reserve Bank of New York or banking and savings and loan institutions in New York, New York are authorized or obligated to close their regular banking business, or (iii) a day on which trading in securities on the New York Stock Exchange or any other major securities exchange in the United States is not conducted.

"Capital Lease Obligations" means, for any Person, all obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) Collateral to the extent such obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP, and, for purposes of this Loan

Agreement, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP.

"Cash Equivalents" means (a) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (b) certificates of deposit and eurodollar time deposits with maturities of 90 days or less from the date of acquisition and overnight bank deposits of any commercial bank having capital and surplus in excess of $500,000,000, (c) repurchase obligations of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than seven days with respect to securities issued or fully guaranteed or insured by the United States Government, (d) commercial paper of a domestic issuer rated at least A-1 or the equivalent thereof by Standard and Poor's Ratings Group ("S&P") or P-1 or the equivalent thereof by Moody's Investors Service, Inc. ("Moody's") and in either case maturing within 90 days after the day of acquisition, (e) securities with maturities of 90 days or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the requirements of clause (b) of this definition, or (f) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (e) of this definition.

"Chapter 11 Cases" has the meaning set forth in the recitals hereto.

"Closing Date" means the Initial Closing Date (as defined in the Purchase Agreement).

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" has the meaning set forth in Section 4.01(a).

"Collateral Documents" means this Agreement and any and all other security agreements, pledge agreements, mortgages, deeds of trust, financing statements, assignments, or Guarantees at any time delivered to the Administrative Agent to create or evidence Liens securing the Obligations, together with all reaffirmations, amendments, and modifications thereof or supplements thereto made in accordance with the Loan Documents.

"Commitment" means the commitment of a Lender to make Loans hereunder in the amount set forth opposite its name on Schedule A hereto or as may subsequently be set forth in the Register from time to time, as the case may be.

"Committee" means an Official Committee of Unsecured Creditors for the Borrowers appointed pursuant to Section 1102(a) of the Bankruptcy Code by the United States Trustee, as the membership of such committee may from time to time be constituted and reconstituted.

"Contractual Obligation" means as to any Person, any material provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound or any material provision of any security issued by such Person.

"Contaminant" means any material, substance or waste that is classified or regulated under any Environmental Law as hazardous, toxic, a contaminant or a pollutant or by other words of similar meaning, including any petroleum or petroleum-derived substance or waste, asbestos and polychlorinated biphenyls.

"Control Account" means an account subject to a Control Agreement.

"Control Account Party" means the applicable securities intermediary with respect to a securities account or bank with respect to a deposit account.

"Control Agreements" means, as applicable, the any control agreement, in form and substance reasonably satisfactory to the Administrative Agent, executed and delivered by a Borrower, the Administrative Agent and the Control Account Party in accordance with the terms hereof.

"Custodian Category" means the category of the same name on the MERS System that reflects the custodial party that is in possession of the mortgage loans pledged by Borrowers to mortgage warehouse lenders.

"Default" means an Event of Default or an event that with notice or lapse of time or both would become an Event of Default.

"Disposition" means any transaction, or series of related transactions, pursuant to which any Borrower or any of its Subsidiaries sells, assigns, transfers or otherwise disposes of any Collateral (whether now owned or hereafter acquired) to any other Person, in each case whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person.

"Dollars" and "$" means lawful money of the United States of America.

"Environmental Laws" means all applicable Requirements of Law now or hereafter in effect, as amended or supplemented from time to time, relating to pollution or the regulation and protection of human health, safety, the environment or natural resources, including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. § 9601 *et seq.*); the Hazardous Material Transportation Act, as amended (49 U.S.C. § 180 *et seq.*); the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. § 136 *et seq.*); the Resource Conservation and Recovery Act, as amended (42 U.S.C. § 6901 *et seq.*); the Toxic Substance Control Act, as amended (42 U.S.C. § 7401 *et seq.*); the Clean Air Act, as amended (42 U.S.C. § 740 *et seq.*); the Federal Water Pollution Control Act, as amended (33 U.S.C. § 1251 *et seq.*); the Occupational Safety and Health Act, as amended (29 U.S.C. § 651 *et seq.*); the Safe Drinking Water Act, as amended (42 U.S.C. § 300f *et seq.*); and their state and local counterparts or equivalents and any transfer of ownership notification or approval statute.

"Environmental Liabilities and Costs" means, with respect to any Person, all liabilities, obligations, responsibilities, Remedial Actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all fees, disbursements and expenses of counsel, experts and consultants and costs of investigation and feasibility

studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any other Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute, including any thereof arising under any Environmental Law, Permit, order or agreement with any Governmental Authority or other Person, which relate to any environmental, health or safety condition or a Release or threatened Release, and result from the past, present or future operations of, or ownership of property by, such Person or any of its Subsidiaries.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

"Equity Interests" means, with respect to any Person, any and all shares, securities, interests, participations or other equivalents, including membership interests (however designated, whether or not voting) of equity of such Person, including, any interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, such entity, but in no event will Equity Interest include any debt securities convertible or exchangeable into equity unless and until actually converted or exchanged.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any corporation or trade or business that is a member of any group of organizations (i) described in Section 414(b) or (c) of the Code of which any Borrower is a member and (ii) solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the Lien created under Section 302(f) of ERISA and Section 412(n) of the Code, described in Section 414(m) or (o) of the Code of which any Borrower is a member.

"Event of Default" has the meaning set forth in Section 8 hereof.

"Exchange Act" means the United States Securities and Exchange Act of 1934, as amended from time to time.

"Excluded Taxes" means, with respect to the Administrative Agent, a Lender, a Participant and its Tax Related Persons, only the following Taxes: (a) income, franchise Taxes (imposed in lieu of net income Taxes) or similar Taxes imposed on (or measured by) the net income of such Person by the jurisdiction under the laws of which such Person is organized, in which its principal or applicable lending office is located or in which it is otherwise doing business (other than a jurisdiction in which such Person is treated as doing business as a result of its execution, delivery of any Loan Document or its exercise of its rights or performance of its obligations thereunder or otherwise as a result of its participation (or the participation of an entity in which it owns a beneficial interest) in the transactions contemplated by this Loan Agreement); (b) withholding Taxes imposed by the United States of America on payments to such Person, other than as a result of a change in applicable law occurring after (i) the date that such Person became a party to this Agreement, or (ii) with respect to an assignment, participation, acquisition, designation of a new applicable lending office or the appointment of a

successor Administrative Agent, the effective date of such assignment, participation, acquisition, designation or appointment, except, in each case, to the extent and at the rate that such Person's predecessor was entitled to such amounts (or in the case of a designation of a new applicable lending office, to the extent such Person was entitled to such amounts with respect to its prior applicable lending office); and (c) Taxes that would not have been imposed but for and solely as a result of the failure of such Person to comply with its obligations under Section 3.06(e).

"Facility" has the meaning set forth in the recitals hereto.

"Facility Fee" has the meaning set forth in Section 3.07.

"Federal Funds Rate" means, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three primary dealers (other than an affiliate of the Administrative Agent).

"FHA" means the Federal Housing Authority and any successor agency.

"FHLMC" means the Federal Home Loan Mortgage Corporation and any successor agency.

"Filing Date" has the meaning set forth in the recitals hereto.

"Final Order" means the order of the Bankruptcy Court in substantially the form as the Interim Financing Order (with only such modifications thereto as are satisfactory in form and substance to the Administrative Agent), as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Administrative Agent, the Lenders and the Borrowers.

"Financing Order" means, prior to the entry of the Final Financing Order, the Interim Financing Order, and thereafter, the Final Financing Order.

"FNMA" means the Federal National Mortgage Association and any successor agency.

"Funding Date" means the date on which a Loan is made hereunder.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States of America.

"Governmental Authority" means any nation or government, any state or other political subdivision, agency or instrumentality thereof, any entity exercising executive, legislative, judicial, regulatory, taxing or administrative functions of or pertaining to government and any court or arbitrator having jurisdiction over any Borrower or any of its Subsidiaries or properties.

"Guarantee" means, as to any Person, any obligation of such Person directly or indirectly guaranteeing any Indebtedness of any other Person or in any manner providing for the payment of any Indebtedness of any other Person or otherwise protecting the holder of such Indebtedness against loss (whether by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, or to take-or-pay or otherwise), provided that the term "Guarantee" shall not include (i) endorsements for collection or deposit in the ordinary course of business, or (ii) obligations to make servicing advances in respect of any mortgaged property. The amount of any Guarantee of a Person shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith. The terms "Guarantee" and "Guaranteed" used as verbs have correlative meanings.

"HUD" means the Department of Housing and Urban Development and any successor thereto.

"Indebtedness" means, for any Person: (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, the issuance and sale of debt securities or the sale of Collateral to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Collateral from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of Collateral or services, other than trade accounts payable (other than for borrowed money) arising, and accrued expenses incurred, in the ordinary course of business so long as such trade accounts payable are payable within 90 days of the date the respective goods are delivered or the respective services are rendered; (c) indebtedness of others secured by a Lien on the Collateral of such Person, whether or not the respective indebtedness so secured has been assumed by such Person; (d) obligations (contingent or otherwise) of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for the account of such Person; (e) Capital Lease Obligations of such Person; (f) obligations of such Person under repurchase agreements or like arrangements; (g) indebtedness of others Guaranteed by such Person; (h) all obligations of such Person incurred in connection with the acquisition or carrying of fixed assets by such Person; (i) indebtedness of general partnerships of which such Person is a general partner; and (j) any other indebtedness of such Person evidenced by a note, bond, debenture or similar instrument.

"Indemnified Taxes" means all Taxes other than Excluded Taxes.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Intellectual Property" means, with respect to any Person, any copyrights, patents, trademarks or other intellectual property and all registrations, licenses agreements and other rights relating thereto constituting Transferred Intellectual Property, as defined in the Purchase Agreement.

"Interest Period" means, with respect to any Loan, (i) initially, the period commencing on the Funding Date with respect to such Loan and ending on the calendar day prior to the next succeeding Monthly Payment Date, and (ii) thereafter, each period commencing on the Monthly Payment Date of a month and ending on the calendar day prior to the Monthly Payment Date of the next succeeding month. Notwithstanding the foregoing, no Interest Period may end after the Maturity Date.

"Interim Funder Category" means the category of the same name on the MERS System that reflects the custodial party that is in possession of the mortgage loans pledged by Borrowers to mortgage warehouse lenders.

"Interim Order" means the order of the Bankruptcy Court, in the form of Exhibit C, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Administrative Agent, the Lenders and the Borrowers.

"Lender" has the meaning set forth in the preamble hereto.

"Lender Expenses" means all (a) costs or expenses (including taxes, and insurance premiums) required to be paid by any Borrower under any of the Loan Documents that are paid, advanced, or incurred by the Administrative Agent, any Lender or any Lender-Related Party, (b) reasonable fees or charges paid or incurred by any Lender-Related Party in connection with the Administrative Agent's or any Lender's transactions with the Borrowers under the Loan Documents, including, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and Uniform Commercial Code searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal (including periodic collateral appraisals or business valuations to the extent of the fees and charges (and up to the amount of any limitation) contained in this Loan Agreement), real estate surveys, real estate title policies and endorsements, and environmental audits, (c) reasonable out-of-pocket costs and expenses incurred by the Administrative Agent or any Lender in the disbursement of funds to the Borrowers (by wire transfer or otherwise), (d) out-of-pocket charges paid or incurred by any Lender-Related Party resulting from the dishonor of checks payable by or to any Borrower, (e) reasonable out-of-pocket costs and expenses paid or incurred by any Lender-Related Party to correct any default or enforce any provision of the Loan Documents, or in monitoring, gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (f) reasonable audit fees and expenses of Lender-Related Parties related to audit examinations of the Collateral, (g) costs and expenses of third party claims or any other suit paid or incurred by any Lender-Related Party in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or the Administrative Agent or any Lender's relationship with any Borrower or any of its Affiliates, and (h) reasonable out-of-pocket costs and expenses (including attorneys fees and expenses) incurred by the Lender-Related Parties in advising, structuring, drafting, documenting, executing, reviewing, administering, syndicating, or amending the Loan Documents.

"Lender-Related Party" means the Administrative Agent, the Lenders and each of the Administrative Agent's or any Lender's, members, Affiliates, sponsors, managing directors, directors, together with their respective officers, employees, agents, advisors, attorneys and other representatives.

"LIBO Base Rate" means with respect to each day a Loan is outstanding (or if such day is not a Business Day, the next succeeding Business Day), the rate per annum equal to the rate published by Bloomberg or if such rate is not available, the rate appearing at Reuters Screen LIBOR01 Page as one-month LIBOR on such date and, if such rate shall not be so quoted, the rate per annum at which the Administrative Agent is offered Dollar deposits at or about 11:00 AM, eastern time, on such date by prime banks in the interbank eurodollar market where the eurodollar and foreign currency and exchange operations in respect of the Administrative Agent's Loans are then being conducted for delivery on such day for a period of one month and in an amount comparable to the amount of the Loans to be outstanding on such day.

"LIBO Rate" means with respect to each Interest Period pertaining to a Loan, a rate per annum (reset on a monthly basis) determined by the Administrative Agent in its sole discretion in accordance with the following formula (rounded upwards to the nearest 1/100th of one percent), which rate as determined by the Administrative Agent shall be conclusive absent manifest error by the Administrative Agent:

$$\frac{\text{LIBO Base Rate}}{1.00 - \text{LIBO Reserve Requirements}}$$

The LIBO Rate shall be calculated on each Funding Date and Monthly Payment Date commencing with the first Funding Date.

"LIBO Reserve Requirements" means for any Interest Period for any Loan, the aggregate (without duplication) of the rates (expressed as a decimal fraction) of any reserve requirements applicable to any Lender or any Lender-Related Party in effect on such day (including, without limitation, basic, supplemental, marginal and emergency reserves under any regulations of the Board of Governors of the Federal Reserve System or other Governmental Authority having jurisdiction with respect thereto), dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of such Board) maintained by a member bank of such Governmental Authority as of the Closing Date, the LIBO Reserve Requirements shall be deemed to be zero.

"Lien" means any mortgage, lien, pledge, charge, security interest or similar encumbrance.

"Loans" means, collectively, the Servicing Rights Loans and the Working Capital Loans.

"Loan Agreement" has the meaning set forth in the preamble hereto.

"Loan Documents" means, collectively, the Control Agreements, this Loan Agreement, the Orders, any note or notes executed by the Borrowers in connection with this Loan Agreement and payable to any Lender, and any other agreement entered into, now or in the future, by any Borrower and the Administrative Agent or any Lender in connection with this Loan Agreement.

"Majority Lenders" means Lenders whose Pro Rata Shares, taken in the aggregate, represent at least 51% of the Total Commitment.

"Material Adverse Change" means an event, fact, circumstance, change in, or effect on the business of any Borrower or any Subsidiary that individually or in the aggregate or on a cumulative basis with any other events, facts, circumstances, changes in, or effects on, the Borrowers, taken as a whole, or any Borrower or any Subsidiary could reasonably be expected to have a Material Adverse Effect.

"Material Adverse Effect" means a material adverse effect which either occurs after the date hereof or with respect to which any Lender obtains knowledge after the date hereof on (a) the validity or enforceability of any of the Loan Documents, (b) the rights and remedies of the Administrative Agent or any Lender under any of the Loan Documents or (c) the Collateral; provided, however, that the commencement of the Chapter 11 Cases, events customarily resulting from the filing of a case under Chapter 11 of the Bankruptcy Code and the Borrowers' efforts to market and sell substantially all of their businesses and assets (other than the Collateral) shall not constitute a Material Adverse Effect.

"Maturity Date" means the date which is the earliest of (a) the Final Closing Date, and (b) such earlier date on which either (i) all Loans shall become due and payable, in whole, in accordance with the terms of this Loan Agreement and the other Loan Documents or (ii) all Loans and all other Obligations for the payment of money shall be paid in full and the Commitments and this Loan Agreement are terminated.

"Maximum Credit" means the lesser of (i) the maximum amount of Loans permitted pursuant to the Financing Orders, and (ii) $50,000,000, as reduced from time to time in accordance with Section 2.06.

"MERS" means Mortgage Electronic Registration System, Inc.

"MERSCORP" means MERSCORP, Inc.

"MERS Member" means any entity that is a member of MERS, in good standing and in compliance with all rules, regulations, procedures and requirements set forth by MERS, including, but not limited to the payment of membership dues.

"MERS Mortgage" means any deed of trust or mortgage registered to any of the Borrowers on the MERS System.

"MERS System" means the Mortgage Electronic Registration System.

"Monthly Payment Date" means the last Business Day of each month.

"Multiemployer Plan" means a multiemployer plan defined as such in Section 3(37) of ERISA to which contributions have been or are required to be made by any Borrower or any ERISA Affiliate and that is covered by Title IV of ERISA.

"Net Cash Proceeds" means, with respect to any Disposition by any Person, the amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Person or any of its Subsidiaries, in connection therewith after deducting therefrom only (A) the principal amount of any Indebtedness secured by any senior Permitted Lien on any asset (other than Indebtedness assumed by the purchaser of such asset) and interest, fees and expenses in respect thereof which is (x) required to be, and is, repaid in connection with such Disposition (other than Indebtedness under this Loan Agreement) or (y) in escrow in connection with such Person contesting such Indebtedness or the Lien securing such Indebtedness in connection with such Disposition, (B) reasonable costs, fees and expenses related to such Disposition reasonably incurred by such Person in connection therewith and paid in cash, and (C) Taxes paid by such Person in connection therewith, to the extent approved (to the extent such approval is required) by the Bankruptcy Court.

"Non-Stayed Order" means an order of the Bankruptcy Court that is in full force and effect, as to which no stay has been entered and which has not been reversed, amended, modified, reversed, vacated or overturned in any respect without the prior written consent of the Administrative Agent, the Required Lenders and the Borrowers.

"Note" means each promissory note executed by the Borrowers in favor of a Lender evidencing such Lender's Loans.

"Obligations" means, collectively, all Loans, advances, debts, principal, interest, contingent reimbursement obligations with respect to any of the Loan Documents, premiums, liabilities (including all amounts charged to the Borrower Account pursuant hereto), obligations, fees (including the fees provided for in Section 3.07 hereof), charges, costs, Lender Expenses, guaranties, covenants, and duties of any kind and description owing by any Borrower or any of its Subsidiaries to the Administrative Agent, any Lender or any Lender-Related Party pursuant to or evidenced by the Loan Documents, in each case irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising. Any reference in this Loan Agreement or in the Loan Documents to the Obligations shall include all extensions, modifications, renewals or alterations thereof.

"Orders" means the Sale Order, the Interim Financing Order and the Final Financing Order.

"Other Taxes" means any and all present or future stamp, registration, transfer or documentary Taxes or any excise or property Taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to or in connection with, the Loan Documents.

"Participant" has the meaning set forth in Section 11.15(c).

"Patents" means (i) all letters patent of the United States, any other country or any political subdivision thereof, all reissues and extensions thereof and all goodwill associated therewith, (ii) all applications for letters patent of the United States or any other country and all provisionals, divisions, continuations and continuations-in-part thereof, and (iii) all rights to obtain any reissues or extensions of the foregoing.

"Payment Date" means the first Business Day of each week.

"PBGC" means the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"Permit" means any permit, approval, authorization, license, variance or permission required from a Governmental Authority under an applicable Requirement of Law.

"Permitted Disposition" means any Disposition on terms and conditions reasonably satisfactory to the Administrative Agent (so long as such Disposition does not create a Default or Event of Default).

"Permitted Liens" has the meaning set forth in Section 7.11.

"Person" means any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, unincorporated association or Governmental Authority.

"Plan" means an employee benefit or other plan established or maintained by any Borrower or any ERISA Affiliate and that is covered by Title IV of ERISA, other than a Multiemployer Plan.

"Post-Default Rate" means, in respect of any principal of any Loan or any other amount under this Loan Agreement or any other Loan Document, a rate per annum equal to (a) 2.00% per annum plus (b)(i) the interest rate otherwise applicable to such Loan or other amount, or (ii) if no interest rate is otherwise applicable, the LIBO Rate plus the Applicable Margin.

"Pre-Petition Credit Facilities" means the B of A Credit Agreement.

"Pre-Petition Payment" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness (including with respect to any of the Pre-Petition Credit Facilities) or trade payables or other pre-petition claims against any Borrower.

"Property" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Pro Rata Share" means, with respect to any Lender, the percentage obtained by dividing (i) such Lender's Commitment by (ii) the Total Commitment, provided, that, if the Total Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's Loans and the denominator shall be the aggregate unpaid principal amount of all of the applicable Loans.

"Purchase Agreement" has the meaning set forth in the Recitals to this Agreement.

"Reference Rate" means the rate of interest specified in the Wall Street Journal as the prime rate. The prime rate is determined from time to time by such bank as a means of pricing some loans to its borrowers and neither is tied to any external rate of interest or index nor necessarily reflects the lowest rate of interest actually charged by such bank to any particular class or category of customers. Each change in the Reference Rate shall be effective from and including the date such change is publicly announced as being effective.

"Register" has the meaning set forth in the Section 11.15(b)(ii).

"Registered Loan" means any loan recorded on the Register maintained pursuant to Section 11.15(b)(ii).

"Regulations T, U and X" means Regulations T, U and X of the Board of Governors of the Federal Reserve System (or any successor), as the same may be modified and supplemented and in effect from time to time.

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration, in each case, of any Contaminant into the indoor or outdoor environment or into or out of any property, including the movement of Contaminants through or in the air, soil, surface water, ground water or property.

"Remedial Action" means all actions required pursuant to Environmental Law to (a) clean up, remove, treat or in any other way remediate any Contaminant in the indoor or outdoor environment, (b) reasonably prevent the Release or reasonably minimize the further Release so that a Contaminant does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or (c) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"Required Lenders" means (a) for so long as the Pro Rata Share of AHM Acquisition represents at least 51% of the Commitments, AHM Acquisition, and (b) in all other cases, Lenders whose Pro Rata Shares, taken in the aggregate, represent at least 51% of the Commitments.

"Requirement of Law" means as to any Person, (a) the certificate of incorporation and by-laws or other organizational or governing documents of such Person, (b) all laws (including consumer regulatory laws), treaties, rules or regulations, and (c) all determinations of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer" means an officer of AHMS acceptable to the Administrative Agent, as to any Person, the chief executive officer or, with respect to financial matters, the chief financial officer, the chief restructuring officer of such Person; provided, that in the event any such officer is unavailable at any time he or she is required to take any action hereunder, Responsible Officer means any officer authorized to act on such officer's behalf as demonstrated by a certificate of corporate resolution.

"Restricted Payments" means with respect to any Person, collectively, all dividends or other distributions of any nature (cash, securities, assets or otherwise), and all payments, by virtue of redemption or otherwise, on any class of equity securities (including, without limitation, warrants, options or rights therefor) issued by such Person, whether such securities are now or may hereafter be authorized or outstanding and any distribution in respect of any of the foregoing, whether directly or indirectly.

"Sale Order" has the meaning set forth in the Recitals to this Agreement, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Administrative Agent, the Lenders and the Borrowers, approving the Loans made and to be made to the Borrowers in accordance with this Loan Agreement and granting the Liens contemplated hereby.

"SEC" means the United States Securities and Exchange Commission, or any other regulatory body that succeeds to the functions of the United States Securities and Exchange Commission.

"Secured Parties" means the Administrative Agent and the Lenders.

"Subsidiary" means, with respect to any Person, (a) any corporation, partnership or other entity of which at least a majority of the securities or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other persons performing similar functions of such corporation, partnership or other entity (irrespective of whether or not at the time securities or other ownership interests of any other class or classes of such corporation, partnership or other entity shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person, or (b) if such Person is a trust, the depositor of such trust.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority, and shall include all interest, penalties and additions to Tax related thereto.

"Tax Related Person" means any Person (including, without limitation, a beneficial owner of an interest in a pass-through entity) whose income is realized through or determined by reference to the Administrative Agent, a Lender or Participant or any Tax Related Person of any of the foregoing.

"Tax Return" means any report, filing, return, information return, document, election, including amendments to any of the foregoing, filed or furnished or required to be filed or furnished with respect to Taxes.

"Total Commitment" means, at any time, the sum of the Commitments.

"Trademarks" means (i) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, domain names, logos and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all

applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto, and (ii) the right to obtain all renewals thereof.

"Transactions" has the meaning set forth in the Recitals to this Agreement.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect on the date hereof in the State of New York; provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection or the priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or priority.

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"VA" means the Veterans Administration or any successor agency.

1.02    Accounting Terms and Determinations.  Except as otherwise expressly provided herein, all accounting terms used herein shall be interpreted, and all financial statements and certificates and reports as to financial matters required to be delivered to the Lender hereunder shall be prepared, in accordance with GAAP.

1.03    Uniform Commercial Code.  Any capitalized terms used in this Agreement that are defined in the Uniform Commercial Code shall be construed and defined as set forth in the Uniform Commercial Code unless otherwise defined herein.

1.04    Construction.  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in the other Loan Documents to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in the other Loan Documents shall be satisfied by the transmission of a record and any record

transmitted shall constitute a representation and warranty as to the accuracy and completeness of the information contained therein.

    1.05  Conflicts; Purchase Agreement Obligations. Notwithstanding the foregoing or anything else in any Loan Document to the contrary, (a) in the event of any conflict between terms and provisions of (i) this Loan Agreement or any other Loan Document and (ii) the Sale Order or the Purchase Agreement, the terms and provisions of the Sale Order and the Purchase Agreements shall prevail, and (b) nothing in this Agreement or the Loan Documents is intended to, nor shall it (i) limit, modify or affect the obligations of AH Mortgage Acquisition as "Purchaser" under the Purchase Agreement, including, without limitation the obligation of AH Mortgage Acquisition to provided liquidity or working capital in accordance in Section 6.2, or (ii) expand or increase the obligations of the Borrowers under the Purchase Agreement.

## Section 2. Loans, Evidence of Debt and Prepayments.

    2.01  Loans. Subject to fulfillment of the conditions precedent set forth in Sections 5.01 and 5.02 hereof, each Lender hereby severally agrees, from time to time, on the terms and conditions of this Loan Agreement and the other Loan Documents, to make loans (individually, a "Loan"; collectively, the "Loans") to the Borrowers in Dollars, on any Business Day (but the Borrowers will endeavor to limit requests for Loans to not more frequently than once weekly) from and including the Closing Date to but excluding the Maturity Date in an aggregate principal amount at any one time outstanding not to exceed such Lender's Pro Rata Share of the Total Commitment as in effect from time to time. Subject to the terms and conditions of this Loan Agreement, during such period the Borrowers may borrow, repay and reborrow Loans hereunder. In no event shall the Lenders be obligated to make a Loan when any Default or Event of Default has occurred and is continuing, and in no event shall the aggregate principal amount of all Loans outstanding at any time exceed the Maximum Credit.

    2.02  Evidence of Debt.

    (a)  The Administrative Agent shall maintain an account or accounts evidencing the indebtedness of the Borrowers to each Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.

    (b)  In the absence of manifest error, the entries made in the accounts maintained pursuant to paragraph (a) of this Section shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein; provided that the failure of the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Loans in accordance with the terms of this Loan Agreement.

    (c)  Any Lender may request that the Loans be evidenced by a Note or Notes. In such event, the Borrowers shall prepare, execute and deliver to such Lender a Note or Notes payable to the order of such Lender (or, if requested by such Lender, to such Lender and its assigns) and in a form approved by such Lender, which Notes shall reflect the non-recourse nature of the obligations of the Borrowers hereunder. Thereafter, the Loans evidenced by such

17

Note and interest thereon shall at all times be represented by one or more Notes in such form payable to the payee named therein or its registered assigns.

2.03    Procedure for Borrowing.

(a)    Borrowing Procedure for Requesting a Loan.    The Administrative Borrower may request a borrowing, on any Business Day during the period from and including the Closing Date to the Maturity Date to the extent set forth above for any Loan, by delivering to the Administrative Agent, with a copy to the Lenders, an irrevocable Borrowing Notice, appropriately completed and with all required supporting documentation, which Borrowing Notice (other than the initial Borrowing Notice) must be received no later than 12:00 noon (eastern time) at least three Business Days prior to the requested Funding Date. Such Borrowing Notice shall be irrevocable and shall specify (i) the principal amount of the proposed Loans, (ii) the use of the proceeds of such proposed Loans and (iii) the proposed borrowing date, which must be a Business Day. The Administrative Agent and the Lenders may act without liability upon the basis of written, telecopied or telephonic notice believed by the Administrative Agent in good faith to be from the Administrative Borrower or any Borrower (or from any Authorized Officer thereof designated in writing purportedly from the Administrative Borrower to the Administrative Agent). The Administrative Agent and each Lender shall be entitled to rely conclusively on any Authorized Officer's authority to request Loans on behalf of the Borrowers until the Administrative Agent receives written notice to the contrary. The Administrative Agent and the Lenders shall have no duty to verify the authenticity of the signature appearing on any Borrowing Notice. Except as otherwise provided in this Section 2.03, Loans shall be made ratably in accordance with each Lender's Pro Rata Share.

(b)    Minimum Amount.    Each Borrowing Notice pursuant to this Section 2.03 shall be irrevocable and the Borrowers shall be bound to make a borrowing in accordance therewith. Each Loan shall be made in a minimum amount of $1,000,000 and shall be in an integral multiple of $100,000 (or such lesser amount or integral as the Administrative Agent shall agree).

(c)    Mechanics of Loans.

(i)    Except as otherwise provided in this Section 2.03(c), all Loans under this Agreement shall be made by the Lenders simultaneously and proportionately to their Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligations to make a Loan requested hereunder, nor shall the Commitment of any Lender be increased or decreased as a result of the default by any other Lender in that other Lender's obligation to make a Loan requested hereunder, and each Lender shall be obligated to make the Loans required to be made by it by the terms of this Loan Agreement regardless of the failure of any other Lender to do so.

(ii)    Notwithstanding any other provision of this Loan Agreement, and in order to reduce the number of fund transfers among the parties hereto, the Borrowers, the Administrative Agent and the Lenders agree that the Administrative Agent may (but shall not be obligated to), and the Borrowers and the Lenders hereby irrevocably authorize the

Administrative Agent to, fund, on behalf of the Lenders, Loans pursuant to Section 2.01; provided, however, that the Administrative Agent shall in no event fund such Loans if the Administrative Agent shall have received written notice from the Required Lenders prior to the funding of the proposed Loan that one or more of the conditions precedent contained in Section 5.01 or Section 5.02, will not be satisfied on the day of the proposed Loan. If the Administrative Borrower gives a Borrowing Notice requesting a Loan and the Administrative Agent elects not to fund such Loan on behalf of the Lenders, then promptly after receipt of the Borrowing Notice requesting such Loan, the Administrative Agent shall notify each applicable Lender of the specifics of the requested Loan and that it will not fund the requested Loan on behalf of the Lenders. If the Administrative Agent notifies the Lenders that it will not fund a requested Loan on behalf of the Lenders and that the Administrative Agent has also notified the Lenders in accordance with Section 2.03(b), each applicable Lender shall make its Pro Rata Share of the Loan available to the Administrative Agent, in immediately available funds, no later than 2:00 p.m. (eastern time) (provided that, except with respect to any Loan to be made on the Closing Date, the Administrative Agent requests payment from such Lender not later than 5:00 p.m. (eastern time) on the prior Business Day) on the date of the proposed Loan. The Administrative Agent will make the proceeds of such Loans available to the Borrowers on the day of the proposed Loan by causing an amount, in immediately available funds, equal to the proceeds of all such Loans received by the Administrative Agent or the amount funded by the Administrative Agent on behalf of the Lenders to be deposited in the Borrower Account.

(iii)    If the Administrative Agent has notified the Lenders that the Administrative Agent, on behalf of the Lenders, will fund a particular Loan pursuant to Section 2.03(c)(ii), the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such day and the Administrative Agent, in its sole discretion, may, but shall not be obligated to, cause a corresponding amount to be made available to the Borrowers on such day. If the Administrative Agent makes such corresponding amount available to the Borrowers and such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from the date such payment was due until the date such amount is paid to the Administrative Agent, at the Federal Funds Rate for three Business Days and thereafter at the Reference Rate plus the Applicable Margin.    During the period in which such Lender has not paid such corresponding amount to the Administrative Agent, notwithstanding anything to the contrary contained in this Loan Agreement or any other Loan Document, the amount so advanced by the Administrative Agent to the Borrowers shall, for all purposes hereof, be a Loan made by the Administrative Agent for its own account. Upon any such failure by a Lender to pay the Administrative Agent, the Administrative Agent shall promptly thereafter notify the Administrative Borrower of such failure and the Borrowers shall immediately pay such corresponding amount to the Administrative Agent for its own account.

(iv)      Subject to the terms and conditions of this Loan Agreement, from and including the Closing Date to but excluding the Maturity Date the Borrowers may borrow, repay and reborrow Loans hereunder.

(v)       Nothing in this Section 2.03(c) shall be deemed to relieve any Lender from its obligations to fulfill its Commitment hereunder or to prejudice any rights that the Administrative Agent or the Borrowers may have against any Lender as a result of any default by such Lender hereunder.

(d)       Upon the Borrowers' request for a borrowing pursuant to Section 2.03(a) above and subject to Section 2.03(c) above, each Lender shall, assuming all conditions precedent set forth in this Section 2.03 and in Sections 5.01 and 5.02 have been met, and provided no Default shall have occurred and be continuing (in accordance with Section 2.01), not later than 3:00 p.m. (eastern time) on the requested Funding Date, make a Loan (determined by the Administrative Agent) in an amount equal to such Lender's Pro Rata Share and which would not cause the aggregate amount of Loans then outstanding to exceed the Maximum Credit. Subject to the foregoing, such borrowing will be made available to the Borrowers in accordance with Section 2.03(c) via wire transfer to the applicable Borrower Account in funds immediately available to the Borrowers.

2.04      Limitation on Types of Loans; Illegality.    Anything herein to the contrary notwithstanding, if, on or prior to the determination of any LIBO Base Rate:

(a)       any Lender determines, which determination shall be conclusive, that quotations of interest rates for the relevant deposits referred to in the definition of "LIBO Base Rate" in Section 1.01 hereof are not being provided in the relevant amounts or for the relevant maturities for purposes of determining rates of interest for Loans as provided herein; or

(b)       any Lender determines, which determination shall be conclusive, that the Applicable Margin plus the relevant rate of interest referred to in the definition of "LIBO Base Rate" in Section 1.0.1 hereof upon the basis of which the rate of interest for Loans is to be determined is not likely adequately to cover the cost to such Lender of making or maintaining Loans; or

(c)       it becomes unlawful for such Lender to make or maintain Loans hereunder using a LIBO Rate;

then such Lender shall give the Administrative Agent and the Administrative Borrower prompt notice thereof and, so long as such condition remains in effect, the Lenders shall not make additional Loans, and the Borrowers shall, at their option, either prepay such Loans or pay interest on such Loans at a rate per annum as determined by such Lender taking into account the increased cost to such Lender of making and maintaining the Loans.

2.05      Repayment of Loans; Interest.    Subject in all respects to Section 3.05 hereof:

(a)        Each Borrower hereby unconditionally promises to pay in full on the Maturity Date the then aggregate outstanding principal amount of the Loans and all other Obligations due under this Loan Agreement and the other Loan Documents.

(b)        The Borrowers shall pay to the Administrative Agent for the account of the Lenders interest on the unpaid principal amount of each Loan for the period from and including the date of such Loan to but excluding the date such Loan shall be paid in full, at a rate per annum equal to the LIBO Rate plus the Applicable Margin. Notwithstanding the foregoing, upon the occurrence and during the continuance of any Event of Default, the Borrowers shall pay to the Administrative Agent for the account of the Lenders interest at the applicable Post-Default Rate on any principal of any Loan and on any other amount payable by the Borrowers hereunder, for the period from and including the date of occurrence of such Event of Default to but excluding the date such Event of Default is waived or such amount is paid in full.

(c)        Accrued interest on each Loan as calculated in <u>Section 2.05(b)</u> above shall be payable in arrears on each Monthly Payment Date and on the Maturity Date, except that interest payable at the Post-Default Rate shall accrue daily and shall be payable promptly upon receipt of invoice. Promptly after the determination of any interest rate provided for herein or any change therein, the Lender shall give written notice thereof to the Administrative Borrower.

2.06        <u>Mandatory Prepayment; Reduction of Commitments.</u>

(a)        <u>Deficiency.</u>  If at any time the aggregate outstanding principal amount of Loans exceeds the Maximum Credit (a "<u>Deficiency</u>"), as determined by the Administrative Agent and notified to the Administrative Borrower on any Business Day, the Borrowers shall, subject to <u>Section 3.05</u>, immediately upon receipt of such written notice by the Administrative Borrower, prepay the Loans in part or in whole, such that after giving effect to such prepayment a Deficiency no longer exists. To the extent that there are Deficiencies with respect to more than one Loan, funds on deposit in the Control Accounts shall be applied pro rata to the Loans.

(b)        Subject to <u>Section 3.03(b)</u>, any prepayments made by the Borrower pursuant to <u>Section 2.06(a)</u> shall be applied to repay the outstanding principal balance of the Loans until such Loans shall have been paid in full. All repayments of Loans required to be made pursuant to such paragraphs shall, at the election of the Lenders, result in a permanent reduction of the Commitments.

(c)        The Borrowers may, upon notice to the Administrative Agent, from time to time, permanently reduce (in whole or in part) the Maximum Credit; <u>provided</u> that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. (eastern time) five Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in the aggregate amount of $1,000,000 or an integral multiple of $1,000,000 in excess thereof, and (iii) the Borrowers may not reduce the Maximum Credit if, after giving effect thereto and to any concurrent prepayments hereunder, the outstanding principal balance of the Loans would exceed the Maximum Credit. The Administrative Agent will promptly notify the Lenders of any such notice of reduction of the Maximum Credit. Any reduction of the Maximum Credit shall be applied to the Maximum Commitment of each Lender according to its Pro Rata Share. All fees accrued until the effective date of any reduction to $0 of the Maximum Credit shall be paid on

the effective date of such reduction and, in the case of a partial reduction in the Maximum Credit, the Facility Fee payable pursuant to Section 3.07(a) shall be reduced accordingly.

> 2.07    Optional Prepayments

(a)    The Loans are prepayable without premium or penalty, in whole or in part on each Payment Date. The Loans are prepayable at any other time, in whole or in part, in accordance herewith and subject to clause (b) below. Amounts repaid may be reborrowed in accordance with the terms of this Loan Agreement to the extent permitted under Section 2.01. If the Borrowers intend to prepay a Loan in whole or in part from any source other than as required under Section 2.06, the Administrative Borrower shall give two (2) Business Days' prior written notice thereof to the Lenders. If such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid. Partial prepayments shall be in a minimum principal amount of $100,000 and shall be in an integral multiple of $100,000 (or such lesser amounts as the Administrative Agent shall agree).

(b)    If the Borrowers, subject to Section 3.05, make a prepayment of the Loans on any day which is not a Payment Date, the Borrowers shall indemnify the Administrative Agent and the Lenders and hold the Administrative Agent and the Lenders harmless from any actual loss or expense which the Administrative Agent or such Lender may sustain or incur arising from (a) the re-employment of funds obtained by the Administrative Agent or any Lender to maintain the Loans hereunder or from (b) fees payable to terminate the deposits from which such funds were obtained, in either case, which actual loss or expense shall be equal to an amount equal to the excess, as reasonably determined by the Administrative Agent or such Lender, of (i) its cost of obtaining funds for such Loans for the period from the date of such payment through the following Payment Date over (ii) the amount of interest likely to be realized by such Lender in redeploying the funds not utilized by reason of such payment for such period. This Section 2.07 shall survive termination of this Loan Agreement and payment of the Loans.

(c)    This Loan Agreement may be terminated by the Borrowers at any time upon payment in full in cash of all Obligations, including all payments required to be made under Sections 2.05, 3.06 and 3.07 of this Loan Agreement.

> 2.08    Requirements of Law.

(a)    If any Requirement of Law (other than with respect to any amendment made after the Closing Date to the Administrative Agent's or any Lender's certificate of incorporation and by-laws or other organizational or governing documents) or any change in the interpretation or application thereof or compliance by the Administrative Agent or any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(i)    shall subject any Lender-Related Party to any tax of any kind whatsoever with respect to this Loan Agreement or any Loan made by it other than

Excluded Taxes or change the basis of taxation of payments to any Lender-Related Party in respect thereof;

(ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory advance or similar requirement against assets held by deposits or other liabilities in or for the account of Loans or other extensions of credit by, or any other acquisition of funds by any office of any Lender-Related Party which is not otherwise included in the determination of the LIBO Base Rate hereunder; or

(iii)    shall impose on any Lender-Related Party any other condition;

and the result of any of the foregoing is to increase the cost to the Administrative Agent or any Lender, by an amount which the Administrative Agent or such Lender deems to be material, of making, continuing or maintaining any Loan or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrowers shall promptly pay the Administrative Agent or such Lender such additional amount or amounts as will compensate the Administrative Agent or such Lender, on an after-Tax basis, for such increased cost or reduced amount receivable thereafter incurred.

(b)    If the Administrative Agent or any Lender shall have determined that the adoption of or any change in any Requirement of Law (other than with respect to any amendment made after the Closing Date to the Administrative Agent's or any Lender's certificate of incorporation and by-laws or other organizational or governing documents) regarding capital adequacy or in the interpretation or application thereof or compliance by any Lender-Related Party or any corporation controlling any Lender-Related Party with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on such corporation's or any Lender- Related Party's capital as a consequence of any obligations hereunder to a level below that which such corporation or any Lender-Related Party (taking into consideration such corporation's or any Lender-Related Party's policies with respect to capital adequacy) by an amount reasonably deemed by the Administrative Agent or such Lender to be material, then from time to time, the Borrowers shall promptly pay to the Administrative Agent or such Lender such additional amount or amounts as will thereafter compensate the Administrative Agent or such Lender for such reduction.

(c)    If the Administrative Agent or any Lender becomes entitled to claim any additional amounts pursuant to this subsection, it shall promptly notify the Administrative Borrower of the event by reason of which it has become so entitled. A certificate as to any additional amounts payable pursuant to this subsection submitted by the Administrative Agent or such Lender to the Administrative Borrower shall be conclusive in the absence of manifest error.

2.09    Purpose of Loans.    Each Loan shall be used in accordance with Section 7.10.

**Section 3. Payments; Computations; Taxes; Fees.**

3.01    Payments.    Except to the extent otherwise provided herein, all payments of principal, interest and other amounts to be made by the Borrowers under this Loan

Agreement, shall be made in Dollars, in immediately available funds, without deduction, set-off or counterclaim, to the Borrower Account not later than 12:00 noon, eastern time, on the date on which such payment shall become due (each such payment made after such time on such due date to be deemed to have been made on the next succeeding Business Day). Each Borrower acknowledges that it has no rights of any kind with respect to the foregoing account (including, without limitation, any right of withdrawal therefrom); provided, that, absent a Default or Event of Default, the Administrative Agent shall release to the Borrowers all funds not otherwise required to be applied to the Obligations.

      3.02    Sharing of Payments Etc. Except as provided in Section 2.08 hereof, if any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of any Obligation in excess of its Pro Rata Share on account of similar obligations obtained by all the Lenders, such Lender shall forthwith purchase from the other Lenders such participations in such similar obligations held by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided, however, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and such Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender of any interest or other amount paid by the purchasing Lender in respect of the total amount so recovered). The Borrowers agree that any Lender so purchasing a participation from another Lender pursuant to this Section 3.02 may, to the fullest extent permitted by law, exercise all its rights (including the Lender's right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrowers in the amount of such participation.

      3.03    Apportionment of Payments.

      (a)    All payments of principal and interest in respect of outstanding Loans, all payments of fees and all other payments in respect of any other Obligations, shall be allocated by the Administrative Agent among such of the Lenders as are entitled thereto, in proportion to their respective Pro Rata Shares or otherwise as provided herein or, in respect of payments not made on account of the Loans as designated by the Person making payment when the payment is made. The Administrative Agent will promptly distribute any such payment to each Lender, as appropriate, within one (1) Business Day of receipt. So long as no Event of Default shall have occurred and be continuing, the Administrative Agent shall, subject to the provisions of this Agreement, apply all payments in respect of any Obligations and all proceeds of the Collateral as set forth in Section 2.06(b).

      (b)    After the occurrence and during the continuance of an Event of Default or on the Maturity Date, the Administrative Agent may, and upon the direction of the Required Lenders shall, apply all payments in respect of any Obligations and all proceeds of the Collateral, subject to the provisions of this Agreement (i) first, to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due to the Administrative Agent, as administrative agent, until paid in full; (ii) second, to pay the Obligations in respect of any fees, expense reimbursements and indemnities then due to the

Lenders until paid in full; (iii) <u>third</u> to pay interest due in respect of the Loans, as determined by the Administrative Agent, until paid in full; (iv) <u>fourth</u> to pay principal of the Loans, as determined by the Administrative Agent, until paid in full; (v) <u>fifth</u>, to the ratable payment of all other Obligations then due and payable, (vi) <u>sixth</u>, to the extent that there has been asserted any claim to which the Administrative Agent and/or the Lender-Related Parties may be entitled to indemnification pursuant to the terms of this Loan Agreement, to establish a reserve in an amount determined by the Administrative Agent in good faith, and (vii) <u>seventh</u>, to the Administrative Borrower for distribution to the Borrowers or to whomever is legally entitled to such proceeds as ordered by the Bankruptcy Court.

3.04    <u>Computations</u>. Interest on the Loans shall be computed based on a 360-day year for the actual days elapsed (including the first day but excluding the last day) occurring in the period for which payable.

3.05    <u>Limited Recourse; Remedies</u>.

(a)    NOTWITHSTANDING ANYTHING HEREIN OR IN ANY OTHER LOAN DOCUMENT TO THE CONTRARY, THE LIABILITY OF THE BORROWERS HEREUNDER IS LIMITED SOLELY TO THE EXTENT, BUT ONLY TO THE EXTENT, OF THE INTEREST OF EACH BORROWER IN THE COLLATERAL ONLY. IN THE EVENT OF DEFAULT, INCLUDING, WITHOUT LIMITATION, ANY DEFAULT ARISING AS A RESULT OF ANY BREACH OF ANY REPRESENTATION, WARRANTY OR COVENANT MADE BY BORROWERS UNDER ANY LOAN DOCUMENTS, ANY ACTION TAKEN BY, AND ALL REMEDIES OF, THE ADMINISTRATIVE AGENT OR ANY LENDER AGAINST THE BORROWERS UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE LIMITED TO THE COLLATERAL AND NO ATTACHMENT, EXECUTION OR OTHER ACTION OR PROCESS SHALL BE SOUGHT, ISSUED OR LEVIED UPON ANY ASSETS, PROPERTIES OR FUNDS OF THE BORROWERS OTHER THAN THE COLLATERAL. IN THE EVENT OF ENFORCEMENT BY THE ADMINISTRATIVE AGENT OR ANY LENDER OF THEIR REMEDIES HEREUNDER, NO JUDGMENT FOR ANY DEFICIENCY UPON THE OBLIGATIONS SHALL BE OBTAINED BY THE SECURED PARTIES AGAINST THE BORROWERS. THE PROVISIONS OF THIS SECTION 3.05 SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT AND ANY OTHER LOAN DOCUMENT.

(b)    Upon the occurrence and during the continuance of an Event of Default, the sole and exclusive remedy of the Secured Parties with respect to the Collateral shall be limited to the collection by the Secured Parties of the cash proceeds thereof upon the receipt of the same by the Borrowers and the application of such cash proceeds to the repayment of the Obligations. Neither the Administrative Agent nor any other Secured Party shall have the right to foreclose upon, or sell, lease, transfer, assign or otherwise dispose of any of the Collateral or otherwise enforce their security interest or Lien upon the Collateral other than with respect to the cash proceeds thereof in accordance with this Section 3.05(b).

3.06        U.S. Taxes.

(a)        Except as required by applicable law, any and all payments by or on account of any Obligation of the Borrowers hereunder shall be made free and clear of and without deduction for any Taxes; provided, however, that if any deduction of Indemnified Taxes shall be required, then (i) the Borrowers shall increase the sum payable so that after all required deductions (including deductions applicable to additional sums payable under this Section 3.06) the Administrative Agent, the Lenders and each of their respective Tax Related Persons receives and retains (after withholding and payment of all Taxes, including income Taxes) an amount equal to the sum it would have received and retained had no such deductions been made, (ii) the Borrowers or the Administrative Agent shall make such deductions and (iii) the Borrowers or the Administrative Agent shall pay the full amount deducted to the relevant Governmental Authorities in accordance with applicable law.

(b)        In addition, each Borrower shall pay all Other Taxes to the relevant Governmental Authorities in accordance with applicable law.

(c)        To the extent legally entitled to do so, the Administrative Agent and each Lender shall furnish to the Administrative Borrower and the Administrative Agent (as applicable) Internal Revenue Service Forms W-8BEN, W-8ECI, W-8IMY or W-9 to the extent necessary to obtain a reduction of or exemption from withholding taxes imposed by the United States of America with respect to payments made by the Borrowers or the Administrative Agent under any Loan Document. Each Lender and the Administrative Agent shall provide such forms prior to the first interest payment date after becoming a party to this Agreement and when reasonably and timely requested by the Administrative Borrower or the Administrative Agent (as applicable). "United States persons" (within the meaning of Code Section 7701(a)(30)) that are "exempt recipients" (within the meaning of Treasury Regulations Section 1.6049-4(c)(i)(ii) (without regard to the second sentence thereof)) shall not be required to furnish an Internal Revenue Service Form W-9, except to the extent required under Treasury Regulations Section 1.1441-l(d)(4) (if applicable). None of the Administrative Agent, any Lender or any Tax Related Person shall be required to make available any information that it deems confidential to the Borrowers or to any other Person.

3.07        Fees.  The Borrowers shall pay to each Lender under the Facility, a facility fee on such Lender's Pro Rata Share of the Maximum Credit (the "Facility Fee") from the date hereof until the Maturity Date or, if later, the date on which all the Loans shall have been fully and finally repaid, at a rate equal to 0.50% per annum, payable in arrears (i) on each Monthly Payment Date, commencing on the first Monthly Payment Date following the Closing Date, (ii) on the Maturity Date and (iii) if later than the Maturity Date, the date on which all the Loans shall have been fully and finally repaid.

## Section 4. Collateral Security and Administrative Priority.

4.01        Collateral; Security Interest.

(a)        Capitalized terms used in this Section 4.01(a) and not otherwise defined in this Agreement, shall have the meaning given to such terms in the Sale Order.  The

Administrative Agent, on behalf of the Secured Parties, shall have and is hereby granted, as security for the full and timely payment and performance of all of the Obligations, a valid, binding, enforceable, and perfected (a) security interest in and lien on all (i) the Purchased Assets, of every kind or type whatsoever, tangible, intangible, real, personal and mixed, whether now owned or existing or hereafter acquired or arising and regardless of where located, whether within the United States or in other locations, and all cash and cash equivalents earned in connection with the Servicing Business from and after the Initial Closing until the later of the Final Closing and the payment of the Reconciliation Payment; and (ii) all proceeds, products, rents and profits, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any and all tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof (collectively, (i) and (ii), the "Collateral") that is not encumbered by a Permitted Lien; and (b) security interest in and lien on the Collateral that is immediately junior to any Permitted Lien. The liens arising pursuant to the foregoing sentence shall not be released until the earliest of (a) the Final Closing, (b) the Termination Date and (c) the Administrative Agent's written consent; except that with respect to any Disputed Servicing Agreement that is designated an Excluded Asset as provided in the Purchase Agreement, the liens arising pursuant to the foregoing sentence shall be automatically released upon such designation, and B of A's lien and security interest in such Excluded Asset shall automatically reattach upon such designation without any further action by the Borrowers, Secured Party or the Bankruptcy Court and without the need for the entry of an order (with such liens to have the same priority and rights as existed prior to the Initial Closing). Notwithstanding the foregoing, if any Permitted Lien is voided, extinguished, or determined not to be valid, the liens granted to the Administrative Agent pursuant to this paragraph shall, notwithstanding anything to the contrary in section 551 of the Bankruptcy Code, be deemed first priority liens without any further action by the Borrowers, the Secured Parties, or the Bankruptcy Court. For the avoidance of doubt, notwithstanding anything to the contrary herein or in any other Loan Document, the Secured Parties shall not have, and nothing herein shall be construed as granting the Secured Parties a security interest in or lien on any (i) proceeds of the Sale, (ii) proceeds of the B of A Collateral received by the Sellers before the Initial Closing Date but not paid to B of A as of the Initial Closing Date (which proceeds of the B of A Collateral shall be held in trust and segregated for the benefit of the B of A and paid to B of A in the manner set forth in the Cash Collateral Order, regardless of whether the Termination Date (as defined in the Cash Collateral Order) has occurred), (iii) assets of the Sellers that are not being purchased by AIIM Acquisition pursuant to the Purchase Agreement, or (iv) any other assets of the Borrowers used in the Servicing Business not being purchased by the AIIM Acquisition, in accordance with the terms of the Purchase Agreement.

(b)     Each Borrower agrees to direct and to cause all Persons remitting funds that constitute part of the Collateral, to remit such funds to the Borrower Account. To the extent that any Borrower (or any of its agents or employees) receives any funds that would be remitted to Control Accounts pursuant to the immediately preceding sentence, such Borrower agrees to deposit immediately such funds into the applicable Control Account.

4.02    Perfection of Security Interests.

(a) Each Borrower shall promptly and duly execute and deliver, and have recorded, such agreements, instruments and documents and perform any and all actions reasonably requested by the Administrative Agent at any time and from time to time to perfect, maintain, protect, and enforce the Lenders' security interest in the Collateral of such Borrower, including, without limitation, (i) executing and filing financing or continuation statements, and amendments thereof, in form and substance satisfactory to the Administrative Agent, (ii) in the case of any Investment Property, Deposit Accounts, taking any actions required by the Administrative Agent to enable the Administrative Agent to obtain Control with respect thereto, (iii) executing and delivering such documents, agreements and instruments as may be required by the Administrative Agent to further evidence and perfect its security interests in all Intellectual Property, (iv) delivering to the Administrative Agent all documents, certificates and Instruments necessary or desirable to perfect the Administrative Agent's Lien in letters of credit on which such Borrower is named as beneficiary and all acceptances issued in connection therewith, and (v) taking such other steps as are deemed necessary or desirable to maintain the Administrative Agent's security interest in the Collateral.

(b) Each Borrower hereby authorizes the Administrative Agent at any time and from time to time to execute and file financing statements or continuation statements and amendments thereto and other filing or recording documents or instruments with respect to the Collateral without the signature of such Borrower in such form and in such offices as the Administrative Agent determines appropriate to perfect the security interests of the Administrative Agent under this Agreement.

(c) Notwithstanding subsections (a) and (b) of this Section 4.02, or any failure on the part of any Borrower or the Administrative Agent to take any of the actions set forth in such subsections, the Liens and security interests granted herein shall be deemed valid, enforceable and perfected by entry of the applicable Order. No financing statement, notice of Lien, mortgage, deed of trust or similar instrument in any jurisdiction or filing office need be filed or any other action taken in order to validate and perfect the Liens and security interests granted by or pursuant to this Agreement or the Orders.

4.03    Rights of Lender; Limitations on Lenders' Obligations.

(a) Subject to Section 4.05, the Administrative Agent authorizes each Borrower to collect its Accounts, provided that such collection is performed in accordance with such Borrower's customary procedures, and the Administrative Agent may, upon the occurrence and during the continuation of any Event of Default and without notice, other than any requirement of notice provided in the Orders, limit or terminate said authority at any time.

(b) Subject to any requirement of notice provided in the Orders, the Administrative Agent may at any time, upon the occurrence and during the continuation of any Event of Default, notify Account Debtors, notify the other parties to the Contracts of the Borrowers, notify obligors of Instruments and Investment Property of the Borrowers and notify obligors in respect of Chattel Paper of the Borrowers that the right, title and interest of the Borrowers in and under such Accounts, such Contracts, such Instruments, such Investment

Property and such Chattel Paper have been assigned to the Administrative Agent and that payments shall be made directly to the Administrative Agent. Subject to any requirement of notice provided in the Orders, upon the request of the Administrative Agent, the Borrowers will so notify such Account Debtors, such parties to Contracts, obligors of such Instruments and Investment Property and obligors in respect of such Chattel Paper. Subject to any requirement of notice provided in the Orders, upon the occurrence and during the continuation of an Event of Default, the Administrative Agent may in its own name, or in the name of others, communicate with such parties to such Accounts, Contracts, Instruments, Investment Property and Chattel Paper to verify with such Persons to the Administrative Agent's reasonable satisfaction the existence, amount and terms of any such Accounts, Contracts, Instruments, Investment Property or Chattel Paper.

4.04     Covenants of the Borrowers with Respect to Collateral. Each Borrower hereby covenants and agrees with the Administrative Agent that from and after the date of this Agreement and until the Obligations are fully satisfied:

(a) Such Borrower will keep and maintain, at its own cost and expense, satisfactory and complete records of the Collateral, in all material respects, including, without limitation, a record of all payments received and all credits granted with respect to the Collateral and all other dealings concerning the Collateral. For the Administrative Agent's further security, each Borrower agrees that the Administrative Agent shall have a property interest in all of such Borrower's books and Records pertaining to the Collateral and, upon the occurrence and during the continuation of an Event of Default, such Borrower shall deliver and turn over any such books and Records to the Administrative Agent or to their respect representatives at any time on demand of the Administrative Agent.

(b) Such Borrower will not, without the Administrative Agent's prior written consent, grant any extension of the time of payment of any of the Accounts, Accounts Receivable, Chattel Paper, Instruments, Payment Intangibles or Supporting Obligations, compromise, compound or settle the same for less than the full amount thereof, release, wholly or partly, any Person liable for the payment thereof, or allow any credit or discount whatsoever thereon other than any of the foregoing which are done in the ordinary course of business, consistent with past practices and trade discounts granted in the ordinary course of business of such Borrower.

### Section 5. Conditions Precedent

5.01     Conditions Precedent to Initial Loan. The obligation of the Lenders to make the initial Loans (or otherwise to extend any credit provided for hereunder), is subject to the fulfillment, to the satisfaction of the Lenders, of each of the conditions precedent set forth below:

(a)     Initial Closing.  The Initial Closing shall have occurred under the Purchase Agreement.

(b)     Loan Documents.  The Administrative Agent and the Lenders shall have received executed copies of each of the other Loan Documents, to the extent applicable,

each of which shall be satisfactory to the Administrative Agent and the Lenders in form and substance;

(c)        Orders.    At the time of the making of the initial Loan, the Administrative Agent and the Lenders shall have received satisfactory evidence of the entry of the applicable Orders;

(d)        Other Documents.    The Administrative Agent and each Lender shall have received such other documents as the Administrative Agent or such Lender or its respective counsel may reasonably request.

5.02        Conditions Precedent to Initial and Subsequent Loans.    The obligation of the Lenders to make any Loans hereunder at any time (or to extend any other credit hereunder) shall be subject to the following conditions precedent:

(a)        no Default or Event of Default shall have occurred and be continuing or would result from the making of such Loans;

(b)        both immediately prior to the making of such Loan and also after giving effect thereto and to the intended use thereof, the representations and warranties made by each Borrower in Section 6 hereof, and in each of the other Loan Documents, shall be true and complete on and as of the date of the making of such Loan in all material respects with the same force and effect as if made on and as of such date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date). At the request of the Administrative Agent, the Administrative Agent shall have received an officer's certificate signed by a Responsible Officer of each Borrower certifying as to the truth and accuracy of the above;

(c)        following the funding of such Loan:

(i)        The aggregate principal amount of Loans advanced by any Lender will not exceed its respective Commitment;

(ii)        The aggregate principal amount of Loans outstanding will not exceed the Maximum Credit;

(d)        the Administrative Agent and each Lender shall have received a Borrowing Notice;

(e)        the Orders shall not have been stayed in any respect; and if any Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the performance by the Borrowers of any of their respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal; and

(f)        there shall not have occurred or be continuing an event beyond the reasonable control of the Administrative Agent or any Lender which the Administrative Agent or such Lender reasonably determines may imminently result in the Administrative Agent's or such Lender's inability to perform its obligations under this Loan Agreement including, without

limitation, acts of God, strikes, lockouts, riots, acts of war or terrorism, epidemics, nationalization, expropriation, currency restrictions, fire, communication line failures, computer viruses, power failures, earthquakes, or other disasters of a similar nature to the foregoing.

Each Borrowing Notice hereunder shall constitute a certification by the Borrowers to the effect set forth in this Section 5.02 (both as of the date of such Borrowing Notice, request or confirmation and as of the date of such borrowing).

**Section 6. <u>Borrowers Representations and Warranties</u>.**    Each Borrower represents and warrants to the Administrative Agent and the Lenders that throughout the term of this Loan Agreement:

6.01    <u>Existence; Compliance with Law</u>.  Each Borrower (a) is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (b) has all requisite corporate or other power, and has all governmental licenses, authorizations, consents and approvals, necessary to own its assets and carry on its business as now being or as proposed to be conducted, except where the lack of such licenses, authorizations, consents and approvals would not be reasonably likely to have a Material Adverse Effect; and (c) is qualified to do business and is in good standing in all other jurisdictions in which the nature of the business conducted by it makes such qualification necessary, except where failure so to qualify would not be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect; and (c) is in compliance in all material respect with all Requirements of Law.

6.02    [Reserved].

6.03    <u>Litigation</u>. **[Reserved]**.

6.04    <u>No Breach</u>.  Subject to the entry of the Orders, neither (a) the execution and delivery of the Loan Documents or (b) the consummation of the transactions therein contemplated in compliance with the terms and provisions thereof will conflict with or result in a breach of the charter or by-laws of any Borrower, or any applicable law, rule or regulation, or any order, writ, injunction or decree of any Governmental Authority, or other instrument, indenture, or other material agreement, to which any Borrower or any of its Subsidiaries is a party or by which any of them or any of their property is bound or to which any of them is subject (other than conflicts, breaches and defaults the enforcement of which will be stayed by virtue of the filing of the Chapter 11 Cases), or constitute a default under any such instrument, indenture, or other material agreement or (except for the Liens created pursuant to this Loan Agreement) result in the creation or imposition of any Lien upon any property of any Borrower or any of its Subsidiaries, pursuant to the terms of any such agreement or instrument.

6.05    <u>Action</u>.  Subject to the entry of the Orders, each Borrower has all necessary corporate or other power, authority and legal right to execute, deliver and perform its obligations under each of the Loan Documents to which it is a party; the execution, delivery and performance by each Borrower of each of the Loan Documents to which it is a party has been duly authorized by all necessary corporate or other action on its part; and each Loan Document has been duly and validly executed and delivered by each Borrower and constitutes a legal, valid

and binding obligation of each Borrower, enforceable against each Borrower in accordance with its terms.

        6.06        <u>Approvals</u>. No authorizations, approvals or consents of, and no filings or registrations with, any Governmental Authority, or any other Person, are necessary for the execution, delivery or performance by any Borrower of the Loan Documents to which it is a party or for the legality, validity or enforceability thereof, except for the Orders and those consents which have been obtained.

        6.07        <u>Margin Regulations</u>. Neither the making of any Loan hereunder, nor the use of the proceeds thereof, will violate or be inconsistent with the provisions of Regulation T, U or X.

        6.08        <u>Taxes</u>. Each Borrower and its Subsidiaries have filed all federal income Tax Returns and all other material Tax Returns that are required to be filed by them and have paid all Taxes otherwise required to be paid by them, except for any such taxes (other than payroll Taxes), if any, that are being appropriately contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been provided in accordance with GAAP or except as permitted by the Bankruptcy Code to the contrary. The charges, accruals and reserves on the books of each Borrower and its Subsidiaries in respect of taxes and other governmental charges are adequate.

        6.09        <u>Intellectual Property</u>. Each Borrower owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business as currently conducted. No material claim has been asserted and is pending by any Person challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any Intellectual Property, nor does any Borrower know of any valid basis for any such claim. The use of Intellectual Property by each Borrower does not infringe on the rights of any Person in any material respect.

        6.10        <u>Environmental Matters</u>.

        (a)        The operations of the Borrowers have been and are in compliance with all Environmental Laws, including obtaining and complying with all required environmental, health and safety Permits, other than non-compliances that in the aggregate have (i) no reasonable likelihood of the Borrowers incurring Environmental Liabilities and Costs in excess of $50,000 and (ii) no Material Adverse Effect.

        (b)        None of the Borrowers or any Collateral currently or, to the knowledge of the Borrowers, previously owned, operated or leased by or for any Borrower is subject to any pending or, to the knowledge of the Borrowers, threatened, claim, order, agreement, notice of violation, notice of potential liability or is the subject of any pending or threatened proceeding or governmental investigation under or pursuant to Environmental Laws other than those that in the aggregate have (i) no reasonable likelihood of the Borrowers incurring Environmental Liabilities and Costs in excess of $50,000 and (ii) no Material Adverse Effect.

        (c)        None of the Borrower or any of its Subsidiaries is a treatment, storage or disposal facility requiring a Permit under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, the regulations thereunder or any state analog.

(d)        There are no facts, circumstances or conditions arising out of or relating to the operations or ownership of real property owned, operated or leased by the Borrowers that are not specifically included in the financial information furnished to the Lenders other than those that in the aggregate have (i) no reasonable likelihood of the Borrowers incurring Environmental Liabilities and Costs in excess of $50,000 and (ii) no Material Adverse Effect.

(e)        As of the date hereof, to the knowledge of the Borrowers; no Environmental Lien has attached to any property of any Borrower and, to the knowledge of the Borrowers, no facts, circumstances or conditions exist that could reasonably be expected to result in any such Lien attaching to any such property.

(f)        The Borrowers have provided the Lenders with copies of all environmental, health or safety audits, studies, assessments, inspections, investigations or other environmental health and safety reports relating to the operations of the Borrowers or any of their real property that are in the possession, custody or control of the Borrowers.

6.11    <u>Investment Company Act</u>.    No Borrower nor any Subsidiary of a Borrower is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.  No Borrower is subject to any federal or state statute or regulation that limits its ability to incur indebtedness.

6.12    <u>No Legal Bar</u>.    Subject to the entry of the Orders, neither the execution, delivery and performance of this Loan Agreement, the borrowings hereunder and the use of the proceeds thereof nor the provisions of any other Loan Documents will violate any Requirement of Law or Contractual Obligation (other than violations the enforcement of which will be stayed by virtue of the filing of the Chapter 11 Cases) of any Borrower or of any Subsidiary of a Borrower and will not result in, or require, the creation or imposition of any Lien (other than the Liens created hereunder) on any of its respective properties or revenue, pursuant to any such Requirement of Law or Contractual Obligation.

6.13    <u>No Default</u>.    No Default or Event of Default has occurred and is continuing.

6.14    <u>Collateral; Collateral Security; Administrative Priority</u>.

(a)        Except for Permitted Liens, no Borrower has assigned, pledged, or otherwise conveyed or encumbered any Collateral to any other Person.  The Borrowers represents that they are the sole owners of the Collateral and have good and marketable title thereto free and clear of all Liens, other than the Lien of the Administrative Agent and Permitted Liens.

(b)        The provisions of this Loan Agreement, together with the Orders, are effective to create in favor of the Administrative Agent a valid and perfected security interest in all right, title and interest of the Borrowers in, to and under the Collateral.

(c)        Upon the entry of the Orders, the Administrative Agent has the priority of Liens and claims as set forth in Section 4.09.

6.15      [Reserved].

6.16      <u>True and Complete Disclosure</u>.  The information, reports, financial statements, exhibits and schedules furnished in writing by or on behalf of the Borrowers to the Administrative Agent or any Lender in connection with the negotiation, preparation or delivery of this Loan Agreement, the other Loan Documents or included herein or therein or delivered pursuant hereto or thereto, when taken as a whole, do not contain any untrue statement of material fact or omit to state any material fact necessary to make the statements herein or therein, in light of the circumstances under which they were made, not misleading.  All written information furnished after the date hereof by or on behalf of the Borrowers to the Administrative Agent or any Lender in connection with this Loan Agreement, the other Loan Documents and the transactions contemplated hereby and thereby will be true, complete and accurate in every material respect, or based on reasonable estimates, on the date as of which such information is stated or certified.  There is no Material Adverse Change and no fact known to a Responsible Officer that could reasonably be expected to have a Material Adverse Effect that has not been disclosed herein, in the other Loan Documents or in a report, financial statement, exhibit, schedule, disclosure letter or other writing furnished to the Lenders for use in connection with the transactions contemplated hereby or thereby.

6.17      <u>ERISA</u>.  **[Reserved]**.

6.18      <u>Use of Proceeds</u>.  The Borrowers will use the proceeds of the Loans to support working capital needs, in each case, to the extent permitted pursuant to this Loan Agreement and in the Ordinary Course of Business.

6.19      <u>Insurance</u>.  All insurance required to be obtained and maintained by any Borrower pursuant to the Loan Documents has been obtained.  All premiums then due and payable on all such insurance have been paid.

6.20      <u>No Agent or Lender Licenses</u>.  Neither the Administrative Agent nor any Lender will be required solely as a result of this Loan Agreement or the financing or taking a pledge of the mortgage loans to be licensed, registered or approved or to obtain permits or otherwise qualify (i) to do business in any state in which it is not currently so required or (ii) under any state consumer lending, fair debt collection or other applicable state statute or regulation.

6.21      [Reserved].

6.22      <u>Orders.</u>  The Orders are in full force and effect and have not been stayed.

6.23      <u>REIT Status.</u>  AHMC has elected to be treated as a REIT for U.S. federal income tax purposes. AHMC is a taxable REIT Subsidiary of AHMC.

6.24      <u>MERS Membership.</u>  As of the Closing Date, American Home Mortgage Holdings, Inc. is a MERS Member, and AHMSI and AHMC in their capacity as affiliates of American Home Mortgage Holdings, Inc. are each authorized users of the MERS System pursuant to American Home Mortgage Holding, Inc.'s membership and American Home

Mortgage Holdings, Inc. is in compliance with all terms and conditions of its membership in MERS.

6.25     Collection Accounts and Escrow Accounts.   The collection accounts and escrow accounts of the Borrowers held for the benefit of third parties shall be fully funded (or the applicable amounts shall be on deposit in segregated accounts) in accordance with the terms of the applicable securitization documents.   At any time upon the request of the Administrative Agent, the Borrowers shall provide an officer's certificate in support thereof, in form and substance satisfactory to the Administrative Agent.

6.26     Anti-Terrorism Law Compliance.   No Borrower is in violation of any law or regulation, or is identified in any list, of any Governmental Authority (including, without limitation, the U.S. Office of Foreign Asset Control list, Executive Order No. 13224 or the USA Patriot Act) that prohibits or limits the conduct of business with or the receiving of funds, goods or services to or for the benefit of certain Persons specified therein or that prohibits or limits any Lender from making any Loans to any Borrower or from otherwise conducting business with any Borrower.

**Section 7.  Covenants of the Borrowers**.   Each Borrower covenants and agrees with the Administrative Agent and the Lenders that, so long as any Loan is outstanding and until payment in full of all Obligations:

7.01     Financial Statements and Other Information.   The Borrowers shall deliver (or cause to be delivered) to the Administrative Agent and each Lender:

(a)     by the 15th and last day of each month, copies of all pleadings, motions, applications, financial information and other papers and documents filed by the Borrowers in the Chapter 11 Cases, with copies of such papers and documents also provided to or served on the Administrative Agent's counsel; and

(b)     as soon as reasonably possible, and in any event within ten (10) Business Days after a Responsible Officer knows, or with respect to any Plan or Multiemployer Plan to which any Borrower or any of its Subsidiaries makes direct contributions, has reason to believe, that any of the events or conditions specified below with respect to any Plan or Multiemployer Plan has occurred or exists, a statement signed by a senior financial officer of the Administrative Borrower setting forth details respecting such event or condition and the action, if any, that such Borrower or its ERISA Affiliate proposes to take with respect thereto (and a copy of any report or notice required to be filed with or given to PBGC by the Borrowers or an ERISA Affiliate with respect to such event or condition):

(i)     any reportable event, as defined in Section 4043(b) of ERISA and the regulations issued thereunder, with respect to a Plan, as to which PBGC has not by regulation or otherwise waived the requirement of Section 4043(a) of ERISA that it be notified within thirty (30) days of the occurrence of such event (provided that a failure to meet the minimum funding standard of Section 412 of the Code or Section 302 of ERISA, including, without limitation, the failure to make on or before its due date a required installment under Section 412(m) of the Code or Section 302(e) of ERISA, shall

be a reportable event regardless of the issuance of any waivers in accordance with Section 412(d) of the Code); and any request for a waiver under Section 412(d) of the Code for any Plan;

(ii)     the distribution under Section 4041(c) of ERISA of a notice of intent to terminate any Plan or any action taken by the Borrower, AHM Acquisition or an ERISA Affiliate to terminate any Plan;

(iii)    the institution by PBGC of proceedings under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or the receipt by any Borrower or any ERISA Affiliate of a notice from a Multiemployer Plan that such action has been taken by PBGC with respect to such Multiemployer Plan;

(iv)     the complete or partial withdrawal from a Multiemployer Plan by any Borrower or any ERISA Affiliate that results in liability under Section 4201 or 4204 of ERISA (including the obligation to satisfy secondary liability as a result of a purchaser default) or the receipt by any Borrower or any ERISA Affiliate of notice from a Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA or that it intends to terminate or has terminated under Section 4041A of ERISA;

(v)      the institution of a proceeding by a fiduciary of any Multiemployer Plan against any Borrower or any ERISA Affiliate to enforce Section 515 of ERISA, which proceeding is not dismissed within 30 days; and

(vi)     the adoption of an amendment to any Plan that, pursuant to Section 401(e) of the Code or Section 307 of ERISA, would result in the loss of tax-exempt status of the trust of which such Plan is a part if any Borrower or an ERISA Affiliate fails to timely provide security to such Plan in accordance with the provisions of said Sections.

7.02    Litigation. Each Borrower shall promptly, and in any event within 5 Business Days after service of process on such Borrower, give to the Administrative Agent and the Lenders notice of all legal or arbitrable proceedings affecting the Borrowers that questions or challenges the validity or enforceability of any of the Loan Documents or as to which there is a reasonable likelihood of adverse determination which would result in a Material Adverse Effect.

7.03    Existence, Etc. Each Borrower shall:

(a)     preserve and maintain its legal existence and all of its material rights, privileges, licenses and franchises;

(b)     comply with the requirements of all applicable laws, rules, regulations and orders of Governmental Authorities (including, without limitation, truth in lending, real estate settlement procedures and all environmental laws, rules, regulations and orders of Governmental Authorities) if failure to comply with such requirements would be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect;

(c)        keep adequate records and books of account, in which complete entries will be made in accordance with historical practice;

(d)        pay and discharge and make deposit of all Taxes, assessments and governmental charges or levies imposed on it or on its income or profits or on any of the Collateral or which it is otherwise required to deposit prior to the date on which such Taxes are due, except for any such Tax, assessment, charge or levy (excluding payroll Taxes) the payment of which is being contested in good Faith and by proper proceedings and against which adequate reserves are being maintained in accordance with GAAP or except as permitted by the Bankruptcy Code; and

(e)        permit representatives of the Administrative Agent, any Lender or any Lender-Related Party, during normal business hours upon reasonable advance notice (or at any time and from time to time during the continuance of an Event of Default), to examine, copy and make extracts from its books and records, to inspect any of the Collateral, and to discuss its business and affairs with its, all to the extent reasonably requested by the Administrative Agent, any Lender or any Lender-Related Party.

7.04       Prohibition of Fundamental Changes.       Except for Permitted Dispositions, no Borrower will enter into any transaction of merger or consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation, winding up or dissolution) or sell all or substantially all of its assets.

7.05       [Reserved]

7.06       [Reserved]

7.07       Notices.  Each Borrower shall give notice to the Administrative Agent and the Lenders promptly:

(a)        upon any Borrower becoming aware of, and in any event within one (1) Business Day after, the occurrence of any Default or Event of Default or any event of default or default under any other material agreement of a Borrower (except any such default the enforcement of which is stayed by the filing of the Chapter 11 Cases);

(b)        upon, and in any event within one (1) Business Day after, service of process on any Borrower or any Affiliate of any Borrower, or the Administrative Agent thereof for service of process, in respect of any legal or arbitrable proceedings affecting any Borrower or any Subsidiary or Affiliate of any Borrower (i) that questions or challenges the validity or enforceability of any of the Loan Documents or (ii) in which the amount in controversy exceeds $100,000, unless such proceeding is stayed by the commencement of the Chapter 11 Cases;

(c)        upon any Borrower becoming aware of any Material Adverse Change, or any Material Adverse Effect; and

(d)        upon the entry of a judgment or decree affecting the Borrowers in an amount in excess of $100,000, unless collection of such judgment or decree is stayed by the commencement of the Chapter 11 Cases.

Each notice pursuant to this Section 7.07 shall be accompanied by a statement of a Responsible Officer of the applicable Borrower setting forth details of the occurrence referred to therein and stating what action the applicable Borrower has taken or proposes to take with respect thereto.

7.08    Lines of Business.  The Borrowers will not engage to any substantial extent in any line or lines of business activity other than the businesses engaged in by the Borrowers as of the Closing Date.

7.09    [Reserved].

7.10    Use of Proceeds.  The Borrowers will use the proceeds of the Loans to support working capital needs, in each case, to the extent permitted pursuant to this Loan Agreement and in the Ordinary Course of Business.

7.11    Limitation on Liens.  No Borrower will, nor will it permit or allow others to, create, incur or permit to exist any Lien, security interest or claim on or to any Collateral, except for (i) Permitted Liens (as defined in the Purchase Agreement) and any Lien created in favor of AH Mortgage Acquisition pursuant to the Purchase Agreement or Sale Order, (ii) Liens on the Collateral created pursuant to this Loan Agreement and the other Loan Documents and (iii) other Liens acceptable to the Administrative Agent (collectively, "Permitted Liens").  Each Borrower will defend the Collateral against, and will take such other action as is necessary to remove, any Lien, security interest or claim on or to the Collateral, other than the security interests created or allowed under this Loan Agreement, and each Borrower will defend the right, title and interest of the Administrative Agent and the Lenders in and to any of the Collateral against the claims and demands of all persons whomsoever.

7.12    Limitation on Sale of Assets.  No Borrower will convey, sell, lease, assign, transfer or otherwise dispose of (collectively, "Transfer"), any of the Collateral, other than Permitted Dispositions.

7.13    Limitation on Distributions.  No Borrower will make any payment on account of, or set apart assets for a sinking or other analogous fund for the purchase, redemption, defeasance, retirement or other acquisition of any stock or senior or subordinate debt of such Borrower, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of such Borrower.

7.14    Restricted Payments.  No Borrower shall make any Restricted Payments other than Restricted Payments by any Borrower to any other Borrower.

7.15    Loans, Investments, Etc.  The Borrowers shall not make or commit or agree to make any loan, advance, guarantee of obligations, other extension of credit or capital contributions to, or hold or invest in or commit or agree to hold or invest in, or purchase or otherwise acquire or commit or agree to purchase or otherwise acquire any shares of the Equity Interests, bonds, notes, debentures or other securities of, or make or commit or agree to make any other investment in, any other Person, or purchase or own any futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or permit any of its Subsidiaries to do any of the foregoing, except

for: (i) investments existing on the Closing Date, but not any increase in the amount thereof or any other modification of the terms thereof, (ii) loans and advances by any Borrower to another Borrower made in the ordinary course of business, and (iii) cash and Cash Equivalents held in Control Accounts and the Borrower Account.

7.16    Orders; Lien Priority; Payment of Claims.

(a)    The Borrowers shall not at any time seek, consent to or suffer to exist any modification, stay, vacation or amendment of the Orders except for modifications and amendments agreed to by the Administrative Agent.

(b)    The Borrowers shall not at any time suffer to exist any Lien on the Collateral having a priority equal or superior to the Lien in favor of the Administrative Agent and the Lenders in respect of the Collateral except for Permitted Liens.

7.17    Maintenance of Collateral; Insurance. Each Borrower shall keep all of its property useful and necessary in its business in good working order and condition. Each Borrower shall maintain errors and omissions insurance or mortgage impairment insurance and blanket bond coverage in such amounts as are in effect on the Closing Date (as disclosed to the Lenders in writing) and shall not permit the reduction of such coverage without the written consent of the Lenders, and shall also cause to be maintained such other insurance with financially sound and reputable insurance companies, and with respect to property and risks of a character usually maintained by entities engaged in the same or similar business similarly situated, against loss, damage and liability of the kinds and in the amounts customarily maintained by such entities.

7.18    ERISA. No Borrower will engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by the Administrative Agent or any Lender of any of its rights under this Loan Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA or result in a violation of a state statute regulating governmental plans that would subject the Lender to liability for a violation of ERISA or such state statute.

7.19    [Reserved].

(a)    [Reserved].

7.20    MERS.

(a)    Each of the Borrowers shall, at all times, maintain its status as a MERS Member (or, if applicable, as an authorized user of the MERS System) and at all times remain in compliance with all terms and conditions of membership in MERS, including the MERSCORP, Inc. "Rules of Membership" most recently promulgated by MERSCORP, Inc., the "MERS Procedures Manual" most recently promulgated by MERS, and any and all other guidelines or requirements set forth by MERS or MERSCORP, as each of the foregoing may be modified from time to time, including, but not limited to, compliance with guidelines and procedures set forth with respect to technological capabilities, drafting and recordation of deeds

of trust or mortgages, registration of deeds of trust or mortgages on the MERS System, including registration of the interest of the Administrative Agent and the Lenders in such mortgages and membership requirements; provided, however, that any of the Borrowers may resign from the MERS System (or cease to be an authorized user of the MERS System) so long as such Borrower has delivered to the Administrative Agent: (1) written notice that it intends to resign from the MERS System (or cease to be an authorized user of the MERS System) no later than 60 days prior to the proposed effective date of such resignation or cessation, and (2) such evidence as the Administrative Agent may request that upon the effective date of such Borrower's resignation from the MERS System (or cessation as an authorized user of the MERS System) and at all times thereafter, no deed of trust or mortgage shall be registered to such Borrower on the MERS System unless such Borrower shall be a MERS Member (or an authorized user of the MERS System).

(b)     Each of the Borrowers that is a MERS Member shall promptly, upon the request of the Administrative Agent, execute and deliver to the Administrative Agent an assignment of mortgage, in blank, with respect to any MERS Mortgage that the Administrative Agent reasonably determines shall be removed from the MERS System.

(c)     Upon the registration of any Mortgage on the MERS System, each of the Borrowers designates the Administrative Agent in the Custodian Category and the Interim Funder Category with respect to such Mortgage.

(d)     Each of the Borrowers agrees that it shall not de-register or attempt to de-register any deed of trust or mortgage from the MERS System unless such Borrower has complied with the requirements set forth in the Electronic Tracking Agreement (as defined for the purposes of the MERS System and the requirements hereof relating to a release of Collateral.

(e)     Each of the Borrowers shall employ officers who have the authority, pursuant to a corporate resolution of MERS, to execute assignments of deeds of trust and mortgages in the name of MERS in the event de-registration of a deed of trust or mortgage from the MERS System is necessary or desirable.

(f)     Each of the Borrowers shall execute and deliver to the Administrative Agent such blank assignments of deeds of trust and mortgages as the Administrative Agent may require.

**Section 8. Events of Default.**  Each of the following events shall constitute an event of default (an "Event of Default") hereunder:

(a)     the Borrowers shall fail to make a payment of (i) when and as required to be paid herein, any amount of principal of any Loan, (ii) within three days after the same becomes due, any interest on any Loan or any fee due hereunder or (iii) within five days after the same becomes due, any other amount payable hereunder or under any other Loan Document (whether at stated maturity or upon acceleration); or

(b)     the Borrowers shall fail to make any mandatory prepayment under Section 2.06; or

(e)        the Borrowers shall default in the payment of any other Obligation or any other amount due under any other Loan Document, and such default shall have continued unremedied for 5 Business Days; or

(d)        any representation, warranty or certification made or deemed made herein (including in <u>Section 6</u>) or in any other Loan Document by any Borrower or any certificate furnished to the Administrative Agent or any Lender pursuant to the provisions thereof, shall prove to have been false or misleading in any material respect as of the time made or furnished; or

(e)        the Borrowers shall fail to comply with the requirements of <u>Section 7</u>; or (ii) the Borrowers shall otherwise fail to observe or perform any other agreement contained in this Loan Agreement or any other Loan Document and such failure to observe or perform shall continue unremedied for a period of 10 Business Days; or

(f)        except for any judgment the enforcement of which is stayed by the commencement of the Chapter 11 Cases, a final judgment or judgments for the payment of money in excess of (i) $50,000, individually, or (iii) $250,000 in the aggregate, (to the extent that it is, in the reasonable determination of the Administrative Agent, uninsured and provided that any insurance or other credit posted in connection with an appeal shall not be deemed insurance for these purposes) shall be rendered against the Collateral by one or more courts, administrative tribunals or other bodies having jurisdiction over them and the same shall not be discharged (or provision shall not be made for such discharge) or bonded, or a stay of execution thereof shall not be procured, within 30 days from the date of entry thereof and any such Borrower or any such Subsidiary shall not, within said period of 30 days, or such longer period during which execution of the same shall have been stayed or bonded, appeal therefrom and cause the execution thereof to be stayed during such appeal; or

(g)        any Loan Document shall for whatever reason (including an event of default thereunder) be terminated or the Lien on the Collateral created by this Loan Agreement and the Orders, any Borrower's material obligations hereunder or under any Loan Document shall cease to be in full force and effect or, in the Administrative Agent's good faith determination, otherwise cease to benefit the Administrative Agent or any Lender, or the enforceability thereof shall be contested by any Borrower; or

(h)        (i) any Person shall engage in any "prohibited transaction" (as defined in <u>Section 406</u> of ERISA or <u>Section 4975</u> of the Code) involving any Plan, (ii) any material "accumulated funding deficiency" (as defined in <u>Section 302</u> of ERISA), whether or not waived, shall exist with respect to any Plan, any Borrower or any ERISA Affiliate shall fail to make a required installment payment to any Plan on or before the date due under <u>Section 302</u> of ERISA or <u>Section 412</u> of the Code, or any Lien in favor of the PBGC or a Plan shall arise on the assets of any Borrower or any ERISA Affiliate, (iii) a reportable event as defined in <u>Section 4043(b)</u> of ERISA and the regulations issued thereunder shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Plan, which reportable event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Lender, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Plan shall terminate for purposes of Title IV of

ERISA, (v) any Borrower or any ERISA Affiliate shall, or in the reasonable opinion of the Administrative Agent is likely to, incur any liability in connection with a withdrawal from, or the insolvency or reorganization of, a Multiemployer Plan, (vi) any Borrower or any ERISA Affiliate shall fail to pay when due or is in default on an amount which it shall have become liable to pay to the PBGC, any Plan, any Multiemployer Plan or a trust established under Section 4049 of ERISA, or (vii) a condition shall exist by reason of which the PBGC would be entitled to obtain a decree adjudicating that an ERISA Plan must be terminated or have a trustee appointed to administer any ERISA Plan, (viii) any other event or condition shall occur or exist with respect to any Plan which could subject any Borrower or any ERISA Affiliate to any tax, penalty or other liability or the imposition of any Lien or security interest on any Borrower or any ERISA Affiliate, (ix) any Borrower shall incur any liability for any post-retirement or post-termination health or life insurance or (x) the assets of any Borrower become or are deemed to be "plan assets" of a plan subject to ERISA or Section 4975 of the Code. No Event of Default shall be deemed to be, or have been, waived or corrected because of any disclosure by any Borrower; and in each case in clauses (i) through (ix) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect; or

       (i)      any Borrower shall grant, or suffer to exist, any Lien on any Collateral except the Liens in favor of the Administrative Agent and the Secured Parties and other Permitted Liens; or the Liens granted hereunder shall cease to be valid and perfected first priority Liens on the Collateral subject, as to priority, only to Permitted Liens; or

       (j)      an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, or any Borrower shall file an application for on order with respect to any Chapter 11 Case seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or

       (k)      an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a Chapter 7 case; or

       (l)      an order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the Commitments, and payment in full in cash of all Obligations of the Borrowers hereunder and under the other Loan Documents upon entry thereof; or

       (m)     an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court or any other court of competent jurisdiction without the express prior written consent of the Lenders, (i) to revoke, reverse, stay for a period in excess of 10 days, vacate, rescind, modify, supplement or amend the Orders, this Loan Agreement or any other Loan Document, in each case in a manner that is adverse the Administrative Agent and the Lenders, or (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Borrowers equal or superior to the priority of the Lenders in respect of the Obligations to the extent that such Obligations are able to be repaid from the foreclosure or other creditors' remedies with

respect to the Collateral or (iii) to grant or permit the grant of a Lien on the Collateral other than Permitted Liens; or

(n)        an application for any of the orders described in clauses (j), (k), (l), or (m) shall be made by a Person other than the Borrowers, and such application is not being diligently contested by the Borrowers in good faith; or

(o)        (i) any Borrower challenges or (ii) any other Person successfully challenges, in each case the rights of the Administrative Agent or any Lender under this Loan Agreement or any Loan Document, including, without limitation, the Liens hereunder; or

(p)        an order shall be entered by the Bankruptcy Court that is not stayed pending appeal granting relief from the automatic stay to any creditor of any of the Borrowers with respect to any Collateral.

**Section 9. <u>Remedies Upon Default</u>.**  Upon the occurrence of one or more Events of Default (subject to the expiration of the applicable cure period contained therein), the Administrative Agent may, and shall at the request of the Required Lenders, immediately declare the principal amount of the Loans then outstanding to be immediately due and payable, together with all interest and other amounts payable hereunder (including amounts payable pursuant to Sections 2.05, and 3.07 hereof) thereon and reasonable fees and out-of-pocket expenses accruing under this Loan Agreement. Upon such declaration, the balance then outstanding shall become immediately due and payable, without further order of, or application to, the Bankruptcy Court, without presentment, demand, protest or other formalities of any kind, all of which are hereby expressly waived by each Borrower and the Administrative Agent may, on behalf of the Secured Parties, exercise the rights and remedies set forth in <u>Section 3.05</u> hereof, which are the only remedies that the Secured Parties may exercise.

**Section 10.    <u>Administrative Agent</u>.**

10.01      Appointment.  Each Lender (and each subsequent holder of any Loans by its acceptance thereof), hereby irrevocably appoints and authorizes the Administrative Agent to perform the duties of the Administrative Agent as set forth in this Loan Agreement including: (i) to receive on behalf of each Lender any payment of principal of or interest on the Loans outstanding hereunder and all other amounts accrued hereunder for the account of the Lenders and paid to the Administrative Agent, and to distribute promptly to each Lender its Pro Rata Share of all payments so received, (ii) to distribute to each Lender copies of all material notices and agreements received by the Administrative Agent and not required to be delivered to each Lender pursuant to the terms of this Loan Agreement, provided that the Administrative Agent shall not have any liability to the Lenders for the Administrative Agent's inadvertent failure to distribute any such notices or agreements to the Lenders and (iii) subject to <u>Section 10.03</u> of this Agreement, to take such action as the Administrative Agent deems appropriate on its behalf to administer the Loans and the Loan Documents and to exercise such other powers delegated to the Administrative Agent by the terms hereof or the Loan Documents (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and) instructions and the power to make or to refuse to make determinations and calculations) together with such powers as are reasonably incidental thereto to carry out the purposes hereof

and thereof. As to any matters not expressly provided for by this Loan Agreement and the other Loan Documents (including, without limitation, enforcement or collection of the Notes), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions of the Required Lenders shall be binding upon all Lenders and all subsequent holders of Notes; provided, however, that the Administrative Agent shall not be required to take any action which, in the reasonable opinion of the Administrative Agent, exposes the Administrative Agent to liability or which is contrary to this Loan Agreement or any Loan Document or applicable law.

10.02    Nature of Duties. The Administrative Agent shall have no duties or responsibilities except those expressly set forth in this Loan Agreement or in the Loan Documents. The duties of the Administrative Agent shall be mechanical and administrative in nature. The Administrative Agent shall not have by reason of this Loan Agreement or any Loan Document a fiduciary relationship in respect of any Lender. Nothing in this Loan Agreement or any of the Loan Documents, express or implied, is intended to or shall be construed to impose upon the Administrative Agent any obligations in respect of this Loan Agreement or any of the Loan Documents except as expressly set forth herein or therein. Each Lender shall make its own independent investigation of the financial condition and affairs of the Borrowers in connection with the making and the continuance of the Loans hereunder and shall make its own appraisal of the creditworthiness of the Borrowers and the value of the Collateral, and the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the initial Loans hereunder or at any time or times thereafter, provided that, upon the reasonable request of a Lender, the Administrative Agent shall provide to such Lender any documents or reports delivered to the Administrative Agent by the Borrowers pursuant to the terms of this Loan Agreement or any Loan Document. The Administrative Agent shall seek any consent or approval of the Required Lenders to the taking or refraining from taking any action hereunder by sending notice thereof to each Lender. The Administrative Agent shall promptly notify each Lender any time that the Required Lenders have instructed the Administrative Agent to act or refrain from acting pursuant hereto.

10.03    Rights, Exculpation, Etc. The Administrative Agent and its directors, officers, agents or employees shall not be liable to the Secured Parties or their participants or assignees for any action taken or omitted to be taken by it under or in connection with this Loan Agreement or the other Loan Documents, Without limiting the generality of the foregoing, the Administrative Agent (i) may treat the payee of any Note as the holder thereof until the Administrative Agent receives written notice of the assignment or transfer thereof, pursuant to Section 11.15 hereof, signed by such payee and in form satisfactory to the Administrative Agent; (ii) may consult with legal counsel (including, without limitation, counsel to the Administrative Agent or counsel to the Borrowers), independent public accountants, and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel or experts; (ii) make no warranty or representation to any Secured Party and shall not be responsible to any Secured Party for any statements, certificates, warranties or representations made in or in connection with this Loan Agreement or the other Loan Documents; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Loan Agreement

or the other Loan Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the Collateral (including, without limitation, the books and records) of any Person; (v) shall not be responsible to any Secured Party for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Loan Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (vi) shall not be deemed to have made any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Borrower in connection therewith, nor shall the Administrative Agent be responsible or liable to the Secured Parties for any failure to monitor or maintain any portion of the Collateral. The Administrative Agent shall not be liable for any apportionment or distribution of payments made in good faith pursuant to Section 3.03, and if any such apportionment or distribution is subsequently determined to have been made in error the solo recourse of any Secured Party to whom payment was due but not made, shall be to recover from other Secured Parties any payment in excess of the amount which they are determined to be entitled. The Administrative Agent may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Loan Agreement or of any of the Loan Documents the Administrative Agent is permitted or required to take or to grant, and if such instructions are promptly requested, the Administrative Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Loan Documents until it shall have received such instructions from the Required Lenders. Without limiting the foregoing, no Secured Party shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting under this Agreement, the Notes or any of the other Loan Documents in accordance with the instructions of the Required Lenders.

10.04    Reliance. The Administrative Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Loan Agreement or any of the Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

10.05    Indemnification. To the extent that the Administrative Agent is not reimbursed and indemnified by any Borrower, the Lenders will reimburse and indemnify the Administrative Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Administrative Agent in any way relating to or arising out of this Loan Agreement or any of the Loan Documents or any action taken or omitted by the Administrative Agent under this Loan Agreement or any of the Loan Documents, in proportion to each Lender's Pro Rata Share, including, without limitation, all advances and disbursements made pursuant to Section 10.08; provided, however, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final judicial determination that such resulted from the Administrative Agent's gross negligence or willful misconduct The obligations of the Lenders under this Section 10.05 shall survive the payment in full of the Loans and the termination of this Loan Agreement.

10.06    Agent Individually.  With respect to its Pro Rata Share of the Total Commitment hereunder, the Loans made by it and the Notes issued to or held by it, the Administrative Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender or holder of a Note.  The terms "Lenders" or "Required Lenders" or any similar terms shall, unless the context clearly otherwise indicates, include the Administrative Agent in its individual capacity as a Lender or one of the Required Lenders.  The term "Administrative Agent" means the Administrative Agent solely in its individual capacity as an administrative agent hereunder and under each other Loan Document.  The Administrative Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with the Borrowers as if it were not acting as an Administrative Agent pursuant hereto without any duty to account to the Lenders.

10.07    Successor Agent.

(a)    The Administrative Agent may resign from the performance of all its functions and duties hereunder and under the other Loan Documents at any time by giving at least thirty (30) Business Days' prior written notice to the Administrative Borrower and each Lender.  Such resignation shall take effect upon the acceptance by a successor Administrative Agent of appointment pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)    Upon any such notice of resignation, the Required Lenders shall be entitled to appoint a successor Administrative Agent who, in the absence of a continuing Event of Default, shall be reasonably satisfactory to the Administrative Borrower.   Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under this Loan Agreement and the other Loan Documents.   After the Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Section 10 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under this Loan Agreement and the other Loan Documents.

(c)    If a successor Administrative Agent shall not have been so appointed within said thirty (30) Business Day period, the retiring Administrative Agent shall then appoint a successor Administrative Agent who, if an Event of Default is not continuing, shall be reasonably satisfactory to the Administrative Borrower, who shall serve as the Administrative Agent until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

10.08    Collateral Matters.

(a)    The Secured Parties hereby irrevocably authorize the Administrative Agent, at its option and in its discretion, to release any Lien granted to or held by the Administrative Agent upon any Collateral upon termination of the Total Commitment and payment and satisfaction of all Loans and all other Obligations which have matured and which the Administrative Agent has been notified in writing are then due and payable; or constituting

Collateral being sold or disposed of pursuant to a Permitted Disposition or in the ordinary course of any Borrower's business and in compliance with the terms of this Loan Agreement and the other Loan Documents; or constituting Collateral in which the Borrowers owned no interest at the time the Lien was granted or at any time thereafter; or if approved, authorized or ratified in writing by the Required Lenders subject to Section 11.01.

(b)       Without in any manner limiting the Administrative Agent's authority to act without any specific or further authorization or consent by the Secured Parties (as set forth in Section 10.08(a)), each Secured Party agrees to confirm in writing, upon request by the Administrative Agent, the authority to release Collateral conferred upon the Administrative Agent under Section 10.08(a). Upon receipt by the Administrative Agent of confirmation from the Lenders of its authority to release any particular item or types of Collateral (or, at the option of the Administrative Agent in the absence of such receipt, in reliance on Section 10.08(a), and upon prior written request by any Borrower, the Administrative Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Administrative Agent for the benefit of the Secured Parties upon such Collateral; provided, however, that (i) the Administrative Agent shall not be required to execute any such document on terms which, in the Administrative Agent's opinion, would expose the Administrative Agent to liability or create any obligations or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Lien upon (or obligations of any Borrower in respect of) all interests in the Collateral retained by any Borrower.

(c)       The Administrative Agent shall have no obligation whatsoever to any Secured Party to assure that the Collateral exists or is owned by the Borrowers or is cared for, protected or insured or has been encumbered or that the Lien granted to the Administrative Agent pursuant to this Agreement has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Administrative Agent in this Section 10.08 or in any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Administrative Agent may act in any manner it may deem appropriate, in its sole discretion, given the Administrative Agent's own interest in the Collateral as one of the Secured Parties and that the Administrative Agent shall have no duty or liability whatsoever to any other Secured Party.

(d)       The Administrative Agent acknowledges that, to the extent that the Collateral includes items (such as stock certificates, instruments and chattel paper) which are held in the possession of the Administrative Agent, or a third party on its behalf, pursuant to the Loan Documents, the Administrative Agent is also holding such items in its possession as agent and bailee of the Secured Parties for the benefit of, and for purposes of perfecting the security interest of, the Secured Parties in such items.

## Section 11.    **Miscellaneous**.

11.01    Amendments, Etc. No amendment or waiver of any provision of this Agreement or any Note, and no consent to any departure by the Borrowers therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders, and, in the case of an amendment, the Borrowers, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given, provided, however, that no amendment, waiver or consent shall (i) increase the Commitment of any Lender, reduce the principal of, or interest on, the Loans payable to any lender, reduce the amount of any fee payable for the account of any Lender, or postpone or extend any date fixed for any payment of principal of, or interest or fees on, the Loans payable to any Lender, in each case without the written consent of any Lender affected thereby, (ii) increase the Total Commitment, except as contemplated in the definition of "Maximum Credit," (iii) change the percentage of the Total Commitment or of the aggregate unpaid principal amount of the Notes that is required for the Lenders or any of them to take any action hereunder, (iv) amend the definition of "Required Lenders" or "Pro Rata Share," (v) release all or a substantial portion of the Collateral (except as otherwise provided in this Loan Agreement and the other Loan Documents), subordinate any Lien granted in favor of the Administrative Agent for the benefit of the Secured Parties, or release any Borrower, (vi) modify, waive, release or subordinate the super priority claim status of the Obligations (except as permitted in this Loan Agreement and the Loan Documents), (vii) amend, modify or waive this Section 11.01 of this Loan Agreement, in the case of clauses (ii) through (vii), without the written consent of each Lender, and (viii) amend, modify or waive this Loan Agreement in such a manner that by its terms disproportionately (in comparison with the other Lenders) affects the rights or duties under this Loan Agreement of any Lenders, without the written consent of such affected Lenders. Notwithstanding the foregoing, no amendment, waiver or consent shall affect the rights or duties of either Administrative Agent (but not in its capacity as a Lender) under this Loan Agreement or the other Loan Documents, unless in writing and signed by the Administrative Agent. The parties to this Loan Agreement acknowledge that all material amendments to this Loan Agreement will require the consent of the Bankruptcy Court.

11.02    Waiver. No failure on the part of the Administrative Agent or any Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any Loan Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

11.03    Notices.

(a)    Except as otherwise expressly permitted by this Loan Agreement or expressly provided otherwise in the applicable Loan Document, all notices, requests and other communications provided for herein and under the other Loan Documents (including, without limitation, any modifications of, or waivers, requests or consents under, this Loan Agreement) shall be given or made in writing (including, without limitation, by telex or telecopy) delivered to the intended recipient at the "Address for Notices" specified below its name on the signature pages hereof); or, as to any party, at such other address as shall be designated by such party in a

written notice to each other party. Except as otherwise provided in this Loan Agreement and except for notices given under <u>Section 2</u> (which shall be effective only on receipt), all such communications shall be deemed to have been duly given when transmitted by telex or telecopier or personally delivered or, in the case of a mailed notice, upon receipt, in each case given or addressed as aforesaid.

(b)    Nothing in this Loan Agreement or in any other Loan Document shall be construed to limit or affect the obligation of the Borrowers or any other Person to serve upon the Lenders in the manner prescribed by the Bankruptcy Code of the Federal Rules of Bankruptcy Procedure any pleading or notice required to be given to the Lenders pursuant to the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure.

11.04    [Reserved].

11.05    <u>Amendments</u>. Except as otherwise expressly provided in this Loan Agreement, any provision of this Loan Agreement may be modified or supplemented only by an instrument in writing signed by the Borrowers, the Administrative Agent and the Lenders required pursuant to <u>Section 11.01</u> and any provision of this Loan Agreement may be waived by the Lenders required pursuant to <u>Section 11.01</u>.

11.06    <u>Successors and Assigns</u>. This Loan Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

11.07    [Reserved].

11.08    <u>Captions</u>. The table of contents and captions and section headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Loan Agreement.

11.09    <u>Counterparts; Telefacsimile Execution</u>. This Loan Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Loan Agreement by signing any such counterpart. Delivery of an executed counterpart of this Loan Agreement by telefacsimile shall be equally as effective as delivery of an original executed counterpart of this Loan Agreement. Any party delivering an executed counterpart of this Loan Agreement by telefacsimile also shall deliver an original executed counterpart of this Loan Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Loan Agreement. This Section shall apply to each other Loan Document *mutatis mutandis*.

11.10    <u>LOAN AGREEMENT CONSTITUTES SECURITY AGREEMENT; GOVERNING LAW</u>. THIS LOAN AGREEMENT SHALL BE GOVERNED BY NEW YORK LAW WITHOUT REFERENCE TO CHOICE OF LAW DOCTRINE (BUT WITH REFERENCE TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, WHICH BY ITS TERMS APPLIES TO THIS LOAN AGREEMENT), EXCEPT AS GOVERNED BY THE BANKRUPTCY CODE, AND SHALL CONSTITUTE A SECURITY AGREEMENT WITHIN THE MEANING OF THE UNIFORM COMMERCIAL CODE.

11.11    CERTAIN, WAIVERS: WAIVER OF JURY TRIAL.

(a)        EACH    BORROWER    HEREBY    IRREVOCABLY    AND
UNCONDITIONALLY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW,
ANY RIGHT TO OR IN THE NATURE OF SET-OFF, ABATEMENT, SUSPENSION,
RECOUPMENT    OR    OTHER    RIGHT    TO    WITHHOLD    ANY    PAYMENT    OR
PERFORMANCE DUE BY SUCH BORROWER OR ON ITS BEHALF, TO OR FOR THE
BENEFIT OF THE ADMINISTRATIVE AGENT OR ANY LENDER OR RELATED TO THE
COLLATERAL.

(b)        WAIVER OF JURY TRIAL.  EACH OF THE BORROWERS, THE
AGENTS AND THE LENDERS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST
EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY
JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS LOAN
AGREEMENT,    ANY    OTHER    LOAN    DOCUMENT    OR    THE    TRANSACTIONS
CONTEMPLATED HEREBY OR THEREBY.

11.12    Acknowledgments.  Each Borrower hereby acknowledges that:

(a)        it has been advised by counsel in the negotiation, execution and
delivery of this Loan Agreement and the other Loan Documents;

(b)        each of the Administrative Agent and the Lenders has no fiduciary
relationship to the Borrowers, and the relationship between the Borrowers and the
Administrative Agent and the Lenders is solely that of debtor and creditor; and

(c)        no joint venture exists among or between the Administrative Agent,
the Lenders and the Borrowers.

11.13    No Party Deemed Drafter.  Each of the parties hereto agrees that no
party hereto shall be deemed to be the drafter of this Loan Agreement.

11.14    AHMS as Agent for Borrowers.  Each Borrower hereby irrevocably
appoints AHMS as the borrowing agent and attorney-in-fact for the Borrowers (the
"Administrative Borrower") which appointment shall remain in full force and effect unless and
until the Administrative Agent shall have received prior written notice signed by all of the
Borrowers that such appointment has been revoked and that another Borrower has been
appointed Administrative Borrower. Each Borrower hereby irrevocably appoints and authorizes
the Administrative Borrower (i) to provide the Administrative Agent with all notices with respect
to Loans obtained for the benefit of any Borrower and all other notices and instructions under
this Agreement and (ii) to take such action as the Administrative Borrower deems appropriate or
its behalf to obtain Loans and to exercise such other powers as are reasonably incidental thereto
to carry out the purposes of this Agreement. It is understood that the handling of the Borrower
Account and Collateral of the Borrowers in a combined fashion, as more fully set forth herein, is
done solely as an accommodation to the Borrowers in order to utilize the collective borrowing
powers of the Borrowers in the most efficient and economical manner and at their request, and
that neither the Administrative Agent nor the Lenders shall incur liability to the Borrowers as a
result hereof. Each of the Borrowers expects to derive benefit, directly or indirectly, from the

handling of the Borrower Account and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group.

> 11.15    Assignments; Participations.

(a)    This Loan Agreement and the Notes shall be binding upon and inure to the benefit of the Borrowers and the Administrative Agent and each Lender and their respective successors and assigns (including, except for the right to request Loans, any trustee succeeding to the rights of the Borrowers pursuant to Chapter 11 of the Bankruptcy Code or pursuant to any conversion to a case under Chapter 7 of the Bankruptcy Code); provided, however, that each of the Borrowers may not assign or transfer any of their rights hereunder, or under the Notes, without the prior written consent of each Lender and any such assignment without the Lenders' prior written consent shall be null and void.

(b)    Each Lender may, with the written consent of (x) the Administrative Agent and (y) the Administrative Borrower; (which consent, in the case of either clauses (x) or (y), is not to be unreasonably withheld) assign to one or more other lenders or other entities all or a portion or its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitment, the Loans made by it and the Notes held by it); provided, however, that no consent of the Administrative Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, or if a Event of Default has occurred and is continuing; and provided, further, however, that (i) such assignment is in an amount which is at least $1,000,000 or a multiple of $100,000 in excess thereof (or the remainder of such Lender's Commitment) and (ii) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance, an Assignment and Acceptance, together with any Note subject to such assignment. Upon such execution, delivery and acceptance, from and after the effective date specified in each Assignment and Acceptance, which effective date shall be al least three (3) Business Days after the delivery thereof to the Administrative Agent (or such shorter period as shall be agreed to by the Administrative Agent and the parties to such assignment), (A) the assignee thereunder shall become a "Lender" hereunder and, in addition to the rights and obligations hereunder held by it immediately prior to such effective date, have the rights and obligations hereunder that have been assigned to it pursuant to such Assignment and Acceptance and (B) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(i)    By executing and delivering an Assignment and Acceptance, the assigning Lender and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (A) other than as provided in such Assignment and Acceptance, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Loan Agreement or any other Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto; (B) the assigning Lender makes no

representation or warranty and assumes no responsibility with respect to the financial condition of the Borrowers or any of their Subsidiaries or the performance or observance by the Borrowers of any of their obligations under this Loan Agreement or any other Loan Document furnished pursuant hereto; (C) such assignee confirms that it has received a copy of this Loan Agreement and the other Loan Documents, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (D) such assignee will, independently and without reliance upon the Assigning Lender, the Administrative Agent or any Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Loan Agreement and the other Loan Documents; (E) such assignee appoints and authorizes the Administrative Agent to take such action as the Administrative Agent on its behalf and to exercise such powers under this Loan Agreement and the other Loan Documents as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto; and (F) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Loan Documents are required to be performed by it as a Lender.

(ii)     The Administrative Agent shall maintain, or cause to be maintained at the Payment Office, a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names and addresses of the Lenders and the Commitments of, and principal amount of the Loans owing to each Lender from time to time (the "Register"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrowers, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Administrative Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(iii)     Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an assignee, together with the Notes subject to such assignment, the Administrative Agent shall, if the Administrative Agent consents to such assignment and if such Assignment and Acceptance has been completed (i) accept such Assignment and Acceptance, (ii) give prompt notice thereof to the Administrative Borrower, (iii) record the information contained therein in the Register, and (iv) prepare and distribute to each Lender and the Administrative Borrower a revised Schedule A hereto after giving effect to such assignment, which revised Schedule A shall replace the prior Schedule A and become part of this Agreement.

(iv)     A Registered Loan (and the Note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each Note shall expressly so provide), together with the surrender of the Note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such Note, whereupon, at the request of the designated assignee) or transferee(s), one or more new Notes in the same aggregate principal amount shall be issued to the designated assignee(s) or

transferee(s). Prior to the registration of assignment or sale of any Registered Loan (and the Note, if any evidencing the same), the Administrative Agent shall treat the Person in whose name such Registered Loan (and the Note, if any, evidencing the same) is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.

(v)        In the event that any Lender sells participations in a Registered Loan, such Lender shall maintain a register on which it enters the name of all participants in the Loans held by it (the "Participant Register"). A Registered Loan (and the Note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each Note shall expressly so provide). Any participation of such Registered Loan (and the Note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register.

(vi)        Any foreign Person who purchases or is assigned or participates in any portion of such Registered Loan shall provide the Administrative Agent (in the case of a purchase or assignment) of the Lender (in the case of a participation) with a completed Internal Revenue Service Form W-8 (Certificate of Foreign Status) or a substantially similar form for such purchaser, participant or any other affiliate who is a holder of beneficial interests in the Registered Loan.

(c)        Each Lender may sell participations to one or more banks or other entries ("Participants") in or to all or a portion of its rights and obligations under this Loan Agreement and the other Loan Documents (including, without limitation, all or a portion of any of its Commitments and any Loans made by it); provided, that (i) such Lender's obligations under this Loan Agreement (including without limitation, its Commitment hereunder) and the other Loan Documents shall remain unchanged; (ii) such lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Loan Agreement and the other Loan Documents, and (iii) a participant shall not be entitled to require such Lender to take or omit to take any action hereunder except (A) action directly effecting an extension of the maturity dates or decrease in the principal amount of the Loans, or (B) action directly effecting an extension of the due dates or a decrease in the rate of interest payable on the Loans or the fees payable under this Agreement, or (C) except for Permitted Dispositions, actions directly effecting a release of all or substantially all of the Collateral or any Borrower.

(d)        Each Lender may furnish any information concerning the Borrowers in the possession of such Lender from time to time to assignees and Participants (including prospective assignees and Participants) who agree to be bound by the provisions of Section 11.21 and this Section 11.16(d) only after notifying the Administrative Borrower in writing and only for the sole purpose of evaluating participations or assignments, as the case may be, and for no other purpose.

(e)        The Borrowers, at no material costs or expenses to the Borrower, agree to cooperate with the Lenders in connection with any such assignment or participation, to

execute and deliver such replacement Notes and other documents in order to give effect to such assignment or participation.

11.16    [Reserved].

11.17    Entire Agreement.    This Loan Agreement and the other Loan Documents embody the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings relating to the matters provided for herein or therein; provided, however, that nothing herein is intended to supersede in any respect the Purchase Agreement or Sale Order, which evidence separate and independent transactions and obligations.    No alteration, waiver, amendments, or change or supplement hereto or thereto shall be binding or effective unless the same is set forth in writing by a duly authorized representative of each party hereto.

11.18    Records.    The unpaid principal of and interest on the Notes, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability, the Commitments, and the accrued and unpaid fees payable pursuant to Section 3.07 hereof, shall at all times be ascertained from the records of the Administrative Agent, which shall be conclusive and binding absent manifest error.

11.19    Confidentiality.    The Administrative Agent, each Lender, each Borrower and their Affiliates shall take normal and reasonable precautions to maintain the confidentiality of all non-public information obtained pursuant to the requirements of this Loan Agreement and the other Loan Documents which has been identified as such by the Borrowers, but may, in any event, make disclosures (i) in the case of the Administrative Agent or any Lender, as reasonably required by any participant or assignee in connection with the contemplated assignment of any interest under this Loan Agreement or participations therein and in accordance with Section 11.15(d), or (ii) as required or requested by any governmental agency or representative thereof or as required pursuant to legal process, or (iii) to its officers, attorneys, accountants, agents, and advisors who are directly involved in the transactions described in this Loan Agreement, or (iv) as required by law, or (v) in connection with litigation involving the Administrative Agent or any Lender.

11.20    Public Announcements.    The Administrative Agent may issue and disseminate to the public general information describing this credit facility, including a general description of the Borrowers' businesses, and may use Borrowers' names in published advertising and other promotional materials.

11.21    USA Patriot Act.    Each Lender subject to the USA Patriot Act hereby notifies the Borrowers that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of each Borrower and other information that will allow such Lender to identify such Borrower in accordance with the USA Patriot Act.

* * * * *

IN WITNESS WHEREOF, the parties hereto have caused this Loan Agreement to be duly executed and delivered as of the day and year first above written.

**LENDERS:**

**AH MORTGAGE ACQUISITION CO., INC.**

By:_____
Name: _____
Title: _____

Address for Notices:

WLR Recovery Fund IV, L.P.
1166 Avenue of the Americas, 27th Floor
New York, New York, 10036
Attention:
Telecopier No.: 212-317-4891
Telephone No.: 212-826-1100

**BORROWERS:**

**AMERICAN HOME MORTGAGE INVESTMENT CORP**

By:_____
Name: _____
Title: _____

**AMERICAN HOME MORTGAGE CORP.**

By:_____
Name: _____
Title: _____

**AMERICAN HOME MORTGAGE SERVICING, INC.**

By:_____
Name: _____
Title: _____

Address for Notices:

    c/o American Home Mortgage Investment Corp.
    538 Broadhollow Road
    Melville, New York 11747
    Facsimile:  (516) 949-3929
    Attention:  Mr. Steven Cooper

    And

    David M. Friedman
    c/o American Home Mortgage Servicing, Inc
    4600 Regent Blvd.
    Suite 200
    Irving, TX 75063
    214.260.6800(direct)
    214.260.6799(fax)

    And

    Young Conaway Stargatt & Taylor, LLP
    The Brandywine Building
    1000 West Street, 17th Floor
    Wilmington, Delaware 19801
    Facsimile:  (302) 571-1253
    Attention:  James L. Patton, Jr., Esq.

NYI-4032312v8
DB02:6367667.1

066585.1001

Schedule A

Initial Lenders

| Lender | Commitment |
|---|---|
| AH Mortgage Acquisition Co., Inc. | $50,000,000 |