IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------- x
In re:                                           :
                                                 :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,           :
a Delaware corporation, et al.,[1]               :
                                                 :
                    Debtors.                     :
                                                 :
                                                 :
------------------------------------------------- x
                                                 x
------------------------------------------------- x
Credit Suisse First Boston Mortgage Capital, LLC,:
                                                 :
            Plaintiff and                        :
            Counterclaim Defendant,              :
                                                 :
                                                 :
    v.                                           :
                                                 :
American Home Mortgage Corp., American Home      :
Mortgage Acceptance, Inc., American Home Mortgage:
Servicing, Inc., American Home Mortgage Investment:
Corp., and American Home Mortgage Holdings, Inc.,:
                                                 :
            Debtor-Defendants and                :
            Counterclaim Plaintiffs.             :
------------------------------------------------- x
```

Chapter 11

Case No. 07-11047 (CSS)

Jointly Administered

Adv. Proc. No. 07-51684 (CSS)

Objection Deadline: November 20, 2007 at 12:00 p.m. (ET) [2]
Hearing Date: November 21, 2007 at 10:00 a.m. (ET)

## NOTICE OF MOTION

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

[2] Motion to Shorten Time for Notice of the Debtors' Motion Pursuant to Section 105 of the Bankruptcy Code and Bankruptcy Rule 9019(a) for an Order Approving and Authorizing Global Settlement Agreement with Credit Suisse First Boston Mortgage Capital LLC, Credit Suisse Securities (USA) LLC and DLJ Mortgage Capital Inc. filed contemporaneously herewith.

066585.1001

TO:     (I) THE UNITED STATES TRUSTEE FOR THE DISTRICT OF DELAWARE;
        (II) THE CREDITORS' COMMITTEE; (III) COUNSEL TO BANK OF
        AMERICA, N.A., AS ADMINISTRATIVE AGENT FOR CERTAIN LENDERS
        UNDER THAT CERTAIN SECOND AMENDED AND RESTATED CREDIT
        AGREEMENT DATED AS OF AUGUST 10, 2006; (IV) COUNSEL TO THE
        AGENT FOR THE DEBTORS' POSTPETITION LENDER; AND (V) ALL
        PARTIES ENTITLED TO NOTICE UNDER DEL. BANKR. LR 2002-1(B).

        The above-captioned debtors and debtors-in-possession (the "Debtors") have filed
the **DEBTORS' MOTION PURSUANT TO SECTIONS 105 AND 362 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULES 4001 AND 9019(a) FOR AN
ORDER APPROVING AND AUTHORIZING GLOBAL SETTLEMENT AGREEMENT
WITH CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC, CREDIT SUISSE
SECURITIES (USA) LLC AND DLJ MORTGAGE CAPITAL INC.** (the "Motion").

        A HEARING ON THE MOTION WILL BE HELD ON **NOVEMBER 21, 2007
AT 10:00 A.M. (ET)** BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI, UNITED
STATES BANKRUPTCY COURT, 6th FLOOR, 824 N. MARKET STREET, WILMINGTON,
DELAWARE 19801.

        Responses to the Motion, if any, must be filed by November 20, 2007, at 12:00
p.m. (ET), with the United States Bankruptcy Court for the District of Delaware, 3rd Floor, 824
N. Market Street, Wilmington, Delaware 19801, or raised at the Hearing. If a response to the
Motion is filed, you must also serve a copy of the response upon the undersigned counsel to the
Debtors so that the response is received on or before the Objection Deadline.

        IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE
COURT MAY GRANT THE RELIEF REQUESTED BY THE MOTION WITHOUT
FURTHER NOTICE OR HEARING.

Dated: Wilmington, Delaware
November 16, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Pauline K. Morgan (No. 3650)
Erin Edwards (No. 4392)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors-in-Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------- x
In re:                                               :    Chapter 11
                                                     :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,               :    Case No. 07-11047 (CSS)
a Delaware corporation, et al.,[1]                   :
                                                     :    Jointly Administered
                Debtors.                             :
                                                     :
                                                     :
---------------------------------------------------- x
---------------------------------------------------- x
Credit Suisse First Boston Mortgage Capital, LLC,    :
                                                     :
                Plaintiff and                        :
                Counterclaim Defendant,              :
                                                     :
        v.                                           :
                                                     :
American Home Mortgage Corp., American Home          :
Mortgage Acceptance, Inc., American Home Mortgage    :    Adv. Proc. No. 07-51684 (CSS)
Servicing, Inc., American Home Mortgage Investment   :
Corp., and American Home Mortgage Holdings, Inc.,    :
                                                     :
                Debtor-Defendants and                :    **Objection Deadline: November 20, 2007 at 12:00 p.m. (ET)**[2]
                Counterclaim Plaintiffs.             :    **Hearing Date: November 21, 2007 at 10:00 a.m. (ET)**
---------------------------------------------------- x


## DEBTORS' MOTION PURSUANT TO SECTIONS 105 AND 362 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 4001(d) AND 9019(a) FOR AN ORDER APPROVING AND AUTHORIZING GLOBAL SETTLEMENT AGREEMENT WITH CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC, CREDIT SUISSE SECURITIES (USA) LLC AND DLJ MORTGAGE CAPITAL INC.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

[2] Motion to Shorten Time for Notice of this Motion filed contemporaneously herewith.

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors in possession in the above cases (collectively with AHM Holdings, the "Debtors"), by this motion (the "Motion"), seek entry of an order pursuant to Rules 4001(d) and 9019(a) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and sections 105(a) and 362 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") approving a global settlement agreement (the "Global Settlement Agreement") by and among the Debtors and Credit Suisse First Boston Mortgage Capital, LLC ("CS Mortgage"), Credit Suisse Securities (USA) LLC ("CS Securities"), and DLJ Mortgage Capital, Inc. ("DLJ" and, collectively with CS Mortgage and CS Securities, "CSFB"), a copy of which is attached as Exhibit A to the proposed form of Order annexed hereto (the "Order"). CSFB and the Debtors are referred herein as the "Parties." In support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## GENERAL BACKGROUND

2.      On August 6, 2007 (the "Commencement Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

4.     On August 14, 2007, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee"). No trustee or examiner has been appointed.

## THE DEBTORS' BUSINESS[3]

5.     Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

6.     As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain of the Debtors originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

---

[3] The facts set forth herein are derived from the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief (the "First Day Declaration"), which is incorporated by reference.

7.     A large component of AHM's business is the servicing of loans, which is conducted through AHM Servicing. The servicing business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries, and maintains control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion.

8.     In the weeks prior to the Commencement Date, an unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' warehouse lenders began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the company's continued viability.

9.     The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees.

10.     Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

11.     On the Commencement Date, the Debtors filed a motion [Docket No. 11], seeking authority, *inter alia*, to sell substantially all assets relating to the Debtors' mortgage loan

servicing business (the "Servicing Business"). After a week long trial that commenced on

October 15, 2007, by Order dated October 30, 2007 [Docket No. 1711], the Court approved the

sale of the Servicing Business to AH Mortgage Acquisition Co., Inc. pursuant to the terms of that

certain Asset Purchase Agreement dated as of September 25, 2007 (as amended and

supplemented, and including all schedules, exhibits, and attachments thereto).

## RELEVANT BACKGROUND

12.     Prior to the Commencement Date, certain of the Parties entered into the

following agreements:

- that certain Master Repurchase Agreement, dated as of December 2, 2003 (the "Securities Repurchase Agreement"), between CS Securities (f/k/a Credit Suisse First Boston LLC) and AHM Investment;

- that certain Servicing Agreement, dated as of October 31, 2005 (the "Servicing Agreement"), among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company ("Deutsche"), as Trustee, DLJ, as Seller, and AHM Servicing, as Servicer;

- that certain Amended and Restated Seller's Purchase, Warranties and Interim Servicing Agreement, dated as of August 1, 2006 (as amended and restated, the "DLJ Purchase Agreement"), among DLJ, AHM Corp and AHM Servicing;

- that certain Master Repurchase Agreement, dated as of September 13, 2006 (as amended, supplemented, or otherwise modified from time to time (the "Mortgage Repurchase Agreement"), among CS Mortgage, AHM Corp., AHM Acceptance, AHM Servicing, AHM Investment, and AHM Holdings; and

- that certain Master Securities Forward Transaction Agreement, dated September 18, 2006 (the "TBA Agreement"), between CS Securities and AHM Corp.;

13.     On or about August 10, 2006, AHM Investment, AHM Servicing, AHM

Corp., and AHM Acceptance, as Borrowers, and Bank of America, N.A., as Administrative

Agent, and the lenders party thereto, including Credit Suisse Cayman Islands Branch, entered

into that certain Second Amended Restated Credit Agreement (the "BofA Credit Agreement").

14.     As of the Commencement Date, AHMIC owed CS Securities approximately $1.6 million on account of its repurchase obligations under the Securities Repurchase Agreement and CS Securities is holding approximately $1.4 million in cash collateral (the "Securities Cash Collateral") to secure AHMIC's repurchase obligations under such agreement.

15.     As of the Commencement Date, AHMC owed CS Securities approximately $837,656 under the TBA Agreement (the "TBA Claim").

16.     As of the Commencement Date, AHMC and AHM Servicing owed DLJ an unliquidated amount under the DLJ Purchase Agreement on account of "Early Payment Default" claims which could be in the amount of at least $2.8 million (the "EPD Claims").

17.     On or about August 6, 2007, CS Mortgage commenced the above-captioned Adversary Proceeding (the "Adversary Proceeding"), seeking, among other things, a declaratory judgment with respect to CS Mortgage's rights under the Mortgage Repurchase Agreement and to obtain possession of the Records and Asset Files (each as defined in the Mortgage Repurchase Agreement).

18.     On or about August 24, 2007, the Debtors filed a Motion for Order Under Bankruptcy Rule 2004 Directing Examination Of, and Production of Documents By, Certain Loan and Purported Repurchase Counterparties (the "Rule 2004 Motion") authorizing the examination of, and production of certain documents by, CSFB and other respondents.

19.     On or about August 31, 2007, the Debtors filed their Answer and First Counterclaim, disputing the rights asserted by CS Mortgage in the Adversary Proceeding.

20.     As of November 15, 2007, the Debtors are holding in a segregated account established on or about August 1, 2007 (the "P&I Account") $547,123.03 in principal and

interest payments made by the Mortgagors (as defined in the Mortgage Repurchase Agreement) to the Debtors relating to the Mortgage Loans (as defined below), whether collected prior to or after the Commencement Date. The Debtors are also holding in a segregated account established on or about August 1, 2007 (the "T&I Account") $36,937.82 in tax and insurance payments made by the Mortgagors to the Debtors relating to the Mortgage Loans, whether collected prior to or after the Commencement Date.

     21.    The Debtors do not concede CSFB's claims in the Adversary Proceeding are meritorious and likewise CSFB does not concede that any of the Debtors' claims, defenses or counterclaim in the Adversary Proceeding are meritorious.

## SUMMARY OF THE GLOBAL SETTLEMENT AGREEMENT

     22.    The Debtors and CSFB believe it is in their respective best interests to compromise and settle, without further litigation, the Adversary Proceeding and the Parties' respective rights and obligations under the Servicing Agreement, the Securities Repurchase Agreement, the DLJ Purchase Agreement, the Mortgage Repurchase Agreement, and the TBA Agreement on the terms and subject to the conditions set forth in this Global Settlement Agreement. The effectiveness of the Global Settlement Agreement is conditioned upon approval of the Bankruptcy Court. The principal terms of the Global Settlement Agreement are as follows:[4]

     a.    Transfer of Servicing. On a date that is designated by CS Mortgage (the "Transfer Date"), but no later than April 30, 2008, the Debtors shall transfer to CS Mortgage or its designee, all right, title, and interest in the servicing of the mortgage loans that are the subject of the Mortgage Repurchase Agreement (the "Mortgage

---

[4]  The summary of the Global Settlement Agreement is qualified in its entirety by the Global Settlement Agreement. If there are any inconsistencies between the summary contained herein and the Global Settlement Agreement, the Global Settlement Agreement shall control. Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Global Settlement Agreement.

Loans"), including, without limitation, all rights to collect fees and other payments made on account of the Mortgage Loans and the Records and Asset Files relating thereto (the "Servicing Rights"); provided, however, that CS Mortgage will provide the Debtors with not less than two business days' notice of the Transfer Date; and provided further, however, that the Transfer Date will be at least five business days following the date on which the Court enters an order approving the Global Settlement Agreement (the "Approval Date"). The Debtors shall transfer the Servicing Rights in accordance with the Servicing Transfer Guidelines set forth in Exhibit A annexed to the Global Settlement Agreement. The Servicing Transfer Guidelines may be modified only upon the written consent of both Parties.

b.  Servicing Transfer Cooperation. The Debtors, CS Mortgage and its designee, if any, shall cooperate in connection with the transfer of the Servicing Rights and shall use good faith efforts to cause the transfer in an efficient nondisruptive manner.

c.  Mortgage Files. The Debtors shall use good-faith efforts to ensure any and all instruments, agreements and other books, records, and reports and data with respect to Mortgage Loans, including the credit files related to the Mortgage Loans and any other instruments necessary to document or service a mortgage loan (collectively, the "Mortgage Files") are intact and to resolve any document exceptions to the Mortgage Files and the servicing files. CSFB reserves the right to assert as a defense to the Debtors' right to challenge the commercial reasonableness of the sale(s) of the Mortgage Loan under applicable state and federal law that any deficiency that is incurable with respect to a Mortgage File may impact the ultimate value of the underlying Mortgage Loan.

d.  Construction Loan Information. On or prior to the date of execution of the Global Settlement Agreement, the Debtors shall provide CS Mortgage all information and documents within their possession concerning the three Mortgage Loans that are construction loans (the "Construction Loans"), including, without limitation, all collector comments related to the Construction Loans.

e.  Sale of the Mortgage Loans. CS Mortgage, in its sole discretion, may market and offer the Mortgage Loans for sale at any time pursuant to one or more auctions (each an "Auction") for the sale or sales of each of the Mortgage Loans and the servicing rights related thereto. The Debtors irrevocably consent to CS Mortgage's conveyance, transfer, quitclaim, release and/or turnover and delivery of the Mortgage Loans and related servicing rights to the

successful bidder(s) at the Auction(s). The Debtors reserve the right to assert that CS Mortgage's sale(s) of the Mortgage Loans was not done in a commercially reasonable manner under applicable state and federal law.

f.    Sale Cooperation. The Debtors shall cooperate with CS Mortgage or its designee in connection with CS Mortgage's efforts to sell the Mortgage Loans. Without limiting the generality of the foregoing, the Debtors shall, as soon as possible, provide to CS Mortgage or its designee copies of the Records and Asset Files (or images thereof), loan level information, and access to information and/or documentation requested (to the extent that the same exists) by prospective purchasers related to the Mortgage Loans.

g.    Offering List. Not less than three business days prior to the commencement of the solicitation for participants in the Auction(s), and subject to an appropriate form of confidentiality agreement to be executed between the Debtors and CS Mortgage, CS Mortgage shall provide the Debtors with a list of individuals or entities to which CS Mortgage will market the Mortgage Loans (the "Offering List"). The Debtors shall have the right to supplement the Offering List and CS Mortgage agrees to include such parties in its efforts to market the Mortgage Loans; provided that CS Mortgage, in its sole discretion, shall determine who is a qualified bidder.

h.    Participation. CS Mortgage shall have the right to participate in the Auction(s).

i.    Excess Proceeds. In the event CS Mortgage sells the Mortgage Loans following the Auction(s) for an amount greater than the amounts advanced by CS Mortgage under the Mortgage Repurchase Agreement (the "Advance Amount") CS Mortgage shall turn over to the Debtors any proceeds received in excess of the Advance Amount as soon as practicable.

j.    Construction Loan Advances. The Advance Amount shall include any advances made by CS Mortgage in connection with the Construction Loans, including, without limitation, advances made following the date of the Global Settlement Agreement.

k.    Deficiency Claim; Rights to Object. If CS Mortgage sells the Mortgage Loans for an amount that is in the aggregate less than the Advance Amount, CS Mortgage shall have a general unsecured claim against the Debtors in an amount equal to the Advance Amount minus the proceeds received from the sale(s) of the Mortgage Loans (the "Deficiency Claim") provided, however, the

Debtors and the Official Committee of Unsecured Creditors (the "Creditors' Committee") may object to the allowance of the Deficiency Claim only on the following bases: (i) CS Mortgage's calculation of the Deficiency Claim was incorrect; or (2) the sale(s) of the Mortgage Loans was not done in a commercially reasonable manner under applicable state and federal law

l.      Attorneys' Fees. In addition to the Deficiency Claim, if any, CSFB shall have an allowed general unsecured claim for reasonable attorney's fees and expenses. CS Mortgage shall provide a summary fee statement of the fees and expenses incurred by CS Mortgage only to the Debtors and the Creditors' Committee, which the Debtors and the Creditors' Committee may review for reasonableness. Such summary fee statement will provide a summary of the tasks undertaken by the attorneys and paraprofessionals for CS Mortgage, each attorney's and paraprofessional's billing rate, and each individual's total time billed to this matter. The Debtors and Creditors' Committee reserve their rights to request additional information if they believe the summary fee statement of fees and expenses provided by CS Mortgage is insufficient to determine reasonableness.

m.     P&I Account; T&I Account. On or within three business days after the Transfer Date, the Debtors shall transfer to CS Mortgage or its designee, by wire transfer, all amounts in the T&I Account less any advances appropriately made by the Debtors in accordance with Accepted Servicing Practices (as defined in the Mortgage Repurchase Agreement). On or within three business days after the Approval Date, and on a monthly basis thereafter, the Debtors shall transfer to CS Mortgage or its designee, by wire transfer, all amounts in the P&I Account. CS Mortgage shall apply all amounts in the P&I Account attributable to principal payments by the Mortgagors to reduce the Advance Amount. On or within three business days after the Transfer Date, the Debtors will provide payment histories for the Mortgage Loans. CS Mortgage will have 45 days from receipt of the payment histories to advise the Debtors if any payments posted or that should have been posted to the system were not included in the amounts transferred by the Debtors from the T&I Account and the P&I Account. If after the Transfer Date, CS Mortgage or the Debtors discover that any payments posted or that should have been posted to the system were not included in the amounts transferred by the Debtors from the T&I Account and the P&I Account, or the Debtors receive additional Mortgagor funds, the Debtors will remit such funds within three business days to CS Mortgage or its designee.

n.   Setoff of Securities Cash Collateral. On of the Approval Date, CS Securities shall be authorized to setoff the Securities Cash Collateral against its claims under the Securities Repurchase Agreement.

o.   Waiver of Deficiency Claim. After setoff of the Securities Cash Collateral as authorized in the Global Settlement Agreement, CS Securities shall waive any deficiency claim under the Securities Repurchase Agreement.

p.   Turn Over of Securities. On the Approval Date, CS Securities shall turn over to the Debtors any Securities in CS Securities's possession that were delivered to CS Securities by AHMC under the Securities Repurchase Agreement, consisting of the following:

| (i)    | 026931AH8 | AMERICAN 2007-A 1M2 |
| (ii)   | 026931AJ4 | AMERICAN 2007-A 1M3 |
| (iii)  | 026931AQ8 | AMERICAN 2007-A 2M6 |
| (iv)   | 026931AP0 | AMERICAN 2007-A 2M5 |
| (v)    | 026933AG6 | AMERICAN 2007-A 4M6 |
| (vi)   | 026933AE1 | AMERICAN 2007-A 4M4 |
| (vii)  | 026933AF8 | AMERICAN 2007-A 4M5 |

q.   Principal & Interest. AHM shall be authorized to retain any principal and interest collected on account of the Securities after the Commencement Date.

r.   The TBA Agreement. On the Approval Date, CS Securities shall waive the TBA Claim.

s.   The EPD Claim. On the Approval Date, DLJ shall waive the EPD Claim.

t.   Release by Debtors. Except as specifically set forth in Section 5.3 below, each of the Debtors and their successors and assigns, hereby waive, release and forever discharge CSFB and each of its past, present and future officers, directors, partners, members, employees, agents and servants from any and all claims, obligations, demands, actions, causes of action and liabilities, of whatsoever kind and nature, character and description, whether in law or equity, whether sounding in tort, contract or under other applicable law, whether known or unknown, and whether anticipated or unanticipated, including, without limitation, claims, obligations, demands, actions, causes of action and liabilities arising from or relating to the Mortgage Repurchase Agreement, the Securities Repurchase Agreement, the Servicing Agreement, the DLJ Purchase Agreement, the TBA Agreement (including,

without limitation, (i) any claim or cause of action arising from or related to any margin call under the Mortgage Repurchase Agreement or the appropriateness thereof, or (ii) the termination or exercise of remedies under each such agreement), and/or the Debtors' assertion that CSFB caused or contributed to the commencement of the Debtors' chapter 11 cases.

u.    Release by CSFB.  Except as specifically set forth in Section 5.3 below, CSFB and its successors and assigns, hereby waives, releases and forever discharges the Debtors and each of their past, present and future officers, directors, partners, members, employees, agents and servants from any and all claims, obligations, demands, actions, causes of action and liabilities, of whatsoever kind and nature, character and description, whether in law or equity, whether sounding in tort, contract or under other applicable law, whether known or unknown, and whether anticipated or unanticipated, including, without limitation, claims, obligations, demands, actions, causes of action and liabilities arising from or relating to the Mortgage Repurchase Agreement, the Securities Repurchase Agreement, the Servicing Agreement, the DLJ Purchase Agreement, and/or the TBA Agreement.

v.    Limitation of Releases.  The Parties acknowledge and agree that the releases set forth in Sections 5.1 and 5.2 of the Global Settlement Agreement shall not include or have any effect upon the following claims and causes of action which are expressly preserved and retained by the respective Party:

- Claims of Credit Suisse Cayman Islands Branch or AHMIC, AHM Servicing, AHMC, and AHMA arising from or relating to the BofA Credit Agreement;

- The Debtors' right to assert that the sale(s) of the Mortgage Loans was not conducted in a commercially reasonable manner under applicable state and federal law;

- The Debtors' right to assert a claim against CS Mortgage if, after the date the Debtors transfer servicing of the Construction Loans to CS Mortgage, CS Mortgage takes any action or fails to make an advance in accordance with the agreements governing the Construction Loans, which causes damage to the related mortgaged properties and for which a related borrower under a Construction Loan asserts a claim against a Debtor related to such action or failure to advance by CS Mortgage; provided, however, the Debtors retain such claim only if they have fully disclosed all

information in their possession relating to such
Construction Loan;

- Claims or causes of action of CSFB or the Debtors that
arise from or are related to any contract between CSFB and
Debtors other than the Master Repurchase Agreement, the
Securities Repurchase Agreement, the Servicing
Agreement, the DLJ Purchase Agreement and the TBA
Agreement; and

- Waiver, release or discharge from any obligations under, or
the breach of, this Global Settlement Agreement.

w.   <u>Discovery of Additional Facts</u>.  The consequences of the foregoing
release provisions have been explained by each of the Parties'
respective attorneys.  Each of the Parties acknowledge that they
may hereafter discover facts different from, or in addition to, those
which they now know or believe to be true and agree that the
Global Settlement Agreement and the releases contained herein
shall be and remain effective in all respects notwithstanding such
different or additional facts or the discovery thereof.

x.   <u>Waiver of Benefits</u>.  To the extent applicable law would not
otherwise recognize the releases in Sections 5.1 and 5.2 as
constituting a full and final release applying to all unknown and
unanticipated claims, the Parties hereby expressly waive all rights
or benefits which any one or all of them may have now or in the
future under any such applicable law.

y.   <u>Creditors' Committee Support</u>.  The Creditors' Committee shall
support the 9019 Motion and the motion to expedite filed in
connection therewith.  On the Approval Date, the Creditors'
Committee shall be bound by the terms, conditions, and limitations
of the Global Settlement Agreement.

z.   <u>The Rule 2004 Motion</u>.  The Parties agree that the Rule 2004
Motion shall be withdrawn with prejudice and shall submit a
proposed order for approval of the Global Settlement Agreement
that provides for such withdrawal.

aa.   <u>The Adversary Proceeding</u>.  The Parties agree that the Adversary
Proceeding shall be dismissed with prejudice and shall submit a
proposed order for approval of the Global Settlement Agreement
that provides for such dismissal.

## RELIEF REQUESTED

23.    By this Motion, the Debtors respectfully requests entry of an order approving the Global Settlement Agreement pursuant to sections 105 and 362 of the Bankruptcy Code and Bankruptcy Rules 4001(d) and 9019(a).

## STANDARDS FOR AGREEMENTS PURSUANT TO RULE 4001

24.    Rule 4001(d) of the Federal Rules of Bankruptcy Procedure provides that "[a] motion for approval of an agreement . . . to modify or terminate the stay provided for in § 362 . . . shall be served on any committee . . . appointed pursuant to § 1102 of the Code or its authorized agent and on such other entities as the court may direct. The motion shall be accompanied by a copy of the agreement." Rule 4001(d) goes on to further state that, "[i]f no objection is filed, the court may enter an order approving . . . the agreement without conducting a hearing."

25.    By this Motion, the Debtors seek approval of the Global Settlement Agreement, which provides, *inter alia*, authorization for CS Securities to setoff of the Securities Cash Collateral against it's claims against AHM Investment under the Securities Repurchase Agreement. Thus, to effectuate the Global Settlement Agreement, the Debtors request that the Court approve the Global Settlement Agreement pursuant to Bankruptcy Rule 4001(d) and modify the stay to allow setoff under the Securities Repurchase Agreement.

## STANDARDS FOR SETTLEMENTS PURSUANT TO RULE 9019

26.    Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P 9019(a). The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged and "generally favored in bankruptcy." In re World Health Alternatives, Inc., 344

B.R. 291, 296 (Bankr. D. Del. 2006); see also In re Penn Central Transportation Co., 596 F.2d

1102 (3d Cir. 1979) ("'administering reorganization proceedings in an economical and practical

manner it will often be wise to arrange the settlement of claims . . . .'"), quoting In re Protective

Committee for Independent Stockholders of TMT Ferry, Inc. v. Anderson, 390 U.S. 414, 424

(1968).

      27.     In determining the fairness and equity of a compromise in bankruptcy, the

United States Court of Appeals for the Third Circuit has stated that it is important that the

bankruptcy court "apprise[] itself of all facts necessary to form an intelligent and objective

opinion of the probabilities of ultimate success should the claims be litigated, and estimated the

complexity, expense and likely duration of such litigation, and other factors relevant to a full and

fair assessment of the [claims]." In re Penn Central Transportation Co., 596 F.2d 1127, 1153 (3d

Cir. 1979); see also In re Marvel Entertainment Group, Inc., 222 B.R. 243 (D. Del. 1998)

(quoting, In re Louise's Inc., 211 B.R. 798, 801 (D. Del. 1997) (describing "the ultimate inquiry

to be whether 'the compromise is fair, reasonable, and in the interest of the estate.'").

      28.     The Third Circuit Court of Appeals has enumerated four factors that

should be considered in determining whether a settlement should be approved. The four

enumerated factors are: "(1) the probability of success in litigation; (2) the likely difficulties in

collection; (3) the complexity of the litigation involved and the expense, inconvenience and

delay necessarily attending it; and (4) the paramount interest of the creditors." Meyers v. Martin

(In re Martin), 91 F.3d 389, 393 (3d Cir. 1996); accord Will v. Northwestern Univ. (In re

Nutraquest, Inc.), 434 F.3d 639, 644 (3d Cir. 2006).

      29.     The decision to approve a settlement "is within the sound discretion of the

bankruptcy court." In re World Health Alternatives, Inc., 344 B.R. at 296; see also In re

Neshaminy Office Building Associates, 62 B.R. 798, 803 (E.D. Pa. 1986), cited with approval in Meyers v. Martin (In re Martin), 91 F.3d 389. The bankruptcy court should not substitute its judgment for that of the debtor. See In re Neshaminy Office Building Associates, 62 B.R. at 803. The court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to see whether the settlement falls below the lowest point in the range of reasonableness. See In re W.T. Grant and Co., 699 F.2d 599, 608 (2d Cir. 1983), cert. denied, 464 U.S. 22 (1983); see also In re World Health Alternatives, Inc., 344 B.R. at 296 (stating that "the court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities.") (internal citations and quotations omitted).

      30.    The Debtors respectfully request that the Court approve the Global Settlement Agreement because the Global Settlement Agreement lies well above the lowest point in the range of reasonable potential litigation possibilities. The Global Settlement Agreement resolves both the Adversary Proceeding and potentially millions of dollars of claims that would otherwise be asserted against the Debtors by CSFB. In fact, it would be difficult, time consuming, costly, and uncertain that litigation over the Parties' respective rights and obligations under the Servicing Agreement, the Securities Repurchase Agreement, the DLJ Purchase Agreement, the Mortgage Repurchase Agreement, and the TBA Agreement would yield a more favorable outcome for the Debtors. Furthermore, the Global Settlement Agreement was the product of significant and lengthy discussions and negotiations between the Debtors, the Creditors' Committee and CSFB. In addition, each of the applicable Martin factors weigh in favor of approving the Global Settlement Agreement. Accordingly, the Global Settlement Agreement should be approved pursuant to Bankruptcy Rule 9019.

A.     **The Probability Of Success In Litigation**

31.     As with all litigation, the probability that the Debtors will prevail in litigating the Adversary Proceeding and in subsequent claim litigation with CSFB is uncertain. Moreover, the Adversary Proceeding contains novel issues of law regarding a relatively new provision of the Bankruptcy Code with little case law on it to provide guidance. Absent the Global Settlement Agreement, the disputes between the Debtors and CSFB under five separate contracts would have to be litigated before the Court with no assurances of a favorable outcome. The resolution of these disputes with CSFB under the terms of the Global Settlement Agreement, without the need for further litigation, is a favorable outcome because it will save the Debtors significant time and expense in the litigation of the Adversary Proceeding and potential litigation in connection with other claims CSFB may have and allow the Debtors to receive substantial value from CSFB in the form of, among other things, the waived TBA Claim and EPD Claim, valuable securities held by CSFB, as well as the potential Excess Proceeds.

B.     **The Complexity Of The Litigation Involved, And The Expense, Inconvenience And Delay Necessarily Attending It**

32.     The Global Settlement Agreement satisfies the second factor in Martin's four-factor test largely for the reasons set forth above in the discussion of the Debtors' probability of success in litigation. Completing the litigation of the Adversary Proceeding, which involves complex legal issues and a potentially lengthy appeal process, would be expensive and unduly delay the relief the chapter 11 case. Moreover, there is the potential for litigation of various disputes under the Servicing Agreement, the Securities Repurchase Agreement, the DLJ Purchase Agreement, and the TBA Agreement, not addressed in the Adversary Proceeding. This additional litigation would likely be fact intensive and therefore would give rise to additional delays and potentially significant increased costs to the estates.

## C.   The Paramount Interest Of Creditors

33.     Entry into the Global Settlement Agreement serves the paramount interest of creditors of the Debtors.  In fact, the Creditors' Committee, who was involved in the negotiation, fully supports the Global Settlement Agreement.  The Global Settlement Agreement's resolution of the Adversary Proceeding and other potential litigation surrounding a resolution of issues under the other agreements among CSFB and the Debtors represents a savings for the creditors by obviating further litigation, including through one or more lengthy appeal processes, thereby saving the expenses attendant to such litigation, while at the same time significantly reducing potentially substantial claims in the case.  Therefore, the third factor of Martin's four-factor test is satisfied and weighs in favor of the Court approving the Global Settlement Agreement.

## D.   The Likely Difficulties In Collection

34.     Finally, the fourth factor enunciated by the Third Circuit in Martin, is not applicable under these circumstances.

## E.   Summary

35.     The settlement of the Adversary Proceedings and the Parties' respective rights and obligations under the Servicing Agreement, the Securities Repurchase Agreement, the DLJ Purchase Agreement, the Mortgage Repurchase Agreement, and the TBA Agreement embodied in the Global Settlement Agreement:  (i) is fair and equitable; (ii) represents a settlement that rests well above the lowest point in the reasonable range of potential litigation outcomes; (iii) obviates the expense, delay, inconvenience and uncertainty that would attend any

litigation of the Parties' issues under the five contracts; and (iv) advances the paramount interests of creditors by adding value, as a matter of certainty, to the Debtors' estate. Therefore, the Global Settlement Agreement satisfies Bankruptcy Rule 9019 and should be approved by the Court

## NOTICE

36.     Notice of this Motion will be provided to (i) the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Bank of America, N.A.; (iv) Counsel to the Agent for the Debtors' Postpetition Lender; and (v) all parties entitled to notice under Del. Bankr. LR 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PREVIOUS REQUEST

37.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court issue and enter

Orders (i) pursuant to sections 105(a) and 362 of the Bankruptcy Code and Bankruptcy Rules

4001(d) and 9019, approving the Global Settlement Agreement, and (ii) granting such other and

further relief as may be just and proper.

Dated: Wilmington, Delaware
      November 16, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Pauline K. Morgan (No. 3650)
Erin Edwards (No. 4392)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors-in-Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------x
In re:                                          :    Chapter 11
                                                :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,          :    Case No. 07-11047 (CSS)
a Delaware corporation, et al.,                 :
                                                :    Jointly Administered
                     Debtors.                   :
                                                :
                                                :
------------------------------------------------x

------------------------------------------------x
Credit Suisse First Boston Mortgage Capital, LLC, :
                                                :
              Plaintiff and                     :
              Counterclaim Defendant,           :
                                                :
        v.                                      :
                                                :
American Home Mortgage Corp., American Home Mortgage :
Acceptance, Inc., American Home Mortgage Servicing, Inc., :
American Home Mortgage Investment Corp., and American :    Adv. Proc. No. 07-51684 (CSS)
Home Mortgage Holdings, Inc.,                   :
                                                :
         Debtor-Defendants and                  :
         Counterclaim Plaintiffs.               :    REFERENCE DOCKET NO._____
------------------------------------------------x
```

## ORDER PURSUANT TO BANKRUPTCY RULE 9019
### APPROVING GLOBAL SETTLEMENT AGREEMENT WITH
### CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC, CREDIT
### SUISSE SECURITIES (USA) LLC AND DLJ MORTGAGE CAPITAL INC.

Upon the motion, dated November 16, 2007 (the "Motion")[1], of American

Home Mortgage Holdings, Inc., and its direct and indirect subsidiaries and affiliates, as

debtors and debtors in possession (collectively, "Debtors") pursuant to Rules 9019 and

---

[1] Any capitalized terms not defined herein shall have the meanings ascribed in the
Motion.

4001(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and

section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the

"Bankruptcy Code") for approval of a settlement pursuant to the terms of the Global

Settlement Agreement, dated November 16, 2007 (the "Global Settlement Agreement"),

between and among Credit Suisse First Boston Mortgage Capital LLC ("CS Mortgage"),

Credit Suisse Securities (USA) LLC ("CS Securities"), and DLJ Mortgage Capital Inc.

("DLJ" and, collectively with CS Mortgage and CS Securities, "CSFB") and the

Debtors, as more fully set forth in the Motion; and the Court having jurisdiction to

consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and

1334; and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having

been provided, and it appearing that no other or further notice need be provided; and the

relief requested in the Motion being in the best interests of the Debtors and their estates

and creditors; and the Court having reviewed the Motion and having heard the statements

in support of the relief requested therein at a hearing before the Court (the "Hearing");

and the Court having determined that the legal and factual bases set forth in the Motion

and at the Hearing establish just cause for the relief granted herein; and upon all of the

proceedings had before the Court and after due deliberation and sufficient cause

appearing therefor, it is

ORDERED, that the Motion is granted; and it is further

ORDERED, that, pursuant to Bankruptcy Rule 9019, the Global

Settlement, in the form attached hereto as Exhibit A, is approved; and it is further

ORDERED, that the Global Settlement Agreement was entered into following good-faith, arm's-length negotiations between the Debtors, the Official Committee of Unsecured Creditors, and CSFB and the compromise and settlement reflected in the Global Settlement Agreement is in the best interests of the Debtors, their estates and creditors and all other parties in interest and falls within the range of reasonableness; and it is further

ORDERED, that the Debtors are authorized and directed to execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers and to take any and all actions reasonably necessary or appropriate to consummate and fully execute the Global Settlement Agreement; and it is further

ORDERED, that CSFB is authorized to setoff of the Securities Cash Collateral against its claims under the Securities Repurchase Agreement as contemplated by section 2.1 of the Global Settlement Agreement; and it is further

ORDERED, that the Rule 2004 Motion is hereby dismissed with prejudice; and it is further

ORDERED, that this Adversary Proceeding is hereby dismissed with prejudice; and it is further

ORDERED, that due and proper notice of the Motion having been provided, and no other or further notice need be provided; and it is further

3

ORDERED, that this Court shall retain jurisdiction to hear any and all disputes arising out of the interpretation or enforcement of this Order.

Dated: Wilmington, Delaware
       November____, 2007

_____
UNITED STATES BANKRUPTCY JUDGE

DB02:6370160.1

066585.1001

# EXHIBIT A

## GLOBAL SETTLEMENT AGREEMENT

This Global Settlement Agreement (the "Global Settlement Agreement") is made and entered into as of the 16th day of November, 2007 between and among Credit Suisse First Boston Mortgage Capital LLC ("CS Mortgage"), Credit Suisse Securities (USA) LLC ("CS Securities"), and DLJ Mortgage Capital, Inc. ("DLJ" and, collectively with CS Mortgage and CS Securities, "CSFB") and American Home Mortgage Investment Corporation ("AHMIC"), and each of its direct and indirect subsidiaries as debtors and debtors in possession (collectively with AHMIC, the "Debtors").  CSFB and the Debtors are referred to herein as the "Parties."

WHEREAS, on August 6, 2007 (the "Commencement Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code with the United States Bankruptcy Court for the District of Delaware (the "Court");

WHEREAS, prior to the Commencement Date, certain of the Parties entered into the following agreements:

- that certain Master Repurchase Agreement, dated as of December 2, 2003 (the "Securities Repurchase Agreement"), between CS Securities (f/k/a Credit Suisse First Boston LLC) and AHMIC;

- that certain Servicing Agreement, dated as of October 31, 2005 (the "Servicing Agreement"), among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company ("Deutsche"), as Trustee, DLJ, as Seller, and American Home Mortgage Servicing, Inc. ("AHM Servicing"), as Servicer;

- that certain Amended and Restated Seller's Purchase, Warranties and Interim Servicing Agreement, dated as of August 1, 2006 (as amended and restated, the "DLJ Purchase Agreement"), among DLJ, American Home Mortgage Corporation ("AHMC") and AHM Servicing;

- that certain Master Repurchase Agreement, dated as of September 13, 2006 (as amended, supplemented, or otherwise modified from time to time, the "Mortgage Repurchase Agreement"), among CS Mortgage, AHMC, American Home Mortgage Acceptance, Inc. ("AHMA"), AHM

Servicing, AHMIC, and American Home Mortgage Holdings, Inc. ("<u>AHM Holdings</u>"); and

- that certain Master Securities Forward Transaction Agreement, dated September 18, 2006 (the "<u>TBA Agreement</u>"), between CS Securities and AHMC;

WHEREAS, Credit Suisse Cayman Islands Branch is a lender under that certain Second Amended and Restated Credit Agreement, dated August 10, 2006 (the "<u>BofA Credit Agreement</u>"), among AHMIC, AHM Servicing, AHMC, and AHMA, as Borrowers, Bank of America, N.A., as Administrative Agent, and the lenders party thereto;

WHEREAS, as of November 15, 2007, the Debtors are holding in a segregated account established on or about August 1, 2007 (the "<u>P&I Account</u>") $547,123.03 in principal and interest payments made by the Mortgagors (as defined in the Mortgage Repurchase Agreement) to the Debtors relating to the Mortgage Loans (as defined below), whether collected prior to or after the Commencement Date. The Debtors are also holding in a segregated account established on or about August 1, 2007 (the "<u>T&I Account</u>") $36,937.82 in tax and insurance payments made by the Mortgagors to the Debtors relating to the Mortgage Loans, whether collected prior to or after the Commencement Date;

WHEREAS, as of the Commencement Date, AHMIC owed CS Securities approximately $1.6 million on account of its repurchase obligations under the Securities Repurchase Agreement and CS Securities is holding approximately $1.4 million in cash collateral (the "<u>Securities Cash Collateral</u>") to secure AHMIC's repurchase obligations under such agreement.

WHEREAS, as of the Commencement Date AHMC owed CS Securities approximately $837,656 under the TBA Agreement (the "<u>TBA Claim</u>");

WHEREAS, as of the Commencement Date, AHMC and AHM Servicing owed DLJ an unliquidated amount under the DLJ Purchase Agreement on account of "Early Payment Default" claims which could be in the amount of at least $2.8 million (the "EPD Claims");

WHEREAS, the Parties are not aware of any claims either Party may have against the other under the Servicing Agreement;

WHEREAS, on or about August 6, 2007, CS Mortgage commenced an Adversary Proceeding (the "Adversary Proceeding"), Adversary Proceeding No. 07-51684 (CSS), seeking, among other things, a declaratory judgment with respect to CS Mortgage's rights under the Mortgage Repurchase Agreement and to obtain possession of the Records and Asset Files (each as defined in the Mortgage Repurchase Agreement);

WHEREAS, on or about August 24, 2007, the Debtors filed a Motion for Order Under Bankruptcy Rule 2004 Directing Examination Of, and Production of Documents By, Certain Loan and Purported Repurchase Counterparties (the "Rule 2004 Motion") authorizing the examination of, and production of certain documents by, CSFB and other respondents;

WHEREAS, on or about August 31, 2007, the Debtors filed their Answer and First Counterclaim, disputing the rights asserted by CS Mortgage in the Adversary Proceeding;

WHEREAS, CSFB does not concede that any of the Debtors' claims, defenses or counterclaim in the Adversary Proceeding are meritorious and likewise the Debtors do not concede CSFB's claims in the Adversary Proceeding are meritorious;

WHEREAS, CSFB and the Debtors believe it is in their respective best interests to compromise and settle, without further litigation, the Adversary Proceeding and the Parties' respective rights and obligations under the Servicing Agreement, the Securities Repurchase Agreement, the DLJ Purchase Agreement, the Mortgage Repurchase Agreement, and the TBA

3

Agreement on the terms and subject to the conditions set forth in this Global Settlement
Agreement;

NOW, THEREFORE, CSFB and the Debtors agree as follows:

## ARTICLE I

## MORTGAGE REPURCHASE AGREEMENT

1.1    <u>Transfer of Servicing</u>.  On a date that is designated by CS Mortgage (the
"<u>Transfer Date</u>"), but no later than April 30, 2008, the Debtors shall transfer to CS Mortgage or
its designee, all right, title, and interest in the servicing of the mortgage loans that are the subject
of the Mortgage Repurchase Agreement (the "<u>Mortgage Loans</u>"), including, without limitation,
all rights to collect fees and other payments made on account of the Mortgage Loans and the
Records and Asset Files relating thereto (the "<u>Servicing Rights</u>"); <u>provided</u>, <u>however</u>, that CS
Mortgage will provide the Debtors with not less than two business days' notice of the Transfer
Date; and <u>provided further</u>, <u>however</u>, that the Transfer Date will be at least five business days
following the date on which the Court enters an order approving this Global Settlement
Agreement (the "<u>Approval Date</u>").  The Debtors shall transfer the Servicing Rights in
accordance with the Servicing Transfer Guidelines set forth in Exhibit A annexed hereto.  The
Servicing Transfer Guidelines may be modified only upon the written consent of both Parties.

1.2    <u>Servicing Transfer Cooperation</u>.  The Debtors, CS Mortgage and its designee, if
any, shall cooperate in connection with the transfer of the Servicing Rights and shall use good
faith efforts to cause the transfer in an efficient nondisruptive manner.

1.3    <u>Mortgage Files</u>.  The Debtors shall use good-faith efforts to ensure any and all
instruments, agreements and other books, records, and reports and data with respect to Mortgage
Loans, including the credit files related to the Mortgage Loans and any other instruments

4

necessary to document or service a mortgage loan (collectively, the "<u>Mortgage Files</u>") are intact and to resolve any document exceptions to the Mortgage Files and the servicing files. CSFB reserves the right to assert as a defense to the Debtors' right to challenge the commercial reasonableness of the sale(s) of the Mortgage Loan under applicable state and federal law that any deficiency that is incurable with respect to a Mortgage File may impact the ultimate value of the underlying Mortgage Loan.

1.4    <u>Construction Loan Information</u>.  On or prior to the date of execution of this Global Settlement Agreement, the Debtors shall provide CS Mortgage all information and documents within their possession concerning the three Mortgage Loans that are construction loans (the "<u>Construction Loans</u>"), including, without limitation, all collector comments related to the Construction Loans.

1.5    <u>Sale of the Mortgage Loans</u>.  CS Mortgage, in its sole discretion, may market and offer the Mortgage Loans for sale at any time pursuant to one or more auctions (each an "<u>Auction</u>") for the sale or sales of each of the Mortgage Loans and the servicing rights related thereto.  The Debtors irrevocably consent to CS Mortgage's conveyance, transfer, quitclaim, release and/or turnover and delivery of the Mortgage Loans and related servicing rights to the successful bidder(s) at the Auction(s).  The Debtors reserve the right to assert that CS Mortgage's sale(s) of the Mortgage Loans was not done in a commercially reasonable manner under applicable state and federal law.

1.6    <u>Sale Cooperation</u>.  The Debtors shall cooperate with CS Mortgage or its designee in connection with CS Mortgage's efforts to sell the Mortgage Loans.  Without limiting the generality of the foregoing, the Debtors shall, as soon as possible, provide to CS Mortgage or its designee copies of the Records and Asset Files (or images thereof), loan level information, and

5

access to information and/or documentation requested (to the extent that the same exists) by prospective purchasers related to the Mortgage Loans.

    1.7    <u>Offering List</u>. Not less than three business days prior to the commencement of the solicitation for participants in the Auction(s), and subject to an appropriate form of confidentiality agreement to be executed between the Debtors and CS Mortgage, CS Mortgage shall provide the Debtors with a list of individuals or entities to which CS Mortgage will market the Mortgage Loans (the "<u>Offering List</u>"). The Debtors shall have the right to supplement the Offering List and CS Mortgage agrees to include such parties in its efforts to market the Mortgage Loans; <u>provided</u> that CS Mortgage, in its sole discretion, shall determine who is a qualified bidder.

    1.8    <u>Participation</u>. CS Mortgage and/or its affiliates shall have the right to participate in the Auction(s).

    1.9    <u>Excess Proceeds</u>. In the event CS Mortgage sells the Mortgage Loans following the Auction(s) for an amount greater than the amounts advanced by CS Mortgage under the Mortgage Repurchase Agreement (the "<u>Advance Amount</u>") CS Mortgage shall turn over to the Debtors any proceeds received in excess of the Advance Amount as soon as practicable.

    1.10    <u>Construction Loan Advances</u>. The Advance Amount shall include any advances made by CS Mortgage in connection with the Construction Loans, including, without limitation, advances made following the date of this Global Settlement Agreement.

    1.11    <u>Deficiency Claim; Rights to Object</u>. If CS Mortgage sells the Mortgage Loans for an amount that is in the aggregate less than the Advance Amount, CS Mortgage shall have a general unsecured claim against the Debtors in an amount equal to the Advance Amount minus the proceeds received from the sale(s) of the Mortgage Loans (the "<u>Deficiency Claim</u>");

6

provided, however, the Debtors and the Official Committee of Unsecured Creditors (the "Creditors' Committee") may object to the allowance of the Deficiency Claim only on the following bases: (i) CS Mortgage's calculation of the Deficiency Claim was incorrect; or (2) the sale(s) of the Mortgage Loans was not done in a commercially reasonable manner under applicable state and federal law.

    1.12   Attorneys' Fees. In addition to the Deficiency Claim, if any, CSFB shall have an allowed general unsecured claim for reasonable attorney's fees and expenses. CS Mortgage shall provide a summary fee statement of the fees and expenses incurred by CS Mortgage only to the Debtors and the Creditors' Committee, which the Debtors and the Creditors' Committee may review for reasonableness. Such summary fee statement will provide a summary of the tasks undertaken by the attorneys and paraprofessionals for CS Mortgage, each attorney's and paraprofessional's billing rate, and each individual's total time billed to this matter. The Debtors and Creditors' Committee reserve their rights to request additional information if they believe the summary fee statement of fees and expenses provided by CS Mortgage is insufficient to determine reasonableness.

    1.13   P&I Account; T&I Account. On or within three business days after the Transfer Date, the Debtors shall transfer to CS Mortgage or its designee, by wire transfer, all amounts in the T&I Account less any advances appropriately made by the Debtors in accordance with Accepted Servicing Practices (as defined in the Mortgage Repurchase Agreement). On or within three business days after the Approval Date, and on a monthly basis thereafter, the Debtors shall transfer to CS Mortgage or its designee, by wire transfer, all amounts in the P&I Account. CS Mortgage shall apply all amounts in the P&I Account attributable to principal payments by the Mortgagors to reduce the Advance Amount. On or within three business days after the Transfer

Date, the Debtors will provide payment histories for the Mortgage Loans. CS Mortgage will have 45 days from receipt of the payment histories to advise the Debtors if any payments posted or that should have been posted to the system were not included in the amounts transferred by the Debtors from the T&I Account and the P&I Account. If after the Transfer Date, CS Mortgage or the Debtors discover that any payments posted or that should have been posted to the system were not included in the amounts transferred by the Debtors from the T&I Account and the P&I Account, or the Debtors receive additional Mortgagor funds, the Debtors will remit such funds within three business days to CS Mortgage or its designee.

## ARTICLE II

### SECURITIES REPURCHASE AGREEMENT

2.1    <u>Setoff of Securities Cash Collateral</u>. On of the Approval Date, CS Securities shall be authorized to setoff the Securities Cash Collateral against its claims under the Securities Repurchase Agreement.

2.2    <u>Waiver of Deficiency Claim</u>. After setoff of the Securities Cash Collateral as authorized above, CS Securities shall waive any deficiency claim under the Securities Repurchase Agreement.

2.3    <u>Turn Over of Securities</u>. On the Approval Date, CS Securities shall turn over to the Debtors any Securities in CS Securities's possession that were delivered to CS Securities by AHMC under the Securities Repurchase Agreement, consisting of the following:

| | | |
|---|---|---|
| (i) | 026931AH8 | AMERICAN 2007-A 1M2 |
| (ii) | 026931AJ4 | AMERICAN 2007-A 1M3 |
| (iii) | 026931AQ8 | AMERICAN 2007-A 2M6 |
| (iv) | 026931AP0 | AMERICAN 2007-A 2M5 |
| (v) | 026933AG6 | AMERICAN 2007-A 4M6 |
| (vi) | 026933AE1 | AMERICAN 2007-A 4M4 |
| (vii) | 026933AF8 | AMERICAN 2007-A 4M5 |

8

066585.1001

2.4    _Principal & Interest_.  AHM shall be authorized to retain any principal and interest collected on account of the Securities after the Commencement Date.

## ARTICLE III

## TBA AGREEMENT

3.1    _The TBA Agreement_.  On the Approval Date, CS Securities shall waive the TBA Claim.

## ARTICLE IV

## DLJ PURCHASE AGREEMENT

4.1    _The EPD Claim_.  On the Approval Date, DLJ shall waive the EPD Claim.

## ARTICLE V

## MUTUAL RELEASES

5.1    _Release by Debtors_.  Except as specifically set forth in Section 5.3 below, each of the Debtors and their successors and assigns, hereby waive, release and forever discharge CSFB and each of its past, present and future officers, directors, partners, members, employees, agents and servants from any and all claims, obligations, demands, actions, causes of action and liabilities, of whatsoever kind and nature, character and description, whether in law or equity, whether sounding in tort, contract or under other applicable law, whether known or unknown, and whether anticipated or unanticipated, including, without limitation, claims, obligations, demands, actions, causes of action and liabilities arising from or relating to the Mortgage Repurchase Agreement, the Securities Repurchase Agreement, the Servicing Agreement, the DLJ Purchase Agreement, the TBA Agreement (including, without limitation, (i) any claim or cause of action arising from or related to any margin call under the Mortgage Repurchase Agreement or the appropriateness thereof, or (ii) the termination or exercise of remedies under

9

each such agreement), and/or the Debtors' assertion that CSFB caused or contributed to the commencement of the Debtors' chapter 11 cases.

5.2     <u>Release by CSFB</u>.  Except as specifically set forth in Section 5.3 below, CSFB and its successors and assigns, hereby waives, releases and forever discharges the Debtors and each of their past, present and future officers, directors, partners, members, employees, agents and servants from any and all claims, obligations, demands, actions, causes of action and liabilities, of whatsoever kind and nature, character and description, whether in law or equity, whether sounding in tort, contract or under other applicable law, whether known or unknown, and whether anticipated or unanticipated, including, without limitation, claims, obligations, demands, actions, causes of action and liabilities arising from or relating to the Mortgage Repurchase Agreement, the Securities Repurchase Agreement, the Servicing Agreement, the DLJ Purchase Agreement, and/or the TBA Agreement.

5.3     <u>Limitation of Releases</u>.  The Parties acknowledge and agree that the releases set forth in Sections 5.1 and 5.2 above shall not include or have any effect upon the following claims and causes of action which are expressly preserved and retained by the respective Party:

- Claims of Credit Suisse Cayman Islands Branch or AHMIC, AHM Servicing, AHMC, and AHMA arising from or relating to the BofA Credit Agreement;

- The Debtors' right to assert that the sale(s) of the Mortgage Loans was not conducted in a commercially reasonable manner under applicable state and federal law and CSFB's right to defend such action;

- The Debtors' right to assert a claim against CS Mortgage if, after the date the Debtors transfer servicing of the Construction Loans to CS Mortgage, CS Mortgage takes any action or fails to make an advance in accordance with the agreements governing the Construction Loans, which causes damage to the related mortgaged properties and for which a related borrower under a Construction Loan asserts a claim against a Debtor related to such action or failure to advance by CS Mortgage; <u>provided</u>,

10

however, the Debtors retain such claim only if they have fully disclosed all information in their possession relating to such Construction Loan;

- Claims or causes of action of CSFB or the Debtors that arise from or are related to any contract between CSFB and Debtors other than the Master Repurchase Agreement, the Securities Repurchase Agreement, the Servicing Agreement, the DLJ Purchase Agreement and the TBA Agreement; and

- Waiver, release or discharge from any obligations under, or the breach of, this Global Settlement Agreement.

5.4     Discovery of Additional Facts.  The consequences of the foregoing release provisions have been explained by each of the Parties' respective attorneys.  Each of the Parties acknowledge that they may hereafter discover facts different from, or in addition to, those which they now know or believe to be true and agree that this Global Settlement Agreement and the releases contained herein shall be and remain effective in all respects notwithstanding such different or additional facts or the discovery thereof.

5.5     Waiver of Benefits.  To the extent applicable law would not otherwise recognize the releases in Sections 5.1 and 5.2 as constituting a full and final release applying to all unknown and unanticipated claims, the Parties hereby expressly waive all rights or benefits which any one or all of them may have now or in the future under any such applicable law.

ARTICLE VI

MISCELLANEOUS

6.1     Approval of Settlement.  The Debtors shall take all necessary steps to obtain approval of this Global Settlement Agreement under Fed. R. Bankr. P. 9019 (the "9019 Motion") by no later than November 21, 2007.

6.2     Creditors' Committee Support.  The Creditors' Committee shall support the 9019 Motion and the motion to expedite filed in connection therewith.  On the Approval Date, the

11

Creditors' Committee shall be bound by the terms, conditions, and limitations of this Global Settlement Agreement.

6.3     The Rule 2004 Motion. The Parties agree that the Rule 2004 Motion shall be withdrawn with prejudice and shall submit a proposed order for approval of the Global Settlement Agreement that provides for such withdrawal.

6.4     The Adversary Proceeding. The Parties agree that the Adversary Proceeding shall be dismissed with prejudice and shall submit a proposed order for approval of the Global Settlement Agreement that provides for such dismissal.

6.5     No Disclosure. Neither of the Parties shall make any disclosure or issue any press release concerning this Global Settlement Agreement without the prior written consent of the other Party. The Creditors' Committee shall not make any disclosure or issue any press release concerning this Global Settlement Agreement without the prior written consent of both Parties. Notwithstanding the foregoing, this provision shall not prevent the Parties or their attorneys from responding to valid and enforceable subpoenas.

6.6     Further Actions. On or after the Approval Date, the Parties and the Creditors' Committee shall cooperate in taking any action and preparing, executing, and delivering any documents that may be necessary to dismiss the Adversary Proceeding, obtain all other necessary approvals, and implement the purpose of this Global Settlement Agreement.

6.7     Due Authorization. Each of the Parties represents that it, she, or he has read and understands the scope and effect of each provision of this Global Settlement Agreement and has had the opportunity to consult with attorneys for further explanation of the Global Settlement Agreement's terms, covenants, and provisions. Each of the undersigned Parties represents that it, she, or he has executed the Global Settlement Agreement freely, voluntarily, and with

12

authority, intending to be bound thereby. Each party represents that it, she, or he has been duly authorized to enter into this Global Settlement Agreement.

6.8    No Admission. This Global Settlement Agreement shall not constitute or be deemed to constitute any admission or acknowledgement of liability or wrongdoing on the part of any of the Parties. The Parties will not offer this Global Settlement Agreement or the fact of its execution into evidence in any proceeding other than a proceeding to approve or enforce this Global Settlement Agreement or any of its terms.

6.9    Controlling Law. The terms and conditions of this Global Settlement Agreement are contractual in nature and shall be construed and governed in accordance with the laws of the State of New York as applied to contracts entered into and performed entirely within that state.

6.10    Jurisdiction. The Court shall retain jurisdiction to interpret and enforce the terms of this Global Settlement Agreement.

6.11    Integrated Agreement. This Global Settlement Agreement, including the Servicing Transfer Guidelines, contains the entire agreement between the Parties and supersedes any and all prior and contemporaneous agreements or understandings, written or oral, including but not limited to the term sheet executed by the parties on November 7, 2007, with respect to the subject matter hereof. Each of the Parties acknowledges that no promises or inducements have been made that caused any party to execute this Global Settlement Agreement other than those that are expressly set forth herein.

6.12    Headings. The headings, subheadings or titles in this Global Settlement Agreement are used for purposes of convenience only and have no legal force, meaning, or effect.

DB02:6380993.1                                                            066585.1001

6.13    _Amendments_.  This Global Settlement Agreement may not be amended or revised except by a writing executed by an authorized representative of each of the Parties.

6.14    _Signatures and Effective Date_.  This Global Settlement Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which will constitute one and the same instrument, and it shall constitute sufficient proof of this Global Settlement Agreement to present any copy, copies, or facsimiles signed by the parties hereto to be charged.  This Global Settlement Agreement will become effective as soon as all parts of this Global Settlement Agreement have been executed by all of the Parties.

DB02:6380993.1                                                                                                              066585.1001

WHEREFORE, the Parties acknowledge their agreement and consent to the terms and conditions set forth above through their respective signatures below.

| | |
|---|---|
| | **CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC**<br><br>By: /s/ _____<br>Name: _____<br>Title: _____ |
| | **CREDIT SUISSE SECURITIES (USA) LLC**<br><br>By: /s/ _____<br>Name: _____<br>Title: _____ |
| | **DLJ MORTGAGE CAPITAL, INC.**<br><br>By: /s/ _____<br>Name: _____<br>Title: _____ |
| | **AMERICAN HOME MORTGAGE INVESTMENT CORPORATION AND EACH OF ITS DIRECT AND INDIRECT SUBSIDIARIES, AS DEBTORS AND DEBTORS IN POSSESSION**<br><br>By: /s/ _____<br>Name: _Craig Pino_____<br>Title: _EuP + Treasurer_____ |

15

WHEREFORE, the Parties acknowledge their agreement and consent to the terms and conditions set forth above through their respective signatures below.

| | |
|---|---|
| | CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC<br><br>By: /s/ _____<br>Name: ___MICHAEL A. CRISCITO___<br>Title: ___VICE PRESIDENT___ |
| | CREDIT SUISSE SECURITIES (USA) LLC<br><br>By: /s/ _____<br>Name: ___Michael A. Criscito___<br>Title: ___Managing Director___ |
| | DLJ MORTGAGE CAPITAL, INC.<br><br>By: /s/ _____<br>Name: ___MICHAEL A. CRISCITO___<br>Title: ___VICE PRESIDENT___ |
| | AMERICAN HOME MORTGAGE INVESTMENT CORPORATION AND EACH OF ITS DIRECT AND INDIRECT SUBSIDIARIES, AS DEBTORS AND DEBTORS IN POSSESSION<br><br>By: /s/ _____<br>Name: _____<br>Title: _____ |

The Creditors' Committee agrees to support the Rule 9019 Motion to approve this Global Settlement Agreement and any motion to expedite filed in connection therewith, and agrees to be bound by the terms of the settlement upon bankruptcy court approval.


Bonnie Glantz Fatell, Esq.
BLANK ROME LLP
Chase Manhattan Centre
1201 Market Street
Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464
Attorneys for the Creditors' Committee

DB02:6380993.1                                                          066585.1001