# EXHIBIT A

# GLOBAL SETTLEMENT AGREEMENT

This Global Settlement Agreement (the "Global Settlement Agreement") is made and entered into as of the 16th day of November, 2007 between and among Credit Suisse First Boston Mortgage Capital LLC ("CS Mortgage"), Credit Suisse Securities (USA) LLC ("CS Securities"), and DLJ Mortgage Capital, Inc. ("DLJ" and, collectively with CS Mortgage and CS Securities, "CSFB") and American Home Mortgage Investment Corporation ("AHMIC"), and each of its direct and indirect subsidiaries as debtors and debtors in possession (collectively with AHMIC, the "Debtors"). CSFB and the Debtors are referred to herein as the "Parties."

WHEREAS, on August 6, 2007 (the "Commencement Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code with the United States Bankruptcy Court for the District of Delaware (the "Court");

WHEREAS, prior to the Commencement Date, certain of the Parties entered into the following agreements:

- that certain Master Repurchase Agreement, dated as of December 2, 2003 (the "Securities Repurchase Agreement"), between CS Securities (f/k/a Credit Suisse First Boston LLC) and AHMIC;

- that certain Servicing Agreement, dated as of October 31, 2005 (the "Servicing Agreement"), among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company ("Deutsche"), as Trustee, DLJ, as Seller, and American Home Mortgage Servicing, Inc. ("AHM Servicing"), as Servicer;

- that certain Amended and Restated Seller's Purchase, Warranties and Interim Servicing Agreement, dated as of August 1, 2006 (as amended and restated, the "DLJ Purchase Agreement"), among DLJ, American Home Mortgage Corporation ("AHMC") and AHM Servicing;

- that certain Master Repurchase Agreement, dated as of September 13, 2006 (as amended, supplemented, or otherwise modified from time to time, the "Mortgage Repurchase Agreement"), among CS Mortgage, AHMC, American Home Mortgage Acceptance, Inc. ("AHMA"), AHM

Servicing, AHMIC, and American Home Mortgage Holdings, Inc. ("AHM Holdings"); and

• that certain Master Securities Forward Transaction Agreement, dated September 18, 2006 (the "TBA Agreement"), between CS Securities and AHMC;

WHEREAS, Credit Suisse Cayman Islands Branch is a lender under that certain Second Amended and Restated Credit Agreement, dated August 10, 2006 (the "BofA Credit Agreement"), among AHMIC, AHM Servicing, AHMC, and AHMA, as Borrowers, Bank of America, N.A., as Administrative Agent, and the lenders party thereto;

WHEREAS, as of November 15, 2007, the Debtors are holding in a segregated account established on or about August 1, 2007 (the "P&I Account") $547,123.03 in principal and interest payments made by the Mortgagors (as defined in the Mortgage Repurchase Agreement) to the Debtors relating to the Mortgage Loans (as defined below), whether collected prior to or after the Commencement Date. The Debtors are also holding in a segregated account established on or about August 1, 2007 (the "T&I Account") $36,937.82 in tax and insurance payments made by the Mortgagors to the Debtors relating to the Mortgage Loans, whether collected prior to or after the Commencement Date;

WHEREAS, as of the Commencement Date, AHMIC owed CS Securities approximately $1.6 million on account of its repurchase obligations under the Securities Repurchase Agreement and CS Securities is holding approximately $1.4 million in cash collateral (the "Securities Cash Collateral") to secure AHMIC's repurchase obligations under such agreement.

WHEREAS, as of the Commencement Date AHMC owed CS Securities approximately $837,656 under the TBA Agreement (the "TBA Claim");

066585.1001

WHEREAS, as of the Commencement Date, AHMC and AHM Servicing owed DLJ an unliquidated amount under the DLJ Purchase Agreement on account of "Early Payment Default" claims which could be in the amount of at least $2.8 million (the "EPD Claims");

WHEREAS, the Parties are not aware of any claims either Party may have against the other under the Servicing Agreement;

WHEREAS, on or about August 6, 2007, CS Mortgage commenced an Adversary Proceeding (the "Adversary Proceeding"), Adversary Proceeding No. 07-51684 (CSS), seeking, among other things, a declaratory judgment with respect to CS Mortgage's rights under the Mortgage Repurchase Agreement and to obtain possession of the Records and Asset Files (each as defined in the Mortgage Repurchase Agreement);

WHEREAS, on or about August 24, 2007, the Debtors filed a Motion for Order Under Bankruptcy Rule 2004 Directing Examination Of, and Production of Documents By, Certain Loan and Purported Repurchase Counterparties (the "Rule 2004 Motion") authorizing the examination of, and production of certain documents by, CSFB and other respondents;

WHEREAS, on or about August 31, 2007, the Debtors filed their Answer and First Counterclaim, disputing the rights asserted by CS Mortgage in the Adversary Proceeding;

WHEREAS, CSFB does not concede that any of the Debtors' claims, defenses or counterclaim in the Adversary Proceeding are meritorious and likewise the Debtors do not concede CSFB's claims in the Adversary Proceeding are meritorious;

WHEREAS, CSFB and the Debtors believe it is in their respective best interests to compromise and settle, without further litigation, the Adversary Proceeding and the Parties' respective rights and obligations under the Servicing Agreement, the Securities Repurchase Agreement, the DLJ Purchase Agreement, the Mortgage Repurchase Agreement, and the TBA

3

Agreement on the terms and subject to the conditions set forth in this Global Settlement
Agreement;

NOW, THEREFORE, CSFB and the Debtors agree as follows:

ARTICLE I

MORTGAGE REPURCHASE AGREEMENT

1.1    Transfer of Servicing.  On a date that is designated by CS Mortgage (the
"Transfer Date"), but no later than April 30, 2008, the Debtors shall transfer to CS Mortgage or
its designee, all right, title, and interest in the servicing of the mortgage loans that are the subject
of the Mortgage Repurchase Agreement (the "Mortgage Loans"), including, without limitation,
all rights to collect fees and other payments made on account of the Mortgage Loans and the
Records and Asset Files relating thereto (the "Servicing Rights"); provided, however, that CS
Mortgage will provide the Debtors with not less than two business days' notice of the Transfer
Date; and provided further, however, that the Transfer Date will be at least five business days
following the date on which the Court enters an order approving this Global Settlement
Agreement (the "Approval Date").  The Debtors shall transfer the Servicing Rights in
accordance with the Servicing Transfer Guidelines set forth in Exhibit A annexed hereto.  The
Servicing Transfer Guidelines may be modified only upon the written consent of both Parties.

1.2    Servicing Transfer Cooperation.  The Debtors, CS Mortgage and its designee, if
any, shall cooperate in connection with the transfer of the Servicing Rights and shall use good
faith efforts to cause the transfer in an efficient nondisruptive manner.

1.3    Mortgage Files.  The Debtors shall use good-faith efforts to ensure any and all
instruments, agreements and other books, records, and reports and data with respect to Mortgage
Loans, including the credit files related to the Mortgage Loans and any other instruments

4

necessary to document or service a mortgage loan (collectively, the "<u>Mortgage Files</u>") are intact and to resolve any document exceptions to the Mortgage Files and the servicing files. CSFB reserves the right to assert as a defense to the Debtors' right to challenge the commercial reasonableness of the sale(s) of the Mortgage Loan under applicable state and federal law that any deficiency that is incurable with respect to a Mortgage File may impact the ultimate value of the underlying Mortgage Loan.

  1.4 <u>Construction Loan Information</u>. On or prior to the date of execution of this Global Settlement Agreement, the Debtors shall provide CS Mortgage all information and documents within their possession concerning the three Mortgage Loans that are construction loans (the "<u>Construction Loans</u>"), including, without limitation, all collector comments related to the Construction Loans.

  1.5 <u>Sale of the Mortgage Loans</u>. CS Mortgage, in its sole discretion, may market and offer the Mortgage Loans for sale at any time pursuant to one or more auctions (each an "<u>Auction</u>") for the sale or sales of each of the Mortgage Loans and the servicing rights related thereto. The Debtors irrevocably consent to CS Mortgage's conveyance, transfer, quitclaim, release and/or turnover and delivery of the Mortgage Loans and related servicing rights to the successful bidder(s) at the Auction(s). The Debtors reserve the right to assert that CS Mortgage's sale(s) of the Mortgage Loans was not done in a commercially reasonable manner under applicable state and federal law.

  1.6 <u>Sale Cooperation</u>. The Debtors shall cooperate with CS Mortgage or its designee in connection with CS Mortgage's efforts to sell the Mortgage Loans. Without limiting the generality of the foregoing, the Debtors shall, as soon as possible, provide to CS Mortgage or its designee copies of the Records and Asset Files (or images thereof), loan level information, and

5

access to information and/or documentation requested (to the extent that the same exists) by prospective purchasers related to the Mortgage Loans.

1.7    Offering List.  Not less than three business days prior to the commencement of the solicitation for participants in the Auction(s), and subject to an appropriate form of confidentiality agreement to be executed between the Debtors and CS Mortgage, CS Mortgage shall provide the Debtors with a list of individuals or entities to which CS Mortgage will market the Mortgage Loans (the "Offering List").  The Debtors shall have the right to supplement the Offering List and CS Mortgage agrees to include such parties in its efforts to market the Mortgage Loans; provided that CS Mortgage, in its sole discretion, shall determine who is a qualified bidder.

1.8    Participation.  CS Mortgage and/or its affiliates shall have the right to participate in the Auction(s).

1.9    Excess Proceeds.  In the event CS Mortgage sells the Mortgage Loans following the Auction(s) for an amount greater than the amounts advanced by CS Mortgage under the Mortgage Repurchase Agreement (the "Advance Amount") CS Mortgage shall turn over to the Debtors any proceeds received in excess of the Advance Amount as soon as practicable.

1.10    Construction Loan Advances.  The Advance Amount shall include any advances made by CS Mortgage in connection with the Construction Loans, including, without limitation, advances made following the date of this Global Settlement Agreement.

1.11    Deficiency Claim; Rights to Object.  If CS Mortgage sells the Mortgage Loans for an amount that is in the aggregate less than the Advance Amount, CS Mortgage shall have a general unsecured claim against the Debtors in an amount equal to the Advance Amount minus the proceeds received from the sale(s) of the Mortgage Loans (the "Deficiency Claim");

6

provided, however, the Debtors and the Official Committee of Unsecured Creditors (the "Creditors' Committee") may object to the allowance of the Deficiency Claim only on the following bases: (i) CS Mortgage's calculation of the Deficiency Claim was incorrect; or (2) the sale(s) of the Mortgage Loans was not done in a commercially reasonable manner under applicable state and federal law.

1.12    Attorneys' Fees. In addition to the Deficiency Claim, if any, CSFB shall have an allowed general unsecured claim for reasonable attorney's fees and expenses. CS Mortgage shall provide a summary fee statement of the fees and expenses incurred by CS Mortgage only to the Debtors and the Creditors' Committee, which the Debtors and the Creditors' Committee may review for reasonableness. Such summary fee statement will provide a summary of the tasks undertaken by the attorneys and paraprofessionals for CS Mortgage, each attorney's and paraprofessional's billing rate, and each individual's total time billed to this matter. The Debtors and Creditors' Committee reserve their rights to request additional information if they believe the summary fee statement of fees and expenses provided by CS Mortgage is insufficient to determine reasonableness.

1.13    P&I Account; T&I Account. On or within three business days after the Transfer Date, the Debtors shall transfer to CS Mortgage or its designee, by wire transfer, all amounts in the T&I Account less any advances appropriately made by the Debtors in accordance with Accepted Servicing Practices (as defined in the Mortgage Repurchase Agreement). On or within three business days after the Approval Date, and on a monthly basis thereafter, the Debtors shall transfer to CS Mortgage or its designee, by wire transfer, all amounts in the P&I Account. CS Mortgage shall apply all amounts in the P&I Account attributable to principal payments by the Mortgagors to reduce the Advance Amount. On or within three business days after the Transfer

7

Date, the Debtors will provide payment histories for the Mortgage Loans. CS Mortgage will have 45 days from receipt of the payment histories to advise the Debtors if any payments posted or that should have been posted to the system were not included in the amounts transferred by the Debtors from the T&I Account and the P&I Account. If after the Transfer Date, CS Mortgage or the Debtors discover that any payments posted or that should have been posted to the system were not included in the amounts transferred by the Debtors from the T&I Account and the P&I Account, or the Debtors receive additional Mortgagor funds, the Debtors will remit such funds within three business days to CS Mortgage or its designee.

ARTICLE II

SECURITIES REPURCHASE AGREEMENT

2.1     Setoff of Securities Cash Collateral. On of the Approval Date, CS Securities shall be authorized to setoff the Securities Cash Collateral against its claims under the Securities Repurchase Agreement.

2.2     Waiver of Deficiency Claim. After setoff of the Securities Cash Collateral as authorized above, CS Securities shall waive any deficiency claim under the Securities Repurchase Agreement.

2.3     Turn Over of Securities. On the Approval Date, CS Securities shall turn over to the Debtors any Securities in CS Securities's possession that were delivered to CS Securities by AHMC under the Securities Repurchase Agreement, consisting of the following:

|       |          |                      |
|-------|----------|----------------------|
| (i)   | 026931AH8 | AMERICAN 2007-A 1M2 |
| (ii)  | 026931AJ4 | AMERICAN 2007-A 1M3 |
| (iii) | 026931AQ8 | AMERICAN 2007-A 2M6 |
| (iv)  | 026931AP0 | AMERICAN 2007-A 2M5 |
| (v)   | 026933AG6 | AMERICAN 2007-A 4M6 |
| (vi)  | 026933AE1 | AMERICAN 2007-A 4M4 |
| (vii) | 026933AF8 | AMERICAN 2007-A 4M5 |

8

2.4    <u>Principal & Interest</u>.  AHM shall be authorized to retain any principal and interest collected on account of the Securities after the Commencement Date.

## ARTICLE III

## <u>TBA AGREEMENT</u>

3.1    <u>The TBA Agreement</u>.  On the Approval Date, CS Securities shall waive the TBA Claim.

## ARTICLE IV

## <u>DLJ PURCHASE AGREEMENT</u>

4.1    <u>The EPD Claim</u>.  On the Approval Date, DLJ shall waive the EPD Claim.

## ARTICLE V

## <u>MUTUAL RELEASES</u>

5.1    <u>Release by Debtors</u>.  Except as specifically set forth in Section 5.3 below, each of the Debtors and their successors and assigns, hereby waive, release and forever discharge CSFB and each of its past, present and future officers, directors, partners, members, employees, agents and servants from any and all claims, obligations, demands, actions, causes of action and liabilities, of whatsoever kind and nature, character and description, whether in law or equity, whether sounding in tort, contract or under other applicable law, whether known or unknown, and whether anticipated or unanticipated, including, without limitation, claims, obligations, demands, actions, causes of action and liabilities arising from or relating to the Mortgage Repurchase Agreement, the Securities Repurchase Agreement, the Servicing Agreement, the DLJ Purchase Agreement, the TBA Agreement (including, without limitation, (i) any claim or cause of action arising from or related to any margin call under the Mortgage Repurchase Agreement or the appropriateness thereof, or (ii) the termination or exercise of remedies under

9

each such agreement), and/or the Debtors' assertion that CSFB caused or contributed to the commencement of the Debtors' chapter 11 cases.

5.2 <u>Release by CSFB</u>. Except as specifically set forth in Section 5.3 below, CSFB and its successors and assigns, hereby waives, releases and forever discharges the Debtors and each of their past, present and future officers, directors, partners, members, employees, agents and servants from any and all claims, obligations, demands, actions, causes of action and liabilities, of whatsoever kind and nature, character and description, whether in law or equity, whether sounding in tort, contract or under other applicable law, whether known or unknown, and whether anticipated or unanticipated, including, without limitation, claims, obligations, demands, actions, causes of action and liabilities arising from or relating to the Mortgage Repurchase Agreement, the Securities Repurchase Agreement, the Servicing Agreement, the DLJ Purchase Agreement, and/or the TBA Agreement.

5.3 <u>Limitation of Releases</u>. The Parties acknowledge and agree that the releases set forth in Sections 5.1 and 5.2 above shall not include or have any effect upon the following claims and causes of action which are expressly preserved and retained by the respective Party:

- Claims of Credit Suisse Cayman Islands Branch or AHMIC, AHM Servicing, AHMC, and AHMA arising from or relating to the BofA Credit Agreement;

- The Debtors' right to assert that the sale(s) of the Mortgage Loans was not conducted in a commercially reasonable manner under applicable state and federal law and CSFB's right to defend such action;

- The Debtors' right to assert a claim against CS Mortgage if, after the date the Debtors transfer servicing of the Construction Loans to CS Mortgage, CS Mortgage takes any action or fails to make an advance in accordance with the agreements governing the Construction Loans, which causes damage to the related mortgaged properties and for which a related borrower under a Construction Loan asserts a claim against a Debtor related to such action or failure to advance by CS Mortgage; <u>provided</u>,

10

however, the Debtors retain such claim only if they have fully disclosed all information in their possession relating to such Construction Loan;

- Claims or causes of action of CSFB or the Debtors that arise from or are related to any contract between CSFB and Debtors other than the Master Repurchase Agreement, the Securities Repurchase Agreement, the Servicing Agreement, the DLJ Purchase Agreement and the TBA Agreement; and

- Waiver, release or discharge from any obligations under, or the breach of, this Global Settlement Agreement.

5.4    Discovery of Additional Facts.  The consequences of the foregoing release provisions have been explained by each of the Parties' respective attorneys.  Each of the Parties acknowledge that they may hereafter discover facts different from, or in addition to, those which they now know or believe to be true and agree that this Global Settlement Agreement and the releases contained herein shall be and remain effective in all respects notwithstanding such different or additional facts or the discovery thereof.

5.5    Waiver of Benefits.  To the extent applicable law would not otherwise recognize the releases in Sections 5.1 and 5.2 as constituting a full and final release applying to all unknown and unanticipated claims, the Parties hereby expressly waive all rights or benefits which any one or all of them may have now or in the future under any such applicable law.

ARTICLE VI

MISCELLANEOUS

6.1    Approval of Settlement.  The Debtors shall take all necessary steps to obtain approval of this Global Settlement Agreement under Fed. R. Bankr. P. 9019 (the "9019 Motion") by no later than November 21, 2007.

6.2    Creditors' Committee Support.  The Creditors' Committee shall support the 9019 Motion and the motion to expedite filed in connection therewith.  On the Approval Date, the

11

Creditors' Committee shall be bound by the terms, conditions, and limitations of this Global Settlement Agreement.

6.3    The Rule 2004 Motion. The Parties agree that the Rule 2004 Motion shall be withdrawn with prejudice and shall submit a proposed order for approval of the Global Settlement Agreement that provides for such withdrawal.

6.4    The Adversary Proceeding. The Parties agree that the Adversary Proceeding shall be dismissed with prejudice and shall submit a proposed order for approval of the Global Settlement Agreement that provides for such dismissal.

6.5    No Disclosure. Neither of the Parties shall make any disclosure or issue any press release concerning this Global Settlement Agreement without the prior written consent of the other Party. The Creditors' Committee shall not make any disclosure or issue any press release concerning this Global Settlement Agreement without the prior written consent of both Parties. Notwithstanding the foregoing, this provision shall not prevent the Parties or their attorneys from responding to valid and enforceable subpoenas.

6.6    Further Actions. On or after the Approval Date, the Parties and the Creditors' Committee shall cooperate in taking any action and preparing, executing, and delivering any documents that may be necessary to dismiss the Adversary Proceeding, obtain all other necessary approvals, and implement the purpose of this Global Settlement Agreement.

6.7    Due Authorization. Each of the Parties represents that it, she, or he has read and understands the scope and effect of each provision of this Global Settlement Agreement and has had the opportunity to consult with attorneys for further explanation of the Global Settlement Agreement's terms, covenants, and provisions. Each of the undersigned Parties represents that it, she, or he has executed the Global Settlement Agreement freely, voluntarily, and with

12

authority, intending to be bound thereby. Each party represents that it, she, or he has been duly authorized to enter into this Global Settlement Agreement.

6.8    No Admission. This Global Settlement Agreement shall not constitute or be deemed to constitute any admission or acknowledgement of liability or wrongdoing on the part of any of the Parties. The Parties will not offer this Global Settlement Agreement or the fact of its execution into evidence in any proceeding other than a proceeding to approve or enforce this Global Settlement Agreement or any of its terms.

6.9    Controlling Law. The terms and conditions of this Global Settlement Agreement are contractual in nature and shall be construed and governed in accordance with the laws of the State of New York as applied to contracts entered into and performed entirely within that state.

6.10    Jurisdiction. The Court shall retain jurisdiction to interpret and enforce the terms of this Global Settlement Agreement.

6.11    Integrated Agreement. This Global Settlement Agreement, including the Servicing Transfer Guidelines, contains the entire agreement between the Parties and supersedes any and all prior and contemporaneous agreements or understandings, written or oral, including but not limited to the term sheet executed by the parties on November 7, 2007, with respect to the subject matter hereof. Each of the Parties acknowledges that no promises or inducements have been made that caused any party to execute this Global Settlement Agreement other than those that are expressly set forth herein.

6.12    Headings. The headings, subheadings or titles in this Global Settlement Agreement are used for purposes of convenience only and have no legal force, meaning, or effect.

13

6.13    <u>Amendments</u>.  This Global Settlement Agreement may not be amended or revised except by a writing executed by an authorized representative of each of the Parties.

6.14    <u>Signatures and Effective Date</u>.  This Global Settlement Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which will constitute one and the same instrument, and it shall constitute sufficient proof of this Global Settlement Agreement to present any copy, copies, or facsimiles signed by the parties hereto to be charged.  This Global Settlement Agreement will become effective as soon as all parts of this Global Settlement Agreement have been executed by all of the Parties.

DB02:6380993.1                                                                            066585.1001

WHEREFORE, the Parties acknowledge their agreement and consent to the terms and conditions set forth above through their respective signatures below.

| | |
|---|---|
| | **CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC**<br><br>By: /s/ _____<br>Name: _____<br>Title: _____ |
| | **CREDIT SUISSE SECURITIES (USA) LLC**<br><br>By: /s/ _____<br>Name: _____<br>Title: _____ |
| | **DLJ MORTGAGE CAPITAL, INC.**<br><br>By: /s/ _____<br>Name: _____<br>Title: _____ |
| | **AMERICAN HOME MORTGAGE INVESTMENT CORPORATION AND EACH OF ITS DIRECT AND INDIRECT SUBSIDIARIES, AS DEBTORS AND DEBTORS IN POSSESSION**<br><br>By: /s/ _____<br>Name: _Craig Pino_<br>Title: _EVP + Treasurer_ |

15

**WHEREFORE,** the Parties acknowledge their agreement and consent to the terms

and conditions set forth above through their respective signatures below.

| | |
|---|---|
| | CREDIT SUISSE FIRST BOSTON<br>MORTGAGE CAPITAL LLC<br><br>By: /s/<br>Name: _____MICHAEL A. CRISCITO_____<br>Title: _____VICE PRESIDENT_____ |
| | CREDIT SUISSE SECURITIES (USA) LLC<br><br>By: /s/<br>Name: **Michael A. Criscito**<br>Title: **Managing Director** |
| | DLJ MORTGAGE CAPITAL, INC.<br><br>By: /s/<br>Name: _____MICHAEL A. CRISCITO_____<br>Title: _____VICE PRESIDENT_____ |
| | AMERICAN HOME MORTGAGE INVESTMENT<br>CORPORATION AND EACH OF ITS DIRECT<br>AND INDIRECT SUBSIDIARIES, AS DEBTORS<br>AND DEBTORS IN POSSESSION<br><br>By: /s/_____<br>Name: _____<br>Title: _____ |

The Creditors' Committee agrees to support the Rule 9019 Motion to approve this Global Settlement Agreement and any motion to expedite filed in connection therewith, and agrees to be bound by the terms of the settlement upon bankruptcy court approval.

Bonnie Glantz Fatell, Esq. (DE. No. 3809)
BLANK ROME LLP
Chase Manhattan Centre
1201 Market Street
Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464
Attorneys for the Creditors' Committee

16

# EXHIBIT A

## SERVICING TRANSFER GUIDELINES

## SERVICING TRANSFER GUIDELINES

On a date (the "Transfer Date") that is designated by Credit Suisse First Boston Mortgage Capital LLC ("CS Mortgage"), but that is no later than April 30, 2008, the Debtors shall transfer to CS Mortgage or its designee, all right, title, and interest in the servicing of the mortgage loans that are the subject of the Mortgage Repurchase Agreement (the "Mortgage Loans") and related Custodial Agreement, dated September 13, 2006 among CS Mortgage, the Debtors, and Deutsche Bank National Trust Company (the "Custodian"), including, without limitation, all rights to collect fees and other payments made on account of the Mortgage Loans and the Records and Asset Files relating thereto (the "Servicing Rights"); provided, however, that CS Mortgage will provide the Debtors with not less than two business days' notice of the Transfer Date; and provided further, however, that the Transfer Date will be at least five days following the date on which the Court enters an order approving this Global Settlement Agreement (the "Approval Date"). The Debtors shall transfer the Servicing Rights in accordance with these Servicing Transfer Guidelines. These Servicing Transfer Guidelines may be modified only upon the written consent of both Parties. The Debtors, CS Mortgage and its designee, if any, shall cooperate in connection with the transfer of the Servicing Rights and shall use good-faith efforts to cause the transfer in an efficient nondisruptive manner.

Capitalized terms used, but not otherwise defined herein, shall have the respective definitions assigned to such terms in the Global Settlement Agreement, dated as of November 16, 2007 (the "Global Settlement Agreement"), between and among CS Mortgage, Credit Suisse Securities (USA) LLC ("CS Securities"), and DLJ Mortgage Capital Inc. ("DLJ" and, collectively with CS Mortgage and CS Securities, "CSFB") and American Home Mortgage Investment Corporation ("AHMIC"), and each of its direct and indirect subsidiaries as debtors and debtors in possession (collectively with AHMIC, the "Debtors"). All obligations under these Servicing Transfer Guidelines are qualified by section 1.2 of the Global Settlement Agreement which provides that the Debtors shall use good-faith efforts in connection with the transfer of the Servicing Rights. In the event there is a conflict between the terms of these Servicing Transfer Guidelines and the Global Settlement Agreement, the Global Settlement Agreement controls.

The Debtors shall use good-faith efforts to ensure the Mortgage Files related to the Mortgage Loans are intact and to resolve any document exceptions to the Mortgage Files. CSFB reserves the right to assert as a defense that any deficiency that is incurable with respect to a Mortgage File may impact the ultimate value of the underlying Mortgage Loan.

On or prior to the date of execution of the Global Settlement Agreement, the Debtors shall provide CS Mortgage and its designee all information and documents within their possession concerning the three Mortgage Loans that are construction loans (the "Construction Loans"), including, without limitation, all collector comments related to the Construction Loans.

Upon the terms and subject to the conditions of the Global Settlement Agreement, the Debtors shall, on the Transfer Date, transfer and assign to CS Mortgage or its designee, and CS Mortgage or its designee shall, on the Transfer Date, assume from Debtors, all right, title, interest and obligation of the Debtors in and to: (i) the Servicing Rights, and all rights related thereto, (ii) the Advances, (iii) the Custodial Funds and Escrow Funds, (iv) the Mortgage Files in the Debtors' possession, (v) the exclusive right to enter into arrangements that generate, or to otherwise receive, ancillary income with respect to the Mortgage Loans, and (vi) the right to collect and retain prepayment charges.

The Servicing Rights that are being transferred by the Debtors on the Transfer Date shall be transferred and assigned to and accepted by CS Mortgage or its designee on an "as is", "where is" and "with all faults" conditions, free of any warranties or representations whatsoever, whether express or implied, except as expressly set forth in the Global Settlement Agreement. On the Transfer Date, the Debtors shall deliver to CS Mortgage or its designee such other instruments of assignment, transfer and conveyance, and do such other acts as are reasonably necessary to effectuate the transfer, assignment and delivery to CS Mortgage or its designee of the right, title and interest of the Debtors in and to the Servicing Rights.

No later than one business day after the Debtors and CSFB execute the Global Settlement Agreement, the Debtors shall provide CS Mortgage or its designee with a preliminary tape(s) containing the information necessary to transfer the Servicing Rights on the Transfer Date and within one (1) business day after the Transfer Date, the Debtors shall deliver to CS Mortgage or its designee the final data tapes.

In addition to the forgoing, on a date to be agreed upon by the Parties, the Debtors shall provide CS Mortgage or its designee with the data, information and materials reasonably necessary for CS Mortgage or CS Mortgage's designee to service the Mortgage Loans, including, but not limited to, all Mortgage Files or electronic images pertaining to the Mortgage Loans and the related servicing records in Debtors' possession, mortgage notes (including e-Notes), riders, loan modification documents, and servicing files, but excluding the final data tapes. The Debtors shall provide CS Mortgage or its designee with prior written notice of the carrier, shipping arrangements, and insurance arrangements with respect to the delivery of the Mortgage Files.

On or before the Transfer Date, the Debtors shall appoint CS Mortgage or its designee to be their true and lawful agent and attorney-in-fact, in the form of the Special and Limited Power of Attorney attached hereto as Exhibit A, with respect to each Mortgage Loan in the Debtors' name, place, and stead:

(i)    to effectuate the transfer of servicing to CS Mortgage or its designee;

(ii)    to complete (to the extent necessary) and to cause to be submitted for filing or recording in the appropriate public filing or recording offices all assignments

of mortgage, deeds of trust, or similar documents, assignments, or reassignments of rents, leases and profits, in each case in favor of CS Mortgage or its designee, and all Form UCC-2 or UCC-3 assignments of financing statements and all other comparable instruments or documents with respect to the Mortgage Loans, and to evidence, provide notice of and perfect such assignments and conveyances in favor of CS Mortgage or its designee in the public records of the appropriate filing and recording offices;

(iii)    to file or record in the appropriate public filing or recording offices all other Mortgage Loan documents to be recorded which have not been submitted for filing or recordation by the Debtors on or before the date hereof or which have been so submitted but are subsequently lost or returned unrecorded or unfiled as a result of actual or purported defects therein, in order to evidence, provide notice of and perfect such documents in the public record of the appropriate filing and recording offices; and

(iv)    to do and perform all acts in connection with the servicing, administration and management of the Mortgage Loans, including but not limited to:

(1)    execution and delivery of customary consents or waivers and other instruments and documents;

(2)    consent to transfers of any Mortgage Loans and assumptions of the Mortgage Notes and related Mortgages;

(3)    collect any Insurance Proceeds and other Liquidation Proceeds;

(4)    effectuate foreclosure or other conversions of the ownership of the mortgage property securing any Mortgage Loan;

(5)    to sign any necessary assignments of Mortgage or endorsements to give fully the lienholder rights over from the Debtors to CS Mortgage or its designee;

(6)    execute and deliver any and all instruments of satisfaction or cancellation or of partial or full release or discharge and all other comparable instruments, with respect to the Mortgage Loans, and with respect to the Mortgaged Properties; and

(7)    execute all documents customarily and reasonably necessary and appropriate for the transfer post-foreclosure of the previously Mortgaged Properties to third parties, and then to collect the sales proceeds from that transfer.

The Debtors shall be responsible for preparing and sending goodbye letters related to the Mortgage Loans at least ten (10) days after to the Transfer Date. CSFB or its designee shall send hello letters no later than fifteen (15) days after the Transfer Date.

Notwithstanding the foregoing, if a Mortgage Loan already is registered with the Mortgage Electronic Registration System ("MERS"), which enables members to execute and deliver an Assignment of Mortgage Instrument with respect to a Mortgage Loan to MERS for recording in the office of the appropriate local jurisdiction, Debtors shall follow the requirement of MERS to reflect in the records of MERS the transfer of the ownership of the Mortgage Loans and of the Servicing Rights from the Debtors to CSFB or its designee. The Debtors shall continue the transmission of recording information of the Mortgage Instruments to MERS after the Transfer Date, until all such recording information is received and transmitted to MERS and CSFB, which in any event and under all circumstances shall be completed not later than three (3) days after the Transfer Date. The Debtors' shall bear all costs associated with the registration of a Mortgage Loan with MERS, to the extent done before the Transfer Date, including, without limitation, the related preparation and recordation of an assignment of Mortgage Instrument, and all costs associated with the reflection of the transfer of Servicing to the Mortgage Loan in the records of MERS. For each Mortgage Loan registered with MERS, the Debtors shall provide CS Mortgage or its designee with the MERS mortgage loan identification number in an electronic format acceptable to the parties.

Within 15 days of the Transfer Date, the Debtors shall provide CS Mortgage or its designee with an electronic file of the Mortgage Loans which shall set forth whether each Mortgage Loan is or is not covered by a Tax Service Contract as of one (1) business day prior to the Transfer Date (the "Cut-off Date").

Within one (1) business day of the Transfer Date, the Debtors shall provide CS Mortgage or its designee with an electronic file of the related Mortgage Loans which shall set forth whether each Mortgage Loan is or is not covered by fully transferable life-of-loan flood contract as of the Cut-off Date. Within five (5) business days following the Transfer Date, the Debtors shall assign and transfer, in an electronic file format, the transferable life-of-loan flood certifications and contract information to CS Mortgage or its designee.

The Debtors shall take all such actions as may be necessary to transfer or record all right, title and interest in the Mortgage Loans to CS Mortgage or its designee and the Servicing Rights with respect to the Mortgage Loans to CS Mortgage or its designee, consisting of:

(i)     assigning nominal title to the related Mortgage Loans to CS Mortgage or its designee;

(ii)     preparing or causing to be prepared all prior intervening assignments of mortgage instruments, and recording such assignments of mortgage instruments; and

(iii)     endorsing or causing to be endorsed the related Mortgage Notes.

The Debtors shall bear all actual out-of-pocket costs associated with the preparation and recording of the assignments of mortgage instruments described in (i) and (ii) above, and the preparation of the endorsements described in (iii) above.

The Debtors shall forward to the Custodian the original recorded assignments of mortgage instruments upon return from the recording office on a weekly basis and forward to CS Mortgage or its designee a report of all original recorded assignments delivered to Custodian.

The Debtors shall (i) provide or assist CS Mortgage or its designee in the procurement or execution of such affidavits, land court orders or other documents as it currently uses to evidence CS Mortgage's ownership of such Servicing Rights, and (ii) prepare such endorsements or prepare and record such intervening assignments of mortgage instruments as may be required to reflect of record CS Mortgage or its designee's ownership of such Servicing Rights in any jurisdiction or recording office that refuses to accept the documents described in clause (i) as proof of CS Mortgage or its designee's ownership of such Servicing Rights, and the Debtors shall in each case bear all actual out-of-pocket costs associated therewith.

The Debtors shall be responsible for ensuring all documents comprising the Mortgage File in the possession of the Debtors, related to the Mortgage Loans and that are not already held by the Custodian, are transferred to CS Mortgage or its designee in a timely manner including, but not limited to, Mortgage Notes (including e-Notes), riders, loan modification documents and servicing files.

On or prior to the Transfer Date, the Debtors and CS Mortgage or its designee shall execute and deliver the documents required to be executed and delivered under the Global Settlement Agreement, in form and substance reasonably satisfactory to CS Mortgage or its designee and the Debtors, and shall execute and deliver such other instruments or documents as CS Mortgage or its designee and the Debtors shall reasonably determine are necessary or appropriate to effectuate or evidence the transactions contemplated hereby.

The Debtors shall be responsible for all transfer and recording fees, out-of-pocket costs and expenses actually incurred with respect to the transfer of Servicing Rights, the review, inspection, and delivery of Mortgage Loan Files and related documents, the preparation and mailing of goodbye letters.

## EXHIBIT A

### SPECIAL AND LIMITED POWER OF ATTORNEY AND COVENANTS

### from AMERICAN HOME MORTGAGE SERVICING, INC.
### in favor of SUCESSOR SERVICER

KNOW ALL MEN BY THESE PRESENTS:

WHEREAS, the Global Settlement Agreement dated as of November __, 2007 (the "Global Settlement Agreement") between and among Credit Suisse First Boston Mortgage Capital LLC ("CS Mortgage"), Credit Suisse Securities (USA) LLC ("CS Securities"), and DLJ Mortgage Capital, Inc. ("DLJ" and, collectively with CS Mortgage and CS Securities, "CSFB") and American Home Mortgage Investment Corporation ("AHMIC"), and each of its direct and indirect subsidiaries as debtors and debtors in possession (collectively with AHMIC, the "Debtors") provides for the transfer of the Servicing Rights and the servicing functions by Debtor to CSFB or its designee (each, a "Successor Servicer") for certain Mortgage Loans (the "Mortgage Loans"). Initially capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to such terms in the Master Repurchase Agreement, between CSFB and the Debtors, dated as of September 13, 2006.

NOW, THEREFORE, **American Home Mortgage Servicing, Inc.**, as the transferor of the related servicing functions for the Mortgage Loans under the Global Settlement Agreement (hereinafter referred to as "Principal"), acting through its duly authorized officer _____, as the _____ of the Principal, DOES HEREBY:

      1.    constitute and appoint each **Authorized Officer** (which are referred to collectively as "Attorneys" and individually as "Attorney") of **the Successor Servicer**, as the successor servicer, individually, as a true and lawful attorney for Principal (but only for the purposes expressly set forth herein);

      2.    for and in the name and stead of Principal, as the seller and prior servicer, and in connection with the servicing of the Mortgage Loans, authorize and empower each such Attorney to:

      (a)    endorse, negotiate, deliver and deposit any checks, draft, money order or other form of payment instrument payable to Principal and tendered as payment on the Mortgage Loans;

      (b)    endorse, execute, seal, acknowledge, deliver and file (including, without limitation, the recording or filing with the appropriate public officials) the following:

(1)     any documents or instruments (i) to endorse any promissory note for the Mortgage Loan to the Investor or its successor in interest, (ii) to assign any Mortgage or any other security instrument for the Mortgage Loan to CSFB as servicer, (iii) to maintain and protect the validity, priority or value of the lien and security interest created by any Mortgage on the related Mortgaged Property and any other security instrument for the Mortgage Loan, including without limitation the notification of any property tax authorities and any casualty or mortgage insurers with respect to such Mortgaged Property and the Mortgage Loan, (iv) to represent the interests of and act as the lender of the Mortgage Loan in connection with the default, collection, liquidation or foreclosure of any such Mortgage Loan and the related Mortgaged Property, the bankruptcy of the related borrower or any lawsuit or legal proceeding involving the related Mortgaged Property, and (v) to appoint any successor or substitute trustee under a Mortgage that consists of a deed of trust;

(2) .    any modifications, waivers, assumptions, amendments or agreements for subordination or forbearance of any Mortgage, promissory note or any other documents related to the Mortgage Loan; and

(3)     any instruments of satisfaction or cancellation, or of partial or full release or discharge, and all other comparable instruments with respect to any Mortgage or the related Mortgaged Property for the Mortgage Loan; and

(c)     institute and pursue foreclosure proceedings or obtain a deed in lieu of foreclosure so as to effect ownership of any Mortgaged Property in the name or on behalf of the Investor and manage and liquidate any resulting REO; and

(d)     to take any and all actions reasonably necessary to effectuate the proper servicing of the Mortgage Loans.

3.     further authorize and empower each such Attorney, for and in the name and stead of Principal, to (a) file and record this Special and Limited Power of Attorney with the appropriate public officials; and (b) appoint and name such substitute attorneys with all authority and powers hereunder, provided that such substitute attorneys are duly elected and qualified officers of successor servicer.

Principal covenants and grants to the Attorneys full authority and power to execute any documents and instruments and to do and perform any act that is necessary or appropriate to effect the intent and purposes of the foregoing authority and powers hereunder. Principal further ratifies and confirms each act that the Attorneys shall lawfully do or cause to be done in accordance with the authority and powers granted hereunder. The foregoing authority and powers shall not be deemed invalidated solely by reason of any action or omission of any Attorneys appointed hereunder. Principal covenants and agrees that, from time to time at the request of Successor Servicer, Principal shall execute instruments confirming all of the foregoing authority and powers of any Attorneys. Without actual notice to the contrary, any person may rely on authorities and powers granted hereunder and any actions of the Attorneys taken pursuant to such authorities and

powers as the valid, binding and enforceable actions of Principal and that all conditions hereunder to the exercise of such actions by the Attorneys have been completed and are satisfied.

This power of attorney is irrevocable by Principal.

IN WITNESS WHEREOF, Principal has caused this instrument to be signed by its duly authorized officer as of November __, 2007.

**American Home Mortgage Servicing, Inc., as Principal**

By:_____

Name: _____

Title: _____

_____
      Witness

## ACKNOWLEDGMENT

STATE OF _____ )
                     ) ss:
COUNTY OF _____ )

On the ____ day of _____, 2007, before me personally appeared the above-named, _____, on behalf of **American Home Mortgage Servicing, Inc.**, to me known and known by me to be the _____ of said corporation, and acknowledged said instrument so executed to be his free act and deed in said capacity and the free act and deed of said corporation.

My commission expires:

_____
      Notary Public