UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                        . Case No. 07-11047(CSS)
                              .
                              . (Jointly Administered)
AMERICAN HOME MORTGAGE        .
HOLDINGS, INC., et al.,       . 824 Market Street
                              . Wilmington, Delaware  19801
                              .
              Debtors.        . November 14, 2007
. . . . . . . . . . . . . . . . 10:10 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE CHRISTOPHER H. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:              Young Conaway Stargatt & Taylor,
                               LLP
                              By:  SEAN M. BEACH, ESQ.
                                   SEAN T. GREECHER, ESQ.
                                   JOEL A. WAITE, ESQ.
                                   PAULINE K. MORGAN, ESQ.
                              The Brandywine Building
                              1000 West Street
                              17th Floor
                              P.O. Box 391
                              Wilmington, DE  19899


Audio Operator:               Leslie Murin


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-Mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (Cont'd.):

For the U.S. Trustee:          Office of the U.S. Trustee
                               By:  JOSEPH J. McMAHON, JR., ESQ.
                               844 King Street
                               Suite 2313
                               Lockbox 35
                               Wilmington, DE 19801

For AH Mortgage Acquisition    Greenberg Traurig , LLP
Co.:                           By:  VICTORIA W. COUNIHAN, ESQ.
                               The Brandywine Building
                               1000 West Street
                               Suite 1540
                               Wilmington, DE  19801

                               Jones Day
                               By:  ERICA RYLAND, ESQ.
                               222 East 41st Street
                               New York, NY  10022

                               Jones Day
                               By:  BRETT BARRAGATE, ESQ.
                               901 Lakeside Avenue
                               Cleveland, OH  44114-1190

For Bank of America:           Kaye Scholer LLP
                               By:  SCOTT TALMADGE, ESQ.
                                    MARGOT SCHONHOLTZ, ESQ.
                                      (telephonic appearance)
                               425 Park Avenue
                               New York, NY  10022

                               Potter, Anderson & Corroon, LLP
                               By: LAURIE SELBER SILVERSTEIN,
                                    ESQ.
                               Hercules Plaza
                               1313 North Market Street
                               Wilmington, DE 19801

For EMC Mortgage Corp.:        Duane Morris LLP
                               By:  FREDERICK B. ROSNER, ESQ.
                               1100 North Market Street
                               Suite 1200
                               Wilmington, DE 19801

APPEARANCES (Cont'd.):

For Societe Generale:          Buchanan Ingersoll & Rooney
                               By:  TERESA K.D. CURRIER, ESQ.
                               The Brandywine Building
                               1000 West Street
                               Suite 1410
                               Wilmington, DE 19801

For U.S. Bank:                 Dorsey & Whitney
                               By:  ERIC LOPEZ SCHNABEL, ESQ.
                               1105 North Market Street
                               Suite 1600
                               Wilmington, DE  19801

For the Committee:             Hahn & Hessen LLP
                               By:  MARK S. INDELICATO, ESQ.
                               488 Madison Avenue
                               14th and 15th Floor
                               New York, NY  10022

                               Blank Rome, LLP
                               By:  JASON W. STAIB, ESQ.
                               Chase Manhattan Centre
                               1201 Market Street
                               Suite 800
                               Wilmington, DE 19801

For UBS, CTFG, Morgan          Ashby & Geddes
Stanley Mortgage Capital:      By:  WILLIAM P. BOWDEN, ESQ.
                               222 Delaware Avenue
                               17th Floor
                               Wilmington, DE  19899

For J.P. Morgan Chase:         Landis Rath & Cobb, LLP
                               By:  MATTHEW McGUIRE, ESQ.
                               919 Market Street
                               Wilmington, DE  19801

For ABN AMRO Bank:             Milbank, Tweed, Hadley &
                               McCloy LLP
                               By:  FRED NEUFELD, ESQ.
                                    (telephonic appearance)
                                    ROBERT J. MOORE, ESQ.
                                    (telephonic appearance)
                               1 Chase Manhattan Plaza
                               New York, NY  10005

4

APPEARANCES (Cont'd.):

For Bear Stearns:               Sidley Austin
                                By:  ALEX R. ROVIRA, ESQ.
                                787 Seventh Avenue
                                New York, NY  10019

1           THE CLERK:  All rise.

2           THE COURT:  Please be seated.

3           MR. BEACH:  Good morning, Your Honor.  May it please

4  the Court.  Sean Beach from Young, Conaway, Stargatt, and

5  Taylor on behalf of the debtors.  Your Honor, I think I can

6  move quickly through the beginning of the agenda.

7           Items 1 through 3 have been resolved.  Item 4 has

8  been adjourned.

9           With respect to Item 5, the motion of Societe

10 Generale, there was a 9019 settlement motion filed, which is

11 Item 10 on the agenda today, and a certification of counsel was

12 filed with respect to that order.  I don't believe Your Honor

13 has entered that order yet.  So to the extent Your Honor has

14 questions, we can address those today, or I do have a form of

15 order.

16          THE COURT:  Well, I was ready to sign it, but no one

17 provided -- the settlement agreement attached was not signed.

18 I had blanks.  I need an executed version.

19          MR. GREECHER:  Your Honor, Sean Greecher for the

20 debtors.  Your Honor, that is a logistical matter we've been

21 trying to resolve.  We can certainly provide an executed copy

22 for the Court as an exhibit today.

23          THE COURT:  Okay.

24          MR. GREECHER:  Thank you.

25          THE COURT:  All right.  That's -- if you want me to

**J&J COURT TRANSCRIBERS, INC.**

1 approve it, it needs to be signed.

2          MR. BEACH:  Thank you, Your Honor.  We'll submit

3 that.  Item Number 6, Your Honor, is adjourned.  The same with

4 Item Number 7.  Item Number 8 has been withdrawn.  Item 9 has

5 been adjourned.  Item 10 we just spoke about, which is the Soc

6 Gen settlement.

7          Item Number 11, Your Honor, is the application to

8 employ and retain Kekst.  I believe Your Honor has entered that

9 order.  We have had a brief discussion with the U.S. Trustee

10 this morning about an issue that came up and are going to work

11 to resolve that issue with the Committee and the U.S. Trustee,

12 and to the extent necessary, we may be filing a supplemental or

13 revised order --

14          THE COURT:  All right.

15          MR. BEACH:  -- in connection with that.  Your Honor,

16 Item Number 12 is the debtors' motion pursuant to Section

17 107(b) of the Bankruptcy Code to seal the purchase price with

18 respect to the sale of servicing rights to EMC Mortgage

19 Corporation.  Your Honor, the debtors filed that motion on --

20 well, the sale was approved on October 19th, 2007.  We filed a

21 seal motion on October 22nd.  EMC filed a joinder on October

22 29th, and the U.S. Trustee on November 9th objected to the

23 relief requested in the seal motion.

24          As Your Honor is aware, similar relief has been

25 granted with respect to several other servicing sales in this

1    case.  Most recently on October 25th Your Honor approved the

2    sealing of the purchase price in connection with the MidFirst

3    transaction and overruled an almost virtually identical

4    objection of the U.S. Trustee.  In overruling the U.S.

5    Trustee's objection Your Honor stated that, at least in

6    connection with the buyer MidFirst, I think that there is

7    significant issue of pricing and confidentiality of pricing

8    involved.  Your Honor made certain comments with respect to the

9    debtors' interest in sealing the pricing but stated that there

10   was no need to rule with respect to the debtors, because the

11   relief was appropriate with respect to the interest of the

12   buyers.

13            Your Honor, the same clearly holds true with respect

14   to the EMC transaction.  EMC is a party in interest pursuant to

15   107(b).  The purchase price is confidential commercial

16   information pursuant to 107(b).  The parties negotiated for the

17   purchase price in the asset purchase agreement.  EMC is in the

18   business of buying selling servicing rights, and EMC has filed

19   a joinder in support of the relief requested in the seal

20   motion.

21            While the objection, Your Honor, we respectfully

22   believe should be overruled, those same grounds that Your Honor

23   approved the seal motion with respect to MidFirst, given the

24   U.S. Trustee's objection, I think it's important that we point

25   out some -- as to why the relief is necessary and appropriate

**J&J COURT TRANSCRIBERS, INC.**

8

1  with respect to the debtors.  The U.S. Trustee's reliance on

2  Alterra we believe is misplaced, Your Honor.  The Court's

3  ruling was not in Alterra that the pricing information can

4  never be sealed with respect to a transaction.  In fact, the

5  Court's ruling in Alterra, and I quote, provides that, "The

6  Court concludes that the information in the sealed settlement

7  agreements does not relate to the commercial operations of the

8  reorganized debtor.  Accordingly, the Court concludes that

9  Section 107(b) is not applicable."

10        In reaching that conclusion, Your Honor, the Court

11  determined that the business that the debtor was in in Alterra

12  was to provide services for assisted living to elderly

13  residents in the Alterra facilities and as well as providing

14  healthcare to those elderly residents.

15        The Court further found that -- and expressly found

16  with respect to the Alterra decision that if the parties were

17  seeking to seal monthly charges or average costs with respect

18  to the elderly residents, then that would be commercial

19  confidential information that could be sealed under 107(b).

20  Here from day one the debtors filed a motion to sell the

21  servicing rights in connection with the debtors' business, and

22  Your Honor entered an order on the first day of these cases.

23  So it has been since that time -- since no later than the

24  petition date the business of this debtor to sell servicing

25  rights.  And Alterra doesn't make a distinction btween pre-

1 petition and post-petition, because in that case the

2 reorganized debtor had the same business pre-petition and post-

3 petition.  The Court simply ruled that the settlement -- the

4 tort settlements were not in the business operations of that

5 debtor.

6           And in overruling the U.S. Trustee's objections in

7 the MidFirst, the court appropriately found that when you're

8 talking about financial services and the buying and selling of

9 financial vehicles, pricing is really all there is to the

10 business.  The debtors are now very much in the business of

11 selling servicing rights, Your Honor, and we do believe that

12 the motion can be granted, simply because EMC is in the

13 business of buying and selling servicing rights, but we also

14 believe that the relief is appropriate with respect to the

15 debtors and ask that Your Honor approve the seal motion and

16 overrule the U.S. Trustee's objection.

17           MR. McMAHON:  Your Honor, good morning.  Joseph

18 McMahon for the United -- I'm sorry.

19           MR. ROSNER:  Your Honor, I apologize.  Do you want to

20 hear from a joinder before the objector --

21           THE COURT:  Yes.

22           MR. ROSNER:  -- or do you -- okay.  Good morning,

23 Your Honor.  Now for the record Fred Rosner with Duane Morris

24 on behalf of EMC Mortgage Corporation.  I am joined today by my

25 co-counsel Alex Rovira of Sidley Austin, who is participating

1  telephonically.

2        The debtor, Your Honor -- Your Honor, EMC did file a

3  joinder, because it has a strong interest in the relief sought,

4  which is to have the purchase price percentage remain under

5  seal.  And to appreciate EMC's concerns a little background is

6  necessary, and certainly counsel for the debtor touched on

7  this.  EMC is a market player in this type of financial

8  product.  It buys and sells mortgage servicing rights on a

9  regular basis.  As the Court can imagine, the competition in

10 that arena is stiff, and the other players are very well

11 resourced.

12        So EMC seeks an order that would keep the purchase

13 price percentage that paid for in essence its own servicing

14 rights.  It purchased back the EMC servicing rights kept under

15 seal, because to reveal that Your Honor would competitors and

16 parties that are presently seeking to sell servicing rights and

17 potentially future parties that would be seeking to sell

18 servicing rights an unfair competitive advantage.  It would

19 reveal how EMC values -- internally values those servicing

20 rights.

21        So that would have -- divulgence of that purchase

22 price would have an immediate adverse effect on present deals,

23 future deals, and certainly would affect the way competitors

24 compete with us for product.  One aspect of this is that it

25 would effectively freeze EMC's ability to competitively bid

1  along a range of values.  It would in effect create an

2  artificial floor for deals, and I can't stress that part of our

3  request enough.

4          I'd also bring to the Court's attention the fact that

5  EMC's goal in this Chapter 11 case was to retake those rights,

6  and it commenced negotiation to purchase those rights early on

7  and well before any litigation in this matter commenced, and

8  the litigation served two purposes.  Certainly, it was

9  offensive, but it was also defensive in that we wanted to

10 protect those rights and not to go into the sale and retake

11 them.  And we negotiated vigorously and well with the debtors,

12 and we eventually reached a deal with the debtor.

13         And during that process, Your Honor, we were very

14 mindful of the Court's docket, and we did see that the court

15 recognized the importance of keeping the purchase price

16 percentage confidential in private sales, and the debtor

17 recounted some of the history of that, certainly, the Barkley's

18 (phonetic) deal and MidFirst deal, etcetera.  And at all times

19 that we were negotiating with the debtor EMC made clear that it

20 wanted to keep the purchase price percentage confidential.  It

21 was never revealed.  It was always omitted or bracketed from

22 the deal documents, and we did file

23 -- joined in the debtors' motion to have it kept under seal for

24 those reasons.  If the Court has any questions about that --

25         THE COURT:  No, thank you, Mr. Rosner.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. ROSNER:  Thank you.

2          THE COURT:  Mr. McMahon.

3          MR. McMAHON:  Your Honor, good morning.  Joseph

4  McMahon.  I'm not going to reiterate my entire argument from

5  the MidFirst motion.  I think it's probably fresh in Your

6  Honor's mind, but to briefly review our office broke down the

7  analysis into two parts, one with respect to the debtors'

8  interest and second with respect to the purchasers' interest.

9  With respect to the debtors' interest, we argued, and I believe

10 the Court agreed that the mere fact that the debtors are

11 seeking to I guess preserve some type of competitive advantage

12 in the marketplace for sales pursuant to Section 363 was not a

13 sufficient justification for sealing the information that was

14 requested in that instance, and I believe that the Court found

15 that <u>Alterra</u> was controlling with respect to that.

16          So notwithstanding the debtors' efforts today to

17 reserve for themselves some type of going concern, business-

18 related reason for sealing the information -- and again, Your

19 Honor, simply, you could take judicial notice of where we're at

20 in this proceeding.  The debtors are in the process of

21 consummating a sale of their servicing business.  Certainly

22 whatever I guess competitive interest they have in maintaining

23 the confidentiality of their information from a going concern

24 perspective is rapidly waning.

25          But with respect to the purchaser's side, I believe

**J&J COURT TRANSCRIBERS, INC.**

1   Your Honor found the argument more compelling, and the key

2   concern there I think is to the extent to which internal

3   valuation information is exposed via a purchase price.  And I

4   think there's essentially, from our office's perspective, two

5   considerations as to reasons why that would not be the case.

6   The first being that a purchase price can represent I guess a

7   series of other considerations that wouldn't necessarily be

8   reflected upon a business model, the desire to have a

9   particular asset.

10       There are a host of considerations that get wrapped

11   up in a particular purchase price, and it doesn't necessarily -

12   - the market doesn't necessarily reflect I guess a cold

13   numerical approach by a purchaser, meaning that they just

14   simply drop numbers into a model, spit it out, and then say

15   here it is.  In other words, the number doesn't give away the

16   internal valuation necessarily.

17       And that -- there are other instances in the Code,

18   and the types of disclosures that are required by Rule 2019

19   come to mind where the Bankruptcy Court actually requires

20   information of this type to be disclosed.  And irrespective I

21   guess of what impact it may have on a purchaser's, if you will,

22   business model.

23       The second consideration I'd like to raise for the

24   Court is what I call the cascade of consequences that stem from

25   decisions to seal this type of information.  Presumably, at

1 some point the debtors will be receiving consideration for the

2 sale of the assets that are at issue.  That information will

3 have to be reflected on a monthly operating report in a

4 receipts column in some fashion.  The debtors have not made a

5 -- I guess a motion to seal that information from public view.

6 Our office is concerned about the direction in which I guess

7 motions like this get taken from the standpoint of where their

8 natural ending point is.

9        So those are the two considerations that I'd like to

10 I guess raise for the Court on behalf of my client.  First, the

11 fact that -- mere fact that a purchase price is exposed to the

12 market I don't think necessarily entails disclosure of a

13 company's internal valuation models or criteria.  And second,

14 the fact that this type of information does get disclosed in

15 other aspects of the bankruptcy process, and it's certainly

16 relevant for the consideration of the parties in interest as to

17 how these bankruptcy cases are proceeding.

18        THE COURT:  Thank you.

19        MR. BEACH:  Your Honor, if I may briefly, Sean Beach

20 on behalf of the debtors.  I believe with respect to the

21 debtors' interest what the U.S. Trustee is essentially asking

22 this Court to do is to suggest some kind of blanket rule that

23 under 363 sales in bankruptcies you can't seal the purchase

24 price, which, Your Honor, I do not believe <u>Alterra</u> went

25 anywhere near that far, and certainly, I don't believe that

1  that is appropriate, because there are certainly facts and

2  circumstances -- and I would argue and have argued that there

3  are facts and circumstances under the instant motion where it

4  is appropriate to seal the purchase price.  And so I'd Your

5  Honor certainly not to suggest that any blanket rule would be

6  appropriate under <u>Alterra</u> in that regard, and that, you know,

7  with respect to the debtors' interest, it is appropriate to

8  seal the purchase price.

9       With respect to the purchaser's interest and the idea

10 that there will be amounts disclosed in the monthly operating

11 reports, Your Honor, I think we had the same argument last

12 time, and with respect to those reports, it's not going to

13 designate that, you know, X amount of assets were received with

14 respect to the EMC sale.  There will be information in those

15 monthly operating reports that's required to be reported but

16 doesn't have to disclose the specifics of each individual sale.

17 So, Your Honor, I would ask that you overrule the U.S.

18 Trustee's objections and grant this motion.

19       THE COURT:  Mr. Rosner.

20       MR. ROSNER:  Your Honor, Fred Rosner again for EMC.

21 A very brief response.  Obviously, this is not the <u>Northwest</u>

22 case.  This is not a 2019 issue.  We don't appear today

23 purporting to represent an ad hoc committee, so that analogy is

24 -- I think misses its mark.  Reiterating again, Your Honor,

25 this is -- disclosure of this information will allow parties to

1  understand how EMC internally values its own servicing rights

2  and would put EMC at a competitive disadvantage in the

3  marketplace.

4         Your Honor, finally, you know, read broadly a lot of

5  these 107(b) cases courts do engage in a balancing test, and

6  one of the court's concerns is accountability.  That parties in

7  interest can assess what factors went into the court making its

8  decision, and those concerns were put to rest in this case,

9  Your Honor.  You'll recall that the benchmark for this deal was

10 the purchase price offered by W.L. Ross.  There was a record

11 made at the time of the private sale to EMC that EMC was paying

12 a premium over that price.  So there is that transparency, and

13 for those reasons we'd respectfully request that the purchase

14 price be placed under seal.  Thank you.

15        THE COURT:  Okay.  Thank you.  I'm going to grant the

16 motion.  A couple comments.  Mr. Rosner at the very end touched

17 on a matter of significance to me, which was the fact that it

18 had been publicly disclosed that EMC was paying in excess of

19 the 92 basis points that the Wilbur Ross entity was paying.

20 And I think that goes a long way toward satisfying the public

21 interest concern that the Office of the United States Trustee

22 is appropriately concerned about, and that is transparency to

23 what's going on, whether or not EMC was receiving some sort of

24 sweetheart deal, or there was anything -- any sort of amount of

25 money that was so low that it would raise issues that people

1  needed to look at, and it was clear from the record that that

2  was not the case.

3       Moreover, I am -- while I understand Mr. McMahon's

4  comment that prices and everything in every deal -- I think --

5  and Mr. Beach commented -- touched on my comments previously.

6  I think in the nature of these assets that are being sold,

7  frankly, price is everything, and I have no doubt, and I think

8  the record is sufficient from the trial and the lengthy sale

9  hearing, that this type of information is in the nature of

10 confidential commercial information of at least the buyer.  And

11 as a result under -- the way I read 107(b), frankly, the Court

12 has very little choice in that instance but to enter an

13 appropriate order limited in scope protecting that confidential

14 commercial information, which is what is sought here.  The only

15 thing at all taken out of the purchase agreement was the

16 purchase price.  All other elements of the purchase agreement

17 were made publicly available.

18       In connection with the debtors' argument in _Alterra_,

19 I'm not sure I buy it, frankly.  I think it's a bit of a reach

20 as to the holding in that case.  Even if the focus was on the

21 debtors' sort of commercial activity as opposed to what -- you

22 know, the settlement of tort claims, which wasn't commercial

23 activity.  And since this debtor's in liquidation its

24 commercial activity is now selling servicing rights, I think

25 that raises some wrinkles that, you know, frankly, I'm not sure

1  how they would play out.  Every large public enterprise or

2  private enterprise is involved in commercial activity involving

3  the settlement of tort claims.  It's a basic part of any large

4  business in the United States of America given our tort system.

5  So I'm not sure that that's really a distinction in <u>Alterra</u>,

6  and I'd have to look at it again to see if the Court was really

7  focused on that.

8          In any event, even if we were going to start talking

9  about what's the debtors' business and what's not the debtors'

10  business, the record is clear in this case that the debtor

11  never sold servicing rights pre-petition.  So the fact that

12  they're now liquidating and selling them post-petition, I'm not

13  sure that's really much of a difference between settling claims

14  and liquidating assets.

15          But, in any event, as with the MidFirst sale, I don't

16  think I need to get there.   There is no requirement that I

17  protect the debtor.  The statute simply says any entity, so --

18  or an entity, and EMC is an entity, and I think that's

19  sufficient for granting the relief requested, so I'll grant the

20  motion.

21          MR. BEACH:  Thank you, Your Honor.  I do have a form

22  of order.  If I may approach?

23          THE COURT:  Sure.  Thank you.

24          MR. BEACH:  Your Honor, that brings us to Item Number

25  13 on the agenda, which is the motion of the debtors for

1 approval of a stipulated order confirming the debtors'

2 authority to make certain payments for penalties, interests,

3 and related charges solely in connection with certain tax and

4 insurance remittances.

5 Your Honor, there were no objections to the motion,

6 and we filed a certificate of no objection on that.  So unless

7 Your Honor has any questions or would like me to submit a form

8 of order today, I think we can move on.

9 THE COURT:  I signed that this morning.

10 MR. BEACH:  Thank you, Your Honor.  Item Number 14,

11 Your Honor, is a motion by EMC Mortgage Corporation to seal

12 certain exhibits in connection with the larger servicing sale,

13 and I'll cede the podium to EMC's counsel.

14 MR. ROSNER:  Good morning, Your Honor.  Fred Rosner

15 for EMC again.  This was our motion to have filed under seal

16 the March 1, 2006 PWSA agreement.

17 THE COURT:  Right.

18 MR. ROSNER:  During the trial the Court did request

19 that parties file, you know, motions to have their exhibits

20 filed under seal.  We have done so.  We have provided a copy of

21 the proposed exhibit to the Court and to the Office of the U.S.

22 Trustee.  There were no objections received and ask that that

23 relief be granted and certainly available if the Court has any

24 questions.

25 THE COURT:  Do you have a form of order with you?  I

1  have it.  I'm sorry.  I have it here.  It's just got holes in

2  it.  I think this is -- you know, again this is the same issues

3  we just touched on, slightly different issues, but in the

4  absence of an objection and, you know, given frankly that the

5  issues were resolved with the settlement, I don't think any

6  purpose would be served by having the documents publicly

7  available, and I'll sign the seal order.

8         MR. ROSNER:  Your Honor, I appreciate that.  That

9  concludes my business before the Court today.  May I be

10 excused?

11        THE COURT:  Yes, you may.

12        MR. ROSNER:  Thank you, Your Honor.

13                    (Pause)

14        THE COURT:  Okay.

15        MR. WAITE:  Good morning, Your Honor.  Joel Waite

16 from Young, Conaway, Stargatt, and Taylor on behalf of the

17 debtors.  Your Honor, the next item on the agenda is the final

18 hearing on the motion to extend the use of cash collateral

19 through this Friday, November 16th.  On October 31st Your Honor

20 may recall the Court entered an interim order that extended the

21 use of cash collateral pursuant to the terms of the final cash

22 collateral order that the Court had previously entered on

23 September 4th through November 16th with a couple

24 modifications.

25        Notice of the entry of the interim extension order

1  and the November 9th objection deadline was provided as

2  required by the interim extension order.  We did not receive

3  any objections.  We did receive a reservation of rights filed

4  by the purchaser.  Your Honor may recall we made certain

5  clarifications on the record at the interim hearing, and we've

6  made a few modifications to the order, and we'll make -- repeat

7  some of those clarifications from the prior hearing to resolve

8  their issues.

9          Your Honor, if I could, I'd like to hand up a black

10  line copy of the order that shows the changes made from the

11  interim extension order?

12          THE COURT:  Yes.  Thank you.

13          MR. WAITE:  Your Honor, on Page 1 we have changed the

14  title to reflect that it's a final order rather than an

15  interim.  On Page 2 there's a typographical correction in

16  Paragraph D, and we've added a new Paragraph F, which just

17  reflects the entry of the interim extension order on October

18  31st.  And Paragraph G has been changed to reflect that this is

19  a final order.  That's on Page 3.  On Page 4 there have been no

20  changes in the interim order.

21          As Your Honor may recall, the interim order did

22  reflect a change to Paragraph 6 that had been included in the

23  September 4th final order, and at the interim hearing we made

24  certain clarifications on the record to address concerns raised

25  by the purchaser.  And what I'm referring to, Your Honor, is in

1  the middle of that page in that Paragraph 6 starting at the

2  parenthetical Z, there was language added to provide for the

3  payment of cash collateral on hand on the initial closing date

4  to Bank of America, and we clarified that provision at the

5  interim hearing, and I agreed with the purchaser to do that

6  again today.

7         As we stated before, this is intended to refer to the

8  cash collateral in the form of the operating funds that have

9  been used by the company to run the servicing business prior to

10  the initial closing, and by its language it only amounts in

11  excess of those which are being to pay the incurred and unpaid

12  budget expenses will be paid over, and there is a mechanism to

13  get their agreement to that amount or come back to the Court if

14  we disagree.  As we stated before, this provision does not

15  change other provisions of the September 4th final order

16  regarding the treatment of cash collateral.

17         For example, Paragraph 5 of that order has a

18  mechanism for dealing with net proceeds, and to the extent

19  funds are being held to pay direct, necessary expenses in

20  connection with the disposition of assets pursuant to Paragraph

21  5, this provision wouldn't change that mechanism.  It also

22  doesn't change the provisions of any other order that's been

23  entered by the Court regarding the treatment or disposition of

24  proceeds including the sale ordering and the servicing rights

25  in the Fannie Mae settlement order which the purchaser had

1 asked that we identify.  And, obviously, by its own terms it

2 only requires us to pay over funds which are, in fact, the

3 administrative agent's cash collateral and wouldn't permit or

4 require us to pay funds in which they do not have a lien.

5       Now moving on to Page 5 towards the end of Paragraph

6 6, those -- there were two sentences added to the end of that

7 paragraph.  It's actually Paragraph 2 of the order but

8 Paragraph 6 of the September 4th order.  We have made some

9 clarifications there at the request of the purchaser.  The

10 first one is to make it clear that the funds that are the

11 collateral agent is required to pay over to the administrative

12 agent are funds which constitute the proceeds of the

13 administrative agent's pre-petition collateral or their

14 collateral.  Those are defined terms in the September 4th final

15 order.  And at the end of the paragraph we've added a sentence

16 to make it clear that any disputes regarding amounts which are

17 transferred would be determined by the Bankruptcy Court.

18       And on Page 6 in the middle we've added a reference

19 to the -- to this order to the Paragraph 11 that's in the

20 existing final cash collateral order.  Your Honor, at the

21 bottom of Page 6, turning over to the top of Page 7, we've

22 modified the new sentence that was added in the interim

23 extension stipulation.  And this addresses an issue that had

24 been raised by the debtors and some concerns raised by the

25 purchaser.

1           We discussed this at the interim hearing, and this

2    provision was intended to make clear that notwithstanding the

3    termination of the use of cash collateral that's been

4    authorized by this order certain payments of proceeds of

5    collateral will continue to be paid over to Bank of America as

6    administrative agent in accordance with provisions of the final

7    order except as is provided by another order of the Court.  And

8    this provision is not intended to expand any of Bank of

9    America's rights to receive proceeds and is -- you know, is

10   subject to whatever other orders may be entered by the Court.

11          As a further modification, we wanted to make it clear

12   that upon the termination of the use of cash collateral certain

13   collections of principal and interest on the mortgage loans --

14   and the mortgage loans is a defined term that refers to the

15   loans that are part of the Bank of America warehouse facility

16   that's part of this second amended facility -- as well as

17   collections or revenues and fees and other amounts from the

18   servicing business on account of any of the administrative

19   agent's collateral that was not a purchased asset could be used

20   to pay the sub-servicing fees that are required to be paid over

21   to the purchaser under Section 6.2(f) and 6.10(f) of the

22   purchase agreement.  And this clarification was made, because

23   the debtors and purchasers wanted to make it clear that the

24   ongoing sub-servicing fees for the mortgage loans or any

25   servicing rights that were not acquired by the purchaser in

1  which Bank of America has a lien, that those sub-servicing fees

2  would be paid out of the collateral.

3          Your Honor, the remaining changes on Pages 7 and 8

4  relate to making this a final order.  Your Honor, this

5  stipulation is designed to provide the continued consensual use

6  of cash collateral through this Friday, which, hopefully, the

7  initial closing on the servicing sale will conclude by then.

8  Everyone's working very hard to make sure that happens.  In all

9  other respects, the September 4th final order has been

10 unaltered except for these minor changes we've discussed in

11 this order.

12         Nothing in the order expands the assets in which the

13 administrative agent has a lien.  It doesn't give him a lien on

14 assets which are not property of the estate.  We've made those

15 representations before.

16         Your Honor, because this only runs through November

17 16th, we obviously reserve the right to come back to the Court

18 if for some reason the initial closing doesn't occur or there's

19 a further need for use of cash collateral.  The September 4th

20 final order reserved all the debtors' rights to seek use of

21 cash collateral on a contested basis, if necessary.  We hope

22 that won't happen, and we hope the closing will occur, and we

23 won't have to come back.  But I just wanted to give the Court a

24 little warning that if this thing runs out on Friday, we may be

25 calling the Court on Monday.  I don't think that will happen.

1        Your Honor, I have a clean copy of the order to hand

2  up that has been signed by the parties.  I know the Committee

3  has reviewed it, and the purchaser has reviewed it I think.

4  Everyone's on board with the form of order.  If I may approach?

5        THE COURT:  Yes.  Thank you.  Does anyone else wish

6  to be heard?

7        MR. WAITE:  Your Honor, one more thing.  I just will

8  mention that the original order we filed the last time we had

9  filed the incorrect budget, and we filed a submission of a

10  corrected budget.  The one I handed up today does include the

11  correct budget.

12        THE COURT:  All right.

13        MR. TALMADGE:  Good morning, Your Honor.  Scott

14  Talmadge from Kaye Scholer on behalf of Bank of America, the

15  administrative agent for the pre-petition lenders on the pre-

16  petition secured facility.  Your Honor, we have executed the

17  stipulation I believe.  Mr. Waite, if he hasn't handed it up to

18  you already, will be handing up an executed copy.  So we've

19  consented to the continued use of the cash collateral on the

20  terms as set forth in the first final stipulation and order.

21        THE COURT:  Okay.  I have it.  I actually have the

22  executed copy with Ms. Silverstein's signature.  Anyone else?

23  The Committee?  Mr. Indelicato.

24        MR. INDELICATO:  Good morning, Your Honor.  Mark

25  Indelicato from Hahn and Hessen on behalf of the Committee.

1  Your Honor, Mr. Waite was correct.  The Committee was involved

2  in the discussions and negotiation regarding the continued

3  extension of the use of cash collateral.  We're hoping

4  everything comes together.  We have an initial close this

5  Friday, and then this case piece of the case will be done with.

6  If not, we will be back before Your Honor, but we do support

7  the entry of the order extending the cash collateral through

8  Friday.

9          THE COURT:  All right.  Thank you.  Anyone else?

10                    (No verbal response)

11          THE COURT:  I'll sign the order then.

12          MS. MORGAN:  Good morning, Your Honor.

13          THE COURT:  I won't give you a date at this point

14  hoping not to incentivize you to not close.  Good morning, Ms.

15  Morgan.

16          MS. MORGAN:  Good morning, Your Honor.  Pauline

17  Morgan from Young, Conaway, Stargatt, and Taylor for the

18  record.  Your Honor, Item 16 on the agenda is the debtors'

19  motion for authority to modify its non-insider employee

20  retention plan, which was approved early in the case.  Your

21  Honor, we did file this on shortened notice.  The objection

22  deadline was yesterday at 10, and under the local rules we

23  could not file a certification of counsel or a cert of no

24  objection.

25          I can tell you that we have not received any

**J&J COURT TRANSCRIBERS, INC.**

1  objections, Your Honor, but we have some informal comments and

2  statements of clarification that we need to make on the record

3  for the benefit of the purchaser.  We have made one change to

4  one word in the order.  It is in Paragraph 3, which referred to

5  alterations or modifications to an employee retention plan as

6  may be implemented by the purchaser.  We have changed that word

7  implemented to requested, and that exactly tracks the language

8  of the APA -- Section 6.1(e) of the APA which said the

9  purchaser could request modifications rather than implement the

10  changes.

11        As Your Honor knows, the employees are technically

12  still ours until a final closing occurs.  But for all intents

13  and purposes, Your Honor, we believe the employees, after the

14  initial closing, will be operating the business and working for

15  the benefit of a purchaser which is to receive the benefits and

16  burdens of the operation of the business pending a final

17  closing.  So we actually think this motion is neutral to the

18  estate, but it's just meant to -- out of an abundance of

19  caution to seek the Court's authority to deem these employees

20  terminated as of the initial closing and to pay any benefits

21  that they may be entitled to under the non-employee insider

22  KERP plan that was previously approved by the Court.

23        Another clarification I was asked to make on the

24  record was that the funding of the obligations are again in

25  accordance with the terms of the APA, and, therefore, there was

1  a characterization, Your Honor, in Footnote 7 of the motion

2  that was not technically correct.  It referred to the employee

3  -- it referred to the purchaser as reimbursing the debtor for

4  these obligations, and it's technically not the way it works.

5  Under the APA there is a procedure for reconciliations that

6  happen over a regular basis, including a final reconciliation

7  payment post-final closing.  And again it's not technically a

8  reimbursement, but again the employees are -- will be working

9  for the benefit and the burden, and the entire operation will

10 be for the benefit and burden of the purchaser, and any

11 reconciliation, as necessary, will be in accordance with the

12 APA.

13         And, Your Honor, unless you have any other questions,

14 I'd like to approach with a clean and a black line.

15         THE COURT:  You may.  Thank you.

16         MS. MORGAN:  And again, Judge, the only change was

17 changing the word implemented to requested in Paragraph 3.

18         THE COURT:  Does anyone have any comments in

19 connection with this matter?

20         MR. INDELICATO:  Your Honor, Mark Indelicato from

21 Hahn and Hessen again on behalf of the Committee.  Your Honor,

22 as we have with all employee-related matters, the Committee's

23 taken a look at this.  We believe the entry of the order

24 comports with the spirit that we originally negotiated the

25 employee retention plan as well as with the APA, and so we

**J&J COURT TRANSCRIBERS, INC.**

1    would support the entry of the order.

2            THE COURT:  Anyone else?

3                    (No verbal response)

4            THE COURT:  I agree.  Obviously, the initial close

5    versus final close structure that initially - that eventually

6    appeared here was not sort of contemplated at the time the non-

7    insider employee retention plan was put into place, but I think

8    I agree with Mr. Indelicato that was in effect the spirit,

9    which was to get the servicing business in the hands of a

10   buyer, and that will be achieved at the initial close.  So I

11   think this order makes sense, and I'll approve it.

12           MS. MORGAN:  Thank you, Your Honor.  Your Honor, the

13   next item on the agenda, Item 17, is the debtors' application

14   to retain the law firm of Cadwalader, Wickersham, and Taft as

15   special counsel pursuant to Section 327(e).  This was filed

16   early in the case, but we did receive an objection from the

17   U.S. Trustee.  And over the past weeks and months there have

18   been discussions between Cadwalader and the United States

19   Trustee to resolve the issues in the objection, which we're

20   pleased to report had been resolved to the satisfaction of the

21   U.S. Trustee.

22           We did file late yesterday -- I'm not sure Your Honor

23   saw it -- a certification of counsel and a supplemental

24   disclosure of Cadwalader.  Did Your Honor get an opportunity to

25   see that?

1          THE COURT:  I haven't seen that.

2          MS. MORGAN:  Okay.

3          THE COURT:  I'm in different chambers this week, so

4    it may have been delayed in showing up.

5          MS. MORGAN:  Well, Your Honor, maybe what makes sense

6    -- and Mr. Petrick -- Gregory Petrick from Cadwalader is on the

7    phone.  But I also have a black line form of order which was

8    filed along with the certification.  If I may approach, Your

9    Honor?

10          THE COURT:  Yes, that's fine.

11                    (Pause)

12          MS. MORGAN:  Your Honor, and I'll walk through them

13   in a minute, but essentially what this order does is limit the

14   scope of the retention of Cadwalader to the items that I'll go

15   over in the black lining.  Supplemental disclosure was filed.

16   The initial disclosure filed by Cadwalader reflected several

17   representations of the firm, of lending institutions, and other

18   entities, some of which had an involvement in this case.  So

19   again pursuant to the discussions between the U.S. Trustee's

20   Office and Cadwalader, there's been an agreement to a form of

21   retention but limited in scope.

22          And again, if I may refer to the black line, Your

23   Honor, other than the what I will call the non-substantive

24   changes on Page 1, beginning with the ordered paragraph at the

25   bottom of Page 2, again CWT is to be employed as special

1 counsel for the following matters.  And with respect to

2 Subparagraph (i), non-bankruptcy transactional work with

3 respect to the sale of the debtors' servicing business but only

4 from the dates August 6th through September 26th of '07.  And

5 then from the petition date through September 3rd Cadwalader is

6 authorized to represent the debtors in connection with

7 inquiries of the Securities and Exchange Commission.  And, as

8 Your Honor will recall, we have another law firm now on tap to

9 do that, Allen and Overy.

10        Subparagraph (3), non-bankruptcy transactional work

11 with respect to the sale of non-debtor bank entity, which we

12 hope to get on track shortly.  Subparagraph (4), representation

13 of the debtors in a pre-petition litigation,  American Home

14 versus Union Federal Bank of Indianapolis.  CWT is to being

15 authorized to represent the debtors in connection with other

16 litigation matters referenced in the application.

17        And, finally, the debtors are authorized to employ

18 CWT in connection with securities class action litigation

19 matters referenced in Paragraph 20(f) of the application, but

20 not today, Your Honor.  This will be adjourned to a date to be

21 determined by the Court in consultation with the U.S. Trustee,

22 and the intent is to have this coincide with the further

23 application of Allen and Overy on that aspect.

24        And, finally, Your Honor, on Page 4 we've reflected

25 that this order is without prejudice to the debtors' right to

1  seek a modification and on notice to parties including the U.S.

2  Trustee and, of course, the other parties' opportunity to

3  object to such relief.

4         THE COURT:  All right.  Anyone wish to be heard in

5  connection with this matter?

6                    (No verbal response)

7         THE COURT:  All right.  I will -- oh, I'm sorry.

8         MR. TALMADGE:  Your Honor, Scott Talmadge from Kaye

9  Scholer again on behalf of Bank of America, the administrative

10 agent under the debtors' pre-petition secured facility.  Your

11 Honor, I'd just like to note one thing for the record.  As set

12 forth in the Cadwalader retention application, Cadwalader holds

13 in excess of a million dollars as a retainer for services that

14 it's to perform.  And as also reflected in the debtors' second

15 supplement to their initial monthly operating report, which was

16 filed on November 5th, 2007, that supplement similarly shows

17 that Cadwalader holds a million for a retainer, and Bank of

18 America expects that the -- whatever fees that Cadwalader has

19 incurred for work within the scope of the engagement will come

20 out of this retainer particularly with respect to fees or

21 services performed in connection with the sale of the servicing

22 business.  And I note, Your Honor, that this would be

23 consistent with the representations made in Cadwalader's

24 application that the retainer would be applied against these

25 fees.

1          THE COURT:  Mr. Petrick.

2          MR. PETRICK:  Thank you, Your Honor.  That is our

3  understanding.  That is correct, Your Honor.

4          THE COURT:  Thank you.  Mr. Indelicato.

5          MR. INDELICATO:  Your Honor, Mark Indelicato on

6  behalf of the Committee.  Your Honor, I don't disagree with any

7  of the representations made regarding how they're going to be

8  applied as it relates to the firm.  I think what Mr. Talmadge

9  was talking about was something a little different, and it's an

10  issue as under the existing cash collateral order, there is a

11  requirement that B of A pay all the expenses related to the

12  cost of the sale.

13          To the extent B of A disagrees with what are expenses

14  the debtor is asserting, there's a procedure in which it will

15  be resolved by this Court.  I think what -- how -- whether they

16  apply the retainer is not the issue.  The issue is how does it

17  get determined when it relates to the calculation of the

18  amounts that are supposed to come out of the proceeds of the

19  initial closing.  And I believe not knowing where the million

20  dollar retainer came from or any of the pre-petition

21  activities, whether it came from the B of A collateral, or it

22  did not come from the B of A collateral, the Committee reserves

23  it's right.  If, in fact, those were free assets that were paid

24  to Cadwalader as a retainer, that, in fact, any of the expenses

25  associated with the sale should come out of the initial

**J&J COURT TRANSCRIBERS, INC.**

1  proceeds.  So that may still be an issue this Court needs to

2  address, and I think that was the issue Mr. Talmadge was

3  addressing.  B of A I believe believes that it was their

4  collateral, and it should come out of that, and we just -- on

5  behalf of the Committee, we are not sure, and that issue may

6  still need to be addressed.

7          THE COURT:  Well, there are two issues in front of

8  the Court I guess.  One is retention of a professional and

9  whether or not they're going to get an Evergreen retainer.  And

10 this order says the professional is retained, and they don't

11 get an Evergreen retainer.

12         The other issue goes to terms of the cash collateral

13 order, the DIP financing order, the sales order.  I'm not

14 making -- that's not in front of me today.  I'm not making any

15 ruling on that.

16         MR. INDELICATO:  That's correct, Your Honor, and we

17 agree that it should not be an Evergreen retainer in that as it

18 relates to the firm the fees should come out of the retainer.

19 Our issue is just their ultimate application.

20         THE COURT:  Understood.

21         MR. INDELICATO:  Thank you.

22         MR. TALMADGE:  Your Honor, I want to be clear I

23 wasn't trying to be coy or anything.  Mr. Indelicato is right.

24 It is our position that the fees for Cadwalader with respect to

25 the sale should come out of their retainer and not out of the

1  proceeds.  I understand it's not before Your Honor right now.

2  We're just letting Your Honor know that that's the position

3  that we're taking.

4          THE COURT:  All right.  Understood.

5          MS. MORGAN:  Your Honor, again for the record,

6  Pauline Morgan.  We also on behalf of the estate reserve rights

7  with respect to the retainer.  The cash collateral order will

8  govern -- it does provide that the direct cost of disposing of

9  B of A's collateral will be borne by B of A, and if we can't

10 agree on that, we'll come before the Court another day, but

11 that day is not today.

12         THE COURT:  All right.

13         MS. MORGAN:  May I approach with a clean copy of the

14 order?

15         THE COURT:  Yes, please.  Thank you.  I'll sign the

16 order.

17         MS. MORGAN:  Thank you, Your Honor.  The next items

18 on the agenda are the Committee's applications to retain

19 various professionals, and I'll yield the podium to Mr.

20 Indelicato.

21         MR. INDELICATO:  Thank you, Your Honor.  For the

22 record, Mark Indelicato again.  Your Honor, we have before you

23 Items 18, 19, and 21.  I will deal with them together.

24         Your Honor, when these applications were initially

25 filed, we were contacted, at least with respect to Hahn and

**J&J COURT TRANSCRIBERS, INC.**

1  Hessen and Blank Rome, by the U.S. Trustee's Office with some

2  additional questions regarding our affidavits, and the U.S.

3  Trustee asked for some additional information, which we have

4  provided.  They also asked for a copy of the waiver letter that

5  we had received from Bank of America, which we provided.  It

6  raised some issues for them.  We had a meeting with them.

7  They've asked for a supplemental affidavit to address certain

8  issues which we are presently in the process of putting

9  together.

10        What we would like, unless the Court has some

11  additional concerns, to adjourn this to the next hearing, but

12  if we have resolved all of our issues with the U.S. Trustee,

13  what we would like to do is file our -- the proposed order

14  under a certification of counsel including with that the

15  additional affidavits, so the Court could consider them as well

16  when it's considering the order.  If the Court has no problem

17  with that procedure, we'd like to go forward.  If not, we'll

18  deal with it at the next hearing.

19        THE COURT:  Okay.  What hearing do you want to -- do

20  you want the December or the November?

21        MR. INDELICATO:  The November, Your Honor.

22        THE COURT:  November 28th?

23        MR. INDELICATO:  That would be fine, Your Honor.

24        THE COURT:  All right.

25        MR. INDELICATO:  With respect to BDO, the U.S.

1  Trustee's Office has asked that the investment banking arm of

2  BDO, or Trendwood Securities, be retained on a separate letter,

3  a separate engagement application.  We have -- we're doing

4  that, and that should be filed shortly.  The U.S. Trustee's

5  Office is checking to make sure -- whether they want any

6  additional representations from BDO.  Once we have that

7  clarified, we will either submit the BDO application under a

8  certification of counsel or submit a supplemental affidavit as

9  we will do with Hahn and Hessen and Blank Rome.

10            THE COURT:  All right.

11            MR. INDELICATO:  Thank you, Your Honor.

12            THE COURT:  So we'll also continue that to the 28th?

13            MR. INDELICATO:  Yes, Your Honor.

14            THE COURT:  That was with BDO.  Right?

15            MR. INDELICATO:  Yes, Your Honor.

16                      (Pause)

17            THE COURT:  Okay.

18            MS. MORGAN:  Thank you, Your Honor.  Your Honor,

19  going back briefly to Item 20, which is the motion of Vantage

20  Point Capital for a Rule 2004 examination, as indicated in the

21  agenda, the parties have agreed to adjourn this matter, but I'm

22  also authorized to advise the Court that we believe we've

23  resolved the matter.  So you can expect to receive either a

24  stipulation or certification of some kind I believe withdrawing

25  the matter.

1          THE COURT:  Okay.

2          MS. MORGAN:  And that will take us to Item 22, and I

3  will yield the podium to Mr. Waite.

4          MR. WAITE:  Good morning again, Your Honor.

5          THE COURT:  Good morning.

6          MR. WAITE:  Your Honor, this is -- this item is the

7  debtors' motion for interim and final orders approving a

8  limited recourse DIP financing and granting certain liens.

9  This motion is being made in furtherance of the order the Court

10  entered on October 30th approving the sale of the servicing

11  rights to AH Mortgage Acquisition Co., the purchaser.

12          We are here today seeking entry of an interim order.

13  The motion was filed on Monday afternoon together with the

14  motion.  We filed a motion to schedule a preliminary hearing.

15  I understand the Court has entered an order scheduling this

16  morning's hearing, and I'd like to thank the Court for that.

17          We requested an objection deadline of 9:00 a.m. this

18  morning, which was included in the notice that we provided.

19  I'm happy to report to the Court that we have not received any

20  objections.  I know Mr. Schnabel is here with comment to make

21  on the record, and I'm going to make a reservation or a

22  statement on the record I think to address his concern.

23          But we did work with the Committee and Bank of

24  America's counsel over the weekend and early on Monday and were

25  able to incorporate and address their comments and concerns in

**J&J COURT TRANSCRIBERS, INC.**

1  the form of order and credit agreement that we filed with the

2  motion, and we have just a couple minor changes I'll address

3  with the Court shortly.

4          Your Honor, I'll acknowledge to the Court that this

5  DIP financing is not your normal DIP.  It's a little bit of a

6  strange duck, but it's strange in good ways, because it is very

7  limited in its scope.  It's very limited in the liens that are

8  being granted, and it is consistent with the terms of the asset

9  purchase agreement that the Court has already approved.

10          As Your Honor is aware, because of certain state

11  licensure issues, the sale of the servicing rights of the

12  purchaser is structured as a two-step closing with an initial

13  or economic closing scheduled to occur in the next couple days

14  and a final or legal closing to occur in the future.  Section

15  6.2(a) of the asset purchase agreement requires the debtors to

16  operate the servicing business from the initial closing until

17  the final closing in the ordinary course for the benefit and

18  for the risk of the purchaser, however, because the liens of

19  the pre-petition lenders will be released on the purchased

20  assets as of the initial closing, the cash collateral usage

21  we've been operating under will no longer be in effect.

22          Because of that, Section 6.2(a) of the asset purchase

23  agreement requires the purchaser to either provide or arrange

24  for financing to enable the debtors to run the business between

25  the initial closing and the final closing.  Section 6.14(a) of

**J&J COURT TRANSCRIBERS, INC.**

the asset purchase agreement requires the debtors to cooperate
with the purchaser in obtaining that financing and specifically
provides for the execution and delivery of loan agreements,
security agreements, the granting of liens, and including
becoming directly liable on any loans or indebtedness, so long
as recourse under those documents is limited to the purchased
assets and the cash and cash equivalents from the operation of
the business following the initial closing.

The purchaser has chosen to provide financing to
operate the servicing business after the initial closing
through this limited recourse facility, which is what brings us
here today.  Your Honor, in the motion we outline the basic
terms of the financing.  I'll just highlight some of them for
the record.  The borrowers are AHM Investment, AHM Corp. and
AHM Servicing.  Those are the three sellers under the asset
purchase agreement and the parties who have title to the assets
which are being purchased by the purchaser.

The facility is a $50 million facility, and we are
seeking approval of 35 million which we believe is the amount
that will be sufficient to operate the business through a final
hearing.  Obviously, the purpose of the financing is to provide
working capital to operate the servicing business in the
ordinary course of business.

The administrative agent and lender under the
facility is AH Mortgage Acquisition Co., Inc., which is the

1  purchaser.  The facility also contemplates that additional

2  lenders could be added to the facility.  The facility will

3  mature on the final closing date unless earlier terminated by

4  its terms.  The interest rate is Y over plus three percent.

5  Again, those -- all those fees are being paid from the business

6  after the initial closing, so that those are all being incurred

7  by the purchaser.  But just for point of reference, that

8  interest rate is the same interest rate that is in the other

9  DIP financing that was provided by WLR at the beginning of the

10  case for the non-servicing part of the business.

11          In terms of fees, there is no commitment fee.  There

12  is a facility fee in the amount of a half a percent per annum

13  on the maximum credit amount.  As for the collateral, the

14  collateral that is being provided is very limited.  It includes

15  the purchased assets that the purchaser is acquiring under the

16  asset purchase agreement as well as the cash and cash

17  equivalents earned in operating the business after the initial

18  closing until the final and payment of the reconciliation

19  payment and, of course, any proceeds from that.

20          In terms of the clarification I said I would make,

21  Mr. Schnabel had requested the clarification that this not

22  include a lien on any assets which are not property of the

23  estate, and I think he was specifically referring to P&I and

24  T&I that are in the various accounts which are used to -- for

25  those accounts are held by the debtors in running the servicing

1    business, but the proceeds in those accounts belong to other

2    parties.   Again, the only liens that are being granted are on

3    the purchased assets, and I don't believe the Court's sale

4    order authorized us to sell any assets which were not property

5    of the estate.   So I don't think there is a concern there.

6              THE COURT:   We've had this conversation now --

7              MR. WAITE:   Several times, Your Honor.

8              THE COURT:   -- a dozen times, and --

9              MR. WAITE:   It's Groundhog Day.

10             THE COURT:   -- it continues to boggle my mind, but

11   just for clarity --

12             MR. WAITE:   Just for clarity.

13             THE COURT:   -- I don't have jurisdiction over

14   something that's not property of the estate.   The debtors can't

15   sell what's not property of the estate, nor can they provide a

16   lien on anything that is not property of the estate.   That was

17   true last week.   It's true this week.   It's true next week.

18             MR. WAITE:   I'll try not to have to repeat it again,

19   but I won't make any promises.   Your Honor, in terms of the

20   events of a default, they're fairly limited and customary and

21   are set forth in Section 8 of the DIP credit facility.   Your

22   Honor, at this point I want to focus the Court on a few

23   provisions, which I think really get to the crux of what this

24   facility does or doesn't do.

25             This is a limited recourse facility, and language in

**J&J COURT TRANSCRIBERS, INC.**

1  Section 3.05 of the credit agreement and Paragraph 7 of the

2  interim order make it abundantly clear that the purchaser is

3  only getting liens in the purchased assets.  It's only course

4  of recovery is from the purchased assets.  The estates are not

5  incurring new claims or liabilities aside from recovery from

6  the purchased assets.

7       In the event of a default, their remedy is to

8  basically collect the cash as it is collected by the company.

9  They have no right to foreclose on the underlying purchased

10  assets.  And, like I said, that is made clear in Sections 3.05

11  and Paragraph 7 of the order.

12       Additionally, Section .105 of the credit agreement

13  makes it clear that in any inconsistencies between the sale

14  order and the purchase agreement as -- and the -- this order or

15  the credit agreement, the sale order and the purchase agreement

16  will control.  We're not trying to change or modify in any way

17  any of the rights or obligations under the purchase agreement.

18       Finally, Your Honor, in Paragraph 31 of the order,

19  we've added language that specifically says that.  That,

20  "Nothing in the credit agreement or the loan documents or the

21  order is intended to limit, modify, or affect the obligations

22  of the purchaser under the asset purchase agreement including

23  its obligations to make financing available."  This is the --

24  this facility is the facility that the purchaser has chosen to

25  provide the financing.  It doesn't change its obligations under

**J&J COURT TRANSCRIBERS, INC.**

1  the asset purchase agreement to provide financing.  If this

2  facility is insufficient or for whatever reason is not

3  available, it doesn't change whatever obligations it has under

4  the asset purchase agreement to provide financing until the

5  final closing.  And it doesn't expand or increase the

6  obligations of the borrowers under the asset purchase

7  agreement.

8       And, finally, we've added language in that section to

9  make it clear that any failure of the debtors to be able to

10  comply with their obligations under the asset purchase

11  agreement because of the exercise of remedies by the lender

12  under this facility would give the purchaser the right to

13  declare a breach by the debtors of the asset purchase

14  agreement.

15       Now, the bottom line is that while the

16  debtors/sellers are borrowers under the facility, that is

17  structured, only because they are still legal title holders to

18  the assets which were purchased.  The rights and remedies of

19  the lender under the financing are limited, and no new liens or

20  claims are being created on the debtors' assets.

21       Your Honor, the debtors/borrowers believe that the

22  terms of the financing are fair and reasonable and consistent

23  with the purchase agreement, and we believe approval of the

24  financing is appropriate and needed, so that we can proceed to

25  the initial closing.  Your Honor, the terms of it were

1  negotiated in good faith and arm's length.  I think that is

2  evident by the fact of the limited nature of relief as well as

3  the consistency with the asset purchase agreement.

4         Your Honor, one note.  Pursuant to Local Rule 4001-2,

5  we're supposed to identify certain provisions in orders.  There

6  is a 506(c) waiver language that appears in Paragraph 18, and

7  while that is not customary in an interim order, in this case

8  we believe it's appropriate.  That same provision was granted

9  to the purchaser in the sale order -- in Paragraph 18 of the

10 sale order, carried that language over.  We're not granting

11 anything new, and under these circumstances we believe that is

12 appropriate.

13        Your Honor, in light of the consistency with the

14 asset purchase agreement and the record the Court already has

15 from the sale hearing, I don't know that the Court needs any

16 evidence.  I do have Mr. Nisham (phonetic).  I can make a

17 proffer if the Court would like, but I'm happy to dispense with

18 it if the Court sees no need.

19        THE COURT:  Unless there's an objection, I really

20 view this as an extension of the extensive hearing and record

21 developed in connection with the sale of the servicing

22 business.  So I'm prepared to take judicial notice and

23 incorporate the record from that, including the hearing we had

24 on the form of order.

25              (No verbal response)

1        THE COURT:  Hearing no objection, I'll do that.  I

2    don't think we need an additional proffer.

3        MR. WAITE:  Your Honor, if I may approach, I'll hand

4    the Court both a clean copy with the credit agreement attached.

5    There have been no amendments to the credit agreement from what

6    we filed.  The order does give us the right to make certain

7    non-material modifications and amendments prior to the closing.

8        THE COURT:  Okay.

9        MR. WAITE:  And I have a black line of the order.

10    There's two very minor changes I'll just point out to the

11    Court.  Let me point out the two changes, and I think there's a

12    few dates we'll need to fill in.  The first change in the black

13    line appears on Page 11.  We struck some language, and that was

14    really just to make it consistent with the other documents.

15        THE COURT:  All right.

16        MR. WAITE:  And at the very end of Paragraph 31 on

17    Page 19 we've added language to make it clear that if the

18    debtors can't perform under the asset purchase agreement

19    because of the exercise of remedies, it would not constitute a

20    default or deemed a breach of their obligations to the

21    purchaser as opposed to --

22        THE COURT:  Right.

23        MR. WAITE:  -- any other party.

24        THE COURT:  So we need a hearing date.

25        MR. WAITE:  I was going to suggest that we use the

**J&J COURT TRANSCRIBERS, INC.**

48

1  November 28th for a final hearing.  I believe that gives us the

2  15 days, and it avoids us asking the Court for another hearing

3  date.  I think you see enough of us.

4           THE COURT:  That's fine.

5           MR. WAITE:  And I guess I would suggest the

6  objections be due a week prior to that?

7           THE COURT:  Well, it's going to be -- that runs into

8  Thanksgiving, so hang on.

9           MR. WAITE:  Okay.

10                         (Pause)

11          THE COURT:  Yes, that would be the Wednesday before

12  Thanksgiving.  Let's --

13          MR. WAITE:  Yes, looking at the options, I thought

14  maybe that was better than the Friday after, but --

15          THE COURT:  Well, no, I'm not going to do that to

16  anybody.  Yes, all right, 11/21 at 4:00 p.m.  Does anyone wish

17  to be heard before I sign the order?

18          MR. WAITE:  And, Your Honor, there's one other I

19  think blank to filled in.  I'm sorry.  It's in Paragraph 9,

20  Page 11.  It's just the date of the first final cash collateral

21  extension -- that would be today's date -- that the Court

22  entered earlier.

23          THE COURT:  So November 14th?

24          MR. WAITE:  Yes.

25          THE COURT:  There's a blank on Page 1 here.

                    **J&J COURT TRANSCRIBERS, INC.**

1         MR. WAITE:  Actually, there's two blanks.  The first

2    one would be the motion was dated November 12th at the top.

3    The second blank, I think at this point we're going to have to

4    leave it blank, because it's the date of the credit agreement.

5    We haven't actually executed it yet.

6         THE COURT:  All right.  That would be done at the

7    final close I expect, or the initial close?

8         MR. WAITE:  Yes.

9         THE COURT:  It will all be --

10        MR. WAITE:  And then actually then again on Page 2 at

11   the bottom there's a date for today's hearing which is the

12   14th.

13        THE COURT:  That's already -- someone already filled

14   that in for you.

15        MR. WAITE:  Okay.

16        MR. INDELICATO:  Your Honor, Mark Indelicato from

17   Hahn and Hessen on behalf of the Committee.  Your Honor, just

18   to make clear and make the record clear, the Committee was

19   involved and has been involved in the negotiations with this

20   DIP.  We viewed it, Your Honor, very much, as you articulated,

21   as an extension of the sale agreement, and all of our comments

22   and suggested changes to both the creditor agreement and the

23   order related to that.

24        What was important to the Committee was that this

25   either affect either of the parties' rights under the APA, and

1  that to the extent they are putting in place an interim

2  financing order that provides for $50 million in financing, to

3  the extent the purchaser has different obligations under the

4  APA, this financing is just a means of getting up to $50

5  million to the debtor if they need it.  If there are other

6  obligations under the APA, this order in no way is changing

7  that, and the order and the credit agreement have reflected

8  that as well.

9         Also, we wanted to make sure, Your Honor, as Mr.

10  Waite had indicated, to the extent there are defaults under

11  this -- in this credit agreement, it's not going to be a means

12  for the purchaser to try and alleviate some of the obligations

13  he has under the APA.  So this is just a mere instrumentality

14  of getting the money to the debtor.  It no way changes the

15  rights or obligations of the parties under the APA.  That's

16  what the Committee as concerned about.  This is what this

17  revised order and agreement do.  So on that basis we would

18  support entry of the order.

19         THE COURT:  Thank you.  Mr. Schnabel.

20         MR. SCHNABEL:  Your Honor, Eric Lopez Schnabel on

21  behalf of U.S. Bank in its capacity as a trustee for a variety

22  of trusts.  Judge, that representation was more than adequate

23  for us regarding cash and custodial accounts or other cash

24  that's property of the trusts.  And this obviously is an issue

25  in other cases given, you know, legal title that the debtor

1  might have versus equitable title that resides with another

2  party, and I think that's why you get such a deja vu feeling on

3  this issue in this case.

4          Your Honor, the only other thing we'd like to add is

5  that we obviously, I think as everyone expects the debtor and

6  the purchaser to continue operating under these applicable

7  service agreements and service guidelines to segregate and

8  remit cash that's not -- that they don't have equitable title

9  in or segregate cash that should be placed into custodial

10  accounts.  Obviously, you know, whatever the obligations are,

11  they are, but we don't want to have a situation created where a

12  dispute can arise because of monies not being handled

13  appropriately.  But we expect the debtor to continue to live up

14  to those obligations.

15          THE COURT:  All right.  Thank you.

16          MR. SCHNABEL:  Thank you.

17          MR. WAITE:  Your Honor, I think that's it.  I did

18  speak with Mr. McMahon just before the hearing, and I

19  understand the U.S. Trustee had no comments on the order as

20  well.

21          THE COURT:  All right.

22          MR. WAITE:  So I'd ask that the Court enter the

23  order.

24          THE COURT:  I will do so.

25          MR. WAITE:  That finishes the items that are listed

1  on the agenda.  I know Ms. Morgan has one issue to raise with

2  the Court.

3         THE COURT:  Do we have an attachment to this Societe

4  Generale order, or are you going to do that at a later time?

5         MR. GREECHER:  Your Honor, Sean Greecher.  We will

6  send over to the Court a fully executed version of the

7  attachment.

8         THE COURT:  All right.  Send me an order under

9  certification of counsel.

10        MR. GREECHER:  Yes, Your Honor.

11        THE COURT:  Thank you.

12        MS. MORGAN:  And, Your Honor, if I may trouble the

13 Court again with one more matter.  I don't think we realized

14 you were out of your chambers.  Another thing that was filed

15 yesterday was a certification of counsel regarding the debtors'

16 entry into a second amendment to the APA regarding the

17 servicing sale.  And we did send it over yesterday.  The APA

18 does permit the parties to make amendments with the prior

19 consent of the administrative agent and in consultation with

20 the Committee.  And the sale order, in fact, does that as well

21 It allows us to make non-material modifications without -- or

22 modifications that have no adverse affect on the debtors'

23 estate without even coming to the Court.

24        And Your Honor will also recall we've had some

25 hearings on the motion of DB Structured Products as well as

**J&J COURT TRANSCRIBERS, INC.**

1 UBS, but the DB motion for stay pending appeal resulted in some

2 negotiations and an eventual agreement to amend the APA to move

3 DB Structured from one exhibit and to add them to a disputed

4 servicing agreement schedule which we've made 1.1(l) of the

5 APA, and that was basically to move out the stay pending appeal

6 request and to allow us time to defend the appeal.

7          We have done that, Your Honor.  We have filed the

8 second amendment to the APA under certification of counsel

9 yesterday.  We did get the consent of the administrative agent.

10 We did consult with the Committee.  The purchaser has asked for

11 the comfort of an order authorizing the debtors' entry into

12 that second amendment.  So the certification of counsel also

13 attaches a form of order, and we would ask that the Court

14 approve that either today or shortly before the initial

15 closing.

16          THE COURT:  Well, do I have jurisdiction?

17          MS. MORGAN:  To authorize the debtors' entry into an

18 amendment?  I think you do, Your Honor, and, in fact, the first

19 amendment to the APA you approved through the sale order

20 itself.

21          THE COURT:  Well, yes, but before the appeal.  The

22 appeal is a matter of jurisdictional significance.  It's one

23 thing for me to deal with a motion for stay pending appeal

24 filed prior to an appeal -- after the appeal, but to go back

25 and enter orders that modify the in effect agreement that's on

**J&J COURT TRANSCRIBERS, INC.**

1  appeal, do I have jurisdiction to do that after the appeal has

2  been taken, or should you --

3             MS. MORGAN:  Your Honor, I --

4             THE COURT:  -- shudder to say shouldn't you go to the

5  District Court?

6             MS. MORGAN:  Again Your Honor is not being asked --

7  you're only being asked to approve the APA not the sale order

8  -- approve the amendment to the APA.  The APA itself does

9  permit that.  The sale order permits that.  I don't think that

10 would be a violation of your jurisdiction to order -- authorize

11 the amendment, which again I see as a technical amendment that

12 incorporates what we've already advised the Court.  You're not

13 ruling on DB --

14            THE COURT:  Well, one thing --

15            MS. MORGAN:  -- on DB's motion.

16            THE COURT:  It's one thing for the parties to agree

17 to amend the structure.  It's another thing for you to request

18 that the Court approve it.  I'm talking in a vacuum, because

19 although I did see that it was in my in box, I was preparing

20 for the hearing, so I haven't even looked at it.  So I don't

21 know if you have a copy you want to show me or --

22            MS. MORGAN:  Yes, Your Honor.  May I approach?

23            THE COURT:  Yes.  Mr. Indelicato.

24            MR. INDELICATO:  Yes, Your Honor.  If I can just

25 interject a thought.  Your Honor, I don't -- I do believe the

1  Court has jurisdiction.  This is an amendment to the APA which

2  actually resolves the stay pending appeal of DB Bank -- DB

3  Structured.  What it does is it allows us to deal with their

4  loans in a way that gave them the relief that they're

5  requesting pending their appeal, so that their MSRs would be

6  brought into another disputed category.

7          So it's not affecting any other parties' rights.

8  Whatever other appeals are pending, all this does is approve

9  the amendment to the APA that resolve the issues with DB

10  Structured Product under which they withdrew their motion for a

11  stay pending appeal.  So I believe in that respect, Your Honor,

12  you do have jurisdiction to enter this order as it relates to

13  that amendment.

14          THE COURT:  Because they consent?  I mean that --

15          MR. INDELICATO:  Yes.

16          THE COURT:  -- that doesn't do it.  I --

17          MR. INDELICATO:  No, Your Honor, because I believe

18  what is on appeal are the issues related to the ultimate relief

19  they're seeking.  All this does is it gives them the relief

20  that they're looking for pending the appeal, so that their

21  appeal is not mooted.  So it's changing it in a way that is not

22  affected on the issues on appeal.  It's a clarifying -- as Ms.

23  Morgan said, it's a clarifying order related to the APA.

24          THE COURT:  All right.

25          MS. MORGAN:  And, Your Honor, just to reiterate, this

1  order does not affect anything that is on appeal.  This was the

2  mechanism to avoid the stay pending appeal.  And I think we --

3          THE COURT:  And I --

4          MS. MORGAN:  Yes.

5          THE COURT:  I'm not arguing with what a great idea it

6  is.  I really am not, but I have to be very careful making sure

7  that when I enter orders that I'm not -- I'm entering them in

8  the -- in a manner that's consistent with my jurisdiction.  Let

9  me just -- Mr. Bowden, do you remember the day you filed your

10 appeal?  I know Mr. Beskrone signed it, but --

11         MR. BOWDEN:  Good morning, Your Honor.  Bill Bowden

12 of Ashby and Geddes for DB Structured Products.  Your Honor, I

13 was out of the office last week.  I don't recall of the top of

14 my head, but if Your Honor will give me a moment, I think I can

15 get an answer to your question.

16         THE COURT:  I'm looking too, so --

17                  (Pause)

18         THE COURT:  A lot of docket entries.  I don't know

19 who -- what the -- who the paralegal is at Young Conaway that's

20 tracking them, but here she deserves a raise.  Here we go.

21         MS. MORGAN:  Hoping she's doesn't read the transcript

22 when it comes in.

23         THE COURT:  Yes.  It's November 6th.  All right.

24                  (Pause)

25         THE COURT:  Well --

1    MS. MORGAN:  Your Honor, I know you already said it

2    was a good idea, but again as a reminder, it was a limited

3    appeal based on the transferability of their --

4    THE COURT:  Well, that's not what it says.  That's --

5    I just looked.  It says "Take notice that pursuant to Rule

6    8001, DB Structured Products, Inc. hereby appeals from this

7    Court's order dated October 30th, period.  A copy of the sale

8    order is attached."  It's -- and then, you know, all the

9    exhibits are the sale order.  So that's why I was looking.

10   Just give me a second to read something.

11   MS. MORGAN:  Sure.

12                           (Pause)

13   THE COURT:  All right.  Bankruptcy Rule 8005 provides

14   that, "The Bankruptcy Judge may suspend or order the

15   continuation of other proceedings in the case under the Code or

16   make any other appropriate order during the pendency of an

17   appeal on such terms as will protect the rights of all parties

18   in interest."  Let me read that again.

19   "The Bankruptcy Judge may suspend or order the

20   continuation of other proceedings in the case under the Code or

21   make any other appropriate order during the pendency of an

22   appeal on such terms as will protect the rights of all parties

23   in interest."

24   And I think that's sufficient authority in this case

25   -- somewhat unique case where again I'm not altering the actual

**J&J COURT TRANSCRIBERS, INC.**

58

1  order that's on appeal.  I am providing debtor with authority

2  to enter into an amendment to the APA that is subject to that

3  order in which the debtor, by the way, already has the right to

4  do notwithstanding the Court's failure or agreement to enter

5  such an order.  And given the support of all parties, including

6  the appellant, to the Court asking it to provide that relief, I

7  don't think there's a jurisdictional basis not to do so.

8          That said, I need to read it, so I will endeavor to

9  do so as soon as I leave the bench.  And I'll either sign an

10 order, or I'll give you a call and let you know if I have any

11 issues.

12         MS. MORGAN:  Thank you very much, Your Honor.

13         THE COURT:  Got to be careful with these housekeeping

14 matters, Ms. Morgan.

15         MS. MORGAN:  I know.  I'll try to limit those in the

16 future, Your Honor.  Thank you very much for your time today.

17 That concludes our agenda.

18         THE COURT:  All right.  Thank you very much.  Hearing

19 is adjourned.

20         ALL:  Thank you, Your Honor.

21                      * * * * *

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**

59

## CERTIFICATION

I, PATRICIA C. REPKO, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter to the best of my ability.


/s/ Patricia C. Repko          Date:  November 21, 2007
PATRICIA C. REPKO
J&J COURT TRANSCRIBERS, INC.


**J&J COURT TRANSCRIBERS, INC.**