IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x
In re:                                                           :   Chapter 11
                                                                 :
AMERICAN HOME MORTGAGE                                           :   Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,                  :
                                                                 :   Jointly Administered
    Debtors.                                                     :
                                                                 :
                                                                 :   Ref. Docket Nos. 11 and 1711
---------------------------------------------------------------- x

## NOTICE OF DEBTORS' ENTRY INTO
## THIRD AMENDMENT TO ASSET PURCHASE AGREEMENT

TO:   THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE DISTRICT OF
      DELAWARE; COUNSEL FOR THE COMMITTEE; COUNSEL FOR BANK OF
      AMERICA, N.A.; COUNSEL TO THE DEBTORS' POSTPETITION LENDERS; AND
      ALL PARTIES THAT HAVE REQUESTED NOTICE PURSUANT TO FEDERAL
      RULE OF BANKRUPTCY PROCEDURE 2002.

**PLEASE TAKE NOTICE** that on August 6, 2007, the above-captioned debtors and debtors-in possession (the "Debtors") filed the *Emergency Motion of the Debtors for Orders: (A) (i) Approving Sale Procedures; (ii) Scheduling a Hearing to Consider Sale of Certain Assets Used In the Debtors' Loan Servicing Business; (iii) Approving Form and Manner of Notice Thereof; and (iv) Granting Related Relief; and (B) (i) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (ii) Authorizing and Approving Purchase Agreement Thereto; (iii) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (iv) Granting Related Relief* [Docket No. 11] (the "Sale Motion"). On October 30, 2007, the Court entered an order approving the Sale Motion [Docket No. 1711] (the "Sale Order").

**PLEASE TAKE FURTHER NOTICE** that, among other things, the Sale Order authorized the sale of the Debtors' loan servicing business in accordance with that certain Asset Purchase Agreement dated as of September 25, 2007 (a copy of which is annexed to the Sale Order as Exhibit A-1) (as amended from time to time, and including all schedules, exhibits, and attachments thereto, including the Ancillary Agreements (as such term is defined therein) to be entered into by and among the parties as contemplated therein, collectively, the "APA").[1] Section 11.4 of the APA permits amendment of the APA by a written instrument signed by all of the parties to the APA, with the prior written consent of Bank of America, N.A., as Administrative Agent for certain lenders under that certain Second Amended and Restated Credit Agreement dated as of August 10, 2006 (the "Administrative Agent"), and with prior consultation with the official committee of unsecured creditors appointed in these cases (the "Committee").

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the APA.

Further, Paragraph 27 of the Sale Order provides that:

> Prior to the Final Closing, the APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by all parties and in accordance with the terms thereof, without further order of the Court, provided, however, that (a) any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates; and (b) five (5) business days prior written notice is given to the counsel to (i) the Administrative Agent, and (ii) the Committee. Notice of any modification, amendment or supplement to the APA will be filed by the Debtors with the Court.

Sale Order, at ¶27 (together, the "Modification Provisions").

**PLEASE TAKE FURTHER NOTICE** that, consistent with the Modification Provisions, the Debtors, in consultation with AH Mortgage Acquisition Co., Inc., the Administrative Agent, and the Committee, agreed to the Third Amendment to Asset Purchase Agreement (the "Amendment"), a copy of which is annexed hereto as Exhibit A. The Amendment modifies the APA to provide for certain temporary employees to be retained for the benefit of the Sellers, and amends Exhibit G to the APA.

Dated: Wilmington, Delaware
November 26, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ _____
James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Pauline K. Morgan (No. 3650)
M. Blake Cleary (No. 3614)
Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession

# **EXHIBIT A**

THIRD AMENDMENT
TO ASSET PURCHASE AGREEMENT

This Third Amendment to Asset Purchase Agreement dated as of November 16, 2007 (this "Third Amendment"), is entered into by and among AH Mortgage Acquisition Co., Inc., a Delaware corporation ("Purchaser"), American Home Mortgage Investment Corp., a Maryland corporation, as a debtor and debtor-in-possession ("Parent"), American Home Mortgage Corp., a New York corporation, as a debtor and debtor-in-possession, and American Home Mortgage Servicing Inc, a Maryland corporation, as a debtor and debtor-in-possession (the "Company" and together with American Home Mortgage Corp. and Parent, the "Sellers").

WHEREAS, Purchaser and Sellers are parties to that certain Asset Purchase Agreement, dated as of September 25, 2007, as amended by that certain First Amendment to Asset Purchase Agreement, dated as of November 1, 2007, and that certain Second Amendment to Asset Purchase Agreement, dated as of November 6, 2007 (the "Agreement");

WHEREAS, Section 11.4 of the Agreement permits amendment of the Agreement by a written instrument signed by all of the parties to the Agreement with the prior written consent of the Administrative Agent (as defined in the Agreement) and with prior consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases (as defined in the Agreement); and

WHEREAS, the parties to the Agreement desire to amend certain provisions of the Agreement pursuant to this Third Amendment in order to provide for certain temporary employees (and any Liabilities related thereto) to be retained for the benefit of Sellers and to amend Exhibit G to the Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

Section 1.    Definitions. Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Agreement.

Section 2.    Temporary Employees. After the Initial Closing, Sellers shall retain, on a temporary basis, up to 28 employees ("Box Employees") currently employed by American Home Mortgage Servicing Inc. to facilitate the completion of certain documentation related requirements of Sellers (the "Box Project"). Sellers shall provide Purchaser with a list of all Box Employees prior to the Initial Closing Date and shall be responsible for (i) all salaries, benefit costs, employment taxes and any other out of pocket costs or expenses associated with the continued employment of Box Employees, including any costs arising as a result of the termination of Box Employees upon completion of the Box Project. Within 5 calendar days after the end of each calendar month in which Box Employees continue to be employed, Purchaser and Sellers shall reconcile all actual salaries, benefit costs, employment taxes, termination of employment costs and any other out of pocket costs or expenses incurred by the Business in connection with the continued employment of Box Employees and Sellers shall remit to the

DLI-6155961v5

Business the amount of such actual costs. For the avoidance of doubt and notwithstanding anything to the contrary in the Agreement, Sellers acknowledge and agree that (A) Box Employees will not be Transferred Employees and (B) Sellers will retain all Liabilities related to Box Employees, including any Liabilities arising under any Plan or under WARN, COBRA or any other similar Law.

Section 3.    Purchase Price.

(a)    The first sentence of Section 4.1(a) of the Agreement is amended by deleting "$6.0 million" as it appears therein and inserting "$3.45 million" in its place; and

(b)    The third sentence of Section 4.1(a) of the Agreement is deleted and the following sentence is inserted in its place:

> At the Initial Closing, Purchaser shall pay the Purchase Price (less (x) an amount equal to $757,350 (the "MERS Amount") to be held by Purchaser for the sole purpose of paying all assignment fees payable to MERS upon the Final Closing (the "MERS Costs") in connection with the transfer of Servicing Rights included in the Purchased Assets and (y) $6,061,810 to reconcile a deficiency in the cash available to be transferred to Purchaser's accounts contemporaneously with the Initial Closing with respect to amounts collected to pay premiums for lender paid mortgage insurance ("LPMI") and with respect to amounts collected for prepayment penalties ("PP")) as follows (and in the following order of priority) (i) an amount equal to the Dispute Amount to the Dispute Escrow Agent, (ii) subject to Section 4.1(d), an amount equal to the FNMA Closing Payment, on behalf of Sellers, to FNMA by wire transfer of immediately available funds to an account or accounts designated by Sellers in writing no less than two Business Days prior to the Initial Closing to Purchaser on behalf of FNMA, (iii) an amount equal to the necessary direct costs of Sellers incurred in connection with this Agreement which are reasonably acceptable to the Administrative Agent (it being agreed that the fees, costs, and expenses of Kroll Zolfo Cooper are not to be deducted and that such amount shall be reduced by any amounts that are disputed by the Administrative Agent in accordance with the Cash Collateral Order) as directed by Sellers (but in no event will Purchaser be required to pay an aggregate amount in excess of the aggregate amount directed by Sellers to be paid pursuant to this Section 4.1(a)(iii) for the satisfaction of such direct costs), (iv) an amount equal to $10,000,000 in cash by wire transfer of immediately available funds to be held pursuant to the Cure Escrow Agreement and (v) the remaining Purchase Price (less any amounts delivered on behalf of Sellers in accordance with Section 4.3(a)) shall be paid by wire transfer of immediately available funds to an account or accounts designated by the Administrative

- 2 -

Agent (pursuant to the Sale Approval Order) in writing to the Purchaser, no less than two Business Days prior to the Initial Closing, on behalf of Sellers, to the Administrative Agent in accordance with the Cash Collateral Order (the amounts payable under clause (v) hereinafter referred to as "Net Proceeds"). To the extent the MERS Costs payable upon the Final Closing are less than the MERS Amount, on the Final Closing Date, Purchaser shall pay the excess amount on behalf of Sellers to the Administrative Agent in accordance with the Cash Collateral Order.

Section 4.    LPMI and Prepayment Penalty Amounts. Contemporaneous with the Initial Closing, Sellers shall cause all amounts held by Sellers as of the Initial Closing representing monies collected by Sellers as premiums for LPMI or as PP to be transferred to an account or accounts designated by Purchaser; provided that after the Initial Closing Date the parties shall work together in good faith to determine whether the amount transferred under this Section 4 and the $6,061,810 reduction from the Purchase Price set forth in Section 4.1(a) of the Agreement (the "Aggregate Amount") was the appropriate amount with respect to such PP and LPMI (the "Appropriate Amount"). To the extent it is finally determined that the Aggregate Amount exceeded the Appropriate Amount, Purchaser, on behalf of Sellers, shall pay an amount equal to such excess by wire transfer of immediately available funds to an account or accounts designated by the Administrative Agent (pursuant to the Sale Approval Order) in writing to the Purchaser in accordance with the Cash Collateral Order. To the extent it is finally determined that the Aggregate Amount was less than the Appropriate Amount, Sellers shall pay an amount equal to such deficiency by wire transfer of immediately available funds to Purchaser.

Section 5.    Allocation of the Purchase Price. The first sentence of Section 4.2(a) of the Agreement is deleted and the following sentence is inserted in its place:

> The Purchase Price and the value of any Assumed Liabilities shall be allocated among the Business, the Purchased Assets and the agreements provided herein for transfer of the Business to Purchaser in a manner consistent with an allocation schedule (the "Allocation Schedule"), which Allocation Schedule shall be mutually agreed upon by Purchaser and Sellers within 60 days following the Initial Closing Date to the extent reasonably possible, in compliance with Section 1060 of the Code and the regulations promulgated thereunder.

Section 6.    Subservicing. Section 6.10(f) of the Agreement is hereby amended by adding the following sentence at the end of such section:

> Notwithstanding the foregoing, if on the Final Closing Date the outstanding principal and interest balance of Defaulted Mortgage Loans included in (i) the Mortgage Loans serviced under the Disputed Servicing Agreements that are treated as Excluded Assets and (ii) Mortgage Loans set forth on Schedule 6.10(f) are equal to

- 3 -

or greater than 12% of the outstanding principal and interest balance of all such Mortgage Loans described in (i) and (ii) hereof, then Purchaser and Sellers shall negotiate in good faith to establish a per Mortgage Loan monthly Servicing Fee that is equal to the actual costs of Purchaser to service such Mortgage Loans.

Section 7. <u>Exhibit G</u>. <u>Exhibit G</u> to the Agreement is deleted and <u>Exhibit G</u> attached to this Third Amendment is inserted in its place.

Section 8. <u>Bankruptcy Court Approval</u>. Sellers hereby represent and warrant to Purchaser that the amendments and modifications to the Agreement set forth in this Third Amendment does not have a material adverse effect on the Debtors' (as defined in the Sale Approval Order) estate and that the Administrative Agent and the official committee of unsecured creditors appointed in the Bankruptcy Cases have waived the five business day prior written notice requirement of paragraph 27 of the Sale Approval Order. Sellers shall promptly file a notice of the entry into this Third Amendment with the Bankruptcy Court as contemplated by paragraph 27 of the Sale Approval Order.

Section 9. <u>Payments "to the Business"</u>. For the avoidance of doubt, the parties hereto acknowledge and agree that (a) where there are provisions that require Sellers to "remit to the Business" or "pay to the Business" (or similar phrases) that Sellers are required to (i) pay those amounts from funds that are not (x) funds received in connection with the operation of the Business or in connection with the Purchased Assets during the period from the Initial Closing until the later of the Final Closing and payment of the Reconciliation Payment or (y) funds drawn on the financing provided by Purchaser for the operation of the Business from the Initial Closing to the Final Closing as contemplated by Section 6.2(a) of the Agreement and (ii) deposit those amounts into the separate accounts of the Business that are required to be established pursuant to Section 6.14(d) of the Agreement and (b) such funds so remitted or paid to the Business will be available for payment of the Reconciliation Payment and subject to the liens granted to Purchaser in paragraph 10 of the Sale Order.

Section 10. <u>Consent; Consultation</u>. Sellers jointly and severally represent and warrant to Purchaser that Sellers have obtained the prior written consent of the Administrative Agent to enter into this Third Amendment and have consulted with the official committee of unsecured creditors appointed in the Bankruptcy Cases prior to entering into this Third Amendment.

Section 11. <u>Amendment</u>. This Third Amendment may be amended, modified and supplemented only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Third Amendment. Sellers shall not agree to amend, modify or supplement this Third Amendment, or waive any provision of this Third Amendment without the prior written consent of the Administrative Agent and without prior consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases.

Section 12. <u>Counterparts</u>. This Third Amendment may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to

DLI-6155961v5

the other parties. Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of such counterparts is confirmed.

Section 13.  Entire Agreement; No Third Party Beneficiaries. The Agreement as amended by this Third Amendment (a) constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof, except for the Confidentiality Agreement, which shall remain in full force and effect until the Initial Closing Date, and (b) is not intended to confer any rights or remedies upon any Person other than the parties hereto and thereto, including without limitation any Business Employee or Transferred Employee.

Section 14.  Governing Law. THIS THIRD AMENDMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH (A) THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO RULES GOVERNING THE CONFLICT OF LAWS AND, (B) TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

**[SIGNATURES ON FOLLOWING PAGE]**

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Third Amendment or caused this Third Amendment to be executed by their respective officers thereunto duly authorized as of the date first written above.

AH MORTGAGE ACQUISITION CO., INC.,
as Purchaser

By: _____
Name: JOSH SEGGOPAUL
Title: VP

AMERICAN HOME MORTGAGE
INVESTMENT CORP.,
as Seller and Debtor and Debtor-in-Possession

By: _____
Name:
Title:

AMERICAN HOME MORTGAGE CORP,
as Seller and Debtor and Debtor-in-Possession

By: _____
Name:
Title:

AMERICAN HOME MORTGAGE
SERVICING, INC.,
as Seller and Debtor and Debtor-in-Possession

By: _____
Name:
Title:

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Third Amendment or caused this Third Amendment to be executed by their respective officers thereunto duly authorized as of the date first written above.

AH MORTGAGE ACQUISITION CO., INC.,
as Purchaser

By: _____
Name:
Title:

AMERICAN HOME MORTGAGE
   INVESTMENT CORP.,
   as Seller and Debtor and Debtor-in-Possession

By: _____
Name: MICHAEL STRAUSS
Title: CEO

AMERICAN HOME MORTGAGE CORP,
   as Seller and Debtor and Debtor-in-
   Possession

By: _____
Name: MICHAEL STRAUSS
Title: PRESIDENT

AMERICAN HOME MORTGAGE
   SERVICING, INC.,
   as Seller and Debtor and Debtor-in-Possession

By: _____
Name: MICHAEL STRAUSS
Title: PRESIDENT

Exhibit G

[See Attached.]

**EXHIBIT G - AMENDED**

Sources of Cash[a]
    Servicing Receipts[b] ..............................................
    Investment Income[c]..............................................
    Other Servicing Revenue[d] ......................................
    Borrowings under liquidity and working capital
      financing as may be necessary to enable Sellers
      to operate the Business from the Initial Closing
      to the Final Closing as contemplated by
      Section 6.2(a) (the "Interim Financing") ..............
    Employee Funding[e] ...............................................
    Other Receipts Generated by the Purchased
      Assets ........................................................
        Total Sources ............................................

Uses of Cash[f]
    Payroll and Payroll Taxes[g] ...................................
    Health Insurance – BCBS[g] ...................................
    Direct Non-Payroll Costs[h]....................................
    Allocated Corporate Overhead Costs[i] ...................
    Servicing Advances[j]............................................
    Payments under Interim Financing .........................
        Total Uses ................................................

---

(a)    Excludes any draws under the DIP Financing Agreement

(b)    Comprised of fees and other funds that the servicer receives and is entitled to retain, including any ancillary fees, under Servicing Agreements or other agreements included in the Purchased Assets and all recoveries of Advances that are not Excluded Assets

(c)    Comprised of earnings on payments before remittance thereof under Servicing Agreements or in respect of Advances included in the Purchased Assets

(d)    Includes, the amounts contemplated by Section 6.2(f). Revenue under Section 6.2(f) will be calculated based on actual daily loan volumes for each month following the Initial Closing Date. The Business will be entitled to $15 per loan per month (based on a daily average count) during the two month period following the Initial Closing Date, $20 per loan per month for the subsequent two month period, and $25 per loan per month thereafter (such amounts, as applicable, the "Monthly Fee"). The foregoing Monthly Fees shall be payable as follows. The Business shall collect the monthly Servicing Fees for the subject loans. If the aggregate Servicing Fees collected by the Business for these loans in each monthly period is less than the product of the number of subject Mortgage

Loans multiplied by the applicable Monthly Fee per Mortgage Loan set forth in Section 6.2(f), Sellers shall remit to the Business the amount of such deficiency. If such Servicing Fees collected by the Business are greater than the product of the number of subject Mortgage Loans multiplied by the applicable Monthly Fee per Mortgage Loan set forth in Section 6.2(f), the Business will remit the excess to Sellers. Additionally, on a monthly basis, Sellers shall remit to the Business $25 for each of the subject loans that is "deboarded" during such month.

(e) Up to 28 existing employees are being temporarily retained by American Home Mortgage Servicing Inc. to facilitate the completion of documentation related requirements for the benefit of Sellers. Sellers will make periodic payments to the Business to cover the salary and benefit costs of those employees. It is estimated that these monthly costs will be approximately $90,000. Payments will be based on actual costs incurred

(f) Each item set forth below excludes uses of cash to the extent such uses relate to liabilities or obligations (i) accrued at or prior to the Initial Closing; (ii) associated with Excluded Assets; (iii) with respect to adjudicating or settling Disputed Servicing Agreements; or (iv) included in Assumed Liabilities. Uses of cash will exclude (A) payment of any Initial Cure Amounts; (B) payments of any Interim Cure Amounts; and (C) repayments of draws under the DIP Financing Agreement

(g) Uses of Cash will exclude any compensation paid or payable or benefits with respect to (i) persons providing the Allocated Corporate Overhead services and (ii) the Executive Incentive Plan referred to on Schedule 6.1(e)

(h) Comprised of occupancy and equipment, data processing and communications, office supplies and expenses and other direct costs of the Business

(i) Calculated initially at the amounts per month set forth below, with each such amount being reduced from time to time and in such amounts as Purchaser and Sellers mutually reasonably agree to reflect any cost savings achieved by Sellers as a result of any decrease in utilization by the Business of corporate level support provided by Sellers whether as a result of increased resources within the Business or otherwise:

| Category | Initial Amount per Month |
|---|---|
| Information Technology | $ 290,000 |
| Accounting/Tax | $ 50,000 |
| Legal/Human Resources | $ 10,000 |

Notwithstanding the foregoing, Seller shall not agree to any such reductions without the prior reasonable consent of the Administrative Agent and without prior consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases.

(j) Comprised of advances under Servicing Agreements included in the Purchased Assets

DLI-6153412v5