| UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

**Name of Debtor:**
**AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation, et al.**

**Case Number**
**07-11047 (CSS)**

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**Name of Creditor** (The person or other entity to whom the debtor owes money or property): **COWIFI IRONPOINT, LLC**

**Name and address where notices should be sent:**
**COWIFI IRONPOINT, LLC**
**c/o Nancy Hotchkiss, Esquire**
**Trainor Fairbrook**
**980 Fulton Avenue**
**Sacramento, California  95825**
**nhotchkiss@trainorfairbrook.com**
**Telephone: (916) 929-7000**
**Facsimile: (916) 929-7111**

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor:
0478.049

Check here if this claim ☐ replaces  ☐ amends  previously filed claim, dated: _____

**1. Basis for Claim**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☑ Other: **Unpaid rent and rejection damages under the lease of commercial real property located at 1180 Iron Point Road, Suite 200, Folsom, California**

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (Fill out below)

Last four digits of SS#: _____

Unpaid compensation for services performed

from _____ to _____
    (date)            (date)

**2. Date debt was incurred:**
**Pursuant to lease dated 6/12/06**

**3. If court judgment, date obtained:  N/A**

**4. Total Amount of Claim at Time Case Filed:**

| $ 280,415.85 | $ 26,556.00 | $ | $306,971.85 |
|---|---|---|---|
| (unsecured) | (secured) | (Priority) | (Total) |

If all or part of your claim is secured or entitled to priority, also complete Item 5 of 6 below.

☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.** (partial)
☑ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate    ☐ Motor Vehicle
☑ Other: security deposit
Value of Collateral: $ 26,556.00
Amount of arrearage and other charges at time case filed included in secured claim, if any: **$26,556.00**

**6. Unsecured Nonpriority Claim.  $280,415.85**

☑ Check this box if: a) there is no collateral or lien securing your claim; or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☑ Check this box if you have an unsecured priority claim
Amount entitled to priority $_____, plus attorneys' fees and costs, interest and late charges

Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4)
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☑ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(3).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

Date: 11/30/07

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): Trainor Fairbrook
By: *Nancy Hotchkiss* Nancy Hotchkiss, Esquire

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571

| UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE<br>AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation, et al.<br>Case Number: 07-11047 (CSS) | PROOF OF CLAIM |
| --- | --- |

Debtor was the tenant under a lease with Claimant's predecessor-in-interest for the rental of commercial real property located at 1180 Iron Point Road, Suite 200, Folsom, California ("Premises"). A true and correct copy of said lease is attached hereto.

Debtor rejected its interest in this lease effective as of August 31, 2007 pursuant to this court's entry of its Order on Debtor's Second Motion For An Order, Pursuant to Sections 105, 365 and 554 of the Bankruptcy Code and Bankruptcy Rules 6006 and 6007, Authorizing the Debtors to Reject Certain Executing Contracts and Unexpired Lease and to Abandon Certain Furniture, Fixtures and Equipment. Claimant has incurred pre-petition and rejection damages, limited by Section 502 (b)(6), as follows:

Pre-Petition Claim:

| | |
| --- | --- |
| Balance of rent for June 2007 | $   682.00 |
| Balance of rent for July 2007 | 682.00 |
| Rent for August 2007 | 23,413.00 |
| SUBTOTAL | $24,777.00 |
| Late charge of five percent (5%) per lease | 1,238.85 |
| Total Pre-Petition Claim    = | $26,015.85 |

Rejection Damages:

| | |
| --- | --- |
| Lease term would have otherwise expired June 12, 2011.<br>12 months x $23,413.00 | $280,956.00 |
| GRAND TOTAL | $306,971.85 |

Landlord holds a security deposit of $26,556.00 as partial collateral/offset for this claim.

0478049.534743.1

# CAPITAL BUILDERS

## STANDARD LEASE

### *MULTI-TENANT MULTI-BUILDING FULL SERVICE*

This Lease (the "Lease"), for reference purposes only dated ___6/12___, 2006 is entered into by and between Lampert at Iron Point, LLC, a California limited liability company ("Landlord"), whose address is c/o Capital Builders, Inc., 1130 Iron Point Road, Suite 170, Folsom, CA 95630 and American Home Mortgage Corp., a New York corporation, a wholly owned subsidiary of American Home Mortgage Investment Corp., a New York corporation ("Tenant"), whose address is 1180 Iron Point Road, Suite 200, Folsom, CA 95630. Tenant's additional address for notices is American Home Mortgage Corporation, Inc., 538 Broadhollow Road, Melville, NY 11747, Attention: Lease Administration.

1. **Terms and Definitions.** For the purposes of this Lease, the following terms shall have the following definitions:

    1.1    **Premises:** Those certain premises commonly known as 1180 Iron Point Road, Suite 200, Folsom, CA 95630 outlined on the floor plan attached as EXHIBIT A, consisting of approximately ten thousand four hundred seventy-five (10,475) rentable square feet, located on the second floor of the Building described in Paragraph 1.2.

    1.2    **Building:** The Building on the Project commonly known as 1180 Iron Point Road, Folsom, CA 95630 consisting of approximately one hundred twelve thousand seven hundred forty-five (112,745) rentable square feet.

    1.3    **Project:** The real property commonly known as Iron Point Business Park, 1110, 1120, 1130, 1150, and 1180 Iron Point Road, Folsom, CA 95630 consisting of approximately sixteen and four tenths (16.4) acres, as more particularly described in EXHIBIT B, upon which are located the Buildings and four (4) other buildings consisting of a total building square footage of approximately two hundred eleven thousand five hundred ninety-two (211,592) rentable square feet.

    1.4    **Tenant's Building Percentage:** _____9.30%_____

    1.5    **Tenant's Project Percentage:** _____4.95%_____

    1.6    **Term:** _____Sixty (60) months_____

    1.7    **Commencement Date:** If no Tenant Improvements are to be constructed, the Commencement Date shall be June 11, 2006. If Tenant Improvements are to be constructed, the Commencement Date shall be the earlier occurring of the following:

        1.7.1    The date the appropriate governmental authority has approved the Tenant Improvements constructed pursuant to EXHIBIT C evidenced by its completion of a final inspection and written approval of such improvements as so completed in accordance with the building permit issued for such improvements; or

        1.7.2    The date Tenant commences occupancy of the Premises.

    1.8    **Anticipated Commencement Date:** N/A ( ) days after the date the appropriate governmental authority has issued a building permit for the construction of the Tenant Improvements.

    1.9    **Monthly Rent:**

| Months of Term | Monthly Rent |
|---|---|
| 01 - 12 | $22,731.00 |
| 13 - 24 | $23,413.00 |
| 25 - 36 | $24,115.00 |
| 37 - 48 | $24,839.00 |
| 49 - 60 | $25,584.00 |

    1.10    **Direct Expense Base:** _____$6,913.00 ($ .66 per rentable square foot)_____ /month.

    1.11    **Security Deposit:** _____$25,584.00_____ *See Addendum*.

    1.12    **Tenant Improvements:** The improvements to be constructed by Landlord pursuant to EXHIBIT C.

    1.13    **Load Factor:** _____Thirteen percent (13%)_____

2. **Premises, Common Area and Outside Area.**

    2.1    **Premises.** Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Premises together with a right in common to use the Common Area and the Outside Area. Tenant's right to use the Common Area shall be a right in common with other tenants of the Building. Tenant's right to use the Outside Area shall be a right in common with other tenants of the Project. The parties agree that, for all purposes under this Lease, the Premises are conclusively deemed to consist of the number of rentable square feet set forth in Paragraph 1.1 above.

Initials: _____

2.2    **Common Area.** The Common Area shall be all areas and facilities within the Building designated by Landlord for the general use and convenience of Tenant and other tenants of the Building, including, without limitation, hallways, stairs, elevators, entrances and exits, restrooms, appurtenant equipment serving the Building, trash disposal facilities, and the exterior walls and windows and roof of the Building.

2.3    **Outside Area.** The Outside Area shall be all areas and facilities within the Project, exclusive of the interior of the Building and any other buildings on the Project, now or hereafter designated by Landlord for the general use and convenience of Tenant and other tenants of the Project, including, without limitation, the land underlying the Project, the parking areas, access and perimeter roads, sidewalks, landscaped areas, service areas, trash disposal facilities, and similar areas and facilities.

2.4    **Control in Landlord.** Landlord shall at all times have exclusive control of the Common Area and the Outside Area and may at any reasonable time temporarily close any part thereof, exclude and restrain anyone from any part thereof, except the bona fide customers, employees and invitees of Tenant who use such areas in accordance with the reasonable rules and regulations as Landlord may from time to time establish, and may reasonably change the configuration or location of the Common Area or the Outside Area. In exercising any such rights, Landlord shall use diligent efforts to minimize any disruption of Tenant's business. Landlord shall have the right to reconfigure the parking area and ingress to and egress from the parking area, and to modify the directional flow of traffic of the parking area.

3.    **Term.** The Term of this Lease shall be for the period set forth in Paragraph 1.6, commencing on the Commencement Date and ending on the expiration of such period, unless the Term is sooner terminated as hereinafter provided. Once the actual Commencement Date has been determined, the parties shall execute a Commencement Date Memorandum in the form attached as EXHIBIT D.

3.1    **Delivery of Possession.** If Landlord is unable to deliver possession of the Premises to Tenant on the Anticipated Commencement Date set forth in Paragraph 1.8, Landlord shall not be subject to liability therefor, nor shall such failure affect the validity of this Lease, the obligations of Tenant, or extend the Term. In such case, subject to the provisions of Paragraph 3.2, Tenant shall not be obligated to pay Rent or perform any other obligations of Tenant under this Lease, except as may be otherwise provided herein, until possession of the Premises is tendered to Tenant; provided, however, if Landlord has not delivered possession of the Premises within sixty (60) days from the Anticipated Commencement Date, subject to extension for force majeure, as Tenant's sole remedy for such delay, Tenant may, at Tenant's option with notice in writing to Landlord within ten (10) days thereafter, cancel this Lease. If such notice is not received by Landlord within such ten (10) day period, Tenant's right to cancel this Lease shall terminate and be of no further force and effect. For purposes of this Paragraph 3.1, the term "force majeure" shall refer to any delay or prevention of Landlord's delivery of the Premises by reason of acts of God, strikes, lockouts, labor troubles, inability to procure labor or materials, fire, accident, riot, civil commotion, laws or regulations of general applicability, Tenant Delays (as defined in Exhibit C), or other causes without Landlord's fault and beyond its reasonable control.

3.2    **Tenant Delays.** If the Commencement Date has not occurred on or before the Anticipated Commencement Date due to a Tenant Delay (as defined in Exhibit C), then notwithstanding any other provision hereof, the Commencement Date of this Lease shall be the date specified as the Anticipated Commencement Date and Tenant shall commence payment to Landlord of the Monthly Rent and Additional Rent due hereunder.

3.3    **Early Entry.** If Tenant is permitted to occupy the Premises prior to the Commencement Date for the purpose of fixturing or any other purpose permitted by Landlord, such early entry shall be at Tenant's sole risk and subject to all the terms and provisions hereof (including, without limitation, Tenant's indemnification and insurance obligations under Paragraph 19 of this Lease), except for the payment of Monthly Rent which shall commence on the date set forth in Paragraph 4.1. Landlord shall have the right to impose such additional conditions on Tenant's early entry as Landlord shall deem appropriate, and shall further have the right to require that Tenant execute an early entry agreement containing such conditions prior to Tenant's early entry.

4.    **Rent.**

4.1    **Monthly Rent.** Tenant shall pay to Landlord, in lawful money of the United States, commencing on the first day of the month specified in Paragraph 1.9 and continuing on the first day of each calendar month thereafter throughout the Term, the Monthly Rent set forth in Paragraph 1.9, except that the first Monthly Rent payment due shall be paid upon execution. The Monthly Rent includes the Direct Expenses Base set forth in Paragraph 1.10. Monthly Rent shall be payable in advance, without abatement, right of recoupment, deduction, claim, offset, prior notice or demand. Monthly Rent for any partial month shall be prorated. The Monthly Rent is calculated on the rentable square footage of the Premises which is established by measurement of the usable square footage of the Premises by Landlord's architect (using the method for calculating usable area set forth in the American National Standard Method of Measuring Floor Area in Office Buildings, ANSI Z65.1-1980 (Reaffirmed 1989), published by the Building Owners and Managers Association International), plus the load factor set forth in Paragraph 1.13.

4.2    **Direct Expenses.** The term "Direct Expenses" shall mean Tenant's Building Percentage of Building Operating Expenses and Tenant's Project Percentage of Outside Area Expenses.

4.2.1    *Direct Expense Base.* The term "Direct Expense Base" shall mean the amount of monthly Direct Expenses which is included in the base Monthly Rent. For the purposes of this Lease, the Direct Expense Base is the amount set forth in Paragraph 1.10. Tenant acknowledges that the Monthly Rent has been established utilizing the Direct Expense Base, and that a higher Direct Expense Base would have resulted in a higher Monthly Rent. Tenant acknowledges that Landlord has not made any representation about the actual or anticipated Direct Expenses for the current calendar year or any other year.

4.2.2    *Tenant's Building Percentage.* Tenant's Building Percentage shall be determined by dividing the approximate rentable square footage of the Premises by the approximate total rentable square footage of the Building. For the purposes of this Lease, Tenant's Building Percentage is agreed to be the percentage set forth in Paragraph 1.4.

4.2.3    *Tenant's Project Percentage.* Tenant's Project Percentage shall be determined by dividing the approximate rentable square footage of the Premises by the approximate total rentable square footage of all buildings on the Project. For the purposes of this Lease, Tenant's Project Percentage is agreed to be the percentage set forth in Paragraph 1.5.

Initials:

4.020303

4.2.4 *Building Operating Expenses.* Tenant's Building Percentage of Building Operating Expenses shall be included within the Direct Expenses and paid by Tenant as and with Monthly Rent. The term "Building Operating Expenses" shall mean all expenses paid or incurred by Landlord in connection with the operation, maintenance, cleaning and repair of the Building and the Common Area including, without limitation, the cost of all utilities for the Building and Common Area, the cost of all supplies, materials and labor used in the operation, repair and maintenance of the Building and the Common Area, the cost of all insurance which Landlord or Landlord's lender deems necessary for the Building and the Common Area, repairs and replacements to the Building and Common Area which Landlord deems to be necessary or appropriate for the continued operation of the Building. Also included in Building Operating Expenses, but subject to the limitations set forth in Paragraph 4.2.8 below, shall be the cost of any capital improvements made by Landlord which (i) are required by any governmental authority, or (ii) effect a labor saving, energy saving or other economy.

4.2.5 *Outside Area Expenses.* Tenant's Project Percentage of Outside Area Expenses shall be included within Direct Expenses and paid by Tenant as and with Monthly Rent. The term "Outside Area Expenses" shall mean all expenses paid or incurred by Landlord in connection with the operation, maintenance, cleaning and repair of the Outside Area including, without limitation, real property taxes and assessments levied against the Project, the cost of insurance policies covering the Outside Area, the cost (including all sales, use, and excise taxes thereon) of labor, materials, supplies and services used or consumed in operating, maintaining, cleaning and repairing the Outside Area, including landscaping and sprinkler systems, concrete walkways and paved parking areas, signs and site lighting, and all utilities provided to the Outside Area, Owners' Association assessments, a reasonable management fee for the Project or the Building (it being acknowledged that the property management company may be owned or controlled by Landlord or its affiliates), and repairs or replacements to Outside Area which Landlord deems to be necessary or appropriate for the continued operation of the Project. Also included in Outside Area Expenses, but subject to the limitations set forth in Paragraph 4.2.8 below, shall be the cost of any capital improvements to the Outside Area which (i) are required by any governmental authority, or (ii) effect a labor saving, energy saving or other economy. As used in this Paragraph, the term 'real property taxes and assessments levied against the Project" shall include any form of real estate tax or assessment, general, special, ordinary or extraordinary, and any license fee, commercial rental tax, improvement bond or bonds, levy or tax (other than inheritance, personal income or estate taxes) imposed on the Building or the Project or any portion thereof by any authority having the direct or indirect power to tax, including any city, county, state or federal government, or any school, agricultural, sanitary, fire, street, drainage or other improvement district thereof, as against any legal or equitable interest of Landlord in the Building or the Project or in any portion thereof, or as against Landlord's right to rent or other income therefrom, or as against Landlord's business of leasing the Project. Real property taxes and assessments shall also include any expenses, including attorneys' fees, reasonably incurred by Landlord in seeking reduction by the taxing authority of any such taxes, less tax refunds obtained as a result of Landlord's application for review.

4.2.6 *Adjustment.* If the Direct Expenses paid or incurred by Landlord for any calendar year exceed the Direct Expense Base included in Tenant's base Monthly Rent, then Tenant shall pay such excess as Additional Rent. Within one hundred twenty (120) days following the end of each calendar year, Landlord shall furnish Tenant a statement of the Direct Expenses for the calendar year, however, Landlord's failure to timely provide such statement shall not constitute a waiver of Tenant's obligation to pay Additional Rent. If the Direct Expense Base is less than the actual Direct Expenses, Tenant shall pay Landlord the deficiency as Additional Rent within ten (10) days after receipt of such statement. In addition, for each year after the first calendar year or portion thereof, Tenant shall pay Landlord's estimate of the amount by which Direct Expenses for that year will exceed the Direct Expenses Base. This estimated amount shall be divided into twelve (12) monthly installments. Tenant shall pay Landlord as Additional Rent one monthly installment of such estimate concurrently with the regular Monthly Rent payment next due following receipt of Landlord's statement, and thereafter with the regular Monthly Rent payments due for the balance of that calendar year, until the next calendar year statement is delivered by Landlord. If, in any calendar year, the actual Direct Expenses are less than Landlord's estimate for that year, Landlord shall credit any overpayment against the Direct Expenses next thereafter due to Landlord. Notwithstanding any other provision hereof, if Landlord incurs costs, including Landlord's administrative costs which relate only to the Premises or Tenant's use of the Premises or the Project, such costs shall be payable solely by Tenant. Landlord may either bill such costs directly to Tenant, in which case Tenant shall pay such costs within ten (10) days of receipt of a statement therefor, or Landlord may include such costs on the statement of Direct Expenses payable by Tenant.

For a period of three (3) months after receipt of each annual statement of the Direct Expenses, Tenant shall be entitled, upon thirty (30) days prior written notice and during normal business hours, at the office of the Building's property manager or such other place as Landlord shall designate, to inspect and examine those books and records of Landlord relating to the determination of Additional Rent for the immediately preceding calendar year. Failure of Tenant to request such inspection within such three (3) month period shall render such statement of Direct Expenses conclusive and binding on Tenant. If, after inspection and examination of such books and records, Tenant disputes the amounts of Additional Rent charged by Landlord, Tenant may, by written notice to Landlord, request an independent audit of such books and records. The independent audit of the books and records shall be conducted by a certified public accountant ("CPA") acceptable to both Landlord and Tenant. If, within thirty (30) days after Landlord's receipt of Tenant's notice requesting an audit, Landlord and Tenant are unable to agree on the CPA to conduct such audit, then Landlord may designate a nationally recognized accounting firm not then employed by Landlord or Tenant to conduct such audit. The audit shall be limited to the determination of the amount of Additional Rent for the subject calendar year. If the audit discloses that the amount of the Additional Rent billed to Tenant was incorrect, the appropriate party shall pay to the other party the deficiency or overpayment, as applicable. All costs and expenses of the audit shall be paid by Tenant unless the audit shows that Landlord overstated Direct Expenses for the subject calendar year by more than five percent (5%), in which case Landlord shall pay all costs and expenses of the audit. Tenant and the CPA shall keep any information gained from such audit confidential and shall not disclose it to any other party. The exercise by Tenant of the audit rights hereunder shall not relieve Tenant of its obligation to timely pay all sums due hereunder, including, without limitation, the disputed Additional Rent.

4.2.7 *Occupancy Adjustment.* If at any time during the Term, less than ninety-five percent (95%) of the Building is occupied, then, during such period, the Building Operating Expenses and Outside Area Expenses which vary depending upon the occupancy rate of the Building, shall be adjusted by Landlord to reasonably approximate the amount of such expenses which would have been incurred if the Building had been ninety-five percent (95%) occupied.

Initial

4620303

4.2.8  *Limitation on Major Expenditures.*  If the cost of any single replacement or capital improvement under Paragraphs 4.2.4 and 4.2.5 above (each of which is hereinafter referred to as a "Major Expenditure") shall exceed ten percent (10%) of the Direct Expenses for the calendar year in which such cost is incurred, then no more than the amount equal to the 10% limit shall be charged in the year incurred and each subsequent year until fully recovered. The unpaid balance of the Major Expenditure, together with interest thereon at the Landlord's cost of funds prevailing as of the date that the Major Expenditure is completed, shall be carried forward to subsequent calendar years, provided that in no given calendar year shall more than ten percent (10%) of the original cost of the Major Expenditure be included for purposes of calculating Tenant's liability for Direct Expenses.

4.2.9  *Allocation of Certain Direct Expenses.*  Tenant acknowledges that, in order to achieve an equitable allocation of the Direct Expenses among the various tenants in the Project, Landlord may allocate specific Direct Expenses to certain components of the Project (e.g. to the Building or another building located in the Project). For example, expenses for management fees and real property taxes and assessments allocated to a building devoted to industrial use might be less, on a per square foot of rentable area basis, than those allocated to a building used for office purposes. Such allocation shall not be inconsistent with generally accepted accounting principles applied on a consistent basis.

4.3  **Additional Rent.**  Additional Rent shall mean all monies required to be paid by Tenant under this Lease, including, without limitation, repair and maintenance charges, Direct Expenses and attorneys' fees.

4.4  **Rent.**  Rent shall mean Monthly Rent plus Additional Rent.

5.  **Late Payment Charges.**  Tenant acknowledges that late payment by Tenant to Landlord of Rent and other charges provided for under this Lease will cause Landlord to incur costs not contemplated by this Lease, the exact amount of such costs being extremely difficult or impracticable to fix. Therefore, if any installment of Rent or any other charge due from Tenant is not received by Landlord when *due, Tenant shall pay to Landlord an additional sum equal to five percent (5%) of the amount overdue as a late charge. The parties agree that this late charge represents a fair and reasonable estimate of the costs that Landlord will incur by reason of the late payment by Tenant.  *See Addendum*

Initials:

Landlord    Tenant

6.  **Security Deposit.**  Tenant has deposited with Landlord the Security Deposit set forth in Paragraph 1.11 for the full and faithful performance of every provision of this Lease to be performed by Tenant. If Tenant defaults with respect to any provision of this Lease, Landlord may apply all or any part of the Security Deposit for the payment of any Rent or other sum in default, the repair of such damage to the Premises or the payment of any other amounts which Landlord may spend or become obligated to spend by reason of Tenant's default or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of Tenant's default to the full extent permitted by law. If any portion of the Security Deposit is so applied, Tenant shall, within ten (10) days after written demand therefor, deposit cash with Landlord in an amount sufficient to restore the Security Deposit to its original amount. If Tenant is not otherwise in default, the Security Deposit or any balance thereof shall be returned to Tenant within thirty (30) days of termination of the Lease.

7.  **Holding Over.**  If Tenant remains in possession of all or any part of the Premises after the expiration of the Term, with or without the express or implied consent of Landlord, such tenancy shall be from month-to-month only and not a renewal hereof or any extension for any further term, and in such case, Monthly Rent shall be payable at a rate equal to one hundred twenty-five percent (125%) of the Monthly Rent in effect at the time of expiration, and at the time specified in this Lease, and such month-to-month tenancy shall be subject to every other term, covenant and agreement of this Lease. If Tenant fails to surrender the Premises upon the expiration of the Term, Tenant shall indemnify and hold Landlord harmless from all liability, cost or expense, including attorneys' fees and costs, and any claim made by any succeeding tenant based upon or resulting from Tenant's failure to timely surrender the Premises.

8.  **Condition of Premises.**  If no Tenant Improvements are to be constructed by Landlord, Tenant acknowledges that Tenant has inspected the Premises and accepts the Premises as of the Commencement Date in their "as is" condition. Tenant acknowledges that neither Landlord nor its agents have made any representations or warranties as to the suitability or fitness of the Premises for the conduct of Tenant's business or for any other purpose, nor has Landlord or its agents agreed to undertake any Alterations or construct any Tenant Improvements to the Premises except as expressly provided in this Lease. If Tenant Improvements are to be constructed by Landlord, within ten (10) days after completion of the Tenant Improvements, Tenant shall conduct a walk-through inspection of the Premises with Landlord and complete a punch-list of items needing additional work by Landlord. Other than the items specified in the punchlist, by taking possession of the Premises, Tenant shall be deemed to have accepted the Premises as improved with the Tenant Improvements in good, clean and completed condition and repair, subject to all applicable laws, codes and ordinances.

9.  **Use of the Premises.**

9.1  **Tenant's Use.**  Tenant shall use the Premises solely for general office purposes and purposes incidental thereto and shall not use the Premises for any other purpose.

9.2  **Compliance.**  Tenant shall not use the Premises or suffer or permit anything to be done in or about the Project which will in any way conflict with any law, statute, zoning restriction, ordinance or governmental law, rule, regulation or requirement of duly constituted public authorities now in force or which may hereafter be in force, or the requirements of the Board of Fire Underwriters or other similar body now or hereafter constituted relating to or affecting the condition, use or occupancy of the Premises or the Project. Tenant shall, at its cost, comply with all present and future regulations, rules, laws, ordinances, and requirements of all governmental authorities, arising from the use or occupancy of, or applicable to the Premises or the Project or privileges appurtenant thereto, including, without limitation, The Americans With Disabilities Act of 1990 (42 U.S.C. 12101 et seq.), any amendment thereto or regulations promulgated thereunder, or state or local ordinances or codes enacted pursuant thereto (collectively, the "ADA"), and any transportation systems management program adopted by the County or other governmental authority. The cost of all such compliance (including capital expenditures) shall be borne by Tenant. Tenant shall not commit any public or private nuisance or any other act or thing which might or would disturb the quiet enjoyment of any other tenant of Landlord or any occupant of nearby property. Tenant shall place no loads upon the floors, walls or ceilings in excess of the maximum designed load determined by Landlord or which endanger the structure; nor place any harmful liquids in the drainage systems; nor dump or store waste materials or refuse or allow such to remain outside the Building

Initials:

4.020303

proper, except in the enclosed trash areas provided, if any. Tenant shall not store or permit to be stored or otherwise placed any other material of any nature whatsoever outside the Building. In particular, Tenant, at its sole cost, shall comply with all laws relating to the storage, use and disposal of hazardous, toxic or radioactive matter, including those materials identified in Sections 66680 through 66685 of Title 22 of the California Administrative Code, Division 4, Chapter 30 ("Title 22") as they may be amended from time to time (collectively "Toxic Materials"). If Tenant does store, use or dispose of any Toxic Materials, Tenant shall notify Landlord in writing at least ten (10) days prior to their first appearance on the Premises.

10.    **Quiet Enjoyment.** Subject to the terms of this Lease, and upon Tenant's performance of all of its obligations hereunder, Tenant shall have quiet and peaceful possession of the Premises as against Landlord or any of Landlord's successors or assigns.

11.    **Alterations.** Except as expressly provided, Tenant shall not make or permit any alterations, additions or improvements ("Alterations") in, on or about the Premises, except for nonstructural Alterations not exceeding Five Thousand and no/100ths Dollars ($5,000.00) in cost, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, and according to plans and specifications reasonably approved in writing by Landlord. Notwithstanding the foregoing, Tenant shall not make any (i) Alterations to the exterior of the Building; (ii) Alterations to and penetrations of the roof of the Building; (iii) Alterations visible from outside the Building; (iv) Alterations that would adversely affect the structure or safety of the Building or its electrical, plumbing, HVAC, mechanical or safety systems, or (v) Alterations that would create an obligation on Landlord's part to make modifications to the Building or Project (in order, for example, to comply with laws such as the ADA mandating building accessibility for persons with disabilities). The parties agree that it would be reasonable for the Landlord to deny consent to a proposed Alteration if Tenant fails to post a completion bond or otherwise demonstrate adequate financial ability to pay all costs in connection with the proposed Alteration. All Alterations shall be installed at Tenant's sole expense, in compliance with all applicable laws and permit requirements (including, without limitation, the ADA), by a licensed contractor, in a good and workmanlike manner conforming in quality and design with the Premises existing as of the Commencement Date, and not diminish the value of either the Building or the Premises. All Alterations made by Tenant shall be and become the property of Landlord upon installation and shall not be deemed Tenant's personal property; provided, however, that Landlord may, at its option, at the time that Tenant requests Landlord's approval for any Alterations, require that Tenant, at Tenant's expense, remove any or all nonstructural Alterations installed by Tenant and return the Premises to their condition as of the Commencement Date of this Lease, normal wear and tear excepted and subject to the provisions of Paragraph 21. Notwithstanding any other provision of this Lease, Tenant shall be solely responsible for the maintenance and repair of any Alterations made by it to the Premises.

12.    **Surrender of the Premises.** Upon the expiration or earlier termination of the Term, Tenant shall surrender the Premises to Landlord in its condition existing as of the Commencement Date, normal wear and tear and fire or other casualty excepted, with all interior areas cleaned. Tenant shall remove from the Premises all of Tenant's Alterations required to be removed pursuant to Paragraph 11, and all Tenant's personal property and repair any damage and perform any restoration work caused by such removal. If Tenant fails to remove such Alterations and Tenant's personal property, and such failure continues after the termination of this Lease, Landlord may retain such property and all rights of Tenant with respect to it shall cease, or Landlord may place all or any portion of such property in public storage for Tenant's account. Tenant shall be liable to Landlord for costs of removal of any such Alterations and Tenant's personal property and storage and transportation costs of same, and the cost of repairing and restoring the Premises, together with interest at the maximum rate permitted by law from the date of expenditure by Landlord.

13.    **Taxes on Alterations and Personal Property.** Notwithstanding any other provision hereof, Tenant shall pay the full amount of any increase in real property taxes during the Term resulting from any and all Alterations of any kind whatsoever placed in, on or about the Premises and the Project for the benefit of, at the request of, or by Tenant. Tenant shall pay prior to delinquency all taxes assessed or levied against Tenant's personal property in, on or about the Premises. When possible, Tenant shall cause its personal property to be assessed and billed separately from the real or personal property of Landlord.

14.    . **Utilities and Services.**

    14.1    **Utilities Provided.** Provided that Tenant is not in default of this Lease, Landlord agrees to furnish or cause to be furnished to the Premises the utilities and services described in the Standards for Utilities and Services, attached as EXHIBIT E, subject to the conditions and in accordance with the standards set forth therein. Landlord shall not be liable in damages or otherwise for any failure or interruption of any utility service or other service furnished to the Premises when such failure is caused by accident, breakage, or repairs; strikes, lockouts or other labor disturbance or labor dispute of any character governmental regulation, moratorium or other governmental action; inability despite the exercise of reasonable diligence to obtain electricity, water or fuel; or by any other cause beyond Landlord's reasonable control. In the event of any failure, stoppage or interruption thereof, Landlord shall diligently attempt to promptly resume service.

    14.2    **Telephone.** Tenant shall be responsible for direct payment of the cost of telephone service or any other communication system utilized by Tenant on the Premises. The cost of installing such services shall also be paid by Tenant.

15.    **Repair and Maintenance.**

    15.1    **Landlord's Obligations.** Landlord shall maintain the Building, including the Premises, exterior and interior walls, plumbing, HVAC and electrical systems, the roof, and the Common Area and the Outside Area in good order, condition and repair. Except as provided in Paragraph 15.2, the cost of all repairs and maintenance shall be included in Direct Expenses. It is a condition precedent to all obligations of Landlord to repair and maintain the Premises that Tenant shall have notified Landlord in writing of the need for such repairs or maintenance. Except as provided in Paragraphs 21.1 and 21.2, there shall be no abatement of rent and no liability of Landlord for any injury to or interference with Tenant's business arising from any repairs, alterations or improvements in or to any portion of the Building or the Premises. Except as provided in this Paragraph 15.1, Landlord shall have no obligation whatsoever to improve or repair the Premises, nor has Landlord made any other representations to Tenant respecting the condition of the Premises or the Project.

    15.2    **Tenant's Obligations.** Except for those areas that are Landlord's responsibility pursuant to Paragraph 15.1 above, Tenant shall, at Tenant's sole cost and expense, keep the entire Premises secure, clean, and in good order, condition and repair, and shall make promptly all necessary repairs including extraordinary and unforeseen repairs (as used in this Paragraph, the term "repairs" shall include alterations, replacements or renewals). All repairs shall be equal in quality and class to the original work.

    15.3    **Waiver.** Landlord and Tenant agree that the terms of this Lease shall govern the respective obligations of Landlord and Tenant with respect to repairs and maintenance. Accordingly, Tenant waives the provisions of Sections 1932(1), 1941 and 1942 of the California Civil Code and any similar or successor law regarding Tenant's right to make repairs and deduct the expenses of such repairs from the Rent due under this Lease.

Initials: CK

16.     Liens.  Tenant shall keep the Building and the Project free from any liens arising out of any work performed, materials furnished or obligations incurred by or on behalf of Tenant and hereby indemnifies and holds Landlord and its agents, officers, partners and employees harmless from all liability and cost, including attorneys fees and costs, in connection with or arising out of any such lien or claim of lien. Tenant shall cause any such lien imposed to be released of record by payment or posting of a proper bond acceptable to Landlord within ten (10) days after written request by Landlord. Tenant shall give Landlord written notice of Tenant's intention to perform work on the Premises which might result in any claim of lien at least ten (10) days prior to the commencement of such work to enable Landlord to post and record a Notice of Nonresponsibility or other notice reasonably deemed proper by Landlord. If Tenant fails to so remove any such lien within the prescribed ten (10) day period, then Landlord may do so and Tenant shall reimburse Landlord upon demand. Such reimbursement shall include all sums incurred by Landlord including Landlord's reasonable attorneys' fees, with interest thereon at the maximum rate permitted by law.

17.     Landlord's Right to Enter the Premises.  Tenant shall permit Landlord and its agents, employees and contractors to enter the Premises at all reasonable times with reasonable notice, except for emergencies in which case no notice shall be required, to inspect the same, to post Notices of Nonresponsibility and similar notices, to show the Premises to interested parties such as prospective lenders and purchasers, to make necessary repairs, to discharge Tenant's obligations hereunder when Tenant has failed to do so within a reasonable time after written notice from Landlord, and at any reasonable time within one hundred eighty (180) days prior to the expiration of the Term, to place upon the Building or in the Outside Area ordinary "For Lease" signs and to show the Premises to prospective tenants, provided, however, that if Tenant is not in possession of the Premises, Landlord shall be permitted to post such signs and show the Premises at any time. The above rights are subject to reasonable security regulations of Tenant, and to the requirement that Landlord shall at all times act in a manner to cause the least possible interference with Tenant's business.

18.     Signs.  Tenant shall have the right to a Tenant identification sign at the entry to the Premises and to have Tenant's name listed on the Building directory. Tenant shall have no right to maintain a Tenant identification sign in any other location in, on or about the Premises, the Building or the Project and shall not display or erect any other Tenant identification sign, display or other advertising material that is visible from the exterior of the Building. The size, design, color and other physical aspects of the Tenant identification sign shall be subject to Landlord's prior written approval and appropriate municipal or other governmental approvals. Landlord shall install and maintain, as necessary, Tenant's identification sign. Tenant shall reimburse Landlord for the cost of the sign and its installation and maintenance within five (5) days after receipt of a statement of such costs from Landlord. The cost of removing the sign, including any repair to the Premises or the Building necessitated by such removal shall be deducted from the Security Deposit, or at Landlord's election, shall be billed to Tenant as provided above.

19.     Insurance.

        19.1    Indemnification.  Tenant hereby agrees to defend, indemnify and hold harmless Landlord and its agents, partners, officers and employees from and against any and all damage, loss, liability or expense including, without limitation, attorneys' fees and legal costs suffered directly or by reason of any claim, suit or judgment brought by or in favor of any person or persons for damage, loss or expense due to, but not limited to, bodily injury and property damage sustained by such person or persons which arises out of, is occasioned by or in any way attributable to the use or occupancy of the Premises, the Building or the Project or any part thereof and adjacent areas by the Tenant, the acts or omissions of the Tenant, its agents, employees or any contractors brought onto the Premises, the Building or the Project by Tenant, except to the extent (i) caused by the negligence or willful misconduct of Landlord or its agents, partners, officers or employees, and (ii) not covered by insurance actually carried (or required to be carried) by Tenant. Tenant agrees that the obligations assumed herein shall survive this Lease.

        19.2    Tenant's Insurance.  Tenant agrees to maintain in full force and effect at all times during the Term, at its own expense, for the protection of Tenant and Landlord, as their interests may appear, policies of insurance issued by a responsible carrier or carriers acceptable to Landlord which afford the following coverages:

                19.2.1   Liability.  Commercial general liability insurance providing coverage on an occurrence form basis with limits of not less than Two Million and No/100ths Dollars ($2,000,000.00) each occurrence for bodily injury and property damage combined, Two Million and No/100ths Dollars ($2,000,000.00) annual general aggregate, and Two Million and No/100ths Dollars ($2,000,000.00) products and completed operations annual aggregate, having coverage at least as broad as the Insurance Services Office Commercial General Liability Policy form CG 00 01. Tenant's liability insurance policy or policies shall: (i) include premises and operations liability coverage, products and completed operations liability coverage, broad form property damage coverage, blanket contractual liability coverage including, to the maximum extent possible, coverage for the indemnification obligations of Tenant under this Lease, and personal and advertising injury coverage; (ii) provide that the insurance company has the duty to defend all insureds under the policy; (iii) provide that defense costs are paid in addition to and do not deplete any of the policy limits; (iv) cover liabilities arising out of or incurred in connection with Tenant's use or occupancy of the Premises or the Project; (v) extend coverage to cover liability for the actions of Tenant's representatives and visitors; (vi) contain a cross liability endorsement or separation of insureds clause; (vii) provide that any waiver of subrogation rights or release prior to a loss does not void coverage; (viii) provide that it is primary to and not contributing with, any policy of insurance carried by Landlord covering the same loss; (ix) provide that any failure to comply with the reporting provisions shall not affect coverage provided to Landlord, its partners, property managers and mortgagees; and (x) name Landlord, its partners, the property manager, mortgagees, and such other parties in interest as Landlord may from time to time reasonably designate to Tenant in writing, as additional insureds. Such additional insured shall be provided the same extent of coverage as provided to Tenant under such policies. All endorsements effecting such additional insured status shall be acceptable to Landlord and shall be at least as broad as additional insured endorsement form number CG 20 11 promulgated by the Insurance Services Office.

                19.2.2   Personal Property.  With respect to Tenant's trade fixtures and personal property, commercial property insurance providing coverage, at a minimum, for "special form" perils, to the extent of the full replacement cost of covered property, having coverage at least as broad as the Insurance Services Office Special Form Cause of Loss, CP 00 30, and for business income coverage for a minimum of twelve (12) months, having coverage at least as broad as Insurance Services Office form CP 00 30. Tenant may carry such insurance under a blanket policy, provided that such policy provides equivalent coverage to a separate policy. During the Term, the proceeds from any such policies of insurance shall be used for the repair or replacement of the trade fixtures and personal property so insured. Landlord shall be provided coverage under such insurance to the extent of its insurable interest and, if requested by Landlord, both Landlord and Tenant shall sign all documents reasonably necessary or proper in connection with the settlement of any claim or loss under such insurance. Landlord will have no obligation to carry insurance on Tenant's trade fixtures or personal property.

19.3    **Landlord's Insurance.** During the Term, Landlord shall maintain in effect insurance on the Building against "special form" perils (to the extent such coverages are available), with responsible insurers, insuring the Building and the Tenant Improvements in an amount equal to at least ninety percent (90%) of the replacement cost therof, excluding land, foundations, footings and underground installations. Landlord may, but shall not be obligated to, carry insurance against additional perils and/or in greater amounts. If Landlord's insurance premiums are increased after the Commencement Date due to Tenant's use of the Premises or any other cause solely attributable to Tenant, Tenant shall pay the full amount of the increase within ten (10) days of notice of such increase.

19.4    **Co-Insurer.** If, due to Tenant's failure to comply with the foregoing provisions, Landlord is adjudged a co-insurer by its insurance carrier, then, any loss or damage Landlord sustains by reason thereof, including attorneys' fees and costs, shall be borne by Tenant and shall be immediately paid by Tenant upon receipt of a bill therefor and evidence of such loss.

19.5    **Insurance Requirements.** All insurance carried by Tenant shall be in a form satisfactory to Landlord and shall be carried with companies that have a general policy holder's rating of not less than "A" and a financial rating of not less than Class "X" in the most current edition of *Best's Insurance Reports*. Tenant shall provide to Landlord evidence that the insurance required to be carried by Tenant pursuant to this Paragraph 19, including any endorsement effecting the additional insured status, is in full force and effect and that premiums therefor have been paid. Such evidence shall, at Landlord's discretion, be in either form of (i) an ACORD form 25-S (as to liability insurance) (or its equivalent) and an ACORD Form 27 (as to property insurance) (or its equivalent), or (ii) a certified copy of the original policy, in either event providing that the insurer will provide Landlord with at least thirty (30) days prior written notice before any termination or amendment to the policy. If Tenant fails to procure and maintain the insurance required hereunder Landlord may upon written notice to Tenant, order such insurance at Tenant's expense and Tenant shall reimburse Landlord upon demand. Such reimbursement shall include all sums incurred by Landlord, including Landlord's reasonable attorneys' fees and costs, with interest thereon at the maximum rate permitted by law.

19.6    **Landlord's Disclaimer.** Landlord and its agents, partners, officers and employees shall not be liable for any loss or damage to persons or property resulting from fire, explosion, falling plaster, glass, tile or sheetrock, steam, gas, electricity, water or rain which may leak from any part of the Building, or from the pipes, appliances or plumbing works therein or from the roof, street or subsurface or whatsoever, except to the extent (i) caused by or due to the negligence, or willful acts of Landlord, and (ii) not covered by insurance actually carried (or required to be carried) by Tenant. Landlord and its agents, partners, officers and employees shall not be liable for interference with the light, air, or any latent defect in the Premises. Tenant shall give prompt written notice to Landlord in case of a casualty, accident or repair needed in the Premises.

19.7    **Increase in Policy Limits.** Tenant shall increase the amounts of insurance as required by any mortgagee, and, not more frequently than once every three (3) years, as recommended by Landlord's insurance broker, if, in the opinion of either of them, the amount of insurance then required under this Lease is not adequate. Any limits set forth in this Lease on the amount or type of coverage required by Tenant's insurance shall not limit the liability of Tenant under this Lease.

20.    **Waiver of Subrogation.** Landlord and Tenant each hereby waive all rights of recovery against the other on account of loss and damage occasioned to such waiving partly for its property or the property of others under its control to the extent that such loss or damage is insured against under any insurance policies which may be in force at the time of such loss or damage. Tenant and Landlord shall, upon obtaining policies of insurance required hereunder, give notice to the insurance carrier that the foregoing mutual waiver of subrogation is contained in this Lease and Tenant and Landlord shall cause each insurance policy obtained by such party to provide that the insurance company waives all right of recovery by way of subrogation against either Landlord or Tenant in connection with any damage covered by such policy.

21.    ` **Damage or Destruction.**

21.1    **Partial Damage-Insured.** If the Premises are damaged by any casualty which is covered under the "special form" insurance carried by Landlord pursuant to Paragraph 19.3, then Landlord shall restore such damage, provided insurance proceeds are available to pay at least ninety percent (90%) or more of the cost of restoration and provided such restoration can be completed within one hundred twenty (120) days after the commencement of the work in the reasonable opinion of a registered architect or engineer appointed by Landlord for such determination. In such event, this Lease shall continue in full force and effect, except that Tenant shall be entitled to a proportionate reduction of Monthly Rent while such restoration takes place, such proportionate reduction to be based upon the extent to which the restoration efforts interfere with Tenant's use of the Premises, as reasonably agreed upon between Tenant and Landlord.

21.2    **Partial Damage - Uninsured.** If the Premises or the Building is damaged by a risk not covered by Landlord's insurance, or the proceeds of available insurance are less than ninety percent (90%) of the cost of restoration, or the restoration cannot be completed within one hundred twenty (120) days after the commencement of work, in the reasonable opinion of the registered architect or engineer appointed by Landlord for such determination, then Landlord shall have the option either to (i) repair or restore such damage, this Lease continuing in full force and effect, but the Monthly Rent to be proportionately abated as provided in Paragraph 21.1; or (ii) give notice to Tenant at any time within thirty (30) days after such damage terminating this Lease as of a date to be specified in such notice, which date shall be not less than thirty (30) nor more than sixty (60) days after giving such notice. If notice of termination is given, this Lease shall expire and all interest of Tenant in the Premises shall terminate on such date so specified in such notice and the Monthly Rent, reduced by any proportionate reduction based upon the extent, if any, to which such damage interfered with the use of the Premises by Tenant, shall be paid to the date of such termination.

21.3    **Total Destruction.** If the Premises or the Building is totally destroyed or the Premises or Building, as the case may be, cannot be reasonably restored under applicable laws and regulations or due to the presence of hazardous factors such as earthquake faults, chemical waste and similar dangers, notwithstanding the availability of insurance proceeds, this Lease shall be terminated effective the date of the damage.

21.4    **Landlord's Obligations.** Landlord shall not be required to repair any injury or damage by fire or other cause, or to make any restoration or replacement of any panelings, decorations, partitions, railings, floor coverings, office fixtures which are Alterations or personal property installed in the Premises by Tenant or at the expense of Tenant, Tenant shall be obligated to restore or replace any of the same which Tenant elects to restore or replace. Except for abatement of Monthly Rent, if any, Tenant shall have no claim against Landlord for any damage suffered by reason of any such damage, destruction, repair or restoration; nor shall Tenant have the right to terminate this Lease as the result of any statutory provision now or hereafter in effect pertaining to the damage and destruction of the Premises, except as expressly provided herein.

Initials: CJC
                m/h

21.5    **Damage Near End of Term.** Anything herein to the contrary notwithstanding, if the Premises or the Building is destroyed or damaged during the last twelve (12) months of the Term, then Landlord may cancel and terminate this Lease as of the date of the occurrence of such damage. If Landlord does not elect to so terminate this Lease, the repair of such damage shall be governed by the other provisions of this Paragraph 21.

21.6    **Waiver.** Landlord and Tenant agree that the terms of this Lease shall govern the respective obligations of Landlord and Tenant with respect to repairs and maintenance. Accordingly, Tenant waives the provisions of Sections 1932(2) and 1933(4) of the California Civil Code and any similar or successor law with respect to damage or destruction of leased premises or with respect to the termination of a lease agreement in the event of such damage or destruction.

22.    **Condemnation.** If title to all of the Premises, the Building or the Project or so much thereof is taken or appropriated for any public or quasi-public use under any statute or by right of eminent domain so that reconstruction of the Premises or the Building will not, in Landlord's and Tenant's mutual reasonable judgment, result in the Premises being suitable for Tenant's continued occupancy for the uses and purposes permitted by this Lease, this Lease shall terminate as of the date that possession of the Premises or Building or part thereof be taken. A sale by Landlord to any authority having the power of eminent domain, either under threat of condemnation or while condemnation proceedings are pending, shall be deemed a taking under the power of eminent domain for all purposes of this paragraph. If any part of the Premises, the Building or the Project is taken and the remaining part is reasonably suitable for Tenant's continued occupancy for the purposes and uses permitted by this Lease, this Lease shall, as to the part so taken, terminate as of the date that possession of such part of the Premises or Building is taken. If the Premises are partially taken the Rent and other sums payable hereunder shall be reduced in the same proportion that Tenant's use and occupancy of the Premises is reduced. No award for any partial or entire taking shall be apportioned. Tenant assigns to Landlord its interest in any award which may be made in such taking or condemnation, together with any and all rights of Tenant arising in or to the same or any part thereof. Nothing contained herein shall be deemed to give Landlord any interest in or require Tenant to assign to Landlord any separate award made to Tenant for the taking of Tenant's personal property, for the interruption of Tenant's business, or its moving costs, or for the loss of its good will. No temporary taking of the Premises shall terminate this Lease or give Tenant any right to any abatement of Rent. Any award made to Tenant, by reason of such temporary taking shall belong entirely to Tenant. Each party agrees to execute and deliver to the other all instruments that may be required to effectuate the provisions of this paragraph. Tenant waives the provisions of California Code of Civil Procedure Section 1265.130 and any similar or successor law allowing either party to petition the Superior Court to terminate this Lease in the event of a partial taking of the Premises.

23.    **Assignment and Subletting.**

23.1    **Definitions.**

23.1.1    *Sublet.* Any transfer, sublet, assignment, license or concession agreement, change of ownership, mortgage, or hypothecation of this Lease or the Tenant's interest in the Lease or in and to all or a portion of the Premises, or the transfer of voting control of Tenant (if Tenant is a corporation), or the transfer of more than fifty percent (50%) of the interest in the capital of Tenant (if Tenant is a partnership).

23.1.2    *Subrent.* Any consideration of any kind received, or to be received, by Tenant from a Subtenant if such sums are related to Tenant's interest in this Lease or in the Premises, including, but not limited to, bonus money and payments (in excess of fair market value) for Tenant's assets including its trade fixtures, equipment and other personal property, goodwill, general intangibles, and any capital stock or other equity ownership of Tenant.

23.1.3    *Subtenant.* The person or entity with whom a Sublet agreement is proposed to be or is made.

23.2    **Landlord's Consent.** Tenant shall not enter into a Sublet without Landlord's prior written consent, which consent shall not be unreasonably withheld. Any attempted or purported Sublet without Landlord's prior written consent shall be void and confer no rights upon any third person and shall be deemed a material default of this Lease. Each Subtenant shall agree in writing, for the benefit of Landlord, to assume, to be bound by, and to perform the terms, conditions and covenants of this Lease to be performed by Tenant. Notwithstanding anything contained herein, Tenant shall not be released from personal liability for the performance of each term, condition and covenant of this Lease by reason of Landlord's consent to a Sublet. Landlord shall be permitted to consider any reasonable factor in determining whether or not to withhold its consent to a proposed Sublet. In addition to other grounds for denial, it shall be reasonable for Landlord to withhold its consent if any of the following conditions are not satisfied: (i) the proposed Subtenant shall be at least as creditworthy as is Tenant as of the date of this Lease, and shall satisfy Landlord's then-current credit standards for tenants of the Building; (ii) the proposed use of the Premises by the Subtenant shall comply with the provisions of Paragraph 9 hereof, and not otherwise have or cause a material adverse impact on the Premises, the Building, the Project, or Landlord's interest therein; (iii) the proposed Subtenant shall not be an existing tenant or occupant of the Project or a person or entity with whom Landlord is then dealing, or with whom Landlord has had any dealings within the previous six (6) months, with respect to the leasing of space in the Project; (iv) the proposed Sublet shall not require any variation in the terms of this Lease; and (v) at the time of the request, no event of default under this Lease shall have occurred and be continuing. Tenant shall have the burden of demonstrating that each of the foregoing conditions has been satisfied.

23.3    **Information to be Furnished.** If Tenant desires at any time to Sublet the Premises or any portion thereof, it shall first notify Landlord of its desire to do so and submit in writing to Landlord: (i) the name of the proposed Subtenant; (ii) the nature of the proposed Subtenant's business to be carried on in the Premises; (iii) the terms and provisions of the proposed Sublet and a copy of the proposed Sublet form containing a description of the subject Premises and (iv) such financial information, including financial statements, as Landlord may reasonably request concerning the proposed Subtenant.

23.4    **Landlord's Alternatives.** At any time within thirty (30) days after Landlord's receipt of the information specified in Paragraph 23.3, Landlord may, by written notice to Tenant elect: (i) to lease for its own account the Premises or the portion thereof so proposed to be Sublet by Tenant, upon the same terms as those offered to the proposed Subtenant but on a form acceptable to Landlord; (ii) to lease for its own account the Premises or the portion thereof so proposed to be Sublet by Tenant to any person upon any terms desired by Landlord; (iii) to consent to the Sublet by Tenant; or (iv) to refuse its consent to the Sublet. If Landlord consents to the Sublet, Tenant may thereafter enter into a valid Sublet of the Premises or portion thereof, upon the terms and conditions and with the proposed Subtenant set forth in the information furnished by Tenant to Landlord pursuant, to Paragraph 23.3, subject, however, to the condition that any excess of the Subrent over the Rent required to be paid by Tenant hereunder shall be paid to Landlord as and with the Monthly Rent.

Initials: 
4.020303

23.5     **Proration.**  If a portion of the Premises is Sublet, the pro rata share of the Rent attributable to such partial area of the Premises shall be determined by Landlord by dividing the Rent payable by Tenant hereunder by the total square footage of the Premises and multiplying the resulting quotient (the per square foot rent) by the number of square feet of the Premises which are Sublet.

23.6     **Executed Counterpart.**  No Sublet shall be valid nor shall any Subtenant take possession of the Premises until an executed counterpart of the Sublet agreement has been delivered to Landlord.

23.7     **Exempt Sublets.**  Notwithstanding the above, Landlord's prior written consent shall not be required for an assignment of this Lease to a subsidiary, affiliate or parent corporation of Tenant, or a corporation into which Tenant merges or consolidates, if Tenant gives Landlord prior written notice of the name of any such assignee and if the assignee assumes, in writing, all of Tenant's obligations under the Lease.  An assignment or other transfer of this Lease to a purchaser of all or substantially all of the assets of Tenant shall be deemed a Sublet requiring Landlord's prior written consent.

24.     **Default.**

24.1     **Tenant's Default.**  A default under this Lease by Tenant shall exist if any of the following events shall occur:

24.1.1   If Tenant fails to pay Rent or any other sum required to be paid hereunder when *due; or

24.1.2   If Tenant shall have failed to perform any term, covenant or condition of this Lease except those requiring the payment of money and Tenant shall have failed to cure such breach within twenty (20) days after written notice from Landlord where such breach could reasonably be cured within such twenty (20) day period, provided, however, that where such failure could not reasonably be cured within the twenty (20) day period that Tenant shall not be in default if it commences such performance within the twenty (20) day period and diligently thereafter prosecutes the same to completion; or

24.1.3   If Tenant shall abandon the Premises or fail to occupy the Premises for more than ten (10) consecutive business days*; or

24.1.4   If Tenant assigns its assets for the benefit of its creditors; or

24.1.5   If the sequestration or attachment of or execution on any material part of Tenant's personal property essential to the conduct of Tenant's business occurs, and Tenant fails to obtain a return or release of such personal property within thirty (30) days thereafter, or prior to sale pursuant to such sequestration, attachment or levy, whichever is earlier; or

24.1.6   If a court shall make or enter any decree or order other than under the bankruptcy laws of the United States adjudging Tenant to be insolvent or approving as properly filed a petition seeking reorganization of Tenant; or directing the winding up or liquidation of Tenant and such decree or order shall have continued for a period of thirty (30) days; or

24.1.7   Chronic delinquency by Tenant in the payment of Rent or any other periodic payments required to be paid by Tenant under this Lease shall constitute a separate default.  "Chronic delinquency" shall mean the failure by Tenant to pay the Rent or any other periodic payments required to be paid by Tenant under this Lease when due for any three (3) months (consecutive or nonconsecutive) in any twelve (12) month period.  In the event of a chronic delinquency, and without the necessity for any further notice of default, Landlord shall have the option, in addition to all other remedies, to require Tenant to pay Landlord an amount not to exceed the equivalent of three (3) months of Monthly Rent and Direct Expenses, which sum Landlord shall hold as a Security Deposit in accordance with the terms of Paragraph 6 above.  Tenant's failure to pay the foregoing sum within ten (10) days after Landlord's demand shall be deemed a separate and additional event of default by Tenant.                    **See Addendum**

24.2     **Remedies.**  Upon a default, Landlord shall have the following remedies, in addition to all other rights and remedies provided by law or otherwise provided in this Lease, to which Landlord may resort cumulatively or in the alternative:

24.2.1   Landlord may continue this Lease in full force and effect, and this Lease shall continue in full force and effect as long as Landlord does not terminate this Lease, and Landlord shall have the right to collect Rent when due.  Without limiting the foregoing, it is the intention of the parties that the Landlord shall have the remedy set forth in Section 1951.4 of the California Civil Code, which provides that the Landlord may continue this Lease in effect after Tenant's breach and abandonment and recover Rent as it becomes due, if Tenant has the right to sublet or assign, subject only to reasonable limitations.

24.2.2   Landlord may terminate Tenant's right to possession of the Premises at any time by giving written notice to that effect, and relet the Premises or any part thereof.  Tenant shall be liable immediately to Landlord for all costs Landlord incurs in reletting the Premises or any part thereof, including, without limitation, broker's commissions, expenses of cleaning and redecorating the Premises required by the reletting and like costs.  Reletting may be for a period shorter or longer than the remaining Term of this Lease.  No act by Landlord other than giving written notice to Tenant shall terminate this Lease.  Acts of maintenance, efforts to relet the Premises or the appointment of a receiver on Landlord's initiative to protect Landlord's interest under this Lease shall not constitute a termination of Tenant's right to possession.  On termination, Landlord has the right to remove all Tenant's personal property and store same at Tenant's cost and to recover from Tenant as damages:

(a)     The worth at the time of award of unpaid Rent and other sums due and payable which had been earned at the time of termination; plus

(b)     The worth at the time of award of the amount by which the unpaid Rent and other sums due and payable which would have been payable after termination until the time of award exceeds the amount of such Rent loss that Tenant proves could have been reasonably avoided; plus

(c)     The worth at the time of award of the amount by which the unpaid Rent and other sums due and payable for the balance of the Term after the time of award exceeds the amount of such Rent loss that Tenant proves could be reasonably avoided; plus

Initials
A.020303

(d)    Any other amount necessary which is to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform Tenant's obligations under this Lease, or which, in the ordinary course of things, would be likely to result therefrom, including, without limitation, any costs or expenses incurred by Landlord: (i) in retaking possession of the Premises; (ii) in maintaining, repairing, preserving, restoring, replacing, cleaning, altering or rehabilitating the Premises or any portion thereof, including such acts for reletting to a new tenant or tenants; (iii) for leasing commissions, or (iv) for any other costs necessary or appropriate to relet the Premises; plus

(e)    At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by the laws of the State of California.

The "worth at the time of award" of the amounts referred to in Paragraphs 24.2.2(a) and 24.2.2(b) is computed by allowing interest at the maximum rate permitted by law on the unpaid rent and other sums due and payable from the termination date through the date of award.  The "worth at the time of award" of the amount referred to in Paragraph 24.2.2(c) is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

24.2.3    Landlord may, with or without terminating this Lease, re-enter the Premises and remove all persons and property from the Premises; such property may be removed and stored in a public warehouse or elsewhere at the cost of and for the account of Tenant.  No re-entry or taking possession of the Premises by Landlord pursuant to this paragraph shall be construed as an election to terminate this Lease unless a written notice of such intention is given to Tenant.

24.2.4    If this Lease provides for a postponement or abatement of any monthly rental payments, a period of "free" rent or other rent concessions, such postponed rent, or "free" rent is called the "Abated Rent".  Tenant acknowledges that its right to receive credit for the Abated Rent is absolutely conditioned upon Tenant's full, faithful and punctual performance of its obligations under this Lease.  If Tenant defaults and does not cure within any applicable grace period, the Abated Rent, on a prorated basis, shall immediately become due and payable and this Lease shall be enforced as if there were no such rent abatement or other rent concession.

24.3    **Landlord's Default.**  Landlord shall not be deemed to be in default in the performance of any obligation required to be performed by it hereunder unless and until it has failed to perform such obligation within twenty (20) days after receipt of written notice by Tenant to Landlord specifying the nature of such default, provided, however, that if the nature of Landlord's obligation is such that more than twenty (20) days are required for its performance, then Landlord shall not be deemed to be in default if it shall commence such performance within such twenty (20) day period and thereafter diligently pursue the same to completion.  In no event shall Tenant have the right to terminate this Lease as the result of Landlord's default, it being agreed that Tenant's remedies shall be limited to money damages and injunctive relief.

24.4    **Waiver.**  Landlord and Tenant agree that the terms of this Lease shall govern the respective obligations of Landlord and Tenant with respect to repairs and maintenance.  Accordingly, Tenant hereby waives the provisions of Sections 1174 and 1179 of the California Code of Civil Procedure.

25.    **Subordination.**  This Lease is subject and subordinate to ground and underlying leases, mortgages and deeds of trust (collectively "Encumbrances") which may now affect the Premises, the Building, or the Project, and to all renewals, modifications, consolidations, replacements and extensions thereof, provided, however, if the holder ("Holder") or holders of any such Encumbrances shall require this Lease to be prior and superior thereto, within ten (10) days after written request from Landlord, Tenant shall execute, have acknowledged and deliver any and all documents or instruments, in the form presented to Tenant, which Landlord or Holder deems necessary or desirable for such purposes.  Landlord shall have the right to cause this Lease to be and become and remain subject and subordinate to any and all Encumbrances which are now or may hereafter be executed covering the Premises, the Building, or the Project, or any renewals, modifications, consolidations, replacements or extensions thereof, for the full amount of all advances made or to be made thereunder together with interest thereon and subject to all the terms and provisions thereof.  Landlord shall use reasonable efforts to obtain from the Holder to whom Tenant is required to subordinate a "non-disturbance agreement" in such form as that Holder ordinarily provides tenants such as Tenant (taking into account the terms of this Lease, the creditworthiness of Tenant and such other criteria as the Holder customarily applies), which agreement would provide that in the event of termination of any such lease or upon the foreclosure of any such mortgage or deed of trust, Holder agrees to recognize Tenant's rights under this Lease as long as Tenant is not then in default and continues to pay the Rent and observe and perform all the provisions of this Lease to be observed and performed by Tenant.  Within ten (10) days after Landlord's written request, Tenant shall execute any and all documents required by Landlord or the Holder to make this Lease subordinate to any lien of the Encumbrances.  If Tenant fails to do so, it shall be deemed that this Lease is so subordinated.  Notwithstanding anything to the contrary set forth in this paragraph, Tenant hereby attorns and agrees to attorn to any entity purchasing or otherwise acquiring the Building at any sale or other proceeding or pursuant to the exercise of any other rights, powers or remedies under any Encumbrances.

26.    **Tenant Statements.**  Tenant shall within seven (7) days following written request by Landlord:

26.1    **Estoppel Certificates.**  Execute and deliver to Landlord any documents, including estoppel certificates, in the form prepared by Landlord (a) certifying that this Lease is unmodified and in full force and effect or, if modified, stating the nature of such modification and certifying that this Lease as so modified, is in full force and effect and the date to which the Rent and other charges are paid in advance, if any, and (b) acknowledging that there are not, to Tenant's knowledge, any uncured defaults on the part of Landlord, or, if there are uncured defaults on the part of the Landlord, stating the nature of such incurred defaults, and (c) evidencing the status of the Lease as may be required either by a lender making a loan to Landlord to be secured by deed of trust or mortgage covering the Building or the Project or a purchaser of the Building or the Project from Landlord.  Tenant's failure to deliver an estoppel certificate within seven (7) days after delivery of Landlord's written request therefor shall be conclusive upon Tenant (a) that this Lease is in full force and effect, without modification except as may be represented by Landlord, (b) that there are no uncured defaults in Landlord's performance and (c) that no Rent has been paid in advance.  If Tenant fails to deliver a requested estoppel certificate within the prescribed time it shall be deemed that there exist no defaults under this Lease on the part of Landlord, that the Rent is current and that Tenant has no claims against Landlord.

26.2    **Financial Statements.**  Deliver to Landlord the current financial statements of Tenant, and financial statements of the two (2) years prior to the current financial statements year, with an opinion of a certified public accountant, including a balance sheet and profit and loss statement for the most recent prior year, all prepared in accordance with generally accepted accounting principles consistently applied.

Initials:

L.020303

27.     **Notices.** Any notice or demand required or desired to be given under this Lease shall be in writing and shall be personally served or in lieu of personal service may be given by mail. If given by mail, such notice shall be deemed to have been given seventy-two (72) hours after deposit in the United States mail, registered or certified, postage prepaid, and addressed to the party to be served. At the date of execution of this Lease, the addresses of Landlord and Tenant are as set forth in the first Paragraph of this Lease. After the Commencement Date, the address of Tenant shall be the address of the Premises. Either party may change its address by giving notice of same in accordance with this paragraph.

28.     **Attorneys' Fees.** If either party seeks to enforce any provision of this Lease to recover rent, or other sums due, to terminate the tenancy of the Premises or to enforce, protect or establish any term, condition or covenant of this Lease or right of either party, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs.

29.     **Building Planning:**

29.1     **Conditions:** In the event Landlord requires the Premises for use in conjunction with another suite or for other reasons connected with the Building or Project planning program, Landlord shall have the right from time to time during the Term to relocate the Premises within the Project on the following terms and conditions:

a)      The rentable and useable area of the new premises ("New Premises") shall be of equivalent size to the existing Premises, subject to a variation of up to ten percent (10%);

b)      Landlord shall pay the cost of providing tenant improvements in the New Premises, which shall be substantially comparable in layout to those in the existing Premises;

c)      Landlord shall reimburse Tenant for out-of-pocket expenses reasonably incurred by Tenant in moving to the New Premises, including actual costs of moving, telephone relocation and sign relocation which reimbursement, however, shall be limited to the equivalent of one-half (½) of one (1) months rent at the rental rate in effect at the time of relocation;

d)      The terms and conditions of the original Lease shall remain in full force and effect except that a revised Exhibit "A" shall become part of this Lease and shall reflect the location of the New Premises and Paragraph 1 of this Lease shall be amended to include and state all correct data as to the New Premises which shall thereafter for all purposes under this Lease be deemed to be the "Premises"; and

e)      Upon relocation to the New Premises, Tenant shall deliver the Premises to Landlord under the same terms and conditions set forth in Paragraph 12 of this Lease as if the Premises were being vacated due to expiration or earlier termination of the Lease, except however, the Lease will not have expired or been terminated.

29.2     **Notices:** Landlord shall deliver to Tenant written notice of Landlord's election to relocate the Premises, specifying the new location and the amount of rent payable therefor, at least sixty (60) days prior to the date the relocation is to be effective. If the relocation of the Premises is not acceptable to Tenant, Tenant shall have the right (by delivering written notice to Landlord within ten (10) days after receipt of Landlord's relocation notice) to terminate this Lease. If Tenant so notifies Landlord, Landlord at its option may withdraw its relocation notice (by delivering written notice to Tenant within ten (10) days after receipt of Tenant's termination notice), in which event this Lease shall continue and Tenant shall not be relocated, or accept Tenant's termination notice, in which event this Lease shall terminate effective as of the date the relocation was to be effective.

30.     **Transfer of the Building by Landlord.** In the event of any conveyance of the Building or the Project and assignment by Landlord of this Lease, Landlord shall be entirely released from all liability under any and all of its covenants and obligations contained in from this Lease occurring after the date of such conveyance and assignment, provided such transferee assumes Landlord's obligations under this Lease.

31.     **Landlord's Right to Perform Tenant's Covenants.** If Tenant fails to make any payment or perform any other act on its part to be made or performed under this Lease, Landlord may, but shall not be obligated to and without waiving or releasing Tenant from any obligation of Tenant under this Lease, make such payment or perform such other act to the extent Landlord may deem desirable, and in connection therewith, pay expenses and employ counsel. All sums so paid by Landlord and all late charges, interest and costs in connection therewith shall be due and payable by Tenant on the next day after any such payment by Landlord, together with interest thereon at the maximum rate permitted by law from such date to the date of payment by Tenant to Landlord, plus collection costs and attorneys' fees. Landlord shall have the same rights and remedies for the nonpayment thereof as in the case of default in the payment of Rent.

32.     **Tenant's Remedy.** If, as a consequence of a default by Landlord under this Lease, Tenant recovers a money judgment against Landlord such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levied thereon against the right, title and interest of Landlord in the Building and out of Rent or other income from the Building receivable by Landlord or out of consideration received by Landlord from the sale or other disposition of all or any part of Landlord's right, title or interest in the Building, and neither Landlord nor its agents, partners, officers or employees (collectively, "Principals"), shall be liable for any deficiency. No Principal shall be sued or named as a party in any suit or action, no Principal shall be required to answer or otherwise plead to any service of process, nor shall any judgment be taken against any Principal. The foregoing agreements are enforceable by both Landlord and any Principal of Landlord. If any provision of this Lease expressly or impliedly obligates Landlord not to unreasonably withhold its consent, an action for declaratory judgment or specific performance shall be Tenant's sole remedy in any dispute as to whether Landlord has breached such obligation. In no event shall Tenant have the right to terminate this Lease as a result of Landlord's default.

33.     **Mortgagee Protection.** If Landlord defaults under this Lease, Tenant will notify any beneficiary of a deed of trust or mortgagee of a mortgage covering the Building or the Project, and offer such beneficiary or mortgagee a reasonable opportunity to cure the default, including time to obtain possession of the Building or the Project by power of sale or a judicial foreclosure, if such should prove necessary to effect a cure.

34.     **Recording.** Neither party shall record this Lease nor a short form memorandum thereof.

35.     **Parking.** Tenant shall have the right to park on the Project's parking facilities in common with other tenants of the Project upon terms and conditions, including imposition of a reasonable parking charge, as may from time to time be established by Landlord. Tenant agrees not to overburden the parking facilities and agrees to cooperate with Landlord and other tenants in the use

Initials:

4.020303

of the parking facilities. Landlord reserves the right in its discretion to determine whether the parking facilities are becoming crowded and to allocate and assign parking spaces among Tenant and the other tenants.

36.    **Rules and Regulations.** Tenant shall faithfully observe and comply with the Rules and Regulations, a copy of which is attached as EXHIBIT F, and all reasonable and nondiscriminatory modifications and additions thereto put into effect by Landlord. Landlord shall not be responsible to Tenant for the violation or non-performance by any other tenant or occupant of the Project of any of the Rules and Regulations.

37.    **General.**

    37.1    **Captions.** With the exception of Paragraph 1, the captions and headings used in this Lease are for the purpose of convenience only and shall not be construed to limit or extend the meaning of any part of this Lease.

    37.2    **Executed Copy.** Any fully executed copy of this Lease shall be deemed an original for all purposes.

    37.3    **Time.** Time is of the essence for the performance of each term, condition and covenant of this Lease.

    37.4    **Separability.** If one or more of the provisions contained herein, except for the payment of Rent, is for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Lease, but this Lease shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

    37.5    **Choice of Law.** This Lease shall be construed and enforced in accordance with the laws of the State of California. The language in all parts of this Lease shall in all cases be construed as a whole according to its fair meaning and not strictly for or against either Landlord or Tenant.

    37.6    **Gender, Singular, Plural.** When the context of this Lease requires, the neuter gender includes the masculine, the feminine, a partnership or corporation or joint venture, and the singular includes the plural.

    37.7    **Binding Effect.** The covenants and agreement contained in this Lease shall be binding on the parties hereto and on their respective successors and assigns to the extent this Lease is assignable.

    37.8    **Waiver.** The waiver by Landlord of any breach of any term, condition or covenant, of this Lease shall not be deemed to be a waiver of such provision or any subsequent breach of the same or any other term, condition or covenant of this Lease. The subsequent acceptance of Rent hereunder by Landlord shall not be deemed to be a waiver of any preceding breach at the time of acceptance of such payment. No covenant, term or condition of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing signed by Landlord.

    37.9    **Authority.** If Tenant is a corporation or a partnership, each individual executing this Lease on behalf of said corporation or partnership, as the case may be, represents and warrants that he is duly authorized to execute and deliver this Lease on behalf of said entity in accordance with its corporate bylaws, statement of partnership or certificate of limited partnership, as the case may be, and that this Lease is binding upon said entity in accordance with its terms. Landlord, at its option, may require a copy of such written authorization to enter into this Lease. The failure of Tenant to deliver the same to Landlord within seven (7) days of Landlord's request therefor shall be deemed a default under this Lease.

    37.10    **Accord and Satisfaction; Application of Delinquent Payments.** No payment by Tenant of a lesser amount than the Rent owing hereunder shall be deemed to be other than on account of the Rent, nor shall any endorsement or statement on any check or letter accompanying any check or payment as Rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other remedy provided in this Lease. No endorsement on any check nor any letter accompanying any check or payment of Rent or partial payment thereof, shall prevent Landlord from treating such payment as on account of the earliest delinquent sum owed Landlord.

    37.11    **Disputed Sums.** Numerous charges are and may be due from Tenant to Landlord including, without limitation, Additional Rent and other items of a similar nature. If at any time there is a dispute between the parties as to the amount due Landlord for any such charges, the amount demanded by Landlord shall be paid by Tenant until the resolution of the dispute between the parties or by litigation. Failure by Tenant to pay the disputed sums until resolution shall constitute a default under the terms of this Lease.

    37.12    **Survival of Obligations.** Any obligations of Tenant accruing prior to the expiration of this Lease shall survive the termination of this Lease, and Tenant shall promptly perform all such obligations whether or not this Lease has expired.

    37.13    **Exhibits.** All exhibits, amendments, riders and addendums attached hereto are hereby incorporated herein and made a part hereof.

| | |
|---|---|
| EXHIBIT A | The Premises and Approved Space Plan |
| EXHIBIT B | The Project |
| EXHIBIT C | Work Letter Agreement |
| EXHIBIT D | Commencement Date Memorandum |
| EXHIBIT E | Standards for Utilities and Services |
| EXHIBIT F | Rules and Regulations |

Addenda and other exhibits:    Addendum One
                         EXHIBIT G – Fitness Center

Initials: 

38.    **Acceptance.**  Delivery of this Lease, duly executed by Tenant, constitutes an offer to lease the Premises, and under no circumstances shall such delivery be deemed to create an option or reservation to lease the Premises for the benefit of Tenant. This Lease shall only become effective and binding upon full execution hereof by Landlord and delivery of a signed copy to Tenant.

39.    **Landlord's Condition.**  Notwithstanding any other provision hereof this Lease and Landlord's obligation to lease the Premises to Tenant shall be subject to the condition precedent that Landlord's lender shall approve this Lease within fifteen (15) days from the date of its full execution.  If Landlord's lender fails to so approve this Lease, Landlord shall have the right, upon notice to Tenant to terminate this Lease, and, if so terminated, the parties' rights and obligations hereunder shall be discharged.

40.    **Brokers.**  Landlord and Tenant warrant and represent each to the other that they have had no dealings with any real estate broker or agent in connection with the negotiation of this Lease, except for the broker(s) named below and that they know of no other real estate broker or agent who is or might be entitled to a commission in connection with this Lease.  Tenant agrees to defend, indemnify and hold harmless Landlord and its agents, partners, officers and employees from and against any and all liabilities or expenses, including attorneys' fees and costs, arising out of or in connection with claims made by any, other broker or individual for commissions or fees resulting from Tenant's execution of this Lease.
None _____

_____

_____

_____

41.    **Entire Agreement.**  This Lease is the entire agreement between the parties, and there are no agreements or representations between the parties except as expressed herein.  Except as otherwise provided herein, no subsequent change or addition to this Lease shall be binding unless in writing and signed by the parties hereto.
*                                                                                         *See Addendum*
This Lease is effective as of the date the last signatory necessary to execute the Lease shall have executed this Lease.


LANDLORD:
Lampert at Iron Point, LLC
a California limited liability company

By:    Capital Builders, Inc.
       a California corporation
Its:   Property Manager

       By:    _Michael J. Metzger_ (signature)
              Michael J. Metzger
       Its:   President

Dated:    _6/12/06_


TENANT:
American Home Mortgage Corp.,
a New York corporation,
a wholly owned subsidiary of American Home Mortgage
Investment Corp., a New York corporation

By:    _____ (signature)
       Alan Horn
Its:   Executive Vice President & General Council

By:    _____

Its:   _____

Dated:    _10/9/06_

## ADDENDUM ONE TO THE LEASE

*THIS ADDENDUM ONE TO THE LEASE DATED* ___6/12___ *2006, IS ENTERED INTO BY AND BETWEEN LAMPERT AT IRON POINT, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY ("LANDLORD") AND AMERICAN HOME MORTGAGE CORP., A NEW YORK CORPORATION, A WHOLLY OWNED SUBSIDIARY OF AMERICAN HOME MORTGAGE INVESTMENT CORP., A NEW YORK CORPORATION ("TENANT"), AND IS ATTACHED TO AND MADE PART OF THE LEASE BETWEEN THE PARTIES OF EVEN DATE HEREWITH (THE "LEASE").*

*Except as set forth herein, all other terms and conditions of the Lease remain unchanged.*

**1.1**     **Security Deposit:**    Tenant has previously deposited with Landlord the sum of Fourteen thousand seven hundred seventy-seven and 80/100ths dollars *($14,777.80)* as a security deposit *(the "Existing Security Deposit")* under the sublease *(as defined in Paragraph 42 herinbelow)*. The balance of the Security Deposit, Ten thousand eight hundred six and 20/100ths dollars *($10,806.20)* shall be paid to Landlord upon execution of this lease and that sum together with the Existing Security Deposit shall be held by Landlord as security for the full and faithful performance by Tenant of its obligations under this Lease.

**5.**     **Late Payment Charges:**    In the fourth line delete "when" and replace with "within five *(5)* days of the date".

**24.1**     **Tenant's Default:**    In subparagraph 24.1.1 delete "when" and replace with "within fifteen *(15)* days of date". In subparagraph 21.1.2 in the second, third, fourth and fifth lines delete "twenty *(20)*" and replace with "thirty *(30)*". In subparagraph 24.1.3 delete "ten *(10)*" and replace with "thirty *(30)*" and after "business days" insert "without prior written notice to Landlord".

*INSERT THE FOLLOWING NEW PARAGRAPHS:*

**42.**     **"Tenant's Occupancy of Premises:**    Landlord and Tenant hereby acknowledge that Tenant is currently in possession of the Premises under a sublease dated October 30, 2002, as amended May 7, 2003, which was assigned to Tenant as of September 1, 2003 and amended June 30, 2004 *(collectively the "Sublease")* for the same Premises which Lease expires June 10, 2006. Except to the extent specifically set forth in this Lease, Landlord is not obligated to and shall not make any improvements to the Premises in addition to those improvements in existence as of the date of the execution of this Lease by Tenant, and Tenant understands and acknowledges that the Premises are leased without any further improvements or alterations thereto in an "AS-IS" condition. Because of Tenant's previous occupancy, Tenant has had an opportunity to inspect the Premises and to have its architects, engineers, or other consultants inspect the Premises. Tenant, pursuant to its inspection of the Premises, has found the Premises' current state of repair, condition and maintenance without further improvements by Landlord to be sufficient for Tenant's use except those improvements be constructed pursuant to Exhibit "C" of this Lease. Tenant agrees that, by taking possession of the Premises, it is acknowledging that the Premises and all systems serving the Premises are in good working order and repair. In the event of any inconsistency between this Paragraph 42 and any other provision of this Lease, the provisions of this Paragraph 42 shall govern."

**43.**     **"Tenant's Waiver and Indemnification for Tenant Use of the Fitness Center:** Tenant hereby agrees that the use of the fitness center in the Project *("Iron Point Fitness Center" or "IPFC")*, by Tenant and those persons authorized by Tenant will be within the guidelines established, from time to time, by the IPFC and/or Landlord for the number and type of such authorized users *(collectively, "Tenant's Users")*, and will be entirely at the risk of Tenant and Tenant's Users. Tenant further agrees that it *(i)* waives all claims against Landlord and shall be responsible for all costs, damages or liabilities of whatever nature arising out of the use of the IPFC by Tenant's Users, *(ii)* shall cause each of Tenant's Users to execute Landlord's standard waiver and indemnification form for use of the IPFC, a copy of which is attached to this Lease as Exhibit "G" and *(iii)* agrees to indemnify, defend and hold Landlord, its agents or employees harmless from all claims, lawsuits, damages, expenses or costs, including reasonable attorneys' fees, arising from or related to the use of the IPFC by Tenant's Users; provided, however, that the foregoing waiver and indemnification shall not apply to any injuries or damages caused by the gross negligence or willful misconduct of Landlord or its agents or employees. Tenant agrees that the use of the IPFC shall be in accordance with the rules and regulations established from time to time by Landlord, its agents or employees for the IPFC."

*IN WITNESS WHEREOF, Landlord and Tenant have executed this Addendum as of the date of the Lease.*

<table>
<tr><td><strong>LANDLORD:</strong><br>Lampert at Iron Point, LLC<br>a California limited liability company</td><td><strong>TENANT:</strong><br>American Home Mortgage Corp., a New York corporation<br>a wholly owned subsidiary of American Home Mortgage<br>Investment Corp., a New York corporation</td></tr>
<tr><td>By:    Capital Builders, Inc.<br>      a California corporation<br>Its:    Property Manager</td><td>By:     _____<br>      Alan Horn<br>Its:    Executive Vice President & General Council</td></tr>
<tr><td>      By:    _____<br>         Michael J. Metzger<br>      Its:    President</td><td>Date: _____</td></tr>
<tr><td></td><td>By: _____</td></tr>
<tr><td>Date:    __6/12/06__</td><td>Its: _____</td></tr>
<tr><td></td><td>Date: __6/9/06__</td></tr>
</table>



Plan prepared 5/24/06
By Capital Builders, Inc.

**Tenant Improvements are existing except the following modifications which shall be provided by Landlord in accordance with Exhibit C:**

A. Construct new walls as shown ( ———— ) and install new doors and sidelights to create 2 new offices;
B. Construct new wall as shown ( ———— ) to create smaller data/storage room;
C. Demolish existing walls as shown (xxxxxxxx);
D. Fill in double door at corridor at new open office area;
E. Remove existing racks in new open office area;
F. Paint new walls and patched areas to match existing, touch up existing paint as needed;
G. Install carpet at new open office area to match or coordinate with existing;
H. Modify HVAC, lighting and electrical as needed;
I. Install new telephone/data outlets as shown (N);
J. Install new junction boxes as shown (J);
K. Repair and clean existing carpet;
L. All construction, materials and finishes to be building standard; colors to match existing or to be selected from standard range and mutually acceptable to Landlord and Tenant;

**Iron Point Business Park**
**1180 Iron Point Road, Suite 200**
**9,270 usf / 10,475 rsf**

# EXHIBIT "A"

Initials



# EXHIBIT "B"



# WORK LETTER AGREEMENT

In connection with the Tenant Improvements to be installed on the Premises the parties hereby agree as follows:

1.  **Tenant's Initial Plans.** Tenant desires that Landlord performs certain leasehold improvement work in the Premises in substantial accordance with the plan or plans *(collectively, the "Initial Plan")*-prepared by Capital Builders, Inc. dated May 24, 2006 and last revised N/A, a copy or copies of which is/are attached to the Lease as Exhibit "A". Such work, as shown in the Initial Plan and as more fully detailed in the Final Plans and Specifications *(as defined and described in Paragraph 2 below)*, shall be hereinafter referred to as the "Tenant Improvements". Tenant shall cooperate diligently with the Landlord and shall furnish on or before June 5, 2006 all information required by the Landlord's architect and engineers for completion of the Final Plans and Specifications. All plans, drawings, specifications and other details describing the Tenant Improvements which have been or are hereafter furnished by or on behalf of Tenant shall be subject to Landlord's approval, which Landlord agrees shall not be unreasonably withheld.

2.  **Final Plans and Specifications.** If necessary for the performance of the Tenant Improvements and not included as part of the Initial Plan attached hereto, Landlord shall prepare or cause to be prepared final working drawings and specifications for the Tenant Improvements *(the "Final Plans and Specifications")* based on and consistent with the Initial Plan and the other plans, drawings, specifications, finish details and other information furnished by Tenant to Landlord and approved by Landlord pursuant to Paragraph 1 above. Landlord and Tenant shall indicate their approval of the Final Plans and Specifications by initialing them and attaching them hereto as EXHIBIT "C-1"; Tenant shall have ten *(10)* days after receipt to approve the plans and specifications prepared by Landlord's architect. If Final Plans and Specifications are not necessary for the performance of the Tenant Improvements, the Initial Plan as approved by Landlord and Tenant shall serve as the Final Plans and Specifications for the purposes of this Work Letter Agreement.

3.  **Construction of the Tenant Improvements.** Landlord, at its expense, shall cause the Tenant Improvements to be constructed using building standard materials, quantities and procedures then in use by Landlord *("Building Standards")*, except as may be stated or otherwise in the Final Plans and Specifications.

4.  **Additional Tenant Improvements.** Upon Tenant's request and submission by Tenant *(at Tenant's sole cost and expense)* of the necessary information and/or plans and specifications for work other than the Tenant Improvements described in the Final Plans and Specifications *("Additional Tenant Improvements")* and the approval by Landlord of such Additional Tenant Improvements, which approval Landlord agrees shall not be unreasonably withheld, Landlord shall perform such Additional Tenant Improvements, at Tenant's sole cost and expense, subject, however, to the following provisions of this Paragraph 4. Prior to commencing any Additional Tenant Improvements requested by Tenant, Landlord shall submit to Tenant a written statement of the cost of such Additional Tenant Improvements, which costs shall include a fee payable to Landlord in the amount of ten percent *(10%)* of the total cost of such Additional Tenant Improvements as compensation to Landlord for monitoring the Additional Tenant Improvements and for administration, overhead and field supervision associated with the Additional Tenant Improvements *("Landlord's Additional Compensation")*, and, concurrently with such statement of cost, Landlord shall also submit to Tenant a proposed change order *(the "Change Order")* for the Additional Tenant Improvements in the standard form then in use by Landlord. Tenant shall execute and deliver to Landlord such Change Order and shall pay to Landlord the entire cost of the Additional Tenant Improvements, including Landlord's Additional Compensation *(as reflected in Landlord's statement of such cost)*, within five *(5)* days after Landlord's submission of such statement and Change Order to Tenant. If Tenant fails to execute or deliver such Change Order or pay the entire costs of such Additional Tenant Improvements within such five-day period, then Landlord shall not be obligated to do any of the Additional Tenant Improvements and may proceed to do only the Tenant Improvements, as specified in the Final Plans and Specifications. Landlord's commencement of the Additional Tenant Improvements prior to receipt of payment of the cost thereof shall in no event be deemed a waiver of Tenant's obligation to pay such cost.

5.  **Termination.** If the Lease is terminated prior to the Commencement Date and prior to the completion of the Tenant Improvements, either by Landlord pursuant to the provisions of Paragraphs 6 or 8 of this Work Letter Agreement, or for any reason due to default of Tenant hereunder, Tenant shall pay to Landlord, within five *(5)* days of receipt of a statement therefore, any costs *(including architectural and engineering fees and reproduction costs)* incurred by Landlord through the date of the termination in connection with the Tenant Improvements.

6.  **Condition.** If Landlord is unable to obtain a building permit for the Tenant Improvements within one hundred twenty *(120)* days from the date of execution hereof, then Landlord shall have the right to terminate this Lease upon written notice to Tenant.

7.  **Punch-list.** Within ten *(10)* days after completion of the Tenant Improvements, Tenant shall conduct a walk-through inspection of the Premises with Landlord and complete a punch-list of items needing additional work by Landlord. The punch-list to be prepared by Tenant shall not include any damage to the Premises caused by Tenant move-in, which damage shall be repaired or corrected by Tenant, at its expense. If Tenant fails to submit a punch-list to Landlord within such ten *(10)* day period it shall be deemed that there are no items needing additional work or repair. Landlord's contractor shall complete all reasonable punch-list items within thirty *(30)* days after the walk-through inspection or as soon as practicable thereafter. Upon completion of such punch-list items Tenant shall approve such completed items in writing to Landlord. If Tenant fails to reasonably approve such items within seven *(7)* days of completion, such items shall be deemed approved by Tenant.

8.  **Tenant Delays.** Each of the following shall be deemed a "Tenant Delay" for the purposes of establishing the Commencement Date pursuant to Paragraph 3.2 of the Lease: *(a)* Tenant's failure either to supply information necessary to complete the Final Plans and Specifications, or to approve the proposed plans and specifications, within the time frames established above; or *(b)* changes to the Final Plans and Specifications requested by Tenant; or *(c)* any other delay of any kind caused by Tenant or its contractors, architects, space planners or other agents or employees. In the event that Tenant fails to supply the information required under Paragraph 1 above within thirty *(30)* days after the date that is called for under Paragraph 1 above, or if Tenant fails to approve the Final Plans and Specifications within thirty *(30)* days after receipt thereof, or if Landlord reasonably believes that a Tenant Delay of any other kind has occurred which will result in the Commencement Date occurring more than ninety *(90)* days after the Anticipated Commencement Date, then in any such event, Landlord shall have the right, in addition to any other remedy provided for in the Lease or this Agreement, to terminate the Lease upon written notice to Tenant and thereafter both parties shall be relieved of all obligations under the Lease thereafter accruing.

9.  **Incorporation of Lease Provisions.** The terms and provisions of the Lease, insofar as they are applicable by the Work Letter Agreement, are hereby incorporated herein by reference. All amounts payable by Tenant to Landlord hereunder shall be deemed to be additional rent under the Lease, and, upon any default in the payment of same, Landlord shall have all of the rights and remedies provided for in the Lease.

Turnkey

Initial

3.091297

## STANDARDS FOR UTILITIES AND SERVICES

The following standards for utilities and services are in effect. Landlord reserves the right to adopt nondiscriminatory modifications and additions hereto.

As long as Tenant is not in default under any of the terms, covenants, conditions, provisions or agreements of this Lease, Landlord shall:

1.       Provide non-attended automatic elevator facilities Monday through Friday, except holidays, during normal business hours, as determined by Landlord, and have one elevator available at all other times

2.       On Monday through Friday except holidays, from 8 A.M. to 6 P.M. or during such other business hours as Landlord shall establish from time to time, ventilate the Premises and furnish air conditioning or heating (collectively described as "HVAC") on such days and hours, when in the judgment of Landlord it may be required for the comfortable occupancy of the Premises. Landlord may provide HVAC during non-business hours, upon Tenant's prior written request, for a reasonable additional charge to Tenant to be fixed by Landlord (which additional charge shall be based upon the cost of utilities for such overtime usage, as well as Landlord's other costs associated therewith, including administrative costs, start-up costs, maintenance costs and reasonable reserves for repair and replacement). Tenant agrees to cooperate fully at all times with Landlord, and to abide by all regulations and requirements which Landlord may prescribe for the proper function and protection of said air conditioning system. Tenant agrees not to connect any apparatus, device, conduit or pipe to the Building chilled and hot water air conditioning supply lines. Tenant further agrees that neither Tenant nor its employees, agents, visitors, licensees or contractors shall at any time enter mechanical installations or facilities of the Building or adjust, tamper with, touch or otherwise in any manner affect said installations or facilities.

3.       Landlord shall furnish to the Premises, during the usual business hours on business days, electric current as required by the Building standard office lighting and fractional horsepower office business machines in the amount of approximately two and one-half (2.5) watts per square foot, subject to reasonable availability, and subject to Title 24 regulations. Tenant agrees, should its electrical installation or electrical consumption be in excess of such quantity or extend beyond normal business hours, to reimburse Landlord monthly for the measured consumption at the terms, classifications and rates charged to similar consumers by the public utility serving the neighborhood in which the Building is located. If there is no separate meter to measure such utilities consumption, such excess cost will be established by an estimate agreed upon by Landlord and Tenant, and if the parties fail to agree, as established by an independent licensed engineer. Tenant agrees not to use any apparatus or device in, or upon, or about the Premises which may in any way increase the amount of such services usually furnished or supplied to said Premises, and Tenant further agrees not to connect any apparatus or device with wires conduits or pipes or other means by which such services are supplied, for the purpose of using additional or unusual amounts of such services without written consent of Landlord. Should Tenant use the same to excess, the refusal on the part of Tenant to pay upon demand of Landlord the amount established by Landlord for such excess charge shall constitute a breach of the obligation to pay rent under this Lease and shall entitle Landlord to the rights therein granted for such breach. At all times Tenant's use of electric current shall never exceed the capacity of the feeders to the Building or the risers or wiring installation and Tenant shall not install or use or permit the installation or use of any computer or electronic data processing equipment in the Premises without the prior written consent of Landlord.

4.       Water will be available in public areas for drinking and lavatory purposes only, but if Tenant requires, uses or consumes water for any purposes in addition to ordinary drinking and lavatory purposes of which fact Tenant constitutes Landlord to be the sole judge, Landlord may install a water meter and thereby measure Tenant's water consumption for all purposes. Tenant shall pay Landlord for the cost of the meter and the cost of the installation thereof and throughout the duration of Tenant's occupancy Tenant shall keep said meter and installation equipment in good working order and repair at Tenant's own cost and expense, in default of which Landlord shall cause such meter and equipment to be replaced or repaired and collect the cost thereof from Tenant. Tenant agrees to pay for water consumed as shown on the meter, as and when bills are rendered, and on default in making such payment, Landlord may pay such charges and collect the same from Tenant. Any such costs or expenses incurred, or payments made by Landlord for any of the reasons or purposes hereinabove stated shall be deemed to be additional rent payable by Tenant.

Landlord reserves the right to stop service of the elevator, plumbing, ventilation, air conditioning and electric systems, when necessary, by reason of accident or emergency or for repairs alterations or improvements, in the judgment of Landlord desirable or necessary to be made, until such repairs, alterations or improvements are completed and shall further have no responsibility or liability for failure to supply elevator facilities, plumbing ventilating, air conditioning or electric service when prevented from so doing by strike or accident or by any cause beyond Landlord's reasonable control, or by laws, rules orders, ordinances, directions regulations or requirements of any federal, state, county or municipal authority or failure of gas, oil or other suitable fuel supply or inability by exercise of reasonable diligence to obtain gas, oil or other suitable fuel. It is expressly understood and agreed that any covenants on Landlord's part to furnish any service pursuant to any of the terms, covenants, conditions, provisions or agreements of this Lease, or to perform any act or thing for the benefit of Tenant, shall not be deemed breached if Landlord is unable to furnish or perform the same by virtue of a strike or labor trouble or any other cause whatsoever beyond Landlord's control.

Initials C.H.

COMMENCEMENT DATE MEMORANDUM

LANDLORD:      Lampert at Iron Point, LLC

TENANT:        American Home Mortgage Corp., a wholly owned subsidiary of American Home

               Mortgage Investment Corp.

LEASE DATE:    6/12/06

PREMISES:      1180 Iron Point Road

               Suite 200

               Folsom, CA 95630

Pursuant to Paragraph 3 of the above-referenced Lease, the Commencement Date is hereby established as June 11, 2006.

LANDLORD:

Lampert at Iron Point, LLC
a California limited liability company

By:      Capital Builders, Inc.
         a California corporation
Its:     Property Manager

         By:    _Michael J. Metzger_
                Michael J. Metzger
         Its:   President

Dated:   6/12/06

TENANT:

American Home Mortgage Corp., a New York corporation
a wholly owned subsidiary of American Home Mortgage Investment
Corp., a New York corporation

By:      _Alan Horn_
         Alan Horn
Its:     Executive Vice President & General Council

By:      _____

Its:     _____

Dated:   6/9/06

EXHIBIT "D"
-1-

3.091297

## RULES AND REGULATIONS

1.    Except as may be expressly permitted in the Lease, no sign, placard, picture, advertisement, name or notice shall be installed or displayed on any part of the outside or inside of the Building. Landlord shall have the right to remove and dispose of any item installed or placed in violation of this rule at Tenant's expense, without prior notice. All approved signs or lettering on doors and walls shall be printed, painted, affixed or inscribed at the expense of Tenant by a person chosen by Landlord.

2.    If Landlord objects in writing to any curtains, blinds, shades, screens or hanging plants or other similar objects attached to or used in connection with any window or door of the Premises, Tenant shall immediately discontinue such use. No awning shall be permitted on any part of the Premises. Tenant shall not place anything against or near glass partitions or doors or windows which may appear unsightly from outside the Premises.

3.    Tenant shall not obstruct any sidewalks, halls, passages, exits, entrances, elevators, escalators, or stairways of the Building. The halls, passages, exits, entrances, elevators, escalators and stairways are not open to the general public. Landlord shall in all cases retain the right to control and prevent access thereto of all persons whose presence in the judgment of Landlord would be prejudicial to the safety, character, reputation and interest of the Building and its tenants; provided that nothing herein contained shall be construed to prevent such access to persons with whom any tenant normally deals in the ordinary course of its business, unless such persons are engaged in illegal activities. No tenant and no employee or invitee of any tenant shall go upon the roof of the Building.

4.    The directory of the Building will be provided exclusively for the display of the name and location of tenants only, and Landlord reserves the right to exclude any other names therefrom.

5.    All cleaning and janitorial services for the Building shall be provided exclusively through Landlord, and except with the written consent of Landlord, no person or persons other than those approved by Landlord shall be employed by Tenant or permitted to enter the Building for the purpose of cleaning the same. Tenant shall not cause any unnecessary labor by carelessness or indifference to the good order and cleanliness of the Premises. Landlord shall not in any way be responsible to any tenant for any loss of property on the Premises, however occurring, or for any damage to any Tenant's property by the janitor or any other employee or any other person.

6.    Landlord will furnish Tenant, free of charge, with two keys to each door lock in the Premises. Landlord may make a reasonable charge for any additional keys or Tenant may, with Landlord's consent, make or have made additional keys as required. Tenant shall not alter any lock or install a new additional lock or bolt on any door of its Premises. Tenant, upon the termination of its tenancy, shall deliver to Landlord the keys of all doors which have been furnished to Tenant, and in the event of loss of any keys so furnished, shall pay Landlord therefore; Tenant shall also deliver to Landlord any additional keys that Tenant may have had made for any locks in the Premises during its occupancy.

7.    If Tenant requires telegraphic, telephonic, burglar alarm or similar services, it shall first obtain and comply with Landlord's instructions in their installation.

8.    Any freight elevator shall be available for use by all tenants in the Building, subject to such reasonable scheduling as Landlord in its discretion shall deem appropriate. No equipment, materials, furniture, packages, supplies, merchandise or other property will be received in the Building or carried in the elevators except between such hours and in such elevators as may be designated by Landlord.

9.    Tenant shall not place a load upon any floor of the Premises which exceeds the load per square foot which such floor was designed to carry and which is allowed by law. Landlord shall have the right to prescribe the weight, size and position of all equipment, materials, furniture or other property brought into the Building. Heavy objects shall, if considered necessary by Landlord, stand on such platforms as determined by Landlord to be necessary to properly distribute the weight. Business machines and mechanical equipment belonging to Tenant, which cause noise or vibration that may be transmitted to the structure of the Building or to any space therein to such a degree as to be objectionable to Landlord or to any tenants in the Building, shall be placed and maintained by Tenant, at Tenant's expense, on vibration eliminators or other devices sufficient to eliminate noise or vibration. The persons employed to move such equipment in or out of the Building must be acceptable to Landlord. Landlord will not be responsible for loss of, or damage to, any such equipment or other property from any cause, and all damage done to the Building by maintaining or moving such equipment or other property shall be repaired at the expense of Tenant.

10.    Tenant shall not use or keep in the Premises any kerosene, gasoline or inflammable or combustible fluid or material other than those limited quantities necessary for the operation or maintenance of office equipment. Tenant shall not use or permit to be used in the Premises any foul or noxious gas or substance, or permit or allow the Premises to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Building by reason of noise, odors or vibrations, nor shall Tenant bring into or keep in or about the Premises any birds or animals.

11.    Tenant shall not use any method of heating or air-conditioning other than that supplied by Landlord.

12.    Tenant shall not waste electricity, water or air-conditioning and agrees to cooperate fully with Landlord to assure the most effective operation of the Building's heating and air-conditioning and to comply with any governmental energy-saving rules, laws or regulations of which Tenant has actual notice, and shall refrain from attempting to adjust controls other than room thermostats installed for Tenant's use. Tenant shall keep corridor doors closed, and shall close window coverings at the end of each business day.

13.    Landlord reserves the right, exercisable with reasonable notice and without liability to Tenant, to change the name and street address of Building.

14.    Landlord reserves the right to exclude from the Building between the hours of 6:00 p.m. and 7:00 a.m. to the following day, or such other hours as may be established from time to time by Landlord, and on Sundays and legal holidays, any person unless that person is known to the person or employee in charge of the Building and has a pass or is properly identified. Tenant shall be responsible for all persons from whom it requests passes and shall be liable to Landlord for all acts of such persons. Landlord shall not be liable for damages for any error with regard to the admission to or exclusion from the Building of any person, Landlord reserves the right to prevent access to the Building in case of invasion, mob, riot, public excitement or other commotion by closing the doors or by other appropriate action.

15.    Tenant shall close and lock the doors of its Premises and entirely shut off all water faucets or other water apparatus, and electricity, gas or air outlets before Tenant and its employees leave the Premises. Tenant shall be responsible for any damage or injuries sustained by other, tenants or occupants of the Building or by Landlord for noncompliance with this rule.

Initials: ___

16.     Tenant shall not obtain for use on the Premises food, towel, barbering, shoeshine or other similar services, except at such hours and under such regulations as may be fixed by Landlord.

17.     The toilet rooms, toilets, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed and no foreign substance of any kind whatsoever shall be thrown therein. The expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the tenant who, or whose employees or invitees, shall have caused it.

18.     Tenant shall not sell, or permit the sale at retail, of newspapers, magazines, periodicals, theater tickets or any goods or merchandise to the general public in or on the Premises. Tenant shall not make any room-to-room solicitation of business from other tenants in the Building. Tenant shall not use the Premises for any business or activity other than that specifically provided for in Tenant's Lease.

19.     Tenant shall not install any radio, television, or microwave antenna, loudspeaker or other devices on the roof or exterior walls of the Building and, if installed, Landlord shall have the right to remove same at Tenant's expense without prior notice. Tenant shall not interfere with radio or television broadcasting or reception from or in the Building or elsewhere.

20.     Tenant shall not mark, drive nails, screw or drill into the partitions, woodwork or plaster or in any way deface the Premises or any part thereof except as necessary for the hanging of artwork and/or display materials. Landlord reserves the right to direct electricians as to where and how telephone and data wires are to be introduced to the Premises. Tenant shall not cut or bore holes for wires. Tenant shall not affix any floor covering to the floor of the Premises in any manner except as approved by Landlord. Tenant shall repair any damage resulting from noncompliance with this rule as well as any damage resulting from the hanging of artwork or display materials.

21.     Tenant shall not install, maintain or operate upon the Premises any vending machine without the written consent of Landlord, which shall not be unreasonably withheld.

22.     Canvassing, soliciting and distribution of handbills or any other written material, and peddling in the Building are prohibited, and each tenant shall cooperate to prevent same.

23.     Landlord reserves the right to exclude or expel from the Building any person who, in Landlord's judgment, is intoxicated or under the influence of liquor or drugs or who is in violation of any of the Rules and Regulations of the Building.

24.     Tenant shall store all its trash and garbage within its Premises. Tenant shall not place in any trash box or receptacle any material which cannot be disposed of in the ordinary and customary manner of trash and garbage disposal. All garbage and refuse disposal shall be made in accordance with directions issued from time to time by Landlord.

25.     The Premises shall not be used for the storage of merchandise held for sale to the general public, or for lodging or for manufacturing of any kind, nor shall the Premises be used for any improper, immoral or objectionable purpose. No cooking shall be done or permitted by any tenant on the Premises, except that use by Tenant of Underwriters' Laboratory approved equipment for brewing coffee, tea, hot chocolate and similar beverages or microwaving food or beverages shall be permitted, provided that such equipment and use is in accordance with all applicable federal, state, county and city laws, codes, ordinances, rules and regulations.

26.     Tenant shall not use in any space or in the public halls of the Building any hand truck except those equipped with rubber tires and side guards or such other material-handling equipment as Landlord may approve. Tenant shall not bring any other vehicles of any kind into the Building.

27.     Without the written consent of Landlord, Tenant shall not use the name of the Building in connection with or in promoting or advertising the business of Tenant except as Tenant's address.

28.     Tenant shall comply with all safety, fire protection and evacuation procedures and regulations established by Landlord or any governmental agency.

29.     Tenant assumes any and all responsibility for protecting its Premises from theft, robbery and pilferage, which includes keeping doors locked and other means of entry to the Premises closed.

30.     The requirements of Tenant will be attended to only upon appropriate application to the office of the Building by an authorized individual. Employees of Landlord shall not perform any work or do anything outside of their regular duties unless under special instructions from Landlord, and no employee of Landlord will admit any person (Tenant or otherwise) to any office without specific instructions from Landlord.

31.     Tenant shall not park its vehicles in any parking areas designated by Landlord as areas for parking by visitors to the Building. Tenant shall not leave vehicles in the Building parking areas overnight nor park any vehicles in the Building parking areas other than automobiles, motorcycles, motor driven or non-motor driven bicycles or four wheeled trucks.

32.     Landlord may waive any one or more of these Rules and Regulations for the benefit of Tenant or any other tenant, but no such waiver by Landlord shall be construed as a waiver of such Rules and Regulations in favor of Tenant or any other tenant, nor prevent Landlord from thereafter enforcing any such Rules and Regulations against any or all of the tenants of the Building.

33.     These Rules and Regulations are in addition to, and shall not be construed to in any way modify or amend, in whole or in part, the terms, covenants, agreements and conditions of any lease of premises in the Building.

34.     Landlord reserves the right to make such other and reasonable Rules and Regulations as in its judgment may from time to time be needed for safety and security, for care and cleanliness of the Building and for the preservation of good order therein. Tenant agrees to abide by all such Rules and Regulations hereinabove stated and any additional rules and regulations which are adopted.

35.     Tenant shall be responsible for the observance of all foregoing rules by Tenant's employees, agents, clients, customers, invitees and guests.



**FITNESS CENTER**
Application Form and Waiver of Liability

Electronic Key Number: _____    Date Registered: _____
                                                            (Completed by Owner)

Name: _____    Company: _____

Company Address: _____    Suite/Dept. _____

Business
Telephone:    (   ) _____    Home Telephone:    (   ) _____

Home Address: _____

Age 18 or over    O Yes    O No    Drivers License/ID # _____

In case of emergency, please notify: _____

Relationship: _____    Telephone: (   ) _____

*Waiver of Liability*

In consideration of the right to membership in the **Iron Point Fitness Center (IPFC)**, the undersigned acknowledges and agrees that neither **Lampert at Iron Point, LLC** nor property manager *(collectively, "Owner")*, nor their successors and assignees shall be liable for any personal injury to the undersigned or to persons whom the undersigned allows to use the **IPFC**, arising out of the use of the facility or arising on the premises, whether or not the injuries are caused in whole or in part by the active or passive negligence of Owner. In this regard, the undersigned hereby agrees to assume all risk of such occurrences and to hold Owner harmless and defend Owner against any and all claims, liabilities, damages, liens and expenses *(including, without limitation, reasonable attorneys' fees)* arising directly or indirectly from any such occurrences.

ACCEPTED AND AGREED TO:

_____
Name

_____    _____
Signature    Date

SAMPLE

EXHIBIT "G"    Initials _____
Page 1



**FITNESS CENTER**
Rules and Regulations

*PLEASE READ CAREFULLY BEFORE SIGNING*

1. The Iron Point Fitness Center *("IPFC")* is open Monday through Friday, 5:00am to 8:00pm or such other times as Owner may designate.

2. Membership is available to tenants of Iron Point Business Park only.

3. Membership in the *IPFC* is an individual membership only.  Access keys are not to be "lent" to nonmembers at any time. Memberships are not transferable.

4. A $12.00 fee will be charged for any lost, stolen or unreturned electronic keys.  All fees are nonrefundable.

5. Appropriate exercise attire, including shirts and shoes, are required at all times during your workout.

6. Please enter and exit the *IPFC* through the restrooms.

7. The television equipment is reserved for members who are working out.

8. Lockers are only to be used during the time of your workout.  Lockers are coin operated *($.25)*; your quarter will be returned when the key is returned to the locker.  All articles are to be removed from lockers upon leaving the *IPFC.*

9. Any articles found in the *IPFC*, locker rooms or restrooms will be turned in to the Lost and Found, which is located at the office of *Capital Builders, Inc.*, 1130 Iron Point Road, Suite 170.

10. Members are required to read the equipment instructions provided before operating the exercise/weight equipment.

11. Members must bring a towel and wipe down equipment after use.

12. Absolutely no minors (under age 18) are allowed in the *IPFC*.

13. No alcoholic beverages or glassware are allowed in the *IPFC*.

14. The Owner reserves the right to change membership obligations and hours of operation at its option.  The Owner reserves the right to add to, change or delete any of the rules and regulations of the *IPFC*, as may from time to time be deemed necessary.

15. The undersigned Member of the *IPFC* agrees that any infringement of the above rules or regulations which the Owner may from time to time establish will serve as grounds for cancellation of membership at the Owner's option and will cause forfeiture of membership.

ACCEPTED AND AGREED TO:

_____
Name

_____          _____
Signature                                              Date

_____          _____
Company                                              Phone Number

SAMPLE

EXHIBIT "G"
Page 2

Initial: _____