IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------------------------- x

In re:                                          :      Chapter 11
                                                :
AMERICAN HOME MORTGAGE                          :      Case No. 07-11047 (CSS)
HOLDINGS, INC.,                                 :
a Delaware corporation, et al., [1]             :      Jointly Administered
                                                :
          Debtors.                              :      **Objection Deadline: December 14, 2007 at 4:00 p.m. (ET)**
                                                :      **Hearing Date: December 21, 2007 at 10:00 a.m. (ET)**

--------------------------------------------------- x

## DEBTORS' MOTION FOR AN ORDER EXTENDING THEIR EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THERETO PURSUANT TO SECTION 1121(d) OF THE BANKRUPTCY CODE

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby move this Court (the "Motion"), pursuant to section 1121(d) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 9006 the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9006-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order extending the Debtors' exclusive periods to file a chapter 11 plan or plans and to solicit acceptances of such plan(s) through and including March 3, 2008 and May 5, 2008, respectively. In support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

---

[1] The Debtors (as defined below) in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. (6303) ("AHM Holding"); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580) (collectively, "AHM" or the "Debtors"). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

## JURISDICTION

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The statutory and legal predicate for the relief sought herein is section 1121(d) of the Bankruptcy Code, together with Bankruptcy Rule 9006(b)(1) and Local Rule 9006-2.

## GENERAL BACKGROUND[2]

2.      On August 6, 2007 (the "Petition Date"), the Debtors each filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

4.      On August 14, 2007, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee").  No trustee or examiner has been appointed.

## POSTPETITION DEVELOPMENTS

5.      Since the Petition Date, the Debtors have made progress in administering these cases by, among other things, stabilizing their business operations, eliminating administrative costs arising from discontinued portions of the Debtors' business operations, and commencing, conducting, and concluding a hotly contested sale process for the Debtors' loan servicing business, while engaging in numerous other "ordinary" and extraordinary activities in

---

[2]  Many of the facts set forth herein are derived from the Declaration of Michael Strauss in Support of the Debtors' Chapter 11 Petitions and First Day Relief [Docket No. 2], which is incorporated by reference as if fully set forth herein at length.

066585.1001

the name of preservation and maintenance of value for the Debtors' estates. The following is a non-exclusive summary of the Debtors' activities in the first four months of these chapter 11 cases.

**A.      First Day Motions and Related Relief**

6.      One day after filing their voluntary petitions, the Debtors obtained court authority to, among other things, (i) pay employee wages and payroll taxes and certain benefits, (ii) continue prepetition insurance policies, (iii) pay sales and use taxes, and (iv) obtain, on an interim basis, authority to use cash collateral and approval of debtor-in-possession financing. Within a month after the Petition Date, the Debtors obtained final approval of their entry into a $50 million debtor-in-possession financing facility.

**B.      Cessation of Resale and Origination Businesses**

7.      Just prior to their chapter 11 filings, the Debtors discontinued their nationwide loan servicing operations, resulting in the termination of approximately 6,500 employees. The Debtors sought and obtained authority from this Court to establish procedures to effectuate the sale of assets related to the Debtors' mortgage origination business, including but not limited to real property leases, equipment leases, and furniture, fixtures and equipment located therein.

8.      Further, the Debtors have filed five motions, seeking to reject approximately 800 unexpired leases of nonresidential real property and numerous executory contracts and, most of which leased locations and executory contracts were utilized by the Debtors in connection with the loan origination business. The Court has entered orders approving the rejection of the leases and executory contracts listed in the first four motions, and a hearing is scheduled for December 21, 2007 with respect to the fifth motion. Based on these

efforts, the Debtors have closed and fully vacated numerous locations within the first 90 days of these cases and avoided significant additional administrative rent liability by vacating the various locations in a timely manner.

## C.    Loan Auction and Sale

9.    On August 22, 2007, the Debtors obtained approval of procedures for the sale of certain mortgage loans owned by two non-debtor affiliates of the Debtors: Broadhollow Funding, LLC ("Broadhollow") and Melville Funding, LLC ("Melville," and together with Broadhollow, the "Non-Debtor Affiliates"). Broadhollow and Melville are non-Debtor special purpose entities established by AHM Investment to fund a portion of its prime mortgage origination. Prior to the Petition Date, the Non-Debtor Affiliates owned approximately 5,700 mortgage loans. On September 26, 2007, AHM Servicing conducted an auction and sold all but 32 mortgage loans owned by the Non-Debtor Affiliates,[3] and the Non-Debtor Affiliates are in the process of obtaining buyers for the remaining loans.

## D.    Schedules of Assets and Liabilities; Statements of Financial Affairs; Bar Date

10.    On October 5, 2007, each of the Debtors filed their schedules of assets and liabilities and statement of financial affairs (collectively, the "Schedules").

11.    By order dated October 30, 2007, the Court approved the Debtors' motion to establish January 11, 2008 (the "Bar Date") as the date by which creditors must file proofs of claim, substantially conforming to Official Bankruptcy Form No. 10, with the Debtors' court-appointed claims agent, Epiq Bankruptcy Solutions, LLC.

## E.    Objections to Various Motions

12.    In addition to obtaining the relief necessary to stabilize their operations and improve their financial condition, the Debtors also spent significant time and energy

---

[3]  Since the auction, one of the 32 mortgage loans has been paid off.

opposing relief that the Debtors believed was not in the best interests of their estates. Over twenty motions for relief from the automatic stay (the "Stay Relief Motions") have been filed by various parties in interest. While the Debtors have agreed to consensual resolutions of certain of the Stay Relief Motions or only objected on limited bases, the Debtors have litigated a number of the Stay Relief Motions before this Court.

13.    The Debtors litigated three motions seeking, among other things, (i) production of documents and examinations of the Debtors pursuant to Bankruptcy Rule 2004; (ii) appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code, and (iii) appointment of a trustee or examiner pursuant to section 1104 of the Bankruptcy Code (collectively, the "Consumer Motions"), to which the Office of the United States Trustee joined in part.

14.    The Debtors also engaged in considerable litigation and negotiation with Federal Home Loan Mortgage Corp. ("Freddie Mac"), the Government National Mortgage Association ("GNMA"), and Fannie Mae (together with GNMA and Freddie Mac, the "Government Agencies") regarding the Debtors' rights to continue service mortgage loans owned by or guaranteed by the Government Agencies. Ultimately, the Debtors and the Government Agencies agreed to stipulations permitting the Debtors to continue to service the subject mortgage loans for sufficient periods of time to effectuate the orderly transfer of the servicing of such loans for value.

15.    On August 3, 2007, Freddie Mac obtained a temporary restraining order from the United States District Court for the Northern District of Texas, requiring AHM Corp. to, inter alia, immediately turn over certain loan origination and servicing files to Freddie Mac. On September 10, 2007, Freddie Mac filed a motion seeking relief from the automatic stay to

- 5 -

effect the turnover of those files.  The Debtors and Freddie Mac, along with Bank of America,

N.A. ("Bank of America"), ultimately entered into a stipulation providing for an interim

servicing transfer to Bank of America and a subsequent sale of the right to service the Freddie

Mac loans.

16.    On August 20, 2007, GNMA filed a motion requiring AHM Servicing to

turn over other loan origination and servicing files to GNMA (the "GNMA Turnover Motion").

The Debtors contested the GNMA Turnover Motion on a number of bases, stating, among other

things, that GNMA's alleged prepetition termination of the Debtors' right to service mortgages

backed by GNMA was ineffective.  The parties engaged in extensive discovery in relation to the

GNMA Turnover Motion, resulting in the deposition of four witnesses and the review and

production of thousands of pages of documents.  Ultimately, the parties agreed to a resolution of

the GNMA Turnover Motion, whereby the Debtors were entitled to transfer the servicing of the

subject portfolio of loans to a GNMA-approved servicer.

17.    Fannie Mae similarly asserted that it had terminated the Debtors' contract

to service a portfolio of mortgage loans owned by Fannie Mae prior to the Petition Date.  The

Debtors and Fannie Mae reached a resolution of Fannie Mae's alleged termination by way of a

settlement agreement approved by the Court, which agreement allowed the Debtors to continue

to service the portfolio of mortgage loans owned by Fannie Mae for a period of time, in which

the Debtors were able to find a buyer for the rights to service the Fannie Mae loan portfolio.

**F.    Adversary Proceedings**

18.    The Debtors are also parties to a number of adversary proceedings

initiated in this Court, which have occupied a significant portion of the Debtors' time.

19.     On August 8, 2007, two former employees of the Debtors, on their own behalf and purportedly on behalf of several similarly situated former employees, filed a complaint for damages on account of alleged violations of the Worker Adjustment Retraining Notification Act, 29 U.S.C. § 2101 *et seq.*  The Debtors answered the complaint and entered into a pretrial discovery and scheduling order.  Discovery has commenced in the proceeding, which remains pending.

20.     Morgan Stanley Mortgage Capital Holdings, LLC ("Morgan Stanley") filed a complaint against the Debtors on August 15, 2007, seeking, among other things, declaratory and injunctive relief from the Court based on Morgan Stanley's assertion that the Debtors' servicing rights under a servicing agreement between Morgan Stanley and the Debtors were terminated prior to the Petition Date.  After negotiations with Morgan Stanley, the parties reached a resolution of the proceeding, which was embodied in a stipulation approved by the Court.

21.     Similar actions were filed by Credit Suisse First Boston Mortgage Capital LLC ("CSFB"), Bear Stearns Mortgage Capital Corp. and EMC Mortgage Corp. ("BS/EMC"), and Calyon New York Branch ("Calyon")), each of whom similarly asserted that the Debtors' rights under mortgage loan servicing agreements had terminated prepetition,  and that the Debtors were obligated to transfer the servicing of certain loans over to CSFB, BS/EMC, and Calyon, respectively.  The Debtors asserted certain counterclaims in the answers to these complaints.  The adversary proceedings with CSFB and BS/EMC have been settled.  The litigation with Calyon continues, however, and the Court held a "Phase I Trial" in connection with that adversary proceeding.

066585.1001

22.     On August 22, 2007, Waldner's Business Environments Inc. filed a complaint against AHM Corp. for reclamation of goods and immediate payment of an administrative expense claim for goods shipped to AHM Corp. prior to the Petition Date.  In addition, three other parties have asserted demands for reclamation of goods shipped prior to the Petition Date.  The Debtors have begun reconciliations of the reclamation demands made, but all of these matters remain pending.

23.     On October 22, 2007, certain of the Debtors filed a complaint against Bank of America, asserting a breach of payment obligations under certain swap agreements entered into in connection with mortgage loan purchases.  This action remains pending.

24.     On October 24, 2007, AHM Investment filed a complaint against Lehman Brothers Inc. and Lehman Commercial Paper Inc. (collectively, "Lehman"), asserting that Lehman breached its contract with AHM Corp. when it sought to foreclose on certain private-label notes, and seeking the turnover of the notes as well as various declaratory relief. This proceeding remains pending.

25.     On October 25, 2007, Wells Fargo Bank, N.A., in its capacity as Securities Administrator ("Wells"), filed an interpleader action, seeking a resolution of a dispute between the Debtors and BS/EMC regarding the rights to mortgage-backed certificates held by BS/EMC, as well as August 2007 principal and interest payments related to the mortgage-backed certificates.  This matter remains pending and the Debtors will be filing an answer in the action.

26.     On November 5, 2007, AHM Investment and AHM Servicing filed a complaint against Triad Guaranty Insurance Corp. ("Triad"), a private mortgage insurance company, asserting that Triad breached its insurance agreement by denying coverage for claims

relating to certain defaulted mortgage loans that borrowers procured by fraud. This proceeding remains pending.

## G.    Sale of the Debtors' Servicing Business

27.    The primary thrust of the Debtors' activities since the Petition Date has been in furtherance of the sale and disposition of the Debtors' mortgage loan servicing business (the "Servicing Business"), and the resolution of various disputes related thereto.

28.    On the Petition Date, the Debtors filed a motion [Docket No. 11] (the "Sale Motion") requesting, among other things, authority to establish sale procedures and approve the sale of the Servicing Business (the "Sale"). By Order dated August 9, 2007, the Court granted the Sale Motion to the extent it requested the establishment of sale procedures. After the selection of AH Mortgage Acquisition Co., Inc. ("AH Mortgage Acquisition" or the "Purchaser"), as the stalking horse bidder for the Sale, the Debtors filed a motion for authority to grant the Purchaser certain auction protections and to modify the sale procedures, which was approved by an order dated September 25, 2007.

29.    The Debtors received over sixty objections to the Sale. The Court held a week-long hearing on the Sale Motion, which hearing included testimony and oral argument from a number of parties in interest. Ultimately, after considering the evidence presented, pleadings filed, and the arguments of counsel, the Court ultimately ruled in the Debtors' favor and authorized the Sale of the Servicing Business.

30.    By Order dated October 30, 2007 [Docket No. 1711] (the "Sale Order"), the Court approved the Sale of the Servicing Business to the Purchaser pursuant to the terms of that certain Asset Purchase Agreement dated September 25, 2007 (as amended and together with

all exhibits and schedules thereto, the "APA").[4]  The Sale will be closed in two steps: an initial

(or economic) closing, which occurred on November 16, 2007 (the "Initial Closing"), and a final

closing anticipated to occur on or prior to September 30, 2008 (the "Final Closing").

31.    The APA provides that from and after the Initial Closing, the Purchaser

will fund the obligations associated with the Servicing Business.  As a result, pursuant to section

6.14(b) of the APA, the Sellers agreed to grant the Purchaser, as of the Initial Closing, a first

priority (subject only to any Permitted Liens) lien on and security interest in all of the Purchased

Assets and the Sellers' cash and cash equivalents and other proceeds received in connection with

the Servicing Business after the Initial Closing.  Further, paragraph 10 of the Sale Order

approves the Sellers' grant of the aforementioned lien and security interest upon the payment of

the Purchase Price at the Initial Closing.

32.    To fund the working capital of the Servicing Business upon payment of

the Purchase Price in accordance with the provisions of the APA and from and after the Initial

Closing as contemplated by the APA and the Sale Order, certain of the Debtors obtained

approval of a limited recourse credit facility to permit the continued operation of the Servicing

Business beyond the Initial Closing.

33.    In addition to the primary Sale of the Servicing Business to the Purchaser,

the Debtors negotiated and obtained approval of their entry into several sales of rights to service

discrete portfolios of mortgage loans to interested parties.  The Court has approved sales of

servicing rights to Barclays Bank PLC [Docket No. 610]; BS/EMC [Docket No. 1619], and

Midfirst Bank [Docket No. 1697], and the Debtors have been negotiating a separate sale

agreement with Countrywide Bank, N.A., for which the Debtors anticipate seeking Court

---

[4]  Capitalized terms not defined in this section shall have the meanings provided in the APA.  The description of the
terms of the APA herein is for descriptive purposes only.

066585.1001

approval shortly. Each of these sales was negotiated in order to realize more value than would have been realized if the servicing rights were sold to the Purchaser, and/or to resolve certain pending disputes regarding the Debtors' rights to maintain the ability to service the subject mortgage loans.

## H.    Executive Incentive Plan

34.    On November 8, 2007, the Debtors filed a motion [Docket No. 1885] (the "EIP Motion") seeking the approval of their executive incentive plan (the "EIP"). The Debtors proposed the EIP Motion for purposes of ensuring that senior management would be properly incentivized to achieve maximum value for the Debtors' stakeholders through the completion of these cases.

35.    Since the early stages of these cases, the Debtors worked diligently to ensure that they would be able present the Court with an incentive plan that was supported by the members of their senior management, yet unopposed by the Committee. This was a lengthy process that required significant negotiations with the Committee. An objection to the EIP Motion was filed by one of the Debtors' employees. After a hearing held on November 28, 2007, the Court overruled the objection and entered an order approving the EIP.

## RELIEF REQUESTED

36.    By this Motion, the Debtors respectfully request, pursuant to section 1121(d) of the Bankruptcy Code, that: (a) the period in which the Debtors have the exclusive right to file a chapter 11 plan be extended by 90 days through and including March 3, 2008; and (b) the period in which the Debtors have the exclusive right to solicit acceptances of such plan be extended by approximately 90 days through and including May 5, 2008. This is the Debtors' first request for an extension of these deadlines.

37.     The Debtors also request that such extensions be without prejudice to their rights to request further extensions or to seek other appropriate relief. In fact, notwithstanding their commitment to continue to diligently prosecute these chapter 11 cases, the Debtors do not expect that the extensions sought herein will provide sufficient time to complete the various sales and other tasks that must be completed before a plan can be filed and acceptances of such plan can be solicited. As stated below, much more must be done in these cases before any party will be in a position to file a chapter 11 plan and accompanying disclosure statement. However, based upon discussions and negotiations with the Committee, the Debtors have agreed to seek only 90-day extensions at this time, without prejudice to their rights to seek further extensions.[5] The Committee supports the 90-day extensions of time requested herein.

## BASIS FOR RELIEF

38.     Section 1121(b) of the Bankruptcy Code provides for an initial period of 120 days after the commencement of a chapter 11 case during which a debtor has the exclusive right to file a plan (the "Exclusive Filing Period"). Section 1121(c)(3) of the Bankruptcy Code provides that, if a debtor files a plan within the Exclusive Filing Period, then it has an initial period of 180 days after the commencement of its chapter 11 case to solicit acceptances of such plan (the "Exclusive Solicitation Period" and, together with the Exclusive Filing Period, the "Exclusive Periods"). The Debtors' initial Exclusive Filing Period will expire on December 4, 2007[6] and the Debtors' initial Exclusive Solicitation Period will expire on February 4, 2008.[7]

---

[5]   The Debtors requested that the Committee consent to 120-day extensions of the Exclusive Periods.

[6]   Pursuant to Local Rule 9006-2, the Debtors' Exclusive Filing Period "shall automatically be extended until the Court acts on the motion, without the necessity for the entry of a bridge order." Del. Bankr. LR 9006-2.

[7]   The 180th day of the Exclusive Solicitation Period falls on Saturday, February 2, 2007. Pursuant to Bankruptcy Rule 9006(a), the Exclusive Solicitation Period expires on Monday, February 4, 2007.

DB02:6368742.2                                                                          066585.1001

Section 1121(d) permits the Court to extend the Exclusive Periods for "cause." For the reasons set forth herein, the Debtors believe that "cause" exists to extend the Exclusive Periods.

**A.      Section 1121(d) of the Bankruptcy Code Permits the Court to Extend the Exclusive Periods for "Cause"**

39.      The Exclusive Periods under section 1121(b) of the Bankruptcy Code are intended to afford the Debtors the opportunity to propose a chapter 11 plan and to solicit acceptances of such plan without the deterioration and disruption to the Debtors' business operations that might be caused by the filing of competing plans by non-Debtor parties. In circumstances where, as here, the initial Exclusive Periods prove to be an unrealistic time frame to file and solicit acceptances of a meaningful chapter 11 plan that might garner support from parties in interest, section 1121(d) of the Bankruptcy Code allows the Court to extend the Debtors' Exclusive Periods for "cause." Specifically, section 1121(d) of the Bankruptcy Code provides:

(1)      Subject to paragraph (2), on request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.

(2)      (A)      The 120-day period specified in paragraph (1) may not be extended beyond a date that is 18 months after the date of the order for relief under this chapter.

(B)      The 180-day period specified in paragraph (1) may not be extended beyond a date that is 20 months after the date of the order for relief under this chapter.

11 U.S.C. § 1121(d).

40.      It is well established that the decision to extend the Exclusive Periods is left to the sound discretion of the Bankruptcy Court and should be based upon the facts and

- 13 -

circumstances of a particular case.[8]  See First American Bank of New York v. Southwest Gloves

and Safety Equip., Inc., 64 B.R. 963, 965 (D. Del. 1986); In re Reetz, 61 B.R. 412, 414 (Bankr.

W.D. Wis. 1986).  Although the Bankruptcy Code does not define "cause" for the purpose of an

extension of the Exclusive Periods, courts have looked to the legislative history of section

1121(d) of the Bankruptcy Code for guidance.  See In re Gibson & Cushman Dredging Corp.,

101 B.R. 405, 409 (E.D.N.Y. 1989); In re Amko Plastics, Inc., 197 B.R. 74, 77 (Bankr. S.D.

Ohio 1996).  Indeed, courts have found that Congress did not intend that the 120- and 180-day

periods be a hard and fast rule.  See Amko Plastics, 197 B.R. at 77 (noting that Congress

intended courts to have flexibility in dealing with extensions of exclusivity); Gaines v. Perkins

(In re Perkins), 71 B.R. 294, 297 (W.D. Tenn. 1987) ("The hallmark of ... [section 1121(d)] is

flexibility").  Rather, Congress intended that the Exclusive Periods be of an adequate length,

given the circumstances, for a debtor to formulate, negotiate and draft a viable plan of

reorganization, which by definition means one supported by some or all of a debtor's key

constituents, without the disruption to its business that would occur with the filing of competing

plans.  See Geriatrics Nursing Home v. First Fidelity Bank, N.A., 187 B.R. 128, 133 (D.N.J.

1995) ("The opportunity to negotiate its plan unimpaired by competition, the court held, is meant

to allow the debtor time to satisfy all creditors and win support for its restructuring scheme and

thus ensure its survival as a business.").  Indeed, Congress recognized that often a 120-day

exclusivity period will not afford a debtor sufficient time to formulate and negotiate a plan:

> The court is given the power, though, to increase . . . the 120-day
> period depending on the circumstances of the case. [T]he bill
> allows the flexibility for individual cases that is not available

---

[8]    Although the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") amended
section 1121(d) by prohibiting extensions of the Exclusive Filing Period and Exclusive Solicitation Period
beyond 18 and 20 months, respectively, of the Petition Date, there was no revision to the standards for obtaining
interim extensions.  Accordingly, pre-BAPCPA case law continues to apply and must be examined in the
context of the instant case.

066585.1001

today. For example, if an unusually large company were to seek
reorganization under chapter 11, the Court would probably need to
extend the time in order to allow the debtor to reach an agreement.

H.R. Rep. No. 95-595, 95th Cong. 1st Sess. 232 (1977) (footnotes omitted).

41.     When determining whether cause exists for an extension of the Exclusive

Periods, courts have relied on a variety of factors, each of which may provide sufficient grounds

for extending the periods. Factors considered by the courts in making such a determination have

included: (a) the size and complexity of the case; (b) the necessity of sufficient time to negotiate

and prepare adequate information; (c) the existence of good faith progress toward reorganization;

(d) whether the debtor is paying its debts as they come due; (e) whether the debtor has

demonstrated reasonable prospects for filing a viable plan; (f) whether the debtor has made

progress in negotiating with creditors; (g) the length of time the case has been pending; (h)

whether the debtor is seeking the extension to pressure creditors; and (i) whether unresolved

contingencies exist. See, e.g., Continental Casualty Co. v. Burns & Roe Enters., Inc., 2005 U.S.

Dist. LEXIS 26247, at *11-12 (D.N.J. 2005); In re Gibson & Cushman Dredging Corp., 101 B.R.

405, 409-10 (E.D.N.Y. 1989); In re Central Jersey Airport Servs., LLC, 282 B.R. 176, 184

(Bankr. D.N.J. 2002); In re Express One Int'l Inc., 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996); In

re Grand Traverse Dev. Co. Ltd. P'ship, 147 B.R. 418, 420 (Bankr. W.D. Mich. 1992); In re

Southwest Oil Co. of Jourdanton, Inc., 84 B.R. 448, 451-54 (Bankr. W.D. Tex. 1987). The

application of these factors to the facts and circumstances of these cases demonstrates that the

requested extensions are both appropriate and necessary to afford the Debtors with time to

adequately evaluate their alternatives for a plan or plans of reorganization in these cases.

**B.**    **Cause Exists for an Extension of the Debtors' Exclusive Periods in These Cases**

   **(1)**    **The Size and Complexity of These Cases**

   42.    As with other large and complex cases, the initial 120-day period in these cases did not provide the Debtors with an adequate opportunity to develop and negotiate a chapter 11 plan or plans.  Particularly with respect to these cases, the contested nature of nearly every facet of these cases to date has prevented the Debtors and their professionals from turning their attention to a chapter 11 plan.  The Debtors have been focused on stabilizing the Debtors' operations in the wake of the unprecedented upheaval in the mortgage loan and mortgage-backed securities experienced nationwide.  This sudden upheaval in the mortgage industry was caused by, among other factors, falling real estate prices and a spike in consumer defaults on mortgage obligations.  The downward pressure on loan and security values accelerated as more and more borrowers were forced to sell securities and loans in an effort to meet margin calls.  Many lenders asserted defaults prior to the Petition Date and sought to, among other things, exercise the right to terminate the Debtors' ability to service mortgage loans.  In the two weeks immediately prior to the Petition Date, the markets for these assets was disrupted to the point of dysfunction, leaving the company unable to meet the volume of margin calls and forcing major write-downs of its loan and security portfolios.

   43.    In the months since the Petition Date, the Debtors have had to work with – and in some cases, vigorously litigate with – the numerous large financial entities and other parties in interest with whom the Debtors did business, to obtain approval of the sale of the Servicing Business.  The Debtors received various notices of purported defaults from parties to the Debtors' master servicing agreements.  Certain of these parties also notified the Debtors that such alleged defaults served as the basis for disqualifying AHM Servicing from continuing to act as servicer for their loans.  Ultimately, the Debtors either resolved their disputes with these

- 16 -

066585.1001

counterparties, or obtained an order from the Court authorizing the transfer of the Servicing

Business to the Purchaser.

44.     The servicing sale process involved time-consuming litigation and

discovery, and has been the primary focus of senior management and the Debtors' professionals,

but completing the sale was essential to preserving the value of the Servicing Business for the

Debtors' estates and creditors.  Accordingly, the Debtors have not, and could not reasonably

have been expected to have formulated and negotiated a meaningful chapter 11 plan or plans

within the Exclusive Periods.

45.     Further, the sheer size alone of the Debtors' chapter 11 cases supports a

finding of cause to extend the Exclusive Periods.  The Debtors conducted business in 47 states,

and scheduled thousands of creditors in their Schedules.  In addition to the complexity of the sale

of the Servicing Business, the number of creditors and amount of prepetition liabilities in these

cases suggest a chapter 11 plan process will be complex as well.

**(2)     Good Faith Progress Made in These Cases**

46.     The Debtors have made material progress in these chapter 11 cases and do

not seek the extension of the Exclusive Periods as a means to exert pressure on the relevant

parties in interest.  In the first four months of these cases, the Debtors have focused much of their

time and resources towards minimizing the disruption to the Debtors' business operations caused

by the events leading up to and arising as a result of the commencement of these cases.  For

example, during this period, the Debtors sought and obtained, among other things, approval of a

debtor in possession financing facility and the limited use of cash collateral, authorization to

maintain their centralized cash management system and continued use of existing bank accounts

and business forms, authorization to pay wages and benefits to their employees, and

authorization to retain and employ professionals to facilitate their efforts in these chapter 11

- 17 -

cases. In addition, during this period of time, the Debtors have expended substantial time and resources in timely filing their schedules of assets and liabilities and statements of financial affairs.

47.    Most notably, as described above, the Debtors have primarily focused on accomplishing numerous tasks in furtherance of the sale of the Servicing Business. With the Initial Closing of the Servicing Business now concluded, the Debtors can now proceed in earnest, and in good faith, to resolve the various other matters required to consummate a chapter 11 plan.

(3)    **The Necessity of Sufficient Time to Negotiate and Prepare Adequate Information**

48.    As set forth above, during the four months since the Petition Date, the Debtors have focused much of their time and resources towards: (a) minimizing the disruption to the Debtors' business operations caused by the events leading up to and arising as a result of the commencement of these cases; (b) selling the Servicing Business; and (c) managing the requests and litigation initiated by various parties. As a result, the Debtors have not had sufficient time to commence substantive negotiations with respect to a consensual chapter 11 plan based on adequate information. Among other things, the Debtors have begun, but have not concluded, their analysis of whether the Debtors' chapter 11 cases should be substantively consolidated or whether the estates should be administered separately.

49.    Additionally, there are a variety of other tasks that lie ahead of the Debtors before a meaningful plan can be proposed. The Debtors still have numerous assets that must be marketed and sold, including the Debtors' federally chartered thrift and bank (which will need to be sold in a manner consistent with strict regulatory guidelines), certain whole loans and construction loans still owned by the Debtors, and certain other real estate holdings such as the

Debtors' corporate headquarters in Melville, New York. Also, the Debtors will need time to review and evaluate the claims filed once the Bar Date passes. The resolution of these asset sales and the review and analysis of claims will be determinative of the value available to the estates' creditors, and must be considered in the formulation of any plan.

      **(4)     The Debtors are Paying Their Debts as They Come Due**

      50.     The Debtors respectfully submit that, under the relevant facts and circumstances, the requested extension of the Exclusive Periods will not prejudice the legitimate interests of creditors, as the Debtors continue to make timely payment on their undisputed postpetition obligations. As such, the requested extension will afford the parties in interest a meaningful and reasonable opportunity to formulate and negotiate a chapter 11 plan or plans.

      **(5)     Termination of the Debtors' Exclusive Periods Would Adversely Impact These Cases**

      51.     Termination of the Debtors' Exclusive Periods would adversely impact the Debtors' business operations and the progress of these cases. In effect, if this Court were to deny the Debtors' request for an extension of the Exclusive Periods, any party in interest then would be free to propose a plan of reorganization for each of the Debtors. Such a ruling would foster a chaotic environment with no central focus. Now that the sale of the Servicing Business has been completed, the Debtors have an opportunity to focus on the next steps toward plan confirmation. Only after these tasks are significantly completed can the Debtors (or any party) create a reliable valuation of the Debtors' estates and liabilities and begin the plan negotiation process.

      52.     The Debtors also note that the relief requested in this Motion has been granted to other debtors in this jurisdiction in other chapter 11 cases. See, e.g., In re FLYi, Inc., No. 05-20011 (Bankr. D. Del., March 16, 2006) (Walrath, C.J.); In re Meridian Automotive Systems Composites Operations, Inc., No. 05-11168 (Bankr. D. Del., August 11, 2005) (Walrath,

C.J.); In re The Glass Group, Inc., No. 05-10532 (Bankr. D. Del., July 20, 2005) (Walsh, J.); In re Ultimate Electronics, et al., No. 05-10104 (Bankr. D. Del., June 1, 2005) (Walsh, J.); In re PSO Successor Corp., No. 04-13030 (Bankr. D. Del., March 29, 2005) (Walrath, C.J.);

53.    Finally, the fact that a Debtor may propose a liquidating rather than reorganizing plan should not negatively impact its ability to retain the exclusive right to file a plan.  Indeed, courts in this District have, on other occasions, granted multiple extensions of exclusivity in liquidating chapter 11 cases.  See In re Cone Mills Corp., et al., No. 03-12944 (Bankr. D. Del., March 8, 2004) (Walrath, C.J.).; In re SFMB Acquisition Corp., Ch. 11 Case No. 03-11524 (Bankr. D. Del., August 25, 2004) (Walsh, J.); In re SHC, Inc., Ch. 11 Case No. 03-12002 (Bankr. D. Del., April 2, 2004) (Walrath, C.J.); In re Golf America Stores, Inc., Ch. 11 Case No. 02-12313 (Bankr. D. Del., April 11, 2003) (Walsh, J.).

54.    Based upon the foregoing, the Debtors respectfully submit that cause exists in these bankruptcy proceedings to extend the Debtors' Exclusive Periods pursuant to section 1121(d) of the Bankruptcy Code.

### NOTICE

55.    The Debtors will serve this Motion on (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to the Administrative Agent; (iv) counsel to the DIP Lender; and (v) those parties who have requested notice pursuant to Bankruptcy Rule 2002, in accordance with Del. Bankr. LR 2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

56.    No previous motion for the relief requested herein has been made to this or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order

substantially in the form attached hereto:  (a) granting the relief requested herein; and

(b) granting to the Debtors such other and further relief as the Court may deem just and proper.

Dated: Wilmington, Delaware
      December 3, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

      /s/ Sean T. Greecher
James L. Patton, Jr. (No. 2202)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Sean T. Greecher (No. 4484)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

Counsel to the Debtors and Debtors in Possession

DB02:6368742.2

066585.1001