UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                           . Case No. 07-11047(CSS)
                                 .
  AMERICAN HOME MORTGAGE         .
  HOLDINGS, INC., a Delaware     .
  Corporation, et. al.,          . 824 Market Street
                                 . Wilmington, Delaware  19801
                    Debtors.     .
                                 . November 28, 2007
. . . . . . . . . . . . . . . . . 10:00 a.m.

TRANSCRIPT OF MOTIONS HEARING
BEFORE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:                 Young Conaway Stargatt &
                                 Taylor, LLP
                                 By:  MATTHEW B. LUNN, ESQ.
                                      JOEL WAITE, ESQ.
                                      PAULINE K. MORGAN, ESQ.
                                      JOHN T. DORSEY, ESQ.
                                 The Brandywine Building
                                 1000 West Street, 17th Floor
                                 P.O. Box 391
                                 Wilmington, DE  19899


                                 Quinn, Emanuel Urquhart,
                                 Oliver & Hedges, LLP
                                 By: JAMES C. TECCE, ESQ.
                                 New York, NY

For Unsecured Creditors Comm:    Blank Rome, LLP
                                 By: BONNIE FATELL, ESQ.
                                 Chase Manhattan Centre
                                 1201 Market Street
                                 Suite 800
                                 Wilmington, DE 19801


Audio Operator:                  Nicole Schaefer


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

**APPEARANCES CONTINUED:**

For Unsecured Creditors Comm.:     Hahn & Hessen LLP
By:  MARK S. INDELICATO, ESQ.
488 Madison Avenue
14th and 15th Floor
New York, NY  10022

For Dept. of Justice:     Office of the U.S. Trustee
By:  JOSEPH McMAHON, ESQ.
844 King Street
Suite 2313, Lockbox 35
Wilmington, DE 19801

For Lehman Brothers:     Ashby & Geddes
By:  DON BESKRONE, ESQ.
222 Delaware Avenue
17th Floor
Wilmington, DE  19899

Latham & Watkins, LLP
By:  ROBERT ROSENBERG, ESQ.
885 Third Avenue
Suite 1000
New York, NY  10022

Various Movants:     Draper & Goldberg PLLC
By:  ADAM HILLER, ESQ.
803 Sycolin Road
Leesburg, VA  21075

For Karen Gowins:     STEVE LANDIS, ESQ.

## **I N D E X**

**WITNESS FOR THE DEBTORS:**                                    **PAGE**

  Kevin Nystrom

    Cross Examination by Mr. Landis                     70
    Direct Examination by Ms. Morgan                    83


**EXHIBITS:**                                          **ID**    **EV**

    Debtors' Exhibit 1  Copy of plan               84     85
    Debtors' Exhibit 2  Redacted copy              85     85

4

1           COURT CLERK:  All rise.

2           THE COURT:  Please be seated.

3           MR. LUNN:  Good morning, Your Honor.

4           THE COURT:  Good morning.

5           MR. LUNN:  May it please the Court, Matthew Lunn from

6 Young, Conaway on behalf of the Debtors.

7           Referring to the amended agenda that was filed

8 yesterday, Your Honor, the first three agenda items are being

9 adjourned.  The fourth agenda item, which was a motion filed by

10 Galaxy, has been withdrawn.  Agenda item number five, this is

11 the Debtors motion to extent the removal periods.  There was an

12 objection that was filed.  We contacted the objector, explained

13 to them the relief that we were requesting, as the objection

14 seemed to indicate that they didn't understand exactly the

15 relief that was being sought.  They have sent a withdraw to the

16 clerk's office, it does not appear to have been docketed yet.

17 I have a copy of the notice of withdraw that was sent to Young

18 Conaway, if Your Honor would like to see that.  Otherwise, I

19 have a form of order unless Your Honor has any questions.

20           THE COURT:  No, I'll take your representation that

21 the objection is withdrawn.

22           MR. LUNN:  Thank you.  May I approach?

23           THE COURT:  Yes, you may.  I'll enter the order, it's

24 a routine matter.  Thank you.

25           MR. LUNN:  Thank you.  The next agenda item, Your

**J&J COURT TRANSCRIBERS, INC.**

1  Honor, is agenda item number six.  This is also being adjourned

2  by agreement of the parties.  And agenda item number seven has

3  been withdrawn.

4        Agenda items eight, through eleven were subject to

5  certificates of no objection, or certification of counsel.

6  Your Honor, I believe, entered orders with respect to those

7  matters yesterday, which then brings us to agenda item number

8  12, which is the final approval of the limited recourse DIP,

9  and Mr. Waite will be handling that.

10        MR. WAITE:  Good morning, Your Honor.

11        THE COURT:  Good morning.

12        MR. WAITE:  This is the time set for a final hearing

13  on the motion to approve the limited recourse DIP.  As Your

14  Honor may recall, we were here for an interim hearing on

15  November 14th.  The limited recourse DIP is the financing

16  that's being provided by the purchaser of the servicing assets

17  to fund the servicing business between the initial closing,

18  which occurred on November 16 and the final closing to replace

19  the cash collateral usage that we were using prior to the

20  initial closing.

21        At the conclusion of the hearing on the 14th, the

22  Court entered an interim order, and in accordance with that

23  order we served out notice of the final hearing and an

24  objection deadline.  I'm happy to report we received to

25  objections and as far as I know, this may be a first, I don't

1 believe we even have any reservation of rights to put on the

2 record today with respect to the final order.

3        Your Honor, the only change that has been made to the

4 proposed final order from the interim are those changes

5 necessary to turn into a final order.  There have been no

6 substantive changes.  So, unless the Court has any questions,

7 rather than repeat the record we made at the last hearing, I

8 propose to hand up the proposed final order and a black line

9 copy which will show the Court the changes that have been made.

10        THE COURT:  All right, that's fine.

11        MR. WAITE:  May I approach?

12        THE COURT:  Yes.  Thank you.  Does anyone wish to be

13 heard in connection with this matter?  All right, hearing none,

14 let me review the black line.  Okay.  I'll sign the order.

15 Thank you.

16        MR. WAITE:  Thank you, Your Honor.  Your Honor, I

17 believe the next item on the calendar is a motion filed by the

18 Committee.  I'll turn the podium over to Mr. Indelicato.

19        THE COURT:  All right.

20        MR. WAITE:  Ms. Fatell.

21        MS. FATELL:  Good morning, Your Honor, Bonnie Fatell

22 from Blank Rome on behalf of the Committee.  Mr. Indelicato

23 also is here.  13, 14 and 15 are the Committee's applications

24 to retain their professionals for the Committee.  The first,

25 number 13, is the application to employ Hahn & Hessen.  The

1  U.S. Trustee had some questions with respect to some of the

2  points raised in the application for both Hahn & Hessen and

3  Blank Rome.  We've met with the U.S. Trustee and we have each

4  filed supplemental affidavits to address those concerns, I

5  believe, to the Trustee's satisfaction.  And, so, we'd like to

6  hand up revised orders for both 13 and 14 for the employment of

7  Hahn & Hessen and Blank Rome, as co-counsel.

8         THE COURT:  Okay.

9         MS. FATELL: Your Honor, does the Court need a copy of

10  the supplemental affidavits?

11         THE COURT:  I have them here.  I read them before the

12  hearing.

13         MS. FATELL:  May I approach?

14         THE COURT:  Yes.  Thank you.  Does anyone wish to be

15  heard in connection with either matter?  Mr. McMahon, your

16  issues are resolved?

17         MR. McMAHON:  They are, Your Honor.

18         THE COURT:  All right.  I'll approve the retention of

19  each.

20         MS. FATELL:  Thank you, Your Honor.

21         THE COURT:  Of Hahn & Hessen and Blank Rome.

22         MS. FATELL:  With respect to item 15, Your Honor,

23  it's the Committee's application to retain BDO Seidman as

24  financial advisors.  In the original application, BDO intended

25  to use a group called Trendwith as consultants and at the U.S.

1  Trustee's request, they have agreed to withdraw that portion of

2  the application and there will be a separate application for

3  Trendwith filed in the near term, I believe.

4          THE COURT:  All right.

5          MS. FATELL:  And we've made an appropriate change to

6  the order for BDO Seidman as well.

7          THE COURT:  Okay.  You may approach.

8          MS. FATELL:  Thank you.

9          THE COURT:  Thank you. I'll sign the order.

10          MS. FATELL:  Thank you, Your Honor.

11          THE COURT:  Wells Fargo, there's a series of stay

12  relief motions, Mr. Hiller, yes.

13          MR. HILLER:  Good morning, Your Honor, Adam Hiller on

14  behalf of various movants, reflected in agenda items 16 through

15  23.  Your Honor, this is fairly routine.  Your Honor has

16  probably become accustomed to this type of motion, in which the

17  estate has a junior lien on property in which the movant

18  asserts a senior lien and wants to exercise its rights and

19  remedies with respect to the senior lien.

20          In these instances, the Debtor has begun filing

21  reservations of rights that we have no problem with.  We think

22  that's an appropriate resolution for the Debtor to assert that

23  it has no objection to the relief requested but that it doesn't

24  want to surrender any rights that it has in the underlying

25  property and we think that's an appropriate response.

1          With the Court's permission, in the future, we'll

2    probably file certification of counsel reflecting that there

3    were no other objections but that technically, since there was

4    a reservation, it was a contested matter and that's probably

5    why it's on the agenda for today.

6          Unless the Court has any questions, I have the

7    proposed orders that have been revised to reflect the

8    reservations of rights that docket numbers that --

9          THE COURT:  No, I have no questions.  These are

10   routine matters and I've reviewed them.  They meet the criteria

11   of our local rules.  So, why don't you approach with the

12   orders.

13         MR. HILLER:  Very good.  I have them tabbed by agenda

14   item number.

15         THE COURT:  Thank you.  Any comments from the

16   Debtor?

17         MR. LUNN:  No, Your Honor.

18         THE COURT:  All right.  I'll sign them all.

19         MR. HILLER:  Thank you, Your Honor.  May I be excused

20   from the balance of the hearing?

21         THE COURT:  Yes, you may.

22         MR. HILLER:  Thank you.

23         THE COURT:  Give me a minute.  You can start talking,

24   Ms. Morgan, I can --

25         MS. MORGAN:  Thank you, Your Honor, good morning.

1 Your Honor, items 24 and 25 on the agenda are contested today.

2 They are the Debtors' motion for authority to pay incentive pay

3 to senior management as well as a motion to seal certain

4 portions of the exhibit.

5          I'm not sure if Your Honor wants to do that first.

6 There will be evidence presented, we do have other matters on

7 the agenda, I guess one of which is contested.  But the rest of

8 which should not entail testimony.  It's up to Your Honor.  We

9 can proceed in the order of the agenda, or move it to the end.

10          THE COURT:  Well, let's move these to the end, but

11 let's take the seal motion, when we deal with it, let's take

12 the seal motion first and then we'll move into the substance

13 and if we can get rid of the sort of more routine matters, we

14 can deal with that at the end.

15          MS. MORGAN:  Thanks, Your Honor.  But would you like

16 to move forward for now to item 26, or do you want to do the

17 seal motion right now?

18          THE COURT:  No, no, let's move to 26.

19          MS. MORGAN:  And, Your Honor, I will give the podium

20 back to Mr. Lunn.

21          THE COURT:  I understand there was a certification

22 filed, but I did not have an opportunity to read it.

23          MR. LUNN:  That's correct, Your Honor.  A

24 certification of counsel was filed.  This relates to -- agenda

25 item 26, Your Honor, is the Debtors' motion to establish

1   omnibus settlement procedures in connection with the settlement

2   of affirmative litigation that was commenced by the Debtors

3   prior to the petition date.  There's approximately 150 causes

4   of action that generally fall into three categories, actions

5   against former employees, actions against appraisers, insurers,

6   settlement agents and actions against sellers of mortgage

7   loans.

8           The procedures, to give Your Honor, sort of a broad

9   brush overview, is that the Debtors' upon, entering into a

10  settlement will provide notice of that settlement to the

11  various parties, including the U.S. Trustee, the Committee, DIP

12  lender, and provide those parties with a 20 day objection

13  period.  The U.S. Trustee filed a limited objection requesting

14  certain revisions for the proposed form of order.

15          Your Honor, I have a black line, if I may approach,

16  of that form of order.

17          THE COURT:  Yes, please.  Thank you.  These are

18  basically the changes that were attached to the U.S. Trustee

19  objection?

20          MR. LUNN:  That's exactly correct, Your Honor.

21          THE COURT:  All right.  This resolves the U.S.

22  Trustee's objection.

23          MR. McMAHON:  Your Honor, Joseph McMahon, it does.

24          THE COURT:  Yes.  All right.  I'll sign the order.

25  Do you have a clean copy?

1           MR. LUNN:  I do have a clean copy, give me a moment,

2 Your Honor.

3           THE COURT:  Okay.

4           MR. LUNN:  The next agenda item, Your Honor, is the

5 motion for approval to establish miscellaneous asset sale

6 donation and abandonment procedures.  A brief background, Your

7 Honor.

8           The Debtors have accumulated, prior to the petition

9 date, numerous office equipment, desks, chairs, computers and

10 as a result of the shutdown of the Debtors' mortgage loan

11 origination business, no longer have a need for these assets.

12 And as a result, have decided to move forward with the sale and

13 in the event they cannot sell those assets, to donate or

14 abandon them, to avoid having to continue to store these

15 assets.

16           Generally, the procedures provide for the sale or

17 donation of the miscellaneous assets, the Debtors will provide

18 notice to the Court, constituencies, with a period of time for

19 those parties to object.  The Committee will have 10 day

20 period.  One of the comments received from the DIP lenders was

21 that they wanted to included within that 10 day objection

22 period.  Other parties would have 5 days to object to a

23 proposed sale.  The notice of the proposed sale would be served

24 by overnight delivery.  If there are no objections to the

25 proposed sale, Debtors could proceed with consummation of the

1  sale.    Same idea with the abandonment, same idea with the

2  donation.

3          The Debtors did receive an objection from the Office

4  of the United States Trustee.    Through revisions to the

5  proposed form of order, we have reached an agreement that

6  resolves the United States Trustee's objection, probably makes

7  sense to walk through those revisions, Your Honor.

8          THE COURT:    Yes.

9          MR. LUNN:    May I approach?

10          THE COURT:    Yes.    Thank you.

11          MR. LUNN:    Walking through the black line, Your

12  Honor, the first substantive change appears on the second page

13  in the first ordered paragraph.    My black line is actually

14  numbered one at the bottom of that page.    I don't know if Your

15  Honor's is.

16          THE COURT:    I'm sorry, Page 2?

17          MR. LUNN:    Page 2 is actually numbered Page 1.

18          THE COURT:    Mine is numbered correctly.

19          MR. LUNN:    Okay.    The first is the first ordered

20  paragraph, the U.S. Trustee wanted to make clear that the

21  measurement of the sales, which the sales for the procedures

22  are limited to sales in the aggregate of $100,000 per sale, so

23  we made a clarification that the $100,000 is measured by the

24  total cash and other consideration received.

25          The next change appears in the second ordered

1  paragraph on that page, and which is the definition of DIP

2  lender.  This revision will become apparative (sic) or later in

3  the order, Your Honor.

4          The next ordered paragraph deals with what the sale

5  notice will contain.  After discussions with the U.S. Trustee

6  we've agreed to include the identity of the selling Debtor.

7  Also to attach a copy of the sale agreement and also to lay out

8  the objection procedures so that parties know how to object if

9  they wish to object to the proposed sale.

10          Flipping over to the next page, in the first ordered

11  paragraph, the Debtors have agreed that they will not sell

12  miscellaneous assets pursuant to these procedures to officers,

13  directors, or affiliates of the Debtors, but retain the right

14  to sell to employees of the Debtors.

15          The next few revisions are in the next ordered

16  paragraph and this is what I eluded to earlier, Your Honor,

17  with the DIP lender's comment that they wanted to be included

18  within the 10 day period to object, along with the Committee.

19  The U.S. Trustee asked that we include a provision that the

20  Debtors can agree to extent the objection period, and that

21  objections could be served by electronic mail.

22          The second from the bottom ordered paragraph, the

23  U.S. Trustee requested that instead of 5 days after service of

24  an objection to the scheduling of a hearing, that we move that

25  out to 10 days.

1          THE COURT:  Okay.

2          MR. LUNN:  The next substantive revision, Your Honor,

3   was a comment from the DIP lender.  They wanted to make clear

4   that the liens attached with the same validity, priority and

5   force that such things has prior to the sale.

6          The U.S. Trustee also requested and the Debtors have

7   agreed to cap the donation of particular miscellaneous assets

8   in the event that the Debtors cannot sell them, to each asset

9   have a fair market value of less than $5,000 and also that if

10  parties wish to object to the identity of the proposed donee,

11  they can.

12         Your Honor, the next substantive objection is in the

13  last ordered paragraph on Page 4.  These similarly track the

14  changes that were done for the sale notice --

15         THE COURT:  Right.

16         MR. LUNN:  -- where we're proposing to identify the

17  donee and also to make clear that parties can object and how

18  they can object.

19         As was done with the ability to sell to insiders,

20  here, though, the Debtors have agreed that they will not donate

21  to employees, insiders, or affiliates.  This was a comment

22  requested by the U.S. Trustee.

23         Again, the objection procedures with respect to

24  donations essentially mirror those that were done with the sale

25  notice.

1        Page 6, first full ordered paragraph, the Debtors

2   have agreed to cap abandonment per item at $5,000 fair market

3   value in the event they cannot sell or donate.  Again, the

4   noticed procedures for the sale, notice of abandonment, mirror

5   those of the donation and of the sale notices.

6        Finally, Your Honor, the last, I guess it's the

7   second to last and the third to last ordered paragraphs were,

8   at the request of the U.S. Trustee, clarifying first that we're

9   not going to sell personally identifiable information, property

10  that's not owned by the Debtors or leased by the Debtors from

11  third parties and interest that the Debtors have in consumer

12  credit transactions, pursuant to these procedures.

13       The second to last ordered paragraph, the Debtors

14  have agreed that if the Debtors have leased property to a third

15  party, that they will not sell such property, pursuant to these

16  procedures, absent consent from that third party.

17       With those revisions, Your Honor, we have resolved

18  the U.S. Trustee's objection.  The Debtors believe and submit

19  that under the circumstances of this case, these procedures are

20  necessary and justified.  The miscellaneous assets have

21  relatively de minimis value and as a result, the usual process

22  of obtaining separate approval of each sale, abandonment or

23  donation is not cost effective and, accordingly, Your Honor, we

24  would request that Your Honor approve these miscellaneous

25  procedures.

1          THE COURT:  All right.  Any comments?

2          MR. McMAHON:  Your Honor, Joseph McMahon for the U.S.

3  Trustee.  The changes do resolve our concerns.

4          THE COURT:  Thank you.  Mr. Indelicato.

5          MR. INDELICATO:  Good morning, Your Honor, Mark

6  Indelicato from Hahn & Hessen on behalf of the Committee.  Your

7  Honor, the Committee was involved with the Debtor, they

8  provided us with a draft of the motion before it was filed with

9  the Court.  We had some concerns that were addressed in the

10  revised motion that was ultimately.  We believe this is an

11  appropriate procedure to be utilized to minimize the

12  administrative burden of liquidating and selling these

13  miscellaneous assets.  So, we would support the entry of the

14  order approving the procedures.

15          THE COURT:  Okay.

16          MR. LUNN:  I have a proposed form of order if I may

17  approach.

18          THE COURT:  Yes.  I'll approve the order as agreed.

19          MR. LUNN:  Thank you, Your Honor.  Your Honor, the

20  next agenda item, which is agenda item 28, is still contested

21  by the Office of the United States Trustee and this is the

22  motion for the Debtors for authority to approve procedures for

23  the sale of loans that are owned by Broad Hollow Funding, LLC

24  and Melville Funding, LLC., of which there are 32 of these

25  loans with an approximate unpaid principle balance of about $7

1  million dollars.

2          Brief background, Your Honor.  Broad Hollow Funding,

3  LLC and Melville Funding, LLL, are non-debtor, special purpose

4  entities that were established by American Home Investment

5  Corp., one of the Debtors, to fund a portion of its prime

6  mortgage origination prior to the petition date.

7          As Your Honor may recall, in late August you approved

8  procedures for the sale of Broad Hollow and Melville loans,

9  5700 of which, with an approximate unpaid principle balance of

10 $1.6 billion dollars, through agreed procedures that were

11 proposed by the Debtors in connection with the swap parties

12 under those facilities, on September 26th, American Home

13 Servicing, again, one of the Debtors, conducted the auction,

14 sold the vast majority, other than the 32 loans that do remain.

15 The 32 loans that are at issue with respect to these

16 procedures, were not sold, due to certain compliance issues,

17 one of them is a construction loan, others are loans to which

18 American Express has an interest, so there are various reasons

19 why they were not included within the vast sale.  And as a

20 result, the Debtors are now proceeding to move forward to

21 liquidate these remaining loans and to close out the Broad

22 Hollow and Melville facilities.

23          The procedures, generally speaking, are that a sale

24 notice will be provided to the Office of the United States

25 Trustee,  Committee, DIP lender and at the request of Bank of

1  America, informally, Bank of America as counsel or as

2  administrative agent, will also receive notice.

3      Additionally, any party to have a lien, or known to

4  have a lien on the loan will also receive notice.  Parties will

5  have 10 days to object.  If the Debtors receive a better or

6  improved offer within the 10 day period, it will provide notice

7  to the same parties and consummate that sale, the later of

8  three business days, or that 10 day period.

9      The sale notice will, again, identify what loans are

10 being sole, the purchaser, purchase price, or estimated

11 purchase price and the summary of the significant terms and it

12 will remain confidential between the parties.

13      If no objections are filed, the Debtors and Broad

14 Hollow and Melville will be authorized, pursuant to the

15 procedures, to proceed with the sale, execute the necessary

16 documents to close the transaction, however, if an objection is

17 filed, we'll come before Your Honor to address whether or not

18 the sale should be approved.  Upon consummation, assuming there

19 are no objections and upon consummation of the sale, the

20 Debtors will file and serve on the 2002 list, a notice that

21 says that such sale has been consummated.

22      Your Honor, Debtors believe that the approval of the

23 procedures is in the best interest of the estate.  These

24 procedures provide the core constituencies in these cases

25 notice as to the Debtors efforts to liquidate assets that they

1  may have an interest in that, in particular, AHM is servicing

2  these loans still.

3          The U.S. Trustee has, as I indicated, Your Honor, has

4  filed an objection, however, what the U.S. Trustee fails to

5  recognize is the Debtors actually have an interest, and these

6  loans directly affect the Debtors estates for a couple reasons.

7          First, the procedures -- well, I shouldn't say -- let

8  me backup.  The procedures are designed to provide

9  transparency, which I would believe the U.S. Trustee would want

10  to have in connection with what the Debtors are doing, in their

11  efforts to liquidate the remaining assets.  As I said, Your

12  Honor, these loans are continuing to be served by American Home

13  Servicing.  Despite the sale, these loans were not transferred,

14  the servicing rights were not transferred over to the

15  (indiscernible) entity.

16          Second, Your Honor, as you heard in connection -- the

17  testimony you heard in connection with the approval of the

18  prior sale procedures, the ability to sell the remaining loans

19  by the Debtors, directly affects the claim that swap parties

20  have against American Home Servicing, through a backup

21  servicing agreement.  So, the ability of the Debtors to sell

22  it, again, directly reflects, or affects the claim of the swap

23  providers against one of the Debtors, American Home Servicing.

24          And, third, and as I alluded to, Your Honor, the

25  procedures will further the Debtors efforts to liquidate the

1 remaining assets as American Home Servicing continues to act as

2 a server for these loans.  The remaining loans were not

3 included in the servicing sale and pursuant to the APA, Section

4 6.2(f), the servicing fees received from these loans are to be

5 paid over to the purchaser in addition to other fees.

6         Accordingly, the Debtors submit that the expeditious

7 sale of these remaining loans, pursuant to procedures approved

8 by Your Honor, is a matter that concerns the administration of

9 the estate and will have a direct effect on the liquidation of

10 the Debtors assets.

11         THE COURT:  Okay.

12         MR. McMAHON:  Your Honor, good morning, Joseph

13 McMahon for the United States Trustee.  Your Honor, we filed an

14 objection to this particular motion on jurisdictional grounds

15 and a couple of points.

16         I think it's important to remember this motion is

17 different than the prior motion that the Court ruled upon in a

18 couple different respects.  First and foremost that there was

19 no, I guess, jurisdictional question, at least from our

20 perspective, with respect to the prior go with this particular

21 issue because the Debtors made a direct request for use of

22 property of the estate in connection with a set of bidding

23 procedures that was put before the Court and the Court was

24 being asked to prove certain bid protections to be paid by

25 Debtors in connection with the sale of non-debtor assets.  We

1  don't have that here and that does make matters different for

2  today's purposes insofar as the issue of whether or not this

3  Court does have jurisdiction to enter relief in connection with

4  the proposed motion.

5        In response to our jurisdictional question, I don't

6  think there's any really dispute here, is the fact that we're

7  talking about the sale of non-debtor assets and in response to

8  this jurisdictional argument, the Debtors offer two things.

9  First, these procedures, as proposed, offer transparency and,

10 therefore, we should, at least the U.S. Trustee should welcome

11 that.  And as a general matter, Mr. Lunn is correct, but again

12 the focus of this Court and our concerns is on property of the

13 Debtors estates.

14        We start with the issue of whether or not, as a legal

15 matter, there is jurisdiction for this Court to enter orders

16 with respect to that and we have to answer that question first.

17 I think the transparency question, or how we address particular

18 sale procedures as being fair is a secondary question.

19        The second point that Debtors' counsel offers is that

20 the prior testimony at the other hearing, indicating that the

21 end result of this, the size of the creditors claim, vis-a-vis,

22 the Debtors' estates, provides, I guess, independent basis for

23 this Court's jurisdiction, and we disagree with that, Your

24 Honor.  The bottom line is that the cases that we cited in our

25 objection, Marchisen, and Soko, make it clear that when we're

1  dealing with an interest that the Debtor has in a corporate

2  subsidiary, they do not have a direct interest in the assets

3  and liabilities of a subsidiary and basically the Debtors are

4  trying to, in its end run, establish case law in this area by

5  providing this Court with jurisdiction over non-debtor assets.

6          The other thing that I find, I guess, just troubling

7  is by way of comment on the proposed form of order, Your Honor,

8  is that the Debtors seem to be going forward with these

9  procedures on the premise that the Court may rule at a later

10  point, based upon objection of a party in interest, and it's

11  not even limited to jurisdictional grounds, Your Honor, that

12  the Court will determine later, whether or not this Court has

13  jurisdiction to rule upon any matters relating to a proposed

14  sale.

15          If we take a look at Page 3 of the proposed form of

16  order, Romanette 5, Romanette 4 provides that if there's no

17  objections then the Debtors are authorized to do anything and

18  everything they need to do and presumably the result binds

19  parties in interest in connection with this bankruptcy case.

20          But with respect to Romanette 5, it indicates that if

21  a written objection is filed and served in accordance with the

22  sale notice procedures, it can't be resolved, there's going to

23  be a hearing scheduled for a determination of this Court as to

24  whether or not the sale of the loan requires the Court's

25  approval and if Court approval is required, whether to approve

1  it.

2           There seems to be a, I'd say, an inconsistency there.

3  If there's no objection we're going to presume that the Court

4  has jurisdiction but if there's an objection lodged on any

5  ground, then we'll pick up with this thread later.  At a

6  minimum, Your Honor, we believe that the issue should be

7  resolved today in one way or another.  Those are our comments.

8           THE COURT:  All right, thank you.

9           MR. INDELICATO:  Good morning, again, Your Honor,

10 Mark Indelicato on behalf of the Committee.

11          Your Honor, interestingly enough the objection that

12 the U.S. Trustee had to the order is the provision that the

13 Committee found to be its saving grace.  Your Honor, we had

14 mentioned at the beginning of the case, when the first sale was

15 occurring, the committee was very concerned with the

16 transparency.  Given the peculiar nature of these assets and

17 the argument that certain parties had that these were not

18 property of the estate and that they could be sold at will, the

19 Committee was very concerned that at least procedures be put in

20 place so that the Committee could view the process and ensure

21 that maximum value was achieved.

22          What we believe these procedures do, Your Honor, is

23 (1) establish that transparency, (2) it answers some of the

24 fundamental questions that the purchasers may have that these,

25 in essence, are not property of the estate, the Debtor is

1  saying so, but to the extent it is ultimately necessary, Your

2  Honor, and an objection is raised, this Court ultimately will

3  decide it.  We don't believe the jurisdictional issue is

4  prevalent today because we believe that issue will come to the

5  Court at some point in the future.  And if ultimately the Court

6  believes these are non-debtor assets and the Court's authority

7  doesn't extend to those, if there's an objection raised, the

8  Court will so rule and the parties will be guided accordingly.

9          We believe that these procedures are in place because

10  there are a number of assets that have already been sold or

11  that may come up in the future that may have this same nature

12  and we would propose that similar procedures be put in place so

13  that there is this transparency, that the Committee has the

14  right and the ability to view them and that the other parties

15  are agreeing to it.

16          So, we believe, Your Honor, that that provision

17  provides the saving grace.  Ultimately, this Court's

18  jurisdiction may be decided at another point in time and the

19  U.S. Trustee's objection may be well taken at that point in

20  time but today, Your Honor, we believe the procedures should be

21  approved, we think it's in everybody's best interest, we

22  believe the transparency is important for this and for future

23  matters.  So, we would support the Debtor's application.

24          THE COURT:  Okay, thank you.

25          MR. McMAHON:  Your Honor, I just have to reiterate

1  something that I said earlier.  It is a today issue because of

2  the fact that in the absence of an objection, this order, this

3  procedure order is going to bind parties in interest in this

4  case with respect to a particular sale.  That's what makes it

5  a today issue.

6          THE COURT:  Where do you see that?

7          MR. McMAHON:  In other words, the question of

8  jurisdiction should not turn on whether or not an objection to

9  a particular sale is lodged.

10          THE COURT:  Well, if it's not property of the estate

11  and in no way affects the administration of the case and I

12  don't have jurisdiction over it, then the Debtors could go and

13  sell it tomorrow to anybody that -- the non-debtors could go

14  and sell it tomorrow in anyway they wish, to any party they

15  wish.  And that would be binding on the world as long as it

16  was, you know, done legally pursuant to whatever the

17  controlling law is in connection with the sale or purchase of

18  the asset of the non-debtor.

19          So, my concern would be sort of two things, (1) am I,

20  you know, providing the imprimatur of the bankruptcy court on

21  something that the bankruptcy court doesn't have jurisdiction

22  over, or am I today, deciding that in the event that there is a

23  fight, that I'll resolve it, in deciding today whether or not I

24  have jurisdiction to do that.  And I think those are valid

25  concerns.  But I'm more concerned, frankly, with the second

1  issue than I am with the first issue because I see it as a more

2  -- I see sort of approving the procedure today where I'm

3  setting sort of rules of the road by which a non-debtor can

4  sell assets as limiting the non-debtors rights as opposed to

5  expanding them.  And, in effect, the non-debtor giving sort of

6  something up that it really may be not required to do in order

7  to preserve the transparency of the bankruptcy process.

8        And, the Court is not being asked to do anything,

9  really, other than say, okay, if they want to agree to it, they

10  agreed to it, and I'll sign an order approving their agreement

11  to it.  And there are some issues in connection with the fact

12  that the loans continue to be serviced at a loss to the Debtors

13  estates because they have to pay Mr. Ross' entity, in order to

14  do that.  My memory is, in connection with the servicing sale,

15  that to the extent there are loans being serviced that were not

16  transferred, that that is something the Debtors have to pay

17  for.  So, there's that effect and, so, I think there is -- and

18  there's no other way to get rid of that servicing obligation

19  until you sell the loan.  So, I think there is some effect

20  there.

21        My concern though, is to sort of decide today that

22  I'm going to come back if there's an objection and to limit,

23  you know, Romanette 5 basically limits or you can read it as

24  limiting what the Court can look into, and it doesn't include,

25  for instance, whether the Court even has jurisdiction to make

1 that decision.

2          And, there's the retention of jurisdiction provision.

3 I don't know if you can retain something you don't already

4 have.  And then there's an invocation of 105 and 363 on behalf

5 of the non-debtor subsidiaries which I think is troubling as

6 well.

7          So, what I'd like to do, actually, whenever we take a

8 break at some point, I'm going to defer deciding this, I'm

9 going to go through the order a little more carefully when I'm

10 not sitting on the bench in front of all you people and decide

11 what provisions I'm comfortable with and I'm not comfortable

12 with because I think the Office of the U.S. Trustee raises some

13 issues.

14          I don't think they're sufficient to deny the motion

15 in its entirety, but I think they go, really, to the form of

16 order.  So, I'll take the matter under advisement for today's

17 purposes.  You're going to get a ruling before you leave, but

18 you're not going to get one right now.

19          MR. LUNN:  Thank you, Your Honor.  With that, I

20 believe we're moving onto the hearing on the management

21 incentive program.

22          THE COURT:  We have a pretrial, can we deal with

23 that?

24          MR. LUNN:  Oh, I'm sorry, you're right, there is a

25 pretrial conference, Your Honor, thank you.

1          MR. DORSEY:  Good morning, Your Honor, John Dorsey on

2  behalf of the Debtors.  Mr. Tecce from Quinn & (indiscernible)

3  is here on behalf of the Debtors, as well and I believe Lehman

4  Brothers counsel is here.

5          We did have a conference call yesterday between the

6  Debtors counsel and Lehman's counsel.  Lehman on Monday filed a

7  motion to dismiss the complaint, a partial motion to dismiss,

8  but it would resolve almost all of the counts but one, and the

9  parties agreed that it would be in the best interest of both

10 sides to stay discovery pending the resolution of that motion,

11 but we wanted to present that to Your Honor and see how Your

12 Honor feels about it.

13         THE COURT:  That's fine.  Mr. Beskrone, good morning.

14 Introduce Mr. Rosenberg to me.

15         MR. BESKRONE: You're a mind reader.

16         THE COURT:  We've met.

17         MR. BESKRONE:  I was going to say, I'd like to

18 introduce -- Don Beskrone, Ashby & Geddes for Lehman Brothers.

19 Your Honor is familiar with Mr. Rosenberg, I'd like to move his

20 admission pro hac vice.  I'll follow up with a formal motion

21 afterwards.  Thank you.

22         THE COURT:  You're welcome, yes.  Mr. Rosenberg is

23 admitted.

24         MR. ROSENBERG:  Thank you, Your Honor.

25         THE COURT:  Good morning.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. ROSENBERG:  We agree with the plaintiff's

2   position that since we are very hopeful to dispose of most of

3   this matter on a motion to dismiss, that it makes sense to have

4   that decided before a lot of money and effort is spent on

5   discovery, so we would ask Your Honor's agreement in that

6   regard.

7          THE COURT:  All right.  That's fine.  Do you want a

8   formal order saying that or should we just simply allow the

9   briefing to go forward, submit it under certification of

10  counsel when it's done, and we'll schedule something and then

11  we can just hold in abeyance any further scheduling order until

12  I've decided that.

13         MR. ROSENBERG:  That's fine, Your Honor.

14         THE COURT:  All right.  That's fine.  Have you agreed

15  on a briefing schedule?

16         MR. DORSEY:  I believe we're just going to follow the

17  local rule, Your Honor.  But Mr. Tecce does have an issue where

18  he will be out of the country for an extended period of time.

19  I know he wanted to make sure that the oral argument didn't get

20  scheduled during that period.

21         THE COURT:  Well, the way I generally proceed is, I

22  don't order oral argument until I've actually read the briefs,

23  but if the parties feel strongly they'd like oral argument and,

24  you know, I'm very familiar with counsel for both sides and I

25  trust their judgment, so if you want to schedule it now, we can

1 do that now.  That may make some sense to accommodate your

2 schedule Mr. Tecce.

3            MR. TECCE:  Well, I appreciate that very much, Your

4 Honor.  I'd like to confer with opposing counsel, but I think

5 -- and talk to our clients.  We may want to request oral

6 argument at some point.  The scheduling issue that I had

7 raised, actually, was that I will not be in the country from

8 the 19th until the 2nd, of January.  And, I think the way the

9 briefing schedule will work, our response is due on the 11th,

10 and if they put in a reply, it'll be bucking up right on that

11 date anyway.

12            THE COURT:  We won't deal with this until the new

13 year then.

14            MR. TECCE:  That's what I thought, thanks.

15            MR. ROSENBERG:  That's certainly fine, Your Honor.

16            THE COURT:  All right.  Okay, very well.  I don't

17 think we need to worry about it then, it's not a today issue.

18            So, we'll continue the scheduling conference, sort of

19 without date pending a determination of the motion to dismiss

20 and once I get the briefs, I'll work with -- Ms. Gadsen will

21 work with you to come up with an appropriate date for oral

22 argument.

23            MR. TECCE:  Thank you very much, Your Honor.

24            THE COURT:  You're welcome.

25            MR. ROSENBERG:  Thank you, sir.

1          MR. BESKRONE:  Thank you, Your Honor.

2          THE COURT:  All right.

3          MR. BESKRONE:  Your Honor, may we be excused?

4          THE COURT:  Yes, you may.

5          MR. BESKRONE:  Thank you.

6          THE COURT:  All right.  Let's do this.

7          MR. TECCE:  Your Honor, may I be excused?

8          THE COURT:  Yes, you may.

9          MR. TECCE:  Thank you very much.

10          THE COURT:  Before we turn to the issues with regard

11 to the management incentive plan, I almost said KERP, I

12 wouldn't do that to you, Ms. Morgan.

13          MS. MORGAN:  Thank you.

14          THE COURT:  Let's take a brief recess so I can hear

15 the Freedom Rings matter which was on for 11, which I believe

16 is short, because I think there are only two matters on the

17 agenda and one was resolved.

18          MS. MORGAN:  Very well, Your Honor.

19          THE COURT:  All right.  So, let's take a brief recess

20 to allow sort of a switch of the players.  We'll take Freedom

21 Rings and then we'll go right back into the management

22 incentive plan.  All right.

23              (Court hears another matter)

24          COURT CLERK:  All rise.

25          THE COURT:  Please be seated.

1          MS. MORGAN:  Good morning, again, Your Honor, Pauline

2     Morgan from Young, Conaway, Stargatt and Taylor on behalf of

3     the Debtors.

4          Your Honor, we're back to items 24 and 25 of the

5     agenda and as Your Honor indicated, you prefer to go to 25

6     first?

7          THE COURT:  Yes.

8          MS. MORGAN:  Your Honor, briefly 24 is the Debtors

9     motion for order authorizing payment of incentive pay to senior

10    management pursuant to Sections 105, 363 and 503(c)(3) of the

11    bankruptcy code.

12         Item 25 is a related motion for authority to place

13    under seal Exhibits A and C to the plan.  The plan is attached

14    as an exhibit to the motion and it is Exhibits A and C to the

15    plan itself that we seek to place under seal.

16         There were no formal objections filed to this motion.

17    We did have informal discussions with the U.S. Trustee and the

18    SEC with respect to both motions, actually, but in connection

19    with 25, the seal motion, the U.S. Trustee requested and the

20    Debtors have agreed, to disclose the proposed minimum plan pool

21    payment allocations for those plan participants whose

22    compensation would be required to be disclosed for SEC purposes

23    anyway.

24         THE COURT:  All right.

25         MR. MORGAN:  So, we have agreed to do that and if we

1 get there, Your Honor, I will have an order that the U.S.

2 Trustee and the SEC and the Committee are comfortable with.

3       With respect to the objection of Karen Gowins, Your

4 Honor, Ms. Gowins filed an objection to item 24 which is the

5 motion itself, to approve the executive incentive plan but in

6 the body of her objection she does take issue with the motion

7 to place certain aspects under seal.

8       Essentially, she seems to suggest that she needs to

9 have that information and if she were privy to that information

10 she could better evaluate whether the Debtors proposed

11 allocation is appropriate.

12       Your Honor, with all due respect, we don't think

13 we're here today to assess Ms. Gowins' business judgment, but

14 the Debtors and we do believe that the information is

15 confidential information and would like to proceed, if

16 acceptable to the Court, to make a brief proffer of testimony

17 with respect to the need to have these exhibits under seal.

18       THE COURT:  All right.  Any objection to the use of a

19 proffer?

20       MS. MORGAN:  I should say, the witness is available

21 for cross-examination.  He's in the courtroom.

22       MR. LANDIS:  Who is the witness?  I'm sorry, Steve

23 Landis, attorney for Karen Gowins.

24       THE COURT:  You have to speak into the microphone,

25 sir.

1        MR. LANDIS:  Steve Landis, the attorney for Karen

2 Gowins, who is here in the courtroom today.  Who is the

3 witness?

4        MS. MORGAN:  The witness is Mr. Kevin Nystrom, he's a

5 senior director of Kroll, Zolfo, Cooper and he is director of

6 restructuring of the Debtors.  Is that acceptable?

7        MR. LANDIS:  Sure.

8        THE COURT:  Okay, you may proceed by proffer.

9        MS. MORGAN:  Thank you, Your Honor.  Your Honor,

10 again, if called to testify today, we would call as a witness

11 Mr. Kevin Nystrom.  He's a senior director of Kroll, Zolfo,

12 Cooper.  Kroll, Zolfo, Cooper has ben retained in these cases

13 to act as crisis managers and advisors to the Debtors, and Mr.

14 Nystrom has the role of director of restructuring of the

15 Debtors.

16        If called to testify in connection with the motion to

17 place Exhibits A and C to the executive incentive plan under

18 seal, he would testify that those exhibits contain nonpublic

19 information, which is highly confidential to the Debtors.  It

20 relates to the identities of the plan participants and the

21 proposed payments to be made to each of those plan participants

22 if the plan is approved today.

23        The plan participants are critical to the Debtors

24 asset sales and also to the remaining matters that are upcoming

25 in these cases, such as the preparation and prosecution of a

1  plan and the management of the claims reconciliation process.

2          Mr. Nystrom would testify that if this confidential

3  information is exposed, other potential employers of these

4  individuals would use such -- may use such information to lure

5  away these employees who we consider highly important at this

6  critical juncture in the cases.

7          They could, by gleaning that information, by

8  obtaining that information, know exactly what would be needed

9  to bonus these people away, or pay appropriate compensation to

10  lure they away.

11          In addition, he would testify that disclosure of the

12  names of the plan participants and the proposed amounts, would

13  be highly disruptive to the Debtors day-to-day business

14  operations.  It would create a competitive and unhealthy work

15  environment in which each employee would be privy to his

16  colleagues worth in the eyes of the Debtors with respect to

17  this process and he believes that would be harmful to the

18  Debtors estates and is not appropriate.  And that would

19  conclude Mr. Nystrom's proffer as to that motion.

20          THE COURT:  All right.  Anyone wish to cross-examine

21  the witness?

22          MR. LANDIS:  Your Honor, if I may, without going to

23  the cross-examination point at this juncture, I think the

24  issues are notwithstanding the existence of that potential

25  testimony, should the witness go on the stand, but whether or

1 not the information should be made available under the

2 bankruptcy code.  There is no specific provision for the

3 secrecy of employee information.  The reasons stated, or would

4 be stated by Mr. Nystrom are not necessarily binding on this

5 Court.  This Court can find that the release of the information

6 is allowed and should be given under the bankruptcy statute for

7 the release of the records.  It allows not just for Ms. Gowins

8 to determine whether or not the payment and numbers are

9 appropriate, but for this Court to consider the amounts of

10 incentive given to each particular employee.

11       The arguments that are being raised by Mr. Nystrom go

12 more towards a KERP, if it was going to be a severance plan,

13 but this is an incentive, and each employee should know exactly

14 whether or not they're being incentivized appropriately under

15 the management incentive plan as well as management should be

16 able to justify and give specific reasons for each employee as

17 to why that particular employee is being incentivized in that

18 particular way for that particular amount. I think that's the

19 critical distinction between the KERP and the incentive plan

20 and I'm not aware of decisions that allow under the new

21 bankruptcy code, for the secrecy of the information, and why

22 this Court should allow it to be done.

23       There is an analysis that this Court needs to take --

24 that this Court needs to do with regards to the approval of

25 this particular plan.  If there was a particular desire to keep

1    all employee information secret, then certainly the bankruptcy

2    code would provide for a particular provision, but it does not.

3    It's secret, it's talking about trade secrets, but these

4    employees, regardless of Mr. Nystrom's proffer, are certainly

5    looking for employment already.  There is no disruption to the

6    workplace.  There are folks who have left and are planning to

7    leave because, of course, the company is in bankruptcy.  There

8    is a finite end to their employment and there's not going to be

9    any more disruption to the workplace than there is already that

10   now exists because employees have left.  Critical employees who

11   needed to perform certain functions are gone from the

12   workplace.  There are folks who performed duties that are there

13   in the office, sometimes and not in the office at other times

14   because they're going on interviews.  They're looking for other

15   work.  And, so, the disruption that's suggested by counsel and

16   Mr. Nystrom, I think, is overblown.  They're talking about 27

17   total employees.  This is, and if I recall correctly, there's a

18   thousand current employees.  This is not a complete disruption.

19   And to the extent that they don't want to release the

20   individual names of the employees, they can certainly release

21   the titles of the employees, the particular incentive amounts

22   and provide further information as to how they came up with

23   each particular dollar amount for each particular employee.

24        In Ms. Gowins' case, it certainly is unclear as to

25   why as indicated in the motion papers, she's only being given

1  2.2 percent --

2          THE COURT:  All right.  I actually asked you if you

3  had any questions for the witness.

4          MR. LANDIS:  I'm sorry, I apologize.

5          THE COURT:  You've gotten into oral argument now.

6          MR. LANDIS:  I apologize.

7          THE COURT:  So, I take it the answer is no, you don't

8  have any questions.

9          MR. LANDIS:  That's correct.

10          THE COURT:  All right.  Ms. Morgan, do you have any

11  other witnesses or any other testimony, or evidence, I

12  apologize?

13          MS. MORGAN:  Your Honor, I don't have any evidence,

14  but whenever you're ready, I'm prepared to proceed to argument

15  as well.

16          THE COURT:  Well, let me ask some questions, because

17  I think they are raised by the argument that I was hearing.

18  I'm looking at Exhibit A, and I'm wondering why any of that

19  information needs to be confidential.  Or is confidential?

20  Certainly it's not secret to anyone that the chief information

21  officer or the general counsel or the chief executive officer,

22  et cetera, are covered by the incentive plan.  So, I guess my

23  first question to you is, why is the identity of who's covered

24  under a senior management incentive plan secret or confidential

25  when who senior management is is not confidential information?

1          MS. MORGAN:  Your Honor, with respect to the identity

2   of the -- obviously, once you disclose the descriptions of who

3   is being paid, you obviously know -- I'm sorry, of the

4   positions, you obviously know who is being paid under the

5   executive incentive plan and we did want to keep that

6   information confidential.  And before I further respond, I did

7   want to point out to the Court that we did disclose to Ms.

8   Gowins at her request, at her counsel's request, what the

9   proposed amount for her bonus would be.  So, she does have that

10  information with respect to herself.  She does not have that

11  with respect to others.

12          Getting back to this exhibit, Your Honor, you know,

13  we merely believe that both the identities of the individuals

14  as well as their compensation, certainly, and their bonus

15  percentage, should be kept confidential, otherwise, everyone

16  would know who the participants are, even if they didn't know

17  how much they would be receiving.

18          THE COURT:  All right.  Well, 107(b) says that I

19  shall protect an entity with respect to a trade secret or

20  confidential commercial information, so confidential commercial

21  information is, I'm sure, what you're relying on here.

22          MS. MORGAN:  Yes, it is, Your Honor.

23          THE COURT:  And, of course, for something to be

24  confidential, it can't be in the sphere of the general public.

25          MS. MORGAN:  Yes, Your Honor, and the --

1          THE COURT:  You've already identified, there are

2   ceratin people to resolve the Office of the United States

3   Trustee objection, there are certain persons you're going to --

4          MS. MORGAN:  We're going to disclose their identities

5   as well as their share of the pool.

6          THE COURT:  All right.  So, Exhibit A and Exhibit C

7   will be, at least for certain people, be in redacted form and

8   those would be the persons that would generally be covered

9   under SEC reporting requirements.

10         MS. MORGAN:  Yes.  Actually, Your Honor, the way

11  we've worked it out with the U.S. Trustee, again, if we get to

12  that point, a modified order attaches a short chart with those

13  individuals named, their titles and their, again, participation

14  in the pool.

15         THE COURT:  But I'm looking at your motion, okay, and

16  it says, to motivate the approximately 27 executives, senior

17  vice presidents and vice presidents remaining in the Debtors

18  employ and then you define that as senior management.  I'm

19  struggling, you know, having sort of generally described who

20  senior management is, give an number of who the senior

21  management is and then going through the bulk of the plan, and

22  talking about the different criteria that have been set in

23  order to trigger payments under the plan and, you know, who is

24  going to be required to do what, isn't it already in the public

25  sphere basically all -- and I'm not talking about what you're

1  going to pay them, I think -- I draw a distinction between, you

2  know, what they're going to get paid and the issues that that

3  raises for the Debtors, vis-a-vis, protecting its competitive

4  ability to maintain its valuable employees versus identifying

5  who, basically senior management is and what the

6  responsibilities are.

7       MS. MORGAN:  Your Honor, I understand the

8  distinction.  From the perspective of the Debtors, and we do

9  have -- we have less than a thousand employees left now, we

10  just believe that with the two exhibits together, although you

11  wouldn't necessarily have the payment information with the

12  first exhibit, each employee would be able to basically go on

13  our website and determine who was getting a bonus.  They might

14  not be able to determine why depending on the Court's decision,

15  or how much, but they would be able to identify the people that

16  work around them, their bosses or their colleagues bosses, and

17  we thought it would be disruptive and would be harmful and,

18  again, not necessary for purposes of this hearing.

19       We do believe it's confidential commercial

20  information.  We understand that Your Honor sees a distinction

21  between the amounts to be paid and the identity of the

22  positions but, again, when you read the two together, Your

23  Honor, it was our view that it would be disruptive to the

24  workplace and harmful to the estates to allow employees to

25  basically piece this together.

1          THE COURT:  And, how is that confidential commercial

2 information?

3          MS. MORGAN:  Because, essentially, Your Honor, we're

4 identifying who is getting a bonus.  We're identifying every

5 position that is getting an incentive bonus under the plan.

6 Not by name, but by title.  And it could easily be figured out.

7 And I understand --

8          THE COURT:  Well, I would, I mean, I'm leaning

9 towards requiring you to identify by name and title and

10 description, but not necessarily what they're going to receive.

11 And, I'm trying to figure out how that -- it doesn't affect the

12 competitiveness, it's not an issue of losing employees to

13 competitors.  Your focus is more that it would be disruptive to

14 the Debtors business.

15          MS. MORGAN:  Well, if Your Honor requires us to

16 identify the names, then it would also be an issue for the

17 outside world.  And I realize we're in a world where there

18 aren't that many industry -- employers of the exact industry,

19 but there are many of these senior executives who have high

20 level positions, transferable skills that could be useful to

21 any employer.

22          THE COURT:  Do you have to list that you've worked

23 out with the U.S. Trustee that I can see?

24          MS. MORGAN:  Yes, Your Honor.

25          THE COURT:  Thank you.  Oh, it's not very many

1  people.

2       MS. MORGAN:  Your Honor, since you seem to be

3  intently analyzing, I did speak to my client while you were

4  reviewing, the Debtors would be, if the Court feels more

5  comfortable, would be willing to disclose, again, the names and

6  the titles.  But, again, we feel very strongly that to disclose

7  anything further would be harmful to the estates.

8       THE COURT:  All right. I think that's -- I think you

9  need to -- I think you have, in effect, for all intents and

10  purposes, identified these people already, publicly.  It

11  certain may be, you know, three or four or five people would

12  still be somewhat of a -- the question as to whether they were

13  in that pool or not, but I think that just the very nature of

14  the program, you've in effect, identified these people.  And

15  while I understand that I'm required to protect information

16  under 107(b), the confidential commercial information, at some

17  point the Court, while it's required to do that under the

18  statute, has to weigh, in connection with being asked to

19  provide relief, whether the Court can provide that relief

20  without that information becoming public and that the give and

21  take in the statutes, as I'm continuing to sort of puzzle

22  through this, as I have other issues come before me and I think

23  more and more about the statute, I think at some point while

24  Debtors have the ability or other entities have the ability to

25  protect this information, that choice to invoke that right at

1  some point, may affect the ability of the Court to provide

2  other relief related to that information.  I'm not saying

3  that's where we are today.

4       All that said, I thin Exhibit A needs to be publicly

5  disclosed.  Let me hear, since I cut off the objector, let me

6  hear argument why you need -- why the share of the minimum plan

7  pool by percentage and dollar amount or whatever, needs to be

8  public information, and is not confidential commercial

9  information, under 107(b), if you still wish to make that

10  argument.

11       MR. LANDIS:  Thank you, Your Honor, and I apologize

12  for stepping over the boundary before the question.  To some

13  extent, you know, it is intertwined in terms of the issues

14  between the names of the employees versus the amounts that

15  they're getting.  As a general issue, I just need to note, to

16  kind of give you some degree of comfort with regard to the

17  names of the employees, my client advises me that the senior

18  management were part of an organizational chart that was

19  publicly available on the website, and certainly these were not

20  CIA employees who maintained a veil of secrecy over their life.

21  They were out in the business community, they were certainly

22  known to the business folks.

23       With regard to the dollar amount itself, since that

24  seems to be the remaining issue, there is no inherent right for

25  an employer to maintain secrecy under statute, certainly not

1 under bankruptcy law of salary information.

2       THE COURT:  Well, no, I take issue with that.

3 Generally speaking, other than those that are publicly

4 disclosed as required under the law, most companies do keep

5 salary information confidential.  I remember my law firm

6 practice, we were very careful about trying to keep salary

7 information as confidential as possible and you can't do

8 anything about employees who like to tell everybody else what

9 they're making, but there are valid commercial reasons to keep

10 that type of information confidential.  And I mean, 107(b) says

11 that I'm required to protect an entity with respect to

12 confidential commercial information.  I mean, that's what it

13 says.

14       MR. LANDIS:  Understood, and I have the statute in

15 front of me, Your  Honor, and I understand the policy reasons

16 why an employer would like to keep the salary or compensation

17 information confidential, but that doesn't necessarily mean

18 that it is confidential as required by the statute, or that it

19 needs to be required confidential in terms of when the Debtor

20 is coming before you in order to seek approval of a management

21 incentive plan under the statute.

22       THE COURT:  Well, that's what I was touching on with

23 Ms. Morgan which is --

24       MR. LANDIS:  Right.

25       THE COURT:  -- it may be that ultimately this issue

1  affects their ability to get the affirmative relief they're

2  requesting on the merits, which -- I mean, it may be, I'm not

3  deciding that, but it may be that, you know, I can't grant you

4  the 503(c)(3) relief being requested without disclosing what

5  people are going to be paid.  That's a separate issue from

6  107(b).

7       MR. LANDIS:  That's right, and I touched upon that

8  briefly and I didn't mean to confuse the two.  Obviously,

9  there's the two separate motions but to some extent as I

10 mentioned, they are inexorably intertwined.

11      But I think the distinction within the statute, it

12 says that it's confidential or commercial information.  There's

13 information with regard to particular strategies that an

14 employer has or the Debtor has with regard to which loans it

15 wants to seek refinancing or which loans it needs, or thinks

16 it's going to have difficulty in terms of collecting payments

17 it might be willing to waive, that's a strategy issue but it's

18 a factual issue at this particular point with regard to the

19 salaries and compensation.

20      And, you know, appropriately, it's appropriate for

21 Ms. Gowins as a debtor as well as an employee because as I

22 mentioned in our objections, she is owed substantial amounts

23 for non-payment of her wages, both prepetition as well as now

24 an administrative expense post petition and it's a significant

25 concern to her because -- and I'll explain how this ties in, in

1  a moment, but as she looks and determines through her filed

2  proof of claim, what is she going to receive as both an

3  unsecured creditor as well as for as a continued employee, she

4  needs to make evaluations as to how the monies are being spent

5  and the bankruptcy code allows her to intervene and to come and

6  make objections as well the creditors committee which, of

7  course, in theory, represents the unsecured creditors, but she

8  has no right, otherwise right, to determine as an individual

9  interested in the process, whether or not the money is being

10 spent appropriately.  And, so, although, again, it ties into

11 the next remaining issue for the other motion, but simply

12 because they call it commercial or confidential information

13 does not make it so.

14        And the information to some extent is known,

15 obviously, senior executives are going to get paid significant

16 sums of money.  I don't think there's any doubt here.  Folks

17 were very successful in the company up until the credit crisis

18 in August or around that time.  And so, this is not an issue

19 where people are going to, in theory, are going to be getting

20 paid you know $1 versus their buddy in the next cubicle getting

21 paid a million dollars.  It should all be consistent in theory

22 with what they have been owed and what's going to incentivize

23 them.  So, there shouldn't be an issue of the confidentiality

24 or commercial secrecy because, again, it's inexorably

25 intertwined.  If they're getting paid the appropriate,

1  reasonable amounts to incentivize them, based upon their job

2  duties, it really shouldn't be a secret.  It should be

3  something that's known, to say, hey, folks, this is what you

4  need to do in order to make sure that you as well as everybody

5  else, because this is not, the way the plan is designed, it's

6  not just focused on individual performance, it's a group as a

7  whole.  And so, the group as a whole needs to know what the

8  group as a whole should be getting because that's the nature

9  and design of the plan.  And under the nature and design of the

10 plan, I'm not sure how you could then say, well, we'll focus on

11 the whole but, you know, when the individuals want to know

12 their individual amounts, you can't.

13         I mean, interestingly enough, the counsel for the

14 Debtor indicated that, you know, Ms. Gowins was told the amount

15 she was getting.  I just need to note for the record that it

16 was not easy for us to even get that information as it related

17 to her.  When the incentive plan was identified or publicly

18 filed, Ms. Gowins sought to get the information and she was

19 told, I can't tell you.  She went from person to person within

20 American Home Mortgage and they would not tell her.  She was

21 told, in fact, that only the president and CEO could tell her

22 and as I indicated in the motion papers, either filed or soon

23 to be filed, the CEO was not available to meet with her and

24 only upon pressing the issue with counsel for the Debtor was

25 that information finally disclosed.  And so the idea is that

1  there's secrecy overall which I just don't think is appropriate

2  under the bankruptcy code.

3          THE COURT:  All right.  Thank you.  I am going to

4  overrule the objection in connection with Exhibit C.

5          MS. MORGAN:  Your Honor, I'm sorry.

6          THE COURT:  Yes?

7          MS. MORGAN:  I realize I was starting to get on a

8  role there, but I just wanted to come back very briefly.

9          Your Honor, when I mentioned earlier about Exhibit A,

10  and our willingness to disclose the names and the titles, we

11  did not make that same offer and I realize it's not binding on

12  the Court for the job descriptions.  Your Honor referred to the

13  entirety of Exhibit A, which does, basically, not only identify

14  the positions but it tells everyone what these responsibilities

15  of each of these people are and we do think that how we

16  delegate our duties within the company, to individual tasks, is

17  a confidential, commercial document.

18          So, again, I would ask with respect to A, that we be

19  required to disclose the name and the title and if Your Honor

20  likes, we could probably do a much brief job description, but I

21  think some of the information in this Exhibit A, we would find

22  to be confidential commercial information.

23          THE COURT:  Well, yes, and I think some of it is.

24  Some of it deals specifically with the -- some of it is really

25  editorial type information and identifies the Debtors -- how

**J&J COURT TRANSCRIBERS, INC.**

1  these people fit into the Debtors strategy for liquidating the

2  case.  So, I was focused more on the name and title.  So, I

3  will require the Debtors to identify the participants by name

4  and title on Exhibit A.  I will not require any job

5  description.  I think it's to a certain extent

6  self-explanatory.

7        MS. MORGAN:  Thank you, Your Honor.

8        THE COURT:  And I will hold Exhibit -- and I do hold

9  and overrule the objection in connection with Exhibit C, that

10  the share of the minimum plan pool by a percentage in dollar

11  should remain confidential.  It's confidential, commercial

12  information.  It reveals the Debtors strategy and internal

13  information in connection with the various value of its

14  employees.  It would -- the evidence is that it could be

15  harmful to the Debtors, both in the competition for the

16  employees that it's been able to retain, as well as its ability

17  to maintain a positive working environment to liquidate these

18  cases at the greatest amount possible for the Debtors estates.

19  So, I will require the Debtors to identify the name and title

20  of the participants, but the remainder of the information on

21  Exhibit A and C will remain confidential.  And that's without

22  prejudice to the objectors argument that having invoked that

23  protection, that that may somehow affect the Debtors ability to

24  get the relief requested in the substantive motion.

25        MS. MORGAN:  Thank you, Your Honor.  Obviously, the

1 order will need to be revised to reflect the Court's ruling, so

2 I would suggest that we do that under certificate of counsel.

3          THE COURT:  Yes, that's fine.  I'll so order the

4 record for present purposes.

5          MS. MORGAN:  Thank you, Your Honor.  Your Honor, then

6 turning back to item 24, which is the motion itself, to seek

7 Court authority to pay incentive pay to the Debtors senior

8 management.  As Your Honor will recall from other hearings, and

9 other pleadings filed in the Court, we did have a significant

10 reduction of force immediately prior to the bankruptcy.  We

11 went from a workforce of about 7500 to 1,000 at that time, and

12 it's even less today.

13          On the first day of the case we filed a motion for

14 approval of a retention plan for non-officer employees, this

15 current executive incentive plan, Your Honor, has actually been

16 under consideration for near the beginning of the case as well.

17 The Debtors employees including senior management are of

18 critical importance to the success of these cases.

19          In accordance with Section 503(c)(3), the Debtors

20 have attempted and believe they have, developed an executive

21 incentive plan which is designed carefully, to incentivize and

22 motivate senior management to maximize creditor recoveries, to

23 consummate sales of assets, additional sales other than the

24 ones you've already seen in the courtroom, on an expedited time

25 frame and also to expeditiously and efficiently manage the rest

1  of the case, including the wind down of the Debtors operations

2  and a Chapter 11 plan and claim process.

3         In addition, Your Honor, it was important to the

4  Debtors to develop a plan that would be acceptable to the

5  Committee.  We've had substantial discussions with the

6  Committee since early in the cases, and with their advisors.

7  We've listened to the Committee's issues and concerns and over

8  the course of the last few months have made certain revisions

9  to the order -- I'm sorry, to the plan, so that it would be

10 acceptable to the Committee and we're pleased to be here in the

11 position of having a plan that is acceptable to the Committee.

12        The Debtors believe that the plan in its current form

13 will be beneficial to the estates and their creditors because

14 it does incentivize people to maximize creditor recoveries and

15 we hope the Court will agree after hearing the evidence and we

16 assume that's why we do have the Committee on board for this.

17        We've also had discussions about the plan with the

18 United States Trustee and the Security Exchange Commission and

19 they have not filed an objection either, Your Honor, but they

20 did have two requests.  One of which we've already dealt with

21 and that was the unsealing of certain individuals who would be

22 participants and also with respect to the order, the U.S.

23 Trustee and the SEC asked for a provision that would allow a

24 participants bonus to be clogged back or disgorged if one or

25 both of the following circumstances comes to light.  If such

1  plan participant is determined to have civil or criminal

2  liability relating to his or her employment, or if the Debtors

3  later discover that such a participant had a material and

4  direct conflict of interest that was not specifically waived,

5  the concerns was that these facts or events may not come to

6  light until after the bonuses are paid.  So, we have revised

7  the order in way that it is now acceptable to the SEC, the U.S.

8  Trustee as well as the Committee.

9       THE COURT:  I assume that would -- if that happened,

10 that would undo the release.

11      MS. MORGAN:  I would assume that would, Your Honor.

12      THE COURT:  Okay.

13      MS. MORGAN:  We do, as you know, have an objection.

14 A little unusual, at least from my perspective, to have an

15 objection from a plan participant but that is what we have

16 today, Your Honor.  Ms. Karen Gowins has objected to the

17 executive incentive plan.  Her primary objection appears to be

18 the fact that she would be required to release any other claims

19 to bonuses she may have and she's right, that is a requirement

20 of the plan.  The plan does require that in consideration for

21 receiving the bonuses that are contemplated, participants would

22 have to sign a release and waiver form that was attached to the

23 motion.  I think Ms. Gowins believes that because of that, the

24 plan doesn't properly incentivize her because she believes she

25 has substantial claims against the Debtors.

1          We do believe, and the Committee shares our view,

2    that it is reasonable to request participants to waive other

3    bonuses that they may be entitled to or other claims and, in

4    fact, the Committee requested that this be included as part of

5    the plan.

6          Secondly, her objection largely relates to her claim

7    and her employment agreement and the fact that she has not been

8    paid in her view, prepetition and that she alleges that there

9    are certain administrative expenses that may be owed to her,

10   post petition.

11         Your Honor, neither Ms. Gowins contract nor her claim

12   are before the Court today.  And we don't believe they're

13   relevant to the Court's consideration of the executive

14   incentive plan.  We think we're here today to demonstrate to

15   Your Honor, hopefully, that we have devised a plan that will

16   properly incentivize employees to benefit the estate and its

17   creditors and that is justified under the facts and

18   circumstances of this case.

19         Your Honor, I can, if you'd like, do a brief overview

20   of the benchmarks for the plan.  They are set forth in the plan

21   which was filed and that part is not under seal, of course, and

22   I don't believe there's really any objection to that part of

23   it.  It seems to be, primarily, that, again with respect to Ms.

24   Gowins, that the plan does not properly incentivize her and

25   that it is, therefore, I believe not justified.

1          Your Honor, again, I have Mr. Kevin Nystrom in the

2    courtroom who is prepared to testify.  I would like to proceed

3    by proffer just to make it go quicker, but it is up to the

4    Court.

5          THE COURT:  Any objection to the use of a proffer?

6          MR. LANDIS:  No, Your Honor.

7          THE COURT:  all right, you may proceed by proffer.

8          MS. MORGAN:  Thank you, Your Honor.  Again, if called

9    to testify, Kevin Nystrom, who is present in the courtroom,

10   would testify that he is a senior director of Kroll, Zolfo,

11   Cooper, which has been retained by the Debtors to provide

12   interim management and financial advisory services during the

13   cases.

14          Mr. Nystrom is currently serving as the director of

15   restructuring of the Debtors.

16          Since Kroll was retained by the Debtors, Mr. Nystrom

17   and his colleagues have assisted the company with all aspects

18   of operating within a Chapter 11 environment, including

19   managing the process of selling the Debtors assets, to maximize

20   recoveries to creditors.  Mr. Nystrom spends 100 percent of his

21   time on this engagement, at this time.

22          In connection with his duties, he would state that he

23   works closely with members of the Debtors senior management

24   team, including many of those individuals who are slated to be

25   participants in the executive incentive plan currently before

1 the Court.

2        Mr. Nystrom is familiar with the executive incentive

3 plan, as well as the Debtors motion for approval of it.  He

4 would testify that he played a primary role in developing the

5 plan, the parameters of the plan, negotiating the plan with

6 advisors to the Committee and then revising the plan to address

7 the issues raised by the Committee.

8        Mr. Nystrom would testify that since the petition

9 date, the Debtors have been operating with a drastically

10 reduced work force, retaining only those employees determined

11 to be essential to wind down the loan origination business,

12 maintain a loan servicing business until a sale of that

13 business could be consummated, and administer, manage and wind

14 down the Debtors remaining business and assets.

15        As a result, members of the Debtors senior management

16 have been and will continue to be faced with certain challenges

17 to motivate and maintain the workforce of individuals which is

18 being asked to perform in addition to their prepetition duties,

19 the duties previously performed by their former colleagues.

20        In addition, they have the additional tasks that come

21 with being a Chapter 11 Debtor, including the reporting

22 requirements and responses to requests that are made from the

23 Debtors professionals in order to conduct the case itself.

24        At the same time, senior management has been

25 intimately involved and continues to be asked to assist with

1  conducting structured sales of substantially all the Debtors

2  assets, within an expedited time frame.

3         Mr. Nystrom would state that as part of the Debtors

4  efforts to solicit, negotiate and consummate the sales of their

5  assets, members of the management team have been called upon to

6  take upon significant responsibilities.  They have provided

7  assistance with respect to issues arising in the bankruptcy

8  cases, they have reviewed solicitation materials, in connection

9  with sales, they have gathered and coordinated due diligence

10 information for potential bidders and they have reviewed and

11 commented on terms of proposed asset purchase agreements and

12 other related documents, among other additional tasks that,

13 again, are required of the Chapter 11 cases.

14        He would testify that the extraordinary efforts of

15 the members of the senior management team have already produced

16 measurable results in these cases, most notably the sale of one

17 of the Debtors largest assets, the servicing business.  The

18 servicing sale which recently had its initial close resulted in

19 a purchase price of approximately $480 million dollars for

20 these estates and it was the result of intense collaboration

21 between and among numerous parties, including the Debtors, the

22 purchaser, the creditors committee, Bank of America as

23 administrative agent and numerous parties whose contracts were

24 transferred to the purchaser as part of the sale.  That process

25 required tremendous effort from the members of senior

1 management, many of whom were instrumental in facilitating that

2 process.

3        Mr. Nystrom would testify that significant tasks

4 remain to be completed in these cases.  The Debtors have many

5 additional and varied assets that need to be marketed and sold,

6 including their building in Melville, New York, a large

7 mortgage loan portfolio, a federally chartered thrift and

8 certain reinsurance companies.

9        In addition, subsequent to conducting and

10 consummating these asset sales, members of senior management

11 will be tasked with, among other things, minimizing costs so as

12 to complete the wind down efficiently.  And to, again, assist

13 the Debtors professionals with the preparation and prosecution

14 of a Chapter 11 plan, as well as the management of the claims

15 reconciliation process.  The knowledge and expertise of the

16 individuals is very important to the process of minimizing

17 claims.

18        Mr. Nystrom would testify that the approximately 26

19 members of senior management who are currently included within

20 the incentive plan, have been and will remain critical to these

21 efforts.

22        With respect to the plan itself, Mr. Nystrom would

23 testify that the copy of the plan attached to the motion is a

24 true and correct copy of the incentive plan that has been

25 negotiated with the creditors committee and that we seek

1 approval of today.  He would testify that the Debtors have been

2 developing this plan since early in these cases and that the

3 plan was not filed with the Court earlier because the Debtors

4 deemed it important to present an incentive plan that was

5 acceptable to the Committee.  And the plan before the Court

6 currently is acceptable to the Committee.

7        He would testify that the incentive plan proposed

8 would provide for a minimum plan pool in the amount of $3.65

9 million dollars, which amount could be reduced if any of the

10 employees voluntarily leave the Debtors employ before that

11 payment is scheduled to be made.  It also would be reduced if a

12 plan participant was terminated for cause.

13        He would testify that the maximum plan pool is $9

14 million dollars.  Although there is no minimum guarantee

15 payment for any individual, he would testify that in the

16 Debtors business judgment it was important to establish a

17 minimum plan pool because any material risk of a zero payment

18 would not be an incentive at all for the employees.

19        The compensation packages for senior management,

20 pre-bankruptcy, generally included both a base compensation

21 component as well as a bonus component.  Generally, the bonuses

22 had been based upon individual performance criteria as well as

23 the success of various aspects of the Debtors operations.

24 Those bonus programs are no longer in place.

25        He would testify that at the beginning of the case,

1  when the executive incentive plan was formulated, there was

2  considerable uncertainty as to the asset values that could be

3  achieved through Section 363 sales, particularly with respect

4  to the mortgage loans, the mortgage servicing rights, and

5  residual interest sales, given the extreme volatility in this

6  particular industry, in the weeks leading up to the bankruptcy

7  case and continuing today.

8           He would state that the Debtors needed to assess what

9  values could be achieved on the sales of a wide range in

10  categories of assets and also needed to provide incentives to

11  the employees for disposing of those assets efficiently and for

12  appropriate value.

13          Finally, again, the Debtors needed to devise a plan

14  that would be acceptable to the creditors committee because the

15  money to be used to fund this plan is money that would

16  otherwise be available for the estate and its creditors.

17          The minimum plan pool represents the Debtors view in

18  consultation with the Committee as to a reasonable minimum

19  based upon the Debtors best estimate of the values to be

20  achieved through the sales at the time the incentive plan was

21  developed.

22          The total amount to be distributed to plan

23  participants will be calculated based upon the achievement of

24  objective goals, associated primarily with our success in

25  achieving net recovery after payment of secured claims through

**J&J COURT TRANSCRIBERS, INC.**

62

1   asset sales.  It also depends on the timeliness of consummation

2   of those sales.  There are metrics in the plan that would,

3   again, increase the plan pool if the sales of the servicing

4   sale and the thrift were consummated quickly.

5          Also, the metrics of the plan provide that the cost

6   of winding down the Debtors operations should be minimized to

7   the extent possible and employees will be rewarded by additions

8   to the incentive plan pool if the Debtors are successful in

9   winding down those operations at a lower cost.

10         And, finally, there are metrics in the plan that

11  would reward the Debtors senior management if a plan can be

12  confirmed promptly.

13         Mr. Nystrom would testify that the Debtors propose to

14  make initial incentive plan payments on January 31st and again

15  they shall be no greater than 3.65 million and could be lower

16  in the event of voluntary departures or terminations for cause.

17  That initial plan payment pool would be distributed in

18  accordance with the percentages that were identified on Exhibit

19  C to the plan.

20         THE COURT:  So, the minimum plan pool gets paid out

21  on January 31.

22         MS. MORGAN:  That's correct, Your Honor.

23         THE COURT:  Unless you are terminated for cause.

24         MS. MORGAN:  Or leave voluntarily.

25         THE COURT:  Or leave voluntarily.

1          MS. MORGAN:  Yes, Your Honor.  These initial

2    allocations, Your Honor, were determined, again, early in the

3    case by Michael Strauss, the Debtors chief executive officer,

4    who is not a plan participant.  The allocations as to how

5    individuals would share in the minimum plan pool were based

6    upon his knowledge of the individuals who form the senior

7    management team and who are plan participants.  Their

8    historical compensation, their particular levels of experience

9    and expertise and their anticipated role in achieving each of

10   the goals that the Debtors had in this case to maximize value.

11   So, the plan was truly an individualized plan from that

12   perspective.

13        He would testify that the plan provides that to the

14   extent any additional incentive plan payments are earned, such

15   payments would be distributed to plan participants every three

16   months thereafter, with each participant receiving his or her

17   pro rata share of 50 percent of what was remaining in the

18   incentive plan distribution at that time.

19        The allocation of any additional incentive plan

20   payments, over and above the minimum, would be based upon

21   subjective criteria determined by Michael Strauss, the Debtors

22   CEO, Steve Cooper, the Debtors chief restructuring officer, and

23   the compensation committee of the Debtors board of directors.

24        THE COURT:  All right.  So that this percentage only

25   applies to the minimum plan pool, the additional payments will

1  go up or down or change based on performance and impact on

2  achieving the criteria?

3       MS. MORGAN: Exactly, Your Honor.  And Mr. Nystrom

4  would testify that among the subjective criteria to be

5  considered, would be the overall job performance of individual

6  plan participants and, again, their contributions to the value

7  of the estates that is being achieved, through the sales and

8  through the minimization of wind down costs and through the

9  expeditious prosecution of the Chapter 11 case.

10      Final incentive plan --

11      THE COURT:  Is there any cap on what they can do?  I

12 mean, can they give 95 percent of the plan pool to general

13 counsel, let everybody else split the rest?

14      MS. MORGAN:  Your Honor, as to the allocations is

15 there a cap?

16      THE COURT:  Right.

17      MS. MORGAN:  There is no cap, Your Honor.  It is

18 based on subjective criteria by those -- the two individuals I

19 mentioned, plus the compensation committee and board.

20      THE COURT:  Who has the final say in that group and

21 what if they disagree?

22      MS. MORGAN:  Your Honor, I believe it's intended to

23 be a democratic decision, Your Honor.

24      THE COURT:  Consensual decision.

25      MS. MORGAN:  Yes, yes.

1          THE COURT:  Not -- democratic would be three to two.

2          MS. MORGAN:  Oh, that's true, Your Honor, a

3 consensual decision.

4          THE COURT:  All right.

5          MS. MORGAN:  With respect to the amounts to be

6 contributed to the plan pool, those are set by the success or

7 lack of success in achieving the goals with respect to asset

8 sales.  And, again, timing.

9          THE COURT:  I'm sorry, does the Committee get any

10 input?  Their input is in the plan itself, but going forward,

11 they have no input.

12          MS. MORGAN:  Your Honor, one thing you should be

13 aware of is that the plan provides that after -- or before

14 January 31st, actually, we have committed to the committee to

15 present an updated plan for matters going forward and we will

16 not file any such updated plan unless it is consented to by the

17 committee.  But with respect to the metrics of this particular

18 incentive plan, and if we should be so fortunate to hit above

19 the minimums, they do not have a particular say in how the

20 money would be allocated.

21          THE COURT:  All right.

22          MS. MORGAN:  Your Honor, Mr. Nystrom would also

23 testify that the plan participants are not eligible for

24 payments under the incentive plan, if they resign voluntary or

25 are terminated for cause.  In addition as a condition precedent

1 to receiving payments under the incentive plan, plan

2 participants are required to fully execute and return to the

3 Debtors a general release and waiver of claims.

4          THE COURT:  What happens if someone who is going to

5 get 10 percent of the minimum pool either doesn't sign the

6 release or is fired, does that 10 percent get redistributed to

7 the other people or does it just stay in the Debtors estate?

8          MS. MORGAN:  It stays in the Debtors estate.

9          THE COURT:  All right, okay.

10          MS. MORGAN:  Your Honor, in addition, he would

11 testify that all payments under the incentive plan are in lieu

12 of other performance bonus, severance or retention compensation

13 under any other plan, program, agreement, applicable law, or

14 policy otherwise applicable to the plan participants and the

15 Debtors.

16          Mr. Nystrom would testify that he knows Ms. Karen

17 Gowins who filed an objection to the executive incentive plan

18 and that he has reviewed her objection.  He understands that in

19 accordance with her objection she does not believe that the

20 plan properly incentivizes her, because it would require her,

21 among other things, to waive any claim she may have, however,

22 the requirement to waive claims was a consideration requested

23 by the Unsecured Creditors Committee and it is a requirement

24 that the Debtors believe is appropriate as well.

25          He would testify that the Debtors have not made any

1  concessions to Ms. Gowins as to the validity of her claims at

2  this time and that even taking those alleged claims into

3  consideration, Mr. Nystrom believes that Ms. Gowins'

4  anticipated payments under the incentive plan are fair and

5  appropriate.  However, if Ms. Gowins believes that her claims,

6  that she believes she has, are more valuable than the incentive

7  bonus she is slated to receive, there is no requirement that

8  she sign the release and waiver form, she may decide to pursue

9  her claims and forego any right to participate in the executive

10 incentive plan.

11      Mr. Nystrom would testify that the incentive plan is

12 reasonable and in the best interest of these estates for

13 several reasons.  Initially, it is designed to reward plan

14 participants with respect to significant efforts since the

15 petition date and motivate them with respect to their increased

16 responsibilities and burdens in the upcoming months as a result

17 of the preparation for and the closing of the sales of the

18 Debtors assets, followed by the efficient wind down of the

19 Debtors operations and a filing of a plan.

20      Secondly, the Debtors ability to maximize and

21 preserve the value of their estates would be substantially

22 hindered if they are unable to properly incentivize their

23 employees.  Prior to the petition date, incentive programs were

24 a significant component of the salaries of the members of the

25 management team and if these individuals are to continue to

1  dedicate themselves to the additional duties that are now being

2  asked of them, because of the filing of the cases,

3  implementation of a post petition incentive plan is critical.

4          Third, the overall cost of the incentive plan is

5  reasonable in the context of the magnitude of the sale process

6  and the size of these cases.  Indeed, the Debtors ability to

7  generate any real recovery for creditors depends very much on

8  the proper and timely execution of the asset sales and the

9  motivation of a dedicated workforce that will help us achieve

10 those sales and, again, help us with the efficient management

11 of these cases.

12          In conclusion, he would testify that the

13 implementation of the incentive plan is necessary to preserve

14 and maximize value of the Debtors estates, is justified by the

15 facts and circumstances of these cases, is reasonable in light

16 of the size and nature of the Debtors operations, has been

17 developed and negotiated in good faith, and reflects the

18 exercise of the Debtors reasonable business judgment.  And that

19 would conclude the proffer.

20          THE COURT:  All right.  Does anyone wish to

21 cross-examine the witness?

22          MR. LANDIS: Yes, Your Honor.

23          THE COURT:  All right, you may.  Please take the

24 stand, sir.  Have you been provided with the Exhibit A list

25 without the job descriptions?

Nystrom - Landis

1          MR. LANDIS:  Not yet, no.  Just other than the two

2    SEC employees, but I have not been given the other information.

3          THE COURT:  Let's get you a copy of that.  Hang on

4    for just a second.  You may be seated for a minute.  Do you

5    need an opportunity to review that before you cross-examine the

6    witness?

7          MR. LANDIS:  I would like it, but I can certainly ask

8    some questions now of Mr. Nystrom.

9          THE COURT:  However you want to proceed.

10          MS. MORGAN:  This isn't very -- but here it is.

11          THE COURT:  I was going to propose the same, but all

12   right.

13          MR. LANDIS:  Now that I have it, I'm going to take a

14   moment. Your Honor.

15          THE COURT:  Well, yes, let's take a short recess to

16   allow you to do that.  So, we'll take, say, five minutes.  All

17   right?

18          MR. LANDIS:  Sure.

19          THE COURT:  All right.  You may not discuss the

20   substance of your testimony with counsel because you're

21   technically under oath.

22                (Short break in proceedings)

23          COURT CLERK:  All rise.

24          THE COURT:  Be seated.  Please swear the witness.

25          COURT CLERK:  Raise your right hand, place your left

1  hand on the Bible.

2  K E V I N   N Y S T R O M, DEBTORS WITNESS, SWORN:

3         COURT CLERK:  Would you please state your name for

4  the record and spell your name.

5         THE WITNESS:  Kevin Nystrom, K-e-v-i-n N-y-s-t-r-o-m.

6         THE COURT:  Sir, you're going to need to either move

7  the microphone closer to you, or you closer to the microphone.

8         THE WITNESS:  I'll move closer.

9         MR. LANDIS:  And for the record, my name is Steve

10 Landis, I represent Karen C. Gowins.  She is an employee at

11 American Home Mortgage.  Good afternoon, Mr. Nystrom.

12 DIRECT EXAMINATION BY MR. LANDIS:

13 Q    If I understood the proffer correctly from your attorney,

14 you were not involved in the creation of the numbers?  That was

15 done by Michael Strauss?

16 A    If by numbers you mean the minimum amounts.

17 Q    That's correct.

18 A    It was done by Michael Strauss.

19 Q    And, that was prior to your arrival at, or soon after your

20 arrival at American Home Mortgage?

21 A    It was generally done in early August and I was there in

22 early August.

23 Q    Okay.  And at that point, you had not spoken to Karen

24 Gowins regarding her incentive payment?

25 A    No, I had not.

1  A    Okay.  And, you have not spoken to her about her incentive

2  goals that she is required to do with regard to receipt of the

3  incentive payment?

4  A    No.

5  Q    Okay.  And, you're aware of her claim, Ms. Gowins claim

6  that she's not been paid her monthly profitability bonus?

7  A    Yes.

8  Q    Okay.  And you're aware that she claims that she's owed

9  approximately $250,00 up to, but not including October and

10 November, 2007 payments?

11 A    Yes.

12 Q    Okay.  Is it fair to say that the motion for the MIP, or

13 the management incentive plan or the executive incentive plan,

14 as identified in the motion, does not identify the analysis for

15 each particular employee that's now in the now disclosed

16 Exhibit A?

17 A    Yes.  The Exhibit A lists the employee name and their

18 title.

19 Q    But it doesn't provide any analysis as to how the

20 incentive payment was determined or calculated for that

21 particular employee?

22 A    No, it does not.

23 Q    And, the only person who has knowledge for that analysis

24 is Michael Strauss?

25 A    The only person that has -- that was involved in arriving

1 at those numbers was Michael Strauss.

2 Q    And Michael Strauss is not here today, correct?

3 A    Correct.

4 Q    Okay.  And, so, when Ms. Gowins claims that she is owed a

5 particular monthly profitability bonus you're not aware at this

6 particular point if others are in similar situations, is that

7 correct?

8 A    To my knowledge, I'm not aware of any other particular

9 claims for bonuses.

10 Q    And, you're not aware of any particular knowledge -- you

11 don't have any particular knowledge if those bonuses are

12 claimed by other employees?

13 A    No, I'm not aware.

14 Q    Including for those particular employees that are covered

15 by the MIP?

16 A    Correct.  I do not know.

17 Q    At the time those numbers were created or soon after you

18 had arrived at American Home Mortgage, on or about August of

19 2007, were you aware at that particular time that Karen Gowins

20 had not been paid her monthly profitability bonus for 2007?

21 A    I don't believe I aware at that time.

22 Q    Okay.  And just to clarify for the record, just through

23 your testimony, we can agree that she's a senior vice president

24 at American Home Mortgage?

25 A    Forgive me.  I don't know her exact title.  I do know that

1  Karen is in charge of construction lending.

2  Q    That's fair, okay.  And she is -- are you also aware that

3  she created the construction lending program and the

4  construction loan platform?

5  A    I did not know she created the program.

6  Q    Okay.  But it doesn't surprise you?

7  A    I know that she's involved in at least that program, and

8  is critical to that program.

9  Q    Okay.  And, at the time of -- in or about August of 2007,

10 post petition, the total value of that program with the loans

11 was approximately $220 million dollars, or that range?  I'm not

12 trying to pin you down to an exact dollar amount.

13 A    I don't know the specific numbers.  That range sounds

14 right.

15 Q    Okay.

16 A    But I can't quote the exact amount.

17 Q    I make the representation or proffer -- okay, that's fine.

18 Through the proffer of testimony through counsel, she indicated

19 that there would be a zero risk, that a zero risk would not be

20 an incentive for employees.  Do you agree with that statement?

21 A    A zero risk --

22 Q    Zero, I'm sorry, zero -- zero risk of payment, that if an

23 employee receives zero dollars as an incentive there would be,

24 obviously, no incentive for that employee to perform?

25 A    I'm not following your question.

1             THE COURT:  I think you're misspeaking.  Risk of zero

2   payment.  No zero risk of payment.

3   Q    I apologize.

4   A    If you're saying that if there is no incentive bonus, then

5   there is no incentive to those employees, I agree.  That if

6   there is no dollar amount specified for a particular employee,

7   then the incentive program would be of little benefit to that

8   employee.

9   Q    Okay.  Would you also agree that if an employee was

10  offered a significant reduction of the amount that an employee

11  was claimed to be owed, that that would also not be an

12  incentive?

13  A    If you're saying that an amount provided in an approved

14  incentive plan is less than a prepetition claim, no I would not

15  agree that that would provide no incentive.

16  Q    What about for a post petition administrative claim

17  expense, that they're offering pennies on the dollar for what

18  the amount owed?

19  A    Well, this plan, in particular, the intent of this

20  executive incentive plan is to replace all other severance and

21  incentive bonus plans.

22  Q    I understand that, but at this particular point the

23  question is, if the management incentive plan only offers, for

24  example, 10 cents on the dollar for what the employee claims to

25  be owed, either prepetition or post petition claims, would you

1 agree that is not much of an incentive for the employee to

2 either remain at American Home Mortgage or to perform at the

3 level that you would expect pursuant to the MIP?

4 A    Every employee is going to have to make their own decision

5 about whether or not they stay with the company and stay in the

6 employ of the company.  This incentive plan is intended to

7 encourage the critical people of the company that we need, to

8 liquidate the assets of the estate, to stay around.

9 Q    Okay.  Let me ask you a particular question and this is

10 information that's public.  Your fee at this particular point

11 along with Mr. Cooper is $250,000.  If your fee was reduced to

12 $25,000 a month, would that be much of an incentive for you?

13          MS. MORGAN:  Objection, Your Honor, that's

14 irrelevant.

15          THE COURT:  Overruled.

16          THE WITNESS:  I would -- if my fee was reduced from

17 250,000 to 25,000 yes, I'd be discouraged.

18 Q    Okay.  And if it was reduced to 50,000 you'd be

19 discouraged?

20 A    Yes.

21 Q    75,000 would still be discouraged?

22 A    Yes.

23 Q    Obviously, the point I'm trying to make more directly and

24 specifically to you is that if you're receiving a reduction in

25 the amount that you're owed and expecting to receive, that

1  would not be an incentive for you to perform well.  Would you

2  now agree to that particular point?

3  A    Yes.

4  Q    Thank you.  The testimony through your attorney, the

5  proffer actually, was that at the time of the petition in

6  August of 07, there was uncertainty regarding the valuation of

7  the business, that's correct?

8  A    Ask that again, I didn't --

9  Q    Sure.  At the time of the petition in August of 2007,

10 there was an uncertainty as to the valuation of American Home

11 Mortgage's business, specifically with regard to the loans?

12 A    The value of many of the assets of American Home Mortgage

13 are extremely volatile both in August and today.

14 Q    Okay.  And would you agree that Karen Gowins has

15 stabilized the values in terms of her particular loan portfolio

16 in the construction lending business?

17 A    The value of the construction loans is an example of the

18 extreme volatility of the value of those assets.  By way of

19 example, we attempted an auction of those loans and our highest

20 bid was 1 percent of the unpaid balance.

21 Q    Of course, that was a low bid, you would agree?  In order

22 for the bidder to attempt to gain leverage in the negotiation

23 process?

24 A    It was the highest bid we received after soliciting bids

25 from over 50 people, in which approximately a dozen reviewed

1  the materials.  That was the highest bid we received.

2  Q    And, that was unrelated to Karen Gowins's performance,

3  past, present or future?

4  A    It was an express of value in the marketplace of our

5  construction loans.

6  Q    Unrelated to Karen Gowins' performance, again, based upon

7  external factors, including the credit crisis.

8  A    I would agree that some of it is based upon external

9  values but also the person -- it's a reflection of Karen and

10 the whole team's efforts in trying to build value with regards

11 to those particular loans.

12 Q    Would you agree that Karen Gowins has been cooperative

13 throughout the post bankruptcy petition filing process?

14 A    Yes, I would agree.

15 Q    And, would you agree that Karen Gowins has also provided

16 the numbers for the profit and loss and construction loan

17 snapshots as you've requested and provided whatever services

18 you or Mr. Cooper and/or Mr. Strauss or Mr. Dick Leffler, the

19 Chief Administrative Officer have requested of her?

20 A    To my knowledge, Karen has performed everything we have

21 asked.

22 Q    And, she's done not just what you've asked, but she's

23 performed well?

24 A    Yes.

25 Q    Okay.  And there's no issues with regard to her

1  performance, is that correct?

2  A    I can only answer for myself --

3  Q    Sure.

4  A    -- but I have no issues with her particular job

5  performance.

6  Q    And, you've worked closely with her since you've arrived

7  at American Home Mortgage?

8  A    I have not directly supervised her but I have indirectly

9  supervised her and I have worked with her, yes.

10  Q    And, you've been pleased with her performance?

11  A    Yes.

12  Q    Thank you.  If I understand the plan pool as it's now

13  been described, for at least the period prior to January 31st,

14  of 2008, the plan pool is not based on individual performance

15  but on the group as a whole, is that correct?

16  A    The incentive calculations are based upon the ultimate

17  recovery on the sale of assets, in excess of the related

18  secured debt.  It's based, in part, upon the cost incurred in

19  liquidating the company, it's based in part upon the timing of

20  the sale of certain assets of the company and it's also based

21  in part upon the successful filing and approval of a

22  liquidation plan.

23  Q    But each particular person's dollar amount that they're

24  due to receive are based on the group as a whole not, for

25  example, one particular person's performance?

1  A     Correct.

2  Q     And, so, by way of example, if there's 27 employees

3  currently scheduled, according to the plan, if 26 of 27 perform

4  well and one did not, that one particular employee was a bad

5  performer or didn't maximize their achievements, that one would

6  still benefit from the plan, is that correct, and get the

7  minimum payment that they're due to receive under the hidden

8  Schedule A amount?

9  A     Only if that -- it's a requirement of all employees that

10 they act with good behavior and they not do anything that

11 causes us to release them for cause.

12 Q     That's correct.  Assuming that didn't meet the specific

13 list for cause and they were not otherwise engaged in any

14 criminal wrongdoing, but, you know, they didn't perform as well

15 as the others, that particular employee didn't perform as well

16 as others or didn't, in the contest of things, perform as well

17 as they might otherwise, or should have.

18 A     Each person has a particular share of the minimum bonus

19 and they need to perform as expected and they do not provide

20 cause for us to dismiss them.

21 Q     Right.  And so that one particular person would still get

22 that minimum share?

23 A     Yes.

24 Q     Just to clarify.  Thank you.  And just to go back to a

25 particular point, the allocation, the minimum share allocations

1 are based on Michael Strauss's knowledge of the employees as he

2 determined whatever factors he determined, but he made the

3 determination.

4 A    Mr. Strauss made the determination, yes.

5 Q    And, just to clarify for the record, Michael Strauss is

6 the Chairman, President and Chief Executive Officer of American

7 Home Mortgage?

8 A    Yes.

9 Q    Thank you.  With regard to future allocations, after

10 January 31st of 2008, or even prior to January 31st, 2008,

11 there's no determination in the plan as to the factors or how

12 the determination is going to be made for future allocation,

13 there's nothing specified.  I know there was a discussion

14 regarding consensus or overall issues to try to get things done

15 and to work with the Creditors Committee b ut there's no laid

16 out factors, is that correct?

17 A    To the extent that the overall incentive plan formula

18 exceeds the minimum bonus amount, the divvying up of that

19 excess will be determined consensually by a group of Mr.

20 Strauss, Mr. Cooper and the committee of the board responsible

21 for salaries.

22 Q    So, at this particular point, Ms. Gowins, in particular,

23 was not able to determine how much she might actually receive,

24 assuming she continues to perform well in her job, that she

25 could in fact receive zero or she could receive a dollar or two

1  dollars, or a thousand dollars, an uncertain dollar amount, is

2  that correct?

3  A    Because as of this point many of the assets we still have

4  and have not yet been liquidated, it's hard for us to determine

5  how much the ultimate incentive calculation will be in the

6  future.

7  Q    And, so, I guess the answer to my questions is that she,

8  Ms. Gowins, cannot fairly determine how much she is going to

9  receive in the future either prior to January 31st, 2008 or

10 after January 31st, 2008?

11 A    As I indicated, because most of that is based upon

12 ultimate sales values --

13 Q    Understood, but --

14 A    And assets we have not sold and in addition to that,

15 management of costs of the estate, management of future costs

16 that have not yet been incurred, no one really knows what the

17 eventual incentive plan bonus will be.

18 Q    And with regard to costs to the estate, I understand, or

19 I'm sorry, you understand that Ms. Gowins has repeatedly

20 requested information as to the cost of the estate with regard

21 to a construction lending program, and it has not been provided

22 to her?

23 A    Yes.

24 Q    And, any particular reason why it's not been provided to

25 her?

1  A    It's not yet completed.

2  Q    Any particular reason why it's not yet been completed?

3  A    I have no reason right now.

4  Q    Okay.  And the person who will complete that is Rob

5  Bernstein or --

6  A    Yes.  Rob is the controller of the company, and he's

7  responsible for providing financial information as that

8  information.

9  Q    And, so, for Ms. Gowins to determine how much, in fact,

10 she's owed and if she were to -- if I were to proffer that she

11 needs this particular information which is a reasonable amount

12 of information that she would need, and that she would need

13 that information in her role as the director of the

14 construction lending program, so she's entitled to get it, it's

15 not secret or confidential, that for example others can't get

16 it, but she can get it --

17        MS. MORGAN:  Your Honor, objection.  It's a very

18 compound question and I'm not sure that --

19        MR. LANDIS: Withdrawn.

20        THE COURT:  Sustained.

21        MS. MORGAN:  -- claim information is related -- yes.

22        MR. LANDIS:  Thank you.

23 Q    And just to close up here, there are 27 employees who are

24 eligible for the management incentive program, under the

25 motion?

1  A    I believe so.

2  Q    Okay.  Only one has left?

3  A    I believe three have left.

4  Q    Three have left, okay.  And, you don't know the particular

5  circumstances taken into account as to the remaining employees,

6  as to how much they're getting and why they're getting those

7  particular amounts under the MIP?

8  A    I have seen the amounts that every employee is going to

9  get.

10  Q    Right.  But you don't know the calculations or the

11  analysis for that particular employee?

12  A    As I said before, that was determined by  Mr. Strauss,

13  judgmentally based upon his assessment of their contribution to

14  the company, his assessment of their skill set, his assessment

15  of what roles they will play in the liquidation of the estate.

16       MR. LANDIS:  No further questions at this time, Your

17  Honor.

18       THE COURT:  Any other cross?  Any redirect?

19       MS. MORGAN:  Thank you, Your Honor.

20  DIRECT EXAMINATION BY MS. MORGAN:

21  Q    Mr. Nystrom, now that you have been at the company since

22  late July, early August, and you know some of the participants

23  that are identified as participants in the plan, do you have

24  any reason to believe that the determinations made by Mr.

25  Strauss as to the allocations was appropriate or not

1  appropriate?

2  A    I have no reason to believe they were not appropriate.

3  Q    Okay.  And if Ms. Gowins chooses not to sign a release and

4  waiver form, she would then just decline to participate in the

5  plan, is that correct?

6  A    Correct.

7  Q    So, she would not be required to sign any release?

8  A    Release or waiver of claims, correct.

9            MS. MORGAN:  Your Honor, no further questions.

10            THE COURT:  Thank you, you may step down.  Any other

11  evidence, Ms. Morgan?

12            MS. MORGAN:  No, Your Honor, no other evidence.

13            THE COURT:  All right.  Any evidence by the objector?

14            MR. LANDIS:  One moment, Your Honor.

15            MS. MORGAN:  Your Honor, may I change my mind and

16  move into evidence just the copy of the plan that Mr. Nystrom

17  identified as a true and correct copy of the plan in his

18  proffer?

19            THE COURT:  This was what was attached to the motion?

20            MS. MORGAN:  Correct, Your Honor.

21            THE COURT:  Any objection?

22            MR. LANDIS: No objection.

23            THE COURT:  It'll be admitted.

24            MS. MORGAN:  Thank you, Your Honor.  It's marked as

25  Debtors' Exhibit 1.

1          THE COURT:  Okay.  Thank you.  Let's also have the

2  redacted version of Exhibit A admitted into evidence.  We'll

3  call that Debtor 2.  Any objection?

4          MR. LANDIS: Your Honor, Exhibit A is the motion with

5  the original proposed order?

6          THE COURT:  I'm sorry?  Yes.  No, no, it's -- well,

7  here, Ms. Morgan will you show counsel -- I'm sorry, sir, I

8  forget your name.

9          MR. LANDIS:  Steve is fine.

10          THE COURT:  Stevens?

11          MR. LANDIS:  Landis.

12          THE COURT:  Landis, show Mr. Landis a copy of D-1,

13  please.

14          MS. MORGAN:  And, Your Honor, by redacted Exhibit A

15  you mean the titles -- the names and the titles of the

16  individuals?

17          THE COURT:  Yes.

18          MS. MORGAN:  Yes.  May I approach with that, Your

19  Honor?

20          THE COURT:  Yes, you may.  Thank you.

21          MR. LANDIS:  Your Honor, no objection to D-1 or to

22  D-2.

23          THE COURT:  All right, they're admitted without

24  objection.  All right, and that will -- the Debtors rest?

25          MS. MORGAN:  Yes, Your Honor.

1          THE COURT:  All right.  Any evidence by the objector?

2          MR. LANDIS:  Not at this time, Your Honor.

3          THE COURT:  All right.  I'll hear argument.  Let me

4  ask you out of the box.  How is a minimum payment primarily

5  incentive as opposed to primarily retentive?

6          MS. MORGAN:  Your Honor, again, as indicated in the

7  testimony, there is no minimum payment guaranteed for each

8  individual.  There is a minimum pool and that pool was based

9  upon, according to Mr. Nystrom's testimony, the Debtors best

10 estimate when devising this plan, again, in consultation with

11 the Committee, as to the minimum that would be achieved through

12 the actual benchmarks that are set forth in the plan itself.

13 So, we do believe that the benchmarks are still applicable and

14 they do form the basis for the plan, including the minimum

15 bonus pool.  But this is our best estimate for an initial

16 payment so that we could incentivize people on January 31st

17 after we thought a large portion of the servicing sale would be

18 concluded and other sales would be underway and, again, we

19 believe that this was the appropriate way to incentivize people

20 to reflect at least a minimum that could be achieved.

21          But, again, it's based on the estimates of what will

22 be achieved, actually, through the targets that have been

23 established.

24          THE COURT:  All right.  So, sort of to restate that,

25 it's part of the bigger program.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. MORGAN:  It is, Your Honor.

2          THE COURT:  But if nobody does anything further

3    that's at all helpful between now and January 31, they still

4    receive the payment.

5          MS. MORGAN:  It is -- that would be the way to set

6    up, Your Honor, that is not likely to occur.  We have already

7    achieved some of the benchmarks.  For instance, in connection

8    with the servicing sale, the speed with which that sale has

9    happened and we do anticipate that we'll be hitting at least

10   the minimum targets.

11         THE COURT:  Right.  And, you've been in negotiations

12   with the Committee for months on this?

13         MS. MORGAN:  Yes, Your Honor. I think we devised the

14   plan in late August, so that -- at that time we did not have a

15   stalking horse for the sale.

16         THE COURT:  And the share of minimum pool and the

17   plan pool percentages, in dollar amounts, have not changed

18   since then?

19         MS. MORGAN:  Your Honor, there have been some changes

20   over the months, I believe, but not substantial.

21         THE COURT:  But not to the percentages?

22         MS. MORGAN:  I -- no, Your Honor.  Your Honor, Mr.

23   Enos reminded me of one thing that was changed.  As Your Honor

24   may recall when we did the non-insider retention plan, we had

25   an agreement with the U.S. Trustee that certain people be

**J&J COURT TRANSCRIBERS, INC.**

1 removed from that plan, so one of the changes, for instance,

2 was to add three individuals to this particular plan.

3          THE COURT: Right.  Okay.

4          MS. MORGAN:   Your Honor, the Debtors acknowledge

5 that these proposed payments to be made under the plan are

6 outside the ordinary course of business and, thus, should be

7 evaluated under Section 593(c)(3).  503(c)(3) limits

8 non-ordinary course payments to officers and managers unless

9 they are justified by the facts and circumstances of the case.

10          Again, although it's, I think, difficult to precisely

11 determine the nature of the objectors argument, it seems to

12 take issue, again, with the claim waiver provisions and also

13 asserts that the plan doesn't properly motivate Ms. Gowins.

14 So, at bottom, it does seem to be an argument and an objection

15 that the plan is not justified by the facts and circumstances.

16          Since the enactment of this provision of the code in

17 2005, courts construing this provision, in this jurisdiction

18 and elsewhere, have uniformly held that the proper standard for

19 determining whether a particular plan is justified, is the

20 business judgment standard.  And in this district, I can refer

21 the Court to the Warner decision by Judge Cary, the Nobex

22 decision by Judge Walrath, the Riverstone decision by Your

23 Honor.

24          The business judgment standard is not a rigorous

25 standard.  It's a differential standard that shields the

1  Debtors from second guessing by others.  Essentially by her

2  objection Ms. Gowins is asking the Court to reject the Debtors

3  business judgment in favor of her own judgment as to how the

4  plan should be structured.

5      Although the servicing sale has already concluded, at

6  least as for its initial close, you've heard testimony that

7  there is still much to be done in these cases.  There's a wide

8  variety of assets to be sold and the Debtors will soon be

9  turning their attention to the claims reconciliation and

10 formulation of a plan.  You've also heard testimony that the

11 members of the Debtors senior management team are critical and

12 necessary to each of these elements.

13     You've also heard testimony that the plan was

14 designed to motivate and incentivize the plan participants to

15 maximize creditor recoveries.  Contributions to the plan pool

16 are based on net recovery from asset sales, the speed at which

17 those sales can be accomplished, the management of the wind

18 down costs and the prompt prosecution of a Chapter 11 plan.

19 Thus, the plan is designed to motivate the plan participants

20 and to have their motivations be aligned with the goals of the

21 Debtors and their creditors.  The business goals triggering the

22 incentive payments are reasonable and appropriate.

23     Another check on whether the Debtors have properly

24 exercised their business judgment, an important factor for the

25 Court to consider, is that the incentive plan is acceptable to

1  the Creditors Committee.

2          As you heard in the testimony, the Debtors did spend

3  significant time to negotiate the plan and delay the

4  presentation of the plan to this Court so that it could have --

5  it could come here with Committee support.  We think this

6  should be meaningful to this Court because it basically

7  provides an independent confirmatione that the plan is designed

8  to maximize creditor recoveries.  Otherwise, we would not be

9  here with the Committee on board.

10          Your Honor approval of this motion is of critical

11  importance to the Debtors and their employees.  The executive

12  incentive plan will motivate, we believe, the senior management

13  team to achieve the goals that we believe are appropriate and

14  that are important for the Debtors and their estates.  The

15  evidence presented shows that the plan is reasonable and

16  reflects the appropriate exercise of the Debtors business

17  judgment and is justified by the facts and circumstances of

18  this very large and complex case.  And the Debtors request that

19  the motion be granted.

20          THE COURT:  I'll hear from the Committee.

21          MR. INDELICATO:  Thank you, Your Honor, Mark

22  Indelicato from Hahn & Hessen on behalf of the Committee.

23          Your Honor, I think the Court's observations were

24  very similar to the Committee's observations at the inception

25  of the case.  It would not surprise the Court that I believe

1  this may have been one of the topics on the very first meeting

2  we had with the Debtors and the Committee had significant

3  concerns regarding the management incentive plan.  In fact, I

4  believe if I'm not mistaken, the narrative descriptive of the

5  job titles was at the request of the Committee, so the

6  Committee's financial advisors could independently analyze each

7  individual person, what they would be doing and how they would

8  be contributing to the overall success of the liquidation going

9  forward.

10        I think to be fair to the process, Your Honor, while

11 the Committee who is not 100 percent on board with what every

12 party was getting in the minimum, in the overall scheme of

13 things, we believe it was in the Debtors business judgment and

14 it was reasonable in light of the factors.  We did have some

15 issues with some parties, but ultimately, to get the deal done,

16 we agreed to support the Debtor.

17        What we found to be of utmost importance to the

18 Committee was, obviously, that to the extent these 27

19 individuals, now I believe down to 24, were getting incentive

20 payments going forward and it is a pot plan, so to speak, so

21 some of them do rise on the benefits of, for example, the sale

22 of the servicing business, even if they had nothing to do with

23 it, and they fall with respect to some of the other things and

24 not picking on Ms. Gowins, it may be just a function of the

25 industry but we're not able to sell the construction platform

1 had we hoped.  A lot of time and effort went into that, but for

2 whatever reason we haven't been able to sell that to date.

3          So, there were checks and balances with respect to

4 all of the employees and as I said, if the Committee and its

5 professionals had chosen to do it themselves, we might have

6 done it differently.  We believe with respect to the Debtors

7 proposal, it did make sound business judgment in order to do

8 it.

9          Your Honor, to address your concern about the minimum

10 payment being a retention as opposed to an incentive payment,

11 we also thought about that.  And if the Court will look at the

12 chronology, when we started negotiated, we had a concern that

13 it was a retention. By the time we finally signed off on it, it

14 was more of an incentive as opposed to a retention because it

15 had been -- it was in late September and we really, pretty much

16 knew where we were going, at least on a threshold basis, with

17 the sale of the servicing platform, and we knew that that

18 threshold was going to -- which would have gotten to

19 substantially where we wanted to get for the minimum threshold.

20          We did analyze the numbers, Your Honor, we did

21 analyze it in great detail and we believed, again, that by the

22 time the Committee had signed off on it, it was clearly an

23 incentive based plan.

24          Your Honor, one of the fundamental requirements of

25 the Committee with respect to this incentive plan was that

1  parties waive any and all of the claims they have for bonus

2  programs and not picking on Ms. Gowins, based on the numbers

3  that she has in her objection, I don't want to minimize her

4  claim of $247,000.  That is a significant sum of money and if

5  she believes that's the claim she has, then her options are not

6  to participate.  We've had -- in other cases that we've been

7  involved in, where people believe they have claims that exceed

8  the amounts they would be entitled to under any particular

9  plan, they just should not participate in the plan.

10       But what we can't have, Your Honor is, we can't have

11  a situation where the Committee supports an incentive plan and

12  then the employees line up and say, well, we were entitled to

13  this, we were entitled to that, we were entitled to this and

14  then we have to not only evaluate what we gave them in the

15  incentive plan, but -- and litigate issues related to other

16  incentive plans, they may claim they're entitled to, some may

17  have been in writing, some may not have been in writing.  So,

18  as a fundamental predicate of these plans that we always

19  recommend as representing the creditors committee, is that

20  there be a waiver and I think that was something that was very

21  important to this Committee with respect to this plan and we

22  would not have supported the plan if there was not such a

23  waiver.

24       So, Your Honor, based on the testimony we've heard

25  from Mr. Nystrom and the arguments made by Ms. Morgan which I'm

1  not going to repeat, but which we support, we believe that this

2  program should be approved, we believe it was an exercise of

3  the Debtors business judgment and we believe it's appropriate

4  to be approved, as it, without any modifications.   Thank you.

5          THE COURT:  Mr. McMahon?

6          MR. McMAHON:  Your Honor, good afternoon, Joseph

7  McMahon for the United States Trustee.  Your Honor, as a

8  preliminary statement, while we are not taking the exception

9  with proposed plan today, Your Honor has heard our office

10  appear in this court on numerous occasions arguing as to what

11  the appropriate interpretation of Section 503(c)(3) means, and

12  we have a view that justified by the facts and circumstances of

13  the case, does not necessarily entail deference to the Debtors

14  business judgment.  That's an issue that we've taken up before.

15  I just want to note our, I guess, our disagreement with the

16  Debtors in that vein.

17          It's not a germane point for today, Your Honor,

18  because after reviewing the plan that was appended to the

19  motion, evaluating it, we reached out to Debtors counsel and

20  were able to obtain a concession that from our standpoint does

21  resolve our concerns with respect to this plan and that has to

22  do with the call back which Ms. Morgan referenced.

23          Our concern was, Your Honor, with the fact that there

24  is a pending Securities and Exchange Commission inquiry or

25  investigation pending, and the possibility that there may be

1  more coming, that there would not be a situation where while

2  the plan contains termination for cause events, that are

3  clearly identified in the plan, we would have a situation where

4  an employee wins the race to the door, so to speak.

5          And, the language that we have worked out with

6  Debtors counsel, to the extent that we get to that point, it

7  will be presented with it, is acceptable to the United States

8  Trustee.

9          THE COURT:  Okay.  Thank you, Mr. McMahon.  Mr.

10  Landis?

11          MR. LANDIS:  Thank you, Your Honor.  I think just to

12  clarify, there's no objection to having a MIP generally, nor is

13  there an objection to the goal or having a desire to motivate

14  senior management.  I think that's an appropriate goal and the

15  code allows for that, but the testimony and the arguments that

16  have been raised today focus on the business judgment and the

17  general issues about dollar amounts and allocations.  Mr.

18  Nystrom, my client, I want to make clear, has great respect for

19  Mr. Nystrom, but he's not an appropriate witness.  There was no

20  testimony that he was able to provide as to how those dollar

21  amounts were determined with regard to particular employees and

22  I think that's something that the code requires.  And I think

23  specifically that is what Ms. Gowins really is requiring

24  because there's a disconnect between what she is being offered

25  under the plan and what, in fact, she is owed and that is a

1  significant concern to her and I think it's certainly an

2  appropriate policy issue that if there's going to be a required

3  analysis as to how to incentivize employees under the amended

4  code, as opposed to a retention argument, you need to provide

5  the appropriate determination as to how incentivize her.  There

6  is not.  She's owed a substantial amount, pre and post

7  petition, we have tried to resolve that, but as a question to

8  Mr. Nystrom, we can't even get the underlying numbers to

9  determine how much she's owed to even make that evaluation as

10 to whether or not the 77,000 is an appropriate compromise of

11 here claims.  She's an employee, a senior executive at the

12 company, she needs it to run her business, she's asked for the

13 monthly profit and loss numbers by Mr. Nystrom and by other

14 employees, but you can't fill in the chart.  How can you have

15 an Excel spreadsheet without having the appropriate numbers and

16 those numbers are, of course, what she needs to evaluate what

17 she's owed in order to consider appropriately the waiver

18 agreement.

19       I think we have an overall issue with regard to the

20 waiver agreement generally.  Just because the business judgment

21 of the Debtors is -- I'm not even going to say it's the

22 business judgment, it's, I think, a compromise that exists

23 between the Debtors and the Creditors Committee but there's

24 other incentive plans that have not had the waiver agreement

25 and having the waiver agreement, frankly, I think more suggests

1 a retention plan because generally when you have severance you

2 have a waiver agreement, in form or in substance similar to

3 what is now being offered before this Court for its approval.

4        Mr. Nystrom testified that there's no change in her

5 percentage, or numbers to his knowledge.  Her role has changed,

6 her knowledge of her monthly activity, or daily activities has

7 changed in a significant way but the dollar amount prepared by

8 Mr. Strauss who upon information and belief may or may not have

9 had knowledge of the non-payment of her monthly profitability

10 bonus, has not made any -- there's been no change.  And so,

11 once information is being prepared and provided to the Debtors

12 and Debtors counsel, there's no change.  And, again, that

13 speaks to the analysis required for the incentive payment

14 program.

15        The Court can certainly reject the MIP because of the

16 waiver.  I'm hesitant to suggest an overall rejection of the

17 MIP because certainly the other employees want it and

18 management wants it, but you can't have it if it's not going to

19 appropriately incentivize.

20        The Court's concern about retaining and incentivizing

21 employees, I've addressed, but the bottom line is, Ms. Gowins

22 was promised her dream of getting paid money.  She gets paid a

23 salary and she was promised the overall bonus.  She's not

24 received it.  When we asked why hasn't she received it, or why

25 wasn't it paid, going back from 2006, there's not an answer and

1  I would have hoped that Michael Strauss was here today to

2  because she's tried to speak with Michael Strauss to get a

3  better understanding and Michael Strauss is not available to

4  meet with one of his senior executives to discuss her role and

5  function within the company, although she performs it well.

6          That's it.

7          THE COURT:  Okay, thank you.  Reply?

8          MS. MORGAN:  Very briefly, Your Honor.  We do think

9  that Ms. Gowins' issues primarily relate to her claim.  We've

10 heard from her counsel that a motion is going to be filed with

11 the Court in connection with her claim and her agreement and we

12 will deal with that at the appropriate time and we will deal

13 with it as we're required to and as promptly as we can, but it

14 is not -- does not serve as a basis for rejecting a plan for

15 all management employees to which no one else has objected to,

16 and which the testimony provides, is supported by the Debtors

17 business judgment.

18         Again, with respect to Ms. Gowins, between now and

19 January 31st, she will have a decision to make, based on the

20 events that will occur between now and then, and her own

21 analysis as to whether her claims, pre and allegedly post, are

22 more valuable than the plan and if she does not believe -- if

23 she believes her claims are more valuable, she will not be

24 required to participate and I think that is her choice and I

25 think it does not mean that the plan is flawed and that the

1  testimony presented does not support the Debtors business

2  judgment.  We believe it does, and we ask you to approve it.

3        THE COURT:  All right, thank you.  Well, to frame the

4  analysis properly, I sort of have to figure out where we are in

5  connection with the applicability of the various provisions of

6  the bankruptcy code.

7        The Debtors acknowledge that this plan is outside the

8  ordinary course of business, as opposed to inside the ordinary

9  course of business, and it covers at least in significant part,

10  persons who could be considered insiders under the bankruptcy

11  code.  So, the provision of 503(c)(1), which in practical

12  effect, I think, prohibits retention claimants to insiders, at

13  least needs to be deal with on a speciality issue to see

14  whether it's applicable.  If this is a retention plan for the

15  benefit of insiders, I think it would be prohibited under

16  503(c)(1).

17        I've previously dealt in a variety of cases and I've

18  written an opinion in the Nelson Nutrasecuticals case that

19  analyze sort of how you figure out whether a retention plan --

20  or whether a plan is a retention plan or an incentive plan for

21  insiders.

22        First of all, there's some ambiguity to the statute

23  as to exactly what tests you should apply in connection with

24  whether 503(c)(1) is applicable and I've ruled previously, and

25  I continue to believe, that the statute prohibits payments that

1  are primarily for the purpose of retention.

2          So, then the issue becomes in this case, is the plan

3  primarily for the purpose of retention or is it primarily for

4  the purpose of incentive?  What I haven't had to deal with

5  previously is a plan that contains, I think, fairly put,

6  different elements.  I think the concept of a minimum payment

7  clearly as retentive aspects to it.  The plan as a whole is

8  mostly, if you will, focused on motivational targets that are

9  clearly designed to provide incentive to the employees and I

10 would applaud the Debtors management for constructing a plan

11 that has such specific targets, asset sale targets, wind down

12 cost targets, confirmation of a plan targets.

13         I think the evidence today is that based on a whole,

14 the plan is primarily for purposes of incentive and I'm not

15 going to get into line item by line item analysis, and I don't

16 think that would be appropriate, in the context of an overall

17 plan, to determine, okay, this payment under the plan is

18 retentive, this payment under the plan is motivational.  I

19 think you need to look at the plan as a whole.  Looking at the

20 plan as a whole, I think it's primarily motivational and, thus,

21 503(c)(1) is not implicated.

22         I would add that even if one were to look at the

23 minimum payment as a line item, there could be an argument, I

24 don't think I need to get there, but there could be an argument

25 that if you look at it in the context of the case as a whole,

1  and you have to sort of go back in time two months, when the

2  numbers were first being negotiated, that even that minimum

3  payment and the minimum payment pool which was the Debtors best

4  estimate as to what the minimum payments would be if it was

5  just truly incentive based as opposed to having sort of this

6  minimum payment aspect to it, that that makes it an incentive

7  or motivational target as opposed to a retentive target. I'm

8  not sure that's appropriate, frankly.  Again, I don't think I

9  have to get there.  There's only so much the Court can go back

10 in time.  The reality is, everything takes time, including

11 negotiations, but I can only deal with what I'm presented with

12 when I'm presented with it.

13        So, I'm not sure that analysis, if I were to do that,

14 would be the proper analysis.  Again, I don't have to get there

15 because I think the more appropriate way to deal with this is

16 in the plan as a whole and I think the plan as a whole is

17 primarily motivational and as a result 503(c)(1) is not

18 implicated.  503(c)(2) is not implicated because it's not

19 severance, so the question is, all right, should I approve the

20 plan under 503(c)(3) as justified by the facts and

21 circumstances of the case.

22        There's been some discussion, I know Judge Walrath

23 has made this statement in an oral ruling, and some of the

24 other judges have struggled to figure out what justified by the

25 facts and circumstances means and whether that is, in effect,

1  the old 363(b)(2) test for transactions outside the ordinary

2  course of business, and whether they're justified by the

3  Debtors exercise of its business judgment.

4       I don't know what the answer to that is and no one

5  has really briefed that issue for me, yet, and I haven't

6  decided whether that is, or is not the case.  I would make sort

7  of a general comment about the business judgment test.  The

8  business judgment test for transactions outside the ordinary

9  course of business in bankruptcy court is not the Delaware

10 business judgment rule.  The Delaware business judgment rule is

11 a defense to actions taken by a board of directors, or a

12 fiduciary, that indicates that as long as the fiduciary is not

13 acting in bad faith, to be specific, as long as the fiduciary

14 is not acting with gross negligence or worse, or is some sort

15 of conflict that the court will not disturb the action taken by

16 the board of directors.

17      A bankruptcy courts exercise determining whether an

18 action is a proper exercise of the debtors business judgment is

19 more of a proactive test.  The debtor is coming into court and

20 asking for affirmative relief.  So, it can't be somehow, you

21 know, raised as a defense to some action taken.  They're coming

22 in, they're asking for affirmative relief and the bankruptcy

23 court is actually looking at what was done in determining

24 whether or not that's a reasonable exercise of business

25 judgment.  So, it's unfortunate that I think there's some

confusion in the case law that arises, basically, because of
the use of the same words as the more traditional Smith v Bank
Orcum or whatever the Delaware, latest Delaware recitation of
the business judgment standard is.  It's not the standard the
court looks at.  But the court does defer, as long as there's
no evidence of bad faith, or some other inappropriate
self-dealing, et cetera, the court will defer to the debtors
business judgment, even though it's looking more intently to
see whether that exercise is reasonable.

        The reason I go on this lengthy, I apologize,
description of what I'm deciding and not deciding, is, I think
it's important in this case because it goes to te point raised
by the objector, which is whether the Court is going to get
involved in a line item by line item inquiry into whether
providing X employee 5 percent of the minimum payment pool and
Y employee 2 percent, is a reasonable exercise of the Debtors
business judgment.  And the answer is no, I'm not going to get
into that nor do I think the statute requires it.

        I think the statute requires that the Court have a
more global inquiry into the development of the plan and heaven
help me if this job ever involves the bankruptcy court going
into that level of detail as to the exercise of a debtors
business judgment.  No matter how much evidence is presented to
me, I'm never going to be in a position to decide whether a
debtor should pay X cents for a widget or Y cents for widget,

1 that's what business people do, that's what business people are

2 for.

3       And, although it becomes somewhat easier with

4 different types of criteria, I think the fundamental issue is

5 still the same, and the Court can't get into that kind of level

6 of detail, nor would I think it'd be appropriate.  That's

7 really something for negotiation among the parties, that's

8 something for the Debtors to decide in the exercise of their

9 business judgment, and I look more on those types of issues, I

10 think I focus more on procedural protections.  Did the Debtors,

11 in coming up and making those decisions as to who is going to

12 get what percentage, did they negotiate with the Committee?

13 Well, yes, they negotiated heavily with the Committee in the

14 context of the greater plan, although not, again, line item by

15 line item, but the Debtors, I think that the Committee wouldn't

16 have agreed to the plan if they had had issues with the line

17 item breakdowns.

18       So, looking at the plan as a whole, not getting into

19 -- I don't think the evidence, clearly the evidence wasn't

20 there, Mr. Strauss isn't here, so there is no evidence before

21 the Court as to why X employee receives 5 percent and why Y

22 employee receives 10 percent.  I don't think it's required.  I

23 think the Court can look at those numbers on a more general

24 context, I note that no one is getting 50 percent of that pool,

25 they all run a range that's -- you know, some get more, some

1  get less, but no one is getting some huge or unreasonable

2  percentage.  So, I think the pool, the minimum pool of the plan

3  as set up with all the various incentive pieces, et cetera, et

4  cetera, et cetera, I think, is a reasonable exercise of the

5  Debtors business judgment.

6           I think that whether that's the same thing as

7  justified by the facts and circumstances of the case, I think

8  is a distinction I don't need to get into because, frankly, I

9  find the finding that it's a reasonable exercise of the Debtors

10 business judgment to be so overwhelming, that even were the

11 criteria somewhat higher, I think the Debtors would have met it

12 in this case.

13          Now, the objector focuses primarily on the fact that

14 this program will not provide an incentive to her, and that

15 it's impossible for her to decide whether or not to participate

16 in the program because she has incomplete information.  Again,

17 there's nothing required that anyone participate in this plan

18 on a person by person basis and it very well may be that there

19 are several employees, including the objector, who choose not

20 to participate in this plan.  The Court is not going to get,

21 nor do I think the Court need get involved in that person by

22 person analysis.  The question is whether the plan in general

23 is a reasonable exercise of the Debtors business judgment, and

24 I believe that it is.

25          She's not being required to participate, no one is

1  being required to participate.  I would note that, frankly, I

2  don't give a lot of credence to the argument that it's not an

3  incentive for me to take an amount of money that I know I'm

4  going to get when I balance it against my claims, which I may

5  get, first of all unsecured claims I don't know what they're

6  going to be in this case, but if the claims are truly

7  unsecured, they're certainly not going to rise to the level of

8  100 cents on the dollar.  Even administrative claims have to be

9  proven up and there are plenty of motivated people in this case

10 who may file objections to administrative claims.  So, you

11 know, the bird in the hand principle, especially in bankruptcy

12 court, is a powerful motivator and Ms. Gowins will have to make

13 her decision and it will be somewhat difficult given incomplete

14 information, but, again, that's not in front of me today,

15 whether or not she's entitled to information she needs.  If she

16 thinks she's not getting it, she has all of the tools of the

17 bankruptcy code at her disposal, including Rule 2004.

18      So, she's going to be required to make a hard

19 decision based on unpredictability versus predictability and

20 that decision will have to be made on incomplete information.

21 Frankly, I think that's every creditor in this case and often

22 the creditors in any case are required to make those kind of

23 hard decisions.  So, I don't think there's anything

24 particularly unique about her situation in this case and it's

25 certainly not sufficient to defeat the program as a whole.

1              With regard to requiring releases, that's what's in

2    the plan.  I don't think I've ever had a situation where

3    basically the objection has been that the plan is not rich

4    enough for the executives.  I'm not sure how the Court would

5    deal with that.  Usually the context -- usually the norm is

6    that the fight is that it's too rich for a variety of reasons.

7    This is a negotiated point, I think it's a critical point for

8    the Committee, obviously, as Mr. Indelicato said.  It would be

9    a critical point for me if I were standing in his shoes, I

10   don't think it's all inappropriate.

11             You know, the worse thing that happens here is that

12   all 27, or however many are left, employees decide that it's

13   not worth -- the game is not worth the candle and they're not

14   going to participate in the program because they don't want to

15   release the claims, and okay, then the Debtors are where they

16   are.  They're where they started from.  And maybe people aren't

17   incentivized or motivated to do the job that the Debtor is

18   hoping to motivate them to do, but at least the Debtor hasn't

19   paid out a bunch of money to those people.  So, I'm going to

20   overrule that objection and I'll grant the motion.

21             MS. MORGAN:  Thank you, Your Honor.  May I approach

22   with a black line and a clean form of order?

23             THE COURT:  Yes.  Thank you.

24             MS. MORGAN:  Your Honor, other than the cleanup

25   change on Page 1, all of the changes are to paragraph four and

1  this is entirely in response to the requests of the U.S.

2  Trustee and the SEC.  And, again, I'll just read it into the

3  record, the addition is that notwithstanding any language in

4  the executive incentive plan to the contrary, and regardless of

5  whether a plan participant is employed by the Debtors at the

6  time of the event, payments under the executive incentive plan

7  to particular plan participants may be subject to disgorgement

8  to the estates upon the motion of any party in interest,

9  including the U.S. Trustee, after appropriate notice and a

10 hearing, if one or both of the following events occurs (1) such

11 plan participant is determined by a court or governmental

12 entity to have civil liability, and/or criminal liability

13 relating to such plan participants employment, unless such

14 civil or criminal liability results from a negotiated

15 settlement in which the plan participant does not admit to the

16 alleged conduct giving rise to such liability, and (2) the

17 Debtors discover that the plan participant had a material and

18 direct conflict of interest that was not specifically waived in

19 advance by the Debtors.

20         And, Your Honor, that language, again, is acceptable

21 to the U.S. Trustee, the SEC and the Committee.

22         THE COURT:  Okay.  I'll sign the order with that

23 revision.

24         MS. MORGAN:  Thank you.

25         THE COURT:  And, you'll submit an order on the seal

1 motion, under certification of counsel?

2        MS. MORGAN:  We will, Your Honor.  Thank you very

3 much.

4        THE COURT:  All right.  Anything further for today?

5        MS. MORGAN:  That concludes our agenda.

6        THE COURT:  Thank you.  Hearing is adjourned.

7        MS. MORGAN:  Thank you.

8        UNIDENTIFIED MALE SPEAKER:  -- order --

9        MS. MORGAN:  Oh, yes.  Your Honor, did you have time

10 to look at the loan sale order?

11        THE COURT:  No, I didn't.

12        MS. MORGAN:  Okay.

13        THE COURT:  Let's take a brief recess, I apologize.

14        MS. MORGAN:  That's okay.

15        THE COURT:  Let me find the right notebook.  What

16 agenda item was it?

17        MR. LUNN:  There was only one change --

18        THE COURT:  All right, thank you.  Do you know what

19 agenda item that was?

20        MR. LUNN:  27 I believe.

21        THE COURT:  No.

22        MR. LUNN:  28, Your Honor.

23        THE COURT:  28, okay.  I'm sorry.  Yes, we'll take a

24 -- give me about 10 minutes to look at it and I'll come back on

25 the bench.

1          MS. MORGAN:  Thank you, Your Honor

2          THE COURT:  Thank you.

3               (Short break in proceedings)

4          COURT CLERK:  All rise.

5          THE COURT:  Please be seated.  All right.  I've gone

6    through the order.  I have a couple concerns and changes.  With

7    Romanette 4 on Page 2, I'm concerned with the Court, in effect,

8    authorizing non-debtor subsidiaries to do something in that

9    context.  Again, they're non-debtor subsidiaries.  So, I

10   propose to change Romanette 4 to read, "If no written

11   objections are filed and served in accordance with the sale

12   notice procedures, the Debtors are authorized by the Court to

13   direct the non-debtor subsidiaries to take any and all actions"

14   -- et cetera, et cetera.  Obviously, I have jurisdiction to

15   authorize the Debtors to dispose of their assets, which include

16   the stock and control of the non-debtor subsidiaries.

17          In connection with Romanette 5, I'd like to add a

18   reservation to the effect of, nothing contained in this

19   provision shall be considered a determination by the Court as

20   to its jurisdiction to grant any relief requested at such

21   hearing.  I've made these changes already so, hopefully,

22   they'll be legible.  As long as we don't have Mr. Waite making

23   the changes, we'll be fine.

24          And, then I'd like to strike, again, the next ordered

25   paragraph, authorizing the non-debtors to do something, so I

1  strike, and the non-debtor subsidiaries from that provision.

2  And then just given the concerns as to the scope of the Court's

3  subject matter jurisdiction, I know it's become a standard

4  paragraph in every order I receive, I don't think it's

5  particularly necessary because I think I always have the

6  jurisdiction to reconsider my orders, but I'm going to strike

7  the retention of jurisdiction provision.  With those changes

8  I'm prepared to overrule the Office of the United States

9  Trustee's objection to the extent it's still extant, and given

10 those changes, I grant the relief as modified.  I'll just --

11          MR. LUNN:  You're just going to enter that order yo

12 have, Your Honor?

13          THE COURT:  Yes, I have it right here.

14          MR. LUNN:  Thank you.

15          THE COURT:  You're welcome.  And thank you for

16 reminding me that we had work to do.  All right.  Anything

17 further?

18          MS. MORGAN:  That's it, Your Honor.  Thank you.

19          THE COURT:  You mean it this time, right?

20          MS. MORGAN:  Yes, yes, we do.

21          THE COURT:  Okay.  Thank you very much.  Hearing is

22 adjourned.

23                          * * * * *

24

25

## CERTIFICATION

I, ELAINE HOWELL, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of my ability.


/s/ Elaine Howell                Date:  December 4, 2007

ELAINE HOWELL

J&J COURT TRANSCRIBERS, INC.