UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Case No. 07-11047 (CSS) |
| | . | Adv. No. 07-51704 |
| | . | |
| AMERICAN HOME MORTGAGE | . | |
| HOLDINGS, INC., et al., | . | 824 Market Street |
| | . | Wilmington, Delaware 19801 |
| | . | |
| Debtors. | . | November 26, 2007 |
| . . . . . . . . . . . . . . | . | 3:03 p.m. |

TRANSCRIPT OF HEARING
BEFORE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtors: | Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP<br>By:  JAMES C. TECCE, ESQ.<br>     CARLOS A. RODRIGUEZ, ESQ.<br>     SUSHEEL KIRPALANI, ESQ.<br>51 Madison Avenue<br>New York, NY 10010 |
| For Calyon New York Branch: | Hunton & Williams, LLP<br>By:  JASON W. HARBOUR, ESQ.<br>     BENJAMIN C. ACKERLY, ESQ.<br>Riverfront Plaza, East Tower<br>951 East Byrd Street<br>Richmond, VA 23219-4074 |

| | |
|---|---|
| Audio Operator: | Nicole Schaefer |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (continued):

For Calyon New York          Eckert Seamans
Branch:                      By:  MICHAEL BUSENKELL, ESQ.
                             300 Delaware Avenue, Suite 1210
                             Wilmington, DE 19801

For Calyon New York          Hunton & Williams, LLP
Branch:                      By:  THOMAS A. RICE, ESQ.
(via telephone)                   SAMANTHA GRUMMAN, ESQ.
                             200 Park Avenue
                             New York, NY 10166-0091

For Bank of America:         Potter, Anderson & Corroon, LLP
                             By:  LAURIE SELBER SILVERSTEIN, ESQ.
                             Hercules Plaza
                             1313 North Market Street, 6th Floor
                             Wilmington, DE 19801

For Creditors                Blank Rome, LLP
Committee:                   By:  BONNIE GLANTZ FATELL
                             Chase Manhattan Center
                             1201 Market Street
                             Suite 800
                             Wilmington, DE 19801

1          THE COURT OFFICER:  All rise.

2          THE COURT:  Please be seated.  Good afternoon.  I

3  don't know who wants to go first.  Calyon is the plaintiff, so,

4  I think that makes some sense.

5          MR. ACKERLY:  May it please the Court, Ben Ackerly

6  here on behalf of Calyon, New York branch.  And I have with me,

7  Jason Harbour and Doug Murphy from Hunton Williams, and Michael

8  Busenkell who is our counsel here in Delaware.

9          If I could just reserve rebuttal with respect to the

10 counter-claim -- because there's a claim and a counter-claim,

11 I'd just like to reserve rebuttal with respect to the argument

12 on the counter-claim.

13         THE COURT:  All right.

14         MR. ACKERLY:  Your Honor, the debtors'

15 re-characterization argument as set forth in their trial brief

16 and in their post-trial brief is like magic.  It is an example

17 of the art of illusion.  The debtors argue that the Calyon

18 repurchase agreement is not a repurchase agreement for purposes

19 of Section 559 of the Bankruptcy Code because of the following

20 factors.  First, it's not on the standard BMA form.  Second, it

21 started off as a secured warehouse facility that was changed to

22 a repurchase warehouse facility.  Third, it does not have the

23 requisite alienability and liquidity provisions which they say

24 are the sine qua non of a repurchase agreement.  They say that

25 the intent of the parties is irrelevant.  Fifth point they make

1    is that the repurchase agreement was called a loan and the

2    mortgages were called collateral in e-mails that were sent.

3            They say it has the characteristics of a loan and

4    that operationally, it was not treated any differently for

5    servicing purposes than when it was a secured loan.  They say

6    that -- also that monitoring purposes in terms of the payments,

7    it was not treated any differently than when it was a loan than

8    when it was a repurchase agreement.

9            And finally, they point to the fact that the parties

10   provided for U.C.C. financing statements to be filed as further

11   evidence that it should be re-characterized as a loan.

12           But I would ask the Court to note what the illusion

13   is in their argument.  Not once in their brief do they mention

14   101(47)(a)(i), the definition of repurchase agreement to argue

15   that the Calyon repurchase agreement does not satisfy the

16   Bankruptcy Code definition.  Not once do they argue that any of

17   the factors they contend are reasons why the Calyon repurchase

18   agreement is not safe harbored under Section 559 are elements

19   of the definition of repurchase agreement in Section 101(47).

20           And Your Honor, I think the reason is clear that they

21   don't mention this.  And that is because they can see that the

22   Calyon repurchase agreement satisfies the Bankruptcy Code

23   definition.  The legal standard for this case begins and ends

24   with the Bankruptcy Code definition in 101(47).  Congress did

25   not intend that the Bankruptcy Court would get sidetracked by

5

1 the re-characterization arguments that the debtors are making.

2       The legislative history of the Section 555 of the

3 Bankruptcy Code in 2005 stated the reference to "repurchase and

4 reverse repurchase transactions is intended to eliminate any

5 inquiry under Section 555 and related provisions as to whether

6 a repurchase or reverse repurchase agreement is a purchase and

7 sale transaction or a secured financing."  Repurchased and

8 reverse repurchase transactions meeting certain criteria are

9 already covered under the definition of repurchase agreement in

10 the Bankruptcy Code.

11       The argument that they are making with respect to

12 re-characterization defeats the whole purpose of the safe

13 harbor.  And that is that the contractual rights of a repo

14 participant to cause the liquidation, termination, or

15 acceleration of a repurchase agreement on account of a

16 bankruptcy filing not be stayed, avoided, or otherwise limited

17 by operation of any provision of the Bankruptcy Code or by

18 order of a Court.

19       The issues in this case are quite simple, whether the

20 Calyon repurchase agreement satisfies the Bankruptcy Code

21 definition of a repurchase agreement.  On this score, the

22 repurchase agreement was put into evidence.  Mr.

23 Pinot(phonetic), their witness, testified on cross examination

24 that it satisfied each of the five elements of the definition.

25 And there's never been a dispute in this case as to whether it

1  satisfied the five elements of the definition in 101(47).  So,

2  there's no question in this case that the Calyon repurchase

3  agreement satisfies the definition in 101(47).

4        The next issue, and the last issue, is did the

5  parties operate under the terms of the Calyon repurchase

6  agreement?  And there again there is no dispute.  Mr. Pilcer

7  (phonetic) for Calyon testified that they operated pursuant to

8  the terms of the repurchase agreement.  And Mr. Pinot for the

9  debtor testified, a denigrate on that score.

10        Your Honor, the inquiry should stop here.  The Calyon

11  repurchase agreement satisfies the definition and the parties

12  operated under the definition.  But if we're going to go

13  further and even if the debtors' factors, which I have

14  identified at the outset, are relevant, they would not support

15  a re-characterization.

16        Their first point, Your Honor, had to do with the

17  standard BMA form.  The debtors stated in their post-trial

18  brief that the BMA developed a form agreement for repurchase

19  transactions that comports with congressional intent and

20  embodies the form of repurchase agreement used and recognized

21  by market participants.  Your Honor, I submit there's not a

22  shred of evidence in the record to support that statement.

23        The debtors stated in their opening brief, their

24  trial brief, they made reference to the 2000 Global Master

25  repurchase agreement form which the debtors relied on for the

7

1 proposition that the Calyon repurchase was flawed because it

2 requires the return of identical mortgage and no -- identical

3 mortgages and substitutability.  Again, the 2000 global master

4 repurchase agreement is not in evidence in this case.  The only

5 repo agreements that are in evidence in this case are the

6 Calyon repo agreement and the Bear Stearns repo agreement.

7         And I would point the Court to the Bear Stearns repo

8 agreement and note that it predates the 2005 amendments to the

9 Bankruptcy Code.  And it is not a warehouse repo like the

10 Calyon repo because if you look at the first paragraph of the

11 repo, you'll see it only applies to transactions which take

12 place within three days of the date of the agreement.  It is

13 not a facility such as the facility that Calyon provided which

14 was in essence a repurchase agreement, a revolving repurchase

15 agreement that the debtor could put loans -- put mortgages in

16 and take money out up to a ceiling.  The Bear Stearns repo

17 agreement was different in that fundamental respect.

18         But let's compare the Bear Stearns repo to the Calyon

19 repo.  Both of those repurchase agreements provide for

20 protective security agreements.  In other words, the U.C.C.

21 financing statements were filed as protective measures in both

22 of those.  Both of those repurchase agreements provide that the

23 repo buyer has the right to transfer the mortgages.  Both of

24 those repurchase agreements provide that the repo buyer must

25 sell back to the repo seller the same mortgage loans.

1      Neither of those repurchase agreements provide for the

2  repo buyer to substitute mortgages for ones that were bought.

3          Both of those repurchase agreements provide that the

4  seller shall provide the day to day servicing.  In both of

5  those repurchase agreements, the repo seller is entitled to the

6  proceeds received from the servicing until there is a default.

7  And in both of those repurchase agreements, there is a

8  statement of intent that the documents constitute a repurchase

9  agreement under the bankruptcy code.

10          Your Honor, there is no evidence in the record that

11 there is a form, BMA form.  There's no evidence that the Bear

12 Stearns is the BMA form.  The evidence was that it was modeled

13 after a BMA form.  The -- and I pointed out, the BMA form which

14 the debtors put into evidence is not the BMA form which

15 provided for substitutability which they refer to in their

16 trial brief.

17          The only evidence with respect to the BMA form that

18 is the Bear Stearns form is that it was filed twice by the

19 debtor, once with respect to the SPV financing which was the

20 predecessor to the Calyon repurchase agreement and the other

21 time in connection with the Bear Stearns repurchase agreement.

22 But there's no evidence in the record that the BMA form or that

23 the Bear Stearns repo agreement, which was testified to to be

24 followed after the BMA form, was used more than twice.

25          And the Court will recall that Mr. Pinot testified

1 that American Home Mortgage entered into at least 15 repos

2 during the course of his -- mortgage repos during the course of

3 his time there, and only two have been identified as being

4 anywhere related to what they refer to as the BMA form.  Mr.

5 Pinot further testified that all repurchase agreements are not

6 identical.

7          The final argument they make with respect to the form

8 here has to do with the Calyon credit policy.  The Court will

9 recall a thick exhibit was introduced by the debtors.  That was

10 the Calyon credit policy.  And an argument was attempted to be

11 made that the Calyon credit policy required Calyon to follow

12 the BMA form.  The Calyon credit policy doesn't refer to the

13 BMA form.  And Mr. Pilcer testified directly that the Calyon

14 credit policy was not relevant to the repurchase agreement

15 entered into between Calyon and the debtors.

16          The second argument they make to support

17 re-characterization is what I call the genesis argument.  And

18 that is that before there was a repurchase agreement, there was

19 a loan.  This is not the case as the Court noted in opening of

20 the trial.  This is not a case of taking a promissory note and

21 striking a promissory note and calling it a repurchase

22 agreement.

23          If the Court looks at the black line that was

24 introduced into evidence by the debtors and looks at the final

25 repurchase agreement, they will note that there are significant

1 changes that were made to comply with the 2005 amendments.  The

2 first and foremost of which of course is the provision that

3 there would be a purchase and sale of mortgages.

4        The changes that were made in the Calyon repurchase

5 agreement comply in all respects with the definition of

6 repurchase agreement in the Bankruptcy Code.  And it should be

7 of no consequence that warehouse lenders reacted to the 2005

8 change by reconstituting their relationships with the companies

9 that they were financing by making them into repurchase

10 agreements.  That should be of no consequence.

11        The next argument the debtors make for

12 re-characterization is that the Calyon repurchase agreement

13 does not have the requisite alienability and liquidity.  Now,

14 alienability -- it's hard to understand why they make this

15 argument since the alienability provisions of the Calyon

16 repurchase are the same as the ones in the Bear Stearns

17 repurchase agreement which is one they didn't object to as a

18 repurchase agreement.  They didn't seek to re-characterize Bear

19 Stearns.  So the alienability provisions, the right of the repo

20 buyer to transfer the mortgages in the warehouse are identical

21 in those two provisions.

22        The second, as Mr. Pinot testified, the provisions in

23 the Calyon repurchase agreement are the same as in all 15 other

24 of the American Home Mortgage repurchase agreements that he was

25 familiar with.

1         And finally on the subject of alienability, the
2  mortgage loans are not fungible.  And there obviously are
3  government securities and things which are fungible, but
4  mortgage loans are not fungible.  And the evidence is
5  undisputed that they are not fungible.  And that distinguishes
6  repo agreements regarding whole loan mortgages from perhaps
7  government securities and others.  But here there's no dispute,
8  they're not fungible.

9         On the liquidity issue, the argument here is, I
10 think, a bit misguided.  The argument is based on the fact that
11 the reason Congress adopted the 2005 amendments to 101(47) to
12 expand the definition to include mortgages was to preserve
13 market liquidity.  And then they cite -- they make the argument
14 in their brief that there was no evidence submitted that any
15 -- let me back up a second.  The Congress on the liquidity
16 issue, they say the purpose is to preserve liquidity.  But
17 there is no evidence here that any repo buyer ever sold its
18 mortgages to any unrelated third party.

19        Now, the suggestion that's made by the debtors here
20 is that there needs to be liquidity so that you can sell your
21 mortgages.  And they argue that if the debtor can't -- if the
22 repo buyer, excuse me, can't immediately transfer mortgages to
23 a third party, than the safe harbor purposes are lost.  And
24 what they're focusing on is, they're going back to the
25 alienability provisions and saying that because you have to

1  sell back the identical mortgage, you really have no

2  alienability rights and you have no liquidity rights because

3  you can't liquidate your interests in the repurchase agreement

4  by selling all the mortgages.

5         What they confuse here is, is what Congress was

6  talking about with respect to liquidity.  And what they were

7  talking about with respect to liquidity is that upon an event

8  of default; i.e., a bankruptcy, the non-debtor party to the

9  repo agreement could accelerate its rights without interference

10 from the bankruptcy in order to liquidate its collateral.  And

11 that's exactly what is contemplated by Section 559.  So, the

12 liquidity argument simply I don't think flies in this case.

13        The fourth argument they make is that the intent of

14 the parties is not relevant.  Is the substance of -- the

15 substance of the transaction here should control.  The repo

16 agreement clearly provides for the purchase and sale of

17 mortgages.  The parties operated as if it were a purchase and

18 sale of mortgages.  The cases which the debtor relies on here

19 with respect to intent are the Third Circuit's decision in

20 Pillowtex.  Pillowtex did not involve whole unmortgage repo

21 under 559.  It involved a -- the question of whether a lease

22 was a secure transaction instead of a lease.  An entirely

23 different situation because Congress has not taken the effort

24 to define in the Bankruptcy Code exactly what a lease is;

25 whereas, Congress has taken the time to define exactly what a

1  repurchase agreement is.

2          Secondly, under the lease versus loan situation,

3  there's a whole body of case law out there that says how you

4  look at -- it says that you look at the economic substance of

5  the transaction.  We submit that that's not applicable here

6  because of the definition of repurchase agreement in 101(47).

7  And I had to look at the whole economic substance of the

8  transaction would make the transaction -- would defeat the

9  purpose of the safe harbor.

10          The debtors argue that the Calyon bankers labeled

11  this a loan and called the mortgages collateral.  And the Court

12  will recall several e-mails which had those words in them.  We

13  submit that's totally irrelevant.  I think Mr. Pilcer indicated

14  that he was not giving a legal opinion as to what it was; he

15  was just looking at the fact that they had a loan -- they had a

16  repurchase agreement that was in default, that they were owed

17  over a billion dollars under that repurchase agreement.  And he

18  was thinking of it in terms of that.

19          The sixth point they make is that it has the

20  characteristics of a loan.  Repurchase agreements have the

21  characteristics of a loan.  Well, I think the <u>Bevill, Bresler</u>

22  (phonetic) case among others noted that repurchase transactions

23  are hybrid transactions that have many of -- and frequently

24  serve the same economic function of secured loans.  But it

25  doesn't make them a secured loan.  All the mortgage repos in

1  this case have the same fundamental characteristics.  Transfer

2  of mortgages, the right to transfer -- the right to transfer

3  the mortgages, the obligation to transfer the mortgages back to

4  the repo seller, requirements for U.C.C. financing statements

5  and so on.

6          That the -- the fact that the repurchase agreement

7  has some of the characteristics of a loan and serves the same

8  purpose of a loan and is recognized as hybrid transaction

9  doesn't make it a loan.  I think this was pointed out, Congress

10 probably recognized this in Section 559 when they provided that

11 any access after the disposition of the mortgage loans and the

12 satisfaction of the debt in full would go back to the repo

13 seller.  Not exactly a characteristic of something that would

14 be in essence a true sale.  But Congress was recognizing here

15 that if the mortgages -- if my client liquidates the mortgages,

16 and there's an excess after payment of the debt, that excess

17 under Section 559 goes back.

18         The fact that U.C.C. financing statements were filed,

19 these are simply backup financing statements.  They're used in

20 every transaction like this.  It doesn't render the transaction

21 a loan.  They only become relevant if the Court determines that

22 it's not a repurchase agreement under 101(47).

23         The Bear Stearns repurchase agreement has exactly the

24 same language in it.  And Mr. Pinot testified that all 15

25 repurchase agreements that AH -- American Home Mortgage had

1  entered into had similar backup provisions for U.C.C. financing
2  statements.
3       So, Your Honor, we don't think any of the factors
4  that they pointed to to suggest that the repurchase agreement
5  should be re-characterized would support a re-characterization.
6  But I would emphasize, we don't think the Court should go
7  there.  We think the inquiry stops with 101(47).  And the fact
8  that the undisputed testimony is that the parties operated
9  pursuant to the terms of the repurchase agreement.
10       Now, let me turn to the servicing issue.  The debtors
11  argue that the servicing component of the repurchase agreement
12  should be severed from the repurchase agreement.  Your Honor,
13  there are two components to servicing.  One is the servicing
14  right, the underlying right to control the servicing.  And the
15  other is the day to day servicing.  In this case, the evidence
16  is undisputed that the servicing right was sold with the
17  mortgages.  The servicing right is a contract right.  And as a
18  contract right, it qualifies as a general intangible.  And the
19  definition of assets that were sold included general
20  intangibles under the repurchase agreement.
21       The Court will recall that Mr. Pilcer from Calyon
22  testified that Calyon paid more for -- under this repurchase
23  agreement because they were buying the servicing rights.  Mr.
24  Love testified that the price is higher when you sell the
25  mortgages if you sell them servicing released.  So, the

1  servicing right is something here that was sold.  It's

2  undisputed that it was sold.  It's undisputed that we paid

3  more -- that we bought it and we paid more for it because we

4  were buying the servicing right.  And Mr. Love acknowledged

5  that it was worth more -- the collateral was worth more with

6  the servicing right.

7          Now, with the servicing right, came the right to

8  designate who the day to day servicer was.  And here, the day

9  to day servicer was American Home Mortgage Servicing.  And

10 there was a lot of testimony from Mr. Love, from Mr. Pilcer as

11 to why the American Home Mortgage would stay the interim

12 servicer or the day to day servicing responsibility during the

13 time these loans were in the warehouse.

14         First was that the servicing -- these mortgages

15 remained in the warehouse only approximately 30 days to begin

16 with.  And to change the servicing during that period of time

17 would not only be complicated, time consuming, expensive, but

18 would jeopardize the value of the mortgages themselves.  So,

19 there was -- the right to control the day to day servicing is

20 important, but the day to day servicing responsibility is

21 distinguishable from the underlying servicing right.

22         THE COURT:  Well, forget -- assume that you're not

23 -- the servicing's not incorporated or related or linked in

24 anyway to a repurchase agreement, but assume this was just a

25 right that Calyon owned the loans, they had the right to

1  designate a servicer.  They designated AHM Servicing as that

2  servicer. In an ordinary bankruptcy context, HM would still

3  have that contract right and would have the ability to assume

4  and assign or sell that contract right to another servicer.

5  Correct?

6        MR. ACKERLY:  If you're making the assumption that

7  it's totally separate from the repurchase agreement.

8        THE COURT:  Well, disregard it.  Say it's pursuant to

9  a master loan purchase and servicing agreement, and MLPSA, I

10 had a lengthy trial on that earlier in the case, and that had a

11 servicing component and an ownership component.  And they

12 sought to -- the debtors sought successfully to sell or assign

13 that servicing component irrespective of the loan purchase and

14 sale component.

15        Those loans -- those servicing pieces were in many

16 ways similar to the servicing right that the debtors enjoy at

17 least currently under the repurchase agreement with Calyon.

18 But they were different in different ways, as well.  For

19 example -- and here's my point, is -- the point I'm making is,

20 are you saying that the debtor never would have a right as a

21 day to day servicer to assign away that right to be the day to

22 day servicer for which the debtors get paid for example, some

23 certain, you know, contractually so many basis points, et

24 cetera on the unpaid principal?  Are you saying that the

25 there's something special about that day to servicing right in

1 connection with the repurchase agreement that makes that right

2 inalienable?

3        MR. ACKERLY:  Well, under the -- under the repurchase

4 agreement, they are designated as the day to day or interim

5 servicer will have the loans -- are in the warehouse.

6        THE COURT:  Right.

7        MR. ACKERLY:  The -- and the repurchase agreement

8 provides that upon an event of default which would be a

9 bankruptcy filing, that right terminates.  That right may be

10 terminated.  And we put into evidence that we did terminate

11 their rights to the interim servicing.  So --

12        THE COURT:  But the master loan purchase and sale

13 agreements that the debtor was a party to, which were for

14 -- which were sort of the next step what would happen after the

15 use of the warehouse line to originate and fund the loans, they

16 would go out, they'd find a private investor or a

17 securitization vehicle.  They would repurchase those loans from

18 your client and put them in that vehicle sometimes under

19 servicing released and sometimes on the servicing retained

20 basis.  But even on a servicing released basis, they often were

21 maintained -- they often stayed the servicer because there was

22 evidence, I think at this trial, that every -- and it's common

23 sense, you change servicers -- you know, every time you change

24 something, something can mess up.

25        MR. ACKERLY:  Right.

1          THE COURT:  And you're going to mess up your string

2   of payments which is the whole point of the transaction.

3          So, in that situation, I found that under certain

4   circumstances, you could sever the servicing component from the

5   buy and sell component, and that the servicing component was

6   alienable.  And I'm trying to focus on what's different in this

7   case from that case because the Court's already ruled to a

8   certain extent -- and I like to be consistent when possible

9   -- that in some circumstances, you can sever the servicing

10  component off, and you can -- and I have found in certain

11  circumstances it's severable.

12          MR. ACKERLY:  Well --

13          THE COURT:  So, what's different here?  What's

14  different in this situation?

15          MR. ACKERLY:  I think the difference is 30 days.  And

16  let me explain.  In the example, I think that you had of a case

17  that you dealt with, dealt with the ultimate buyer of a

18  package, the securitization of a -- and so those -- you had a

19  finite group of mortgages that are packaged and sold to a buyer

20  through a securitization or whatever.  And it's either sold on

21  a purchasing retained or purchasing released basis.  But let's

22  assume that American Home Mortgage Servicing retained the day

23  to day servicing on those.  Those mortgages remain there until

24  they're paid out.  Here the mortgages are only in the facility

25  for a very short period of time.  So, you know, I would submit

1  that they are different.

2          I'm not privy with the contract documents that were

3  the subject of your case, but I think the contract documents

4  here are clear that upon an event of default, the servicing

5  right terminates.

6          THE COURT:  Right.  And you would -- your distinction

7  would be that -- the response to that would be, not all of

8  -- not all events of default are created equal.  And an event

9  of default for instance that's linked to the filing of a

10 bankruptcy petition is generally not enforceable.  And your

11 response to that would be, that's the not the case here because

12 559 and 555 --

13         MR. ACKERLY:  Yes, sir.

14         THE COURT:  -- make it enforceable.  So, it's really

15 going to come down to the finding that the two pieces are so

16 linked -- otherwise, it's sort of -- if it's so related to the

17 repurchase side, then the event of default actually means

18 something.  If it's sufficiently unrelated to the mortgage or

19 mortgage interest, that -- then the event of default doesn't

20 mean anything because it normally would be unenforceable.

21         MR. ACKERLY:  Well, let me make two other points

22 which may not be exactly responsive to your question, but

23 consistent kind of with my argument here.  One is that the

24 -- as I said, the undisputed evidence is that these were sold

25 servicing released, all right.  So, that the servicing right

1 was brought by the purchasers.  And so, I don't see how you can

2 sever something that you sold.  It's not a remaining contract,

3 so to speak.

4          THE COURT:  Well, what remains is the right to be the

5 day to day servicer until that right is terminated

6          MR. ACKERLY:  That's correct.

7          THE COURT:  And you can only do that under certain

8 circumstances.

9          MR. ACKERLY:  That's my second point here.  If you

10 were going to treat it -- if you were going to treat the day to

11 day as an executory contract that the debtor could assume, or

12 reject, or sign, the Court has got to determine that it's in

13 the best interest of the estate to assume, the best interest of

14 the estate to reject, the best interest of the estate to assume

15 and assign.

16          In this case it would not be -- even if it was an

17 executory contract that the debtor could do, it would not be in

18 the best interest of the estate because again, under the

19 repurchase agreement, once there's been an event of default,

20 there is no servicing fee paid until the purchasers have been

21 paid in full.  So, there would be no benefit to the estate here

22 of assuming this contract and continuing to do the day to day

23 servicing or trying to sell it to somebody because they're not

24 going to get paid.  The only time they will get paid is in the

25 event that the purchasers get paid in full their debt.  And

1  that's clear in the documents.

2          So, there's a waterfall of payments that comes due

3  upon a default.  And at the bottom of the waterfall is the

4  servicing fee.  So, there would be no benefit to the debtor

5  here in that situation.

6          THE COURT:  Well, in -- I understand that point.  But

7  is there -- there's a separate point which is that assume no

8  event of default -- let's assume no enforceable event of

9  default occurred, so the debtors would otherwise be entitled to

10 payment because the Court finds that the servicing portion of

11 these agreements is severable and that the debtors have a

12 contract right to be the day to day servicer on the repurchaser

13 -- on the mortgage that's subject to the repurchase agreement,

14 and to be paid pursuant to the contract with regard to that,

15 and that the -- I'm going to say -- to assume this -- that the

16 event of default is really a repurchase agreement issue, not a

17 servicing agreement issue, okay?  The repurchase -- say, it's a

18 repurchase agreement, that's fine.  That event of default

19 relates to that side.  But on the servicing side, because it's

20 not interest and a mortgage or a mortgage, and you also have to

21 assume that I find that it's not related to the mortgage or the

22 interest in a mortgage, okay.  So, it's a severable piece, all

23 right.  So, the event of default is inapplicable.

24          Is there anything else under the contract which would

25 make it in effect stupid for the debtors to seek to assume the

1 right to continue to be the servicer in this instance or to try

2 to sell the right to be the servicer in this instance?

3      MR. ACKERLY:  And I am to assume that the waterfall

4 doesn't apply?

5      THE COURT:  Right.

6      MR. ACKERLY:  But --

7      THE COURT:  And I'm not -- in my -- here's the -- I

8 didn't quite understand it, but assuming the waterfall doesn't

9 apply, the servicing fee itself expires at some point, is that

10 correct, by the passage of time?

11      MR. ACKERLY:  I know as of November 20th, it expired,

12 November 20th, 2007 if not earlier by the default.

13      THE COURT:  All right, assuming that a default didn't

14 apply, as of six days ago, the debtor has no right to get paid

15 for servicing the loans?

16      MR. ACKERLY:  Right.

17      THE COURT:  So, even if I were to say, it's

18 severable, in effect, all I would do -- we'd be doing is

19 loading an obligation onto the debtor's estate with no

20 commencement of pay?

21      MR. ACKERLY:  That's their position.

22      THE COURT:  All right.  And that's in the contract?

23      MR. ACKERLY:  Yes, I think it's termination date was

24 the defining term.  Your Honor, our position with respect to

25 the servicing, whether we are going to treat it as a servicing

1 right or as a day to day obligation, is that it is a related

2 term under 101(47).  We believe, and the testimony I think

3 supports this, that servicing is integral to the mortgages and

4 to the value of the mortgages.  And you would never have a

5 repurchase agreement without a provision dealing with

6 servicing.  It just affects the whole value of the financial

7 transaction to ensure that it is being serviced properly.

8        If you were to sever the servicing, it seems to us

9 that it would violate the safe harbor in itself because it

10 would have an adverse impact on our ability to liquidate the

11 collateral because again the testimony was that you need to

12 have the servicing information in order to liquidate the

13 collateral to convince a potential buyer as to what the value

14 of the collateral is.  I mean, I think these are -- these are

15 obvious points.

16        THE COURT:  Well, that's a pricing point, though.

17 It's not that you need it necessarily to liquidate.  It's that

18 you need it to liquidate at the highest possible price.

19        MR. ACKERLY:  Well, I think that's what 559 is

20 intended to do is to allow the repo buyer to liquidate its

21 collateral as quickly as possible so that it doesn't suffer the

22 time delay caused by bankruptcy which frequently causes the

23 value to go down.

24        THE COURT:  Well, I agree that liquidity is clearly a

25 purpose of 559, but liquidity and maximizing value aren't

1  necessarily the same thing.  We all know you're going to get

2  more in an orderly liquidation or orderly sale than you are in

3  a fire sale.  So, it may be one thing for Congress to say, yes,

4  we want to preserve your liquidity, by they're not necessarily

5  saying, we want to preserve your liquidity at the greatest

6  possible price.

7          MR. ACKERLY:  But Your Honor, I don't think we're

8  talking about a fire sale.  This is not like foreclosing on a

9  home where you've got to do it under, you know, state law

10  procedures whether it's a Deed of Trust state or not --

11          THE COURT:  Well, but my point was -- your point in

12  effect is that if I don't find that the servicing component is

13  related to the repurchase element, that I am in effect

14  frustrating the congressional intent that your client had -- be

15  able to liquidate its position.

16          My response to that would be, your client can

17  liquidate its position regardless of how the servicing goes

18  out, it will affect the price your client is going to be able

19  receive.  And for example, there's evidence in the record that

20  mortgages get sold and purchased on a servicing retained and a

21  servicing released basis.  And that on a servicing released

22  basis, the price is higher.  And that -- these were clearly,

23  under the terms, servicing released.

24          But in effect, what would happen if I say the debtors

25  still have the right to control the servicing, is it you could

1  still liquidate your position, but you'd have to do so on a

2  servicing retained basis.  And you'd get a lower price, no

3  question.

4       MR. ACKERLY:  Well, Your Honor, I think -- the way

5  you stated the issue, I think answers the question.  I can't

6  believe that Congress intended to put a safe harbor in here

7  without also intending that they wanted to be able to make the

8  markets comfortable that the repo buyer in this case would be

9  able to get -- to be able to maximize the value of its

10 property.

11      And yes, you can reason that you could sever off the

12 servicing and we could still sell the mortgages.  But we would

13 sell the mortgages for significantly less.  And I suspect if we

14 went back and read -- reread the testimony from Mr. Pilcer who

15 did testify about this, is he -- is that he said it makes it

16 virtually impossible to sell the mortgages if you don't have

17 the servicing information to go along with them because you

18 don't -- buyer doesn't know what they're getting.  All they

19 know is that they're getting mortgages, but they don't have the

20 files that are necessary to do the due diligence --

21      THE COURT:  But they don't do due diligence on the

22 files until after the sale.  They do -- they -- that's why

23 there's 120-day or whatever it is, 150-day look back period.

24 They do the due diligence based on the tape, the information,

25 but the actual physical file to verify whether what's on the

1 tape is accurate, they don't do due diligence on that in the

2 buying and selling of mortgages.  They couldn't.

3        MR. ACKERLY:  But ultimately they do diligence to

4 determine that there is a recorded mortgage that makes it a

5 valid lien under applicable state law.  And they do due

6 diligence to understand what the payment history is and whether

7 it's in default and those things.  They do all that stuff.  And

8 maybe they do it after the fact, but they have the right to

9 charge those back.  But I mean, I think -- I mean to -- I mean

10 the evidence is just so uncontradicted here that the servicing

11 is an integral component to the value of these mortgages.  You

12 have to separate them out, you're defeating the purpose of the

13 safe harbor.

14        So, you know, we would take exception with the notion

15 that you could do that here because, I mean, first off, it's

16 not a question of doing anything here in my -- the way I look

17 at it other than the day to day servicing.  They don't have the

18 servicing right.  It was sold servicing release.  They don't

19 have that right.  It's been sold.

20        THE COURT:  I think -- you're paying them to do

21 something.  I mean, they have a right to receive payment in

22 exchange for services.

23        MR. ACKERLY:  That's correct.  But it's not the right

24 to control who does the servicing.

25        THE COURT:  I understand.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. ACKERLY:  That's the valuable right, to control

2 who does the --

3          THE COURT:  Well, I don't know if that's valuable.  I

4 mean, to get 85 basis points on a couple billion dollars with

5 of loans, if you run it right, it's a nice little business.

6 And buying and selling mortgages may be not so much this month,

7 you know, is a good business.  So, I'm not sure -- I mean I

8 agree with you, they're two different things.  But you want to

9 say that 100 percent of the value is in controlling who you get

10 to designate as your servicer and that there's no value in

11 actually being a mortgage servicer.  Well, that's

12 counter-intuitive and counter-factual.  Of course, there's

13 value in being a mortgage servicer.

14          MR. ACKERLY:  Well, I did --

15          THE COURT:  As a matter of fact, it's probably the

16 most solid piece of the mortgage business as we sit here today.

17          MR. ACKERLY:  Okay.  Well, I think as I said before,

18 and I don't want to belabor this point, I think there's a

19 difference between being a mortgage servicer on a pool of

20 mortgages that have been sold long term as opposed to being a

21 mortgage servicer on mortgages that are going to be subject to

22 a warehouse repo for 30 days.

23          THE COURT:  Well, I --

24          MR. ACKERLY:  I think --

25          THE COURT:  -- Mr. Love said he didn't draw that

1 distinction, that servicing is servicing.

2      MR. ACKERLY:  No, he -- well, he said, servicing was

3 servicing.  But from the debtors' point of view, once these

4 things come out of the warehouse, the debtor then has to make

5 decision as to whether it's going to sell them servicing

6 retained or servicing released.  And they may sell them

7 servicing released and not have the day to day servicing

8 either.  So, those mortgages have no value to the estate.  All

9 I'm saying is I think there's a distinction between the, you

10 know, having the long term servicing right under a

11 securitization or whatever when they've been sold to an

12 ultimate buyer as opposed to having the day to day servicing

13 right under a repurchase agreement which -- which you know has

14 a year's duration at maximum, and the mortgages come in and

15 out, you know, on 30 days duration.

16      Well, I'll move on.  The -- at least the orange

17 lights not going off up here.

18      THE COURT:  You have as long as you like.

19      MR. ACKERLY:  The other question about this servicing

20 is that, you know, if you -- this repurchase agreement is

21 governed by New York law.  And we've got some argument in our

22 post-trial brief about that.  But there the question is what's

23 the parties' intent with respect to the servicing.  There was

24 no evidence offered by the debtor of -- with respect to intent

25 to sever.  No evidence that they put on about the severability

1  or the -- that the parties had the intent that it was

2  severable.

3        We -- another factor that New York courts consider,

4  whether the parts are inter-dependent and common to one

5  another.  I think we -- I've argued that they are

6  inter-dependent and common to one another.  We've argued -- the

7  other point that New York law looks to is whether the repo

8  agreement must address servicing because servicing is integral

9  to the basic economics of the repurchase agreement.

10       The repurchase agreement in this case, Your Honor,

11 contains no agreement that it's severable.  The repurchase

12 agreement is a single integrated contract.  Again, no intent

13 there that it would be severable.  There's an entire agreements

14 clause in the repurchase agreement.  So, again, no indication

15 that there's other agreements that would suggest that it's

16 severable.

17       And finally, the servicing -- the servicing fee in

18 the case is based upon the number of mortgages better subject

19 to the servicing.  So, there's interrelation there with the

20 repurchase agreement, as well.

21       So, Your Honor, we would contend that the servicing

22 cannot be severed and separated whether you look at the

23 servicing right or the day to day servicing.

24       Finally, Your Honor, just some quick points.  One of

25 the issues here that the debtor had raised was that the action

1  that was brought by Calyon is barred by the automatic stay.  We

2  believe that's addressed by Section 559 and Section 555 of the

3  Bankruptcy Code that the automatic stay does not apply.  If the

4  automatic stay were to apply to a situation like this, again,

5  it would frustrate the safe harbor.

6       The -- another issue is whether the filing of the

7  Chapter 11 petitions automatically terminated the repurchase

8  agreement.  And the language of the repurchase agreement is

9  cited in our brief, make it clear that the Chapter 11 filing

10  was an event of default and that upon an event of default, the

11  Calyon repurchase agreement automatically terminated.

12       There's an issue, you know, that we've asked that the

13  Court in addition to finding that the repurchase agreement is

14  safe harbored, that the Court direct the debtor to turn over to

15  Calyon the books, records, and funds associated with its

16  efforts as the day to day servicer.  Again, you know, our

17  argument there is that that is necessary under 559 and 555 to

18  allow us to liquidate the mortgages.  And I understand the

19  Court's position that it only affects the dollars.  But again,

20  I believe that the intent of Congress was that you maximize

21  dollars and not try to minimize dollars.

22       The other argument that has been made with respect to

23  the turnover of the property is the debtor has argued that all

24  we have here is a prepetition claim of some sort.  And that we

25  should be -- filed a proof of claim for damages.  Your Honor,

1  we're not seeking in this phase or in trial any money damages.

2  It's our position that this is a repurchase agreement and that

3  the property is our property, not their property, that they

4  hold it in constructed trust and that the Court has the power

5  to direct them to turn the property over to us.

6        The -- finally, I think the Court has the power under

7  Section 105(a) to direct the turnover of the property because

8  it would be consistent with the congressional intent in Section

9  559 and 555.

10        The final argument -- I've come back to it -- is the

11  prepetition claim argument, Your Honor.  The debtor relies on

12  Section 541(c) of the Bankruptcy Code for the notion that

13  despite bankruptcy, it has a right to the property and that the

14  ipso facto provisions in 365 do not apply and that it retains a

15  right to the property.  We would call the Court's attention to

16  the language in 559 which is -- which refers to the ipso facto

17  language in Section 365.  And it's clear in 559 that that

18  reference is not limited to 559, and would also apply to

19  Section 541(c).  So, their argument under 541(c) essentially

20  assumes that they've won the safe harbor argument and assumes

21  that they've won the servicing argument.  And it's our

22  position, respectfully, that they should not win either of

23  those arguments.

24        Finally, Your Honor, I haven't said much about

25  Section 555 of the Code.  The debtors didn't say anything about

1  Section 555 of the Code in their brief.  I think again it's

2  undisputed the Calyon repurchase agreement is a securities

3  contract under Section 741(7) of the Bankruptcy Code and that

4  Calyon may take advantage of Section 555 safe harbor because

5  it's a financial institution.

6         And so we believe, Your Honor, for the reasons stated

7  in our brief and from the lectern and the evidence that was

8  submitted to the Court that the Court should determine that the

9  safe harbor applies to the Calyon repurchase agreement, direct

10 the debtor to turn over the records and funds, and other

11 documents in connection with the servicing, not sever the

12 servicing, and rule against the debtor on it's counter-claim.

13 Thank you.

14         THE COURT:  All right, thank you.

15         MR. TECCE:  Good afternoon, Your Honor, James Tecce,

16 Quinn, Emanuel, Urquhart, Oliver, and Hedges on behalf of the

17 debtors, American Home.  Your Honor, I actually don't disagree

18 with Calyon that re-characterization is like magic.  In fact

19 we'd submit that federal judges have magic wands to actually

20 see things the way that they are.  And we're asking you to wave

21 it in this instance.

22         Your Honor, this litigation has covered considerable

23 ground.  A number of depositions, oral arguments, four days of

24 trial, and a number of written submissions.  And in the end, we

25 think from the documentary and testimonial evidence, as well as

1  the legal arguments that have been presented, two areas of

2  inquiry emerge.

3          The first, whether the true character of an agreement

4  that was hastily amended from a two-step financing transaction

5  into a single repurchase agreement and that operated exactly

6  the same way as the lending agreement it replaced, whether the

7  true character of that agreement is in the nature of a

8  disguised secured financing or whether it is the nature of a

9  repurchase agreement simply because the parties ascribed the

10 term repurchase agreement to it and installed empty

11 nomenclature with no operative significance apart from adding

12 new terms to mirror the text of the Bankruptcy Code's safe

13 harbors.

14         The second issue which emerges, Your Honor, is

15 putting examinations of the true character of the agreement

16 aside and irrespective of the result of that examination,

17 whether servicing rights are severable from the underlying

18 agreement such that the Bankruptcy Code's automatic stay

19 provision applies to those rights and precludes Calyon from

20 taking any action with respect to those rights regardless of

21 the agreement's true character.

22         Without minimizing the importance of determining the

23 true character of the Calyon agreement and without diminishing

24 the import, vigor, or veracity of our argument that the Calyon

25 agreement constitutes a disguised secured financing that finds

1  no protection in the Bankruptcy Code's safe harbors, we begin

2  with servicing rights.   And specifically, Your Honor, starting

3  with the plain text of the definitions of repurchase agreement

4  under 101(47)(a)(1) and securities contract under 741(7).

5         Both agreements provide expressly that agreements

6  only constitute repurchase agreements and securities contracts

7  to the extent they fall within the main definitions outlined in

8  each statute; that is, to the extent they constitute repurchase

9  agreements and securities contracts.   And while that may seem

10 circular, the thrust of the provision is to expressly exclude

11 transactions that do not in and of themselves constitute

12 repurchase agreements and securities contracts.   And the rights

13 to service mortgage loans are neither repurchased agreements

14 nor securities contracts.

15        And Calyon could not argue credibly and nor does it

16 that the sale of servicing is included in the sale of a

17 mortgage loan in exchange for the agreement to repurchase the

18 mortgage loan within one year.   Servicing rights are not

19 repurchase agreements or securities contracts because they are

20 entirely severable from the Calyon agreement; and therefore,

21 they fall squarely within the exceptions to the safe harbors in

22 101(47)(a)(4) and 741(a)(8).   These provisions are nearly

23 identical and carve out from the definition of repurchase

24 agreements, agreements which themselves are not repurchase

25 agreements.

**J&J COURT TRANSCRIBERS, INC.**

1          Now, in ascertaining whether or not servicing rights

2   are severable, the relevant factors include, (1) whether the

3   nature and purpose of the agreements are different, (2) whether

4   consideration is separate and distinct, (3) whether the

5   obligation as to each party to the -- instrument are

6   interrelated, and (4) whether the agreements obligate different

7   parties.  And notwithstanding Calyon's arguments to the

8   contrary, Your Honor, the case law is clear and this law has

9   previously recognized in another context that the fact that the

10  terms of a transaction are set forth in one instrument is not

11  conclusive evidence that the parties intended to make only

12  contract.  But it's only one factor in determining intent.  So,

13  the fact that there's only one instrument before the Court is

14  not dispositive.

15          Instead what is dispositive is the evidence that's

16  been presented at this trial.  Number one, that servicing is an

17  administrative function that is unrelated to the underlying

18  financial transaction.  It's performed by different personnel

19  who are located in Irving, Texas not Belleview, New York where

20  the debtors are located, where there headquarters are.  It is

21  so separate and distinct that the American Home Mortgage

22  Servicing, Inc. employees who were performing the servicing had

23  no idea as to what the form of the underlying loan was or who

24  was party to those underlying loans.

25          Number three, the testimony evidence is that

1  servicing is a separate asset that's traded separately and it's

2  afforded different accounting treatment.

3         And number four, the agreement itself, Your Honor,

4  shows that servicing is entirely separate when number one,

5  there's a separate servicer default.  Number two, servicing is

6  performed by a separate entity, American Home Mortgage

7  Servicing Inc.  Number three, there's a specific identifiable

8  apportioned consideration for servicing which is the basis

9  points.  And lastly, Your Honor, Calyon itself has showed its

10  understanding that servicing was distinct and severable because

11  it issued two separate default notices on the same day, one

12  directed to the purported sellers and the other directed to the

13  purported servicer.  And those are in evidence as Calyon

14  Exhibits 3 and 4 in this trial.

15         THE COURT:  But -- but there are differences between

16  the servicing rights the debtors enjoy under this agreement

17  than -- that are -- make it different from the contractual

18  relationship that the debtors enjoyed in connection with the

19  MLPSAs in the Wilbur Ross sale.  (1) the limited term of when

20  they'll get paid which is, I think, key.  I mean, how do you

21  get around that, the fact that as of today, the debtors have no

22  right to get paid for servicing.

23         MR. TECCE:  Well --

24         THE COURT:  How doesn't that make it different?

25         MR. TECCE:  Well, I think -- first of all, the

1 debtors, Your Honor, would maintain that as long as there are

2 continuing servicing -- as long as they are performing

3 servicing, then on a quantum meruit basis at the very least,

4 that they are entitled to quantum meruit for the servicing

5 function that they perform.

6        Number two, the idea of shortened duration for

7 servicing, that's not consistent with Section 11.1 of this

8 agreement.  This agreement says that until there's an event of

9 default, American Home Mortgage Servicing, Inc. is the

10 servicer.  And that can't be disrupted.  Absent an event of

11 default, Calyon is powerless to change that.

12        Lastly, Your Honor, I just note that there are

13 certain servicing provisions in the Calyon agreement,

14 specifically Section 11.4 which governs the standards that

15 apply to servicing that survive the termination of the

16 agreement under what I believe is Section 13.10 of the

17 agreement.  So, that suggests that there may be a period of

18 time after the termination of the agreement where American Home

19 Mortgage is still providing services on behalf of -- under the

20 terms of this agreement.

21        Going back, Your Honor, to another argument raised by

22 Calyon.  This extensive discussion of the existence of an

23 integration clause under the Calyon agreement that there's a

24 provision that says that this is the entire agreement of the

25 parties and that the existence of that integration caused

1   somehow under <u>Cutson</u> (phonetic) argument that servicing is

2   severable.

3          In response to that, we just note that number one,

4   the existence of an integration clause is not dispositive under

5   <u>Gardinier</u> (phonetic) or other relevant cases.

6          THE COURT:  Was <u>Gardinier</u> then the case that I look

7   at at this point?  You're not seeking to assume and assign

8   these at this point?

9          MR. TECCE:  No, but <u>Gardinier</u> does examine whether or

10  not the rights are severable in the first instance.   The

11  elements of separate nature, apportionable compensation go to

12  the question as to whether or not that portion of the agreement

13  is severable, not necessarily whether it can be assumed and

14  assigned.

15         THE COURT:  Yes, but one of the reasons you look at

16  the federal law as opposed to the state law in that instance is

17  you're trying to, you know, understand and give in fact a 363

18  and 365, neither of which are implicated in this instance.

19         MR. TECCE:  But I would submit, Your Honor,

20  respectfully, that those factor, the separate apportionment,

21  the separate nature -- those are state law factors not federal

22  factors that are derived under state law.

23         THE COURT:  All right, they're virtually identical to

24  the New York state law controlling factors which are slightly

25  different terminology.

1            MR. TECCE:  That's correct, Your Honor.  And to get

2  to the point, Your Honor, that not only is -- it's true that

3  there's an integration clause in this particular agreement, but

4  Courts also look at whether or not there are severability

5  provisions and what I would call severability provisions.  And

6  they look at that in the -- in context with an integration

7  clause.  And first of all, it's not clear what an integration

8  clause gets Calyon because an integration clause says that this

9  agreement is the entire agreement of the parties.  Well, we're

10  not arguing that there are other agreements floating around out

11  there.

12            Number two, there are two provisions in this

13  agreement that suggests that itself can be severed.  The first

14  one located on Page 104 of the agreement, Your Honor, in

15  Section 1310 which says that the provisions of the sections

16  11.4, 11.5 and other provisions shall survive any termination

17  of this agreement.

18            The second, Your Honor, which I think is more

19  compelling, Section 13.3 on Page 101 says that in the event

20  that any one or more of the provisions contained in this

21  agreement or any other transaction document shall for any

22  reason be held invalid, illegal or unenforceable in any respect

23  such invalidity, illegality, or unenforceability shall not

24  affect any other provisions of such document.  So, clearly the

25  agreement contemplates that some provisions may ultimately be

1  severed from the agreement.

2          Now, going to the --

3          THE COURT:  Well, well, that's a reach.  I mean,

4  that's boiler plate language.  That just means, you know, you

5  don't void the whole contract because one provision is deemed

6  unenforceable.  I mean, I don't think I've ever seen an

7  agreement that didn't have that type of language in it.  And I

8  think most agreements aren't severable.

9          MR. TECCE:  Well, correct, Your Honor.  But the point

10 being that in response to an argument that an integration

11 clause somehow signifies that portions of the agreement cannot

12 be severed --

13         THE COURT:  Fair enough.

14         MR. TECCE:  Moving on, Your Honor, Calyon's argument

15 boils down to servicing rights being related terms to the sale

16 of the whole loan mortgages and we'd respectfully disagree with

17 that for a number of reasons.  Number one, that as we

18 enunciated previously, we don't believe servicing rights bear

19 relationship to the underlying transaction.  The underlying

20 transaction being securing financing by way of the purchase and

21 sale of mortgage loans.  Servicing which would involve

22 collecting principal and interest payments.  Sending out hello

23 and goodbye letters, we would submit is not related to that

24 underlying transaction.

25         More importantly, Your Honor, the term, related terms

1  -- the phrase related terms in the statute in specifically

2  101(47)(a)(1) says an agreement including related terms.  Now

3  that phrase, Your Honor, predates the 2005 amendments to

4  Section 101(47)(a).  And it was in 2005 that 101(47)(a)(1) was

5  amended to include mortgage loans and interests in mortgage

6  loans.  But prior to that time, the statute read in pertinent

7  part that repurchase agreement means an agreement including

8  related terms which provides for the transfer of certificates

9  of deposit, eligible banker acceptances, or securities that are

10  direct obligations of or that are fully guaranteed as to

11  principal in interest by the United States against the transfer

12  of funds by the transferee of such certificates of deposit,

13  eligible bankers acceptances, or securities with the

14  simultaneous agreement by such transferee to transfer to the

15  transferor thereof certificates of deposit, eligible bankers

16  acceptances, or securities.

17        So, servicing rights, Your Honor, could not fall

18  within "related terms" because that phrase previously modified

19  certificates of deposit, eligible bankers acceptances, and U.S.

20  Treasury securities.  And there are no servicing rights in

21  connection with those instruments.

22        So, Calyon can't shoe horn an entirely different type

23  of agreement, servicing rights, into a boot if you will that

24  previously existed with a separate meaning.  Put simply, Your

25  Honor, related terms cannot encompass servicing because the

1 phrase existed in the statute before mortgage loans were added

2 to the repurchase agreement definition and applied to

3 instruments that do not have servicing rights.

4       Lastly, I think, Your Honor, that the Calyon argument

5 as to why servicing would fall within the repurchase agreement

6 definition is that servicing somehow constitutes an interest in

7 mortgage loans.  And we would submit that --

8       THE COURT:  Well, let's go back to the related two

9 piece.  What about the point that -- because I don't think they

10 get anywhere with servicing being an interest in a mortgage

11 loan or a mortgage backed security.  So, I don't think you need

12 to spend much time on that.  But the concept that servicing is

13 vital to -- being able to control the servicing is vital to the

14 ability to liquidate the position which is the whole point of

15 the statute, and doesn't that make it a related term, and isn't

16 that the difference between what was going on in connection

17 with the MLPSAs and the Wilbur Ross sale as opposed to what's

18 going on here?

19       MR. TECCE:  That argument suggests that on the one

20 hand, the Court must strictly read the statute that the

21 elements -- as long as the elements to a repurchase agreement

22 are contained in this agreement, then you're within the safe

23 harbor.  But the safe harbor doesn't apply to servicing.  And

24 now we're supposed to treat the statute as a living and

25 breathing document and say, oh, notwithstanding the strict

1  reading of the statute, notwithstanding the fact that our

2  agreement has all these elements, we also have to examine

3  whether or not the spirit and the purpose of the safe harbor

4  are met because in reality, the mortgage loans can't be sold

5  without the servicing rights.  That's entirely inconsistent

6  position.

7       THE COURT:  I think only the Supreme Court is allowed

8  to be that inconsistent.

9       MR. TECCE:  Your Honor, just briefly, I note that our

10 papers on the issue of not interested mortgage loans, 541(d) we

11 think makes it pretty clear that they're not interested in

12 mortgage loans.

13      Now, moving on, Your Honor, what servicing is, is

14 property of the estate.  And the -- there is no allegation.

15 There is no fact on the record that any servicing default

16 -- again a separate defined term under the agreement -- that

17 any servicing default occurred apart from possibly the filing

18 of the bankruptcy cases.  And if that is the case, Your Honor,

19 then an ipso facto provision cannot afford Calyon any interest

20 in the servicing rights under the agreements because of the

21 plain language of 541(c) which says that an interest of the

22 debtor become property of the estate notwithstanding any

23 provision in an agreement.  And this is -- that is conditioned

24 on the insolvency or the financial condition of the debtor or

25 on the commencement of a case under this title and that gives

1  -- that affects or gives an option to effect a forfeiture,

2  modification, or termination of the debtors interest in that

3  property.  That's exactly what's being argued here which is

4  that the filing of the bankruptcy cases somehow forfeited

5  American Homes rights and servicing rights under this

6  agreement.  And 541(c) simply says that argument is a

7  non-start.

8           THE COURT:  It all rises and falls on the related two

9  point, doesn't it?  Because if the servicing is related to the

10 repurchase agreement, then the event of default was not stayed

11 by operation of the Bankruptcy Code.  And they get everything.

12 But if it's not related to the repurchase agreement -- the

13 servicing is not related to the repurchase agreement, then the

14 event of default is unenforceable.  It's an ipso facto clause,

15 period.  I mean am I being overly simplistic?

16          MR. TECCE:  No, I just would say that Your Honor

17 there's another argument which is that assuming that it is

18 related to, that assumes also that this agreement is not

19 subject to re-characterization which we would submit that it

20 is.  So, even if it's --

21          THE COURT:  Yes, we're focusing -- yes, okay.

22          MR. TECCE:  Okay?

23          THE COURT:  I'm focusing on, assuming it's a

24 repurchase agreement --

25          MR. TECCE:  Assuming it's a repurchase agreement

1 if --

2          THE COURT:  And it's -- the issue of servicing

3 -- assuming it's a repurchase agreement, I know you're not

4 waiving that and we haven't talked about that.

5          MR. TECCE:  Right.  And we'll get to it, yes.

6          THE COURT:  You and I haven't talked about that yet,

7 but assuming it's a repurchase agreement, the servicing issue

8 if it's a repurchase agreement and if the servicing is related

9 to the repurchase agreement, you lose.

10          MR. TECCE:  All right, if the servicing is related to

11 a repurchase agreement, then it falls within the definition of

12 101(47).  And assuming that the agreement itself is not -- that

13 the agreement itself is a repurchase agreement for purposes of

14 that statute, which we dispute, then I would agree with that

15 point.

16          THE COURT:  Okay.  But if it's not related, then

17 we're just in normal bankruptcy land in connection with their

18 ability to take whatever actions they want or can't take under

19 the servicing contract and that is subject to the automatic

20 stay.

21          MR. TECCE:  That's correct, Your Honor.  It's subject

22 to the automatic stay and not only are we in bankruptcy land,

23 to put a finer point on it, we're in proof of claim prepetition

24 claim land.  That's where we are because Calyon argues that it

25 will suffer economic injury as a consequence of the debtors'

1  failure to surrender servicing rights.  And we don't dispute

2  that some amount of money -- assuming that that's correct

3  -- that some amount of money could compensate them for that

4  loss.  But of course, Your Honor, this assumes that Calyon had

5  a cheaper alternative to what it is obligated to pay American

6  Home Mortgage Servicing, Inc. or it sustain some other

7  pecuniary loss which we would not concede.

8           But we are in prepetition claim land.  There is

9  -- you know, the definition of claim under 101(5)(a) includes a

10 right to payment.  Under 101(5)(b) it includes a right to an

11 equitable remedy for breach of performance if such breach gives

12 rise to a right to payment.  In the end, Calyon has a

13 prepetition claim arising from whatever damages -- again we

14 wouldn't concede that they have any -- but whatever damages it

15 sustains from the failure of American Home to surrender the

16 servicing rights.  And that is a prepetition claim that is

17 subject to reconciliation and discharge in the American Home

18 bankruptcy cases.

19          And if you grant them specific performance through

20 some kind of equitable relief, then you're giving them a

21 preference basically and you're affording them preferential

22 treatment that is not enjoyed by other creditors holding

23 prepetition claims in these cases.

24          Switching gears, Your Honor, to what I would --

25          THE COURT:  Go ahead.

1          MR. TECCE:  -- what I would style as "true character

2    arguments", in our argument that the true character of the

3    Calyon agreement is that of a disguised secured financing that

4    is not entitled to safe harbor provisions -- Your Honor,

5    there's been considerable discussion in the Calyon papers and

6    during the course of the oral argument at the trial as to what

7    Congress intended in enacting the safe guard provisions.  And

8    with respect to congressional intent and specifically attempts

9    to divine that intent from legislative history, we think it's

10   important to stress two points.  (1) What Congress did not

11   intend in crafting the safe harbor provisions and (2) the

12   diminishing importance of what we would style as self-serving

13   selections of legislative history that Calyon repeatedly

14   references.

15          Now, unfortunately there's no lobbyist on hand to

16   argue in favor of debtors against special interest lenders.

17   So, it's not surprising that the legislative history is often

18   one-sided in bankruptcy amendments.  But comments in

19   legislative history are not law.  And even congressional text

20   in a statute must be read against the backdrop of the entire

21   Bankruptcy Code in its jurisprudence.

22          First, Your Honor, Congress did not intend to strip

23   federal courts of their power and indeed responsibility to

24   examine the substance of transactions in bankruptcy cases for

25   the purposes of determining their true character.  There's no

1  legislative history that's been cited that suggests that

2  federal courts no longer have that authority.  More

3  importantly, there's no law that's been cited.  Either the

4  decision or law or statutory law that's been identified by

5  Calyon indicating that federal courts are relieved from that

6  responsibility or that power.  That change would require law,

7  not statements in legislative history.

8        And the law in this point, Your Honor, specifically

9  that federal courts have the inherent authority and in deed

10  obligation to scrutinize the substance of transactions to

11  ascertain their true character has been clear since the

12  Bankruptcy Code's enactment in 1978.  And as was noted in -- by

13  the Second Circuit Court of Appeals in <u>PCX Associates</u>

14  (phonetic) which is cited in our brief which examined that a

15  sale lease back arrangement did not constitute a lease, quote

16  from Page 198, "It was not error to look behind the form of the

17  agreements to the economic substance of the transactions.  We

18  look to the economic realities of the lease and not to the

19  labels applied by the parties to determine the true nature of a

20  transaction."

21        THE COURT:  All right.  I agree.  I get an

22  opportunity to look.  But Congress has -- they've got a

23  definition here, okay.  Repurchase agreement means -- and you

24  have to parse through it, but it has the five elements that are

25  cited by -- five or six elements cited by Calyon.  Isn't that

1  the -- not that I don't get a look at it, but isn't that the

2  beginning, middle, and end, I think, my analysis which is

3  whether this agreement meets those five criteria?

4          MR. TECCE:  No, it's not, Your Honor.  It's not

5  because Congress didn't intend and no one can argue that they

6  did that secured financings that have these terms written on

7  the front of them are supposed to be covered by the safe harbor

8  if it's a secured financing.

9          THE COURT:  Well, I don't care what it is.  If it's a

10 contract, you can call it a duck.  If it contains those five

11 elements, it's a repurchase agreement.

12         MR. TECCE:  No --

13         THE COURT:  Now, it's only limited under the -- and

14 then it goes on to say in those provisions of it that aren't

15 are not.  So, you can parse it out.  But those five provisions

16 -- they can call it whatever they want to.  They didn't need to

17 call it a repurchase agreement.  They could have called it, you

18 know, anything they wanted.

19         MR. TECCE:  Well --

20         THE COURT:  They could have called it, you know, a

21 duck --

22         MR. TECCE:  But --

23         THE COURT:  -- contains these five provisions.  And

24 if it contains these five provisions, the automatic stay is not

25 applicable to that agreement that contains those provisions.

1          MR. TECCE:  Your Honor, they didn't call the secured

2 financing agreement.  And what -- they didn't -- it's not

3 called a secured financing agreement.  The existence of those

4 -- of a statutory definition does not strip you of your power

5 to review the true nature of that agreement.  And frankly

6 <u>Bevill</u> --

7          THE COURT:  Well, I'm not -- frankly, I'm not sure

8 that's true what you just said that the statutory definition

9 does not strip me of the power to go beyond the definition.

10          MR. TECCE:  Because Your Honor, for example in the

11 lease context, the Court retains the power to review the

12 substance of that transaction.

13          THE COURT:  Yes, but lease isn't defined in the

14 Bankruptcy Code.

15          MR. TECCE:  It's not defined, Your Honor, but there

16 are provisions like 365 that governs specifically how the lease

17 is to be treated.  And that provision 365 differentiates a

18 lease from a secured financing.

19          THE COURT:  Right.

20          MR. TECCE:  And the fact that lease is not defined

21 does not stop courts from reviewing the economic substance of a

22 transaction.  And there's no -- Your Honor, the Congress could

23 not by statute strip a federal court of its power to review the

24 substance of a transaction.

25          THE COURT:  Well, I disagree.  I'm -- look I'm an

1   Article 1 Court.  All right, I am a creature of Congress.  This

2   isn't -- you're not across the street in District Court.  There

3   is no constitutional authority here other than what's granted

4   to me by Congress.

5           MR. TECCE:  Well, Your Honor, I think --

6           THE COURT:  Now, my ego wishes that were not the

7   case.

8           MR. TECCE:  Right.

9           THE COURT:  But --

10          MR. TECCE:  But Your Honor, I don't think that that's

11   consistent with what circuit courts have said.  Starting with

12   the PCH and then going to -- actually the Third Circuit Court

13   of Appeals in Sun Oil saying that the labels that are affixed

14   through our particular agreement -- now admittedly that was not

15   in the bankruptcy context; it was in a tax code context, but

16   the Court said in 1977, whatever labels affixed to the

17   agreement is not relevant.  You have to look at the substance

18   of the transaction.  And the only party that looks at the

19   substance of the transaction is the Court.

20          THE COURT:  Well, I agree I have to look at the

21   substance of the transaction to see if it meets the definition.

22   But you want me to add elements.

23          MR. TECCE:  No, no.

24          THE COURT:  You want me to add elements to what

25   constitutes a true repurchase agreement.

1          MR. TECCE:  Well, actually we don't, Your Honor.  And
2 I'll speak to that in a second.  We're not asking you to add
3 any elements that have not already been installed by the
4 agreement itself.  And what I mean by that -- and I'll get to
5 that more fully -- is that 2.23(c) of this agreement says that
6 there has to be a transfer and that that transfer has to be an
7 absolute transfer.  It has to be a sale.  So, I'm not asking
8 you as a technical matter to read the transfer/true sale
9 requirement of the statute, the parties have already agreed to
10 that.  And I'm not prepared to discuss why that is in there
11 nonetheless.

12          But to get back to your point, Your Honor, what we're
13 -- the Court has the power to make sure that parties don't shoe
14 horn the wrong agreement into a statute by simply inserting
15 empty labels that have no operative significance.  And we'll
16 get to that in a second.

17          The agreement that is before the Court, operationally
18 is no different then the secured loan that preceded it.  And
19 there is absolutely no expression of the congressional intent
20 or legislative authority to include that kind of agreement
21 within the repurchase agreement definition.

22          Going back -- I guess the genesis of this inquiry may
23 be the reliance by Calyon on the statements and legislative
24 history that the purpose of 555, I believe the statement that
25 is made is that the purpose of 555 is to end the inquiry, if

1 you will, on whether or not something is a repurchase agreement

2 or a secured loan.

3       And with respect to that, Your Honor, we'd note two

4 things.  Number one, it's only a statement of legislative

5 history.  And I think there's a Supreme Court -- recently had

6 the opportunity to review the significance of legislative

7 history in a case called Exxon Mobile Corp. v. Allapattah 545

8 U.S. 546.  Now, that case examined the question of whether or

9 not pendent jurisdiction under 1367 -- 28 U.S.C. 1367 could be

10 exercised over plaintiffs that did not satisfy the federal

11 diversity jurisdiction amount requirement.

12       But there was a lot of -- bantered back and forth,

13 there was a lot of legislative history about 1367.  And what

14 the Court said, and I think it applies quite forcefully here,

15 is as we repeatedly held, the authoritative statement is in the

16 statutory text, not the legislative history or any other

17 intrinsic material.  Not all intrinsic materials are reliable

18 sources of insight into legislative understandings.  And

19 legislative history in particular is vulnerable in two serious

20 criticisms.

21       Number one, legislative history is itself often

22 murky, ambiguous, and contradictory.  Judicial investigation of

23 legislative history has a tendency to become -- to borrow Judge

24 Leventhal's memorable phrase -- an exercise in looking over a

25 crowd and picking out your friends.

1          And second, judicial reliance on legislative

2    materials like committee reports which are not themselves

3    subject to the requirements of Article 1, may give

4    unrepresentative committee members or worse yet, unelected

5    staffers and lobbyists both the power and the incentive to

6    attempt strategic manipulations of legislative history to

7    secure results that they were unable to achieve through the

8    statutory text.

9          This actually takes us back to Your Honor's question.

10   If 555, and 559, and the repurchase agreement definition were

11   designed to strip the Court of its power to look at the

12   substance of a transaction, notwithstanding the presence of

13   these terms, that that would have had to appeared specifically

14   in the statute.  And it does not.  It appears in legislative

15   history which does not on its own strip the Court of that

16   power.  And at least since the Third Circuit's <u>Sun Oil</u>

17   decision, this Court has always had and continues to have both

18   the power and the responsibility to scrutinize the economic

19   substance of the transactions to determine their true

20   character.

21         What's more, Your Honor, the legislative history has

22   been identified by Calyon.  But American Home has identified

23   <u>Bevill, Bresler</u> which is a Third Circuit case and we think is

24   much more relevant for purposes of determining the background

25   of the safe harbors.  Specifically that the liquidity ideal

1  that Congress identified in enacting the safe harbors in the

2  first interest that has been discussed extensively by the Third

3  Circuit in <u>Bevill, Bresler</u> and by New York court in <u>Granite</u>

4  <u>Partners</u>.

5          And in <u>Bevill, Bresler</u>, the Third Circuit recognized

6  repurchase agreement safe harbors are designed to avoid a

7  ripple effect through financial markets that might be

8  occasioned by the bankruptcy filing of a single repurchase

9  agreement participant.  And it noted that repurchase

10 transactions are intertwined with the broader market because

11 each repurchase agreement participant in turn promptly sells

12 the purchased assets to a third party.  And the safe harbor

13 provisions ensure the bankruptcy filing of a single participant

14 will not impede the ability of the myriad of other participants

15 to sell their underlying assets to meet their obligations to

16 other counter parties.

17         And we would submit, Your Honor, that <u>Bevill,</u>

18 <u>Bresler</u>, the Third Circuit case, confirms liquidity and

19 alienability of the sine qua non of the repurchase agreement.

20 If the repo buyer cannot immediately transfer the purchased

21 assets to a third party, the safe harbors purposes are lost.

22 And the transaction resembles a collateral pledge.

23         And here, Your Honor, Calyon never transferred

24 anything.  The mortgage loans served and were parked as

25 collateral.  They never made any attempt to sell the mortgage

1  loans through a third party and they were not sold to a third

2  party, which is exactly the way the mortgage loans were treated

3  when the agreement was a secured loan.

4        Now, going to the model BMA form, Your Honor, the

5  form developed by the Bond Market Association which we argue

6  embodies the market practice and the form repurchase agreement

7  that the market recognizes and is also consistent with <u>Bevill,</u>

8  <u>Bresler</u>, Your Honor, contrary to the argument that the model

9  BMA form is not part of the record, we note two things.  Number

10 one, Mr. Pinot testified that American Homes repurchase

11 agreement with Bear Stearns was modeled after the BMA form.

12 And that Bear Stearns form has been admitted into evidence.  He

13 also testified that the Calyon agreement that existed under the

14 old regime before this agreement was put into place was also

15 modeled on the BMA form.

16       So, there's evidence that American Home entered into

17 repurchase transactions covering mortgage loans, using the

18 model BMA form, and there's an actual agreement in evidence

19 that was based on the model BMA form.  And Your Honor, every

20 mortgage backed securities form used the model BMA form and

21 there weren't -- I mean there are 15 identified, but there

22 weren't that many repos involving mortgage loans in the first

23 place.

24       Number two, Your Honor, the Securities Industry

25 Financial Markets Association's attorney, SIFMA, as it were,

1  indicated in their opening remarks that the model BMA form was

2  the starting point for the repurchase agreements that were at

3  issue in this litigation.  Now, I don't know whether they were

4  specifically speaking to the Calyon form, but the evidence that

5  we've put into the record in this case is that that is not the

6  case.

7          And all this, Your Honor, all this begs the question

8  of which provisions are lacking in the Calyon agreement that

9  are in the model BMA form.  And I would submit that there are

10 four provisions.  The first one is, in the model BMA form, the

11 Bear Stearns form, there are bilateral defaults.  Meaning, the

12 buyer can default under the agreement and the seller can

13 default under the agreement.

14         And under the Calyon agreement, there are no

15 bilateral defaults.  If you read Section 8.2 of the Calyon

16 agreement, it lists the seller's defaults.  There are -- the

17 buyer does -- cannot default under the Calyon agreement.

18         And you may ask, what is the significance of that?

19 The significance is that if the buyer can't default under the

20 Calyon agreement, then it's clearly a loan because the buyer

21 has done the one thing that it has to do which is extend the

22 funds as a lender.  And the buyer's repurchase obligation or

23 purported repurchase obligation is not real because there's no

24 event of default for the buyer who fails to perform that

25 obligation.

**J&J COURT TRANSCRIBERS, INC.**

1          But under the Bear Stearns repo, it's quite clear.

2     There are seller defaults and there are buyer defaults.  And

3     with the buyer default, if the buyer does not return the

4     identical mortgages, it can go out and secure replacement

5     mortgages, the liquidity concept discussed in <u>Bevill, Bresler</u>.

6          The second provision missing from the Calyon

7     agreement that's present in the Bear Stearns agreement is the

8     funding commitment.  The Bear Stearns agreement refers to in

9     Section 1 transactions from time to time.  From time to time,

10    Bear Stearns and American Home may enter into transaction.

11    May.  Permissive language that's almost like a requirements

12    contract that if they entered the transactions, these are the

13    provisions that govern.

14         To the contrary, the Calyon agreement has a firm

15    commitment to fund.  It says that the banks shall in Section

16    2.1 on Page 34 -- the banks shall purchase -- meaning they

17    shall extend the funds.  That's consistent with a loan.

18         The third provision, Your Honor, financial covenants.

19    Financial covenants, negative covenants, and affirmative

20    covenants in the Calyon agreement that are consistent with the

21    secured loan.  In the BMA form, there are no financial

22    covenants because they're selling assets.  There are no

23    financial covenants.  If you're selling an asset to somebody,

24    you're not concerned with what they're -- with the liquidity

25    ratio is, what they're EBITDA ratio is, what their EBITDA to

1  debt ratio.  You're not concerned with those covenants.  But if

2  you're lending that entity money and you're worried about

3  whether or not you're going to paid back, then those financial

4  covenants become relevant.

5          The last distinction, Your Honor -- the fourth

6  distinction is what I would call the backup security interest

7  issue.  The model BMA form simply provides for a backup

8  security interest.  It says that if the agreement is not a

9  repurchase agreement, then there are security interests in

10 place.

11          But the BMA -- the Bear Stearns form does not provide

12 guidance as to how to make the determination whether a repo or

13 a loan was created.  And this agreement does.  2.23(c), Your

14 Honor, on Page 55 says, if this agreement does not -- if the

15 transactions consummated under this agreement do not constitute

16 sales or absolute transfers, then this agreement is to be

17 treated as a secured loan.

18          Now, Calyon submits, Your Honor, that it's

19 commercially impractical to have repurchase agreement that

20 covers mortgage loans consistent with what the model BMA form

21 that enables a repo buyer to sell different mortgage loans back

22 to the repo seller.  But we've actually submitted evidence to

23 the contrary.

24          Number one, that American Home had entered into no

25 fewer than two repo agreements based on the model BMA form, the

1  first with Bear Stearns and the second involving the Calyon

2  parties in the prior transaction.   Number two, the Bear Stearns

3  agreement was based on a model repo form.   Three, Calyon's own

4  30(b)(6) witness testified at his deposition to the existence

5  of repurchase agreements involving mortgage loans being sold by

6  the repo buyer.  And that's at Page 129:12 to 130:6.   And

7  lastly, Your Honor, there's what we would characterize,

8  respectfully, as the so-what factor.   There's no parade of

9  horribles that will befall Calyon and the syndicate members in

10 the event that this agreement is -- the true character of this

11 agreement is uncovered and it's continued -- it's considered to

12 be a secured finance agreement.

13     We still have to pay off the debt.   We still have to

14 repay Calyon.   But you know, Calyon is a commercial bank and

15 it's very familiar with secured financing arrangements.   It's a

16 participant in the Bank of America facility.   All the lenders

17 under this participants in the Bank of America facility.   There

18 are sophisticated parties that know what secured lenders rights

19 and obligations are in a bankruptcy case.

20     Now going -- I think we had discussed previously,

21 Your Honor, the issue of trying to read in the word transfer

22 and what that means in the statute in the repurchase agreement

23 definition.   Calyon maintains that transfers broadly defined

24 for purposes of 101(47)(a) and 747(7) to include transactions

25 involving the creation of a lien as opposed to true sales.

**J&J COURT TRANSCRIBERS, INC.**

62

1  And Your Honor, the Court need not answer the question of

2  whether transfer always means true sales or mere pledges of

3  collateral for purposes of this trial.  And that's because as

4  we mentioned previously, Calyon has already agreed in Section

5  2.23 of the agreement that, "In the event" -- and I say this in

6  pertinent part, Your Honor -- "in the event that any purchase

7  of mortgage assets here under is not characterized as a sale or

8  absolute transfer, this agreement shall be deemed to be a

9  security agreement."

10        So, Calyon has already stipulated that each

11  transaction consummated under the Calyon agreement must

12  constitute a "sale or absolute transfer in order for the safe

13  harbor provisions to apply."  Otherwise the agreement

14  constitutes a secured loan by its very terms by 2.23.  And this

15  also serves to stress, Your Honor, that you're dealing with

16  unique facts and circumstances here.  You're dealing with an

17  agreement that contains this 2.23 which is a very unique

18  provision and it stresses that any decision that the Court

19  reaches with respect to this agreement is limited to the facts

20  here.  It doesn't impact the model BMA form.  It doesn't impact

21  all model agreements, repurchase agreements.  It could hinge on

22  this 2.23 which is a provision that's specific to this

23  agreement.

24        And now Calyon, what they're trying to do is --

25        THE COURT:  You want to read a provision that's

1 clearly designed as a backstop in the event something awful

2 happens, to actually be a limitation on their rights.

3        MR. TECCE:  No, Your Honor --

4        THE COURT:  No, I think that's what you're arguing.

5 You're arguing that by saying that if X, Y, and Z happen, it's

6 a security agreement, and thus only X, Y, and Z go into play.

7 Aren't you really switching a backstop into a limitation?

8        MR. TECCE:  No, Your Honor, I'm referencing a

9 provision of the agreement that indicates what the parties

10 intent was with respect to transfer for purposes of this

11 statute, that the parties agreed contractually --

12        THE COURT:  But they don't define transfer anywhere

13 in the agreement?

14        MR. TECCE:  Your Honor, they use the word, absolute

15 transfer.  Now -- in juxtaposition with the word, sales.  So, I

16 don't -- I'm not clear that common sense -- I'm not -- the

17 word, absolute transfer is --

18        THE COURT:  You can speak as frankly as you wish.

19        MR. TECCE:  -- that --

20        THE COURT:  You're not going to insult me.

21        MR. TECCE:  -- phrase is pretty straightforward, Your

22 Honor.  And I'm not trying -- actually I would submit,

23 respectfully, that the converse is true, is that in bankruptcy,

24 it's Calyon that's trying to escape the impact of a provision

25 that it agreed to.  It's trying to elevate its rights in the

1  bankruptcy case by relying on the safe harbor in bankruptcy to

2  give back a right that it negotiated and contracted to give

3  away when it signed the agreement.

4        So, you know, the bankruptcy -- that is really more

5  -- bankruptcy is designed to rehabilitate debtors and let

6  debtors, you know, exercise their rights in their bankruptcy

7  case, not for a creditor to come into the bankruptcy court and

8  say, we negotiated away this right and now we want it back in

9  the bankruptcy contest.

10        You know, getting away from the agreement, Your

11  Honor, assuming that 2.23 is not a contractual waiver, we think

12  that there is authority for the proposition that transfer means

13  true sale for purposes of the statute.  And those authorities

14  are set forth in our brief.  But at the time that the statute

15  was enacted, Your Honor, there was testimony before both the

16  house and the senate indicating a content -- an intent the

17  transfer would be narrowly not broadly construed.

18        THE COURT:  So, now you're using legislative issues.

19  He can't resist.  It's the great thing about legislative

20  history.  When it's in your favor, it's a wonderful thing to

21  talk about.

22        MR. TECCE:  Well, actually that is what the Supreme

23  Court said, you're picking your friends in the crowd.

24        THE COURT:  All right.

25        MR. TECCE:  So, we picked ours for that purpose

1  there, Your Honor.

2        THE COURT:   I mean, transfer is defined in the code.

3        MR. TECCE:   It is defined, Your Honor, but it defined

4  -- it was defined to include the creation of a lien for reasons

5  that have absolutely no bearing on repurchase agreements.

6  Okay?   It was defined to include the creation of a lien in

7  response to a Ninth Circuit case where the trustee could not

8  avoid the execution of a deed of trust in favor of its lenders

9  as an unauthorized post-petition transfer because the word,

10 transfer, didn't include the creation of the lien.   So,

11 Congress basically had to address an aberration in the Ninth

12 Circuit.   It had absolutely nothing to do with repurchase

13 agreements.

14       And there is case law that supports the proposition

15 that there has to be a true sale.   We cite <u>Criimi Mae</u>, Your

16 Honor, 251 B.R. 800 at 801 to 802.   We cite <u>Granite Partners</u> 17

17 F. Supp 2d at 298 to 301 that through sale is what's intended

18 and required for purposes of satisfying the statute.

19       Getting to the text of the agreement itself, Your

20 Honor, as to why the text of the agreement indicates clearly

21 that there's a secured financing and why the hallmarks -- we

22 discussed what's lacking vis-a-vis the BMA agreement.   But

23 there are other features of the agreement that suggest it is a

24 secured financing.   Number one, the very same mortgage loans

25 that are purchased have to be sold back.   That number two, the

1  buyer can't breach in anyway as we've discussed.  And the buyer

2  can't provide replacement mortgages.  And that there's really

3  no buyer default.  Number three, absent an event of default,

4  the servicer can't be replaced which negatively inhibits -- as

5  Calyon will concede -- the ability to sell the mortgage loans.

6  We view that as a restriction on alienation.

7       Number three, Your Honor, an argument which we need

8  to take some issue with what's set forth in Calyon's brief.

9  The agreement does not unequivocally authorize the sale of the

10 mortgage loans.  Now, Calyon does refer to Section 2.24 which

11 uses the word, sell.  But it also uses the word, sell, in

12 juxtaposition with a provision that says that notwithstanding

13 the ability to sell, at all times, you're subject to an

14 obligation to return the same mortgage loans.  And <u>Criimi Mae</u>

15 looked at a very similar provision and said, that's really not

16 of operative significance in authorizing the lenders to sell.

17       We think it's actually more compelling to review

18 2.23(d) of the agreement which specifically omits the word,

19 sell.  It says, the administrative agent can re-hypothecate,

20 pledge, but not using the word, sell, we think that's pretty

21 compelling when you compare that with an event of default where

22 there it says, if there's been an event of default, then the

23 mortgage loans can be sold.

24       So, we'd submit that the agreement does not

25 unambiguously provide the lenders with the ability to "sell"

1  -- a very important word -- the mortgage loans in question.

2  You know other features indicative of a secured loan, the price

3  differential calculation, Your Honor, is not tied to income

4  generated by the underlying assets.  Number two, the existence

5  of affirmative and negative covenants which we've discussed,

6  conditions precedent to funding which are notably absent from

7  the BMA form, and commits to fund.

8        And in terms of operation, Your Honor, there's a

9  significant point that the repurchase agreement that's in

10  question operated exactly the same way as the secured loan that

11  it replaced.  And what the evidence before the Court

12  demonstrates is that there was a two-step transaction to which

13  Calyon and American Home were party involving a special purpose

14  vehicle.  And the American Home Mortgage Corp. originated

15  mortgage loans and sold them to the special purchase vehicle

16  that used funds obtained under a separate loan agreement to

17  -- that in short -- well, going back, Your Honor, the agreement

18  operated identically the same way as the secured loan.

19        We've put plenty of evidence into the record on that

20  score that mortgages were originated in the same way, that

21  mortgages were put on line the same way, that commitment and

22  unused line fees were still charged, that the maturity date

23  between the old Calyon loan and the repo agreement state

24  exactly the same 364 days.  And Calyon's own counsel recognized

25  that the changes to the agreement did not require "operational

1 modifications".

2        Lastly, Your Honor, I just would like to say that

3 this has been quite an involved trial.  We've had oral argument

4 on motions to strike.  We've had scheduling disputes.  And at

5 every opportunity, the Court has made itself available and been

6 fully engaged.  And I just would like to thank the Court for

7 the amount of time and effort that it's expended.

8        THE COURT:  Did Mr. Kirpalani, tell you to sit down?

9        MR. TECCE:  Not at all, Your Honor.

10        THE COURT:  I'm just teasing.  I'm sorry.  No, you're

11 more than welcome.  It's an interesting and important issue.

12        MR. TECCE:  Thank you.

13        THE COURT:  I want to ask Calyon's counsel to address

14 before you start to go into your rebuttal.  There are two

15 sentences in your -- Page 9 of your brief.  And they -- I'm

16 wondering what you're argument is as to the basis for them.

17 The first is, the purpose of the Section 559 safe harbor is to

18 prevent repurchase agreements that meet the definition in

19 Section 101(47) from facing re-characterization claims

20 regarding whether the transaction is a true sale or a secured

21 financing.

22        And you basically say the same thing in connection

23 with 555.  There's no citation authority for that.  I'm just

24 -- what's the basis for that fundamental point that you

25 -- that's really behind --

1            MR. ACKERLY:  Well, Your Honor --

2            THE COURT:  -- the force of your argument that my

3    scope of my inquiry is limited?

4            MR. ACKERLY:  Well, I think it goes back to <u>Criimi</u>

5    <u>Mae</u> and maybe before <u>Criimi Mae</u> when the bankruptcy court

6    determined that it had to delve into whether something was a

7    true sale and what the intent of the parties was.  We believe

8    that in Section 559 as well as in Section 555, it -- the

9    statute is very clear, and --

10           THE COURT:  Well --

11           MR. ACKERLY:  -- and the purpose of the statute is to

12   prevent the Court from getting side-tracked from the issue

13   which this Court has identified.  And that is this Court has

14   -- this Court is not stripped of its judicial authority.  This

15   Court has to determine that in fact the repurchase agreement at

16   issue satisfies the definition, and that the parties operated

17   under it, but that the Court doesn't have to go further,

18   doesn't have to delve into the intent of the parties, doesn't

19   have to look at all of the elements which Mr. Tecce has argued

20   here because they're not part of the definition.  The Court

21   merely has to look at the definition of repurchase agreement,

22   satisfy itself that the repurchase agreement meets that

23   definition, and then that mortgages were in fact being sold

24   instead of crabs under it.  You know, I mean, it's just that

25   simple.  And it's not about taking the power away from the

1  Court to make to make that analysis.

2          But Congress does not want the Bankruptcy Court, we

3  believe, to get bogged down in analysis.  They want take us

4  back to Criimi Mae.

5          THE COURT:  All right.

6          MR. ACKERLY:  And if they were taking us back to

7  Criimi Mae, Congress wouldn't have needed to make these

8  amendments to the code.  So, we believe that that's, you know,

9  not where the Court, you know, should go in this situation.

10          THE COURT:  So, I need to look to sort of the

11  judicial/legislative, I don't know if you'd call it history,

12  but development of the statute?

13          MR. ACKERLY:  No, sir.  I don't think -- I think you

14  need to look at the statute not the history of the statute but

15  you need to look at Section 559.

16          THE COURT:  All right.  Okay.

17          MR. ACKERLY:  And then determine 559 takes you to

18  what's a repo participant, and Calyon's a repo participant.

19  And in a repo participation case, you do what's a repurchase

20  agreement.  And that's the analysis that you have to do here.

21          THE COURT:  Yes, but all that says is, the exercise

22  of the contractual right of a repo participant to cause

23  liquidation, termination, or acceleration of repurchase

24  agreement is not stayed, voided, or otherwise limited by any

25  operation of this title or by order of the Court.

1             MR. ACKERLY:  Correct.

2             THE COURT:  And your point is -- I mean, there's

3  nothing in 559 that sort of says, and that's all you do.  I

4  mean, it's fairly straightforward.  When you go and you

5  actually look at -- read what constitutes a repurchase

6  agreement, it's got five elements.  And that's sort of the

7  beginning, middle, and end of the analysis.

8             MR. ACKERLY:  Yes, sir.

9             THE COURT:  But it also goes on to say that those

10 portions of an agreement that sort of aren't a repurchase

11 agreement aren't covered.  You know what four says?

12            MR. ACKERLY:  I don't --

13            THE COURT:  Or --

14            MR. ACKERLY:  You're talking about 47(a)(4)?

15            THE COURT:  Yes.  Thank you.

16            MR. ACKERLY:  Well, I think (a)(4) addressed a master

17 repurchase agreement.

18            THE COURT:  All right.

19            MR. ACKERLY:  Which involves multiple mortgages that

20 meets the definition in (a)(1).  And you know, our position is

21 that the --

22            THE COURT:  But if you look under securities contract

23 -- well, that's a different provision -- but if you look under

24 securities contract under 741 --

25            MR. ACKERLY:  It's a 741 -- includes among its

1 definitions of what's a securities contract or repurchase

2 agreement.

3          THE COURT:  Right.

4                      (Pause)

5          THE COURT:  Oh, and it -- but it makes the same

6 reference to master agreement in --

7          MR. ACKERLY:  Right.

8          THE COURT:  -- 777, 78, excuse me, 7 not 8.

9          MR. ACKERLY:  Right.

10          THE COURT:  So, you're -- so a contract could contain

11 a number of different provisions as long as it wasn't a master

12 agreement and as long as it contained those five elements for a

13 repurchase agreement --

14          MR. ACKERLY:  It's protected.

15          THE COURT:  -- in its entirety, this automatic stay

16 is not applicable?

17          MR. ACKERLY:  It's automatically protected by the

18 safe harbor.  I mean, as the Court noted when I stood up, this

19 is an important case.  This is to our -- is a case of first

20 impression.  I'm not making the drama argument here.  But you

21 know, this is to our knowledge the first case that's been

22 litigated with respect to whether a repurchase agreement

23 involving whole loan mortgages is safe harbored.

24          And the whole thrust of the debtors' argument has

25 been and is today that the Court should lop onto the definition

1 other criteria and find that even though it meets the criteria

2 that Congress has established, this Court should establish

3 additional criteria --

4        THE COURT:  Well, I think to put it -- I think they

5 would say, no, everyone has, you know, sort of the development

6 of what a repurchase agreement -- before Congress got into the

7 mix -- sort of development of what this meant.  And it would

8 include a variety of elements including alienability -- excuse

9 me -- for -- but I think the response to that would be, well,

10 that's well and good.  But Congress has acted.  We assume they

11 act with some sort of knowledge as to what the general state of

12 the law in the world is when they act.  And they've said, these

13 are the five things we care about.  If it contains these five

14 elements, it's a repurchase agreement even though, you know

15 -- if it contains these five elements, it's a duck even though

16 anyone who knew anything about birds would say, it's a goose.

17 But if it contains the five elements -- I mean, that's where we

18 are.  We're not in reality, we're in the world of the law.

19        MR. ACKERLY:  Well, you know, we are after all a

20 country of laws.  And you know --

21        THE COURT:  I'm not -- it's poorly put, but my point

22 simply is, they've spoken, and they speak through the statute.

23 And the laws -- and the Supreme Court has been pretty dog-gone

24 clear about this.  I start -- it's not a finishing point, but

25 the starting point is unambiguous, clear meaning, and kind of

**J&J COURT TRANSCRIBERS, INC.**

1  hard to get beyond that.

2          Now, there other response would be, forget about what

3  the statute says, let me look at your contract.  And your

4  contract contains some troubling provisions in connection with

5  whether this is a repurchase agreement.

6          So, I'm wondering     -- I'm struggling frankly with

7  this concept that there could be five elements that are met and

8  then the contract could also contain provisions that are

9  strikingly inconsistent with those five elements and yet still

10 be considered a repurchase agreement.

11         MR. ACKERLY:  Well, Bevill, Bresler and Granite

12 Partners, both cases which the debtors talked today about, both

13 recognized that a repurchase agreement is a hybrid transaction,

14 and that it is going to look in some respects like a loan.  But

15 that Congress specifically carved out repurchase agreements and

16 said what it -- an agreement had to meet in order to satisfy

17 the definition of repurchase agreement.  And even though it had

18 -- it may have some things that look like interest and other

19 things in it, it's still a repurchase agreement.

20         And, you know, if this Court were to, you know, look

21 at the repurchase agreement here and conclude that it meets the

22 definition, but it's still not a repurchase agreement, and

23 therefore not safe harbored because of other things which are

24 not in the definition or that Congress found important enough

25 to put in the definition, what is that going to say to the

1  market out there, people who are drafting repurchase

2  agreements to fall within the safe harbor?  I mean there's no

3  secret that, you know, that's why this agreement was changed in

4  2006, to bring it under the safe harbor so that Calyon would

5  not have to come into this Court and seek relief from this

6  stay, and al the delay that can be associated with that, and

7  all the problems that can be associated with that because

8  Congress in 2005 said you don't have to do that if it's a

9  repurchase agreement.

10        I mean, to me -- I stated in my opening statement and

11 I stand by it.  I mean, this -- the beginning and end of the

12 legal inquiry here is does the repurchase agreement meet the

13 congressional definition that they put in Section 101(27) of

14 the code -- (47) of the code?  I mean, it's just that simple,

15 we think.

16        Now, there's an issue, Your Honor, with respect to

17 servicing and the related to issue.  The definition as the

18 Court is aware in 101(47) specifically says an agreement

19 including related terms.  Now, Mr. Tecce argues that because

20 the phrase, including relate terms predates the inclusion of

21 the addition of mortgages to the statute, that of course it

22 couldn't modify mortgages.  Well Congress couldn't write it

23 that way.  They could have written it that way.  So, I mean, I

24 think it's very clear that an agreement including related terms

25 applies to a mortgage including related terms.

1          And as we've said in our brief, we believe that the

2    servicing is related.  It's -- the testimony is that it's

3    integral to the value of the mortgages here in every respect.

4    And I come back to where I was in opening that the purpose of

5    the safe harbor is to maximize the value of the collateral so

6    the parties do not get bogged down in bankruptcy with the

7    attendant risk associated with bankruptcy.

8          And there's risk on the front end before the deal is

9    -- if investors know that they're not going to get bogged down

10   in bankruptcy, then deals can be done at lower cost.  You'll

11   remember that Mr. Pinot testified, I think, quite surprisingly

12   that they could do this transaction cheaper because it was a

13   repurchase agreement than they could do the Bank of America

14   loan which was a secured facility.

15         And one of the reasons for that, obviously, Your

16   Honor, is you've got the advantage of a safe harbor.  You don't

17   have a risk that you have to deal with when you are providing

18   financing or repurchasing agreement, or whatever, to the

19   debtor.  So, you know, we do believe the Court can't just say

20   it's a matter of money and slough off the question about, you

21   know, getting the records back and getting the money back.  I

22   think that would be, you know, not what the statute intends.

23         The -- they make the argument that American Home

24   Mortgage Servicing was only in the servicing business.  But

25   Your Honor, look at the exhibit, the repurchase agreement, they

1  are a party to it.  They are a seller under it.  They didn't

2  object to that.  They entered into it with the advise of

3  counsel.

4          And why were they a seller?  They were a seller

5  because what was being sold was the servicing right.  And

6  unclear who might have owned the servicing right before the

7  servicing right was sold, but in order to be sure, you get

8  clear title to the servicing right, you have American Home

9  Mortgage Servicing enter into the agreement to transfer that

10 right.

11         Also, the servicer, they control the proceeds.  And

12 the proceeds are also something that's sold.  And so, they have

13 to sign the agreement for that.  So, it's not like servicing is

14 totally unrelated to the transaction here.  It's totally

15 related to the transaction.  It's, you know, it's

16 interdependent and critical to the economic substance of the

17 transaction.

18         Give me a second.  The debtors continue to talk about

19 a model form.  And I will just repeat there's no evidence in

20 the record of what the model form is.  All they've got is that

21 this Bear Stearns was modeled after the model form.  But it's

22 not -- there's no evidence that it is the model form.  And as

23 I've said in my opening, Your Honor, the things which they

24 point to as being fatal to our agreement make being a

25 repurchase agreement, the Bear Stearns has in it.  Remember Mr.

1  Tecce argued, we don't use the word sale in our agreement; we

2  use the word transfer as to what we have a right to do with the

3  mortgages in the interim?

4       If you look at the Bear Stearns agreement, ownership

5  of all purchased mortgage loans shall pass to buyer, nothing in

6  this agreement shall preclude buyer from engaging in repurchase

7  transactions with respect to the mortgage loans, or otherwise

8  pledging, or hypothecating the mortgage loans.  No such

9  transaction shall relieve the buyer of its obligation to

10 resell, transfer, purchased mortgage loans -- define term -- to

11 seller pursuant to the terms hereof.

12      Your Honor, there's no word, sell, in there anywhere.

13 And yet, they didn't object to this repurchase agreement.  And

14 this repurchase agreement, you know, has the word, sell in it.

15 Excuse me, doesn't have the word sell in it.  And requires them

16 to sell back the identical mortgages.  Again, a thing they say

17 is fatal because of their liquidity argument.

18      Your Honor, there are probably lots of other things

19 that I could address.  I think this case is obviously very

20 important.  I don't believe that there's any factual issue in

21 dispute in this case.  Your Court will recall we filed a motion

22 for summary judgment before trial, and the Court deferred that.

23 I don't think anything has changed after, you know, two days of

24 evidence in this case.

25      I don't believe any facts are in dispute.  The

1 record, I think, is replete with admissions with respect to the

2 critical factors concerning the repurchase agreement and what

3 the -- how the parties operated under the repurchase agreement.

4 So, I don't think there are any factors here that are -- facts

5 here that are in dispute -- any material facts, anyway, that

6 are in dispute.  I think the question about whether the

7 servicing is related to -- I think to me, the evidence is

8 overwhelming.  The fact that American Home Mortgage was a

9 separate company doesn't mean that the servicing wasn't an

10 integral part of the repurchase agreement.  It is undisputed we

11 purchased the servicing rights.  It's undisputed under the

12 document that as of November 20th, they've got no right to

13 anything under that agreement.

14         And so,  Your Honor, I would ask the Court to render

15 a ruling that the Calyon repurchase agreement is protected by

16 the safe harbors, both at 559 and 555 of the Bankruptcy Code,

17 and that there's no basis to re-characterize the repurchase

18 agreement as secure loan as asserted in their counter-claim.

19 Thank you.

20         MR. TECCE:  Your Honor, may I have one minute?

21         THE COURT:  Sure.  Brief.

22         MR. TECCE:  I'll be very brief, Your Honor.  Just a

23 few points I'd like to make.  The first, Your Honor, going back

24 to this argument which has been the focus of so much of the

25 afternoon, if the statute contains a definition, does the Court

1 have the power to look past the terms of that definition?  I

2 would just note further that in <u>Bevill, Bresler</u>, the issue was

3 whether or not the payment constituted a settlement payment.

4 That is a defined term.  That is a safe harbor provision.  But

5 that didn't stop the Third Circuit Court of Appeals from

6 reviewing the history of repurchase agreements, liquidity, and

7 alienability issues that we've talked about today.

8        Number two, Your Honor, Congress did not write on a

9 clean slate when it amended the Bankruptcy Code provisions.

10 And they knew -- presumably they knew of re-characterization,

11 and they knew of the Court's judicial power to re-characterize

12 agreements.  And they did not specifically draft provisions in

13 the safe harbor sections that eviscerated the Court's power to

14 do that.

15        Lastly, Your Honor, on the issue of related to term

16 with respect to servicing rights, the -- given the argument

17 that servicing is a critical part of the mortgage loan -- and

18 that's Calyon's argument that they cannot sell the mortgage

19 loans.  We find it hard to believe that Congress relied on the

20 phrase related term when it added mortgage loans and interest

21 in mortgage loans to cover servicing.  If servicing was so

22 important, then presumably servicing would have been included

23 in the 2005 amendments as part of the repurchase agreement

24 definition.

25        And frankly the fact that it was performed by a

1  separate entity, American Home Mortgage Servicing, Inc.,

2  further underscores that it's not related to the Calyon

3  agreement.  If it were, it would not have involved an entirely

4  separate entity and party to the agreement.

5        And lastly, Your Honor, it is true that the case is

6  discussed similarity between purchase agreements and secured

7  financing, and that both agreements contain overlapping

8  provisions.  That's true, but the point we're making is that

9  this particular loan agreement has provisions that are unique

10  to loan agreements.  There are provisions that are unique to

11  loan agreements and provisions that are unique to repos, and

12  there are provisions that are unique to both.  We're not saying

13  that it has provisions that are unique to both.  We're saying

14  it has provisions that are unique to secured financing

15  agreements.  And that is a factor that militates in favor of

16  re-characterization.  Thank you.

17        THE COURT:  Thank you.  Thank you.  Well, I'm sorry

18  to say, I'm not in a position to render a ruling from the bench

19  today.  This is -- and I know the parties have worked hard.

20  And the briefing is excellent.  And the argument was excellent.

21  But I need to think about it.  So, I'm going to take it under

22  advisement.  I'm -- hope to be in a position to render an oral

23  ruling in short order.  I'm not going to make any promises on

24  time, but I'll give you advanced notice if I do that.

25        It may be that the issues are sufficiently complex

82

1  that the Court will have to write on it.  I just -- I, frankly,

2  as I sit here today, can't tell you what I'm going to do.  It

3  would be my preference to simply render an oral ruling because

4  you've waited long enough for an answer.  And I know every day

5  is increased risk for both sides.  So, I'll endeavor to get you

6  an answer as quickly as possible in any event, whether it be

7  oral or written.  And I'll let you know at the appropriate

8  time.

9        Is there anything further for today?  I'd like to

10  thank you for an excellent argument and traveling to Delaware

11  on such miserable weather day.  And I hope you have a safe

12  journey home.  Hearing is adjourned.

13        UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

14                    * * * * *

15

16            **C E R T I F I C A T I O N**

17        I, Vidhya Veerappan, court approved transcriber,

18  certify that the foregoing is a correct transcript from the

19  official electronic sound recording of the proceedings in the

20  above-entitled matter, and to the best of my ability.

21

22  /s/ Vidhya Veerappan          DATE:  December 5, 2007

23  VIDHYA VEERAPPAN

24  J&J COURT TRANSCRIBERS, INC.

25

                    **J&J COURT TRANSCRIBERS, INC.**