# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------- x   Chapter 11
In re:                                                  :
                                                        :   Case No. 07-11047 (CSS)
AMERICAN HOME MORTGAGE                                   :
HOLDINGS, INC., a Delaware corporation, et al.,[1] :   Jointly Administered
                                                        :
        Debtors.                                        :   Hearing Date: January 4, 2008 at 11:00 a.m. (ET)
                                                        :   Objection Deadline: December 27, 2007 at 4:00 p.m. (ET)
------------------------------------------------------- x
```

## DEBTORS' MOTION FOR AN ORDER MODIFYING EXISTING PROCEDURES FOR THE COMPENSATION AND REIMBURSEMENT OF EXPENSES OF CERTAIN FORECLOSURE PROFESSIONALS UTILIZED IN THE ORDINARY COURSE, *NUNC PRO TUNC* TO THE PETITION DATE

The above-captioned debtors and debtors in possession (collectively, "AHM" or the "Debtors") hereby move this Court (this "Motion"), pursuant to §§ 105(a), 327, 328, 330, 331, and 363(c)(1) of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rule 9024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order modifying existing procedures for compensation and reimbursement of expenses of certain foreclosure professionals utilized in the ordinary course of business to liquidate mortgage loans and REO Property (as hereinafter defined) (such professionals, the "Foreclosure Professionals"), effective *nunc pro tunc* to August 6, 2007 (the "Petition Date"). In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

## SUMMARY OF RELIEF REQUESTED

1.      By this Motion, the Debtors seek to modify the existing procedures for compensating and reimbursing expenses of Foreclosure Professionals to reflect changed circumstances following the "economic" close of the sale of the Debtors' servicing business on the Initial Closing Date.  Specifically, the Debtors seek entry of an order, effective *nunc pro tunc* to the Petition Date, authorizing the Debtors to pay Foreclosure Professionals for services performed and expenses incurred postpetition in accordance with pre-bankruptcy practice or otherwise in the ordinary course of business.

2.      Such modification will benefit the Debtors' estates by (i) reducing the administrative burden and expense associated with continued compliance with the existing procedures; (ii) permitting the payment of customary, per-transaction minimum fees to real estate Foreclosure Professionals, which was inadvertently left out of the original procedures; and (iii) facilitating the repayment of Servicing Advances (as hereinafter defined) made to Foreclosure Professionals from the proceeds of mortgage loan and REO Property (as hereinafter defined) liquidations (the "Liquidation Proceeds"), to which such advances are properly chargeable.

## STATUS OF THE CASE AND JURISDICTION

3.      On the Petition Date, each of the Debtors filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1005(b).  Each Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

DB02:6352412.11                                                          066585.1001

4.     On August 14, 2007, the United States Trustee for the District of Delaware (the "UST") appointed the Official Committee of Unsecured Creditors (the "Committee"). No trustee or examiner has been appointed in these chapter 11 cases.

5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and procedural predicates for the relief requested are Bankruptcy Code §§ 105(a), 327, 328, 330, 331 and 363(c)(1), and Bankruptcy Rule 9024.

## GENERAL BACKGROUND

### A.    The Debtors' Business

6.     Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate-A quality.

7.     As of December 31, 2006, AHM held a leveraged portfolio of mortgage loans held for investment and mortgage-backed securities in the amount of approximately $15.6 billion. As of December 31, 2006, AHM operated more than 550 loan-production offices located in 47 states and the District of Columbia, and made loans throughout all 50 states and the District of Columbia. Certain AHM entities originated mortgages through a network of loan origination offices. In addition, AHM originated loans obtained from mortgage brokers and purchased loans

3

from correspondents. AHM originated approximately $58.9 billion in aggregate principal amount of loans in 2006 and for the third quarter of 2006 was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.

8.      A large component of AHM's business was the servicing of loans (the "Servicing Business"), which it conducted through AHM Servicing. The Servicing Business entails, among other things, collecting mortgage payments, administering tax and insurance escrows, responding to borrower inquiries, and maintaining control over collection and default mitigation processes. As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans with an aggregate principal amount of approximately $46.3 billion.

9.      The Debtors continued to operate the Servicing Business after the Petition Date and, as discussed further below, currently operate it for the benefit of the Purchaser (as hereinafter defined).

B.      **The Foreclosure Process**

10.      In the ordinary course of the Servicing Business, the Debtors are involved in hundreds of foreclosure-related proceedings throughout the country. To conduct such foreclosures and to perform related services, the Debtors regularly call upon certain Foreclosure Professionals, including, but not limited to, attorneys, appraisers, accountants, and real estate brokers.

11.      Prior to bankruptcy, the Debtors ordinarily advanced funds to Foreclosure Professionals to compensate them and reimburse them for necessary foreclosure-related fees, costs, and expenses (such advances, together with other advances made to preserve or rehabilitate the mortgaged real property, the "Servicing Advances"). Although the Debtors are required to make Servicing Advances per their servicing agreements (the "Servicing

066585.1001

Agreements"), such advances are ultimately chargeable to the owners of the mortgage loans. Accordingly, where mortgaged real property is sold to a third party in foreclosure, the Debtors are entitled to reimburse themselves for any Servicing Advances made with respect to the underlying mortgage loan before remitting the Liquidation Proceeds (net of the applicable servicing fees) to the owner.

12.    Where foreclosure proceedings are initiated but do not result in a sale of the mortgaged real property, the mortgagor is typically responsible for reimbursing the Debtors for any Servicing Advances as a cost of curing/reinstating the mortgage.

13.    Where foreclosure proceedings are consummated but the Debtors determine that a foreclosure sale would not generate sufficient proceeds to pay off the underlying mortgage on a given property and that a higher price could be obtained by rehabilitating and/or marketing the property over time, the owner of the mortgage loan will typically acquire the property (property so acquired, "real-estate owned" or "REO Property"). The Debtors will typically market REO Property for several months before liquidating it for the best price then available.

C.    **The OCP Procedures**

14.    On August 16, 2007, the Debtors filed a motion [D.I. 192] (the "OCP Motion") for an order authorizing, subject to certain limitations, the employment, compensation, and reimbursement of expenses of certain ordinary-course professionals ("OCPs"), including, but not limited to, Foreclosure Professionals. The Committee filed a limited objection to the OCP Motion [D.I. 481], expressing concern that the proposed compensation procedures were "overly unrestrictive and could give rise to excessive waste and expenditure of tremendous sums of

money where unnecessary or inappropriate and without adequate oversight." (Committee Objection ¶ 11.)

15.    The Court granted the OCP Motion by Order dated September 7, 2007 [D.I. 643] (the "OCP Order"), which established procedures governing the retention, compensation, and reimbursement of expenses of OCPs (the "OCP Procedures"). The OCP Procedures represented a compromise between the Debtors and the Committee on key issues such as the amount of the caps on fees and expenses, and the extent of oversight by the Committee.

16.    The OCP Procedures permit the Debtors to retain OCPs without separate retention applications or orders, provided that each OCP files with the Court an affidavit of disinterestedness (a "Retention Affidavit") to ensure that the OCP may be employed under § 327 of the Bankruptcy Code. The Debtors are required to serve the Retention Affidavits on certain notice parties (the "Notice Parties"), who have 20 days to object to the proposed retention. In the absence of any objection, the Debtors are authorized to employ and compensate the OCPs in accordance with the terms of the OCP Order.

17.    The OCP Procedures permit the Debtors to make monthly payments for postpetition compensation and reimbursement of postpetition expenses to each OCP upon presentation by the OCP of a "reasonably detailed" invoice, subject to (i) a per-transaction cap for real estate brokers equal to the lower of 6% of the selling price or $3 million; (ii) monthly and quarterly caps (either $35k/$75k or $75k/$185k) for non-broker OCPs; and (iii) the requirement that the Debtors provide copies of all OCP invoices to the Committee, which may dispute or object to the invoices within twenty days of receipt thereof. If the Committee disputes

6

or objects to an invoice, the Debtors may not pay the disputed amount absent agreement from the Committee or further order of this Court.

18.    If the total postpetition compensation and reimbursement of postpetition expenses payable to any OCP exceeds the amount of the applicable cap(s), the OCP Procedures require the OCP to file a formal fee application in accordance with the Court's Order [D.I. 547] establishing procedures for interim compensation and reimbursement of expenses of professionals (such procedures, the "Interim Compensation Procedures"), and the OCP is entitled to payment of fees and expenses in excess of the applicable cap only as provided by such procedures.

19.    Finally, the OCP Procedures require the Debtors to file and serve on the Notice Parties quarterly statements (i) certifying the Debtors' compliance with the terms of the OCP Order and (ii) naming, and stating the aggregate amount of compensation and expense reimbursement paid to, each OCP during the preceding quarter.

20.    Following entry of the OCP Order, the Debtors determined that several OCPs would regularly exceed the applicable cap(s) in the OCP Procedures. For the sake of administrative convenience, the Debtors filed separate retention applications with respect to such OCPs (the "Retained Professionals").

### 1.    Administrative Difficulties

21.    Despite making reasonable efforts, the Debtors have experienced substantial difficulty administering the OCP Procedures with respect to Foreclosure Professionals. The OCP Procedures are directly at odds with both industry practice and the established course of dealing with most Foreclosure Professionals, and the sheer volume of Foreclosure Professionals involved (in excess of 600) has made it both difficult and costly to

7

police the Foreclosure Professionals' compliance with the OCP Procedures and Interim Compensation Procedures, as applicable.

22. For example, a typical uncontested mortgage foreclosure is a standardized process that requires a predictable expenditure of time. Accordingly, the mortgage loan servicing markets in most jurisdictions have developed standard, flat fees for routine foreclosures and related legal services performed by attorney Foreclosure Professionals (collectively, the "Flat-Fee Legal Services"), including, e.g.: (i) demand letters, (ii) commencement of (or answer to) foreclosure lawsuits, (iii) deeds in lieu of foreclosure, (iv) writs of possession after foreclosure, (v) proofs of claim in bankruptcy, (vi) lift-stay motions in bankruptcy, (vii) responses to motions to value, redeem, or avoid liens in bankruptcy, (viii) objections to plans or proofs of claim in bankruptcy, (ix) stipulations, and (x) reset sales. Thus, within the mortgage industry, a "reasonably detailed" invoice for Flat-Fee Legal Services could state "Foreclosure Fee ($840.00)," which a business person would understand to mean "preparation, filing, and prosecution of civil complaint, including one court appearance." The Debtors have worked with the Foreclosure Professionals to ensure that their invoices are "reasonably detailed" from a bankruptcy standpoint rather than a business standpoint. Nevertheless, many of the Foreclosure Professionals are still not in compliance, and those that are in compliance have passed along their increased costs (e.g., time spent manually revising their automatically-generated invoices) to the Debtors' estates.

23. By way of further example, most Foreclosure Professionals bill on a per-transaction basis rather than a monthly or quarterly basis. A line item for Flat-Fee Legal Services or a broker's commission reflected on an invoice relating to a particular foreclosure proceeding may reflect services performed over a span of several months. Similarly, a given

8

invoice may include expenses incurred at various times during the foreclosure process, which may or may not be broken out by specific date.  As a result, while it is simple to determine the cost of services relating to a particular mortgage foreclosure, it is difficult to track the aggregate monthly and quarterly fees and expenses payable to each Foreclosure Professional.

24.     To ensure compliance with the caps set forth in the OCP Procedures (and to make certain the Debtors are not paying for any services performed or expenses incurred prepetition), the Debtors have had to work with each Foreclosure Professional to dissect almost every invoice, line item by line item, to determine when a particular fee or expense accrued.

25.     Notwithstanding these and other efforts by the Debtors to facilitate payment of the Foreclosure Professionals in accordance with the OCP Procedures and Interim Compensation Procedures, as applicable, defective invoices have prevented many Foreclosure Professionals from receiving any payment to date for their postpetition services and expenses. The Debtors expect that if this state of affairs persists for an extended amount of time, they could experience attrition among the Foreclosure Professionals.

2.     **Payments Outside the OCP Procedures**

26.     On information and belief, difficulties with and confusion in the administration of the OCP Procedures and Interim Compensation Procedures with respect to Foreclosure Professionals also led to the payment of certain professionals outside the applicable procedures.  For example, certain real estate brokers' fees and expenses, which may or may not have been in excess of the applicable caps, were paid from closing escrows upon the sale of REO Property postpetition, without prior notice being given to the Committee.

27.     Under the OCP Procedures and Interim Compensation Procedures, as applicable, such payments would likely be subject to disgorgement if the Committee or the Court

DB02:6352412.11                                                     066585.1001

took issue with such payments after notice was served. However, as discussed below, in the ordinary course of business such payments would have been made directly, or ultimately reimbursed, from the Liquidation Proceeds, which are not property of the Debtors' bankruptcy estates. As such, there was no economic impact on the Debtors' bankruptcy estates as a result of such payments, and disgorgement would be a meaningless remedy. Thus, under the circumstances, and if the relief requested in this Motion is granted, corrective action by the Debtors or the Foreclosure Professionals to comply retroactively with the OCP Procedures and/or Interim Compensation Procedures would serve no practical purpose.

### 3.    Minimum Transaction Fees for Brokers

28.    In addition to the foregoing logistical problems, the OCP Procedures' per-transaction cap for real estate brokers was flawed in that it did not provide for a guaranteed minimum fee per transaction, which is customary in the mortgage servicing industry and is necessary to ensure steady and orderly liquidation of REO Properties. Thus, for example, under the OCP Procedures, a real estate broker who would have received a $2,000.00 minimum fee for the sale of REO Property for $15,000.00 outside of bankruptcy would only be entitled to a $900.00 commission from a sale of the same property under the OCP Procedures.

### 4.    The Debtors' Reimbursement Rights

29.    Prior to the Petition Date, Servicing Advances were timely made and seamlessly reimbursed from Liquidation Proceeds. It has recently come to the Debtors' attention that the disruption of this process in bankruptcy resulting from the OCP Procedures and Interim Compensation Procedures could hinder or, at a minimum, delay the Debtors' recovery of such payments once they are made.

30.    The Servicing Agreements typically require the Debtors to remit Liquidation Proceeds to a custodial account (a "Collection Account") within a short time after liquidation of a mortgage loan. "Liquidation" of a mortgage loan occurs when the Debtors determine that no further collections can/will be made on that mortgage loan, usually corresponding to the sale of the mortgaged property to a third party via a foreclosure sale or the closing of a sale of REO Property previously acquired out of foreclosure.

31.    With respect to a sale of REO Property, closing costs such as the broker's and closing attorney's fees are typically escrowed at the time of closing and, accordingly, are withheld from any Liquidation Proceeds received by the Debtors.  Prior to depositing the Liquidation Proceeds into the appropriate Collection Account, the Debtors are permitted contractually to "reimburse" themselves for any Servicing Advances previously made with respect to the underlying mortgage loan (e.g., payments made to foreclosure attorneys).

32.    After Liquidation Proceeds are deposited in a Collection Account, but before the funds on deposit in such account are remitted to the owner of the mortgage loans, the Debtors are also permitted contractually to "reimburse" themselves for any Servicing Advances previously made with respect to a given mortgage loan from any funds related to such loan that are on deposit in the Collection Account.

33.    Funds on deposit in a Collection Account are remitted periodically (typically, monthly) to the owner of the underlying mortgage loans, after which point the Debtors must request reimbursement from the owner for any "trailing expenses" (i.e., Servicing Advances that were not reimbursed, or were not yet made, when the funds in the Collection Account were remitted to the owner of the mortgage loans).

11

066585.1001

34.    The Debtors have a right to reimbursement of trailing expenses from the owners of the mortgage loans (and reserve all rights, at law or in equity, to assert the same). However, given the delay and administrative costs associated with requesting and receiving such reimbursements, it is more efficient and cost-effective for the Debtors to avoid trailing expenses altogether by making and receiving reimbursement for all Servicing Advances related to a particular loan prior to remitting the Liquidation Proceeds of such loan.

35.    In the ordinary course of the Servicing Business, the Debtors have begun to liquidate REO Properties that were acquired via foreclosures occurring on or near the Petition Date. Due to the delays resulting from the OCP Procedures and Interim Compensation Procedures, however, to date the Debtors have been unable to pay many Foreclosure Professionals for services performed and expenses incurred in connection with such foreclosures. If the Debtors are unable to make such payments prior to remitting the related Liquidation Proceeds to the owners of the loans, the Debtors will be left with trailing expenses for which they must seek reimbursement from the owners of the loans.

E.    **The Servicing Sale**

36.    By Order dated October 30, 2007, [D.I. 1711] (the "Sale Order") the Court authorized the sale of the Servicing Business (the "Servicing Sale") to an affiliate of W.L. Ross & Co., LLC. (such affiliate, the "Purchaser") pursuant to the terms of that certain Asset Purchase Agreement dated as of September 25, 2007 (as subsequently amended, the "APA").

37.    Under the APA, the Servicing Sale will close in two steps.[2] At the "economic" close, which occurred on November 16, 2007 (the "Initial Closing Date"), the

---

[2] Description of the APA in this Motion is by way of summary only. To the extent there is any discrepancy between such description and the actual terms of the APA, the latter are controlling.

066585.1001

Purchaser paid the Purchase Price (as defined in the APA) in the manner and to the parties in

interest contemplated by the APA.  From the Initial Closing Date until the "legal" close on the

Final Closing Date (as defined in the APA), the Debtors will continue to operate the Servicing

Business in the Ordinary Course of Business (as defined in the APA), subject to the Bankruptcy

Exceptions (as defined in the APA), but for the economic benefit of the Purchaser.  Following

the Initial Closing Date, the Purchaser (i) bears all of the upside benefit and downside risk of the

Servicing Business; and (ii) is responsible for providing the necessary working capital to fund

the business, which working capital funds, together with revenue generated from the Servicing

Business, will be used to make all necessary Servicing Advances to Foreclosure Professionals in

accordance with the Servicing Agreements.

## RELIEF REQUESTED

38.     By this Motion, the Debtors request entry of an order, effective *nunc pro*

*tunc* to the Petition Date, modifying the OCP Procedures and Interim Compensation Procedures

to authorize the Debtors to pay Foreclosure Professionals for services performed and expenses

incurred postpetition in accordance with the Debtors' pre-bankruptcy practice or otherwise in the

ordinary course of business, without need for (a) monthly invoices and/or formal fee applications

(monthly, quarterly, or final), (b)  detailed activity descriptions, (c) monthly, quarterly, or per-

transaction caps on fees or expenses payable to each professional, (d) review of invoices by the

Committee and the right of the Committee to object to the same, or (e) quarterly fee reports by

the Debtors relating to such Foreclosure Professionals.  In lieu of the foregoing, the Debtors will

file monthly reports (on or before the 20th day of the following calendar month) listing the

Foreclosure Professionals and the amounts paid to such professionals. As discussed below, such

reports will adequately safeguard the interests of creditors and other parties in interest of

13

monitoring the Debtors' use of estate property while at the same time reducing administrative

expenses and assuring seamless reimbursement of Servicing Advances from Liquidation

Proceeds.

39.     To be clear, the Debtors and the Foreclosure Professionals (both OCPs and

Retained Professionals) will continue to fulfill all requirements necessary to ensure proper

retention of Foreclosure Professionals in these bankruptcy cases, including, *inter alia*, the

requirement to properly file and notice Retention Affidavits.

## BASIS FOR RELIEF REQUESTED

40.     Section 105(a) of the Bankruptcy Code provides, in relevant part, that the

Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

41.     It is well settled that the Court's power under § 105(a) includes "the power

to vacate or modify [the Court's] orders, as long as it is equitable to do so." In re Marcus Hook

Dev. Park, Inc., 943 F.2d 261, 265 n.5 (3d Cir. 1991) (quoting Big Shanty Land Corp. v. Comer

Properties, Inc., 61 B.R. 272, 282 (N.D. Ga. 1985)); see In re Argose, Inc., 372 B.R. 705, 708

(Bankr. D. Del. 2007) ("Under section 105(a), the Court may modify an order if it is equitable to

do so."); In re Mariner Post-Acute Network, Inc., 257 B.R. 723 (Bankr. D. Del. 2000)

(modifying prior order establishing procedures for compensation of professionals).

42.     Similarly, Rule 60 of the Federal Rules of Civil Procedure, made

applicable to these proceedings by Bankruptcy Rule 9024, provides, in pertinent part, that "[o]n

motion and upon such terms as are just, the court may relieve a party or a party's legal

representative from a final judgment, order, or proceeding" on account of "mistake,

inadvertence, surprise, or excusable neglect," Fed. R. Civ. P. 60(b)(1), or if, among other

reasons, "it is no longer equitable that the judgment should have prospective application," Fed.

R. Civ. P. 60(b)(5), or "any other reason justif[ies] relief from the operation of the judgment,"

Fed. R. Civ. P. 60(b)(6).

## A.  **Changed Circumstances**

43.  Relief under Rule 60(b)(5) is appropriate when "a significant change in

circumstances warrants revision of the [prior] decree." Rufo v. Inmates of Suffolk County Jail,

502 U.S. 367, 383 (1992); see In re Lee, Case No. 03-33604, 2007 Bankr. LEXIS 1965, *11-12

(Bankr. E.D. Pa. June 5, 2007) (applying Rufo standard to chapter 13 debtor's motion to modify

prior order). "If the moving party meets this standard, the court should consider whether the

proposed modification is suitably tailored to the changed circumstance." Id.

44.  Though the OCP Procedures and Interim Compensation Procedures were

onerous as applied to the Foreclosure Professionals, such procedures were necessary (at least,

arguably)[3] to comply with §§ 328, 330, and 331 of the Bankruptcy Code, which govern the

compensation and reimbursement of expenses of professionals by the bankruptcy estate. Cf.

Wasserman v. Bressman (In re Bressman), 327 F.3d 229, 241 (3d Cir. 2003) ("The purpose of

§§ 327 and 330 is to allow for the necessary participation of lawyers in the bankruptcy process,

while remedying the lack of incentive, on the part of the debtor, to negotiate attorneys' fees and

to find representation at a cost-effective level.").

45.  Following the economic close of the Servicing Sale, however, the

Debtors' bankruptcy estates are only *nominally* responsible for compensating and reimbursing

---

[3]  As noted above, the OCP Procedures represented a compromise between the Debtors and the
Committee. Had the Debtors or the Committee fully anticipated how difficult administration of the OCP
Procedures would be with respect to Foreclosure Professionals, they might have negotiated a different
deal.

066585.1001

the expenses of the Foreclosure Professionals. As discussed above, the Purchaser is the real economic party in interest with respect to the Servicing Business and is ultimately responsible for the costs of operating such business. As such, for all practical purposes, Servicing Advances required to be made to Foreclosure Professionals after the Initial Closing Date are ultimately advanced by a non-estate source, either through the Purchaser's responsibility to provide the necessary liquidity and working capital to fund the Servicing Business or from the revenue generated by the Servicing Business. The Purchaser will also retain the benefit of the repayment of such Servicing Advances from the Liquidation Proceeds.

46.     While any professional retained by the bankruptcy estate must meet the standards of § 327 of the Bankruptcy Code, only professionals seeking compensation and reimbursement of expenses *from the bankruptcy estate* are required to comply with § 330. See Ferrara & Hantman v. Alvarez (In re Engel), 124 F.3d 567, 571-572 (3d Cir. 1997).

> Section 330 provides that after notice to any parties in interest and to the United States trustee and a hearing the court may award to a professional person employed under section 327 reasonable compensation for actual, necessary services rendered, and which *benefit the estate.* In the case of compensation which is to come from some nonestate source, the determination would be made solely under § 329, which empowers the court to review any compensation arrangement between a debtor and an attorney.

Id. (internal quotations, footnotes omitted; emphasis in original); see 11 U.S.C. § 329(a) ("Any attorney representing a debtor in a case under this title, or in connection with such case, *whether or not such attorney applies for compensation under this title,* shall . . ." (emphasis added).).

47.     Because the Purchaser is ultimately responsible for the costs of operating the Servicing Business following the Initial Closing Date, including providing working capital to make Servicing Advances to Foreclosure Professionals, subject to reimbursement thereof from the Liquidation Proceeds, the Debtors respectfully submit that payment of the Foreclosure Professionals following the Initial Closing Date is governed by § 363(c)(1) of the Bankruptcy

DB02:6352412.11                                                                                          066585.1001

Code, and not by §§ 328, 330, and 331 as implemented by the OCP Procedures and the Interim

Compensation Procedures.

      48.    Section 363 permits the Debtors, in their business judgment, to use, sell, or

lease property of the estate in the ordinary course of business without notice or a hearing. See 11

U.S.C. § 363(c)(1). The Debtors respectfully submit that advancing payments to Foreclosure

Professionals from working capital provided by the Purchaser in accordance with pre-bankruptcy

practice and the APA, subject to reimbursement from the related Liquidation Proceeds, is an

exercise of sound business judgment. First and foremost, payment of Foreclosure Professionals

free of the formal requirements (other than the Retention Affidavit requirement) of the OCP

Procedures and the Interim Compensation Procedures will save the Debtors and their

professionals significant (and unnecessary) administrative hassle and the associated costs. It will

also facilitate the Debtors' reimbursement of Servicing Advances from the related Liquidation

Proceeds, thus relieving the Debtors (and ultimately, the Purchaser) of the delay, administrative

burden, and expense associated with seeking reimbursement of trailing expenses from the

owners of the mortgage loans.

      49.    The proposed modification of the OCP Procedures and Interim

Compensation Procedures will also assist the Debtors in maintaining a good working relationship

with the Foreclosure Professionals, insofar as attorney Foreclosure Professionals will be able to

return to their standard invoicing system and the broker Foreclosure Professionals will be able to

be paid their customary per-transaction minimum fees. It will also help the Purchaser to realize

the full benefit of its bargain, by removing transaction costs imposed by the bankruptcy process

upon the operations of the Servicing Business while such business was in the hands of the

Debtors.

066585.1001

50.    In light of the foregoing, the Debtors respectfully submit that the change in circumstances brought about by the economic close of the Servicing Sale, and the resulting change in governing law from §§ 328, 330, and 331 to § 363(c)(1) of the Bankruptcy Code, render the application of the OCP Procedures and the Interim Compensation Procedures to the Foreclosure Professionals unnecessary and inequitable following the Initial Closing Date, which justifies relief under either or both of § 105(a) of the Bankruptcy Code or Fed. R. Civ. P. 60(b).

51.    The Debtors have conferred with the Committee regarding the foregoing, and the Committee generally supports the relief sought, provided that the order granting such relief includes a provision requiring the Debtors to provide reports within twenty days after the last day of each month of disbursements made to Foreclosure Professionals for such month. The Debtors have included such a provision in the proposed form of order, and submit that it adequately safeguards the interests of creditors and other parties in interest in monitoring the Debtors' use of estate property, while at the same time reducing administrative expenses and assuring the seamless reimbursement of Servicing Advances from Liquidation Proceeds.

**B.    _Nunc Pro Tunc_ Effect**

52.    As discussed above, due to difficulties with and confusion in the administration of the OCP Procedures and Interim Compensation Procedures with respect to Foreclosure Professionals, certain professionals have received payment outside the applicable procedures. On information and belief, any such payments were the result of mistake, inadvertence, and/or excusable neglect, and were either made directly from Liquidation Proceeds or ultimately reimbursed from Liquidation Proceeds or other non-estate source. As such, there would appear to be little legal or practical basis for ordering Foreclosure Professionals to disgorge any such payments to the Debtors' estates.

18

53.     In light of the foregoing, any payments made to Foreclosure Professionals outside the OCP Procedures or Interim Compensation Procedures Liquidation Proceeds have not prejudiced the Debtors' estates or creditors.  While the Debtors are, of course, willing to take such corrective action as is necessary to remedy any prior, albeit inadvertent, violations of the OCP Procedures or Interim Compensation Procedures, the Debtors respectfully submit that any such action would entail additional administrative costs with no real benefit to the Debtors' estates or creditors.  Accordingly, the Debtors request that the Court make the proposed modifications of the OCP Procedures and Interim Compensation Procedures effective *nunc pro tunc* to the Petition Date, and respectfully submit there is ample authority in § 105(a) of the Bankruptcy Code and Fed. R. Civ. P. 60(b) for such relief.  See 11 U.S.C. § 105(a) (court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]"); Fed. R. Civ. P. 60(b)(1) & (6) (court may relieve a party from a prior order (i) on account of "mistake, inadvertence, . . . or excusable neglect" or if "any other reason justif[ies] relief").

## NOTICE

54.     Notice of this Motion will be provided to: (i) the Office of the UST; (ii) counsel to the Committee; (iii) counsel to Bank of America, N.A.; (iv) counsel to the Debtors' postpetition lender; (v) counsel to the Purchaser; (vi) the Securities and Exchange Commission; and (vii) all parties entitled to notice under Local Rule 2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

DB02:6352412.11                                                         066585.1001

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that this Court enter an order substantially in the form of the Proposed Order attached hereto as <u>Exhibit A</u> and grant the Debtors such other and further relief as this Court may deem just and proper.

Dated:     Wilmington, Delaware
           December 14, 2007

                              YOUNG CONAWAY STARGATT & TAYLOR, LLP

                              James L. Patton, Jr. (No. 2202)
                              Pauline K. Morgan (No. 3650)
                              Sean M. Beach (No. 4070)
                              Matthew B. Lunn (No. 4119)
                              Margaret Whiteman (No. 4652)
                              Patrick A. Jackson (No. 4976)
                              The Brandywine Building
                              1000 West Street, 17th Floor
                              Wilmington, Delaware 19801
                              Telephone: (302) 571-6600
                              Facsimile: (302) 571-1253

                              Counsel for Debtors and Debtors in Possession

DB02:6352412.11                                              066585.1001