# EXHIBIT A

## ASSIGNMENT OF LEASES

This Assignment of Leases ("Assignment") is made on August 26, 2003, by and between Capitol Commerce Mortgage Co., a California corporation ("Assignor") and American Home Mortgage Corp., a New York corporation ("Assignee").

1.    Background.

(a)    Assignor, as either Tenant or Lessee [or Sublessee] entered into the leases identified on Exhibit "A" attached hereto (the "Leases"), whereby Assignor leased those premises and/or property more particularly described in the Leases.

(b)    Assignor desires to assign the Leases to Assignee and Assignee desires to accept the assignment of the Leases.

(c)    The Leases require that the Lessor or Landlord [or Sublessor or Sublandlord] of each of the Leases consent to the assignment of that particular lease.  The person or entity executing this Assignment as Lessor or Landlord is willing to consent to the assignment from Assignor to Assignee and to release Assignor from all further liability or obligation under the lease of which such person or entity is the Lessor or Landlord.

2.    Assignment.  In consideration of the agreement of Assignee set forth herein and in consideration of Lessor's consent to this assignment, Assignor hereby assigns and transfers to Assignee all of Assignor's right, title and interest in and to the Leases and the premises which are the subject of the leases, and Assignee agrees to and does accept this assignment and from September 1, 2003, expressly assumes and agrees to keep, perform and fulfill all of the terms, covenants, conditions and obligations, required to be kept, performed and fulfilled by Assignor as Lessee or Tenant under the Leases, including the making of all payments due or payable to Lessor or Landlord under the Leases, accruing or occurring on or after September 1, 2003.

3.    Security Deposits.  As a part of the assignment of the Leases, Assignor hereby assigns and transfers to Assignee all of Assignor's right, title, and interest in and to any security deposits paid by Assignor to Lessor or Landlord of each of the Leases assigned hereby. Assignee hereby agrees to immediately pay to Assignor the amount of any such security deposits assigned hereunder and applied by Lessor or Landlord to the account of Assignee.

4.    Communication Lines.  The assignment or transfer of each Lease shall include all of Assignor's right, title, and interest, if any, in or to any T-1 lines and other existing telephone lines to or on the premises which are the subject of the Leases.

5.    Effective Date.  This Assignment shall be effective as of September 1, 2003.

6.      Consent to Assignments.  Each assignment of each of the Leases is conditioned upon obtaining the consent of the Lessor or Landlord of that lease and upon the release by such Lessor or Landlord of Assignor as more specifically set forth below.  The failure to obtain the consent of the Lessor or Landlord of any one or more of the Leases shall not invalidate the assignment of those Leases to which a Lessor or Landlord has consented and released.

7.      Counterparts.  This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, and the Consent of Landlord shall be attached to this Assignment.

8.      Recovery of Litigation Costs.  If any legal action or any arbitration or other proceeding is brought for the enforcement of this Assignment, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Assignment, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the date first written above.

ASSIGNOR                                              ASSIGNEE

By: _____        By: _____

_____                  Alan Horn
_____                  Executive Vice President
                                                           American Home Mortgage Corp.

## LESSOR'S CONSENT AND RELEASE OF ASSIGNOR

The undersigned is the Lessor or Landlord of one of the of the leases described in the above Assignment and consents to the assignment of such lease to the above described Assignee without waiving any of Lessor's rights against said Assignee as the new lessee under the lease.

Dated: Aug. 28 , 2003          LESSOR OR LANDLORD

Shoreham-Viewridge, LLC,
dba Shoreham Place, a Washington
limited liability company

By: Washington Capital Management, Inc.
    Its Manager

By: _____
    Donald R. Maescher
    President, California Division

117240.1

## EXHIBIT "A"

1.    Office Lease for 4200 Commerce Court, Lisle, Illinois, between Teachers' Retirement System of the State of Illinois, Landlord, and Capitol Commerce Mortgage Co., Tenant, dated October 1, 2002, amended by First Amendment to Lease dated March 20, 2003.

2.    Prestonwood Tower Office Lease for 5151 Belt Line Road, Suite 1201, Dallas, Texas, between Prestonwood Tower, Ltd., Landlord, and Capitol Commerce Mortgage Co., Tenant, dated April 15, 2002, amended by First Modification of Office Lease dated April 29, 2002, and amended by Second Modification of Office Lease dated October ___, 2002. Additionally, Sublease between Horizons Training Centers, L.P., Sublessor, and Capitol Commerce Mortgage Co., Sublessee, dated May 20, 2003.

3.    Lease Agreement for 6455 S. Yosemite Street, Suite 700, Greenwood Village, Colorado, between Prentiss Properties Real Estate Fund I, L.P., a Delaware limited partnership, Landlord, and Capitol Commerce Mortgage Co., a California corporation, Tenant, dated June 23, 2003.

4.    Capital Builders, Inc. Sublease dated October 30, 2002, for 1180 Iron Point Road, Suite 210, Folsom, CA, between Portal Software, Inc., a Delaware corporation, Sublessor, and Capitol Commerce Mortgage Co., a California corporation, Subtenant, under Master Lease dated November 15, 2000, as amended February 2, 2001, entered into by Iron Point Capital Investors, LLC, Landlord, and Sublessor as Tenant, amended by Amendment No. 1 to Sublease dated May 7, 2003.

5.    Office Building Lease for 1500 West Shaw, Suite 403, Fresno, California, between Sarita Grove, Landlord, and Capitol Commerce Mortgage Co., Tenant, dated May 28, 1998, amended by Lease Addendum dated October 10, 2001, Lease Addendum II dated February 26, 2002, Lease Addendum III dated September 16, 2002, and Lease Addendum dated January 22, 2003.

6.    Lease Agreement for 480 North Sam Houston Pkwy East, Suite 230, Houston, Texas, between GAR Associates IX, L.L.C. c/o Oak Leaf Management, Landlord, and Capitol Commerce Mortgage Company Inc., Tenant, dated March 26, 2002, amended by First Amendment to Lease dated November ___, 2002.

7.    Lease Agreement for 6480 Spring Mountain Road #3, Las Vegas, Nevada, between Paul Robarts, Lessor, and Capitol Commerce Mortgage Co., Lessee, dated May 13, 1999, amended by Addendum to Lease Agreement dated March 12, 2002, between SMP Center LLC, formerly Paul Robarts, Lessor, and Capitol Commerce Mortgage Company, Lessee.

8.    Lease for 75 Rowland Way, Suite 250, Novato, California, between Multi-Employer Property Trust, a trust organized under 12 C.F.R. Section 9.18, and Capitol Commerce Mortgage Co., a California corporation, dated December 31, 2002.

9.     Lease Agreement for 1060 Maitland Center Commons, Suite 230, Maitland, Florida, between POI Maitland, LP a Delaware limited partnership, Landlord, and Capitol Commerce Mortgage Co., a California corporation, Tenant, dated July 19, 2002, amended by First Amendment of Lease dated May 12, 2003.

10.     Office Lease for 7310 North 16th Street, Suite 220, Phoenix, Arizona, between Transwestern/Mony Squaw Peak, L.L.C., a Delaware Limited Liability Company, Landlord, and Capitol Commerce Mortgage Company, a California corporation, Tenant, dated March 1, 2001, amended by Lease Amendment dated May 17, 2001.

11.     Office Lease for 5505 South 900 East, Suite 140, Murray, Utah, between Sports Mall Plaza I, a general partnership, Landlord, and Capitol Commerce Mortgage Co., a California corporation, Tenant, dated July 9, 2002, amended by Amendment to Lease dated March 24, 2003.

12.     Lease Agreement for 5010 Shoreham Place, Suite 250, San Diego, California, between Shoreham-Viewridge, LLC, dba Shoreham Place, a Washington limited liability company, Landlord, and Capitol Commerce Mortgage Co., a California corporation, Tenant, dated February 18, 2003.

08/28/2003   15:42   WASHINGTON CAPITAL MANAGEMENT >   18585712503   NO.065   D02



# Washington Capital
## M A N A G E M E N T,   I N C.

4350 La Jolla Village Drive, Suite 960
San Diego, California 92122

Telephone (858) 457-3100
Facsimile (858) 457-2885

August 27, 2003

**VIA FAX AND MAIL**

Sandy V. Bahr
Columbia National, Inc.
American Home Mortgage Corp.
7142 Columbia Gateway Drive
Columbia, MD 21046-2132

Re:   5010 Shoreham Dr., Suite 250, San Diego, CA 92122
      Lessor's Consent

Dear Ms. Bahr:

Related to the Lease Assignment by Capitol Commerce Mortgage Company to American Home Mortgage Corp., enclosed please find the document entitled LESSOR'S CONSENT AND RELEASE OF ASSIGNOR, which has been signed by Mr. Donald R. Maescher, President, Calif. Division of Washington Capital Management, Inc.

We wish the best to American Home Mortgage with its recent acquisition.

Regards,

Jim Mason
Director, Asset Management

Enclosure.

Cc:  Mike Stasse, Heffner Strain, Fax: 916-438-5201 (w/ Encl.)

## LESSOR'S CONSENT AND RELEASE OF ASSIGNOR

The undersigned is the Lessor or Landlord of one of the of the leases described in the above Assignment and consents to the assignment of such lease to the above described Assignee without waiving any of Lessor's rights against said Assignee as the new lessee under the lease. ~~Lessor hereby expressly releases the above described Assignor from any past, present of future liability or obligation under the lease.~~

Dated: __Aug 28__ , 2003

LESSOR OR LANDLORD

Shoreham-Viewridge, LLC,
dba Shoreham Place, a Washington
limited liability company

By: Washington Capital Management, Inc.
Its Manager

By: _____

117240.1

6.   **Consent to Assignments**. Each assignment of each of the Leases is conditioned upon obtaining the consent of the Lessor or Landlord of that lease and upon the release by such Lessor or Landlord of Assignor as more specifically set forth below. The failure to obtain the consent of the Lessor or Landlord of any one or more of the Leases shall not invalidate the assignment of those Leases to which a Lessor or Landlord has consented and released.

7.   **Counterparts**. This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, and the Consent of Landlord shall be attached to this Assignment.

8.   **Recovery of Litigation Costs**. If any legal action or any arbitration or other proceeding is brought for the enforcement of this Assignment, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Assignment, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the date first written above.

ASSIGNOR                                    ASSIGNEE

By: _____              By: _____

Chris S. Sends                            Alan B Horn
Capitol Commerce Mortgage                 American Home Mortgage Corp
President                                 Executive Vice President /
                                          General Counsel

117240.1                     2

## FIRST AMENDMENT TO LEASE AGREEMENT

This First Amendment to Lease Agreement is entered into as of April 7, 2003 between Shoreham-Viewridge, LLC, dba Shoreham Place ("Landlord") and Capitol Commerce Mortgage Co., a California corporation ("Tenant").

WHEREAS, Landlord and Tenant entered into that certain Lease dated February 18, 2003, for the Premises located at 5010 Shoreham Place, Suite 250, San Diego, California 92122 (the "Lease").

NOW, THEREFORE, in consideration of the mutual covenants herein, the parties hereto agree as follows:

1.     Lease Term.   Landlord and Tenant agree that the Lease Term as defined in the Lease commences on April 6, 2003 and ends on April 5, 2008.

All other terms and conditions of the Lease remain unchanged and in full force and affect.

The parties have caused this First Amendment to Lease Agreement to be executed as of the date first set forth above.

LANDLORD:                                      TENANT:

Shoreham-Viewridge, LLC                        Capitol Commerce Mortgage Co.
dba Shoreham Place                             a California corporation
a Washington limited liability company

By: Washington Capital Management, Inc.        By: _____
    Its Manager                                    (signature)
By: _____              By: Chris Sordi, President
    (signature)                                    (print name and title)
By: Donald R. Maescher
    President, California Division
Dated:   5/12/03                               Dated:  April 30, 2003

# FEE MANAGEMENT, INC.

8304 Clairemont Mesa Blvd., Suite 109
San Diego, CA 92111
(858) 292-9948    FAX (858) 571-2993

May 6, 2003

Mr. Chris B. Sordi
CAPITOL COMMERCE MORTGAGE CO.
3600 American River Drive, Suite 150
Sacramento, CA 95864

RE:    TENANT IMPROVEMENTS – FINAL COSTS
        LEASING COMMISSIONS PAID
        5010 Shoreham Place, Suite 250
        San Diego, CA 92122

Dear Chris:

Enclosed is a final accounting of the tenant improvement costs and a copy of the invoice for leasing commissions paid for the above referenced Premises. In the event you should exercise your right to terminate the lease, you will need this information.

As always, if you have any questions, please do not hesitate to call me.

Sincerely,

Rose Silverwater, RPA
Property Manager

Enclosure

c:     Michael Stassi, Aguer Pipgras Assoc.
       Jim Mason, Washington Capitol
       Tom Wilcox, Voit Commercial

*An Affiliate of Hanken Cono Assad & Co., Inc.*

## LEASE AGREEMENT
## BASIC TERMS AND INDEX

This Lease Agreement (this "Lease") is dated for reference purposes only as of <u>February 18, 2003.</u>

This is a summary of the basic terms set forth in subsequent sections of this lease, and made a part hereof. All of these basic terms are subject to the more detailed provisions set forth subsequently in this Lease, including the attached Exhibits.

**SECTION 1.**                                                                                    **PAGE**

1.    a)    Landlord: SHOREHAM-VIEWRIDGE, LLC, DBA SHOREHAM PLACE,
               A WASHINGTON LIMITED LIABILITY COMPANY

      b)    Tenant: <u>CAPITOL COMMERCE MORTGAGE CO., a California corporation</u>

2.    Premises:                                                                                        5

      a)    Project: One story commercial office building known as the Project.

      b)    Premises Address: <u>5010 Shoreham Place          </u>, Suite <u>250</u>, San Diego, California 92122

      c)    Floor on which Premises are located: <u>First</u>

      d)    Agreed Upon Rentable Area of Premises: <u>4,778</u> square feet (<u>4,281</u> usable square feet).

      e)    Approximate Percentage of Premises for allocation of operating expenses:
               <u>14.1</u>% of Project.

3.    Tenant Improvements:                                                                     5

      Per Plans and Specifications (See Exhibit B).

4.    Term and Possession:                                                                      6

      The term shall be <u>five (5)</u> years, commencing fourteen (14) days after Landlord's tenant improvement work has been substantially completed. Landlord shall use its best efforts to deliver the premises no later than March 15, 2003. For the purposes of this lease the commencement date of the term shall be <u>April 1, 2003,</u> and ending on <u>March 31, 2008.</u>

5.    Parking and Common Areas:                                                             7

6.    Security Deposit:                                                                             8

      The Security Deposit shall be $<u> None  </u>, due upon execution of this lease.



LESSEE INITIAL

LESSOR INITIAL

7.    Base Monthly Rent:                                                                                8

The Base Monthly Rent payable in advance on the first day of each month of the lease Term shall be $9,221.54 ($1.93 per rentable square foot) based upon the Floor Plan (see Exhibit "A") and shall be increased in accord with Exhibit J.  Concurrently with the execution of this Lease, Tenant shall deliver to Landlord a rental deposit in the amount of $9,221.54.  The Base Monthly Rent for months 1 and 2 shall be abated.  The rental deposit delivered with the executed lease shall be applied to third month's rent.

8.    Cost of Living Adjustment to Rent:                                                8

9.    Property Taxes:                                                                            9

10.    Special Tenant's Expenses:                                                        9

11.    Permitted Use of Premises:    General office usage.
                                                    The zoning is IP2-1.                      10

12.    Services and Utilities:    Utilities paid by Landlord (subject to reimbursement by Tenant
                                            pursuant to Section 15).                          10

13.    Repairs and Maintenance:                                                        12

14.    Alterations:                                                                                13

15.    Additional Rent:                                                                        14

Landlord's Expense Stop shall be actual operating expenses for year 2003 (Base Year).

16.    Inspection of Premises:                                                            15

17.    Damages to Premises:                                                            15

18.    Indemnity and Risk of Injury:                                                    16

19.    Insurance:                                                                                16

20.    Assignment and Subletting:                                                      17

21.    Subordination, Estoppel Certificate, Attornment:
19

22.    Default and Remedies:                                                            19

23.    Condemnation:                                                                        22

24.    Costs and Attorney's Fees:                                                        22

2



LESSEE INITIAL

LESSOR INITIAL

25. Quiet Enjoyment: 22

26. Rules and Regulations: 22

27. Surrender of Premises: 23

28. Waiver: 23

29. Notice and Addresses: 23

    a)    Landlord:               (b)    Address for Rent Payment:

**Shoreham-Viewridge, LLC**              **Shoreham-Viewridge, LLC**
**dba Shoreham Place**                  **dba Shoreham Place**
c/o Fee Management, Inc.              c/o Fee Management, Inc.
5550 Baltimore Drive, 2nd Floor          8304 Clairemont Mesa Blvd., Suite 109
La Mesa, California 91942-1776         San Diego, CA 92111

    c)    Tenant:
Capitol Commerce Mortgage Co.
5010 Shoreham Place, Suite 250
San Diego, CA 92122

With Additional Notice To:
Capitol Commerce Mortgage Co.
Attn: Chris B. Sordi
3600 American River Drive, Suite 150
Sacramento, CA 95864

30. Holding Over: 23

31. Public Safety Alterations: 24

32. Hazardous Materials: 24

33. Security Measures: 24

34. General Miscellaneous Provisions: 24

Exhibits and Special Conditions: The following drawings and special provisions are or will be attached hereto and made a part of this Lease upon final approval by the parties:

Exhibit A:      Floor Plan showing the Premises.
Exhibit B:      Tenant Improvement Plans and Specifications.
~~Exhibit C:~~      ~~Tenant Improvement Standards and Allowances.~~
Exhibit D:      Site Plan.
Exhibit E:      Rules and Regulations.

3



LESSEE INITIAL
LESSOR INITIAL

Exhibit F:      Option to Extend
Exhibit G:      ERISA Certification
Exhibit H:      Tenant's Right to Terminate the Lease
Exhibit I:      Right of First Offer
Exhibit J:      Rent Adjustment Schedule
Exhibit K:      Broker Acknowledgment
Exhibit L:      Janitorial Specifications

IN WITNESS WHEREOF, THE PARTIES HAVE EXECUTED AND DELIVERED THIS LEASE AS OF THE DATE FIRST SET FORTH ABOVE.

LANDLORD:                                    TENANT:
SHOREHAM-VIEWRIDGE, LLC                       CAPITOL COMMERCE MORTGAGE CO.
DBA SHOREHAM PLACE                            a California corporation
A Washington limited liability company

By: Washington Capital Management, Inc.       By: _____
    Its Manager                                  (signature)
By: _____          By: _____
    Donald R. Maescher                           (print name)
Title: President, California Division         Title: _____

4



LESSEE INITIAL
LESSOR INITIAL

2.    **Premises:**

    Landlord leases to Tenant and Tenant rents from Landlord those certain interior premises described in Section 1 and designated on Exhibit A ("Premises") and subject to the terms and conditions set forth herein. Tenant agrees to keep and perform each and all of the following terms and conditions, and this Lease is made upon the conditions of such performance. The building in which the Premises are located, the adjoining parking areas and other common areas are sometimes hereinafter referred to as the "Project." Landlord and Tenant hereby acknowledge and agree that any statement regarding the rentable area or square footage of the Premises set forth in this Lease is not a representation or warranty of the exact number of square feet but rather is only a reasonable approximation and that the Base Monthly Rent payable hereunder is not subject to revision whether or not the actual square footage is more or less than the approximations.

3.    **Tenant Improvements:**

    A.    **Construction of Tenant Improvements:**

        (1)    Landlord shall cause the Premises to be improved with certain "Tenant Improvements" in accordance with the plans and specifications ("Plans") attached hereto as Exhibit "B," which Plans are hereby approved by Landlord and Tenant. New improvements will be constructed to match existing.

        (2)    Landlord shall expend all funds, supply the necessary materials and labor and shall have the work performed promptly and diligently in a first-class workman-like manner to complete the Tenant Improvements and prepare the Premises for initial occupancy by Tenant. Landlord's obligation to perform said work shall be subject to delays due to acts of God, governmental restrictions, judicial restrictions, moratoriums, strikes, labor disturbances, shortage of material and supplies, and for any other cause or event beyond Landlord's reasonable control.

        (3)    Tenant acknowledges that all Tenant Improvements must be performed by contractors and workers who are signatory to appropriate AFL-CIO Union agreements, and that any work coming within the jurisdiction of I.B.E.W. Local 569 shall be performed under a Union agreement with I.B.E.W. Local 569 regardless of whether any other Union claims concurrent jurisdiction. Tenant acknowledges that Landlord would suffer damages to its reputation and standing in the community for which Landlord would have no adequate remedy at law, and that Landlord shall have the right to seek injunctive relief against the use of any non-union contractors or workers together with its costs and attorneys fees as provided in Section 23.A.

        (4)    Tenant shall inspect the Tenant Improvements from time to time as they are constructed and shall promptly notify Landlord in writing of any manner in which Tenant contends that the Tenant Improvements do not conform to Plans. If Tenant Improvements do not conform with Plans, upon notification by Tenant, Landlord will use its best efforts to cause Tenant Improvements to be amended and constructed in accordance with Plans.

        (5)    Landlord shall have no responsibility to provide interior design services and shall have no liability for payment of fees or expenses for interior design services.

    B.    **Payment for Tenant Improvements:**


LESSEE INITIAL
LESSOR INITIAL

(1)     Landlord agrees to pay the cost of constructing Tenant Improvements in accordance with the Plans and Standards and Allowances (as per Exhibits B), which amount shall include the direct costs of construction, space planning and engineering fees, permit fees, Contractor's combined General Conditions and Fee, and any other direct and indirect costs associated with said construction.

(2)     Any and all additional costs or expenses resulting from any changes, additions or deletions (collectively "alterations") made at Tenant's request to the Plans and Standards and Allowances including, but not limited to, costs incurred for those services, will be borne by Tenant. If Tenant shall request any alterations of anything set forth in Exhibits B and C.

a)     Landlord shall promptly notify Tenant in writing of the costs to prepare the revised Plans in accordance with such request. Tenant shall, within three (3) business days of receipt of such notification, deliver either (a) written authorization to proceed with such revisions, together with full payment of all costs to prepare revised Plans, or (b) written authorization to abandon such alterations. Within three (3) business days after receipt of the revised Plans, Tenant shall approve the same in writing.

b)     Absent receipt of any written authorization and/or payment, Landlord shall not be obligated to continue work on interior improvements to the Premises and may suspend work, Tenant shall be chargeable with any and all resulting delays in the completion of the Premises.

c)     The cost of the alterations shall be paid, as additional rent pursuant the Lease, within twenty (20) days after the rendition of a statement therefore, accompanied by a statement certifying the balance due.

C.     **Title to Tenant Improvements:**

The Tenant Improvements installed by Landlord pursuant to this Section shall be owned by Landlord, subject to the terms of Section 26, "Surrender of Premises," upon the expiration or termination of this Lease.

D.     **Tenant-Caused Delay:**

If Tenant causes any delay in the construction of Premises, whether by reasons by any failure by Tenant to comply with any applicable time limitations set forth herein or by Tenant's requirement for materials or installation different from that set forth in Exhibits B, or by reason of building code problems arising from Tenant's design or by reason of changes in the work requested by Tenant, or for any other reasons attributable to Tenant, then, not withstanding any provision in this Lease to the contrary, the commencement and expiration dates of the term of this Lease shall be unaffected and unchanged by reason of such Tenant-caused delays, and the rent shall be paid at the times specified in the Lease without change.

4.     **Term and Possession:**

A.     The Term of this Lease ("Term") shall be <u>five (5)</u> years, commencing fourteen (14) days after Landlord's tenant improvement work has been substantially completed. Landlord shall use its best efforts to deliver possession of the Premises to Tenant by no later than March 15, 2003. For the purposes of this lease the commencement date of the term shall be <u>April 1, 2003,</u> (the "Commencement Date"), and the Term shall end on <u>March 31, 2008.</u> Landlord and Tenant shall execute an addendum to this Lease stating the actual Commencement

6



LESSEE INITIAL

LESSOR INITIAL

Date, if such date differs from the "Original Commencement Date" specified above; provided, that the absence of such addendum will not affect the determination of the Commencement Date or Tenant's liability to commence payment of the Base Monthly Rent. The Term shall be five (5) years from the Commencement Date, if and as amended.

B.    In the event of Landlord's inability to deliver possession of the Premises by fourteen (14) days prior to the Original Commencement Date, Landlord shall not be liable for any damage caused by such delays nor shall this Lease become void or voidable. Base Monthly Rent shall be payable by Tenant to Landlord commencing on the third month of the Term of the Lease.

C.    Within three (3) days prior to possession of the Premises, Tenant and Landlord shall conduct a walk-through inspection of the Premises and Tenant and Landlord shall create a written punch list of any and all deficiencies identified by the parties related to the Premises and Landlord's tenant improvement work. Landlord shall use commercially reasonable efforts to diligently and timely commence and pursue the completion of repairs under this Section and fix all items on the punch list prior to the Commencement Date. Tenant agrees, other than as specified during the walk-through inspection and on the punch list, that by taking possession of the Premises, that the Premises are then in a tenantable and good condition, and that Tenant waives any right to the claim that the Premises are not suited for the purposes set forth herein.

5.    **Parking and Common Areas:**

Tenant, its employees and visitors shall be permitted to use four (4) parking spaces per 1,000 rentable square feet of space in the Project's parking facility. The term "Common Areas" means all areas and facilities outside of the boundaries of the Premises and within the exterior boundaries of Project that are not leased to other tenants. Common Areas include without limitation, parking, pedestrian walkways, patios, landscaped areas, sidewalks, entrance ways, hallways, service corridors, restrooms, drinking fountains, stairways, elevators, loading areas, and ramps, and the common pipes, conduits, wires, and appurtenant equipment servicing the Project.

A.    **Landlord's Control:**

The Landlord may increase, reduce, or change in any manner the Common Areas as it, in its sole discretion, deems appropriate. The Landlord shall also have the right, without limitation, to establish rules and regulations applicable to all tenants concerning the use, maintenance, and operation of the Common Areas; to close temporarily any part of the Common Areas for maintenance, repair, and renovation; to change the location and size of the Common Areas; to designate other areas to become parts of the Common Areas; and to perform any other acts with respect to the Common Areas as it may deem appropriate.

B.    **Tenant's Rights:**

(1)    Parking: Tenant, its employees and visitors, agree to obey and abide by all rules and regulations established by Landlord for the safety, protection, cleanliness and preservation of order in connection with parking, ingress and egress and other automobile and pedestrian use of said property. Landlord shall not be responsible to Tenant, its employees or visitors, for the non-performance by any other Tenant, visitor or user of said parking facilities of said rules and regulations or assignment of spaces. If a Tenant is utilizing more than its allocable share of parking spaces, it will be subject to assessments equal to the then monthly

7


LESSEE INITIAL
LESSOR INITIAL

assessments being charged for parking spaces in the Project, and shall be responsible for reimbursing Landlord for the costs (if any) incurred by Landlord to monitor and control the Project's parking facilities.

(2)    Other Common Areas: Tenant, its employees and visitors, shall also have a non-exclusive right to use the other Common Areas with Landlord and other tenants, subject to the rules and regulation established by Landlord for the safety, protection, cleanliness and preservation of such Common Areas. Such non-exclusive use is appurtenant to this Lease only, and will terminate upon the termination for any reason of this Lease.

6.    **Security Deposit:**

A.    ~~Concurrently with the execution of this Lease, Tenant shall deliver to Landlord a security deposit as specified in Section 1 as security for the performance by Tenant of every covenant and condition of this Lease. Said deposit may be commingled with other funds of Landlord and shall bear no interest.~~

B.    ~~If Tenant defaults on any covenant or condition of this Lease, Landlord may apply the whole or any part of such security deposit to the payment of any sum in default or any other sum which Landlord may be required to spend by reason of Tenant's default. In the event Landlord should so apply all or any part of said deposit, Tenant shall within fifteen (15) days after receipt of notice from Landlord, pay the sum expended in order to replenish such deposit. Failure to do so shall be a default under this Lease. Should Landlord assign its interest in the Project, Landlord shall assign any security deposit hereunder to the purchaser who shall become Landlord under the terms of this Lease and Landlord shall thereby be released from any obligations or liabilities to Tenant therefore. Landlord shall return the security deposit or any balance thereof to Tenant at the expiration of the term hereof, within one (1) month following Tenant's moving out of Premises. Tenant hereby waives the provisions of Section 1950.7 of the California Civil Code, as amended or recodified from time to time.~~

7.    **Base Monthly Rent:**

A.    Tenant shall pay to Landlord monthly in advance on the first day of each month throughout the Term of this Lease, without deduction or set-off, the Base Monthly Rent as specified in Section 1 in United States currency, over and above all other charges herein set forth. The installment of rent payable for any portion less than all of a calendar month shall be a pro-rata portion, assuming a 30-day month, of the rent payable for a full calendar month.

B.    Every installment of rent and every other payment due hereunder from Tenant to Landlord which shall not be paid within ten (10) days after the same shall have become due shall bear interest at the rate of one and one-half percent (1.5%) per month from that date whether or not demand be made therefore. It is also agreed that since collection of any amount past due imposes an administrative cost on Landlord, in addition to any fees of collection agents or attorneys or other out-of-pocket costs, Tenant will pay to Landlord a sum to reimburse Landlord for such administrative costs equal to four cents ($.04) for every dollar which is ten (10) days past due computed on the total amount of each billing or demand but not to exceed one such billing or demand per month. All rent shall be payable without demand, and without any deduction, offsets, or other credits.

All sums, if any, required to be paid by Tenant pursuant to the terms of this Section 7 and all other fees, assessments, expenses and charges required to be paid by Tenant pursuant to this Lease (except for the Base Monthly Rent), however denominated, including but not limited to Tenant's Share of Operating Costs,

8


LESSEE INITIAL
LESSOR INITIAL

shall be deemed Additional Rent.  If any Additional Rent is not paid at the time provided for in this Lease, such Additional Rent nevertheless shall be payable with the next installment of Base Monthly Rent falling due.

8.    **Cost-of-Living Adjustment to Rent:**

A.    The amount of the Base Monthly Rent set forth in Section 1 shall be adjusted annually as more fully described in Exhibit J attached hereto.

~~B.        Effective on the first day ("Adjustment Date") of each year of the Term, the Base Monthly Rent shall be increased by the percentage that the Consumer Price Index (the "Index") for the Los Angeles/Riverside/Orange County, CA area, All Urban Consumers (1982-1984 = 100), for the month nearest preceding the respective Adjustment Date has increased as compared with the Index published for the month nearest preceding: (a) the first month of the lease Term as to the first adjustment only, and (b) the preceding Adjustment Date, as to all subsequent adjustments.  If there is any material change in the method of calculation or formulation of the Index, or if the Index ceases to be published, then Landlord and Tenant shall mutually select another similar index, or if they cannot agree, the issue shall be resolved by arbitration pursuant to the Section entitled "General Provisions" hereof so as to achieve a cost of living adjustment most similar to that accomplished by the Index.  The Base Monthly Rent shall remain the same as the preceding lease year if there is a decrease in the Index.~~

9.    **Property Taxes:**

A.    **Real Estate Taxes:**

Subject to reimbursement by Tenant as hereinafter provided, Landlord shall pay all taxes, assessments and governmental charges levied upon or with respect to the Property, the Project, and all other improvements now existing or hereafter constructed on the Property which are applicable to the term of this Lease or any renewal hereof, and any tax or excise on rents or any other tax, however described, levied against Landlord on account of this Lease or the rent reserved hereunder; provided, however, that the term "real estate taxes" shall not include any franchise, estate, inheritance, succession, capital levy, net income or excess profits taxes imposed upon Tenant, or any rents received by Tenant.  The term "real estate taxes" shall also include all expenses reasonably incurred by Landlord in seeking reduction by the taxing authorities of real estate taxes applicable to the Property.

B.    **Taxes on Tenant's Property:**

Tenant shall be liable for and shall pay at least ten (10) days before delinquency, all taxes levied against any personal property or trade fixtures and equipment placed by Tenant in or about the Premises or, if the assessed value of the Landlord's Premises is increased by the inclusion of a value placed upon such personal property or trade fixtures of Tenant, pay all such additional taxes based upon such increased assessment.  If any such taxes are levied against Landlord or Landlord's property, Landlord shall give written notice to Tenant and Tenant shall pay the same within ten (10) days after receipt of such notice.  Landlord shall have the right to pay such taxes regardless of the validity of such levy, but only under proper protest if requested by Tenant.  Tenant shall repay to Landlord upon demand the full amount so paid.  In the event that Tenant should bring suit in any

9


LESSEE INITIAL
LESSOR INITIAL

court of competent jurisdiction to recover the amount of any taxes paid under protest, any amount so recovered shall belong to the Tenant.

10.    **Special Tenant's Expenses:**

Where any expense over and above normal operating expenses is incurred or paid by Landlord specifically for the benefit of a particular tenant, at the request of a particular tenant, such expense shall be charged directly against such particular tenant and shall not be included in operating expenses for the purposes of this Lease.

11.    **Permitted Use of Premises:**

A.    The Premises may be used and occupied only for the purposes set forth in Section 1 hereof and for no other purpose or purposes. No use shall be made of the Premises nor act done in or about the Premises, which is illegal, unlawful, or which would cause Landlord to be in violation of any regulation, law, order or obligation or which Landlord believes to be incompatible with the use or occupancy of any other tenant in the Project. No use shall be made of the Premises, which would cause the rate of any insurance carried by Landlord to be in-creased as the result of such use. In the event that the rate of any insurance carried by Landlord is increased as the result of Tenant's use, Tenant shall pay to Landlord within 10 days after Landlord delivers to Tenant a notice of such increase, the amount of such increase. Tenant shall not commit or allow to be committed any waste upon the Premises or the Common Areas, or any public or private nuisance or other act or thing which disturbs the quiet enjoyment of any other tenant in the Project. Notwithstanding anything contained herein to the contrary, the Premises may not be used in whole or part for any medical or medical treatment use.

B.    Tenant shall not use any apparatus, machinery or device which shall cause any substantial noises or vibration. Tenant shall not overload the plumbing, heating and air conditioning, electrical systems, or floors. Tenant shall not use and shall not allow any use of the Common Areas by its employees and visitors which interferes with the use of the Common Areas by any other tenant or their employees and visitors.

12.    **Services and Utilities:**

A.    **Landlord's Obligations:**

1)    Landlord shall furnish to the Premises, between the hours of 7:00 a.m. and 6: p.m. Monday through Friday and 9:00 a.m. and 1:00 p.m. Saturdays, and to the Common Areas, between the hours of 6:30 A.M. and 6:00 P.M. Monday through Friday, excluding -holidays, reasonable amounts of air conditioning, heating and ventilation. For purposes of this Lease, "holidays" means only the following days: Thanksgiving, Christmas, New Year's Day, Memorial Day, Independence Day, Labor Day. Tenant shall have access to the Project at all times and upon request from Tenant, and at Tenant's expense, Landlord shall have available heating and air conditioning for the Premises outside of the normal hours of service named herein at an hourly rate of $20.00.

2)    Landlord shall at all times furnish electrical service, reasonable amounts of electric current for normal lighting and fractional horsepower office machines, water for lavatory and drinking purposes, janitor service each day Monday through Friday, equivalent to that furnished in other office buildings in [Governor Park] San Diego, California and as further specified in Exhibit L, and exterior window washing as

10


LESSEE INITIAL
LESSOR INITIAL

Landlord deems necessary. Landlord shall replace fluorescent tubes in standard overhead fluorescent fixtures. Subject to reimbursement by Tenant in accordance herewith, Landlord shall pay all costs and expenses of maintaining, repairing, operating, and owning the Project, its parking areas, and other Common Areas, which costs and expenses shall include without limitation, the following:

(a)     insuring, sweeping, gardening, lighting, watering, and otherwise maintaining the landscaping, parking areas, and outside planters, sidewalks, driveways and sprinkler systems;

(b)     daily trash removal and sanitary control;

(c)     cleaning, repairing and replacing signs (other than those installed by Tenant);

(d)     employment of personnel used in connection with the operation and maintenance of the Project and improvements thereon, including without limitation bookkeeping, accounting and property management services, and parking and security guard personnel which may be employed or discontinued at any time at Landlord's sole discretion;

(e)     parking fees and other impositions levied or imposed by any governmental authority attributable to the common areas;

(f)     all other items reasonably necessary from time to time to properly repair, maintain and operate the Project and the Common Areas.

(3)     Subject to Paragraph 12.E. below, Landlord shall not be liable for any failure to furnish any services or utilities unless caused by the gross negligence or willful misconduct of Landlord, and Tenant shall not be entitled to any damages nor shall any such failure relieve Tenant of the obligation to pay the full rent reserved herein or constitute or be construed as a constructive or other eviction of Tenant.

B.     **Tenant's Obligations:**

Tenant shall pay for, prior to delinquency, all telephone and all other materials and services, not expressly required to be paid by Landlord, which may be furnished to or used in, on or about the Premises during the term of this Lease.

C.     **Utility Service:**

(1)     Premises.  Landlord shall pay for all electricity, gas and water as well as sewer and garbage collection which are furnished to the Premises. The electricity provided for Tenant's lighting, HVAC and other power needs shall be metered to the Project, or portion of the Project, and the costs thereof shall be specifically allocated to the Tenant for the purpose of determining any Additional Rent payable by Tenant under Section 15. Tenant's share to be determined by dividing the rentable square feet of the Premises by the occupied rentable square feet of the premises included in the Project meter. Other utilities shall be metered to the Project and the costs thereof, for the purpose of determining any Additional Rent payable by Tenant, shall be specifically allocated to the tenants in the Project including Tenant, in accordance with each tenant's pro rata share of such costs; such pro rata share to be determined by dividing the rentable square feet of the respective leasehold interest of each such tenant by the rentable square footage of the Building.

11



LESSEE INITIAL

LESSOR INITIAL

(2)    Common Areas:  Tenant shall also pay as Additional Rent a pro-rata share of the cost of all utility services required for the Common Areas of the Project including but not limited to electricity; gas and water for the service of the interior building systems and exterior areas and power for the elevator, exterior lighting, equipment and other project systems.

(3)    Common Costs: Where such services are supplied by common meter or other method of billing and no allocation by the utility supplying services is made among tenants of the Project, such charges to be paid by the tenant for the use of such utilities within the Project shall be determined by Landlord in accordance with the percentage for allocating operating expenses as shown in Section 1 or with such other reasonable scheme of allocation taking into account the extent of use of the same by Tenant in comparison with all others using such service and any other factor which Landlord believes will result in an overall fair allocation of the cost of such service, and any such determination made by Landlord in good faith shall be final and binding on Tenant and not be subject to arbitration.  All charges so allocated shall also be payable as Additional Rent.

D.    **Tenant's Additional Requirements:**

Tenant shall not use any apparatus or device in the Premises, including, without limitation, electronic data processing machines, computers and reproduction equipment, which will in any way increase the amount of electricity or water usually furnished or supplied for use of the Premises as general office; nor connect with electric current, except through existing electrical outlets in the Premises, or water pipes, any apparatus or device for the purposes of using electric current or water, without the prior written consent of Landlord, which written consent shall not be unreasonably withheld, and provided Tenant agrees to pay for the costs of extra services including installation, maintenance, and utility expenses.

E.    **Non-Liability:**

Landlord shall not be liable for, and Tenant shall not be entitled to any abatement or reduction of rent by reason of Landlord's failure to furnish any of the foregoing services.  Landlord shall not be liable under any circumstances for loss of or injury to property, however occurring, through or in connection with or incidental to failure to furnish any of the foregoing.  However, Landlord shall abate Tenant's rent in the event that utilities are not furnished for more than 72 consecutive hours during any Monday through Friday or consecutive Monday through Friday periods.

13.    **Repairs and Maintenance:**

A.    **Landlord's Obligations:**

(1)    Subject to the provisions of the Section 17 entitled "Damages to Premises" and subject to reimbursement by Tenant as provided under Section 15 hereof, Landlord shall keep in good order, the Project, the Common Areas, and the Premises, including the plumbing, heating and air conditioning, and electrical systems, lighting fixtures, elevator, windows, floors and floor coverings (except any carpeting and other floor covering installed by Tenant or as part of the initial Tenant Improvements), but excluding any improvements, fixtures, equipment or personal items installed by Tenant.  Landlord shall use commercially reasonable efforts to diligently and timely commence and pursue the completion of repairs under this Section after receipt of written notice of the need for such repairs.  If Landlord fails to complete the repairs within thirty (30) days after receipt of the notice or fails to initiate the repairs within such thirty (30) day period, then except as otherwise expressly provided for



LESSEE INITIAL

LESSOR INITIAL

herein, Tenant may incur any reasonable expense necessary to perform the covenants or agreements, including commencement of completion of repairs at Tenant's own expense, and seek reimbursement from Landlord by written demand accompanied by documentation evidencing the expense. If Landlord fails to reimburse Tenant for such expense within fifteen (15) days after receipt of Tenant's written demand, then Tenant shall pursue its rights by following the procedure set forth in Section 22. Notwithstanding the remedies for breach of Lease and default by Landlord, Tenant expressly waives the benefits of any statute now or hereinafter in effect, including, but not limited to, Sections 1941 and 1942 of the California Civil Code (as amended or recodified from time to time), which affords Tenant the right to make repairs at Landlord's expense or terminate this Lease because of Landlord's failure to keep the Premises in good order, condition and repair. Where reasonable and practical, Landlord shall cause such repairs and maintenance to be done so as to minimize the interference with Tenant's normal operation of business.

(2)   All repairs to the structure of the Project, to the central systems serving the Project and to the Common Areas in the Project necessary to maintain the same in good condition shall be done by or under the direction of Landlord and at Landlord's expense except as otherwise specifically provided herein, and Landlord or its designees may enter the Premises at all reasonable times to make such repairs upon notice to Tenant.

B.      **Tenant's Obligations:**

Subject to the provisions of the Section entitled "Damages to Premises" hereof and except as otherwise expressly provided in Subsection A. of this Section, Tenant at its sole cost and expense shall keep in good order, condition and repair the Tenant Improvements installed by or for Tenant pursuant to the Section entitled "Tenant Improvements" hereof and any improvements installed by Tenant after the Commencement Date. Without limiting the foregoing, Tenant shall maintain and repair all interior walls and partitions, all floor, wall and window-coverings, and false (or "dropped") ceilings and doors which are installed as part of the Tenant Improvements. Tenant shall also maintain and repair all of Tenant's furnishings, trade fixtures and equipment.

(1)   Tenant shall pay the cost of remedying damage or injury done to the Premises by Tenant or by any persons who may be in or upon the Premises. Tenant shall pay for remedying damage to the Project caused by Tenant's misuse of the Premises or the appurtenances thereto, less any insurance proceeds realized by Landlord. Tenant shall pay for the maintenance, repair or replacement of any component or portion of the Project which is damaged or broken by Tenant, its employees, agents or invitees.

(2)   Landlord shall have the right to charge Tenant for the full cost of any repairs occasioned by the negligence or misconduct of Tenant, or Tenant's employees, guests, or subtenants.

14.      **Alterations:**

A.      Tenant shall not add, disturb or in any way change any locks on doors, plumbing, heating and air conditioning, electrical systems including power panels or wiring, lighting fixtures, communication systems and security and/or fire protection systems, if any, or make any other alterations, additions or improvements to the Premises without Landlord's prior written consent. Landlord shall not unreasonably withhold such consent so long as repairs, alterations or improvements are consistent with the intended design, purpose and use of Project and are usual and customary for normal office use.

B.      All construction, additions and alterations by Tenant shall be done in a good and workmanlike manner and shall conform to all applicable governmental laws, rules and regulations and to the terms and

13


LESSEE INITIAL
LESSOR INITIAL

conditions of the Standards and Allowances (Exhibit C), and Rules and Regulations (Exhibit E), and shall be performed in accordance with the requirements of Section 3.A.(3) unless at Landlord's sole discretion, this condition is waived in writing. Tenant shall furnish complete plans and specifications and a building permit covering the desired additions or alterations when applying for any such consent. Before commencing construction of any improvements in the Premises, Tenant will pay to Landlord in cases in which Landlord lacks knowledge of feasibility of repairs, maintenance or alterations a reasonable fee equal to Landlord's actual cost for review and approval of said plans and specifications, including any fees charged by an architect or engineer employed by Landlord for such review. Landlord shall have the right to approve any contractor performing alterations in the Premises on behalf of Tenant and Tenant shall provide Landlord with not less than ten (10) business days written notice prior to commencement of any alterations in order to provide Landlord the opportunity to post appropriate notices of non-responsibility.

C.      Tenant shall pay when due all claims for labor and materials furnished to the Premises. Landlord may require Tenant to provide labor and material and completion bonds in forms and amounts satisfactory to Landlord. Landlord may elect to record and post notices of non-responsibility on the Premises and Tenant shall give Landlord adequate time prior to commencement of any work in order to satisfy all applicable statutory requirements for the effectiveness of such notices.

D.      Tenant shall not add, disturb or in any way change the window coverings or put any curtains, draperies or other hangings on or beside the windows in the Premises without first obtaining Landlord's consent.

E.      Landlord may make any alterations or additions which Landlord may deem necessary for the preservation, safety or improvement of the Premises or the Building or to comply with any laws, codes, regulations or ordinances now or hereafter in effect.

15.   **Additional Rent:**

A.    **Landlord's Expense Stop:**

Tenant shall pay to Landlord as Additional Rent in addition to the Base Monthly Rent provided in Section 7, Tenant's pro-rata portion of (a) the amount (if any) by which the total cost of the items described in Sections 12, 13, 14 and 19 of this Lease, entitled "Services and Utilities," "Repairs and Maintenance", "Alterations" and "Insurance", excluding Utility Expenses (as hereinafter defined) (the cost of all such items excluding Utility Expenses is collectively referred to herein as "Operating Expenses"), in each calendar year exceeds actual Operating Expenses for the Base Year (b) the amount (if any) by which the total cost of the items described in Section 9(A) of this Lease, entitled "Real Estate Taxes" (the cost of all such items is collectively referred to herein as "Real Estate Taxes") in each calendar year exceeds the actual Real Estate Taxes for the Base Year, and (c) the amount (if any) by which Utility Expenses in each calendar year exceeds actual Utility Expenses for the Base Year. For purposes of this Section, "Utility Expenses" shall mean the cost of all electricity, gas, sewers, oil and other utilities, including any surcharges imposed, serving the Premises, the Building or any part thereof that are not separately metered or impositions levied, assessed or imposed upon the Premises, the Building or any part thereof, and the cost of operating, maintaining, repairing, renovating and managing the utility systems. Landlord and Tenant have agreed that those particular items excluded from Operating Expenses are those listed in the attachment entitled: "Items Excluded From Operating Expenses". The foregoing amounts payable by Landlord are collectively called "Landlord Expenses." The amount of Additional Rent payable by Tenant shall be determined by first determining the amount which the Landlord Expense exceeds the Landlord's Expense Stop. The Tenant's share shall then be determined by multiplying the amount

14


LESSEE INITIAL
LESSOR INITIAL

of such excess by Tenant's percentage for allocation of operating expenses of Project or Building set forth in Section 1 and as further defined in Section 12(C)1. All Operating Expenses, and utility expenses shall be adjusted to reflect a minimum of 95% occupancy. Notwithstanding anything to the contrary contained herein, the aggregate Controllable Operating Expense, as that term is defined below, shall not increase more than five percent (5%) in any calendar year (noncumulative) over the maximum amount of Controllable Operating Expense chargeable for the immediately preceding calendar year, with no limit on the Controllable Operating Expense during the Base Year (i.e., the actual Controllable Operating Expense for the Base Year shall be the maximum amount for the Base Year for purposes of this provision). "Controllable Operating Expense" shall mean all Operating Expenses as described above excluding insurance, real estate taxes and utilities.

Tenant shall not be subject to any Operating Expense for the first twelve (12) calendar months following the Commencement Date.

(1)    . So called "capital" repairs and replacements (i.e., "depreciable" assets) shall be amortized and included in calculating the Landlord Expenses, except that the initial construction pursuant to the Section entitled "Tenant Improvements" hereof shall not be included. "Capital" repairs and replacements shall not include the cost of assets which Landlord shall have reasonably expected to be necessary for the operation of the Project, but shall include the replacement and repair of "capital" assets, except additions and enhancements which do not benefit Tenant's occupancy, as said items are required during the term of the Lease.

(2)    Insurance proceeds, damage awards and similar amounts (but excluding rents) received by Landlord in the nature of reimbursement for Landlord Expenses, if any, shall be deducted in calculating the Landlord Expenses.

(3)    Tenant understands and agrees that Landlord may hire a property management and/or maintenance company (which may be affiliated with Landlord or one of Landlord's partners) to perform some or all of Landlord's duties under this Lease, and the actual reasonable expenses incurred by such manager and/or maintenance company, plus a total fee of not more than four percent (4%) of the gross collected income rents from the Project, shall be included as Landlord Expenses. Any charges for other services performed or materials required or requested by Tenant which are provided by Landlord or an entity controlled by Landlord shall be included as part of Landlord Expenses, not to exceed their reasonable cost.

B.    **Estimate and Payment:**

Landlord shall give Tenant a written estimate of the total Landlord Expenses prior to commencement of this Lease for the initial pro-rata calendar period, and prior to the commencement of each calendar year during the Lease Term and the amount, if any, payable by Tenant as Additional Rent pursuant to this Section and the method of calculation thereof. Tenant shall pay such Additional Rent in equal monthly installments in advance, along with its Base Monthly Rent payment. Within ninety (90) days after the end of each calendar year (or such shorter interval as Landlord shall select), Landlord shall furnish to Tenant a statement showing in reasonable detail the actual Landlord Expenses incurred for the year in question and the actual Additional Rent due for such year. In the event that the estimated Additional Rent payments made by Tenant during the calendar year were less than the actual Additional Rent due for such year, then within thirty (30) days after Tenant's receipt of Landlord's statement, Tenant shall pay to Landlord the difference between the estimated Additional Rent payments made by Tenant and the actual Additional Rent owed by Tenant. In the event that the Additional Rent payments made by Tenant exceeded the actual Additional Rent owed by Tenant, the difference shall be credited

-15-


LESSEE INITIAL
LESSOR INITIAL

by Landlord against the rent next due and owing from Tenant; provided that, if the Lease Term has expired, Landlord shall accompany said statement with payment for the amount of such difference.

C.      **Supplemental Estimate:**

In the event Landlord shall determine at any time (after the first twelve (12) months of the Term) or from time to time that the payment of Additional Rent based upon the estimate of the total Landlord Expenses for the current lease year is, or will become, inadequate to pay all Landlord Expenses, Landlord may determine the approximate amount of such inadequacy and issue a supplemental estimate as to the total Landlord Expenses and Additional Rent, and Tenant shall pay such increase in the estimated Additional Rent as reflected by such supplemental estimate in equal payments over the remainder of the calendar year.

D.      **Books:**

Landlord shall keep or cause to be kept separate and complete books showing the method of calculating Landlord Expenses and Additional Rent, and shall preserve the same for at least two (2) calendar years after the close of the calendar year to which the Landlord Expenses and Additional Rent pertain. Tenant, through Tenant's agent, representative, internal auditor, or any certified public accountant or other qualified individual designated by Tenant, shall have the right to examine and/or audit the books and other documents mentioned above evidencing such costs and expenses, with or without, at Tenant's sole option, both Landlord's third-party management company property manager and bookkeeper assigned to the Property in attendance, conducted during reasonable business hours, and not more frequently than quarterly. Any such audit shall be at Tenant's expense. In no event shall Tenant have access to Landlord's tax returns. Any dispute between Landlord and Tenant with regard to Landlord's calculations described herein shall be resolved within three (3) days of the such examination to Tenant's satisfaction, or otherwise by arbitration pursuant to Section 34.0. of this Lease."

16.     **Inspection of Premises:**

Upon prior notice of at least 24 hours, except in the case of emergencies where notice shall not be required, Landlord and Landlord's employees, agents, brokers, janitors, workers and engineers shall have the right to enter the Premises at all reasonable times, during normal business hours or otherwise. Landlord shall retain a passkey to the Premises to enable Landlord and its employees, agents, brokers, janitors, workers and engineers to enter, inspect, maintain and repair the Premises, and during the last twelve (12) months of the Term, for the purpose of showing the Premises to brokers, agents, buyers, tenants or other persons interested in purchasing or leasing the Premises.

17.     **Damages to Premises:**

A.      Landlord shall use commercially reasonable efforts to repair the Premises or the Project of which the Premises are a part in the event that either is damaged as a result of any cause other than the perils covered by the fire and extended coverage insurance carried by Landlord on the Project, and provided the extent of the damage is less than twenty-five percent (25%) of the then full replacement cost of said Premises or Project, as applicable. In the event the damage to the Premises or the Project is greater than twenty-five percent (25%) of the then full re-placement cost, Landlord shall have the option: (1) to repair or restore such damage, this Lease continuing in full force and effect, but the rent to be proportionately reduced as hereinabove in this Section provided; or (2) give notice to Tenant at any time within sixty (60) days after such damage terminating this Lease as of the date specified in such notice, which date shall be no less than thirty (30) days and no more than sixty (60)



LESSEE INITIAL

LESSOR INITIAL

days after the giving of such notice. In the event of such notice, this Lease shall terminate on the date specified in such notice and be of no further force or effect except with respect to any obligations under this Lease that expressly survive termination, including without limitation, Tenant's indemnity obligations and Tenant's obligations in connection with its move from the Premises Tenant shall pay rent, proportionately reduced based upon the extent to which such damage has materially interfered with the business carried on by the Tenant in the Premises, and all other amounts due under this Lease through the date Tenant vacates and surrenders the Premises to Landlord in the condition required hereunder. In the event damage to the Premises or the Project is greater than twenty-five percent (25%) of the then full re-placement cost, and Landlord elects to repair or restore such damage, then Landlord shall give written notice to Tenant at any time within sixty (60) days after such damage of Landlord's intention to restore, specifying the targeted length of time reasonably necessary to contract, mobilize, and complete the contemplated repairs and restoration. If the targeted length of time reasonably necessary to complete delivery of the repairs and restoration of the Premises is less than one-hundred and eighty (180) days, then Tenant shall have no rights with respect to termination of the Lease. If the targeted length of time reasonably necessary to complete delivery of the repairs and restoration of the Premises exceeds one-hundred and eighty (180) days, then Tenant shall have the right to terminate this Lease. Should Tenant so elect to terminate the Lease, Tenant shall notify Landlord in writing within ten (10) days of its intent. This notwithstanding, Landlord and Tenant within ten (10) days may elect and agree in writing to continue the Lease in full force and effect, and Tenant shall pay rent, proportionately reduced, and Landlord shall proceed with repairs and restoration of the Premises.

B.    Tenant shall not be entitled to any compensation or damages from Landlord for the loss of the use of the whole or any part of the Premises, for loss or damage to any of Tenant's fixtures or personal property, or for any loss or damage to Tenant's business or any other inconvenience occasioned by such damage or by any repair, reconstruction or restoration by Landlord, or by any failure of Landlord to make any repair, reconstruction or restoration under this Section or any other provision of this Lease.

18.    **Indemnity and Risk of Injury.** Tenant assumes all risk of personal injury or wrongful death or property damage occurring in the Premises unless caused by gross negligence or willful misconduct of Landlord. Tenant hereby agrees to indemnify, defend and save harmless Landlord from and against any and all claims for personal injury, wrongful death or property damage brought by or on behalf of third persons (including but limited to, officers, employees or agents of Tenant or Landlord) arising out of, caused by, occasioned by or resulting from any accident, fire, nuisance, or failure to maintain the Premises, except to the extent such injury or death or property damage is caused by the gross negligence or willful misconduct Landlord, or the failure of Landlord after reasonable written notice of a hazardous or dangerous defect or condition to repair the same. Without limitation, Tenant will indemnify, defend, and save harmless Landlord from and against any and all claims by or on behalf of any person or persons, firm or firms, corporation or corporations, arising from the conduct or management of any work or thing whatsoever done by Tenant in, about, or from transactions of Tenant concerning the Premises, and will further indemnify, defend and save Landlord harmless against and from any and all claims arising from any breach or default on the part of Tenant to be performed pursuant to the terms of this Lease, or arising from any act or negligence of Tenant or any of its agents, contractors, servants, employees, or licensees and from and against the costs, attorneys' fees, expenses and liabilities incurred in or about any such claim of any action or proceeding brought thereon.

19.    **Insurance:**

A.    **Fire and Extended Coverage:**

17



LESSEE INITIAL
LESSOR INITIAL

Landlord shall procure and at all times maintain a policy or policies of insurance covering loss or damage to the Project in the amount of the full replacement value thereof (exclusive of Tenant's trade fixtures, personal property and improvements, but including the initial Tenant Improvements), providing protections against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, sprinkler and/or air conditioning leakage and special extended peril (all-risk). Tenant shall procure and at all times maintain at its cost and expense, a policy or policies of insurance covering its fixtures, personal property and other improvements (other than initial Tenant Improvements) located on the Premises, in an amount not less than one hundred percent (100%) of their actual cash value from time to time during the term of this Lease, providing protection against any peril included within the classification Fire and Extended Coverage, together with insurance against sprinkler and/or air conditioning damage, vandalism and malicious mischief. The proceeds of such insurance, so long as this Lease remains in effect, shall be used to repair or replace the fixtures, equipment and improvements so insured. Landlord and selected agents determined by Landlord shall be named as an additional insured on each policy. In the event Tenant fails to procure the insurance required hereunder, Tenant shall be liable for the cause which would otherwise have been covered.

B.    **Liability:**

Tenant shall procure and at all times maintain at its cost and expense commercial general liability insurance, naming Landlord and selected agents determined by Landlord as additional insureds, in amounts not less than $2,000,000.00 combined single limit for bodily injury and death with $25,000.00 property damage coverage and worker's compensation insurance as required by law to protect Tenant's employees. The limit of such insurance shall not limit the liability of Tenant. Said insurance shall have a Landlord's Protective Liability endorsement attached thereto. All insurance required hereunder shall be with companies rated AAA+, or better in Best's Insurance Guide. Prior to the Commencement Date, Tenant shall deliver to Landlord certificates of insurance evidencing the existence and amounts of the insurance with loss payable clauses satisfactory to Landlord. In the event Tenant fails to procure and maintain such insurance, Landlord may (but shall not be required to) procure same at Tenant's expense after ten (10) days prior written notice to Tenant. No such policy shall be cancelable or subject to reduction of coverage or other modification except after thirty (30) days prior written notice to Landlord by the insurer. Tenant shall, within twenty (20) days prior to the expiration of such policies, furnish Landlord with renewals or binders, or Landlord may order such insurance and charge the cost to the Tenant, which amount shall be payable by Tenant upon demand. All such policies shall be written as primary policies, not contributing with and not in excess of coverage which Landlord may carry. Tenant shall have the right to provide such insurance coverage pursuant to blanket policies obtained by Tenant provided such blanket policies expressly afford coverage to the Premises, Project and adjacent areas and to Landlord and Tenant as required by this Lease.

C.    **Waiver of Subrogation:**

Landlord and Tenant each hereby waive any and all rights of recovery against the other or against the officers, employees, agents and representatives of the other, on account of loss or damage occasioned to such waiving party of its property or the property of others under its control caused by fire or any of the extended coverage risks described above to the extent that such loss or damage is insured against under any fire or extended coverage insurance policy which either Landlord or Tenant may have in force at the time of such loss or damage. Landlord and Tenant shall for each policy of insurance required under this Lease give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Lease.

20.    **Assignment and Subletting:**

-18-

LESSEE INITIAL

LESSOR INITIAL

Tenant shall not assign this Lease or sublet or encumber all or any portion of this Lease or the Premises, or any interest therein, or any right or privilege appurtenant thereto, or suffer any other person or entity to occupy or use the said Premises, or any portion thereof, without the prior written consent of Landlord. A consent to one assignment, subletting, occupation or use by any other person or entity shall not be deemed to be a consent to any subsequent assignment, subletting, occupation or use by another person. No consent shall be required for an assignment or sublet to any successor, subsidiary, affiliate or related company, however, Tenant shall notify Landlord, and Tenant agrees to execute any reasonable documentation required by Landlord to memorialize said assignment or sublease.

A.    If Tenant proposes to assign or sublet all or a portion of the Premises, Tenant shall submit in writing to Landlord; (1) the name of the proposed assignee or sub-tenant; (2) the nature of the proposed assignee's or sub-tenant's business to be carried on in the Premises; (3) the terms and provisions of the proposed assignment or sub-lease; and (4) such reasonable financial information as Landlord may request including, but not limited to, the current financial statement and financial statements for the preceding two years, concerning the proposed assignee or sub-tenant. Lack of response from Landlord after fourteen (14) days after receipt by Landlord of all Landlord requested information regarding the potential sublease and the Sublessee shall be deemed as Landlord's approval.

B.    If Tenant submits a written proposal for an assignment or subletting to Landlord, Landlord shall have the options to:

(1)    Approve or disapprove such assignment or sublease, which approval shall not be unreasonably withheld; or,

(2)    Sublet from Tenant that portion of the Premises which Tenant has requested to sublease at the rental rate and upon all the other terms set forth in this Lease for the term set forth in Tenant's notice; or

(3)    Terminate this Lease in the case of an assignment of this Lease or a sublease of fifty percent (50%) or more of the Premises which termination shall be effective thirty (30) days after Tenant's receipt of Landlord's notice.

If Landlord does not exercise its option to sublease the Premises or terminate this Lease, Tenant may enter into the proposed assignment or sublease subject to the conditions that the assignment or sublease shall be on the same terms as submitted to Landlord, and any rent or other economic consideration received by Tenant which exceeds the aggregate of the total rent which Tenant is obligated to pay under this Lease, plus any reasonable brokerage commissions, attorney's fees actually paid by Tenant, shall be shared equally between Landlord and Tenant and Landlord shall be paid within ten (10) days after receipt thereof as additional rental under this Lease without affecting or reducing any other obligation of Tenant hereunder.

C.    Tenant acknowledges that Landlord's disapproval of any proposed assignment or sublease shall be deemed reasonably withheld if based on any reasonable factor including, but not limited to, any or all of the following factors:

(1)    The contemplated use conflicts with the permitted use of Premises as specified in Section 11 of this Lease and/or the uses of other tenants in the Building;

19



LESSEE INITIAL

LESSOR INITIAL

(2)    The proposed assignee or subtenant has not established sufficient business reputation or experience to insure the operation of a successful business of the type proposed;

(3)    The present net worth of the proposed assignee or subtenant in Land-lord's reasonable business judgment is inadequate; or

(4)    The proposed assignment or sublease would likely result in significant increase in the use of the Common Areas.

D.    Any assignment or subletting which is not in compliance with this Section, shall be void and shall, at the option of Landlord, terminate Tenant's right to continue possession of the Premises.

## 21.    Subordination, Estoppel Certificate, Attornment:

### A.    Subordination:

This Lease shall be subject and subordinate to all ground or underlying leases which now exist or may hereafter be executed by Landlord affecting the Premises and to the lien of any mortgages or deeds of trust in any amount or amounts whatsoever now or hereafter placed on or against the Premises or on or against Landlord's interest or estate therein, or on or against any ground or underlying lease, without the necessity of the execution and delivery of any further instruments on the part of Tenant to effectuate such subordination; provided, however, that no lease, mortgage and/or deed of trust entered into after this Lease is executed shall be prior to this Lease unless it contains a "non-disturbance" clause providing that Tenant's rights and interest under this Lease shall be recognized so long as Tenant shall not be in default hereunder. Tenant covenants and agrees to execute and deliver upon demand without charge therefore such further instruments (such as a title company standard form subordination agreement) evidencing such subordination of this Lease to such ground or underlying leases and/or to the lien of any such mortgages or deeds of trust as may be required by Landlord.

### B.    Estoppel Certificate:

Tenant shall within seven (7) working days after receipt of a request from Landlord execute, acknowledge and deliver to Landlord a statement in writing (i) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect and the date to which the rent and other charges are paid in advance, if any), and (ii) acknowledging that there are not, to Tenant's knowledge, any uncured defaults on the part of Landlord here-under, or specifying such defaults if any are claimed and (iii) verifying any other information concerning this Lease as may be reasonably requested by a third-party lender or prospective purchaser. Any such statement may be conclusively relied upon by a prospective purchaser or encumbrancer of the Project. Tenant's failure to deliver such statement within such time will be conclusive upon Tenant (i) that this Lease is in full force and effect without modification except as may be in Landlord's performance, and (ii) that no rent has been paid in advance. If Landlord desires to sell, finance or refinance the Premises or any part thereof, Tenant hereby agrees to deliver to Landlord such financial statements of Tenant as may be reasonably required by such purchaser or lender. All such financial statements shall be received by Landlord in confidence and shall be used only for the purposes herein set forth.

### C.    Attornment:

20



LESSEE INITIAL

LESSOR INITIAL

In the event any proceedings are brought for default under any ground lease or any underlying lease or in the event of foreclosure or the exercise of the power of sale under any mortgage or deed of trust made by Landlord covering the Project, or in the event of any other transfer of the Project by Landlord, the Tenant shall attorn to Landlord's successor in interest and recognize such successor as the Landlord under this Lease. Notwithstanding the foregoing, said assignment shall only be effective if such successor in interest recognizes that the Lease is in full force and effect, providing there is no default hereunder.

### D.    Non-Disturbance:

If in the future there is a lender on the property, and the lender requests that Tenant subordinate its interest in the Lease to the lien of the mortgage and/or deed of trust, then the Landlord shall obtain a Non-Disturbance Agreement from such lender for the benefit of Tenant. The Non-Disturbance Agreement shall contain a "non-disturbance" clause providing that Tenant's rights and interest under this Lease shall be recognized so long as Tenant shall not be in default hereunder. Concurrently, Tenant covenants and agrees to execute and deliver upon demand without charge therefore such further instruments (such as a title company standard form subordination agreement) evidencing such subordination of this Lease to the lien of any such mortgages or deeds of trust as may be required by Landlord.

### 22.    Default and Remedies:

### A.    Default:

The occurrence of any of the following shall constitute a material default and breach of this Lease by Tenant:

(1)    Any failure by Tenant to pay the rent or Additional Rent or any other monetary sums required to be paid when due;

(2)    The abandonment or vacation of the Premises by Tenant only if Tenant ceases to pay Base Monthly Rent and Additional Rent per the terms of the Lease. "Abandonment" for the purposes of this Section includes, but is not limited to, any absence of Tenant from the Premises for five (5) consecutive business days or more while in default under any other provision of this Lease;

(3)    Any failure by Tenant to observe any other provision of this Lease to be observed or performed by Tenant, where such failure continues for ten (10) days after written notice thereof by Landlord to Tenant; provided, however, that if the nature of the default is such that the same cannot reasonably be cured within said ten-day period, Tenant shall not be deemed to be in default if Tenant shall within such period commence such cure and thereafter diligently prosecute the same to completion;

(4)    The making by Tenant of any general assignment or general arrangement for the benefit of creditors;

(5)    The filing by or against Tenant of a petition to have Tenant adjudged as bankrupt or of a petition for reorganization or arrangement under any law relating to bankruptcy unless, in the case of a petition of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, possession is not restored to Tenant within thirty (30) days; or



LESSEE INITIAL

LESSOR INITIAL

(6)    The attachment, execution, or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where such seizure is not discharged within thirty (30) days.

All notices given pursuant to this Section 22 shall be in lieu of, and not in addition to, the notices required under the California Code of Civil Procedure Sections 1161, et seq.

B.    **Reentry:**

In the event of any material default and breach of this Lease by Tenant, Landlord shall have, in addition to any other rights or remedies provided hereunder or by law or in equity, the immediate right of reentry without notice and may remove all persons and property from the Premises; such property may be removed and stored in any other place in the Project in which the Premises are situated, or in any other place, for the account of and at the expense and at the risk of Tenant. Tenant hereby waives all claims for damages which may be caused by the reentry of Landlord and taking possession of the Premises or removing or storing the furniture and property as herein provided, and will save Landlord harmless from any loss, costs or damages occasioned by Landlord thereby. No such reentry shall be considered or construed to be a forcible entry, or shall be considered or construed to be an election by Landlord to terminate this Lease unless a written notice of such intention be given to Tenant or unless the termination is by court order.

C.    **Landlord's Remedies:**

(1)    In the event of any material default and breach of this Lease, Landlord may, at Landlord's option, terminate this Lease and Tenant's right to possession. On such termination, Landlord may exercise any and all rights available to a Landlord under the laws of the State of California, including, without limitation, the right to recover from Tenant all damages authorized under the provisions of the California Civil Code, as amended or recodified from time to time. The damages Landlord may recover include:

(a)    The worth at the time of award of the unpaid rent which had been earned at the time of termination;

(b)    The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided;

(c)    The worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss for such period that Tenant proves could be reasonably avoided; and,

(d)    Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform his obligations under this Lease, or which in the ordinary course of things would be likely to result therefrom.

(e)    At Landlord's election, such other amounts in addition to or in lieu of the foregoing which may be permitted by law at the time of such material default and breach of this Lease.



LESSEE INITIAL

LESSOR INITIAL

(2)    In the event of any material default and breach of this Lease, Landlord may, at Landlord's option, pursue the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has right to sublet or assign, subject only to reasonable limitations).

The following do not constitute a termination of Tenant's right to possession:

(a)    Acts of maintenance or preservation or efforts to relet the property.

(b)    The appointment of a receiver at the initiative of Landlord to protect its interest under this Lease.

(3)    In the event of any material default and breach of this Lease, Landlord may, at Landlord's option, pursue any other remedy now or hereafter available to Landlord under the laws or judicial decisions of the state in which the Premises is located.

(4)    Any rent subsequent to the time of award to which Landlord is entitled under this Lease shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award plus one percent.

D.    **Defaults by Landlord:**

Notwithstanding anything to the contrary in this Lease, Landlord shall not be deemed to be in default under any provision of this Lease unless written notice specifying such default is mailed to Landlord, and to all mortgagees and/or trust deed holders (limited to three) of which Tenant has, prior to such notice, been notified in writing. Tenant agrees that Landlord and any such mortgagee or trust deed holder (limited to three) shall have the right to cure such default on behalf of Landlord within thirty (30) days after receipt of such notice, or within a reasonable time if default cannot be cured within thirty (30) days. Tenant further agrees not to invoke any of its remedies under this Lease until said thirty (30) days plus additional reasonable time have elapsed, as long as Landlord has commenced with corrective action to cure.

23.    **Condemnation:**

A.    If the whole of the Premises shall be condemned and taken, then this Lease shall terminate.

B.    If a part only of the Premises is condemned and taken and the remaining portion thereof is not suitable for the purposes of which Tenant has leased said Premises, Tenant shall have right to terminate this Lease. If by such condemnation and taking a part only of the Premises is taken, and the remaining part thereof is suitable for the purposes for which Tenant has leased Premises, this Lease shall continue, but the rental shall be reduced in an amount proportionate to the value of the portion taken as it relates to the total value of the Premises.

C.    Should the whole or any part of the Premises be condemned and taken, all awards payable based on the fair market value of the leasehold estate or remainder interest on account of such condemnation and taking shall be payable to Landlord. Any award payable on account of the relocation of Tenant's business or payable as the result of Tenant's loss of goodwill shall be payable to Tenant.

23


LESSEE INITIAL
LESSOR INITIAL

## 24.    Costs and Attorney's Fees:

A.      If Tenant or Landlord shall bring any court action or arbitration proceeding for any relief against the other, declaratory or otherwise, arising out of this Lease, including any suit by Landlord for the recovery of rent or possession of the Premises, the losing party shall pay the successful party a reasonable sum for attorneys' fees which shall be deemed to have accrued on the commencement of such action and shall be paid whether or not such action is prosecuted to judgment.

B.  .    Should Landlord, without fault on Landlord's part, be made a party to any litigation instituted by Tenant or by any third party against Tenant, or by or against any person holding under or using the Premises by license of Tenant, or for the foreclosure of any lien for labor or materials furnished to or for Tenant or any such other person otherwise arising out of or resulting from any act or transaction of Tenant or of any such other person, or should Landlord bring any action, motion or proceeding to protect or enforce Landlord's rights in connection with any bankruptcy or insolvency proceeding, Tenant covenants to pay and save and hold Landlord harmless from any judgment rendered against Landlord or the Premises or any part thereof, and to pay all costs and expenses, including reasonable attorneys' fees within thirty (30) days from which such expense and fees are incurred by Landlord in connection with such litigation.

## 25.    Quiet Enjoyment:

Landlord covenants and agrees with Tenant that upon Tenant paying rent and other monetary sums due under this Lease, performing its covenants and conditions under this Lease and, if applicable, upon recognizing purchaser as Landlord pursuant thereto, Tenant shall and may peaceably and quietly have, hold and enjoy the Premises for the Term in accordance with the terms of this Lease.

## 26.    Rules and Regulations:

Tenant shall observe and comply with the Rules and Regulations attached hereto which are made part hereof, and with such further reasonable rules and regulations as Landlord may prescribe, on written notice to Tenant, for safety, care and cleanliness of the Project and the comfort, quiet and convenience of other occupants of the Project. Landlord shall not be responsible to Tenant for the non-performance by any other Tenant or occupant of the Project of any of said Rules and Regulations.

## 27.    Surrender of Premises:

At the expiration or sooner termination of this Lease, Tenant will surrender and deliver up possession of the Premises to Landlord, including all improvements made or placed therein by Tenant, in as good condition as Tenant received the Premises at the commencement of the Term, ordinary use and wear excepted; provided, however, that if Landlord shall so require by notice thereof to be given prior to the end of the term hereof, Tenant shall remove prior to the termination of this Lease all signs and trade fixtures erected or placed upon the Premises, and on such notice shall also remove any improvements made or placed by Tenant in the Premises, as specified in such notice by Landlord, and Tenant shall replace and repair all damage to the Premises caused by or resulting from such removal and leave the Premises in a clean and orderly condition. In the event Tenant shall fail to perform such removal and/or restoration, Landlord may do so and Tenant, upon demand, shall pay to Landlord the cost thereof, plus interest at the rate of one and one-half percent (1.5%) per month from the date the same be demanded by Landlord until paid. This obligation shall survive the termination of this Lease. Any


_____ LESSEE INITIAL

_____ LESSOR INITIAL

property left upon the Premises by Tenant at the termination of this Lease may, at the option of Landlord (a) be removed and stored by Landlord, at the cost of and for the account of Tenant, or (b) be deemed and declared by Landlord to have been abandoned by Tenant, in which case Landlord may appropriate, destroy or dispose of the same without liability or accountability to Tenant but only after written notice to Tenant.

28.    **Waiver:**

Landlord's failure to take advantage of any default or breach of covenant on the part of Tenant shall not be construed as a waiver thereof, nor shall any custom or practice which may grow up between the parties in the course of administering this instrument be construed to waive or to lessen the right of Landlord to insist upon the performance by Tenant of any term, covenant or condition hereof, or to exercise any rights given to Landlord on account of any such default. A waiver by Landlord of a particular breach of default shall not be deemed to be waiver of the same or any other subsequent breach or default. The acceptance of rent hereunder shall not be, or be construed to be, a waiver of any breach of any term, covenant or condition of this Lease.

29.    **Notice and Addresses:**

Any notice from Landlord to the Tenant or from the Tenant to Landlord shall be deemed duly served if mailed by regular, registered or certified mail addressed to the Tenant at the Premises, whether or not Tenant has departed from, vacated or abandoned the Premises, or to Landlord at the place from time to time established for the payment of rent, and the customary registered or certified mail receipt or declaration of mailing shall be conclusive evidence of such service. Personal delivery of any notice to the office of Landlord or Tenant shall also constitute proper service of notice. Notice shall be deemed given when received or forty-eight (48) hours after mailing, whichever is earlier.

30.    **Holding Over:**

If Tenant shall remain in possession of the Premises, with Landlord's written consent, after the expiration or sooner termination of the term of this Lease, all the terms, covenants and agreements hereof shall continue to apply and bind Tenant so long as Tenant shall remain in possession, insofar as the same are applicable, the Base Monthly Rent shall be equal to the rent paid under the lease as of the last day of the term of the lease for the first sixty (60) days. Thereafter, Tenant shall pay rent at one hundred twenty five percent (125%) of prior rate. If Tenant remains in possession with Landlord's written consent, such tenancy shall be a month to month tenancy, terminable by either party upon thirty (30) days notice.

31.    **Public Safety Alterations:**

If Landlord is required to make any modifications or additions to the Project or its components by any governmental authority due to any changes in any building, fire or other code, law or ordinance respecting public safety, then, beginning with the month following completion of such modifications and continuing during each month of this Lease and any renewal or extension thereof, Tenant's Base Monthly Rent shall be increased by 1/12 of Tenant's proportionate share of the annual maintenance cost of such modifications.

32.    **Hazardous Materials:**

Pursuant to California Health & Safety Code 25359.7, as amended or recodified from time to time, Landlord notifies Tenant that Landlord knows or has reasonable cause to believe that certain hazardous substances,

25


LESSEE INITIAL
LESSOR INITIAL

including without limitation, common cleaning supplies, office supplies, and consumer products, may have come to be located on the Premises. Tenant releases and indemnifies Landlord from all costs, expenses and attorney's fees incurred in connection with or in defense of any "Environmental Claim" arising from or seeking to impose liability under or because of any federal, state or local environmental law, statute, regulation, or common law principal relating to public health or safety or the use or control of the environment. Tenant shall be permitted the right to bring upon the Premises small amounts of common cleaning supplies, office supplies, and consumer products used in the normal course of Tenant's business that are legal for such use, but are or contain hazardous materials. Other than common cleaning and office supplies, Tenant shall not use, store, or dispose of any hazardous material in or about the Premises or the Project without the express written consent of Landlord, and then shall only use, store, or dispose of such hazardous materials in accordance with all laws regulating the same. Notwithstanding the consent of Landlord, Tenant shall be responsible for all costs incurred in connection with the removal of any hazardous material and to correct any contamination or damage caused thereby. Tenant shall indemnify and hold Landlord harmless as provided herein from any liability caused by Tenant's use, storage or disposal of any hazardous material, or from Tenant's failure to fully remove and correct any contamination and damage resulting from the presence of such hazardous material. This clause shall survive the termination of this Lease.

33.    **Security Measures:**

Tenant acknowledges that the Base Monthly Rent does not include the cost of any security measures for any portion of the Premises, that Landlord shall have no obligation to provide any such security measures, and that Landlord has made no representations to Tenant regarding the safety or security of the Premises. If Landlord should provide any security measures at any time, Landlord shall not be obligated to continue to provide such security measures, and Landlord shall have no obligation to provide such security measures with any particular standard of care. Tenant assumes all responsibility for the security and safety of Tenant and any of its agents, servants, employees, licensees, or invitees even if such damage, loss or injury is caused by a result from a criminal or negligent acts of third parties.

34.    **General Miscellaneous Provisions:**

A.    **Definitions; Joint Obligation; Etc.:**

The words "Landlord" and "Tenant" as used herein shall include the plural as well as the singular. Words used in masculine gender include the feminine and neuter. If there is more than one Tenant, the obligations hereunder imposed upon Tenant shall be joint and several. The titles to the Sections of this Lease are not a part of this Lease and shall have no effect upon the construction or interpretation of any part hereof.

B.    **Time of Essence:**

Time is of the essence in this Lease and each and every provision hereof.

C.    **Effectiveness:**

Submission of this instrument for examination or signature by Tenant does not constitute a reservation of or option for Lease, and it is not effective as a Lease or otherwise until execution and delivery by both Landlord and Tenant.


LESSEE INITIAL
LESSOR INITIAL

D.    **Interest Charge:**

Any amount due from Tenant to Landlord hereunder which is not paid within ten (10) days after same is due shall bear interest at the rate of eighteen percent (18%) per annum from the due date until paid, provided that in no case shall such rate be greater than the maximum amount of interest permitted by applicable law.

E.    **Exhibits:**

Addendums, amendments, exhibits, clauses, plats and riders, if any, signed or initialed by Landlord and Tenant or an authorized representative of Tenant and endorsed on or affixed to this Lease are a part hereof, and in the event of variation or discrepancy, the duplicate original hereof, including such addendums, amendments, exhibits, clauses, plats and riders held by Landlord shall control.

F.    **Invalidity:**

Any provision of this Lease which shall prove to be invalid, void, or illegal shall in no way affect, impair or invalidate any other provision hereof and such other provisions shall remain in full force and effect.

G.    **California Law:**

This Lease shall be governed by and construed pursuant to the laws of the State of California.

H.    **Recording:**

This Lease or a memorandum of this Lease may be recorded at Landlord's option.

I.    **Authority:**

If Tenant is a corporation, partnership or limited liability company, each individual executing this Lease on behalf of said corporation, partnership or limited liability company, represents and warrants that Tenant is a duly formed and existing entity qualified to do business in the state in which the Project is located and he or she is duly authorized to execute and deliver this Lease on behalf of said corporation, partnership or limited liability company, (in accordance with a duly adopted resolution of the Board of Directors if Tenant is a corporation), and that this Lease is binding upon said corporation, partnership or limited liability company, as applicable, in accordance with its terms.

J.    **Successor:**

All of the covenants, agreements, terms and conditions contained in this Lease shall apply to, accrue to and be binding upon Landlord and Tenant and their respective heirs, executors, administrators, successors and assigns.

K.    **Liens:**

Tenant shall keep the Premises free from any liens or encumbrances arising out of any work performed by Tenant, materials furnished by Tenant or obligation incurred by Tenant.

27


LESSEE INITIAL
LESSOR INITIAL

L.   **Limited Liability**:

In the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of the Lease, Tenant shall look solely to Landlord's interest in the Project for the satisfaction of Tenant's remedies for the collection of judgment (or any other judicial process requiring the payment of money by Landlord), and no other property or assets of Landlord shall be subject to levy, execution, or other enforcement procedure for the satisfaction of Tenant's remedies; Tenant acknowledges that the obligations of Landlord under this Lease do not constitute personal obligations of the individual partners, directors, officers, shareholders, members or trustees of Landlord, and Tenant shall not seek recourse against the individual partners, directors, officers, shareholders, members or trustees of Landlord or any of their personal assets for satisfaction of any liability under this Lease. Notwithstanding anything to the contrary contained in this Lease, in no event shall Landlord be liable under any circumstances for any consequential damages, including without limitation, lost profits.

M.   **Signs**:

Tenant shall not place or permit to be placed in or upon the outside of the Project or any other place visible to the public any signs, notices, or displays of any type without the prior written consent of Landlord as to the size, color, material, and placement thereof. Landlord shall have the right to establish uniform sign standards for the Property, and to re-quire standard window coverings for all windows.

Landlord, at Landlord's sole cost and expense, shall provide Tenant with building standard door signage and one (1) directory listing on the building's directory.

Notwithstanding anything above, Tenant shall have the right to one (1) non-exclusive space in the existing monument sign at the front of the building. All costs associated with permitting by the City of San Diego, fabrication, installation, operating, maintenance and removal shall be the sole cost of Tenant. Monument signage shall be consistent with the Signage Criteria for the Project and any required governmental approval.

N.   **Satellite Antenna**:

Subject to all CC&R's, Association and City approvals, and Landlord's prior written review and approval of the proposed equipment and method of installment, Tenant shall have the option, at Tenant's sole cost and expense, to install and operate satellite antenna(e) and cabling related thereto on the roof of the building as may be necessary for the operation of Tenant's business. Tenant will be responsible to all maintenance of the satellite antenna and roof penetrations, and any leakage or damage to any part of the building that may occur as a result of the satellite antenna.

O.   **Entirety**:

This Lease (with its Exhibits) contains the entire agreement between the parties with respect to the Premises. The Lease supersedes all prior negotiations, understandings, representations, and agreements.

P.   **Arbitration Procedure**:

28


_____LESSEE INITIAL

_____LESSOR INITIAL

Any dispute over any provision in this Lease shall be resolved by binding arbitration pursuant to the rules of the American Arbitration Association then in effect. Tenant hereby waives any right to trial by jury.

Q.    **ERISA:**

Tenant understands and acknowledges that the Landlord is governed by and subject to regulations under Employee Retirement Income Security Act of 1974 (ERISA) as more particularly described in Exhibit G.

29


LESSEE INITIAL
LESSOR INITIAL

R.    **Attachments**:

The following are attachments to this Lease:  Exhibit A, B, D, E, F, G, H, I, J, K and L.

S.    **Landlord Powers**:

Landlord shall not have the remedy of accelerating Tenant's rent in the event of either a monetary or non-monetary default so long as Tenant continues to pay rent on a monthly basis.

IN WITNESS WHEREOF, the parties have executed and delivered the Lease as of the date set forth.

LANDLORD:                                          TENANT:
SHOREHAM-VIEWRIDGE, LLC.              CAPITOL COMMERCE MORTGAGE CO.
DBA SHOREHAM PLACE                        a California corporation
a Washington limited liability company

By: Washington Capital Management, Inc.    By: _____
    Its Manager                                           (signature)
By: _____               By: _____
    Donald R. Maescher                              (print name)
Title: President, California Division            Title: _____

Dated: 3/18/03                                        Dated: 3-11-03

**EXHIBIT A**
**PREMISES**

**SHOREHAM PLACE**
5010 Shoreham Place
San Diego, CA 92122



SUITE 100

SUITE 150

SUITE 300

REST ROOMS

SUITE 325

SUITE 275

REST ROOMS

SUITE 225

SUITE 250

SUITE 200

LESSOR INITIAL
LESSEE INITIAL



**ROOM SCHEDULE**

| | |
|---|---|
| 101 | RECEPTION |
| 102 | BREAK ROOM |
| 103 | OPEN OFFICE/ SHIPPING |
| 104 | PRIVATE OFFICE |
| 105 | PRIVATE OFFICE |
| 106 | OPEN OFFICE |
| 107 | PRIVATE OFFICE |

FLOOR PLAN

EXHIBIT B
TENANT IMPROVEMENT PLANS AND SPECIFICATIONS

Landlord will provide turnkey tenant improvements based upon a mutually agreed upon space plan. All costs associated with the design, drawing, permitting and construction of the tenant improvements shall be sole financial responsibility of the Landlord. Landlord shall not charge any coordination or review fee for Tenant's construction of the original improvement work. Subsequent alterations of the demised premises including all expansion space, shall be per the Lease. Tenant's improvements to include the following:

1. Touch up paint as needed (building standard).
2. New carpet and base (building standard).
3. Electrical distribution for the installation of systems furniture (subject to cost estimates).
4. Small wing wall for privacy in reception area (height to be determined) and a wall for the copy area.

All other improvements shall be at Tenant's expense.

106536.1

1

LESSEE INITIAL

LESSOR INITIAL

EXHIBIT D
SITE PLAN

5010 Shoreham Place
San Diego, CA 92122



LESSOR INITIAL

LESSEE INITIAL

EXHIBIT E
RULES AND REGULATIONS

1.    No projection shall be attached to the outside walls of the Building or any exterior portion of the Project without the prior written consent of Landlord. No curtains, blinds, shades or screens shall be attached to or hung in, or used in connection with, any window or door on a tenant's premises, without the prior written consent of Landlord. Such projections, curtains, blinds, shades, screens or other fixtures must be of a quality, type, design and color, and attached in the manner approved by Landlord. All electrical ceiling fixtures hung in office or spaces along the perimeter of the Building must be fluorescent, of quality, type, design and bulb color approved by Landlord.

2.    Except permitted smoking areas, Tenant and its authorized representative and invitees shall not loiter in the parking areas or other common areas that Tenant has the right to use.

The common halls, passages, exits and entrances in the Building in which the Premises are located shall not be for any purpose other than for ingress to and egress from their respective Premises. The sashes, sash doors, skylights, windows, and doors that reflect or admit light and air into the passageways or other public places in the Building shall not be covered or obstructed by any tenant, nor shall any bottles, parcel or other articles be placed on the window sills. The halls, passages, exits and entrances are not for the use of the general public, and Landlord shall retain the right to control and prevent access to them by all persons whose presence in the judgment of Landlord shall be prejudicial to the safety, character, reputation and interest of the Building and its tenants, or who shall in any manner do any act in violation of any of the Building's Rules and Regulations. However, nothing in these Rules and Regulations shall be construed to prevent access by persons with whom the Tenant usually deals in the ordinary course of its business, unless those persons are engaged illegal activities.

3.    No tenant and no employees or invitees of any tenant shall go up on the roof of the Building.

4.    Tenant shall not use or keep in the Premises or the Building any kerosene, gasoline, flammable, or combustible fluid or material, or use any method of heating or air conditioning other than that supplied by Landlord.

5.    Tenant shall not install or use any machinery in the Premises which may cause any unusual noise, jar, or tremor to the floor or walls which by its weight may injure the floors of the Building.

6.    Tenant shall not overload the floor of the Premises. Landlord shall have the right to prescribe the weight size and position of the all safes and other heavy equipment brought into the Building and the time and manner of moving them into or out of the Building. If it is considered necessary by Landlord, safes or other heavy objects shall stand on wood strips of whatever thickness is necessary to properly distribute the weight. All damage done to the Building by moving or maintaining any such safe or other property shall be repaired at Tenant's cost.

7.    No furniture or freight, or bulky matter carried in or out of the building shall be without the consent of Landlord. All moving of the same into or out of the Building shall be in such manner as Landlord shall reasonably prescribe. No hand trucks or vehicles (other than a wheelchair for an individual or other method of medical transportation) shall be used in passenger elevators. Any hand trucks permitted in the building must be equipped with soft rubber tires and side guards. Landlord will not be responsible for loss of or damage to any furniture, equipment, or freight from any cause. Tenant shall be responsible for any damage to the Building caused by moving any said articles.

1

_____ LESSEE INITIAL

_____ LESSOR INITIAL

8.      Tenant shall not mark, drive nails, screw or drill into the walls, ceilings, floors, stonework, partitions, woodwork or plaster or in any way deface the Premises or any part thereof except that Tenant is permitted to hang or mount artwork or promotional material within Tenant's Premises provided Tenant repairs any damage done thereby to the Premises upon expiration of the Lease term.

Where roll type chairs are used, Tenant shall, at Tenant's expense, provide and utilize carpet protection mats to prevent excessive carpet wear and tear.

No tenant shall do any type of improvements, or alterations including, but not limited to, the installation of linoleum, tile, carpet or other similar floor covering so that the same shall be affixed or constructed to the floor of the Premises in any manner except as approved by Landlord. The expenses of repairing any damage resulting from a violation of the rule or removal of any floor covering shall be borne by Tenant by whom or by whose contractors, employees or invitees, the damage shall have been caused.

9.      Landlord shall direct electricians as to where and how telephone and telegraph wires are to be introduced. No boring or cutting for wires shall be allowed without Landlord's consent. The location of telephone equipment, call boxes and other office equipment affixed to the Premises shall be subject to Landlord's approval.

10.     Tenant, its authorized representatives or invitees shall not smoke in the Building which includes, but is not limited to, private offices, restrooms, and all common areas unless designated by Landlord as a permitted smoking area ("PSA"). Tenant, its authorized representatives or invitees shall not throw cigar or cigarette butts or other substance or litter of any kind in or about the Building, except in receptacles placed in it for that purpose.

11.     Any material or debris of abnormal size to be discarded that does not fit in trash cans shall be placed in dumpsters by Tenant. In no event shall such material be placed in hallways, walkways, landings, or stairwells.

12.     No liquid matter of any kind shall be poured on any part of the Landscape, or any other common area.

13.     The rest rooms, toilets, urinals, washbowls, and other apparatus available to Tenant shall not be used for any purpose other than that for which they were constructed. No foreign substance of any kind shall be thrown into them and the expense of any breakage, stoppage or damage resulting from the violation the this rule shall be paid by the Tenant (or its authorized representative or invitee) that has caused it.

14.     Tenant shall give Landlord prompt notice of any accidents to or defects in the water pipes, gas pipes, electric lights and fixtures, heating apparatus or any other service equipment.

15.     Only making coffee and tea, and cooking with a microwave oven shall be permitted by Tenant on the Premises, and shall be used only in areas specifically designed for their use and with consent of Landlord.

16.     No bicycles, vehicles or animals of any kind shall be brought into or kept in or about a tenant's Premises.

17.     No vending machine or machines of any description shall be installed, maintained or operated on the Premises without the written consent of Landlord, except for vending machines to be used exclusively by Tenant's employees, or machinery specifically used in Tenant's regular business, which machinery shall be disclosed to Landlord upon execution of this Lease.

18.     Tenant shall not conduct any auction or otherwise sell goods or merchandise or "cry" foreclosures on the Premises without the prior written consent of Landlord which written consent shall not be unreasonably

2


LESSEE INITIAL
LESSOR INITIAL

withheld if use and purpose are usual and customary with Tenant's normal operation of business and conducted within the confines of Tenant's Premises and not in common areas or outside of the Building.

19.    No tenant's premises shall be used for manufacturing or for the storage of merchandise except as such storage may be incidental to the use of the premises for general office purposes. No tenant shall occupy or permit any portion of its premises to be occupied for any use other than permitted by such tenant's Lease. No tenant's premises shall be used for lodging or sleeping or for any immoral or illegal purposes.

20.    Tenant shall see that the doors of the Premises are closed and securely locked before leaving the Premises and must observe strict care and caution that all water faucets or water apparatus are shut off before Tenant or Tenant's employees leave and that all electricity shall likewise be carefully shut off so as to prevent waste or damage and for default of carelessness Tenant shall make good all injuries sustained by other tenants or occupants of the Building or Landlord.

21.    During non-business hours, each tenant shall lower, raise, draw, open or adjust the venetian blinds, shades or other window coverings in its premises if such lowering, raising, drawing, opening or adjusting reduces energy consumption.

22.    Tenant shall not disturb, solicit or canvass any occupant of the Building and shall cooperate to prevent same.

23.    Landlord shall have the right, exercisable without notice and without liability of Tenant, to change the name and the street address of the Building of which the Premises are a part.

24.    Without written consent of Landlord, Tenant shall not use the name of the Building in connection with or in promoting or advertising the business of Tenant except as the Tenant's address.

25.    Rooms used in common by Tenant and others shall be subject to such additional Regulations as are posted therein.

26.    The requirements of Tenant will be attended to only upon application at the office of the Building. Employees of Landlord shall not perform any work or do anything outside of their regular duties unless under special instructions from Landlord and no employee will admit any person, Tenant or otherwise, to any office without specific instructions from Landlord.

27.    Tenant agrees that it shall comply with all fire and security regulations that may be issued from time to time by Landlord, and Tenant also shall provide Landlord with the name of a designated responsible employee to represent Tenant in all matters pertaining to such fire or security regulations.

28.    Landlord shall not be responsible to Tenant or to any other person for the non-observance or violation of these Rules and Regulations by any other tenant or other person. Tenant shall be deemed to have read these Rules and have agree to abide by them as a condition to its occupancy of the spaced leased.

29.    No tenant shall alter the standard building lighting or air conditioning system or install any special wiring or abnormal power-consuming equipment without approval of Landlord. Where applicable, if air conditioning and/or power issued out of normal hours or there is abnormal consumption thereof, the Tenant involved shall pay on demand a reasonable charge. The air conditioning system will operate between the hours of 7:00 a.m. - 6:00 p.m. Monday through Friday and between the hours of 9:00 a.m. – 1:00 p.m. Saturdays.



LESSEE INITIAL
LESSOR INITIAL

30.    Tenants shall cooperate with Landlord in obtaining maximum effectiveness of the cooling system by closing drapes when the sun's rays fall directly on windows of the Premises. Tenant shall not obstruct, alter or in any way impair the efficient operation of Landlord's heating, ventilating and air conditioning system and shall not place bottles, machines parcels or any other articles on the induction unit enclosure so as to interfere with air flow.

31.    No tenant shall purchase spring water, ice, towels, janitorial or maintenance or other like services, from any company or persons not approved by Landlord.

32.    Except as provided in the Lease, all approved signs or lettering on doors and walls to the Premises shall be printed, painted, affixed or inscribed at the expense of Tenant or by a person approved by Landlord in a manner and style acceptable to Landlord.

33.    No sign, advertisement or notice shall be exhibited, painted or affixed by any tenant on any part of, or so as to be seen from the outside of a tenant's premises or the Building without the prior written consent of Landlord. In the event of the violation of the foregoing by any tenant, Landlord may remove same without any liability, and may charge the expense incurred in such removal to the tenant violating this rule. Except as provided in the Lease, interior signs on doors and directory tablet shall be inscribed, painted or affixed for each tenant by Landlord at the expense of such tenant, and shall be of a size color and style acceptable to Landlord.

34.    Except as otherwise provided in the Lease or any Exhibits thereto, the bulletin board or directory of the Building, if any shall be provided exclusively for the display of the name and location of only and Landlord reserves the right to exclude any other names therefrom and otherwise limit the number of listings thereon.

35.    If any tenant desires to have janitorial services in addition to the services furnished by Landlord under its Lease, such tenant shall not employ any person other than Landlord's janitor(or a janitor approved of by Landlord) for that purpose without Landlord's prior written consent and then only subject to supervision of Landlord, at such tenant's sole responsibility. Tenant shall not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness. Landlord shall in no way be responsible to any tenant for any loss of property on the Premises, however occurring, or for any damage done to the effects of any tenant by the janitor or any other employee or any other person.

36.    Except as otherwise provided in the Lease, all parking ramps and areas plus other public areas forming a part of the project shall be under the sole and absolute control of Landlord with the exclusive right to regulate and control these areas. Tenant agrees to conform to the Rules and Regulations that may be established by Landlord for these areas from time to time.

37.    There shall be no overnight parking without prior written consent of Landlord.

38.    No additional locks or bolts of any kind shall be placed upon any of the doors or windows by any tenant, nor shall any changes be made in existing locks or the mechanism thereof without prior written consent of Landlord. If permitted, Tenant must, upon the termination of his tenancy, restore to Landlord all keys of stores, offices, and rest rooms, either furnished to, or otherwise procured by, such tenant, and in the event of the loss of any keys, so furnished, such tenant shall pay to Landlord the cost of replacing the same or of changing the lock or locks opened by such lost key if Landlord shall deem it necessary to make such change.

39.    No alarms shall be placed on any door in Building without written consent of Landlord. If alarm is permitted, Tenant shall promptly provide Landlord with code(s) and/or phone number(s) necessary for access.

4



LESSEE INITIAL

LESSOR INITIAL

40.    Landlord shall have the right to prohibit any advertising by any tenant which, in Landlord's opinion, tends to impair the reputation of the Building or the desirability as an office building, and upon written notice from Landlord any tenant shall refrain from or discontinue such advertising.

41.    Except as provided in the Lease, no tenant shall install any antennas, aerial wires or other such equipment on the roof or exterior walls of the Building or elsewhere in the project without, in each and every instance, obtaining the prior approval in writing by Landlord. Any antennas or aerial wires installed without such written approval shall be subject to removal at any time without notice. The use of any of the above equipment, if permitted shall be subject to control by Landlord to the end that others shall not be disturbed or annoyed.

42.    Except as otherwise provided in the Lease, Landlord reserves the right to close and keep locked all entrance and exit doors and otherwise regulate access of all persons to the halls, corridors, elevators and stairways in the Building on <u>weekends</u> and <u>holidays</u> and on other days between the hours of <u>6:00 p.m.</u> and <u>8:00 a.m.</u> and at such other times as Landlord may deem advisable for the adequate protection and safety of the Building.

43.    Landlord reserves the right by written notice to Tenant to rescind, alter or waive any Rule or Regulation at any time prescribed for the Building when, in Landlord's judgment, it is necessary or proper for the best interest of the Building and its.

Whenever the consent or approval of Landlord is required under these Rules and Regulations, Landlord agrees that such consent shall not be unreasonably withheld or delayed.

In the event of any conflict between these Rules and Regulations and the Lease, the Lease shall prevail.

5


LESSEE INITIAL
LESSOR INITIAL

EXHIBIT F
OPTION TO EXTEND

Landlord grants to Tenant the option to extend the term of this Lease on the following terms and conditions:

1.    This Lease must still be in full force and effect and Tenant must have fully and faithfully performed all of the terms and conditions to be performed by Tenant both at the time Tenant exercises its option to extend this Lease, and at the time of the commencement of the option period.

2.    Subject to the options and/or rights of first refusal of other tenants, Tenant shall have an option to extend the initial term of this Lease for one (1) five (5) year period, provided that Tenant has given Landlord written notice of Tenant's intent to exercise this Option at least six months prior to the expiration of the original Term. The Base Monthly Rent at the commencement of the option period shall be at the then current market rate for comparable general administrative office space in commercial buildings in Governor Park.

3.    Within thirty (30) days of the date Tenant delivers to Landlord its written notice of Tenant's intent to exercise this Option, Landlord and Tenant shall agree on the initial rental rate for the option period. If within such thirty (30) days the parties cannot agree on the appropriate Base Monthly Rent at commencement of the option period, the failure to agree shall not be grounds for invalidating the option or for the voiding of this Lease except for Tenant's right set forth hereafter after determination of the Base Monthly Rent to exercise or withdraw from this Option. Each party shall, upon ten (10) days written demand, notify the other of that party's selection of a real estate broker familiar with the comparable general administrative office space in commercial buildings in Governor Park. If the two real estate brokers cannot agree within ten (10) days on the appropriate rental rate, then the two real estate brokers shall within that time period select one (1) additional real estate broker whose determination shall be rendered within ten (10) days. The three real estate broker opinions of the appropriate market rental rate for the Premises shall be averaged and the resulting rental rate shall become the basis for calculating the Base Monthly Rent at the commencement of the option period. If the appointment of a third real estate broker is necessary, the parties shall bear any expense of that real estate broker equally. Upon determination of the Base Monthly Rent as provided herein, Tenant shall have ten (10) additional days to determine and notify Landlord in writing if Tenant shall, without further recourse, exercise or withdraw from this Option.

4.    Excepting the amendment to the Base Monthly Rent provided for above, all of the other terms and conditions of this Lease Agreement shall continue in full force and effect during the option period.

LANDLORD:
SHOREHAM-VIEWRIDGE, LLC,
DBA VIEWRIDGE BUSINESS PARK
a Washington limited liability company

BY: Washington Capital Management, Inc.,
      Its Manager

BY: _____

      Donald R. Maescher
      President, California Division
DATE: 3/18/03

TENANT:
CAPITOL COMMERCE MORTGAGE CO.
a California corporation

BY: _____
      (signature)
BY: _____
      (print name and title)

DATE: 3-11-03

1

EXHIBIT G
TENANT ERISA CERTIFICATION

Washington Capital Management, Inc.("WCM"), in its capacity as Investment Manager for the Washington Capital Joint Master Trust Real Estate Equity Fund, the sole member of Landlord (the "Fund"), is leasing the Property. As a tenant in the Property, we understand that the Fund is governed by ERISA and that it is necessary for WCM to determine that the leasing of the Property will not cause a "prohibited transaction" to occur. This certification provides important information that allows WCM to make that determination.

Having independently reviewed the following certifications for accuracy, the undersigned makes the certifications set forth below.

For purposes of the certifications set forth herein the following terms have the meanings set forth below:

"Code" means the Internal Revenue Code of 1986, as amended, or any successor statute.

"Control Party" means with respect to any person (i) any person directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person, (ii) any corporation, partnership, trust or unincorporated enterprise of which such person is an officer, director, five percent or more partner or employee (but only if the employer of such employee is the plan sponsor of the Plan, (iii) any director of the person, or any employee of the person who earns ten percent or more of the yearly wages of such person or has direct or indirect authority, responsibility, or control regarding the custody, management or disposition of plan assets, and (iv) with respect to a named fiduciary (within the meaning of Section 402(a)(2) of ERISA) of a Plan, an employer any of whose employees are covered by such Plan, if such employer or an affiliate of such employer has the authority, alone or shared with others, to appoint or terminate the named fiduciary or otherwise negotiate the terms of the named fiduciary's employment agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Interest" means with respect to the ownership of an entity (i) the combined voting power of all classes of stock entitled to vote or the total value of the shares of all classes of stock of a corporation, (ii) the capital interest or the profits interest of a partnership, or (iii) the beneficial interest of a trust or unincorporated enterprise. A person is considered to own an interest held in any capacity if the person has or shares the authority to exercise any voting rights or to direct some other person to exercise the voting rights relating to such interest, or to dispose of or to direct the disposition of such interest.

"Investment Manager" means Washington Capital Management, Inc.

"Party in Interest" means (A) a fiduciary, counsel or employee of the Plan; (B) a service provider to the Plan; (C) an employer or employee organization whose employees or members are covered by the Plan, or the owner, directly or indirectly, of fifty percent or more of such employer or employee organization; (D) a corporation, partnership, estate or trust fifty percent or more owned or held, directly or indirectly, by persons described in the foregoing clauses (A), (B) and (C); (E) a relative (spouse, ancestor, lineal descendent or spouse of a lineal descendent) of any individual described in the foregoing clauses (A), (B) and (C); (F) an employee, officer or director (or individual having powers or responsibilities similar to those of officers or directors), or a ten percent or more shareholder, directly or indirectly, of the Plan or of any person described in the foregoing clauses (B), (C) or (D); (G) a ten percent or more (directly or indirectly, in capital or profits) partner or joint venturer of a person described in the foregoing clauses (B), (C) or (D), all within the meaning of Section 3(14) of ERISA.

"Plan" means any employee welfare, benefit or retirement plan, fund or program the assets of which are included in the Fund, a current list of which is labeled "Pension Plan Participants in Washington Capital Joint Master Trust Real Estate Equity Fund" and is attached hereto as Schedule A (i) .

"Property" means that certain real property together with the improvements, structures, fixtures, equipment and other personal property used in connection therewith or stored thereon commonly known as Suite 250 located at 5010 Shoreham Place, San Diego, CA.

"Related Party" means (i) an employer or employee organization whose employees or members are covered by the Plan; (ii) the owner, directly or indirectly, of fifty percent or more of such employer or employee organization; (iii) a corporation, partnership, estate or trust fifty percent or more owned or held, directly or indirectly, by persons described in subparagraph (A), (B),(C), (D) or (E) of Section 4975 (e)(2) of the Code; (iv) a member of the family (including a spouse, ancestor, lineal descendent or spouse of a lineal descendent), or an officer, director , ten percent or more shareholder, or highly compensated employee of a person described in subparagraphs (i), (ii) or (iii) above, all within the meaning of Section 4975(e)(2) of the Code.

"Tenant" means Capitol Commerce Mortgage Company.

"Transaction" means any transaction involving the assets of the Plan with respect to the Property.

In connection with the Transaction, the undersigned hereby represents, warrants and certifies to you as follows:

1. Neither Tenant nor any Control Party with respect to Tenant has or had at the time of the Transaction, or has exercised at any time during the one-year period preceding the Transaction, the authority to appoint or terminate Investment Manager as a manager of any of the assets of the Plan, or to negotiate the terms of any management agreement with Investment Manager (including renewals or modifications thereof) on behalf of the Plan.

2. Neither Tenant nor any Control Party with respect to Tenant owns an Interest of five (5%) percent or more in Investment Manager.

3. Neither Investment Manager nor any Control Party with respect to Investment Manager owns an Interest of five (5%) or more in Tenant.

4. Tenant is not a Party in Interest or a Related Party with respect to the Plan.

5. The foregoing certifications are true and correct as of the date hereof.

The undersigned hereby acknowledges that you will be relying on the foregoing certifications in determining the availability of ERISA Prohibited Transaction Class Exemption 84-14 (Qualified Professional Asset Manager) with respect to the Transaction and in making certain determinations under the Code with respect to unrelated business taxable income.

In witness whereof the undersigned has caused this certificate to be executed under seal in its name and behalf by its duly authorized general partner, officer or attorney-in-fact.

Capitol Commerce Mortgage Company
a California corporation

Date: _____

By: _____
(signature)

By: _Chris R. Sorri_  President
(print name and title)

<u>SCHEDULE A (i)</u>

# Washington Capital Management, Inc.
## Real Estate Equity Fund Institutional Client List

- Carpenters Retirement Trust of Western Washington

- Operating Engineers Retirement Fund Locals 302 & 612

- Western Washington Laborers-Employers Pension Trust

- San Diego Electrical Pension Trust Fund

- AGC-IOUE Local 701 Pension Trust Fund

- Oregon-Washington Carpenters Employers Pension Trust Fund

- Cement Masons and Plasterers Retirement Trust Fund

- Washington State Plumbing & Pipefitting Industry Pension Plan

- Washington-Idaho Laborers Employers Pension Trust Fund

- Western Washington Painters Defined Contribution Pension Plan

- IBEW 191 Money Purchase Plan

- Idaho Plumbers & Pipefitters Pension Trust

EXHIBIT H

<u>TENANT'S RIGHT TO TERMINATE THE LEASE</u>

Provided there is no continuing and uncured material default by Tenant under this Lease (i.e., Tenant's failure to pay Rent or to perform any other similar material covenant required to be performed by Tenant within the time required by this Lease), Tenant shall have the one time right to terminate this Lease ("Termination Right") for the entire Premises effective as of the expiration of the <u>thirty sixth (36th) month</u> of this Lease term ("Termination Date").

(a)     <u>Notice/Effective Date</u>.  If Tenant elects to exercise the Termination Right, Tenant shall provide written notice thereof, ("Termination Notice") to Landlord <u>one hundred twenty (120) days prior to the date of termination of the Lease</u>. To be effective the Termination Notice must be accompanied by the concurrent payment in full of a termination fee ("Termination Fee") equal to ( i ) the remaining unamortized cost of the tenant improvements installed by Landlord in the Premises as of the Termination Date, and (ii) the amount of unamortized free rent for months 1 and 2, and (iii) the unamortized leasing commissions. Amortization shall be computed on a straight-line basis over sixty (60) months including nine percent (9%) interest. In the event the Termination Fee is not included with the Termination Notice, such Termination Notice shall have no force or effect.

(b)     <u>Landlord's Right to Cancel Tenant's Termination Right</u>.  Notwithstanding the foregoing, if at any time during the period on or after the date on which Tenant shall exercise its Termination Right (in accordance with Par. (a) hereof) up to and including the Termination Date, Tenant shall be in default of this Lease, then Landlord may elect, but is not obligated, to cancel and declare null and void Tenant's exercise of the Termination Right and this Lease shall continue in full force and effect for the full Lease Term hereof unaffected by Tenant's exercise of the Termination Right. If Landlord does not cancel Tenant's exercise of the Termination Right after Tenant's default, Tenant shall cure any default within the period of time specified in this Lease and this obligation shall survive the Termination Date.

(c)     <u>Documentation/Delivery of Premises</u>.  Upon the exercise of the Termination Right by Tenant, Landlord and Tenant shall enter into a written agreement which shall provide that if on the Termination Date Tenant has satisfied all outstanding monetary and non-monetary obligations under this Lease, the Landlord and Tenant shall be relieved from their respective obligations under this Lease, except for those which have accrued prior to the Termination Date or those which by the terms of this Lease survive such termination. On the Termination Date, Tenant shall deliver possession of the Premises to Landlord in accordance with the provisions of this Lease, as if the Termination Date were the expiration date of this Lease.

LANDLORD:
SHOREHAM-VIEWRIDGE, LLC.
dba Shoreham Place
a Washington limited liability company

By: Washington Capital Management, Inc.
    Its Manager
By: _____
    Donald R. Maescher, Pres., California Division
Date: __3/18/03__

TENANT:
CAPITOL COMMERCE MORTGAGE CO.
a California corporation

By: _____
    (signature)
By: _____
    (print name and title)
Date: __5-11-03__

EXHIBIT I

RIGHT OF FIRST OFFER FOR ADDITIONAL SPACE

Provided (i) there is no continuing and uncured event of default by Tenant under this Lease; and (ii) Tenant has not assigned its interest in this Lease or sublet any portion of the Premises, Tenant shall have a continuing right of first offer ("First Offer Right") to lease all or any portion of contiguous or non-contiguous space ("First Offer Space"), excluding the current vacancy Suite 100, as it becomes available from time-to-time, located within the Project.

The First Offer Right shall be on the following terms and conditions:

Landlord shall provide Tenant with reasonable advance written notice ("First Offer Notice") of (i) the availability of the First Offer Space, (ii) the anticipated date upon which the applicable First Offer Space will be vacated by any then existing tenant, and (iii) Landlord's determination of the "Fair Market Rent" (determined as set forth below) for the applicable First Offer Space.

The Fair Market Rent payable by Tenant for the applicable First Offer Space shall be the prevailing per square foot rental rate ("Fair Market Rental Rate") , including annual adjustments, then being charged by Landlord to new, non-renewal, non-equity tenants for comparable space in the Project, or if insufficient comparable transactions exist in the Project, then the prevailing market rate being charged to new, non renewal, non-equity tenants for comparable space by landlords of similar office premises in the Governor Park sub-market area of San Diego, with similar amenities, taking into consideration the size and location of the First Offer Space, the proposed time remaining in the Term of the Lease the time the particular rental under consideration was agreed upon and became or is to become effective, the extent of the improvements and services to be provided and any other relevant terms and conditions.

Tenant shall have five (5) business days from Tenant's receipt of any First Offer Notice from Landlord within which to notify Landlord of Tenant's election to exercise the First Offer Right for the First Offer Space described therein. If Tenant provides Landlord with written notice of its election not to exercise the First Offer Right within such five (5) business day period or fails to notify Landlord of its election with respect to the exercise of the Fist Offer Right within such five (5) business day period, then Landlord shall be free to lease such First Offer Space on the open market without further notice to Tenant, and except as specifically hereinafter provided, this First Offer Right shall terminate and be of no further force or effect with respect to the First Offer Space described in the First Offer Notice until such time as such First Offer Space again becomes vacant and available for Lease to third parties.

Upon the proper and timely exercise of the First Offer Right by Tenant as described herein, Landlord and Tenant shall enter into a written amendment to this Lease specifying that the First Offer Space subject to the First Offer Right is a part of the Premises under this Lease and containing other appropriate terms and provisions relating to such space including, without limitation, any increase in Monthly Rent and Tenant's Share of Operating Costs.

Tenant specifically acknowledges and agrees that the First Offer Right granted to Tenant is subordinate to all options, rights of first refusal and other similar rights of tenants in the Project with respect to such First Offer Space (if any) existing on the Commencement Date.



LESSOR INITIAL

LESSEE INITIAL

LANDLORD:
SHOREHAM-VIEWRIDGE, LLC
DBA SHOREHAM PLACE
A Washington limited liability company

By: _Washington Capital Management, Inc._
    Its Manager,
By: _____
    Donald R. Maescher
Title: _President, California Division_

TENANT:
CAPITOL COMMERCE MORTGAGE CO.
a California corporation

By: _____
    (signature)
By: _____
    (print name)
Title: _____

## EXHIBIT J
## RENT ADJUSTMENT SCHEDULE

| PERIOD | MONTHLY RENT |
|---|---|
| April 1, 2004 – March 31, 2005 | $ 9,460.44  ($1.98 p/r.s.f.) |
| April 1, 2005 – March 31, 2006 | $ 9,699.34  ($2.03 p/r.s.f.) |
| April 1, 2006 – March 31, 2007 | $ 9,938.24  ($2.08 p/r.s.f.) |
| April 1, 2007 – March 31, 2008 | $10,177.14  ($2.13 p/r.s.f.) |

LANDLORD:
SHOREHAM-VIEWRIDGE, LLC.

dba Shoreham Place
a Washington limited liability company

By: Washington Capital Management, Inc.
    Its Manager
By: _____
    Donald R. Maescher, Pres., California Division
Date: _____

TENANT:
CAPITOL COMMERCE MORTGAGE COMPANY

a California corporation

By: _____
    (signature)
By: _____
    (print name and title)
Date: _____

EXHIBIT  K
BROKER ACKNOWLEDGMENT

Tenant hereby represents and warrants that Tenant has had no dealing with any broker or agent in connection with the negotiation of this Lease, except for <u>Aguer Pipgras Associates and Lee Associates</u>.  Landlord agrees to pay Aguer Pipgras Associates and Lee Associates through its broker, Voit Commercial Brokerage, a 4% commission paid 50% upon full execution of the Lease and 50% upon earlier occupancy of Premises by Tenant or lease commencement date.  Tenant hereby agrees to indemnify, defend, and hold Landlord harmless from and against all costs, attorneys' fees, expenses and liabilities for commissions or other charges claimed by or awarded to any other broker or agent with respect to this Lease.  Landlord hereby agrees to pay a leasing commission to <u>Voit Commercial Brokerage</u>, as Landlord's representative, based on an industry standard schedule of 2.5%

TENANT:
<u>CAPITOL COMMERCE MORTGAGE CO.</u>
a California corporation

By: _____

(print name)

Title: _____

Date: _____

1

EXHIBIT L
JANITORIAL SPECIFICATIONS

<u>TENANT OFFICE AREA</u>

<u>Five Timer Per Week</u>:  Monday through Friday evenings.

1. Gather waste paper and place for disposal
2. Empty and wash ashtrays
3. Sweep and/or dust mop floor surfaces
4. Vacuum clean all carpeted traffic area – Spot clean as necessary
5. Dust chairs, tables and other office furniture
6. Properly arrange furniture in offices
7. Remove fingerprints from door and partition glass
8. Secure doors and windows upon completion of work
9. Sweep stairways
10. Leave only designated night lights on

<u>One Time Per Week</u>:

1. Dust high partition ledges and moldings
2. Clean door kick plates and trash cans
3. Dust panel walls and wood doors
4. Edge all carpeted areas on a rotating basis

<u>One Time Per Month</u>:

1. Clean, wax and polish composition floors

<u>Window Washing</u>:

1. Outside of windows cleaned three times per year
2. Interior of windows cleaned one time per year

1


LESSEE INITIAL
LESSOR INITIAL

## LOBBIES AND STAIRWAYS

Five Times Per Week:

1. Wet mop or vacuum main entrance lobby floors
2. Spot wash walls and doors
3. Secure exit doors, stairways and corridors
4. Clean and polish main entrance doors

One Time Per Month:

1. Dust high ledges and partitions
2. Wet mop stairs, as applicable
3. Clean and polish composition floors

One Time Per Year: Professionally clean carpet

## RESTROOMS

Five Times Per Week:

1. Clean restrooms, wash basins, dispensers and chrome plating
2. Clean mirrors and frames
3. Wet mop floors
4. Sanitize toilets, toilet seats and urinals
5. Dust ledges and partitions
6. Refill all dispensers

One Time Per Month: Wash walls and doors

One Time Per Year: Machine scrub and seal restroom floors

## ELEVATOR (If Applicable)

Five Times Per Week:

1. Vacuum carpet
2. Damp wipe and/or dust walls and polish call button plates
3. Clean doors and thresholds

2

_____ LESSEE INITIAL

_____ LESSOR INITIAL