# EXHIBIT C

BEAR STEARNS ASSET BACKED SECURITIES I LLC

AS PURCHASER,

AMERICAN HOME MORTGAGE ACCEPTANCE, INC.

AS SELLER

---

MORTGAGE LOAN PURCHASE AGREEMENT

DATED AS OF OCTOBER 7, 2005

---

FIXED-RATE, ADJUSTABLE RATE AND HOME EQUITY LINE OF CREDIT
MORTGAGE LOANS

## TABLE OF CONTENTS

Page

ARTICLE I

 DEFINITIONS...................................................................................................1

Section 1.1. Definitions................................................................................................1

ARTICLE II

 SALE OF MORTGAGE LOANS AND RELATED PROVISIONS ...................................1

Section 2.1. Sale of Mortgage Loans .........................................................................1

Section 2.2. Payment of Purchase Price for the Mortgage Loans.........................4

ARTICLE III

 REPRESENTATIONS AND WARRANTIES;
 REMEDIES FOR BREACH................................................................................5

Section 3.1. Seller Representations and Warranties .................................................5

Section 3.2. Purchaser Representations and Warranties.........................................15

ARTICLE IV

 SELLER'S COVENANTS.................................................................................16

Section 4.1. Covenants of the Seller ..........................................................................16

ARTICLE V

 INDEMNIFICATION BY THE SELLER
 WITH RESPECT TO THE MORTGAGE LOANS .........................................17

Section 5.1. Indemnification With Respect to the Mortgage Loans .....................17

Section 5.2. Limitation on Liability of the Seller ....................................................17

ARTICLE VI

 TERMINATION.................................................................................................17

Section 6.1. Termination...............................................................................................17

3

ARTICLE VII

MISCELLANEOUS PROVISIONS...................................................................................18

Section 7.1. Amendment.............................................................................................18

Section 7.2. Governing Law .......................................................................................18

Section 7.3. Notices ...................................................................................................18

Section 7.4. Severability of Provisions.......................................................................18

Section 7.5. Relationship of Parties ...........................................................................19

Section 7.6. Counterparts ...........................................................................................19

Section 7.7. Further Agreements ................................................................................19

Section 7.8. Intention of the Parties............................................................................19

Section 7.9. Successors and Assigns; Assignment of Purchase Agreement...................19

Section 7.10. Survival .................................................................................................19

Exhibits

| Exhibit 1 | RMBS Mortgage Loan Schedule |
| Exhibit 2 | HELOC Mortgage Loan Schedule |

This MORTGAGE LOAN PURCHASE AGREEMENT (this "Agreement"), dated as of October 7, 2005, is made between American Home Mortgage Acceptance, Inc. (the "Seller") and Bear Stearns Asset Backed Securities I LLC (the "Purchaser").

W I T N E S S E T H:

WHEREAS, the Seller owns the Mortgage Loans indicated on the Mortgage Loan Schedule attached as Exhibit 1 hereto (the "RMBS Mortgage Loans") and the Mortgage Loan Schedule attached as Exhibit 2 hereto (the "HELOC Mortgage Loans", together with the RMBS Mortgage Loans, the "Mortgage Loans"), including rights to (a) any property acquired by foreclosure or deed in lieu of foreclosure or otherwise, and (b) the proceeds of any insurance policies covering the Mortgage Loans;

WHEREAS, the parties hereto desire that the Seller sell the Mortgage Loans to the Purchaser, and that the Seller make certain representations and warranties and undertake certain obligations with respect to the Mortgage Loans;

WHEREAS, pursuant to the terms of an Amended and Restated Trust Agreement dated as of October 7, 2005 (the "Trust Agreement"), among the Purchaser, as depositor, Wilmington Trust Company, as owner trustee (the "Owner Trustee"), U.S. Bank National Association, as certificate registrar and certificate paying agent and Wells Fargo Bank, N.A., as securities administrator, the Purchaser will convey the Mortgage Loans to the Issuer (as defined below); and

WHEREAS, pursuant to the terms of the RMBS Master Servicing Agreement, dated as of October 7, 2005 (the "RMBS Master Servicing Agreement"), among Wells Fargo Bank, N.A., as RMBS Master Servicer (in such capacity, the "RMBS Master Servicer"), and as securities administrator (in such capacity, the "Securities Administrator"), American Home Mortgage Investment Trust 2005-4A, as issuer (the "Issuer") and U.S. Bank National Association, as indenture trustee (the "Indenture Trustee"), the RMBS Servicing Agreement, dated as of October 7, 2005 (the "RMBS Servicing Agreement"), among the RMBS Master Servicer, the Issuer, the Seller, the Indenture Trustee and American Home Mortgage Acceptance, Inc., as RMBS Servicer (the "RMBS Servicer"), the RMBS Subservicing Agreement, dated as of October 7, 2005 (the "RMBS Subservicing Agreement"), among the Issuer, the RMBS Servicer, the Indenture Trustee and American Home Mortgage Servicing, Inc., as the RMBS Subservicer (in such capacity, "RMBS Subservicer"), the HELOC Servicing Agreement, dated as of October 7, 2005 (the "HELOC Servicing Agreement"), among GMAC Mortgage Corporation, as HELOC Back-Up Servicer (the "HELOC Back-Up Servicer"), the Issuer, the Seller and the Indenture Trustee, the HELOC Backup-Up Servicing Agreement, dated as of October 7, 2005 (the "HELOC Back-Up Servicing Agreement"), among the HELOC Back-Up Servicer, the Issuer and the Indenture Trustee, and the HELOC Subservicing Agreement, dated as of October 7, 2005 (the "HELOC Subservicing Agreement"), among the HELOC Back-Up Servicer, the Issuer, the Seller, the Indenture Trustee and American Home Mortgage Servicing, Inc. as the HELOC Servicer (the "HELOC Servicer" or the "RMBS Subservicer", as applicable; and together with the RMBS Master Servicer, the RMBS Subservicer the HELOC Back-Up Servicer, the "Servicers"), each of the RBMS Master Servicer, RMBS Servicer, RMBS Subservicer, the HELOC Back-Up Servicer and the HELOC Servicer will service the related Mortgage Loans. If

there is an event of default by the HELOC Servicer under the HELOC Servicing Agreement, the HELOC Back-up Servicer shall terminate the HELOC Servicer under the HELOC Servicing Agreement and act as servicer with respect to the HELOC Mortgage Loans in accordance with the terms of the HELOC Back-Up Servicing Agreement. Wells Fargo Bank, N.A. shall act as master servicer with respect to the non-HELOC Mortgage Loans pursuant to the RMBS Master Servicing Agreement; and

WHEREAS, pursuant to the terms of an Indenture dated as of October 7, 2005 (the "Indenture"), between the Issuer, Wells Fargo Bank, N.A., in its capacity as Securities Administrator (the "Securities Administrator") and the Indenture Trustee, the Issuer will pledge the Mortgage Loans and issue and transfer to the Purchaser the American Home Mortgage Investment Trust 2005-4A, Mortgage-Backed Notes, Series 2005-4A, Class I-A-1, Class I-A-2, Class I-A-3, Class II-A, Class I-M-1, Class I-M-2, Class I-M-3, Class I-M-4, Class I-M-5 and Class I-M-6 Notes (collectively, the "Notes"), representing debt of the Issuer;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1.    Definitions.  For all purposes of this Mortgage Loan Purchase Agreement, except as otherwise expressly provided herein or unless the context otherwise requires, capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in Appendix A attached to the Indenture, which is incorporated by reference herein. All other capitalized terms used herein shall have the meanings specified herein.

## ARTICLE II

## SALE OF MORTGAGE LOANS AND RELATED PROVISIONS

Section 2.1.    Sale of Mortgage Loans.

(a)    The Seller, by the execution and delivery of this Agreement, does hereby sell, assign, set over, and otherwise convey to the Purchaser, without recourse but subject to the terms of this Agreement, all of its right, title and interest in, to and under the following, whether now existing or hereafter acquired and wherever located: (i) all of its right, title and interest in the Mortgage Loans identified on Exhibit 1 and Exhibit 2 as of the Closing Date, including the related Cut-off Date Principal Balance (including, with respect to the HELOC Mortgage Loans, all Additional Balances resulting from Draws made pursuant to the related HELOC Mortgage Loan prior to the termination of the Trust; provided however, that the Purchaser does not assume any obligation under any HELOC Mortgage Loan to fund any such future Draws, and the Purchaser will not be obligated or permitted to fund such future Draws), all interest accruing thereon on and after the Cut-off Date, and all collections of interest and principal due after the Cut-off Date, (ii) the Seller's interest in any insurance policies related to the Mortgage Loans and (iii) all proceeds of the foregoing.

(b)    In connection with such conveyances by the Seller, the Seller shall on behalf of the Purchaser deliver to, and deposit with the Indenture Trustee, on or before the Closing Date, the following documents or instruments with respect to each Mortgage Loan:

(i)    the original Mortgage Note endorsed without recourse to the order of the Indenture Trustee or in blank, and showing an unbroken chain of endorsements from the original payee thereof to the Person endorsing it to the Indenture Trustee or in blank or, with respect to any Mortgage Loan as to which the original Mortgage Note has been lost or destroyed and has not been replaced, a Lost Note Affidavit;

(ii)    the original Mortgage with evidence of recording thereon, or, if the original Mortgage has not yet been returned from the public recording office, a copy of the original Mortgage certified by the Seller or the public recording office in which such original Mortgage has been recorded;

(iii)    an assignment (which may be included in one or more blanket assignments if permitted by applicable law) of the Mortgage in blank or to the Indenture Trustee (or to MERS, if the Mortgage Loan is registered on the MERS® System and noting the presence of a MIN) and otherwise in recordable form;

(iv)    originals of any intervening assignments of the Mortgage, with evidence of recording thereon, or, if the original of any such intervening assignment has not yet been returned from the public recording office, a copy of such original intervening assignment certified by the Seller or the public recording office in which such original intervening assignment has been recorded;

(v)    with respect to the RMBS Mortgage Loans, the original policy of title insurance (or a preliminary title report commitment for title insurance, if the policy is being held by the title insurance company pending recordation of the Mortgage). With respect to a HELOC Mortgage Loan, (i) if the Credit Limit for such HELOC Mortgage Loan is greater than $100,000, the original attorney's opinion of title or the original policy of title insurance, provided that if any such original policy of title insurance has not yet been received by the Seller, the Seller shall have delivered to the Indenture Trustee a copy of such policy or title insurance binder or commitment for the insurance policy; or (ii) if the Credit Limit for such Mortgage Loan is equal to or less than $100,000, a limited review of the title conveyed to the Mortgagor by the seller of the Mortgaged Property to the Mortgagor; and

(vi)    the original or a true and correct copy of any assumption, modification, consolidation or substitution agreement, if any, relating to the Mortgage Loan.

If a material defect in any Mortgage File is discovered which may materially and adversely affect the value of the related Mortgage Loan, or the interests of the Indenture Trustee (as pledgee of the Mortgage Loans), the Noteholders, the Insurers or the Certificateholders in such Mortgage Loan, including if any document required to be delivered to the Indenture Trustee has not been delivered (provided that a Mortgage File will not be deemed to contain a defect for an unrecorded assignment under clause (iii) above if the Seller has submitted such assignment

for recording pursuant to the terms of the second following paragraph), the Seller shall cure such defect, repurchase the related Mortgage Loan at the Repurchase Price or substitute an Eligible Substitute Mortgage Loan for the related Mortgage Loan upon the same terms and conditions set forth in Section 3.1 hereof for breaches of representations and warranties as to the Mortgage Loans.

In connection with the assignment of any Mortgage Loan registered on the MERS® System, the Seller further agrees that it will cause, at the Seller's own expense, as of the Closing Date, the MERS® System to indicate that such Mortgage Loans have been assigned by the Seller to the Indenture Trustee in accordance with this Agreement for the benefit of the Noteholders and Certificateholders by including (or deleting, in the case of Mortgage Loans which are repurchased in accordance with the related Servicing Agreement) in such computer files (a) the code in the field which identifies the specific Trustee and (b) the code in the field "Pool Field" which identifies the series of the Notes issued in connection with such Mortgage Loans. The Seller further agrees that it will not, and will not permit the RMBS Master Servicer or HELOC Back-up Servicer (or any subservicer) to, alter the codes referenced in this paragraph with respect to any Mortgage Loan during the term of the Indenture, unless and until such Mortgage Loan is repurchased in accordance with the terms of the Indenture.

Promptly after the Closing Date (or after the date of transfer of any Eligible Substitute Mortgage Loan), the Seller, at its own expense, shall complete and submit for recording in the appropriate public office for real property records each of the assignments referred to in clause (iii) above, with such assignment completed in favor of the Indenture Trustee. While such assignment to be recorded is being recorded, the Indenture Trustee shall retain a photocopy of such assignment. If any assignment is lost or returned unrecorded to the Indenture Trustee because of any defect therein, the Seller is required to prepare a substitute assignment or cure such defect, as the case may be, and the Seller shall cause such substitute assignment to be recorded in accordance with this paragraph.

In instances where an original Mortgage or any original intervening assignment of Mortgage was not, in accordance with clause (ii) or (iv) above, delivered by the Seller to the Indenture Trustee, prior to or concurrently with the execution and delivery of this Agreement, the Seller will deliver or cause to be delivered the originals of such documents to the Indenture Trustee, promptly upon receipt thereof.

The Purchaser hereby acknowledges its acceptance of all right, title and interest to the Mortgage Loans and other property, now existing and hereafter created, conveyed to it pursuant to this Section 2.1.

(c)    The parties hereto intend that the transactions set forth herein, including the sale of the Mortgage Loans pursuant to this Agreement, constitute a sale by the Seller to the Purchaser of all the Seller's right, title and interest in and to the Mortgage Loans and other property as and to the extent described above. In the event the transactions set forth herein are deemed by a court of competent jurisdiction not to be a sale, the Seller hereby grants to the Purchaser a security interest in all of the Seller's right, title and interest in, to and under the Mortgage Loans and such other property, to secure all of the Seller's obligations hereunder, and this Agreement shall constitute a security agreement under applicable law, including, without

limitation, Article 9 of the applicable Uniform Commercial Code. The Seller agrees to take or cause to be taken such actions and to execute such documents, including without limitation the filing of all necessary UCC-1 financing statements (which shall have been submitted for filing as of the Closing Date with respect to the Principal Balance of the Mortgage Loans), any continuation statements with respect thereto and any amendments thereto required to reflect a change in the name or corporate structure of the Seller or the filing of any additional UCC-1 financing statements due to the change in the principal office of the Seller, as are necessary to ensure that, if this Agreement were deemed to create a security interest in the Mortgage Loans, such security interest would be deemed to be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of the Indenture.

Section 2.2.    <u>Payment of Purchase Price for the Mortgage Loans</u>.

(a)    The purchase price for the Mortgage Loans shall be $_____*_____.

(b)    In consideration of the sale of the Mortgage Loans from the Seller to the Purchaser on the Closing Date, the Purchaser shall (A) pay to the Seller on the Closing Date by wire transfer of immediately available funds to a bank account designated by the Seller, the amount specified above in clause (a) of this Section 2.2 and (B) the Transferor's Interest.

(c)    With respect to the HELOC Mortgage Loans, each Mortgage Note permits the related Mortgagor to make Draws against its Mortgage Loan. Such Draws will create Additional Balances, which Additional Balances the Seller shall sell to the Purchaser from time to time. In consideration of the sale of Additional Balances by the Seller to the Purchaser from time to time, the Purchaser agrees to pay the Seller on the date any such Additional Balance is delivered an amount equal to the outstanding principal balance of such Additional Balance. Payment will be made, (i) during the Managed Amortization Period, (A) from Principal Collections to the extent Principal Collections exceed Draws, and/or (B) by increasing the value of the Transferor Interest, to the extent that Draws exceed Principal Collections, and (ii) during the Rapid Amortization Period, by increasing the value of the Transferor Interest.

* Please contact the Seller for this information.

ARTICLE III

### REPRESENTATIONS AND WARRANTIES;
### REMEDIES FOR BREACH

Section 3.1.  <u>Seller Representations and Warranties</u>.  The Seller hereby represents and warrants to the Purchaser as of the Closing Date (or if otherwise specified below, as of the date so specified) that:

(a)     with respect to the Seller:

(i)     the Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Maryland, and is qualified and in good standing to do business in each jurisdiction where such qualification is necessary, except where the failure so to qualify would not reasonably be expected to have a material adverse effect on its business as presently conducted or on its ability to enter into this Agreement and to consummate the transactions contemplated hereby;

(ii)     the Seller has full corporate power to own its property, to carry on its business as presently conducted and to enter into and perform its obligations under this Agreement;

(iii)     the execution and delivery by the Seller of this Agreement have been duly authorized by all necessary corporate action on the part of the Seller; and neither the execution and delivery of this Agreement, nor the consummation of the transactions herein contemplated hereby, nor compliance with the provisions hereof, will conflict with or result in a breach of, or constitute a default under, any of the provisions of any applicable law, governmental rule, regulation, judgment, decree or order binding on the Seller or its properties or the certificate of incorporation or by-laws of the Seller, except those conflicts, breaches or defaults which would not reasonably be expected to have a material adverse effect on the Seller's ability to enter into this Agreement and to consummate the transactions contemplated hereby;

(iv)     the execution, delivery and performance by the Seller of this Agreement and the consummation of the transactions contemplated hereby do not require the consent or approval of, the giving of notice to, the registration with, or the taking of any other action in respect of, any state, federal or other governmental authority or agency, except those consents, approvals, notices, registrations or other actions as have already been obtained, given or made and, in connection with the recordation of the Mortgages, powers of attorney or assignments of Mortgages not yet completed;

(v)     this Agreement has been duly executed and delivered by the Seller and, assuming due authorization, execution and delivery by the Purchaser, constitutes a valid and binding obligation of the Seller enforceable against it in accordance with its terms (subject to applicable bankruptcy and insolvency laws

and other similar laws affecting the enforcement of the rights of creditors generally);

(vi)     there are no actions, litigation, suits or proceedings pending or, to the best of the Seller's knowledge, threatened against the Seller before or by any court, administrative agency, arbitrator or governmental body (i) with respect to any of the transactions contemplated by this Agreement or (ii) with respect to any other matter which in the judgment of the Seller if determined adversely to the Seller would reasonably be expected to materially and adversely affect the Seller's ability to perform its obligations under this Agreement; and the Seller is not in default with respect to any order of any court, administrative agency, arbitrator or governmental body so as to materially and adversely affect the transactions contemplated by this Agreement;

(vii)     The execution and delivery of this Agreement and the performance of the transactions contemplated hereby by the Seller will not violate any provision of any existing law or regulation or any order or decree of any court applicable to the Seller or any provision of the Charter or Bylaws of the Seller, or constitute a material breach of any mortgage, indenture, contract or other agreement to which the Seller is a party or by which the Seller may be bound; and

(viii)     the Seller's chief executive office and principal place of business are located in the County of Suffolk in the State of New York; and

(b)     with respect to the Initial Mortgage Loans:

(i)     as of the Cut-off Date, the information set forth on the Mortgage Loan Schedule with respect to each Mortgage Loan is true and correct in all material respects;

(ii)     immediately prior to the transfer to the Purchaser, the Seller had good title to and is the sole owner of each Mortgage and Mortgage Note relating to the Mortgage Loans, and is conveying the same free and clear of any and all liens, claims, encumbrances, pledges, charges or security interests of any nature, the related Mortgage Note and the Mortgage were not subject to any pledge or assignment, and the Seller has full legal authority to sell and assign the Mortgage Loans pursuant to this Agreement;

(iii)     no default, release or waiver exists under the mortgage documents, and no modifications to the mortgage documents have been made that have not been disclosed;

(iv)     there is no monetary default existing under any Mortgage or the related Mortgage Note; neither the Seller, any of its affiliates nor any servicer of any related Mortgage Loan has taken any action to waive any default, breach or event of acceleration with respect thereto; and no foreclosure action is threatened or has been commenced with respect to such Mortgage Loan;

(v)    each Mortgage Loan was underwritten in accordance with the underwriting guidelines of the Seller and its affiliates.  The Seller has no knowledge of any fact that should have led it to expect at the time of the initial creation of an interest in the Mortgage Loan that such Mortgage Loan would not be paid in full when due;

(vi)    no selection procedures reasonably believed by the Seller to be adverse to the interest of the Noteholders, the Insurers or Certificateholders have been used in selecting the Mortgage Loans;

(vii)    each Mortgage is a valid and enforceable first or second lien on the Mortgaged Property securing the related Mortgage Note and each Mortgaged Property is owned by the Mortgagor in fee simple (except with respect to common areas in the case of condominiums, PUDs and de minimis PUDs) or by leasehold for a term at least 10 years longer than the term of the related Mortgage, subject only to (1) the lien of nondelinquent current real property taxes and assessments, (2) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording of such Mortgage, such exceptions appearing of record being acceptable to mortgage lending institutions generally or specifically reflected in the appraisal made in connection with the origination of the related Mortgage Loan or referred to in the lender's title insurance policy delivered to the originator of the related Mortgage Loan, (3) with respect to each second lien mortgage, the first or senior lien on the related Mortgaged Property, and (4) other matters to which like properties are commonly subject that do not materially interfere with the benefits of the security intended to be provided by such Mortgage;

(viii)    there is no mechanics' lien or claim for work, labor or material affecting the premises subject to any Mortgage which is or may be a lien prior to, or equal with, the lien of such Mortgage except those which are fully insured against by a title insurance policy included in the Mortgage File;

(ix)    there is no delinquent tax or assessment lien against the Mortgaged Property subject to any Mortgage, including the obligation of the Mortgagor to pay the unpaid principal and interest on such Mortgage Note;

(x)    there is no valid offset, defense or counterclaim of any obligor under any Mortgage Note or Mortgage, including the obligation of the Mortgagor to pay the unpaid principal and interest on such Mortgage Note;

(xi)    the physical property subject to any Mortgage is free of material damage and is in good repair, and there is no proceeding pending or, to the best of Seller's knowledge, threatened, for the total or partial condemnation of any Mortgaged Property;

(xii)    neither any improvement located on or being part of the Mortgaged Property, nor the Mortgaged Property itself, is in violation of any applicable zoning law or regulation, or subdivision law or ordinance;

(xiii)   each Mortgage Loan has been serviced since origination in accordance with the servicing standard set forth in Section 3.01 of the related Servicing Agreement and in accordance with all applicable laws and regulations, including, without limitation, usury, equal credit opportunity, disclosure and recording laws and all predatory lending laws and the terms of the related Mortgage Note, the Mortgage and other loan documents;

(xiv)   the terms of the Mortgage Note or Mortgage have not been impaired, altered or modified in any material respect, except that a Mortgage Loan may have been modified by a written instrument which has been recorded, if necessary to protect the interests of the owner of such Mortgage Loan or the Notes and which has been delivered to the Indenture Trustee;

(xv)    a lender's policy of title insurance (on an ALTA or CLTA form) or binder, or other assurance of title customary in the relevant jurisdiction therefor in a form acceptable to Fannie Mae or Freddie Mac, which policy insures the Seller and successor owners of indebtedness secured by the insured Mortgage as to the first lien priority of the Mortgage Loan subject to the standard exceptions set forth therein, together with a condominium endorsement and extended coverage endorsement, if applicable, and an 8.1 ALTA environmental endorsement or equivalent endorsement in an amount at least equal to the original principal balance of each such Mortgage Loan or a commitment binder, commitment to issue the same or preliminary policy affirmatively insuring ingress and egress and insuring against encroachments by or upon the Mortgaged Property on the standard ALTA form, was effective on the date of the origination of each Mortgage Loan, and each such policy is valid and remains in full force and effect;

(xvi)   at the time of origination, each Mortgaged Property was the subject of an appraisal on Form 1004 or Form 2055 with an interior inspection which conformed to the underwriting requirements of the originator of the Mortgage Loan;

(xvii)   if for any Mortgage Loan the related Mortgaged Property is in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy in a form meeting the requirements of the current guidelines of the Flood Insurance Administration is in effect with respect to such Mortgaged Property with a generally acceptable carrier in an amount representing coverage not less than the least of (A) the outstanding Principal Balance of the Mortgage Loan, (B) the minimum amount required to compensate for damage or loss on a replacement cost basis and (C) the maximum amount of coverage that is available under federal law; the Mortgage obligates the Mortgagor thereunder to maintain all such insurance, including flood insurance, at the Mortgagor's cost and expense, and

upon the Mortgagor's failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at the Mortgagor's cost and expense and to seek reimbursement therefor from the Mortgagor;

(xviii)  the improvements upon each Mortgaged Property are covered by a valid and existing hazard insurance policy which policy provides for fire extended coverage and such other hazards as are customary in the area where the Mortgaged Property is located representing coverage in an amount not less than the lesser of (A) the maximum insurable value of the improvements securing such Mortgage Loan and (B) the outstanding Principal Balance of the related Mortgage Loan, but in no event an amount less than an amount that is required to prevent the Mortgagor from being deemed to be a co-insurer thereunder;

(xix)  as of the Cut-off Date, no payment of principal of or interest on or in respect of any Mortgage Loan is 30 or more days past due, and no borrower under a Mortgage Loan has been 30 or more days past due more than once during the twelve months preceding the Cut-off Date;

(xx)  the information set forth under the caption "The Mortgage Pool—General" and "—Mortgage Loan Characteristics" in the Prospectus Supplement is true and correct in all material respects;

(xxi)  with respect to each Mortgage Loan secured by a leasehold estate:

(1)  The leasehold created by direct lease of the freehold estate, the ground lease or memorandum thereof has been recorded, and by its terms permits the leasehold estate to be mortgaged. The ground lease grants any leasehold mortgagee standard protections necessary to protect the security of a leasehold mortgagee including the right of the leasehold mortgagee to receive notice of the lessee's default under the ground lease; the right of the leasehold mortgagee, with adequate time, to cure such default; and, in the case of incurable defaults of the lessee, the right of the leasehold mortgagee to enter into a new ground lease with the lessor on terms financially identical and otherwise substantially identical to the existing ground lease;

(2)  The ground lease was made at the origination of the Mortgage Loan, and is in full force and effect without any outstanding defaults, and was and is not subject to liens and encumbrances;

(3)  The ground lease has an original term which extends not less than ten (10) years beyond the term of the Mortgage; and

(4)  The fee estate of the lessor under the ground lease is encumbered by the ground lease, and any lien of any present or future fee mortgagee is and will be subject to and subordinate to the ground lease. The foreclosure of the fee mortgage will not terminate the leasehold estate

or the rights of the sub tenants, and the fee mortgage is subject to the ground lease;

(xxii) each of the Mortgage and the assignment of Mortgage is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located;

(xxiii) the Mortgagor has not notified the Seller, and the Seller has no knowledge of any relief requested or allowed to the Mortgagor under the Servicemembers Civil Relief Act;

(xxiv) none of the Mortgage Loans are reverse mortgage loans, graduated payment mortgage loans or growth equity mortgage loans. With the exception of certain of the mortgage loans in Loan Group I, none of the Mortgage Loans provide for deferred interest or negative amortization. None of the Mortgage Loans are "buy down" mortgage loans;

(xxv) the terms of the related Mortgage Note and the related Mortgage have not been impaired, waived, altered or modified in any respect, except by written instruments, (x) if required by law in the jurisdiction where the Mortgaged Property is located, or (y) to protect the interests of the Indenture Trustee on behalf of the Noteholders;

(xxvi) each Mortgage Loan was originated or purchased by (a) a savings and loan association, savings bank, commercial bank, credit union, insurance company or similar institution which is supervised and examined by a federal or state authority (or originated by (i) a subsidiary of any of the foregoing institutions which subsidiary is actually supervised and examined by applicable regulatory authorities or (ii) a mortgage loan correspondent of any of the foregoing and that was originated pursuant to the criteria established by any of the foregoing) or (b) a mortgagee approved by the Secretary of Housing and Urban Development pursuant to sections 203 and 211 of the National Housing Act, as amended, in each case within the meaning of Section 3(a)(41)(A)(ii) of the Exchange Act;

(xxvii) The Seller has not advanced funds, or induced, solicited or knowingly received any advance of funds from a party other than the owner of the related Mortgaged Property, directly or indirectly, for the payment of any amount required by the Mortgage Note or Mortgage;

(xxviii) with respect to each Mortgage Loan, either (i) the Mortgage Loan is assumable pursuant to the terms of the Mortgage Note, or (ii) the Mortgage Loan contains a customary provision for the acceleration of the payment of the unpaid principal balance of the Mortgage Loan in the event the related Mortgaged Property is sold without the prior consent of the mortgagee thereunder;

(xxix) each Mortgage Loan complies with applicable local, state and federal laws and regulations, including, without limitation, usury, equal credit

opportunity, real estate settlement procedures, the Federal Truth-In-Lending Act ("TILA"), disclosure laws and all applicable predatory and abusive lending laws and consummation of the transactions contemplated hereby, including without limitation, the receipt of interest by the owner of such Mortgage Loan, will not involve the violation of any such laws or regulations;

(xxx)   none of the Mortgage Loans are (a) Mortgage Loans subject to 12 CFR Part 226.31, 12 CFR Part 226.32 or 226.34 of Regulation Z, the regulation implementing TILA, which implements the Home Ownership and Equity Protection Act of 1994, as amended, or (b) except as may be provided in subparagraph (c) below, classified and/or defined, as a "high cost", "threshold", "predatory", "high risk home loan" or "covered" loan (or a similarly classified loan using different terminology under a law imposing additional legal liability for mortgage loans having high interest rates, points and or/fees) under any other applicable state, federal or local law including, but not limited to, the District of Columbia and the States of Georgia, New York, North Carolina, Arkansas, Maine, Nevada, Florida, Kentucky or New Mexico or (c) Mortgage Loans subject to the New Jersey Home Ownership Security Act of 2002 (the "Act"), unless such Mortgage Loan is a (1) "Home Loan" as defined in the Act that is a first lien Mortgage Loan, which is not a "High Cost Home Loan" as defined in the Act or (2) "Covered Home Loan" as defined in the Act that is a first lien purchase money Mortgage Loan, which is not a "High Cost Home Loan" under the Act;

(xxxi)   no loan is a High Cost Loan or Covered Loan, as applicable (as such terms are defined in the then current Standard & Poor's LEVELS® Glossary, Version 5.6b Revised (or the then current version), Appendix E, attached hereto as Exhibit 3 and no mortgage loan originated on or after October 1, 2002 through March 6, 2003 is governed by the Georgia Fair Lending Act;

(xxxii)   with respect to the HELOC Mortgage Loans, each HELOC Mortgage Loan is a revolving home equity loan. Each HELOC Mortgage Note provides for (a) Monthly Payments which are at least equal to accrued interest during such Accrual Period and (b) at the maturity of the related HELOC Mortgage Loan, payment in full of the principal balance of such HELOC Mortgage Note;

(xxxiii)   with respect to the HELOC Mortgage Loans, the Mortgage Note related to each HELOC Mortgage Loan bears a variable Mortgage Rate (except with respect to those HELOC Mortgage Loans for which the Lock Feature has been exercised or the Fixed Teaser Rate is in effect) and there is only one original of each Mortgage Note;

(xxxiv)   with respect to each HELOC Mortgage Loan with a Credit Limit more than $100,000, either (a) a lender's title insurance policy, issued in standard American Land Title Association or California Land Title Association form, or other form acceptable in a particular jurisdiction, by a title insurance company authorized to transact business in the state in which the related Mortgaged

Property is situated, together with a condominium endorsement, if applicable, in an amount at least equal to the original principal balance of such HELOC Mortgage Loan insuring the Seller and its successor's and assignees' interest under the related HELOC Mortgage Loan as the holder of a valid first or second mortgage lien of record on the real property described in the Mortgage, subject only to the exceptions of the character referred to in Section 3.2(b)(ii), was valid and in full force and effect on the date of the origination of such HELOC Mortgage Loan or (b) an attorney's opinion of title was prepared in connection with the origination of such HELOC Mortgage Loan;

(xxxv)    with respect to the HELOC Mortgage Loans, no HELOC Mortgage Loan had a Combined Loan to Value Ratio at the time of origination of more than 100%;

(xxxvi)    with respect to the HELOC Mortgage Loans, as of the Closing Date, the Seller has not received a notice of default of a Senior Lien which has not been cured;

(xxxvii)    None of the Mortgage Loans that are secured by property located in Illinois are in violation of the provisions of the Illinois Interest Act;

(xxxviii)    None of the Mortgage Loans originated on or after October 1, 2002 and before March 7, 2003 was secured by property located in the State of Georgia;

(xxxiv)    The servicer for each Mortgage Loan has fully furnished, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (i.e., favorable and unfavorable) on its borrower credit files to Equifax, Experian, and Trans Union Credit Information Company (three of the credit repositories), on a monthly basis;

(xl)    With respect to the HELOC Mortgage Loans, the Mortgaged Property is a fee simple property located in the state identified in the HELOC Mortgage Loan Schedule except that with respect to real property located in jurisdictions in which the use of leasehold estates for residential properties is a widely-accepted practice, the Mortgaged Property may be a leasehold estate and consists of a single parcel of real property with a detached single family residence erected thereon, or a two- to four-family dwelling or a high-rise dwelling, or an individual residential condominium unit in a low-rise condominium project or a cooperative dwelling, or an individual unit in a planned unit development and that no residence or dwelling is (i) a mobile home or (ii) a manufactured home;

(xli)    With respect to the HELOC Mortgage Loans, the Mortgage Note and the Mortgage and any other agreement executed and delivered by a Mortgagor in connection with a Mortgage Loan are genuine, and each is the legal, valid and binding obligation of the maker thereof enforceable in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency,

reorganization, receivership, moratorium or other similar laws relating to or affecting the rights of creditors generally, and by general equity principles (regardless of whether such enforcement is considered a proceeding in equity or a law). All parties to the Mortgage Note, the Mortgage and any other such related agreement had legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note, the Mortgage and any such agreement, and the Mortgage Note, the Mortgage and any other such related agreement have been duly and properly executed by other such related parties. To the best of the Seller's knowledge, no fraud, error, omission, misrepresentation, gross negligence or similar occurrence with respect to a Mortgage Loan has taken place on the part of any Person, including without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination or servicing of the Mortgage Loan; and

(xlii) The Seller has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws"); to the extent required to comply with the Anti-Money Laundering Laws, as of the Closing Date, the Seller has established an anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Mortgage Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Mortgagor and the origin of the assets used by the said Mortgagor to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable Mortgagor for purposes of the Anti-Money Laundering Laws.

It is understood and agreed that the representations and warranties set forth in this Section 3.1 shall survive the sale of the Mortgage Loans from the Seller to the Purchaser and shall inure to the benefit of the Purchaser, its successors and assigns, notwithstanding any restrictive or qualified endorsement on any Mortgage Note or assignment of Mortgage or the examination of any Mortgage File.

Upon discovery by the Seller or upon notice from the Purchaser, the Indenture Trustee, the Issuer, the Owner Trustee, the Insurer (with respect to the HELOC Mortgage Loans) or any custodian, as applicable, of a breach of any representation or warranty in clause (a) above which materially and adversely affects the interest of the Noteholders in any Mortgage Loan, the Seller shall, within 90 days of its discovery or its receipt of notice of such breach, either (i) cure such breach in all material respects, or (ii) to the extent that such breach is with respect to a Mortgage Loan and can be cured by the removal of that Mortgage Loan from the Trust, either (A) repurchase such Mortgage Loan from the Trust at the Repurchase Price, or (B) substitute one or more Eligible Substitute Mortgage Loans for such Mortgage Loan, in each case in the manner and subject to the conditions and limitations set forth herein.

Upon discovery or receipt of notice by the Seller, the Purchaser, the Insurer (with respect to the HELOC Mortgage Loans), or the Indenture Trustee of a breach of any representation or warranty of the Seller set forth in clause (b) above with respect to any

Mortgage Loan which materially and adversely affects the value of the Mortgage Loans or the interests of the Purchaser, the Noteholders, the Insurer (with respect to the HELOC Mortgage Loans), the Holders of the Trust Certificates, or the Indenture Trustee in any of the Mortgage Loans delivered to the Purchaser pursuant to this Agreement, the party discovering or receiving notice of such breach shall give prompt written notice to the others. In the case of any such breach of a representation or warranty set forth in clause (b) above, the Seller shall, within 90 days from the date that the Seller was notified or otherwise obtained knowledge of such breach, either (i) cure such breach in all material respects or (ii) purchase such Mortgage Loan from the Trust Fund at the Purchase Price. However, subject to the approval of the Purchaser, the Seller shall have the option to substitute an Eligible Substitute Mortgage Loan or Loans for such Mortgage Loan if such substitution occurs within two years following the Closing Date, except that if the breach would cause the Mortgage Loan to be other than a "qualified mortgage" as defined in Section 860G(a)(3) of the Code, any such substitution must occur within 90 days from the date the breach was discovered if such 90 day period expires before two years following the Closing Date. If the breach of representation and warranty that gave rise to the obligation to repurchase or substitute a Mortgage Loan pursuant to this Section 3.1 was either of the representations set forth in clauses (xxix), (xxx) or (xxxi) of this Section 3.1, then the Seller shall pay to the Trust Fund, concurrently with and in addition to the remedies provided in the third preceding sentence, an amount equal to any liability, penalty or the expense that was actually incurred and paid out of or on behalf of the Trust Fund, and that directly resulted from such breach, or if incurred and paid by the Trust Fund thereafter, concurrently with such payment. The Repurchase Price for any such Mortgage Loan repurchased by the Seller, and any amounts paid by the Seller in connection with the preceding sentence, shall be deposited or caused to be deposited by the Seller in the Collection Account maintained by the RMBS Master Servicer pursuant to Section 3.06 of the RMBS Master Servicing Agreement or the HELOC Back-Up Servicer pursuant to Section 3.06 of the HELOC Back-up Servicing Agreement. The obligations of the Seller to cure, purchase or substitute an Eligible Substitute Mortgage Loan shall constitute the Purchaser's, the Indenture Trustee's and the Noteholders' sole and exclusive remedy under this Agreement or otherwise respecting a breach of representations or warranties hereunder with respect to the Mortgage Loans.

In the event that the Seller elects to substitute an Eligible Substitute Mortgage Loan or Loans for a Deleted Mortgage Loan pursuant to this Section 3.1(b), the Seller shall deliver to the Indenture Trustee and the RMBS Master Servicer or HELOC Back-Up Servicer, as appropriate, with respect to such Eligible Substitute Mortgage Loan or Loans, the original Mortgage Note, the Mortgage, an Assignment of the Mortgage in recordable form, and such other documents and agreements as are required by Section 2.1, with the Mortgage Note endorsed as required by Section 2.1. No substitution will be made in any calendar month after the Determination Date for such month. Monthly Payments due with respect to Eligible Substitute Mortgage Loans in the month of substitution, to the extent received by the RMBS Master Servicer or HELOC Back-Up Servicer, as applicable, will be retained by the RMBS Master Servicer or HELOC Back-Up Servicer, as applicable and remitted by the RMBS Master Servicer or HELOC Back-Up Servicer, as applicable, to the Seller on the next succeeding Distribution Date. After the month of substitution, the Seller shall be entitled to retain all amounts received in respect of such Deleted Mortgage Loan. Upon such substitution, the related Mortgage Loan Schedule shall be amended to reflect the addition of the Qualified Substituted Mortgage Loan or Loans, the Eligible Substitute Mortgage Loan or Loans shall be subject to the

terms of this Agreement in all respects and the Seller shall be deemed to have made the representations and warranties with respect to the Eligible Substitute Mortgage Loan contained in Section 3.1(b) as of the date of substitution (other than representation (xx)).

In connection with the substitution of one or more Eligible Substitute Mortgage Loans for one or more Deleted Mortgage Loans, the RMBS Servicer or HELOC Servicer, as applicable, will determine the amount (if any) by which the aggregate principal balance of all such Eligible Substitute Mortgage Loans as of the date of substitution is less than the aggregate Stated Principal Balance of all such Deleted Mortgage Loans (in each case after application of the principal portion of the Monthly Payments due in the month of substitution that are to be distributed to the related Payment Account in the month of substitution). The Seller shall provide the RMBS Master Servicer or HELOC Back-Up Servicer, as applicable, on the day of substitution for immediate deposit into the related Payment Account the amount of such shortfall, without any reimbursement therefor. The costs of any substitution as described above, including any related assignments, opinions or other documentation in connection therewith shall be borne by the Seller.

Any cause of action against the Seller or relating to or arising out of a breach by the Seller of any representations and warranties made in clause (b) above shall accrue as to any Mortgage Loan upon (i) discovery of such breach by the Seller or notice thereof by the party discovering such breach and (ii) failure by the Seller to cure such breach, purchase such Mortgage Loan or substitute an Eligible Substitute Mortgage Loan pursuant to the terms hereof.

With respect to the representations and warranties, which are made to the best of Seller's knowledge or as to which Seller has no knowledge, if it is discovered by the Seller, the Custodian or the Indenture Trustee that the substance of any such representation and warranty is inaccurate and such inaccuracy materially and adversely affects the value of the related Mortgage Loan, then notwithstanding the Seller's knowledge or lack of knowledge with respect to the inaccuracy of such representation and warranty at the time it was made, they shall take the action as described under the remedies section.

Section 3.2. _Purchaser Representations and Warranties_. The Purchaser hereby represents and warrants to the Seller as of the date hereof and as of the Closing Date (or if otherwise specified below, as of the date so specified) that:

(a)      the Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and is qualified and in good standing to do business in each jurisdiction where such qualification is necessary, except where the failure so to qualify would not reasonably be expected to have a material adverse effect on its business as presently conducted or on its ability to enter into this Agreement and to consummate the transactions contemplated hereby;

(b)      the Purchaser has full power to own its property, to carry on its business as presently conducted and to enter into and perform its obligations under this Agreement;

(c)      the execution and delivery by the Purchaser of this Agreement have been duly authorized by all necessary action on the part of the Purchaser; and neither the

execution and delivery of this Agreement, nor the consummation of the transactions herein contemplated hereby, nor compliance with the provisions hereof, will conflict with or result in a breach of, or constitute a default under, any of the provisions of any law, governmental rule, regulation, judgment, decree or order binding on the Purchaser or its properties or the certificate of formation or limited liability company agreement of the Purchaser, except those conflicts, breaches or defaults which would not reasonably be expected to have a material adverse effect on the Purchaser's ability to enter into this Agreement and to consummate the transactions contemplated hereby;

(d)     the execution, delivery and performance by the Purchaser of this Agreement and the consummation of the transactions contemplated hereby do not require the consent or approval of, the giving of notice to, the registration with, or the taking of any other action in respect of, any state, federal or other governmental authority or agency, except those consents, approvals, notices, registrations or other actions as have already been obtained, given or made;

(e)     this Agreement has been duly executed and delivered by the Purchaser and, assuming due authorization, execution and delivery by the Seller, constitutes a valid and binding obligation of the Purchaser enforceable against it in accordance with its terms (subject to applicable bankruptcy and insolvency laws and other similar laws affecting the enforcement of the rights of creditors generally); and

(f)     except as previously disclosed to the Purchaser in the Prospectus Supplement, there are no actions, suits or proceedings pending or, to the best of the Purchaser's knowledge, threatened against the Purchaser, before or by any court, administrative agency, arbitrator or governmental body (i) with respect to any of the transactions contemplated by this Agreement or (ii) with respect to any other matter which, in the judgment of the Purchaser, if determined adversely to the Purchaser, would reasonably be expected to materially and adversely affect the Purchaser's ability to perform its obligations under this Agreement; and the Purchaser is not in default with respect to any order of any court, administrative agency, arbitrator or governmental body so as to materially and adversely affect the transactions contemplated by this Agreement.

Section 3.3.  Optional Purchase by the Seller. The Seller will have the option to purchase, at any one time, 1.00% (and in any case, at least 5 Mortgage Loans) of the Mortgage Loans, by aggregate Stated Principal Balance of the Mortgage Loans as of such date, at a purchase price equal to the aggregate fair market value of such Mortgage Loans. The Mortgage Loans that may be purchased by the Seller pursuant to this paragraph will be selected by the Seller in its sole discretion. If at any time the Seller exercises such option, it shall immediately notify or cause to be notified the Indenture Trustee and the Custodian by a certification in the form of Exhibit B to the Custodial Agreement (which certification shall include a statement to the effect that all amounts required to be deposited in the Collection Account pursuant to Section 3.06 of the RMBS Master Servicing Agreement have been or will be so deposited) of an Officer of the Seller and shall request delivery to it of the Mortgage File. Upon receipt of such certification and request, the Custodian as agent for the Indenture Trustee shall promptly release the related Mortgage Files to the Seller.

ARTICLE IV

SELLER'S COVENANTS

Section 4.1. <u>Covenants of the Seller</u>. The Seller hereby covenants that, except for the transfer hereunder with respect to the Mortgage Loans, the Seller will not sell, pledge, assign or transfer to any other Person, or grant, create, incur or assume any Lien on, any Mortgage Loan, whether now existing or hereafter created, or any interest therein; the Seller will notify the Indenture Trustee, as assignee of the Purchaser, of the existence of any Lien (other than as provided above) on any Mortgage Loan immediately upon discovery thereof; and the Seller will defend the right, title and interest of the Indenture Trustee, on behalf of the Trust, in, to and under the Mortgage Loans, whether now existing or hereafter created, against all claims of third parties claiming through or under the Seller.

ARTICLE V

INDEMNIFICATION BY THE SELLER
WITH RESPECT TO THE MORTGAGE LOANS

Section 5.1. <u>Indemnification With Respect to the Mortgage Loans.</u> The Seller shall, jointly and severally, indemnify and hold harmless the Purchaser and its directors, officers and controlling persons (as such term is used in Section 15 of the Securities Act) from and against any loss, liability or expense arising from the breach by the Seller of its representations and warranties in Section 3.1 of this Agreement which materially and adversely affects the Purchaser's interest in any Mortgage Loan or from the failure by the Seller to perform its obligations under this Agreement in any material respect, provided that the Seller shall not have any obligation to indemnify the Purchaser in respect of any loss, liability or expense that arises as a result of the Purchaser's willful malfeasance, bad faith or gross negligence or as a result of the breach by the Purchaser of its obligations hereunder.

Section 5.2. <u>Limitation on Liability of the Seller</u> None of the directors, officers, employees or agents of the Seller shall be under any liability to the Purchaser, it being expressly understood that all such liability is expressly waived and released as a condition of, and as consideration for, the execution of this Agreement. Except as and to the extent expressly provided in the Basic Documents, the Seller shall not be under any liability to the Trust Fund, the Trustee, the Noteholders. The Seller and any director, officer, employee or agent of the Seller may rely in good faith on any document of any kind *prima facie* properly executed and submitted by any Person respecting any matters arising hereunder.

ARTICLE VI

TERMINATION

Section 6.1. <u>Termination</u>. The respective obligations and responsibilities of the Seller and the Purchaser created hereby shall terminate, except for the Seller's indemnity obligations as provided herein, upon the termination of the Trust Fund pursuant to the terms of the Trust Agreement.

ARTICLE VII

MISCELLANEOUS PROVISIONS

Section 7.1. <u>Amendment</u>. This Agreement may be amended from time to time by the Seller and the Purchaser only by written agreement signed by the Seller and the Purchaser.

Section 7.2. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws, without regarding to its rules and principles governing conflicts of law.

Section 7.3. <u>Notices</u>. All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by registered mail, postage prepaid, addressed as follows:

    (i)    if to the Seller:

        American Home Mortgage Acceptance, Inc.
        538 Broadhollow Road
        Melville, New York 11747
        Attention: General Counsel

or, such other address as may hereafter be furnished to the Purchaser in writing by the Seller.

    (ii)    if to the Purchaser:

        American Home Mortgage Securities LLC
        538 Broadhollow Road
        Melville, New York 11747
        Attention: General Counsel

or such other address as may hereafter be furnished to the Seller in writing by the Purchaser.

    (iii)    if the to the HELOC Insurer: at the address designated in the Financial Guaranty Insurance Company Insurance Agreement.

Section 7.4. <u>Severability of Provisions</u>. If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be held invalid for any reason whatsoever. then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

Section 7.5. <u>Relationship of Parties</u>. Nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties hereto, and the services of the Seller shall be rendered as an independent contractor and not as agent for the Purchaser.

Section 7.6. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original and such counterparts together shall constitute one and the same Agreement.

Section 7.7.    <u>Survival</u>. The representations and warranties made herein by the Seller and the provisions of Article V hereof shall remain operative and in full force and effect and shall survive the purchase of the Mortgage Loans hereunder and the delivery of the Mortgage Loans and related documents to the Indenture Trustee.

Section 7.8.    <u>Further Agreements</u>. The Purchaser and the Seller each agree to execute and deliver to the other such additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

Section 7.9. <u>Intention of the Parties</u>. It is the intention of the parties that the Purchaser is purchasing, and the Seller is selling, the Mortgage Loans (other than the servicing rights with respect thereto), rather than a loan by the Purchaser to the Seller secured by the Mortgage Loans. Accordingly, the parties hereto each intend to treat this transaction with respect to the Mortgage Loans for federal income tax purposes as a sale by the Seller, and a purchase by the Purchaser, of the Mortgage Loans (other than the servicing rights with respect thereto). The Purchaser will have the right to review the Mortgage Loans and the Related Documents to determine the characteristics of the Mortgage Loans which will affect the federal income tax consequences of owning the Mortgage Loans and the Seller will cooperate with all reasonable requests made by the Purchaser in the course of such review.

Section 7.10. <u>Successors and Assigns; Assignment of Purchase Agreement</u>. This Agreement shall bind and inure to the benefit of and be enforceable by the Seller, the Purchaser and their respective successors and assigns. The obligations of the Seller under this Agreement cannot be assigned or delegated to a third party without the consent of the Purchaser, which consent shall be at the Purchaser's sole discretion. The parties hereto acknowledge that the Purchaser is acquiring the Mortgage Loans for the purpose of assigning the Mortgage Loans to the Trustee, on behalf of the Trust Fund, for the benefit of the Noteholders, the Insurers and Certificateholders. As an inducement to the Purchaser to purchase the Mortgage Loans, the Seller acknowledges and consents to the assignment by the Purchaser to the Trustee, on behalf of the Trust Fund of all of the Purchaser's rights against the Seller pursuant to this Agreement and to the enforcement or exercise of any right or remedy against the Seller pursuant to this Agreement by the Purchaser. Such enforcement of a right or remedy by the Trustee, on behalf of the Trust Fund, shall have the same force and effect as if the right or remedy had been enforced or exercised by the Purchaser directly.

IN WITNESS WHEREOF, the Seller and the Purchaser have caused their names to be signed to this Mortgage Loan Purchase Agreement by their respective officers thereunto duly authorized as of the day and year first above written.

BEAR STEARNS ASSET BACKED SECURITIES I LLC
as Purchaser

By:_____
        Name: Baron Silverstein
        Title: **Vice President**


AMERICAN HOME MORTGAGE ACCEPTANCE, INC.
as Seller

By:_____
        Name:
        Title:

IN WITNESS WHEREOF, the Seller and the Purchaser have caused their names to be signed to this Mortgage Loan Purchase Agreement by their respective officers thereunto duly authorized as of the day and year first above written.

BEAR STEARNS ASSET BACKED SECURITIES I LLC
as Purchaser

By:_____
      Name:
      Title:


AMERICAN HOME MORTGAGE ACCEPTANCE, INC.
as Seller

By:_____
      Name:
      Title:        Alan Horn
           EVP, General Counsel and Secretary

# EXHIBIT 1

## RMBS MORTGAGE LOAN SCHEDULE

Provided Upon Request

EXHIBIT 1

HELOC MORTGAGE LOAN SCHEDULE

Provided Upon Request

EXHIBIT 3

REVISED August 1, 2005

## APPENDIX E – STANDARD & POOR'S PREDATORY LENDING CATEGORIES

Standard & Poor's has categorized loans governed by anti-predatory lending laws in the Jurisdictions listed below into three categories based upon a combination of factors that include (a) the risk exposure associated with the assignee liability and (b) the tests and thresholds set forth in those laws. Note that certain loans classified by the relevant statute as Covered are included in Standard & Poor's High Cost Loan Category because they included thresholds and tests that are typical of what is generally considered High Cost by the industry.

## STANDARD & POOR'S HIGH COST LOAN CATEGORIZATION

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|
| Arkansas | Arkansas Home Loan Protection Act, Ark. Code Ann. §§ 23-53-101 et seq. Effective July 16, 2003 | High Cost Home Loan |
| Cleveland Heights, OH | Ordinance No. 72-2003 (PSH), Mun. Code §§ 757.01 et seq. Effective June 2, 2003 | Covered Loan |
| Colorado | Consumer Equity Protection, Colo. Stat. Ann. §§ 5-3.5-101 et seq. Effective for covered loans offered or entered into on or after January 1, 2003. Other provisions of the Act took effect on June 7, 2002 | Covered Loan |
| Connecticut | Connecticut Abusive Home Loan Lending Practices Act, Conn. Gen. Stat. §§ 36a-746 et seq. Effective October 1, 2001 | High Cost Home Loan |
| District of Columbia | Home Loan Protection Act, D.C. Code §§ 26-1151.01 et seq. Effective for loans closed on or after January 28, 2003 | Covered Loan |
| Florida | Fair Lending Act, Fla. Stat. Ann. §§ 494.0078 et seq. Effective October 2, 2002 | High Cost Home Loan |

| Georgia (Oct. 1, 2002 – Mar. 6, 2003) | Georgia Fair Lending Act, Ga. Code Ann. §§ 7-6A-1 et seq. | High Cost Home Loan |

**STANDARD & POOR'S HIGH COST LOAN CATEGORIZATION**

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|
| | Effective October 1, 2002 – March 6, 2003 | |
| Georgia as amended (Mar. 7, 2003 – current) | Georgia Fair Lending Act, Ga. Code Ann. §§ 7-6A-1 et seq. Effective for loans closed on or after March 7, 2003 | High Cost Home Loan |
| HOEPA Section 32 | Home Ownership and Equity Protection Act of 1994, 15 U.S.C. § 1639, 12 C.F.R. §§ 226.32 and 226.34 Effective October 1, 1995, amendments October 1, 2002 | High Cost Loan |
| Illinois | High Risk Home Loan Act, Ill. Comp. Stat. tit. 815, §§ 137/5 et seq. Effective January 1, 2004 (prior to this date, regulations under Residential Mortgage License Act effective from May 14, 2001) | High Risk Home Loan |
| Kansas | Consumer Credit Code, Kan. Stat. Ann. §§ 16a-1-101 et seq. Sections 16a-1-301 and 16a-3-207 became effective April 14, 1999; Section 16a-3-308a became effective July 1, 1999 | High Loan to Value Consumer Loan (id. § 16a-3-207) and; High APR Consumer Loan (id. § 16a-3-308a) |
| Kentucky | 2003 KY H.B. 287 – High Cost Home Loan Act, Ky. Rev. Stat. §§ 360.100 et seq. Effective June 24, 2003 | High Cost Home Loan |
| Maine | Truth in Lending, Me. Rev. Stat. tit. 9-A, §§ 8-101 et seq. Effective September 29, 1995 and as amended from time to time | High Rate High Fee Mortgage |
| Massachusetts | Part 40 and Part 32, 209 C.M.R. §§ 32.00 et seq. and 209 C.M.R. §§ 40.01 et seq. | High Cost Home Loan |

**STANDARD & POOR'S HIGH COST LOAN CATEGORIZATION**

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|
| | Effective March 22, 2001 and amended from time to time | |
| Nevada | Assembly Bill No. 284, Nev. Rev. Stat. §§ 598D.010 et seq.<br><br>Effective October 1, 2003 | Home Loan |
| New Jersey | New Jersey Home Ownership Security Act of 2002, N.J. Rev. Stat. §§ 46:10B-22 et seq.<br><br>Effective for loans closed on or after November 27, 2003 | High Cost Home Loan |
| New Mexico | Home Loan Protection Act, N.M. Rev. Stat. §§ 58-21A-1 et seq.<br><br>Effective as of January 1, 2004; Revised as of February 26, 2004 | High Cost Home Loan |
| New York | N.Y. Banking Law Article 6-l<br><br>Effective for applications made on or after April 1, 2003 | High Cost Home Loan |
| North Carolina | Restrictions and Limitations on High Cost Home Loans, N.C. Gen. Stat. §§ 24-1.1E et seq.<br><br>Effective July 1, 2000; amended October 1, 2003 (adding open-end lines of credit) | High Cost Home Loan |
| Ohio | H.B. 386 (codified in various sections of the Ohio Code), Ohio Rev. Code Ann. §§ 1349.25 et seq.<br><br>Effective May 24, 2002 | Covered Loan |
| Oklahoma | Consumer Credit Code (codified in various sections of Title 14A)<br><br>Effective July 1, 2000; amended effective January 1, 2004 | Subsection 10 Mortgage |
| South Carolina | South Carolina High Cost and Consumer Home Loans Act, S.C. Code | High Cost Home Loan |

## STANDARD & POOR'S HIGH COST LOAN CATEGORIZATION

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|
| | Ann. §§ 37-23-10 et seq.<br><br>Effective for loans taken on or after January 1, 2004 | |
| West Virginia | West Virginia Residential Mortgage Lender, Broker and Servicer Act, W. Va. Code Ann. §§ 31-17-1 et seq. Effective June 5, 2002 | West Virginia Mortgage Loan Act Loan |

## STANDARD & POOR'S COVERED LOAN CATEGORIZATION

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|
| Georgia (Oct. 1, 2002 – Mar. 6, 2003) | Georgia Fair Lending Act, Ga. Code Ann. §§ 7-6A-1 et seq.<br><br>Effective October 1, 2002 – March 6, 2003 | Covered Loan |
| New Jersey | New Jersey Home Ownership Security Act of 2002, N.J. Rev. Stat. §§ 46:10B-22 et seq.<br><br>Effective November 27, 2003 – July 5, 2004 | Covered Home Loan |

## STANDARD & POOR'S HOME LOAN CATEGORIZATION

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|
| Georgia (Oct. 1, 2002 – Mar. 6, 2003) | Georgia Fair Lending Act, Ga. Code Ann. §§ 7-6A-1 et seq.<br><br>Effective October 1, 2002 – March 6, 2003 | Home Loan |
| New Jersey | New Jersey Home Ownership Security | Home Loan |

**STANDARD & POOR'S HOME LOAN CATEGORIZATION**

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|
|  | Act of 2002, N.J. Rev. Stat. §§ 46:10B-22 et seq.<br><br>Effective for loans closed on or after November 27, 2003 |  |
| New Mexico | Home Loan Protection Act, N.M. Rev. Stat. §§ 58-21A-1 et seq.<br><br>Effective as of January 1, 2004; Revised as of February 26, 2004 | Home Loan |
| North Carolina | Restrictions and Limitations on High Cost Home Loans, N.C. Gen. Stat. §§ 24-1.1E et seq.<br><br>Effective July 1, 2000; amended October 1, 2003 (adding open-end lines of credit) | Consumer Home Loan |
| South Carolina | South Carolina High Cost and Consumer Home Loans Act, S.C. Code Ann. §§ 37-23-10 et seq.<br><br>Effective for loans taken on or after January 1, 2004 | Consumer Home Loan |

4

sjmeixel

(the "2005-4A Servicing Agreement" and collectively with the 2005-1 Servicing Agreement and the 2005-2 Servicing Agreement, the "Servicing Agreements").

     4.      The 2005-1 HELOCs, the 2005-2 HELOCS and the 2005 4-A HELOCS (collectively, the "HELOCS") were issued by one or more of the Debtors and thereafter sold to the Trusts[2] pursuant to various documents and agreements, including the Mortgage Loan Purchase Agreement dated March 23, 2005 between American Home Mortgage Securities LLC, as Purchaser, and AHMA, as Seller (the "2005-1 MLPA")[3], the Mortgage Loan Purchase Agreement dated June 22, 2005 between American Home Mortgage Securities LLC, as Purchaser, and AHMA, as Seller (the "2005-2 MLPA")[4], and the Mortgage Loan Purchase Agreement dated October 7, 2005 between Bear Stearns Backed Securities I LLC, as Purchaser and AHMA, as Seller (the "2005-4A MLPA" and collectively with the 2005-1 MLPA and 2005-2 MLPA, the "MLPAs")[5], many of which are attached as exhibits to the Motion (respectively referred to as either the "2005-1 HELOC Documents," the "2005-2 HELOC Documents," or the "2005-4A HELOC Documents" and collectively, the "HELOC Documents").

     5.      Pursuant to the 2005-1 MLPA, the 2005-2 MLPA and the 2005-4A MLPA (collectivley, the "MLPAs"), AHMA sold to a Trust and such Trust acquired and currently owns certain of the HELOCs and the Additional Balances (as that term is defined in the HELOC Documents associated with the respective Trusts) under the HELOCs. See MLPAs at Section 2.1(a).

---

2      The Trusts issued various notes (the "Notes") that are "backed by" or that rely upon the HELOCs and collections thereunder as a source of payment with respect to the Notes.

3      A true and correct copy of the 2005-1 MLPA is attached hereto as Exhibit A.

4      A true and correct copy of the 2005-2 MLPA is attached hereto as Exhibit B.

5      A true and correct copy of the 2005-4A MLPA is attached hereto as Exhibit C.