IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- x
In re:                                            :    Chapter 11
                                                  :
AMERICAN HOME MORTGAGE                            :    Case No.  07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,  :
                                                  :    Jointly Administered
                                                  :
       Debtors.                                   :    Ref. Docket Nos. 11, 113, 647, 865, 931 & 937
-------------------------------------------------------- x

**CERTIFICATION OF COUNSEL REGARDING ORDER (I) RESOLVING
OBJECTIONS OF COUNTRYWIDE BANK, N.A.  TO DEBTORS' MOTION
AUTHORIZING THE SALE OF THE DEBTORS' SERVICING BUSINESS;
(II) AUTHORIZING THE PRIVATE SALE OF CERTAIN SERVICING
RIGHTS TO COUNTRYWIDE BANK, N.A. FREE AND CLEAR OF LIENS,
CLAIMS AND INTERESTS; (III) APPROVING THE TERMS OF THE
PURCHASE AGREEMENT; AND (IV) GRANTING RELATED RELIEF**

On August 6, 2007,  On October 23, 2007, the above-captioned debtors and

debtors-in-possession (the " Debtors") filed a motion [Docket No. 11] (the "Servicing Sale

Motion") requesting, among other things, authority to establish sale procedures and approve the

sale of the Debtors' mortgage servicing business and assets related thereto (the "Servicing

Business").  As part of the Servicing Sale Motion, the Debtors sought authority to establish

procedures (the "Servicing Sale Procedures") whereby the Debtors were entitled, in their

discretion, to bifurcate the sale of the Servicing Business into separate pieces.  The Servicing

Sale Procedures, as amended, were approved by order of the Court on August 9, 2007 [Docket

No. 113].

Countrywide Bank, N.A. (the "Purchaser" or "Countrywide") and certain of its

affiliates objected to the Servicing Sale Motion on several bases, see Docket Nos. 614, 924, 1056

(the "Countrywide Objections"), to the extent that the Debtors proposed to transfer servicing

rights (the "Countrywide Servicing Rights") related to certain loans that the Debtors have been

servicing on a servicing retained basis pursuant to that certain Mortgage Loan Purchase and

Servicing Agreement, dated as of March 14, 2006.

During the hearing for approval of the sale of the Debtors' servicing business and

assets pursuant to the Servicing Sale Motion, the Debtors and Countrywide, along with the

official committee of unsecured creditors appointed in the Debtors' cases (the "Committee") and

Bank of America, N.A., as Administrative Agent for the lenders under that certain Second

Amended and Restated Credit Agreement dated as of August 10, 2006 (the "Administrative

Agent"), agreed to the terms of a consensual resolution of the Countrywide Objections and

would be entering into a purchase agreement to effectuate that resolution.

Attached hereto as Exhibit 1 is a proposed form of order (the "Proposed Order")

approving the Purchase Agreement (the "Purchase Agreement") entered into by the Debtors and

Countrywide, whereby the Debtors will transfer the Countrywide Servicing Rights to

Countrywide.  A copy of the Purchase Agreement is attached to the Proposed Order as Exhibit

A.  The Debtors submit that sufficient notice of the proposed sale has been provided of the sale

of the Countrywide Servicing Rights pursuant to the Servicing Sale Motion, and that the

Debtors' entry into the Purchase Agreement is authorized by the Servicing Sale Procedures.  The

Debtors rely on the record made in connection with the hearing on the Servicing Sale Motion in

support of entry of the Proposed Order.

The Debtors, Countrywide, the Committee, and the Administrative Agent have

consented to the entry of the Proposed Order approving the Purchase Agreement.  The Debtors

submit that the Proposed Order is appropriate and consistent with the Court's rulings at the Sale

Hearing, and that entry into the Purchase Agreement is in the best interest of the Debtors and

their estates.

Countrywide has indicated that its willingness to enter into the Purchase Agreement is contingent on the Transfer Date (as defined in the Purchase Agreement) occurring prior to the end of the year.  For this reason, the Debtors respectfully request that the Court enter the Proposed Order attached hereto as Exhibit 1 at its earliest convenience.

Counsel to the parties are available should the Court have any further questions or concerns with the foregoing.

Dated:    Wilmington, Delaware
          December 20, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

     /s/ Sean T. Greecher
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Pauline K. Morgan (No. 3650)
Sean M. Beach (No. 4070)
Sean T. Greecher (No. 4484)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession

# **EXHIBIT 1**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x

In re:                                                : Chapter 11

                                                      :

AMERICAN HOME MORTGAGE                                 : Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,[1] :

                                                      : Jointly Administered

        Debtors.                                      :

                                                      : **Ref. Docket Nos. 11, 113, 614, 865, 924, and 1056**

---------------------------------------------------------------- x

### ORDER (I) RESOLVING OBJECTIONS OF COUNTRYWIDE BANK, N.A.  TO DEBTORS' MOTION AUTHORIZING THE SALE OF THE DEBTORS' SERVICING BUSINESS; (II) AUTHORIZING THE PRIVATE SALE OF CERTAIN SERVICING RIGHTS TO COUNTRYWIDE BANK, N.A. FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS; (III) APPROVING THE TERMS OF THE PURCHASE AGREEMENT; AND (IV) GRANTING RELATED RELIEF

This matter coming on to be heard on the Emergency Motion of the Debtors for

Orders:  (A) (i) Approving Sale Procedures; (ii) Scheduling a Hearing to Consider Sale of

Certain Assets Used In the Debtors' Loan Servicing Business; (iii) Approving Form and Manner

of Notice Thereof; and (iv) Granting Related Relief; and (B) (i) Authorizing the Sale of Such

Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (ii) Authorizing and

Approving Purchase Agreement Thereto; (iii) Approving the Assumption and Assignment of

Certain Executory Contracts and Unexpired Leases Related Thereto; and (iv) Granting Related

Relief [Docket No. 11] (the "Servicing Sale Motion") and the subsequent Motion of the Debtors

for Order Pursuant to Sections 105(a), 363, 364, 365, and 503(b) of the Bankruptcy Code and

Rules 2002, 4001, 6004, 6006, 7062, 9007 and 9014 of the Federal Rules of Bankruptcy

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road,

Procedure (A) Approving Revised Procedures for the Sale of the Debtors' Mortgage Servicing

Business; (B) Approving Certain Protections for the Stalking Horse Bidder in Such Sale; (C)

Directing that Certain Notices of Such Sale and Deadline be Given; and (D) Authorizing, on an

Interim Basis, the Debtors to Grant Certain Liens and Other Protections for the Purchaser's

Collateral Effective After the Initial Closing [Docket No. 865] (the "Revised Sale Procedures

Motion" and collectively, with the Servicing Sale Motion, the "Motion") of the above-captioned

debtors (collectively, the "Debtors"), pursuant to sections 105 and 363 of Title 11 of the United

States Code (the "Bankruptcy Code") and Rules 2002 and 6004 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and upon the various objections of

Countrywide Bank, FSB (the "Purchaser" or "Countrywide") to the relief requested in the

Motion [Docket Nos. 614, 924, and 1056] (the "Objections"), regarding the proposed sale of the

servicing rights (the "Countrywide Servicing Rights") related to certain loans the Debtors have

been servicing on a servicing retained basis pursuant to that certain Mortgage Loan Purchase and

Servicing Agreement dated as of March 14, 2006 (as may have been amended from time to time,

the "Servicing Agreement"), and the Debtors and Countrywide having stated on the record at the

hearing on the Motion (the "Hearing") that they had agreed to a consensual resolution of the

Objections and would be entering into a purchase agreement to effectuate that resolution, and the

Debtors and Countrywide having entered into the Purchase Agreement (the "Purchase

Agreement"), attached to hereto as Exhibit A; and the Court having reviewed the Purchase

Agreement; and the Court having determined that the relief requested in the Motion is in the best

interests of the Debtors, their estates, creditors and other parties-in-interest; and due and

adequate notice of the Motion having been given under the circumstances; and upon the record

---

Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving,
Texas 75063.

set forth at the Hearing on the remainder of the record herein; and after due deliberation thereon, and good and sufficient cause appearing therefor:

### FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief sought in the Motion are sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9019.

C.    For the reasons set forth in the Motion, due and adequate notice of the Motion, the Purchase Agreement, the hearing, and the subject matter thereof has been provided to all parties-in-interest herein, and no other or further notice is necessary. A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

D.    Resolution of the Objections and approval of the Purchase Agreement is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest. The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief requested herein.

E.    The Purchase Agreement was negotiated and proposed, and has been entered into by the parties, in good faith, from arms-length bargaining positions, and without collusion. The Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is entitled to the protection thereof. Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement, or the sale of the Countrywide Servicing Rights to the Purchaser pursuant thereto and hereto, to be avoided under section 363(n) of the Bankruptcy Code.

F.      Under the circumstances, and due and adequate notice having been provided, for the reasons stated at the Hearing, it is in the best interests of the Debtors, their creditors, and all other parties-in-interest herein that the Countrywide Servicing Rights be sold to the Purchaser in a private sale under Section 363(b) of the Bankruptcy Code and Bankruptcy Rules 2002(c)(1) and 6004(f)(1).

G.      The consideration provided by Purchaser for the Countrywide Servicing Rights pursuant to the Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Countrywide Servicing Rights, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory or possession.

H.      The Debtors are authorized to sell the Countrywide Servicing Rights free and clear of all interests of any kind or nature whatsoever, because one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) have been satisfied.  Those holders of interests who did not object to the Motion or the relief requested therein, or who imposed and then withdrew their objections, are deemed to have consented to the sale pursuant to 11 U.S.C. § 363(f)(2).  Those holders of interests who did object fall within one or more of the other subsections of 11 U.S.C. § 363(f) and are adequately protected by having their interests, if any, attach to the proceeds of the sale of the Countrywide Servicing Rights.  The Purchaser does not constitute a successor to the Debtors or their estates.

I.      Because the Purchaser is already the owner of the Mortgage Loan Documents (as defined in the Purchase Agreement), the Debtors are not selling personally identifiable information to the Purchaser.  Additionally, (i) the privacy policy given by the

4

Debtors to homeowners does not prohibit the sale contemplated under the Purchase Agreement

and (ii) the sale is consistent with the privacy policy given by the Debtors to homeowners.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.      Pursuant to sections 105 and 363 of the Bankruptcy Code, as well as Rule

9019 of the Bankruptcy Rules, the Debtors are hereby authorized and empowered to enter into

the Purchase Agreement and to sell, transfer, and convey the Countrywide Servicing Rights to

the Purchaser.

2.      The Objections are hereby resolved and withdrawn in their entirety.

3.      The Countrywide Sale and the Purchase Agreement and all of its terms are

APPROVED, and this Order and the Purchase Agreement, upon execution, shall be binding upon

the Debtors, all creditors of the Debtors, and any trustees appointed in these proceedings or any

trustees appointed in any subsequent proceedings under chapter 7 or chapter 11 of the

Bankruptcy Code relating to the Debtors, and all other parties-in-interest herein.

4.      Pursuant to 11 U.S.C. § 363(b), the Debtors and the Purchaser, as well as

their officers, employees, and agents, shall be, and hereby are, authorized to take any and all

actions and/or execute any and all documents as may be necessary or desirable to consummate

the transactions contemplated by the Purchase Agreement and to sell, transfer, and convey the

Countrywide Servicing Rights and all ancillary rights to the Purchaser.  Any actions taken by the

Debtors and the Purchaser necessary or desirable to consummate such transactions prior to the

entry of this Order are hereby ratified.

5.      The Purchaser is a good faith purchaser within the meaning of section

363(m) of the Bankruptcy Code and is entitled to the protection thereof.

6.      Upon the Transfer Date, the Countrywide Servicing Rights shall be

transferred to Purchaser free and clear of all liens, claims, encumbrances, or other interests,

DB02:6322325.6                                                                      066585.1001

pursuant to Bankruptcy Code sections 105 and 363, provided that the liens and security interests of the Administrative Agent in the Countrywide Servicing Rights shall attach to the proceeds thereof. All persons and entities (including, without limitation, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, and trade and other creditors) holding liens, claims, encumbrances, or other interests of any kind or nature whatsoever against or in the Debtors or the Countrywide Servicing Rights (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated) arising under or out of, in connection with, or in any way relating to the Debtors, the Countrywide Servicing Rights, the operation of the Debtors' businesses prior to the Transfer Date, or the transfer of the Countrywide Servicing Rights to Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting against Purchaser, its successors or assigns, or the Countrywide Servicing Rights, such persons' or entities' liens, claims, encumbrances, or other interests.

7.    To the extent of any conflict between this Order and the Order Approving (i) Sale Procedures; (ii) Scheduling a Hearing to Consider Sale of Certain Assets Used in the Debtors' Loan Servicing Business; (iii) Approving Form and Manner of Notice Thereof; and (iv) Granting Related Relief [Docket No. 113], the terms of this Order shall govern.

8.    The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of this Court; provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates, and provided further that, with respect to any modifications, amendments, and supplements, the Debtors shall consult with, and notice shall be provided to, the Committee, the DIP Lender, and the Administrative Agent.

6

9.      The failure specifically to include any particular provisions of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement substantially in the form attached hereto as Exhibit A be authorized and approved in its entirety.

10.     The Debtors and Purchaser agree that none of the representations and warranties set forth in the Purchase Agreement shall survive the Transfer Date, and neither party has agreed to the indemnification of the other pursuant to the Purchase Agreement.

11.     Except as expressly set forth herein or in the Purchase Agreement, Purchaser shall have no right of setoff, counterclaim or recoupment for any liability or claim not arising out of the Purchase Agreement against any amounts the Purchaser owes the Seller pursuant to the Purchase Agreement.

12.     Notwithstanding anything to the contrary in the Order or the Purchase Agreement, to the extent any of the Countrywide Servicing Rights consist of an interest in a consumer credit transaction subject to the Truth in Lending Act or an interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations), the Purchaser shall remain subject to the same claims and defenses that are related to such consumer credit transaction or such consumer credit contract to the same extent as the Purchaser would be subject to such claims and defenses of the consumer if such interest had been purchased at a sale not under section 363 of the Bankruptcy Code, as provided for in section 363(o) of the Bankruptcy Code.

13.     Except as otherwise expressly provided for in this Order or the Purchase Agreement, the Purchaser shall not have any liability or responsibility for any liability or other obligation of the Debtors arising prior to the Transfer Date and arising under or related to the Countrywide Servicing Rights or otherwise. Without limiting the generality of the foregoing,

7

and except as otherwise specifically provided herein or in the Purchase Agreement, the Purchaser shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, whether known or unknown as of the Transfer Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors arising prior to the Transfer Date.

14.     All proceeds of the sale received by the Debtors, including, without limitation, the proceeds from all outstanding documented advances, shall be paid in accordance with the terms of (i) the Final Order (I) Authorizing Debtors' Limited Use of Cash Collateral and (II) Granting Replacement Liens and Adequate Protection to Certain Pre-Petition Secured Parties, approved by the Court on September 4, 2007 [D.I. 554], and (ii) the First Final Stipulation and Order Extending Limited Use of Cash Collateral Pursuant to the Final Order (I) Authorizing Debtors' Limited Use of Cash Collateral and (II) Granting Replacement Liens and Adequate Protection to Certain Pre-Petition Secured Parties [D.I. 2002] (collectively, the "Cash Collateral Order").

15.     All rights of the Debtors under and pursuant to the Purchase Agreement including, without limitation, the Debtors' rights to enforce the provisions of the Purchase Agreement, shall constitute "Collateral," as such term is defined in the Cash Collateral Order, of the Administrative Agent.

16.     To the extent that Countrywide intends to assert a general unsecured claim for a Servicer Breach Claim, Countrywide shall be obligated to file a proof of claim with respect to such Servicer Breach Claim on or before January 11, 2007.  Failure to timely file any such proof of claim shall result in Countrywide being forever barred from asserting such a claim.

17.     To the extent that there are any inconsistencies between the Purchase Agreement and this Order, the terms of this Order shall govern.

8

18.    The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to implement the terms and conditions of the Purchase Agreement and the provisions of this Order.

19.    Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Purchaser are free to close under the Purchase Agreement at any time, subject to the terms of the Purchase Agreement.

20.    The Court shall retain exclusive jurisdiction to resolve any dispute arising from or relating to the Purchase Agreement or this Order.

Dated: Wilmington, Delaware
_____, 2007

_____
Christopher S. Sontchi
United States Bankruptcy Judge

# EXHIBIT A

## Purchase Agreement

DB02:6322325.4

066585.1001

## COUNTRYWIDE BANK, FSB

## SERVICING RIGHTS PURCHASE AND SALE AGREEMENT

**THIS SERVICING RIGHTS PURCHASE AND SALE AGREEMENT**, dated as of the 19th day of December, 2007, is hereby mutually agreed upon and entered into by and between COUNTRYWIDE BANK, FSB, having an address at 225 West Hillcrest Drive, Thousand Oaks, California 91360 ("Countrywide" or "Purchaser"), and AMERICAN HOME MORTGAGE CORP., having an address at 538 Broadhollow Road, Melville, New York 11747 ("Servicer"). Servicer and certain of its affiliates are each a debtor and debtor-in-possession (the "Debtors") under Title 11 of the United States Code (11 U.S.C. §101 *et seq.*), as amended (the "Bankruptcy Code").

### WITNESSETH:

**WHEREAS**, Countrywide and American Home Mortgage Corp., a New York corporation ("AHM"), entered into a Mortgage Loan Purchase and Servicing Agreement dated as of March 14, 2006 (as may have been amended from time to time, the "Servicing Agreement"), pursuant to which Countrywide has purchased from AHM certain first lien, adjustable-rate residential mortgage loans on a servicing retained basis;

**WHEREAS**, Servicer has serviced and administered the Mortgage Loans (as hereinafter defined) on behalf of Countrywide pursuant to the Servicing Agreement;

**WHEREAS**, on August 6, 2007, Servicer and certain of its affiliates filed for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, in the bankruptcy case captioned *In re American Home Mortgage Holdings, Inc., a Delaware Corporation, et al.,* Case No.07-11047 (CSS) Jointly Administered (the "Bankruptcy Case"), and Servicer remains in possession and control of its assets as of the date hereof; and

**WHEREAS**, Purchaser and Servicer desire to set forth the terms and conditions pursuant to which Servicer will sell, transfer and assign to Purchaser all of Servicer's right, title and interest in and to the Servicing Rights, and Purchaser will purchase and assume all right, title and interest in and to the Servicing Rights.

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and conditions and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and upon the terms and subject to the conditions set forth herein, the Parties hereto agree as follows:

### ARTICLE I.

### DEFINITIONS

As used in this Agreement, the following terms shall have the meanings specified below.

DB02:6315984.12                                                                                          066585.1001

"Accepted Servicing Practices" means, with respect to any Mortgage Loan, those mortgage servicing practices of prudent mortgage lending institutions that service mortgage loans of the same type as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located.

"Administrative Agent" means Bank of America, N.A., as administrative agent under that certain Second Amended and Restated Credit Agreement, dated August 10, 2006, among Servicer, certain affiliates of Servicer, Bank of America, N.A., as administrative agent, and certain other parties, as amended.

"Advances" means, with respect to the Mortgage Loans, all customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) advanced by the Servicer in the performance of its servicing obligations, and which are reimbursable to the Servicer in accordance with the Servicing Agreement including, but not limited to, the cost of (a) the preservation, restoration and protection of the Mortgaged Property, (b) any enforcement or judicial proceedings, including foreclosures, (c) the management and liquidation of the Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage, and (d) compliance with the obligations under the Servicing Agreement.

"Agency" or "Agencies" means Fannie Mae or Freddie Mac, as applicable.

"Agreement" means this Servicing Rights Purchase and Sale Agreement, including all amendments, supplements, and Exhibits hereto.

"Ancillary Income" means all late charges, assumption fees, reinstatement fees, and escrow account benefits or similar types of fees arising from or in connection with any Mortgage Loan, to the extent not otherwise payable to the Mortgagor under applicable law or pursuant to the terms of the related Mortgage Note.

"Applicable Requirements" means, as of the time of reference, (i) the Accepted Servicing Practices; (ii) all contractual obligations of Servicer with respect to the Servicing Rights, including without limitation those contractual obligations contained herein, in the Servicing Agreement or in the Mortgage Loan Documents; (iii) all applicable federal, state, and local laws, statutes, rules, regulations, and ordinances applicable to Servicer or to the Servicing Rights; (iv) all other judicial and administrative judgments, orders, approvals, stipulations, awards, writs, and injunctions applicable to Servicer, the Servicing Rights, or the related Mortgage Loans.

"Assignments of Mortgage Instruments" means an assignment of Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction where the related Mortgaged Property is located to reflect the transfer of the Mortgage to the party indicated therein or if the related Mortgage has been recorded in the name of MERS or its designee, such actions as are necessary to cause the designee to be shown as the owner of the related Mortgage on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS.

2

"Bankruptcy Code" has the meaning set forth in the introductory paragraph of this Agreement.

"Bankruptcy Loan" means a Mortgage Loan with respect to which, as of the Transfer Date, the Mortgagor thereon has sought relief under or has otherwise been subjected to the federal bankruptcy laws under the Bankruptcy Code or any other similar federal or state laws of general application for the relief of debtors, through the institution of appropriate proceedings, and such proceedings are continuing.

"Business Day" means any day other than a Saturday, Sunday, or other day on which banking institutions in the State of California or New York are required or authorized by law or by executive order to be closed.

"Cash Collateral Order" means the Order of the Bankruptcy Court (i) Authorizing Debtors' Use of Cash Collateral and (ii) Granting Replacement Liens and Adequate Protection to Certain Pre-Petition Secured Creditors, dated September 4, 2007, entered in the Bankruptcy Cases, including any amendments or extensions thereof.

"Claim" has the meaning set for in Section 101(5) of the Bankruptcy Code, including any third-party claim, demand or litigation.

"Custodial Accounts" means the accounts in which Custodial Funds are deposited and held by Servicer pursuant to the Servicing Agreement.

"Custodial Funds" means all funds held by Servicer with respect to the related Mortgage Loans including, but not limited to, all principal and interest funds and any other funds due to the Investor that are maintained by Servicer relating to the Mortgage Loans.

"Custodian" means an entity acting as a mortgage loan document custodian pursuant to Applicable Requirements.

"Cut-off Date" means the close of business one Business Day prior to the Transfer Date.

"Encumbrance" means any security interest, pledge, hypothecation, mortgage, lien (including environmental and tax liens), violation, charge, lease, license, encumbrance, servient easement, adverse claim, reversion, reverter, preferential arrangement, restrictive covenant, condition, or restriction of any kind, including any restriction on the use, voting, transfer, receipt of income, or other exercise of any attributes of legal ownership.

"Escrow Account" means the accounts in which Escrow Funds are deposited and held by a Servicer pursuant to the Servicing Agreement.

"Escrow Funds" means funds held by the Servicer with respect to the Mortgage Loans for the payment of taxes, assessments, insurance premiums, ground rents, funds from hazard insurance loss drafts, other mortgage escrow and impound items, and similar charges (including interest accrued thereon for the benefit of the Mortgagors under the Mortgage Loans, if applicable), maintained by Servicer relating to the Mortgage Loans.

3

"Exhibit" means an exhibit attached hereto or delivered or to be delivered pursuant to this Agreement.

"Final Payment" means the amount to be paid by Purchaser to Servicer pursuant to Section 3.03(D).

"Flood Contract" means a paid in full, fully assignable, life of loan flood contract with respect to a Mortgage Loan.

"HUD" means United States Department of Housing and Urban Development or any successor thereto.

"Insurer" or "Insurers" means any Person providing any standard hazard insurance policy, any federal flood insurance policy, any title insurance policy, any earthquake insurance policy, or any other insurance policy applicable to a Mortgage Loan and any successor thereto, including, without limitation, as applicable, an Agency, private mortgage insurer, or other insurer or guarantor under such policies.

"Investor" means with respect to each Mortgage Loan, Countrywide, in its capacity as the owner of such Mortgage Loan, and any successor or assigns as an owner thereof.

"Litigation Loan" means a Mortgage Loan with respect to which, as of the Transfer Date, any litigation is pending relating to the Mortgage Loan and materially and adversely affecting the value of the related Servicing Rights or subjecting the Servicer to potential liability or cost (excluding class action lawsuits).

"Loss" or "Losses" means any and all direct, actual and out-of-pocket losses, damages, deficiencies, claims, costs, or expenses, including without limitation, reasonable attorneys' fees and disbursements.

"MERS" means the Mortgage Electronic Registration System that enables members to execute and deliver an Assignment of Mortgage Instrument with respect to a Mortgage Loan to MERS for recording in the office of the appropriate local jurisdiction.

"Mortgage Escrow Payments" means the portion, if any, of the Mortgage Loan Payment in connection with a Mortgage Loan that will, upon receipt by Servicer, become part of the Escrow Funds.

"Mortgage File" means the file containing copies in the form set forth in Section 2.07, and original documents to the extent required by the Applicable Requirements, of the Mortgage Loan Documents with respect to a Mortgage Loan, as well as the related credit and closing packages, disclosures, custodial documents, and all other files, books, records and documents necessary, as applicable, to (i) establish the eligibility of the Mortgage Loan for insurance by an Insurer, (ii) service the Mortgage Loan in accordance with Applicable Requirements, and (iii) comply with Applicable Requirements regarding the Mortgage Loan documentation to be maintained by the servicer of the Mortgage Loan or document custodian with respect to such Mortgage Loan.

4

"Mortgage Instrument" means any deed of trust, security deed, mortgage, security agreement, or any other instrument that constitutes a first lien on real estate securing payment by a Mortgagor of a Mortgage Note.

"Mortgage Loan" means the one-to-four family residential mortgage loans listed on the Mortgage Loan Schedule as to which Servicer is the owner of the Servicing Rights under the Servicing Agreement.

"Mortgage Loan Documents" means, to the extent not previously delivered, with respect to any Mortgage Loan: (i) the original Mortgage Note, (ii) the original Mortgage Instrument, (iii) a mortgagee title insurance policy (or other evidence of title acceptable under Applicable Requirements), (iv) any private mortgage insurance policy, and (v) the original recorded Assignments of Mortgage Instrument(s), along with such other documents or instruments, or substitutes therefor, as are required to be retained by the Custodian pursuant to Applicable Requirements.

"Mortgage Loan Payment" means, with respect to a Mortgage Loan, the amount of each monthly installment on such Mortgage Loan, whether principal and interest or interest alone or escrow or other payment, required to be paid by the Mortgagor in accordance with the terms of the Mortgage Loan Documents.

"Mortgage Loan Schedule" means the schedule of the related Mortgage Loans to be attached hereto as Exhibit B or provided in electronic form by Servicer to Purchaser setting forth information with respect to such Mortgage Loans.

"Mortgage Note" means the promissory note executed by a Mortgagor and secured by a Mortgage Instrument evidencing the indebtedness of the Mortgagor under a Mortgage Loan.

"Mortgaged Property" means the fully constructed one-to-four family residential real property that is encumbered by a Mortgage Instrument, including all buildings and fixtures thereon and all accessions thereto, including installations of mechanical, electrical, plumbing, heating, and air conditioning systems located in or affixed to such buildings, and all alterations, additions, and replacements.

"Mortgagor" means any obligor under a Mortgage Note or a Mortgage Instrument.

"Order" means any order or ruling issued by the United States Bankruptcy Court for the District of Delaware and such other Court having jurisdiction over Servicer's Bankruptcy Case that is applicable to the Agreement and the rights and obligations of the parties hereto.

"Parties" means Servicer and Purchaser.

"Person" means an individual, a corporation, a partnership, a limited liability company, a joint venture, a trust, an unincorporated association or organization, or a government body, agency or instrumentality, rather than the meaning set forth in Section 101(41) of the Bankruptcy Code.

"Prepayment Charge" means with respect to any Mortgage Loan, the charges or premiums, if any, due in connection with a Principal Prepayment of such Mortgage Loan, in accordance with the terms of the related Mortgage Note or Mortgage Instrument, and in accordance with applicable state and federal laws.

"Principal Prepayment" means any recovery of principal on a Mortgage Loan that is received in advance of such principal's scheduled due date and that is not accompanied by an amount of interest representing scheduled interest due on any date subsequent to the month of prepayment.

"Purchase Price" means, with respect to Servicing Rights to be sold to Purchaser hereunder, the total amount to be paid by Purchaser to Servicer pursuant to Article III to acquire the Servicing Rights.

"Purchase Price Percentage" means 0.92%.

"Purchaser" has the meaning set forth in the introductory paragraph of this Agreement.

"REO Loan" means a Mortgage Loan that was acquired by Servicer as a result of a foreclosure or deed in lieu of foreclosure.

"Servicer" has the meaning set forth in the introductory paragraph of this Agreement.

"Servicing Agreement" means the Mortgage Loan Purchase and Servicing Agreement dated as of March 14, 2006, by and between Countrywide and the Servicer, as may have been amended from time to time.

"Servicing Fee" means the amount payable to Servicer under the Servicing Agreement related to a Mortgage Loan, as consideration for servicing the Mortgage Loan.

"Servicing Rights" means the rights and obligations of Servicer to administer, collect the payments for the reduction of principal and application of interest, collect payments on account of taxes and insurance, pay taxes and insurance, remit collected payments, provide foreclosure services, provide full escrow administration and any other obligations and rights required for or in connection with, the Mortgage Loans pursuant to the Servicing Agreement, together with the right to receive the Servicing Fee, Prepayment Charges, if any, reimbursement for Advances and any Ancillary Income arising from or connected to the Mortgage Loans, and all rights, powers, and privileges incident to any of the foregoing.

"Servicing Transfer Instructions" means the instructions detailing the procedures pursuant to which Servicer shall effect the transfer of Servicing Rights, Mortgage Files and Servicing Agreements to Purchaser, which instructions are attached hereto as Exhibit A.

"Tax Service Contract" means a paid in full, fully assignable, life of loan real estate tax service contract with respect to a Mortgage Loan.

"Transfer Date" means a date that is no later than December 27, 2007.

**ARTICLE II.**

TRANSFER OF SERVICING RIGHTS

Section 2.01.    Conveyance of Servicing Rights.

(a)    Upon the terms and subject to the conditions of this Agreement, and subject to the Applicable Requirements, Servicer shall, on the Transfer Date, sell, transfer and assign to Purchaser, and Purchaser shall, on the Transfer Date, purchase and assume from Servicer, all right, title, interest and obligation of Servicer in and to: (i) the Servicing Rights, and all rights related thereto, (ii) the Advances, (iii) the Custodial Funds and Escrow Funds, (iv) the Mortgage Files, (v) the exclusive right to enter into arrangements that generate, or to otherwise receive, Ancillary Income with respect to the Mortgage Loans, including any Ancillary Income accrued and uncollected prior to the Transfer Date, (vi) the right to collect and retain Prepayment Charges, (vii) the Flood Contracts and (viii) the Tax Service Contracts. The Servicing Rights that are being sold and transferred by Servicer on the Transfer Date shall be transferred and assigned to and accepted by Purchaser on "as is" "where is" and "with all faults" conditions, free of any warranties or representations whatsoever, whether express or implied, except as expressly set forth in this Agreement.

(b)    On the Transfer Date, the Servicer shall deliver to Purchaser such other instruments of assignment, transfer and conveyance, and do such other acts as are reasonably necessary to effectuate the transfer, assignment and delivery to Purchaser of the right, title and interest of the Servicer in and to the Servicing Rights to be sold, transferred, assigned and delivered to Purchaser on such date pursuant to Article II free and clear of any Encumbrances.

(c)    This Agreement shall terminate the servicing obligations under the Servicing Agreement.  Purchaser hereby releases and waives any and all rights to assert an administrative expense claim related to the servicing of the Mortgage Loans by the Servicer pursuant to the Servicing Agreement, and agrees to limit its rights to assert general unsecured claims related to the servicing of the Mortgage Loans by the Servicer pursuant to the Servicing Agreement, to the right to assert Servicer Breach Claims in the manner and to the extent set forth in Section 4.03, in each case arising prior to the Transfer Date that Purchaser may have against Servicer related to the servicing of the Mortgage Loans by the Servicer pursuant to the Servicing Agreement; provided, however, that this termination and release shall not affect (i) any other claims that Purchaser may have against Servicer under the Servicing Agreement (it being acknowledged that any such claims against Servicer would not relate to the servicing of the Mortgage Loans by the Servicer pursuant to the Servicing Agreement); and (ii) Purchaser's right to deduct costs and expenses related to Identified Deficiencies and Servicer Breach Claims as set forth in section 4.03 herein.

Section 2.02.    Assumption of Liabilities.

Upon the terms and subject to the conditions of this Agreement, and subject to the Applicable Requirements, Purchaser shall, on the Transfer Date, accept the appointment to

service the Mortgage Loans and become fully vested with all the rights, powers, duties, responsibilities, obligations and liabilities of the Servicer, with like effect as if named as of the Transfer Date as the successor to the Servicer under the Servicing Agreement and the Custodial Agreement with respect to any Servicing Rights and related assets described in Section 2.01, pursuant to the Servicing Agreement, and any other liabilities as are expressly assumed by Purchaser under this Agreement.

Section 2.03.   Evidence of Transfer.

Pursuant to this Agreement, Servicer and Purchaser agree that as of the Transfer Date, Servicer hereby assigns and Purchaser hereby assumes the Servicing Rights and the servicing for the Mortgage Loans, in which such servicing by Servicer under the Servicing Agreement will be terminated for the Mortgage Loans and servicing by Purchaser will commence for the Mortgage Loans.

On or prior to the Transfer Date, Purchaser and Servicer shall execute and deliver the documents required to be executed and delivered under this Agreement, in form and substance reasonably satisfactory to Purchaser and Servicer, and shall execute and deliver such other instruments or documents as Purchaser and Servicer shall reasonably determine are necessary or appropriate to effectuate or evidence the transactions contemplated hereby.

Section 2.04.   Servicing Transfer Instructions.

In connection with the transfer of Servicing Rights from Servicer to Purchaser or any sub-servicer designated by Purchaser pursuant to this Agreement, Servicer and Purchaser shall follow the Servicing Transfer Instructions, attached hereto as Exhibit A.   The Servicing Transfer Instructions may be modified by mutual agreement between Purchaser and Servicer.

Section 2.05.   Delivery of Mortgage Loan Data and Files.

(a)     Transfer Date Data Tapes.     Purchaser acknowledges receipt of a preliminary tape(s) containing the information to transfer the Servicing Rights to be sold on the Transfer Date.

(b)     Delivery of Mortgage Loan Files.   No later than two (2) Business Days prior to the Transfer Date, Servicer shall, in accordance with the Servicing Transfer Instructions, provide Purchaser, Purchaser's sub-servicer or Purchaser's other designee with the data, information and materials reasonably necessary for Purchaser, Purchaser's sub-servicer or Purchaser's other designee to service the Mortgage Loans, including, but not limited to, Mortgage Notes, riders, loan modification documents, and servicing files, but excluding the final data tapes, in accordance with the Applicable Requirements. Servicer shall, in accordance with the Servicing Transfer Instructions, package and ship to Purchaser or Purchaser's sub-servicer or Purchaser's other designee for inside delivery, to be received by Purchaser or Purchaser's sub-servicer or Purchaser's other designee no later than five (5) Business Days after the Transfer Date, all Mortgage Files pertaining to the Mortgage Loans and the related servicing records in Servicer's possession. Servicer shall provide Purchaser with prior written notice of the carrier, shipping arrangements, and insurance arrangements with respect to the delivery of the Mortgage Files.

8

(c)    <u>Power of Attorney.</u>  As of the date of this Agreement, Servicer hereby irrevocably constitutes and appoints Purchaser and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full power and authority in the place and stead of Servicer, and in the name of Servicer or in its own name, from time to time, for the purpose of carrying out the terms of this Agreement (including the transfer of the Servicing Rights and servicing functions for the Mortgage Loans hereunder) and complying with the terms of the related Mortgage Loan Documents as the servicer thereof, and to take any and all appropriate action and execute any and all documents and instruments which may be necessary or appropriate to accomplish the purpose of this Agreement (including without limitation the transfer of the Servicing Rights and servicing functions for the Mortgage Loans to the Purchaser hereunder) and comply with the terms of the Mortgage Loan Documents as the servicer thereof, including without limitation the preparation and mailing or other distribution of goodbye letters to the related Mortgagors.

Section 2.06.    <u>Recordation of Assignments of Mortgage.</u>

Servicer shall take all such actions as may be necessary to transfer or record all right, title and interest in the Mortgage Loans to Purchaser and the Servicing Rights with respect to the Mortgage Loans to Purchaser, consisting of: (i) assigning nominal title to the related Mortgage Loans to Purchaser; (ii) preparing or causing to be prepared all prior intervening Assignments of Mortgage Instruments, and recording such Assignments of Mortgage Instruments if required under Applicable Requirements; and (iii) endorsing or causing to be endorsed the related Mortgage Notes in accordance with Applicable Requirements.  Servicer shall bear all costs associated with the preparation and recording of the Assignments of Mortgage Instruments described in (i) and (ii) above, and the preparation of the endorsements described in (iii) above.  Servicer shall forward to the Custodian the original recorded Assignments of Mortgage Instruments upon return from the recording office on a weekly basis and forward to Purchaser a report of all original recorded Assignments delivered to Custodian. Servicer shall (X) procure or execute such affidavits, land court orders or other documents as it currently uses to evidence Servicer's ownership of such Servicing Rights, with the reasonable cooperation of Purchaser in the Servicer's procurement or execution thereof, and (Y) prepare such endorsements or prepare and record such intervening Assignments of Mortgage Instruments as may be required to reflect of record Servicer's ownership of such Servicing Rights in any jurisdiction or recording office that refuses to accept the documents described in clause (X) as proof of Servicer's ownership of such Servicing Rights.

Notwithstanding the foregoing provisions of this Section 2.06, if a Mortgage Loan already is registered with MERS, Servicer shall follow the requirement of MERS to reflect in the records of MERS the transfer of the Servicing Rights to the Mortgage Loan from Servicer to Purchaser.  Servicer shall continue the transmission of recording information of the Mortgage Instruments to MERS after the Transfer Date, until all such recording information is received and transmitted to MERS and Purchaser, which in any event and under all circumstances shall be completed not later than two (2) days after the Transfer Date.  For each Mortgage Loan registered with MERS, Servicer shall bear all costs and all responsibility associated with the registration of a Mortgage Loan with MERS, including, without limitation, the related preparation and recordation of an Assignment of Mortgage Instrument, and all costs and responsibility associated with the reflection of the transfer of Servicing to the Mortgage Loan in

9

the records of MERS. For each Mortgage Loan registered with MERS, Servicer shall provide Purchaser with the MERS mortgage loan identification number in an electronic format acceptable to the parties.

Section 2.07.   Transfer of Mortgage Loan Files.

Servicer shall be responsible for ensuring all documents comprising the Mortgage File held by or on behalf of Servicer, related to the Mortgage Loans and that are not already held by the Custodian, are transferred to Purchaser in a timely manner including, but not limited to, Mortgage Notes, riders, loan modification documents and servicing files.

Section 2.08.   Transfer of Escrow Funds, Custodial Funds, Advances and Reconciliation.

Within two (2) Business Days after the Transfer Date, the Servicer shall remit and deliver to Purchaser, or Purchaser's sub-servicer or Purchaser's other designee, Escrow Funds, Custodial Funds and all other funds and collections, the legal, right, title, and interest to which were transferred to Purchaser on the Transfer Date and shall reconcile such amounts with Purchaser in accordance with the Servicing Transfer Instructions.

Section 2.09.   Transfer of Tax and Flood Contracts.

(a)     No later than five (5) days prior to the Transfer Date, Servicer shall provide Purchaser with an electronic file of the Mortgage Loans which shall set forth whether each Mortgage Loan is or is not covered by a Tax Service Contract as of the Cut-off Date. If a Mortgage Loan is covered by a Tax Service Contract as of the Cut-off Date, then Servicer shall assign and transfer such contract to Purchaser, without further cost to Purchaser, on or before the Transfer Date. If a Mortgage Loan is not covered by a Tax Service Contract, the Servicer agrees that Countrywide shall have the right to obtain a Tax Service Contract and pursuant to Section 4.03, deduct from the Final Payment an amount equal to the actual cost of obtaining such Tax Service Contract, not to exceed eighty-six dollars ($86.00) for each Tax Service Contract.

(b)     No later than five (5) days prior to the Transfer Date, Servicer shall provide Purchaser with an electronic file of the related Mortgage Loans which shall set forth whether each Mortgage Loan is or is not covered by Flood Contract issued by First American as of the Cut-off Date. If a Mortgage Loan is covered by a Flood Contract issued by First American as of the Cut-off Date, then Servicer shall assign and transfer such contract to Purchaser, without further cost to Purchaser, on or before the Transfer Date. Within five (5) days following the Transfer Date, Servicer shall assign and transfer, in an electronic file format, the transferable life-of-loan flood certifications and contract information to Purchaser. If a Mortgage Loan is not covered by a Flood Contract, the Servicer agrees that Countrywide shall have the right to obtain a Flood Contract and pursuant to Section 4.03, deduct from the Final Payment an amount equal the actual cost of obtaining such Flood Contract, not to exceed eighteen dollars ($18.00) for each Flood Contract.

Section 2.10.   Costs of Transfer.

Except as otherwise provided herein, (i) Servicer shall be responsible for all transfer and recording fees, costs and expenses with respect to the transfer of Servicing Rights,

10

the delivery of Mortgage Loan Files and related documents, the remittance of Custodial Funds, and all other fees, costs and expenses incurred by Servicer in Servicer's performance of Servicer's obligations under this Agreement, including without limitation the fees, costs and expenses of Servicer's document custodian, attorneys and accountants and (ii) Purchaser shall be responsible for the fees, costs and expenses of the Purchaser in its performance of its obligations under this Agreement, including without limitation the fees of the Purchaser's attorneys and accountants.

Section 2.11.  <u>Statements.</u>

      For the period beginning on January 1, 2007 and ending on the Transfer Date, Servicer shall provide, and for the period beginning on the Transfer Date and ending on December 31, 2007, Purchaser shall provide each Mortgagor with an annual year-end statement in accordance with reasonable requirements of the Investor, and in accordance with Internal Revenue Service and/or Treasury Department regulations. Servicer shall not have any responsibility for providing such information for the period of time the Mortgage Loan was serviced by Purchaser, and Purchaser shall not have any responsibility for providing such information for the period of time the Mortgage Loan was serviced by Servicer.

Section 2.12.  <u>Notice to Borrowers.</u>

      As soon as practicable, Servicer and Purchaser shall deliver to each borrower under a Mortgage Loan a mutually agreed upon letter advising the borrower of the transfer of Servicing Rights contemplated herein. Such letter shall comply with all Applicable Requirements, including, without limitation, the federal Real Estate Settlement Procedures Act, as amended, and Regulation X, as amended. Purchaser and Servicer shall each pay 50% of the costs and expenses of such letter. Upon receipt of the Purchaser's invoice, for the Servicer's portion of the costs and expenses of the letter, the Debtors shall, within five (5) Business Days, wire such payment in immediately available funds to an account designated by the Purchaser.

Section 2.13.  <u>Servicing Prior to Transfer Date.</u>

      On and prior to the Transfer Date, the Servicer shall discharge such duties and responsibilities during the period from the date hereof until the Transfer Date with the same degree of diligence and prudence that Servicer is obligated to exercise under the Servicing Agreement.

Section 2.14.  <u>Servicing Following Transfer Date.</u>

      Purchaser shall assume responsibility for servicing the Mortgage Loans for which it has purchased the Servicing Rights effective as of the Transfer Date. Following such transfer of servicing, Purchaser shall be responsible for servicing each such Mortgage Loan in accordance with Applicable Requirements. Each of Purchaser and Servicer hereby agrees and acknowledges that Servicer shall not be responsible for monitoring any of the obligations of Purchaser to service the Mortgage Loans. In addition, each of Servicer and Purchaser hereby agrees and acknowledges (i) that Servicer shall not have any liability for the administration or servicing by Purchaser of the Mortgage Loans or the manner in which Purchaser services the Mortgage Loans for the benefit of the Investor on and after the Transfer Date, and (ii) that

11

Purchaser shall not have any liability for the administration or servicing by Servicer of the Mortgage Loans or the manner in which Servicer has serviced the Mortgage Loans for the benefit of the Investor prior to the Transfer Date.

Section 2.15.   Forwarding Post-Transfer Date Items.

Servicer shall forward, within two (2) Business Days of receipt thereof, to Purchaser, Purchaser's sub-servicer, or Purchaser's other designee, all Mortgagor correspondence, insurance notices, tax bills, or any other correspondence or documentation related to the transferred Servicing Rights and the Advances that are received by Servicer after the Transfer Date. Without limiting the generality of the forgoing, Servicer shall forward to Purchaser, by first class mail, within one (1) Business Day after the date on which such payments are received by Servicer, any Mortgage Loan payments due Purchaser that are received by Servicer after the Transfer Date. The Servicer agrees that it will not deposit nor cash any payment related to the Mortgage Loans that are received after the Transfer Date and shall forward any electronic payments or checks received within one (1) Business Day after the date on which such electronic payment or check is received.

### ARTICLE III.

### TRANSFER OF SERVICING RIGHTS

Section 3.01.   Purchase Price.

In full consideration for the transfer and sale of Servicing Rights as of the Transfer Date, Purchaser shall pay, in the manner provided in Section 3.03, and subject to the adjustments provided for in this agreement, an amount equal to (i) the Purchase Price Percentage multiplied by the aggregate unpaid principal balance of the Mortgage Loans as of the Cut-off Date, excluding the aggregate unpaid principal balances of Litigation Loans as of the Cut-off Date, Bankruptcy Loans as of the Cut-off Date, REO Loans as of the Cut-off Date and Mortgage Loans that are sixty (60) or more days past due as of the Cut-off Date, plus (ii) all outstanding documented Advances funded by Servicer in accordance with the terms of the Servicing Agreement. All amounts owed by Purchaser on account of the Purchase Price shall be placed in escrow or otherwise segregated and held in trust for the benefit of the Servicer, in a manner acceptable to the Servicer, the Administrative Agent, and the official committee of unsecured creditors appointed in the Bankruptcy Cases.

Section 3.02.   Verification of Purchase Price Items.

Within five (5) Business Days prior to the Transfer Date, Servicer shall provide Purchaser with a preliminary Mortgage Loan Schedule that sets forth the Mortgage Loans as of the Cut-off Date, the aggregate actual unpaid principal balance of each such Mortgage Loan as of the Cut-off Date, and all other mortgage loan data reasonably required by Purchaser at such time. If Purchaser notifies Servicer that the preliminary Mortgage Loan Schedule is acceptable, then the Mortgage Loan Schedule shall become final. If, however, after reviewing the preliminary Mortgage Loan Schedule, Purchaser reasonably believes that there is an error in the preliminary Mortgage Loan Schedule, Purchaser shall so notify Servicer and in such event the Parties shall

12

cooperate in connection with resolving the matter. The Servicer agrees that it shall make any and all applicable revisions to the preliminary Mortgage Loan Schedule and shall provide Purchaser with the revised preliminary Mortgage Loan Schedule no later than four (4) Business Days following the Transfer Date and upon review and approval by Countrywide, the Mortgage Loan Schedule shall be finalized, after any applicable revisions to the preliminary Mortgage Loan Schedule are made.

Section 3.03.    Payment of Purchase Price by Purchaser.

The Purchase Price for the Servicing Rights shall be paid by Purchaser by wire transfer in immediately available funds as follows:

(A) twenty percent (20%) of the Purchase Price on the Transfer Date provided that Countrywide has received all documents commercially reasonably required to effect a transfer of the Servicing Rights, including but not limited to, the Mortgage File, the Servicing File, the REO file, the Bankruptcy file and the Foreclosure file, required to transfer all right, title and interest in the Servicing Rights related to the Mortgage Loans, or other documents as required in the Servicing Transfer Instructions, (B) seventy percent (70%) of the Purchase Price within five (5) Business Days following the Transfer Date, provided that the Servicer delivers, or causes to be delivered, to Countrywide (i) the final transfer tape, (ii) substantially all items in the Mortgage File as required in the Servicing Transfer Instructions, and (iii) any funds in any Escrow Account, Custodial Account or other account held, controlled, or managed by the Servicer or its designee related to such Mortgage Loans, (C) one hundred percent (100%) of all Advances, provided that a valid invoice or other reasonable supporting documentation in accordance with Applicable Requirements for reimbursement has been delivered to and approved by Countrywide, which approval will not be unreasonably withheld, no later than ninety (90) days after the Transfer Date, and (D) ten percent (10%) of the Purchase Price, within one hundred and eighty (180) days following the Transfer Date and upon confirmation by Countrywide that (i) all Escrow Accounts, Custodial Accounts, or other accounts related to the Mortgage Loans have been reconciled and are in Countrywide's possession, (ii) Countrywide has received all outstanding items enumerated in subpart (B) above; provided that any disputes regarding the receipt and reconciliation of items (i) and (ii) shall be resolved pursuant to section 4.03 of this Agreement.

Purchaser will wire all funds payable pursuant to Article III, on the day such amounts are due, to an account designated by the Administrative Agent in accordance with and subject to the Cash Collateral Order.

**ARTICLE IV.**

REPRESENTATIONS AND WARRANTIES; FINAL PAYMENT CONTINGENCY

Section 4.01.    Representations and Warranties of the Servicer.

Servicer hereby makes the following representations and warranties as of the Transfer Date:

13

(a) <u>Due Organization and Authority</u>. The Servicer is a corporation duly incorporated and validly existing under the laws of the state of Maryland and is licensed to conduct business of the type conducted by the Servicer. Subject only to entry of an Order in the Bankruptcy Case approving this Agreement: (i) the Servicer has the full corporate power and authority to execute and deliver this Agreement and to perform in accordance herewith; (ii) the execution, delivery and performance of this Agreement (including all instruments or transfer to be delivered pursuant to this Agreement) by the Servicer, and the consummation by the Servicer of the transactions contemplated hereby, have been duly and validly authorized; (iii) this Agreement has been duly authorized, executed and delivered by the Servicer; (iv) this Agreement evidences the valid, binding, and enforceable obligation of the Servicer, subject to bankruptcy laws and other similar laws of general application affecting the rights of creditors; and (v) all requisite corporate action has been taken by the Servicer to make this Agreement valid and binding upon the Servicer in accordance with its terms.

(b) <u>No Conflicts</u>. Upon entry of an Order in the Bankruptcy Case approving this Agreement, neither the execution and delivery of this Agreement, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of the Servicer's charter, by laws or other organizational documents or any legal restriction or any material agreement or instrument to which the Servicer is now a party or by which it is bound, or constitute a default or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Servicer or its property is subject.

(c) <u>No Litigation Pending</u>. Except for the pending Bankruptcy Case and the Servicer's request for entry of an Order approving this Agreement, there is no action, suit, proceeding or investigation pending or, to Servicer's knowledge, threatened against the Servicer, before any court, administrative agency or other tribunal regarding the invalidity of this Agreement, which would draw into question the validity of this Agreement or the Mortgage Loans or of any action taken or to be taken in connection with the obligations of the Servicer contemplated herein.

(d) <u>No Consent Required</u>. Other than entry of an Order in the Bankruptcy Case approving this Agreement, no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Servicer of or compliance by the Servicer with this Agreement as evidenced by the consummation of the transactions contemplated by this Agreement.

(e) <u>Brokers Fees</u>. If Servicer has utilized a broker or other financial or other advisor(s) for which a fee or commission may be due, Servicer represents and warrants that such fee or commission shall be the sole responsibility of the Servicer.

Section 4.02. <u>Representations and Warranties Of Purchaser</u>.

Purchaser hereby makes the following representations and warranties to the Servicer as of the Transfer Date:

14

(a) <u>Due Incorporation and Good Standing</u>.  Purchaser is a corporation, duly organized, validly existing, and in good standing under the laws of the United States.

(b) <u>Authority and Capacity</u>.  The execution, delivery, and performance by Purchaser of this Agreement have been duly and validly authorized by all necessary corporate action.  Subject only to entry of an Order in the Bankruptcy Case approving Servicer's participation in and compliance with this Agreement, this Agreement constitutes a legal, valid, and enforceable obligation of Purchaser.

(c) <u>No Conflicts</u>.  Upon entry of an Order in the Bankruptcy Case approving this Agreement, neither the execution and delivery of this Agreement, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions, or provisions of Purchaser's charter, by laws or other organizational documents or any legal restriction or any agreement or instrument to which Purchaser is now a party or by which it is bound, or constitute a default, or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment, or decree to which the Purchaser or its property is subject.

(d) <u>No Litigation Pending</u>.  Except for the pending Bankruptcy Case and the Servicer's request for entry of an Order approving this Agreement, there is no action, suit, proceeding or investigation pending or, to the best of Purchaser's knowledge, threatened against Purchaser, before any court, administrative agency or other tribunal regarding the invalidity of this Agreement, that would draw into question the validity of this Agreement or the Mortgage Loans or of any action taken or to be taken in connection with the obligations of Purchaser contemplated herein.

(e) <u>No Consent Required</u>.  Other than entry of an Order in the Bankruptcy Case approving this Agreement, no consent, approval, authorization, or order of any court or governmental agency or body is required for the execution, delivery, and performance by Purchaser of or compliance by Purchaser with this Agreement as evidenced by the consummation of the transactions contemplated by this Agreement.

(f) <u>Brokers Fees</u>.  If Purchaser has utilized a broker or other financial or other advisor(s) for which a fee or commission may be due, Purchaser represents and warrants that such fee or commission shall be the sole responsibility of Purchaser.

(g) <u>Financing</u>.  Purchaser has available sufficient funding to enable Purchaser to consummate the purchase of the Servicing Rights from Servicer and otherwise to perform all of Purchaser's obligations under this Agreement.

Section 4.03.  <u>Final Payment Contingency.</u>

The Servicer agrees that Purchaser shall have the right to deduct any and all reasonable costs and expenses that were incurred by Purchaser with respect to the transfer of the Servicing Rights from the Final Payment as provided for under this Agreement to the extent that such costs and expenses arise as a result of the Servicer's failure to effect the transfer of the

15

Servicing Rights to Countrywide in accordance with the servicing transfer instructions and/or Accepted Servicing Practices (the "Identified Deficiencies"). Further, the Servicer agrees that Purchaser shall have the right to deduct from the Final Payment any and all costs, expenses, or damages associated with any breach, or correcting any breach, of the Servicer's obligations related to the servicing of the Mortgage Loans pursuant to the Servicing Agreement prior to the Transfer Date (the "Servicer Breach Claims").

Purchaser's recourse for any Identified Deficiency, Servicer Breach Claim (except as provided in the last sentence of the following paragraph) or Servicer's breach of any representation, warranty, covenant or delivery requirement hereunder, or any other breach of, violation of, or default under any provision of this Agreement by Servicer, including the accuracy of the Mortgage Loan Schedule and final transfer tape (a "Seller Contract Claim"), or for other remedies to which Purchaser may become entitled pursuant to this Agreement, shall be limited to offset against the amount of the Final Payment that has not been paid by Purchaser to Servicer at the time such breach is discovered by Purchaser or such obligation arises. Servicer shall not be liable to pay Purchaser or any other Person any damages, fees, penalties or other similar payments due to any Identified Deficiency, Servicer Breach Claim (except as provided in the last sentence of the following paragraph) or Seller Contract Claim, including, but not limited to, Servicer's representations, warranties, covenants and agreements contained herein (it being understood that Purchaser may only satisfy such claims out of the amount of the Final Payment that has not been paid by Purchaser to Servicer at the time such Identified Deficiency, Servicer Breach Claim, Seller Contract Claim, or breach, violation or default is discovered by Purchaser or such obligation arises).

The Parties agree to cooperate to resolve any alleged Identified Deficiencies, Servicer Breach Claims and Seller Contract Claims. If Servicer (with the consent of the Administrative Agent and after consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases) does not object to the amount of the Identified Deficiencies, Servicer Breach Claims and/or Seller Contract Claims within ten (10) days after written notice of the Identified Deficiencies, Servicer Breach Claims and/or Seller Contract Claims, then Purchaser shall retain from the Final Payment the amount of the Identified Deficiencies Servicer Breach Claims and/or Seller Contract Claims and pay the remainder of the Final Payment to Servicer. If Servicer objects to all or any portion of the Identified Deficiencies, Servicer Breach Claims and/or Seller Contract Claims, then Purchaser shall pay the amount of the Final Payment that is in excess of the Identified Deficiencies Servicer Breach Claims and/or Seller Contract Claims to Servicer and the parties shall, in good faith, seek to resolve any objection (with the consent of the Administrative Agent and after consultation with the official committee of unsecured creditors appointed in the Bankruptcy Cases in the case of Servicer) for a period of fifteen (15) days. If Purchaser and Servicer are not able to resolve a dispute with respect to any Identified Deficiencies Servicer Breach Claims and/or Seller Contract Claims during such fifteen-day period, the dispute shall be submitted to the Bankruptcy Court for final determination. In the event that the amount of Servicer Breach Claims that is undisputed, resolved by the parties or determined by the Bankruptcy Court exceeds the funds available from the Final Payment for the payment of such Servicer Breach Claims, the right of Purchaser to assert a general unsecured claim against the Debtors with respect to such excess is preserved.

DB02:6315984.12                                                                                                   066585.1001

## ARTICLE V.

## CONDITIONS PRECEDENT

Section 5.01.  Conditions Precedent to the Obligations of Purchaser and Servicer.

The obligations of each of Purchaser and Servicer under this Agreement are subject to the satisfaction in all material respects, at or prior to the Transfer Date, of each of the following conditions, any or all of which in subsections (a) and (b) below may be waived in writing by Purchaser and/or Servicer:

(a)  Correctness of Representations and Warranties.  The representations and warranties made by each of Purchaser and Servicer in this Agreement are true and correct in all material respects as of each of the Transfer Date;

(b)  Compliance with Conditions.  All material terms, covenants and conditions of this Agreement required to be complied with and performed by each of Purchaser and Servicer at or prior to the Transfer Date shall have been duly complied with and performed by such party in all material respects; and

(c)  Bankruptcy Court Order.  Entry of an Order in the Bankruptcy Case in form and substance reasonably acceptable to Purchaser approving this Agreement.

## ARTICLE VI.

## MISCELLANEOUS

Section 6.01.  Supplementary Information.

From time to time prior to and after the Transfer Date, Servicer shall furnish to Purchaser such information supplementary to the information contained in the documents and schedules delivered pursuant hereto which is reasonably available to Servicer as Purchaser may reasonably request or which may be reasonably necessary to enable Purchaser to file any reports due to any investors in connection with the related Mortgage Loans or Servicing Rights.

Section 6.02.  Access to Information.

Servicer shall allow Purchaser and its counsel, accountants, and other representatives, reasonable access, during normal business hours, to all of Servicer's files, books and records directly relating to the Servicing Rights and the related Mortgage Loans, Custodial Accounts, and Advances.  Purchaser and its representatives and affiliates shall treat all information obtained in such investigation, not otherwise in the public domain, as confidential and shall not use any such information for its own benefit, unless Purchaser acquires the related Servicing Rights hereunder.

Section 6.03.  Further Assurances.

Subject to Bankruptcy Court approval, Purchaser and the Servicer each agree to execute and deliver to the other such additional documents, instruments or agreements as may be necessary to effectuate the purposes of this Agreement. Purchaser and Servicer shall cooperate in good faith to consummate the transactions contemplated by this Agreement.

Section 6.04.    <u>Survival</u>.

Notwithstanding anything to the contrary herein, no warranties or representations of the Parties set forth herein shall survive the Transfer Date.

Section 6.05.    <u>Assignment.</u>

Neither Party shall assign, sub-license, sub-contract, charge or otherwise subject to any Encumbrance any of its rights or obligations under this Agreement without the prior written consent of the other Party.

Section 6.06.    <u>Notices.</u>

All demands, notices and communications hereunder shall be in writing and shall be given via e-mail, facsimile transmission or registered or certified mail to the person at the address set forth below:

      i.   if to the Servicer:

American Home Mortgage Servicing, Inc.
4600 Regent Blvd, Suite 200
Irving, Texas 75063
Attention: David Friedman
Fax: (866) 841-2568
E-mail: David.Friedman@Americanhm.com

with a copy (which shall not constitute notice) to:

American Home Mortgage Servicing, Inc.
538 Broadhollow Road
Melville, NY 11747
Attention: Alan Horn, General Counsel
Fax: (800) 209-7276
E-mail: Alan.Horn@Americanhm.com

And

18

066585.1001

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Attention:  Craig D. Grear
Fax:  (302) 571-1253
E-mail:  cgrear@ycst.com


Hahn & Hessen LLP
488 Madison Avenue
New York, NY  10022
Attention:  Mark T. Power
Fax:  (212) 478-7350
E-mail:  mpower@hahnhessen.com

 ii. if to Purchaser:

Countrywide Bank, FSB
4500 Park Granada
Mail Suite CH-20
Calabasas, California 93102
Attn: Kathleen Conte, Executive Vice President

And

Countrywide Home Loans Servicing, LP
4200 Amon Carter Blvd.
Mail Suite FWACS-108
Forth Worth, Texas 76155
Attn: Michael Capps, Senior Vice President

With copy to:

Countrywide Bank, FSB
225 West Hillcrest Drive
Thousand Oaks, California 91360
Attn: General Counsel

or such other address as may hereafter be furnished to the other party by like notice.  Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

Section 6.07.  Entire Agreement; Amendment.

This Agreement constitutes the entire agreement between the Parties with respect to the sale of the servicing rights of the Mortgage Loans. This Agreement may be amended and any provision hereof waived, but, only in writing signed by the Party against whom such enforcement is sought.

Section 6.08.    Execution; Binding Effect.

This Agreement may be executed in one or more counterparts and by the different Parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same agreement. This Agreement shall inure to the benefit of and be binding upon the Servicer and Purchaser and their respective successors and assigns.

Section 6.09.    Governing Law Jurisdiction; Consent to Service of Process.

THIS AGREEMENT SHALL BE DEEMED IN EFFECT WHEN A FINAL, UNAPPEALABLE ORDER HAS BEEN ENTERED BY THE BANKRUPTCY COURT AND SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK. THIS AGREEMENT SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ITS CHOICE OF LAW RULES AND PRINCIPLES.

PURCHASER AND SERVICER FURTHER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (A) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT. PURCHASER CONSENTS TO AND EXPRESSLY AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION; *PROVIDED, HOWEVER,* THAT IF THE BANKRUPTCY COURT REFUSES TO ACCEPT JURISDICTION OVER ANY SUCH DISPUTE, EACH OF PURCHASER AND THE SERVICER IRREVOCABLY (I) SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK FOR THE PURPOSE OF ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT; (II) WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT; (III) AGREES THAT A FINAL JUDGMENT IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW; AND (IV) CONSENTS TO SERVICE OF PROCESS UPON IT BY MAILING A COPY THEREOF BY CERTIFIED MAIL ADDRESSED TO IT AS PROVIDED FOR NOTICES HEREUNDER.

Section 6.10.    Waiver of Trial by Jury.

THE SERVICER AND PURCHASER EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY

DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 6.11.   Counterparts.

This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

Section 6.12.   No Remedy Exclusive.

Except as otherwise set forth in this Agreement, no remedy under this Agreement is intended to be exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to any remedies given under this Agreement or existing at law or in equity.

Section 6.13.   Construction.

This Agreement shall be construed and interpreted fairly as to both Parties and not in favor or against either Party, regardless of which Party prepared this Agreement.

Section 6.14.   Waivers.

Except for the requirement of entry of an Order in the Bankruptcy Case in form and substance acceptable to Purchaser approving this Agreement, either the Servicer or Purchaser may upon written consent:

(a)   Waive compliance with any of the terms, conditions or covenants required to be complied with by the others hereunder; and

(b)   Waive or modify performance of any of the obligations of the others hereunder.

The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other subsequent breach.

Section 6.15.   Announcements.

Neither Party shall issue press releases or announcements regarding, or otherwise disclose to the general public or mortgage servicing industry, the existence or terms of this Agreement without the prior written approval of the other Party, except to the extent required by any court, tribunal, regulatory authority or law.

Section 6.16.   No Solicitation.

From and after the Transfer Date, the Servicer agrees that it will not take any action or cause any action to be taken by any of its employees, agents or affiliates, or by any independent contractors acting on the Servicer's behalf, to solicit in any manner whatsoever any Mortgagor for any purpose, including, without limitation, to prepay or refinance a Mortgage

21

Loan. It is understood and agreed by Servicer and Purchaser that all rights and benefits relating to the solicitation of any Mortgagor shall be transferred to Purchaser pursuant hereto on the Transfer Date and the Servicer shall take no action to undermine these rights and benefits. Promotions undertaken by the Servicer which are directed to the general public at large (including, without limitation, mass mailings based on commercially acquired mailing lists, newspaper, radio and television advertisements) shall not constitute solicitation under this Section 6.16. In addition, the Servicer shall use commercially reasonable efforts to prevent the sale of the name of any Mortgagor to any person or entity.

Section 6.17.   Relationship of Parties.

Nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties. The duties and responsibilities of the Servicer shall be rendered by it as an independent contractor and not as an agent of Purchaser.

Section 6.18.   Severability of Provisions.

Any part, provision representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.

Section 6.19.   Exhibits.

The exhibits to this Agreement are hereby incorporated and made a part hereof and are integral parts of this Agreement.

Section 6.20.   General Interpretive Principles.

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)   Terms used in this Agreement have the meanings assigned to them in this Agreement (as defined herein), and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender.

(b)   Accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles.

(c)   References herein to a "Section," shall be to the specified section(s) of this Agreement and shall include all subsections of such section(s).

(d)   The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provisions.

(e)   Headings of the Articles and Sections in this Agreement are for reference purposes only and shall not be deemed to have any substantive effect.

22

      (f)   Each reference to any federal, state or local statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder.

      IN WITNESS WHEREOF, each of the undersigned parties to this Agreement has caused this Agreement to be duly executed in its name by one of its duly authorized officers, all as of the date first above written.

Servicer:

**AMERICAN HOME MORTGAGE CORP., DEBTOR AND DEBTOR IN POSSESSION**

By: _____

Name: _Kevin Nystrom_____

Title: _Director of Restructuring_____

Purchaser:

**COUNTRYWIDE BANK, FSB**

By: _____

Name: _____

Title: _____

(c)    References herein to a "Section," shall be to the specified section(s) of this Agreement and shall include all subsections of such section(s).

(d)    The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provisions.

(e)    Headings of the Articles and Sections in this Agreement are for reference purposes only and shall not be deemed to have any substantive effect.

(f)    Each reference to any federal, state or local statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder.

IN WITNESS WHEREOF, each of the undersigned parties to this Agreement has caused this Agreement to be duly executed in its name by one of its duly authorized officers, all as of the date first above written.

Servicer:

**AMERICAN HOME MORTGAGE CORP., DEBTOR AND DEBTOR IN POSSESSION**

By: _____

Name: _____

Title: _____

Purchaser:

**COUNTRYWIDE BANK, FSB**

By: _____

Name: _____

Title: _____
**KATHLEEN CONTE
EXECUTIVE VICE-PRESIDENT**

23

## Exhibit A

### Servicing Transfer Instructions

## Exhibit B

### Mortgage Loan Schedule