# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AMERICAN HOME MORTGAGE<br>HOLDINGS, INC., et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 07-11047 (CSS)<br>(Jointly Administered)<br><br>Proposed Objection Deadline: December 28, 2007 at 4:00 p.m.<br>Proposed Hearing Date: January 4, 2008 at 11:00 a.m. |

## GMAC MORTGAGE LLC'S MOTION TO COMPEL THE DEBTORS TO SEND NOTICE TO THE HELOC BORROWERS REGARDING THE "FREEZING" OF THE HELOC LOANS

GMAC Mortgage LLC ("GMACM"), by and through its undersigned counsel, respectfully files this Motion to Compel the Debtors to Send Notice to the HELOC Borrowers Regarding the "Freezing" of the HELOC Loans (the "Motion"), pursuant to Section 105 of the United States Code (the "Bankruptcy Code"), and Rule 2002(m) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an order compelling American Home Mortgage Acceptance, Inc. and American Home Mortgage Servicing, Inc. (the "Debtors") to send a notice to the HELOC Borrowers (as defined below) regarding the status of funding under the HELOC loans. In support of this Motion, GMACM respectfully states as follows:

### JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested herein are Section 105 of the Bankruptcy Code and Rule 2002(m) of the Bankruptcy Rules.

## BACKGROUND

4. On August 6, 2007 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

5. Prior to the filing of their bankruptcy cases, the Debtors were in the business of originating, servicing and selling home equity lines of credit (collectively, "HELOCs") and mortgage loans. Many of the mortgage loans and HELOCs originated by one or more of the Debtors were bundled together in pools and thereafter sold to trusts formed to acquire and own the mortgage loans or HELOCs. Thus, the trusts hold all right, title and interest to the separate pools of mortgage loans or HELOCs, as the case may be, under indentures.

6. The trusts issued securities in the form of trust certificates or notes to investors "backed" by the mortgage loans or HELOCs and the stream of payments made thereunder. The payments called for under the trust certificates or notes derive from the income stream generated by the pool of mortgage loans and HELOCs owned by the trusts and serviced by the Debtors. The holders of the certificates thus rely on the servicer to comply with its responsibilities as servicer to manage the collateral in order to receive payment.

7. GMACM and the Debtors are parties to various servicing agreements in connection with mortgage loan securitizations under which the Debtors are the master servicer, servicer, or the subservicer. GMACM is either the back-up servicer[1] or master servicer, as the case may be, under certain of these home equity lines of credit securitization arrangements. As back-up servicer or master servicer, GMACM is designated as the entity to take over the servicing function of the HELOC portfolios following a HELOC Servicer Termination Event (as defined in the indentures relating to the securitizations involving GMACM as back-up servicer or master servicer).

---

[1] GMACM is a party to HELOC Back-Up Servicing Agreements which specify its obligations as back-up servicer in connection with certain of the securitizations at issue here. The HELOC Back-Up Servicing Agreements are described with more specificity in paragraph 10 of this Motion.

8. GMACM serves as the master servicer with respect to the securitized portfolio of HELOCS known as the Series 2004-4 HELOC loan portfolio (the "2004-4 HELOCs") under the following servicing agreements:

   a. Servicing Agreement dated December 21, 2004 (the "2004-4 Servicing Agreement") among GMACM, as HELOC Master Servicer, American Home Mortgage Trust 2004-4, as Issuer, American Home Mortgage Acceptance, Inc. ("AHMA"), as Seller, and The Bank of New York, as Indenture Trustee; and

   b. HELOC Subservicing Agreement dated December 21, 2004 among GMACM, as HELOC Master Servicer, and American Home Mortgage Servicing, Inc. ("AHM Servicing"), as HELOC Subservicer (the "2004-4 Subservicing Agreement" and collectively with the 2004-4 Servicing Agreement, the "2004-4 Servicing Agreements").

9. Additionally, GMACM is the back-up servicer ("Back-Up Servicer") and AHM Servicing or AHMA is the servicer for certain HELOC loans under the following agreements:

   a. HELOC Servicing Agreement (the "2005-1 Servicing Agreement") dated as of March 23, 2005 among AHM Servicing, as Servicer, GMACM, as Back-Up Servicer, American Home Mortgage Trust 2005-1, as Issuer, Deutsche Bank National Trust Company, as the Indenture Trustee and AHM Acceptance, as Seller, with respect to the securitized portfolio of home equity line of credit mortgage loans known as the Series 2005-1 HELOC loan portfolio (the "2005-1 HELOCs");

   b. HELOC Servicing Agreement (the "2005-2 Servicing Agreement") dated as of June 22, 2005 among AHM Servicing, as Servicer, GMACM, as Back-Up Servicer, American Home Mortgage Investment Trust 2005-2, as Issuer, Deutsche Bank National Trust Company, as the Indenture Trustee and AHMA, as Seller, with respect to the securitized

portfolio of home equity line of credit mortgage loans known as the Series 2005-2 HELOC loan portfolio (the "2005-2 HELOCs")

        c.      HELOC Servicing Agreement dated (the "2005-4A Servicing Agreement") as of October 7, 2005 among AHMA, as Servicer, GMACM, as Back-up Servicer, American Home Mortgage Investment Trust 2005-4A, as Issuer, U.S. Bank National Association, as the Indenture Trustee and AHMA, as Seller, with respect to the securitized portfolio of home equity line of credit mortgage loans known as the Series 2005-4A HELOC loan portfolio (the "2005-4A HELOCs")

        d.      HELOC Servicing Agreement (the "2006-2 Servicing Agreement") dated June 30, 2006 among AHM Servicing, as Servicer, GMACM, as Back-Up Servicer, American Home Mortgage Trust 2006-2, as Issuer, Deutsche Bank Trust Company Americas, as Indenture Trustee, AHMA, as Sponsor, with respect to the securitized portfolio of home equity line of credit mortgage loans known as the Series 2006-2 HELOC loan portfolio (the "2006-2 HELOCs"); and

        e.      HELOC Servicing Agreement (the "2007-A Servicing Agreement" and collectively with the 2004-4 Servicing Agreement, 2005-1 Servicing Agreement, 2005-2 Servicing Agreement, 2005-4A Servicing Agreement, and the 2006-2 Servicing Agreement, the "Servicing Agreements") dated March 13, 2007, among AHM Servicing, as Servicer, GMACM, as Back-Up Servicer, American Home Mortgage Trust 2007-A, as Issuer, Deutsche Bank Trust Company Americas, as Indenture Trustee, and AHMA, as Sponsor, with respect to the securitized portfolio of home equity line of credit mortgage loans known as the Series 2007-A HELOC loan portfolio (the "2007-A HELOCs" and collectively with the 2004-4 HELOCs,

2005-1 HELOCs, 2005-2 HELOCs, 2005-4A HELOCs and the 2006-2 HELOCs, the "<u>HELOCs</u>").

10.     In connection with the securitization of the HELOCs, various back-up servicing agreements were entered into as follows::

a.     HELOC Back-Up Servicing Agreement dated March 23, 2005 among GMACM, as Back-Up Servicer, American Home Mortgage Trust 2005-1, as Issuer, and Deutsche Bank National Trust Company, as Indenture Trustee (the "<u>2005-1 Back-Up Servicing Agreement</u>");

b.     HELOC Back-Up Servicing Agreement dated June 22, 2005 among GMACM, as Back-Up Servicer, American Home Mortgage Investment Trust 2005-2, as Issuer, and Deutsche Bank National Trust Company, as Indenture Trustee (the "<u>2005-2 Back-Up Servicing Agreement</u>");

c.     HELOC Back-Up Servicing Agreement dated October 7, 2005 among GMACM, as Back-Up Servicer, American Home Mortgage Trust 2005-4A, as Issuer, and U.S. Bank National Association, as Indenture Trustee (the "<u>2005-4A Back-Up Servicing Agreement</u>");

d.     HELOC Back-Up Servicing Agreement dated June 30, 2006 among GMACM, as Back-Up Servicer, American Home Investment Trust 2006-2, as Issuing Entity, and Deutsche Bank Trust Company Americas, as Indenture Trustee (the "<u>2006-2 Back-Up Servicing Agreement</u>"); and

e.     HELOC Back-Up Servicing Agreement dated March 13, 2007 among GMACM, as Back-Up Servicer, American Home Mortgage Investment Trust 2007-A, as Issuing

Entity, and Deutsche Bank National Trust Company, as Indenture Trustee ("<u>2007-A Back-Up Servicing Agreement</u>" and collectively with the 2005-1 Back-Up Servicing Agreement, 2005-2 Back-Up Servicing Agreement, 2005-4A Back-Up Servicing Agreement, and the 2006-2 Back-Up Servicing Agreement, the "<u>Back-Up Servicing Agreements</u>").

11. HELOCs operate in a similar fashion to revolving lines of credit. So long as no default exists under the HELOC, the borrower under the HELOC (a "<u>HELOC Borrower</u>") is permitted to borrow up to the credit limit and thereafter re-borrow principal amounts previously repaid. Typically for each HELOC there exists a "lender" who is obligated to honor draw requests thereunder and a "servicer" who is responsible for servicing the HELOC by, among other things, collecting payments and issuing billing statements to the HELOC Borrower. Even if the servicer and the lender are the same entity (which ordinarily they are not), their obligations and duties are to different entities and arise under different documents.

12. The Back-Up Servicer (here, GMACM) is solely obligated to back up the servicing function. GMACM, as Back-Up Servicer or as master servicer, as the case may be, has no obligation to step into the shoes of the lender, should the lender fail to fulfill its obligations to the HELOC Borrowers.

13. The HELOCs were issued by one or more of the Debtors and thereafter sold to a trust (the "<u>Trusts</u>") pursuant to various documents and agreements, including mortgage loan purchase agreements (collectively, the "<u>Trust Documents</u>").

14. Pursuant to the Trust Documents, the Debtors sold and the Trusts acquired and own the HELOCs and the Additional Balances (as that term is defined in the Trust Documents) under the HELOCs. Although the Trusts acquired the HELOCs, the Debtors, as lenders, specifically retained, and the Trusts did not assume, any obligation under any HELOC to fund any future draws. The Trust Documents specifically provide that the purchaser (i.e. the Trust) is not obligated or permitted to fund any future draws under the HELOCs. Accordingly, the

obligation to fund any draws under the HELOCs is an obligation of the Debtors, as lender (in such capacity, the "Lender").

15.     Under the Trust Documents, prior to the occurrence of a "Rapid Amortization Event" (as such term is defined in the Trust Documents), the servicer may use a portion of the principal and interest payments collected from the HELOC Borrowers to honor draw requests made under the HELOCs. To the extent that such funds are insufficient to cover the draw requests or to the extent that a Rapid Amortization Event has occurred, the Lender is obligated to fund the entire draw request or that portion of the draw request that is not covered by the Trust funds. Even in a "managed amortization" situation, the Lender is obligated to fund draw requests under the HELOCs to the extent that funds in the Trust which are available for funding draw requests are insufficient to fund such requests.

16.     CIFG Assurance North America, Inc. ("CIFG"), Financial Guaranty Insurance Company ("FGIC"), and Assured Guaranty Corp. ("Assured") have each asserted that a "HELOC Servicer Termination Event" occurred under the Trusts whose Notes they insure, as more fully described in the CIFG Motion (as defined below), FGIC Motion (as defined below) and Assured Motion (as defined below)[2].

17.     According to the Trust Documents, upon the occurrence of a HELOC Servicer Termination Event, a "Rapid Amortization Event" automatically (and without the need to provide notice to the servicer) occurs. Following the occurrence of a Rapid Amortization Event, all collections from the HELOCs (net of the fees and expenses of the servicer and the back-up servicer) are to be paid into the Trusts and used to pay down the principal and interest due under the Notes. Thus, following a Rapid Amortization Event, the collections from the HELOCs may not be used to fund draw requests by the HELOC Borrowers. Therefore, following a Rapid Amortization Event, and absent a default under the HELOC or some other circumstance which

---

[2]     GMACM is without sufficient information to determine whether a HELOC Servicer Termination Event has occurred.

would permit the Lender not to advance funds, the Lender is obligated to fund a properly submitted draw request under the HELOCs.

18. On August 6, 2007, the Debtors filed the Emergency Motion Of The Debtors For Orders: (A)(1) Approving Sale Procedures; (II) Scheduling A Hearing To Consider Sale Of Certain Assets Used In Debtors' Loan Servicing Business; (III) Approving Form And Manner Of Notice Thereof And (IV) Granting Related Relief; And (B)(I) Authorizing The Sale Of Such Assets Free And Clear Of Liens, Claims And Encumbrances, And Other Interests; (II) Authorizing And Approving Purchase Agreement Thereto; (III) Approving The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases Related Thereto; And (IV) Granting Related Relief (the "Sale Motion") seeking an order of the Court that, *inter alia*, authorizes the sale (the "Sale") of the Debtors' servicing business and servicing rights (the "Servicing Business") free and clear of liens, claims, and encumbrances, and approving the assumption and assignment of certain executory contracts and unexpired leases (D.I. 11).

19. Prior to the hearing on the Sale Motion (the "Sale Hearing"), the Debtors included in the list of assets they intended to sell, the servicing platform related to the HELOCs (the "HELOC Servicing Rights"). At the Sale Hearing, the Debtors withdrew the HELOC Servicing Rights from the list of assets being sold; however, the Debtors continued to service the HELOCs following the Sale and assured the Court that the HELOCs would continue to be serviced until the HELOC Servicing Rights were either sold or turned over to the Back-Up Servicer.

20. On October 30, 2007, the Court entered the Order (A) Approving (i) The Sale Of The Debtors' Mortgage Servicing Business Free And Clear Of Liens, Claims And Interests, (ii) The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases Related Thereto, And (B) Granting Certain Related Relief (D.I. 1711) (the "Sale Order"), which authorized the Debtors to sell their servicing business to AH Mortgage Acquisition Co., Inc. (the "Purchaser").

21. The Sale Order provides, among other things, for a two step closing as follows: the first step, which occurred on November 16, 2007, transferred to the Purchaser the right to service

the mortgage loans that were part of the servicing platform being acquired. The second and final closing (which is likely to occur during the first quarter of 2008) will transfer to the Purchaser legal title to the servicing platform. Even though the Purchaser is not purchasing the servicing rights in connection with the HELOCs, it is GMACM's understanding that the Purchaser is servicing the HELOCs at this time, on behalf of the Debtors.

22.     Upon the initial closing, the Debtors' post-petition financing facility was replaced with a loan facility provided by the Purchaser. The Purchaser's facility was approved by the Court on an interim basis on November 14, 2007. While the Purchaser's facility provides financing to the Debtors to operate the Servicing Business pursuant to the asset purchase agreement during the interim period between the initial and final closing, the facility does not provide financing to the Debtors for funding obligations under the HELOCs.

23.     On November 9, 2007, CIFG, the credit enhancer under the 2006-2 Trust filed the Motion of CIFG Assurance North America, Inc. for Relief from the Automatic Stay to Permit Termination Rights and Responsibilities of Debtor as Servicer Under the HELOC Servicing Agreement for Series 2006-2 (the "CIFG Motion") (D.I. 1955). The Court entered the Order Granting, In Part, the Motion of CIFG Assurance North America, Inc. for Relief from the Automatic Stay to Permit Termination of the Rights and Responsibilities of the Debtor as Servicer Under the HELOC Servicing Agreement for Series 2006-2 on December 17, 2007 (the "CIFG Order") (D.I. 2398). The CIFG Order, among other things, provides for the termination of AHM Servicing as the servicer of the 2006-2 Trust HELOCs as of January 14, 2008 and the turnover of the HELOC Servicing Rights to GMACM on that date.

24.     On November 29, 2007, FGIC, the insurer under the 2005-1 Trust, 2005-2 Trust, and 2005-4A Trust filed the Motion of Financial Guaranty Insurance Company for Relief from the Automatic Stay (the "FGIC Motion") (D.I. 2224).

25.     On December 17, 2007, Assured, the insurer under the 2007-A Trust filed the Motion of Assured Guaranty Corp. for Relief from the Automatic Stay (the "Assured Motion") (D.I. 2416).

26. GMACM believes that the Debtors desire to turn over to GMACM as Back-Up Servicer or Master Servicer, the servicing rights with respect to all of the HELOCs currently serviced by the Debtors or the Purchaser on behalf of the Debtors on or about January 14, 2008. GMACM also believes that the Debtors, in their capacity as Lender, are no longer making loans to fund draw requests of the HELOC Borrowers under the HELOCs. GMACM believes that notwithstanding the assertions by FIGC, CIFG, and Assured that a Rapid Amortization Event occurred under the Trust Documents pertaining to Notes which they insure, the Debtors are continuing to fund draw requests submitted by HELOC Borrowers from payments made under the HELOCs.

27. GMACM believes that the HELOC Borrowers have not received any notice from any Debtor that the Debtors, as Lender, will no longer be honoring draw requests under the HELOCs after the HELOCs are turned over to GMACM as Back-Up Servicer or Master Servicer. This presents a very serious issue in that individual HELOC Borrowers may be incurring obligations believing that they can draw on their HELOC to fund such obligations.

28. While GMACM is prepared to meet its obligations under the Back-Up Servicing Agreements and upon taking over the servicing function, the Servicing Agreements, GMACM has no obligation to advance any funds in order to meet draw requests made by HELOC Borrowers.

29. Further, inasmuch as a Rapid Amortization Event may have occurred under the Trust Documents[3], the servicer is not authorized to use any of the payments made on account of those HELOCs to fund draw requests.

---

[3] GMACM is without sufficient information to determine whether a HELOC Servicer Termination Event or a Rapid Amortization Event has occurred. The Back-Up Servicer (here, GMACM) is solely obligated to back up the servicing function. GMACM, as Back-Up Servicer or as master servicer, as the case may be, has no obligation to step into the shoes of the lender, should the lender fail to fulfill its obligations to the HELOC Borrowers. In addition, the servicer has no obligation to step into the shoes of the lender, should the lender fail to fulfill its obligations to the HELOC Borrowers. Accordingly,
Continued on following page

## RELIEF REQUESTED

30. By this Motion, GMACM requests, in accordance with Section 105 of the Bankruptcy Code and Bankruptcy Rule 2002(m), that this Court enter an order compelling the Debtors to send a notice to the HELOC Borrowers regarding the status of funding under the HELOCs. A suggested form of notice is attached hereto as Exhibit "A" (the "HELOC Notice"). To save expense, GMACM suggests that the HELOC Notice be included in the same envelope that the Debtors send to HELOC Borrowers notifying them of the fact that the HELOCs will no longer be serviced by the Debtors but will be serviced by GMACM after a designated date[4].

## BASIS FOR RELIEF REQUESTED

31. Section 105 provides that the Court "may issue any order ... that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a). Section 105, however, does not authorize a bankruptcy court to take any action that is contrary to, or not authorized by, the Bankruptcy Code. See In re Morristown & Erie R.R. Co., 885 F.2d 98, 100 (3d Cir. 1989) (Section 105(a) power must be exercised in manner "consistent with the Bankruptcy Code"); see In re Quanta Resources Corp., 739 F.2d 912, 921 (3d Cir. 1984), aff'd sub nom. Midlantic Bank v. New Jersey Dept. of Environmental Protection, 474 U.S. 494 (1986). Section 105(a) does not authorize a bankruptcy court to create "substantive rights that would otherwise be unavailable under the Code", U.S. v. Pepperman, 976 F.2d 123, 131 (3d Cir. 1992), or "rights not otherwise available under applicable law", Southern Ry. Co. v. Johnson Bronze Co., 758 F.2d 137, 141 (3d Cir. 1985).

---

Continued from previous page
    when GMACM steps into the shoes of the Debtors as servicer, GMACM will not be assuming any of the Lenders' obligations.

[4]   While the Debtors would like that date to be in early January, 2008, given the size of the loan portfolio at issue (over 5,000 loans) and the work that is involved in transferring servicing rights, including the issues associated with transferring HELOCs mid-month, GMACM would prefer such date to be January 31, 2008.

32. As the Third Circuit has held, "[t]he fact that a [bankruptcy] proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his [or her] personal views of justice and fairness, however enlightened those views may be." In re Kaplan, 104 F.3d 589, 597-98 (3d Cir. 1997). Rather, Section 105(a) only authorizes a bankruptcy court to do whatever is necessary to enforce the Bankruptcy Code. In re Fesco Plastics Corp. 996 F.2d 152, 157 (7th Cir. 1993). As the Supreme Court has advised, "whatever equitable powers remain in the bankruptcy court must and can only be exercised within the confines of the Bankruptcy Code." Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988). Thus, Section 105(a) has a "limited scope" and does not authorize a bankruptcy court "to create substantive rights that would otherwise be unavailable under the Code" or applicable law. See In re Continental Airlines, Inc., 203 F.3d 203, 211 (3d Cir. 2000); Pepperman, 976 F.2d at 131; Southern Ry. Co., 758 F.2d at 141. Thus, this Court may only exercise its power under Section 105 in a manner consistent with the Bankruptcy Code.

33. Rule 2002(m) of the Bankruptcy Rules provides that the Court "may from time to time enter orders designating the matters in respect to which, the entity to whom, and the form and manner in which notices shall be sent except as otherwise provided by these rules." Fed.R.Bankr.P. 9019(a).

34. Upon information and belief, the HELOCs contain a provision that provides for a five (5) year draw period. At the end of the five (5) year draw period, the HELOCs provide that the five (5) year draw term will automatically renew, unless the lender thereunder notifies the HELOC Borrower that it will no longer lend under the HELOC.

35. Upon information and belief, the HELOCs also contain provisions which require the Lenders to send notice to a HELOC Borrower if the Lender suspends or terminates a HELOC Borrower's rights to obtain advances upon the occurrence of certain events or conditions.

36. Therefore, even if a Rapid Amortization Event had not occurred, the HELOCs contemplate that the Lender will provide notice to the HELOC Borrower when the HELOC

Borrower will no longer be able to obtain advances, either as a result of certain events or conditions or because the Lender is not renewing the five (5) year draw period.

37. Here, the Lenders' bankruptcy and lack of ability to fund draw requests under the HELOCs has created a situation that while not contemplated by the Trust Documents, will similarly preclude the HELOC Borrowers from obtaining advances. This circumstance exists regardless of whether a Rapid Amortization Event occurred because the Lender is required to fund draw requests to the extent that the principal and interest payments (less certain amounts as set forth in the Trust Documents) are insufficient to satisfy the draws. Therefore, even if there was no Rapid Amortization Event, the Lender would remain obligated to fund draw requests in excess of amounts available for that purpose from the principal and interest payments.

38. A related issue is that the Trust Documents provide for a date certain when the rapid amortization period will begin, regardless of whether or not a Rapid Amortization Event occurred. Under the Trust Documents, the rapid amortization period automatically begins (provided that the rapid amortization period was not previously triggered by virtue of the occurrence of a Rapid Amortization Event), five (5) years after the Trust was formed. Therefore, the Debtors, as Lender, would be obligated to fund all draw requests from and after the start of the contractually agreed upon rapid amortization period specifically contemplated by the Trust Documents.

39. Upon information and belief, the HELOCs also contain "change in terms" provisions which require notice to a HELOC Borrower before a change in terms. Clearly, it is a change in terms for a HELOC Borrower to no longer be able to obtain advances outside of the circumstances specifically contemplated by the HELOCs.

40. Therefore, the notice that GMACM is requesting is consistent with and in fact required by the notice provisions of the HELOCs.

41. Because the Debtors, as Lenders, retained the sole obligation to fund draws requests under the HELOCs, the Debtors should "do the right thing" and notify HELOC Borrowers that no further draw requests will be honored. These HELOC Borrowers may be

relying on their HELOCs and incurring obligations based upon that reliance. For example, the HELOC borrowers may have entered into construction contracts and allowed construction to take place on their homes fully expecting their draw requests to be honored. The HELOC Borrowers may also be incurring certain financial obligations in connection with the holiday season in reliance on their ability to make a draw under their HELOC to pay those obligations. GMACM believes that the notice it is requesting will prevent HELOC Borrowers from incurring additional obligations to the extent they were relying upon future advances under the HELOCs to cover such obligations.

42.  Further, the HELOC Borrowers may be contingent creditors under the Bankruptcy Code and as such are entitled to notice of the bankruptcy filing and the bar date, among other things. See 11 U.S.C. § 101(10) and Bankruptcy Rule 2002. Therefore, the notice requested by GMACM would not only prevent the incurrence of liabilities by the HELOC Borrowers, but would also reduce any potential claims against the Debtors' estates that may be incurred as a result of the HELOC Borrowers reliance on their ability to obtain advances under the HELOCs.

43.  Since the Debtors are required to fund advances during both the managed[5] and rapid amortization periods, the Debtors should be required to notify all HELOC Borrowers regarding the status of funding under the HELOCs.

44.  Based upon the foregoing, GMACM asserts that the entry of an order compelling the Debtors to notify the HELOC Borrowers of the status of their HELOCs is appropriate, necessary and consistent with the Bankruptcy Code and Bankruptcy Rules..

---

5   As previous indicated, the Debtors, as lenders, are required to fund draws during a managed amortization period to the extent that the draws exceed the principal and interest collections on the HELOCs.

## NOTICE

45. Notice of this Motion has been given to: (a) counsel for the Debtors, (b) the Office of the United States Trustee, (c) counsel for the Official Committee of Unsecured Creditors, (d) counsel for CIFG, FGIC, Assured and MBIA Insurance Corporation, and (e) those persons who have requested notice pursuant to Fed.R.Bankr.P. 2002. GMACM submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, GMACM respectfully requests that the Court (i) enter an order compelling the Debtors to send a notice to the HELOC Borrowers in substantially the form of Exhibit "A" attached hereto regarding the status of funding under the HELOC loans and (ii) grant such other and further relief as the Court may deem necessary and proper.

Dated: December 20, 2007
Wilmington, Delaware

Respectfully submitted,

REED SMITH LLP

By: /s/ Kimberly E. C. Lawson
Kimberly E. C. Lawson (No. 3966)
1201 Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 778-7500
Facsimile: (302) 778-7575
E-mail: klawson@reedsmith.com

and

Robert P. Simons
435 Sixth Avenue
Pittsburgh, PA 15219
Telephone: (412) 288-3131
Facsimile: (412) 288-3063
E-mail: rsimons@reedsmith.com

and

Claudia Z. Springer
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103
Telephone: (215) 851-8100
Facsimile: (215) 851-1420
E-mail: cspringer@reedsmith.com

Attorneys for GMAC Mortgage LLC