UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re:                                                    :    Chapter 11

                                                          :

AMERICAN HOME MORTGAGE                                     :    Case No. 07-11047 (CSS)
HOLDINGS, INC.,
a Delaware corporation, et al.,                           :    Jointly Administered

                                                          :
      Debtors.                                            :    Sale Procedures Hearing Date:  January 14, 2008 at 2:00 p.m.
                                                          :    Sale Procedures Objection Deadline: January 7, 2008 at 4:00 p.m.
                                                          :    Sale Motion Hearing Date: February 14, 2008 at 11:00 a.m.
                                                          :    Sale Motion Objection Deadline: February 7, 2008 at 4:00 p.m.
------------------------------------------------------------ x

## MOTION OF THE DEBTORS FOR ORDERS:
### (A)(I) APPROVING SALE PROCEDURES; (II) APPROVING PAYMENT OF EXPENSE REIMBURSEMENT; (III) SCHEDULING A HEARING TO CONSIDER SALE OF CERTAIN NON-PERFORMING LOANS; (IV) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (V) GRANTING RELATED RELIEF; AND (B)(I) AUTHORIZING THE SALE OF NON-PERFORMING LOANS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) AUTHORIZING AND APPROVING SALE AGREEMENT THERETO; (III) AUTHORIZING THE <u>DISTRIBUTION OF THE PROCEEDS; AND (IV) GRANTING RELATED RELIEF</u>

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors

in possession in the above cases (collectively, "AHM" or the "Debtors"),[1] hereby submit this

motion (the "Motion"), pursuant to sections 105(a) and 363 of title 11 of the United States Code,

11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rules 2002, 6004 and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of two orders:  (a) one,

substantially in the form annexed hereto as Exhibit A (the "Sale Procedures Order"), (i) approving

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

procedures (the "Sale Procedures") substantially in the form annexed hereto as Exhibit B with

respect to the proposed sale or sales (the "Sale") of certain Non-Performing Loans (collectively,

the "Non-Performing Loans"), pursuant to the form Loan Sale and Interim Servicing Agreement

(the "Sale Agreement"), to be filed prior to the hearing, (ii) approving the Expense Reimbursement

(as defined below), (iii) scheduling a hearing (the "Sale Hearing") on the Sale and setting objection

and bidding deadlines with respect to the Sale, (iv) approving the form and manner of notice of an

auction for the Non-Performing Loans (the "Auction"), and (v) granting related relief; and (b) the

other, substantially in the form annexed hereto as Exhibit D (the "Sale Order"), (i) authorizing the

Sale free and clear of liens, claims, encumbrances, and interests, pursuant to the Sale Agreement,

(ii) authorizing and approving the Sale Agreement related thereto, (iii) authorizing the distribution

of certain of the proceeds from the Sale to certain secured lenders (each, a "Secured Lender"),

which include, Bank of America, N.A., as Administrative Agent ("BofA"), under that certain

Second Amended and Restated Credit Agreement dated as of August 10, 2006 (the "BofA Credit

Agreement"), and JPMorgan Chase Bank, N.A. ("JPMorgan"), under that certain Senior Secured

Credit Agreement, dated as of January 23, 2006 (the "JPMorgan Credit Agreement"), as

applicable, and (iv) granting related relief.  In support of this Motion, the Debtors respectfully

represent:

**STATUS OF CASE AND JURISDICTION**

1.      On August 6, 2007 (the "Petition Date"), the Debtors each filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in

possession of their properties and have continued to operate their businesses as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

DB02:6444157.4                                                          066585.1001

2.      An official committee of unsecured creditors (the "Committee") was appointed on August 14, 2007. No trustee or examiner has been appointed.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code, along with Bankruptcy Rules 6004 and 9014.

## GENERAL BACKGROUND

### A.    The Debtors' Business

4.      Prior to the filing of these bankruptcy cases, AHM's business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans. AHM also invested in securitized mortgage loans originated by others and originated and sold mortgage loans to institutional investors. AHM offered an array of mortgage products and primarily made loans to borrowers with good credit profiles. Most of its portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of prime and alternate A quality.

5.      One segment of the Debtors' business is the loan servicing business (the "Servicing Business"), which is an active and revenue producing unit that is conducted through AHM Servicing. As this Court is well aware, the Servicing Business has been and remains a very important and profitable part of the Debtors' business. Loans are serviced primarily for the trusts of the Debtors' securitizations and for Fannie Mae and other third-party purchasers of the loans originated by the Debtors. Servicing Business activities are designed and implemented to ensure that the borrowers repay each loan in a mortgage servicing portfolio in accordance with its terms.

The Debtors' Servicing Business collects mortgage payments, administers tax and insurance escrows, responds to borrower inquiries and enables the Debtors to maintain control over the collection and default mitigation processes.

**B.**     **Events Leading to the Chapter 11 Filing**

6.     In the weeks prior to the Petition Date, an unprecedented disruption in the credit markets caused major write-downs of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans.  During this time, certain of the Debtors' warehouse lenders began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening AHM's continued viability.

7.     The Debtors' inability to originate loans and the exercise of remedies by certain warehouse lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business.  As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the termination of over 6,500 employees.  The Debtors now employ or contract approximately 650 persons who are absolutely essential to the Debtors' continued operations, although that number is expected to decline as various wind-up tasks are completed and the Debtors' remaining assets are sold.

8.     In the wake of these events, the Debtors, assisted by counsel and professional advisors, sought alternative funding sources and capital infusions.  Additionally, the Debtors engaged in efforts to sell their businesses and assets, including, but not limited to, loans owned by the Debtors, residual mortgage-backed securities in securitization trusts and "scratch and dent" loans, to financial and strategic investors.

4

9.       Unfortunately, in the short time available and given the severe financial pressures facing them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, filed these chapter 11 petitions to preserve and maximize the value of their estates through orderly sales of their assets.

## C.    The Liquidation Process

10.      Since the Petition Date, the sale of the Servicing Business has been a focus of the Debtors' efforts to maximize value for their creditors. By Order dated October 30, 2007 [Docket No. 1711] (the "Sale Order"), after a five-day hearing, this Court approved the sale (the "Servicing Sale") of the Servicing Business to AH Mortgage Acquisition Co., Inc. (the "Purchaser") for a purchase price estimated to be $450-500 million. The Servicing Sale will be closed in two steps - an initial (or economic) closing that has already occurred and a final closing anticipated to occur on or prior to September 30, 2008.

11.      In addition to the Servicing Sale, the Debtors have successfully completed separate sales of servicing rights, certain mortgage loans and other miscellaneous assets.

## SALE OF THE NON-PERFORMING LOANS

12.      The Non-Performing Loans are first-lien loans in which the mortgagors have not fulfilled one or more of the terms, covenants, conditions or obligations required under the mortgages. Each Non-Performing Loan is greater than sixty days past due. The Non-Performing Loans are owned by the Debtors, but are subject to the liens of the Secured Lenders and the DIP Lender (as defined below). The Debtors propose to pool and sell the Non-Performing Loans as follows:

> (a)      Non-Performing Loans owned by the Debtors, but subject to the liens of AH Mortgage Acquisition Co., Inc., in its capacity as Lender and Administrative Agent, and the other lenders (the "DIP Lender") under that certain Debtor-in-Possession Loan and Security

Agreement (the "DIP Facility") dated as of November 16, 2007 (the "Unencumbered Non-Performing Loans"). The Debtors propose to sell approximately 83 Unencumbered Non-Performing Loans with an aggregate unpaid principal balance of approximately $24.0 million.

(b)     Non-Performing Loans owned by the Debtors that constitute a portion of the collateral securing the obligations owing by certain of the Debtors to the Secured Lenders (the "BofA Secured Lenders") under the BofA Credit Agreement, among BofA, the BofA Secured Lenders and certain of the Debtors (the "BofA Non-Performing Loans"). BofA and the BofA Secured Lenders were granted liens upon and security interests in, among other assets, the BofA Non Performing Loans pursuant to (i) a certain Security and Collateral Agency Agreement dated as of August 30, 2004, as amended, restated, modified, ratified or supplemented from time to time and (ii) the Interim Order [Docket No. 68] and the Final Order [Docket No. 554] (I) Authorizing Debtors' Limited Use of Cash Collateral, (II) Granting Replacement Liens and Adequate Protection to Certain Pre-Petition Secured Parties and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001, and any extensions thereof. The Debtors propose to sell approximately 208 BofA Non-Performing Loans with an aggregate unpaid principal balance of approximately $14.0 million.

(c)     Non-Performing Loans owned by the Debtors pursuant to the JPMorgan Credit Agreement (the "JPMorgan Non-Performing Loans"). The Debtors propose to sell approximately 327 JPMorgan Non-Performing Loans with an aggregate unpaid principal balance of approximately $127.0 million.

Pursuant to the authority requested in this Motion, the Debtors propose to sell approximately 618 Non-Performing Loans with an aggregate unpaid principal balance of $164.0 million. The number of Non-Performing Loans that the Debtors propose to sell may decrease or increase, respectively as a result of, for instance, mortgagors satisfying their loan obligations, or additional loans becoming greater than sixty days past due.

13.     The Debtors, after significant deliberation, have concluded that pooling the Non-Performing Loans as set forth above creates the greatest likelihood of obtaining the maximum return for these estates, while ensuring that the rights of the secured parties under the DIP Facility, the BofA Credit Agreement, and the JPMorgan Credit Agreement, respectively, are protected.

6

14.    Pursuant to a Sale Agreement or such other agreement as the Debtors may enter into with respect to the Sale, the Debtors propose to sell, assign and transfer the Non-Performing Loans to a Successful Bidder or Successful Bidders,[2] free and clear of all liens, claims, interests and encumbrances (collectively, the "Liens"), other than those expressly assumed by the Successful Bidder.  Any and all Liens will attach to proceeds of any sale received by the Debtors with the same validity, priority, force and effect such Liens had on the Non-Performing Loans immediately prior to the Sale.  The Sale is subject to the Court's approval and the Auction process proposed herein.

15.    The Debtors, with the assistance of their financial advisors have determined that the potential sale of the Non-Performing Loans pursuant to the Sale Procedures is a reasonable exercise of their sound business judgment, is consistent with their fiduciary duties to these estates, and will maximize the value of these assets for creditors of these estates.

## RELIEF REQUESTED

16.    By this Motion, the Debtors seek the entry of two orders of this Court:  (a) the Sale Procedures Order (i) approving the Sale Procedures; (ii) approving the Expense Reimbursement; (iii) scheduling the Sale Hearing; (iv) approving the form and manner of notice of the Sale Procedures, including the Auction and Sale Hearing; and (v) granting such other and further relief as is just and proper; and (b) the Sale Order (i) authorizing the Sale of the Non-Performing Loans free and clear of Liens to the highest or otherwise best bid received at the Auction; (ii) authorizing and approving the form of Sale Agreement; (iii) authorizing the distribution of the proceeds to the Secured Lenders; and (iv) granting related relief.  It is

---

[2] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Sale Procedures annexed hereto as Exhibit B.

anticipated that the Non-Performing Loans may be sold to multiple buyers. The Debtors seek

approval of the Sale of each pool of Non-Performing Loans through separate Sale Agreements with

different purchasers; provided that the Debtors reserve the right to seek approval of a combination

bid in the event that a bid for a combination of the Non-Performing Loans is determined by the

Debtors, to obtain the highest value for such Loans.

## A.    Sale Procedures

17.    The Debtors are proposing the Sale Procedures, in the form annexed hereto

as Exhibit B and which are incorporated herein by reference, in an attempt to maximize the

realizable value of the Non-Performing Loans for the benefit of the Debtors' estates, creditors and

other interested parties. The Sale Procedures contemplate an Auction process pursuant to which

bids for each pool of Non-Performing Loans will be subject to higher or better offers. As

described more fully in the Sale Procedures, only Qualified Bidders who timely submit Qualified

Bids may be eligible to participate in the Auction.

## B.    Notice of Auction

18.    The Debtors seek to have the Auction Scheduled for February 13, 2008 at

10:00 a.m. (ET) and the Sale Hearing scheduled for February 14, 2008 at 11:00 a.m. (ET), with an

objection deadline of February 7, 2008 at 4:00 p.m. (ET).

19.    The Debtors further request, pursuant to Bankruptcy Rule 9014, that

objections, if any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules

and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court

for the District of Delaware; (c) be filed with the Clerk of the United States Bankruptcy Court for

the District of Delaware (the "Bankruptcy Court"), 824 Market Street, 3rd Floor, Wilmington,

Delaware 19801, by 4:00 p.m. (ET) on February 7, 2008; and (d) be served so as to be received by

such date and time on: (i) the Debtors; (ii) counsel to the Debtors; (iii) counsel to the Committee;

(iv) counsel to BofA; (v) counsel to the DIP Lender; (vi) the Office of the United States Trustee;

(vii) counsel to JPMorgan;  and (viii) all parties entitled to notice pursuant to Bankruptcy Rule

2002, in accordance with Del. Bankr. L.R. 2002-1(b).

        20.     Not later than two business days after the entry of the Sale Procedures

Order, the Debtors will serve copies of the Notice of Auction, substantially in the form attached

hereto as Exhibit D, the Sale Procedures, and the Sale Procedures Order by mail, postage prepaid

to:  (i) all entities known to have expressed a *bona fide* interest in acquiring the Non-Performing

Loans; (ii) counsel to the BofA; (iii) counsel to the DIP Lender, (iv) counsel to the Committee; (v)

the Office of the United States Trustee for the District of Delaware; (vi) counsel to JPMorgan; (vii)

known entities holding or asserting a security interest in or lien against any of the Non-Performing

Loans; (viii) taxing authorities whose rights may be affected by a sale of the Non-Performing

Loans; (ix) all government agencies required to receive notice of proceedings under the

Bankruptcy Rules; and (x) all parties that have requested notice pursuant to Bankruptcy Rule 2002

as of the date prior to the date of entry of the Sale Procedures Order.

        21.     Not later than five business days after entry of the Sale Procedures Order,

the Debtors will publish the Notice of Auction, substantially in the form attached hereto as Exhibit

D in the national edition of *The Wall Street Journal*.  Additionally, the Debtors will cause the

Notice of Auction to be posted on the Bloomberg newswire service.

## C.    Bid Deadline

        22.     The Debtors propose to accept indicative bids (each, an "Indicative Bid")

and formal, binding, unconditional, irrevocable bids (each, a "Bid").  The purpose of the Indicative

Bids shall be to allow the Debtors, with the prior written consent of BofA or JPM, as applicable,

which consent may not be unreasonably withheld, and in consultation with the Committee, to

determine which, if any, of the bidders submitting such Indicative Bids should be entitled to

receive an Expense Reimbursement (as defined below) in accordance with the Sale Procedures

Order. The Debtors request that all Indicative Bids be submitted in writing so that they are actually

received no later than 12:00 NOON (ET) on January 25, 2008 (the "Indicative Bid Deadline"), and

that all Bids must be submitted in writing so that they are actually received no later than 12:00

NOON (ET) on February 11, 2008 (the "Bid Deadline").

**D.    Expense Reimbursement**

        23.    The Debtors, with the prior written consent of BofA or JPM, as applicable,

which consent may not be unreasonably withheld, and in consultation with the Committee, seek

authority to select no more than three (3) designated Qualified Indicative Bidders (each, a "Lead

Bidder") who shall be entitled to be paid the reasonable costs and expenses in connection with the

due diligence process of the Lead Bidder in an amount not to exceed $150.00 for each Non-

Performing Loan in the pool of Assets for which a Qualified Indicative Bidder has submitted a

Qualified Indicative Bid (the "Expense Reimbursement"); provided however, that payment of the

Expense Reimbursement is contingent on the Lead Bidder submitting a Qualified Bid and the

Qualified Bid must be in an amount that is no less than the Qualified Indicative Bid or, if lower,

the Lead Bidder must provide reasonable justification for the decrease between the Qualified

Indicative Bid and the Qualified Bid. The Debtors, in their sole discretion, but with the prior

written consent of BofA or JPM, as applicable, which consent may not be unreasonably withheld,

and in consultation with the Committee, shall determine whether the decrease is reasonably

justified.   The Expense Reimbursement shall be payable only from the proceeds received from the

Sale of the Assets for which the Lead Bidder submitted the Qualified Bid, and from no other

source.

        24.    Notwithstanding the foregoing, the Debtors, with the prior written consent of

BofA or JPM, as applicable, which consent may not be unreasonably withheld, and in consultation

with the Committee, reserve the right seek Court approval of a stalking horse bidder and the terms of a stalking horse bid.

## AUTHORITY FOR REQUESTED RELIEF

A.    **The Sale is Within the Sound Business Judgment of the Debtors and Should be Approved**

25.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991).

26.    The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith. Abbotts Dairies, 788 F.2d 143; Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).

11

In this case, the Debtors submit that the decision to proceed with the Sale of the Non-Performing Loans and the Sale Procedures related thereto are based upon their sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. Lionel, 722 F.2d at 1071; Montgomery Ward, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

27. Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect

12

whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

28.     The Debtors submit that more than ample business justification exists to sell the Non-Performing Loans to the Successful Bidder (or Second Best Bidder) pursuant to the Sale Procedures. The Debtors believe that a targeted sale process is most likely to achieve the highest and best price for the Non-Performing Loans. Simply put, given the default status of the loans that the Debtors are seeking to sell pursuant to this Motion, the relief sought herein is not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of their stakeholders.

29.     The Notice of Auction and the Sale Procedures are designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Non-Performing Loans. Accordingly, the proposed Sale satisfies the second prong of the Abbotts Dairies standard.

30.     Moreover, the Sale Procedures are designed to maximize the value received for the Non-Performing Loans. The process proposed by the Debtors allows for a timely and efficient auction process, given the circumstances facing the Debtors, while providing bidders and consultants with ample time and information to submit a timely bid. The Sale Procedures are designed to ensure that the Non-Performing Loans will be sold for the highest or otherwise best possible purchase price. The Debtors are subjecting the value of the Non-Performing Loans to market testing and permitting prospective purchasers to bid on the Non-Performing Loans. The proposed Sale will be further subject to a market check through the solicitation of competing bids in a court-supervised Auction process as set forth in the Sale Procedures. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Non-Performing

Loans will be fair and reasonable, and, therefore, the third prong of the <u>Abbotts Dairies</u> standard is satisfied. As discussed below, the "good faith" prong of the <u>Abbotts Dairies</u> standard is also satisfied here.

**B.    The Sale is Proposed in "Good Faith"**
      <u>**Under Section 363(m) of the Bankruptcy Code**</u>

31.    The Debtors request that the Court find that the Successful Bidder (or Second Best Bidder) is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.

32.    Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

33.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Non-Performing Loans.

34.    As required by section 363(m) of the Bankruptcy Code, the Sale Procedures have been proposed in good faith and provide for both the Debtors and the potential purchaser to act in good faith in negotiating the Sale. Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." <u>Abbotts Dairies</u>, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale

14

must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." Id. (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)). See also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1998 (7th Cir. 1978)).

35.    Here, the Sale of the Non-Performing Loans is in good faith. There is no evidence of fraud or collusion in the terms of the Sale. To the contrary, as discussed throughout this Motion, and as will be further demonstrated at the Sale Hearing, the Sale Agreement will be the culmination of a solicitation and negotiation process in which all parties will be represented by sophisticated counsel and financial advisors. No known potential bidder is an insider of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code, and all negotiations will be conducted on an arm's length, good faith basis. With respect to the potential bidders, the Sale Procedures are designed to ensure that no party is able to exert undue influence over the process. Under the circumstances, the Successful Bidder (or Second Best Bidder) should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser. Furthermore, the Sale Procedures are designed to prevent the Debtors or the Successful Bidder (or Second Best Bidder) from engaging in any conduct that would cause or permit the Sale Agreement, or the Sale of the Non-Performing Loans to the Successful Bidder (or Second Best Bidder) pursuant thereto and hereto, to be avoided under section 363(n) of the Bankruptcy Code.

36.     All creditors and parties in interest will receive notice of the Sale and will be provided with an opportunity to be heard.  The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under section 363(b) of the Bankruptcy Code.

## C.     The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code

37.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if:  (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.  11 U.S.C. § 363(f); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).  Because the Debtors expect that they will satisfy, at minimum, the second and fifth of these requirements, if not others as well, approving the sale of the Non-Performing Loans free and clear of all adverse interests is warranted.  Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f).  See, e.g., In re Trans World Airlines, Inc., 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001); Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

16

**D.      The Expense Reimbursement is Reasonable and Appropriate**

38.      Section 363(b) of the Bankruptcy Code provides that a trustee, and through

the application of section 1107(a) of the Bankruptcy Code, a debtor-in-possession, "after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b)(1).  Moreover, section 105(a) of the Bankruptcy Code states that "the

Court may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title."

39.      Court authorization pursuant to section 363(b) is appropriate where there

exists a sound business justification for the proposed transaction.  See, e.g., Meyers v. Martin (In re

Martin), 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a

trustee's judgment concerning use of property under section 363(b) when there is a legitimate

business justification); In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983) (same); In re Del. &

Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991) (noting that the Third Circuit has adopted the "sound

business judgment" test for use of property under section 363).  For example, courts look to

whether the sale was negotiated in "good faith," whether the transaction is "fair and equitable," and

whether the sale is "in the best interest of the estate."  See, e.g., In re Phoenix Steel Corp., 82 B.R.

334 (Bankr. D. Del. 1987); WBQ P'ship v. Commonwealth of Virginia, 189 B.R. 97 (Bankr. E.D.

Va. 1995).

40.      Under these circumstances, there is a sound business justification for

approving the Expense Reimbursement, because it is necessary to obtain the maximum return for

the Non-Performing Loans.

41.      The Expense Reimbursement brings motivated bidders into the Sale Process,

and allows such bidders to conduct due diligence and be compensated for the costs of such due

diligence, but only if a reasonable Qualified Indicative Bid is ultimately made.  The Debtors

17

believe that this will build momentum in the Sale Process, which is critical in this competitive and

disjointed market. In the current economic environment it is unlikely that potential bidders would

be willing to both submit significant Qualified Indicative Bids, in addition to being responsible for

the due diligence costs associated with evaluating the loans. Accordingly, absent authorization of

the payment of the Expense Reimbursement, the Debtors may lose the opportunity to obtain the

highest and best available Qualified Indicative Bids for the Non-Performing Loans.

42.    Moreover, as the Expense Reimbursement will generate higher Qualified

Indicative Bids, the floor for bidding at the Auction will also be raised. Thus, even if a Lead

Bidder is offered the Expense Reimbursement, and is ultimately not the Successful Bidder, the

Debtors will still have benefited from the higher floor established by the improved bid and thereby

increase the likelihood that the price at which the Non-Performing Loans will be sold will reflect

their true worth. Accordingly, to achieve the optimal Successful Bid, the Debtors must have

authority to offer the Expense Reimbursement.

43.    Lastly, the Debtors believe that the Expense Reimbursement is fair and

reasonable for several reasons. First, payment of the Expense Reimbursement is subject to the

prior written consent of BofA or JPM, as applicable, and consultation with the Committee. With

respect to the amount of the Expense Reimbursement, it will almost certainly be *de minimus* when

compared to the Successful Bid; likely amounting to less than $100,000 in the aggregate for all

three pools of Non-Performing Loans. Also, if the final bid submitted by the Lead Bidder at the

Auction is lower than the Qualified Indicative Bid submitted by such Bidder prior to the Auction,

the Expense Reimbursement shall not be paid absent a material justification for such decreased

Bid. Finally, the Expense Reimbursement shall be payable only from the proceeds received from

DB02:6444157.4    066585.1001

the Sale of the Non-Performing Loans for which the Qualified Bidder submitted the Qualified Bid,

and from no other source.

      44.     The Debtors have demonstrated a sound business justification for

authorizing the Expense Reimbursement.  Accordingly, this Court should approve and authorize

payment of the Expense Reimbursement.

**E.**    **Relief from the Ten Day Waiting Periods**
       **Under Bankruptcy Rules 6004(h) is Appropriate**

      45.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale,

or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the

court orders otherwise."  The Debtors request that the Sale Order be effective immediately by

providing that the ten (10) day stays under Bankruptcy Rules 6004(h) is waived.

      46.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an

objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to

Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rules 6004(h) and the Advisory Committee

Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10)

day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be

eliminated to allow a sale or other transaction to close immediately "where there has been no

objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev.

ed. 1988).  Furthermore, Collier's provides that if an objection is filed and overruled, and the

objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of

time actually necessary to file such appeal.  Id.

      47.     The Debtors hereby request that the Court waive the ten-day stay period

under Bankruptcy Rules 6004(h).

                                                                       

## NOTICE

48.     Notice of this Motion will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to the BofA; (iv) counsel to the DIP Lender; (v) counsel to JPMorgan (vi) all parties who are known to possess or assert a secured claim against the Non-Performing Loans; (vii) the Internal Revenue Service; (viii) the U.S. Securities and Exchange Commission; and (ix) all parties entitled to notice under Local Rule 2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

DB02:6444157.4                                                                                    066585.1001

## CONCLUSION

WHEREFORE, the Debtors respectfully request (i) entry of the proposed Sale Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>, (ii) entry of the proposed Sale Order, substantially in the form attached hereto as <u>Exhibit C</u> and (iii) such other and further relief as the Court deems just and proper.

Dated: December 22, 2007
      Wilmington, Delaware

          YOUNG CONAWAY STARGATT & TAYLOR, LLP

          James L. Patton, Jr. (No. 2202)
          Pauline K. Morgan (No. 3650)
          M. Blake Cleary (No. 3614)
          Sean M. Beach (No. 4070)
          Matthew B. Lunn (No. 4119)
          Kenneth J. Enos (No. 4544)
          The Brandywine Building
          1000 West Street, 17th Floor
          Wilmington, Delaware 19801
          (302) 571-6600

          Counsel for the Debtors and Debtors in Possession